UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| PEDRO RAMIREZ, JR., Individually and on Behalf of All Others Similarly Situated, | § § § | Case No. 3:16-cv-3111 |
| | § | CLASS ACTION |
| Plaintiff, | § | |
| | § | COMPLAINT FOR VIOLATIONS OF THE |
| vs. | § | FEDERAL SECURITIES LAWS |
| | § | |
| EXXON MOBIL CORPORATION, REX W. TILLERSON, ANDREW P. SWIGER and JEFFREY J. WOODBURY, | § § § | |
| | § | |
| Defendants. | § | |
| | § | DEMAND FOR JURY TRIAL |

Plaintiff Pedro Ramirez, Jr. ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned counsel, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's counsel, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by the Exxon Mobil Corporation ("Exxon" or the "Company"), as well as conference call transcripts and media and analyst reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities fraud class action on behalf of all purchasers of Exxon common stock between February 19, 2016 and October 27, 2016, inclusive (the "Class Period") seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder.

2.      Defendant Exxon is a multinational oil and gas company and the world's largest publicly traded company.  For more than sixty years prior to the Class Period, Exxon had enjoyed a AAA corporate rating, the highest debt rating awarded and a rating shared by only two other U.S. publicly traded companies – Microsoft and Johnson & Johnson.  Exxon's AAA rating gave the Company access to billions of dollars in capital financing at extraordinarily favorable rates.

3.      Throughout the Class Period, Exxon repeatedly highlighted the strength of its business model and its transparency and reporting integrity, particularly with regard to its oil and gas reserves and the value of those reserves.  Exxon's public statements were materially false and misleading when made as they failed to disclose:

(a)      that Exxon's own internally generated reports concerning climate change recognized the environmental risks caused by global warming and climate change;

(b)      that, given the risks associated with global warming and climate change, the Company would not be able to extract the existing hydrocarbon reserves Exxon claimed to have and, therefore, a material portion of Exxon's reserves were stranded and should have been written down; and

(c)      that Exxon had employed an inaccurate "price of carbon" – the cost of regulations such as a carbon tax or a cap-and-trade system to push down emissions – in evaluating the value of certain of its future oil and gas prospects in order to keep the value of its reserves materially overstated.

4.      As a result of Defendants' (as defined below) positive Class Period statements, the price of Exxon common stock was artificially inflated, reaching a Class Period high of more than $95 per share by mid-July 2016.  Meanwhile, Exxon's material misstatements and omissions not only artificially inflated the price of Exxon publicly traded securities, but also influenced the rating agencies to issue strong ratings on Exxon's $20 billion of outstanding debt.  In early March 2016, Exxon took advantage of its AAA rating, completing a massive $12 billion public debt offering – its single largest debt offering ever – capital Exxon knew it would need to keep it afloat when the Company was ultimately forced to write down the billions of dollars of fraud-inflated reserve values carried on its books.  At approximately the same point in time, the Company cancelled its previously announced multi-billion dollar stock repurchase program, demonstrating that despite the Company's public statements, Exxon knew the market price of its common stock was anything but a bargain.

5.      Through a series of partial disclosures issued by different news sources between mid-August 2016 and late September 2016, the market learned that federal regulators were actively scrutinizing Exxon's reserve accounting related to climate change and global warming and its refusal to write down any of its oil and gas reserves in the face of declining global oil prices.  On this news, the price of Exxon common stock plummeted to a close of $82.54 per share, down more than 13% from the stock's Class Period high, erasing billions of dollars of market capitalization.

6.      Finally on October 28, 2016, before the open of trading, Exxon issued a release announcing its financial results for the quarter ended September 30, 2016.  Exxon disclosed that it might be forced to write down nearly 20% of its oil and gas assets.  Specifically, the Company acknowledged that it might have to write down 3.6 billion barrels of oil sand reserves and one billion barrels of other North American reserves that Exxon now conceded were not profitable to produce under current prices.  As *The New York Times* lamented later that day, while Exxon "has

- 2 -

long insisted that it has been adequately accounting for the value of its oil and gas reserves – even as many other petroleum companies have taken big write-offs to reflect a two-year price slump," the potential write-down the Company now "face[s] ***could be the biggest accounting revision of reserves in its history***." [1]  *The Wall Street Journal* noted Exxon "warned that it may be forced to eliminate almost 20% of its future oil and gas prospects, yielding to the sharp decline in global energy prices," even though up until then "Exxon [had been] alone among major oil companies in not having written down the value of its future wells as prices fell."

7.      In response to this news, the price of Exxon common stock fell more than $2 per share on October 28, 2016, on unusually high trading volume of more than 19 million shares traded, more than twice the average volume over the preceding ten trading days, erasing billions of dollars in market capitalization.

## JURISDICTION AND VENUE

8.      Jurisdiction is conferred by §27 of the Exchange Act.  The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

9.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as many of the false and misleading statements alleged herein were disseminated from this District.  Defendant Exxon is headquartered in Irving, Texas and defendant Andrew P. Swiger lives in this District.

10.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

---

[1]    Emphasis added herein unless otherwise noted.

## PARTIES

11.     Plaintiff Pedro Ramirez Jr. purchased Exxon common stock during the Class Period, as set forth in the accompanying Certification incorporated by reference herein, and has been damaged thereby.

