# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

In the Matter of the Application of the

PEOPLE OF THE STATE OF NEW YORK, by
ERIC T. SCHNEIDERMAN,
Attorney General of the State of New York,

                                Petitioner,

             - against –

PRICEWATERHOUSECOOPERS LLP and
EXXON MOBIL CORPORATION,

                               Respondents.

Index No. 451962/2016

IAS Part 61
Hon. Barry R. Ostrager

Motion Sequence No. 4

### AFFIRMATION OF JOHN OLESKE IN OPPOSITION TO EXXON'S MOTION TO QUASH AND IN SUPPORT OF THE OFFICE OF THE ATTORNEY GENERAL'S CROSS-MOTION TO COMPEL

JOHN OLESKE, under penalty of perjury, affirms:

1.      I am Senior Enforcement Counsel to the Office of the Attorney General of the State of New York ("OAG"), counsel for Petitioner.  I have personal knowledge of the matters set forth herein.

2.      I make this affirmation in opposition to Exxon Mobil Corporation's ("Exxon") motion to quash OAG's investigative subpoenas, and in support of OAG's cross-motion to compel Exxon's compliance with those subpoenas.[1]

3.      The facts below relate to three critical issues: (i) OAG's factual basis to believe that Exxon may have violated New York law by making false and misleading representations

---

[1]    For the convenience of the Court and the parties, OAG addresses all facts relevant to both Exxon's motion and OAG's cross-motion in this affirmation in lieu of two separate submissions.

1

about its risk-management practices, investment practices and valuation practices; (ii) Exxon's

bad-faith pattern of obstruction and document destruction in response to OAG's November 4,

2015 subpoena duces tecum (the "2015 Subpoena"); and (iii) the relationship between the

subpoenas OAG issued on May 8, 2017, OAG's ongoing inquiries, and the relief needed to allow

OAG to proceed with its concededly proper investigation.

## I.   OAG's Factual Basis for its Ongoing Investigation of Exxon

### A.   *OAG's Pre-Existing Monitoring Of Potentially-Misleading Corporate Representations Concerning The Impact Of Climate Change*

4.      OAG is responsible for enforcing New York's anti-fraud laws, including General

Business Law §§ 352 *et seq.* (the "Martin Act"), which empowers OAG to take remedial action

to protect investors from false and misleading statements made in connection with the sale and

purchase of securities.

5.      When a company makes disclosures about the impact of climate change and

related government policies on that company's core business, New York law requires it do so

accurately.  It may not present a picture to investors, regulators and the public that is materially

at odds with what the company or its executives have concluded internally. OAG has conducted

numerous investigations to ensure that corporate statements about environmental issues comply

with New York laws governing commercial disclosures. For example:

- In 2008 and 2009, OAG announced the successful settlement of three investigations of potentially misleading statements by three companies operating in New York, Dynegy Inc., Excel Energy Inc. and AES Corporation, about the impact of climate change on their business.

- In 2014, OAG announced the successful settlement of two investigations of potentially misleading statements by two companies, Anadarko Petroleum Corp. and EOG Resources, Inc., concerning the financial impact of the use of hydraulic fracturing as part of the natural gas extraction process.

- In 2015, OAG announced the successful settlement of an investigation of Peabody Energy (formerly Peabody Coal). As a result of the settlement, Peabody was prohibited

2

from making the following misleading statements to investors: (1) stating that it could not predict the potential impact of climate regulations on its business when, in fact, Peabody *had* projected internally that such regulations would have severe negative impacts on coal demand, and (2) claiming that an International Energy Agency report had found government action affecting demand for coal unlikely, and that such demand would remain high, when the report had not, in fact, drawn that conclusion.

> **B.** **The Publication Of "Energy And Carbon–Managing The Risks" And Other Representations Related To Exxon's Purported Proxy-Cost Analysis**

6.   For several years prior to 2014, shareholders of several major fossil-fuel energy companies doing business in New York began proposing shareholder resolutions calling for increased disclosures concerning potential risks to the companies' value posed by the risk of future climate-change-related regulations.

7.   In March 2014, Exxon negotiated the withdrawal of one such resolution proposed by a group of its shareholders in exchange for the company's agreement to publish a report concerning such risks.

8.   The report, *Energy and Carbon–Managing the Risks* ("the MTR Report"), was published later that month. According to its opening paragraph, the MTR Report "seeks to address important questions raised recently by several stakeholder organizations on the topics of global energy demand and supply, climate change policy, and carbon asset risk." A true and correct copy of *Energy and Carbon–Managing the Risks* is attached as Exhibit 1.

9.   In the MTR Report, Exxon represented that it "does not believe current investment in new reserves are exposed to the risk of stranded assets" and that it is "confident that none of our hydrocarbon reserves are now or will become 'stranded.'" (Ex. 1, MTR Report at 1, 19.)

3

10.     The MTR Report specifies how Exxon purports to manage risk relating to prospective climate-change-related regulation:

> We also address the potential for future climate-related controls, including the potential for restriction on emissions, through the use of a proxy cost of carbon. This proxy cost of carbon is embedded in our current *Outlook for Energy*, and has been a feature of the report for several years. The proxy cost seeks to reflect all types of actions and policies that governments may take over the Outlook period relating to the exploration, development, production, transportation or use of carbon-based fuels. Our proxy cost, which in some areas may approach $80/ton over the Outlook period, is not a suggestion that governments should apply specific taxes . . .   Perhaps most importantly, we require that all our business segments include, where appropriate, GHG costs in their economics when seeking funding for capital investments. *We require that investment proposals reflect the climate-related policy decisions we anticipate governments making during the Outlook period and therefore incorporate them as a factor in our specific investment decisions.*

(*Id.* at 17-18) (emphasis added).

11.     The MTR Report's proxy cost representations followed years of similar representations by Exxon. In its annual *Outlook for Energy* reports starting in 2008, Exxon stated that it anticipated that governments would impose a cost of greenhouse gas emissions (GHGs). Exxon Mobil Corp., *2008 The Outlook for Energy: A View To 2030*, at 12. Over time, these representations grew more specific. By the 2010 *Outlook for Energy*, Exxon set out specific GHG prices, on specific timelines, that it expected as a result of regulatory action. Exxon Mobil Corp., *2010 The Outlook for Energy: A View To 2040*, at 9, 29-31. These representations grew even more detailed in the 2012 *Outlook for Energy*, in which Exxon represented that these expectations were "integral to [its] forecasts" for hydrocarbon demand. Exxon Mobil Corp., *2012 The Outlook for Energy: A View To 2040*, at 30.

12.     After the MTR Report was published in March 2014, and continuing to the present, Exxon has represented that the core risk-management statements in the MTR Report

4

concerning the application of a proxy cost of GHGs to investment decisions apply to Exxon's business practices over the past decade, reflecting company policy going back to 2007.  In reports, speeches, and on its website, Exxon has frequently repeated the representations made in the MTR Report and referred investors back to representations made in the MTR Report.

13.     For example, in November 2014, Exxon published an article on its *Perspectives* website, in which it stated that "ExxonMobil's Outlook for Energy" assumes a proxy cost of carbon of $80 per ton.  Exxon Mobil Corp., *More On Divestment: A Letter to Tim Wirth* (Nov. 6, 2014), http://www.exxonmobilperspectives.com/2014/11/06/more-on-divestment.  In a December 2, 2015 article on the same website, Exxon stated that "ExxonMobil has included a proxy price on carbon in our business planning since 2007."  Exxon Mobil Corp., *ExxonMobil and the Carbon Tax* (Dec. 2, 2015), https://energyfactor.exxonmobil.com/corporate-citizenship-sustainability/exxonmobil-and-the-carbon-tax/.

14.     Likewise, in a 2016 report entitled "Meeting Global Needs – Managing Climate Change Business Risks," Exxon stated that "in most OECD nations, we assume an implied cost of carbon dioxide ("CO2") emissions that will reach about $80 per metric ton in 2040," and that "this GHG proxy cost is integral to Exxon's planning."  Exxon Mobil Corp., *Meeting Global Needs – Managing Climate Change Business Risks,* http://corporate.exxonmobil.com/en/current-issues/climate-policy/climate-perspectives/managing-climate-change-business-risks.

15.     Exxon's proxy notices to shareholders contained similar representations.  In Exxon's April 13, 2016 notice of the company's 2016 annual shareholder meeting, Exxon repeated the representations in the MTR Report quoted *supra* at ¶ 10, and also represented that the "proxy cost of carbon is embedded in our *Outlook for Energy*, and has been a feature of the report since 2007."  Exxon Mobil Corp., *Notice of 2016 Annual Meeting & Proxy Statement*

5

(Apr. 13, 2016), http://cdn.exxonmobil.com/~/media/global/files/investor-reports/2016/2016_Proxy_Statement.pdf.

16.     On May 25, 2016, Exxon's then-Chairman and CEO Rex Tillerson told attendees at Exxon's annual shareholder meeting that the company's "price of carbon gets put into all of our economic models when we make investment decisions as well.  It's a proxy… So we choose to put it in as a cost.  *So we have accommodated that uncertainty in the future, and everything gets tested against it.*" (emphasis added).  A true and correct copy of the relevant portion of the transcript of this meeting is attached as Exhibit 2.

17.     In Exxon's April 13, 2017 notice of the company's 2017 annual shareholder meeting, Exxon recommended that shareholders vote against two proposals relating to the integration of climate-regulatory risk, referring shareholders to the MTR Report for a description of "how the Company integrates consideration of climate change risks into planning processes and investment evaluation." Exxon Mobil Corp., *Notice of 2017 Annual Meeting & Proxy Statement*, at 66 (Apr. 13, 2017), http://cdn.exxonmobil.com/~/media/global/files/investor-reports/2017/2017_proxy_statement.pdf.

18.     On May 31, 2017, Exxon shareholders voted in favor of a proposal that the company publish an annual assessment of the long-term financial impacts of climate change.  At the shareholder meeting itself, Exxon's CEO Darren Woods stated that Exxon's *Outlook for Energy* is consistent with the Paris Accord and that all of Exxon's businesses are required to include where appropriate an estimate of the costs associated with greenhouse gas emissions.

19.     Exxon has repeated its proxy cost representations in multiple 10-Ks, multiple

submissions to the Carbon Disclosure Project (CDP)[2], its annual *Outlook for Energy* public

reports, and a separate report it issued in March 2017 entitled *2016 Energy and Carbon

Summary*.

20.     Evidence reviewed by the OAG to date indicate that Exxon's major oil and gas

projects often span multiple decades, and that the proxy cost of GHGs can have a material effect

on the long-term profitability of Exxon's projects and the value of its assets.

**C.     *Evidence Indicates That Exxon's Internal Proxy Cost Policies
         Were Inconsistent With Its Representations***

21.     The investigation to date has uncovered evidence that, from 2010 through June

2014, the proxy cost Exxon set out in its internal policies was lower than the proxy cost the

company publicly represented that it used in investment decisions.  In other words, Exxon

represented to investors and the public that it was incorporating higher costs of GHG regulation

into its business decisions than documents indicate that it actually was using, thereby potentially

misleading investors and the public about the extent to which it was protecting its business from

regulatory risks related to climate change.

22.     In particular, Exxon publicly stated in the MTR Report and its *Outlook for Energy*

reports that for projects in developed countries, it applied proxy costs that reached $60/ton of

GHGs by 2030, and $80/ton by 2040.  In fact, the proxy cost figures used for Exxon's internal

planning and budgeting reached only $40/ton by 2030.  *See infra* at ¶¶ 23-25, Exs. 3-5.

---

[2]     The Carbon Disclosure Project ("CDP") is a United Kingdom-based nongovernmental organization that
runs a global disclosure system that enables companies and governments to measure and manage their
environmental impacts.  CDP's data enables its network of investors, supply chain purchasers and policy
makers to link environmental integrity, fiduciary duty and public interest to make better-informed
decisions on climate action.  Thousands of corporations voluntarily report their GHGs to the CDP.  Each year
Exxon submits answers to questions about climate change posed by the CDP.

7

23.     It appears that this discrepancy was known at Exxon's highest levels.  As one example, an email from Exxon's Corporate Greenhouse Gas Manager acknowledged as early as 2010 that the publicly disclosed proxy cost figures were "more realistic" than those that Exxon actually used.  A true and correct copy of this correspondence, EMC 000339155, is attached as Exhibit 3.

24.     As another example, a 2011 email states that CEO Rex Tillerson was "happy with the difference" because using a lower proxy cost was "conservative" from the perspective of investing in projects, like carbon capture and storage, that allow Exxon to claim emissions-reduction credits.  The email acknowledged, however, that using a lower cost than publicly disclosed was "not conservative . . . from the perspective of debiting actions that increase emissions," such as investing in oil and gas development projects.  A true and correct copy of this correspondence, EMC 000354827, is attached as Exhibit 4.

25.     It was not until June 2014 that Exxon sought to eliminate this glaring inconsistency between external and internal figures.  At that time, Exxon's new Corporate Greenhouse Gas Manager acknowledged in an internal presentation that the proxy costs that Exxon used internally were "non-conservative" with respect to projects that increase carbon emissions, and admitted that, in public reports, "we have implied that we use the [publicly-disclosed] basis for proxy cost of carbon when evaluating investments."  A true and correct copy of this presentation, EMC 000539921, is attached as Exhibit 5.

26.     According to documents produced from the custody of Jason Iwanika, a Development Planner at Imperial Oil Limited ("Imperial"), Exxon's majority-owned subsidiary in Canada, another planner at another Exxon affiliate referred to the 2014 alignment of external

8

and internal proxy cost figures as a "huge change." A true and correct copy of this correspondence, EMC 000556782, is attached as Exhibit 6.

27.     Exxon did not inform investors about the undisclosed variation in its use of proxy-cost formulas when it represented in 2016 that it had been applying its publicly-touted proxy-cost analysis since 2007. *Supra* at ¶ 15.

### D.     *Exxon's Documents Indicate That Exxon Often Did Not Apply Any Proxy Cost Of Ghgs*

28.     Compounding the discrepancy between Exxon's public representations and its internal policies, it now seems apparent that Exxon has not applied a proxy cost of GHGs at all with respect to many of its oil and gas projects. This understanding is based both on documents Exxon has produced, and on documents that Exxon has failed to produce but that OAG would have expected to see if Exxon's much-touted proxy cost analysis was consistently implemented.

### 1.     Evidence Reveals A Corporate Decision To Abandon Proxy-Cost Analysis For Its Canadian Oil Sands Projects

29.     The investigation to date has uncovered evidence that indicates that, by 2015, the company faced a problem with respect to its multi-decade, multi-billion-dollar oil sands projects in Alberta, Canada. These projects, which have a significant impact on the company's bottom line, apparently have not been as profitable as Exxon expected. As described above, Exxon had in mid-2014 increased the proxy cost of GHGs in its internal analyses to match those that it had been touting to the public for years. This change would have affected the projected profitability of all of Exxon's projects, including its oil sands projects, and, according to evidence reviewed by OAG, may have rendered at least one of its major oil sands projects unprofitable over the life of the project.

9

30.     Evidence reviewed to date indicates that the company's response was not to faithfully apply the proxy-cost analysis and recognize losses as appropriate.  Rather, evidence indicates that Exxon decided in the fall of 2015 to abandon the proxy-cost figures applicable to Alberta projects that were set out in its internal policies, and decided instead to apply the current, much lower GHG tax that existed under Alberta law at that time.

31.     The proxy cost analysis set out in Exxon's internal policies required the incorporation of an escalating GHG cost, reaching $80/ton of carbon dioxide (or CO2 equivalent in other GHGs) by 2040, into the company's economic forecasting for purposes of corporate decision-making.  Instead of applying this analysis, Exxon applied the Alberta GHG tax, which did not exceed $24/ton (U.S. currency), and held that figure flat indefinitely into the future.  Further, Exxon applied this cost of carbon to only a small percentage of emissions – 15% to 20% – specified under existing Alberta law, resulting in an effective cost of less than $4/ton.

32.     Applying a GHG tax that already exists is not a "proxy" for anything, and does not "address the potential for future climate-related controls," as Exxon repeatedly represented that its proxy cost of GHGs was intended to do.  (*See* ¶ 10 *supra*.)  The apparent discrepancy between Exxon's words and actions is particularly significant where, as here, the actual GHG costs Exxon applied were both significantly lower than its purported proxy costs, and applied only to a very limited percentage of its GHGs.

33.     Indeed, evidence shows that Jason Iwanika, the Imperial Development Planner discussed *supra* in ¶ 26, sought direction from Exxon concerning how to apply the GHG assumptions set out in the Corporate Plan Dataguide to the Canadian oil sands projects, and questioned Exxon's directions that he deviate from those assumptions.  Nonetheless, it appears

10

that Exxon ignored his concerns and instructed him to disregard the proxy-cost assumptions set out in its internal policies.

### 2.  Exxon Has Produced No Documents Reflecting Consistent Application of Proxy-Cost Analysis to Investment Decisions

34.     It appears that Exxon's proxy-cost risk-management process may be a sham based on the fact that the company has failed to produce certain documents it would have had to create to accomplish its publicly-stated representations.

35.     Notwithstanding the numerous deficiencies in its subpoena compliance, Exxon has produced approximately 450,000 documents, including documents from a number of custodians who should have been involved in the application and management of the proxy-cost analysis described in Exxon's public representations.  These documents appear to be devoid of evidence that Exxon applied any consistent proxy-cost analysis – whether the publicly-stated figures or its secret internal version – to its major investment decisions.

36.     The two documents Exxon points to in its motion papers do not provide any evidence of Exxon actually doing what it told investors.  First, Exxon cites a two-page insert that it published annually in its Corporate Dataguide Appendix, which does little more than list the purportedly-applicable proxy costs across geographic regions and timeframes.  However, as set out above, it appears that this internal policy clashed with Exxon's public representations for years, and that Exxon did not even follow this policy in many instances.  Beyond these two pages, Exxon has not produced any company-wide or region-specific procedures, guidance, or analysis related to the proxy cost of GHGs, undermining any notion that Exxon implemented its touted proxy-cost analysis across a meaningfully wide spectrum of investment or planning decisions.  Further, evidence reviewed by OAG reveal a widespread lack of awareness among employees of the proxy cost policy, or how it should be applied.

11

37. Second, the single instance in which Exxon has affirmatively identified to OAG

and this Court its purported application of the proxy-cost analysis concerned a single, unusual

project in which applying the proxy cost was to the company's benefit. For this project, Exxon

sold CO2 to other operators rather than releasing it into the atmosphere, generating GHG credits

rather than added costs. Thus, the evidence shows that Exxon applied it proxy-cost analysis to

generate additional profit, but failed to apply it in cases that would have reduced profits or

increased losses. This in no way constitutes the kind of risk-management exercise for future oil

and gas development and production as described by Exxon's proxy-cost representations, and in

any event concerns only a single project. (Feb. 11, 2017 Toal Letter to OAG at 2; Mar. 16, 2017

Toal Letter to Court at 4.) True and correct copies of this correspondence are attached as

Exhibits 7 and 8.

### 3. Evidence Indicates That It Excluded 90% of Emissions When Applying Its Purported Proxy-Cost Analysis

38. Exxon represented to investors that its proxy-cost analysis included emission from

the end use of its fossil fuels, *i.e.,* Scope 3 emissions, when it stated in the MTR Report (and

elsewhere) that "[t]he proxy cost seeks to reflect all types of actions and policies that

governments may take over the Outlook period relating to the… *transportation or use* of carbon-

based fuels". (*e.g.*, Ex. 1, MTR Report at 17.)

39. Emissions from the end-use of fossil fuels, synonymous with Scope 3 emissions,

account for approximately 90% of all fossil-fuel-related greenhouse gases, as Exxon

acknowledged in its submission to the CDP. (*See, e.g.*, Exxon's 2015 submission to the CDP at

23, Answer CC14.4c) ("approximately 90 percent of petroleum-related GHG emissions are

generated when customers use our products and the remaining 10 percent are generated by

industry operations.")  A true and correct copy of Exxon's 2015 submission to the Carbon Disclosure Project is attached as Exhibit 9.

40.     Yet Exxon's documents indicate that even in the few instances where Exxon tried to apply some semblance of a proxy-cost, Exxon failed to include costs relating to end use, or Scope 3, emissions, thus ensuring that even in Exxon's most robust application of proxy cost it failed to account for 90% of the "use" of its fossil fuels.  (*e.g.*, EMC 000548250.)  A true and correct copy of one example, EMC 000548250, is attached as Exhibit 10.

### E.     *Documents Produced By Pwc And Exxon Indicate That Exxon Failed To Apply The Proxy-Cost Analysis To Its Impairment Decisions Prior To 2016*

41.     As set forth above, Exxon's internal policies concerning its application of a proxy cost of GHGs were inconsistent with its representations to investors.  In addition, its actual practices with respect to major investment decisions were inconsistent with both internal policies and representations to investors.  The evidence OAG has reviewed to date indicates that, at least until 2016, Exxon failed to apply a proxy cost of GHGs in determining whether its long-lived assets, such as oil and gas reserves and resources, were impaired, rendering its representations false and misleading.

### 1.     Standards Governing Impairment

42.     Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 360 governs the accounting for the impairment of long-lived assets under U.S. generally-accepted accounting principles ("GAAP").  A true and correct copy of relevant excerpts from ASC 360 is attached as Exhibit 11. As set out below, Exxon represents in its public filings that it follows the guidance set out in ASC 360.

13

43.     ASC 360 sets out a three-step process for identifying and measuring the impairment of long-lived assets or asset groups.

44.     First, a company must routinely assess whether indicators of impairment are present. Examples of such indicators, also known as "impairment triggers," include:

a.   a "significant decrease in the market price of a long-lived asset";

b.   a "significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset . . . including an adverse action or assessment by a regulator";

c.   an "accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of a long-lived asset"; and

d.   a "current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset[.]"

(Ex. 11, ASC 360-10-31-21.) Exxon has repeatedly represented to investors and to the public that it meets these accounting requirements by "perform[ing] asset valuation analyses on an ongoing basis as a part of its asset management program" to determine whether events and circumstances such as those set out in ASC 360-10-31-21 are present. (*See, e.g.*, Exxon's 2015 Form 10-K at 57, 69.) A true and correct copy of Exxon's 2015 Form 10-K is attached as Exhibit 12.

45.     Second, if one or more impairment triggers are present, a company must test the asset in question to determine whether the balance sheet carrying amount of the asset exceeds the sum of the undiscounted future cash flows expected to result from the use and disposition of the asset. (Ex. 11, ASC 360-10-35-17, 360-10-35-21.) Exxon has represented to investors and to

14

the public that it has complied with its obligations under this accounting requirement.  (*See, e.g.,* Ex. 12, Exxon Mobil Corp., 2015 Form 10-K at 57, 70.)

46.     Third, if it is determined that the carrying amount of a long-lived asset is not recoverable, a company must determine the fair value of the asset and calculate an impairment loss based on this fair value.  ASC 360-10-35-17.  Exxon has represented to investors and to the public that it has complied with its obligations under this accounting requirement.  (*See, e.g., id*. at 57, 70.)

47.     In developing future cash flow estimates for impairment analyses, accounting standards require that a company must "incorporate the entity's own assumptions . . . and shall consider all available evidence."  (Ex. 11, ASC 360-10-35-30.)  Further, "[t]he assumptions used in developing those estimates shall be reasonable in relation to the assumptions used in developing other information used by the entity for comparable periods, such as internal budgets and projections, accruals related to incentive compensation plans, or information communicated to others."  *Id*.  Exxon has represented to investors and to the public that it has met this obligation as well.  (*See, e.g.,* Ex. 12, Exxon Mobil Corp., 2015 Form 10-K at 70) ("Cash flows used in impairment evaluations . . . make use of the Corporation's price, margin, volume, and cost assumptions developed in the annual planning and budgeting process, and are consistent with the criteria management uses to evaluate investment opportunities.").

## 2.     Exxon's Omission of Proxy Cost of GHGs in Impairment Decisions

48.     Because Exxon refused to produce documents relating to valuation of its assets for impairment purposes, OAG subpoenaed the company's accountants, PricewaterhouseCoopers LLP ("PwC") in October 2016, and has since received approximately 38,000 documents from PwC.

49.     The evidence to date indicates no attempt at all, by Exxon or by PwC, to incorporate a proxy cost of GHGs into the economic models of cash flows used in determining whether a trigger for impairment testing existed or whether Exxon's assets were actually impaired prior to 2016.  To the contrary, these documents indicate that Exxon and PwC only began incorporating proxy cost assumptions into some of Exxon's impairment-related accounting analyses in 2016, after OAG first subpoenaed Exxon.

50.     Exxon's apparent failure to incorporate a proxy cost of GHGs into its impairment-related decisions is particularly important in light of Exxon's stated accounting approach to low oil and gas prices.  Exxon has stated that it "does not view temporarily low prices or margins as a trigger event for conducting impairment tests."  (Ex. 12, Exxon Mobil Corp., 2015 Form 10-K at 57.)  Exxon has also asserted that it instead considers prices over the "long term," *id*., and that its "assessment is that its operations will exhibit strong performance over the long term."  (*Id.* at 42.)  Indeed, documents produced by PwC show that, with oil and gas prices at low levels, Exxon relied on long-term cash flow models to forecast that certain of its projects, even if losing money currently and in the near-to-medium term, will ultimately generate cash flows that exceed their balance sheet carrying values, and thus are not impaired or do not exhibit triggers for impairment evaluation.

51.     Such forecasts must abide by Exxon's representations, and GAAP requirements, that the company use the same assumptions in its impairment decisions that it uses (or purports to use) in its other business decisions, including the application of a proxy cost of GHGs that grows over time.  *See supra.*  To the extent that Exxon did not do so, it seems clear that the company misled investors about the value of the company's assets and its risk management

16

processes in light of the dual challenges of ongoing low oil and gas prices and growing GHG costs over time.

52.     Exxon's apparent failure to incorporate a proxy cost of GHGs into its impairment-related cash flow models is even more relevant given its public stance with respect to the question of whether its long-lived assets could become stranded or uneconomical to produce due to rising GHG costs.  In the MTR Report, Exxon represented that it was "confident that none of [its] hydrocarbon reserves are now or will become 'stranded'" (Ex. 1 at 1) and that "the company does not believe current investments in new reserves are exposed to the risk of stranded assets[.]" (*Id.* at 19.)  The MTR Report originally contained a footnote addressing impairment, but that footnote was removed at the request of David Rosenthal, Exxon's Vice President for Investor Relations, after he stated in a March 25, 2014 email: "[t]hat word gives folks on the third floor heartburn."  A true and correct copy of that correspondence, at EMC 001198245 is attached as Exhibit 13.

### 3.     The Importance of Production of Exxon's Impairment-Related Documents

53.     OAG has received impairment-related documents from PwC, but without documents from Exxon itself, OAG's window into Exxon's impairment-related decisions is limited.  Documents produced by PwC indicate that Exxon has not shared with PwC all relevant documents on this topic, including many of the cash flow models Exxon uses for impairment-related purposes.  In other cases, PwC was shown such documents, but Exxon did not permit PwC to retain them. Further, PwC does not appear to possess drafts of relevant Exxon documents such as impairment memoranda and asset recoverability reviews.  Nor does PwC possess related internal Exxon communications.  Such documents are reasonably related–indeed, highly relevant–to OAG's inquiry.

54.     Additionally, despite the First Department's May 23, 2017 Decision and Order unanimously affirming this Court's order granting OAG's October 14, 2016 petition to compel Exxon and PwC to comply with OAG's subpoena notwithstanding any purported accountant-client privilege, PwC has still not produced the documents that were withheld on that basis, as Exxon has sought and received a stay from the First Department.  There is likely to be some (though not complete) overlap between the withheld PwC documents and responsive documents in Exxon's possession, and therefore requiring Exxon to produce such documents would avoid further delays.

## II.     Exxon Failed to Conduct a Compliant Subpoena Response, Resulting in the Still-Unexplained Destruction of Documents from Key Custodians

55.     Exxon's compliance with the original subpoena has been marked by delays, obstruction, and the destruction of untold numbers of documents from over a dozen key custodians.

56.     The root of Exxon's apparent destruction of subpoenaed documents was the failure of its Law Department to observe basic requirements in document preservation, collection, production, and recovery.  These failures have also contributed to numerous other delays and deficiencies in Exxon's document production.

57.     In an attempt to understand the scope of these failures and their impact on the prospective completion of Exxon's document production, and as specifically ordered by the Court at the March 23, 2017 conference, OAG solicited affidavits and took testimony from two witnesses proffered by Exxon: Connie Feinstein of Exxon's Information Technology Department ("EMIT") and Michelle Hirshman of Paul, Weiss.

18

58.    Neither witness could testify to the topics for testimony stated in the subpoenas issued to Exxon.  True and correct copies of the subpoenas for testimony issued to Exxon are attached as Exhibits 14 and 15.

59.    Indeed, the totality of these witnesses' testimony confirms Exxon's Law Department failed to search for, collect, and preserve documents responsive to the 2015 Subpoena, resulting in the destruction of unknown number of Exxon documents from key custodians.

60.    However, neither Ms. Feinstein nor Ms. Hirshman were able to provide key information about the scope of Exxon's past compliance failures or the company's conduct in attempting to recover the destroyed documents.

### A.    *Exxon's External Counsel Was Insufficiently Involved in the Process of Subpoenas Compliance*

61.    An important preliminary fact was confirmed in the witness testimony: Exxon's external counsel did not supervise important aspects of Exxon's subpoena compliance.

62.    Specifically, external counsel played no part in the process of interviewing potential Exxon document custodians, including top managers, their assistants, and other key custodians. (Ex. 17, May 3, 2017 Toal Letter to OAG, Ex. B; Hirshman Tr. 60-61.)  A true and correct copy of the testimony taken of Michele Hirshman, dated March 10, 2017 is attached as Exhibit 16.

63.    External counsel also failed to familiarize themselves with Exxon's information-technology department or Exxon's data storage and management practices.  (*See*, *e.g.*, Ex. 16, Hirshman Tr. 119-20, 123-24, 131-32, 159-61, 174-78.)

64.    External counsel failed to even learn the details of, let alone supervise, Exxon's preservation-hold process, failed to reiterate preservation instructions to potential custodians who

19

received preservation holds, and failed to monitor those potential custodians' actual compliance

with the preservation holds.  (*See*, *e.g.*, Ex. 16, Hirshman Tr. 36-49, 50-52, 142-44.)

65.     In the absence of external supervision, Exxon's in-house Law Department

repeatedly violated established compliance obligations.

### B.     *Exxon Failed to Interview Key Custodians, Contrary to Prior Representations to OAG*

66.     Exxon repeatedly represented in its correspondence with OAG that its procedure

for document collection began, as required, with witness interviews to identify likely repositories

of responsive documents.  *See, e.g.,* Ex. 18, Apr. 18, 2016 Hirshman Letter to OAG, at 6-7 ("As

we have repeatedly explained, ExxonMobil is conducting a custodian-by custodian search for

documents. *Documents are collected from the data sources identified by a custodian as*

*containing potentially responsive documents*."); Ex. 19, Dec. 5, 2016 Toal Letter to Court, at 5

("ExxonMobil crafted its custodian list through comprehensive research, witness interviews, and

document review."); Ex. 20, Dec. 9, 2016 Hearing Tr. 23:13-16 (Toal: "We have asked

custodians, we've interviewed custodians, we've asked them where they store documents, we

asked them if they store documents on shared drives."); Ex. 21, Revised Hirshman Cert. ¶ 28

("ExxonMobil identified the[] custodians through comprehensive research, witness interviews,

and document review."). *Cf.* Ex. 17, May 3, 2017 Toal Letter to OAG at Ex. B (confirming that

Management Committee members and their assistants were not interviewed until March or April

of 2017, and some not at all).  A true and correct copy of these letters are attached as Exhibits 17

through 21.

67.     As confirmed in the witness' testimony, Exxon did not interview any of its

Management Committee members or their assistants to identify the locations of responsive

documents prior to March 2017.  (Ex. 16, Hirshman Tr. 62,146-49.)

20

68.     Several such custodians, including former Chairman and CEO Rex Tillerson, had left the company by that time, and apparently they were never interviewed at all.  (Ex. 17, May 3, 2017 Toal Letter to OAG, Ex. B; Ex. 16, Hirshman Tr. 64-65.)

69.     Exxon also did not interview custodians of reserves-related documents until at least July or August of 2016, and in some cases, has still not done so.  (Ex. 17, May 3, 2017 Toal Letter to OAG, Ex. B.)

**C.      *Exxon Failed to Preserve Documents it Knew Were Potentially Relevant, Despite OAG's Repeated Questioning of Inadequate Preservation***

70.     Partly as a consequence of the its failure to interview key custodians, Exxon failed to place on preservation hold documents from those and other custodians.

71.     Exxon failed in this respect despite correspondence from OAG that Exxon's preservation efforts appeared inadequate.  (*See, e.g.*, Ex. 16, Hirshman Tr. 154-55.)

**1.      Management-Committee Documents**

72.     Exxon failed to preserve documents from multiple custodians who it knew might possess relevant documents relating to the communications and work of the company's Management Committee.

**a)      *Wayne Tracker***

73.     Exxon knew at the time the 2015 Subpoena was issued that Mr. Tillerson used a secondary email account, wayne.tracker@exxonmobil.com, in addition to his "official" email account rex.w.tillerson@exxonmobil.com.

74.     Exxon knew that in its internal computer systems relating to identity-management, the company had assigned the wayne.tracker@exxonmobil.com email account not to Mr. Tillerson, but to an information-technology employee named Ramona Helble.

21

75.     Exxon did not place Ms. Helble on a preservation hold, or otherwise take any action to ensure that documents stored with respect to the wayne.tracker@exxonmobil.com email account would be preserved.

76.     During Ms. Hirshman's testimony, she testified that she personally knew in "early 2016" that there existed a second email address for Rex Tillerson – the Wayne Tracker email address, and that she believed Exxon's failure to inform OAG of this alias email address would constitute "an interesting test of whether the Attorney General's office is reading the documents." (Ex. 16, Hirshman Tr. 134.)  However, Ms. Hirshman further testified that neither she nor her firm made any attempt to look further into the preservation, collection or production of documents of the Wayne Tracker email address at that time, leading to months of automatic destruction of relevant correspondence.  (*Id*. at 141-42.)

> b)     *Management-Committee Assistants*

77.     Exxon also knew that assistants to its Management-Committee members were highly knowledgeable of and involved in their principals' communications.

78.     In previous litigations where Exxon preserved Management-Committee documents, it also placed management assistants on preservation hold.

79.     Here, Exxon did not place any management assistants on preservation hold until March 2017.

> c)     *Management-Committee Member Donald Humphreys*

80.     Exxon's outside counsel affirmed that management custodians requested in the 2015 Subpoena were placed on hold and their documents collected.  This was not true.

81.     Donald D. Humphreys served as a Senior Vice President on Exxon Mobil's Management Committee from January 1, 2006 to February 1, 2013.

82.     Based on Exxon's representations, Exxon appears to have made no effort to preserve or collect Mr. Humphreys' documents.

### d)     Imperial President Richard Kruger

83.     Exxon's outside counsel affirmed that management custodians requested in the 2015 Subpoena were placed on hold and their documents collected.  OAG had also requested, and Exxon has produced and placed on hold responsive documents of employees of Exxon and its affiliates.

84.     To date over 750 documents from the custody of Imperial employees have been produced to the OAG.  Another almost 1800 documents to or from custodians with an 'esso.ca' email address (one of Imperial's domains) were also produced.  *See also infra* ¶ 133.

85.     Imperial President Kruger is shown in Exxon's documents as having routine contact with Exxon's Management Committee.  In 2015, Mr. Kruger sent an email to the Management Committee promising detailed information about the impact of Alberta GHG regulations, including the low carbon tax Exxon used in place of a proxy cost, with respect to Exxon's oil sands projects, stating that Imperial was "turning our immediate focus to a detailed examination of the announcement and its impact on our existing operations and possible future projects in Alberta."  A true and correct copy of this correspondence, EMC 001844415, is attached as Exhibit 22.

86.     Despite that fact, Exxon did not place the documents of Mr. Kruger and his executive assistant on hold until April 2017, 18 months after the subpoena was issued, presumably resulting in the destruction of more than a year's worth of their documents.

### 2.   Reserves-Related Documents

87.   Exxon also knew that the 2015 Subpoena called for, and that OAG had specifically requested, documents from custodians responsible for analyzing the company's oil and gas reserves estimates.

88.   Exxon did not place any such custodians on preservation hold until July 2016, and OAG believes that some relevant custodians have never been placed on hold.

89.   This is in part because Exxon has refused to identify members of various reserves-related committees that existed prior to 2016.  Because of Exxon's refusal, OAG cannot presently determine what potential reserves custodians' documents Exxon has failed to preserve. (*See* ¶ 126, *infra*).

### D.   *Potentially Relevant Documents from Key Custodians Have Been Destroyed*

90.   As a direct consequence of these failures, an unknown number of documents from Exxon's Management-Committee and reserves custodians have been destroyed.

91.   Specifically, Exxon has disclosed that its document-management software automatically "sweeps" (deletes) emails and attached documents from custodians after a period of 395 days, unless the subject email accounts are placed on a preservation hold.  (Anderson Ex. Q, Amended Feinstein Aff. ¶ 51, n.4.)  Non-email documents (electronic or paper) may also have been destroyed during this time by the key custodians not notified of the preservation hold.

92.   Because emails and attached documents from the wayne.tracker@exxonmobil.com email account, the management assistants, Mr. Humphreys, Mr. Kruger, and relevant custodians of reserve documents were not placed on a preservation hold until March 2017, at the earliest, at least a full year's worth of emails, attached documents and

non-email documents from each of those sources during the pendency of the 2015 Subpoena

have been destroyed.

### E.   Exxon Falsely Represented that it Conducted a Compliant Search for Management Documents While Its Document Destruction was Ongoing

93.     Exxon represented that its document production protocol began with witness

interviews and otherwise conformed to its compliance obligations, including through the

application of agreed-upon Boolean search terms. (*See supra* at ¶ 66; *see also* Ex. 23, Dec. 22,

2015 Jansen Letter, at 1 ("[I]n your December 16, 2015 correspondence, you suggested several

modifications to the search terms that ExxonMobil is using to identify potentially relevant

electronic data. ExxonMobil confirms that we have incorporated all of your suggested

modifications."); Ex. 19, Dec. 5, 2016 Toal Letter to Court, at 5 n.4 ("Here, the parties did

'carefully craft' the set of search terms.").  A true and correct copy of December 22, 2015 Jansen

Letter is attached as Exhibits 23.

94.     In fact, as was only disclosed in March 2017, Exxon had actually conducted

document collection and production of Management-Committee documents in a wholly

undisclosed and non-compliant fashion prior to that time.

95.     Specifically, Exxon did not interview Management-Committee custodians, nor

their assistants, to identify likely locations of responsive documents.

96.     Instead, Exxon's Law Department gave still-undisclosed instructions directly to

the Management-Committee assistants directing them to collect paper documents and an

unspecified range of electronic documents.

97.     Separately, Exxon's Law Department purportedly instructed an EMIT employee

named Bob Lauck to conduct a noncompliant search of the individual management custodians'

documents in Microsoft Outlook, a method which has severe technical deficiencies in collecting

all relevant documents – including those observed by courts[3] – rather than Exxon's own

document collection software and processes.

98.     Based on what Exxon has been able to explain thus far, these searches did not

employ the agreed-upon Boolean search terms,[4] and otherwise failed to meet basic standards for

e-discovery compliance.

### F.     *Exxon's Failure to Explain the Scope of the Document Destruction or its Remediation Efforts, Requires Testimony From Additional Witnesses*

99.     Even though OAG made its specific need for witness testimony to assess the

scope and remediation of Exxon's document destruction clear at the conference before the Court

on March 23, 2017, in multiple letters and emails leading up to both witnesses' testimony, and in

the noticed topics for testimony, Exxon failed to proffer witnesses who could explain the full

scope of Exxon's document destruction and the details of how it came about, the nature and

operation of Exxon's data backup systems, or the efforts Exxon has made to recover documents

known to have been destroyed.

---

[3]     *See, e.g.*, *Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enforcement Agency*, 877 F. Supp. 2d 87, 106-07 (S.D.N.Y. 2012) ("Seemingly minor decisions – whether intentional or not – will have major consequences. Choosing 'subject field' rather than 'subject field and message body' during a search using the Microsoft Outlook email client will dramatically change its scope and results."); *see also T.A. Ahern Contrs. Corp. v. Dormitory Auth. of State of N.Y.*, 875 N.Y.S.2d 862, 865 (N.Y. Sup. Ct. N.Y. Cnty. 2009) ("Microsoft Outlook… does not allow for mailbox-wide searches which could potentially locate project-specific e-mails and/or documents."); *Burke v. Ryan*, No. OCN-L-1642-13, 2013 N.J. Super. Unpub. LEXIS 2331, at *7 (N.J. Law Div. Sept. 17, 2013) ("In order to search for records [defendant] uses the search engine which will only search the sender's name and subject line. She explained that Outlook will not search the actual attachment itself.")

[4]     The "simple" search terms used by Exxon to search documents in Outlook were in some cases narrower than the compound terms. For example: "anthropogenic emissions" is not a simplified term for "anthropogenic"; "climate model" and "climate research" are not simplified terms for the following terms: climate! /5 (skeptic! or deni! or model! or research! or fund! or support! or warming or low or science); "climate change," "climate model," and "climate research" are not simplified terms for the following terms: climate /5 uncertain!; the terms "stranded asset" and "stranded reserve" will not collect the plurals of the following agreed-upon terms: stranded /5 (asset! or reserve!). (*See* Anderson Ex. Q, Amended Feinstein Aff. Ex. A.)

26

100.     Only three paragraphs in the Feinstein Affidavit were based exclusively on Ms.

Feinstein's personal knowledge.  In fact, 30 of 60 paragraphs in the Feinstein Affidavit listed

other individuals, and not Ms. Feinstein, as having personal knowledge concerning the noticed

topics for testimony.  A true and correct copy of the April 19, 2017 Toal Letter to OAG and its

Exhibit A is attached as Exhibit 24.

101.     During her examination, Ms. Feinstein admitted that she did not know basic

information concerning the identification, preservation, collection, destruction, or recovery of

documents in connection with Exxon's response to the 2015 Subpoena.  On almost 200

occasions, Ms. Feinstein testified that she did not know the requested details on the six topics in

OAG's subpoena.  *See, e.g.,* Feinstein Tr. 17, 27, 29, 42-43, 45-46, 49-50, 52, 54-55, 57-59, 62-

63, 70, 74, 87, 89, 92-94, 96, 100, 102-03, 107, 117, 119-20, 127-29, 131-38, 141-42, 143, 148-

49, 152, 155, 158-61, 164, 167, 169-76, 178, 183-85, 193, 195, 197, 199, 202-07, 209-12, 224,

226, 230, 232-37, 242-43, 246, 251, 253, 255-56, 259-62, 272-73, 275-78, 280, 282, 285-86,

289, 297-98, 300, 302.  A true and correct copy of Ms. Feinstein's testimony, taken April 26,

2017, is attached as Exhibit 25.

102.     Specifically, while Ms. Feinstein testified that she knew of CEO Tillerson's alias

wayne.tracker@exxonmobil.com email account, and also knew that the company's new CEO

Darren Woods was also assigned a secondary email account – j.e.gray@exxonmobil.com, she

testified that she did not know details of the preservation, collection, destruction, or recovery of

emails from those accounts.  She did know, however, that Exxon had assigned these accounts'

identities to a different EMIT employee, Ramona Helble, who Ms. Feinstein testified worked

closely with the Management Committee.  Ms. Feinstein testified that Ms. Helble would have the

relevant information. (*See*, *e.g.*, Ex. 25, Feinstein Tr. 201-08, 265-67, 273-74.)

27

103.     Ms. Feinstein also testified that she did not know details of Exxon's improper

identification and search for Management Committee documents described in paragraphs 7 to 39

of her affidavit.  (Anderson Ex. Q, Revised Hirshman Cert. ¶¶ 7-39.)  Ms. Feinstein responded

to dozens of OAG's questions seeking these details by stating that another EMIT employee, Bob

Lauck, would have the relevant information. (*See*, *e.g.*, Ex. 25, Feinstein Tr. 73, 116, 126, 139-

40, 148, 153-55, 171-182, 250-53.)  Indeed, Ms. Feinstein referred to Mr. Lauck nearly 50 times

in her examination and Mr. Lauck was listed as having personal knowledge as to 15 of the

paragraphs in Ms. Feinstein's affidavit.  (*Id.*; Ex. 24, Apr. 19, 2017 Toal Letter to OAG, Ex. A.)

104.     Ms. Feinstein also testified that she did not know details of Exxon's email

preservation, automatic destruction, backup, and recovery systems and capabilities.  With respect

to virtually every question OAG asked about these critical topics, Ms. Feinstein testified that

another EMIT employee in the Email Collaboration Services unit, Cynthia Leong, would have

the relevant information.  (*See*, *e.g.*, Ex. 25, Feinstein Tr. 60-62, 83-84, 93-94, 143, 151-52, 158-

59, 222-23, 226.)  Indeed, Ms. Feinstein referred to Ms. Leong nearly 17 times in her

examination and Ms. Leong was listed as having personal knowledge as to 11 of the paragraphs

in Ms. Feinstein's affidavit.  (*Id.*; Ex. 24, Apr. 19, 2017 Toal Letter to OAG, Ex. A.)

105.     Finally, Ms. Feinstein testified that she did not know details of Exxon's

instructions to its employees in connection with subpoena compliance.  In particular, while Ms.

Feinstein was generally aware that Exxon had directed Management-Committee assistants to

collect documents, she could not explain what those instructions were or what they were based

on, given that Exxon never interviewed the custodians or the assistants.  When questioned on

these topics, Ms. Feinstein testified that Daniel Bolia of Exxon's Law Department would have

the relevant information. (*See*, *e.g.*, Ex. 25, Feinstein Tr. 73, 75-79, 168-69, 182-83.)  Indeed,

28

Mr. Bolia was listed as having personal knowledge as to 29 of the paragraphs in Ms. Feinstein's affidavit.  (Ex. 24, Apr. 19, 2017 Toal Letter to OAG, Ex. A.)

106.    For her part, Ms. Hirshman's testimony revealed that she does not know any specific information about Exxon's preservation, backup, or recovery of the documents destroyed by Exxon during the pendency of the subpoena, and she was unable to provide any of the information Ms. Feinstein did not have, and for which Ms. Feinstein referred OAG to the four other Exxon employees identified above.  (*See*, *e.g.*, Ex. 16, Hirshman Tr. 162-65.)

## III.    OAG's May 8, 2017 Subpoenas Are Reasonably Related to OAG's Investigation

### A.    *May 8, 2017 Subpoena Duces Tecum for Documents and Information*

107.    OAG's May 8, 2017 subpoena duces tecum includes requests for both information ("Interrogatories") and documents.  (Anderson Ex. T.)

108.    The Interrogatories seek details about Exxon's purported application of a proxy cost of GHGs to its investment decisions and evaluation of assets, along with the identification of individuals assigned to various committees overseeing the company's reserves.

109.    The Interrogatories are targeted first at eliciting specific information as to whether Exxon applied a proxy cost analysis to its investment decisions, impairment decisions, and internal reserves estimates.  (*See* Interrogatory Nos. 1, 3, 4, and 6.)

110.    The Interrogatories then follow up, in cases where Exxon did apply a proxy-cost analysis, with requests for information that may indicate practices that make Exxon's proxy cost representations meaningless and deceptive, such as: (i) applying a lower proxy cost than it publicly represented to investors; (ii) applying a proxy cost to only a fraction of GHG emissions from a given project; (iii) applying a proxy cost to only certain GHGs and not others; (iv) applying a proxy cost to only direct emissions as opposed to emissions stemming from end use

29

of the oil and gas; and/or (v) assuming that it could pass-through most or all of the proxy cost to

its customers, while unreasonably assuming that such pass-through would have no effect on

demand for its products.  (Interrogatory Nos. 2, 5, and 7.)  OAG has evidence from its

investigation that Exxon engaged in each these practices.

111.    If anything, Exxon's responses to the Interrogatories should narrow, rather than

expand, the need for additional documents by focusing on instances in which Exxon actually

applied proxy costs to its investment or impairment decisions.

112.    The document requests seek four major categories of documents.

113.    First, OAG seeks documents relating to the use and application of the proxy cost

analysis from the post-November 2015 period.  Such documents are relevant to Exxon's

continuing proxy-cost-related representations, and any related changes in the company's

practices.

114.    Second, OAG seeks documents that Exxon previously produced to the Securities

and Exchange Commission ("SEC") relating to impairment decisions, reserves calculations, and

climate change.  Such documents are relevant to the evaluation of Exxon's apparent failure to

use a proxy-cost analysis in valuing assets for impairment purposes.

115.    Third, OAG seeks documents that were exchanged between Exxon and banks or

other financial institutions relating to impairment decisions, reserves calculations, and climate

change.  Such documents are relevant to the importance that investors ascribe to climate change

issues in their investment decisions.

116.    Finally, OAG seeks documents related to the company's asset valuation and

impairment practices for its long lived assets, particularly its hydrocarbon assets, again given

Exxon's apparent failure to use a proxy-cost analysis in its valuation and impairment practices. Documents produced by PwC are insufficient in this regard, as set out in ¶¶ 41-49 above.

### B.    *May 8, 2017 Testimonial Subpoenas*

117.    Four of the testimonial subpoenas were issued for the witnesses discussed in ¶¶ 99-106, above, who were identified by Ms. Feinstein as having key information she was unable to provide about Exxon's improper preservation of and search for management documents, its consequent destruction of those documents, and its incomplete data-recovery efforts: Ms. Helble, Mr. Lauck, Ms. Leong and Mr. Bolia.  (Anderson Exs. U-X.)

118.    Four testimonial subpoenas were issued for fact witnesses employed directly by Exxon, all of whom are shown by Exxon's documents to have had responsibility for development and/or implementation of the proxy-cost analysis Exxon represented it applied (as well as knowledge as to other OAG theories of liability, including but not limited to other misstatements in the MTR Report[5]).

119.    The remaining testimonial subpoena was issued for Jason Iwanika, an employee of Exxon's majority-owned subsidiary Imperial.  A true and correct copy of the testimonial subpoena for Mr. Iwanika is attached as Exhibit 26.

120.    Exxon produced approximately 670 documents from Mr. Iwanika's custody. These documents show that Mr. Iwanika was centrally involved in the instances described supra

---

[5]    For example, among other things, OAG is investigating whether the "Substantial Costs for $CO_2$ Mitigation" data used by Exxon in the MTR Report was erroneously attributed to the Massachusetts Institute of Technology.  *See* Ex. 1, MTR Report at 9.  The MIT researcher whose study was cited in the MTR Report, John Reilly, informed the report's authors at Exxon as early as July 1, 2015 that critical figures used in the chart "[we]re not numbers we report in that study… that the chart's "numbers were extremely high," and that the overall impression created by the chart was "misleading."  A true and correct copy of this correspondence, EMC 001189007, is attached as Exhibit 27.   As Reilly explained to reporters just this week, his "work would not come up with that number or anywhere near it," and the data's presentation "may lend some readers to believe that that number is based on our work."  A true and correct copy of the May 30, 2017 E&E News, *MIT Researcher Says Exxon Report Inflated His Data* article is attached as Exhibit 28.

31

at ¶¶ 26, 29-33, in which Exxon applied existing GHG taxes instead of the company's purported proxy costs to its Canadian oil sands assets, deviating from the company's representations and underrepresenting the company's risks.

### C.    OAG Attempted to Meet And Confer Regarding Exxon's Prospective Compliance with the May 8, 2017 Subpoenas

121.    Prior to Exxon filing this motion, OAG initiated and attempted to conduct a meet-and-confer session with Exxon concerning its prospective compliance with the subpoenas.

122.    Specifically, OAG raised the issue of a conference to discuss the subpoena on the afternoon of May 10, 2017, during an in-person discussion with Exxon's counsel after Ms. Hirshman's testimony had concluded for the day.

123.    Exxon's counsel responded on May 12, 2017 that it would be available only for a telephonic meet and confer, and no earlier than Thursday, May 18, 2017, two business days before the return date of the May 8, 2017 subpoena duces tecum.

124.    The parties conducted a teleconference on May 19, 2017 regarding Exxon's prospective compliance with the May 8, 2017 subpoenas.

125.    During that conference, Exxon refused to consider complying with *any* of the requests in the subpoena duces tecum.

126.    When OAG pointed out that Interrogatory 9 asked only for a list of names of individuals on Exxon's reserves-related committees that were predecessors to a similar committee that came into existence in 2015, Exxon refused, citing "overarching fundamental concerns."

127.    When OAG pointed out that Document Request No. 5 would require Exxon to do nothing more than copy a CD previously produced to the SEC, Exxon again declined, on the same basis.

128.    When OAG asked whether Exxon would consider responding to any more limited requests, Exxon stated that it would only negotiate such limitations *after* OAG withdrew its subpoena.

129.    Exxon also stated that the record-witness subpoenas were unnecessary on the grounds that Ms. Feinstein's and Ms. Hirshman's affidavits and testimony complied with the Court's prior orders and purportedly satisfied all of OAG's needs concerning Exxon's subpoena compliance, and in particular, its admitted destruction of documents and its requisite recovery efforts.

130.    Finally, Exxon contended that despite producing many relevant documents from Mr. Iwanika on its own volition, it could not yet confirm whether Exxon would produce Mr. Iwanika for testimony.

131.    Less than an hour after this teleconference, Exxon filed this motion to quash the subpoena duces tecum and the four records-witness subpoenas for testimony from Ms. Helble, Mr. Lauck, Ms. Leong and Mr. Bolia.

132.    After filing this motion, Exxon told OAG that it will also not comply with the subpoena for testimony for Mr. Iwanika.  Exxon followed up by letter confirming its position.

133.    As discussed *supra*, Exxon has produced hundreds of documents from Iwanika's custody (¶ 120), Exxon's Law Department interviewed him (Ex. 17, May 3, 2017 Toal Letter Ex. B), and Exxon has produced privilege logs for communications purportedly containing legal advice on which Mr. Iwanika and other Imperial employees appear.  Documents from other Imperial employees have been produced by Exxon, other Imperial employees have been interviewed by Exxon's Law Department, and 27 other Imperial employees have been placed on

33

preservation hold by Exxon's Law Department.  (Ex. 17, May 3, 2017 Toal Letter Ex. B; *supra* at ¶ 84.)

134.     After Exxon filed its motion, OAG sent a letter to Exxon asking the company to withdraw it, and to actually meet and confer in good faith regarding Exxon's prospective compliance.

135.     Exxon responded by again rejecting any obligation to make any effort at all to negotiate the scope or timing of Exxon's prospective responses before seeking to quash OAG's subpoenas on the grounds it has advanced here.

## IV.     <u>Additional Attachments</u>

136.     A true and correct copy of an excerpt of the Public Papers of Governor Lehman, dated August 15, 1933, is attached as Exhibit 29.  A true and correct copy of an excerpt of the Annual Report of the Attorney-General for the Year Ending Dec. 31, 1933 is attached as Exhibit 30.

137.     A true and correct copy of the former N.Y.C. Admin. Code § B1-5.0 is attached as Exhibit 31.

138.     A true and correct copy of the former New York State Executive Law § 11 is attached as Exhibit 32.

139.     A true and correct copy of a transcript of Exxon's fourth quarter 2016 earnings call is attached as Exhibit 33.

140.    No previous application has been made to this Court or any other court for the

relief requested herein.

Dated: New York, New York
        June 2, 2017

_____/s_____
John Oleske

# Exhibit 1

## Energy and Carbon -- Managing the Risks

ExxonMobil[1] engages in constructive and informed dialogue with a wide variety of stakeholders on a number of energy-related topics.  This report seeks to address important questions raised recently by several stakeholder organizations on the topics of global energy demand and supply, climate change policy, and carbon asset risk.

As detailed below, ExxonMobil makes long-term investment decisions based in part on our rigorous, comprehensive annual analysis of the global outlook for energy, an analysis that has repeatedly proven to be consistent with the International Energy Agency *World Energy Outlook*, the U.S. Energy Information Administration *Annual Energy Outlook*, and other reputable, independent sources.  For several years, our *Outlook for Energy* has explicitly accounted for the prospect of policies regulating greenhouse gas emissions (GHG).  This factor, among many others, has informed investments decisions that have led ExxonMobil to become the leading producer of cleaner-burning natural gas in the United States, for example.

Based on this analysis, we are confident that none of our hydrocarbon reserves are now or will become "stranded."  We believe producing these assets is essential to meeting growing energy demand worldwide, and in preventing consumers – especially those in the least developed and most vulnerable economies – from themselves becoming stranded in the global pursuit of higher living standards and greater economic opportunity.

---

[1] As used in this document, "ExxonMobil" means Exxon Mobil Corporation and/or one or more of its affiliated companies.  Statements of future events or conditions in this report are forward-looking statements.  Actual future results, including economic conditions and growth rates; energy demand and supply sources; efficiency gains; and capital expenditures, could differ materially due to factors including technological developments; changes in law or regulation; the development of new supply sources; demographic changes; and other factors discussed herein and under the heading "Factors Affecting Future Results" in the Investors section of our website at: www.exxonmobil.com. The information provided includes ExxonMobil's internal estimates and forecasts based upon internal data and analyses, as well as publicly available information from external sources including the International Energy Agency.  Citations in this document are used for purposes of illustration and reference only and any citation to outside sources does not necessarily mean that ExxonMobil endorses all views or opinions expressed in or by those sources.

1

### 1. Strong Correlation between Economic Growth and Energy Use

The universal importance of accessible and affordable energy for modern life is undeniable. Energy powers economies and enables progress throughout the world. It provides heat for homes and businesses to protect against the elements; power for hospitals and clinics to run advanced, life-saving equipment; fuel for cooking and transportation; and light for schools and streets. Energy is the great enabler for modern living and it is difficult to imagine life without it. Given the importance of energy, it is little wonder that governments seek to safeguard its accessibility and affordability for their growing populations. It is also understandable that any restrictions on energy production that decrease its accessibility, reliability or affordability are of real concern to consumers who depend upon it.



## 2.  World Energy Needs Keep Growing

Each year, ExxonMobil analyzes trends in energy and publishes our forecast of global energy requirements in our *Outlook for Energy*.  The Outlook provides the foundation for our business and investment planning, and is compiled from the breadth of the company's worldwide experience in and understanding of the energy industry.  It is based on rigorous analyses of supply and demand, technological development, economics, and government policies and regulations, and it is consistent with many independent, reputable third-party analyses.

ExxonMobil's current *Outlook for Energy* extends through the year 2040, and contains several conclusions that are relevant to questions raised by stakeholder organizations.  Understanding this factual and analytical foundation is crucial to understanding ExxonMobil's investment decisions and approach to the prospect of further constraints on carbon.

World population increases.  Ultimately, the focus of ExxonMobil's *Outlook for Energy* – indeed, the focus of our business – is upon people, their economic aspirations and their energy requirements.  Accordingly, our analysis begins with demographics.  Like many independent analyses, ExxonMobil anticipates the world's population will add two billion people to its current total of seven billion by the end of the Outlook period.  The majority of this growth will occur in developing countries.

World GDP grows.  The global economy will grow as the world's population increases, and it is our belief that GDP gains will outpace population gains over the Outlook period, resulting in higher living standards.  Assuming sufficient, reliable and affordable energy is available, we see world GDP growing at a rate that exceeds population growth through the Outlook period, almost tripling in size from what it was globally in 2000.[2]  It is

---

[2] We see global GDP approaching $120 trillion, as compared to $40 trillion of global GDP in 2000 (all in constant 2005 USA$'s).  GDP per capita will also grow by about 80 percent between 2010 and 2040, despite the increase in population.

3

largely the poorest and least developed of the world's countries that benefit most from
this anticipated growth. However, this level of GDP growth requires more accessible,
reliable and affordable energy to fuel growth, and it is vulnerable populations who would
suffer most should that growth be artificially constrained.



Energy demand grows with population and GDP. As the world becomes more populous
and living standards improve over the Outlook period, energy demand will increase as
well. We see the world requiring 35 percent more energy in 2040 than it did in 2010.
The pace of this energy demand increase is higher than the population growth rate, but
less than global GDP growth rate. Greater energy efficiency is a key reason why energy
demand growth trails economic growth. We see society implementing policy changes
that will promote energy efficiency, which will serve to limit energy demand growth. We
also see many governments adopting policies that promote the switch to less carbon-
intensive fuels, such as natural gas. As noted in the chart above, energy demand in 2040
could be almost double what it would be without the anticipated efficiency gains.

ExxonMobil believes that efficiency is one of the most effective tools available to manage greenhouse gas emissions, and accordingly our company is making significant contributions to energy efficiency, both in our own operations and in our products.

<u>Energy-related CO2 emissions stabilize and start decreasing.</u>  As the world's population grows and living standards increase, we believe GHG emissions will plateau and start decreasing during the Outlook period.  In the OECD countries, energy-based GHG emissions have already peaked and are declining.  Our views in this regard are similar to other leading, independent forecasts.[3]



As part of our Outlook process, we do not project overall atmospheric GHG concentration, nor do we model global average temperature impacts.[4] However, we do project an energy-related CO2 emissions profile through 2040, and this can be compared

---

[3] For example, the IEA predicts that energy-related emissions will grow by 20%, on trend but slightly higher than our Outlook. See www.worldenergyoutlook.org.
[4] These would require data inputs that are well beyond our company's ability to reasonably measure or verify.

to the energy-related $CO_2$ emissions profiles from various scenarios outlined by the Intergovernmental Panel on Climate Change (IPCC). When we do this, our Outlook emissions profile through 2040 would closely approximate the IPCC's intermediate RCP 4.5 emissions profile pathway in shape, but is slightly under it in magnitude.[5]

<u>All economic energy sources are needed to meet growing global demand.</u>  In analyzing the evolution of the world's energy mix, we anticipate renewables growing at the fastest pace among all sources through the Outlook period. However, because they make a relatively small contribution compared to other energy sources, renewables will continue to comprise about 5 percent of the total energy mix by 2040.  Factors limiting further penetration of renewables include scalability, geographic dispersion, intermittency (in the case of solar and wind), and cost relative to other sources.



_____

[5] The IPCC RCP 4.5 scenario extends 60 years beyond our Outlook period to the year 2100, and incorporates a full carbon cycle analysis. The relevant time horizons differ and we do not forecast potential climate impacts as part of our Outlook, and therefore cannot attest to their accuracy.

The cost limitations of renewables are likely to persist even when higher costs of carbon are considered.



### 3. Climate Change Risk

ExxonMobil takes the risk of climate change seriously, and continues to take meaningful steps to help address the risk and to ensure our facilities, operations and investments are managed with this risk in mind.

Many governments are also taking these risks seriously, and are considering steps they can take to address them.   These steps may vary in timing and approach, but regardless, it is our belief they will be most effective if they are informed by global energy demand and supply realities, and balance the economic aspirations of consumers.

### 4.   Carbon Budget and Carbon Asset Risk Implications

One focus area of stakeholder organizations relates to what they consider the potential for a so-called carbon budget.  Some are advocating for this mandated carbon budget in order to achieve global carbon-based emission reductions in the range of 80 percent through the year 2040, with the intent of stabilizing world temperature increases not to exceed 2 degrees Celsius by 2100 (i.e., the "low carbon scenario"). A concern expressed by some of our stakeholders is whether such a "low carbon scenario" could impact ExxonMobil's reserves and operations – i.e., whether this would result in unburnable proved reserves of oil and natural gas.

The "low carbon scenario" would require $CO_2$ prices significantly above current price levels.  In 2007, the U.S. Climate Change Science Program published a study that examined, among other things, the global $CO_2$ cost needed to drive investments and transform the global energy system, in order to achieve various atmospheric $CO_2$ stabilization pathways. The three pathways shown in the chart below are from the MIT IGSM model used in the study, and are representative of scenarios with assumed climate policies that stabilize GHGs in the atmosphere at various levels, from 650 ppm $CO_2$ down to 450 ppm $CO_2$, a level approximating the level asserted to have a reasonable chance at meeting the "low carbon scenario."  Meeting the 450 ppm pathway requires large, immediate reductions in emissions with overall net emissions becoming negative in the second half of the century. Non-fossil energy sources, like nuclear and renewables, along with carbon capture and sequestration, are deployed in order to transform the energy system. Costs for $CO_2$ required to drive this transformation are modeled.  In general, $CO_2$ costs rise with more stringent stabilization targets and with time. Stabilization at 450 ppm would require $CO_2$ prices significantly above current price levels, rising to over $200 per ton by 2050.  By comparison, current EU Emissions Trading System prices are approximately $8 to $10 per ton of $CO_2$.

In the right section of the chart below, different levels of added $CO_2$ are converted to estimated added annual energy costs for an average American family earning the median

income.  For example, by 2030 for the 450ppm $CO_2$ stabilization pathway, the average American household would face an added $CO_2$ cost of almost $2,350 per year for energy, amounting to about 5 percent of total before-tax median income.  These costs would need to escalate steeply over time, and be more than double the 2030 level by mid-century. Further, in order to stabilize atmospheric GHG concentrations, these $CO_2$ costs would have to be applied across both developed and developing countries.



In 2008, the International Energy Agency estimated that reducing greenhouse gas emissions to just 50 percent below 2005 levels by 2050 would require $45 trillion in added energy supply and infrastructure investments.[6]  In this scenario, the IEA estimated that *each year* between 2005 and 2050 the world would need to construct 24 to 32 one-thousand-megawatt nuclear plants, build 30 to 35 coal plants with carbon capture and

---

[6] See *IEA Energy Technology Perspectives 2008, Scenarios & Strategies to 2050*.

sequestration capabilities, and install 3,700 to 17,800 wind turbines of four megawatt capacity.

Transforming the energy system will take time.  Energy use and mix evolve slowly due to the vast size of the global energy system.  As shown in the chart below, biomass like wood was the primary fuel for much of humanity's existence. Coal supplanted biomass as the primary energy source around 1900; it was not until the middle of the 20th century before oil overtook coal as the primary source of energy.  We believe the transition to lower carbon energy sources will also take time, despite rapid growth rates for such sources.  Traditional energy sources have had many decades to scale up to meet the enormous energy needs of the world.  As discussed above, renewable sources, such as solar and wind, despite very rapid growth rates, cannot scale up quickly enough to meet global demand growth while at the same time displacing more traditional sources of energy.



A "low carbon scenario" will impact economic development.   Another consideration related to the "low carbon scenario" is that capping of carbon-based fuels would likely harm those least economically developed populations who are most in need of affordable, reliable and accessible energy.[7] Artificially restricting supplies can also increase costs, and increasing costs would not only impact the affordability and accessibility of energy, especially to those least able to pay, it could impact the rate of economic development and living standards for all. Increasing energy costs leads to a scarcity of affordable, reliable and accessible energy and can additionally lead to social instability. While the risk of regulation where GHG emissions are capped to the extent contemplated in the "low carbon scenario" during the Outlook period is always possible, it is difficult to envision governments choosing this path in light of the negative implications for economic growth and prosperity that such a course poses, especially when other avenues may be available, as discussed further below.



---

[7] According to the International Energy Agency, 2.6 billion people still rely on biomass for cooking and over 15% of the world's population lacks access to electricity (http://www.iea.org/topics/energypoverty/).

Even in a "low carbon scenario," hydrocarbon energy sources are still needed. The IEA in its World Energy Outlook 2013 examined production of liquids from currently-producing fields, in the absence of additional investment, versus liquids demand, for both their lead "*New Policies Scenario*" and for a "*450 Scenario.*" As shown in the chart above, in both scenarios, there remains significant liquids demand through 2035, and there is a need for ongoing development and investment. Without ongoing investment, liquids demand will not be met, leaving the world short of oil.

ExxonMobil believes that although there is always the possibility that government action may impact the company, the scenario where governments restrict hydrocarbon production in a way to reduce GHG emissions 80 percent during the Outlook period is highly unlikely.  The Outlook demonstrates that the world will require all the carbon-based energy that ExxonMobil plans to produce during the Outlook period.[8]  Also, as discussed above, we do not anticipate society being able to supplant traditional carbon-based forms of energy with other energy forms, such as renewables, to the extent needed to meet this carbon budget during the Outlook period.

## 5.  Managing the Risk

ExxonMobil's actions.  ExxonMobil addresses the risk of climate change in several concrete and meaningful ways.  We do so by improving energy efficiency and reducing emissions at our operations, and by enabling consumers to use energy more efficiently through the advanced products we manufacture.  In addition, we conduct and support extensive research and development in new technologies that promote efficiency and reduce emissions.

---

[8] ExxonMobil's proved reserves at year-end 2013 are estimated to be produced on average within sixteen years, well within the Outlook period.  See Exxon Mobil Corporation 2013 Financial & Operating Review, p. 22.  It is important to note that this sixteen year average reserves-to-production ratio does not mean that the company will run out of hydrocarbons in sixteen years, since it continues to add proved reserves from its resource base and has successfully replaced more than 100% of production for many years.  See Item 2 Financial Section of ExxonMobil's 2013 Form 10-K for ExxonMobil's proved reserves, which are determined in accordance with current SEC definitions.

In our operations, we apply a constant focus on efficiency that enables us to produce energy to meet society's needs using fewer resources and at a lower cost.

For example, ExxonMobil is a leader in cogeneration at our facilities, with equity ownership in more than 100 cogeneration units at more than 30 sites with over 5200 megawatts of capacity. This capacity, which is equivalent to the electricity needs of approximately 2.5 million U.S. households, reduces the burden on outside power and grid suppliers and can reduce the resulting emissions by powering ExxonMobil's operations in a more efficient and effective manner.

We also constantly strive to reduce the emission intensity of our operations. Cumulative savings, for example, between 2009 and 2012 amounted to 8.4 million metric tons of greenhouse gases.

Many of ExxonMobil's products also enable consumers to be more energy efficient and therefore reduce greenhouse gas emissions. Advancements in tire liner technology developed by ExxonMobil allow drivers to save fuel. Our synthetic lubricants also improve vehicle engine efficiency. And lighter weight plastics developed by ExxonMobil reduce vehicle weights, further contributing to better fuel efficiency. [9]

ExxonMobil is also the largest producer of natural gas in the United States, a fuel with a variety of consumer uses, including heating, cooking and electricity generation. Natural gas emits up to 60 percent less $CO_2$ than coal when used as the source for power generation.

Research is another area in which ExxonMobil is contributing to energy efficiency and reduced emissions. We are on the forefront of technologies to lower greenhouse gas emissions. For example, ExxonMobil operates one of the world's largest carbon capture

---

[9] Using ExxonMobil fuel-saving technologies in one-third of U.S. vehicles, for example, could translate into a saving of about 5 billion gallons of gasoline, with associated greenhouse gas emissions savings equivalent to taking about 8 million cars off the road.

and sequestration (CCS) operations at our LaBarge plant in Wyoming.  It is a co-venturer in another project, the Gorgon natural gas development in Australia, which when operational will have the largest saline reservoir $CO_2$ injection facility in the world.  The company is leveraging its experience with CCS in developing new methods for capturing $CO_2$, which can reduce costs and increase the application of carbon capture for society. ExxonMobil also is actively engaged, both internally and in partnership with renowned universities and institutions, in research on new break-through technologies for energy.

The company also engineers its facilities and operations robustly with extreme weather considerations in mind.  Fortification to existing facilities and operations are addressed, where warranted due to climate or weather events, as part of ExxonMobil's Operations Integrity Management System.

ExxonMobil routinely conducts life cycle assessments (LCAs), which are useful to understand whether a technology can result in environmental improvements across a broad range of factors.  For example, in 2011 we conducted a LCA in concert with Massachusetts Institute of Technology and Synthetic Genomics Inc. to assess the impact of algal biofuel production on GHG emissions, land use, and water use.  The study demonstrated the potential that algae fuels can be produced with freshwater consumption equivalent to petroleum refining, and enable lower GHG emissions.  A more recent LCA demonstrated that "well-to-wire" GHG emissions from shale gas are about half that of coal, and not significantly different than emissions of conventional gas.

In addition, ExxonMobil is involved in researching emerging technologies that can help mitigate the risk of climate change.  For example, the company has conducted research into combustion fundamentals with automotive partners in order to devise concepts to improve the efficiency and reduce emissions of internal combustion engines.

ExxonMobil has also developed technology for an on-board hydrogen-powered fuel cell that converts other fuels into hydrogen directly under a vehicle's hood, thereby eliminating the need for separate facilities for producing and distributing hydrogen.  This

technology can be up to 80 percent more fuel efficient and emit 45 percent less $CO_2$ than conventional internal combustion engines.  The company is also a founding member of the Global Climate and Energy Project at Stanford University, a program that seeks to develop fundamental, game-changing scientific breakthroughs that could lower GHG emissions.

Government policy.  Addressing climate risks is one of many important challenges that governments face on an ongoing basis, along with ensuring that energy supplies are affordable and accessible to meet societal needs.

Energy companies like ExxonMobil can play a constructive role in this decision-making process by sharing our insights on the most effective means of achieving society's goals given the workings of the global energy system and the realities that govern it.

The introduction of rising $CO_2$ costs will have a variety of impacts on the economy and energy use in every sector and region within any given country.  Therefore, the exact nature and pace of GHG policy initiatives will likely be affected by their impact on the economy, economic competitiveness, energy security and the ability of individuals to pay the related costs.

Governments' constraints on use of carbon-based energy sources and limits on greenhouse gas emissions are expected to increase throughout the Outlook period. However, the impact of these rising costs of regulations on the economy we expect will vary regionally throughout the world and will not rise to the level required for the "low carbon scenario." These reasonable constraints translate into costs, and these costs will help drive the efficiency gains that we anticipate will serve to curb energy growth requirements for society as forecasted over the Outlook period.

We also see these reasonable constraints leading to a lower carbon energy mix over the Outlook period, which can serve to further reduce greenhouse gas emissions. For example, fuel switching to cleaner burning fuels such as natural gas has significantly

15

contributed to the United States reducing greenhouse gas emissions last year to levels not seen since 1994. Furthermore, the impact of efficiency is expected to help stabilize and eventually to reduce GHG emissions over the Outlook period, as discussed previously. These constraints will also likely result in dramatic global growth in natural gas consumption at the expense of other forms of energy, such as coal.

We see the continued focus on efficiency, conservation and fuel switching as some of the most effective and balanced ways society can address climate change within the Outlook period in a manner that avoids the potentially harmful and destabilizing consequences that the artificial capping of needed carbon-based energy sources implied within the "low carbon scenario" can cause.[10]

## 6. Planning Bases and Investments

ExxonMobil is committed to disciplined investing in attractive opportunities through the normal fluctuations in business cycles. Projects are evaluated under a wide range of possible economic conditions and commodity prices that are reasonably likely to occur, and we expect them to deliver competitive returns through the cycles. We do not publish the economic bases upon which we evaluate investments due to competitive considerations. However, we apply prudent and substantial safety margins in our planning assumptions to help ensure robust returns. In assessing the economic viability of proved reserves, we do not believe a scenario consistent with reducing GHG emissions by 80 percent by 2050, as suggested by the "low carbon scenario," lies within the "reasonably likely to occur" range of planning assumptions, since we consider the scenario highly unlikely.

The company also stress tests its oil and natural gas capital investment opportunities, which provides an added margin of safety against uncertainties, such as those related to technology, costs, geopolitics, availability of required materials, services, and labor, etc.

---

[10] Permitting the freer trade and export of natural gas is but one way, for example, where countries that rely on more carbon-intense forms of energy can increase their use of cleaner-burning fuels.

16

Such stress testing differs from alternative scenario planning, such as alternate Outlooks, which we do not develop, but stress testing provides us an opportunity to fully consider different economic scenarios in our planning and investment process.  The Outlook is reviewed at least annually, and updated as needed to reflect changes in views and circumstances, including advances in technology.



We also address the potential for future climate-related controls, including the potential for restriction on emissions, through the use of a proxy cost of carbon.  This proxy cost of carbon is embedded in our current *Outlook for Energy*, and has been a feature of the report for several years. The proxy cost seeks to reflect all types of actions and policies that governments may take over the Outlook period relating to the exploration, development, production, transportation or use of carbon-based fuels.  Our proxy cost,

which in some areas may approach $80/ton over the Outlook period[11], is not a suggestion that governments should apply specific taxes.  It is also not the same as a "social cost of carbon," which we believe involves countless more assumptions and subjective speculation on future climate impacts.  It is simply our effort to quantify what we believe government policies over the Outlook period could cost to our investment opportunities.  Perhaps most importantly, we require that all our business segments include, where appropriate, GHG costs in their economics when seeking funding for capital investments.  We require that investment proposals reflect the climate-related policy decisions we anticipate governments making during the Outlook period and therefore incorporate them as a factor in our specific investment decisions.

When governments are considering policy options, ExxonMobil advocates an approach that ensures a uniform and predictable cost of carbon; allows market prices to drive solutions; maximizes transparency to stakeholders; reduces administrative complexity; promotes global participation; and is easily adjusted to future developments in climate science and policy impacts.  We continue to believe a revenue-neutral carbon tax is better able to accommodate these key criteria than alternatives such as cap-and-trade.

Our views are based on our many years of successful energy experience worldwide and are similar to long-term energy demand forecasts of the International Energy Agency.  As discussed previously, we see population, GDP and energy needs increasing for the world over the Outlook period, and that *all* economically viable energy sources will be required to meet these growing needs. We believe that governments will carefully balance the risk of climate change against other pressing social needs over the Outlook period, including the need for accessible, reliable and affordable energy, and that an artificial capping of carbon-based fuels to levels in the "low carbon scenario" is highly unlikely.

---

[11] As noted in our Outlook, this amount varies from country to country, with that amount generally equating to OECD countries, and lower amounts applying to non-OECD countries.

### 7.  Capital Allocation

ExxonMobil maintains capital allocation discipline with rigorous project evaluation and investment selectivity, while consistently returning cash to our shareholders.  Our capital allocation approach is as follows:

I.    Invest in resilient, attractive business opportunities

II.   Pay a reliable and growing dividend

III.  Return excess cash to shareholders through the purchase of shares.

Although the company does not incorporate the "low carbon scenario" in its capital allocation plans, a key strategy to ensure investment selectivity under a wide range of economic assumptions is to maintain a very diverse portfolio of oil and gas investment opportunities.  This diversity – in terms of resource type and corresponding development options (oil, gas, NGLs, onshore, offshore, deepwater, conventional, unconventional, LNG, etc.) and geographic dispersion is unparalleled in the industry.  Further, the company does not believe current investments in new reserves are exposed to the risk of stranded assets, given the rising global need for energy as discussed earlier.

### 8.  Optional Reserves Disclosure under SEC Rules

Some have suggested that ExxonMobil consider availing itself of an optional disclosure available to securities issuers under Item 1202 of SEC Regulation S-K. [12]  That SEC item provides, among other things, that "the registrant may, but is not required to, disclose, in the aggregate, an estimate of reserves estimated for each product type based on different price and cost criteria, such as a range of prices and costs that may reasonably be

---

[12] The rules were subject to comment at the time that they were proposed. See Modernization of Oil and Gas Reporting, Securities and Exchange Commission, 17 CFR Parts 210, 211, 229, and 249 [Release Nos. 33-8995; 34-59192; FR-78; File Nos. S7-15-08] at p. 66. (*www.sec.gov/rules/final/2008/33-8995.pdf*) ExxonMobil also provided comments to the proposed provision. See Letter of Exxon Mobil Corporation to Ms. Florence Harmon, Acting Secretary, Securities and Exchange Commission, September 5, 2008, File Number S7-15-08 – Modernization of the Oil and Gas Reporting Requirements at p. 24.

achieved, including standardized futures prices or management's own forecasts." Proponents ask the company to use this option to identify the price sensitivity of its reserves, with special reference to long-lived unconventional reserves such as oil sands.

We believe the public reporting of reserves is best done using the historical price basis as required under Item 1202(a) of Regulation S-K, rather than the optional sensitivity analysis under Item 1202(b), for several reasons. First and most importantly, historical prices are a known quantity and reporting on this basis provides information that can be readily compared between different companies and over multiple years.[13] Proved reserve reporting using historical prices is a conservative approach that gives investors confidence in the numbers being reported.

Using speculative future prices, on the other hand, would introduce uncertainty and potential volatility into the reporting, which we do not believe would be helpful for investors. In fact, we believe such disclosure could be misleading. Price forecasts are subject to considerable uncertainty. While ExxonMobil tests its project economics to ensure they will be robust under a wide variety of possible future circumstances, we do not make predictions or forecasts of future oil and gas prices. If reserves determined on a speculative price were included in our SEC filings, we believe such disclosure could potentially mislead investors, or give such prices greater weight in making investment decisions than would be warranted.

We are also concerned that providing the optional sensitivity disclosure could enable our competitors to infer commercial information about our projects, resulting in commercial harm to ExxonMobil and our shareholders. We note that none of our key competitors to our knowledge provide the Item 1202(b) sensitivity disclosure.

---

[13] We note the rules under 1202(a) use an average of monthly prices over the year rather than a single "spot" price, thus helping to reduce the effects of short-term volatility that often characterize oil and gas prices.

Lastly, we note that even when sensitivity disclosure under Item 1202(b) is included in a filing, the price and cost assumptions must be ones the company believes are reasonable. This disclosure item is therefore not intended or permitted to be a vehicle for exploring extreme scenarios.

For all the above reasons, we do not believe including the sensitivity disclosure under Item 1202(b) in our SEC filings would be prudent or in the best interest of our shareholders.

## 9.   Summary

In summary, ExxonMobil's *Outlook for Energy* continues to provide the basis for our long-term investment decisions.  Similar to the forecasts of other independent analysts, our Outlook envisions a world in which populations are growing, economies are expanding, living standards are rising, and, as a result, energy needs are increasing. Meeting these needs will require all economic energy sources, especially oil and natural gas.

Our *Outlook for Energy* also envisions that governments will enact policies to constrain carbon in an effort to reduce greenhouse gas emissions and manage the risks of climate change.  We seek to quantify the cumulative impact of such policies in a proxy cost of carbon, which has been a consistent feature of our *Outlook for Energy* for many years.

We rigorously consider the risk of climate change in our planning bases and investments. Our investments are stress tested against a conservative set of economic bases and a broad spectrum of economic assumptions to help ensure that they will perform adequately, even in circumstances that the company may not foresee, which provides an additional margin of safety.  We also require that all significant proposed projects include a cost of carbon – which reflects our best assessment of costs associated with potential GHG regulations over the Outlook period – when being evaluated for investment.

Our *Outlook for Energy* does not envision the "low carbon scenario" advocated by some because the costs and the damaging impact to accessible, reliable and affordable energy resulting from the policy changes such a scenario would produce are beyond those that societies, especially the world's poorest and most vulnerable, would be willing to bear, in our estimation.

In the final analysis, we believe ExxonMobil is well positioned to continue to deliver results to our shareholders and deliver energy to the world's consumers far into the future. Meeting the economic needs of people around the world in a safe and environmentally responsible manner not only informs our *Outlook for Energy* and guides our investment decisions, it is also animates our business and inspires our workforce.

**10. Additional Information**

There were additional information requests raised by some in the course of engagement with the groups with whom we have been dialoguing. These are addressed in the Appendix.

# Appendix

| Topic | Page |
|---|---|
| Proved Reserves | 24 |
| Resource Base | 25 |
| Oil & Gas Production Outlook | 26 |
| CAPEX Outlook | 27 |
| Oil & Gas Exploration and Production Earnings and Unit Profitability | 28 |
| Production Prices and Production Costs | 29 |
| Wells-to-Wheels GHG emissions seriatim | 30 |

# EXXONMOBIL PROVED RESERVES - AT DECEMBER 31, 2013

| | United States | Canada/ S. Amer. (2) | Europe | Africa | Asia | Australia/ Oceania | Total | Worldwide | Canada/ S. Amer. (2) | Canada/ S. Amer. (2) | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Crude Oil | | | | Natural Gas Liquids (2) | Bitumen | Synthetic Oil | |
| Total liquids proved reserves (1) **(millions of barrels)** | 2,338 | 284 | 273 | 1,193 | 3,308 | 155 | 7,551 | 1,479 | 3,630 | 579 | 13,239 |
| | | | | Natural Gas | | | | | | | |
| Total natural gas proved reserves (1) **(billions of cubic feet)** | 26,301 | 1,235 | 11,694 | 867 | 24,248 | 7,515 | 71,860 | - | - | - | 71,860 |
| Oil-Equivalent Total All Products (3) **(millions of oil-equivalent barrels)** | 6,722 | 490 | 2,222 | 1,338 | 7,349 | 1,407 | 19,528 | 1,479 | 3,630 | 579 | 25,216 |

**Proved Reserves Distribution** (4)
*(percent, oil equivalent barrels)*



**By Region**

**By Resource Type**

**By Hydrocarbon Type**

*(1)  Source:  ExxonMobil 2013 Form 10-K (pages 103 and 106).*

*(2)  Includes total proved reserves attributable to Imperial Oil Limited, in which there is a 30.4 percent noncontrolling interest. Refer to ExxonMobil 2013 Form 10-K (pages 103, 104, and 106) for more details.*

*(3)  Natural gas is converted to oil-equivalent basis at six million cubic feet per one thousand barrels.*

*(4)  Source:  ExxonMobil 2013 Financial and Operating Review (page 22).*

# EXXONMOBIL RESOURCE BASE – AT DECEMBER 31, 2013 (1)



*(1) Source: 2013 ExxonMobil Financial & Operating Review (page 21) and 2014 Analyst Meeting (slide 49).*

**Note:** ExxonMobil's resource base includes quantities of oil and gas that are not yet classified as proved reserves under SEC definitions, but that we believe will ultimately be developed. These quantities are also not intended to correspond to "probable" or "possible" reserves under SEC rules.

## EXXONMOBIL OIL & GAS PRODUCTION OUTLOOK (1)

**Total Production Outlook (2)**
**Millions Oil-Equivalent Barrels Per Day (MOEBD), net**

| | '13 | '14 | '15 | '16 | '17 |
|---|---|---|---|---|---|
| **Total** | 4.0 | 4.0 | 4.1 | 4.2 | 4.3 |

- ▪ Total production outlook
  - 2014: Flat
  - 2015 – 2017: up 2-3% per year

- ▪ Liquids outlook
  - 2014: up 2%
  - 2015 – 2017: up 4% per year

- ▪ Gas outlook
  - 2014: down 2%
  - 2015 – 2017: up 1% per year

(1)  *Source 2014 ExxonMobil Analyst Meeting (slide 32).*
(2)  *2013 production excludes the impact of UAE onshore concession expiry and Iraq West Qurna 1 partial divestment. Production outlook excludes impact from future divestments and OPEC quota effects. Based on 2013 average price ($109 Brent).*

# EXXONMOBIL CAPEX OUTLOOK (1)



- Expect to invest $39.8B in 2014
  - Reduced Upstream spending
  - Selective Downstream and Chemical investments

- Average less than $37B per year from 2015 to 2017

*(1) Source 2014 ExxonMobil Analyst Meeting (slide 33).*

# EXXONMOBIL OIL & GAS EXPLORATION AND PRODUCTION EARNINGS AND UNIT PROFITABILITY (1)

The revenue, cost, and earnings data are shown both on a total dollar and a unit basis, and are inclusive of non-consolidated and Canadian oil sands operations.

| | Total Revenues and Costs, Including Non-Consolidated Interests and Oil Sands | | | | | | | Revenues and Costs per Unit of Sales or Production (2) | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | United States | Canada/ South America | Europe | Africa | Asia | Australia/ Oceania | Total | United States | Canada/ South America | Outside Americas | Worldwide |
| **2013** | | | | *(millions of dollars)* | | | | | *(dollars per unit of sales)* | | |
| Revenue | | | | | | | | | | | |
| Liquids | **13,350** | **7,558** | **6,751** | **18,811** | **28,440** | **1,596** | **76,506** | 84.87 | 75.28 | 101.92 | 95.25 |
| Natural gas | **3,880** | **360** | **11,384** | **6** | **13,477** | **539** | **29,646** | 3.00 | 2.80 | 8.77 | 6.86 |
| | | | | | | | | *(dollars per barrel of net oil-equivalent production)* | | | |
| Total revenue | 17,230 | 7,918 | 18,135 | 18,817 | 41,917 | 2,135 | 106,152 | 46.20 | 63.93 | 78.86 | 69.66 |
| Less costs: | | | | | | | | | | | |
| Production costs | | | | | | | | | | | |
| excluding taxes | 4,742 | 3,965 | 3,318 | 2,396 | 2,423 | 654 | 17,498 | 12.72 | 32.02 | 8.56 | 11.48 |
| Depreciation and depletion | 5,133 | 989 | 2,050 | 3,269 | 2,635 | 334 | 14,410 | 13.76 | 7.99 | 8.07 | 9.46 |
| Exploration expenses | 413 | 386 | 260 | 288 | 997 | 92 | 2,436 | 1.11 | 3.12 | 1.59 | 1.60 |
| Taxes other than income | 1,617 | 94 | 4,466 | 1,583 | 9,146 | 427 | 17,333 | 4.33 | 0.74 | 15.21 | 11.37 |
| Related income tax | 1,788 | 542 | 4,956 | 6,841 | 14,191 | 202 | 28,520 | 4.79 | 4.38 | 25.50 | 18.72 |
| Results of producing activities | 3,537 | 1,942 | 3,085 | 4,440 | 12,525 | 426 | 25,955 | 9.49 | 15.68 | 19.93 | 17.03 |
| Other earnings (3) | 662 | (495) | 302 | 59 | 234 | (118) | 644 | 1.77 | (4.00) | 0.47 | 0.42 |
| Total earnings, excluding | | | | | | | | | | | |
| power and coal | 4,199 | 1,447 | 3,387 | 4,499 | 12,759 | 308 | 26,599 | 11.26 | 11.68 | 20.40 | 17.45 |
| Power and coal | (8) | - | - | - | 250 | - | 242 | | | | |
| **Total earnings** | 4,191 | 1,447 | 3,387 | 4,499 | 13,009 | 308 | 26,841 | 11.23 | 11.68 | 20.64 | 17.61 |
| | | | | | | | | Unit Earnings Excluding NCI Volumes (4) | | | 18.03 |

*(1) Source: ExxonMobil 2013 Financial and Operating Review (page 56).*

*(2) The per-unit data are divided into two sections: (a) revenue per unit of sales from ExxonMobil's own production; and, (b) operating costs and earnings per unit of net oil-equivalent production. Units for crude oil and natural gas liquids are barrels, while units for natural gas are thousands of cubic feet. The volumes of crude oil and natural gas liquids production and net natural gas production available for sale used in this calculation are shown on pages 48 and 49 of ExxonMobil's 2013 Financial & Operating Review. The volumes of natural gas were converted to oil-equivalent barrels based on a conversion factor of 6 thousand cubic feet per barrel.*

*(3) Includes earnings related to transportation operations, LNG liquefaction and transportation operations, sale of third-party purchases, technical services agreements, other nonoperating activities, and adjustments for noncontrolling interests.*

*(4) Calculation based on total earnings (net income attributable to ExxonMobil) divided by net oil-equivalent production less noncontrolling interest (NCI) volumes.*

# EXXONMOBIL

## PRODUCTION PRICES AND PRODUCTION COSTS (1)

The table below summarizes average production prices and average production costs by geographic area and by product type.

| | United States | Canada/ S. America | Europe | Africa | Asia | Australia/ Oceania | Total |
|---|---|---|---|---|---|---|---|
| **During 2013** | | | *(dollars per unit)* | | | | |
| **Total** | | | | | | | |
| Average production prices (2) | | | | | | | |
| Crude oil, per barrel | 95.11 | 98.91 | 106.49 | 108.73 | 104.98 | 107.92 | 104.01 |
| NGL, per barrel | 44.24 | 44.96 | 65.36 | 75.24 | 61.64 | 59.55 | 56.26 |
| Natural gas, per thousand cubic feet | 3.00 | 2.80 | 9.59 | 2.79 | 8.53 | 4.20 | 6.86 |
| Bitumen, per barrel | - | 59.63 | - | - | - | - | 59.63 |
| Synthetic oil, per barrel | - | 93.96 | - | - | - | - | 93.96 |
| Average production costs, per oil-equivalent barrel - total (3) | 12.72 | 32.02 | 12.42 | 13.95 | 4.41 | 16.81 | 11.48 |
| Average production costs, per barrel - bitumen (3) | - | 34.30 | - | - | - | - | 34.30 |
| Average production costs, per barrel - synthetic oil (3) | - | 50.94 | - | - | - | - | 50.94 |

(1)  *Source: ExxonMobil 2013 Form 10-K (page 9)*

(2)  *Revenue per unit of sales from ExxonMobil's own production. (See ExxonMobil's 2013 Financial & Operating Review, page 56.)  Revenue in this calculation is the same as in the Results of Operations disclosure in ExxonMobil's 2013 Form 10-K (page 97) and does not include revenue from other activities that ExxonMobil includes in the Upstream function, such as oil and gas transportation operations, LNG liquefaction and transportation operations, coal and power operations, technical service agreements, other nonoperating activities and adjustments for noncontrolling interests, in accordance with Securities and Exchange Commission and Financial Accounting Standards Board rules.*

(3)  *Production costs per unit of net oil-equivalent production.  (See ExxonMobil's 2013 inancial & Operating Review, page 56.)  The volumes of natural gas were converted to oil-equivalent barrels based on a conversion factor of 6 thousand cubic feet per barrel.  Production costs in this calculation are the same as in the Results of Operations disclosure in ExxonMobil's 2013 Form 10-K (page 97) and do not include production costs from other activities that ExxonMobil includes in the Upstream function, such as oil and gas transportation operations, LNG liquefaction and transportation operations, coal and power operations, technical service agreements, other nonoperating activities and adjustments for noncontrolling interests, in accordance with Securities and Exchange Commission and Financial Accounting Standards Board rules.  Depreciation & depletion, exploration costs, and taxes are not included in production costs.*



# Exhibit 2



## Report Information from ProQuest

February 08 2017 16:20

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM
INDEX NO. 451962/2016
NYSCEF DOC. NO. 171
RECEIVED NYSCEF: 06/02/2017

## Table of contents

1. Exxon Mobil Corp Annual Shareholders Meeting - Final.............................................................................. 1

Document 1 of 1

## Exxon Mobil Corp Annual Shareholders Meeting - Final

ProQuest document link

Links: Check for full text via 360 Link

**Full text:**

Presentation

REX TILLERSON, CHAIRMAN, CEO, EXXONMOBIL CORPORATION: Good morning, ladies and gentlemen. If you'd please take your seats.

I'm Rex Tillerson, I'm the Chairman and Chief Executive Officer of the Exxon Mobil Corporation. And I am pleased to welcome each of you that made the effort to join us today in person. I also, though, want to welcome our shareholders around the world who are joining us by way of the Internet.

I do hope you had the opportunity to meet some of our employees in person while visiting the displays in the foyer this morning. These Exxon Mobil employees are among the over 73,000 people who are working 24 hours a day, seven days a week, 365 days a year on your behalf. And many of them are working in challenging locations to deliver the energy and products needed by consumers around the world.

The financial and operating results that I bring to you today are really their results, and I have the privilege of presenting them to you on their behalf.

Seated next to me is Jeff Woodbury, Vice President of Investor Relations and our Corporate Secretary. He will assist me in running the meeting today. I'll introduce the other members of the board to you a little later in the meeting.

As mentioned on Page 2 of the proxy statement, it is the policy of the corporation to provide confidential voting to shareholders. For shareholders who returned their proxy cards without written comments, the voted proxies have not been seen by nor reported to the corporation except in aggregate numbers. Anyone turning in a proxy card at this meeting who wishes to keep his or her votes secret, may obtain an envelope from the ushers. Proxy cards will be collected later in the meeting. A list of shareholders entitled to vote at this meeting or at any adjournment thereof is available for inspection. If anyone wishes to examine this list, an usher will be pleased to direct you to the proper location.

Shirley Nessralla and Paula Buckley of Computershare Trust Company have been appointed Inspectors of the Election for this meeting. They have taken an oath of office that has been delivered to the Secretary for filing with the minutes of the meeting. Notice of this meeting has been properly given, and the Inspectors of Election have determined that a quorum is present. There are 3.5 billion shares represented at this meeting, equating to approximately 85% of the issued and outstanding shares of stock of the corporation that are entitled to vote. I directed the inspector's written determination as to the number of shares entitled to vote at the meeting be filed with the minutes. I declare a quorum present and the meeting ready for business.

I'd now like to explain our plan for conducting the meeting today. First, Secretary Woodbury will outline the rules of conduct and how to gain recognition. Then, I'll make some brief comments about our business results and the future we see for your company. After that, the items of business comprised of 14 proposals from the Board of Directors and shareholders will be presented. As described in the Annual Meeting program, discussion on the items of business will be deferred until all items have been presented. Time permitting, we may also have time to respond to some of the questions submitted ahead of time via proxy cards and the Internet. Upon completion of the discussion on the items of business and voting, the polls will be closed, the formal business of this year's Annual Meeting will be concluded, and the Inspectors of Election will prepare this preliminary voting report. While this is occurring, there may be time for additional comments or questions regarding our business. When the inspectors are ready, I'll ask them to give us their voting report. We will then conclude the meeting.

And I'm going to talk a little bit about the Items 11 and 12 today and talk specifically about some of the peer groups that were mentioned, peer companies and their recognition of the 2-degree scenario. Specifically, I want to talk about one, which is Saudi Aramco. Saudi Arabia has made it clear that they are seeking to monetize their oil reserves now, regardless of the impact on price.

Minister Al-Naimi said that he could live with $20 per barrel. The Deputy Crown Prince has said $30 per barrel or $70 per barrel, it's all the same to them. And he has furthermore announced plans, a plan called Vision 2030, in which he wants to wean his country off of oil by the year 2030 or sooner.

Given the global signals of the end of the oil era, from low commodity prices to recent statements and decisions from Saudi Aramco to start selling shares publicly to build up a $2 trillion sovereign wealth fund, we're concerned about some of the claims of the future of energy will look very much like the past.

I think you've talked a little bit today about 2040 scenarios. My question is, what do the Saudis -- or why do the Saudis see the future of oil -- future of energy so differently than the leadership of ExxonMobil? What do they know that we are not considering? Furthermore, what specifically are you doing to ensure the business model of ExxonMobil is nimble enough to withstand low carbon demand scenarios, including disruptions, be they technological regulatory or market-based?

REX TILLERSON: Well, as to Saudi Aramco's views or the Kingdom of Saudi Arabia, I -- you would have to ask them. I can't speak on their behalf. I think we showed you today a number of things that we're doing in terms of remaining flexible to alternative outcomes in the future.

We have, unlike many of our competitors, we have for many years included a price of carbon in our outlook. And that price of carbon gets put into all of our economic models when we make investment decisions as well. It's a proxy. We don't know how else to model what future policy impacts might be. But whatever policies are, ultimately they come back to either your revenues or your cost. So we choose to put it in as a cost.

So we have accommodated that uncertainty in the future, and everything gets tested against it. As to other actions, it's the research areas you see in terms of our understanding of the issue. And we probably have been engaged in the scientific study of this longer than any of our peers for four decades now. And we continue to be engaged, so we are very, very aware and up-to-date on the current scientific understanding. And we fund a number of research areas, both academically and institutionally, that are areas where people are investigating possible breakthroughs, whether it'd be in battery technologies or alternative fuel technologies or what's the next possible game-changing technology.

We do that so we're aware of whether that is something that has potential or not. And so we monitor all of that, and we invest and run our programs accordingly. And should something evolve, we have the capacity to become engaged in that if we see it is in the interest of our shareholders. So that's how we're responding. So back over here.

HUNTER MARTIN, SHAREHOLDER: Mr. Tillerson, my name is [Hunter Martin]. My wife and I have been driving up here from Houston for more than 25 years, going back to Larry Rawl's days for the meetings. And I think I bought my first shares of the company probably the year you were born. And I don't presume --

REX TILLERSON: I wish my dad had bought some shares the year I was born.

HUNTER MARTIN: I do not presume to forecast what's going to happen over the next 12 months. But [Lori] and I want to thank you and compliment you on your stewardship of our company.

Applying whatever parameters one would choose, you personify all that is best in America and world industry, and the lives of all of us shareholders are more secure and in return, happier because of you.

Our thanks embrace the employees as well as the board. At the top, of course, is you and your superlative guidance. Congratulations on your achievements, Mr. Tillerson, and thanks for your dedication to all of us.

REX TILLERSON: Thank you for those kind words. Right here.

ANNA KOLINSKI: CEO Tillerson, it's good to have the opportunity to speak to you. So my name is [Anna Kolinski] and my grandfather, James F. Black, was a scientist for Exxon for over 40 years. He started with

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM
INDEX NO. 451962/2016
NYSCEF DOC. NO. 172
RECEIVED NYSCEF: 06/02/2017

# Exhibit 3

**Robert W Bailes/Dallas/Mobil-Notes**

04/30/2010 10:45 PM

To   Tom R Eizember/Dallas/ExxonMobil@xom

cc   Brian P Flannery/Dallas/ExxonMobil@xom, R A Mire/Houston/Mobil-Notes@xom

bcc

Subject   Re: PROP: 2010 Plan GHG Guidance

Note: 1 Attachment(s) removed from this message

⬤ Proprietary

Tom---

Some potential wording offered in the attached (in red).  On the quantitative guidance:

- Agree that there has not been enough net action (in either direction) over the past year to justify a change to the 2030 cost of $40/T CO2.  Recognize that it is a conservative (low) estimate appropriate for P&B purposes.  EO assumption of $60/T is likely more realistic.  Best intelligence on K-G-L price collar indicates upper limit of $65/T in 2030.  Some EU estimates for Phase 3 have notably higher price forecasts than $40 in the nearer-term (this decade).
- Agree with proposal to raise EU ETS cost to $30/T with onset of Phase 3.
- Agree with Rick's suggestion that likely justified to move "rest of OECD" start date on out to 2015.  Could avoid annual 1-year slides, and prognosis not encouraging for near-term breakthrough.  K-G-L does not bring our industry in until 2016.  May not matter that much as either 2013 or 2015 get us out of the Plan years.
- **Strongly agree with Rick's suggestion that non-OECD should be required to provide a sensitivity at "rest of OECD" prices to reflect impact of international offsets opening up through some national program, if not CDM.**

---Bob



1BOP G-G Par Gueance)_rwb.ppt

R. W. (Bob) Bailes
Corporate Greenhouse Gas Manager
Exxon Mobil Corporation
5959 Las Colinas Blvd., Room 3322
Irving, TX  75039
(972) 444-1811
Tom R Eizember/Dallas/ExxonMobil

**Tom R Eizember/Dallas/ExxonMobil**

04/30/10 01:33 PM

To   Robert W Bailes/Dallas/Mobil-Notes@xom, R A Mire/Houston/Mobil-Notes@xom, Brian P Flannery/Dallas/ExxonMobil@xom

cc

Subject   PROP: 2010 Plan GHG Guidance

⬤ Proprietary

Attached is my thinking on GHG guidance for this year's Plan.   Comments please

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)          EMC 000339155

[attachment "10CP GHG Plan Guidance).ppt" deleted by Robert W Bailes/Dallas/Mobil-Notes]

Tom R. Eizember
Planning Manager, Corporate Strategic Planning
Exxon Mobil Corporation
tom.r.eizember@exxonmobil.com
972-444-1789   fax: 972-444-1679

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)          EMC 000339156

# Exhibit 4

**Tom R Eizember/Dallas/ExxonMobil**

04/22/2011 05:13 PM

To   Robert W Bailes/Dallas/Mobil-Notes@xom

cc   Brian P Flannery/Dallas/ExxonMobil@xom, Sherri K Stuewer/Dallas/ExxonMobil@xom

bcc

Subject   Re: PROP: GHG emission cost planning basis 

 Proprietary

I have pointed out the difference in past reviews - we've been at $60 for the EO and $40 for the plan circa 2030 for several years. Rex has seemed happy with the difference previously - appeared to feel it provides a "conservative" basis (but only if viewed from the perspective of claiming economics credits to reduce emissions; it is not conservative vs EO from the perspective of debiting actions that increase emissions).

I will point out the difference this year again if the consensus is to stay with $40.

Tom R. Eizember
Planning Manager, Corporate Strategic Planning
Exxon Mobil Corporation
tom.r.eizember@exxonmobil.com
972-444-1789   fax: 972-444-1679
Robert W Bailes/Dallas/Mobil-Notes

**Robert W Bailes/Dallas/Mobil-Notes**

04/22/2011 09:55 AM

To   Tom R Eizember/Dallas/ExxonMobil@xom

cc   Brian P Flannery/Dallas/ExxonMobil@xom, Sherri K Stuewer/Dallas/ExxonMobil@xom

Subject   Re: PROP: GHG emission cost planning basis 

Note: 1 Attachment(s) removed from this message

 Proprietary

I agree there is no "compelling" reason to change, and that is consistent with EO assumption discussion we had on Tuesday. I think we can wait another year on deciding whether to push non-EU OECD beyond 2015 ... that's still far enough out to be feasible, but this is a very slow train.

One potential change I would like for us to discuss/consider is whether to harmonize P&B assumptions with EO assumptions. I recognize they serve two different purposes, but I think it would provide more clarity and alignment throughout organization. I also think the $60/T is a rational point to be in striking distance of power sector CCS traunche, whereas $40/T feels like no-man's land that won't really drive much 20 years from now (though it would drive fuel switching). I also don't think the extra $20/T risks unduly justifying more capital investments, though it would give another minor nudge to energy efficiency and/or emission reduction projects.

R. W. (Bob) Bailes
Corporate Greenhouse Gas Manager
Exxon Mobil Corporation

5959 Las Colinas Blvd., Room 3322
Irving, TX  75039
(972) 444-1811
Tom R Eizember/Dallas/ExxonMobil

| **Tom R Eizember/Dallas/ExxonMobil** | To | Robert W Bailes/Dallas/Mobil-Notes@xom |
|---|---|---|
| | cc | Brian P Flannery/Dallas/ExxonMobil@xom, Sherri K Stuewer/Dallas/ExxonMobil@xom |
| 04/22/11 09:39 AM | Subject | PROP: GHG emission cost planning basis |

 Proprietary

We need to settle on a basis for this year's plan - combined Plan basis review with MC is late May.  At this point, I don't see a compelling reason to change last year's basis (attached).  Your thoughts?

[attachment "10CP GHG Plan Guidance.ppt" deleted by Robert W Bailes/Dallas/Mobil-Notes]

Tom R. Eizember
Planning Manager, Corporate Strategic Planning
Exxon Mobil Corporation
tom.r.eizember@exxonmobil.com
972-444-1789   fax: 972-444-1679

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)          EMC 000354828

# Exhibit 5

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)

EMC 000539921

# GHG Emissions Background

DRAFT

**Proprietary**

**EU-Emissions Trading System Credit Prices**
Monthly Average Spot Prices



## EU-Emissions Trading Scheme (ETS)

- Remains the world's largest carbon market

- Allowance values depressed by oversupply due to economic slump and overlapping directives

- EC implemented "backloading" policy February 2014 in attempt to buoy price; limited market response experienced or expected

## Activities outside the EU

- Advancement of U.S. federal GHG regulations under the CAA likely in 2014 for power plants and methane emissions; broad market-based system unlikely in near-term

- California Cap & Trade to add mobile sources in 2015; became linked with Quebec program January 2014

- Anticipate price and intensity reduction target increase for Alberta SGRE program in 2014/15; currently at $15/T and 12% reduction

- Australia program to convert to market-based Cap & Trade July 2015 with linkage to EU, if not repealed by Abbott government

- New Zealand remains linked with EU



Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)

EMC 000539922

# GHG Emissions Planning Basis

DRAFT

**Proprietary**



- Propose aligning 2015 Corporate Planning basis with EO for EU ETS @ $60/T CO2e in 2030

- For locations covered by the EU or NZ ETS, include in project and operational economics: $10/T CO2e for 2014-18, then rising linearly to $60/T in 2030

- For Australia, include: $24/T CO2e in 2014 and $25/T in 2015, then falling to EU ETS price in 2016

- For California, include: $12/T CO2e in 2014, rising with floor price escalation (5%/yr) through 2018, then merging with EU / NZ ETS

- For OECD areas not covered by the EU, NZ, AU, or CA programs, include: EU / NZ pricing basis for CO2 and Methane beginning in 2018, or local specifics if known to differ from EU price basis

- For non-OECD areas, do not include a GHG cost/credit in base economics; include a sensitivity case where there is a material possibility of domestic GHG regulation (e.g. Kazakhstan, China)

- Identify where GHG costs or credits are material to decision economics

- Identify where GHG emissions are material to total corporate emissions





# GHG Emissions Planning Basis

**GHG Planning Basis**

- Propose aligning 2015 Corporate Planning basis with EO for EU ETS @ $60/T CO2e in 2030

- For locations covered by the EU or NZ ETS, include in project and operational economics: $10/T CO2e for 2014-18, then rising linearly to $60/T in 2030

- For Australia, include: $24/T CO2e in 2014 and $25/T in 2015, then falling to EU ETS price in 2016

- For California, include: $12/T CO2e in 2014, rising with floor price escalation (5%/yr) through 2018, then merging with EU / NZ ETS

- For OECD areas not covered by the EU, NZ, AU, or CA programs, include: EU / NZ pricing basis for CO2 and Methane beginning in 2018, or local specifics if known to differ from EU price basis

- For non-OECD areas, do not include a GHG cost/credit in base economics; include a sensitivity case where there is a material possibility of domestic GHG regulation (e.g. Kazakhstan, China)

- Identify where GHG costs or credits are material to decision economics

- Identify where GHG emissions are material to total corporate emissions

**ExonMobil**

- Over the past several years, the Corporate Plan and Energy Outlook GHG emissions costs basis have been disconnected (CP $40/T and EO $60/T in 2030). The likely rational for this was to provide a conservative CP basis for evaluating energy conservation / emissions reductions projects. We propose to bring these prices together in 2014 for the following reasons:
  1. While using a lower cost basis in the CP provides a conservative view for evaluating energy conservation / emissions reduction investments, it provides an non-conservative view for evaluating capacity growth investments that involve GHG emission creation (combustion / venting / flaring etc.)
  2. In recent reports released by EM ("Energy and Climate" and "Energy and Carbon – Managing the risk") we have implied that we use the EO basis for proxy cost of carbon when evaluating investments.

- The direction and slope of the EU/NZ ETS line is driven by reaching $80/T in 2040. This is our outlook price for CCS on new coal fired power plants.

- EU ETS outlook pricing basis remains flat through 2018, then begins to increasing in 2019, reflecting a decision at the Conference of Parties meeting in Paris (COP 21). At this meeting, binding GHG reduction commitments should be made by member nations for implementation in 2020, consistent with 2011 COP 17 Durban Platform.

- Australia outlook reflects current regulation where as Cap & Trade program transitions from effective fixed price to market based, versus discussed regulatory repeal

- California outlook reflects credit pricing 10% above regulated floor price, consistent with demonstrated market performance (January 2013 – current). The market is currently over supplied with allowances and is expected to remain oversupplied for the next several year. The over supply was mainly driven by reduced power consumption as a result of the economic downturn.

- In 2013 we showed OECD areas adopting regulation and linking with the EU ETS in 2016. Due to lack of regulatory activity, we have shifted this start date to 2019. We are also requesting that methane emissions be included as well as CO2.

- For non-OECD we are not including GHG cost or credits in base economics. We are however requesting that a sensitivity case be included where there is a material possibility of domestic GHG regulation (e.g. Kazakhstan, China). We are also requesting that any material options to reduce GHG emissions that could be attractive at 75% of EU-ETS price basis which might be captured through international offsets: Likely long term mechanism to tie programs together, despite recent CDM market collapse

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM
INDEX NO. 451962/2016
NYSCEF DOC. NO. 175
RECEIVED NYSCEF: 06/02/2017

# Exhibit 6

**From:** Powell, Guy A
**Sent:** Thursday, October 30, 2014 5:01 PM
**To:** Iwanika, Jason D
**CC:** Luckasavitch, Richard J; Fisk, Norma; Weppler, Jim; Cornish, Lucie M; Dunn, Edward J
**Subject:** RE: PROP:RE: Seeking Guidance for GHG Treatment in DevPlanning Economics/Opportunities

Jason – Please see the responses below.  It is probably worth a quick chat to talk through the cogen economics.  In general your assessment is correct in that cogen should receive a "credit" vs. the alternative power source, but it is a firm economic impact vs. a social impact.

Guy A. Powell
Exxon Mobil Corporation
Corporate Greenhouse Gas Manager
5959 Las Colinas Blvd., Room 3322
Irving, TX  75039
(972) 444-1811

---

**From:** Iwanika, Jason D
**Sent:** Thursday, October 30, 2014 11:38 AM
**To:** Powell, Guy A
**Cc:** Luckasavitch, Richard J; Fisk, Norma; Weppler, Jim; Cornish, Lucie M; Dunn, Edward J
**Subject:** FW: PROP:RE: Seeking Guidance for GHG Treatment in DevPlanning Economics/Opportunities

Guy, I'm contacting you in regards to your role in GHG emissions and Corporate Strategic Planning.
Please see the dialogue below between myself and Jim Weppler (or EMDC-DevPlanning Economic STP).


In summary, I'm looking for clarity on:
1. Application to Heavy Oil Projects in Western Canada.  Looks like guidance is to follow new EU GHG costs.  Please confirm – That is correct. Beginning in 2020, the price is $24.30/T, then increases to $100/T by 2050.
2. The GHG update was released under Corporate Plan (P&B); what is the direction for use go-forward with Financial (funding) decisions?  GHG costs / credits should be included in project economics.  If these costs / credits look like they will be material to the funding decisions, we should have a more in depth discussion.
3. What is the guidance on evaluating GHG costs related to power projects (specifically Cogen).  In Alberta, COGEN displaces coal generation ... thus in effect being a GHG offset to the province (social impact). – Let talk through this one.

Thanks,



**Jason Iwanika**
**Development Planning Supervisor**
Oil Sands Development & Research, Imperial
Quarry Park  |  W4C.196
jason.d.iwanika@exxonmobil.com   **P** 587.476.2347

---

**From:** Weppler, Jim
**Sent:** Thursday, October 30, 2014 8:21 AM
**To:** Iwanika, Jason D
**Cc:** Griffith, Michael G; Sullivan, Michael B; Allain, Gwenael P
**Subject:** PROP:RE: Seeking Guidance for GHG Treatment in DevPlanning Economics/Opportunities

See my responses below.

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)           EMC 000556782

The much higher CO2 unit pricing for the 2014 plan is directly out of the 2014 Energy Outlook which reads **(my bolding/underlining).**

*"Today there are some policies in effect that limit GHG growth, and we anticipate **stronger policies** developing over time. OECD nations will continue to lead the way in adopting these policies, with developing nations gradually following, led by China.*

*While policies related to carbon remain uncertain, for our Outlook we use a cost of carbon as a proxy to model a wide variety of potential policies that might be adopted by governments to help stem GHG emissions. For example, in the OECD nations, **we expect costs to rise to about $80 per ton in 2040.** The developing world will have a range of policy costs with the most wealthy ones reaching about $30/ton.*

*Naturally, as we go forward, the exact nature and the pace of GHG policy initiatives will likely be affected by their impact on the economy, economic competitiveness, energy security and the ability of individuals to pay related-costs."*

I suspect the change is related to EM's enhanced approach rolled out earlier this year to address GHG risks in response to shareholder increasing queries and concerns (but I might be wrong).

**Jim Weppler**
OML 133 Select Stage Manager
Development Planning

**Mobil Producing Nigeria**
Mobil House, 1 Lekki Expressway
Lagos, Nigeria
234-(0)1-2801100 ext. 22144  Tel
713-431-8500 ext. 22144  Tel (U.S)
234-(0)817 206 7656  Mobile

---

**From:** Iwanika, Jason D
**Sent:** Tuesday, October 28, 2014 2:44 PM
**To:** Weppler, Jim; Griffith, Michael G
**Cc:** Cornish, Lucie M
**Subject:** Seeking Guidance for GHG Treatment in DevPlanning Economics/Opportunities

Jim/Mike, good seeing you both at the DevPlanning offsite.
I have a request for guidance/clarity on GHG treatment for DevPlanning economics supporting P&B and funding steps.

If you feel it is easier to discuss via phone-call, please let me know and I'll set up a telecom.
Note, I have talked to a few DevPlanning supervisors on this topic, and received varying advice/input........, seeking both your guidance as STPs.

**Background**

Recently, our team in Calgary (post P&B submission) was notified (by EMPC, current model owners of our Insitu Thermal Economic Model and Kearl Economic Model) of changes to the GHG guidance provided per CP14 Dataguide Appendices: EMDC Planning & Budget/Reference Documents/Instructions and Guidelines.  (note, pages 31&32 in the Appendices, directing Alberta to follow EU '14 Plan)



Looking into our EMDC Guidelines (<u>EMDC Economics Evaluation Guidelines</u>), guidance remains (in most current version online) to continue to estimate Carbon and Greenhouse Gas (GHG) Emission Costs based on ExxonMobil 2008 Corporate Guidance (section 3.2.3), which follows the ~40$/tonne CO2 long-term cost basis.



### Request/Questions:

1. Can you please confirm what the standard practice is for EMDC DevPlanning, for both Planning Basis (CP14) and forward Funding Actions for Upstream N.America opportunities?

    a. We are looking for clarity on approach to remain consistent with the treatment across our DevPlanning portfolio.  The intent of the Economic Evaluation Guidelines is to use prevailing Corporate Planning CO2 unit cost basis.  Over the past few years, the annual CSP guidance had remained on the order of the 2008 guidance of reaching $40/te (real) by 2030, so we didn't see a big need to change our Eco Guidelines.  But as you have highlighted, there has now been a huge change in the 2014 Corporate outlook (to $60/te in 2030, then to $80/te in 2040) that was rolled out in June 2014 for the 2014 P&B (even the May 2014 draft Corporate guidance still reflected the old $40/te level used through the 2013 P&B, though it indicated a change was coming out in June).

2. What guidance is given post 2030 (old basis) and post 2040 (EU) basis?  Continue to escalate?  Or keep flat at 40 $/tonne ; 80$/tonne?  We recommend not increasing the real price beyond the published guidance (e.g. staying at $80/te real beyond 2040), since there is no guidance that the projected real trend will continue.  And these are real prices, so we still recommend to use the Corporate Plan CPI inflation (roughly the 2.5% / yr we see in the nominal oil price forecasts)

3. What guidance is given for evaluating Power (Cogen) Opportunities; do these 'social' projects take the brunt of the full GHG impact?  I don't know, but it is a good question.  The 2014 Dataguide suggests " Questions related to GHG emissions should be referred to Guy Powell (972-444-1811) in Corporate Strategic Planning (CSP) - Environmental Policy and Planning (EPP)."  So I recommend giving him a call to discuss.

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)        EMC 000556784

**Jason Iwanika**
**Development Planning Supervisor**
Oil Sands Development & Research, Imperial
Quarry Park | W4C.196
jason.d.iwanika@exxonmobil.com   **P** 587.476.2347

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)          EMC 000556785

# Exhibit 7

Case 3:16-cv-03111-K Document 36-1 Filed 07/26/17 Page 89 of 553 PageID 516

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064

TELEPHONE (212) 373-3000

LLOYD K. GARRISON (1946-1991)
RANDOLPH E. PAUL (1946-1956)
SIMON H. RIFKIND (1950-1995)
LOUIS S. WEISS (1927-1950)
JOHN F. WHARTON (1927-1977)

WRITER'S DIRECT DIAL NUMBER

212-373-3869

WRITER'S DIRECT FACSIMILE

212-492-0868

WRITER'S DIRECT E-MAIL ADDRESS

dtoal@paulweiss.com

February 11, 2017

*Via Email*

John Oleske, Esq.
Senior Enforcement Counsel
Office of the Attorney General
State of New York
120 Broadway, 26th Floor
New York, NY 10271

UNIT 3601, OFFICE TOWER A, BEIJING FORTUNE PLAZA
NO. 7 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT
BEIJING 100020
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300

12TH FLOOR, HONG KONG CLUB BUILDING
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, U.K.
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

MATTHEW W. ABBOTT
ALLAN J. ARFFA
ROBERT A. ATKINS
DAVID J. BALL
SCOTT A. BARSHAY
JOHN F. BAUGHMAN
LYNN B. BAYARD
CRAIG A. BENSON
MITCHELL L. BERG
MARK S. BERGMAN
DAVID M. BERNICK
JOSEPH J. BIAL
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
ANGELO BONVINO
JAMES L. BROCHIN
DAVID W. BROWN
SUSANNA M. BUERGEL
PATRICK S. CAMPBELL*
JESSICA S. CAREY
JEANETTE K. CHAN
GEOFFREY R. CHEPIGA
ELLEN N. CHING
WILLIAM A. CLAREMAN
LEWIS R. CLAYTON
JAY COHEN
KELLEY A. CORNISH
CHRISTOPHER J. CUMMINGS
CHARLES E. DAVIDOW
THOMAS V. DE LA BASTIDE III
ARIEL J. DECKELBAUM
ALICE BELISLE EATON
ANDREW J. EHRLICH
GREGORY A. EZRING
LESLIE GORDON FAGEN
ROSS A. FIELDSTON
ANDREW C. FINCH
BRAD J. FINKELSTEIN
BRIAN P. FINNEGAN
ROBERTO FINZI
PETER E. FISCH
ROBERT C. FLEDER
MARTIN FLUMENBAUM
ANDREW J. FOLEY
ANDREW J. FORMAN*
HARRIS B. FREIDUS
MANUEL S. FREY
ANDREW L. GAINES
KENNETH A. GALLO
MICHAEL E. GERTZMAN
ADAM M. GIVERTZ
SALVATORE GOGLIORMELLA
ROBERT D. GOLDBAUM
NEIL GOLDMAN
ROBERTO J. GONZALEZ*
CATHERINE L. GOODALL
ERIC GOODISON
CHARLES H. GOOGE, JR.
ANDREW G. GORDON
UDI GROFMAN
NICHOLAS GROOMBRIDGE
BRUCE A. GUTENPLAN
ALAN S. HALPERIN
JUSTIN G. HAMILL
CLAUDIA HAMMERMAN
BRIAN S. HERMANN
MICHELE HIRSHMAN
MICHAEL S. HONG
DAVID S. HUNTINGTON
AMRAN HUSSEIN
LORETTA A. IPPOLITO
JAREN JANGHORBANI
BRIAN M. JANSON
MEREDITH J. KANE

BRAD S. KARP
PATRICK N. KARSINTZ
JOHN C. KENNEDY
BRIAN KIM
DAVID M. KLEIN
ALAN W. KORNBERG
DANIEL J. KRAMER
DAVID K. LAKHDHIR
STEPHEN P. LAMB*
JOHN E. LANGE
GREGORY F. LAUFER
BRIAN C. LAVIN
DANIEL J. LEFFELL
XIAOYU GREG LIU
JEFFREY D. MARELL
MARCO V. MASOTTI
EDWIN S. MAYNARD
DAVID W. MAYO
ELIZABETH R. McCOLM
MARK F. MENDELSOHN
CLAUDINE MEREDITH-GOUJON
WILLIAM B. MICHAEL
JUDIE NG SHORTELL*
CATHERINE NYARADY
JANE B. O'BRIEN
ALEX YOUNG K. OH
BRAD R. OKUN
KELLEY D. PARKER
VALERIE E. RADWANER
CARL L. REISNER
LORIN L. REISNER
WALTER G. RICCIARDI
WALTER RIEMAN
RICHARD A. ROSEN
ANDREW N. ROSENBERG
JACQUELINE P. RUBIN
CHARLES F. "RICK" RULE*
RAPHAEL M. RUSSO
ELIZABETH M. SACKSTEDER
JEFFREY D. SAFERSTEIN
JEFFREY B. SAMUELS
DALE M. SARRO
TERRY E. SCHIMEK
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JOHN M. SCOTT
STEPHEN J. SHIMSHAK
DAVID R. SICULAR
MOSES SILVERMAN
STEVEN SIMKIN
JOSEPH J. SIMONS
AUDRA J. SOLOWAY
SCOTT M. SONTAG
TARUN M. STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
RICHARD C. TARLOWE
MONICA K. THURMOND
DANIEL J. TOAL
LIZA M. VELAZQUEZ
LAWRENCE G. WEE
THEODORE V. WELLS, JR.
STEVEN J. WILLIAMS
LAWRENCE I. WITDORCHIC
MARK B. WLAZLO
JULIA MASON WOOD
JENNIFER H. WU
BETTY YAP*
JORDAN E. YARETT
KAYE N. YOSHINO
TONG YU
TRACEY A. ZACCONE
TAURIE M. ZEITZER
T. ROBERT ZOCHOWSKI, JR.

*NOT ADMITTED TO THE NEW YORK BAR

Re:     In the Matter of the Application of the People of the State of New York,
        by Eric T. Schneiderman, Index No. 451962/2016.

Dear John:

We write in response to your letter of February 6, 2017.

*First*, contrary to your suggestion, Justice Ostrager has never held or even suggested that gate review packages, EMCAPS manuals, and P&B Economic Guidelines "are relevant and responsive" to the November 4, 2015 subpoena issued by your office. In fact, at the January 9, 2017 hearing, when your office moved to compel the production of these specific documents, Justice Ostrager expressly denied the motion. He clarified that applying a set of supplemental search terms to the previously agreed upon and supplemental custodians identified by the NYAG "could *not possibly not yield* every document that [you] could possibly be interested in." (Jan. 9, 2017 Hr'g Tr. at 12:26–13:2-3 (emphasis added).) He went so far as to repeatedly underscore that ExxonMobil's discovery obligation was limited to "produc[ing] the documents from the application of the search terms to the custodians you've identified and *that should be the end of this*." (*Id.* at 8:26–9:4 (emphasis added); *accord, e.g.*, 14:12-14.) By February 15, 2017, ExxonMobil will be in full compliance with this order. And, at that point, the NYAG's office will possess "all the documents [that it] could possibly need for th[is] investigation." (*Id.* at 14:22-23) Whatever gate review packages, EMCAPS manuals, and P&B

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM INDEX NO. 451962/2016

NYSCEF DOC. NO. 176                                                    RECEIVED NYSCEF: 06/02/2017

John Oleske, Esq.                                                                              2

Economic Guidelines have been produced at that point—the result of a massive and extraordinarily burdensome search by ExxonMobil—are those to which the NYAG is entitled.

    *Second*, the NYAG's office contends that it does not possess documents that "represent the actual incorporation of a proxy cost of carbon or any other greenhouse gas into a project economics decision." Not so. Contained within the documents produced to date are (a) ExxonMobil Dataguide Appendices, *i.e.*, internal policy documents that specify precisely how ExxonMobil applies its proxy cost of carbon in every jurisdiction worldwide through the year 2040 (*see, e.g.*, EMC 002571948), and (b) numerous documents that reflect the actual application of the precise figures used in the Dataguide Appendices to Company-sponsored projects (*see, e.g.*, EMC 000137097). More fundamentally, the thousands of "proxy cost" documents produced to date show that the information contained in ExxonMobil's internal documents is entirely consistent with its public statements—including, for example, ExxonMobil's 2014 *Outlook for Energy*. No further documentation showing how the Company applies a proxy cost of carbon is required. Indeed, the NYAG would have no reasonable basis for believing that ExxonMobil has failed to apply its proxy cost of carbon in precisely the manner described in its public statements and its internal policies, let alone that any supposed failure affected any New York consumer or investor. The NYAG is not entitled to demand "every document," spreadsheet, or line item reflecting an application of the proxy cost of carbon across the entire company, particularly when his request reflects nothing more than idle curiosity or groundless suspicion.[1] (Dec. 9, 2016 Hr'g Tr. at 23:20-22.) This is just another example of the NYAG's office "throwing darts against the wall," (*id.* at 23:24-25),[2] a practice for which it has already been admonished.

    *Third*, your letter inaccurately claims both that Justice Ostrager required ExxonMobil to search shared locations for responsive documents, and that ExxonMobil nonetheless has refused to do so. To the contrary, in advance of the January 9, 2017 hearing, ExxonMobil voluntarily agreed to search more than half of the twenty shared locations requested by the NYAG. (Dec. 16, 2016 letter from Daniel J. Toal to John Oleske 3–4.) As your colleague Ms. Sheth acknowledged at the hearing, that left just three shared sites in dispute. (Jan. 9, 2017 Hr'g Tr. at 4:15-20.) Although ExxonMobil was not ordered to produce documents from any of them, it nonetheless agreed after the hearing to produce responsive documents from all remaining shared locations requested by the NYAG, thereby substantially exceeding its discovery obligations. (Jan. 27, 2017 email from Daniel J. Toal to Katherine Milgram.) And in your effort to argue that the NYAG somehow has been denied "project-specific documents," you mistakenly assert that ExxonMobil limited its search for responsive documents "exclusively" to "e-mail inboxes." Nothing could be further from the truth. As you are well aware, ExxonMobil

---

[1] *See, e.g.*, *AAA Vascular Care, PLLC* v. *Integrated Healthcare Mgmt., LLC*, 99 A.D.3d 642, 643 (2d Dep't 2012) (affirming protective order "on grounds that those requests were redundant"); *Mabry* v. *Coughlin*, 196 A.D.2d 931, 931 (3d Dep't 1993) (affirming denial of requests to produce "irrelevant or redundant" documents); *Great Am. Ins. Co.* v. *Veteran's Support Org.*, 2015 WL 10633939, at *6 (S.D. Fla. Aug. 24, 2015) (party need not produce *all* documents "generated, maintained, or received" relating to a specific policy).

[2] "Discovery should not be permitted to continue indefinitely merely because a requesting party can point to undiscovered documents . . . ." Sedona Conf., *The Sedona Principles (Second Edition): Best Practices Recommendations & Principles for Addressing Electronic Document Production* 38 (2007).

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

NYSCEF DOC. NO. 176

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 91 of 553   PageID 518

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

John Oleske, Esq.                                                                                  3

has collected and produced responsive documents from not only email inboxes, but also personal hard drives, network hard drives, and multiple shared databases and locations, including numerous "TeamSites" and "I: / Drives." Indeed, this is well understood by your office since, at your request, we regularly provide you with "Data Source" lists specifying the locations searched for each custodian. These searches have resulted in the production of a large number of project-specific documents that are responsive to the NYAG's subpoena. As Justice Ostrager has repeatedly recognized, the NYAG is entitled to no more.

*Fourth*, ExxonMobil's conduct and record of compliance, including throughout the recent meet-and-confer process, has been entirely reasonable, and the law requires nothing more. To date, and in accordance with the NYAG's investigative priorities, ExxonMobil has collected and produced documents from 121 custodians and twelve shared locations (untethered to specific custodians), running the exceedingly broad search terms agreed to on December 6, 2015, and the even broader and, in our view, "unreasonable" supplemental search strings that we agreed to apply on January 17, 2017. (Jan. 9, 2017 Hr'g Tr. at 13:10.) As of January 31, 2017, ExxonMobil has produced over 2.5 million pages of documents from the custodians and shared locations most central to the NYAG's investigation. The custodial list reaches into almost every corner of the Company and includes the scientists who conducted ExxonMobil's climate change research, employees who developed ExxonMobil's principal communications regarding the relevance of climate change, individuals involved in accounting and valuation, personnel engaged in the planning and execution of oil and gas development projects, senior management, and even ExxonMobil's current and former Chief Executive Officers. This was a list created with the NYAG's knowledge, participation, and consent. Notably, at no point did ExxonMobil refuse to add a single custodian requested by the NYAG, even agreeing to substitute one of the nine additional custodians requested by your office with yet another custodian. This hardly reflects ExxonMobil's refusal to meaningfully participate in the meet-and-confer process. To the contrary, the record confirms that ExxonMobil has repeatedly worked to accommodate requests from the NYAG's office, often notwithstanding ExxonMobil's conviction that the NYAG had no entitlement to the information sought.

Now the NYAG demands that ExxonMobil identify specific documents within its production to ease the office's burden of sifting through the numerous "false positives" that it requested. (Jan. 9, 2017 Hr'g Tr. at 18:10-18.) We plainly have no obligation to do so. But, in any event, your letter fails to note that ExxonMobil offered to review any search terms used by your office to identify the gate review packages that you claim to seek, going so far as to offer to provide suggestions that might help you locate others. You have refused to respond to this proposal, yet, remarkably, condemn ExxonMobil's conduct as "unproductive." We respectfully disagree. Compliance with the NYAG's subpoena does not require ExxonMobil to provide support services. It is not incumbent on us to now search through the massive volume of documents produced for those that were truly of interest to the NYAG all along. Nor must we respond to the NYAG's informal questions about the locations of documents to which he is not entitled.

ExxonMobil has made repeated concessions in an effort to accommodate the NYAG's improper investigative demands. Particularly in light of this record, we disagree with your claim that anything more is required of the Company.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

John Oleske, Esq.                                                              4

Sincerely,

*/s/ Daniel J. Toal*
Daniel J. Toal

cc:    Manisha Sheth, Esq.    Patrick Conlon, Esq.
        Katherine Milgram, Esq    Theodore V. Wells, Jr., Esq.
        Mandy DeRoche, Esq.    Michele Hirshman, Esq.

# Exhibit 8

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064
TELEPHONE (212) 373-3000

LLOYD K. GARRISON  (1946-1991)
RANDOLPH E. PAUL  (1946-1956)
SIMON H. RIFKIND  (1950-1995)
LOUIS S. WEISS  (1927-1950)
JOHN F. WHARTON  (1927-1977)

UNIT 3601, OFFICE TOWER A, BEIJING FORTUNE PLAZA
NO. 7 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT
BEIJING 100020
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300

12TH FLOOR, HONG KONG CLUB BUILDING
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, U.K.
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

MATTHEW W. ABBOTT
ALLAN J. ARFFA
ROBERT A. ATKINS
DAVID J. BALL
SCOTT A. BARSHAY
JOHN F. BAUGHMAN
LYNN B. BAYARD
DANIEL J. BELLER
CRAIG A. BENSON
MITCHELL L. BERG
MARK S. BERGMAN
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
ANGELO BONVINO
JAMES L. BROCHIN
RICHARD J. BRONSTEIN
DAVID W. BROWN
SUSANNA M. BUERGEL
PATRICK S. CAMPBELL*
JESSICA S. CAREY
JEANETTE K. CHAN
GEOFFREY R. CHEPIGA
ELLEN N. CHING
WILLIAM A. CLAREMAN
LEWIS R. CLAYTON
JAY COHEN
KELLEY A. CORNISH
CHRISTOPHER J. CUMMINGS
CHARLES E. DAVIDOW
THOMAS V. DE LA BASTIDE III
ARIEL J. DECKELBAUM
ALICE BELISLE EATON
ANDREW J. EHRLICH
GREGORY A. EZRING
LESLIE GORDON FAGEN
MARC FALCONE
ROSS A. FIELDSTON
ANDREW C. FINCH
BRAD J. FINKELSTEIN
BRIAN P. FINNEGAN
ROBERTO FINZI
PETER E. FISCH
ROBERT C. FLEDER
MARTIN FLUMENBAUM
ANDREW J. FOLEY
ANDREW J. FORMAN*
HARRIS R. FREIDUS
MANUEL S. FREY
ANDREW L. GAINES
KENNETH A. GALLO
MICHAEL E. GERTZMAN
ADAM M. GIVERTZ
SALVATORE GOGLIORMELLA
ROBERT D. GOLDBAUM
NEIL GOLDMAN
ROBERTO J. GONZALEZ*
CATHERINE L. GOODALL
ERIC GOODISON
CHARLES H. GOOGE, JR.
ANDREW G. GORDON
UDI GROFMAN
NICHOLAS GROOMBRIDGE
BRUCE A. GUTENPLAN
GAINES GWATHMEY, III
ALAN S. HALPERIN
JUSTIN G. HAMILL
CLAUDIA HAMMERMAN
BRIAN S. HERMANN
MICHELE HIRSHMAN
MICHAEL S. HONG
DAVID S. HUNTINGTON
AMRAN HUSSEIN
LORETTA A. IPPOLITO

JACOB A. ADLERSTEIN
MEREDITH J. KANE
JONATHAN S. KANTER
ROBERTA A. KAPLAN
BRAD S. KARP
PATRICK N. KARSNITZ
JOHN C. KENNEDY
BRIAN KIM
ALAN W. KORNBERG
DANIEL J. KRAMER
DAVID K. LAKHDHIR
STEPHEN P. LAMB*
JOHN E. LANGE
GREGORY F. LAUFER
DANIEL J. LEFFELL
XIAOYU GREG LIU
JEFFREY D. MARELL
MARCO V. MASOTTI
EDWIN S. MAYNARD
DAVID W. MAYO
ELIZABETH R. MCCOLM
MARK F. MENDELSOHN
CLAUDINE MEREDITH-GOUJON
WILLIAM B. MICHAEL
TOBY S. MYERSON
JUDIE NG SHORTELL*
CATHERINE NYARADY
JANE B. O'BRIEN
ALEX YOUNG K. OH
BRAD R. OKUN
KELLEY D. PARKER
VALERIE E. RADWANER
CARL L. REISNER
LORIN L. REISNER
WALTER G. RICCIARDI
WALTER RIEMAN
RICHARD A. ROSEN
ANDREW N. ROSENBERG
JACQUELINE P. RUBIN
CHARLES F. "RICK" RULE*
RAPHAEL M. RUSSO
ELIZABETH M. SACKSTEDER
JEFFREY D. SAFERSTEIN
JEFFREY B. SAMUELS
DALE M. SARRO
TERRY E. SCHIMEK
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JOHN M. SCOTT
STEPHEN J. SHIMSHAK
DAVID R. SICULAR
MOSES SILVERMAN
STEVEN SIMKIN
JOSEPH J. SIMONS
AUDRA J. SOLOWAY
SCOTT M. SONTAG
TARUN M. STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
ROBYN F. TARNOFSKY
DANIEL J. TOAL
LIZA M. VELAZQUEZ
LAWRENCE G. WEE
THEODORE V. WELLS, JR.
STEVEN J. WILLIAMS
LAWRENCE I. WITDORCHIC
MARK B. WLAZLO
JULIA MASON WOOD
JENNIFER H. WU
BETTY YAP*
JORDAN E. YARETT
KAYE N. YOSHINO
TONG YU
TRACEY A. ZACCONE
TAURIE M. ZEITZER
T. ROBERT ZOCHOWSKI, JR.

*NOT ADMITTED TO THE NEW YORK BAR

WRITER'S DIRECT DIAL NUMBER

212-373-3089

WRITER'S DIRECT FACSIMILE

212-492-0089

WRITER'S DIRECT E-MAIL ADDRESS

twells@paulweiss.com

March 16, 2017

*By NYCSEF*

The Honorable Barry R. Ostrager
Supreme Court of the State of New York
Commercial Division
60 Centre Street, Room 629
New York, NY 10007

Re:    *In the Matter of the Application of the People of the State of New York, by Eric T. Schneiderman, Index No. 451962/2016.*

Dear Justice Ostrager:

On March 13, 2017, the New York Attorney General filed a letter with this Court regarding former CEO Rex Tillerson's use of multiple ExxonMobil email accounts. That letter marked the first time ExxonMobil learned of the Attorney General's concern about Mr. Tillerson's email accounts. The fact that Mr. Tillerson used two email accounts was readily apparent from documents produced in this matter over the past year. While there is nothing improper about using more than one account to organize and prioritize emails, it is entirely improper for the Attorney General to raise this issue for the first time in a letter filed publicly with the Court. Not only did that letter violate this Court's requirement that parties attempt to resolve disputes before bringing them to the Court, it has unfairly prejudiced ExxonMobil in the eyes of the public based on sensational coverage in the press. A simple question about subpoena compliance should not have been handled this way.

*The "Wayne Tracker" Email Account*

At times during his tenure as CEO, Mr. Tillerson used two email accounts on the ExxonMobil platform: a primary account identified by his first and last name and a secondary account for priority emails identified by the name "Wayne Tracker." When complying with the subpoena issued by the New York Attorney General (the "NYAG"), ExxonMobil searched the

Justice Ostrager                                                                                    2

Wayne Tracker email account, along with Mr. Tillerson's primary account. As fully disclosed to the NYAG in prior communications, ExxonMobil's collection and production efforts have focused on specific *custodians* (*i.e.*, employees and officers of the company), not specific *email accounts*. In keeping with that approach, Mr. Tillerson was designated a custodian, which means that the ExxonMobil email accounts he used were within the scope of ExxonMobil's search for responsive documents. The search of documents from Mr. Tillerson thus reached not only his primary ExxonMobil email account, but also the Wayne Tracker account.

        None of this should come as a surprise to the NYAG. ExxonMobil produced emails sent to the Wayne Tracker account for the first time on February 20, 2016, and it has continued to do so over the last year. Mr. Tillerson's use of the Wayne Tracker account is evident from the face of a number of those emails, several of which were transparently addressed to or signed by "Rex" or "RWT" in the body of the email.

        Notwithstanding insinuations to the contrary, Mr. Tillerson's use of the Wayne Tracker account was entirely proper. It allowed a limited group of senior executives to send time-sensitive messages to Mr. Tillerson that received priority over the normal daily traffic that crossed the desk of a busy CEO. The purpose was efficiency, not secrecy. Were it otherwise, emails to the Wayne Tracker account would have scrupulously avoided any reference to Mr. Tillerson as the intended recipient. Instead, numerous emails to the Wayne Tracker account are expressly addressed to Mr. Tillerson or contain his initials in the body of the email. And, while some of those emails pertain to climate change, the Wayne Tracker account was not established for the purpose of discussing that or any other particular topic. It was a general purpose means of sending priority communications to the CEO of the company.

        In light of the questions raised by the Attorney General in his March 13 letter, ExxonMobil reexamined the Wayne Tracker account in connection with the NYAG's subpoena. ExxonMobil confirmed that it searched for potentially responsive documents from both Mr. Tillerson's primary account and the Wayne Tracker account in January 2016, approximately two months after the NYAG issued his subpoena. Those searches were conducted against the emails that were in the accounts at that point in time. In addition, ExxonMobil confirmed that it also searched both accounts again after the parties agreed to a supplemental set of search terms in January 2017.

        In the course of this process, ExxonMobil confirmed that it placed a litigation hold on Mr. Tillerson promptly after receipt of the NYAG subpoena. The legal hold process at ExxonMobil, which was designed and implemented prior to this subpoena, engages a technology that protects emails in accounts from automated processes for persons subject to legal hold. ExxonMobil determined, however, that despite the company's intent to preserve the relevant emails in both of Mr. Tillerson's accounts, due to the manner in which email accounts had been configured years earlier and how they interact with the system, these technological processes did not automatically extend to the secondary email account. ExxonMobil is in the process of determining whether this preexisting technology process design had any impact on the production process. A number of factors suggest that any possible impact will not be significant. First, ExxonMobil searched the Wayne Tracker account within two months of receiving the

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM
NYSCEF DOC. NO. 177
INDEX NO. 451962/2016
RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K  Document 36-1  Filed 07/26/17  Page 96 of 553  PageID 523
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Justice Ostrager                                                                                                 3

NYAG's subpoena.  Second, many of the emails sent to or from the Wayne Tracker account included Mr. Tillerson's primary account as a recipient, which means email would appear in both accounts.  Third, a limited number of senior executives used the Wayne Tracker address to communicate with Mr. Tillerson, and many of them—including, as relevant here, those who work on matters related to climate change—are on litigation hold.  As ExxonMobil's evaluation of this issue continues, we will provide the Court and the NYAG with further information.

Obtaining publicity, not information, appears to have been the real goal of the NYAG's March 13 letter.  Under this Court's rules, discovery disputes such as this one should be resolved bilaterally, between the parties, prior to being raised with the Court.  But the Attorney General did not do so, raising his concerns about the Wayne Tracker email account for the first time in a public filing received by the Court, ExxonMobil, and the press at the same time.  Such an approach does not serve the productive resolution of discovery disputes, but it does serve the NYAG's well-established preference to litigate his case in the press rather than court.  That objective also explains the NYAG's decision to portray an innocuous business practice unfairly and inaccurately as a sinister effort to withhold information.

The NYAG knows better.  To date, ExxonMobil has produced more than 2.4 million pages of documents in connection with the NYAG's climate-change investigation and has worked diligently to respond to the NYAG's extraordinarily broad and, in our view, often unreasonable and improper, investigative demands.  So far the NYAG has found no evidence of the far-flung campaign to mislead the public that he routinely claims has been going on for decades.  The NYAG now suggests that a single email account might house the evidence that his 18-month investigation has yet to uncover.  The suggestion is preposterous.  If the Wayne Tracker account was used to communicate with other ExxonMobil executives about climate change, those emails would reside in the accounts of the other executives.  But the NYAG nowhere claims that the emails he has seen involving the Wayne Tracker account are of any significance whatsoever.  All that remains is false innuendo and suspicion.  Predictably, ExxonMobil received press inquiries within minutes of receiving the NYAG's letter, and advocacy groups allied with the NYAG in his campaign against the company quickly issued press releases denouncing ExxonMobil's purported misdeeds, going so far as to suggest that the Wayne Tracker account was used to conceal information about climate change.  The facts, as known to the NYAG, come nowhere near supporting such allegations.  And ultimately no amount of distortion and dissembling can distract from the NYAG's failure to develop any evidence supporting the allegations he has been pressing for the last year and a half.

**The NYAG's Other Concerns**

The NYAG raises three other challenges to ExxonMobil's production that are either frivolous, premature, or both.  None is worthy of this Court's consideration at this time.

*First*, the NYAG falsely contends that ExxonMobil "delayed and obstructed" the production of documents from its top executives.  Ltr. 1.  The record says otherwise, as ExxonMobil has worked with the NYAG to address an ever widening and ever changing scope of demands and questions about the production.  In keeping with that approach, ExxonMobil will

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 97 of 553   PageID 524

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Justice Ostrager                                                                                      4

shortly produce additional Management Committee documents to the NYAG on March 17, 2017. The NYAG should not be heard to complain about the adequacy of this production until he has at least taken the time to review it.[1]

      *Second*, the NYAG erroneously argues that 34 additional email accounts contain information that should have been produced to his office. Ltr. 2-3. The NYAG first expressed interest in these accounts a mere 24 hours before filing his March 13 letter, and this request amounts to nothing more than an impermissible attempt to expand the number of custodians beyond the limit expressly ordered by this Court. ExxonMobil is not required to produce documents from every employee within the company, and the NYAG offers no reason to believe that the identified individuals or email addresses are reasonably likely to possess unique responsive documents, as the law requires.

      *Third*, the NYAG wrongly contests ExxonMobil's public statements regarding the manner in which it incorporates a "proxy cost of carbon" into its business operations. Ltr. 3. This argument is refuted by the record. Contained within the documents produced to date are (a) ExxonMobil Dataguide Appendices, *i.e.*, internal policy documents that specify precisely how ExxonMobil applies its proxy cost of carbon in every jurisdiction worldwide through the year 2040 (*see, e.g.*, EMC 002571948), and (b) numerous documents that reflect the actual application of the precise figures used in the Dataguide Appendices to Company-sponsored projects (*see, e.g.*, EMC 000137097). More fundamentally, the thousands of "proxy cost" documents produced to date show that the information contained in ExxonMobil's internal documents is entirely consistent with its public statements—including, for example, ExxonMobil's 2014 *Outlook for Energy*.[2]

---

[1]  The NYAG's March 12, 2017 email demanded answers to five questions in just 22 hours. When ExxonMobil informed the NYAG that it would provide a response "promptly," but would not meet the NYAG's arbitrarily short deadline, instead of responding, his office filed a letter with the Court approximately two hours later.

[2]  The NYAG simply has no reasonable basis for believing that ExxonMobil has failed to apply its proxy cost of carbon in precisely the manner described in its public statements and its internal policies, let alone that any supposed failure affected any New York consumer or investor. As the NYAG is well aware, even among the companies that do utilize internal proxy costs of carbon, it is a matter of public record that the highest carbon prices used by ExxonMobil are in most cases higher than those reported by other energy companies, and among the highest reported by any company. *See, e.g.*, Carbon Disclosure Project, *Putting a Price on Risk: Carbon Pricing in the Corporate World* at 6 (Sept. 2015), *available at* https://www.oceanfdn.org/sites/default/files/CDP%20Carbon%20Pricing%20in%20the%20corporate%20world. compressed.pdf (last visited Mar. 15, 2017); *see also* Cntr. for Amer. Progress, *Proxy Carbon Pricing: A Tool for Fiscally Rational and Climate-Compatible Governance* at 7 (Apr. 2016), *available at* https://cdn.americanprogress.org/wp-content/uploads/2016/04/13143140/CarbonPricing.pdf (last visited Mar. 15, 2017). This simply underscores that the proxy cost of carbon utilized by ExxonMobil is eminently reasonable. In view of this fact, and the NYAG's acknowledgement that companies utilize a range of proxy costs for carbon, ExxonMobil is once again left to conclude that the NYAG's investigation has more to do with the identity of the subject than with any good faith theory that the Company has violated any law.

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM
INDEX NO. 451962/2016
NYSCEF DOC. NO. 177
RECEIVED NYSCEF: 06/02/2017

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Justice Ostrager                                                                          5


                                        Respectfully Submitted,

                                        /s/ Theodore V. Wells, Jr.
                                        Theodore V. Wells, Jr.


cc:    Manisha Sheth, Esq.      Mandy DeRoche, Esq.      Daniel J. Toal, Esq.
       Katherine Milgram, Esq.  Patrick Conlon, Esq.     Michele Hirshman, Esq.

# Exhibit 9



Climate Change 2015 Information Request
Exxon Mobil Corporation

## Module: Introduction

## Page: Introduction

**CC0.1**
**Introduction**
**Please give a general description and introduction to your organization.**

ExxonMobil is the world's largest publicly traded international oil and gas company. We hold an industry-leading inventory of global oil and gas resources. We are the world's largest integrated refiner and manufacturer of lube basestocks, a leading marketer of petroleum products and finished lubricants, and one of the largest chemical companies in the world. We are also a technology company, applying science and innovation to find better, safer and cleaner ways to deliver the energy the world needs.

Our Upstream business encompasses high-quality exploration opportunities across all resource types and geographies, an industry-leading resource base, a portfolio of world-class projects, and a diverse set of producing assets. We have an active exploration or production presence in 36 countries. We sell natural gas in almost all major and developing markets. Our total net oil and gas production available for sale in 2014 averaged 4.0 million oil-equivalent barrels per day.

As the largest global integrated refiner and lube basestock manufacturer, ExxonMobil has interests in 30 refineries in 17 countries. We market our fuels products to millions of customers worldwide through more than 19,000 retail service stations and four Fuels Marketing business lines—Retail, Wholesale, Aviation, and Marine. We are the world's largest manufacturer of lubricant base stocks and a market leader of high-technology and globally recognized synthetic lubricant brands, such as Mobil 1 and Mobil SHC. We are also a leading supplier of asphalt and specialty products. In 2014, refinery throughput averaged 4.5 million barrels per day and petroleum product sales were 5.9 million barrels per day.

ExxonMobil Chemical Company is one of the largest chemical companies in the world. Our product portfolio is a unique combination of commodity and specialty businesses that have been developed through proprietary technology. We are one of the largest producers of aromatics and olefins, the basic petrochemical building blocks, and polyolefins, including plastics such as polyethylene and polypropylene. Our world-scale, integrated facilities allow us to produce a diverse set of less cyclical specialty products that deliver advanced performance and value to our customers in a broad array of applications. In 2014, chemical prime product sales totaled 24.2 million metric tons.

Note: The term 'project' as used in this report does not necessarily have the same meaning as under any government payment transparency reporting rules

**CC0.2**
**Reporting Year**
**Please state the start and end date of the year for which you are reporting data.**
**The current reporting year is the latest/most recent 12-month period for which data is reported. Enter the dates of this year first.**
**We request data for more than one reporting period for some emission accounting questions. Please provide data for the three years prior to the current reporting year if you have not provided this information before, or if this is the first time you have answered a CDP information request. (This does not apply if you have been offered and selected the option of answering the shorter questionnaire). If you are going to provide additional years of data, please give the dates of those reporting periods here. Work backwards from the most recent reporting year.**
**Please enter dates in following format: day(DD)/month(MM)/year(YYYY) (i.e. 31/01/2001).**

| Enter Periods that will be disclosed |
| --- |
| Wed 01 Jan 2014 - Wed 31 Dec 2014 |

**CC0.3**
**Country list configuration**

**Please select the countries for which you will be supplying data. If you are responding to the Electric Utilities module, this selection will be carried forward to assist you in completing your response.**

| Select country |
| --- |
| Rest of world |

**CC0.4**
**Currency selection**

**Please select the currency in which you would like to submit your response. All financial information contained in the response should be in this currency.**

USD($)

**CC0.6**
**Modules**
**As part of the request for information on behalf of investors, electric utilities, companies with electric utility activities or assets, companies in the automobile or auto component manufacture sub-industries, companies in the oil and gas sub-industries, companies in the information technology and telecommunications sectors and companies in the food, beverage and tobacco industry group should complete supplementary questions in addition to the main questionnaire.**
**If you are in these sector groupings (according to the Global Industry Classification Standard (GICS), the corresponding sector modules will not appear below but will automatically appear in the navigation bar when you save this page. If you want to query your classification, please email respond@cdp.net.**
**If you have not been presented with a sector module that you consider would be appropriate for your company to answer, please select the module below. If you wish to view the questions first, please see https://www.cdp.net/en-US/Programmes/Pages/More-questionnaires.aspx.**

Further Information

## Module: Management

## Page: CC1. Governance

**CC1.1**

**Where is the highest level of direct responsibility for climate change within your organization?**

Board or individual/sub-set of the Board or other committee appointed by the Board

**CC1.1a**

**Please identify the position of the individual or name of the committee with this responsibility**

The Board of Directors is comprised of eleven independent directors and one executive director. The Board's Public Issues and Contributions Committee is responsible for the oversight of safety, health, and environmental performance, including issues associated with the risks of climate change. This committee reviews the effectiveness of the Corporation's policies, programs, and practices on safety, health and the environment, and social responsibility. The Committee hears reports relating to operating units' safety and environmental activities and also visits operating sites to observe and comment on current operating practices. All members of the Committee are independent within the meaning of the NYSE listing standards. The Committee's charter is available on the Corporate Governance section of our website. Corporate governance is managed with systems and standards for all aspects of our business. With regard to management, the Chairman of the Board and Chief Executive Officer and the members of the Management Committee are responsible for climate change matters. Specific to environmental issues including climate change, there are timely interactions with members of the Management Committee as well as updates at least annually with the ExxonMobil Board of Directors and the Public Issues and Contributions Committee. On the subject of the risks of climate change, the full ExxonMobil Board of Directors receives in depth briefings at least annually that cover updates on public policy, scientific and technical research, as well as company positions and actions in this area. In addition, the Chairman of the Board and Chief Executive Officer and members of the Management Committee are actively engaged in discussions relating to greenhouse gas emissions and the risks of climate change on an ongoing basis.

**CC1.2**

**Do you provide incentives for the management of climate change issues, including the attainment of targets?**

Yes

**CC1.2a**

**Please provide further details on the incentives provided for the management of climate change issues**

| Who is entitled to benefit from these incentives? | The type of incentives | Incentivized performance indicator | Comment |
|---|---|---|---|
| Other: Board Chairman, CEO, Management Committee, and all management, professional, and technical employees | Monetary reward | Other: See Comment | Environmental performance (including GHG emissions and energy efficiency) is assessed and recognized through the annual planning and budget process. During this process, key strategies and objectives are established for each business line for both the short and long term. Results are regularly stewarded against prior commitments. Each year the businesses and individual sites are assessed on how well they are executing the strategies outlined for their operating unit. They are assessed on the performance of the Corporation overall and each of the respective business lines for which they have responsibility, on both an absolute basis and relative to companies of comparable size and scope of business activities. Performance is assessed throughout the year during specific business reviews and other meetings that provide reports on strategy development; operating and financial results; safety, health, and environmental results, including GHG emissions and energy efficiency; business controls; and other areas pertinent to the general performance of the Company. In assessing the performance, weights are not assigned to the factors considered. Performance in environmental stewardship areas is used in our merit-driven employee development and compensation systems. |

**Further Information**

**Page: CC2. Strategy**

**CC2.1**

**Please select the option that best describes your risk management procedures with regard to climate change risks and opportunities**

Integrated into multi-disciplinary company wide risk management processes

**CC2.1a**

**Please provide further details on your risk management procedures with regard to climate change risks and opportunities**

| Frequency of monitoring | To whom are results reported? | Geographical areas considered | How far into the future are risks considered? | Comment |
|---|---|---|---|---|
| Annually | Board or individual/sub-set of the Board or committee appointed by the Board | We consider risks associated with climate change across our global operations | > 6 years | |

**CC2.1b**

**Please describe how your risk and opportunity identification processes are applied at both company and asset level**

ExxonMobil is committed to conducting business in a manner that is compatible with the environmental and economic needs of the communities in which we operate, and that protects the safety, security, and health of our employees, those involved with our operations, our customers, and the public. These commitments are documented in our Safety, Health, Environment, and Product Safety policies. These policies are put into practice through a disciplined management framework called the Operations Integrity Management System (OIMS).

ExxonMobil's OIMS Framework establishes common worldwide expectations for addressing risks inherent in our business. The term Operations Integrity (OI) is used by ExxonMobil to address all aspects of its business that can impact personnel and process safety, security, health, and environmental performance, including energy efficiency and risks from climate change.

The OIMS Framework includes 11 Elements. Each Element contains an underlying principle and a set of Expectations. The OIMS Framework also includes the characteristics of, and processes for, evaluating and implementing OI Management Systems.

Application of the OIMS Framework is required across all of ExxonMobil, with particular emphasis on design, construction and operations. Management is responsible for ensuring that management systems satisfying the Framework are in place. The scope, priority and pace of management system implementation should be consistent with the risks associated with the business.

The eleven elements of OIMS are:

1. Management, Leadership, and Accountability
2. Risk Assessment and Management
3. Facilities Design and Construction
4. Information/Documentation
5. Personnel and Training
6. Operations and Maintenance
7. Management of Change
8. Third-Party Services
9. Incident Investigation and Analysis
10. Community Awareness and Emergency Response
11. Operations Integrity Assessment and Improvement

**CC2.1c**

**How do you prioritize the risks and opportunities identified?**

ExxonMobil applies established OIMS systems and process to assess risks and opportunities, identify potential actions and prioritize the rate and pace of implementation.

**CC2.2**

**Is climate change integrated into your business strategy?**

Yes

**CC2.2a**

**Please describe the process of how climate change is integrated into your business strategy and any outcomes of this process**

Society continues to face the dual challenge of expanding energy supplies to support economic growth and improve living standards, while simultaneously addressing the societal and environmental risks posed by rising greenhouse gas (GHG) emissions and climate change. Our climate change risk management strategy includes four components: engaging on climate change policy and planning; mitigating GHG emissions in our operations; developing future technology; and developing products that reduce GHG emissions for customers.

Managing the risks of climate change requires the participation of governments, private companies, consumers and other stakeholders. We engage a variety of stakeholders — including policymakers, investors, consumers, academia, NGOs and the public — on climate change issues of direct relevance to the company to encourage sound policy solutions for addressing these risks.

ExxonMobil is committed to mitigating greenhouse gas emissions in our operations. We have a robust set of processes designed to improve efficiency, reduce emissions and contribute to effective long-term solutions to manage climate change risks. In the near term, we are working to increase energy efficiency while reducing flaring, venting and fugitive emissions in our operations. In the medium term, we are deploying proven technologies such as cogeneration and, where technically and economically feasible, carbon capture and sequestration. Longer term, we are conducting and supporting research to develop breakthrough, game-changing technologies.

ExxonMobil is conducting scientific research to discover innovative approaches to developing existing and next-generation energy sources, while at the same time developing products that can enable more efficient energy consumption. We spend approximately $1 billion per year on research and technology development and have approximately 11,000 active patents. ExxonMobil's Corporate Strategic Research (CSR) laboratory is a fundamental research institution, with approximately 150 Ph.D. scientists and engineers focused on addressing the company's long-range science needs. The laboratory's scientists are recognized as world experts and authorities in their field. Our research portfolio includes a broad array of programs, including alternative energy, CCS, biofuels, life-cycle analysis, climate science and materials science.

One of the greatest opportunities for society to reduce GHG emissions is through the use of natural gas in power generation. On a life-cycle basis, from extraction through electricity consumption, using natural gas emits 50 percent fewer GHG emissions than coal. It is also the ideal partner for intermittent renewable energy sources, such as solar or wind, as it can provide power when these renewable sources are not available. As the world moves toward a lower carbon-intensive energy mix over the coming decades, natural gas will be one of the most important fuels to enable reductions in GHG emissions. Since our merger with XTO Energy in 2010, ExxonMobil has been one of the largest natural gas producers in the world. Coupled with our leadership in the development and production of liquefied natural gas (LNG), ExxonMobil is well-positioned to meet growing demand for this clean energy source.

**CC2.2c**

**Does your company use an internal price of carbon?**

Yes

**CC2.2d**

**Please provide details and examples of how your company uses an internal price of carbon**

We update our long-term energy outlook each year — taking into account the most up-to-date demographic, economic and technological information available. This analysis serves as a foundation for our long-term business strategies and investments. We address the potential for future climate change policy, including the potential for restrictions on emissions, by estimating a proxy cost of carbon. This cost, which in some geographies may approach $80 per ton by 2040, has been included in our Outlook for several years. This approach seeks to reflect potential policies governments may employ related to the exploration, development, production, transportation or use of carbon-based fuels. We believe our view on the potential for future policy action is realistic and, by no means represents a "business as usual" case. We require all of our business lines to include, where appropriate, an estimate of GHG-related emissions costs in their economics when seeking funding for capital investments.

**CC2.3**

**Do you engage in activities that could either directly or indirectly influence public policy on climate change through any of the following? (tick all that apply)**

Direct engagement with policy makers
Trade associations
Funding research organizations

**CC2.3a**

**On what issues have you been engaging directly with policy makers?**

| Focus of legislation | Corporate Position | Details of engagement | Proposed legislative solution |
|---|---|---|---|
| | Support | | |

Climate Change Information Request CDP 2015 Information Request CDP 2015
Page 4 of 28

Case 3:16-cv-03111-K    Document 36-1    Filed 07/26/17    Page 103 of 553    PageID 530

| Focus of legislation | Corporate Position | Details of engagement | Proposed legislative solution |
|---|---|---|---|
| Other: Sound Climate Policy | | We engage with policymakers directly and through trade associations around the world to encourage sound policy solutions for addressing the risks of climate change. We also fund research organizations such as the MIT Joint Program on Global Change to enhance integrated assessment modelling of policy and climate change. Our scientists are directly involved in the IPCC reports on climate science. | Climate change presents serious risks that are worthy of cost-effective action by individuals, companies, and policymakers. Effective policy steps should promote global participation while recognizing the priorities of the developing world and limiting the consequences of differing national policies on competitiveness; maximize transparency; minimize complexity and administrative costs; provide flexibility to adjust to developments in climate science and the economic impacts of climate policies |
| Other: Clean Energy Technology | Support | In addition to our own extensive internal research and development, we sponsor research organizations that are involved in fundamental clean energy technology R&D such as Stanford's GCEP program and MIT's Carbon Sequestration Initiative. | Promote fundamental energy research to enable cost-effective technology alternatives.. |

**CC2.3b**

**Are you on the Board of any trade associations or provide funding beyond membership?**

Yes

**CC2.3c**

**Please enter the details of those trade associations that are likely to take a position on climate change legislation**

| Trade association | Is your position on climate change consistent with theirs? | Please explain the trade association's position | How have you, or are you attempting to, influence the position? |
|---|---|---|---|
| International Petroleum Industry Environmental Conservation Association (IPIECA) | Consistent | In June 2015, IPIECA published a series of position paper on climate change under the title: "The Paris Puzzle - The pathway to a low-emissions future. These papers are available on the IPIECA website. ExxonMobil's views are generally consistent with those expressed in these position papers, which express an industry consensus positon. | ExxonMobil actively participates in multiple IPIECA work activities, including those related to crafting climate change policy positions |
| International Oil & Gas Producers (IOGP) | Consistent | In November 2014, an "IOGP position paper on climate change" was published and is available on the IOGP website. ExxonMobil's views are generally consistent with those expressed in this position paper, which express an industry consensus positon | ExxonMobil actively participates in multiple IOGP work activities, including those related to crafting climate change policy positions. |

**CC2.3d**

**Do you publicly disclose a list of all the research organizations that you fund?**

Yes

**CC2.3e**

**Do you fund any research organizations to produce or disseminate public work on climate change?**

Yes

**CC2.3f**

**Please describe the work and how it aligns with your own strategy on climate change**

ExxonMobil engages a variety of stakeholders — including policymakers, investors, consumers, academia, NGOs and the public — on climate change issues of direct relevance to the company. We contribute to a wide range of academic and policy organizations that research and promote dialogue on domestic and foreign policy issues. We annually review our support of tax-exempt organizations and make appropriate adjustments. We publish a list of the 501(c)(3) organizations we support on our website and update the list annually. http://corporate.exxonmobil.com/en/community/worldwide-giving/worldwide-giving-report

**CC2.3h**

**What processes do you have in place to ensure that all of your direct and indirect activities that influence policy are consistent with your overall climate change strategy?**

We align our internal positions and external communications via a corporate-wide global climate change and GHG issue management team with national and regional sub-teams. This team applies corporate level policy principles and positions to external issues that arise at local, state, national and regional levels to ensure consistency across the globe.

**CC2.4**

**Would your organization's board of directors support an international agreement between governments on climate change, which seeks to limit global temperature rise to under two degree Celsius from pre-industrial levels in line with IPCC scenarios such as RCP2.6?**

**CC2.4a**

**Please describe your board's position on what an effective agreement would mean for your organization and activities that you are undertaking to help deliver this agreement at the 2015 United Nations Climate Change Conference in Paris (COP 21)**

Managing the risks of climate change requires the participation of governments, private companies, consumers and other stakeholders. We engage stakeholders directly and through trade associations around the world to encourage sound policy solutions for addressing these risks.

ExxonMobil believes the long-term objective of a climate change policy should be to reduce the risk of serious impacts to humanity and ecosystems at minimum societal cost, while recognizing the importance of abundant, reliable and affordable energy to enable improved living standards worldwide. Both developed and developing countries need to work together in crafting policies aimed at mitigating global CO2 emissions, while recognizing the potential for differing priorities. If policymakers choose to take action to address the risks of climate change, we believe effective policies will be those that:

• Promote global participation;
• Let market prices drive the selection of solutions;
• Ensure a uniform and predictable cost of GHG emissions across the economy;
• Minimize complexity and administrative costs;

- Maximize transparency; and
- Provide flexibility for future adjustments to react to developments in climate science and the economic impacts of climate policies.

We believe a properly designed, revenue-neutral carbon tax is a more effective policy option for imposing a cost on carbon than cap-and-trade schemes, regulations, mandates or standards. Properly designed, a revenue-neutral carbon tax:

- Is a more efficient means of reflecting the cost of carbon in all economic decisions, and thus is more transparent and predictable;
- More easily lends itself to global application;
- Avoids the complexity of building additional carbon security markets;
- Can be implemented through the existing tax infrastructure; and
- Is better-suited for setting a uniform standard to hold all nations accountable.

---

**Further Information**

For question CC2.1, ExxonMobil reviews the risk of climate change with its full Board of Directors annually

**Page: CC3. Targets and Initiatives**

---

**CC3.1**
**Did you have an emissions reduction target that was active (ongoing or reached completion) in the reporting year?**

No

---

**CC3.1e**
**Please explain (i) why you do not have a target; and (ii) forecast how your emissions will change over the next five years**

ExxonMobil understands the importance of progressing solutions to address greenhouse gas (GHG) emissions and the risks of climate change. As ExxonMobil seeks to increase production of oil and gas to meet growing global energy demand, the Company continues to take steps to improve efficiency, reduce emissions and contribute to effective long-term solutions to manage climate change risks. ExxonMobil accomplishes this through a robust set of processes designed to drive long-term, sustainable improvement. These processes include, where appropriate, setting tailored objectives at the business, site and equipment level and then stewarding progress toward meeting these objectives. ExxonMobil believes that this rigorous bottom-up approach is a more effective way to drive efficiency improvement and GHG emissions reduction than setting top-down corporate targets.

ExxonMobil has provided extensive public disclosure on its approach to managing climate change risks in its annual Corporate Citizenship Report and Carbon Disclosure Project (CDP) submission, which are posted on its external website at exxonmobil.com/climate. Included in these reports is information regarding GHG emissions performance, steps the Company is taking to mitigate GHG emissions in its operations, technology the Company is developing and deploying to improve the GHG emissions performance of its operations as well as those of its customers, and the process and governance by which the Company manages climate-related risks.

In the near-term, ExxonMobil is working to increase energy efficiency and reduce flaring, venting and fugitive emissions in its operations. In the medium-term, the company is deploying proven technologies such as cogeneration. Longer term, ExxonMobil is progressing breakthrough, game-changing technologies. Through its Corporate Strategic Research (CSR) laboratory, ExxonMobil conducts fundamental research on a broad range of scientific topics including alternative energy, carbon capture and sequestration, advanced biofuels, lifecycle analysis, climate science and materials science. The Company also conducts strategic research with leading universities around the world focused on developing fundamental game-changing scientific breakthroughs that could lead to lower GHG emissions and a less carbon-intensive global energy system. Examples include the MIT Energy Initiative and Global Climate and Energy Project at Stanford University.

In general, energy is required to produce and process oil and gas, so increases in production volumes that are needed to meet the world's rising need for energy will lead to increases in emissions from our operations and from end use by customers. To be accurate, goals for absolute GHG emissions would need to reflect the coincident impact of largely unforeseeable factors that influence year-to-year changes in market demand, including macroeconomic issues, weather, and responses by national oil companies. Goals that reflect so many variables would be impractical for guiding business performance.

---

**CC3.2**
**Does the use of your goods and/or services directly enable GHG emissions to be avoided by a third party?**

Yes

---

**CC3.2a**
**Please provide details of how the use of your goods and/or services directly enable GHG emissions to be avoided by a third party**

ExxonMobil does not collect data related to the emissions avoided by a third party due to the inability to accurately and consistently calculate these numbers. ExxonMobil believes producers, refiners, distributors, and end-users should each be responsible for managing and reporting the emissions generated from activities under their control.

However, one of the greatest opportunities for society to reduce GHG emissions is through the use of natural gas in power generation. Natural gas is a flexible, abundant and low-emissions fuel that is available across the globe. On a life-cycle basis, from extraction through electricity consumption, using natural gas emits 50 percent fewer GHG emissions than coal. It is also the ideal partner for intermittent renewable energy sources, such as solar or wind, as it can provide power when these renewable sources are not available. As the world moves toward a lower carbon-intensive energy mix over the coming decades, natural gas will be one of the most important fuels to enable reductions in GHG emissions.

Since our merger with XTO Energy in 2010, ExxonMobil has been one of the largest natural gas producers in the world. Coupled with our leadership in the development and production of liquefied natural gas (LNG), ExxonMobil is well-positioned to meet growing demand for this clean energy source.

Sustainability is an ongoing journey at ExxonMobil. Our employees are committed to innovation and continuous improvement. In both our Downstream and Chemical businesses, we have sustainability steering teams that meet regularly to drive our longer-term vision into multiyear strategic plans to improve our own operations, as well as provide sustainability benefits, such as increasing efficiency and reducing waste, for the entire value chain. We have the ability to make a sizable positive impact on society. Our products help customers and consumers conserve energy and reduce raw material use, which in turn can help reduce costs and lower greenhouse gas (GHG) emissions around the world.

Among the many product offerings in our Chemical business, our materials used in automotive applications provide manufacturers and consumers with quantifiable benefits. For example, we manufacture butyl rubber — invented by ExxonMobil researchers in 1937 — which is utilized to produce tire innerliners. This material helps maintain optimal tire air pressure, which in turn contributes to improved vehicle fuel economy, tire durability and performance. Our next-generation tire innerliner materials have the potential to deliver further leading-edge air retention performance. Tires incorporating these new technologies provide the potential to reduce weight in the innerliner by up to 90 percent, while also improving rolling resistance and fuel efficiency.

In the United States, it is estimated that 25 percent of vehicle tires are underinflated, leading to inefficient driving. If drivers in the United States kept their tires properly inflated, they could save up to 1 billion gallons of gasoline per year. Our ongoing development of lighter, more efficient products aims to address this problem.

ExxonMobil products can be found in a variety of automotive parts. Plastic parts are typically much lighter than comparable metal parts, allowing drivers to save on fuel costs and reduce their cars' emissions. To learn more, view this American Chemistry Council video. https://www.youtube.com/watch?v=B6RyBHG51VQ

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 105 of 553   PageID 532

We also are developing innovative resins for use in plastic packaging products. According to a recent life cycle study, substituting a variety of plastics packaging with non-plastic alternatives — such as glass, paper, aluminum or steel — would increase the amount of packaging generated annually in the United States by 55 million tons. Plastics help significantly reduce packaging weight, which results in more products per shipment, fewer trucks on the road, less energy used, fewer GHG emissions and less material to reuse, recover and/or recycle.

ExxonMobil Chemical is continuing to help the food packaging industry "do more with less." Innovations such as our ExceedTM and EnableTM metallocene polyethylene (mPE) product lines have allowed the average film thickness of high-performance heavy-duty bags to decrease from 200 microns in 1990 to 80 microns today, while providing similar or sometimes better performance. In a peer-reviewed study conducted by ExxonMobil Chemical researchers, heavy-duty sacks used for packaging made with our ExceedTM mPE product use 45 percent less energy, 70 percent less water, weigh half as much and provide more protection to the product as compared with a similar paper sack.

**CC3.3**
**Did you have emissions reduction initiatives that were active within the reporting year (this can include those in the planning and/or implementation phases)**

Yes

**CC3.3a**
**Please identify the total number of projects at each stage of development, and for those in the implementation stages, the estimated CO2e savings**

| Stage of development | Number of projects | Total estimated annual CO2e savings in metric tonnes CO2e (only for rows marked *) |
|---|---|---|
| Under investigation | 9 | 1000000 |
| To be implemented* | 2 | 210000 |
| Implementation commenced* | 0 | 0 |
| Implemented* | 3 | 370000 |
| Not to be implemented | 2 | 300000 |

**CC3.3b**
**For those initiatives implemented in the reporting year, please provide details in the table below**

| Activity type | Description of activity | Estimated annual CO2e savings (metric tonnes CO2e) | Scope | Voluntary/ Mandatory | Annual monetary savings (unit currency - as specified in CC0.4) | Investment required (unit currency - as specified in CC0.4) | Payback period | Estimated lifetime of the initiative | Comment |
|---|---|---|---|---|---|---|---|---|---|
| Energy efficiency: Processes | Energy Efficiency: We use our Global Energy Management System in our Downstream and Chemical businesses and our Production Operations Energy Management System in our Upstream businesses to identify and act on energy savings Opportunities. | | Scope 1 | Voluntary | | | | Ongoing | In 2014, energy used in our operations totaled 1.6 billion gigajoules, which is similar to our 2013 energy usage. Despite an increase in energy intensity in some parts of our business, our focus on efficiency has allowed energy consumption to remain essentially flat over the past five years. Energy consumed in our operations generates more than 80 percent of our direct GHG emissions and is one of our largest operating costs. As such, we have focused on energy efficiency for several decades. |
| Energy efficiency: Processes | Flaring Reduction: Consistent with the Global Gas Flaring Reduction Initiative, of which ExxonMobil is a charter member, and as specified in our Upstream Flaring and Venting Reduction Environmental Standard for Projects, our aim is to avoid routine flaring and venting of natural gas in new projects and reduce flaring in our existing operations flaring in our existing operations. | | Scope 1 | Voluntary | | | | Ongoing | In 2014, flaring volume from our combined Upstream, Downstream and Chemical operations totaled 4.5 million metric tons. This represents an increase of 0.8 million metric tons compared with our 2013 performance. The increase in flaring in 2014 was primarily due to typical startup activities at our new LNG facility in Papua New Guinea, and assuming operatorship of the existing Usan production field in Nigeria, where we previously did not report flaring emissions since we did not operate the field. |

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 106 of 553   PageID 533

| Activity type | Description of activity | Estimated annual CO2e savings (metric tonnes CO2e) | Scope | Voluntary/ Mandatory | Annual monetary savings (unit currency - as specified in CC0.4) | Investment required (unit currency - as specified in CC0.4) | Payback period | Estimated lifetime of the initiative | Comment |
|---|---|---|---|---|---|---|---|---|---|
| Energy efficiency: Processes | Venting and Fugitive Emissions Reduction: We continue to look for cost-effective ways to reduce methane and other hydrocarbon emissions in our operations, such as replacing high-bleed pneumatic devices with lower-emission technology and conducting green well completions in targeted Upstream operations. | | Scope 1 | Voluntary | | | | Ongoing | While venting and fugitive emissions, most of which are methane, represent less than 5 percent of our GHG emissions, we recognize the importance of reducing these emissions. |
| Energy efficiency: Processes | Cogeneration: We have interests in approximately 5,500 megawatts of cogeneration capacity in more than 100 installations at more than 30 locations around the world. In 2014, we added 250 megawatts of additional capacity at our Kearl and Cold Lake sites in Alberta, Canada, as well as 30 megawatts of additional capacity at our Grossenkneten facility in Germany. Since 2005, we have invested more than $1 billion in cogeneration projects, and we continue to develop additional investment opportunities. | 7000000 | Scope 1 | Voluntary | | | | Ongoing | Through the ongoing incorporation of cogeneration into many of our facilities, ExxonMobil is able to generate power more efficiently than many local utilities. Cogeneration captures heat generated from the production of electricity for use in production, refining and chemical processing operations. Due to its inherent energy efficiency, the use of cogeneration also leads to reduced GHG emissions; our cogeneration facilities alone enable the avoidance of approximately 7 million metric tons per year of GHG emissions. |
| Other | Carbon Capture and Sequestration (CCS) involves capturing, transporting and sequestering CO2 in underground geologic formations such as saline reservoirs, depleted oil or gas reservoirs, or deep coal beds. In the future, CCS will likely be one of several important technologies used to help reduce CO2 emissions, with the greatest opportunity being in the coal- and natural gas-fired power sectors. ExxonMobil has extensive operating experience with the component technologies of carbon capture and sequestration. | 7000000 | Scope 1 | Voluntary | | | | Ongoing | In 2014, ExxonMobil captured 7 million metric tons for sequestration. Our LaBarge plant in Wyoming, which sells CO2 to third parties for enhanced oil recovery, is one of the largest CO2 capture operations in the world. We have also successfully concluded operations at our Controlled Freeze ZoneTM (CFZTM) commercial demonstration unit at LaBarge. The technology is ready for commercial deployment and could provide a more cost-efficient approach to separating CO2 from natural gas, allowing for the CO2 to be geosequestered or used in enhanced oil recovery. |

**CC3.3c**

**What methods do you use to drive investment in emissions reduction activities?**

| Method | Comment |
|---|---|
| Other | Adherence to internal standards and objectives: Our Operations Integrity Management System (OIMS) provides a systematic and disciplined approach to managing safety, security, health, environmental, and social risks. OIMS is consistent with the standard for environmental management systems established by the International Organization for Standardization (ISO14001:2004). Together, our Corporate Environment Policy and OIMS Framework set an expectation that all projects will be developed, constructed, maintained, and operated in compliance with all applicable environmental laws and regulations and with responsible standards where laws and regulations are not adequately protective. Our Protect Tomorrow Today initiative outlines |

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 107 of 553   PageID 534

| Method | Comment |
|---|---|
| | our expectations for each business to deliver superior environmental performance, drive environmental incidents with real impact to zero, and achieve industry-leading performance in focus areas of importance to each business. Progress toward these goals is managed through our Environmental Business Planning (EBP) process, which integrates environmental improvement into overall business plans and strategies. The businesses use EBP to identify key environmental drivers, set targets in high-priority focus areas, and identify actions to achieve these targets. |
| Internal price of carbon | ExxonMobil addresses the potential for future climate-related controls, including the potential for restriction on emissions, through the use of a proxy cost of carbon. This proxy cost of carbon is embedded in our current Outlook for Energy, and has been a feature of the report for several years. The proxy cost seeks to reflect all types of actions and policies that governments may take over the Outlook period relating to the exploration, development, production, transportation or use of carbon-based fuels. Our proxy cost, which in some areas may approach $80/ton over our Outlook period, is our effort to quantify what we believe government policies could cost to our investment opportunities. Perhaps most importantly, we require that all our business segments include, where appropriate, GHG costs in their economics when seeking funding for capital investments. We require that investment proposals reflect the climate-related policy decisions we anticipate governments making during the Outlook period and therefore incorporate them as a factor in our specific investment decisions. |

**Further Information**

For Question 3.3a, only our cogeneration projects are represented. These projects are developed based on financial return, but also result in significant GHG emission reductions.

**Page: CC4. Communication**

**CC4.1**
**Have you published information about your organization's response to climate change and GHG emissions performance for this reporting year in places other than your CDP response? If so, please attach the publication(s)**

| Publication | Status | Page/Section reference | Attach the document |
|---|---|---|---|
| In mainstream financial reports but have not used the CDSB Framework | Complete | 37 (SAR) | https://www.cdp.net/sites/2015/36/6136/Climate Change 2015/Shared Documents/Attachments/CC4.1/03.19.15_2014_XOM_Summary_Annual_Report_POST-processed.pdf |
| In mainstream financial reports but have not used the CDSB Framework | Complete | 8, 21 (FinStat) | https://www.cdp.net/sites/2015/36/6136/Climate Change 2015/Shared Documents/Attachments/CC4.1/2014 Financials.pdf |
| In mainstream financial reports but have not used the CDSB Framework | Complete | 1, 3, 41, 54 (10k) | https://www.cdp.net/sites/2015/36/6136/Climate Change 2015/Shared Documents/Attachments/CC4.1/xom10k2014.htm |
| In mainstream financial reports but have not used the CDSB Framework | Complete | 2, 3, 33-42, 72-75 (CCR) | https://www.cdp.net/sites/2015/36/6136/Climate Change 2015/Shared Documents/Attachments/CC4.1/2014_CCR_Full_Digital_approved.pdf |
| In mainstream financial reports but have not used the CDSB Framework | Complete | 7, 39-41 (EO) | https://www.cdp.net/sites/2015/36/6136/Climate Change 2015/Shared Documents/Attachments/CC4.1/2015 Outlook for Energy_print resolution.pdf |
| In voluntary communications | Complete | 1-30 | https://www.cdp.net/sites/2015/36/6136/Climate Change 2015/Shared Documents/Attachments/CC4.1/2014_Exxonmobil Report - Energy and Carbon - Managing the Risks.pdf |
| In voluntary communications | Complete | 1-21 | https://www.cdp.net/sites/2015/36/6136/Climate Change 2015/Shared Documents/Attachments/CC4.1/2014_ExxonMobil Report - Energy and Climate.pdf |

**Further Information**

**Module: Risks and Opportunities**

**Page: CC5. Climate Change Risks**

**CC5.1**
**Have you identified any inherent climate change risks that have the potential to generate a substantive change in your business operations, revenue or expenditure? Tick all that apply**

Risks driven by changes in regulation
Risks driven by changes in physical climate parameters
Risks driven by changes in other climate-related developments

**CC5.1a**
**Please describe your inherent risks that are driven by changes in regulation**

| Risk driver | Description | Potential impact | Timeframe | Direct/ Indirect | Likelihood | Magnitude of impact | Estimated financial implications | Management method | Cost of management |
|---|---|---|---|---|---|---|---|---|---|
| International agreements | The climate policy debate has shifted from a focus primarily on targets to limit near-term emissions to also include consideration of long-term emissions pathways that | Increased operational cost | 1 to 3 years | Direct | Unknown | Unknown | Technological, political, and regulatory risks have been inherent in the oil and gas industry since its earliest beginnings. The uncertainties associated with | ExxonMobil will respond to these uncertainties and developments using our traditional approach: disciplined planning and investment, | Our investments in energy efficiency, cogeneration, developing energy-efficient products, flaring / venting reduction, and production of lower carbon |

Climate Change 2015 Information Request CDP

| Risk driver | Description | Potential impact | Timeframe | Direct/ Indirect | Likelihood | Magnitude of impact | Estimated financial implications | Management method | Cost of management |
|---|---|---|---|---|---|---|---|---|---|
| | ultimately stabilize GHG concentrations. As well, International and national attention has turned to focus on adaptation as a strategy to mitigate risk. There has been extensive international focus on the costs and benefits of policies to reduce GHG emissions and address the risk of climate change. Throughout the world, national and regional policymakers are considering a variety of legislative and regulatory options to mitigate GHG emissions and to develop capacity to adapt to potential impacts. | | | | | | these regulatory risks impede assessment of potential financial implications. | financial strength, efficient and reliable operations, and research and development. | resources all contribute to preparing for these risks. |
| Carbon taxes | If policy makers choose to address the risks of climate change, ExxonMobil believes that a properly designed, revenue-neutral carbon tax is more effective policy option to impose a cost on carbon to reduce GHG emissions than an emissions Cap and Trade scheme or regulations, mandates and standards. | Increased operational cost | Up to 1 year | Direct | Likely | Unknown | Technological, political, and regulatory risks have been inherent in the oil and gas industry since its earliest beginnings. The uncertainties associated with these regulatory risks impede assessment of potential financial implications. | ExxonMobil will respond to these uncertainties and developments using our traditional approach: disciplined planning and investment, financial strength, efficient and reliable operations, and research and development. | Our investments in energy efficiency, cogeneration, developing energy-efficient products, flaring / venting reduction, and production of lower carbon resources all contribute to preparing for these risks. |
| Cap and trade schemes | Cap-and-trade systems inevitably introduce unnecessary cost and complexity, as well as unpredictable price volatility, as evidenced recently by the EU ETS. It is important to remember that a cap-and-trade system requires a new market infrastructure for traders to trade emissions allowances. | Increased operational cost | Up to 1 year | Direct | Very likely | Unknown | Technological, political, and regulatory risks have been inherent in the oil and gas industry since its earliest beginnings. The uncertainties associated with these regulatory risks impede assessment of potential financial implications. | ExxonMobil will respond to these uncertainties and developments using our traditional approach: disciplined planning and investment, financial strength, efficient and reliable operations, and research and development. | Our investments in energy efficiency, cogeneration, developing energy-efficient products, flaring / venting reduction, and production of lower carbon resources all contribute to preparing for these risks. |
| Emission reporting obligations | Current and pending greenhouse gas regulations may increase our compliance | Increased operational cost | Up to 1 year | Direct | Very likely | Low | Technological, political, and regulatory risks have been inherent in the oil and gas | ExxonMobil will respond to these uncertainties and developments | Our investments in energy efficiency, cogeneration, developing |

Climate Change 2015 Information Request CDP

| Risk driver | Description | Potential impact | Timeframe | Direct/ Indirect | Likelihood | Magnitude of impact | Estimated financial implications | Management method | Cost of management |
|---|---|---|---|---|---|---|---|---|---|
| | costs, such as monitoring and reporting. These requirements could make our products more expensive and reduce demand for hydrocarbons, as well as shifting hydrocarbon demand toward relatively lower-carbon sources such as natural gas. | | | | | | industry since its earliest beginnings. The uncertainties associated with these regulatory risks impede assessment of potential financial implications. | using our traditional approach: disciplined planning and investment, financial strength, efficient and reliable operations, and research and development. | energy-efficient products, flaring / venting reduction, and production of lower carbon resources all contribute to preparing for these risks. |
| Product efficiency regulations and standards | Efficiency or specific product regulations or standards (e.g. CAFE, LCFS, RPS, RFS), may exceed the technological or economic limitations of specific processes or products thereby increasing costs to consumers or reducing supplies in the marketplace. Standards or mandates generally result in higher cost emission reductions versus establishing a price on emissions and allowing the market to select the solutions. | Increased operational cost | Up to 1 year | Direct | More likely than not | Unknown | Technological, political, and regulatory risks have been inherent in the oil and gas industry since its earliest beginnings. The uncertainties associated with these regulatory risks impede assessment of potential financial implications. | ExxonMobil will respond to these uncertainties and developments using our traditional approach: disciplined planning and investment, financial strength, efficient and reliable operations, and research and development. | Our investments in energy efficiency, cogeneration, developing energy-efficient products, flaring / venting reduction, and production of lower carbon resources all contribute to preparing for these risks. |
| Uncertainty surrounding new regulation | ExxonMobil's financial and operating results are subject to a variety of risks inherent in the global oil and gas business. Many of these risk factors are not within the Company's control and could adversely affect our business, our financial and operating results or our financial condition. Due to concern over the potential risk of climate change, a number of countries have adopted, or are considering the adoption of, regulatory frameworks to reduce greenhouse gas emissions. These include adoption of cap and trade regimes, carbon taxes, increased efficiency | Increased operational cost | Up to 1 year | Direct | More likely than not | Unknown | Technological, political, and regulatory risks have been inherent in the oil and gas industry since its earliest beginnings. The uncertainties associated with these regulatory risks impede assessment of potential financial implications. | ExxonMobil will respond to these uncertainties and developments using our traditional approach: disciplined planning and investment, financial strength, efficient and reliable operations, and research and development. | Our investments in energy efficiency, cogeneration, developing energy-efficient products, flaring / venting reduction, and production of lower carbon resources all contribute to preparing for these risks. |

Climate change 2015 Information Request CDP 2015

| Risk driver | Description | Potential impact | Timeframe | Direct/Indirect | Likelihood | Magnitude of impact | Estimated financial implications | Management method | Cost of management |
|---|---|---|---|---|---|---|---|---|---|
| | standards, and incentives or mandates for renewable energy. These requirements could make our products more expensive and reduce demand for hydrocarbons, as well as shifting hydrocarbon demand toward relatively lower-carbon sources such as natural gas. Current and pending greenhouse gas regulations may also increase our compliance costs, such as monitoring or sequestering emissions. | | | | | | | | |
| General environmental regulations, including planning | Throughout the world, national and regional policymakers are considering a variety of legislative and regulatory options to mitigate GHG emissions and to develop capacity to adapt to potential impacts. Policy options and their overall effect upon the Corporation vary greatly from country to country and are not predictable. These requirements could make our products more expensive and reduce demand for hydrocarbons, as well as shifting hydrocarbon demand toward relatively lower-carbon sources such as natural gas. | Increased operational cost | 1 to 3 years | Direct | More likely than not | Unknown | Technological, political, and regulatory risks have been inherent in the oil and gas industry since its earliest beginnings. The uncertainties associated with these regulatory risks impede assessment of potential financial implications. | ExxonMobil will respond to these uncertainties and developments using our traditional approach: disciplined planning and investment, financial strength, efficient and reliable operations, and research and development. | Our investments in energy efficiency, cogeneration, developing energy-efficient products, flaring / venting reduction, and production of lower carbon resources all contribute to preparing for these risks. |
| Renewable energy regulation | Several jurisdictions have implemented or are considering regulations that require a designated amount of electricity to come from renewable sources. Similarly, several jurisdictions are requiring designated amounts of biofuels in transport fuel, or | Reduced demand for goods/services | Up to 1 year | Direct | Very likely | Unknown | Technological, political, and regulatory risks have been inherent in the oil and gas industry since its earliest beginnings. The uncertainties associated with these regulatory risks impede assessment of potential financial implications. | ExxonMobil will respond to these uncertainties and developments using our traditional approach: disciplined planning and investment, financial strength, efficient and reliable operations, and research and development. | Our investments in energy efficiency, cogeneration, developing energy-efficient products, flaring / venting reduction, and production of lower carbon resources all contribute to preparing for these risks. |

| Risk driver | Description | Potential impact | Timeframe | Direct/ Indirect | Likelihood | Magnitude of impact | Estimated financial implications | Management method | Cost of management |
|---|---|---|---|---|---|---|---|---|---|
| | low carbon fuel standards. Other mechanisms for similar ends are subsidies, feed-in-tariffs, etc. These regulations force higher cost GHG mitigation solutions, thus costing society more for fewer emission reductions. Market-based mechanisms can be far more effective in achieving the greatest emission reductions at the least cost and maintaining a level playing field. When evaluating the benefits of various renewable energy sources, policymakers should ensure full lifecycle analyses are used to evaluate the benefits, including indirect land use change effects. | | | | | | | | |

**CC5.1b**

**Please describe your inherent risks that are driven by change in physical climate parameters**

| Risk driver | Description | Potential impact | Timeframe | Direct/ Indirect | Likelihood | Magnitude of impact | Estimated financial implications | Management method | Cost of management |
|---|---|---|---|---|---|---|---|---|---|
| Uncertainty of physical risks | Current scientific understanding provides limited guidance on the likelihood, magnitude, and timeframe of physical risks such as sea level rise, extreme weather events, temperature extremes, and precipitation. While these potential climate change impacts are slow-evolving, they could impact our operations. There is more uncertainty at the regional or local level versus global averages. In addition to potential production disruptions, these impacts can lead to | Reduction/disruption in production capacity | >6 years | Direct | Unknown | Unknown | ExxonMobil's operations around the world include both onshore and offshore activities that can experience weather extremes and storms, large sea level variations and wave height, and temperature and precipitation extremes. We design, construct and operate our facilities to withstand a variety of extreme weather conditions, including much of the range of potential outcomes. | At ExxonMobil, risks are mitigated with appropriate contingency planning and the application of a comprehensive risk management system. Known risks are mitigated first of all by factoring them into equipment and facility design, construction and operations. Business continuity planning and emergency preparedness are two essential elements to manage risks of business disruption, so that we can continue supplying fuels for transportation and electrical power as well as chemicals | Regular updates to our engineering standards and operating practices incorporate new knowledge on extreme conditions and events, which can impact capital and operating costs. |

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM
INDEX NO. 451062/2016
NYSCEF DOC. NO. 178
RECEIVED NYSCEF: 06/02/2017

Climate Change 2015 Information Request CDP

Page 45 of 82

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 112 of 553   PageID 539

| Risk driver | Description | Potential impact | Timeframe | Direct/Indirect | Likelihood | Magnitude of impact | Estimated financial implications | Management method | Cost of management |
|---|---|---|---|---|---|---|---|---|---|
| | increased costs. | | | | | | | for consumer products. | |

**CC5.1c**

**Please describe your inherent risks that are driven by changes in other climate-related developments**

| Risk driver | Description | Potential impact | Timeframe | Direct/Indirect | Likelihood | Magnitude of impact | Estimated financial implications | Management method | Cost of management |
|---|---|---|---|---|---|---|---|---|---|
| Reputation | Effective management of business and operational risks, including risks related to greenhouse gas emissions, is essential to promoting and maintaining a good corporate reputation. A reputation for effective, responsible and ethical management, in turn, is an important component of the corporation's dealings with governments, business partners, employees and shareholders. Any lack of effective management can negatively impact reputation. | Other: Increased regulatory, capital and other costs. | >6 years | Direct | Unknown | Unknown | ExxonMobil believes that our ability to consistently deliver strong returns to shareholders is a direct result of our ability to effectively manage risk. Risk cannot be eliminated, but it can be managed. | ExxonMobil manages risk through a capable and committed workforce with clear accountability, well-developed and clearly defined policies and procedures, high standards of design, rigorously applied management systems, employee and contractor training, and a systematic approach to assessing performance that drives continuous improvement. ExxonMobil employs our Operations Integrity Management System (OIMS). OIMS is the cornerstone of our commitment to managing risks to safety, security, health, and the environment. It guides the activities of each of our employees and contractors around the world. OIMS is a rigorous, 11-element system designed to identify hazards and manage risks. It covers: design, construction and maintenance of facilities; preparation of employees and communities for natural disaster or other incidents; and thorough investigations into accidents and safety incidents. | The costs associated with our management systems are not considered to be incremental, but instead inherent costs of running the business. |

**Further Information**

**Page: CC6. Climate Change Opportunities**

**CC6.1**

**Have you identified any inherent climate change opportunities that have the potential to generate a substantive change in your business operations, revenue or expenditure? Tick all that apply**

Opportunities driven by changes in regulation
Opportunities driven by changes in other climate-related developments

**CC6.1a**

**Please describe your inherent opportunities that are driven by changes in regulation**

| Opportunity driver | Description | Potential impact | Timeframe | Direct/Indirect | Likelihood | Magnitude of impact | Estimated financial implications | Management method | Cost of management |
|---|---|---|---|---|---|---|---|---|---|
| General environmental regulations, | ExxonMobil's strength in management | Other: Improved competitive position | Up to 1 year | Direct | Unknown | Unknown | Technological, political, and regulatory | ExxonMobil will respond to these | Our investments in energy |

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 113 of 553   PageID 540

| Opportunity driver | Description | Potential impact | Timeframe | Direct/Indirect | Likelihood | Magnitude of impact | Estimated financial implications | Management method | Cost of management |
|---|---|---|---|---|---|---|---|---|---|
| including planning | systems provides us an ongoing opportunity to comply with emerging regulations in a manner that is more efficient and provides an economic advantage with respect to competitors. Examples include our leadership in energy efficiency through the Global Energy Management System. | | | | | | risks have been inherent in the oil and gas industry since its earliest beginnings. The uncertainties associated with the physical and regulatory risks impede assessment of potential financial implications. | uncertainties and developments using our traditional approach: disciplined planning and investment, risk management, financial strength, efficient and reliable operations, and research and development. | efficiency, cogeneration, developing energy-efficient products, flaring / venting reduction, and production of lower carbon resources all contribute to preparing for these opportunities. |
| Emission reporting obligations | ExxonMobil's strength in management systems provides us an ongoing opportunity to comply with emerging regulations in a manner that is more efficient and provides an economic advantage with respect to competitors. | Other: Improved competitive position | Up to 1 year | Direct | Unknown | Unknown | Technological, political, and regulatory risks have been inherent in the oil and gas industry since its earliest beginnings. The uncertainties associated with the physical and regulatory risks impede assessment of potential financial implications. | ExxonMobil will respond to these uncertainties and developments using our traditional approach: disciplined planning and investment, risk management, financial strength, efficient and reliable operations, and research and development. | Our investments in energy efficiency, cogeneration, developing energy-efficient products, flaring / venting reduction, and production of lower carbon resources all contribute to preparing for these opportunities. |
| Product efficiency regulations and standards | Innovations in the chemicals industry play an important role in meeting the world's energy and environmental challenges. Through lightweight plastics and other products that enable consumers to use energy more efficiently, ExxonMobil is helping reduce emissions associated with energy use. In fact, a recent study – industry-commissioned and independently validated – concluded that for every unit of greenhouse gas (GHG) emitted by the chemical industry during production, more than two | New products/business services | 1 to 3 years | Indirect (Client) | Unknown | Unknown | Technological, political, and regulatory risks have been inherent in the oil and gas industry since its earliest beginnings. The uncertainties associated with the physical and regulatory risks impede assessment of potential financial implications. | ExxonMobil will respond to these uncertainties and developments using our traditional approach: disciplined planning and investment, risk management, financial strength, efficient and reliable operations, and research and development. | Our investments in energy efficiency, cogeneration, developing energy-efficient products, flaring / venting reduction, and production of lower carbon resources all contribute to preparing for these opportunities. |

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 114 of 553   PageID 541

| Opportunity driver | Description | Potential impact | Timeframe | Direct/Indirect | Likelihood | Magnitude of impact | Estimated financial implications | Management method | Cost of management |
|---|---|---|---|---|---|---|---|---|---|
| | units of GHGs are saved by society through the use of products and technologies enabled by our industry. As a leader in the global petrochemical industry, ExxonMobil is focused on providing value and improving the efficiency of our customers throughout the supply chain. | | | | | | | | |
| Other regulatory drivers | The adoption of climate policies by countries or regions could shift hydrocarbon demand toward relatively lower-carbon sources such as natural gas. ExxonMobil is the largest producer of natural gas in the U.S. and one of the largest in the world. | Increased demand for existing products/services | >6 years | Direct | Likely | Medium-high | Technological, political, and regulatory risks have been inherent in the oil and gas industry since its earliest beginnings. The uncertainties associated with the physical and regulatory risks impede assessment of potential financial implications. | ExxonMobil will respond to these uncertainties and developments using our traditional approach: disciplined planning and investment, risk management, financial strength, efficient and reliable operations, and research and development. | Our investments in energy efficiency, cogeneration, developing energy-efficient products, flaring / venting reduction, and production of lower carbon resources all contribute to preparing for these opportunities. |

**CC6.1c**
**Please describe the inherent opportunities that are driven by changes in other climate-related developments**

| Opportunity driver | Description | Potential impact | Timeframe | Direct/Indirect | Likelihood | Magnitude of impact | Estimated financial implications | Management method | Cost of management |
|---|---|---|---|---|---|---|---|---|---|
| Reputation | The risk associated with major energy projects and the day-to-day operations we undertake are considerable. The importance of risk management has been brought back into the market spotlight as a variety of sectors in the global economy have experienced significant challenges stemming from the failure to assess and manage risk effectively. ExxonMobil is experienced in managing the financial, technological, market, and operational risks that are | Other: Improved reputation | >6 years | Direct | Unknown | Unknown | Meeting the dual challenge of supplying the world the energy it needs to support economic growth and raise living standards, while minimizing impact on the environment will require new technologies. | To develop new technologies, ExxonMobil was the founding sponsor of the Global Climate and Energy Project (GCEP) at Stanford University. We have since contributed over three-quarters of our $100 million commitment to the program. This pioneering research program is focused on identifying breakthrough energy technologies that reduce GHG emissions and that could be developed on a large scale within a 10-to-50-year timeframe. GCEP has sponsored | ExxonMobil's commitment to invest in technology enables us to develop innovative solutions to improve safety, minimize environmental impact, and maximize resource levels. We have invested approximately $8 billion in research and development during the past 10 years, and almost $2 billion on technologies related to safety and the environment. |

Climate Change 2015 Information Request CDP CDP 2015 Information Request

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 115 of 553   PageID 542

| Opportunity driver | Description | Potential impact | Timeframe | Direct/Indirect | Likelihood | Magnitude of impact | Estimated financial implications | Management method | Cost of management |
|---|---|---|---|---|---|---|---|---|---|
| | inherent to our industry. Long-term planning is fundamental to our approach to risk management. Our long-term view also guides our commitment to technology. Technology gives us the confidence in our ability to deliver new solutions, to invest in unconventional resources, and to continue to deliver operational excellence. Technology also enables us to operate with less impact on the environment. | | | | | | | more than 40 research programs in Australia, Europe, Japan, and the United States. In addition, ExxonMobil researchers are active in technology development. | |
| Changing consumer behaviour | Perhaps the most obvious opportunity created by the concern over climate change lies in the enhanced use of natural gas to reduce emissions growth in electric power generation. As the leading private equity holder of gas reserves and a leader in LNG and tight gas technologies, ExxonMobil is well positioned to play a leading role in meeting rising demand for natural gas. Global demand for energy will continue to rise especially in developing countries where about 2.5 billion people who still rely on traditional biomass fuels for heating and cooking. We are well positioned to respond to this opportunity and challenge to develop and utilize efficient and clean energy technologies and products that meet growing demand. | Increased demand for existing products/services | Up to 1 year | Direct | Unknown | Unknown | Meeting the dual challenge of supplying the world the energy it needs to support economic growth and raise living standards, while minimizing impact on the environment will require new technologies. | To develop new technologies, ExxonMobil was the founding sponsor of the Global Climate and Energy Project (GCEP) at Stanford University. We have since contributed over three-quarters of our $100 million commitment to the program. This pioneering research program is focused on identifying breakthrough energy technologies that reduce GHG emissions and that could be developed on a large scale within a 10-to-50-year timeframe. GCEP has sponsored more than 40 research programs in Australia, Europe, Japan, and the United States. In addition, ExxonMobil researchers are active in technology development. | ExxonMobil's commitment to invest in technology enables us to develop innovative solutions to improve safety, minimize environmental impact, and maximize resource levels. We have invested approximately $8 billion in research and development during the past 10 years, and almost $2 billion on technologies related to safety and the environment. |

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 116 of 553   PageID 543

**CC6.1e**
**Please explain why you do not consider your company to be exposed to inherent opportunities driven by physical climate parameters that have the potential to generate a substantive change in your business operations, revenue or expenditure**

We view potential changes to physical climate parameters as risks to be managed, similar to multiple other risks we successfully manage.

Further Information

**Module: GHG Emissions Accounting, Energy and Fuel Use, and Trading**

**Page: CC7. Emissions Methodology**

**CC7.1**
**Please provide your base year and base year emissions (Scopes 1 and 2)**

| Scope | Base year | Base year emissions (metric tonnes CO2e) |
|---|---|---|
| Scope 1 | Sat 01 Jan 2005 - Sat 31 Dec 2005 | 139000000 |
| Scope 2 | Sat 01 Jan 2005 - Sat 31 Dec 2005 | 9000000 |

**CC7.2**
**Please give the name of the standard, protocol or methodology you have used to collect activity data and calculate Scope 1 and Scope 2 emissions**

| Please select the published methodologies that you use |
|---|
| IPIECA's Petroleum Industry Guidelines for reporting GHG emissions, 2nd edition, 2011 |
| American Petroleum Institute Compendium of Greenhouse Gas Emissions Methodologies for the Oil and Natural Gas Industry, 2009 |

**CC7.2a**
**If you have selected "Other" in CC7.2 please provide details of the standard, protocol or methodology you have used to collect activity data and calculate Scope 1 and Scope 2 emissions**

**CC7.3**
**Please give the source for the global warming potentials you have used**

| Gas | Reference |
|---|---|
| CO2 | IPCC Fourth Assessment Report (AR4 - 100 year) |
| CH4 | IPCC Fourth Assessment Report (AR4 - 100 year) |
| Other: N2O | IPCC Fourth Assessment Report (AR4 - 100 year) |

**CC7.4**
**Please give the emissions factors you have applied and their origin; alternatively, please attach an Excel spreadsheet with this data at the bottom of this page**

| Fuel/Material/Energy | Emission Factor | Unit | Reference |
|---|---|---|---|
| Natural gas | 130.07 | lb CO2e per million BTU | API GHG Compendium, 2009 |
| Refinery gas | 133.82 | | API GHG Compendium, 2009 |
| Petroleum coke | 237.00 | | API GHG Compendium, 2009 |
| Distillate fuel oil No 4 | 176.81 | | API GHG Compendium, 2009 |
| Residual fuel oil | 182.76 | | API GHG Compendium, 2009 |
| Other: Low BTU Gas | 278.00 | | API GHG Compendium, 2009 |

Further Information

CC7.4 - The Fuel/Material/Energy categories listed comprise over 95% of our energy sources. Our operations utilize the most accurate emission factors available to them beginning with the API GHG Compendium emission factors, then applying locally regulated emission factors where required, and finally, by applying site specific emission factors, if determined to be more accurate than API.

**Page: CC8. Emissions Data - (1 Jan 2014 - 31 Dec 2014)**

**CC8.1**
**Please select the boundary you are using for your Scope 1 and 2 greenhouse gas inventory**

Equity share

**CC8.2**
**Please provide your gross global Scope 1 emissions figures in metric tonnes CO2e**

121000000

**CC8.3**
**Please provide your gross global Scope 2 emissions figures in metric tonnes CO2e**

8000000

**CC8.4**
**Are there are any sources (e.g. facilities, specific GHGs, activities, geographies, etc.) of Scope 1 and Scope 2 emissions that are within your selected reporting boundary which are not included in your disclosure?**

No

**CC8.5**
**Please estimate the level of uncertainty of the total gross global Scope 1 and 2 emissions figures that you have supplied and specify the sources of uncertainty in your data gathering, handling and calculations**

| Scope | Uncertainty range | Main sources of uncertainty | Please expand on the uncertainty in your data |
|---|---|---|---|
| Scope 1 | More than 5% but less than or equal to 10% | Metering/ Measurement Constraints Other: Published Emissions Factors | ExxonMobil has conducted a rigorous analysis of our GHG reporting uncertainty. The study showed that our reported Scope 1 emissions have an uncertainty of 5-10%. The degree of uncertainty varies by type, age, and location of facility. |
| Scope 2 | More than 30% but less than or equal to 40% | Assumptions Other: Unknown due to global power sector variations | ExxonMobil has not undertaken an analysis of Scope 2 uncertainty. However, recent studies on electric power generation grid factor uncertainty, such as the one described in the paper by Christopher Weber, etal from Carnegie Mellon University in 2009, indicate that uncertainty across the U.S. grid CO2 emission factors maybe in the range of 40%. |

**CC8.6**
**Please indicate the verification/assurance status that applies to your reported Scope 1 emissions**

Third party verification or assurance complete

**CC8.6a**
**Please provide further details of the verification/assurance undertaken for your Scope 1 emissions, and attach the relevant statements**

| Type of verification or assurance | Attach the statement | Page/section reference | Relevant standard | Proportion of reported Scope 1 emissions verified (%) |
|---|---|---|---|---|
| Reasonable assurance | https://www.cdp.net/sites/2015/36/6136/Climate Change 2015/Shared Documents/Attachments/CC8.6a/2014 CCR Pages 71-75.pdf | Page 71-75 | ISAE3000 | 100 |

**CC8.7**
**Please indicate the verification/assurance status that applies to your reported Scope 2 emissions**

Third party verification or assurance complete

**CC8.7a**
**Please provide further details of the verification/assurance undertaken for your Scope 2 emissions, and attach the relevant statements**

| Type of verification or assurance | Attach the statement | Page/Section reference | Relevant standard | Proportion of reported Scope 2 emissions verified (%) |
|---|---|---|---|---|
| Reasonable assurance | https://www.cdp.net/sites/2015/36/6136/Climate Change 2015/Shared Documents/Attachments/CC8.7a/2014 CCR Pages 71-75.pdf | Page 71-75 | ISAE3000 | 100 |

**CC8.8**
**Please identify if any data points have been verified as part of the third party verification work undertaken, other than the verification of emissions figures reported in CC8.6, CC8.7 and CC14.2**

| Additional data points verified | Comment |
|---|---|
| No additional data verified | |

**CC8.9**
**Are carbon dioxide emissions from biologically sequestered carbon relevant to your organization?**

No

**Further Information**

CC8.2: ~6 percent of ExxonMobil's Scope 1 emissions (7 million metric tonnes) are associated with electricity generated in company owned power plants or cogeneration facilities that is exported to others. Therefore, from a net emissions perspective, ExxonMobil's Scope 1 + Scope 2 emissions (less the Scope 1 emissions associated with export power) = 121 + 8 -7 = 122 million metric tonnes. We believe net emissions are a more appropriate measure of a company's or facility's GHG emissions performance. Net emissions are reported in our Corporate Citizenship Report.

**Page: CC9. Scope 1 Emissions Breakdown - (1 Jan 2014 - 31 Dec 2014)**

**CC9.1**
**Do you have Scope 1 emissions sources in more than one country?**

Yes

**CC9.1a**
**Please break down your total gross global Scope 1 emissions by country/region**

| Country/Region | Scope 1 metric tonnes CO2e |
|---|---|
| Americas | 62000000 |
| Europe, Middle East and Africa (EMEA) | 41000000 |
| Asia Pacific (or JAPA) | 18000000 |

**CC9.2**
**Please indicate which other Scope 1 emissions breakdowns are you able to provide (tick all that apply)**

By business division
By GHG type

**CC9.2a**
**Please break down your total gross global Scope 1 emissions by business division**

| Business division | Scope 1 emissions (metric tonnes CO2e) |
|---|---|
| Upstream | 57000000 |
| Downstream | 45000000 |
| Chemicals | 19000000 |

**CC9.2c**
**Please break down your total gross global Scope 1 emissions by GHG type**

| GHG type | Scope 1 emissions (metric tonnes CO2e) |
|---|---|
| CO2 | 114000000 |
| CH4 | 6000000 |
| Other: Other GHG Combined | 1000000 |

**Further Information**

**Page: CC10. Scope 2 Emissions Breakdown - (1 Jan 2014 - 31 Dec 2014)**

**CC10.1**
**Do you have Scope 2 emissions sources in more than one country?**

Yes

**CC10.1a**
**Please break down your total gross global Scope 2 emissions and energy consumption by country/region**

| Country/Region | Scope 2 metric tonnes CO2e | Purchased and consumed electricity, heat, steam or cooling (MWh) | Purchased and consumed low carbon electricity, heat, steam or cooling accounted for in CC8.3 (MWh) |
|---|---|---|---|
| Americas | 5000000 | 19400000 | 0 |
| Europe, the Middle East, Africa and Russia (EMEAR) | 2000000 | 21200000 | 0 |
| Asia Pacific (or JAPA) | 1000000 | 2600000 | 0 |

**CC10.2**
**Please indicate which other Scope 2 emissions breakdowns are you able to provide (tick all that apply)**

By business division

**CC10.2a**
**Please break down your total gross global Scope 2 emissions by business division**

| Business division | Scope 2 emissions (metric tonnes CO2e) |
|---|---|
| Upstream | 3000000 |
| Downstream | 2000000 |
| Chemicals | 3000000 |

**Further Information**

**Page: CC11. Energy**

**CC11.1**
**What percentage of your total operational spend in the reporting year was on energy?**

More than 20% but less than or equal to 25%

**CC11.2**
**Please state how much fuel, electricity, heat, steam, and cooling in MWh your organization has purchased and consumed during the reporting year**

| Energy type | MWh |
|---|---|
| Fuel | 333000000 |

Climate Change Information Request      Exxon Mobil Corporation

| Energy type | MWh |
| --- | --- |
| Electricity | 67000000 |
| Heat | |
| Steam | |
| Cooling | |

**CC11.3**

**Please complete the table by breaking down the total "Fuel" figure entered above by fuel type**

| Fuels | MWh |
| --- | --- |
| Other: Blended mix of own produced and purchased fuel | 333000000 |

**CC11.4**

**Please provide details of the electricity, heat, steam or cooling amounts that were accounted at a low carbon emission factor in the Scope 2 figure reported in CC8.3**

| Basis for applying a low carbon emission factor | MWh associated with low carbon electricity, heat, steam or cooling | Comment |
| --- | --- | --- |
| No purchases or generation of low carbon electricity, heat, steam or cooling accounted with a low carbon emissions factor | 0 | |

**Further Information**

**Page: CC12. Emissions Performance**

**CC12.1**

**How do your gross global emissions (Scope 1 and 2 combined) for the reporting year compare to the previous year?**

Decreased

**CC12.1a**

**Please identify the reasons for any change in your gross global emissions (Scope 1 and 2 combined) and for each of them specify how your emissions compare to the previous year**

| Reason | Emissions value (percentage) | Direction of change | Comment |
| --- | --- | --- | --- |
| Emissions reduction activities | 2 | Decrease | Improved energy efficiency through projects and operational optimizations in our Refining and Chemicals businesses. Last year 3,000,000 tCO2e were reduced by our emissions reduction activities, and our total S1 and S2 emissions in the previous year was 148,000,000 tCO2e, therefore we arrived at 2% through (3,000,000/148,000,000)*100= 2% |
| Divestment | 7 | Decrease | Partial year effect of divestment of Hong Kong Power interest and divestment of remaining Japanese refining interest |
| Acquisitions | 0 | No change | |
| Mergers | 0 | No change | |
| Change in output | 0 | No change | |
| Change in methodology | 5 | Decrease | Change reflects removal of inter-company transfers of power; previously reflected as scope 2 emissions |
| Change in boundary | 0 | No change | Assuming operatorship of the existing Usan production field in Nigeria and startup activities at our new LNG facility in Papua New Guinea, offset by emissions improvements in other operations |
| Change in physical operating conditions | 0 | No change | |
| Unidentified | 0 | No change | |
| Other | 1 | Increase | Mix of upstream production resources more energy-intensive |

**CC12.2**

**Please describe your gross global combined Scope 1 and 2 emissions for the reporting year in metric tonnes CO2e per unit currency total revenue**

| Intensity figure | Metric numerator | Metric denominator | % change from previous year | Direction of change from previous year | Reason for change |
| --- | --- | --- | --- | --- | --- |
| .00031 | metric tonnes CO2e | unit total revenue | 7 | Decrease | Reported emissions decreased by 13% while revenue decreased by 6%. Revenue can vary significantly with the cyclic nature of the oil and gas industry. Emissions/Revenue is not a useful intensity measure for our industry. |

**CC12.3**

**Please describe your gross global combined Scope 1 and 2 emissions for the reporting year in metric tonnes CO2e per full time equivalent (FTE) employee**

| Intensity figure | Metric numerator | Metric denominator | % change from previous year | Direction of change from previous year | Reason for change |
| --- | --- | --- | --- | --- | --- |
| 1713 | metric tonnes CO2e | FTE employee | 13 | Decrease | Reported emissions decreased by 13% while headcount increased by 0.4%. The oil and gas industry is a capital intensive industry rather than a labor intensive industry. Emissions/FTE is not a useful intensity measure for our industry. |

Climate change Information Request - ExxonMobil Corporation

**CC12.4**

**Please provide an additional intensity (normalized) metric that is appropriate to your business operations**

| Intensity figure | Metric numerator | Metric denominator | % change from previous year | Direction of change from previous year | Reason for change |
|---|---|---|---|---|---|
| .191 | metric tonnes CO2e | metric tonne of product | 3 | Decrease | REFINING: Improved energy efficiency through projects and operational optimizations |
| .535 | metric tonnes CO2e | metric tonne of product | 6 | Decrease | CHEMICAL: Improved energy optimization from Singapore plants and Increased cogeneration utilization |
| .230 | metric tonnes CO2e | | 3 | Increase | UPSTREAM: Energy-intensity of new developments to meet energy demand largely offset by reduction in existing operations base due to asset-level stewardship against goals |

**Further Information**

Normalization factors facilitate a level of comparison over time among similar business operations within the company. We believe that measuring GHG intensity in this way (metric tons of CO2-e per unit production volume or throughput) is a more useful measure for our industry than normalization per US$ total revenue or employee FTEs. It does however significantly oversimplify the drivers of emissions, which, for example in the case of refining, include the complexity of the refinery, how much processing is done between the input crude and the finished slate of products (which can vary widely between facilities). In addition, we use net (Scope 1 + Scope 2 - Exports) in the numerator. We believe net emissions is a more appropriate measure of a company's or facility's GHG emissions performance as it fully comprehends trade-offs between steam and power choices and fully reflects the benefits of increased cogeneration. Net emissions are reported in our Corporate Citizenship Report.

**Page: CC13. Emissions Trading**

**CC13.1**

**Do you participate in any emissions trading schemes?**

Yes

**CC13.1a**

**Please complete the following table for each of the emission trading schemes in which you participate**

| Scheme name | Period for which data is supplied | Allowances allocated | Allowances purchased | Verified emissions in metric tonnes CO2e | Details of ownership |
|---|---|---|---|---|---|
| European Union ETS | Wed 01 Jan 2014 - Wed 31 Dec 2014 | 14081000 | 2837000 | 17195000 | Facilities we own and operate |
| California's Greenhouse Gas Cap and Trade Program | Wed 01 Jan 2014 - Wed 31 Dec 2014 | 2302000 | 1028000 | 3023000 | Facilities we own and operate |
| New Zealand ETS | Wed 01 Jan 2014 - Wed 31 Dec 2014 | 0 | 1725000 | 4037000 | Other: Products Sold |

**CC13.1b**

**What is your strategy for complying with the schemes in which you participate or anticipate participating?**

ExxonMobil's strategy is to manage compliance obligations of our regulated facilities through comprehensive measurement and reporting, ongoing assessment and implementation of cost effective energy efficiency and environmental improvements and ratable purchase and sale of allowances. ExxonMobil has traded allowances in regulated emissions trading schemes when cost-effective for compliance and expects to continue to do so in the future.

We comply with all applicable laws and regulations, including the existing programs in the European Union, New Zealand, California.

**CC13.2**

**Has your organization originated any project-based carbon credits or purchased any within the reporting period?**

Yes

**CC13.2a**

**Please provide details on the project-based carbon credits originated or purchased by your organization in the reporting period**

| Credit origination or credit purchase | Project type | Project identification | Verified to which standard | Number of credits (metric tonnes of CO2e) | Number of credits (metric tonnes CO2e): Risk adjusted volume | Credits cancelled | Purpose, e.g. compliance |
|---|---|---|---|---|---|---|---|
| Credit Purchase | Other: Various wind, biogas, fuel switching projects | UNFCCC Reference Number: 325, 425, 426, 431, 668, 689, 799, 812, 842, 845, 1116, 1228, 1293, 1307, 1320, 1729, 1833, 1859, 1896, 1898, 1960, 2088, 2118, 2215, 2382, 2383, 2396, 2441, 2744, 2744, 2777, 2811, 2827, 2829, 2831, 3092, 3107, 3153, 3241, 3251, 3470, 3529, 3569, 3624, 3688, 3736, 3965, 4004, 4172, 4178, 4734, 4784, 5211, 5233, 5235, 5491, 5587 | CDM (Clean Development Mechanism) | 2777000 | 2777000 | No | Compliance |

**Further Information**

**Page: CC14. Scope 3 Emissions**

Climate change 2015 Information Request Exxon Mobil Corporation

**CC14.1**

**Please account for your organization's Scope 3 emissions, disclosing and explaining any exclusions**

| Sources of Scope 3 emissions | Evaluation status | metric tonnes CO2e | Emissions calculation methodology | Percentage of emissions calculated using data obtained from suppliers or value chain partners | Explanation |
|---|---|---|---|---|---|
| Purchased goods and services | | | | | |
| Capital goods | | | | | |
| Fuel-and-energy-related activities (not included in Scope 1 or 2) | | | | | |
| Upstream transportation and distribution | | | | | |
| Waste generated in operations | | | | | |
| Business travel | | | | | |
| Employee commuting | | | | | |
| Upstream leased assets | | | | | |
| Downstream transportation and distribution | | | | | |
| Processing of sold products | | | | | |
| Use of sold products | Relevant, calculated | 291760000 | New Zealand GHG Regulation & U.S. EPA GHG Mandatory Reporting Rule | 0.00% | NOTE: THIS IS NOT TOTAL CORPORATION DATA. ONLY NEW ZEALAND & U.S. SCOPE 3 SUBMITTED UNDER REGULATORY REPORTING REQUIREMENT. According to the International Energy Agency, approximately 90 percent of petroleum-related GHG emissions are generated when customers use our products and the remaining 10 percent are generated by industry operations. |
| End of life treatment of sold products | | | | | |
| Downstream leased assets | | | | | |
| Franchises | | | | | |
| Investments | | | | | |
| Other (upstream) | | | | | |
| Other (downstream) | | | | | |

**CC14.2**

**Please indicate the verification/assurance status that applies to your reported Scope 3 emissions**

Third party verification or assurance underway for the reporting year but not yet complete - last year's statement attached

**CC14.2a**

**Please provide further details of the verification/assurance undertaken, and attach the relevant statements**

| Type of verification or assurance | Attach the statement | Page/Section reference | Relevant standard | Proportion of Scope 3 emissions verified (%) |
|---|---|---|---|---|
| Third party verification/assurance underway | https://www.cdp.net/sites/2015/36/6136/Climate Change 2015/Shared Documents/Attachments/CC14.2a/ALG GHG Verification Report - ExxonMobil Fuel Supplier 2013 with Attachments (1).pdf | 1-89 | Other: California ARB | |

**CC14.3**

**Are you able to compare your Scope 3 emissions for the reporting year with those for the previous year for any sources?**

Yes

**CC14.3a**

**Please identify the reasons for any change in your Scope 3 emissions and for each of them specify how your emissions compare to the previous year**

| Sources of Scope 3 emissions | Reason for change | Emissions value (percentage) | Direction of change | Comment |
|---|---|---|---|---|
| Processing of sold products | Change in output | 0.4 | Decrease | Lower refinery throughput and product sales |

Climate Change Information Request Exxon Mobil Corporation

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 122 of 553   PageID 549

**CC14.4**

**Do you engage with any of the elements of your value chain on GHG emissions and climate change strategies? (Tick all that apply)**

Yes, our suppliers
Yes, our customers

**CC14.4a**

**Please give details of methods of engagement, your strategy for prioritizing engagements and measures of success**

In our oil & gas operations, the vast majority of our emissions are not in our supply chain, and therefore we choose to focus our GHG reduction efforts on our own internal operations vs suppliers and customers. In our lubricants and chemical businesses, we focus our efforts on customers that can benefit from the energy-saving/GHG reducing properties of our chemical and lubricant products.

**CC14.4b**

**To give a sense of scale of this engagement, please give the number of suppliers with whom you are engaging and the proportion of your total spend that they represent**

| Number of suppliers | % of total spend | Comment |
|---|---|---|

**CC14.4c**

**If you have data on your suppliers' GHG emissions and climate change strategies, please explain how you make use of that data**

| How you make use of the data | Please give details |
|---|---|

**Further Information**

According to the International Energy Agency, approximately 90 percent of petroleum-related GHG emissions are generated when customers use our products and the remaining 10 percent are generated by industry operations. Only Scope 3 emissions that have been reported under mandatory reporting regulations where consistent definitions are assured are included in this submission. U.S. EPA Scope 3 reporting rules include products that go into non-emissive uses such as asphalt and plastics. We report here consistent with those EPA reporting rules.

**Module: Sign Off**

**Page: CC15. Sign Off**

**CC15.1**

**Please provide the following information for the person that has signed off (approved) your CDP climate change response**

| Name | Job title | Corresponding job category |
|---|---|---|
| Mr. Rex W. Tillerson | Chairman of the Board and Chief Executive Officer Exxon Mobil Corporation | Board chairman |

**Further Information**

**Module: Oil & Gas**

**Page: OG0. Reference information**

**OG1.1**

**Please identify the significant petroleum industry components of your business within your reporting boundary (select all that apply)**

Exploration, production & gas processing
Storage, transportation & distribution
Specialty operations
Refining
Retail & marketing

**Further Information**

**Page: OG1. Production & reserves by hydrocarbon type - (1 Jan 2014 - 31 Dec 2014)**

**OG1.1**

**Is your organization involved with oil & gas production or reserves?**

Yes

**OG1.2**

**Please provide values for annual production by hydrocarbon type (in units of BOE) for the reporting year in the following table. The values required are aggregate values for the reporting organization. The values required for the next reporting year are forward-looking estimates**

| Product | Production (BOE) - Reporting year | Production (BOE) - Next reporting year estimate |
|---|---|---|
| Natural gas condensate | 770515000 | |
| Natural gas liquids (NGL) | | |
| Liquefied Petroleum Gas (LPG) | | |
| Light oil | | |
| Medium oil | | |
| Heavy oil | | |

| Product | Production (BOE) - Reporting year | Production (BOE) - Next reporting year estimate |
|---|---|---|
| Extraheavy oil | | |
| Bitumen (oil sands) | | |
| Shale oil | | |
| Synthetic oil | | |
| Tight oil | | |
| Conventional non-associated natural gas | | |
| Associated natural gas | | |
| Shale gas | 677987000 | |
| Tight gas | | |

**OG1.3**
**Please provide values for reserves by hydrocarbon type (in units of BOE) for the reporting year. Please indicate if the figures are for reserves that are proved, probable or both proved and probable. The values required are aggregate values for the reporting organization**

| Product | Country/region | Reserves (BOE) | Date of assessment | Proved/Probable/Proved+Probable |
|---|---|---|---|---|
| Natural gas condensate<br>Natural gas liquids (NGL)<br>Light oil<br>Medium oil<br>Heavy oil<br>Extraheavy oil<br>Shale oil<br>Tight oil | Rest of world | 8946000000 | Wed 31 Dec 2014 | Proved |
| Bitumen (oil sands)<br>Synthetic oil | Rest of world | 4767000000 | Wed 31 Dec 2014 | |
| Conventional non-associated natural gas<br>Associated natural gas<br>Shale gas<br>Tight gas | Rest of world | 11556000000 | Wed 31 Dec 2014 | |

**OG1.4**
**Please explain which listing requirements or other methodologies you have used to provide reserves data in OG1.3. If your organization cannot provide data due to legal restrictions on reporting reserves figures in certain countries, please explain this**

Proved reserves in this submission are based on current SEC definitions.

**OG1.5**
**Please provide the average breakeven cost of current production used in estimation of proven reserves**

| Hydrocarbon/project | Breakeven cost/BOE | Comment |
|---|---|---|

**OG1.6**
**In your economic assessment of hydrocarbon reserves and resources, do you conduct scenario analysis consistent with global developments to avoid dangerous climate change by reducing GHG emissions?**

Yes, other

**OG1.6a**
**Please describe your analysis and the implications for your capital expenditure plans**

ExxonMobil believes producing our existing hydrocarbon reserves is essential to meeting growing global energy demand. We enable consumers — especially those in the least-developed and most-vulnerable economies — to pursue higher living standards and greater economic opportunity. We believe all economic energy sources will be necessary to meet growing demand, and the transition of the energy system to lower carbon sources will take many decades due to its enormous scale, capital intensity and complexity. As such, we believe that none of our proven hydrocarbon reserves are, or will become, stranded.

ExxonMobil makes long-term investment decisions based in part on our comprehensive annual analysis that underpins our global Outlook for Energy. We project an energy-related CO2 emissions profile through 2040. This can be compared with the energy-related CO2 emissions profiles from various scenarios outlined by the IPCC. When we do this, our Outlook emissions profile would closely approximate the IPCC's intermediate Representative Concentration Pathways 4.5 emissions profile in shape, but is slightly under it in magnitude.

We address the potential for future climate change policy, including the potential for restrictions on emissions, by estimating a proxy cost of carbon. This cost, which in some geographies may approach $80 per ton by 2040, has been included in our Outlook for several years. This approach seeks to reflect potential policies governments may employ related to the exploration, development, production, transportation or use of carbon-based fuels. We believe our view on the potential for future policy action is realistic and, by no means represents a "business as usual" case. We require all of our business lines to include, where appropriate, an estimate of GHG-related emissions costs in their economics when seeking funding for capital investments.

We evaluate potential investments and projects using a wide range of economic conditions and commodity prices. We apply prudent and substantial margins in our planning assumptions to help ensure competitive returns over a wide range of market conditions. We also financially "stress test" our investment opportunities, which provides an added margin against uncertainties, such as those related to technology development, costs, geopolitics, availability of required materials, services and labor. Stress testing, which differs from alternative scenario planning, further enables us to consider a wide range of market environments in our planning and investment process.

**Further Information**

Anti-trust laws in the United States and other jurisdictions require that companies avoid providing information about levels of future business activity which could be competitively sensitive; therefore, data has not been provided for future years.

**Page: OG2. Emissions by segment in the O&G value chain - (1 Jan 2014 - 31 Dec 2014)**

**OG2.1**
**Please indicate the consolidation basis (financial control, operational control, equity share) used to report the Scope 1 and Scope 2 emissions by segment in the O&G value chain. Further information can be provided in the text box in OG2.2**

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 124 of 553   PageID 551

| Segment | Consolidation basis for reporting Scope 1 emissions | Consolidation basis for reporting Scope 2 emissions |
|---|---|---|
| Exploration, production & gas processing | Equity Share | Equity Share |
| Refining | Equity Share | Equity Share |
| Specialty operations | Equity Share | Equity Share |

**OG2.2**
**Please provide clarification for cases in which different consolidation bases have been used and the level/focus of disclosure. For example, a reporting organization whose business is solely in storage, transportation and distribution (STD) may use the text box to explain why only the STD row has been completed**

ExxonMobil consolidates GHG emissions information by business unit (Upstream, Downstream and Chemicals) for the oil and gas sectors with the specific activities of storage, transportation and distribution integrated into the respective business unit. Therefore, our submission includes upstream activities listed under "Exploration, production & gas processing", Downstream activities listed under "refining" and chemicals activities under "Specialty operations".

**OG2.3**
**Please provide masses of gross Scope 1 GHG emissions in units of metric tonnes CO2e for the organization's owned/controlled operations by value chain segment. The values required for the next reporting year are forward-looking estimates**

| Segment | Gross Scope 1 emissions (metric tonnes CO2e) - Reporting year | Gross Scope 1 emissions (metric tonnes CO2e) - Next reporting year estimate |
|---|---|---|
| Exploration, production & gas processing | 57000000 | |
| Refining | 45000000 | |
| Specialty operations | 19000000 | |

**OG2.4**
**Please provide masses of gross Scope 2 GHG emissions in units of metric tonnes CO2e for the organization's owned/controlled operations by value chain segment. The values required for the next reporting year are forward-looking estimates**

| Segment | Gross Scope 2 emissions (metric tonnes CO2e) – Reporting year | Gross Scope 2 emissions (metric tonnes CO2e) – Next reporting year estimate |
|---|---|---|
| Exploration, production & gas processing | 3000000 | |
| Refining | 2000000 | |
| Specialty operations | 3000000 | |

**Further Information**

Anti-trust laws in the United States and other jurisdictions require that companies avoid providing information about levels of future business activity which could be competitively sensitive; therefore, data has not been provided for future years.

<span style="color:red">Page: OG3. Scope 1 emissions by emissions category - (1 Jan 2014 - 31 Dec 2014)</span>

**OG3.1**
**Please confirm the consolidation basis (financial control, operational control, equity share) used to report Scope 1 emissions by emissions category**

| Segment | Consolidation basis for reporting Scope 1 emissions by emissions category |
|---|---|
| Exploration, production & gas processing | Equity Share |
| Refining | Equity Share |
| Specialty operations | Equity Share |

**OG3.2**
**Please provide clarification for cases in which different consolidation bases have been used to report by emissions categories (combustion, flaring, process emissions, vented emissions, fugitive emissions) in the various segments**

Equity share is applied for our GHG emissions; no further clarification required.

**OG3.3**
**Please provide masses of gross Scope 1 GHG emissions released into the atmosphere in units of metric tonnes CO2e for the whole organization broken down by emissions categories: combustion, flaring, process emissions, vented emissions, fugitive emissions. The values required for the next reporting year are forward-looking estimates**

| Category | Gross Scope 1 emissions (metric tonnes CO2e) – Reporting year | Gross Scope 1 emissions (metric tonnes CO2e) – Next reporting year estimate |
|---|---|---|
| Combustion | 114000000 | |
| Flaring | | |
| Process emissions | | |
| Vented emissions | | |

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM INDEX NO. 451962/2016

NYSCEF DOC. NO. 178                                                                    RECEIVED NYSCEF: 06/02/2017

| Category | Gross Scope 1 emissions (metric tonnes CO2e) – Reporting year | Gross Scope 1 emissions (metric tonnes CO2e) – Next reporting year estimate |
|---|---|---|
| Fugitive emissions | 6000000 | |

**Further Information**

Anti-trust laws in the United States and other jurisdictions require that companies avoid providing information about levels of future business activity which could be competitively sensitive; therefore, data has not been provided for future years.

**Page: OG4. Transfers & sequestration of CO2 emissions - (1 Jan 2014 - 31 Dec 2014)**

**OG4.1**
**Is your organization involved in the transfer or sequestration of CO2?**

Yes

**OG4.2**
**Please indicate the consolidation basis (financial control, operational control, equity share) used to report transfers and sequestration of CO2 emissions**

| Activity | Consolidation basis |
|---|---|
| Transfers | Equity Share |
| Sequestration of CO2 emissions | Equity Share |

**OG4.3**
**Please provide clarification for cases in which different consolidation bases have been used (e.g. for a given activity, capture, injection or storage pathway)**

Equity share is applied for our GHG emissions; no further clarification required.

**OG4.4**
**Using the units of metric tonnes of CO2, please provide gross masses of CO2 transferred in and out of the reporting organization (as defined by the consolidation basis). Please note that questions of ownership of the CO2 are addressed in OG4.6**

| Transfer direction | CO2 transferred – Reporting year |
|---|---|
| CO2 transferred in | 0 |
| CO2 transferred out | 13300000 |

**OG4.5**
**Please provide clarification on whether any oil reservoirs and/or sequestration system (geological or oceanic) have been included within the boundary of the reporting organization. Provide details, including degrees to which reservoirs are shared with other entities**

Saline reservoir for CO2 injection from Sleipner field in Norway is included within our boundary in this report. We have a 32% equity interest in Sleipner, which is operated by Statoil. Our equity share of oil reservoirs in Texas and New Mexico where CO2 is injected for Enhanced Oil Recovery (EOR) is included within our boundary. Also included within our boundary is the acid gas injection well at our Labarge, Wyoming facility where we are the 100% owner and operator. CO2 transferred noted in Question OG4.4 represents CO2 purchased from 3rd parties to use in our own EOR operations. The 3rd party source is not included within our boundary, but our EOR operations are. CO2 transferred out in Question OG4.4 represents CO2 from our facilities that is sold to others, primarily for Enhanced Oil Recovery (EOR). Their EOR storage is not included within our boundary in this report.

**OG4.6**
**Please explain who (e.g. the reporting organization) owns the transferred emissions and what potential liabilities are attached. In the case of sequestered emissions, please clarify whether the reporting organization or one or more third parties owns the sequestered emissions and who has potential liability for them**

The CO2 that is sold (transferred out) from our facilities and any associated responsibilities are owned by the purchasers. We retain our 32% equity ownership of the CO2 sequestered at Sleipner and 100% ownership of the CO2 sequestered via acid gas injection at Labarge, as well as our varying equity interests in the Texas and New Mexico EOR fields.

**OG4.7**
**Please provide masses in metric tonnes of gross CO2 captured for purposes of carbon capture and sequestration (CCS) during the reporting year according to capture pathway. For each pathway, please provide a breakdown of the percentage of the gross captured CO2 that was transferred into the reporting organization and the percentage that was transferred out of the organization (to be stored)**

| Capture pathway in CCS | Captured CO2 (metric tonnes CO2) | Percentage transferred in | Percentage transferred out |
|---|---|---|---|
| Gas stream separation from natural gas purification | 7000000 | 8% | 92% |

**OG4.8**
**Please provide masses in metric tonnes of gross CO2 injected and stored for purposes of CCS during the reporting year according to injection and storage pathway**

| Injection and storage pathway | Injected CO2 (metric tonnes CO2) | Percentage of injected CO2 intended for long-term (>100 year) storage | Year in which injection began | Cumulative CO2 injected and stored (metric tonnes CO2) |
|---|---|---|---|---|
| | 212000 | 100% | 1996 | 4900000 |

| Injection and storage pathway | Injected CO2 (metric tonnes CO2) | Percentage of injected CO2 intended for long-term (>100 year) storage | Year in which injection began | Cumulative CO2 injected and stored (metric tonnes CO2) |
|---|---|---|---|---|
| CO2 injected into a geological formation or saline formation for long-term storage | | | | |
| Acid gas injection (CO2 and H2S co-injected into a production reservoir) | 382000 | 100% | 2005 | 2900000 |
| CO2 used for enhanced oil recovery (EOR) or enhanced gas recovery (EGR) | 2171000 | 100% | 1980 | |

**OG4.9**
**Please provide details of risk management performed by the reporting organization and/or third party in relation to its CCS activities. This should cover pre-operational evaluation of the storage (e.g. site characterisation), operational monitoring, closure monitoring, remediation for CO2 leakage, and results of third party verification**

Our Operations Integrity Management System (OIMS) is the cornerstone to managing the safety, security, health and environmental risks in our operations and achieving excellence in performance. As such, OIMS is rigorously applied in our CCS activities. The Sleipner project involved extensive storage site characterization prior to injection. Operational monitoring is extensive using 2-D, 3-D and 4-D seismic, time-lapse, and gravity monitoring. Monitoring has been and continues to be supported by various consortia including SACS, CO2STORE and CO2REMOVE, and the results are shared broadly to promote learning, and advance technology and best practices. Extensive dispersion modeling and reservoir characterization was used to select the injection site for the Labarge, Wyoming acid gas injection facilities. Rigorous state agency permitting requirements were met. Extensive pressure monitoring and continuous air monitoring with alarms have been applied throughout the operation. Comprehensive personnel training has been applied and refresher training is on-going. Rigorous mechanical integrity testing is conducted annually.

**Further Information**

**Page: OG5. Sales and emissions intensity - (1 Jan 2014 - 31 Dec 2014)**

**OG5.1**
**Please provide values for annual sales of the hydrocarbon types (in units of BOE) for the years given in the following table. The values required are aggregate values for the reporting organization. The values for the next reporting year are forward-looking estimates**

| Product | Sales (BOE) - Reporting year | Sales (BOE) - Next reporting year estimate |
|---|---|---|
| Refined products | 2140000000 | |
| Other: Natural Gas Available for Sale | 677000000 | |

**OG5.2**
**Please provide estimated emissions (Scope 1 + Scope 2) intensities for the a) exploration, production and gas processing, b) storage, transportation and distribution, and c) refining associated with current production and operations**

| Year ending | Emissions intensity: exploration, production & gas processing (metric tonnes CO2e per thousand BOE) | Emissions intensity: storage, transportation & distribution (metric tonnes CO2e per thousand BOE) | Emissions intensity: refining (metric tonnes CO2e per thousand BOE) |
|---|---|---|---|
| 2009 | 20.1 | | 21.0 |
| 2010 | 20.5 | | 20.8 |
| 2011 | 20.7 | | 20.1 |
| 2012 | 22.3 | | 19.5 |
| 2013 | 22.4 | | 19.7 |
| 2014 | 23.0 | | 19.1 |

**OG5.3**
**Please clarify how each of the emissions intensities has been derived and supply information on the methodology used where this differs from information already given in answer to the methodology questions in the main information request**

Emissions intensities are based on greenhouse gas emissions (net equity, CO2-equivalent emissions) normalized to 100 metric tons of throughput (Refining) or production (Upstream)

**Further Information**

Anti-trust laws in the United States and other jurisdictions require that companies avoid providing information about levels of future business activity which could be competitively sensitive, therefore, data has not been provided for future years

**Page: OG6. Development strategy - (1 Jan 2014 - 31 Dec 2014)**

**OG6.1**
**For each relevant strategic development area, please provide financial information for the reporting year**

| Strategic development area | Describe how this relates to your business strategy | Sales generated | EBITDA | Net assets | CAPEX | OPEX | Comment |
|---|---|---|---|---|---|---|---|

**OG6.2**
**Please describe your future capital expenditure plans for different strategic development areas**

| Strategic development area | CAPEX | Total return expected from CAPEX investments | Comment |
|---|---|---|---|

**OG6.3**

Climate change 2015 Information Request CDP 2015 Information Request
Page 28 of 28

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 127 of 553   PageID 554

Please describe your current expenses in research and development (R&D) and future R&D expenditure plans for different strategic development areas

| Strategic development area | R&D expenses – Reporting year | R&D expenses – Future plans | Comment |
|---|---|---|---|

**Further Information**

ExxonMobil addresses the risk of climate change in several concrete and meaningful ways. We do so by improving energy efficiency and reducing emissions at our operations, and by enabling consumers to use energy more efficiently through the advanced products we manufacture. In addition, we conduct and support extensive research and development in new technologies that promote efficiency and reduce emissions. In our operations, we apply a constant focus on efficiency that enables us to produce energy to meet society's needs using fewer resources and at a lower cost. For example, ExxonMobil is a leader in cogeneration at our facilities, with equity ownership in more than 100 cogeneration units at more than 30 sites with over 5500 megawatts of capacity. This capacity, which is equivalent to the electricity needs of approximately 2.5 million U.S. households, reduces the burden on outside power and grid suppliers and can reduce the resulting emissions by powering ExxonMobil's operations in a more efficient and effective manner. We also constantly strive to reduce the emission intensity of our operations. Cumulative savings between 2005 and 2014 were 21.5 million metric tons (net equity) of $CO_2e$ from ExxonMobil actions, including flare reduction, cogeneration and energy efficiency. Many of ExxonMobil's products also enable consumers to be more energy efficient and therefore reduce greenhouse gas emissions. Advancements in tire liner technology developed by ExxonMobil allow drivers to save fuel. Our synthetic lubricants also improve vehicle engine efficiency. And lighter weight plastics developed by ExxonMobil reduce vehicle weights, further contributing to better fuel efficiency. ExxonMobil is also the largest producer of natural gas in the United States, a fuel with a variety of consumer uses, including heating, cooking and electricity generation. Natural gas emits up to 60 percent less $CO_2$ than coal when used as the source for power generation. Research is another area in which ExxonMobil is contributing to energy efficiency and reduced emissions. We are on the forefront of technologies to lower greenhouse gas emissions. For example, ExxonMobil operates one of the world's largest carbon capture and sequestration (CCS) operations at our LaBarge plant in Wyoming. In a co-venturer in another project, the Gorgon natural gas development in Australia, which when operational will have the largest saline reservoir $CO_2$ injection facility in the world. The company is leveraging its experience with CCS in developing new methods for capturing $CO_2$, which can reduce costs and increase the application of carbon capture for society. ExxonMobil also is actively engaged, both internally and in partnership with renowned universities and institutions, in research on new break-through technologies for energy. ExxonMobil routinely conducts life cycle assessments (LCAs), which are useful to understand whether a technology can result in environmental improvements across a broad range of factors. For example, in 2011 we conducted a LCA in concert with Massachusetts Institute of Technology and Synthetic Genomics Inc. to assess the impact of algal biofuel production on GHG emissions, land use, and water use. The study demonstrated the potential that algae fuels can be produced from outside freshwater consumption equivalent to petroleum refining, and enable lower GHG emissions. A more recent LCA demonstrated that "well-to-wire" GHG emissions from shale gas are about half that of coal, and not significantly different than emissions of conventional gas. In addition, ExxonMobil is involved in researching emerging technologies that can help mitigate the risk of climate change. For example, the company has conducted research into combustion fundamentals with automotive partners in order to devise concepts to improve the efficiency and reduce emissions of internal combustion engines. ExxonMobil has also developed technology for an on-board hydrogen-powered fuel cell that converts other fuels into hydrogen directly under a vehicle's hood, thereby eliminating the need for separate facilities for producing and distributing hydrogen. This technology can be up to 80 percent more fuel efficient and emit 45 percent less $CO_2$ than conventional internal combustion engines. The company is also a founding member of the Global Climate and Energy Project at Stanford University, a program that seeks to develop fundamental, game-changing scientific breakthroughs that could lower GHG emissions.

**Page: OG7. Methane from the natural gas value chain**

**OG7.1**
**Please indicate the consolidation basis (financial control, operational control, equity share) used to prepare data to answer the questions in OG7**

| Segment | Consolidation basis |
|---|---|

**OG7.1a**
**Please provide clarification for cases in which different consolidation bases have been used**

**OG7.2**
**Does your organization have written operating procedures and/or policies covering the reduction of methane leakage and venting?**

**OG7.3**
**Please indicate the proportion of your organization's methane emissions inventory estimated using the following methodologies (+/- 5%)**

| Methodology | Proportion of total methane emissions estimated with methodology | What area of your operations does this answer relate to? |
|---|---|---|
| Direct detection and measurement | | |
| Engineering calculations | | |
| Source-specific emission factors (IPCC Tier 3) | | |
| IPCC Tier 1 and/or Tier 2 emission factors | | |

**OG7.3a**
**Do your operations include the production, gathering and processing stages?**

**OG7.4**
**OG7.4: Does your organization participate in voluntary methane emissions reduction programs?**

**Further Information**

CDP: [W][-,-][AQ][Pu]

# Exhibit 10

**From:** Powell, Guy A
**Sent:** Saturday, November 29, 2014 3:32 PM
**To:** Trelenberg, Pete W
**Subject:** Re: Some issues that may come up at our meeting Tuesday

Pete - about to get on a plane to Belize - here is my thoughts on the carbon price question:  our carbon price assumptions are based on our view of the marginal cost of abatement in the future.  Our price assumptions tend to be higher than stated policy - we assume additional policy beyond what is currently proposed.  We test our upstream projects bases on the scope 1 emissions they will create.  We do not make any assumptions on scope 3 emissions associated with producing additional hydrocarbons.

Sent from my iPhone

On Nov 28, 2014, at 5:22 PM, "Trelenberg, Pete W" <pete.w.trelenberg@exxonmobil.com> wrote:

> Haroon, Guy, Tahmid - note attached list of questions we will be asked to answer next Tuesday during a meeting with SRI's. Please provide input as follows (feel free to comment on any question):
>
> Technology and adaptation - Haroon, please comment specifically on adaptation
>
> Renewables - Tahmid, please provide comments on renewable cost curves, cost comparisons, update frequency, etc.
>
> Carbon Price - Guy, please provide you thoughts on this.
>
> Warming impact on GDP - Haroon, Guy,  would it be correct to say that all scenarios/RCP's are fairly similar out through 2040? Would temperature rise be about the same? Would most models predict positive impacts of a modest temperature rise as would be seen in all scenarios at least through 2040? What did the Risky Business report say about climate impacts by mid-century?
>
> Thanks. I will need input over the weekend, as I fly to NYC Monday morning.
>
> Pete.
>
>
> Sent from my iPad
>
> Begin forwarded message:
>
>> **From:** "Cohen, Kenneth P" <kenneth.p.cohen@exxonmobil.com>
>> **Date:** November 26, 2014 at 3:09:55 PM PST
>> **To:** "Woodbury, Jeffrey J" <jeff.j.woodbury@exxonmobil.com>
>> **Cc:** "Tinsley, Brian D" <brian.d.tinsley@exxonmobil.com>, "Luettgen, Robert A" <robert.a.luettgen@exxonmobil.com>, "Trelenberg, Pete W" <pete.w.trelenberg@exxonmobil.com>, "McCarron, Suzanne M" <suzanne.m.mccarron@exxonmobil.com>
>> **Subject: Re: Some issues that may come up at our meeting Tuesday**
>>
>> Suggest Suzanne and I handle the legislative Q's: carbon tax and energy policy.
>>
>> Sent from my iPhone

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)          EMC 000548250

On Nov 26, 2014, at 4:44 PM, Woodbury, Jeffrey J
<jeff.j.woodbury@exxonmobil.com> wrote:

Please note questions below.  We should have an aligned view on each of
these.  Thanks.

Regards,  Jeff

Sent from my iPad

Begin forwarded message:

> **From:** Donald Kirshbaum <donald.kirshbaum@gmail.com>
> **Date:** November 26, 2014 at 1:19:22 PM CST
> **To:** "Tinsley, Brian D" <brian.d.tinsley@exxonmobil.com>,
> "Luettgen, Robert A" <robert.a.luettgen@exxonmobil.com>,
> "Woodbury, Jeffrey J" <jeff.j.woodbury@exxonmobil.com>
> **Cc:** "Smith, Timothy" <tsmith@bostontrust.com>
> **Subject: Some issues that may come up at our meeting
> Tuesday**
>
> **As I mentioned to Brian in an email earlier today,
> some of the investors who will be joining us on
> Tuesday had a call yesterday to talk about the
> agenda.  We wanted to give you a heads up on
> some of the questions that may come up next
> week so you may be able to address them in your
> presentations.  If we don't get to all of these
> questions, investors would be interested in
> having some follow up on these after in the
> coming weeks.**
>
> **These of course don't cover everything, but will
> hopefully give you a sense of some of the issues
> that are on investors' minds.**
>
>   • **Stanford and MIT research projects:
>     update on the status of these studies, what
>     Exxon's expectations are and what is
>     Exxon's funding commitment to them.  Are
>     there any similar project Exxon is
>     supporting?**
>
>   • **Carbon Tax:  What is Exxon's current
>     position on a carbon tax, and is Exxon
>     actively supporting any federal legislation
>     regarding a carbon tax (some has been
>     introduced).**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)          EMC 000548251

- **National energy policy:  Given that Exxon believes that "all the economic sources of energy are needed to meet the word's energy needs" (Ken Cohen Perspectives November 6), how is Exxon supporting national (and international) energy policy that promotes the growth of clean energy.**

- **Technology and climate change adaptation:  Mr. Tillerson has spoken about how technology has provided solutions to significant problems throughout history and how he sees this as an approach to climate change.  What technology based solutions do you see for both reducing the impact of climate change, as well as humanity and the global economy adapting to it – and what is Exxon doing to help create these solutions?**

- **What are Exxon's current thoughts on oil demand scenarios – both in the short term in the context of the current price of oil, and in the mid term and longer term to meet global energy needs in the context of accelerated growth in the availability of alternative energy solutions?  How is this feeding into your capital expenditure planning?**

- **RENEWABLES:  How does Exxon calculate cost curves for renewables and potentially competitive energy sources?  Does it rely on third party sources?  If so, which?  Does it update this information?**

- **CARBON PRICE:  How does Exxon develop the carbon prices it identifies?  Are these tied to stated policy outcomes and if not, why not?  How does it incorporate those prices into its process for selecting/ rejecting upstream projects?**

- **WARMING IMPACT ON GDP:  How does Exxon evaluate the impact that 3.6C warming will have?  Does it incorporate**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)         EMC 000548252

that analysis into its GDP/population growth projections?

- **CAPEX CUT:  If Exxon will not do high cost projects, will it so state publicly?**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)          EMC 000548253

# Exhibit 11

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM
INDEX NO. 451962/2016
NYSCEF DOC. NO. 180
RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 134 of 553   PageID 561
June 01, 2017

# 360 Property, Plant, and Equipment
## 10 Overall
### 35 Subsequent Measurement

> **General Note**: The Subsequent Measurement Section provides guidance on an entity's subsequent measurement and subsequent recognition of an item. Situations that may result in subsequent changes to carrying amount include impairment, credit losses, fair value adjustments, depreciation and amortization, and so forth.

## General

**360-10-35-1**   This Subsection addresses depreciation of property, plant, and equipment and the post acquisition accounting for an interest in the residual value of a leased asset.

> **Depreciation**

**360-10-35-2**   This guidance addresses the concept of depreciation accounting and the various factors to consider in selecting the related periods and methods to be used in such accounting.

**360-10-35-3**   Depreciation expense in financial statements for an asset shall be determined based on the asset's useful life.

**360-10-35-4**   The cost of a productive facility is one of the costs of the services it renders during its useful economic life. Generally accepted accounting principles (GAAP) require that this cost be spread over the expected useful life of the facility in such a way as to allocate it as equitably as possible to the periods during which services are obtained from the use of the facility. This procedure is known as depreciation accounting, a system of accounting which aims to distribute the cost or other basic value of tangible capital assets, less salvage (if any), over the estimated useful life of the unit (which may be a group of assets) in a systematic and rational manner. It is a process of allocation, not of valuation.

**360-10-35-5**   See paragraph 360-10-35-20 for a discussion of depreciation of a new cost basis after recognition of an **impairment** loss.

**360-10-35-6**   See paragraph 360-10-35-43 for a discussion of cessation of depreciation on long-lived assets classified as held for sale.

> > **Declining Balance Method**

**360-10-35-7**   The declining-balance method is an example of one of the methods that meet the requirements of being systematic and rational. If the expected productivity or revenue-earning power of the asset is relatively greater during the earlier years of its life, or maintenance charges tend to increase during later years, the declining-balance method may provide the most satisfactory allocation of cost. That conclusion also applies to other methods, including the sum-of-the-years'-digits method, that produce substantially similar results.

**Pending Content:**

**Transition Date:** *(P) December 18, 2017; (N) December 16, 2018* **Transition Guidance: 806-10-65-1**

The declining-balance method is an example of one of the methods that meet the requirements of being systematic and rational. If the expected productivity of the asset or ability of the asset to generate revenue is relatively greater during the earlier years of its life, or maintenance charges tend to increase during later years, the declining-balance method may provide the most satisfactory allocation of cost. That conclusion also applies to other methods, including the sum-of-the-years'-digits method, that produce substantially similar results.

> > **Loss or Damage Experience as a Factor in Estimating Depreciable Lives**

**360-10-35-8**   In practice, experience regarding loss or damage to depreciable assets is in some cases one of the factors considered in estimating the depreciable lives of a group of depreciable assets, along with such other factors as wear and tear, obsolescence, and maintenance and replacement policies.

> > **Unacceptable Depreciation Methods**

**360-10-35-9**   If the number of years specified by the Accelerated Cost Recovery System of the Internal Revenue Service (IRS) for recovery deductions for an asset does not fall within a reasonable range of the asset's useful life, the recovery deductions shall not be used as depreciation expense for financial reporting.

**360-10-35-10**   Annuity methods of depreciation are not acceptable for entities in general.

> > **Accounting Changes**

**360-10-35-11**   See paragraphs 250-10-45-17 through 45-20 for guidance on the accounting and presentation of changes in methods of depreciation.

**360-10-35-12**   [Paragraph not used]

> **Adjusting the Residual Value in Leased Assets by a Third Party**

**360-10-35-13**   The following paragraph provides guidance on how an entity acquiring an interest in the residual value of a leased asset shall account for that asset during the lease term.

**360-10-35-14**   An entity acquiring an interest in the residual value of any leased asset, irrespective of the classification of the related lease by the lessor, shall not recognize increases to the asset's estimated value over the remaining term of the related lease, and the asset shall be reported at no more than its acquisition cost until sale or disposition. If it is subsequently determined that the fair value of the residual value of a leased asset has declined below the carrying amount of the acquired interest and that decline is other than temporary, the asset shall be written down to fair value, and the amount of the write-down shall be recognized as a loss. That fair value becomes the asset's new carrying amount, and the asset shall not be increased for any subsequent increase in its fair value before its sale or disposition.

## Impairment or Disposal of Long-Lived Assets

**360-10-35-15**   There are unique requirements of accounting for the **impairment** or disposal of long-lived assets to be held and used or to be disposed of. Although this guidance deals with matters which may lead to the ultimate disposition of assets, it is included in this Subsection because it describes the measurement and classification of assets to be held and used and assets held for disposal before actual disposition and derecognition. See the Impairment or Disposal of Long-Lived Assets Subsection of Section 360–10–40 for a discussion of assets or asset groups for which disposition has taken place in an exchange or distribution to owners.

> **Long-Lived Assets Classified as Held and Used**

**360-10-35-16**   This guidance addresses how long-lived assets or asset groups that are intended to be held and used in an entity's business shall be reviewed for impairment.

> > **Measurement of an Impairment Loss**

**360-10-35-17**   An impairment loss shall be recognized only if the carrying amount of a long-lived asset (**asset group**) is not recoverable and exceeds its fair value. The carrying amount of a long-lived asset (asset group) is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset (asset group). That assessment shall be based on the carrying amount of the asset (asset group) at the date it is tested for recoverability, whether in use (see paragraph 360-10-35-33) or under development (see paragraph 360-10-35-34). An impairment loss shall be measured as the amount by which the carrying amount of a long-lived asset (asset group) exceeds its fair value.

> > > **Assets Subject to Asset Retirement Obligations**

**360-10-35-18**   In applying the provisions of this Subtopic, the carrying amount of the asset being tested for impairment shall include amounts of capitalized asset retirement costs. Estimated future cash flows related to the liability for an asset retirement obligation that has been recognized in the financial statements shall be excluded from both of the following:

   a.   The undiscounted cash flows used to test the asset for recoverability

   b.   The discounted cash flows used to measure the asset's fair value.

**360-10-35-19**   If the fair value of the asset is based on a quoted market price and that price considers the costs that will be incurred in retiring that asset, the quoted market price shall be increased by the fair value of the asset retirement obligation for purposes of measuring impairment.

> > **Adjusted Carrying Amount Becomes New Cost Basis**

**360-10-35-20**   If an impairment loss is recognized, the adjusted carrying amount of a long-lived asset shall be its new cost basis. For a depreciable long-lived asset, the new cost basis shall be depreciated (amortized) over the remaining useful life of that asset. Restoration of a previously recognized impairment loss is prohibited.

> > **When to Test a Long-Lived Asset for Recoverability**

**360-10-35-21**   A long-lived asset (asset group) shall be tested for recoverability whenever events or changes in circumstances indicate that its carrying amount may not be recoverable. The following are examples of such events or changes in circumstances:

   a.   A significant decrease in the market price of a long-lived asset (asset group)

   b.   A significant adverse change in the extent or manner in which a long-lived asset (asset group) is being used or in its physical condition

   c.   A significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset (asset group), including an adverse action or assessment by a regulator

   d.   An accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of a long-lived asset (asset group)

   e.   A current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a

long-lived asset (asset group)

f.  A current expectation that, more likely than not, a long-lived asset (asset group) will be sold or otherwise disposed of significantly before the end of its previously estimated useful life. The term *more likely than not* refers to a level of likelihood that is more than 50 percent.

**360-10-35-22**   When a long-lived asset (asset group) is tested for recoverability, it also may be necessary to review depreciation estimates and method as required by Topic 250 or the amortization period as required by Topic 350. Paragraphs 250-10-45-17 through 45-20 and 250-10-50-4 address the accounting for changes in estimates, including changes in the method of depreciation, amortization, and depletion. Paragraphs 350-30-35-1 through 35-5 address the determination of the useful life of an intangible asset. Any revision to the remaining useful life of a long-lived asset resulting from that review also shall be considered in developing estimates of future cash flows used to test the asset (asset group) for recoverability (see paragraphs 360-10-35-31 through 35-32). However, any change in the accounting method for the asset resulting from that review shall be made only after applying this Subtopic.

> >   **Grouping Long-Lived Assets Classified as Held and Used**

**360-10-35-23**   For purposes of recognition and measurement of an impairment loss, a long-lived asset or assets shall be grouped with other assets and liabilities at the lowest level for which identifiable cash flows are largely independent of the cash flows of other assets and liabilities. However, an impairment loss, if any, that results from applying this Subtopic shall reduce only the carrying amount of a long-lived asset or assets of the group in accordance with paragraph 360-10-35-28.

**360-10-35-24**   In limited circumstances, a long-lived asset (for example, a corporate headquarters facility) may not have identifiable cash flows that are largely independent of the cash flows of other assets and liabilities and of other asset groups. In those circumstances, the asset group for that long-lived asset shall include all assets and liabilities of the entity.

**360-10-35-25**   In limited circumstances, an asset group will include all assets and liabilities of the entity. For example, the cost of operating assets such as corporate headquarters or centralized research facilities may be funded by revenue-producing activities at lower levels of the entity. Accordingly, in limited circumstances, the lowest level of identifiable cash flows that are largely independent of other asset groups may be the entity level. See Example 4 (paragraph 360-10-55-35).

> > >   **Effect of Goodwill when Grouping**

**360-10-35-26**   Goodwill shall be included in an asset group to be tested for impairment under this Subtopic only if the asset group is or includes a reporting unit. Goodwill shall not be included in a lower-level asset group that includes only part of a reporting unit. Estimates of future cash flows used to test that lower-level asset group for recoverability shall not be adjusted for the effect of excluding goodwill from the group. The term *reporting unit* is defined in Topic 350 as the same level as or one level below an **operating segment**. That Topic requires that goodwill be tested for impairment at the reporting unit level.

**360-10-35-27**   Other than goodwill, the carrying amounts of any assets (such as accounts receivable and inventory) and liabilities (such as accounts payable, long-term debt, and asset retirement obligations) not covered by this Subtopic that are included in an asset group shall be adjusted in accordance with other applicable generally accepted accounting principles (GAAP) before testing the asset group for recoverability. Paragraph 350-20-35-31 requires that goodwill be tested for impairment only after the carrying amounts of the other assets of the reporting unit, including the long-lived assets covered by this Subtopic, have been tested for impairment under other applicable accounting guidance.

> >   **Allocating Impairment Losses to an Asset Group**

**360-10-35-28**   An impairment loss for an asset group shall reduce only the carrying amounts of a long-lived asset or assets of the group. The loss shall be allocated to the long-lived assets of the group on a pro rata basis using the relative carrying amounts of those assets, except that the loss allocated to an

individual long-lived asset of the group shall not reduce the carrying amount of that asset below its fair value whenever that fair value is determinable without undue cost and effort. See Example 1 (paragraph 360-10-55-20) for an illustration of this guidance.

> > **Estimates of Future Cash Flows Used to Test a Long-Lived Asset for Recoverability**

**360-10-35-29**  Estimates of future cash flows used to test the recoverability of a long-lived asset (asset group) shall include only the future cash flows (cash inflows less associated cash outflows) that are directly associated with and that are expected to arise as a direct result of the use and eventual disposition of the asset (asset group). Those estimates shall exclude interest charges that will be recognized as an expense when incurred.

**360-10-35-30**  Estimates of future cash flows used to test the recoverability of a long-lived asset (asset group) shall incorporate the entity's own assumptions about its use of the asset (asset group) and shall consider all available evidence. The assumptions used in developing those estimates shall be reasonable in relation to the assumptions used in developing other information used by the entity for comparable periods, such as internal budgets and projections, accruals related to incentive compensation plans, or information communicated to others. However, if alternative courses of action to recover the carrying amount of a long-lived asset (asset group) are under consideration or if a range is estimated for the amount of possible future cash flows associated with the likely course of action, the likelihood of those possible outcomes shall be considered. A probability-weighted approach may be useful in considering the likelihood of those possible outcomes. See Example 2 (paragraph 360-10-55-23) for an illustration of this guidance.

**360-10-35-31**  Estimates of future cash flows used to test the recoverability of a long-lived asset (asset group) shall be made for the remaining useful life of the asset (asset group) to the entity. The remaining useful life of an asset group shall be based on the remaining useful life of the primary asset of the group. For purposes of this Subtopic, the primary asset is the principal long-lived tangible asset being depreciated or intangible asset being amortized that is the most significant component asset from which the asset group derives its cash-flow-generating capacity. The primary asset of an asset group therefore cannot be land or an intangible asset not being amortized.

**360-10-35-32**  Factors that an entity generally shall consider in determining whether a long-lived asset is the primary asset of an asset group include the following:

   a. Whether other assets of the group would have been acquired by the entity without the asset

   b. The level of investment that would be required to replace the asset

   c. The remaining useful life of the asset relative to other assets of the group. If the primary asset is not the asset of the group with the longest remaining useful life, estimates of future cash flows for the group shall assume the sale of the group at the end of the remaining useful life of the primary asset.

**360-10-35-33**  Estimates of future cash flows used to test the recoverability of a long-lived asset (asset group) that is in use, including a long-lived asset (asset group) for which development is substantially complete, shall be based on the existing service potential of the asset (asset group) at the date it is tested. The service potential of a long-lived asset (asset group) encompasses its remaining useful life, cash-flow-generating capacity, and for tangible assets, physical output capacity. Those estimates shall include cash flows associated with future expenditures necessary to maintain the existing service potential of a long-lived asset (asset group), including those that replace the service potential of component parts of a long-lived asset (for example, the roof of a building) and component assets other than the primary asset of an asset group. Those estimates shall exclude cash flows associated with future capital expenditures that would increase the service potential of a long-lived asset (asset group).

**360-10-35-34**  Estimates of future cash flows used to test the recoverability of a long-lived asset (asset group) that is under development shall be based on the expected service potential of the asset (group) when development is substantially complete. Those estimates shall include cash flows associated with all future expenditures necessary to develop a long-lived asset (asset group), including interest payments

that will be capitalized as part of the cost of the asset (asset group). Subtopic 835-20 requires the capitalization period to end when the asset is substantially complete and ready for its intended use.

**360-10-35-35**    If a long-lived asset that is under development is part of an asset group that is in use, estimates of future cash flows used to test the recoverability of that group shall include the cash flows associated with future expenditures necessary to maintain the existing service potential of the group (see paragraph 360-10-35-33) as well as the cash flows associated with all future expenditures necessary to substantially complete the asset that is under development (see the preceding paragraph). See Example 3 (paragraph 360-10-55-33). See also paragraphs 360-10-55-7 through 55-18 for considerations of site restoration and environmental exit costs.


> >    **Fair Value**


**360-10-35-36**    For long-lived assets (asset groups) that have uncertainties both in timing and amount, an expected present value technique will often be the appropriate technique with which to estimate fair value.


>    **Long-Lived Assets Classified as Held for Sale**


**360-10-35-37**    This guidance addresses the accounting for expected disposal losses for long-lived assets and asset groups that are classified as held for sale but have not yet been sold. See paragraphs 360-10-45-9 through 45-11 for the initial criteria to be met for classification as held for sale.


> >    **Measurement of Expected Disposal Loss or Gain**


**360-10-35-38**    Costs to sell are the incremental direct costs to transact a sale, that is, the costs that result directly from and are essential to a sale transaction and that would not have been incurred by the entity had the decision to sell not been made. Those costs include broker commissions, legal and title transfer fees, and closing costs that must be incurred before legal title can be transferred. Those costs exclude expected future losses associated with the operations of a long-lived asset (**disposal group**) while it is classified as held for sale. Expected future operating losses that marketplace participants would not similarly consider in their estimates of the fair value less cost to sell of a long-lived asset (disposal group) classified as held for sale shall not be indirectly recognized as part of an expected loss on the sale by reducing the carrying amount of the asset (disposal group) to an amount less than its current fair value less cost to sell. If the sale is expected to occur beyond one year as permitted in limited situations by paragraph 360-10-45-11, the cost to sell shall be discounted.

**360-10-35-39**    The carrying amounts of any assets that are not covered by this Subtopic, including goodwill, that are included in a disposal group classified as held for sale shall be adjusted in accordance with other applicable GAAP prior to measuring the fair value less cost to sell of the disposal group. Paragraphs 350-20-40-1 through 40-7 provide guidance for allocating goodwill to a lower-level asset group to be disposed of that is part of a reporting unit and that constitutes a business. Goodwill is not included in a lower-level asset group to be disposed of that is part of a reporting unit if it does not constitute a business.

**360-10-35-40**    A loss shall be recognized for any initial or subsequent write-down to fair value less cost to sell. A gain shall be recognized for any subsequent increase in fair value less cost to sell, but not in excess of the cumulative loss previously recognized (for a write-down to fair value less cost to sell). The loss or gain shall adjust only the carrying amount of a long-lived asset, whether classified as held for sale individually or as part of a disposal group.

**360-10-35-41**    See paragraphs 310-40-35-11 and 310-40-40-10 for guidance related to determination of cost basis for foreclosed assets under Subtopic 310-40 and the measurement of cumulative losses previously recognized under the preceding paragraph.

**360-10-35-42**    See paragraphs 830-30-45-13 through 45-15 for guidance regarding the application of Topic 830 to an investment being evaluated for impairment that will be disposed of.

> > **Accounting While Held for Sale**

**360-10-35-43**  A long-lived asset (disposal group) classified as held for sale shall be measured at the lower of its carrying amount or fair value less cost to sell. If the asset (disposal group) is newly acquired, the carrying amount of the asset (disposal group) shall be established based on its fair value less cost to sell at the acquisition date. A long-lived asset shall not be depreciated (amortized) while it is classified as held for sale. Interest and other expenses attributable to the liabilities of a disposal group classified as held for sale shall continue to be accrued.

> > **Changes to a Plan of Sale**

**360-10-35-44**  If circumstances arise that previously were considered unlikely and, as a result, an entity decides not to sell a long-lived asset (disposal group) previously classified as held for sale, the asset (disposal group) shall be reclassified as held and used. A long-lived asset that is reclassified shall be measured individually at the lower of the following:

a.  Its carrying amount before the asset (disposal group) was classified as held for sale, adjusted for any depreciation (amortization) expense that would have been recognized had the asset (disposal group) been continuously classified as held and used

b.  Its fair value at the date of the subsequent decision not to sell.

**360-10-35-45**  If an entity removes an individual asset or liability from a disposal group previously classified as held for sale, the remaining assets and liabilities of the disposal group to be sold shall continue to be measured as a group only if the criteria in paragraph 360-10-45-9 are met. Otherwise, the remaining long-lived assets of the group shall be measured individually at the lower of their carrying amounts or fair values less cost to sell at that date.

> **Long-Lived Assets to Be Disposed of Other than by Sale**

**360-10-35-46**  This guidance addresses the accounting for impairment of long-lived assets and asset groups that are intended to be disposed of by abandonment.

> > **Long-Lived Assets to Be Abandoned**

**360-10-35-47**  For purposes of this Subtopic, a long-lived asset to be abandoned is disposed of when it ceases to be used. If an entity commits to a plan to abandon a long-lived asset before the end of its previously estimated useful life, depreciation estimates shall be revised in accordance with paragraphs 250-10-45-17 through 45-20 and 250-10-50-4 to reflect the use of the asset over its shortened useful life (see paragraph 360-10-35-22).

**360-10-35-48**  Because the continued use of a long-lived asset demonstrates the presence of service potential, only in unusual situations would the fair value of a long-lived asset to be abandoned be zero while it is being used. When a long-lived asset ceases to be used, the carrying amount of the asset should equal its salvage value, if any. The salvage value of the asset shall not be reduced to an amount less than zero.

> > **Long-Lived Asset Temporarily Idled**

**360-10-35-49**  A long-lived asset that has been temporarily idled shall not be accounted for as if abandoned.

# Exhibit 12

# PART I

**ITEM 1.   BUSINESS**

Exxon Mobil Corporation was incorporated in the State of New Jersey in 1882. Divisions and affiliated companies of ExxonMobil or market products in the United States and most other countries of the world. Their principal business is energy, involving explorat and production of, crude oil and natural gas, manufacture of petroleum products and transportation and sale of crude oil, natural g petroleum products. ExxonMobil is a major manufacturer and marketer of commodity petrochemicals, including olefins, aro polyethylene and polypropylene plastics and a wide variety of specialty products. Affiliates of ExxonMobil conduct extensive r programs in support of these businesses.

Exxon Mobil Corporation has several divisions and hundreds of affiliates, many with names that include *ExxonMobil*, *Exxon*, *Esso* or *XTO*. For convenience and simplicity, in this report the terms *ExxonMobil, Exxon, Esso, Mobil* and *XTO*, as well as ter *Corporation*, *Company*, *our*, *we* and *its*, are sometimes used as abbreviated references to specific affiliates or groups of affiliat precise meaning depends on the context in question.

Throughout ExxonMobil's businesses, new and ongoing measures are taken to prevent and minimize the impact of our operations water and ground. These include a significant investment in refining infrastructure and technology to manufacture clean fuels, as projects to monitor and reduce nitrogen oxide, sulfur oxide and greenhouse gas emissions, and expenditures for asset ret obligations. Using definitions and guidelines established by the American Petroleum Institute, ExxonMobil's 2015 wo environmental expenditures for all such preventative and remediation steps, including ExxonMobil's share of equity co expenditures, were \$5.6 billion, of which \$3.8 billion were included in expenses with the remainder in capital expenditures. The to for such activities is expected to decrease to approximately \$5 billion in 2016 and 2017, mainly reflecting lower project activity in C Capital expenditures are expected to account for approximately 30 percent of the total.

The energy and petrochemical industries are highly competitive. There is competition within the industries and also with other indu supplying the energy, fuel and chemical needs of both industrial and individual consumers. The Corporation competes with other f the sale or purchase of needed goods and services in many national and international markets and employs all methods of com which are lawful and appropriate for such purposes.

Operating data and industry segment information for the Corporation are contained in the Financial Section of this report un following: "Quarterly Information", "Note 18: Disclosures about Segments and Related Information" and "Operating Sur Information on oil and gas reserves is contained in the "Oil and Gas Reserves" part of the "Supplemental Information on Oil a Exploration and Production Activities" portion of the Financial Section of this report.

ExxonMobil has a long-standing commitment to the development of proprietary technology. We have a wide array of research pr designed to meet the needs identified in each of our business segments. Information on Company-sponsored research and devel spending is contained in "Note 3: Miscellaneous Financial Information" of the Financial Section of this report. ExxonMob approximately 11 thousand active patents worldwide at the end of 2015. For technology licensed to third parties, revenues approximately \$158 million in 2015. Although technology is an important contributor to the overall operations and results of our Co the profitability of each business segment is not dependent on any individual patent, trade secret, trademark, license, franc concession.

The number of regular employees was 73.5 thousand, 75.3 thousand, and 75.0 thousand at years ended 2015, 2014 and 2013, respe Regular employees are defined as active executive, management, professional, technical and wage employees who work full time time for the Corporation and are covered by the Corporation's benefit plans and programs. Regular employees do not include emplo the company-operated retail sites (CORS). The number of CORS employees was 2.1 thousand, 8.4 thousand, and 9.8 thousand a ended 2015, 2014 and 2013, respectively. The decrease in CORS employees reflects the multi-year transition of the company-o retail network in portions of Europe to a more capital-efficient Branded Wholesaler model.

Information concerning the source and availability of raw materials used in the Corporation's business, the extent of seasonality business, the possibility of renegotiation of profits or termination of contracts at the election of governments and risks attendant to operations may be found in "Item 1A. Risk Factors" and "Item 2. Properties" in this report.

ExxonMobil maintains a website at exxonmobil.com. Our annual report on Form 10-K, quarterly reports on Form 10-Q, current rep Form 8-K and any amendments to those reports filed or furnished pursuant to Section 13(a) of the Securities Exchange Act of 1 made available through our website as soon as reasonably practical after we electronically file or furnish the reports to the Securit Exchange Commission. Also available on the Corporation's website are the Company's Corporate Governance Guidelines and C Ethics and Business Conduct, as well as the charters of the audit, compensation and nominating committees of the Board of Di Information on our website is not incorporated into this report.

**FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM**
INDEX NO. 451962/2016
NYSCEF DOC. NO. 181
RECEIVED NYSCEF: 06/02/2017
Page 46 of 127

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 143 of 553   PageID 570

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

gas supply requirements worldwide over the period 2015−2040 will be about $25 trillion (measured in 2014 dollars) or approx $1 trillion per year on average.

International accords and underlying regional and national regulations covering greenhouse gas emissions continue to evolve with ur timing and outcome, making it difficult to predict their business impact. For many years, the Corporation has taken into account established to reduce energy−related greenhouse gas emissions in its long-term *Outlook for Energy*, which is used as a foundati assessing the business environment and business strategies and investments. The climate accord reached at the recent Conference Parties (COP 21) in Paris set many new goals, and while many related policies are still emerging, the *Outlook for Energy* conti anticipate that such policies will increase the cost of carbon dioxide emissions over time. For purposes of the *Outlook for Ener* continue to assume that governments will enact policies that impose living costs on energy−related $CO_2$ emissions, which we assu reach an implied cost in OECD nations of about $80 per tonne in 2040. China and other leading non−OECD nations are expected OECD policy initiatives. Nevertheless, as people and nations look for ways to reduce risks of global climate change, they will con need practical solutions that do not jeopardize the affordability or reliability of the energy they need. Thus, all practical and econo viable energy sources, both conventional and unconventional, will be needed to continue meeting global energy needs – because scale of worldwide energy demand.

The information provided in the Long−Term Business Outlook includes ExxonMobil's internal estimates and forecasts based upon data and analyses as well as publicly available information from external sources including the International Energy Agency.

## Upstream

ExxonMobil continues to maintain a diverse portfolio of exploration and development opportunities, which enables the Corporatio selective, maximizing shareholder value and mitigating political and technical risks. ExxonMobil's fundamental Upstream b strategies guide our global exploration, development, production, and gas and power marketing activities. These strategies capturing material and accretive opportunities to continually high-grade the resource portfolio, exercising a disciplined appro investing and cost management, developing and applying high-impact technologies, pursuing productivity and efficiency gains, g profitable oil and gas production, and capitalizing on growing natural gas and power markets. These strategies are underpinne relentless focus on operational excellence, commitment to innovative technologies, development of our employees, and investmen communities within which we operate.

As future development projects and drilling activities bring new production online, the Corporation expects a shift in the geograp and in the type of opportunities from which volumes are produced. Oil equivalent production from North America is expected to i over the next several years based on current capital activity plans, contributing over a third of total production. Further, the propo our global production from resource types utilizing specialized technologies such as arctic, deepwater, and unconventional drilli production systems, as well as LNG, is also expected to grow, becoming a slight majority of production in the next few years. We anticipate that the expected change in the geographic mix of production volumes, and in the types of opportunities from which volun be produced, will have a material impact on the nature and the extent of the risks disclosed in Item 1A. Risk Factors, or result in a r change in our level of unit operating expenses.

The Corporation anticipates several projects will come online over the next few years providing additional production capacity. Ho actual volumes will vary from year to year due to the timing of individual project start-ups; operational outages; reservoir perfor performance of enhanced oil recovery projects; regulatory changes; the impact of fiscal and commercial terms; asset sales; weather price effects on production sharing contracts; changes in the amount and timing of capital investments that may vary depending on and gas price environment; and other factors described in Item 1A. Risk Factors.

The upstream industry environment has been challenged throughout 2015 with abundant crude oil supply causing crude oil p decrease to levels not seen since 2004, while natural gas prices remained depressed. However, current market conditions are not nec indicative of future conditions. The markets for crude oil and natural gas have a history of significant price volatility. ExxonMobil b prices over the long term will continue to be driven by market supply and demand, with the demand side largely being a function o economic growth. On the supply side, prices may be significantly impacted by political events, the actions of OPEC and oth government resource owners, and other factors. To manage the risks associated with price, ExxonMobil evaluates annual plans investments across a wide range of price scenarios. The Corporation's assessment is that its operations will exhibit strong performan the long term. This is the outcome of disciplined investment, cost management, asset enhancement programs, and application of ad technologies.

## Downstream

ExxonMobil's Downstream is a large, diversified business with refining, logistics, and marketing complexes around the wor Corporation has a presence in mature markets in North America and Europe, as well as in the growing Asia Pacific region.

https://www.sec.gov/Archives/edgar/data/34088/000003408816000065/xom10k2015.htm          5/27/2016

### MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

**Impact of Oil and Gas Reserves on Depreciation.** The calculation of unit-of-production depreciation is a critical accounting estim measures the depreciation of upstream assets. It is the ratio of actual volumes produced to total proved reserves or proved dev reserves (those proved reserves recoverable through existing wells with existing equipment and operating methods), applied to th cost. In the event that the unit-of-production method does not result in an equitable allocation of cost over the economic life of an up asset, an alternative such as the straight-line method is used. The volumes produced and asset cost are known and, while proved r have a high probability of recoverability they are based on estimates that are subject to some variability. While the revisic Corporation has made in the past are an indicator of variability, they have had a very small impact on the unit-of-production rates l they have been small compared to the large reserves base.

**Impact of Oil and Gas Reserves, Prices and Margins on Testing for Impairment.** The Corporation performs impairment asses whenever events or circumstances indicate that the carrying amounts of its long-lived assets (or group of assets) may not be reco through future operations or disposition. Assets are grouped at the lowest level for which there are identifiable cash flows that are independent of the cash flows of other groups of assets for this assessment.

Potential trigger events for impairment evaluation include:

- a significant decrease in the market price of a long-lived asset;
- a significant adverse change in the extent or manner in which an asset is being used or in its physical condition inclu significant decrease in current and projected reserve volumes;
- a significant adverse change in legal factors or in the business climate that could affect the value, including an adverse ac assessment by a regulator;
- an accumulation of project costs significantly in excess of the amount originally expected;
- a current-period operating loss combined with a history and forecast of operating or cash flow losses; and
- a current expectation that, more likely than not, a long-lived asset will be sold or otherwise disposed of significantly before of its previously estimated useful life.

The Corporation performs asset valuation analyses on an ongoing basis as a part of its asset management program. These analy other profitability reviews assist the Corporation in assessing whether the carrying amounts of any of its assets may not be recoverab

In general, the Corporation does not view temporarily low prices or margins as a trigger event for conducting impairment tests. The for crude oil, natural gas and petroleum products have a history of significant price volatility. Although prices will occasional significantly, industry prices over the long term will continue to be driven by market supply and demand. On the supply side, i production from mature fields is declining, but this is being offset by production from new discoveries and field developments. production policies also have an impact on world oil supplies. The demand side is largely a function of global economic grow relative growth/decline in supply versus demand will determine industry prices over the long term, and these cannot be ac predicted.

If there were a trigger event, the Corporation estimates the future undiscounted cash flows of the affected properties to jud recoverability of carrying amounts. Cash flows used in impairment evaluations are developed using estimates for future crude natural gas commodity prices, refining and chemical margins, and foreign currency exchange rates. Volumes are based on projec and facility production profiles, throughput, or sales. These evaluations make use of the Corporation's price, margin, volume, a assumptions developed in the annual planning and budgeting process, and are consistent with the criteria management uses to e investment opportunities. Where unproved reserves exist, an appropriately risk-adjusted amount of these reserves may be include evaluation.

An asset group would be impaired if its undiscounted cash flows were less than the asset's carrying value. Impairments are measure amount by which the carrying value exceeds fair value. Cash flow estimates for impairment testing exclude the effects of de instruments.

In light of continued weakness in the upstream industry environment in late 2015, the Corporation undertook an effort to assess it long-lived assets most at risk for potential impairment. The results of this assessment confirm the absence of a trigger event and i that the future undiscounted cash flows associated with these assets substantially exceed the carrying value of the assets. The asse reflects crude and natural gas prices that are generally consistent with the long-term price forecasts published by third-party i experts. Critical to the long-term recoverability of certain assets is the assumption that either by supply and demand changes, or general inflation, prices will rise in the future. Should increases in long-term prices not materialize, certain of the Corporation's ass be at risk for impairment. Due to the inherent difficulty in predicting future commodity prices, and the relationship between industry and costs, it is not practicable to reasonably estimate a range of potential future impairments related to the Corporation's long-lived a

Significant unproved properties are assessed for impairment individually, and valuation allowances against the capitalized co recorded based on the estimated economic chance of success and the length of time that the Corporation expects to hold the

57

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 145 of 553   PageID 572

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Level 2 inputs are inputs other than quoted prices included within Level 1 that are directly or indirectly observable for the asset or l Hierarchy Level 3 inputs are inputs that are not observable in the market.

**Inventories.** Crude oil, products and merchandise inventories are carried at the lower of current market value or cost (generally dete under the last-in, first-out method – LIFO). Inventory costs include expenditures and other charges (including depreciation) direc indirectly incurred in bringing the inventory to its existing condition and location. Selling expenses and general and admini expenses are reported as period costs and excluded from inventory cost. Inventories of materials and supplies are valued at cost or les

**Property, Plant and Equipment.** Depreciation, depletion and amortization, based on cost less estimated salvage value of the as primarily determined under either the unit-of-production method or the straight-line method, which is based on estimated asset serv taking obsolescence into consideration. Maintenance and repairs, including planned major maintenance, are expensed as incurred renewals and improvements are capitalized and the assets replaced are retired.

The Corporation uses the "successful efforts" method to account for its exploration and production activities. Under this method, c accumulated on a field-by-field basis. Costs incurred to purchase, lease, or otherwise acquire a property (whether unproved or prov capitalized when incurred. Exploratory well costs are carried as an asset when the well has found a sufficient quantity of reserves to its completion as a producing well and where the Corporation is making sufficient progress assessing the reserves and the econom operating viability of the project. Exploratory well costs not meeting these criteria are charged to expense. Other exploratory expen including geophysical costs and annual lease rentals, are expensed as incurred. Development costs, including costs of productive w development dry holes, are capitalized.

Acquisition costs of proved properties are amortized using a unit-of-production method, computed on the basis of total proved oil reserves. Capitalized exploratory drilling and development costs associated with productive depletable extractive properties are am using unit-of-production rates based on the amount of proved developed reserves of oil, gas and other minerals that are estimate recoverable from existing facilities using current operating methods. Under the unit-of-production method, oil and gas volur considered produced once they have been measured through meters at custody transfer or sales transaction points at the outlet valve lease or field storage tank. In the event that the unit-of-production method does not result in an equitable allocation of cost o economic life of an upstream asset, an alternative such as the straight-line method is used.

Production involves lifting the oil and gas to the surface and gathering, treating, field processing and field storage of the oil and g production function normally terminates at the outlet valve on the lease or field production storage tank. Production costs are those i to operate and maintain the Corporation's wells and related equipment and facilities and are expensed as incurred. They become par cost of oil and gas produced. These costs, sometimes referred to as lifting costs, include such items as labor costs to operate the w related equipment; repair and maintenance costs on the wells and equipment; materials, supplies and energy costs required to ope wells and related equipment; and administrative expenses related to the production activity.

The Corporation performs impairment assessments whenever events or circumstances indicate that the carrying amounts of its lor assets (or group of assets) may not be recoverable through future operations or disposition. Assets are grouped at the lowest level fo there are identifiable cash flows that are largely independent of the cash flows of other groups of assets for this assessment.

Potential trigger events for impairment evaluation include:

- a significant decrease in the market price of a long-lived asset;
- a significant adverse change in the extent or manner in which an asset is being used or in its physical condition inclu significant decrease in current and projected reserve volumes;
- a significant adverse change in legal factors or in the business climate that could affect the value, including an adverse ac assessment by a regulator;
- an accumulation of project costs significantly in excess of the amount originally expected;
- a current-period operating loss combined with a history and forecast of operating or cash flow losses; and
- a current expectation that, more likely than not, a long-lived asset will be sold or otherwise disposed of significantly before of its previously estimated useful life.

The Corporation performs asset valuation analyses on an ongoing basis as a part of its asset management program. These analy other profitability reviews assist the Corporation in assessing whether the carrying amounts of any of its assets may not be recoverab

In general, the Corporation does not view temporarily low prices or margins as a trigger event for conducting impairment tests. The r for crude oil, natural gas and petroleum products, have a history of significant price volatility. Although prices will occasional significantly, industry prices over the long term will continue to be driven by market supply and demand.

69

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

On the supply side, industry production from mature fields is declining, but this is being offset by production from new discover field developments. OPEC production policies also have an impact on world oil supplies. The demand side is largely a function of economic growth. The relative growth/decline in supply versus demand will determine industry prices over the long term, and these be accurately predicted.

If there were a trigger event, the Corporation estimates the future undiscounted cash flows of the affected properties to ju recoverability of carrying amounts. Cash flows used in impairment evaluations are developed using estimates for future crude natural gas commodity prices, refining and chemical margins, and foreign currency exchange rates. Volumes are based on project and facility production profiles, throughput, or sales. These evaluations make use of the Corporation's price, margin, volume, a assumptions developed in the annual planning and budgeting process, and are consistent with the criteria management uses to e investment opportunities. Where unproved reserves exist, an appropriately risk-adjusted amount of these reserves may be include evaluation.

An asset group would be impaired if its undiscounted cash flows were less than the asset's carrying value. Impairments are measured amount by which the carrying value exceeds fair value. Cash flow estimates for impairment testing exclude the effects of de instruments.

Significant unproved properties are assessed for impairment individually, and valuation allowances against the capitalized co recorded based on the estimated economic chance of success and the length of time that the Corporation expects to hold the pro Properties that are not individually significant are aggregated by groups and amortized based on development risk and average period.

Gains on sales of proved and unproved properties are only recognized when there is neither uncertainty about the recovery applicable to any interest retained nor any substantial obligation for future performance by the Corporation.

Losses on properties sold are recognized when incurred or when the properties are held for sale and the fair value of the propertie than the carrying value.

Interest costs incurred to finance expenditures during the construction phase of multiyear projects are capitalized as part of the hi cost of acquiring the constructed assets. The project construction phase commences with the development of the detailed engi design and ends when the constructed assets are ready for their intended use. Capitalized interest costs are included in property, pl equipment and are depreciated over the service life of the related assets.

**Asset Retirement Obligations and Environmental Liabilities.** The Corporation incurs retirement obligations for certain assets. T values of these obligations are recorded as liabilities on a discounted basis, which is typically at the time the assets are installed. Th associated with these liabilities are capitalized as part of the related assets and depreciated. Over time, the liabilities are accreted change in their present value.

Liabilities for environmental costs are recorded when it is probable that obligations have been incurred and the amounts can be rea estimated. These liabilities are not reduced by possible recoveries from third parties and projected cash expenditures are not discount

**Foreign Currency Translation.** The Corporation selects the functional reporting currency for its international subsidiaries based currency of the primary economic environment in which each subsidiary operates.

Downstream and Chemical operations primarily use the local currency. However, the U.S. dollar is used in countries with a history inflation (primarily in Latin America) and Singapore, which predominantly sells into the U.S. dollar export market. Upstream op which are relatively self-contained and integrated within a particular country, such as Canada, the United Kingdom, Norw continental Europe, use the local currency. Some Upstream operations, primarily in Asia and Africa, use the U.S. dollar becau predominantly sell crude and natural gas production into U.S. dollar-denominated markets.

For all operations, gains or losses from remeasuring foreign currency transactions into the functional currency are included in income

**Stock-Based Payments.** The Corporation awards stock-based compensation to employees in the form of restricted stock and re stock units. Compensation expense is measured by the price of the stock at the date of grant and is recognized in income over the re service period.

# Exhibit 13

**From:** Rosenthal, David S
**Sent:** Tuesday, March 25, 2014 6:57 PM
**To:** Luettgen, Robert A
**Subject:** RE: Ceres draft


Yes. Lets leave off the impairment footnote. That word gives the folks on the third floor heartburn.


David Rosenthal
Vice President, Investor Relations and Secretary
Exxon Mobil Corporation
Phone: 972-444-1538
Facs: 972-444- 1199

---

**From:** Luettgen, Robert A
**Sent:** Tuesday, March 25, 2014 7:54 AM
**To:** Rosenthal, David S
**Subject:** Ceres draft

I've adopted what I could from Pete's draft.  I'd like to get your thoughts first before I send it out to the team for review.

Pete makes a good point in suggesting that the carbon asset risk discussion should precede the discussion on managing risks.  I understand why you would like for the managing risks section to follow the statement of how important we view the risk of climate change, but I think we would be best served to dive into the carbon asset risk discussion (now that it has been amplified by Pete) earlier.  I would just flip the order, if acceptable to you.

Pete placed the graph and discussion regarding the need to continue investing in hydrocarbons in the Planning Bases section of the document; but, I really think it fits better in the carbon asset discussion, as I've indicated in the attached. Let me know if you agree with this.

I'm afraid I couldn't use a lot of the material that Pete brought over (word-for-word) from Viederman, but I did backfill some of the points we had addressed in Viederman (e.g., technology, hydrogen fuel cells, etc.) where those concepts fit best in the Ceres document.

I'm not sure we've got the team sold yet on the need for a separate, self-standing document in the Ceres response (witness both Alan Jeffers and now Pete's whole-scale insertion of text from Viederman).  I'll reiterate this in my note to the team and emphasize to them that while it's OK to bring over concepts from the Viederman piece, but we need to make sure that the Ceres letter reads independent, even if it shares many of the same looks and feel of the Viederman piece.  The Viederman piece is intended to tell a story; the Ceres piece (while telling a story) is really focused on answering questions.  They're different points of departure and deserving of separate treatment.

One last thing, while we address the issue of whether we anticipate having stranded assets, but we deleted the footnote that addressed the question of impairment.  I know you asked to delete that, but I'm just confirming that this is your desire.


Robert A. Luettgen
Manager, Office of the Secretary
Exxon Mobil Corporation
5959 Las Colinas Blvd.
Rm 2616
Irving, Texas  75039

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)        EMC 001198245

MySite Link

Phone: 972-444-1236
Fax: 972-444-1204
Cell: 281-224-9573

This communication may contain confidential information and is intended only for the addressee and may be legally privileged and exempt from disclosure under applicable laws. If you are not the intended addressee, or if this email is received in error, please notify me that you have received this message in error and then kindly delete this message without copying or saving it.  Any use, dissemination or reproduction of this message by persons or entities other than the intended addressee(s) is unauthorized and is strictly prohibited.

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)      EMC 001198246

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

NYSCEF DOC. NO. 183

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

# Exhibit 14



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

### SUBPOENA AD TESTIFICANDUM

### THE PEOPLE OF THE STATE OF NEW YORK
### <u>GREETINGS</u>

**TO:**

Exxon Mobil Corporation
c/o Theodore V. Wells Jr.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064

**YOU ARE HEREBY COMMANDED,** pursuant General Business Law § 352, Executive Law § 63(12), and § 2302(a) of the New York Civil Practice Law and Rules, to appear and testify, through one or more designated persons having knowledge of the subjects set forth in the Schedule attached hereto, before Eric T. Schneiderman, the Attorney General of the State of New York, or a designated Assistant Attorney General, on ***the 10th day of April, 2017, at 9:30 a.m.,*** or any agreed upon adjourned date or time, at 120 Broadway, New York, New York 10271, to testify in connection with an investigation concerning Exxon Mobil Corporation, and specifically in connection with the matters described in the attached Schedule, or any matter which the Attorney General deems pertinent thereto.

**TAKE NOTICE** that the Attorney General deems the testimony commanded by this Subpoena to be relevant and material to an investigation and inquiry undertaken in the public interest.

**TAKE FURTHER NOTICE** that Your disobedience of this Subpoena, by failing to attend and testify on the date, time and place stated above or on any agreed upon adjourned date or time, ***may subject You to prosecution for a misdemeanor or penalties and other lawful punishment*** under General Business Law § 352 and § 2308 of the New York Civil Practice Law, and/or other statutes.

**TAKE FURTHER NOTICE** that You should not disclose the existence of this Subpoena, its contents, or any subsequent communications with the Office of the Attorney General while this investigation is pending. In the event You believe that You are required to disclose the existence of this Subpoena or any information related thereto, You shall notify the individual listed below immediately and well in advance of Your disclosure of the same.

1

   ·  **WITNESS, The Honorable Eric T. Schneiderman,** Attorney General of the State of New York, this 24th day of March, 2017.

By: _____

    John Oleske
    Senior Enforcement Counsel
    120 Broadway, 26th Floor
    New York, New York 10271
    (212) 416-8222

## SCHEDULE

## TOPICS FOR TESTIMONY

1. Exxon Mobil Corporation's ("Exxon") process for identifying sources of potentially responsive documents, communications, and other information in response to the Office of the New York State Attorney General's ("OAG") November 4, 2015 subpoena to Exxon (the "Subpoena").

2. Exxon's preservation of, or failure to preserve, documents, communications, and other information in response to the Subpoena.

3. Exxon's collection of, or failure to collect, documents, communications, and other information in response to the Subpoena.

4. Exxon's production of, or failure to produce, documents, communications, and other information in response to the Subpoena.

5. Exxon's process for identifying, preserving, collecting, and producing documents, communications, and other information from Exxon's Management Committee members, Board of Directors members, and other high-level executives in response to the Subpoena.

6. The application of Exxon's preservation process to secondary e-mail accounts, and the non-application of that process to Rex Tillerson's secondary e-mail account after the Subpoena was issued.

# Exhibit 15



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

## SUBPOENA AD TESTIFICANDUM

**TO**:   Exxon Mobil Corporation
c/o Michele Hirshman, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064

**YOU ARE HEREBY COMMANDED**, pursuant General Business Law § 352, Executive Law § 63(12), and § 2302(a) of the New York Civil Practice Law and Rules, to appear and testify, through one or more designated persons having knowledge of the subjects set forth in the Schedule attached hereto, before Eric T. Schneiderman, the Attorney General of the State of New York, or a designated Assistant Attorney General, on ***the 3rd day of May, 2017, at 9:30 a.m.***, or any agreed upon adjourned date or time, at 120 Broadway, New York, New York 10271, to testify in connection with an investigation concerning Exxon Mobil Corporation, and specifically in connection with the matters described in the attached Schedule, or any matter which the Attorney General deems pertinent thereto.

**PLEASE TAKE NOTICE** that the Attorney General deems the testimony commanded by this Subpoena to be relevant and material to an investigation and inquiry undertaken in the public interest.

**PLEASE TAKE FURTHER NOTICE** that Your disobedience of this Subpoena, by failing to attend and testify on the date, time and place stated above or on any agreed upon adjourned date or time, ***may subject You to prosecution for a misdemeanor or penalties and other lawful punishment*** under General Business Law § 352 and § 2308 of the New York Civil Practice Law, and/or other statutes.

**PLEASE TAKE FURTHER NOTICE** that You should not disclose the existence of this Subpoena, its contents, or any subsequent communications with the Office of the Attorney General while this investigation is pending.  In the event You believe that You are required to disclose the existence of this Subpoena or any information related thereto, You shall notify the individual listed below immediately and well in advance of Your disclosure of the same.

1

**WITNESS, The Honorable Eric T. Schneiderman,** Attorney General of the State of New York, this 19th day of April, 2017.

By: _____

John Oleske
Senior Enforcement Counsel
120 Broadway, 26th Floor
New York, New York 10271
(212) 416-8660

# SCHEDULE

## TOPICS FOR TESTIMONY

1.  Exxon Mobil Corporation's ("Exxon") response to the Office of the New York State Attorney General's ("OAG") November 4, 2015 subpoena to Exxon (the "Subpoena"), including but not limited to:

    a.  Date(s), person(s) instituting, and content of each preservation hold notice sent to each custodian;

    b.  Date(s), person(s) conducting, and content of each custodial interview conducted;

    c.  Date(s), person(s) conducting, and method of collecting potentially responsive or responsive documents, communications, and information for each custodian;

    d.  Date(s), person(s) conducting, and method of reviewing potentially responsive or responsive documents, communications, and information for each custodian;

    e.  Dates(s), person(s) conducting, and method of determination that potentially responsive or responsive documents, communications, and information were lost, for each custodian; and

    f.  Dates(s), person(s) conducting, and method of recovery of potentially responsive or responsive documents, communications, and information that were lost for each custodian in 1(e).

2.  Exxon's compliance with the Subpoena, including but not limited to the attestations required by Subpoena Instruction Nos. 3, 4, 10, 12, and 13 and including but not limited to the attestations required in the Affidavit Of Compliance Paragraph Nos. 5, 8 and 9.

3.  Exxon's collection, preservation, review and production of Documents and Communications of reserves custodians responsive to the Subpoena, including but not limited to those of (a) William Strawbridge; (b) the Upstream Reserves Committee; (c) the EMPC Reserves Committee; (d) the EMDC Reserves Committee; and (e) the IOL Reserves Management Committee (RMC) for Time Period 1 of the Subpoena.

# Exhibit 16

Page 1

1

2      - - - - - - - - - - - - - - - - - -x

3    In the Matter of the Investigation of

4

5            EXXON MOBIL CORPORATION

6    - - - - - - - - - - - - - - - - - - -x

7                        May 10, 2017

8                        9:38 a.m.

9

10           EXAMINATION OF MICHELE

11    HIRSHMAN, held at the Office of the

12    Attorney General, 120 Broadway, New York,

13    New York, before Jamie Ann Stanton, a

14    Notary Public of the State of New York.

15

16            *      *      *

17

18

19

20

21

22

23

24

25

Page 2

1
2 A P P E A R A N C E S :
3
4        STATE OF NEW YORK
5        OFFICE OF THE ATTORNEY GENERAL
6        ERIC T. SCHNEIDERMAN
7          120 Broadway
8          New York, New York 10271-0332
9
10       BY:  JOHN OLESKE, ESQ.
11          MANDY DeROCHE, ESQ.
12
13       PAUL, WEISS, RIFKIND, WHARTON
14       & GARRISON LLP
15       Attorney for Exxon Mobil Corporation
16          1285 Avenue of the Americas
17          New York, New York 10019-6064
18       BY:  DANIEL J. TOAL, ESQ.
19          NORA AHMED, ESQ.
20          JANE BOBET, ESQ.
21  Also present:
22    Ted Wells
23          *    *    *
24
25

Page 3

1
2    M I C H E L E   H I R S H M A N , having
3  first been duly sworn by the Notary
4  Public, was examined and testified as
5  follows:
6        MR. TOAL:  Before we get
7     started, Ms. Hirshman is here to
8     testify about the contents of her
9     affirmation.  We are not intending to
10    and will not be waiving
11    attorney/client privilege and work
12    product protection, so we will try and
13    get through this as best we can, but
14    we will just have to take it one
15    question at a time.
16        MR. OLESKE:  Understood.
17    Obviously, the Attorney General's
18    Office is not waiving any objections
19    it might have to assertions of
20    privilege and the right to continue or
21    reopen the examination to account for
22    any testimony not taken as a result of
23    such an assertion.
24  EXAMINATION BY
25  MR. OLESKE:

Page 4

1        M. Hirshman
2    Q    Please state your name for the
3  record.
4    A    Michele Hirshman.
5    Q    Please state your address for
6  the record.
7    A    Paul, Weiss, Rifkind, Wharton &
8  Garrison, LLP, 1285 Avenue of the
9  Americas, New York, New York.
10   Q    Ms. Hirshman, good morning.
11   A    Good morning.
12   Q    I am going to dispense with
13  some of the preliminaries and just get
14  to:  You understand you are here to
15  testify on behalf of ExxonMobil with our
16  office's subpoena dated November 4, 2014,
17  correct?
18   A    I understand I am here to
19  testify to the contents of my affirmation
20  which concerns that subject matter.
21   Q    And is there any reason that
22  you are aware of why your testimony today
23  would not be truthful or accurate?
24   A    No.
25   Q    And just some quick background:

Page 5

1        M. Hirshman
2  You are currently employed by Paul, Weiss
3  correct?
4    A    I am a partner in the law firm
5  of Paul, Weiss, yes.
6    Q    And you have been a partner of
7  Paul, Weiss in the last ten years, right?
8    A    Correct.
9    Q    And immediately preceding that,
10  you were Deputy Attorney General for the
11  State of New York for about eight years,
12  correct?
13   A    I was the First Deputy Attorney
14  General for the State of New York for a
15  little over eight years.
16   Q    And then prior to that, you
17  were in the Department of Justice, the
18  Federal Department of Justice, for about
19  11 years, correct?
20   A    That's correct.
21        MR. OLESKE:  I would like to
22    show you a document we will mark as
23    Exhibit 1, if we can.
24        (Hirshman Exhibit 1 was
25    marked for identification, as of this

2 (Pages 2 - 5)

Page 6

1        M. Hirshman
2    date.)
3    Q    Ms. Hirshman, can you please
4  take a look at the document that you have
5  been handed marked Exhibit 1, and just
6  let me know when you are able to confirm
7  whether or not this is the certification
8  that you swore to on April 10th, 2017.
9    A    (Reviewing exhibit.)
10       It is the document to which I
11  affirmed on April 10, 2017.
12   Q    And that is the same document
13  that you referred to in your answer to my
14  first question and that Mr. Toal to
15  referred to in his colloquy before we
16  began, correct?
17   A    Correct.  And there is also a
18  supplemental affirmation as well.
19       MR. OLESKE:  I will show you
20  a document we will mark as Exhibit 2.
21       (Hirshman Exhibit 2 was
22  marked for identification, as of this
23  date.)
24   Q    Ms. Hirshman, can you please
25  look at the document that is been handed

Page 7

1        M. Hirshman
2  you as Exhibit 2, and tell me whether or
3  not you are able to confirm it is the
4  supplement to your certification sworn to
5  on May 3, 2017, that you were just
6  referring to?
7    A    (Reviewing exhibit.)
8        It is the supplemental
9  affirmation, which I executed on May 3rd.
10       MR. OLESKE:  I would like to
11  show you a document that we will mark
12  as Exhibit 3.
13       (Hirshman Exhibit 3 was
14  marked for identification, as of this
15  date.)
16   Q    Ms. Hirshman, can you please
17  review the document that is been handed
18  you marked Exhibit 3, and when you are
19  able to, please tell me if you recognize
20  this document.
21   A    (Reviewing exhibit.)  I do.
22   Q    What do you recognize this
23  document to be?
24       MR. TOAL:  John, before you
25  go on, I think there is Exhibit A on

Page 8

1        M. Hirshman
2  the back of this, and I'm not sure it
3  actually belongs with this document.
4        MR. OLESKE:  I see what you
5  are saying.  This is an extraneous
6  part of a letter to which this
7  document was attached; isn't it?  This
8  very last page, Exhibit A, letter from
9  D. Toal.
10       MR. TOAL:  This is not part
11  of the affidavit of Connie Feinstein.
12       MR. OLESKE:  Sure, we will
13  let the record reflect that the last
14  page on the back side of the paper of
15  Exhibit 3 is extraneous to the rest of
16  the document that we are talking
17  about.
18   Q    Is that your understanding,
19  Ms. Hirshman?
20   A    Well, what I can testify to is
21  that with respect to pages -- the pages
22  that are marked through page 13 of 13, in
23  Exhibit 3, those pages of Hirshman
24  Exhibit 3 were -- are the affidavit of
25  Ms. Feinstein, which was attached as an

Page 9

1        M. Hirshman
2  exhibit to my affirmation of April 10th.
3    Q    And it was incorporated by
4  reference into that affirmation, correct,
5  of April 10th?
6    A    I need to review the footnote.
7  I think it -- it says in paragraph 45,
8  that the affidavit, which is attached,
9  describes the protocol used for the
10  collection and review of documents
11  belonging to the management custodians.
12  So it was referred to in my affirmation
13  and attached.
14   Q    And Ms. Feinstein swore to that
15  affirmation on March 30th of 2017; is
16  that correct?
17   A    I don't have personal knowledge
18  of that.  I see the affidavit and the
19  document in front of me and I see, you
20  know, Ms. Feinstein's signature as well
21  as signatures of what appears to be a
22  Texas Notary Public, indicating that
23  date.
24   Q    Sure, from your personal
25  knowledge, though, you do know that

3 (Pages 6 - 9)

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 162 of 553   PageID 589

Page 10

M. Hirshman

1        M. Hirshman
2  Ms. Feinstein actually swore to this
3  certification around that time, correct?
4       A    I can tell you what I'm reading
5  on the document.
6       Q    Okay.
7       A    I was not present for her
8  swearing of that certification in front
9  of the Notary.
10           MR. OLESKE:  I am going to
11  hand to the reporter what we will mark
12  as Exhibit 4.
13           (Hirshman Exhibit 4 was
14  marked for identification, as of this
15  date.)
16       Q    Ms. Hirshman, could you please
17  just review the document that's been
18  handed to you as Exhibit 4, and let me
19  know when you are able to recognize that
20  document.
21       A    (Reviewing exhibit.)  It
22  appears to be the amended affidavit of
23  Ms. Feinstein, executed on April 19th.
24       Q    And this is a supplement or
25  amendment to Exhibit 3, correct?

Page 11

1        M. Hirshman
2       A    Correct.
3            MR. OLESKE:  Why don't we
4  take our break at this point?
5            [A recess was taken.]
6            MR. OLESKE:  I am going to
7  hand to the reporter to mark as
8  Exhibit 5 a document.
9            (Hirshman Exhibit 5 was
10  marked for identification, as of this
11  date.)
12           THE WITNESS:  I have the
13  document in front of me.
14       Q    Could you please review the
15  document, and let me know when you are
16  able to confirm whether or not you
17  recognize this document.
18       A    (Reviewing exhibit.)  I do.
19       Q    And what do you recognize this
20  document to be?
21       A    It appears to be the subpoena
22  that was served on ExxonMobil around
23  November 4, 2015.
24       Q    And is this Exhibit 5 the
25  subpoena that is referenced in your

Page 12

1        M. Hirshman
2  certification sworn to on April 10, 2017?
3       A    In my certification to which I
4  affirmed -- wait, could you repeat the
5  question again?
6       Q    Sure.  Referring to Exhibit 1,
7  at paragraph 2, is Exhibit 5 the subpoena
8  referenced in paragraph 2 of Exhibit 1?
9       A    Yes.
10       Q    Was Paul, Weiss, your law firm,
11  retained by ExxonMobil at or about the
12  time of the issuance of this subpoena in
13  order to represent it in connection with
14  responding to the subpoena?
15       A    Yes.
16       Q    And were you and Mr. Wells
17  designated as the lead counsel for Paul,
18  Weiss in this matter?
19       A    I would be hesitant to
20  characterize any, you know,
21  characterization, but Mr. Wells and I --
22  I believe Mr. Wells was contacted, and
23  asked me to work on the matter with him.
24       Q    And at or around the time that
25  Paul, Weiss was retained for this

Page 13

1        M. Hirshman
2  purpose, did you receive a copy of the
3  subpoena, Exhibit 5?
4       A    Yes.
5       Q    And did you review Exhibit 5 at
6  that time?
7       A    Yes.
8       Q    Did you familiarize yourself
9  with the contents of the document at that
10  time?
11       A    Generally, yes.
12           MR. OLESKE:  I would like to
13  mark this document as Exhibit 6,
14  please.
15           (Hirshman Exhibit 6 was
16  marked for identification, as of this
17  date.)
18       Q    Ms. Hirshman, could you please
19  review the document that you have been
20  handed marked Exhibit 6, and let me know
21  when you have had a chance to determine
22  whether you can confirm whether you
23  recognize this document.
24       A    Certainly.
25           (Reviewing exhibit.)  I do.

4 (Pages 10 - 13)

Page 14

1       M. Hirshman
2    Q    What do you recognize this
3  document to be?
4    A    It's correspondence that was
5  sent to you and signed by me.
6    Q    And what is the date of the
7  correspondence?
8    A    April 18th, 2016.
9    Q    Was this correspondence sent in
10  connection with your representation of
11  Exxon in responding to the subpoena that
12  was Exhibit 5?
13    A    It was sent in connection with
14  my representation of Exxon, and it
15  covered some matters related to the
16  subpoena as well as other matters.
17    Q    If I could direct you to page 6
18  of that document.
19    A    (Complying.)
20    Q    And I would just ask you to,
21  specifically, to yourself, read and just
22  make sure you are familiar with the
23  contents of that first full paragraph,
24  beginning, "with respect to."
25    A    Sure.

Page 15

1       M. Hirshman
2    Q    And let me know when you are
3  through with that paragraph.
4    A    Great.
5       (Reviewing exhibit.)
6    Q    Have you had a chance to review
7  that paragraph, Ms. Hirshman?
8    A    I have.
9    Q    Did you write this paragraph?
10    A    I am pretty sure I wrote
11  significant parts of this paragraph, yes.
12    Q    The paragraph states, in part,
13  I am looking at the second line of the
14  paragraph:  ExxonMobil is well aware of
15  its legal obligations to preserve
16  documents in connection with its receipt
17  of the subpoena.
18       You wrote that, correct?
19    A    Yes.
20    Q    And then you state:
21  ExxonMobil's comprehensive effort to
22  identify custodians with responsive
23  documents plainly complies with
24  applicable documents caselaw.
25       And you wrote that also,

Page 16

1       M. Hirshman
2  correct?
3    A    Correct.
4    Q    And you cite some caselaw and
5  other authorities in the rest of the
6  paragraph, correct?
7    A    That is correct.
8    Q    And you cite the First
9  Department's holding in VOOM HD Holdings
10  and also the Zubulake series of cases,
11  correct?
12    A    I cite the -- I cite that VOOM,
13  Zubulake.  I cite Zubulake's quotations
14  on this subject.
15    Q    And you also cite the Sedona
16  Conference document in the eDiscovery
17  field, correct?
18    A    Yes, I did.
19    Q    And if I could turn you to page
20  8.
21    A    (Complying.)
22    Q    Do you see that there is a
23  heading, a bold number 8 and a heading,
24  E-Discovery Contacts?
25    A    Yes, I do.

Page 17

1       M. Hirshman
2    Q    And that first paragraph right
3  underneath that, it says:  We have fully
4  and accurately provided answers to all of
5  your e-discovery inquiries and we
6  therefore see no reason for your
7  e-discovery specialists to speak with our
8  counterparts at ExxonMobil.
9       You wrote that, correct?
10    A    Yes.
11    Q    And then you wrote:
12  Messrs. Conlon and Wells and I
13  collectively have been practicing law for
14  over 100 years, and we each take great
15  care in assuring that our representations
16  to governmental bodies and opposing
17  counsel are accurate.
18       You wrote that, correct?
19    A    Yes, I did.
20       MR. OLESKE:  Let's mark as
21  Exhibit 7.
22       (Hirshman Exhibit 7 was
23  marked for identification, as of this
24  date.)
25    Q    Ms. Hirshman, can you please

5 (Pages 14 - 17)

Page 18

1          M. Hirshman
2   review the document you have been handed
3   marked Exhibit 7, and let me know when
4   you are able to confirm whether or not
5   you recognize it.
6       A     (Reviewing exhibit.)  Okay.
7   I've read it.
8       Q     Do you recognize this document?
9       A     I do.
10      Q     And what is this document?
11      A     It's a correspondence from me
12  to you, dated August 3rd, 2016.
13      Q     I direct you to page 3 of this
14  document.
15      A     (Complying.)
16      Q     On that page, do you see there
17  is a bold heading that states:  Preserved
18  Documents and Custodians?
19      A     Yes, I do.
20      Q     And then going to the second
21  line of the following paragraph, the
22  letter reads: ExxonMobil is well aware
23  of its preservation obligations, and that
24  the duty to preserve extends only to
25  those employees likely to have relevant

Page 19

1          M. Hirshman
2   information, i.e., what the caselaw
3   defines as "key players," and not any
4   person the Office decides to identify.
5          Did you write that?
6       A     Yes.
7       Q     When you referred to caselaw,
8   and its definition of key players, you
9   were referring to the Zubulake series of
10  cases, correct?
11         MR. TOAL:  Objection.
12      Attorney/client privilege and work
13      product protection.
14         MR. OLESKE:  Just to clarify,
15      I am asking what Ms. Hirshman was
16      referring to -- when she says caselaw
17      and key players, I'm asking whether
18      she is, in fact, in this paragraph,
19      referring to the same authorities that
20      she cited in Exhibit 6.
21         MR. TOAL:  I understand.
22      Same objection.  You are not entitled
23      to Ms. Hirshman's mental impressions
24      on legal issues.
25         MR. OLESKE:  Let's mark

Page 20

1          M. Hirshman
2   Exhibit 8.
3          (Hirshman Exhibit 8 was
4   marked for identification, as of this
5   date.)
6       Q     Ms. Hirshman, would you please
7   review the document that's been handed to
8   you as Exhibit 8, and let me know when
9   you are able to confirm whether or not
10  you recognize it.
11      A     (Reviewing exhibit.)
12         MR. TOAL:  Would you please
13      read the question back, please?
14         [The requested portion of the
15      record was read.]
16      A     I can tell you what it purports
17  to be, but I have never seen this
18  document before.
19      Q     So does this document purport
20  to be an article from the New York Law
21  Journal, dated December 6, 2016?
22      A     That's what it looks like.  I
23  have not burdened everyone's time by
24  reading the entirety of the document,
25  which I never saw before.

Page 21

1          M. Hirshman
2       Q     Okay, but you are confident --
3       A     If you would like me to read
4   it, I could spend time to read it.
5       Q     I am just asking:  You are
6   confident from looking at the document
7   that you have never seen the article?
8       A     Correct.
9       Q     You see that this article
10  purports to have been authored by
11  Mr. Toal and by a Mr. Christopher
12  Boehning -- is that the correct
13  pronunciation?
14      A     It's name is Chris "Boehning."
15      Q     Mr. Boehning is a partner at
16  Paul, Weiss, correct?
17      A     Both Mr. Toal and Mr. Boehning
18  are my partners at Paul, Weiss.
19      Q     And putting aside your
20  familiarity or lack thereof with this
21  particular article, you are aware that
22  Mr. Toal and Mr. Boehning write an
23  ongoing series of articles about complex
24  litigation and e-discovery for the New
25  York Law Journal, correct?

6 (Pages 18 - 21)

Page 22

1          M. Hirshman
2     A    I'm actually not aware of that.
3  I mean, I know that Mr. Boehning speaks
4  on these issues occasionally, and I know
5  Mr. Toal is very experienced in civil
6  litigation and discovery issues.
7     Q    Putting aside the issue of
8  whether or not you specifically read the
9  article, if I direct you to the front
10 page of the article, do you see there is
11 a bold heading in the middle of the page
12 near the bottom, 'Rodman v. Safeway'?
13    A    I see the heading Rodman v.
14 Safeway.
15    Q    And do you see a case citation
16 immediately below that?
17    A    I do.
18    Q    Sitting here today, are you
19 familiar at all with Rodman v. Safeway,
20 that citation?
21    A    I am not.
22    Q    Putting aside your familiarity
23 with Mr. Toal's potential authorship of
24 article to the New York Law Journal, you
25 are aware that Mr. Toal is an experienced

Page 23

1          M. Hirshman
2  e-discovery litigator, correct?
3     A    I am aware, as I said, that
4  Mr. Toal is experienced in civil
5  litigation, including discovery and the
6  processes associated with it.
7     Q    And you, yourself, have been
8  recognized with awards multiple times by
9  publications and organizations for
10 expertise in internal investigations,
11 correct?
12    A    I don't believe that's true.
13    Q    Have you been honored with
14 those sorts of awards with respect to
15 representing clients complying with
16 government investigations?
17    A    I'm only aware of -- I can only
18 think of one award I've been given as I
19 sit here.
20    Q    Why don't you just tell me what
21 that is?
22    A    It's from an organization, I
23 don't remember the name now.  It has --
24 Dick Dadey is the executive director, and
25 it has to do with civic engagement that I

Page 24

1          M. Hirshman
2  have been honored.
3     Q    Other than that, sitting here
4  today, you don't know of any other
5  instances where you have been honored for
6  your work in civil litigation; is that
7  correct?
8     A    In civil litigation?  No, I
9  don't know any time that I have been
10 honored or noted for work in civil
11 litigation.  I am recognized, I think, in
12 chambers and other items.
13    Q    If I could return you to
14 Exhibit 1, please.
15    A    (Complying.)
16    Q    And if I could refer you to
17 paragraph 1 of Exhibit 1.  Paragraph 1 of
18 Exhibit 1 states that you are a partner
19 at the law firm of Paul, Weiss and either
20 have personal information of the matter
21 set forth in this document or state facts
22 based on information and belief.
23         That was true when you swore to
24 that, correct?
25    A    It says I have personal

Page 25

1          M. Hirshman
2  knowledge of the matters or state facts
3  based upon information and belief.  And
4  that was true and accurate at the time I
5  affirmed.
6     Q    And then the next sentence
7  states:  For the facts stated upon
8  information and belief, I have made
9  reasonable inquiries of individuals with
10 knowledge to confirm the information.
11        You stated that, and that was
12 true when you swore to it, correct?
13    A    I stated that, and that was
14 true at the time I made my affirmation,
15 correct.
16    Q    Who are the individuals that
17 you spoke to with respect to facts stated
18 upon information and belief?
19    A    Sure.
20        MR. TOAL:  And with respect
21 to anyone at Paul, Weiss, you can just
22 identify that you relied upon people
23 at Paul, Weiss.
24        I am not going to allow you
25 to inquire into the individual people

7 (Pages 22 - 25)

Page 26

M. Hirshman

1   M. Hirshman
2   at Paul, Weiss who she might have
3   obtained knowledge from.  I think
4   that's protected by the
5   attorney/client privilege and the work
6   product protection.
7       MR. OLESKE:  So just to be
8   clear, for the remainder of this
9   proceeding, you are going to be
10  objecting on the basis of
11  attorney/client privilege as to any
12  identification of different roles
13  played by different individuals at the
14  law firm of Paul, Weiss; is that
15  correct?
16      MR. TOAL:  That's correct.
17      MR. OLESKE:  And you are
18  going to restrict Ms. Hirshman's
19  answers to referring generically to
20  Paul, Weiss?
21      MR. TOAL:  That's correct.
22      MR. OLESKE:  This is all
23  subject -- everything will be subject
24  to my earlier colloquy regarding our
25  disagreement regarding the scope of

Page 27

1   M. Hirshman
2   the privilege.
3   Q   So let's start with that.  Did
4   you make reasonable inquiries of
5   individuals at Paul, Weiss?
6   A   Yes.
7   Q   Did you make reasonable
8   inquiries of individuals who were
9   employed by ExxonMobil Corporation?
10  A   Over time, yes, which is -- but
11  I guess to the extent I had conversations
12  with people with ExxonMobil, that is the
13  basis for my personal knowledge as well.
14  Q   Well, I am putting aside
15  contacts with ExxonMobil personnel from
16  which you derived personal knowledge that
17  may be part of this document.
18      I am asking you:  What
19  individuals at ExxonMobil Corporation did
20  you make reasonable inquiries of in order
21  to obtain facts stated on information and
22  belief in this document?
23  A   In this particular document, I
24  did not need to speak to people for the
25  completion of this affirmation.

Page 28

1   M. Hirshman
2   Q   So the answer to the question
3   is you spoke to no one at ExxonMobil
4   Corporation regarding this document?
5   A   For the completion of this
6   particular document, that is correct.
7   Q   And that includes
8   Ms. Feinstein?
9   A   I have never spoken to
10  Ms. Feinstein.
11  Q   Moving to paragraph 2.  The
12  document reads:  I am Counsel to
13  ExxonMobil Corporation in connection with
14  this matter.  As part of my
15  responsibilities, I oversaw the
16  production of documents in response to
17  the subpoena duces tecum dated
18  November 4, 2015.
19      You wrote this, and it was true
20  when you swore to it; is that correct?
21  A   Yes.  I didn't swear to it.  I
22  affirmed and it is true.
23  Q   Under the penalty of perjury,
24  correct?
25  A   Correct.

Page 29

1   M. Hirshman
2   Q   When you state here that you
3   oversaw the production of documents, does
4   that include overseeing -- well, first,
5   let me ask you:  What do you mean by
6   that, that you oversaw production of the
7   documents?  What does that mean?
8   A   Sure.  As part of my
9   responsibilities, I oversaw the lawyers
10  at the firm who were working with the
11  client to identify, retrieve, review,
12  determine responsiveness, of documents
13  responsive to the subpoena.
14  Q   So in addition to overseeing
15  attorneys at Paul, Weiss, did you oversee
16  the activities of the ExxonMobil Legal
17  Department?
18  A   I was familiar with the
19  activities of the ExxonMobil Legal
20  Department in connection with the effort
21  to respond to the subpoena.
22  Q   But I guess my question is:
23  Does your oversight, did your oversight
24  not include overseeing the actions of the
25  ExxonMobil Legal Department in responding

8 (Pages 26 - 29)

Page 30

1         M. Hirshman
2 to the subpoena, or was that outside the
3 purview of your oversight?
4     Q     My representation included
5 consultation with ExxonMobil about the
6 efforts to recover documents responsive
7 to the subpoena.
8     Q     Okay. I'm just asking a simple
9 question, yes or no: Was ExxonMobil's
10 Legal Department within the purview of
11 your oversight of the company's response
12 to the subpoena?
13     A     I think in a general sense,
14 yes.
15     Q     And by virtue of the oversight
16 in a general sense of the Legal
17 Department, were you also responsible for
18 overseeing the actions of the ExxonMobil
19 Information Technology Department as it
20 responded to the subpoena?
21     A     I do not believe I was
22 responsible for overseeing the legal
23 technology department at ExxonMobil. I
24 was familiar with the processes that they
25 were employing, and I spoke to them in

Page 31

1         M. Hirshman
2 connection with representations to be
3 made to your office.
4     Q     Just to go back to something
5 you just said when you were testifying, I
6 believe you said that you do not believe
7 you were responsible for overseeing the
8 legal technology department.
9         Did you mean to say the
10 Information Technology Department?
11     A     I meant to say the Information
12 Technology Department, yes.
13     Q     And so you do not view your
14 role of oversight as having included
15 oversight of the ExxonMobil Information
16 Technology Department; is that correct?
17     A     That is correct.
18     Q     Apart from people who worked on
19 behalf of Paul, Weiss or people who
20 worked on behalf of ExxonMobil
21 Corporation, did your oversight include
22 responsibility for overseeing any other
23 individuals or entities?
24     A     I would say, generally
25 speaking, I had familiarity with the

Page 32

1         M. Hirshman
2 operations of the vendor who was part of
3 the process.
4     Q     Was there just one vendor who
5 was part of the process?
6     A     I am aware of one vendor as
7 part of the process. There may have been
8 others, but I am aware of one vendor.
9     Q     And what was the name of that
10 vendor?
11     A     It's Kierstad.
12     Q     How do you spell that?
13     A     I believe it's K-I-E-R-S-T-A-D.
14     Q     What sort of services did
15 Kierstad provide in response to the
16 subpoena?
17     A     Kierstad is the vendor that
18 hosts the -- I don't know that they host
19 relativity, which is the platform on
20 which documents are reviewed for
21 determination of responsiveness, but
22 Kierstad is the vendor that has the
23 technology to run search terms through
24 documents that are uploaded on to their
25 platform which then are available on

Page 33

1         M. Hirshman
2 Relativity for review.
3     Q     Do you have any other
4 understanding of what Kierstad did in
5 response to the subpoena other than what
6 you just testified to?
7     A     That is my general
8 understanding of what Kierstad does.
9     Q     Do you know whether or not
10 other attorneys at Paul, Weiss would know
11 more information about Kierstad's
12 activities, including, but not limited
13 to, the details about where the
14 Relativity platform is located?
15     A     Can you repeat the question
16 again?
17     Q     Sure. Do you know whether or
18 not there are any other attorneys at
19 Paul, Weiss who would have a greater
20 understanding of Kierstad's activities,
21 including, but not limited to, the
22 specific information you are unaware of
23 with respect to where the Relativity
24 platform is hosted?
25     A     Yes.

9 (Pages 30 - 33)

Page 34

1          M. Hirshman
2     Q     But are you willing to identify
3 who at Paul, Weiss has that information?
4          MR. TOAL:  I would assert the
5     same objection on attorney/client
6     privilege and work product protection.
7     Q     Do you know whether or not
8 anyone at the ExxonMobil Legal Department
9 has the same range of additional
10 information or specifics with regard to
11 Kierstad's activities?
12    A     I expect so.
13    Q     But you don't know that?
14    A     I'm not certain.
15    Q     Do you know whether or not
16 anyone who works for ExxonMobil's
17 Information Technology Department would
18 have such information?
19    A     That, I don't know.
20    Q     Any other individuals or
21 entities that we haven't discussed so far
22 that you believe you were responsible for
23 overseeing in connection with
24 ExxonMobil's response to the subpoena?
25    A     I don't believe so.

Page 35

1          M. Hirshman
2     Q     If I can direct you to
3 paragraph 3 of this document.
4     A     (Complying.)
5     Q     Paragraph 3 follows a bolded
6 heading that says Subpoena, correct?
7     A     Correct.
8     Q     And the paragraph reads:
9 ExxonMobil received the subpoena from the
10 Environmental Protection Bureau of the
11 New York Office of the Attorney General
12 on November 4, 2015.
13         And then it continues:  The
14 subpoena sought documents relating to
15 ExxonMobil's past climate change research
16 and public statements concerning climate
17 change.
18         You wrote this paragraph,
19 correct?
20    A     I am agreeing with the contents
21 of this paragraph and this specific
22 statement.
23    Q     So you read this paragraph
24 before you signed this document, correct?
25    A     I read this, and I may have

Page 36

1          M. Hirshman
2 edited it.
3     Q     That second sentence, where you
4 state what the subpoena sought --
5     A     Mm-hm.
6     Q     -- the following language is
7 not an exclusive list of the requests in
8 the subpoena; is it?
9     A     It is not exclusive.
10    Q     I direct you to paragraph 4,
11 please.
12    A     (Complying.)
13    Q     And immediately preceding
14 paragraph 4, there is a bolded heading
15 that says, Issuance of Legal Hold
16 Notices, correct?
17    A     Correct.
18    Q     Paragraph 4 states that:
19 ExxonMobil's Law Department uses the
20 Atlas e-Discovery Process Management
21 legal hold tool ("Atlas") to institute
22 and send legal hold notices to
23 individuals identified as reasonably
24 likely to possess unique responsive
25 documents pertinent to a pending, or a

Page 37

1          M. Hirshman
2 reasonably anticipated, investigation or
3 litigation.
4          Did you write this paragraph?
5     A     I don't know if I wrote it.
6 It's certainly consistent in all respects
7 of my understanding of Atlas.
8     Q     And you read this paragraph --
9     A     Absolutely.
10    Q     -- before you signed the
11 document, correct?
12    A     Absolutely.
13    Q     The contents of this paragraph,
14 is this information that you testified to
15 on information and belief?
16    A     I have personal knowledge of
17 this paragraph based on my conversations
18 with people at ExxonMobil that I obtained
19 in preparation for meetings with your
20 office early in 2016 and perhaps before
21 that.
22    Q     Okay.  So you obtained this
23 information prior to the preparation of
24 this document?
25    A     I knew this information before.

10 (Pages 34 - 37)

Page 38

1      M. Hirshman
2   Q    Sitting here, now, do you know
3 any more specific information about the
4 Atlas legal hold tool that is related in
5 this paragraph 4?
6   A    I know more -- some more
7 information about -- some more detail
8 about the information, but I'm not sure
9 it's about the Atlas hold tool.
10   Q    So sitting here today, are you
11 unable to recall any additional specific
12 information about the Atlas hold tool
13 other than what's in this paragraph?
14   A    The additional information that
15 I am aware of with respect to holds, I
16 just don't know whether it has to do with
17 the hold tool or something else at Exxon.
18   Q    So what is the additional
19 information you have that you are not
20 sure whether it relates to Atlas?
21   A    I understand, based on the
22 information relating to the Wayne Tracker
23 matter, that there have been iterations
24 of a program called Exchange at Exxon
25 that provide different types of

Page 39

1      M. Hirshman
2 capabilities and that the company was
3 transitioning to during this period.  And
4 I have no idea whether those are related
5 to Atlas or separate.
6   Q    And so you have no personal
7 knowledge of how Atlas relates to this
8 program you mentioned called Exchange; is
9 that correct?
10   A    Correct.
11   Q    And the program that you
12 mentioned called Exchange, do you know
13 any other details about that program?
14   A    No.
15   Q    Do you know whether any other
16 attorneys at Paul, Weiss would know more
17 than you about the relationship between
18 the Atlas legal hold tool and the program
19 you know as Exchange?
20   A    I don't know.
21   Q    Do you know whether or not
22 there are individuals at the Exxon Legal
23 Department who would know more than you
24 do about the relationship between the
25 Atlas legal hold tool and the program you

Page 40

1      M. Hirshman
2 know as Exchange?
3   A    I don't know if they're in the
4 Legal Department.
5   Q    Let me back up, then.
6      Do you know whether or not
7 there are individuals employed by
8 ExxonMobil Corporation who have more
9 information than you do about the
10 relationship between Atlas legal hold
11 tool and the program you know as
12 Exchange?
13   A    I expect that there are.
14   Q    But you don't know that for
15 sure?
16   A    I expect that there are, based
17 on my understanding, yes.
18   Q    Do you know what department of
19 ExxonMobil Corporation those people work
20 for?
21   A    I would expect that they would
22 be in Information Technology and in the
23 Legal Department.
24   Q    If I could direct you to
25 paragraph 5?

Page 41

1      M. Hirshman
2   A    Mm-hm.
3   Q    Paragraph 5 states:  At
4 ExxonMobil, the automatic "file sweep"
5 program is suspended for e-mail accounts
6 linked to the Active Directory Account
7 ("ADA") of any employee subject to a
8 legal hold in the Atlas system.
9      Did you write that paragraph?
10   A    I did not write that paragraph.
11   Q    Did you read that paragraph
12 before you signed the document?
13   A    I absolutely did.  And I read
14 the Feinstein affidavit, and I had
15 knowledge based on my prior conversations
16 relating to the file sweep program.
17   Q    Do you have any knowledge,
18 sitting here today, about the automatic
19 file sweep program utilized at ExxonMobil
20 other than what's contained in this
21 paragraph 5?
22   A    I can explain it in my own
23 words.
24   Q    If you could, please?
25   A    Yes.  As I learned in the

11 (Pages 38 - 41)

Page 42

1        M. Hirshman
2 course of this matter, you know, in the
3 beginning -- at the end of 2015 or the
4 beginning of 2016, I understood that
5 associated with Atlas was this program
6 that would prevent -- would essentially
7 disable the automatic sweep of e-mails if
8 someone was placed on litigation hold.
9    Q    Do you know any other details
10 about the automatic file sweep program
11 other than what you just testified to?
12    A    That's my general understanding
13 of how it operated, correct.
14    Q    Do you know what, if any,
15 computer application the file sweep
16 program was associated with?
17    A    Can you repeat that question
18 again?
19    Q    Yes. The paragraph refers to
20 an automatic file sweep program.
21       My question is: Do you know
22 which, if any, computer application the
23 automatic file sweep program operates
24 under?
25    A    As I sit here, I can't name

Page 43

1        M. Hirshman
2 that. I don't recall whether such
3 information is in the Feinstein affidavit
4 or not.
5    Q    Do you know, sitting here
6 today, any details about the actual
7 technical operation of the automatic file
8 sweep program?
9    A    Beyond my knowledge that the
10 program prevents e-mails from being
11 deleted if there's a litigation hold on a
12 custodian, I don't know more about
13 technical apparatus that will allow that
14 to happen or not happen.
15    Q    Just to clarify, is it your
16 understanding that the automatic file
17 sweep program is what prevents documents
18 from being deleted?
19    A    No. There's an automatic file
20 sweep program. It is disabled when
21 someone is put on litigation hold.
22    Q    Right, okay.
23       So is it your understanding
24 that there is some other computer
25 application that disables the automatic

Page 44

1        M. Hirshman
2 file sweep program?
3    A    I imagine so.
4    Q    Do you know anything about that
5 separate application, what the name of it
6 is, or what computer software it uses?
7    A    I do not know the name of the
8 application, and I do not know what
9 computer software it uses.
10    Q    Do you know whether or not
11 there are other attorneys at Paul, Weiss
12 who would have more information about
13 ExxonMobil's automatic file sweep program
14 than what you have related in your
15 affidavit and here today?
16    A    I don't.
17    Q    Do you know whether or not
18 there are any individuals employed by
19 ExxonMobil Corporation who would know
20 more about Exxon's automatic file sweep
21 program than what's in your affirmation
22 and what you have related here today?
23    A    I expect that there are.
24    Q    As is similar to your prior
25 answer, that you don't have any

Page 45

1        M. Hirshman
2 particular details; you just expect that
3 somebody in the Legal or IT departments
4 knows about this?
5    A    I would expect that they do,
6 yes.
7    Q    But you have no specific
8 individuals that you could point us to?
9    A    I would be speculating about
10 names.
11    Q    Turning your attention to
12 paragraph 6.
13    A    (Complying.)
14    Q    Paragraph 6 reads: On
15 November 6, 2015, ExxonMobil issued legal
16 hold notices through Atlas to
17 ExxonMobil's Management Committee,
18 scientists working on climate change
19 issues, senior members of various
20 departments, including Law; Public
21 Government Affairs; Corporate Strategic
22 Planning; safety Security Health and
23 Environment ("SSH&E"); and others. Each
24 employee was instructed to preserve
25 information responsive to the Subpoena

12 (Pages 42 - 45)

Page 46

1        M. Hirshman
2   (the "Legal Hold") and to confirm receipt
3   of the legal hold notice.
4        Did you write this paragraph?
5    A   I didn't write this paragraph,
6   but I am fully familiar with all parts of
7   it.
8    Q   And you read this paragraph
9   before you signed the document?
10   A   Absolutely.  You can -- my
11  answer will be the same, I read each
12  paragraph.
13   Q   Then we can dispense with any
14  questions about that in the future, thank
15  you.
16       So do you have any knowledge of
17  Exxon's process of issuing legal hold
18  notices through Atlas other than what's
19  related in this paragraph 6?
20   A   Yes.
21   Q   Can you please tell me what
22  that is?
23   A   At a general level, I
24  understand, right, that the Atlas system,
25  right, basically communicates to a

Page 47

1        M. Hirshman
2   particular custodian the fact that that
3   custodian is now on legal hold.  And I
4   think within the Atlas program, there's a
5   provision for the person who receives
6   that notice to acknowledge the receipt of
7   that notice.
8    Q   And so the process you just
9   described, that's what you are referring
10  to in the last sentence of paragraph 6,
11  each employee was instructed to preserve
12  information responsive to the subpoena,
13  and to confirm receipt of the legal hold
14  notice?
15   A   Correct.  And that happens
16  through Atlas.
17   Q   Okay.  Do you know anything
18  about Atlas's interaction with any other
19  aspect of ExxonMobil's computer systems
20  in connection with the legal hold notice
21  process?
22   A   Only what I've described about
23  the suspension of the automatic file
24  sweep.
25   Q   Do you know whether or not

Page 48

1        M. Hirshman
2   there are other attorneys at Paul, Weiss
3   who would know more about ExxonMobil's
4   issuance of legal hold notices through
5   Atlas beyond what you have provided in
6   paragraph 6 and testified to?
7    A   I actually don't think so.
8    Q   And do you know whether or not
9   there are any persons employed by
10  ExxonMobil who would have more
11  information than you provided in your
12  affidavit or in your testimony about its
13  process for issuing legal hold notices
14  through Atlas?
15   A   I don't know.
16   Q   If I could ask you to briefly
17  review paragraphs 7 through 12, and just
18  let me know when you have had a chance to
19  read through paragraphs 7 through 12.
20   A   Sure.
21       (Reviewing exhibit.)  Okay.  I
22  have reviewed those paragraphs.
23   Q   So paragraphs 7 through 12, is
24  it fair to say that this relates the
25  sequence of ExxonMobil adding additional

Page 49

1        M. Hirshman
2   individuals to the legal hold in
3   connection with response to this
4   subpoena?
5    A   Yes.  And I had knowledge of
6   that at the time.
7    Q   And these processes that are
8   described in paragraphs 7 through 12,
9   these are or involve the same issuance of
10  legal hold notices through Atlas that's
11  described in paragraph 6, correct?
12   A   I believe that would have been
13  the case, but those paragraphs don't
14  address that precise question.
15   Q   Right.  So paragraphs 7 through
16  12, did you write those yourself?
17   A   I did not write those myself,
18  but I had knowledge of them at the time
19  that they occurred.
20   Q   I guess the question is:
21  Sitting here today, do you know whether
22  or not, after the initial issuance of
23  legal hold notices on November 6, 2015,
24  that's related in paragraph 6, whether
25  the following issuance of legal hold

13 (Pages 46 - 49)

Page 50

1        M. Hirshman
2   notices in the subsequent paragraphs was
3   done pursuant to the process involving
4   the Atlas tool described in paragraph 6?
5   Do you know that today?
6      A   I don't specifically know that,
7   but I have every expectation that it was
8   because of my understanding about how the
9   legal hold process at ExxonMobil was
10  initiated here and thereafter followed.
11     Q   Beyond what's described in
12  paragraphs 4 through 12, did you
13  personally do anything to regularly
14  reiterate the need for these individuals
15  to retain documents?
16     A   Did I personally reiterate to
17  the custodians the need?
18     Q   To any individuals who were
19  subject to the legal hold notices, did
20  you regularly reiterate their obligations
21  to any of them?
22     A   No, I did not personally do
23  that.
24     Q   Do you know whether or not
25  anyone at Paul, Weiss regularly

Page 51

1        M. Hirshman
2   reiterated those obligations to any of
3   those individuals?
4      A   I do not believe that anyone at
5   Paul, Weiss would have done so because
6   there is an instruction in the initial
7   legal hold to do so.
8      Q   Do you know whether or not
9   anyone employed by ExxonMobil Corporation
10  regularly reiterated the obligations in
11  the legal hold notices to the recipients
12  of those notices?
13     A   I do not know.
14     Q   Did you, personally, do
15  anything to monitor the compliance of the
16  individuals identified in the legal hold
17  notices with the obligations that were
18  stated therein?
19     A   I did not.
20     Q   Do you know whether or not
21  anyone, any attorneys at Paul, Weiss, did
22  anything to monitor the compliance of the
23  individuals who received legal hold
24  notices and the obligations therein?
25     A   I do not.

Page 52

1        M. Hirshman
2      Q   Do you know whether or not
3   anyone employed by ExxonMobil Corporation
4   did anything to monitor the compliance of
5   the individuals who received the legal
6   hold notices and the obligations therein?
7      A   I believe as part of custodial
8   interviews that ExxonMobil did, that
9   instruction was reiterated as part of
10  those interviews.
11     Q   Other than ExxonMobil
12  Corporation -- well, so would that be
13  ExxonMobil Corporation monitoring
14  compliance or would that be, then,
15  reiterating the instructions?
16     A   I believe it would have been
17  ExxonMobil reiterating instructions in
18  the context of a custodial interview.
19     Q   If I could turn your attention
20  to paragraph 16. I'm sorry, if I could
21  just refer you to the prior page marked
22  page 3 of 11 of this document. Preceding
23  paragraph 13, there is a bold heading,
24  Production of Documents, correct?
25     A   Correct.

Page 53

1        M. Hirshman
2      Q   And if we continue to the next
3   page, there are no further headings until
4   or prior to paragraph 16, which is
5   included in that same heading, correct?
6      A   Correct.
7      Q   Paragraph 16 states: In
8   addition to the collection of hard copy
9   documents, relevant electronic documents
10  belonging to, or used by, each custodian
11  were collected from multiple data
12  sources.
13        Did you write that sentence?
14     A   I did not write that sentence.
15     Q   The next sentence says: The
16  data sources collected therefore included
17  not only e-mails and hard drives
18  particular to each custodian, but also,
19  where relevant, shared locations,
20  including SharePoint MySites, SharePoint
21  TeamSites, and I:/Drives.
22        Did you write that sentence?
23     A   I did not write that sentence.
24     Q   And then it says: ExxonMobil
25  searched the shared locations and folders

14 (Pages 50 - 53)

Page 54

1          M. Hirshman
2 that the custodians themselves indicated
3 that were reasonably likely to contain
4 unique responsive documents.
5          Did you write that sentence?
6     A    I may have edited that
7 sentence.
8     Q    You don't recall anything
9 particular about that right now?
10    A    I don't.  I know it to be true.
11    Q    If I could direct you to
12 paragraph 18.
13    A    (Complying.)
14    Q    And immediately preceding
15 paragraph 18, there is a bold heading
16 reading, Document Review Protocol,
17 correct?
18    A    Correct.
19    Q    And that continues under that
20 heading for four paragraphs, 18, 19, 20,
21 and 21, correct?
22    A    Correct.
23    Q    And then on the next page,
24 there is another bold heading, Search
25 Terms, correct?

Page 55

1          M. Hirshman
2     A    Yes.
3     Q    And three paragraphs following
4 that in that heading, 22, 23, and 24,
5 correct?
6     A    That is correct.
7     Q    Could you just please read
8 through all seven of those paragraphs
9 right now, so that you are familiar with
10 the contents of what we are talking about
11 specifically?
12          MR. TOAL:  That's paragraphs
13    18 through 24?
14          MR. OLESKE:  That's right.
15    A    (Complying.) I have read those
16 paragraphs.
17    Q    Did you write paragraphs 18
18 through 24 yourself?
19    A    Not by myself.
20    Q    Do you recall any particulars
21 about editing any of those paragraphs
22 yourself?
23    A    Because I have a lot of
24 personal knowledge about this
25 information, I don't recall whether I had

Page 56

1          M. Hirshman
2 to edit any of this.
3     Q    Is it fair to say that these
4 two sections of the document, the
5 Document Review Protocol and the section
6 entitled Search Terms, are your effort to
7 fairly and accurately describe those two
8 processes, the document review protocol
9 and the application of search terms that
10 was employed by ExxonMobil in response to
11 the subpoena?
12    A    I believe those paragraphs
13 fairly describe that process, yes.
14    Q    Now, these paragraphs do not
15 apply to anything having to do with the
16 documents of the Management Committee of
17 ExxonMobil; do they?
18    A    I think they do.
19    Q    And is it your -- I have the
20 same question about -- returning to
21 paragraph 16.
22          Is it your understanding that
23 paragraph 16 is an accurate description
24 of the processes described therein as
25 they relate to the Management Committee,

Page 57

1          M. Hirshman
2 as well as the rest of Exxon's
3 production?
4     A    I believe that aspects of
5 paragraph 16 apply to the documents of
6 the Management Committee, as do aspects
7 of the remaining paragraphs, 18 through
8 21 and 22, it 23, 24, with, you know, a
9 small variation with respect to
10 Management Committee documents.
11    Q    So it is your testimony that
12 aspects of paragraphs 16 and 18 through
13 24 are accurate with respect to the
14 collection of management custodian
15 documents in response to the subpoena?
16    A    I think probably all of them
17 are.
18    Q    Turning to paragraph 16.
19    A    (Complying.) Mm -hm.
20    Q    The last sentence reads:
21 ExxonMobil searched the shared locations
22 and folders that the custodians
23 themselves indicated were reasonably
24 likely to contain unique responsive
25 documents.

15 (Pages 54 - 57)

Page 58

M. Hirshman

1        That sentence is not true as to
3  management custodian documents; isn't
4  that the case?
5     A    I'm not sure whether that's not
6  true or not.
7     Q    If I could return your
8  attention to your supplemental
9  certification, which is Exhibit 2.
10    A    (Complying.)
11        MR. OLESKE:  Oh, I'm sorry,
12    we have to introduce a new document,
13    which is the May 3rd letter to which
14    it was attached.  So let's mark this
15    as Exhibit 9.
16        (Hirshman Exhibit 9 was
17    marked for identification, as of this
18    date.)
19    Q    Ms. Hirshman, could you please
20  review what's been handed to you as
21  Exhibit 9, and let me know when you are
22  able to confirm whether or not you
23  recognize it.
24    A    Sure.
25        (Reviewing exhibit.)  I do

Page 59

M. Hirshman

2  recognize this document.
3     Q    What is this document?
4     A    It's a letter from Mr. Toal to
5  you to which is attached various
6  exhibits, including my supplemental
7  affirmation.
8     Q    And if I could ask you to turn
9  to what's marked as page B-1 of this
10  document.  At the bottom center, it has
11  page numbers and it's Exhibit B, B-1.
12        Do you see that?
13    A    Okay, yes.
14    Q    At the top it says:  Exhibit B,
15  Letter from D. Toal to J. Oleske, May 3,
16  2017, correct?
17    A    Correct.
18    Q    And this exhibit which
19  continues on through the page marked B-5,
20  this is a list of custodians at
21  ExxonMobil Corporation or formerly at
22  ExxonMobil Corporation who were
23  custodians of documents produced to our
24  office in response to the subpoena,
25  correct?

Page 60

M. Hirshman

1     A    I believe so, yes.
3     Q    And the second column of the
4  chart in this exhibit lists the dates
5  that these custodians were interviewed in
6  connection with obtaining documents in
7  response to the subpoena, correct?
8     A    Correct.
9     Q    And the third column identifies
10  the affiliation of persons conducting
11  those interviews, correct?
12    A    Correct.
13    Q    And every case that's listed
14  here, the affiliation of persons
15  conducting the interview is ExxonMobil
16  Law Department, unless there was no
17  interview conducted, in which the
18  affiliation that is listed is "none,"
19  correct?
20    A    Correct.
21    Q    And is it the case that
22  ExxonMobil Law Department conducted all
23  of the interviews of document custodians
24  in responding to this subpoena?
25    A    That is my understanding, yes.

Page 61

M. Hirshman

2     Q    Do you have any understanding
3  that attorneys from Paul, Weiss ever
4  participated in any of those interviews?
5     A    I do not believe that attorneys
6  from Paul, Weiss participated in
7  custodial interviews.
8     Q    So according to this document,
9  you are aware that there are numerous
10  custodians identified who were not
11  interviewed until March or April of 2017,
12  correct?
13    A    I have to review the document.
14    Q    Before you do, without looking
15  at the document, are you saying that you
16  don't know whether or not there are
17  custodians who were not interviewed with
18  respect to subpoena compliance prior to
19  March or April of this year?
20    A    No.  Your question was that
21  there were numerous --
22    Q    Yes.
23    A    -- people who were not
24  interviewed until March or April of this
25  year, and I was not comfortable agreeing

16 (Pages 58 - 61)

Page 62

M. Hirshman

1     with your characterization of numerous
2     without re-looking at the document.
3
4     Q    Okay, I will ask a different
5     question.
6     A    Okay.
7     Q    You are aware, without looking
8     it at the document, that none of the
9     Management Committee Custodians were
10    interviewed prior to March or April 2017,
11    correct?
12    A    I am aware of that.
13    Q    You are aware that none of the
14    administrative assistants to any of those
15    members of the Management Committee were
16    interviewed prior to March or April of
17    2017, correct?
18    A    I'd have to look at the
19    document to ascertain that.
20    Q    So without looking at the
21    document, you think it's possible that
22    some of the administrative assistants
23    were interviewed prior to that?
24    A    Based on my understanding of
25    the process, I believe that

Page 63

M. Hirshman

1
2     administrative assistants were spoken to.
3     I don't know whether they were
4     interviewed earlier than that.
5     Q    And there are some individuals
6     who are custodians of documents who were
7     never interviewed because they had left
8     ExxonMobil Corporation, correct?
9     A    That is my understanding.
10    Q    And turning your attention to
11    page B-4.
12    A    (Complying.)
13    Q    The fourth entry from the
14    bottom, do you see, is for Mr. Rex
15    Tillerson?
16    A    I do see that.
17    Q    And you recognize him as the
18    former Chairman and CEO of ExxonMobil
19    Corporation?
20    A    I do.
21    Q    And this document indicates
22    that he was never interviewed, correct?
23    A    That's what I -- that's what it
24    does interview (sic) -- that's what it
25    does indicate.

Page 64

M. Hirshman

1
2     Q    And do you have any
3     understanding that Mr. Tillerson was ever
4     interviewed in connection with the
5     subpoena --
6          MR. OLESKE:  Strike that.
7     A    I do not know.
8     Q    Okay, you do not know.
9     A    In connection with the
10    subpoena.
11    Q    Yes, in connection with the
12    subpoena.
13         And Mr. Tillerson separated
14    from the company, was it in December of
15    2016 or January of 2017; do you know
16    which?
17    A    I do not know which date.
18    Q    But it was around sometime in
19    those months; is that correct?
20    A    I would expect that it would
21    have been in and around that time period,
22    yes.
23    Q    And the subpoena had issued a
24    year prior to that, in November of 2015,
25    correct?

Page 65

M. Hirshman

1
2     A    That's correct.
3     Q    So Mr. Tillerson was, in fact,
4     employed by ExxonMobil Corporation, but
5     not interviewed in connection with the
6     subpoena for about a year, correct?
7     A    I believe what this indicated,
8     he was not subject to a custodial
9     interview relating to documents prior to
10    the time he separated from the company,
11    that's correct.
12    Q    Right.  And the same would go,
13    for example, for any administrative
14    assistant who had been with the company
15    after the issuance of the subpoena, but
16    who left before March or April 2017,
17    correct?
18    A    Again, I don't -- I don't know
19    who is an administrative assistant or not
20    on this list, so I can't speak to any
21    particular person.
22    Q    So you personally have -- you
23    have no specific knowledge of who of
24    these custodians are administrative
25    assistants to the Management Committee

17 (Pages 62 - 65)

Page 66

M. Hirshman

1    members?
2    A    I'd have to look at the
3    documents to see if I recognize any
4    names.
5    Q    So returning to paragraph 16 of
6    your affirmation in Exhibit 1.
7    A    (Complying.) Okay.
8    Q    That last sentence of paragraph
9    16 where you say:  ExxonMobil searched
10   the shared locations and folders that the
11   custodians themselves indicated were
12   reasonably likely to contain unique
13   responsive documents.
14   A    Mm-hm.
15   Q    That sentence is inaccurate
16   with respect to at least Mr. Tillerson,
17   correct, in that Exxon never interviewed
18   Mr. Tillerson to find out where he would
19   indicate documents would be?
20   A    I think it is true -- it is
21   accurate that ExxonMobil did not
22   interview Mr. Tillerson.  What I don't
23   know is whether Mr. Tillerson had
24   provided information so someone or that

Page 67

M. Hirshman

1    someone knew the information already, you
2    know, where locations and folders could
3    be found to identify documents.
4    Q    Okay, but those are two
5    separate things, right?  The first thing
6    you said is whether Mr. Tillerson
7    volunteered some information, but outside
8    the context of an interview, correct,
9    that's one possibility that you raise
10   there?
11   A    That is correct.
12   Q    The other possibility you raise
13   is that someone else knew where the
14   documents were, and that's how they were
15   located, correct?
16   A    Correct.
17   Q    But if it was that second
18   thing, someone else knowing, that would
19   not be consistent with the custodians,
20   themselves, indicating where the
21   documents are, correct?
22   A    Correct.
23   Q    Turning to paragraph 18.
24   A    (Complying.)

Page 68

M. Hirshman

1    Q    You state here:  On a rolling
2    basis, hard copy documents and relevant
3    sources of unfiltered electronic data,
4    i.e. data to which search terms had not
5    yet to be applied, identified during the
6    document collection process were employed
7    to ExxonMobil's third-party e-Discovery
8    vendor.
9        Is that what this says?
10   A    You inserted the word "not" in
11   between "had" and "yet," but otherwise,
12   that is what that paragraph says.  I
13   don't believe you intentionally inserted
14   that.
15   Q    Right.  So with respect to all
16   of the Management Committee Custodians,
17   this paragraph is inaccurate in the sense
18   that unfiltered electronic data was not
19   provided to ExxonMobil's third-party
20   e-Discovery vendor on a rolling basis;
21   was it?
22   A    Well, it wasn't entirely
23   unfiltered in the same way that other
24   custodial -- other custodians' electronic

Page 69

M. Hirshman

1    data was provided.
2    Q    Right.  And, rather, the
3    process that was followed was the
4    separate process described in
5    Ms. Feinstein's affidavit and in your
6    firm's letters to the court of earlier
7    this year, correct?
8    A    Correct.
9    Q    And paragraph 19 says:  All
10   hardcopy documents, and those electronic
11   documents that hit on the search terms
12   (discussed in further detail below in
13   paragraphs 22-24), were uploaded to the
14   e-Discovery vendor's document review
15   platform.
16       That sentence is inaccurate
17   with respect to the Management Committee
18   Custodians, correct?
19   A    I'm not certain of that.
20   Q    Well, the search terms
21   described in paragraphs 22 to 24 were, in
22   fact, not applied to the electronic
23   documents of the Management Committee
24   Custodians prior to being uploaded to the

18 (Pages 66 - 69)

Page 70

1          M. Hirshman
2    e-Discovery vendor's document review
3    platform; isn't that the case?  Isn't
4    that what the Feinstein affidavit says?
5     A    I have to look back at the
6    Feinstein affidavit to answer that
7    question.
8     Q    Okay, then we can come back to
9    that.
10         Paragraph 22 states:  On
11   December 15, 2015, ExxonMobil proposed a
12   set of broad search terms designed to
13   identify potentially responsive
14   documents.  The next day, the Attorney
15   General proposed twelve modifications and
16   three additional terms.  On December 22,
17   2015, ExxonMobil confirmed its agreement
18   to run the terms as modified by the
19   Attorney General (the "Original Terms").
20         And then the paragraph
21   continues:  The Original Terms, which
22   were used for the next year, included
23   such commonplace phrases, and then it
24   recites some phrases.
25         That final sentence is

Page 71

1          M. Hirshman
2    inaccurate in that the Original Terms
3    were not used for the next year to search
4    for Management Committee documents; were
5    they?
6     A    Initially they were not,
7    correct.
8     Q    And then --
9     A    I should clarify that, because
10   I'd have to compare what I now understand
11   to be the terms that were used initially
12   on the Management Committee Custodians'
13   e-mails with the specific words in this
14   paragraph 22 to know whether those words
15   were actually part of those searches,
16   so -- and I -- I can do that at another
17   time.
18    Q    So sitting here today, without
19   doing a comparison now, you don't already
20   know whether or not the search terms that
21   were used on the Management Committee
22   documents were the same as the Original
23   Terms listed in paragraph 22?
24    A    Some of them were, and some of
25   them weren't.  What I understand is that

Page 72

1          M. Hirshman
2    you couldn't use the boolean strings on
3    the initial filtering of -- you know, the
4    initial application of terms to the
5    Management Committee documents.
6     Q    I will come back to the details
7    on that, but so is it in fact the case
8    that you do know that the search terms
9    that were applied to the Management
10   Committee documents were at least, in
11   some cases, not the original terms?
12    A    Yes.
13    Q    I direct your attention to
14   paragraph 25.
15    A    (Complying.)
16    Q    In paragraph 25, it's preceded
17   by a header in bold entitled, Custodians,
18   correct?
19    A    Correct.
20    Q    Paragraph 25 states that:
21   ExxonMobil has produced documents from
22   custodians that are central to the
23   Attorney General's investigation.
24         What is your understanding of
25   which custodians are central to the

Page 73

1          M. Hirshman
2    Attorney General's investigation?
3     A    My understanding is that this
4    investigation initiated with respect to
5    questions of Exxon's historical treatment
6    of climate change.  And it has proceeded
7    in different areas and the Attorney
8    General's Office has identified
9    priorities among custodians and the --
10   and ExxonMobil has produced documents
11   from custodians responsive to the
12   subpoena and what the Attorney General's
13   office has identified as its priorities
14   within the scope of the November 4th
15   subpoena.
16    Q    So my follow-up question is:
17   When you say the word "central," here,
18   does that mean anything more than what
19   you just said, which is that these people
20   had responsive documents to the subpoena?
21    A    And they were most likely to be
22   the people who had responsive documents
23   to the subpoena.
24    Q    And --
25    A    They were the key custodians,

19 (Pages 70 - 73)

Page 74

1        M. Hirshman
2 yes.
3      Q    Okay.  And was it Paul Weiss's
4 role to determine who the key custodians
5 were?
6      A    I think it's Paul Weiss's role,
7 along with the company, to review the
8 subpoena.  And as part of the effort to
9 respond to the subpoena, to identify the
10 individuals who were most likely to have
11 documents responsive to the subpoena, to
12 collect those documents, to review those
13 documents, and to produce documents
14 responsive to the subpoena.
15      Q    So that was a responsibility
16 both of Paul, Weiss and of the ExxonMobil
17 Legal Department, in your understanding,
18 correct?
19      A    Well, I think it's the -- the
20 responsibility of the company, and its
21 attorneys play a significant role in
22 assisting them in executing that
23 responsibility.
24      Q    And one of the ways in which
25 key custodians are identified is through

Page 75

1        M. Hirshman
2 the interviews that are conducted with
3 potential custodians, correct?
4      A    That is correct.
5      Q    And, again, ExxonMobil Law
6 Department conducted all of the
7 interviews in this subpoena response,
8 correct?
9      A    Correct.
10        MR. TOAL:  Can you read back
11     that last question, please?
12        [The requested portion of the
13     record was read.]
14      Q    I will refer you to
15 paragraph 26.
16      A    (Complying.)
17      Q    Paragraph reads:  The
18 custodians come from across the Company,
19 and comprise a cross-section of
20 individuals identified as most likely to
21 have unique responsive documents and
22 information sought by the Subpoena.
23        This is what you were just
24 talking about; the central custodians are
25 the ones most likely to have the unique

Page 76

1        M. Hirshman
2 responsive documents, correct?
3      A    I don't think it says the
4 central custodians, but I think it --
5 that is an inference you could draw from
6 it.  This paragraph describes, you know,
7 where the custodians were and what they
8 can -- who they consist of, correct.
9      Q    Paragraph 27, states that the
10 custodians consist of, and then it lists
11 different categories of individuals at
12 ExxonMobil, correct?
13      A    Correct.
14      Q    And then the last two lines say
15 that those categories include senior
16 management across various business lines
17 and ExxonMobil's Management Committee,
18 correct?
19      A    Correct.
20      Q    Paragraph 28 states:
21 ExxonMobil identified these custodians
22 through comprehensive research, witness
23 interviews, and document review, correct?
24      A    Correct.
25      Q    This paragraph is inaccurate

Page 77

1        M. Hirshman
2 with respect to the Management Committee
3 Custodians; isn't that correct?
4      A    Well, I think we knew the names
5 of the Management Committee Custodians
6 because we knew their names.  So there is
7 true -- it is true that we did not have
8 to do comprehensive research, witness
9 interviews, and document review to
10 identify the names of the Management
11 Committee Custodians.
12      Q    You didn't need to do that to
13 identify the names of those individuals,
14 right?
15      A    Correct.
16      Q    ExxonMobil did not conduct
17 comprehensive research witness interviews
18 and document review to identify where
19 Management Committee custodian documents
20 were located; did they?
21      A    I disagree with that.
22      Q    Did ExxonMobil conduct witness
23 interviews to identify where ExxonMobil's
24 Management Committee document custodians
25 had their documents?

20 (Pages 74 - 77)

Page 78

M. Hirshman

1
2   A    I don't know the answer to that
3   question.
4        MR. OLESKE:  I am going to go
5   into a new line of questioning at this
6   point, and so I don't know whether or
7   not you folks would prefer me to start
8   with that and continue on for a half
9   hour or hour or take an early lunch
10  break now?  I'll leave that to the
11  convenience of Counsel and the
12  witness.
13       Why don't we go off the
14  record?
15       [A recess was taken.]
16       THE WITNESS:  Before we get
17  to the next phase, I just want to
18  clarify a matter, because, Mr. Oleske,
19  you are asking me specific questions,
20  I am trying to answer those questions,
21  but so that the record is clear, I
22  think it's important when you read my
23  entire affirmation, as well as
24  Ms. Feinstein's affidavit, which is an
25  exhibit to my affirmation, that the

Page 79

M. Hirshman

1
2   record reflect that the process for
3   production of the Management Committee
4   documents was entirely the same as
5   that for other custodians with the
6   exception of what is laid out in
7   Ms. Feinstein's affidavit and has been
8   laid out to you and to your office in
9   the past several months.  So I think
10  it's important that the record reflect
11  that comprehensive facts.
12       MR. OLESKE:  And I assure you
13  that I will move on, later on, to
14  questions about Ms. Feinstein's
15  affidavit and the specific differences
16  regarding the Management Committee
17  documents, but thank you.
18  BY MR OLESKE:
19  Q    For right now, I would like to
20  turn your attention to paragraph 31 in
21  Exhibit 1 of your affirmation.
22       Immediately preceding paragraph
23  31, there is a bold header reading:  The
24  Attorney General Sets the Production
25  Priorities, correct?

Page 80

M. Hirshman

1
2   A    That is correct.
3   Q    And then paragraph 31 states:
4   By January 11, 2016, ExxonMobil had
5   produced over 5,300 documents, totaling
6   near 64,000 pages, from the four key
7   custodians at ExxonMobil Research and
8   Engineering who studied climate science,
9   correct?
10  A    That is correct.
11  Q    Did you write this paragraph?
12  A    I don't believe I wrote this
13  paragraph, but it is completely
14  consistent with my knowledge, and I
15  confirmed the numbers.
16  Q    So a little more than
17  two months after the subpoena issued,
18  ExxonMobil had produced 5,300 documents
19  from custodians relating to the study of
20  climate science, correct?
21  A    It produced documents from
22  those custodians, and that was their
23  duties at ExxonMobil, correct.
24  Q    And so prior to January 11,
25  2016, Exxon had been focused on producing

Page 81

M. Hirshman

1
2   documents from custodians who studied
3   climate science, correct?
4   A    Prior to -- well, I would say
5   ExxonMobil's obligation and its intent as
6   expressed to the Attorney General's
7   office early in the investigation was to
8   produce the documents from persons who
9   were, you know, involved in the study of
10  climate science and we knew there were
11  documents and we knew those were relevant
12  and responsive to the subpoena.
13  Q    I will move on.
14       Paragraph 32 states:  The
15  following month, the Attorney General
16  informed ExxonMobil that his new
17  "priority" was documents from custodians
18  who contributed to the preparation of a
19  2014 report entitled "Energy and Carbon -
20  Managing the Risks" -- and then there is
21  a parenthetical -- ("Managing the
22  Risks"), and those on ExxonMobil's
23  greenhouse gas management team,
24  ExxonMobil responded accordingly.
25       Did you write this paragraph?

21 (Pages 78 - 81)

Page 82

M. Hirshman

1
2     A     I don't believe I wrote this
3  paragraph, but it is consistent with my
4  knowledge of the investigation, and how
5  it proceeded.
6     Q     And then paragraph 33, states:
7  After ExxonMobil produced over 24,000
8  documents (totaling over 110,000 pages)
9  from Managing the Risks custodians, the
10  Attorney General shifted his focus yet
11  again.
12        Did you write that paragraph?
13     A     I don't know, but, again, that
14  is consistent with my knowledge of the
15  matters in this investigation.
16     Q     And then paragraph 34 states:
17  In June 2016, the Attorney General
18  indicated that his "immediate
19  investigative priorities were focused
20  specifically" on matters relating to
21  ExxonMobil's "valuation, accounting, and
22  reporting of its assets and liabilities"
23  ("Valuation and Accounting Documents").
24        Did you write that paragraph?
25     A     I didn't write it initially.  I

Page 83

M. Hirshman

1
2  confirmed -- I confirmed the quote marks,
3  and I may have edited it.
4     Q     And this paragraph relates back
5  to paragraph 33, in that this paragraph
6  34 provides the specifics of the Attorney
7  General shifting his focus yet again,
8  described in paragraph 33, correct?
9     A     Well, 33 describes the
10  production of the documents relating to
11  Managing the Risks custodians.  And then
12  34 describes what the Attorney General
13  said both publicly and in correspondence
14  around that period of time about his
15  priorities.
16     Q     But just to be clear, the part
17  of paragraph 33 that says, the Attorney
18  General shifted his focus yet again,
19  paragraph 34 describes that shift in
20  focus, correct?
21     A     That -- I think that that's
22  correct, it specifies that, yes.
23     Q     Okay.
24     A     At least based on our
25  understanding of what we understood the

Page 84

M. Hirshman

1
2  Attorney's focus and shift in focus was.
3        MR. OLESKE:  And so let me
4  mark as Exhibit 10.
5        (Hirshman Exhibit 10 was
6  marked for identification, as of this
7  date.)
8     Q     And Ms. Hirshman, can you
9  please review the document that's been
10  marked as Exhibit 10, and let me know
11  when you are able to confirm whether or
12  not you recognize the document.
13     A     (Reviewing exhibit.)  I have
14  reviewed this.
15     Q     Do you recognize this document?
16     A     I do.
17     Q     What do you recognize it to be?
18     A     It's a letter from you to Ted
19  and me.
20     Q     And what is the date on the
21  letter?
22     A     June 24th, 2016.
23     Q     Having now had the opportunity
24  to review this letter, this letter is
25  what you were referring to in paragraph

Page 85

M. Hirshman

1
2  34, when you say, in June 2016, the
3  Attorney General indicated, and then you
4  say, immediate investigative priorities
5  were focused specifically --
6        That quote is a quote from this
7  letter; isn't it?
8     A     I would have to look at that.
9  I reviewed this letter generally for
10  recognition; not to --
11     Q     I refer you to page 2 of the
12  letter, and ask you to look at the final
13  paragraph on page 2.
14        And after you review that
15  paragraph, let me know if that refreshes
16  your recollection as to whether or not
17  this letter is what you were referring to
18  in paragraph 34 of Exhibit 1.
19     A     (Reviewing exhibit.)
20        These quotes in paragraph 34 of
21  my affirmation are a reference to these
22  words in your letter of June 24th, which
23  is Exhibit 10.
24     Q     And so the events described in
25  paragraph 31 through 34, this entire

22 (Pages 82 - 85)

Page 86

1          M. Hirshman
2  sequence is what you, in your letters,
3  and Paul, Weiss, in general, have
4  referred to in this proceeding as the
5  Attorney General's shifting priorities
6  for Exxon's response to the subpoena,
7  correct?
8      A     These are among the items that
9  constitute the reference to shifting
10  priorities, correct.  These are not the
11  exclusive items, because there are public
12  statements by the Attorney General in
13  which he, himself, stated he was changing
14  the focus.
15      Q     You don't specify any of those
16  in your affirmation; do you?
17      A     I don't believe those were in
18  my affirmation --
19      Q     Do you recall --
20      A     -- because they don't refer to
21  document production.
22      Q     Did you, sitting here, now,
23  recall what specific time or place you
24  are referring to the Attorney General
25  making comments that he had shifted his

Page 87

1          M. Hirshman
2  priorities?
3      A     Yes.  I recall two New York
4  Times articles, I believe one in June and
5  one in August of 2016.  I believe the New
6  York Times.  There may be another media
7  outlet, but yes, I do remember that
8  specifically.
9      Q     Between the events described in
10  paragraphs 31 through 34, the letter that
11  is Exhibit 10, and the public statements
12  that you say you heard from the Attorney
13  General, at this time, June of 2016, you
14  believe that the Attorney General had
15  shifted his priorities for response to
16  the subpoena?
17      A     I believe that the Attorney
18  General was publicly remarking on an
19  investigation and indicating that much.
20      Q     But it wasn't just his remarks;
21  it was this sequence of events in 31
22  through 34 that also described what you
23  believed was a shift in priorities,
24  correct?
25      A     I see this and I see the words

Page 88

1          M. Hirshman
2  and I see that they were from you and you
3  said your immediate investigative
4  priorities were focused on these issues.
5      Q     Right, but I am not just
6  referring to that letter, now, I'm also
7  talking about in paragraph 31 and 32, you
8  describe the production of climate
9  science documents and then you say a
10  month after January 11th, the following
11  month, the Attorney General says he has a
12  new priority about the Managing the Risks
13  report, correct?
14      A     I think that -- the priority in
15  32 relates to priority of production as
16  opposed to priority of change of
17  investigation.  Because the Managing the
18  Risks report is identified in, you know,
19  obviously, in the original subpoena.
20      Q     So you believe that the
21  Managing the Risks, this is not a shift
22  in priorities, described in paragraph 32?
23      A     The title of this section is
24  the Attorney General Sets the Production
25  Priorities.

Page 89

1          M. Hirshman
2      Q     Right, but I guess what I am
3  referring to is paragraph 33, which
4  refers to the June shift that you have
5  described says, shifted his focus yet
6  again.
7          And so when you say "yet
8  again," is the prior instance you were
9  referring to the shift from climate
10  science in January or up to January of
11  2016 to Managing the Risks the following
12  month?
13      A     I think that's a fair focus.
14      Q     So if I could refer you to
15  Exhibit 5, the subpoena.
16      A     (Complying.)
17      Q     And if I could turn your
18  attention to page 8 of that document.
19      A     (Complying.)
20      Q     Could you please just review
21  for me to yourself items 3 and 4 on page
22  8, and let me know when you have a chance
23  to read through those items.
24      A     (Reviewing exhibit.)  I have
25  read them.

23 (Pages 86 - 89)

Page 90

1        M. Hirshman
2    Q    Item 3 is one of the Documents
3 to Be Produced categories in the
4 subpoena, correct?
5    A    Yes.
6    Q    It's the header at the top of
7 the page?  Okay.
8        And item 3 requests:  All
9 Documents and Communications, within Time
10 Period 2, Concerning the integration of
11 Climate Change-related issues.
12        And then it lists a series of
13 items, (a) through (g), and then says:
14 Into Your business decisions, including
15 but not limited to, financial projections
16 and analyses, operations projections and
17 analyses and strategic planning performed
18 by you.
19        You read this request at the
20 time you received the subpoena, correct?
21    A    Correct.
22    Q    And item 4 calls for:  All
23 Documents and Communications within Time
24 Period 1, Concerning whether and how You
25 disclosed the impacts of Climate Change

Page 91

1        M. Hirshman
2 (including but not limited to regulatory
3 risks and opportunities, physical risks
4 and opportunities, Greenhouse Gas
5 emissions and management, indirect risks
6 and opportunities, International Energy
7 Agency scenarios for energy consumption,
8 and other carbon scenarios) in Your
9 filings with the U.S. Securities and
10 Exchange Commission and in Your
11 public-facing and investor-facing reports
12 including but not limited to Your Outlook
13 For Energy reports, Your Energy Trends,
14 Greenhouse Gas Emissions, and Alternative
15 Energy reports, and Your Energy and
16 Carbon - Managing the Risks Report.
17        You read this paragraph when
18 you received the subpoena, correct?
19    A    Correct.
20    Q    And the end of this item
21 number 4 which lists the Energy and
22 Carbon - Managing the Risks Report, that
23 was what you were just referring to in
24 your previous testimony when you said
25 that the Managing the Risks report was

Page 92

1        M. Hirshman
2 actually mentioned in the subpoena,
3 correct?
4    A    Correct.
5        MR. OLESKE:  I am going to
6 mark as Exhibit 11.
7        (Hirshman Exhibit 11 was
8    marked for identification, as of this
9    date.)
10    Q    Ms. Hirshman, could you please
11 review the document that is been marked
12 as Exhibit 11, and let me know when you
13 are able to confirm whether or not you
14 recognize this document.
15    A    (Reviewing exhibit.)  I
16 recognize this document.
17    Q    What is this document?
18    A    It's a series of e-mails
19 between Monica Wagner and others and
20 Paul, Weiss and Pat Conlon is also on
21 these documents, as well.
22    Q    Just to direct your attention
23 to the second physical page of this
24 exhibit, do you recognize that there is
25 an e-mail from Monica Wagner to

Page 93

1        M. Hirshman
2 Mr. Wells, yourself and others dated
3 December 14, 2015?
4    A    Yes.
5    Q    And if I direct your attention
6 to the next physical page, the first full
7 paragraph that begins "finally."  It
8 states:  Finally, we would like to
9 request that as the next priority item,
10 documents and communications of the
11 authors and contributors to the 2014
12 Report entitled, Energy and Carbon -
13 Managing the Risks (see Subpoena Request
14 No. 4) be produced, including but not
15 limited to those of Peter Trelenbeg and
16 Robert Luettgen.
17        Do you see that?
18    A    I do see that.
19    Q    So paragraph 32 your
20 affirmation is false; isn't it?
21    A    No.
22    Q    Please refer to paragraph 32 of
23 your affirmation.
24    A    (Complying.)
25    Q    Paragraph 31, first of all,

24 (Pages 90 - 93)

Page 94

1         M. Hirshman
2 says: By January 11, 2016, and then
3 recalls events that had taken place up to
4 that time. And paragraph 32 says: The
5 following month, the Attorney General
6 informed ExxonMobil of a new priority.
7         In fact, the Attorney General
8 had notified you of that priority a month
9 prior to January 11, 2016, correct?
10    A    May I answer the question --
11    Q    Yes.
12    A    -- so that I can give a
13 complete answer?
14        At the time I considered this
15 e-mail to be a suggestion and a
16 direction, although I don't believe that
17 the Attorney General has the power to
18 direct, but to be a suggestion and -- to
19 us that essentially once you produce the
20 science custodians, then this is what we
21 want you to turn to next. And we were
22 producing the science custodians. There
23 was never any question in my mind that we
24 needed to -- that the Attorney General's
25 office would want to focus on this issue.

Page 95

1         M. Hirshman
2 It was a matter of this is a very broad
3 subpoena, there were many documents
4 responsive to the subpoena. We were
5 acting expeditiously to produce as many
6 documents as possible.
7    Q    Ms. Hirshman, you haven't
8 answered my question.
9    A    I did answer your question.
10 The statement is not false.
11    Q    Paragraph 32 says that the
12 Attorney General informed ExxonMobil that
13 his new priority was documents from
14 custodians who contributed to the
15 Managing the Risks report.
16        Those events actually occurred
17 in December of 2015, not in February of
18 2016, correct?
19    A    I believe there's
20 correspondence in February of -- in
21 February of 2016 that talks about
22 Managing the Risks and greenhouse gas
23 issue management teams from your -- from
24 your office.
25    Q    Okay, but ExxonMobil was not

Page 96

1         M. Hirshman
2 informed of the priority of producing
3 Managing the Risks of custodians for the
4 first time in February 2016; they were
5 notified of that in December of 2015,
6 correct?
7    A    That's not what -- right. And
8 my affirmation does not say that in
9 February 2016, ExxonMobil was notified
10 for the first time that this was a
11 priority for the office.
12    Q    And it is your belief, sitting
13 here today, that this is an accurate and
14 non-misleading description of these
15 series of events?
16    A    Yes, I do.
17    Q    Paragraph 33 mentions
18 production of documents relating to the
19 Managing the Risks custodians, correct?
20    A    Yes, it does.
21    Q    And it goes on to describe, in
22 paragraph 34, the shift we talked about
23 in June 2016. So putting those timelines
24 together, that means that as of
25 June 2016, Exxon had produced over 24,000

Page 97

1         M. Hirshman
2 documents relating to the Managing the
3 Risks custodians, correct?
4    A    Correct. That is my
5 understanding.
6    Q    But, in fact, ExxonMobil had
7 not completed production of documents
8 relating to the Managing the Risks
9 custodians in June 2016, had they?
10    A    I would expect that to be
11 correct.
12    Q    That they had not?
13    A    That we had not completed
14 production.
15    Q    Okay.
16    A    That we had produced some
17 documents, but that there might be
18 additional documents to be produced.
19    Q    And it is, in fact, true that
20 from the time of Ms. Wagner's
21 December 14, 2015, e-mail, asking Exxon
22 to prioritize next the production of
23 Managing the Risks documents, it took
24 ExxonMobil more than 9 months to complete
25 production of documents relating to that

25 (Pages 94 - 97)

Page 98

1        M. Hirshman
2 report, correct?
3     A    I'm not certain of that.  I
4 don't know when all of the documents for
5 Managing the Risks custodians were
6 produced.  And I don't know when -- I
7 have a recollection that your office
8 identified people as associated with
9 Managing the Risks, and there had to be
10 review done to determine whether your
11 office's identifications, in fact, you
12 know, bore out as individuals possessing
13 documents, so I don't know whether
14 9 months is accurate or not.
15    Q    Do you have any independent
16 basis to know how long it took
17 ExxonMobil, from when it started
18 producing documents, from Managing the
19 Risks, to complete that production?
20    A    What does "independent basis"
21 mean?
22    Q    Do you have any knowledge,
23 sitting here today --
24    A    I'd have to go back and look at
25 the various letters and the custodians

Page 99

1        M. Hirshman
2 identified and match those up.
3     Q    So without looking at,
4 referring to other documents to refresh
5 your recollection, you don't have a
6 recollection you can testify to today?
7     A    With respect to -- no, I do
8 not.  There are many millions of pages of
9 documents produced here.
10    Q    You are familiar with the
11 Managing the Risks Report, correct?
12    A    Yes.
13    Q    And you are aware that the
14 Managing the Risks Report relates, at
15 least in part, to the integration of
16 climate change, regulation risk into
17 Exxon's business decisions, correct?
18    A    I'd have to review it to make
19 certain that your words accurately
20 characterize the report, but I understand
21 generally the genesis of the Managing the
22 Risks Report.
23    Q    Why don't you tell me what your
24 understanding of the Managing the Risks
25 Report is about.

Page 100

1        M. Hirshman
2     A    My recollection is that there
3 were some shareholders who were
4 interested in how ExxonMobil dealt with
5 issues relating to CO2 emissions and that
6 this report was prepared, in part, to
7 address some of those issues.
8     Q    Do you know any of the
9 specifics as to what the issues relating
10 to carbon emissions were that were the
11 genesis of the report?
12        MR. TOAL:  I am just going to
13    instruct the witness to exclude from
14    your answer anything that's covered by
15    the attorney/client privilege.
16        THE WITNESS:  Yeah, I can't
17    answer.
18    A    I don't believe I have any -- I
19 don't believe I have knowledge separate
20 and apart from privileged conversations
21 that I could draw on today without me
22 reading the report.
23    Q    From your review of Managing
24 the Risks, do you know whether or not the
25 Managing the Risks Report incorporates a

Page 101

1        M. Hirshman
2 discussion of ExxonMobil's use of a proxy
3 cost of carbon?
4     A    I don't.  I don't remember the
5 specifics of the words of the report.
6     Q    Do you know whether or not the
7 Managing the Risks report includes any
8 discussion of the potential for Exxon's
9 assets to become stranded as a result of
10 climate change regulation?
11    A    No, I can't tell you -- I
12 can't, as I sit here, remember the
13 contents of the document, standing alone.
14    Q    With respect to the subject
15 area I just asked you about; is that
16 correct?
17    A    I think that would be true of
18 almost every subject area.
19    Q    Well, I will ask just to be
20 sure.
21        Do you know whether or not the
22 Managing the Risks Report includes any
23 discussion of processes that ExxonMobil
24 uses to ensure that it is evaluating the
25 risk of potential future climate change

26 (Pages 98 - 101)

Page 102

1       M. Hirshman
2 regulation?
3     A    As I sit here, you know, I
4 do -- as I sit here, I cannot report to
5 you the specific contents of the report.
6     Q    I will ask one more question
7 about it.
8     A    Sure.
9     Q    Do you know whether or not the
10 Managing the Risks Report addresses
11 Exxon's evaluation of the likelihood of a
12 future low carbon scenario?
13    A    Without reference to privileged
14 information, I can't speak to that.
15    Q    So turning to paragraph 34,
16 again, where --
17    A    This is in Exhibit 1?
18    Q    Yes, this is in Exhibit 1, I am
19 sorry.
20       So paragraph 34 of your
21 affirmation, Exhibit 1, this is where you
22 quote the June 24th letter, which is
23 Exhibit 10.
24       Do you have them both in front
25 of you?

Page 103

1       M. Hirshman
2     A    Yes.
3     Q    Okay.  So you quote from the
4 letter in paragraph 34 from page 2 of the
5 letter, saying, the portion of the letter
6 on page 2 that says:  Our immediate
7 investigative priorities are focused
8 specifically, and then you end your quote
9 from the letter, the first portion of
10 your quote from the letter of paragraph
11 34 there, correct?
12    A    After the word "liabilities."
13    Q    Well, you --
14    A    Yes.
15    Q    The quotation marks in your
16 paragraph begin before "immediate,"
17 correct?
18    A    Correct.
19    Q    And they end after the word
20 "specifically," correct?
21    A    Correct.
22    Q    And then you have your own
23 language saying, on matters relating to
24 ExxonMobil's, and then you begin the
25 quotes again, valuation, accounting and

Page 104

1       M. Hirshman
2 reporting of its assets and liabilities.
3     A    Yes.
4     Q    And you end the quote there,
5 correct?
6     A    Yes.  And the words "on
7 matters" and "ExxonMobil's" are also in
8 your letter, but you are absolutely
9 correct as to where the quotes begin and
10 end, both in my affirmation.
11    Q    And you refer to these
12 documents collectively in your
13 parenthetical as valuation and accounting
14 documents, correct?
15    A    Correct.
16    Q    The letter actually goes on to
17 ask for documents relating to -- and this
18 is the end of page 2 -- the impact of
19 climate change and related government
20 action on such valuation, accounting and
21 reporting, correct?
22    A    The letter does say that,
23 correct.
24    Q    But you don't include that in
25 your summary in paragraph 34; do you?

Page 105

1       M. Hirshman
2     A    It is not included there.
3     Q    And then that paragraph
4 continues and ends with the sentence:
5 For your convenience, we have outlined
6 exemplar categories of responsive
7 documents below.
8       Correct?
9     A    That is what the letter states,
10 yes.
11    Q    I am going to ask you to read
12 to yourself the numbered 1 through 6 that
13 immediately follows that paragraph, and
14 please let me know when you have had a
15 chance to read it.
16    A    Okay.
17       (Reviewing exhibit.)  I've
18 completed reading numbers 1 through 6
19 from page 3 of Exhibit 10.
20    Q    Having read numbers 1 through
21 6, does that exercise refresh your
22 recollection in any respect as to the
23 contents of the Managing the Risks
24 Report?
25    A    No.

27 (Pages 102 - 105)

Page 106

1        M. Hirshman
2    Q    And so sitting here today,
3 based on your prior testimony, you have
4 no way of knowing whether or not the
5 categories outlined in numbers 1 through
6 6 relate to the subject matter of the
7 Managing the Risks Report; do you?
8    A    Well, with respect to number 5,
9 it states: Such as in the 2014 Managing
10 the Risks Report. So I expect you would
11 have not said that if you did not know
12 that that to be the content in the
13 Managing the Risks Report.
14    Q    Right, but sitting here today,
15 apart from that being included in number
16 5, you have no independent way to know
17 whether or not that's true, whether or
18 not the subject matter of number 5 is, in
19 fact, the subject matter of the Managing
20 the Risks Report, correct?
21    A    Generally expect that
22 governmental officials will not write
23 things that are false.
24    Q    Sure, sure. I am just trying
25 to differentiate between knowledge that

Page 107

1        M. Hirshman
2 you gained as a result of relying on that
3 expectation in this list and knowledge
4 that you had independently before you saw
5 this again today. And what I am trying
6 to get at is that including number 5, but
7 as to all of numbers 1 through 6, you
8 have no basis, apart from what you read
9 here today, to know whether or not these
10 are the same subject matter as what's in
11 Managing the Risks, correct?
12    A    I don't have a recollection of
13 the specific content of Managing the
14 Risks, correct.
15    Q    Having read numbers 1 through 6
16 again, do you know whether or not these
17 categories of documents are responsive to
18 items number 3 and 4 on page 8 of the
19 subpoena, which is Exhibit 5?
20        MR. TOAL: Objection.
21 Attorney/client privilege. I think
22 that calls for a legal interpretation
23 of these categories and the language
24 in the subpoena.
25        MR. OLESKE: I think this is

Page 108

1        M. Hirshman
2 probably going to be the time where I
3 prefer to take a lunch break, if we
4 can. I am about to move on to new
5 subject matter.
6        THE WITNESS: I should note 1
7 item, though. I don't believe
8 paragraph number 4 on page 3 relates
9 to the managing the content of -- to
10 the Managing the Risks Report or its
11 words because it references statements
12 made in 2016, and the Managing the
13 Risks Report was prepared several
14 years earlier.
15    Q    Right, specifically to that
16 point, though, let's just get into the
17 record, number 4 asks for documents
18 relating to Rex Tillerson's statements at
19 ExxonMobil's 2016 shareholder meeting
20 that most of ExxonMobil's projects are
21 either too short term or too large for
22 the cost of carbon to affect its
23 decisionmaking.
24        You are saying you don't
25 believe that relates to Managing the

Page 109

1        M. Hirshman
2 Risks because it's describing an event in
3 2016, correct?
4    A    To the extent that what you are
5 trying to get me to -- what you are
6 trying to ask me is whether this
7 refreshes my recollection of the content
8 of the Managing the Risks Report. And
9 none of it does generally. The topics
10 that are listed here, I would expect, the
11 have some relevance to the report, but
12 number 4, I think I could say pretty
13 clearly doesn't relate to the content of
14 the report, although the subject matter
15 may be the same.
16        MR. OLESKE: Thank you. Why
17 don't we take a break for lunch, if
18 that works for everybody else? And
19 it's 12:37. Like I said, I think we
20 are moving fairly briskly, so I think
21 we could take a full hour.
22        [Whereupon, a luncheon recess
23 was taken.]
24
25

28 (Pages 106 - 109)

Page 110

1      M. Hirshman
2      [Whereupon, after a luncheon
3   recess was taken, the following was
4   had:]
5
6   A F T E R N O O N   S E S S I O N
7
8  BY MR OLESKE:
9      Q    Ms. Hirshman, I would like to
10  direct you now to Exhibit 1, your
11  affirmation at paragraph 44.
12     A    (Complying.)
13     Q    And immediately preceding
14  paragraph 44, there is a bolded heading
15  that reads:  ExxonMobil Addresses
16  Additional Concerns Raised By the
17  Attorney General, correct?
18     A    Correct.
19     Q    And then paragraph 44 relates
20  that the Attorney General inquired about
21  the volume of data for Management
22  Committee custodians, correct?
23     A    Correct.
24     Q    And then moving to paragraph
25  45, this is where you reference,

Page 111

1      M. Hirshman
2  incorporate, and attach Ms. Feinstein's
3  affidavit, correct?
4      A    I reference it and attach it.
5      Q    When you say here that the
6  affidavit dated March 30, 2017, describes
7  the protocol, does that mean to
8  incorporate into your affidavit a
9  representation on your part, at least, on
10  information and belief that her affidavit
11  accurately describes the protocol?
12     A    No.  I have reviewed her
13  affidavit.  She swore to it.  And I have
14  every expectation that her sworn
15  affidavit is truthful.
16     Q    Did you --
17     A    And, therefore, that is why I
18  was happy to submit it along with my
19  affirmation.
20     Q    Paragraph 46, just says that in
21  response to issues raised by the Attorney
22  General, Exxon conducted additional
23  searches of the Management Committee
24  Custodians, correct?
25     A    Correct.

Page 112

1      M. Hirshman
2      Q    So --
3      A    And -- and that their
4   information about that is reflected in
5   her affidavit.
6      Q    It doesn't say that in
7   paragraph 46; that's what you are telling
8   us?
9      A    I'm telling you that and I'm
10  describing it, yes.
11     Q    And you believe that her
12  affidavit accurately reflects the facts
13  related in paragraph 46?
14     A    I have -- yes, to that
15  question, yes.  And her affidavit is
16  Exhibit 3.
17     Q    So the process for preserving,
18  collecting, reviewing and producing
19  documents from the Management Committee
20  Custodians that is described in
21  Ms. Feinstein's affidavit does differ in
22  some respects from the process that you
23  described earlier in your affidavit, in
24  paragraphs 16 and 18 through 24, correct?
25     A    I believe it differs in only

Page 113

1      M. Hirshman
2  one respect.
3      Q    What's the one respect in which
4  you believe it differs?
5      A    That with respect to electronic
6  data from the management custodians,
7  there were search terms applied to
8  extract that electronic data, which was
9  then transferred to the vendor and put on
10  the review platform.  With respect to
11  other custodians, the entirety of their
12  electronic data was -- e-mail data, at
13  least, was taken and unfiltered placed on
14  the vendor's platform where search terms
15  were then -- where, then, the agreed-upon
16  search terms were then applied.  The
17  agreed-upon search terms were also
18  applied at the vendor to the management
19  custodian's data.
20     Q    Okay.
21     A    That's what my understanding is
22  of the difference.
23     Q    You are aware that unlike the
24  other custodians, ExxonMobil's Legal
25  Department did not interview the

29 (Pages 110 - 113)

Page 114

M. Hirshman

1    Management Committee Custodians prior to
2    attempting to collect their documents in
3    the first instance; you are aware of
4    that, right?
5
6    A    I don't know if I'm aware of
7    that.  I would have to refresh my
8    recollection with respect to that.
9    Q    Are you aware that
10   Ms. Feinstein testified that with respect
11   to documents other than e-mails,
12   ExxonMobil's Legal Department issued some
13   kind of instructions to the custodians'
14   administrative assistants as to how to
15   locate such non-e-mail documents?
16       MR. TOAL:  I am going to
17   direct the witness to exclude from her
18   answer any information she learned
19   from Counsel.  And since she wasn't
20   present for that examination, I don't
21   see how she could possibly know that
22   otherwise.
23       MR. OLESKE:  I will rephrase
24   my question.
25   Q    In your role as, in overseeing

Page 115

M. Hirshman

1    ExxonMobil's compliance with this
2    subpoena, are you aware of whether or not
3    Ms. Feinstein has provided testimony
4    regarding the specific process by which
5    administrative assistants were directed
6    to obtain documents from Management
7    Committee Custodians?
8
9        MR. TOAL:  I am going to make
10   the same objection based on
11   attorney/client privilege.  If you can
12   reframe the question to avoid focusing
13   on what she learned from --
14       MR. OLESKE:  I will.
15       MR. TOAL:  -- Counsel.
16       MR. OLESKE:  I will.
17   Q    Sitting here, now, regardless
18   of the source of information, are you
19   aware whether or not Exxon's Legal
20   Department issued instructions to
21   administrative assistants of Management
22   Committee Custodians with respect to how
23   to collect non-e-mail documents from
24   those custodians?
25   A    I expect that they would have,

Page 116

M. Hirshman

1    because I know that they -- and I know
2    this from personal knowledge, early in
3    the investigation, that the Legal
4    Department spoke with those assistants in
5    order to collect management custodian --
6    Management Committee Custodians'
7    documents.
8
9    Q    There are no interviews with
10   the administrative assistants listed in
11   the documents that Paul, Weiss has
12   provided prior to March of this year.
13       Are you aware that
14   notwithstanding that disclosure from
15   Paul, Weiss, that ExxonMobil actually did
16   interview those administrative assistants
17   at some time prior to March or April of
18   this year?
19   A    No.  I'm aware that they talked
20   to them as part of the process of
21   obtaining the data.
22   Q    Are you --
23   A    And I know -- and I know that
24   historically and based on my personal
25   knowledge, going back to the early part

Page 117

M. Hirshman

1    of the investigation.
2
3    Q    Do you have any knowledge as to
4    what the instructions were from
5    ExxonMobil's Legal Department to the
6    administrative assistants with respect to
7    how they should collect documents from
8    Management Committee Custodians other
9    than e-mails?
10       MR. TOAL:  Objection.
11   Attorney/client privilege.
12   Q    Are you aware that
13   Ms. Feinstein has provided information
14   that the e-mails of Management Committee
15   Custodians were initially collected by
16   someone named Bob Lauck?
17       MR. TOAL:  Objection.
18   Attorney/client privilege.
19   Q    Separate from anything
20   Ms. Feinstein may have said, are you
21   aware of whether or not ExxonMobil had
22   someone named Bob Lauck conduct a search
23   for e-mails of Management Committee
24   Custodians as part of the process
25   described in Ms. Feinstein's affidavit?

30 (Pages 114 - 117)

Page 118

1          M. Hirshman
2     A     Apart from communications --
3 wait, did you say in Ms. Feinstein's
4 affidavit? Why don't you ask me the
5 question again?
6     Q     Are you aware of whether or not
7 ExxonMobil directed someone named Bob
8 Lauck to conduct a search for e-mails of
9 Management Committee Custodians as part
10 of the process described in
11 Ms. Feinstein's affidavit?
12     A     I don't think so.
13     Q     Do you know who Bob Lauck is?
14     A     I recognize the name, but I
15 can't tell you what his title is.
16     Q     Apart from not knowing his
17 title, do you know if he works for
18 ExxonMobil Corporation?
19     A     I would expect that if his name
20 came up in the course of this, he has
21 some affiliation with ExxonMobil
22 Corporation.
23     Q     Okay, but apart from that, you
24 have no independent knowledge of that?
25     A     No.

Page 119

1          M. Hirshman
2     Q     And you have no independent
3 knowledge of what someone named Bob
4 Lauck's role in this whole subpoena
5 compliance would have been; is that
6 correct?
7     A     Apart from privileged
8 communications, no.
9     Q     So is it fair to say that you
10 never had any direct contact yourself
11 with someone named Bob Lauck?
12     A     That is correct.
13     Q     Previously you mentioned that
14 you did have --
15     A     As far as I know.
16     Q     Okay.
17     A     Right?  I don't know if he was
18 on a call that I was on also, but I don't
19 know.
20     Q     Previously in your testimony,
21 you mentioned that you did have personal
22 communications with unspecified persons
23 who worked for ExxonMobil's Information
24 Technology Department.
25          Do you recall the names of any

Page 120

1          M. Hirshman
2 of those people?
3     A     I don't recall their names, but
4 they were both non-lawyers and lawyers.
5     Q     Are you saying that there were
6 lawyers within the IT department that you
7 had contact with?
8     A     I don't know whether they're in
9 the IT department or whether they're in
10 the Legal Department, but I know there's
11 a lawyer who is associated with IT
12 issues.
13     Q     Is that Mr. Bolia?
14     A     No.
15     Q     But you don't recall the name
16 of the lawyer you are talking about?
17     A     I think the lawyer's name is
18 Robert Levy.
19     Q     And do you recall the names of
20 any of the non-lawyers who you spoke to
21 at ExxonMobil Information Technology?
22     A     I don't.  It was early on in
23 the investigation.
24     Q     Previously you described that
25 the difference you are aware of being how

Page 121

1          M. Hirshman
2 the search terms were applied to the
3 Management Committee Custodians'
4 documents, correct?
5     A     I don't think that that's a
6 correct recitation of what I said.
7     Q     Okay.  Well, why don't you tell
8 me, specifically, with respect to how
9 e-mails were collected from Management
10 Committee Custodians, what is your
11 understanding of how that process
12 differed from the collection of e-mails
13 from other custodians?
14     A     As I said, there were e-mails
15 and those e-mails have been provided to
16 you in exhibits to various documents.
17 There were e-mail terms that were
18 initially applied to the Management
19 Committee Custodians' documents as well
20 as Mr. Welberry's, in order to obtain
21 potentially responsive documents and
22 avoid the uploading onto the vendor
23 system of other confidential materials,
24 that is, so that the entirety of their
25 e-mail box was not uploaded, unfiltered

31 (Pages 118 - 121)

Page 122

1          M. Hirshman
2  onto the vendor's review platform.
3    Q    Okay.
4    A    That's what I understand the
5  distinction to be between Management
6  Committee Custodians and Mr. Welberry and
7  other custodians.
8    Q    Who is Mr. Welberry?
9    A    He is -- I believe he's in the
10 Corporate Secretary's office.
11   Q    How do you spell his name?
12   A    I think it's W-E-L-B-E-R-R-Y.
13   Q    So you are aware that there is
14 a difference in that the Management
15 Committee Custodians's e-mail files were
16 not simply uploaded unfiltered to the
17 vendor, correct, that didn't happen for
18 them in the first three searches that
19 ExxonMobil conducted, correct?
20   A    Well, that didn't happen in the
21 first search.  And I believe in the
22 intermediate, second, and third searches,
23 there were other ways of extracting data.
24 And it was not until a fourth search, as
25 described in Ms. Feinstein's affidavit,

Page 123

1          M. Hirshman
2  that their data was uploaded.
3    Q    It was only in the fourth
4  search that the data was uploaded
5  unfiltered; the entire e-mail contents
6  were uploaded unfiltered only in the
7  fourth search, correct?
8    A    I believe that's correct.
9    Q    So do you know whether or not
10 the administrative assistants were told
11 to identify certain folders or locations
12 of e-mail for the search term process
13 that you described to be applied to?
14   A    Locations of e-mail?
15   Q    Yes.
16   A    I mean, people have e-mail
17 accounts.
18   Q    Sure.  But for example, you are
19 aware -- do you know what e-mail program
20 ExxonMobil was using at the time of the
21 document collection?
22   A    I believe I've read it in a
23 document, but I don't know.
24   Q    Sitting here now, you --
25 okay --

Page 124

1          M. Hirshman
2    A    It's either Lotus Notes,
3  something like that.  You know, Lotus
4  Notes, Outlook, something.  I can't tell
5  you without going back and looking at a
6  document.
7    Q    So sitting here today, you are
8  not familiar with whether or not the
9  e-mail program that Exxon had in active
10 use at the time of the events described
11 in Ms. Feinstein's affidavit was Lotus
12 Notes or Outlook or something else?
13   A    That is correct.
14   Q    Are you familiar with Outlook?
15   A    I have general familiarity, but
16 I am not -- I am not and I continue to be
17 not technologically proficient.  I use
18 e-mail regularly.
19   Q    Right.  Are you familiar with
20 the search function -- or do you use
21 Outlook, yourself?
22   A    I believe I use Outlook.
23   Q    Are you familiar with the
24 search function in Outlook that allows
25 you to type a word into a box at the top

Page 125

1          M. Hirshman
2  left of the screen and hit "enter" and a
3  list of results will show up below that,
4  indicating which e-mails match that term?
5  Are you familiar with that tool?
6    A    I'm familiar with that.  I
7  don't use that tool.  I only use the
8  search function to search by the name of
9  the sender or recipient.
10   Q    So you never use it to search
11 for text; is that correct?
12   A    I don't.  I know.  It's funny,
13 but it's true.
14   Q    Are you aware that in this
15 instance, what happened was that someone
16 from ExxonMobil typed individual words
17 into the Management Committee Custodians'
18 Outlook search function and got a list of
19 results that way?
20   A    Is the question am I aware?
21   Q    Yes.
22   A    No, I'm not aware.
23   Q    Is there anyone else at Paul,
24 Weiss who would have greater familiarity
25 with the specifics of how ExxonMobil

32 (Pages 122 - 125)

Page 126

1          M. Hirshman
2  searched for e-mails in the first three
3  searches described in Ms. Feinstein's
4  affidavit?
5      A    I don't think so.
6      Q    Do you know if there is anyone
7  at the ExxonMobil Legal Department who
8  would have greater or more specific
9  information in that respect?
10     A    I don't know -- I know Dan
11  Bolia is involved in this process. I
12  don't know whether he would have more
13  specific information on that particular
14  question.
15     Q    And the same question with
16  respect to whether you know whether
17  anyone at ExxonMobil's Information
18  Technology Department would have more
19  specific information about that subject
20  matter?
21     A    I -- I don't know.
22     Q    Sitting here today now, are you
23  personally aware of any vulnerabilities
24  or flaws in using the search function in
25  Outlook to locate documents?

Page 127

1          M. Hirshman
2      A    Specifically, no.
3      Q    Do you know whether or not
4  anyone else at Paul, Weiss would have a
5  greater knowledge of any vulnerabilities
6  or flaws in using Microsoft Outlook's
7  search function to identify e-mails?
8      A    I have no idea.
9      Q    Same question with respect to
10  ExxonMobil's Legal Department?
11     A    I don't know specifically with
12  respect to that specific question.
13     Q    And same question with respect
14  to ExxonMobil's Information Technology
15  Department?
16     A    Correct.
17     Q    And do you --
18     A    But I want to be clear, I
19  understood early on that search terms
20  were going to be applied to the
21  Management Committee Custodians' data and
22  that the data would not be uploaded in an
23  unfiltered fashion on the vendor's review
24  platform. I want to make that crystal
25  clear.

Page 128

1          M. Hirshman
2      Q    Okay, you testified in that
3  respect. I want to clarify:  When did
4  you become aware of that?  You just
5  testified that it was early on?
6      A    Early.  Yeah, I would say
7  between November and January.
8      Q    So you knew at that time --
9      A    November of 2015 and
10  January 2016, yes.
11     Q    So you knew at that time that
12  Exxon was not going to upload the
13  unfiltered data and instead was going to
14  use a different protocol?
15     A    I understood precisely -- I
16  understood that the protocol would
17  involve, because of the sensitivity of
18  the data of the management custodians'
19  e-mail accounts, that their -- that, you
20  know, very broad terms that should
21  capture much information were going to be
22  applied so that what came off of the
23  management custodians' e-mail accounts
24  would then be uploaded, but, you know,
25  data that, you know, was not even within

Page 129

1          M. Hirshman
2  the realm of targeting would not be
3  uploaded.
4      Q    Okay.
5      A    I definitely knew that, and I
6  knew that early on in the investigation.
7      Q    But you didn't know the ways in
8  which the search term application that
9  was going to be made to the Management
10  Committee Custodians' documents differed
11  from the search term application that was
12  made to the rest of the documents; did
13  you?
14     A    I am not certain when I learned
15  about that boolean -- the boolean string
16  issue, you know, actually existed.  I
17  don't -- I'm not sure about that.
18     Q    Okay.
19     A    And I could have learned -- I
20  could have appreciated early on that that
21  existed.  And as I sit here today, I
22  can't tell you, you know, whether I
23  remembered it -- whether I knew it at the
24  time and, you know, then having read
25  this, my recollection, you know, was

33 (Pages 126 - 129)

Page 130

1          M. Hirshman
2 refreshed -- I can't tell you that. But
3 I am very confident I understood that
4 there were search terms being applied.
5 And I knew -- I can tell you this: I
6 understood that at a point in time before
7 we had agreed-upon search terms. I
8 understood that.
9     Q    Okay.
10    A    Because we were focused on
11 getting -- because the holds went out to
12 the Management Committee totally done by
13 ExxonMobil, you know, very, very soon.
14    Q    So you -- at some point, and
15 you are not exactly sure when -- became
16 aware that one of the differences between
17 the two different kinds of search term
18 applications was that the process for the
19 Management Committee Custodians was
20 unable to use boolean search connectors,
21 correct?
22    A    The initial process. The
23 initial. Taking the data off of the
24 person's custodial accounts.
25    Q    Right.

Page 131

1          M. Hirshman
2    A    But I believe the boolean
3 search terms were applied there
4 afterwards, when you are at the vendor.
5    Q    You believe the search terms
6 were applied again at the vendor after
7 these --
8    A    Yes.
9    Q    During the course of the first
10 three searches?
11    A    Yes.
12    Q    Do you know whether or not
13 putting a single word search term into
14 the Outlook search function will return
15 e-mails where only the attachment
16 contains the searched for word as opposed
17 to the e-mail itself?
18    A    I don't know the answer to that
19 question.
20    Q    Have you heard of something
21 called EMURALD, spelled E-M-U-R-A-L-D?
22    A    Yes.
23    Q    What is your understanding of
24 what EMURALD is?
25    A    At this minute, I don't have

Page 132

1          M. Hirshman
2 one.
3    Q    You just --
4    A    I know that as part of my
5 preparation for here, I have, you know,
6 seen something about EMURALD, but I don't
7 know what it is.
8    Q    Regardless of any specifics
9 regarding EMURALD, are you aware that
10 ExxonMobil had an internal computer
11 system application that assigned the
12 Wayne Tracker e-mail and a secondary
13 e-mail for Mr. Woods not to them, but to
14 an Information Technology employee named
15 Ramona Helble?
16    A    I know that there is such a
17 process. And I know that that was -- at
18 least one of them was assigned to Ramona
19 Helble. I don't know as I sit here that
20 both of them were assigned to Ramona
21 Helble. I would have to review the
22 affidavit.
23    Q    Do you believe that the
24 affidavit discusses these identities
25 being assigned to Ramona Helble?

Page 133

1          M. Hirshman
2    A    I'd have to review it.
3    Q    Is it your understanding that
4 when Exxon conducted the first three
5 searches described in Ms. Feinstein's
6 affidavit, that the Wayne Tracker e-mail
7 account was searched as well at those
8 times?
9    A    Yes.
10    Q    But you are aware that for some
11 kind of technical reason, the automatic
12 sweep of the Wayne Tracker e-mails was
13 not suspended at any time prior to 2017,
14 correct?
15    A    I am aware of that.
16    Q    Are you aware of any of the
17 details of how that happened?
18    A    I don't have firsthand
19 knowledge. I do have the knowledge based
20 on Ms. Feinstein's affidavit.
21    Q    Do you know anyone other than
22 Ms. Feinstein who would be able to
23 provide details about that technical
24 issue that Ms. Feinstein was unable to
25 provide to us?

34 (Pages 130 - 133)

Page 134

1       M. Hirshman
2       MR. TOAL:  I object on
3    attorney/client privilege, because she
4    is giving a source of information
5    about what information Ms. Feinstein
6    provided to you other than
7    communications with Counsel.
8       MR. OLESKE:  I will rephrase
9    my question.
10       MR. TOAL:  I don't know if it
11    will matter if you rephrase your
12    question, because it is still
13    inevitably going to call for
14    information that she could only have
15    learned from conversations with
16    Counsel.
17       MR. OLESKE:  I am going to
18    rephrase the question.  You can object
19    again if you would like.
20    Q    Do you know anyone other than
21    Ms. Feinstein at Paul, Weiss or at
22    ExxonMobil who has knowledge about the
23    technical details of the failure to
24    suspend the automatic sweep on the
25    Tracker account?

Page 135

1       M. Hirshman
2    A    I don't think so.  I mean, I
3    think my knowledge is really -- it comes
4    from the Connie Feinstein affidavit.
5    Q    Prior to --
6    A    But I want to be clear, again,
7    because you didn't ask me this.  You
8    know, I know that Wayne Tracker e-mails
9    were produced early on in this
10    investigation.  And I want to be crystal
11    clear that I know that, and I know that
12    from personal knowledge.
13    Q    And you know from personal
14    knowledge that Tracker e-mails were
15    produced, you said, early on in this
16    investigation --
17    A    Correct.
18    Q    What do you mean by early on?
19    A    In the first part of 2016.
20    Q    Were you aware of that at the
21    time?
22    A    Yes, I was.  Because I knew
23    about them and I read them and I said,
24    well, this will be an interesting test
25    of whether the Attorney General's office is

Page 136

1       M. Hirshman
2    reading the documents, because there are
3    documents from that e-mail account and
4    they say Rex Tillerson on them.
5    Q    So you are volunteering that in
6    the first part of 2016, you were aware
7    that Mr. Tillerson had an alternate
8    e-mail account named Wayne Tracker,
9    correct?
10    A    I don't know if I'm aware of
11    that -- that it was called Wayne Tracker,
12    but I have a vague recollection that it
13    was.
14    Q    Well --
15    A    And I -- and I am certain that
16    those e-mails said the name "Rex" on
17    them.
18    Q    And so your testimony is at the
19    time that you became aware of this in the
20    beginning of 2016, you thought it would
21    be an interesting test to see if the
22    Attorney General could divine --
23    A    No.
24    Q    -- that Mr. Tillerson had an
25    alternate e-mail address from the

Page 137

1       M. Hirshman
2    production of this document?
3    A    It is not a test.  It is a very
4    fair question for you to ask me that
5    because of what I just said.  And I
6    didn't think it was a test.  I thought it
7    was evidence of the -- of the production
8    that -- and that the production was
9    appropriately focused on the right
10    custodians, that those e-mails were being
11    produced because Rex Tillerson was a
12    custodian.
13    Q    But those documents that you
14    are talking about were not produced from
15    Mr. Tillerson's custody; were they?
16    A    They were produced by
17    ExxonMobil, correct.
18    Q    No.  I am saying they were not
19    produced as custodial files of
20    Mr. Tillerson; were they?
21    A    I don't know how they were
22    produced.  They were produced by
23    ExxonMobil and they were -- I don't know
24    what the metadata showed, but I know they
25    were produced.

35 (Pages 134 - 137)

Page 138

M. Hirshman

1
2    Q    Are you unaware that ExxonMobil
3  produced no documents from the custody of
4  Mr. Tillerson prior to at least
5  December 2016?
6    A    I'm not aware of that one way
7  or the other.
8    Q    And so you are not aware that
9  the documents you are referring to that
10  were produced in the first half of 2016
11  were produced from the custody of
12  non-Management Committee Custodians who
13  incidentally had communicated with
14  Mr. Tillerson and the Tracker account?
15    A    Oh, I see what you are saying.
16  I see what you are saying.  I guess
17  that's possible.
18    Q    And you are aware that --
19    A    I see what you are saying.
20    Q    From the affidavit you
21  submitted and the other representations
22  that Paul, Weiss has made to the court,
23  you are aware that ExxonMobil has, at
24  this point, produced over 2.8 million
25  pages of documents, correct?

Page 139

M. Hirshman

1
2    A    Correct.
3    Q    And you are aware that by the
4  time the document that you are referring
5  to was produced, the e-mail that
6  identified or had a Wayne Tracker e-mail
7  address on it, you are aware that by that
8  time, ExxonMobil had produced over a
9  million pages of documents, correct?
10    A    No, I don't think so.
11    Q    Okay.
12    A    I think that -- you are correct
13  to point out that the document that I may
14  be thinking about may have come from a
15  different custodian's files.
16    Q    That's not my question.
17    A    No, no, no.  But -- but to be
18  clear, and I believe that that was at a
19  time before ExxonMobil had produced over
20  a million pages of documents.
21    Q    Regardless of the specifics, by
22  that time, ExxonMobil had certainly
23  produced hundreds of thousands of pages
24  of documents; hadn't it?
25    A    I don't know if that's correct.

Page 140

M. Hirshman

1
2    Q    And so at the time that
3  document was produced and you knew that
4  there was an alternate e-mail address for
5  Mr. Tillerson under the label Wayne
6  Tracker, rather than telling the Attorney
7  General's office that Mr. Tillerson had a
8  secondary e-mail address under the alius
9  Wayne Tracker, it would be an interesting
10  test to see if we detected it on our own?
11    A    That is not my testimony.
12    Q    Why don't you please clarify
13  it?
14    A    Nor is it accurate to say that
15  there was an alius.  It was another
16  e-mail account that was used by
17  Mr. Tillerson.
18    Q    Okay.
19    A    And I understood that there was
20  an e-mail between Mr. Tillerson and
21  someone else with a Wayne Tracker e-mail
22  address.  And I would say this:  Whether
23  or not it was an interesting test in my
24  own mind, I do not believe that
25  ExxonMobil was under any obligation to

Page 141

M. Hirshman

1
2  notify your office of that because
3  ExxonMobil's obligation, in my view, is
4  to produce documents responsive to the
5  subpoena.
6    Q    Understood.  So you are aware,
7  sitting here now --
8    A    And had I believed ExxonMobil
9  had an obligation to do so, I would have
10  advised them.
11    Q    Sitting here now, you are aware
12  that by the time the Wayne Tracker
13  e-mails were searched by ExxonMobil the
14  first time, that the automatic file sweep
15  program had already destroyed
16  approximately three months' worth of
17  e-mails from that account, correct?
18    A    I believe that that is correct,
19  yes.
20    Q    And you are aware, sitting
21  here, now, that over the course of the
22  remainder of 2016, another approximately
23  nine months' worth of Wayne Tracker
24  e-mails were destroyed by the automatic
25  file sweep program?

36 (Pages 138 - 141)

Page 142

1          M. Hirshman
2     A   Correct.  Correct.  I believe
3  that's correct.  It's in the affidavit,
4  and it specifies the dates.
5     Q   Right.
6     A   I'm taking you at your word,
7  that those are correct numbers.
8     Q   First, let's start with your
9  personal knowledge.
10         At the time that you became
11 aware that there was a secondary e-mail
12 address for Mr. Tillerson, did you take
13 any steps to ensure that the Wayne
14 Tracker e-mails were effectively subject
15 to a preservation hold?
16    A   I do not believe I took any
17 steps to that effect.
18    Q   Do you know whether or not
19 anyone at Paul, Weiss took any such steps
20 at any time prior to 2017?
21    A   I do not believe that anyone
22 did.
23    Q   Do you know whether or not
24 anyone at the ExxonMobil Legal Department
25 took any such steps?

Page 143

1          M. Hirshman
2     A   I believe there was an
3  expectation that that account was on
4  hold.
5     Q   But my question is: Do you
6  know whether or not --
7     A   I do not know what steps were
8  taken.
9     Q   So it's not the case that Paul,
10 Weiss found out about the Wayne Tracker
11 account in 2017, when we sent a letter to
12 your office, and that then you
13 investigated the matter and determined
14 the issue about the e-mails being
15 destroyed; you already knew about the
16 Wayne Tracker e-mail address the previous
17 year?
18    A   I knew about the existence of a
19 Wayne Tracker e-mail address, that is
20 correct, and I knew that there were
21 documents that been produced that
22 reflected the Wayne Tracker e-mail
23 address and that it was clear from those
24 e-mails that the address -- that -- that
25 they were sent to someone named Rex.

Page 144

1          M. Hirshman
2     Q   Do you know if they were sent
3  from --
4     A   Maybe they may have been sent
5  or from.  I don't remember specifically.
6  I just know the name "Rex" is on those
7  e-mails, and that they were subjects that
8  would have been discussed with
9  Mr. Tillerson.
10    Q   So during this period of time
11 in the first half of 2016, were you aware
12 that the administrative assistants to the
13 Management Committee were not subject to
14 a preservation hold?
15    A   I think it's -- I don't believe
16 I was aware that they were not.  I would
17 not have expected them to be, and I know
18 we sent you the names of persons
19 repeatedly who were on litigation hold.
20 And I don't recall that any of their
21 titles reflected them as being
22 assistants.  So I think that those
23 different facts would suggest that I was
24 aware that assistants were not on hold,
25 correct.

Page 145

1          M. Hirshman
2     Q   What's the basis for your
3  statement that you would not have
4  expected the administrative assistants to
5  be on hold?
6     A   Because, generally, unique
7  responsive documents are generally not in
8  the custodial accounts of assistants.
9  And --
10    Q   When you say "generally," do
11 you mean in corporations, generally?
12    A   Generally, in my experience, I
13 have not found the unique responsive
14 documents to be there, and I have not --
15 I don't recall ever directing anyone to
16 put a hold on an assistant's e-mail
17 account, and I don't recall being --
18 well, I -- let me change that.
19         You, in your letters, asked at
20 certain points in time for assistants to
21 be placed on hold.  That's the only time
22 in my career that I recall being directed
23 to do that.  And I don't recall generally
24 requesting that when I was on the other
25 side.

37 (Pages 142 - 145)

Page 146

1        M. Hirshman
2    Q    What do you mean by when you
3    were on the other side?
4    A    When I worked for the
5    government for over 20 years.
6    Q    And so the Zubulake series of
7    cases and following authorities that you
8    cited in various correspondence we
9    reviewed earlier, are you aware of
10   whether or not administrative assistants
11   have been considered key players in those
12   authorities?
13   A    I am not, specifically, one way
14   or the other.
15   Q    Did you take any steps to
16   determine whether or not ExxonMobil's
17   particular situation and the particular
18   situation of administrative assistants to
19   the Management Committee at ExxonMobil
20   might differ from your general
21   understanding of what's in the custodial
22   files of administrative assistants in
23   corporations generally?
24   A    I did not take -- it's not just
25   corporations; it's other organizations as

Page 147

1        M. Hirshman
2    well that that perspective derives from.
3    I did not take any specific steps, and
4    given the, you know, extensive number of
5    custodians who were placed on hold in
6    this matter.
7    Q    Do you know whether or not
8    anyone else at Paul, Weiss took any such
9    steps?
10   A    I don't know whether, after
11   your requests, and more recently, people
12   did or not.
13   Q    Let's say prior to any requests
14   that my office may have made in 2017, are
15   you aware of anyone at Paul, Weiss who
16   would have made any such inquiries?
17   A    No.
18   Q    Are you aware that, in fact, at
19   ExxonMobil, the administrative assistants
20   have a high degree of knowledge and
21   involvement in the communications of
22   their principals on the Management
23   Committee?
24   A    I'm not aware one way or
25   another. Nor do I think that that

Page 148

1        M. Hirshman
2    addresses the question of whether they
3    have unique responsive documents.
4    Q    What do you think addresses the
5    question of whether or not they have
6    unique responsive documents?
7    A    Whether there is any indication
8    that they have unique responsive
9    documents.
10   Q    And how would one find that
11   out?
12   A    I think there are many people
13   who work at the company who made
14   determinations based on custodial
15   interviews, based on their knowledge of
16   the organization, based on extensive
17   custodial interviews, who would provide
18   them with that information.
19   Q    But the information you
20   provided us is that none of those
21   administrative assistants were, in fact,
22   interviewed prior to 2017, correct?
23   A    I believe that's correct.
24   Q    Okay.
25   A    Those aren't the only people

Page 149

1        M. Hirshman
2    who would have knowledge as to whether
3    those -- whether those administrative
4    assistants would have unique responsive
5    documents.
6    Q    Are you aware of whether or not
7    Paul, Weiss or ExxonMobil interviewed
8    anybody else to determine whether or not
9    the administrative assistants would have
10   unique responsive documents?
11   A    I don't have specific knowledge
12   of that.
13   Q    Can you tell me any other ways
14   in which Paul, Weiss, any other basis for
15   Paul Weiss's determination that
16   administrative assistants were unlikely
17   to have unique responsive documents?
18   A    I didn't say that was Paul
19   Weiss's determination. I said that's my
20   view. And I said that it's my view, and
21   I don't know of anyone else at Paul,
22   Weiss who would have made a
23   determination.
24   Q    So you are aware that during
25   the entire time of the subpoena

38 (Pages 146 - 149)

Page 150

1        M. Hirshman
2 compliance, from its issuance until
3 November 4, 2015, until when these
4 administrative assistants were placed on
5 hold sometime in March or April of 2017,
6 that ExxonMobil's automatic file sweep
7 program was still actively sweeping their
8 files? Are you aware of that?
9    A    If they were not on hold, I
10 believe that that would be correct.
11    Q    And so as a result, given that
12 the subpoena had been outstanding for
13 approximately 12 to 14 months before
14 those custodians were placed on hold,
15 that 12 to 14 months of their e-mails
16 have been deleted from Exxon's e-mail
17 system, correct?
18    A    I don't know that it's 12 to
19 14 months, because there's a -- the way
20 the file sweep program works -- and this
21 is based on very general understanding,
22 right -- there's -- there's timeframe --
23 there's a time lag. So I don't know
24 whether it's 12 to 14 months, but I do
25 not disagree that e-mails from persons

Page 151

1        M. Hirshman
2 not on litigation hold during a relevant
3 period would have been deleted.
4        MR. OLESKE:  I am going to
5    ask that we mark as Exhibit 12.
6        (Hirshman Exhibit 12 was
7    marked for identification, as of this
8    date.)
9    Q    And Ms. Hirshman, could you
10 please review what's been marked as
11 Exhibit 12, and let me know when you are
12 able to confirm whether or not you
13 recognize it.
14    A    Sure.  (Reviewing exhibit.)
15    Q    Ms. Hirshman, have you had a
16 chance to review Exhibit 12?
17    A    Yes, I have.
18    Q    Do you recognize Exhibit 12?
19    A    I do.
20    Q    What is Exhibit 12?
21    A    It's a series of e-mails
22 between myself and Lem Srolovic and
23 Monica Wagner and your office.
24    Q    So first, if I could direct you
25 to the part of the e-mail thread that is

Page 152

1        M. Hirshman
2 on physical page 2 of this document, it's
3 in the middle of the page.  It says from
4 Lemuel Srolovic to you, Thursday,
5 November 19, 2015.
6        Do you see where I am looking
7 at?
8    A    Yes.
9    Q    And the e-mail below is
10 addressed to you, Mr. Wells, and
11 Mr. Conlon, correct?
12    A    You mean the addressees on this
13 e-mail that you are describing?
14    Q    Yes.  Well, the salutation is
15 to you --
16    A    Correct.
17    Q    -- Mr. Wells, and Mr. Conlon?
18    A    Correct.
19    Q    And the second full paragraph,
20 it states:  We would also like to confirm
21 the steps that Exxon has taken to
22 preserve documents and information
23 potentially responsive to the subpoena.
24 Michelle indicated at our first meeting
25 that Exxon had instituted a litigation

Page 153

1        M. Hirshman
2 hold but we are not clear whether that
3 was imposed on all custodians of
4 potentially responsive documents and
5 information or a smaller group of
6 custodians.  Please let us know the full
7 extent of the hold that has been imposed.
8        Did I recite that accurately?
9    A    Correct.
10    Q    And do you recall receiving
11 this e-mail --
12    A    Yes.
13    Q    -- at the time?
14        And then turning back to page 1
15 of the document.
16    A    (Complying.)
17    Q    The e-mail above that in the
18 thread is an e-mail from -- a response
19 e-mail from you to Mr. Srolovic, copying
20 Mr. Wells and Mr. Conlon on Friday,
21 November 20, 2015, correct?
22    A    Mm-hm.
23    Q    And in that e-mail here reads,
24 in part:  In response to your request
25 regarding the legal hold, ExxonMobil's

39 (Pages 150 - 153)

Page 154

1         M. Hirshman
2 Law Department issued a legal hold to all
3 employees whom it currently knows to have
4 potentially responsive documents.
5 ExxonMobil's search for custodians is
6 ongoing and it continues to add employees
7 to the legal hold as they are identified.
8 There are currently approximately 100
9 employees on hold.
10        Did you write that?
11    A    I did.
12    Q    Was it accurate at the time?
13    A    I believed it to be accurate at
14 the time, correct.
15    Q    Do you have any reason to
16 believe now that it, in hindsight, was
17 not accurate?
18    A    Nope.
19    Q    Looking at the e-mail above
20 that in the thread, that indicates it is
21 from Mr. Srolovic to you, Mr. Wells,
22 Mr. Conlon.  And it says:  Michele, We
23 appreciate the preservation efforts Exxon
24 has taken thus far, but we are concerned
25 that a hold on the documents of

Page 155

1         M. Hirshman
2 approximately 100 employees is not
3 sufficient to preserve relevant or
4 potentially relevant documents.
5        Do you see that?
6    A    I do see that.
7    Q    Do you remember receiving this?
8    A    Yes, I do.
9    Q    Down in the next paragraph, it
10 says: If this has not already been done,
11 we request that an immediate hold be
12 distributed to those entire
13 department/divisions (including
14 management), and not employees on an
15 individual basis.
16        Do you remember receiving that?
17    A    I do.
18        MR. OLESKE:  I am going to
19 mark as Exhibit 13.
20        (Hirshman Exhibit 13 was
21 marked for identification, as of this
22 date.)
23        THE WITNESS:  Would you like
24 me to read Exhibit 13?
25    Q    Yes, please, if you could

Page 156

1         M. Hirshman
2 review Exhibit 13, and let me know when
3 you are able to confirm whether or not
4 you recognize it.
5    A    (Reviewing exhibit.)  I do.
6    Q    What do you recognize this
7 document to be?
8    A    So it looks to me like
9 Exhibit 13 just has an additional e-mail
10 at the top to the chain of e-mails that's
11 contained in Exhibit 12.  It looks -- I
12 think this is correct.  And it looks like
13 it's my response to Mr. Srolovic's e-mail
14 of Friday, November 20th.
15    Q    And your response is dated
16 Tuesday, November 24th, correct?
17    A    Correct.
18    Q    And in this response, it reads,
19 here:  Lem, I'm writing in response to
20 your e-mail from late Friday afternoon
21 (below) regarding ExxonMobil's
22 preservation efforts.  Since receiving
23 the subpoena, ExxonMobil has acted
24 reasonably and responsibly to identify
25 and notify custodians likely to have

Page 157

1         M. Hirshman
2 relevant information and to place them on
3 litigation hold.  That comprehensive
4 effort is ongoing, and your request for
5 preservation efforts in addition to what
6 has been done and the ongoing process
7 that is currently underway is unsupported
8 by the controlling caselaw.
9        Did you write that?
10    A    Yes, I did.
11    Q    And in the following paragraph,
12 you reference the VOOM HD case and its
13 reference, in turn, to the Zubulake
14 series of cases, correct?
15    A    Correct.
16    Q    And then the next paragraph
17 after that, you state: ExxonMobil's good
18 faith and expeditious preservation
19 efforts aimed at employees likely to have
20 relevant information clearly meet the
21 standards of reasonableness and
22 proportionality laid out in the
23 controlling authority.
24        You wrote that?
25    A    I did.

40 (Pages 154 - 157)

Page 158

1         M. Hirshman
2    Q    And you believed this all to be
3 true at the time that you wrote it?
4    A    Yes.
5    Q    In hindsight, do you believe
6 there is anything inaccurate about this?
7    A    Nope.
8    Q    Just a couple of other
9 questions.
10        With respect to -- let me
11 direct you back to paragraph 6 of
12 Exhibit 1.
13   A    (Complying.)
14   Q    And this paragraph, again,
15 discusses the legal hold notice process
16 at ExxonMobil, correct?
17   A    Mm-hm.
18   Q    There is a footnote at the end
19 of that paragraph, footnote 3, correct?
20   A    Mm-hm.
21   Q    And footnote 3 says:
22 Individuals who had separated from
23 ExxonMobil prior to the receipt of the
24 Subpoena, and whose documents were not
25 otherwise separately retained at the time

Page 159

1         M. Hirshman
2 of separation, were not placed on Legal
3 Hold.
4    A    Mm-hm.
5    Q    Did you write this?
6    A    No, I did not write this.
7    Q    Do you have an understanding of
8 what happens to the documents belonging
9 to ExxonMobil employees when they leave
10 the company's employ?
11   A    My understanding is if they are
12 not -- if they are not otherwise on a
13 legal hold at that time, those documents
14 are not retained.
15   Q    Are you familiar with a process
16 whereby those documents are transferred
17 to the custody of still-current employees
18 who have a similar or overlapping
19 responsibilities?
20   A    I have heard of that.  That
21 where employees -- regardless of whether
22 they are on legal hold, if they have some
23 documents that would be relevant to the
24 work of employees, either who are
25 assuming their functions or have

Page 160

1         M. Hirshman
2 functions related to theirs, that some of
3 their -- that some of their -- I don't
4 know what -- which of their documents,
5 but some of their documents are
6 transferred to other people.  I've heard
7 that.
8    Q    So as to that process that you
9 have heard about, do you know any
10 specifics about any steps taken by Paul,
11 Weiss or anyone at ExxonMobil Corporation
12 to trace documents from custodians who
13 had left the company's employ, that would
14 have been relevant or responsive to the
15 subpoena, to other individuals' custody
16 through the process you just described?
17   A    I'm not aware of specific steps
18 to trace --
19   Q    Okay.
20   A    -- that information.
21   Q    But in the case of individuals
22 who separated, and whose documents were
23 not so-transferred to someone else, if
24 they were separately retained, your
25 understanding is that they would be

Page 161

1         M. Hirshman
2 placed on legal hold, correct?
3    A    Can you repeat that question?
4    Q    Sure.  Sure.  Well, just to go
5 back to the wording of your footnote 3.
6 You said individuals who had separated
7 from ExxonMobil and whose documents were
8 not otherwise retained were not placed on
9 legal hold.
10        I guess the question is:  Does
11 that demonstrate the inverse, which is
12 for custodians who had left, but whose
13 documents were otherwise separately
14 retained, were they placed on legal hold?
15   A    I don't know the answer to that
16 question.
17   Q    Do you know who Donald
18 Humphries is?
19   A    I've heard the name.
20   Q    So you are not aware whether or
21 not he served on ExxonMobil's Management
22 Committee during the time of the
23 subpoena?
24   A    I think I have heard his name
25 in connection with a -- with a discussion

41 (Pages 158 - 161)

Page 162

1        M. Hirshman
2 that he was on the Management
3 Committee --
4    Q    Okay.
5    A    -- at some point in time.
6    Q    Did you take any steps to
7 determine whether any of the custodians
8 at issue in Exxon's subpoena response
9 here had been on a legal hold for another
10 matter, and whether or not that separate
11 legal hold could aid ExxonMobil in
12 collecting or recovering documents from
13 custodians relevant to this subpoena
14 response?
15    A    The question, did I take any
16 steps?
17    Q    Yes.  Have you at any time
18 investigated whether or not any of these
19 custodians were on a different legal
20 hold, and, if they were, whether or not
21 that could be utilized to help collect or
22 recover relevant custodians' documents?
23    A    I'm -- what I'm trying to
24 remember is in the process of the efforts
25 to recover information from the Tracker

Page 163

1        M. Hirshman
2 account, that that was one of the steps
3 that was deployed or not, that is, you
4 try to go to accounts of other people who
5 are on hold who might not be on hold on
6 this but they might have e-mails to the
7 Tracker account.  I just don't know
8 whether that is a step or not that is
9 described in the affidavit.  I would have
10 to look at the affidavits.
11    Q    Is it fair to say you know that
12 you, personally, didn't do anything like
13 that?
14    A    I am very confident I
15 personally did not do anything like that.
16    Q    And is it fair to say that
17 sitting here now, you are not sure
18 whether or not anyone else at Paul, Weiss
19 or at ExxonMobil did anything like that?
20    A    Sitting here at the moment, I
21 don't know.  I would have to look at
22 Ms. Feinstein's affidavit to see if it's
23 laid out there.
24    Q    Other than Ms. Feinstein, can
25 you point us to any other individual who

Page 164

1        M. Hirshman
2 might have more knowledge about that than
3 you?
4    A    No.
5    Q    As an initial matter, prior to
6 the issue of the loss of the Wayne
7 Tracker e-mails coming up, do you know
8 whether or not ExxonMobil took any steps
9 to preserve any backup resources for
10 electronic data with respect to
11 responding to this subpoena?
12    A    I think that the preservation
13 efforts, you know, have been laid out.
14 And I don't know specifically what other
15 backup systems exist otherwise.
16    Q    Other than Ms. Feinstein, can
17 you point us to anyone who would know
18 more about backup systems at ExxonMobil
19 than you?
20    A    I can't speak -- I am confident
21 there are many people who would know more
22 about backup systems than me, but the
23 only person I would point to is
24 Ms. Feinstein, because that's the source
25 of my knowledge about those issues.

Page 165

1        M. Hirshman
2    Q    You've never spoken to her;
3 your source of knowledge is reading the
4 affidavit.
5    A    When I am pointing to the
6 documents in front of me, I mean her
7 affidavit.
8        MR. OLESKE:  Let's mark this
9 as Exhibit 14.
10        (Hirshman Exhibit 14 was
11 marked for identification, as of this
12 date.)
13    Q    Ms. Hirshman, can you please
14 review what has been marked as
15 Exhibit 14, and let me know when you are
16 able to confirm whether you recognize it.
17    A    (Reviewing exhibit.)  I
18 recognize it as a letter on Paul, Weiss
19 letterhead from Dan Toal to you.
20    Q    And it's dated --
21    A    With a date of April 4th.
22    Q    2017?
23    A    Correct.
24    Q    The second full paragraph in
25 the letter says:  First, we are providing

42 (Pages 162 - 165)

Page 166

1          M. Hirshman
2 to you under separate cover a production
3 letter enclosing ExxonMobil's Management
4 and Protection of Information (MPI)
5 Guidelines and copies of ExxonMobil's
6 Business Continuity Plans ("BCPs") and
7 Disaster Recovery Plans ("DCPs").  We
8 redacted certain nonresponsive
9 information from the BCPs and DCPs that
10 is highly confidential because of its
11 implications for ExxonMobil's
12 cybersecurity.
13          Did I recite that correctly?
14    A    Yes.
15    Q    Were you aware, on April 4,
16 2017, that your firm was providing these
17 documents and making these
18 representations to our office?
19    A    I don't believe I was.
20    Q    Were you aware of that before
21 you saw this letter today?
22    A    I know that there -- I've seen
23 in correspondence reference to that, but
24 I was not -- and so I -- I've seen an
25 indication that some documents like this

Page 167

1          M. Hirshman
2 have been provided to you recently, but
3 that's what I know.
4          MR. OLESKE:  I am going to
5    ask to mark 2 documents as 15 and then
6    16.
7          (Hirshman Exhibits 15 and 16
8    identification, as of this date.)
9          THE WITNESS:  Would you like
10    me to read these documents?
11    Q    Let's start with Exhibit 15,
12 and I am going to ask you some questions
13 straight off.  The document that you have
14 been handed that is marked Exhibit 15, on
15 the first page, it has a designation,
16 MSG-D-5118 near the top of the page,
17 correct?
18    A    Yes, I see those letters and
19 number.
20    Q    And then underneath that, it
21 says, Exchange Server Design, correct?
22    A    I see that.
23    Q    And this document is Bates
24 stamped EMC 002747908, correct?
25    A    I see that as well.

Page 168

1          M. Hirshman
2    Q    I will ask you to turn to page
3 7 of 17, as denoted at the top right of
4 the document where the page numbers are.
5    A    (Complying.) Okay.
6    Q    The document reads:  Internal
7 Storage Mailbox servers, (Type A4) will
8 be limited to 300 Users and only deployed
9 at locations that do not have sufficient
10 network connectivity to support the
11 Site's Users at a Regional Hub location,
12 or due to a special need, i.e.,
13 Management Committee Server.
14          Do you know what an Internal
15 Storage Mailbox server (Type A4) is?
16    A    No.
17    Q    Do you know what the Management
18 Committee Server is?
19    A    No.
20    Q    If I could ask you to turn to
21 page 16 of 17.
22    A    (Complying.)
23    Q    Do you see that there is a
24 header, maybe a quarter of the way down
25 the page, Exchange 2007 Backup?

Page 169

1          M. Hirshman
2    A    Yes, I do see that.
3    Q    And the document says:  Only
4 Exchange 2007 Mailbox servers will have
5 backup.  Exchange Hub and CAS servers
6 only store transient data that does not
7 need to be maintained.  Recovery of these
8 server roles can be performed by
9 re-installing the OS, joining to the
10 domain as the same server name and then
11 re-installing Exchange with the Mode
12 recoverserver switch.  This will
13 reinstall the original Exchange server
14 role on the server, and also include all
15 the stored Active Directory information
16 for the server.
17          Did I recite that accurately?
18    A    Except for the slash line
19 before "mode" and the colon between
20 "mode" and "recoverserver."
21    Q    Do you have any understanding
22 of the information contained in this
23 paragraph?
24    A    No.
25    Q    And do you see below that there

43 (Pages 166 - 169)

Page 170

1          M. Hirshman
2 is a line that says:  Mailbox servers
3 will have a full backup performed.
4          And then there is a redaction,
5 correct?
6     A    I see that yes.
7     Q    And then it says:  Transaction
8 log backups will be performed.
9          And then there is a redaction,
10 correct?
11    A    I see that also.
12    Q    And it says:  Exchange Mailbox
13 Servers with SAN storage will use --
14         And then there is a redaction,
15 correct?
16    A    I see that as well.
17    Q    And then it says:  Exchange
18 Mailbox Servers using Internal Storage
19 will be --
20         And then there is a redaction,
21 correct?
22    A    I see that as well.
23    Q    Is it your understanding that
24 these redactions were made because this
25 is nonresponsive information that is

Page 171

1          M. Hirshman
2 highly confidential because of its
3 implications for ExxonMobil's
4 cybersecurity?
5     A    I have no understanding one way
6 or the other.  I see that in the letter,
7 and I expect that it is accurate.
8     Q    Well, in your role of
9 supervising ExxonMobil's subpoena
10 compliance, was it Paul Weiss's
11 responsibility or the ExxonMobil Legal
12 Department's responsibility to determine
13 whether or not specific material was
14 nonresponsive and therefore should be
15 redacted in documents such as this?
16    A    In a document that where the
17 redaction is based on the confidential
18 nature and the proprietary nature of the
19 information, I would expect that that is
20 something that was a decision made by the
21 parties together, by Paul Weiss and the
22 company.
23    Q    And you mentioned material
24 that's highly confidential, but the
25 letter says that in addition to being

Page 172

1          M. Hirshman
2 highly confidential, the redacted
3 material is nonresponsive, correct?
4     A    Correct.
5     Q    And so with that --
6     A    Paul, Weiss would make that
7 determination.
8     Q    Do you know --
9     A    Informed by information from
10 the company.
11    Q    Do you know who at Paul, Weiss
12 made the determination in the case of
13 this document, that the redacted material
14 here was nonresponsive?
15    A    I do not.
16    Q    I am going to turn you to
17 Exhibit 16.  The front of this document
18 reads:  Foundation Infrastructure,
19 Windows Server & Storage Solutions,
20 Business Continuity Plan.
21         Did I read that accurately?
22    A    Yes, you did.
23    Q    And if I could turn you page 37
24 of 46.  The page numbers in this case are
25 in the bottom center of the document.

Page 173

1          M. Hirshman
2     A    (Complying.)  Okay, I've turned
3 to that page.
4     Q    At the top center of the page
5 it says Windows Server & Storage
6 Solutions?
7     A    Yes.
8     Q    And then underneath that, it
9 says:  8.3, Key Vendors and Suppliers,
10 correct?
11    A    Correct.
12    Q    And below that it says:  Please
13 find below list of current vendors and
14 suppliers for WSSS, correct?
15    A    Correct.
16    Q    And then if you will look at
17 the next -- that page, and then the next
18 3 pages, there is a table of information,
19 all of the information from which has
20 been redacted, correct?
21    A    I see that it has been
22 redacted.
23    Q    I have the same question as to
24 these redactions.  Is your answer the
25 same as to who determined that this

44 (Pages 170 - 173)

Page 174

1           M. Hirshman
2 material was nonresponsive?
3      A    I don't know whether the
4 determination of this material was based
5 on nonresponsiveness or security-related
6 issues.  From the face of the document, I
7 can understand why the redaction would be
8 based on security issues.
9      Q    I just want to go back --
10     A    But I didn't make the
11 determination, and I don't know who made
12 the determination.
13     Q    Okay, don't know.
14          Apart from what might be behind
15 these redactions --
16     A    Well, I think we know what's
17 probably behind these redactions.  The
18 names of vendors who provide Security and
19 Business Continuity services.
20     Q    Well, my specific question is:
21 As to that document, do you know whether
22 or not any of those vendors perform data
23 backup services for ExxonMobil?
24     A    I do not know.
25     Q    Do you know whether or not

Page 175

1           M. Hirshman
2 ExxonMobil has any vendors at all that --
3 putting this document aside -- that
4 maintain data or provide data backup
5 services for ExxonMobil?
6      A    I do not know.
7      Q    Have you made any attempt to
8 determine whether or not ExxonMobil has
9 third-party vendors who provide data
10 backup services?
11     A    I, personally, have not done
12 so.
13     Q    Do you know whether or not
14 anyone at Paul, Weiss or ExxonMobil has
15 tried to determine whether or not the
16 company has vendors that provide data
17 backup services in connection with the
18 response to this subpoena?
19     A    Again, I would have to refer to
20 the Feinstein affidavit.
21     Q    Apart from referring to the
22 Feinstein affidavit, are you able to
23 identify any other individuals who would
24 have more information than you about
25 whether or not ExxonMobil has third-party

Page 176

1           M. Hirshman
2 vendors who provide data backup services?
3      A    I can't tell you specific
4 names.
5      Q    Do you know --
6      A    I mean, I don't know the
7 specific names.  Not that I can't tell
8 you.
9      Q    Do you know, with respect to
10 any of the time period since the issuance
11 of the subpoena, whether ExxonMobil has
12 had any of its data backed up to a Cloud
13 Networking System?
14     A    I do not know.
15     Q    Do you know whether or not
16 ExxonMobil has, during the time since the
17 issuance of the subpoena, had a practice
18 of backing up its data to any third-party
19 location not at an ExxonMobil corporate
20 location?
21     A    I believe -- I'm just trying to
22 remember something.  I believe I have
23 heard kind of information about sites
24 that aren't at a corporate headquarters
25 location in Texas, but I don't --

Page 177

1           M. Hirshman
2 that's -- it's a very vague recollection.
3      Q    And that vague recollection,
4 does that include whether or not those
5 non-headquarters locations are still
6 ExxonMobil properties or a third-party's
7 properties?
8      A    That, I don't know.
9      Q    And do you know whether or not
10 anyone else at Paul, Weiss or at
11 ExxonMobil Corporation has made any
12 effort to determine whether any of
13 ExxonMobil's data was backed up to a
14 cloud system in connection with
15 responding to the subpoena?
16     A    I don't know.
17     Q    Do you know whether or not
18 anyone at Paul, Weiss or ExxonMobil has
19 made any efforts to determine whether or
20 not any of ExxonMobil's data was backed
21 up to any other third-party location in
22 connection with responding to this
23 subpoena?
24     A    Again, I have to look at the
25 segment of the Feinstein affidavit.

45 (Pages 174 - 177)

Page 178

1         M. Hirshman
2    Q    Other than the Feinstein
3 affidavit, are you able to point us to
4 any individuals who would know more than
5 you do about whether or not ExxonMobil
6 has attempted to locate third-party
7 sources of its data in response to this
8 subpoena?
9    A    Can you say that question
10 again? Can you read it back, I'm sorry.
11   Q    Sure. Other than the Feinstein
12 affidavit, are you able to point us to
13 any individuals who would know more than
14 you do about the subject matter of my
15 previous questions, specifically,
16 locating ExxonMobil data in a Cloud
17 Networking System or in any other
18 third-party-maintained location?
19   A    I don't know what the specific
20 knowledge of specific individuals would
21 be, but there's obviously people at Paul,
22 Weiss and ExxonMobil who are working on
23 this matter in addition to me.
24         MR. OLESKE:  Let's mark this
25 as Exhibit 17.

Page 179

1         M. Hirshman
2         (Hirshman Exhibit 17 was
3 marked for identification, as of this
4 date.)
5    Q    Ms. Hirshman, could you please
6 review what has been marked as
7 Exhibit 17, and let me know when you are
8 able to confirm whether or not you
9 recognize it.
10   A    I will do that.
11        (Reviewing exhibit.)  I do
12 recognize this document.
13   Q    What do you recognize it to be?
14   A    It's a letter dated April 24th,
15 2017, to you and it's slash signed by Dan
16 Toal.
17   Q    This letter addresses some
18 technical issues that arose after you
19 submitted your affirmation that is
20 Exhibit 1, correct?
21   A    That is correct.
22   Q    Without getting into the
23 details of those technical issues, I want
24 to draw your attention to the second
25 page. The first full paragraph, which

Page 180

1         M. Hirshman
2 begins:  ExxonMobil took immediate
3 remedial action.
4         Do you see the paragraph I am
5 talking about?
6    A    Yes, I do.
7    Q    It lists a series of four steps
8 ExxonMobil took with respect to the
9 technical issue that I mentioned,
10 correct?
11   A    Correct.
12   Q    And the fourth of those is,
13 near the bottom of that paragraph:
14 Fourth, in abundance of caution, on
15 April 14, 2017, ExxonMobil's outside
16 counsel engaged Deloitte Transactions and
17 Business Analytics, LLP ("Deloitte ") to
18 validate the remediation efforts
19 conducted by the vendor at the direction
20 of ExxonMobil (the "Validation
21 Exercise").
22        Did I recite that correctly?
23   A    Yes.
24   Q    And did part of your
25 responsibilities for overseeing

Page 181

1         M. Hirshman
2 ExxonMobil's subpoena compliance involve
3 overseeing Deloitte in performing the
4 function described in this letter?
5    A    I did not personally oversee
6 Deloitte.
7    Q    Who did?
8         MR. TOAL:  I am going to
9 object on attorney/client privilege
10 grounds.  I think you are not entitled
11 to know how Paul Weiss's staffing this
12 matter.
13   Q    Did somebody at Paul, Weiss
14 other than you have responsibility for
15 overseeing Deloitte?
16   A    Yes.
17   Q    Do you know whether or not
18 Deloitte had any other functions with
19 respect to ExxonMobil's subpoena
20 compliance?
21   A    In this matter?
22   Q    Yes.
23   A    I am not aware of Deloitte
24 having other responsibilities.
25   Q    Are you aware that at some

46 (Pages 178 - 181)

Page 182

1          M. Hirshman
2  point after the potential destruction of
3  the Wayne Tracker e-mails came to light,
4  that ExxonMobil made efforts to determine
5  whether or not information could be
6  recovered from mobile devices assigned to
7  or belonging to members of the Management
8  Committee?
9      A    I have a recollection of
10  hearing that.
11     Q    You didn't have any personal
12  involvement in that, though?
13     A    No.
14     Q    Do you know whether or not
15  Deloitte had any involvement in that
16  process?
17     A    I don't recall hearing that.
18     Q    Do you know whether or not the
19  person named Bob Lauck at ExxonMobil, do
20  you have any knowledge as to whether or
21  not his son was involved in the retention
22  of Deloitte for subpoena compliance in
23  this matter?
24     A    I have no knowledge one way or
25  another.

Page 183

1          M. Hirshman
2      Q    Do you know whether or not
3  Deloitte was involved in any respect with
4  the attempted recovery of any lost or
5  destroyed e-mails from potential backup
6  sources?
7      A    I don't know.
8      Q    Do you know whether or not
9  anyone else at Paul, Weiss might have
10  more information about that than you?
11     A    No.
12     Q    Do you know whether or not
13  anyone else at ExxonMobil would have more
14  information about that than you?
15     A    No.
16         MR. OLESKE:  Let's mark this
17  as Exhibit 18.
18         (Hirshman Exhibit 18 was
19  marked for identification, as of this
20  date.)
21     Q    Ms. Hirshman, before we address
22  this document, let me ask:  In your role
23  in overseeing ExxonMobil's subpoena
24  compliance in this matter, did your
25  responsibilities include overseeing the

Page 184

1          M. Hirshman
2  activities of Sidley Austin LLP?
3      A    I would not say that my role
4  included overseeing any activities of
5  Sidley.
6      Q    If I could address you to the
7  document that's been marked Exhibit 18,
8  do you see that at the top left, it has a
9  notation saying "pwc"?
10     A    Yes.
11     Q    And at the bottom right, the
12  document begins with a Bates stamp
13  PNYAG0126718; is that correct?
14     A    That is correct.
15     Q    If you could turn to page 3 of
16  6, as denoted at the bottom right, where
17  the page numbers are.
18     A    (Complying.)  Okay.
19     Q    The document in the first full
20  paragraph after the list of numbers at
21  the top of the page says that:  The
22  internal effort is being overseen by
23  General Counsel.  PwC's primary contact
24  is Randall Ebner, Assistant General
25  Counsel.

Page 185

1          M. Hirshman
2          Did I recite that correctly?
3      A    Yes.
4      Q    And then after a bold
5  parenthetical, it continues:  Management
6  of the Corporation have hired the law
7  firm Paul, Weiss for external
8  representation with attorney Ted Wells
9  serving as lead external counsel on this
10  matter.  ExxonMobil has hired Sidley
11  Austin LLP to assist them with
12  identifying documents internally that are
13  responsive to the various requests.
14         Did I recite that correctly?
15     A    You did.
16     Q    Is it your understanding that
17  ExxonMobil hired Sidley Austin LLP to
18  help identify documents internally that
19  were responsive to the subpoenas
20  requests?
21     A    I don't know, because I haven't
22  read this document, so I don't know what
23  "various requests" refers to.
24     Q    Why don't you refer back to the
25  first page?

47 (Pages 182 - 185)

Page 186

1        M. Hirshman
2    A    You want me to read the
3 document now?
4    Q    Well, I am going to ask you to
5 look at the first page of the document
6 and read that first page and then tell me
7 whether or not reading that first page
8 enables you to tell me about the
9 information I was just asking about.
10    A    Sure.
11        (Reviewing exhibit.)
12        THE WITNESS:  I am going to
13    have to get that phone.  Can we go off
14    the record, please?
15        [Discussion held off the
16    record.]
17 BY MR. OLESKE:
18    Q    For the sake of completeness,
19 Ms. Hirshman, why don't you just continue
20 to read, to make sure that we don't waste
21 time, the rest of the letter through that
22 section on page 3 that we previously
23 discussed.
24    A    Sure.
25    Q    Thank you.

Page 187

1        M. Hirshman
2    A    (Reviewing exhibit.)  Okay, I
3 have read up to the sentence you
4 described.
5    Q    So now having read the first
6 portion of this document up to the
7 section that we previously discussed,
8 this document, on its face, is a memo
9 from someone named Richard Auter, dated
10 sometime in October 2016, Subject:
11 Climate Change Investigations, correct?
12    A    It appears to be a draft
13 insofar as it's missing various
14 information and asks questions within the
15 draft --
16    Q    Sure.
17    A    -- about information.
18    Q    Notwithstanding its prospective
19 status as a draft, though this document
20 does discuss ExxonMobil being served with
21 the New York Attorney General subpoena,
22 November 4, 2015, correct?
23    A    Correct.
24    Q    And pages 2 and 3, through the
25 bottom of page 2 and the top of page 3

Page 188

1        M. Hirshman
2 through the section that we previously
3 discussed, is about ExxonMobil's response
4 to the New York Attorney General's
5 subpoena, correct?
6    A    You mean at the very bottom of
7 page 2?
8    Q    Yes, where it says ExxonMobil
9 Response, from there following until the
10 section that we previously discussed on
11 page 3, that relates to ExxonMobil's
12 response to our office's subpoena,
13 correct?
14    A    That's what it appears to
15 describe.
16    Q    And so back to what we were
17 discussing before, the section that says:
18 ExxonMobil has hired Sidley Austin LLP to
19 assist them with identifying documents
20 internally that are responsive to the
21 various requests.
22        You stated earlier that you did
23 not oversee Sidley Austin LLP.  Are you
24 aware of what role Sidley Austin LLP had
25 in assisting Exxon with identifying

Page 189

1        M. Hirshman
2 documents internally that are responsive
3 to the various requests?
4    A    I am not aware of what role
5 Sidley had with respect to identifying
6 documents internally that are responsive
7 to the various requests.
8        MR. OLESKE:  19.
9    A    I guess I am also not aware
10 whether Sidley had a role in identifying
11 documents internally that are responsive
12 to the various requests.
13        MR. OLESKE:  So this is
14    Exhibit 19 that we are going to look
15    at after it's marked.
16        (Hirshman Exhibit 19 was
17    marked for identification, as of this
18    date.)
19        THE WITNESS:  Should I read
20    this document?
21    Q    Why don't we just start with me
22 asking a couple of questions about it.
23        The document you have just been
24 handed marked as Exhibit 19, the first
25 page has a large black oblong shape, and

48 (Pages 186 - 189)

Page 190

1          M. Hirshman
2  in the middle of it, it says:  Document
3  Placeholder in white, correct?
4      A    That's -- that looks to be an
5  accurate description.
6      Q    And then underneath that, in
7  black, it says:  Document Produced in
8  Native, correct?
9      A    That's what it says.
10     Q    In the bottom right, there is a
11  Bates number PNYAG0038905, correct?
12     A    Correct.
13     Q    Turning to page 2 or the second
14  physical page of this document, when you
15  have a chance.
16     A    (Complying.)
17     Q    This document has a logo "pwc"
18  at the top left, correct?
19     A    Correct.
20     Q    And then it has a to field
21  saying:  To:  PwC Assurance - ExxonMobil
22  Audit File, correct?
23     A    Correct.
24     Q    And then it says:  From:  Alan
25  Page / Kyle Liner, correct?

Page 191

1          M. Hirshman
2      A    Correct.
3      Q    And it's dated February 12,
4  2016?
5      A    Correct.
6      Q    And the regarding line is:  New
7  York Attorney General and SEC
8  investigation.
9          Correct?
10     A    Correct.
11     Q    Going down, there is a header
12  immediately following that says:  I.
13  Summary of Issue, correct?
14     A    Yes.
15     Q    And then it says:  On
16  November 4, 2015, ExxonMobil received a
17  subpoena from New York Attorney General,
18  correct?
19     A    Correct.
20     Q    And then going down there is a
21  header, II. Company Response to
22  Allegations, correct?
23     A    Right.  Well, there's, you
24  know --
25     Q    There's text in between there?

Page 192

1          M. Hirshman
2      A    There's text in between.  And
3  then number two, in a Roman numeral, it
4  says:  Company Response to Allegations.
5      Q    Right.  And then, thereafter,
6  it says:  Alan Page (PwC GEP) and Kyle
7  Liner (PwC Corporate Partner) met with
8  David Rosenthal (ExxonMobil Controller)
9  and Randy Ebner (ExxonMobil Assistant
10  General Counsel) on November 10, 2015 to
11  discuss the public news articles related
12  to this matter and the content of the
13  subpoena.  As part of this meeting, the
14  Corporation communicated they were:
15          And then there is a series of
16  bullet points beginning on the next page,
17  correct?
18     A    I haven't turned to the page
19  because you didn't tell me -- you told me
20  I couldn't read the document.  You are
21  going to go through it.
22     Q    I'm sorry.
23     A    So now I will turn to page 2?
24     Q    Yes.  The next page follows
25  with a series of four bullet points,

Page 193

1          M. Hirshman
2  correct?
3      A    Correct.
4      Q    And the first bullet point is:
5  Intending to comply with the subpoena,
6  correct?
7      A    Correct.
8      Q    The next bullet:  Commencing an
9  internal process to identify items
10  requested in the subpoena, correct?
11     A    Correct.
12     Q    Next bullet point reads:
13  Hiring Ted Wells from Paul, Weiss as lead
14  external counsel to interact with the
15  NYAG's office on the extent of
16  information requested and to evaluate
17  items identified by ExxonMobil, correct?
18     A    Correct.
19     Q    And then it says, in the last
20  bullet point:  Hiring Sidley Austin LLP
21  from Austin to support the internal
22  investigation, correct?
23     A    That's what it says.
24     Q    Are you aware of what role, if
25  any, Sidley Austin LLP had in "supporting

49 (Pages 190 - 193)

Page 194

1        M. Hirshman
2 the internal investigation"?
3    A    No.  I am also not aware of
4 what the term, "the internal
5 investigation," means in this context.
6    Q    Understood.
7        MR. OLESKE:  Let's mark this
8 as Exhibit 20.
9        (Hirshman Exhibit 20 was
10    marked for identification, as of this
11    date.)
12    Q    Ms. Hirshman, the document you
13 have been handed marked Exhibit 20 has a
14 Bates number on the first page of
15 PNYAG006161, correct?
16    A    Correct.
17    Q    If I could ask you to turn to
18 the second physical page of the document,
19 there is a logo at the top left that says
20 "pwc," correct?
21    A    Yes.
22    Q    And then the next word is
23 "Memo," correct?
24    A    Okay.  So it's an un-marked
25 page.  So it's the second physical page,

Page 195

1        M. Hirshman
2 correct.
3    Q    It's the second physical page.
4    A    Right, but not the page marked
5 2 of 5.
6        Correct.
7    Q    After that, it says that it's:
8 To:  Files / Dallas, and Richard Auter,
9 A-U-T-E-R, correct?
10    A    That's what it says, yes.
11    Q    And it's dated April 29, 2016,
12 correct?
13    A    Correct.
14    Q    The subject matter is:  Q1
15 Update on Pending Investigations,
16 correct?
17    A    Yes.
18    Q    Could you please refer to the
19 third physical page that is marked page 2
20 of 5 on the lower right-hand corner.
21    A    (Complying.)
22    Q    Do you see that there is a
23 header on that page in bold, New York
24 Attorney General - Climate Change
25 Disclosure?

Page 196

1        M. Hirshman
2    A    I do see that.
3    Q    Could you just take the time to
4 read the text that is underneath that
5 header and precedes whatever header comes
6 next in the document?
7    A    Sure.
8        (Reviewing exhibit.)  I've
9 reviewed that section of Exhibit 20.
10    Q    Excuse me, I'm sorry?
11    A    I have reviewed that section of
12 Exhibit 20.
13    Q    Thank you.
14        That section includes a set of
15 four bullet points, correct?
16    A    Correct.
17    Q    And, again, the final bullet
18 point in this section is:  Hiring Sidley
19 Austin LLP from Austin to support the
20 internal investigation, correct?
21    A    That is correct.  That bullet
22 point is identical from both documents,
23 Exhibit 19 and Exhibit 20.
24    Q    And if I ask you what you
25 understand as of the date of this

Page 197

1        M. Hirshman
2 document, April 29, 2016, what you
3 understood as of that time, April 29,
4 2016, what the role of Sidley Austin in
5 supporting the internal investigation,
6 would that be the same as your answer
7 with respect to the last document?
8    A    My answer with the respect to
9 the last document was based on my
10 knowledge as of today.
11    Q    Okay.
12    A    And so it is the same.
13    Q    Okay.  Putting aside the
14 references to supporting internal
15 investigation or assisting in locating
16 documents, sitting here today, are you
17 aware of whether or not Sidley Austin LLP
18 has played any role in ExxonMobil's
19 response and compliance with our office's
20 subpoena?
21    A    I am aware that Sidley Austin
22 has been retained by ExxonMobil in
23 connection with matters related to
24 climate change and our investigation.
25    Q    Putting aside matters regarding

50 (Pages 194 - 197)

Page 198

M. Hirshman

1   M. Hirshman
2   climate change that are not connected to
3   this investigation, what is or has ever
4   been Sidley Austin LLP's role in
5   ExxonMobil's compliance with this
6   subpoena?
7       MR. TOAL:  So I am going to
8   object on attorney/client privilege
9   grounds.
10      Is your question whether
11  Sidley has played a role in review of
12  documents in this matter?
13      MR. OLESKE:  I am asking
14  whether or not -- Ms. Hirshman has
15  testified as to the role of Paul,
16  Weiss and its attorneys, has testified
17  to the role of ExxonMobil's Legal
18  Department, other employees of
19  ExxonMobil, other third parties.  She
20  has testified to the extent as to
21  which she has either overseen them or
22  not overseen them in those roles.
23      I am asking what role, if
24  any, at any time, Ms. Hirshman knows
25  Sidley Austin LLP played in

Page 199

1   M. Hirshman
2   ExxonMobil's compliance with this
3   subpoena.
4       MR. TOAL:  Give me a minute.
5       MR. OLESKE:  We are going to
6   go off the record for this?
7       MR. TOAL:  Yes.
8       THE WITNESS:  Can I go to the
9   ladies' room?
10      MR. OLESKE:  Yes.  There is a
11  pending question, so obviously you
12  shouldn't consult with your counsel.
13      [A recess was taken.]
14  BY MR OLESKE:
15  Q   Ms. Hirshman, my question is:
16  With respect to ExxonMobil's compliance
17  with the subpoena at issue here, what
18  role, if any, at any time, did Sidley
19  Austin LLP have with respect to
20  ExxonMobil's compliance with the
21  subpoena?
22      MR. TOAL:  Objection.
23  Attorney/client privilege.
24  Q   Did Paul, Weiss retain Sidley
25  Austin LLP in connection with compliance

Page 200

1   M. Hirshman
2   with this subpoena?
3       MR. TOAL:  You can answer yes
4   or no.
5   A   No.
6   Q   Do you know if ExxonMobil
7   retained Sidley Austin LLP in connection
8   with compliance with this subpoena?
9       MR. TOAL:  Objection of
10  attorney/client privilege.
11      MR. OLESKE:  Let's mark as
12  Exhibit 21.
13      (Hirshman Exhibit 21 was
14  marked for identification, as of this
15  date.)
16  Q   Ms. Hirshman, directing your
17  attention to the document you have been
18  handed marked Exhibit 21, you can see
19  there is a Bates number at the bottom
20  right-hand corner PNYAG01165508?
21  A   Correct.
22  Q   Turning to the second physical
23  page of the document which is marked at
24  the bottom page 1 of 11; do you see that
25  page?

Page 201

1   M. Hirshman
2   A   I do.
3   Q   At the top of the page there is
4   a "pwc" logo, correct?
5   A   Correct.
6   Q   And there is a word "Memo"
7   underneath that, correct?
8   A   Correct.
9   Q   And it has a "to" field, saying
10  ExxonMobil Upstream, Downstream and
11  Chemical 2016 Audit File, correct?
12  A   Correct.
13  Q   And then it has a "From: /
14  Location," and it says:  PwC Houston
15  Engagement Team, correct?
16  A   Yes.
17  Q   And it's dated June of 2016,
18  correct?
19  A   Correct.
20  Q   And the subject is Auditing
21  Litigation Matters, correct?
22  A   Yes.
23  Q   And then there is a heading
24  that says Purpose; do I have that right?
25  A   Yes.

51 (Pages 198 - 201)

Page 202

1         M. Hirshman
2    Q    And then it says:  This
3  memorandum summarizes PwC's audit
4  approach to litigation matters on the
5  ExxonMobil ("ExxonMobil", or the
6  "Corporation") audit engagement.
7         Did I read that correctly?
8    A    Yes.
9    Q    Just if I could ask you to skip
10  ahead to what is marked at the bottom
11  center as page 8 of 11.
12    A    (Complying.)
13    Q    Do you see that there is a
14  header, maybe a fifth of the way from the
15  top of the page that says in bold,
16  Representation Letters - Content and
17  Rationale?
18    A    Yes.
19    Q    Could you please read that full
20  paragraph that follows, just that full
21  paragraph that follows that header,
22  please, and let me know when you have had
23  a chance to read through that paragraph.
24    A    (Reviewing exhibit.)  I've read
25  it.

Page 203

1         M. Hirshman
2    Q    The first sentence says:
3  ExxonMobil Law is led by Jack Balagia,
4  Vice President and General Counsel, who
5  is in turn supported by several Assistant
6  General Counsels, including the Assistant
7  General Counsel for Litigation.
8         Did I read that correctly?
9    A    Yes, you did.
10    Q    And the information related in
11  that sentence was accurate with respect
12  to your involvement with ExxonMobil, at
13  least, until Mr. Balagia left the employ
14  of ExxonMobil, correct?
15    A    Yes.
16    Q    When did Mr. Balagia leave
17  ExxonMobil?
18    A    I think November 2016?  Maybe
19  earlier, but around that time, I think,
20  the second half of 2016.
21    Q    Do you know whether any of the
22  documents of Mr. Balagia or any other
23  members of the ExxonMobil Law Department
24  have ever been put on a preservation hold
25  with respect to ExxonMobil's compliance

Page 204

1         M. Hirshman
2  with the subpoena in this matter?
3    A    I have to look at the list of
4  holds.
5    Q    The next sentence says:
6  ExxonMobil Law, which rivals many law
7  firms in size and experience, employs
8  over 500 lawyers worldwide and is
9  represented at the affiliate, functional
10  and corporate levels.
11         Is that description of
12  ExxonMobil's Law Department consistent
13  with your experience with ExxonMobil's
14  Law Department during the time of your
15  work overseeing its compliance with the
16  subpoena here?
17    A    I'd say consistent -- generally
18  consistent.  I don't know the specific
19  number of lawyers in the department, you
20  know, in the Law Department, but it
21  wouldn't surprise me.
22    Q    The next sentence says:
23  ExxonMobil Law does not typically
24  outsource the task of managing
25  litigation.

Page 205

1         M. Hirshman
2         Does that accord with your
3  general understanding of ExxonMobil law's
4  practices with respect to the management
5  of litigation?
6    A    Yes.  Although this is an
7  investigation, and I have never
8  represented the company in connection
9  with litigation, but my experience here
10  is consistent with that.
11    Q    If I could return your
12  attention to Exhibit 12.
13    A    (Complying.)
14    Q    Before we look at specific
15  portions of this document, do you recall
16  earlier in your testimony, we were
17  discussing the timing of the Attorney
18  General's informing ExxonMobil of the
19  production of Managing the Risks-related
20  documents as a priority.
21         Do you remember that general
22  discussion?
23    A    Yes.
24    Q    And do you recall that I showed
25  you a document that appeared to identify

52 (Pages 202 - 205)

Page 206

M. Hirshman

1       M. Hirshman
2   and inform ExxonMobil of that priority in
3   December of 2015?  Do you remember that?
4       A   Well, it's among the exhibits
5   that you have marked, so -- but I don't
6   know which exhibit it is that you've
7   marked.
8       Q   Putting that aside, do you
9   recall that?
10      A   I do.
11      Q   And do you recall at the time
12  that you responded that you believed your
13  reference in paragraph 32 of Exhibit 1,
14  your affirmation that information coming
15  out in February of 2016 --
16          THE WITNESS:  I'm sorry, can
17      you please ask the people who are
18      adjacent to these rooms to lower the
19      volume a little bit so I can focus on
20      the questions?  Thank you.
21          [Discussion held off the
22      record.]
23      Q   Do you recall testifying with
24  respect to paragraph 32 of Exhibit 1,
25  your affirmation, that you may have been

Page 207

M. Hirshman

1       M. Hirshman
2   referring to correspondence you said you
3   thought you might remember from February,
4   that refer to Managing the Risks and the
5   greenhouse gas issue management team as
6   new priorities separate from the December
7   correspondence that we looked at?
8       A   Mm-hm.  I do, yes.
9       Q   So if I could direct you to
10  what is marked on the bottom of page 3,
11  in the bottom center of the page, there
12  is page numbering.  You see page 3 at the
13  very bottom?
14      A   Is this on Exhibit 12?
15      Q   Yes, this is on Exhibit 12.
16  And do you see at the very bottom, there,
17  there is the beginning of an e-mail from
18  Lemuel Srolovic to Mr. Wells, yourself --
19      A   Yes.
20      Q   -- and yourself?
21      A   Yes.
22      Q   And then it begins on page 3,
23  Ted and Michele, and then it goes to the
24  next page, page 4.
25          Could you please read the

Page 208

M. Hirshman

1       M. Hirshman
2   remainder of that e-mail to yourself and
3   let me know when you have had a chance to
4   look at that.
5       A   (Reviewing exhibit.)  I have
6   read it.
7       Q   So looking at the middle of
8   page 4, do you see that there is a
9   section of e-mail that begins:  Documents
10  to be produced on or before January 11,
11  2016?
12      A   I do.
13      Q   And do you see that there is a
14  second bullet point underneath that that
15  says:  Responsive non-e-mail records
16  and communications in the custody of the
17  employees in the corporate-wide global
18  climate change and GHG issue management
19  team?
20          Do you see that?
21      A   I do.
22      Q   And then do you see two bullets
23  below that, there is a bullet that says:
24  Non-e-mail documents and communications,
25  including drafts, concerning the Energy

Page 209

M. Hirshman

1       M. Hirshman
2   Trends, Greenhouse Gas Emissions and
3   Alternative Energy and Energy and Carbon
4   - Managing the Risks reports that are in
5   the custody of the primary authors of
6   those reports.
7          Do you see that?
8       A   I do.
9       Q   Do you recall receiving this on
10  or about November 13, 2015?
11      A   I do.
12      Q   So, in fact, the Attorney
13  General alerted or informed ExxonMobil
14  that GHG issue management team and
15  Managing the Risks Reports were a
16  priority for production even earlier than
17  the December document that we earlier
18  looked at, in fact, as early as November
19  13, nine days after the issuance of the
20  subpoena, correct?
21      A   I think the Attorney General
22  listed a number of items in which those
23  were included that it wanted to produce.
24  And these items turned out to be very
25  voluminous.

53 (Pages 206 - 209)

Page 210

```
 1        M. Hirshman
 2        MR. OLESKE:  If we could,
 3   let's just take five minutes, and
 4   we'll come back and I think we will be
 5   just about ready to wrap up.
 6        [A recess was taken.]
 7        MR. OLESKE:  With the proviso
 8   on the record that, this is always the
 9   case, our view is that the hearing is
10   held open potentially regardless, but
11   in particular given the
12   attorney/client privilege issues and
13   assertions that were raised, the
14   office explicitly reserves all of its
15   rights to continue this examination at
16   a later date to obtain whatever
17   testimony to which the office may be
18   legally entitled.  With that said, I
19   am prepared to go off the record at
20   this time.  Do you guys have anything
21   for the record?
22        MR. TOAL:  No.  Ted, anything
23   for the record?  No.
24        MR. OLESKE:  Okay.
25        (Time noted:  4:00 p.m.)
```

Page 211

```
 1
 2            I N D E X
 3
 4   WITNESS          EXAMINATION BY        PAGE
 5   M. Hirshman      Mr. Oleske        4
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 212

```
 1
 2          E X H I B I T S
 3   HIRSHMAN  DESCRIPTION              PAGE
 4   Exhibit 1  Certificate of Compliance   5
 5   Exhibit 2  Supplemental Affirmation
            Of Michele Hirshman        6
 6
 7   Exhibit 3  Affidavit of Connie Lynn
            Feinstein          7
 8   Exhibit 4  Amended Affidavit of
            Connie Lynn Feinstein      10
 9
     Exhibit 5  Subpoena for Production
10       of documents to Jack
         Balagia, Jr.          11
11
     Exhibit 6  April 18, 2016 letter to
12       J. Oleske          13
13   Exhibit 7  August 3, 2016 letter to
         J. Oleske          17
14
     Exhibit 8  NY Law Journal Vol 256 -
15       No. 108, Tuesday, 12/6/2016  20
16   Exhibit 9  May 3, 2017 letter to
         J. Oleske          58
17
     Exhibit 10  June 24, 2016 letter to
18       Wells and Hirshman       84
19   Exhibit 11  December 16, 2015 e-mail from
         Monica Wagner to Sean Jansen  92
20
     Exhibit 12  November 20, 2015 e-mail from
21       Lemuel Srolovic to Michele
         Hirshman          151
22
     Exhibit 13  November 25, 2015 e-mail from
23       Michele Hirshman to Lemuel
         Srolovic          155
24
     Exhibit 14  April 4, 2017 letter to
25       J. Oleske from D. Toal    165
```

Page 213

```
 1
 2          E X H I B I T S
           (CONTINUED)
 3
 4   HIRSHMAN  DESCRIPTION              PAGE
 5   Exhibit 15  EMC 002747908-002747924    167
 6   Exhibit 16  EMC 002747862-002747907    167
 7   Exhibit 17  April 24, 2017 letter to
         J. Oleske from D. Toal     178
 8
     Exhibit 18  PNYAG 0126718-0126724     183
 9
     Exhibit 19  PNYAG 0038905 and
10       PwC documents dated 2/12/16,
         four pages        189
11
     Exhibit 20  PNYAG 0006161 and
12       PwC documents dated 4/29/16,
         five pages        194
13
     Exhibit 21  PNYAG 0116508 and
14       PwC documents dated June
         2016, eleven pages      200
15
16       (Reporter retained exhibits.)
17
18
19
20
21
22
23
24
25
```

54 (Pages 210 - 213)

Page 214

1
2          CERTIFICATION
3
4          I, JAMIE ANN STANTON, a
5    Notary Public for and within the State of
6    New York, do hereby certify:
7          That the within transcript is
8    a true and accurate record of the
9    proceedings.
10         I further certify that I am
11   not related to any of the parties to this
12   action by blood or marriage, and that I
13   am in no way interested in the outcome of
14   this matter.
15         IN WITNESS WHEREOF, I have
16   hereunto set my hand this 11th day of
17   May, 2017.
18
19
20   _____
21
22         JAMIE ANN STANTON
23         *    *    *
24
25

55 (Page 214)

**&**

**&**   2:14 4:7 172:19
173:5

**0**

**0006161**   213:11
**002747862-002...**
213:6
**002747908**   167:24
**002747908-002...**
213:5
**0038905**   213:9
**0116508**   213:13
**0126718-0126724**
213:8

**1**

**1**   5:23,24 6:5 12:6
12:8 24:14,17,17
24:17,18 59:9,11
66:7 79:21 85:18
90:24 102:17,18
102:21 105:12,18
105:20 106:5
107:7,15 108:6
110:10 153:14
158:12 179:20
200:24 206:13,24
212:4
**10**   1:7 6:11 12:2
84:4,5,10 85:23
87:11 102:23
105:19 192:10
212:8,17
**100**   17:14 154:8
155:2
**10019-6064**   2:17
**10271-0332**   2:8
**108**   212:15
**10th**   6:8 9:2,5
**11**   5:19 52:22 80:4
80:24 92:6,7,12

94:2,9 200:24
202:11 208:10
212:10,19
**110,000**   82:8
**11th**   88:10 214:16
**12**   48:17,19,23
49:8,16 50:12
150:13,15,18,24
151:5,6,11,16,18
151:20 156:11
191:3 205:12
207:14,15 212:20
**12/6/2016**   212:15
**120**   1:12 2:7
**1285**   2:16 4:8
**12:37**   109:19
**13**   8:22,22 52:23
155:19,20,24
156:2,9 209:10,19
212:12,22
**14**   93:3 97:21
150:13,15,19,24
165:9,10,15
180:15 212:24
**15**   70:11 167:5,7
167:11,14 213:5
**151**   212:21
**155**   212:23
**16**   52:20 53:4,7
56:21,23 57:5,12
57:18 66:6,10
112:24 167:6,7
168:21 172:17
212:19 213:6
**165**   212:25
**167**   213:5,6
**17**   168:3,21 178:25
179:2,7 212:13
213:7
**178**   213:7

**18**   54:12,15,20
55:13,17 57:7,12
67:24 112:24
183:17,18 184:7
212:11 213:8
**183**   213:8
**189**   213:10
**18th**   14:8
**19**   54:20 69:10
152:5 189:8,14,16
189:24 196:23
213:9
**194**   213:12
**19th**   10:23

**2**

**2**   6:20,21 7:2 12:7
12:8 28:11 58:9
85:11,13 90:10
103:4,6 104:18
152:2 167:5
187:24,25 188:7
190:13 192:23
195:5,19 212:5
**2.8**   138:24
**2/12/16**   213:10
**20**   54:20 146:5
153:21 194:8,9,13
196:9,12,23
212:15,20 213:11
**200**   213:14
**2007**   168:25 169:4
**2014**   4:16 81:19
93:11 106:9
**2015**   11:23 28:18
35:12 42:3 45:15
49:23 64:24 70:11
70:17 93:3 95:17
96:5 97:21 128:9
150:3 152:5
153:21 187:22
191:16 192:10

206:3 209:10
212:19,20,22
**2016**   14:8 18:12
20:21 37:20 42:4
64:15 80:4,25
82:17 84:22 85:2
87:5,13 89:11
94:2,9 95:18,21
96:4,9,23,25 97:9
108:12,19 109:3
128:10 135:19
136:6,20 138:5,10
141:22 144:11
187:10 191:4
195:11 197:2,4
201:11,17 203:18
203:20 206:15
208:11 212:11,13
212:17 213:14
**2017**   1:7 6:8,11
7:5 9:15 12:2
59:16 61:11 62:10
62:17 64:15 65:16
111:6 133:13
142:20 143:11
147:14 148:22
150:5 165:22
166:16 179:15
180:15 212:16,24
213:7 214:17
**20th**   156:14
**21**   54:21 57:8
200:12,13,18
213:13
**22**   55:4 57:8 69:22
70:10,16 71:14,23
**22-24**   69:14
**23**   55:4 57:8
**24**   55:4,13,18 57:8
57:13 69:22
112:24 212:17

[24 - addition]                                                                                                                    Page 2

213:7
**24,000**   82:7 96:25
**24th**   84:22 85:22
   102:22 156:16
   179:14
**25**   72:14,16,20
   212:22
**256**   212:14
**26**   75:15
**27**   76:9
**28**   76:20
**29**   195:11 197:2,3

**3**

**3**   7:5,12,13,18 8:15
   8:23,24 10:25
   18:13 35:3,5
   52:22 59:15 89:21
   90:2,8 105:19
   107:18 108:8
   112:16 158:19,21
   161:5 173:18
   184:15 186:22
   187:24,25 188:11
   207:10,12,22
   212:6,13,16
**30**   111:6
**300**   168:8
**30th**   9:15
**31**   79:20,23 80:3
   85:25 87:10,21
   88:7 93:25
**32**   81:14 88:7,15
   88:22 93:19,22
   94:4 95:11 206:13
   206:24
**33**   82:6 83:5,8,9,17
   89:3 96:17
**34**   82:16 83:6,12
   83:19 85:2,18,20
   85:25 87:10,22
   96:22 102:15,20

103:4,11 104:25
**37**   172:23
**3rd**   7:9 18:12
   58:13

**4**

**4**   4:16 10:12,13,18
   11:23 28:18 35:12
   36:10,14,18 38:5
   50:12 63:11 89:21
   90:22 91:21 93:14
   107:18 108:8,17
   109:12 150:3
   166:15 187:22
   191:16 207:24
   208:8 211:5 212:8
   212:24
**4/29/16**   213:12
**44**   110:11,14,19
**45**   9:7 110:25
**46**   111:20 112:7,13
   172:24
**4:00**   210:25
**4th**   73:14 165:21

**5**

**5**   11:8,9,24 12:7
   13:3,5 14:12
   40:25 41:3,21
   59:19 89:15 106:8
   106:16,18 107:6
   107:19 195:5,20
   212:4,9
**5,300**   80:5,18
**500**   204:8
**5118**   167:16
**58**   212:16

**6**

**6**   13:13,15,20
   14:17 19:20 20:21
   45:12,14,15 46:19
   47:10 48:6 49:11

49:23,24 50:4
   105:12,18,21
   106:6 107:7,15
   158:11 184:16
   212:5,11
**64,000**   80:6

**7**

**7**   17:21,22 18:3
   48:17,19,23 49:8
   49:15 168:3 212:7
   212:13

**8**

**8**   16:20,23 20:2,3,8
   89:18,22 107:18
   202:11 212:14
**8.3**   173:9
**84**   212:18

**9**

**9**   58:15,16,21
   97:24 98:14
   212:16
**92**   212:19
**9:38**   1:8

**a**

**a.m.**   1:8
**a4**   168:7,15
**able**   6:6 7:3,19
   10:19 11:16 18:4
   20:9 58:22 84:11
   92:13 133:22
   151:12 156:3
   165:16 175:22
   178:3,12 179:8
**absolutely**   37:9,12
   41:13 46:10 104:8
**abundance**   180:14
**accord**   205:2
**account**   3:21 41:6
   133:7 134:25

136:3,8 138:14
   140:16 141:17
   143:3,11 145:17
   163:2,7
**accounting**   82:21
   82:23 103:25
   104:13,20
**accounts**   41:5
   123:17 128:19,23
   130:24 145:8
   163:4
**accurate**   4:23
   17:17 25:4 56:23
   57:13 66:22 96:13
   98:14 140:14
   154:12,13,17
   171:7 190:5
   203:11 214:8
**accurately**   17:4
   56:7 99:19 111:11
   112:12 153:8
   169:17 172:21
**acknowledge**   47:6
**acted**   156:23
**acting**   95:5
**action**   104:20
   180:3 214:12
**actions**   29:24
   30:18
**active**   41:6 124:9
   169:15
**actively**   150:7
**activities**   29:16,19
   33:12,20 34:11
   184:2,4
**actual**   43:6
**ada**   41:7
**add**   154:6
**adding**   48:25
**addition**   29:14
   53:8 157:5 171:25

**FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM**
INDEX NO. 451962/2016
NYSCEF DOC. NO. 185
RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 216 of 553   PageID 643

[addition - asking]

Page 3

178:23
**additional** 34:9
38:11,14,18 48:25
70:16 97:18
110:16 111:22
156:9
**address** 4:5 49:14
100:7 136:25
139:7 140:4,8,22
142:12 143:16,19
143:23,24 183:21
184:6
**addressed** 152:10
**addressees** 152:12
**addresses** 102:10
110:15 148:2,4
179:17
**adjacent** 206:18
**administrative**
62:14,22 63:2
65:13,19,24
114:14 115:6,21
116:10,16 117:6
123:10 144:12
145:4 146:10,18
146:22 147:19
148:21 149:3,9,16
150:4
**advised** 141:10
**affairs** 45:21
**affect** 108:22
**affidavit** 8:11,24
9:8,18 10:22
41:14 43:3 44:15
48:12 69:6 70:4,6
78:24 79:7,15
111:3,6,8,10,13,15
112:5,12,15,21,23
117:25 118:4,11
122:25 124:11
126:4 132:22,24

133:6,20 135:4
138:20 142:3
163:9,22 165:4,7
175:20,22 177:25
178:3,12 212:6,8
**affidavits** 163:10
**affiliate** 204:9
**affiliation** 60:10
60:14,18 118:21
**affirmation** 3:9
4:19 6:18 7:9 9:2
9:4,12,15 25:14
27:25 44:21 59:7
66:7 78:23,25
79:21 85:21 86:16
86:18 93:20,23
96:8 102:21
104:10 110:11
111:19 179:19
206:14,25 212:5
**affirmed** 6:11 12:4
25:5 28:22
**afternoon** 156:20
**agency** 91:7
**agreed** 113:15,17
130:7
**agreeing** 35:20
61:25
**agreement** 70:17
**ahead** 202:10
**ahmed** 2:19
**aid** 162:11
**aimed** 157:19
**alan** 190:24 192:6
**alerted** 209:13
**alius** 140:8,15
**allegations** 191:22
192:4
**allow** 25:24 43:13
**allows** 124:24

**alternate** 136:7,25
140:4
**alternative** 91:14
209:3
**amended** 10:22
212:8
**amendment** 10:25
**americas** 2:16 4:9
**analyses** 90:16,17
**analytics** 180:17
**ann** 1:13 214:4,22
**answer** 6:13 28:2
44:25 46:11 70:6
78:2,20 94:10,13
95:9 100:14,17
114:18 131:18
161:15 173:24
197:6,8 200:3
**answered** 95:8
**answers** 17:4
26:19
**anticipated** 37:2
**anybody** 149:8
**apart** 31:18
100:20 106:15
107:8 118:2,16,23
119:7 174:14
175:21
**apparatus** 43:13
**appeared** 205:25
**appears** 9:21
10:22 11:21
187:12 188:14
**applicable** 15:24
**application** 42:15
42:22 43:25 44:5
44:8 56:9 72:4
129:8,11 132:11
**applications**
130:18

**applied** 68:6 69:23
72:9 113:7,16,18
121:2,18 123:13
127:20 128:22
130:4 131:3,6
**apply** 56:15 57:5
**appreciate** 154:23
**appreciated**
129:20
**approach** 202:4
**appropriately**
137:9
**approximately**
141:16,22 150:13
154:8 155:2
**april** 6:8,11 9:2,5
10:23 12:2 14:8
61:11,19,24 62:10
62:16 65:16
116:17 150:5
165:21 166:15
179:14 180:15
195:11 197:2,3
212:11,24 213:7
**area** 101:15,18
**areas** 73:7
**arose** 179:18
**article** 20:20 21:7
21:9,21 22:9,10,24
**articles** 21:23 87:4
192:11
**ascertain** 62:19
**aside** 21:19 22:7
22:22 27:14 175:3
197:13,25 206:8
**asked** 12:23
101:15 145:19
**asking** 19:15,17
21:5 27:18 30:8
78:19 97:21 186:9
189:22 198:13,23

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

NYSCEF DOC. NO. 185

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 217 of 553   PageID 644

[asks - background]                                                                                          Page 4

**asks** 108:17
187:14
**aspect** 47:19
**aspects** 57:4,6,12
**assert** 34:4
**assertion** 3:23
**assertions** 3:19
210:13
**assets** 82:22 101:9
104:2
**assigned** 132:11
132:18,20,25
182:6
**assist** 185:11
188:19
**assistant** 65:14,19
184:24 192:9
203:5,6
**assistant's** 145:16
**assistants** 62:14
62:22 63:2 65:25
114:14 115:6,21
116:5,10,16 117:6
123:10 144:12,22
144:24 145:4,8,20
146:10,18,22
147:19 148:21
149:4,9,16 150:4
**assisting** 74:22
188:25 197:15
**associated** 23:6
42:5,16 98:8
120:11
**assuming** 159:25
**assurance** 190:21
**assure** 79:12
**assuring** 17:15
**atlas** 36:20,21 37:7
38:4,9,12,20 39:5
39:7,18,25 40:10
41:8 42:5 45:16

46:18,24 47:4,16
48:5,14 49:10
50:4
**atlas's** 47:18
**attach** 111:2,4
**attached** 8:7,25
9:8,13 58:14 59:5
**attachment**
131:15
**attempt** 175:7
**attempted** 178:6
183:4
**attempting** 114:3
**attention** 45:11
52:19 58:8 63:10
72:13 79:20 89:18
92:22 93:5 179:24
200:17 205:12
**attorney** 1:12 2:5
2:15 3:11,17 5:10
5:13 19:12 26:5
26:11 34:5 35:11
70:14,19 72:23
73:2,7,12 79:24
81:6,15 82:10,17
83:6,12,17 85:3
86:5,12,24 87:12
87:14,17 88:11,24
94:5,7,17,24 95:12
100:15 107:21
110:17,20 111:21
115:11 117:11,18
134:3 135:25
136:22 140:6
181:9 185:8
187:21 188:4
191:7,17 195:24
198:8 199:23
200:10 205:17
209:12,21 210:12

**attorney's** 84:2
**attorneys** 29:15
33:10,18 39:16
44:11 48:2 51:21
61:3,5 74:21
198:16
**audit** 190:22
201:11 202:3,6
**auditing** 201:20
**august** 18:12 87:5
212:13
**austin** 184:2
185:11,17 188:18
188:23,24 193:20
193:21,25 196:19
196:19 197:4,17
197:21 198:4,25
199:19,25 200:7
**auter** 187:9 195:8
**authored** 21:10
**authorities** 16:5
19:19 146:7,12
**authority** 157:23
**authors** 93:11
209:5
**authorship** 22:23
**automatic** 41:4,18
42:7,10,20,23 43:7
43:16,19,25 44:13
44:20 47:23
133:11 134:24
141:14,24 150:6
**available** 32:25
**avenue** 2:16 4:8
**avoid** 115:12
121:22
**award** 23:18
**awards** 23:8,14
**aware** 4:22 15:14
18:22 21:21 22:2
22:25 23:3,17

32:6,8 38:15 61:9
62:7,12,13 99:13
113:23 114:4,6,9
115:3,19 116:13
116:19 117:12,21
118:6 120:25
122:13 123:19
125:14,20,22
126:23 128:4
130:16 132:9
133:10,15,16
135:20 136:6,10
136:19 138:6,8,18
138:23 139:3,7
141:6,11,20
142:11 144:11,16
144:24 146:9
147:15,18,24
149:6,24 150:8
160:17 161:20
166:15,20 181:23
181:25 188:24
189:4,9 193:24
194:3 197:17,21

**b**

**b** 59:9,11,11,14,19
63:11 122:12
212:2 213:2
**back** 8:2,14 20:13
31:4 40:5 70:5,8
72:6 75:10 83:4
98:24 116:25
124:5 153:14
158:11 161:5
174:9 178:10
185:24 188:16
210:4
**backed** 176:12
177:13,20
**background** 4:25

[backing - certain]                                                                    Page 5

**backing** 176:18
**backup** 164:9,15
  164:18,22 168:25
  169:5 170:3
  174:23 175:4,10
  175:17 176:2
  183:5
**backups** 170:8
**balagia** 203:3,13
  203:16,22 212:10
**based** 24:22 25:3
  37:17 38:21 40:16
  41:15 62:24 83:24
  106:3 115:10
  116:24 133:19
  148:14,15,16
  150:21 171:17
  174:4,8 197:9
**basically** 46:25
**basis** 26:10 27:13
  68:3,21 98:16,20
  107:8 145:2
  149:14 155:15
**bates** 167:23
  184:12 190:11
  194:14 200:19
**bcps** 166:6,9
**began** 6:16
**beginning** 14:24
  42:3,4 136:20
  192:16 207:17
**begins** 93:7 180:2
  184:12 207:22
  208:9
**behalf** 4:15 31:19
  31:20
**belief** 24:22 25:3,8
  25:18 27:22 37:15
  96:12 111:10
**believe** 12:22
  23:12 30:21 31:6

31:6 32:13 34:22
34:25 49:12 51:4
52:7,16 56:12
57:4 60:2 61:5
62:25 65:7 68:14
80:12 82:2 86:17
87:4,5,14,17 88:20
94:16 95:19
100:18,19 108:7
108:25 112:11,25
113:4 122:9,21
123:8,22 124:22
131:2,5 132:23
139:18 140:24
141:18 142:2,16
142:21 143:2
144:15 148:23
150:10 154:16
158:5 166:19
176:21,22
**believed** 87:23
  141:8 154:13
  158:2 206:12
**belonging** 9:11
  53:10 159:8 182:7
**belongs** 8:3
**best** 3:13
**beyond** 43:9 48:5
  50:11
**bit** 206:19
**black** 189:25
  190:7
**blood** 214:12
**bob** 117:16,22
  118:7,13 119:3,11
  182:19
**bobet** 2:20
**bodies** 17:16
**boehning** 21:12,14
  21:15,17,22 22:3

**bold** 16:23 18:17
  22:11 52:23 54:15
  54:24 72:17 79:23
  185:4 195:23
  202:15
**bolded** 35:5 36:14
  110:14
**bolia** 120:13
  126:11
**boolean** 72:2
  129:15,15 130:20
  131:2
**bore** 98:12
**bottom** 22:12
  59:10 63:14
  172:25 180:13
  184:11,16 187:25
  188:6 190:10
  200:19,24 202:10
  207:10,11,13,16
**box** 121:25 124:25
**break** 11:4 78:10
  108:3 109:17
**briefly** 48:16
**briskly** 109:20
**broad** 70:12 95:2
  128:20
**broadway** 1:12
  2:7
**bullet** 192:16,25
  193:4,8,12,20
  196:15,17,21
  208:14,23
**bullets** 208:22
**burdened** 20:23
**bureau** 35:10
**business** 76:16
  90:14 99:17 166:6
  172:20 174:19
  180:17

**c**

**c** 2:2 3:2
**call** 119:18 134:13
**called** 38:24 39:8
  39:12 131:21
  136:11
**calls** 90:22 107:22
**capabilities** 39:2
**capture** 128:21
**carbon** 81:19 91:8
  91:16,22 93:12
  100:10 101:3
  102:12 108:22
  209:3
**care** 17:15
**career** 145:22
**cas** 169:5
**case** 22:15 49:13
  58:4 60:13,21
  70:3 72:7 143:9
  157:12 160:21
  172:12,24 210:9
**caselaw** 15:24
  16:4 19:2,7,16
  157:8
**cases** 16:10 19:10
  19:10 72:11 146:7
  157:14
**categories** 76:11
  76:15 90:3 105:6
  106:5 107:17,23
**caution** 180:14
**center** 59:10
  172:25 173:4
  202:11 207:11
**central** 72:22,25
  73:17 75:24 76:4
**ceo** 63:18
**certain** 34:14
  69:20 98:3 99:19
  123:11 129:14

[certain - comply]

136:15 145:20 166:8

**certainly** 13:24 37:6 139:22

**certificate** 212:4

**certification** 6:7 7:4 10:3,8 12:2,3 58:9 214:2

**certify** 214:6,10

**chain** 156:10

**chairman** 63:18

**chambers** 24:12

**chance** 13:21 15:6 48:18 89:22 105:15 151:16 190:15 202:23 208:3

**change** 35:15,17 45:18 73:6 88:16 90:11,25 99:16 101:10,25 104:19 145:18 187:11 195:24 197:24 198:2 208:18

**changing** 86:13

**characterization** 12:21 62:2

**characterize** 12:20 99:20

**chart** 60:4

**chemical** 201:11

**chris** 21:14

**christopher** 21:11

**citation** 22:15,20

**cite** 16:4,8,12,12 16:13,15

**cited** 19:20 146:8

**civic** 23:25

**civil** 22:5 23:4 24:6,8,10

**clarify** 19:14 43:15 71:9 78:18 128:3 140:12

**clear** 26:8 78:21 83:16 127:18,25 135:6,11 139:18 143:23 153:2

**clearly** 109:13 157:20

**client** 3:11 19:12 26:5,11 29:11 34:5 100:15 107:21 115:11 117:11,18 134:3 181:9 198:8 199:23 200:10 210:12

**clients** 23:15

**climate** 35:15,16 45:18 73:6 80:8 80:20 81:3,10 88:8 89:9 90:11 90:25 99:16 101:10,25 104:19 187:11 195:24 197:24 198:2 208:18

**cloud** 176:12 177:14 178:16

**co2** 100:5

**collect** 74:12 114:3 115:23 116:6 117:7 162:21

**collected** 53:11,16 117:15 121:9

**collecting** 112:18 162:12

**collection** 9:10 53:8 57:14 68:7 121:12 123:21

**collectively** 17:13 104:12

**colloquy** 6:15 26:24

**colon** 169:19

**column** 60:3,9

**come** 70:8 72:6 75:18 139:14 210:4

**comes** 135:3 196:5

**comfortable** 61:25

**coming** 164:7 206:14

**commencing** 193:8

**comments** 86:25

**commission** 91:10

**committee** 45:17 56:16,25 57:6,10 62:9,15 65:25 68:17 69:18,24 71:4,12,21 72:5,10 76:17 77:2,5,11,19 77:24 79:3,16 110:22 111:23 112:19 114:2 115:8,22 116:7 117:8,14,23 118:9 121:3,10,19 122:6 122:15 125:17 127:21 129:10 130:12,19 138:12 144:13 146:19 147:23 161:22 162:3 168:13,18 182:8

**commonplace** 70:23

**communicated** 138:13 192:14

**communicates** 46:25

**communications** 90:9,23 93:10 118:2 119:8,22 134:7 147:21 208:16,24

**company** 39:2 64:14 65:10,14 74:7,20 75:18 148:13 171:22 172:10 175:16 191:21 192:4 205:8

**company's** 30:11 159:10 160:13

**compare** 71:10

**comparison** 71:19

**complete** 94:13 97:24 98:19

**completed** 97:7,13 105:18

**completely** 80:13

**completeness** 186:18

**completion** 27:25 28:5

**complex** 21:23

**compliance** 51:15 51:22 52:4,14 61:18 115:2 119:5 150:2 171:10 181:2,20 182:22 183:24 197:19 198:5 199:2,16,20 199:25 200:8 203:25 204:15 212:4

**complies** 15:23

**comply** 193:5

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

NYSCEF DOC. NO. 185

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 220 of 553   PageID 647

[complying - correct]

Page 7

complying  14:19
16:21 18:15 23:15
24:15 35:4 36:12
45:13 54:13 55:15
57:19 58:10 63:12
66:8 67:25 72:15
75:16 89:16,19
93:24 110:12
153:16 158:13
168:5,22 173:2
184:18 190:16
195:21 202:12
205:13
comprehensive
15:21 76:22 77:8
77:17 79:11 157:3
comprise  75:19
computer  42:15
42:22 43:24 44:6
44:9 47:19 132:10
concerned  154:24
concerning  35:16
90:10,24 208:25
concerns  4:20
110:16
conduct  77:16,22
117:22 118:8
conducted  60:17
60:22 75:2,6
111:22 122:19
133:4 180:19
conducting  60:10
60:15
conference  16:16
confident  21:2,6
130:3 163:14
164:20
confidential
121:23 166:10
171:2,17,24 172:2

confirm  6:6 7:3
11:16 13:22 18:4
20:9 25:10 46:2
47:13 58:22 84:11
92:13 151:12
152:20 156:3
165:16 179:8
confirmed  70:17
80:15 83:2,2
conlon  17:12
92:20 152:11,17
153:20 154:22
connected  198:2
connection  12:13
14:10,13 15:16
28:13 29:20 31:2
34:23 47:20 49:3
60:6 64:4,9,11
65:5 161:25
175:17 177:14,22
197:23 199:25
200:7 205:8
connectivity
168:10
connectors  130:20
connie  8:11 135:4
212:6,8
considered  94:14
146:11
consist  76:8,10
consistent  37:6
67:20 80:14 82:3
82:14 204:12,17
204:18 205:10
constitute  86:9
consult  199:12
consultation  30:5
consumption  91:7
contact  119:10
120:7 184:23

contacted  12:22
contacts  16:24
27:15
contain  54:3 57:24
66:13
contained  41:20
156:11 169:22
contains  131:16
content  106:12
107:13 108:9
109:7,13 192:12
202:16
contents  3:8 4:19
13:9 14:23 35:20
37:13 55:10
101:13 102:5
105:23 123:5
context  52:18 67:9
194:5
continue  3:20 53:2
78:8 124:16
186:19 210:15
continued  213:2
continues  35:13
54:19 59:19 70:21
105:4 154:6 185:5
continuity  166:6
172:20 174:19
contributed  81:18
95:14
contributors
93:11
controller  192:8
controlling  157:8
157:23
convenience  78:11
105:5
conversations
27:11 37:17 41:15
100:20 134:15

copies  166:5
copy  13:2 53:8
68:3
copying  153:19
corner  195:20
200:20
corporate  45:21
122:10 176:19,24
192:7 204:10
208:17
corporation  1:5
2:15 27:9,19 28:4
28:13 31:21 40:8
40:19 44:19 51:9
52:3,12,13 59:21
59:22 63:8,19
65:4 118:18,22
160:11 177:11
185:6 192:14
202:6
corporations
145:11 146:23,25
correct  4:17 5:3,8
5:12,19,20 6:16,17
9:4,16 10:3,25
11:2 15:18 16:2,3
16:6,7,11,17 17:9
17:18 19:10 21:8
21:12,16,25 23:2
23:11 24:7,24
25:12,15 26:15,16
26:21 28:6,20,24
28:25 31:16,17
35:6,7,19,24 36:16
36:17 37:11 39:9
39:10 42:13 47:15
49:11 52:24,25
53:5,6 54:17,18,21
54:22,25 55:5,6
59:16,17,25 60:7,8
60:11,12,19,20

[correct - data]

| | | | |
|---|---|---|---|
| 61:12 62:11,17 | 165:23 167:17,21 | **course** 42:2 | 96:19 97:3,9 98:5 |
| 63:8,22 64:19,25 | 167:24 170:5,10 | 118:20 131:9 | 98:25 110:22 |
| 65:2,6,11,17 66:18 | 170:15,21 172:3,4 | 141:21 | 111:24 112:20 |
| 67:9,12,16,17,22 | 173:10,11,14,15 | **court** 69:7 138:22 | 113:6,11,24 114:2 |
| 67:23 69:8,9,19 | 173:20 179:20,21 | **cover** 166:2 | 114:13 115:8,22 |
| 71:7 72:18,19 | 180:10,11 184:13 | **covered** 14:15 | 115:24 116:7 |
| 74:18 75:3,4,8,9 | 184:14 187:11,22 | 100:14 | 117:8,15,24 118:9 |
| 76:2,8,12,13,18,19 | 187:23 188:5,13 | **cross** 75:19 | 121:3,10,13,19 |
| 76:23,24 77:3,15 | 190:3,8,11,12,18 | **crystal** 127:24 | 122:6,7 125:17 |
| 79:25 80:2,9,10,20 | 190:19,22,23,25 | 135:10 | 127:21 128:18,23 |
| 80:23 81:3 83:8 | 191:2,5,9,10,13,18 | **current** 159:17 | 129:10 130:19 |
| 83:20,22 86:7,10 | 191:19,22 192:17 | 173:13 | 137:10 138:12 |
| 87:24 88:13 90:4 | 193:2,3,6,7,10,11 | **currently** 5:2 | 147:5 150:14 |
| 90:20,21 91:18,19 | 193:17,18,22 | 154:3,8 157:7 | 153:3,6 154:5 |
| 92:3,4 94:9 95:18 | 194:15,16,20,23 | **custodial** 52:7,18 | 156:25 160:12 |
| 96:6,19 97:3,4,11 | 195:2,6,9,12,13,16 | 61:7 65:8 68:25 | 161:12 162:7,13 |
| 98:2 99:11,17 | 196:15,16,20,21 | 130:24 137:19 | 162:19,22 |
| 101:16 103:11,17 | 200:21 201:4,5,7,8 | 145:8 146:21 | **custodians's** |
| 103:18,20,21 | 201:11,12,15,18 | 148:14,17 | 122:15 |
| 104:5,9,14,15,21 | 201:19,21 203:14 | **custodian** 43:12 | **custody** 137:15 |
| 104:23 105:8 | 209:20 | 47:2,3 53:10,18 | 138:3,11 159:17 |
| 106:20 107:11,14 | **correctly** 166:13 | 57:14 58:3 77:19 | 160:15 208:16 |
| 109:3 110:17,18 | 180:22 185:2,14 | 116:6 137:12 | 209:5 |
| 110:22,23 111:3 | 202:7 203:8 | **custodian's** 113:19 | **cybersecurity** |
| 111:24,25 112:24 | **correspondence** | 139:15 | 166:12 171:4 |
| 119:6,12 121:4,6 | 14:4,7,9 18:11 | **custodians** 9:11 | |
| 122:17,19 123:7,8 | 83:13 95:20 146:8 | 15:22 18:18 50:17 | **d** |
| 124:13 125:11 | 166:23 207:2,7 | 54:2 57:22 59:20 | **d** 8:9 32:13 59:15 |
| 127:16 130:21 | **cost** 101:3 108:22 | 59:23 60:5,23 | 131:21 167:16 |
| 133:14 135:17 | **counsel** 12:17 | 61:10,17 62:9 | 211:2 212:25 |
| 136:9 137:17 | 17:17 28:12 78:11 | 63:6 65:24 66:12 | 213:7 |
| 138:25 139:2,9,12 | 114:19 115:15 | 67:20 68:17,25 | **dadey** 23:24 |
| 139:25 141:17,18 | 134:7,16 180:16 | 69:19,25 71:12 | **dallas** 195:8 |
| 142:2,2,3,7 143:20 | 184:23,25 185:9 | 72:17,22,25 73:9 | **dan** 126:10 165:19 |
| 144:25 148:22,23 | 192:10 193:14 | 73:11,25 74:4,25 | 179:15 |
| 150:10,17 152:11 | 199:12 203:4,7 | 75:3,18,24 76:4,7 | **daniel** 2:18 |
| 152:16,18 153:9 | **counsels** 203:6 | 76:10,21 77:3,5,11 | **data** 53:11,16 68:4 |
| 153:21 154:14 | **counterparts** 17:8 | 77:24 79:5 80:7 | 68:5,19 69:2 |
| 156:12,16,17 | **couple** 158:8 | 80:19,22 81:2,17 | 110:21 113:6,8,12 |
| 157:14,15 158:16 | 189:22 | 82:9 83:11 94:20 | 113:12,19 116:21 |
| 158:19 161:2 | | 94:22 95:14 96:3 | 122:23 123:2,4 |
| | | | 127:21,22 128:13 |

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

NYSCEF DOC. NO. 185

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 222 of 553   PageID 649

[data - directed]

Page 9

128:18,25 130:23
164:10 169:6
174:22 175:4,4,9
175:16 176:2,12
176:18 177:13,20
178:7,16
**date** 6:2,23 7:15
9:23 10:15 11:11
13:17 14:6 17:24
20:5 58:18 64:17
84:7,20 92:9
151:8 155:22
165:12,21 167:8
179:4 183:20
189:18 194:11
196:25 200:15
210:16
**dated** 4:16 18:12
20:21 28:17 93:2
111:6 156:15
165:20 179:14
187:9 191:3
195:11 201:17
213:10,12,14
**dates** 60:4 142:4
**david** 192:8
**day** 70:14 214:16
**days** 209:19
**dcps** 166:7,9
**dealt** 100:4
**december** 20:21
64:14 70:11,16
93:3 95:17 96:5
97:21 138:5 206:3
207:6 209:17
212:19
**decides** 19:4
**decision** 171:20
**decisionmaking**
108:23

**decisions** 90:14
99:17
**defines** 19:3
**definitely** 129:5
**definition** 19:8
**degree** 147:20
**deleted** 43:11,18
150:16 151:3
**deloitte** 180:16,17
181:3,6,15,18,23
182:15,22 183:3
**demonstrate**
161:11
**denoted** 168:3
184:16
**department** 5:17
5:18 29:17,20,25
30:10,17,19,23
31:8,10,12,16 34:8
34:17 36:19 39:23
40:4,18,23 60:16
60:22 74:17 75:6
113:25 114:12
115:20 116:5
117:5 119:24
120:6,9,10 126:7
126:18 127:10,15
142:24 154:2
155:13 198:18
203:23 204:12,14
204:19,20
**department's** 16:9
171:12
**departments** 45:3
45:20
**deployed** 163:3
168:8
**deputy** 5:10,13
**derived** 27:16
**derives** 147:2

**deroche** 2:11
**describe** 56:7,13
88:8 96:21 188:15
**described** 47:9,22
49:8,11 50:4,11
56:24 69:5,22
83:8 85:24 87:9
87:22 88:22 89:5
112:20,23 117:25
118:10 120:24
122:25 123:13
124:10 126:3
133:5 160:16
163:9 181:4 187:4
**describes** 9:9 76:6
83:9,12,19 111:6
111:11
**describing** 109:2
112:10 152:13
**description** 56:23
96:14 190:5
204:11 212:3
213:4
**design** 167:21
**designated** 12:17
**designation**
167:15
**designed** 70:12
**destroyed** 141:15
141:24 143:15
183:5
**destruction** 182:2
**detail** 38:7 69:13
**details** 33:13
39:13 42:9 43:6
45:2 72:6 133:17
133:23 134:23
179:23
**detected** 140:10
**determination**
32:21 149:15,19

149:23 172:7,12
174:4,11,12
**determinations**
148:14
**determine** 13:21
29:12 74:4 98:10
146:16 149:8
162:7 171:12
175:8,15 177:12
177:19 182:4
**determined**
143:13 173:25
**devices** 182:6
**dick** 23:24
**differ** 112:21
146:20
**differed** 121:12
129:10
**difference** 113:22
120:25 122:14
**differences** 79:15
130:16
**different** 26:12,13
38:25 62:4 73:7
76:11 128:14
130:17 139:15
144:23 162:19
**differentiate**
106:25
**differs** 112:25
113:4
**direct** 14:17 18:13
22:9 35:2 36:10
40:24 54:11 72:13
92:22 93:5 94:18
110:10 114:17
119:10 151:24
158:11 207:9
**directed** 115:6
118:7 145:22

**directing**  145:15
200:16
**direction**  94:16
180:19
**director**  23:24
**directory**  41:6
169:15
**disable**  42:7
**disabled**  43:20
**disables**  43:25
**disagree**  77:21
150:25
**disagreement**
26:25
**disaster**  166:7
**disclosed**  90:25
**disclosure**  116:14
195:25
**discovery**  16:24
17:5,7 21:24 22:6
23:2,5 36:20 68:8
68:21 69:15 70:2
**discuss**  187:20
192:11
**discussed**  34:21
69:13 144:8
186:23 187:7
188:3,10
**discusses**  132:24
158:15
**discussing**  188:17
205:17
**discussion**  101:2,8
101:23 161:25
186:15 205:22
206:21
**dispense**  4:12
46:13
**distinction**  122:5
**distributed**  155:12

**divine**  136:22
**divisions**  155:13
**document**  5:22 6:4
6:10,12,20,25 7:11
7:17,20,23 8:3,7
8:16 9:19 10:5,17
10:20 11:8,13,15
11:17,20 13:9,13
13:19,23 14:3,18
16:16 18:2,8,10,14
20:7,18,19,24 21:6
24:21 27:17,22,23
28:4,6,12 35:3,24
37:11,24 41:12
46:9 52:22 54:16
56:4,5,8 58:12
59:2,3,10 60:23
61:8,13,15 62:3,8
62:19,21 63:21
68:7 69:15 70:2
76:23 77:9,18,24
84:9,12,15 86:21
89:18 92:11,14,16
92:17 101:13
123:21,23 124:6
137:2 139:4,13
140:3 152:2
153:15 156:7
167:13,23 168:4,6
169:3 171:16
172:13,17,25
174:6,21 175:3
179:12 183:22
184:7,12,19
185:22 186:3,5
187:6,8,19 189:20
189:23 190:2,7,14
190:17 192:20
194:12,18 196:6
197:2,7,9 200:17
200:23 205:15,25

209:17
**documents**  9:10
15:16,23,24 18:18
28:16 29:3,7,12
30:6 32:20,24
35:14 36:25 43:17
50:15 52:24 53:9
53:9 54:4 56:16
57:5,10,15,25 58:3
59:23 60:6 63:6
65:9 66:4,14,20
67:4,15,22 68:3
69:11,12,24 70:14
71:4,22 72:5,10,21
73:10,20,22 74:11
74:12,13,13 75:21
76:2 77:19,25
79:4,17 80:5,18,21
81:2,8,11,17 82:8
82:23 83:10 88:9
90:2,9,23 92:21
93:10 95:3,6,13
96:18 97:2,7,17,18
97:23,25 98:4,13
98:18 99:4,9
104:12,14,17
105:7 107:17
108:17 112:19
114:3,11,15 115:7
115:23 116:8,11
117:7 121:4,16,19
121:21 126:25
129:10,12 136:2,3
137:13 138:3,9,25
139:9,20,24 141:4
143:21 145:7,14
148:3,6,9 149:5,10
149:17 152:22
153:4 154:4,25
155:4 158:24
159:8,13,16,23

160:4,5,12,22
161:7,13 162:12
162:22 165:6
166:17,25 167:5
167:10 171:15
185:12,18 188:19
189:2,6,11 196:22
197:16 198:12
203:22 205:20
208:9,15,24
212:10 213:10,12
213:14
**doing**  71:19
**domain**  169:10
**donald**  161:17
**downstream**
201:10
**draft**  187:12,15,19
**drafts**  208:25
**draw**  76:5 100:21
179:24
**drives**  53:17,21
**duces**  28:17
**due**  168:12
**duly**  3:3
**duties**  80:23
**duty**  18:24

**e**

**e**  2:2,2 3:2,2 16:24
17:5,7 21:24 23:2
32:13 36:20 41:5
42:7 43:10 53:17
68:8,21 69:15
70:2 71:13 92:18
92:25 94:15 97:21
110:6,6 113:12
114:11,15 115:23
117:9,14,23 118:8
121:9,12,14,15,17
121:25 122:12,12
122:15 123:5,12

[e - exhibit]

123:14,16,19
124:9,18 125:4
126:2 127:7
128:19,23 131:15
131:17,21 132:12
132:13 133:6,12
135:8,14 136:3,8
136:16,25 137:10
139:5,6 140:4,8,16
140:20,21 141:13
141:17,24 142:11
142:14 143:14,16
143:19,22,24
144:7 145:16
150:15,16,25
151:21,25 152:9
152:13 153:11,17
153:18,19,23
154:19 156:9,10
156:13,20 163:6
164:7 182:3 183:5
195:9 207:17
208:2,9,15,24
211:2 212:2,19,20
212:22 213:2
**earlier** 26:24 63:4
69:7 108:14
112:23 146:9
188:22 203:19
205:16 209:16,17
**early** 37:20 78:9
81:7 116:3,25
120:22 127:19
128:5,6 129:6,20
135:9,15,18
209:18
**ebner** 184:24
192:9
**ediscovery** 16:16
**edit** 56:2

**edited** 36:2 54:6
83:3
**editing** 55:21
**effect** 142:17
**effectively** 142:14
**effort** 15:21 29:20
56:6 74:8 157:4
177:12 184:22
**efforts** 30:6
154:23 156:22
157:5,19 162:24
164:13 177:19
180:18 182:4
**eight** 5:11,15
**either** 24:19
108:21 124:2
159:24 198:21
**electronic** 53:9
68:4,19,25 69:11
69:23 113:5,8,12
164:10
**eleven** 213:14
**emc** 167:24 213:5
213:6
**emissions** 91:5,14
100:5,10 209:2
**employ** 159:10
160:13 203:13
**employed** 5:2 27:9
40:7 44:18 48:9
51:9 52:3 56:10
65:4 68:7
**employee** 41:7
45:24 47:11
132:14
**employees** 18:25
154:3,6,9 155:2,14
157:19 159:9,17
159:21,24 198:18
208:17

**employing** 30:25
**employs** 204:7
**emurald** 131:21
131:24 132:6,9
**enables** 186:8
**enclosing** 166:3
**ends** 105:4
**energy** 81:19 91:6
91:7,13,13,15,15
91:21 93:12
208:25 209:3,3
**engaged** 180:16
**engagement** 23:25
201:15 202:6
**engineering** 80:8
**ensure** 101:24
142:13
**enter** 125:2
**entire** 78:23 85:25
123:5 149:25
155:12
**entirely** 68:23
79:4
**entirety** 20:24
113:11 121:24
**entities** 31:23
34:21
**entitled** 19:22 56:6
72:17 81:19 93:12
181:10 210:18
**entry** 63:13
**environment**
45:23
**environmental**
35:10
**eric** 2:6
**esq** 2:10,11,18,19
2:20
**essentially** 42:6
94:19

**evaluate** 193:16
**evaluating** 101:24
**evaluation** 102:11
**event** 109:2
**events** 85:24 87:9
87:21 94:3 95:16
96:15 124:10
**everybody** 109:18
**everyone's** 20:23
**evidence** 137:7
**exactly** 130:15
**examination** 1:10
3:21,24 114:20
210:15 211:4
**examined** 3:4
**example** 65:13
123:18
**exception** 79:6
**exchange** 38:24
39:8,12,19 40:2,12
91:10 167:21
168:25 169:4,5,11
169:13 170:12,17
**exclude** 100:13
114:17
**exclusive** 36:7,9
86:11
**excuse** 196:10
**executed** 7:9 10:23
**executing** 74:22
**executive** 23:24
**exemplar** 105:6
**exercise** 105:21
180:21
**exhibit** 5:23,24 6:5
6:9,20,21 7:2,7,12
7:13,18,21,25 8:8
8:15,23,24 9:2
10:12,13,18,21,25
11:8,9,18,24 12:6
12:7,8 13:3,5,13

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

NYSCEF DOC. NO. 185

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 225 of 553   PageID 652

[exhibit - exxonmobil's]                                                              Page 12

13:15,20,25 14:12
15:5 17:21,22
18:3,6 19:20 20:2
20:3,8,11 24:14,17
24:18 48:21 58:9
58:15,16,21,25
59:11,14,18 60:4
66:7 78:25 79:21
84:4,5,10,13 85:18
85:19,23 87:11
89:15,24 92:6,7,12
92:15,24 102:17
102:18,21,23
105:17,19 107:19
110:10 112:16
151:5,6,11,14,16
151:18,20 155:19
155:20,24 156:2,5
156:9,11 158:12
165:9,10,15,17
167:11,14 172:17
178:25 179:2,7,11
179:20 183:17,18
184:7 186:11
187:2 189:14,16
189:24 194:8,9,13
196:8,9,12,23,23
200:12,13,18
202:24 205:12
206:6,13,24
207:14,15 208:5
212:4,5,6,8,9,11
212:13,14,16,17
212:19,20,22,24
213:5,6,7,8,9,11
213:13
**exhibits** 59:6
121:16 167:7
206:4 213:16
**exist** 164:15

**existed** 129:16,21
**existence** 143:18
**expect** 34:12 40:13
40:16,21 44:23
45:2,5 64:20
97:10 106:10,21
109:10 115:25
118:19 171:7,19
**expectation** 50:7
107:3 111:14
143:3
**expected** 144:17
145:4
**expeditious**
157:18
**expeditiously** 95:5
**experience** 145:12
204:7,13 205:9
**experienced** 22:5
22:25 23:4
**expertise** 23:10
**explain** 41:22
**explicitly** 210:14
**expressed** 81:6
**extends** 18:24
**extensive** 147:4
148:16
**extent** 27:11 109:4
153:7 193:15
198:20
**external** 185:7,9
193:14
**extract** 113:8
**extracting** 122:23
**extraneous** 8:5,15
**exxon** 1:5 2:15
14:11,14 38:17,24
39:22 66:18 80:25
96:25 97:21
111:22 124:9
128:12 133:4

152:21,25 154:23
188:25
**exxon's** 44:20
46:17 57:2 73:5
86:6 99:17 101:8
102:11 115:19
150:16 162:8
**exxonmobil** 4:15
11:22 12:11 15:14
17:8 18:22 27:9
27:12,15,19 28:3
28:13 29:16,19,25
30:5,18,23 31:15
31:20 34:8 35:9
37:18 40:8,19
41:4,19 44:19
45:15 48:10,25
50:9 51:9 52:3,8
52:11,13,17 53:24
56:10,17 57:21
59:21,22 60:15,22
63:8,18 65:4
66:10,22 70:11,17
72:21 73:10 74:16
75:5 76:12,21
77:16,22 80:4,7,18
80:23 81:16,24
82:7 94:6 95:12
95:25 96:9 97:6
97:24 98:17 100:4
101:23 110:15
116:15 117:21
118:7,18,21
120:21 122:19
123:20 125:16,25
126:7 130:13
132:10 134:22
137:17,23 138:2
138:23 139:8,19
139:22 140:25
141:8,13 142:24

146:19 147:19
149:7 156:23
158:16,23 159:9
160:11 161:7
162:11 163:19
164:8,18 171:11
174:23 175:2,5,8
175:14,25 176:11
176:16,19 177:6
177:11,18 178:5
178:16,22 180:2,8
180:20 182:4,19
183:13 185:10,17
187:20 188:8,18
190:21 191:16
192:8,9 193:17
197:22 198:19
200:6 201:10
202:5,5 203:3,12
203:14,17,23
204:6,23 205:3,18
206:2 209:13
**exxonmobil's**
15:21 30:9 34:16
34:24 35:15 36:19
44:13 45:17 47:19
48:3 68:8,20
76:17 77:23 81:5
81:22 82:21 101:2
103:24 104:7
108:19,20 113:24
114:12 115:2
117:5 119:23
126:17 127:10,14
141:3 146:16
150:6 153:25
154:5 156:21
157:17 161:21
166:3,5,11 171:3,9
177:13,20 180:15
181:2,19 183:23

[exxonmobil's - functional]

188:3,11 197:18
198:5,17 199:2,16
199:20 203:25
204:12,13

**f**

**f**  110:6
**face**  174:6 187:8
**facing**  91:11,11
**fact**  19:18 47:2
65:3 69:23 72:7
94:7 97:6,19
98:11 106:19
147:18 148:21
209:12,18
**facts**  24:21 25:2,7
25:17 27:21 79:11
112:12 144:23
**failure**  134:23
**fair**  48:24 56:3
89:13 119:9 137:4
163:11,16
**fairly**  56:7,13
109:20
**faith**  157:18
**false**  93:20 95:10
106:23
**familiar**  14:22
22:19 29:18 30:24
46:6 55:9 99:10
124:8,14,19,23
125:5,6 159:15
**familiarity**  21:20
22:22 31:25
124:15 125:24
**familiarize**  13:8
**far**  34:21 119:15
154:24
**fashion**  127:23
**february**  95:17,20
95:21 96:4,9
191:3 206:15

207:3
**federal**  5:18
**feinstein**  8:11,25
9:14 10:2,23 28:8
28:10 41:14 43:3
70:4,6 114:10
115:4 117:13,20
133:22,24 134:5
134:21 135:4
163:24 164:16,24
175:20,22 177:25
178:2,11 212:7,8
**feinstein's**  9:20
69:6 78:24 79:7
79:14 111:2
112:21 117:25
118:3,11 122:25
124:11 126:3
133:5,20 163:22
**field**  16:17 190:20
201:9
**fifth**  202:14
**file**  41:4,16,19
42:10,15,20,23
43:7,16,19 44:2,13
44:20 47:23
141:14,25 150:6
150:20 190:22
201:11
**files**  122:15 137:19
139:15 146:22
150:8 195:8
**filings**  91:9
**filtering**  72:3
**final**  70:25 85:12
196:17
**finally**  93:7,8
**financial**  90:15
**find**  66:19 148:10
173:13

**firm**  5:4 12:10
24:19 26:14 29:10
166:16 185:7
**firm's**  69:7
**firms**  204:7
**first**  3:3 5:13 6:14
14:23 16:8 17:2
29:4 67:6 93:6,25
96:4,10 103:9
114:4 122:18,21
126:2 131:9 133:4
135:19 136:6
138:10 141:14
142:8 144:11
151:24 152:24
165:25 167:15
179:25 184:19
185:25 186:5,6,7
187:5 189:24
193:4 194:14
203:2
**firsthand**  133:18
**five**  210:3 213:12
**flaws**  126:24 127:6
**focus**  82:10 83:7
83:18,20 84:2,2
86:14 89:5,13
94:25 206:19
**focused**  80:25
82:19 85:5 88:4
103:7 130:10
137:9
**focusing**  115:12
**folders**  53:25
57:22 66:11 67:3
123:11
**folks**  78:7
**follow**  73:16
**followed**  50:10
69:4

**following**  18:21
19:10 36:6 49:25
55:3 81:15 88:10
89:11 94:5 110:3
146:7 157:11
188:9 191:12
**follows**  3:5 35:5
105:13 192:24
202:20,21
**footnote**  9:6
158:18,19,21
161:5
**former**  63:18
**formerly**  59:21
**forth**  24:21
**found**  67:4 143:10
145:13
**foundation**  172:18
**four**  54:20 80:6
180:7 192:25
196:15 213:10
**fourth**  63:13
122:24 123:3,7
180:12,14
**friday**  153:20
156:14,20
**front**  9:19 10:8
11:13 22:9 102:24
165:6 172:17
**full**  14:23 93:6
109:21 152:19
153:6 165:24
170:3 179:25
184:19 202:19,20
**fully**  17:3 46:6
**function**  124:20
124:24 125:8,18
126:24 127:7
131:14 181:4
**functional**  204:9

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM
NYSCEF DOC. NO. 185
INDEX NO. 451962/2016
RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 227 of 553   PageID 654

[functions - hirshman]                                                Page 14

**functions** 159:25 160:2 181:18

**funny** 125:12

**further** 53:3 69:13 214:10

**future** 46:14 101:25 102:12

**g**

**g** 90:13

**gained** 107:2

**garrison** 2:14 4:8

**gas** 81:23 91:4,14 95:22 207:5 209:2

**general** 1:12 2:5 5:10,14 30:13,16 33:7 35:11 42:12 46:23 70:15,19 79:24 81:15 82:10 82:17 83:7,12,18 85:3 86:3,12,24 87:13,14,18 88:11 88:24 94:5,7,17 95:12 110:17,20 111:22 124:15 136:22 146:20 150:21 184:23,24 187:21 191:7,17 192:10 195:24 203:4,6,7 205:3,21 209:13,21

**general's** 3:17 72:23 73:2,8,12 81:6 86:5 94:24 135:25 140:7 188:4 205:18

**generally** 13:11 31:24 85:9 99:21 106:21 109:9 145:6,7,10,11,12 145:23 146:23 204:17

**generically** 26:19

**genesis** 99:21 100:11

**gep** 192:6

**getting** 130:11 179:22

**ghg** 208:18 209:14

**give** 94:12 199:4

**given** 23:18 147:4 150:11 210:11

**giving** 134:4

**global** 208:17

**go** 7:25 31:4 65:12 78:4,13 98:24 161:4 163:4 174:9 186:13 192:21 199:6,8 210:19

**goes** 96:21 104:16 207:23

**going** 4:12 10:10 11:6 18:20 25:24 26:9,18 78:4 92:5 100:12 105:11 108:2 114:16 115:9 116:25 124:5 127:20 128:12,13,21 129:9 134:13,17 151:4 155:18 167:4,12 172:16 181:8 186:4,12 189:14 191:11,20 192:21 198:7 199:5

**good** 4:10,11 157:17

**government** 23:16 45:21 104:19 146:5

**governmental** 17:16 106:22

**great** 15:4 17:14

**greater** 33:19 125:24 126:8 127:5

**greenhouse** 81:23 91:4,14 95:22 207:5 209:2

**grounds** 181:10 198:9

**group** 153:5

**guess** 27:11 29:22 49:20 89:2 138:16 161:10 189:9

**guidelines** 166:5

**guys** 210:20

**h**

**h** 3:2,2,2 212:2 213:2

**half** 78:8 138:10 144:11 203:20

**hand** 10:11 11:7 195:20 200:20 214:16

**handed** 6:5,25 7:17 10:18 13:20 18:2 20:7 58:20 167:14 189:24 194:13 200:18

**happen** 43:14,14 122:17,20

**happened** 125:15 133:17

**happens** 47:15 159:8

**happy** 111:18

**hard** 53:8,17 68:3

**hardcopy** 69:11

**hd** 16:9 157:12

**header** 72:17 79:23 90:6 168:24 191:11,21 195:23

196:5,5 202:14,21

**heading** 16:23,23 18:17 22:11,13 35:6 36:14 52:23 53:5 54:15,20,24 55:4 110:14 201:23

**headings** 53:3

**headquarters** 176:24 177:5

**health** 45:22

**heard** 87:12 131:20 159:20 160:6,9 161:19,24 176:23

**hearing** 182:10,17 210:9

**helble** 132:15,19 132:21,25

**held** 1:11 186:15 206:21 210:10

**help** 162:21 185:18

**hereunto** 214:16

**hesitant** 12:19

**high** 147:20

**highly** 166:10 171:2,24 172:2

**hindsight** 154:16 158:5

**hired** 185:6,10,17 188:18

**hiring** 193:13,20 196:18

**hirshman** 1:11 3:7 4:1,4,10 5:1,24 6:1,3,21,24 7:1,13 7:16 8:1,19,23 9:1 10:1,13,16 11:1,9 12:1 13:1,15,18 14:1 15:1,7 16:1

17:1,22,25 18:1
19:1,15 20:1,3,6
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1,16,19
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1,5,8 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1,7,10 93:1
94:1 95:1,7 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1,9
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1

135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1,6,9,15
152:1 153:1 154:1
155:1,20 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
165:10,13 166:1
167:1,7 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1,2,5
180:1 181:1 182:1
183:1,18,21 184:1
185:1 186:1,19
187:1 188:1 189:1
189:16 190:1
191:1 192:1 193:1
194:1,9,12 195:1
196:1 197:1 198:1
198:14,24 199:1
199:15 200:1,13
200:16 201:1
202:1 203:1 204:1
205:1 206:1 207:1
208:1 209:1 210:1
211:5 212:3,5,18
212:21,23 213:4
**hirshman's** 19:23
26:18
**historical** 73:5
**historically**
116:24
**hit** 69:12 125:2
**hm** 36:5 41:2
57:19 66:15

153:22 158:17,20
159:4 207:8
**hold** 36:15,21,22
38:4,9,12,17 39:18
39:25 40:10 41:8
42:8 43:11,21
45:16 46:2,3,17
47:3,13,20 48:4,13
49:2,10,23,25 50:9
50:19 51:7,11,16
51:23 52:6 142:15
143:4 144:14,19
144:24 145:5,16
145:21 147:5
150:5,9,14 151:2
153:2,7,25 154:2,7
154:9,25 155:11
157:3 158:15
159:3,13,22 161:2
161:9,14 162:9,11
162:20 163:5,5
203:24
**holding** 16:9
**holdings** 16:9
**holds** 38:15
130:11 204:4
**honored** 23:13
24:2,5,10
**host** 32:18
**hosted** 33:24
**hosts** 32:18
**hour** 78:9,9
109:21
**houston** 201:14
**hub** 168:11 169:5
**humphries** 161:18
**hundreds** 139:23

**i**

**i.e.** 19:2 68:5
168:12

**idea** 39:4 127:8
**identical** 196:22
**identification** 5:25
6:22 7:14 10:14
11:10 13:16 17:23
20:4 26:12 58:17
84:6 92:8 151:7
155:21 165:11
167:8 179:3
183:19 189:17
194:10 200:14
**identifications**
98:11
**identified** 36:23
51:16 61:10 68:6
73:8,13 74:25
75:20 76:21 88:18
98:8 99:2 139:6
154:7 193:17
**identifies** 60:9
**identify** 15:22
19:4 25:22 29:11
34:2 67:4 70:13
74:9 77:10,13,18
77:23 123:11
127:7 156:24
175:23 185:18
193:9 205:25
**identifying** 185:12
188:19,25 189:5
189:10
**identities** 132:24
**ii** 191:21
**imagine** 44:3
**immediate** 82:18
85:4 88:3 103:6
103:16 155:11
180:2
**immediately** 5:9
22:16 36:13 54:14
79:22 105:13

**FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM**
INDEX NO. 451962/2016
NYSCEF DOC. NO. 185
RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 229 of 553   PageID 656

[immediately - interpretation]                                    Page 16

110:13 191:12
**impact** 104:18
**impacts** 90:25
**implications**
166:11 171:3
**important** 78:22
79:10
**imposed** 153:3,7
**impressions** 19:23
**inaccurate** 66:16
68:18 69:17 71:2
76:25 158:6
**incidentally**
138:13
**include** 29:4,24
31:21 76:15
104:24 169:14
177:4 183:25
**included** 30:4
31:14 53:5,16
70:22 105:2
106:15 184:4
209:23
**includes** 28:7
101:7,22 196:14
**including** 23:5
33:12,21 45:20
53:20 59:6 90:14
91:2,12 93:14
107:6 155:13
203:6 208:25
**incorporate** 111:2
111:8
**incorporated** 9:3
**incorporates**
100:25
**independent** 98:15
98:20 106:16
118:24 119:2
**independently**
107:4

**indicate** 63:25
66:20
**indicated** 54:2
57:23 65:7 66:12
82:18 85:3 152:24
**indicates** 63:21
154:20
**indicating** 9:22
67:21 87:19 125:4
**indication** 148:7
166:25
**indirect** 91:5
**individual** 25:25
125:16 155:15
163:25
**individuals** 25:9
25:16 26:13 27:5
27:8,19 31:23
34:20 36:23 39:22
40:7 44:18 45:8
49:2 50:14,18
51:3,16,23 52:5
63:5 74:10 75:20
76:11 77:13 98:12
158:22 160:15,21
161:6 175:23
178:4,13,20
**inevitably** 134:13
**inference** 76:5
**inform** 206:2
**information** 19:2
24:20,22 25:3,8,10
25:18 27:21 30:19
31:10,11,15 33:11
33:22 34:3,10,17
34:18 37:14,15,23
37:25 38:3,7,8,12
38:14,19,22 40:9
40:22 43:3 44:12
45:25 47:12 48:11
55:25 66:25 67:2

67:8 75:22 102:14
111:10 112:4
114:18 115:18
117:13 119:23
120:21 126:9,13
126:17,19 127:14
128:21 132:14
134:4,5,14 148:18
148:19 152:22
153:5 157:2,20
160:20 162:25
166:4,9 169:15,22
170:25 171:19
172:9 173:18,19
175:24 176:23
182:5 183:10,14
186:9 187:14,17
193:16 203:10
206:14
**informed** 81:16
94:6 95:12 96:2
172:9 209:13
**informing** 205:18
**infrastructure**
172:18
**initial** 49:22 51:6
72:3,4 130:22,23
164:5
**initially** 71:6,11
82:25 117:15
121:18
**initiated** 50:10
73:4
**inquire** 25:25
**inquired** 110:20
**inquiries** 17:5
25:9 27:4,8,20
147:16
**inserted** 68:11,14
**insofar** 187:13

**installing** 169:9,11
**instance** 89:8
114:4 125:15
**instances** 24:5
**institute** 36:21
**instituted** 152:25
**instruct** 100:13
**instructed** 45:24
47:11
**instruction** 51:6
52:9
**instructions** 52:15
52:17 114:13
115:20 117:4
**integration** 90:10
99:15
**intending** 3:9
193:5
**intent** 81:5
**intentionally**
68:14
**interact** 193:14
**interaction** 47:18
**interested** 100:4
214:13
**interesting** 135:24
136:21 140:9,23
**intermediate**
122:22
**internal** 23:10
132:10 168:6,14
170:18 184:22
193:9,21 194:2,4
196:20 197:5,14
**internally** 185:12
185:18 188:20
189:2,6,11
**international** 91:6
**interpretation**
107:22

**interview** 52:18
60:15,17 63:24
65:9 66:23 67:9
113:25 116:16
**interviewed** 60:5
61:11,17,24 62:10
62:16,23 63:4,7,22
64:4 65:5 66:18
148:22 149:7
**interviews** 52:8,10
60:11,23 61:4,7
75:2,7 76:23 77:9
77:17,23 116:9
148:15,17
**introduce** 58:12
**inverse** 161:11
**investigated**
143:13 162:18
**investigation** 1:3
37:2 72:23 73:2,4
81:7 82:4,15
87:19 88:17 116:4
117:2 120:23
129:6 135:10,16
191:8 193:22
194:2,5 196:20
197:5,15,24 198:3
205:7
**investigations**
23:10,16 187:11
195:15
**investigative**
82:19 85:4 88:3
103:7
**investor** 91:11
**involve** 49:9
128:17 181:2
**involved** 81:9
126:11 182:21
183:3

**involvement**
147:21 182:12,15
203:12
**involving** 50:3
**issuance** 12:12
36:15 48:4 49:9
49:22,25 65:15
150:2 176:10,17
209:19
**issue** 22:7 94:25
95:23 129:16
133:24 143:14
162:8 164:6 180:9
191:13 199:17
207:5 208:18
209:14
**issued** 45:15 64:23
80:17 114:12
115:20 154:2
**issues** 19:24 22:4,6
45:19 88:4 90:11
100:5,7,9 111:21
120:12 164:25
174:6,8 179:18,23
210:12
**issuing** 46:17
48:13
**item** 90:2,8,22
91:20 93:9 108:7
**items** 24:12 86:8
86:11 89:21,23
90:13 107:18
193:9,17 209:22
209:24
**iterations** 38:23

**j**

**j** 2:18 59:15
212:12,13,16,25
213:7
**jack** 203:3 212:10

**jamie** 1:13 214:4
214:22
**jane** 2:20
**jansen** 212:19
**january** 64:15
80:4,24 88:10
89:10,10 94:2,9
128:7,10 208:10
**john** 2:10 7:24
**joining** 169:9
**journal** 20:21
21:25 22:24
212:14
**jr** 212:10
**june** 82:17 84:22
85:2,22 87:4,13
89:4 96:23,25
97:9 102:22
201:17 212:17
213:14
**justice** 5:17,18

**k**

**k** 32:13
**key** 19:3,8,17
73:25 74:4,25
80:6 146:11 173:9
**kierstad** 32:11,15
32:17,22 33:4,8
**kierstad's** 33:11
33:20 34:11
**kind** 114:13
133:11 176:23
**kinds** 130:17
**knew** 37:25 67:2
67:14 77:4,6
81:10,11 128:8,11
129:5,6,23 130:5
135:22 140:3
143:15,18,20
**know** 6:6 9:20,25
10:19 11:15 12:20

13:20 15:2 18:3
20:8 22:3,4 24:4,9
32:18 33:9,10,17
34:7,13,15,19 37:5
38:2,6,16 39:12,15
39:16,19,20,21,23
40:2,3,6,11,14,18
42:2,9,14,21 43:5
43:12 44:4,7,8,10
44:17,19 47:17,25
48:3,8,15,18 49:21
50:5,6,24 51:8,13
51:20 52:2 54:10
57:8 58:21 61:16
63:3 64:7,8,15,17
65:18 66:24 67:3
71:14,20 72:3,8
76:6 78:2,6 81:9
82:13 84:10 85:15
88:18 89:22 92:12
98:4,6,12,13,16
100:8,24 101:6,21
102:3,9 105:14
106:11,16 107:9
107:16 114:6,21
116:2,2,23,23
118:13,17 119:15
119:17,19 120:8
120:10 123:9,19
123:23 124:3
125:12 126:6,10
126:10,12,16,21
127:3,11 128:20
128:24,25 129:7
129:16,22,24,25
130:13 131:12,18
132:4,5,7,16,17,19
133:21 134:10,20
135:8,8,11,11,13
136:10 137:21,23
137:24 139:25

**FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM**
NYSCEF DOC. NO. 185                                    RECEIVED NYSCEF: 06/02/2017
Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 231 of 553   PageID 658

INDEX NO. 451962/2016

142:18,23 143:6,7
144:2,6,17 147:4,7
147:10 149:21
150:18,23 151:11
153:6 156:2 160:4
160:9 161:15,17
163:7,11,21 164:7
164:13,14,17,21
165:15 166:22
167:3 168:14,17
172:8,11 174:3,11
174:13,16,21,24
174:25 175:6,13
176:5,6,9,14,15
177:8,9,16,17
178:4,13,19 179:7
181:11,17 182:14
182:18 183:2,7,8
183:12 185:21,22
191:24 200:6
202:22 203:21
204:18,20 206:6
208:3
**knowing**  67:19
106:4 118:16
**knowledge**  9:17
9:25 25:2,10 26:3
27:13,16 37:16
39:7 41:15,17
43:9 46:16 49:5
49:18 55:24 65:23
80:14 82:4,14
98:22 100:19
106:25 107:3
116:3,25 117:3
118:24 119:3
127:5 133:19,19
134:22 135:3,12
135:14 142:9
147:20 148:15
149:2,11 164:2,25

165:3 178:20
182:20,24 197:10
**knows**  45:4 154:3
198:24
**kyle**  190:25 192:6

**l**

**l**  3:2 122:12
131:21
**label**  140:5
**lack**  21:20
**ladies**  199:9
**lag**  150:23
**laid**  79:6,8 157:22
163:23 164:13
**language**  36:6
103:23 107:23
**large**  108:21
189:25
**late**  156:20
**lauck**  117:16,22
118:8,13 119:11
182:19
**lauck's**  119:4
**law**  5:4 12:10
17:13 20:20 21:25
22:24 24:19 26:14
36:19 45:20 60:16
60:22 75:5 154:2
185:6 203:3,23
204:6,6,12,14,20
204:23 212:14
**law's**  205:3
**lawyer**  120:11,16
**lawyer's**  120:17
**lawyers**  29:9
120:4,4,6,20 204:8
204:19
**lead**  12:17 185:9
193:13
**learned**  41:25
114:18 115:13

129:14,19 134:15
**leave**  78:10 159:9
203:16
**led**  203:3
**left**  63:7 65:16
125:2 160:13
161:12 184:8
190:18 194:19
203:13
**legal**  15:15 19:24
29:16,19,25 30:10
30:16,22 31:8
34:8 36:15,21,22
38:4 39:18,22,25
40:4,10,23 41:8
45:3,15 46:2,3,17
47:3,13,20 48:4,13
49:2,10,23,25 50:9
50:19 51:7,11,16
51:23 52:5 74:17
107:22 113:24
114:12 115:19
116:4 117:5
120:10 126:7
127:10 142:24
153:25 154:2,7
158:15 159:2,13
159:22 161:2,9,14
162:9,11,19
171:11 198:17
**legally**  210:18
**lem**  151:22 156:19
**lemuel**  152:4
207:18 212:21,23
**letter**  8:6,8 18:22
58:13 59:4,15
84:18,21,24,24
85:7,9,12,17,22
87:10 88:6 102:22
103:4,5,5,9,10
104:8,16,22 105:9

143:11 165:18,25
166:3,21 171:6,25
179:14,17 181:4
186:21 212:11,13
212:16,17,24
213:7
**letterhead**  165:19
**letters**  69:7 86:2
98:25 145:19
167:18 202:16
**level**  46:23
**levels**  204:10
**levy**  120:18
**liabilities**  82:22
103:12 104:2
**light**  182:3
**likelihood**  102:11
**limited**  33:12,21
90:15 91:2,12
93:15 168:8
**line**  15:13 18:21
78:5 169:18 170:2
191:6
**liner**  190:25 192:7
**lines**  76:14,16
**linked**  41:6
**list**  36:7 59:20
65:20 107:3 125:3
125:18 173:13
184:20 204:3
**listed**  60:13,18
71:23 109:10
116:10 209:22
**lists**  60:4 76:10
90:12 91:21 180:7
**litigation**  21:24
22:6 23:5 24:6,8
24:11 37:3 42:8
43:11,21 144:19
151:2 152:25
157:3 201:21

[litigation - mails]                                                          Page 19

202:4 203:7
204:25 205:5,9
**litigator** 23:2
**little** 5:15 80:16
206:19
**llp** 2:14 4:8 180:17
184:2 185:11,17
188:18,23,24
193:20,25 196:19
197:17 198:25
199:19,25 200:7
**llp's** 198:4
**locate** 114:15
126:25 178:6
**located** 33:14
67:16 77:20
**locating** 178:16
197:15
**location** 168:11
176:19,20,25
177:21 178:18
201:14
**locations** 53:19,25
57:21 66:11 67:3
123:11,14 168:9
177:5
**log** 170:8
**logo** 190:17
194:19 201:4
**long** 98:16
**look** 6:4,25 62:18
66:3 70:5 85:8,12
98:24 163:10,21
173:16 177:24
186:5 189:14
204:3 205:14
208:4
**looked** 207:7
209:18
**looking** 15:13 21:6
61:14 62:3,7,20

99:3 124:5 152:6
154:19 208:7
**looks** 20:22 156:8
156:11,12 190:4
**loss** 164:6
**lost** 183:4
**lot** 55:23
**lotus** 124:2,3,11
**low** 102:12
**lower** 195:20
206:18
**luettgen** 93:16
**lunch** 78:9 108:3
109:17
**luncheon** 109:22
110:2
**lynn** 212:6,8

**m**

**m** 3:2,2 4:1 5:1 6:1
7:1 8:1 9:1 10:1
11:1 12:1 13:1
14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1

74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1,21 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1 195:1

196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1 207:1
208:1 209:1 210:1
211:5
**mail** 41:5 92:25
94:15 97:21
113:12 114:15
115:23 121:17,25
122:15 123:5,12
123:14,16,19
124:9,18 128:19
128:23 131:17
132:12,13 133:6
136:3,8,25 139:5,6
140:4,8,16,20,21
142:11 143:16,19
143:22 145:16
150:16 151:25
152:9,13 153:11
153:17,18,19,23
154:19 156:9,13
156:20 207:17
208:2,9,15,24
212:19,20,22
**mailbox** 168:7,15
169:4 170:2,12,18
**mails** 42:7 43:10
53:17 71:13 92:18
114:11 117:9,14
117:23 118:8
121:9,12,14,15
125:4 126:2 127:7
131:15 133:12
135:8,14 136:16
137:10 141:13,17
141:24 142:14
143:14,24 144:7
150:15,25 151:21
156:10 163:6

[mails - monitor]                                                        Page 20

164:7 182:3 183:5
**maintain** 175:4
**maintained** 169:7
178:18
**making** 86:25
166:17
**management** 9:11
36:20 45:17 56:16
56:25 57:6,10,14
58:3 62:9,15
65:25 68:17 69:18
69:24 71:4,12,21
72:5,9 76:16,17
77:2,5,10,19,24
79:3,16 81:23
91:5 95:23 110:21
111:23 112:19
113:6,18 114:2
115:7,21 116:6,7
117:8,14,23 118:9
121:3,9,18 122:5
122:14 125:17
127:21 128:18,23
129:9 130:12,19
138:12 144:13
146:19 147:22
155:14 161:21
162:2 166:3
168:13,17 182:7
185:5 205:4 207:5
208:18 209:14
**managing** 81:20
81:21 82:9 83:11
88:12,17,21 89:11
91:16,22,25 93:13
95:15,22 96:3,19
97:2,8,23 98:5,9
98:18 99:11,14,21
99:24 100:23,25
101:7,22 102:10
105:23 106:7,9,13

106:19 107:11,13
108:9,10,12,25
109:8 204:24
205:19 207:4
209:4,15
**mandy** 2:11
**march** 9:15 61:11
61:19,24 62:10,16
65:16 111:6
116:12,17 150:5
**mark** 5:22 6:20
7:11 10:11 11:7
13:13 17:20 19:25
58:14 84:4 92:6
151:5 155:19
165:8 167:5
178:24 183:16
194:7 200:11
**marked** 5:25 6:5
6:22 7:14,18 8:22
10:14 11:10 13:16
13:20 17:23 18:3
20:4 52:21 58:17
59:9,19 84:6,10
92:8,11 151:7,10
155:21 165:11,14
167:14 179:3,6
183:19 184:7
189:15,17,24
194:10,13,24
195:4,19 200:14
200:18,23 202:10
206:5,7 207:10
**marks** 83:2 103:15
**marriage** 214:12
**match** 99:2 125:4
**material** 171:13
171:23 172:3,13
174:2,4
**materials** 121:23

**matter** 1:3 4:20
12:18,23 24:20
28:14 38:23 42:2
78:18 95:2 106:6
106:18,19 107:10
108:5 109:14
126:20 134:11
143:13 147:6
162:10 164:5
178:14,23 181:12
181:21 182:23
183:24 185:10
192:12 195:14
198:12 204:2
214:14
**matters** 14:15,16
25:2 82:15,20
103:23 104:7
197:23,25 201:21
202:4
**mean** 22:3 29:5,7
31:9 73:18 98:21
111:7 123:16
135:2,18 145:11
146:2 152:12
165:6 176:6 188:6
**means** 96:24 194:5
**meant** 31:11
**media** 87:6
**meet** 157:20
**meeting** 108:19
152:24 192:13
**meetings** 37:19
**members** 45:19
62:15 66:2 182:7
203:23
**memo** 187:8
194:23 201:6
**memorandum**
202:3

**mental** 19:23
**mentioned** 39:8,12
92:2 119:13,21
171:23 180:9
**mentions** 96:17
**messrs** 17:12
**met** 192:7
**metadata** 137:24
**michele** 1:10 4:4
154:22 207:23
212:5,21,23
**michelle** 152:24
**microsoft** 127:6
**middle** 22:11
152:3 190:2 208:7
**million** 138:24
139:9,20
**millions** 99:8
**mind** 94:23 140:24
**minute** 131:25
199:4
**minutes** 210:3
**misleading** 96:14
**missing** 187:13
**mm** 36:5 41:2
57:19 66:15
153:22 158:17,20
159:4 207:8
**mobil** 1:5 2:15
**mobile** 182:6
**mode** 169:11,19
169:20
**modifications**
70:15
**modified** 70:18
**moment** 163:20
**monica** 92:19,25
151:23 212:19
**monitor** 51:15,22
52:4

**FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM**

NYSCEF DOC. NO. 185

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 234 of 553   PageID 661

[monitoring - office]

Page 21

**monitoring** 52:13
**month** 81:15
88:10,11 89:12
94:5,8
**months** 64:19 79:9
80:17 97:24 98:14
141:16,23 150:13
150:15,19,24
**morning** 4:10,11
**move** 79:13 81:13
108:4
**moving** 28:11
109:20 110:24
**mpi** 166:4
**msg** 167:16
**multiple** 23:8
53:11
**mysites** 53:20

**n**

**n** 2:2 3:2 110:6,6,6
211:2
**name** 4:2 21:14
23:23 32:9 42:25
44:5,7 118:14,19
120:15,17 122:11
125:8 136:16
144:6 161:19,24
169:10
**named** 117:16,22
118:7 119:3,11
132:14 136:8
143:25 182:19
187:9
**names** 45:10 66:5
77:4,6,10,13
119:25 120:3,19
144:18 174:18
176:4,7
**native** 190:8
**nature** 171:18,18

**near** 22:12 80:6
167:16 180:13
**need** 9:6 27:24
50:14,17 77:12
168:12 169:7
**needed** 94:24
**network** 168:10
**networking**
176:13 178:17
**never** 20:17,25
21:7 28:9 63:7,22
66:18 94:23
119:10 125:10
165:2 205:7
**new** 1:12,13,14 2:4
2:8,8,17,17 4:9,9
5:11,14 20:20
21:24 22:24 35:11
58:12 78:5 81:16
87:3,5 88:12 94:6
95:13 108:4
187:21 188:4
191:6,17 195:23
207:6 214:6
**news** 192:11
**nine** 141:23
209:19
**non** 96:14 114:15
115:23 120:4,20
138:12 177:5
208:15,24
**nonresponsive**
166:8 170:25
171:14 172:3,14
174:2
**nonresponsiven...**
174:5
**nope** 154:18 158:7
**nora** 2:19
**notary** 1:14 3:3
9:22 10:9 214:5

**notation** 184:9
**note** 108:6
**noted** 24:10
210:25
**notes** 124:2,4,12
**notice** 46:3 47:6,7
47:14,20 158:15
**notices** 36:16,22
45:16 46:18 48:4
48:13 49:10,23
50:2,19 51:11,12
51:17,24 52:6
**notified** 94:8 96:5
96:9
**notify** 141:2
156:25
**notwithstanding**
116:14 187:18
**november** 4:16
11:23 28:18 35:12
45:15 49:23 64:24
73:14 128:7,9
150:3 152:5
153:21 156:14,16
187:22 191:16
192:10 203:18
209:10,18 212:20
212:22
**number** 16:23
91:21 106:8,15,18
107:6,18 108:8,17
109:12 147:4
167:19 190:11
192:3 194:14
200:19 204:19
209:22
**numbered** 105:12
**numbering** 207:12
**numbers** 59:11
80:15 105:18,20
106:5 107:7,15

142:7 168:4
172:24 184:17,20
**numeral** 192:3
**numerous** 61:9,21
62:2
**ny** 212:14
**nyag's** 193:15

**o**

**o** 110:6,6,6
**object** 134:2,18
181:9 198:8
**objecting** 26:10
**objection** 19:11,22
34:5 107:20
115:10 117:10,17
199:22 200:9
**objections** 3:18
**obligation** 81:5
140:25 141:3,9
**obligations** 15:15
18:23 50:20 51:2
51:10,17,24 52:6
**oblong** 189:25
**obtain** 27:21 115:7
121:20 210:16
**obtained** 26:3
37:18,22
**obtaining** 60:6
116:21
**obviously** 3:17
88:19 178:21
199:11
**occasionally** 22:4
**occurred** 49:19
95:16
**october** 187:10
**office** 1:11 2:5
3:18 19:4 31:3
35:11 37:20 59:24
73:8,13 79:8 81:7
94:25 95:24 96:11

[office - paragraph]                                                    Page 22

98:7 122:10
135:25 140:7
141:2 143:12
147:14 151:23
166:18 193:15
210:14,17
**office's** 4:16 98:11
188:12 197:19
**officials** 106:22
**oh** 58:11 138:15
**okay** 10:6 18:6
21:2 30:8 37:22
43:22 47:17 48:21
59:13 62:4,6 64:8
66:8 67:5 70:8
74:3 83:23 90:7
95:25 97:15 103:3
105:16 113:20
118:23 119:16
121:7 122:3
123:25 128:2
129:4,18 130:9
139:11 140:18
148:24 160:19
162:4 168:5 173:2
174:13 184:18
187:2 194:24
197:11,13 210:24
**oleske** 2:10 3:16
3:25 5:21 6:19
7:10 8:4,12 10:10
11:3,6 13:12
17:20 19:14,25
26:7,17,22 55:14
58:11 59:15 64:6
78:4,18 79:12,18
84:3 92:5 107:25
109:16 110:8
114:23 115:14,16
134:8,17 151:4
155:18 165:8

167:4 178:24
183:16 186:17
189:8,13 194:7
198:13 199:5,10
199:14 200:11
210:2,7,24 211:5
212:12,13,16,25
213:7
**once** 94:19
**ones** 75:25
**ongoing** 21:23
154:6 157:4,6
**open** 210:10
**operated** 42:13
**operates** 42:23
**operation** 43:7
**operations** 32:2
90:16
**opportunities** 91:3
91:4,6
**opportunity** 84:23
**opposed** 88:16
131:16
**opposing** 17:16
**order** 12:13 27:20
116:6 121:20
**organization**
23:22 148:16
**organizations** 23:9
146:25
**original** 70:19,21
71:2,22 72:11
88:19 169:13
**os** 169:9
**outcome** 214:13
**outlet** 87:7
**outlined** 105:5
106:5
**outlook** 91:12
124:4,12,14,21,22
124:24 125:18

126:25 131:14
**outlook's** 127:6
**outside** 30:2 67:8
180:15
**outsource** 204:24
**outstanding**
150:12
**overlapping**
159:18
**oversaw** 28:15
29:3,6,9
**oversee** 29:15
181:5 188:23
**overseeing** 29:4,14
29:24 30:18,22
31:7,22 34:23
114:25 180:25
181:3,15 183:23
183:25 184:4
204:15
**overseen** 184:22
198:21,22
**oversight** 29:23,23
30:3,11,15 31:14
31:15,21

**p**

**p** 2:2,2
**p.m.** 210:25
**page** 8:8,14,22
14:17 16:19 18:13
18:16 22:10,11
52:21,22 53:3
54:23 59:9,11,19
63:11 85:11,13
89:18,21 90:7
92:23 93:6 103:4
103:6 104:18
105:19 107:18
108:8 152:2,3
153:14 167:15,16
168:2,4,21,25

172:23,24 173:3,4
173:17 179:25
184:15,17,21
185:25 186:5,6,7
186:22 187:25,25
188:7,11 189:25
190:13,14,25
192:6,16,18,23,24
194:14,18,25,25
195:3,4,19,19,23
200:23,24,25
201:3 202:11,15
207:10,11,12,12
207:22,24,24
208:8 211:4 212:3
213:4
**pages** 8:21,21,23
80:6 82:8 99:8
138:25 139:9,20
139:23 173:18
187:24 213:10,12
213:14
**paper** 8:14
**paragraph** 9:7
12:7,8 14:23 15:3
15:7,9,11,12,14
16:6 17:2 18:21
19:18 24:17,17
28:11 35:3,5,8,18
35:21,23 36:10,14
36:18 37:4,8,13,17
38:5,13 40:25
41:3,9,10,11,21
42:19 45:12,14
46:4,5,8,12,19
47:10 48:6 49:11
49:24 50:4 52:20
52:23 53:4,7
54:12,15 56:21,23
57:5,18 66:6,9
67:24 68:13,18

**FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM**
NYSCEF DOC. NO. 185
INDEX NO. 451962/2016
RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 236 of 553   PageID 663

[paragraph - please]

69:10 70:10,20
71:14,23 72:14,16
72:20 75:15,17
76:6,9,20,25 79:20
79:22 80:3,11,13
81:14,25 82:3,6,12
82:16,24 83:4,5,5
83:8,17,19 84:25
85:13,15,18,20,25
88:7,22 89:3
91:17 93:7,19,22
93:25 94:4 95:11
96:17,22 102:15
102:20 103:4,10
103:16 104:25
105:3,13 108:8
110:11,14,19,24
111:20 112:7,13
152:19 155:9
157:11,16 158:11
158:14,19 165:24
169:23 179:25
180:4,13 184:20
202:20,21,23
206:13,24
**paragraphs** 48:17
48:19,22,23 49:8
49:13,15 50:2,12
54:20 55:3,8,12,16
55:17,21 56:12,14
57:7,12 69:14,22
87:10 112:24
**parenthetical**
81:21 104:13
185:5
**part** 8:6,10 15:12
27:17 28:14 29:8
32:2,5,7 52:7,9
71:15 74:8 83:16
99:15 100:6 111:9
116:20,25 117:24

118:9 132:4
135:19 136:6
151:25 153:24
180:24 192:13
**participated** 61:4
61:6
**particular** 21:21
27:23 28:6 45:2
47:2 53:18 54:9
65:21 126:13
146:17,17 210:11
**particulars** 55:20
**parties** 171:21
198:19 214:11
**partner** 5:4,6
21:15 24:18 192:7
**partners** 21:18
**parts** 15:11 46:6
**party** 68:8,20
175:9,25 176:18
177:21 178:6,18
**party's** 177:6
**pat** 92:20
**paul** 2:13 4:7 5:2,5
5:7 12:10,17,25
21:16,18 24:19
25:21,23 26:2,14
26:20 27:5 29:15
31:19 33:10,19
34:3 39:16 44:11
48:2 50:25 51:5
51:21 61:3,6 74:3
74:6,16 86:3
92:20 116:11,15
125:23 127:4
134:21 138:22
142:19 143:9
147:8,15 149:7,14
149:15,18,21
160:10 163:18
165:18 171:10,21

172:6,11 175:14
177:10,18 178:21
181:11,13 183:9
185:7 193:13
198:15 199:24
**penalty** 28:23
**pending** 36:25
195:15 199:11
**people** 25:22,25
27:12,24 31:18,19
37:18 40:19 61:23
73:19,22 98:8
120:2 123:16
147:11 148:12,25
160:6 163:4
164:21 178:21
206:17
**perform** 174:22
**performed** 90:17
169:8 170:3,8
**performing** 181:3
**period** 39:3 64:21
83:14 90:10,24
144:10 151:3
176:10
**perjury** 28:23
**person** 19:4 47:5
65:21 164:23
182:19
**person's** 130:24
**personal** 9:17,24
24:20,25 27:13,16
37:16 39:6 55:24
116:3,24 119:21
135:12,13 142:9
182:11
**personally** 50:13
50:16,22 51:14
65:22 126:23
163:12,15 175:11
181:5

**personnel** 27:15
**persons** 48:9
60:10,14 81:8
119:22 144:18
150:25
**perspective** 147:2
**pertinent** 36:25
**peter** 93:15
**phase** 78:17
**phone** 186:13
**phrases** 70:23,24
**physical** 91:3
92:23 93:6 152:2
190:14 194:18,25
195:3,19 200:22
**place** 86:23 94:3
157:2
**placed** 42:8
113:13 145:21
147:5 150:4,14
159:2 161:2,8,14
**placeholder** 190:3
**plainly** 15:23
**plan** 172:20
**planning** 45:22
90:17
**plans** 166:6,7
**platform** 32:19,25
33:14,24 69:16
70:3 113:10,14
122:2 127:24
**play** 74:21
**played** 26:13
197:18 198:11,25
**players** 19:3,8,17
146:11
**please** 4:2,5 6:3,24
7:16,19 10:16
11:14 13:14,18
17:25 20:6,12,13
24:14 36:11 41:24

[please - produced]                                                                Page 24

46:21 55:7 58:19
75:11 84:9 89:20
92:10 93:22
105:14 140:12
151:10 153:6
155:25 165:13
173:12 179:5
186:14 195:18
202:19,22 206:17
207:25
**pnyag** 213:8,9,11
213:13
**pnyag0038905**
190:11
**pnyag006161**
194:15
**pnyag01165508**
200:20
**pnyag0126718**
184:13
**point** 11:4 45:8
78:6 108:16 130:6
130:14 138:24
139:13 162:5
163:25 164:17,23
178:3,12 182:2
193:4,12,20
196:18,22 208:14
**pointing** 165:5
**points** 145:20
192:16,25 196:15
**portion** 20:14
75:12 103:5,9
187:6
**portions** 205:15
**possess** 36:24
**possessing** 98:12
**possibility** 67:10
67:13
**possible** 62:21
95:6 138:17

**possibly** 114:21
**potential** 22:23
75:3 101:8,25
182:2 183:5
**potentially** 70:13
121:21 152:23
153:4 154:4 155:4
210:10
**power** 94:17
**practice** 176:17
**practices** 205:4
**practicing** 17:13
**preceded** 72:16
**precedes** 196:5
**preceding** 5:9
36:13 52:22 54:14
79:22 110:13
**precise** 49:14
**precisely** 128:15
**prefer** 78:7 108:3
**preliminaries** 4:13
**preparation** 37:19
37:23 81:18 132:5
**prepared** 100:6
108:13 210:19
**present** 2:21 10:7
114:20
**preservation**
18:23 142:15
144:14 154:23
156:22 157:5,18
164:12 203:24
**preserve** 15:15
18:24 45:24 47:11
152:22 155:3
164:9
**preserved** 18:17
**preserving** 112:17
**president** 203:4
**pretty** 15:10
109:12

**prevent** 42:6
**prevents** 43:10,17
**previous** 91:24
143:16 178:15
**previously** 119:13
119:20 120:24
186:22 187:7
188:2,10
**primary** 184:23
209:5
**principals** 147:22
**prior** 5:16 37:23
41:15 44:24 52:21
53:4 61:18 62:10
62:16,23 64:24
65:9 69:25 80:24
81:4 89:8 94:9
106:3 114:2
116:12,17 133:13
135:5 138:4
142:20 147:13
148:22 158:23
164:5
**priorities** 73:9,13
79:25 82:19 83:15
85:4 86:5,10 87:2
87:15,23 88:4,22
88:25 103:7 207:6
**prioritize** 97:22
**priority** 81:17
88:12,14,15,16
93:9 94:6,8 95:13
96:2,11 205:20
206:2 209:16
**privilege** 3:11,20
19:12 26:5,11
27:2 34:6 100:15
107:21 115:11
117:11,18 134:3
181:9 198:8
199:23 200:10

210:12
**privileged** 100:20
102:13 119:7
**probably** 57:16
108:2 174:17
**proceeded** 73:6
82:5
**proceeding** 26:9
86:4
**proceedings** 214:9
**process** 32:3,5,7
36:20 46:17 47:8
47:21 48:13 50:3
50:9 56:13 62:25
68:7 69:4,5 79:2
112:17,22 115:5
116:20 117:24
118:10 121:11
123:12 126:11
130:18,22 132:17
157:6 158:15
159:15 160:8,16
162:24 182:16
193:9
**processes** 23:6
30:24 49:7 56:8
56:24 101:23
**produce** 74:13
81:8 94:19 95:5
141:4 209:23
**produced** 59:23
72:21 73:10 80:5
80:18,21 82:7
90:3 93:14 96:25
97:16,18 98:6
99:9 135:9,15
137:11,14,16,19
137:22,22,25
138:3,10,11,24
139:5,8,19,23
140:3 143:21

**[produced - reads]**                                                          Page 25

190:7 208:10
**producing**  80:25
94:22 96:2 98:18
112:18
**product**  3:12
19:13 26:6 34:6
**production**  28:16
29:3,6 52:24 57:3
79:3,24 83:10
86:21 88:8,15,24
96:18 97:7,14,22
97:25 98:19 137:2
137:7,8 166:2
205:19 209:16
212:9
**proficient**  124:17
**program**  38:24
39:8,11,13,18,25
40:11 41:5,16,19
42:5,10,16,20,23
43:8,10,17,20 44:2
44:13,21 47:4
123:19 124:9
141:15,25 150:7
150:20
**projections**  90:15
90:16
**projects**  108:20
**pronunciation**
21:13
**properties**  177:6,7
**proportionality**
157:22
**proposed**  70:11,15
**proprietary**
171:18
**prospective**
187:18
**protected**  26:4
**protection**  3:12
19:13 26:6 34:6

35:10 166:4
**protocol**  9:9 54:16
56:5,8 111:7,11
128:14,16
**provide**  32:15
38:25 133:23,25
148:17 174:18
175:4,9,16 176:2
**provided**  17:4
48:5,11 66:25
68:20 69:2 115:4
116:12 117:13
121:15 134:6
148:20 167:2
**provides**  83:6
**providing**  165:25
166:16
**provision**  47:5
**proviso**  210:7
**proxy**  101:2
**public**  1:14 3:4
9:22 35:16 45:20
86:11 87:11 91:11
192:11 214:5
**publications**  23:9
**publicly**  83:13
87:18
**purport**  20:19
**purports**  20:16
21:10
**purpose**  13:2
201:24
**pursuant**  50:3
**purview**  30:3,10
**put**  43:21 113:9
145:16 203:24
**putting**  21:19 22:7
22:22 27:14 96:23
131:13 175:3
197:13,25 206:8

**pwc**  184:9 190:17
190:21 192:6,7
194:20 201:4,14
213:10,12,14
**pwc's**  184:23
202:3

**q**

**q1**  195:14
**quarter**  168:24
**question**  3:15 6:14
12:5 20:13 28:2
29:22 30:9 33:15
42:17,21 49:14,20
56:20 61:20 62:5
70:7 73:16 75:11
78:3 94:10,23
95:8,9 102:6
112:15 114:24
115:12 118:5
125:20 126:14,15
127:9,12,13
131:19 134:9,12
134:18 137:4
139:16 143:5
148:2,5 161:3,10
161:16 162:15
173:23 174:20
178:9 198:10
199:11,15
**questioning**  78:5
**questions**  46:14
73:5 78:19,20
79:14 158:9
167:12 178:15
187:14 189:22
206:20
**quick**  4:25
**quotation**  103:15
**quotations**  16:13
**quote**  83:2 85:6,6
102:22 103:3,8,10

104:4
**quotes**  85:20
103:25 104:9

**r**

**r**  2:2 3:2 32:13
110:6 122:12,12
131:21 195:9
**raise**  67:10,13
**raised**  110:16
111:21 210:13
**ramona**  132:15,18
132:20,25
**randall**  184:24
**randy**  192:9
**range**  34:9
**rationale**  202:17
**read**  14:21 18:7
20:13,15 21:3,4
22:8 35:23,25
37:8 41:11,13
46:8,11 48:19
55:7,15 75:10,13
78:22 89:23,25
90:19 91:17
105:11,15,20
107:8,15 123:22
129:24 135:23
155:24 167:10
172:21 178:10
185:22 186:2,6,20
187:3,5 189:19
192:20 196:4
202:7,19,23,24
203:8 207:25
208:6
**reading**  10:4
20:24 54:16 79:23
100:22 105:18
136:2 165:3 186:7
**reads**  18:22 28:12
35:8 45:14 57:20

75:17 110:15
153:23 156:18
168:6 172:18
193:12
**ready** 210:5
**really** 135:3
**realm** 129:2
**reason** 4:21 17:6
133:11 154:15
**reasonable** 25:9
27:4,7,20
**reasonableness**
157:21
**reasonably** 36:23
37:2 54:3 57:23
66:13 156:24
**recall** 38:11 43:2
54:8 55:20,25
86:19,23 87:3
119:25 120:3,15
120:19 144:20
145:15,17,22,23
153:10 182:17
205:15,24 206:9
206:11,23 209:9
**recalls** 94:3
**receipt** 15:16 46:2
47:6,13 158:23
**receive** 13:2
**received** 35:9
51:23 52:5 90:20
91:18 191:16
**receives** 47:5
**receiving** 153:10
155:7,16 156:22
209:9
**recess** 11:5 78:15
109:22 110:3
199:13 210:6
**recipient** 125:9

**recipients** 51:11
**recitation** 121:6
**recite** 153:8
166:13 169:17
180:22 185:2,14
**recites** 70:24
**recognition** 85:10
**recognize** 7:19,22
10:19 11:17,19
13:23 14:2 18:5,8
20:10 58:23 59:2
63:17 66:4 84:12
84:15,17 92:14,16
92:24 118:14
151:13,18 156:4,6
165:16,18 179:9
179:12,13
**recognized** 23:8
24:11
**recollection** 85:16
98:7 99:5,6 100:2
105:22 107:12
109:7 114:8
129:25 136:12
177:2,3 182:9
**record** 4:3,6 8:13
20:15 75:13 78:14
78:21 79:2,10
108:17 186:14,16
199:6 206:22
210:8,19,21,23
214:8
**recover** 30:6
162:22,25
**recovered** 182:6
**recovering** 162:12
**recoverserver**
169:12,20
**recovery** 166:7
169:7 183:4

**redacted** 166:8
171:15 172:2,13
173:20,22
**redaction** 170:4,9
170:14,20 171:17
174:7
**redactions** 170:24
173:24 174:15,17
**refer** 24:16 52:21
75:14 85:11 86:20
89:14 93:22
104:11 175:19
185:24 195:18
207:4
**reference** 9:4
85:21 86:9 102:13
110:25 111:4
157:12,13 166:23
206:13
**referenced** 11:25
12:8
**references** 108:11
197:14
**referred** 6:13,15
9:12 19:7 86:4
**referring** 7:6 12:6
19:9,16,19 26:19
47:9 84:25 85:17
86:24 88:6 89:3,9
91:23 99:4 138:9
139:4 175:21
207:2
**refers** 42:19 89:4
185:23
**reflect** 8:13 79:2
79:10
**reflected** 112:4
143:22 144:21
**reflects** 112:12
**reframe** 115:12

**refresh** 99:4
105:21 114:7
**refreshed** 130:2
**refreshes** 85:15
109:7
**regard** 34:10
**regarding** 26:24
26:25 28:4 79:16
115:5 132:9
153:25 156:21
191:6 197:25
**regardless** 115:17
132:8 139:21
159:21 210:10
**regional** 168:11
**regularly** 50:13,20
50:25 51:10
124:18
**regulation** 99:16
101:10 102:2
**regulatory** 91:2
**reinstall** 169:13
**reiterate** 50:14,16
50:20
**reiterated** 51:2,10
52:9
**reiterating** 52:15
52:17
**relate** 56:25 106:6
109:13
**related** 14:15 38:4
39:4 44:14,22
46:19 49:24 90:11
104:19 112:13
160:2 174:5
192:11 197:23
203:10 205:19
214:11
**relates** 38:20 39:7
48:24 83:4 88:15
99:14 108:8,25

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

NYSCEF DOC. NO. 185

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 240 of 553   PageID 667

[relates - retained]

Page 27

110:19 188:11
**relating** 35:14
38:22 41:16 65:9
80:19 82:20 83:10
96:18 97:2,8,25
100:5,9 103:23
104:17 108:18
**relationship** 39:17
39:24 40:10
**relativity** 32:19
33:2,14,23
**relevance** 109:11
**relevant** 18:25
53:9,19 68:3
81:11 151:2 155:3
155:4 157:2,20
159:23 160:14
162:13,22
**relied** 25:22
**relying** 107:2
**remainder** 26:8
141:22 208:2
**remaining** 57:7
**remarking** 87:18
**remarks** 87:20
**remedial** 180:3
**remediation**
180:18
**remember** 23:23
87:7 101:4,12
144:5 155:7,16
162:24 176:22
205:21 206:3
207:3
**remembered**
129:23
**reopen** 3:21
**repeat** 12:4 33:15
42:17 161:3
**repeatedly** 144:19

**rephrase** 114:23
134:8,11,18
**report** 81:19 88:13
88:18 91:16,22,25
93:12 95:15 98:2
99:11,14,20,22,25
100:6,11,22,25
101:5,7,22 102:4,5
102:10 105:24
106:7,10,13,20
108:10,13 109:8
109:11,14
**reporter** 10:11
11:7 213:16
**reporting** 82:22
104:2,21
**reports** 91:11,13
91:15 209:4,6,15
**represent** 12:13
**representation**
14:10,14 30:4
111:9 185:8
202:16
**representations**
17:15 31:2 138:21
166:18
**represented** 204:9
205:8
**representing**
23:15
**request** 90:19 93:9
93:13 153:24
155:11 157:4
**requested** 20:14
75:12 193:10,16
**requesting** 145:24
**requests** 36:7 90:8
147:11,13 185:13
185:20,23 188:21
189:3,7,12

**research** 35:15
76:22 77:8,17
80:7
**reserves** 210:14
**resources** 164:9
**respect** 8:21 14:24
23:14 25:17,20
33:23 38:15 57:9
57:13 61:18 66:17
68:16 69:18 73:4
77:2 99:7 101:14
105:22 106:8
113:2,3,5,10 114:8
114:10 115:22
117:6 121:8 126:9
126:16 127:9,12
127:13 128:3
158:10 164:10
176:9 180:8
181:19 183:3
189:5 197:7,8
199:16,19 203:11
203:25 205:4
206:24
**respects** 37:6
112:22
**respond** 29:21
74:9
**responded** 30:20
81:24 206:12
**responding** 12:14
14:11 29:25 60:24
164:11 177:15,22
**response** 28:16
30:11 32:15 33:5
34:24 49:3 56:10
57:15 59:24 60:7
75:7 86:6 87:15
111:21 153:18,24
156:13,15,18,19
162:8,14 175:18

178:7 188:3,9,12
191:21 192:4
197:19
**responsibilities**
28:15 29:9 159:19
180:25 181:24
183:25
**responsibility**
31:22 74:15,20,23
171:11,12 181:14
**responsible** 30:17
30:22 31:7 34:22
**responsibly**
156:24
**responsive** 15:22
29:13 30:6 36:24
45:25 47:12 54:4
57:24 66:14 70:13
73:11,20,22 74:11
74:14 75:21 76:2
81:12 95:4 105:6
107:17 121:21
141:4 145:7,13
148:3,6,8 149:4,10
149:17 152:23
153:4 154:4
160:14 185:13,19
188:20 189:2,6,11
208:15
**responsiveness**
29:12 32:21
**rest** 8:15 16:5 57:2
129:12 186:21
**restrict** 26:18
**result** 3:22 101:9
107:2 150:11
**results** 125:3,19
**retain** 50:15
199:24
**retained** 12:11,25
158:25 159:14

[retained - search]                                                          Page 28

160:24 161:8,14
197:22 200:7
213:16
**retention** 182:21
**retrieve** 29:11
**return** 24:13 58:7
131:14 205:11
**returning** 56:20
66:6
**review** 7:17 9:6,10
10:17 11:14 13:5
13:19 15:6 18:2
20:7 29:11 33:2
48:17 54:16 56:5
56:8 58:20 61:13
69:15 70:2 74:7
74:12 76:23 77:9
77:18 84:9,24
85:14 89:20 92:11
98:10 99:18
100:23 113:10
122:2 127:23
132:21 133:2
151:10,16 156:2
165:14 179:6
198:11
**reviewed** 32:20
48:22 84:14 85:9
111:12 146:9
196:9,11
**reviewing** 6:9 7:7
7:21 10:21 11:18
13:25 15:5 18:6
20:11 48:21 58:25
84:13 85:19 89:24
92:15 105:17
112:18 151:14
156:5 165:17
179:11 186:11
187:2 196:8
202:24 208:5

**rex** 63:14 108:18
136:4,16 137:11
143:25 144:6
**richard** 187:9
195:8
**rifkind** 2:13 4:7
**right** 3:20 5:7 17:2
43:22 46:24,25
49:15 54:9 55:9
55:14 65:12 67:6
68:16 69:3 77:14
79:19 88:5 89:2
96:7 106:14
108:15 114:5
119:17 124:19
130:25 137:9
142:5 150:22
168:3 184:11,16
190:10 191:23
192:5 195:4,20
200:20 201:24
**rights** 210:15
**risk** 99:16 101:25
**risks** 81:20,22
82:9 83:11 88:12
88:18,21 89:11
91:3,3,5,16,22,25
93:13 95:15,22
96:3,19 97:3,8,23
98:5,9,19 99:11,14
99:22,24 100:24
100:25 101:7,22
102:10 105:23
106:7,10,13,20
107:11,14 108:10
108:13 109:2,8
205:19 207:4
209:4,15
**rivals** 204:6
**robert** 93:16
120:18

**rodman** 22:12,13
22:19
**role** 31:14 74:4,6
74:21 114:25
119:4 169:14
171:8 183:22
184:3 188:24
189:4,10 193:24
197:4,18 198:4,11
198:15,17,23
199:18
**roles** 26:12 169:8
198:22
**rolling** 68:2,21
**roman** 192:3
**room** 199:9
**rooms** 206:18
**rosenthal** 192:8
**run** 32:23 70:18

**s**

**s** 2:2 3:2 32:13
110:6,6,6 212:2
213:2
**safety** 45:22
**safeway** 22:12,14
22:19
**sake** 186:18
**salutation** 152:14
**san** 170:13
**saw** 20:25 107:4
166:21
**saying** 8:5 61:15
103:5,23 108:24
120:5 137:18
138:15,16,19
184:9 190:21
201:9
**says** 9:7 17:3
19:16 24:25 35:6
36:15 53:15,24
59:14 68:10,13

69:10 70:4 76:3
83:17 88:11 89:5
90:13 94:2,4
95:11 103:6
111:20 152:3
154:22 155:10
158:21 165:25
167:21 169:3
170:2,7,12,17
171:25 173:5,9,12
184:21 188:8,17
190:2,7,9,24
191:12,15 192:4,6
193:19,23 194:19
195:7,10 201:14
201:24 202:2,15
203:2 204:5,22
208:15,23
**scenario** 102:12
**scenarios** 91:7,8
**schneiderman** 2:6
**science** 80:8,20
81:3,10 88:9
89:10 94:20,22
**scientists** 45:18
**scope** 26:25 73:14
**screen** 125:2
**sean** 212:19
**search** 32:23
54:24 56:6,9 68:5
69:12,21 70:12
71:3,20 72:8
113:7,14,16,17
117:22 118:8
121:2 122:21,24
123:4,7,12 124:20
124:24 125:8,8,10
125:18 126:24
127:7,19 129:8,11
130:4,7,17,20
131:3,5,13,14

[search - sitting]                                                 Page 29

154:5
**searched** 53:25
57:21 66:10 126:2
131:16 133:7
141:13
**searches** 71:15
111:23 122:18,22
126:3 131:10
133:5
**sec** 191:7
**second** 15:13
18:20 36:3 60:3
67:18 92:23
122:22 152:19
165:24 179:24
190:13 194:18,25
195:3 200:22
203:20 208:14
**secondary** 132:12
140:8 142:11
**secretary's** 122:10
**section** 56:5 75:19
88:23 186:22
187:7 188:2,10,17
196:9,11,14,18
208:9
**sections** 56:4
**securities** 91:9
**security** 45:22
174:5,8,18
**sedona** 16:15
**see** 8:4 9:18,19
16:22 17:6 18:16
21:9 22:10,13,15
59:12 63:14,16
66:4 87:25,25
88:2 93:13,17,18
114:21 136:21
138:15,16,19
140:10 152:6
155:5,6 163:22

167:18,22,25
168:23 169:2,25
170:6,11,16,22
171:6 173:21
180:4 184:8
195:22 196:2
200:18,24 202:13
207:12,16 208:8
208:13,20,22
209:7
**seen** 20:17 21:7
132:6 166:22,24
**segment** 177:25
**send** 36:22
**sender** 125:9
**senior** 45:19 76:15
**sense** 30:13,16
68:18
**sensitivity** 128:17
**sent** 14:5,9,13
143:11,25 144:2,4
144:18
**sentence** 25:6 36:3
47:10 53:13,14,15
53:22,23 54:5,7
57:20 58:2 66:9
66:16 69:17 70:25
105:4 187:3 203:2
203:11 204:5,22
**separate** 39:5 44:5
67:6 69:5 100:19
117:19 162:10
166:2 207:6
**separated** 64:13
65:10 158:22
160:22 161:6
**separately** 158:25
160:24 161:13
**separation** 159:2
**sequence** 48:25
86:2 87:21

**series** 16:10 19:9
21:23 90:12 92:18
96:15 146:6
151:21 157:14
180:7 192:15,25
**served** 11:22
161:21 187:20
**server** 167:21
168:13,15,18
169:8,10,13,14,16
172:19 173:5
**servers** 168:7
169:4,5 170:2,13
170:18
**services** 32:14
174:19,23 175:5
175:10,17 176:2
**serving** 185:9
**set** 24:21 70:12
196:14 214:16
**sets** 79:24 88:24
**seven** 55:8
**shape** 189:25
**shared** 53:19,25
57:21 66:11
**shareholder**
108:19
**shareholders**
100:3
**sharepoint** 53:20
53:20
**shift** 83:19 84:2
87:23 88:21 89:4
89:9 96:22
**shifted** 82:10
83:18 86:25 87:15
89:5
**shifting** 83:7 86:5
86:9
**short** 108:21

**show** 5:22 6:19
7:11 125:3
**showed** 137:24
205:24
**sic** 63:24
**side** 8:14 145:25
146:3
**sidley** 184:2,5
185:10,17 188:18
188:23,24 189:5
189:10 193:20,25
196:18 197:4,17
197:21 198:4,11
198:25 199:18,24
200:7
**signature** 9:20
214:20
**signatures** 9:21
**signed** 14:5 35:24
37:10 41:12 46:9
179:15
**significant** 15:11
74:21
**similar** 44:24
159:18
**simple** 30:8
**simply** 122:16
**single** 131:13
**sit** 23:19 42:25
101:12 102:3,4
129:21 132:19
**site's** 168:11
**sites** 176:23
**sitting** 22:18 24:3
38:2,10 41:18
43:5 49:21 71:18
86:22 96:12 98:23
106:2,14 115:17
123:24 124:7
126:22 141:7,11
141:20 163:17,20

**FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM**
NYSCEF DOC. NO. 185
INDEX NO. 451962/2016
RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 243 of 553   PageID 670

[sitting - subpoena]                                                       Page 30

197:16
situation  146:17
  146:18
size  204:7
skip  202:9
slash  169:18
  179:15
small  57:9
smaller  153:5
software  44:6,9
solutions  172:19
  173:6
somebody  45:3
  181:13
son  182:21
soon  130:13
sorry  52:20 58:11
  102:19 178:10
  192:22 196:10
  206:16
sort  32:14
sorts  23:14
sought  35:14 36:4
  75:22
source  115:18
  134:4 164:24
  165:3
sources  53:12,16
  68:4 178:7 183:6
speak  17:7 27:24
  65:20 102:14
  164:20
speaking  31:25
speaks  22:3
special  168:12
specialists  17:7
specific  33:22
  35:21 38:3,11
  45:7 65:23 71:13
  78:19 79:15 86:23
  102:5 107:13

115:5 126:8,13,19
  127:12 147:3
  149:11 160:17
  171:13 174:20
  176:3,7 178:19,20
  204:18 205:14
specifically  14:21
  22:8 50:6 55:11
  82:20 85:5 87:8
  103:8,20 108:15
  121:8 127:2,11
  144:5 146:13
  164:14 178:15
specifics  34:10
  83:6 100:9 101:5
  125:25 132:8
  139:21 160:10
specifies  83:22
  142:4
specify  86:15
speculating  45:9
spell  32:12 122:11
spelled  131:21
spend  21:4
spoke  25:17 28:3
  30:25 116:5
  120:20
spoken  28:9 63:2
  165:2
srolovic  151:22
  152:4 153:19
  154:21 207:18
  212:21,23
srolovic's  156:13
ssh&e  45:23
staffing  181:11
stamp  184:12
stamped  167:24
standards  157:21
standing  101:13

stanton  1:13 214:4
  214:22
start  27:3 78:7
  142:8 167:11
  189:21
started  3:7 98:17
state  1:14 2:4 4:2
  4:5 5:11,14 15:20
  24:21 25:2 29:2
  36:4 68:2 157:17
  214:5
stated  25:7,11,13
  25:17 27:21 51:18
  86:13 188:22
statement  35:22
  95:10 145:3
statements  35:16
  86:12 87:11
  108:11,18
states  15:12 18:17
  24:18 25:7 36:18
  41:3 53:7 70:10
  72:20 76:9,20
  80:3 81:14 82:6
  82:16 93:8 105:9
  106:9 152:20
status  187:19
step  163:8
steps  142:13,17,19
  142:25 143:7
  146:15 147:3,9
  152:21 160:10,17
  162:6,16 163:2
  164:8 180:7
storage  168:7,15
  170:13,18 172:19
  173:5
store  169:6
stored  169:15
straight  167:13

stranded  101:9
strategic  45:21
  90:17
strike  64:6
string  129:15
strings  72:2
studied  80:8 81:2
study  80:19 81:9
subject  4:20 16:14
  26:23,23 41:7
  50:19 65:8 101:14
  101:18 106:6,18
  106:19 107:10
  108:5 109:14
  126:19 142:14
  144:13 178:14
  187:10 195:14
  201:20
subjects  144:7
submit  111:18
submitted  138:21
  179:19
subpoena  4:16
  11:21,25 12:7,12
  12:14 13:3 14:11
  14:16 15:17 28:17
  29:13,21 30:2,7,12
  30:20 32:16 33:5
  34:24 35:6,9,14
  36:4,8 45:25
  47:12 49:4 56:11
  57:15 59:24 60:7
  60:24 61:18 64:5
  64:10,12,23 65:6
  65:15 73:12,15,20
  73:23 74:8,9,11,14
  75:7,22 80:17
  81:12 86:6 87:16
  88:19 89:15 90:4
  90:20 91:18 92:2
  93:13 95:3,4

107:19,24 115:3
119:4 141:5
149:25 150:12
152:23 156:23
158:24 160:15
161:23 162:8,13
164:11 171:9
175:18 176:11,17
177:15,23 178:8
181:2,19 182:22
183:23 187:21
188:5,12 191:17
192:13 193:5,10
197:20 198:6
199:3,17,21 200:2
200:8 204:2,16
209:20 212:9
**subpoenas** 185:19
**subsequent** 50:2
**sufficient** 155:3
168:9
**suggest** 144:23
**suggestion** 94:15
94:18
**summarizes** 202:3
**summary** 104:25
191:13
**supervising** 171:9
**supplement** 7:4
10:24
**supplemental** 6:18
7:8 58:8 59:6
212:5
**suppliers** 173:9,14
**support** 168:10
193:21 196:19
**supported** 203:5
**supporting** 193:25
197:5,14
**sure** 8:2,12 9:24
12:6 14:22,25

15:10 25:19 29:8
33:17 38:8,20
40:15 48:20 58:5
58:24 101:20
102:8 106:24,24
123:18 129:17
130:15 151:14
161:4,4 163:17
178:11 186:10,20
186:24 187:16
196:7
**surprise** 204:21
**suspend** 134:24
**suspended** 41:5
133:13
**suspension** 47:23
**swear** 28:21
**swearing** 10:8
**sweep** 41:4,16,19
42:7,10,15,20,23
43:8,17,20 44:2,13
44:20 47:24
133:12 134:24
141:14,25 150:6
150:20
**sweeping** 150:7
**switch** 169:12
**swore** 6:8 9:14
10:2 24:23 25:12
28:20 111:13
**sworn** 3:3 7:4 12:2
111:14
**system** 41:8 46:24
121:23 132:11
150:17 176:13
177:14 178:17
**systems** 47:19
164:15,18,22

**t**

**t** 2:6 32:13 110:6
195:9 212:2 213:2
**table** 173:18
**take** 3:14 6:4 11:4
17:14 78:9 108:3
109:17,21 142:12
146:15,24 147:3
162:6,15 196:3
210:3
**taken** 3:22 11:5
78:15 94:3 109:23
110:3 113:13
143:8 152:21
154:24 160:10
199:13 210:6
**talked** 96:22
116:19
**talking** 8:16 55:10
75:24 88:7 120:16
137:14 180:5
**talks** 95:21
**targeting** 129:2
**task** 204:24
**team** 81:23 201:15
207:5 208:19
209:14
**teams** 95:23
**teamsites** 53:21
**technical** 43:7,13
133:11,23 134:23
179:18,23 180:9
**technologically**
124:17
**technology** 30:19
30:23 31:8,10,12
31:16 32:23 34:17
40:22 119:24
120:21 126:18
127:14 132:14

**tecum** 28:17
**ted** 2:22 84:18
185:8 193:13
207:23 210:22
**tell** 7:2,19 10:4
20:16 23:20 46:21
99:23 101:11
118:15 121:7
124:4 129:22
130:2,5 149:13
176:3,7 186:6,8
192:19
**telling** 112:7,9
140:6
**ten** 5:7
**term** 108:21
123:12 125:4
129:8,11 130:17
131:13 194:4
**terms** 32:23 54:25
56:6,9 68:5 69:12
69:21 70:12,16,18
70:19,21 71:2,11
71:20,23 72:4,8,11
113:7,14,16,17
121:2,17 127:19
128:20 130:4,7
131:3,5
**test** 135:24 136:21
137:3,6 140:10,23
**testified** 3:4 33:6
37:14 42:11 48:6
114:10 128:2,5
198:15,16,20
**testify** 3:8 4:15,19
8:20 99:6
**testifying** 31:5
206:23
**testimony** 3:22
4:22 48:12 57:11
91:24 106:3 115:4

[testimony - true]                                                    Page 32

119:20 136:18
140:11 205:16
210:17
**texas** 9:22 176:25
**text** 125:11 191:25
192:2 196:4
**thank** 46:14 79:17
109:16 186:25
196:13 206:20
**theirs** 160:2
**thereof** 21:20
**thing** 67:6,19
**things** 67:6 106:23
**think** 7:25 9:7
23:18 24:11 26:3
30:13 47:4 48:7
56:18 57:16 62:21
66:21 74:6,19
76:3,4 77:4 78:22
79:9 83:21 88:14
89:13 101:17
107:21,25 109:12
109:19,20 118:12
120:17 121:5
122:12 126:5
135:2,3 137:6
139:10,12 144:15
144:22 147:25
148:4,12 156:12
161:24 164:12
174:16 181:10
203:18,19 209:21
210:4
**thinking** 139:14
**third** 60:9 68:8,20
122:22 175:9,25
176:18 177:6,21
178:6,18 195:19
198:19
**thought** 136:20
137:6 207:3

**thousands** 139:23
**thread** 151:25
153:18 154:20
**three** 55:3 70:16
122:18 126:2
131:10 133:4
141:16
**thursday** 152:4
**tillerson** 63:15
64:3,13 65:3
66:17,19,23,24
67:7 136:4,7,24
137:11,20 138:4
138:14 140:5,7,17
140:20 142:12
144:9
**tillerson's** 108:18
137:15
**time** 3:15 10:3
12:12,24 13:6,10
20:23 21:4 24:9
25:4,14 27:10
49:6,18 64:21
65:10 71:17 83:14
86:23 87:13 90:9
90:20,23 94:4,14
96:4,10 97:20
108:2 116:17
123:20 124:10
128:8,11 129:24
130:6 133:13
135:21 136:19
139:4,8,19,22
140:2 141:12,14
142:10,20 144:10
145:20,21 149:25
150:23 153:13
154:12,14 158:3
158:25 159:13
161:22 162:5,17
176:10,16 186:21

196:3 197:3
198:24 199:18
203:19 204:14
206:11 210:20,25
**timeframe** 150:22
**timelines** 96:23
**times** 23:8 87:4,6
133:8
**timing** 205:17
**title** 88:23 118:15
118:17
**titles** 144:21
**toal** 2:18 3:6 6:14
7:24 8:9,10 19:11
19:21 20:12 21:11
21:17,22 22:5,25
23:4 25:20 26:16
26:21 34:4 55:12
59:4,15 75:10
100:12 107:20
114:16 115:9,15
117:10,17 134:2
134:10 165:19
179:16 181:8
198:7 199:4,7,22
200:3,9 210:22
212:25 213:7
**toal's** 22:23
**today** 4:22 22:18
24:4 38:10 41:18
43:6 44:15,22
49:21 50:5 71:18
96:13 98:23 99:6
100:21 106:2,14
107:5,9 124:7
126:22 129:21
166:21 197:10,16
**told** 123:10 192:19
**tool** 36:21 38:4,9
38:12,17 39:18,25
40:11 50:4 125:5

125:7
**top** 59:14 90:6
124:25 156:10
167:16 168:3
173:4 184:8,21
187:25 190:18
194:19 201:3
202:15
**topics** 109:9
**totaling** 80:5 82:8
**totally** 130:12
**trace** 160:12,18
**tracker** 38:22
132:12 133:6,12
134:25 135:8,14
136:8,11 138:14
139:6 140:6,9,21
141:12,23 142:14
143:10,16,19,22
162:25 163:7
164:7 182:3
**transaction** 170:7
**transactions**
180:16
**transcript** 214:7
**transferred** 113:9
159:16 160:6,23
**transient** 169:6
**transitioning** 39:3
**treatment** 73:5
**trelenbeg** 93:15
**trends** 91:13 209:2
**tried** 175:15
**true** 23:12 24:23
25:4,12,14 28:19
28:22 54:10 58:2
58:6 66:21 77:7,7
97:19 101:17
106:17 125:13
158:3 214:8

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

NYSCEF DOC. NO. 185

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 246 of 553   PageID 673

[truthful - way]

Page 33

**truthful** 4:23 111:15

**try** 3:12 163:4

**trying** 78:20 106:24 107:5 109:5,6 162:23 176:21

**tuesday** 156:16 212:15

**turn** 16:19 52:19 59:8 79:20 89:17 94:21 157:13 168:2,20 172:16 172:23 184:15 192:23 194:17 203:5

**turned** 173:2 192:18 209:24

**turning** 45:11 57:18 63:10 67:24 102:15 153:14 190:13 200:22

**twelve** 70:15

**two** 56:4,7 67:5 76:14 80:17 87:3 130:17 192:3 208:22

**type** 124:25 168:7 168:15

**typed** 125:16

**types** 38:25

**typically** 204:23

**u**

**u** 131:21 195:9

**u.s.** 91:9

**un** 194:24

**unable** 38:11 130:20 133:24

**unaware** 33:22 138:2

**underneath** 17:3 167:20 173:8 190:6 196:4 201:7 208:14

**understand** 4:14 4:18 19:21 38:21 46:24 71:10,25 99:20 122:4 174:7 196:25

**understanding** 8:18 33:4,8,20 37:7 40:17 42:12 43:16,23 50:8 56:22 60:25 61:2 62:24 63:9 64:3 72:24 73:3 74:17 83:25 97:5 99:24 113:21 121:11 131:23 133:3 146:21 150:21 159:7,11 160:25 169:21 170:23 171:5 185:16 205:3

**understood** 3:16 42:4 83:25 127:19 128:15,16 130:3,6 130:8 140:19 141:6 194:6 197:3

**underway** 157:7

**unfiltered** 68:4,19 68:24 113:13 121:25 122:16 123:5,6 127:23 128:13

**unique** 36:24 54:4 57:24 66:13 75:21 75:25 145:6,13 148:3,6,8 149:4,10 149:17

**unspecified** 119:22

**unsupported** 157:7

**update** 195:15

**upload** 128:12

**uploaded** 32:24 69:14,25 121:25 122:16 123:2,4,6 127:22 128:24 129:3

**uploading** 121:22

**upstream** 201:10

**use** 72:2 101:2 124:10,17,20,22 125:7,7,10 128:14 130:20 170:13

**users** 168:8,11

**uses** 36:19 44:6,9 101:24

**utilized** 41:19 162:21

**v**

**v** 22:12,13,19

**vague** 136:12 177:2,3

**validate** 180:18

**validation** 180:20

**valuation** 82:21,23 103:25 104:13,20

**variation** 57:9

**various** 45:19 59:5 76:16 98:25 121:16 146:8 185:13,23 187:13 188:21 189:3,7,12

**vendor** 32:2,4,6,8 32:10,17,22 68:9 68:21 113:9,18 121:22 122:17 131:4,6 180:19

**vendor's** 69:15 70:2 113:14 122:2 127:23

**vendors** 173:9,13 174:18,22 175:2,9 175:16 176:2

**vice** 203:4

**view** 31:13 141:3 149:20,20 210:9

**virtue** 30:15

**vol** 212:14

**volume** 110:21 206:19

**voluminous** 209:25

**volunteered** 67:8

**volunteering** 136:5

**voom** 16:9,12 157:12

**vulnerabilities** 126:23 127:5

**w**

**w** 122:12

**wagner** 92:19,25 151:23 212:19

**wagner's** 97:20

**wait** 12:4 118:3

**waiving** 3:10,18

**want** 78:17 94:21 94:25 127:18,24 128:3 135:6,10 174:9 179:23 186:2

**wanted** 209:23

**waste** 186:20

**way** 68:24 106:4 106:16 125:19 138:6 146:13 147:24 150:19 168:24 171:5

[way - zubulake's]                                                    Page 34

182:24 202:14
214:13
**wayne** 38:22
132:12 133:6,12
135:8 136:8,11
139:6 140:5,9,21
141:12,23 142:13
143:10,16,19,22
164:6 182:3
**ways** 74:24 122:23
129:7 149:13
**weiss** 2:13 4:7 5:2
5:5,7 12:10,18,25
21:16,18 24:19
25:21,23 26:2,14
26:20 27:5 29:15
31:19 33:10,19
34:3 39:16 44:11
48:2 50:25 51:5
51:21 61:3,6
74:16 86:3 92:20
116:11,15 125:24
127:4 134:21
138:22 142:19
143:10 147:8,15
149:7,14,22
160:11 163:18
165:18 171:21
172:6,11 175:14
177:10,18 178:22
181:13 183:9
185:7 193:13
198:16 199:24
**weiss's** 74:3,6
149:15,19 171:10
181:11
**welberry** 122:6,8
**welberry's** 121:20
**wells** 2:22 12:16
12:21,22 17:12
93:2 152:10,17

153:20 154:21
185:8 193:13
207:18 212:18
**went** 130:11
**wharton** 2:13 4:7
**whereof** 214:15
**white** 190:3
**wide** 208:17
**willing** 34:2
**windows** 172:19
173:5
**witness** 11:12
76:22 77:8,17,22
78:12,16 100:13
100:16 108:6
114:17 155:23
167:9 186:12
189:19 199:8
206:16 211:4
214:15
**woods** 132:13
**word** 68:11 73:17
103:12,19 124:25
131:13,16 142:6
194:22 201:6
**wording** 161:5
**words** 41:23 71:13
71:14 85:22 87:25
99:19 101:5 104:6
108:11 125:16
**work** 3:11 12:23
19:12 24:6,10
26:5 34:6 40:19
148:13 159:24
204:15
**worked** 31:18,20
119:23 146:4
**working** 29:10
45:18 178:22
**works** 34:16
109:18 118:17

150:20
**worldwide** 204:8
**worth** 141:16,23
**wrap** 210:5
**write** 15:9 19:5
21:22 37:4 41:9
41:10 46:4,5
49:16,17 53:13,14
53:22,23 54:5
55:17 80:11 81:25
82:12,24,25
106:22 154:10
157:9 159:5,6
**writing** 156:19
**wrote** 15:10,18,25
17:9,11,18 28:19
35:18 37:5 80:12
82:2 157:24 158:3
**wsss** 173:14

| x |
| --- |

**x** 1:2,6 211:2
212:2 213:2

| y |
| --- |

**y** 122:12
**yeah** 100:16 128:6
**year** 61:19,25
64:24 65:6 69:8
70:22 71:3 116:12
116:18 143:17
**years** 5:7,11,15,19
17:14 108:14
146:5
**york** 1:12,13,14
2:4,8,8,17,17 4:9,9
5:11,14 20:20
21:25 22:24 35:11
87:3,6 187:21
188:4 191:7,17
195:23 214:6

| z |
| --- |

**zubulake** 16:10,13
19:9 146:6 157:13
**zubulake's** 16:13

# Exhibit 17

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064

TELEPHONE (212) 373-3000

LLOYD K. GARRISON (1946-1991)
RANDOLPH E. PAUL (1946-1956)
SIMON H. RIFKIND (1950-1995)
LOUIS S. WEISS (1927-1950)
JOHN F. WHARTON (1927-1977)

WRITER'S DIRECT DIAL NUMBER
212-373-3869

WRITER'S DIRECT FACSIMILE
212-492-0868

WRITER'S DIRECT E-MAIL ADDRESS
dtoal@paulweiss.com

UNIT 3601, OFFICE TOWER A, BEIJING FORTUNE PLAZA
NO. 7 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT
BEIJING 100020
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300

12TH FLOOR, HONG KONG CLUB BUILDING
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, U.K.
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

MATTHEW W. ABBOTT
EDWARD T. ACKERMAN
JACOB A. ADLERSTEIN
ALLAN J. ARFFA
ROBERT A. ATKINS
DAVID J. BALL
SCOTT A. BARSHAY
JOHN F. BAUGHMAN
J. STEVEN BAUGHMAN
LYNN B. BAYARD
CRAIG A. BENSON
MITCHELL L. BERG
MARK S. BERGMAN
DAVID M. BERNICK
JOSEPH J. BIAL
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
ANGELO BONVINO
JAMES L. BROCHIN
DAVID W. BROWN
SUSANNA M. BUERGEL
PATRICK S. CAMPBELL*
JESSICA S. CAREY
JEANETTE K. CHAN
GEOFFREY R. CHEPIGA
ELLEN N. CHING
WILLIAM A. CLAREMAN
LEWIS R. CLAYTON
JAY COHEN
KELLEY A. CORNISH
CHRISTOPHER J. CUMMINGS
CHARLES E. DAVIDOW
THOMAS V. DE LA BASTIDE III
ARIEL J. DECKELBAUM
ALICE BELISLE EATON
ANDREW J. EHRLICH
GREGORY A. EZRING
LESLIE GORDON FAGEN
ROSS A. FIELDSTON
BRAD J. FINKELSTEIN
BRIAN P. FINNEGAN
ROBERTO FINZI
PETER E. FISCH
ROBERT C. FLEDER
MARTIN FLUMENBAUM
ANDREW J. FOLEY
ANDREW J. FORMAN*
HARRIS B. FREIDUS
MANUEL S. FREY
ANDREW L. GAINES
KENNETH A. GALLO
MICHAEL E. GERTZMAN
ADAM M. GIVERTZ
SALVATORE GOGLIORMELLA
NEIL GOLDMAN
ROBERTO J. GONZALEZ*
CATHERINE L. GOODALL
ERIC GOODISON
CHARLES H. GOOGE, JR.
ANDREW G. GORDON
UDI GROFMAN
NICHOLAS GROOMBRIDGE
BRUCE A. GUTENPLAN
ALAN S. HALPERIN
JUSTIN G. HAMILL
CLAUDIA HAMMERMAN
BRIAN S. HERMANN
MICHELE HIRSHMAN
MICHAEL S. HONG
DAVID S. HUNTINGTON
AMRAN HUSSEIN
LORETTA A. IPPOLITO
JAREN JANGHORBANI
BRIAN M. JANSON
JEH C. JOHNSON
MEREDITH J. KANE

ROBERTA A. KAPLAN
BRAD S. KARP
PATRICK N. KARSNITZ
JOHN C. KENNEDY
BRIAN KIM
DAVID M. KLEIN
ALAN W. KORNBERG
DANIEL J. KRAMER
DAVID K. LAKHDHIR
STEPHEN P. LAMB*
JOHN E. LANGE
GREGORY F. LAUFER
BRIAN C. LAVIN
DANIEL J. LEFFELL
XIAOYU GREG LIU
JEFFREY D. MARELL
MARCO V. MASOTTI
EDWIN S. MAYNARD
DAVID W. MAYO
ELIZABETH R. McCOLM
MARK F. MENDELSOHN
CLAUDINE MEREDITH-GOUJON
WILLIAM B. MICHAEL
JUDIE NG SHORTELL*
CATHERINE NYARADY
JANE B. O'BRIEN
ALEX YOUNG H. OH
BRAD R. OKUN
KELLEY D. PARKER
VALERIE E. RADWANER
CARL L. REISNER
LORIN L. REISNER
WALTER G. RICCIARDI
WALTER RIEMAN
RICHARD A. ROSEN
ANDREW N. ROSENBERG
JACQUELINE P. RUBIN
CHARLES F. "RICK" RULE*
RAPHAEL M. RUSSO
ELIZABETH M. SACKSTEDER
JEFFREY D. SAFERSTEIN
JEFFREY B. SAMUELS
DALE M. SARRO
TERRY E. SCHIMEK
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JOHN M. SCOTT
STEPHEN J. SHIMSHAK
DAVID R. SICULAR
MOSES SILVERMAN
STEVEN SIMKIN
JOSEPH J. SIMONS
AUDRA J. SOLOWAY
SCOTT M. SONTAG
TARUN M. STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
RICHARD C. TARLOWE
MONICA K. THURMOND
DANIEL J. TOAL
LIZA M. VELAZQUEZ
LAWRENCE G. WEE
THEODORE V. WELLS, JR.
STEVEN J. WILLIAMS
LAWRENCE I. WITDORCHIC
MARK B. WLAZLO
JULIA MASON WOOD
JENNIFER H. WU
BETTY YAP*
JORDAN E. YARETT
KAYE N. YOSHINO
TONG YU
TRACEY A. ZACCONE
TAURIE M. ZEITZER
T. ROBERT ZOCHOWSKI, JR.

*NOT ADMITTED TO THE NEW YORK BAR

May 3, 2017

*Via Email*

John Oleske, Esq.
Senior Enforcement Counsel
Office of the Attorney General
State of New York
120 Broadway, 26th Floor
New York, NY 10271

> Re:     In the Matter of the Application of the People of the State of New York,
>             by Eric T. Schneiderman, Index No. 451962/2016.

Dear John:

        We write in response to the testimonial subpoena that your office issued to ExxonMobil on April 19, 2017 (the "Testimonial Subpoena") in connection with the Attorney General's November 4, 2015 subpoena (the "Subpoena"). The Testimonial Subpoena identifies three topics for testimony, all of which are most appropriately and efficiently addressed in writing. We discuss each topic below.

        *First*, the Testimonial Subpoena asks for (a) dates concerning, and (b) the identity of persons involved with, various aspects of the discovery process, including litigation hold notices, custodial interviews, and document collection and review. We enclose three exhibits that respond to this request. Exhibit A lists the issuing dates of, and the persons responsible for instituting, each litigation hold notice.[1] Exhibit B lists the dates of, and the persons responsible for conducting, each custodial interview.[2] Exhibit C lists the document collection dates for each

---

[1]    The Attorney General improperly demands information regarding the "content" of each litigation hold notice. This information is protected by the work product doctrine and attorney-client privilege. *See, e.g., Capitano* v. *Ford Motor Co.*, 831 N.Y.S.2d 687, 688 (Sup. Ct. 2007).

[2]    The Attorney General is not entitled to testimony regarding the "content" of each custodial interview conducted by ExxonMobil's Law Department. This information reflects the mental impressions of counsel, which are protected by the work product doctrine and attorney-client privilege. *See Smith* v. *City of New York*, 854

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 250 of 553   PageID 677
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

John Oleske, Esq.                                                                              2

custodian, the persons responsible for each document collection, and the methods used to collect and review each custodian's potentially responsive documents.[3]

*Second*, the Testimonial Subpoena requests information regarding ExxonMobil's compliance with five "Instructions" included with the Subpoena.  But, for the reasons already explained in our letters of April 19 and 27, 2017, we disagree with your contention that ExxonMobil is required to comply with any of these supposed Instructions.  As you know, Justice Ostrager has never endorsed these Instructions or otherwise required ExxonMobil to abide by them.  Nor are we aware of any authority supporting the right of the Attorney General unilaterally to impose such Instructions.  Nevertheless, as we explained to your office previously, the Affirmation of Michele Hirshman sufficiently addresses Instruction 3 ("Documents No Longer in Your Possession"), Instruction 4 ("No Documents Responsive to Subpoena Requests"), and Instruction 12 ("Affidavit of Compliance").[4]  Instruction 10 ("Your Production Instructions to be Produced"), however, is improper.  As we noted in our letter of April 19, 2017, it seeks information protected by the work product doctrine and attorney-client privilege.  Finally, with respect to Instruction 13 ("Identification of Persons Preparing Production"), the Attorney General inaccurately contends that ExxonMobil is required to provide the names of "all natural persons who prepared or assembled any productions or responses" to the Subpoena.  No case so holds.[5]

*Third*, the Testimonial Subpoena demands information related to "Exxon's collection, preservation, review and production of Documents and Communications of reserves custodians," specifically William Strawbridge and members of various ExxonMobil reserves-related committees.  Because we adequately addressed this demand in our letter of April 27, 2017, we do not address it here.

                                    *       *       *

---

N.Y.S.2d 44, 45 (1st Dep't 2008); *Corcoran* v. *Peat, Marwick, Mitchell & Co.*, 542 N.Y.S.2d 642, 643 (1st Dep't 1989); *Rossi* v. *Blue Cross & Blue Shield*, 528 N.Y.S 2d 51, 53 (1st Dep't 1988).

[3]  The Attorney General improperly requests testimony regarding the methods used to identify and recover allegedly "lost" files.  No further testimony on this topic is required.  Just last week, the Attorney General conducted a full-day examination of a senior member of ExxonMobil's Information Technology Department on this very topic.  Indeed, the examination itself was cumulative of information already provided in the deponent's affidavit, and in correspondence to the Court dated March 21, 2017.

[4]  *See* April 19, 2017 Letter from D. Toal to J. Oleske (explaining that the Connie Lynn Feinstein Affidavit, attached to the Affirmation of Michele Hirshman, satisfies Instruction 3 because it explains the issue relating to the Wayne Tracker email account and the steps ExxonMobil took to remediate these issues); *see id.* ("ExxonMobil has produced documents responsive to each of the Attorney General's [S]ubpoena requests," rendering Instruction 4 inapplicable); *see id.* (Because "Ms. Hirshman oversaw the production of documents in response to" the Subpoena, ExxonMobil has "complied in good faith with" Instruction 12.)

[5]  Equally meritless is the Attorney General's request for testimony regarding the attestations mentioned in ¶¶ 5, 8, and 9 of the "Affidavit of Compliance" template attached to the Subpoena.  Paragraphs 8 and 9 are coextensive with Instructions 13 and 4, respectively, and therefore do not need to be addressed separately by testimony or in writing.  Paragraph 5 seeks an attestation confirming that those documents withheld from production are privileged.  The Affirmation of Michele Hirshman, and the supplement to her Affirmation that we enclose here as Exhibit D, make this very point.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

John Oleske, Esq.                                                                                                 3

        As requested, we enclose as Exhibit D a supplement to the Affirmation of Michele Hirshman. It addresses the data processing errors that we previously brought to your office's attention on April 12 and 24, 2017.

        If—after reviewing the information provided in this letter and the enclosed exhibits—the Attorney General seeks further testimony, Michele Hirshman will appear for a deposition on May 10, 2017 (barring any unforeseen circumstance preventing her attendance).

        Sincerely,

        */s/ Daniel J. Toal*
        Daniel J. Toal

cc:  Manisha Sheth, Esq.     Mandy DeRoche, Esq.     Theodore V. Wells, Jr., Esq.
      Katherine Milgram, Esq.   Patrick Conlon, Esq.      Michele Hirshman, Esq.

**Exhibit A**
**Letter from D. Toal to J. Oleske**
**May 3, 2017**

| Custodian | Litigation Hold Notice Date | Implemented By |
|---|---|---|
| Albers, Mark | 11.6.2015 | ExxonMobil Law Department |
| Albrecht, Robert | 12.8.2016 | ExxonMobil Law Department |
| Allexon, Kevin | 11.6.2015 | ExxonMobil Law Department |
| Anderson, Heather | 7.11.2016 | ExxonMobil Law Department |
| Arslan, Haydar | 11.6.2015 | ExxonMobil Law Department |
| Bagley, Donald | 8.1.2016 | ExxonMobil Law Department |
| Bailes, Robert | 11.6.2015 | ExxonMobil Law Department |
| Bailey, David | 11.6.2015 | ExxonMobil Law Department |
| Bannister, Kirsten | 7.11.2016 | ExxonMobil Law Department |
| Beard, Robert | 11.6.2015 | ExxonMobil Law Department |
| Becker, David | 7.11.2016 | ExxonMobil Law Department |
| Becker, Roger (Rocky) | 3.23.2017 | ExxonMobil Law Department |
| Berek, Eugene | 11.6.2015 | ExxonMobil Law Department |
| Bergeron, David | 11.6.2015 | ExxonMobil Law Department |
| Boudreaux, Mark | 11.6.2015 | ExxonMobil Law Department |
| Brown, Michael | 3.23.2017 | ExxonMobil Law Department |
| Buchholtz, Walter | 11.6.2015 | ExxonMobil Law Department |
| Burner, Kathleen (Kathi) | 3.23.2017 | ExxonMobil Law Department |
| Champine, Arthur | 7.11.2016 | ExxonMobil Law Department |
| Chatham, Theresa | 3.23.2017 | ExxonMobil Law Department |
| Climo, Amy | 11.6.2015 | ExxonMobil Law Department |

**Exhibit A**
**Letter from D. Toal to J. Oleske**
**May 3, 2017**

| Custodian | Litigation Hold Notice Date | Implemented By |
|---|---|---|
| Cochrane, David | 12.13.2016 | ExxonMobil Law Department |
| Cohen, Kenneth | 11.6.2015 | ExxonMobil Law Department |
| Colton, William | 11.6.2015 | ExxonMobil Law Department |
| Cook, Michael | 11.6.2015 | ExxonMobil Law Department |
| Cooney, Philip | 11.6.2015 | ExxonMobil Law Department |
| Copeskey, Jeffrey | 11.6.2015 | ExxonMobil Law Department |
| Copley, G. Bruce | 11.6.2015 | ExxonMobil Law Department |
| Dashwood, John | 11.6.2015 | ExxonMobil Law Department |
| Davidson, Carolyn | 7.11.2016 | ExxonMobil Law Department |
| Deal, Michael | 7.15.2016 | ExxonMobil Law Department |
| Devlin, Dennis | 11.6.2015 | ExxonMobil Law Department |
| Dickerson, Steven | 7.11.2016 | ExxonMobil Law Department |
| Dolan, Michael | 11.6.2015 | ExxonMobil Law Department |
| DuCharme, Richard | 7.11.2016 | ExxonMobil Law Department |
| Edwards, Brant | 8.1.2016 | ExxonMobil Law Department |
| Eizember, Thomas | 11.6.2015 | ExxonMobil Law Department |
| Ellsworth, John | 7.11.2016 | ExxonMobil Law Department |
| Elvert, Robert | 11.6.2015 | ExxonMobil Law Department |
| Esenkov, Oleg | 11.6.2015 | ExxonMobil Law Department |
| Fancher, James | 7.27.2016 | ExxonMobil Law Department |
| Feeley, Jennifer | 11.6.2015 | ExxonMobil Law Department |

**Exhibit A**
**Letter from D. Toal to J. Oleske**
**May 3, 2017**

| Custodian | Litigation Hold Notice Date | Implemented By |
|---|---|---|
| Fisk, Norma | 8.23.2016 | ExxonMobil Law Department |
| Flannery, Brian | 11.6.2015 | ExxonMobil Law Department |
| Foss, Kimberly | 3.23.2017 | ExxonMobil Law Department |
| Franklin, Robert | 3.1.2016 | ExxonMobil Law Department |
| Frederick, Kenneth | 7.11.2016 | ExxonMobil Law Department |
| Gadgil, Abhijit | 8.1.2016 | ExxonMobil Law Department |
| Genetti, Dominic | 7.15.2016 | ExxonMobil Law Department |
| Glennon, John | 11.6.2015 | ExxonMobil Law Department |
| Gober, Nancy | 3.15.2017 | ExxonMobil Law Department |
| Gobush, Matthew | 11.6.2015 | ExxonMobil Law Department |
| Granquist, Mark | 12.13.2016 | ExxonMobil Law Department |
| Hamid, Taher | 7.15.2016 | ExxonMobil Law Department |
| Hay, Elizabeth | 7.11.2016 | ExxonMobil Law Department |
| Hochhalter, Theresa | 11.6.2015 | ExxonMobil Law Department |
| Holguin, Margo | 11.6.2015 | ExxonMobil Law Department |
| Hollingsworth, Timothy | 8.29.2016 | ExxonMobil Law Department |
| Horne, Joseph | 11.6.2015 | ExxonMobil Law Department |
| Hudson, Elizabeth | 3.23.2017 | ExxonMobil Law Department |
| Hughes, Mary | 3.15.2017 | ExxonMobil Law Department |
| Humphreys, Donald | 3.23.2017 | ExxonMobil Law Department |
| Iwanika, Jason | 10.17.2016 | ExxonMobil Law Department |

**Exhibit A**
**Letter from D. Toal to J. Oleske**
**May 3, 2017**

| Custodian | Litigation Hold Notice Date | Implemented By |
|---|---|---|
| Janse, Robin | 3.23.2017 | ExxonMobil Law Department |
| Jeffers, Alan | 11.6.2015 | ExxonMobil Law Department |
| Keil, Richard | 11.6.2015 | ExxonMobil Law Department |
| Kemp, Simon | 7.15.2016 | ExxonMobil Law Department |
| Kerby, Michael | 11.6.2015 | ExxonMobil Law Department |
| Kerr, Lauren | 11.6.2015 | ExxonMobil Law Department |
| Kheshgi, Haroon | 11.6.2015 | ExxonMobil Law Department |
| Kite, Robert | 11.6.2015 | ExxonMobil Law Department |
| Klekar, Chad | 11.6.2015 | ExxonMobil Law Department |
| Kominas, Charles | 7.11.2016 | ExxonMobil Law Department |
| Krishna, Paul | 11.6.2015 | ExxonMobil Law Department |
| Lachenmyer, Lynne | 11.6.2015 | ExxonMobil Law Department |
| Landuyt, William | 11.6.2015 | ExxonMobil Law Department |
| Lewis, Robert Jeffrey | 11.6.2015 | ExxonMobil Law Department |
| Ligh, David | 11.6.2015 | ExxonMobil Law Department |
| Linderman, John | 8.1.2016 | ExxonMobil Law Department |
| Lokken, Roald | 11.6.2015 | ExxonMobil Law Department |
| Luettgen, Robert | 11.6.2015 | ExxonMobil Law Department |
| Luxbacher, Roberta | 10.17.2016 | ExxonMobil Law Department |
| Matturro, Michael | 11.6.2015 | ExxonMobil Law Department |
| McCarron, Suzanne | 11.6.2015 | ExxonMobil Law Department |

**Exhibit A**
**Letter from D. Toal to J. Oleske**
**May 3, 2017**

| Custodian | Litigation Hold Notice Date | Implemented By |
|---|---|---|
| McKee, Karen | 3.23.2017 | ExxonMobil Law Department |
| Mignone, Bryan | 11.6.2015 | ExxonMobil Law Department |
| Mire, Richard | 11.6.2015 | ExxonMobil Law Department |
| Mizan, Tahmid | 11.6.2015 | ExxonMobil Law Department |
| Monahan, Tom | 11.6.2015 | ExxonMobil Law Department |
| Murphy, Kevin | 11.6.2015 | ExxonMobil Law Department |
| Mut, Alan | 10.17.2016 | ExxonMobil Law Department |
| Nelson, Ralph (Dan) | 3.1.2016 | ExxonMobil Law Department |
| Noecker, Fredrick | 7.6.2016 | ExxonMobil Law Department |
| Norman, John | 11.6.2015 | ExxonMobil Law Department |
| Norwood, David | 8.1.2016 | ExxonMobil Law Department |
| Onderdonk, Todd | 11.6.2015 | ExxonMobil Law Department |
| O'Neill, Marguerite (Meg) | 11.6.2015 | ExxonMobil Law Department |
| Perkins, Franklin (Terry) | 11.17.2016 | ExxonMobil Law Department |
| Perkins, Samuel | 8.1.2016 | ExxonMobil Law Department |
| Powell, Guy | 11.6.2015 | ExxonMobil Law Department |
| Rau, Charles | 11.6.2015 | ExxonMobil Law Department |
| Raymond, Lee[1] | *n/a* | ExxonMobil Law Department |
| Reep, Brien | 11.6.2015 | ExxonMobil Law Department |

---

[1]   Mr. Raymond separated from ExxonMobil before the Atlas e-Discovery Management legal hold tool ("Atlas") was in place. He therefore could not be placed on hold through Atlas. Nevertheless, after receiving the Attorney General's subpoena *duces tecum* dated November 4, 2015, ExxonMobil preserved and searched Mr. Raymond's potentially responsive records.

**Exhibit A**
**Letter from D. Toal to J. Oleske**
**May 3, 2017**

| Custodian | Litigation Hold Notice Date | Implemented By |
|---|---|---|
| Rhodes, Deborah (Debbie) | 3.23.2017 | ExxonMobil Law Department |
| Richardson, Stacy | 7.11.2016 | ExxonMobil Law Department |
| Roberts, Patricia | 7.11.2016 | ExxonMobil Law Department |
| Robertson, Sherlone | 7.11.2016 | ExxonMobil Law Department |
| Rodgers, Abigail | 11.6.2015 | ExxonMobil Law Department |
| Roman, Michael | 11.6.2015 | ExxonMobil Law Department |
| Rosenthal, David | 11.6.2015 | ExxonMobil Law Department |
| Russell, Tyler | 11.6.2015 | ExxonMobil Law Department |
| Schulz, Christopher (Max) | 11.6.2015 | ExxonMobil Law Department |
| Schulz, James (Nick) | 11.6.2015 | ExxonMobil Law Department |
| Shah, Prateek | 7.11.2016 | ExxonMobil Law Department |
| Shenefelt, Patricia | 11.6.2015 | ExxonMobil Law Department |
| Shores, Mark | 11.6.2015 | ExxonMobil Law Department |
| Smith, Annemarie | 3.23.2017 | ExxonMobil Law Department |
| Snow, Angela | 11.6.2015 | ExxonMobil Law Department |
| Soraci, Ben | 11.6.2015 | ExxonMobil Law Department |
| Swan, Susan | 1.25.2016 | ExxonMobil Law Department |
| Swiger, Andrew | 11.6.2015 | ExxonMobil Law Department |
| Tamacas, Julio | 9.12.2016 | ExxonMobil Law Department |
| Tanaka, Paul | 11.6.2015 | ExxonMobil Law Department |
| Taschner, Lynne | 11.6.2015 | ExxonMobil Law Department |

**Exhibit A**
**Letter from D. Toal to J. Oleske**
**May 3, 2017**

| Custodian | Litigation Hold Notice Date | Implemented By |
|---|---|---|
| Theurer, Derek | 11.6.2015 | ExxonMobil Law Department |
| Tillerson, Rex | 11.6.2015 | ExxonMobil Law Department |
| Trelenberg, Peter | 11.6.2015 | ExxonMobil Law Department |
| Tyler, David | 11.6.2015 | ExxonMobil Law Department |
| Vela, Marcos | 11.17.2016 | ExxonMobil Law Department |
| Walker, Patricia (Patty) | 8.1.2016 | ExxonMobil Law Department |
| Walton, Gantt | 11.6.2015 | ExxonMobil Law Department |
| Welberry, Christopher | 11.6.2015 | ExxonMobil Law Department |
| Werner, Sandra | 11.6.2015 | ExxonMobil Law Department |
| Wheeler, Derek | 11.6.2015 | ExxonMobil Law Department |
| Wierstra, Charles | 10.17.2016 | ExxonMobil Law Department |
| Williams, Jack | 11.6.2015 | ExxonMobil Law Department |
| Wilson, Gary | 3.23.2017 | ExxonMobil Law Department |
| Woodbury, Jeffrey | 11.6.2015 | ExxonMobil Law Department |
| Woods, Darren | 11.6.2015 | ExxonMobil Law Department |
| Young, Kimberly | 3.23.2017 | ExxonMobil Law Department |
| Zinngrabe, Kay | 11.6.2015 | ExxonMobil Law Department |

**Exhibit B**
**Letter from D. Toal to J. Oleske**
**May 3, 2017**

| Custodian[1] | Date(s) Interviewed[2] | Affiliation of Persons Conducting Interview |
|---|---|---|
| Albers, Mark | 3.9.2017 | ExxonMobil Law Department |
| Albrecht, Robert | 6.14.2016 | ExxonMobil Law Department |
| Allexon, Kevin* | None | None |
| Anderson, Heather | 8.4.2016 | ExxonMobil Law Department |
| Arslan, Haydar | 5.16.2016 | ExxonMobil Law Department |
| Bagley, Donald | 8.3.2016 | ExxonMobil Law Department |
| Bailes, Robert | 12.7.2015 | ExxonMobil Law Department |
| Bailey, David* | None | None |
| Bannister, Kirsten | 8.3.2016 | ExxonMobil Law Department |
| Beard, Robert | 4.28.2016 | ExxonMobil Law Department |
| Becker, David* | 8.23.2016 | ExxonMobil Law Department |
| Becker, Roger (Rocky)* | None | None |
| Berek, Eugene | 1.19.2016 | ExxonMobil Law Department |
| Bergeron, David | 5.25.2016 | ExxonMobil Law Department |
| Boudreaux, Mark* | None | None |
| Brown, Michael | 4.4.2017 | ExxonMobil Law Department |
| Buchholtz, Walter | 12.18.2015 | ExxonMobil Law Department |
| Burner, Kathleen (Kathi) | 4.3.2017 | ExxonMobil Law Department |
| Champine, Arthur | 8.11.2016 | ExxonMobil Law Department |
| Chatham, Theresa | 4.7.2017 | ExxonMobil Law Department |
| Climo, Amy | 11.24.2015 | ExxonMobil Law Department |
| Cochrane, David | 12.14.2016 | ExxonMobil Law Department |
| Cohen, Kenneth* | Late 11.2015 *or* Early 12.2015 | ExxonMobil Law Department |
| Colton, William | 11.20.2015 | ExxonMobil Law Department |
| Cook, Michael | 1.7.2016 | ExxonMobil Law Department |
| Cooney, Philip | 1.20.2016 | ExxonMobil Law Department |
| Copeskey, Jeffrey | 1.15.2016 | ExxonMobil Law Department |
| Copley, G. Bruce | 11.18.2015 | ExxonMobil Law Department |
| Dashwood, John | 12.10.2015 | ExxonMobil Law Department |
| Davidson, Carolyn* | None | None |

[1]   An asterisk (*) next to a name indicates that the individual listed no longer works for ExxonMobil.
[2]   Where ExxonMobil could not readily identify the exact date on which an interview occurred, the month and year of the interview is provided.

**Exhibit B**
**Letter from D. Toal to J. Oleske**
**May 3, 2017**

| Custodian[1] | Date(s) Interviewed[2] | Affiliation of Persons Conducting Interview |
|---|---|---|
| Deal, Michael | 11.7.2016 | ExxonMobil Law Department |
| Devlin, Dennis | 11.19.2015 | ExxonMobil Law Department |
| Dickerson, Steven | 8.12.2016 | ExxonMobil Law Department |
| Dolan, Michael | 3.9.2017 | ExxonMobil Law Department |
| DuCharme, Richard | 8.3.2016 | ExxonMobil Law Department |
| Edwards, Brant | 8.8.2016 | ExxonMobil Law Department |
| Eizember, Thomas* | None | None |
| Ellsworth, John | 8.11.2016 | ExxonMobil Law Department |
| Elvert, Robert* | 3.3.2016 | ExxonMobil Law Department |
| Esenkov, Oleg | 5.16.2016 | ExxonMobil Law Department |
| Fancher, James | 8.18.2016 | ExxonMobil Law Department |
| Feeley, Jennifer | 12.3.2015 | ExxonMobil Law Department |
| Fisk, Norma | 8.23.2016 | ExxonMobil Law Department |
| Flannery, Brian* | None | None |
| Foss, Kimberly | 4.3.2017 | ExxonMobil Law Department |
| Franklin, Robert | 12.2.2015 | ExxonMobil Law Department |
| Frederick, Kenneth | 8.11.2016 | ExxonMobil Law Department |
| Gadgil, Abhijit* | None | None |
| Genetti, Dominic | 11.8.2016 | ExxonMobil Law Department |
| Glennon, John* | 2.22.2016 | ExxonMobil Law Department |
| Gober, Nancy | 4.5.2017 | ExxonMobil Law Department |
| Gobush, Matthew | 1.14.2016 | ExxonMobil Law Department |
| Granquist, Mark* | 12.14.2016 | ExxonMobil Law Department |
| Hamid, Taher | None | None |
| Hay, Elizabeth | 8.19.2016 | ExxonMobil Law Department |
| Hochhalter, Theresa | 1.6.2016 | ExxonMobil Law Department |
| Holguin, Margo | 4.7.2017 | ExxonMobil Law Department |
| Hollingsworth, Timothy | 8.26.2016 | ExxonMobil Law Department |
| Horne, Joseph | 2.17.2016 | ExxonMobil Law Department |
| Hudson, Elizabeth* | None | None |
| Hughes, Mary | 4.5.2017 | ExxonMobil Law Department |
| Humphreys, Donald* | None | None |
| Iwanika, Jason | 12.16.2016 | ExxonMobil Law Department |
| Janse, Robin | 4.3.2017 | ExxonMobil Law Department |

**Exhibit B**
**Letter from D. Toal to J. Oleske**
**May 3, 2017**

| Custodian[1] | Date(s) Interviewed[2] | Affiliation of Persons Conducting Interview |
|---|---|---|
| Jeffers, Alan | 1.12.2016 | ExxonMobil Law Department |
| Keil, Richard* | 11.20.2015 | ExxonMobil Law Department |
| Kemp, Simon | 10.19.2016 | ExxonMobil Law Department |
| Kerby, Michael | 11.19.2015 | ExxonMobil Law Department |
| Kerr, Lauren | 1.27.2016 | ExxonMobil Law Department |
| Kheshgi, Haroon | 11.12.2015 | ExxonMobil Law Department |
| Kite, Robert | 5.24.2016 | ExxonMobil Law Department |
| Klekar, Chad | None | None |
| Kominas, Charles | 7.8.2016 | ExxonMobil Law Department |
| Krishna, Paul | 3.29.2016 | ExxonMobil Law Department |
| Lachenmyer, Lynne | 1.12.2016 | ExxonMobil Law Department |
| Landuyt, William | 11.13.2015 | ExxonMobil Law Department |
| Lewis, Robert Jeffrey | 11.16.2015 | ExxonMobil Law Department |
| Ligh, David | 1.18.2016 | ExxonMobil Law Department |
| Linderman, John | 8.4.2016 | ExxonMobil Law Department |
| Lokken, Roald | 4.25.2016 | ExxonMobil Law Department |
| Luettgen, Robert | 2.9.2016 | ExxonMobil Law Department |
| Luxbacher, Roberta* | None | None |
| Matturro, Michael | 11.18.2015 | ExxonMobil Law Department |
| McCarron, Suzanne | 1.12.2016 | ExxonMobil Law Department |
| McKee, Karen | 4.7.2017 | ExxonMobil Law Department |
| Mignone, Bryan | 11.18.2015 | ExxonMobil Law Department |
| Mire, Richard | 2.12.2016 | ExxonMobil Law Department |
| Mizan, Tahmid | 12.3.2015 | ExxonMobil Law Department |
| Monahan, Tom* | 3.11.2016 | ExxonMobil Law Department |
| Murphy, Kevin | 11.20.2015 | ExxonMobil Law Department |
| Mut, Alan | 10.21.2016 | ExxonMobil Law Department |
| Nelson, Ralph (Dan)* | None | None |
| Noecker, Fredrick | 12.5.2016 | ExxonMobil Law Department |
| Norman, John | 11.17.2015 | ExxonMobil Law Department |
| Norwood, David | 8.10.2016 | ExxonMobil Law Department |
| Office of the Secretary[3] | 11.20.2015 | ExxonMobil Law Department |
| Onderdonk, Todd | 1.26.2016 | ExxonMobil Law Department |

---

[3]   Robert Luettgen was interviewed in his role as Manager of the Office of the Secretary.

**FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM**
INDEX NO. 451962/2016
NYSCEF DOC. NO. 186
RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 262 of 553   PageID 689

**Exhibit B**
**Letter from D. Toal to J. Oleske**
**May 3, 2017**

| Custodian[1] | Date(s) Interviewed[2] | Affiliation of Persons Conducting Interview |
|---|---|---|
| O'Neill, Marguerite (Meg) | 2.5.2016 | ExxonMobil Law Department |
| Perkins, Franklin (Terry) | 11.28.2016 | ExxonMobil Law Department |
| Perkins, Samuel | 8.9.2016 | ExxonMobil Law Department |
| Powell, Guy | 11.19.2015 | ExxonMobil Law Department |
| Rau, Charles | 11.23.2015 | ExxonMobil Law Department |
| Raymond, Lee* | None | None |
| Reep, Brien | 2.5.2016 | ExxonMobil Law Department |
| Rhodes, Deborah (Debbie)* | None | None |
| Richardson, Stacy | 8.23.2016 | ExxonMobil Law Department |
| Roberts, Patricia | 11.15.2016 | ExxonMobil Law Department |
| Robertson, Sherlone | 11.16.2016 | ExxonMobil Law Department |
| Rodgers, Abigail | 11.23.2015 | ExxonMobil Law Department |
| Roman, Michael | 11.17.2015 | ExxonMobil Law Department |
| Rosenthal, David | 11.19.2015 | ExxonMobil Law Department |
| Russell, Tyler | 6.6.2016 | ExxonMobil Law Department |
| Schulz, Christopher (Max) | 11.20.2015 | ExxonMobil Law Department |
| Schulz, James (Nick) | 11.19.2015 | ExxonMobil Law Department |
| Shah, Prateek | 8.4.2016 | ExxonMobil Law Department |
| Shenefelt, Patricia* | 1.21.2016 | ExxonMobil Law Department |
| Shores, Mark | 11.20.2015 | ExxonMobil Law Department |
| Smith, Annemarie* | None | None |
| Snow, Angela | 11.23.2015 | ExxonMobil Law Department |
| Soraci, Ben | 2.8.2016 | ExxonMobil Law Department |
| Swan, Susan* | None | None |
| Swiger, Andrew | 3.8.2017 | ExxonMobil Law Department |
| Tamacas, Julio | 9.12.2016 | ExxonMobil Law Department |
| Tanaka, Paul | 3.7.2016 | ExxonMobil Law Department |
| Taschner, Lynne | 2.10.2016 | ExxonMobil Law Department |
| Theurer, Derek | 11.17.2015 | ExxonMobil Law Department |
| Tillerson, Rex* | None | None |
| Trelenberg, Peter | 11.20.2015 | ExxonMobil Law Department |
| Tyler, David | 2.3.2016 | ExxonMobil Law Department |
| Vela, Marcos | 11.17.2016 | ExxonMobil Law Department |

**Exhibit B**
**Letter from D. Toal to J. Oleske**
**May 3, 2017**

| Custodian[1] | Date(s) Interviewed[2] | Affiliation of Persons Conducting Interview |
|---|---|---|
| Walker, Patricia (Patty) | 8.5.2016 | ExxonMobil Law Department |
| Walton, Gantt | 2.16.2016 | ExxonMobil Law Department |
| Welberry, Christopher | 12.3.2015 | ExxonMobil Law Department |
| Werner, Sandra | 1.25.2016 | ExxonMobil Law Department |
| Wheeler, Derek | 2.29.2016 | ExxonMobil Law Department |
| Wierstra, Charles | 12.15.2016 | ExxonMobil Law Department |
| Williams, Jack | 3.9.2017 | ExxonMobil Law Department |
| Wilson, Gary | 4.10.2017 | ExxonMobil Law Department |
| Woodbury, Jeffrey | 12.11.2015 | ExxonMobil Law Department |
| Woods, Darren | 4.7.2017 | ExxonMobil Law Department |
| Young, Kimberly | 4.6.2017 | ExxonMobil Law Department |
| Zinngrabe, Kay | 2.3.2016 | ExxonMobil Law Department |

**Exhibit C**
**Letter from D. Toal to J. Oleske**
**May 3, 2017**

| Custodian | Collection Conducted by | Date(s) of Collection(s)[1] | Method(s) of Collection | Method of Review |
|---|---|---|---|---|
| Albers, Mark | ExxonMobil Law Department | 12.2015<br>3.9.2017<br>3.14.2017<br>3.17.2017<br>3.20.2017 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Albrecht, Robert | ExxonMobil Law Department | 6.15.2016<br>6.21.2016<br>6.23.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Allexon, Kevin | ExxonMobil Law Department | 9.2015 | ESI collected from prior litigation | Manual attorney review by Paul, Weiss |
| Anderson, Heather | ExxonMobil Law Department | 8.8.2016<br>8.15.2016<br>8.17.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Arslan, Haydar | ExxonMobil Law Department | 5.18.2016<br>5.20.2016<br>8.12.2016<br>8.15.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Bagley, Donald | ExxonMobil Law Department | 8.8.2016<br>8.11.2016<br>8.12.2016<br>9.2.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Bailes, Robert | ExxonMobil Law Department | 12.16.2015 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Bailey, David | ExxonMobil Law Department | 3.2016<br>4.2016<br>5.2016<br>7.11.2016 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |

---

[1]   Where ExxonMobil could not readily identify the exact date on which a document collection occurred, the month and year or year only is provided.

**Exhibit C**
**Letter from D. Toal to J. Oleske**
**May 3, 2017**

| Custodian | Collection Conducted by | Date(s) of Collection(s)[1] | Method(s) of Collection | Method of Review |
|---|---|---|---|---|
| Bannister, Kirsten | ExxonMobil Law Department | 8.5.2016<br>8.9.2016<br>8.11.2016<br>8.16.2016 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Beard, Robert | ExxonMobil Law Department | 5.2016 | Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Becker, David | ExxonMobil Law Department | 8.24.2016<br>9.6.2016<br>9.9.2016<br>1.11.2017<br>1.19.2017<br>1.30.2017 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Becker, Roger (Rocky) | ExxonMobil Law Department | 4.3.2017 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Berek, Eugene | ExxonMobil Law Department | 1.20.2016<br>2.19.20164.26.2016<br>5.5.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Bergeron, David | ExxonMobil Law Department | 6.2.2016<br>6.13.2016<br>6.21.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Boudreaux, Mark | ExxonMobil Law Department | 8.30.2012 | ESI collected from prior litigation | Manual attorney review by Paul, Weiss |
| Brown, Michael | ExxonMobil Law Department | 3.31.2017<br>4.3.2017<br>4.5.2017 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Buchholtz, Walter | ExxonMobil Law Department | 11.19.2015<br>11.20.2015<br>11.23.2015<br>11.30.2015<br>1.20.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |

**Exhibit C**
**Letter from D. Toal to J. Oleske**
**May 3, 2017**

| Custodian | Collection Conducted by | Date(s) of Collection(s)[1] | Method(s) of Collection | Method of Review |
|---|---|---|---|---|
| Burner, Kathleen (Kathi) | ExxonMobil Law Department | 4.3.2017<br>4.8.2017 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Champine, Arthur | ExxonMobil Law Department | 8.15.2016<br>8.17.2016<br>8.18.2016<br>8.22.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Chatham, Theresa | ExxonMobil Law Department | 4.5.2017 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Climo, Amy | ExxonMobil Law Department | 11.26.2015<br>11.30.2015<br>12.2.2015<br>12.7.2015 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Cochrane, David | ExxonMobil Law Department | 12.14.2016<br>12.19.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Cohen, Kenneth | ExxonMobil Law Department | 11.18.2015<br>11.19.2015<br>12.8.2015<br>3.9.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Colton, William | ExxonMobil Law Department | 11.17.2015<br>11.18.2015<br>11.19.2015<br>12.7.2015 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Cook, Michael | ExxonMobil Law Department | 2.17.2016<br>2.18.2016<br>2.24.2016 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Cooney, Philip | ExxonMobil Law Department | 2.9.2016<br>2.17.2016 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |

**Exhibit C**
**Letter from D. Toal to J. Oleske**
**May 3, 2017**

| Custodian | Collection Conducted by | Date(s) of Collection(s)[1] | Method(s) of Collection | Method of Review |
|---|---|---|---|---|
| Copeskey, Jeffrey | ExxonMobil Law Department | 1.19.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Copley, G. Bruce | ExxonMobil Law Department | 12.16.2015 12.24.2016 12.26.2016 1.3.2017 1.4.2017 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Dashwood, John | ExxonMobil Law Department | 3.22.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Davidson, Carolyn | ExxonMobil Law Department | 11.29.2016 12.8.2016 12.22.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Deal, Michael | ExxonMobil Law Department | 11.8.2016 11.29.2016 12.10.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Devlin, Dennis | ExxonMobil Law Department | 11.16.2015 11.17.2015 12.8.2015 6.24.2016 6.29.2016 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Dickerson, Steven | ExxonMobil Law Department | 8.16.2016 8.25.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Dolan, Michael | ExxonMobil Law Department | 12.29.2015 1.29.2016 2.3.2016 1.5.2017 3.9.2017 3.14.2017 3.17.2017 3.18.2017 3.20.2017 3.22.2017 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |

**Exhibit C**
**Letter from D. Toal to J. Oleske**
**May 3, 2017**

| Custodian | Collection Conducted by | Date(s) of Collection(s)[1] | Method(s) of Collection | Method of Review |
|---|---|---|---|---|
| DuCharme, Richard | ExxonMobil Law Department | 8.5.2016 8.9.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Edwards, Brant | ExxonMobil Law Department | 8.9.2016 8.17.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Eizember, Thomas | ExxonMobil Law Department | 3.25.2014 | ESI collected from prior litigation | Manual attorney review by Paul, Weiss |
| Ellsworth, John | ExxonMobil Law Department | 8.16.2016 8.17.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Elvert, Robert | ExxonMobil Law Department | 5.2011 | ESI collected from prior litigation | Manual attorney review by Paul, Weiss |
| Esenkov, Oleg | ExxonMobil Law Department | 5.18.2016 5.19.2016 5.20.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Fancher, James | ExxonMobil Law Department | 8.18.2016 8.22.2016 8.31.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Feeley, Jennifer | ExxonMobil Law Department | 1.13.2016 1.14.2016 1.25.2016 1.29.2016 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Fisk, Norma | ExxonMobil Law Department | 8.23.2016 8.24.2016 8.31.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |

**FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM**
INDEX NO. 451962/2016
NYSCEF DOC. NO. 186
RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 269 of 553   PageID 696

**Exhibit C**
**Letter from D. Toal to J. Oleske**
**May 3, 2017**

| Custodian | Collection Conducted by | Date(s) of Collection(s)[1] | Method(s) of Collection | Method of Review |
|---|---|---|---|---|
| Flannery, Brian | ExxonMobil Law Department | 1.2012 | ESI collected from prior litigation; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Foss, Kimberly | ExxonMobil Law Department | 4.3.2017 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Franklin, Robert | ExxonMobil Law Department | 3.8.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Frederick, Kenneth | ExxonMobil Law Department | 8.15.2016 8.16.2016 8.17.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Gadgil, Abhijit | ExxonMobil Law Department | 11.30.2016 12.1.2016 12.6.2016 12.8.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Genetti, Dominic | ExxonMobil Law Department | 11.10.2016 11.15.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Glennon, John | ExxonMobil Law Department | 11.16.2015 11.18.2015 12.2.2015 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Gober, Nancy | ExxonMobil Law Department | 1.29.2016 3.15.2017 3.17.2017 3.22.2017 4.6.2017 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Gobush, Matthew | ExxonMobil Law Department | 1.19.2016 1.21.2016 1.22.2016 1.27.2016 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |

**Exhibit C**
**Letter from D. Toal to J. Oleske**
**May 3, 2017**

| Custodian | Collection Conducted by | Date(s) of Collection(s)[1] | Method(s) of Collection | Method of Review |
|---|---|---|---|---|
| Granquist, Mark | ExxonMobil Law Department | 12.14.2016 1.6.2017 4.11.2017 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Hamid, Taher | ExxonMobil Law Department | 11.30.2016 12.1.2016 12.14. 2016 12.22.2016 12.29.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Hay, Elizabeth | ExxonMobil Law Department | 8.23.2016 8.25.2016 8.31.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Hochhalter, Theresa | ExxonMobil Law Department | 1.11.2016 1.19.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Holguin, Margo | ExxonMobil Law Department | 3.31.2017 4.3.2017 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Hollingsworth, Timothy | ExxonMobil Law Department | 9.9.2016 9.22.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Horne, Joseph | ExxonMobil Law Department | 2.29.2016 3.30.2016 8.19.2016 8.20.2016 8.26.2016 8.31.2016 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Hudson, Elizabeth | ExxonMobil Law Department | 3.31.2017 4.3.2017 4.6.2017 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Hughes, Mary | ExxonMobil Law Department | 3.15.2017 4.5.2017 4.6.2017 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |

**Exhibit C**
**Letter from D. Toal to J. Oleske**
**May 3, 2017**

| Custodian | Collection Conducted by | Date(s) of Collection(s)[1] | Method(s) of Collection | Method of Review |
|---|---|---|---|---|
| Humphreys, Donald | ExxonMobil Law Department | 3.30.2017 3.31.2017 4.10.2017 4.19.2017 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Iwanika, Jason | ExxonMobil Law Department | 12.16.2016 12.19.2016 1.6.2017 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Janse, Robin | ExxonMobil Law Department | 3.31.2017 4.3.2017 4.4.2017 4.11.2017 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Jeffers, Alan | ExxonMobil Law Department | 12.3.2015 12.7.2015 12.9.2015 12.11.2015 1.25.2016 1.27.2016 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Keil, Richard | ExxonMobil Law Department | 11.19.2015 11.30.2015 12.28.2016 1.2.2017 1.10.2017 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Kemp, Simon | ExxonMobil Law Department | 10.27.2016 11.2.2016 11.16.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Kerby, Michael | ExxonMobil Law Department | 11.18.2015 11.19.2015 11.23.2015 12.23.2015 1.4.2016 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Kerr, Lauren | ExxonMobil Law Department | 11.24.2015 12.9.2015 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 272 of 553   PageID 699

**Exhibit C**
**Letter from D. Toal to J. Oleske**
**May 3, 2017**

| Custodian | Collection Conducted by | Date(s) of Collection(s)[1] | Method(s) of Collection | Method of Review |
|---|---|---|---|---|
| Kheshgi, Haroon | ExxonMobil Law Department | 11.18.2015 11.24.2015 12.9.2015 12.19.2015 12.21.2015 1.12.2016 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Kite, Robert | ExxonMobil Law Department | 5.25.2016 5.27.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Klekar, Chad | ExxonMobil Law Department | 12.1.2015 1.13.2016 1.20.2016 3.9.2016 3.11.2016 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Kominas, Charles | ExxonMobil Law Department | 7.11.2016 7.13.2016 7.25.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Krishna, Paul | ExxonMobil Law Department | 4.1.2016 4.14.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Lachenmyer, Lynne | ExxonMobil Law Department | 11.18.2015 11.19.2015 11.30.2015 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Landuyt, William | ExxonMobil Law Department | 11.19.2015 11.24.2015 2.1.2016 2.2.2016 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Lewis, Robert Jeffrey | ExxonMobil Law Department | 1.14.2016 1.21.2016 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Ligh, David | ExxonMobil Law Department | 1.19.2016 1.21.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |

**Exhibit C**
**Letter from D. Toal to J. Oleske**
**May 3, 2017**

| Custodian | Collection Conducted by | Date(s) of Collection(s)[1] | Method(s) of Collection | Method of Review |
|---|---|---|---|---|
| Linderman, John | ExxonMobil Law Department | 8.8.2016<br>8.11.2016<br>8.12.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Lokken, Roald | ExxonMobil Law Department | 2.4.2016<br>2.18.2016<br>4.27.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Luettgen, Robert | ExxonMobil Law Department | 2.11.2016<br>2.15.2016<br>2.16.2016<br>3.18.2017<br>3.22.2017<br>4.4.2017 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Luxbacher, Roberta | ExxonMobil Law Department | 11.4.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Matturro, Michael | ExxonMobil Law Department | 1.15.2016<br>1.25.2016<br>1.29.2016<br>2.4.2016<br>2.16.2016 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| McCarron, Suzanne | ExxonMobil Law Department | 11.18.2015<br>11.19.2015<br>12.7.2015<br>1.14.2016<br>1.15.2016 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| McKee, Karen | ExxonMobil Law Department | 4.3.2017<br>4.4.2017 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Mignone, Bryan | ExxonMobil Law Department | 11.18.2015<br>11.19.2015<br>11.23.2015 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |

**Exhibit C**
**Letter from D. Toal to J. Oleske**
**May 3, 2017**

| Custodian | Collection Conducted by | Date(s) of Collection(s)[1] | Method(s) of Collection | Method of Review |
|---|---|---|---|---|
| Mire, Richard | ExxonMobil Law Department | 2.16.2016 2.17.2016 2.24.2016 3.8.2016 1.9.2017 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Mizan, Tahmid | ExxonMobil Law Department | 12.16.2015 12.17.2015 12.21.2015 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Monahan, Tom | ExxonMobil Law Department | 12.8.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Murphy, Kevin | ExxonMobil Law Department | 11.2015 11.19.2015 11.20.2015 12.7.2015 7.13.2016 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Mut, Alan | ExxonMobil Law Department | 10.27.2016 10.28.2016 11.1.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Nelson, Ralph (Dan) | ExxonMobil Law Department | 2009, 2010 | ESI collected from prior litigation | Manual attorney review by Paul, Weiss |
| Noecker, Fredrick | ExxonMobil Law Department | 12.2.2016 12.6.2016 12.7.2016 12.19.2016 12.21.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Norman, John | ExxonMobil Law Department | 12.2015 12.10.2015 1.5.2016 12.27.2016 1.4.2017 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Norwood, David | ExxonMobil Law Department | 8.12.2016 8.15.2016 8.16.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |

**Exhibit C**
**Letter from D. Toal to J. Oleske**
**May 3, 2017**

| Custodian | Collection Conducted by | Date(s) of Collection(s)[1] | Method(s) of Collection | Method of Review |
|---|---|---|---|---|
| Office of the Secretary | ExxonMobil Law Department | 12.2015 2.2016 | Scanning of hardcopy documents | Manual review by Paul, Weiss |
| Onderdonk, Todd | ExxonMobil Law Department | 1.29.2016 3.12.2016 3.13.2017 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| O'Neill, Marguerite (Meg) | ExxonMobil Law Department | 2.8.2016 2.25.2016 2.29.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Perkins, Franklin (Terry) | ExxonMobil Law Department | 12.1.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Perkins, Samuel | ExxonMobil Law Department | 8.12.2016 8.16.2016 8.17.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Powell, Guy | ExxonMobil Law Department | 11.18.2015 11.19.2015 11.23.2015 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Rau, Charles | ExxonMobil Law Department | 11.25.2015 12.3.2015 12.9.2015 12.15.2015 1.8.2016 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Raymond, Lee | ExxonMobil Law Department | 12.2015 1.4.2017 | Scanning of hardcopy documents; Converted VHS to viewable format | Manual attorney review by Paul, Weiss |
| Reep, Brien | ExxonMobil Law Department | 2.16.2016 2.19.2016 2.24.2016 3.3.2016 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |

Exhibit C
**Letter from D. Toal to J. Oleske**
**May 3, 2017**

| Custodian | Collection Conducted by | Date(s) of Collection(s)[1] | Method(s) of Collection | Method of Review |
|---|---|---|---|---|
| Rhodes, Deborah (Debbie) | ExxonMobil Law Department | 3.31.2017<br>4.3.2017 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Richardson, Stacy | ExxonMobil Law Department | 8.24.2016<br>8.31.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Roberts, Patricia | ExxonMobil Law Department | 11.21.2016<br>11.21.2016<br>12.1.2016<br>12.20.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Robertson, Sherlone | ExxonMobil Law Department | 11.29.2016<br>11.30.2016<br>12.1.2016<br>12.6.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Rodgers, Abigail | ExxonMobil Law Department | 12.13.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Roman, Michael | ExxonMobil Law Department | 11.24.2015<br>12.4.2015<br>12.7.2015 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Rosenthal, David | ExxonMobil Law Department | 2.17.2016<br>2.24.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Russell, Tyler | ExxonMobil Law Department | 6.14.2016<br>6.16.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Schulz, Christopher (Max) | ExxonMobil Law Department | 1.19.2016<br>1.22.2016 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |

**Exhibit C**
**Letter from D. Toal to J. Oleske**
**May 3, 2017**

| Custodian | Collection Conducted by | Date(s) of Collection(s)[1] | Method(s) of Collection | Method of Review |
|---|---|---|---|---|
| Schulz, James (Nick) | ExxonMobil Law Department | 1.19.2016 1.25.2016 1.29.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Shah, Prateek | ExxonMobil Law Department | 8.5.2016 8.8.2016 8.17.2016 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Shenefelt, Patricia | ExxonMobil Law Department | 11.18.2015 12.9.2015 2.1.2016 2.2.2016 2.3.2016 2.6.2017 2.7.2017 2.8.2017 2.10.2017 2.15.2017 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Shores, Mark | ExxonMobil Law Department | 11.19.2015 11.23.2015 12.2.2015 12.16.2015 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Smith, Annemarie | ExxonMobil Law Department | 4.3.2017 4.6.2017 4.23.2017 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Snow, Angela | ExxonMobil Law Department | 1.11.2016 1.15.2016 1.21.2016 1.25.2016 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Soraci, Ben | ExxonMobil Law Department | 2.15.2016 2.17.2016 4.20.2017 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Swan, Susan | ExxonMobil Law Department | 1.2.2017 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |

**Exhibit C**
**Letter from D. Toal to J. Oleske**
**May 3, 2017**

| Custodian | Collection Conducted by | Date(s) of Collection(s)[1] | Method(s) of Collection | Method of Review |
|---|---|---|---|---|
| Swiger, Andrew | ExxonMobil Law Department | 1.29.2016 2.11.2016 12.1.2016 1.5.2017 3.8.2017 3.17.2017 3.18.2017 3.20.2017 3.22.2017 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Tamacas, Julio | ExxonMobil Law Department | 9.14.2016 9.15.2016 9.28.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Tanaka, Paul | ExxonMobil Law Department | 4.26.2016 4.28.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Taschner, Lynne | ExxonMobil Law Department | 2.15.2016 4.21.2016 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Theurer, Derek | ExxonMobil Law Department | 11.19.2015 11.23.2015 12.9.2015 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Tillerson, Rex | ExxonMobil Law Department | 1.29.2016 2.2.2016 1.5.2017 1.12.2017 3.9.2017 3.14.2017 3.16.2017 3.17.2017 3.21.2017 3.22.2017 3.23.2017 3.24.2017 3.28.2017 3.29.2017 | Electronic collection of ESI; Scanning of hardcopy documents; ESI collected from prior litigation | Manual attorney review by Paul, Weiss |

**Exhibit C**
**Letter from D. Toal to J. Oleske**
**May 3, 2017**

| Custodian | Collection Conducted by | Date(s) of Collection(s)[1] | Method(s) of Collection | Method of Review |
|---|---|---|---|---|
| Trelenberg, Peter | ExxonMobil Law Department | 11.18.2015 12.4.2015 12.7.2015 12.8.2015 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Tyler, David | ExxonMobil Law Department | 2.4.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Vela, Marcos | ExxonMobil Law Department | 11.28.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Walker, Patricia (Patty) | ExxonMobil Law Department | 8.8.2016 8.15.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Walton, Gantt | ExxonMobil Law Department | 2.29.2016 3.2.2016 3.7.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Welberry, Christopher | ExxonMobil Law Department | 12.6.2015 12.10.2015 12.11.2015 12.16.2015 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Werner, Sandra | ExxonMobil Law Department | 2.5.2016 2.15.2016 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Wheeler, Derek | ExxonMobil Law Department | 3.1.2016 3.3.2016 3.8.2016 3.10.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Wierstra, Charles | ExxonMobil Law Department | 12.19.2016 12.27.2016 1.10.2017 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |

**Exhibit C**
**Letter from D. Toal to J. Oleske**
**May 3, 2017**

| Custodian | Collection Conducted by | Date(s) of Collection(s)[1] | Method(s) of Collection | Method of Review |
|---|---|---|---|---|
| Williams, Jack | ExxonMobil Law Department | 1.28.2016<br>2.2.2016<br>1.5.2017<br>3.17.2017<br>3.20.2017 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Wilson, Gary | ExxonMobil Law Department | 4.3.2017<br>4.4.2017<br>4.13.2017<br>4.24.2017 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Woodbury, Jeffrey | ExxonMobil Law Department | 12.29.2015<br>4.20.2016<br>4.29.2016<br>3.18.2017<br>3.20.2017<br>3.22.2017 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Woods, Darren | ExxonMobil Law Department | 1.29.2016<br>2.3.2016<br>1.6.2017<br>3.15.2017<br>3.17.2017<br>3.20.2017<br>3.21.2017<br>3.22.2017 | Electronic collection of ESI; Scanning of hardcopy documents | Manual attorney review by Paul, Weiss |
| Young, Kimberly | ExxonMobil Law Department | 4.3.2017<br>4.5.2017 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |
| Zinngrabe, Kay | ExxonMobil Law Department | 2.3.2016<br>2.4.2016<br>2.18.2016 | Electronic collection of ESI | Manual attorney review by Paul, Weiss |

**Exhibit D**
**Letter from D. Toal to J. Oleske**
**May 3, 2017**

|  | ) |
| In the Matter of the Subpoena Issued by | ) |
| The Attorney General of the State of | ) |
| New York, Dated November 4, 2015, | ) |
| to Exxon Mobil Corporation | ) |
|  | ) |

## SUPPLEMENTAL AFFIRMATION OF MICHELE HIRSHMAN

I, Michele Hirshman, an attorney admitted to the practice of law before the courts of the State of New York, and not a party to the above entitled cause, affirm the following to be true under penalties of perjury pursuant to N.Y. C.P.L.R. 2106:

1.       I am a partner in the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss"), and either have personal knowledge of the matters set forth herein, or state facts based upon information and belief.  For the facts stated upon information and belief, I have made reasonable inquiries of individuals with knowledge to confirm the information.  If called as a witness, I could and would competently testify to the contents herein.

2.       I am counsel to Exxon Mobil Corporation ("ExxonMobil" or "the Company") in connection with this matter.  As part of my responsibilities, I oversaw the production of documents in response to the subpoena *duces tecum* dated November 4, 2015 ("the Subpoena").

### *Hirshman Affirmation*

3.       On April 10, 2017, I executed an affirmation describing ExxonMobil's compliance with the Subpoena (the "Hirshman Affirmation").

*Identification of Document Processing Error and Disclosure*

    4.     The next morning, on April 11, 2017, ExxonMobil's e-discovery vendor (the "Vendor") provided to Paul, Weiss and ExxonMobil a search term hit report (the "Hit Report") concerning the then-upcoming April 30, 2017 production.[1] That report did not list four of the 25 search terms (the "Complete Set of Search Terms")[2] that ExxonMobil had instructed the Vendor to apply to the data set described in the Hit Report. Absent from the Hit Report were the four supplemental search strings (the "Supplemental Search Terms") that, on January 17, 2017, ExxonMobil had agreed to add to the then-current list of 21 search terms.[3]

    5.     Unable to reconcile the Hit Report with the Complete Set of Search Terms, Paul, Weiss exchanged multiple emails with, and spoke by phone to, the Vendor.

    6.     By day's end, Paul, Weiss and ExxonMobil had learned that, on or around March 15, 2017, the Vendor had stopped running the Supplemental Search Terms against any data received in connection with the Subpoena. The Vendor explained by phone that, on March 15, 2017, in preparation for leaving the Vendor's employ, the former project manager responsible for processing all data related to the Subpoena transitioned his responsibilities to a new project manager. The Vendor clarified that, when this transition occurred, the former project manager failed to notify his replacement that the search terms in use included the Supplemental Search Terms.

---

[1]  *See* Hirshman Affirmation, ¶ 48.
[2]  *See* Exhibit C to Hirshman Affirmation (listing the Complete Set of Search Terms that the Vendor was instructed to apply); *see also* Hirshman Affirmation ¶¶ 22–24 ("Search Terms").
[3]  *See* Hirshman Affirmation, ¶ 24.

7.     On April 11, 2017, the Vendor confirmed that the Supplemental Search Terms had not been applied to the unfiltered data of the Management Committee Custodians[4] (the "Employee Transition Error").

8.     The following day, on April 12, 2017, at the direction of ExxonMobil, Paul, Weiss disclosed to the Attorney General the Employee Transition Error. Paul, Weiss informed the Attorney General that it was continuing to gather and analyze all facts relevant to the error (the "Assessment").

### Identification of Two Additional Document Processing Errors

9.     During the course of the Assessment, Paul, Weiss and ExxonMobil learned that, in addition to the Employee Transition Error, the Vendor had also failed to properly apply the Supplemental Search Terms to two other sets of data.

10.     Both of these additional oversights occurred in mid-January 2017. Each was the result of human error.

11.     On April 13, 2017, Paul, Weiss and ExxonMobil learned that, in mid-January 2017, the Vendor had failed to manually transfer from a proprietary systems tool to Relativity (*i.e.*, the document review platform) a subset of documents hitting on the Supplemental Search Terms. Because these documents were never uploaded to Relativity, they were not reviewed by Paul, Weiss (the "Relativity Upload Error").

---

[4]     The "Management Committee Custodians" as defined herein include (i) those six members who served on the Management Committee on the date that the Attorney General issued the Subpoena, *i.e.*, Rex W. Tillerson, Darren W. Woods, Mark W. Albers, Jack P. Williams, Andrew P. Swiger, and Michael J. Dolan, and (ii) Jeffrey Woodbury, Secretary of ExxonMobil and Vice President of Investor Relations, whose documents, due to their highly confidential and sensitive nature, were treated in the same way as those belonging to the six members of the Management Committee. *See* Amended Affidavit of Connie Lynn Feinstein (April 19, 2017), ¶¶ 12–39 (describing the document search, collection, and review protocols applied to the six members of the Management Committee). The Vendor processed the unfiltered data of the Management Committee Custodians after March 15, 2017.

12.    On April 14, 2017, Paul, Weiss and ExxonMobil learned that, also in mid-January 2017, the Vendor had segregated, in error, a distinct subset of documents to an ancillary Relativity platform. That ancillary platform, referred to as "Administrative Staging," is controlled by, and only visible to, the Vendor. Because documents in Administrative Staging that hit on the Supplemental Search Terms were hidden from view, they also were not reviewed by Paul, Weiss (the "Administrative Staging Error").

### *Remediation Efforts*

13.    ExxonMobil took immediate remedial action as soon as it learned of the three above described document processing errors.

14.    *First*, ExxonMobil and Paul, Weiss instructed the Vendor to re-apply the Complete Set of Search Terms (which includes the Supplemental Search Terms) to all unfiltered data belonging to the 125 custodians from whom, and 11 shared locations from which, ExxonMobil had to date produced documents (the "Remedial Search").

15.    *Second*, ExxonMobil and Paul, Weiss directed the Vendor to upload to Relativity, and render visible for review, all non-duplicative documents identified as a result of the Remedial Search.

16.    *Third*, ExxonMobil directed Paul, Weiss to (a) manually review all documents identified by the Remedial Search, and (b) prepare for production all responsive, non-privileged documents resulting from this review.

*Validation Exercise*

17.     In an abundance of caution, on April 14, 2017, Paul, Weiss engaged Deloitte Transactions and Business Analytics LLP ("Deloitte") to validate the remediation efforts conducted by the Vendor at the direction of ExxonMobil (the "Validation Exercise").

18.     On April 21, 2017, Deloitte concluded the Validation Exercise.  It confirmed that the Vendor had uploaded to Relativity, and rendered visible for review, all non-duplicative documents identified as a result of the Remedial Search.

*Additional Disclosures*

19.     On April 24, 2017, at the direction of ExxonMobil, Paul, Weiss disclosed to the Attorney General (i) the Relativity Upload and Administrative Staging Errors; (ii) the Company's remediation efforts concerning the three document processing errors identified to date; and (iii) the inception and outcome of the Validation Exercise.

*Document Production*

20.     On April 30, 2017, ExxonMobil produced to the Attorney General all responsive, non-privileged documents reviewed as part of the Remedial Search.  That production also included responsive, non-privileged documents from 17 additional custodians, whose files ExxonMobil had agreed, on March 31, 2017, to search and review as an accommodation to the Attorney General.

21.     By April 30, 2017, ExxonMobil had produced to the Attorney General all responsive, non-privileged documents that, as of April 24, 2017, it had agreed to produce or was required to produce.

22.     To date, and in accordance with the Attorney General's investigative priorities, ExxonMobil has collected and produced over 430,000 documents (totaling nearly 2.8 million pages) from (a) 142 custodians, and (b) 11 shared locations untethered to specific custodians.

23.     On May 15, 2017, ExxonMobil will produce to the Attorney General (i) a privilege log pertaining to documents withheld from the April 30, 2017 production, and (ii) responsive, non-privileged electronically stored information from the custodial files of Amy Climo, whose documents ExxonMobil agreed to produce on April 27, 2017 as an accommodation to the Attorney General.

24.     If, after May 15, 2017, ExxonMobil learns of additional responsive, non-privileged documents in its custody and control belonging to any of the 142 custodians and/or the 11 shared locations referenced above in ¶ 22, they will be produced promptly to the Attorney General.

I affirm that the foregoing statements made by me are true.

Dated:  May 3, 2017
        New York, New York

_____
Michele Hirshman

# Exhibit 18

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064

TELEPHONE (212) 373-3000

LLOYD K. GARRISON  (1946-1991)
RANDOLPH E. PAUL  (1946-1956)
SIMON H. RIFKIND  (1950-1995)
LOUIS S. WEISS   (1927-1950)
JOHN F. WHARTON  (1927-1977)

WRITER'S DIRECT DIAL NUMBER

212-373-3747

WRITER'S DIRECT FACSIMILE

212-492-0747

WRITER'S DIRECT E-MAIL ADDRESS

mhirshman@paulweiss.com

April 18, 2016

UNIT 3601, OFFICE TOWER A, BEIJING FORTUNE PLAZA
NO. 7 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT
BEIJING 100020
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300

12TH FLOOR, HONG KONG CLUB BUILDING
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, U.K.
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

EDWARD T ACKERMAN
JACOB A. ADLERSTEIN
ALLAN J. ARFFA
ROBERT A. ATKINS
DAVID J. BALL
SCOTT A. BARSHAY
JOHN F. BAUGHMAN
LYNN B. BAYARD
DANIEL J. BELLER
CRAIG A. BENSON
MITCHELL L. BERG
MARK S. BERGMAN
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
ANGELO BONVINO
JAMES L. BROCHIN
RICHARD J. BRONSTEIN
DAVID W. BROWN
SUSANNA M. BUERGEL
PATRICK S. CAMPBELL*
JESSICA S. CAREY
JEANETTE K. CHAN
YVONNE Y. F. CHAN
GEOFFREY R. CHEPIGA
ELLEN N. CHING
WILLIAM A. CLAREMAN
LEWIS R. CLAYTON
JAY COHEN
KELLEY A. CORNISH
CHRISTOPHER J. CUMMINGS
CHARLES E. DAVIDOW
THOMAS V. DE LA BASTIDE III
ARIEL J. DECKELBAUM
ALICE BELISLE EATON
ANDREW J. EHRLICH
GREGORY A. EZRING
LESLIE GORDON FAGEN
MARC FALCONE
ROSS A. FIELDSTON
ANDREW C. FINCH
BRAD J. FINKELSTEIN
BRIAN P FINNEGAN
ROBERTO FINZI
PETER E. FISCH
ROBERT C. FLEDER
MARTIN FLUMENBAUM
ANDREW J. FOLEY
HARRIS B. FREIDUS
MANUEL S. FREY
ANDREW L. GAINES
KENNETH A. GALLO
MICHAEL E. GERTZMAN
ADAM M. GIVERTZ
SALVATORE GOGLIORMELLA
ROBERT D. GOLDBAUM
NEIL GOLDMAN
ROBERTO J. GONZALEZ*
CATHERINE L. GOODALL
ERIC GOODISON
CHARLES H. GOOGE, JR.
ANDREW G. GORDON
UDI GROFMAN
NICHOLAS GROOMBRIDGE
BRUCE A. GUTENPLAN
GAINES GWATHMEY, III
ALAN S. HALPERIN
JUSTIN G. HAMILL
CLAUDIA HAMMERMAN
BRIAN S. HERMANN
MICHELE HIRSHMAN
MICHAEL S. HONG
DAVID S. HUNTINGTON
AMRAN HUSSEIN
LORETTA A. IPPOLITO

JAREN JANGHORBANI
MEREDITH J. KANE
ROBERTA A. KAPLAN
BRAD S. KARP
PATRICK N. KARSNITZ
JOHN C. KENNEDY
BRIAN KIM
ALAN W. KORNBERG
DANIEL J. KRAMER
DAVID K. LAKHDHIR
STEPHEN P. LAMB*
JOHN E. LANGE
GREGORY F. LAUFER
DANIEL J. LEFFELL
XIAOYU GREG LIU
JEFFREY D. MARELL
MARCO V. MASOTTI
EDWIN S. MAYNARD
DAVID W. MAYO
ELIZABETH R. McCOLM
MARK F. MENDELSOHN
CLAUDINE MEREDITH-GOUJON
WILLIAM B. MICHAEL
TOBY S. MYERSON
CATHERINE NYARADY
JANE B. O'BRIEN
ALEX YOUNG K. OH
BRAD R. OKUN
KELLEY D. PARKER
MARC E. PERLMUTTER
VALERIE E. RADWANER
CARL L. REISNER
LORIN L. REISNER
WALTER G RICCIARDI
WALTER RIEMAN
RICHARD A. ROSEN
ANDREW N. ROSENBERG
JACQUELINE P. RUBIN
RAPHAEL M. RUSSO
ELIZABETH M. SACKSTEDER
JEFFREY D. SAFERSTEIN
JEFFREY B. SAMUELS
DALE M. SARRO
TERRY E. SCHIMEK
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JOHN M. SCOTT
STEPHEN J. SHIMSHAK
DAVID R. SICULAR
MOSES SILVERMAN
STEVEN SIMKIN
JOSEPH J. SIMONS
AUDRA J. SOLOVAY
SCOTT M. SONTAG
TARUN M. STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
ROBYN F. TARNOFSKY
MONICA K. THURMOND
DANIEL J. TOAL
LIZA H. VELAZQUEZ
LAWRENCE G. WEE
THEODORE V. WELLS, JR.
STEVEN J. WILLIAMS
LAWRENCE I. WITDORCHIC
MARK B. WLAZLO
JULIA MASON WOOD
JENNIFER H. WU
JORDAN E. YARETT
KAYE N. YOSHINO
TONG YU
TRACEY A. ZACCONE
TAURIE M. ZEITZER
T. ROBERT ZOCHOWSKI, JR.

*NOT ADMITTED TO THE NEW YORK BAR

John Oleske, Esq.
Senior Enforcement Counsel
Office of the Attorney General
State of New York
120 Broadway, 26th Floor
New York, NY 10271

Dear John:

　　This letter responds to your correspondence of March 31, 2016 which seeks, among other things, "to clarify [your] expectations with respect to" our "client's continued cooperation" with your office. Before responding to your specific inquiries, we lay out some observations and make a request of our own based on recent events.

**Service of the Subpoena**

　　As you may know, ExxonMobil first learned of the office's "investigation" from an email on the night of November 4, 2015, enclosing a subpoena also dated November 4, 2015. By early the following day, before ExxonMobil had even confirmed its willingness to accept service of the subpoena, the company had received multiple media inquiries and the *New York Times* was reporting online—and members of the Attorney General's office had confirmed—the service of the prior evening's subpoena. *See* "ExxonMobil on Hot Seat for Global Warming," US News (http://www.usnews.com/news/articles/2015/11/05/exxon-mobil-under-investigation-for-climate-change-denial). The *New York Times* story, entitled "ExxonMobil Investigated for

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM
INDEX NO. 451962/2016
NYSCEF DOC. NO. 187
RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 290 of 553   PageID 717
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

John Oleske, Esq.                                                                                       2

Possible Climate Change Lies by NYAG," also appeared on November 6, 2015 on the front page of the *New York Times'* print edition.

The *New York Times* article specifically reported that the subpoena "demand[ed] extensive financial records, emails and other documents" and that the "focus" of the NYAG's investigation was "on whether statements made to investors about climate risk as recently as this year were consistent with the company's own long running scientific research." The story and its details were attributed to "people with knowledge of the investigation" who "spoke on the condition of anonymity saying they were not authorized to speak publicly about investigations that could produce civil or criminal charges."

This was an ethically questionable and highly irregular announcement of an investigation. *See* Ethics and Best Practices Subcommittees of the District Attorneys Ass'n of the State of New York (DAASNY) Comm. on the Fair and Ethical Admin. of Justice, *The Right Thing: Ethical Guidelines for Prosecutors* 11 (2015) ("The general rule is that a lawyer participating in a criminal or civil proceeding 'shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter.'"). We likewise took notice of Attorney General Schneiderman's November 10, 2015 appearance on a *PBS NewsHour* segment in which he described the investigation's focus on, among other things, ExxonMobil's scientific deliberations and perspective on the costs of a wholesale switch to renewable energy sources.

At our first meeting on November 12, 2015 and thereafter, we expressed our serious concern that the investigation was politically motivated and sought the office's assurances that documents that ExxonMobil provided to the NYAG in response to its unique subpoena power would be kept confidential. We were given assurances that our documents would be maintained as confidential and specific assurance that this was not a "political investigation."

### **ExxonMobil's Cooperation**

We have communicated with your office and met on multiple occasions to work collaboratively to chart a course for the production of materials in response to what your office has recognized is an extremely broad and burdensome subpoena. The subpoena, which cites as its authority New York's Martin Act, General Business Law §§349 and 350 and Executive Law §63(12), seeks documents, with respect to some requests, going back to 1977, and, with respect to other requests, going back to 2005. Those laws have, at most, six-year statutes of limitation. Your office has to date been unable or unwilling to identify any even arguably improper conduct by ExxonMobil that falls within those statutes' limitations periods. This is hardly surprising because, years before the limitations period, ExxonMobil made clear that "[b]ecause the risk to society and ecosystems from rising greenhouse gas emissions could prove to be significant, strategies that address the risk need to be developed and implemented." ExxonMobil Corp., *2006 Corporate Citizenship Report* 15 (2007).

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 291 of 553   PageID 718

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

John Oleske, Esq.                                                                        3

ExxonMobil has nonetheless proceeded in good faith to assist your investigation by (i) preserving documents of hundreds of employees and placing those employees on a litigation hold; (ii) producing to date over 85,000 documents amounting to the equivalent of over 500,000 pages; (iii) adjusting the sequence of production so that documents of custodians in whom you have expressed interest would be produced before those of other custodians (presumably after you saw that the tens of thousands of documents initially produced from the files of ExxonMobil's scientists undermined the theory of the investigation articulated in the *New York Times*) on a 30-day rolling basis and also to the office's e-discovery specifications; and (iv) entering into a tolling agreement in order to facilitate what we have been assured would be a fair, evenhanded and confidential examination of the facts.[1] And in reliance on that understanding, ExxonMobil made its most recent production to the office on March 19, 2016. That production amounted to over 28,000 documents, consisting of the equivalent of over 143,000 pages of hardcopy and electronic documents.

**The March 29 Press Conference**

Given ExxonMobil's cooperation with the Attorney General's presumably confidential "investigation," we obviously were concerned when we saw the office's Media Advisory late in the afternoon on Monday, March 28, 2016 regarding a "State-Based Effort to Combat Climate Change" press conference scheduled for the next morning featuring multiple state attorneys general, with an appearance by former Vice President Al Gore. Upon learning of that advisory, we immediately placed calls to you, Monica Wagner and Lemuel Srolovic, Deputy Chief and Chief, respectively, of the Environmental Protection Bureau. Ms. Wagner returned our call. In that call, we expressed our concern about the disclosure of ExxonMobil documents that have been produced to your office pursuant to subpoena under New York's specific and unique statutes to other entities or persons—both governmental and non-governmental. We reiterated our understandings, based on your office's prior representations and assurances, that documents produced to your office pursuant to the subpoena would be treated confidentially and were reassured twice in that conversation that our understandings were correct.

Despite those assurances, the statements at the next day's press conference heightened our concern. Attorney General Schneiderman made clear that he and his fellow attorneys general were "dedicated to coming up with creative ways to enforce laws being flouted by the fossil fuel industry" and had assembled a coalition of state attorneys general to "step into [the] breach" of "gridlock in Washington" to do "battle with an unprecedented level of commitment and coordination" against the "relentless assault from well-funded, highly aggressive and morally vacant forces that are trying to block every step by the federal government to take meaningful action." Another attorney general pledged that "we will not stop until we get to the bottom of this and make it clear

---

[1]    On this point, we note an *InsideClimate News* article dated April 14, 2016 which states that "Exxon has turned over more than 10,000 pages of records in the past two months according to an official in Schneiderman's office." Given the office's assurances, we would not have expected any "official" to be publicly commenting on the number of pages in ExxonMobil's production.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

John Oleske, Esq.                                                                                                    4

to our residents as well as the American people that we have to do something transformational. We cannot continue to rely on fossil fuel." Echoing the themes laid out by Attorney General Schneiderman in his PBS appearance, Vice President Gore derided those who questioned the "renewable revolution" and hailed the "historic coalition" of attorneys general because "those who are using unfair and illegal means to try to prevent the change are likely now, finally at long last, to be held to account."

From its inception, this "investigation" has posed the troubling prospect of law enforcement being used to put its thumb on the scale of an essentially legislative debate about how best to address the risk of climate change. As you undoubtedly know, ExxonMobil favors adoption of a revenue-neutral carbon tax as one way to encourage use of different energy sources. When one compares ExxonMobil's policy view against the press conference's call to battle against the "morally vacant forces" who have the audacity to question whether the world's energy needs can be met without fossil fuels, we are hard-pressed to believe that the origins of this investigation lie anywhere other than in a political debate. It is one thing to seek to prevail in that debate by legislative or executive administrative actions or popular appeals to the public's reason or even emotion. It is quite another to use the power of government to demonize, attempt to punish, and suppress opposing viewpoints. The use of law enforcement for that purpose is out of bounds.

We were recently most disturbed by certain documents that were posted on the website of the Energy & Environment Legal Institute on Friday, April 15, 2016. *See* "Emails Reveal Schneiderman, Other AG's Colluding with Al Gore and Greens to Investigate Climate Skeptics," Energy & Environment Legal Institute (http://eelegal.org/2016/04/15/release-emails-reveal-schneiderman-other-ags-colluding-with-al-gore-and-greens-to-investigate-climate-skeptics/). Those documents relate to, among other things, the participation by your office in the planning and convening of the "State-Based Effort to Combat Climate Change" press conference and meeting event on March 29, 2016. According to one these documents, your office led a 45-minute session briefing other meeting participants on the NYAG's ExxonMobil investigation.[2] A second document indicates that your office specifically approved the attendance at meetings related to the event of private individuals not employed by any governmental entity— both of whom are on record as having called for a "tobacco-style" investigation and lawsuit against ExxonMobil. And finally, one document consists of an email dated March 30, 2016 in which one of those private individuals, Matthew Pawa, having reported that he was contacted by the *Wall Street Journal* about the March 29, 2016 event meetings, is instructed by your office to not "confirm that [he] attended or otherwise discuss the event."

---

[2]    While the agenda items on the document refer to the "fossil fuel company disclosure investigations," the document—consisting of a string of emails—makes clear that that session was designed to provide "an opportunity for states to hear about Exxon-Mobil and [the NYAG's] efforts, and explore whether there is interest in doing something together as a group or supporting [the NYAG] in whatever way makes sense."

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 293 of 553   PageID 720

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

John Oleske, Esq.                                                                      5

We do not wish to delay our response to your March 31 letter while we consider the implications of these disclosures. We therefore ask that you take immediate steps to preserve all materials in the possession of the NYAG related to (i) the March 29th event, including the press conference and all meetings associated with the event, (ii) all existing emails of all NYAG employees involved in the office's investigation of ExxonMobil, and (iii) all communications between any employee of the office and third parties, including but not limited to Matthew Pawa, Sharon Eubanks, Albert Gore, Linda Singer, William McKibben and Peter Frumhoff.

*         *         *

We now respond to the specific inquiries in your letter.

### 1.   Custodians

As we have previously explained, ExxonMobil's process to comply with the subpoena is ongoing. As we identify potential custodians, they are placed on a litigation hold. Enclosed as Exhibit A is a list of the 275 current ExxonMobil employees in the United States who have been identified as potential custodians and placed on litigation hold. In addition to the names on Exhibit A, eighty-nine individuals who are employed by global ExxonMobil affiliates are also on hold. These eighty-nine individuals are located in Australia, Belgium, Canada, China, Germany, Japan, Kazakhstan, the Netherlands, New Zealand, Papua New Guinea, Qatar, Russia, Singapore, Tanzania and United Kingdom. As we have previously explained, with respect to former employees, ExxonMobil's practice—in the absence of a litigation hold—is for a prospective retiree to transfer any documents whose retention is required to his or her successor. Accordingly, if individuals had retired from ExxonMobil prior to its receipt of the subpoena and those individuals' documents were not otherwise separately retained at the time of retirement, there are no documents associated with that individual to put on hold.

We decline to attempt to respond to the request to identify the "areas" in which any potential custodians "work[ed]" over the course of their employment with ExxonMobil. The categories in your letter bear no relation to the reality of how ExxonMobil operates. There is simply not a person at ExxonMobil whose responsibility it is to "integrat[e] the impacts of climate change into decision-making and operations." As part of our effort to assist your investigation, we have already identified individuals with responsibilities in the designated areas and we are in the process of collecting and reviewing those documents in the sequence you requested.

### 2.   Confirmation of Preservation

As set forth above, ExxonMobil is preserving the documents of the individuals listed on Exhibit A. Sixty-two of the 275 individuals listed on Exhibit A and twenty-three of the eighty-nine individuals who are employed by global ExxonMobil affiliates and also on hold are identified in the Bates-stamped documents, EMC 5532, EMC 5534, EMC 5536, EMC 5616-17, EMC 31126, EMC 31133, EMC 31142, EMC 38225 and

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

John Oleske, Esq.                                                         6

EMC 63230-31 or otherwise referenced in your correspondence of December 30, 2015, January 28, 2016 and February 3, 2016.

With respect to any individuals identified in the correspondence from those three dates who are not on litigation hold, ExxonMobil is well aware of its legal obligations to preserve documents in connection with its receipt of the subpoena. ExxonMobil's comprehensive effort to identify custodians with responsive documents plainly complies with applicable case law. As we noted at the outset of the investigation, (*see* email from M. Hirshman to L. Srolovic Nov. 24, 2015), the leading case on this issue, as recognized by the First Department in *VOOM HD Holdings LLC v. EchoStar Satellite L.L.C.*, 93 A.D.3d 33, 36 (App. Div. 1st Dep't 2012), is *Zubulake v. UBS Warburg LLC (Zubulake IV)*, 220 F.R.D. 212 (S.D.N.Y. 2003). *Zubulake* makes clear, among other things, that the duty to preserve extends only to those employees likely to have relevant information, *i.e.*, what the case law defines as "key players," and not any person the office decides to identify. *Zubulake*, 220 F.R.D. at 217 ("Must a corporation, upon recognizing the threat of litigation, preserve every shred of paper, every e-mail or electronic document, and every backup tape? The answer is clearly, 'no.' Such a rule would cripple large corporations. . . ."). *See also* 11 *Sedona Conference J.* 265, 279 (2010) (emphasis added) ("[T]he duty to preserve involves *reasonable and good faith efforts*, taken as soon as is practicable and *applied proportionately*, to identify and, as necessary, notify persons likely to have relevant information to preserve the information . . . [I]t is *unreasonable* to expect parties to take every conceivable step to preserve all potentially relevant data."). Accordingly, the request to preserve the documents of all employees identified in the above correspondence or the more than 70,000 employees located in various jurisdictions throughout the world—some with their own laws and rules governing data privacy—is not only unworkable and unduly burdensome, but also unsupported by the caselaw.

## 3.    Trelenberg Documents

In regard to your concern about the volume and date range of the more than 10,000 documents produced from Mr. Trelenberg's files, you should know that Mr. Trelenberg became the manager of Environmental Policy & Planning in late 2011. Thus, it is not surprising that nearly all of the responsive documents are from after that period.

As to your inquiry regarding whether the March 19, 2016 production included all documents to be produced from Mr. Trelenberg's custodial files: the overwhelming majority of Mr. Trelenberg's responsive non-privileged documents that were located after a diligent search have been produced, except those which we have already identified as duplicates of either (i) previously produced documents or (ii) documents from other custodians under review.

## 4.    Data Locations

As we have repeatedly explained, ExxonMobil is conducting a custodian-by-custodian search for documents. Documents are collected from the data sources identified by a custodian as containing potentially responsive documents. These data sources vary by custodian, but often include Outlook, C:/ drives, personal network drives, and share

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM
NYSCEF DOC. NO. 187

INDEX NO. 451962/2016
RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 295 of 553   PageID 722

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

John Oleske, Esq.                                                                                         7

drives/SharePoint sites. To date, no custodian has identified SAP databases, FileNet or Documentum as a potential source of responsive documents. If this were to occur, ExxonMobil would collect and preserve the appropriate documents in such databases.

**5.      Search Capabilities**

In your correspondence dated January 28, 2015 and February 3, 2015 you asked whether ExxonMobil has the capability to search for documents responsive to the subpoena based on keyword search via Retention Key Search ("RKS"). ExxonMobil cannot do so. RKS, a tool identified in EMC000000077-119, is used to assist in identifying potential record retention codes for particular types of documents. For example, a search for the word "contract" in RKS will return results for records retention codes that could apply to certain types of contracts. The retention codes correspond to ExxonMobil's Basic Records Retention Schedule (which we have produced to you) and are used to identify the retention period for the type of records covered by the code. RKS has nothing to do with e-discovery or the ability to search for documents. There are no ExxonMobil programs or tools with capability to search for responsive documents by document retention codes.

**6.      Entity-Wide Preservation Hold**

As Mr. Conlon represented to your colleagues at our December 10, 2015 meeting, ExxonMobil has numerous servers throughout the world and does not have the capability to institute an entity-wide hold on all its employees based on keyword searches, nor does controlling law impose that obligation on ExxonMobil.

**7.      Identifying Number of Documents**

You have previously asked whether ExxonMobil can identify the number of documents hitting on the Attorney General's search terms without first processing a custodian's data. We have repeatedly represented to your colleagues that ExxonMobil cannot do so. We once again reiterate that representation.

At our February 2, 2016 meeting, in response to inquiries from the NYAG's e-discovery staff, Mr. Conlon explained that ExxonMobil cannot obtain the number of search term "hits" for custodians' documents until the documents are loaded for processing by ExxonMobil's discovery vendor. As Mr. Conlon further explained, ExxonMobil incurs costs beginning at the time it loads data for processing. To process custodial data far in advance of when that data will be reviewed for the sole purpose of obtaining hit rates would impose significant additional costs on ExxonMobil beyond the several million dollars in expenses that have already been incurred in this matter.

As a follow-up to that conversation, we agreed to determine whether the version of ATLAS, or any other software that ExxonMobil uses, enables ExxonMobil to ascertain a "hit rate" before a custodian's documents are loaded for processing. In a February 25, 2016 phone call with the office, based on our own direct inquiries and investigation, Mr. Wells and I confirmed that ExxonMobil uses ATLAS simply to manage the distribution of

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM
INDEX NO. 451962/2016

NYSCEF DOC. NO. 187
RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 296 of 553   PageID 723

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

John Oleske, Esq.                                                                              8

litigation holds and that the version of ATLAS used by ExxonMobil is not configured to obtain search term hits.

We therefore represent, for the third time, that ExxonMobil does not have a program or tool capable of obtaining search term hit rates without processing custodial data at ExxonMobil's document review vendor.

**8.      E-Discovery Contacts**

We have fully and accurately provided answers to all of your e-discovery inquiries and we therefore see no reason for your e-discovery specialists to speak with their counterparts at ExxonMobil. Messrs. Conlon and Wells and I collectively have been practicing law for over 100 years, and we each take great care in ensuring that our representations to governmental bodies and opposing counsel are accurate.

In addition, the premise of these inquiries—that ExxonMobil has readily accessible e-discovery programs or tools at its disposable that would make this process less costly and more efficient, and that ExxonMobil has simply overlooked such programs or tools in all of the other litigations in which ExxonMobil is involved—borders on the preposterous.

**9.      Withholding/Redaction**

As you know, ExxonMobil's document review efforts are ongoing. Twenty attorneys at Paul, Weiss, Rifkind, Wharton & Garrison are dedicated to completing the document review in a timely manner. This is not the appropriate juncture to discuss the timing of a potential privilege log because, among other reasons, attorneys presently dedicated to completing the document review would be diverted to preparing a privilege log. As is evident from the productions, certain documents have been redacted before production. When ExxonMobil produces redacted documents, the text of the redaction denotes whether the document was redacted for privilege or responsiveness.

**10.     Public-Relations Firms**

You have requested a list of all public-relations firms retained by ExxonMobil since 2005. We are considering this request and ask that you provide an explanation as to the request's relevance to the investigation.

**11.     Future Productions**

Finally, you request "projected dates of delivery" for certain "datasets." As we explained on our February 25, 2016 call, it has been ExxonMobil's intention to continue to produce documents on a rolling basis every 30 days. While ExxonMobil has been willing to process and review custodians' documents in the sequence proposed by the Attorney General, it remains the case that it not possible to estimate when we will complete our review of each custodian's documents given that the time it takes to review a custodians' documents depends on the number of documents that "hit" the search terms, which we learn once the documents are loaded for processing.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

John Oleske, Esq.                                                        9

                        *        *        *

        We will provide you with an additional letter concerning the documents disclosed
by the Energy & Environment Legal Institute. In the interim, please confirm your receipt
of this letter and your affirmation that the NYAG is preserving the documents referenced
in the first paragraph on page 5 of this letter.

                                Sincerely,

                                Michele Hirshman

cc:      Patrick J. Conlon, Esq.
         Theodore V. Wells, Jr., Esq.

         Lemuel Srolovic, Esq.
         Monica Wagner, Esq.

**Exhibit A**
**Letter from M. Hirshman to J. Oleske**
**April 18, 2016**

| Name |
|------|
| Aerts, Kurt A. |
| Aguiar, Matthew J |
| Albers, Mark W. |
| Albert, James |
| Allen, Dawna L. |
| Allman, Gemma T. |
| Ames, Thomas L. |
| Andreko, Marion S. |
| Ashton, Michael D. |
| Aspray, Tristan J. |
| Aziz, Azivy C. |
| Bachman, Ammie N. |
| Bailes, Robert W. |
| Bailey, Kevin D. |
| Balagia, S. Jack |
| Banaszak, Sara J. |
| Barckholtz, Tim |
| Berek, Eugene P. |
| Bell, Annora B. |
| Bergman, Cynthia L. |
| Bhore, Nazeer A. |
| Bigler, Michael D. |
| Bishop, Nathan R. |
| Blevins, Susan K. |
| Bork, Lisa K. |
| Boyer, Robert F. |
| Bradbury, Sidney M. |
| Brundage, Mark D. |
| Buchholtz, Walt F. |
| Bunnelle, Eric M. |
| Byrne, Richard E. |
| Calder, Steve |
| Carpenter, Bill C. |
| Carron, Christopher M. |
| Carter, Susan E. |
| Chambard, Trisha M. |
| Chapman, Neil A. |
| Chaves, Milton |
| Christensen, Karen P. |
| Chuchro, Alicia J. |
| Clark, Alan L. |
| Clark, Kimberly A. |

**Exhibit A**
**Letter from M. Hirshman to J. Oleske**
**April 18, 2016**

| Name |
|------|
| Cleveland, Randy J. |
| Climo, Amy E. |
| Cochrane, Maureen A. |
| Cohen, Kenneth P. |
| Collins, Douglas |
| Colton, William M. |
| Comer, Hugh M. |
| Connell, Dylan B. |
| Contreras, Wally |
| Cook, Michael F. |
| Cooney, Philip |
| Copeskey, Jeff F. |
| Copley, G. Bruce |
| Cousins, Michael |
| Creegan, Kathleen M. |
| Dalcol, Devan J. |
| Dashwood, John R. |
| Deason, Douglas L. |
| Devlin, Dennis J. |
| Dingmore, Lindsey |
| Dobson, Monte K. |
| Dolan, Michael J. |
| Doriski, Mark W. |
| DuCharme, Linda D. |
| Duffin, Neil W. |
| Easley, Daniel C. |
| Ebner, Randall M. |
| Eidt, Brian D. |
| Eikenberry, Jeremy |
| Faldi, Alessandro |
| Fariello, Theresa M. |
| Farris, J. Hunter |
| Febbo, Eric J. |
| Feeley, Jennifer S. |
| Fente, Javier |
| Fick, C. Milton |
| Forehand, Nina J. |
| Franklin, Rob S. |
| Fu, Dong |
| Furman, Kevin C. |
| Gardner, Robert E. |
| Gehring, Michael D. |

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

INDEX NO. 451962/2016

NYSCEF DOC. NO. 187

RECEIVED NYSCEF: 06/02/2017

**Exhibit A**
**Letter from M. Hirshman to J. Oleske**
**April 18, 2016**

| Name |
|------|
| Gilbert, Jeanine |
| Glennon, John P. |
| Gobush, Matthew N. |
| Goins, Neal R. |
| Goudge, Laura M. |
| Graber, Mary Y. |
| Greenlee, Stephen M. |
| Gunn, John P. |
| Gunnlaugsson, Tracey C. |
| Guerrant, Richard F. |
| Gunter, John W. |
| Hafker, William R. |
| Hall, James A. |
| Hallam, Malcolm |
| Hamilton, Jed M. |
| Hart, Jenifer |
| Hart, Stephen P. |
| Hazel, Carol C. |
| Heckman, D. Christopher |
| Henry, David G. |
| Herrin, Tammy S. |
| Hochhalter, Theresa J. |
| Holbrook, William F. |
| Holguin, Margo |
| Hollenbach, John H. |
| Hommema, Scott E. |
| Horne, Joseph M. |
| Howard, Amber C. |
| Howison, Susan S. |
| Hubbard, Andy J. |
| Huffaker, Charlotte B. |
| Hulbert, Kristen R. |
| Hunsaker, James K. |
| Hutton, Nina |
| Jackson, Jay L. |
| Jackson, Lorie D. |
| Jeffers, Alan T. |
| Johnson, Kenneth C. |
| Johnson, Robert W. |
| Jones, Edward |
| Keil, Richard D. |
| Keller, Laura H. |

**Exhibit A**
**Letter from M. Hirshman to J. Oleske**
**April 18, 2016**

| Name |
|---|
| Kelley, Rusty |
| Kelman, Brie Vankeuren |
| Kerby, Michael C. |
| Kerr, Lauren A. |
| Kestle, Stephen J. |
| Kevelson, Pamela A. |
| Kheshgi, Haroon S. |
| Kirchhoff, Steve P. |
| Klein, Travis |
| Klekar, Chad C. |
| Knapp, Andrew C. |
| Knight, Matthew |
| Koch, Philip S. |
| Krishna, Paul P. |
| Lachenmyer, Lynne M. |
| Landuyt, William |
| Langford, Alison C. |
| Langlands, Cynthia G. |
| Levey, Seth |
| Lewis, R. Jeffrey |
| Ligh, David |
| Linker, Jennifer D. |
| Linville, Kristine K. |
| Littleton, Stephen A. |
| Logan, Laura E. |
| Lokken, Ro T. |
| Luettgen, Robert A. |
| Lyons, Glen C. |
| Mainland, Monica M. |
| Mairs, Heide L. |
| March, Bruce H. |
| Mart, Chuck J. |
| Martin, J. Christopher |
| Martin, Jena C. |
| Matturro, Michael G. |
| Matusic, Karen P. |
| McCarron, Suzanne M. |
| McCoy, Keith W. |
| McGowan, Marie C. |
| Meidel, Rick W. |
| Melli, Tomas R. |
| Mignone, Bryan K. |

**Exhibit A**
**Letter from M. Hirshman to J. Oleske**
**April 18, 2016**

| Name |
| --- |
| Mills, Darlene C. |
| Mire, Richard A. |
| Mitchell, Jeanne O. |
| Mizan, Tahmid I. |
| Monahan, Tom |
| Moynihan, Kelly J. |
| Mueller, Daniel |
| Mundt, Karsten H. |
| Murphy, Kevin |
| Nauman, Scott A. |
| Nelson, Neely S. |
| Nevas, Erica B. |
| Nielsen, Bruce T. |
| Nolan, Robert M. |
| Norman, John P. |
| O'Brien, David P. |
| O'Connor, James |
| Omey, Samantha A. |
| O'Neill, Meg E. |
| Onderdonk, Todd W. |
| Ortwein, Sara N. |
| Palmer, Molly A. |
| Papka, Scott D. |
| Parker, Donna J. |
| Parker, Randy E. |
| Parsons, James E. |
| Popovech, Marusia A. |
| Porche, Wil J. |
| Powell, Guy A. |
| Pratt, Karen |
| Prince, Roger C. |
| Pulliam, Gregory |
| Quinn, John |
| Rapaka, Raj |
| Rau, Charlie T. |
| Redman, Aaron D. |
| Reep, Brien E. |
| Rippe, Robert D. |
| Roberts-Judd, Alexandra J. |
| Robinson, Matthew S. |
| Rodgers, Abigail L. |
| Roman, Michael J. |

**Exhibit A**
**Letter from M. Hirshman to J. Oleske**
**April 18, 2016**

| Name |
| --- |
| Rosenthal, David S. |
| Roux, Timothee W. |
| Rucker, Rebecca L. |
| Rzakulieva, Leyla R. |
| Sakamoto, Craig T. |
| Sandefur, Kristin T. |
| Sanguedolce, Lynn A. |
| Schuessler, Daniel L. |
| Schulz, Christopher |
| Schulz, James |
| Scinta, Nicholas |
| Scott, Sherry L. |
| Shenefelt, Patricia F. |
| Shores, Mark M. |
| Silvestri, Scott J. |
| Simpson, Tricia L. |
| Sinha, Somnath |
| Smith, Joseph P. |
| Snow, Angela K. |
| Sokul, Stanley S. |
| Soraci, Ben A. |
| Spellings, Jaime |
| Spitler, Todd M. |
| Stern, David L. |
| Stroud, Darren W. |
| Stuckwisch, Kurt D. |
| Summa, Lori L. |
| Swarup, Vijay |
| Swiger, Andrew P. |
| Tait, Russell D. |
| Tanaka, Paul L. |
| Taschner, Lynne D. |
| Tasker, Richard |
| Theurer, Derek J. |
| Thomann, Hans |
| Tillerson, Rex W. |
| Timmons, Sharon M. |
| Tinsley, Brian D. |
| Trelenberg, Pete W. |
| Turner, James W. |
| Tyler, David C. |
| Ulickas, Walter J. |

**Exhibit A**
**Letter from M. Hirshman to J. Oleske**
**April 18, 2016**

| Name |
| --- |
| Usadi, Adam |
| Van Pelt, Doug J. |
| Vendel, Jason D. |
| Walton, Gantt H. |
| Welberry, Christopher R. |
| Werner, Sandra R. |
| Wheeler, Derek B. |
| Williams, Jack P. |
| Williams, Tyler C. |
| Williamson, Judith G. |
| Wilson, Douglas J. |
| Winn, Lisa |
| Wirsing, Penny |
| Wojnar, Theodore J. |
| Woodbury, Jeffrey J. |
| Woods, Darren W. |
| Yeh, Grace C. |
| Younan, Adel H. |
| Young, Robert B. |
| Yuskiewicz, Vincent G. |
| Zamora, Michael P. |
| Zhang, Changyong |
| Zinngrabe, Kay E. |

# Exhibit 19

PAUL, WEISS

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064

TELEPHONE (212) 373-3000

LLOYD K. GARRISON    (1946-1991)
RANDOLPH E. PAUL     (1946-1956)
SIMON H. RIFKIND     (1950-1995)
LOUIS S. WEISS       (1927-1950)
JOHN F. WHARTON      (1927-1977)

WRITER'S DIRECT DIAL NUMBER

212-373-3869

WRITER'S DIRECT FACSIMILE

212-492-0868

WRITER'S DIRECT E-MAIL ADDRESS

dtoal@paulweiss.com

December 5, 2016

*By NYSEF*

The Honorable Barry R. Ostrager
Supreme Court of the State of New York
Commercial Division
60 Centre Street, Room 629
New York, NY 10007

Re:    *In the Matter of the Application of the People of the State of New York, by Eric T.*
       *Schneiderman, Index No. 451962/2016.*

Dear Justice Ostrager:

      We represent Respondent Exxon Mobil Corporation ("ExxonMobil") in the above referenced matter.  We write in response to the New York Attorney General's ("NYAG") letter to the Court, dated December 1, 2016, complaining of purported deficiencies in ExxonMobil's response to the NYAG's November 4, 2015 investigative subpoena (the "Subpoena").

      The record in this matter makes clear that ExxonMobil is fully complying with its obligations with regard to the Subpoena.  ExxonMobil has undertaken an extensive search for responsive documents that is reasonable in all respects.  It has spent millions of dollars producing documents to the NYAG, has accommodated the NYAG's shifting investigative priorities, and has already produced nearly 1.4 million pages of responsive documents.  The NYAG nonetheless complains that ExxonMobil must do more.  While the NYAG proclaims that something must be done, it does not say what additional steps ExxonMobil should take.  Contrary to the NYAG's position, ExxonMobil's production of documents has been entirely reasonable, and the law requires nothing more.

### *ExxonMobil's History of Compliance*

ExxonMobil has been reviewing and producing documents to the NYAG in compliance with the Subpoena since December 3, 2015. To date, and in accordance with the NYAG's investigative priorities, ExxonMobil has collected and produced documents from 56 custodians. The search terms it has used to identify potentially responsive documents are those agreed to by the NYAG and ExxonMobil on December 16, 2015. (Exhibit A.) These include the original terms proposed by ExxonMobil on December 15, 2015, as well as the twelve modifications and three additional terms proposed by the NYAG on December 16—all of which ExxonMobil accepted that same day. The terms are unusually broad, containing such commonplace phrases as (i) "climate" within two words of "change"; (ii) "global warming"; (iii) "carbon dioxide" within five words of "tax," "cost," "asset," or "budget"; and (iv) "greenhouse." Using these broad terms, ExxonMobil has already produced 1,389,703 pages of documents from 56 custodians. The Company has agreed to produce documents from an additional 12 custodians—and, as applicable and if feasible, other key custodians identified during the course of the document review—by the end of December 2016.

The custodians from whom ExxonMobil has produced documents are those most central to the NYAG's investigation. Most of them were identified and prioritized based on the NYAG's shifting investigative theories. ExxonMobil thus produced over 109,000 documents, totaling over 680,000 pages, from four custodians who studied climate science. When these documents evidently refuted the NYAG's investigative theory, the NYAG directed ExxonMobil instead to review the documents of employees who had contributed to a report ExxonMobil published in 2014, entitled "*Energy and Carbon - Managing the Risks,*" and those on ExxonMobil's greenhouse gas issue management teams. After ExxonMobil produced over 80,000 documents (totaling over 455,000 pages) from these custodians, the NYAG shifted its focus yet again to ExxonMobil's "valuation, accounting, and reporting of its assets and liabilities," expressing an interest in two groups that have exceedingly limited involvement in issues relating to climate change: the "Global Reserves Group" and the "Reserves Technical Oversight Group."[1]

In view of these diligent and concerted efforts, ExxonMobil has agreed to complete a reasonable production of documents responsive to Requests 3 through 5 by December 31, 2016, and a reasonable production of documents responsive to Requests 8 through 11 by January 31, 2017. And the NYAG has agreed that no further production is required for Requests 1, 2, 6, and 7.

### *Efforts to Resolve the Discovery Dispute*

Notwithstanding ExxonMobil's willingness to work with the NYAG, in a letter dated November 1, 2016, the NYAG demanded the production of all accounting and proxy cost of carbon documents within three weeks' time. ExxonMobil, in a letter dated November 11,

---

[1]    As ExxonMobil stated in its letter to the NYAG, dated September 8, 2016, the Reserves Technical Oversight Group is also known, and referred to, as the Global Reserves Group.

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 308 of 553   PageID 735

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Justice Ostrager                                                                                      3

2016, explained that while it was willing to collect documents from the remaining accounting custodians identified on its September 8 list, production from additional custodians inevitably would extend into 2017.

The parties then appeared before your Honor on November 21, 2016. At that hearing, the Court noted that since "there has been a long negotiation between the parties," he would not "fix a specific date" for discovery to be concluded. (Exhibit B at 24:16-17.) Instead, the Court instructed the parties to meet-and-confer to determine when ExxonMobil could reasonably complete production of all documents requested by the Subpoena. (*Id.* at 24:13-23.) The Court added that, if the parties could not reach a "reasonable resolution on a consensual basis among themselves," then the Court would resolve the outstanding issues. (*Id.* at 24:22-23.)

The next day, pursuant to the Court's November 21, 2016 Order, ExxonMobil requested a meet-and-confer with the NYAG to "develop a joint proposal for completing the production of documents responsive to the [Subpoena]." (Exhibit C.) The NYAG accepted ExxonMobil's invitation, and the parties agreed to meet the following week. (Exhibit D.) In advance of the meeting, the NYAG, in a letter dated November 22, 2016, proposed a timeline for the completion of the production with December deadlines. (*Id.*) ExxonMobil responded in a letter dated November 29, 2016 that it would discuss a production schedule that provided sufficient time for review and production, but noted that production from any additional custodians would require additional time.

During the meet-and-confer, which took place on November 29, 2016, ExxonMobil sought to discuss a reasonable production schedule with the NYAG's office. The NYAG, however, declined to discuss specific perceived deficiencies in ExxonMobil's production, instead asserting that the Subpoena would not be satisfied until ExxonMobil had identified every responsive document. The NYAG expressly stated that a "reasonable production" would not suffice, and insisted that it wanted "everything."

ExxonMobil has made substantial efforts to compromise with the NYAG. Although ExxonMobil believes that the agreed-to search terms are more than adequate to identify potentially responsive documents, it nonetheless agreed to add the term "proxy cost" to the list of terms. But, no sooner had the NYAG made this demand, than it rejected ExxonMobil's acceptance of it as inadequate. Similarly, when ExxonMobil said it was willing to consider producing documents from additional custodians at the NYAG's request, the NYAG steadfastly refused to identify any.

### *The NYAG's December 1 Letter to the Court*

In its submission to the Court, the NYAG raised several supposed deficiencies with ExxonMobil's production in response to the Subpoena. Each of the NYAG's complaints is without merit. For the past year, ExxonMobil has worked tirelessly to address the NYAG's ever-changing objectives. This has included the identification and collection of documents from scores of custodians, the negotiation of broad search terms with the NYAG, and the production of over 214,000 documents—and nearly 1.4 million pages—identified by those terms. The

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 309 of 553   PageID 736
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Justice Ostrager                                                                        4

NYAG appears to believe that it is entitled to every responsive document possessed by any of ExxonMobil's tens of thousands of employees, but the law establishes otherwise.[2]

  *First*, the NYAG contends that ExxonMobil has failed to produce documents from certain categories. Not so. ExxonMobil has collected responsive documents from an expansive selection of key custodians, including its CEO, senior management, Public and Government Affairs professionals, members of its Corporate Strategic Planning group, authors and contributors to various external facing publications that reference climate change, and numerous science teams that have focused on climate change. The NYAG has no basis for believing that the current custodians and search terms exclude unique relevant documents in the categories that it has identified. With respect to documents involving the proxy cost of carbon, for example, ExxonMobil has produced 1,403 documents from 25 custodians where the term "proxy cost" appears, notwithstanding that "proxy cost" was not an agreed-to search term. Further, and notwithstanding that this Court explicitly ruled that the current Subpoena applies only to documents concerning climate change, the NYAG continues to press for greater information about reserves, a topic that has no connection to climate change. ExxonMobil nonetheless has produced, and continues to produce, climate change–related documents that mention reserves and are otherwise responsive to the Subpoena. To date, 1,400 such documents have been produced. The NYAG should not be surprised that there are not more documents that discuss a connection between ExxonMobil's reserves and climate change because no such connection exists. "Proved reserves" under Securities and Exchange Commission ("SEC") regulations encompass only energy sources that ExxonMobil estimates with "reasonable certainty" to be economically producible "under existing economic conditions, operating methods, and government regulations." *Modernization of Oil & Gas Reporting*, SEC Release No. 78, File No. S7-15-08, 2008 WL 5423153, at *66 (Dec. 31, 2008). By definition, therefore, future government regulations related to climate change, which may or may not be enacted, are not to be considered when measuring and disclosing proved reserves.

  The NYAG's contention that ExxonMobil has failed to search databases or shared folders and collect responsive documents therefrom is similarly baseless. As previously detailed to the NYAG, relevant electronic documents belonging to each custodian are collected from multiple data sources, including shared folders such as "MySite" and "TeamSite." (Exhibit E at 1, Ex. B.) The Company searched shared drives or databases where custodians indicated that there was a reasonable likelihood that a shared drive or database contained responsive

---

[2] As noted in the *Sedona Principles*, "[d]iscovery should not be permitted to continue indefinitely merely because a requesting party can point to undiscovered documents and electronically stored information when there is no indication that the documents or information are relevant to the case, or further discovery is disproportionate to the needs of the case." The Sedona Conference, *The Sedona Principles (Second Edition): Best Practices Recommendations & Principles for Addressing Electronic Document Production* (2007), at 38, http://www.thesedonaconference.org; *see also Zubulake* v. *UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004) ("counsel and client must take *some reasonable steps* to see that sources of relevant information are located") (emphasis in original); *Barrison* v. *D'Amato & Lynch, LLP*, 2015 WL 1158573, at *2 (N.Y. Sup. New York Cty. March 16, 2015) (recognizing that "litigants are not entitled to a perfect production of documents in e-discovery").

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM    INDEX NO. 451962/2016
NYSCEF DOC. NO. 188                                    RECEIVED NYSCEF: 06/02/2017
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 310 of 553   PageID 737

Justice Ostrager                                                              5

documents. Thus, the underlying location of a document is immaterial with regard to whether the relevant custodial files of a custodian are reviewed and subsequently produced.

*Second*, the list of custodians from whom ExxonMobil has collected documents is more than reasonable.[3] ExxonMobil crafted its custodian list through comprehensive research, witness interviews, and document review. The custodial list reaches into almost every component of the Company and includes a cross section of individuals who may have the type of information sought by the Subpoena. This list includes the scientists who conducted ExxonMobil's climate change research, employees who developed ExxonMobil's principal communications regarding the relevance of climate change, individuals involved in accounting and valuation, senior management, and even ExxonMobil's current and former CEOs. Indeed, this was not a list created without the NYAG's knowledge and consent. In fact, the NYAG often proposed names to be added to the list of custodians. Now, having repeatedly selected custodians for collection at earlier stages of the investigation, the NYAG disclaims the obligation and ability to identify additional custodians that it considers necessary to a reasonable production. Instead, the NYAG asserts that key custodians must be missing because it has not found documents supporting any of its investigative theories. Notably, at no point has ExxonMobil refused to add a single custodian requested by the NYAG, although it has noted that the addition of custodians inevitably would affect and prolong the timetable for production.

*Third*, the search terms to which ExxonMobil and the NYAG agreed in December 2015 are entirely reasonable and sufficient to identify potentially relevant documents.[4] The current search terms used by ExxonMobil were created after discussion with, and modification by, the NYAG. Indeed, when the NYAG suggested the addition of twelve modifications and three additional terms, ExxonMobil immediately complied. (Exhibit A.) Further, as explained above, there is no evidence that these search terms have been inadequate. They have resulted in almost 1.4 million pages of responsive information, and have been broad enough to capture documents related to the proxy cost of carbon, even though "proxy cost" was not itself a search-term. Contrary to the NYAG's suggestion, the search terms agreed to on December 16, 2015 were expected to capture an exceedingly broad swath of documents and were not intended to be "preliminary." (AG Letter at 3.) And, in all circumstances to date, ExxonMobil never said that

---

[3]    The NYAG's reliance on *Crown Castle USA Inc.* v. *Fred A. Nudd Corp.*, No. 05-CV-6163T, 2010 WL 1286366 (W.D.N.Y. Mar. 31 2010), is unavailing. In that case, the company's in-house counsel erred by failing to implement a litigation hold, leading to the destruction of relevant documents. *Id.* at *12. In contrast, ExxonMobil immediately instituted a litigation hold of relevant custodians—including ExxonMobil's CEO, senior management, and various science-based teams—as soon as the investigation began. ExxonMobil has also conducted numerous witness interviews and reviewed documents in its efforts to identify key custodians.

[4]    The NYAG quotes *William A. Gross Const. Associates, Inc.* v. *American Manufacturers Mutual Insurance. Co.*, 256 F.R.D. 134 (S.D.N.Y. 2009), out of context. (NYAG Letter of December 1, 2016 ("AG Letter") at 3 n.4.) Inappropriate search terms, as the court in *William A. Gross* noted, are those created "without adequate information" or "involvement" from the parties themselves. *Id.* at 136. Here, the parties did "carefully craft" the set of search terms. First, ExxonMobil investigated terms that would capture documents of interest through interviews and review of documents. Second, ExxonMobil accommodated the request from the NYAG to add an additional search term. The NYAG has not alleged—nor could it—that there was inadequate "involvement" from both parties in this case.

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 311 of 553   PageID 738

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Justice Ostrager                                                              6

it was unwilling to consider additional terms that have a reasonable likelihood of identifying unique responsive documents that the prior search terms would have missed. In fact, during the November 29, 2016 discussion with the NYAG, ExxonMobil agreed to add "proxy cost" to the list of search terms that ExxonMobil will apply across the files of the produced custodians. By contrast, the additional search terms that the NYAG proposed in its October 14, 2016 letter were largely unrelated to climate change and, in any event, were unreasonably broad, including such generic terms as "capital investments," "environmental standards," or "project economics" (Exhibit F[5] at 1).[6]

        *Fourth*, the NYAG objects to ExxonMobil's redaction in certain documents of non-responsive material. But the NYAG fails to cite to a single New York state court case in support of its position that it is entitled to the production of non-responsive information, and, as far as ExxonMobil is aware, no such case exists. Instead, the NYAG relies upon a handful of unrepresentative federal cases applying the Federal Rules of Civil Procedure, which are not at issue here, in the context of discovery disputes.[7] While ExxonMobil maintains that New York state law unambiguously and routinely permits redactions for non-responsiveness,[8] it is nonetheless willing to re-review all of its non-responsiveness redactions. In conducting this re-review, ExxonMobil will limit its redactions to proprietary and commercially sensitive information, which even the NYAG concedes is proper. That review is underway and will be completed by month's end.

        *Finally*, ExxonMobil maintains that, the current protocol–which involves monthly document productions and quarterly submissions of privilege logs covering documents withheld over a three-month period–is reasonable.[9] By contrast, weekly productions and productions of

---

[5]   Exhibit F is an excerpt of a letter from the NYAG, dated October 14, 2016. ExxonMobil omitted the second page of the letter in order to protect the identities of specific document custodians. The Company will provide the full letter to the Court for *in camera* review upon request.

[6]   Paradoxically, the very documents highlighted in the NYAG's October 14 letter were identified through use of the search terms the NYAG now claims are inadequate to identify such documents.

[7]   Even if these federal cases had been applicable to this matter, which they are not, the NYAG's citations would still be inapt. The NYAG cited *John Wiley & Sons, Inc.* v. *Book Dog Books, LLC*, 298 F.R.D. 184, 186 (S.D.N.Y. 2014), for the proposition that "redactions of portions of a document are normally impermissible unless the redactions are based on a legal privilege." However, it overlooks the court's statement that governing federal standards "specifically contemplate[] that in the case of trade secret[s] or other confidential . . . commercial information, that the Court may order that such information be not revealed at all or be revealed only in a specified way." *Id.* at 186 (internal quotation marks omitted). Indeed, it is well established that "[r]edactions of documents are commonplace where sensitive and irrelevant materials are mixed with highly relevant information." *In re AutoHop Litig.*, 2014 WL 6455749, at *9 (S.D.N.Y. Nov. 4, 2014) (quoting *The New York Times Co.* v. *Gonzales*, 459 F.3d 160, 170 (2d Cir. 2006)).

[8]   *See, e.g., Feingold* v. *River Place 1 Holding, LLC*, No. 150084/2012, 2014 N.Y. Misc. LEXIS 2169, at *7 (N.Y. Sup. Ct. N.Y. Cty. May 9, 2014) ("Irrelevant material may be redacted prior to production of the records."); *accord Fox Paine & Co., LLC* v. *Houston Cas. Co.*, 37 N.Y.S.3d 207 (N.Y. Sup. Ct. Westchester Cty. 2016) (holding that a party "may redact[] as irrelevant" information about matters "not relevant to the issues" in the case).

[9]   NYAG will be receiving a privilege log for the July through September 2016 productions on December 30, 2016.

Justice Ostrager                                                                  7

privilege logs two weeks later would impose needless administrative burdens.  A more frequent production schedule is also unnecessary given the parties' common aspiration to conclude the production by January 31, 2017.

### *ExxonMobil's Proposal to Conclude Production*

ExxonMobil remains intent on completing its reasonable production of documents responsive to the Subpoena by January 31, 2017.  To that end, ExxonMobil proposes the following schedule for completion of its production:

1. ExxonMobil agrees with the NYAG that no further production is required regarding Requests 1, 2, 6, and 7.

2. ExxonMobil will complete a reasonable production of documents responsive to Requests 3 through 5 by December 31, 2016.  The December production will include documents belonging to (a) three proxy cost of carbon custodians; (b) two greenhouse gas issue management team custodians; (c) seven senior manager custodians; and (d) as applicable and if feasible, other key custodians identified during the course of the document review.

3. ExxonMobil will complete a reasonable production of documents responsive to Requests 8–11 by January 31, 2017.

To the extent that ExxonMobil is required to produce documents from additional custodians, it would not be possible to produce any such documents by January 31, 2017.  If ordered to produce from additional custodians, ExxonMobil would have to collect documents from each such custodian and transfer that data to its discovery vendor.  The vendor would then have to upload the data and apply the search terms.  After determining the volume of documents that contain any of the search terms, ExxonMobil's counsel would then have to conduct a manual review to determine responsiveness, identify privileged documents, and redact any proprietary and commercially sensitive information.  As a result, it is only after determining the volume of documents that "hit" any of the search terms that ExxonMobil would be in a position to assess how long it would take to complete the production of documents from those custodians.  It is clear, however, that any such production could not be completed by January 31, 2017.

ExxonMobil regrets that the parties have been unable to resolve this discovery dispute without judicial intervention.  Nonetheless, ExxonMobil looks forward to a productive discussion that will allow it to complete a reasonable production of documents by a date certain.

Case 3:16-cv-03111-K Document 36-1 Filed 07/26/17 Page 313 of 553 PageID 740

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Justice Ostrager                                                                                      8

Respectfully Submitted,

/s/ Daniel J. Toal
Daniel J. Toal

cc:

| | |
|---|---|
| Katherine Milgram, Esq. | Theodore V. Wells, Jr., Esq. |
| John Oleske, Esq. | Michele Hirshman, Esq. |
| Mandy DeRoche, Esq. | David Meister, Esq. |
| Patrick Conlon, Esq. | Jocelyn Strauber, Esq. |

# Exhibit 20

1

```
 1

 2    SUPREME COURT OF THE STATE OF NEW YORK
      NEW YORK COUNTY  - CIVIL TERM - PART  61
 3    ----------------------------------------------X
      In the Matter of the Application of the
 4
      PEOPLE OF THE STATE OF NEW YORK, by
 5    ERIC T. SCHNEIDERMAN,
      Attorney General of the State of New York,
 6
                        PETITIONER,
 7    For an order pursuant to CPLR 2308(b) to compel
      Compliance with a subpoena issued by the Attorney
 8    General

 9                -against-

10    PRICE WATERHOUSE COOPERS LLP and
      EXXON MOBIL CORPORATION,
11
                        RESPONDANTS
12    ----------------------------------------------X

13    Index No. 451962/16          60 Centre Street
      Proceedings                  New York, New York
14                                 December 9, 2016

15    B E F O R E:

16        HONORABLE BARRY R. OSTRAGER,
      Justice
17

18    A P P E A R A N C E S:

19        STATE OF NEW YORK
          OFFICE OF THE ATTORNEY GENERAL
20        ERIC T. SCHNEIDERMAN
          Attorneys for the Petitioner
21        120 Broadway
          New York, New York 10271
22            BY:  MANISHA M. SHETH, ESQ.
                   JONATHAN C. ZWEIG, ESQ.
23                 KATHERINE C. MILGRAM, ESQ.

24
      -appearances continued on following page-
25

26
                            AB
```

1                              Proceedings

2        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
         Attorneys for the Respondents
3        Four Times Square
         New York, New York 10036
4             BY:  DAVID HEISTER,  ESQ.
                   JOCELYN E. STRAUBER, ESQ.
5
         PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
6        Attorneys for  Respondents
         1285 Avenue of the Americas
7        New York, New York 10019
              BY:  THEODORE V. WELLS, ESQ.
8                  DANIEL J. TOAL, ESQ.
                   NORA AHMED, ESQ.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

                    Angela Bonello, RPR, Sr. Court Reporter

3

1                              Proceedings

2              THE COURT: Presently before the Court is a

3       discovery dispute relating to the compliance by Exxon with

4       the subpoena issued by the New York Attorney General.  And

5       in a letter dated December 1, 2016, the Office of the

6       Attorney General requested the Court to order Exxon to, one;

7       insure "all sources of discoverable information identified

8       in search"  including adding document custodians,

9       supplemental search terms and searching shared folders and

10      data bases.  Two; address the deficiencies identified by OAG

11      as outlined above.  Three; complete its production by

12      January 31, 2017, a schedule that was set forth in footnote

13      one, with weekly rolling productions followed by privileged

14      logs for each production two weeks later.  Four; produce

15      un-redacted copies of documents previously redacted on

16      responsive grounds.

17              Now, in response to the December 1st letter, Exxon

18      notes that it's produced 1.4 million pages of responsive

19      documents, its committed to producing all documents it

20      undertook to produce, based on the stipulated search terms

21      from the custodians previously identified no later than

22      January 31, 2017, and that it's going to complete production

23      of documents responsive to a number of the requests by

24      December 31, 2016.  And Exxon and the New York A.G. have

25      agreed that no further production is required regarding the

26      requests 1, 2, 6 and 7.

                Angela Bonello, RPR, Sr. Court Reporter

4

1                       Proceedings

2            Now, with respect to the New York A.G.'s request

3       that Exxon make rolling productions weekly followed by

4       privileged logs for each production two weeks later, that

5       hasn't been the practice of the parties for the year long

6       period, during which the document production has been

7       ongoing and I think that's an unreasonable burden to impose

8       on Exxon, although perhaps the parties can agree to

9       something other than quarterly productions of privileged

10      logs.

11           I'll hear from the New York A.G., but the

12      December 1st letter doesn't identify the additional document

13      custodians that the New York A.G. wants to have documents

14      search from.  The New York A.G. hasn't indicated what

15      additional search terms it wants Exxon to utilize and Exxon

16      claims that it's already searching shared folders and data

17      bases, so short of having a hearing with witnesses with

18      respect to what Exxon is doing and it's agreed to meet and

19      confer process, I need to understand what it is that the

20      Court can order at this point in time.

21           MS. SHETH:   Thank you, Your Honor.

22           Your Honor, I think what would be helpful is we

23      prepared a presentation for the Court that will help the

24      Court understand what is deficient about Exxon's production,

25      both from a substantive document and categories of document

26      perspective, but also with regard to the process.  And with

                Angela Bonello, RPR, Sr. Court Reporter

5

Proceedings

1

2   regard to Your Honor's last question with regard to the

3   relief we're seeking, we plan to address that as well.  So

4   if I may hand up a copy of the presentation, and we have

5   copies for counsel, as well.

6        THE COURT:  All right.

7        MS. SHETH:   Now, Your Honor, I think the question

8   before the Court is why is what Exxon is doing unreasonable.

9   All right, they're telling the Court we've made a reasonable

10  production of documents, what is the A.G. complaining about;

11  and let me address that.

12       First, we had identified for Exxon and its counsel,

13  specific categories of documents that are missing or

14  incomplete in Exxon's production.  And if Your Honor turns

15  to slide one of our presentation, we have listed these nine

16  categories of documents and they're outlined in our letter

17  of December 1st, to Your Honor.  These are categories that

18  are missing and incomplete from Exxon's production.

19       Now, rather than going back to their client and

20  finding these categories of documents, Exxon has simply said

21  we are not going to address these deficiencies until after

22  our production is complete, so, New York A.G., wait until

23  the end of December, wait until the end of January and then

24  we'll go and try to find these documents.  That is not

25  appropriate.

26       Second; Exxon has attempted to shift the burden of

1                          Proceedings

2         finding all sources of responsive documents to the A.G. and

3         that is what they have done by saying, New York A.G., you

4         identify additional custodians, you identify supplemental

5         search terms, you tell us where these documents are.  We

6         can't do that.  Exxon has the best knowledge about where

7         these documents reside in the company, whether they're aware

8         of shared drives or with document custodians and what

9         specific language and terms are used within the company to

10        capture these concepts.

11              THE COURT: I completely understand that, but the

12        problem that I am having is that as a result of extensive

13        negotiations, which culminated a year ago, an agreement was

14        reached with respect to search terms and an agreement was

15        apparently reached with respect to custodians and unless you

16        tell me otherwise, it's my understanding from the

17        correspondence that Exxon is producing documents predicated

18        on search terms that were stipulated to a year ago and

19        custodians that were identified and agreed to a year ago.

20              Now, if there are additional custodians that the

21        A.G. has identified from its review of the 1.4 million

22        documents that had been produced and New York A.G. can

23        identify from that review of that volume of documents

24        specific individuals who, whose files should be searched, I

25        believe that Exxon will agree to add those custodians to its

26        production and I believe that Exxon will have the production

                     Angela Bonello, RPR, Sr. Court Reporter

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 321 of 553   PageID 748

7

1                           Proceedings

2        from those additional custodians made available in the

3        timeframe that you're requesting.

4              Is that correct, Mr. Wells?

5              MR. TOAL:  Your Honor, during the meet and confer

6        process we invited the A.G.'s Office to identify additional

7        custodians they thought were necessary for reasonable

8        production.  We've already produced from the custodians we

9        think are reasonable production.  Obviously we've given them

10       the benefit of these 1.4 million pages of documents which

11       give them a basis to identify additional custodians.  In the

12       meet and confer they refused to identify additional

13       custodians; they said that's not our job, that is your job.

14       So in this presentation for the first time we're seeing

15       identification of additional custodians.

16             MS. SHETH:  Actually, Your Honor, I do want to

17       correct one point, and that is about the search terms and

18       custodians which Your Honor specifically asked about.

19             The search terms that were agreed to were a

20       preliminary set of search terms at the very beginning, so

21       literally one month after we got the subpoena before we had

22       the benefit of  any documents, so once we started to get the

23       documents we saw that other terms were being used in the

24       documents that Exxon provided and we respectfully asked them

25       over the period from June to present for, you know, your

26       search terms that we initially ran before we had the benefit

                    Angela Bonello, RPR, Sr. Court Reporter

8

1

2      of a single one of your documents that are not capturing

3      what we expected.

4             And if Your Honor turns to slide four in our

5      presentation, we list specific reasons why we think that

6      preliminary search terms were not adequate. We have, for

7      example, just four custodians that we've identified that

8      have produced, where Exxon has produced relevant documents

9      anywhere between one and twenty-four documents.  These are

10     highly relevant documents, exactly what we're looking for,

11     but we only have twenty-four documents, and that suggests

12     that there's a serious mismatch or improper use of the

13     search terms that were initially proposed by Exxon.

14            In addition, another example of why the search

15     terms that were initially proposed and agreed to at the

16     beginning are insufficient are because the number of reserve

17     and proxy reference documents are very small.  If you look

18     at the second bullet point, now they keep talking about

19     1.4 million pages, that's only 20,000 documents, and out of

20     those 20,000 documents we only have slightly more than 1,100

21     documents that pertain to reserves.  So there is something

22     that is inadequate about the search terms that they have

23     identified.

24            We have repeatedly asked them, can you supplement

25     these search terms and they have refused to do so until the

26     very last meet and confer where they said we are agreeing to

9

1                          Proceedings

2    add one -- familiar terms and that term is proxy cost but we

3    will only do that if you agree you're not going to

4    supplement with any additional search terms.  Now we can't

5    agree to that.

6            THE COURT:  Given the size of Exxon and the

7    potentially available universe of documents which could be,

8    what is a magnitude more than the 1.4 million pages that

9    Exxon has produced, a Court can't invent search terms and a

10   Court can't identify custodians.

11           It seems to me that it's incumbent upon the

12   New York Attorney General, after receiving 1.4 million pages

13   of documents over the last year to propose additional search

14   terms and different custodians based on the review of the

15   documents that you already have.  And if you do propose

16   additional search terms and additional custodians and Exxon

17   refuses to comply that's something that the Court can rule

18   upon, but what the Court can't do is independently identify

19   search terms for you or independently identify custodians

20   that Exxon should have a document search from.

21           MS. SHETH:  I agree with Your Honor, obviously we

22   can't ask the Court to do that and we wouldn't expect the

23   Court to do that.  What we're saying is we've identified

24   where the deficiencies are and let Exxon make the initial

25   proposal, let them tell us who are the custodians and places

26   where these documents reside because what they have given us

                 Angela Bonello, RPR, Sr. Court Reporter

10

1                     Proceedings

2       is a list of 368 potential custodians that they put on the

3       litigation hold and they have produced from 56 of those

4       custodians.  We can't look at that list of the remaining 300

5       plus custodians and figure out who has the documents that

6       are missing and incomplete from the production.

7            So what I would propose, respectfully, is that

8       Exxon tell us who are the custodians that have the documents

9       that are missing which we've identified for them, and if

10      they tell us that then we can certainly have a back and

11      forth about whether or not those are the right people, but

12      to put the burden on us to find those people from the list

13      of 38 puts us in a position where we're guessing. We know

14      the documents of search terms are not pulling up the precise

15      documents, but we can't tell them where the documents reside

16      in the company.

17           MR. TOAL:  This is all based on falsity.  They

18      pointed to three areas of supposed gaps.  One is proxy

19      costs; we've already produced 1,200 documents related to

20      proxy costs even when it was not a search term.  We also

21      agreed to supplement our search term with the term proxy

22      cost and we'll produce them from three additional custodians

23      that we think are likely to have documents relating to proxy

24      costs.  So we're going to produce all those documents by the

25      end of the year.  That's not a gap in the production.

26           With respect to reserve documents, again there's no

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 325 of 553   PageID 752

11

1                        Proceedings

2       gap in the production.  We've explained for a long time that

3       reserves have nothing to do with climate change.

4       Reserves --

5            THE COURT:  I read your letter, I understand your

6       argument, there.

7            MR. TOAL:  And Your Honor, as I said and as you

8       recognize, we have searched, we have searched all the places

9       we think are reasonably likely to have responsive documents

10      and in the meet and confer we said if you think we missed

11      something, if you think there's a custodian we didn't search

12      that is likely to have responsive documents tell us who that

13      is and we can have discussions.  And with respect to search

14      terms, we think our existing search terms are adequate.  We

15      didn't think we need to search for proxy costs, but we

16      agreed to do it anyway and we said if you think there are

17      missing search terms, tells us what they are and we can have

18      a discussion.  And the A.G.'s office was unwilling to have

19      that discussion.

20           THE COURT:  Look, I want to be helpful to the

21      parties and to the process, but it really does seem to me

22      that if you have 1,200 documents relating to a specific

23      subject and those documents are to and from particular

24      people, and undoubtedly cc many other people that New York

25      Attorney General, looking at those 1,200 documents and

26      looking at the recurrence of the names that appear on those

                   Angela Bonello, RPR, Sr. Court Reporter

12

Proceedings

1,200 documents can say these four, six, eight or twelve
people whose names appear on repeated occasions in these
1,200 documents are custodians whose documents we want to
see.  And if you do that and you say to the Court we have a
reasonable basis to believe based on our review of these
1,200 documents that these four, six or eight additional
custodians are custodians whose documents should be
produced, you know, I'll say that makes sense to me.

Similarly, if you look at the 1,200 documents and
you see a particular term that's not a search term that you
think would produce relevant and pertinent material I would
order that Exxon add that to the list of search terms, but
this concept that they know what you're looking for, I don't
think is fair.

MS. SHETH:  Your Honor, I don't want to give the
Court the impression that we're not willing to do the work,
because we are, and we have done the work.  For example,
with your last suggestion on proxy cost we did send them a
letter, I believe it was October or November of this year
where we said what you've pulled with regard to proxy cost
is insufficient, 1,400 documents out of a universe of 20,000
documents, clearly, something is missing.  And we either
proposed --we didn't say, run this particular search term,
but we gave them terms that we saw in the documents and we
said we're seeing these kinds of words, maybe you want to

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 327 of 553   PageID 754

13

1                          Proceedings

2       run these terms.  We can't tell you, but here is what we're

3       seeing, can you go find the correct documents, can you fill

4       out what's missing.

5              And I want to give Your Honor a better sense of

6       what's missing because, you know, with regard to proxy cost

7       what we don't have, what we have seen in the production is

8       internal policies and procedures that show how Exxon is

9       applying the proxy cost to its projects, the actual

10      application of the proxy cost to specific oil and gas

11      projects, the effect of the proxy cost on the evaluation and

12      reporting of its gas assets and probably most significantly,

13      its CEO's own statement that Exxon's projects are either too

14      short term or too large for the cost of carbon, meaning the

15      proxy cost, to effect the decision-making.  So we haven't

16      seen the documents that support the representations that

17      Exxon has made to the public and to the investors.

18             So what we have seen in documents is one side of

19      the coin.  We've seen the documents, actually more than half

20      of their production relates to documents from scientists

21      that talk about climate change as a scientific principle and

22      we've seen the documents that reveal what the representation

23      that Exxon has made about the effect of climate change on

24      its business and its financial reporting, but we haven't

25      seen the other side of the coin, which is what are the

26      documents that support what Exxon has told the public and

14

Proceedings

1

2   investors?  What are the documents that show the facts and

3   the assumptions that Exxon considered and relied on in

4   making those statements?  And we need those document to test

5   the accuracy of Exxon's own statements, and that's what's

6   missing.  And we're happy to do the work to try to identify

7   additional custodians and additional search terms, but what

8   I'm concerned with is that we will be back here in front of

9   Your Honor because we will have suggested wrong custodians,

10  because we have such a limited universe of document to base

11  our review on 1,400 out of 200,000.

12       And I think another point --well, actually, on

13  reserves I do want to address Mr. Toal's point about

14  reserves, that when he says that reserves are-- let me make

15  sure-- in their letter they say:  "Reserves are a topic that

16  has no connection to climate change."  And I find that to be

17  a very troubling statement and I'll tell you why.

18       If I could hand up to Your Honor a copy of the

19  report called Managing the Risks, and this is a report

20  that-- if you can hand that up, thank you.

21       (Handing.)

22       MS. SHETH:   And Your Honor, this is a publicly

23  available report that Exxon made various disclosures

24  regarding the effect of the climate change on its business.

25       Now, if Your Honor looks at page 1 of the report,

26  the third paragraph, they say:  "Based on this analysis we

Angela Bonello, RPR, Sr. Court Reporter

1                         Proceedings

2    are confident that none of our hydrocarbon reserves are now

3    or will become stranded." So they're specifically talking

4    about reserves.

5              Second, if you look at page --

6              THE COURT: Let me understand your point today. As

7    I understand it, Exxon's position is that none of its

8    hydrocarbon reserves are now or will become stranded means

9    that nothing relating to climate change will affect its

10   reserves.

11             MS. SHETH:    That's correct.  So, if you look at

12   page 8, they make the statement again. They say: "A

13   concern --" this is this the top paragraph of page 8, last

14   sentence. "A concern expressed by some of our stakeholders

15   is whether such a "low carbon scenario" could impact Exxon

16   Mobil's reserves and operations-i.e., whether this would

17   result in unburnable proved reserves of oil and natural

18   gas."

19             So we need to be able to test the accuracy of that

20   statement. Exxon is is telling the public and investors,

21   don't worry about climate change, don't worry about climate

22   change regulation, it is not going to affect our business

23   operations and it is not going to affect our oil and natural

24   gas reserves.  We need the documents that will allow us to

25   test whether that representation is in fact accurate.

26             THE COURT: So what specific documents are you

                 Angela Bonello, RPR, Sr. Court Reporter

16

1                          Proceedings

2     talking about?

3              MS. SHETH:   So what we're talking about, the

4     categories are outlined of bottom of page 1.  We're talking

5     about the documents that will discuss the impact of climate

6     change and climate change reservation on reserves, on the

7     reserve replacement ratio, and the likelihood that the

8     reserves will be impaired or stranded, the rate at which

9     reserves will be utilized and the likelihood of low carbon

10    emission scenarios.

11             THE COURT: You just outlined a half a dozen

12    potential search terms that you can give to Exxon and which

13    I would ask Exxon to utilize.

14             That's the point of what I'm trying to get across,

15    here, which is if you have search terms that you want to add

16    and they're reasonable, based on everything that you have

17    done for the last year the Court would order them produced.

18    And frankly, I think Exxon would agree to add them at a meet

19    and confer without the Court's intervention.

20             MS. SHETH:   Okay, we've tried that in the past and

21    we'll try that again, Your Honor.

22             We will try again and we will do it expeditiously

23    because we do want these documents by the end of January.

24             THE COURT:  Well it seems to me we have a record

25    here.  You just articulated a half a dozen search terms

26    which may or may not be search terms that Exxon has

                Angela Bonello, RPR, Sr. Court Reporter

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 331 of 553   PageID 758

17

Proceedings

1

2    previously utilized.

3          I'm satisfied, based on what you presented to the

4    Court, that those terms are reasonable for Exxon to add to

5    search terms that its using and you should just send Exxon

6    an e-mail or a letter listing those half a dozen search

7    terms and it would be the order of the Court that those

8    should be added to the search that's being made of the 56

9    custodians that have previously been agreed upon.  And if

10   there are additional custodians that you've identified based

11   on the review of the 1.4 million pages of documents that

12   Exxon has produced those will be added, as well.  And it

13   seems to me that Exxon has the resources to add those

14   additional custodians and add those additional search terms

15   without affecting the January 31st deadline.

16         Now, with respect to this business of having

17   privileged logs produced every two weeks, that's just

18   unreasonable.

19         MS. SHETH:  Thank you, Your Honor, we will do that.

20   We will expeditiously provide them with a supplemental list

21   of custodians and supplemental list of search terms.

22         And if I could address just one other point, Your

23   Honor.

24         THE COURT:  Let me just make sure that Exxon is

25   agreeable to this.

26         MR. TOAL: So, I would just say a few things.  I

Angela Bonello, RPR, Sr. Court Reporter

18

1                       Proceedings

2       think we have a set of search terms that it was agreed upon

3       and it was negotiated.

4               THE COURT: I understand.

5               MR. TOAL: So I think those are reasonable terms to

6       accomplish the task of trying to come --

7               THE COURT: The New York Attorney General has

8       indicated there are these additional search terms that the

9       New York Attorney General deems to be relevant based on its

10      evolving review of the documents and it doesn't seem to me

11      to be extraordinarily onerous to add the four or five

12      additional specific search terms that counsel has

13      articulated, and if there are a couple of, three or four

14      custodians that the New York Attorney General has

15      identified, it doesn't seem to me to be onerous for you to

16      add those.

17              The burden of your letter to the Court was that the

18      New York Attorney General wasn't telling you what it was

19      they wanted you to search or whose files they wanted you to

20      search.  Now we've convened here with a large audience, the

21      New York Attorney General has identified a handful of

22      additional search terms and is proposing to add a handful of

23      additional custodians.  I would have thought that could have

24      been agreed upon at a meet and confer but it wasn't, so --

25              MR. TOAL: So Your Honor, I would say a few things.

26      If we're talking about a handful of search terms and they're

                    Angela Bonello, RPR, Sr. Court Reporter

19

1              Proceedings

2    not their terms that are likely to capture documents that

3    the existing search terms wouldn't have caught and they're

4    reasonable and responsive to the subpoena, that obviously is

5    something we've been willing to talk about from the

6    beginning.  If we're talking about a few additional

7    custodians and there's a reasonable likelihood to believe

8    they have responsive documents, that is something we can

9    talk about if there is reasonable documents in that the

10   existing custodians wouldn't have produced that we can talk

11   about.

12            The January 31st deadline was predicated on the

13   custodians that were specifically identified in the search

14   terms that were specifically identified and if we do have to

15   go back and collect data from additional custodians, load

16   that data, run search terms, that will take additional time

17   and we don't know how much additional time until we know how

18   many of those documents hit on the search terms.  So that's

19   the only proviso that I would add, Your Honor, is that we

20   really can't predict what the volume is going to be, how

21   many documents will hit on the search terms.  Once we know

22   that we can make reliable predictions about how long it will

23   take us to review those documents.

24            MR. WELLS:  Your Honor, if I could just add, in

25   terms of what I'll call a big picture answer we'll get done

26   what you just said.  If we're talking about a handful of new

Angela Bonello, RPR, Sr. Court Reporter

20

Proceedings

1

2    search terms, whatever they are, we'll run them, okay.

3           With respect to the handful of custodians, we will

4    take care of that and do our best to meet the end of the

5    month deadline, if possible.

6           The search terms are different from the custodians.

7    What's different is that with the existing custodians

8    they're now in the data base.  So they give us handful of

9    new search terms we can run it, okay.  The custodians, if

10   they're new names, what has to happen is more time-consuming

11   in the sense we've got to go out to that person's office.

12          THE COURT: You have to upload the document.  I've

13   been there done this, so I understand exactly what we're

14   talking about.  And it's my belief that if the parties both

15   behave reasonably and responsibly, adding a handful of

16   additional search terms and a handful of additional

17   custodians shouldn't be an insuperable barrier to production

18   of all of the documents by January 31st.

19          MR. WELLS:   I agree, Your Honor.

20          MS. SHETH:   Thank you, Your Honor.

21          One last point, and this goes to Mr. Wells's point

22   about the custodians.  I just want to be clear about the

23   shared drives, and I know Your Honor is well familiar with

24   shared drives.  I like to think of them as an electronic

25   filing cabinet where, you know, the entire filing cabinet a

26   particular department or group of individuals at the company

Angela Bonello, RPR, Sr. Court Reporter

1                        Proceedings

2      has access to that cabinet.  They can pull it out and within

3      the cabinets are folders and they're organized by either

4      topic or sometimes by person.

5           Now, Exxon is telling the Court it has searched

6      those shared drives, but I think what Exxon has done, based

7      on my understanding of the correspondence, is that they have

8      searched the folders within this cabinet that relate to the

9      56 custodians.  What they haven't searched are the topical

10     folders.  And I have a nice document from Exxon's own

11     production, which if I may hand it up, will show what I'm

12     talking about, here.

13          So, we were lucky in that we coincidentally found

14     this in Exxon's production, it's on a topic that really is

15     not relevant to this investigation but Exxon happened to

16     produce this document which pertains to something relating

17     to water resource management.  But what this document shows

18     is this, a screen shot of the shared drive system or one of

19     the shared drive systems in place at Exxon.  And if you look

20     at the right --sorry, the left hand corner, it says Document

21     Resource Library, and at the bottom, you see a bunch of

22     documents; some look like word documents, some appear to be

23     power point documents.  But these are documents that are

24     within this folder called Water Resources.

25          Now, we had asked Exxon repeatedly, can you please

26     search these shared drives.  And if you look at page 3 of

22

Proceedings

1

2       our dec we've even identified the specific shared drives

3       that we've identified based on their document production.

4       We said, rather than look for the folder of custodians,

5       please look for the topical folder.  For example, look at

6       the folder that pertains to greenhouse gases, look at the

7       folder that pertains to oil and gas project approvals which

8       does have documents concerning the application of the proxy

9       cost and they have refused to do that.  So I would ask Your

10      Honor that in addition to us identifying additional

11      supplemental custodians and search terms, that Exxon also

12      search these shared drives and the specific topical folder

13      in the shared drives.

14              And the one other area is data bases.  We have not

15      seen any documents in their production that come from data

16      bases and we know based on a review of the documents there

17      are data bases for example the flex data base which contains

18      emissions and environmental data, so we would ask that they

19      also search those the January 31st deadline.

20              THE COURT:  Well, let me ask a very practical

21      question.  Is it contemplated that there are going to be

22      depositions in this proceeding?

23              MS. SHETH:  Yes, Your Honor, I think that that's a

24      fair assumption.

25              THE COURT: What I think is that the search terms

26      that you give to Exxon, supplemental search terms will

Angela Bonello, RPR, Sr. Court Reporter

23

1                         Proceedings

2      capture what you're looking for.

3             MS. SHETH:   Only if they run them in the shared

4      drives.  If they're just running them on custodians we may

5      not get these shared drive documents.  That's my

6      understanding of how it works.

7             THE COURT: You've represented they have run the

8      search terms on shared drives, that's what they have

9      represented.

10            MS. SHETH: I would ask for a clarification from

11     counsel.  Are they running the search terms on the topical

12     shared drive folder?

13            MR. TOAL: We have asked custodians, we've

14     interviewed custodians, we've asked them where they store

15     documents, we asked them if they store documents on shared

16     drives.  They indicated they stored documents on the shared

17     drives that are reasonably likely to be responsive to the

18     subpoena.  We searched the shared drive.

19            THE COURT:  Okay, it seems to me that, you know,

20     it's unreasonable for Exxon to deliver to the New York

21     Attorney General's Office every document that Exxon has in

22     its possession and it seems to me that when you commence the

23     deposition process it will become very apparent if there are

24     any gaps in the document production, and you're just

25     throwing darts against the wall, here.

26            If you give them, as part of the supplemental

                   Angela Bonello, RPR, Sr. Court Reporter

24

1                           Proceedings

2       search terms, some of the terms that are, that appear on

3       page 3 and they run those through the shared drives, which

4       they have represented that they're doing, you're going to

5       get pretty close to the universe of what you need and what

6       you want.

7             MS. SHETH:   I agree with Your Honor, if that's what

8       they're doing, if they're willing to run our search terms on

9       the shared drives then, yes, you're absolutely right, we

10      will get what we're asking go for and looking for.  I don't

11      interpret what Mr. Toal said to be doing that.  I think

12      what he's saying is we're only going to look in a particular

13      shared drive because the custodians said I put my documents

14      in the shared drive.

15            So what that means is, let's say we have the search

16      shared climate change, if I am one of their custodians I

17      mention that drive, they're not running searches in that

18      drive but meanwhile, based on the folder name we know there

19      are documents in a shared drive, that's the climate change

20      implementation shared drive.  So we're asking to search that

21      drive using the search terms, and if they're willing to do

22      that, that's perfect.

23            MR. TOAL:   So we're aware of our obligation to

24      search for documents in places that they're reasonably

25      likely to be found.  I can't address all the specific shared

26      drives now because they were raised for the first time right

25

Proceedings

1
2   now.  This is really what should have happened during the

3   meet and confer.  The A.G. was not willing to engage on

4   these topics so I can only talk generally.

5        We are aware of our obligation to search for

6   documents where they're reasonably likely to be found and

7   we'll continue to do that.

8        MS. SHETH:  And I would submit that the documents

9   relating to climate change are reasonably likely to be found

10  in the shared drives with these names.

11        THE COURT:  Counsel is attempting to be responsive

12  to your concerns and I think we've accomplished all we can

13  accomplish this morning.  If it turns out that you believe

14  that there isn't good faith compliance with what we've

15  agreed upon and discussed this morning then you come back

16  here and we'll drill down deeper than we've drilled today,

17  but it seems to me that they have agreed to produce by

18  January 31st, documents captured by additional search terms.

19  They have agreed to produce by January 31st documents from

20  additional custodians and they have agreed, to the extent

21  the search terms are reasonably likely to produce documents

22  from shared drives, they will produce them.  That's by order

23  of the Court.

24        And if there is any further issues you will

25  initiate additional conferences in early January.

26        MS. SHETH:  Thank you, Your Honor, we really

Angela Bonello, RPR, Sr. Court Reporter

26

1                          Proceedings

2      appreciate your time and your patience and we will do that,

3      we'll work expeditiously starting as soon as Monday or even

4      this afternoon to get that done.  And I would ask Your Honor

5      that if we could keep the December 15th pre-existing

6      conference on the calendar so that if we do have disputes

7      about what's a reasonable handful of custodians and search

8      terms that we may revisit that issue with Your Honor.

9              MR. WELLS:   I was going to ask just the opposite,

10     Your Honor.  The December 15th date was set with respect to

11     the climate.  We reached a stipulation, we don't have any

12     dispute, we have a schedule and that's all in place, so that

13     was the purpose of the December 15th date.

14              THE COURT: I understand and I agree.

15              MR. WELLS:   And so, since -- so I would ask that

16     we not be --not have to hold this date.  People have to fly

17     here from Texas and make plans and there's no reason, as

18     Your Honor has indicated it looks like if there's a problem

19     they can write a letter and you call us in on short notice

20     and we appear and that's worked out so far fine with

21     everybody, so I would ask that we adjourn the December 15th

22     date and if we have to get back here whenever, we will.

23              THE COURT: I agree with that.  The December 15th

24     date relating to the PWC issues, and I signed the

25     stipulation yesterday memorializing your agreement as

26     respects the PWC documents, so there's no reason to come

                    Angela Bonello, RPR, Sr. Court Reporter

27

1                          Proceedings

2       back here on December 15th, but, if things go awry in

3       connection with what we've discussed this morning you'll

4       apprise me by letter and if you have to come back next week

5       or the week after we'll do that.  But it seems to me that

6       there's been a meeting of the minds, here, and let's hope

7       that things move smoothly and cooperatively.

8              MS. SHETH:    Thank you, Your Honor.

9              I think there is one issue that's still pending and

10      that pertains to the redactions of --the redactions for

11      responsiveness.  So we had asked in our letter --well, we

12      submitted in our letter that those redactions are improper.

13      Exxon is only permitted to redact on the basis of privilege

14      or work product and instead we have received documents that

15      are responsive but have been redacted oftentimes in the

16      entirety.  So we've got multiple documents where the entire

17      document, but for one line, has been redacted for

18      responsiveness reasons.  So we would respectfully ask those

19      documents be produced immediately.

20             THE COURT: I'm not prepared to order that at this

21      point in time.  That's something that would have to be fully

22      briefed by both parties.  And if you want to submit  within

23      ten days simultaneous briefs on that issue, I will address

24      it.

25             MS. SHETH:    Thank you, Your Honor.

26             MR. TOAL: Your Honor, I would say on the redaction

                Angela Bonello, RPR, Sr. Court Reporter

28

1                        Proceedings

2       point, we have agreed to go back and re-review all of our

3       redactions for responsiveness and limit our redactions to

4       issues regarding sensitive and private information which

5       even the A.G. says is an appropriate reaction.

6               THE COURT: That's among the reasons why I'm not

7       prepared to order anything today.

8               MR. TOAL: Thank you, Your Honor.

9               THE COURT:  Okay.  Thank you.  You will order the

10      transcript.

11

12                    C E R T I F I C A T E

13

14

15      It is hereby certified that the foregoing is a true and accurate

16      transcript of the proceedings.

17

18

19      _____

20          ANGELA BONELLO

21          SENIOR COURT REPORTER

22          SUPREME COURT-NEW YORK COUNTY

23

24

25

26

                Angela Bonello, RPR, Sr. Court Reporter

# Exhibit 21

---

|   |   |
|---|---|
| In the Matter of the Subpoena Issued by | ) |
| The Attorney General of the State of | ) |
| New York, Dated November 4, 2015, | ) |
| to Exxon Mobil Corporation | ) |
|   | ) |

---

### SUPPLEMENTAL AFFIRMATION OF MICHELE HIRSHMAN

I, Michele Hirshman, an attorney admitted to the practice of law before the courts of the State of New York, and not a party to the above entitled cause, affirm the following to be true under penalties of perjury pursuant to N.Y. C.P.L.R. 2106:

1.      I am a partner in the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss"), and either have personal knowledge of the matters set forth herein, or state facts based upon information and belief.  For the facts stated upon information and belief, I have made reasonable inquiries of individuals with knowledge to confirm the information.  If called as a witness, I could and would competently testify to the contents herein.

2.      I am counsel to Exxon Mobil Corporation ("ExxonMobil" or "the Company") in connection with this matter.  As part of my responsibilities, I oversaw the production of documents in response to the subpoena *duces tecum* dated November 4, 2015 ("the Subpoena").

### *Hirshman Affirmation*

3.      On April 10, 2017, I executed an affirmation describing ExxonMobil's compliance with the Subpoena (the "Hirshman Affirmation").

### Identification of Document Processing Error and Disclosure

4.      The next morning, on April 11, 2017, ExxonMobil's e-discovery vendor (the "Vendor") provided to Paul, Weiss and ExxonMobil a search term hit report (the "Hit Report") concerning the then-upcoming April 30, 2017 production.[1] That report did not list four of the 25 search terms (the "Complete Set of Search Terms")[2] that ExxonMobil had instructed the Vendor to apply to the data set described in the Hit Report.  Absent from the Hit Report were the four supplemental search strings (the "Supplemental Search Terms") that, on January 17, 2017, ExxonMobil had agreed to add to the then-current list of 21 search terms.[3]

5.      Unable to reconcile the Hit Report with the Complete Set of Search Terms, Paul, Weiss exchanged multiple emails with, and spoke by phone to, the Vendor.

6.      By day's end, Paul, Weiss and ExxonMobil had learned that, on or around March 15, 2017, the Vendor had stopped running the Supplemental Search Terms against any data received in connection with the Subpoena.  The Vendor explained by phone that, on March 15, 2017, in preparation for leaving the Vendor's employ, the former project manager responsible for processing all data related to the Subpoena transitioned his responsibilities to a new project manager.  The Vendor clarified that, when this transition occurred, the former project manager failed to notify his replacement that the search terms in use included the Supplemental Search Terms.

---

[1]   *See* Hirshman Affirmation, ¶ 48.
[2]   *See* Exhibit C to Hirshman Affirmation (listing the Complete Set of Search Terms that the Vendor was instructed to apply); *see also* Hirshman Affirmation ¶¶ 22–24 ("Search Terms").
[3]   *See* Hirshman Affirmation, ¶ 24.

7.    On April 11, 2017, the Vendor confirmed that the Supplemental Search Terms had not been applied to the unfiltered data of the Management Committee Custodians[4] (the "Employee Transition Error").

8.    The following day, on April 12, 2017, at the direction of ExxonMobil, Paul, Weiss disclosed to the Attorney General the Employee Transition Error. Paul, Weiss informed the Attorney General that it was continuing to gather and analyze all facts relevant to the error (the "Assessment").

### *Identification of Two Additional Document Processing Errors*

9.    During the course of the Assessment, Paul, Weiss and ExxonMobil learned that, in addition to the Employee Transition Error, the Vendor had also failed to properly apply the Supplemental Search Terms to two other sets of data.

10.    Both of these additional oversights occurred in mid-January 2017. Each was the result of human error.

11.    On April 13, 2017, Paul, Weiss and ExxonMobil learned that, in mid-January 2017, the Vendor had failed to manually transfer from a proprietary systems tool to Relativity (*i.e.*, the document review platform) a subset of documents hitting on the Supplemental Search Terms. Because these documents were never uploaded to Relativity, they were not reviewed by Paul, Weiss (the "Relativity Upload Error").

---

[4]    The "Management Committee Custodians" as defined herein include (i) those six members who served on the Management Committee on the date that the Attorney General issued the Subpoena, *i.e.*, Rex W. Tillerson, Darren W. Woods, Mark W. Albers, Jack P. Williams, Andrew P. Swiger, and Michael J. Dolan, and (ii) Jeffrey Woodbury, Secretary of ExxonMobil and Vice President of Investor Relations, whose documents, due to their highly confidential and sensitive nature, were treated in the same way as those belonging to the six members of the Management Committee. *See* Amended Affidavit of Connie Lynn Feinstein (April 19, 2017), ¶¶ 12–39 (describing the document search, collection, and review protocols applied to the six members of the Management Committee). The Vendor processed the unfiltered data of the Management Committee Custodians after March 15, 2017.

12.     On April 14, 2017, Paul, Weiss and ExxonMobil learned that, also in mid-January 2017, the Vendor had segregated, in error, a distinct subset of documents to an ancillary Relativity platform. That ancillary platform, referred to as "Administrative Staging," is controlled by, and only visible to, the Vendor. Because documents in Administrative Staging that hit on the Supplemental Search Terms were hidden from view, they also were not reviewed by Paul, Weiss (the "Administrative Staging Error").

*Remediation Efforts*

13.     ExxonMobil took immediate remedial action as soon as it learned of the three above described document processing errors.

14.     *First*, ExxonMobil and Paul, Weiss instructed the Vendor to re-apply the Complete Set of Search Terms (which includes the Supplemental Search Terms) to all unfiltered data belonging to the 125 custodians from whom, and 11 shared locations from which, ExxonMobil had to date produced documents (the "Remedial Search").

15.     *Second*, ExxonMobil and Paul, Weiss directed the Vendor to upload to Relativity, and render visible for review, all non-duplicative documents identified as a result of the Remedial Search.

16.     *Third*, ExxonMobil directed Paul, Weiss to (a) manually review all documents identified by the Remedial Search, and (b) prepare for production all responsive, non-privileged documents resulting from this review.

*Validation Exercise*

17.    In an abundance of caution, on April 14, 2017, Paul, Weiss engaged Deloitte Transactions and Business Analytics LLP ("Deloitte") to validate the remediation efforts conducted by the Vendor at the direction of ExxonMobil (the "Validation Exercise").

18.    On April 21, 2017, Deloitte concluded the Validation Exercise. It confirmed that the Vendor had uploaded to Relativity, and rendered visible for review, all non-duplicative documents identified as a result of the Remedial Search.

*Additional Disclosures*

19.    On April 24, 2017, at the direction of ExxonMobil, Paul, Weiss disclosed to the Attorney General (i) the Relativity Upload and Administrative Staging Errors; (ii) the Company's remediation efforts concerning the three document processing errors identified to date; and (iii) the inception and outcome of the Validation Exercise.

*Document Production*

20.    On April 30, 2017, ExxonMobil produced to the Attorney General all responsive, non-privileged documents reviewed as part of the Remedial Search. That production also included responsive, non-privileged documents from 17 additional custodians, whose files ExxonMobil had agreed, on March 31, 2017, to search and review as an accommodation to the Attorney General.

21.    By April 30, 2017, ExxonMobil had produced to the Attorney General all responsive, non-privileged documents that, as of April 24, 2017, it had agreed to produce or was required to produce.

22.     To date, and in accordance with the Attorney General's investigative priorities, ExxonMobil has collected and produced over 430,000 documents (totaling nearly 2.8 million pages) from (a) 142 custodians, and (b) 11 shared locations untethered to specific custodians.

23.     On May 15, 2017, ExxonMobil will produce to the Attorney General (i) a privilege log pertaining to documents withheld from the April 30, 2017 production, and (ii) responsive, non-privileged electronically stored information from the custodial files of Amy Climo, whose documents ExxonMobil agreed to produce on April 27, 2017 as an accommodation to the Attorney General.

24.     If, after May 15, 2017, ExxonMobil learns of additional responsive, non-privileged documents in its custody and control belonging to any of the 142 custodians and/or the 11 shared locations referenced above in ¶ 22, they will be produced promptly to the Attorney General.

I affirm that the foregoing statements made by me are true.

Dated:  May 3, 2017
        New York, New York

_____
Michele Hirshman

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM
INDEX NO. 451962/2016
NYSCEF DOC. NO. 191
RECEIVED NYSCEF: 06/02/2017

# Exhibit 22

**From:** Williams, Jack P
**Sent:** Monday, November 23, 2015 5:36 PM
**To:** Kruger, Rich M; Woods, Darren W
**Subject:** RE: Alberta GHG policy announcement

Thanks Rich.


Jack Williams
Exxon Mobil Corporation
5959 Las Colinas Blvd.  Rm 9
Irving, TX  75039
Ph: 972-444-1919

---

**From:** Kruger, Rich M
**Sent:** Monday, November 23, 2015 8:53 AM
**To:** Williams, Jack P; Woods, Darren W
**Subject:** Alberta GHG policy announcement

Gentlemen,

Alberta's new Premier Rachel Notley and Environment Minister Shannon Phillips announced the next steps on Alberta's GHG policy on Sunday, November 22.  The announcement draws on the work of the climate change policy panel Premier Notley appointed upon election six months ago.  The Premier will travel today to a meeting with Canada's new Prime Minister Trudeau and all of Canada's other premiers to discuss GHG policy in the run-up to the Paris CoP.  Notley and Phillips will both be at CoP with the stated objective of "improving Alberta's reputation."

The announced framework will accelerate Alberta's transition from a coal dominated power sector to natural gas and renewables-heavy electricity production.  The Premier also stressed that Alberta will focus more than it has on energy conservation and renewables in general.  In addition to coal, the focus of the public announcement was on what sounds like a complex, more demanding regime for GHGs from oil sands production when compared to the existing, intensity based regime under the "Specified Gas Emitters Regulation" (SGER) policy for major emitters.  The details of the new framework will take time to assess, but among the major highlights appear to be an industry-wide cap on oil sands GHGs at a level above current production and a broader (perhaps economy wide) tax on carbon that would no longer be intensity based and which would capture all tons at a $30 level staring in 2018.  This contrasts with an effective $5-6 price per ton price associated with the planned $30 per ton intensity-based policy already in place via SGER.

The Premier described the carbon tax as revenue neutral and then enumerated a long list of ways, including in part technology development, on which the additional funds would be spent.   The policy does contemplate some form of offsets to address competitiveness which we need to better understand.  Several oil sands producers (specifically CNRL, Cenovus, Shell and Suncor) and various ENGOs were present and on stage with the Premier and endorsed the policy announcement.

We are turning our immediate focus to a detailed examination of the announcement and its impact on our existing operations and possible future projects in Alberta.

If contacted by the media we plan a short, simple response something like the following:

--We believe any GHG policy for Alberta should be designed to protect the competitiveness of the province's oil and gas industry.
--We are studying the announcements from the government to assess their impact on our existing operations and possible future projects.


Rich

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)          EMC 001844415

# Exhibit 23

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

2001 K STREET, NW                           WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

1285 AVENUE OF THE AMERICAS
NEW YORK, NY 10019-6064
TELEPHONE (212) 373-3000

UNIT 3601, OFFICE TOWER A
BEIJING FORTUNE PLAZA
NO. 7 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT
BEIJING 100020
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300

12TH FLOOR, HONG KONG CLUB BUILDING
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, U.K.
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

WRITER'S DIRECT DIAL NUMBER

(202) 223-7446

WRITER'S DIRECT FACSIMILE

(202) 315-3802

WRITER'S DIRECT E-MAIL ADDRESS

sjansen@paulweiss.com

December 22, 2015

*Via E-Mail*

Monica Wagner, Esq.
Deputy Chief
Environmental Protection Bureau
Office of the Attorney General
State of New York
120 Broadway, 26th Floor
New York, NY 10271

Re:    *New York State Attorney General Subpoena Directed to Exxon Mobil Corporation*

Dear Ms. Wagner:

We represent Exxon Mobil Corporation ("ExxonMobil") in connection with the above-referenced matter. In response to your subpoena dated November 4, 2015 (the "Subpoena"), we are enclosing materials bearing Bates numbers EMC 000000005 – EMC 000000022. Pursuant to our December 10, 2015 discussions, the enclosed materials include organizational charts for certain individuals who are on litigation hold.

We are also enclosing as Appendix A a list of the names, titles, and business units for individuals who are on litigation hold in the United States. In addition to the names included on Appendix A, sixty-six individuals who are employed by global ExxonMobil affiliates are also on hold. These sixty-six individuals are located in the following countries: Australia, China, Belgium, Canada, Qatar, Russia, Singapore, and the United Kingdom.

Moreover, in your December 16, 2015 correspondence, you suggested several modifications to the search terms that ExxonMobil is using to identify potentially relevant electronic data. ExxonMobil confirms that we have incorporated all of your suggested modifications.

During our November 18 discussions, you and your colleagues represented that the New York Attorney General ("NYAG") would maintain the confidentiality of ExxonMobil's information produced in response to the Subpoena. Because this

Monica Wagner, Esq.                                                                  2

submission contains confidential information which, if disclosed, would cause substantial injury to the competitive position of ExxonMobil, ExxonMobil requests that the NYAG accord confidential treatment under New York's Freedom of Information Law ("FOIL") to this letter, the files and the data accompanying this letter, and all information derived therefrom (the "Confidential Information") pursuant to New York Public Officers Law § 87(2). Accordingly, we have stamped the enclosed files "Confidential / FOIL Treatment Requested by Exxon Mobil Corporation Pursuant to Pub. Officers Law Section 87(2)." We respectfully request that you take all appropriate measures to ensure that the Confidential Information (i) will not be publicly released, disseminated or publicized, (ii) will only be shared with NYAG staff on a need-to-know basis, and (iii) will be maintained in a secure facility.

If you have any questions about the production, please do not hesitate to call me.

Very truly yours,

Sean D. Jansen

Enclosures

cc:     Patrick J. Conlon, Esq.
cc:     Michele Hirshman, Esq.
cc:     Theodore V. Wells, Jr., Esq.

**Letter from S. Jansch to M. Wagner**

**Appendix A**

**December 22, 2015**

| Name | Job Title | Business Unit |
|------|-----------|---------------|
| Aguiar, Matthew J. | Sr. Vice President | ExxonMobil Chemical Company |
| Albers, Mark W. | Sr. Vice President | Exxon Mobil Corporation |
| Allman, Gemma T. | Manager | Public and Government Affairs, Downstream |
| Ames, Thomas L. | Research Analyst | Corporate Strategic Planning, Economics & Energy |
| Bachman, Ammie N. | Associate Toxicologist | EMRE, Biomedical Sciences -Toxicology |
| Bailes, Robert W. | Downstream & Chemical SSH&E Manager | Safety, Security, Health and Environment |
| Balagia, S. Jack | Vice President, General Counsel | Exxon Mobil Corporation |
| Banaszak, Sara J. | Manager | Public and Government Affairs, Upstream, Gas & Power Marketing |
| Bell, Annora B. | Counsel | Law |
| Bergman, Cynthia L. | U.S. Government Relations Manager | Public and Government Affairs, U.S. Government Relations |
| Bishop, Nathan R. | Public & Government Affairs Manager, Fuels & Lubes | Public and Government Affairs, Downstream, Fuels & Lubes |
| Blevins, Susan K. | Climate Policy Planning Sr. Advisor | ExxonMobil Refining and Supply Company, Strategy and Planning-Global Regulatory Affairs |
| Boyer, Robert F. | Claims Supervisor | Treasurers, Risk Management-Claims |
| Bradbury, Sidney M. | Financial Advisor | Controller's, Corporate-Financial Reporting |
| Buchholtz, Walt F. | Manager | Public and Government Affairs, Chemicals |
| Byrne, Richard E. | General Counsel | Law, Downstream |
| Carpenter, Bill C. | Program Manager | Public and Government Affairs, Budget and Controls Management |
| Carron, Christopher M. | Counsel | Law |
| Carter, Susan E. | Sr. Advisor | Public and Government Affairs, Executive Branch Issues Management Coordination |
| Chapman, Neil A. | President | ExxonMobil Chemical Company |
| Chaves, Milton | Sr. Advisor | Public and Government Affairs, Federal Government Relations |
| Christensen, Karen P. | Environmental Associate | EMRE, Biomedical Sciences and Environmental Sciences |
| Chuchro, Alicia J. | Environmental Engineer | U.S. Production |
| Clark, Alan L. | Manager | Gas & Power Marketing |
| Clark, Kimberly A. | Employee Communications Manager | Public and Government Affairs, Communications |

A-1

**Confidential / FOIL Treatment Requested by Exxon Mobil Corporation Pursuant to Pub. Officers Law Section 87(2)**

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 356 of 553   PageID 783

**Appendix A**
**Letter from S. Jansen to M. Wagner**
**December 22, 2015**

| Name | Job Title | Business Unit |
|------|-----------|---------------|
| Climo, Amy E. | Environmental Advisor | Safety, Security, Health and Environment, Environment & Regulatory |
| Cohen, Kenneth P. | Vice President; Chairman | Public and Government Affairs; ExxonMobil Foundation |
| Collins, Douglas | Chief Attorney | Law, Downstream |
| Colton, William M. | Vice President | Corporate Strategic Planning, Management & Staff |
| Connell, Dylan B. | Media Analyst | Public and Government Affairs, Media Relations, Center of Expertise |
| Cooney, Philip | USA Operations Manager | Public and Government Affairs, U.S. Public and Government Affairs Operations |
| Copeskey, Jeff F. | Advisor | Public and Government Affairs, Government Relations & Business Support, State Government Relations |
| Copley, Bruce G. | Sr. Scientific Associate | EMRE, Biomedical Sciences -Occupational & Public Health |
| Cousins, Mike | Executive Vice President | ExxonMobil Exploration Company, Exploration Regions |
| Creegan, Kathleen M. | Chemist | EMRE, Research & Development Support Services |
| Dalcol, Devan J. | Integrated Advocacy Advisor | Public and Government Affairs, Integrated Advocacy |
| Dashwood, John R. | Vice President, Upstream Commercial Resources | Gas & Power Marketing |
| Devlin, Dennis J. | Sr. Environmental Health Advisor | Corporate Strategic Planning, Environmental Policy & Planning |
| Dingmore, Lindsey | Vice President | XTO Energy, Public and Government Affairs |
| Dolan, Michael J. | Sr. Vice President | Exxon Mobil Corporation |
| DuCharme, Linda D. | Vice President | Gas & Power Marketing, Americas, Asia Pacific, Africa & New Markets |
| Easley, Daniel C. | House Sr. Advisor | Public and Government Affairs |
| Ebner, Randall M. | Assistant General Counsel | Law, Corporate |
| Eikenberry, Jeremy | Program Officer | Public and Government Affairs, Corporate Citizenship |
| Faldi, Alessandro | Distinguished Research Associate | EMRE, Research & Development - Corporate Strategic Research |
| Fariello, Theresa M. | Vice President | Public and Government Affairs |
| Feeley, Jennifer S. | Corporate Program Portfolio Manager | EMRE, Research & Development - Corporate Strategic Research |
| Fick, C. Milton | Counsel | Law, Upstream |
| Furman, Kevin C. | Associate Developer | Gas & Power Marketing Corporate Power Projects |
| Gardner, Robert E. | Manager | Corporate Strategic Planning, Economics & Energy |

A-2

**Confidential / FOIL Treatment Requested by Exxon Mobil Corporation Pursuant to Pub. Officers Law Section 87(2)**

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 357 of 553   PageID 784

**Appendix A**
**Letter from S. Jansch to M. Wagner**
**December 22, 2015**

| Name | Job Title | Business Unit |
|---|---|---|
| Glennon, John P. | Manager | ExxonMobil Refining and Supply Company, Strategy & Planning-Global Regulatory Affairs |
| Gobush, Matthew N. | Integrated Advocacy Sr. Advisor | Public and Government Affairs, Integrated Advocacy |
| Goins, Neal R. | Vice President | Public and Government Affairs, Government Relations & Business Support -International Government Relations |
| Goudge, Laura M. | Corporate Communications Advisor | Public and Government Affairs, Communications, Center of Expertise |
| Graber, Mary Y. | Air Group Head | EMRE, Engineering, Specialized Engineering Division, Environmental Technology |
| Greenlee, Stephen M. | President | ExxonMobil Exploration Company |
| Gunn, John P. | Manager | Gas & Power Marketing, Upstream Fiscal & Regulatory Affairs |
| Gunnlaugsson, Tracey C. | Manager | ExxonMobil Refining & Supply Company, Supply & Transportation Global Logistics Optimization-Americas Product |
| Gunter, John W. | Global Energy and Oil Loss Advisor | ExxonMobil Refining & Supply Company, Global HQ - Refining & Supply-Operations Support & Best Practices |
| Hafker, William R. | Environmental Global Technology Sponsor | EMRE, Engineering, Specialized Engineering Division, Environmental Technology |
| Hamilton, Jed M. | Sr. Artic Consultant | ExxonMobil Upstream Research Company, Engineering Offshore & Environment |
| Hazel, Carol C. | Chemicals Issues Advisor | Public and Government Affairs, Issues Management , Center of Expertise |
| Heckman, D. Christopher | General Counsel, ExxonMobil Risk Management Inc., Petroleum Casualty Company | Exxon Mobil Corporation, Compliance & Corporate |
| Herrin, Tammy S. | Tax Counsel | Exxon Mobil Corporation |
| Holbrook, William F. | Corporate Media Sr. Advisor | Public and Government Affairs, Corporate Public Affairs |
| Holguin, Margo | Board Secretariat | Office of the Secretary |
| Howison, Susan S. | Paralegal | Law |
| Hubbard, Andy J. | Global Regulatory Advisor | Upstream Fiscal & Regulatory Affairs |
| Huffaker, Charlotte B. | Executive Communications Advisor | Public and Government Affairs, Communications, Center of Expertise |
| Hulbert, Kristen R. | Counsel | Law |
| Jackson, Lorie D. | State Government Relations Advisor | Public and Government Affairs, Government Relations & Business Support -U.S. Government Relations |

A-3

**Confidential / FOIL Treatment Requested by Exxon Mobil Corporation Pursuant to Pub. Officers Law Section 87(2)**

Appendix A
Letter from S. Jansch to M. Wagner
December 22, 2015

| Name | Job Title | Business Unit |
|---|---|---|
| Jeffers, Alan T. | Media Relations Manager | Exxon Mobil Corporation, Corporate Public Affairs |
| Johnson, Kenneth C. | Counsel | Law, Litigation |
| Johnson, Robert W. | Assistant General Counsel | Exxon Mobil Corporation, Management Support Services |
| Jones, Edward | Energy Advisor | Corporate Strategic Planning, Economics & Energy |
| Keil, Richard D. | Sr. Advisor | Public and Government Affairs, Integrated Advocacy |
| Kerby, Michael C. | Manager | EMRE Research & Development, Corporate Strategic Research |
| Kerr, Lauren A. | Manager | Public and Government Affairs, Media Relations Operations, Center of Expertise |
| Kestle, Stephen J. | Manager | Controller's, Corporate-Financial Reporting |
| Kheshgi, Haroon S. | Global Climate Change Science Program Lead | EMRE Research & Development, Corporate Strategic Research |
| Klein, Travis | Gulf Coast Growth Venture Air Engineer | Central SHE (Safety, Health & Environment) |
| Klekar, Chad C. | Planning Advisor | Corporate Strategic Planning |
| Knapp, Andrew C. | Manager | Public and Government Affairs, Functional Issues Management, Center of Expertise |
| Knight, Matt | Manager | Gas & Power Marketing, Corporate Power Projects |
| Krishna, Paul P. | Environmental Programs Manager | XTO Energy, Environmental Health & Safety |
| Lachenmyer, Lynne M. | Vice President | Safety, Security, Health and Environment |
| Landuyt, William | Research Associate | EMRE Research & Development, Corporate Strategic Research |
| Levey, Seth | Integrated Advocacy Advisor | Public and Government Affairs, Integrated Advocacy |
| Lewis, R. Jeffrey | Section Head, Epidemiology & Health Surveillance | EMRE, Biomedical Sciences - Occupational & Public Health |
| Ligh, David | State Government Relations Advisor | Public and Government Affairs, Government Relations & Business Support-U.S. Government Relations |
| Linker, Jennifer D. | Downstream Issues Advisor | Public and Government Affairs, Issues Management, Center of Expertise |
| Linville, Kristine K. | Attorney | Law, Legal Services |
| Logan, Laura E | Regional Communications Manager | Public and Government Affairs, Communications, Center of Expertise |
| Luettgen, Robert A. | Manager | Office of the Secretary |
| Lyons, Glen C. | Regulatory Advisor | Upstream Fiscal & Regulatory Affairs |
| Matturro, Michael G. | Lab Director | EMRE Research & Development, Corporate Strategic Research |

A-4

Confidential / FOIL Treatment Requested by Exxon Mobil Corporation Pursuant to Pub. Officers Law Section 87(2)

**Appendix A**
**Letter from S. Jansen to M. Wagner**
**December 22, 2015**

| Name | Job Title | Business Unit |
|------|-----------|---------------|
| Matusic, Karen P. | Sr. Director, Federal Relations; Executive Director | Public and Government Affairs, Corporate Citizenship, Center of Expertise; ExxonMobil Foundation |
| McCarron, Suzanne M. | General Manager; President | Public and Government Affairs, Government Relations & Public Affairs Business Support; ExxonMobil Foundation |
| McCoy, Keith W. | House Sr. Advisor | Public and Government Affairs |
| McGowan, Marie C. | Chief Attorney | Law, Legal Services |
| Mignone, Bryan K. | Research Associate | EMRE Research & Development, Corporate Strategic Research, Emerging Energy Sciences Section |
| Mills, Darlene C. | Office Manager | Public and Government Affairs |
| Mire, Richard A. | Manager | Safety, Security, Health and Environment - Environment, Regulatory and Socioeconomics |
| Mitchell, Jeanne O. | Senate Sr. Advisor | Public and Government Affairs |
| Mizan, Tahmid I. | Sr. Technology Advisor | Corporate Strategic Planning |
| Monahan, Tom | Staff Regulatory Specialist | XTO Energy, Environmental, Health & Safety Project Management |
| Mueller, Daniel | Legislative and Regulatory Manager | Fuels Marketing Retail Americas - Retail Support |
| Murphy, Kevin | Global Issues Manager | Public and Government Affairs, Issues Management, Center of Expertise |
| Nelson, Neely S. | EMRE/URC Manager | Public and Government Affairs, Operations Management |
| Nolan, Robert M. | Federal Government Relations Sr. Advisor | Public and Government Affairs |
| Norman, John P. | Associate Toxicologist | EMRE, Biomedical Sciences - Toxicology |
| O'Brien, David P. | Sr. Consultant, Power Projects | Gas & Power Marketing, Upstream Commercial Resources |
| Omey, Samantha A. | State Government Relations Advisor | Public and Government Affairs, Government Relations & Business Support-U.S. Government Relations |
| Onderdonk, Todd W. | Sr. Energy Advisor | Corporate Strategic Planning, Economics & Energy |
| Ortwein, Sara N. | President | ExxonMobil Upstream Research Company |
| Parker, Randy E. | Regulatory Advisor | Upstream Fiscal & Regulatory Affairs |
| Parsons, James E. | Corporate Securities & Finance Coordinator | Law, Corporate |
| Plumeri, John A. | Manager | EMRE, Biomedical Science |
| Popovech, Marusia A. | Advanced Toxicologist | EMRE, Biomedical Sciences - Toxicology |
| Powell, Guy A. | Corporate Greenhouse Gas Manager | Corporate Strategic Planning, Environmental Policy & Planning |

A-5

**Confidential / FOIL Treatment Requested by Exxon Mobil Corporation Pursuant to Pub. Officers Law Section 87(2)**

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 360 of 553   PageID 787

**Appendix A**
**Letter from S. Jansch to M. Wagner**
**December 22, 2015**

| Name | Job Title | Business Unit |
|---|---|---|
| Prince, Roger C. | Sr. Scientific Associate | EMRE, Biomedical Sciences - Environmental Sciences |
| Quinn, John | State Government Affairs Advisor | Public and Government Affairs, Government Relations & Business Support, U.S. Government Relations |
| Rau, Charlie T. | Global Environmental and Sustainability Advisor | Safety, Security, Health, and Environment - Environment & Regulatory |
| Redman, Aaron D. | Sr. Environmental Scientist | EMRE, Biomedical Sciences - Environmental Sciences |
| Rippe, Robert D. | Sr. Counsel | Law, Corporate |
| Roberts-Judd, Alexandra J. | Manager | Public and Government Affairs, Exploration & Upstream Ventures |
| Robinson, Matthew S. | Executive Communications Manager | Public and Government Affairs, Communications, Center of Expertise |
| Rodgers, Abigail L. | Corporate Brand Manager | Public and Government Affairs, Corporate Brand CIT&CO |
| Roman, Michael J. | Federal Government Relations Sr. Advisor | Public and Government Affairs |
| Rosenthal, David S. | Vice President and Controller's | Controller's |
| Rzakulieva, Leyla R. | ExxonMobil Production Company Manager and Upstream Lead | Public and Government Affairs, Upstream |
| Sakamoto, Craig T. | Staff Regulatory Strategist | ExxonMobil Oil Corporation, Marketing & Refining U.S. General Ledger - Downstream Embedded Safety, Health & Environmental, Refining - North America |
| Sandefur, Kristin T. | Dallas IMS Supervisor | Global Services Company, Global Real Estate & Facilities, Facilities America, Irving |
| Schuessler, Daniel L. | Sr. Advisor | ExxonMobil Chemical Company, Business Services, Planning & Business Development |
| Schulz, Christopher | Executive Communications Advisor | Public and Government Affairs, Corporate Brand CIT&CO, Center of Expertise |
| Schulz, James | Issue Advocacy Manager | Public and Government Affairs, Integrated Advocacy |
| Scinta, Nicholas | Issues Advisor | Public and Government Affairs, Issues Management, Center of Expertise |
| Scott, Sherry L. | Counsel | Law, Legal Services |
| Shenefelt, Patricia F. | Corporate Issues Sr. Advisor | Public and Government Affairs, Issues Management, Center of Expertise |
| Shores, Mark M. | Planning Manager | Corporate Strategic Planning |
| Silvestri, Scott J. | Corporate Media Sr. Advisor | Public and Government Affairs, Corporate Public Affairs |

**Confidential / FOIL Treatment Requested by Exxon Mobil Corporation Pursuant to Pub. Officers Law Section 87(2)**

**Appendix A**

**Letter from S. Jansen to M. Wagner**

**December 22, 2015**

| Name | Job Title | Business Unit |
|---|---|---|
| Smith, Joseph P. | Sr. Research Associate | ExxonMobil Upstream Research Company, Engineering Offshore & Environment |
| Snow, Angela K. | Advertising and Corporate Projects Manager | Public and Government Affairs, Corporate Brand CIT& CO, Center of Expertise |
| Sokul, Stanley S. | XTO Issues Management and Advocacy Advisor | XTO Energy, Government & Regulatory Affairs |
| Spellings, Jaime | Vice President, General Tax Counsel | Tax, General Management |
| Stern, David L. | Policy Planning Executive | ExxonMobil Refining & Supply Company, Strategy & Planning Global Regulatory Affairs |
| Stuckwisch, Kurt D. | Manager | ExxonMobil Development Company, Public and Government Affairs, Upstream |
| Swarup, Vijay | Vice President | EMRE, Research Development |
| Swiger, Andrew P. | Sr. Vice President | EMRE, Research & Development, Management |
| Tanaka, Paul L. | Energy & Technology Advisor | Corporate Strategic Planning, Economics & Energy |
| Theurer, Derek J. | Federal Government Relations Sr. Advisor | Public and Government Affairs |
| Tillerson, Rex W. | Chairman and CEO | Exxon Mobil Corporation |
| Timmons, Sharon M. | Paralegal | Law, Legal Services |
| Tinsley, Brian D. | Manager | Office of the Secretary, Shareholder Relations |
| Trelenberg, Pete W. | Manager | Corporate Strategic Planning, Environmental Policy & Planning |
| Turner, James Ward | Sr. Technical Professional, Sr. Structural and Civil Consultant | Development Co., Engineering Function, Marine & Arctic; Marine Civil & Materials / Civil Structural & Arctic |
| Usadi, Adam | Section Head | EMRE Research & Development, Corporate Strategic Research |
| Van Pelt, Doug J. | Regulatory Manager, Environmental, Regulatory, and Socioeconomic Group | Central Safety, Security, Health, and Environment - Environment & Regulatory |
| Vendel, Jason D. | Counsel | Law, Downstream |
| Walton, Gantt H. | Operations Manager | Public and Government Affairs, Operations Management |
| Welberry, Christopher R. | Corporate Communications Manager | Public and Government Affairs, Communications, Center of Expertise |
| Wheeler, Derek B. | Compliance and Logistics Optimizer | ExxonMobil Refining & Supply Company, Supply & Transportation Global Logistics Optimization-Americas Product |

**Confidential / FOIL Treatment Requested by Exxon Mobil Corporation Pursuant to Pub. Officers Law Section 87(2)**

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 362 of 553   PageID 789

**Appendix A**
**Letter from S. Jansch to M. Wagner**
**December 22, 2015**

| Name | Job Title | Business Unit |
|---|---|---|
| Williams, Jack P. | Sr. Vice President | Exxon Mobil Corporation |
| Williams, Tyler C. | Associate Analyst | Gas & Power Marketing, Business & Market Analysis Americas / Asia Pacific / Africa Gas Marketing (New Markets) |
| Wirsing, Penny | Environmental Section Supervisor | ExxonMobil Oil Corp., Marketing & Refining U.S. General Ledger - Downstream Embedded Safety, Health & Environmental, Refining - North America |
| Wojnar, Theodore J. | President | EMRE |
| Woodbury, Jeffrey J. | Vice President | Investor Relations & Office of the Secretary |
| Woods, Darren W. | Sr. Vice President | Exxon Mobil Corporation |
| Yeh, Grace C. | Counsel | Law, Downstream |
| Young, Robert B. | Regional Operations Manager | Public and Government Affairs, Regional Operations |
| Zamora, Michael P. | Global Logistics Optimization Manager | ExxonMobil Refining & Supply Company, Supply & Transportation Global Logistics Optimization |

A-8

**Confidential / FOIL Treatment Requested by Exxon Mobil Corporation Pursuant to Pub. Officers Law Section 87(2)**

# Exhibit 24

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064
TELEPHONE (212) 373-3000

LLOYD K. GARRISON    (1946-1991)
RANDOLPH E. PAUL    (1946-1956)
SIMON H. RIFKIND    (1950-1995)
LOUIS S. WEISS    (1927-1950)
JOHN F. WHARTON    (1927-1977)

UNIT 3601, OFFICE TOWER A, BEIJING FORTUNE PLAZA
NO. 7 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT
BEIJING 100020
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300

12TH FLOOR, HONG KONG CLUB BUILDING
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, U.K.
TELEPHONE (44 20) 7367 1600

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

WRITER'S DIRECT DIAL NUMBER

212-373-3869

WRITER'S DIRECT FACSIMILE

212-492-0868

WRITER'S DIRECT E-MAIL ADDRESS

dtoal@paulweiss.com

MATTHEW W. ABBOTT
ALLAN J. ARFFA
ROBERT A. ATKINS
DAVID J. BALL
SCOTT A. BARSHAY
JOHN F. BAUGHMAN
LYNN B. BAYARD
CRAIG A. BENSON
MITCHELL L. BERG
MARK S. BERGMAN
DAVID M. BERNICK
JOSEPH J. BIAL
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
ANGELO BONVINO
JAMES L. BROCHIN
DAVID W. BROWN
SUSANNA M. BUERGEL
PATRICK S. CAMPBELL*
JESSICA S. CAREY
JEANETTE K. CHAN
GEOFFREY R. CHEPIGA
ELLEN N. CHING
WILLIAM A. CLAREMAN
LEWIS R. CLAYTON
JAY COHEN
KELLEY A. CORNISH
CHRISTOPHER J. CUMMINGS
CHARLES E. DAVIDOW
THOMAS V. DE LA BASTIDE III
ARIEL J. DECKELBAUM
ALICE BELISLE EATON
ANDREW J. EHRLICH
GREGORY A. EZRING
LESLIE GORDON FAGEN
ROSS A. FIELDSTON
ANDREW C. FINCH
BRAD J. FINKELSTEIN
MARTIN FLUMENBAUM
ANDREW J. FOLEY
ANDREW J. FORMAN*
HARRIS B. FREIDUS
MANUEL S. FREY
ANDREW L. GAINES
KENNETH A. GALLO
MICHAEL E. GERTZMAN
ADAM M. GIVERTZ
SALVATORE GOGLIORMELLA
ROBERT D. GOLDBAUM
NEIL GOLDMAN
CHARLES H. GOOGE, JR.
ANDREW G. GORDON
UDI GROFMAN
NICHOLAS GROOMBRIDGE
BRUCE A. GUTENPLAN
ALAN S. HALPERIN
JUSTIN G. HAMILL
CLAUDIA HAMMERMAN
BRIAN S. HERMANN
MICHELE HIRSHMAN
MICHAEL S. HONG
DAVID S. HUNTINGTON
AMRAN HUSSEIN
LORETTA A. IPPOLITO
JAREN JANGHORBANI
BRIAN M. JANSON
MEREDITH J. KANE

ROBERTO FINZI
PETER E. FISCH
ROBERT C. FLEDER

BRAD S. KARP
PATRICK N. KARSITZ
JOHN C. KENNEDY
BRIAN KIM
DAVID M. KLEIN
ALAN W. KORNBERG
DANIEL J. KRAMER
DAVID K. LAKHDHIR
STEPHEN P. LAMB*
JOHN E. LANGE
GREGORY F. LAUFER
BRIAN C. LAVIN
DANIEL J. LEFFELL
XIAOYU GREG LIU
JEFFREY D. MARELL
MARCO V. MASOTTI
EDWIN S. MAYNARD
DAVID W. MAYO
ELIZABETH R. McCOLM
MARK F. MENDELSOHN
CLAUDINE MEREDITH-GOUJON
WILLIAM B. MICHAEL
JUDIE NG SHORTELL*
CATHERINE NYARADY
JANE B. O'BRIEN
ALEX YOUNG K. OH
BRAD R. OKUN
KELLEY D. PARKER
VALERIE E. RADWANER
CARL L. REISNER
LORIN L. REISNER
WALTER G. RICCIARDI
WALTER RIEMAN
RICHARD A. ROSEN
ANDREW N. ROSENBERG
JACQUELINE P. RUBIN
CHARLES F. "RICK" RULE*
RAPHAEL M. RUSSO
ELIZABETH M. SACKSTEDER
JEFFREY D. SAFERSTEIN
JEFFREY B. SAMUELS
DALE M. SARRO
TERRY E. SCHIMEK
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JOHN M. SCOTT
STEPHEN J. SHIMSHAK
DAVID R. SICULAR
MOSES SILVERMAN
STEVEN SIMKIN
JOSEPH J. SIMONS
AUDRA J. SOLOWAY
SCOTT M. SONTAG
TARUN M. STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
RICHARD C. TARLOWE
MONICA K. THURMOND
DANIEL J. TOAL
LIZA M. VELAZQUEZ
LAWRENCE G. WEE
THEODORE V. WELLS, JR.
STEVEN J. WILLIAMS
LAWRENCE I. WITDORCHIC
MARK B. WLAZLO
JULIA MASON WOOD
JENNIFER H. WU
BETTY YAP*
JORDAN E. YARETT
KAYE N. YOSHINO
TONG YU
TRACEY A. ZACCONE
TAURIE M. ZEITZER
T. ROBERT ZOCHOWSKI, JR.

*NOT ADMITTED TO THE NEW YORK BAR

April 19, 2017

*Via Email*

John Oleske, Esq.
Senior Enforcement Counsel
Office of the Attorney General
State of New York
120 Broadway, 26th Floor
New York, NY 10271

Re:    *In the Matter of the Application of the People of the State of New York,*
       *by Eric T. Schneiderman, Index No. 451962/2016.*

Dear John:

        We write in response to your letter, dated April 13, 2017, which demands information that deviates from the instructions provided by Justice Ostrager at the March 22, 2017 discovery conference (the "Discovery Conference"). We disagree with your claim that the Affidavit of Connie Lynn Feinstein (the "Feinstein Affidavit") and the Affirmation of Michele Hirshman (the "Hirshman Affirmation") "lack the key information" required. To the contrary, the substance of each submission corresponds to the Court's express guidelines.

***Feinstein Affidavit***

        In accordance with the Court's March 22 directive, the Feinstein Affidavit confirms the representations of ExxonMobil's counsel regarding the collection of documents and electronic data from the Management Committee custodians. (*See* Mar. 22, 2017 Tr. at 17:14–26.) It also explains the issue relating to the Wayne Tracker email account, and the steps taken by ExxonMobil to address the issue. (*See id.*) At the Discovery Conference, Justice Ostrager ordered ExxonMobil to provide one or more affidavits "attesting to" the information "represented by counsel" in ExxonMobil's letter of March 21, 2017. (*Id.* at 17:18–19, 17:25–26.) The Feinstein Affidavit does precisely that. And, indeed, it is entirely appropriate for

John Oleske, Esq.                                                              2

ExxonMobil to designate Ms. Feinstein to testify on its behalf not only as to information known to her first hand, but also as to information known to others at ExxonMobil.[1] Nevertheless, as you requested and in an effort to streamline her deposition, we enclose as Exhibit A the list of individuals with whom Ms. Feinstein conferred regarding the facts contained in her Affidavit.

As a further accommodation to the Attorney General, ExxonMobil will produce Ms. Feinstein for a deposition on April 26, 2017, at the New York offices of ExxonMobil's counsel, Paul, Weiss, Rikfind, Wharton & Garrison LLP.[2]

### Hirshman Affirmation

Your letter also requests a new "Certification of Compliance." This is unreasonable and contrary to the Court's March 22 order. *First*, contrary to the suggestion in your letter, at no point during the Discovery Conference, or at any other time, did the Court endorse or otherwise require ExxonMobil to comply with any of the supposed Instructions contained in the Attorney General's subpoena. *Second*, subpoena Instruction No. 10 ("Your Production Instructions to be Produced") is plainly improper because both written and oral instructions prepared by counsel concerning the steps taken to respond to a subpoena are protected by the work product doctrine and attorney-client privilege. ExxonMobil therefore rejects any purported obligation to produce such instructions. *Third*, without providing any specifics, you claim that ExxonMobil failed to produce documents responsive to some, but not all, subpoena requests. Not so. ExxonMobil has produced documents responsive to each of the Attorney General's subpoena requests. As a result, even setting aside issues about the propriety of subpoena Instruction 4 ("No Documents Responsive to Subpoena Requests"), the Hirshman Affirmation need not address it. *Fourth*, the suggestion in your letter that the Hirshman Affirmation fails to conform to subpoena Instruction No. 3 ("Documents No Longer in Your Possession") is without merit. The Feinstein Affidavit, attached to the Hirshman Affirmation, was provided to you for this very reason. No more is required. *Fifth*, as indicated in her Affirmation, Ms. Hirshman oversaw the production of documents in response to the subpoena. ExxonMobil has thus complied in good faith with subpoena Instruction No. 12 ("Affidavit of Compliance").[3]

*               *               *

---

[1]   The Rules of the Commercial Division of the Supreme Court expressly permit ExxonMobil to designate an individual to testify on the Company's behalf. Rule 11-f—enacted in 2015—permits a company to designate an individual to testify on the company's behalf in response to a subpoena directed to the company. 22 N.Y.C.R.R. § 202.70, Rule 11-f(a), (c), (f). The deponent may testify "about information known or reasonably available *to the entity*," not just to information known first-hand. *Id.* at Rule 11-f(f) (emphasis added).

[2]   ExxonMobil reserves its rights to contest the content and location of any additional depositions of ExxonMobil employees pertaining to the subject matter of the Feinstein Affidavit.

[3]   It is unclear what your office means when it states in Exhibit A to your April 13 letter that "Exhibit Listing Litigation Hold Persons Incomplete (Mar. 28, 2017 Tr. 33-34.)." Attached as Exhibit B to the Hirshman Affirmation is a list of 638 employees placed on litigation hold.

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 366 of 553   PageID 793

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

John Oleske, Esq.                                                                 3

       Finally, as indicated in Ms. Ahmed's April 12, 2017 email, the Feinstein Affidavit and Hirshman Affirmation will be supplemented, as necessary.  We are still in the process of gathering, analyzing, and verifying all relevant facts regarding application of the supplemental search terms to all data, including the Management Committee data, provided to ExxonMobil's e-discovery vendor.  We plan to provide an amended version of the Feinstein Affidavit by Friday, April 21, 2017.  Unfortunately, Ms. Hirshman has been addressing two pressing personal issues, and it will take additional time to supplement her Affirmation.  She is prepared to describe these issues to your office if necessary.

       Sincerely,

       */s/ Daniel J. Toal*
       Daniel J. Toal

cc:  Manisha Sheth, Esq.     Mandy DeRoche, Esq.     Theodore V. Wells, Jr., Esq.
      Katherine Milgram, Esq.   Patrick Conlon, Esq.      Michele Hirshman, Esq.

**Exhibit A**
**Letter from D. Toal to J. Oleske**
**April 19, 2017**

| Paragraph | Source |
|:---:|:---|
| 1 | Personal Knowledge |
| 2 | Donnie Wilburn<br>Personal Knowledge |
| 3 | Personal Knowledge |
| 4 | Jeff Demuynck<br>Karen Cunningham<br>Personal Knowledge<br>Robert Levy |
| 5 | Karen Cunningham<br>Personal Knowledge<br>Robert Levy |
| 6 | Paul, Weiss<br>Robert Levy |
| 7 | Paul, Weiss<br>Personal Knowledge |
| 8 | Jeff Demuynck<br>Personal Knowledge<br>Robert Levy |
| 9 | Jeff Demuynck<br>Personal Knowledge<br>Robert Levy |
| 10 | Personal Knowledge<br>Robert Levy |
| 11 | Personal Knowledge<br>Robert Levy |
| 12 | Dan Bolia |
| 13 | Bob Lauck<br>Dan Bolia |
| 14 | Dan Bolia<br>Paul, Weiss<br>Personal Knowledge |

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

NYSCEF DOC. NO. 193

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 368 of 553   PageID 795

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

**Exhibit A**
**Letter from D. Toal to J. Oleske**
**April 19, 2017**

| Paragraph | Source |
|-----------|--------|
| **15** | Bob Lauck<br>Dan Bolia<br>Personal Knowledge |
| **16** | Bob Lauck<br>Dan Bolia<br>John Rudisill |
| **17** | Personal Knowledge |
| **18** | Bob Lauck<br>Dan Bolia |
| **19** | Bob Lauck<br>Dan Bolia<br>Personal Knowledge |
| **20** | Dan Bolia<br>Paul, Weiss |
| **21** | Dan Bolia<br>Paul, Weiss |
| **22** | Dan Bolia<br>Paul, Weiss |
| **23** | Dan Bolia<br>Paul, Weiss |
| **24** | Bob Lauck<br>Dan Bolia |
| **25** | Bob Lauck<br>Dan Bolia |
| **26** | Dan Bolia<br>Personal Knowledge |
| **27** | Dan Bolia<br>Paul, Weiss |
| **28** | Dan Bolia<br>Paul, Weiss |
| **29** | Dan Bolia<br>Paul, Weiss |

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 369 of 553   PageID 796
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

**Exhibit A**
**Letter from D. Toal to J. Oleske**
**April 19, 2017**

| Paragraph | Source |
|:---:|:---|
| **30** | Dan Bolia<br>Paul, Weiss |
| **31** | Dan Bolia<br>Paul, Weiss |
| **32** | Bob Lauck<br>Dan Bolia<br>Doug Neagli |
| **33** | Bob Lauck<br>Dan Bolia<br>Doug Neagli<br>Personal Knowledge |
| **34** | Dan Bolia<br>Personal Knowledge |
| **35** | Dan Bolia<br>Paul, Weiss |
| **36** | Archana Patel<br>Dan Bolia<br>Personal Knowledge |
| **37** | Dan Bolia<br>Paul, Weiss |
| **38** | Dan Bolia<br>Paul, Weiss |
| **39** | Dan Bolia<br>Paul, Weiss |
| **40** | Cynthia Leong<br>Personal Knowledge<br>Ronald ("J.R.") Brown |
| **41** | Bob Lauck<br>Cynthia Leong<br>Eric Wells<br>Ramona Helble |
| **42** | Personal Knowledge<br>Robert Levy |

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 370 of 553   PageID 797
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

**Exhibit A**
**Letter from D. Toal to J. Oleske**
**April 19, 2017**

| Paragraph | Source |
|:---:|:---|
| **43** | Bob Lauck<br>Eric Wells<br>Personal Knowledge<br>Ramona Helble<br>Ronald ("J.R.") Brown |
| **44** | Bob Lauck<br>Eric Wells<br>Personal Knowledge<br>Ramona Helble<br>Ronald ("J.R.") Brown |
| **45** | Eric Wells<br>Personal Knowledge |
| **46** | Kathryn Evans<br>Personal Knowledge |
| **47** | Cynthia Leong |
| **48** | Cynthia Leong<br>Personal Knowledge |
| **49** | Cynthia Leong<br>John Rudisill<br>Personal Knowledge<br>Ronald ("J.R.") Brown |
| **50** | Cynthia Leong<br>Eric Wells<br>Kathryn Evans |
| **51** | Personal Knowledge<br>Ye-Ching Lee |
| **52** | Jeff Demuynck<br>Personal Knowledge<br>Robert Levy |
| **53** | Dan Bolia<br>Cynthia Leong<br>Robert Levy |

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM
NYSCEF DOC. NO. 193
INDEX NO. 451962/2016
RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K Document 36-1 Filed 07/26/17 Page 371 of 553 PageID 798
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

**Exhibit A**
**Letter from D. Toal to J. Oleske**
**April 19, 2017**

| Paragraph | Source |
|---|---|
| 54 | Jackie Barrs<br>Jeff Demuynck<br>Michael Luc<br>Robert Levy<br>Ronald ("J.R.") Brown |
| 55 | Ronald ("J.R.") Brown |
| 56 | Bob Lauck<br>Cynthia Leong<br>John Rudisill<br>Ronald ("J.R.") Brown |
| 57 | Bob Lauck<br>Cynthia Leong<br>John Rudisill<br>Ronald ("J.R.") Brown |
| 58 | Eric Wells<br>Ramona Helble<br>Ronald ("J.R.") Brown |
| 59 | Archana Patel<br>Bob Lauck<br>Cody Creel<br>Cynthia Leong<br>Dan Bolia<br>Donnie Wilburn<br>Doug Neagli<br>Ian Hjolm<br>Jamie Manning<br>Jeffrey Woolsey<br>John Cooney<br>John Rudisill<br>Mac Oparakum<br>Mary McHenry<br>Paul Ivy<br>Personal Knowledge<br>Ryan Seager<br>Shirley Hughes |
| 60 | Cynthia Leong<br>Personal Knowledge |

# Exhibit 25

1

- - - - - - - - - - - - - - - - - - -x

In the Matter of the Investigation of


       EXXON MOBIL CORPORATION

- - - - - - - - - - - - - - - - - - -x

               April 26, 2017

               10:00 a.m.


       EXAMINATION OF CONNIE

FEINSTEIN, held at the Office of the

Attorney General, 120 Broadway, New York,

New York, before Jamie Ann Stanton, a

Notary Public of the State of New York.


        *     *     *

**2**

1
2   A P P E A R A N C E S :
3
4       STATE OF NEW YORK
5       OFFICE OF THE ATTORNEY GENERAL
6       ERIC T. SCHNEIDERMAN
7           120 Broadway
8           New York, New York 10271-0332
9
10      BY:  MANDY DeROCHE, ESQ.
11           JOHN OLESKE, ESQ.
12
13
14      PAUL, WEISS, RIFKIND, WHARTON
15      & GARRISON LLP
16      Attorney for Exxon Mobil Corporation
17          1285 Avenue of the Americas
18          New York, New York 10019-6064
19      BY:  DANIEL J. TOAL, ESQ.
20           NORA AHMED, ESQ.
21           JANE BOBET, ESQ.
22
23              *    *    *
24
25

**3**

1           C. Feinstein
2       C O N N I E  F E I N S T E I N, having
3   first been duly sworn by the Notary
4   Public, was examined and testified as
5   follows:
6   EXAMINATION BY
7   MS. DeROCHE:
8       Q    Ms. Feinstein.  My name is
9   Mandy DeRoche.  I am an attorney with the
10  Office of the Attorney General, and I am
11  here representing the State of New York.
12  This is an examination under New York
13  State Executive Law 6312 and General
14  Business Law 352.  This is an
15  investigation examination; it is not a
16  deposition.
17      A    Okay.
18      Q    It's different from a
19  deposition in that you have no right to
20  have Counsel present here today, but, as
21  a courtesy, our office is permitting
22  Counsel to be here.
23      A    Okay.
24      Q    It is different in that Counsel
25  has no right to object as to the form of

**4**

1           C. Feinstein
2   the question or the scope of the
3   question, but we will permit Counsel to
4   interpose objections as to
5   attorney/client privilege issues and to
6   be constitutional issues.
7       A    Okay.
8       Q    Do you have any questions?
9       A    No.
10      Q    The testimony you give here
11  today is under oath and accordingly has
12  the same force and affect as in a court
13  of law.  This means you have to tell the
14  truth or you can be prosecuted for
15  perjury.
16          Do you understand?
17      A    Yes, I do.
18      Q    I will be asking you questions
19  today and the court reporter will be
20  taking your answers down.  Please do not
21  nod or shade your head or otherwise make
22  non verbal gestures in response to my
23  questions.  You must answer no, yes, or
24  otherwise verbally in a manner that can
25  be taken down by the court reporter.

**5**

1           C. Feinstein
2       Do you understand?
3       A    Yes.
4       Q    Because the court reporter can
5   only take down one of us at a time,
6   please wait until I have finished asking
7   the question to begin your answer so we
8   don't talk over each other, and have a
9   clear record.
10          Do you understand?
11      A    Yes.
12      Q    Once a question is pending, you
13  must answer the question, except if you
14  have a question about attorney/client
15  privilege, at which time you may speak to
16  your attorneys, for that purpose, and
17  that purpose only, before answering.
18          Do you understand?
19      A    Yes.
20      Q    If you don't understand a
21  question I ask, you may ask me to
22  rephrase the question.  I will try to do
23  so.  If you answer a question, I will
24  assume you have heard and understood it.
25          Do you understand?

2 (Pages 2 to 5)

**6**

C. Feinstein
1
2    A    Yes.
3    Q    If at any time you need a
4  break, please let us know.  We will try
5  to accommodate it as long as there no
6  question pending.  So after an answer, we
7  can take a break.
8        Do you understand?
9    A    Yes.
10   Q    Are you presently under the
11  influence of any drugs or alcohol that
12  might affect your ability to answer
13  questions truthfully or affect your
14  memory?
15   A    No, I'm not.
16   Q    Are you presently under the
17  influence of any medication or any
18  medical condition that might affect your
19  ability to answer the questions
20  truthfully or that affect your memory?
21   A    No, I am not.
22   Q    Can you please state your name
23  and home address for the record?
24   A    My name is Connie Feinstein and
25  my home address is 2003 Allan Parkway,

**8**

C. Feinstein
1
2    A    That would have been 2016.  I
3  believe that was 2016.  2015 or 2016.  I
4  would have to look at the exact date.
5    Q    And you testified on behalf of
6  ExxonMobil Corporation?
7    A    I was deposed in an ExxonMobil
8  matter.
9    Q    Have you been a plaintiff or a
10  defendant in any action as an individual?
11   A    I have not been a plaintiff or
12  a defendant in any action as an
13  individual.
14   Q    Have you otherwise been
15  involved in any litigation in an
16  individual capacity?
17   A    My parents, when my parents
18  died, I was the administrator of their
19  estate, and so we had to give some -- we
20  had some -- I don't know if they were
21  actual depositions or there were a number
22  of meetings with attorneys and I had to
23  be the administrator of the estate.
24   Q    Anything else?
25   A    Other than divorce.

**7**

C. Feinstein
1
2  Houston, Texas 77019.
3    Q    Have you gone by any other
4  name?
5    A    Yes.  Connie Devine.
6    Q    And when did your name change?
7    A    June 23rd of last year, 2016.
8  I got married.
9    Q    Congratulations.
10   A    Thank you.
11   Q    Have you gone by any other name
12  besides Devine?
13   A    Yes.  My maiden name is Connie
14  Hamilton.
15   Q    And when did your name change?
16   A    Let's see, so I got married --
17  let's see, I got married -- Devine was
18  in 1984.
19   Q    Have you ever testified, been
20  deposed or examined before?
21   A    I have been deposed before.
22   Q    In what matter?
23   A    The Mayflower Pipeline
24  incident.
25   Q    What year was that?

**9**

C. Feinstein
1
2    Q    Have you ever been convicted of
3  a crime?
4    A    No, I have not.
5    Q    In your affidavit, you stated
6  that you were the Security and Consulting
7  Manager in Information Technology Risk
8  Management for ExxonMobil Corporation; is
9  that correct?
10   A    That's correct.
11   Q    Is Information Technology Risk
12  Management a part of the -- the acronym
13  is EMIT -- ExxonMobil Information
14  Technology?
15   A    Sorry?
16   Q    Is Risk Management a
17  subdivision or an affiliate of EMIT,
18  ExxonMobil Corporation Information
19  Technology?
20   A    It's a department within the
21  ExxonMobil IT department.  So it's a
22  group.
23   Q    Thank you.
24        What other subdivisions are
25  there besides Risk Management?

3 (Pages 6 to 9)

**10**

C. Feinstein

A    There are a large number of subdivisions. I'm not sure if I can recite all of them off the top of my head, but -- so the ExxonMobil IT department has -- they have a number of subdivisions which would include groups like the infrastructure organizations, the applications organization, the strategy group, let's see, the -- I'm not doing a very good job of reciting these off the top of my head.

Q    That's okay.

A    But there are a number of them, and I would have to look them all up on a chart to tell you exactly what all of them are.

Q    What are your job duties as security and consulting manager?

A    My job duties include providing guidance to our IT organization on the appropriate level of controls that are required to make sure that we manage compliance to secure our applications, our network, monitor our compliance

**11**

C. Feinstein

programs for our internal audits, ensure that we conduct internal assessments appropriately. We provide support for our risk advisors who also work in the IT Risk Management area so that they can help respond to audit inquiries, audit comments. Part of my responsibilities include the e-Discovery support services where I provide support to the ExxonMobil Law Department. We provide documentation and support for Dom Rep process. We provide support for internal investigations that are carried on within ExxonMobil. And those are the highlights. There are a few other things, but those are the general highlights.

Q    Who do you report to?

A    I report to Don Wilburn.

Q    And who reports to you?

A    I have 15 direct reports. I have two supervisors that report to me and then I have two people who are direct reports and the other folks report to my

**12**

C. Feinstein

supervisors.

Q    What are the names of your supervisors?

A    Jamie Manning, is one, and Tanya Hitler is the other.

Q    Can you tell me your job history from your current position and going back to when you first began at ExxonMobil?

A    I can do my best. It's easier if I start first and then work forward.

Q    Yes.

A    So I hired originally in 1981, I hired into the HR department as an HR assistant. And at that time I was in professional recruiting at the -- I was first assigned to the Bay Town Refinery. And I did input on wage applicants and then later on professional recruits that we were bringing through. I went to an assignment in the controllers organization for a brief period, for about a year, I think, in gas accounting. I then came back to an assignment that we

**13**

C. Feinstein

were building an employee relations information system and then I worked on that project for some time. That was during the period of time that I got married. During that time, I decided to leave the company. My ex-husband worked for the company and I had a child. They didn't have a part-time policy, so I left. Then I worked contract off and on. I came back full time in, I believe it was, 2001. I came back as a Security Controls Advisor.

Q    Security and Controls Advisor?

A    Security and Controls Advisor.

Q    Is that in HR or was that in IT?

A    No, that was in IT. I'm sorry, I should clarify. During the time that I was working on the HR information system and when I was working contract, I later was moved over to the IT department and so because of -- I had -- I had started working in the IT area. So I had moved over to the IT department. And when I

**14**

C. Feinstein

1  came back, I came back to the IT
2  department. And I was working as a
3  Security and Controls Advisor, providing
4  support for the refining organizations in
5  downstream.
6      Q    How long did you do that for?
7      A    That was a couple of years. I
8  don't know the exact amount of time. And
9  then I went to an assignment where I was
10  working on infrastructure as we were
11  opening -- we were doing some work on the
12  intranet security. And then I went to a
13  different assignment in E-business doing
14  strategy and planning. And then after
15  that I went to the SAP area in the
16  applications organization where I did SAP
17  security. I was a supervisor for SAP
18  security. And then I went to -- I became
19  the Security and Controls Manager for the
20  business line applications organization.
21  And then we had a couple of
22  reorganizations. I went into -- I stayed
23  in the same job. I changed
24  organizations. I eventually went into a

**15**

C. Feinstein

1  role where I was a Strategy Advisor for
2  the IT Risk Management organization. And
3  then I moved into this role, where I'm
4  the Security and Consulting Manager for
5  IT Risk Management.
6      Q    How long have you been in your
7  current role?
8      A    I have been in this current
9  role -- I have been in this current role
10  since, I believe, January 2014.
11      Q    I would like to show you a
12  document. I would like to explain it
13  first and then introduce it. In this
14  investigation, documents have been
15  produced both from ExxonMobil and from
16  its auditor, Pricewaterhousecoopers.
17  This is a document that's been produced
18  by Pricewaterhousecoopers.
19      MS. DeROCHE: I would like to
20  mark it as Feinstein examination
21  Exhibit 1. I will give this to the
22  court reporter to mark.
23      (Feinstein Exhibit 1 was
24  marked for identification, as of this

**16**

C. Feinstein

1  date.)
2      Q    Ms. Feinstein, do you recognize
3  this document?
4      A    I do.
5      Q    And what is this document?
6      A    It's an organization chart.
7      Q    It's dated May 1, 2014.
8      Is the organizational chart as
9  of today similar to the one that's
10  presented here?
11      A    I would say that it's -- it's
12  similar, yes.
13      Q    And I understand from your
14  prior testimony that, and correct me if
15  I'm wrong, that you report in to the box
16  on the far right bottom, where it says IT
17  Risk Management, Manager, D.W. Wilburn,
18  is that correct?
19      A    That's correct, Donnie Wilburn,
20  that's correct.
21      Q    Were any of the roles or people
22  on this organizational chart involved in
23  responding to the subpoena issued by our
24  office on November 4, 2015, to your

**17**

C. Feinstein

1  knowledge?
2      A    I'm sorry, which -- can you
3  repeat the question?
4      Q    Sure. Were any of the
5  individuals or titles on this
6  organizational chart involved in
7  responding to the subpoena issued by our
8  office on November 4, 2015?
9      A    I don't know the answer to
10  that. That's the original subpoena. I
11  don't know the answer to that.
12      Q    Moving on from the exhibit, did
13  you prepare for your testimony today?
14      A    Yes, I did.
15      Q    How did you do so?
16      A    By reviewing -- by reviewing
17  the affidavit that I had prepared and
18  asking questions of people that had
19  knowledge about some of the things that I
20  didn't have firsthand knowledge about.
21  I -- interviewing some people and
22  refreshing my memory about some things,
23  about exactly what happened and when.
24  And then working with our attorneys on --

**FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM**
INDEX NO. 451962/2016
NYSCEF DOC. NO. 194
RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 378 of 553   PageID 805

**18**

C. Feinstein

1  on the preparation, understanding what
2  would be happening.
3      Q     You mentioned that you reviewed
4  your affidavit, and that you asked
5  questions of people.
6          Did you ask questions of people
7  after you had submitted the affidavit?
8      A     I asked questions of people
9  before I submitted the affidavit in
10 preparation -- in preparing the
11 affidavit.
12         I'm trying to -- I'm not sure I
13 understand your question exactly.
14     Q     My initial question was how you
15 prepared for testimony today, and you had
16 responded that you had met with people or
17 interviewed people and asked questions.
18 I am wondering when that happened; if it
19 was at one time, more than one time, when
20 it happened?
21     A     Oh, it was more than one time.
22     Q     Okay.  So for the people that
23 you spoke to to prepare your affidavit,
24 did you speak to them after your

**19**

C. Feinstein

1  affidavit was submitted, but before
2  today's testimony?
3      A     There may be some -- I may
4  have -- I may have spoken to those
5  people.  I speak to a number of those
6  people on an ongoing basis as part of my
7  everyday job.  So I may have spoken to
8  some of them as just a part of my
9  regular, ongoing job.  And I may have
10 gone back and clarified some questions as
11 I was going through the affidavit to be
12 sure that I had some more details down.
13     Q     Did you review documents to
14 prepare for your testimony today?
15     A     I did review some documents.
16     Q     Which documents?
17         MR. TOAL:  Objection.  That's
18 attorney/client privilege and work
19 product.
20     Q     When you met with Counsel to
21 prepare for your testimony, who was
22 present?
23     A     When I met with Counsel to
24 prepare -- I'm sorry, so when I met with

**20**

C. Feinstein

1  Counsel to prepare for my testimony, who
2  was present?  It would be myself and the
3  lawyer or lawyers that I was talking to.
4      Q     Which lawyers?
5      A     I talked with Robert Levy in
6  our Law Department at ExxonMobil.  I
7  talked with Dan Bolia.  I talked with
8  Mr. Toal and Ms. Ahmed.  And I think
9  that's all.  I can't recall if I talked
10 with anyone else.
11     Q     Did you speak with Mr. Levy and
12 Mr. Bolia to prepare for your testimony?
13     A     Did I speak to Mr. Levy and
14 Mr. Bolia to prepare for my testimony?  I
15 spoke with them -- I spoke with them,
16 yes, in preparation -- I spoke with them
17 in order to prepare the affidavit, as I
18 was working through that.  And I spoke
19 with them after I had prepared the
20 affidavit.
21         MS. DeROCHE:  I would like to
22 introduce the next document as
23 Exhibit 2.
24         (Feinstein Exhibit 2 was

**21**

C. Feinstein

1  marked for identification, as of this
2  date.)
3      Q     What I have marked as
4  Exhibit 2, do you recognize the document,
5  Ms. Feinstein?
6      A     Yes, I do recognize it.
7      Q     What is it?
8      A     It's the subpoena.
9      Q     This is the subpoena for your
10 testimony dated March 24, 2017; is that
11 correct?
12     A     I'm not certain of the date.
13     Q     If you look to the top of page
14 two?
15     A     Oh, there.  24th of March, yes,
16 okay.
17     Q     When did you receive this
18 document?
19     A     When I did receive this
20 document?  I do not know the exact date
21 that I received it.
22     Q     Was it close to the 24th?
23     A     I would say that it was close
24 to the 24th.

6 (Pages 18 to 21)

**22**

1       C. Feinstein
2     Q    What did you do when you first
3   received it?
4     A    What did I do when I first
5   received it?  I spoke with Robert -- I
6   spoke -- actually, I spoke with my boss,
7   Donnie Wilburn.  And I spoke with Robert
8   Levy in the Law Department.
9     Q    Did either of those gentlemen
10  give you the subpoena?
11    A    I believe that Mr. Levy gave it
12  to me.
13    Q    If you could turn to page
14  three.
15    A    (Complying.)
16    Q    The topics for testimony
17  schedule.  I would like to go through
18  each of these topics in turn.
19        Are you able to testify
20  truthfully to topic one?
21    A    Yes.
22    Q    Are you able to truthfully
23  testify to topic two?
24    A    Yes.
25    Q    Are you able to testify

**23**

1       C. Feinstein
2   truthfully to topic three?
3     A    Yes.
4     Q    Are you able to testify
5   truthfully to topic four?
6     A    Yes.
7     Q    To topic five?
8     A    Yes.
9     Q    And to topic six?
10    A    Yes.
11        MS. DeROCHE:  I would like to
12  introduce the next exhibit, Exhibit 3.
13        (Feinstein Exhibit 3 was
14  marked for identification, as of this
15  date.)
16    Q    Do you recognize this document?
17    A    Yes, I do.
18    Q    What is it?
19    A    It's Exxon Mobil's Record
20  Management Guidelines.
21    Q    What is the date of this
22  document?
23    A    This is October of 2015.
24    Q    How do you use this document in
25  your duties?

**24**

1       C. Feinstein
2     A    I use the document two ways in
3   my duties:  One is that I provide
4   guidance, help provide guidance, my team
5   helps provide guidance to the
6   organization on how to comply with these
7   guidelines, and then I also have to
8   comply with these guidelines and ensure
9   that my team complies with these
10  guidelines.
11    Q    How often do you work with this
12  document?
13    A    The document, itself, I don't
14  work with frequently.  It doesn't change
15  that frequently.  But ensuring compliance
16  with it is something that's ongoing.
17    Q    Could you turn to page 13?
18    A    (Complying.)
19    Q    There is a heading there that
20  says:  ExxonMobil Information Technology
21  (EMIT.)
22        Could you read that, and tell
23  me if that is an accurate description?
24    A    (Reading.)  ExxonMobil
25  Information Technology (EMIT).  Set

**25**

1       C. Feinstein
2   strategy for electronic record solutions
3   in collaboration with IMS CoE,
4   departments and business units.  Serve as
5   custodian of --
6        MR. TOAL:  Did you want her
7   to read it out loud?
8     Q    You don't need to read it out
9   loud?
10    A    Can you repeat your question?
11    Q    Does it accurately describe
12  EMIT's role in Records Management?
13    A    Yes, it does.
14    Q    Are you involved in the
15  revisions to this document over time?
16    A    I could have been in the past.
17  I don't recall that I specifically have
18  been recently.
19    Q    What is IMS CoE?
20    A    The IMS CoE is the group in the
21  graph, the Information Management
22  Services Center of Expertise.
23    Q    How does it relate to EMIT?
24    A    It's a different -- it's a
25  different organization in ExxonMobil.

7 (Pages 22 to 25)

**26**

1          C. Feinstein
2     Q     What are its roles and
3  responsibilities, if you know?
4     A     I don't -- I don't know
5  specifically.
6     Q     And do you collaborate with IMS
7  CoE at all?
8     A     We probably have in the past as
9  part of whenever we need to, to work out
10  some issue. I don't collaborate with
11  them on a regular ongoing basis.
12     Q     Could you turn to page 16?
13     A     (Complying.)
14     Q     And, specifically, section 4.1.
15     A     (Complying.)
16     Q     Are you familiar with business
17  continuity plans and disaster recovery
18  plans at ExxonMobil?
19     A     I am.
20     Q     Were the business continuity
21  plans or disaster recovery plans
22  consulted in relation to collecting
23  and/or recovering records in response to
24  the investigation by our office?
25     A     No. Not to my knowledge.

**27**

1          C. Feinstein
2     Q     Do you know if there is a
3  specific business continuity plan or
4  disaster recovery plan for the management
5  committee?
6     A     I do not know about the
7  management committee.
8     Q     Are they considered a separate
9  business unit or department from other
10  departments or business units at
11  ExxonMobil?
12     A     I don't know the answer to
13  that.
14     Q     Do you know who would know the
15  answer to that?
16     A     I -- I don't know.
17     Q     In section 4.3, the last
18  sentence in the first paragraph, it
19  reads: For electronic records, the
20  standard recovery process will involve
21  restoration from a point in time as
22  identified by the business unit.
23          Was this section and/or
24  sentence consulted when ExxonMobil was
25  collecting and/or trying to recover

**28**

1          C. Feinstein
2  records in response to the investigation
3  by our office?
4     A     No.
5     Q     How did it differ?
6     A     Disaster recovery is for
7  recovering when you have an application
8  outage or you have a failure, and so you
9  are trying to restore capability.
10          In this case, what we were
11  looking for were -- we were using
12  backups, but we were looking for
13  information that might have been deleted
14  and swept through an automated file
15  sweeper.
16     Q     And what policy, procedure or
17  guidance governs recovery in that
18  instance?
19     A     In that instance, it would
20  be -- it would be procedures.
21     Q     What kind of procedures?
22     A     So there would be the e-mail
23  backup procedures, the e-mail procedures
24  for how the data is maintained on an
25  ongoing basis, and then the backup

**29**

1          C. Feinstein
2  procedures for the e-mail system.
3     Q     Are there specific document
4  titles that you can recall that govern
5  e-mail procedures and e-mail backup?
6     A     I don't recall the specific
7  document names.
8     Q     Could you turn to page 35 of
9  this document, section 10.1?
10     A     (Complying.)
11     Q     Are you familiar with Basic
12  Records Retention Schedules?
13     A     Yes, I am.
14     Q     Are you familiar with
15  Supplemental Records Retention Schedules?
16     A     Yes, I am.
17     Q     And was there a Supplemental
18  Records Retention Schedule for the
19  Management Committee?
20     A     I do not know the answer to
21  that.
22     Q     Who might know?
23     A     I'm not sure who would know the
24  answer to that.
25          MS. DeROCHE: I would like to

8 (Pages 26 to 29)

**30**

C. Feinstein

introduce the next exhibit, Exhibit 4,
I believe.
        (Feinstein Exhibit 4 was
marked for identification, as of this
date.)
    Q    If you could turn to page
three, I believe, of the exhibit.
    A    (Complying.)
    Q    Do you recognize that?
    A    Yes, I do.
    Q    What is that?
    A    It's a SharePoint site.
    Q    And what is the title of the
SharePoint site?
    A    GREF Information Management
Services.
    Q    What does G-R-E-F stand for?
    A    That is the Global Real Estate
Facilities organization.
    Q    And is this where all Records
Management Guidelines reside?
    A    Yes.
    Q    It doesn't reside with EMIT?
    A    GREF owns and maintains the

**31**

C. Feinstein

Records Management Guidelines and Global
Security owns the management protection
information policy.
    Q    If we go to the first photo on
the top left that says, Records
Management Guidelines, how many Records
Management Guidelines exist?
    A    The Records Management
Guidelines would be this document.
    Q    There is just one?
    A    There is just one, to my
knowledge.
    Q    The photo, top right, basic
records retention schedule, is there more
than one?
    A    To my knowledge, there's only
one.
    Q    And then bottom right
photograph, Supplemental Records
Retention Schedule, is there one
supplemental or are there many?
    A    I don't recall that there are
one or many, but it's only one document
or those can be separate documents.

**32**

C. Feinstein

    Q    I believe these photos are
icons that you can click into when you
were on the SharePoint site?
    A    That's correct.
    Q    Does it take you to an index or
a list of documents?
    A    As I recall, it takes you
directly to these documents.  I don't
recall that it takes you to an index.
    Q    The top row middle, it says
forms and checklists, what kind of forms
and checklists reside here?
    A    I don't recall what all the
forms are.  I believe there is a form,
the destruction notice.  But I don't know
what the other forms that are in the
checklist are.
    Q    And the middle photo, BRRS
mapping document, what is that?
    A    I'm not sure what that is.
    Q    Below it, BRRS Reference Card,
what is that?
    A    That's a shorter reference card
that helps people summarize some of the

**33**

C. Feinstein

information in the larger, the longer
BRRS.
    Q    Are there different cards for
different business units?
    A    I'm not sure.
    Q    What is an RMG Reference Card?
    A    It's a reference card that's a
summary of this document.
    Q    What is a Retention Keyword
Search, RKS?
    A    So that's a search facility to
help you find information within, I
believe it searches only the BRRS.  I
don't think it actually searches the RMG.
I think it just searches the BRRS.
    Q    And is this the full set of
policies or guidelines with respect to
Records Management?
    A    To my knowledge, it is.
    Q    Is there a separate repository
in EMIT?
    A    Separate repository?  I'm not
sure I understand the question.
    Q    Is there a similar type of

**34**

C. Feinstein

1  collection, SharePoint site, like this,
2  in EMIT?
3  A    Not to my knowledge.  We use --
4  we comply by these guidelines.
5  Q    If we can turn back to the
6  prior exhibit, which, I believe, is
7  Exhibit 4.  If you could turn to page 23,
8  Section 8.1?
9  MR. TOAL:  The Records
10  Management Guidelines?
11  MS. DeROCHE:  Yes, thank you.
12  A    Which one?
13  Q    Records Management Guidelines.
14  MR. TOAL:  Which page?
15  MS. DeROCHE:  23.
16  MR. TOAL:  I have that as
17  Exhibit 3.  What does that sticker
18  say?
19  MS. DeROCHE:  I think you are
20  right.
21  A    What page did you say?
22  Q    23, Section 8.1.
23  A    Okay.
24  Q    If you could read the first

**35**

C. Feinstein

1  paragraph to yourself.
2  A    Okay.
3  Q    And let me know when you are
4  finished.
5  A    Okay.
6  Q    How do your job duties involve
7  this section of the Records Management
8  Guidelines section?
9  A    My job duties would apply in
10  two ways:  So my job duties would apply
11  in giving guidance to our EMIT folks, our
12  risk advisors or our employees who may
13  have questions about what they need to do
14  to ensure compliance.  And then on a
15  personal level, I also have to make sure
16  that I comply with it.  And then I have
17  some responsibility for the coordination
18  of some of the IT processes that are used
19  for the litigation hold processes, where
20  we use tools to disable file sweepers,
21  the file sweeper tool.
22  Q    Are you involved in the
23  retention of records?
24  A    I am involved in the retention

**36**

C. Feinstein

1  of the records that I or my team use.
2  Q    Do you send out litigation hold
3  notices?
4  A    I do not.
5  Q    Do you work with folks that do?
6  A    The Law Department sends the
7  litigation hold notices.
8  Q    For persons subject to a
9  litigation hold, do they call you for
10  questions, with their questions?
11  A    No, they do not.
12  Q    Who do they call?
13  A    They would call the Law
14  Department.
15  Q    Are you responsible for
16  ensuring that the retention of records is
17  robust?
18  A    I am not sure what you mean by
19  that.
20  Q    The last sentence in the first
21  paragraph says that:  The retention of
22  records includes both not destroying
23  records as well as taking appropriate
24  steps to prevent records from automatic

**37**

C. Feinstein

1  deletion.
2  Are you involved in complying
3  with that sentence?
4  A    Yes, I am involved in complying
5  with that sentence.
6  Q    Are you involved in ensuring
7  that records are not destroyed?
8  A    I am involved in ensuring that
9  records that I or my team use are not
10  destroyed.  And then I play a
11  coordination role in making sure that the
12  tools that we use to disable the
13  automated file sweeper are working
14  appropriately.
15  Q    The file sweeper that we have
16  been discussing, is that a synonym for
17  automatic deletion in this sentence?
18  A    I am talking about the e-mail
19  automated file sweeper.
20  Q    Do you have responsibilities
21  over the e-mail automated file sweeper
22  for all custodians at ExxonMobil?
23  A    I play a coordination role in
24  ensuring that the tools that work

38

C. Feinstein

1
2 together to ensure that the automated
3 file sweepers are disabled for folks who
4 are on litigation hold are working
5 appropriately.
6      Q      Who do you coordinate with?
7      A      I coordinate with the owners of
8 those tools or the organizations
9 responsible for supporting those tools
10 and the Law Department.
11      Q      Who are the owners of the
12 tools?
13      A      I don't know the -- I guess
14 there are several tools involved.  And so
15 it would depend on which tool that we're
16 talking about.
17      Q      So is the e-mail automated file
18 sweeper more than one tool?
19      A      The e-mail automated file
20 sweeper is a separate tool from the
21 e-mail system.  It is a tool by itself.
22      Q      And who is the owner of that
23 tool?
24      A      I believe -- so the
25 Collaboration Services, E-Mail

39

C. Feinstein

1
2 Collaboration Services would own that
3 tool.  I don't know the specific
4 individual who owns it.
5      Q      The name of the position is
6 E-Mail Collaboration Services?
7      A      Services.
8      Q      And you had mentioned that you
9 coordinate with people who support that
10 tool.
11           Who are the folks that support
12 that tool?
13      A      Cynthia Leong, L-E-O-N-G, is my
14 primary contact on that.
15      Q      And what is her business unit
16 or job title, if you know?
17      A      She is an e-mail -- she's --
18 bear with me one second, I will tell you
19 exactly.  She is the Operations Tools
20 Security and Controls Manager For
21 Collaboration Solutions.
22      Q      What document are you consult
23 right now?
24      A      This one.
25      Q      Could you tell us what that

40

C. Feinstein

1
2 document is?
3      A      This is dated April 24th.  This
4 is a letter from Mr. Toal to John Oleske
5 in which some of the names and titles of
6 the people are listed.
7      Q      Thank you.
8           Could you turn to page 19 of
9 the Records Management Guideline, section
10 6.3?
11      A      (Complying.)
12      Q      This section is entitled:
13 Destruction Notification Process.
14           Could you explain how your job
15 duties interact with Destruction
16 Notification Processes?
17      A      Well, if we were to have
18 records that were due to be destroyed,
19 then I would -- my team answers questions
20 and give guidance if folks have records
21 that are due to be destroyed and they
22 need to complete a Destruction
23 Notification Form, we give guidance on
24 that.  And then if we have records within
25 our other than organization that need to

41

C. Feinstein

1
2 be destroyed, then we would fill out.
3      Q      Did you receive any questions
4 in response to the investigation subpoena
5 issued by our office as to compliance
6 with this section?
7      A      I'm sorry, can you state that
8 one more time?
9      Q      Yes, sorry.
10      A      Thank you.
11      Q      In the course of responding to
12 this office's investigation, did you
13 receive any questions about the
14 destruction or the form that needs to be
15 completed under this section?
16      A      So you are asking did I receive
17 any questions from your office about this
18 form?
19      Q      No, I'm sorry.
20           I understood your previous
21 testimony to say that one of your roles
22 was to answer questions about destruction
23 and the form to be completed upon
24 destruction.
25           Did you receive any questions?

11 (Pages 38 to 41)

**42**

1           C. Feinstein
2       A    No.
3       Q    Do you collect the Destruction
4    Notification Forms?
5       A    No, I do not.
6       Q    Who does?
7       A    The department -- the
8    appropriate department records contact.
9       Q    When you say "department,"
10   could you elaborate?
11      A    Well, we have -- we are
12   organized into a number of different
13   departments and each department has some
14   type of Records Management contact
15   identified.
16      Q    Do you know who the Records
17   Management contact is for the management
18   custodian, Management Committee
19   custodians?
20      A    No, I do not.
21           MS. DeROCHE:  I would like to
22   introduce the next exhibit, which, I
23   believe, is Exhibit 5.
24           (Feinstein Exhibit 5 was
25   marked for identification, as of this

**43**

1           C. Feinstein
2    date.)
3       Q    Do you recognize this document?
4       A    I do.
5       Q    What is it?
6       A    It is the disaster recovery
7    procedure for restoring Active Directory.
8       Q    Is this policy related to the
9    file, automated file sweep that we had
10   been talking about?
11      A    No, not really.
12           Let me make sure I understood
13   your question.  You are asking me if the
14   ability to restore Active Directory is
15   related to the use of the automated file
16   sweep tool?
17      Q    Yes.
18      A    Not really, not generally.
19      Q    Was this policy referred to
20   when trying to recover documents in
21   response to the subpoena?
22      A    I don't know if the document
23   was referred to or not.
24      Q    Were Active Directories
25   reviewed and searched?

**44**

1           C. Feinstein
2       A    Were Active Directories
3    reviewed and searched?  I'm not sure I
4    understand your question.  So were Active
5    Directories reviewed and searched?
6       Q    In response to the subpoena for
7    relevant documents.
8       A    Well, documents wouldn't be
9    stored in Active Directory.
10      Q    Okay.
11      A    Active Directory information
12   was reviewed.
13      Q    What information was reviewed?
14      A    To determine on the Wayne
15   Tracker account the setup of that and how
16   that was set up and as part of the
17   troubleshooting and root cause analysis
18   to figure out what happened there.
19      Q    On page two of this document,
20   under Network Disasters, it mentions
21   Windows Server 2003/2008/2012R2.
22      A    Mm-hm.
23      Q    Which server was hosting the
24   Active Directory accounts of
25   Mr. Tillerson, both of his e-mail

**45**

1           C. Feinstein
2    addresses?
3       A    I don't know the answer to
4    that, specifically.
5       Q    Who would know?
6       A    The e-mail -- the e-mail
7    Collaboration Solutions Group or the
8    Identity and Access Management Group.
9           MS. DeROCHE:  I would like to
10   introduce the next exhibit, Exhibit 6.
11           (Feinstein Exhibit 6 was
12   marked for identification, as of this
13   date.)
14      Q    Do you recognize this document?
15      A    I do.
16      Q    What is it?
17      A    It's the Backup and Recovery
18   Guide for Active Directory.
19      Q    If you could turn to page two
20   at the bottom, terms of reference, there
21   is a subsection there entitled edb.log.
22           Can you describe the log files
23   that are described here?
24      A    No, I am not familiar with
25   these, with the edb logs.

**12 (Pages 42 to 45)**

**46**

```
 1            C. Feinstein
 2      Q    Who might be?
 3      A    That would be someone in the
 4  Active Directory group who supports this.
 5      Q    Do you know if edb log files
 6  were reviewed to collect documents in
 7  response to the subpoena?
 8      A    I do not know.
 9      Q    Can you turn to page six?
10      A    (Complying.)
11      Q    The section at the bottom
12  entitled:  What Constitutes a Good
13  Backup?
14      A    (Complying.)
15      Q    On page seven, there are two
16  subheadings, one is Contents and one is
17  Age.
18           Are you familiar with the
19  contents of the backups at ExxonMobil?
20      A    I'm not familiar with the
21  contents of the backups.
22      Q    Who might be?
23      A    The group that does that.
24      Q    What is the group that does
25  that?
```

**47**

```
 1            C. Feinstein
 2      A    The Backup and Recovery Group.
 3      Q    Are you familiar with the age
 4  of the backups?
 5      A    Am I familiar with the age of
 6  the backups?
 7      Q    The subsection there, about
 8  ages --
 9           MR. TOAL:  Just to be clear,
10      you are asking about backups for the
11      Active Directory?
12           MS. DeROCHE:  I am.
13           MR. TOAL:  Okay.
14      A    I read the description.  I
15  understand conceptually what it means,
16  but I am not familiar with the process.
17      Q    Is it's not part of your daily
18  job duties?
19      A    No.
20           MS. DeROCHE:  If we can go
21      off the record.  Do you mind if we
22      take a five-minute break?
23           MR. TOAL:  Sure.
24           [A recess was taken from
25      10:48 a.m. to 10:58 a.m.]
```

**48**

```
 1            C. Feinstein
 2           THE WITNESS:  You asked me
 3      about any other names.  I was married
 4      when I was nineteen, so I went by
 5      Connie Towers for a number of years.
 6           MS. DeROCHE:  I would like to
 7      introduce the next exhibit, Exhibit 7.
 8           (Feinstein Exhibit 7 was
 9      marked for identification, as of this
10      date.)
11      Q    Do you recognize this document?
12      A    I do.
13      Q    What is it?
14      A    It's the DDR Recovery
15  Procedures.
16      Q    What does "DDR" stand for?
17      A    I don't recall what "DDR"
18  stands for.
19      Q    Is this document one of the
20  procedures you referenced earlier when
21  you mentioned that backup and recovery
22  procedures were referenced in order to
23  collect and recover documents in response
24  to the subpoena in this case?
25      A    No.
```

**49**

```
 1            C. Feinstein
 2      Q    Which recovery, if you
 3  remember, or procedures were applicable?
 4      A    The recovery -- so let me make
 5  sure that I'm clear.  When you asked me
 6  did I review any -- any documents
 7  earlier -- let me make sure that I'm
 8  clear on what you are asking.  Can you
 9  ask it one more time?
10      Q    Sure.  You had mentioned
11  earlier that there were recovery
12  procedures or backup procedures that were
13  consulted or utilized in order to collect
14  or recover documents in response to our
15  office's subpoena.
16      A    That's correct.
17      Q    And this is not one of them?
18      A    So I am not sure exactly which
19  recovery procedures the people who were
20  doing the backup restore used.  I don't
21  know if this was one of them or not.
22  This is not one that I looked at in --
23  I'm familiar with what the document is,
24  but this is not one that I would have
25  referenced in my backup.  I don't know --
```

13 (Pages 46 to 49)

**50**

1          C. Feinstein
2    the people that were doing the restores
3    as part of the efforts that we went
4    through, I'm not sure exactly which
5    procedures they followed.
6          Q    Okay.
7          A    I don't know if they followed
8    written or verbal or if it's part of
9    their every day job, so I don't know
10   specifically what they did.
11         Q    Do you recall which procedures
12   you consulted?
13         A    I didn't do any, so I didn't
14   consult procedures and backups. I didn't
15   do backups.
16         Q    If you turn to page two of this
17   document, at the bottom, do you know if,
18   in response to the subpoena -- I am
19   looking at the image at the bottom -- if
20   any offsite storage sites were searched?
21         A    I don't know.
22         Q    Do you know where the offsite
23   storage sites are?
24         A    We generally replicate between
25   Dallas and Houston locations that are our

**51**

1          C. Feinstein
2    own locations, we have two data centers
3    that we generally replicate back and
4    forth between. If there are other
5    offsite centers, I don't know what those
6    are.
7          Q    You said that you have your own
8    locations?
9          A    Right. So we generally use
10   either our Dallas or Houston data
11   centers, and we replicate back and forth
12   between them.
13         Q    So those are Exxon-owned or
14   controlled offsite storage sites?
15         A    They are ExxonMobil-controlled
16   sites, we have data centers. We have the
17   ability to replicate between our own
18   centers as part our disaster recovery
19   capability.
20         Q    And did I understand you to say
21   that there may be other offsite storage
22   sites that are not Exxon owned?
23         A    I don't know. If there are, I
24   don't know what those are. I wouldn't
25   know if there's more or not.

**52**

1          C. Feinstein
2          Q    These offsite storage sites,
3    are they, in addition to being a location
4    in Dallas or Houston, are there any cloud
5    locations?
6          A    I am not aware of any cloud
7    locations. I don't know if there are any
8    or not.
9          Q    And do you know if any vendors
10   of ExxonMobil have their own offsite
11   storage sites for ExxonMobil documents
12   and communications?
13         A    Ask me the question one more
14   time, please?
15         Q    Do you know of any vendors on
16   behalf of ExxonMobil have offsite storage
17   sites for ExxonMobil documents and
18   communications?
19         A    Certainly, we have vendors who
20   store data, ExxonMobil data on our
21   behalf.
22         Q    Are they located at these
23   Dallas and Houston locations that you
24   mentioned before, or those are separate
25   locations?

**53**

1          C. Feinstein
2          A    We have, as an example, we have
3    HR service providers who would have
4    HR-type data and they provide services to
5    us. So if it's a third-party contract
6    like that, they would store some of that
7    data at their sites. And then we use
8    vendor software, where we use that
9    software and we store that data
10   internally.
11         Q    As an example, I am trying to
12   think of one for vendor software,
13   SharePoint is, I believe, a Microsoft
14   product.
15         A    SharePoint is a Microsoft
16   product.
17         Q    Where does SharePoint data get
18   backed up?
19         A    SharePoint data gets backed up
20   on the corporate network internally.
21         Q    This example, on the bottom of
22   page two, is that on the right side where
23   it says backup site?
24         A    I'm sorry, you are saying in
25   which picture?

**14 (Pages 50 to 53)**

**54**

1          C. Feinstein
2     Q     On the bottom of page two?
3     A     I can't specifically speak to
4  it.  I don't have enough detailed
5  knowledge to know exactly how they do
6  this.
7     Q     And would Microsoft also back
8  up as a vendor of that software?
9     A     I would not think so.
10    Q     What is an IP-based backup?
11    A     I'm not sure.
12    Q     Is it true that you don't know
13 which vendors, if any, assist ExxonMobil
14 with its backups?
15    A     I do not know which vendors, if
16 any, assist ExxonMobil with their
17 backups.
18          MS. DeROCHE:  I would like to
19    introduce the next exhibit, which
20    would be Exhibit 8.
21          (Feinstein Exhibit 8 was
22    marked for identification, as of this
23    date.)
24    Q     Do you recognize this document?
25    A     I've seen this before, yes.

**55**

1          C. Feinstein
2     Q     What is it?
3     A     It's the Exchange Server Design
4  for the e-mail servers.
5     Q     This document controls or
6  governs the servers for both documents
7  and communications at ExxonMobil; is that
8  correct?
9     A     Ask me one more time?
10    Q     Does this document govern the
11 servers on which documents and
12 communications at ExxonMobil reside?
13    A     The e-mail.
14    Q     Just the e-mail?
15    A     What do you mean by
16 "communications"?
17    Q     I mean electronic
18 communications like e-mail.
19    A     So -- so it certainly governs
20 the e-mail communications.  I'm trying to
21 think of what -- I don't know that it
22 governs SharePoint.  I don't know that it
23 governs the Link telephone system, but it
24 does govern the e-mail.
25    Q     On the bottom of page two under

**56**

1          C. Feinstein
2  the heading Exchange 2000 Server Mailbox
3  Server Role-Physical Server, the first
4  line reads that Exchange 2007 Server
5  Mailbox Servers can be classified in two
6  storage types:  SAN storage and internal
7  storage.
8          Can you describe these two
9  storage types?
10    A     No.  I can give you a very high
11 level understanding, but basically, that
12 the SAN would be the additional storage
13 and the internal storage would be the --
14 the -- the -- SAN storage is typically
15 where you connect to additional storage
16 capability and the internal storage is
17 where you are using the storage that you
18 are working with most frequently and
19 that's the extent of my knowledge.
20    Q     Do you know if SAN storage is
21 offsite?
22    A     I don't know.
23    Q     Do you know if different
24 policies or protocols apply to the
25 different storage types?

**57**

1          C. Feinstein
2     A     No, I do not know.
3     Q     You could turn to page seven,
4  please.
5     A     (Complying.)
6     Q     The paragraph at the top, if
7  you could read that.
8     A     (Reviewing exhibit.)
9     Q     It mentions an internal storage
10 mailbox server called the Management
11 Committee Server.
12    A     Mm-hm.
13    Q     Are you familiar with that?
14    A     Not really.  I vaguely know
15 that there is a Management Committee
16 server, but that's really the extent of
17 my knowledge.
18    Q     Is there only one Management
19 Committee server?
20    A     I don't know.
21    Q     Do you know where the
22 Management Committee server resides?
23    A     I do not know.
24    Q     The clause right before the
25 Management Committee server reads that:

15 (Pages 54 to 57)

**58**

1      C. Feinstein
2  If there is a special need.
3      Do you understand what the
4  context is for special need with respect
5  to the Management Committee server?
6      A   I would presume that
7  security -- I don't know that for
8  certain, but I would presume that's
9  security.
10     Q   Other than the identity of the
11 employees on their accounts that is
12 stored on the Management Committee
13 server, is it different in any other way
14 from any other storage?
15     A   I don't know.
16     Q   What is the Legal Discovery
17 Server?
18     A   The Legal Discovery Server is
19 one where we put documents that we're
20 collecting.
21     Q   After they have been collected?
22     A   After they have been collected.
23 I believe that's right in this context.
24 That's what we typically refer to it as.
25 Let me just read this one more time.

**59**

1      C. Feinstein
2      I believe that's the same
3  server that we're referring to.  I would
4  have to validate that to be absolutely
5  certain, that looks like one that we put
6  documents on.
7      Q   Who would have personal
8  knowledge of that?
9      A   I believe that Cynthia Leong
10 would be able to answer that.
11     Q   If you could turn to page 16.
12     A   (Complying.)
13     Q   The section called Exchange
14 2007 Backup.
15     A   Mm-hm.
16     Q   It reads, the first sentence:
17 Only Exchange 2007 mailbox servers will
18 have backup.
19     Do you know how frequently they
20 are backed up?
21     A   They are backed up daily, on a
22 daily backup.  They are backed up weekly,
23 on a full backup.
24     Q   Underneath the first paragraph,
25 there are four lines about different

**60**

1      C. Feinstein
2  types of backups.  The first one reads:
3  Mailbox servers will have a full backup
4  performed.
5      Is that, when you answered the
6  prior question about daily and weekly, is
7  that also applicable to mailbox servers?
8      A   That's what I am answering for.
9  So mailbox servers have a full backup
10 performed weekly.
11     Q   And who performs that?
12     A   The Operations Support Team
13 that supports the servers.
14     Q   Do you know how long the full
15 backups are stored?
16     A   My understanding is they are
17 stored five weeks.
18     Q   What is your understanding
19 based on?
20     A   Discussions that I had with the
21 e-mail services group, Cynthia Leong.
22     Q   What are transactions logs?
23     A   In this case, I'm not sure what
24 the transaction logs would be.
25 Generally, transaction logs are logs that

**61**

1      C. Feinstein
2  tell you what traffic has gone back and
3  forth.  I'm not sure in this case what
4  this is referring to.
5      Q   When you say traffic that has
6  gone back and forth, can you explain?
7      A   Well, it can vary depending on
8  the system and what kind of transactions
9  you are processing or what type of
10 transaction data its monitoring.  So I
11 don't know in this case what type of
12 transaction -- it's not necessarily -- it
13 doesn't necessarily mean the types of
14 e-mails.  It may mean whatever types
15 of -- whatever types of transaction codes
16 have been identified in Exchange as to be
17 monitored by the architecture of that
18 system.  So I don't know what that is.
19     Q   Would a transaction log show
20 automatic deletion or deletion of files?
21     A   I do not know what these show.
22     Q   Who would know?
23     A   Cynthia Leong.
24     Q   Do you know how frequently
25 transaction logs are backed up?

**16 (Pages 58 to 61)**

**62**

1        C. Feinstein
2    A    No, I do not know when the
3 transaction logs are...
4    Q    Do you know who would?
5    A    I would -- I would think that
6 Cynthia would be knowledgable of that.
7    Q    Are different mailbox servers
8 backed up differently depending on the
9 type of content?
10    A    Not to my knowledge.  I don't
11 know specifically, but as far as I
12 understand, they are all backed up the
13 same.
14    Q    Who might know direct knowledge
15 of that?
16    A    Cynthia.  Cynthia Leong.
17        MS. DeROCHE:  The next
18 exhibit, Exhibit 9, I would like to
19 introduce.
20        (Feinstein Exhibit 9 was
21 marked for identification, as of this
22 date.)
23    Q    Do you recognize this document?
24    A    Yes, I do.
25    Q    What is it?

**63**

1        C. Feinstein
2    A    It is the subpoena that was
3 issued in December 2015.
4    Q    When did you first see it?
5    A    I think I first saw it in March
6 or April.
7    Q    Of what year?
8    A    Of 2017.
9    Q    In what context did you see it?
10    A    I saw it after I had been made
11 aware that this subpoena for me.
12    Q    I'm sorry?
13    A    So when I was aware that I
14 needed to come and talk to you guys, then
15 I was aware -- I had heard about the
16 subpoena before, but I hadn't seen it
17 until then, to my knowledge.
18    Q    When did you first hear about
19 the subpoena?
20    A    About this one?  I heard
21 generally in 2016.  I couldn't tell you
22 exactly when.
23    Q    When did you first have to do
24 something within your job duties with
25 respect to the subpoena?

**64**

1        C. Feinstein
2    A    With respect to the subpoena.
3 So I specifically didn't have to do
4 anything in 2015 or 2016.  My team had to
5 extract data for some of the custodians,
6 and I would have to determine whether
7 that started in December of 2015 or it
8 started in 2016.
9    Q    Can you explain what you meant
10 by your team had to extract data?
11    A    I have a team that provides
12 support to litigation services.  And what
13 we do is we -- they identify for us
14 custodians --
15    Q    Who is "they"?
16    A    Litigation services, the Law
17 Department, identifies for us a list of
18 custodians that they want to have data
19 extracted for, and then what type of data
20 needs to be extracted.  And then my team
21 does the extraction without filtering and
22 provides it back to the Law Department.
23        So I became aware of a need to
24 make sure that we had adequate staffing
25 because we're a small team.  I had to

**65**

1        C. Feinstein
2 make sure that we had resources to meet
3 the deadlines.
4    Q    What instructions were you
5 given by the litigation team?
6        MR. TOAL:  Objection.
7        I am going to direct the
8 witness to exclude from your answer
9 any instructions you were given by
10 Counsel.
11        THE WITNESS:  Okay.
12    A    I'm not sure -- that's pretty
13 broad.  Can you tell me what you are
14 asking about?
15    Q    Let me step back.
16        Were you given instructions for
17 the collection of custodians and data?
18    A    We are routinely given, as part
19 of the process, we are routinely given
20 the names of the custodians and then the
21 objects to collect from.
22    Q    Is that done in writing or
23 orally?
24    A    It's done through our ticketing
25 system.

17 (Pages 62 to 65)

66

```
1              C. Feinstein
2       Q     What is the ticketing system
3  called?
4       A     ITSM.
5       Q     What does it stand for?
6       A     I think it's IT Service
7  Management.
8       Q     So would the first time that
9  you were given instructions with respect
10 to the subpoena come through the ITSM
11 ticketing?
12      A     I believe that Shirley Hughes
13 gave me a heads up that we had some
14 collections coming and that we needed to
15 make sure we had adequate staffing.  So
16 we talked about the staffing, but those
17 were not instructions about what to
18 collect or whatnot to collect.
19      Q     Who is Shirley Hughes?
20      A     Shirley Hughes was the
21 litigation services manager or
22 supervisor.
23      Q     And then when would
24 instructions come; after the ticketing?
25      A     No.  The -- so the -- it's part
```

67

```
1              C. Feinstein
2  of the documented process.  It's part of
3  the process that we follow.  So the
4  litigation services enters tickets with
5  the names of the custodians and the
6  records to collect for them and then my
7  team processes that.  So those are the
8  instructions.  I'm not sure if I am being
9  clear, but those are the instructions.
10      Q     Where does the litigation hold
11 notice factor into this timeframe of
12 notification of custodians and which data
13 to collect?
14      A     The litigation hold notices go
15 out long before collection occurs.  So
16 litigation hold notices go out at the
17 time that there is understanding that
18 there might be potential litigation or
19 something has been filed.  So the
20 litigation hold notices go out first.
21      Q     Are you involved in that?
22      A     No, not really.
23      Q     Do you receive a copy?
24      A     I do not.
25      Q     Do you know which custodians
```

68

```
1              C. Feinstein
2  were put on hold, when?
3       A     No, I typically do not.  Not as
4  part of the ongoing process.  I could
5  look it up if I needed to research it,
6  but typically, we don't.
7       Q     You had mentioned that you
8  collected data from the custodians
9  without extraction.
10      What does that mean?
11      A     Without filtering.
12      Q     "Without filtering," what does
13 that mean?
14      A     In our typical process, what we
15 do or our prevalent process, what we do
16 is the litigation services sends us
17 through the ticketing system a list of
18 custodians and they tell us what objects
19 to collect from.  So they say e-mail for
20 this time period, C:/Drive for this time
21 period, whatever.  And so we just collect
22 all of that.  We don't apply search terms
23 or anything.  We just collect it and we
24 put it on -- we provide it back to the
25 Law Department so that they can then
```

69

```
1              C. Feinstein
2  provide it to their third-party vendor.
3       Q     Did you collect for all
4  custodians that were responsive to the
5  subpoena or only some?
6       A     So I don't know whether all the
7  custodians have had records collected yet
8  or not.  I think that work is still
9  ongoing, so I can't -- I can't say that
10 it's all been done, because I don't know
11 that to be true.
12      On the Management Committee
13 searches, on the Management Committee
14 collections, those were done a different
15 way.  Those were done using a different
16 process initially.
17      Q     When did you first get involved
18 with the collection of Management
19 Committee custodians' data?
20      A     That would have been in the
21 March/April timeframe.
22      Q     Of what year?
23      A     2017.
24      Q     When we were just discussing
25 the first work you did under the subpoena
```

18 (Pages 66 to 69)

**70**

C. Feinstein

1  of collecting custodians, I believe you
2  said that was either in late 2015 or
3  2016?
4  A    That's right. But that didn't
5  include the Management Committee
6  custodians. That was the -- those were
7  the custodians who are nonmanagement
8  committee members that came through
9  the --
10  Q    Did another team handle the
11  collection of Management Committee
12  custodians at that time?
13  A    Yes.
14  Q    What team was that?
15  A    We -- there is an area ops team
16  or a local contact -- a local EMIT
17  contact in Dallas.
18  Q    Who is that?
19  A    Bob Lauck, L-A-U-C-K.
20  Q    Did you work with Mr. Lauck at
21  all when you were doing the collection of
22  custodians in late 2015 or early 2016?
23  A    No. Mr. Lauck was not involved
24  in the part of the collection that is my

**71**

C. Feinstein

1  team did.
2  MS. DeROCHE: Can we just go
3  off the record for a moment?
4  [Discussion held off the
5  record.]
6  Q    When you first became involved
7  with the Management Committee custodians'
8  data, when was that?
9  A    That would have been March or
10  April of 2017.
11  Q    And how did that occur?
12  A    That occurred when I was
13  working with the Law Department as we
14  were trying to understand about the Wayne
15  Tracker account and understand what had
16  happened there, what the recall of that
17  issue was. So at that point, I began to
18  understand from the Law Department how
19  the initial Management Committee searches
20  had been conducted.
21  Q    In the course of gaining
22  understanding about the collection and
23  production of documents before your
24  involvement, did you review the

**72**

C. Feinstein

1  production of documents to date for the
2  management custodians?
3  A    I'm not sure what you mean by
4  "review the production."
5  MS. DeROCHE: Let me
6  introduce the next exhibit.
7  (Feinstein Exhibit 10 was
8  marked for identification, as of this
9  date.)
10  Q    Do you recognize this document?
11  A    Just let me read it. I have
12  seen this before, yes.
13  Q    What is it?
14  A    It is an e-mail or -- I'm
15  sorry, a letter. It is a letter to
16  Mr. Oleske where it outlines documents
17  that are being produced and the Bates
18  numbers on those.
19  Q    Can you turn to page five,
20  underneath the table?
21  A    (Complying.)
22  Q    The sentence right below it and
23  read it out loud?
24  A    (Reading.) Exhibit A contains

**73**

C. Feinstein

1  a list of the data sources searched for
2  each custodian listed above.
3  Q    And if you could turn to that
4  Exhibit A, which is two pages later.
5  A    (Complying.)
6  Q    Did you review this Exhibit A
7  to familiarize yourself with the prior
8  searches that had been conducted for the
9  Management Committee custodians?
10  A    I believe that I did.
11  Q    What else did you do to
12  familiarize yourself with what had been
13  done before your involvement in March or
14  April of this year?
15  A    Familiarize myself with what
16  had been done before March or April of
17  this year? I talked to Bob Lauck who
18  conducted the searches. I talked to Dan
19  Bolia in the Law Department. I talked to
20  Doug Neagli in the Law Department.
21  Q    Who was that last name?
22  A    Neagli, N-E-A-G-L-I. I don't
23  know his role exactly. I believe he is
24  in the Law Department, but who

**74**

1       C. Feinstein
2   participated in -- in some of the
3   searches.  I talked with Robert Levy in
4   the Law Department.  I looked back at
5   some of the tickets to see what had been
6   done, what work had been done -- can you
7   restate your question, to make sure I am
8   answering it?
9       Q    You are answering it.
10      A    Oh, okay.
11      Q    What did you review and what
12  did you do to familiarize yourself with
13  the searches that had been done prior to
14  your involvement?
15      A    I'm trying to think if there is
16  anything else that I did.  That's all
17  that I can recall right now.
18      Q    Did you look at the actual
19  documents collected?
20      A    No, I did not.
21      Q    Did you look at the methodology
22  under which they had been collected?
23      A    I looked at the search terms to
24  get an understanding of how they did the
25  searches.  I looked at some

**75**

1       C. Feinstein
2   correspondence that had gone back and
3   forth about it.  I talked with Bob about
4   how they had done the searches.  And I
5   looked at some of the instructions that
6   had been given on how they did the
7   searches.
8       Q    Did you review the locations
9   where the search terms had been applied?
10          MR. TOAL:  I couldn't hear
11      the end of that question.
12          MS. DeROCHE:  Sorry.
13      Q    Did you look at the data
14  sources or locations where the search
15  terms were applied?
16      A    Make sure I'm understanding the
17  question, did I look at like the laptops
18  and the C:/Drives and where they applied?
19      Q    Yes.  But also if you didn't
20  look at the physical hardware, what did
21  you look at?
22      A    No, I did not look at the -- I
23  did not look at the physical hardware.  I
24  did not look at the drives where they had
25  done the collections.  So I relied on the

**76**

1       C. Feinstein
2   information coming from Mr. Lauck and
3   then from Mr. Bolia about what had been
4   collected and produced.
5       Q    Was that in the tickets?
6       A    No, that's not in the tickets.
7       Q    Where does that data reside,
8   the methodology?
9       A    Oh, the methodology.  There was
10  an e-mail that I reviewed where the
11  instructions were given to the admins as
12  part of the searches on how to do that.
13  So that was done in an e-mail and I had a
14  copy of that.  So the e-mail is where I
15  know that that came from.  And the other
16  came from the telephone conversations
17  that I had with Mr. Lauck and then
18  face-to-face conversations with Dan
19  Bolia.
20      Q    In the e-mail, did it list the
21  data sources where the search terms were
22  applied?
23          MR. TOAL:  Object.
24      Attorney/client privilege.  I believe
25      the e-mail she is referencing came

**77**

1       C. Feinstein
2   from Counsel so...
3       Q    You had mentioned admins had
4   conducted the search.
5           What did you mean by that?
6       A    Not admins who conducted the
7   search.  So what I meant was that there
8   were -- in the first search -- so there
9   were instructions given to the admins
10  about how to identify where there were
11  potentially responsive documents.
12      Q    Whose admins?
13      A    The Management Committee
14  admins.
15      Q    And they were given
16  instructions on how to identify
17  responsive documents when, if you
18  remember?
19      A    I -- I don't.  Let's see, they
20  would have been -- the first search would
21  have been in January of 2016.  So it
22  would have been in January of 2016 that
23  the instructions were given.  So on that,
24  the Law Department worked with the admins
25  to identify where these potential

                              20 (Pages 74 to 77)

78

1      C. Feinstein
2  documents were. And then how to move
3  those into a folder where they could be
4  searched.
5      Q    Could you tell me about your
6  personal involvement in the recovery
7  efforts undertaken March or April of 2017
8  with respect to the Management Committee
9  custodians?
10     A    The recovery efforts, the
11 Management Committee custodians? Are you
12 speaking specifically about the Wayne
13 Tracker?
14     Q    Right now, more generally,
15 management custodian, Management
16 Committee custodians. Did you only focus
17 on Wayne Tracker recovery or did you look
18 at recovery for more than just that
19 account?
20     A    So in the March timeframe, we
21 were very focused on the recovery for
22 the -- well, there were two pieces. One
23 I wouldn't call recovery, but there was
24 one piece where we were looking at -- the
25 Law Department had decided to upload all

79

1      C. Feinstein
2  of the data to the third-party vendor
3  server. And so I was engaged somewhat on
4  the security of that and ensuring that we
5  took perfect steps in security on that.
6  And then on the Wayne Tracker, where we
7  realized that the automated file sweeper
8  had not been disabled for a period of
9  time as it should have been, then we were
10 engaged in looking at backups and trying
11 to do recovery for that period.
12     Q    So with the Management
13 Committee custodians data, going to a
14 third-party data server, what was your
15 involvement?
16     A    My involvement was identifying
17 someone to go over and review the
18 security on the server, to make sure that
19 we had locked that data down as tightly
20 as we could and to make sure that we had
21 all the necessary controls in place, that
22 we were going to get them in place as
23 quickly as we could.
24     Q    Was the server at the
25 third-party vendor's location or at

80

1      C. Feinstein
2  Exxon's location or cloud-based?
3      A    For that search, it was at the
4  third-party vendor's location.
5      Q    Physical location?
6      A    Physical location.
7      Q    There was no cloud?
8      A    There was no cloud, to my
9  knowledge.
10     Q    After you had ascertained the
11 security of the server, were you involved
12 at all in the Management Committee
13 custodians data?
14     A    So my team collected the data
15 to provide to the Management Committee --
16 to put on the server.
17     Q    What did your team collect the
18 data from?
19     A    The data would have been
20 collected from the Management Committee
21 sources, so e-mail, C:/Drives.
22     Q    Are you talking about the
23 records that had been collected
24 previously, or was this a different
25 collection effort?

81

1      C. Feinstein
2      A    So I am talking about the
3  fourth collection.
4      Q    Okay. I will get back to that
5  in a moment.
6      A    Okay.
7      Q    Could you tell me, generally,
8  about the recovery efforts that you were
9  involved with, with the Wayne Tracker
10 e-mail account?
11     A    So could I tell you about the
12 recovery effort for the Wayne Tracker
13 account? So I think that's fairly broad.
14 Can you tell me what -- sorry, it was a
15 big effort.
16     Q    Let me get back to that.
17     A    Okay.
18     Q    I would like to focus a little
19 bit on the technology end of it, rather
20 than the custodians.
21     A    Okay.
22     Q    When the recovery efforts were
23 conducted, both for the Management
24 Committee -- I am just going to include
25 the Wayne Tracker e-mail account for all

21 (Pages 78 to 81)

**82**

C. Feinstein

1  the Management Committee custodians --
2  
3      A     Okay, right.
4      Q     -- was an effort undertaken to
5  review all backup tapes?
6      A     I'm sorry, can you say that one
7  more time?
8      Q     Was an effort undertaken to try
9  to assess and recover all backup tapes
10  that might have existed?
11     A     For the Wayne Tracker?
12     Q     For all Management Committee
13  custodians and accounts.
14     A     So as part of the effort to
15  restore the data on the Wayne Tracker,
16  one of the things that was done is that
17  the -- there was not a period when the
18  Management Committee custodians had their
19  file sweeper disabled.  So there was a
20  review -- so there was an attempt to
21  recover the Wayne Tracker account.  But
22  then there was also an extra step taken
23  to go through, because -- because when
24  the e-mails are sent or received, if he
25  was sending or receiving anything to the

**83**

C. Feinstein

1
2  Management Committee members, then those
3  e-mails would have existed in their
4  e-mail, as well.  So their e-mail was
5  reviewed, as well.
6      Q     Who reviewed the backup tapes?
7      A     We had -- who reviewed the
8  backup tapes.  So the backup data, we had
9  e-mail services working to -- to do
10  restores and then to restore the data and
11  then whatever could be restored, then
12  searched and Bob Lauck was conducting the
13  searches.
14     Q     Who collected before they were
15  restored?
16     A     Who collected before they were
17  restored?  I'm not sure I understand your
18  question.
19     Q     Who inventoried where all the
20  backup materials might have existed?
21     A     Who inventoried for all the
22  backup materials?  Are you -- are you --
23  I'm not sure I am understanding.  Are you
24  asking about who inventoried where the
25  Management Committee might have had

**84**

C. Feinstein

1
2  responsive documents, or are you asking
3  about which servers?
4      Q     I am asking about the servers.
5      A     Okay.  So we had a team of
6  folks involved in doing that.  There were
7  a number of people involved, and I'm not
8  sure I could tell you specifically which
9  individual identified those servers.
10  Cynthia Leong could probably provide more
11  information, but we had a number of
12  people involved who were working to
13  identify servers, potentially, that might
14  have data that we could go to and get
15  back that information.
16     Q     Were you involved in any of the
17  forensic imaging that was conducted in
18  any of the Management Committee
19  custodians records?
20     A     I was not directly involved.  I
21  was aware that the process was going on.
22  I was -- I listened to some of the
23  discussions, understood some of the --
24  the work that was going on, but I was not
25  directly involved in it.

**85**

C. Feinstein

1
2      Q     Who was directly involved?
3      A     On the imaging, you are asking
4  about, let me make sure I am clear about
5  what piece you are asking about, to make
6  sure I give the right answer.
7      Q     I can help clarify.
8      A     Okay.
9      Q     Some of the documents that were
10  produced to our office came from a
11  location called Logical Imaging.  I am
12  wondering who was involved in the Logical
13  Imaging?
14     A     If we are talking about the
15  Logical Imaging related to e-mail, then
16  it would have been the E-Mail Services
17  Group, would have been -- let me see.
18  Your question -- tell me your question
19  one more time.  It was about who was
20  involved?
21     Q     Who was involved in the
22  forensic imaging?
23     A     In the forensic imaging.  So in
24  the forensic imaging, we had Deloitte
25  engaged to help us with some of that.

**22 (Pages 82 to 85)**

86

1          C. Feinstein
2     Q     When was Deloitte engaged?
3     A     They were engaged -- I don't
4  know specifically -- I think it was in
5  the March timeframe, but I don't know the
6  specific date.
7     Q     Did Deloitte conduct the
8  imaging, or did ExxonMobil conduct the
9  imaging?
10    A     I did not know specifically who
11  did what as far as the operations.  I
12  know they provided a lot of guidance to
13  this.  I don't know whose hands were on
14  the keyboard.
15    Q     Okay.
16    A     And then we also did some
17  imaging of the iOS devices.  So I am not
18  sure which one you are referring to
19  there.
20    Q     Okay, thank you.
21         MS. DeROCHE:  I would like to
22  introduce an exhibit, Exhibit 11.
23         (Feinstein Exhibit 11 was
24  marked for identification, as of this
25  date.)

88

1          C. Feinstein
2  think Ye-Ching is -- messaging, that's
3  e-mail messaging.
4     Q     Okay.
5     A     And that's all that I see.
6     Q     Do you know if any of the hard
7  drives for the Management Committee
8  custodians were mirrored?
9     A     I do not know if they were
10  mirrored.
11    Q     Who might have done that, if
12  they were?
13    A     If they were, Bob Lauck would
14  have done it.
15    Q     Do you know if any mailbox
16  auditing was done?
17    A     No, I don't know -- mailbox
18  auditing, can you tell me more what you
19  mean by that?
20    Q     I understand it's a mechanism
21  for tracking events in a mailbox server.
22    A     I -- I don't know.  I don't
23  know for sure.
24    Q     Was the E-Mail Services Group,
25  any individuals who you identified,

87

1          C. Feinstein
2     Q     You had referenced this
3  document earlier.  We are introducing it
4  as an exhibit now.
5         Could you tell me what this
6  document is?
7     A     This is a letter from Mr. Toal
8  to Mr. Oleske.  It gives the job titles
9  and business units of the people who were
10  involved in the recovery effort or
11  understanding of what happened with the
12  Management Committee searches.
13    Q     You mentioned that E-Mail
14  Services Group a number of times.
15    A     Mm-hm.
16    Q     Who on this list is on the
17  E-Mail Services Group?
18    A     Okay.  I will tell you to the
19  best of my ability.  Cynthia Leong.
20  Kathryn Evans.
21    Q     Can you say the last name
22  again?
23    A     Kathryn Evans.  I believe
24  Ye-Chin Lee is.  I'm not sure exactly.
25  It's Messaging Service Design Lead, so I

89

1          C. Feinstein
2  involved in all of the recovery efforts
3  for the Management Committee custodians
4  or just parts?
5     A     They were involved in all of
6  the recovery efforts where we were going
7  through these efforts to find any backup
8  tapes, to find any -- or backups, to find
9  any backup information, to go back and
10  restore that information where the
11  automated file sweeper had been enabled,
12  so they were involved in that.
13        MS. DeROCHE:  I would like to
14  go off the record, if we could take a
15  short break?
16         [A recess was taken from
17  11:53 a.m. to 12:02 p.m.]
18        MS. DeROCHE:  If it's okay
19  with everyone, we would like to ask a
20  couple more questions, and then take a
21  lunch break.
22        MR. TOAL:  Okay.
23  BY MS. DeROCHE:
24    Q     So can you tell me what steps
25  you took in the recovery of Wayne Tracker

                              23 (Pages 86 to 89)

90

1        C. Feinstein
2    e-mails?
3        A    What steps I personally took?
4    So I participated in -- I participated in
5    an effort to determine the root cause.
6    So I worked with a number of people who
7    had specific expertise or knowledge in
8    the different areas of the systems that
9    linked together to make the automated
10   file sweeper work or not work.
11       So I worked with my boss, I
12   worked with different subject matter
13   experts who had an understanding of it
14   to -- and with the Law Department, with
15   Robert Levy, to understand what had
16   happened, what it looked like was
17   impacted, how could that have happened,
18   how was -- where was the Wayne Tracker ID
19   set up, and then what was the root cause
20   of this, what we could do to go back and
21   what could we get out of the existing
22   system, what could we do to recover
23   things from the backups, what could we do
24   to get things from the dumpster in the
25   e-mail system, what could we do as far as

91

1        C. Feinstein
2    data carving.  And so I played the role
3    of contributing some knowledge about the
4    process and then doing the coordination
5    and working to make sure that we kept
6    things on track and that we could fully
7    understand how far back we could get.  So
8    some knowledge and some coordination.
9        Q    Who worked on identifying the
10   root cause, meaning, what accounts were
11   impacted and when?
12       A    What accounts were impacted and
13   when?
14       MS. DeROCHE:  Strike that.
15       THE WITNESS:  Okay.
16       Q    Do you know who was responsible
17   in EMIT for setting up the secondary
18   e-mail account?
19       A    Mr. Tillerson's Wayne Tracker
20   account.  That account was set up in
21   2007, and I understand Erick Wells was
22   knowledgable about that.  So I don't know
23   who made the initial request, but I know
24   that Erick Wells was the contact who was
25   knowledgable about when that account was

92

1        C. Feinstein
2    set up and why.
3        Q    Who was the person with the
4    personal knowledge about what devices or
5    software that account showed up in, and
6    to be practical about it, in Outlook, you
7    know, if you see two different e-mail
8    addresses populate or if you have got a
9    BlackBerry with one e-mail address on one
10   or the other or two addresses in one, who
11   set that up for Mr. Tillerson?
12       A    Let me make sure I understand.
13   So when the Wayne Tracker account was set
14   up initially, it was set up in Lotus
15   notes.  So Erick Wells would have been
16   knowledgable about how that was set up.
17   And then it got transitioned over to
18   Exchange, Microsoft Exchange, 2007, in
19   late 2011, early 2012.
20       As far as how that displayed?
21   I'm not sure I understand the question.
22   How it was set up in Lotus Notes
23   originally would have been Erick Wells.
24       Q    Okay.
25       A    And then I don't know when

93

1        C. Feinstein
2    Erick changed roles.  And then when we
3    did the transition -- to Microsoft
4    Exchange 2007 -- what was your question?
5        Q    Who would have set up the two
6    e-mail accounts on his devices or in his
7    software?
8        A    Well, the account was initially
9    set up -- the account was initially set
10   up in Lotus Notes in 2007.  Erick Wells
11   was knowledgable about that.
12       As it transitioned over, as we
13   migrated, we shut down Lotus Notes and
14   migrated over Microsoft Exchange 2007.
15   The account would have migrated and been
16   set up as a new account.
17       Q    And who would do that?
18       A    I'm not sure who would --
19   e-mail services would have done the
20   migration.  I don't know specifically who
21   would have helped him, if anyone would
22   have helped him with that migration.
23       Q    You had mentioned that there
24   were subject matter experts that worked
25   with you on the recovery of the Wayne

24 (Pages 90 to 93)

94

```
 1              C. Feinstein
 2    Tracker e-mail.
 3              Who are those subject matter
 4    experts?  What were their expertise?
 5         A    So there were a number of
 6    people who were involved in that.  It was
 7    a -- it was a pretty massive effort.  I
 8    can tell you who -- I can give you a list
 9    of most of the people.  There were a
10    large number of people.
11              So on the recovery efforts,
12    obviously, Cynthia Leong was involved.
13         Q    What was her expertise?
14         A    Her expertise is e-mail,
15    Microsoft Exchange.
16         Q    Would she have been involved in
17    the recovery efforts on the Exchange
18    server?
19         A    Yes.
20         Q    And the Exchange server
21    backups?
22         A    Yes.  She was very much
23    involved in that, the recovery for the
24    Wayne Tracker account where the automated
25    file sweep was not disabled.
```

95

```
 1              C. Feinstein
 2              And you are focused just on
 3    recovery, right?
 4         Q    Yes.
 5         A    Paul Ivy, I believe.
 6         Q    Who was?
 7         A    Paul Ivy was a storage
 8    operation supervisor and he has some
 9    responsibility for backup.
10         Q    Do you know what he did with
11    respect to the backups in this matter?
12         A    I don't know specifically all
13    he did.  This was a very large effort and
14    very extensive, so I can't tell you what
15    exactly all he did.
16              Bob Lauck would have been
17    involved in helping to conduct additional
18    searches.
19         Q    Where?
20         A    Bob Lauck.
21         Q    I'm sorry, searches where?
22         A    Of the hardware or looking for
23    additional LST or PST files.
24         Q    What kind of hardware?
25         A    Whatever hardware Mr. Tillerson
```

96

```
 1              C. Feinstein
 2    may have had.
 3         Q    That includes desktop, remote
 4    or personal devices?
 5         A    So that would include his --
 6    that would have included his laptop, that
 7    would have included his C:/Drive, his
 8    H:/Drive, whatever drives that he was
 9    looking for.  Mr. Lauck was not
10    involved -- I don't think he was involved
11    in searching his iOS devices.  I think
12    that was done separately, but I have to
13    verify whether he was involved in that or
14    not.
15         Q    Okay.
16         A    Let's see, still talking about
17    backup.
18         Q    Mm-hm.
19         A    John Rudisill.
20         Q    What was his involvement?
21         A    He is in Customer
22    Infrastructure E-Mail Technical Support,
23    so he has technical knowledge about the
24    server support and backup processes.
25         Q    The Exchange e-mail server?
```

97

```
 1              C. Feinstein
 2         A    The Exchange e-mail server.
 3         Q    What do you understand the
 4    steps he took?
 5         A    I can't tell you specifically
 6    what steps each person took.
 7         Q    Okay.
 8         A    There were many, many steps
 9    that were taken over a number of days and
10    so I can't tell you exactly how all of
11    the different steps broke down.
12         Q    Maybe we should take it in
13    terms of steps, if you were involved in
14    coordinating and providing content,
15    expertise.
16              Do you want to take me through
17    the step-by-step?
18         A    Okay, for the Wayne Tracker
19    account?
20         Q    Mm-hm.
21         A    Okay.  Give me one second, let
22    me go back to --
23         Q    We will have some questions
24    about the affidavit specifically after
25    lunch.
```

25 (Pages 94 to 97)

**98**

1        C. Feinstein
2     A    Okay.
3     Q    If this refreshes your
4  recollection, in order to describe the
5  steps, great.
6     A    I will tell you everything I
7  can about the steps.  As I said, it was a
8  large effort, and so -- okay.  So the
9  first step was to identify what could be
10 recovered from within Microsoft Exchange.
11 And some that, including identifying any
12 places on the existing Exchange servers
13 where the data might be available.  And
14 then going through the backups, as many
15 backups as could be found, or the servers
16 on which the Wayne Tracker account may
17 have had information.  And then looking
18 at those backups.
19      There were steps taken to
20 search any of the laptops that
21 Mr. Tillerson might have used.  There was
22 a search made of the IOS devices, his
23 iPad and his -- his iPhone.  Then there
24 was searching of all of the e-mails of
25 all the other Management Committee

**99**

1        C. Feinstein
2  Custodians who might have received
3  e-mails from Mr. Tillerson using the
4  Wayne Tracker ID.  There was -- brought
5  Deloitte in to see if there was any more
6  data carving or forensics work that could
7  be done to restore something else that
8  had not yet been identified.
9     Q    The laptops you mentioned, were
10 those backed up?
11    A    So laptops have a C:/Drive
12 which periodically gets backed up to an
13 H:/Drive, if they are put in a certain
14 folder, and then the H:/Drive gets backed
15 up.  So the laptops were searched.  I
16 don't know specifically, out of the data
17 that Mr. Tillerson had, exactly how much
18 was -- some people don't use their
19 C:/Drive very much, some people do.  I
20 don't know -- I know that the drives were
21 searched, and I know that the backups
22 were searched.
23    Q    The IOS devices, are they
24 backed up?
25    A    The IOS devices, so the IOS

**100**

1        C. Feinstein
2  devices, if they are downloading e-mail,
3  then the e-mail is coming from the e-mail
4  server, so that's what gets backed up.
5  The IOS devices were -- they -- the --
6  whatever they are connecting to, if it's
7  connecting to the network, it's part of
8  that other backup, right, it's not a
9  backup of the IOS device, itself.
10      So the IOS devices were
11 searched thoroughly.  And if there is any
12 other backup of the IOS devices, I am not
13 aware of it.
14    Q    You mentioned looking at
15 e-mails of the other Management Committee
16 Custodians.
17    A    Correct.
18    Q    Did you look at the admins for
19 those Management Committee members?
20    A    I don't believe that the
21 admins' e-mail was looked at for that.  I
22 would have to confirm that, but I don't
23 believe it was.
24    Q    You had mentioned earlier in
25 your testimony that admins were asked to

**101**

1        C. Feinstein
2  conduct some of the searches for the
3  management custodians 2016?
4     A    So what they were asked to do
5  was to work to identify the locations of
6  documents, and then to put those in a
7  folder --
8     Q    And --
9     A    -- where they can be searched.
10    Q    -- did you work with the admins
11 to do that?
12    A    I did not.
13    Q    Who did?
14    A    That would be Bob Lauck.
15    Q    Do you know if, at the time the
16 admins collected these documents, they
17 were placed on litigation hold?
18    A    I do not know for certain, but
19 I do not believe they were placed on
20 litigation hold.
21    Q    Do you know of any efforts that
22 had been made to recover e-mails and
23 documents of the admins in the relevant
24 time period?
25    A    I do not know.  I have no idea.

26 (Pages 98 to 101)

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 399 of 553   PageID 826

---

**102**

1          C. Feinstein
2     Q    The --
3     A    Actually, actually, let me
4  check -- let me check something.  I
5  believe they may be listed as some of the
6  custodians.  Here's an attachment that
7  has some of the custodians, and I think I
8  did see that one of the names was in
9  there, but I am not absolutely certain
10  about it, so I can't tell you
11  definitively.  I think I may have seen it
12  in the list of names, but I don't know
13  the admins' names off the top of my head,
14  so I'm not sure.
15     Q    We will go through that later.
16          The steps we just described
17  about recovering the Wayne Tracker
18  e-mails, the Exchange server, the
19  laptops, IOS devices, the e-mails of
20  other Management Committee members and
21  the forensics by Deloitte, were those
22  similar steps taken to recover other
23  Management Committee Custodians records?
24     A    No.  Other Management Committee
25  members didn't have their file sweeper

---

**103**

1          C. Feinstein
2  disabled, so there wasn't a need to do
3  recovery on theirs.
4          MS. DeROCHE:  We are ready to
5     take our lunch break.
6          [A luncheon recess was taken
7     fro 12:20 p.m. to 1:21 p.m.]
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**104**

1          C. Feinstein
2          [Whereupon, after a luncheon
3  recess was taken, the following was
4  had:]
5
6          A F T E R N O O N   S E S S I O N
7
8  BY MS. DeROCHE:
9     Q    Thanks for coming back.
10          I would like to go back to
11  Exhibit 10, which is the December 31,
12  2016, production letter.
13     A    Okay.  I have that.
14     Q    Do I have this right?  It's
15  that you had no involvement in the
16  collection of potentially responsive
17  documents for this production in
18  December 31, 2016?
19     A    For this production on
20  December -- which one are you talking
21  about?
22     Q    For this production cover
23  letter, December 31, 2016.
24     A    That I had -- I'm not sure I
25  understand.  That I had no?

---

**105**

1          C. Feinstein
2     Q    Did I understand your prior
3  testimony that you had no involvement in
4  the collection of potentially responsive
5  documents for the Management Committee
6  Custodians that were produced on this
7  day?
8     A    December -- produced on -- you
9  are not talking about collected.  You are
10  talking about -- I'm trying to figure out
11  which search you are talking about.  The
12  Management Committee searches, I didn't
13  do any of those.  So the Management
14  Committee searches, Bob Lauck did those.
15          Now, let me go back and look
16  at -- let me go back and look at which
17  one you are talking about specifically.
18     Q    That's all right.  You
19  understood my question correctly, which
20  is the collection before your involvement
21  in March or April of this year for the
22  Management Committee?
23     A    Right.
24     Q    And do I understand that there
25  were no interviews of Management

---

27 (Pages 102 to 105)

**FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM**
INDEX NO. 451962/2016
NYSCEF DOC. NO. 194
RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 400 of 553   PageID 827

**106**

C. Feinstein

1
2  Committee custodians in 2015 or 2016 to
3  collect their documents?
4      A    So the Management Committee
5  Custodians were interviewed during the
6  third search, so let me look at the date
7  on that.  That would have been in -- let
8  me look at the date to make sure I am
9  right.  So they would not have been
10  interviewed in 2015 or 2016.  The
11  Management Committee members would have
12  been interviewed in 2017.
13      Q    And were you involved in those
14  interviews?
15      A    No, I was not.
16      Q    Who was?
17      A    It would be the Law Department.
18      Q    Do you know if Mr. Lauck was
19  involved in the interviews?
20      A    I do not know.  I don't know if
21  he would be -- I wouldn't think, but I
22  don't know.
23      Q    For the collection that we
24  talked about earlier today about the
25  admins collecting documents, how did they

**107**

C. Feinstein

1
2  review for potentially responsive
3  documents?
4      A    How did the Management
5  Committee admins review?  They got a set
6  of instructions where they worked with
7  the Law Department and I wasn't in on
8  those discussions, but they worked with
9  the Law Department to identify -- the
10  Management Committee admins tend to be
11  quite knowledgable about how their bosses
12  worked.  So they worked with the Law
13  Department to identify where the
14  potentially responsive documents would be
15  located based on their knowledge of what
16  their Management Committee did.  And so
17  based on their knowledge of his working
18  habits and some of those people have
19  delegated access to the e-mails and that
20  sort of thing.
21      Q    Do I understand this correctly,
22  that it was Law Department directed, but
23  that Mr. Lauck was involved?
24      A    That's correct.
25      Q    And that you were not

**108**

C. Feinstein

1
2  personally involved?
3      A    I was not personally involved
4  in those searches, that is correct.
5      Q    The ticketing multiple tickets
6  that you testified to in the middle of
7  2016 that your team had worked on for
8  collecting custodians and relevant data
9  sources for those custodians, is it right
10  that there were no management custodians
11  on that ticket?
12      A    As far as I know, there would
13  not have been -- I have to go back and
14  look to be absolutely certain there was
15  none on there, but the Management
16  Committee Custodians were handled
17  differently because of the sensitivity of
18  the data that they had.  So the searches
19  that we were doing for the other
20  custodians, using our access data tool
21  would have been different and was -- the
22  point of that was that it was not the
23  Management Committee.
24      Q    Was this the first time that
25  the Management Committee Custodians had

**109**

C. Feinstein

1
2  been collected in a separate manner than
3  other relevant custodians to a potential
4  litigation or investigation?
5      A    I believe that it's been done
6  before.  My team doesn't normally support
7  that, but I understand it's been done
8  before, I just don't have the details on
9  it.
10      Q    What is the basis for your
11  belief?
12      A    Information that I gathered
13  from the -- from the Law Department.  I
14  think I asked the question.
15      MS. DeROCHE:  I would like to
16  introduce an exhibit, Exhibit 12.
17      (Feinstein Exhibit 12 was
18  marked for identification, as of this
19  date.)
20      Q    Do you recognize this document?
21      A    No, I don't.  I know it's a
22  litigation hold notice, but not this
23  specific document.
24      Q    Were you, if you recall,
25  involved in the litigation hold or data

28 (Pages 106 to 109)

**110**

1        C. Feinstein
2 preservation or data collection for
3 documents responsive to the Kivalina and
4 Comer lawsuits?
5      A    No. This looks like it was
6 from 2010. And so I'm not familiar with
7 this suit at all.
8      Q    Did a similar notice like this
9 go out when the subpoena was issued?
10 Obviously, the names will have changed
11 and the description will have changed,
12 but this sort of e-mail to all --
13      A    You are talking about the
14 December 2015?
15      Q    Yes, November 2015.
16      A    November 4th? Yes, so when the
17 November 4th subpoena went out, there
18 were litigation hold notices sent after
19 that went out.
20      Q    And did the litigation hold
21 notice that went out after the OAG
22 subpoena was issued in November of 2015,
23 did that notice include the Management
24 Committee Custodians?
25      A    It did include the Management

**111**

1        C. Feinstein
2 Committee Custodians.
3      Q    And so when the ticketing was
4 created for your department to start the
5 collection, at some point somebody went
6 through and took out particular
7 custodians from that hold notice for a
8 different workflow in terms of
9 collection?
10      A    Oh, okay. So -- so when
11 litigation hold notices are sent, they're
12 sent out of Atlas. So subjects are
13 identified, but we may not collect from
14 all of those at one time.
15      Q    Right.
16      A    So it's not a matter of
17 everybody in Atlas generates one single
18 ticket to do all of them at one time. So
19 yes, someone in the Law Department would
20 tell us out of everybody who is on
21 litigation hold which ones to collect at
22 what point in time.
23      Q    And who told you, in response
24 to this subpoena, in 2016, who to collect
25 from and at what point in time?

**112**

1        C. Feinstein
2      A    In 2016, through the normal
3 workflow, what would have happened is
4 that Litigation Services, or the Law
5 Department, through Litigation Services,
6 would have decided what custodians need
7 to be collected from at what point in
8 time and then what needed to be
9 collected. And then they would send that
10 through a ticketing to my team and then
11 my team would -- and then they would tell
12 them what, generally, we understand,
13 collect information about what deadline
14 do you need these collections by. And so
15 then they would have done that collection
16 based upon what custodian information was
17 been provided to them by Litigation
18 Services.
19      Q    If we could turn to Exhibit 10,
20 the December 1, 2016 cover letter, and
21 moving to Exhibit A.
22      A    (Complying.)
23      Q    If you could look at the first
24 row, row one, Albers, Mark.
25      A    Did you say ten? Am I on the

**113**

1        C. Feinstein
2 wrong one?
3      Q    It's the December 31, 2016,
4 cover letter. Exhibit A, the first row,
5 Albers, Mark, data sources are e-mail,
6 H:/Drive and paper.
7      A    I must be on the wrong page.
8 Which page are you on?
9      Q    Here. I believe your testimony
10 earlier today was that when you got
11 involved in March of 2017, that you
12 reviewed what had been collected from the
13 Management Committee Custodians.
14      A    So when I got involved, that's
15 where I began to learn what had been
16 collected from the Management Committee
17 Custodians. So somewhere during that
18 time I saw some of the documentation
19 about what had been collected. Now, I
20 had never reviewed the documents,
21 themselves, and so I don't have an
22 understanding of exactly what was
23 produced, I just know that the searches
24 were conducted, what the search terms
25 were, that sort of thing.

29 (Pages 110 to 113)

**114**

1           C. Feinstein
2      Q     For Mr. Albers here, e-mail,
3    H:/Drive and paper, who conducted the
4    search in these data sources?
5      A     So let me make sure that I am
6    clear about the timeline on this.  So
7    this would have been December 31st.  I
8    believe this would have been search
9    number one, if I'm not mistaken.  Let me
10   just double check and make sure that I
11   have got this.  This would have been from
12   search number one.  I'm sorry, could you
13   repeat your question?
14     Q     How was it searched and by
15   whom?
16     A     So the Management Committee
17   information on this search would have
18   been -- this would have been -- this
19   would have been an e-mail search.  This
20   would have been -- I'm sorry, let me back
21   up.
22          So what would have happened
23   here is that the Law Department worked
24   with the admins to determine where the
25   sources of this data was and they

**115**

1           C. Feinstein
2    manually identified the e-mail locations,
3    the other electronic sources and the hard
4    copy documentation.  And then on this
5    one, there was a search -- so they
6    identified the documents and they put
7    them in a folder.  And then the search
8    was conducted by Bob Lauck and it was
9    using the simplified terms that were
10   intended to be an approximation of the
11   more complex terms that couldn't be done
12   using the native Microsoft Exchange
13   technology.
14     Q     How did the admins manually ID
15   sources for Mr. Lauck to run simplified
16   searches upon?
17     A     Based on their knowledge of
18   where the documents would be.
19     Q     So did they run any search
20   terms?
21     A     Not to my knowledge.  I would
22   have to double check that, but I think
23   they collected documents, put them in the
24   folder and Mr. Lauck ran research terms.
25   I have to be certain about that.

**116**

1           C. Feinstein
2      Q     For any e-mail, in-box or sent
3    items, how were those collected?  Was
4    everything from the in-box moved over for
5    a search, or was everything from the sent
6    items moved over for Mr. Lauck's search?
7      A     I would have to look back at
8    the specific instructions to them on how
9    they were told to do that.  I don't
10   know --
11     Q     Who would know that best?
12     A     Bob Lauck would have those
13   instructions or the Law Department.
14     Q     What about the H:/Drive?  How
15   would the admin collect documents for
16   searches to be applied?
17     A     It would be the same
18   methodology as we see, identify the
19   documents, put them in the folder.
20     Q     What about paper?
21     A     Paper, I don't know how they
22   did the paper collections.
23     Q     And who might know that?
24     A     The Law Department.
25     Q     If you could move to, I guess

**117**

1           C. Feinstein
2    it's Exhibit A, page A-3, row 26.
3      A     I'm sorry, where am I?  This is
4    on Exhibit 10?
5      Q     Yes.
6      A     And where am I?
7      Q     It's Exhibit A, page A-3, row
8    26, Dolan, Michael.  The data sources
9    that were searched that are listed here
10   are e-mail, H:/Drive, C:/Drive, MySites
11   and paper.
12     A     Mm-hm -- I'm sorry, I should be
13   saying yes.
14     Q     Were these collected in the
15   same manner that you just described for
16   Mr. Albers?
17     A     Yes, those had been collected
18   in the same manner.
19     Q     There are two additional
20   sources here; a C:/Drive and a MySites.
21          Can you tell me what the
22   C:/Drive is?
23     A     So the C:/Drive is the hard
24   drive.
25     Q     Do you know why the hard drive

30 (Pages 114 to 117)

**118**

1        C. Feinstein
2    might not have been searched for
3    Mr. Albers?
4        A    He might not have used his hard
5    drive. Sometimes a lot of folks don't
6    like to use their C:/Drive. They store
7    everything on their H:/Drive.
8        Q    Do you know if it was searched?
9        A    I do not know if it was
10    searched.
11        Q    And who would know that best?
12        A    Bob Lauck. Bob Lauck, the Law
13    Department, or the admin, the Management
14    Committee admin.
15        Q    Do you know who the admin
16    was --
17        A    I do not.
18        Q    -- who conducted the search for
19    Mr. Dolan?
20        A    I do not know who Mr. Dolan's
21    admin is.
22        Q    Do you know who the admin is
23    that conducted the search, that may or
24    may not be the same person?
25        A    I don't know who the admins, by

**119**

1        C. Feinstein
2    name, that were involved in identifying
3    the sources of the data.
4        Q    Is that true for each of the
5    Management Committee --
6        A    Yes, I don't know who that is.
7        Q    Another location for Mr. Dolan
8    is MySites.
9        What is MySites?
10        A    Each of our employees has a
11    SharePoint site that we deem as their
12    MySites that they can choose to use or
13    not use and they can choose to store
14    documents on it or not store documents on
15    it.
16        Q    Did the Management Committee
17    have a team site on SharePoint?
18        A    I do not recall specifically
19    whether they had a team site or not.
20        Q    Do you know who would know
21    that?
22        A    I would think that Bob Lauck
23    would know that.
24        Q    Do you know, during your
25    efforts in March or April of this year,

**120**

1        C. Feinstein
2    for recovery efforts, if there was a team
3    site that was searched?
4        A    For the recovery efforts. The
5    recovery efforts were focused on the
6    Wayne Tracker ID. And so the Wayne
7    Tracker ID, there would -- the short
8    answer is no, there wouldn't have been a
9    recovery effort for a team site.
10        Q    If Mr. Tillerson used that team
11    site, would it have been searched?
12        A    If Mr. Tillerson had used a
13    team site and, yes, it would have been
14    searched.
15        Q    Turning back to Exhibit 10,
16    Exhibit A. It's page A-8, row 85,
17    Swiger, Andrew.
18        Do you know how his e-mail,
19    H:/Drive and paper documents were
20    searched?
21        A    They would have been searched
22    in the same manner as the other
23    Management Committee members.
24        Q    Same page, further down, row
25    89, Mr. Tillerson, do you know if his

**121**

1        C. Feinstein
2    e-mail, H:/Drive and paper documents were
3    searched?
4        A    It would have been in the same
5    manner as the other Management Committee
6    members.
7        Q    And on page A-9, row 97,
8    Mr. Williams, his e-mail, H:/Drive and
9    paper, were they searched in the same
10    manner as the other custodians?
11        A    They would have been searched
12    in the same manner as the other
13    custodians.
14        Q    Row 99, Woods, Darren.
15        A    They would have been searched
16    in the same manner.
17        MS. DeROCHE: If we can turn
18    to the next exhibit, number 13.
19        (Feinstein Exhibit 13 was
20    marked for identification, as of this
21    date.)
22        Q    Do you recognize this document?
23        A    Yes, I have seen it before.
24        Q    What is it?
25        A    This is a letter from Nora

31 (Pages 118 to 121)

**FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM**
INDEX NO. 451962/2016
NYSCEF DOC. NO. 194
RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 404 of 553   PageID 831

**122**

1    C. Feinstein
2  Ahmed to John Oleske, outlining the
3  production of some documents from the
4  Management Committee members.
5    Q    And the document is dated
6  March 21, 2017?
7    A    That's correct.
8    Q    Were you involved in the
9  collection of documents that were
10  produced on this date?
11    A    No, I would not have been
12  involved.  I am trying to make sure that
13  I am certain about which one this is.
14    Q    We can go through it.
15    A    Give me one second to make sure
16  the dates are lined up.  So this is -- is
17  this from the fourth search?  This is
18  from -- this is from the fourth search.
19  I believe that this is from the fourth
20  search.
21    Q    If you could turn to page two
22  of the exhibit underneath the table of
23  Bates ranges for each custodian.
24    Can you read the sentence right
25  below the table?

**123**

1    C. Feinstein
2    A    I'm sorry.  Oh, over here.
3  Okay.  (Reading.)  Exhibit A contains a
4  list of the data sources searched for
5  each custodian listed above.
6    Q    And if you could turn to
7  Exhibit A, first row, Mr. Albers is in
8  the first row, and the data sources
9  listed here are a little bit different
10  than the December 31st data sources.
11    A    Okay.
12    Q    We have the addition of the
13  C:/Drive.  So who conducted the search of
14  the C:/Drive for this production?
15    A    So on this fourth search, which
16  is what I believe this to be from, so on
17  the fourth search, all of the data was
18  collected from the various sources and it
19  was uploaded to the Law Department's
20  third-party vendor and the vendor
21  conducted the searches.
22    Q    Who collected the documents
23  from Mr. Albers?
24    A    I would have to double check on
25  this.  I'm not sure on this one whether

**124**

1    C. Feinstein
2  or not -- whether or not we collected
3  this using access data where we collected
4  all of them or they actually did just
5  a -- loading all of them.  I think we did
6  this through the access data tool, but I
7  need to verify to be sure.  This was
8  using unfiltered data, so the search
9  terms applied by the IT department.
10    Q    Was all the contents of this
11  Albers C:/Drive collected?
12    A    Yes.  All the contents of the
13  C:/Drive would have been collected
14  because this was unfiltered data.
15    Q    And who collected it?
16    A    That's what I'm not certain
17  about.  I need to verify whether it
18  was --
19    Q    Was it someone at ExxonMobil?
20    A    It was someone at ExxonMobil.
21    Q    Was it someone at EMIT?
22    A    It would have been someone at
23  EMIT.  I'm just -- I'm questioning myself
24  about whether it -- whether Bob Lauck did
25  that collection, or we did it through the

**125**

1    C. Feinstein
2  Access Data Tool.  I need to check that.
3    Q    What is the Access Data Tool?
4    A    The Access Data Tool is the one
5  that we use to do collections, unfiltered
6  collections.
7    Q    And the Access Data Tool was
8  not used for the collection of the
9  documents produced in December of 2016?
10    A    That is correct.
11    Q    Who administered -- what group,
12  if not the person, administered the
13  Access Data Tool?
14    A    That's my tool -- that's my
15  team.  Jamie Manning is my supervisor of
16  it, her team administers the Access Data
17  Tool.
18    Q    Another new data source from
19  this will letter is the I/:Drive.
20    What is the I:/Drive?
21    A    I/:Drives are used for land
22  folders, like shared land locations or
23  other folders.
24    Q    Are there multiple folders on
25  an I:/Drive?

**32 (Pages 122 to 125)**

**126**

1           C. Feinstein
2     A    There could be multiple folders
3 on an I:/Drive.
4     Q    And is the I:/Drive shared with
5 other custodians or the folders or both?
6     A    The I:/Drive would be shared --
7 could potentially be shared with other
8 custodians.  I don't know exactly how
9 this one was set up, who has access to
10 it, but the I:/Drive could be shared.
11 The intent of that is to be a shared
12 drive.
13     Q    And is there a Management
14 Committee I:/Drive?
15     A    I do not know how their
16 I/:Drives are set up, exactly.
17     Q    Who would know that?
18     A    Probably Bob Lauck would know
19 how it was set up on share drives.
20     Q    The next entry here is Lotus
21 Notes Archives.  This is a new data
22 source.
23          What is Lotus Notes Archives?
24     A    We shut down our Lotus Notes
25 system or we -- we used to use Lotus

**127**

1           C. Feinstein
2 Notes for our e-mail system.  And then,
3 beginning in two thousand -- late 2011,
4 2012, we started migrating from Lotus
5 Notes to Microsoft Exchange for our
6 e-mail system.  So there are some old
7 archived files out there for all those
8 databases.
9     Q    Did the admins not have access
10 to Lotus Notes Archives when they were
11 collecting documents?
12     A    I do not know whether they had
13 access or not.
14     Q    Who collected the Lotus Notes
15 Archives in this instance?
16     A    It would be the same person who
17 did these other collections.  I just --
18 I'm not sure whether that was Bob Lauck,
19 or whether that was my team processing
20 through access data.
21     Q    Is that also true of the
22 I:/Drive?
23     A    Yes.
24     Q    Would the admins have had
25 access to the C:/Drives and the I/:Drives

**128**

1           C. Feinstein
2 by Mr. Albers?
3     A    I believe that they would have.
4 I'm not absolutely certain, but I believe
5 that the admins likely would have that
6 access.  I'm not sure.
7     Q    And the new sources here, the
8 C:/Drive, the I:/Drive and the Lotus
9 Notes Archives, were the contents of
10 those data sources on preservation hold
11 as of the date of our subpoena, November
12 in 2015?
13     A    Let me think about that.  So
14 your subpoena went back as far as -- so
15 I'm not absolutely certain.  I'm trying
16 to reason my way through that.  I am not
17 absolutely certain.  I'm not sure what
18 the date of these are, and so I don't
19 know that for sure.
20     Q    Who would know or who might
21 have checked that, that the preservation
22 hold was intact on new data sources
23 collected from in 2017?
24     A    Preservation hold, the
25 preservation hold -- I'm trying to think

**129**

1           C. Feinstein
2 if I understand your question.  The
3 preservation hold is assigned to a
4 person.  And so that would mean to all of
5 their sources.  So if Mr. Albers was on
6 litigation hold and depending on when he
7 received it, what -- it depends on what
8 the time period is for that hold and then
9 it depends on whether there was data
10 available that had not already been
11 removed in accordance with the RMG
12 policy.
13          So let me go back and -- ask
14 your question one more time and see if I
15 understand.
16     Q    My question is whether the new
17 data sources in this exhibit, the
18 contents were preserved throughout the
19 period since our subpoena was issued?
20     A    How would we -- you are asking
21 how would we validate that?
22     Q    Mm-hm.
23     A    The way that we would validate
24 it would be -- so when Mr. Albers
25 received the litigation hold notice, it

33 (Pages 126 to 129)

130

1        C. Feinstein
2    would tell him -- we use a
3    preserve-in-place strategy. So when he
4    receives a litigation hold notice, it
5    would tell him not to delete any records.
6    It was not an automated delete on a Lotus
7    Notes Archive. Lotus Notes did not have
8    the automated delete program. So there
9    was nothing to disable on that.
10       I don't know what was in this
11   Lotus Notes archive. I presume it's his
12   old e-mail archive, and I don't know
13   exactly where it was stored. So it's a
14   little hard for me to give you details on
15   how they would have validated that.
16       Q    I think you said Mr. Lauck
17   would have the most data about this?
18       A    I think he would have the most
19   data about that.
20       Q    And you had mentioned that data
21   would have been removed at some point in
22   accordance with the RMGs.
23       When was the data removed from
24   Mr. Albers' responsive documents in this
25   investigation?

131

1        C. Feinstein
2    A    So if you are -- it's a
3    complicated question. Give my best
4    answer. So it would depend on the type
5    of data. It would depend on whether
6    Mr. Albers was already on litigation hold
7    in some other matter. If he was not on
8    litigation hold in some other matter,
9    then his e-mail would have the automated
10   file sweeper in place and the automated
11   file sweeper would retain the data for
12   13 months. If he were on litigation hold
13   in an earlier case, then it might go back
14   further than that. And the same is true
15   of all of these, this is our standard
16   process. So I would have to look at each
17   one to know were they on a prior
18   litigation hold, if so, how far back did
19   that go. At the time they received the
20   litigation hold notice, would have
21   been -- that notice would have gone out
22   on November 6th, so at that point the
23   file sweeper would have become disabled.
24       Q    And did anyone that you are
25   aware of check on each of these steps

132

1        C. Feinstein
2    that you said that you might yourself
3    check, to see if any documents -- if the
4    hold was intact for the new sources?
5        A    We have checked -- we have
6    checked since -- certainly I am aware we
7    have checked since then once we knew that
8    there was an issue about the Wayne
9    Tracker account. Checks that were done
10   prior to that, I don't know about the
11   checks.
12       Q    When you say "checks," who are
13   you speaking about?
14       A    As part of the root cause
15   analysis we were doing to try to
16   understand what was happening with the
17   Wayne Tracker account was to see did
18   anybody else have an issue and that would
19   have been on the Management Committee.
20   One of these names, I don't recognize as
21   the Management Committee.
22       Q    We will get there.
23       Someone at EMIT was checking
24   this in March or April of this year?
25       A    Yes. So we were checking this

133

1        C. Feinstein
2    as part of the root cause analysis.
3        Q    And you had mentioned that
4    Mr. Albers, when he received the
5    litigation hold, would have been directed
6    not to delete things.
7        Is there anything preventing
8    him technologically from deleting
9    anything?
10       A    He could do it. In some cases,
11   it would go to a recycle bin, where we
12   could find it for a period of time, but
13   we don't have a hard stop that would
14   prevent everybody on litigation hold from
15   deleting any documents whatsoever.
16       Q    And it's true that no
17   litigation hold notice went to the admins
18   in this case?
19       A    I don't know if they were -- if
20   they received a copy of a Management
21   Committee member hold notice or not. I
22   know that they were aware that this
23   litigation hold was in place, simply
24   because of the work that they did with
25   the Law Department in identifying the

34 (Pages 130 to 133)

**FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM**
INDEX NO. 451962/2016
NYSCEF DOC. NO. 194
RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 407 of 553   PageID 834

**134**

1          C. Feinstein
2    sources. So they would have been aware
3    of it. They did not receive one, to my
4    knowledge, specifically aimed at them
5    that --
6        Q    But they have control over
7    these data sources for the person for
8    whom they work?
9        A    My understanding is that they
10   do have a lot of control and knowledge
11   about these sources.
12       Q    And you had also mentioned that
13   if one of these custodians had been on
14   litigation hold for some other matter at
15   the time of the subpoena, do you know
16   which of these custodians were on that
17   hold?
18       A    I don't know that.
19       Q    And who might know that?
20       A    The Law Department would know
21   that.
22       Q    Moving on to row two,
23   Mr. Dolan, the new data sources as of
24   March 21st, as compared to the
25   December 31st production, are the

**135**

1          C. Feinstein
2    I:/Drive and Lotus Notes Archives?
3            Would this be the same I:/Drive
4    location as Mr. Albers?
5        A    Yes, I would presume that's the
6    same I:/Drive location.
7        Q    And when you say --
8        A    I didn't validate that, but I
9    would presume it's the same one.
10       Q    Did anyone validate that, or
11   who would know if it is?
12       A    Whether it was the same one or
13   not?
14       Q    Mm-hm.
15       A    Bob Lauck would know whether
16   it's the same one. I don't know if
17   anyone validated whether or not. They
18   were just collected.
19       Q    Is it the same answer that
20   either Bob Lauck or someone who uses the
21   Access Data Tool on your team would have
22   collected documents from the I:/Drive?
23       A    Yes.
24       Q    And is it also --
25       A    Or collected or coordinate the

**136**

1          C. Feinstein
2    collection.
3        Q    Is that also true for the Lotus
4    Notes Archives of Mr. Dolan?
5        A    The Lotus Notes Archives, I
6    would have to double check on how that
7    one -- I'm not -- I'm not sure the
8    details on how that's collected.
9        Q    Who would know?
10       A    Who would know about Lotus
11   Notes Archives? I think that would
12   probably be -- that would either be Bob
13   Lauck or -- Bob Lauck or Cynthia Leong
14   might know -- well, let me think.
15   Cynthia -- Bob Lauck or probably the Law
16   Department. I would have to double check
17   on that one.
18       Q    The next row is for Mr. Robert
19   Luettgen.
20           Do you know why Mr. Luettgen is
21   a source for Management Committee
22   documents?
23       A    No, actually, I don't. I don't
24   know who he is.
25       Q    Do you know who collected for

**137**

1          C. Feinstein
2    Mr. Luettgen's e-mail, H:/Drive,
3    C:/Drive, I:/Drive and paper files?
4        A    No, I don't. I don't know what
5    his role is.
6        Q    For Mr. Swiger, the fourth name
7    on this list, there is a new data source
8    of the C:/Drive and I:/Drive.
9        A    Right.
10       Q    Is it also the case that
11   Mr. Lauck or a person on your team who
12   conducted the Access Data Tool would have
13   collected from those new data sources?
14       A    That's correct.
15       Q    Did Mr. Swiger have a Lotus
16   Notes archive?
17       A    I do not know. Apparently not
18   or it would have been listed as the data
19   source, but I do not know whether he had
20   one or not.
21       Q    And was it the same answer
22   about who would have known the --
23       A    Right.
24       Q    -- Lotus Notes Archives for
25   Mr. Albers and Dolan?

35 (Pages 134 to 137)

**138**

```
1            C. Feinstein
2      A    That's correct.
3      Q    The next name on the list is
4  Mr. Tillerson.  The new data sources in
5  this letter are from the C:/Drive and
6  I:/Drive.
7      A    Right.
8      Q    Is it similar or same answers
9  as for Mr. Albers, Dolan and Swiger?
10     A    Right.
11     Q    And then the next name on this
12  list is Mr. Williams.
13     A    Yes.
14     Q    The new data sources on here
15  are the C:/Drive, the I:/Drive, his iPad
16  and iPhone.
17     A    Correct.
18     Q    Who conducted the searches for
19  the C:/Drive and I:/Drive?
20     A    That would have been the same
21  as the other.
22     Q    And who conducted the searches
23  for the iPad and iPhone?
24     A    The iPad and iPhone, it would
25  have either been Deloitte or my team that
```

**139**

```
1            C. Feinstein
2  did it.
3      Q    And were you involved?
4      A    I was not involved.
5      Q    Who on your team might have
6  done it?
7      A    Could have been Archana Patel
8  or Jamie Manning.
9      Q    Were document that were
10  collected from the iPad or iPhone for the
11  production of March 21st preserved from
12  the date of the subpoena, November 4,
13  2015, to its production?
14     A    They -- they, they would have
15  been preserved for Jack Williams.
16     Q    How so?
17     A    Well, again, going back to the
18  litigation hold notice, it says not to
19  delete anything.
20     Q    For the names above
21  Mr. Williams for the Management
22  Committee, Albers, Dolan, Swiger and
23  Tillerson, there is no iPad or iPhone
24  listed here.
25         Do you know why?
```

**140**

```
1            C. Feinstein
2      A    I do not know why.  I know
3  Mr. Tillerson had an iPad or an iPhone
4  that we looked at, but I do not know
5  about these others.
6      Q    And who might know that?
7      A    Bob Lauck would know that.
8      Q    If you could turn to the next
9  page, number seven, Jeffrey Woodbury?
10     A    Yes.
11     Q    Do you know why his documents
12  were searched for Management Committee?
13     A    I do know that Mr. Woodbury's
14  been in the Office of Investor Relations
15  and so he has a role -- and that may not
16  be specifically why he is there, but he
17  plays a -- he has a high level management
18  role in the corporation where he has a
19  lot of sensitive documents and materials,
20  so I presume that he was treated the same
21  way as the other Management Committee
22  members or as the Management Committee
23  members.
24     Q    Who would be able to confirm
25  your presumption?
```

**141**

```
1            C. Feinstein
2      A    About the reason why he is on
3  here?  The Law Department.
4      Q    And Mr. Woodbury's documents
5  have been produced previously to this.
6         Do you know why there were
7  additional documents that were responsive
8  to the subpoena produced on March 21st?
9      A    No, I don't.
10     Q    Who would know that?
11     A    The Law Department.
12     Q    Does Mr. Lauck have any role
13  with Mr. Woodbury's data sources?
14     A    I don't know if he collects
15  services to Mr. Woodbury or not.
16     Q    The last row, number eight, for
17  Mr. Woods, the new data source on this
18  list as compared to the December 31 is
19  the I:/Drive.
20         Is it also true that the
21  I:/Drive was searched either by Mr. Lauck
22  or someone using the Access Data Tool?
23     A    Right.
24     Q    Do you know why Mr. Woods' iOS
25  devices are not listed here?
```

**36 (Pages 138 to 141)**

**142**

1          C. Feinstein
2     A    I do not know.
3     Q    And is it also true that either
4 Deloitte or Mr. Patel or someone else on
5 your team might know the answer to that?
6     A    Ms. Patel.
7     Q    Ms. Patel, thank you.
8     A    Ms. Patel and Mr. -- well, the
9 Law Department might know -- I'm sorry.
10 Let me -- rephrase your question, again,
11 if you don't mind?
12    Q    Thanks.
13    A    What was your question again?
14 I'm sorry.
15    Q    Who would know why the iOS
16 devices of Mr. Woods were not searched or
17 produced at this time?
18    A    That would be the Law
19 Department.  Whether he had iOS devices,
20 Mr. Lauck could tell us.  If he had them
21 and it was not produced, that would be
22 the Law Department.
23    Q    Before we took our lunch break,
24 we had talked about the steps that had
25 been taken to recover the Wayne Tracker

**143**

1          C. Feinstein
2 e-mails and documents.
3     A    Yes.
4     Q    There are several steps.  I
5 would like to just go back through them
6 quickly about the backups for each of
7 them and who conducted the search of the
8 backups.
9     A    Okay.
10    Q    We had mentioned a backup for
11 the Exchange server, the e-mail server.
12    A    Right.
13    Q    Who conducted the search for
14 the backups?
15    A    So that would have been Cynthia
16 Leong and/or John Rudisill.
17    Q    Were you involved?
18    A    I was -- I was not -- I did not
19 conduct the searches.  I was involved in
20 the coordination effort, but I was not
21 involved in conducting the searches.
22    Q    Did you supervise or quality
23 control the searches?
24    A    I provided information when
25 asked.  I don't have the deep Exchange

**144**

1          C. Feinstein
2 technical knowledge that they do, so.
3     Q    What questions were asked?
4     A    What questions were asked?
5     Q    About searching the backup of
6 the Exchange server for e-mails.
7     A    There were many, many questions
8 asked.
9     Q    Okay.
10    A    One of the key questions was
11 what is available, what servers could we
12 locate data on, what -- basically, have
13 we exhausted every possibility.  I am
14 shortcutting here.  There were many, many
15 questions that were asked.
16    Q    Okay.
17    A    We were working very diligently
18 to try and get anything that we could to
19 close that gap.  And so there were many,
20 many questions asked to just determine if
21 we had exhausted every possibility and
22 looked in every location that we could to
23 try to find this data.
24    Q    The backups and the servers for
25 the Exchange server for the e-mails for

**145**

1          C. Feinstein
2 Wayne Tracker, they were on an ExxonMobil
3 infrastructure, not on a third-party
4 infrastructure?
5     A    That's correct, ExxonMobil
6 infrastructure.
7     Q    The laptops that were searched,
8 the backups for those, who conducted the
9 search of the backups of the laptops?
10    A    That would have been Bob Lauck.
11    Q    Where do the servers and
12 backups for the laptops reside?
13    A    On the ExxonMobil
14 infrastructure.
15    Q    And not a third-party?
16    A    Not a third-party.
17    Q    For the iOS devices of the
18 Management Committee Custodians, who
19 searched the backups and servers for
20 those devices?
21    A    There's not a server for that
22 device.
23    Q    Okay.
24    A    So for the iOS devices, we had
25 help from Deloitte.  And then we did --

37 (Pages 142 to 145)

**146**

C. Feinstein

1
2    and then internally, we had my team
3    search as well.
4        Q    Who on your team?
5        A    Archana Patel and Jamie
6    Manning.
7        Q    And the backups --
8        A    I'm sorry, I may have been
9    answering the question just then.
10       Deloitte helped us with the
11   backups on those.  I think that's
12   actually what your question was, right?
13       Q    Mm-hm.
14       A    Okay.  My team helped to
15   recover the data, but they were not the
16   ones searching for backups.  That would
17   have been Deloitte and our mobility team.
18       Q    Your team was looking at the
19   devices, themselves?
20       A    We were looking at the devices
21   themselves to help get copies of the
22   documents from the Wayne Tracker account.
23       Q    And the iOS device backup, was
24   that on ExxonMobil infrastructure or on a
25   third-party infrastructure?

**147**

C. Feinstein

1
2        A    I would have to double check
3    that.  I believe that's only on
4    ExxonMobil infrastructure, but I would
5    have to double check that to be sure.
6        Q    Who would you double check
7    with?
8        A    I would double check that
9    with -- Ian Hjorth, I believe -- bear
10   with me one second.  I will look his name
11   up to be sure.  It's our mobility
12   technical person.
13       So I would check that with --
14   yes, Ian Hjorth, I-A-N, H-J-O-R-T-H.
15       Q    The Management Committee server
16   that we discussed this morning, where is
17   that backed up?
18       A    I am not sure where it's backed
19   up.  It's on the corporate network, and I
20   don't know if they have any kind of
21   different backup than would be on the
22   corporate network.
23       Q    Who would know that?
24       A    Backup on that, it would be
25   Paul Ivy would likely know that or Bob

**148**

C. Feinstein

1
2    Lauck.
3        Q    When a litigation hold is
4    issued to everyone on the Management
5    Committee, do the contents of that server
6    get preserved independently?
7        A    I would not think so.  I don't
8    know for sure, but I would not think so.
9    The litigation hold notices are sent to
10   individuals, and so I am not aware of a
11   process where they would say preserve the
12   entire server.  I wouldn't rule it out.
13   It may be possible, but I don't think
14   that's typical.
15       Q    And who would know for sure?
16       A    Probably Robert Levy in the Law
17   Department.
18       Q    Is there one person in EMIT
19   that is responsible for the Management
20   Committee server?
21       A    There very well could be.  I'm
22   not sure who it is.  It would be somebody
23   in Infrastructure, in Server Ops.  Bob
24   Lauck, again, would know that.
25       MS. DeROCHE:  If we can just

**149**

C. Feinstein

1
2    go off the record for a few minutes?
3        [A recess was taken from 2:10
4    p.m. to 2:11 p.m.]
5    BY MS. DeROCHE:
6        Q    The e-mail servers backup
7    tapes --
8        A    The e-mail servers backups,
9    mm-hm.
10       Q    -- would Mr. Lauck have been
11   involved in the Management Committee
12   Custodians' e-mail servers and backups?
13       A    No.  No.  Not to my knowledge.
14   I can't think of why it would be.
15       Q    When Deloitte was engaged for
16   forensic recovery, what did you
17   understand their engagement to entail?
18       A    I didn't -- I was not party to
19   that initial conversation with them to
20   outline what their scope of work was.  My
21   understanding, coming into it, was that
22   they were there to help us do forensic
23   work to understand if there was any stone
24   we were leaving unturned in looking for
25   the -- the period of time when the Wayne

38 (Pages 146 to 149)

**150**

C. Feinstein
1. C. Feinstein
2. Tracker e-mail was -- was enabled and it
3. should have been disabled, to make sure
4. that as far as backups, that we could --
5. we had considered, you know, forensics in
6. looking for everything that we could as
7. far as backups or other available data.
8. And then to help us with the collections
9. on iOS devices.
10. Q    How did you personally interact
11. with Deloitte, if at all?
12. A    I interacted on calls with them
13. where, as I said, we were -- there were a
14. number of people engaged in
15. troubleshooting and trying to figure out,
16. how did this occur, what could we do
17. about it, where might we be able to find
18. data to back up.  So I was engaged in the
19. conversations with them along with a
20. number of other people on these calls in
21. trying to understand, had we looked at
22. all the different places, providing
23. information to them about, well, how does
24. this work and how does that work and
25. where is -- where is this information.

**151**

C. Feinstein
1. C. Feinstein
2. And then I worked with -- with -- not
3. directly with them, but as we started to
4. do some of the iOS collection ourselves,
5. they provided some expertise and guidance
6. on how to do that.  Not directly through
7. me, but through another EMIT person on
8. our team on how to set that up and make
9. sure that we did it correctly.
10. Q    Other than the iOS devices,
11. what forensic work did they recommend?
12. A    They tried data carving and
13. they provided some expertise and
14. knowledge about just going back and
15. looking at the backup tapes and logs and
16. seeing if there was anything else that we
17. can do.
18. Q    What did they suggest, with
19. respect to the logs?
20. A    I don't recall -- I don't know
21. if I was there when they gave the
22. specific suggestions on the logs.  Or if
23. I was, it was probably more technical
24. than I knew about the Exchange logs.  So
25. I -- I don't know that I could tell you

**152**

C. Feinstein
1. C. Feinstein
2. specifically what they said.
3. Q    Who would know that?
4. A    Cynthia Leong would know that,
5. the Exchange logs.
6.     MS. DeROCHE:  If we can go
7. off the record and take a five-minute
8. break, please?
9.     [A recess was taken from
10. 2:15 p.m. to 2:30 p.m.]
11.     THE WITNESS:  Can I just
12. clarify?
13. BY MS. DeROCHE:
14. Q    Sure.
15. A    On that first search, I think
16. what I had said may have been confusing.
17. I'm not sure it was confusing or not, but
18. I want to make sure I was clear about it.
19.     So on the first search, the
20. Management Committee search, which was
21. back in January of 2016, the way that
22. search was done -- so there were -- there
23. was the e-mail piece of it, and that's
24. where the simplified search terms were
25. applied, in the e-mail.  And that's Bob

**153**

C. Feinstein
1. C. Feinstein
2. Lauck that did that.  And then there
3. were -- the admins had identified the
4. potential locations for the non-e-mail
5. documents and the hard copy and that sort
6. of thing, so the non-e-mail stuff was put
7. into a folder.  I wasn't sure if I was
8. clear earlier about the simplified search
9. terms being applied
10. Q    Let's take that in reverse
11. order.
12.     The non-e-mail documents that
13. were collected by the admins, they didn't
14. pull all the contents from a particular
15. drive or location over; they pulled
16. certain documents out?
17. A    Yes.
18. Q    Did they take it on a
19. document-by-document basis or on a
20. folder-by-folder basis or you are not
21. sure?
22. A    So Bob would have -- Bob would
23. have done it.  So they would have
24. identified where the documents were
25. located, and then Bob would have worked

39 (Pages 150 to 153)

154

1          C. Feinstein
2    with them to put them into a folder.  And
3    I don't know if they did that -- they had
4    specific instructions on how to do it,
5    but I don't recall if that was document
6    by document or folder by folder, exactly
7    how they did that.
8          Q     And the e-mails who you just
9    said were searched by Mr. Lauck using
10   simplified search terms --
11         A     Right.
12         Q     -- how did he collect the
13   e-mails?  He collected all the e-mails,
14   or he --
15         A     He collected -- so he used
16   their e-mail accounts, and then used
17   simplified search terms that were in that
18   exhibit that were intended to be in
19   approximation of those more complicated
20   ones.  So he then did that and then the
21   ones -- ones that came of his hits were
22   put into a folder, and he provided it to
23   Bob Lauck.
24         Q     He went to the particular
25   custodian's Outlook?

155

1          C. Feinstein
2    A     Right.
3          Q     On their desktop?
4    A     Right.
5          Q     And went into their e-mail
6    boxes?
7    A     Into their e-mail boxes, into
8    the search terms in Outlook.
9          Q     And he did it across all
10   contents and all folders?
11         A     Yes.  I believe the
12   instructions were all contents and all
13   folders.  I would have to double check
14   that, but I think that's what the
15   instruction said.
16         Q     And when Mr. Lauck went into
17   Mr. Tillerson's Outlook, would he have
18   seen both e-mail accounts populated?
19         A     Both the Wayne Tracker and
20   rexwtillerson@ExxonMobil, and the Wayne
21   Tracker account, those would have been
22   two separate e-mail accounts, and I
23   understand he did search for both.
24         Q     In January 2016?
25         A     In January 2016.

156

1          C. Feinstein
2          Q     What is your understanding
3    based on?
4    A     What he told me.
5          Q     The I:/Drive that we had spoken
6    about, that the management custodians had
7    access to, if other people had access to
8    those I/:Drives that were not on
9    litigation hold, could they have deleted
10   from them, from the I:/Drive for example,
11   the assistants of the Management
12   Committee custodians?
13         A     It would depend on what type of
14   access they had.
15         Q     In theory, if you have access
16   to an I:/Drive, you can delete from it?
17         A     It depends on whether you have
18   read only access or read-write access.
19         Q     Who would know that with
20   respect to the Management Committee
21   custodians?
22         A     I believe that Bob Lauck could
23   look up the permissions on the I:/Drive.
24         Q     And do you understand the
25   admins for the management custodians to

157

1          C. Feinstein
2    have read only access to their --
3    A     I do not know what type of
4    access they had to the shared drive.
5          Q     With respect to the iOS devices
6    that we have been speaking about, were
7    there any steps taken to determine if any
8    content had separately been backed up to
9    the Cloud, the Apple Cloud, independent
10   of the Exxon backups process, such as the
11   e-mails or the calendar items that might
12   have been on those devices?
13         A     Any steps -- so -- on the iOS
14   devices, were there any steps taken to
15   determine if someone backed up their --
16   their iOS devices to the Cloud?
17         Q     If there was any backup to any
18   Cloud.
19         A     I don't believe that it gets
20   backed up to the Cloud.  I'd have to
21   double check that.  I don't recall off
22   the top of my head, but I know that was
23   checked, if it was a possibility, and all
24   the backups were checked.
25         Q     Who checked them?

40 (Pages 154 to 157)

**158**

C. Feinstein

1  C. Feinstein
2   A   So -- so let's see, who would
3  have checked on that.  On the iOS
4  devices, that would have likely been --
5  we had some help from Deloitte on that.
6  And I would have to ask our -- I would
7  have to ask our Mobility Engineer person.
8   Q   Who is the Mobility Engineer?
9   A   That's Ian Hjorth, if I'm not
10  mistaken.  Let me double check his name.
11  Ian Hjorth.
12   Q   Were any steps taken to
13  determine from the logs if documents were
14  not able to be recovered, if any metadata
15  could be recovered through those logs?
16   A   For the Wayne Tracker account?
17   Q   For the Wayne Tracker
18  deleted -- things that had been deleted
19  while the file sweep had not been
20  disabled.
21   A   I do know that there was an
22  attempt to look at the metadata to
23  determine if there was anything of value
24  that would help there.  I don't know
25  exactly what the results of that, how

**159**

1  C. Feinstein
2  helpful it was in -- in the ability to go
3  back.  We were able to -- to go back and
4  restore some additional data, but I don't
5  know -- and I know the metadata was
6  looked at, but I don't know how effective
7  or helpful it was.
8   Q   And do you know who conducted
9  that analysis?
10   A   On the e-mail, it would have
11  been probably John Rudisill or Cynthia
12  Leong could tell us who did it.
13   Q   And this is with respect to the
14  logs?
15   A   You are talking about e-mail?
16   Q   E-mail logs?
17   A   E-mail logs, right, it would
18  have been John Rudisill or Cynthia Leong.
19   Q   What about logs of the
20  electronic documents, either on the
21  E/:drives or where else?
22   A   The Wayne Tracker account was
23  about the e-mail.  It was the automated
24  file sweep on the e-mail was disabled.
25   Q   So no logs were looked at for

**160**

1  C. Feinstein
2  electronic documents?
3   A   Right.  There was no need to do
4  that.
5   MS. DeROCHE:  I am going to
6  introduce three new documents at once.
7  They are related.  It's the March 31,
8  2017, affidavit of Ms. Feinstein.  And
9  then the next exhibit is the revised
10  exhibit of Ms. Feinstein, dated
11  April 21, 2017.  And then the third is
12  a letter from Paul Weiss, dated
13  April 19th.
14   (Feinstein Exhibits 14-16
15  were marked for identification, as of
16  this date.)
17   Q   Do you recognize Exhibit 14?
18   A   Yes, I do.
19   Q   What is it?
20   A   That's the affidavit that I
21  prepared and signed.
22   Q   And did you sign that statement
23  under oath?
24   A   I presume.  I'm not sure.  I
25  don't know what that means.

**161**

1  C. Feinstein
2   Q   Did you draft the affidavit?
3   A   I provided the information to
4  draft it.  I didn't type it.
5   Q   Do you know who drafted it?
6   A   No, I really don't.  Someone in
7  the Law Department.
8   Q   And Exhibit 15, do you
9  recognize the document?
10   A   Yes.  That's the amended
11  affidavit.
12   Q   Did you draft the revisions in
13  this affidavit?
14   A   I did not draft the -- I didn't
15  type any of this.  I provided information
16  on both of them, but I didn't draft
17  either one of them.
18   Q   And Exhibit 16, do you
19  recognize the document?
20   A   Yes, I do recognize this.
21   Q   What is it?
22   A   This is a letter from Paul
23  Weiss to Mr. Oleske, where there was a
24  request for information about who all
25  that I talked to in preparing the

41 (Pages 158 to 161)

162

1        C. Feinstein
2   affidavit and trying to get the
3   information.
4        Q    And is that information in
5   Exhibit A?
6        A    That information is in
7   Exhibit A.
8        Q    Did you draft Exhibit A?
9        A    I didn't draft it. I provided
10  the information for it.
11       Q    If you could turn to the
12  revised affidavit, paragraph three.
13       A    Paragraph three, okay.
14       Q    The last sentence about the
15  identity and access management.
16       What is identity and access
17  management?
18       A    So one of the key things that
19  we have to manage is who has access to
20  our corporate network or to our assets,
21  to our electronic information or
22  applications, etcetera, etcetera. And
23  because we are a large company, it's a
24  field where we have to really be -- have
25  some expertise in understanding how to

164

1        C. Feinstein
2   of this paragraph?
3        A    About the -- about
4   November 2008 rolled out the e-Discovery?
5   Yes, I do.
6        Q    How so?
7        A    So I've talked with Jackie Barr
8   who was a person, the project manager who
9   was rolling it out at that time. I was
10  aware that this was going on. I know
11  some of the folks who were involved in
12  supporting at the time. I talked to
13  Karen Cunningham in the Law Department.
14  But I also, being in the Security and
15  Controls area, was aware that this
16  process was going on in 2008.
17       Q    Who is Jeff Demuynck?
18       A    Jeff Demuynck is a -- he is an
19  IT Support Analyst in the Exxon
20  organization. I also talked to him.
21  Jeff was also a source of knowledge about
22  the processes in general, about Atlas.
23  He supports Atlas as part of his role, as
24  far as some other e-Discovery tools.
25       Q    If you could turn to paragraph

163

1        C. Feinstein
2   maintain identity of people. So how to
3   identify and authenticate people to the
4   assets that they might need access to.
5        Q    In paragraph four, you describe
6   the rollout of the Atlas e-Discovery
7   Process Legal Hold Tool in November 2008.
8        A    Right.
9        Q    Was Atlas used for the hold in
10  this subpoena?
11       A    Yes. Atlas was used for the
12  litigation hold notices in this matter.
13       Q    What happens at the end of a
14  hold?
15       A    At some point after the Law
16  Department determines that the custodians
17  are no longer subject to the hold, the
18  matter is resolved or whatever -- I don't
19  know what goes into that decision, but
20  the folks that are on litigation hold at
21  some point receive a notice that says you
22  are no longer on litigation hold, and
23  they are notified that they can revert
24  back to their normal processes.
25       Q    Do you have personal knowledge

165

1        C. Feinstein
2   seven.
3        A    Yes.
4        Q    Do you have personal knowledge
5   of the contents of this paragraph?
6        A    Yes, I did know who Management
7   Committee members were.
8        Q    So this speaks to the time
9   period of when the subpoena was issued?
10       A    Yes.
11       Q    The time period of the subpoena
12  goes back further than the date of when
13  it was issued.
14       Did you understand other people
15  to be on the Management Committee during
16  the relevant time period of the subpoena?
17       A    I understood that there could
18  be more people. I understood that at the
19  time the subpoena was issued, this is who
20  was there, but I did understand that it
21  went back further, and so historically,
22  it could have included more folks.
23       Q    I might be repeating a question
24  from before, but were any of these
25  custodians on hold for other litigations

42 (Pages 162 to 165)

**166**

1　　　　C. Feinstein
2　or investigations before November 2015?
3　　A　I don't know.
4　　Q　And would anyone in EMIT know
5　that?
6　　A　I don't know whether anyone in
7　EMIT would know it. The Law Department
8　would know it, but I don't know whether
9　anyone at EMIT would know it. There may
10　be someone who would, but I don't know.
11　　Q　In paragraph nine, you write
12　that Management Committee custodians had
13　confirmed receipt of the legal hold
14　notice.
15　　A　Yes.
16　　Q　How was that done?
17　　A　So they respond -- there's a
18　place in the notice for them to respond
19　that they received the notice, and then
20　that information gets tracked in Atlas.
21　So I looked in Atlas to verify that.
22　　Q　Paragraph 12, do you have
23　personal knowledge of the contents of
24　this paragraph?
25　　A　I have personal knowledge. I

**167**

1　　　　C. Feinstein
2　did not have personal knowledge at the
3　time, but through the inquiries that I
4　made and numerous discussions, I have
5　some personal knowledge of that.
6　　Q　Since the affidavit was
7　submitted?
8　　A　No. Before the affidavit was
9　submitted.
10　　Q　Did you draft this paragraph?
11　　A　I did not. I didn't type any
12　of this. I gave a lot of information on
13　it. I gave the information, but I didn't
14　type any of it.
15　　Q　The search protocol that is
16　described in this paragraph, who
17　developed that?
18　　A　The search protocol, I
19　understand, was developed by the Law
20　Department.
21　　Q　And I understand from your
22　prior testimony that you did not have any
23　involvement in that; is that correct?
24　　A　Not in the search protocol, no.
25　　Q　Was a third-party electronic

**168**

1　　　　C. Feinstein
2　discovery vendor used in the development
3　of the search protocol?
4　　A　Was a third-party electronic
5　vendor used? Not to my knowledge. I
6　believe the Law Department may have
7　consulted with outside counsel, but I
8　don't think -- I don't know that. So I
9　don't believe they used a third-party.
10　　Q　The electronic discovery vendor
11　in paragraph 12 is only related to the
12　upload of documents?
13　　A　Yeah, that's related to the
14　upload.
15　　Q　And who is that third-party
16　e-Discovery vendor?
17　　A　That would be Kirsten. Let me
18　make sure I am reading it right to make
19　sure I am answering your question
20　correctly.
21　　　　Right. That's talking about
22　not loading -- not moving the files over
23　to the e-Discovery vendor, Kirsten.
24　　Q　In paragraphs 13 and 14, I
25　understand it was conducted by Mr. Lauck

**169**

1　　　　C. Feinstein
2　and the Law Department.
3　　　　Whose responsibility was it to
4　supervise or quality control the
5　protocols and processes described here?
6　　A　That would be the Law
7　Department.
8　　Q　Do you know who in the Law
9　Department?
10　　A　I would presume that it's Dan
11　Bolia.
12　　Q　Was Mr. Bolia at Exxon in
13　January 2016?
14　　A　As far as I know, yes, he would
15　have been, in January 2016.
16　　Q　In paragraphs 15 and 16,
17　discussing simplified versions of the
18　complex search terms, do you know who
19　determined the simplified search terms?
20　　A　I understand the Law Department
21　did that.
22　　Q　Do you know who in the Law
23　Department?
24　　A　I don't know specifically who.
25　　Q　Paragraph 18 describes in

43 (Pages 166 to 169)

**170**

C. Feinstein

1
2  January 2016 where potentially responsive
3  e-mails and non-e-mail electronic
4  documents were stored.
5      Who decided to do it this way?
6      A    The Law Department would have
7  made the decision about how to do this.
8      Q    And is a personal drive of each
9  management committee custodian of their
10  LAN drives, either their H:/Drive or
11  their C:/Drive?
12      A    I would interpret that to be
13  either their C:/Drive or their H:/Drive.
14      Q    Do the admins who collected
15  some of these materials and Mr. Lauck who
16  collected some of these materials have
17  access to the Management Committee
18  custodians' C or H:/Drives?
19      A    So Mr. Lauck did the
20  collections. So do -- do they have
21  access to the C:/Drives and H:/Drives?
22  Yes, they would have access to those. Or
23  they were granted access for this. They
24  would have had access to -- to put these
25  in the folder. I don't know how broad

**171**

C. Feinstein

1
2  their access is.
3      Q    You are not sure?
4      A    I am not sure exactly what
5  their access is, but they would have had
6  access to do this.
7      Q    Was it possible for the
8  Management Committee custodians or their
9  assistants to view the documents in this
10  personal drive?
11      A    Was it possible for them to
12  view the documents in the personal drive,
13  the documents that had been collected? I
14  presume it would be. I don't know for
15  sure, but I presume it would be.
16      Q    How long did the documents
17  collected reside on this personal drive?
18      A    I don't know.
19      Q    Who would know that?
20      A    Bob Lauck would know that.
21      Q    In paragraph 19, it says that
22  these folders from the personal drives of
23  each Management Committee custodian were
24  collected by EMIT.
25      Who in EMIT collected them?

**172**

C. Feinstein

1
2      A    That would be Bob Lauck.
3      Q    When did he do that?
4      A    I don't know the exact date
5  that he did that.
6      Q    Was it in January 2016?
7      A    I don't know if he did that in
8  January, or if he did that later.
9      Q    And then the next clause
10  describes it being uploaded to the
11  platform of Exxon Mobil's e-Discovery
12  vendor.
13      Who uploads the data?
14      A    So the data gets uploaded -- in
15  this case, I -- I believe that it got
16  uploaded to a law server first and then
17  to an e-Discovery, but I need to double
18  check that to be sure. I don't know if
19  they did a direct load of this over to
20  the e-Discovery vendor, or if they went
21  through -- normally, we send things over
22  to -- back to the Law Department and they
23  do the upload. In this case, I'm not
24  sure whether they did that directly, or
25  if they went through the law server

**173**

C. Feinstein

1
2  first.
3      Q    This is the Kirsten platform?
4      A    Right.
5      Q    The last clause, it says that
6  the folders or the contents were made
7  available for manual review.
8      What does "made available"
9  mean?
10      A    Provided to them. Sent to
11  them. I presume, from Kirsten, right,
12  made available through that to Exxon
13  Mobil's outside counsel.
14      Q    Did the Law Department have
15  access to these documents?
16      A    That's what I'm not certain
17  about, is whether it went to the Law
18  Department server first or whether it
19  went straight to Kirsten.
20      Q    Did the Law Department have
21  access to the Kirsten database?
22      A    I don't know.
23      Q    The platform?
24      A    I don't know if they did or
25  not.

44 (Pages 170 to 173)

**174**

1           C. Feinstein
2      Q    Do you know who did the review
3  of these documents, the Law Department or
4  outside counsel?
5      A    I don't know.
6      Q    In paragraph 21, your affidavit
7  describes a second search conducted in
8  December 2016.
9      A    Right.
10     Q    For the term of proxy cost.
11     A    Right.
12     Q    Across all custodians for whom
13  it had produced documents to date.
14          Was proxy cost run against the
15  Management Committee custodians then?
16     A    Yes, it was.
17     Q    How do you know that?
18     A    Because I asked Bob Lauck about
19  that.
20     Q    Did Mr. Lauck run that search?
21     A    Yes, Mr. Lauck ran that search.
22     Q    And did he run it on the data
23  that he had collected from the personal
24  drive and saved on the personal drives?
25     A    He ran it in Outlook.

**175**

1           C. Feinstein
2      Q    In December 2016?
3      A    He ran it -- he ran it in
4  Outlook in December -- would have been
5  January 2016, actually, I think.
6      Q    And did he run it on Lotus
7  Notes contents?
8      A    I don't know if he ran it on
9  Lotus Notes. I think he just ran it --
10  no. I know that he ran it on Outlook.
11     Q    Did he run it in electronic
12  documents that were not e-mail?
13     A    No. He ran it on Outlook.
14     Q    Did he search the paper
15  documents of the management custodians?
16     A    No. This was an Outlook
17  search. Broader terms, proxy cost, plus
18  the other broader terms.
19     Q    Were the accounts of
20  Mr. Tillerson, both Wayne Tracker and
21  Tillerson, preserved from November 2015
22  until this search in December 2016?
23     A    So Mr. Tillerson's account had
24  the file sweeper disabled. The Wayne
25  Tracker account did not have the file

**176**

1           C. Feinstein
2  sweeper disabled.
3      Q    I will come back to that.
4      A    Okay.
5      Q    Paragraph 22: Out of an
6  abundance of caution, ExxonMobil crafted
7  additional search terms to run across the
8  e-mail files of Management Committee
9  custodians.
10          Who at ExxonMobil crafted
11  additional search terms?
12     A    That would have been the Law
13  Department.
14     Q    Do you know what they were?
15     A    I do know what they were. They
16  are listed in the next paragraph.
17     Q    Paragraph 24, ExxonMobil
18  conducted a second Microsoft Outlook
19  search using these terms.
20          Who conducted this search?
21     A    That was Bob Lauck.
22     Q    Under whose direction?
23     A    It would have been the
24  direction of the Law Department.
25     Q    Paragraph 25, potentially

**177**

1           C. Feinstein
2  responsive e-mails identified through the
3  use of these terms were stored in a
4  folder and the personal drive of each
5  management custodian.
6          Is this the same personal drive
7  discussed in paragraph 18, or is it an
8  additional personal drive?
9      A    No. It's the same. That would
10  be the same personal drive.
11     Q    So in December of 2016, the
12  documents and communications collected in
13  January of 2016 were still residing on
14  the personal drive of those management
15  custodians?
16     A    I don't know if they were still
17  there, or if they had been provided to
18  the Law Department. And so I don't know
19  if they were in a separate folder, but we
20  have a limited number of personal drives.
21     Q    In paragraphs 28 and 29, under
22  the heading "Third Search," describes
23  running additional search strings.
24     A    Right.
25     Q    When was this conducted?

45 (Pages 174 to 177)

**178**

1        C. Feinstein
2    A    This would have been in -- this
3    would have been in March of 2017.  I
4    believe March.  I think March.
5    Q    Were you involved?
6    A    No, I was not involved in this,
7    in this search.
8    Q    Who in EMIT was involved?
9    A    Bob Lauck was involved from
10   EMIT.
11   Q    Was he running these search
12   terms across all custodians?
13   A    He was running these across the
14   Management Committee custodians.
15   Q    And who would run them against
16   all custodians?
17   A    On all custodians -- on all
18   custodians, the non-Management
19   Committee -- let me back up just a
20   minute.
21       This was about the Management
22   Committee.  So Bob Lauck runs things
23   against the Management Committee.
24   Q    In paragraph 28 it says that
25   the search terms were run against all

**179**

1        C. Feinstein
2    custodians?
3    A    From whom may have produced
4    documents to date.
5    Q    Mm-hm.
6    A    So on the nonmanagement
7    committee custodians, those are done
8    through Access Data.  Now, from the
9    Access Data, I'm not familiar with what
10   was run with regard to these additional
11   search terms on a nonmanagement
12   committee.  I would have to look that up
13   in Access Data.
14   Q    You know that Access Data Tool
15   members were involved, but just not which
16   individuals?
17   A    I am not sure.  That's what I
18   am not sure about.  I know the Management
19   Committee searches were -- the Management
20   Committee searches on this.  So I am not
21   sure what other custodians these were run
22   against besides the Management Committee.
23   The Management Committee, I know, because
24   I checked that and got permission.
25   Q    But your team would have run

**180**

1        C. Feinstein
2    against the nonmanagement committee
3    custodians?
4    A    If this is run against any
5    nonmanagement committee custodians, those
6    would have been done by my team.
7    Q    So you are not sure it was done
8    against --
9    A    I'm trying to recall on this.
10   So -- give me one second.  Let me try and
11   straighten my head.  So I know for sure
12   that we ran it on all of the Management
13   Committee members or the persons that
14   have been identified as being treated
15   like Management Committee.  And then
16   those were done by Bob Lauck using the
17   broader terms.  I'm not certain.  I have
18   to refresh my memory on whether or not
19   there were other custodians.  I just am
20   drawing a blank.  I don't want to tell
21   you the wrong thing.
22   Q    In paragraph 31, it describes
23   ExxonMobil crafting additional broad
24   simplified search terms.
25   A    Right.

**181**

1        C. Feinstein
2    Q    Who would have crafted those?
3    A    The Law Department.
4    Q    Would anyone in EMIT have
5    assisted?
6    A    I don't think anyone in EMIT
7    would have assisted on that.
8    Q    In paragraph 32 --
9    A    We may have had to talk to
10   someone at some point in time, obviously,
11   a Microsoft Exchange expert to understand
12   what Microsoft Exchange could or could
13   not do, but to my knowledge, this was
14   being done by the Law Department only at
15   that time.
16   Q    In paragraph 32, the additional
17   simplified search terms and the
18   previously crafted search terms were
19   conducted.
20       Who ran those searches?
21   A    So Bob Lauck ran these.
22   Q    Where did he run them?
23   A    Where did he run them?  He ran
24   them in their e-mail.
25   Q    Who ran the searches in the

46 (Pages 178 to 181)

**182**

```
 1            C. Feinstein
 2   hard drives and shared drives?
 3       A     That would have been Bob.
 4       Q     Do you know what relevant hard
 5   drives or shared drives were run?
 6       A     I don't know specifically
 7   which -- which drives for each person.
 8       Q     Paragraph 33, potentially
 9   responsive electronic documents
10   identified through the use of these terms
11   were stored in various folders.
12            Which various folders and
13   where?
14       A     Those would have been folders
15   that had been designated to hold the
16   different types of items and I don't know
17   exactly where.  I believe it's on their
18   personal drives, but I'm not sure exactly
19   where.
20       Q     Who would know?
21       A     Bob Lauck.
22       Q     This paragraph references
23   electronic documents, does that include
24   e-mails, as well, or are they saved
25   elsewhere?
```

**183**

```
 1            C. Feinstein
 2       A     That would include e-mails.
 3       Q     How do you know?
 4       A     Just from my conversations with
 5   Bob Lauck.  And Dan Bolia.  I talked to
 6   Dan Bolia and Bob Lauck about this.
 7       Q     For paragraph 36, under the
 8   heading "Fourth Search," when was the
 9   fourth search conducted?
10       A     The fourth search was done in
11   March of 2017.
12       Q     Do you know what date?
13       A     I don't know specifically what
14   date.
15       Q     What do you mean by "unfiltered
16   data" here?
17       A     So that's all the data that --
18   all the data.  Everything in the e-mail
19   box or everything on the C:/Drive,
20   everything on H:/Drive.
21       Q     That had been previously
22   collected by the admins?
23       A     No.  This would be everything.
24       Q     Every e-mail?
25       A     So this would be every e-mail.
```

**184**

```
 1            C. Feinstein
 2   This would be all of the e-mail, all of
 3   the C:/Drive, all the --
 4       Q     That did not hit on a search
 5   term, this is just raw data?
 6       A     This is unfiltered, so it would
 7   be all of the data.
 8       Q     For what time period?
 9       A     For the time period that was
10   subject to the subpoena that was
11   available.
12       Q     At this time, did anyone go
13   back to look at the Management Committee
14   custodians who were on the Management
15   Committee during the time period of the
16   subpoena?
17       A     I don't know the answer to
18   that.
19       Q     Who might know?
20       A     The Law Department.
21       Q     How is the unfiltered data, all
22   data, collected?
23       A     This is the one where I have to
24   check whether it came through our Access
25   Data system or whether Bob did it and
```

**185**

```
 1            C. Feinstein
 2   just put the files up.  I think it came
 3   through Access Data system, but I have to
 4   verify that.
 5            Although I should be clear.  On
 6   e-Discovery, we have -- I mean, on -- we
 7   use e-Discovery center for some of the
 8   e-mail collections in addition to the
 9   Access Data Tool, so there's actually two
10   tools, not just the Access Data Tool.
11   It's the same process.
12       Q     Who would you check with on
13   your team for both of those tools?
14       A     I would check with Archana
15   Patel.
16       Q     In paragraph 37, whose decision
17   was it to have the e-Discovery vendor
18   apply the search terms?
19       A     Whose decision?  Well, they
20   work at the direction of the Law
21   Department.
22       Q     This unfiltered data in the
23   fourth search, did it include any of the
24   assistants to the Management Committee?
25       A     I don't believe that it did.  I
```

47 (Pages 182 to 185)

**186**

C. Feinstein

1  can't confirm that for sure, but I don't
2  believe that it did.  I have to go back
3  and look at the list, but I believe this
4  was the custodians -- the Management
5  Committee member's data.
6
7      Q    Paragraph 37 has a revision --
8      A    Yes.
9      Q    -- from your original
10 affidavit.
11     A    Yes, it does.
12     Q    Did you make that revision?
13     A    I didn't type it.  I -- I
14 discussed it and helped provide the
15 wording, but I didn't type it.
16     Q    Same question for paragraph 38,
17 which was revised.
18     A    Right.
19     Q    What was your involvement in
20 the revision of this paragraph?
21     A    Again, it was providing the
22 information, discussing it, but not
23 actually doing the typing.
24     Q    Were you involved with the
25 vendor running the search terms?

**187**

C. Feinstein

1
2      A    No, I was not.  Which was one
3  of the reasons for the change, was the
4  recognition that I couldn't say that
5  specifically since I hadn't talked to the
6  vendor to collect that.
7      Q    In paragraph 38, in the
8  revision, a change was made that the
9  results of the application of the
10 complete search terms were available for
11 manual review.
12     What does available "for manual
13 review" mean?
14     A    It means provided, to look at,
15 to go through, and manually determine
16 what's responsive or not.
17     Q    And how is that different from
18 it just being uploaded for review?
19     A    Well, the uploading part is,
20 generally what we are talking about, we
21 are talking about when it's being
22 uploaded to the third-party vendor's
23 platform.  And then where it's available
24 for manual review is typically where the
25 Law Department or outside counsel is

**188**

C. Feinstein

1
2  taking those documents and looking at
3  them.
4      Q    Paragraph 39 is a similar
5  revision.  The word "search" is changed
6  to "manual review."
7      What is the significance of
8  that change?
9      A    Oh, just to be more clear, so
10 the documents resulting from the manual
11 review, so after -- after they were
12 uploaded, the third-party vendor, then
13 they were manually reviewed by either the
14 Law Department or outside counsel.
15     MS. DeROCHE:  Do you mind if
16 we take a five-minute break?
17     MR. TOAL:  Sure.
18     [A recess was taken from
19 3:18 p.m. to 3:27 p.m.]
20     THE WITNESS:  I have
21 clarification, if you don't mind.  You
22 were asking me a question about
23 searches and I answered you about
24 collection so that's why I was getting
25 really confused.

**189**

C. Feinstein

1
2      So on that third search, you
3  were asking me about the searches for
4  the nonmanagement committee members,
5  and I think I answered you about
6  collection, because I just had a brain
7  freeze there.
8      Q    What is the difference between
9  search and collection?
10     A    So collection is where we get
11 the data and provide it.  And then search
12 is where -- so -- so a search would be
13 for the -- I mean, a collection would be
14 for the unfiltered data, typically, when
15 we're talking about the nonmanagement
16 committee members.  So that would be the
17 unfiltered data.  And then what happens
18 for the majority of our processes is we
19 collect the unfiltered data, and we
20 provide it to the Law Department.  They
21 provide it to the third-party vendor, and
22 the third-party vendor applies the search
23 terms.  So for the nonmanagement
24 committee members, that's the way the
25 searches were done all the way through,

48 (Pages 186 to 189)

190

C. Feinstein
1    C. Feinstein
2    except there's a couple of exceptions
3    like Jack Woodbury, we talked about. But
4    you were asking me about collection a
5    moment ago, and I was struggling to
6    answer, but you were actually asking
7    about searches.
8        Q    Let's turn back to paragraph
9    28, then, which is where the all
10   custodians language is.
11           ExxonMobil agreed to run the
12   additional search strings against the
13   unfiltered data of all custodians.
14       A    Right.
15       Q    Who conducted those searches?
16       A    So the searches were done in
17   two different ways, okay. So for the
18   nonmanagement committee members, I'm not
19   sure where Jeff Woodbury fell in all
20   this, but for nonmanagement committee
21   members, the data is collected unfiltered
22   and then it's sent over to the Law
23   Department, they send it to the
24   third-party vendor and the third-party
25   vendor applies the search and there they

191

C. Feinstein
1    C. Feinstein
2    have the capability to do the complex
3    boolean searches and proximity locators.
4        Q    So in paragraph 28, these
5    search strings that run against all
6    custodians for the nonmanagement
7    committee custodians, that search was
8    conducted by a third-party vendor?
9        A    Say it one more time? Let me
10   double check it. Can you say it one more
11   time?
12       Q    Paragraph 28, the search
13   strings that were run, for the custodians
14   that were nonmanagement committee
15   custodians, those searches were run by
16   the vendor?
17       A    Those searches were run by the
18   third-party vendor.
19       Q    From the data that you had
20   collected, from those custodians --
21       A    The unfiltered data.
22       Q    Unfiltered data that you
23   collected previously?
24       A    Correct.
25       Q    Turning to paragraph 40 of your

192

C. Feinstein
1    C. Feinstein
2    revised affidavit.
3        A    Yes.
4        Q    40 reads:  As a standing
5    practice, ExxonMobil employees are
6    assigned only one e-mail account on the
7    ExxonMobil platform.
8        A    Correct.
9        Q    What does it mean, "as a
10   standing practice"?
11       A    So it means, as a standing
12   practice, we -- I don't know whether it's
13   technically possible to do it differently
14   in Active Directory or not, but as a
15   standing practice, the way that we have
16   implemented our network identity and
17   access management solutions is that we
18   only give our employees one e-mail
19   account to use at a time for their
20   ongoing communications. So --
21       Q    Whose standing practice is it?
22       A    It's -- it's the EMIT standing
23   practice.
24       Q    And is that documented
25   somewhere?

193

C. Feinstein
1    C. Feinstein
2        A    I'm sure that it is. I could
3    not point you to the specific
4    documentation, but I am sure that it is.
5        Q    In the Active Directory manuals
6    that we reviewed this morning, do you
7    recall it being in those?
8        A    No. Those are backup and
9    disaster recovery guides.
10       Q    Who is Mr. Ronald J.R. Brown?
11       A    J.R. Brown is one of our folks
12   who is very knowledgable in this area and
13   provides support in this area. So he
14   helps to determine how we manage in this
15   area.
16       Q    Does he know about the standing
17   practice?
18       A    Yes, he does.
19       Q    What personal knowledge do you
20   have about the contents of this
21   paragraph?
22       A    I have some personal knowledge
23   of this because I have been involved in
24   identity and access management in the
25   past. I participated in a project on

49 (Pages 190 to 193)

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 422 of 553   PageID 849

**194**

1           C. Feinstein
2    access management and it's one of our key
3    controls in corporation's managing
4    access, so I have some personal knowledge
5    of how this works.
6        Q    In paragraph 41, it describes
7    an exception being made to this standing
8    practice for Mr. Tillerson?
9        A    Right.
10       Q    Who decided to make the
11   exception?
12       A    Erick Wells is the person that
13   I talked with about how this was set up
14   and when and why.  I don't know if he was
15   the chief decisionmaker, but he is the
16   source of knowledge about it.  Erick
17   Wells and Kathryn Evans.
18       Q    Who is Kathryn Evans?
19       A    Kathryn Evans, she is the
20   manager of the e-mail -- let me look up
21   her exact title.  So Kathryn is Customer
22   Infrastructure, Collaboration Solutions
23   E-Mail Engineering and Technical Support
24   Supervisor.  And then J.R. Brown is
25   Identity and Access Management Process

**196**

1           C. Feinstein
2    practice or rule?
3        A    I don't know who would -- now,
4    when this was set up, it was in Lotus
5    Notes.  And that was a different setup.
6        Q    Is it technically impossible
7    for a second e-mail address to be
8    connected to a single ADA account?
9        A    I don't know if it's
10   technically possible or not.
11       Q    Who would know that?
12       A    We need an Active Directory
13   expert.  Let's see.
14       Q    Is that not Mr. Wells?
15       A    No.  Mr. Wells was in a
16   different role.  I think Kathryn Evans
17   would know that.
18       Q    For -- are there --
19       A    Possibly John Rudisill.
20       Q    Thanks.
21           Are there people at Exxon who
22   change positions through different
23   entities and change e-mail addresses?
24       A    Yes, they do.
25       Q    And what happens with their

**195**

1           C. Feinstein
2    Advisor.
3           Oh, you asked me about Erick
4    Wells?
5        Q    No, that's good.
6        A    Sorry.
7        Q    You had said that Wells was
8    knowledgable about this exception?
9        A    Yes.
10       Q    But you weren't sure if he had
11   made the decision.
12           Was he the person who might
13   have created, physically created this
14   second e-mail?
15       A    He may have.  In the role that
16   he was in at that time, he may have been
17   the person who created it.
18       Q    And who would have considered
19   the implications of making this
20   exception?
21       A    Who -- I'm sorry, I'm not sure
22   what you mean by that.
23       Q    Who did he run it by?  Who
24   would have considered the implications of
25   making an exception to a standing

**197**

1           C. Feinstein
2    former and then latter e-mail addresses?
3        A    So the information gets
4    transferred over to their new e-mail
5    account.
6        Q    So no one at Exxon could have,
7    for example, two e-mail addresses at one
8    time, @SO and @XTO and @ExxonMobil or any
9    variation of that?
10       A    They can exist temporarily.  As
11   a standing practice, we don't let people
12   have two like that for ongoing.  Now,
13   when they are transitioning between
14   domains, if they had moved from -- not
15   every time they move between domains do
16   we have to do it, but there are certain
17   instances when they're moving from one
18   domain to another that we have to create
19   a new e-mail address.  And in that
20   case -- so temporarily, while the new
21   e-mail address is being created, the
22   other one may exist, but they don't use
23   both at the same time.  Same thing
24   happens with XTO.  We have folks that go
25   to XTO and they come back.  So they may

50 (Pages 194 to 197)

**198**

C. Feinstein

1  C. Feinstein
2  have two e-mail addresses, but one is not
3  used. There is only one that is active
4  at a time.
5      Q    Can only one of those be
6  associated with its Active Directory
7  account, or could they both be?
8      A    So as a standing practice, we
9  only -- we have a different Active
10 Directory account for each e-mail
11 address. Now, the way that that's
12 working is one is -- one is considered
13 active, and then the other becomes
14 inactive. I don't know if that's set up
15 on the same -- so actually, transitioning
16 between domains, you are actually
17 training the LAN account. You are
18 actually changing their e-mail address,
19 their LAN account and their e-mail
20 address both at the same time. So we
21 would still be doing a one-to-one on
22 that.
23     Q    So it's possible to have an
24 inactive ADA account?
25     A    You can have an inactive Active

**199**

1  C. Feinstein
2  Directory account.
3      Q    Was the Wayne Tracker e-mail
4  address ever designated as an inactive
5  ADA account?
6      A    After Mr. Tillerson retired.
7      Q    For folks who migrate from
8  domains within the ExxonMobil
9  organization and are put on litigation
10 hold, does the system go back -- is it
11 able to identify the prior inactive
12 former e-mail addresses?
13     A    I would have to verify this,
14 but -- but yes, we should be able to. We
15 use -- Active Directory is not the only
16 identity tool that we use. We have
17 another tool that we use here to add some
18 supplementary information, supplemental
19 information. And we have a unique
20 identifier for each identity at
21 ExxonMobil, who is who.
22     Q    You have a unique identifier
23 for each human?
24     A    Each human.
25     Q    And it associates with all its

**200**

1  C. Feinstein
2  prior e-mail addresses?
3      A    It associates -- I believe it
4  does. I have to check with J.R. on all
5  the prior e-mail addresses. But the --
6      Q    What is that tool called?
7      A    EMURALD, E-M-U-R-A-L-D.
8      Q    What does "R-A-L-D" stand for?
9      A    Something like ExxonMobil User
10 something.
11     Q    When Mr. Tillerson was put on
12 hold, did EMURALD identify Wayne Tracker
13 as one of his affiliated accounts?
14     A    No. It wasn't tied to
15 Mr. Tillerson's AD account.
16     Q    So who would have had to tie
17 that upon its creation; Mr. Wells?
18     A    Let me back up here. At the
19 time that Mr. Tillerson's ID was created,
20 it was created in Lotus Notes. It is not
21 necessary to tie Lotus Notes to an Active
22 Directory account. So the tie to Active
23 Directory, to the e-mail addresses,
24 didn't happen until we implemented
25 Microsoft Exchange 2007, which would have

**201**

1  C. Feinstein
2  been in late 2011, early 2012.
3      Q    And who handled Mr. Tillerson's
4  Microsoft Exchange connection in the
5  connection between the e-mail addresses
6  and the ADA?
7      A    Ramona Helble, H-E-L-B-L-E.
8      Q    What was her role?
9      A    Ramona Helble is a Bit Manager
10 in the EMIT organization.
11     Q    And does she interact with your
12 EMURALD system?
13     A    E-M-U-R-A-L-D, "EMURALD."
14     Q    Thank you.
15     A    She has records in the EMURALD
16 system. I don't know that she interacts
17 with it. I don't know that she would
18 query it or use it.
19     Q    With the hypothetical employee
20 who switches between Exxon affiliates and
21 then switches their domains, how does it
22 get registered in EMURALD? Does someone,
23 whoever is setting up that new address,
24 have to manually tell EMURALD to look for
25 this former e-mail address?

51 (Pages 198 to 201)

**FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM**
INDEX NO. 451962/2016
NYSCEF DOC. NO. 194
RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 424 of 553   PageID 851

**202**

C. Feinstein
1
2     A     I don't know exactly how that
3     happens.  I'd have to -- to -- I'd have
4     to see the process documentation and talk
5     to the process advisor, exactly how they
6     do that.
7         Q     Who would that be?
8         A     That would J.R. Brown.  I know
9     I have talked to him, and there is a
10    process a plan for managing that.  I
11    know there can be a delay of a couple of
12    days while they're transitioning between
13    domains and then they tie the information
14    together.
15        Q     Mr. Tillerson's secondary
16    e-mail address was not picked up in this
17    litigation hold.
18            Was it picked up in prior legal
19    holds?
20        A     So the files -- so -- let me go
21    back and clarify a little bit.
22            When the litigation hold notice
23    goes out, it goes out to the individual,
24    which would have been Mr. Tillerson.  So
25    the litigation hold notice says that all

**203**

C. Feinstein
1
2     of the records should be retained.  And
3     so that would include Wayne Tracker.  So
4     Wayne Tracker's not an actual human,
5     so --
6         Q     Did the litigation hold notice
7     go to the Wayne Tracker e-mail address?
8         A     No.  It goes to Mr. Tillerson's
9     address.  Goes to Mr. Tillerson, would be
10    the one who would be using the account.
11    So litigation hold notices go to an
12    individual, not to accounts, okay.
13            So -- so restate your question.
14    I will see if I can finish answering it.
15        Q     I'm not sure I remember my
16    question.
17            Were the records affiliated
18    with the Wayne Tracker e-mail account
19    preserved under prior litigation holds?
20        A     I don't know about prior
21    litigation holds.
22        Q     Who would be the best person to
23    ask about that?  I assume the Management
24    Committee custodians are on several legal
25    holds.

**204**

C. Feinstein
1
2     A     It wouldn't surprise me.  I
3     would think the Law Department would know
4     that.
5         Q     Would Mr. Lauck know?
6         A     I don't know that Mr. Lauck
7     would know that.
8         Q     Did Mr. Lauck collect
9     separately from the management custodians
10    in this investigation only, or does he do
11    that with every litigation hold?
12        A     He -- I don't -- I think this
13    has happened with the Management
14    Committee in the past, although I don't
15    know the details about it, and I don't
16    know if he was the one that did it.
17        Q     Did the CEO, prior to
18    Mr. Tillerson, have a secondary account?
19        A     No, he did not.
20        Q     The description of the
21    considerations in creating a secondary
22    account are about large quantities of
23    e-mail.  I assume everybody on the
24    Management Committee has large quantities
25    of e-mail.

**205**

C. Feinstein
1
2             Did any of them ask for a
3     secondary e-mail account and were
4     declined?
5         A     I don't know that.  Mr. Woods
6     has an e-mail account set up and it's
7     never been used.
8         Q     Which one is that?
9         A     It's called J.E. Gray.
10        Q     What is J.E. Gray?
11        A     I'm sorry?
12        Q     Is that "J" like first initial?
13        A     J, E, and then I think it's
14    G-R-A-Y.
15        Q     And so the e-mail address is
16    j.e.gray@ExxonMobil.com?
17        A     I would have to look it up.  I
18    have seen the J.E. Gray.  It's never been
19    used, so I've never seen it used in the
20    title, so I don't know where the periods
21    are.  I think it's -- I am not sure.
22        Q     Is it "Gray" with an E-Y or an
23    A-Y?
24        A     I would have to look it up.  I
25    am not sure.

52 (Pages 202 to 205)

**206**

C. Feinstein

1
2　Q　Did he ask for that to be set
3 up?
4　A　I don't know if he asked for it
5 or not. He's never used it, so I
6 don't -- I don't know if he is aware of
7 it. I don't know.
8　Q　Who would know that?
9　A　Ramona Helble.
10　Q　And is that secondary e-mail
11 address for Mr. Woods affiliated with his
12 ADA account?
13　A　It's affiliated with Ramona
14 Helble, again, just like
15 Mr. Tillerson's -- just like the Wayne
16 Tracker, sorry.
17　Q　Can you explain the affiliation
18 to me a little bit more, please?
19　A　Okay, I will try, here.
20　So when the account was -- so
21 there needs to be some way to link the
22 account back to an identity. And there
23 was a desire to link it back to
24 Mr. Tillerson because of the reasons
25 described in the affidavit. So it is

**207**

C. Feinstein

1
2 linked to Ramona Helble in the EMURALD
3 system.
4　Q　And Mrs. Helble has her own
5 e-mail address?
6　A　She does.
7　Q　And that is also linked to her
8 ADA account?
9　A　Her e-mail address is linked to
10 her ADA account. Now, technically, the
11 Wayne Tracker account has a separate ADA
12 account, but it's linked to Ramona in the
13 EMURALD system, which is what's visible
14 to people.
15　Q　Can she, Ms. Helble, review the
16 e-mails that come into these two e-mail
17 addresses?
18　A　No, she cannot. You still have
19 to have the password to log in.
20　Q　Were both the J.E. Gray e-mail
21 addresses and the Wayne Tracker e-mail
22 addresses created at the same time?
23　A　No, they were not.
24　Q　When was the Gray e-mail
25 address set up?

**208**

C. Feinstein

1
2　A　I would have to look it up. It
3 was much more recent.
4　Q　The association or affiliation
5 of Wayne Tracker to Helble occurred when
6 you transferred to Microsoft Exchange?
7　A　Right.
8　Q　And who made the decision to
9 affiliate it with Helble, if you know?
10　A　I believe that Ms. Helble did.
11 And I don't know who she consulted with,
12 but -- but in her role as bit manager,
13 decided to do that.
14　Q　Would she have consulted with
15 Mr. Tillerson before doing so?
16　A　She would have consulted with
17 Mr. Tillerson or someone that he gave
18 instructions to on this. I don't know
19 exactly who she consulted with.
20　Q　How did you learn about the
21 J.E. Gray e-mail address?
22　A　When I learned about the
23 existence of the Wayne Tracker account
24 and I learned that it was linked to
25 Ramona Helble, I went to the EMURALD

**209**

C. Feinstein

1
2 system to look it up and I saw the J.E.
3 Gray account and I asked the question:
4 Is there anyone else who has a second
5 account? And I asked what is the J.E.
6 Gray account. And so that is a how I
7 found out that one had been set up, and
8 never been used.
9　Q　Does Ms. Helble have any other
10 accounts associated with her?
11　A　No. That's all I saw.
12　Q　Were there other methods that
13 the Management Committee custodians used
14 to deal with the large influx of e-mail
15 correspondence in the inability to
16 prioritize important documents or
17 important communications?
18　A　I don't know what they did.
19　Q　Who would know that?
20　A　The Management Committee
21 members, themselves, would know that.
22 Their admins would know how they dealt
23 with it.
24　Q　When you were conducting the
25 review of the collection process here,

53 (Pages 206 to 209)

**210**

C. Feinstein

1
2  did you see any of the Management
3  Committee custodians using personal
4  e-mail addresses to conduct business?
5     A    No, I did not.
6     Q    When you were conducting your
7  review of this matter in March and April
8  of this year, did you know if the
9  assistants were aware of both the Wayne
10  Tracker and J.E. Gray e-mail accounts?
11     A    I do not know anything about
12  whether the assistants were aware of the
13  J.E. Gray.  I know that some assistants
14  were aware -- some of Mr. Tillerson's
15  assistants were aware of the Wayne
16  Tracker account.
17     Q    How do you know that?
18     A    Because I -- I talked to
19  someone who dealt with him who told me
20  that they sometimes move documents, that
21  the assistant would sometimes move
22  documents from -- that Mr. Tillerson
23  needed to see immediately from his
24  primary account over to the Wayne
25  Tracker, so that he would spot them

**211**

C. Feinstein

1
2  immediately if he were traveling or
3  something like that.
4     Q    And who told you that?
5     A    I'm trying to recall whether
6  that would have been -- I am not sure.  I
7  think that would have probably been Bob
8  Lauck that told me that.
9     Q    Did you interview any of the
10  assistants?
11     A    I have not.
12     Q    Do you know how an assistant
13  manually moves a document from one e-mail
14  account to another?
15     A    I do not know how they would be
16  doing that.
17     Q    And who would know that?
18     A    Mr. Lauck would probably know
19  it or Ms. Helble might know how they were
20  doing it.
21     Q    Why would Ms. Helble know that?
22     A    She provides support to them,
23  so she may have had some conversations
24  with them in the past.  I'm not sure if
25  she would know or if Bob would know.

**212**

C. Feinstein

1
2     Q    What kind of support does
3  Ms. Helble provide?
4     A    So she is the corporate
5  headquarters business IT manager, so she
6  helps provide support for that group and
7  makes sure that their IT needs are met.
8  So it's possible that she may have that.
9     Q    Would she have moved documents
10  between accounts?
11     A    I don't believe that she would
12  have had access to do that.  She would
13  need the password, and I don't believe
14  she would have done that.
15     Q    Turning to paragraph 51 of your
16  revised affidavit.
17     A    (Complying.)
18     Q    Paragraph 51 describes the file
19  sweep.
20     A    Yes.
21     Q    Do you have personal knowledge
22  of the contents of this paragraph?
23     A    Yes, I do.
24     Q    Who is Ye-Chin Lee?
25     A    Ye-Chin Lee is the Messaging

**213**

C. Feinstein

1
2  Service Design Lead.
3     Q    How did he or she provide
4  information for you to draft this
5  paragraph or to provide content for this
6  paragraph?
7     A    So I went back to verify
8  that -- that -- that the file sweep was
9  enabled at the time of migration.
10     Q    And was it enabled at the time
11  of migration?
12     A    It was enabled at the time of
13  migration.
14     Q    Whose responsibility was it to
15  disable the file sweep?
16     A    The file sweep is -- there's an
17  automated -- there is an automated
18  program that runs.  So there is a series
19  of systems involved.  And so the Law
20  Department determines who is on
21  litigation hold.  There is a system in
22  which a flag gets set, and that is
23  what disables the file sweep for folks on
24  litigation hold.
25     Q    The litigation triggers a flag

54 (Pages 210 to 213)

**214**

C. Feinstein
1     C. Feinstein
2  which triggers the disabling?
3      A     So when someone is put on
4  litigation hold, then there is a flag
5  that is triggered that says this person
6  is on litigation hold, and that flag then
7  is set and that flag is used in the
8  e-mail system to -- or in the file sweep,
9  the automated file sweep system, to
10  disable the file sweep program while that
11  person is on litigation hold.  And it's
12  also used for -- to ensure that assets
13  are retained.
14      Q     Who physically or
15  technologically changes the setting from
16  enabled to disabled?
17      A     So someone doesn't physically
18  change it.  The system changes it based
19  on the flag.
20      Q     And who creates the flag?
21      A     The Law Department creates the
22  flag.  And they determine who goes on to
23  litigation hold and they upset -- they
24  update the Atlas tool and that provides a
25  feed which then ultimately sets a flag in

**215**

1     C. Feinstein
2  another system.
3      Q     Whose responsibility is it to
4  ensure this is working correctly?
5      A     So to ensure that the -- which
6  piece are you asking about?
7      Q     The disabling.
8      A     The disabling of the file
9  sweep?  Overall, on the EMIT side, I have
10  responsibility for making sure that the
11  whole process, end to end, is working
12  right on the EMIT side.
13          On the determination of who
14  goes on to litigation hold and whether
15  the Atlas tool is working correctly, then
16  the Law Department has that
17  responsibility.  The tool -- there are
18  several tools involved here that are
19  owned by different folks in the IT
20  department, in the EMIT department, so we
21  have to coordinate to make sure they all
22  work together, and I hold responsibility
23  for coordinating that.
24      Q     When the collection process in
25  response to the subpoena was bifurcated

**216**

1     C. Feinstein
2  into nonmanagement custodians and
3  management custodians, was the
4  responsibility for the disabling of the
5  file sweep moved to Mr. Lauck who handled
6  the management custodian collection?
7      A     I'm sorry, one more time?  I'm
8  not sure I got that.
9      Q     When the collection process in
10  response to the subpoena was bifurcated
11  into nonmanagement custodians and
12  management custodians, was the
13  responsibility for the disabling of the
14  file sweep moved to Mr. Lauck, who
15  handled the management custodian
16  collection?
17      A     No.  No.
18      Q     It was still the Risk
19  Management team under you and the Law
20  Department?
21      A     Right, for the file sweep, for
22  the setting the litigation hold flag that
23  disables the file sweep, that did not
24  transfer to Mr. Lauck.  That stayed with
25  the folks who were responsible for that

**217**

1     C. Feinstein
2  process overall.
3      Q     You had mentioned that several
4  systems were involved in the disabling.
5          Have we covered all those
6  systems?
7      A     We talked about the Access Data
8  Tool (sic), which provides information
9  which sets a flag.
10      Q     Are you responsible for the
11  Access Data Tool?
12      A     No, I am not.
13      Q     Who is?
14      A     The Law Department.
15      Q     Okay.
16      A     It provides -- it interfaces
17  with the Enterprise Directory which
18  provides some additional
19  ExxonMobil-specific information.  Which
20  it also interfaces with the EMURALD
21  system.  The EMURALD system is used to
22  set the flag, the R37 flag, which
23  indicates that a person is on litigation
24  hold.  That then provides a feed over to
25  the e-mail system and the file sweeper,

55 (Pages 214 to 217)

**218**

C. Feinstein

1  that functionality is tied in with the
2  e-mail system.  That's all I can recall
3  off the top of my head.
4       MR. TOAL:  Did you say the
5  access system or the Atlas system at
6  the beginning of that?
7       THE WITNESS:  At the
8  beginning the Atlas, the Atlas system
9  is used to indicate who is on
10 litigation hold and then it gathers
11 some additional information from the
12 Enterprise Directory -- I'm sorry, I
13 am saying that wrong.  Let me correct
14 that, I apologize.  Let me go back and
15 correct that.
16      The Enterprise Directory
17 comes in before that, actually.  Atlas
18 provides information over to EMURALD.
19 It does not go through Enterprise
20 Directory at that point.  Enterprise
21 was earlier in the conversation.  So
22 Atlas puts -- determines whether
23 somebody is on litigation hold or not
24 and that provides information to

**219**

C. Feinstein

1  EMURALD where the flag is set that
2  indicates that someone is on
3  litigation hold.  And then that
4  provides information to the e-mail
5  system to disable the file sweeper
6  routine, the automated file sweeper
7  routine.
8       Q    If Ms. Helble had been put on a
9  litigation hold, would the e-mails of
10 Wayne Tracker been preserved correctly?
11      A    No, they still would not be.
12      Q    Why?
13      A    Because when the Wayne Tracker
14 e-mail was set up, it was set up as a
15 nonpersonal account directory.  And
16 because it was set up as an nonpersonal
17 account, because of the way that this
18 information flows and the flag works, it
19 still would not have recognized that this
20 was an identity that had a litigation
21 hold flag set.  It needed to be set as a
22 personal account.  So it was not a
23 personal account.
24      Q    So it was not a personal
25 account of Ms. Helble?

**220**

C. Feinstein

1       A    No.  Ms. Helble has her own
2  personal account.
3       Q    And the D.E. Gray (sic) e-mail
4  address?
5       A    J.E. Gray.
6       Q    J.E. Gray was a personal
7  account?
8       A    It was not set up as a personal
9  account.  It would be a nonpersonal.
10 It's never been used, so we haven't had
11 to address that, but...
12      Q    Footnote four to your paragraph
13 51 regarding the file sweep routine.
14      A    Yes.
15      Q    There is discussion of despite
16 the disabling of the file sweep, that
17 documents can be retained for 395 days.
18      Does that mean all e-mails,
19 regardless of what the user has done with
20 them, meaning foldering them,
21 categorizing them, flags?
22      A    So no, not exactly.  What that
23 means is that -- so this is an automated
24 file sweep routine that will

**221**

C. Feinstein

1  automatically sweep e-mails over
2  13 months old, which is where the
3  395 days come from.
4       If someone -- someone could
5  delete something before that, this is not
6  the only delete mechanism, but this is
7  intended to help people keep their --
8  their quotas down or their e-mail bogging
9  down.
10      Q    So in the Wayne Tracker
11 instance, things could have been deleted
12 during this 395-day period?
13      A    When the person was not on
14 litigation hold, yes.  So -- so --
15      Q    Well, the person was on
16 litigation hold.
17      A    Just -- okay, make sure I
18 understand the question.  So?
19      Q    My question is:  During the
20 13-month period where the file sweep has
21 not run, while it's waiting to run, the
22 user could have deleted contents?
23      A    Under Microsoft Exchange 2007,
24 they could do that.  As we've migrated to

56 (Pages 218 to 221)

**222**

1        C. Feinstein
2   Microsoft Exchange -- as we've migrated
3   to the later version of Microsoft
4   Exchange, the data would still be
5   retained, but under Microsoft Exchange
6   2007, that would have been true.
7        Q    When did you migrate to the
8   Microsoft Exchange --
9        A    2016.
10       Q    When in 2016?
11       A    So we have been doing it --
12  they don't typically migrate all at one
13  time, so I'm not sure of the exact dates.
14  I would have to get Cynthia to tell me
15  the exact dates.
16       Q    Was the file sweep disabled in
17  the files in Microsoft Exchange, the
18  later version?  The Wayne Tracker e-mail
19  was migrated over to the new Exchange
20  server in 2016.  At that time, was the
21  file sweep setting changed?
22       A    No.  That migration would have
23  not had anything to do with the -- the --
24  a change in the file sweep, so...
25       Q    Does anyone check the file

**223**

1        C. Feinstein
2   sweep settings when they are doing a
3   migration?
4        A    I'm not sure what the migration
5   protocol is on that.
6        Q    Who might know that?
7        A    Cynthia Leong would know that.
8   The -- the piece that disables the file
9   sweep is done in a separate system from
10  the e-mail system.  I know there was
11  testing of that when they were migrating
12  to the new version of Microsoft Exchange
13  to make sure that it was working
14  properly, but I don't know the exact
15  protocol of how they do that.
16       Q    Who conducted the testing?
17       A    Cynthia Leong could tell you
18  all who conducted the testing.
19       Q    In paragraph 53, you describe
20  the discovery that the Wayne Tracker
21  account hadn't been searched in the prior
22  searches.
23       Who discovered that at
24  ExxonMobil?
25       A    Discovered that it was never

**224**

1        C. Feinstein
2   exempted from the file sweep routine?
3   The Law Department is the one who made me
4   aware of it.
5        Q    What other kind of nonpersonal
6   accounts exist?
7        A    There's -- there's personal,
8   there's nonpersonal, but some other types
9   might be accounts that we use to manage
10  conference room reservations,
11  calendars...
12       Q    Distribution lists?
13       A    Distribution lists is a good
14  example.
15       Q    And so if you have an e-mail
16  address that's distribution list
17  A@ExxonMobil.com and it goes to all the
18  management custodians, where do the
19  contents of the in-box and sent box for
20  that distribution list lie?
21       A    They lie in each of those
22  members' e-mail.  So that distribution
23  list is just a way of aggregating those
24  existing -- it's not a -- it's not really
25  a separate e-mail address.  It's -- it's

**225**

1        C. Feinstein
2   a way of aggregating a group of existing
3   e-mail addresses, but it still gets
4   picked up.
5        Q    Is that true of all
6   distribution lists?
7        A    Yes.  To my knowledge, I don't
8   know if any would look a different way.
9        Q    Are there any other nonpersonal
10  accounts that exist?
11       A    Are there any other types of
12  nonpersonal accounts.  So we've talked
13  about the conference rooms.  We've talked
14  about -- there are some shared mailboxes
15  that are used for processes and
16  operational support.
17       Q    Can you give me an example?
18       A    Let me see if I can give a good
19  example.  Let's say that -- a good
20  example of one that I used at one time.
21       So I used to have an
22  operational team where they needed to
23  take action and perform certain
24  activities as part of their role.  And so
25  rotating where we handed over one

57 (Pages 222 to 225)

**226**

C. Feinstein

1  activity to another person.  And so this
2  would say, you know, this is -- this
3  ticket is here and this is to document
4  that we've done this.  They're not used
5  typically for ongoing communication.
6  They are for operational purposes.
7       Q     Do you know if anyone in the
8  Management Committee or their assistants
9  have shared mailboxes?
10      A     We did check the Management
11  Committee members and determined that
12  they did not have shared mailboxes.
13      Q     Who checked that?
14      A     That would have been Cynthia
15  Leong.
16      Q     With the assistants, did
17  anybody check if they had shared
18  mailboxes?
19      A     I don't know if anyone checked
20  the assistants or not.
21      Q     In paragraph 56, you describe
22  Wayne Tracker e-mails not available for
23  review between September 5, 2014, and
24  November 27, 2014.
25

**227**

C. Feinstein

1       A     That's right.
2       Q     Can you describe why this time
3  period was not available?
4       A     So this time period was not
5  available because the file sweeper was
6  enabled, the file sweeper was enabled and
7  so during that time there was some
8  automatic deletions that happened.
9       Q     What about the time period from
10 the migration to the Exchange server in
11 2011 or 2012 through September 5, 2014;
12 what happened to those e-mails?
13      A     So 2012, those would have
14 logically been swept.
15      Q     So why doesn't it say that the
16 e-mails in the Wayne Tracker account from
17 2011 or 2012 through November 27, 2014,
18 were deleted?
19      A     Well, those were -- that would
20 have been before the subpoena was
21 received, right?  That would have been
22 more than 13 months back from the date
23 the subpoena was received.
24      Q     So this time period is pegged
25

**228**

C. Feinstein

1  to the issuance of the subpoena, not the
2  time period of the subpoena?
3       A     Well, they would only know to
4  put -- they would only know to disable
5  the file sweeper once the subpoena came
6  in.
7       Q     And did they disable the file
8  sweeper when the subpoena came in?
9       A     For Mr. Tillerson, it was
10 disabled, but the Wayne Tracker, there
11 was a mistake and so the file sweeper did
12 not get disabled for the Wayne Tracker
13 account.
14      Q     Is it true that documents
15 before November 27, 2014, going back in
16 time, were swept and deleted?
17      A     I don't have evidence of that,
18 but knowing how the file sweeper works,
19 the date that the subpoena came in -- so
20 if the subpoena came in on November 4th
21 and file sweeper was disabled on -- or
22 the litigation hold notice went out on
23 November 6th, then what would have --
24 where the file sweeper should have been
25

**229**

C. Feinstein

1  disabled would have been from that point
2  on.  So 13 months back from that,
3  13 months back from that, e-mail before
4  that time would logically have been
5  automatically swept.
6       Q     And did the file sweep work in
7  Lotus Notes?
8       A     There was no file sweep in
9  Lotus Notes.
10      Q     So the documents in Lotus Notes
11 between 2007 and 2012 that were preserved
12 either for other litigations or otherwise
13 were available for searching for the
14 Wayne Tracker account?
15      A     Well, I don't know -- I don't
16 know about that.
17      Q     Okay.
18      A     I don't know if there was
19 another litigation hold.  I don't know if
20 there were any documents.  I don't know
21 if there was a litigation hold, was it
22 released.  So I don't know the answer to
23 that.
24      Q     In paragraph 57, footnote five,
25

58 (Pages 226 to 229)

**230**

C. Feinstein
2  you reference a Legacy Disk-Based Backup
3  Device?
4      A    That's right.
5      Q    Can you explain to me who
6  identified it and the contents thereof?
7      A    I'm not sure who identified it.
8  It would be one of the people who were
9  working on this effort.  John Rudisill
10 could probably tell us who identified it.
11 So on that, we were able to go back.
12 That was the oldest full backup that we
13 were able to find.
14     Q    Where was it?
15     A    Where was it?  I'm not sure
16 where it was.  It was on one of the
17 servers that were identified as
18 potentially having some e-mail.
19     Q    And what does Legacy Disk-Based
20 mean?
21     A    So Legacy Disk-Based means that
22 we used to do backups -- we have changed
23 the way we do backup processes over the
24 years.  And so in the past, we used to
25 do -- use a disk-based, whereas now we do

**231**

C. Feinstein
2  something different than that.  And so
3  this would have been the older
4  technology.
5      Q    What is the new technology?
6      A    I don't -- so today we use
7  Convault for our backups.
8      Q    Is that a proprietary system or
9  a vendor system?
10     A    I believe it's a vendor system.
11     Q    Where were these Legacy
12 Disk-Based Backup -- oh, you don't know.
13     A    Yeah, I don't know, I haven't
14 located them.
15     Q    Was this backup device for the
16 Management Committee server?
17     A    I don't know specifically which
18 server it was for.  This would have been
19 for -- for e-mail.
20     Q    Who would know which server?
21     A    Cynthia Leong would know which
22 server this was.  So in the Wayne Tracker
23 account, we were looking for the e-mail
24 because that's where the file sweep
25 happened.

**232**

C. Feinstein
2      Q    And the Management Committee
3  server -- sorry if I asked this before --
4  this covers everyone in the Management
5  Committee and their assistants?
6      A    I don't know who all has access
7  to the Management Committee system.  I'm
8  not sure what's in there.
9          MS. DeROCHE:  If we could
10 take a five-minute break.
11         [A recess was taken.]
12 EXAMINATION BY
13 MR. OLESKE:
14     Q    I am going to finish up with
15 hopefully not too many questions, and we
16 will get out of here relatively quickly.
17 And I am sorry if I seem to go over
18 ground that's been covered.  I just want
19 to make sure that I have got some things
20 clear.  I will try to move quickly so
21 that if I am duplicating, at least it
22 will go quickly.
23         First of all, is it your
24 understanding that there is, in fact, a
25 Management Committee server for the

**233**

C. Feinstein
2  Microsoft Exchange 2007 system?
3      A    I don't know that there is a
4  server for the 2007 system.  I know there
5  is a Management Committee server.  I
6  don't know what's on it.
7      Q    And you don't know who the
8  custodians are who are assigned to that
9  server; is that correct?
10     A    That's correct.
11     Q    And you don't know whether or
12 not the Wayne Tracker e-mail is housed on
13 that server as opposed to any other
14 server; is that correct?
15     A    I do have some knowledge of the
16 servers that they looked at for the Wayne
17 Tracker account.  I don't recall any of
18 those being the Management Committee
19 server.  But I was looking at the
20 technical names of them, so there were
21 multiple servers, I don't believe it was
22 Management Committee, but I am not
23 absolutely certain.
24     Q    So the Wayne Tracker e-mails
25 were located on more than one server?

**234**

1 C. Feinstein
2 A We looked for backups on more
3 than one server.
4 Q Was there a primary server that
5 hosted the Wayne Tracker e-mail account?
6 A I don't know if this was a
7 primary -- well, there is always a
8 primary server that hosts e-mail
9 accounts. This account existed for a
10 long time, so I -- I don't know that --
11 which of those, I would say, is the
12 primary.
13 Q And do you know whether or not
14 it was located on the same primary or
15 secondary server as Mr. Tillerson's Rex
16 Tillerson e-mail account?
17 A I do not know that.
18 Q In your affidavit, we discussed
19 how the reason why the tracker e-mail
20 account didn't get picked up is because
21 in the Active Directory system, it was
22 not identified as a personal account; is
23 that correct?
24 A That's correct.
25 Q And the restraint that you

**235**

1 C. Feinstein
2 understand is that the Active Directory
3 system can only assign one personal
4 account per person; is that correct?
5 A I don't know that it's a
6 technical constraint to Active Directory.
7 That's the way we deployed it.
8 Q And your understanding is that
9 when the Law Department puts up the flag
10 for a legal hold on an individual, it
11 will only automatically exempt the file
12 sweep for personal accounts, the one
13 personal account connected to that
14 individual in the ADA system; is that
15 correct?
16 A It -- repeat it one more time?
17 Q Sure. When the Law Department
18 signals someone's on hold, that's who
19 does that, correct, the Law Department?
20 A Yes, the Law Department.
21 Q And you said there is a system
22 where that puts a flag into the system
23 and that flag is what triggers the
24 exemption from the file sweep, correct?
25 A They -- there -- when you say

**236**

1 C. Feinstein
2 "the system," it's not the same system as
3 the litigation hold system.
4 Q Okay.
5 A Okay.
6 Q So a litigation hold is put in
7 place by the Legal Department, and then
8 someone at the Legal Department also has
9 the responsibility to flip the flag --
10 A No.
11 Q That's not correct.
12 Who has the responsibility to
13 flip the flag to say, exempt this person
14 from the automatic file sweep?
15 A It's -- it's an automated
16 process.
17 Q I guess that's what I am
18 getting at.
19 A Okay.
20 Q When the Legal Department puts
21 someone on hold, does that automatically
22 trigger the system exempting that
23 person's personal ADA account from the
24 file sweep?
25 A Yes. That would disable the

**237**

1 C. Feinstein
2 automated file sweep on their e-mail
3 account.
4 Q Now, you mentioned that there
5 is a secondary system called EMURALD?
6 A EMURALD.
7 Q And that also identifies
8 people's e-mail address by what
9 individual they belong to, correct?
10 A So that's not as -- let me see
11 if I can clear -- when you say "a
12 secondary system," it is -- it is one of
13 our identity in access management systems
14 and tools.
15 Q One of those is the ADA system,
16 correct?
17 A One of the tools in this sweep,
18 this architecture, Active Directory is
19 one piece of the architecture. EMURALD
20 is another piece of the architecture.
21 Q Right. And but just talking
22 about in the ADA tool, the Active
23 Directory tool to start with, the Active
24 Directory tool can know that an
25 individual is connected to one active

60 (Pages 234 to 237)

**FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM**
INDEX NO. 451962/2016
NYSCEF DOC. NO. 194
RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 433 of 553   PageID 860

**238**

C. Feinstein

1
2  personal account, that's the way Exxon
3  has it set up, correct?
4      A    That's the way we set it up.
5      Q    And if I'm not mistaken,
6  correct me if I am wrong, it could know,
7  theoretically, that that person is
8  connected to another inactive account; is
9  that correct?
10     A    I am not sure about that. I
11  would have to talk to --
12     Q    But it won't know whether that
13  person is connected to an e-mail account
14  that was previously designated as
15  nonpersonal; is that correct?
16     A    For the purposes of setting the
17  litigation hold flag, if -- for the
18  purposes of setting the litigation hold
19  flag, if an account is flagged as
20  nonpersonal, then the litigation hold
21  flag won't be set appropriately.
22     Q    Now, separate from that is the
23  EMURALD system, correct?
24     A    The litigation hold flag gets
25  set in the EMURALD system.

**239**

C. Feinstein

1
2      Q    The EMURALD system also
3  identifies individuals, correct?
4      A    Yes, it does.
5      Q    And it separately connects them
6  to different e-mail addresses, correct?
7      A    It records in there which
8  e-mail -- which e-mail accounts are
9  associated with that identity.
10     Q    And that system doesn't have
11  any of the restrictions of the ADA
12  system; in other words, it can have more
13  than one e-mail account attached to a
14  single person, correct?
15     A    It can tell you -- it can tell
16  you what e-mail accounts, personal or
17  nonpersonal, are associated with that
18  identity.
19     Q    And in a way that ADA could
20  not; is that correct?
21     A    In a way that ADA, the Active
22  Directory does not.
23     Q    And if I am correct, your
24  testimony is that when the Wayne Tracker
25  e-mail was transitioned from Lotus Notes

**240**

C. Feinstein

1
2  to Microsoft Exchange, Ramona Helble
3  linked the Wayne Tracker e-mail address
4  to herself; is that correct?
5      A    That is correct.
6      Q    Now, you mentioned that that
7  had something to do with the basis in
8  your affidavit. And my understanding of
9  the basis in the affidavit are that the
10  Management Committee people would be
11  getting e-mail traffic from outside the
12  organization; is that one of them? Is
13  that correct?
14     A    Well, this is Mr. Tillerson?
15     Q    Right.
16     A    So yes, there was some concern
17  about Mr. Tillerson, the e-mail traffic
18  coming from the outside.
19     Q    Because people could just write
20  to Rex W. Tillerson and flood his e-mail
21  box because they could know his identity?
22     A    That's correct.
23     Q    And the other issue is that he
24  gets so many e-mails, this is the way for
25  him to get the most important e-mails; is

**241**

C. Feinstein

1
2  that correct?
3      A    That's correct.
4      Q    But his account didn't need to
5  be linked to Ramona Helble in EMURALD to
6  achieve those objectives; did it?
7      A    Well, if -- it didn't have to
8  be Ramona Helble, per se, but had it been
9  linked to something that said
10  Mr. Tillerson, then the anonymity would
11  not have been there.
12     Q    That is my question: Is the
13  anonymity from who? In other words, who
14  can see who is linked to an e-mail
15  account in EMURALD? It's just people who
16  work for EMIT, right?
17     A    I don't know who all has access
18  to EMURALD. I think access is fairly
19  broad. I am not sure. I would have to
20  look up and see if it is people outside
21  of EMURALD or not.
22     Q    So the concern would be that
23  someone inside of Exxon who has access to
24  EMURALD would have been able to tell that
25  Wayne Tracker was really Mr. Tillerson?

**61 (Pages 238 to 241)**

242

C. Feinstein
1
2      A    Well, that was one of the
3  concerns, as well.
4      Q    Do you know at the time whether
5  or not anyone raised any questions about
6  Exxon, itself, not being able to keep
7  track of who the Wayne Tracker e-mail was
8  attached to?
9      A    At which point in time?
10      Q    When Ms. Helble transitioned it
11  to herself.
12      A    I'm not sure I understand your
13  question.  Tell me one more time.
14      Q    You know what, scratch that.
15      A    Okay.
16      Q    Does Ms. Helble have any prior
17  involvement in producing documents in
18  response to litigations or
19  investigations?
20      A    I don't know.
21      Q    You have never worked with her
22  on something like that before?
23      A    She is the Bit Manager.  So
24  she -- one of her responsibilities is --
25  is -- is understanding about the -- the

243

C. Feinstein
1
2  Litigation e-Discovery Services, but I
3  have never worked with her on producing
4  documents.
5      Q    You previously mentioned that
6  keeping these identities secure and
7  straight is a key compliance role at
8  Exxon, correct, a key control item; is
9  that correct?
10      A    It is a -- it is a key control.
11  It's a control that we worry about
12  because it's complex given the volume of
13  what we have and it's something that's
14  significant given the assets we have to
15  protect.
16      Q    And, ultimately, at ExxonMobil,
17  that's your job, correct?
18      A    Not -- no, not -- not exactly.
19  I'm not responsible for all of the access
20  management.
21      Q    Are you responsible for
22  identity in access management when it
23  comes to the Microsoft Exchange servers?
24      A    No.  I -- I'm not.
25      Q    Who is responsible for that?

244

C. Feinstein
1
2      A    So the Microsoft Exchange
3  servers have an owner -- and I don't
4  recall exactly who the owner of the
5  overall service is right now.  There is a
6  group in collaboration, E-Mail
7  Collaboration Services that owns that.  I
8  do provide guidance about access
9  management procedures and guidelines.
10      Q    Prior to March of 2017, did you
11  know the Wayne Tracker e-mail existed?
12      A    I did not.
13      Q    Did you learn that Ms. Helble
14  had linked it to herself and EMURALD at
15  the same time, basically, that you
16  learned of the existence of the account?
17      A    Several days later.
18      Q    If you had known about that,
19  would it have been part of your role to
20  address any potential risks to Exxon's
21  identity controls posed by this setup?
22      A    Ask me the question one more
23  time, make sure I'm clear.
24      Q    Sure.  If you had known about a
25  secondary e-mail address, not designated

245

C. Feinstein
1
2  personal, linked to a different person in
3  EMURALD, if you had known about that,
4  would that be your role to investigate or
5  address potential risks to Exxon and its
6  internal controls posed by that kind of a
7  setup?
8      A    I certainly would have had part
9  of that responsibility.  I don't know
10  that it would have been fully mine.
11  There are several pieces involved in
12  this, but certainly I would have had some
13  responsibility in that.
14      Q    Do you know whether there were
15  any individuals who would have been
16  responsible for addressing that kind of
17  risk?
18      A    For addressing that kind of
19  risk.  Let me think through for just a
20  moment.
21      Q    Sure.
22      A    So I would think the folks who
23  do our identity and access management and
24  our ITOB organization would have played
25  some role in that.  The folks who own and

62 (Pages 242 to 245)

246

1    C. Feinstein
2  maintain the file sweeper tool would have
3  had some responsibility in that.
4    Q    Who owns and maintains the file
5  sweeper tool?
6    A    It is also owned by the same
7  group that does the e-mail service.
8    Q    Is it the e-mail collaboration?
9    A    The e-mail collaboration
10  service.
11    Q    Going to the e-mails that were
12  actually swept from the Wayne Tracker
13  account.  So I understand correctly, what
14  you were testifying is the subpoena had
15  come in because of this snafu, the
16  sweeper wasn't exempted and kept
17  sweeping, and by the time Mr. Lauck
18  looked at the Wayne Tracker account
19  e-mails for the first time in January of
20  2016, by that time the sweeper had
21  already swept away the e-mails between
22  September and November of 2014; is that
23  correct?
24    A    Let me double check this.  Let
25  me double check those dates.

247

1    C. Feinstein
2    Q    This is paragraph 57.
3    A    Okay.  So between September 5,
4  2014, and November 27th.
5    Q    I'm sorry, that's paragraph 56.
6    A    56, yeah.
7    Q    So the previous stuff might
8  have gotten swept, it might have been
9  deleted, but as far as you know, it
10  wasn't subject to the litigation hold
11  here, and so that's why that time period
12  wasn't examined.  The time period that
13  was examined was what could have been
14  swept while hold was in place, correct?
15    A    That is my understanding.
16    Q    Do you know whether or not
17  Exxon took any steps to see whether or
18  not any data could be recovered for the
19  material that was presumably swept prior
20  to September 5, 2014?
21    A    Well, that would have been as
22  we were looking for the backups for the
23  oldest backup in this, that would have
24  been implied in that.
25    Q    So you had been looking for any

248

1    C. Feinstein
2  old Wayne Tracker?
3    A    Any Wayne Tracker, yeah.
4  Because we were trying to find the oldest
5  backups to find to go as far back as we
6  could.
7    Q    To go back a second, to what
8  must Mr. Lauck had done in the beginning,
9  I just want to understand.
10    So when all this happened
11  originally, the subpoena is issued,
12  litigation holds go out, which I
13  understand you were not directly involved
14  in, but correct me if I am wrong, what
15  you are directly involved in is you get a
16  ticket that says:  Here are custodians,
17  here are locations, go get this stuff; is
18  that correct?
19    A    When a collection is done.
20    Q    Okay.
21    A    Sometime after a litigation
22  hold.
23    Q    Right.  But at some point in
24  this case, that's what you got.  You got
25  tickets with custodians and what to

249

1    C. Feinstein
2  collect, correct?
3    A    Correct.  My team did.
4    Q    Right.  And your understanding
5  now is that the Management Committee
6  custodians were not included in that and
7  done through this separate process,
8  right?
9    A    That's correct.
10    Q    And so when that separate
11  process was started, your understanding
12  is Mr. Lauck took the single word search
13  terms and went into the individual
14  custodian's Microsoft Outlook account,
15  correct?
16    A    Correct.
17    Q    And then he would put those
18  individual terms into a little search box
19  at the top of their e-mail box; is that
20  correct?
21    A    Correct.
22    Q    And hit "enter" and see what
23  came up, correct?
24    A    That's correct.
25    Q    And then whatever came up from

63 (Pages 246 to 249)

---

250

C. Feinstein

1  that, he would "select all" or "copy" or
2  something and move it into a folder,
3  correct?
4      A    Begin a process to move it into
5  a folder.
6      Q    Do you have a lot of experience
7  using Microsoft Outlook?
8      A    Some.  I mean, I am a user, but
9  I am not a deep technical expert.
10      Q    Do you know, for example,
11  whether or not if you put a search term
12  into that box, whether it searches the
13  contents of just the e-mails, or if it
14  also searches the contents of attachments
15  to the e-mails?
16      A    I don't know whether it
17  searches the contents of the attachments.
18      Q    So sitting here today, you
19  don't know whether or not these searches
20  that Mr. Lauck would have done would have
21  captured attachments to e-mails through
22  that process he used as opposed to just
23  the e-mails themselves?
24      A    Right.  I don't know if it
25

---

251

C. Feinstein

1  captured the attachments or not.
2      Q    And so then, basically, my
3  understanding is this was done two more
4  times by Mr. Lauck, effectively, just
5  with more search terms; is that correct?
6      A    Correct.  So the second search
7  was broaden the search terms, and then
8  the third search was also an attempt to
9  broaden the search terms.
10      Q    Right.  So when Mr. Lauck ran
11  the first search, he would have gone
12  into, for example, the Wayne Tracker
13  Outlook box, correct, to run these
14  searches?
15      A    That's correct.
16      Q    And there would have been a
17  search box and underneath that would have
18  been all the e-mails listed before a
19  search, it would have just been all of
20  them, right?
21      A    Right.
22      Q    And so when he ran those
23  searches the first time, you don't know
24  whether or not he noticed it, but three
25

---

252

C. Feinstein

1  months were missing, they had been swept,
2  correct?
3      A    About three months.
4      Q    And when he came back to do the
5  second and third searches, by the time he
6  finished doing that process, another nine
7  months had been swept, correct?
8      A    That's correct, approximately
9  nine is referenced here.
10      Q    And you don't know whether or
11  not he noticed that nine months of
12  e-mails had disappeared from the last
13  time he had seen that Outlook in-box?
14      A    Right, I don't believe that he
15  noticed.  I don't know for sure whether
16  or not he did, but I don't believe that
17  he did.
18      Q    Did you discuss with him
19  whether or not he noticed that?
20      A    I don't believe that I asked
21  him that question.
22      Q    Do you remember him saying
23  anything about that to you?
24      A    No.  We discussed how he did
25

---

253

C. Feinstein

1  the searches, but I don't believe I ever
2  asked him:  Did you notice that anything
3  was missing.
4      Q    Did you guys ever discuss any
5  kind of -- stepping back from that
6  specific issue -- any kind of risk
7  involved in conducting searches in this
8  way as opposed to in the ordinary course,
9  the way you would normally do them?
10      A    I did not talk to Mr. Lauck
11  about the risk of that.  I was getting
12  information from him about how he had
13  done it, and so I did not talk to him
14  about the risk of that.
15      Q    So after it's discovered that,
16  in fact, these things got swept, then
17  that's when we have what you describe in
18  paragraph 59, that talks about the steps
19  to recover what had been swept, correct?
20      A    Right.
21      Q    And 50 members of EMIT spending
22  more than a thousand hours over a
23  seven-day period, and then you list what
24  was done.  And the first thing you list
25

---

64 (Pages 250 to 253)

254

1         C. Feinstein
2    is backup data.  I believe earlier you
3    testified there was an effort to find out
4    if anything was recoverable from the
5    server itself, correct?
6         A    From the Microsoft Exchange
7    server.
8         Q    And one thing you mentioned was
9    a dumpster; is that right?
10        A    That's correct.
11        Q    What is a dumpster?
12        A    So a dumpster is inside
13   Microsoft Exchange there is an additional
14   file where items that -- that have
15   already been processed and have been
16   deleted be retained for 35 days.
17        Q    But there was nothing in the
18   dumpster in this case?
19        A    I don't recall if there was
20   anything in the dumpster or not.  I know
21   we went back and searched it and I'm not
22   sure whether there was anything found in
23   it or not.
24        Q    And then in this same section,
25   you talk about a Legacy Disk-Based Backup

255

1         C. Feinstein
2    Device.  I just want to zero in on this.
3         You said there is a new process
4    now, of backing up the server?
5         A    That's correct.
6         Q    What is the name of that again?
7         A    Convault.
8         Q    That is a third-party vendor
9    controls that; is that correct?
10        A    No.  We do our backup service.
11        Q    You do the backup?
12        A    We do -- EMIT does the backup.
13        Q    And where is it stored?
14        A    It's stored on our
15   infrastructure.
16        Q    In Houston or Dallas?
17        A    In Houston or Dallas.  I don't
18   know specifically where things are backed
19   up, but we store it internally.
20        Q    And prior to that system, it is
21   your understanding there was some
22   disk-based backup?
23        A    There was some disk-based
24   backup.
25        Q    You don't know where that is

256

1         C. Feinstein
2    located?
3         A    No.  I know it was on our
4    infrastructure as well.
5         Q    And you don't know who was in
6    charge of running that disk-based
7    service?
8         A    It would be the E-Mail
9    Operations Group.
10        Q    That same group that we were
11   referencing before?
12        A    Right.
13        Q    If I could turn you back to --
14        A    Sorry, which one?
15        Q    -- Exhibit 8, previously
16   marked.
17        A    Yes.
18        Q    If you turn to page -- why
19   don't we start with page three.  At the
20   top of page three, it discusses SAN
21   Storage Servers; do you see that?
22        A    I do see that.
23        Q    And then when you turn to page
24   seven, it discusses near the top again
25   Internal Storage Mailbox Servers; do you

257

1         C. Feinstein
2    see that?
3         A    Yes, I do.
4         Q    And then in that same
5    paragraph, do you see how it states that
6    the Management Committee Server will be
7    an Internal Storage Server?
8         A    Right.
9         Q    If you turn to page 16 of this
10   document.
11        A    (Complying.)
12        Q    There is a section that says:
13   Exchange 2007 Backup.
14        A    Okay.
15        Q    And then you will see a series
16   of four redactions there.
17        A    Right.
18        Q    The last two of those, it says:
19   Exchange Mailbox Servers with SAN storage
20   will use -- redacted -- and then Exchange
21   servers using internal storage will be --
22   redacted.
23        A    Right.
24        Q    Do you know whether or not
25   these redaction sections identify where

65 (Pages 254 to 257)

258

1          C. Feinstein
2   backups are to be stored?
3       A    I don't know for certain.  I
4   believe this is the frequency and the
5   type of backup, but I'm not certain.
6       Q    Sitting here now, do you know
7   whether or not internal storage servers
8   like the management server are backed up
9   or were backed up during the relevant
10  time to any location other than the
11  company's own Dallas or Houston
12  locations?
13      A    I do not.  I would be very
14  surprised if they were.  I don't -- I
15  don't know for certain, but I don't
16  believe they were.
17      Q    I guess kind of a broader
18  question:  Catastrophe strikes in Texas.
19      A    Right.
20      Q    The location for both the
21  Houston and Dallas IT centers completely
22  flooded.
23      A    Right.
24      Q    The servers are wiped out.
25          Does Exxon have another

259

1          C. Feinstein
2   location where it backs up its e-mails?
3       A    I don't know about e-mail.  I
4   don't -- I would have to talk to the
5   e-mail folks to see whether or not -- how
6   critical the actual e-mails are.
7          We have a capability for
8   restoring the functionality of highly
9   critical systems, but the functionality
10  of the system versus the data in the
11  system are two different things.
12      Q    So is it my understanding,
13  then, that you know that there is a way
14  to recover using e-mail --
15      A    Using e-mail.
16      Q    -- but you are not sure if
17  there is a way to recover what is on the
18  e-mails?
19      A    Correct, correct.
20      Q    When this process was
21  undertaken to find what was lost from the
22  Wayne Tracker e-mails, do you know what
23  efforts were made to find out if or
24  whether e-mails were stored in some third
25  location besides the company's own Dallas

260

1          C. Feinstein
2   or Houston locations?
3       A    I know that the -- the -- the
4   e-mail folks who were -- who were working
5   that issue would know that already.  And
6   so I know that we asked them to -- to
7   make sure that they check any location
8   where we might be able to get the data.
9   So I don't know whether or not -- I
10  didn't ask them specifically, is there
11  any -- any location outside of
12  ExxonMobil, because, typically, there's
13  not.  But -- but I don't know that for
14  sure.
15      Q    And this is, again, the same
16  e-mail group that we are talking about?
17      A    Yes, this would be the same
18  e-mail group.
19      Q    And you would presume they
20  would know?
21      A    They would know.
22      Q    So for example, if Management
23  Committee Server documents get backed up
24  to a Cloud somewhere, those are the
25  people who know that happens?

261

1          C. Feinstein
2       A    Well, if there is a Management
3   Committee e-mail server, then the e-mail
4   folks would know how that backup occurs.
5       Q    Okay.
6       A    I don't know specifically what
7   is on that Management Committee server.
8       Q    And so the limit of what you
9   know about what they did is you guys told
10  them, go find everything, and they came
11  back to you and said we looked
12  everywhere; is that basically it?
13      A    So it wasn't quite as simple as
14  that.
15      Q    Okay.
16      A    There were a lot of people
17  involved.  A lot of daily consultations
18  and calls and discussions about have you
19  tried this, have you tried this and have
20  we looked here and have we isolated this.
21  It's a lot of technical detail.  I can't
22  recall the specifics, all of it, sitting
23  here today, because it was too much
24  detail.
25      Q    Understood.  I guess what I am

66 (Pages 258 to 261)

Veritext Legal Solutions

212 267-6868          www.veritext.com          516 608-2400

**262**

C. Feinstein

1  C. Feinstein
2  trying to make sure that we figure out is
3  whether or not you know whether or not
4  third-party outside vendor or Cloud-based
5  backup storage was actually investigated
6  and searched?  It sound like you don't
7  have that information.
8      A   Yeah, I don't have that
9  information specifically.
10     Q   Okay.  The
11  jegray@ExxonMobil.com e-mail address.
12     A   Yes.
13     Q   You testified that that's never
14  been used?
15     A   That's correct.
16     Q   How do you know that?
17     A   I checked it.
18     Q   And what do you do to check
19  that?
20     A   I go into EMURALD and it tells
21  me whether there is a date that says
22  whether the account's ever been used.
23     Q   Does the EMURALD system log
24  activity or does it just give you the
25  last used date or what is it?

**263**

1  C. Feinstein
2      A   It gives me the last used date.
3  In this one it says something to the
4  effect of never activated.
5      Q   Would EMURALD be able to tell
6  you the last used date of any e-mail in
7  the Exxon system?
8      A   No.  Not e-mail.  Remember,
9  this is -- this is -- this is an account.
10     Q   Right.  But this is an e-mail
11  account we are talking about, right?
12     A   Well, this would be -- this
13  would be -- this is the e-mail account,
14  so would it be able to tell me the
15  last -- EMURALD has -- so the Active
16  Directory and e-mail accounts are linked.
17  What I'm not sure, on that last -- last
18  used date is whether that is the last
19  date connected to the network, which is
20  what I think it would be, or whether it
21  would be connected to e-mail.  So I'm not
22  sure that I could answer that.
23     Q   I just want to make sure I
24  understand this.
25         So you go into EMURALD, you

**264**

1  C. Feinstein
2  look up -- I'm sorry, who is J.E. Gray
3  connected to?  Was it connected to
4  Mr. Woods?
5      A   Mr. Woods.
6      Q   And you look up Mr. Woods and
7  you see in the EMURALD system his Darren
8  Woods e-mail address and this e-mail
9  address?
10     A   No.  So Mr. Woods is set up
11  under Ms. Helble's account, just like
12  Wayne Tracker.
13     Q   His regular e-mail address is
14  connected to Ms. Helble?
15     A   No.
16     Q   So if you go into EMURALD and
17  you look at Mr. Woods, you will see his
18  Mr. Woods Exxon account.  If you go to
19  Mr. Tillerson in EMURALD, you will see
20  his Mr. Tillerson account.  If you go
21  into Ms. Helble, you will see presumably
22  Ms. Helble and Wayne Tracker and J.E.
23  Gray?
24     A   Correct.
25     Q   Does it tell you separately for

**265**

1  C. Feinstein
2  each of those e-mail addresses, by what
3  you just testified, the last time that
4  e-mail address was connected to the
5  e-mail network, or just the last time
6  Ms. Helble was connected to the network?
7      A   There are different dates for
8  each of those accounts.
9      Q   Okay.
10     A   What I said is I'm not sure
11  whether that is the date that it last hit
12  the network, or that's the date that it
13  hit e-mail.
14     Q   I guess that's where my
15  confusion is, what the difference between
16  hit the network or hit e-mail is.
17     A   I can log into network, but not
18  log into e-mail.
19     Q   Right, so if you are
20  Ms. Helble, you can log into the network
21  and check your own e-mail, for example?
22     A   That's correct.
23     Q   And you are not sure whether
24  what's in EMURALD shows the last date she
25  logged into the network --

67 (Pages 262 to 265)

**266**

C. Feinstein
2  A    Right.
3  Q    -- or whether it's the last
4  date she used her own e-mail account?
5  A    Right.
6  Q    I guess my confusion is:
7  Presumably, Ms. Helble has been working
8  at Exxon this whole time, right?
9  A    That's correct.
10  Q    And so it must give you some
11  actual recent date where Ms. Helble has
12  logged into the network, right?
13  A    Correct.
14  Q    So what are these separate
15  dates for the Wayne Tracker e-mail and
16  the J.E. Gray e-mail?
17  A    Those are different accounts.
18  Q    And they have their own dates?
19  A    They have their own dates.
20  Q    So I am sorry to go over this,
21  I just want to make sure we are clear.
22        It's one EMURALD page for
23  Ms. Helble, correct?
24  A    There are multiple tabs for
25  Ms. Helble's account.

**267**

C. Feinstein
2  Q    But she has one account.  You
3  go into EMURALD, I want to look up Ramona
4  Helble.
5  A    Right.
6  Q    You go into something.  Now
7  there are multiple tabs.
8        There is one for her e-mail
9  account; is that correct?
10  A    No.
11  Q    What is there?  When you log
12  into EMURALD for Ms. Helble, what do you
13  see?
14  A    So there is a tab that I go to
15  that says ID information.  And under
16  that, I can see that -- Ramona's primary
17  account, and then I could see the other
18  two accounts.
19  Q    And there is a date by each of
20  those accounts?
21  A    There is a date by each of
22  those accounts.
23  Q    And you are not sure whether
24  that date is the date that that -- I
25  guess this is my confusion with the

**268**

C. Feinstein
2  network versus the e-mail thing.  All of
3  those accounts are e-mail accounts,
4  right?
5  A    So -- let me see if I can
6  clarify.  Ms. Helble's is both her -- it
7  would be her network account and her
8  e-mail account.
9  Q    Okay.
10  A    Now, associated with it are two
11  nonperson accounts, which would be just
12  e-mail accounts.  And so I believe that
13  hers is the same.  I would have to look
14  at the record again to be absolutely
15  certain on this, but what's in there, I
16  think, is her network address and her
17  e-mail, which I think are the same,
18  right.  I would have to look at it again
19  to be sure, I may be wrong on this.  But
20  it tells me Ramona's account and then
21  that one is set up as a personal account
22  and then there are two nonperson, which
23  J.E. Gray has never been logged into and
24  then there is the date of the last
25  activity for the Wayne Tracker.

**269**

C. Feinstein
2  Q    So for the Wayne Tracker and
3  the J.E. Gray, it will tell you some
4  date, and you are not sure whether that
5  is the date that someone logged onto the
6  network as Wayne Tracker or as J.E. Gray
7  or whether the last time they sent an
8  e-mail as Wayne Tracker or J.E. Gray?
9  A    That's correct.
10  Q    But there is a date there for
11  both of them separately?
12  A    Right.
13  Q    Do you know what the date was
14  for the Wayne Tracker e-mail address?
15  A    As I recall, I believe it was
16  the date the account was disabled.
17  Q    And these dates should show up
18  for everybody's e-mail account at Exxon
19  in the EMURALD system, right?
20  A    So EMURALD has the identity
21  information, so yes, all of their
22  identity information should show up in
23  EMURALD.
24  Q    So if we want to find out the
25  last time someone either logged into the

68 (Pages 266 to 269)

**270**

1    C. Feinstein
2  network or used an e-mail account at
3  Exxon, the EMURALD system should be able
4  to tell us that, right?
5    A    The EMURALD system should be
6  able to tell us the last time -- again, I
7  would have to validate what exactly that
8  date is showing and exactly what that
9  account information is representing,
10  but -- but that information is tracked
11  for all of the -- the folks who we
12  maintain identity identification on
13  Exxon.
14    Q    Help me resolve this confusion.
15    A    Okay.
16    Q    So I understand, Ms. Helbie
17  signs on to the network, she doesn't
18  necessarily sign on to her e-mail, but
19  she signs on to her network, and then she
20  signs on to her e-mail using, what, a
21  password?
22    A    We have single sign on.
23    Q    So she signs on to the network
24  can automatically go into it?
25    A    She can automatically go into

**271**

1    C. Feinstein
2  it, yes.
3    Q    Can she bring up the Wayne
4  Tracker or the Gray e-mail boxes on her
5  own?
6    A    Not to my knowledge.  She does
7  not have the passwords to do that, and I
8  don't believe -- I don't believe that she
9  can.  I don't know, but I don't believe
10  she can.
11    Q    So she would log on, single
12  logon, put in her password.  That is
13  going to get her into her access into
14  Exxon's network, and, specifically, into
15  her own Ramona Helbie e-mail box?
16    A    That's correct.
17    Q    Back when Mr. Tillerson was
18  working at Exxon, he puts in his
19  password, it gives him access to the
20  network, correct?
21    A    Correct.
22    Q    It gives him access to his
23  rex.w.tillerson@ExxonMobil e-mail
24  address, correct?
25    A    It would have been set up to do

**272**

1    C. Feinstein
2  that, yes.
3    Q    Does it also automatically give
4  him access to the Wayne Tracker e-mail
5  box?
6    A    I don't know how that access
7  was set up.  I don't know how that was
8  managed.
9    Q    You don't know if he had to do
10  a separate log in to get into that?
11    A    I don't know how he got into
12  it, specifically.
13    Q    You don't know if there was a
14  password required?
15    A    I don't know.
16    Q    Is it possible that the EMURALD
17  page for Ms. Helble only records her
18  activity in those e-mail accounts and
19  that activity by someone else in the
20  Wayne Tracker or the Mr. Grey e-mail
21  account that were not accessed through
22  Ms. Helble --
23    A    Could you ask me that again?
24    Q    Sure.  So you said you went
25  into Ms. Helble's EMURALD and it says the

**273**

1    C. Feinstein
2  Gray account, never used.
3    A    Correct.
4    Q    Are you sure that means that no
5  one's ever sent an e-mail with the Gray
6  account, or does that just mean that no
7  one's used it via Ms. Helble's account?
8    A    No, it means that no one's ever
9  used of the account.
10    Q    How do you know that?
11    A    Because I checked -- I asked
12  the folks who were knowledgable about it.
13    Q    Who is that?
14    A    So I asked J.R. Brown and
15  Cynthia Leong and Ramona Helble.
16    Q    So these are the people who
17  know about what the EMURALD system tracks
18  in terms of logging nothing or logging
19  off with e-mail addresses; is that
20  correct?
21    A    Yes.  J.R. is very knowledgable
22  about EMURALD.  Ramona, about the
23  accounts.
24    Q    Is it both of these people or
25  one or both of them who would know the

69 (Pages 270 to 273)

**274**

1          C. Feinstein
2    information about how Mr. Tillerson would
3    have gained access to the Wayne Tracker
4    e-mail account?
5          A    So Ms. Helble would know that.
6    And I don't know that J.R. would know how
7    he gets the access.  So probably Cynthia
8    Leong would also know.
9          Q    Ms. Helble, you said she works
10   closely with the Management Committee
11   members, correct?
12         A    She is the ExxonMobil Bit
13   Representative For Corporate
14   Headquarters.
15         Q    Do you know whether or not she
16   has regular interactions with the
17   assistants to the Management Committee?
18         A    I don't know that.
19         Q    Do you know whether or not the
20   assistants to the Management Committee
21   are able to log into the Management
22   Committee members' network access and
23   e-mail?
24         A    I don't know about network
25   access.  I don't know what access they've

**275**

1          C. Feinstein
2    been delegated from their Management
3    Committee members.  In Exchange, it is
4    possible to delegate access, but I don't
5    know what they have.
6          Q    So just theoretically,
7    Mr. Tillerson's assistant, he could have
8    delegated to her full access to his
9    e-mail box; is that correct?
10         A    He -- he technically could
11   have.
12         Q    But you don't know whether or
13   not --
14         A    I don't know how that worked.
15         Q    And not just in Mr. Tillerson's
16   case, you don't know how that works at
17   Exxon period; is that correct?
18         A    I -- I -- I don't know how it
19   works in the Management Committee.  I
20   know that technically, it's possible, but
21   I don't know who's done what.
22         MR. OLESKE:  Just give us
23   five minutes, I think I am just
24   cleaning up here.
25         [A recess was taken from

**276**

1          C. Feinstein
2    5:03 p.m. to 5:07 p.m.]
3    BY MR. OLESKE:
4          Q    Just a few follow-ups.
5          Do you recall being involved in
6    a United Kingdom Audit Special Review in
7    2013?
8          A    I recall being involved to some
9    extent.  I recall some details of it.  I
10   was not heavily involved, so I am trying
11   to refresh my memory on it.
12         Q    Do you recall that there was
13   some issue involved there where there had
14   been some custom coding used and that had
15   caused a problem?
16         A    About -- I don't know if I knew
17   specifically what the issue was.  I
18   remember there was something I had to
19   help track to completion and handle the
20   reporting of it.  I guess I am including
21   a SAP.
22         Q    What is that?
23         A    SAP is a large ERP system that
24   we use.
25         Q    And what kind of custom coding

**277**

1          C. Feinstein
2    are you familiar with?
3          A    I don't recall what that was.
4    I would have to look at the details.  I
5    vaguely remember it.  I remember working
6    on it, but I don't remember the details.
7          (Feinstein Exhibit 17 was
8    marked for identification, as of this
9    date.)
10         Q    Now, the exhibits that I have
11   shown you are an e-mail dated -- the top
12   string of which is dated August 29, 2013,
13   and it's got a document attached to it.
14         Now, you are not a sender or a
15   recipient of any of these e-mails, so I
16   don't know whether you have seen this
17   e-mail chain before.
18         Does it look familiar to you?
19         A    No.  I remember the issue, but
20   I have never seen these e-mails.
21         Q    I want to direct your attention
22   to after the first full paragraph of the
23   e-mail, it says:  The current plan to
24   progress this with EMIT is...
25         And then it says:  UB to follow

70 (Pages 274 to 277)

**278**

C. Feinstein

1
2  up on certain items outlined below with
3  Connie Devine.
4      A    Right.
5      Q    Now, that was you, correct?
6      A    That was me.
7      Q    Do you know who UB is?
8      A    UB, it looks like this would be
9  Ulysses Burgess, I believe.  I would have
10  to keep reading, but I think it's UB.
11      Q    Who is Ulysses Burgess?
12      A    He is an EMIT manager who, at
13  that time, was responsible for the
14  financials, SAP financials module.  The
15  EMIT support of the SAP financials
16  module.
17      Q    And then if I turn your
18  attention to the attachment.
19      A    (Complying.)
20      Q    And if you just take a look at
21  that first paragraph under "Dear
22  Mr. Norwood," does that refresh your
23  recollection of how this issue you were
24  involved in, in 2013, got an audit, in
25  the UK?

**279**

C. Feinstein

1
2      A    I don't know if I saw this
3  level of detail or not.
4      Q    Okay.
5      A    I will just keep reading it for
6  a minute.  I do remember this part, the
7  last part.  I don't think I saw this
8  e-mail, but if not, I recall what the
9  issue was about.
10      Q    You do?
11      A    Yeah, vaguely, I recall what
12  the issue was about.
13      Q    So which part of it has
14  refreshed your recollection?
15      A    The missing bespoke coding was
16  restored to the mapping table by EMIT.
17      Q    So are you talking about on the
18  second page of this document underneath
19  Compounding Factors?
20      A    Yes, under Compounding Factors.
21      Q    And this is the section where
22  it says:  In November 2012, the missing
23  bespoke coding was restored to the
24  mapping table by EMIT following a
25  separate investigation into incorrect

**280**

C. Feinstein

1
2  coding for a climate change accounting.
3      That is what you are referring
4  to?
5      A    Yeah.  I don't think I knew at
6  the time what this issue was about.  I
7  don't think I knew that it was related to
8  climate change.  Let me finish reading,
9  here.
10      Yeah, I recall there was a
11  change in the tables that had to be made,
12  but I don't think I knew what the details
13  of the issue were about, just that we had
14  to make some coding changes on the SAP
15  table, and the timing of how soon that
16  could be done.
17      Q    So at the time, were you aware
18  of the substance of this issue with
19  climate change accounting?
20      A    I don't think so.  I don't
21  think I knew what the -- as I recall, you
22  are jogging my memory, here, really big
23  time.  I don't think I knew that it was
24  related to climate change.  I don't think
25  I had that much detail on it.

**281**

C. Feinstein

1
2      Q    Do you know whether or not
3  documents relating to an investigation
4  into climate change accounting were
5  searched in this investigation, in
6  response to this investigation?
7      A    Well, I've seen the search
8  terms and the term "climate" would --
9  would have been searched, so I would
10  presume that would include -- you know, I
11  don't know who all of the custodians are.
12      Q    I guess that's my question,
13  is --
14      A    No, I don't know -- I don't
15  know who -- I don't have any insight into
16  how the custodians were selected, or who
17  those custodians are, other than what I
18  have read.
19      Q    Right.  Do you know who the
20  people at Exxon who would have been
21  involved in a climate change accounting
22  investigation in 2012 would have been?
23      A    I think this is -- I think it's
24  people on the e-mail, but I'm checking to
25  see.

71 (Pages 278 to 281)

**282**

```
 1           C. Feinstein
 2     Q    Okay.
 3     A    Okay.  So ask me your question
 4  one more time, please?
 5     Q    I will scratch that.
 6          Did you ever have any dealings
 7  with Mr. Roger Adams?
 8     A    I have dealt with Mr. Adams in
 9  the past.
10     Q    In what capacity?
11     A    He was the UK Audit Manager.
12     Q    What is SAP?
13     A    SAP is a large enterprise
14  computing application.
15     Q    Where is it located?  Like
16  where is data for SAP stored?
17     A    So data has historically been
18  stored onsite in either Houston or
19  Dallas.
20     Q    Is it used globally by Exxon
21  employees?
22     A    It is one of our global
23  systems.  SAP -- yes, it's used globally.
24     Q    So folks all over the world
25  will -- do they log into the SAP system
```

**283**

```
 1           C. Feinstein
 2  to use it?
 3     A    Those folks who have certain
 4  responsibilities would do that.
 5     Q    And will they conduct
 6  communications by SAP through the SAP
 7  system?
 8     A    You really can't do
 9  communications through SAP.
10     Q    Will they create documents that
11  are stored in the SAP system?
12     A    No.  SAP is a -- is an online
13  transactional processing system.  So we
14  use modules like for accounting or for
15  maintenance activities or for sales and
16  distribution, but it's not a -- it's not
17  an e-mail-type system.
18     Q    Right, no, but when I say
19  "document," I am also including, for
20  example, spreadsheets, tables.
21          Will those be stored in the SAP
22  system?
23     A    SAP is made up of tables.
24     Q    It is, okay.
25          And are these used in the
```

**284**

```
 1           C. Feinstein
 2  accounting functions at ExxonMobil?
 3     A    Yes.  Our accounting functions
 4  are primarily very heavily done through
 5  SAP.
 6     Q    Do you know whether or not SAP
 7  was searched at any point in response to
 8  the subpoena?
 9     A    I do not know that.
10     Q    Do you know whether or not
11  reserve accounting is performed for the
12  SAP system?
13     A    I don't know.  I'm not on the
14  business side.  I don't know exactly
15  what -- what they do.
16          MR. OLESKE:  I will give you
17     what we want to mark as Exhibit 18.
18          (Feinstein Exhibit 18 was
19     marked for identification, as of this
20     date.)
21     Q    Let me show when you have had a
22  chance to review this.
23     A    (Reviewing exhibit.)  Okay.
24     Q    Do you recognize this document?
25     A    I do.
```

**285**

```
 1           C. Feinstein
 2     Q    Do you recall being on a
 3  teleconference with
 4  Pricewaterhousecoopers in May of 2013?
 5     A    I vaguely recall it.
 6     Q    There are two dates.  If you
 7  look at the front page, it says May 9,
 8  2013, and the next says it's May 9, 2014.
 9          Do you know which is the
10  correct date?
11     A    I don't know.  It's probably --
12  let me look at it -- probably 2014.
13     Q    And what is the purpose of this
14  document?
15     A    This document is when we have
16  our Pricewaterhouse auditors come in to
17  do our S-A- -- is this for SAP?  This is
18  for Pricewaterhouse auditing.  It looks
19  like -- it looks like it's for our SOX
20  audit, but I can't tell that for sure.
21     Q    If we look at the first
22  substantive slide where it says:
23  Overview of IT Changes in ExxonMobil?
24  It's the very first page there.
25     A    (Complying.)
```

72 (Pages 282 to 285)

**286**

1         C. Feinstein
2    Q    Does this accurately reflect
3  the different subject matters relating to
4  IT changes that were discussed on this
5  call?
6    A    As far as I recall.
7    Q    And it says:  Application
8  support, one of the items.  SAP and
9  non-SAP, Connie Devine?
10   A    Correct.
11   Q    That was you, correct?
12   A    Correct.
13   Q    And so is it fair to say that
14 you were responsible for updating PWC
15 about IT changes that have to do with
16 applications at ExxonMobil; is that
17 correct?
18   A    SOX critical applications.
19   Q    By "SOX," you mean
20 Sarbanes-Oxley?
21   A    Sarbanes-Oxley.
22   Q    Rita Cormier -- am I
23 pronouncing it correctly?
24   A    Yes.
25   Q    She is listed here for both

**287**

1         C. Feinstein
2  Chemicals and Corporate.
3         What her job at Exxon?
4    A    She is a Risk Advisor in the IT
5  Risk Management group.
6    Q    Like you; is that correct?
7    A    Yes.  I am a Manager, and she
8  is a Risk Advisor, but very much like
9  what I do.
10   Q    Is yours a management-level
11 position; hers is not?  Is that the
12 distinction?
13   A    That's correct.  That's
14 correct.  This was written at a different
15 time, but --
16   Q    Before you had become --
17   A    No.  At this time I was the
18 S&C.  I believe I was responsible for --
19 I have to look back to see the dates, but
20 I was either a supervisor or a manager,
21 and I was responsible for the S&C support
22 for the applications organization, which
23 included SAP and non-SAP applications.
24   Q    And your responsibilities have
25 changed since this time?

**288**

1         C. Feinstein
2    A    My responsibilities are broader
3  now.  They have changed since that time.
4    Q    Do you supervise someone now
5  who was in the role you were in then?
6    A    No.
7    Q    Was the role that you were in
8  then subsumed into the role that you are
9  in now?
10   A    No.
11   Q    Who does the role that you did
12 then?
13   A    Karen Vieira.
14   Q    Who is John Hickman?
15   A    John Hickman is a Controls
16 Advisor.
17   Q    Excuse me?
18   A    Risk Advisor, similar to Rita
19 Cormier.  He is a Risk Advisor.
20   Q    And Ken Bloomfield?
21   A    I believe that he is a retired
22 Risk Advisor.
23   Q    This next name, maybe you can
24 help me out with it.  Wole Olugbenle?
25   A    Don't know Wole Olugbenle.

**289**

1         C. Feinstein
2    Q    And then skipping you, Mr. --
3  or Cliff Carter; who is that?
4    A    He is an EMIT employee.
5    Q    And he was responsible for SAP
6  Unix Infrastructure?
7    A    Right.
8    Q    So that is different for what
9  you were responsible for, because were
10 you responsible for applications that ran
11 on SAP; is that correct?
12   A    I was responsible for the
13 application for the controls and
14 compliance activities on the SAP
15 applications and Middleware, and his is
16 infrastructure.
17   Q    And then Eddie Mc Brien, what
18 does he do?
19   A    Eddie Mc Brien is also an IT
20 employee in the Mainframe area.
21   Q    It says "Mainframe
22 Infrastructure."
23        When we were talking earlier
24 about infrastructure issues, would
25 Mr. Mc Brien be someone who knew about

73 (Pages 286 to 289)

290

1         C. Feinstein
2    the infrastructure issues we talked about
3    earlier?
4        A    Which infrastructure issues?
5        Q    When you were talking about
6    infrastructure, for example, for the
7    servers?
8        A    Well, he's Mainframe.
9        Q    So he wouldn't be?
10       A    He wouldn't be.
11       Q    Did any of the changes -- this
12   document is about changes to Exxon
13   Mobil's IT systems, correct?
14       A    Yes, this is IT changes.
15       Q    Did any of these major changes
16   have any impact on the way that Exxon
17   would collect or produce documents in
18   response to an investigation or
19   litigation?
20       A    No. Let me check it, but I
21   don't think so. Let me just check. Oh,
22   I'm sorry, I'm wrong. So there was the
23   e-Discovery Business Processing and
24   Engineering Activities.
25       Q    Where is that? What page are

291

1         C. Feinstein
2    you on?
3        A    Page four.
4        Q    But this was not something --
5    were you involved in this, or was this
6    just Ms. Cormier?
7        A    No. I was not involved in
8    this.
9        Q    If we go to page seven, this is
10   you, though, right? This is the stuff
11   that you were involved with?
12       A    Page six -- no, page seven
13   is -- oh, wait.
14       Q    Do you have two page sevens?
15       A    Two page sevens. I am on the
16   second page seven.
17       Q    There you go. Where it says
18   "Application Support" at the top?
19       A    Right.
20       Q    And it has your former name,
21   correct?
22       A    That's correct.
23       Q    There are a series of bullet
24   points under Application/Business
25   Systems; do you see that?

292

1         C. Feinstein
2        A    Yes, I do.
3        Q    The last one says: Provide and
4    Support For Identity and Access
5    Management Implementations?
6        A    That is correct.
7        Q    What is that?
8        A    That was a project that we
9    implemented a new tool that was initially
10   aimed at providing better management for
11   SAP access.
12       Q    So did this have any connection
13   with the EMURALD or ADA systems that we
14   were discussing earlier?
15       A    No, I don't think it would
16   have.
17       Q    Would anyone else at the
18   company have a better idea of whether or
19   not that process had impacted EMURALD or
20   the ADA systems?
21       A    Possibly.
22       Q    Who would that be?
23       A    J.R. Brown.
24       Q    And then I guess I have a
25   similar question on the very last bullet

293

1         C. Feinstein
2    point on this page. Continue to
3    Implement Role-Based Access Through IAM.
4        What is role-based access?
5        A    So role-based access is access
6    that is granted depending on the role
7    that a person is in, as opposed to I'm
8    going to give this person this access,
9    this person this access. It's more
10   efficient if you can define what role
11   that person plays.
12       Q    Everybody who is a Controller
13   gets access, for example?
14       A    Everybody who is a Financial
15   Analyst gets this access. Everybody who
16   is Maintenance Specialist gets this
17   access.
18       Q    And are you likewise not of
19   whether or not that would have impacted
20   EMURALD or ADA, or does that differ from
21   your previous answer?
22       A    That would not have impacted
23   EMURALD or ADA.
24       Q    You mentioned being involved in
25   the Mayflower Pipeline litigation; is

74 (Pages 290 to 293)

**294**

C. Feinstein
1
2  that correct?
3      A    I was deposed.
4      Q    You were deposed in that case.
5          Were you deposed with respect
6  to your role in compliance with discovery
7  in that case?
8      A    E-Discovery.
9      Q    Okay.  What role did you play
10  in e-Discovery in that case, and when did
11  that start?
12      A    I don't remember the exact
13  dates.  I can't remember if it's 2015 or
14  2016, but essentially the same role that
15  I play today.  My team supported the
16  e-Discovery collection process.
17      Q    And you are not sure of whether
18  or not your role in that began 2015 or
19  2016; is that right?
20      A    I am not sure when I was
21  deposed.  I don't remember the exact
22  date.
23      Q    I am not asking about when you
24  were deposed.  I am asking about when you
25  actually started working on

**295**

C. Feinstein
1
2  e-Discovery --
3      A    Oh.
4      Q    -- in response to that lawsuit?
5      A    Well, I was in e-Discovery
6  before that -- that came up.
7      Q    Oh, I understand.
8      Okay.
9      Q    I guess what I'm -- you were in
10  e-Discovery, the Mayflower litigation
11  came in, and you did work on it, correct?
12      A    Yes.
13      Q    Do you remember when that
14  started; when you started doing work on
15  e-Discovery response for the Mayflower
16  litigation?
17      A    If you are asking when I
18  personally became involved, or when my
19  team started responding?
20      Q    Whichever started first.
21      A    I don't remember the dates off
22  the top of my head.  I would have to look
23  it up.  I just don't remember.
24      Q    Did you become involved at the
25  same as your team, before or after your

**296**

C. Feinstein
1
2  team?
3      A    I would have to look it up.  I
4  think it was after my team did the
5  collections, but I would have to check
6  that.
7      Q    Do you know whether or not the
8  company followed the same policy with the
9  Mayflower litigation that it did in this
10  one; in other words, having the
11  Management Committee documents segregated
12  and separately collected and reviewed?
13      A    I don't know on the Mayflower.
14      Q    Do you recall whether or not
15  your team processed Management Committee
16  custodians as custodians through your
17  team?
18      A    I -- I -- I don't know.  I
19  don't -- I don't know who the custodians
20  were.  I don't usually see the list of
21  custodians.
22      Q    Was there an allegation that
23  documents were lost in the Mayflower
24  litigation?
25      A    I don't know the answer to

**297**

C. Feinstein
1
2  that.  I don't know the answer to that.
3      Q    Were you asked at your
4  deposition about any documents being
5  lost?
6      A    Let me think about that.  I was
7  asked about hard copy documents that were
8  quite old.  I was asked a lot of
9  questions about whether we had a separate
10  network.  I don't remember any questions
11  about whether documents were lost.
12      Q    You were asked questions about
13  whether or not Exxon had a separate
14  network to hold documents?
15      A    Right.  It was a
16  misunderstanding.
17      Q    Were they similar to my
18  questions about there being a third-party
19  vendor or Cloud-based --
20      A    Sort of similar to that, but
21  different.
22      Q    And you were deposed sometime
23  in 2015 or 2016?
24      A    I think it was -- I think it
25  was 2015.  I believe it was 2015.  I

75 (Pages 294 to 297)

298

1          C. Feinstein
2    would have to look it up.  I don't recall
3    the date.
4          Q      And do you recall, did you not
5    know the answer to those questions then?
6          A    I did know the answer to most
7    of -- there were many questions that they
8    asked me that I did know the answer to.
9    There were some that I didn't.
10         Q    And were those questions that
11   you didn't know the answer to, did they
12   include questions about whether the
13   company had another network or a
14   third-party server or a cloud-based
15   system for storing documents?
16         A    Ask me that question one more
17   time, make sure I understand.
18         Q    Sure.  Were there any questions
19   that you weren't able to answer that
20   involved cloud-based storage or
21   third-party vendor storage of Exxon data?
22         A    I -- I'd have to look at the --
23   the transcript.  I don't recall them
24   asking me that specifically, but, you
25   know, it's been a long time.  I don't

299

1          C. Feinstein
2    remember exactly what they asked.
3          Q      Were you the only
4    representative of Exxon Mobil's IT
5    department who was deposed in that case?
6          A    I don't know the answer to
7    that.
8          Q      Did you ever discuss that case
9    with Bob Lauck?
10         A    No, not to my knowledge.
11         MR. OLESKE:  Last one.
12   Exhibit 19.
13         (Feinstein Exhibit 19 was
14   marked for identification, as of this
15   date.)
16         Q    Ms. Feinstein, I have shown you
17   as Exhibit 19 what appears to be an
18   e-mail from Mr. Swiger dated April 22,
19   2011.  You are not a sender or a
20   recipient or copied on any of this.
21         My question goes specifically
22   to an issue that we have had with this
23   production, which is, if you go down to
24   the bottom of this e-mail chain, which is
25   actually an e-mail from Sherri Stuewer to

300

1          C. Feinstein
2    Mr. Swiger.  Do you see that e-mail?  It
3    begins "Andy," and then continues,
4    "yesterday I reviewed the attached
5    handout"?
6          A    Yes.
7          Q      At the end of that paragraph,
8    you see there is a bracket that says
9    "Statement," and it says, quote, "NGLCA
10   April 20, 2011, with mdolan.ppt, close
11   quote, deleted by Andrew P
12   Swiger/R/Dallas/Exxon Mobil"?
13         A    Right.
14         Q      What does that mean?  In other
15   words, is it possible to delete the
16   attachment to an e-mail without deleting
17   the e-mail, itself?
18         A    Yes.
19         Q      How does one do that?
20         A    I think you do that when you --
21   I don't remember if it's reply or
22   forward, but depending on which -- which
23   methods you use to reply -- actually, I'm
24   not sure when this message comes up.  I
25   would have to talk to the e-mail folks to

301

1          C. Feinstein
2    see when this message comes up.  I'm not
3    sure if it happens as a result of that,
4    or how it is possible to forward an
5    e-mail without an attachment.  But I
6    don't know if that causes this message to
7    come up or not, so I couldn't speak to
8    specifically how that transpired.
9          Q      Do you know whether or not
10   Exxon has the capability to recover
11   attachments that have been deleted from
12   e-mails after the fact?
13         A    I don't know that.
14         Q      So is it fair to say that you
15   don't -- sitting here today, you don't
16   really know how it works when someone
17   deletes an attachment to an e-mail, how
18   that gets recorded in the system, or what
19   happens to that attachment afterward?
20         A    That's correct, I'm not sure.
21         MR. OLESKE:  I think we are
22   done.
23         (Time noted:  5:35 p.m.)
24
25

76 (Pages 298 to 301)

**302**

1
2
3          LITIGATION SUPPORT INDEX
   WITNESS        EXAMINATION BY        PAGE
4  C. Feinstein    Ms. DeRoche      3
5               Mr. Oleske      232
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**304**

1
2       E X H I B I T S (CONTINUED):
   FEINSTEIN
3  EXHIBIT      DESCRIPTION          PAGE
4
   Exhibit 18  PNYAG 0182555        284
5
   Exhibit 19  EMC 2742078          299
6
7
      (Reporter retained exhibits.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**303**

1
2           E X H I B I T S
   FEINSTEIN
3  EXHIBIT      DESCRIPTION          PAGE
4
   Exhibit 1   PNYAG 0182556        15
5
   Exhibit 2   Subpoena, 3/24/17, 3 pages   20
6
   Exhibit 3   EMC 77-119           23
7
   Exhibit 4   e-mail, 4/4/17, to J. Oleske
8             from D. Toal and GREF page   30
9  Exhibit 5   EMC 2747763-2747773   42
10 Exhibit 6   EMC 2747736-2747773   45
11 Exhibit 7   EMC 2747774-2747816   48
12 Exhibit 8   EMC 2747908-2747924   54
13 Exhibit 9   Subpoena for Production of
              Documents            62
14
   Exhibit 10  letter, 12/31/16 to OAG and
15            material for production with
              Bates ranges         72
16
   Exhibit 11  letter, 4/24/17 to J. Oleske
17            from D. Toal, Exhibit A-1,
              Exhibit A-2          86
18
   Exhibit 12  EMC 1852537-1852542   109
19
   Exhibit 13  letter, 3/21/17 to J. Oleske
20            from N. Ahmed, Exhibit A   121
21 Exhibit 14  affidavit, 3/31/17    160
22 Exhibit 15  amended affidavit, 4/21/17  160
23 Exhibit 16  4/19/17 letter to J. Oleske
              from Paul Weiss, Exhibit A  160
24
   Exhibit 17  EMC 1205291-1205302   277
25

**305**

1
2           CERTIFICATION
3
4       I, JAMIE ANN STANTON, a
5  Notary Public, do here hereby certify
6  that the foregoing witness, CONNIE
7  FEINSTEIN, was duly sworn on the date
8  indicated, and that the foregoing is a
9  true and accurate transcription of my
10 stenographic notes.
11      I further certify that I am
12 not employed by nor related to any
13 parties to this action.
14
15
16  _____
17  JAMIE ANN STANTON
18
         *    *    *
19
20
21
22
23
24
25

77 (Pages 302 to 305)

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM
NYSCEF DOC. NO. 194
INDEX NO. 451962/2016
RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 450 of 553   PageID 877

Page 1

**A**

**A-1** 303:17
**A-2** 303:17
**A-3** 117:2,7
**A-8** 120:16
**A-9** 121:7
**A-Y** 205:23
**a.m** 1:8 47:25,25
89:17
**A@ExxonMobil.c...**
224:17
**ability** 6:12,19
43:14 51:17 87:19
159:2
**able** 22:19,22,25
23:4 59:10 140:24
150:17 158:14
159:3 199:11,14
230:11,13 241:24
242:6 260:8 263:5
263:14 270:3,6
274:21 298:19
**absolutely** 59:4
102:9 108:14
128:4,15,17
233:23 268:14
**abundance** 176:6
**access** 45:8 107:19
108:20 124:3,6
125:2,3,4,7,13,16
126:9 127:9,13,20
127:25 128:6
135:21 137:12
141:22 156:7,7,14
156:15,18,18
157:2,4 162:15,16
162:19 163:4
170:17,21,22,23
170:24 171:2,5,6
173:15,21 179:8,9
179:13,14 184:24
185:3,9,10 192:17
193:24 194:2,4,25

212:12 217:7,11
218:6 232:6
237:13 241:17,18
241:23 243:19,22
244:8 245:23
271:13,19,22
272:4,6 274:3,7,22
274:25,25 275:4,8
292:4,11 293:3,4,5
293:5,8,9,13,15,17
**accessed** 272:21
**accommodate** 6:5
**account** 44:15 71:16
78:19 81:10,13,25
82:21 91:18,20,20
91:25 92:5,13 93:8
93:9,15,16 94:24
97:19 98:16 132:9
132:17 146:22
155:21 158:16
159:22 175:23,25
192:6,19 196:8
197:5 198:7,10,17
198:19,24 199:2,5
200:15,22 203:10
203:18 204:18,22
205:3,6 206:12,20
206:22 207:8,10
207:11,12 208:23
209:3,5,6 210:16
210:24 211:14
219:16,18,23,25
220:3,8,10 223:21
227:17 228:14
229:15 231:23
233:17 234:5,9,16
234:20,22 235:4
235:13 236:23
237:3 238:2,8,13
238:19 239:13
241:4,15 244:16
246:13,18 249:14
263:9,11,13

264:11,18,20
266:4,25 267:2,9
267:17 268:7,8,20
268:21 269:16,18
270:2,9 272:21
273:2,6,7,9 274:4
**account's** 262:22
**accounting** 12:24
280:2,19 281:4,21
283:14 284:2,3,11
**accounts** 44:24
58:11 82:13 91:10
91:12 93:6 154:16
155:18,22 175:19
200:13 203:12
209:10 210:10
212:10 224:6,9
225:10,12 234:9
235:12 239:8,16
263:16 265:8
266:17 267:18,20
267:22 268:3,3,11
268:12 272:18
273:23
**accurate** 24:23
305:9
**accurately** 25:11
286:2
**achieve** 241:6
**acronym** 9:12
**action** 8:10,12
225:23 305:13
**activated** 263:4
**active** 43:7,14,24
44:2,4,9,11,24
45:18 46:4 47:11
192:14 193:5
196:12 198:3,6,9
198:13,25 199:15
200:21,22 234:21
235:2,6 237:18,22
237:23,25 239:21
263:15

**activities** 225:24
283:15 289:14
290:24
**activity** 226:2
262:24 268:25
272:18,19
**actual** 8:21 74:18
203:4 259:6
266:11
**AD** 200:15
**ADA** 196:8 198:24
199:5 201:6
206:12 207:8,10
207:11 235:14
236:23 237:15,22
239:11,19,21
292:13,20 293:20
293:23
**Adams** 282:7,8
**add** 199:17
**addition** 52:3
123:12 185:8
**additional** 56:12,15
95:17,23 117:19
141:7 159:4 176:7
176:11 177:8,23
179:10 180:23
181:16 190:12
217:18 218:12
254:13
**address** 6:23,25
92:9 196:7 197:19
197:21 198:11,18
198:20 199:4
201:23,25 202:16
203:7,9 205:15
206:11 207:5,9,25
208:21 220:5,12
224:16,25 237:8
240:3 244:20,25
245:5 262:11
264:8,9,13 265:4
268:16 269:14

271:24
**addresses** 45:2 92:8
92:10 196:23
197:2,7 198:2
199:12 200:2,5,23
201:5 207:17,21
207:22 210:4
225:3 239:6 265:2
273:19
**addressing** 245:16
245:18
**adequate** 64:24
66:15
**admin** 116:15
118:13,14,15,21
118:22
**administered**
125:11,12
**administers** 125:16
**administrator** 8:18
8:23
**admins** 76:11 77:3,6
77:9,12,14,24
100:18,25 101:10
101:16,23 106:25
107:5,10 114:24
115:14 118:25
127:9,24 128:5
133:17 153:3,13
156:25 170:14
183:22 209:22
**admins'** 100:21
102:13
**advisor** 13:13,14,15
14:4 15:2 195:2
202:5 287:4,8
288:16,18,19,22
**advisors** 11:5 35:13
**affect** 4:12 6:12,13
6:18,20
**affidavit** 9:5 17:18
18:5,8,10,12,24
19:2,12 20:18,21

97:24 160:8,20
161:2,11,13 162:2
162:12 167:6,8
174:6 186:10
192:2 206:25
212:16 234:18
240:8,9 303:21,22
**affiliate** 9:17 208:9
**affiliated** 200:13
203:17 206:11,13
**affiliates** 201:20
**affiliation** 206:17
208:4
**afterward** 301:19
**age** 46:17 47:3,5
**ages** 47:8
**aggregating** 224:23
225:2
**ago** 190:5
**agreed** 190:11
**Ahmed** 2:20 20:9
122:2 303:20
**aimed** 134:4 292:10
**Albers** 112:24 113:5
114:2 117:16
118:3 123:7,23
124:11 128:2
129:5,24 131:6
133:4 135:4
137:25 138:9
139:22
**Albers'** 130:24
**alcohol** 6:11
**Allan** 6:25
**allegation** 296:22
**amended** 161:10
303:22
**Americas** 2:17
**amount** 14:9
**analysis** 44:17
132:15 133:2
159:9
**Analyst** 164:19

293:15
**and/or** 26:23 27:23
27:25 143:16
**Andrew** 120:17
300:11
**Andy** 300:3
**Ann** 1:13 305:4,17
**anonymity** 241:10
241:13
**answer** 4:23 5:7,13
5:23 6:6,12,19
17:10,12 27:12,15
29:20,24 41:22
45:3 59:10 65:8
85:6 120:8 131:4
135:19 137:21
142:5 184:17
190:6 229:23
263:22 293:21
296:25 297:2
298:5,6,8,11,19
299:6
**answered** 60:5
188:23 189:5
**answering** 5:17 60:8
74:8,9 146:9
168:19 203:14
**answers** 4:20 40:19
138:8
**anybody** 132:18
226:18
**apologize** 218:15
**Apparently** 137:17
**appears** 299:17
**Apple** 157:9
**applicable** 49:3 60:7
**applicants** 12:19
**application** 28:7
187:9 282:14
286:7 289:13
291:18
**Application/Busi...**
291:24

**applications** 10:9,24
14:17,21 162:22
286:16,18 287:22
287:23 289:10,15
**applied** 75:9,15,18
76:22 116:16
124:9 152:25
153:9
**applies** 189:22
190:25
**apply** 35:10,11
56:24 68:22
185:18
**appropriate** 10:22
36:24 42:8
**appropriately** 11:4
37:15 38:5 238:21
**approximately**
252:9
**approximation**
115:10 154:19
**April** 1:7 40:3 63:6
71:11 73:15,17
78:7 105:21
119:25 132:24
160:11,13 210:7
299:18 300:10
**Archana** 139:7
146:5 185:14
**architecture** 61:17
237:18,19,20
**archive** 130:7,11,12
137:16
**archived** 127:7
**Archives** 126:21,23
127:10,15 128:9
135:2 136:4,5,11
137:24
**area** 11:6 13:24
14:16 70:16
164:15 193:12,13
193:15 289:20
**areas** 90:8

**FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM**

NYSCEF DOC. NO. 194

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 452 of 553   PageID 879

**Page 3**

**ascertained** 80:10
**asked** 18:5,9,18 48:2
49:5 100:25 101:4
109:14 143:25
144:3,4,8,15,20
174:18 195:3
206:4 209:3,5
232:3 252:21
253:3 260:6
273:11,14 297:3,7
297:8,12 298:8
299:2
**asking** 4:18 5:6
17:19 41:16 43:13
47:10 49:8 65:14
83:24 84:2,4 85:3
85:5 129:20
188:22 189:3
190:4,6 215:6
294:23,24 295:17
298:24
**assess** 82:9
**assessments** 11:3
**assets** 162:20 163:4
214:12 243:14
**assign** 235:3
**assigned** 12:18
129:3 192:6 233:8
**assignment** 12:22
12:25 14:10,14
**assist** 54:13,16
**assistant** 12:16
210:21 211:12
275:7
**assistants** 156:11
171:9 185:24
210:9,12,13,15
211:10 226:9,17
226:21 232:5
274:17,20
**assisted** 181:5,7
**associated** 198:6
209:10 239:9,17

268:10
**associates** 199:25
200:3
**association** 208:4
**assume** 5:24 203:23
204:23
**Atlas** 111:12,17
163:6,9,11 164:22
164:23 166:20,21
214:24 215:15
218:6,9,9,18,23
**attached** 239:13
242:8 277:13
300:4
**attachment** 102:6
278:18 300:16
301:5,17,19
**attachments** 250:15
250:18,22 251:2
301:11
**attempt** 82:20
158:22 251:9
**attention** 277:21
278:18
**attorney** 1:12 2:5,16
3:9,10
**attorney/client** 4:5
5:14 19:19 76:24
**attorneys** 5:16 8:22
17:25
**audit** 11:7,7 276:6
278:24 282:11
285:20
**auditing** 88:16,18
285:18
**auditor** 15:17
**auditors** 285:16
**audits** 11:2
**August** 277:12
**authenticate** 163:3
**automated** 28:14
37:14,20,22 38:2
38:17,19 43:9,15

79:7 89:11 90:9
94:24 130:6,8
131:9,10 159:23
213:17,17 214:9
219:7 220:24
236:15 237:2
**automatic** 36:25
37:18 61:20 227:9
236:14
**automatically** 221:2
229:6 235:11
236:21 270:24,25
272:3
**available** 98:13
129:10 144:11
150:7 173:7,8,12
184:11 187:10,12
187:23 226:23
227:4,6 229:14
**Avenue** 2:17
**aware** 52:6 63:11,13
63:15 64:23 84:21
100:13 131:25
132:6 133:22
134:2 148:10
164:10,15 206:6
210:9,12,14,15
224:4 280:17

_____

**B**
**B** 303:2 304:2
**back** 12:9,25 13:11
13:12 14:2,2 19:11
34:6 51:3,11 54:7
61:2,6 64:22 65:15
68:24 74:4 75:2
81:4,16 84:15 89:9
90:20 91:7 97:22
104:9,10 105:15
105:16 108:13
114:20 116:7
120:15 128:14
129:13 131:13,18
139:17 143:5

150:18 151:14
152:21 159:3,3
163:24 165:12,21
172:22 176:3
178:19 184:13
186:3 190:8
197:25 199:10
200:18 202:21
206:22,23 213:7
218:15 227:23
228:16 229:3,4
230:11 248:5,7
252:5 253:6
254:21 256:13
261:11 271:17
287:19
**backed** 53:18,19
59:20,21,22 61:25
62:8,12 99:10,12
99:14,24 100:4
147:17,18 157:8
157:15,20 255:18
258:8,9 260:23
**backing** 255:4
**backs** 259:2
**backup** 28:23,25
29:5 45:17 46:13
47:2 48:21 49:12
49:20,25 53:23
54:10 59:14,18,22
59:23 60:3,9 82:5
82:9 83:6,8,8,20
83:22 89:7,9 95:9
96:17,24 100:8,9
100:12 143:10
144:5 146:23
147:21,24 149:6
151:15 157:17
193:8 230:2,12,23
231:12,15 247:23
254:2,25 255:10
255:11,12,22,24
257:13 258:5

261:4 262:5
**backups** 28:12
  46:19,21 47:4,6,10
  50:14,15 54:14,17
  60:2,15 79:10 89:8
  90:23 94:21 95:11
  98:14,15,18 99:21
  143:6,8,14 144:24
  145:8,9,12,19
  146:7,11,16 149:8
  149:12 150:4,7
  157:10,24 230:22
  231:7 234:2
  247:22 248:5
  258:2
**Barr** 164:7
**based** 60:19 107:15
  107:17 112:16
  115:17 156:3
  214:18
**basic** 29:11 31:14
**basically** 56:11
  144:12 244:15
  251:3 261:12
**basis** 19:7 26:11
  28:25 109:10
  153:19,20 240:7,9
**Bates** 72:18 122:23
  303:15
**Bay** 12:18
**bear** 39:18 147:9
**began** 12:9 71:18
  113:15 294:18
**beginning** 127:3
  218:7,9 248:8
**begins** 300:3
**behalf** 8:5 52:16,21
**belief** 109:11
**believe** 8:3 13:11
  15:11 22:11 30:3,8
  32:2,15 33:14 34:7
  38:24 42:23 53:13
  58:23 59:2,9 66:12

70:2 73:11,24
  76:24 87:23 95:5
  100:20,23 101:19
  102:5 109:5 113:9
  114:8 122:19
  123:16 128:3,4
  147:3,9 155:11
  156:22 157:19
  168:6,9 172:15
  178:4 182:17
  185:25 186:3,4
  200:3 208:10
  212:11,13 231:10
  233:21 252:15,17
  252:21 253:2
  254:2 258:4,16
  268:12 269:15
  271:8,8,9 278:9
  287:18 288:21
  297:25
**belong** 237:9
**bespoke** 279:15,23
**best** 12:11 87:19
  116:11 118:11
  131:3 203:22
**better** 292:10,18
**bifurcated** 215:25
  216:10
**big** 81:15 280:22
**bin** 133:11
**bit** 81:19 123:9
  201:9 202:21
  206:18 208:12
  242:23 274:12
**BlackBerry** 92:9
**blank** 180:20
**Bloomfield** 288:20
**Bob** 70:20 73:18
  75:3 83:12 88:13
  95:16,20 101:14
  105:14 115:8
  116:12 118:12,12
  119:22 124:24

126:18 127:18
  135:15,20 136:12
  136:13,15 140:7
  145:10 147:25
  148:23 152:25
  153:22,22,25
  154:23 156:22
  171:20 172:2
  174:18 176:21
  178:9,22 180:16
  181:21 182:3,21
  183:5,6 184:25
  211:7,25 299:9
**BOBET** 2:21
**bogging** 221:9
**Bolia** 20:8,13,15
  73:20 76:3,19
  169:11,12 183:5,6
**boolean** 191:3
**boss** 22:6 90:11
**bosses** 107:11
**bottom** 16:17 31:19
  45:20 46:11 50:17
  50:19 53:21 54:2
  55:25 299:24
**box** 16:16 183:19
  224:19 240:21
  249:18,19 250:13
  251:14,18 271:15
  272:5 275:9
**boxes** 155:6,7 271:4
**bracket** 300:8
**brain** 189:6
**break** 6:4,7 47:22
  89:15,21 103:5
  142:23 152:8
  188:16 232:10
**brief** 12:23
**Brien** 289:17,19,25
**bring** 271:3
**bringing** 12:21
**broad** 65:13 81:13
  170:25 180:23

241:19
**broaden** 251:8,10
**broader** 175:17,18
  180:17 258:17
  288:2
**Broadway** 1:12 2:7
**broke** 97:11
**brought** 99:4
**Brown** 193:10,11
  194:24 202:8
  273:14 292:23
**BRRS** 32:19,22 33:3
  33:14,16
**building** 13:2
**bullet** 291:23 292:25
**Burgess** 278:9,11
**business** 3:14 14:21
  25:4 26:16,20 27:3
  27:9,10,22 33:5
  39:15 87:9 210:4
  212:5 284:14
  290:23

---

**C**

**C** 2:2 3:1,2 4:1 5:1
  6:1 7:1 8:1 9:1
  10:1 11:1 12:1
  13:1 14:1 15:1
  16:1 17:1 18:1
  19:1 20:1 21:1
  22:1 23:1 24:1
  25:1 26:1 27:1
  28:1 29:1 30:1
  31:1 32:1 33:1
  34:1 35:1 36:1
  37:1 38:1 39:1
  40:1 41:1 42:1
  43:1 44:1 45:1
  46:1 47:1 48:1
  49:1 50:1 51:1
  52:1 53:1 54:1
  55:1 56:1 57:1
  58:1 59:1 60:1
  61:1 62:1 63:1

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM
NYSCEF DOC. NO. 194

INDEX NO. 451962/2016
RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 454 of 553   PageID 881

Page 5

| | | | |
|---|---|---|---|
| 64:1 65:1 66:1 | 192:1 193:1 194:1 | 138:19 170:11,13 | **center** 25:22 185:7 |
| 67:1 68:1 69:1 | 195:1 196:1 197:1 | 183:19 184:3 | **centers** 51:2,5,11,16 |
| 70:1 71:1 72:1 | 198:1 199:1 200:1 | **C:/Drives** 75:18 | 51:18 258:21 |
| 73:1 74:1 75:1 | 201:1 202:1 203:1 | 80:21 127:25 | **CEO** 204:17 |
| 76:1 77:1 78:1 | 204:1 205:1 206:1 | 170:21 | **certain** 21:13 58:8 |
| 79:1 80:1 81:1 | 207:1 208:1 209:1 | **calendar** 157:11 | 59:5 99:13 101:18 |
| 82:1 83:1 84:1 | 210:1 211:1 212:1 | **calendars** 224:11 | 102:9 108:14 |
| 85:1 86:1 87:1 | 213:1 214:1 215:1 | **call** 36:10,13,14 | 115:25 122:13 |
| 88:1 89:1 90:1 | 216:1 217:1 218:1 | 78:23 286:5 | 124:16 128:4,15 |
| 91:1 92:1 93:1 | 219:1 220:1 221:1 | **called** 57:10 59:13 | 128:17 153:16 |
| 94:1 95:1 96:1 | 222:1 223:1 224:1 | 66:3 85:11 200:6 | 173:16 180:17 |
| 97:1 98:1 99:1 | 225:1 226:1 227:1 | 205:9 237:5 | 197:16 225:23 |
| 100:1 101:1 102:1 | 228:1 229:1 230:1 | **calls** 150:12,20 | 233:23 258:3,5,15 |
| 103:1 104:1 105:1 | 231:1 232:1 233:1 | 261:18 | 268:15 278:2 |
| 106:1 107:1 108:1 | 234:1 235:1 236:1 | **capability** 28:9 | 283:3 |
| 109:1 110:1 111:1 | 237:1 238:1 239:1 | 51:19 56:16 191:2 | **certainly** 52:19 |
| 112:1 113:1 114:1 | 240:1 241:1 242:1 | 259:7 301:10 | 55:19 132:6 245:8 |
| 115:1 116:1 117:1 | 243:1 244:1 245:1 | **capacity** 8:16 | 245:12 |
| 118:1 119:1 120:1 | 246:1 247:1 248:1 | 282:10 | **CERTIFICATION** |
| 121:1 122:1 123:1 | 249:1 250:1 251:1 | **captured** 250:22 | 305:2 |
| 124:1 125:1 126:1 | 252:1 253:1 254:1 | 251:2 | **certify** 305:5,11 |
| 127:1 128:1 129:1 | 255:1 256:1 257:1 | **card** 32:22,24 33:7,8 | **chain** 277:17 299:24 |
| 130:1 131:1 132:1 | 258:1 259:1 260:1 | **cards** 33:4 | **chance** 284:22 |
| 133:1 134:1 135:1 | 261:1 262:1 263:1 | **carried** 11:14 | **change** 7:6,15 24:14 |
| 136:1 137:1 138:1 | 264:1 265:1 266:1 | **Carter** 289:3 | 187:3,8 188:8 |
| 139:1 140:1 141:1 | 267:1 268:1 269:1 | **carving** 91:2 99:6 | 196:22,23 214:18 |
| 142:1 143:1 144:1 | 270:1 271:1 272:1 | 151:12 | 222:24 280:2,8,11 |
| 145:1 146:1 147:1 | 273:1 274:1 275:1 | **case** 28:10 48:24 | 280:19,24 281:4 |
| 148:1 149:1 150:1 | 276:1 277:1 278:1 | 60:23 61:3,11 | 281:21 |
| 151:1 152:1 153:1 | 279:1 280:1 281:1 | 131:13 133:18 | **changed** 14:24 93:2 |
| 154:1 155:1 156:1 | 282:1 283:1 284:1 | 137:10 172:15,23 | 110:10,11 188:5 |
| 157:1 158:1 159:1 | 285:1 286:1 287:1 | 197:20 248:24 | 222:21 230:22 |
| 160:1 161:1 162:1 | 288:1 289:1 290:1 | 254:18 275:16 | 287:25 288:3 |
| 163:1 164:1 165:1 | 291:1 292:1 293:1 | 294:4,7,10 299:5,8 | **changes** 214:15,18 |
| 166:1 167:1 168:1 | 294:1 295:1 296:1 | **cases** 133:10 | 280:14 285:23 |
| 169:1 170:1,18 | 297:1 298:1 299:1 | **Catastrophe** 258:18 | 286:4,15 290:11 |
| 171:1 172:1 173:1 | 300:1 301:1 302:4 | **categorizing** 220:22 | 290:12,14,15 |
| 174:1 175:1 176:1 | **C:/Drive** 68:20 96:7 | **cause** 44:17 90:5,19 | **changing** 198:18 |
| 177:1 178:1 179:1 | 99:11,19 117:10 | 91:10 132:14 | **charge** 256:6 |
| 180:1 181:1 182:1 | 117:20,22,23 | 133:2 | **chart** 10:16 16:7,9 |
| 183:1 184:1 185:1 | 118:6 123:13,14 | **caused** 276:15 | 16:23 17:7 |
| 186:1 187:1 188:1 | 124:11,13 128:8 | **causes** 301:6 | **check** 102:4,4 |
| 189:1 190:1 191:1 | 137:3,8 138:5,15 | **caution** 176:6 | 114:10 115:22 |

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM
NYSCEF DOC. NO. 194
INDEX NO. 451962/2016
RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 455 of 553   PageID 882

Page 6

123:24 125:2
131:25 132:3
136:6,16 147:2,5,6
147:8,13 155:13
157:21 158:10
172:18 184:24
185:12,14 191:10
200:4 222:25
226:11,18 246:24
246:25 260:7
262:18 265:21
290:20,21 296:5
**checked** 128:21
132:5,6,7 157:23
157:24,25 158:3
179:24 226:14,20
262:17 273:11
**checking** 132:23,25
281:24
**checklist** 32:18
**checklists** 32:12,13
**checks** 132:9,11,12
**Chemicals** 287:2
**chief** 194:15
**child** 13:8
**choose** 119:12,13
**clarification** 188:21
**clarified** 19:11
**clarify** 13:19 85:7
152:12 202:21
268:6
**classified** 56:5
**clause** 57:24 172:9
173:5
**cleaning** 275:24
**clear** 5:9 47:9 49:5,8
67:9 85:4 114:6
152:18 153:8
185:5 188:9
232:20 237:11
244:23 266:21
**click** 32:3
**Cliff** 289:3

**climate** 280:2,8,19
280:24 281:4,8,21
**close** 21:23,24
144:19 300:10
**closely** 274:10
**cloud** 52:4,6 80:7,8
157:9,9,16,18,20
260:24
**cloud-based** 80:2
262:4 297:19
298:14,20
**codes** 61:15
**coding** 276:14,25
279:15,23 280:2
280:14
**CoE** 25:3,19,20 26:7
**collaborate** 26:6,10
**collaboration** 25:3
38:25 39:2,6,21
45:7 194:22 244:6
244:7 246:8,9
**collect** 42:3 46:6
48:23 49:13 65:21
66:18,18 67:6,13
68:19,21,23 69:3
80:17 106:3
111:13,21,24
112:13 116:15
154:12 187:6
189:19 204:8
249:2 290:17
**collected** 58:21,22
68:8 69:7 74:19,22
76:4 80:14,20,23
83:14,16 101:16
105:9 109:2 112:7
112:9 113:12,16
113:19 115:23
116:3 117:14,17
123:18,22 124:2,3
124:11,13,15
127:14 128:23
135:18,22,25

136:8,25 137:13
139:10 153:13
154:13,15 170:14
170:16 171:13,17
171:24,25 174:23
177:12 183:22
184:22 190:21
191:20,23 296:12
**collecting** 26:22
27:25 58:20 70:2
106:25 108:8
127:11
**collection** 34:2
65:17 67:15 69:18
70:12,22,25 71:23
80:25 81:3 104:16
105:4,20 106:23
110:2 111:5,9
112:15 122:9
124:25 125:8
136:2 151:4
188:24 189:6,9,10
189:13 190:4
209:25 215:24
216:6,9,16 248:19
294:16
**collections** 66:14
69:14 75:25
112:14 116:22
125:5,6 127:17
150:8 170:20
185:8 296:5
**collects** 141:14
**come** 63:14 66:10
66:24 176:3
197:25 207:16
221:4 246:15
285:16 301:7
**Comer** 110:4
**comes** 218:18
243:23 300:24
301:2
**coming** 66:14 76:2

100:3 104:9
149:21 240:18
**comments** 11:8
**committee** 27:5,7
29:19 42:18 57:11
57:15,19,22,25
58:5,12 69:12,13
69:19 70:6,9,12
71:8,20 73:10
77:13 78:8,11,16
79:13 80:12,15,20
81:24 82:2,12,18
83:2,25 84:18
87:12 88:7 89:3
98:25 100:15,19
102:20,23,24
105:5,12,14,22
106:2,4,11 107:5
107:10,16 108:16
108:23,25 110:24
111:2 113:13,16
114:16 118:14
119:5,16 120:23
121:5 122:4
126:14 132:19,21
133:21 136:21
139:22 140:12,21
140:22 145:18
147:15 148:5,20
149:11 152:20
156:12,20 165:7
165:15 166:12
170:9,17 171:8,23
174:15 176:8
178:14,19,22,23
179:7,12,19,20,22
179:23 180:2,5,13
180:15 184:13,15
185:24 186:6
189:4,16,24
190:18,20 191:7
191:14 203:24
204:14,24 209:13

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

NYSCEF DOC. NO. 194

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 456 of 553   PageID 883

Page 7

209:20 210:3
226:9,12 231:16
232:2,5,7,25 233:5
233:18,22 240:10
249:5 257:6
260:23 261:3,7
274:10,17,20,22
275:3,19 296:11
296:15
**communication**
226:6
**communications**
52:12,18 55:7,12
55:16,18,20
177:12 192:20
209:17 283:6,9
**company** 13:7,8
162:23 292:18
296:8 298:13
**company's** 258:11
259:25
**compared** 134:24
141:18
**complete** 40:22
187:10
**completed** 41:15,23
**completely** 258:21
**completion** 276:19
**complex** 115:11
169:18 191:2
243:12
**compliance** 10:24
10:25 24:15 35:15
41:5 243:7 289:14
294:6
**complicated** 131:3
154:19
**complies** 24:9
**comply** 24:6,8 34:5
35:17
**complying** 22:15
24:18 26:13,15
29:10 30:9 37:3,5

40:11 46:10,14
57:5 59:12 72:22
73:6 112:22
212:17 257:11
278:19 285:25
**Compounding**
279:19,20
**computing** 282:14
**conceptually** 47:15
**concern** 240:16
241:22
**concerns** 242:3
**condition** 6:18
**conduct** 11:3 86:7,8
95:17 101:2
143:19 210:4
283:5
**conducted** 71:21
73:9,19 77:4,6
81:23 84:17
113:24 114:3
115:8 118:18,23
123:13,21 137:12
138:18,22 143:7
143:13 145:8
159:8 168:25
174:7 176:18,20
177:25 181:19
183:9 190:15
191:8 223:16,18
**conducting** 83:12
143:21 209:24
210:6 253:8
**conference** 224:10
225:13
**confirm** 100:22
140:24 186:2
**confirmed** 166:13
**confused** 188:25
**confusing** 152:16,17
**confusion** 265:15
266:6 267:25
270:14

**Congratulations** 7:9
**connect** 56:15
**connected** 196:8
235:13 237:25
238:8,13 263:19
263:21 264:3,3,14
265:4,6
**connecting** 100:6,7
**connection** 201:4,5
292:12
**connects** 239:5
**Connie** 1:10 6:24
7:5,13 48:5 278:3
286:9 305:6
**considerations**
204:21
**considered** 27:8
150:5 195:18,24
198:12
**Constitutes** 46:12
**constitutional** 4:6
**constraint** 235:6
**consult** 39:22 50:14
**consultations**
261:17
**consulted** 26:22
27:24 49:13 50:12
168:7 208:11,14
208:16,19
**consulting** 9:6 10:19
15:5
**contact** 39:14 42:8
42:14,17 70:17,18
91:24
**contains** 72:25
123:3
**content** 62:9 97:14
157:8 213:5
**contents** 46:16,19
46:21 124:10,12
128:9 129:18
148:5 153:14
155:10,12 165:5

166:23 173:6
175:7 193:20
212:22 221:23
224:19 230:6
250:14,15,18
**context** 58:4,23 63:9
**Continue** 293:2
**CONTINUED**
304:2
**continues** 300:3
**continuity** 26:17,20
27:5
**contract** 13:10,21
53:5
**contributing** 91:3
**control** 134:6,10
143:23 169:4
243:8,10,11
**controlled** 51:14
**Controller** 293:12
**controllers** 12:22
**controls** 10:22 13:13
13:14,15 14:4,20
39:20 55:5 79:21
164:15 194:3
244:21 245:6
255:9 288:15
289:13
**Convault** 231:7
255:7
**conversation** 149:19
218:22
**conversations** 76:16
76:18 150:19
183:4 211:23
**convicted** 9:2
**coordinate** 38:6,7
39:9 135:25
215:21
**coordinating** 97:14
215:23
**coordination** 35:18
37:12,24 91:4,8

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

NYSCEF DOC. NO. 194

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 457 of 553   PageID 884

Page 8

143:20
**copied** 299:20
**copies** 146:21
**copy** 67:23 76:14
 115:4 133:20
 153:5 250:2 297:7
**Cormier** 286:22
 288:19 291:6
**corporate** 53:20
 147:19,22 162:20
 212:4 274:13
 287:2
**corporation** 1:5
 2:16 8:6 9:8,18
 140:18
**corporation's** 194:3
**correct** 9:9,10 16:15
 16:19,20,21 21:12
 32:5 49:16 55:8
 100:17 107:24
 108:4 122:7
 125:10 137:14
 138:2,17 145:5
 167:23 191:24
 192:8 218:14,16
 233:9,10,14
 234:23,24 235:4
 235:15,19,24
 236:11 237:9,16
 238:3,6,9,15,23
 239:3,6,14,20,23
 240:4,5,13,22
 241:2,3 243:8,9,17
 246:23 247:14
 248:14,18 249:2,3
 249:9,15,16,20,21
 249:23,24 250:4
 251:6,7,14,16
 252:3,8,9 253:20
 254:5,10 255:5,9
 259:19,19 262:15
 264:24 265:22
 266:9,13,23 267:9

269:9 271:16,20
 271:21,24 273:3
 273:20 274:11
 275:9,17 278:5
 285:10 286:10,11
 286:12,17 287:6
 287:13,14 289:11
 290:13 291:21,22
 292:6 294:2
 295:11 301:20
**correctly** 105:19
 107:21 151:9
 168:20 215:4,15
 219:11 246:13
 286:23
**correspondence**
 75:2 209:15
**cost** 174:10,14
 175:17
**counsel** 3:20,22,24
 4:3 19:21,24 20:2
 65:10 77:2 168:7
 173:13 174:4
 187:25 188:14
**couple** 14:8,22
 89:20 190:2
 202:11
**course** 41:11 71:22
 253:9
**court** 4:12,19,25 5:4
 15:23
**courtesy** 3:21
**cover** 104:22 112:20
 113:4
**covered** 217:5
 232:18
**covers** 232:4
**crafted** 176:6,10
 181:2,18
**crafting** 180:23
**create** 197:18
 283:10
**created** 111:4

195:13,13,17
 197:21 200:19,20
 207:22
**creates** 214:20,21
**creating** 204:21
**creation** 200:17
**crime** 9:3
**critical** 259:6,9
 286:18
**Cunningham**
 164:13
**current** 12:8 15:8,9
 15:10 277:23
**custodian** 25:5
 42:18 73:3 78:15
 112:16 122:23
 123:5 170:9
 171:23 177:5
 216:6,15
**custodian's** 154:25
 249:14
**custodians** 37:23
 42:19 64:5,14,18
 65:17,20 67:5,12
 67:25 68:8,18 69:4
 69:7 70:2,7,8,13
 70:23 72:3 73:10
 78:9,11,16 79:13
 80:13 81:20 82:2
 82:13,18 84:19
 88:8 89:3 99:2
 100:16 101:3
 102:6,7,23 105:6
 106:2,5 108:8,9,10
 108:16,20,25
 109:3 110:24
 111:2,7 112:6
 113:13,17 121:10
 121:13 126:5,8
 134:13,16 145:18
 156:6,12,21,25
 163:16 165:25
 166:12 171:8

174:12,15 175:15
 176:9 177:15
 178:12,14,16,17
 178:18 179:2,7,21
 180:3,5,19 184:14
 186:5 190:10,13
 191:6,7,13,15,20
 203:24 204:9
 209:13 210:3
 216:2,3,11,12
 224:18 233:8
 248:16,25 249:6
 281:11,16,17
 296:16,16,19,21
**custodians'** 69:19
 71:8 149:12
 170:18
**custom** 276:14,25
**Customer** 96:21
 194:21
**Cynthia** 39:13 59:9
 60:21 61:23 62:6
 62:16,16 84:10
 87:19 94:12
 136:13,15 143:15
 152:4 159:11,18
 222:14 223:7,17
 226:15 231:21
 273:15 274:7

---

**D**

**D** 303:8,17
**D.E** 220:4
**D.W** 16:18
**daily** 47:17 59:21,22
 60:6 261:17
**Dallas** 50:25 51:10
 52:4,23 70:18
 255:16,17 258:11
 258:21 259:25
 282:19
**Dan** 20:8 73:19
 76:18 169:10
 183:5,6

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

NYSCEF DOC. NO. 194

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 458 of 553   PageID 885

Page 9

**DANIEL** 2:19
**Darren** 121:14
264:7
**data** 28:24 51:2,10
51:16 52:20,20
53:4,7,9,17,19
61:10 64:5,10,18
64:19 65:17 67:12
68:8 69:19 71:9
73:2 75:13 76:7,21
79:2,13,14,19
80:13,14,18,19
82:15 83:8,10
84:14 91:2 98:13
99:6,16 108:8,18
108:20 109:25
110:2 113:5 114:4
114:25 117:8
119:3 123:4,8,10
123:17 124:3,6,8
124:14 125:2,3,4,7
125:13,16,18
126:21 127:20
128:10,22 129:9
129:17 130:17,19
130:20,23 131:5
131:11 134:7,23
135:21 137:7,12
137:13,18 138:4
138:14 141:13,17
141:22 144:12,23
146:15 150:7,18
151:12 159:4
172:13,14 174:22
179:8,9,13,14
183:16,17,18
184:5,7,21,22,25
185:3,9,10,22
186:6 189:11,14
189:17,19 190:13
190:21 191:19,21
191:22 217:7,11
222:4 247:18

254:2 259:10
260:8 282:16,17
298:21
**database** 173:21
**databases** 127:8
**date** 8:4 16:2 21:3
21:13,21 23:15,21
30:6 43:2 45:13
48:10 54:23 62:22
72:2,10 86:6,25
106:6,8 109:19
121:21 122:10
128:11,18 139:12
160:16 165:12
172:4 174:13
179:4 183:12,14
227:23 228:20
262:21,25 263:2,6
263:18,19 265:11
265:12,24 266:4
266:11 267:19,21
267:24,24 268:24
269:4,5,10,13,16
270:8 277:9
284:20 285:10
294:22 298:3
299:15 305:7
**dated** 16:8 21:11
40:3 122:5 160:10
160:12 277:11,12
299:18
**dates** 122:16 222:13
222:15 246:25
265:7 266:15,18
266:19 269:17
285:6 287:19
294:13 295:21
**day** 50:9 105:7
**days** 97:9 202:12
220:18 221:4
244:17 254:16
**DDR** 48:14,16,17
**deadline** 112:13

**deadlines** 65:3
**deal** 209:14
**dealings** 282:6
**dealt** 209:22 210:19
282:8
**Dear** 278:21
**December** 63:3 64:7
104:11,18,20,23
105:8 110:14
112:20 113:3
114:7 123:10
125:9 134:25
141:18 174:8
175:2,4,22 177:11
**decided** 13:6 78:25
112:6 170:5
194:10 208:13
**decision** 163:19
170:7 185:16,19
195:11 208:8
**decisionmaker**
194:15
**declined** 205:4
**deem** 119:11
**deep** 143:25 250:10
**defendant** 8:10,12
**define** 293:10
**definitively** 102:11
**delay** 202:11
**delegate** 275:4
**delegated** 107:19
275:2,8
**delete** 130:5,6,8
133:6 139:19
156:16 221:6,7
300:15
**deleted** 28:13 156:9
158:18,18 221:12
221:23 227:19
228:17 247:9
254:16 300:11
301:11
**deletes** 301:17

**deleting** 133:8,15
300:16
**deletion** 37:2,18
61:20,20
**deletions** 227:9
**Deloitte** 85:24 86:2
86:7 99:5 102:21
138:25 142:4
145:25 146:10,17
149:15 150:11
158:5
**Demuynck** 164:17
164:18
**department** 9:20,21
10:6 11:11 12:15
13:22,25 14:3 20:7
22:8 27:9 36:7,15
38:10 42:7,8,9,13
64:17,22 68:25
71:14,19 73:20,21
73:25 74:4 77:24
78:25 90:14
106:17 107:7,9,13
107:22 109:13
111:4,19 112:5
114:23 116:13,24
118:13 124:9
133:25 134:20
136:16 141:3,11
142:9,19,22
148:17 161:7
163:16 164:13
166:7 167:20
168:6 169:2,7,9,20
169:23 170:6
172:22 173:14,18
173:20 174:3
176:13,24 177:18
181:3,14 184:20
185:21 187:25
188:14 189:20
190:23 204:3
213:20 214:21

215:16,20,20
216:20 217:14
224:3 235:9,17,19
235:20 236:7,8,20
299:5
**Department's**
123:19
**departments** 25:4
27:10 42:13
**depend** 38:15 131:4
131:5 156:13
**depending** 61:7 62:8
129:6 293:6
300:22
**depends** 129:7,9
156:17
**deployed** 235:7
**deposed** 7:20,21 8:7
294:3,4,5,21,24
297:22 299:5
**deposition** 3:16,19
297:4
**depositions** 8:21
**DeROCHE** 2:10 3:7
3:9 15:20 20:22
23:11 29:25 34:12
34:16,20 42:21
45:9 47:12,20 48:6
54:18 62:17 71:3
72:6 75:12 86:21
89:13,18,23 91:14
103:4 104:8
109:15 121:17
148:25 149:5
152:6,13 160:5
188:15 232:9
302:4
**describe** 25:11
45:22 56:8 98:4
163:5 223:19
226:22 227:3
253:18
**described** 45:23

102:16 117:15
167:16 169:5
206:25
**describes** 169:25
172:10 174:7
177:22 180:22
194:6 212:18
**description** 24:23
47:14 110:11
204:20 303:3
304:3
**Design** 55:3 87:25
213:2
**designated** 182:15
199:4 238:14
244:25
**desire** 206:23
**desktop** 96:3 155:3
**despite** 220:16
**destroyed** 37:8,11
40:18,21 41:2
**destroying** 36:23
**destruction** 32:16
40:13,15,22 41:14
41:22,24 42:3
**detail** 261:21,24
279:3 280:25
**detailed** 54:4
**details** 19:13 109:8
130:14 136:8
204:15 276:9
277:4,6 280:12
**determination**
215:13
**determine** 44:14
64:6 90:5 114:24
144:20 157:7,15
158:13,23 187:15
193:14 214:22
**determined** 169:19
226:12
**determines** 163:16
213:20 218:23

**developed** 167:17
167:19
**development** 168:2
**device** 100:9 145:22
146:23 230:3
231:15 255:2
**devices** 86:17 92:4
93:6 96:4,11 98:22
99:23,25 100:2,5
100:10,12 102:19
141:25 142:16,19
145:17,20,24
146:19,20 150:9
151:10 157:5,12
157:14,16 158:4
**Devine** 7:5,12,17
278:3 286:9
**died** 8:18
**differ** 28:5 293:20
**difference** 189:8
265:15
**different** 3:18,24
14:14 25:24,25
33:4,5 42:12 56:23
56:25 58:13 59:25
62:7 69:14,15
80:24 90:8,12 92:7
97:11 108:21
111:8 123:9
147:21 150:22
182:16 187:17
190:17 196:5,16
196:22 198:9
215:19 225:8
231:2 239:6 245:2
259:11 265:7
266:17 286:3
287:14 289:8
297:21
**differently** 62:8
108:17 192:13
**diligently** 144:17
**direct** 11:22,24

62:14 65:7 172:19
277:21
**directed** 107:22
133:5
**direction** 176:22,24
185:20
**directly** 32:9 84:20
84:25 85:2 151:3,6
172:24 248:13,15
**Directories** 43:24
44:2,5
**directory** 43:7,14
44:9,11,24 45:18
46:4 47:11 192:14
193:5 196:12
198:6,10 199:2,15
200:22,23 217:17
218:13,17,21
219:16 234:21
235:2,6 237:18,23
237:24 239:22
263:16
**disable** 35:21 37:13
130:9 213:15
214:10 219:6
228:5,8 236:25
**disabled** 38:3 79:8
82:19 94:25 103:2
131:23 150:3
158:20 159:24
175:24 176:2
214:16 222:16
228:11,13,22
229:2 269:16
**disables** 213:23
216:23 223:8
**disabling** 214:2
215:7,8 216:4,13
217:4 220:17
**disappeared** 252:13
**disaster** 26:17,21
27:4 28:6 43:6
51:18 193:9

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

NYSCEF DOC. NO. 194

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 460 of 553   PageID 887

Page 11

**Disasters** 44:20
**discovered** 223:23
   223:25 253:16
**discovery** 58:16,18
   168:2,10 223:20
   294:6
**discuss** 252:19
   253:5 299:8
**discussed** 147:16
   177:7 186:14
   234:18 252:25
   286:4
**discusses** 256:20,24
**discussing** 37:17
   69:24 169:17
   186:22 292:14
**discussion** 71:5
   220:16
**discussions** 60:20
   84:23 107:8 167:4
   261:18
**disk-based** 230:2,19
   230:21,25 231:12
   254:25 255:22,23
   256:6
**displayed** 92:20
**distinction** 287:12
**distribution** 224:12
   224:13,16,20,22
   225:6 283:16
**divorce** 8:25
**document** 15:13,18
   16:4,6 20:23 21:5
   21:19,21 23:16,22
   23:24 24:2,12,13
   25:15 29:3,7,9
   31:10,24 32:20
   33:9 39:22 40:2
   43:3,22 44:19
   45:14 48:11,19
   49:23 50:17 54:24
   55:5,10 62:23
   72:11 87:3,6

109:20,23 121:22
122:5 139:9 154:5
154:6 161:9,19
211:13 226:4
257:10 277:13
279:18 283:19
284:24 285:14,15
290:12
**document-by-doc...**
   153:19
**documentation**
   11:11 113:18
   115:4 193:4 202:4
**documented** 67:2
   192:24
**documents** 15:15
   19:14,16,17 31:25
   32:7,9 43:20 44:7
   44:8 46:6 48:23
   49:6,14 52:11,17
   55:6,11 58:19 59:6
   71:24 72:2,17
   74:19 77:11,17
   78:2 84:2 85:9
   101:6,16,23
   104:17 105:5
   106:3,25 107:3,14
   110:3 113:20
   115:6,18,23
   116:15,19 119:14
   119:14 120:19
   121:2 122:3,9
   123:22 125:9
   127:11 130:24
   132:3 133:15
   135:22 136:22
   140:11,19 141:4,7
   143:2 146:22
   153:5,12,16,24
   158:13 159:20
   160:2,6 168:12
   170:4 171:9,12,13
   171:16 173:15

174:3,13 175:12
175:15 177:12
179:4 182:9,23
188:2,10 209:16
210:20,22 212:9
220:18 228:15
229:11,21 242:17
243:4 260:23
281:3 283:10
290:17 296:11,23
297:4,7,11,14
298:15 303:13
**doing** 10:11 14:12
   14:14 49:20 50:2
   70:22 84:6 91:4
   108:19 132:15
   186:23 198:21
   208:15 211:16,20
   222:11 223:2
   252:7 295:14
**Dolan** 117:8 118:19
   119:7 134:23
   136:4 137:25
   138:9 139:22
**Dolan's** 118:20
**Dom** 11:12
**domain** 197:18
**domains** 197:14,15
   198:16 199:8
   201:21 202:13
**Don** 11:20
**Donnie** 16:20 22:7
**double** 114:10
   115:22 123:24
   136:6,16 147:2,5,6
   147:8 155:13
   157:21 158:10
   172:17 191:10
   246:24,25
**Doug** 73:21
**downloading** 100:2
**downstream** 14:6
**draft** 161:2,4,12,14

161:16 162:8,9
167:10 213:4
**drafted** 161:5
**drawing** 180:20
**drive** 117:24,25
   118:5 126:12
   153:15 157:4
   170:8 171:10,12
   171:17 174:24
   177:4,6,8,10,14
**drives** 75:24 88:7
   96:8 99:20 126:19
   170:10 171:22
   174:24 177:20
   182:2,2,5,5,7,18
**drugs** 6:11
**due** 40:18,21
**duly** 3:3 305:7
**dumpster** 90:24
   254:9,11,12,18,20
**duplicating** 232:21
**duties** 10:18,20
   23:25 24:3 35:7,10
   35:11 40:15 47:18
   63:24

---

**E**

**E** 2:2,2 3:2,2,2 104:6
   104:6 205:13
   303:2 304:2
**E-business** 14:14
**e-Discovery** 11:9
   163:6 164:4,24
   168:16,23 172:11
   172:17,20 185:6,7
   185:17 243:2
   290:23 294:8,10
   294:16 295:2,5,10
   295:15
**E-M-U-R-A-L-D**
   200:7 201:13
**e-mail** 28:22,23 29:2
   29:5,5 37:19,22
   38:17,19,21,25

**FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM**
NYSCEF DOC. NO. 194
INDEX NO. 451962/2016
RECEIVED NYSCEF: 06/02/2017
Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 461 of 553   PageID 888

Page 12

39:6,17 44:25 45:6
45:6 55:4,13,14,18
55:20,24 60:21
68:19 72:15 76:10
76:13,14,20,25
80:21 81:10,25
83:4,4,9 85:15,16
87:13,17 88:3,24
90:25 91:18 92:7,9
93:6,19 94:2,14
96:22,25 97:2
100:2,3,3,21
110:12 113:5
114:2,19 115:2
116:2 117:10
120:18 121:2,8
127:2,6 130:12
131:9 137:2
143:11 149:6,8,12
150:2 152:23,25
154:16 155:5,7,18
155:22 159:10,15
159:16,17,23,24
175:12 176:8
181:24 183:18,24
183:25 184:2
185:8 192:6,18
194:20,23 195:14
196:7,23 197:2,4,7
197:19,21 198:2
198:10,18,19
199:3,12 200:2,5
200:23 201:5,25
202:16 203:7,18
204:23,25 205:3,6
205:15 206:10
207:5,9,16,20,21
207:24 208:21
209:14 210:4,10
211:13 214:8
217:25 218:3
219:5,15 220:4
221:9 222:18

223:10 224:15,22
224:25 225:3
229:4 230:18
231:19,23 233:12
234:5,8,16,19
237:2,8 238:13
239:6,8,8,13,16,25
240:3,11,17,20
241:14 242:7
244:6,11,25 246:7
246:8,9 249:19
256:8 259:3,5,14
259:15 260:4,16
260:18 261:3,3
262:11 263:6,8,10
263:13,16,21
264:8,8,13 265:2,4
265:5,13,16,18,21
266:4,15,16 267:8
268:2,3,8,12,17
269:8,14,18 270:2
270:18,20 271:4
271:15,23 272:4
272:18,20 273:5
273:19 274:4,23
275:9 277:11,17
277:23 279:8
281:24 299:18,24
299:25 300:2,16
300:17,25 301:5
301:17 303:7
**e-mail-type** 283:17
**e-mails** 61:14 82:24
83:3 90:2 98:24
99:3 100:15
101:22 102:18,19
107:19 143:2
144:6,25 154:8,13
154:13 157:11
170:3 177:2
182:24 183:2
207:16 219:10
220:19 221:2

226:23 227:13,17
233:24 240:24,25
246:11,19,21
250:14,16,22,24
251:19 252:13
259:2,6,18,22,24
277:15,20 301:12
**E-Y** 205:22
**E/:drives** 159:21
**earlier** 48:20 49:7
49:11 87:3 100:24
106:24 113:10
131:13 153:8
218:22 254:2
289:23 290:3
292:14
**early** 70:23 92:19
201:2
**easier** 12:11
**edb** 45:25 46:5
**edb.log** 45:21
**Eddie** 289:17,19
**effect** 263:4
**effective** 159:6
**effectively** 251:5
**efficient** 293:10
**effort** 80:25 81:12
81:15 82:4,8,14
87:10 90:5 94:7
95:13 98:8 120:9
143:20 230:9
254:3
**efforts** 50:3 78:7,10
81:8,22 89:2,6,7
94:11,17 101:21
119:25 120:2,4,5
259:23
**eight** 141:16
**either** 22:9 51:10
70:3 135:20
136:12 138:25
141:21 142:3
159:20 161:17

170:10,13 188:13
229:13 269:25
282:18 287:20
**elaborate** 42:10
**electronic** 25:2
27:19 55:17 115:3
159:20 160:2
162:21 167:25
168:4,10 170:3
175:11 182:9,23
**EMC** 303:6,9,10,11
303:12,18,24
304:5
**EMIT** 9:13,17 24:21
24:25 25:23 30:24
33:22 34:3 35:12
70:17 91:17
124:21,23 132:23
148:18 151:7
166:4,7,9 171:24
171:25 178:8,10
181:4,6 192:22
201:10 215:9,12
215:20 241:16
253:22 255:12
277:24 278:12,15
279:16,24 289:4
**EMIT's** 25:12
**employed** 305:12
**employee** 13:2
201:19 289:4,20
**employees** 35:13
58:11 119:10
192:5,18 282:21
**EMURALD** 200:7
200:12 201:12,13
201:15,22,24
207:2,13 208:25
217:20,21 218:19
219:2 237:5,6,19
238:23,25 239:2
241:5,15,18,21,24
244:14 245:3

**FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM**
NYSCEF DOC. NO. 194
INDEX NO. 451962/2016
RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 462 of 553   PageID 889

Page 13

262:20,23 263:5
263:15,25 264:7
264:16,19 265:24
266:22 267:3,12
269:19,20,23
270:3,5 272:16,25
273:17,22 292:13
292:19 293:20,23
**enabled** 89:11 150:2
213:9,10,12
214:16 227:7,7
**engaged** 79:3,10
85:25 86:2,3
149:15 150:14,18
**engagement** 149:17
**Engineer** 158:7,8
**Engineering** 194:23
290:24
**ensure** 11:2 24:8
35:15 38:2 214:12
215:4,5
**ensuring** 24:15
36:17 37:7,9,25
79:4
**entail** 149:17
**enter** 249:22
**enterprise** 217:17
218:13,17,20,21
282:13
**enters** 67:4
**entire** 148:12
**entities** 196:23
**entitled** 40:12 45:21
46:12
**entry** 126:20
**ERIC** 2:6
**Erick** 91:21,24
92:15,23 93:2,10
194:12,16 195:3
**ERP** 276:23
**ESQ** 2:10,11,19,20
2:21
**essentially** 294:14

**estate** 8:19,23 30:19
**etcetera** 162:22,22
**Evans** 87:20,23
194:17,18,19
196:16
**events** 88:21
**eventually** 14:25
**everybody** 111:17
111:20 133:14
204:23 293:12,14
293:15
**everybody's** 269:18
**everyday** 19:8
**evidence** 228:18
**ex-husband** 13:7
**exact** 8:4 14:9 21:21
172:4 194:21
222:13,15 223:14
294:12,21
**exactly** 10:16 17:24
18:14 39:19 49:18
50:4 54:5 63:22
73:24 87:24 95:15
97:10 99:17
113:22 126:8,16
130:13 154:6
158:25 171:4
182:17,18 202:2,5
208:19 220:23
243:18 244:4
270:7,8 284:14
299:2
**examination** 1:10
3:6,12,15 15:21
232:12 302:3
**examined** 3:4 7:20
247:12,13
**example** 53:2,11,21
156:10 197:7
224:14 225:17,19
225:20 250:11
251:13 260:22
265:21 283:20

**290**:6 293:13
**exception** 194:7,11
195:8,20,25
**exceptions** 190:2
**Exchange** 55:3 56:2
56:4 59:13,17
61:16 92:18,18
93:4,14 94:15,17
94:20 96:25 97:2
98:10,12 102:18
115:12 127:5
143:11,25 144:6
144:25 151:24
152:5 181:11,12
200:25 201:4
208:6 221:24
222:2,4,5,8,17,19
223:12 227:11
233:2 240:2
243:23 244:2
254:6,13 257:13
257:19,20 275:3
**exclude** 65:8
**Excuse** 288:17
**Executive** 3:13
**exempt** 235:11
236:13
**exempted** 224:2
246:16
**exempting** 236:22
**exemption** 235:24
**exhausted** 144:13
144:21
**exhibit** 15:22,24
17:13 20:24,25
21:5 23:12,12,13
30:2,2,4,8 34:7,8
34:18 42:22,23,24
45:10,10,11 48:7,7
48:8 54:19,20,21
57:8 62:18,18,20
72:7,8,25 73:5,7
86:22,22,23 87:4

**104**:11 109:16,16
109:17 112:19,21
113:4 117:2,4,7
120:15,16 121:18
121:19 122:22
123:3,7 129:17
154:18 160:9,10
160:17 161:8,18
162:5,7,8 256:15
277:7 284:17,18
284:23 299:12,13
299:17 303:3,4,5,6
303:7,9,10,11,12
303:13,14,16,17
303:17,18,19,20
303:21,22,23,23
303:24 304:3,4,5
**exhibits** 160:14
277:10 304:7
**exist** 31:8 197:10,22
224:6 225:10
**existed** 82:10 83:3
83:20 234:9
244:11
**existence** 208:23
244:16
**existing** 90:21 98:12
224:24 225:2
**experience** 250:7
**expert** 181:11
196:13 250:10
**expertise** 25:22 90:7
94:4,13,14 97:15
151:5,13 162:25
**experts** 90:13 93:24
94:4
**explain** 15:13 40:14
61:6 64:9 206:17
230:5
**extensive** 95:14
**extent** 56:19 57:16
276:9
**extra** 82:22

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

NYSCEF DOC. NO. 194

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 463 of 553   PageID 890

Page 14

**extract** 64:5,10
**extracted** 64:19,20
**extraction** 64:21
  68:9
**Exxon** 1:5 2:16
  23:19 51:22
  157:10 164:19
  169:12 173:11
  173:12 196:21
  197:6 201:20
  238:2 241:23
  242:6 243:8 245:5
  247:17 258:25
  263:7 264:18
  266:8 269:18
  270:3,13 271:18
  275:17 281:20
  282:20 287:3
  290:12,16 297:13
  298:21 299:4
  301:10
**Exxon's** 80:2 244:20
  271:14
**Exxon-owned** 51:13
**ExxonMobil** 8:6,7
  9:8,13,18,21 10:5
  11:10,15 12:10
  15:16 20:7 24:20
  24:24 25:25 26:18
  27:11,24 37:23
  46:19 52:10,11,16
  52:17,20 54:13,16
  55:7,12 86:8
  124:19,20 145:2,5
  145:13 146:24
  147:4 176:6,10,17
  180:23 190:11
  192:5,7 197:8
  199:8,21 200:9
  223:24 243:16
  260:12 274:12
  284:2 285:23
  286:16

**ExxonMobil-cont...**
  51:15
**ExxonMobil-spec...**
  217:19

_____

**F**

**F** 3:2 104:6
**face-to-face** 76:18
**Facilities** 30:20
**facility** 33:12
**fact** 232:24 253:17
  301:12
**factor** 67:11
**Factors** 279:19,20
**failure** 28:8
**fair** 286:13 301:14
**fairly** 81:13 241:18
**familiar** 26:16
  29:11,14 45:24
  46:18,20 47:3,5,16
  49:23 57:13 110:6
  179:9 277:2,18
**familiarize** 73:8,13
  73:16 74:12
**far** 16:17 62:11
  86:11 90:25 91:7
  92:20 108:12
  128:14 131:18
  150:4,7 164:24
  169:14 247:9
  248:5 286:6
**feed** 214:25 217:24
**Feinstein** 1:11 3:1,8
  4:1 5:1 6:1,24 7:1
  8:1 9:1 10:1 11:1
  12:1 13:1 14:1
  15:1,21,24 16:1,3
  17:1 18:1 19:1
  20:1,25 21:1,6
  22:1 23:1,13 24:1
  25:1 26:1 27:1
  28:1 29:1 30:1,4
  31:1 32:1 33:1
  34:1 35:1 36:1

37:1 38:1 39:1
40:1 41:1 42:1,24
43:1 44:1 45:1,11
46:1 47:1 48:1,8
49:1 50:1 51:1
52:1 53:1 54:1,21
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1,20 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1,8
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1,23 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1,17 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1,19
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
160:8,10,14 161:1

162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1 253:1 254:1
255:1 256:1 257:1
258:1 259:1 260:1
261:1 262:1 263:1
264:1 265:1 266:1
267:1 268:1 269:1
270:1 271:1 272:1
273:1 274:1 275:1
276:1 277:1,7
278:1 279:1 280:1
281:1 282:1 283:1
284:1,18 285:1
286:1 287:1 288:1

**FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM**

NYSCEF DOC. NO. 194

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 464 of 553   PageID 891

Page 15

289:1 290:1 291:1 292:1 293:1 294:1 295:1 296:1 297:1 298:1 299:1,13,16 300:1 301:1 302:4 303:3 304:3 305:7
**fell** 190:19
**field** 162:24
**figure** 44:18 105:10 150:15 262:2
**file** 28:14 35:21,22 37:14,16,20,22 38:3,17,19 43:9,9 43:15 79:7 82:19 89:11 90:10 94:25 102:25 131:10,11 131:23 158:19 159:24 175:24,25 212:18 213:8,15 213:16,23 214:8,9 214:10 215:8 216:5,14,21,23 217:25 219:6,7 220:14,17,25 221:21 222:16,21 222:24,25 223:8 224:2 227:6,7 228:6,8,12,19,22 228:25 229:7,9 231:24 235:11,24 236:14,24 237:2 246:2,4 254:14
**filed** 67:19
**files** 45:22 46:5 61:20 95:23 127:7 137:3 168:22 176:8 185:2 202:20 222:17
**fill** 41:2
**filtering** 64:21 68:11,12
**Financial** 293:14
**financials** 278:14,14

278:15
**find** 33:13 89:7,8,8 133:12 144:23 150:17 230:13 248:4,5 254:3 259:21,23 261:10 269:24
**finish** 203:14 232:14 280:8
**finished** 5:6 35:5 252:7
**first** 3:3 12:9,12,18 15:14 22:2,4 27:18 31:5 34:25 36:21 56:3 59:16,24 60:2 63:4,5,18,23 66:8 67:20 69:17,25 71:7 77:8,20 98:9 108:24 112:23 113:4 123:7,8 152:15,19 172:16 173:2,18 205:12 232:23 246:19 251:12,24 253:25 277:22 278:21 285:21,24 295:20
**firsthand** 17:21
**five** 23:7 60:17 72:20 229:25 275:23
**five-minute** 47:22 152:7 188:16 232:10
**flag** 213:22,25 214:4 214:6,7,19,20,22 214:25 216:22 217:9,22,22 219:2 219:19,22 235:9 235:22,23 236:9 236:13 238:17,19 238:21,24
**flagged** 238:19
**flags** 220:22

**flip** 236:9,13
**flood** 240:20
**flooded** 258:22
**flows** 219:19
**focus** 78:16 81:18
**focused** 78:21 95:2 120:5
**folder** 78:3 99:14 101:7 115:7,24 116:19 153:7 154:2,6,6,22 170:25 177:4,19 250:3,6
**folder-by-folder** 153:20
**foldering** 220:21
**folders** 125:22,23,24 126:2,5 155:10,13 171:22 173:6 182:11,12,14
**folks** 11:25 35:12 36:6 38:3 39:11 40:20 84:6 118:5 163:20 164:11 165:22 193:11 197:24 199:7 213:23 215:19 216:25 245:22,25 259:5 260:4 261:4 270:11 273:12 282:24 283:3 300:25
**follow** 67:3 277:25
**follow-ups** 276:4
**followed** 50:5,7 296:8
**following** 104:3 279:24
**follows** 3:5
**footnote** 220:13 229:25
**force** 4:12
**foregoing** 305:6,8

**forensic** 84:17 85:22 85:23,24 149:16 149:22 151:11
**forensics** 99:6 102:21 150:5
**form** 3:25 32:15 40:23 41:14,18,23
**former** 197:2 199:12 201:25 291:20
**forms** 32:12,12,15 32:17 42:4
**forth** 51:4,11 61:3,6 75:3
**forward** 12:12 300:22 301:4
**found** 98:15 209:7 254:22
**four** 23:5 59:25 163:5 220:13 257:16 291:3
**fourth** 81:3 122:17 122:18,19 123:15 123:17 137:6 183:8,9,10 185:23
**freeze** 189:7
**frequency** 258:4
**frequently** 24:14,15 56:18 59:19 61:24
**fro** 103:7
**front** 285:7
**full** 13:11 33:17 59:23 60:3,9,14 230:12 275:8 277:22
**fully** 91:6 245:10
**functionality** 218:2 259:8,9
**functions** 284:2,3
**further** 120:24 131:14 165:12,21 305:11

---

**G**

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

NYSCEF DOC. NO. 194

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 465 of 553   PageID 892

Page 16

**G-R-A-Y** 205:14
**G-R-E-F** 30:18
**gained** 274:3
**gaining** 71:22
**gap** 144:19
**GARRISON** 2:15
**gas** 12:24
**gathered** 109:12
**gathers** 218:11
**general** 1:12 2:5
  3:10,13 11:17
  164:22
**generally** 43:18
  50:24 51:3,9 60:25
  63:21 78:14 81:7
  112:12 187:20
**generates** 111:17
**gentlemen** 22:9
**gestures** 4:22
**getting** 188:24
  236:18 240:11
  253:12
**give** 4:10 8:19 15:22
  22:10 40:20,23
  56:10 85:6 94:8
  97:21 122:15
  130:14 131:3
  180:10 192:18
  225:17,18 262:24
  266:10 272:3
  275:22 284:16
  293:8
**given** 65:5,9,16,18
  65:19 66:9 75:6
  76:11 77:9,15,23
  243:12,14
**gives** 87:8 263:2
  271:19,22
**giving** 35:12
**global** 30:19 31:2
  282:22
**globally** 282:20,23
**go** 22:17 31:5 47:20

67:14,16,20 71:3
79:17 82:23 84:14
89:9,14 90:20
97:22 102:15
104:10 105:15,16
108:13 110:9
122:14 129:13
131:13,19 133:11
143:5 149:2 152:6
159:2,3 184:12
186:3 187:15
197:24 199:10
202:20 203:7,11
218:15,20 230:11
232:17,22 248:5,7
248:12,17 261:10
262:20 263:25
264:16,18,20
266:20 267:3,6,14
270:24,25 291:9
291:17 299:23
**goes** 163:19 165:12
202:23,23 203:8,9
214:22 215:14
224:17 299:21
**going** 12:9 19:12
65:7 79:13,22
81:24 84:21,24
89:6 98:14 139:17
151:14 160:5
164:10,16 228:16
232:14 246:11
271:13 293:8
**good** 10:11 46:12
195:5 224:13
225:18,19
**gotten** 247:8
**govern** 29:4 55:10
55:24
**governs** 28:17 55:6
55:19,22,23
**granted** 170:23
293:6

**graph** 25:21
**Gray** 205:9,10,18,22
207:20,24 208:21
209:3,6 210:10,13
220:4,6,7 264:2,23
266:16 268:23
269:3,6,8 271:4
273:2,5
**great** 98:5
**GREF** 30:16,25
303:8
**Grey** 272:20
**ground** 232:18
**group** 9:22 10:10
25:20 45:7,8 46:4
46:23,24 47:2
60:21 85:17 87:14
87:17 88:24
125:11 212:6
225:2 244:6 246:7
256:9,10 260:16
260:18 287:5
**groups** 10:7
**guess** 38:13 116:25
236:17 258:17
261:25 265:14
266:6 267:25
276:20 281:12
292:24 295:9
**guidance** 10:21 24:4
24:4,5 28:17 35:12
40:20,23 86:12
151:5 244:8
**Guide** 45:18
**Guideline** 40:9
**guidelines** 23:20
24:7,8,10 30:22
31:2,7,8,10 33:18
34:5,11,14 35:9
244:9
**guides** 193:9
**guys** 63:14 253:5
261:9

**H**
**H** 303:2 304:2
**H-E-L-B-L-E** 201:7
**H-J-O-R-T-H**
147:14
**H:/Drive** 96:8 99:13
99:14 113:6 114:3
116:14 117:10
118:7 120:19
121:2,8 137:2
170:10,13 183:20
**H:/Drives** 170:18,21
**habits** 107:18
**Hamilton** 7:14
**handed** 225:25
**handle** 70:11 276:19
**handled** 108:16
201:3 216:5,15
**handout** 300:5
**hands** 86:13
**happen** 200:24
**happened** 17:24
18:19,21 44:18
71:17 87:11 90:16
90:17 112:3
114:22 204:13
227:9,13 231:25
248:10
**happening** 18:3
132:16
**happens** 163:13
189:17 196:25
197:24 202:3
260:25 301:3,19
**hard** 88:6 115:3
117:23,25 118:4
130:14 133:13
153:5 182:2,4
297:7
**hardware** 75:20,23
95:22,24,25
**head** 4:21 10:5,12
102:13 157:22

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

NYSCEF DOC. NO. 194

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 466 of 553   PageID 893

Page 17

180:11 218:4
295:22
**heading** 24:19 56:2
177:22 183:8
**headquarters** 212:5
274:14
**heads** 66:13
**hear** 63:18 75:10
**heard** 5:24 63:15,20
**heavily** 276:10
284:4
**Helble** 201:7,9
206:9,14 207:2,4
207:15 208:5,9,10
208:25 209:9
211:19,21 212:3
219:9,25 220:2
240:2 241:5,8
242:10,16 244:13
264:14,21,22
265:6,20 266:7,11
266:23 267:4,12
270:16 271:15
272:17,22 273:15
274:5,9
**Helble's** 264:11
266:25 268:6
272:25 273:7
**held** 1:11 71:5
**help** 11:7 24:4 33:13
85:7,25 145:25
146:21 149:22
150:8 158:5,24
221:8 270:14
276:19 288:24
**helped** 93:21,22
146:10,14 186:14
**helpful** 159:2,7
**helping** 95:17
**helps** 24:5 32:25
193:14 212:6
**Hickman** 288:14,15
**high** 56:10 140:17

**highlights** 11:16,18
**highly** 259:8
**hired** 12:14,15
**historically** 165:21
282:17
**history** 12:8
**hit** 184:4 249:22
265:11,13,16,16
**Hitler** 12:6
**hits** 154:21
**Hjorth** 147:9,14
158:9,11
**hold** 35:20 36:3,8,10
38:4 67:10,14,16
67:20 68:2 101:17
101:20 109:22,25
110:18,20 111:7
111:11,21 128:10
128:22,24,25
129:3,6,8,25 130:4
131:6,8,12,18,20
132:4 133:5,14,17
133:21,23 134:14
134:17 139:18
148:3,9 156:9
163:7,9,12,14,17
163:20,22 165:25
166:13 182:15
199:10 200:12
202:17,22,25
203:6,11 204:11
213:21,24 214:4,6
214:11,23 215:14
215:22 216:22
217:24 218:11,24
219:4,10,22
221:15,17 228:23
229:20,22 235:10
235:18 236:3,6,21
238:17,18,20,24
247:10,14 248:22
297:14
**holds** 202:19 203:19

203:21,25 248:12
**home** 6:23,25
**hopefully** 232:15
**hosted** 234:5
**hosting** 44:23
**hosts** 234:8
**hours** 253:23
**housed** 233:12
**Houston** 7:2 50:25
51:10 52:4,23
255:16,17 258:11
258:21 260:2
282:18
**HR** 12:15,15 13:16
13:20 53:3
**HR-type** 53:4
**Hughes** 66:12,19,20
**human** 199:23,24
203:4
**hypothetical** 201:19

---

**I**

**I-A-N** 147:14
**I/:Drive** 125:19
**I/:Drives** 125:21
126:16 127:25
156:8
**I:/Drive** 125:20,25
126:3,4,6,10,14
127:22 128:8
135:2,3,6,22 137:3
137:8 138:6,15,19
141:19,21 156:5
156:10,16,23
**IAM** 293:3
**Ian** 147:9,14 158:9
158:11
**icons** 32:3
**ID** 90:18 99:4
115:14 120:6,7
200:19 267:15
**idea** 101:25 292:18
**identification** 15:25
21:2 23:14 30:5

42:25 45:12 48:9
54:22 62:21 72:9
86:24 109:18
121:20 160:15
270:12 277:8
284:19 299:14
**identified** 27:22
42:15 61:16 84:9
88:25 99:8 111:13
115:2,6 153:3,24
177:2 180:14
182:10 230:6,7,10
230:17 234:22
**identifier** 199:20,22
**identifies** 64:17
237:7 239:3
**identify** 64:13 77:10
77:16,25 84:13
98:9 101:5 107:9
107:13 116:18
163:3 199:11
200:12 257:25
**identifying** 79:16
91:9 98:11 119:2
133:25
**identities** 243:6
**identity** 45:8 58:10
162:15,16 163:2
192:16 193:24
194:25 199:16,20
206:22 219:21
237:13 239:9,18
240:21 243:22
244:21 245:23
269:20,22 270:12
292:4
**image** 50:19
**imaging** 84:17 85:3
85:11,13,15,22,23
85:24 86:8,9,17
**immediately** 210:23
211:2
**impact** 290:16

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

NYSCEF DOC. NO. 194
INDEX NO. 451962/2016
RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 467 of 553   PageID 894

Page 18

impacted 90:17
91:11,12 292:19
293:19,22
**Implement** 293:3
**Implementations**
292:5
**implemented**
192:16 200:24
292:9
**implications** 195:19
195:24
**implied** 247:24
**important** 209:16
209:17 240:25
**impossible** 196:6
**IMS** 25:3,19,20 26:6
**in-box** 116:2,4
224:19 252:14
**inability** 209:15
**inactive** 198:14,24
198:25 199:4,11
238:8
**incident** 7:24
**include** 10:7,20 11:9
70:6 81:24 96:5
110:23,25 182:23
183:2 185:23
203:3 281:10
298:12
**included** 96:6,7
165:22 249:6
287:23
**includes** 36:23 96:3
**including** 98:11
276:20 283:19
**incorrect** 279:25
**independent** 157:9
**independently**
148:6
**index** 32:6,10 302:2
**indicate** 218:10
**indicated** 305:8
**indicates** 217:23

219:3
**individual** 8:10,13
8:16 39:4 84:9
202:23 203:12
235:10,14 237:9
237:25 249:13,18
**individuals** 17:6
88:25 148:10
179:16 239:3
245:15
**influence** 6:11,17
**influx** 209:14
**information** 9:7,11
9:13,18 13:3,20
24:20,25 25:21
28:13 30:16 31:4
33:2,13 44:11,13
76:2 84:11,15 89:9
89:10 98:17
109:12 112:13,16
114:17 143:24
150:23,25 161:3
161:15,24 162:3,4
162:6,10,21
166:20 167:12,13
186:22 197:3
199:18,19 202:13
213:4 217:8,19
218:12,19,25
219:5,19 253:13
262:7,9 267:15
269:21,22 270:9
270:10 274:2
**infrastructure** 10:8
14:11 96:22 145:3
145:4,6,14 146:24
146:25 147:4
148:23 194:22
255:15 256:4
289:6,16,22,24
290:2,4,6
**initial** 18:15 71:20
91:23 149:19

205:12
**initially** 69:16 92:14
93:8,9 292:9
**input** 12:19
**inquiries** 11:7 167:3
**inside** 241:23
254:12
**insight** 281:15
**instance** 28:18,19
127:15 221:12
**instances** 197:17
**instruction** 155:15
**instructions** 65:4,9
65:16 66:9,17,24
67:8,9 75:5 76:11
77:9,16,23 107:6
116:8,13 154:4
155:12 208:18
**intact** 128:22 132:4
**intended** 115:10
154:18 221:8
**intent** 126:11
**interact** 40:15
150:10 201:11
**interacted** 150:12
**interactions** 274:16
**interacts** 201:16
**interfaces** 217:16,20
**internal** 11:2,3,13
56:6,13,16 57:9
245:6 256:25
257:7,21 258:7
**internally** 53:10,20
146:2 255:19
**interpose** 4:4
**interpret** 170:12
**interview** 211:9
**interviewed** 18:18
106:5,10,12
**interviewing** 17:22
**interviews** 105:25
106:14,19
**intranet** 14:13

**introduce** 15:14
20:23 23:12 30:2
42:22 45:10 48:7
54:19 62:19 72:7
86:22 109:16
160:6
**introducing** 87:3
**inventoried** 83:19
83:21,24
**investigate** 245:4
**investigated** 262:5
**investigation** 1:3
3:15 15:15 26:24
28:2 41:4,12 109:4
130:25 204:10
279:25 281:3,5,6
281:22 290:18
**investigations** 11:14
166:2 242:19
**Investor** 140:14
**involve** 27:20 35:7
**involved** 8:15 16:23
17:7 25:14 35:23
35:25 37:3,5,7,9
38:14 67:21 69:17
70:24 71:7 80:11
81:9 84:6,7,12,16
84:20,25 85:2,12
85:20,21 87:10
89:2,5,12 94:6,12
94:16,23 95:17
96:10,10,13 97:13
106:13,19 107:23
108:2,3 109:25
113:11,14 119:2
122:8,12 139:3,4
143:17,19,21
149:11 164:11
178:5,6,8,9 179:15
186:24 193:23
213:19 215:18
217:4 245:11
248:13,15 253:8

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

NYSCEF DOC. NO. 194

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 468 of 553   PageID 895

Page 19

261:17 276:5,8,10
276:13 278:24
281:21 291:5,7,11
293:24 295:18,24
298:20
**involvement** 71:25
73:14 74:14 78:6
79:15,16 96:20
104:15 105:3,20
167:23 186:19
242:17
**iOS** 86:17 96:11
98:22 99:23,25,25
100:5,9,10,12
102:19 141:24
142:15,19 145:17
145:24 146:23
150:9 151:4,10
157:5,13,16 158:3
**IP-based** 54:10
**iPad** 98:23 138:15
138:23,24 139:10
139:23 140:3
**iPhone** 98:23 138:16
138:23,24 139:10
139:23 140:3
**isolated** 261:20
**issuance** 228:2
**issue** 26:10 71:18
132:8,18 240:23
253:7 260:5
276:13,17 277:19
278:23 279:9,12
280:6,13,18
299:22
**issued** 16:24 17:8
41:5 63:3 110:9,22
129:19 148:4
165:9,13,19
248:11
**issues** 4:5,6 289:24
290:2,4
**item** 243:8

**items** 116:3,6
157:11 182:16
254:14 278:2
286:8
**ITOB** 245:24
**ITSM** 66:4,10
**Ivy** 95:5,7 147:25

— **J** —

**J** 2:19 205:12,13
303:7,16,19,23
**J.E** 205:9,10,18
207:20 208:21
209:2,5 210:10,13
220:6,7 264:2,22
266:16 268:23
269:3,6,8
**j.e.gray@Exxon...**
205:16
**J.R** 193:10,11
194:24 200:4
202:8 273:14,21
274:6 292:23
**Jack** 139:15 190:3
**Jackie** 164:7
**Jamie** 1:13 12:5
125:15 139:8
146:5 305:4,17
**JANE** 2:21
**January** 15:11
77:21,22 152:21
155:24,25 169:13
169:15 170:2
172:6,8 175:5
177:13 246:19
**Jeff** 164:17,18,21
190:19
**Jeffrey** 140:9
**jegray@ExxonM...**
262:11
**job** 10:11,18,20 12:7
14:24 19:8,10 35:7
35:10,11 39:16
40:14 47:18 50:9

63:24 87:8 243:17
287:3
**jogging** 280:22
**John** 2:11 40:4
96:19 122:2
143:16 159:11,18
196:19 230:9
288:14,15
**June** 7:7

— **K** —

**Karen** 164:13
288:13
**Kathryn** 87:20,23
194:17,18,19,21
196:16
**keep** 221:8 242:6
278:10 279:5
**keeping** 243:6
**Ken** 288:20
**kept** 91:5 246:16
**key** 144:10 162:18
194:2 243:7,8,10
**keyboard** 86:14
**Keyword** 33:10
**kind** 28:21 32:12
61:8 95:24 147:20
212:2 224:5 245:6
245:16,18 253:6,7
258:17 276:25
**Kingdom** 276:6
**Kirsten** 168:17,23
173:3,11,19,21
**Kivalina** 110:3
**knew** 132:7 151:24
276:16 280:5,7,12
280:21,23 289:25
**know** 6:4 8:20 14:9
17:10,12 21:21
26:3,4 27:2,6,12
27:14,14,16 29:20
29:22,23 32:16
35:4 38:13 39:3,16
42:16 43:22 45:3,5

46:5,8 49:21,25
50:7,9,17,21,22
51:5,23,24,25 52:7
52:9,15 54:5,12,15
55:21,22 56:20,22
56:23 57:2,14,20
57:21,23 58:7,15
59:19 60:14 61:11
61:18,21,22,24
62:2,4,11,14 67:25
69:6,10 73:24
76:15 86:4,5,10,12
86:13 88:6,9,15,17
88:22,23 91:16,22
91:23 92:7,25
93:20 95:10,12
99:16,20,20,21
101:15,18,21,25
102:12 106:18,20
106:20,22 108:12
109:21 113:23
116:10,11,21,23
117:25 118:8,9,11
118:15,20,22,25
119:6,20,20,23,24
120:18,25 126:8
126:15,17,18
127:12 128:19,20
130:10,12 131:17
132:10 133:19,22
134:15,18,19,20
135:11,15,16
136:9,10,14,20,24
136:25 137:4,17
137:19 139:25
140:2,2,4,6,7,11
140:13 141:6,10
141:14,24 142:2,5
142:9,15 147:20
147:23,25 148:8
148:15,24 150:5
151:20,25 152:3,4
154:3 156:19

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM
NYSCEF DOC. NO. 194
INDEX NO. 451962/2016
RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 469 of 553   PageID 896

Page 20

157:3,22 158:21
158:24 159:5,5,6,8
160:25 161:5
163:19 164:10
165:6 166:3,4,6,7
166:8,8,9,10 168:8
169:8,14,18,22,24
170:25 171:14,18
171:19,20 172:4,7
172:18 173:22,24
174:2,5,17 175:8
175:10 176:14,15
177:16,18 179:14
179:18,23 180:11
182:4,6,16,20
183:3,12,13
184:17,19 192:12
193:16 194:14
196:3,9,11,17
198:14 201:16,17
202:2,8,11 203:20
204:3,5,6,7,15,16
205:5,20 206:4,6,7
206:8 208:9,11,18
209:18,19,21,22
210:8,11,13,17
211:12,15,17,18
211:19,21,25,25
223:6,7,10,14
225:8 226:3,8,20
228:4,5 229:16,17
229:19,20,21,23
231:12,13,17,20
231:21 232:6
233:3,4,6,7,11
234:6,10,13,17
235:5 237:24
238:6,12 240:21
241:17 242:4,14
242:20 244:11
245:9,14 247:9,16
250:11,17,20,25
251:24 252:11,16

254:20 255:18,25
256:3,5 257:24
258:3,6,15 259:3
259:13,22 260:3,5
260:6,9,13,20,21
260:25 261:4,6,9
262:3,16 269:13
271:9 272:6,7,9,11
272:13,15 273:10
273:17,25 274:5,6
274:6,8,15,18,19
274:24,25 275:5
275:12,14,16,18
275:20,21 276:16
277:16 278:7
279:2 281:2,10,11
281:14,15,19
284:6,9,10,13,14
285:9,11 288:25
296:7,13,18,19,25
297:2 298:5,6,8,11
298:25 299:6
301:6,9,13,16
**knowing** 228:19
**knowledgable** 62:6
91:22,25 92:16
93:11 107:11
193:12 195:8
273:12,21
**knowledge** 17:2,20
17:21 26:25 31:13
31:17 33:20 34:4
54:5 56:19 57:17
59:8 62:10,14
63:17 80:9 90:7
91:3,8 92:4 96:23
107:15,17 115:17
115:21 134:4,10
144:2 149:13
151:14 163:25
164:21 165:4
166:23,25 167:2,5
168:5 181:13

193:19,22 194:4
194:16 212:21
225:7 233:15
271:6 299:10
**known** 137:22
244:18,24 245:3

————————
**L**
**L-A-U-C-K** 70:20
**L-E-O-N-G** 39:13
**LAN** 170:10 198:17
198:19
**land** 125:21,22
**language** 190:10
**laptop** 96:6
**laptops** 75:17 98:20
99:9,11,15 102:19
145:7,9,12
**large** 10:2 94:10
95:13 98:8 162:23
204:22,24 209:14
276:23 282:13
**larger** 33:2
**late** 70:3,23 92:19
127:3 201:2
**Lauck** 70:20,21,24
73:18 76:2,17
83:12 88:13 95:16
95:20 96:9 101:14
105:14 106:18
107:23 115:8,15
115:24 116:12
118:12,12 119:22
124:24 126:18
127:18 130:16
135:15,20 136:13
136:13,15 137:11
140:7 141:12,21
142:20 145:10
148:2,24 149:10
153:2 154:9,23
155:16 156:22
168:25 170:15,19
171:20 172:2

174:18,20,21
176:21 178:9,22
180:16 181:21
182:21 183:5,6
204:5,6,8 211:8,18
216:5,14,24
246:17 248:8
249:12 250:21
251:5,11 253:11
299:9
**Lauck's** 116:6
**law** 3:13,14 4:13
11:11 20:7 22:8
36:7,14 38:10
64:16,22 68:25
71:14,19 73:20,21
73:25 74:4 77:24
78:25 90:14
106:17 107:7,9,12
107:22 109:13
111:19 112:4
114:23 116:13,24
118:12 123:19
133:25 134:20
136:15 141:3,11
142:9,18,22
148:16 161:7
163:15 164:13
166:7 167:19
168:6 169:2,6,8,20
169:22 170:6
172:16,22,25
173:14,17,20
174:3 176:12,24
177:18 181:3,14
184:20 185:20
187:25 188:14
189:20 190:22
204:3 213:19
214:21 215:16
216:19 217:14
224:3 235:9,17,19
235:20

lawsuit 295:4
lawsuits 110:4
lawyer 20:4
lawyers 20:4,5
Lead 87:25 213:2
learn 113:15 208:20
  244:13
learned 208:22,24
  244:16
leave 13:7
leaving 149:24
Lee 87:24 212:24,25
left 13:10 31:6
Legacy 230:2,19,21
  231:11 254:25
legal 58:16,18 163:7
  166:13 202:18
  203:24 235:10
  236:7,8,20
Leong 39:13 59:9
  60:21 61:23 62:16
  84:10 87:19 94:12
  136:13 143:16
  152:4 159:12,18
  223:7,17 226:16
  231:21 273:15
  274:8
let's 7:16,17 10:10
  77:19 96:16
  153:10 158:2
  190:8 196:13
  225:19
letter 40:4 72:16,16
  87:7 104:12,23
  112:20 113:4
  121:25 125:19
  138:5 160:12
  161:22 303:14,16
  303:19,23
level 10:22 35:16
  56:11 140:17
  279:3
Levy 20:6,12,14

22:8,11 74:3 90:15
  148:16
lie 224:20,21
likewise 293:18
limit 261:8
limited 177:20
line 14:21 56:4
lined 122:16
lines 59:25
link 55:23 206:21,23
linked 90:9 207:2,7
  207:9,12 208:24
  240:3 241:5,9,14
  244:14 245:2
  263:16
list 32:7 64:17 68:17
  73:2 76:20 87:16
  94:8 102:12 123:4
  137:7 138:3,12
  141:18 186:4
  224:16,20,23
  253:24,25 296:20
listed 40:6 73:3
  102:5 117:9 123:5
  123:9 137:18
  139:24 141:25
  176:16 251:19
  286:25
listened 84:22
lists 224:12,13 225:6
litigation 8:15 35:20
  36:3,8,10 38:4
  64:12,16 65:5
  66:21 67:4,10,14
  67:16,18,20 68:16
  101:17,20 109:4
  109:22,25 110:18
  110:20 111:11,21
  112:4,5,17 129:6
  129:25 130:4
  131:6,8,12,18,20
  133:5,14,17,23
  134:14 139:18

148:3,9 156:9
  163:12,20,22
  199:9 202:17,22
  202:25 203:6,11
  203:19,21 204:11
  213:21,24,25
  214:4,6,11,23
  215:14 216:22
  217:23 218:11,24
  219:4,10,21
  221:15,17 228:23
  229:20,22 236:3,6
  238:17,18,20,24
  243:2 247:10
  248:12,21 290:19
  293:25 295:10,16
  296:9,24 302:2
litigations 165:25
  229:13 242:18
little 81:18 123:9
  130:14 202:21
  206:18 249:18
LLP 2:15
load 172:19
loading 124:5
  168:22
local 70:17,17
locate 144:12
located 52:22
  107:15 153:25
  231:14 233:25
  234:14 256:2
  282:15
location 52:3 79:25
  80:2,4,5,6 85:11
  119:7 135:4,6
  144:22 153:15
  258:10,20 259:2
  259:25 260:7,11
locations 50:25 51:2
  51:8 52:5,7,23,25
  75:8,14 101:5
  115:2 125:22

153:4 248:17
  258:12 260:2
locators 191:3
locked 79:19
log 45:22 46:5 61:19
  207:19 262:23
  265:17,18,20
  267:11 271:11
  272:10 274:21
  282:25
logged 265:25
  266:12 268:23
  269:5,25
logging 273:18,18
Logical 85:11,12,15
logically 227:15
  229:5
logon 271:12
logs 45:25 60:22,24
  60:25,25 61:25
  62:3 151:15,19,22
  151:24 152:5
  158:13,15 159:14
  159:16,17,19,25
long 6:5 14:7 15:7
  60:14 67:15
  171:16 234:10
  298:25
longer 33:2 163:17
  163:22
look 8:4 10:15 21:14
  68:5 74:18,21
  75:13,17,20,21,22
  75:23,24 78:17
  100:18 105:15,16
  106:6,8 108:14
  112:23 116:7
  131:16 147:10
  156:23 158:22
  179:12 184:13
  186:4 187:14
  194:20 201:24
  205:17,24 208:2

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

NYSCEF DOC. NO. 194

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 471 of 553   PageID 898

Page 22

209:2 225:8
241:20 264:2,6,17
267:3 268:13,18
277:4,18 278:20
285:7,12,21
287:19 295:22
296:3 298:2,22
**looked** 49:22 74:4
74:23,25 75:5
90:16 100:21
140:4 144:22
150:21 159:6,25
166:21 233:16
234:2 246:18
261:11,20
**looking** 28:11,12
50:19 78:24 79:10
95:22 96:9 98:17
100:14 146:18,20
149:24 150:6
151:15 188:2
231:23 233:19
247:22,25
**looks** 59:5 110:5
278:8 285:18,19
**lost** 259:21 296:23
297:5,11
**lot** 86:12 118:5
134:10 140:19
167:12 250:7
261:16,17,21
297:8
**Lotus** 92:14,22
93:10,13 126:20
126:23,24,25
127:4,10,14 128:8
130:6,7,11 135:2
136:3,5,10 137:15
137:24 175:6,9
196:4 200:20,21
229:8,10,11
239:25
**loud** 25:7,9 72:24

**LST** 95:23
**Luettgen** 136:19,20
**Luettgen's** 137:2
**lunch** 89:21 97:25
103:5 142:23
**luncheon** 103:6
104:2

## M

**maiden** 7:13
**mailbox** 56:2,5
57:10 59:17 60:3,7
60:9 62:7 88:15,17
88:21 256:25
257:19
**mailboxes** 225:14
226:10,13,19
**Mainframe** 289:20
289:21 290:8
**maintain** 163:2
246:2 270:12
**maintained** 28:24
**maintains** 30:25
246:4
**maintenance** 283:15
293:16
**major** 290:15
**majority** 189:18
**making** 37:12
195:19,25 215:10
**manage** 10:23
162:19 193:14
224:9
**managed** 272:8
**management** 9:8,12
9:16,25 11:6 15:3
15:6 16:18 23:20
25:12,21 27:4,7
29:19 30:16,22
31:2,3,7,8,9 33:19
34:11,14 35:8 40:9
42:14,17,17,18
45:8 57:10,15,18
57:22,25 58:5,12

66:7 69:12,13,18
70:6,12 71:8,20
72:3 73:10 77:13
78:8,11,15,15
79:12 80:12,15,20
81:23 82:2,12,18
83:2,25 84:18
87:12 88:7 89:3
98:25 100:15,19
101:3 102:20,23
102:24 105:5,12
105:13,22,25
106:4,11 107:4,10
107:16 108:10,15
108:23,25 110:23
110:25 113:13,16
114:16 118:13
119:5,16 120:23
121:5 122:4
126:13 132:19,21
133:20 136:21
139:21 140:12,17
140:21,22 145:18
147:15 148:4,19
149:11 152:20
156:6,11,20,25
162:15,17 165:6
165:15 166:12
170:9,17 171:8,23
174:15 175:15
176:8 177:5,14
178:14,21,23
179:18,19,22,23
180:12,15 184:13
184:14 185:24
186:5 192:17
193:24 194:2,25
203:23 204:9,13
204:24 209:13,20
210:2 216:3,6,12
216:15,19 224:18
226:9,11 231:16
232:2,4,7,25 233:5

233:18,22 237:13
240:10 243:20,22
244:9 245:23
249:5 257:6 258:8
260:22 261:2,7
274:10,17,20,21
275:2,19 287:5
292:5,10 296:11
296:15
**management-level**
287:10
**manager** 9:7 10:19
14:20 15:5 16:18
39:20 66:21 164:8
194:20 201:9
208:12 212:5
242:23 278:12
282:11 287:7,20
**managing** 194:3
202:10
**Mandy** 2:10 3:9
**manner** 4:24 109:2
117:15,18 120:22
121:5,10,12,16
**Manning** 12:5
125:15 139:8
146:6
**manual** 173:7
187:11,12,24
188:6,10
**manually** 115:2,14
187:15 188:13
201:24 211:13
**manuals** 193:5
**mapping** 32:20
279:16,24
**March** 21:11,16
63:5 71:10 73:14
73:17 78:7,20 86:5
105:21 113:11
119:25 122:6
132:24 134:24
139:11 141:8

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM
NYSCEF DOC. NO. 194                                    INDEX NO. 451962/2016
                                                       RECEIVED NYSCEF: 06/02/2017
Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 472 of 553   PageID 899

Page 23

160:7 178:3,4,4
  183:11 210:7
  244:10
**March/April** 69:21
**mark** 15:21,23
  112:24 113:5
  284:17
**marked** 15:25 21:2
  21:4 23:14 30:5
  42:25 45:12 48:9
  54:22 62:21 72:9
  86:24 109:18
  121:20 160:15
  256:16 277:8
  284:19 299:14
**married** 7:8,16,17
  13:6 48:3
**massive** 94:7
**material** 247:19
  303:15
**materials** 83:20,22
  140:19 170:15,16
**matter** 1:3 7:22 8:8
  90:12 93:24 94:3
  95:11 111:16
  131:7,8 134:14
  163:12,18 210:7
**matters** 286:3
**Mayflower** 7:23
  293:25 295:10,15
  296:9,13,23
**Mc** 289:17,19,25
**mdolan.ppt** 300:10
**mean** 36:19 55:15
  55:17 61:13,14
  68:10,13 72:4 77:5
  88:19 129:4 173:9
  183:15 185:6
  187:13 189:13
  192:9 195:22
  220:19 230:20
  250:9 273:6
  286:19 300:14

**meaning** 91:10
  220:21
**means** 4:13 47:15
  160:25 187:14
  192:11 220:24
  230:21 273:4,8
**meant** 64:9 77:7
**mechanism** 88:20
  221:7
**medical** 6:18
**medication** 6:17
**meet** 65:2
**meetings** 8:22
**member** 133:21
**member's** 186:6
**members** 70:9 83:2
  100:19 102:20,25
  106:11 120:23
  121:6 122:4
  140:22,23 165:7
  179:15 180:13
  189:4,16,24
  190:18,21 209:21
  226:12 253:22
  274:11 275:3
**members'** 224:22
  274:22
**memory** 6:14,20
  17:23 180:18
  276:11 280:22
**mentioned** 18:4
  39:8 48:21 49:10
  52:24 68:7 77:3
  87:13 93:23 99:9
  100:14,24 130:20
  133:3 134:12
  143:10 217:3
  237:4 240:6 243:5
  254:8 293:24
**mentions** 44:20 57:9
**message** 300:24
  301:2,6
**messaging** 87:25

88:2,3 212:25
**met** 18:17 19:21,24
  19:25 212:7
**metadata** 158:14,22
  159:5
**methodology** 74:21
  76:8,9 116:18
**methods** 209:12
  300:23
**Michael** 117:8
**Microsoft** 53:13,15
  54:7 92:18 93:3,14
  94:15 98:10
  115:12 127:5
  176:18 181:11,12
  200:25 201:4
  208:6 221:24
  222:2,3,5,8,17
  223:12 233:2
  240:2 243:23
  244:2 249:14
  250:8 254:6,13
**middle** 32:11,19
  108:6
**Middleware** 289:15
**migrate** 199:7 222:7
  222:12
**migrated** 93:13,14
  93:15 221:25
  222:2,19
**migrating** 127:4
  223:11
**migration** 93:20,22
  213:9,11,13
  222:22 223:3,4
  227:11
**mind** 47:21 142:11
  188:15,21
**mine** 245:10
**minute** 178:20
  279:6
**minutes** 149:2
  275:23

**mirrored** 88:8,10
**missing** 252:2 253:4
  279:15,22
**mistake** 228:12
**mistaken** 114:9
  158:10 238:5
**misunderstanding**
  297:16
**mm-hm** 44:22 57:12
  59:15 87:15 96:18
  97:20 117:12
  129:22 135:14
  146:13 149:9
  179:5
**Mobil** 1:5 2:16
  300:12
**Mobil's** 23:19
  172:11 173:13
  290:13 299:4
**mobility** 146:17
  147:11 158:7,8
**module** 278:14,16
**modules** 283:14
**moment** 71:4 81:5
  190:5 245:20
**monitor** 10:25
**monitored** 61:17
**monitoring** 61:10
**months** 131:12
  221:3 227:23
  229:3,4 252:2,4,8
  252:12
**morning** 147:16
  193:6
**move** 78:2 116:25
  197:15 210:20,21
  232:20 250:3,5
**moved** 13:22,24
  15:4 116:4,6
  197:14 212:9
  216:5,14
**moves** 211:13
**moving** 17:13

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

NYSCEF DOC. NO. 194

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 473 of 553   PageID 900

Page 24

112:21 134:22
168:22 197:17
**multiple** 108:5
125:24 126:2
233:21 266:24
267:7
**MySites** 117:10,20
119:8,9,12

**N**

**N** 2:2 3:2,2,2,2
104:6,6,6 303:20
**N-E-A-G-L-I** 73:23
**name** 3:8 6:22,24
7:4,6,11,13,15
39:5 73:22 87:21
119:2 137:6 138:3
138:11 147:10
158:10 255:6
288:23 291:20
**names** 12:3 29:7
40:5 48:3 65:20
67:5 102:8,12,13
110:10 132:20
139:20 233:20
**native** 115:12
**Neagli** 73:21,23
**near** 256:24
**necessarily** 61:12,13
270:18
**necessary** 79:21
200:21
**need** 6:3 25:8 26:9
35:14 40:22,25
58:2,4 64:23 103:2
112:6,14 124:7,17
125:2 160:3 163:4
172:17 196:12
212:13 241:4
**needed** 63:14 66:14
68:5 112:8 210:23
219:22 225:22
**needs** 41:14 64:20
206:21 212:7

**network** 10:25
44:20 53:20 100:7
147:19,22 162:20
192:16 263:19
265:5,6,12,16,17
265:20,25 266:12
268:2,7,16 269:6
270:2,17,19,23
271:14,20 274:22
274:24 297:10,14
298:13
**never** 113:20 205:7
205:18,19 206:5
209:8 220:11
223:25 242:21
243:3 262:13
263:4 268:23
273:2 277:20
**new** 1:12,13,14 2:4
2:8,8,18,18 3:11
3:12 93:16 125:18
126:21 128:7,22
129:16 132:4
134:23 137:7,13
138:4,14 141:17
160:6 197:4,19,20
201:23 222:19
223:12 231:5
255:3 292:9
**NGLCA** 300:9
**nine** 166:11 252:7
252:10,12
**nineteen** 48:4
**nod** 4:21
**non** 4:22
**non-e-mail** 153:4,6
153:12 170:3
**non-Management**
178:18
**non-SAP** 286:9
287:23
**nonmanagement**
70:8 179:6,11

180:2,5 189:4,15
189:23 190:18,20
191:6,14 216:2,11
**nonperson** 268:11
268:22
**nonpersonal** 219:16
219:17 220:10
224:5,8 225:9,12
238:15,20 239:17
**Nora** 2:20 121:25
**normal** 112:2
163:24
**normally** 109:6
172:21 253:10
**Norwood** 278:22
**Notary** 1:14 3:3
305:5
**noted** 301:23
**notes** 92:15,22
93:10,13 126:21
126:23,24 127:2,5
127:10,14 128:9
130:7,7,11 135:2
136:4,5,11 137:16
137:24 175:7,9
196:5 200:20,21
229:8,10,11
239:25 305:10
**notice** 32:16 67:11
109:22 110:8,21
110:23 111:7
129:25 130:4
131:20,21 133:17
133:21 139:18
163:21 166:14,18
166:19 202:22,25
203:6 228:23
253:3
**noticed** 251:25
252:12,16,20
**notices** 36:4,8 67:14
67:16,20 110:18
111:11 148:9

163:12 203:11
**notification** 40:13
40:16,23 42:4
67:12
**notified** 163:23
**November** 16:25
17:9 110:15,16,17
110:22 128:11
131:22 139:12
163:7 164:4 166:2
175:21 226:25
227:18 228:16,21
228:24 246:22
247:4 279:22
**number** 8:21 10:2,6
10:14 19:6 42:12
48:5 84:7,11 87:14
90:6 94:5,10 97:9
114:9,12 121:18
140:9 141:16
150:14,20 177:20
**numbers** 72:19
**numerous** 167:4

**O**

**O** 3:2 104:6,6,6
**OAG** 110:21 303:14
**oath** 4:11 160:23
**object** 3:25 76:23
**Objection** 19:18
65:6
**objections** 4:4
**objectives** 241:6
**objects** 65:21 68:18
**obviously** 94:12
110:10 181:10
**occur** 71:12 150:16
**occurred** 71:13
208:5
**occurs** 67:15 261:4
**October** 23:23
**office** 1:11 2:5 3:10
3:21 16:25 17:9
26:24 28:3 41:5,17

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

NYSCEF DOC. NO. 194

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 474 of 553   PageID 901

Page 25

85:10 140:14
**office's** 41:12 49:15
**offsite** 50:20,22 51:5
51:14,21 52:2,10
52:16 56:21
**oh** 18:22 21:16
74:10 76:9 111:10
123:2 188:9 195:3
231:12 290:21
291:13 295:3,7
**okay** 3:17,23 4:7
10:13 18:23 21:17
34:24 35:3,6 44:10
47:13 50:6 65:11
74:10 81:4,6,17,21
82:3 84:5 85:8
86:15,20 87:18
88:4 89:18,22
91:15 92:24 96:15
97:7,18,21 98:2,8
104:13 111:10
123:3,11 143:9
144:9,16 145:23
146:14 162:13
176:4 190:17
203:12 206:19
217:15 221:18
229:18 236:4,5,19
242:15 247:3
248:20 257:14
261:5,15 262:10
265:9 268:9
270:15 279:4
282:2,3 283:24
284:23 294:9
295:8
**old** 127:6 130:12
221:3 248:2 297:8
**older** 231:3
**oldest** 230:12
247:23 248:4
**Oleske** 2:11 40:4
72:17 87:8 122:2

161:23 232:13
275:22 276:3
284:16 299:11
301:21 302:5
303:7,16,19,23
**Olugbenle** 288:24
288:25
**once** 5:12 132:7
160:6 228:6
**one's** 273:5,7,8
**one-to-one** 198:21
**ones** 111:21 146:16
154:20,21,21
**ongoing** 19:7,10
24:16 26:11 28:25
68:4 69:9 192:20
197:12 226:6
**online** 283:12
**onsite** 282:18
**opening** 14:12
**operation** 95:8
**operational** 225:16
225:22 226:7
**operations** 39:19
60:12 86:11 256:9
**opposed** 233:13
250:23 253:9
293:7
**ops** 70:16 148:23
**orally** 65:23
**order** 20:18 48:22
49:13 98:4 153:11
**ordinary** 253:9
**organization** 10:9
10:21 12:23 14:17
14:21 15:3 16:7
24:6 25:25 30:20
40:25 164:20
199:9 201:10
240:12 245:24
287:22
**organizational** 16:9
16:23 17:7

**organizations** 10:8
14:5,25 38:8
**organized** 42:12
**original** 17:11 186:9
**originally** 12:14
92:23 248:11
**outage** 28:8
**outline** 149:20
**outlined** 278:2
**outlines** 72:17
**outlining** 122:2
**Outlook** 92:6
154:25 155:8,17
174:25 175:4,10
175:13,16 176:18
249:14 250:8
251:14 252:14
**outside** 168:7
173:13 174:4
187:25 188:14
240:11,18 241:20
260:11 262:4
**overall** 215:9 217:2
244:5
**Overview** 285:23
**owned** 51:22 215:19
246:6
**owner** 38:22 244:3,4
**owners** 38:7,11
**owns** 30:25 31:3
39:4 244:7 246:4

———————————
**P**
**P** 2:2,2 300:11
**p.m** 89:17 103:7,7
149:4,4 152:10,10
188:19,19 276:2,2
301:23
**page** 21:14 22:13
24:17 26:12 29:8
30:7 34:8,15,22
40:8 44:19 45:19
46:9,15 50:16
53:22 54:2 55:25

57:3 59:11 72:20
113:7,8 117:2,7
120:16,24 121:7
122:21 140:9
256:18,19,20,23
257:9 266:22
272:17 279:18
285:7,24 290:25
291:3,9,12,12,14
291:15,16 293:2
302:3 303:3,8
304:3
**pages** 73:5 303:5
**paper** 113:6 114:3
116:20,21,22
117:11 120:19
121:2,9 137:3
175:14
**paragraph** 27:18
35:2 36:22 57:6
59:24 162:12,13
163:5 164:2,25
165:5 166:11,22
166:24 167:10,16
168:11 169:25
171:21 174:6
176:5,16,17,25
177:7 178:24
180:22 181:8,16
182:8,22 183:7
185:16 186:7,16
186:20 187:7
188:4 190:8 191:4
191:12,25 193:21
194:6 212:15,18
212:22 213:5,6
220:13 223:19
226:22 229:25
247:2,5 253:19
257:5 277:22
278:21 300:7
**paragraphs** 168:24
169:16 177:21

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM
NYSCEF DOC. NO. 194
INDEX NO. 451962/2016
RECEIVED NYSCEF: 06/02/2017
Case 3:16-cv-03111-K Document 36-1 Filed 07/26/17 Page 475 of 553 PageID 902

Page 26

**parents** 8:17,17
**Parkway** 6:25
**part** 9:12 11:8 19:7
19:9 26:9 44:16
47:17 50:3,8 51:18
65:18 66:25 67:2
68:4 70:25 76:12
82:14 100:7
132:14 133:2
164:23 187:19
225:24 244:19
245:8 279:6,7,13
**part-time** 13:9
**participated** 74:2
90:4,4 193:25
**particular** 111:6
153:14 154:24
**parties** 305:13
**parts** 89:4
**party** 149:18
**password** 207:19
212:13 270:21
271:12,19 272:14
**passwords** 271:7
**Patel** 139:7 142:4,6
142:7,8 146:5
185:15
**Paul** 2:14 95:5,7
147:25 160:12
161:22 303:23
**pegged** 227:25
**pending** 5:12 6:6
**people** 11:24 16:22
17:19,22 18:6,7,9
18:17,18,23 19:6,7
32:25 39:9 40:6
49:19 50:2 84:7,12
87:9 90:6 94:6,9
94:10 99:18,19
107:18 150:14,20
156:7 163:2,3
165:14,18 196:21
197:11 207:14

221:8 230:8
240:10,19 241:15
241:20 260:25
261:16 273:16,24
281:20,24
**people's** 237:8
**perfect** 79:5
**perform** 225:23
**performed** 60:4,10
284:11
**performs** 60:11
**period** 12:23 13:5
68:20,21 79:8,11
82:17 101:24
129:8,19 133:12
149:25 165:9,11
165:16 184:8,9,15
221:13,21 227:4,5
227:10,25 228:3
247:11,12 253:24
275:17
**periodically** 99:12
**periods** 205:20
**perjury** 4:15
**permission** 179:24
**permissions** 156:23
**permit** 4:3
**permitting** 3:21
**person** 92:3 97:6
118:24 125:12
127:16 129:4
134:7 137:11
147:12 148:18
151:7 158:7 164:8
182:7 194:12
195:12,17 203:22
214:5,11 217:23
221:14,16 226:2
235:4 236:13
238:7,13 239:14
245:2 293:7,8,9,11
**person's** 236:23
**personal** 35:16 59:7

78:6 92:4 96:4
163:25 165:4
166:23,25 167:2,5
170:8 171:10,12
171:17,22 174:23
174:24 177:4,6,8
177:10,14,20
182:18 193:19,22
194:4 210:3
212:21 219:23,24
220:3,7,9 224:7
234:22 235:3,12
235:13 236:23
238:2 239:16
245:2 268:21
**personally** 90:3
108:2,3 150:10
295:18
**persons** 36:9 180:13
**photo** 31:5,14 32:19
**photograph** 31:20
**photos** 32:2
**physical** 75:20,23
80:5,6
**physically** 195:13
214:14,17
**picked** 202:16,18
225:4 234:20
**picture** 53:25
**piece** 78:24 85:5
152:23 215:6
223:8 237:19,20
**pieces** 78:22 245:11
**Pipeline** 7:23 293:25
**place** 79:21,22
131:10 133:23
166:18 202:10
236:7 247:14
**placed** 101:17,19
**places** 98:12 150:22
**plaintiff** 8:9,11
**plan** 27:3,4 277:23
**planning** 14:15

**plans** 26:17,18,21
26:21
**platform** 172:11
173:3,23 187:23
192:7
**play** 37:11,24 294:9
294:15
**played** 91:2 245:24
**plays** 140:17 293:11
**please** 4:20 5:6 6:4
6:22 52:14 57:4
152:8 206:18
282:4
**plus** 175:17
**PNYAG** 303:4
304:4
**point** 27:21 71:18
108:22 111:5,22
111:25 112:7
130:21 131:22
163:15,21 181:10
193:3 218:21
229:2 242:9
248:23 284:7
293:2
**points** 291:24
**policies** 33:18 56:24
**policy** 13:9 28:16
31:4 43:8,19
129:12 296:8
**populate** 92:8
**populated** 155:18
**posed** 244:21 245:6
**position** 12:8 39:5
287:11
**positions** 196:22
**possibility** 144:13
144:21 157:23
**possible** 148:13
171:7,11 192:13
196:10 198:23
212:8 272:16
275:4,20 300:15

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM
NYSCEF DOC. NO. 194
INDEX NO. 451962/2016
RECEIVED NYSCEF: 06/02/2017
Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 476 of 553   PageID 903

Page 27

301:4
Possibly 196:19
  292:21
potential 67:18
  77:25 109:3 153:4
  244:20 245:5
potentially 77:11
  84:13 104:16
  105:4 107:2,14
  126:7 170:2
  176:25 182:8
  230:18
practical 92:6
practice 192:5,10,12
  192:15,21,23
  193:17 194:8
  196:2 197:11
  198:8
preparation 18:2,11
  20:17
prepare 17:14 18:24
  19:15,22,25 20:2
  20:13,15,18
prepared 17:18
  18:16 20:20
  160:21
preparing 18:11
  161:25
present 3:20 19:23
  20:3
presented 16:11
presently 6:10,16
preservation 110:2
  128:10,21,24,25
  129:3
preserve 148:11
preserve-in-place
  130:3
preserved 129:18
  139:11,15 148:6
  175:21 203:19
  219:11 229:12
presumably 247:19

264:21 266:7
presume 58:6,8
  130:11 135:5,9
  140:20 160:24
  169:10 171:14,15
  173:11 260:19
  281:10
presumption 140:25
pretty 65:12 94:7
prevalent 68:15
prevent 36:25
  133:14
preventing 133:7
previous 41:20
  247:7 293:21
previously 80:24
  141:5 181:18
  183:21 191:23
  238:14 243:5
  256:15
Pricewaterhouse
  285:16,18
Pricewaterhousec...
  15:17,19 285:4
primarily 284:4
primary 39:14
  210:24 234:4,7,8
  234:12,14 267:16
prior 16:15 34:7
  60:6 73:8 74:13
  105:2 131:17
  132:10 167:22
  199:11 200:2,5
  202:18 203:19,20
  204:17 223:21
  242:16 244:10
  247:19 255:20
prioritize 209:16
privilege 4:5 5:15
  19:19 76:24
probably 26:8 84:10
  126:18 136:12,15
  148:16 151:23

159:11 211:7,18
  230:10 274:7
  285:11,12
problem 276:15
procedure 28:16
  43:7
procedures 28:20
  28:21,23,23 29:2,5
  48:15,20,22 49:3
  49:12,12,19 50:5
  50:11,14 244:9
process 11:12 27:20
  40:13 47:16 65:19
  67:2,3 68:4,14,15
  69:16 84:21 91:4
  131:16 148:11
  157:10 163:7
  164:16 185:11
  194:25 202:4,5,10
  209:25 215:11,24
  216:9 217:2
  236:16 249:7,11
  250:5,23 252:7
  255:3 259:20
  292:19 294:16
processed 254:15
  296:15
processes 35:19,20
  40:16 67:7 96:24
  163:24 164:22
  169:5 189:18
  225:15 230:23
processing 61:9
  127:19 283:13
  290:23
produce 290:17
produced 15:16,18
  72:18 76:4 85:10
  105:6,8 113:23
  122:10 125:9
  141:5,8 142:17,21
  174:13 179:3
producing 242:17

243:3
product 19:20 53:14
  53:16
production 71:24
  72:2,5 104:12,17
  104:19,22 122:3
  123:14 134:25
  139:11,13 299:23
  303:13,15
professional 12:17
  12:20
program 130:8
  213:18 214:10
programs 11:2
progress 277:24
project 13:4 164:8
  193:25 292:8
pronouncing 286:23
properly 223:14
proprietary 231:8
prosecuted 4:14
protect 243:15
protection 31:3
protocol 167:15,18
  167:24 168:3
  223:5,15
protocols 56:24
  169:5
provide 11:4,10,11
  11:13 24:3,4,5
  53:4 68:24 69:2
  80:15 84:10
  186:14 189:11,20
  189:21 212:3,6
  213:3,5 244:8
  292:3
provided 86:12
  112:17 143:24
  151:5,13 154:22
  161:3,15 162:9
  173:10 177:17
  187:14
providers 53:3

**FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM**
NYSCEF DOC. NO. 194
INDEX NO. 451962/2016
RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 477 of 553   PageID 904

Page 28

**provides** 64:11,22
193:13 211:22
214:24 217:8,16
217:18,24 218:19
218:25 219:5
**providing** 10:20
14:4 97:14 150:22
186:21 292:10
**proximity** 191:3
**proxy** 174:10,14
175:17
**PST** 95:23
**Public** 1:14 3:4
305:5
**pull** 153:14
**pulled** 153:15
**purpose** 5:16,17
285:13
**purposes** 226:7
238:16,18
**put** 58:19 59:5 68:2
68:24 80:16 99:13
101:6 115:6,23
116:19 153:6
154:2,22 170:24
185:2 199:9
200:11 214:3
219:9 228:5 236:6
249:17 250:12
271:12
**puts** 218:23 235:9
235:22 236:20
271:18
**PWC** 286:14

────────
**Q**
────────

**quality** 143:22
169:4
**quantities** 204:22,24
**query** 201:18
**question** 4:2,3 5:7
5:12,13,14,21,22
5:23 6:6 17:4
18:14,15 25:10

33:24 43:13 44:4
52:13 60:6 74:7
75:11,17 83:18
85:18,18 92:21
93:4 105:19
109:14 114:13
129:2,14,16 131:3
142:10,13 146:9
146:12 165:23
168:19 186:16
188:22 203:13,16
209:3 221:19,20
241:12 242:13
244:22 252:22
258:18 281:12
282:3 292:25
298:16 299:21
**questioning** 124:23
**questions** 4:8,18,23
6:13,19 17:19 18:6
18:7,9,18 19:11
35:14 36:11,11
40:19 41:3,13,17
41:22,25 89:20
97:23 144:3,4,7,10
144:15,20 232:15
242:5 297:9,10,12
297:18 298:5,7,10
298:12,18
**quickly** 79:23 143:6
232:16,20,22
**quite** 107:11 261:13
297:8
**quotas** 221:9
**quote** 300:9,11

────────
**R**
────────

**R** 2:2 104:6
**R-A-L-D** 200:8
**R37** 217:22
**raised** 242:5
**Ramona** 201:7,9
206:9,13 207:2,12
208:25 240:2

241:5,8 267:3
271:15 273:15,22
**Ramona's** 267:16
268:20
**ran** 115:24 174:21
174:25 175:3,3,8,9
175:10,13 180:12
181:20,21,23,25
251:11,23 289:10
**ranges** 122:23
303:15
**raw** 184:5
**read** 24:22 25:7,8
34:25 47:14 57:7
58:25 72:12,24
122:24 156:18
157:2 281:18
**read-write** 156:18
**reading** 24:24 72:25
123:3 168:18
278:10 279:5
280:8
**reads** 27:19 56:4
57:25 59:16 60:2
192:4
**ready** 103:4
**Real** 30:19
**realized** 79:7
**really** 43:11,18
57:14,16 67:22
161:6 162:24
188:25 224:24
241:25 280:22
283:8 301:16
**reason** 128:16 141:2
234:19
**reasons** 187:3
206:24
**recall** 20:10 25:17
29:4,6 31:23 32:8
32:10,14 48:17
50:11 71:17 74:17
109:24 119:18

151:20 154:5
157:21 180:9
193:7 211:5 218:3
233:17 244:4
254:19 261:22
269:15 276:5,8,9
276:12 277:3
279:8,11 280:10
280:21 285:2,5
286:6 296:14
298:2,4,23
**receipt** 166:13
**receive** 21:18,20
41:3,13,16,25
67:23 134:3
163:21
**received** 21:22 22:3
22:5 82:24 99:2
129:7,25 131:19
133:4,20 166:19
227:22,24
**receives** 130:4
**receiving** 82:25
**recess** 47:24 89:16
103:6 104:3 149:3
152:9 188:18
232:11 275:25
**recipient** 277:15
299:20
**recite** 10:4
**reciting** 10:11
**recognition** 187:4
**recognize** 16:3 21:5
21:7 23:16 30:10
43:3 45:14 48:11
54:24 62:23 72:11
109:20 121:22
132:20 160:17
161:9,19,20
284:24
**recognized** 219:20
**recollection** 98:4
278:23 279:14

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

NYSCEF DOC. NO. 194
RECEIVED NYSCEF: 06/02/2017

INDEX NO. 451962/2016

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 478 of 553   PageID 905

Page 29

**recommend** 151:11
**record** 5:9 6:23
    23:19 25:2 47:21
    71:4,6 89:14 149:2
    152:7 268:14
**recorded** 301:18
**records** 25:12 26:23
    27:19 28:2 29:12
    29:15,18 30:21
    31:2,6,7,9,15,20
    33:19 34:10,14
    35:8,24 36:2,17,23
    36:24,25 37:8,10
    40:9,18,20,24 42:8
    42:14,16 67:6 69:7
    80:23 84:19
    102:23 130:5
    201:15 203:2,17
    239:7 272:17
**recover** 27:25 43:20
    48:23 49:14 82:9
    82:21 90:22
    101:22 102:22
    142:25 146:15
    253:20 259:14,17
    301:10
**recoverable** 254:4
**recovered** 98:10
    158:14,15 247:18
**recovering** 26:23
    28:7 102:17
**recovery** 26:17,21
    27:4,20 28:6,17
    43:6 45:17 47:2
    48:14,21 49:2,4,11
    49:19 51:18 78:6
    78:10,17,18,21,23
    79:11 81:8,12,22
    87:10 89:2,6,25
    93:25 94:11,17,23
    95:3 103:3 120:2,4
    120:5,9 149:16
    193:9

**recruiting** 12:17
**recruits** 12:20
**recycle** 133:11
**redacted** 257:20,22
**redaction** 257:25
**redactions** 257:16
**refer** 58:24
**reference** 32:22,24
    33:7,8 45:20 230:2
**referenced** 48:20,22
    49:25 87:2 252:10
**references** 182:22
**referencing** 76:25
    256:11
**referred** 43:19,23
**referring** 59:3 61:4
    86:18 280:3
**Refinery** 12:18
**refining** 14:5
**reflect** 286:2
**refresh** 180:18
    276:11 278:22
**refreshed** 279:14
**refreshes** 98:3
**refreshing** 17:23
**regard** 179:10
**regarding** 220:14
**regardless** 220:20
**registered** 201:22
**regular** 19:10 26:11
    264:13 274:16
**relate** 25:23
**related** 43:8,15
    85:15 160:7
    168:11,13 280:7
    280:24 305:12
**relating** 281:3 286:3
**relation** 26:22
**relations** 13:2
    140:14
**relatively** 232:16
**released** 229:23
**relevant** 44:7

101:23 108:8
109:3 165:16
182:4 258:9
**relied** 75:25
**remember** 49:3
77:18 203:15
252:23 263:8
276:18 277:5,5,6
277:19 279:6
294:12,13,21
295:13,21,23
297:10 299:2
300:21
**remote** 96:3
**removed** 129:11
130:21,23
**reorganizations**
14:23
**Rep** 11:12
**repeat** 17:4 25:10
114:13 235:16
**repeating** 165:23
**rephrase** 5:22
142:10
**replicate** 50:24 51:3
51:11,17
**reply** 300:21,23
**report** 11:19,20,23
11:25 16:16
**reporter** 4:19,25 5:4
15:23 304:7
**reporting** 276:20
**reports** 11:21,22,25
**repository** 33:21,23
**representative**
274:13 299:4
**representing** 3:11
270:9
**request** 91:23
161:24
**required** 10:23
272:14
**research** 68:5

115:24
**reservations** 224:10
**reserve** 284:11
**reside** 30:22,24
32:13 55:12 76:7
145:12 171:17
**resides** 57:22
**residing** 177:13
**resolve** 270:14
**resolved** 163:18
**resources** 65:2
**respect** 33:18 58:4
63:25 64:2 66:9
78:8 95:11 151:19
156:20 157:5
159:13 294:5
**respond** 11:7 166:17
166:18
**responded** 18:17
**responding** 16:24
17:8 41:11 295:19
**response** 4:22 26:23
28:2 41:4 43:21
44:6 46:7 48:23
49:14 50:18
111:23 215:25
216:10 242:18
281:6 284:7
290:18 295:4,15
**responsibilities** 11:8
26:3 37:21 242:24
283:4 287:24
288:2
**responsibility** 35:18
95:9 169:3 213:14
215:3,10,17,22
216:4,13 236:9,12
245:9,13 246:3
**responsible** 36:16
38:9 91:16 148:19
216:25 217:10
243:19,21,25
245:16 278:13

**FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM**

NYSCEF DOC. NO. 194

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 479 of 553   PageID 906

Page 30

286:14 287:18,21
289:5,9,10,12
**responsive** 69:4
77:11,17 84:2
104:16 105:4
107:2,14 110:3
130:24 141:7
170:2 177:2 182:9
187:16
**restate** 74:7 203:13
**restoration** 27:21
**restore** 28:9 43:14
49:20 82:15 83:10
89:10 99:7 159:4
**restored** 83:11,15
83:17 279:16,23
**restores** 50:2 83:10
**restoring** 43:7 259:8
**restraint** 234:25
**restrictions** 239:11
**result** 301:3
**resulting** 188:10
**results** 158:25 187:9
**retain** 131:11
**retained** 203:2
214:13 220:18
222:5 254:16
304:7
**retention** 29:12,15
29:18 31:15,21
33:10 35:24,25
36:17,22
**retired** 199:6 288:21
**reverse** 153:10
**revert** 163:23
**review** 19:14,16
49:6 71:25 72:5
73:7 74:11 75:8
79:17 82:5,20
107:2,5 173:7
174:2 187:11,13
187:18,24 188:6
188:11 207:15

209:25 210:7
226:24 276:6
284:22
**reviewed** 18:4 43:25
44:3,5,12,13 46:6
76:10 83:5,6,7
113:12,20 188:13
193:6 296:12
300:4
**reviewing** 17:17,17
57:8 284:23
**revised** 160:9
162:12 186:17
192:2 212:16
**revision** 186:7,12,20
187:8 188:5
**revisions** 25:15
161:12
**Rex** 234:15 240:20
**rex.w.tillerson@...**
271:23
**rexwtillerson@E....**
155:20
**RIFKIND** 2:14
**right** 3:19,25 16:17
31:14,19 34:21
39:23 51:9 53:22
57:24 58:23 70:5
72:23 74:17 78:14
82:3 85:6 95:3
100:8 104:14
105:18,23 106:9
108:9 111:15
122:24 137:9,23
138:7,10 141:23
143:12 146:12
154:11 155:2,4
159:17 160:3
163:8 168:18,21
173:4,11 174:9,11
177:24 180:25
186:18 190:14
194:9 208:7

215:12 216:21
227:2,22 230:4
237:21 240:15
241:16 244:5
248:23 249:4,8
250:25 251:11,21
251:22 252:15
253:21 254:9
256:12 257:8,17
257:23 258:19,23
263:10,11 265:19
266:2,5,8,12 267:5
268:4,18 269:12
269:19 270:4
278:4 281:19
283:18 289:7
291:10,19 294:19
297:15 300:13
**risk** 9:7,11,16,25
11:5,6 15:3,6
16:18 35:13
216:18 245:17,19
253:7,12,15 287:4
287:5,8 288:18,19
288:22
**risks** 244:20 245:5
**Rita** 286:22 288:18
**RKS** 33:11
**RMG** 33:7,15
129:11
**RMGs** 130:22
**Robert** 20:6 22:5,7
74:3 90:15 136:18
148:16
**robust** 36:18
**Roger** 282:7
**role** 15:2,4,8,10,10
25:12 37:12,24
73:24 91:2 137:5
140:15,18 141:12
164:23 195:15
196:16 201:8
208:12 225:24

243:7 244:19
245:4,25 288:5,7,8
288:11 293:6,10
294:6,9,14,18
**role-based** 293:3,4,5
**Role-Physical** 56:3
**roles** 16:22 26:2
41:21 93:2
**rolled** 164:4
**rolling** 164:9
**rollout** 163:6
**Ronald** 193:10
**room** 224:10
**rooms** 225:13
**root** 44:17 90:5,19
91:10 132:14
133:2
**rotating** 225:25
**routine** 219:7,8
220:14,25 224:2
**routinely** 65:18,19
**row** 32:11 112:24,24
113:4 117:2,7
120:16,24 121:7
121:14 123:7,8
134:22 136:18
141:16
**Rudisill** 96:19
143:16 159:11,18
196:19 230:9
**rule** 148:12 196:2
**run** 115:15,19
174:14,20,22
175:6,11 176:7
178:15,25 179:10
179:21,25 180:4
181:22,23 182:5
190:11 191:5,13
191:15,17 195:23
221:22,22 251:14
**running** 177:23
178:11,13 186:25
256:6

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM
INDEX NO. 451962/2016
NYSCEF DOC. NO. 194
RECEIVED NYSCEF: 06/02/2017
Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 480 of 553   PageID 907

Page 31

**runs** 178:22 213:18

___

**S**

**S** 2:2 3:2 104:6,6,6
303:2 304:2
**S-A-** 285:17
**S&C** 287:18,21
**sales** 283:15
**SAN** 56:6,12,14,20
256:20 257:19
**SAP** 14:16,17,18
276:21,23 278:14
278:15 280:14
282:12,13,16,23
282:25 283:6,6,9
283:11,12,21,23
284:5,6,12 285:17
286:8 287:23
289:5,11,14
292:11
**Sarbanes-Oxley**
286:20,21
**saved** 174:24 182:24
**saw** 63:5,10 113:18
209:2,11 279:2,7
**saying** 53:24 117:13
218:14 252:23
**says** 16:17 24:20
31:6 32:11 36:22
53:23 139:18
163:21 171:21
173:5 178:24
202:25 214:5
248:16 257:12,18
262:21 263:3
267:15 272:25
277:23,25 279:22
285:7,8,22 286:7
289:21 291:17
292:3 300:8,9
**schedule** 22:17
29:18 31:15,21
**Schedules** 29:12,15
**SCHNEIDERMAN**

2:6
**scope** 4:2 149:20
**scratch** 242:14
282:5
**se** 241:8
**search** 33:11,12
68:22 74:23 75:9
75:14 76:21 77:4,7
77:8,20 80:3 98:20
98:22 105:11
106:6 113:24
114:4,8,12,17,19
115:5,7,19 116:5,6
118:18,23 122:17
122:18,20 123:13
123:15,17 124:8
143:7,13 145:9
146:3 152:15,19
152:20,22,24
153:8 154:10,17
155:8,23 167:15
167:18,24 168:3
169:18,19 174:7
174:20,21 175:14
175:17,22 176:7
176:11,19,20
177:22,23 178:7
178:11,25 179:11
180:24 181:17,18
183:8,9,10 184:4
185:18,23 186:25
187:10 188:5
189:2,9,11,12,22
190:12,25 191:5,7
191:12 249:12,18
250:12 251:6,7,8,9
251:10,12,18,20
281:7
**searched** 43:25 44:3
44:5 50:20 73:2
78:4 83:12 99:15
99:21,22 100:11
101:9 114:14

117:9 118:2,8,10
120:3,11,14,20,21
121:3,9,11,15
123:4 140:12
141:21 142:16
145:7,19 154:9
223:21 254:21
262:6 281:5,9
284:7
**searches** 33:14,15
33:16 69:13 71:20
73:9,19 74:3,13,25
75:4,7 76:12 83:13
87:12 95:18,21
101:2 105:12,14
108:4,18 113:23
115:16 116:16
123:21 138:18,22
143:19,21,23
179:19,20 181:20
181:25 188:23
189:3,25 190:7,15
190:16 191:3,15
191:17 223:22
250:13,15,18,20
251:15,24 252:6
253:2,8
**searching** 96:11
98:24 144:5
146:16 229:14
**second** 39:18 97:21
122:15 147:10
174:7 176:18
180:10 195:14
196:7 209:4 248:7
251:7 252:6
279:18 291:16
**secondary** 91:17
202:15 204:18,21
205:3 206:10
234:15 237:5,12
244:25
**section** 26:14 27:17

27:23 29:9 34:9,23
35:8,9 40:9,12
41:6,15 46:11
59:13 254:24
257:12 279:21
**sections** 257:25
**secure** 10:24 243:6
**security** 9:6 10:19
13:12,14,15 14:4
14:13,18,19,20
15:5 31:3 39:20
58:7,9 79:4,5,18
80:11 164:14
**see** 7:16,17 10:10
63:4,9 74:5 77:19
85:17 88:5 92:7
96:16 99:5 102:8
116:18 129:14
132:3,17 158:2
196:13 202:4
203:14 210:2,23
225:18 237:10
241:14,20 247:17
249:22 256:21,22
257:2,5,15 259:5
264:7,17,19,21
267:13,16,17
268:5 281:25
287:19 291:25
296:20 300:2,8
301:2
**seeing** 151:16
**seen** 54:25 63:16
72:13 102:11
121:23 155:18
205:18,19 252:14
277:16,20 281:7
**segregated** 296:11
**select** 250:2
**selected** 281:16
**send** 36:3 112:9
172:21 190:23
**sender** 277:14

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

NYSCEF DOC. NO. 194

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 481 of 553   PageID 908

Page 32

299:19
**sending** 82:25
**sends** 36:7 68:16
**sensitive** 140:19
**sensitivity** 108:17
**sent** 82:24 110:18
   111:11,12 116:2,5
   148:9 173:10
   190:22 224:19
   269:7 273:5
**sentence** 27:18,24
   36:21 37:4,6,18
   59:16 72:23
   122:24 162:14
**separate** 27:8 31:25
   33:21,23 38:20
   52:24 109:2
   155:22 177:19
   207:11 223:9
   224:25 238:22
   249:7,10 266:14
   272:10 279:25
   297:9,13
**separately** 96:12
   157:8 204:9 239:5
   264:25 269:11
   296:12
**September** 226:24
   227:12 246:22
   247:3,20
**series** 213:18 257:15
   291:23
**Serve** 25:4
**server** 44:21,23 55:3
   56:2,3,3,4 57:10
   57:11,16,19,22,25
   58:5,13,17,18 59:3
   79:3,14,18,24
   80:11,16 88:21
   94:18,20 96:24,25
   97:2 100:4 102:18
   143:11,11 144:6
   144:25 145:21

147:15 148:5,12
148:20,23 172:16
172:25 173:18
222:20 227:11
231:16,18,20,22
232:3,25 233:4,5,9
233:13,14,19,25
234:3,4,8,15 254:5
254:7 255:4 257:6
257:7 258:8
260:23 261:3,7
298:14
**servers** 55:4,6,11
   56:5 59:17 60:3,7
   60:9,13 62:7 84:3
   84:4,9,13 98:12,15
   144:11,24 145:11
   145:19 149:6,8,12
   230:17 233:16,21
   243:23 244:3
   256:21,25 257:19
   257:21 258:7,24
   290:7
**service** 53:3 66:6
   87:25 213:2 244:5
   246:7,10 255:10
   256:7
**services** 11:9 25:22
   30:17 38:25 39:2,6
   39:7 53:4 60:21
   64:12,16 66:21
   67:4 68:16 83:9
   85:16 87:14,17
   88:24 93:19 112:4
   112:5,18 141:15
   243:2 244:7
**set** 24:25 33:17
   44:16 90:19 91:20
   92:2,11,13,14,16
   92:22 93:5,9,9,16
   107:5 126:9,16,19
   151:8 194:13
   196:4 198:14

205:6 206:2
207:25 209:7
213:22 214:7
217:22 219:2,15
219:15,17,22,22
220:9 238:3,4,21
238:25 264:10
268:21 271:25
272:7
**sets** 214:25 217:9
**setting** 91:17 201:23
   214:15 216:22
   222:21 238:16,18
**settings** 223:2
**setup** 44:15 196:5
   244:21 245:7
**seven** 46:15 57:3
   140:9 165:2
   256:24 291:9,12
   291:16
**seven-day** 253:24
**sevens** 291:14,15
**shade** 4:21
**share** 126:19
**shared** 125:22 126:4
   126:6,7,10,11
   157:4 182:2,5
   225:14 226:10,13
   226:18
**SharePoint** 30:13
   30:15 32:4 34:2
   53:13,15,17,19
   55:22 119:11,17
**Sherri** 299:25
**Shirley** 66:12,19,20
**short** 89:15 120:7
**shortcutting** 144:14
**shorter** 32:24
**show** 15:12 61:19,21
   269:17,22 284:21
**showed** 92:5
**showing** 270:8
**shown** 277:11

299:16
**shows** 265:24
**shut** 93:13 126:24
**sic** 217:8 220:4
**side** 53:22 215:9,12
   284:14
**sign** 160:22 270:18
   270:22
**signals** 235:18
**signed** 160:21
**significance** 188:7
**significant** 243:14
**signs** 270:17,19,20
   270:23
**similar** 16:10,13
   33:25 102:22
   110:8 138:8 188:4
   288:18 292:25
   297:17,20
**simple** 261:13
**simplified** 115:9,15
   152:24 153:8
   154:10,17 169:17
   169:19 180:24
   181:17
**simply** 133:23
**single** 111:17 196:8
   239:14 249:12
   270:22 271:11
**site** 30:13,15 32:4
   34:2 53:23 119:11
   119:17,19 120:3,9
   120:11,13
**sites** 50:20,23 51:14
   51:16,22 52:2,11
   52:17 53:7
**sitting** 250:19 258:6
   261:22 301:15
**six** 23:9 46:9 291:12
**skipping** 289:2
**slide** 285:22
**small** 64:25
**snafu** 246:15

**FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM**
NYSCEF DOC. NO. 194
INDEX NO. 451962/2016
RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 482 of 553   PageID 909

Page 33

**software** 53:8,9,12
54:8 92:5 93:7
**solutions** 25:2 39:21
45:7 192:17
194:22
**somebody** 111:5
148:22 218:24
**someone's** 235:18
**somewhat** 79:3
**soon** 280:15
**sorry** 9:15 13:18
17:3 19:25 41:7,9
41:19 53:24 63:12
72:16 75:12 81:14
82:6 95:21 114:12
114:20 117:3,12
123:2 142:9,14
146:8 195:6,21
205:11 206:16
216:7 218:13
232:3,17 247:5
256:14 264:2
266:20 290:22
**sort** 107:20 110:12
113:25 153:5
297:20
**sound** 262:6
**source** 125:18
126:22 136:21
137:7,19 141:17
164:21 194:16
**sources** 73:2 75:14
76:21 80:21 108:9
113:5 114:4,25
115:3,15 117:8,20
119:3 123:4,8,10
123:18 128:7,10
128:22 129:5,17
132:4 134:2,7,11
134:23 137:13
138:4,14 141:13
**SOX** 285:19 286:18
286:19

**speak** 5:15 18:25
19:6 20:12,14 54:3
301:7
**speaking** 78:12
132:13 157:6
**speaks** 165:8
**special** 58:2,4 276:6
**Specialist** 293:16
**specific** 27:3 29:3,6
39:3 86:6 90:7
109:23 116:8
151:22 154:4
193:3 253:7
**specifically** 25:17
26:5,14 45:4 50:10
54:3 62:11 64:3
78:12 84:8 86:4,10
93:20 95:12 97:5
97:24 99:16
105:17 119:18
134:4 140:16
152:2 169:24
182:6 183:13
187:5 231:17
255:18 260:10
261:6 262:9
271:14 272:12
276:17 298:24
299:21 301:8
**specifics** 261:22
**spending** 253:22
**spoke** 18:24 20:16
20:16,17,19 22:5,6
22:6,7
**spoken** 19:5,8 156:5
**spot** 210:25
**spreadsheets** 283:20
**staffing** 64:24 66:15
66:16
**stand** 30:18 48:16
66:5 200:8
**standard** 27:20
131:15

**standing** 192:4,10
192:11,15,21,22
193:16 194:7
195:25 197:11
198:8
**stands** 48:18
**Stanton** 1:13 305:4
305:17
**start** 12:12 111:4
237:23 256:19
294:11
**started** 13:23 64:7,8
127:4 151:3
249:11 294:25
295:14,14,19,20
**state** 1:14 2:4 3:11
3:13 6:22 41:7
**stated** 9:5
**statement** 160:22
300:9
**states** 257:5
**stayed** 14:23 216:24
**stenographic**
305:10
**step** 65:15 82:22
98:9
**step-by-step** 97:17
**stepping** 253:6
**steps** 36:25 79:5
89:24 90:3 97:4,6
97:8,11,13 98:5,7
98:19 102:16,22
131:25 142:24
143:4 157:7,13,14
158:12 247:17
253:19
**sticker** 34:18
**stone** 149:23
**stop** 133:13
**storage** 50:20,23
51:14,21 52:2,11
52:16 56:6,6,7,9
56:12,13,14,15,16

56:17,20,25 57:9
58:14 95:7 256:21
256:25 257:7,19
257:21 258:7
262:5 298:20,21
**store** 52:20 53:6,9
118:6 119:13,14
255:19
**stored** 44:9 58:12
60:15,17 130:13
170:4 177:3
182:11 255:13,14
258:2 259:24
282:16,18 283:11
283:21
**storing** 298:15
**straight** 173:19
243:7
**straighten** 180:11
**strategy** 10:10 14:15
15:2 25:2 130:3
**Strike** 91:14
**strikes** 258:18
**string** 277:12
**strings** 177:23
190:12 191:5,13
**struggling** 190:5
**Stuewer** 299:25
**stuff** 153:6 247:7
248:17 291:10
**subdivision** 9:17
**subdivisions** 9:24
10:3,7
**subheadings** 46:16
**subject** 36:9 90:12
93:24 94:3 163:17
184:10 247:10
286:3
**subjects** 111:12
**submitted** 18:8,10
19:2 167:7,9
**subpoena** 16:24
17:8,11 21:9,10

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

NYSCEF DOC. NO. 194

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 483 of 553   PageID 910

Page 34

22:10 41:4 43:21
44:6 46:7 48:24
49:15 50:18 63:2
63:11,16,19,25
64:2 66:10 69:5,25
110:9,17,22
111:24 128:11,14
129:19 134:15
139:12 141:8
163:10 165:9,11
165:16,19 184:10
184:16 215:25
216:10 227:21,24
228:2,3,6,9,20,21
246:14 248:11
284:8 303:5,13
**subsection** 45:21
47:7
**substance** 280:18
**substantive** 285:22
**subsumed** 288:8
**suggest** 151:18
**suggestions** 151:22
**suit** 110:7
**summarize** 32:25
**summary** 33:9
**supervise** 143:22
169:4 288:4
**supervisor** 14:18
66:22 95:8 125:15
194:24 287:20
**supervisors** 11:23
12:2,4
**supplemental** 29:15
29:17 31:20,22
199:18
**supplementary**
199:18
**support** 11:4,9,10
11:12,13 14:5 39:9
39:11 60:12 64:12
96:22,24 109:6
164:19 193:13

194:23 211:22
212:2,6 225:16
278:15 286:8
287:21 291:18
292:4 302:2
**supported** 294:15
**supporting** 38:9
164:12
**supports** 46:4 60:13
164:23
**sure** 10:3,23 17:5
18:13 19:13 29:23
32:21 33:6,24
35:16 36:19 37:12
43:12 44:3 47:23
49:5,7,10,18 50:4
54:11 60:23 61:3
64:24 65:2,12
66:15 67:8 72:4
74:7 75:16 79:18
79:20 83:17,23
84:8 85:4,6 86:18
87:24 88:23 91:5
92:12,21 93:18
102:14 104:24
106:8 114:5,10
122:12,15 123:25
124:7 127:18
128:6,17,19 136:7
147:5,11,18 148:8
148:15,22 150:3
151:9 152:14,17
152:18 153:7,21
160:24 168:18,19
171:3,4,15 172:18
172:24 179:17,18
179:21 180:7,11
182:18 186:2
188:17 190:19
193:2,4 195:10,21
203:15 205:21,25
211:6,24 212:7
215:10,21 216:8

221:18 222:13
223:4,13 230:7,15
232:8,19 235:17
238:10 241:19
242:12 244:23,24
245:21 252:16
254:22 259:16
260:7,14 262:2
263:17,22,23
265:10,23 266:21
267:23 268:19
269:4 272:24
273:4 285:20
294:17,20 298:17
298:18 300:24
301:3,20
**surprise** 204:2
**surprised** 258:14
**sweep** 43:9,16 94:25
158:19 159:24
212:19 213:8,15
213:16,23 214:8,9
214:10 215:9
216:5,14,21,23
220:14,17,25
221:2,21 222:16
222:21,24 223:2,9
224:2 229:7,9
231:24 235:12,24
236:14,24 237:2
237:17
**sweeper** 28:15 35:22
37:14,16,20,22
38:18,20 79:7
82:19 89:11 90:10
102:25 131:10,11
131:23 175:24
176:2 217:25
219:6,7 227:6,7
228:6,9,12,19,22
228:25 246:2,5,16
246:20
**sweepers** 35:21 38:3

**sweeping** 246:17
**swept** 28:14 227:15
228:17 229:6
246:12,21 247:8
247:14,19 252:2,8
253:17,20
**Swiger** 120:17 137:6
137:15 138:9
139:22 299:18
300:2
**Swiger/R/Dallas/...**
300:12
**switches** 201:20,21
**sworn** 3:3 305:7
**synonym** 37:17
**system** 13:3,20 29:2
38:21 55:23 61:8
61:18 65:25 66:2
68:17 90:22,25
126:25 127:2,6
184:25 185:3
199:10 201:12,16
207:3,13 209:2
213:21 214:8,9,18
215:2 217:21,21
217:25 218:3,6,6,9
219:6 223:9,10
231:8,9,10 232:7
233:2,4 234:21
235:3,14,21,22
236:2,2,3,22 237:5
237:12,15 238:23
238:25 239:2,10
239:12 255:20
259:10,11 262:23
263:7 264:7
269:19 270:3,5
273:17 276:23
282:25 283:7,11
283:13,17,22
284:12 298:15
301:18
**systems** 90:8 213:19

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

NYSCEF DOC. NO. 194

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 484 of 553   PageID 911

Page 35

217:4,6 237:13
259:9 282:23
290:13 291:25
292:13,20

**T**

**T** 2:6 3:2 104:6
303:2 304:2
**tab** 267:14
**table** 72:21 122:22
122:25 279:16,24
280:15
**tables** 280:11
283:20,23
**tabs** 266:24 267:7
**take** 5:5 6:7 32:6
47:22 89:14,20
97:12,16 103:5
152:7 153:10,18
188:16 225:23
232:10 278:20
**taken** 4:25 47:24
82:22 89:16 97:9
98:19 102:22
103:6 104:3
142:25 149:3
152:9 157:7,14
158:12 188:18
232:11 275:25
**takes** 32:8,10
**talk** 5:8 63:14 181:9
202:4 238:11
253:11,14 254:25
259:4 300:25
**talked** 20:6,8,8,10
66:16 73:18,19,20
74:3 75:3 106:24
142:24 161:25
164:7,12,20 183:5
187:5 190:3
194:13 202:9
210:18 217:7
225:12,13 290:2
**talking** 20:4 37:19

38:16 43:10 80:22
81:2 85:14 96:16
104:20 105:9,10
105:11,17 110:13
159:15 168:21
187:20,21 189:15
237:21 260:16
263:11 279:17
289:23 290:5
**talks** 253:19
**Tanya** 12:6
**tapes** 82:5,9 83:6,8
89:8 149:7 151:15
**team** 24:4,9 36:2
37:10 40:19 60:12
64:4,10,11,20,25
65:5 67:7 70:11,15
70:16 71:2 80:14
80:17 84:5 108:7
109:6 112:10,11
119:17,19 120:2,9
120:10,13 125:15
125:16 127:19
135:21 137:11
138:25 139:5
142:5 146:2,4,14
146:17,18 151:8
179:25 180:6
185:13 216:19
225:22 249:3
294:15 295:19,25
296:2,4,15,17
**technical** 96:22,23
144:2 147:12
151:23 194:23
233:20 235:6
250:10 261:21
**technically** 192:13
196:6,10 207:10
275:10,20
**technologically**
133:8 214:15
**technology** 9:7,11

9:14,19 24:20,25
81:19 115:13
231:4,5
**teleconference**
285:3
**telephone** 55:23
76:16
**tell** 4:13 10:16 12:7
24:22 39:18,25
61:2 63:21 65:13
68:18 78:5 81:7,11
81:14 84:8 85:18
87:5,18 88:18
89:24 94:8 95:14
97:5,10 98:6
102:10 111:20
112:11 117:21
130:2,5 142:20
151:25 159:12
180:20 201:24
222:14 223:17
230:10 239:15,15
241:24 242:13
263:5,14 264:25
269:3 270:4,6
285:20
**tells** 262:20 268:20
**temporarily** 197:10
197:20
**ten** 112:25
**tend** 107:10
**term** 174:10 184:5
250:12 281:8
**terms** 45:20 68:22
74:23 75:9,15
76:21 97:13 111:8
113:24 115:9,11
115:20,24 124:9
152:24 153:9
154:10,17 155:8
169:18,19 175:17
175:18 176:7,11
176:19 177:3

178:12,25 179:11
180:17,24 181:17
181:18 182:10
185:18 186:25
187:10 189:23
249:13,18 251:6,8
251:10 273:18
281:8
**testified** 3:4 7:19 8:5
108:6 254:3
262:13 265:3
**testify** 22:19,23,25
23:4
**testifying** 246:14
**testimony** 4:10
16:15 17:14 18:16
19:3,15,22 20:2,13
20:15 21:11 22:16
41:21 100:25
105:3 113:9
167:22 239:24
**testing** 223:11,16,18
**Texas** 7:2 258:18
**thank** 7:10 9:23
34:12 40:7 41:10
86:20 142:7
201:14
**Thanks** 104:9
142:12 196:20
**theirs** 103:3
**theoretically** 238:7
275:6
**theory** 156:15
**thereof** 230:6
**thing** 107:20 113:25
153:6 180:21
197:23 253:25
254:8 268:2
**things** 11:17 17:20
17:23 82:16 90:23
90:24 91:6 133:6
158:18 162:18
172:21 178:22

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

NYSCEF DOC. NO. 194

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 485 of 553   PageID 912

Page 36

221:12 232:19
253:17 255:18
259:11
**think** 12:24 20:9
33:15,16 34:20
53:12 54:9 55:21
62:5 63:5 66:6
69:8 74:15 81:13
86:4 88:2 96:10,11
102:7,11 106:21
109:14 115:22
119:22 124:5
128:13,25 130:16
130:18 136:11,14
146:11 148:7,8,13
149:14 152:15
155:14 168:8
175:5,9 178:4
181:6 185:2 189:5
196:16 204:3,12
205:13,21 211:7
241:18 245:19,22
263:20 268:16,17
275:23 278:10
279:7 280:5,7,12
280:20,21,23,24
281:23,23 290:21
292:15 296:4
297:6,24,24
300:20 301:21
**third** 106:6 160:11
177:22 189:2
251:9 252:6
259:24
**third-party** 53:5
69:2 79:2,14,25
80:4 123:20 145:3
145:15,16 146:25
167:25 168:4,9,15
187:22 188:12
189:21,22 190:24
190:24 191:8,18
255:8 262:4

297:18 298:14,21
**thoroughly** 100:11
**thousand** 127:3
253:23
**three** 22:14 23:2
30:8 160:6 162:12
162:13 251:25
252:4 256:19,20
**ticket** 108:11 111:18
226:4 248:16
**ticketing** 65:24 66:2
66:11,24 68:17
108:5 111:3
112:10
**tickets** 67:4 74:5
76:5,6 108:5
248:25
**tie** 200:16,21,22
202:13
**tied** 200:14 218:2
**tightly** 79:19
**Tillerson** 44:25
92:11 95:25 98:21
99:3,17 120:10,12
120:25 138:4
139:23 140:3
175:20,21 194:8
199:6 200:11
202:24 203:9
204:18 206:24
208:15,17 210:22
228:10 234:16
240:14,17,20
241:10,25 264:19
264:20 271:17
274:2
**Tillerson's** 91:19
155:17 175:23
200:15,19 201:3
202:15 203:8
206:15 210:14
234:15 275:7,15
**time** 5:5,15 6:3

12:16 13:4,5,6,11
13:19 14:9 18:20
18:20,22 25:15
27:21 41:8 49:9
52:14 55:9 58:25
66:8 67:17 68:20
68:20 70:13 79:9
82:7 85:19 101:15
101:24 108:24
111:14,18,22,25
112:8 113:18
129:8,14 131:19
133:12 134:15
142:17 149:25
164:9,12 165:8,11
165:16,19 167:3
181:10,15 184:8,9
184:12,15 191:9
191:11 192:19
195:16 197:8,15
197:23 198:4,20
200:19 207:22
213:9,10,12 216:7
222:13,20 225:20
227:3,5,8,10,25
228:3,17 229:5
234:10 235:16
242:4,9,13 244:15
244:23 246:17,19
246:20 247:11,12
251:24 252:6,14
258:10 265:3,5
266:8 269:7,25
270:6 278:13
280:6,17,23 282:4
287:15,17,25
288:3 298:17,25
301:23
**timeframe** 67:11
69:21 78:20 86:5
**timeline** 114:6
**times** 87:14 251:5
**timing** 280:15

**title** 30:14 39:16
194:21 205:20
**titles** 17:6 29:4 40:5
87:8
**Toal** 2:19 19:18
20:9 25:6 34:10,15
34:17 40:4 47:9,13
47:23 65:6 75:10
76:23 87:7 89:22
188:17 218:5
303:8,17
**today** 3:20 4:11,19
16:10 17:14 18:16
19:15 106:24
113:10 231:6
250:19 261:23
294:15 301:15
**today's** 19:3
**told** 111:23 116:9
156:4 210:19
211:4,8 261:9
**tool** 35:22 38:15,18
38:20,21,23 39:3
39:10,12 43:16
108:20 124:6
125:2,3,4,7,13,14
125:17 135:21
137:12 141:22
163:7 179:14
185:9,10 199:16
199:17 200:6
214:24 215:15,17
217:8,11 237:22
237:23,24 246:2,5
292:9
**tools** 35:21 37:13,25
38:8,9,12,14 39:19
164:24 185:10,13
215:18 237:14,17
**top** 10:4,12 21:14
31:6,14 32:11 57:6
102:13 157:22
218:4 249:19

**FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM**
NYSCEF DOC. NO. 194                                    INDEX NO. 451962/2016
                                                       RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 486 of 553   PageID 913

Page 37

256:20,24 277:11
291:18 295:22
**topic** 22:20,23 23:2
23:5,7,9
**topics** 22:16,18
**Towers** 48:5
**Town** 12:18
**track** 91:6 242:7
276:19
**tracked** 166:20
270:10
**tracker** 44:15 71:16
78:13,17 79:6 81:9
81:12,25 82:11,15
82:21 89:25 90:18
91:19 92:13 94:2
94:24 97:18 98:16
99:4 102:17 120:6
120:7 132:9,17
142:15 145:2
146:22 150:2
155:19,21 158:16
158:17 159:22
175:20,25 199:3
200:12 203:3,7,18
206:16 207:11,21
208:5,23 210:10
210:16,25 219:11
219:14 221:11
222:18 223:20
226:23 227:17
228:11,13 229:15
231:22 233:12,17
233:24 234:5,19
239:24 240:3
241:25 242:7
244:11 246:12,18
248:2,3 251:13
259:22 264:12,22
266:15 268:25
269:2,6,8,14 271:4
272:4,20 274:3
**Tracker's** 203:4

**tracking** 88:21
**tracks** 273:17
**traffic** 61:2,5 240:11
240:17
**training** 198:17
**transaction** 60:24
60:25 61:10,12,15
61:19,25 62:3
**transactional**
283:13
**transactions** 60:22
61:8
**transcript** 298:23
**transcription** 305:9
**transfer** 216:24
**transferred** 197:4
208:6
**transition** 93:3
**transitioned** 92:17
93:12 239:25
242:10
**transitioning**
197:13 198:15
202:12
**transpired** 301:8
**traveling** 211:2
**treated** 140:20
180:14
**tried** 151:12 261:19
261:19
**trigger** 236:22
**triggered** 214:5
**triggers** 213:25
214:2 235:23
**troubleshooting**
44:17 150:15
**true** 54:12 69:11
119:4 127:21
131:14 133:16
136:3 141:20
142:3 222:6 225:5
228:15 305:9
**truth** 4:14

**truthfully** 6:13,20
22:20,22 23:2,5
**try** 5:22 6:4 82:8
132:15 144:18,23
180:10 206:19
232:20
**trying** 18:13 27:25
28:9 43:20 53:11
55:20 71:15 74:15
79:10 105:10
122:12 128:15,25
150:15,21 162:2
180:9 211:5 248:4
262:2 276:10
**turn** 22:13,18 24:17
26:12 29:8 30:7
34:6,8 40:8 45:19
46:9 50:16 57:3
59:11 72:20 73:4
112:19 121:17
122:21 123:6
140:8 162:11
164:25 190:8
256:13,18,23
257:9 278:17
**Turning** 120:15
191:25 212:15
**two** 11:23,24 21:15
22:23 24:2 35:11
44:19 45:19 46:15
50:16 51:2 53:22
54:2 55:25 56:5,8
73:5 78:22 92:7,10
93:5 117:19
122:21 127:3
134:22 155:22
185:9 190:17
197:7,12 198:2
207:16 251:4
257:18 259:11
267:18 268:10,22
285:6 291:14,15
**type** 33:25 42:14

61:9,11 62:9 64:19
131:4 156:13
157:3 161:4,15
167:11,14 186:13
186:15 258:5
**types** 56:6,9,25 60:2
61:13,14,15
182:16 224:8
225:11
**typical** 68:14 148:14
**typically** 56:14
58:24 68:3,6
187:24 189:14
222:12 226:6
260:12
**typing** 186:23

**U**
**UB** 277:25 278:7,8
278:10
**UK** 278:25 282:11
**ultimately** 214:25
243:16
**Ulysses** 278:9,11
**underneath** 59:24
72:21 122:22
251:18 279:18
**understand** 4:16 5:2
5:10,18,20,25 6:8
16:14 18:14 33:24
44:4 47:15 51:20
58:3 62:12 71:15
71:16,19 83:17
88:20 90:15 91:7
91:21 92:12,21
97:3 104:25 105:2
105:24 107:21
109:7 112:12
129:2,15 132:16
149:17,23 150:21
155:23 156:24
165:14,20 167:19
167:21 168:25
169:20 181:11

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

NYSCEF DOC. NO. 194

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 487 of 553   PageID 914

Page 38

221:19 235:2
242:12 246:13
248:9,13 263:24
270:16 295:7
298:17
**understanding** 18:2
56:11 60:16,18
67:17 71:23 74:24
75:16 83:23 87:11
90:13 113:22
134:9 149:21
156:2 162:25
232:24 235:8
240:8 242:25
247:15 249:4,11
251:4 255:21
259:12
**understood** 5:24
41:20 43:12 84:23
105:19 165:17,18
261:25
**undertaken** 78:7
82:4,8 259:21
**unfiltered** 124:8,14
125:5 183:15
184:6,21 185:22
189:14,17,19
190:13,21 191:21
191:22
**unique** 199:19,22
**unit** 27:9,22 39:15
**United** 276:6
**units** 25:4 27:10
33:5 87:9
**Unix** 289:6
**unturned** 149:24
**update** 214:24
**updating** 286:14
**upload** 78:25 168:12
168:14 172:23
**uploaded** 123:19
172:10,14,16
187:18,22 188:12

**uploading** 187:19
**uploads** 172:13
**upset** 214:23
**use** 23:24 24:2 34:4
35:21 36:2 37:10
37:13 43:15 51:9
53:7,8 99:18 118:6
119:12,13 125:5
126:25 130:2
177:3 182:10
185:7 192:19
197:22 199:15,16
199:17 201:18
224:9 230:25
231:6 257:20
276:24 283:2,14
300:23
**user** 200:9 220:20
221:23 250:9
**uses** 135:20
**usually** 296:20
**utilized** 49:13

_____
                 **V**
**vaguely** 57:14 277:5
279:11 285:5
**validate** 59:4 129:21
129:23 135:8,10
270:7
**validated** 130:15
135:17
**value** 158:23
**variation** 197:9
**various** 123:18
182:11,12
**vary** 61:7
**vendor** 53:8,12 54:8
69:2 79:2 123:20
123:20 168:2,5,10
168:16,23 172:12
172:20 185:17
186:25 187:6
188:12 189:21,22
190:24,25 191:8

191:16,18 231:9
231:10 255:8
262:4 297:19
298:21
**vendor's** 79:25 80:4
187:22
**vendors** 52:9,15,19
54:13,15
**verbal** 4:22 50:8
**verbally** 4:24
**verify** 96:13 124:7
124:17 166:21
185:4 199:13
213:7
**version** 222:3,18
223:12
**versions** 169:17
**versus** 259:10 268:2
**Vieira** 288:13
**view** 171:9,12
**visible** 207:13
**volume** 243:12

_____
                 **W**
**W** 240:20
**wage** 12:19
**wait** 5:6 291:13
**waiting** 221:22
**want** 25:6 64:18
97:16 152:18
180:20 232:18
248:9 255:2
263:23 266:21
267:3 269:24
277:21 284:17
**wasn't** 103:2 107:7
153:7 200:14
246:16 247:10,12
261:13
**way** 58:13 69:15
128:16 129:23
140:21 152:21
170:5 189:24,25
192:15 198:11

206:21 219:18
224:23 225:2,8
230:23 235:7
238:2,4 239:19,21
240:24 253:9,10
259:13,17 290:16
**Wayne** 44:14 71:15
78:12,17 79:6 81:9
81:12,25 82:11,15
82:21 89:25 90:18
91:19 92:13 93:25
94:24 97:18 98:16
99:4 102:17 120:6
120:6 132:8,17
142:25 145:2
146:22 149:25
155:19,20 158:16
158:17 159:22
175:20,24 199:3
200:12 203:3,4,7
203:18 206:15
207:11,21 208:5
208:23 210:9,15
210:24 219:11,14
221:11 222:18
223:20 226:23
227:17 228:11,13
229:15 231:22
233:12,16,24
234:5 239:24
240:3 241:25
242:7 244:11
246:12,18 248:2,3
251:13 259:22
264:12,22 266:15
268:25 269:2,6,8
269:14 271:3
272:4,20 274:3
**ways** 24:2 35:11
190:17
**we're** 38:15 58:19
59:3 64:25 189:15
**we've** 221:25 222:2

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

NYSCEF DOC. NO. 194

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 488 of 553   PageID 915

Page 39

225:12,13 226:5
**weekly** 59:22 60:6
  60:10
**weeks** 60:17
**Weiss** 2:14 160:12
  161:23 303:23
**Wells** 91:21,24
  92:15,23 93:10
  194:12,17 195:4,7
  196:14,15 200:17
**went** 12:21 14:10,13
  14:16,19,23,25
  48:4 50:3 110:17
  110:19,21 111:5
  128:14 133:17
  154:24 155:5,16
  165:21 172:20,25
  173:17,19 208:25
  213:7 228:23
  249:13 254:21
  272:24
**weren't** 195:10
  298:19
**WHARTON** 2:14
**whatnot** 66:18
**whatsoever** 133:15
**Whichever** 295:20
**Wilburn** 11:20
  16:18,20 22:7
**Williams** 121:8
  138:12 139:15,21
**Windows** 44:21
**wiped** 258:24
**witness** 48:2 65:8,11
  91:15 152:11
  188:20 218:8
  302:3 305:6
**Wole** 288:24,25
**wondering** 18:19
  85:12
**Woodbury** 140:9
  141:15 190:3,19
**Woodbury's** 140:13

141:4,13
**Woods** 121:14
  141:17 142:16
  205:5 206:11
  264:4,5,6,8,10,17
  264:18
**Woods'** 141:24
**word** 188:5 249:12
**wording** 186:15
**words** 239:12
  241:13 296:10
  300:15
**work** 11:5 12:12
  14:12 19:19 24:11
  24:14 26:9 36:6
  37:25 69:8,25
  70:21 74:6 84:24
  90:10,10 99:6
  101:5,10 133:24
  134:8 149:20,23
  150:24,24 151:11
  185:20 215:22
  229:7 241:16
  295:11,14
**worked** 13:3,7,10
  77:24 90:6,11,12
  91:9 93:24 107:6,8
  107:12,12 108:7
  114:23 151:2
  153:25 242:21
  243:3 275:14
**workflow** 111:8
  112:3
**working** 13:20,21
  13:24 14:3,11
  17:25 20:19 37:14
  38:4 56:18 71:14
  83:9 84:12 91:5
  107:17 144:17
  198:12 215:4,11
  215:15 223:13
  230:9 260:4 266:7
  271:18 277:5

294:25
**works** 194:5 219:19
  228:19 274:9
  275:16,19 301:16
**world** 282:24
**worry** 243:11
**wouldn't** 44:8 51:24
  78:23 106:21
  120:8 148:12
  204:2 290:9,10
**write** 166:11 240:19
**writing** 65:22
**written** 50:8 287:14
**wrong** 16:16 113:2
  113:7 180:21
  218:14 238:6
  248:14 268:19
  290:22

### X

**x** 1:2,6 303:2 304:2
**XTO** 197:8,24,25

### Y

**Ye-Chin** 87:24
  212:24,25
**Ye-Ching** 88:2
**yeah** 168:13 231:13
  247:6 248:3 262:8
  279:11 280:5,10
**year** 7:7,25 12:24
  63:7 69:22 73:15
  73:18 105:21
  119:25 132:24
  210:8
**years** 14:8 48:5
  230:24
**yesterday** 300:4
**York** 1:12,13,14 2:4
  2:8,8,18,18 3:11
  3:12

### Z

**zero** 255:2

### 0

**0182555** 304:4
**0182556** 303:4

### 1

**1** 15:22,24 16:8
  112:20 303:4
**1:21** 103:7
**10** 72:8 104:11
  112:19 117:4
  120:15 303:14
**10.1** 29:9
**10:00** 1:8
**10:48** 47:25
**10:58** 47:25
**10019-6064** 2:18
**10271-0332** 2:8
**109** 303:18
**11** 86:22,23 303:16
**11:53** 89:17
**12** 109:16,17 166:22
  168:11 303:18
**12/31/16** 303:14
**12:02** 89:17
**12:20** 103:7
**120** 1:12 2:7
**1205291-1205302**
  303:24
**121** 303:20
**1285** 2:17
**13** 24:17 121:18,19
  131:12 168:24
  221:3 227:23
  229:3,4 303:19
**13-month** 221:21
**14** 160:17 168:24
  303:21
**14-16** 160:14
**15** 11:22 161:8
  169:16 303:4,22
**16** 26:12 59:11
  161:18 169:16
  257:9 303:23

**FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM**

NYSCEF DOC. NO. 194

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 489 of 553   PageID 916

**Page 40**

**160** 303:21,22,23
**17** 277:7 303:24
**18** 169:25 177:7
284:17,18 304:4
**1852537-1852542**
303:18
**19** 40:8 171:21
299:12,13,17
304:5
**1981** 12:14
**1984** 7:18
**19th** 160:13

### 2

**2** 20:24,25 21:5
303:5
**2:10** 149:3
**2:11** 149:4
**2:15** 152:10
**2:30** 152:10
**20** 300:10 303:5
**2000** 56:2
**2001** 13:12
**2003** 6:25
**2003/2008/2012R2**
44:21
**2007** 56:4 59:14,17
91:21 92:18 93:4
93:10,14 200:25
221:24 222:6
229:12 233:2,4
257:13
**2008** 163:7 164:4,16
**2010** 110:6
**2011** 92:19 127:3
201:2 227:12,18
299:19 300:10
**2012** 92:19 127:4
201:2 227:12,14
227:18 229:12
279:22 281:22
**2013** 276:7 277:12
278:24 285:4,8
**2014** 15:11 16:8

**226**:24,25 **227**:12
227:18 228:16
246:22 247:4,20
285:8,12
**2015** 8:3 16:25 17:9
23:23 63:3 64:4,7
70:3,23 106:2,10
110:14,15,22
128:12 139:13
166:2 175:21
294:13,18 297:23
297:25,25
**2016** 7:7 8:2,3,3
63:21 64:4,8 70:4
70:23 77:21,22
101:3 104:12,18
104:23 106:2,10
108:7 111:24
112:2,20 113:3
125:9 152:21
155:24,25 169:13
169:15 170:2
172:6 174:8 175:2
175:5,22 177:11
177:13 222:9,10
222:20 246:20
294:14,19 297:23
**2017** 1:7 21:11 63:8
69:23 71:11 78:7
106:12 113:11
122:6 128:23
160:8,11 178:3
183:11 244:10
**21** 122:6 160:11
174:6
**21st** 134:24 139:11
141:8
**22** 176:5 299:18
**23** 34:8,16,23 303:6
**232** 302:5
**23rd** 7:7
**24** 21:11 176:17
**24th** 21:16,23,25

**40**:3
**25** 176:25
**26** 1:7 117:2,8
**27** 226:25 227:18
228:16
**2742078** 304:5
**2747736-2747773**
303:10
**2747763-2747773**
303:9
**2747774-2747816**
303:11
**2747908-2747924**
303:12
**277** 303:24
**27th** 247:4
**28** 177:21 178:24
190:9 191:4,12
**284** 304:4
**29** 177:21 277:12
**299** 304:5

### 3

**3** 23:12,13 34:18
302:4 303:5,6
**3/21/17** 303:19
**3/24/17** 303:5
**3/31/17** 303:21
**3:18** 188:19
**3:27** 188:19
**30** 303:8
**31** 104:11,18,23
113:3 141:18
160:7 180:22
**31st** 114:7 123:10
134:25
**32** 181:8,16
**33** 182:8
**35** 29:8 254:16
**352** 3:14
**36** 183:7
**37** 185:16 186:7
**38** 186:16 187:7
**39** 188:4

**395** 220:18 221:4
**395-day** 221:13

### 4

**4** 16:25 17:9 30:2,4
34:8 139:12 303:7
**4.1** 26:14
**4.3** 27:17
**4/19/17** 303:23
**4/21/17** 303:22
**4/24/17** 303:16
**4/4/17** 303:7
**40** 191:25 192:4
**41** 194:6
**42** 303:9
**45** 303:10
**48** 303:11
**4th** 110:16,17
228:21

### 5

**5** 42:23,24 226:24
227:12 247:3,20
303:9
**5:03** 276:2
**5:07** 276:2
**5:35** 301:23
**50** 253:22
**51** 212:15,18 220:14
**53** 223:19
**54** 303:12
**56** 226:22 247:5,6
**57** 229:25 247:2
**59** 253:19

### 6

**6** 45:10,11 303:10
**6.3** 40:10
**62** 303:13
**6312** 3:13
**6th** 131:22 228:24

### 7

**7** 48:7,8 303:11

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

INDEX NO. 451962/2016

NYSCEF DOC. NO. 194

RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 490 of 553   PageID 917

Page 41

**72** 303:15
**77-119** 303:6
**77019** 7:2

**8**

**8** 54:20,21 256:15
303:12
**8.1** 34:9,23
**85** 120:16
**86** 303:17
**89** 120:25

**9**

**9** 62:18,20 285:7,8
303:13
**97** 121:7
**99** 121:14

# Exhibit 26



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

## SUBPOENA AD TESTIFICANDUM

TO:     **Jason Iwanika**
**Imperial Oil Corporation**
**c/o Patrick J. Conlon, Esq.**
**Exxon Mobil Corporation**
**Corporate Headquarters**
**5959 Las Colinas Boulevard**
**Irving, Texas 75039-2298**

**YOU ARE HEREBY COMMANDED**, pursuant General Business Law § 352, Executive Law § 63(12), and § 2302(a) of the New York Civil Practice Law and Rules, to appear and testify before Eric T. Schneiderman, the Attorney General of the State of New York, or a designated Assistant Attorney General, on ***the 28th day of June 2017 at 9:30 a.m.***, or any agreed upon adjourned date or time, at 120 Broadway, New York, New York 10271, in connection with an investigation concerning Exxon Mobil Corporation or any matter which the Attorney General deems pertinent thereto.

**PLEASE TAKE NOTICE** that the Attorney General deems the testimony commanded by this Subpoena to be relevant and material to an investigation and inquiry undertaken in the public interest.

**PLEASE TAKE NOTICE** that the examination may be recorded by stenographic, videographic and/or audio means.

**PLEASE TAKE FURTHER NOTICE** that Your disobedience of this Subpoena, by failing to attend and testify on the date, time and place stated above or on any agreed upon adjourned date or time, ***may subject You to prosecution for a misdemeanor or penalties and other lawful punishment*** under General Business Law § 352 and § 2308 of the New York Civil Practice Law, and/or other statutes.

**PLEASE TAKE FURTHER NOTICE** that Your disclosure to any person, other than to the Attorney General's Office, of the name of any witness examined or any other information obtained regarding this investigation ***may subject You to prosecution for a misdemeanor*** under the General Business Law. In the event You believe that You are required to disclose the existence of this Subpoena or any information related thereto, You shall notify the Assistant Attorney General listed below immediately and well in advance of Your disclosure of same.

1

WITNESS, **The Honorable Eric T. Schneiderman,** Attorney General of the State of New York, this 8th day of May, 2017.

By: _____
           John Oleske
           Senior Enforcement Counsel
           Office of the Attorney General
           120 Broadway, 26th Floor
           New York, New York 10271
           (212) 416-8660 (telephone)
           (212) 416-6007 (facsimile)

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 494 of 553   PageID 921

# Exhibit 27

**From:** Trelenberg, Pete W
**Sent:** Thursday, July 02, 2015 2:36 PM
**To:** Landuyt, William
**CC:** jreilly@mit.edu
**Subject:** Re: Last years shareholders report

I am on vacation right now, so don't have access to the numbers or chart. Memory says the numbers were based on the 2007 MIT JP report done in conjunction with the U.S. Govt. I believe the numbers were a calculation we did internally of the carbon tax impact on gasoline/heating/electricity costs compared to 2013 median household US income of about $51,300. Take a look at the chart, I believe it was clearly labeled.

Hope this helps. Call me if you need more. Pete.

Sent from my iPhone

On Jul 1, 2015, at 10:28 PM, Landuyt, William <william.landuyt@exxonmobil.com> wrote:

> Pete,
>
> I believe you are traveling now, but see the email below from John Reilly (cc'd here) regarding the cost estimates that were reported in our Shareholder Report that included input from IGSM.
>
> Billy
>
> William Landuyt
> ExxonMobil Research and Engineering
> Corporate Strategic Research
>
> Begin forwarded message:
>
>> **From:** John M Reilly <jreilly@mit.edu>
>> **Date:** July 1, 2015 at 9:09:23 PM EDT
>> **To:** "Landuyt, William" <william.landuyt@exxonmobil.com>
>> **Cc:** Ronald G Prinn <rprinn@mit.edu>, Sergey Paltsev <paltsev@mit.edu>
>> **Subject: Last years shareholders report**
>>
>> Billy,
>>
>> I would have sent this directly to Peter but I'm traveling and his email address is not popping up on my phone and your's is so maybe you can answer or forward to him.
>>
>> I have had an inquiry from someone on the cost of climate policy in your shareholders report attributed to the IGSM results in the old CCSP report.
>>
>> The figure they mentioned was something like $22,000 per household  in 2100 which is reported to be 40+% if after tax income for the average household.
>>
>> These are not numbers we report in that study and so they would have to be calculated in some way from the other numbers we present. The inquiry felt these numbers were extremely high, and they do strike me so--especially the 40+%. I think the relevant calculation is % welfare cost for the representative agent consumption in 2100 which by my (foggy) recollection is less than 10% in the U.S. They wonder if this is 2100 (undiscounted) cost as a percent of current after tax income, or what. If so, I think I'd agree with them that this is misleading. Of course, realistically the 2 degree target is

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)          EMC 001189007

probably not achievable (or it might cost that much) if in fact we continue as expected through 2030 as Jakes COP21 analysis and then need to crash emissions in less than a decade. However, if the CCSP report is the source of you calculation then I would want to know how you got these numbers from the results so I could clarify how our results relate to these calculations.

Thanks much.

John


Sent from my iPhone

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)        EMC 001189008

# Exhibit 28

POLICY. SCIENCE. BUSINESS.

## CARBON TAX

### MIT researcher says Exxon report inflated his data

**Benjamin Hulac, E&E News reporter**
*Published: Tuesday, May 30, 2017*

A Massachusetts Institute of Technology researcher whose team's work is cited in a key Exxon Mobil Corp. report on climate change says the oil giant distorted his findings.

The 2014 **analysis**, "Energy and Carbon — Managing the Risks," has been Exxon's go-to answer for journalists, investors and activists inquiring about what the company is doing about climate change. Exxon officials also turn to the report when fielding climate change questions and cite it as proof that the company grasps the risks of a warming world.

But John Reilly, co-director of the MIT Joint Program on the Science and Policy of Global Change, told E&E News that the report inflates the costs of cutting emissions. In a chart in the report, under the title "Substantial Costs for $CO_2$ Mitigation," Exxon said a carbon tax could cost American households up to 44 percent of their income, or $22,000, every year.





[+] An author of the Massachusetts Institute of Technology research that Exxon Mobil Corp. cited in its projections says the company sharply exaggerated the cost to American families of mitigating emissions. Source: Exxon Mobil

"Our work would not come up with that number or anywhere near it," Reilly said. The figure Exxon reached is about 10 times costlier than what he and his colleagues would reach, he noted. "It's not a calculation I would make. ... It doesn't make a lot of sense."

The Exxon authors properly cite the work of Reilly and his peers but use their data in ways Reilly called misleading, most prominently by exaggerating the cost of mitigating emissions through a carbon tax. The chart also references the Census Bureau, U.S. EPA and the U.S. Energy Information Administration as sources.

"If you don't read it carefully, it may lend some readers to believe that that number is based on our work," Reilly said.

He pointed out that the report also uses a future carbon price on current emissions and doesn't consider economic benefits of taxing carbon, such as dividends to taxpayers, less climate damage and fewer respiratory ailments.

Exxon representatives did not respond to questions about the company report and Reilly's work. The report is taking on new importance as shareholders and investors demand more information about how the companies they own are thinking about climate change. Indeed, Exxon noted the analysis in its **statement** to investors before tomorrow's annual shareholder meeting.

Critics say there are other problems, as well. For example, the oil giant issued the report before world leaders agreed to the 2015 Paris climate accord, in which countries pledged to keep global temperature rise to manageable levels. So while Exxon today cites the study as evidence that its business will smoothly adapt to climate regulations, the analysis omits any repercussions from the Paris deal.

## Comparisons with Chevron

The Exxon report has vexed Bob Litterman for years.

"I don't think it's honest, and the problems with the report have been pointed out several years ago, and yet Exxon is still pointing to this report," said Litterman, a founding partner of Kepos Capital, a New York City investment firm. "They've inflated the costs, obviously intentionally, and the obvious answer is: to prevent the appropriate policy."

Litterman is the former head of risk management at Goldman Sachs. He now sits on a number of boards, many of which focus on climate change in their work.

A few weeks ago, a majority of Occidental Petroleum Corp. stockholders demanded that the company produce a "stress test" report on how climate change threatens operations. The vote made history: It was the first time such a resolution had passed at an American oil company (*Climatewire*, May 15). And a few weeks before, Chevron Corp., under pressure from investors, announced it had reached a deal to produce a similar report of its own.

That report is more open than Exxon's about changes in the oil and gas trade, Litterman said. While both companies tell investors they'll be fine and even prosper in a future with stricter carbon regulations, Chevron is more frank about the challenges the industry faces, he said.

"They say, 'Look, if there's a movement to a low-carbon economy, that's going to reduce the overall demand for oil, and it will make it a more difficult environment for companies like ourselves,'" Litterman said.

Before the company gathers tomorrow for its yearly meeting in a Dallas symphony hall, investors and climate advocates are hopeful that the resolution at Exxon, which demands a climate report, will pass.

If stockholders manage to pass the climate resolution, it would mark a significant swing in company history.

Twitter: **@benhulac**  |  Email: **bhulac@eenews.net**

*Advertisement*



*The essential news for energy & environment professionals*

© 1996-2017 Environment & Energy Publishing, LLC   Privacy Policy   Site Map

# Exhibit 29

STATE OF NEW YORK

PUBLIC PAPERS

OF

HERBERT H. LEHMAN

FORTY-NINTH GOVERNOR

OF THE

STATE OF NEW YORK

1933



ALBANY
J. B. LYON COMPANY, PRINTERS
1934

ment of a certain sewer district improvement known as Lincoln Avenue Drain.

Therefore, pursuant to Article IV, Section 4 of the Constitution, I recommend as a subject for your consideration the enactment of legislation authorizing the City of Lockport to issue bonds in the sum of $208,275.44 with the requirement that all moneys received in connection with the Lincoln Avenue Drain, the cost of which has not yet been paid by the property benefited, shall be earmarked and applied toward the payment of such bonds.

(Signed)     HERBERT H. LEHMAN

---

## RACKETEERING

### Recommending Enlargement of Powers of the Attorney-General to Suppress Illegitimate Activities of Gang Elements

STATE OF NEW YORK — EXECUTIVE CHAMBER

ALBANY, *August* 15, 1933

*To the Legislature (in Extraordinary Session):*

Interference with legitimate business by professional gang elements who prey upon lawful industry to sustain themselves has grown to such proportions that drastic measures are immediately needed to curtail and eventually to suppress such activities completely.

The Attorney-General has called my attention to suggested amendments to Article 22 of the General Business Law, known as the Donnelly Act, which would enable the Department of Law to take steps in a wholesome endeavor to restrain and to exterminate such activities. The General Business Law requires investigation and restraint of any monopoly when found to exist. But I am informed that in its present state the law is not of sufficient scope to permit investigations and prosecutions of interferences with trade practices, services and businesses which do not themselves partake of the production and sale of commodities. Moreover, the existing procedure does not permit of speedy inquiry and prosecution.

During the last legislative session a measure incorporating amendments to the law was introduced at the recommendation of the Attorney-General. The bill succeeded in passing one house but failed to arrive at a vote in the other. Recent events, it seems to me, particularly dictate the passage of such a law at this time.

In order that the powers of the Attorney-General may properly be rounded out, I also recommend that the General Business Law be further amended to enlarge the power of subpoena, examination and prosecution by the Attorney-General in the same manner as now provided in the Martin Act relating to the fraudulent sale

of securities. The provisions of that act have produced very salutary results. By so extending his powers the Attorney-General would be in a position to conduct adequate investigations to ascertain the underlying facts concerning violations of the Donnelly Act, to make rigid inquiries into practices commonly known as racketeering, and to provide more adequate protection of the public against such unlawful practices. Legal measures designed to provide successfully for the prosecution of such offenders should be adopted at once.

Therefore, pursuant to Article IV, Section 4, of the Constitution, I recommend for your consideration the amendment of the General Business Law so as to enlarge the powers of the Attorney-General (1) to permit him to make investigations and prosecutions of interferences with trade practices, services and businesses, though they do not themselves partake of the production and sale of commodities; and (2) to subpoena, examine and prosecute any violation of the General Business Law by the same procedure now provided in the Martin Act.

(Signed)    HERBERT H. LEHMAN

---

## GENERAL RECOMMENDATIONS

### Recommending Legislation Proposed by the City of New York to Meet Existing Needs

1. Amending New York Charter to provide for the creation of the Department of Purchase.

2. Authorizing the Board of Commissioners of the Sinking Fund of the City of New York to transfer certain securities from the Rapid Transit Sinking Fund to the Sinking Fund of the City of New York.

3. Amending the Tax Law to Permit Tax Commission to Furnish Taxing Officers of any Municipality Imposing Retail Sales Tax Copies of its Pertinent Records and Other Data Obtained in Administration of State Retail Sales Tax.

### Other Subjects

Recommending the enactment of a procedure permitting the reorganization of private banks and banking corporations upon the order of a Supreme Court and the approval of the Superintendent of Banks on condition that depositors and creditors representing eighty per centum in amount of total deposits and liabilities and stockholders owning at least two-thirds of capital stock shall have consented in writing to a plan of reorganization.

Recommending amendment to the Village Law empowering board of trustees of any village to provide for the payment of taxes by

6

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

NYSCEF DOC. NO. 199

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

# Exhibit 30

# STATE OF NEW YORK

---

# ANNUAL REPORT

OF THE

# ATTORNEY-GENERAL

FOR THE

Year Ending December 31, 1933

---

JOHN J. BENNETT, JR., Attorney-General



ALBANY
J. B. LYON COMPANY, PRINTERS
1934

A notorious stock fraud case during 1933 was that which involved the indictment of Edna V. O'Brien, an investment counsellor, whose clientele included many persons of national prominence. It is believed that as a result of the defendant's activities, her clients suffered losses approximating $500,000.

Other criminal proceedings were the convictions of Frank M. Best and Nathan Caidin, each of whom received prison sentences for refusing to obey a subpoena.

During the current year I have co-operated fully with the United States Senate Investigating Committee and its counsel, Hon. Ferdinand Pecora. At the request of Mr. Pecora, I assigned Mr. Frank J. Meehan, statistician and accountant attached to the New York City Bureau of Securities, to head the staff of accountants and examiners employed by the committee and made available to the committee all of the records of the Bureau. Mr. Meehan is still working with the committee.

I wish to thank the District Attorneys of the several counties for their continued hearty co-operation in the prosecution of crimes arising out of violations of the Martin Act. Without their assistance the record of the past year could not have been achieved.

The following is a State-wide summary of the activities of the Bureau:

A—Cases on hand January 1, 1933................ 324
    Cases received .............................. 1,471

                                                  1,795
    Cases closed ................................ 1,132

    Cases on hand December 31, 1933............ 663

B—Persons and firms enjoined................... 880
    Receivers appointed ........................ 114
    Criminal prosecutions ...................... 182

C—Losses sustained by investors in cases investigated $25,256,000
    Restitution procured ...................... 1,525,600

## BUREAU FOR THE INVESTIGATION OF RESTRAINTS ON BUSINESS



Following a special message to the Legislature in its special session in August of this year, given by the Governor at my request, Article 22 of the General Business Law, the so-called Donnelly Act, was amended so as to give the Attorney-General power to investigate and prosecute racketeering in industry. The new act was patterned after the Martin Act, and by its terms the Attorney-General was given the right to subpoena witnesses, books, records, etc. Concurrent jurisdiction with the district attorney to investi-

gate and prosecute offenses involving racketeering was also conferred. It was also provided that failure to obey a subpoena without reasonable cause, or to answer any question, or to produce any book, paper or record subpoenaed without reasonable cause, constitutes a misdemeanor.

On November 1st an appropriation became available and a new bureau was immediately established in New York City. Assistant Attorney-General John F. X. McGohey, then in charge of the Bureau of Securities, was appointed to head the legal division of the Anti-Racket Bureau, while Thomas F. Ward, Jr., Chief Investigator of the Department of Law at Albany, was transferred to New York City to head the investigating staff. Several additional employees were assigned to the new bureau, some of whom were transferred from other offices within the department.

It is gratifying to note that since the Bureau was set up and to the first of the year seventeen indictments charging extortion have been obtained in New York, Kings, Queens and Suffolk counties.

In Suffolk county, where seven persons were indicted, racketeering was uncovered in the duck industry. In Kings county a well organized racket was revealed in the Italian bakery industry. As a result of an investigation embracing several weeks, during the course of which 150 witnesses were examined, several of whom received police protection, five persons, charged with twenty-one offenses, were indicted.

Recently the results of investigations into the kick-back racket in the building industry were presented to the grand juries in New York and in Westchester counties. In the latter county the grand jury refused to indict, but in New York county two indictments were secured charging six offenses of extortion and coercion. Kick-back is the term applied to the practice of certain contractors in forcing their employees to turn back to them part of their weekly wages.

Since the Anti-Racket Bureau was established, eighty-four complaints have been received. Of these, forty-one cases have been disposed of and forty-three were pending on December 31.

The Bureau has encountered extreme reluctance on the part of victims of racketeering to testify. It has been my policy to conduct all investigations in as secret a manner as possible and to guarantee to every witness police protection. It has been possible for me to carry out these promises because of the whole-hearted co-operation of police officials in the various localities. The Police Commissioner of New York City has been especially co-operative. Detectives of the radical squad have been permanently assigned to the Anti-Racket Bureau, and every other request for aid has been promptly granted.

The district attorneys of the several counties have co-operated in every way, and I am deeply appreciative of the aid extended to the Bureau.

# Exhibit 31

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM INDEX NO. 451962/2016

NYSCEF DOC. NO. 200 RECEIVED NYSCEF: 06/02/2017

NEW YORK LAW INSTITUTE
LIBRARY

JUL 8 1971

120 BROADWAY - N.Y.C.

# NEW YORK CITY CHARTER

AND

# ADMINISTRATIVE CODE

## ANNOTATED

A complete text of the New York City Charter and the New York City
Administrative Code with court decisions from the time of the
enactment of the Code and Charter

## VOLUME 2

WILLIAMS PRESS, INC.        ALBANY, NEW YORK

NEW YORK LAW INSTITUTE
LIBRARY

120 BROADWAY - N.Y.C.

Copyright 1971
by
WILLIAMS PRESS, INC.

## NEW YORK

**CHAPTER**

Introductory
§ 1–0.0  Co

Title A
§ 1–1.0  Th
    exten
§ 1–2.0  Na
    seal
§ 1–3.0  Cit
§ 1–4.0  Off
§ 1–5.0  Da
    procee
§ 2–1.0  Di
§ 2–2.0  Po

1   Mayor

Title A
§ 3–1.0  Fla
§ 3–2.0  Fla
§ 3–3.0  Off
§ 8a–1.0  A
§ 8a–3.0  F
§ 8a–4.0  P
§ 8a–5.0  D
§ 8a–6.0  E
§ 8a–7.0  F
§ 8a–8.0  D
§ 8a–9.0  Vi
§ 8a–10.0  I
    tution
§ 8a–11.0  I

Title B—City
§ B1–1.0  P
§ B1–2.0  D
§ B1–3.0  C
§ B1–4.0  F

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

NYSCEF DOC. NO. 200

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 511 of 553   PageID 938

bers, to be appointed by the mayor, one of whom shall be designated by him as its chairman and shall serve as such at the pleasure of the mayor. The chairman shall devote his entire time to his duties and shall not engage in any other occupation, profession or employment. Members other than the chairman shall serve without compensation. Of the fifteen members first appointed, five shall be appointed for one year, five for two years and five for three years; thereinafter all appointments to the commission shall be for a term of three years. In the event of the death or resignation of any member, his successor shall be appointed to serve for the unexpired period of the term for which such member had been appointed. (Added by L. L. 1955, No. 55; amended by L. L. 1962, No. 11, March 23; L. L. 1965, No. 60, June 14.)

§ B1-4.0   **Functions.**—The functions of the commission shall be:

(1) To foster mutual understanding and respect among all racial, religious and ethnic groups in the city of New York;

(2) To encourage equality of treatment for, and prevent discrimination against, any racial, religious or ethnic group or its members;

(2) To cooperate with governmental and non-governmental agencies and organizations having like or kindred functions; and

(4) To make such investigations and studies in the field of human relations as in the judgment of the commission will aid in effectuating its general purposes. (As added by L. L. 1955, No. 55, June 3, effective July 1, 1955. See note to § B1-1.0.)

§ B1-5.0   **Powers and duties.**—The powers and duties of the commission shall be:

(1) To work together with federal, state and city agencies in developing courses of instruction, for presentation to city employees and in public and private schools, public libraries, museums and other suitable places, on techniques for achieving harmonious intergroup relations within the city of New York.

(2) To enlist the cooperation of the various racial, religious and ethnic groups, community organizations, labor organizations, fraternal and benevolent associations and other groups in New York City, in programs and campaigns devoted to eliminating group prejudice, intolerance, bigotry and discrimination.

(3) To study the problems of prejudice, intolerance, bigotry, discrimination and disorder occasioned thereby in all or any fields of human relationship.

(4) To receive, investigate and pass upon complaints and to initiate its own investigations of:

(a) racial, religious and ethnic group tensions, prejudice, intolerance, bigotry and disorder occasioned thereby;

(b) discrimination against any person, group of persons, organization or corporation, whether practiced by private persons, associations, corporations and, after consultation with the

Mayor, by city
to make, sign a

(5) To hold heari
ister oaths, take the
nection therewith t
ing to any material
commission.

(6) To issue publi
designed to promote
intolerance, bigotr
thereby.

(7) To appoint a
ing on of the comm
in the city treasury

(8) To recommen
aid in carrying out

(9) To submit a
which shall be pul
1955, No. 55, June
97, December 13.)

¶ 1. A petitioner accu
inatory renting prac
secure the quashing of
the Commission on In
tions on the grounds
ination. When he app
Commission, he may
stitutional objections
Matter of Martin, 1
188 N. Y. S. 2d 566 [

¶ 2. The Commissio
Rights, which was co
vestigation into real
known as block-busti
New York area of
within its authority i
poena duces tecum
production of certai
though the records w
to respondent's tran
East New York area
New York (Gross),
L. J. (10-23-62) 14,

¶ 3. Complaint whic
plaintiffs had contrac
of defendant cooperat
that lease and by-law
tive required the con
of directors; that th
consent of the direct
through the device
rector move for its a
sole motive for reje
cation was because
Jewish; and that a

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM  INDEX NO. 451962/2016

NYSCEF DOC. NO. 200                                    RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 512 of 553   PageID 939

Mayor, by city officials or city agencies. Upon its own motion, to make, sign and file complaints alleging violations of this title.

(5) To hold hearings, compel the attendance of witnesses, administer oaths, take the testimony of any person under oath and in connection therewith to require the production of any evidence relating to any material under investigation or any question before the commission.

(6) To issue publications and reports of investigations and research designed to promote good will and minimize or eliminate prejudice, intolerance, bigotry, discrimination and disorder occasioned thereby.

(7) To appoint an executive director. The expenses for the carrying on of the commission's activities shall be paid out of the funds in the city treasury.

(8) To recommend to the Mayor and to the council legislation to aid in carrying out the purpose of this title.

(9) To submit an annual report to the Mayor and the council which shall be published in the City Record. (Added by L. L. 1955, No. 55, June 3, eff. July 1, 1955; amended by L. L. 1965, No. 97, December 13.)

## CASE NOTES

¶ 1. A petitioner accused of discriminatory renting practices may not secure the quashing of a subpoena of the Commission on Intergroup Relations on the grounds of self-incrimination. When he appears before the Commission, he may urge any constitutional objections to testifying.—Matter of Martin, 16 Misc. 2d 235, 188 N. Y. S. 2d 566 [1959].

¶ 2. The Commission on Human Rights, which was conducting an investigation into real estate practices known as block-busting in the East New York area of Brooklyn, acted within its authority in issuing a subpoena duces tecum requiring the production of certain records even though the records were not limited to respondent's transactions in the East New York area.—In re City of New York (Gross), 148 (79) N. Y. L. J. (10-23-62) 14, Col. 3 M.

¶ 3. Complaint which alleged that plaintiffs had contracted to buy stock of defendant cooperative corporation; that lease and by-laws of the cooperative required the consent of its board of directors; that the application for consent of the directors was rejected through the device of having no director move for its approval; that the sole motive for rejecting the application was because plaintiffs were Jewish; and that as a result plain-

tiffs had to buy another apartment at a higher cost and which sought compensation and punitive damages was dismissed on ground that statute prohibiting discrimination in housing provided administrative remedy and judicial remedies only on initiative of administrative agency and made no provision for private or individual remedies.—Bachrach v. 1001 Tenants Corp., 21 App. Div. 662, 249 N. Y. S. 2d 855 [1964], aff'd., 15 N. Y. 2d 718, 256 N. Y. S. 2d 929, 205 N. E. 2d 196 [1965].

¶ 4. Commission was without jurisdiction to investigate alleged discriminatory practices in the construction industry where State Commission for Human Rights had asserted its jurisdiction over such subject matter.—Lowell v. Rueckert, 43 Misc. 2d 1025, 252 N. Y. S. 2d 646 [1963].

¶ 5. Provisions of the Administrative Code creating the Commission on Human Rights was not invalid as an unconstitutional usurpation of powers vested solely in the state by provisions of the Executive Law creating the State Commission.—City of N. Y. v Clafington, Inc., 40 Misc. 2d 547, 243 N. Y. S. 2d 437 [1963].

¶ 6. Complaint charging that defendants had refused to rent an apartment to complainant solely because of her race, and seeking to restrain defend-

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 513 of 553   PageID 940

# Exhibit 32

used fifteen dollars for such services, respectively. The clerks shall serve from the opening of the polls to the closing of the polls and each such clerk shall receive eleven dollars for such services. The chairman of each board of inspectors actually serving as such, shall receive in addition to the sums herein provided, one dollar for primary day, last day of registration and election day.

§ 2. This act shall take effect immediately.

---

## EXTRAORDINARY SESSION

## CHAPTER 887

AN ACT to amend the executive law, in relation to creating the office of commissioner of investigation, defining the functions, powers and duties thereof, and making an appropriation therefor

Became a law July 2, 1953, with the approval of the Governor. Passed, on message of necessity, pursuant to article III, section 14 of the Constitution, by a majority vote, three-fifths being present

*The People of the State of New York, represented in Senate and Assembly, do enact as follows:*

Section 1. The executive law is hereby amended by adding thereto a new section, to be section eleven, to read as follows:

§ 11. Commissioner of investigation. (1) Commissioner. The governor may appoint and at pleasure remove a commissioner of investigation who shall receive a salary to be fixed by the governor within the amount appropriated therefor.

(2) Investigations. At the direction of the governor, the commissioner shall investigate:

a. The conduct in office of any public officer who is subject to removal by the governor, or by any person or body upon the recommendation of the governor;

b. The management and affairs of any department, board, bureau, commission or other agency of the state;

c. Any matter concerning the faithful execution or effective enforcement of the laws of the state; or

d. Any matter concerning the public peace, public safety and public justice.

(3) General powers and duties. The commissioner shall be authorized:

a. Subject to the approval of the governor, to appoint and employ and at pleasure remove deputies, investigators, clerks and such other persons as he may deem necessary, determine their duties and fix their salaries or compensation within the amount appropriated therefor.

b. To conduct any investigation authorized by this section at any place within the state.

c. During the course of any investigation, to hold such private hearings as he may determine are required.

*Executive Law, new § 11, added.*

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

d. To administer oaths or affirmations, subpoena witnesses, compel their attendance, examine them under oath or affirmation and require the production of any books, records, documents or other evidence he may deem relevant or material to the investigation. The commissioner may designate any member of his staff to exercise such powers.

e. Upon request of district attorneys and other law enforcement officers, to cooperate with, advise and assist them in the performance of their official powers and duties.

f. To perform such other functions, powers and duties as the governor may assign to him.

(4) Cooperation and facilities of other departments. The commissioner may request and shall receive from every department, division, board, bureau, commission or other agency of the state, or of any political subdivision thereof, cooperation and assistance in the performance of his duties.

(5) Disclosures. Any person conducting or participating in any examination or investigation who shall disclose to any person other than the governor or the commissioner the name of any witness examined, or any information obtained or given upon such examination or investigation, except as directed by the governor, shall be guilty of a misdemeanor.

(6) Combination of duties. At the direction of the governor, the functions, powers and duties of the office of commissioner of investigation may be combined with or added to those of any other officer or employee of the executive department; or, with the approval of the attorney-general, with those of any officer or employee of the department of law. The governor may reassign the functions, powers and duties of such office whenever he may deem it appropriate.

(7) Construction. Nothing contained in this section shall be construed to supersede, repeal or limit any power, duty or function of the executive department or any other department or agency of the state, or any political subdivision thereof, as prescribed or defined by law.

§ 2. The sum of seventy-five thousand dollars ($75,000), or so much thereof as may be necessary, is hereby appropriated from any funds in the state treasury in the general fund to the credit of the state purposes fund, not otherwise appropriated, and made immediately available to the executive department for the expenses, including personal service, of the office of the commissioner of investigation, in carrying out the provisions of this act. Such moneys shall be payable on the audit and warrant of the comptroller on vouchers certified or approved by the commissioner or by an officer or employee duly designated by him.

§ 3. This act shall take effect immediately.

Appropriates $75,000

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM

NYSCEF DOC. NO. 201

INDEX NO. 451962/2016

RECEIVED NYSCEF: 06/02/2017

# LAWS

OF THE

# STATE OF NEW YORK

PASSED AT THE

ONE HUNDRED AND SEVENTY-SIXTH
SESSION

OF THE

# LEGISLATURE

BEGUN JANUARY SEVENTH AND ENDED MARCH
TWENTY-FIRST
INCLUDING TWO EXTRAORDINARY SESSIONS

## 1953

AT THE CITY OF ALBANY

ALSO OTHER MATTERS REQUIRED BY LAW
TO BE PUBLISHED WITH THE SESSION LAWS

Volume II



ALBANY
1953

# Exhibit 33

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM
INDEX NO. 451962/2016

NYSCEF DOC. NO. 202
RECEIVED NYSCEF: 06/02/2017

5/4/2017
Exxon Mobil's (XOM) Q4 2016 Results - Earnings Call Transcript | Seeking Alpha

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 518 of 553   PageID 945

Seeking Alpha$^{\alpha}$

# Exxon Mobil's (XOM) Q4 2016 Results - Earnings Call Transcript

Jan. 31, 2017 5:17 PM ET1 comment
by: SA Transcripts

Q4: 01-29-17 Earnings Summary

📰 *Press Release*    ▶ *Slides*    **SEC** *10-K*    📄 *Analysis*    α *News*

EPS of $0.41 misses by $-0.29 | Revenue of $61.02B (+ 2.0% Y/Y) misses by $-1.26B

Exxon Mobil Corporation (NYSE:XOM)

Q4 2016 Results Earnings Conference Call

January 31, 2017, 9:30 am ET

**Executives**

Jeff Woodbury - Vice President of Investor Relations and Secretary

**Analysts**

Neil Mehta - Goldman Sachs

Phil Gresh - JPMorgan

Doug Leggate - Bank of America

John Herrlin - Societe Generale

Doug Terreson - Evercore ISI

Sam Margolin - Cowen and Company

Evan Calio - Morgan Stanley

Jason Gammel - Jefferies

Ryan Todd - Deutsche Bank

Paul Sankey - Wolfe Research

Asit Sen - CLSA Americas

Moses Sutton - Barclays

Alastair Syme - Citi

Brendan Warren - BMO Capital Markets

Ed Westlake - Credit Suisse

Theepan Jothilingam - Exane BNP

Pavel Molchanov - Raymond James

## Operator

Good day everyone and welcome to this ExxonMobil Corporation fourth quarter and full year 2016 earnings call. Today's call is being recorded.

At this time, I would like to turn the call over to the Vice President of Investor Relations and Secretary, Mr. Jeff Woodbury. Please go ahead, sir.

## Jeff Woodbury

Thank you. Ladies and gentlemen, good morning and welcome to ExxonMobil's fourth quarter and full year 216 earnings call. My comments this morning will refer to the **slides** that are available through the Investors section of our website.

So before we go further, I would like to draw your attention to our cautionary statements shown on slide two.

Turning now to slide three, let me begin by summarizing the key headlines of our performance. ExxonMobil generated full year earnings of $7.8 billion and fourth quarter earnings of $1.7 billion. Corporation continues to generate cash flow through the business cycle to meet our commitment to shareholders and support investments across the value chain.

In the fourth quarter, cash flow from operations and asset sales exceeded dividends and net investments by a healthy margin. We are realizing the benefit of strengthening prices in the fourth quarter in our upstream financial results. However these results included a $2 billion impairment charge in the U.S. segment, largely related to dry gas operations with undeveloped acreage in the Rocky Mountain region. The impairment charge was the result of an asset recoverability study completed during the quarter and is consistent with the approach we took in 2015.

Exxon Mobil's (XOM) Q4 2016 Results - Earnings Call Transcript | Seeking Alpha
Case 3:16-cv-03111-K Document 36-1 Filed 07/26/17 Page 520 of 553 PageID 947

Continued solid performance on our downstream and chemicals segments underscores the resilience of our integrated business throughout the commodity price cycle. Corporation continued to progress strategic investments across the upstream, downstream and chemical segments during the year, including execution of major projects, value accretive acquisitions and pursuit of high potential exploration opportunities.

Moving to slide four, we provide an overview of some of the external factors affecting our results. Global economic growth remained modest during the fourth quarter. In the United States, the pace of economic expansion slowed relative to a stronger third quarter. We have stabilized in China and remain tepid in Europe and Japan despite some improvement in the quarter.

Crude oil and natural gas prices strengthened during the quarter on anticipation of an improved supply balance as well as colder weather. Refining margins improved in Europe and Asia while seasonal margins in the United States weakened. And finally, chemical margins decreased due to higher feed and energy costs, driven largely by commodity products.

Turning now to the financial results shown on slide five. As indicated, fourth quarter earnings were $1.7 billion or $0.41 per share. In the quarter, the corporation distributed dividends of $3.1 billion to our shareholders. CapEx was $4.8 billion, down 35% from the fourth quarter of 2015 reflecting ongoing capital discipline and strong project execution. Cash flow from operations and asset sales was $9.5 billion and at the end of the quarter cash totaled $3.7 billion and debt was $42.8 billion.

The next slide provides more detail on sources and uses of cash. So over the quarter, cash decreased from $5.1 billion to $3.7 billion. Earnings, adjusted for depreciation expense, changes in working capital and other items and our ongoing asset management program yielded $9.5 billion of cash flow from operations and asset sales. The negative adjustment for working capital and other items reflects changes in deferred tax balances.

Uses of cash included shareholder distributions of $3.1 billion and net investments in the business of $3.8 billion. Debt and other financing items decreased cash by $4 billion, primarily due to a reduction in short-term debt. Cash flow from operations and asset sales cover dividends and net investments in the quarter by more than $2 billion.

Moving now to slide seven for a review of our segmented results. ExxonMobil's fourth quarter earnings decreased $1.1 billion from a year ago quarter as a result of the impairment charge taken in the U.S. upstream segment. This was partly offset by stronger

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 521 of 553   PageID 948
Exxon Mobil's (XOM) Q4 2016 Results - Earnings Call Transcript | Seeking Alpha

upstream results and in earnings benefit in the corporate and financing segment as a result of favorable non-U.S. one-time tax items. On average, we expect that near-term corporate and financing expenses will be in the range of $400 million to $600 million per quarter which does represent a reduction relative to our previous guidance.

Similarly in the sequential comparison shown on slide eight, earnings decreased $970 million.

Turning now to the upstream financial and operating results starting on slide nine. Fourth quarter upstream earnings decreased $1.5 billion from a year ago quarter resulting in a loss of $642 million. Higher realizations improved earnings by $510 million driven by higher liquids prices. Crude realizations increased more than $8 per barrel whereas natural gas realizations decreased $0.32 per thousand cubic feet. Volume and mix effects decreased earnings by $50 million. And other items added $70 million driven by lower operating expenses partly offset by the absence of favorable tax items. Excluding the impairment charge, fourth quarter 2016 upstream earnings totaled $1.4 billion, up $528 million from the prior year quarter.

Moving to slide 10. Oil equivalent production decreased 3% compared to the fourth quarter of last year to 4.1 million barrels per day. Liquids production decreased 97,000 barrels per day as new project growth and more program volumes were more than offset by field decline, entitlement impacts and downtime in Nigeria. Natural gas production decreased to 179 million cubic feet per day as higher demand and project growth were more than offset by decline, regulatory impacts in the Netherlands, entitlement effects and divestments.

Turning now to the sequential comparison, starting on slide 11. Upstream earnings decreased $1.3 billion from the third quarter of 2016. Improved realizations increased earnings by $450 million. Crude prices were $4 per barrel higher and natural gas prices were up $0.41 per thousand cubic feet. Favorable volume and mix effects contributed $230 million, driven by higher seasonal demand, lower downtime and project growth. Other items increased earnings by $90 million driven by favorable foreign exchange effects.

Moving to slide 12. Sequentially, volumes increased more than 8% or 310,000 oil equivalent barrels per day. Liquids production was up 173,000 barrels per day, mainly the result of lower downtime and growth from new projects and work programs. Natural gas

5/4/2017    Exxon Mobil's (XOM) Q4 2016 Results - Earnings Call Transcript | Seeking Alpha

Case 3:16-cv-03111-K Document 36-1 Filed 07/26/17 Page 522 of 553 PageID 949

production was 623 million cubic feet per day higher than the previous quarter. Stronger seasonal demand in Europe and entitlement effects were partly offset by regulatory impacts in the Netherlands and field decline.

Moving now to the downstream financial and operating results starting on slide 13. Downstream earnings for the quarter were $1.2 billion, a decrease of $110 million compared to the fourth of 2015. Weaker margins reduced earnings by $570 million. Favorable volume mix effects mainly from increased operational efficiency and production optimization improved earnings by $200 million. All other items added $260 million, mostly from asset management activities, partly offset by increased maintenance costs and unfavorable foreign exchange effects. In the quarter, Imperial Oil completed the sale of its retail network. The sites are then converted to their branded wholesale distributor model resulting in an earnings benefit of $522 million dollars.

Turning to slide 14. Downstream earnings were flat sequentially. Stronger refining margins outside the United States and improved volume mix increased earnings by $160 million and $100 million respectively. All other items reduced earnings by $250 million driven by increased maintenance costs and unfavorable inventory and foreign exchange effects partially offset by asset management gains.

Moving now to the chemical financial and operating results, starting on slide 15. Fourth quarter chemical earnings were $872 million, down $91 million compared to the prior year quarter. Weaker margins primarily for specialty products decreased earnings by $10 million while unfavorable volumes and mix effects further reduced earnings by $30 million. All other items decreased earnings by $50 million largely due to unfavorable inventory and foreign exchange effects.

Moving to slide 16. Chemical earnings were down almost $300 million sequentially. Weaker margins driven by higher feed and energy costs reduced earnings by $200 million. Higher volumes added $50 million and all other items decreased earnings $150 million including seasonally higher operating expenses and unfavorable inventory and foreign exchange effects.

Turning now to the full year financial results, starting on slide 17. As I mentioned, 2016 earnings totaled $7.8 billion and represents a $1.88 per share. Corporation distributed $12.5 billion in dividends to our shareholders. CapEx totaled $19.3 billion for the year, a reduction of $11.7 billion versus 2015.

Exxon Mobil's (XOM) Q4 2016 Results - Earnings Call Transcript | Seeking Alpha

Throughout the year, we maintained a relentless focus on costs, capturing both structural efficiencies and market savings while maintaining operational integrity. These efforts resulted in further reduction in total CapEx and OpEx of $16 billion in the year versus 2015 when excluding the effect of the upstream impairment charge. As a result, cash flow from operations and asset sales was $26.4 billion.

Turning to slide 18. Cash balances were flat to year end 2015 at $3.7billion. Earnings, adjusted for depreciation expense, changes in working capital and other items and our ongoing asset management program, resulted in $26.4 billion of cash flow from operations and asset sales. The negative working capital and other impacts for the year were driven by lower upstream payables, deferred tax impacts and cash contributions to the U.S. pension plan. Uses included shareholder distributions of $12.5 billion and net investments of $16.7 billion. Debt and other financing items provided $2.8 billion in the year.

Moving to slide 19. This graphic illustrates the corporation's sources and uses of cash during the year and highlights our ability to meet our financial objectives. In a difficult business environment, the corporation continued to generate strong cash flow from operations and asset sales to support the dividend and most of our net investments in the business, supplemented by a moderate increase in debt financing. We maintain financial flexibility to continue to invest through the cycle in attractive opportunities.

As indicated, shareholder distributions totaled $12.5 billion. Annual per share dividends were up 3.5% compared to 2015 and this marks the 3fourth consecutive year of per share dividend growth. In the fourth quarter of 2017, ExxonMobil will limit share purchases to amounts needed to offset dilution related to our benefit plans and programs. During the year, ExxonMobil generated $9.7 billion of free cash flow, up $3.2 billion from 2015 reflecting the resilience of our integrated businesses and our focus on the fundamentals.

Looking ahead, we anticipate our 2017 capital and exploration expenditures to be about $22 billion. I know there will be a lot of interest in our investment plans and we will share additional details in a few weeks at our Analyst Meeting.

Moving on to slide 20 and a review of our full year segment results. 2016 earnings fell $8.3 billion as the impact of lower realizations in margins on our upstream and downstream segments was partially offset by stronger chemical results and lower corporate costs associated with several one-time tax items. As a result, the full year effective tax rate was 30%. Now assuming current commodity prices and the existing

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM INDEX NO. 451962/2016
NYSCEF DOC. NO. 202 RECEIVED NYSCEF: 06/02/2017
5/4/2017 Exxon Mobil's (XOM) Q4 2016 Results - Earnings Call Transcript | Seeking Alpha

Case 3:16-cv-03111-K Document 36-1 Filed 07/26/17 Page 524 of 553 PageID 951

portfolio mix, we do anticipate that the effective tax rate will be between 25% and 35% excluding the impact of any large one-time items. On this basis, our full year 2016 effective tax rate was within the new guidance range.

Turning now to the full year comparison of upstream results, starting on slide 21. Upstream earnings of $196 million were $6.9 billion lower than 2015. Realizations reduced earnings by $5.3 billion as crude oil prices decreased over $7 per barrel and natural gas prices declined by $1.40 per thousand cubic feet. Favorable volume and mix effects increased earnings by $130 million driven by new project growth. All other items added $310 million dollars due to lower operating expenses partly offset by the absence of favorable tax items. Excluding the impairment charge, 2016 upstream earnings totaled $2.2 billion.

Moving to slide 22. As indicated, volumes ended the year at 4.1 million oil equivalent barrels per day, down about 1% compared to last year but within our full year guidance of four to 4.2 million oil equivalent barrels per day. Liquids production increased 20,000 barrels per day as project and work program growth was partly offset by field decline and higher unplanned downtime, most notably from third-party impacts in Nigeria and wildfires in Canada. Natural gas production, however, decreased 388 million cubic feet per day. Growth in projects and work programs was more than offset field decline, regulatory restrictions in the Netherlands and divestments.

The full year comparison for downstream results as shown on slide 23. Earnings were $4.2 billion, a decrease of $2.4billion from 2015. Weaker margins decreased earnings by $3.8 billion. Favorable volume, mix effects increased earnings by $560 million and all other items primarily asset management gains increased earnings by $920 million.

On slide 24, we show the full year comparison for chemical results. 2016 earnings were $4.6 billion, up $197 million from 2015. Stronger commodity margins driven by advantage liquids cracking increased earnings $440 million while higher volumes added $100 million. Other items reduced earnings by $340 million reflecting the absence of asset management gains.

Moving next to an update on our upstream project activities. So we continue to deliver on our investment plans with an unwavering focus on long-term value. Five major projects started up in 2016, adding 250 thousand oil equivalent barrels per day of working interest production capacity. In the fourth quarter, Kashagan and Gorgon Train 2 started up and like other 2016 projects continue to ramp up to plateau production levels. Looking forward,

construction activities continue to progress on another five major projects that will come online over the next two years. These projects we will together contribute another 340,000 oil equivalent barrels per day of working interest production capacity.

Moving now to slide 26. Our focused exploration program continues to enhance our resource portfolio as demonstrated in the fourth quarter. In Guyana, ExxonMobil submitted the development plan for the initial phase of the Liza field. We continue to progress broader development planning activities based on a phased development approach. As part of these activities, contracts were awarded to perform front-end engineering and design. We expect to reach the final investment decision for the project later this year. Additionally, as I mentioned in the third quarter earnings call, the Liza-3 appraisal well successfully encountered an additional deeper reservoir which was being evaluated at the time. This reservoir is now estimated to contain 100 to 150 million oil equivalent barrels beneath the Liza field.

Also, offshore Guyana, the Payara exploration well discovered hydrocarbons marking the second discovery on the Stabroek Block. The well encountered more than 95 feet of high quality oil bearing sandstone reservoirs. Two sidetracks have been drilled to rapidly evaluate the discovery and a well test is about to get underway. The data will be analyzed in the coming months to better understand the full resource potential and development options.

Now, after the Payara well test, the Stena Carron drillship will next move to the Snoek prospect just south of the Liza discovery. ExxonMobil also made two additional discoveries in the fourth quarter including the Nigeria Owowo-3 oil discovery announced in the third quarter earnings call and the Muruk discovery in Papa New Guinea. Both Owowo and Muruk are near currently producing fields which will enable capital efficient development. We also continued to capture new prospective exploration acreage. In Mexico's offshore bid round one, ExxonMobil and Total jointly submitted the apparent high bid for Block 2 located in the Perdido area near the U.S. border. In Cyprus, ExxonMobil and our partner Qatar Petroleum have been selected as the winners of offshore Block 10 in a recent tender round and we look forward to negotiating the production sharing contract for this high potential block. ExxonMobil has also been awarded an offshore prospecting license for exploration activities in the Gulf of Papua in Papua New Guinea. The initial scope of work on this block is expected to include seismic acquisition.

Turning now to slide 27 and an update on ExxonMobil's U.S. unconventional portfolio. As a leading oil and gas producer in the United States, we have a strong acreage position and proven operational expertise in unconventional plays. XTO's daily production is

5/4/2017                Exxon Mobil's (XOM) Q4 2016 Results - Earnings Call Transcript | Seeking Alpha
Case 3:16-cv-03111-K Document 36-1 Filed 07/26/17 Page 526 of 553 PageID 953

currently more than 700,000 oil equivalent barrels per day of which 38% is liquids. Our ownership and operating position enable flexible development and allow us to maximize learning curve benefits through the cycle. For instance, in the Permian Basin, where we operate two-thirds of our production, our average drilling footage per day has increased about 85% since 2014 because of continuous learning and application of ExxonMobil's proprietary Fast Drill process. We continue to focus on liquids growth through development activities and strategic farm-ins and acquisitions. Since 2010, XTO has grown liquids production at a compounded annual growth rate of about 11% and which currently represents about 12% of the corporation's global liquids production.

Moving now to slide 28. Our most recent acquisition in the Permian further strengthens our unconventional portfolio adding high quality acreage in the Delaware Basin and more than doubling our resources in the Permian to greater than six billion oil equivalent barrels. ExxonMobil agreed to acquire privately owned companies whose holdings include 250,000 net acres of leasehold in the Permian. The acquisition includes an upfront payment $5.6 billion in Exxon Mobil shares plus additional continued cash payments totaling up to $1 billion based on development of the resource over a specified timeframe.

The map on the left shows our heritage acreage in yellow, acreage acquired in transactions in 2014 and 2015 in blue and the acreage associated with the most recent transactions in red. As you can see, the new leasehold represents a significant position in the heart of the Delaware Basin. Less than 5% of the acquired resource has been developed to-date, providing substantial opportunity for future growth. As a result of our proven capabilities, we are well positioned to maximize the value of this resource. This acquisition will add an estimated 3.4 billion oil equivalent barrels in multiple stacked plays, 75% of which is liquids. The highly contiguous nature of the acreage will also provide significant cost advantages by combining XTO's low-cost execution capabilities with proprietary technology from Upstream Research Company.

We plan to drill the longest laterals within the play which will maximize per well recoveries and help generate market leading development costs. More than 85% of the wells are expected to have lateral lengths two miles or longer because the acreage is not constrained by traditional land lease issues. This transaction increases ExxonMobil's inventory of Permian drill wells that yield at least a 10% rate of return at $40 per barrel to more than 4,500 wells. We currently produce more than 140,000 net oil equivalent barrels per day in the Permian and are operating 10 rigs. This is expected to move higher in 2017 as we begin activity on the newly acquired acreage.

Moving now to slide 29. We continue to strengthen our downstream and chemical business through selected integrated investments in our facilities and operations. We recently completed investments in lubricants and chemical facilities in Louisiana that support our aviation lubricants business commissioning a new state-of-the-art jet oil manufacturing facility in October of last year. The new plant will use Group V synthetic base stocks sourced from facilities that started up last year at our adjacent Baton Rouge chemical plant. Across the fuels, lubricants and chemical value chains, we continued to high grade our portfolio and reduce complexity to efficiently capture market value while reducing operational risk and capital expenditures. In the quarter, we reached agreements to divest several downstream affiliates in Africa and South America.

Additionally, as I mentioned earlier, Imperial Oil completed their conversion of its retail business to a branded wholesaler model. This model benefits from significantly lower capital requirements while continuing to grow retail sales. We also continue to enhance our logistics capabilities by focusing on strategic midstream assets. We recently announced the formation of a joint venture with Sunoco Logistics that will expand access to domestic crude oils by improving transportation options from the Permian and Ardmore basins to the U.S. Gulf Coast refineries.

In Baytown, at Mont Belvieu, Texas, the construction of our new 1.5 million ton per annum ethane steam cracker and associated metallocene polyethylene facility is progressing well with phase startup commencing in the second half of this year.

Finally, ExxonMobil recently announced a new project at our Beaumont, Texas facility to expand polyethylene capacity by 650,000 tons per year. This expansion amounts to 65% increase in polyethylene capacity at the site. Together, the projects at Beaumont and Mont Belvieu represent multibillion dollar investments that will increase ExxonMobil's U.S. polyethylene production by nearly two million tons per year or 40% making Texas our largest polyethylene supply point. The new facilities will process advantaged ethane feedstock to meet growing global chemical demand.

Moving to the final chart on slide 30. I would like to conclude today's comments with a brief summary of our 2016 performance, which is really underpinned by our sustained focus on value. ExxonMobil earned $7.8 billion in the year, while managing through a challenging business environment. Corporation delivered on its plan to produce 4.1 million oil equivalent barrels per day and maintained focus on business fundamentals. Volume contributions from our portfolio of new developments underscore our project execution excellence and reputation as a reliable operator.

Total CapEx was $19.3 billion, down 38% from 2015 as we exercised capital discipline and investment selectivity and continued to pursue market and execution efficiencies. Solid operating performance combined with continued investment and cost discipline generated cash flow from operations and asset sales of $26.4 billion and positive free cash flow of $9.7 billion. As I mentioned in the fourth quarter, cash flow from operations and asset sales more than cover the dividend and net investments in the business. Our commitment to shareholders remain strong as demonstrated by our reliable and growing dividend. We are confident in ExxonMobil's integrated business model and our ability to continue to grow long-term value in any business environment. I will discuss our forward plans in more detail at the upcoming Analyst Meeting, which will take place at the New York Stock Exchange on Wednesday, March 1.

That concludes my prepared remarks on a very busy year. And now I would be happy to your questions.

## Question-and-Answer Session

### Operator

Thank you, Mr. Woodbury. [Operator Instructions]. We will take our first question from Neil Mehta with Goldman Sachs.

### Neil Mehta

Good morning Jeff.

### Jeff Woodbury

Good morning Neil.

### Neil Mehta

Jeff, I appreciate the incremental disclosure here on the Delaware transaction. That's where I want to start. As you think about that deal, is it indicative of the view that Exxon has that you see more value in, let's say, the private market than the public market? And can you just talk a bit more about the opportunity you see in U.S. unconventional to do deals?

### Jeff Woodbury

Yes. Neil, it's a good question. I would tell you that I would not view it as being exclusive to one type of transaction. As we have talked in the past, we keep a full view on what may be out there that could be competitive with our existing resource base and accretive to overall long-term financial performance. You know, these things don't happen overnight. Several of these take many, many months to go ahead and put in place and not all of them transpire into an executed deal, but what's important is that it is a key aspect of our overall asset management program in order to high grade our portfolio with the view of our underlying mission of growing shareholder value.

**Neil Mehta**

I appreciate that. And then my follow-up, Jeff, is on CapEx. I imagine we are going to get a little bit more color on this at the Analyst Day in a couple of weeks, but the $22 billion that you outlined is in line with what you talked about earlier this year, but up from 2016. Can you speak high level to what's driving the growth in 2017 versus 2016 in terms of CapEx? Is that cost inflation? Or is that higher growth? And then bigger picture, can you talk about what you are seeing in terms of cost inflation across your portfolio?

**Jeff Woodbury**

Yes. Well, Neil, as you indicated, we do plan on giving a lot more detail around our investment plans in the analyst presentation that will be just a little bit more in a month from now. As you indicated, the $22 billion that I mentioned is fairly consistent with our forward-looking plan that we provided a year ago. I would tell you that it does not reflect a year-on-year increase associated with cost inflation and in fact the inverse is true is that the organization continues to look for high impact capital efficiencies to drive the cost down and it is, by and large, a function of activity level. Certainly as activity continues to build, we will all experience some market pressures, but that doesn't relieve us of our fundamental objective of maximizing the value proposition and rest assure that the organization will continue to keep focused on what new solutions are there for us to get to a lower cost outcome and the organization is very committed to make sure that we are capturing those and really leading the cost curve.

**Operator**

Our next question comes from Phil Gresh with JPMorgan.

**Phil Gresh**

Hi Jeff. Good morning.

**Jeff Woodbury**

Good morning Phil.

**Phil Gresh**

I wanted to start on the working capital and other headwind, $2.4 billion in the quarter, $8 billion for the year. It's a pretty big number. I guess I was just wondering if you could maybe elaborate or break that down a little more between deferred taxes and some of the other items? And moving forward how do you think about the ability to lessen that headwind in 2017.

**Jeff Woodbury**

Well, I mean obviously there's really two large components that are driving it. Obviously the changes in the working capital, by and large, adjustments in receivables and payables due to activity and changes in commodity prices and then the second part of other balance sheet items, some of that associated with deferred taxes. As I said, it also includes cash contributions that we made to the pension plan. So a lot of moving pieces, as is understandable. And I understand the interest, but that's about all the color I have for you at this point.

**Phil Gresh**

Okay. And then in terms of priorities with cash from here, to the extent you have excess free cash flow above the dividend in 2017, is the first priority, with the trending balances where they are, would it be debt paydown or do you feel like you have flexibility to do other things?

**Jeff Woodbury**

I think it's a function of the business climate and the opportunities that we have for ourselves. As you have heard us say before, if you think about our capital allocation approach, it's a commitment to provide a reliable and growing dividend to our shareholders and at the same time continue to selectively invest in our business with opportunities we believe are going to enhance the long-term return of the corporation. The excess cash, by and large, we don't want to hold large cash balances that we don't have immediate need for it. We will think about either paying down debt or buying back shares and that is done primarily on a quarterly basis. The corporation will step back and look at a number of factors like our current financial position, our potential opportunities to put capital to work as well as what we see in the near term in terms of the business outlook.

**Phil Gresh**

Okay. Thanks.

**Operator**

We will take our next question from Doug Leggate with Bank of America.

**Doug Leggate**

Thanks. Good morning, everybody. Good morning Jeff.

**Jeff Woodbury**

Good morning Doug.

**Doug Leggate**

Jeff, I wonder if I could kick off with your capital guidance. I guess it's kind of a follow-up. But ask you if could you move it on to talk a little bit about the production capacity that you see that goes along with that capital, because I am assuming the Permian is part of it? What I am really driving at is, you have got a number of projects still ramping up, so could you give us some idea as to what the remaining capacity is of those ramp-ups? In other words, what would the delta be if those projects were running full out in 2017? And then I have got a follow-up, please.

**Jeff Woodbury**

Yes. Doug, I mean first observation would be is that you are correct that we have projects that started up all the way back to early 2015 that are still well within their development drilling programs are ramping up to plateau production rate. Some of these things could take 12 to 24 months to fully reach the plateau production rate. I don't have a specific number for you as to what is that incremental capacity that's left to ramp up, but I will also highlight that a number of those projects also are exceeding design expectations due to really strong management by the organization around reliability and reservoir performance. We talked about Papa New Guinea in the past, a design at about 6.9, it's now produced above eight million tons per annum. You have heard in the news about Banyu Urip which the development basis was about 165,000 barrels a day. We have been producing about a 185,000 and it is now under review to take it all the way up to 200,000 barrels a day. Again very, very strong operational reliability and very good reservoir

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM    INDEX NO. 451962/2016
NYSCEF DOC. NO. 202                                                    RECEIVED NYSCEF: 06/02/2017
Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 532 of 553   PageID 959

Exxon Mobil's (XOM) Q4 2016 Results - Earnings Call Transcript | Seeking Alpha

performance. So the point I am making is above the additional ramp up that's anticipated from the major project startups, there is also another layer of capacity that we are building on based on the organization's focus on the operational capabilities of our assets.

### Doug Leggate

Okay. Just to be clear, Jeff, on the Permian piece of that, I think at the time of the acquisition you talked about moving to a 15-rig program. What's the starting point for that? What are you running right now?

### Jeff Woodbury

So you are talking about the recent acquisition, I believe?

### Doug Leggate

Right.

### Jeff Woodbury

So let me back up and first I say that if you look at the overall development of the new acreage, we see that over the long term it would support a multi-decade production plateau of about 350,000 oil equivalent barrels per day. So a very substantial addition to liquids production as well and in fact if I can put it in scale for you, if you remember, in my prepared comments, I said that our current liquids production from XTO represents about 12% of the corporation's global liquids production. If you were just to add on the expectation from the Delaware acreage, that would take us up somewhere between 20% to 25% of our global liquids production. So the point being is, it's a very material part of the portfolio. As I indicated, we have got 10 rigs running right now. We are planning on ramping up that activity over the near future. But what we would do is, commensurate with the leasehold development requirements, we are very, very positive about this obviously given the acquisition and we want to get to it right away.

### Doug Leggate

Jeff, I appreciate the answer. My follow-up is a very quick one. Payara, I think in Guyana, the limited disclosure you have given us so far, I guess, has raised some questions about potential scale. Is there anything you can tell us about relative scale or absolute scale of both the Liza and Payara reserve expectations ultimately but also like the development plan on both and the outlook of production system? And I will live it there. Thanks.

### Jeff Woodbury

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM          INDEX NO. 451962/2016

NYSCEF DOC. NO. 202          Exxon Mobil's (XOM) Q4 2016 Results - Earnings Call Transcript | Seeking Alpha          RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 533 of 553   PageID 960

Yes, Doug. So, as we indicated in the third quarter, given the Liza-3 appraisal well, that really built confidence in a view that we have got at least a billion barrels of recoverable reserve. Since then, we have drilled a deeper zone that added additional volume, as I indicated in the prepared comments. Payara, we are very pleased with the outcome. We moved very quickly two drill additional sidetracks in order to better define the reservoir. And as I said, I think the next critical piece of information will be this well test we are starting right now. And that will allow us to size Payara. Now obviously, as we move along in each operational activity, that data is feeding our real time development planning effort to assess the full development scope of the block. And remember, we have got two other blocks that we will have to integrate as well. But right now, we are moving forward with the initial phase development. As we have said previously, it's 100,000 barrel a day FPSO. We do feel like that's a prudent step, very good strong returns and right now, we view that as just the initial phase.

**Doug Leggate**

Okay. I will wait till the Analyst Day. Thanks, Jeff.

**Jeff Woodbury**

Thank you, Doug.

**Operator**

We will go next to John Herrlin with Societe Generale.

**John Herrlin**

Yes. Hi. Two quick ones for me, Jeff. Regarding your CapEx, is that just strictly E&D or you are including the acquisition costs for Bass?

**Jeff Woodbury**

Well, John, on the Permian acquisition, remember we are purchasing that via shares. So it excludes that share purchase.

**John Herrlin**

Okay. Well, it would still be part of the costs incurred at the end of the day, but that's fine. Next on Payara, is that age correlative with the upper Liza pay or the lower Liza pay or can you not say anything on that?

**Jeff Woodbury**

Exxon Mobil's (XOM) Q4 2016 Results - Earnings Call Transcript | Seeking Alpha

Yes. I really don't have anything to share on that at this point.

**John Herrlin**

Okay. That's it. Thank you.

**Jeff Woodbury**

Thank you.

**Operator**

We will go next to Doug Terreson with Evercore ISI.

**Doug Terreson**

Good morning Jeff.

**Jeff Woodbury**

Good morning Doug.

**Doug Terreson**

Just for clarification, is it correct that the $2.1 billion in asset sale gains were after tax and included in the $1.7 billion earnings figure and either way, could you provide some guidance as to which operating segments that these gains came from?

**Jeff Woodbury**

So the proceeds of $2.1 billion are -- you are asking about the proceeds that we had in the press release?

**Doug Terreson**

Correct.

**Jeff Woodbury**

Yes. Those are before tax proceeds.

**Doug Terreson**

Okay.

**Jeff Woodbury**

Case 3:16-cv-02111-K   Document 36-1   Filed 07/26/17   Page 535 of 553   PageID 962

Exxon Mobil's (XOM) Q4 2016 Results - Earnings Call Transcript | Seeking Alpha

And then those proceeds are primarily within our downstream portfolio. I would say about over 80% of it, it's in the downstream.

**Doug Terreson**

Okay.

**Jeff Woodbury**

And the largest part of that is in the Canada retail sales.

**Doug Terreson**

Can you give guidance on after-tax?

**Jeff Woodbury**

On the proceeds?

**Doug Terreson**

Yes.

**Jeff Woodbury**

Now I don't have any numbers to share with you on that.

**Doug Terreson**

Okay. And then also, three of your competitors have taken steps to enhance their pay for performance linkage by changing the metrics that they are using for their business units to ones which tie to intrinsic value in the stock market and probably CEO pay too. And while your stock has outperformed some of these companies in the equity market over the years, my question is, how is the company thinking about P-for-P this year and specifically where there is a need for change given its rising profile as a corporate governance issue with investors?

**Jeff Woodbury**

Well, if you remember -- you are talking about our executive compensation program?

**Doug Terreson**

I am.

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM INDEX NO. 451962/2016
NYSCEF DOC. NO. 202    Exxon Mobil's (XOM) Q4 2016 Results - Earnings Call Transcript | Seeking Alpha    RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K    Document 36-1    Filed 07/26/17    Page 536 of 553    PageID 963

**Jeff Woodbury**

Yes. As you and I have talked in the past, remember that a large part of our compensation program is based on a long-term payment schedule and it is intended in order to make sure that our executives are being held to the decisions that we are making over the long term. And our long-term incentive is paid over a 10-year period, 50% about 5 years. The remaining 50% after 10 years, really it's the later of 10 years or retirement. So some of us go even beyond 10 years, but it's really designed to ensure that our executives feel the same performance that our investors feel because when it does payout, it's paid out at the current stock price. Now I will tell you that the compensation committee does step back and look at the program periodically to make sure that it's ensuring, it's encouraging the right type of behaviors and it's recognizing the success of the corporation. For those that are listening about it, we have got, what we call an executive compensation overview disclosure that we send out annually that provide a lot of good detail about the structure of the program.

**Doug Terreson**

Okay. Thanks a lot, Jeff.

**Jeff Woodbury**

Doug, just a follow-up on your question regarding the Canadian retail. As I said in my prepared comments, it was $522 million after tax.

**Doug Terreson**

Great. Thanks a lot.

**Operator**

We will go next to Sam Margolin with Cowen and Company.

**Sam Margolin**

Good morning Jeff. How are you?

**Jeff Woodbury**

Good morning Sam.

**Sam Margolin**

Case 3:16-cv-03111-K Document 36-1 Filed 07/26/17 Page 537 of 553 PageID 964
Exxon Mobil's (XOM) Q4 2016 Results - Earnings Call Transcript | Seeking Alpha

So late in the quarter, you finally got FERC approval for Golden Pass. I guess I would add that to the bucket in one of the later **slides** about de-lengthening your U.S. nat-gas position, maybe. So I was wondering, I am sure you have made comments on this before, but how do you think now in the new environment or how things have played out currently, how U.S. LNG competes with some of your other world-scale LNG potential assets around the world? And how do you think about that moving forward as you want to develop additional U.S. gas assets in the context of that?

**Jeff Woodbury**

It's a good question, Sam. The best place to start is really thinking about it from our overall energy outlook and our supply and demand balances. Over the long term, we expect that LNG capacity or demand will continue to grow. In fact, almost it's up to like 250% of today's LNG net capacity. A large part of that growth is primarily driven by Asia. Now like most commodities, you are going to have periods in which there is oversupply and periods where there is insufficient supply. And we do expect that with the number of projects coming on that there are some projects where there is period in which they will see LNG over supply. Now if I step back from that that's, if you will, the value proposition and I step back, we have got a very extensive portfolio and I would tell you that brownfield developments that is incremental investments to existing operations like Papa New Guinea or even Golden Pass provide us economic advantage by lowering the cost by leveraging the installed investment. At Golden Pass, as you noted, we did get FERC approval. The one key step that we are still waiting for after many years is final Department of Energy approval of non-FTA export authorization. And we are hopeful that that will come shortly. But each one of these projects will be evaluated on their own merit. As you have heard us say previously, as it relates to LNG projects, we want to lock in a large part of that capacity on long-term contracts. And Golden Pass, within the whole portfolio of investment opportunities that we have, we are pursuing long-term sales contracts. But they all will be evaluated on their own merits.

**Sam Margolin**

Okay. I guess my follow-up then, is on the same topic. It might be a similar answer on sort of an individual project analysis basis, but as you look within your 30-year outlook and a lot of energy demand globally is driven by gas and against the backdrop of early this year, the de-booking of some natural gas reserves domestically and an imperative to get those rebooked over time, what do you think is more preferable between uses of that gas for you? Investing in shipping it to these Asian demand centers via LNG? Or keeping it onshore and consuming it within your chemical business?

Exxon Mobil's (XOM) Q4 2016 Results - Earnings Call Transcript | Seeking Alpha

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 538 of 553   PageID 965

**Jeff Woodbury**

That's a good question. It really highlights and talks to the issue of optionality. We are the largest gas producer in the U.S. Where do we see that gas going in the future, again stepping back from that energy outlook, we expect gas is going to grow about 1.5% per year. That's primarily driven by two things, one, power generation and the second thing petrochemicals. As you know, we have got a very integrated value chain. The anticipation is that resource will not only meet domestic growth and power generation, but we will also look at the utilization of that into our value chain in the chemicals business as well as, well, we started this discussion around LNG export, so optionality gives us tremendous amount of flexibility to make sure that we are maximizing the value proposition.

**Sam Margolin**

All right. Thanks Jeff.

**Jeff Woodbury**

You bet.

**Operator**

We will go next to Evan Calio with Morgan Stanley.

**Evan Calio**

Hi. Good morning, Jeff.

**Jeff Woodbury**

Good morning.

**Evan Calio**

I have a question. Any outlook on future project returns, conventional versus your acquired Permian? And I ask the question in the context that you make a significant acquisition in one of the tighter energy asset markets in the world, the Permian. You discuss a relatively healthy future plateau level of production, while there's distress in asset markets globally in regions in which Exxon operates. So I mean just given the assets and these longer laterals you discussed, can you talk about how you think the future returns compete within your portfolio or how advantaged they may be?

**Jeff Woodbury**

Case 3:16-cv-03111-K Document 36-1 Filed 07/26/17 Page 539 of 553 PageID 966
Exxon Mobil's (XOM) Q4 2016 Results - Earnings Call Transcript | Seeking Alpha

Well, from a general perspective, Evan, I would tell you that clearly the recent acquisition, predominantly in the Delaware Basin, is a very competitive. It really goes back to the fundamental objective that we are trying to achieve through acquisitions or through exploration or our investment program that is to make sure that we continue to maintain a focus on value accretive performance. So we are looking for investments that are going to continue to maintain our industry-leading return on capital employed. So certainly very attractive. We have given you sense for the economics where I think back in the second quarter we showed you some of the progress we have made in unit development cost, operating cost. We gave you a sense for the portfolio then, which with the Bakken improvement together, we had over 2,000 wells that achieved greater than 10% return, money forward economics, full and fully loaded on a $40 per barrel price. You add this acquisition into this, it takes us up to about 4,500 wells. So a very robust inventory. The long-term objective, thinking about the short cycle versus long cycle is one of making sure that the pace maximizes the learnings that we are integrating and captures a technology application that we want to apply in order to achieve these outcomes like the length of the laterals. But I would say that this acquisition and the investments that we plan under it are going to be very competitive to our existing inventory of opportunities.

**Evan Calio**

Can you even mention how much of your expected CapEx, $22 million CapEx, is in shorter cycle, however you define that, whether offshore or onshore? And related, how do you consider the value of capital flexibility or cycle times in your gating process, either as a plus or a minus for a longer cycle project?

**Jeff Woodbury**

Yes. On the first question, I would tell you that we are going there to provide some more color in about a month's time at the Analyst Meeting. So if I ask you to just to hold that thought, we will give you a little bit more perspective at that time.

On the second one, the overall balance of short cycle versus long cycle, obviously we have got a very large resource inventory with over 90 billion barrels. We are trying to move that resource inventory at the same time maintaining a robust level of short cycle investments. Now, of course, that short cycle inventory continues to grow with all these acquisitions that we have been picking up. So that's done through our annual planning process. We look at the execution capability of the organization, the service sector and then we look at the fundamental cash management objective is to make sure that we have

5/4/2017          Exxon Mobil's (XOM) Q4 2016 Results - Earnings Call Transcript | Seeking Alpha

Case 3:16-cv-03111-K  Document 36-1  Filed 07/26/17  Page 540 of 553  PageID 967

got that flexibility and a key element of when we share a CapEx objective, we have built in flexibility to the upside as well as flexibility to the downside. We know how to flex that program depending on what commodity prices do.

**Evan Calio**

I appreciate it.

**Operator**

We will go next to Jason Gammel with Jefferies.

**Jason Gammel**

Thanks. Hi Jeff. Jeff, I note that in the third quarter press release, you talked about the potential for needing to take some negative revisions to proved reserves in the oil sands and clearly, at least in the quarter, you haven't taken any financial impairments to those assets. Can you talk about whether you would still view those proved reserves as potentially needing to be written down? Or whether the price recovery into the end of the year was sufficient to allow those to remain on the books?

**Jeff Woodbury**

Yes. It's a good question. Again, I want to make sure that everybody's very clear that there is a separation between proved reserves reporting under the SEC rules and then the whole issue of asset impairments. And really what you are asking, Jason, is I think clearly the question about proved reserves.

In the third quarter we indicated, because we thought it was prudent at the time given where crude prices were that we indicated that we were likely going to take as much 4.6 billion barrels out of proved and put them in our resource base. And I will remind you that I emphasized at that time that even though we make that transfer, there is no change to our operations or how we manage the business, those assets going forward. We will be announcing our final year-end reserves here in the next couple of weeks as we typically do. In short, we do expect to reflect most of the SEC pricing impact that we discussed in the third quarter, but I will also note that we anticipate that there will be some partial offsets to those numbers. So stay tuned, we will be finalizing that shortly and we will be releasing that information here in the next two weeks.

**Jason Gammel**

5/4/2017                          Exxon Mobil's (XOM) Q4 2016 Results - Earnings Call Transcript | Seeking Alpha

I appreciate that, Jeff. And then just as a follow-up, the InterOil acquisition that you announced this year, I am afraid I am a little bit lost on the process for actually completing the InterOil transaction. Can you talk about what is still outstanding there in order to get that deal done?

**Jeff Woodbury**

Yes. So we are going back through the process following a decision by Canadian courts and we have put in place a new amended agreement between InterOil and ExxonMobil. And I will just remind everybody that in the first process through, the InterOil Board fully unanimously approved this transaction and shareholders approved it by over 80%. So we are going back through the process and right now there is a shareholder vote anticipated in the middle of February. And then as in the last cycle through this, we will need to go back to the Yukon courts to make a final ruling on the offer and then hopefully close thereafter.

**Jason Gammel**

Great. Thanks Jeff. I appreciate that.

**Operator**

We will go next to Ryan Todd with Deutsche Bank.

**Ryan Todd**

Great. Thanks. Maybe if I could have a couple of quick follow-ups on capital budget. And I realize you are giving more details next month. But how should we think about capital allocation for the Lower 48 business with the addition of the Permian acquisition? Does that highlight a growing relative share of the capital budget by the U.S. on shore? Is it additive to your existing activity? Or should we expect to see the capital diverted away from areas like the Bakken in Oklahoma and be replaced by activity in the Permian?

**Jeff Woodbury**

Well, Ryan, we will certainly provide more color here in a month or so. But I mean, directionally, it's a fairly sizable acquisition that we are making in the Permian. We feel good about our acreage position in the other unconventional basins. I showed you a map where we have got a meaningful presence in everyone of them. As an indicative

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM INDEX NO. 451962/2016

NYSCEF DOC. NO. 202    Exxon Mobil's (XOM) Q4 2016 Results - Earnings Call Transcript | Seeking Alpha    RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 542 of 553   PageID 969

guidance, I would tell you that it's likely going to add additional CapEx to our short cycle investments in order to move forward on the acreage that we have picked up in acquisition.

**Ryan Todd**

Okay. Thanks. That's helpful. And then maybe just one on 2016 CapEx, which came in quite a bit lower than guidance early in the year. Any comments on what were the primary drivers? Is that cost deflation, deferral of activity, change in any expected scope in spend?

**Jeff Woodbury**

Yes. Thanks for asking the question, Ryan, because I think it does reflect very well on how the corporation responded and particularly our people and their focus on recognizing that we are in a down cycle and we have got a great opportunity to take advantage during that down cycle. I would say that it really is a function of a number of things. One is and it all is underpinned by our very strong focus around capital discipline. But it comes down to capital efficiency opportunities that we are able to continue to capture, regardless of where we are in the commodity price cycle. It includes market capture. We all know that the service sector and the related costs have dropped materially. Also importantly it has to do with the very strong project execution performance on our operated projects, most of which coming in on-budget and on-cost. And then there was an element of how we paced our projects for several reasons. One, recognizing the business climate, wanting to stay within our means. And two, in a low price environment, there is unique value that we are able to capture by going back and recycling through the development planning process on some of these projects to try to do things like reduce the cost structure, add additional resource to increase resource density, but it really is a opportunity in the down cycle to go ahead and add incremental value to those future investment.

**Ryan Todd**

Okay. Thanks Jeff.

**Jeff Woodbury**

Okay. Thank you.

**Operator**

We will go next to Paul Sankey with Wolfe Research.

**Paul Sankey**

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM          INDEX NO. 451962/2016

NYSCEF DOC. NO. 202          Exxon Mobil's (XOM) Q4 2016 Results - Earnings Call Transcript | Seeking Alpha          RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 543 of 553   PageID 970

Hi Jeff.

**Jeff Woodbury**

Good morning Paul.

**Paul Sankey**

Jeff, with the changes in Washington, I just wondered what Exxon has done to, firstly, I assume you guys are pro lifting sanctions on Russia. Secondly, I assume that you would be anti the border adjusted tax. And then finally, can you make any comments about the impact on your operations in Iraq from the recent limitations on travel there? I wondered if that was going to -- I assume that's going to directly impact you. Thanks.

**Jeff Woodbury**

Yes. I guess a couple of comments. We will continue to advocate for many of the areas you talked about, advocate for free market principles. When it comes down to the important discussion that's happening in Congress in the current administration around the tax code, we believe the tax code should be globally competitive. It should be predictable, stable, providing investment certainty and not picking winners and losers. So I mean, we will continue to stay principle based in our view on those matters.

With respect to Russia, we will continue to fully comply with the existing sanctions and I am not going to speculate when or if they are fully satisfied and removed in the future. And then on Iraq and more broadly speaking some of the issues associated with decisions taken in the U.S., a key aspect wherever we are around the world, including Iraq, is the security of our people and our contractors and we have very dedicated effort within the organization to ensure that we are trying to stay in front of potential threats that the organization needs to respond to in order to ensure the safety and security of our assets and people. So I would rather not talk about specifics, but I will tell you that we are monitoring the situation very closely.

**Paul Sankey**

Understood. Jeff, if I could completely change subject, the President of Guyana was commenting earlier in the week that we could see production startup in 2019 from Liza. Is that reasonable, do you think? We have also obviously heard from Hess about a final investment decision this year. And if we look back to what you did in Angola as an

Case 3:16-cv-03111-K Document 36-1 Filed 07/26/17 Page 544 of 563 PageID 971

Exxon Mobil's (XOM) Q4 2016 Results - Earnings Call Transcript | Seeking Alpha

example of your speed with which you can get these things up and running with the idea of getting very early cash flow, I wondered if you could handicap the chances that we do see first production much sooner than the, I think you have been talking more 2021?

**Jeff Woodbury**

Yes. It's a good question. Listen, I think first and foremost is that we are going to work with our co-ventures and the government to move this project along in the most efficient and expedient way. And all stakeholders have a role in deciding how this project moves forward. And we certainly understand the resource owners' interest and I will tell you, we are very attuned to it. As I indicated in my prepared comments, we think it is reasonable that the initial phase will move forward to an FID decision later this year. The guidance that we have been providing as well as consistent with the regulatory filings says that the initial phase would startup in 2020.

**Paul Sankey**

Got it, Jeff. Thank you.

**Jeff Woodbury**

You are welcome.

**Operator**

We will take our next question from Asit Sen with CLSA Americas.

**Asit Sen**

Good morning Jeff.

**Jeff Woodbury**

Good morning Asit.

**Asit Sen**

So thanks for the color on the short cycle versus long cycle. I just wanted to make sure I got the Permian numbers right. So the 140,000 barrels a day production now and your comment on the 350,000 barrels a day of plateau production from the recent Delaware acquisition, what time frame are we looking at?

**Jeff Woodbury**

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM
INDEX NO. 451962/2016
NYSCEF DOC. NO. 202
RECEIVED NYSCEF: 06/02/2017

Exxon Mobil's (XOM) Q4 2016 Results - Earnings Call Transcript | Seeking Alpha

Case 3:16-cv-03111-K Document 36-1 Filed 07/26/17 Page 545 of 553 PageID 972

Well, we have yet to share the specifics around the buildup of that. But as I indicated, Asit, we want to get at it quickly. But the 350,000 potential and that's oil equivalent barrels per day, we believe is a reasonable investment program that could be maintained over multi-decades.

**Asit Sen**

Got you. Okay. And my quick question on the new project startup, Barzan, is that a 2017 startup? And could you remind us on the working interest that you have there? 7% is that's what I have.

**Jeff Woodbury**

Yes. Our working interest is 7% and you really need to talk to the operator RasGas on specifics around the project.

**Asit Sen**

Great. Thanks Jeff.

**Jeff Woodbury**

Welcome.

**Operator**

We will go next to Paul Cheng with Barclays.

**Moses Sutton**

Hi. This is Moses Sutton, on for Paul. A quick question on the impairment charges. Have you completed the review of the entire portfolio? Or are certain assets still under review in 2017?

**Jeff Woodbury**

We have completed the review of the entire portfolio.

**Moses Sutton**

Great. Thank you. That's it from us.

**Jeff Woodbury**

You are welcome.

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM
INDEX NO. 451962/2016
NYSCEF DOC. NO. 202
RECEIVED NYSCEF: 06/02/2017

Exxon Mobil's (XOM) Q4 2016 Results - Earnings Call Transcript | Seeking Alpha
5/4/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 546 of 553   PageID 973

**Operator**

We will go next to Alastair Syme with Citi.

**Alastair Syme**

Hi Jeff. I also had a question on the impairment. If you look back at your most recent energy outlook, it looks like you have made some quite big changes around the expectation on North American tight oil and gas. Is it possible to relate those changes back to today's impairment decision? It feels like you expect there's going to be a lot of growth in associated gas, for instance.

**Jeff Woodbury**

Well, I mean it's good question, Alastair, but I would tell you, the first point I would make is the reason why we do an annual updated energy outlook is really to make sure that we are most informed about the fundamental building blocks that really underpin that demand projection. The changes that you are asking about is really a function of a number of factors. It's not just energy outlook. We do this in conjunction with our annual budget and plans process. And it also is of the function as part of the energy outlook is looking at the competitiveness of different resources that underpin that demand outlook. So it's a number of factors that will drive our decisions and ultimately the choices that we make.

**Alastair Syme**

Thank you. As a follow-up, can I ask, can you explain what non-U.S. tax effects are on the corporate items? Are these upstream or downstream items?

**Jeff Woodbury**

The non-U.S. tax items are really across a number of the business segments, but the largest in the fourth quarter were primarily in the upstream business.

**Alastair Syme**

Is it possible to get any color what they relate to?

**Jeff Woodbury**

No, we don't have any additional information to share.

**Alastair Syme**

Okay. Thanks very much, Jeff.

**Jeff Woodbury**

You are welcome.

**Operator**

We will go next to Brendan Warren with BMO Capital Markets.

**Brendan Warren**

Thanks Jeff. Just first question, just on those five major project startups. You flagged 2017 into 2018, particularly with Hebron and Sakhalin that you do operate. Are they still in 2017, recognizing Hebron most recently said it was on track for end-2017. I have a follow-up as well. Thanks.

**Jeff Woodbury**

Yes. That's correct. They are currently on plan to achieve those objectives.

**Brendan Warren**

Okay. So they are both in before end-2017. And then my follow-up refers and you would probably say defer this to the capital markets day, but if I refer back to slide 33 from the capital markets day, you had given guidance of cash flow from operations and asset sales for 2016 with a range at $40 a barrel to $80 a barrel. It looks like at $45 average for this year, you have just come in where the $40 a barrel line should be. I am trying to reconcile, you had a weaker cash flow number for 2016. And whether that changes your view for 2017 in terms of cash flow from operations?

**Jeff Woodbury**

Yes. Brendan, a good question. An important dialog that we think is something that we should be talking to and we will update that chart you are referring to in the upcoming Analyst Day here within a month and be ready to talk more about it with our current views.

**Brendan Warren**

Okay. Thanks Jeff.

**Jeff Woodbury**

Welcome.

5/4/2017                Exxon Mobil's (XOM) Q4 2016 Results - Earnings Call Transcript | Seeking Alpha

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 548 of 553   PageID 975

**Operator**

We will go next to Ed Westlake with Credit Suisse.

**Ed Westlake**

Yes. Good morning at top of the hour here. Two questions, I guess. Firstly, decline rates. I mean you guys have done very well on the production side to minimize base decline. You have got long duration assets in a number of geographies. Maybe just a quick update as far out as you could go on expected decline rate on the base business.

**Jeff Woodbury**

Yes. So we assess our long-term decline rate over every year and in fact, it's in our 10-K. And what we have had in terms of a decline rate here in the recent past, last couple of years, has been 3%. And let me just qualify that 3% as being that does not include project activity. So if we were to stop our investment program, that's what we would have.

**Ed Westlake**

Yes.

**Jeff Woodbury**

Okay.

**Ed Westlake**

And then we haven't really had a conversation around OpEx and margins, maybe deferred tax maybe to the prior question on cash flow as you go forward, but maybe just a word on how much more savings you can get on OpEx? The new projects, are they accretive to margins? And then what you expect to happen to deferred taxes as prices bump up a little here?

**Jeff Woodbury**

Yes. A really good question in terms of OpEx and how we are managing that. I would tell you that we are never satisfied. We clearly understand there's been a lot of progress here over the last two years, but I can tell you that the organization doesn't believe status quo is sufficient. As I alluded to previously, we will continue to look for structural opportunities. We will continue to be very focused on our organizational effectiveness. And importantly, we will continue to work with the service sector to come up with lower cost, higher quality

opportunities. And I am sure if the activity continues to build, there is going to be market pressures, but we are going to continue to work against those market pressures to capture incremental value.

On deferred income taxes in the future, there's really nothing more I can share with you. You can appreciate some of this has to do with the current low price environment that have been through here last couple years.

**Ed Westlake**

And margin should also improve with the new projects coming on, presumably?

**Jeff Woodbury**

Well, that's the objective of the investment program. Thanks, Ed.

**Operator**

We will go next to Theepan Jothilingam with Exane BNP.

**Theepan Jothilingam**

Yes. Hi. Good morning Jeff. Thanks for taking my questions. I had two actually. Firstly, could you talk about, I know you are intending to issue equity for the recent Permian transaction. Is there any thoughts about buying back to offset that dilution? And my second question, just in terms of exploration for 2017. I know the focus is on Guyana, but could you talk about any other high impact place for 2017 and the spend associated? Thank you.

**Jeff Woodbury**

Yes. So Theepan, on the fundamental question of, to me, I interpret it as whether we would buy back any stock and I will go back to our earlier discussion around it. It's really a quarterly decision that management makes based on a number of variables that I have already described. And as I said in the prepared comments, we don't anticipate doing any type of buybacks, other than into to address anti-dilutive impacts associated with the benefits programs and plans.

On other exploration focus, we expect for the near term, flat spend out to out through the next several years, but I have shared a number of key areas that we are focusing our attention. Cypress, the high quality block we have got there on Block 10 that we have entered in negotiations on the production sharing contract, but we are very encouraged by

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 550 of 553   PageID 977
Exxon Mobil's (XOM) Q4 2016 Results - Earnings Call Transcript | Seeking Alpha

it. Mexico, the Block 1 that we picked up, which is right along the U.S. border adjacent to some U.S. acreage that we have got. Again, very encouraged by it, putting plans in place. I indicated that we continue to expand to our exploration acreage position in Papa New Guinea. You think about some of the big high potential areas for us, Papa New Guinea is very important to us. Guyana, that area has been very important to us. And then as we have been talking about often on today is the unconventional business with a very strong focus on the liquids potential. So I think it really does make a very strong statement around the value proposition that we are trying to deliver to our shareholders.

### Theepan Jothilingam

Okay. Thanks Jeff. I was just wondering, when you think about potential acquisition add between equity and adding debt, could you talk about how the market should think about that? Should we see if there are opportunities Exxon uses paper rather than debt?

### Jeff Woodbury

Yes. Well, it's going to be case specific. I mean the important message for you to understand is that we have the flexibility to do either. The final structure of a given transaction is really a function of the dialog between the parties with the focus of what the seller wants from the transaction. But I wouldn't read anymore into it relating to our capital structure.

### Theepan Jothilingam

Great. Thank you.

### Operator

And our final question comes from Pavel Molchanov with Raymond James.

### Pavel Molchanov

Thanks for taking the question guys. Just two quick ones. You mentioned that almost all of the increase towards the $22 billion CapEx budget reflects higher activity. Can you be a little more specific on what service cost inflation you are assuming, particularly in your North American CapEx?

### Jeff Woodbury

Exxon Mobil's (XOM) Q4 2016 Results - Earnings Call Transcript | Seeking Alpha

Pavel, as I indicated earlier, we are going to provide more color around our investment plans in about a month's time in the Analyst Meeting. I would just ask you to hold out until we get to that point.

**Pavel Molchanov**

Okay. And as far as the InterOil closing process, you are currently doing the rerun of the shareholder vote. Should the Yukon court bock the second attempt, as they blocked the first one, is there any other alternative in your mind to getting shareholder approval?

**Jeff Woodbury**

Yes, well, I mean let me not speculate as to how this will progress. Very strong support from the shareholders of InterOil. This is a process that InterOil is running and we think that we have addressed some of the comments that were made in the first process. So let's let that go through and then we will decide how we move forward from there.

**Pavel Molchanov**

All right. I appreciate it.

**Jeff Woodbury**

Thank you.

**Operator**

And we have no further questions in the queue at this time.

**Jeff Woodbury**

Well, I want to thank everybody for their participation today and I really do appreciate your time and the questions. We appreciate your continues interest in ExxonMobil and we really do look forward to visiting with you next month at the Analyst Meeting. So until then, we will keep very focused on our fundamental mission of growing long-term shareholder value. Thank you.

**Operator**

And that concludes today's conference. We thank you for your participation.

**Copyright policy:** All transcripts on this site are the copyright of Seeking Alpha. However, we view them as an important resource for bloggers and journalists, and are excited to contribute to the democratization of financial information on the Internet. (Until now investors have had to pay thousands of dollars in subscription fees for transcripts.) So our reproduction policy is as follows: **You may quote up to 400 words of any transcript on the condition that you attribute the transcript to Seeking Alpha and either link to the original transcript or to www.SeekingAlpha.com. All other use is prohibited.**

THE INFORMATION CONTAINED HERE IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL, CONFERENCE PRESENTATION OR OTHER AUDIO PRESENTATION, AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE AUDIO PRESENTATIONS. IN NO WAY DOES SEEKING ALPHA ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S AUDIO PRESENTATION ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

If you have any additional questions about our online transcripts, please contact us at: transcripts@seekingalpha.com. Thank you!

## Comments (1)

**Moon Kil Woong, Contributor**
I would prefer they spend their money on paying down debt and buying up cheap oil assets rather than dividends. Other than that their earnings looked decent and their prospects look better going forwards. It is a mistake to trade the stock down too much on their write-offs. I suspect they will need to add them on to the books later when oil rises and they tap these assets later.

This is the whole reason why they don't like to mess with their oil reserve numbers. It skews results overshadowing the fundamentals. They could easily increase the value of their holdings, however, it would also overshadow their fundamentals and be misleading.

31 Jan 2017, 09:42 PM

FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM
INDEX NO. 451962/2016

NYSCEF DOC. NO. 202
5/4/2017
Exxon Mobil's (XOM) Q4 2016 Results - Earnings Call Transcript | Seeking Alpha
RECEIVED NYSCEF: 06/02/2017

Case 3:16-cv-03111-K   Document 36-1   Filed 07/26/17   Page 553 of 553   PageID 980