IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |
|---|---|
| PEDRO RAMIREZ, JR., Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>EXXON MOBIL CORPORATION, REX W. TILLERSON, ANDREW P. SWIGER, JEFFREY J. WOODBURY, and DAVID S. ROSENTHAL,<br><br>Defendants. | Case No. 3:16-cv-3111-K<br><br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT
AND BRIEF IN SUPPORT**

Theodore V. Wells, Jr. (*pro hac vice*)
Daniel J. Kramer (*pro hac vice*)
Daniel J. Toal (*pro hac vice*)
Gregory F. Laufer (*pro hac vice*)
Jonathan H. Hurwitz (*pro hac vice*)
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3000
Fax: (212) 757-3990


Nina Cortell
Daniel H. Gold
HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700
Dallas, TX 75219
Tel: (214) 651-5000
Fax: (214) 651-5940


*Counsel for Exxon Mobil Corporation, Andrew
P. Swiger, Jeffrey J. Woodbury, and David S.
Rosenthal*

D. Patrick Long
SQUIRE PATTON BOGGS
2000 McKinney Ave., Suite 1700
Dallas, TX 75201
Tel: (214) 758-1505
Fax: (214) 758-1550

*Counsel for Rex W. Tillerson*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................iii

PRELIMINARY STATEMENT ........................................................................1

SUMMARY OF PLAINTIFF'S ALLEGATIONS AND RELEVANT FACTS.................4

    A.    The Parties and Plaintiff's Claims ...................................................4

    B.    Plaintiff's Allegations ......................................................................4

ARGUMENT .....................................................................................................9

I.    Legal Standards...........................................................................................9

II.    Count I Should Be Dismissed Because Plaintiff Does Not Allege a
Materially False or Misleading Statement or Actionable Omission.......................10

    A.    Plaintiff's Allegations about ExxonMobil's Use of Proxy Costs
of Carbon and GHG Costs Fail to State a Claim because ExxonMobil
Disclosed All Material Facts.................................................................10

    B.    The Complaint Alleges No Misrepresentations about the Company's
Rocky Mountain Dry Gas Operations...................................................12

    C.    ExxonMobil's Disclosures About Its Kearl Operation's Proved
Reserves Complied with SEC Regulations and Constituted
Non-Actionable Forward-Looking Statements.........................................15

    D.    ExxonMobil Had No Duty to Disclose An Alleged Three-Month
Loss at its Canadian Bitumen Operations................................................16

III.    Count I Should Be Dismissed Because Plaintiff Does Not Plead Facts
Giving Rise To A Strong Inference Of Scienter.....................................................18

    A.    The Generic and Conclusory Allegations In the Complaint Do Not
Create a Strong Inference of Scienter. ..................................................18

    B.    The Remaining Allegations in the Complaint Also Fail to Satisfy
Plaintiff's Scienter Burden as to the Individual Defendants.......................20

    C.    ExxonMobil's Extensive Stock Repurchases, the Absence of
Any Alleged Insider Stock Sales, and Extensive Risk Disclosures
Further Negate Any Inference of Scienter. .............................................22

IV.    Count I Should Be Dismissed Because Plaintiff Does Not Plead
Loss Causation. ........................................................................................23

V.    Plaintiff's Section 20(a) Claims Fail for Lack of A Primary Violation.................24

VI.    The Complaint Should Be Dismissed With Prejudice. .........................................24

CONCLUSION..................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Blackmoss Invs. Inc.* v. *ACA Capital Holdings, Inc.*,
No. 07-cv-10528, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ...................................17

*In re BP p.l.c. Sec. Litig.*,
No. 4:10-MD-2185, 2016 WL 3090779 (S.D. Tex. May 31, 2016) ......................12, 13

*Braun* v. *Eagle Rock Energy Partners, L.P.*,
223 F. Supp. 3d 644 (S.D. Tex. 2016) ........................................................................16

*Carlton* v. *Cannon*,
184 F. Supp. 3d 428 (S.D. Tex. 2016) .........................................................................19

*Cent. Laborers' Pension Fund* v. *Integrated Elec. Servs. Inc.*,
497 F.3d 546 (5th Cir. 2007) ................................................................................20, 24

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys.* v. *Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ...........................................................................12, 13, 14

*In re Dell Inc. Sec. Litig.*,
591 F. Supp. 2d 877 (W.D. Tex. 2008) .................................................................23, 24

*Dempsey* v. *Vieau*,
130 F. Supp.3d 809 (S.D.N.Y. 2015) ..........................................................................13

*In re Exodus Commc'ns, Inc. Sec. Litig.*,
No. C 01-2661 MMC, 2005 WL 1869289 (N.D. Cal. Aug. 5, 2005) ..........................19

*In re Exxon Mobil Corp. Sec. Litig.*,
387 F. Supp. 2d 407 (D.N.J. 2005) ..............................................................................14

*Firefighters Pension & Relief Fund of the City of New Orleans* v. *Bulmahn*,
53 F. Supp. 3d 882 (E.D. La. 2014) .......................................................................12, 15

*In re Hertz Global Holdings, Inc. Sec. Litig.*,
No. 13-7050, 2017 WL 1536223 (D.N.J. Apr. 27, 2017) ............................................13

*Indiana Electrical Workers' Pension Trust Fund IBEW* v. *Shaw Group, Inc.*,
537 F.3d 527 (5th Cir. 2008) ............................................................................... passim

*Izadjoo* v. *Helix Energy Sols. Grp., Inc.*,
237 F. Supp. 3d 492 (S.D. Tex. 2017) .........................................................................22

*Kapps* v. *Torch Offshore, Inc.*,
379 F.3d 207 (5th Cir. 2004) .................................................................................11, 17

*In re Key Energy Servs., Inc. Sec. Litig.,*
  166 F. Supp. 3d 822 (S.D. Tex. 2016) ..........................................................24

*In re: KLX, Inc. Sec. Litig.,*
  232 F. Supp. 3d 1269 (S.D. Fla. 2017) ........................................................15

*Lovelace* v. *Software Spectrum Inc.,*
  78 F.3d 1015 (5th Cir. 1996) ..................................................................4, 11

*Nathenson* v. *Zonagen Inc.,*
  267 F.3d 400 (5th Cir. 2001) ................................................................19, 23

*Neiman* v. *Bulmahn,*
  854 F.3d 741 (5th Cir. 2017) .......................................................................23

*In re NVIDIA Corp. Sec. Litig.,*
  768 F.3d 1046 (9th Cir. 2014) .....................................................................16

*Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund,*
  135 S. Ct. 1318 (2015) ............................................................................12, 13

*Oran* v. *Stafford,*
  226 F.3d 275 (3d Cir. 2000)..........................................................................16

*Owens* v. *Jastrow,*
  789 F.3d 529 (5th Cir. 2015) ...............................................................9, 18, 20

*Plumbers & Pipefitters Local Union 719 Pension Fund* v. *Zimmer Holdings, Inc.,*
  673 F. Supp. 2d 718 (S.D. Ind. 2009) ..........................................................22

