UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| PEDRO RAMIREZ, JR., Individually and on Behalf of All Others Similarly Situated, | § § § | Civil Action No. 3:16-cv-03111-K |
| Plaintiff, | § § | CLASS ACTION |
| vs. | § § | |
| EXXON MOBIL CORPORATION, et al., | § § § | |
| Defendants. | § § | |

**LEAD PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   STATEMENT OF FACTS ......................................................................................4

III.  ARGUMENT ..........................................................................................................7

    A.   The Complaint Alleges Material Misstatements and Omissions ............................8

        1.   Defendants' Material Misstatements and Omissions Concerning
             Exxon's Purported Use of "Proxy Costs" ......................................................8

        2.   Defendants' Material Misstatements and Actionable Omissions
             Concerning Exxon's Rocky Mountain Dry Gas Operations......................13

        3.   Defendants' Material Misstatements and Actionable Omissions
             Concerning Exxon's Canadian Bitumen Operations ................................17

            a.   Defendants' Failure to Disclose that the Canadian Bitumen
                Operations Were Operating at a Loss ............................................17

            b.   Defendants' Failure to Disclose the True State of the Kearl
                Operation.........................................................................................20

    B.   The Complaint Alleges a Strong Inference of Scienter .......................................21

    C.   The Complaint Alleges Loss Causation...............................................................24

IV.   CONCLUSION.....................................................................................................25

# TABLE OF AUTHORITIES

Page

## CASES

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
  572 F.3d 221 (5th Cir. 2009) ...............................................................25

*Bachow v. Swank Energy Income Advisers, LP*,
  No. 3-09-CV-0262–K, 2010 U.S. Dist. LEXIS 1504
  (N.D. Tex. Jan. 6, 2010).........................................................................7, 8, 21, 23

*Barrie v. Intervoice-Brite, Inc.*,
  397 F.3d 249 (5th Cir. 2005), *opinion modified on denial of reh'g*,
  409 F.3d 653 (5th Cir. 2005) ......................................................... *passim*

*Barrie v. InterVoice-Brite, Inc.*,
  No. 3:01-CV-1071-D, 2002 WL 1841631
  (N.D. Tex. Aug. 8, 2002) .......................................................................25

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988).................................................................................7, 18

*Brody v. Zix Corp*.,
  No. 3:04-CV-1931-K, 2006 U.S. Dist. LEXIS 69302
  (N.D. Tex. Sept. 26, 2006)......................................................................23

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005).................................................................................24

*Fin. Acquisition Partners, L.P. v. Blackwell*,
  No. 3:02-CV-1586-K, 2004 U.S. Dist. LEXIS 20110
  (N.D. Tex. Sep. 29, 2004), *aff'd*, 440 F.3d 278 (5th Cir. 2008) .............18

*Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*,
  No. 16-CV-01820 (JGK), 2017 WL 3261609
  (S.D.N.Y. July 28, 2017) .......................................................................15, 16

*Harris v. Progressive Ins., Inc.*,
  No. 3:13-cv-3983-K, 2014 WL 712446
  (N.D. Tex. Feb. 24, 2014).......................................................................4

*In re BP P.L.C., Sec. Litig.*,
  843 F. Supp. 2d 712 (S.D. Tex. 2012) ...................................................23

*In re BP P.L.C. Sec. Litig.*,
  922 F. Supp. 2d 600 (S.D. Tex. 2013) ...................................................25

**Page**

*In re BP P.L.C. Sec. Litig.*,
No. 4:10-MD-2185, 2016 WL 3090779
(S.D. Tex. May 31, 2016) ........................................................................15

*In re CPI Card Grp., Inc. Sec. Litig.*,
No. 16-cv-4531 (LAK), 2017 U.S. Dist. LEXIS 179521
(S.D.N.Y. Oct. 27, 2017) .........................................................................19

*In re Landry's Seafood Rests., Inc.*,
No. Civ.A. H-99-1948, 2001 WL 34115784
(S.D. Tex. Feb. 19, 2001).........................................................................15

*In re Leapfrog Enter. Sec. Litig.*,
237 F. Supp. 3d 943, 953-55 (N.D. Cal. 2017).......................................16

*In re Michaels Stores, Inc. Sec. Litig.*,
No. Civ.A. 3:03-CV-0246, 2004 WL 2851782
(N.D. Tex. Dec. 10, 2004) .......................................................................21

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000) ......................................................24

*In re Questcor Sec. Litig.*,
No. SA CV 12-01623 DMG, 2013 WL 5486762
(C.D. Cal. Oct. 1, 2013)...........................................................................24

*In re Triton Energy Ltd. Sec. Litig.*,
No. 5:98-CV-256, 2001 U.S. Dist. LEXIS 5920
(E.D. Tex. Mar. 30, 2001)................................................................ *passim*

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
818 F.3d 85 (2d Cir. 2016).......................................................................18

*Jones v. Cain*,
600 F.3d 527 (5th Cir. 2010) .....................................................13, 18, 20

*Kapps v. Torch Offshore, Inc.*,
379 F.3d 207 (5th Cir. 2004) ...................................................................19

*KB Partners I, L.P. v. Pain Therapeutics, Inc.*,
No. A-11-CA-1034-SS, 2015 WL 7760201
(W.D. Tex. Dec. 1, 2015).....................................................................8

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ........................................................... *passim*

1331095_1

**Page**

*Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*,
   66 F. Supp. 3d 795 (E.D. Tex. 2014) .........................................................................13, 18, 20

*Malik v. Cont'l Airlines, Inc.*,
   305 F. App'x 165 (5th Cir. 2008) .........................................................................................9

*Marcus v. J.C. Penney Co. Inc.*,
   No. 6:13-cv-736-MHS-KNM, 2015 WL 5766870
   (E.D. Tex. Sept. 29, 2015) ...................................................................................................20

*No. 84 Emp'r-Teamster Joint Council Pension*
*Trust Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ...............................................................................................24

*Omnicare, Inc. v. Laborers Dist. Council Constr.*
*Indus. Pension Fund*,
   _U.S._, 135 S. Ct. 1318 (2015)..............................................................................15, 16, 17

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
   681 F.3d 114 (2d Cir. 2012)..................................................................................................19

*Plotkin v. IP Axcess Inc.*,
   407 F.3d 690 (5th Cir. 2005) ...............................................................................................23

*Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*,
   769 F.3d 313 (5th Cir. 2014) .........................................................................................24, 25

*Schuh v. HCA Holdings, Inc.*,
   947 F. Supp. 2d 882 (M.D. Tenn. 2013)...............................................................................19

*SEC v. Life Partners Holdings, Inc.*,
   854 F.3d 765 (5th Cir. 2017) ...............................................................................................15

*Silverstrand Invs. v. AMAG Pharm., Inc.*,
   707 F.3d 95 (1st Cir. 2013)...................................................................................................19

*Southland Sec. Corp. v. INSpire Ins. Sols. Inc.*,
   365 F.3d 353 (5th Cir. 2004) ...............................................................................................23

*Spitzberg v. Houston Am. Energy Corp.*,
   758 F.3d 676 (5th Cir. 2014) ...........................................................................8, 11, 21, 25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)..............................................................................................................21

**Page**

*Underland v. Alter*,
    No. 10-3621, 2011 U.S. Dist. LEXIS 102896
    (E.D. Pa. Sept. 9, 2011) ..................................................................................................17

*United States ex rel. Grubbs v. Ravikumar Kanneganti*,
    565 F.3d 180 (5th Cir. 2009) .........................................................................................25

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
    780 F.3d 597 (4th Cir. 2015) .........................................................................................24

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §10(b)................................................................................................................7, 8, 18
    §20(a)........................................................................................................................8

Federal Rules of Civil Procedure
    Rule 8(a)...................................................................................................................24
    Rule 12(b)(6)........................................................................................................7, 24

17 C.F.R.
    §210.4-01(a)(1) ........................................................................................................15
    §240.10b-5 ...........................................................................................................9, 18

Lead Plaintiff Greater Pennsylvania Carpenters Pension Fund ("plaintiff") respectfully submits this memorandum of law in opposition to Defendants' Motion to Dismiss the Consolidated Complaint and Brief in Support (Dkt. No. 46) ("Motion").[1]

## I.   INTRODUCTION

Defendants' Motion seeks to avoid the Complaint's straightforward allegations of fraud by offering an unsupported, fact-based counter-narrative and framing plaintiff's claims as a politically charged attack on Exxon's purported "opinions."   But this case is not about politics or a disagreement with defendants' opinions.   Instead, it is about defendants' demonstrably false and misleading statements concerning the value and profitability of Exxon's reserve assets and the specific actions defendants were supposedly taking to protect those assets from the risks posed by climate-related policies and declining commodity prices.   In short, defendants misrepresented the methods Exxon purportedly used to value and evaluate its reserves, and they concealed the significant impact historic price declines had on some of the Company's key operations, thereby portraying Exxon's reserves as far more valuable than they actually were.   The truth was revealed through a number of partial disclosures, ultimately compelling Exxon to de-book nearly ***20% of its proved reserves*** and record an eye-popping ***$3.3 billion pre-tax impairment charge*** on its dry gas operations, causing shareholders significant losses as a result.

