# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| PEDRO RAMIREZ, JR., Individually and on Behalf of All Others Similarly Situated, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 3:16-CV-3111-K |
| EXXON MOBIL CORPORATION, REX W. TILLERSON, ANDREW P. SWIGER, JEFFREY J. WOODBURY, and DAVID S. ROSENTHAL, | § § § § § | |
| Defendants. | § § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are: (1) Defendants ExxonMobil Corporation, Rex W. Tillerson, Andrew P. Swiger, Jeffrey J. Woodbury, and David S. Rosenthal's Motion to Dismiss the Consolidated Complaint (Doc. No. 46) and (2) Defendants ExxonMobil Corporation, Rex W. Tillerson, Andrew P. Swiger, Jeffrey J. Woodbury, and David S. Rosenthal's Motion to Strike the Declaration of Charlotte J. Wright, Ph.D., the Affirmation of John Oleske, and the Allegations of the Consolidated Complaint that Rely on Them (Doc. No. 48). The Court carefully considered the motions, the responses, the replies, the appendices, the relevant record, and the applicable law. Because it is inappropriate to consider expert opinions at the pleading stage of a case and the Court cannot consider conclusory allegations and unwarranted deductions, the Court **GRANTS in part and DENIES in part** Defendants' motion to strike. Lead

Plaintiff sufficiently pleaded the alleged material misstatements and loss causation and met the heightened scienter standard, and therefore the Court **DENIES in part** the motion to dismiss as to Defendants ExxonMobil Corporation, Rex W. Tillerson, Andrew P. Swiger, and David S. Rosenthal. The Court **GRANTS** the motion to dismiss as to the securities fraud Section 10(b) and Rule 10b-5 claim for Defendant Jeffrey J. Woodbury but **DENIES** the motion to dismiss as to the Section 20(a) claim for Defendant Jeffrey J. Woodbury.

## I. Factual and Procedural Background

Lead Plaintiff Greater Pennsylvania Carpenters Pension Fund ("Pension Fund") filed this securities fraud case on behalf of all persons who purchased or otherwise acquired Defendant ExxonMobil Corporation's ("ExxonMobil") publicly traded common stock between March 31, 2014 and January 30, 2017, inclusive (the "Class Period"). Pension Fund bases their securities fraud claims on alleged material misrepresentations or omissions made during the Class Period by Defendants ExxonMobil, Chairman of the Board and Chief Executive Officer Rex W. Tillerson ("Tillerson"), Senior Vice President and Principal Financial Officer Andrew P. Swiger ("Swiger"), Vice President of Investor Relations and Secretary Jeffrey J. Woodbury ("Woodbury"), and Vice President, Controller and Principal Accounting Officer David S. Rosenthal ("Rosenthal") (collectively "ExxonMobil").

On March 31, 2014, the first day of the Class Period, ExxonMobil released its report "Energy and Carbon—Managing the Risks" ("MTR Report"), which addressed

shareholder concerns regarding global energy demand and supply, climate change policy, and carbon asset risk. The MTR Report explained that ExxonMobil considers possible government policy changes on climate-related controls, such as restricting emissions, and the effect of these policy changes on oil and gas exploration, development, production, transportation, and use of carbon-based fuels. The MTR Report stated that ExxonMobil takes these policies into consideration by factoring in a proxy cost of carbon when calculating any investment's or project's projected financial outlook. On March 31, 2014, ExxonMobil also released a report entitled "Energy and Climate," which stated ExxonMobil applied a proxy cost of approximately $60 per ton in 2030 and $80 per ton in 2040.

In mid-2014 oil and gas prices began to fall worldwide. Other oil and gas companies were forced to write off or abandon more than $200 billion worth of oil and gas reserves because the cost of production was higher than the profits. ExxonMobil did not write off or abandon assets but instead repeatedly reassured investors that ExxonMobil had superior investment processes and project management that allowed it to continue operating without writing down any assets. Pension Fund alleges these representations were materially misleading because ExxonMobil knew it could not survive the historic drop in oil and gas prices without writing down assets. Pension Fund alleges ExxonMobil made these misrepresentations so as to maintain its AAA credit rating and allow it to move forward without negative implications on its $12 billion public debt offering scheduled for March 2016.

In November 2015, *The Guardian*, a British newspaper, reported that the NYAG's Office was investigating whether ExxonMobil misled the public about the dangers and business risks associated with climate change. Pension Fund alleges that by year-end 2015, ExxonMobil's Rocky Mountain Dry Gas Operations were impaired, its Canadian Bitumen Operations no longer qualified as proved reserves, and its Kearl Operation operated at a loss for three months. ExxonMobil did not recognize any of these impairments or losses in its 2015 Form 10-K filed with the Securities and Exchange Commission ("SEC"), which Pension Fund alleges makes the 2015 Form 10-K materially misleading to investors. ExxonMobil's 2015 Form 10-K was issued on February 22, 2016, a month before ExxonMobil successfully completed the $12 billion debt offering. On April 26, 2016, just over one month after the debt offering, ExxonMobil's credit rating was downgraded from AAA to AA+ credit rating.

On October 28, 2016, ExxonMobil announced its financial results for the third quarter of 2016. ExxonMobil disclosed that nearly 20% of its proved oil and gas reserves might no longer satisfy the SEC's "proved reserves" definition. Proved reserves represent the amount of hydrocarbons in a particular reservoir that, with reasonable certainty, are economically feasible to recover at the current price. When an updated calculation demonstrates a reservoir no longer qualifies as proved reserves under the SEC's definition, the company must disclose this revision of the previously estimated proved reserves, a process often referred to as de-booking proved reserves. ExxonMobil stated that if the prices persisted as they had in 2016 for the remainder of the year,

certain quantities of oil, such as the Kearl Operations, would not qualify as proved reserves at year-end 2016. Pension Fund alleges ExxonMobil's October 2016 disclosure was materially misleading because the de-booking of certain proved reserves was allegedly all but certain at the time of ExxonMobil's news release.

On January 31, 2017, ExxonMobil announced its fourth quarter and full-year financial results for 2016. In the announcement, ExxonMobil stated it would be recording "an impairment charge of $2 billion largely related to dry gas operations in the Rocky Mountain region." (Doc. No. 36. at 9.) On February 22, 2017, ExxonMobil announced it de-booked the entire proved reserve base from the Kearl Operations.

On November 11, 2016, Plaintiff Pedro Ramirez Jr. initially filed this class action against ExxonMobil, alleging securities fraud claims under the Private Securities Litigation Reform Act ("PSLRA"), Section 10(b) of the Exchange Act, Rule 10b-5, and Section 20(a). *See* 15 U.S.C. § 78j(b); s*ee also* 17 C.F.R. § 240.10b-5; 15 U.S.C. § 78t(a). On May 3, 2017, the Court granted Pension Fund's motion for appointment as lead plaintiff. On July 26, 2017, Lead Plaintiff Pension Fund filed its Consolidated Complaint for Violations of the Federal Securities Laws ("Amended Complaint"). The voluminous Amended Complaint details the alleged material misstatements and alleged fraudulent actions.

## II. Motion to Strike

In support of its allegations, Pension Fund attached the Declaration of Charlotte J. Wright, Ph.D., ("Wright Declaration") and the Affirmation of John Oleske ("Oleske

Affirmation") as exhibits to its Amended Complaint. ExxonMobil moves the Court to strike the Wright Declaration and the Oleske Affirmation.

Because a number of Pension Fund's material misstatement and scienter allegations rely on information in the Wright Declaration and Oleske Affirmation, the Court will address ExxonMobil's motion to strike before considering its motion to dismiss.

### A. The Wright Declaration

ExxonMobil argues that it is inappropriate to consider the Wright Declaration, which contains the opinions and conclusions of a purported expert, at the motion to dismiss stage because it would overly complicate this early stage with evidentiary issues. Pension Fund responds that the Wright Declaration is attached to the Amended Complaint simply to provide additional support and that the Fifth Circuit does not preclude a plaintiff from attaching expert declarations to its complaint. Alternatively, Pension Fund argues the Wright Declaration should not be struck in its entirety because the declaration includes nonconclusory, factual portions.

