UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| PEDRO RAMIREZ, JR., Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>EXXON MOBIL CORPORATION, et al.,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 3:16-cv-03111-K<br><br><u>CLASS ACTION</u> |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

**[REDACTED]**

1511606_1

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ........................................................................................................1

II.     FACTUAL BACKGROUND......................................................................................2

III.    ARGUMENT...............................................................................................................5

    A.      The Proposed Class Satisfies the Standards for Class Certification Under
Rule 23(a).........................................................................................................6

        1.      The Class Is So Numerous that Joinder of All Members Is
Impracticable........................................................................................6

        2.      There Are Questions of Law or Fact Common to the Class.......................7

        3.      The Representative Party's Claims Are Typical of the Claims of
the Class...............................................................................................9

        4.      The Representative Party and Its Counsel Are More Than
Adequate ............................................................................................10

            a.      Plaintiff Is Adequate to Serve as Class Representative .................10

            b.      Proposed Class Counsel Is Adequate............................................12

    B.      The Proposed Class Satisfies the Standards for Class Certification Under
Rule 23(b)(3)...................................................................................................13

        1.      The Common Questions Predominate .......................................................13

            a.      Plaintiff and the Class Are Entitled to the Fraud-on-the-
Market Presumption of Reliance ...................................................15

                (1)     Exxon Shares Experienced a High Weekly Trading
Volume..............................................................................15

                (2)     A Substantial Number of Financial Analysts
Covered and Reported on Exxon During the Class
Period................................................................................16

                (3)     Exxon Common Stock Traded on the NYSE Under
Supervision of a Designated Market Maker .....................16

                (4)     Exxon Was Eligible to File on Form S-3 During the
Class Period .....................................................................16

                (5)     The Price of Exxon Common Stock Reacted to
New, Company-Specific Information During the
Class Period .....................................................................17

                (6)     Exxon Had a Large Market Capitalization and Float ........18

                (7)     Exxon Common Stock's Bid-Ask Spread Was Low .........18

- i -

**Page**

(8) The *Unger* Factors Weigh in Favor of a Finding of Market Efficiency ..................................................................19

b. Plaintiff and the Class Are Also Entitled to a Presumption of Reliance under *Affiliated Ute* ......................................................19

c. Damages Will Be Determined on a Class-Wide Basis ..................20

2. Class Treatment Is Superior to Other Methods of Adjudication ...............21

C. Statement of Compliance with Local Rule 23.2 ....................................................23

IV. CONCLUSION...............................................................................................................25

1511606_1

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Affiliated Ute Citizens v. United States*,
    406 U.S. 128 (1972)..................................................................................2, 14, 19, 20

*Amchem Prods. v. Windsor*,
    521 U.S. 591 (1997)........................................................................................10, 13

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013).......................................................................................... *passim*

*Barrie v. Intervoice-Brite, Inc.*,
    No. 3:01-CV-1071-K, 2009 WL 3424614
    (N.D. Tex. Oct. 26, 2009) ................................................................................ *passim*

*Basic v. Levinson*,
    485 U.S. 224 (1988)........................................................................................ *passim*

*Buettgen v. Harless*,
    No. 3:09-CV-791-K, 2011 WL 1938130
    (N.D. Tex. May 19, 2011)................................................................................11, 12

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989) ................................................................15, 16, 17

*City of Pontiac Gen. Emps.' Ret. Sys. v. Dell Inc.*,
    No. A-15-CV-374-LY, 2018 WL 1558571
    (W.D. Tex. Mar. 29, 2018) .........................................................................9, 11, 12, 14

*Dodona I, LLC v. Goldman, Sachs & Co.*,
    296 F.R.D. 261 (S.D.N.Y. 2014) ....................................................................19, 20

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011)....................................................................................10, 13, 14

*Gaudin v. Saxon Mortg. Servs.*,
    297 F.R.D. 417 (N.D. Cal. 2013)..........................................................................20

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014)........................................................................................14, 15

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
    No. H-14-3428, 2017 WL 2608243
    (S.D. Tex. June 15, 2017) ...............................................................................8, 14

*In re Corrugated Container Antitrust Litig.*,
    643 F.2d 195 (5th Cir. 1981) ..............................................................................10

- iii -

**Page**

*In re Deepwater Horizon*,
   739 F.3d 790 (5th Cir. 2014) ........................................................................................6

*In re Deepwater Horizon*,
   785 F.3d 1003 (5th Cir. 2015) .....................................................................................10

*In re Dell Inc. Sec. Litig.*,
   No. A-06-CA-726-SS, 2010 WL 2371834
   (W.D. Tex. June 11, 2010)............................................................................................22

*In re Diamond Foods Inc. Sec. Litig.*,
   295 F.R.D. 240 (N.D. Cal. 2013)..............................................................................20, 21

*In re Elec. Data Sys. Corp. Sec. Litig.*,
   226 F.R.D. 559 (E.D. Tex. 2005),
   *aff'd sub nom. Feder v. Elec. Data Sys. Corp.*,
   429 F.3d 125 (5th Cir. 2005) ..............................................................................6, 7, 22

*In re Enron Corp. Sec. Litig.*,
   586 F. Supp. 2d 732 (S.D. Tex. 2008) ...........................................................................12

*In re Reliant Sec. Litig.*,
   No. H-02-1810, 2005 WL 8152605
   (S.D. Tex. Feb. 23, 2005)......................................................................................6, 9, 12

*James v. City of Dallas*,
   254 F.3d 551 (5th Cir. 2001) .........................................................................................9

*Jenkins v. Raymark Indus.*,
   782 F.2d 468 (5th Cir. 1986) .........................................................................................8

*KB Partners I, L.P. v. Barbier*,
   No. A-11-CA-1034-SS, 2013 WL 2443217
   (W.D. Tex. June 4, 2013)..................................................................................... *passim*

*Krogman v. Sterritt*,
   202 F.R.D. 467 (N.D. Tex. 2001) .............................................................................15, 18

*Lehocky v. Tidel Techs., Inc.*,
   220 F.R.D. 491 (S.D. Tex. 2004)......................................................................... *passim*

1511606_1

**Page**

*Local 703, I.B. of T. Grocery & Food Emps.*
*Welfare Fund v. Regions Fin. Corp.*,
    282 F.R.D. 607 (N.D. Ala. 2012),
    *aff'd in part and vacated in part on other*
    *grounds*, 762 F.3d 1248 (11th Cir. 2014) ...............................................................................12

*Local 703, I.B. of T. Grocery & Food Emps.*
*Welfare Fund v. Regions Fin. Corp.*,
    762 F.3d 1248 (11th Cir. 2014) ...............................................................................................12

*Ludlow v. BP, P.L.C.*,
    800 F.3d 674 (5th Cir. 2015) .................................................................................5, 13, 20, 21

*Marcus v. J.C. Penney Co., Inc.*,
    No. 6:13-cv-736-MHS-KNM, 2016 WL 8604331
    (E.D. Tex. Aug. 29, 2016) ............................................................................................. *passim*

*N. Am. Acceptance Corp. Sec. Cases v. Arnall, Golden & Gregory*,
    593 F.2d 642 (5th Cir. 1979) ..................................................................................................12

*Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*,
    487 F.3d 261 (5th Cir. 2007) ....................................................................................................8

*Oscar Private Equity Invs. v. Holland*,
    No. Civ. 3-03-CV-2761-H, 2005 WL 877936
    (N.D. Tex. Apr. 15, 2005), *vacated on other grounds sub nom.*
    *Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*,
    487 F.3d 261 (5th Cir. 2007) ....................................................................................................8

