IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| PEDRO RAMIREZ, JR., Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>EXXON MOBIL CORPORATION, REX W. TILLERSON, ANDREW P. SWIGER, JEFFREY J. WOODBURY, and DAVID S. ROSENTHAL,<br><br>Defendants. | Case No. 3:16-cv-3111-K<br><br><br>**EVIDENTIARY HEARING REQUESTED** |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
TO LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

**[PUBLIC REDACTED VERSION]**

TABLE OF CONTENTS

**Page**

Table of Authorities ......................................................................................................... ii

Preliminary Statement........................................................................................................ 1

Statement of Relevant Facts............................................................................................... 4

      A.     The Parties and the Alleged Class. ................................................................ 4

      B.     The Alleged Misrepresentations. .................................................................. 4

      C.     The Alleged Corrective Disclosures. ............................................................ 5

      D.     Plaintiff's Motion and Class Certification Discovery............................................ 7

Argument ......................................................................................................................... 8

I.     A Class Cannot Be Certified Because Individual Issues of Reliance Predominate............ 9

      A.     The Rebuttable *Basic* Presumption. ............................................................ 9

      B.     Defendants Have Rebutted the *Basic* Presumption, and Plaintiff Has Not Satisfied Its Burden of Persuasion To Establish Price Impact.............................. 11

            1.     It is Undisputed that There Was No Price Impact from Any of the Alleged Misrepresentations or Four of the Seven Alleged Corrective Disclosures. ............................................................ 12

            2.     The Remaining Alleged Corrective Disclosures Had No Price Impact Because No New Information Was Disclosed............................. 14

                  (a)     July 29, 2016.............................................................. 16

                  (b)     October 28, 2016........................................................ 19

                    (c)     January 31, 2017 ........................................................ 21

            3.     Dr. Ferrell's Analysis Also Shows That The Allegedly Misrepresented Information About ExxonMobil's Proxy Costs and GHG Costs Was Released to the Market to No Price Impact................... 23

      C.     The *Affiliated Ute* Presumption of Reliance on Omissions Does Not Apply................................................................................................... 25

II.    Plaintiff Is Subject to Unique Defenses That Render It Atypical of the Class. ................ 27

III.    Plaintiff Has Not Proven Adequacy under Rule 23(a)(4). ................................................. 29

IV.    In the Alternative, Plaintiff's Proposed Class Definition Should Be Limited. ................. 32

      A.    The Proposed Class Should Exclude Claims Based on Alleged Misrepresentations Related to Proxy Costs and GHG Costs. .............................. 32

      B.    The Class Period Should Exclude Any Other Alleged Corrective Disclosures That Had No Price Impact. .................................................................. 34

      C.    The Proposed Class Should Exclude All Persons Who Sold All of Their Stock Before July 29, 2016. .................................................................................. 34

Conclusion ................................................................................................................................ 35

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abell* v. *Potomac Ins. Co.*,
  858 F.2d 1104 (5th Cir. 1988) ...........................................................................................26

*Adickes* v. *Hellerstedt*,
  No. 17-50899, 2018 U.S. App. LEXIS 29034 (5th Cir. Oct. 16, 2018) ..................................11

*Affiliated Ute Citizens of Utah* v. *United States*,
  406 U.S. 128 (1972)........................................................................................ passim

*Alaska Elec. Pension Fund* v. *Flowserve Corp.*,
  572 F.3d 221 (5th Cir. 2009) ...........................................................................................25

*In re Allergan, Inc. Sec. Litig.*,
  No. 14-cv-02004-DOC (KES), 2016 WL 5929250 (C.D. Cal. Oct. 5, 2016) ........................27

*Amgen Inc.* v. *Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013)........................................................................................................20

*Ark. Teachers Ret. Sys.* v. *Goldman Sachs Grp., Inc.*,
  879 F.3d 474 (2d Cir. 2018).............................................................................................15

*Baker* v. *SeaWorld Entm't, Inc.*,
  No. 14-cv-2129-MMA (AGS), 2017 WL 5885542 (S.D. Cal. Nov. 29, 2017).....................34

*In re Bank of Am. Corp. Sec., Deriv., & Emp. Ret. Income Sec. Act (ERISA) Litig.*,
  281 F.R.D. 134 (S.D.N.Y. 2012) ................................................................................ 34-35

*In re Barrick Gold Sec. Litig.*,
  314 F.R.D. 91 (S.D.N.Y. 2016) ...........................................................................................7

*Basic Inc.* v. *Levinson*,
  485 U.S. 224 (1988)........................................................................................ passim

*Berger* v. *Compaq Comput. Corp.*,
  257 F.3d 475 (5th Cir. 2001) ....................................................................................29, 31

*Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*,
  310 F.R.D. 69 (S.D.N.Y. 2015) .........................................................................................34

*Castano* v. *Am. Tobacco Co.*,
  84 F.3d 734 (5th Cir. 1996) ................................................................................................9

*City of Arlington, Tex.* v. *Fed. Commc'n Comm'n*,
668 F.3d 229 (5th Cir. 2012) ...................................................................................11

*City of Cape Coral Mun. Firefighters' Ret. Plan* v. *Emergent Biosolutions, Inc.*,
322 F. Supp. 3d 676 (D. Md. 2018) .........................................................................32

*Comcast Corp.* v. *Behrend*,
569 U.S. 27 (2013) .....................................................................................................8

*Cooper* v. *Thoratec Corp.*,
No. 14-cv-0360 CW, 2018 WL 2117337 (N.D. Cal. May 8, 2018) ...........................7

*In re Credit Suisse First Bos. Corp. (Lantronix, Inc.) Analyst Sec. Litig.*,
250 F.R.D. 137 (S.D.N.Y. 2008) .............................................................................13

*DeMarco* v. *Lehman Bros.*,
222 F.R.D. 243 (S.D.N.Y. 2004) ..............................................................................8

*Dodona I, LLC* v. *Goldman, Sachs & Co.*,
296 F.R.D. 261 (S.D.N.Y. 2014) ............................................................................27

*In re Enron Corp. Sec.*,
529 F. Supp. 2d 644 (S.D. Tex. 2006) ................................................................20, 30

*Erica P. John Fund, Inc.* v. *Halliburton Co.*,
309 F.R.D. 251 (N.D. Tex. 2015) ..................................................................... passim

*Erica P. John Fund, Inc.* v. *Halliburton Co.*,
563 U.S. 804 (2011)....................................................................................................9

*Feder* v. *Elec. Data Sys. Corp.*,
429 F.3d 125 (5th Cir. 2005) ...................................................................................29

*In re Finisar Corp. Sec. Litig.*,
2017 WL 6026244 (N.D. Cal. Dec. 5, 2017)............................................................11

*Finkel* v. *Docutel/Olivetti Corp.*,
817 F.2d 356 (5th Cir. 1987) ...................................................................................27

*Greenberg* v. *Crossroads Sys., Inc.*,
364 F.3d 657 (5th Cir. 2004) ...................................................................................15

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
573 U.S. 258 (2014)..................................................................................... passim

*IBEW Local 98 Pension Fund* v. *Best Buy Co., Inc.*,
818 F.3d 775 (8th Cir. 2016) ..............................................................10, 11, 13, 15

iv

*Kalodner* v. *Michaels Stores, Inc.*,
172 F.R.D. 200 (N.D. Tex. 1997) ...............................................................................28

*KB Partners I, L.P.* v. *Pain Therapeutics, Inc.*,
No. A-11-CA-1034-SS, 2015 WL 3794769 (W.D. Tex. June 16, 2015) ...................................8

*KBC Asset Mgmt. NV* v. *3D Sys. Corp.*,
No. 15-cv-2393-MGL, 2017 WL 4297450 (D.S.C. Sept. 28, 2017) ......................................11

*In re Kosmos Energy Ltd. Sec. Litig.*,
299 F.R.D. 133 (N.D. Tex. 2014) ...........................................................................30, 32

*Krim* v. *pcOrder.com, Inc.*,
210 F.R.D. 581 (W.D. Tex. 2002) ............................................................................31

*Krogman* v. *Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001) ............................................................................26

*Loritz* v. *Exide Technologies*,
No. 2:13-cv-02607-SVW-E, 2015 WL 6790247 (C.D. Cal. July 21, 2015) ............................8

*Ludlow* v. *BP, P.L.C.*,
800 F.3d 674 (5th Cir. 2015) ...........................................................................15, 25

*In re Merrill Lynch Auction Rate Sec. Litig.*,
704 F. Supp. 2d 378 (S.D.N.Y. 2010), *aff'd sub nom. Wilson* v. *Merrill Lynch
& Co., Inc.*, 671 F.3d 120 (2d Cir. 2011) ...................................................................27

*Regents of Univ. of California* v. *Credit Suisse First Boston (USA), Inc.*,
482 F.3d 372 (5th Cir. 2007) ............................................................................3, 26

*Steiner* v. *Southmark Corp.*,
734 F. Supp. 269 (N.D. Tex. 1990) ..........................................................................26

*Stevelman* v. *Alias Research, Inc.*,
No. 5:91-cv-682 (EBB), 2000 WL 888385 (D. Conn. June 22, 2000) ..................................32

*Umsted* v. *Intelect Commc'ns, Inc.*,
No. 3:99-cv-2604, 2003 WL 79750 (N.D. Tex. Jan. 7, 2003) ...........................................30

