UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| PEDRO RAMIREZ, JR., Individually and on Behalf of All Others Similarly Situated, | § § § | Civil Action No. 3:16-cv-03111-K |
| | § | <u>CLASS ACTION</u> |
| Plaintiff, | § § | |
| vs. | § § § | |
| EXXON MOBIL CORPORATION, et al., | § § | |
| Defendants. | § § | |
| | § | |

**LEAD PLAINTIFF'S REPLY IN FURTHER SUPPORT OF ITS MOTION
FOR CLASS CERTIFICATION**

**[REDACTED]**

1562491_1

**TABLE OF CONTENTS**

                                                                                    **Page**

I.      Introduction...................................................................................................1

II.     Defendants Have Failed to Rebut the Presumption of Reliance..........................3

        A.      Summary of the Misrepresentations and Omissions...............................4

        B.      The Misrepresentations and Omissions Impacted Exxon's Stock Price..................5

                1.      Statistically Significant Price Declines Followed Each of the Three
                        Corrective Disclosures Made by Exxon ........................................7

                2.      The Corrective Disclosures Revealed New Information ...........................9

                        a.      The Truth-on-the-Market Defense Is Inappropriate at the
                                Class Certification Stage.................................................9

                        b.      The Truth Was Not Publicly Known as Defendants Omitted
                                and Denied the Concealed Truths.......................................9

                        c.      Critical Inputs upon Which Dr. Wright's Analysis Was
                                Based Were Not Publicly Available Before the Corrective
                                Disclosures...................................................................12

                        d.      The Extensive Media and Analyst Reaction, Trading
                                Volume, and Statistically Significant Price Reaction Refute
                                Defendants' Truth-on-the-Market Assertions.............................14

        C.      The January 31, 2017 Disclosure of a $2 Billion Impairment Charge
                Impacted Exxon's Stock Price Both Immediately After the Release of This
                Information and over a Two-Day Cumulative Window .......................................16

        D.      There Is No Evidence that the Disclosures Were Not Corrective .........................18

        E.      The January 18, 2017 UBS Downgrade Impacted Exxon's Stock Price...............21

        F.      Evidence of a Stock Price Increase at the Time of the Misrepresentation or
                Omission Is Not Necessary or Even Expected to Prove Price Impact...................22

III.    Plaintiff Is Not Subject to a Unique Defense and Its Claims Are Thus Typical of
        the Class.......................................................................................................24

IV.     Plaintiff Is a More Than Adequate Class Representative .................................25

V.      The Class Definition Is Appropriate .............................................................28

VI.     Conclusion ...................................................................................................30

1562491_1

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Abell v. Potomac Ins. Co.*,
  858 F.2d 1104 (5th Cir. 1988),
  *vacated in part on other grounds sub nom.*
  *Fryar v. Abell*, 492 U.S. 914 (1989) ...................................................................................3

*Adickes v. Hellerstedt*,
  No. 17-50899, 2018 U.S. App. LEXIS 29034
  (5th Cir. Oct. 16, 2018)........................................................................................................4

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
  572 F.3d 221 (5th Cir. 2009) ............................................................................................21

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013)...................................................................................................2, 9, 18

*Basic Inc. v. Levinson*,
  485 U.S. 244 (1988)..................................................................................................... *passim*

*Berger v. Compaq Comput. Corp.*,
  257 F.3d 475 (5th Cir. 2001) .......................................................................................25, 26

*Buettgen v. Harless*,
  No. 3:09-CV-791-K, 2011 WL 1938130
  (N.D. Tex. May 19, 2011)...............................................................................................26, 27

*Campbell v. Transgenomic, Inc.*,
  916 F.3d 1121 (8th Cir. 2019) ...........................................................................................14

*Carpenters Pension Tr. Fund of St. Louis v. Barclays*,
  310 F.R.D. 69 (S.D.N.Y. 2015) ...................................................................17, 22, 23, 29

*City of Arlington v. FCC*,
  668 F.3d 229 (5th Cir. 2012) ...............................................................................................4

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent*
  *Biosolutions, Inc.*,
  322 F. Supp. 3d 676, 682 (D. Md. 2018)............................................................................28

*City of Pontiac Gen. Emps.' Ret. Sys. v. Dell Inc.*,
  No. A-15-CV-374-LY, 2018 WL 1558571
  (W.D. Tex. Mar. 29, 2018) ................................................................................................19

*City of Roseville Emps. Ret. Sys. v. EnergySolutions, Inc.*,
  814 F. Supp. 2d 395 (S.D.N.Y. 2011)................................................................................14

- ii -

**Page**

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*,
No. 12-5275, 2015 WL 5097883
(D.N.J. Aug. 31, 2015) .................................................................6, 8, 24, 29

*Dirks v. SEC*,
463 U.S. 646 (1983) .................................................................................16

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011) ............................................................................ *passim*

*Erica P. John Fund, Inc. v. Halliburton Co.*,
No. 15-90038, 2015 WL 10714013
(5th Cir. Nov. 4, 2015) ...............................................................................19

*Erica P. John Fund, Inc. v. Halliburton Co.*,
309 F.R.D. 251 (N.D. Tex. 2015) ............................................................. *passim*

*Erickson v. Snap, Inc.*,
No. 2:17-cv-03679-SVW-AGR, 2017 U.S. Dist. LEXIS 221050
(N.D. Cal. Sept. 18, 2017) ...........................................................................25

*Feder v. Elec. Data Sys. Corp.*,
429 F.3d 125 (5th Cir. 2005) ...................................................................24, 27

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000) ......................................................................10, 15

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) .................................................................................1, 5, 18

*Hatamian v. Advanced Micro Devices, Inc.*,
No. 14-cv-00226 YGR, 2016 WL 1042502
(N.D. Cal. Mar. 16, 2016) ...........................................................................23

*Hsingching Hsu v. Puma Biotechnology, Inc.*,
No. SACV 15-00865 AG (JCGx),
2018 WL 4956520 (C.D. Cal. Oct. 5, 2018) .....................................................18

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
818 F.3d 775 (8th Cir. 2016) .........................................................................4

*In re Banc of Cal. Sec. Litig.*,
326 F.R.D. 640 (C.D. Cal. 2018) .....................................................................12

*In re Cardinal Health, Inc. Sec. Litig.*,
226 F.R.D. 298 (S.D. Ohio 2005) ....................................................................25

- iii -

**Page**

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
   No. H-14-3428, 2017 WL 2608243
   (S.D. Tex. June 15, 2017) ..............................................................................................8, 19

*In re Cooper Cos. Sec. Litig.*,
   254 F.R.D. 628 (C.D. Cal. 2009) ........................................................................................30

*In re DVI, Inc. Sec. Litig.*,
   639 F.3d 623 (3d Cir. 2011), *abrogated on other*
   *grounds by Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013)...............................................................................................17, 22

*In re Dynegy, Inc. Sec. Litig.*,
   226 F.R.D. 263 (S.D. Tex. 2004).........................................................................................24

*In re Firstplus Fin. Grp., Inc. Sec. Litig.*,
   No. 3:98-CV-2551-M, 2002 WL 31415951
   (N.D. Tex. Oct. 23, 2002) ...................................................................................................24

*In re HealthSouth Corp. Sec. Litig.*,
   261 F.R.D. 616 (N.D. Ala. 2009)........................................................................................30

*In re Recoton Corp. Sec. Litig.*,
   248 F.R.D. 606 (M.D. Fla. 2006) ( ....................................................................................24

*In re Tyco Int'l, Ltd. Multidistrict Litig.*,
   No. 03-cv-1352-PB, 2007 WL 1703067
   (D.N.H. June 12, 2007).......................................................................................................29

*Kalodner v. Michaels Stores*,
   172 F.R.D. 200 (N.D. Tex. 1997) .......................................................................................24

*KB Partners I, L.P. v. Barbier*,
   No. A-11-CA-1034-SS, 2013 WL 2443217
   (W.D. Tex. June 4, 2013).......................................................................................................5

*Lehocky v. Tidel Techs., Inc.*,
   220 F.R.D. 491 (S.D. Tex. 2004)...........................................................................17, 24, 29

*Ludlow v. BP, P.L.C.*,
   800 F.3d 674 (5th Cir. 2015) ...............................................................................7, 8, 19, 29

*Luna v. Marvell Tech. Grp., Ltd.*,
   No. C 15-05447 WHA, 2017 WL 4865559
   (N.D. Cal. Oct. 27, 2017).....................................................................................................28

- iv -

**Page**

*Marcus v. J.C. Penney Co., Inc.*,
　　No. 6:13-CV-736, 2017 WL 907996
　　(E.D. Tex. Mar. 8, 2017).................................................................................................10

*Marcus v. J.C. Penney Co., Inc.*,
　　No. 6:13-cv-736-MHS-KNM, 2016 WL 8604331
　　(E.D. Tex. Aug. 29, 2016) .............................................................................................12

*McGuire v. Dendreon Corp.*,
　　267 F.R.D. 690 (W.D. Wash. 2010) ..............................................................................30

*Nguyen v. Radient Pharm. Corp.*,
　　No. SA CV 11-0406 DOC, 2011 WL 5041959
　　(C.D. Cal. Oct. 20, 2011).............................................................................................14

*Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*,
　　769 F.3d 313 (5th Cir. 2014) .............................................................................3, 14, 19, 20

*Ryan v. Gifford*,
　　918 A.2d 341 (Del. Ch. 2007)........................................................................................14

*Silverman v. Motorola, Inc.*,
　　259 F.R.D. 163 (N.D. Ill. 2009)......................................................................................30

*Stevelman v. Alias Research Inc.*,
　　No. 5:91-CV-682 (EBB), 2000 WL 888385
　　(D. Conn. June 22, 2000) ..............................................................................................28

*Va. Bankshares v. Sandberg*,
　　501 U.S. 1083 (1991)......................................................................................................14

*Waggoner v. Barclays PLC*,
　　875 F.3d 79 (2d Cir. 2017)...............................................................................4, 8, 17, 23

*Wieland v. Stone Energy Corp.*,
　　No. 05-2088, 2007 WL 29032178
　　(W.D. La. Aug. 17, 2007) .........................................................................................10, 15

*Wilkof v. Caraco Pharm. Labs., Ltd.*,
　　280 F.R.D. 332 (E.D. Mich. 2012) ................................................................................18

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
　　Rule 23(a)(4)..................................................................................................................25
　　Rule 23(b)(3)....................................................................................................................9

1562491_1

**Page**

Federal Rules of Evidence
    Rule 301 ................................................................................................................................4

1562491_1

## I.    Introduction

In their memorandum in opposition (ECF No. 97) ("Opposition") to Lead Plaintiff Greater

Pennsylvania Carpenters Pension Fund's ("plaintiff") motion for class certification (ECF Nos. 86-

88), defendants concede more than they contest.  They do not dispute that numerosity, commonality,

and superiority are satisfied.  They also admit that plaintiff and the Class are entitled to invoke the

*Basic* fraud-on-the-market presumption of reliance because the market for Exxon common stock was

██████████ during the Class Period.[1]  Defs' App. 301 (121:11-13)[2]; *see Halliburton Co. v.*

*Erica P. John Fund, Inc.*, 573 U.S. 258, 269 (2014) ("*Halliburton II*").

