IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |
|---|---|
| PEDRO RAMIREZ, JR., Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>EXXON MOBIL CORPORATION, REX W. TILLERSON, ANDREW P. SWIGER, JEFFREY J. WOODBURY, and DAVID S. ROSENTHAL,<br><br>    Defendants. | Case No. 3:16-cv-3111-K |

**DEFENDANTS' SUPPLEMENTAL BRIEF**
**ADDRESSING NEW CASE DEVELOPMENT**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................... iii

PRELIMINARY STATEMENT .............................................................................................. 1

RELEVANT FACTUAL BACKGROUND .............................................................................. 3

A.    NYAG Conducted a Three-Year Investigation into How ExxonMobil Disclosed and Accounted for the Risks of Climate Change. ............................................................. 3

B.    In Its October 2018 Suit, NYAG Claimed That ExxonMobil Misrepresented Its Use of GHG and Proxy Costs, Inflated Its Oil and Gas Reserves, and Failed Properly to Impair Its Assets. ................................................................................. 5

C.    Plaintiff Based This Action on NYAG's Meritless Allegations. ..................................... 6

D.    NYAG's Theories (Adopted by Plaintiff) Crumbled under Scrutiny. ........................... 7

ARGUMENT .......................................................................................................................10

I.    The NYAG Decision Precludes All Claims Asserted Here. ...........................................10

    A.    Plaintiff's Claims Were, or Could Have Been, Litigated in the NYAG Action. .................................................................................................................10

        1.    Res Judicata Applies to Plaintiff's Claims Concerning ExxonMobil's Use of Proxy Costs of Carbon and GHG Costs. ...............11

        2.    Res Judicata Bars Plaintiff's Remaining Accounting-Based Claims. ...............................................................................................15

    B.    Plaintiff and the Entire Putative Class Were Either Named Parties in the NYAG Action or in Privity with the NYAG. .....................................................17

        1.    All Putative Class Members Who Were New York Residents Were Named as Plaintiffs in the NYAG Action. ...............................17

        2.    Plaintiff and All Putative Class Members Were in Privity with NYAG Because NYAG Purported to Represent All Members of the ExxonMobil Investment Community. ...............................18

II.    The Preclusive Effect of the NYAG Decision Also Defeats Class Certification. ............21

    A.    Preclusion Prevents Plaintiff from Establishing Predominance. .........................21

    B.    Preclusion Prevents Plaintiff from Establishing Numerosity. .............................23

C.      Preclusion Prevents Plaintiff from Establishing Adequacy. ................................24

III.    At a Minimum, the NYAG Decision's Rejection of Plaintiff's Centerpiece Claims Concerning Proxy Costs and GHG Costs Significantly Truncates the Proposed Class...........................................................................................................................25

CONCLUSION.................................................................................................................................25

TABLE OF AUTHORITIES

**Cases**                                                                                              **Page(s)**

*Am. Builders & Contractors Supply Co.* v. *Capital & Home Improvement
Showroom, LLC,*
11 N.Y.S.3d 80 (N.Y. App. Div. 2015) ...............................................................23

*People* v. *Applied Card Sys., Inc.,*
894 N.E.2d 1 (N.Y. 2008) ................................................................. 10, 17, 18

*Berger* v. *Compaq Comput. Corp.,*
257 F.3d 475 (5th Cir. 2001) .............................................................................24

*Chen* v. *Guo Liang Lu,*
41 N.Y.S.3d 517 (N.Y. App. Div. 2016) ...........................................................22

*Dinkins* v. *Leavitt,*
No. 1:07-CV-486-TWT, 2008 WL 447503 (N.D. Ga. Feb. 13, 2008), *aff'd,*
315 F. App'x 171 (11th Cir. 2008) ....................................................................13

*In re Express Scripts, Inc.,*
No. 4:05-MD-1672-HEA, 2014 WL 11394850 (E.D. Mo. Mar. 31, 2014) ...........18

*People* v. *Exxon Mobil Corp.,*
452044/2018 (N.Y. Sup. Ct. Oct. 4, 2019) ................................................ 15, 21

*People* v. *Exxon Mobil Corp.,*
No. 452044/2018, 119 N.Y.S.3d 829 (TABLE), 2019 WL 6795771 (N.Y. Sup.
Ct. Dec. 10, 2019) ....................................................................... 1, 5, 6, 7

*Fabiano* v. *Philip Morris Inc.,*
862 N.Y.S.2d 487 (N.Y. App. Div. 2008). ..........................................................18

*State* v. *Feldman,*
210 F. Supp. 2d 294 (S.D.N.Y. 2002) ................................................................20

*Funk* v. *Stryker Corp.,*
631 F.3d 777 (5th Cir. 2011) ...............................................................................7

*Gaied* v. *New York State Tax Appeals Tribunal,*
6 N.E.3d 1113 (N.Y. 2014) .................................................................................22

*Gene And Gene LLC* v. *BioPay LLC,*
541 F.3d 318 (5th Cir. 2008) ..............................................................................22

*Goshen* v. *Mut. Life Ins. Co. of N.Y.,*
774 N.E.2d 1190 (N.Y. 2002) .............................................................................19

*In re Hunter*,
827 N.E.2d 269 (N.Y. 2005)............................................................................... 11, 16

*Marchon Eyewear, Inc.* v. *Tura LP*,
No. 98-CV-1932(SJ), 2002 WL 31253199 (E.D.N.Y. Sept. 30, 2002) ................................16

*MAZ Encryption Techs., LLC* v. *BlackBerry Ltd.*,
347 F. Supp. 3d 283 (N.D. Tex. 2018).................................................................................7

*People* v. *Merkin*,
907 N.Y.S.2d 439 (TABLE), No. 450879/09, 2010 WL 936208 (N.Y. Sup. Ct.
Feb. 8, 2010) ......................................................................................................................18

*Migra* v. *Warren City Sch. Dist. Bd. of Educ.*,
465 U.S. 75 (1984) .............................................................................................................10

*Morrison* v. *Nat'l Austl. Bank Ltd.*,
561 U.S. 247 (2010) ...........................................................................................................19

*Mountz* v. *Glob. Vision Prod. Inc.*,
770 N.Y.S.2d 603 (N.Y. Sup. Ct. 2003)..............................................................................19

*Newton* v. *S. Wood Piedmont Co.*,
163 F.R.D. 625 (S.D. Ga. 1995), *aff'd*, 95 F.3d 59 (11th Cir. 1996) (TABLE) ......................24

*O'Brien* v. *Syracuse*,
429 N.E.2d 1158 (N.Y. 1981)..............................................................................................10

*Reilly* v. *Reid*,
379 N.E.2d 172 (N.Y. 1978).................................................................................................10

*Robinson* v. *Tex. Auto. Dealers Ass'n*,
387 F.3d 416 (5th Cir. 2004) ..............................................................................................22

*State* v. *Samaritan Asset Management Services, Inc.*,
874 N.Y.S.2d 698 (N.Y. Sup. Ct. 2008)......................................................................... 20, 23

*Thompson* v. *Dallas City Att'y's Off.*,
913 F.3d 464 (5th Cir. 2019) ..............................................................................................10

*Waldman* v. *Vill. of Kiryas Joel*,
207 F.3d 105 (2d Cir. 2000) ................................................................................................16

*Watts* v. *Swiss Bank Corp.*,
265 N.E.2d 739 (N.Y. 1970).................................................................................................17

*Zeidman* v. *J. Ray McDermott & Co., Inc.*,
651 F.2d 1030 (5th Cir. 1981) .............................................................................................23

**STATUTES**

New York Election Law § 1-104(22)......................................................................................22

New York Executive Law § 63(12) ............................................................................ 5, 17, 19

New York General Business Law § 352, *et seq.* ........................................................ 5, 19, 20

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23(a)(4) ...............................................................................................24

Fed. R. Civ. P. 23(b)(3)...............................................................................................21

Defendants Exxon Mobil Corporation ("ExxonMobil"), Rex W. Tillerson, Andrew P. Swiger, Jeffrey J. Woodbury, and David Rosenthal respectfully submit this supplemental brief to explain how the December 2019 decision rejecting all of the claims asserted by the New York Attorney General ("NYAG") in *People* v. *Exxon Mobil Corp.*, No. 452044/2018 (N.Y. Sup. Ct.) (the "NYAG Action") impacts this case and provides further support for denying Plaintiff's motion to certify a class.