12.     Defendant Exxon is the largest direct successor of John D. Rockefeller's Standard Oil Trust.  Exxon was formed on November 30, 1999 by the merger of Exxon (formerly Standard Oil Company of New Jersey) and Mobil (formerly the Standard Oil Company of New York).  The Company has been headquartered in Irving, Texas since 1989.  As of June 30, 2016, Exxon had more than four billion shares of common stock issued and outstanding.  The stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "XOM."  Exxon Mobil Corporation may be served through its Registered Agent, CSC-Lawyers Incorporating Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701.

13.     Defendant Rex W. Tillerson ("Tillerson") is, and was at all relevant times, Chairman of the Board and Chief Executive Officer ("CEO") of Exxon.  Rex W. Tillerson may be served at 624 Dove Creek Road, Bartonville, Texas 76226, or wherever he may be found.

14.     Defendant Andrew P. Swiger ("Swiger") is, and was at all relevant times, Senior Vice President and Chief Financial Officer ("CFO") of Exxon.  Andrew P. Swiger may be served at 9898 Hollow Way Road, Dallas, Texas 77382, or wherever he may be found.

15.     Defendant Jeffrey J. Woodbury ("Woodbury") is, and was at all relevant times, Vice President of Investor Relations and Secretary of Exxon.  Jeffrey J. Woodbury may be served at 19 Villeroy Way, The Woodlands, Texas 77382, or wherever he may be found.

16.     Defendants Tillerson, Swiger and Woodbury are referred to herein as the "Individual Defendants."  Exxon and the Individual Defendants are referred to herein, collectively, as "Defendants."

## CLASS ACTION ALLEGATIONS

17.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Exxon common stock during the Class Period (the "Class").  Excluded from the Class are Defendants and their

families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

18.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Exxon common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Exxon and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

19.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

20.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

21.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Exchange Act was violated by Defendants as alleged herein;

(b)     whether statements made by Defendants misrepresented material facts about the business, operations and management of Exxon; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

22.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## BACKGROUND

23.    Defendant Exxon is the world's largest oil company.

24.    In the fall of 2015, a series of articles reported that, as far back as the 1970s, Exxon, an avid purveyor of climate change skepticism in the 1990s and 2000s, had been investigating the impact that burning fossil fuels was having on the environment.  According to these articles, Exxon ran its own computer models, built up a team of in-house experts and understood that efforts to address global warming could negatively impact fossil fuel use.  As the threat of regulation grew, Exxon spent tens of millions of dollars funding think tanks and advocacy groups that published white papers questioning the existence of climate change.  Exxon even took out full-page advertorials in *The New York Times*, *The Washington Post* and *The Wall Street Journal* with titles like "Climate Change: A Degree of Uncertainty" and "With Climate Change, What We Don't Know Can Hurt Us."

25.    In November 2015, New York Attorney General Eric T. Schneiderman ("NY AG Schneiderman") subpoenaed Exxon demanding that the Company produce all internal memos, e-mails and other documents relating to climate change.

26.    Then, in March 2016, NY AG Schneiderman and the attorneys general of 17 other states and territories, including Massachusetts Attorney General Maura Healey ("MA AG Healey"), announced that they had formed a formal coalition to pursue climate change litigation against big energy companies, including Exxon (the "State AG Climate Change Coalition").  The State AG Climate Change Coalition soon became roiled in partisan politics, as it was subpoenaed by a Congressional committee that characterized the group as engaging in a political witch-hunt.

27.    Exxon publicly defended itself against the suggestion that it had hid its internal research on climate change and represented that it had disclosed as much about global warming as it had learned.  Furthermore, the Company represented that it had "first included information in SEC filings about business risk related to climate change in 2007, several years before the SEC first issued guidance on the issue in 2010."

28.     On June 15, 2016, Exxon filed an action for declaratory relief in this Court styled *Exxon Mobil Corporation v. Healey*, Case No. 4:16-cv-00469-K (N.D. Tex.) (the "*Healey* Complaint").   In its complaint, Exxon alleged that the investigations being conducted by the attorneys general of the several states, including NY AG Schneiderman and MA AG Healey, into potential "securities fraud" claims against Exxon were a "weak pretext for an unlawful exercise of government power to further political objectives," and sought an injunction in this Court "barring enforcement" of a civil investigative demand served on Exxon by MA AG Healey.   *Healey* Complaint at 4, 6.

## EXXON MATERIALLY OVERSTATES
## THE VALUE OF ITS OIL RESERVES

29.     Exxon has long understood the negative effects of climate change and global warning and their relation to the worldwide use of hydrocarbons.   According to numerous investigative reports, in the 1970s and 1980s, Exxon conducted a scientific research program that documented the potential for climate change, the likely contribution of fossil fuels to climate change, and the risks of climate change.   Importantly, Exxon's research included assessing the impact of climate change on the Company's assets and businesses.

30.     According to investigative reports, as a result of their research, Exxon scientists understood that a greater than two degree Celsius warming in global temperatures would pose a significant threat to the environment, and that in order to prevent that temperature increase from happening, the worldwide use of fossil fuels – hydrocarbons – would have to be greatly reduced. Thus, Exxon understood and appreciated that it was highly likely that it would not be able to extract all of its hydrocarbon reserves and that certain of those assets were "stranded."  Yet Exxon publicly represented that none of its assets were "stranded" because the impacts of climate change, if any, were uncertain and far off in the future.