*Plumbers & Pipefitters Local Union 719 Pension Fund* v. *Zimmer Holdings, Inc.,*
  679 F.3d 952 (7th Cir. 2012) .......................................................................22

*Plumbers & Steamfitters Local 773 Pension Fund* v. *Can. Imperial Bank of
  Commerce,* 694 F. Supp. 2d 287 (S.D.N.Y. 2010) .......................................14

*In re Pretium Res. Inc. Sec. Litig.,*
  No. 13-CV-7552 (VSB), 2017 WL 2560005 (S.D.N.Y. June 13, 2017)....................13

*Ret. Sys. of Miss.* v. *Amedisys, Inc.,*
  769 F.3d 313 (5th Cir. 2014) .......................................................................23

*In re Seagate Tech. II Sec. Litig.,*
  No. C 88-20489 RPA, 1989 WL 222969 (N.D. Cal. May 3, 1989) ...........................12

*Southland Sec. Corp.* v. *INSpire Ins. Sols., Inc.,*
  365 F.3d 353 (5th Cir. 2004) ................................................................ passim

*Stephens* v. *Uranium Energy Corp.,*
  No. 15-cv-1862-H, 2016 WL 3855860 (S.D. Tex. July 15, 2016) ............................24

iii

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)........................................................................................10, 18, 22

*In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*,
    202 F. Supp. 2d 8 (S.D.N.Y. 2001) ...........................................................................17

STATUTES

15 U.S.C. § 78u-4, *et seq* ....................................................................................1, 9, 15, 17

OTHER AUTHORITIES

17 C.F.R. § 210.4-10(22) .........................................................................................8, 9, 12

17 C.F.R. § 229.1202(a)(2)...........................................................................................8, 15

Fed. R. Civ. P. 9(b). ..................................................................................................1, 9, 17

Fed. R. Civ. P. 12(b)(6)....................................................................................................1

Exxon Mobil Corporation ("ExxonMobil" or the "Company"), Rex W. Tillerson, Andrew P. Swiger, Jeffrey J. Woodbury and David S. Rosenthal (the "Individual Defendants") submit this motion to dismiss the Consolidated Complaint (the "Complaint"; cited as "¶ _") (ECF No. 36) under Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, *et seq.*, and brief in support.

## PRELIMINARY STATEMENT

Seeking to free ride on the soiled coattails of the New York Attorney General's ("NYAG") politically driven pursuit of ExxonMobil over climate change, plaintiff parrots the baseless insinuations and irresponsible allegations issued by that office. None of that recycled material is entitled to any weight. After years of transparent publicity seeking, pandering to well-financed special interests, and repeated shifts in focus, the NYAG has not established any wrongdoing before a court of law. All that has come of the NYAG's efforts is a stinging rebuke from state attorneys general in twelve other states filed in this Court and in a federal court in New York. The Complaint is similarly worthy of rebuke, in the form of dismissal with prejudice.

*First*, plaintiff attempts to manufacture a securities fraud claim out of its baseless allegation that ExxonMobil pulled a "bait-and-switch" by telling the public it used a proxy cost of carbon of up to $80 per ton to account for the potential impact of climate-related government policies, while actually using a lower figure for internal financial analyses. Under plaintiff's flawed theory, the use of a lower cost figure overstated the value of ExxonMobil's assets and the amount of its reserves. But the reality is that ExxonMobil fully disclosed the risks of climate change to its business, and in no way misrepresented the methodologies it used to analyze those risks. There was no shell game.

Plaintiff's allegations rest on confusing two distinct concepts: a proxy cost of carbon and greenhouse gas ("GHG") costs. As ExxonMobil disclosed, it analyzes the potential impact on its business of climate-change regulation using a proxy cost of carbon, a figure representing the estimated impact of a wide variety of potential climate-related policies on future *global demand* for energy. In addition, where appropriate, ExxonMobil also uses GHG costs to estimate *its own expenses* for its emissions of carbon dioxide or other greenhouse gases. ExxonMobil disclosed its use of these metrics to the public, and none of plaintiff's factual allegations even suggest that the Company did anything other than what it disclosed.

Plaintiffs are also mistaken to argue that a proxy cost of carbon and GHG costs were—or should be—one and the same. ExxonMobil never made such a representation, and there is no reason they should be, as they are different measures of different things. For example, the demand impact of potential climate-related policies that do not impose costs directly on ExxonMobil (for example, taxes imposed on end users) is, by design, built into ExxonMobil's proxy costs of carbon, but is not a GHG cost imposed directly on the Company. It is not surprising that the GHG costs ExxonMobil uses to estimate expenses it might incur on a specific project may differ from a proxy cost it uses to analyze global demand.

There is thus no basis for plaintiff's allegation that the Company overstated the value of its assets by using a lower cost figure than the one it disclosed—both figures were used just as disclosed to the public. Plaintiff's allegations establish only the unremarkable fact that ExxonMobil used two different numbers for two different purposes, all for the purpose of prudently taking account of climate-change risks.

Beyond that, plaintiff premises its claims on disagreements with ExxonMobil's opinions about asset values, and allegations that ExxonMobil should have estimated proved reserves in a

manner that SEC regulations prohibit. These allegations also fail to state a claim as a matter of law. Plaintiff tries to bolster its claims by annexing an irresponsible and unsupported affirmation by the NYAG (intended for the press it was leaked to, not a court of law) and a declaration of a purported accounting expert who has no firsthand knowledge of any of ExxonMobil's internal accounting documents. As shown in defendants' accompanying motion to strike, these documents (and the portions of the Complaint that rely on them) are inadmissible and should be stricken. And in any event they do not remedy plaintiff's failure to allege facts stating a claim. **(Point II, below.)**

*Second,* the Complaint does not adequately plead fraudulent intent. The Fifth Circuit has long rejected as insufficient allegations, such as those here, that defendants must have known that a company's disclosures were false because they were senior officers or because of their role in making the challenged statements. And any inference of scienter is refuted by plaintiff's own allegations that ExxonMobil repurchased billions of dollars of its own stock during the alleged class period; the absence of alleged stock sales by any defendant; and the Company's comprehensive risk disclosures. **(Point III.)**

*Third,* the Complaint does not plead loss causation. None of the documents identified in the Complaint as corrective disclosures actually corrected an alleged prior representation. Thus, as a matter of law, they are not sufficient to allege loss causation. **(Point IV.)**

*Finally,* plaintiff's claims against the Individual Defendants as alleged control persons fail because plaintiff has not alleged an underlying securities violation **(Point V)**, and dismissal should be with prejudice because the Complaint's deficiencies cannot be cured **(Point VI)**.

## SUMMARY OF PLAINTIFF'S ALLEGATIONS AND RELEVANT FACTS

### A.     The Parties and Plaintiff's Claims

ExxonMobil is a multinational oil and gas company, and in the relevant period the Individual Defendants were senior Company officers. (¶¶ 34–38, 41.) Plaintiff is a pension fund that seeks to represent a class of purchasers of ExxonMobil stock between March 31, 2014 and January 30, 2017. (¶ 1.) Plaintiff purports to assert claims against all defendants under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder (Count I, ¶¶ 464–473), and against the Individual Defendants under Section 20(a) of the Act as alleged "controlling persons" of ExxonMobil (Count II, ¶¶ 474–478).