Throughout the Class Period,[2] defendants unequivocally told investors that Exxon "address[ed] the potential for future climate-related controls, including the potential for restriction on emissions," through the use of a ***singular*** tool: a "proxy cost of carbon."   Defendants further stated

---

[1]     The defendants in this action are Exxon Mobil Corporation ("Exxon" or the "Company"), Rex W. Tillerson ("Tillerson"), Andrew P. Swiger ("Swiger"), Jeffrey J. Woodbury ("Woodbury") and David S. Rosenthal ("Rosenthal") (collectively, "defendants").  Defendants Tillerson, Swiger, Woodbury and Rosenthal are collectively referred to herein as the "Individual Defendants."   Emphasis is added and citations are omitted throughout unless otherwise indicated.

[2]     As defined in the Consolidated Complaint for Violations of the Federal Securities Laws (the "Complaint") (Dkt. No. 36) (cited herein as "¶_" and "¶¶_"), the "Class Period" refers to the period from March 31, 2014 up to and including January 30, 2017.  ¶1.

that this *same proxy cost* was aimed at "quantify[ing]" potential costs to "investment opportunities" and was required to be used by "all business units" in "evaluating capital expenditures and *developing business plans*."  In truth, however: (1) Exxon actually used a *separate, undisclosed* set of proxy costs for its internal planning purposes that was significantly *lower* than the proxy costs described in defendants' representations; and (2) for certain assets, the Company used *no proxy costs at all* in connection with its investment, impairment and valuation processes.  As detailed in the Complaint, defendants' undisclosed practices allowed them to portray Exxon's reserves as safer and more valuable than they actually were, misleading investors as a result.

Defendants' contention that the above allegations are founded on "baseless insinuations and irresponsible allegations"  is nothing more than unsupported bluster.  In truth, these allegations are supported by the contents of *internal Exxon documents and communications*, which are described in and attached to the Complaint.  These documents include a statement by an Exxon Planning Manager that "*[defendant] Rex [Tillerson] has seemed happy with the difference*" between the undisclosed separate sets of proxy costs, and a proposal by Exxon's Greenhouse Gas Manager ("GHGM") that the Company should align its undisclosed internal proxy costs with its publicly disclosed costs because defendants' published reports had "*implied that we use the [disclosed] basis for proxy cost of carbon when evaluating investments*," when in fact *they did not*.

Recognizing the damning nature of this evidence, defendants' Motion tries to evade liability by proffering a post-hoc, fact-based explanation that *admits* – but attempts to justify – Exxon's internal use of a separate, undisclosed set of costs that were significantly lower than those described in defendants' public representations.  At best, defendants' unfounded argument raises factual questions that cannot be resolved on a motion to dismiss.  Moreover, defendants' self-serving explanation is flatly contradicted by the internal documents summarized above and defendants' own

- 2 -

Class Period representations, which *made no mention* of the two-pronged approach described in defendants' Motion.  *See* §III.A1., *infra*.

Defendants also made several material misrepresentations concerning the value and profitability of their bitumen heavy crude operations in Alberta, Canada (the "Canadian Bitumen Operations") and Rocky Mountain dry gas operations ("RMDG Assets").  Contrary to defendants' assertions, these claims do *not* rest on disagreements with defendants' purported "opinions"; but rather, *facts* that rendered defendants' statements materially false and misleading and were known to defendants at the time the statements were made.  Among other things, these facts include: (1) defendants' failure to recognize any asset impairment charge for the RMDG Assets in 2015, despite defendants' admission that a *$3.3 billion pre-tax charge* was required for such assets one year later, when the price for natural gas was *62% higher* and the cost to produce it was *lower*; (2) defendants' representation to investors that Exxon's Canadian Bitumen Operations had generated an average profit of more than $5/barrel ("bbl"), while simultaneously concealing that those same operations had, at that time, been operating at a significant loss for at least three months; and (3) defendants' misleading concealment of their knowledge – based on objective facts regarding the market price of oil – that *3.6 billion barrels* of Exxon's proved reserves were all but certain to be de-booked.  *See* §§III.A.2.-3., III.B., *infra*.[3]

The Complaint further alleges that, as a result of defendants' material misrepresentations, investors purchased Exxon stock at artificially inflated prices and suffered economic losses when the price declined in response to several partial disclosures that gradually revealed the truth behind defendants' fraud.  As such, the Complaint alleges loss causation.  *See* §III.C., *infra*.

---

[3]     Contrary to defendants' assertions, these factual allegations are not *dependent* in any way on "inadmissible" expert opinions.  As detailed in Lead Plaintiff's Response in Opposition to Defendants' Motion to Strike ("MTS Response"), filed concurrently herewith, the Declaration of Charlotte J. Wright, Ph.D., CPA (the "Wright Declaration") was attached to the Complaint for the completely proper purpose of providing additional factual support and context for plaintiff's accounting claims.  MTS Response at 1-2, 5-12.  Such claims, however, are founded on well-pled factual allegations that do *not* depend on any expert opinions, as detailed herein.  *See* §III.A.2.-3., *infra*.

## II.      STATEMENT OF FACTS

The Class Period begins on March 31, 2014, when in response to mounting pressure from shareholders, defendants released two detailed reports: "Energy and Carbon – Managing the Risks" (the "MTR Report") and "Energy and Climate" (the "E&C Report") (collectively, the "Climate Reports"). ¶¶3-6, 248-249.  In the Climate Reports, defendants outlined Exxon's purported efforts to "address the potential for future climate-related controls, including the potential for restriction on emissions, through the use of a proxy cost of carbon." ¶¶5-6, 130, 248-249.[4]  Defendants further represented that Exxon's carbon proxy cost was "embedded" into Exxon's "annual analysis of the global outlook for energy" (the "Outlook"),[5] that this *same proxy cost* was required to be used by "*all business units*" when "*evaluating capital expenditures and developing business plans*," and that "in the OECD nations [which include Canada and the United States], *we apply a proxy cost that is about $80 per ton in 2040*." ¶130; App. 36, 50.[6]  Based on these representations, defendants further assured investors "we are confident that *none* of our hydrocarbon reserves are now or will become 'stranded.'" ¶4.

Unfortunately for investors, defendants' representations in the Climate Reports – and other similar statements defendants made throughout the Class Period – failed to disclose, *inter alia*, that: (i) Exxon's internal policies actually prescribed the use of a *separate, undisclosed* set of proxy costs

---

[4]     Throughout the Class Period, defendants interchangeably referred to this "proxy cost of carbon" as, *inter alia*, a "GHG proxy cost," "cost of carbon," "price of carbon," and "implied cost [of energy-related CO2 emissions]." ¶¶6, 249, 283, 305.  The substance of defendants' disclosures, however, all describe the same thing: Exxon's singular tool for "address[ing] the potential for future climate-related controls." *Id.*

[5]     According to Exxon, the Outlook is "*the foundation*" of the Company's investment planning and business decisions, and the Management Committee and Board of Directors discuss and review the Outlook "*extensively*" prior to its release.  *Id.*  In addition, Exxon has stated that the Company's Board "receives in depth briefings" on the "risks of climate change," and that members of the Management Committee, including defendants Tillerson and Swiger, "are actively engaged in discussions relating to greenhouse gas emissions and climate change on an ongoing basis." ¶391.

[6]     "App." refers to the Appendix in Support of Lead Plaintiff's Response in Opposition to Defendants' Motion to Dismiss, filed concurrently herewith.  These publicly available materials are properly considered at this stage, as "'they are referred to in the plaintiff's complaint and are central to [it's] claim.'" *Harris v. Progressive Ins., Inc.*, No. 3:13-cv-3983-K, 2014 WL 712446, at *2 (N.D. Tex. Feb. 24, 2014).

1331095_1

that were **significantly lower** than those described in defendants' statements concerning the Company's investment and asset valuation processes; (ii) for certain assets, Exxon used **no "proxy costs" at all** in connection with its investment, impairment and valuation processes; and (iii) Exxon failed to apply proxy costs to transportation or end-use "Scope 3" emissions, which make up 90% of Exxon's greenhouse gas ("GHG") emissions. *See* ¶¶138-147.[7] By failing to accurately describe the proxy costs defendants used in connection with their internal investment, impairment and valuation processes, defendants misled investors by portraying their assets as safer and more valuable than they actually were.

In mid-2014, around the time defendants released the Climate Reports, oil and gas prices around the world embarked on a precipitous and prolonged decline, which ultimately caused Exxon's peers to write off or abandon a staggering $200 billion worth of oil and gas reserves. ¶¶10-11. Defendants, however, remained uniquely steadfast, repeatedly assuring investors that the Company's superior investment processes and project management distinguished Exxon from its competitors – and effectively allowed the Company to avoid the consequences befalling oil and gas companies around the world. In 2015, defendant Tillerson typified the Company's brazen attitude by flatly declaring: "**We don't do write-downs**." ¶11.