Dr. Charlotte J. Wright ("Dr. Wright") is a purported expert in oil and gas accounting with numerous publications on oil and gas industry-related topics. In the Wright Declaration, Dr. Wright sets out her opinion on matters relating to ExxonMobil's operations. Dr. Wright concluded (1) ExxonMobil's Canadian Bitumen Operations operated at a loss for three months; (2) ExxonMobil should have disclosed sooner than it did that the Kearl Operation no longer qualified as proved reserves; (3)

ExxonMobil failed to recognize the impairment of Rocky Mountain dry gas operations in 2015; and (4) ExxonMobil failed to incorporate the publicly disclosed proxy cost of carbon used in evaluating investment and business decisions. To reach some of her opinions, Dr. Wright relied on financial information available to the public about ExxonMobil's Canadian Bitumen Operations to extrapolate and calculate the "break-even" price of products and then determine that ExxonMobil allegedly violated Generally Accepted Accounting Principles ("GAAP"). Dr. Wright opined on what ExxonMobil should have considered a trigger event for conducting impairment tests.

The Fifth Circuit has held that district courts have the discretion to refuse to consider expert opinions and conclusions reached in affidavits attached to complaints alleging securities fraud. *See Financial Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 285–86 (5th Cir. 2006). Pension Fund argues *Barrie v. Intervoice–Brite, Inc*. indicates district courts can properly consider expert opinions at the motion to dismiss stage of a securities fraud case. 397 F.3d 249, 258 (5th Cir. 2005) ("…this allegation was adequately supported by expert opinion."). The Fifth Circuit has stated that "*Barrie* does *not* hold, however, that, in securities-fraud actions, district courts must consider experts' affidavits attached to complaints." *Blackwell II*, 440 F.3d at 285 (emphasis in original).

This Court previously struck portions of an expert's affidavit that posited opinions but considered factual allegations included in the expert's affidavit, which the Fifth Circuit affirmed. *See Fin. Acquisition Partners, LP v. Blackwell*, Civ. Action No. 3:02-

cv-1586-K, 2004 WL 2203253, at *4–5 (N.D. Tex. Sept. 29, 2004) (Kinkeade, J.); *see also Blackwell II*, 440 F.3d at 285–86. In its opinion affirming, the Fifth Circuit held that "allowing plaintiffs to rely on an expert's opinion in order to state securities claims requires a court to 'confront a myriad of complex evidentiary issues not generally capable of resolution at the pleading stage.'" *Blackwell II*, 440 F.3d at 285–86 (quoting *DeMarco v. DepoTech Corp.*, 149 F. Supp. 2d 1212, 1221 (S.D. Cal. 2001)). If a court considered expert opinions at the motion to dismiss stage of a securities claim, it would necessarily have to rule on the expert's qualifications, which would be inappropriate at this stage. *Id*. at 286; *see also DeMarco*, 149 F. Supp. 2d at 1221 (to consider the expert opinion, the court would likely have to hold a "*Daubert* hearing to determine the admissibility of [the] affidavit.").

The Fifth Circuit also held that because the PLSRA requires a complaint to set out specific facts demonstrating material misstatements and omissions to meet the heightened pleading standard for scienter, "opinions cannot substitute for facts under the PSLRA." *Blackwell II*, 440 F.3d at 286. Thus, the Fifth Circuit affirmed this Court's decision in *Blackwell I* to strike portions of the expert's affidavit stating the expert's opinions but also to consider facts included in the expert's affidavit. *Id*. at 285–86; *see Blackwell I*, 2004 WL 2203253, at *4–5.

Pension Fund incorporated the Wright Declaration in the Amended Complaint, and Dr. Wright, as a purported expert, asserts multiple opinions on ExxonMobil's operations and finances. The Wright Declaration includes non-opinion facts as well as

calculations and opinions on ExxonMobil's operations' profitability, financial outlook, and impairment of assets. To consider the purported expert opinions set out in the Wright Declaration, the Court would have to consider complex evidentiary issues that are inappropriate at the motion to dismiss stage. *See Blackwell II*, 440 F.3d at 286; *see also DeMarco*, 149 F. Supp. 2d at 1221. Thus, the Court, in its discretion, will not consider any opinions or conclusions but will consider any facts included in the Wright Declaration. *See Blackwell II*, 440 F.3d at 286.

### B. The Oleske Affirmation

The Oleske Affirmation was written by John Oleske ("Mr. Oleske"), a Senior Enforcement Counsel to the Office of the Attorney General of the State of New York, for a case in which the New York Attorney General ("NYAG") was investigating ExxonMobil for alleged misrepresentations ExxonMobil made to investors and the public about the impact of climate change on ExxonMobil's business. The Oleske Affirmation states it was written "in opposition to Exxon Mobil Corporation's ("Exxon") motion to quash OAG's investigative subpoenas, and in support of OAG's cross-motion to compel Exxon's compliance with those subpoenas." (Doc. No. 36-1, at 2).

Both ExxonMobil and Pension Fund acknowledge in their briefs that there is no case law directly on point addressing whether at the motion to dismiss stage a court can properly consider an affirmation written by an attorney involved in a separate case. ExxonMobil moves to strike the Oleske Affirmation because it lacks relevant personal

knowledge, which the Fifth Circuit requires in PSLRA cases in which a confidential witness's affidavit supports the complaint. Pension Fund responds the Court can properly consider the affirmation because at the motion to dismiss stage the court should consider any documents attached to the complaint and ExxonMobil has not established that the Oleske Affirmation is "redundant, immaterial, impertinent, or scandalous matter" under Federal Rule of Civil Procedure 12(f).

While courts generally consider "the contents of the pleadings, including attachments thereto," there are some considerations courts must take into account. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). "[A] plaintiff must plead specific facts, not mere conclusory allegations." *Tuchman v. DSC Comms. Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994). Thus, courts do not accept "conclusory allegations, unwarranted deductions, or legal conclusions" at the motion to dismiss stage. *Southland Secs. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 361 (5th Cir. 2004). Similarly, a court cannot rely on such conclusory allegations, unwarranted deductions, or legal conclusions in an affirmation attached to and in support of a complaint. *See id.*

Although there is no case law directly on point, case law addressing confidential witnesses' affidavits attached to complaints is instructive here. In considering a confidential witness's affidavit at the motion to dismiss stage of a securities fraud case, courts are concerned with the reliability of the confidential witness's statements that allege defendants knowingly provided material misrepresentations. *See ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 358 (5th Cir. 2002) ("[T]hese personal sources

are not identified with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements made on information and belief."). In *ABC Arbitrage*, the Fifth Circuit adopted a multi-step analysis to determine whether the statements in the confidential witness's affidavit met the pleading standard of stating with particularity the circumstances constituting the fraud or mistake. *Id*. at 353; *see also* FED. R. CIV. P. 9(b). The Fifth Circuit has clearly indicated it requires sufficient facts and support in an individual's affirmation or affidavit establishing the individual has personal knowledge of the alleged misrepresentations such that the affidavit is not simply based on conclusory allegations, unwarranted deductions, or legal conclusions drawn from unknown sources. *See ABC Arbitrage*, 291 F.3d at 358; *see also Southland*, 365 F.3d at 361. Mr. Oleske did not work for ExxonMobil, so any personal knowledge he has is knowledge of the investigation into ExxonMobil.

The Oleske Affirmation draws a number of conclusions based the NYAG's investigation and ExxonMobil documents attached as exhibits. One of the alleged material misrepresentations in this case is that ExxonMobil told the public it applied a proxy cost of carbon of $60 per ton of carbon dioxide to business investments but actually applied a proxy cost of $40 per ton of carbon. Mr. Oleske's conclusion that "[i]t appears that this discrepancy [in proxy costs] was known at Exxon's highest level" is not based on personal knowledge but is instead based on an investigation in which

11

Mr. Olekse was trying to prove ExxonMobil made this misrepresentation. (*Id*. at 9). Mr. Oleske also drew the legal conclusion that "it seems clear that the company misled investors about the value of the company's assets and its risk management process." (*Id*. at 17–19).