*Pederson v. La. State Univ.*,
    213 F.3d 858 (5th Cir. 2000) ....................................................................................................6

*Snyder v. Harris*,
    394 U.S. 332 (1969)................................................................................................................24

*Stewart v. Winter*,
    669 F.2d 328 (5th Cir. 1982) ....................................................................................................8

*Torres v. S.G.E. Mgmt., L.L.C.*,
    838 F.3d 629 (5th Cir. 2016), *cert. denied*, __ U.S. __,
    138 S. Ct. 76 (2017)................................................................................................................13

*Unger v. Amedisys Inc.*,
    401 F.3d 316 (5th Cir. 2005) ...............................................................................6, 15, 16, 19

- v -

**Page**

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)......................................................................................................2, 8

*Zeidman v. J. Ray McDermott & Co.*,
  651 F.2d 1030 (5th Cir. 1981) ...............................................................................7

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
  §77z-1(a)(3)(B)(iii)(I) ............................................................................................12
  §78j(b).......................................................................................................................13
  §78t(a) ......................................................................................................................13
  §78u-4(e)(1) .............................................................................................................21
  §78u-4(e)(2) .............................................................................................................21
  §78aa(a).....................................................................................................................24

17 C.F.R.
  §240.10b-5(b)......................................................................................................15, 20

Federal Rules of Civil Procedure
  Rule 23 ................................................................................................... *passim*
  Rule 23(a)............................................................................................... *passim*
  Rule 23(a)(2)...........................................................................................................7
  Rule 23(a)(3)...........................................................................................................9
  Rule 23(a)(4)......................................................................................................10, 12
  Rule 23(b) ............................................................................................................5, 13
  Rule 23(b)(3)........................................................................................... *passim*
  Rule 23(b)(3)(A)-(D) ............................................................................................22

## SECONDARY AUTHORITIES

2 William B. Rubenstein, *Newberg on Class Actions* (5th ed.)
  §4:54 ......................................................................................................................20

1511606_1

Lead Plaintiff Greater Pennsylvania Carpenters Pension Fund ("plaintiff"), on behalf of itself and the putative Class, respectfully submits this memorandum of law in support of plaintiff's Motion for Class Certification (the "Motion").

## I.   INTRODUCTION

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, and in accordance with Rule 23.2 of the Local Civil Rules of the United States District Court for the Northern District of Texas (the "Local Rules"), plaintiff moves for certification of a class consisting of:

> All persons who purchased or otherwise acquired Exxon Mobil Corporation ("Exxon" or the "Company") common stock between March 31, 2014 and January 30, 2017, inclusive (the "Class Period"), and were damaged thereby (the "Class").[1]

This case is ideally suited for class treatment and plaintiff has more than adequately carried its burden of establishing the requirements for certification under Fed. R. Civ. P. 23(a) and (b)(3). As explained below, the proposed Class is so numerous and geographically dispersed that joinder is impracticable; plaintiff alleges claims that are identical to – and thus typical of – the claims of the Class; plaintiff is a more than adequate class representative; and class treatment is superior to the alternative of innumerable individual lawsuits adjudicating identical issues. Moreover, the proposed Class also plainly satisfies the commonality and predominance requirements, which simply require plaintiff to establish ***questions*** that are susceptible to Class-wide resolution and predominate over issues affecting individual Class members. In other words, plaintiff need ***not*** prove that the common questions "will be ***answered***, on the merits, in favor of the class." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013).[2]

---

[1]   Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

[2]   Unless otherwise noted, emphasis is added and citations are omitted throughout.

- 1 -

1511606_1

Here, the seminal questions of law and fact are clearly common to the Class. For example, whether defendants publicly misstated and/or omitted material facts and whether those misstatements and/or omissions artificially inflated the price of Exxon common stock are issues that are susceptible to Class-wide resolution because the determination of their "truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). And because plaintiff has demonstrated that Exxon common stock traded in an efficient market during the Class Period, it is entitled to a presumption of reliance under *Basic v. Levinson*, 485 U.S. 224 (1988); thus, common questions predominate over any individual questions that exist.[3]

For these reasons and those expressed more fully below, plaintiff respectfully requests that the Court grant this Motion, certify the Class, appoint plaintiff as Class Representative and appoint Robbins Geller Rudman & Dowd LLP ("Robbins Geller") as Class Counsel.

## II.    FACTUAL BACKGROUND

At the time of the Complaint, Exxon was the world's largest publicly traded oil and gas company. ¶64.[4] Its stock trades on the New York Stock Exchange ("NYSE") under the ticker "XOM." *Id.* The Company and several of its highest ranking current and former officers and directors – Exxon's former Chairman of the Board and CEO Rex W. Tillerson, Senior Vice President and Principal Financial Officer Andrew P. Swiger, Vice President of Investor Relations and Secretary Jeffrey J. Woodbury, and Vice President, Controller and Principal Accounting Officer David S. Rosenthal – are the defendants in this action. ¶¶34-38.[5]

---

[3]    Alternatively, plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972). *See infra* §III.B.1.b.

[4]    Paragraph references ("¶__" and "¶¶__") are to the Consolidated Complaint for Violations of the Federal Securities Laws (ECF No. 36).

[5]    Exxon, Tillerson, Swiger, Woodbury and Rosenthal are referred to collectively as "defendants."

- 2 -

1511606_1

Plaintiff alleges that defendants violated the Securities Exchange Act of 1934 ("Exchange Act") by, among other things, failing to properly account for and disclose massive losses, write-downs and impairments relating to Exxon's bitumen reserves at Kearl Lake ("Kearl") and Rocky Mountain Dry Gas ("RMDG") operations, both of which were struggling mightily during the Class Period. ¶¶141, 144, 169-194. These allegations are corroborated by the limited discovery produced to date. ██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████ Appendix in Support of Lead Plaintiff's Motion for Class Certification ("App."), filed concurrently herewith, App. 204, App. 268. Similarly, other internal Exxon documents indicate that the Company's XTO operations, which included the ████████████████████████████████████████ App. 305.

Plaintiff further alleges that defendants made numerous statements throughout the Class Period that misrepresented Exxon's purported use of a proxy cost of carbon in connection with its investment analyses. ¶¶128, 130-131, 136, 248-249, 253, 263, 283. In truth, had the Company actually incorporated the carbon proxy costs as defendants publicly represented, massive write-downs and/or impairments of the Kearl reserves and RMDG operations would have been required. ¶¶175-176, 190, 193-194, 359-365, 371-372. These allegations are also corroborated by the limited internal Exxon documents produced to date, which confirm that Exxon did not factor ***any proxy cost at all*** into its impairment analyses for the RMDG assets prior to 2016, notwithstanding the mandate under Generally Accepted Accounting Principles ("GAAP") that the Company "incorporate [its] own assumptions" and defendants' Class Period representations that "carbon gets put into all of [Exxon's] economic models . . . ***as a cost***." ¶¶136, 146, 305, 330, 371; ECF No. 36-1, Ex. 2 at 26 of 30; *see also* ECF No. 36-1, Exs. 3-5. Likewise, to avoid disclosing losses and write-offs in connection with its Kearl reserves, defendants applied "the current, much lower [greenhouse gas] tax

- 3 -

1511606_1

that existed under Alberta law at that time" in lieu of the escalating proxy cost that defendants publicly touted.  ¶¶141-144, 354-365.  Indeed, ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████  App. 309.