*Unger* v. *Amedisys Inc.*,
401 F.3d 316 (5th Cir. 2005) ............................................................................8, 9

*W. Va. Pipe Trades Health & Welfare Fund* v. *Medtronic, Inc.*,
325 F.R.D. 280 (D. Minn. 2018) ............................................................................34

**STATUTES**

15 U.S.C. § 78u-4 ..........................................................................................29

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 ................................................................................................................. passim

Fed. R. Civ. P. 30(b)(6) ........................................................................................................... 3, 30

Fed. R. Evid. 301 .......................................................................................................................... 11

## PRELIMINARY STATEMENT

Plaintiff's motion for class certification should be denied because Plaintiff fails to establish three requirements of Federal Rule of Civil Procedure 23. Plaintiff has failed to establish that Rule 23(b)(3) is satisfied because the rebuttable presumptions of classwide reliance under *Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988) and *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972), do not apply here. Thus, each member of the class must demonstrate individual reliance on the alleged misrepresentations. Indeed, for the alleged misrepresentations associated with four of the seven alleged corrective disclosures, Plaintiff concedes the *Basic* presumption is inapplicable. In addition, Rule 23(a)(3) is not satisfied because Plaintiff's claims are atypical of those of the proposed class. Finally, Rule 23(a)(4) is not satisfied because Plaintiff's own deposition testimony demonstrates that Plaintiff has had no meaningful involvement in the litigation, is unfamiliar with even the basic facts of the case, and is thus a patently inadequate class representative. Accordingly, Plaintiff's motion for class certification should be denied or, alternatively, significantly truncated.

*First*, Plaintiff relies on the "fraud-on-the-market" theory adopted in *Basic* to circumvent its burden to demonstrate individualized reliance. *Basic* held that purchasers in an efficient securities market are entitled to a rebuttable presumption of reliance because the misrepresentations would have affected the company's stock price. Evidence that the alleged misrepresentations or alleged corrective disclosures did not affect the stock price rebuts the presumption. The burden then rests on Plaintiff to establish price impact. **(Point I.A, below.)**

Here, neither the alleged misrepresentations nor the purported corrective disclosures affected ExxonMobil's stock price. The parties' respective experts—Defendants' expert Dr. Allen Ferrell, and Plaintiff's expert Frank Torchio—agree that there was no statistically significant price impact from any of the alleged misrepresentations or from four of the seven

alleged corrective disclosures.  These undisputed facts preclude class certification as to the four alleged corrective disclosures and the corresponding alleged misrepresentations.

Torchio does not refute Dr. Ferrell's showing that a fifth alleged corrective disclosure (ExxonMobil's January 31, 2017 earnings report) also had no statistically significant price impact.  Torchio purports to find statistical significance only by improperly aggregating price movements in the stock over two successive days.  But as Judge Lynn of this Court has held, aggregating price movements over more than one day "is inappropriate to measure price impact in an efficient market" because stock prices in such a market change to reflect new information "in a matter of minutes."  *Erica P. John Fund, Inc*. v. *Halliburton Co*., 309 F.R.D. 251, 269 (N.D. Tex. 2015) ("*Halliburton III*").

Nor did the remaining alleged corrective disclosures have any price impact.  Dr. Ferrell has demonstrated that the allegedly corrective information was already public (as shown in the Complaint itself and the accompanying report of Plaintiff's accounting expert, Dr. Charlotte Wright).  Thus, that information was already reflected in ExxonMobil's stock price before the disclosures were made, and the disclosures could have had no price impact.  Torchio's response is inconsistent with Plaintiff's own theory of liability, and relies on a novel standard that is unsupported by any legal or economic authority and is at odds with Supreme Court precedent.  Thus, Plaintiff fails to satisfy its burden of establishing that the *Basic* presumption applies. **(Point I.B, below.)**

That leaves Plaintiff to urge the presumption of reliance under *Affiliated Ute*, but that presumption does not apply as a matter of law.  The *Affiliated Ute* presumption applies only where a plaintiff's claims are primarily based on alleged omissions or non-disclosures, *i.e.*, those in which "the defendant has failed to disclose *any information whatsoever* relating to material

facts." *Regents of Univ. of Cal.* v. *Credit Suisse First Bos. (USA), Inc.*, 482 F.3d 372, 384 n.17 (5th Cir. 2007) (internal quotation marks and citation omitted) (emphasis added). The presumption does not apply here, where all of Plaintiff's claims are based primarily on alleged affirmative misrepresentations. **(Point I.C, below.)**

*Second*, Plaintiff cannot meet its burden to prove that its claims are typical of those of the class. Unlike other class members, Plaintiff purchased all of its ExxonMobil stock after the first two purported corrective disclosures, and more than two years after the beginning of the class period. Plaintiff is thus subject to a unique defense that it plainly could not have relied on alleged misrepresentations that its claims were corrected before its purchase. **(Point II, below.)**

*Third*, Plaintiff is a wholly inadequate class representative. A putative class representative must demonstrate that it is informed about the relevant facts, and that the class representative rather than its lawyers is directing the litigation. Here, the deposition testimony of Plaintiff's designated Rule 30(b)(6) witness established that Plaintiff cannot clear even this modest hurdle. As its representative acknowledged, ███████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████ Plaintiff's lack of fundamental knowledge about the case, and its wholesale abdication to its lawyers of its responsibility to prosecute it, render it inadequate to represent the interests of the class. **(Point III, below.)**

*Finally*, any class should exclude claims as to which no price impact has been shown, and should also exclude all members who sold their ExxonMobil stock before the first corrective disclosure alleged to have had a price impact.  **(Point IV, below.)**

For these reasons, Plaintiff's motion for class certification should be denied or any class should be substantially narrowed.

STATEMENT OF RELEVANT FACTS

**A.    The Parties and the Alleged Class.**

Defendant Exxon Mobil Corporation ("ExxonMobil" or the "Company") is a multinational oil and gas company whose stock trades on the New York Stock Exchange. (Compl. ¶ 34.)  The individual defendants are current or former ExxonMobil executives.

Plaintiff Greater Pennsylvania Carpenters Pension Fund seeks to represent a class of persons who purchased or acquired ExxonMobil stock between March 31, 2014 and January 30, 2017 (the "Class Period").  (Lead Pl.'s Mem. of Law in Supp. of Mot. for Class Cert. ("Pl. Mem."), Dkt. No. 89-3 at 1.)  Plaintiff first purchased ExxonMobil stock on May 12, 2016, approximately six months after the first two alleged corrective disclosures (and more than two years after the start of the Class Period).  (*See* Mot. for App't. as Lead Pl., Dkt. No. 25, Ex. B at Schedule A; *see also* App. 7.)  ██████████████████████████████████

██████████████████████████████████████

**B.    The Alleged Misrepresentations.**

Plaintiff's claims are based on four categories of alleged misrepresentations.

*Proved Reserves at Kearl*:  Plaintiff alleges that "ExxonMobil knew at the time it filed its 2015 10-K on February 2[4], 2016, and throughout 2016 that its Kearl Operations would not satisfy the SEC's definition of proved reserves by year-end 2016."  (Memo. Op. and Order ("MTD Op."), Dkt. No. 62 at 25; Compl. ¶ 280.)  Kearl is a joint venture between ExxonMobil

4

(29.04% interest) and Imperial Oil Limited ("Imperial") (70.96% interest).  (App. 12.)  Plaintiff claims that Defendants' statements about proved reserves were rendered misleading and in violation of Generally Accepted Accounting Principles ("GAAP") due to the alleged failure to warn investors of the supposed "certainty" that these proved reserves would need to be de-booked.  (Compl. ¶¶ 180, 287.)

*Alleged Losses at Canadian Bitumen Operations*:  Plaintiff alleges ExxonMobil's 2015 10-K falsely "implied the Canadian Bitumen Operations were operating at a profit of over $5 per barrel," when, in fact, these operations "operated at a loss for at least three months" before the 10-K was filed.  (MTD Op. at 22; Compl. ¶ 247(iii).)

*Rocky Mountain Dry Gas Operations*:  Plaintiff claims ExxonMobil's 2015 10-K was misleading because it failed to recognize an impairment of its Rocky Mountain dry gas ("RMDG") operations at year-end 2015 (and instead impaired those assets at year-end 2016).  (Compl. ¶ 247(v).)  As a result, Plaintiff alleges, ExxonMobil's 2015 financial statements overstated the value of the RMDG assets.  (*Id.* ¶¶ 247, 277–283.)

*Use of Proxy Costs of Carbon or GHG Costs*:  Plaintiff alleges that statements by ExxonMobil about its use of projected future carbon proxy costs and GHG costs were misleading because "ExxonMobil stated a different proxy cost value in public statements than was actually applied in internal calculations," including in its impairment assessments.  (MTD Op. at 18; Compl. ¶¶ 247(i), (iii).)

C.    **The Alleged Corrective Disclosures.**

Plaintiff alleges that the truth about the alleged misrepresentations was revealed to the market in a series of seven alleged "corrective" disclosures between November 9, 2015 and January 31, 2017 (one day after the end of the Class Period).  A brief summary of the alleged corrective disclosures follows:

5

1. *November 9, 2015*: *The Guardian* reported that the New York Attorney General's Office ("NYAG") was investigating ExxonMobil's disclosures about climate change. (Compl. ¶ 426; App. 20–22.)