Instead, defendants claim they have rebutted the *Basic* presumption by establishing that the

fraud did not impact Exxon's stock price.  But while defendants bear both the burdens of production

and persuasion on this issue, the record is entirely bereft of any evidence to support their assertion.

Indeed, defendants' own expert ***agreed*** with plaintiff's expert that at least two of the corrective

disclosures pertain to reserves de-booking and asset impairment and were followed by ***statistically***

***significant*** stock price declines, thus demonstrating that the market viewed the information revealed

by Exxon on those days as value relevant.  App. 101 (Ex. 6); Defs' App. 101 (¶11), 284 (54:10-

55:14).  This concession, by itself, fatally undermines defendants' contention that there is no price

impact.

Unable to refute the *Basic* presumption, defendants resort to improperly injecting purely

merits-based assertions at the class certification stage, claiming that the (admittedly) statistically

significant price movements following the alleged corrective disclosures could not have impacted

Exxon's stock price because they either revealed nothing new to the market or were not connected to

---

[1]    Emphasis is added and citations are omitted throughout unless otherwise indicated.

[2]    References to "App." are to the Appendix in Support of Lead Plaintiff's Motion for Class Certification (ECF No. 88), references to "Defs' App." are to the Appendix submitted by defendants in opposition to plaintiff's motion (ECF Nos. 98, 103), and references to "Reply App." are to the Appendix in Support of Lead Plaintiff's Reply in Further Support of Its Motion for Class Certification, filed concurrently herewith.

- 1 -

the misrepresentations. But these arguments are premature and inappropriate at this stage of the litigation. *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 482 (2013) (holding that the question of whether "'news of the [truth] credibly entered the market and dissipated the effects of [prior] misstatements' . . . 'is a matter for trial' (and presumably also for a summary-judgment motion under Federal Rule of Civil Procedure 56")) (quoting *Basic Inc. v. Levinson*, 485 U.S. 244, 249 n.29 (1988)); *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 260 (N.D. Tex. 2015) (Lynn, J.) ("*Halliburton III*") ("class certification is not the proper procedural stage for the Court to determine, as a matter of law, whether the relevant disclosures were corrective"). They are also meritless and unsupported by any evidence in the record.

*First*, defendants' expert admits he is ▮▮ ▮▮▮▮▮▮▮▮▮▮▮ that the concealed truths were actually publicly known at any point prior to the corrective disclosures. Defs' App. 312 (166:15-21). Rather, he and defendants claim that because plaintiff was able to piece the truth together after the Class Period with forensic accounting analysis that included some publicly known facts, the truth itself must have been publicly known. But defendants' position is factually incorrect, as plaintiff's analysis was critically based on the ***corrective disclosures themselves***, as well as information that defendants and their expert concede was unavailable until three weeks ***after*** the close of the Class Period. According to defendants' expert, whether the concealed truth was publicly known is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ Defs' App. 295 (98:18-99:14). Accordingly, because critical inputs were not available until after the Class Period, the concealed truths could not have been publicly known under defendants' own misguided truth-on-the-market theory. *Infra* §II.B.

*Second*, the misrepresentations concerning Exxon's use of a proxy cost of carbon ("proxy costs") ***are*** directly linked to the corrective disclosures. These disclosures each pertain to the very reserves de-booking and asset impairment that lie at the heart of this case. Plaintiff alleges that

- 2 -

Exxon failed to apply its proxy costs as publicly stated, and that the de-booking and impairment would have both been required far earlier if Exxon had applied its publicly stated proxy costs – a fact that is supported by ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████ App. 339.  Market analysts similarly made this connection between the U.S. Securities and Exchange Commission ("SEC") and New York ("NY") Attorney General probe and the reserve write-down announced on October 28, 2016.  App. 148.  The proxy cost misrepresentations are thus "'related to' or 'relevant'" to the corrective disclosures, which is all that Fifth Circuit precedent requires.  *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 321-25 (5th Cir. 2014); *infra* §II.D.

Defendants' attacks on plaintiff's typicality and adequacy are equally specious.  Because the only evidence in the record establishes that plaintiff, through its investment manager, purchased Exxon common stock in reliance on the integrity of the market, the timing of those purchases does not render plaintiff atypical.  *Infra* §III.  Similarly, plaintiff has proven itself to be a more than adequate representative, demonstrating its understanding of the case and its devotion to vigorously prosecuting it.  *Infra* §IV.  For these reasons and those stated below, and as demonstrated by the fully developed evidentiary record, plaintiff's motion should be granted.

## II.    Defendants Have Failed to Rebut the Presumption of Reliance

Defendants first claim that they bear only the burden of producing evidence "to show an absence of price impact," but that plaintiff bears the burden of persuasion.  Opp. at 10-11.  Not so. As the Fifth Circuit has stated (in a case that defendants cite, Opp. at 26), "*Basic* explicitly holds that the 'fraud-on-the-market' presumption is rebuttable and serves only to ***shift the burden of persuasion, as to reliance, onto securities fraud defendants***."  *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1120 (5th Cir. 1988), *vacated in part on other grounds sub nom. Fryar v. Abell*, 492 U.S. 914

- 3 -

(1989). Consistent with this precedent and the only circuit court opinion to squarely address the issue, this Court rejected the very argument defendants raise here in support of their position. *Halliburton III*, 309 F.R.D. at 258-60 (rejecting same Fed. R. Evid. 301 argument and holding that "both the burden of production and the burden of persuasion are properly placed on [defendants]"); *Waggoner v. Barclays PLC*, 875 F.3d 79, 85, 99-103 (2d Cir. 2017) ("the burden of persuasion . . . to rebut the *Basic* presumption shifts to defendants").[3] But even if the Court finds that plaintiff bears the burden of persuasion, plaintiff has more than satisfied it.

### A.    Summary of the Misrepresentations and Omissions

The primary misrepresentations and omissions[4] at issue here are summarized as follows:

- Prior to October 28, 2016, defendants concealed the true state of affairs at Kearl (which constituted approximately 14% of Exxon's total proved reserves at the start of 2016) by failing to disclose, among other things, that Kearl was suffering massive operating losses, causing Kearl's bitumen reserves to no longer qualify as "proved reserves";

- Prior to January 31, 2017, defendants concealed that Exxon's Rocky Mountain Dry Gas ("RMDG") assets were impaired, requiring a $2 billion impairment charge that would reduce annual earnings by approximately 20%; and

- During the Class Period, defendants concealed that Exxon was not, in fact, applying its publicly stated proxy costs to the Company's internal profitability analyses because doing so ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ at Kearl and a massive impairment of the RMDG assets.

*See* Motion at 2-5; App. 339.

---

[3]    Defendants' authorities lend no support to their contentions. Neither *City of Arlington v. FCC*, 668 F.3d 229 (5th Cir. 2012), nor *Adickes v. Hellerstedt*, No. 17-50899, 2018 U.S. App. LEXIS 29034 (5th Cir. Oct. 16, 2018), involved securities fraud claims. And in *IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775 (8th Cir. 2016), the Eighth Circuit did not address which party bears the burden of persuasion on the issue of price impact. *See id.* at 782 (stating only that defendants bear the burden of production); *Waggoner*, 875 F.3d at 103 n.36 ("the extent of the burden [of persuasion] was not at issue [in *Best Buy*]").

[4]    The misrepresentations, as described herein, are based on the allegations in the Consolidated Complaint for Violations of the Federal Securities Laws ("Complaint"), filed July 26, 2017 (ECF No. 36), as well as the evidence attached to and described in Lead Plaintiff's Memorandum of Law in Support of Motion for Class Certification, filed December 21, 2018 (ECF Nos. 87, 89-3) ("Motion").

- 4 -

1562491_1

In opposing plaintiff's motion, defendants do not argue that plaintiff failed to establish its entitlement to the *Basic* fraud-on-the-market presumption of reliance. *See Halliburton II*, 573 U.S. at 269. Rather, defendants and their expert, Dr. Ferrell, **concede** that plaintiff's invocation of the presumption is proper by admitting that the market for Exxon common stock is ███████████ Defs' App. 301 (121:11-13); Opp. at 22-23. Defendants, however, claim to have rebutted the presumption of reliance through purported evidence establishing an absence of price impact, insisting that: (1) some of the misrepresentations and corrective disclosures were not followed by a statistically significant price reaction; (2) the remaining corrective disclosures did not disclose new information; and (3) the concealed truth was released to the market with no price impact. Opp. at 12-23. As explained *infra*, defendants are wrong on each point.