## PRELIMINARY STATEMENT

As the Court is aware, the New York Attorney General's suit against ExxonMobil—on which this suit is predicated—has now been tried, resulting in a final, unappealed judgment in ExxonMobil's favor on all claims. That judgment and the detailed post-trial opinion underlying it have profound implications here.

On the merits, the result of the NYAG trial is fatal to this case. From the outset, this case has been a tag-along suit that has relied on NYAG's allegations and theories. Those allegations and theories were tested in a comprehensive 12-day trial that revealed them to be "without merit" and "the result of an ill-conceived initiative" that originated with "politically motivated statements by former New York Attorney General Eric Schneiderman." *People* v. *Exxon Mobil Corp.*, No. 452044/2018, 119 N.Y.S.3d 829 (TABLE), 2019 WL 6795771, at *1, *26 (N.Y. Sup. Ct. Dec. 10, 2019) (the "NYAG Decision"). Plaintiff avoided dismissal of this suit by relying on those now-debunked allegations.

Further, the final judgment in the NYAG Action provides an additional basis to deny Plaintiff's motion to certify a class because the preclusive effect of that judgment creates insurmountable predominance, numerosity, and adequacy issues.

Plaintiff asserts claims that were fully investigated by NYAG, and those claims NYAG thought it could prove were tried to judgment in ExxonMobil's favor. Most obviously from the

face of the post-trial opinion, the trial centered on allegations that form the centerpiece of Plaintiff's case here: that ExxonMobil (i) made misrepresentations or omissions regarding its use of proxy costs of carbon and GHG costs, and (ii) failed to use those costs in business decisions, proved reserves estimates, and impairment analyses. There can be no dispute that Plaintiff asserts those same claims here. Preclusion of such claims, by itself, defers the start of the putative class period by almost two years—*i.e.*, from March 31, 2014 to February 24, 2016—knocks out three of the seven claimed corrective disclosure dates, and significantly streamlines this case.

NYAG also litigated or could have litigated all of Plaintiff's accounting-based claims regarding the timing of ExxonMobil's de-booking of its Kearl proved reserves, impairment of its Rocky Mountain Dry Gas assets, and three-month loss at its Canadian bitumen operations. NYAG thoroughly investigated ExxonMobil's global accounting disclosures and practices. NYAG obtained documents from ExxonMobil and its independent auditor, PricewaterhouseCoopers ("PwC"), and questioned witnesses on those topics. No stone was left unturned; all potential claims were vetted. If those claims were not pursued, it was because even the NYAG recognized they had no merit—and correctly so.

Plaintiff and putative class members here are in privity with NYAG, which both (i) named all New York residents as plaintiffs, and (ii) acted in a broad representative capacity on behalf of all purchasers of ExxonMobil stock in New York or whose alleged injuries arose there, seeking damages on behalf of the ExxonMobil "investment community" nationwide. (App. 13 ¶ 1.) That "investment community" includes Plaintiff and all members of the proposed class in this case, who either (a) reside in New York, (b) purchased ExxonMobil stock on the New York Stock Exchange (where it is primarily traded) or through New York brokers, or (c) were allegedly harmed, at least in part, by public statements made by Defendants in New York.

Plaintiff and all proposed class members cannot relitigate the claims that NYAG brought on their behalf and lost, or those that could have been litigated in that case. At the very least, the NYAG Decision precludes claims by a large part of the proposed class, and the individualized inquiry needed to determine which alleged class members have claims that are precluded by the NYAG Decision would overwhelm any common issues in the case, potentially destroy numerosity, and render Plaintiff an inadequate class representative. The NYAG Decision thus requires, at a minimum, denial of Plaintiff's request for class certification.

Alternatively, for reasons urged in a motion for reconsideration filed contemporaneously herewith, the NYAG Decision—and its repudiation of the NYAG's baseless factual allegations that Plaintiff and this Court previously relied on—provides a strong basis for reconsideration of Defendants' motions to dismiss and to strike, and termination of these proceedings.

## RELEVANT FACTUAL BACKGROUND

### A.    NYAG Conducted a Three-Year Investigation into How ExxonMobil Disclosed and Accounted for the Risks of Climate Change.

In November 2015, NYAG commenced a wide-ranging investigation of ExxonMobil, initially focused on the theory that ExxonMobil had covered up internal knowledge about global climate change and failed to appropriately account for the risks that climate change posed to its business. (App. 106.) NYAG subpoenaed a variety of internal ExxonMobil documents regarding its financial and operational projections, and its long-range strategic planning. (App. 113–14.)

Less than a year later, NYAG shifted the focus of its investigation to a broad review of ExxonMobil's global accounting and related practices involving its impairment assessments and proved reserves estimates. NYAG issued a sweeping document subpoena to ExxonMobil's independent auditor, PwC, seeking every conceivable document related to its new accounting focus. For example, as to proved reserves, NYAG sought all documents about the "accounting,

3

booking, de-booking, and reporting of Exxon's oil, gas, and other hydrocarbon reserves." (App. 133 ¶ 1.) Similarly, as to impairments, NYAG sought all documents about "impairment charges, impairment testing or analysis, and triggers for impairment testing or analysis, actual or potential," "including but not limited to Exxon's late 2015 effort to assess its major long-lived assets most at risk for potential impairment." (*Id.* ¶ 4.) NYAG also extensively examined ExxonMobil and PwC employees about these topics, with a particular focus on ExxonMobil's Kearl oil sands project in Alberta, Canada, and XTO Energy Inc., the ExxonMobil subsidiary that holds its Rocky Mountain Dry Gas ("RMDG") operations.[1]

In May 2017, NYAG subpoenaed ExxonMobil again, this time in support of new theories that ExxonMobil (i) generally misstated its use of proxy costs of carbon and GHG costs, and (ii) did not properly consider proxy costs of carbon and GHG costs in its proved reserves and asset impairment determinations, including with respect to the Kearl project and RMDG operations. In particular, the subpoena sought information regarding (i) "decision[s] as to whether an impairment or write-down as to Any [hydrocarbon project and associated reserves or resource base in which ExxonMobil has any working interest] should be taken . . . where Exxon applied a Proxy Cost to data, projections, forecasts, or models of the cash flow, profit or loss, revenue, capital expenditure, or operating expenditure relating to the relevant Project" and (ii) "each instance in which Exxon internally estimated its oil, gas, or other hydrocarbon reserves or resource base associated with Any [hydrocarbon project in which ExxonMobil has any working interest] . . . where Exxon applied a Proxy Cost in connection with such estimates." (App. 171–72 ¶¶ 3(a), 6(a).)