31.     In addition to failing to recognize the impact of climate change on the value of its reserves, Exxon similarly failed to properly account for the declining price of oil and its impact on the value of its reserves.   In 2014, oil prices began a precipitous slump that has persisted since that time.   Under prevailing SEC reporting rules, the test for "proved" reserves is that the oil and gas

must be "economically producible" based on a backward-looking 12-month average price.  Despite the steep and persistent decline in the price of oil, throughout the Class Period, Exxon failed to write down any of its proved oil reserves

32.     Furthermore, Exxon claims to conduct asset valuations on a periodic basis using forward-looking price assumptions.  The Company, however, has failed to disclose to investors the price of oil that it is using to value its reserves, thereby rendering its asset valuations highly questionable.

33.     Throughout the Class Period, Defendants issued a series of materially false and misleading statements that failed to disclose: (i) that Exxon's internal documents concerning climate change recognized the environmental risks caused by global warming; (ii) that given the risks associated with global warming and climate change, the Company would be unable to extract all of its existing hydrocarbon reserves and, therefore, a material portion of those reserves were stranded and should have been written down; and (iii) that given the foregoing, Exxon had been employing an inaccurate "price of carbon" – the cost of regulations such as a carbon tax or a cap-and-trade system to push down emissions – when evaluating the value of certain of its future oil and gas prospects, causing the Company to materially overstate the value of its reserves.

**DEFENDANTS' MATERIALLY FALSE AND
MISLEADING CLASS PERIOD STATEMENTS**

34.     The Class Period starts on February 19, 2016.  On that day, Exxon issued a release entitled "ExxonMobil Announces 2015 Reserves Additions."  The release stated in pertinent part that Exxon had "added 1 billion oil-equivalent barrels of proved oil and gas reserves in 2015, replacing 67 percent of production, including a 219 percent replacement ratio for crude oil and other liquids," such that "[a]t year-end 2015, ExxonMobil's proved reserves totaled 24.8 billion oil-equivalent barrels."  The release quoted defendant Tillerson as stating that "'ExxonMobil has a successful track record of proved reserves replacement over the long term, demonstrating the strength of our global strategy to identify, evaluate, capture and advance high-quality opportunities,'" and that the Company's "'proved reserves represent a diverse portfolio that positions [it] to create shareholder value as [it] supplies long-term energy demand growth.'"  The

release further quoted defendant Tillerson as emphasizing that Exxon would "'continue to apply [its] disciplined, paced investing approach as [it] develops [its] industry-leading resource base.'"

35. On February 24, 2016, Exxon filed with the SEC its Form 10-K for the year ended December 31, 2015, which was signed by defendants Tillerson and Swiger (the "2015 Form 10-K"). Concerning Exxon's "Disclosure of Reserves," and specifically its "Summary of Oil and Gas Reserves at Year-End 2015," the 2015 Form 10-K stated, in pertinent part, as follows:

> The table below summarizes the oil-equivalent proved reserves in each geographic area and by product type for consolidated subsidiaries and equity companies. Gas is converted to an oil-equivalent basis at six million cubic feet per one thousand barrels. The Corporation has reported proved reserves on the basis of the average of the first-day-of-the-month price for each month during the last 12-month period. When crude oil and natural gas prices are in the range seen in early 2016 for an extended period of time, under the Securities and Exchange Commission's (SEC) definition of proved reserves, certain quantities of oil and natural gas *could temporarily not qualify as proved reserves*. Under the terms of certain contractual arrangements or government royalty regimes, lower prices can also increase proved reserves attributable to ExxonMobil. *Otherwise, no major discovery or other favorable or adverse event has occurred since December 31, 2015, that would cause a significant change in the estimated proved reserves as of that date*.

| | Crude Oil | Natural Gas Liquids | Bitumen | Synthetic Oil | Natural Gas | Oil-Equivalent Basis |
|---|---|---|---|---|---|---|
| | (million bbls) | (million bbls) | (million bbls) | (million bbls) | (billion cubic ft) | (million bbls) |
| **Proved Reserves** | | | | | | |
| **Developed** | | | | | | |
| **Consolidated Subsidiaries** | | | | | | |
| United States | 1,155 | 272 | - | - | 13,353 | 3,652 |
| Canada/South America | 92 | 9 | 4,108 | 581 | 552 | 4,882 |
| Europe | 158 | 34 | - | - | 1,593 | 458 |
| Africa | 738 | 162 | - | - | 750 | 1,025 |
| Asia | 1,586 | 121 | - | - | 4,917 | 2,526 |
| Australia/Oceania | 73 | 34 | - | - | 1,962 | 434 |
| Total Consolidated | 3,802 | 632 | 4,108 | 581 | 23,127 | 12,977 |
| | | | | | | |
| **Equity Companies** | | | | | | |
| United States | 221 | 7 | - | - | 156 | 254 |
| Europe | 25 | - | - | - | 6,146 | 1,049 |
| Asia | 802 | 349 | - | - | 15,233 | 3,690 |
| Total Equity Company | 1,048 | 356 | - | - | 21,535 | 4,993 |
| Total Developed | 4,850 | 988 | 4,108 | 581 | 44,662 | 17,970 |
| | | | | | | |
| | | | | | | |
| **Undeveloped** | | | | | | |
| **Consolidated Subsidiaries** | | | | | | |
| United States | 1,223 | 396 | - | - | 6,027 | 2,624 |
| Canada/South America | 168 | 6 | 452 | - | 575 | 722 |