### B.     Plaintiff's Allegations

Plaintiff's allegations that ExxonMobil made misleading public disclosures during the purported class period do not state a claim, as discussed below, and, in many cases are contradicted by ExxonMobil's disclosures, which the Court may consider on this motion. *See, e.g., Lovelace* v. *Software Spectrum Inc.*, 78 F.3d 1015, 1018 & n.1 (5th Cir. 1996).

#### 1.     ExxonMobil's Disclosures About Proxy Costs and GHG Costs

Beginning well before the alleged class period, ExxonMobil disclosed to investors the risks of climate change to its business. (*See e.g.*, App. 9.) The Company explained that "a number of countries have adopted, or are considering the adoption of, regulatory frameworks to reduce greenhouse gas ['GHG'] emissions." (App. 14.) And it underscored that such regulations could negatively affect its business by "reduc[ing] demand for hydrocarbons, as well as shift[ing] hydrocarbon demand toward relatively lower-carbon sources." (*Id.*)

ExxonMobil explained to investors that its energy price outlook and evaluations of project economics were influenced by the impact of current and potential climate-related policies. As set forth in its public disclosures, ExxonMobil employs for this purpose, among

4

other things, two distinct tools. A "proxy cost of carbon" attempts to reflect the impact of potential climate-related policies on global demand for carbon-intensive energy sources. A "GHG cost," by contrast, seeks to model costs that may be imposed directly on energy producers for their own emissions of carbon dioxide or other greenhouse gases.

   ***Proxy Costs of Carbon***: A proxy cost of carbon seeks to reflect the cumulative impact on demand for carbon-intensive fuels of "all types of actions and policies that governments may take over the [o]utlook period" in certain sectors, regardless of whether ExxonMobil directly bears the costs of those regulations. (¶ 5; App. 26.) Proxy costs of carbon are "embedded" in the Company's annual *Outlook for Energy*, in which the Company "update[s] [its] long-term energy demand projection." (*See e.g.*, App. 38.) For example, ExxonMobil stated that for the U.S., Canada, and certain other economies, it used a proxy cost of approximately $80 per ton of carbon as of 2040. (¶ 130; App. 26-27.) ExxonMobil further disclosed that it uses its internal energy price outlook (which incorporates proxy costs) in business planning, in assessing whether its assets are impaired, and for other purposes. (App. 56-57.)

   ***GHG Costs***: GHG costs are different. ExxonMobil disclosed that it also requires its business segments to "include, where appropriate, GHG costs in their economics" as an expense item. (App. 27; *see also* ¶¶ 293, 295.) Unlike a proxy cost of carbon, which considers the cumulative impact of climate-related policies on demand without regard to who bears the cost, GHG costs reflect costs that climate-related policies might impose directly on ExxonMobil for its own greenhouse gas emissions in developing or operating particular projects. For example, energy companies operating in Alberta (including ExxonMobil's Canadian bitumen operations there) are subject to "a variety of current and future . . . GHG emission taxes." (¶ 106.) Although ExxonMobil has disclosed generally that, "where appropriate," it considers GHG costs in its

5

investment decisions, it does "not publish the economic bases upon which [it] evaluate[s] investments due to competitive considerations." (App. 25)

### 2.    Impairment of Rocky Mountain Dry Gas Operations

Under generally accepted accounting principles ("GAAP"), oil and gas assets are considered impaired if their carrying values are not recoverable through future operations or dispositions. (*See* ¶ 328; App. 61.) As plaintiff and its expert admit, GAAP does not require routine testing for possible impairment. (¶¶ 325–328; Compl. Ex. B ¶ 28.) Testing is only required "whenever events or changes in circumstances indicate that its carrying amount may not be recoverable," a circumstance known as a "trigger event." (App. 71-72; ¶ 325; Compl. Ex. B ¶ 28.) If a company believes that a trigger event has occurred, it must then conduct "recoverability test[ing]" to determine whether the carrying value of the asset is reasonably recoverable. (¶ 328.)

In its 2015 Form 10-K, issued on February 24, 2016, ExxonMobil announced that, while it believed that no trigger event had occurred during 2015, it had performed a detailed assessment of its assets most at risk for potential impairment in light of continued weakness in the upstream industry environment in late 2015. (¶ 281; App. 103.) The Company disclosed that its assessment confirmed the absence of a trigger event, and that future undiscounted cash flows associated with its assets most at risk for impairment "substantially exceed[ed]" their carrying values. (¶ 281; App. 103.) Plaintiff does not allege facts demonstrating that ExxonMobil misrepresented the results of its assessment.

In the same filing, the Company also cautioned investors that oil and gas prices "have a history of significant price volatility," and warned that assets "[would] be at risk for impairment" if "increases in long-term prices [did] not materialize." (¶ 281; App. 88, 103). The Company emphasized that it took a long-term view of energy pricing and did not view "temporarily low prices or margins as a trigger event for conducting impairment tests." Rather, it expressed the

6

opinion that, "[a]lthough prices will occasionally drop significantly, industry prices over the long term will continue to be driven by market supply and demand." (*Id.*)

In its 2016 Form 10-K, filed on February 22, 2017 (the "2016 10-K"), ExxonMobil disclosed that, because of weakness in the upstream environment, a reduction of certain of its long-term internal price outlooks, and other factors, it concluded that a trigger event had occurred. (¶ 232; App. 56.) The Company further disclosed that, following recoverability testing, it had recorded an after-tax impairment charge of $2 billion related to certain asset groups, "primarily dry gas operations in the Rocky Mountains region . . . ." (*Id.*)

The Complaint alleges that ExxonMobil should have recorded an impairment of its Rocky Mountains dry gas operations in 2015 rather than 2016. (¶ 247.) Plaintiff asserts that low energy prices and the actions of ExxonMobil's competitors in taking impairments on their assets should have led ExxonMobil to recognize a trigger event in 2015, and that a recoverability analysis would have shown that the assets were then impaired. (¶¶ 366–376.) Plaintiff relies for this assertion on its purported expert. But the expert's opinion is uninformed (and, as shown in defendants' motion to strike, inadmissible). The expert admits that she did not analyze ExxonMobil's actual impairment analyses in 2015 and 2016, and did not know what specific dry gas operations were impaired in 2016, and relied on her own hindsight opinion that low energy prices in 2015 should have been viewed as a trigger event (Compl. Ex. B ¶¶ 87, 91).

Plaintiff also alleges that ExxonMobil did not incorporate "GHG 'proxy costs'" into its 2015 asset impairment analysis. (¶¶ 145–147, 247.) Plaintiff nowhere alleges any facts suggesting that ExxonMobil failed to incorporate its proxy costs into its price outlooks and thus the cash flow analysis that underlies any impairment assessment. Nor does the complaint allege that ExxonMobil was somehow required to use GHG costs in any impairment analyses.