The truth, however, was that Exxon was **not** immune to the challenges raised by the historic oil and gas price declines. By the end of 2015, Exxon had become a company with declining profits, rapidly rising levels of debt, and an increasingly unsustainable commitment to shareholder payouts. As a result, the Company was teetering on the brink of losing its treasured AAA credit rating. ¶15. At the same time, the Canadian Bitumen Operations were losing money, Exxon's open-pit mining operation at Kearl Lake (the "Kearl Operation") was all but certain to lose its "proved" reserve

---

[7]     The facts described in points (i)-(iii) above are collectively referred to herein as the "Omitted Proxy Cost Facts."

classification, and a significant portion of the Company's RMDG Assets no longer justified their applicable "carrying value" on Exxon's financial statements.  ¶14.

But defendants knew that disclosing any of the above facts regarding Exxon's troubled reserves would put the Company's already-tenuous AAA credit rating in significant jeopardy, and that any decline in Exxon's credit rating would have significant, negative implications for the Company's *$12 billion debt offering* scheduled for March 2016 (the "March 2016 Debt Offering"). Moreover, Exxon needed the massive injection of capital from the  March 2016 Debt Offering – the single largest debt offering in Exxon's history – in order to support the Company's struggling operations and fund its otherwise unsustainable shareholder payouts, which defendant Tillerson had described as "a high priority" and "why we are important to people."  ¶¶15, 85, 396.  Accordingly, defendants concealed the above facts in Exxon's 2015 Form 10-K, misleading shareholders as a result.  ¶¶16-17, 195-201.

Just a month after defendants issued Exxon's false and misleading 2015 Form 10-K, the Company successfully completed its $12 billion debt offering.  And just over a month after that, Standard & Poor's did in fact strip Exxon of its AAA rating.  ¶18.  Later in the year, it was reported that the U.S. Securities and Exchange Commission ("SEC") was investigating Exxon in connection with the Company's ability to avoid the significant impairments and write-downs that had plagued its peers over the last two years, while Exxon continued to face ongoing investigations from several state Attorneys General concerning the same issue.  ¶19.

Under this additional scrutiny, defendants finally began revealing the truth regarding their troubled assets on October 28, 2016.  On that day, despite the fact that oil and gas prices had *risen significantly* in the second half of 2016, defendants announced that *nearly 20%* of Exxon's proved oil and gas reserves might no longer satisfy the SEC's "proved reserves" definition at year-end "[i]f the average prices seen during the first nine months of 2016 *persist* for the remainder of the year."

¶¶20, 180, 228, 231, 309.  Contrary to defendants' tepid and misleading warnings, the truth at that

time was that the de-booking was a virtual certainty, *even if prices increased significantly*.  In fact,

oil prices *did* continue to rise over the remainder of the year, but defendants nonetheless confirmed

the massive de-booking – which ultimately wiped out *all* of the Kearl Operation's 3.5 billion bbl of

proved reserves – on January 31, 2017.  That same day, defendants also belatedly announced the

$3.3 billion pre-tax asset impairment charge for Exxon's RMDG Assets, despite the fact that the

price for natural gas had *increased by 62%* over the past year, while Exxon's production costs had

*decreased* over the span.  ¶¶188-189, 232, 446.  The market was shocked by the October 28, 2016

and January 31, 2017 disclosures – along with several other partial disclosures throughout the Class

Period – leading to significant declines in Exxon's stock price and causing massive loses to investors

as a result.  ¶¶421-452.

## III.    ARGUMENT

Motions to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6)

"are viewed with disfavor and are rarely granted."  *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232

(5th Cir. 2009).  When deciding such a motion, the court must accept all well-pled allegations in the

complaint as true and "*draw all reasonable inferences in the plaintiff's favor*."  *Id.*  As this Court

has recognized, "in the context of securities fraud, a dismissal pursuant to Rule 12(b)(6) is difficult

to obtain since such a claim revolves around *fact-specific inquiries*."  *Bachow v. Swank Energy*

*Income Advisers, LP*, No. 3-09-CV-0262–K, 2010 U.S. Dist. LEXIS 1504, at *5-*6 (N.D. Tex. Jan.

6, 2010) (Kinkeade, J.) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988)).

The basic elements of a claim under §10(b) of the Securities Exchange Act of 1934

("Exchange Act") are: (1) a material misrepresentation or omission ("falsity"); (2) scienter; (3) a

connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss

causation. *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 683 (5th Cir. 2014).  As detailed

below, the Complaint adequately alleges each such element.[8]

### A.      The Complaint Alleges Material Misstatements and Omissions

To allege the element of falsity adequately, a plaintiff asserting claims under §10(b) of the

Exchange Act need only "identify each allegedly misleading statement with particularity and explain

why it is misleading." *Lormand*, 565 F.3d at 239.[9]  As detailed below, the Complaint does so here.

### 1.      Defendants' Material Misstatements and Omissions Concerning Exxon's Purported Use of "Proxy Costs"

As noted *supra*, the Complaint alleges that defendants' failure to disclose the Omitted Proxy

Cost Facts rendered several of their statements regarding Exxon's purported use of carbon or GHG

"proxy costs" materially false and misleading.  Specifically, defendants' affirmative misstatements

on this topic include, among other things:

- Representations in the E&C Report, which stated, *inter alia*, that "in the OECD nations [which include Canada and the United States], ***we apply a proxy cost that is about $80 per ton in 2040***," that "[t]his ***GHG proxy cost*** is integral to ExxonMobil's planning," and that "***all business units***" are required to use "the proxy cost" when "***evaluating capital expenditures and developing business plans***" (¶¶6, 130, 249; *see also* App. 36, 50);

- Representations in the MTR Report, which stated, *inter alia*, that the Company "address[es] the ***potential for future climate-related controls***, including the potential for ***restriction on emissions***, through the use of a proxy cost of carbon" that "seeks to reflect ***all*** types of actions and policies that governments may take over the Outlook period relating to the exploration, development, production, ***transportation or use*** of carbon-based fuels," and attempts to "***quantify***" what such policies "could cost to [Exxon's] ***investment opportunities***" (¶¶5, 130, 248; *see also* App. 17-18);

---

[8]     This memorandum addresses only the elements of falsity, scienter and loss causation, as those are the only elements challenged by defendants' Motion. *See* Motion at 10-24. Defendants also contest the sufficiency of plaintiff's §20(a) claims on the sole ground that the Complaint fails to allege a "primary violation" under §10(b). *Id.* at 24. Because, as detailed herein, plaintiff does allege a §10(b) claim, this argument fails.

[9]     An alleged misrepresentation is considered "material" when "the omitted or misrepresented information would have been significant to a reasonable investor." *Bachow*, 2010 U.S. Dist. LEXIS 1504, at *8. "Materiality is a mixed question of law and fact," and rarely serves as an adequate ground for granting a motion to dismiss. *KB Partners I, L.P. v. Pain Therapeutics, Inc.*, No. A-11-CA-1034-SS, 2015 WL 7760201, at *7-*8 (W.D. Tex. Dec. 1, 2015).

- Defendant Tillerson's statements at Exxon's 2016 Annual Shareholders Meeting that "we have for many years included a price of carbon in our outlook[,] [a]nd *that price of carbon* gets put into all of our economic models *when we make investment decisions* . . . . [W]e choose to put it in *as a cost* . . . and *everything gets tested against it*" (¶¶136, 305); and

- Defendant Woodbury's representation during Exxon's 2016 "annual executive compensation conference call" that the Company "has *used a proxy cost of carbon to assess investments since 2007*" (¶302).[10]

The Omitted Proxy Cost Facts flatly contradict – and render false – each of the above representations regarding Exxon's purported use of a single "proxy cost" that was supposedly: used by all business units in evaluating capital expenditures, developing business plans, and assessing investment opportunities; intended to reflect all types of actions and policies that governments may take; and "was about $80 per ton in 2040" in OECD nations. ¶¶250, 284, 294, 297, 306.[11]

Moreover, as detailed in the Complaint, plaintiff's allegations regarding the Omitted Proxy Cost Facts are supported by particularized facts concerning internal Exxon documents and a sworn affirmation provided by the New York Office of the Attorney General ("NYOAG") under penalty of perjury. ¶¶7, 137-147.[12] For example, the Complaint describes (and attaches) an April 2010 e-mail exchange between Exxon's GHGM and an Exxon Corporate Strategic Planning Manager ("SPM") discussing the two separate sets of proxy costs, and specifically describing the "2030 cost of $40/T CO2" used for [internal Planning and Budgeting] purposes" as "a *conservative (low) estimate*,"

---

[10]    *See also* ¶¶283, 293, 295.