To the extant the Oleske Affirmation includes these specific and conclusions and inferences, as well as others, the Court cannot properly consider the "conclusory allegations, unwarranted deductions, or legal conclusions" in the Oleske Affirmation and any statements in the Complaint based solely on the inferences and conclusions made in the Oleske Affirmation. *See Southland*, 365 F.3d at 361.

The Oleske Affirmation does, however, include exhibits of internal ExxonMobil documents and documents ExxonMobil prepared for shareholders. ExxonMobil does not contest the authenticity of the attached exhibits. Thus, the Court will consider the attached exhibits and any portion of the Complaint that references these documents in deciding the motion to dismiss.

### C. Conclusion

Because the Wright Declaration and the Oleske Affirmation contain opinions and conclusions that are inappropriate to consider at the motion to dismiss stage, the Court **GRANTS in part** ExxonMobil's motion to strike insofar as the Court will not consider any conclusions or opinions in the Wright Declaration and Oleske Affirmation. *See Blackwell II*, 440 F.3d at 286; *see also Southland*, 365 F.3d at 361. The Court **DENIES**

**in part** ExxonMobil's motion to the extent it seeks an order striking those nonconclusory, factual portions of the Wright Declaration and Oleske Affirmation.

## III. Motion to Dismiss

ExxonMobil moved the Court to dismiss Pension Fund's Amended Complaint. ExxonMobil alleges Pension Fund failed to allege sufficient facts to support a materially false or misleading statement, failed to meet the heightened standard of scienter, and failed to adequately plead loss causation. Because ExxonMobil contends Pension Fund did not sufficiently plead a securities fraud claim, ExxonMobil Pension Fund's Section 20(a) claim for control person's liability necessarily fails. Pension Fund responds by detailing its factual allegations demonstrating ExxonMobil's material misstatements, scienter, loss causation, and control person liability.

### A. Legal Standard

In considering a Rule 12(b)(6) motion, a court must determine whether the plaintiff has sufficiently stated claims upon which relief may be granted. FED. R. CIV. P. 12(b)(6). The court must view all facts in the light most favorable to the plaintiff. *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002). A well-pleaded complaint must allege facts upon which the claims are based and not a conclusory recitation of the elements of a cause of action. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint must state sufficient facts such that the "claim has facial plausibility" and is not merely "possible." *Aschcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, "[e]ven under the PSLRA, 'plaintiffs are only required to plead facts, not to produce admissible

evidence.'" *Marcus v. J.C. Penney Co.*, Civ. Action No. 6:13-CV-736-MHS-KNM, 2015 WL 5766870, at *2 (E.D. Tex. Sept. 29, 2015) (*quoting In re McKesson HBOC Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000)). Certain claims or elements, however, many require a plaintiff to meet a heightened pleading standard, such as pleading scienter in a securities fraud claim. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 252 (5th Cir. 2009).

To successfully plead scienter in a securities fraud claim, a plaintiff must allege sufficient facts to support a "'strong inference' of scienter." *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 324 (2007). The court considers "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323. In determining whether the plaintiff alleged a strong inference of scienter, the court must consider the complaint in its entirety, any documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. *See id.* at 322. The plaintiff has met the heightened pleading standard when "a reasonable person would deem the plausible inference of scienter cogent and at least as strong as any opposing inference one could draw." *Lormand*, 565 F.3d at 252. A plaintiff need not have "irrefutable" evidence of scienter; "circumstantial evidence" considered collectively can be sufficient to establish a strong inference of scienter. *Tellabs*, 551 U.S. at 324; *Lormand*, 565 F.3d at 251.

The "group pleading" doctrine, which allows a plaintiff to generally allege claims against a group of defendants, does not apply to the scienter element under the PSLRA. *Southland*, 365 F.3d at 365. The plaintiff must allege material misstatements or omissions with particularity as to each of the defendants and allege facts supporting a strong inference of scienter. *See id*. The plaintiff must plead facts showing the defendant corporate officer was severely reckless or had actual knowledge of the wrongdoing instead of merely alleging the individual's position supports a reasonable inference of his awareness. *Id*; *Local 731 I.B. of T. Excavators & Pavers Pension Trust Fund v. Diodes, Inc.*, 810 F.3d 951, 958 (5th Cir. 2016).

## B. Analysis

### 1. Material Misstatements

In the motion to dismiss, ExxonMobil argues the Amended Complaint fails to allege a materially false or misleading statement or an actionable omission. ExxonMobil contends that: (1) the alleged material misrepresentations regarding ExxonMobil's use of different proxy costs fail to state a claim because ExxonMobil has never stated it assigns the same value to proxy costs of carbon and greenhouse gas ("GHG") proxy costs; (2) recognizing the impairment of ExxonMobil's Rocky Mountain dry gas assets in 2016 instead of in 2015 is simply a difference of opinion and does not amount to an untrue statement of material fact; (3) ExxonMobil's disclosures regarding its Kearl Operations proved reserves complied with SEC regulations; and (4) ExxonMobil had no duty to disclose its Canadian Bitumen Operations were allegedly operating at a loss

for three months. Pension Fund responds that: (1) the Amended Complaint alleges particularized facts that ExxonMobil's publicly disclosed proxy costs differ from internally applied proxy costs; (2) the Amended Complaint alleges particularized facts establishing ExxonMobil's Rocky Mountain dry gas assets were impaired by the end of 2015; (3) based on an analysis of available financial information, ExxonMobil's Canadian Bitumen Operations were operating at a significant loss for at least three months prior to ExxonMobil filing its 2015 From 10-K, violating GAAP and SEC regulations; and (4) the Amended Complaint alleges numerous particularized facts establishing ExxonMobil knew in 2016 that the Kearl Operation's bitumen reserves no longer qualified as proved reserves.

A plaintiff bringing securities fraud claims must allege the defendant made a material misstatement of fact or omitted a material fact which made the statement materially misleading. *See* 15 U.S.C. § 78u-4(b)(1). The complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." *Id*. A fact is material if the reasonable investor would have found the fact significant in making her decision to invest. *Southland*, 365 F.3d at 362; *see also Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988) ("[M]ateriality depends on the significance the reasonable investor would place on the withheld or misrepresented information.").

a)  Use of Proxy Cost of Carbon

Defendant's argue Pension Fund failed to allege ExxonMobil misled the public about its use of proxy costs of carbon because Pension Fund incorrectly contends two different costs—the proxy cost of carbon and proxy cost of GHG—are the same proxy cost. Pension Fund argues the Amended Complaint alleges sufficient facts showing ExxonMobil used a single proxy cost that differed in value in internal documents than the value disclosed to the public, materially misleading investors.

The Amended Complaint alleges ExxonMobil failed to disclose the actual proxy cost of carbon it used—and at times allegedly failed to use—when calculating capital expenditures and making business and investment decisions. Because ExxonMobil failed to disclose the internally applied proxy cost of carbon, ExxonMobil and the individual defendants allegedly made numerous material misstatements.

The Amended Complaint contends ExxonMobil stated publicly in its MTR Report and elsewhere that ExxonMobil applied a proxy cost of carbon of $60 per ton of carbon dioxide in 2030 and $80 per ton in 2040 in all business units. This proxy cost of carbon allegedly allows ExxonMobil to consider governmental policies associated with climate change that may result in higher production costs, fees, or restrictions. The Amended Complaint further contends that Defendants Tillerson and Woodbury made materially misleading statements at ExxonMobil's 2016 Annual Shareholders Meeting by stating ExxonMobil uses a proxy cost of carbon to make all of its investment decisions. While ExxonMobil's public statements show the 2030

proxy cost used was $60 per ton, the Amended Complaint alleges internal ExxonMobil documents indicate the actual proxy cost used was a proxy cost of $40 per ton of carbon dioxide in 2030. An April 2010 email with an ExxonMobil Corporate Strategic Planner appears to demonstrate that employees knew the publicly stated $60 proxy cost in 2030 was likely more realistic than the internally applied proxy cost of $40 per ton.

The Amended Complaint and the attached ExxonMobil documents sufficiently allege ExxonMobil stated a different proxy cost value in public statements than was actually applied in internal calculations. This disparity in proxy cost values sufficiently alleges material misrepresentations arising from statements made referencing these proxy costs. A reasonable investor would likely find it significant that ExxonMobil allegedly applied a lower proxy cost of carbon than it publicly disclosed.