When defendants belatedly disclosed the true likelihood of a massive write-down of Exxon's Kearl reserves and a \$2 billion impairment of its RMDG operations, the Company's stock price declined in a statistically significant manner after controlling for peer and market effects.  These declines are evidence that defendants' failure to timely disclose the losses, write-downs and impairments relating to these specific assets materially impacted Exxon's stock price.

For instance, on October 28, 2016, the Company filed a Form 8-K with the U.S. Securities and Exchange Commission ("SEC") disclosing that "approximately *3.6 billion barrels of bitumen at Kearl*, and about 1 billion oil-equivalent barrels in other North America operations" "could be required to be *de-booked as proved reserves*." App. 137.  Following this disclosure, Exxon's share price declined a statistically significant \$3.84 per share after controlling for peer and market effects.  Expert Report of Frank C. Torchio, App. 23, App. 30-33, App. 101, ¶¶74-82 & Table 2 at 21, Ex. 6 at 2, filed concurrently herewith.  On the next trading day, October 31, 2016, financial analysts following the Company focused extensively on the 8-K disclosure, noting that the "*potential write-downs*" referenced by the Company "account for *~19% of XOM's YE15 proved reserves*." App. 148-App. 158.  Following the issuance of these analyst reports, Exxon's share price continued its decline, closing down an additional \$1.75 on October 31, 2016 after controlling for peer and market effects.  App. 101, Ex. 6 at 2.  In the aggregate, during the two-day period immediately following the

- 4 -

Company's 8-K disclosure, ***Exxon's stock price declined $5.59*** after controlling for peer and market effects, a statistically significant result. App. 23, App. 101, Table 2 at 21, Ex. 6 at 2.[6]

Additionally, on January 31, 2017, Exxon filed another Form 8-K with the SEC disclosing that "U.S. Upstream earnings include an ***impairment charge of $2 billion*** largely related to ***dry gas operations in the Rocky Mountains region***." App. 141. This massive impairment charge reduced Exxon's reported 2016 earnings by over 20%. *Id.* Following this disclosure, numerous financial analysts commented on the impact of the impairment. *See* App. 173-App. 193; App. 33-App. 34, ¶¶85-87. Between January 31, 2017 and the close of trading on February 1, 2017, Exxon's stock price ***suffered a two-day decline of $1.64*** after controlling for peer and market effects, a statistically significant result. App. 23, App. 34-App. 35, App. 101, ¶¶88-90 & Table 2 at 21, Ex. 6 at 2.

The event study conducted by plaintiff's expert Frank C. Torchio demonstrates a statistically significant reaction to the belated disclosure of the allegedly omitted and misrepresented information – namely, the failure to timely disclose losses, write-downs and impairments related to Kearl and the RMDG operations. App. 30-App. 35, ¶¶74-91. This reaction evidences that had the losses, write-downs and impairment charges been timely disclosed in compliance with GAAP, Exxon's share price would have been similarly impacted.

## III.   ARGUMENT

To obtain class certification, plaintiff must demonstrate that the requirements of Fed. R. Civ. P. 23(a) and at least one subsection of Rule 23(b) are satisfied. *See Ludlow v. BP, P.L.C.*, 800 F.3d 674, 682 (5th Cir. 2015). This inquiry is not concerned with whether plaintiff will ultimately prevail on the merits, but rather whether the requirements of Rule 23 are met. *See Amgen*, 568 U.S. at 465-

---

[6]   On January 18, 2017, financial analysts at UBS downgraded Exxon stock to "sell," noting that "another potential catalyst to our Sell rating is XOM's risk of de-booking up to 19% of proved reserves. XOM has stated in its 3Q results that it may de-book proved reserves at Kearl" of approximately 3.6 billion barrels. App. 159-App. 172. Following this downgrade, on January 19, 2017, Exxon's stock price declined an additional statistically significant $1.30 per share after controlling for peer and market effects. App. 98, Ex. 5 at 17 of 18. Exxon formally recorded the de-booking of these reserves on February 22, 2017. App. 146-App. 147.

- 5 -

66.  Accordingly, class certification "should ***not*** be [a] mini-trial[] on the merits of the class or individual claims."  *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005).  Instead, "[m]erits questions may be considered to the extent – ***but only to the extent*** – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Amgen*, 568 U.S. at 466; *In re Deepwater Horizon*, 739 F.3d 790, 798 (5th Cir. 2014).

Rule 23 "'should be construed liberally to permit class actions, especially in the context of securities fraud suits, where the class action device can prove effective in deterring illegal activity.'"  *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 504 (S.D. Tex. 2004).  Thus, "[i]n securities fraud cases, such as this, 'when a court is in doubt as to whether or not to certify a class action, the court should err in favor of allowing the class to go forward.'"  *In re Reliant Sec. Litig.*, No. H-02-1810, 2005 WL 8152605, at *3 (S.D. Tex. Feb. 23, 2005).

### A.    The Proposed Class Satisfies the Standards for Class Certification Under Rule 23(a)

Rule 23(a) requires that: (1) the class be so numerous that joinder is impracticable ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims of the representative parties are typical of the claims of the class ("typicality"); and (4) the representative parties can fairly and adequately protect the interests of the class ("adequacy").  Fed. R. Civ. P. 23(a).  The proposed Class readily satisfies these requirements.

### 1.    The Class Is So Numerous that Joinder of All Members Is Impracticable

To satisfy the numerosity requirement, plaintiff "need not allege the exact number and identity of the class members," but rather, need only "establish that joinder is impracticable through 'some evidence or reasonable estimate of the number of purported class members.'"  *In re Elec. Data Sys. Corp. Sec. Litig.*, 226 F.R.D. 559, 564 (E.D. Tex. 2005) (quoting *Pederson v. La. State Univ.*, 213 F.3d 858, 868 (5th Cir. 2000)), *aff'd sub nom. Feder v. Elec. Data Sys. Corp.*, 429 F.3d

- 6 -

125 (5th Cir. 2005).  Accordingly, "[c]ourts are 'quite willing to accept common sense assumptions in order to support findings of numerosity.'"  *Marcus v. J.C. Penney Co., Inc.*, No. 6:13-cv-736-MHS-KNM, 2016 WL 8604331, at *2 (E.D. Tex. Aug. 29, 2016), *report and recommendation adopted*, 2017 WL 907996 (E.D. Tex. Mar. 8, 2017).  "'The numerosity prerequisite 'is generally assumed to have been met in class action suits involving nationally traded securities,'" such as this one.  *KB Partners I, L.P. v. Barbier*, No. A-11-CA-1034-SS, 2013 WL 2443217, at *11 (W.D. Tex. June 4, 2013) (quoting *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1039 (5th Cir. 1981)).

During the Class Period, Exxon had ***at least 4.1 billion shares outstanding*** and an average weekly trading volume of 61.5 million.  App. 10, App. 12, ¶¶23, 30.  These volumes of shares outstanding and traded during the Class Period "suggest[] a potentially massive class of individual investors," thus supporting a finding of numerosity.  *See KB Partners*, 2013 WL 2443217, at *11 (numerosity "easily satisfied" where "approximately ***two million shares*** of PTI common stock were traded on the NASDAQ each week during the Class Period").  That Exxon was nationally traded on the NYSE during the Class Period further supports a finding of numerosity because "the individuals or entities that traded [Exxon] securities are almost certainly located nationwide."  *Marcus*, 2016 WL 8604331, at *2; *see Zeidman*, 651 F.2d at 1038 ("geographical dispersion of the class" relevant to numerosity).  Thus, because the Class is "'composed of the [purchasers] of a nationally traded security during a period in which hundreds of thousands . . . of shares of the security were traded,'" the Class is "'necessarily . . . so numerous that joinder of all members is impracticable.'"  *Elec. Data*, 226 F.R.D. at 564 (quoting *Zeidman*, 651 F.2d at 1039).