2. *January 20, 2016*: An article in *The Los Angeles Times* reported that the California Attorney General's Office ("CAAG") was investigating ExxonMobil's climate change disclosures. (Compl. ¶ 429; App. 24–27.)

3. *July 29, 2016*: ExxonMobil's earnings report for the second quarter of 2016 disclosed that the Company fell short of analysts' expectations for its upstream business. (*See* App. 29–47; App. 53.)

4. *August 9, 2016*: An op-ed in *The Washington Post* by Senators Elizabeth Warren and Sheldon Whitehouse discussed ongoing state investigations of the Company about climate change disclosures. (Compl. ¶ 432; App. 61–64.)

5. *October 28, 2016*: ExxonMobil's earnings release for the third quarter of 2016 stated that, if energy prices did not increase, ExxonMobil might be required to de-book approximately 3.6 billion barrels of proved reserves at Kearl and one billion barrels of other North American proved reserves at year end. (Compl. ¶ 437; Pl. App.[1] 133–137).)

6. *January 18, 2017*: Citing ExxonMobil's risk of de-booking certain proved reserves, a UBS analyst downgraded ExxonMobil's stock to "sell." (Compl. ¶ 443; Pl. App. 159–172.)

7. *January 31, 2017*: In its earnings report and associated analyst call for the fourth quarter of 2016, ExxonMobil disclosed that it would recognize an impairment charge of about $2 billion related to its RMDG operations and that, as warned, it would de-book approximately 3.6

---

[1]   Citations to "Pl. App." are to the Appendix in Support of Lead Plaintiff's Motion for Class Certification filed on December 21, 2018.

billion barrels of proved reserves at Kearl.  (Compl. ¶¶ 446–447; Pl. App. 138–141; App. 66–95.)

>    **D.**    **Plaintiff's Motion and Class Certification Discovery.**

Plaintiff has moved to certify a class including all persons who purchased or otherwise acquired ExxonMobil common stock between March 31, 2014 and January 30, 2017, inclusive, and were allegedly injured thereby.  (Pl. Mem. at 1.)  Consistent with the Class Certification Scheduling Orders (Dkt. Nos. 71 & 85), the parties have exchanged expert reports and conducted fact and expert discovery on class certification, including depositions of their respective experts.

In opposition to Plaintiff's motion, Defendants submitted an expert economics report by Dr. Allen Ferrell, concluding that there was no price impact from any of the alleged misrepresentations or alleged corrective disclosures.  (App. 97–185.)  Dr. Ferrell holds a Ph.D. in economics with a focus on econometrics and finance from the Massachusetts Institute of Technology and is the Greenfield Professor of Securities Law at Harvard Law School.  (App. 138–143 (Ferrell Report Ex. A).)  Dr. Ferrell has published more than thirty articles in leading legal and financial journals, and courts have routinely relied on his expert opinions in economics and finance.  (*Id.*); *see, e.g.*, *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 104 (S.D.N.Y. 2016); *Cooper* v. *Thoratec Corp.*, No. 14-cv-0360 CW, 2018 WL 2117337, at *4 (N.D. Cal. May 8, 2018); *In re The Bear Sterns Cos., Inc. Sec., Deriv. & ERISA Litig.*, No. 09-cv-8161 (RWS), 2016 WL 4098385, at *10–11 (S.D.N.Y. July 25, 2016).

Plaintiff has submitted a report and rebuttal report by Frank Torchio in support of its motion.  (Pl. App. 1–128; App 187–268.)  Torchio heads a financial consulting firm whose practice is devoted almost entirely to providing expert testimony, predominantly for securities plaintiffs, and is an adjunct professor at the University of Rochester business school.  (Pl. App. 7–8; App. 362–363 (Torchio Dep. at 9:10–10:12).)  Torchio's opinions on market efficiency and

the applicability of the *Basic* presumption have repeatedly been criticized by courts. For example, in *Loritz* v. *Exide Technologies*, No. 2:13-cv-02607-SVW-E, 2015 WL 6790247, at *20 (C.D. Cal. July 21, 2015), the court rejected Torchio's opinion on the efficiency of the market for defendants' bonds based upon "internal inconsistencies and conclusory responses" and Torchio's "fail[ure] to show that his methodology [was] soundly supported by academic authority or is a generally accepted approach to studying the efficiency of a company's debt securities' market." In *DeMarco* v. *Lehman Bro*s., 222 F.R.D. 243, 248 (S.D.N.Y. 2004), the court found that Torchio's expert report on applicability of the *Basic* presumption was "irrelevant on its face" and "so transparently unreliable as to be inadmissible as a matter of law." And in *KB Partners I, L.P.* v. *Pain Therapeutics, Inc.*, No. A-11-CA-1034-SS, 2015 WL 3794769, at *13 (W.D. Tex. June 16, 2015), the court criticized and rejected Torchio's expert testimony on loss causation.

## ARGUMENT

To obtain class certification, a plaintiff "must actually *prove*—not simply plead—that [its] proposed class satisfies each requirement of [Fed. R. Civ. P.] 23." *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014) ("*Halliburton II*") (emphasis in original). Where, as here, a plaintiff seeks to certify a class under Rule 23(b)(3), the plaintiff must prove, among other things, that "common issues of law or fact 'predominate over any questions affecting only individual members.'" *Unger* v. *Amedisys Inc.*, 401 F.3d 316, 320 (5th Cir. 2005) (internal citation omitted). The plaintiff also must establish that its claims are typical of claims of the other class members, and that it is an adequate class representative. Fed. R. Civ. P. 23(a); *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 33 (2013).

Plaintiff cannot satisfy its burden to prove these elements.

**I.      A Class Cannot Be Certified Because Individual Issues of Reliance Predominate.**

To establish predominance in a securities class action, the plaintiff must establish that it can prove on a classwide basis that all members of the class relied on the alleged misrepresentations or omissions. *See Erica P. John Fund, Inc.* v. *Halliburton Co.*, 563 U.S. 804, 810 (2011) ("*Halliburton I*"); *Castano* v. *Am. Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996) ("[A] fraud class action cannot be certified when individual reliance will be an issue."); *Unger*, 401 F.3d at 321 ("If the circumstances surrounding each plaintiff's alleged reliance on fraudulent representations differ, then reliance is an issue that will have to be proven by each plaintiff, and the proposed class fails Rule 23(b)(3)'s predominance requirement.").

Plaintiff attempts to satisfy its burden by relying on the rebuttable presumption or reliance established in *Basic*, under which, in an efficient securities market, the price at which participants trade reflects all publicly available information, including alleged misrepresentations; and, alternatively, on the doctrine established in *Affiliated Ute* that reliance may be presumed where the plaintiffs' claims are predominantly based upon alleged nondisclosures. As shows in Sections A–B (*Basic*) and C (*Affiliated Ute*) below, Plaintiff cannot rely on either presumption.

**A.      The Rebuttable *Basic* Presumption.**

In *Basic*, the Supreme Court permitted plaintiffs to show classwide reliance via a rebuttable presumption. *See Halliburton I*, 563 U.S. at 811. Under the fraud-on-the-market theory recognized in that case, "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *Id.* (internal quotations & citation omitted). Hence, the Court reasoned, "an investor presumptively relies on a defendant's misrepresentation if that information is reflected in the market price of the

stock at the time of the relevant transaction." *Id.* at 812 (internal quotations, alteration & citation omitted).

As the Supreme Court subsequently held in *Halliburton II*, defendants can defeat the *Basic* presumption of reliance by presenting evidence that alleged misrepresentation did not in fact affect the stock price. The defendant can show an absence of price impact by demonstrating that the alleged misrepresentation did not cause the stock price to *increase*, or that a corresponding corrective disclosure did not cause the stock price to *decrease*. *See Halliburton II*, 573 U.S. at 279–80 ("*Basic* itself made clear that the presumption was just that, and could be rebutted by appropriate evidence, including evidence that the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock.") (internal quotations & citation omitted). As the Supreme Court emphasized in *Basic*, "[a]ny showing that severs the link" between the alleged misrepresentations or corrective disclosures and the price paid or received by the stockholder "will be sufficient to rebut the presumption of reliance." *Basic*, 485 U.S. at 248. Where the *Basic* presumption is defeated, a class pursuing securities claims based on alleged misrepresentations cannot be certified. *See, e.g.*, *IBEW Local 98 Pension Fund* v. *Best Buy Co., Inc.*, 818 F.3d 775, 782–83 (8th Cir. 2016) (reversing district court's granting of class certification where defendants showed no price increase attributable to misrepresentations); *Halliburton III*, 309 F.R.D. at 279–80 (denying class certification as to alleged corrective disclosures that were shown not to have resulted in price decrease).

While Defendants bear the burden of producing evidence to show an absence of price impact to rebut the *Basic* presumption of reliance, the burden of persuasion to establish classwide reliance rests with Plaintiff. As set forth in Federal Rule of Evidence 301, "[i]n a civil case, unless a federal statute or these rules provide otherwise, the party against whom a

presumption is directed has the burden of producing evidence to rebut the presumption. But this rule does not shift the burden of persuasion, which remains on the party who had it originally." Fed. R. Evid. 301; *see also KBC Asset Mgmt. NV* v. *3D Sys. Corp.*, No. 15-cv-2393-MGL, 2017 WL 4297450, at \*8 (D.S.C. Sept. 28, 2017) (citing Fed. R. Evid. 301). Under Rule 301, a defendant may rebut the presumption by producing evidence sufficient to create a question of fact at summary judgment, at which point the plaintiff, as the party seeking certification, has the burden of proving price impact. *City of Arlington, Tex.* v. *Fed. Commc'n Comm'n*, 668 F.3d 229, 256 (5th Cir. 2012). In *Best Buy*, for example, the court reversed the district court's grant of class certification after concluding that the plaintiff "provided no evidence that refuted defendants' overwhelming evidence of no price impact." 818 F.3d at 783.[2]

### B.    Defendants Have Rebutted the *Basic* Presumption, and Plaintiff Has Not Satisfied Its Burden of Persuasion To Establish Price Impact.