**B.      The Misrepresentations and Omissions Impacted Exxon's Stock Price**

Consistent with generally accepted principles, Professor Torchio analyzed the reaction of Exxon's common stock prices on earnings announcement dates, three of which were alleged corrective disclosures. App. 20-21 (¶¶51-53). Notably, Dr. Ferrell took no issue with Professor Torchio's methodology and analysis; in fact, he **adopted** Professor Torchio's regression analysis and event study analysis for his own report.[5]  *See* Defs' App. 306 (142:4-20).[6]

The first partially corrective Exxon disclosure that Professor Torchio analyzed occurred on July 29, 2016, when Exxon revealed that its upstream business unit missed expectations in 2Q16. Defs' App. 33-36. After controlling for peer and market effects, Exxon's common stock price

---

[5]    The only exception was Professor Torchio's use of a two-day window, but, as set forth below, Dr. Ferrell's criticism is specious. *See infra* §II.C.

[6]    Professor Torchio has authored over 200 reports during his decades-long career, and his economic opinions have been accepted and adopted by numerous courts. *E.g.*, *KB Partners I, L.P. v. Barbier*, No. A-11-CA-1034-SS, 2013 WL 2443217, at *10 (W.D. Tex. June 4, 2013) ("The Court concludes Mr. Torchio's declaration is reliable and need not be excluded under *Daubert* and its progeny. It is undisputed Mr. Torchio is a well qualified expert. His analysis is thorough, and his methods are supported by references to academic literature and industry practices."). Given Dr. Ferrell's explicit adoption of his regression model, defendants' criticism of Professor Torchio rings hollow.

1562491_1

declined a statistically significant $3.30 per share following Exxon's announcement.  App. 101 (Ex. 6).  The miss was largely driven by massive losses at ███████████████████████████ ██████████████ *See* App. 268 ████████████████████████ ██████████████; App. 305 ████████████████████████████.  Although Exxon chose not to disclose the ***reasons*** for the miss to the market, Dr. Ferrell has conceded that this disclosure "pertained to reserves de-booking and asset impairment."  Defs' App. 101 (¶11).

Next, on October 28, 2016, Exxon disclosed that nearly 20% of the Company's proved reserves, consisting of 3.6 billion barrels of bitumen at Kearl and 1 billion North American barrel equivalents (presumably natural gas), would likely be de-booked,[7] and that the Company would conduct asset-impairment assessments at year-end.  App. 137.  The next trading day, a Morgan Stanley analyst report titled "3Q16: Missed and Likely Impaired" further reported that "[i]n the aftermath of SEC and NY Attorney General probes of XOM's valuation of reserves . . . potential write-downs" including "reserves associated with Kearl (3.6Bn bl) and other NAm assets (1Bn boe) would be at risk.  These account for ~19% of XOM's YE15 proved reserves . . . ."  App. 148.  After controlling for peer and market effects, Exxon's common stock price declined a statistically significant $5.59 per share following this disclosure.  App. 101 (Ex. 6).

Finally, on January 31, 2017, Exxon disclosed that its 2016 earnings would be reduced by approximately 20%, as a result of an impairment charge relating to RMDG.  App. 141.  After controlling for peer and market effects, Exxon's common stock price declined a statistically significant $1.64 per share following this announcement.[8]  App. 101 (Ex. 6).  The percentage stock

---

[7]    Under SEC rules, a de-booking/reserve write-down is required when an asset is no longer profitable because operating and production costs exceed the revenue generated.  Defs' App. 228 n.50.

[8]    Although other partial corrective disclosures contained in newspaper articles (January 20, 2016 *Los Angeles Times* article regarding California AG investigation) and analyst reports (January 18, 2017 UBS downgrade of Exxon as a result of reserve write-down) were also followed by statistically significant stock price reactions, Defs' App. 116 (Ex. 2), the analysis of these events was not necessary at this stage of the litigation to rebut defendants' price impact arguments. *E.g.*, *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*, No. 12-5275, 2015 WL 5097883, at *12

- 6 -

1562491_1

price declines resulting from Professor Torchio's and Dr. Ferrell's event studies for the three Exxon

corrective disclosures are summarized in the chart below ("Table 1"):

| Event Date | First Trading Day Close to Close | Second Trading Day Close to Close | Cumulative Two-Day | Ferrell's Close to Open |
|---|---|---|---|---|
| 7/29/2016 | -1.92%* | -1.77%* | -3.65%** | -1.96%** |
| (t-stat) | (-2.48) | (-2.26) | (-3.35) | (-6.12) |
| 10/28/2016 | -4.42%** | -2.06%** | -6.39%** | -2.83%** |
| (t-stat) | (-6.14) | (-2.85) | (-6.36) | (-10.58) |
| 1/31/2017 | -0.95% | -1.00% | -1.93%* | 0.24% |
| (t-stat) | (-1.38) | (-1.45) | (-2.00) | (0.90) |

*\*\*,\* denotes statisical significance at the 1% and 5% levels, respectively*

Defs' App. 213; App. 101 (Ex. 6).

### 1.    Statistically Significant Price Declines Followed Each of the Three Corrective Disclosures Made by Exxon

Defendants argue that none of the three corrective disclosures made by Exxon impacted the

price of its common stock. Opp. at 14-23.  Specifically, defendants contend that the disclosures on

July 29, 2016, October 28, 2016, and January 31, 2017, could not have impacted Exxon's common

stock price because they did not disclose "new" information, and that the January 31, 2017

disclosure further could not have impacted the price because there was no statistically significant

price movement. *Id.* at 16-23.  Defendants are wrong on all counts.

To defeat a price impact challenge at class certification, a plaintiff need only "show that a

corrective disclosure had a negative impact on a company's share price." *Halliburton III*, 309

F.R.D. at 262.  "[C]ourts generally require a party's expert to testify based on an event study that

meets the 95% confidence standard." *Id.*  As Table 1 illustrates, Professor Torchio met – ***and***

***exceeded*** – this standard, determining that the price declines following Exxon's July 29, 2016 and

(D.N.J. Aug. 31, 2015); *infra* §V.  Accordingly, although some damages may ultimately be attributable to these disclosures, they need not be addressed at this stage of the proceedings. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812-13 (2011) ("*Halliburton I*"); *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 688-89 (5th Cir. 2015).

October 28, 2016 corrective disclosures were statistically significant at the **99%** confidence level, a finding with which Dr. Ferrell agrees. App. 101 (Ex. 6); Defs' App. 193-194 (¶¶11-12), 284 (54:10-55:14), 311 (161:12-20). Dr. Ferrell also agrees that these "two purported corrective disclosures (July 29, 2016 and October 28, 2016) pertained to reserves de-booking and asset impairment," the central alleged misrepresentations and omissions in this case.[9] Defs' App. 101 (¶11). Likewise, the price decline following the January 31, 2017 disclosure was statistically significant at the 95% confidence level. App. 101 (Ex. 6). Such evidence of statistically significant price declines following disclosures pertaining to the central allegations in the case constitutes sufficient evidence to defeat defendants' price impact arguments at this stage. *See Ludlow*, 800 F.3d at 688 ("*Halliburton I* holds that we do not yet require plaintiffs to prove that the defendant's misrepresentation was a substantial cause of loss at this stage . . . ."); *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, No. H-14-3428, 2017 WL 2608243, at *6 (S.D. Tex. June 15, 2017) ("[d]efendants have not demonstrated that there was no price impact from the challenged disclosures and have failed to rebut the fraud-on-the-market presumption" where "[t]he undisputed evidence . . . is that the price of Cobalt stock fell following" the disclosures).

In addition, Dr. Ferrell makes **no effort** to opine that other negative, non-fraud factors were ███████████████████████████████████ Defs' App. 285 (59:18-24). This failure fatally cripples defendants' assertion that there was no price impact and their ability to rebut the *Basic* presumption. *Cf. Waggoner*, 875 F.3d at 105 ("merely suggesting that another factor *also* contributed to an impact on a security's price does not establish that the fraudulent conduct complained of did not also impact the price of the security") (emphasis in original); *Prudential*, 2015 WL 5097883, at *12 (same).

---

[9]    It cannot be disputed that the January 31, 2017 disclosure of the $2 billion asset impairment charge also relates to the asset impairment allegations. App. 141.

- 8 -

### 2.     The Corrective Disclosures Revealed New Information

Unable to show a lack of statistically significant price movements, defendants charge that the three disclosures cannot be corrective because they did not contain new information. Opp. at 14-23. Defendants argue that because Dr. Wright's post-Class Period forensic accounting analysis was based *in part*, upon publicly available information, the truth was publicly available during the Class Period. *Id.* at 16-17, 20-21, 23. Defendants are factually and legally incorrect.

### a.     The Truth-on-the-Market Defense Is Inappropriate at the Class Certification Stage

As an initial matter, defendants' argument is a thinly veiled attempt to end-run around *Amgen*'s unequivocal holding that "proof [of materiality] is not a prerequisite to class certification" because Fed. R. Civ. P. 23(b)(3) requires only that "***questions*** common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen*, 568 U.S. at 459-60 (emphasis in original). Accordingly, proof that "'news of the [truth] credibly entered the market and dissipated the effects of [prior] misstatements' . . . 'is a matter for trial' (and presumably also for a summary-judgment motion under Federal Rule of Civil Procedure 56)." *Id.* at 482 (quoting *Basic*, 485 U.S. at 249 n.29). Following *Amgen*, Judge Lynn of this Court properly rejected defendants' "truth-on-the-market" assertion at the class certification stage because it "pertains to materiality and is not properly before the Court at this stage of the proceedings." *Halliburton III*, 309 F.R.D. at 261. That same rejection should apply here.