---

[1]   *E.g.*, App. 150 at 624:16–22 ("Q: Did [ExxonMobil] de-book reserves or resources from Kearl at the end of 2017? A: I don't know what they did in 2017. I recall what we did in 2016. Q: How about in 2016? A: On an SEC basis, yes."); App. 159 at 486:11–15 ("Q: And why would the XTO assets have been a particular focus? A: My recollection is because natural gas prices had fallen so much in North America.").

On June 2, 2017, NYAG further laid out these theories in a publicly filed brief and an affirmation by John Oleske ("Oleske Affirmation"). NYAG inaccurately claimed that ExxonMobil's proxy costs and GHG costs were, in fact, a single, unified "proxy cost" and that ExxonMobil improperly failed to treat them as such. (*See* App. 192–93 ¶¶ 21, 23.) NYAG also accused ExxonMobil of concealing "secret, internal figures [that] understated the degree to which [the Company] was taking into account the risks of climate change regulations." (App. 231.) And NYAG alleged that ExxonMobil had failed to calculate its proved oil and gas reserves and to impair assets appropriately because it had not incorporated proxy costs and GHG costs into those analyses. (App. 231–34, 245 & n.8, 13, 24.)

**B.    In Its October 2018 Suit, NYAG Claimed That ExxonMobil Misrepresented Its Use of GHG and Proxy Costs, Inflated Its Oil and Gas Reserves, and Failed Properly to Impair Its Assets.**

After "three and one-half years of investigation and pre-trial discovery that required ExxonMobil to produce millions of pages of documents and dozens of witnesses for interviews and depositions," and involved examinations and depositions of "multiple non-parties, including various financial institutions," NYAG sued ExxonMobil in October 2018. 2019 WL 6795771, at *1. NYAG alleged that ExxonMobil misled purchasers of its stock about the actions it was taking to manage the risks of potential climate change regulations. (App. 13 ¶ 1.) NYAG asserted claims under New York General Business Law § 352, *et seq.* (the "Martin Act"), New York Executive Law § 63(12), and for equitable and common law fraud. 2019 WL 6795771, at *1–4; (App. 13–19, 98–101 ¶¶ 1–21, 315–329).

Among other things, retaining theories advanced in May 2017 and in the Oleske Affirmation, NYAG charged that, between 2010 and year-end 2016, ExxonMobil misrepresented its use of proxy and GHG costs to manage the risks of climate change regulation. NYAG alleged that ExxonMobil's statements were false because ExxonMobil purportedly "appl[ied] a lower,

undisclosed proxy cost based on internal guidance" when "projecting its future costs for purposes of making investment decisions." (App. 14, 33–42 ¶¶ 4, 76–104); 2019 WL 6795771, at *4–5.

Consistent with its 2017 theories, NYAG also claimed that ExxonMobil's oil and gas reserves were overstated because its "decision not to apply the publicly represented proxy costs in its company oil and gas reserves assessments enabled the company to avoid 'large write-downs' in reserves that it would have had to take had it abided by its public representations." (App. 17 ¶ 13.) In particular, NYAG continued to allege that this purported failure caused ExxonMobil to overstate reserves at the Kearl project. (App. 16 ¶ 12.)

Finally, consistent with its 2017 theories, NYAG further alleged that ExxonMobil failed to properly evaluate, and recognize, asset impairments in 2015 by not incorporating ExxonMobil's proxy and/or GHG costs into its impairment evaluations, thereby allegedly misleading purchasers of ExxonMobil stock. (App. 17, 75–84 ¶¶ 14, 224–257.) By trial, however, NYAG abandoned this broad accounting claim as to all ExxonMobil's assets, including its RMDG operations, and advanced this claim as to only a single ExxonMobil asset, its facilities at Mobile Bay in the Gulf of Mexico. 2019 WL 6795771, at *29–30.

**C.     Plaintiff Based This Action on NYAG's Meritless Allegations.**

Plaintiff did not formulate its allegations in a vacuum; it followed NYAG's lead. The operative Complaint's allegations were premised on, and track, the Oleske Affirmation and NYAG's 2017 factual theories—including those NYAG presumably considered too weak to plead in its 2018 complaint. Principally, Plaintiff contended that ExxonMobil misrepresented how it used proxy costs of carbon and GHG costs to account for the risks of potential climate change regulation (ECF No. 36 ¶¶ 5–7), including by applying costs lower than those it claimed to be using, and in some cases failing to use such costs at all. (*Id.* at ¶¶ 8, 138, 145.) Plaintiff further alleged that—because ExxonMobil purportedly did not account for proxy and GHG costs as it

6

represented, and because of falling energy prices and the actions of competitors—it purportedly failed to (i) recognize an impairment as of year-end 2015 to its RMDG operations; (ii) timely de-book, and warn of the need to de-book, proved reserves at its Kearl project; and (iii) disclose that its Canadian bitumen operations operated at a loss for three months. (*Id.* ¶¶ 114–127; 170–194.)

The *Ramirez* complaint's reliance on the NYAG Action and NYAG's pre-suit investigation is demonstrated by the complaint's specific references to the NYAG's efforts. It cited the Oleske Affirmation and its exhibits in no fewer than 28 paragraphs. It discussed proxy and GHG costs in 98 paragraphs, the application of proxy and GHG costs in the asset valuation process in 45 paragraphs, the oil sands projects in Canada in 49 paragraphs, the de-booking of proved reserves at the Kearl project in 48 paragraphs, and the purported need to impair RMDG assets in 106 paragraphs. (*See* App. 538–39.)

### D.    NYAG's Theories (Adopted by Plaintiff) Crumbled under Scrutiny.

NYAG's theories—and, by extension, Plaintiff's—were tested last fall in a 12-day bench trial in the Commercial Division of the New York State Supreme Court. At trial, the court admitted 153 exhibits into evidence and heard testimony from 16 fact and four expert witnesses. Testimony in the case filled more than 2,000 transcript pages. At the close of evidence, NYAG tacitly acknowledged it had failed to prove scienter or reliance when it withdrew its common law and equitable fraud claims. 2019 WL 6795771, at *2. On December 10, 2019, the court issued the NYAG Decision, which methodically and thoroughly rejected each of NYAG's claims with prejudice.[2]

---

[2]    The NYAG Decision and public filings from that action discussed here are subject to judicial notice. *See Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (taking judicial notice of "matters of public record"); *MAZ Encryption Techs., LLC v. BlackBerry Ltd.*, 347 F. Supp. 3d 283, 293 (N.D. Tex. 2018) ("The contents of the case records of [two lawsuits] are just the type of records that the Court may take judicial notice of.").

The court first held that ExxonMobil's disclosures regarding proxy and GHG costs were "not misleading," *id.*, at *16–19; that "ExxonMobil's public disclosures in its Form 10-K submissions were true and correct with respect to ExxonMobil's proved reserves," *id.*, at *19; and that ExxonMobil did not improperly fail to recognize asset impairments, *id.*, at *29–30. The court also found that NYAG's abandoned claims of equitable and common law fraud would have failed, even if they had not been withdrawn, because NYAG did not demonstrate a misstatement or omission of any material facts. *Id.*, at *2.