| | Crude Oil | Natural Gas Liquids | Bitumen | Synthetic Oil | Natural Gas | Oil-Equivalent Basis |
|---|---|---|---|---|---|---|
| Europe | 26 | 8 | - | - | 363 | 95 |
| Africa | 225 | 5 | - | - | 43 | 237 |
| Asia | 1,239 | - | - | - | 412 | 1,308 |
| Australia/Oceania | 52 | 31 | - | - | 5,079 | 929 |
| Total Consolidated | 2,933 | 446 | 452 | - | 12,499 | 5,915 |
| **Equity Companies** | | | | | | |
| United States | 33 | 6 | - | - | 64 | 50 |
| Europe | - | - | - | - | 1,757 | 293 |
| Asia | 275 | 52 | - | - | 1,228 | 531 |
| Total Equity Company | 308 | 58 | - | - | 3,049 | 874 |
| Total Undeveloped | 3,241 | 504 | 452 | - | 15,548 | 6,789 |
| **Total Proved Reserves** | 8,091 | 1,492 | 4,560 | 581 | 60,210 | 24,759 |

36.    The 2015 Form 10-K went on to laud the Company's precision and accuracy in calculating its reserves, stating, in pertinent part, as follows.

*The estimation of proved reserves, which is based on the requirement of reasonable certainty, is an ongoing process based on rigorous technical evaluations, commercial and market assessments and detailed analysis of well and reservoir information such as flow rates and reservoir pressure declines*. Furthermore, the Corporation only records proved reserves for projects which have received significant funding commitments by management made toward the development of the reserves. Although the Corporation is reasonably certain that proved reserves will be produced, the timing and amount recovered can be affected by a number of factors including completion of development projects, reservoir performance, regulatory approvals and significant changes in projections of long-term oil and natural gas price levels. In addition, proved reserves *could be affected by an extended period of low prices* which could reduce the level of the Corporation's capital spending and also impact our partners' capacity to fund their share of joint projects.

When crude oil and natural gas prices are in the range seen in late 2015 and early 2016 for an extended period of time, under the SEC definition of proved reserves, certain quantities of oil and natural gas, such as oil sands operations in Canada and natural gas operations in North America could temporarily not qualify as proved reserves. Amounts that could be required to be de-booked as proved reserves on an SEC basis are subject to being re-booked as proved reserves at some point in the future when price levels recover, costs decline, or operating efficiencies occur. Under the terms of certain contractual arrangements or government royalty regimes, lower prices can also increase proved reserves attributable to ExxonMobil. *We do not expect any temporary changes in reported proved reserves under SEC definitions to affect the operation of the underlying projects or to alter our outlook for future production volumes*.

(Footnote omitted.)

37.    On March 2, 2016, Exxon filed a final prospectus with the SEC and conducted a $12 billion underwritten public debt offering.  The registration statement and prospectus used to complete the $12 billion offering expressly incorporated by reference Exxon's 2015 Form 10-K.

38.     On March 2, 2016, Exxon conducted its 2016 analyst meeting at the New York Stock Exchange building in New York City.  Defendant Tillerson displayed the following slide during his opening remarks, which he said demonstrated that, despite the fact that "the business environment ha[d] changed dramatically, even since . . . last year, with a sharp decrease in crude oil and natural gas prices," due to its "operational integrity" and "reliability," Exxon was "***uniquely suited to endure these conditions and outperform competition, leaving [Exxon] best-positioned to capture value in the upturn***."



39.     Expressly addressing the quality of the Company's reserves, defendant Tillerson used the following slides to support his representations that regardless of the impairment charges Exxon's competitors were taking on their oil reserves, the value of Exxon's reserves were not impaired because of the Company's "disciplined investment approach, effective project management and innovative technologies," stating in pertinent part as follows:



Sustained leadership and capital efficiency reflects our commitment to a disciplined investment approach, effective project management and innovative technologies to grow a well-balanced portfolio. Our efficient asset base, enhanced by new investments, positions the Corporation for long-term performance across a broad range of conditions.

*The quality of ExxonMobil's portfolio is also evident relative to significant recent asset impairments by our competitor group*. Not shown [on the graph] are the North American pure play E&P companies, which, if you look at the last couple of years, took impairments of over $120 billion, and, if you look at the last eight years, took impairments of over $200 billion.

Now, while these impairments will improve competitor return on capital employed performance in the future years, *they represent a significant destruction of shareholder assets. Our investment discipline delivers industry-leading returns and a portfolio that is durable across a wide range of commodity prices. Effective project execution provides the lowest installed capital costs, which, along with optimized operations, creates a long-term value that simply outpaces our competitors*.



This chart provides perspective on the quality of our Upstream assets. Upstream capital efficiency underpins long-term financial performance. *The plot illustrates ExxonMobil's structural advantage in capital employed per barrel of crude reserves, which leads competition at $6.50 a barrel.  Our high-quality, efficient capital base is an outcome of our investment approach, consistently applied for decades. Importantly, 73% of our proved reserves are developed and in production, contributing to the bottom line*.