### 3.      ExxonMobil's Proved Reserves Disclosures

As of the end of each fiscal year, in accordance with SEC regulations, ExxonMobil discloses the amount of its oil and gas reserves that qualify as "proved reserves" (meaning that they are estimated with reasonable certainty to be economically producible). *See* 17 C.F.R. § 210.4-10(22); § 229.1202(a)(2) (Instruction 1). Consistent with these regulations, ExxonMobil made repeated disclosures during 2016 and 2017 about its proved reserves:

- On February 24, 2016, ExxonMobil reported its proved reserves as of year-end 2015 in its 2015 10-K. (App. 83.) In light of the slump in energy prices, ExxonMobil disclosed that if early 2016 prices persisted for an extended period, "certain quantities of oil and natural gas could temporarily not qualify as proved reserves." (¶ 285; App. 83.)

- On October 28, 2016, ExxonMobil cautioned that "[i]f the average prices seen during the first nine months of 2016 persist for the remainder of the year . . . certain quantities of oil, such as those associated with the Kearl oil sands operations in Canada, will not qualify as proved reserves at year-end 2016," including "approximately 3.6 billion barrels of bitumen at [those operations]." (¶ 437; App. 113.)

- On February 22, 2017, in its 2016 10-K, ExxonMobil disclosed its year-end 2016 oil and gas proved reserves, and disclosed that 3.5 billion barrels of bitumen at its Kearl operation in Alberta, Canada had been de-booked as proved reserves. (App. 49.)

Despite these clear warnings, plaintiff alleges that ExxonMobil's 2016 disclosures about de-bookings were misleading because it did not predict that de-booking was nearly certain. Plaintiff rests this allegation on internal price outlooks by an ExxonMobil affiliate and the fact that the Company de-booked reserves in 2017. (¶¶ 247, 310, 318, 347–353.) But ExxonMobil could not be certain about its reserves until the close of the year, 17 C.F.R. § 210.4-10(22), and was under no obligation to quantify the obvious risk that the amount of its proved reserves might be reduced due to a slump in prices.

Plaintiff also alleges that ExxonMobil should have incorporated a proxy cost of carbon in its proved reserve estimates. (¶¶ 175, 362.) But doing so would violate SEC regulations. As discussed above (pp. 4–5), a proxy cost of carbon reflects potential *future* regulatory actions,

8

while the SEC requires proved reserves to be estimated using "*existing . . .* government regulations." 17 C.F.R. § 210.4-10(22) (emphasis added). Plaintiff does not allege that ExxonMobil failed to incorporate *actual* GHG costs, based on existing regulations, in estimating its proved reserves.

### 4.    ExxonMobil's Disclosures about Its Canadian Bitumen Operations

Based on its purported expert's analysis of a handful of public documents, plaintiff alleges that ExxonMobil's Canadian bitumen operations were operating at a loss for a five-month period from mid-November 2015 through April 18, 2016. (¶ 173.) Plaintiff alleges that ExxonMobil should have disclosed in its 2015 10-K that those operations had been operating at a loss for the three months preceding the filing. (¶¶ 247, 342–46.) Plaintiff does not allege that ExxonMobil inaccurately reported the results of those operations for any reporting period.

## ARGUMENT

## I.    Legal Standards

To state a claim under Section 10(b), plaintiff must allege: (i) a material misrepresentation or actionable omission of fact; (ii) a connection between the alleged misrepresentation or omission and the purchase or sale of a security; (iii) scienter on the part of each defendant; (iv) justifiable reliance; (v) economic loss, and (vi) loss causation. *See Owens* v. *Jastrow*, 789 F.3d 529, 535 (5th Cir. 2015). To plead a Section 20(a) claim, plaintiff must allege a primary violation by a controlled person and the defendant's control of the primary violator. *Southland Sec. Corp.* v. *INSpire Ins. Sols., Inc.*, 365 F.3d 353, 383 (5th Cir. 2004).

Claims under Sections 10(b) and 20(a) are subject to the strict pleading requirements of Rule 9(b) and the PSLRA. Under Rule 9(b) and the PSLRA, plaintiff must "specify the statements contended to be fraudulent" and "explain why the challenged statement or omission is false or misleading." *Id.* at 362 (quotations omitted). The PSLRA also requires plaintiff to plead

particularized facts that raise a "strong" inference of scienter that is "at least as compelling as any opposing inference" of non-fraudulent intent. *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

The Complaint does not remotely satisfy these rigorous standards.

**II.   Count I Should Be Dismissed Because Plaintiff Does Not Allege a Materially False or Misleading Statement or Actionable Omission.**

Plaintiff fails to plead a material misrepresentation or omission about (i) ExxonMobil's use of proxy costs of carbon and GHG costs, (ii) an alleged impairment of Rocky Mountain dry gas assets, (iii) proved reserves, or (iv) alleged losses at the Canadian bitumen operations.

**A.   Plaintiff's Allegations about ExxonMobil's Use of Proxy Costs of Carbon and GHG Costs Fail to State a Claim because ExxonMobil Disclosed All Material Facts.**

Plaintiff alleges that ExxonMobil misled the public about its proxy costs of carbon by assigning it one value in its public statements and another, lower value in its internal analyses. Attempting to support that claim, plaintiff compares proxy costs of carbon (for analyzing global energy demand) with an entirely different metric, GHG costs (for analyzing expenses incurred by ExxonMobil on particular projects). (*See, e.g.*, ¶¶ 138, 140, 247.) But, as discussed above (pp. 4–6), that comparison conflates two distinct metrics. A proxy cost of carbon is a figure used to model the impact of climate-related policies (whether borne directly by producers, consumers, or some other entity) on global demand, while GHG costs reflect discrete expenses imposed directly on producers. ExxonMobil has never said that it assigns the same value to proxy costs of carbon and GHG costs, and there is no reason that they should be the same.

Plaintiff advances no factual allegations suggesting that ExxonMobil's disclosures about its use of proxy costs of carbon and GHG costs were inaccurate. Plaintiff makes no factual allegation disputing that ExxonMobil used, as it disclosed, a proxy cost of up to $80 per ton to

assess the potential impact of climate-related policies on demand for oil and natural gas. Nor does it allege any facts suggesting that ExxonMobil did not use its GHG costs, the amount of which ExxonMobil never publicly disclosed, when assessing the potential direct costs it would have to pay for greenhouse gases emitted by its projects.

Plaintiff alleges, citing documents attached to the Oleske Affirmation, that ExxonMobil used lower proxy costs internally than it publicly reported. (Compl. Ex. A, Exs. 3–6.) But these documents, far from showing any disparity between the Company's disclosures and its actions, make clear that their subject is GHG costs applicable to particular projects, rather than proxy costs relating to global energy demand. (*See id.*, Ex. 3 ("Attached is my thinking on GHG guidance for this year's Plan."); Ex. 4 ("Subject . . . GHG emission cost planning basis"); Ex. 5 (distinguishing between GHG costs used in ExxonMobil's Plan and proxy costs); Ex. 6 (discussing a change in GHG cost guidance for Alberta-specific projects, not a change in proxy costs).) Indeed, one of the documents expressly notes that GHG costs used for planning and budgeting and proxy costs used for energy demand analysis "serve two different purposes." (*Id.* Ex. 4.) ExxonMobil's disclosures never suggested that the Company uses only a single set of figures for all purposes, and the Complaint includes no factual allegations to the contrary.