[11]    The Complaint also alleges that defendants' failure to disclose the Omitted Proxy Cost Facts rendered several of defendants' statements materially misleading – including, specifically, statements concerning: (1) the profitability of Exxon's Canadian Bitumen Operations (¶¶268, 272, 285, 309, 313); (2) the significance and amount of the Kearl Operation's proved reserves and the Company's reserve replacement ratio (¶¶251, 258, 262, 265, 275, 277-278, 290, 309, 313); and (3) Exxon's asset impairment processes and determinations (¶¶279, 281, 289-290, 313). As detailed in the Complaint, such statements were materially misleading because disclosure of the Omitted Proxy Cost Facts was "'necessary in order to make [these] statements . . . not misleading.'" *See Lormand*, 565 F.3d at 238 (citing 17 C.F.R. §240.10b-5); *id.* at 248-49 ("'a duty to speak the full truth arises when a defendant undertakes a duty to say anything'"). *See also* ¶¶252, 259, 264, 267, 269, 276, 280, 282, 286, 292, 310, 314.

[12]    *See Lormand*, 565 F.3d at 232 n.3, 254 (finding that exhibits attached to the complaint, such as sworn testimony and defendants' internal documents and e-mails, supported plaintiff's factual allegations); *Malik v. Cont'l Airlines, Inc.*, 305 F. App'x 165, 166 n.2 (5th Cir. 2008) (noting court properly considered affidavit attached to complaint in ruling on motion to dismiss for failure to state a claim).

while noting that the "[Energy Outlook] assumption of $60/T is *likely more realistic*."  ¶140; App.

52.  The Complaint also describes (and attaches) an April 2011 e-mail between these same two

employees in which the GHGM proposes that Exxon "*harmonize* [internal Planning and Budgeting]

assumptions with [public Energy Outlook] assumptions."  ¶140; App. 54.  In response, the SPM

states "I have pointed out the difference in past reviews – we've been at $60 for the EO and $40 for

the plan circa 2030 for several years," further noting "*[defendant] Rex [Tillerson] has seemed*

*happy with the difference previously*," and also stating that the proxy cost for "the plan" is "*not*

*conservative* vs EO from the perspective of debiting actions that increase emissions."  *Id.*

The Complaint also describes (and attaches) a June 2014 internal presentation from Exxon's

new GHGM, which expressly confirms the Company's *undisclosed* use of the two separate sets of

proxy costs discussed in the above internal e-mails.  Specifically, the June 2014 presentation states,

*inter alia*: "Over the past several years, the Corporate Plan and Energy Outlook GHG emissions cost

basis have been disconnected (CP $40/T and EO $60/T in 2030)."  ¶141; App. 58.  The GHGM's

presentation further proposes that Exxon "*bring these prices together*," and supports that proposal

by pointing out the "*non-conservative*" nature of the "lower cost basis in the [Corporate Plan]" and

noting that "[i]n recent reports released by EM ('Energy and Climate' and 'Energy and Carbon –

Managing the risk') *we have implied that we use the EO basis for proxy cost of carbon when*

*evaluating investments*."  *Id.*  As such, the GHGM's presentation *explicitly confirms* the false and

misleading nature of defendants' representations.

The above allegations are plainly sufficient to allege material misrepresentations.

Recognizing as much, defendants attempt to refute the Complaint's well-pled allegations by offering

an *unsupported, self-serving, fact-based* explanation that actually *admits* – but seeks to justify –

Exxon's internal use of a separate, undisclosed set of costs that were significantly lower than those

described in defendants' public representations. Motion at 4-6, 10-12. Defendants' post hoc attempt to explain away their clearly false and misleading statements fails for multiple reasons.

As an initial matter, defendants are not entitled to offer fact-based arguments at the motion to dismiss stage, where the court must "accept all factual allegations in the complaint as true . . . [and] ***draw all reasonable inferences in the plaintiff's favor***." *Lormand*, 565 F.3d at 232; *see also Spitzberg*, 758 F.3d at 690 (reversing district court's dismissal based, in part, on holding that an "inherently fact-bound proposition cannot be verified on the face of the pleadings . . . [and] therefore provides no basis to find [plaintiffs'] complaint deficient); *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 257 (5th Cir. 2005) (reversing district court's dismissal, holding that "defendants' argument is fact-based and is therefore insufficient to support a motion to dismiss"), *opinion modified on denial of reh'g*, 409 F.3d 653 (5th Cir. 2005). Moreover, even if the Court were to entertain defendants' fact-based assertions, they fail to explain or refute the plain contradictions between defendants' public representations and their internal actions, for at least two reasons.

First, defendants' explanation that plaintiff's allegations "conflate two distinct metrics" – namely, "proxy costs of carbon (for analyzing global energy demand)" and "GHG costs (for analyzing expenses incurred by ExxonMobil on particular projects)" – is contradicted by Exxon's own documents. Motion at 10-11. Contrary to defendants' assertions, the internal communications set forth in such documents provide ***no basis*** from which to infer that the separate sets of costs at issue in the documents concern "two distinct metrics." *Id*. Instead, the communications on their face concern Exxon's use of ***two different sets of the same metric*** – one for the Company's publicly disclosed "Energy Outlook" and one for the Company's undisclosed "Corporate Plan" – just as the Complaint alleges. App. 52, 54, 58.[13]

---

[13]    Contrary to defendants' assertions, plaintiff's allegations are not at all undermined by the GHGM's statement that the separate set of "assumptions" at issue in the documents "serve two different purposes." Motion at 11; App. 54. Indeed, that is precisely what the Complaint alleges: that defendants used one set of proxy costs for the purpose of

Indeed, if defendants' assertions were true, and the separate sets of costs at issue in the documents really did comprise "two distinct metrics" that cannot and should not be compared, then there would be no reason for ***Exxon employees*** to compare the two metrics and describe one set as "conservative (low)," while describing the other set as "***likely more realistic***."  ¶140; App. 52.  Nor would there be any reason for Exxon's GHGM to "propose to ***bring [the two metrics] together***," based on his ***admission*** that "[the Climate Reports] ***have implied that we use the [publicly disclosed proxy cost] when evaluating investments***" – but yet, that is exactly what he did.  ¶141, App. 58.  Simply put, defendants' unfounded argument fails to explain the damning evidence underlying plaintiff's allegations.  At best, defendants' argument raises factual disputes that cannot be resolved at this stage.  *Barrie*, 397 F.3d at 257.

Second, defendants' explanations are also plainly inconsistent with their own Class Period representations, which ***never disclosed or indicated*** that Exxon's efforts to account for the "impact of current and potential climate-related policies" involved the use of "two distinct tools."  Motion at 4-5.  To the contrary, as detailed above, defendants repeatedly and unequivocally represented that Exxon "address[es] the potential for future climate-related controls, ***including the potential for restriction on emissions***, ***through the use of a proxy cost of carbon***."  ¶¶5-6, 248-249, 293, 295, 305.  Defendants further represented that ***this same*** "proxy cost" was "embedded in [Exxon's Outlook]," and that the ***same*** proxy cost used "for [Exxon's] Outlook" was also used in "***evaluating capital expenditures and developing business plans***."  ¶¶5-6, 130, 248-249, 283; App. 50; *see also* ¶305 (quoting defendant Tillerson's statement to investors that "we have for many years included a price of carbon in our outlook[,] [a]nd ***that price of carbon*** gets put into all of our economic models ***when we make investment decisions*** . . . and ***everything gets tested against it***").

---

disclosing to the public in connection with Exxon's Outlook, and another – lower – set of proxy costs for the Company's internal planning and valuation purposes, which is exactly what the documents reveal.

If, as defendants now contend, Exxon's efforts to address the potential impact of climate-related controls and policies upon the Company's business **actually** involved the use of one set of "proxy costs" for the purpose of estimating such policies' "cumulative impact on demand" and another – **lower** – set of costs for the internal purpose of estimating "expense items" used for "planning and budgeting" purposes, defendants should have disclosed as much to investors. They did not, and their representations were materially misleading as a result. *See Lormand*, 565 F.3d at 248-49 ("'a duty to speak the full truth arises when a defendant undertakes a duty to say anything'").[14]

## 2.  Defendants' Material Misstatements and Actionable Omissions Concerning Exxon's Rocky Mountain Dry Gas Operations

As noted *supra*, the Complaint sets forth numerous particularized facts establishing that Exxon's RMDG Assets were impaired by year-end 2015 and throughout 2016. *See* ¶¶185-194. Among other things, such facts include:

- A comparison of key impairment-related factors – such as the natural gas spot price and Exxon's production costs – at year-end 2015 to the **same factors** at year-end 2016, **all of which** indicate that the conditions impacting the outlook for Exxon's RMDG Assets were actually **much worse** at year-end 2015 than they were at year-end 2016 (when Exxon **admitted** a $3.3 billion pre-tax impairment charge was required for its RMDG Assets) (¶¶189-190);

- Massive impairment charges and/or divestitures by nearly all of Exxon's competitors in the Rocky Mountain dry gas region, as a result of the prolonged natural gas price slump during 2014 and 2015 (¶¶163-164);[15] and

---

[14]   The Complaint also alleges that defendants' failure to incorporate Exxon's publicly stated carbon proxy costs into the Company's investment, valuation, and impairment processes materially violated multiple provisions of GAAP and SEC accounting and disclosure rules. *See* ¶¶354-365. Although these allegations are plainly sufficient to allege a material misstatement, defendants' Motion does not directly address them. *In re Triton Energy Ltd. Sec. Litig.*, No. 5:98-CV-256, 2001 U.S. Dist. LEXIS 5920, at *23 (E.D. Tex. Mar. 30, 2001) ("to withstand a motion to dismiss for failure to allege a misstatement, it is enough that plaintiffs alleged a violation of accounting standards and stated that such violation resulted in a material misstatement") (*see* Motion at 10-12). As such, defendants have waived their right to contest the sufficiency of such allegations in connection with the Motion. *See Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010) ("Arguments raised for the first time in a reply brief are generally waived."); *Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*, 66 F. Supp. 3d 795, 811 (E.D. Tex. 2014) ("Failure to raise an argument in a motion waives the argument; raising it for the first time in a reply memorandum is too late.").