ExxonMobil argues Pension Fund is confusing two separate proxy costs—proxy cost of carbon and GHG costs—as the same proxy cost, and therefore Pension Fund failed to allege a material misrepresentation. Whether the two differing proxy cost values represent two different costs or the same cost with different values applied internally than publicly purported to be applied is a factual dispute and cannot be determined at this motion to dismiss stage. *See Barrie*, 397 F.3d at 257. Moreover, ExxonMobil's argument that the GHG proxy cost is separate from the proxy cost of carbon does not persuade the Court that Pension Fund failed to allege material misrepresentation. Because ExxonMobil's public statements allegedly indicate to investors only one proxy cost value was used across all business units in making

investment decisions, ExxonMobil's argument is not persuasive as investors may still have been materially misled.

Thus, the Court finds Pension Fund sufficiently alleged ExxonMobil made material misstatements regarding ExxonMobil's use of proxy costs in formulating business and investment plans.

### b) Rocky Mountain Dry Gas Operation

The Amended Complaint alleges ExxonMobil made a material misrepresentation by failing to recognize an impairment of its Rocky Mountain Dry Gas Operation in 2015. The Amended Complaint alleges a number of red flags arose in 2015 that indicated ExxonMobil's Rocky Mountain Dry Gas Operation was impaired, but ExxonMobil did not disclose an asset impairment of its Rocky Mountain Dry Gas Operation until January 31, 2017, and later confirmed the impairment in ExxonMobil's 2016 Form 10-K released on February 22, 2017. The 2016 Form 10-K filed with the SEC recognized an asset impairment charge of over $2 billion, most of which related to Rocky Mountain Dry Gas Operation.

ExxonMobil argues Pension Fund failed to allege misrepresentations regarding ExxonMobil's Rocky Mountain Dry Gas Operation because the Amended Complaint relies on a difference of opinion between Pension Fund and ExxonMobil as to the value of its assets. ExxonMobil contends asset valuation is merely an opinion, and this cannot be a material misstatement of fact unless the speaker did not believe the opinion he stated and that the opinion was objectively untrue. *See Onmicare, Inc. v. Laborers Dist.*

*Council Constr. Indus. Pension Fund*, — U.S. —, 135 S. Ct. 1318, 1327 (2015). Pension Fund responds that the Amended Complaint sets out impairment-related factors that establish ExxonMobil's Rocky Mountain Dry Gas Operation was impaired by year-end 2015. Pension Fund further argues the Amended Complaint alleges ExxonMobil's statements that it properly conducted impairment determinations according to GAAP were false because it failed to include its proxy cost of carbon in the impairment analysis. Finally, Pension Fund contends ExxonMobil made objectively false statements by repeatedly asserting it incorporated the proxy cost of carbon into all of ExxonMobil's business and investment decisions but actually failed to include proxy costs in its analysis.

ExxonMobil argues asset valuation and impairment is an opinion, and, therefore, Pension Fund must meet the stringent standard for pleading a material misstatement based on a statement of opinion. When an alleged material misstatement is a statement of opinion, the speaker can be held liable when the speaker did not genuinely hold that opinion and the statement is false. *See Omnicare*, 135 S. Ct. at 1327. A reasonable investor could understand an opinion statement to convey facts about the basis of the opinion, such as implying the speaker performed an investigation or had knowledge of the underlying facts. *See id*. at 1328. If the underlying facts are not provided and contradict the opinion statement, the statement will be misleading by omission and the speaker can be held liable. *See id*. Even if the speaker genuinely holds the opinion, the statement may be a material misstatement by omission if the speaker "omits

material facts about the [speaker's] inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." *Id*. at 1329.

ExxonMobil argues that whether the Rocky Mountain Dry Gas Operation was impaired in 2015 is a matter of opinion and subject to the more stringent pleading requirements set out in *Omnicare*. To support its argument that ExxonMobil's impairment determination is an opinion, ExxonMobil cites only persuasive authority— one Southern District of Texas case as well as courts outside the Fifth Circuit, including the Ninth Circuit. *See e.g. In re BP p.l.c. Secs. Litig.*, Civ. Action No. 4:10-MD-2185, 2016 WL 3090779, at *8 (S.D. Tex. May 31, 2016) (finding estimates of the flow rate of an oil spill were opinion statements)*; City of Dearborn Heights Act 345 Police & Fire Retirement Sys. v. Align Tech., Inc.*, 856 F.3d 605, 618 (9th Cir. 2017) (affirming grant of motion to dismiss securities fraud claim because plaintiff failed to allege the actual assumptions defendants relied on in conducting their goodwill valuation analysis).

But ExxonMobil failed to cite binding case law from the Fifth Circuit, which has held that alleged accounting violations are sufficient to plead material misstatements. *See Barrie*, 397 F.3d at 257–58 (plaintiff pleaded material misstatement by alleging with particularity defendants violated GAAP). Thus, based on Fifth Circuit case law, ExxonMobil's alleged GAAP violation and its failure to recognize the impairment of the Rocky Mountain Dry gas Operation are not opinion statements but create a fact question.

Even if ExxonMobil's impairment decision was an opinion, Pension Fund alleged sufficient facts to plead material misstatement as to ExxonMobil's Rocky Mountain Dry Gas Operation. The Amended Complaint alleges the material misstatements included an embedded statement of fact that was objectively false. ExxonMobil's 2015 Form 10-K did not recognize any impairment of the Rocky Mountain Dry Gas Operation and that ExxonMobil complied with GAAP in making all impairment determinations, meaning it applied a proxy cost of carbon. Pension Fund alleges ExxonMobil failed to incorporate a proxy cost of carbon in its impairment analysis. By allegedly failing to include a proxy cost in its impairment determination, ExxonMobil's purported opinion that Rocky Mountain Dry Gas Operation was not impaired by year-end 2015 necessarily omitted "particular facts going to the basis for the [defendant's] opinion" making the opinion materially misleading. *Omnicare*, 135 S. Ct. at 1332.

c)  Canadian Bitumen Operations

The Amended Complaint alleges the Canadian Bitumen Operations operated at a loss for at least three months prior to ExxonMobil filing its 2015 Form 10-K with the SEC. However, the 2015 Form 10-K allegedly implied the Canadian Bitumen Operations were operating at a profit of over $5 per barrel. In its motion to dismiss, ExxonMobil argues the Amended Complaint failed to allege material misrepresentation regarding the Canadian Bitumen Operations because ExxonMobil had no duty to disclose the Canadian Bitumen Operations operated at a loss for three months, operating at a loss did not render ExxonMobil's 2015 Form 10-K misleading, and

operating at a loss did not constitute a trend. Pension Fund responds that other circuits have found a duty to disclose in similar instances under Item 303 of SEC Regulation S-K and argues operating at a loss for three months rendered the 2015 Form 10-K misleading because it was not readily apparent to investors.

Based on comparing ExxonMobil's 2015 Form 10-K to ExxonMobil's subsidiary Imperial's required public filings with the Canadian Securities Administrators, Pension Fund alleges the Canadian Bitumen Operations operated at a loss for at least three months. Instead of disclosing in its 2015 Form 10-K that the Canadian Bitumen Operations were allegedly operating at a loss, ExxonMobil's 2015 Form 10-K reported that the Canadian Bitumen Operations had generated an average profit of $5 per barrel. Because the Canadian Bitumen Operations represented approximately 31% of ExxonMobil's total liquids proved reserves and 18% of its combined worldwide proved reserves at year-end 2015, Pension Fund alleges it was materially misleading to imply the Canadian Bitumen Operations made a consistent profit of over $5 per barrel when it had allegedly operated at a loss for three months. Pension Fund contends this statement and the failure to disclose the Canadian Bitumen Operations were operating at a loss materially misled investors and violated GAAP and SEC Regulation S-K Item 303.