### 2.    There Are Questions of Law or Fact Common to the Class

Commonality requires that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  A common question is one that "is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one

of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. "The threshold of 'commonality' is not high,'" *Jenkins v. Raymark Indus.*, 782 F.2d 468, 472 (5th Cir. 1986); *Marcus*, 2016 WL8604331, at \*3, and is satisfied where there is just "one issue whose resolution will affect all or a significant number of the putative class members," *Stewart v. Winter*, 669 F.2d 328, 335 (5th Cir. 1982).

Here, plaintiff and all Class members are alleged to have been injured by a common course of conduct arising from defendants' material misrepresentations and omissions made during the Class Period. Thus, there is a well-defined community of interest in the questions at issue, which include, among others: (1) whether defendants violated the Exchange Act; (2) whether defendants publicly omitted and/or misstated material facts concerning, *inter alia*, the Company's investment and asset valuation processes and particular problems facing Exxon's Kearl and RMDG assets; (3) whether defendants knew or deliberately disregarded that their statements were false and misleading; (4) whether defendants' material misstatements and/or omissions artificially inflated the price of Exxon common stock during the Class Period; and (5) the extent and appropriate measure of damages sustained by members of the Class.

Each of the foregoing questions demonstrate that there is a single "theory of recovery" for plaintiff and the Class: "material misrepresentations . . . made in an efficient market artificially inflated the stock price." *Oscar Private Equity Invs. v. Holland*, No. Civ. 3-03-CV-2761-H, 2005 WL 877936, at \*6 (N.D. Tex. Apr. 15, 2005), *vacated on other grounds sub nom. Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261 (5th Cir. 2007).[7] Because "every class member's allegations of securities fraud arise from the same basic set of facts," the commonality requirement is satisfied. *KB Partners*, 2013 WL 2443217, at \*11; *see also Amgen*, 568 U.S. at 467 ("materiality is a 'common questio[n]' for purposes of Rule 23(b)(3)"); *In re Cobalt Int'l Energy,*

---

[7]    The Fifth Circuit's decision in *Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261 (5th Cir. 2007), was subsequently abrogated by the Supreme Court. *See* discussion *infra* at 10 n.8.

1511606_1

*Inc. Sec. Litig.*, No. H-14-3428, 2017 WL 2608243, at *2 (S.D. Tex. June 15, 2017) (commonality satisfied by questions such as "whether Defendants made false and misleading statements concerning Cobalt's business partners in Angola"); *Reliant*, 2005 WL 8152605, at *4 (commonality satisfied by questions such as "whether the market price of Reliant Resources stock was inflated").

### 3. The Representative Party's Claims Are Typical of the Claims of the Class

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  This prerequisite inquires into "whether the class representative's claims have the same essential characteristics of those of the putative class," *James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001), and is satisfied "'when the claims of the named and unnamed plaintiffs have a common source and rest upon the same legal and remedial theories,'" *Reliant*, 2005 WL 8152605, at *5.  "Like commonality, the test for typicality is not demanding." *James*, 254 F.3d at 571; *Marcus*, 2016 WL 8604331, at *3.

Here, plaintiff purchased Exxon common stock during the Class Period.  *See* Declaration of Michael Swiderski in Support of Motion for Class Certification, App. 130, ¶5, filed concurrently herewith.  As explained *supra*, plaintiff's claims are founded on the same alleged facts and legal theories as the claims of all Class members, *e.g.*, defendants' Class Period false statements and/or omissions and their impact on Exxon's stock price.  *See supra* §III.A.2.  Moreover, the injury plaintiff suffered is the same injury suffered by the putative Class as a whole.  *See* App. 56, ¶163. Because plaintiff "and the Class members both allege that the same misrepresentations and omissions caused the same result (artificially inflating the value of securities), [plaintiff's] claims are typical of the claims of the Class members." *Marcus*, 2016 WL 8604331, at *3; *see also City of Pontiac Gen. Emps.' Ret. Sys. v. Dell Inc.*, No. A-15-CV-374-LY, 2018 WL 1558571, at *3 (W.D. Tex. Mar. 29, 2018) (same).

- 9 -

1511606_1

### 4.     The Representative Party and Its Counsel Are More Than Adequate

Adequacy requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  This prerequisite "serves to uncover conflicts of interest between named parties and the class they seek to represent," *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997), and "encompasses the class representative[s], their counsel, and the relationship between the two," *Marcus*, 2016 WL 8604331, at \*3.  The requirement is threefold, inquiring into whether: (1) any conflicts of interest exist between the plaintiff and the class it seeks to represent; (2) the plaintiff has the "willingness and ability to play an active role in the litigation and vigorously represent the class, while protecting the interests of the absentee class members"; and (3) "class counsel has the competence and ability to vigorously conduct the litigation."  *Barrie v. Intervoice-Brite, Inc.*, No. 3:01-CV-1071-K, 2009 WL 3424614, at \*7 (N.D. Tex. Oct. 26, 2009) (Kinkeade, J.).[8]  As explained below, all three prongs are satisfied here.

### a.     Plaintiff Is Adequate to Serve as Class Representative

The crux of the adequacy inquiry is whether the proposed class representative is "'part of the class and "possess[es] the same interest and suffer[s] the same injury" as the class members.'" *Amchem*, 521 U.S. at 625; *In re Deepwater Horizon*, 785 F.3d 1003, 1015 (5th Cir. 2015) ("*Deepwater II*").  "'[As] long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes.'"  *Lehocky*, 220 F.R.D. at 502-03 (quoting *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir. 1981)).

---

[8]     The denial of class certification in *Barrie* turned on then-existing Fifth Circuit authority that required plaintiffs to establish loss causation by a preponderance of evidence.  *See Barrie*, 2009 WL 3424614, at \*1.  The Supreme Court has since abrogated that rule.  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 811-13 (2011) ("*Halliburton I*").

Here, there are no conflicts of interest between plaintiff and the Class. In fact, plaintiff's interests are perfectly aligned with the Class's. Like other putative Class members, plaintiff purchased Exxon common stock at market prices during the Class Period and was injured by the same material misrepresentations and/or omissions. App. 130, ¶5. Plaintiff is thus incentivized to establish defendants' liability and maximize its recovery, and by doing so, plaintiff will necessarily do the same for the absent Class members. *See Barrie*, 2009 WL 3424614, at *7 (adequacy satisfied where "[a]ll class members (including Lead Plaintiffs) will bring claims based upon the same conduct and under the same legal theories, claiming that due to Defendants' alleged conduct, they purchased IVB stock at artificially inflated prices and suffered damages thereafter when IVB's stock price fell"); *see also Dell*, 2018 WL 1558571, at *4 (holding similarly).