Here, as shown below, the evidence proffered by Defendants—principally the expert report of Dr. Ferrell—has rebutted the *Basic* presumption by showing lack of price impact as to all of the alleged misrepresentations and corrective disclosures, and Plaintiff has not met its burden of rebutting Defendants' showing. Plaintiff's expert, Frank Torchio, does not dispute that

---

[2]    Although some courts have held that defendants bear the burden of persuasion on price impact, *e.g.*, *In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244, at \*6 (N.D. Cal. Dec. 5, 2017); *Halliburton III*, 309 F.R.D. at 258, neither the Supreme Court nor the Fifth Circuit has addressed the issue. As Rule 301 makes clear, a presumption—such as the *Basic* presumption of reliance—only shifts to the defendant the burden of producing contrary evidence, and does not alter the ultimate burden of persuasion. And courts have consistently held that the burden of persuasion on every element of class certification under Rule 23 rests with the plaintiff. *See, e.g.*, *Halliburton II*, 573 U.S. at 275; *Adickes* v. *Hellerstedt*, No. 17-50899, 2018 U.S. App. LEXIS 29034, at \*13 (5th Cir. Oct. 16, 2018) ("A party seeking class certification has the burden of establishing that all of Rule 23's requirements are met."). In any event, the evidence here shows no price impact—and thus that class certification is inappropriate—regardless of which party bears the burden of persuasion.

11

there was no price impact following any of the misrepresentations or four of the seven alleged corrective disclosures, and does not rebut the rest of Dr. Ferrell's conclusions.

### 1. It is Undisputed that There Was No Price Impact from Any of the Alleged Misrepresentations or Four of the Seven Alleged Corrective Disclosures.

Dr. Ferrell's event study demonstrates that none of the alleged misrepresentations had a statistically significant positive stock price impact (*i.e.*, the alleged misrepresentations did not cause a price increase). (App. 112 (Ferrell Report ¶¶ 30–31).) Dr. Ferrell's event study also demonstrates that five of the seven alleged corrective disclosures (corrective disclosures nos. 1–2, 4, and 6–7) had no statistically significant negative price impact. (App. 115, 117, 120, 127, 133, 134 (Ferrell Report ¶¶ 32, 36, 40, 52, 61, 64).) (An event study is a statistical analysis designed to determine whether stock price movements following a company-specific event (such as a misrepresentation or corrective disclosure) were caused by the event or, instead, were merely the result of overall market and industry developments or random price fluctuations. (App. 107 (Ferrell Report ¶ 21); Pl. App. 46–47 (Torchio Report ¶ 130).) )

Torchio does not dispute Dr. Ferrell's showing that there was no price impact from four of the seven alleged corrective disclosures (corrective disclosures nos. 1-2, 4, and 6). Nothing in Torchio's initial or rebuttal expert reports even addressed whether those alleged corrective disclosures had a price impact, let alone purport to rebut Dr. Ferrell's showing. And Torchio expressly acknowledged at his deposition that he was offering an opinion only as to the remaining three alleged corrective disclosures. (App. 425 (Torchio Dep. at 258:24-259:19).) Plaintiff offered no other evidence of such price impact.

Torchio also does not dispute that none of the alleged misrepresentations had a statistically significant positive price impact.[3]  (App. 210–212 (Torchio Rebuttal Report ¶¶ 54–59).)  Torchio speculates that the absence of price impact means only that the alleged misrepresentations confirmed prior market expectations (App. 192 (Torchio Rebuttal Report ¶ 8), but he offers no evidence of what the prior market expectations were.  As courts have held, conclusory assertions that alleged misrepresentations "maintain[ed] an inflated stock price" cannot "refute[] defendants' overwhelming evidence of no price impact."  *Best Buy*, 818 F.3d at 782–83; *see also In re Credit Suisse First Bos. Corp. (Lantronix, Inc.) Analyst Sec. Litig.*, 250 F.R.D. 137, 145 (S.D.N.Y. 2008) (finding plaintiffs' price maintenance theory "based not on facts but on speculation" is "patently deficient" to support class certification).

In light of Plaintiff's failure to rebut Defendants' evidence, no class can be certified as to these four alleged corrective disclosures or the corresponding alleged misrepresentations.  The only courts to have considered this issue have so held.  In *Halliburton III*, the court denied class certification as to five of six alleged corrective disclosures where plaintiffs did not successfully establish price impact.  309 F.R.D at 280.  Similarly, in *In re Intuitive Surgical Securities Litigation*, the court concluded that defendants rebutted the *Basic* presumption as to two alleged corrective disclosures by showing lack of price impact.  No. 5:13-cv-01920-EJD, 2016 WL 7425926, at *16 (N.D. Cal. Dec. 22, 2016).  These rulings follow directly from the Supreme

---

[3]  A chart in Torchio's opening report purports to show, without explanation, a statistically significant price movement on the dates of two alleged misrepresentations (April 30, 2015 and February 2, 2016) using a two-day event window (Pl. App. 100–101 (Torchio Report Ex. 6).)  But Torchio makes no effort to justify the use of a two-day event window for those dates, and his rebuttal report does not dispute Dr. Ferrell's conclusion that none of the alleged misrepresentations resulted in a statistically significant price impact.  As discussed below, (pp. 21–23), the use of a two-day event window for a highly traded stock like ExxonMobil is improper.

Court's holding in *Halliburton II* that a class cannot be certified where the evidence shows an absence of price impact.

### 2.    The Remaining Alleged Corrective Disclosures Had No Price Impact Because No New Information Was Disclosed.

The evidence also shows that there was no price impact from the remaining alleged corrective disclosures (ExxonMobil's earnings reports on July 29 and October 28, 2016 and January 31, 2017; corrective disclosures nos. 3, 5, and 7) because the relevant information was already public (and thus necessarily reflected in ExxonMobil's stock price) before those disclosures were made.

As both experts here agreed, a properly conducted event study must consider whether the misrepresentation or corrective disclosure under consideration includes information not previously available to the market—or, as Dr. Ferrell put it, the "news . . . has to be new."  (App. 290 (Ferrell Dep. at 79:25–80:5).); Pl. App. 52 (Torchio Report ¶ 148 ("[I]f the confounding information . . . has already been disclosed and fully incorporated into the stock price, then such confounding information is unlikely to have caused any stock-price changes measured on the day of the corrective disclosure.").)  That is because the "fraud on the market" theory presumes that, in an efficient market, previously disclosed information will already have been incorporated into the price of the stock, and a subsequent disclosure of the same information will have no additional price impact.  (App. 106 (Ferrell Report ¶¶ 20, 37); Pl. App. 47 (Torchio Report ¶¶ 139–40).)

For these reasons, courts have recognized that there can be no price impact unless new information is disclosed.  Thus, the court in *Halliburton III* held that there was no price impact because the plaintiff failed to show that the alleged corrective disclosure contained new information "that was not already impounded in the market price of the stock."  309 F.R.D. at

14

272. The court explained it is "required to assume that the market had already absorbed [previously disclosed] information by the time" the alleged corrective disclosure was made. *Id.* at 274; *see also Greenberg* v. *Crossroads Sys., Inc.*, 364 F.3d 657, 663 (5th Cir. 2004) ("[A] stock's price will not change upon the release of confirmatory information, i.e., information already known to the market"); *Ark. Teachers Ret. Sys.* v. *Goldman Sachs Grp., Inc.*, 879 F.3d 474, 485–86 (2d Cir. 2018) (holding that price impact was not shown where information in alleged corrective disclosure had already been revealed to the market); *Best Buy*, 818 F.3d at 782 (statements that "added nothing to what was already public" had no price impact).

In accordance with this standard, Dr. Ferrell's analysis demonstrates the absence of price impact resulting from ExxonMobil's earnings reports on July 29 and October 28, 2016 and January 31, 2017 (corrective disclosures nos. 3, 5, and 7) because the relevant information in those earnings reports was already available to the market, and thus was already reflected in ExxonMobil's stock price before the reports were released. Plaintiff's own accounting expert, Dr. Wright, proves this point. (App. 120–121, 125–126, 128–130, 133–136 (Ferrell Report ¶¶ 42–50, 54–59, 63–66).) Torchio's responses are inconsistent with Plaintiff's theory of liability and with governing law.[4]

---

[4] Plaintiff may argue that it is inappropriate on a motion for class certification to consider whether the information in an alleged corrective disclosure is new, on the ground that it relates only to loss causation or a "truth on the market" defense. *Cf. Ludlow* v. *BP, P.L.C.*, 800 F.3d 674, 687–88 (5th Cir. 2015) (holding, in context of determining whether damages are susceptible to classwide proof, that the district court could not consider whether an alleged corrective disclosure was corrective). *Ludlow*, however, is inapposite. To begin with, *Ludlow* did not address price impact or reliance, the issues presented here. In any event, for purposes of this argument, Defendants are not challenging whether the alleged corrective disclosures corrected the original alleged misrepresentations—an analysis that requires comparing the contents of the alleged misrepresentation and the alleged corrective disclosure. That issue is entirely distinct from whether the information in the corrective disclosure was previously disclosed to the market—an analysis that does not require any such comparison. As the court reasoned in analogous circumstances in *Halliburton III*, a

15

### (a)     July 29, 2016

Plaintiff asserts that ExxonMobil's disclosure on July 29, 2016 of an earnings miss in its upstream business should be viewed as a corrective disclosure of prior alleged misrepresentations regarding Kearl proved reserves, alleged losses in ExxonMobil's bitumen operations, and impairments of its RMDG assets. The earnings release did not attribute the miss to any of these factors, and Plaintiff cites no analyst or other third party making that connection, but Plaintiff contends that, unbeknownst to the market, the miss was "driven heavily" by those factors. (App. 53; *see* App. 29–47.)