### b.     The Truth Was Not Publicly Known as Defendants Omitted and Denied the Concealed Truths

Even if defendants' contention that the truth was previously publicly available was appropriately considered at this stage (it is not), the assertion fails on the merits because the concealed truths were ***not*** publicly known. The truth-on-the-market defense requires showing that information was "conveyed to the public 'with a degree of intensity and credibility sufficient to

- 9 -

counter-balance effectively any misleading information created by' the alleged misstatements." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000); *see Wieland v. Stone Energy Corp.*, No. 05-2088, 2007 WL 29032178 at \*11 (W.D. La. Aug. 17, 2007) (same).

Defendants cannot make this showing. ***Neither defendants nor their expert point to a single instance where any of the alleged omitted facts were publicly available prior to the corrective disclosures***. The record is devoid of any evidence establishing that prior to the alleged Exxon corrective disclosures, the market was aware that: (1) Kearl was suffering massive losses; (2) Exxon's publicly stated proxy costs were not being applied to the Company's internal profitability analyses because doing so ████████████████████ at Kearl and a massive impairment of the RMDG assets, App. 339; (3) Exxon was likely to de-book 3.6 billion barrels of proved reserves from Kearl and 1 billion barrel equivalents from other liquid and natural gas operations in North America; (4) Exxon would take a $2 billion asset impairment charge related to the RMDG assets; or (5) Exxon upstream operations would miss expectations. In fact, Dr. Ferrell admitted he is ███ ████████████ that any of these facts were publicly available. Defs' App. 312 (166:15-21). This dearth of evidence is fatal to defendants' thinly disguised truth-on-the-market argument. *See Marcus v. J.C. Penney Co., Inc.*, No. 6:13-CV-736, 2017 WL 907996, at \*2-\*3 (E.D. Tex. Mar. 8, 2017) (rejecting same argument where "the previously disclosed analyst reports Defendant relies upon do not disclose the ***same information*** contained in the alleged corrective disclosures and do not amount to a disclosure of information that would sever the causal link").

Rather than revealing the concealed truths, defendants did the opposite by misleadingly omitting them. In the Company's 2015 Form 10-K released on February 24, 2016, for example, Exxon stated that Canadian bitumen (the substance being mined at Kearl) earned an average profit of

- 10 -

1562491_1

$5.87 per barrel for 2015. Defs' App. 227 n.47; Reply App. 3-4.[10] What defendants did not disclose, however, was that Exxon's most important Canadian bitumen operation – the Kearl operation, which accounted for 14% of corporate reserves – ███████████████████████ App. 268. Any purported "truth" was thus concealed by defendants' misleading disclosures.

Defendants also publicly *denied* the concealed truths. For instance, in an interview defendant Tillerson stated: "*We don't do write downs*. If you look at our history, we do not write our investments down. . . . We are not going to bail you out by writing it down. That is the message to our organization." Reply App. 67. Exxon also discussed in its Form 10-K for fiscal year 2015 how its "active asset management program" resulted in "an efficient capital base, and the Corporation has seldom had to write down the carrying value of assets, even during periods of low commodity prices." Reply App. 5.

In addition, in a September 20, 2016 analyst report (*i.e.*, a mere five weeks prior to the October 28, 2016 corrective disclosure), Wells Fargo revealed that Exxon *repeatedly* stated that, unlike its competitors, Exxon was able to avoid the "write-down trap" because it is "*conservative on when and how much is capitalized*." Reply App. 54. In the same report, Wells Fargo further reported under the heading "$CO_2$ and Emissions Risks" that:

> On May 26, 2016, we hosted a group of investors at ExxonMobil's HQ and discussed climate risks including stranded assets. As discussed then, XOM places a proxy cost of carbon on all of its future developments. Depending on the project and its location, the proxy cost of carbon raises from $20 to $80 per ton by 2040. This approach reduces the risks associated with future $CO_2$ emissions . . . .

Reply App. 54. Market participants took Exxon at its word. For example, plaintiff's investment manager understood Exxon to say, ██████████████████████████

██████████████████████ Reply App. 92 (308:2-6). Thus, the information

---

[10]     *See* Exxon Form 10-K filed with the SEC on February 24, 2016, p. 9, showing an average production price per barrel for Bitumen of $25.07 in Canada and average production costs per barrel of $19.20 ($25.07 - $19.20 = $5.87). Defs' App. 227 n.47; Reply App. 3-4.

- 11 -

1562491_1

known to the market as of September 20, 2016 was ███████████████ from and ███ █ ███████ what Exxon ultimately disclosed on October 28, 2016, when the Company finally came clean about the likelihood of reserve write-downs and impairments.  Reply App. 92-93 (308:14-309:3).

Simply put, where, as here, defendants say the "opposite of what [a corrective disclosure] said," by definition the truth could not have been "already publicly available."  *In re Banc of Cal. Sec. Litig.*, 326 F.R.D. 640, 650 (C.D. Cal. 2018); *Marcus v. J.C. Penney Co., Inc.*, No. 6:13-cv-736-MHS-KNM, 2016 WL 8604331, at *7-*8 (E.D. Tex. Aug. 29, 2016) (rejecting defendants' truth-on-the-market argument at the class certification stage because the purported prior disclosures of the concealed liquidity crisis "were tempered with language discussing the 'possibility' or the 'potential' need for financing" and thus did "not amount to disclosure of a liquidity crisis").

Given the complete lack of evidence of any public disclosure, coupled with Exxon's public denials of the very facts plaintiff alleges were concealed, it is unsurprising that the investment manager responsible for purchasing plaintiff's Exxon common stock confirmed that although she



███████████████████████████████████████████ she was not aware ███████████████████████ ██████████████████ ; that ████████████████ ███████████████████████████████████████ at the time she purchased plaintiff's Exxon common stock in May, June, and July 2016.  Defs' App. 7; Reply App. 90-91 (298:4-304:10).  Thus, Defendants' truth-on-the-market argument fails.

> c.    **Critical Inputs upon Which Dr. Wright's Analysis Was Based Were Not Publicly Available Before the Corrective Disclosures**

Defendants do not address the above evidence.  Instead, they inaccurately claim that the truth was publicly known because certain facts that Dr. Wright forensically analyzed were publicly

- 12 -

known.  Opp. at 17, 20, 23.  Specifically, defendants point to the fact that the market prices for bitumen and natural gas were publicly available, and leap from that unsurprising fact to proclaim that the truth about their fraud was publicly available as well.  *Id.*  But they ignore that Dr. Wright's forensic analysis – which was conducted six months *after* the end of the Class Period – was critically based on: (1) Exxon's October 28, 2016 and January 31, 2017 corrective disclosures regarding the Kearl de-booking and the RMDG asset impairment; and (2) general Canadian bitumen data (not specific to Kearl) first made available by Imperial Oil on February 23, 2017, three weeks *after* the Class Period ended.[11]  ¶171[12]; ECF No. 36-2, ¶41; Defs' App. 124 (Ex. 3 n.1).  Dr. Ferrell concedes this point in a footnote, acknowledging: "Dr. Wright also relies on Imperial Oil's Form 51-101F1 for 2016, filed and available to the public on February 23, 2017, to compute an average breakeven price per barrel of Canadian bitumen . . . ."  Defs' App. 124 (Ex. 3 n.1).  Without the above-described information, Dr. Wright could not have conducted the analysis that is central to her opinions.  Because this critical information was not available to either Dr. Wright or the market prior to Exxon's corrective disclosures at the end of the Class Period, Dr. Wright's declaration does not support a truth-on-the-market finding, a point Dr. Ferrell concedes.  *See* Defs' App. 295 (98:18-99:14) (Dr. Ferrell's conclusion that the concealed truth is publicly known is "dependent upon *all* of the [value-relevant] information being disclosed prior to the disclosure date").[13]

But even if one (incorrectly) assumed that every piece of information Dr. Wright relied on was publicly available before the July 29, 2016 corrective disclosure, it does *not* follow that the

---

[11]    Notably, defendants do not even contend that Kearl-specific operating cost information was ever considered, let alone available to Dr. Wright.  Because defendants concealed the massive losses at Kearl in part by blending its reporting with other more profitable (albeit less important) Canadian bitumen operations, they have not and cannot contend that Dr. Wright had access to the data needed to establish Kearl's profitability prior to the end of the Class Period.

[12]    Unless otherwise indicated, paragraph references ("¶__" and "¶¶__") are to the Complaint.

[13]    Moreover, the Court granted defendants' motion to strike Dr. Wright's opinions and did not consider them in ruling on the motion to dismiss.  *See* ECF No. 62 at 6-9.

- 13 -

1562491_1

resulting truth was publicly known.  The Fifth Circuit's decision in *Amedisys*, 769 F.3d 313, makes this clear.  There, the circuit court was called upon to address the appropriate standard for pleading loss causation.  *Id.* at 320.  In reversing the district court's dismissal of the complaint with prejudice, the circuit court disagreed with the lower court's determination that a news article could not, as a matter of law, constitute a corrective disclosure because it was "on its face . . . 'based on publicly available Medicare records.'"  *Id.* at 323.  The court reasoned:

> While it is generally true that in an efficient market, any information released to the public is presumed to be immediately digested and incorporated into the price of a security, ***it is plausible that complex economic data understandable only through expert analysis may not be readily digestible by the marketplace***.