The court expressly rejected the proposition, on which both the NYAG Action and this action are predicated, that ExxonMobil's disclosures led the public to believe that its GHG cost assumptions, used to evaluate potential future projects, were the same as its proxy cost of carbon used to estimate future demand for its products. *Id.*, at *21. Instead, the court concluded, proxy and GHG costs are "clearly . . . separate and distinct metrics" developed by "separate teams" within ExxonMobil. *Id.*, at *11, *5. The court recognized that ExxonMobil uses proxy costs to assess "future energy demand," and that ExxonMobil uses these demand projections, which it publishes in its annual *Outlook for Energy*, to generate the price assumptions "used to evaluate new investment opportunities." *Id.*, at *12. By contrast, the court found that—consistent with its public statements—ExxonMobil uses GHG costs "where appropriate" to evaluate specific, proposed oil and gas projects. *Id.*, at *11, 18, 30.

The court also rejected NYAG's contention that ExxonMobil's disclosures about proxy and GHG costs were material. The court determined that no reasonable investor "would make investment decisions based on speculative assumptions of costs that may be incurred 20+ or 30+ years in the future with respect to unidentified future projects." *Id.*, at *20. The court rejected NYAG's claim that ExxonMobil's "alleged misrepresentations were material and important to

8

research analysts and the investing public," finding that the testimony from investors and analysts that NYAG adduced "establishes the exact opposite." *Id.*, at *22. The court ruled that NYAG failed to prove that any alleged discrepancy between proxy costs and GHG costs would have "affected ExxonMobil's balance sheet, income statement, or any other financial disclosure." *Id.*, at *20. The court underscored that the "forward looking projections" in ExxonMobil's internal economic models "do not impact ExxonMobil's financial statements and other corporate books and records." *Id.*, at *15. Likewise, the court concluded, ExxonMobil's projected regulatory costs had no effect on its publicly reported proved reserves, which—in accordance with governing SEC regulations—account only for "*existing* economic conditions, operating methods, and government regulations." *Id.*, at *19 (internal quotations omitted & emphasis added) (quoting 17 C.F.R. § 210.4-10(a)(22)).) Finally, the court found that NYAG "failed to demonstrate that ExxonMobil's impairment disclosures and accounting practices in 2015 were inconsistent with GAAP." *Id.*, at *29.

Significantly, Justice Ostrager found that ExxonMobil's witnesses, far from misleading stock purchasers, were "uniformly committed to rigorously discharging their duties in the most comprehensive and meticulous manner possible." *Id.*, at *21. The court heard from ten current and former ExxonMobil employees and concluded that their testimony proved ExxonMobil's "culture of disciplined analysis, planning, accounting, and reporting." *Id.* Each witness "swore under oath that he or she was unaware of any scheme at ExxonMobil to mislead investors about the manner in which ExxonMobil managed climate risk." *Id.* The court found the testimony of these witnesses truthful and "uniformly favorable to ExxonMobil." *Id*, at *31. NYAG did not appeal.

**ARGUMENT**

A class cannot be certified here because the NYAG Decision precludes Plaintiff's claims and those of the putative class. In view of the preclusive effect of the NYAG Decision, Plaintiff also cannot establish the prerequisites for class certification, including predominance, numerosity, and adequacy. At a minimum, preclusion significantly truncates the proposed class period and significantly streamlines the case.

**I.    The NYAG Decision Precludes All Claims Asserted Here.**

Federal courts "must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered"—here, New York law. *Migra* v. *Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984); *see Thompson* v. *Dallas City Att'y's Off.*, 913 F.3d 464, 467 (5th Cir. 2019) ("Federal courts must step into the shoes of state courts and afford preclusive effect where state courts would do so.") (citation omitted). Under New York's law of res judicata, a valid final judgment bars future litigation of causes of actions that were, or could have been, litigated in a prior proceeding by the same parties or those in privity with them. *See People* v. *Applied Card Sys., Inc.*, 894 N.E.2d 1, 12–14 (N.Y. 2008). It is undeniable that the NYAG Decision is a valid and final judgment. As discussed below, the other elements of res judicata are also satisfied here.

**A.    Plaintiff's Claims Were, or Could Have Been, Litigated in the NYAG Action.**

To determine whether a cause of action was, or could have been, litigated in another action, New York courts evaluate whether the two actions' claims arise out of the same transaction or series of transactions. *O'Brien* v. *Syracuse*, 429 N.E.2d 1158, 1159 (N.Y. 1981). Under New York's transactional approach to res judicata, "once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy." *Id.* Whether factual groupings constitute

10

a transaction, or a series of transactions, should be determined "pragmatically." *Reilly* v. *Reid*, 379 N.E.2d 172, 176 (N.Y. 1978) (quoting Restatement (Second) of Judgments § 61.1). Courts are required to give "weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understandings or usage." *Id.* Res judicata applies not only to claims that were actually litigated, but also to those that could have been raised in the prior litigation. *See In re Hunter*, 827 N.E.2d 269, 274 (N.Y. 2005).

The claims in this action undeniably arise from the same series of transactions as the NYAG Action and were, or could have been litigated, in the NYAG Action.

### 1. Res Judicata Applies to Plaintiff's Claims Concerning ExxonMobil's Use of Proxy Costs of Carbon and GHG Costs.

Plaintiff's case here and the NYAG Action both rely on substantially identical allegations charging that ExxonMobil's public statements about its use of proxy costs of carbon and GHG costs to account for the potential impact of climate-related government policies were misleading. Plaintiffs in both actions alleged that ExxonMobil used lower figures than those it publicly disclosed when it conducted its internal financial analyses, and when it calculated ExxonMobil's proved reserves and asset impairments.[3] Both lawsuits alleged that, by failing to use its publicly disclosed proxy costs for all purposes, ExxonMobil failed to recognize certain impairments (and thereby overstated the value of its assets), and avoided or delayed de-booking certain of its proved reserves. The similarity is no coincidence. The *Ramirez* complaint drew its allegations extensively from NYAG's filings and public reports about NYAG's lengthy investigation. The NYAG Decision precludes such claims from being pursued in this action.

Specifically, the *Ramirez* complaint raised the following claims, all of which were also

---

[3]   (*Compare* ECF No. 36 ¶¶ 247(i), (ii) *with* App. 13–15 ¶¶ 1–8) .)

11

raised by NYAG and all of which were rejected by Justice Ostrager:

**ExxonMobil's Use of Proxy Costs and GHG Costs.**  Both NYAG and Plaintiff alleged that ExxonMobil misrepresented how it used proxy and GHG costs to account for the risks of potential climate change regulations, by purportedly applying costs lower than those it claimed to be using and, in some cases, failing to use such costs at all.[4]  Justice Ostrager found that the disclosures regarding proxy and GHG costs were not misleading, and that proxy and GHG costs are clearly distinct metrics.  2019 WL 6795771, at *10–11, *16–18.

**Use of Proxy Costs Regarding Oil Sands Assets in Alberta, Canada.**  Both NYAG and Plaintiff claimed that ExxonMobil did not apply its publicly disclosed proxy costs with respect to oil sands projects in Alberta, including the Kearl project, allegedly leading to the understatement of costs used in cash flow projections.[5]  Justice Ostrager rejected this claim.  *Id.*, at *14–15.