Next, I will discuss reserves replacement, which is an outcome of our disciplined investment approach.  *ExxonMobil has a successful track record of long-term proved reserves additions, demonstrating the strength of our global strategy to identify, evaluate, capture, and advance high-quality opportunities*. The Corporation has a diverse resource base of 91 billion oil-equivalent barrels, all in various stages of evaluation, design and development. As you can see in the graphic, we consistently convert sizable portions of the resource base along with

- 12 -

newly acquired resources into proved reserves, which currently total 25 billion oil-equivalent barrels.



We have consistently added about 1.5 billion to 2 billion oil equivalent barrels of resource to prove reserves each year, replacing over 100% of production for over two decades.  We have a long reserve life of 16 years at current production rates, which does lead competition.  Last year, we replaced 67% of production, adding 1 billion oil-equivalent barrels of proved reserves in both oil and gas, but that reflects also a 219% replacement of crude oil and other liquids.

*The level of reserve replacement in any given year is an outcome of our investment choices, and it is not an objective.  We are value-focused, making the best long-term decisions for our shareholders, progressing opportunities at the right time and deploying capital efficiently to create that long-term shareholder value, even if it means interrupting a 21-year trend*.

*The quality of our resource opportunities remains strong into the future. They have not diminished in the current business climate.  ExxonMobil maintains a rigorous reserves evaluation process.  And, as with all aspects of our business, we approach the reporting of reserves balances with the highest integrity*.

40.     Referencing Exxon's "Operations Integrity," and specifically its approach to climate change, Tillerson extolled the Company's efforts to lower emissions and actually claimed Exxon knew so much about climate change that the Company had long been schooling others on the subject, stating, in pertinent part, as follows:



Now let's take a look at our approach to environmental protection. We recognize that meeting the world's growing energy needs while protecting the environment is one of today's grand challenges. We are committed to lowering emissions, reducing spills, and minimizing waste to mitigate the environmental impact of our operations. We have developed and deployed advanced technologies and enhanced products that have lowered greenhouse gas emissions across the value chain.

Sustainable improvements in our operations have reduced cumulative greenhouse gases by more than 20 million metric tons over the past decade. For example, we have increased our energy efficiency significantly over time by installing additional cogeneration facilities in our operations, making us an industry leader with current gross capacity of 5.5 gigawatts. And products we produce, like cleaner-burning natural gas, also help to reduce global emissions.

***At ExxonMobil, we do take the risk of climate change seriously. We have studied climate change for almost 40 years, and we consistently collaborate and share our research with leading scientific institutions, top universities, the United Nations, and other public stakeholders. We also engage in constructive dialogue on climate change policy options with NGOs, industry and policymakers***.

41.  On March 30, 2016, Exxon published its 2015 Corporate Citizenship Report, which purported to describe Exxon's efforts to lower climate change risks. In the report, Exxon represented that since the transition to lower emissions sources would take "many decades," none of Exxon's proven hydrocarbon reserves were or would become "stranded." The report stated in pertinent part as follows:

By 2040, the world's population is projected to reach 9 billion – up from about 7.2 billion today – and global GDP will have more than doubled. As a result, we see global energy demand rising by about 25 percent from 2014 to 2040. In order to meet this demand, we believe all economic energy sources, including our existing hydrocarbon reserves, will be needed. ***We also believe that the transition of the global energy system to lower-emissions sources will take many decades due to its enormous scale, capital intensity and complexity. As such, we believe that none of our proven hydrocarbon reserves are, or will become, stranded***.

ExxonMobil's long-range annual forecast, *The Outlook for Energy*, examines energy supply and demand trends for approximately 100 countries, 15 demand sectors and 20 different energy types. The *Outlook* forms the foundation for the company's business strategies and helps guide our investment decisions. In response to projected increases in global fuel and electricity demand, our 2016 *Outlook* estimates that **global energy-related CO2 emissions will peak around 2030 and then begin to decline**. A host of trends contribute to this downturn – including slowing population growth, maturing economies and a shift to cleaner fuels like natural gas and renewables – some voluntary and some the result of policy.

**ExxonMobil addresses the potential for future climate change policy, including the potential for restrictions on emissions, by estimating a proxy cost of carbon. This cost, which in some geographies may approach $80 per ton by 2040, has been included in our Outlook for several years**. This approach seeks to reflect potential policies governments may employ related to the exploration, development, production, transportation or use of carbon-based fuels. We believe our view on the potential for future policy action is realistic and by no means represents a "business-as-usual" case. We require all of our business lines to include, where appropriate, an estimate of greenhouse gas-related emissions costs in their economics when seeking funding for capital investments.

**We evaluate potential investments and projects using a wide range of economic conditions and commodity prices. We apply prudent and substantial margins in our planning assumptions to help ensure competitive returns over a wide range of market conditions. We also financially stress test our investment opportunities, which provides an added margin against uncertainties, such as those related to technology development, costs, geopolitics, availability of required materials, services and labor. Stress testing further enables us to consider a wide range of market environments in our planning and investment process**.