Where, as here, plaintiff's claims are refuted by the very disclosures they cite, or other disclosures made by the defendant, the claims should be dismissed. *See Lovelace*, 78 F.3d at 1019–20 (affirming dismissal of securities fraud claim after review of SEC filing revealed that company had disclosed allegedly omitted information); *Kapps* v. *Torch Offshore, Inc.*, 379 F.3d 207, 211–12 (5th Cir. 2004) (holding that statement was not materially misleading "when read in the context of the prospectus as a whole").

11

To the extent that plaintiff relies upon the allegation that ExxonMobil should have used hypothetical future carbon costs to estimate proved reserves, its claims should be dismissed for the additional reason that doing so would violate SEC regulations that required ExxonMobil to base those estimates on "existing," not future, government regulations. 17 C.F.R. § 210.4-10(22); *see* pp. 8–9 above. ExxonMobil's disclosures "cannot be misleading" for "compl[ying] with the SEC disclosure requirements." *In re Seagate Tech. II Sec. Litig.*, No. C 88-20489 RPA, 1989 WL 222969, at *5 (N.D. Cal. May 3, 1989); *see also Firefighters Pension & Relief Fund of the City of New Orleans* v. *Bulmahn*, 53 F. Supp. 3d 882, 907 (E.D. La. 2014) (holding that proved reserves disclosures were not misleading where they complied with SEC regulations).

**B.   The Complaint Alleges No Misrepresentations about the Company's Rocky Mountain Dry Gas Operations.**

Plaintiff's allegation that ExxonMobil should have recognized an impairment of its Rocky Mountain dry gas assets in 2015 rather than, as it did, in 2016, rests on a disagreement by plaintiff and its purported expert with ExxonMobil's valuation opinions. But that difference of opinion does not state a claim for fraud.

The Supreme Court has imposed a stringent standard for allegations of securities fraud based on statements of opinion. As the Court has recognized, a "sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless of whether an investor can ultimately prove the belief wrong." *Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015). Under *Omnicare*, when the plaintiff alleges the opinion statement itself is materially misleading, "the plaintiff must allege *both* that 'the speaker did not hold the belief she professed' *and* that the belief is objectively untrue." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys.* v. *Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017) (citing *Omnicare*, 135 S. Ct. at 1327) (emphasis added); *see also In re BP p.l.c. Sec. Litig.*, No.

12

4:10-MD-2185, 2016 WL 3090779, at *9 (S.D. Tex. May 31, 2016) (same). If the plaintiff alleges that a statement of fact contained within an opinion statement is materially misleading, "the plaintiff must allege that 'the supporting fact [the speaker] supplied [is] untrue.'" *City of Dearborn*, 856 F.3d at 616. Finally, if the plaintiff alleges that an opinion statement is materially misleading based on an omission, the plaintiff must "identify particular (and material) facts going to the basis for the [] opinion" that make the opinion statement "misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 135 S. Ct. at 1332. The Supreme Court cautioned that pleading falsity under an omissions theory is "no small task" for plaintiffs because they "cannot just say that the issuer failed to reveal [the] basis" for the opinion or "alleg[e] only that an opinion was wrong." *Id.*

Statements about estimated asset values and projections are "classic examples of opinions" under *Omnicare. In re BP*, 2016 WL 3090779, at *8; *see also In re Pretium Res. Inc. Sec. Litig.*, No. 13-CV-7552 (VSB), 2017 WL 2560005, at *10 (S.D.N.Y. June 13, 2017) ("Statements estimating the fair market value of assets are opinions, not matters of objective fact") (quotations omitted). Thus, the courts have held that a company's disclosures about whether the value of its assets has been impaired are also statements of opinion. *See, e.g.*, *City of Dearborn*, 856 F.3d at 618 (affirming grant of motion to dismiss securities fraud claim based on alleged failure to recognize goodwill impairment); *In re Hertz Global Holdings, Inc. Sec. Litig.*, No. 13-7050, 2017 WL 1536223, at *11 (D.N.J. Apr. 27, 2017) (granting motion to dismiss and holding that company's impairment disclosures were opinion statements); *Dempsey* v. *Vieau*, 130 F. Supp.3d 809, 818 (S.D.N.Y. 2015) (same), *adhered to on reconsideration*, No. 13-cv-6883-LTS, 2016 WL 3351081 (S.D.N.Y. June 15, 2016).

*Omnicare*'s teaching applies directly to ExxonMobil's impairment determinations. For example, to determine whether a trigger event exists, ExxonMobil must determine whether "events or changes in circumstances indicate that [a long-lived asset or asset group's] carrying amount *may* not be recoverable" (¶ 325 (emphasis in original) (quotations omitted))—an exercise that entails consideration of such matters of opinion as internal estimated energy price outlooks, technological and regulatory developments, and other matters.

Plaintiff has alleged no particularized facts showing that ExxonMobil did not genuinely hold its 2015 opinions that there was no trigger event and that its assets were not impaired, or failed to disclose "facts going to the basis" of its belief. Plaintiff's purported disagreement with ExxonMobil's opinions does not show that those opinions were fraudulent. And plaintiff's "pleading of its own calculations indicating impairment . . . does not provide a sufficient substitute for Plaintiff's failure to plead the actual assumptions used by Defendants." *City of Dearborn*, 856 F.3d at 618.

Likewise, plaintiff's allegation that some competitors took asset impairments during the alleged class period does not support the claim that ExxonMobil's opinions about the value of different assets—with different cost structures, carrying values, and physical and economic characteristics—were incorrect, much less fraudulent. *See, e.g.*, *In re Exxon Mobil Corp. Sec. Litig.*, 387 F. Supp. 2d 407, 426–27 (D.N.J. 2005) (dismissing complaint alleging that "the state of oil prices in 1998 and the actions of Exxon's competitors" in taking impairment charges required ExxonMobil to recognize impairment), *aff'd*, 500 F.3d 189 (3d Cir. 2007). Finally, ExxonMobil's recognition of an impairment as of 2016 does not imply that it should have done so earlier. *Plumbers & Steamfitters Local 773 Pension Fund* v. *Can. Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 301–03 (S.D.N.Y. 2010) (granting motion to dismiss claims

based on alleged improper failure to take asset write-downs in earlier period because "the securities laws do not allow fraud by hindsight claims") (quotations omitted); *In re: KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1277–79 (S.D. Fla. 2017) (similar).

> **C.      ExxonMobil's Disclosures About Its Kearl Operation's Proved Reserves Complied with SEC Regulations and Constituted Non-Actionable Forward-Looking Statements.**

As discussed above, the Complaint does not dispute that ExxonMobil's year-end 2016 proved reserves reporting was accurate, that ExxonMobil warned investors in its 2015 10-K that sustained low energy prices could lead to the de-booking of certain proved reserves, or that it specifically warned in October 2016 that approximately 3.6 billion barrels of bitumen in its Kearl operation "will not qualify as proved reserves at year-end 2016" if energy prices remained low. (¶¶ 20, 228, 309.) Instead, plaintiff contends that the Company should have de-booked those reserves earlier or disclosed that de-booking was nearly certain. (¶¶ 310, 318, 347–353.)