[15]   *See also* Wright Declaration, ¶¶99-100.

- Exxon's improper failure to incorporate a proxy cost of carbon into the economic models of cash flows used in connection with its impairment calculations at year-end 2015, despite defendants' representations that (i) Exxon incorporated such proxy costs into all of its investment and planning decisions (¶¶130, 136, 293) and (ii) the "[c]ash flows used in impairment evaluations . . . *are consistent with the criteria management uses to evaluate investment opportunities*" (¶¶146, 192, 364).

Defendants' failure to disclose that Exxon's RMDG Assets were impaired by year-end 2015 and throughout 2016 violated GAAP (specifically, ASC 360-10-35) and rendered several of defendants' statements during the Class Period materially false and misleading. As detailed in the Complaint, these material misrepresentations include:

- Several specific line items in Exxon's 2015 Form 10-K and all of the Company's 2016 Forms 10-Q (¶376);

- Numerous statements in Exxon's 2015 Form 10-K and 2016 Forms 10-Q including, *inter alia*, the Company's touting of its ability to avoid "writ[ing] down the carrying value of assets, even during periods of low commodity prices" (¶¶279, 281, 316);

- "Estimated Key Financial and Operating Data" in press releases distributed by defendants throughout 2016 (¶¶270, 298, 307, 311); and

- Numerous statements by defendants Tillerson and Woodbury in press releases, conference calls and analysts meeting concerning, *inter alia*, the "quality of [Exxon's] portfolio . . . relative to significant recent asset impairments by [Exxon's] competitor group," defendants' purported adherence to "the rules and standards of SEC and the [FASB] . . . [and] GAAP successful efforts," and defendants' determination that "the future undiscounted cash flows associated with [Exxon's reserve] assets exceeded their carrying value" (¶¶272-275, 290, 300, 313).

The Complaint further details precisely how defendants' failure to disclose that Exxon's RMDG Assets were impaired by year-end 2015 and throughout 2016 rendered each of the above statements materially false or misleading. *See* ¶¶271, 276, 280, 282, 292, 299, 301, 308, 312, 314, 317, 376.[16] As a result, the Complaint sufficiently alleges material misrepresentations. *See*

---

[16]  As detailed in the Complaint, some of defendants' statements – such as specific figures in Exxon's SEC filings and press releases, and assertions that defendants complied with GAAP (*see* ¶¶313, 376) – were false due to the RMDG Assets' undisclosed impairment at year-end 2015, while other statements – such as those touting the "quality of [Exxon's] portfolio . . . *relative to significant recent asset impairments by [Exxon's] competitor group*" and Exxon's *ability to avoid "writ[ing] down the carrying value of assets*, even during periods of low commodity prices" (¶¶279,

*Lormand*, 565 F.3d at 239 ("the PSLRA requires a plaintiff to identify each allegedly misleading statement with particularity and explain why it is misleading"). Defendants' arguments to the contrary are each unavailing. *See* Motion at 12-15.

As an initial matter, defendants' assertion that their statements concerning Exxon's RMDG Assets constitute "classic examples of opinion" subject to the analysis detailed in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, _U.S._, 135 S. Ct. 1318, 1327 (2015), is unfounded, as defendants fail to cite a single Fifth Circuit authority holding as much. Motion at 12-15.[17] To the contrary, the Fifth Circuit and numerous other courts have held that well-pled allegations of accounting improprieties ***are sufficient to allege material misstatements***. *See, e.g.*, *Barrie*, 397 F.3d at 257-58 (upholding allegations of material misstatements where "plaintiffs alleged with particularity that [defendants'] accounting practices violated [GAAP]"); *Triton Energy*, 2001 U.S. Dist. LEXIS 5920, at *23 ("to withstand a motion to dismiss for failure to allege a misstatement, ***it is enough*** that plaintiffs alleged a violation of accounting standards and stated that such violation resulted in a material misstatement").[18]

Moreover, even applying *Omnicare*, plaintiff's allegations allege material misrepresentations under all three prongs of the Supreme Court's analysis. First, the Complaint alleges defendants did ***not*** honestly believe that the RMDG Assets were not impaired at year-end 2015. *See Omnicare*, 135

---

290) – were materially misleading because disclosure of the RMDG Assets' impairment was "'necessary in order to make the statements . . . not misleading.'" *Lormand*, 565 F.3d at 238.

[17]   The only opinion defendants cite from within the Fifth Circuit is a non-binding district court opinion in a motion for summary judgment in a case that ***did not involve*** any allegations concerning asset impairment charges, but rather, an expert's opinion concerning the flow rate for an oil spill. *In re BP P.L.C. Sec. Litig.*, No. 4:10-MD-2185, 2016 WL 3090779 (S.D. Tex. May 31, 2016).

[18]   *See also SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765 (5th Cir. 2017) ("GAAP noncompliant financial statements filed with the SEC are presumptively misleading unless the SEC provides otherwise") (citing 17 C.F.R. §210.4-01(a)(1)); *In re Landry's Seafood Rests., Inc.*, No. Civ.A. H-99-1948, 2001 WL 34115784, at *22 n.28 (S.D. Tex. Feb. 19, 2001) ("financial statements filed with the SEC that are not prepared in accordance with GAAP are presumed to be misleading"); *Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*, No. 16-CV-01820 (JGK), 2017 WL 3261609, at *11 (S.D.N.Y. July 28, 2017) ("misstated asset valuations attributable to 'improper accounting practices' raise issues of objective fact that are not protected as opinion statements").

S. Ct. at 1326.   Specifically, as detailed above, the Complaint alleges particularized facts demonstrating that: (1) defendants represented that asset impairment tests ***were performed at year-end 2015***; and (2) the key impairment-related indicators for the RMDG Assets were ***much worse*** at year-end 2015 (when defendants refused to recognize an impairment charge for the RMDG Assets) than those ***same factors*** were at year-end 2016 (when defendants belatedly recognized the $3.3 billion pre-tax impairment charge for the RMDG Assets).  ¶¶189-190.[19]  Accepting these allegations as true, it is ***not possible*** that defendants could have honestly believed their purported opinions that the RMDG Assets were not impaired at year-end 2015.[20]

Second, the Complaint alleges several actionable misstatements concerning the RMDG Assets that "contain embedded statements of fact" alleged to have been objectively false.  *Omnicare*, 135 S. Ct. at 1327.  For example, defendants stated on multiple occasions that their impairment determinations were conducted in accordance with applicable GAAP provisions, which required Exxon to test its assets for impairment using the same cash flow models that the Company used to evaluate its investment opportunities.  *See* ¶¶279, 313, 364.  The Complaint, however, alleges that these ***factual statements were false*** as a result of Exxon's failure to incorporate ***any*** GHG proxy costs into the cash flows used in the Company's impairment analyses prior to 2016.  ¶¶280, 314.  *See comScore*, 2017 WL 3261609, at *11-*12 (upholding claim of "misstated asset valuations

---

[19]   Specifically, the Complaint alleges that the single largest determinative factor in any impairment analysis for the RMDG Assets – the natural gas spot price – ***increased by 62%*** from year-end 2015 to year-end 2016, while Exxon's average gas production costs ***decreased*** by nearly $2/barrel of oil equivalent during this same period.  ¶189.  Based on these ***objective facts***, the Complaint alleges it was ***impossible*** for defendants to conclude that the RMDG Assets were not impaired at year-end 2015 and then conclude that the same assets were subject to a ***$3.3 billion pre-tax*** impairment charge after the price significantly rebounded the following year.  ¶¶189-190.  Defendants fail to identify any other factors that would have caused the RMDG Assets to be impaired at year-end 2016, but not year-end 2015.