Item 303 of SEC Regulation S-K requires a company to include in its SEC filings a discussion of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or

revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). The Circuits are split on whether Item 303 creates an affirmative duty to disclose for the purposes of a securities fraud claim under Section 10(b) and Rule 10b-5. *Compare Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (holding Item 303 creates an actionable duty to disclose), *with In re NVIDA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014) (holding Item 303 does not create a duty to disclose for securities fraud claims under Section 10(b) and Rule 10b-5). The Fifth Circuit has not addressed whether Item 303 creates an affirmative duty to disclose. Assuming without deciding that SEC Regulation S-K Item 303 creates an affirmative duty to disclose under Section 10(b) and Rule 10b-5, the allegation that the Canadian Bitumen Operations operated at a loss for three months does not establish a trend for purposes of Item 303 disclosures. *See Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 221 (5th Cir. 2004) (failure to disclose a five-month price decline for an incomplete fiscal period was not a trend required to be disclosed by Item 303). Thus, Pension Fund failed to plead a material misstatement based on ExxonMobil's alleged failure to comply with Item 303.

However, the Amended Complaint alleged ExxonMobil's failure to disclose the three-month loss also violated GAAP and was therefore materially misleading. It appears ExxonMobil failed to address this alleged GAAP violation in both its motion to dismiss and its reply, essentially conceding Pension Fund adequately pleaded material misrepresentation. *See Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010). Thus,

the Court finds Pension Fund sufficiently pleaded ExxonMobil made a material misstatement by failing to disclose the Canadian Bitumen Operations operated at a loss for three months.

d) Exxon Mobil's Kearl Operations

Pension Fund alleges ExxonMobil knew at the time it filed its 2015 Form 10-K on February 22, 2016, and throughout 2016 that its Kearl Operations would not satisfy the SEC's definition of proved reserves by year-end 2016. Pension Fund contends ExxonMobil made material misstatements by failing to inform or sufficiently warn investors of the high likelihood that the Kearl Operations would be de-booked by year-end 2016. ExxonMobil argues it properly warned investors in its 2015 Form 10-K. Even if the statement was materially misleading, ExxonMobil contends the forward-looking statement is protected under the safe harbor and "bespeaks caution doctrine."

The Amended Complaint alleges ExxonMobil knew at the time it released its 2015 Form 10-K and throughout 2016 that its Kearl Operations would not satisfy the SEC's definition of proved reserves by year-end 2016. Pension Fund contends ExxonMobil made material misstatements by failing to adequately disclose this knowledge in its 2015 Form 10-K and in its quarterly SEC filings throughout 2016. ExxonMobil's 2015 Form 10-K warns:

> When crude oil and natural gas prices are in the range seen in late 2015 and early 2016 for an extended period of time, under the SEC definition of proved reserves, certain quantities of oil and natural gas, such as oil sands operations in Canada and natural gas operations in North America could temporarily not qualify as proved reserves.

The Complaint alleges ExxonMobil's "tepid warnings mentioning the possibility of de-bookings" was insufficient to address the likely de-booking of the Kearl Operations. (Doc. No. 36, at 140). Pension Fund also alleges that statements made throughout 2016 in ExxonMobil's Form 10-Qs filed with the SEC were materially misleading because they failed to inform investors that it was a virtual certainty, according to Pension Fund, that the Kearl Operations would be de-booked at year-end 2016. Pension Fund contends this failure violated GAAP provisions that require an oil and gas company to update proved reserve estimates at the earliest possible time when adverse events cause significant downward estimates in proved reserves. Finally, Pension Fund contends ExxonMobil's October 2016 statement was also materially misleading when it warned investors that approximately 3.6 billion barrels of bitumen in its Kearl Operations would not qualify as proved reserves at year-end 2016 if oil and gas prices remained low. Pension Fund alleges ExxonMobil knew that only a drastic rise in prices could prevent the Kearl Operations from being de-booked.

ExxonMobil argues its forward-looking statement regarding the likelihood of de-booking certain proved reserves is protected by the PSLRA safe harbor and the "bespeaks caution" doctrine. *See* 15 U.S.C. § 78u-5(c); *see also Rubinstein v. Collins*, 20 F.3d 160, 166–67 (5th Cir. 1994). The PSLRA safe harbor protects defendants from liability based on a forward-looking statement when the statement is identified as forward-looking and "is accompanied by meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the

forward-looking statement." *Southland*, 365 F.3d at 371. Courts cannot apply a blanket safe harbor for all forward-looking statements but must determine how a statement is specifically and meaningfully protected by the safe harbor. *See Lormand*, 565 F.3d at 245. Boilerplate cautionary language does not provide a substantive and meaningful warning. *Id*. at 244-45. While ExxonMobil identified the proved reserve disclosures as forward-looking statements, the Amended Complaint alleges ExxonMobil knew at the time of the disclosures that the Kearl Operations would no longer qualify as proved reserves. Thus, Pension Fund alleges the general cautionary language that proved reserves may be de-booked did not provide adequate warning of the all but certain de-booking of the Kearl Operations. Pension Fund has pleaded sufficient factual allegations that at the end of 2015 and throughout 2016 ExxonMobil had actual knowledge the Kearl Operations would require de-booking, making ExxonMobil's forward-looking statement insufficient to provide meaningful cautionary language. *See id.* Thus, the forward-looking statement is not protected by the safe harbor and does sufficiently allege a material misstatement.

Furthermore, when the court, after viewing all the statements in context, finds reasonable minds could disagree as to whether the statements are misleading, "the statutory safe harbor provision cannot provide the basis for dismissal as a matter of law." *See Lormand*, 565 F.3d at 247–48. Pension Fund's pleadings sufficiently allege that ExxonMobil failed to meaningfully warn investors the Kearl Operations were all but certain to be de-booked by year-end 2016. Reasonable minds could disagree on

whether ExxonMobil's statements and warnings are misleading, and, therefore, the Court cannot dismiss this material misstatement based on the safe harbor provision. *Id*. at 248.

ExxonMobil also argues its forward-looking statements are protected under the "bespeaks caution" doctrine. "[T]he 'bespeaks caution' doctrine merely reflects the unremarkable proposition that statements must be analyzed in context." *Rubinstein*, 20 F.3d at 167. The Fifth Circuit has held that courts must consider the alleged material misstatement in light of the surrounding circumstances and whether a reasonable investor would consider the omitted fact significant in making a decision to invest. *See id*. Pension Fund alleges ExxonMobil should have warned investors the Kearl Operation was highly likely to be de-booked at year-end 2016, not just that some proved reserves may be de-booked if prices remained in the price range of late 2015 and early 2016. Considering ExxonMobil's statement in the context of the low bitumen prices and allegations that the Kearl Operations was operating at a loss in late 2015, a reasonable investor would have found it significant that the Kearl Operation, representing a significant portion of ExxonMobil's bitumen reserves, was allegedly very likely to be de-booked by year-end 2016. Thus, the "bespeaks caution" doctrine cannot provide a basis for dismissal at this stage as a matter law. *See id*.

Alternatively, ExxonMobil argues it was not required to update its proved reserves disclosures during the year, and so investors were not materially mislead by ExxonMobil's failure to disclose this information in its 2016 Form 10-Qs. ExxonMobil

points to 17 C.F.R. § 229.1202(a)(2) for the contention that it was not required to update its proved reserves disclosures before the year's end. While it appears 17 C.F.R. § 229.1202(a)(2) only requires ExxonMobil to disclose proved reserves at the end of the fiscal year, it does not stand for the position that no other provision requires oil and gas companies to update proved reserves disclosures. *See Firefighters Pension & Relief Fund of New Orleans v. Bulmahn*, 53 F. Supp. 3d 882, 907 (E.D.L.A. 2014) (finding 17 C.F.R. § 229.1202(a)(2) "require[s] the issuer to 'disclose updated reserves tables as of the close of each year'" but not addressing other provisions that may require updated reserve information). In its motion and reply, ExxonMobil failed to address the Amended Complaint's assertion that GAAP, under ASC 275 and 932, requires a company to update its proved reserves disclosures in an interim financial report when adverse events significantly affect proved reserve quantities. Because ExxonMobil failed to address the alleged GAAP violation, ExxonMobil has essentially conceded that Pension Fund sufficiently pleaded material misrepresentation. *See Jones*, 600 F.3d at 541.