In addition, plaintiff has demonstrated its willingness and ability to serve as a class representative. Plaintiff is actively engaged in this litigation. For instance, plaintiff successfully moved for appointment as lead plaintiff. ECF Nos. 25, 29. Recently, in response to defendants' discovery requests, plaintiff searched for and produced relevant and responsive materials. App. 131, ¶7. Plaintiff has also received and reviewed periodic updates and other correspondence from counsel, reviewed pleadings and other documents in this case, and participated in discussions with counsel regarding significant development in the litigation. *Id.* Additionally, plaintiff is committed to monitoring and participating in the prosecution of this action. App. 131, ¶8. Plaintiff's continued oversight of and participation in this litigation readily satisfies the adequacy requirement. *See Buettgen v. Harless*, No. 3:09-CV-791-K, 2011 WL 1938130, at *5 (N.D. Tex. May 19, 2011) ("*Idearc*") (Kinkeade, J.) (adequacy satisfied where "[t]he Pension Trust Fund's board of directors has been kept informed of the progress of this lawsuit, has moved this Court to appoint it lead plaintiff, has designated a representative for depositions, and is producing documents pursuant to discovery requests").

- 11 -

Plaintiff's status as an institutional investor further supports a finding of adequacy. "[B]oth Congress and the courts have recognized that [large institutional] investors are generally preferred as class representatives in securities litigation." *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1260 (11th Cir. 2014) (citing 15 U.S.C. §77z-1(a)(3)(B)(iii)(I)). Accordingly, "that [plaintiff] is an institutional investor, with significant amounts at stake in this litigation and sufficient skill and resources vigorously to pursue its claims, further supports the adequacy of [plaintiff] as class representative." *Reliant*, 2005 WL 8152605, at *5.

### b.    Proposed Class Counsel Is Adequate

To satisfy Rule 23(a)(4), class counsel must be "'qualified, experienced, and generally able to conduct the proposed litigation.'" *N. Am. Acceptance Corp. Sec. Cases v. Arnall, Golden & Gregory*, 593 F.2d 642, 644 (5th Cir. 1979); *Dell*, 2018 WL 1558571, at *4. Plaintiff here has retained attorneys who satisfy this requirement. As this Court and others have recognized, Robbins Geller "has substantial experience in class actions in general and securities class actions in particular. The firm has demonstrated its knowledge of securities law and its willingness to expend resources to properly pursue this action." *Idearc*, 2011 WL 1938130, at *10; *see Dell*, 2018 WL 1558571, at *4 (same); *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 282 F.R.D. 607, 616 (N.D. Ala. 2012) ("The knowledge and experience of Robbins Geller is not only reflected in its firm resume, but has been previously recognized by a federal court which described it as 'one of the most successful law firms in securities class actions, if not the preeminent one, in the country.'") (quoting *In re Enron Corp. Sec. Litig.*, 586 F. Supp. 2d 732, 789-90 (S.D. Tex. 2008)), *aff'd in part and vacated in part on other grounds*, 762 F.3d 1248 (11th Cir. 2014); App. 340-App. 467. Adequacy is thus satisfied.

- 12 -

**B.      The Proposed Class Satisfies the Standards for Class Certification Under Rule 23(b)(3)**

In addition to meeting the prerequisites of Rule 23(a), plaintiff must also satisfy the requirements of one subsection of Rule 23(b).  *See Ludlow*, 800 F.3d at 682.  Here, plaintiff seeks certification under Rule 23(b)(3), which requires that: (1) common questions predominate over questions affecting only individual Class members ("predominance"); and (2) class resolution is superior to other available methods of adjudication ("superiority").  As with Rule 23(a), plaintiff has met the requirements of Rule 23(b)(3).

**1.      The Common Questions Predominate**

Predominance requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).  "The Rule 23(b) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623; *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 636 (5th Cir. 2016), *cert. denied*, __ U.S. __, 138 S. Ct. 76 (2017).  This inquiry is satisfied where "***questions*** of law or fact common to the class 'will predominate over any questions affecting only individual members' as the litigation progresses." *Amgen*, 568 U.S. at 467 (emphasis in original).  It does ***not*** permit inquiry into whether the common questions "will be answered, on the merits, in favor of the class." *Id.* at 459.  Accordingly, while the inquiry "begins . . . with the elements of the underlying cause of action," *Halliburton I*, 563 U.S. at 809, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage," *Amgen*, 568 U.S. at 466.  Predominance is "readily met" in cases alleging securities fraud.  *Amchem*, 521 U.S. at 625.

Here, plaintiff seeks certification of the putative Class to pursue claims alleging securities fraud under §§10(b) and 20(a) of the Exchange Act.  The elements of a §10(b) claim are: "'(1) a material misrepresentation or omission by the defendant[s]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

- 13 -

1511606_1

misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Amgen*, 568 U.S. at 460-61. There can be no dispute that falsity, scienter, materiality and loss causation are issues common to the Class because "failure of proof" on any of these elements "would end the case" for all Class members. *See, e.g.*, *id.* at 467 ("materiality is a 'common questio[n]' for purposes of Rule 23(b)(3)"); *Halliburton I*, 563 U.S. at 813 (holding plaintiff need not prove loss causation at class certification). Rather, the "key issue" for purposes of predominance in a securities fraud case is "whether plaintiffs are entitled to a presumption of reliance applicable to all class members." *Lehocky*, 220 F.R.D. at 504.

Here, the element of reliance is susceptible to Class-wide proof. Because Exxon common stock traded in an efficient market during the Class Period, plaintiff and the Class are entitled to the fraud-on-the-market presumption first endorsed by the Supreme Court in *Basic*, 485 U.S. at 241, and recently reaffirmed in *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014) ("*Halliburton II*"). App. 6-App. 7, ¶¶10-11 & Table 1 at 4. Plaintiff and the Class are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972). Under either presumption, reliance is presumed on a Class-wide basis and is thus a common question.

Damages will also be determined on a Class-wide basis using the same formula and measure of artificial inflation attributable to defendants' conduct for all Class members. App. 56, ¶163. Thus, the common questions identified in §III.A.2, *supra*, predominate over any questions affecting individual Class members. *See Dell*, 2018 WL 1558571, at *5-*6 (predominance met where plaintiff satisfied the requirements for invoking the *Basic* presumption and defendants failed to rebut it); *Cobalt*, 2017 WL 2608243, at *5-*6 (same).

- 14 -

### a. Plaintiff and the Class Are Entitled to the Fraud-on-the-Market Presumption of Reliance

The premise of the fraud-on-the-market reliance theory is that, "'in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.'" *Basic*, 485 U.S. at 241. Thus, "'reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b-5 action.'" *Halliburton II*, 573 U.S. at 268 (quoting *Basic*, 485 U.S. at 246-47).

The Fifth Circuit uses the following non-exhaustive list of factors in evaluating whether a security traded in an efficient market:

> (1) the average weekly trading volume expressed as a percentage of total outstanding shares; (2) the number of securities analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) the company's eligibility to file SEC registration Form S-3; . . . (5) the existence of empirical facts "showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price"; (6) the company's market capitalization; (7) the bid-ask spread for stock sales; and (8) float, the stock's trading volume without counting insider-owned stock.

*Unger*, 401 F.3d at 323.[9]  When the *Unger* factors are analyzed, it is indisputable that Exxon common stock traded in an efficient market during the Class Period.

### (1) Exxon Shares Experienced a High Weekly Trading Volume

"'A high weekly stock trading volume suggests the presence of active, informed investors.'" *KB Partners*, 2013 WL 2443217, at *5. Here, Exxon common stock traded on the NYSE during the Class Period with an average weekly trading volume of 61.5 million shares. App. 12, ¶30. Exxon's average weekly trading volume as a percentage of shares outstanding was 1.47% during the Class Period, which justifies a "substantial presumption" of market efficiency. App. 12-App. 13, ¶¶30, 33; *Barrie*, 2009 WL 3424614, at *10.