Plaintiff's allegations are based upon Dr. Wright's report, which is annexed to and incorporated by reference in the Complaint, in which Dr. Wright opines that: (i) as of the issuance of ExxonMobil's 2015 10-K on February 24, 2016, its Canadian bitumen operations were operating at a three-month loss, (ii) at the same time, it was virtually certain that ExxonMobil would have to de-book Kearl proved reserves at the end of 2016; and (iii) ExxonMobil improperly overstated the value of its RMDG assets in the same 2015 10-K by failing to take a necessary impairment. (Compl. Ex. B ¶¶ 7–8, 12.)

---

determination that the information in an alleged corrective disclosure was previously disclosed to the market is properly considered in assessing price impact on a class certification motion because "[t]he Court is not determining as a matter of law that the disclosures were not corrective, but rather, that [Defendants have] shown that the information alleged by the [Plaintiff] to be corrective was *both* already disclosed *and* caused no statistically significant price reaction." 309 F.R.D. at 273 (emphasis in original).

Nor is a determination whether the information in an alleged corrective disclosure was previously disclosed an improper assessment of a "truth on the market" defense. As the Second Circuit reasoned in approving the consideration of that issue on class certification in *Arkansas Teachers*, "[t]he 'truth on the market' defense attacks the timing of the plaintiffs' purchase of shares, not price impact." 879 F.3d at 485–86 (holding that the district court erred in refusing to consider evidence that the information in the alleged corrective disclosure had previously been disclosed to the market).

Dr. Wright reached these conclusions in reliance on information publicly available in early 2016, well before the alleged corrective disclosure in July of that year.  For example, Dr. Wright concluded that "it would have been apparent to Exxon at the beginning of 2016 that, absent an extraordinary . . . rise in the price of oil, the Kearl project would not satisfy the SEC definition of proved reserves at year-end 2016," based upon her analysis of Imperial's public filings about expected net cash flows at Kearl and publicly available energy prices and currency exchange rates.  (*Id.* ¶ 69; *see* App. 122–124, 129, 135–136 (Ferrell Report ¶¶ 47, 56, 66, Ex. 3).) Similarly, her opinions about impairments of ExxonMobil's RMDG assets and losses at ExxonMobil's Canadian bitumen operations rested on public sources information disclosed in early 2016, well before ExxonMobil issued its July 29, 2016 earnings release.  (App. 124–125, 129, 135–136 (Ferrell Report ¶¶ 49, 56, 66, Ex. 4).)

Because the information Dr. Wright used was available to market participants before July 2016, the price of ExxonMobil's stock before that time necessarily would have reflected that information.  (App. 111, 120–126 (Ferrell Report ¶¶ 29, 42–50).)  Accordingly, the alleged corrective disclosures on July 29, 2016 could not have impacted the stock price.  As Dr. Ferrell explained, "[i]f the alleged truth, the disclosure that could and should have been made earlier, was publicly available prior to a purported corrective disclosure, it logically follows, if the market's efficient, that that revelation could not have caused a statistically significant price reaction.  Otherwise the market's not efficient." (App. 295 (Ferrell Dep. at 97:10-25); *see Halliburton III*, 309 F.R.D. at 273 ("[A]n efficient market would have already absorbed the news . . . and impounded that news in the stock price before [an alleged corrective disclosure] was issued.").

17

Dr. Ferrell's event study also showed that the initial disclosure of the information in the documents on which Dr. Wright relied did not affect ExxonMobil's stock price. (App. 114 (Ferrell Report Ex. 1).) For example, Dr. Wright's conclusions about Kearl proved reserves relied on Imperial's 2015 Form 10-K and Form 51-101F1, but Dr. Ferrell's event study shows that those documents resulted in no price impact. (*Id.*) As a result, Defendants have shown a lack of price impact through evidence establishing the "disclosure that allegedly caused the price reaction was already disclosed to the market . . . to no price reaction." *Halliburton III*, 309 F.R.D. at 272.

Finally, Dr. Ferrell's analysis refutes Plaintiff's contention that that ExxonMobil's disclosure on July 29, 2016 of an earnings miss in its upstream business should be viewed as a corrective disclosure of alleged "poor performance" at Kearl. (App. 121–122, 185 (Ferrell Report ¶ 45 & Appendix C.3).) Dr. Ferrell's report conclusively refutes that contention because Imperial (which, as noted, owns approximately 70% of Kearl) also issued an earnings release on the same day (July 29, 2016), and its stock had no statistically significant price movement. (*Id.*) If the market attributed ExxonMobil's earnings shortfall to Kearl, the market would have reacted negatively to Imperial's own earnings shortfall on July 29, 2016. The absence of any price impact on Imperial's stock shows that the decline in ExxonMobil's stock on that date cannot be attributed to Kearl. (App. 121–122 (Ferrell Report ¶ 45).)

Torchio concedes that any price movement in ExxonMobil's stock following the July 29 earnings report was not related, as Plaintiff contends, to alleged "poor performance" at Kearl. (App. 53.) As Torchio acknowledged in his rebuttal expert report, there was no mention of Kearl in the earnings report, and accordingly he "agree[d] with Dr. Ferrell that the market did not connect the poor performance of Exxon Upstream disclosed by Exxon on July 29, 2016 with

18

Kearl." (App. 234 (Torchio Rebuttal Report ¶ 112).) When asked about Dr. Ferrell's analysis demonstrating conclusively that Imperial's stock price showed no statistically significant movement following the release of its earnings on the same day, Torchio admitted that "any movement in Exxon Mobil's stock *could not* have been attributable to Kearl, given that Imperial's stock price has no statistically significant price movement." (App. 429 (Torchio Dep. at 275: 4–20) (emphasis added).)

Torchio's responses are insufficient to rebut Dr. Ferrell's other conclusions. Torchio does not dispute that Dr. Wright relied on information that was publicly available before July 29 to conclude that ExxonMobil made alleged misrepresentations about Kearl proved reserves, losses at its Canadian bitumen operations, and RMDG asset impairments (and thus that other market participants could have reached the same conclusions based upon public information). He asserts, instead, that the market must have believed that the July 29 earnings report nevertheless provided new information relevant to Plaintiff's claims because there was a statistically significant negative price reaction. (App. 199 (Torchio Rebuttal Report ¶ 25).) But Torchio's opinion is flatly inconsistent with Plaintiff's theory of liability, based on Dr. Wright's analysis, which shows that the information about which Plaintiff complains was already available to the market months earlier. As discussed above (p. 14), a properly conducted event study must consider whether the event being studied (here, the July 29 earnings report) included relevant new information. (App. 375 (Torchio Dep. at 61:25-62:7).) Absent a showing that the disclosure includes relevant new information—and no such showing can be made here— price impact cannot be established.

### (b)   October 28, 2016

For similar reasons, Dr. Ferrell's report demonstrates that there was no price impact from ExxonMobil's October 28, 2016 earnings report. That report stated that certain proved reserves,

including those at Kearl, might have to be de-booked at year end if prices stayed at the then-current level, and that the Company would perform a year-end impairment assessment of its major long-lived assets, including North American natural gas assets.  The report had no price impact because, according to Plaintiff's theory of liability, any relevant information about alleged de-bookings, impairments, or losses at ExxonMobil's Canadian bitumen operations was previously available to the market.  (*Supra*, pp. 14–15.)

Torchio does not dispute that the information Dr. Wright relied on was publicly available well before the date of the earnings report.  Torchio instead relies exclusively on his statistical analysis showing a statistically significant negative price reaction on that date, and statements by some analysts expressing surprise at the report.  (App. 216–219 (Torchio Rebuttal Report ¶¶ 68–74).)  But Torchio's rebuttal report fails to assess, as it must, whether the earnings report included any new information consistent with Plaintiff's theory of liability.  (*See supra*, p. 14.)