*Id.*  So too here.  *See Va. Bankshares v. Sandberg*, 501 U.S. 1083, 1097 (1991) ("If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow."); *Ryan v. Gifford,* 918 A.2d 341, 360 (Del. Ch. 2007) (stating shareholders are "not require[d] . . . to conduct complicated statistical analysis in order to uncover alleged malfeasance").[14]

### d.    The Extensive Media and Analyst Reaction, Trading Volume, and Statistically Significant Price Reaction Refute Defendants' Truth-on-the-Market Assertions

Not surprisingly, Exxon common stock experienced a statistically significant price decline at the 99% confidence level and on high trading volume following the October 28, 2016 Exxon corrective disclosure.  App. 32-33 (¶¶79-82); Defs' App. 237 (¶¶118-119).  The decline itself,

---

[14]    *See also Campbell v. Transgenomic, Inc.*, 916 F.3d 1121, 1127 (8th Cir. 2019) (rejecting argument that financial "clues" elsewhere in allegedly misleading merger-proxy statement should have sufficiently informed reasonable investors of non-misleading truth); *City of Roseville Emps. Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 415 (S.D.N.Y. 2011) (stating that information that "may have been publicly discoverable" does not mean it was "so manifestly well-known that it was, as a matter of law, already part of the total mix of information available to investors"); *Nguyen v. Radient Pharm. Corp.*, No. SA CV 11-0406 DOC (MLGx), 2011 WL 5041959, at \*6-\*7 (C.D. Cal. Oct. 20, 2011) (rejecting defendants' argument "that although the press release's description . . . did not disclose every detail . . . the alleged 'omissions' are not actionable because the 'missing' details were already in the public sphere").

- 14 -

coupled with the extensive media and analyst coverage of the disclosure and the high trading volume, refute defendants' claim of no price impact.  *See* Defs' App. 235-240 (¶¶116-127).

The de-booking was mentioned prominently in the financial press after Exxon's October 28, 2016 disclosure.  For example, and as discussed in Professor Torchio's expert report, *Bloomberg* reported: "Exxon Mobil Corp. warned it may be facing the ***biggest reserves revision in its history*** as production sank to a seven-year low and profit slid . . . ."  App. 31.  In fact, dozens of articles referencing the historic nature of the reserve write-down that ultimately reduced corporate reserves by nearly 20% were published following the October 28, 2016 disclosure.  *See* Defs' App. 235-237 (collecting media accounts).  Furthermore, there was no indication in the financial press before the October 28, 2016 disclosure that a potential Kearl or North American natural gas de-booking was imminent or expected – and, critically, ***neither defendants nor Dr. Ferrell cite to any such information***.  Defs' App. 197 (¶20), 312-313 (168:12-170:25).

Imperial Oil's statistically significant stock price decline following the October 28, 2016 disclosure is further evidence of price impact, as Imperial Oil and Exxon jointly owned Kearl.  Defs' App. 241-242 (¶¶128-132 & Fig. 6).  Interestingly, Dr. Ferrell did not even attempt to test Imperial Oil's stock price movement on this indisputably relevant date.  Defs' App. 241 (¶128).  This failure undermines his analysis.

Because defendants provide no evidence of a public disclosure of the key facts before the October 28, 2016 corrective disclosure revealing the likelihood of a reserve write-down at Kearl and the upcoming impairment assessments, they cannot avail themselves of a truth-on-the-market defense and likewise fail to show a lack of price impact.  The appropriate inquiry is whether the market had sufficient information prior to each corrective disclosure to draw definitive inferences equivalent in nature and magnitude to those drawn by the market following these events.  *See Ganino*, 228 F.3d at 167; *Wieland*, 2007 WL 2903178, at *11.  Because defendants provide no

- 15 -

evidence establishing that any of the omitted facts were known to the market, they have failed to "sever[] the link" between their fraud and the resulting price impact. *Basic*, 485 U.S. at 248.

### C. The January 31, 2017 Disclosure of a $2 Billion Impairment Charge Impacted Exxon's Stock Price Both Immediately After the Release of This Information and over a Two-Day Cumulative Window

The $2 billion impairment charge was disclosed in Exxon's 4Q2016 earnings announcement, which was issued at approximately 8:00 a.m. before the market opened on January 31, 2017, and later discussed in detail by the Company during Exxon's earnings conference call, which took place during the first 90 minutes of trading on January 31, 2017. Defs' App. 220-222 (¶¶78-83). This $2 billion RMDG asset impairment charge reduced Exxon's reported 2016 earnings by nearly 20%. App. 141. It is undisputed that Exxon's cumulative stock price decline over the following two days was statistically significant, App. 101 (Ex. 6), and there was considerable trading volume on both January 31 and February 1 that coincided with the earnings conference call, news coverage, and analyst reports being issued. Defs' App. 221-222 (¶¶79-82 & Fig. 4).

In addition, as illustrated by the figure below, there was an ***immediate decline at the open*** on January 31, following the Company's earnings release and conference call with investors that disclosed the RMDG asset impairment charge. *See also* Defs' App. 221 (Fig. 4). The figure also shows that on the next trading day, February 1, there was an ***immediate negative price reaction*** that occurred within 60 minutes of the open following the release of numerous analyst reports discussing the impairment charge. Defs' App. 221-222 (¶¶80-83).[15]

---

[15] The 60-minute decline on January 31 occurred concurrent with Exxon's conference call that began at 9:30 a.m. and ended at 10:53 a.m. Defs' App. 221 (¶79). Using a close-to-open return, as advocated by Dr. Ferrell, incorrectly measures the price response before the conference call even began. Defs' App. 222 (¶83). In addition, at least 15 analyst reports were issued near or after the close on January 31, 2017. Defs' App. 221 (¶80). The opinions and commentary from these analysts were not incorporated into Exxon's stock price until February 1, at which time Exxon's price declined further within 60 minutes of the open. Defs. App. 221-222 (¶¶80-81); *see Dirks v. SEC*, 463 U.S. 646, 658-59 (1983) (securities analysts "'ferret out and analyze information,'" which then "normally may be the basis for judgments as to the market worth of a corporation's securities").



Defs' App. 221 (Fig. 4).

Under these facts and circumstances, it is appropriate to apply a two-day window to assess statistical significance. Defs' App. 222-223 (¶84). As defendants' own authority recognizes, "[a] two- to three-day window is common in event studies," and "it is standard for experts to utilize an event window including both the day of the event and the day following an event." *Carpenters Pension Tr. Fund of St. Louis v. Barclays*, 310 F.R.D. 69, 96 & n.183 (S.D.N.Y. 2015); *see* Opp. at 34 (citing *Barclays*). As such, it is no surprise that courts have routinely allowed the use of multi-day windows in assessing market efficiency and loss causation at both the class certification and summary judgment stages. *See, e.g.*, *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 506-08 (S.D. Tex. 2004) (finding the evidence sufficiently demonstrated a cause-and-effect relationship between company-specific announcements and the company's stock price based on the plaintiff expert's event study, which used two-day windows).[16]

---

[16]    *See also, e.g.*, *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 635 (3d Cir. 2011) ("That some information took two days to affect the price does not undermine a finding of efficiency."), *abrogated on other grounds by Amgen Inc. v. Conn. Ret.*

1562491_1

Defendants' expert Dr. Ferrell has also stated in his own academic writing that even if the first day of an event window is not statistically significant, one should then examine whether the two-day (or longer) return is statistically significant due to what Dr. Ferrell calls the "post-disclosure 'trickle' effect." Reply App. 13. ***According to Dr. Ferrell***, "while a single day's return may not be [statistically] significant, the cumulative effect on a firm's stock over the entire corrective disclosure period may be." *Id*. Dr. Ferrell's testimony in other matters further supports the propriety of a two-day window:

> Now the reason I use a two- and three-day [window] is there's an analyst report that came out on October 22nd, so the day after this report. . . .
>
> So I used a two-day, which would be relevant if that report came out on October 22nd during trading hours, and the three-day because if it came out after close, then the following trading day would be what would be relevant.

Reply App. 77-78 (13:23-14:9).

### D.    There Is No Evidence that the Disclosures Were Not Corrective

Defendants contend that the price decline following the July 29, 2016 corrective disclosure cannot be attributed to Kearl. Opp. at 18-19. They also argue that none of the Exxon corrective disclosures are linked to the proxy cost-related misrepresentations. *See* Opp. at 23-25, 32-33.

These assertions are nothing more than an argument that the disclosures did not correct the misrepresentations. As with their truth-on-the-market claim, defendants attempt to inject purely merits-based arguments that have no place at the class certification stage. As this Court has recognized, under the Supreme Court's rulings in *Amgen*, *Halliburton I*, and *Halliburton II*, "***class***

---

*Plans & Tr. Funds*, 568 U.S. 455 (2013); *Hsingching Hsu v. Puma Biotechnology, Inc.*, No. SACV 15-00865 AG (JCGx), 2018 WL 4956520, at *4 (C.D. Cal. Oct. 5, 2018) ("The Court also sees no disqualifying problem with Dr. Feinstein's use of a two-day loss causation window."); *Wilkof v. Caraco Pharm. Labs., Ltd.*, 280 F.R.D. 332, 345 (E.D. Mich. 2012) (concluding that plaintiff's evidence was indicative of market efficiency where the plaintiff's expert found a "significant" cause-and-effect relationship "over a two-day period following each announcement"). Defendants assert that the use of a two-day window in this case is not appropriate because Exxon's stock price is "highly efficient" (as opposed to merely "efficient"). Opp. at 13 n.3, 22-23. But these authorities did not turn on this merits-based distinction, nor should the decision here.

1562491_1

***certification is not the proper procedural stage for the Court to determine, as a matter of law,***

***whether the relevant disclosures were corrective***." *Halliburton III*, 309 F.R.D. at 260; *see also*

*Ludlow*, 800 F.3d at 688 ("*Halliburton I* holds that we do not yet require plaintiffs to prove that the

defendant's misrepresentation was a 'substantial cause' of loss at this stage . . . ."). This is because

"even though [the corrective nature of a disclosure] bears on the issue of price impact, it does not

affect the issue of predominance at the class certification stage." *Erica P. John Fund, Inc. v.*

*Halliburton Co.*, No. 15-90038, 2015 WL 10714013, at \*2 (5th Cir. Nov. 4, 2015) (Dennis, J.,

concurring); *see City of Pontiac Gen. Emps.' Ret. Sys. v. Dell Inc.*, No. A-15-CV-374-LY, 2018 WL

1558571, at \*6 (W.D. Tex. Mar. 29, 2018) (same); *Cobalt*, 2017 WL 2608243, at \*6 n.2 (same).