**Use of Proxy Costs of Carbon in ExxonMobil's Proved Reserves Estimates.**  Both NYAG and Plaintiff claimed ExxonMobil deviated from its publicly represented proxy costs in estimating the size of its oil and gas reserves and resource base, thereby inflating the amount of its proved reserves.[6]  Justice Ostrager rejected this argument, finding that ExxonMobil's disclosures regarding its proved reserves were "true and correct" and "[n]ot [m]isleading."  *Id.*, at *16, *19.  Justice Ostrager properly recognized forward-looking metrics such as proxy cost or GHG costs have no bearing on the estimation of proved reserves because SEC regulations "mandate the use of 'existing economic conditions, operating methods, and government regulations in reporting

---

[4]  (*Compare* App. 13–19, 21–25, 27–28, 29–91, 93–95, 97–98, 100 ¶¶ 2–6, 8–16, 17–18, 20, 33, 35–40, 42–47, 55–56, 61, 64, 66–67, 70, 76–285, 287, 289–90, 294, 299, 302, 311, 313–14, 316, 318, 321, 327 *with* ECF No. 36 ¶¶ 5–9, 106, 110, 113, 128–147, 175–77, 185, 191–94, 201, 239, 246–54, 257–67, 281–86, 293–95, 302, 304–07, 309–10, 313–14, 316–18, 354–57, 359–64, 371–72, 377, 385–86, 399, 421–22.)

[5]  (*Compare* App. 16–17, 24, 46–48, 55–60, 70–73 ¶¶ 12–13, 45, 120, 126, 148, 152–69, 206, 209–15 *with* ECF No. 36 ¶¶ 8, 128, 129, 130, 131, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 248, 249, 250, 253, 254, 268, 269, 283, 284, 285, 286, 293, 294, 304, 305, 306, 309, 310, 354, 355, 356, 357, 358, 359, 360, 361, 362, 363, 364, 365, 421.)

[6]  (*Compare* App. 66–75 ¶¶ 191–224 *with* ECF No. 36 ¶¶ 331–35, 342–65.)

12

proved reserves.'" *Id.* at *19 (citation omitted).

**Use of Proxy Costs of Carbon in ExxonMobil's Asset Impairment Analyses, Including the RMDG Assets.** Both NYAG and Plaintiff claimed ExxonMobil failed to use its publicly disclosed proxy costs when projecting potential regulatory costs as part of its asset impairment analyses, thereby supposedly failing to recognize required asset impairments. In its complaint, NYAG advanced this theory as to all of ExxonMobil's assets. (App. 17, 75–84 ¶¶ 14, 225–257.) By trial, however, NYAG abandoned this theory as to all assets except ExxonMobil's Mobile Bay asset. (*See supra*, at 6.) Justice Ostrager squarely rejected NYAG's theory regarding asset impairment, finding that (i) NYAG "failed to demonstrate that ExxonMobil's impairment disclosures and accounting practices in 2015 were inconsistent with GAAP"; (ii) "neither ExxonMobil nor PricewaterhouseCoopers believed it was 'appropriate' to include GHG costs" in its 2015 asset recoverability review; and (iii) ExxonMobil's later inclusion of GHG costs in impairment assessments was "not considered a significant assumption," but only "reflect[ed] conservatism on the part of management." 2019 WL 6795771, at *29–30.

The fact that NYAG initially advanced and then abandoned this theory as to all assets, except for Mobile Bay, confirms that res judicata applies to the RMDG assets (the subject of Plaintiff's impairment claim based on this same rejected theory). (*See* ECF No. 36 ¶¶ 366–376.) Courts applying the transactional approach New York applies have recognized that res judicata bars such abandoned claims because the "[p]laintiff's decision to abandon these claims indicates that they were available in the prior suit and therefore could have been raised." *Dinkins* v. *Leavitt*, No. 1:07-CV-486-TWT, 2008 WL 447503, at *9 (N.D. Ga. Feb. 13, 2008) (applying transactional approach to res judicata), *aff'd*, 315 F. App'x 171 (11th Cir. 2008).

**Alleged Misstatements in ExxonMobil's *Managing the Risks*, *Energy and Climate* and**

13

*Outlook for Energy* **Reports.**  Both NYAG and Plaintiff identified ExxonMobil's *Managing the Risks*, *Energy and Climate* and *Outlook for Energy* reports as key sources of purported misstatements, alleging these reports created an overly rosy portrait of ExxonMobil's efforts to account for the risk of potential climate change regulation.[7]  Justice Ostrager rejected the claim that the statements made in these reports were false or misleading.  *Exxon Mobil Corp.*, 2019 WL 6795771, at *16–19, *31.

**Alleged Misstatements in Corporate Citizenship Responses and Carbon Disclosure Project.**  Both NYAG and Plaintiff alleged ExxonMobil's Carbon Disclosure Project and Corporate Citizenship Responses contained alleged misstatements about its use of proxy costs.[8]  Justice Ostrager rejected that claim.  *Id.*, at *4–5, *10–12, *31.

**Alleged Misstatements in ExxonMobil's 2014, 2015, and 2016 Forms 10-K.**  Both the NYAG and Plaintiff identify ExxonMobil's 2014, 2015 and 2016 Form 10-Ks as containing misrepresentations regarding ExxonMobil's use of proxy costs and proved reserves.[9]  Justice Ostrager found the public disclosures in ExxonMobil's Form 10-Ks were "true and correct."  *Id.*, at *19.

**Alleged Misstatements at ExxonMobil's March 2, 2016 Analyst Meeting in New York.**  Both NYAG and Plaintiff point to a March 2, 2016 analyst meeting in New York City, where they claim ExxonMobil made misleading statements regarding its impairment evaluations related to climate change risk.[10]  Justice Ostrager found that NYAG "failed to establish by a preponderance

---

[7]  (*Compare* App. 26–27, 32–44, 49–51, 67–68, 78–79, 84–87, 90–92, 95–96 ¶¶ 54, 71–72, 75, 77, 79, 81–104, 109, 112, 128–29, 131, 196, 199, 238, 260, 266, 271, 273, 286, 288, 291–93, 300–01, 303–04 *with* ECF No. 36 ¶¶ 3–8, 10, 129–30, 139, 248–50, 253, 260, 283, 293, 295, 302, 389–90.)

[8]  (*Compare* App. 27–28, 40, 49, 86 ¶¶ 56–57, 98, 128, 272 *with* ECF No. 36 ¶¶ 131 n.17, 293–94.)

[9]  (*Compare* App. 78 ¶¶ 234–36 *with* ECF No. 36 ¶¶ 14, 16–18, 97–98, 101, 109, 146, 163, 174, 178, 196, 233, 253–56, 277–79, 281, 283, 285, 287, 288, 313, 343–45, 348–52, 355, 357, 364–65, 369, 373–74, 376.)

[10]  (*Compare* App. 83–84 ¶ 257 *with* ECF No. 36 ¶ 290.)

14

of the evidence that ExxonMobil made any material misstatements or omissions about its practices and procedures that misled any reasonable investor." *Id.*, at \*30.

**Alleged Misstatements at May 25, 2016 ExxonMobil Shareholder Meeting.** Both NYAG and Plaintiff contend that ExxonMobil made misstatements regarding its use of proxy costs at a May 25, 2016 shareholder meeting.[11] Justice Ostrager rejected that argument. *Id.*, at \*4–5, \*18 n.8, \*30–31.