42.    On April 26, 2016, *CNBC* reported that Standard and Poor's ("S&P") debt rating agency had downgraded Exxon's credit rating from AAA to AA+, citing expectations of continuing low oil prices.  According to *CNBC*, S&P told *CNBC* that it had had a AAA rating on Exxon since July 5, 1949, and that the downgrade left only Microsoft and Johnson & Johnson with AAA ratings from S&P.  In its announcement, S&P said that it expected Exxon's "'credit measures, including free operating cash flow (FOCF) to debt and discretionary cash flow (DCF) to debt, [would] remain below [its] expectations for the "AAA" rating through 2018.'"  S&P added that Exxon's "'debt level ha[d] more than doubled in recent years, reflecting high capital spending on major projects in a high commodity price environment and dividends and share repurchases that substantially exceeded internally generated cash flow.'"

43.    On April 29, 2016, Exxon issued a release announcing its financial results for the period ending March 31, 2016 ("1Q 16").  Exxon reported 1Q 16 profits of $1.8 billion.  Defendant

Tillerson commented on the results, stating in pertinent part that "'[t]he organization continue[d] to respond effectively to challenging industry conditions, capturing enhancements to operational performance and creating margin uplift despite low prices,'" and that "'[t]he scale and integrated nature of [Exxon's] cash flow provide[d] competitive advantage and support[ed] consistent strategy execution.'"

44.     Following the issuance of the earnings release, Exxon held a conference call with investors and analysts to discuss the Company's earnings and operations. During the conference call, defendant Woodbury noted that "Standard & Poor's reduced its credit rating on ExxonMobil by one notch to AA+ with a stable outlook," and that "[e]arlier th[at] month Moody's [had] reaffirmed its AAA credit rating on the Corporation with a negative outlook." Defendant Woodbury also engaged in the following colloquy with a stock analyst about the downgrade and Exxon's reserves during the Q&A portion of the call, stating, in pertinent part, as follows:

> [Paul Sankey, analyst from Wolfe Research:] *I was looking back at the interview that Rex Tillerson gave after the analyst meeting when he was asked about the triple A rating, and what he said specifically is that there's been periods where Exxon's financial metrics have been worse than they are today, but you still retained a triple A rating, and obviously as you mentioned in your remarks, you have been downgraded by S&P.*

> Naturally I went to S&P and what I saw there was the comment that maintaining production and replacing reserves will require higher spending from Exxon. So it seems that given the financial metrics are not the issue, that it seems there's an upstream issue that S&P is concerned about.

> Can you talk about your ability to maintain production and reserves at the current level of spending and address whether or not they're correct in thinking that you are going to have to spend a lot more to maintain reserves in production? Thanks.

> [Woodbury:] Sure Paul. Well, first, *I'll remind everybody that we've got a very large inventory of investment opportunities, over 90 billion barrels of resource in our portfolio, and if you recall in the analyst presentation, we provide a little bit more insi[ght] as to the type of projects and their potential capacity they can bring on over the time horizon*. And of course what we need to do is we need to make sure that as we mature that inventory of projects that we are doing it with the greatest value proposition, and I think we've made a great strive in finding opportunities in order to reduce the cost structure going forward.

> *I'd say, though, Paul, that we've been through these cycles for a long time. We've have been able to maintain a very strong balance sheet. We've maintained our financial flexibility through the ups and downs, and, our inventory looks very attractive going forward. So we think all the elements are set*

*right to continue to invest into an attractive way to maintain our lead on industry return on capital employed*.

The other point I'd remind you is as we showed in the analyst presentation we have done very well in terms of efficiency deploying investment dollars. If you'll recall, the upstream capital efficiency chart that we used in an analyst presentation showing our capital employed over proved reserves clearly we're distinguishing ourselves relative to others.

[Sankey:]  Okay, Jeff, because of time constraints, I'll jump into another one.  You again, mentioned return on capital employed. I really struggle with you losing money in the upstream on an earnings basis, particularly in the U.S., and how you reconcile that with the measure of the return of capital employed. Typically we don't look at that, we look at the cash flow measure. Can you help us with the DD&A upstream particularly in the U.S. so we can get to the cash returns that you're making as opposed to these losses upstream?

[Woodbury:]  *We've got a very strong portfolio in the upstream, and remember that we invest with a long-term view that's informed by our long-term energy demand outlook. All of our assets were managed to maximize returns through the life cycle with the objective of maintaining positive cash flow in low price environments*. We'll continue to focus on those things that we control, cost, reliability, operational integrity.

Importantly, we'll invest in attractive opportunities throughout the cycle that further enhance the asset profitability, *and we see significant value in our assets, so, yes, there is a low price.  We're in a low price period like we've been in the past.  As I've said, we've really designed these assets to be very durable during a low price environment*.

*They continue to generate – our producing assets continue to generate cash flow, and over the long-term we will continue to demonstrate, industry leading returns on capital employed*.

45.    On July 29, 2016, Exxon issued a release announcing its financial results for the period ending June 30, 2016 ("2Q 16").  Exxon reported 2Q 16 profits of $1.7 billion. Defendant Tillerson commented on the results, stating in pertinent part that, "'[w]hile [the Company's] financial results reflect[ed] a volatile industry environment, ExxonMobil remain[ed] focused on business fundamentals, cost discipline and advancing selective new investments across the value chain to extend [its] competitive advantage,'" and that the "'corporation benefit[ed] from scale and integration, which provide the financial flexibility to invest in attractive opportunities and grow long-term shareholder value.'"