Under governing SEC regulations and case law, however, ExxonMobil was required only to disclose proved reserves at the end of each fiscal year. *See* 17 C.F.R. § 229.1202(a)(2) (Instruction 1). *Bulmahn* is on point. There, the court dismissed plaintiff's claim that an energy company's disclosures were misleading because they did not update the company's disclosure of estimated proved reserves after the discovery that one of its wells was underperforming. *Bulmahn*, 53 F. Supp. 3d at 907 (quotations omitted). The court also rejected the plaintiff's allegation that proved reserves disclosures must be updated "where conditions and regulations significantly change" during the year. *Id.* (quotations omitted). The same holds true here.

ExxonMobil's forward-looking statements about the likelihood of de-booking proved reserves in the future are also protected by the PSLRA safe harbor (15 U.S.C. § 78u-5(c)) and the common law "bespeaks caution" doctrine. Under the PSLRA safe harbor, a forward-looking statement, such as a financial projection, is not actionable if it is identified as forward-looking

15

and accompanied by "substantive company-specific warnings based on a realistic description of the risks applicable to the particular circumstances," or it was not made "with actual knowledge of its falsity." *Southland*, 365 F.3d at 371–72 (quotations omitted). Under the bespeaks caution doctrine, forward-looking statements are immaterial as a matter of law where "accompanied by meaningful cautionary language, which would alert the reasonable investor to consider those statements with healthy skepticism." *Braun* v. *Eagle Rock Energy Partners, L.P.*, 223 F. Supp. 3d 644, 653 (S.D. Tex. 2016).

These doctrines protect ExxonMobil's statements about the likelihood of future de-bookings. Estimating proved reserves requires judgments regarding future costs and demand. ExxonMobil identified its proved reserves disclosures as forward-looking statements, and accompanied them with extensive cautionary language. (*See* App. 82-84.) Plaintiff has alleged no facts showing that these forward-looking statements about proved reserves were made with actual knowledge of their falsity. Accordingly, plaintiff's claims based on these disclosures are precluded.

### D. ExxonMobil Had No Duty to Disclose An Alleged Three-Month Loss at its Canadian Bitumen Operations.

Plaintiff also fails to state a claim when it alleges that under Item 303 of SEC Regulation S-K ExxonMobil should have disclosed in its 2015 10-K that its Canadian bitumen operations had been operating at a loss for approximately three months. As a threshold matter, Item 303 does not create a duty to disclose anything for purposes of Section 10(b) and Rule 10b-5. *See, e.g.*, *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014) ("Item 303 does not create a duty to disclose for purposes of Section 10(b) and Rule 10b-5."); *Oran* v. *Stafford*, 226 F.3d 275, 287 (3d Cir. 2000) (same) (Alito, J.).

16

Independently, plaintiff's claim is barred by *Kapps*. There, the Fifth Circuit held that a prospectus, which stated that natural gas prices had increased by 133% over two years, was not materially misleading merely because it did not disclose that prices had fallen sharply in the five months immediately before the prospectus was issued. *Kapps*, 379 F.3d at 221. The court held that a five-month price decline for an incomplete fiscal period did not render the prospectus misleading, where the company made no "representations or infer[red] that the price would continue, either up or down, but rather highlighted its volatility." *Id*.

As in *Kapps*, ExxonMobil's disclosures did not represent that its results were the same throughout the 2015 fiscal year. On the contrary, it disclosed "continued weakness in the upstream industry environment in late 2015," warned that energy prices were "volatile," and emphasized that "[a]ny material decline in oil or natural gas prices could have a material adverse effect on certain of the Company's operations, especially in the Upstream segment" (including its Canadian bitumen operations). (*See* App. 80, 86, 99, 103.)

Moreover, plaintiff's claim that ExxonMobil was obligated under Item 303 to disclose the alleged losses on its Canadian bitumen operations as a "trend" fails as a matter of law, because a loss on a single project over a three-month period is not a disclosable "trend." *Kapps*, 379 F.3d at 217–21; *Blackmoss Invs. Inc.* v. *ACA Capital Holdings, Inc.*, No. 07-cv-10528, 2010 WL 148617, at *10 (S.D.N.Y. Jan. 14, 2010) ("As a matter of law, a two month period of time does not establish a 'trend' for purposes of the disclosures required by Item 303."); *In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001) (a single quarter decline in operating income need not be disclosed under Item 303).  In all events, the Complaint does not allege specific facts showing the alleged loss, an allegation that rests entirely on its expert's inadmissible opinions. This is insufficient under Rule 9(b) and the PSLRA.

17

### III. Count I Should Be Dismissed Because Plaintiff Does Not Plead Facts Giving Rise To A Strong Inference Of Scienter.

To satisfy its burden, plaintiff also must allege particularized facts that give rise to a strong inference of scienter that is as compelling as any inference of non-fraudulent intent. *See Tellabs*, 551 U.S. at 314. To plead a corporation's scienter, plaintiff must plead that the "corporate officer making the statement has the requisite level of scienter." *Southland*, 365 F.3d at 366. The Complaint comes nowhere close to meeting this standard.

#### A. The Generic and Conclusory Allegations In the Complaint Do Not Create a Strong Inference of Scienter.

Plaintiff's conclusory allegations that the Individual Defendants were "involved in" and "discussed" matters "related to the [a]lleged [o]mitted [i]nformation" are insufficient to create the required strong inference of scienter. (¶¶ 384, 388–389, 390.) The Complaint does not allege facts showing that any of the Individual Defendants was aware of, or was reckless in disregarding, information that would suggest that the alleged misstatements were false or misleading. Instead, plaintiff relies on conclusions that the Individual Defendants must have known of the alleged fraud because of their senior corporate positions. (¶¶ 380–392.) And it relies on improper group pleading allegations about "Defendants'" alleged knowledge or recklessness. (*See, e.g.*, ¶¶ 176–180, 184, 200, 286, 310, 378–379.)

The law is plain in this Circuit that such conclusory allegations do not satisfy a plaintiff's pleading burden. In *Owens*, 789 F.3d at 545–46, the Fifth Circuit held that the allegation that a CEO made certain remarks did not allege scienter because it did not rule out "the alternative inference that [he] was merely negligent in believing" his statements to be true. In *Indiana Electrical Workers' Pension Trust Fund IBEW* v. *Shaw Group, Inc.*, 537 F.3d 527, 535 (5th Cir. 2008), the court held that scienter allegations "may not rest on the inference that defendants must have been aware of the misstatement based on their positions with the company." And in

18

*Southland*, 365 F.3d at 365, the court held that "group pleading" allegations that do not identify the role of each defendant in the alleged wrongdoing are insufficient to allege scienter.