[20]   Other courts have recognized that such allegations are sufficient to allege a material misstatement.  *See Triton Energy*, 2001 U.S. Dist. LEXIS 5920, at *14, *26-*29 (finding material misstatement based on defendant's "failure to make a timely write-down materially overstated the value of the company's assets"); *In re Leapfrog Enter. Sec. Litig.*, 237 F. Supp. 3d 943, 953-55 (N.D. Cal. 2017) (upholding allegations that defendants took an untimely asset impairment "based on an obvious stock decline, but that stock decline was obvious [one quarter earlier]").

attributable to 'improper accounting practices'" because "any opinions were predicated on untrue statements of fact").

Third, the Complaint alleges that all of defendants' purported opinions that the RMDG Assets were not impaired at year-end 2015 omitted "particular (and material) facts going to the basis for the [defendants'] opinion . . . whose omission ma[de] the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 135 S. Ct. at 1332. As detailed above, defendants omitted the fact that Exxon did *not* incorporate proxy costs into its impairment analyses.  ¶¶147, 191.  This omitted fact clearly went "*to the basis for*" defendants' impairment determinations and rendered their purported opinions materially misleading, given defendants' express representations that: (1) Exxon was *required* to use the same cash flows for its impairment analyses that it used for evaluating investment opportunities; and (2) proxy costs were incorporated into *all* of the Company's investment decisions.  ¶¶130, 146. *See Underland v. Alter*, No. 10-3621, 2011 U.S. Dist. LEXIS 102896, at *40-*41 (E.D. Pa. Sept. 9, 2011) ("Because Plaintiffs have sufficiently alleged that Defendants departed from their claimed methodology to calculate the loan loss reserve, they have sufficiently alleged [material misstatements] . . . .").

### 3. Defendants' Material Misstatements and Actionable Omissions Concerning Exxon's Canadian Bitumen Operations

#### a. Defendants' Failure to Disclose that the Canadian Bitumen Operations Were Operating at a Loss

The Complaint sets forth numerous particularized facts – based on a detailed analysis comparing financial information contained in public filings by Exxon's subsidiary, Imperial, to publicly available market price data – establishing that Exxon's Canadian Bitumen Operations were operating at a significant loss for *at least* three months prior to the filing of Exxon's' 2015 Form 10-

K.  *See* ¶¶170-174.[21]  Plaintiff further alleges that defendants' failure to disclose this fact violated

GAAP (specifically, ASC 275) and SEC Regulation S-K Item 303 ("Item 303"), while also

rendering materially misleading certain statements by defendants, including defendants' statement in

Exxon's 2015 Form 10-K implying that the Canadian Bitumen Operations were operating at a profit

of $5.87 per barrel.  ¶¶16, 174, 276-277, 280, 286, 292, 301, 343.  As such, the Complaint

sufficiently "identif[ies] each allegedly misleading statement with particularity and explain[s] why it is

misleading."  *Lormand*, 565 F.3d at 239.  Defendants' arguments otherwise are unavailing.[22]

First, defendants' blanket assertion – based on two out-of-circuit authorities – that "Item 303

does not create a duty to disclose anything for purposes of Section 10(b) and Rule 10b-5" is

incorrect.  Motion at 16.  There is no rule of law holding that violations of Item 303 are *per se* not

actionable under §10(b) in the Fifth Circuit, where the issue does not appear to ever have been

addressed, and numerous other courts, including the Second Circuit, have recognized that "Item 303

imposes an 'affirmative duty to disclose . . . [that] can serve as the basis for a securities fraud claim

under Section 10(b).'"  *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 94 n.7 (2d Cir. 2016).

Specifically, a "'failure to comply with Item 303 . . . ***can*** give rise to liability under Rule 10b-5 so

long as the omission is ***material*** under *Basic* . . . and the other elements of Rule 10b-5 have been

---

[21]     Defendants' assertion that these indisputable ***facts*** "rest[] entirely on [plaintiff's] expert's inadmissible opinions" is
plainly incorrect. Motion at 17. Although plaintiff's allegations detailing the comparison of ***facts*** disclosed in Imperial's
public filings to ***facts*** regarding publicly available market price data do cite to the Wright Declaration for additional
support and explanation of the underlying ***factual analysis***, such allegations are ***not*** dependent on Dr. Wright's expertise
or any "inadmissible opinions." *See* ¶¶170-174. Instead, such allegations focus on "nonconclusory, factual" analysis
described in both the Complaint and the Wright Declaration. *Fin. Acquisition Partners, L.P. v. Blackwell*, No. 3:02-CV-
1586-K, 2004 U.S. Dist. LEXIS 20110, at *12 (N.D. Tex. Sep. 29, 2004), *aff'd*, 440 F.3d 278 (5th Cir. 2008). As
detailed in plaintiff's MTS Response, this Court has expressly recognized that such allegations are properly considered at
this stage. *Id.*; *see also* MTS Response at 10-11.

[22]     As above, plaintiff's allegations regarding defendants' violation of GAAP (ASC 275) are sufficient to establish a
material misrepresentation by defendants. *See Barrie*, 397 F.3d at 257-58; *Triton Energy*, 2001 U.S. Dist. LEXIS 5920,
at *23. Defendants' Motion, however, does ***not contest*** the sufficiency of such allegations, thereby waiving defendants'
right to do so in connection with the Motion and establishing another adequately pled material misrepresentation. *See
Jones*, 600 F.3d at 541; *Loyalty Conversion*, 66 F. Supp. 3d at 811.

established.'" *Id*. (emphasis in original).[23]  Here, the Complaint alleges that defendants' failure to disclose the ongoing trend of the Canadian Bitumen Operations' operating losses was indisputably material given the significance of such reserves to Exxon's operations.  *See* ¶¶97-99, 101 (Canadian Bitumen Operations accounted for 31% of Exxon's total liquids proved reserves at year-end 2015); ¶268 (defendant Woodbury describing Canadian Bitumen Operations as "a very strong foundation to our production, but importantly a valuable foundation that contributes significant cash flow").[24]  As such, defendants' violation of Item 303 is sufficient to establish a material misrepresentation.

Second, defendants' reliance on *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207 (5th Cir. 2004), is misplaced.  Motion at 17.  In *Kapps*, the plaintiffs alleged material misrepresentations based on defendants' failure to disclose the fact that natural gas prices had fallen prior to the defendant's IPO. 379 F. 3d at 211.  In dismissing such claims, the court expressly relied on the fact that the allegedly omitted information would have been readily apparent to investors, given that the price of natural gas was widely available in the public domain.  *Id*. at 216.  By contrast, the fact that Exxon's Canadian Bitumen Operations were operating at a significant loss was ***not*** readily apparent to investors, and disclosure of such information "would have significantly altered a reasonable investor's perception of the 'total mix of information available.'"  *Id*.

---

[23]  *See also Silverstrand Invs. v. AMAG Pharm., Inc.*, 707 F.3d 95, 102 (1st Cir. 2013) (finding Item 303 violation actionable under securities laws).

[24]  Defendants' argument that, "as a matter of law, . . . a loss on a single project over a three-month period is not a discloseable 'trend'" (Motion at 17) is incorrect.  *See Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 116-17, 122 (2d Cir. 2012) (finding defendants failed to comply with Item 303 by failing to disclose quality issues discovered three months prior to secondary offering, and noting "Item 303's disclosure obligations, like materiality under the federal securities laws' anti-fraud provisions, do ***not*** turn on restrictive mechanical or quantitative inquiries"); *Schuh v. HCA Holdings, Inc.*, 947 F. Supp. 2d 882, 891-92 (M.D. Tenn. 2013) ("context matters, and what may not constitute a trend in one industry may signal a trend in another"); *In re CPI Card Grp., Inc. Sec. Litig.*, No. 16-cv-4531 (LAK), 2017 U.S. Dist. LEXIS 179521, at *9 (S.D.N.Y. Oct. 27, 2017) ("whether a pattern or occurrence is sufficiently lengthy to constitute a trend is a question that should not be resolved at the motion to dismiss stage").  Moreover, the Complaint also alleges that defendants had a duty to correct their misleading statements that the operations were profitable, when they were not.  ¶¶174-175, 343.