### 2. Scienter

To state a securities fraud claim under Section 10(b) and Rule 10b–5, a plaintiff must plead: "(1) a misstatement or omission; (2) of a material fact; (3) made with scienter; (4) on which the plaintiff relied; and (5) that proximately caused the plaintiff's injuries." *Southland*, 365 F.3d at 362. Under the PSLRA's heightened pleading standard, the plaintiff "must: (1) 'specify each statement alleged to have been

misleading [and] the reason or reasons why the statement is misleading,' 15 U.S.C. § 78u–4(b)(1); and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' § 78u–4(b)(2)." *Tellabs*, 551 U.S. at 321. The particularity requirement alters the Rule 12(b)(6) analysis in that it requires the court to "take into account plausible inferences opposing as well as supporting a strong inference of scienter." *Lormand*, 565 F.3d at 239. "The inquiry…is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322–23 (emphasis in original). The defendant must have made the misleading statement with the requisite scienter, "meaning an 'intent to deceive, manipulate, or defraud' or that 'severe recklessness' in which the 'danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *Southland*, 365 F.3d at 366 (quoting *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961–62 (5th Cir. 1981)). A defendant corporation has the requisite state of mind when the corporate officer making the statement does so knowing it is false. *Southland*, 365 F.3d at 366.

a) Defendant ExxonMobil's Scienter

ExxonMobil argues Pension Fund failed to meet the heightened pleading standard of scienter because Pension Fund's allegations amount to mere conclusions that the Individual Defendants must have known of the alleged fraud based on their executive positions within the company. Pension Fund responds by referencing

multiple instances throughout the Amended Complaint in which specific allegations and facts establish the requisite scienter.

i. The Management Committee

The Amended Complaint alleges Defendants Tillerson and Swiger were members of ExxonMobil's Management Committee throughout the Class Period. Allegedly, the Management Committee "extensively" reviewed and discussed ExxonMobil's annual publication, "The Outlook for Energy" ("Outlook"), published March 31, 2014. The Outlook purportedly describes the foundation for business and investment planning and discusses carbon related risks, including ExxonMobil's use of a proxy cost of carbon to account for current and future government regulation of carbon emissions. Thus, in reviewing and preparing the Outlook for publication, members of the Management Committee received in depth information on ExxonMobils' proxy cost of carbon and its use in investments and business operations, according to Pension Fund. Accepting these pleaded factual allegations as true, as members of the Management Committee, Defendants Tillerson and Swiger would have extensive knowledge of the proxy cost of carbon and should have known a different proxy cost was stated in the Outlook than was actually applied to business operations and investments. *See Tellabs*, 551 U.S. at 322. These specific allegations of receiving regular, detailed information on carbon related risks and proxy costs as members of the Management Committee provide more than mere conclusory allegations that Defendants Tillerson and Swinger must have had knowledge based on their executive

positions within ExxonMobil. *See Brody v. Zix Corp.*, Civ. Action No. 3:04-CV-1931-K, 2006 WL 2739352, at *7 (N.D. Tex. Sept. 26, 2006) (Kinkeade, J.) (finding it reasonable to assume defendants had actual knowledge of material misstatements because they regularly received reports showing the statements were false). Thus, this allegation supports finding a strong inference of scienter as to Defendants ExxonMobil, Tillerson, and Swiger.

### ii. Motive to Maintain Credit Rating

Pension Fund pleaded ExxonMobil was particularly motivated to maintain its AAA credit rating in order to allegedly avoid a significantly negative impact that a drop in its credit rating would have on the March 2016 $12 billion public debt offering ("Debt Offering"). ExxonMobil argues a company's desire to maintain a good credit rating is universal and cannot support an inference of scienter as to all Defendants. Moreover, the market was already aware of ExxonMobil's weakened credit rating because it was placed on 'CreditWatch' with negative implications by S&P a month before the debt offering.

While "[s]cienter in a particular case may not be footed solely on motives universal to corporate executives," the Fifth Circuit has recognized an exception when a company is particularly motivated to maintain or improve its credit rating to receive "crucial" funds. *See Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 544 (5th Cir. 2008). Pension Fund alleges that at the time of the Debt Offering ExxonMobil was in dire financial need of an infusion of capital and that the

Debt Offering was the "largest single debt offering in Exxon's history." (Doc. No. 36, at 74–75). Just before the Debt Offering, ExxonMobil released its 2015 Form 10-K, allegedly showing it did not have sufficient cash flow to pay the shareholders' dividends. Pension Fund alleges paying the shareholder dividends was extremely important to ExxonMobil, quoting Defendant Tillerson as stating the dividends are "part of why we are important to long-term shareholders." (Doc. No. 36, at 32). The Debt Offering, according to Pension Fund, would allow ExxonMobil to pay these important dividends. Because maintaining the AAA credit rating was uniquely important to ExxonMobil in its Debt Offering and thereby paying the high-priority dividends, Pension Fund has sufficiently alleged ExxonMobil's motive, supporting a strong inference of scienter as to all Defendants. *See Indiana Elec. Workers' Pension Trust Fund*, 537 F.3d at 544.

### iii. Oleske's Opinion

Pension Fund contends the Oleske Affirmation, attached as an exhibit to the Amended Complaint, supports an inference of scienter because Oleske, an attorney in the NYAG's office, states it is his opinion that the differing public and private proxy costs of carbon were known at the highest levels of ExxonMobil's executives. As discussed in Section I.B., it is inappropriate to consider Oleske's opinion because it is based on his own conclusions drawn from investigating a separate lawsuit. *See Southland*, 365 F.3d at 361 (court does not accept "conclusory allegations, unwarranted deductions, or legal conclusions."). Oleske's opinion that ExxonMobil's executives

knew about the different internal and public proxy costs cannot support an inference of scienter.

iv. Individual Defendants Signed SEC Filings

The Amended Complaint pleaded Defendants Tillerson, Swiger, and Rosenthal signed ExxonMobil's Form 10-Ks filed with the SEC throughout the Class Period and Defendant Rosenthal signed all but two of ExxonMobil's Form 10-Q quarterly reports filed with the SEC during the Class period. These Form 10-Ks and Form 10-Qs allegedly contained materially misleading information and violated GAAP based on their use of a lower proxy price than publicly disclosed and their failure to sufficiently warn investors of the high risk of impairment and de-booking of certain proved reserves.

Pension Fund contends signing these documents provides further support of a strong inference of scienter for Defendants Tillerson, Swiger, and Rosenthal. ExxonMobil argues Pension Fund failed to establish Defendants Tillerson, Swiger, and Rosenthal had reason to know the financial statements in the Form 10-Ks and Form 10-Qs contained material misstatements or omissions. *See Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 555 (5th Cir. 2007) (a court may only find an inference of scienter from defendants signing the Sarbanes-Oxley certifications if plaintiff has alleged the defendants had reason to know the financial statements contained material misstatements because of obvious accounting irregularities or other red flags). However, as discussed above, Defendants Tillerson and Swiger were

members of the Management Committee, which allegedly received in-depth briefings and actively discussed business issues relating to climate change including the proxy costs of carbon. The Amended Complaint also alleges Defendant Rosenthal was directly involved in drafting the MTR Report, which Pension Fund alleges fraudulently stated the proxy cost used in making business and investment decisions. Thus, Pension Fund has sufficiently alleged Defendants Tillerson, Swiger, and Rosenthal had reason to know the financial statements in ExxonMobil's Form 10-Ks and Form 10-Qs were materially misleading. *See id*. The Court finds Pension Fund pleaded facts supporting a strong inference of scienter by alleging Defendants Tillerson, Swiger, and Rosenthal signed ExxonMobil's Form 10-Ks and by Defendant Rosenthal signing all but two of the Form 10-Qs filed with the SEC during the Class Period.