---

[9]  The first five factors are derived from *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), while the last three are derived from *Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001). *See Unger*, 401 F.3d at 323.

- 15 -

1511606_1

**(2)     A Substantial Number of Financial Analysts
Covered and Reported on Exxon During the
Class Period**

"The number of securities analysts following the company's stock during the class period may offer 'persuasive' evidence of market efficiency because those investment professionals make buy or sell recommendations to their investor clients, and thereby help incorporate market information into the market price of the stock."  *KB Partners*, 2013 WL 2443217, at *7 (citing *Cammer*, 711 F. Supp. at 1286).  Here, between 25 and 31 securities analysts covered Exxon during the Class Period, which strongly supports market efficiency.  App. 14, ¶¶36-37; *see Barrie*, 2009 WL 3424614, at *10 (finding 12 analysts indicative of market efficiency).

**(3)     Exxon Common Stock Traded on the NYSE
Under Supervision of a Designated Market
Maker**

"'The existence of market makers and arbitrageurs . . . ensure[s] completion of the market mechanism; these individuals . . . react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level.'"  *KB Partners*, 2013 WL 2443217, at *8 (quoting *Cammer*, 711 F. Supp. at 1286-87).  Because Exxon common stock traded on the NYSE during the Class Period, it was facilitated by a Designated Marker Maker who helped insure the stock traded in a liquid market, further evidencing the stock's market efficiency.  App. 16, ¶¶41-42.

**(4)     Exxon Was Eligible to File on Form S-3 During
the Class Period**

A company's eligibility to file an SEC Form S-3 Registration Statement is indicative of market efficiency because, *inter alia*, eligible companies typically broadly disseminate corporate reports.  *See Unger*, 401 F.3d at 323 n.5; *Cammer*, 711 F. Supp. at 1284-85; App. 17-App. 18, ¶¶43-44.  Exxon filed Forms S-3 shortly before and after the Class Period, further confirming the Company's efficient market.  App. 17-App. 18, ¶¶44-45; *see Barrie*, 2009 WL 3424614, at *11.

- 16 -

### (5) The Price of Exxon Common Stock Reacted to New, Company-Specific Information During the Class Period

"'[O]ne of the most convincing ways to demonstrate efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.'" *KB Partners*, 2013 WL 2443217, at *8 (quoting *Cammer*, 711 F. Supp. at 1291). Here, plaintiff's expert performed an event study and statistical analysis, evidencing a cause-and-effect relationship between the release of unexpected, Company-specific material information and the price reaction of Exxon common stock during the Class Period. *See* App. 30-App. 35, ¶¶73-91.

For example, on October 28, 2016, Exxon filed a Form 8-K disclosing that Exxon would likely de-book approximately 3.6 billion barrels of oil reserves at Kearl, representing nearly 20% of its oil and gas reserves. App. 137. This disclosure precipitated extensive analyst commentary and a decline of ***$5.59 per share over a two-day period***, a statistically significant result after controlling for peer and market effects. App. 23, App. 30-App. 33, 101, ¶¶74-82 & Table 2 at 21, Ex. 6 at 2. On January 31, 2017, Exxon filed another Form 8-K, this time disclosing that the Company would be taking a $2 billion impairment charge – *e.g.*, 20% of reported earnings – to its RMDG assets. App. 141. Following commentary from numerous financial analysts concerning this massive impairment and the magnitude of the Kearl reserve write-down, the price of Exxon common stock suffered a statistically significant ***two-day decline of $1.64 per share*** after controlling for peer and market effects. App. 23, App. 33-App. 35, App. 101, ¶¶83-91 & Table 2 at 21, Ex. 6 at 2. These prompt, statistically significant stock price reactions demonstrate that the market incorporated new Exxon-specific information during the Class Period, thus supporting a finding of market efficiency. App. 33, App. 35, ¶¶82, 91; *see KB Partners*, 2013 WL 2443217, at *8-*9, *13 (finding Mr. Torchio's declaration admissible and that it "provides more than ample evidence to invoke the [*Basic*]

- 17 -

presumption"); *see also* App. 6, Table 1 at 4 (summarizing each of the tests conducted, all of which support a finding of market efficiency).

### (6)  Exxon Had a Large Market Capitalization and Float

The larger a company's market capitalization, the more likely that its shares trade in an efficient market, *see Krogman*, 202 F.R.D. at 478, because "there is a greater incentive for stock purchasers to invest in more highly capitalized corporations," *Barrie*, 2009 WL 3424614, at *12. During the Class Period, Exxon's market capitalization ranged from $285.6 billion to $448.2 billion. App. 37, ¶98. These figures strongly support a finding of market efficiency. App. 37, ¶¶99-100; *see Barrie*, 2009 WL 3424614, at *12 (finding "large" market capitalization ranging from $300 million to $1.2 billion indicative of market efficiency).

Courts also look to a company's "float" – the percentage of shares held by the public, as opposed to corporate insiders – as an indicator of market efficiency. *See Lehocky*, 220 F.R.D. at 509. "Prices of stocks that have greater holdings by insiders as opposed to the public are less likely to reflect all available information about the security." *Barrie*, 2009 WL 3424614, at *13. Exxon's "float" during the Class Period ranged from 4.14 billion to 4.29 billion shares, or nearly 100% of Exxon's shares outstanding, further evidencing the efficient market for the Company's stock. App. 38-App. 39, ¶¶105-108; *see Barrie*, 2009 WL 3424614, at *13.

### (7)  Exxon Common Stock's Bid-Ask Spread Was Low

"'The bid-ask spread is the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares.'" *KB Partners*, 2013 WL 2443217, at *10. Large bid-ask spreads can be indicative of inefficient markets because it suggests the stock is too expensive to trade. *See id.* Here, the bid-ask spread of Exxon common

- 18 -

stock during the Class Period was 0.01%.  App. 37-App. 38, ¶¶101-104.  This miniscule bid-ask spread further supports a finding of market efficiency.  App. 38, ¶104.

### (8)     The *Unger* Factors Weigh in Favor of a Finding of Market Efficiency

In sum, each of the eight factors identified in *Unger* supports a finding of market efficiency for Exxon stock.  Thus, the Class is entitled to a presumption of reliance under *Basic*.  App. 6-App. 7, ¶¶10-11 & Table 1 at 4.

### b.     Plaintiff and the Class Are Also Entitled to a Presumption of Reliance under *Affiliated Ute*

The foregoing amply demonstrates that the Class is entitled to invoke the fraud-on-the-market presumption of reliance.  In addition, plaintiff and the Class are also entitled to rely on the *Affiliated Ute* presumption of reliance to meet Rule 23(b)(3)'s predominance requirement.  This presumption is available to securities fraud plaintiffs in actions involving material omissions. *Affiliated Ute*, 406 U.S. at 152-54.  To invoke the presumption, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision."  *Id.* at 153-54.  As explained *supra*, materiality is a common question that plaintiff need not prove at the class certification stage.  *See supra* §III.A.2. Thus, to invoke the *Affiliated Ute* presumption at the class certification stage, materiality need only be properly alleged, which this Court has already found plaintiff has done.  *See* ECF No. 62 at 15-29; *see also Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 269 (S.D.N.Y. 2014) (finding plaintiffs could invoke *Affiliated Ute* and presume reliance at class certification stage because "'Dodona has sufficiently alleged the materiality of the omissions'").