Torchio's contention that information is "new" only if it was not previously "available to *and considered by* the market prior to" the alleged corrective disclosure, App. 224–225 (Torchio Rebuttal Report ¶ 88; emphasis added) is squarely inconsistent with *Basic*.  As the Supreme Court has explained, under the efficient market hypothesis on which *Basic* rests, "the price of stock traded in an efficient market reflects *all* public, material information."  *Halliburton II*, 573 U.S. at 263 (emphasis added); *see also Amgen Inc*. v. *Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) ("[I]n an efficient market, all publicly available information is rapidly incorporated into, and thus transmitted to investors through, the market price."); *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 662 (S.D. Tex. 2006) ("[T]he central tenet of 'fraud on the market' theory . . . presupposes that 'an efficient securities market rapidly incorporates all publicly available information about a company's business and financial situation.'") (quoting *In*

*re Livent, Inc. Sec. Litig.*, 211 F.R.D. 219, 222 (S.D.N.Y.2002)). Torchio agreed in his deposition that under the efficient market hypothesis "all public information is impounded into the stock price quickly." (App. 367 (Torchio Dep at 26:15-19).) Torchio's position that publicly available information should be disregarded unless there is evidence that the market "considered" it is unsupported by any economic or legal authority of which Defendants are aware and is contrary to the legal standards in the cases just cited.

### (c)    January 31, 2017

Dr. Ferrell also demonstrated a lack of price impact from ExxonMobil's January 31, 2017 earnings report for two independent reasons: (i) the report had no statistically significant price impact, and (ii) no new information concerning alleged de-bookings, impairments, or losses at ExxonMobil's Canadian bitumen operations was disclosed. (*Supra*, pp. 12, 14–15.) Torchio's responses are wrong as a matter of law and unsupported by the record.

*First*, Dr. Ferrell's event study demonstrates that there was no statistically significant price movement following the January 31, 2017 earnings report. Dr. Ferrell's event study uses a one-day event window—that is, an analysis focusing on the difference between the closing price on the trading day before the earnings report was issued and the closing price on the trading day of the earnings report.[5] (App. 104–107 (Ferrell Report ¶¶ 18–20).) Dr. Ferrell's use of a one-day event window is consistent with academic literature (including literature analyzing ExxonMobil stock specifically) showing that, for stocks such as ExxonMobil that trade in a highly efficient market, the stock price "quickly and fully" reflects new information. (App. 102–106 (Ferrell Report ¶¶ 14–20 & n.20, citing Abigail McWilliams & Donald S. Siegel, *Event*

---

[5]    The January 31 earnings report was issued before the market opened on that day. (Pl. App. 23 (Torchio Report ¶ 57 n.53).) Thus, the market had a full trading day before closing to incorporate any news in the price of ExxonMobil stock.

*Studies in Management Research: Theoretical and Empirical Issues*, 3 The Acad. of Mgmt. J. 626, 636 (1997) ("[T]he assumption of market efficiency implies almost instantaneous adjustment in stock price to the arrival of new information.")).)

Torchio concedes that there was no statistically significant price movement in ExxonMobil stock on either January 31, 2017 (the day of the disclosure) or the following day, but contends that there was nevertheless a statistically significant price impact over the two-day period *in aggregate*.  (Pl. App. 23 (Torchio Report Table 2).)  Multi-day event windows are appropriate only when the stock at issue trades in an inefficient market—not the case here—or where new information is disclosed over multiple days.[6]  (App. 106 (Ferrell Report ¶ 20).)  As Judge Lynn held in *Halliburton III* on similar facts:

> The Court finds that, in this case, the use of a two-day window is inappropriate to measure price impact in an efficient market.  An efficient market is said to digest or impound news into the stock price in a matter of minutes; therefore, an alleged corrective disclosure released to the market at the start of Day 1, coupled with an absence of price impact throughout Day 1, followed by a price impact on Day 2, will not show price impact as to the alleged corrective disclosure.

*Halliburton III*, 309 F.R.D at 269.  Similarly, in *Intuitive Surgical*, the court rejected the use of a two-day window when the alleged corrective disclosure was released five minutes before the market closed.  2016 WL 7425926, at *14.  There is no dispute here that the market for

---

[6]   Torchio claimed in his rebuttal report that Dr. Ferrell's opinion in this case is inconsistent with Dr. Ferrell's supposed use of a multi-day event window in prior cases.  (App. 202–204 (Torchio Rebuttal Report ¶¶ 35-40).)  As Dr. Ferrell explained, there is no inconsistency.  Dr. Ferrell testified that his reference in prior cases to multi-day windows was entirely appropriate in the circumstances of those cases, where the exact time of a disclosure is unknown, there was information leakage in advance of the corrective disclosure, or the market in question was inefficient.  None of those circumstances justifying the use of a multi-day event window exists here.  (App. 295, 298, 302 (Ferrell Dep. at 101:25–102:8; 110:16-113:7; 125:12-127:25).)

ExxonMobil stock is highly efficient.  (Pl. App. 3, 7 (Torchio Report ¶¶ 2, 11); *see also* App. 107 (Ferrell Report ¶ 20).)

Torchio attempted in his deposition to defend his use of a two-day event window by pointing to analyst commentary about ExxonMobil's earnings report on the day after it was issued.  But Torchio identified no new information in those analysts' comments, and Dr. Ferrell showed that they merely "reiterate and comment on previously disclosed information."  (App. 38 (Ferrell Report ¶ 65).)  Torchio cites no support for the assertion that the event window should take account of commentary by analysts that includes no new factual information.

*Second*, Torchio does not dispute that the information Dr. Wright relied on in asserting that ExxonMobil made misstatements with respect to impairments at the RMDG operations, potential de-booking of proved reserves at Kearl, and a three-month loss at ExxonMobil's Canadian bitumen operations was publicly available well before January 31, 2017.  (App. 219–223 (Torchio Rebuttal Report ¶¶ 75–85).)  Instead, Torchio's rebuttal cites as evidence of price impact statements by analysts about the impairment charge after the January 31, 2017 earnings release.  (App. 221–222 (Torchio Rebuttal Report ¶¶ 80–81).)  As discussed above, however, such discussions by analysts of stale information are irrelevant to Plaintiff's claims, because they are not alleged to have been corrective disclosures and because, as Plaintiff itself alleges (based on Dr. Wright's analysis), the information about which they complain was already available to the market before the earnings release was issued.  (*Supra*, pp. 14–15.)

### 3.    Dr. Ferrell's Analysis Also Shows That The Allegedly Misrepresented Information About ExxonMobil's Proxy Costs and GHG Costs Was Released to the Market to No Price Impact.

Dr. Ferrell's analysis further demonstrates that no corrective disclosures relating to ExxonMobil's use of proxy costs of carbon and GHG costs had an impact on the price of ExxonMobil stock.  The only alleged corrective disclosures even arguably related to proxy costs

or GHG costs—those which discussed the NYAG and CAAG investigations (*i.e.*, corrective disclosures nos. 1 and 2)—had no statistically significant price impact. (App. 127–128 (Ferrell Report ¶ 53).) In addition, although not alleged as a corrective disclosure, the Complaint cites (and incorporates by reference) an affirmation publicly filed by John Oleske of the NYAG on June 2, 2017 (five months after the end of the Class Period), which (wrongly) alleges that ExxonMobil's prior public statements misrepresented its use of proxy costs and GHG costs. The filing of that affirmation had no statistically significant negative price impact on ExxonMobil stock. (*Id.*) Finally, Dr. Ferrell's review of analyst reports on ExxonMobil shows an almost complete absence of analyst commentary on these investigations. (App. 118–119 (Ferrell Report ¶ 38).)

In his rebuttal report and in his deposition, Torchio did not show any price impact relating to any alleged misrepresentations about proxy costs or GHG costs. He does not dispute Dr. Ferrell's finding that there was no price impact associated with the June 2, 2017 disclosure of information contained in the NYAG Affirmation concerning ExxonMobil's use of proxy costs of carbon and GHG costs. (App. 400 (Torchio Dep. at 159:16–25).) And, Torchio did not challenge Dr. Ferrell's finding that no price impact resulted from the alleged corrective disclosures on November 9, 2015 and January 20, 2016, the only such disclosures relating to proxy costs and GHG costs.

Torchio unpersuasively responds that the October 28, 2016 and January 31, 2017 earnings reports can be "linked" to proxy and GHG costs because (Plaintiff alleges) those costs contributed to ExxonMobil's de-booking and impairments. (Pl. App. 38 (Torchio Report ¶ 106).) Neither disclosure mentions the Kearl de-booking or the RMDG impairment, much less states that they relate to proxy costs or GHG costs. (Pl. App. 133–141.) Similarly, Torchio

24

identifies no analyst report that mentioned a causal link between ExxonMobil's use of proxy costs and GHG costs and the Kearl de-booking and Rocky Mountain dry gas impairment. (App. 394–395 (Torchio Dep. at 137:5–138:4).) As the Fifth Circuit has recognized, "undisclosed information cannot drive down the market price of a stock. Only information known to the market can cause a loss. For this reason, only information known to the market is relevant under the fraud-on-the-market theory of class wide reliance." *Alaska Elec. Pension Fund* v. *Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009). Here, undisclosed information purportedly linking these earnings reports to undisclosed information about ExxonMobil's use of proxy and GHG costs cannot support the *Basic* presumption.[7]

* * *

For the foregoing reasons, Plaintiff has not rebutted Defendants' showing that the alleged misrepresentations at issue and any corresponding alleged corrective disclosure had no price impact on ExxonMobil stock. Accordingly, it has not satisfied its burden to establish that the *Basic* presumption of reliance applies.