But even if the Court were to consider defendants' merits-centric argument at this stage of

the case, it fails. Undisputed evidence demonstrates that the upstream miss reported on July 29,

2016 was largely driven by massive losses at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮      *See* App. 268 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮; App. 305 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. And Dr. Ferrell conceded that this

disclosure "pertained to reserves de-booking and asset impairment." Defs' App. 101 (¶11).[17]

Likewise, both the October 28, 2016 and January 31, 2017 corrective disclosures are related

to the proxy cost misstatements. The Fifth Circuit has held that "plaintiffs are required to allege the

truth that emerged was 'related to' or 'relevant to' the defendants' fraud and earlier misstatements,"

and in doing so has held far-less-connected disclosures to be related and relevant. *Amedisys*, 769

F.3d at 321-25. Here, the connection between proxy costs and the corrective disclosures is far

greater than the Fifth Circuit found sufficient in *Amedisys* where an announcement that officers

---

[17]    Defendants assert that Professor Torchio conceded their point that Exxon's stock price following July 29, 2016 was not related to Kearl's poor performance. Opp. at 18-19. Defendants' assertion is incorrect, as it entirely ignores that the upstream losses announced on July 29, 2016 were not publicly attributed to Kearl. *See* Defs' App. 233-234 (¶¶111-112). As a result, the price movement of Imperial Oil stock that day is irrelevant. Defs' App. 241 (¶128).

- 19 -

1562491_1

resigned "'to pursue other interests'" was held to be partially corrective of fraud, even though "nothing in the resignation announcement alone reveal[ed] the truth behind the earlier misstatements or provide[d] notice to the Defendants of what the causal connection might be between the relevant economic loss and the misrepresentations." *Id*.

Although Exxon similarly provided little detail in its public filings regarding its reserve write-down and impairment charge taken at year-end 2016, the ***costs*** associated with these operations (including the proxy cost) rendered both Kearl and RMDG no longer profitable under the relevant accounting standards. Plaintiff alleges that these operations had been suffering undisclosed losses that were concealed from the market, and that if Exxon had in fact used its publicly stated proxy costs in analyzing the profitability of these assets, the de-booking and impairment disclosed in October 2016 and January 2017 both would have occurred far earlier. ¶¶6 n.3, 138, 141-144, 156-158, 189-190, 354-365, 371-372. As such, the proxy cost misrepresentations and omissions are also directly linked to the October 2016 and January 2017 corrective disclosures. ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ App. 339.

Moreover, market analysts connected the investigations by the SEC and NY Attorney General – each of which related to both climate change and Exxon's valuation of reserves[18] – to the October 28, 2016 announcement of the likely de-booking. *See* App. 148 (October 31, 2016 Morgan Stanley analyst report titled "3Q16: Missed and Likely Impaired" reports that "[i]n the aftermath of SEC and NY Attorney General probes of XOM's valuation of reserves . . . potential write-downs" including "reserves associated with Kearl (3.6Bn bl) and other NAm assets (1Bn boe) would be at

---

[18]    *See* ¶¶7, 137-147 (describing NY Attorney General investigation of Exxon's failure to employ the proxy cost it claimed to be using in evaluating the profitability of its assets).

- 20 -

risk.  These account for ~19% of XOM's YE15 proved reserves . . . .").  Contrary to defendants'

assertion, the market was made aware of these investigations of how climate change impacted

Exxon's valuation of reserves, and Exxon's stock price was impacted when this revelation was

connected to the potential write-downs that Exxon announced on October 28, 2016.[19]  No further

connection is required at this stage of the litigation.[20]

### E.  The January 18, 2017 UBS Downgrade Impacted Exxon's Stock Price

A UBS research report that was issued after the close of the market on January 18, 2017

downgraded Exxon's rating to "sell," noting the connection between the previously disclosed risk

that Exxon may write down the Kearl reserves.  App. 159-172.  For January 19, 2017, the first day of

trading after the disclosure, the one-day, close-to-close return is negative and statistically significant.

App. 98 (Ex. 5).  Thus, this analyst report indicates the reserve write-down was important, not only

to this analyst, but also to the market.  Defs' App. 239 n.76.  This disclosure and statistically

significant stock price decline is further evidence of price impact.

Defendants attempt to avoid this commonsense result by improperly shortening the event

window to a "close-to-open" window, *i.e.*, from the market's close to the following day's open (in

other words, a period when the stock market is closed).  This arbitrary shortening adheres to an

absolutist view of market efficiency that courts routinely reject and should be rejected here as well.

---

[19]  In addition, defendants ignore that the *Los Angeles Times* published an article on January 20, 2016 titled "California to investigate whether Exxon Mobil lied about climate change risks."  Defs' App. 24-27.  After controlling for peer and market effects, Exxon's common stock price declined a statistically significant $1.49.  App. 92 (Ex. 5).  The statistically significant stock price decline following this article – which clearly relates to defendants' proxy cost misstatements – is further evidence of price impact.

[20]  Defendants' reliance on *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221 (5th Cir. 2009), is misplaced. For starters, *Flowserve* – which holds that a plaintiff must prove loss causation by a preponderance of evidence as a prerequisite for class certification, *id.* at 228-29 – was implicitly overruled when the Supreme Court ruled that securities fraud plaintiffs need not prove loss causation at the class certification stage.  *Halliburton I*, 563 U.S. at 807.  But on the facts, *Flowserve* supports plaintiff's position, not defendants'.  There, the circuit court reversed and remanded the district court's denial of class certification, finding the lower court held plaintiff to a more-stringent loss causation standard than was required.  *Flowserve*, 572 F.3d at 231 ("[I]t was enough that the market learned that the October 2001 guidance was wrong and that other negative information unrelated to the reduced FY2002 guidance did not cause the decline in Flowserve's share price.").

- 21 -

*See Basic*, 485 U.S. at 248 n.28 (refusing to "adopt any particular theory of how quickly and completely publicly available information is reflected in market price").[21] Nor does the academic literature support a close-to-open return. For instance, according to Francis, Pagach, and Stephan: "'We find no evidence that investors impound information conveyed in overnight disclosures in positions taken at the following open, even though the open represents investors' first opportunity to trade on the information.'" Defs' App. 206 (¶45); Reply App. 50.

As Professor Torchio noted, it is important to assess the trading volume and statistical significance for the full day after a pre-open disclosure to properly measure the full effect in the market. Defs' App. 207 (¶46). One cannot categorically reject that the statistically significant close-to-close return is irrelevant simply because the close-to-open return is not statistically significant.[22] Defs' App. 205-209 (¶¶44-51). Indeed, Dr. Ferrell has frequently used close-to-close returns in other matters under similar circumstances. Defs' App. 208-209 (¶¶48-51). Because Dr. Ferrell's use of a close-to-open return is supported by neither the academic literature nor his own testimony in prior cases, it should be rejected here.

### F.    Evidence of a Stock Price Increase at the Time of the Misrepresentation or Omission Is Not Necessary or Even Expected to Prove Price Impact

Defendants point to the absence of a statistically significant price movement following some misrepresentations as supporting their conclusion of no price impact. Opp. at 12. But it is well-

---

[21]    *See also DVI*, 639 F.3d at 635 ("We have addressed the speed with which information is incorporated into market price and explained that because a perfectly efficient market is *not* attainable, we do *not* require that public information be absorbed 'instantaneously.'"); *Barclays*, 310 F.R.D. at 78 ("*Basic* does *not* require that stocks reflect *all* public information within any specific time-frame or to any specific degree") (emphasis added and in original).

[22]    This is particularly true in instances where meaningful disclosure events, such as company conference calls addressing the pre-open disclosure, take place *after* the market opens. That is the case for the January 31, 2017 corrective disclosure, where Exxon issued its 4Q2016 earnings announcement at approximately 8:00 a.m. before the market opened on January 31, 2017, and later held a Company conference call that began at 9:30 a m. and ended at 10:53 a.m. Defs' App. 219-221. In this circumstance, Dr. Ferrell's close-to-open analysis would improperly ignore the market's strong negative reaction to the significant conference call that occurred shortly after the market opened.

- 22 -

settled that "[f]raud on the market securities litigation typically focuses on a price change at the time of a corrective disclosure." *Halliburton III*, 309 F.R.D. at 262. Measuring at the time of disclosure (instead of at the time of misrepresentation) accounts for misrepresentations that omit the alleged truth or are in line with the market's prior expectations, *i.e.*, misrepresentations that maintain the artificially inflated price of a company's stock. *Waggoner*, 875 F.3d at 104. When a plaintiff proceeds on such a "price maintenance" theory, it is "unsurprising" that a defendant company's stock price does "not move in a statistically significant manner on the dates that the purported misstatements . . . were made," even if the information disclosed is highly material. *Id.*; Defs' App. 210-212 (¶¶54-59).[23]

Here, there is no evidence that the information contained in the alleged misrepresentations that Dr. Ferrell analyzed provided information that contradicted prior market expectations. The Complaint does not contend otherwise, but rather alleges that Exxon either omitted material information or made misrepresentations that confirmed or coincided with prior market expectations. Defs' App. 210-212 (¶¶54-59). Consequently, the lack of positive statistically significant returns on alleged misrepresentation days cannot be used as economic evidence supporting a "no price impact" opinion. *Id.* Even defendants' expert concedes that no price impact at the time of ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Defs' App. 281 (41:9-20, 42:2-19); *see* Defs' App. 280 (39:13-25).

Defendants also concede that two of the alleged misrepresentations **were** followed by statistically significant stock price increases. Opp. at 13 n.3; *see* App. 100-101 (Ex. 6). This concession is fatal to their argument: "[Defendants] . . . provide no reason why the absence of a statistically significant price impact following some alleged misrepresentations should be given more

---

[23] *See also Hatamian v. Advanced Micro Devices, Inc.*, No. 14-cv-00226 YGR, 2016 WL 1042502, at *7 (N.D. Cal. Mar. 16, 2016); *Barclays*, 310 F.R.D. at 95.