**Alleged Corrective Disclosures.** Both NYAG and Plaintiff identified three alleged corrective disclosures where the supposed "truth" regarding ExxonMobil's climate change accounting practices allegedly was revealed to stock purchasers—(i) a January 20, 2016 *Los Angeles Times* article reporting that the California Attorney General was investigating ExxonMobil's climate change disclosures, (ii) a September 20, 2016 *Wall Street Journal* article reporting on an SEC investigation of ExxonMobil, and (iii) the June 2, 2017 Oleske Affirmation, in which NYAG outlined its investigative theories against ExxonMobil.[12] Justice Ostrager found these supposed revelations did not constitute corrective disclosures. 2019 WL 6795771, at \*26.

### 2. Res Judicata Bars Plaintiff's Remaining Accounting-Based Claims.

The NYAG Decision also precludes Plaintiff's remaining accounting-based challenges that, because of falling energy prices and the actions of competitors, ExxonMobil purportedly failed to (i) recognize and disclose an impairment as of year-end 2015 to its RMDG operations; (ii) timely de-book, and warn of the need to de-book, proved reserves at its Kearl project; and (iii) disclose that its Canadian bitumen operations operated at loss for three months. (*See supra*, at 7).

All of these claims existed when NYAG filed suit and arise from the very same accounting-related disclosures and practices that NYAG investigated in depth and could have raised at trial.

---

[11]   (*Compare* App. 41–42 ¶ 102) *with* ECF No. 36 ¶¶ 305–06.)
[12]   (*Compare* App. 281, 283–85 at ¶¶ 59, 64–65, 68, 70) *with* ECF No. 36 ¶¶ 218, 226–27, 243.)

*See In re Hunter*, 827 N.E.2d at 275 (affirming application of res judicata to legal and factual theories that "were discernible from the documents filed in [the] prior proceedings"); *Waldman* v. *Vill. of Kiryas Joel*, 207 F.3d 105, 111 (2d Cir. 2000) (affirming application of res judicata where "the various components of the overlapping facts" were properly viewed "as part of the same pattern of behavior by the [defendant]"). Indeed, the same conduct was integral to both suits. *See Marchon Eyewear, Inc.* v. *Tura LP*, No. 98-CV-1932(SJ), 2002 WL 31253199, at *12 (E.D.N.Y. Sept. 30, 2002) (holding that any claim "based upon Plaintiffs' conduct before [the first lawsuit] is barred by res judicata, as Defendants had the opportunity to litigate such claims in [that case].").

Before filing suit, NYAG broadly investigated ExxonMobil's global accounting-related disclosures and practices from 2010 to year-end 2016, which fully encompasses the period of wrongdoing Plaintiff alleged. (*See* App. 133 ¶¶ 1, 4 (seeking information regarding (i) the "accounting, booking, de-booking, and reporting of Exxon's oil, gas, and other hydrocarbon reserves" and (ii) "impairment charges, impairment testing or analysis, and triggers for impairment testing or analysis, actual or potential," "including but not limited to Exxon's late 2015 effort to assess its major long-lived assets most at risk for potential impairment").) NYAG reviewed millions of pages of documents and deposed dozens of witnesses regarding these issues for over three years. And NYAG investigated both ExxonMobil's Canadian operations (including the Kearl project) and its RMDG assets. (*See supra*, at 4 n.1.) Had NYAG believed they had any merit, NYAG unquestionably could have raised the same accounting-based claims premised on falling energy prices and the actions of ExxonMobil's competitors that Plaintiff raises here in relation to ExxonMobil's Kearl proved reserves, RMDG asset impairment analyses, and Canadian bitumen operations. All of these claims are thus barred by res judicata.

16

**B.**     **Plaintiff and the Entire Putative Class Were Either Named Parties in the NYAG Action or in Privity with the NYAG.**

New York's law of res judicata bars claims where "the party against whom the doctrine is invoked was a party to the previous action, or in privity with a party who was." *Applied Card Sys.*, 894 N.E.2d at 12 (citations omitted).  To determine whether parties are in privity, courts applying New York law evaluate whether one party's "interests [were] represented by a party to the [earlier] action." *Watts* v. *Swiss Bank Corp.*, 265 N.E.2d 739, 743 (N.Y. 1970) (citation omitted).

Pursuant to statutory and common law authority, NYAG named all New York residents as plaintiffs in the NYAG Action, thus barring their claims here.  NYAG also purported to represent the ExxonMobil "investment community" and seek relief on behalf of all investors,[13] rendering Plaintiff and the full putative class in privity with NYAG.

**1.**     **All Putative Class Members Who Were New York Residents Were Named as Plaintiffs in the NYAG Action.**

The named plaintiffs in the NYAG Action were "the People of the State of New York." Their status as named parties provides an independent basis for precluding the claims of any proposed class member who is or was a New York resident at the time of a relevant purchase or sale.  Pursuant to statutory and common law authority, NYAG represented all New York residents in the NYAG Action.  By statute, NYAG is authorized to maintain a claim "in the name of the people of the state of New York."  N.Y. Exec. Law § 63(12).  Similarly, under the common law *parens patriae* doctrine, NYAG is authorized to bring an action on behalf of the people of New York to "prevent harm to its sovereign interests, such as the health, safety, comfort, and welfare of its citizens." *People* v. *Merkin*, 907 N.Y.S.2d 439 (TABLE), No. 450879/09, 2010 WL 936208, at *9 (N.Y. Sup. Ct. Feb. 8, 2010).

---

[13]     (App. 13 ¶ 1.)

17

Courts applying New York law have held that private plaintiffs who were New York residents were precluded from pursuing claims previously resolved in litigation brought by NYAG. In *Fabiano* v. *Philip Morris Inc.*, the court found that the doctrine of res judicata precluded a New York resident from relitigating punitive damages claims against a tobacco company because such claims had already been settled between NYAG and the tobacco company, where NYAG had sued "on behalf of the People of the State of New York." 862 N.Y.S.2d 487, 489–90 (N.Y. App. Div. 2008). The court held that the New York resident was in privity with NYAG and thus precluded from relitigating punitive damages. *Id.* at 492.

The decision in *In re Express Scripts, Inc.*, No. 4:05-MD-1672-HEA, 2014 WL 11394850 (E.D. Mo. Mar. 31, 2014), is to the same effect. In that case, a court applying New York law held that a settlement between NYAG and Express Scripts precluded private plaintiffs from pursuing similar claims. *Id.*, at *8. Because NYAG had statutory authority to bring its suit on behalf of New York government plans and New York state and local government employees, the court held that the class action plaintiffs, members of those government plans, were in privity with NYAG and thus precluded from relitigating claims resolved by NYAG's settlement. *Id.*, at *7.

### 2. Plaintiff and All Putative Class Members Were in Privity with NYAG Because NYAG Purported to Represent All Members of the ExxonMobil Investment Community.

Courts applying New York law have consistently held that NYAG and private parties are in privity for preclusion purposes where NYAG has authority to seek relief on behalf of the private parties. *See Applied Card Sys.*, 894 N.E.2d at 13–15. In that case, the New York Court of Appeals, New York's highest appellate court, held that NYAG was precluded under res judicata from seeking restitution on behalf of consumers who had already obtained relief in a national "opt-in" class action in California. *Id.* at 11–12. The court reasoned that because allowing NYAG to seek

18

"additional restitution on behalf of the [consumer] settlement class members would undoubtedly 'destroy or impair rights' conclusively established in the [prior] case." *Id.* at 14 (citation omitted).