46.    The statements referenced above in ¶¶34-41 and 43-45 were materially false and misleading when made as they failed to disclose and misrepresented the following adverse facts which were known to Defendants or recklessly disregarded by them, including:

- 17 -

(a)      that Exxon's internal documents concerning climate change recognized the environmental risks caused by global warming and climate change;

(b)      that, given the risks associated with global warming and climate change, the Company would not be able to extract the existing hydrocarbon reserves Exxon reported in its 1Q 16 and 2Q 16 financial statements and, therefore, a material portion of those reserves were stranded and should have been written down; and

(c)      that Exxon had employed an inaccurate "price of carbon" – the cost of regulations such as a carbon tax or a cap-and-trade system to push down emissions – in evaluating the value of certain of its future oil and gas prospects in order to keep the value of its reserves materially overstated.

47.      On August 19, 2016, *The New York Times* published a report detailing an "extensive interview" during which NY AG Schneiderman reportedly told *The New York Times* that his investigation and the investigations by the other state attorneys general were not focused just on what Exxon had done in the past, but on the fact that Exxon was then currently potentially defrauding its investors by overstating the value of its reserves on its books. *The New York Times* quoted him as pointing out that Exxon had expressly represented in 2014 "that global efforts to address climate change would not mean that it had to leave enormous amounts of oil reserves in the ground as so-called 'stranded assets,'" when in fact "many scientists ha[d] suggested that if the world were to burn even just a portion of the oil in the ground that the industry declares on its books, the planet would heat up to such dangerous levels that 'there's no one left to burn the rest.'" *The New York Times* went on to emphasize that, "[b]y that logic, Exxon Mobil [would] have to leave much of its oil in the ground, which means the company's valuation of its reserves is off by a significant amount," and quoted NY AG Schneiderman as explicitly stating that if Exxon's own internal research showed that Exxon knew better, "'there may be massive securities fraud here.'"

48.      In response to this news, the price of Exxon stock closed down more than $1 per share on August 19, 2016.

49.      Also on August 19, 2016, NY AG Schneiderman issued a subpoena to Exxon's outside auditor, PricewaterhouseCoopers LLP ("PwC"). The PwC subpoena seeks documents

related to PwC's audit of Exxon, among other topics.  PwC has served as Exxon's outside auditor since at least January 1, 2010.  Concomitantly, according to public reports, PwC served from at least 2008 through 2013 as a global advisor and report writer for the Carbon Disclosure Project, a non-profit organization that functions as a global disclosure system for environmental information, including greenhouse gas emissions data and other climate change-related information, from companies including Exxon.

50.     On September 16, 2016, before the open of trading, *The Wall Street Journal* published an exposé further confirming that NY AG Schneiderman was investigating Exxon for potentially defrauding investors.  Noting that Exxon had "for years . . . kept the value of its huge oil and gas reserves steady in the face of slumping energy prices while rivals since 2014 have slashed $200 billion off their combined holdings," *The Wall Street Journal* emphasized that NY AG Schneiderman was "examining accounting practices at the nation's largest energy company," citing "people familiar with the matter."   According to *The Wall Street Journal*, NY AG Schneiderman's office was "adding scrutiny of [Exxon's] reserve values to its probe into Exxon's past knowledge of the impact of climate change and how it could affect its future business."  *The Wall Street Journal* also reported that Exxon had "declined to comment on the New York investigation, and wouldn't disclose specifics of how it evaluates assets apart from what it has said in company filings," yet noting that a "spokesman said Exxon follow[ed] all financial rules and regulations."

51.     In response to this news, on September 16, 2016, the price of Exxon common stock declined again by more than $1 per share on extremely heavy trading volume.

52.     Then, after the close of trading on September 16, 2016, *The Wall Street Journal* published a second exposé, entitled "New York AG Employs Powerful Law in Exxon Probe," which pointed out that "New York's 1921 Martin Act grants prosecutors wide jurisdiction in securities investigations."  The second *Wall Street Journal* exposé further emphasized that NY AG "Schneiderman ha[d] been knee deep in Exxon's internal forecasting for more than a year, using a powerful New York state fraud law to investigate the company's knowledge of the impact of climate change and how it could affect its future business."

- 19 -

53.     Later that same day, *The Wall Street Journal* ran a third exposé entitled "When Should a Company Write Down Assets – It's an issue that's particularly thorny for energy companies, and the answer can make a big difference to investors."  In this exposé, *The Wall Street Journal* interviewed "Derek Ryder, a retired reservoir engineer specializing in reserves accounting who spent most of his career as an executive at Exxon subsidiary Imperial Oil," disclosing that Exxon was "particularly reluctant to write down an asset because that removes its value permanently," and quoting Ryder as stating: "'Impairment is a one-way trap door.  Once they're gone, they're gone.'"  With Exxon continuing to deny the need to take an impairment charge, however, the price of Exxon common stock declined only moderately when trading resumed on Monday, September 19, 2016.

54.     On September 20, 2016, *The Wall Street Journal* reported that the SEC had been investigating Exxon's reserve accounting related to climate change and its failure to write down any of its oil and gas reserves in the face of the decline in global oil prices.  According to the report, the "SEC sought information and documents in August from Exxon and the company's auditor, [PwC]," again citing undisclosed "people familiar with the matter."  Those undisclosed people also reportedly told *The Wall Street Journal* that the SEC had "been receiving documents the company submitted as part of a continuing probe into similar issues begun last year by" NY AG Schneiderman.  *The Wall Street Journal* also reported that the "SEC probe [was]n't believed to involve other energy companies," again citing an undisclosed "person familiar with the matter."