Plaintiff's allegation that defendants were motivated to commit fraud to preserve ExxonMobil's Standard & Poor's ("S&P") credit rating before a March 2016 debt offering is insufficient as a matter of law. (¶¶ 393–398.) Allegations of motive alone do not satisfy plaintiff's burden of pleading scienter. *Nathenson* v. *Zonagen Inc.*, 267 F.3d 400, 412 (5th Cir. 2001). And a defendant's alleged "'desire to maintain a high credit rating is universally held among corporations and their executives and consequently does not contribute significantly to an inference of scienter.'" *Shaw Grp.*, 537 F.3d at 544 (internal quotation and citations omitted). Moreover, the only threatened downgrade here was to AA+ (one step down from the highest possible rating, and a rating that is stronger than that of every other major oil company and the vast majority of U.S. issuers), and the market was already well aware a downgrade was under consideration because S&P had placed the Company's long-term rating "on 'CreditWatch' with 'negative' implications" a month before the debt offering. (¶ 200.) The Complaint alleges no facts showing that an AA+ rating would have materially increased the costs of the offering.

Plaintiff's remaining allegations in support of its scienter claim establish nothing. First, the allegation that defendants are allegedly "involved" in investigations and lawsuits (¶¶ 399–401) is irrelevant because unadjudicated investigations and claims do not support an inference of scienter. *See Carlton* v. *Cannon*, 184 F. Supp. 3d 428, 479–80 (S.D. Tex. 2016) (dismissing Section 10(b) claim, reasoning that existence of SEC investigation did not support strong inference of scienter, especially where "plaintiffs have not alleged the outcome" of the investigation); *In re Exodus Commc'ns, Inc. Sec. Litig.*, No. C 01-2661 MMC, 2005 WL 1869289, at *22 (N.D. Cal. Aug. 5, 2005) (dismissing Section 10(b) claims, reasoning that the

19

"mere filing of a complaint, absent any findings that the allegations of the complaint are true, can provide no basis for a strong inference of scienter"). Second, plaintiff's allegation that ExxonMobil concealed Mr. Tillerson's use of a secondary email account and "knowingly failed" to preserve certain documents in the NYAG's "investigation" (¶ 26) has nothing to do with the claims at issue, and the Individual Defendants are not alleged to have been responsible. And, as shown in defendants' motion to strike, these allegations are based on conclusory and unproven assertions by an affiant with no personal knowledge of the alleged conduct. Third, plaintiff's allegation that ExxonMobil has a "[h]istory of [d]eception" regarding climate change (¶¶ 412–420) is contradicted by the very documents referenced in the Complaint, which show that ExxonMobil's internal knowledge was well within mainstream thought on the issue and fully consistent with its public statements.  Even the NYAG has abandoned that discredited allegation, which is also entirely irrelevant to the claims at issue in the case. Finally, plaintiff does not allege that the Individual Defendants were involved in this alleged deception.

> **B.      The Remaining Allegations in the Complaint Also Fail to Satisfy Plaintiff's Scienter Burden as to the Individual Defendants.**

Plaintiff's allegations about specific Individual Defendants likewise do not give rise to a strong inference of scienter. Plaintiff alleges that Messrs. Tillerson, Swiger, and Rosenthal signed SEC filings (*e.g.*, ¶ 392) and that those statements purportedly violated SEC regulations and GAAP (¶¶ 256, 342–376). But such allegations are insufficient because plaintiff nowhere alleges that they "had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions." *Cent. Laborers' Pension Fund* v. *Integrated Elec. Servs. Inc.*, 497 F.3d 546, 555 (5th Cir. 2007); *see also Owens*, 789 F.3d at 543 (alleged failure to follow accounting standards does not plead scienter); *Shaw Grp.*, 537 F.3d at 534 (same).

Plaintiff also alleges that Mr. Rosenthal had "intimate" involvement in matters relating to the alleged fraud because he requested the removal of a single footnote regarding the issue of impairments in a 2014 report. (¶ 389.) But plaintiff does not identify that footnote's content or explain why it was supposedly improper to remove it. Plaintiff thus does not rule out "a more likely, nonculpable inference" that Mr. Rosenthal "may have simply been pointing out an error that needed to be corrected." *Shaw Grp., Inc.*, 537 F.3d at 538.

As to Mr. Tillerson, plaintiff makes the unsurprising allegation that, as ExxonMobil's then-CEO, he made presentations addressing the Company's reserves and financial results. (¶ 385, referring back to ¶¶ 251, 258, 262, 275, 289–91.) Most of the plaintiff's complaints about Mr. Tillerson's presentations concern the so-called failure to disclose the "lower" GHG costs. But, for reasons already addressed, such allegations do not support any inference that Mr. Tillerson made any knowing misstatements. Plaintiff's reference to an alleged statement by Mr. Tillerson about ExxonMobil's successful track record of proved reserve replacements and a diverse reserve portfolio also does not support its claim, because the Complaint does not allege that those statements are inaccurate. (¶¶ 275–76.) Plaintiff alleges that the statements were misleading because they did not disclose that the Company's assets in Canada and the Rocky Mountains were operating at a loss in the then-current price cycle (*id.*), but the Company's 2015 Form 10-K expressly cautioned investors about the potential impact of "continued weakness in the upstream industry environment" and low long-term energy prices. (¶ 281; App. 103.)

Plaintiff also attributes to Mr. Tillerson a statement that "[w]e don't do write-downs. We are not going to bail you out by writing it down. *That is the message to our organization*." (¶ 90 (emphasis added).) But Mr. Tillerson's statement, by its terms, is simply a message to his management team that they will be held accountable for the actual amounts invested, and that the

21

Company will not "bail [them] out" or manipulate its reported results by taking unwarranted impairments. (¶ 90.) ExxonMobil publicly warned of the risks of impairments, recognized a significant impairment as of 2016, and routinely disclosed the process it used to estimate impairments. (App. 55-58, 103-104.) No reasonable investor could have concluded, as plaintiff seems to imply, that the Company would not recognize impairments when appropriate. In addition, because oral statements are invariably "less precise than written ones," *Plumbers & Pipefitters Local Union 719 Pension Fund* v. *Zimmer Holdings, Inc.*, 679 F.3d 952, 956 (7th Cir. 2012), oral statements that are "susceptible to many interpretations, including innocent ones" do not support a strong inference of scienter. *Shaw Grp.*, 537 F.3d at 538 (quotations omitted).

      **C.**      **ExxonMobil's Extensive Stock Repurchases, the Absence of Any Alleged Insider Stock Sales, and Extensive Risk Disclosures Further Negate Any Inference of Scienter.**

Because the strength of an inference is "inherently comparative," the Court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 323–24. In making this assessment, the Court must consider "the complaint in its entirety," and must determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id*. at 322–23 (emphasis in original).

Plaintiff's own allegations show that defendants honestly believed that ExxonMobil's stock price fairly reflected its value. Far from exploiting its allegedly inflated stock price, ExxonMobil bought billions of dollars of its own stock during the alleged class period. (¶¶ 87, 196.) A "company's 'stock repurchase program rebuts a finding of scienter, since it is illogical that [the company] would have been repurchasing its shares had it been aware of facts that would indicate the price would fall.'" *Izadjoo* v. *Helix Energy Sols. Grp., Inc.*, 237 F. Supp. 3d 492, 518 (S.D. Tex. 2017); *see Plumbers & Pipefitters Local Union 719 Pension Fund* v. *Zimmer*

*Holdings, Inc.*, 673 F. Supp. 2d 718, 749 (S.D. Ind. 2009) (same), *aff'd*, 679 F.3d 952 (7th Cir. 2012). Plaintiff's failure to allege that the Individual Defendants sold ExxonMobil stock also "undermines [its] claim." *Nathenson*, 267 F.3d at 421 (quotations omitted).