### b. Defendants' Failure to Disclose the True State of the Kearl Operation

The Complaint sets forth numerous particularized facts establishing defendants' awareness throughout 2016 that the Kearl Operation bitumen reserves would no longer satisfy the SEC definition for proved reserves at year-end 2016, absent an extraordinary – and, by Exxon's own estimates, unexpected – rise in the price of oil.[25]  ¶¶177-180.  Plaintiff further alleges that defendants' failure to disclose this awareness violated GAAP (specifically, ASC 275 and ASC 932) and Item 303, while also rendering materially misleading certain statements defendants made during 2016 concerning Exxon's proved reserves generally and the likelihood that the Kearl Operation's proved reserves would need to be de-booked at year-end. *See* ¶¶276, 280, 286, 292, 301, 310, 314. Such allegations sufficiently "identify each allegedly misleading statement with particularity and explain why it is misleading." *Lormand*, 565 F.3d at 239. Defendants' contrary arguments fail.[26]

First, defendants' argument that their materially misleading disclosures are protected as forward-looking statements fails, because the Complaint alleges that defendants concealed their affirmative knowledge of ***then-existing facts*** that made the possibility of the Kearl Operation's debooking ***significantly more likely*** than defendants' purported "warnings" would have led a reasonable investor to believe.  ¶¶175-184.  As such, defendants' purported warnings were materially misleading and inadequate. *See Marcus v. J.C. Penney Co. Inc.*, No. 6:13-cv-736-MHS-KNM, 2015 WL 5766870, at *3 (E.D. Tex. Sept. 29, 2015) ("When cautionary language is 'glossed over as a future risk . . . rather than the certain dangers that had already begun to materialize' then

---

[25]    These facts include: (1) an analysis comparing financial information in public filings by Exxon's subsidiary, Imperial, to publicly available market price data (¶¶176-178); (2) price forecasting data contained in Imperial's public filings (¶179); and (3) defendants' drastic reductions in planned development costs for the Kearl Operation (¶¶181-183).

[26]    As above, plaintiff's allegations regarding defendants' violation of GAAP (ASC 275 and ASC 932) are sufficient to establish a material misrepresentation by defendants. *See Barrie*, 397 F.3d at 257-58; *Triton Energy*, 2001 U.S. Dist. LEXIS 5920, at *23.  Defendants' Motion, however, does ***not contest*** the sufficiency of such allegations, thereby waiving defendants' right to do so in connection with the Motion and establishing another adequately pled material misrepresentation. *See Jones*, 600 F.3d at 541; *Loyalty Conversion*, 66 F. Supp. 3d at 811.

the warnings are no longer meaningful."). Second, defendants cannot avoid liability for their misleading statements by arguing that their reserves calculations technically complied with SEC guidelines. *See In re Michaels Stores, Inc. Sec. Litig.*, No. Civ.A. 3:03-CV-0246, 2004 WL 2851782, at *3-*4 (N.D. Tex. Dec. 10, 2004) ("purported compliance with [accounting provisions] does not insulate Defendants from liability [for material omissions under the securities laws]").

### B.      The Complaint Alleges a Strong Inference of Scienter

In the Fifth Circuit, "'[t]he required state of mind for scienter is an intent to deceive, manipulate, or defraud or severe recklessness.'" *Spitzberg*, 758 F. 3d at 684. When considering scienter allegations, a court must *not* "scrutinize each allegation in isolation" and should instead "assess all the allegations holistically." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007); *Lormand*, 565 F.3d at 251 ("The inquiry is whether all of the facts alleged, *taken collectively*, give rise to a strong plausible inference of scienter, *not* whether any individual allegation, scrutinized in isolation, meets that standard."). When the parties present competing inferences for the court to consider in connection with scienter, "'*a tie favors the plaintiff*' on a motion to dismiss." *Spitzberg*, 758 F.3d at 686.

Here, the Complaint pleads the element of scienter by alleging numerous particularized facts establishing that each of the defendants "knowingly or recklessly made statements to the market while aware of facts that, if not disclosed, would render those statements misleading." *See Bachow*, 2010 U.S. Dist. LEXIS 1504, at *15. Among other things, these facts include:

- Internal communications among two Exxon managers stating that "*[defendant] Rex [Tillerson] has seemed happy with the difference*" between the publicly disclosed – "more realistic" – proxy cost figures Exxon used for its Outlook and the *undisclosed* – lower – proxy cost figures the Company used for internal planning and budgeting purposes (¶140; App. 52-58);

- Defendant Tillerson's statement that "*[w]e don't do write-downs*" (¶¶90, 166, 186);

- Defendants' representations that the members of the Management Committee (including defendants Tillerson and Swiger) have "*responsibility for climate change*

- 21 -

*matters*," that Exxon's full Board of Directors (including defendant Tillerson) "receives *in depth briefings at least annually* that cover . . . *company positions and actions* [on the subject of risks of climate change]," and that the members of the Management Committee (including defendants Tillerson and Swiger) are "*actively engaged* in discussions relating to greenhouse gas emissions and climate change on an ongoing basis" (¶391);

- Defendants' representation in the MTR Report that "[t]he Outlook is *reviewed and discussed extensively* with the company's Management Committee [including defendants Tillerson and Swiger] and Board prior to its release" (¶390);

- Defendant Rosenthal's March 25, 2014 e-mail directing that a "footnote" that addressed the question of "*impairment*" be *deleted* from the MTR Report, based on Rosenthal's statement that the word impairment "*gives folks on the third floor heartburn*" (a reference to the third-floor executive suite at Exxon's headquarters) (¶389; App. 59);

- Defendants' unique motivation to maintain Exxon's AAA credit rating in order to "avoid incurring significant additional borrowing costs" in connection with the *$12 billion* March 2016 Debt Offering, which was critical to Exxon's ability to fund its ongoing operations and shareholder payout commitments (¶¶195-214, 393-397);

- Statements by the Individual Defendants emphasizing the importance of Exxon's shareholder payouts, including defendant Tillerson's statement on the March 2016 Debt Offering's closing date describing Exxon's dividend as the reason "*we are important to people*" (¶¶84-85, 388, 396);

- A sworn affirmation provided by the NYOAG under penalty of perjury, affirming, based on a review of internal Exxon documents, that the inconsistency between Exxon's public and private proxy cost figures "*was known at Exxon's highest levels*" (¶140; Complaint, Ex. A, ¶¶23-24);

- The signing of Exxon's false and misleading SEC filings and certifications by defendants Tillerson, Swiger and Rosenthal (¶392);

- Numerous statements by each of the Individual Defendants during shareholder and analyst conference calls and meetings demonstrating each Individual Defendant's intimate involvement in, and awareness of, the precise matters at the heart of the fraudulent conduct alleged in the Complaint (*e.g.*, ¶¶260, 265-266, 268, 273, 300, 302, 313, 385-389); and

- Sworn testimony provided under penalty of perjury confirming that Exxon *knowingly failed to preserve* – and consequently *destroyed* – "untold numbers of documents from over a dozen key custodians" concerning "Exxon's [asset] investment and valuation processes," including, *inter alia*, communications from defendant Tillerson's *alias e-mail account*, which he used to discuss "risk-management issues related to climate change" (¶¶239-245).

- 22 -

Contrary to defendants' assertions, the Complaint neither alleges that the Individual Defendants "must have known of the alleged fraud because of their senior corporate positions" nor "relies on improper group pleading." Motion at 18. To the contrary, the allegations summarized above specifically plead "the connection between [each] individual defendant and the allegedly fraudulent statement[s]," thereby sufficiently alleging scienter. *Southland Sec. Corp. v. INSpire Ins. Sols. Inc.*, 365 F.3d 353, 365 (5th Cir. 2004) ("specific facts tying a corporate officer to a statement would include a signature on the document or particular factual allegations explaining the individual's involvement in the formulation of . . . the document"); *Plotkin v. IP Axcess Inc.*, 407 F.3d 690, 700 (5th Cir. 2005) (finding it "reasonable to assume, given the importance of [the underlying matters]," that defendant was familiar with and discovered details of fraud when statements were made); *In re BP P.L.C., Sec. Litig.*, 843 F. Supp. 2d 712, 783-84 (S.D. Tex. 2012) (explaining that officer's repeated detailed statements about company's responsibility for oil spill "further support the inference that he was aware of inadequacies").[27] Defendants' efforts to negate the Complaint's strong inference of scienter fail.

First, the Complaint does not merely allege the typical """desire to maintain a high credit rating [that] is universally held among corporations.""" Motion at 19. Instead, the Complaint alleges that defendants were ***uniquely*** motivated to maintain their credit rating in order to "avoid incurring significant additional borrowing costs" in connection with Exxon's March 2016 Debt Offering – the ***single largest debt offering in Exxon's history*** – which was needed to fund the otherwise unsustainable shareholder payouts that defendant Tillerson had described as "a high

---

[27] *See also Brody v. Zix Corp.*, No. 3:04-CV-1931-K, 2006 U.S. Dist. LEXIS 69302, at *19-*20 (N.D. Tex. Sept. 26, 2006) (finding scienter sufficiently pled where defendants allegedly received reports and information that rendered their statements false and misleading); *Bachow*, 2010 U.S. Dist. LEXIS 1504, at *16-*17(finding scienter sufficiently pled where performance of defendants' specifically detailed responsibilities "must have disclosed" information rendering their statements false and misleading).

- 23 -

priority" and "why we are important to people."  ¶¶85, 195-214, 393-397.[28]  Second, contrary to

defendants' arguments, defendant Tillerson's statement that "*[w]e don't do write-downs*" supports a

strong inference of scienter because it demonstrates a corporate mindset, mandated from Exxon's

***highest executive***, that Exxon was not constrained by the same accounting rules and obligations as

the rest of its peers – accounting rules that the Complaint expressly alleges were violated.  Third,

defendants' stock purchase program and lack of insider trading do ***not*** refute the Complaint's strong

inference of scienter.[29]  Finally, defendants' purported "warnings" do not negate scienter because, as

detailed above, such warnings were, themselves, misleading.  *See* §III.A., *supra*.