### v. Lack of Insider Trading

ExxonMobil also argues that the lack of allegations of insider trading and ExxonMobil's purchase of billions of dollars' worth of its own stock during the Class Period further undermines Pension Fund's scienter allegations. *See Izadjoo v. Helix Energy Sols. Grp., Inc.,* 237 F. Supp. 3d 492, 518 (S.D. Tex. 2017) (company's stock repurchase program rebutted scienter). Because the Court must consider all plausible explanations and inferences, the Court properly takes into account that the Amended Complaint does not allege any insider trading occurred. The Amended Complaint actually alleges ExxonMobil repurchased billions of dollars' worth of its stock. While a plaintiff is not

required to allege insider trading to plead scienter, the lack of insider trading does weigh against a finding of scienter. *See Tellabs*, 551 U.S. at 325.

       b) Additional Scienter Allegations as to Individual Defendants

        i. Tillerson

The Amended Complaint contains numerous allegations to support Pension Fund's contention that Defendant Tillerson, Chairman of the board and Chief Executive Officer, had knowledge of ExxonMobil's alleged fraudulent activity. As discussed above, Defendant Tillerson was on the Board of Directors and the Management Committee, both of which allegedly received in-depth briefings on and actively engaged in discussions on ExxonMobil's financial position and risks of climate change. *See Brody*, 2006 WL 2739352, at *7. Defendant Tillerson also allegedly had motive to maintain ExxonMobil's AAA credit rating by using a lower, internal proxy cost and not recognizing asset impairment so as to receive sufficient funds to pay the shareholder dividends. *See Shaw*, 537 F.3d at 544. Also as discussed above, Defendant Tillerson signed the allegedly materially misleading Form 10-Ks while aware of their misleading statements. *See Cent. Laborers' Pension Fund*, 497 F.3d at 555.

Pension Fund has alleged ExxonMobil used a different, lower internal proxy cost than the publicly touted proxy cost. Attached to the Amended Complaint are internal ExxonMobil emails that indicate ExxonMobil's management knew of the differing proxy costs and that Defendant Tillerson was aware of and "happy with" the different proxy costs. The Amended Complaint and attached emails allege particularized facts

supporting a strong inference that ExxonMobil, through Defendant Tillerson, knowingly used a lower internal proxy cost than what ExxonMobil told the public and investors it used in making investment and business decisions. *See Lormand*, 565 F.3d at 254 (holding emails attached as exhibits to the complaint provided support for a strong inference of defendants' wrongful state of mind.).

Pension Fund further alleges an inference of scienter is supported by the NYAG's discovery that Defendant Tillerson had a second email account, Wayne.Tracker@ExxonMobil.com ("Wayne Tracker account"), on which ExxonMobil failed to place a litigation hold allegedly resulting in the loss or destruction of all emails on the Wayne Tracker account from at least 2008 through 2015. Pension Fund contends the Wayne Tracker account was used to discuss risk-management issues related to climate change. ExxonMobil argues the Wayne Tracker account and any failure to preserve its emails do not relate to the claims in this case. Other than the conclusions in the Oleske Affirmation that the Wayne Tracker account was used to discuss issues related to climate change, Pension Fund's allegations have no basis or support. Defendant Tillerson could have had many reasons for using a second email account unrelated to a fraudulent or nefarious purpose and unrelated to the securities fraud claims at issue here. Taking into account the plausible inferences opposing as well as supporting Pension Fund's argument that the Wayne Tracker email account supports an inference of scienter, the Wayne Tracker account and the loss of its emails are not indicative of scienter. *See Lormand,* 565 F.3d at 239.

Considering all of the above scienter allegations, Pension Fund has alleged a strong inference of scienter as to Defendant Tillerson.

## ii. Swiger

The Amended Complaint contains multiple factual allegations upon which Pension Fund based its argument as to Defendant Swiger, the Senior Vice President and Principal Financial Officer. As discussed above, Defendant Swiger allegedly participated in discussions and received in-depth briefings on ExxonMobil's financial position and risks related to climate change as a member of the Management Committee, which contributes to scienter. *See Brody*, 2006 WL 2739352, at *7. Moreover, Defendant Swiger signed the allegedly materially misleading 2015 Form 10-K, which also contributes to an inference of scienter as discussed above. *See Cent. Laborers' Pension Fund*, 497 F.3d at 555. Defendant Swiger also allegedly had motive to maintain ExxonMobil's AAA credit rating to ensure shareholder dividends were paid. *See Shaw*, 537 F.3d at 544. Pension Fund alleges Defendant Swiger held in-depth discussions in analyst meetings, in which he demonstrated his "intimate awareness" of ExxonMobil's reserves, financial results, and investment and valuation process. These allegations, taken together, support a strong inference of scienter as to Defendant Swiger.

## iii. Woodbury

In its Amended Complaint, Pension Fund pleaded allegations that Defendant Woodbury, Vice President of Investor Relations and Secretary, demonstrated his

knowledge of ExxonMobil's allegedly fraudulent actions in his discussions of relevant matters in analyst meetings and his desire to maintain the AAA credit rating discussed above. Pension Fund references multiple conferences calls, analyst meetings, and shareholder meetings throughout the Class Period in which Defendant Woodbury discussed ExxonMobil's financial standings, possible asset impairments, and the effect of climate change related risks and low oil and gas prices. Pension Fund contends these comments and discussions support an inference of scienter because allegedly ExxonMobil was applying a lower proxy cost and was aware of the high risk of asset impairment at the time Defendant Woodbury made his allegedly misleading statements. However, Pension Fund does not provide factual allegations demonstrating Defendant Woodbury made the misleading statements in the conference calls and meetings with scienter, as opposed to mere negligence.

In *Owen v. Jastrow*, the Fifth Circuit held the plaintiff failed to plead sufficient facts to support a strong inference of scienter for the defendant CEO despite alleging the defendant signed a Form 10-K containing materially misleading statements and alleging he made materially misleading statements in a board meeting. 789 F.3d 529, 545–46 (5th Cir. 2015). The plaintiff failed to allege any facts showing the defendant CEO had knowledge of the alleged fraudulent activity and only showed the defendant CEO "was merely negligent" in making his statements. *Id*. at 546. Courts cannot base an inference of scienter on the assumption "that defendants must have been aware of the misstatement based on their positions within the company." *See Abrams v. Baker*

*Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002). Pension Fund failed to plead any facts demonstrating Defendant Woodbury's knowledge of ExxonMobil's alleged fraudulent actions. Pension Fund's allegation that Defendant Woodbury was possibly motivated to maintain ExxonMobil's AAA credit rating, as discussed above, "creates a slight inference of scienter, but does not rise to the required 'strong inference.'" *Owen*, 789 F.3d at 546. Without more, Defendant Woodbury's alleged motive does not support a strong inference of scienter but at most alleges negligence. *See id*. While Pension Fund alleged the other individual defendants took additional actions or had specific knowledge of ExxonMobil's fraudulent activity, Pension Fund contends no additional scienter allegations against Defendant Woodbury besides the motive to maintain the AAA credit rating. Because Pension Fund failed to meet the heightened standard for pleading scienter as to Defendant Woodbury, the Court **GRANTS** the motion to dismiss as to the securities fraud claim under Section 10(b) and Rule 10b-5 against Defendant Woodbury.

### iv. Rosenthal

Pension Fund contends it alleged sufficient facts to support a strong inference of scienter as to Defendant Rosenthal, ExxonMobil's Vice President Controller and Principal Accounting Officer during the Class Period. Pension Fund alleges Defendant Rosenthal was motivated to maintain ExxonMobil's AAA credit rating and signed the allegedly materially misleading 2015 Form 10-K and all but two of ExxonMobil's Form 10-Qs during the Class period. As discussed above, these allegations support an

inference of scienter. *See Shaw*, 537 F.3d at 544; *see also Cent. Laborers' Pension Fund*, 497 F.3d at 555.