Here, plaintiff's claims are primarily premised on defendants' failure to disclose material information about Exxon's losses, write-downs and impairments relating to the Company's Kearl reserves and RMDG operations.  ¶¶16, 180, 184, 247, 250, 252, 254, 256, 259, 261, 264, 267, 269,

- 19 -

271, 276, 280, 282, 284, 286, 292, 294, 297, 299, 301, 303, 306, 308, 310, 312, 314, 317.  In upholding plaintiff's falsity allegations concerning the RMDG assets, the Court confirmed that defendants' failure to include the publicly stated proxy cost in Exxon's 2015 RMDG impairment analysis "necessarily omitted" facts that rendered the opinion materially misleading.  ECF No. 62 at 22; *see also id.* at 25 (finding plaintiff "sufficiently pleaded Exxon[] made a material misstatement by failing to disclose the Canadian Bitumen Operations operated at a loss for three months"), 27-29 (finding plaintiff sufficiently pleaded that Exxon's failure to disclose its proved reserves at Kearl were all but certain to be de-booked by year-end 2016 was materially misleading).  Because this case involves defendants' failure to disclose facts "necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading," 17 C.F.R. §240.10b-5(b), the *Affiliated Ute* presumption applies, *see, e.g.*, *Dodona I*, 296 F.R.D. at 269-70 (finding *Affiliated Ute* presumption applicable at class certification where plaintiff's claims "are based on omissions," notwithstanding existence of class-period "affirmative misrepresentations").

### c.       Damages Will Be Determined on a Class-Wide Basis

Once the common questions of liability are resolved, the computation of damages that each Class member suffered is a "'mechanical task.'"  *In re Diamond Foods Inc. Sec. Litig.*, 295 F.R.D. 240, 252 (N.D. Cal. 2013).  Indeed, "'[c]ourts in every circuit have . . . uniformly held that the [Rule] 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations.'"  *Gaudin v. Saxon Mortg. Servs.*, 297 F.R.D. 417, 429 (N.D. Cal. 2013) (quoting 2 William B. Rubenstein, *Newberg on Class Actions* §4:54 (5th ed.)); App. 44-App. 56, ¶¶124-163.

While unnecessary for certification, the damages for all putative Class members here can be calculated by the same methodology, *e.g.*, the out-of-pocket measure of damages.  *See Ludlow*, 800 F.3d at 682 (recognizing out-of-pocket measure of damages to be a legally viable approach to

- 20 -

measuring damages in a §10(b) case).  Under this methodology, for each share of Exxon common stock purchased or acquired during the Class Period and held through disclosure of the fraud, the damages will be the lesser of: (1) the purchase or acquisition price minus the statutory sales prices[10]; or (2) the total inflation that came out of the stock price following disclosure of the fraud, as determined by a jury.[11]  Because this methodology for calculating per-share damages will be the same for each Class member, damages constitute a common question.  App. 56, ¶163.  Thus, common questions predominate over any individualized questions.  *See Marcus*, 2016 WL 8604331, at \*9-\*10 (certifying class where damages model was capable of measuring damages attributable to "[d]efendants' alleged misstatements and/or omissions [that] caused J.C. Penney's common stock and options prices to be artificially inflated [and] damaged investors when the truth was revealed").

### 2.    Class Treatment Is Superior to Other Methods of Adjudication

Superiority requires that class treatment be "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  In assessing whether superiority is satisfied, courts consider the following factors: (1) the class members' interest in individually controlling the prosecution of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by class members; (3) the desirability or undesirability of

---

[10]    The Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes a 90-day look-back provision on the calculation of damages.  15 U.S.C. §78u-4(e)(1).  In accordance with that provision, for shares held more than 90 days following "the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market," the statutory sales price is "the mean trading price of [Exxon common stock] during the 90-day period."  *Id.*  For shares sold prior to the expiration of the 90-day period, the statutory sales price is "the mean trading price of [Exxon common stock] during the period beginning immediately after dissemination of information correcting the misstatement or omission and ending on the date on which the [stock is sold]."  15. U.S.C. §78u-4(e)(2).

[11]    A jury can determine the total inflation that came out of Exxon's stock price based on the results of an event study similar to that done by Mr. Torchio in support of his analysis and opinion regarding the efficiency of the market for Exxon stock.  *See, e.g.*, *Ludlow*, 800 F.3d at 683 (recognizing that an event study can be used to calculate out-of-pocket losses); *Diamond Foods*, 295 F.R.D. at 251 ("'The event study method is an accepted method for the evaluation of materiality damages to a class of stockholders in a defendant corporation.'").

- 21 -

1511606_1

concentrating the litigation in the particular forum; and (4) the likely difficulties in managing a class action.  Fed. R. Civ. P. 23(b)(3)(A)-(D); *see Elec. Data*, 226 F.R.D. at 570.

Here, the Class members' interests in individually controlling the prosecution of separate actions are minimal.  Plaintiff is not aware of any related individual actions.  Indeed, plaintiff was the only entity to move for appointment as lead plaintiff in this case.  ECF No. 29.  In addition, "only economic losses are at issue" here.  *Lehocky*, 220 F.R.D. at 510.  Thus, "the interest to personally control the litigation is small."  *Id.*  This is particularly true in the context of private securities fraud cases where the losses absent class members have suffered are relatively small compared to the high hurdles – and corresponding litigation costs – set by the PSLRA.  *See Elec. Data*, 226 F.R.D. at 570-71; *see also Lechocky*, 220 F.R.D. at 511 (superiority satisfied in part because "[t]here are likely many smaller purchasers of Tidel stock who would be unable to pursue their claims outside of a class action").

Moreover, the maintenance of a consolidated class action in this District ensures an efficient expenditure of litigation costs for all parties and will avoid "a massive waste of judicial resources." *In re Dell Inc. Sec. Litig.*, No. A-06-CA-726-SS, 2010 WL 2371834, at *4 (W.D. Tex. June 11, 2010).  The Northern District of Texas is a desirable forum for this class action because individual Class members are geographically dispersed, Exxon is located in this District, and many of the acts and practices complained of occurred in substantial part in this District.  This Court is also well acquainted with this action, having "already made several rulings in this case thus far," including on defendants' motion to dismiss and defendants' motion for reconsideration of the Court's motion to dismiss ruling.  *Lehocky*, 220 F.R.D. at 511.

Finally, plaintiff does not foresee any management difficulties that will preclude this action from being maintained as a class action.  In fact, the alternative – requiring "innumerable individual actions" by each Exxon shareholder of record during the Class Period – would be impossible to

- 22 -

1511606_1

manage.  *Id.*  Thus, class certification in this case would not only be superior to other available methods for fairly and efficiently adjudicating the controversy; it appears to be the ***only method*** for fairly and efficiently litigating the claims of all members of the putative Class.  Accordingly, superiority is easily satisfied here.

### C.   Statement of Compliance with Local Rule 23.2

In addition to satisfying the requirements of Rule 23 of the Federal Rules of Civil Procedure, plaintiff must also satisfy Local Rule 23.2.  As explained *infra*, plaintiff's Motion addresses each requirement of Local Rule 23.2:

*(a) The appropriate sections of Fed. R. Civ. P. 23 under which the suit is properly maintainable as a class action*: As explained *supra*, this case is ideally suited for class certification under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure.