### C.     The *Affiliated Ute* Presumption of Reliance on Omissions Does Not Apply.

Plaintiff also invokes the doctrine established in *Affiliated Ute*, creating a rebuttable presumption of reliance for claims premised *solely* on alleged omissions of material facts. (Pl. Mem. 19.) But the Fifth Circuit has held that presumption is available only in actions that are "primarily based on omissions or non-disclosure" where "the defendant has failed to disclose *any*

---

[7]   *Ludlow* is not to the contrary. That case held that, in considering at the class certification phase whether damages can be established on a classwide basis, the Court should not assess whether an alleged corrective disclosure is truly corrective. 800 F.3d at 688. *Ludlow* did not address what information can be considered in assessing whether price impact has been rebutted for purposes of the presumption of reliance. And nothing in *Halliburton II* or the other governing cases addressing price impact suggests that the Court can find price impact based on information not identified in an alleged corrective disclosure.

25

*information whatsoever* relating to material facts about which the defendant has a duty to the plaintiff to disclose." *Regents of Univ. of Cal.* v. *Credit Suisse First Bos. (USA), Inc.*, 482 F.3d 372, 384 & n.17 (5th Cir. 2007) (emphasis added) (internal quotations omitted); *Abell* v. *Potomac Ins. Co.*, 858 F.2d 1104, 1119 (5th Cir. 1988).  The presumption thus cannot be relied on in actions based on misstatements, a purported failure to correct or update previous misstatements, or mixed claims based on partial misstatements.  *See Krogman* v. *Sterritt*, 202 F.R.D. 467, 479 (N.D. Tex. 2001) (presumption inapplicable to "'mixed claims' that allege both misstatements and material omissions").

Here, Plaintiff cannot rely on the *Affiliated Ute* presumption because its claims are based primarily on alleged misstatements, not omissions.

- *Kearl Proved Reserves*.  Plaintiff's allegations about Kearl proved reserves are based upon disclosures in ExxonMobil's 2015 10-K, which affirmatively warned that if oil and gas prices stayed at the same level, de-bookings might be necessary, including for "oil sands operations in Canada" (App. 490), and on alleged misrepresentations in its October 28, 2016 earnings release. (Compl. ¶¶ 285, 309.)  This claim thus depends on a purported partial misstatement, and *Affiliated Ute* is accordingly inapplicable.  *See Abell*, 858 F.2d at 1119.

- *Canadian bitumen operations*.  Plaintiff's claims based on alleged losses in its Canadian bitumen operations is similarly based on ExxonMobil's alleged affirmative representation in its 2015 10-K that it was earning a profit of $5.87 per barrel from its Canadian Bitumen Operations.  (*See* Compl. ¶ 343.)

- *Impairment of RMDG assets*.  Plaintiff alleges that ExxonMobil's financial statements overstated the value of its RMDG assets in 2015 by failing to take an impairment charge for those assets.  (Compl. ¶¶ 185-190.)  *See Steiner* v. *Southmark Corp.,* 734 F. Supp. 269, 276 (N.D. Tex. 1990) (declining to apply *Affiliated Ute* where plaintiffs' "primary contention [was] that defendants created a distorted view of [the company's] financial condition through a series of overly optimistic and/or incomplete financial statements, press releases, and statements.").

- *GHG/Proxy costs*.  Plaintiff alleges that ExxonMobil's investment and asset valuation processes did not incorporate GHG or carbon proxy costs in a manner "consistent with the Company's public representations or Exxon's own internal policies" (Compl. ¶ 247–50), and that "defendants made *numerous statements* throughout the Class Period that *misrepresented* Exxon's purported use of a proxy cost of carbon in connection with its investment analyses."  (Pl. Mem. 3 (emphasis added).)

Plaintiff's contrary arguments are unavailing. The sole case Plaintiff cites is the out-of-Circuit district court decision in *Dodona I, LLC* v. *Goldman, Sachs & Co.*, 296 F.R.D. 261 (S.D.N.Y. 2014). (Pl. Mem. 19–20.) In *Dodona I*, the court applied the *Affiliated Ute* presumption where the plaintiff's claims involved both omissions and affirmative misrepresentations. *Id.* at 269–70. But *Dodona I* is no longer good law in the Second Circuit. In *Waggoner* v. *Barclays PLC*, the Second Circuit expressly held that *Affiliated Ute* applies only where "it is *impossible* for [a plaintiff] to point to affirmative misstatements," not actions involving partial misstatements. 875 F.3d 79, 96 (2d Cir. 2017) (emphasis added).

Plaintiff may not rely on *Affiliated Ute* for the additional reason that the "presumption is rebuttable in the same manner as the fraud-on-the-market presumption established in [*Basic*]." *In re Allergan, Inc. Sec. Litig.*, No. 14-cv-02004-DOC (KES), 2016 WL 5929250, at *4 n.4 (C.D. Cal. Oct. 5, 2016); *see also Finkel* v. *Docutel/Olivetti Corp.*, 817 F.2d 356, 364–65 (5th Cir. 1987) (holding defendants may rebut the presumption of reliance by showing that "nondisclosures did not affect the market price"). As discussed above, Plaintiff has failed to demonstrate price impact as to any of its alleged misrepresentations or corrective disclosures in this case, and Defendants successfully rebutted the *Basic* presumption. (App. 114, 116 (Ferrell Report Exs. 1–2).) Plaintiff therefore is not entitled to *Affiliated Ute*'s presumption of reliance. *See In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 397 (S.D.N.Y. 2010) ("As with the fraud on the market theory, the presumption of reliance that arises in this type of case is rebuttable."), *aff'd sub nom. Wilson* v. *Merrill Lynch & Co., Inc.*, 671 F.3d 120 (2d Cir. 2011).

## II.    Plaintiff Is Subject to Unique Defenses That Render It Atypical of the Class.

Plaintiff must show that its claims and defenses are "typical" of the proposed class. Fed. R. Civ. P. 23(a)(3). Class certification should be denied when the proposed class representative

"is subject to unique defenses which threaten to become the focus of the litigation" to "protect[] class members from representation by a party who is 'preoccupied with a defense which is applicable only to himself.'" *Kalodner* v. *Michaels Stores, Inc.*, 172 F.R.D. 200, 205 (N.D. Tex. 1997) (quoting *Warren* v. *Reserve Fund*, *Inc.*, 728 F.2d 741, 747 (5th Cir. 1984)).

This principal precludes class certification here because Plaintiff purchased all of its ExxonMobil stock only after two of the alleged corrective disclosures had been made on November 9, 2015 and January 20, 2016 (more than two years after the beginning of the Class Period). (*See supra*, p. 4.) Plaintiff is thus subject to the unique defense that it could not have relied on any supposed misrepresentations that were concededly corrected before its purchases.

In analogous circumstances, courts have not hesitated to find plaintiffs' claims atypical. In *In re Cardinal Health, Inc. Securities Litigation*, the court held that a proposed plaintiff was subject to a unique defense because it purchased 705,000 shares within the last three months of the class period, after approximately three years of no trading activity and around the same time Cardinal Health publicly disclosed a pending SEC investigation. 226 F.R.D. 298, 310 (S.D. Ohio 2005). The court found that these purchases "undermine[d] any causal nexus between the [d]efendants' alleged misrepresentation and the resulting injury" because it would be difficult for the plaintiff to argue that it "incurred the vast bulk of its injury after [the defendants] acknowledged that [their] accounting methodologies were under investigation." *Id.* Similarly, in *Erickson* v. *Snap, Inc.*, the court held that a proposed plaintiff who "more than double[d] his holdings" in defendant's stock after a corrective disclosure was subject to unique defenses that

28

could threaten to be the focus on the case.  No. 2:17-cv-03679-SVW-AGR, 2017 U.S. Dist.

LEXIS 221050, at *8–9 (C.D. Cal. Sept. 18, 2017).[8]

Like the plaintiffs in *Cardinal Health* and *Erickson*, Plaintiff purchased ExxonMobil

stock for the first time only after two alleged corrective disclosures, and accordingly it cannot

satisfy its burden of establishing that its claims are typical of those of the proposed class.

### III.   Plaintiff Has Not Proven Adequacy under Rule 23(a)(4).

A proposed class representative bears the burden to prove that it "will fairly and

adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  Proving that a proposed

class representative is adequate is essential to "ensure that the due process rights of all class

members are safeguarded" because absent class members must rely on the class representative's

knowledge and judgment in defending their interests.  *Berger* v. *Compaq Comput. Corp.*, 257

F.3d 475, 480 (5th Cir. 2001).  The class representative's duty to protect the class is not

delegable to its counsel: "it is not enough that plaintiff's counsel are competent if the plaintiffs

themselves almost totally lack familiarity with the facts of the case."  *Id.* at 483 n.18.

The Fifth Circuit has made clear that the Private Securities Litigation Reform Act of 1995

("PSLRA"), 15 U.S.C. § 78u-4, "raises the standard adequacy threshold" to "reflect the

governing principles of the [PSLRA] and, particularly, Congress's emphatic command that

competent plaintiffs, rather than lawyers, direct such cases."  *Berger*, 257 F.3d at 483–84.  A

---

8   While some courts have questioned whether a post-disclosure purchase should, by itself, defeat typicality, those courts considered facts distinguishable from those here.  In those cases, the post-disclosure purchases were made *in addition to* pre-disclosure purchases.  For example, in *Feder*, the court opined that "[r]eliance on the integrity of the market prior to disclosure of alleged fraud (i.e., during the class period) is unlikely to be defeated by post-disclosure reliance on the integrity of the market." *Feder* v. *Elec. Data Sys. Corp.*, 429 F.3d 125, 138 (5th Cir. 2005).  This reasoning is not applicable here where Plaintiff did not make *any* purchases until after two alleged corrective disclosures.

class representative thus must "possess a sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation" and their "understanding should not be limited to derivative knowledge acquired solely from counsel." *Id.* at 482–83 & n.18. Class representatives must produce "actual, credible evidence that [they] are informed, able individuals, who are themselves—not the lawyers—actually directing the litigation." *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 145 (N.D. Tex. 2014) (proposed representative inadequate). Courts routinely find class representatives inadequate where they are not "willing to be more than spectators." *Umsted* v. *Intelect Commc'ns, Inc.*, No. 3:99-cv-2604, 2003 WL 79750, at *3 (N.D. Tex. Jan. 7, 2003) (proposed representatives inadequate).