- 23 -

1562491_1

weight than the presence of statistically significant price impact following the[se] [two] alleged misrepresentations . . . ." *Prudential*, 2015 WL 5097883, at *12. This statistically significant increase at the time of two misrepresentations, though not necessary to prove price impact, is further evidence of it.

**III.    Plaintiff Is Not Subject to a Unique Defense and Its Claims Are Thus Typical of the Class**

Defendants next claim that plaintiff is subject to a unique defense (and thus atypical of the Class) because the Fund "purchased all of its [Exxon] stock [in May, June, and July 2016] after two of the alleged corrective disclosures had been made." Opp. at 28.[24]  Not so.

"[T]he key typicality inquiry is whether a class representative would be required to devote considerable time to rebut [d]efendants' claims." *Lehocky*, 220 F.R.D. at 502. Here, that is not the case. As the Fifth Circuit has held, "[r]eliance on the integrity of the market prior to disclosure of alleged fraud (i.e., during the class period) is unlikely to be defeated by post-disclosure reliance on the integrity of the market." *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 138 (5th Cir. 2005). This is because "'both the high [pre-disclosure] and low [post-disclosure] prices were assumed accurate since the stocks were traded on an efficient market.'" *Id.* This reliance on the integrity of the stock price is all that *Basic* requires. *See Kalodner v. Michaels Stores*, 172 F.R.D. 200, 207-08 (N.D. Tex. 1997) (rejecting argument that plaintiffs who purchased "shortly after" a corrective disclosure could not represent those who purchased before the disclosure because "[e]very class member has an interest in establishing the existence and materiality of these misrepresentations").[25]

---

[24]    Defendants ignore that four corrective disclosures, including all of the corrective disclosures made by Exxon in July and October 2016 and January 2017, occurred *after* plaintiff's stock purchases.

[25]    *See also In re Dynegy, Inc. Sec. Litig.*, 226 F.R.D. 263, 277 (S.D. Tex. 2004) ("purchases of stock by class representatives after negative announcements during the class period, or even after the close of the class period, do not destroy typicality"); *Lehocky*, 220 F.R.D. at 501-02 (same); *In re Firstplus Fin. Grp., Inc. Sec. Litig.*, No. 3:98-CV-2551-M, 2002 WL 31415951, at *6 (N.D. Tex. Oct. 23, 2002) (rejecting argument that class representative was rendered atypical due to its post-class period purchase, "when accurate and negative disclosures were public, and this suit was pending"); *In re Recoton Corp. Sec. Litig.*, 248 F.R.D. 606, 619-20 (M.D. Fla. 2006) (finding typicality satisfied,

1562491_1

Defendants' out-of-circuit district court cases do not undermine this conclusion.  For starters, neither *In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. 298, 299-300 (S.D. Ohio 2005), nor *Erickson v. Snap, Inc.*, No. 2:17-cv-03679-SVW-AGR, 2017 U.S. Dist. LEXIS 221050, at \*1 (N.D. Cal. Sept. 18, 2017), involved class certification; rather, they are orders appointing lead plaintiff. Each case is also factually inapposite.  The courts in *Cardinal Health* and *Snap* determined that each proposed plaintiff was atypical at the lead plaintiff stage based on the possibility that each would be subject to the defense that it did not rely on "an integrity-based market."  *Cardinal Health*, 226 F.R.D. at 310; *see Snap*, 2017 U.S. Dist. LEXIS 221050, at \*6-\*10.  In contrast, here, plaintiff's investment manager specifically testified that the price of a security is ███████████████████

███████  Reply App. 88 (27:12-21).  She further testified that she specifically purchased Exxon common stock because she believed that the price set by the market was ██████  Reply App. 89 (62:13-63:12).  Thus, the only evidence in the record supports the fact that plaintiff ***did*** rely on the integrity of the market, and defendants' typicality argument fails.

## IV.   Plaintiff Is a More Than Adequate Class Representative

In order to satisfy Rule 23(a)(4)'s adequacy requirement, a proposed class representative need only demonstrate a "'willingness and ability . . . to take an active role in and control the litigation and to protect the interests of absentees.'"  *Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 479 (5th Cir. 2001).[26]  As the Fifth Circuit has recognized, "class representatives ***need not be legal scholars*** and are ***entitled to rely on counsel***, [although] plaintiffs do need to know more than

---

notwithstanding the fact that plaintiff "did not own any shares of Recoton stock before [the] February 27, 2002 [corrective disclosure], purchasing all of his shares sometime after that date" because "all of the proposed class members were the victims of the defendants' scheme to mislead the public as to the true value of Recoton stock" and plaintiff was thus "incentiv[ized] to prove the fraudulent scheme").

[26]   In certain circumstances, the adequacy requirement may also concern inquiries into the "'zeal and competence of the representative[s'] counsel'" and potential "'conflicts of interest between the named plaintiffs and the class they seek to represent,'" but defendants raise no such adequacy arguments in this case.  *Id.* at 479-80.

- 25 -

1562491_1

that they were 'involved in a bad business deal.'" *Id.* at 483; *Buettgen v. Harless*, No. 3:09-CV-791-K, 2011 WL 1938130, at \*5 (N.D. Tex. May 19, 2011) (Kinkeade, J.) (same).

Plaintiff has more than sufficiently demonstrated its adequacy pursuant to the above standards. Among other things, plaintiff's representative, Mr. Swiderski, declared under penalty of perjury that plaintiff: (1) "received and reviewed periodic updates and other correspondence from counsel"; (2) "reviewed pleadings and other documents in this case"; (3) "participated in discussions with counsel regarding significant developments in the litigation"; and (4) "is committed to continuing to actively monitor and participate in the ongoing prosecution of this action and to fulfilling its fiduciary duty to all members of the proposed class," by among other things, "keep[ing] informed concerning the status and progress of this action, the strengths and weaknesses of the case, and at the appropriate time, the prospects for settlement." *See* App. 131 (¶¶6-10). Moreover, Mr. Swiderski reaffirmed these facts during his deposition, where he testified, among other things: (1) that he, personally, had committed "***[a]t least 60 hours***" to fulfilling his responsibilities as a lead plaintiff and proposed class representative; and (2) that plaintiff understands that its "responsibilities as lead plaintiff" are "to vigorously fight the case for the common good of the class members." *See* Reply App. 98 (95:18-25), 105 (205:2-5).

Defendants' attempts to use cherry-picked snippets from plaintiff's deposition to argue that plaintiff is "a disinterested spectator, lacking even basic knowledge about this case" (Opp. at 30) is disingenuous and belied by the actual record. Contrary to defendants' assertions:

- Plaintiff's understanding of the allegations in this case is more than adequate and far surpasses mere knowledge that plaintiff was "'involved in a bad business deal.'" *Berger*, 257 F.3d at 483; *see, e.g.*, Reply App. 96 (35:19-36:2) (describing the "alleged fraud that occurred" as "the stock price was artificially inflated during the class period . . . [b]ecause [Exxon] overvalued two assets, the oil sands and the Rocky Mountain gas reserve").[27]

---

[27]   *See also* Reply App. 102 (129:6-9) (testifying that plaintiff alleges that defendants violated "Section 10 and 20" of the "Security Act of 1934").

1562491_1

- Plaintiff has actively monitored the progress of the case and stayed informed of key developments. *See, e.g.*, Reply App. 106 (218:17-25) (testifying that plaintiff receives "periodic updates from counsel," including "quarterly updates" and discussions "via email and phone . . . [a]t least once a month, sometimes more").[28]

- Plaintiff's knowledge about the case does *not* come solely from counsel. *See, e.g.*, Reply App. 99 (98:6-24) (testifying that Swiderski reviewed "[p]retty much all the documents that pertain to the case," including "[t]he complaint, the lead plaintiff motion" and other documents that he "could not recall the title of").

- Plaintiff affirmatively chose to participate in this action and has not delegated control of the case to counsel. *See, e.g.*, Reply App. 96 (34:7-17) (testifying that Swiderski "wanted to participate in this case . . . [b]ecause I wanted to do the best for the Fund [because the Fund] incurred a loss and I wanted to – have a fiduciary duty to make sure participants of the Fund get their fair share of the value of the assets of the Fund").

This Court has previously rejected arguments similar to those raised by defendants here, finding adequacy to be sufficiently demonstrated where the proposed class representative "has been kept informed of the progress of this lawsuit, has moved this Court to appoint it lead plaintiff, has designated a representative for depositions, and is producing documents pursuant to discovery requests." *See Buettgen*, 2011 WL 1938130, at *5. Here, plaintiff has taken all of these same steps and proven it knows much "more than that [plaintiff was] 'involved in a bad business deal.'" *Id.* As such, plaintiff has satisfied the adequacy requirement by "demonstrat[ing] an ability and willingness to take an active role in the litigation and to protect the rights of the absentee plaintiffs." *Id*.

---

[28]    *See also* Reply App. 97 (50:15-17), 100-101 (102:8-103:8, 104:2-6, 104:16-105:2) (demonstrating, among other things, that plaintiff: (1) reviewed the lead plaintiff motion and is aware that it was granted, (2) is aware the two complaints have been filed and that only the second one was filed on plaintiff's behalf; (3) is aware that plaintiff opposed defendants' motion to dismiss and that the motion was denied; and (4) that the case is pending in the "Northern District [of Texas]" in front of "[Judge] Kinkeade" who is a "[f]ederal judge"). Defendants' assertion that plaintiff "did not review a copy of the Complaint before it was filed" (Opp. at 30) is contradicted by plaintiff's testimony that plaintiff had its liaison counsel, Tucker Arensberg, "review th[e] complaint on [plaintiff's] behalf." *See* Reply App. 103 (152:20-153:2); *see also* Reply App. 107-108 (236:23-238:3). As the Fifth Circuit has recognized, the use of liaison counsel for such purposes is not only acceptable, but in fact, "'***enhances*** [plaintiff's] ability to control the litigation.'" *Feder*, 429 F.3d at 130.