Whether or not they were New York residents, all members of the putative class were in privity with NYAG because NYAG sought relief in a representative capacity on their behalf, and their claims therefore are precluded. First, all or virtually all putative class members purchased their shares of ExxonMobil through the New York Stock Exchange.[14] Protecting the integrity of New York-based markets was one of NYAG's principal stated concerns, as alleged in the complaint. (App. 13, 19 ¶¶ 1, 22–23.) Second, all putative class members claim to have been injured, at least in part, by ExxonMobil statements that emanated from New York State. (*See* ECF No. 36 ¶¶ 81, 88, 289, 290; App. 83–84 ¶ 257.) The New York-based statements identified in the *Ramirez* complaint were likewise identified in NYAG's complaint. (App. 18, 85, 90–91 ¶¶ 18, 267, 289).) Protecting stock purchasers nationwide from allegedly false statements originating in New York was another of the express objectives of NYAG's suit. (App. 13, 19 ¶¶ 1, 22–23.) These New York connections bring all proposed class members in privity with NYAG and preclude them from relitigating their claims.

Moreover, the NYAG Action was brought on behalf of the ExxonMobil "investment community." (App. 13 ¶ 1.) NYAG asserted claims under the Martin Act and Executive Law § 63(12), both of which allow NYAG to seek relief on behalf of New York and non-New York residents for transactions or conduct that occurred in New York.[15] *See Goshen* v. *Mut. Life Ins. Co. of N.Y.*, 774 N.E.2d 1190, 1196 (N.Y. 2002) (the General Business Law, which includes the

---

[14] Plaintiff cannot seek relief on behalf of those who purchased ExxonMobil stock on foreign exchanges, and any such purchasers necessarily must be excluded from Plaintiff's proposed class definition under controlling law. *See Morrison* v. *Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 265 (2010).

[15] Only "some part" of the conduct must occur in New York. *Mountz* v. *Glob. Vision Prods., Inc.*, 770 N.Y.S.2d 603, 608 (N.Y. Sup. Ct. 2003).

Martin Act, applies to "out-of-state plaintiffs' claims of deceptive acts leading to transactions within the state."); *State* v. *Feldman*, 210 F. Supp. 2d 294, 303 (S.D.N.Y. 2002) (New York courts have "consistently held that [Executive Law] section 63(12) authorizes the [NYAG] to recover for non-residents injured by wrongdoing that occurred in New York.") (citations omitted).  In *State* v. *Samaritan Asset Management Services, Inc.*, 874 N.Y.S.2d 698 (N.Y. Sup. Ct. 2008), the court recognized that NYAG had authority to bring suit under the Martin Act and Executive Law § 63(12) regarding certain mutual fund transactions based on the fact that the allegedly deceptive acts of a nonresident defendant had been "effectuated through New York brokers."  *Id.* at 704.

NYAG unquestionably invoked the full scope of its representative authority in its suit against ExxonMobil.  One of NYAG's principal purported concerns was to "protect[] the integrity of the business and securities markets within New York, as well as the economic health and well-being of *investors* who *reside* or *transact business* in the State."  (App. 13, 19 ¶¶ 1, 22–23 (emphases added).)  NYAG repeatedly claimed its suit was necessary to protect the integrity of the New York Stock Exchange, on which ExxonMobil's stock trades.  (*Id.*)

NYAG purported to protect not only the integrity of New York's markets, but also all stock purchasers who traded on them.  In NYAG's words, that included "New Yorkers planning for retirement and for their children's college education, as well as pension funds, mutual funds, life insurance companies, and other institutional investors, many of which"—but not all of which—"are based in New York." (App. 25 ¶¶ 48, 50.)  In working to protect stock purchasers nationwide from allegedly misleading statements that emanated from New York, NYAG also pointed to statements made at New York meetings with investors in 2013-2014, and analysts in 2015-2016. In keeping with its broad representative purpose, NYAG's claim under the Martin Act asserted

20

violations in connection with "the issuance, distribution, exchange, sale, negotiation, or purchase of securities within or from [New York]," and without geographic limit.  (App. 98–99 ¶ 316.)

NYAG likewise sought damages on behalf of purchasers of ExxonMobil stock nationwide, not just those in New York.  NYAG charged that "Exxon's investors suffered damages in connection with purchasing and retaining securities that were the direct and proximate result of Exxon's fraud." (App. 100 ¶ 325.) NYAG sought "restitution for investors harmed by the artificial inflation of Exxon's share price," without distinguishing between residents and non-residents of New York.  (App. 349 at 31:17–19; App. 450 at n.300 ("Damages in each Inflation Period are based on shares purchased during that period.").)  NYAG's damages expert claimed that the court should award damages based on his analysis of shares held by *all* purchasers of ExxonMobil's stock, without regard to whether they had any connection to New York.  Based on that analysis, NYAG's expert claimed that NYAG was entitled to recover between $460 million and $1.6 billion. (App. 366 ¶ 23.)  (ExxonMobil successfully challenged the reliability of NYAG's expert's analysis, but did not seek to limit the scope of their claims to damages purportedly sustained by New York residents.)

## II.     The Preclusive Effect of the NYAG Decision Also Defeats Class Certification.

Preclusion prevents Plaintiff from satisfying its burden to establish three class certification requirements: (i) predominance, (ii) numerosity, and (iii) adequacy.  Plaintiff's inability to establish each of these requirements independently defeats class certification.

### A.     Preclusion Prevents Plaintiff from Establishing Predominance.

Issues of preclusion regarding individual putative class members overwhelm common issues.  *See* Fed. R. Civ. P. 23(b)(3).  The Fifth Circuit has held that "the predominance of individual issues necessary to decide an affirmative defense may preclude class certification." *Gene And Gene LLC* v. *BioPay LLC*, 541 F.3d 318, 327 (5th Cir. 2008) (internal quotations &

citation omitted).  Litigating that defense would entail a series of mini-trials on each putative class member's residence at the time of a relevant stock transaction, and the domicile of each proposed class member's broker, financial advisor, and other investment professionals.  *See Robinson* v. *Tex. Auto. Dealers Ass'n*, 387 F.3d 416, 424 (5th Cir. 2004) (reversing class certification because district court needed to "hear evidence regarding *each purported class member and his transaction*," and "[s]uch an individual examination would destroy any alleged predominance present in the proposed class") (emphasis in original).  Predominance thus cannot be established.

The proposed class here must exclude all ExxonMobil stock purchasers whose claims are precluded by the NYAG Decision.  To do this, this Court would have to engage in an in-depth examination to determine which stock purchaser's claims are precluded in whole or part, including, among other things, (i) whether alleged putative class members were New York residents at the time of each purchase of ExxonMobil stock, and (ii) whether non-New York putative class members made each purchase in New York or through a New York broker.

**Individual Factual Considerations Regarding New York Residency**.  Determining whether *each* proposed class member was a New York resident at the time of *each* transaction is a fact-intensive inquiry, and may require analyzing:

- the shareholder's intent to make New York his or her "fixed and permanent home," *Chen* v. *Guo Liang Lu*, 41 N.Y.S.3d 517, 520 (N.Y. App. Div. 2016) (internal quotations & citation omitted);
- the number of days the individual maintained a permanent home in New York, *Gaied* v. *New York State Tax Appeals Tribunal*, 6 N.E.3d 1113, 1116 (N.Y. 2014); and/or
- whether the shareholder maintained "a fixed, permanent and principal home" to which he or she "always intend[ed] to return," N.Y. Elec. Law § 1-104(22).