55.     Putting additional color on precisely what the SEC was investigating that Exxon had been concealing from its investors, *The Wall Street Journal* quoted its undisclosed sources as stating that "[a] potential sticking point in the probe is what price Exxon uses to assess the 'price of carbon' – the cost of regulations such as a carbon tax or a cap-and-trade system to push down emissions – when evaluating certain future oil and gas prospects," adding that the "SEC [was] asking how Exxon's carbon price affects its balance sheet and the outlook for its future."  According to *The Wall Street Journal*, "[w]hen such a theoretical price for carbon is low, more oil and gas wells would be commercially viable. Conversely, a high carbon price would make more of Exxon's assets look uneconomic to pull out of the ground in future years."

- 20 -

56.     In response to this news, on September 20, 2016, the price of Exxon common stock fell by another $1.29 per share on extremely heavy trading volume.

57.     Finally on October 28, 2016, before the open of trading, Exxon issued a release announcing its financial results for its third quarter ended September 30, 2016.  Exxon disclosed that it might be forced to write down nearly 20% of its oil and gas assets if energy prices remained low through the end of 2016.  Specifically, the Company acknowledged that it might have to write down 3.6 billion barrels of oil sand reserves and one billion barrels of other North American reserves that Exxon now conceded were not profitable to produce under current prices.  As *The New York Times* stated later that day, while Exxon "has long insisted that it has been adequately accounting for the value of its oil and gas reserves – even as many other petroleum companies have taken big write-offs to reflect a two-year price slump," the potential write-down the Company now "face[s] could be the biggest accounting revision of reserves in its history."  *The Wall Street Journal* noted Exxon "warned that it may be forced to eliminate almost 20% of its future oil and gas prospects, yielding to the sharp decline in global energy prices," even though up until then "Exxon [had been] alone among major oil companies in not having written down the value of its future wells as prices fell."

58.     In response to this news, the price of Exxon common stock fell more than $2 per share on unusually high trading volume of more than 19 million shares traded, more than twice the average volume over the preceding ten trading days.

## ADDITIONAL SCIENTER ALLEGATIONS

59.     As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Defendants, by virtue of their receipt of information reflecting the true facts regarding Exxon, their control over and/or receipt and/or modification of

Exxon's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Exxon, participated in the fraudulent scheme alleged herein.

### APPLICATION OF PRESUMPTION OF RELIANCE:
### FRAUD ON THE MARKET

60.     Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     Exxon common stock traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Exxon common stock; and

(e)     Plaintiff and other members of the Class purchased Exxon common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

61.     At all relevant times, the market for Exxon common stock was efficient for the following reasons, among others:

(a)     As a regulated issuer, Exxon filed periodic public reports with the SEC; and

(b)     Exxon regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

### LOSS CAUSATION/ECONOMIC LOSS

62.     During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Exxon common stock and operated as a fraud or deceit on Class Period purchasers of Exxon common stock by misrepresenting the value of the Company's business and

prospects by overstating its earnings and concealing the significant defects in its internal controls. As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of Exxon common stock fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of Exxon common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## COUNT I

### For Violations of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

63.    Plaintiff incorporates ¶¶1-62 by reference.

64.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

65.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Exxon common stock during the Class Period.

66.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Exxon common stock.  Plaintiff and the Class would not have purchased Exxon common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

### For Violations of §20(a) of the Exchange Act
### Against All Defendants

67.    Plaintiff incorporates ¶¶1-66 by reference.

68.     The Individual Defendants acted as controlling persons of Exxon within the meaning of §20(a) of the Exchange Act.  By reason of their positions with the Company, and their ownership of Exxon common stock, the Individual Defendants had the power and authority to cause Exxon to engage in the wrongful conduct complained of herein.  Exxon controlled the Individual Defendants and all of the Company's employees.  By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  November 7, 2016          KENDALL LAW GROUP, PLLC
                                  JOE KENDALL (Texas Bar No. 11260700)
                                  JAMIE J. McKEY (Texas Bar No. 24045262)


                                  */s/ Joe Kendall*
                                  JOE KENDALL

                                  3232 McKinney, Suite 700
                                  Dallas, Texas 75204
                                  Telephone:  214/744-3000
                                  214/744-3015 (fax)
                                  jkendall@kendalllawgroup.com
                                  jmckey@kendalllawgroup.com

BALON B. BRADLEY LAW FIRM
BALON B. BRADLEY (Texas Bar No. 02821700)
5473 Blair Road, Suite 100
Dallas, TX  75231
Telephone:  972/991-1582
972/755-0424 (fax)
balon@bbradleylaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mblasy@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
PATRICK J. COUGHLIN
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone:  619/231-1058
619/231-7423 (fax)
patc@rgrdlaw.com

ABRAHAM, FRUCHTER & TWERSKY, LLP
JEFFREY S. ABRAHAM
One Penn Plaza, Suite 2805
New York, NY  10119
Telephone:  212/279-5050
212/279-3655 (fax)
jabraham@aftlaw.com

*Attorneys for Plaintiff*

I:\Admin\CptDraft\Securities\Cpt Exxon 16.docx