Finally, ExxonMobil repeatedly warned investors about the risks of low energy prices to its reserves and asset valuations. (¶¶ 20, 23, 232, 237, 281.) This "[a]dditional transparency . . . further negates the inference of scienter," because it would be illogical for defendants "to simultaneously disclose to, and mislead, the public." *Neiman* v. *Bulmahn*, 854 F.3d 741, 750 (5th Cir. 2017) (quotations omitted) (affirming dismissal for failure to plead scienter).

**IV.     Count I Should Be Dismissed Because Plaintiff Does Not Plead Loss Causation.**

To plead loss causation, a plaintiff must allege that "when the 'relevant truth' about the fraud began to leak out . . . it caused the price of the stock to depreciate and, thereby, proximately caused the plaintiff's economic harm." *See Pub. Emps.' Ret. Sys. of Miss.* v. *Amedisys, Inc.*, 769 F.3d 313, 320 (5th Cir. 2014). The Complaint alleges two categories of corrective disclosures: (i) press reports from November 2015 through August 2016 about government investigations of ExxonMobil relating to climate change; and (ii) earnings releases and an analyst's report from October 2016 through January 2017 that disclose disappointing financial results. (¶¶ 426–452; App. 116–157.)

None of these documents qualifies as a corrective disclosure as a matter of law. The press reports about government investigations that plaintiff cites are not corrective disclosures because the "commencement of government investigations on suspected fraud do[es] not, standing alone, amount to a corrective disclosure." *Amedisys*, 769 F.3d at 323; *In re Dell Inc. Sec. Litig.*, 591 F. Supp. 2d 877, 909–10 (W.D. Tex. 2008) (dismissing complaint where disclosure of investigation "did not disclose the existence of any wrongdoing"). In addition, none of the press reports mentioned ExxonMobil's proxy costs of carbon, GHG emission costs, asset valuations, or

23

proved reserves, which are the focus of this lawsuit. *See, e.g.*, *In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 864 (S.D. Tex. 2016) (holding that loss causation was not pleaded where there was "a complete disconnect between the alleged fraud and the two disclosures that precipitated the stock price drops").

The press reports that plaintiff cites from August 2016 (¶¶ 432–36) also are not corrective disclosures because they did not reveal new material information to investors. *See Stephens* v. *Uranium Energy Corp.*, No. 15-cv-1862-H, 2016 WL 3855860, at *19-20 (S.D. Tex. July 15, 2016) (holding loss causation not adequately pleaded on the ground that merely "[c]onfimatory information cannot cause a change in stock price, as a matter of law"). These reports discussed two senators' views of the government investigations and a congressional subpoena that had been publicly disclosed a month earlier. (*See* App. 123–126.)

Finally, the earnings releases and analyst's report (¶¶ 437–52) are not corrective disclosures because they merely disclosed disappointing financial results (including the actual or potential de-booking of proved reserves or asset impairments) and an analyst's decision to downgrade his recommendation on ExxonMobil stock, but did not disclose that any prior statements were false when made. *See Dell*, 591 F. Supp. 2d at 909 (holding that disappointing earnings statements alone do not qualify as a corrective disclosure).

## V.     Plaintiff's Section 20(a) Claims Fail for Lack of A Primary Violation.

Count II against the Individual Defendants should be dismissed because, as shown above, plaintiff has not alleged a primary violation by ExxonMobil. *See Southland*, 365 F.3d at 383 (holding control person liability "cannot exist in the absence of a primary violation").

## VI.     The Complaint Should Be Dismissed With Prejudice.

Dismissal should be with prejudice because granting plaintiff yet another opportunity to amend would be futile. *See Cent. Laborers'*, 497 F.3d at 556 (affirming denial of plaintiff's

request to amend because amendment "would not have cured the defects in the [complaint]"). Plaintiff had eight months to correct the initial complaint and the benefit of substantial public reporting regarding its allegations, and has not satisfied well-established pleading standards.

## CONCLUSION

This Court should reject Plaintiff's attempt to convert the NYAG's grandstanding into a federal securities case. No fact alleged in the Complaint establishes a "bait-and-switch" regarding proxy costs of carbon. And the only factual basis offered to support that assertion requires the illogical and improper conflation of a proxy cost of carbon with a different metric, GHG costs, which encompasses a different set of costs and serves a different purpose. Neither plaintiff's attempt to create that false equivalency nor its quarreling with ExxonMobil over opinions about asset values can support a fraud claim. Plaintiff has similarly failed to allege facts establishing fraudulent intent, relying instead on long-rejected inferences that senior executives must have known about alleged wrongdoing or were motivated by the bottom line to commit fraud. And none of plaintiff's allegations support loss causation in light of the absence of any actual corrections in the so-called corrective disclosures. Lacking factual allegations supporting these key elements, the Complaint should be dismissed with prejudice.

Dated: September 26, 2017

Respectfully submitted,

| | |
|---|---|
| */s/ Daniel J. Kramer* | */s/ D. Patrick Long* |
| Theodore V. Wells, Jr. (*pro hac vice*) | D. Patrick Long |
| Daniel J. Kramer (*pro hac vice*) | Texas State Bar No. 12515500 |
| Daniel J. Toal (*pro hac vice*) | SQUIRE PATTON BOGGS |
| Gregory F. Laufer (*pro hac vice*) | 2000 McKinney Ave., Suite 1700 |
| Jonathan H. Hurwitz (*pro hac vice*) | Dallas, TX 75201 |
| PAUL, WEISS, RIFKIND, | Telephone: (214) 758-1505 |
| WHARTON & GARRISON LLP | Facsimile: (214) 758-1550 |
| 1285 Avenue of the Americas | patrick.long@squirepb.com |
| New York, NY  10019-6064 | |
| Telephone: (212) 373-3000 | *Counsel for Rex W. Tillerson* |
| Facsimile: (212) 757-3990 | |
| twells@paulweiss.com | |
| dkramer@paulweiss.com | |
| dtoal@paulweiss.com | |
| glaufer@paulweiss.com | |
| jhurwitz@paulweiss.com | |

*/s/ Nina Cortell*
Nina Cortell
Texas State Bar No. 04844500
Daniel H. Gold
Texas State Bar No. 24053230
HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700
Dallas, TX 75219
Telephone: (214) 651-5000
Facsimile: (214) 651-5940
nina.cortell@haynesboone.com
daniel.gold@haynesboone.com

*Counsel for Exxon Mobil Corporation,*
*Andrew P. Swiger, Jeffrey J. Woodbury,*
*and David S. Rosenthal*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing Motion has been

served by electronic CM/ECF filing, on this 26th day of September, 2017.


*/s/ Daniel J. Kramer*
Daniel J. Kramer