## C.    The Complaint Alleges Loss Causation

Loss causation, unlike scienter, is measured against Rule 8(a)'s liberal notice pleading

standard.  *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005); *Pub. Emps. Ret. Sys. of

Miss. v. Amedisys, Inc.*, 769 F.3d 313, 320 (5th Cir. 2014).  As the Supreme Court has held, Rule 8(a)

notice pleading ***does "not . . . impose a great burden***," and for loss causation requires ***only*** that

plaintiffs "provide[] the defendants with notice of what the relevant economic loss might be or of what

the causal connection might be."  *Dura*, 544 U.S. at 346-47.  As such, "it is often inappropriate to use

a Rule 12(b)(6) motion as a vehicle to resolve disputes over 'loss causation.'"  *Lormand*, 565 F.3d at

267 n.35.

---

[28]    *See In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 643 (E.D. Va. 2000) ("a more particularized motive to commit fraud, one ***tied to specific circumstances*** . . . and a showing of "'concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged'" may provide the necessary added inferential weight to tilt the balance in favor of scienter").

[29]    *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015) ("allegations of unusual stock sales are ***not required*** to demonstrate a strong inference of scienter in a securities fraud case"); *No. 84 Emp'r-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) ("the lack of stock sales by a defendant is not dispositive as to scienter");  *In re Questcor Sec. Litig.*, No. SA CV 12-01623 DMG (FMOx), 2013 WL 5486762, at *18 (C.D. Cal. Oct. 1, 2013) ("the Court is not persuaded that the existence of the stock repurchase plan wholly negates the inference of scienter that is otherwise plausible in light of the other factors").

- 24 -

Here, the Complaint easily satisfies this minimal pleading standard by alleging several partial disclosures revealing the truth regarding defendants' fraudulent conduct and the value of Exxon's reserves.  ¶¶421-451.  As alleged in the Complaint, these disclosures caused significant declines in Exxon's stock price on the dates in question.  *Id*.  "No more [than this] is required at the pleading stage."  *In re BP P.L.C. Sec. Litig.*, 922 F. Supp. 2d 600, 638 (S.D. Tex. 2013).[30]

## IV.   CONCLUSION

For the foregoing reasons, plaintiff respectfully submits that the Motion should be denied in its entirety.  In the event the Court grants any portion of the Motion, plaintiff respectfully requests leave to amend the Complaint to cure any deficiencies identified by the Court.[31]

DATED:  November 21, 2017                    Respectfully submitted,

                                              KENDALL LAW GROUP, PLLC
                                              JOE KENDALL (Texas Bar No. 11260700)
                                              JAMIE J. McKEY (Texas Bar No. 24045262)


                                              _____
                                                        s/ JOE KENDALL
                                                        JOE KENDALL

---

[30]   Defendants' contrary arguments fail.  First, defendants ignore that disclosures are **not** required to "**squarely and directly contradict the earlier misrepresentations**." *Spitzberg*, 758 F.3d at 688; *see also Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) (recognizing that loss causation may lie even where a disclosure does not "specifically reveal[] the fraud," because requiring a "fact-for-fact disclosure" would "effectively do[] away with the fraud-on-the-market theory of reliance").  Likewise, defendants' attempt to characterize the earnings releases and analyst's report as mere "disappointing financial results" (Motion at 24), glosses over the fact that these disclosures revealed Exxon's need to de-book nearly 20% of its reserves and take a massive asset impairment charge, directly contradicting defendants' misleading statements.  *See Amedisys*, 769 F.3d at 321-25 (requiring only "facts that support an inference that the Defendants' misstatements and omissions concealed the circumstances that bear upon the loss suffered such that Plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud" and finding loss causation adequately pled based in part on allegations of "governmental investigations" and "disappointing" financial results).

[31]   Defendants' conclusory assertion that "granting plaintiff yet another opportunity to amend would be futile" is unfounded and does not support denial of leave to amend – a relief that the Fifth Circuit has mandated "**shall be freely given**." *See United States ex rel. Grubbs v. Ravikumar Kanneganti*, 565 F.3d 180, 192 n.36 (5th Cir. 2009) ("'Rule 15(a) declares that leave to amend "shall be freely given when justice so requires"; **this mandate is to be heeded**.'"); *Barrie v. InterVoice-Brite, Inc.*, No. 3:01-CV-1071-D, 2002 WL 1841631, at *14 (N.D. Tex. Aug. 8, 2002) ("This court's approach in cases decided under the PSLRA has been to allow plaintiffs **at least one opportunity to replead** after the court has filed an opinion identifying defects in a complaint.").

1331095_1

3232 McKinney Avenue, Suite 700
Dallas, TX  75204
Telephone:  214/744-3000
214/744-3015 (fax)
jkendall@kendalllawgroup.com
jmckey@kendalllawgroup.com

BALON B. BRADLEY LAW FIRM
BALON B. BRADLEY (Texas Bar No. 02821700)
5473 Blair Road, Suite 100
Dallas, TX  75231
Telephone:  972/991-1582
972/755-0424 (fax)
balon@bbradleylaw.com

Local Counsel

ROBBINS GELLER RUDMAN
    & DOWD LLP
SCOTT H. SAHAM
NATHAN R. LINDELL
SARA B. POLYCHRON
ERIKA OLIVER
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
scotts@rgrdlaw.com
nlindell@rgrdlaw.com
spolychron@rgrdlaw.com
eoliver@rgrdlaw.com

ROBBINS GELLER RUDMAN
    & DOWD LLP
JOHN C. HERMAN
PETER M. JONES
Monarch Tower, Suite 1650
3424 Peachtree Road, N.E.
Atlanta, GA  30326
Telephone:  404/504-6500
404/504-6501 (fax)
jherman@rgrdlaw.com
pjones@rgrdlaw.com

Lead Counsel for Plaintiff

- 26 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 21, 2017, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on November 21, 2017.

　s/ JOE KENDALL　　　　　　　　　　　
JOE KENDALL

KENDALL LAW GROUP, PLLC
3232 McKinney Avenue, Suite 700
Dallas, TX  75204
Telephone:  214/744-3000
214/744-3015 (fax)

jkendall@kendalllawgroup.com

## Mailing Information for a Case 3:16-cv-03111-K Ramirez v. Exxon Mobil Corporation et al

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Mary K Blasy**
  mblasy@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Balon B Bradley**
  balon@bbradleylaw.com,balonbb@aol.com,iasanchez@bbradleylaw.com,anneh@bbradleylaw.com

- **Nina Cortell**
  nina.cortell@haynesboone.com,denise.stilz@haynesboone.com,robin.hart@haynesboone.com,kelly.hess@haynesboone.com

- **Patrick Coughlin**
  patc@rgrdlaw.com

- **Ralph H Duggins**
  rduggins@canteyhanger.com,adrake@canteyhanger.com

- **Brian Matthew Gillett**
  brian.gillett@squirepb.com,ecf-b3db5569898c@ecf.pacerpro.com,ecf-63532ccae4d9@ecf.pacerpro.com

- **Daniel H Gold**
  daniel.gold@haynesboone.com,elaine.hadaway@haynesboone.com

- **John C Herman**
  jherman@rgrdlaw.com,smeister@rgrdlaw.com

- **Jonathan Hurwitz**
  jhurwitz@paulweiss.com,mao_fednational@paulweiss.com

- **Joe Kendall**
  jkendall@kendalllawgroup.com,administrator@kendalllawgroup.com

- **Daniel Kramer**
  DKramer@paulweiss.com,mao_fednational@paulweiss.com

- **Gregory F Laufer**
  GLaufer@paulweiss.com,jgoldstein@paulweiss.com,BTannenbaum@paulweiss.com,mao_fednational@paulweiss.com,MStachel@paulweiss.com

- **Nathan R. Lindell**
  nlindell@rgrdlaw.com,jillk@rgrdlaw.com,karenc@rgrdlaw.com,e_file_sd@rgrdlaw.com,susanw@rgrdlaw.com

- **D Patrick Long**
  patrick.long@squirepb.com,dawn.furcht@squirepb.com,annie.purcell@squirepb.com,docketingrequest@squirepb.com

- **Jamie Jean McKey**
  jmckey@kendalllawgroup.com,administrator@kendalllawgroup.com

- **Erika Oliver**
  eoliver@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Sara Bierl Polychron**
  spolychron@rgrdlaw.com

- **Samuel H Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Daniel Toal**
  DToal@paulweiss.com,dangelatos@paulweiss.com,mao_fednational@paulweiss.com

- **Theodore V. Wells**
  twells@paulweiss.com,mao_fednational@paulweiss.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`