Additionally, attached to the Amended Complaint is an email from Defendant Rosenthal on March 25, 2014 removing "the impairment footnote" from the MTR Report because "[t]hat word gives the folks on the third floor heartburn." (Doc. No. 36-1, at 148). Pension Fund contends "the folks on the third floor" are ExxonMobil executives, and ExxonMobil does not dispute this. Pension Fund alleges this email shows Defendant Rosenthal was intimately involved in and had detailed knowledge of the MTR Report. Therefore, Defendant Rosenthal allegedly knew the publicly reported proxy costs of $60 per ton of greenhouse gases by 2030 were misleading because ExxonMobil's internal budgeting applied a proxy costs of $40 per ton by 2030, and knew the effect different proxy costs had on impairment calculations. While ExxonMobil argues there may be a nonculpable reason Defendant Rosenthal asked for the footnote to be removed, the email's wording indicates the executives on the third floor found the impairment footnote to be significant. The email demonstrates Defendant Rosenthal had intimate knowledge of and control over the information going into the MTR Report, supporting a strong inference of scienter. *See Southland*, 365 F.3d at 365 ("Such specific facts tying a corporate officer to a statement would include…particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document,

containing the statement.") Thus, taking all the allegations regarding Defendant Rosenthal together, Pension Fund pleaded a strong inference of scienter.

In Conclusion, the Amended Complaint sets out numerous particularized facts alleging all Defendants except Defendant Woodbury had actual awareness and knowledge of the alleged fraudulent activity and material misrepresentations. Because these allegations, taken together, support a strong inference of scienter as to each Defendant, Pension Fund sufficiently alleged scienter as to Defendants ExxonMobil, Tillerson, Swiger, and Rosenthal. However, Pension Fund failed to allege sufficient facts showing a strong inference of scienter as to Defendant Woodbury.

### 3. Loss Causation

Exxon Mobil argues loss causation was not pleaded because Pension Fund failed to allege any actual corrective disclosures and a resulting drop in stock price. ExxonMobil contends press reports, government investigations, and disappointing financial results do not qualify as corrective disclosures. Pension Fund responds that the Amended Complaint sufficiently alleged several partial disclosures resulting in ExxonMobil's stock price dropping, which meets the pleading standards required to overcome a motion to dismiss.

Pension Fund alleged ExxonMobil's common stock was artificially inflated throughout the Class Period, and the Amended Complaint details six incidents at which time information was released to the public. Pension Fund alleges each of these

disclosures partially corrected ExxonMobil's prior misstatements and allegedly resulted in a drop in stock prices.

On November 9, 2015, *The Guardian* revealed the NYAG was investigating ExxonMobil to determine whether the corporation was concealing the dangers and business risks associated with climate change. That same day, ExxonMobil's stock price dropped from $84.47 per share on the previous trading day to $81.95 per share, a decline of 2.98%.

On January 20, 2016, an article in the *Los Angeles Times* informed the public that the California Attorney General had begun a similar investigation into ExxonMobil and sought to determine whether concealing dangers associated with climate change amounted to securities fraud. The market allegedly responded by decreasing ExxonMobil's stock price from $76.40 per share on January 19, 2016 to $73.18 per share on January 20, 2016, representing a 4.31% drop in price.

On August 10, 2016, Pension Fund alleges *The Washington Post* published an op-ed by Senators Elizabeth Warren and Sheldon Whitehouse, in which the Senators stated ExxonMobil was attempting to sidetrack a government investigation into ExxonMobil's possible knowledge of business risks associated with climate change. On August 10, 2016, ExxonMobil's price per share dropped to $86.41, a 2.58% drop from the previous day's price of $88.70 per share.

On October 28, 2016 ExxonMobil announced the results for its third quarter of 2016, disclosing it may be forced to de-book almost 20% of its oil and gas reserves.

That same day, *The New York Times* noted this would be the biggest accounting revision of reserves in ExxonMobil's history. The day before this information was released, ExxonMobil's common stock was $86.92 per share. On the day the information was released, the stock price dropped to $84.78, a decline of 2.46%.

On January 19, 2017, UBS downgraded ExxonMobil to "sell" as a result of the possible de-booking of 4.6 billion barrels of its 24.8 billion barrels of proved reserves. ExxonMobil's stock price dropped from $86.28 per share on January 18, 2017 to $84.73 per share on January 19, 2017, declining 1.8%.

Finally, On January 31, 2017, ExxonMobil released its financial information for the fourth quarter of 2016, disclosing an upstream asset impairment charge of approximately $2 billion. ExxonMobil also announced it would de-book the Kearl Operation reserves. The market allegedly reacted over the next two days with the common stock price falling from $84.86 per share on January 30, 2017 to $82.94 per share on February 1, 2017, a drop in price of 2.26%.

"To plead loss causation, the complaint must allege facts that support an inference that [defendant's] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (5th Cir. 2005). The pleading standard for loss causation is not heightened as it is with scienter but is only the plausibility standard. *See Lormand*, 565

F.3d at 260. Furthermore, "it is often inappropriate to use a Rule 12(b)(6) motion as a vehicle to resolve disputes over 'loss causation.'" *Id*. at 267 n.35.

Courts must properly considers facts alleging loss causation collectively and in the light most favorable to the plaintiff. *See Public Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 324 (5th Cir. 2014); *see also Oliver*, 276 F.3d at 744. The Fifth Circuit has held "'there is no requirement that a corrective disclosure take a particular form or be of a particular quality…. It is the exposure of the fraudulent representation that is the critical component of loss causation.'" *Amedisys, Inc.*, 769 F.3d at 323–24 (quoting *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 165 (S.D.N.Y. 2008)). Furthermore, the Fifth Circuit has considered both news articles that reveal information to the marketplace and government investigations of suspected fraud in the total mix of information to determine whether the alleged partial disclosures cumulatively plead loss causation. *See id*. at 323–25. (considering a *Wall Street Journal* article as a corrective disclosure and stating government investigations into suspected fraud "must be viewed together with the totality of the other alleged partial disclosures.").

The Court considers all of the alleged facts in their totality and finds Pension Fund sufficiently pleaded loss causation. It is plausible that over the course of the alleged partial corrective disclosures, the market became aware of ExxonMobil's alleged fraud and reacted each time with ExxonMobil's common stock falling. Pension Fund has properly pleaded loss causation.

### 4. Section 20(a) Claims

ExxonMobil's sole argument for dismissing Pension Fund's Section 20(a) claim is that Pension Fund failed to sufficiently plead a primary violation. "For a violation of § 20(a), a plaintiff must show (1) an underlying, primary violation of § 10(b) of the Exchange Act and Rule 10b-5 and (2) direct or indirect control of the violator by the defendant." *In re Key Energy Servs., Inc. Secs. Litig.*, 166 F. Supp. 3d 822, 841 (S.D. Tex. 2016) (quoting *Southland*, 365 F.3d at 383-84). Thus, if a plaintiff fails to adequately plead the primary securities violation, the Section 20(a) claim for control person liability necessarily fails. *See Southland*, 365 F.3d at 383.

The Court has already concluded Pension Fund sufficiently alleged a primary violation of securities fraud under Section 10(b) and Rule 10b-5 against Defendant ExxonMobil. Pension Fund pleaded Defendants Tillerson, Swiger, Rosenthal, and Woodbury act as control persons of ExxonMobil. While Pension Fund failed to sufficiently allege a primary securities violation against Defendant Woodbury, Pension Fund has alleged he is a control person of ExxonMobil and has adequately pleaded a primary violation of securities fraud against ExxonMobil. Thus, Pension Fund has adequately pleaded control person liability under Section 20(a) as to Defendant Woodbury. *See id.* Because Pension Fund sufficiently pleaded primary violations of the Securities Exchange Act, Pension Fund adequately pleaded Section 20(a) claims against all Defendants. *See id.*

### E. Conclusion

Pension Fund sufficiently pleaded securities fraud claims under Section 10(b), Rule 10b-5, and Section 20(a), having pleaded material misstatements, met the heightened pleading standard for scienter as to Defendants ExxonMobil, Tillerson, Swiger, and Rosenthal, and sufficiently pleaded loss causation. Thus, the Court **DENIES** ExxonMobil's motion to dismiss as to Defendants ExxonMobil, Tillerson, Swiger, and Rosenthal. However, Pension Fund failed to meet the heightened pleading standard for scienter as to Defendant Woodbury, and, therefore, the Court **GRANTS** ExxonMobil's motion to dismiss regarding Defendant Woodbury as to the Section 10(b) and Rule 10b-5 securities claim, but the Section 20(a) control person liability claim remains.

**SO ORDERED.**

Signed August 14th, 2018.

*Ed Kinkeade*

ED KINKEADE
UNITED STATES DISTRICT JUDGE