*(b) Specific factual allegations concerning the alleged class, including*:

*(1) The approximate number of class members*: Based on consultation with third-party claims administrator Gilardi & Co. LLC ("Gilardi") and using publicly available trading information on Bloomberg, without the benefit of stock transfer records for Exxon during the Class Period, plaintiff estimates that the Class could contain as many as two to four million Class members.  *See also supra* §III.A.1.

*(2) The definition of the class and any subclass*: *See supra* §I. & n.1.

*(3) The distinguishing and common characteristics of class members, such as geography, time, and common financial incentives*: All Class members purchased or otherwise obtained shares of Exxon common stock on the NYSE during the Class Period, suffered damages and economic loss as a result of defendants' alleged fraudulent conduct, and are similarly incentivized to recover the economic losses caused by defendants' conduct.  *See also supra*

- 23 -

§III.A.2.-3.  Given that Exxon common stock is traded on the NYSE, Class members are likely geographically dispersed throughout the United States.  *See supra* §III.A.1.

*(4) Questions of law and fact that are common to the class*: *See supra* §III.A.2.

*(5) In actions asserting a class under Fed. R. Civ. P. 23(b)(3), allegations concerning the findings required by that section*: *See supra* §III.B.

*(c) The basis of the named plaintiff's claim to be an adequate representative of the class, including financial responsibility to fund the action*: *See supra* §III.A.4.  Additionally, all costs associated with this litigation are being advanced by Lead Counsel.

*(d) The basis for determining any required jurisdictional amount*: Because the Court has federal question jurisdiction over this matter, plaintiff need not establish an amount in controversy.  15 U.S.C. §78aa(a) (granting district courts "exclusive jurisdiction" over Exchange Act claims); *see, e.g.*, *Snyder v. Harris*, 394 U.S. 332, 341 (1969) ("A large part of those matters involving federal questions can be brought, by way of class actions or otherwise, without regard to the amount in controversy.").

*(e) The type and estimated expense of notice to be given to class members, and the source of funds from which notice costs will be paid*: Notice will be provided by two methods.  First, notice will be provided to absent Class members by First-Class Mail.  Notice by mail will be in the form of a postcard, which will provide a summary of the Class certification and provide a toll-free telephone number, mailing address, and website address for Class members to obtain further information and to view or request a copy of the full notice.  Mailed notice will be supplemented by an online media campaign consisting of sponsored link advertising on major search engines, social media advertising specifically directed at Class members, outreach to Class members through Twitter messages, and a national press release.  Based on consultation with third-party claims administrator Gilardi, Lead Counsel estimates that notice by mail will cost approximately $0.75 per

- 24 -

1511606_1

Class member, and notice by publication will cost approximately $25,000. Lead Counsel will advance the costs of notice.

*(f) The discovery necessary for a class certification hearing and the estimated time necessary for such discovery*: *See* ECF No. 85.

*(g) All arrangements for payment of plaintiffs' attorney's fees*: The payment of attorneys' fees to Lead Counsel will occur only upon application to and approval by the Court in connection with a common fund judgment. Assuming the Court's approval, such fees will be paid from the common fund created for the benefit of the Class.

## IV.    CONCLUSION

Based on the foregoing, plaintiff respectfully requests that the Court grant this Motion, certify the proposed Class, appoint plaintiff as Class Representative, and appoint Robbins Geller as Class Counsel.

DATED:  December 21, 2018                    Respectfully submitted,

KENDALL LAW GROUP, PLLC
JOE KENDALL (Texas Bar No. 11260700)
JAMIE J. McKEY (Texas Bar No. 24045262)


                                        s/ JOE KENDALL
                                        JOE KENDALL

3811 Turtle Creek Blvd., Suite 1450
Dallas, TX  75219
Telephone:  214/744-3000
214/744-3015 (fax)
jkendall@kendalllawgroup.com
jmckey@kendalllawgroup.com

BALON B. BRADLEY LAW FIRM
BALON B. BRADLEY (Texas Bar No. 02821700)
11910 Greenville Avenue
Dallas, TX  75243
Telephone:  972/991-1582
972/755-0424 (fax)
balon@bbradleylaw.com

Local Counsel

- 25 -

1511606_1

ROBBINS GELLER RUDMAN
  & DOWD LLP
SPENCER A. BURKHOLZ
X. JAY ALVAREZ
SCOTT H. SAHAM
NATHAN R. LINDELL
SARA B. POLYCHRON
ERIKA OLIVER
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
jaya@rgrdlaw.com
scotts@rgrdlaw.com
nlindell@rgrdlaw.com
spolychron@rgrdlaw.com
eoliver@rgrdlaw.com

Lead Counsel for Plaintiff

1511606_1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on December 21, 2018, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ JOE KENDALL
JOE KENDALL

KENDALL LAW GROUP, PLLC
3811 Turtle Creek Blvd., Suite 1450
Dallas, TX  75219
Telephone:  214/744-3000
214/744-3015 (fax)

E-mail:  jkendall@kendalllawgroup.com

1511606_1

## Mailing Information for a Case 3:16-cv-03111-K Ramirez v. Exxon Mobil Corporation et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **X Jay Alvarez**
  JayA@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Justin Anderson**
  janderson@paulweiss.com,mao_fednational@paulweiss.com

- **Mary K Blasy**
  mblasy@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Balon B Bradley**
  balon@bbradleylaw.com,balonbb@aol.com,iasanchez@bbradleylaw.com,anneh@bbradleylaw.com

- **Nina Cortell**
  nina.cortell@haynesboone.com,denise.stilz@haynesboone.com,robin.hart@haynesboone.com,kelly.hess@haynesboone.com

- **Patrick Coughlin**
  patc@rgrdlaw.com

- **Ralph H Duggins**
  rduggins@canteyhanger.com,adrake@canteyhanger.com

- **Brian Matthew Gillett**
  brian.gillett@squirepb.com,janine.schiell@squirepb.com

- **Daniel H Gold**
  daniel.gold@haynesboone.com,elaine.hadaway@haynesboone.com

- **John C Herman**
  jherman@rgrdlaw.com,smeister@rgrdlaw.com

- **Jonathan Hurwitz**
  jhurwitz@paulweiss.com,mao_fednational@paulweiss.com

- **Joe Kendall**
  jkendall@kendalllawgroup.com,administrator@kendalllawgroup.com

- **Daniel Kramer**
  DKramer@paulweiss.com,mao_fednational@paulweiss.com

- **Gregory F Laufer**
  GLaufer@paulweiss.com,jgoldstein@paulweiss.com,BTannenbaum@paulweiss.com,mao_fednational@paulweiss.com,MStachel@paulweiss.com

- **Nathan R. Lindell**
  nlindell@rgrdlaw.com,jillk@rgrdlaw.com,karenc@rgrdlaw.com,e_file_sd@rgrdlaw.com,susanw@rgrdlaw.com

- **D Patrick Long**
  patrick.long@squirepb.com,dawn.furcht@squirepb.com,annie.purcell@squirepb.com,docketingrequest@squirepb.com,janine.schiell@squirepb.com

- **Jamie Jean McKey**
  jmckey@kendalllawgroup.com,administrator@kendalllawgroup.com

- **Erika Oliver**
  eoliver@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Sara Bierl Polychron**
  spolychron@rgrdlaw.com,6287952420@filings.docketbird.com

- **Samuel H Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Scott H Saham**
  scotts@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Daniel Toal**
  DToal@paulweiss.com,dangelatos@paulweiss.com,mao_fednational@paulweiss.com

- **Theodore V. Wells**
  twells@paulweiss.com,mao_fednational@paulweiss.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`