The deposition testimony of Plaintiff's designated representative witness under Rule 30(b)(6)—the employee of Plaintiff allegedly responsible for supervising this lawsuit—confirms that Plaintiff is, at most, a disinterested spectator, lacking even basic knowledge about this case. (App. 499, 513 (Swiderski Dep. at 32:3–33:24, 206:10–207:25).) He testified, among other things, as follows:





████████████████████████████████████████████

███████████

### IV. In the Alternative, Plaintiff's Proposed Class Definition Should Be Limited.

While class certification is inappropriate here, to the extent that the Court grants class certification at all, the proposed class definition should be limited in three ways. The beginning of Plaintiff's proposed Class Period should be shortened to exclude all alleged misrepresentations relating solely to proxy costs and GHG costs. The end of the Class Period should be shortened to exclude the alleged corrective disclosures that Plaintiff concedes did not have a price impact, as well as the January 31, 2017 alleged corrective disclosure that is based on a two-day event window contrary to the court's opinion in *Halliburton III*. Finally, the proposed class definition should not include any persons who sold their shares prior to the date of the first statistically significant price reaction following an alleged corrective disclosure. Thus, at most, any class should be limited to persons who purchased or otherwise acquired ExxonMobil common stock between February 24, 2016 and October 28, 2016, inclusive, and were damaged thereby, excluding all such persons who sold all of their ExxonMobil common stock before July 29, 2016.

### A. The Proposed Class Should Exclude Claims Based on Alleged Misrepresentations Related to Proxy Costs and GHG Costs.

Courts are "required at the class certification stage to limit the proposed Class based on the alleged misrepresentations found to be actionable." *City of Cape Coral Mun. Firefighters' Ret. Plan* v. *Emergent Biosolutions, Inc.*, 322 F. Supp. 3d 676, 682 (D. Md. 2018); *see also Stevelman* v. *Alias Research, Inc.*, No. 5:91-cv-682 (EBB), 2000 WL 888385, at *5 (D. Conn. June 22, 2000) ("No class period may commence prior to the earliest date on which plaintiff can properly allege all the elements of his prima facie case."). An alleged misrepresentation that

does not cause price impact is not actionable and, accordingly, cannot serve as the beginning date for a class period.

For example, in *Luna* v. *Marvell Technology Group, Ltd*., the parties disputed whether the class period properly began with the defendants' third or fourth quarter earnings report. No. 15-0544 WHA, 2017 WL 4865559 (N.D. Cal. Oct. 27, 2017). The defendant argued that the plaintiff failed to bring forward any evidence that transactions in the third quarter were improper and that, "unlike the other three quarters at issue in this action, there was never a corrective disclosure identifying third quarter 2015 pull-ins as misleading or improper." *Id*. at *7. The court agreed, concluding that the plaintiff's mere allegation that pull-in transactions occurred in the third quarter was insufficient to show that "these transactions were misleading or fraudulent," and that the class period properly began when defendant issued its fourth quarter earnings. *Id.*

Plaintiff alleges Defendants made eleven misrepresentations before February 24, 2016, all of which relate *solely* to ExxonMobil's statements about proxy costs and GHG costs—and have nothing to do with Plaintiff's allegations of accounting-related misstatements. (App. 113–114 (Ferrell Report Ex. 1).) None of these eleven statements are, however, tied to *any* alleged corrective disclosure. Indeed, to the extent they were corrected, the purported truth concerning these statements was revealed on June 2, 2017 when the Oleske Affirmation and its exhibits were filed, well outside the proposed Class Period. Moreover, as Ferrell demonstrated (and Torchio did not challenge), there was no negative price impact associated with the filing of the Oleske Affirmation. (*See supra*, pp. 23–25.) The Class Period therefore should not begin before February 24, 2016, the date of the first alleged misstatement that is not solely concerned with ExxonMobil's use of proxy costs and GHG costs.

**B.     The Class Period Should Exclude Any Other Alleged Corrective Disclosures That Had No Price Impact.**

The end of the Class Period should also be shortened to exclude any alleged corrective disclosures that had no price impact and thus cannot "give rise to liability." *Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*, 310 F.R.D. 69, 96–97 (S.D.N.Y. 2015). Substantial prudential considerations support excluding these non-actionable alleged corrective disclosures from the Class Period. For example, if "the class period certified is broader than the law will ultimately support, the parties will be forced to notify more individuals than necessary. And, on some future dispositive motion, the Court will still be forced to decide whether the class should have been certified with respect to these individuals in the first place." *W. Va. Pipe Trades Health & Welfare Fund* v. *Medtronic, Inc.*, 325 F.R.D. 280, 294 (D. Minn. 2018).

Here, Plaintiff has already conceded that there was no price impact associated with the January 18, 2017 alleged corrective disclosure. And Plaintiff's basis for asserting price impact as to the January 31, 2017 alleged corrective disclosure is Torchio's deficient analysis premised on a two-day event window that is contrary to academic literature and the court's opinion in *Halliburton III*. At most, the alleged Class Period should end on October 28, 2016.

**C.     The Proposed Class Should Exclude All Persons Who Sold All of Their Stock Before July 29, 2016.**

Courts frequently hold that proposed class members who sold all of their shares prior to the first alleged statistically significant corrective disclosure should be excluded from the class because they are unable to prove loss causation. *See Baker* v. *SeaWorld Entm't, Inc.*, No. 14-cv-2129-MMA (AGS), 2017 WL 5885542, at *16 (S.D. Cal. Nov. 29, 2017) (excluding from the class those who sold before the first alleged statistically significant corrective disclosures because they "would not have suffered any injury because they would have also sold the stock at an alleged artificially inflated price") (internal quotations omitted); *In re Bank of Am. Corp. Sec.,*

34

*Deriv., & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 281 F.R.D. 134, 148 (S.D.N.Y. 2012) (excluding shareholders who sold shares prior to first statistically significant alleged corrective disclosure). As previously discussed, it is undisputed that the first two alleged corrective disclosures on November 9, 2015 and January 20, 2016 were not statistically significant. Any class certified should exclude all persons who sold their ExxonMobil stock before July 29, 2016.

## CONCLUSION

Plaintiff's motion fails to satisfy its burden to prove three of Rule 23's class certification requirements. Plaintiff has failed to demonstrate that reliance can be presumed on a classwide basis under both *Basic* and *Affiliated Ute*. Plaintiff has further failed to satisfy its burden to show that its claims are typical of the proposed class's because Plaintiff purchased all of its stock following the first two alleged corrective disclosures. Finally, Plaintiff has failed to prove it is an adequate representative because its minimal knowledge about, and involvement in, this case demonstrates Plaintiff is a mere spectator to a lawsuit it has wholly and impermissibly delegated to counsel.

For these reasons, Plaintiff's motion for class certification should be denied or substantially truncated as set forth on page 32, above.

As set forth in the accompanying request, Defendants respectfully request that the Court schedule an evidentiary hearing at which Defendants may present live testimony to address these matters further and address any questions the Court may have.

35

Dated: April 19, 2019

Respectfully submitted,


/s/ Daniel J. Kramer
Theodore V. Wells, Jr. (*pro hac vice*)
Daniel J. Kramer (*pro hac vice*)
Daniel J. Toal (*pro hac vice*)
Justin Anderson (*pro hac vice*)
Jonathan H. Hurwitz (*pro hac vice*)
PAUL, WEISS, RIFKIND,
    WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
twells@paulweiss.com
dkramer@paulweiss.com
dtoal@paulweiss.com
janderson@paulweiss.com
jhurwitz@paulweiss.com

/s/ D. Patrick Long
D. Patrick Long
Texas State Bar No. 12515500
Brian M. Gillett
Texas State Bar No. 24069785
SQUIRE PATTON BOGGS
2000 McKinney Ave., Suite 1700
Dallas, TX 75201
Telephone: (214) 758-1505
Facsimile: (214) 758-1550
patrick.long@squirepb.com
brian.gillett@squirepb.com

*Counsel for Rex W. Tillerson*


/s/ Nina Cortell
Nina Cortell
Texas State Bar No. 04844500
Daniel H. Gold
Texas State Bar No. 24053230
HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700
Dallas, TX 75219
Telephone: (214) 651-5000
Facsimile: (214) 651-5940
nina.cortell@haynesboone.com
daniel.gold@haynesboone.com

*Counsel for Exxon Mobil Corporation,
Andrew P. Swiger, Jeffrey J. Woodbury,
and David S. Rosenthal*

36

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has

been served by electronic CM/ECF filing, on this 19th day of April, 2019.


*/s/ Daniel J. Kramer*
Daniel J. Kramer