- 27 -

## V.    The Class Definition Is Appropriate

Defendants alternatively argue that should the Court grant plaintiff's motion, the certified Class should be limited to exclude: (1) misrepresentations concerning proxy costs; (2) any corrective disclosures the Court finds were not accompanied by a statistically significant price decline; and (3) any persons who sold their shares prior to July 29, 2016. Opp. at 32. This request should be denied.

**First**, defendants' contention that the Court should exclude the proxy cost misrepresentations is based entirely on their assertion that those misrepresentations are not "tied to **any** alleged corrective disclosure." Opp. at 33 (emphasis in original). This contention is factually incorrect, because (as explained *supra* §II.D.), the proxy cost misrepresentations are directly tied to the corrective disclosures. Indeed, there is no evidence in the record to support defendants' position, given their expert's concession that he was ███████████████████████████████ ████████████████████████████████████ Defs' App. 293-294 (92:20-93:6). It is also legally incorrect because (as explained *supra* §II.D.), "at this stage of the proceedings, the Court . . . [must] assume[] that the asserted corrective disclosures were corrective of the alleged misrepresentations." *Halliburton III*, 309 F.R.D. at 262. Finally, the Court already determined that each of the misrepresentations is actionable. *See* ECF No. 62 (MTD Order) at 15-29.[29]

**Second**, the end of the Class Period should not be cut short. As explained *supra* §II.C. and II.E., the January 2017 corrective disclosures impacted the price of Exxon common stock. But even if the Court ultimately disagrees, defendants' own authority teaches that "[t]he failure of an event study to find price movement does **not** prove lack of price impact with scientific certainty."

---

[29] For this reason, defendants' cited authorities are inapposite. The plaintiffs in *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc.*, 322 F. Supp. 3d 676, 682 (D. Md. 2018), *Stevelman v. Alias Research Inc.*, No. 5:91-CV-682 (EBB), 2000 WL 888385, at *5 (D. Conn. June 22, 2000), and *Luna v. Marvell Tech. Grp., Ltd.*, No. C 15-05447 WHA, 2017 WL 4865559, at *7 (N.D. Cal. Oct. 27, 2017), requested that the courts certify classes covering statements the courts had previously found inactionable or for which scienter had been inadequately pleaded.

1562491_1

*Barclays*, 310 F.R.D. at 95. Having found plaintiff's claims sufficiently pleaded, class certification is not the appropriate stage to render the merits-based, loss causation-related determination of truncating the Class Period, particularly where (as here) defendants have failed to carry their burden of proving the absence of price impact. *See Halliburton I*, 563 U.S. at 812-13; *Ludlow*, 800 F.3d at 688-89; *see, e.g.*, *In re Tyco Int'l, Ltd. Multidistrict Litig.*, No. 03-cv-1352-PB, 2007 WL 1703067, at *4 (D.N.H. June 12, 2007) (rejecting request to shorten class period because it is "based on defendants' contention that [those] investors . . . cannot show loss causation").

*Finally*, plaintiff agrees that any Class member who sold all of its Exxon shares prior to the first corrective disclosure lacks damages, but that agreement does not justify carving out corrective disclosures or altering the Class definition at this stage in this case. Defendants ask the Court to exclude any investor that sold their Exxon stock before July 29, 2016, but that is not the first potentially corrective disclosure with a statistically significant price decline – defendants admit that the January 20, 2016 *Los Angeles Times* article is. App. 92; Defs' App. 24-27; *supra* §II.B. n.8.

Professor Torchio's event study did not provide a detailed analysis of the January 20, 2016 event – nor was he required to at this point in the proceedings, as his event study properly focused on the price reaction of Exxon common stock on earnings announcement days. App. 20-23 (¶¶51-57 & T.2). This approach is generally accepted and often employed. App. 20-23, 25 n.57 (collecting cases); *see, e.g.*, *Lehocky*, 202 F.R.D. at 506; *Prudential*, 2015 WL 5097883, at *12. Because the earlier corrective disclosures identified in the Complaint were not earnings announcement dates, plaintiff was not required to analyze them at this stage. *See Prudential*, 2015 WL 5097883, at *12. As such, the merits-based determination of whether the Class can recover damages based on those disclosures is a matter more appropriately suited to summary judgment. *Cf. Halliburton I*, 563 U.S. at 811-13.

1562491_1

Notably, every securities class action involves some class members whose purchases are not damaged as a result of when they bought and sold their shares. But this issue is routinely dealt with during ***the claims process***, by which only those with damaged shares would receive a portion of any recovery. *See McGuire v. Dendreon Corp.*, 267 F.R.D. 690, 699 (W.D. Wash. 2010); *Silverman v. Motorola, Inc.*, 259 F.R.D. 163, 171 (N.D. Ill. 2009); *In re Cooper Cos. Sec. Litig.*, 254 F.R.D. 628, 641 (C.D. Cal. 2009). And the Class definition here also sufficiently addresses defendants' concerns by excluding any investor who was not damaged by their actions. ¶1 (limiting Class membership to those who were "damaged thereby"); *see In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 649 (N.D. Ala. 2009). The Class definition thus does not require alteration.

## VI.    Conclusion

For the foregoing reasons, plaintiff's motion for class certification should be granted, and the Class should be certified. Plaintiff's motion is now fully briefed, both experts have been deposed, and the evidentiary record is complete. There is no need for an evidentiary hearing, particularly because no *Daubert* motions were filed, and as set forth above, the challenges raised in the Opposition are virtually all merits-based and not appropriately considered at class certification. Should the Court wish to hold oral argument, plaintiff requests that it be held on an expedited basis, preferably, and if convenient to the Court, in early June 2019.

DATED: May 8, 2019

Respectfully submitted,

KENDALL LAW GROUP, PLLC
JOE KENDALL (Texas Bar No. 11260700)

s/ JOE KENDALL
JOE KENDALL

3811 Turtle Creek Blvd., Suite 1450
Dallas, TX 75219
Telephone: 214/744-3000
214/744-3015 (fax)
jkendall@kendalllawgroup.com

- 30 -

1562491_1

BALON B. BRADLEY LAW FIRM
BALON B. BRADLEY (Texas Bar No. 02821700)
11910 Greenville Avenue
Dallas, TX  75243
Telephone:  972/991-1582
972/755-0424 (fax)
balon@bbradleylaw.com

Local Counsel

ROBBINS GELLER RUDMAN
   & DOWD LLP
SPENCER A. BURKHOLZ
X. JAY ALVAREZ
SCOTT H. SAHAM
NATHAN R. LINDELL
SARA B. POLYCHRON
ERIKA OLIVER
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
jaya@rgrdlaw.com
scotts@rgrdlaw.com
nlindell@rgrdlaw.com
spolychron@rgrdlaw.com
eoliver@rgrdlaw.com

Lead Counsel for Plaintiff

1562491_1

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on May 8, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

 s/ JOE KENDALL
JOE KENDALL

KENDALL LAW GROUP, PLLC
3811 Turtle Creek Blvd., Suite 1450
Dallas, TX  75219
Telephone:  214/744-3000
214/744-3015 (fax)

E-mail:  jkendall@kendalllawgroup.com

1562491_1

## Mailing Information for a Case 3:16-cv-03111-K Ramirez v. Exxon Mobil Corporation et al

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **X Jay Alvarez**
  JayA@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Justin Anderson**
  janderson@paulweiss.com,mao_fednational@paulweiss.com

- **Mary K Blasy**
  mblasy@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Balon B Bradley**
  balon@bbradleylaw.com,balonbb@aol.com,iasanchez@bbradleylaw.com,anneh@bbradleylaw.com

- **Nina Cortell**
  nina.cortell@haynesboone.com,denise.stilz@haynesboone.com,robin.hart@haynesboone.com

- **Patrick Coughlin**
  patc@rgrdlaw.com

- **Ralph H Duggins**
  rduggins@canteyhanger.com,adrake@canteyhanger.com

- **Brian Matthew Gillett**
  brian.gillett@squirepb.com,janine.schiell@squirepb.com

- **Daniel H Gold**
  daniel.gold@haynesboone.com,elaine.hadaway@haynesboone.com

- **John C Herman**
  jherman@rgrdlaw.com,smeister@rgrdlaw.com

- **Jonathan Hurwitz**
  jhurwitz@paulweiss.com,mao_fednational@paulweiss.com

- **Joe Kendall**
  jkendall@kendalllawgroup.com,administrator@kendalllawgroup.com

- **Daniel Kramer**
  DKramer@paulweiss.com,mao_fednational@paulweiss.com

- **Gregory F Laufer**
  GLaufer@paulweiss.com,BTannenbaum@paulweiss.com,mao_fednational@paulweiss.com,MStachel@paulweiss.com

- **Nathan R. Lindell**
  nlindell@rgrdlaw.com,karenc@rgrdlaw.com,e_file_sd@rgrdlaw.com,susanw@rgrdlaw.com

- **D Patrick Long**
  patrick.long@squirepb.com,dawn.furcht@squirepb.com,annie.purcell@squirepb.com,docketingrequest@squirepb.com,janine.schiell@squirepb.com

- **Erika Oliver**
  eoliver@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Sara Bierl Polychron**
  spolychron@rgrdlaw.com,6287952420@filings.docketbird.com

- **Samuel H Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Scott H Saham**
  scotts@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Daniel Toal**
  DToal@paulweiss.com,mao_fednational@paulweiss.com

- **Theodore V. Wells**
  twells@paulweiss.com,mao_fednational@paulweiss.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)