Whether an institutional investor should be considered a New York resident is an entirely separate analysis.  That analysis requires the Court to determine where the institutional shareholder made investment decisions, and whether a foreign corporation's residency is its principal office as

22

designated in state applications for authority to conduct business. *See Am. Builders & Contractors Supply Co.* v. *Cap. & Home Improvement Showroom, LLC*, 11 N.Y.S.3d 80, 82 (N.Y. App. Div. 2015). Undertaking such an analysis for every purported member of the proposed class is essential to prevent putative class members from being able to re-litigate claims that were conclusively resolved against them in the NYAG Action.

**Individual Factual Considerations for Non-New York Residents**. Determining whether non-New York members of the putative class are precluded from seeking relief will require a careful examination of whether they purchased or sold their shares through a broker or financial advisor with sufficient ties to New York. That analysis must consider, among other things, the location of each non-resident's class period stock transactions, including whether their shares were purchased or sold through New York brokers. *See Samaritan Asset Mgmt. Servs., Inc.*, 874 N.Y.S.2d at 704 (holding NYAG had authority to sue where alleged wrongdoing by nonresident defendant was "effectuated through New York brokers"). Insofar as the claims of all putative class members arising from statements at the 2016 and 2017 analyst meetings in New York City are not entirely precluded by the NYAG Decision, the Court will also have to determine whether non-New York members of the putative class allegedly relied on those statements.

All of these individualized inquiries prevent Plaintiff from establishing predominance.

**B.      Preclusion Prevents Plaintiff from Establishing Numerosity.**

Plaintiff bears the burden of proving that a purported class is "so numerous that joinder of all members is impracticable." *Zeidman* v. *J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1038 (5th Cir. 1981) (quoting Fed. R. Civ. P. 23(a)(1)). "[A] plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members." *Id.* (citation omitted). As shown above, the NYAG Action precludes claims by putative class members who (i) are New York residents, (ii) purchased ExxonMobil stock on the New York Stock Exchange or through

23

New York-based markets or brokers, or (iii) were harmed by allegedly misleading statements that emanated from New York. Plaintiff bears the burden to prove, but has not, that any putative class members who did not purchase ExxonMobil stock on the New York Stock Exchange or through New York-based markets/brokers are "so numerous that joinder of all members is impracticable." *Id.* (citation omitted). For these reasons, Plaintiff cannot satisfy its burden of proving numerosity.

### C.    Preclusion Prevents Plaintiff from Establishing Adequacy.

A proposed class representative bears the burden to prove that it "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Proving that a proposed class representative is adequate is essential to "ensure that the due process rights of all class members are safeguarded." *Berger* v. *Compaq Comput. Corp.*, 257 F.3d 475, 480 (5th Cir. 2001) (citations omitted). That is because absent class members must rely on the class representative's knowledge and judgment in defending their interests. A lead plaintiff whose claims fail as a matter of law cannot satisfy the adequacy requirement of Rule 23(a)(4). *See Newton* v. *S. Wood Piedmont Co.*, 163 F.R.D. 625, 633–35 (S.D. Ga. 1995) (denying class certification on the ground that, among other reasons, proposed lead plaintiffs were inadequate because their claims were barred by res judicata, statute of limitations, and a prior settlement), *aff'd*, 95 F.3d 59 (11th Cir. 1996) (TABLE).

Like the inadequate lead plaintiffs in *Newton*, Plaintiff cannot establish that it is an adequate class representative under Rule 23(a)(4) because its claims are precluded by the NYAG Decision. Plaintiff was in privity with NYAG because Plaintiff purchased ExxonMobil stock on the New York Stock Exchange. (*See* ECF No. 36 ¶ 34 ("[ExxonMobil] stock trades on the New York Stock Exchange ('NYSE') under the ticker symbol "XOM."); *see also* ECF No. 98–99 at App. 7, 530 (detailing Plaintiff's purchases of ExxonMobil stock).) Plaintiff is thus bound by the judgment in the NYAG Action and, accordingly, an inadequate proposed class representative.

**III.    At a Minimum, the NYAG Decision's Rejection of Plaintiff's Centerpiece Claims Concerning Proxy Costs and GHG Costs Significantly Truncates the Proposed Class.**

All 11 alleged misrepresentations from March 31, 2014 to February 24, 2016 and three of the seven alleged corrective disclosure dates—November 9, 2015, January 20, 2016, and August 10, 2016—raised by Plaintiff pertained solely to ExxonMobil's use of proxy costs and GHG costs, including in its proved reserves estimates and asset impairment analyses.  (*See* ECF No. 36 ¶¶ 248–277, 388, 426–436; ECF No. 98 at App. 113–114, 127–128.)  The NYAG Decision's methodical rejection of identical allegations concerning ExxonMobil's use of proxy costs and GHG costs confirms that these issues were, in fact, litigated in the NYAG Action and are thus barred by res judicata.  Accordingly, in addition to Defendants' prior arguments (ECF No. 116 at 33–34), the preclusive effect of the NYAG Decision means that no class can be certified before February 24, 2016 (because all such alleged misrepresentations before then are barred and thus not actionable), and Plaintiff cannot rely on these three alleged corrective disclosure dates.

**CONCLUSION**

This action is a copycat of the discredited NYAG Action.  After more than three years of investigation, millions of pages of documents produced, dozens of witnesses examined and deposed, and a 12-day trial, the New York court concluded that NYAG's allegations were wholly without merit.  The preclusive effect of that judgment prevents class certification because Plaintiff cannot establish predominance, numerosity, or adequacy.  For these reasons, and those in Defendants' opposition brief (ECF No. 116), Plaintiff's motion for class certification should be denied.

25

Dated:  July 31, 2020

Respectfully submitted,

/s/ Daniel J. Kramer
Theodore V. Wells, Jr. (*pro hac vice*)
Daniel J. Kramer (*pro hac vice*)
Daniel J. Toal (*pro hac vice*)
Justin Anderson (*pro hac vice*)
Jonathan H. Hurwitz (*pro hac vice*)
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
twells@paulweiss.com
dkramer@paulweiss.com
dtoal@paulweiss.com
janderson@paulweiss.com
jhurwitz@paulweiss.com

/s/ D. Patrick Long
D. Patrick Long
Texas State Bar No. 12515500
Brian M. Gillett
Texas State Bar No. 24069785
SQUIRE PATTON BOGGS
2000 McKinney Ave., Suite 1700
Dallas, TX 75201
Telephone: (214) 758-1505
Facsimile: (214) 758-1550
patrick.long@squirepb.com
brian.gillett@squirepb.com

*Counsel for Rex W. Tillerson*

/s/ Nina Cortell
Nina Cortell
Texas State Bar No. 04844500
Daniel H. Gold
Texas State Bar No. 24053230
HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700
Dallas, TX 75219
Telephone: (214) 651-5000
Facsimile: (214) 651-5940
nina.cortell@haynesboone.com
daniel.gold@haynesboone.com

*Counsel for Exxon Mobil Corporation,
Andrew P. Swiger, Jeffrey J. Woodbury,
and David S. Rosenthal*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has been

served by electronic CM/ECF filing, on this 31st day of July, 2020.


/s/ Daniel J. Kramer
Daniel J. Kramer