IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |
|---|---|
| PEDRO RAMIREZ, JR., Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> EXXON MOBIL CORPORATION, REX W. TILLERSON, ANDREW P. SWIGER, JEFFREY J. WOODBURY, and DAVID S. ROSENTHAL, <br><br> Defendants. | Case No. 3:16-cv-3111-K |

**APPENDIX IN SUPPORT OF DEFENDANTS' SUPPLEMENTAL BRIEF
<u>ADDRESSING NEW CASE DEVELOPMENT</u>**

| Exhibit | Description | App. Page(s) |
|---|---|---|
| A | Declaration of Daniel J. Toal | App. 1 – App. 5 |
| 1 | Complaint, NYSCEF No. 1, *People* v. *Exxon Mobil Corp.*, No. 452044/2018 (N.Y. Sup. Ct. filed Oct. 24, 2018) | App. 6 – App. 103 |
| 2 | Subpoena for the Production of Documents to Exxon Mobil Corporation dated Nov. 4, 2015, NYSCEF No. 247, *People* v. *Exxon Mobil Corp.*, No. 451962/2016 (N.Y. Sup. Ct. filed June 19, 2018) | App. 104 – App. 123 |
| 3 | Subpoena Duces Tecum to PricewaterhouseCoopers LLP dated August 19, 2016, NYSCEF No. 2, *People* v. *Exxon Mobil Corp.*, No. 451962/2016 (N.Y. Sup. Ct. filed Oct. 14, 2016) | App. 124 – App. 143 |
| 4 | Excerpted transcript of February 14, 2018 examination of Kirsten Bannister (EMC_RAM 000001180 – EMC_RAM 000001876), NYSCEF No. 292, *People* v. *Exxon Mobil Corp.*, No. 451962/2016 (N.Y. Sup. Ct. filed June 19, 2018) | App. 144 – App. 151 |
| 5 | Excerpted transcript of June 27, 2017 examination of William M. Colton (EMC_RAM 000003227 – EMC_RAM 000003776), NYSCEF No. 305, *People* v. *Exxon Mobil Corp.*, No. 451962/2016 (N.Y. Sup. Ct. filed June 19, 2018) | App. 152 – App. 160 |
| 6 | Subpoena for the Production of Information and Documents to Exxon Mobil Corporation dated May 8, 2017, NYSCEF No. 255, *People* v. *Exxon Mobil Corp.*, No. 451962/2016 (N.Y. Sup. Ct. filed June 19, 2018) | App. 161 – App. 184 |
| 7 | Affirmation of John Oleske in Opposition to Exxon's Motion to Quash and in Support of the Office of the Attorney General's Cross-Motion to Compel, NYSCEF No. 169, *People* v. *Exxon Mobil Corp.*, No. 451962/2016 (N.Y. Sup. Ct. filed June 2, 2017) | App. 185 – App. 220 |
| 8 | Memorandum of Law in Opposition to Exxon's Motion to Quash and in Support of the Office of the Attorney General's Cross-Motion to Compel, NYSCEF No. 168, *People* v. *Exxon Mobil Corp.*, No. 451962/2016 (N.Y. Sup. Ct. filed June 2, 2017) | App. 221 – App. 251 |
| 9 | Expert Report of Eli Bartov dated May 8, 2019, NYSCEF No. 362, *People* v. *Exxon Mobil Corp.*, No. 452044/2018 | App. 252 – App. 345 |

| Exhibit | Description | App. Page(s) |
|---|---|---|
| | (N.Y. Sup. Ct. filed Oct. 4, 2019) | |
| 10 | Excerpted trial transcript for October 22, 2019 proceedings, *People* v. *Exxon Mobil Corp.*, No. 452044/2018 (N.Y. Sup. Ct. 2019) | App. 346 – App. 349 |
| 11 | Expert Report of Peter M. Boukouzis dated May 8, 2019, NYSCEF No. 355, *People* v. *Exxon Mobil Corp.*, No. 452044/2018 (N.Y. Sup. Ct. filed Oct. 4, 2019) | App. 350 – App. 536 |
| B | Chart Demonstrating Plaintiff's Reliance on the NYAG Action and NYAG's Pre-Suit Investigation | App. 537 – App. 539 |

Dated:  July 31, 2020

Respectfully submitted,

*/s/ Daniel J. Kramer*
Theodore V. Wells, Jr. (*pro hac vice*)
Daniel J. Kramer (*pro hac vice*)
Daniel J. Toal (*pro hac vice*)
Justin Anderson (*pro hac vice*)
Jonathan H. Hurwitz (*pro hac vice*)
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
twells@paulweiss.com
dkramer@paulweiss.com
dtoal@paulweiss.com
janderson@paulweiss.com
jhurwitz@paulweiss.com

*/s/ D. Patrick Long*
D. Patrick Long
Texas State Bar No. 12515500
Brian M. Gillett
Texas State Bar No. 24069785
SQUIRE PATTON BOGGS
2000 McKinney Ave., Suite 1700
Dallas, TX 75201
Telephone: (214) 758-1505
Facsimile: (214) 758-1550
patrick.long@squirepb.com
brian.gillett@squirepb.com

*Counsel for Rex W. Tillerson*

*/s/ Nina Cortell*
Nina Cortell
Texas State Bar No. 04844500
Daniel H. Gold
Texas State Bar No. 24053230
HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700
Dallas, TX 75219
Telephone: (214) 651-5000
Facsimile: (214) 651-5940
nina.cortell@haynesboone.com
daniel.gold@haynesboone.com

*Counsel for Exxon Mobil Corporation,*
*Andrew P. Swiger, Jeffrey J. Woodbury,*
*and David S. Rosenthal*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has been

served by electronic CM/ECF filing, on this 31st day of July, 2020.


/s/ Daniel J. Kramer
Daniel J. Kramer

# Exhibit A

App.1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| PEDRO RAMIREZ, JR., Individually and on Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>               v.<br><br>EXXON MOBIL CORPORATION, REX W. TILLERSON, ANDREW P. SWIGER, JEFFREY J. WOODBURY, and DAVID S. ROSENTHAL,<br><br>               Defendants. | Case No. 3:16-cv-3111-K |

**DECLARATION OF DANIEL J. TOAL IN SUPPORT OF DEFENDANTS'
SUPPLEMENTAL BRIEF ADDRESSING NEW CASE DEVELOPMENT**

**App.2**

Pursuant to 28 U.S.C. § 1746, I, Daniel J. Toal, declare as follows:

1.      I am over twenty-one years of age and I am fully competent to make this Declaration.  I have personal knowledge of the facts set forth in this Declaration.

2.      I am a partner at the law firm Paul, Weiss, Rifkind, Wharton & Garrison LLP.  My office is located at 1285 Avenue of the Americas, New York, New York 10019.

3.      I am a member in good standing with the State Bar of New York.  I am admitted to practice before this Court *pro hac vice*.

4.      Attached hereto as Exhibit 1 is a true and correct copy of the Complaint filed as NYSCEF No. 1 on October 24, 2018 in the action styled *People* v. *Exxon Mobil Corp.*, No. 452044/2018 (N.Y. Sup. Ct.).

5.      Attached hereto as Exhibit 2 is a true and correct copy of the Subpoena for the Production of Documents issued to Exxon Mobil Corporation on November 4, 2015 by the Office of the New York Attorney General, filed as NYSCEF No. 247 on June 19, 2018 in the action styled *People* v. *Exxon Mobil Corp.*, No. 451962/2016 (N.Y. Sup. Ct.).

6.      Attached hereto as Exhibit 3 is a true and correct copy of the Subpoena Duces Tecum issued to PricewaterhouseCoopers LLP on August 19, 2016 by the Office of the New York Attorney General, filed as NYSCEF No. 2 on October 14, 2016 in the action styled *People* v. *Exxon Mobil Corp.*, No. 451962/2016 (N.Y. Sup. Ct.).

7.      Attached hereto as Exhibit 4 is a true and correct copy of an excerpt of the transcript of the examination of Kirsten Bannister, taken on February 14, 2018, produced in this litigation by Defendants bearing Bates stamps EMC_RAM 000001180 – EMC_RAM 000001876. This document was filed as NYSCEF No. 292 on June 19, 2018 in the action styled *People* v. *Exxon Mobil Corp.*, No. 451962/2016 (N.Y. Sup. Ct.).

**App.3**

8. Attached hereto as Exhibit 5 is a true and correct copy of an excerpt of the transcript of the examination of William M. Colton, taken on June 27, 2017, produced in this litigation by Defendants bearing Bates stamps EMC_RAM 000003227 – EMC_RAM 000003776. This document was filed as NYSCEF No. 305 on June 19, 2018 in the action styled *People* v. *Exxon Mobil Corp.*, No. 451962/2016 (N.Y. Sup. Ct.).

9. Attached hereto as Exhibit 6 is a true and correct copy of the Subpoena for the Production of Information and Documents issued to Exxon Mobil Corporation on May 18, 2017 by the Office of the New York Attorney General, filed as NYSCEF No. 255 on June 19, 2018 in the action styled *People* v. *Exxon Mobil Corp.*, No. 451962/2016 (N.Y. Sup. Ct.).

10. Attached hereto as Exhibit 7 is a true and correct copy of the Affirmation of John Oleske in Opposition to Exxon's Motion to Quash and in Support of the Office of the Attorney General's Cross-Motion to Compel, filed as NYSCEF No. 169 on June 2, 2017 in the action styled *People* v. *Exxon Mobil Corp.*, No. 451962/2016 (N.Y. Sup. Ct.).

11. Attached hereto as Exhibit 8 is a true and correct copy of the Memorandum of Law in Opposition to Exxon's Motion to Quash and in Support of the Office of the Attorney General's Cross-Motion to Compel, filed as NYSCEF No. 168 on June 2, 2017 in the action styled *People* v. *Exxon Mobil Corp.*, No. 451962/2016 (N.Y. Sup. Ct.).

12. Attached hereto as Exhibit 9 is a true and correct copy of the Expert Report of Eli Bartov, filed as NYSCEF No. 362 on October 4, 2019 in the action styled *People* v. *Exxon Mobil Corp.*, No. 452044/2018 (N.Y. Sup. Ct.).

13. Attached hereto as Exhibit 10 is a true and correct copy of an excerpt of the trial transcript for the proceedings on October 22, 2019 in the action styled *People* v. *Exxon Mobil Corp.*, No. 452044/2018 (N.Y. Sup. Ct.).

**App.4**

14.     Attached hereto as Exhibit 11 is a true and correct copy of the Expert Report

of Peter M. Boukouzis, filed as NYSCEF No. 355 on October 4, 2019 in the action styled *People*

v. *Exxon Mobil Corp.*, No. 452044/2018 (N.Y. Sup. Ct.).

I declare under penalty of perjury that the foregoing is true and correct.

Dated:      July 31, 2020
            New York, New York

_____
            Daniel J. Toal

**App.5**

# Exhibit 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

PEOPLE OF THE STATE OF NEW YORK,
By BARBARA D. UNDERWOOD,
Attorney General of the State of New York,

                           Plaintiff,

           - against -

EXXON MOBIL CORPORATION,

                         Defendant.

Index No.

**SUMMONS**

TO THE ABOVE-NAMED DEFENDANT:

     **YOU ARE HEREBY SUMMONED** to answer in this action and serve a copy of your answer, or if the complaint is not served with the summons to serve a notice of appearance, on the Plaintiff's attorney within twenty (20) days after the service of this summons, exclusive of the day of service.  If this summons is not personally served upon you, or if this summons is served upon you outside of the State of New York, then your answer or notice of appearance must be served within thirty (30) days.  In case of your failure to appear or answer, judgment will be taken against you by default, for the relief demanded in the complaint.

     Plaintiff designates New York County as the place of trial pursuant to CPLR 503(a).

Dated: October 24, 2018
New York, New York

                                     BARBARA D. UNDERWOOD
                                     Attorney General of the State of New York

**App.7**

By: _____
   Jonathan Zweig
   Assistant Attorney General
   Investor Protection Bureau
   212-416-8222
   jonathan.zweig@ag.ny.gov

By: _____
   Mandy DeRoche
   Assistant Attorney General
   Environmental Protection Bureau
   212-416-8446
   mandy.deroche@ag.ny.gov

   Steven Glassman
   Senior Counsel
   Economic Justice Division

   Rita Burghardt McDonough
   Assistant Attorney General
   Investor Protection Bureau

   Matthew Eisenson
   Special Assistant Attorney General

   Benjamin Cole
   Project Attorney

   Joanna Zwosta
   Project Attorney

Office of the Attorney General
28 Liberty Street
New York, New York 10005

*Attorneys for Plaintiff*
*People of the State of New York*

Of Counsel:

Manisha M. Sheth
Executive Deputy Attorney General
Economic Justice Division

Lemuel M. Srolovic
Bureau Chief
Environmental Protection Bureau

**App.8**

Case 3:16-cv-03111-K    Document 121    Filed 07/31/20    Page 14 of 544    PageID 4266

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

PEOPLE OF THE STATE OF NEW YORK,
by BARBARA D. UNDERWOOD,
Attorney General of the State of New York,

                             Plaintiff,

            - against -

EXXON MOBIL CORPORATION,

                            Defendant.

Index No.

**<u>COMPLAINT</u>**

**App.9**

TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................. 1

PARTIES ............................................................................................................................... 7

JURISDICTION AND VENUE ........................................................................................... 9

FACTUAL ALLEGATIONS ............................................................................................... 9

I.    CLIMATE CHANGE REGULATION AND INVESTOR CONCERNS......................... 9

    A.    Climate Change and Global Warming.................................................................. 9

    B.    Response by Governments.................................................................................. 10

        1.    Nations of the World Through the United Nations.................................... 10

        2.    The United States...................................................................................... 11

        3.    Other Governments................................................................................... 11

    C.    Climate Change Regulatory Risk Is Important to Investors ................................ 13

        1.    Long-Term Value Is Important to Investors.................................................... 13

        2.    Climate Change Disclosures Are Important to Investors ............................ 15

        3.    Shareholder Advocacy and Exxon's Response............................................ 19

II.    EXXON'S FRAUD REGARDING ITS USE OF A PROXY COST IN ITS COST
PROJECTIONS ................................................................................................................ 21

    A.    Exxon's Misrepresentations Regarding Its Use of a Proxy Cost in Investment
Decision-Making and Business Planning ........................................................... 22

        1.    Exxon's Representations............................................................................ 22

        2.    Exxon's Proxy Cost Representations Were Important to Investors.............. 30

        3.    Exxon's Representations Were Inconsistent with Its Actual Practices ........ 34

            a)    Exxon's Internal Proxy Costs Deviated Significantly from Its
Publicly Represented Proxy Costs................................................. 35

                (i)    OECD Countries............................................................... 36

**App.10**

(ii)     Non-OECD Countries ......................................................... 40

b)    Even After Conforming Internal Proxy Cost Guidance to Its Public Representations, Exxon Continued to Deviate from Its Proxy Cost Representations ................................................................................. 42

(i)      Alberta Oil Sands Assets and Investments ........................ 44

(ii)     United States Assets and Investments .............................. 49

(iii)    LNG Assets and Investments ............................................ 50

(iv)    Refinery Assets and Investments ...................................... 51

(v)     North American Natural Gas Assets and Investments ...... 52

B.    Exxon's Misrepresentations Regarding Its Use of a Proxy Cost in Oil and Gas Reserves and Resource Base Assessments .......................................................... 54

1.   Oil and Gas Reserves and Resource Base Assessment Process ................... 54

2.   Exxon's Representations ................................................................................ 55

3.   Exxon's Representations Were Inconsistent with Its Actual Practices ........ 58

a)    Exxon Did Not Apply the Publicly Represented Proxy Cost to Company Reserves and Resource Base Assessments for Oil Sands Assets in Alberta ............................................................................ 58

b)    Before 2016, Exxon Generally Did Not Apply a Proxy Cost to Company Reserves and Resource Base Assessments .................... 61

4.   Exxon's Decision Not to Apply a Proxy Cost to Company Reserves and Resource Base Assessments Is Material to Investors .................................. 62

C.    Exxon's Misrepresentations Regarding Its Use of a Proxy Cost in Evaluations for Impairment of Long-Lived Assets ...................................................................... 63

1.   Impairment Evaluation Process ................................................................... 63

2.   Exxon's Representations ................................................................................ 65

3.   Exxon's Representations Were Inconsistent with Its Actual Practices ........ 66

a)    Prior to 2016, Exxon Misled Investors by Not Incorporating Proxy Costs into Cost Projections for Impairment Evaluations .............. 67

**App.11**

b)    In 2016, Exxon Misled Investors by Incorporating Proxy Costs into Cost Projections for Impairment Evaluations in a Limited, Internally Inconsistent Manner ...................................................... 68

4.    Exxon's Impairment-Related Misrepresentations Are Material to Investors 70

D.    Exxon's Representations About Its Consistent Application of Proxy Costs Were False and Misleading ..................................................................... 72

III.    EXXON'S FRAUD REGARDING ITS USE OF A PROXY COST IN ITS DEMAND AND PRICE PROJECTIONS ...................................................................... 73

A.    Exxon's Representations.................................................................. 73

B.    Exxon's Failure to Apply Its Proxy Cost in Projecting Demand in the Transportation Sector.................................................................... 74

C.    Exxon's Failure to Apply Its Proxy Cost in Projecting Oil and Gas Prices ......... 76

IV.    EXXON'S FRAUD REGARDING RISKS TO ITS BUSINESS POSED BY TWO DEGREE SCENARIO.................................................................................... 78

A.    Exxon's Representations.................................................................. 80

B.    Exxon's Representations Were Misleading Because They Were Based on Assumptions Exxon Knew Were Unsupported and Unreasonable...................... 82

V.    EXXON'S FRAUD CAUSED SIGNIFICANT HARM .................................................. 85

CAUSES OF ACTION ............................................................................................ 86

FIRST CAUSE OF ACTION (MARTIN ACT SECURITIES FRAUD – GENERAL BUSINESS LAW §§ 352 ET SEQ.)............................................................................................ 86

SECOND CAUSE OF ACTION (PERSISTENT FRAUD AND ILLEGALITY – EXECUTIVE LAW § 63(12))...................................................................................................... 87

THIRD CAUSE OF ACTION (ACTUAL FRAUD) ........................................................ 87

FOURTH CAUSE OF ACTION (EQUITABLE FRAUD).................................................. 88

PRAYER FOR RELIEF ............................................................................................ 89

**App.12**

Plaintiff, the People of the State of New York (the "State"), by Attorney General Barbara D. Underwood, alleges upon information and belief the following against Defendant Exxon Mobil Corporation ("Exxon").

## NATURE OF THE ACTION

1.      This case seeks redress for a longstanding fraudulent scheme by Exxon, one of the world's largest oil and gas companies, to deceive investors and the investment community, including equity research analysts and underwriters of debt securities (together, "investors"), concerning the company's management of the risks posed to its business by climate change regulation.  Exxon provided false and misleading assurances that it is effectively managing the economic risks posed to its business by the increasingly stringent policies and regulations that it expects governments to adopt to address climate change.  Instead of managing those risks in the manner it represented to investors, Exxon employed internal practices that were inconsistent with its representations, were undisclosed to investors, and exposed the company to greater risk from climate change regulation than investors were led to believe.

2.      For years, and continuing through the present, Exxon has claimed that, although it expects governments to impose increasingly stringent climate change regulations, its oil and gas reserves and other long-term assets face little if any risk of becoming stranded (*i.e.*, too costly to develop or operate) due to those regulations, and reassured investors that it would be able to profitably exploit those assets well into the future.  In particular, to simulate the impact of future climate change regulations, Exxon has claimed that, since 2007, it has rigorously and consistently applied an escalating proxy cost of carbon dioxide ($CO_2$) and other greenhouse gases (together, "GHGs") to its business, including in its investment decisions, business planning, company oil and gas reserves and resource base assessments, evaluations of whether

**App.13**

long-term assets are impaired (*i.e.*, have net present value lower than book value), and estimates of future demand for oil and gas.

3.     Exxon's proxy cost representations were materially false and misleading because it did not apply the proxy cost it represented to investors.  This was especially true of investments with high GHG emissions, where applying the publicly represented proxy cost would have had a particularly significant negative impact on the company's economic and financial projections and assessments.

4.     First, in projecting its future costs for purposes of making investment decisions, conducting business planning, and assessing company oil and gas reserves, Exxon for many years did not apply the publicly represented proxy cost.  Instead, the company applied either: (i) a lower, undisclosed proxy cost contained in internal corporate guidance; (ii) an even lower cost based on existing regulations held flat for decades into the future, in lieu of any proxy cost; or (iii) no cost associated with GHG emissions at all.

5.     Second, in evaluating its long-lived assets for purposes of potential impairment charges, Exxon applied no proxy costs to its GHG emissions before 2016.  In 2016, one year after this office opened an investigation into the company's climate change risk management practices, Exxon began to apply proxy costs in its impairment assessments, but even then, it applied those costs in a very limited manner.

6.     Third, in projecting demand for oil and gas, Exxon did not apply its publicly represented proxy cost to the transportation sector, which accounts for more than half of worldwide demand for crude oil.

7.     Fourth, Exxon misled investors by presenting a deceptive analysis that concluded that the company faced little risk associated with a "two degree scenario," in which the

**App.14**

production and consumption of fossil fuels is severely curtailed in order to limit the increase in global temperature to below two degrees Celsius compared to pre-industrial levels. Exxon's analysis of the costs associated with a two degree scenario was based on assumptions it knew to be unreasonable and unsupported by the sources upon which it purported to rely.

8.    Exxon's fraud was sanctioned at the highest levels of the company. For example, former Chairman and Chief Executive Officer (CEO) Rex W. Tillerson knew for years that the company's representations concerning proxy costs were misleading. In particular, Mr. Tillerson knew that the company was using lower, undisclosed proxy cost figures in its internal guidance, rather than the higher, publicly disclosed proxy cost figures in its public representations, in its investment decisions and business planning. Yet despite this knowledge, and despite the recognition that the publicly disclosed proxy costs more accurately reflected the risk of future climate change regulation, Mr. Tillerson allowed the significant deviation between the higher proxy cost figures in Exxon's public representations and the lower proxy cost figures in Exxon's undisclosed internal guidance to continue uncorrected for years.

9.    It was not until an Exxon manager sounded the alarm to Exxon's Management Committee regarding the misleading nature of the company's proxy cost representations that Exxon belatedly increased the proxy cost figures in its internal guidance to conform to those in its public disclosures.

10.    However, after Exxon revised its internal guidance, Exxon's planners realized that applying the newly increased proxy cost figures would result in severe consequences to its economic projections, such as "massive GHG costs" and "large write-downs" (*i.e.*, reductions in estimated volume) of company reserves.

**App.15**

11.      When confronted with the negative impact to its economic and financial assessments that would result from applying proxy costs in a manner consistent with the company's representations to investors, Exxon's management directed the company's planners to adopt what an employee called an "alternate methodology."  Under this so-called "alternate methodology," Exxon did not apply the publicly represented proxy costs.  Instead, Exxon applied only the existing GHG-related costs presently imposed by governments (*i.e.*, legislated costs), and assumed that those existing costs would remain in effect, at existing levels, indefinitely into the future, contrary to the company's repeated representations to investors that it expects those same governments to impose increasingly stringent climate regulations in the future.  These existing costs were much lower than Exxon's publicly represented proxy costs, and were applied to only a small fraction of the company's emissions, rendering Exxon's proxy cost-related representations false and misleading.  By applying this "alternate methodology," Exxon avoided the "large write-downs" it would have incurred had it abided by its stated risk management practices, and failed to take into account "massive GHG costs" resulting from expected climate change regulation.

12.      For example, Exxon's decision not to apply the publicly represented proxy costs in connection with fourteen oil sands projects in Alberta, Canada resulted in the understatement of those costs in the company's cash flow projections by approximately $30 billion CAD (Canadian dollars), or more than $25 billion USD (U.S. dollars).  For one of these projects, an investment at Kearl, a 2015 economic forecast shows that the company understated projected undiscounted costs of GHG emissions by as much as 94% – approximately $14 billion CAD ($11 billion USD) – by applying lower costs to GHG emissions than those publicly represented.

**App.16**

13.     Exxon's decision not to apply the publicly represented proxy costs in its company oil and gas reserves assessments enabled the company to avoid "large write-downs" in reserves that it would have had to take had it abided by its public representations.  For example, at Cold Lake, an oil sands asset in Alberta, the company's own planners noted that applying a proxy cost consistent with Exxon's public representations would shorten the asset's projected economic life by 28 years and reduce company reserves by more than 300 million barrels of oil equivalent – representing billions of dollars in lost revenues.  When presented with these facts, Exxon management instructed the planners to apply a lower cost projection based on existing regulations, contrary to the company's public representations.

14.     Additionally, Exxon repeatedly represented that, per the applicable accounting rules, the economic assumptions it applied for impairment evaluation purposes were consistent with those used elsewhere in its business.  However, prior to 2016, Exxon did not apply its publicly represented proxy costs in assessing whether its long-lived assets, including production sites that were expected to produce oil and gas for decades into the future, were impaired (*i.e.*, had a value that was less than the book value on the company's balance sheet).  Even in 2016, Exxon applied proxy costs only in a very limited manner in its impairment evaluations.

15.     Moreover, despite its representation that it would employ proxy costs across the company's business, Exxon did not apply its publicly represented proxy cost in projecting demand for liquid fuels in the transportation sector.  And even to the extent Exxon did apply a proxy cost in projecting energy demand, it failed to incorporate those projections in setting its internal oil and gas price assumptions.  Instead, Exxon set internal oil and gas price projections based on the desire of its then-CEO Rex Tillerson to send a signal to the organization, rather than any process influenced by proxy costs.  Exxon's failure to incorporate proxy costs into its oil and

**App.17**

gas price projections resulted in the proxy costs being an illusory risk management tool with no actual economic impact on the company.

16.     In addition to its misrepresentations concerning proxy costs, Exxon repeatedly presented a highly misleading analysis to investors to reassure them that the company faced little or no risk of its assets becoming stranded under a two degree scenario.  Exxon falsely implied that its analysis was supported by reputable academic and government sources, when it was not.  Even after being warned by an author of the key source upon which Exxon purported to rely that the company's analysis was "misleading," Exxon continued to present this analysis to investors.

17.     Exxon's representations were important to investors.  Exxon made these representations to placate investors who increasingly demanded that Exxon explain whether and how it was addressing the long-term economic consequences of increasing regulation of GHG emissions around the world, and to assure investors that the company was effectively managing that risk.

18.     Exxon's investors relied on these representations to assess whether the company was adequately managing the risk to its business posed by future climate change regulation.  For example, in a 2016 assessment of Exxon's exposure to emerging climate change regulations, Vanguard Group, Inc. ("Vanguard") – the company's largest shareholder – rated Exxon's risk as "low" based on Exxon's claims that it was protecting itself against the risk of rising regulatory costs by applying its publicly represented proxy cost.

19.     Through its fraudulent scheme, Exxon in effect erected a Potemkin village to create the illusion that it had fully considered the risks of future climate change regulation and had factored those risks into its business operations.  In reality, Exxon knew that its representations were not supported by the facts and were contrary to its internal business

**App.18**

practices. As a result of Exxon's fraud, the company was exposed to far greater risk from climate change regulations than investors were led to believe.

20. Indeed, rather than protecting against the risk of future climate change regulation by reducing investment in GHG-intensive assets, Exxon expanded its investments in such assets. Between 2008 and 2016, the percentage of Exxon's oil and gas development and production (*i.e.*, upstream) projects in GHG-intensive heavy oil and oil sands increased from less than 20% to more than 30% in oil-equivalent barrels. This increased the GHG intensity of the company's upstream operations and, in turn, increased the company's exposure to future climate change regulation.

21. The State brings this action to enforce General Business Law § 352 *et seq.* (securities fraud) and Executive Law § 63(12) (persistent fraud or illegality), and for common law fraud. The State seeks all appropriate relief to prevent Exxon from making false or misleading claims about its climate change risk management, to compel curative disclosures to investors, and for all appropriate monetary relief for Exxon's fraudulent conduct, including disgorgement of all amounts gained or retained as a result of the fraud, damages, restitution, and costs.

**PARTIES**

22. The State brings this action by and through Attorney General Barbara D. Underwood.

23. The Attorney General is the chief law enforcement officer of the State of New York and is charged by law with protecting the integrity of the business and securities markets within New York, as well as the economic health and well-being of investors who reside or transact business in the State.

**App.19**

24.     The Attorney General is authorized to bring this action and to assert the causes of action set forth below pursuant to General Business Law § 352 *et seq*. (the "Martin Act"), Executive Law § 63(12), and under the common law.

25.     Exxon is a New Jersey corporation and has its principal place of business at 5959 Las Colinas Boulevard, Irving, Texas 75039.  It is registered to do business in New York State as an active Foreign Business Corporation and maintains a registered agent for service of process with the Corporation Service Company, 80 State Street, Albany, New York 12207.

26.     Exxon was formed on November 30, 1999, by the merger of Exxon Corporation (formerly the Standard Oil Company of New Jersey) and Mobil Oil Corporation (formerly the Standard Oil Company of New York).

27.     Since 1999, Exxon has been the world's largest investor-owned oil and gas company.  At year-end 2017, there were approximately 4.2 billion shares of Exxon common stock issued and outstanding.  The stock is listed on the New York Stock Exchange (NYSE) under the ticker symbol XOM.

28.     Exxon operates through a number of wholly-owned subsidiaries, including ExxonMobil Development Company, ExxonMobil Production Company, ExxonMobil Gas & Power Marketing Company, XTO Energy, Inc., ExxonMobil Fuels & Lubricants Company, and ExxonMobil Chemical Company.  Additionally, Exxon owns a majority interest in Imperial Oil, Ltd. ("Imperial"), a Canadian oil and gas company.

29.     Exxon has three main business segments, from which it derives essentially all of its earnings: (1) upstream, which involves the exploration, development, and production of oil and gas resources; (2) downstream, which involves the refining, marketing, and distribution of

**App.20**

petroleum and derivative products (*e.g.*, gasoline); and (3) chemical, which involves the manufacture and sale of petrochemicals (*e.g.,* plastics).

30.      Exxon has made three public debt offerings in recent years, which collectively total over $25 billion.  In 2014, Exxon made a public debt offering of $5.5 billion, with HSBC Securities (USA) Inc., J.P. Morgan Securities LLC ("J.P. Morgan"), and Morgan Stanley & Co. LLC ("Morgan Stanley") as lead underwriters.  In 2015, Exxon made a public debt offering of $8 billion, with Citigroup Global Markets Inc. ("Citigroup"), J.P. Morgan, and Morgan Stanley as lead underwriters.  In 2016, Exxon made a public debt offering of $12 billion, with Citigroup, J.P. Morgan, and Merrill Lynch, Pierce, Fenner & Smith Incorporated as lead underwriters.

## JURISDICTION AND VENUE

31.      This Court has jurisdiction over the subject matter of this action, personal jurisdiction over Exxon, and authority to grant the relief requested pursuant to General Business Law § 352 *et seq.*, Executive Law § 63(12), and the common law.

32.      Pursuant to C.P.L.R. § 503, venue is proper in New York County, because Plaintiff resides in that county, and because a substantial part of the events and omissions giving rise to the claims occurred in that county.

## FACTUAL ALLEGATIONS

### I.        CLIMATE CHANGE REGULATION AND INVESTOR CONCERNS

#### A.        Climate Change and Global Warming

33.      Observations of air and ocean temperatures and other climate-related metrics, in combination with improved understanding of the underpinnings of the Earth's climate system,

**App.21**

confirm the well-accepted scientific consensus: the Earth's climate system is changing rapidly, primarily due to human activities, especially activities that cause GHG emissions.

34. When emitted into the atmosphere, GHGs (including $CO_2$) trap heat and energy that otherwise would leave the Earth. Anthropogenic GHG emissions, including from the combustion of fossil fuels, have been increasing since the start of the industrial era, with a dramatic increase of over 80% between 1970 and 2010.

35. Increasing GHG emissions have resulted and will continue to result in significant adverse global impacts, including but not limited to: the increase in number and severity of extreme weather events, including floods, hurricanes, heat waves, and drought; wildfires; rising sea levels; ocean acidification; increased air pollution; and exacerbation of the spread of infectious diseases.

### B. Response by Governments

#### 1. Nations of the World Through the United Nations

36. In 1992, the United Nations Framework Convention on Climate Change ("Convention") was opened for signature at the Earth Summit in Rio de Janeiro, Brazil. The treaty's objective was to stabilize the atmospheric concentration of GHGs "at a level that would prevent dangerous anthropogenic interference with the climate system." The Convention entered into force in 1994, and currently has 197 parties, including the United States. Member states conduct an annual Conference of the Parties, where they assess the progress made to achieve the treaty's objective and periodically adopt implementation agreements.

37. Most recently, the parties adopted the 2015 Paris Agreement, which aims to keep the global temperature increase well below two degrees Celsius above pre-industrial levels. The Paris Agreement requires that each participating nation formulate a nationally determined

**App.22**

contribution and a plan to reduce GHG emissions, and pursue domestic measures to achieve that contribution.

38.     As of this filing, 181 nations and the European Union ("EU"), representing more than 88% of global GHG emissions, have ratified or acceded to the Paris Agreement, and a further 15 nations have signed but not ratified or acceded to the agreement.

### 2.     The United States

39.     The U.S. Environmental Protection Agency ("EPA") has found that GHG emissions endanger public health and welfare, and has adopted regulations limiting GHG emissions from cars, trucks, power plants, oil and gas development, and other sources.

40.     In addition to federal regulation of GHG emissions, numerous states have adopted regulations restricting GHG emissions from electric power generation, motor vehicles, and other sources.  A significant number of states and municipalities also have made commitments substantially to reduce their GHG emissions over the coming decades.

41.     In response to President Trump's announcement on June 1, 2017 that the United States would withdraw from the Paris Agreement, effective November 2020, a bipartisan coalition of states and Puerto Rico formed the United States Climate Alliance, which is committed to upholding the principles of the Paris Agreement by (i) reducing emissions by at least 26-28% below 2005 levels by 2025, and (ii) tracking and reporting progress to the global community.

### 3.     Other Governments

42.     The World Bank reports that, in 2007, ten governmental entities including the EU had adopted policies, regulations, taxes or other fees imposing a cost on GHG emissions.  By 2014, the number had grown to 36, and in 2018 to 53, throughout the world.

**App.23**

43.     In 2005, the EU established its Emissions Trading Scheme ("EU ETS"), a cap-and-trade system that limits total GHG emissions and penalizes those who exceed certain allowances.  The EU ETS is effective in all 28 EU countries, and in Iceland, Liechtenstein, and Norway.  In 2007, the EU set a target of a 20% reduction in GHG emissions from 1990 levels by 2020, and it is on track to exceed this target, having already reduced its emissions by 23% from 1990 levels by 2016.

44.     Other governments, such as the Canadian provinces of Alberta and British Columbia, have adopted carbon tax schemes, which set a price per ton on GHG emissions from the combustion of fossil fuels.

45.     Alberta's carbon tax is particularly relevant because Exxon, through Imperial and otherwise, has substantial investments in Alberta's oil sands.  The oil sands consist of large reservoirs of bitumen, a tar-like substance which functions as an alternative to crude oil, but which requires more energy to produce and process, and is thus more GHG-intensive, than conventional crude.

46.     In 2007, Alberta adopted a carbon regulation called the Specified Gas Emitters Regulation ("SGER"), which effectively imposed a GHG price of $15 CAD per ton on emissions from fossil fuel production and coal-fired power generation.  The fee applied only to the portion of emissions that exceeded certain emissions-intensity targets.  In 2016, the price increased to $20 CAD per ton.  In January 2018, Alberta replaced the SGER with the Carbon Competitive Incentive Regulation ("CCIR"), which generally imposes a price of $30 CAD per ton of GHG emissions that exceed certain intensity targets.

47.     In 2017, Alberta also adopted a carbon tax that applies to GHG emissions from heating (commercial and residential) and transportation fuels in sectors not covered by the

**App.24**

SGER/CCIR, with some exemptions.  In 2018, the tax rate increased from $20 to $30 CAD per ton of GHG emissions.

### C.    Climate Change Regulatory Risk Is Important to Investors

#### 1.    Long-Term Value Is Important to Investors

48.    Many of Exxon's shareholders invest in the company for the long term.  Exxon's shareholders include New Yorkers planning for retirement and for their children's college education, as well as pension funds, mutual funds, life insurance companies, and other institutional investors, many of which are based in New York.

49.    Approximately 54% of Exxon stock is held by institutional investors, which own Exxon shares on behalf of millions of individuals, including retirees and those saving for retirement.  Exxon's top three institutional shareholders are Vanguard, BlackRock, Inc. ("BlackRock"), and State Street Corporation ("State Street"), each of which is also among Exxon's largest bondholders.

50.    Additionally, numerous state, municipal, and other pension funds hold Exxon stock on behalf of teachers, clerical workers, nurses, and many others.  As of June 2018, the New York State Common Retirement Fund and New York State Teachers Retirement System held Exxon shares with a value of over $900 million and over $500 million, respectively.  As of May 2018, New York City Pension Funds held Exxon shares with a value of over $700 million.  Pension funds in other states likewise hold significant positions in Exxon stock.  As of their most recent financial disclosures, state pension funds across the country directly owned nearly 75 million shares of Exxon stock worth approximately $6 billion at Exxon's current stock price; state pension funds in California, New York, Florida, Ohio, Wisconsin, New Jersey, and Texas owned shares worth more than $300 million each.

**App.25**

51.     In an article entitled "Who owns ExxonMobil? Chances are you do," Exxon's former Vice President of Public and Government Affairs observed that "[p]rivate and public pension funds – managing assets on behalf of more than 60 million U.S. households in 145 million accounts – own nearly a third of all shares in U.S. oil and gas companies . . . .  Mutual funds and individual retirement plans account for nearly 40 percent more."

52.     Exxon actively solicits these long-term investors, stating that it "pursues business strategies that maximize long-term shareholder value" and that it is "confident in [its] ability to continue to create shareholder value over the long term."  For example, Mr. Tillerson told market analysts in 2016:

> Well, as we have said many times, in terms of growth – whether it's volume growth, reserve growth, market share growth . . . our approach to the business has never changed. We really are trying to undertake the most attractive opportunities that we see, thinking about them in terms of 30 years. Are we going to be happy with this over the next three decades? Not, are we going to be happy with it over the next three or four years . . . .

> You've heard me say many times, we are not for the short term shareholder, necessarily. That's not what we build the business around. It's not how we run the business. **We run the business for people that are going to own these shares a very long time, that we hope the shares are in the trust that they leave their children and their grandchildren.** Whenever we run into challenges and I have to think about how am I going to pay the dividend? I think about those people. (emphasis added)

53.     Climate change risk is an issue of particular importance to long-term investors. For example, Vanguard, Exxon's largest investor, has noted that "climate change poses risks to investors in certain sectors, such as oil and gas, and . . . these risks are most prominently skewed towards long-term asset owners like Vanguard."

54.     Exxon has assured its investors that it recognizes that a long-term focus on the future of energy and carbon regulation is of critical importance to the health of its business.  For

**App.26**

example, Exxon's Vice President of Corporate Strategic Planning noted in a public presentation concerning the company's 2014 *Outlook for Energy* report that "we are making billion-dollar investment decisions, and the horizon for these projects, a typical project of ours will last easily 50 years. So we have to keep a strong focus on what is going to happen in the future."

### 2. Climate Change Disclosures Are Important to Investors

55. Over the past decade, investors concerned with Exxon's long-term value have increasingly expressed interest in the company's climate change disclosures. For its part, Exxon understood that its proxy cost and other climate change regulatory risk disclosures were important to investors.

56. In June 2014, Exxon's Vice President of Investor Relations summarized this trend in an internal email concerning Exxon's responses to an annual questionnaire from CDP (formerly known as the Carbon Disclosure Project), a nonprofit organization that collects information on behalf of institutional investors, including current and prospective Exxon shareholders, with over $87 trillion in funds under management:

> I sometimes get asked if "**real investors**" read the CDP or even care that we participate. I was in New York City last week meeting with some of our largest shareholders, and for the first time, two different portfolio managers mentioned the CDP and [Exxon's Corporate Citizenship Report] to me in a positive manner. A few other shareholders mentioned the **growing importance** of ESG (environmental, social, governance) issues to their clients, and thus we could expect to see more interest from buy side analysts and portfolio managers directly, and indirectly through . . . their ESG analysts.
>
> In fact, we had a call today with two such ESG analysts from Goldman Sachs, following our meeting last week with the investment group of [Goldman Sachs]. They were complimentary of the Energy Outlook, the [Corporate Citizenship Report], and the two environment related reports we produced during Proxy season [*Energy and Climate* and *Managing the Risks*]. . . . All of the folks we talked to said these types of efforts have enhanced our reputation

**App.27**

> within the investment community and encouraged ExxonMobil to continue. Apparently "reputational risk" has moved into the **upper tier of risks** that investors are concerned about and expect companies to manage. (emphasis added)

57.     Investor interest in the management of climate change risk has been growing for years. In 2010, Exxon recognized internally that "managing climate change risks" is a "material" issue in its corporate citizenship reporting to external audiences, including financial institutions, because those risks may have a "substantial impact" on the company.

58.     In addition, over 2,000 investment firms, pension systems, and other institutions around the world, with over $80 trillion in assets under management, have signed the United Nations-backed Principles for Responsible Investment. These firms have committed to incorporate environmental, social, and governance ("ESG") issues into their investment analysis and decision-making, with climate change being the "highest priority" among these issues. The signatories include major Exxon investors; for example, BlackRock signed the Principles for Responsible Investment in 2008, State Street in 2012, and Vanguard in 2014.

59.     Many of Exxon's major investors have released publications concerning the importance of climate change regulatory risk, also known as "carbon asset risk," in their investment decision-making.

60.     J.P. Morgan Chase & Co., a major Exxon investor and underwriter of Exxon's bonds, issued an Environmental and Social Policy Framework in 2014, which asserted that the bank's transaction and portfolio reviews include "how clients manage climate change related risk factors." Likewise, a 2017 report by J.P. Morgan Asset Management observed that it endeavors to understand how companies in which it invests are "managing and adapting to various climate risks and opportunities, including those presented by evolving government policies," which can "have a material impact for high-carbon intensity sectors."

**App.28**

61.     Morgan Stanley Smith Barney LLC, the financial advisory division of a major Exxon investor and underwriter of Exxon's bonds, stated in a 2016 report that "climate change is increasingly recognized as a material investment consideration that investors cannot ignore"; that increased GHG regulation "could dramatically impair the profitability of higher-carbon energy sources"; and that these risk factors "could strand assets in a range of sectors, resulting in unanticipated or premature write-downs, devaluations or conversion to liabilities." This report also noted that Morgan Stanley Equity Research analysts have "incorporated this issue when analyzing their covered companies." The report concluded that climate change risk is a "critical investment issue," both for investors who are explicitly focused on sustainability, and also for "mainstream" investors, including "the world's largest investors." The report noted that investors explicitly focused on incorporating sustainability into their investment strategies "represented more than $1 out of every $6 of professionally managed assets in the United States, totaling $6.57 trillion" by the end of 2014, a significant increase from prior years. Another Morgan Stanley report in 2016 reiterated that the "risk associated with stranded assets" resulting from climate regulation "could have the potential to cause significant reductions in not only the value of specific companies, but also the long-term value of entire sectors."

62.     State Street Global Advisors, Inc., the investment management division of Exxon's third-largest shareholder, stated in 2017 that the way that companies integrate climate risk into long-term strategy is "particularly important" in the oil and gas sector "where long investment horizons could render assets stranded." State Street also asserted that the "[c]osts of controlling emissions to meet targets should be considered when making capital allocation decisions to arrive at the true cost of an asset." State Street further noted that "carbon price assumptions are important" because they "provide insights into how companies account for

**App.29**

climate risk in the planning process" and "are key in helping companies identify potential stranded assets and mitigate the risk of investing in assets that may become stranded in the future."

63.    Equity research analysts covering Exxon have also highlighted the importance of climate change regulatory risk in their recommendations. For example, in a 2015 report, HSBC Global Research wrote that "[f]ossil fuel companies, or some of their assets, may become economically non-viable in the future" due to climate change regulation, among other factors. HSBC noted that expensive oil and gas ventures might be at risk, while "oil sands face the greatest stranding risks . . . given the combination of high breakeven price and higher carbon intensity of production." HSBC Global Research had previously observed the risks of stranding associated with oil sands assets in a 2013 report.

64.    Exxon knew that there was widespread investor interest in GHG-related topics, including through its knowledge of Bloomberg Terminal usage trends. In 2013, an Exxon Public and Government Affairs advisor observed that, in a recent six-month period, there had been 44 million hits on Bloomberg ESG data. The advisor noted that this data was "used by financial analysts," who showed "far higher interest in [ESG] disclosure scores and GHG emissions than in traditional governance metrics."

65.    Likewise, a 2014 survey conducted by PricewaterhouseCoopers, LLP ("PwC"), Exxon's independent auditor, found that over 80% of institutional investors had considered sustainability issues in one or more contexts in the past year, and most incorporated such issues into their investment strategies. Even more expected to do so in the coming years. With respect to climate change and the energy sector in particular, PwC analysts concluded in 2014 that "[t]he investor community is actively analyzing" the issue of "unburnable carbon" (*i.e.*, stranded oil

**App.30**

Case 3:16-cv-03111-K    Document 121    Filed 07/31/20    Page 36 of 544    PageID 4288

and gas assets), and noted that this concern extends "way beyond the activists already." In particular, PwC has highlighted investor interest in Exxon's 2014 climate change reports as an example of how "[i]nvestors are increasing their attention on how carbon regulations and policies impact companies."

### 3. Shareholder Advocacy and Exxon's Response

66. Exxon shareholders have submitted numerous proposals requesting that the company take various actions addressing climate change. These proposals are included in the annual proxy statement that Exxon is required by law to send to all shareholders prior to voting at Exxon's annual shareholder meeting. The company has consistently opposed these resolutions.

67. For example, beginning in 2007, and for several years thereafter, Exxon shareholders sponsored resolutions requesting that the company adopt quantitative goals for reducing GHG emissions from its products and operations, and report to shareholders its plans to achieve these goals. Between 2007 and 2014, these resolutions received affirmative shareholder votes representing between 22% and 31% of Exxon stock.

68. In December 2013, the Christopher Reynolds Foundation, on behalf of a group of shareholders, submitted a proposal for Exxon's 2014 shareholder meeting requesting that Exxon issue a report on "Climate Change Assumptions used for Strategic Planning," which would describe the company's strategic plan in view of climate change.

69. Similarly, in December 2013, Arjuna Capital LLC ("Arjuna"), a sustainable investment management firm, and others submitted a shareholder proposal requesting that Exxon issue a report describing the company's exposure to climate change regulatory risks, including the risk that the value of Exxon's oil and gas reserves and related infrastructure could be reduced

**App.31**

before the end of their expected useful life, and assessing the company's plans for managing those risks.

70. On January 21, 2014, Exxon wrote to the U.S. Securities and Exchange Commission ("SEC") requesting that it be permitted to omit both the Arjuna and Christopher Reynolds Foundation proposals from its proxy statement. The SEC rejected Exxon's request.

71. Consequently, Exxon negotiated with Arjuna and agreed to produce a report on the topic of carbon asset risk in exchange for the withdrawal of the shareholders' proposal. This led Exxon to publish a report entitled *Energy and Carbon – Managing the Risks* ("*Managing the Risks*") on March 31, 2014.

72. Likewise, Exxon negotiated with the Christopher Reynolds Foundation and agreed to produce a report that would address the shareholders' concerns in exchange for the withdrawal of their proposal. As a result, on March 31, 2014, the same day that it published *Managing the Risks*, Exxon produced *Energy and Climate*, a report that analyzed global energy and climate change.

73. In 2016, the New York State Common Retirement Fund and the Church of England, on behalf of a group of shareholders, co-filed a proposal that Exxon publish an annual assessment of the long-term portfolio impacts of global climate change policies, including analysis of the impacts on Exxon's oil and gas reserves and resources under a two degree scenario. Shareholders representing approximately 38% of the company's stock voted in favor of the proposal.

74. Then, in 2017, the New York State Common Retirement Fund and the Church of England submitted an updated version of the 2016 proposal. This time, the resolution received majority support and was adopted: shareholders representing **over 62%** of the company's stock,

**App.32**

including major shareholders such as Vanguard, BlackRock, and State Street, voted in favor of the resolution that Exxon publish an analysis of how global climate change policies, including a two degree scenario, would affect Exxon's long-term value.

75. Exxon's misrepresentations and omissions, set forth below, thus came in the context of intense and growing investor interest in climate change regulatory risk, and negotiations with investors that resulted in the 2014 *Energy and Climate* and *Managing the Risks* reports.

## II. EXXON'S FRAUD REGARDING ITS USE OF A PROXY COST IN ITS COST PROJECTIONS

76. Exxon has repeatedly and falsely assured investors that it has taken active and consistent steps to protect the company's value from the risk that climate change regulation poses to its business.

77. The key safeguard that Exxon has frequently touted in its annual *Outlook for Energy* report and in other company publications is that it applies a proxy cost of GHG emissions in its long-term projections for purposes of business planning, investment decision-making, and financial reporting. A proxy cost is a cost that is included in economic projections as a proxy, or stand-in, for the likely effects of expected future events.

78. Exxon represented that it applied escalating proxy costs of GHG emissions in its economic projections as a proxy for increasing regulatory costs resulting from the increasingly stringent climate regulations that it expected. Exxon further represented that it used a specific set of proxy costs across all business units, and that it had been applying these proxy costs since 2007.

**App.33**

79.     Exxon's statements were materially false and misleading.  Exxon frequently deviated from its public representations by: (i) applying a lower, undisclosed proxy cost based on internal guidance; (ii) applying even lower costs based on existing regulations and holding those costs flat for decades into the future, in lieu of applying an escalating proxy cost; or (iii) applying no cost associated with GHG emissions at all.

80.     The application of proxy costs is important to Exxon in light of its substantial GHG emissions.  Had Exxon applied its proxy costs in the manner it publicly represented, it would have projected billions of dollars of additional GHG-related costs, and would have projected total GHG-related costs of over $7 billion in 2040 alone.[1]  Because it did not incorporate such costs in its investment decision-making, business planning, and financial reporting in the manner it represented, Exxon's financial vulnerability to climate change regulation is significantly greater than it led investors to believe.

**A.      Exxon's Misrepresentations Regarding Its Use of a Proxy Cost in Investment Decision-Making and Business Planning**

**1.      Exxon's Representations**

81.     Since at least 2010, in its annual *Outlook for Energy* reports and other company publications, Exxon has set forth its expectation that costs associated with GHG emissions will increase in the coming decades as a result of future government policies.  Over time, these representations grew increasingly specific with respect to both the costs the company expected to incur and Exxon's use of a proxy cost to manage the risk associated with more stringent climate change regulation.

---

[1] This estimate assumes that Exxon's emissions total in 2040 will be equal to its 2015 total (122 million tons of $CO_2$ equivalent), and will come from the same sources as in 2015.

**App.34**

82.      Exxon's Corporate Strategic Planning Department prepares the company's *Outlook for Energy* report annually.  These reports are presented to and approved by Exxon's CEO and Management Committee before being released to the public.

83.      In its 2010 *Outlook for Energy*, Exxon asserted that, as a result of climate policies it expected governments to adopt, regulatory carbon costs would reach $60 per ton of $CO_2$ by 2030 in OECD countries.[2]  Likewise, in its 2012 *Outlook for Energy*,[3] Exxon projected that the cost of GHG emissions would rise to $60 per ton in 2030 and $80 per ton in 2040 in OECD countries, and that non-OECD countries "also will begin adding $CO_2$ costs around 2030."

84.      Exxon also made specific representations about its application of a proxy cost.  In its 2013 *Outlook for Energy* report, Exxon stated that for purposes of its projections through 2040, "ExxonMobil assumes a cost of carbon as a proxy for a wide variety of potential policies that might be adopted by governments over time to help stem GHG emissions."  Exxon further stated that it expects these costs to reach about $60 per ton by 2030 and $80 per ton by 2040 in OECD countries.  The 2013 *Outlook for Energy* also contained a color-coded map that set forth the company's expectations concerning future carbon costs in different regions around the world. (*See* ¶ 87 below.)

85.      On March 31, 2014, Exxon published two reports, *Energy and Climate,* and *Energy and Carbon – Managing the Risks*, in exchange for the withdrawal of shareholder resolutions by the Arjuna Capital and Christopher Reynolds Foundation shareholder groups.  The primary drafters of these reports were Exxon's Manager of Environmental Policy and Planning,

---

[2] "OECD" refers to the Organisation for Economic Co-operation and Development, which includes 36 developed and emerging countries as members.

[3] Exxon did not publish a 2011 *Outlook for Energy* report.

**App.35**

and Manager of the Office of the Secretary.  The reports were reviewed and edited by Exxon's

Vice President of Investor Relations, Vice President of Corporate Strategic Planning, and others,

before ultimately being reviewed and approved by Exxon's then-CEO, Rex Tillerson.

86.    In *Energy and Climate*, in a section entitled "The Outlook for Energy: A View to

2040," Exxon described its use of a proxy cost as follows:

> [F]or our Outlook we use a cost of carbon as a proxy to model a wide variety of potential policies that might be adopted by governments to help stem GHG emissions. For example, in the OECD nations, we apply a proxy cost that is about $80 per ton in 2040.  In the developing world, we apply a range of proxy costs with the more wealthy countries, like China and Mexico, reaching about $30/ton in 2040.
>
> . . . .
>
> **This GHG proxy cost is integral to ExxonMobil's planning**, and we believe the policies it reflects will increase the pace of efficiency gains and the adoption by society of lower-carbon technologies through the Outlook period . . . . (emphasis added)

87.    A map in the middle of that passage divided the world into three categories for

purposes of proxy cost application, and set forth Exxon's expectations regarding carbon costs in

each country in 2040: "More than $40 per ton" (most of the OECD countries, including Canada);

"$20-40 per ton" (mostly non-OECD countries, including China, Indonesia, and Russia, among

others); and "Less than $20 per ton" (the remaining non-OECD countries).  The color-coded map

is reproduced below:

**App.36**

Case 3:16-cv-03111-K   Document 121   Filed 07/31/20   Page 42 of 544   PageID 4294



88.     The *Energy and Climate* report also stated that Exxon expected "OECD nations to continue to lead the way" in adopting regulatory policies to limit GHG emissions, "with developing nations gradually following, led by countries like China and Mexico."

89.     Later in the *Energy and Climate* report, under the subheading "Evaluating climate risk in our planning," Exxon emphasized the consistency with which it applies a proxy cost, stating:

> The company employs a **robust process** for evaluating investment opportunities and managing our portfolio of operating assets. ExxonMobil requires that **all business units** use a **consistent corporate planning basis, including the proxy cost of carbon** discussed above, in evaluating capital expenditures and developing business plans. (emphasis added)

**App.37**

90.     Exxon published the *Managing the Risks* report on its website the same day that it published *Energy and Climate*. Exxon explained that the purpose of *Managing the Risks* was to "address important questions raised recently by several stakeholder organizations on the topics of global energy demand and supply, climate change policy, and carbon asset risk." These topics are of particular importance because, as Exxon stated in *Managing the Risks*, "[g]overnments' constraints on use of carbon-based energy sources and limits on greenhouse gas emissions are expected to increase throughout the Outlook period." The "Outlook period" refers to the future years covered by Exxon's projections.

91.     Exxon represented in *Managing the Risks* that it "**rigorously** consider[s] the risk of climate change in [its] planning bases and investments" by "requir[ing] that **all significant proposed projects** include a cost of carbon – which reflects [its] best assessment of costs associated with potential GHG regulations over the Outlook period – when being evaluated for investment." (Emphasis added.)

92.     Under the heading "Planning Bases and Investments," Exxon further stated in *Managing the Risks*:

> We also address the potential for future climate-related controls, including the potential for restriction on emissions, through the use of a proxy cost of carbon. This proxy cost of carbon is embedded in our current Outlook for Energy, and has been a feature of the report for several years. The proxy cost seeks to reflect all types of actions and policies that governments may take over the Outlook period relating to the exploration, development, production, transportation or use of carbon-based fuels. Our proxy cost, which in some areas may approach $80/ton over the Outlook period, is not a suggestion that governments should apply specific taxes. . . .
>
> It is simply our effort to quantify what we believe government policies over the Outlook period could cost to our investment opportunities. Perhaps most importantly, we require that **all our business segments** include, where appropriate, GHG costs in their economics when seeking funding for capital investments. **We require that investment proposals reflect the climate-related**

**App.38**

> **policy decisions we anticipate governments making during the Outlook period and therefore incorporate them as a factor in our specific investment decisions**. (emphasis added)

This statement followed the same color-coded map contained in the *Energy and Climate* report described above.

93.     Based on this analysis, Exxon assured investors that it was "confident that none of [its] hydrocarbon reserves are now or will become 'stranded,'" and that "the company does not believe current investments in new reserves are exposed to the risk of stranded assets."

94.     In these and other public statements, Exxon described its proxy cost as a unitary concept that applies across its business units and functions. While Exxon noted that it applies different proxy cost values in different geographic regions, the company did not disclose that it used different proxy costs for different business purposes.

95.     Following the release of these two reports, Exxon continued to represent to investors that it applied a proxy cost to its projected GHG emissions in business planning and investment decision-making, that its proxy cost reached $80 per ton in OECD countries by 2040, and that it also applied proxy costs in non-OECD countries.

96.     For example, in May 2014, Exxon issued its *2013 Corporate Citizenship Report,* which stated:

> To help model the potential impacts of a broad mosaic of future GHG policies, we use a simple cost of carbon as a proxy mechanism. For example, in most OECD nations, we assume an implied cost of $CO_2$ emissions that will reach about $80 per metric ton in 2040. OECD nations are likely to continue to lead the way in adopting these policies, with developing nations gradually following, led by China.

97.     In November 2014, Exxon published an article on its website stating that its application of a proxy cost of GHG emissions informed the company's natural gas investments –

**App.39**

Case 3:16-cv-03111-K   Document 121   Filed 07/31/20   Page 45 of 544   PageID 4297

such as its $44 billion acquisition of XTO in 2010, which made Exxon the largest producer of natural gas in the United States:

> We fully expect governments to take various actions to constrain carbon emissions in coming years. Our increased investment in cleaner-burning natural gas has been guided in part by this assumption. ExxonMobil's Outlook for Energy assumes a proxy cost of carbon of $80 per ton, significantly above the current average worldwide. Our proxy cost of carbon represents the cumulative impact of government actions, regardless of the precise form these actions eventually take.

98.     Exxon also made clear to investors that it did not expect governments to take a "business as usual" approach to climate change, and that its proxy cost was intended to reflect increasingly stringent policies over the coming decades. For example, in its CDP response for calendar year 2014, when asked how the company "uses an internal price of carbon," Exxon stated:

> We address the potential for future climate change policy, including the potential for restrictions on emissions, by estimating a proxy cost of carbon. This cost, which in some geographies may approach $80 per ton by 2040, has been included in our Outlook for several years. This approach seeks to reflect potential policies governments may employ related to the exploration, development, production, transportation or use of carbon-based fuels. We believe our view on the potential for future policy action is realistic and, **by no means represents a "business as usual" case.** We require **all of our business lines** to include, where appropriate, an estimate of GHG-related emissions costs in their economics when seeking funding for capital investments. (emphasis added)

99.     Exxon has emphasized that it has applied its proxy cost for many years. In a December 2, 2015 publication on its corporate website entitled *ExxonMobil and the carbon tax*, Exxon described its briefings for investors and other interested parties as follows:

> One **key point** we make in many of these briefings is that ExxonMobil has included a proxy price on carbon in our business planning **since 2007**.

**App.40**

> This enables us to analyze the impact of a price on carbon on various investment opportunities. This proxy cost, which in some regions may approach $80 per ton, seeks to reflect all types of actions and policies that governments may take. (emphasis added)

100. Exxon has also emphasized that its "GHG proxy cost" is "integral" to the company's planning. In a statement on its website, published in 2016 or earlier, entitled *Meeting Global Needs – Managing Climate Change Business Risks*, Exxon represented:

> We use a simple cost of carbon as a proxy mechanism to help model the potential impacts of a broad mosaic of future GHG policies. For example, in most OECD nations, we assume an implied cost of $CO_2$ emissions that will reach about $80 per metric ton in 2040. Developing nations will have a wide range of policy costs with the wealthiest ones reaching about $35 per metric ton.
>
> **This GHG proxy cost is integral to ExxonMobil's planning** . . . . (emphasis added)

101. In its 2016 proxy statement to shareholders, Exxon again emphasized the representations in the *Managing the Risks* report:

> The Company addresses the potential for future climate-related policy, including the potential for restriction on emissions, through the use of a proxy cost of carbon. The proxy cost seeks to reasonably reflect the types of actions and policies that governments may take over the outlook period relating to the exploration, development, production, transportation or use of carbon-based fuels. This proxy cost of carbon is embedded in our Outlook for Energy, and has been a feature of the report **since 2007**. **All business segments** are required to include, where appropriate, an estimate of the costs associated with greenhouse gas emissions in their economics when seeking funding for capital investments. (emphasis added)

102. Exxon explained to investors that the company applies a proxy cost of GHG emissions as an added cost in all of its economic projections. At Exxon's 2016 shareholder meeting, then-CEO Tillerson stated:

> We have, unlike many of our competitors, we have for many years included a price of carbon in our outlook. **And that price of carbon gets put into all of our economic models when we make investment decisions as well. It's a proxy.** We don't know how

**App.41**

else to model what future policy impacts might be.  But whatever policies are, ultimately they come back to either your revenues or your cost.  So **we choose to put it in as a cost**.  So we have accommodated that uncertainty in the future, and **everything gets tested against it.** (emphasis added)

103.   Exxon also frequently referred investors to its *Energy and Climate* and *Managing the Risks* reports.  Indeed, in March 2015, Exxon's Manager of Investor Relations noted that the company "continue[s] getting mileage from those white papers" in its outreach to the investors.  More recently, in its 2017 proxy statement opposing a shareholder proposal that sought to address "climate change related risks of stranded carbon assets," Exxon referred shareholders to *Managing the Risks*, stating that the report "describes how the Company integrates consideration of climate change risks into planning processes and investment evaluation."

104.   Exxon has also relied on its application of proxy costs in attempting to avoid additional disclosure to investors.  For example, in a 2016 letter to the SEC opposing a shareholder proposal for additional company disclosures regarding climate change regulatory risk, Exxon stated that it "uses the proxy cost of carbon in relevant long-term investment decisions to ensure the resiliency of its investments."

### 2.   Exxon's Proxy Cost Representations Were Important to Investors

105.   Exxon's representations concerning its purported use of a proxy cost of GHG emissions were important, and remain important, to the company's investors.

106.   As early as 2009, investors specifically asked Exxon how it incorporated a carbon price into its investment decisions.  For example, at a meeting with institutional investors in September 2009, in response to questions from Lazard Asset Management concerning GHG regulation, then-CEO Tillerson assured investors that Exxon built a cost of carbon into its

**App.42**

investments and escalated that cost on a forward basis, and that all of Exxon's project economics were burdened with that cost.

107.    In March 2014, the Credit Suisse equity research team circulated an article from Bloomberg which noted that, "[o]f 30 U.S. companies that use a shadow carbon price, Exxon's is among the most aggressive."  The article continued by stating: "Exxon's shadow price of $60 per ton of CO2 pollution is more than seven times the current cost of carbon permits in the EU cap-and-trade system . . . . While investors might fault Exxon for not doing enough to prepare for the future, it's hard to argue that it's not taking the climate threat seriously, at least on paper."

108.    In 2015 and 2016, Exxon's Environmental Policy and Planning Manager and Assistant Treasurer held a series of meetings with representatives of Exxon's largest institutional investors concerning "GHG Stabilization Pathways and Carbon Asset Risk" and "Managing Climate Risks & Greenhouse Gas Stabilization Challenges."  These meetings were designed to reassure investors that Exxon was managing the risk of climate change, including through the application of a proxy cost.  As the notes from one of those meetings show, a J.P. Morgan employee was told by Exxon in December 2015: "Carbon price = cost of regulation; C [carbon] price is 'conservative' in sense of stranded assets; XOM [Exxon] assumes higher C cost."

109.    Exxon's representations influenced investors' views of the climate-related risks to which the company was exposed.  In a September 2015 internal presentation that assessed the climate risks faced by major energy companies, Bank of America Merrill Lynch, a major Exxon shareholder, noted:

> XOM does . . . factor in a proxy cost of carbon in planning
>
> XOM's proxy cost in the event a carbon based tax is implemented approaches $80/ton over the outlook period . . .

**App.43**

> This proxy cost is used to quantify what XOM believes government policies could look like through 2040 and used in decision making for major projects
>
> Evaluating climate risk in planning . . . All business units plan around the proxy cost of carbon[.]

The presentation indicates that the sources for these statements were "ExxonMobil's Energy and Climate Report, ExxonMobil's Energy and Carbon: Managing the Risks Report and ExxonMobil's 2015 Outlook for Energy Presentation."

110. BlackRock, Exxon's second-largest shareholder and the world's largest asset manager, also sought information from Exxon about how it manages climate change-related risk. In an October 2015 meeting, Exxon representatives told BlackRock that Exxon "[i]nclude[s] a proxy cost of carbon for all their investment decisions (varies by region)."

111. Likewise, in December 2015, Exxon employees told fund managers for the Church of England, a lead proponent of several shareholder proposals regarding climate change in recent years, that the "[c]ost of carbon is included in all investment decisions."

112. In 2016, Vanguard, the company's largest shareholder, conducted an internal analysis of Exxon's vulnerability to adverse economic consequences associated with climate change risk, including "cost of climate change compliance" and "decline in company stock value." Vanguard questioned how Exxon's "capital processes and business strategies incorporate analyses of the short and long-term financial risks of a lower carbon economy." In its analysis, Vanguard quoted Exxon's *Managing the Risks* report and noted that Exxon had represented that it "has used a proxy cost of carbon since 2007 which addresses 'the potential for future climate-related controls, including the potential for restriction on emissions' and is Exxon's 'effort to quantify what [they] believe government policies over the Outlook period could cost to [their] investment opportunities.'" Vanguard also identified a risk that Exxon's

**App.44**

future costs associated with climate change regulations may include fines for non-compliance, but rated this risk as "low" based on its understanding, derived from Exxon's public statements, that Exxon "anticipates that policies will add rising costs (est. $80/ton by 2040)."

113.    In February 2016, Exxon's Investor Relations and Environmental Planning and Policy staff told a group of investors – including the New York State Comptroller, the Church of England, and the Vermont Pension Investment Committee – that Exxon "incorporate[s] a proxy cost of carbon," "use[s] it as a means to test resiliency of our investments," and "assess[es] all of [its] investments on proxy cost."

114.    On May 26, 2016, Wells Fargo equity research analysts hosted a group of investors at Exxon's corporate headquarters to discuss "climate risks including stranded assets." According to the equity research report in which Wells Fargo summarized the meeting, Exxon stated that it "places a proxy cost of carbon on all of its future developments.  Depending on the project and its location, the proxy cost of carbon ranges from $20 to $80 per ton by 2040." Wells Fargo concluded that "[t]his approach reduces the risks associated with future CO2 emissions and incentivizes [Exxon] to reduce overall emissions of all future projects.  Thus we believe ExxonMobil is ahead of the curve on pricing in climate risks."

115.    Later, in August 2017, Wells Fargo released an equity research report which concluded that Exxon "remains the leading energy company in our view," and expressed Wells Fargo's understanding that:

> All XOM [Exxon] projects are assessed an internal carbon tax (on a per ton basis) to take into account carbon intensity. This is very important for long-lived projects to ensure full-cycle returns are fairly evaluated on an environmental basis as well as financial and operational.

**App.45**

116.    As late as 2017, Exxon was continuing to assert in meetings with investors such as State Street that it had been applying a proxy cost of GHG emissions "since 2007." Investors used that information to assess Exxon's exposure to climate change regulatory risks.

117.    Additionally, investors and underwriters rely on the credit ratings provided by rating agencies in making investment and underwriting decisions, and Exxon knew that rating agencies had concerns about the impact of GHG regulation on the company's financial health. Exxon met with representatives of Moody's Investor Service and Standard & Poor's Financial Services LLC in New York City in October 2016, after the ratings agencies had downgraded Exxon's credit rating. Exxon's meeting notes reflect that Moody's "look[s] to understand the potential impact of carbon regulation on the company's ability to remain competitive" and that "Moody's assessment is that carbon regulation has the potential to materially impact [Exxon's] credit quality in the medium to long-term (5+ years)."

### 3.    Exxon's Representations Were Inconsistent with Its Actual Practices

118.    Exxon routinely did not apply the proxy costs that the company represented it was using, especially when doing so would have had a significant impact on the company's business decisions.

119.    This did not occur by accident. Exxon management, including then-CEO Tillerson, knew of and approved of these deviations.

120.    First, Exxon's undisclosed internal guidance authorized applying proxy cost figures that were much lower than those set out in the company's public representations. Second, in projects in developing, non-OECD countries, Exxon did not apply **any** proxy costs to its projected GHG emissions in its base economic projections prior to 2016, contrary to its representations. Third, in significant parts of its business, such as the Alberta oil sands, projects

**App.46**

in the United States, liquefied natural gas ("LNG") projects, refinery and chemical projects, and North American natural gas assets, Exxon applied much lower proxy costs than it represented or no proxy costs at all to its projected GHG emissions. In these parts of its business, Exxon often applied a much lower price per ton to a small percentage of its GHG emissions, based on then-current regulations, and held those lower costs flat far into the future, rather than applying the escalating proxy costs that it represented to investors. These practices rendered Exxon's proxy cost-related representations materially false and misleading.

### a) Exxon's Internal Proxy Costs Deviated Significantly from Its Publicly Represented Proxy Costs

121. For years, to the extent that Exxon applied any proxy cost to its projected GHG emissions, it applied significantly lower proxy costs than those represented to investors.

122. In particular, Exxon used an undisclosed set of proxy costs that was set out in its internal Corporate Plan Dataguides and Appendices ("Corporate Plan"). The Corporate Plan is an internal Exxon document, issued annually, which sets out assumptions for the company's business units to apply in making economic projections. Exxon's management, accountants, and attorneys all recognized that the Corporate Plan contained the company's internal proxy cost assumptions.

123. The proxy cost figures in Exxon's Corporate Plan were inconsistent with, and significantly lower than, the company's publicly represented proxy costs until June 2014 for OECD countries, and until June 2016 for non-OECD countries. For these periods, Exxon's investment decisions and business planning were based on significantly lower proxy costs than those the company represented to investors it used. Exxon's GHG Managers internally warned that using these lower figures made Exxon more susceptible to climate change regulatory risk,

**App.47**

and indeed, one of those GHG Managers effectively admitted in an internal presentation that the company's proxy cost representations were misleading.

### (i)    OECD Countries

124.    In 2010 and 2011, Exxon publicly represented that its proxy cost for projects in OECD countries was $60 per ton of emissions in 2030, while the undisclosed Corporate Plan proxy cost reached only $40 per ton in 2030.  In 2012, 2013, and 2014, Exxon publicly represented that its proxy cost was $60 per ton in 2030, as before, and that it would increase to $80 per ton in 2040.  Internally, until June 2014, Exxon's undisclosed Corporate Plan proxy cost still reached only $40 per ton in 2030 for OECD countries, and did not extend to 2040.

125.    These deviations between Exxon's public representations and its internal Corporate Plan had a material impact on Exxon's investment decisions and business planning.  For example, according to an internal analysis Exxon performed in 2007, a $20 cost per ton of $CO_2$ would have had a $1.8 billion impact in annual operating expenses for the company's upstream projects in a single year (2020).

126.    Exxon's decision to apply lower proxy costs pursuant to its internal Corporate Plan affected investment decisions at major assets.  For example, with respect to a 2013 investment decision at the Aspen oil sands asset in Alberta, a planning supervisor noted that the company applied a proxy cost that "flatlined at $40/t GHG (2013$) long term," which was significantly lower than the publicly represented proxy cost that reached $60 per ton in 2030 and $80 per ton in 2040.

127.    Likewise, at Exxon's largest European refinery in Antwerp, Belgium, Exxon did not apply the publicly represented proxy costs.  Instead, Exxon applied the lower internal proxy costs from its internal Corporate Plan, and furthermore applied that lower proxy cost to only a

**App.48**

fraction of project-related GHG emissions.  Specifically, a cash flow model relating to a 2014 investment project at that refinery applied an internal proxy cost that reached only $40 per ton in 2030 and stayed flat thereafter, as opposed to the publicly represented proxy costs, which escalated to $60 per ton in 2030 and $80 per ton in 2040.  The model also applied those lower costs to only 35.6% of project-related GHG emissions, meaning the effective unit cost was $14.24 per ton both in 2030 (instead of $60 per ton) and in 2040 (instead of $80 per ton).

128.    Exxon's management, including then-CEO Tillerson and other members of the Management Committee,[4] knew and approved of the significant deviation between the publicly disclosed proxy cost and the lower proxy costs set forth in the undisclosed Corporate Plan.  In response to a question from CDP asking Exxon to identify "the highest level of direct responsibility for climate change within [the] organization," the company explained that "the Chairman of the Board and the Chief Executive Officer, the President and the other members of the Management Committee are actively engaged in discussion relating to greenhouse gas emissions and the risk of climate change on an ongoing basis."  Indeed, the Management Committee was kept apprised of climate change-related issues generally and received in-depth briefings on the subject.  In particular, Management Committee members reviewed and approved the *Outlook for Energy* and key elements of the Corporate Plan each year.  Further, Mr. Tillerson reviewed and approved the *Managing the Risks* and *Energy and Climate* reports.

---

[4] The Management Committee consists of Exxon's CEO and Senior Vice Presidents and is responsible for executive decision-making, long-term strategy, endorsements of the Corporate Plan and *Outlook for Energy*, and major investment decisions.  The members of the Management Committee during the time period 2010 to 2016 included: Rex Tillerson (Chairman and CEO), Mark Albers (Senior Vice President), Andy Swiger (Senior Vice President), Don Humphreys (Senior Vice President and Treasurer), Mike Dolan (Senior Vice President), Darren Woods (Senior Vice President), and Jack Williams (Senior Vice President).

**App.49**

129.    Exxon's management approved of this deviation even though it knew that the lower internal values were less protective against climate change regulatory risk than the proxy cost described publicly.  Further, Exxon knew that the higher proxy costs described to investors were a more realistic projection of future costs associated with GHG emissions than the lower costs it actually applied in its cost projections.  Exxon's then-GHG Manager wrote in an email to colleagues on April 30, 2010, that he "[r]ecognize[d]" that the "2030 cost of $40 [per ton]" in the Corporate Plan was a "low" estimate of costs likely to be incurred, and that the *Outlook for Energy*'s "assumption of $60 [per ton] is likely more realistic."

130.    Exxon management discussed reconciling the internal Corporate Plan proxy costs with the publicly disclosed proxy costs years before such alignment took place.  On April 22, 2011, Exxon's then-GHG Manager sent an email to colleagues raising the question of "whether to harmonize" the lower, internal proxy costs with the higher, publicly disclosed proxy costs.  He argued that doing so would "provide more clarity and alignment throughout [the] organization" and would be "rational."  However, the manager responsible for securing executive approval of the internal proxy costs responded that "Rex [Tillerson] has seemed happy with the difference previously," as reflected in the email excerpted below (emphasis added):

04/22/2011 05:13 PM        Subject  Re: PROP: GHG emission cost planning basis

I have pointed out the difference in past reviews - we've been at $60 for the EO and $40 for the plan circa 2030 for several years. Rex has seemed happy with the difference previously - appeared to feel it provides a "conservative" basis (but only if viewed from the perspective of claiming economics credits to reduce emissions; it is not conservative vs EO from the perspective of debiting actions that increase emissions).

As stated in the email, Exxon's deviation from its representations was "not conservative" as to projects that increase GHG emissions.  Such projects comprise the vast majority of Exxon's investments.  Nonetheless, Exxon management rejected the proposal to increase the company's

**App.50**

internal proxy costs to conform to its public representations. Accordingly, the deviation between Exxon's internal and external proxy cost figures continued for over three more years.

131. In May 2014, a new Exxon GHG Manager effectively admitted that the company's *Energy and Climate* and *Managing the Risks* reports contained misleading representations concerning proxy costs, and recommended that the internal figures be increased to match the figures that Exxon had publicly represented. In the speaker notes of a May 2014 presentation to the Management Committee, including Mr. Tillerson, Exxon's new GHG Manager recommended aligning the "non-conservative" (*i.e.*, risky) figures in the Corporate Plan with those in the *Outlook for Energy* reports on the ground that Exxon's March 2014 reports to shareholders had "implied that we use the [Outlook] basis for proxy cost of carbon when evaluating investments."

132. In June 2014, in accordance with its GHG Manager's recommendation, Exxon increased the proxy cost values in its Corporate Plan to conform to its publicly represented proxy cost – but for OECD countries only. The new 2014 Corporate Plan stated that Exxon was changing its internal OECD proxy cost figures to be "aligned with long term Energy Outlook basis," and noted that this was "a change from the 2013 Corporate Plan."

133. Exxon's current GHG Manager testified that he did not know how the lower, internal proxy cost figures utilized prior to June 2014 were derived, even though he and his colleagues "have spent a fair amount of time trying to understand that." He further testified that when he became GHG Manager in 2014, he asked the prior GHG Manager why these figures differed, and his predecessor admitted that he "didn't really know." Likewise, Exxon's current GHG Manager testified that he discussed this issue with the Manager of Environmental Policy and Planning, who also did not know why these figures differed.

**App.51**

134.    Exxon's planners and managers understood the importance of the June 2014 change in internal guidance.  In an October 2014 email, a development planning manager described this alignment as a "huge change," and stated that he suspected the change was made "to address GHG risks in response to shareholder increasing queries and concern."  In response, a development planning supervisor noted that this change would have a "material impact" on Exxon's oil sands assets.  The next month, the same supervisor circulated an analysis to his colleagues showing that the new GHG guidance had a "very material" impact on Exxon's oil sands opportunities, including its projects at Aspen, Clarke Creek, Clyden, Corner, and Grand Rapids.

135.    Despite the significance of this June 2014 proxy cost alignment, Exxon never disclosed it to the company's investors, nor did the company disclose that its internal guidance had significantly deviated from the company's publicly represented proxy costs for years.

*(ii)   Non-OECD Countries*

136.    Contrary to Exxon's representations that it applied a proxy cost to investment decisions and business planning around the world, including in non-OECD countries, Exxon's internal Corporate Plan directed employees not to apply proxy costs to its projected GHG emissions in base economic models for projects in non-OECD countries until June 2016.

137.    Instead, the Corporate Plan instructed employees to include proxy costs in non-OECD countries only in certain sensitivity analyses.  Unlike base economic models, which reflect the company's actual forecasts, sensitivity analyses test a range of hypotheticals that are considered less likely to occur, and thus have far less impact on the company's decision-making than base economic models.

**App.52**

138.    Exxon did not perform even these sensitivity analyses in non-OECD countries with any consistency.  Indeed, Exxon's pre-2016 Corporate Plans did not contain proxy cost figures for use in sensitivity analyses in non-OECD countries.  Moreover, a development planning supervisor testified that she could not recall ever seeing a sensitivity run for such costs, whether in non-OECD countries or otherwise.

139.    Exxon did not revise its internal Corporate Plan to include proxy cost figures for non-OECD countries until June 2016, seven months after the commencement of the State's investigation.

140.    Contemporaneous documents described the 2016 revision as a "major change" in procedures at the company.  The revision resulted in a flurry of activity throughout the company to calculate, for the first time, projected GHG emissions associated with specific assets in non-OECD countries.

141.    Only after meeting a "tight deadline on implementation of the new guidelines" for the July 2016 planning and budgeting submissions did employees begin to consider "how to incorporate" the new proxy costs for non-OECD countries "into [Exxon's] modeling on a more permanent basis," including considering what impact the new guidance might have on the company's investment decisions and reserves calculations.

142.    Before mid-2016, Exxon had not even projected future GHG emissions for many of its non-OECD projects – let alone applied proxy costs to such emissions – even though approximately 30% of Exxon's GHG emissions in 2015 were from non-OECD countries.

143.    Exxon deviated from its public representations by not applying proxy costs to its GHG emissions for major investments in non-OECD countries.  For example, despite Exxon's public representations in 2013 and 2014 in the color-coded map it included in multiple reports

**App.53**

(*see* ¶ 87 above) that it applied a proxy cost in Guyana of $20-$40 per ton in 2040, Exxon did not incorporate proxy costs into its economic analysis for a multibillion dollar project in Guyana until after June 2016.

144.    Likewise, Exxon did not incorporate its publicly represented proxy costs into cost projections for its multibillion dollar projects in Malaysia, Indonesia, and Singapore before July 2016.  While Exxon publicly represented in 2013 and 2014 that it applied proxy costs of $20-$40 per ton for the year 2040 in each of these three countries, email correspondence shows that planners were not instructed to do so until 2016.  In July 2016, a planning advisor in the Asia Pacific region, which includes Malaysia, Indonesia and Singapore, instructed planners to apply proxy costs for the first time, explaining that "what previously was just impacting Australia in the past, now impacts ALL countries" in the region.

145.    Exxon likewise did not incorporate its publicly represented proxy costs into its cost projections for multibillion dollar projects at its Sakhalin oil and gas asset in Russia in 2010 and 2014, or for a funding decision of several hundred million dollars at the Tengiz oil field in Kazakhstan in January 2016.

146.    By not following its public representations regarding the application of proxy costs to its projected GHG emissions in non-OECD countries, Exxon substantially understated its projected costs when making investment decisions and conducting business planning in those countries.

> **b)    Even After Conforming Internal Proxy Cost Guidance to Its Public Representations, Exxon Continued to Deviate from Its Proxy Cost Representations**

147.    After Exxon increased its internal proxy cost guidance to conform to its public representations, the company's planners realized that the application of the higher publicly

**App.54**

disclosed proxy costs would result in "massive GHG costs," "large write-downs," and shorter asset lives.

148.    Rather than accept the consequences of incorporating the risks of climate change regulation as it had represented to investors by applying the publicly represented proxy cost, Exxon management decided to apply an "alternate methodology." This "alternate methodology" was not disclosed to investors, and consisted of applying a lower proxy cost than publicly represented, or no proxy cost at all, to Exxon's projected GHG emissions in important areas of its business, including the Alberta oil sands, assets in the United States, LNG assets, refineries, and North American natural gas assets.

149.    For major projects, rather than applying a proxy cost, Exxon assumed, contrary to its representations, that existing climate regulation would remain in place, unchanged, indefinitely into the future. In these cases, Exxon applied a much lower cost per ton to a small percentage of GHG emissions based on existing regulation, held flat indefinitely. This conduct was directly contrary to Exxon's public representations that it applied escalating proxy costs as a stand-in for the effects of expected future GHG regulation. Exxon's conduct thus rendered those representations materially false and misleading.

150.    Exxon's application of lower proxy costs than it publicly represented or no proxy costs at all, even after the company revised its internal guidance, was most frequent in parts of the business with high GHG emissions, where applying the publicly represented proxy cost would have had a particularly significant impact on the company's investment decisions and business planning.

151.    In 2011, Exxon's Vice President of Environmental Policy and Planning stated in an internal presentation that the application of a "high cost on GHG emissions" would be a

**App.55**

"major concern" for many of the company's "energy intensive operations," such as its "refining and chemical businesses" and "LNG and heavy oil production,"[5] and that "greenhouse gas intensive energy sources such as oil sands" would also be "vulnerable." Exxon failed to apply its publicly represented proxy cost to its projected GHG emissions most frequently to GHG-intensive projects in these areas.

### (i)  Alberta Oil Sands Assets and Investments

152.    While Exxon repeatedly told investors that it was applying a proxy cost rising to $80 per ton of GHG emissions in OECD countries such as Canada by 2040, Exxon management instructed employees not to apply this publicly represented proxy cost to its projected GHG emissions for business planning and investment decision-making purposes at its oil sands projects in Alberta.

153.    Exxon instead applied what a planning supervisor called an "alternate methodology," which deviated from the company's representations to investors in three ways. First, Exxon did not apply a proxy cost to its projected GHG emissions at all, but instead applied a much lower cost that was based on existing regulations. Second, based on existing regulations, Exxon applied those lower costs to only a small percentage of GHG emissions. Third, Exxon held flat those lower costs, and the small percentage of emissions to which those costs were applied, indefinitely into the future, rather than applying costs that escalated over time.

154.    This "alternate methodology" of applying existing legislated costs to a small percentage of project emissions, and holding those costs flat indefinitely into the future, was fundamentally inconsistent with Exxon's repeated representations that the company was

---

[5] Heavy oil is crude oil that is characterized by high density and viscosity.  Oil sands are categorized as heavy oil.

**App.56**

Case 3:16-cv-03111-K   Document 121   Filed 07/31/20   Page 62 of 544   PageID 4314

projecting increasing costs associated with GHG emissions due to increasingly stringent regulation.

155.    As a result of these practices, Exxon effectively applied costs for its GHG emissions in Alberta that were less than $5 per ton, held flat into the future for decades. These costs were far below the publicly represented proxy cost of $80 per ton for Canada – including Alberta – in 2040.

156.    This deviation from Exxon's public representations was willful, and it was directed by Exxon management. After Exxon increased the proxy costs in the internal Corporate Plan to match the publicly represented proxy costs for OECD countries such as Canada, planners reported that applying the publicly represented proxy costs would result in "massive GHG costs," "large write-downs," and other significant impacts on the company's bottom line. Exxon management then instructed the planners to disregard those publicly represented proxy costs. Instead, Exxon management directed planners to apply an "alternate methodology" that did not include the publicly represented proxy costs.

157.    Even when Exxon did apply some proxy costs rather than existing legislated costs to its Alberta oil sands projects, it frequently did so on the basis of the outdated pre-2014 Corporate Plan, which was not aligned with the company's public representations. As a result, for these projects, Exxon applied proxy costs that were significantly lower than those that Exxon represented to investors.

158.    Cash flow models for fourteen of Exxon's Alberta oil sands projects show that the company's deviations from its publicly represented proxy costs would have substantially impacted profits. By applying Alberta's legislated cost, held flat into the future, rather than the escalating proxy cost, or by applying proxy cost figures that were significantly lower than those

**App.57**

set out in Exxon's public representations, Exxon underestimated total projected GHG-related costs at those fourteen projects by approximately $30 billion CAD (more than $25 billion USD), and overestimated cumulative undiscounted cash flows by similar figures.[6]  This overestimate represents over 7% of the aggregate projected discounted cash flow returns over all of these projects, with an average (non-weighted) impact across projects of approximately 0.9 percentage points of discounted cash flow return – and with a significantly higher impact on certain projects.  Exxon's planners consider even a 0.5 percentage point impact to the discounted cash flow of a project's economics to be material in evaluating the company's investment opportunities.

159.    For Exxon's largest Canadian oil sands investment – Kearl – in which the company had invested more than $33 billion in capital expenditures by 2015, the decision to apply an "alternate methodology" instead of the publicly represented proxy costs reduced cost projections associated with GHG emissions by approximately 94%.

160.    Exxon's 2015 economic model for Kearl confirms that Exxon did not apply its publicly represented proxy cost.  Instead, for investment decision-making and business planning purposes, Exxon (i) applied existing legislated costs of $24 USD per ton, rather than the publicly represented $80 per ton in 2040; (ii) held that cost flat through the end of the asset's projected life in 2065, rather than applying costs that rise over time; (iii) applied that cost to only 15% to 20% of Exxon's emissions, pursuant to existing legislation that only taxed the portion of emissions that exceeded certain emissions-intensity targets; and (iv) held that percentage flat through the end of the asset's projected life.  This resulted in an effective cost of less than $5

---

[6] These estimates are based on economic assumptions as they appear in Exxon's cash flow models.

**App.58**

USD per ton of GHG emissions in 2040 – approximately 94% less than the $80 per ton figure that Exxon represented for that year.

161.    By applying existing legislated costs instead of the publicly represented proxy cost to Kearl, Exxon reduced the projected undiscounted costs of GHG emissions for that asset by approximately 94%, or $14 billion CAD ($11 billion USD).  Depending on Exxon's assumption about the future price of oil, this additional cost had the potential to change the cash flow projections for Kearl as a whole from positive to negative, with concomitant reductions in associated reserves.

162.    Exxon's use of this "alternate methodology" is also described in a planning supervisor's July 4, 2016 email concerning Kearl:

> Last year, the [Corporate Plan] guidance resulted in **massive GHG costs** in the out years so **alternate methodology** was applied. I suspect something similar will be required this year. (emphasis added)

163.    This decision was directed by Exxon's management, and it expressly contradicted the company's public representations and internal guidance, which had only recently been aligned with those representations.  On July 14, 2016, another planner wrote:

> Currently the [Kearl] model is still only following 'legislated' GHG guidance (Alberta) as part of a **management decision** last year . . . **versus the global strat[egic] planning guidance**." (emphasis added)

164.    Exxon's application of existing legislated costs cannot be squared with its numerous public statements that it was projecting that governments would impose *increasing* costs on GHG emissions over time, with "OECD nations [such as Canada] to continue to lead the way."

165.    Moreover, in a 2018 cash flow analysis regarding the Aspen oil sands project in Alberta, Exxon applied proxy costs to only a limited percentage of emissions based on existing

**App.59**

legislation, resulting in an understatement in projected costs of approximately $3.8 billion USD. For many of the years in this cash flow projection, Exxon multiplied its proxy cost figures by **negative** percentages, effectively turning its purported proxy cost into a proxy **credit**. Exxon never informed investors that it was accounting for climate change regulatory risk by assuming that this risk would actually turn into a reward.

166.    Exxon also did not apply its publicly represented proxy costs to its projected GHG emissions for assets in which it had an interest as part of a joint venture. Notably, at the multibillion dollar Syncrude oil sands asset in Alberta, in which Imperial has a 25% interest, Exxon did not incorporate proxy costs into its cost projections when deciding to invest nearly $1 billion in 2011 and 2012. Exxon's failure to inform investors that its proxy cost representations did not apply to massive and GHG-intensive joint ventures like Syncrude rendered those representations misleading.

167.    Exxon's misrepresentations concerning its application of proxy costs at its Alberta oil sands assets are highly material. The Alberta oil sands assets are important to Exxon's business overall, and constituted nearly a quarter of Exxon's resource base (*i.e.*, the quantity of oil and gas under Exxon's control that the company expects to develop in the future) as of February 2016.

168.    Exxon's investors are keenly interested in, and have often asked Exxon detailed questions about, the performance and risk profile of individual investments, including Kearl and other oil sands assets. Indeed, Exxon has presented information about Kearl specifically at each of its last seven annual analyst meetings in New York City.

169.    Exxon's oil sands assets are also very GHG-intensive, and are thus particularly vulnerable to climate change regulation. Further, as some of Exxon's highest-cost projects, they

**App.60**

are particularly vulnerable to additional costs associated with GHG emissions.  As HSBC Global Research noted in 2015, "oil sands face the greatest stranding risks, . . . given the combination of high breakeven price and higher carbon intensity of production."  Contrary to its representations, Exxon's response to this acute risk was to remove the proxy cost guardrails that it had touted to its investors.

### (ii)  United States Assets and Investments

170.    Exxon also failed to apply its publicly represented proxy cost to the projected GHG emissions associated with certain investments in the United States for which it had either received a permit to emit GHGs, or determined that no permit was required.

171.    For example, Exxon did not apply a proxy cost with respect to an investment of over $1 billion in its Point Thomson gas field in Alaska in 2012 on the ground that it had received the necessary permit to emit a substantial quantity of GHGs.

172.    Further, Exxon did not apply a proxy cost to investments totaling nearly $1 billion at its Baytown and Beaumont chemical plants in Texas, in 2011 and 2016, respectively, on the ground that the projected GHG emissions did not meet the threshold at which obtaining a permit would have been required under the Clean Air Act.

173.    Exxon never disclosed to investors that it did not apply its proxy cost when it had received a permit to emit GHGs, or determined that no such permit was required under existing law.  To the contrary, Exxon consistently represented that it expects climate change regulations to grow increasingly stringent over the long term, including in the United States and other OECD countries, and that applying its escalating proxy cost protected its investments from that risk. Nonetheless, for these major projects, with long-term cash flow implications, Exxon did not apply its publicly represented proxy cost, but instead assumed, contrary to its representations to

**App.61**

investors, that existing law would remain in place, indefinitely into the future, and would allow Exxon to continue to emit GHGs without ever imposing increased costs.

### (iii)    LNG Assets and Investments

174.    Exxon also deviated from its public representations regarding the use of proxy costs in its "large and diverse portfolio" of liquefied natural gas projects around the world.

175.    Like the oil sands in Alberta, LNG projects are particularly GHG-intensive. Specifically, LNG requires energy to convert natural gas to liquid form for purposes of transportation.  According to an internal Exxon document, LNG was the sector "most impacted" by the prospective application of proxy costs.  However, Exxon did not apply proxy costs to its GHG emissions in assessing project economics for major LNG projects.

176.    For example, Exxon did not apply any proxy costs in 2016 to its projected GHG emissions in its economic model for an LNG project in Cyprus, an EU member state that was subject to the EU ETS cap-and-trade system, at the time of management's review.  An Exxon employee observed that the omission was "material" to the economics of that project.  At that time, Exxon had represented to investors that it applied a proxy cost in Cyprus that exceeded $40 per ton in 2040.

177.    Likewise, Exxon's publicly represented proxy costs were not incorporated into cost projections for an Alaska LNG project.  In January 2016, Exxon planners applied proxy costs of $14 per ton to GHG emissions in 2017, increasing $2 per year and plateauing at $40 per ton "max."  At that time, Exxon had represented to investors that it applied a higher proxy cost in OECD countries including the United States, rising to $80 per ton in 2040.

**App.62**

Case 3:16-cv-03111-K     Document 121     Filed 07/31/20     Page 68 of 544     PageID 4320

*(iv)     Refinery Assets and Investments*

178.     Managers in Exxon's Refining and Supply business, which oversaw Exxon's downstream assets such as oil refineries, noted in March 2016 that planners in that business unit had not been applying the proxy cost figures in the Corporate Plan to project economics, either in base economic models or in sensitivity analyses.  When asked to determine "how CO2 is handled in projects," the Global Project Development and Execution Manager wrote that "[w]e use the GHG pricing outlook *where there is an established program*, but don't think we have been applying a post 2020 sensitivity to projects."  (Emphasis added.)

179.     This was confirmed in June 2016 by a project executive in Refining and Supply, who stated internally:  "We include the carbon cost (or credit) in projects where it is established by the government.  We have not put in sensitivities where it is not anticipated, although we may want to reconsider based on the Paris agreement, but really need to have guidelines that would be consistent across all companies."

180.     For downstream operations in Singapore, an Exxon planner stated in December 2016 that "we haven't to date been using [the proxy cost] in any of our projects."  A manufacturing director in Exxon's downstream business estimated that an impending Singaporean GHG regulation "at roughly 10$ per ton but with likely significantly higher values in the future would . . . significantly impact the ability to compete in the region."  By then, Exxon had represented to investors that the proxy cost it applied in Singapore was $20-$40 per ton by 2040.

181.     Exxon's failure to apply publicly represented proxy costs in its refining business is significant.  For example, in various internal analyses, Exxon found:

- "If CO2 emissions from refineries were charged 20 $/[ton] to emit, the impact on net margins could be significant, as high as -0.85 $/B[arrel]"

**App.63**

- "Potential CO2 cost for [Exxon] refinery emissions are significant compared to 2002-07 earnings"

- Refineries in the United States would become unprofitable at a carbon price of $30 per ton because "Cost of process emissions = Operating margin (@ $30/Tonne GHG)"

- GHG regulations on refineries could "force curtailment of some operations, and "could be significant relative to earnings."

182.    Exxon's failure to apply its proxy cost to GHG emissions from its refineries contradicted its representations that, since 2007, "all business units use a consistent corporate planning basis, including the proxy cost of carbon . . . in evaluating capital expenditures and developing business plans."

*(v)    North American Natural Gas Assets and Investments*

183.    Exxon also failed to disclose to investors that it effectively avoided applying a proxy cost in its investment decision-making and business planning for its major North American natural gas assets, at least in 2016, by assuming that the company would be able to pass through any such costs to customers by increasing the prices for its natural gas products at the point of sale.

184.    Exxon represented that the company requires that "all significant proposed projects include a cost of carbon – which reflects [its] best assessment of costs associated with potential GHG regulations over the Outlook period – when being evaluated for investment" (*see* ¶ 91 above).  Nowhere did Exxon disclose that it was assuming that it would be able to pass on such costs to consumers.  By applying this pass-through assumption (also called a "market recovery" assumption), Exxon effectively assumed that it would bear no costs at all in connection with the GHG emissions associated with these assets, and that it would pass on the

**App.64**

entire cost to consumers in the form of higher prices. Exxon's undisclosed application of this pass-through assumption rendered its proxy cost representations false and misleading.

185.   Moreover, when Exxon made this pass-through assumption, it did not acknowledge the concomitant effects on gas prices. A pass-through assumption depends on a company's ability to raise prices in response to increased costs. However, Exxon did not factor the impact of its pass-through assumption into its price projections for natural gas in 2016 or earlier. Exxon simply assumed that it would be able to recover the costs associated with its GHG emissions by raising prices for customers, but did not incorporate those costs into its price analysis.

186.   Likewise, Exxon did not incorporate the effects of passing through the cost of its GHG emissions to customers in its natural gas demand projections. In effect, Exxon assumed that demand for natural gas is perfectly inelastic, meaning that consumer demand is completely unaffected by changes in price. Such an assumption, which Exxon never disclosed, is contrary to the basic economic principle known as the "law of demand," under which there is an inverse relationship between quantity demanded and price.

187.   By assuming that proxy costs associated with its North American natural gas assets would be fully passed through to customers, without any impact on price or demand, Exxon effectively treated these proxy costs as if they did not exist when evaluating the profitability of its investments. Applying this pass-through assumption allowed Exxon to avoid the "impact to profitability" that would have otherwise resulted from the application of proxy costs at its North American natural gas assets.

188.   Exxon ultimately recognized that its pass-through assumptions were overly aggressive. For older, more GHG-intensive natural gas assets, pass-through is less likely, as

**App.65**

customers generally will not pay more for gas from those assets compared with newer, less GHG-intensive assets. Nonetheless, in 2016, Exxon assumed that it would be able to pass through the full amount of the proxy costs associated with GHG emissions at such older assets. In 2017, Exxon stopped assuming that it would be able to fully pass through its proxy costs at these older assets, at least for purposes of conducting impairment evaluations (*see* ¶ 246 below).

189.    Exxon never informed investors that it had previously applied this flawed pass-through assumption in cost projections for its older, more GHG-intensive natural gas assets.

190.    Through its undisclosed pass-through assumption, Exxon avoided internalizing the proxy costs associated with GHG emissions at its North American natural gas assets into its economics as it had represented to investors. Such an approach was entirely contrary to Exxon's stated risk management practices.

### B.    Exxon's Misrepresentations Regarding Its Use of a Proxy Cost in Oil and Gas Reserves and Resource Base Assessments

191.    Exxon also sharply deviated from its publicly represented proxy costs in estimating the size of its company oil and gas reserves and resource base.

#### 1.    Oil and Gas Reserves and Resource Base Assessment Process

192.    An oil and gas company's most valuable upstream assets are its "reserves," which refer to the amounts of hydrocarbons underground that the company (i) has a legal entitlement to extract and produce, and (ii) determines to be economically and technically producible within a specified degree of certainty.

193.    Reserves are classified as either "proved," "probable," or "possible," in order of likelihood that they will be profitably extracted. "Proved reserves" – which must satisfy the SEC's definition to be included in a company's financial statements – represent the amount of

**App.66**

hydrocarbons in a particular reservoir with the highest confidence of economically feasible recovery.

194.     An oil and gas company's reserves represent a subset of its total oil and gas "resources," or "resource base." Exxon defines its resource base as "the total remaining estimated quantities of oil and gas that are expected to be ultimately recoverable," which "includes quantities of oil and gas that are not yet classified as proved reserves under SEC definitions, but that [it] believes will ultimately be developed." The "resource base" is particularly significant because it represents the main source of future additions to Exxon's proved reserves.

195.     Exxon, like its peers, calculates its resource base as part of an internal "company reserves" process, which is separate and distinct from the estimation of proved reserves under SEC-prescribed criteria. Exxon uses its company reserves assessments for internal business evaluations, while it uses SEC proved reserves estimates for annual disclosure of reserves in its 10-K filings. Exxon's planning and budgeting assumptions "underpin" Exxon's company reserves assessments,  and those assessments are "based on the ExxonMobil cost basis and Company Plan Prices," not "the SEC prescribed cost and price basis." Thus, while SEC proved reserves estimates must be based on historical oil and gas prices and current costs, company reserves and resource base assessments are based on a company's own price and cost projections.

### 2.     Exxon's Representations

196.     Exxon repeatedly touted the size of its oil and gas resource base. For example, in its publicly available 2014 *Financial & Operating Review*, Exxon represented to investors that the total size of its resource base was more than 92 billion oil-equivalent barrels – significantly

**App.67**

Case 3:16-cv-03111-K   Document 121   Filed 07/31/20   Page 73 of 544   PageID 4325

greater than its proved reserves alone.  Exxon further stated that "[t]he size and diversity of ExxonMobil's global resource base, the largest held by an international oil company, provide us with unequaled investment flexibility to profitably develop new supplies of energy to meet future demand."  Exxon also highlighted the volume of its resource base on many other occasions, such as in its 2014 *Managing the Risks* report, its 2016 *Energy and Carbon Summary*, and a March 2014 presentation to prospective bondholders.

197.    Exxon made three distinct representations concerning the application of proxy costs in assessing its company reserves and resource base.

198.    First, Exxon explicitly represented that it applied a proxy cost in its reserves assessments.  In seeking SEC approval to omit a shareholder resolution concerning climate change from its proxy statement, Exxon wrote in a February 2016 letter, copying the shareholder proponents:  "The Company has tied its analysis of a proxy cost of carbon and that cost's effect on the company's oil and gas reserves to the time period between now and 2040."

199.    Exxon also represented in *Managing the Risks* that, based on the analysis summarized in that report, including the company's purported use of a proxy cost, the company was "confident that none of [its] hydrocarbon reserves are now or will become 'stranded,'" and "does not believe current investments in new reserves are exposed to the risk of stranded assets."

200.    Second, Exxon represented to investors that all of the company's business units incorporated its proxy cost as part of its business planning process, also known as "planning and budgeting."

201.    A key element of Exxon's business planning is its company reserves and resource base assessments.  According to the company's procedures and training materials, Exxon's company reserves and resource base assessments are "a key element that underpins the value of

**App.68**

the Corporation," and it is "[i]mportant to get probable [non-proved] reserves correct for planning and budgeting purposes." Moreover, a "good understanding" of Exxon's resource base is "important as it is a prime source of future Opportunity Generation and Asset value enhancement," which enables Exxon to "maximize value [and] maximiz[e] economic recovery from all reservoirs." Exxon's resource base "represents [its] future production," and "[c]lear quantification" of those resources allows the company to "allocat[e] appropriate resources to projects, including people, capital, and new technology[.]"

202.    Exxon's business planning involves "setting near-term operating and capital objectives in addition to providing the longer-term economic assumptions used for investment evaluation purposes." Exxon has repeatedly represented that it applied a proxy cost in its business planning. For example, in its 2014 *Energy and Climate* report, under the subheading "Evaluating climate risk in our planning," Exxon stated that it "requires that all business units use a consistent corporate planning basis, including the proxy cost of carbon discussed above, in evaluating capital expenditures and developing business plans." Likewise, in a December 2, 2015 publication on its website entitled *ExxonMobil and the carbon tax*, Exxon represented that it "has included a proxy price on carbon in our business planning since 2007." In a 2016 publication on its corporate website entitled *Meeting Global Needs – Managing Climate Change Business Risks*, Exxon similarly stated that its "GHG proxy cost is integral to ExxonMobil's planning."

203.    Third, Exxon represented to investors, including in its 2016 *Energy and Carbon Summary*, that its "Reserves and Resources [are] Governed by a Rigorous Process with Reporting Integrity," and stated that its resource base assessments are "aligned with" the

**App.69**

Petroleum Resources Management System (PRMS), the common industry standard for evaluating reserves and resources.

204.    PRMS states that all reserves and resource assessments "require application of a consistent set of forecast conditions, including assumed future costs and prices."  PRMS guidelines further specify that such assessments "shall reflect," *inter alia*, "[t]he estimated costs associated with the project . . . including environmental . . . costs charged to the project, based on the [company's] view of the costs expected to apply in future periods."  Likewise, PRMS states that "[r]esources evaluations are based on estimates of future production and the associated cash flow schedules."

205.    Exxon repeatedly described its proxy costs as reflecting the company's view of the climate-related regulatory costs it expects to incur in the future.  Such costs fall squarely within the consistency requirements of the PRMS guidelines.  Exxon's representations that its resource base assessments were aligned with the PRMS guidelines are representations that the publicly disclosed proxy costs were incorporated into those estimates.

### 3.    Exxon's Representations Were Inconsistent with Its Actual Practices

#### a)    Exxon Did Not Apply the Publicly Represented Proxy Cost to Company Reserves and Resource Base Assessments for Oil Sands Assets in Alberta

206.    Exxon did not apply its publicly represented proxy costs in the cost projections associated with its company reserves assessments for its Alberta oil sands assets.  Rather, as with its investment decision-making, Exxon applied far lower existing legislated costs, held those costs flat into the future, and applied those costs to only a small percentage of emissions pursuant to existing legislation.  This is a far cry from the higher, rising proxy costs that Exxon described

**App.70**

in its representations to investors. Accordingly, the company's representations were materially false and misleading.

207. On October 5, 2015, Exxon management instructed an Imperial planner tasked with evaluating company reserves to assume based on existing legislation that only 20% of GHG emissions would be taxed, and to "hold flat" that assumption indefinitely into the future.

208. In response, the planner expressed frustration, stating that "[t]he basis provided is different from the pricing/guidance at CP15 [2015 Corporate Plan]; Meaning, on this basis, our GHG costs are misaligned," and that the costs "need to be accurate & aligned . . . for our economics to be accurate." He then asked a colleague: "Just between ourselves ........ Why is it necessary to deviate from CP15 [2015 Corporate Plan] GHG assumptions?"

209. Rather than correcting this deviation, Exxon management decided, as described in an October 8, 2015 internal email, to "go 'full legislated' (legislated price of carbon, legislated intensity)." Thus, for purposes of evaluating company reserves, Exxon assumed that no new costs associated with GHG emissions would be imposed in Alberta, and (with respect to "intensity") that only 20% of GHG emissions would be taxed, indefinitely into the future.

210. Additionally, a November 2015 internal presentation concerning the Kearl oil sands asset states that, for company reserves assessments, Exxon was applying proxy costs that were "reflective of current Alberta legislation (not corporate guidance)." According to an internal company analysis, this resulted in an application of projected GHG-related costs at Kearl of approximately $0.25 USD per barrel rather than $4 USD per barrel, a difference of nearly 94%.

211. Exxon's employees observed significant economic impacts on company reserves and resource base volumes as a result of being instructed to use lower costs than the publicly

**App.71**

represented proxy cost.  For example, an internal meeting invitation from August 2016 concerning company reserves assessments in Alberta states:  "Last year, after initial guidance to use the EM [Exxon] corporate forecast (despite warnings it would result in **large write-downs**) we had to redo our calculations using legislated GHG taxes."  (Emphasis added.)

212.    Exxon's decision not to apply the publicly represented proxy costs to its company reserves assessments, and instead to apply existing legislated costs, also had a particularly significant impact on its multibillion dollar Cold Lake oil sands asset in Alberta.

213.    In September 2015, an Imperial employee observed internally that applying the publicly represented proxy cost to evaluate company reserves at Cold Lake would "result in enough additional opex [operating expense] to shorten asset life and reduce gross reserves." According to the company's analysis, applying the publicly represented proxy costs would have reduced Cold Lake's asset life by 28 years and reduced company reserves by more than 300 million barrels of oil equivalent.  The projected reduction in reserves would have reduced the company's revenues by billions of dollars.

214.    An internal review confirmed that it was the "GHG tax price forecast" that "drives the reduced cash flow that shortens end of life" at Cold Lake.

215.    As a result of these forecasts, Exxon's corporate planning department decided that a proxy cost should not be applied in assessing company reserves at Cold Lake.  Instead, according to an October 2015 email by an Exxon reserves coordinator, corporate planning decided that existing Alberta "legislated price and intensity" (*i.e.*, the percentage of emissions to which the price is applied) should be used, which "reduce[d] the EOFL [end of field life] impact significantly."  By not applying the publicly represented proxy costs, Exxon projected that it would be profitable for the company to continue producing at Cold Lake for a significantly

**App.72**

longer period of time, which led the company to report inflated company reserves and resource base figures.

216.    Exxon reserves personnel were well aware, as an October 2015 internal meeting invitation made clear, that proxy cost assumptions have "significant reserves implications." Further, Exxon management was frequently briefed concerning company reserves assessments, including for assets where proxy costs had a significant impact.  Nonetheless, Exxon chose not to apply its publicly represented proxy costs to its company reserves and resource base assessments for its oil sands assets in Alberta, thereby rendering its representations to investors false and misleading.

**b)    Before 2016, Exxon Generally Did Not Apply a Proxy Cost to Company Reserves and Resource Base Assessments**

217.    Before 2016, Exxon generally did not apply proxy costs to its GHG emissions for purposes of assessing its company reserves and resource base in many countries throughout the world.  Indeed, until mid-2016, Exxon planners did not develop a methodology for applying proxy costs to GHG emissions for purposes of those estimates.

218.    On July 20, 2016, Exxon's Deepwater Supervisor of Upstream Development Planning suggested to colleagues that they "start thinking about how to incorporate [the new 2016 Corporate Plan proxy costs] into our modeling on a more permanent basis including for Reserves."  The next day, the same supervisor noted that a "methodology" for incorporating these costs into reserves assessments would be determined at an August 2016 meeting.

219.    A Senior Upstream Advisor's notes from a December 2016 meeting state that company reserves calculations and asset recoverability (*i.e.*, impairment evaluations, discussed below) were two areas with "unintended consequences" resulting from the proxy cost guidance in the 2016 Corporate Plan.

**App.73**

220.    Exxon's decision not to incorporate its publicly represented proxy cost into its company reserves and resource base assessments for many countries before mid-2016 rendered its representations relating to proxy costs and to company reserves and resource base assessments false and misleading.

### 4.    Exxon's Decision Not to Apply a Proxy Cost to Company Reserves and Resource Base Assessments Is Material to Investors

221.    An oil and gas company's non-proved reserves and resource base represent its sources of future growth.  Exxon's reserves and resource base size are thus highly important to investors, and the company often publicizes its ability to exploit its large oil and gas resource base.  For example, at a 2015 meeting with equity research analysts in New York City, then-CEO Rex Tillerson stated:

> The lifeblood of our business relies upon capturing the highest quality resources. . . . These resource captures add to our high-quality 92 billion oil-equivalent barrel resource base, which is the largest and most diverse resource base in the industry. . . . Simply put, our large resource base affords us the flexibility to select and develop the most attractive opportunities.

222.    Similarly, Rex Tillerson described Exxon's "enormously large resource base" as a prerequisite to the company's "selective investment process," which he frequently touted to investors.

223.    Exxon failed to disclose to investors that, in estimating the reserves and resource base volumes that are the "lifeblood" of the company, it decided not to apply the proxy costs that it publicly represented.  Further, Exxon did not disclose that it was choosing to exclude such proxy costs just when they would have had particularly consequential effects, such as "large write-downs" or "significantly" reducing an asset's projected production life.  This information

**App.74**

would have been highly significant to investors from the perspectives of both climate change regulatory risk and the status of Exxon's resource base more generally.

224.    Additionally, company reserves estimates are inputs that feed into Exxon's impairment assessments, which are discussed below.  Exxon's decision not to include its publicly represented proxy cost in its company reserves assessments therefore caused Exxon to utilize assumptions for impairment evaluation purposes that were inconsistent with its public representations.

### C.    Exxon's Misrepresentations Regarding Its Use of a Proxy Cost in Evaluations for Impairment of Long-Lived Assets

225.    Exxon flouted its representations to investors, as well as applicable accounting standards, by failing to apply proxy cost assumptions in its impairment evaluations that were consistent with the assumptions described in its public statements.

### 1.    Impairment Evaluation Process

226.    An impairment evaluation is the process mandated by accounting rules for determining whether the value of an asset is less than the value listed on a company's balance sheet.  Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 360 governs accounting for the impairment (*i.e.*, "write-down") of long-lived assets[7] under U.S. Generally Accepted Accounting Principles ("GAAP").  GAAP are accounting standards that companies reporting their financial results in the United States must follow.

---

[7] A long-lived asset is an asset that a company expects to retain for at least one year.  Included within long-lived assets are a company's property, plant, and equipment, *i.e.*, its tangible property, which includes oil and gas-related assets.  Both an impairment of a long-lived asset and a reduction in estimated reserves volumes can be referred to as a "write-down."

**App.75**

227.    ASC 360 sets out a three-step process for identifying and measuring the impairment of long-lived assets.

228.    First, a company must assess whether indicators of potential impairment are present.  Examples of such indicators, also known as "impairment triggers," include (i) a "current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset"; (ii) a "significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset . . . including an adverse action or assessment by a regulator"; and (iii) an "accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of a long-lived asset."  Exxon has repeatedly represented to investors that it follows this accounting rule by "perform[ing] asset valuation analyses on an ongoing basis as a part of its asset management program" to determine whether impairment triggers are present.

229.    Second, if one or more impairment triggers are present, a company must test the asset in question by comparing its "carrying value" as set forth on the company's balance sheet, and included within the "property, plant and equipment" portion of its financial statements, with the sum of the undiscounted future cash flows expected to result from the asset's use and disposition.  If the sum of undiscounted future cash flows is less than the asset's carrying value, then that carrying value is not considered to be recoverable, and an impairment loss must be recognized and reported.  Exxon has represented in its public filings that it has complied with its obligations under this accounting requirement.

230.    To the extent that an impairment trigger is identified based on an analysis of an asset's projected future cash flows (see ¶ 228 above), the same cash flow analysis is used to

**App.76**

determine whether the sum of undiscounted future cash flows is less than the asset's carrying value.

231.    Third, if the sum of undiscounted future cash flows is less than a long-lived asset's carrying value, then a company must recognize and report an impairment loss equal to the difference between the carrying value and the fair value of the asset.[8]    Exxon has represented to investors that it has complied with its obligations under this accounting requirement.

232.    In developing future cash flow estimates to determine whether an impairment trigger exists or whether the carrying amount of an asset is recoverable, accounting standards state that a company "shall incorporate [its] own assumptions . . . and shall consider all available evidence."    According to the accounting standards, "[t]he assumptions used in developing those estimates shall be reasonable in relation to the assumptions used in developing other information used by the [company] for comparable periods, such as internal budgets and projections, accruals related to incentive compensation plans, or information communicated to others."    By contrast, if an asset is impaired, then the magnitude of the impairment is measured using fair value, which incorporates marketplace assumptions that may be different from the company's own assumptions.

### 2.    Exxon's Representations

233.    Exxon repeatedly represented that it follows GAAP accounting standards in preparing its public filings.    Exxon specifically represented that it follows the accounting rules relating to impairment of long-lived assets set out in ASC 360.

---

[8] Fair value is based on market prices if an active market exists for the asset, and is otherwise based on a discounted cash flow analysis.

**App.77**

234.    Exxon also repeatedly represented to investors that it uses cost assumptions for impairment evaluations that are "consistent" with those it uses in its annual planning and budgeting process and in investment decisions.  For example, in its 2015 Form 10-K, Exxon stated:  "Cash flows used in impairment evaluations . . . make use of the Corporation's price, margin, volume, and cost assumptions developed in the annual planning and budgeting process, and are consistent with the criteria management uses to evaluate investment opportunities."  Exxon made essentially the same representation the following year in its 2016 Form 10-K.

235.    Exxon's assumptions concerning a proxy cost of GHG emissions are a quintessential "cost assumption" of the kind that Exxon represented it would apply in its impairment evaluations in a manner consistent with its investment decision-making criteria, planning and budgeting process, and public communications.

236.    As set forth below, Exxon failed to act in a manner consistent with these representations or with GAAP requirements.

### 3.    Exxon's Representations Were Inconsistent with Its Actual Practices

237.    Exxon's senior management has expressed general opposition to taking impairments.  For example, Exxon's then-CEO Rex Tillerson stated in an August 2015 interview:

> We don't do write-downs.  I mean, if you look at our history, we do not write investments down.  And we follow the accounting standards.  But a lot of other people are very quick to want to write investments down because then it kind of improves things going forward. . . . [W]e're not going to bail you out by writing that down.  That's kind of the message to our organization, and they all understand that.

238.    Exxon management's reluctance to take impairments is also illustrated by a March 2014 email in which Exxon's Vice President for Investor Relations recommended that a

**App.78**

footnote concerning asset impairment be removed from the company's *Managing the Risks* report (as indeed it was) because "[t]hat word gives the folks on the third floor heartburn." The "third floor" is a reference to Exxon's executive suite.

239.    It was in this context of senior management's general opposition to taking impairments that Exxon deviated from its representations in the following ways.

                **a)**        **Prior to 2016, Exxon Misled Investors by Not Incorporating Proxy Costs into Cost Projections for Impairment Evaluations**

240.    Contrary to its representations to investors, Exxon did not incorporate a proxy cost of GHG emissions in making cost projections for purposes of its impairment evaluations for any of its assets prior to its year-end 2016 evaluation. In particular, Exxon did not incorporate such costs in determining whether impairment triggers related to future cash flows existed, or whether the carrying value of its assets was recoverable.

241.    This was no oversight. Exxon's Assistant Controller testified that he was aware in 2015 that the cost projections in Exxon's impairment evaluations did not incorporate a proxy cost of GHG emissions.

242.    Exxon's knowing failure to apply a proxy cost to its projected GHG emissions in its impairment evaluations made its representations materially misleading. By using cost assumptions for its impairment evaluations that differed from, and were more favorable than, those it used for other business purposes and stated in its public communications, Exxon misled investors concerning the value of its assets.

**App.79**

b)  **In 2016, Exxon Misled Investors by Incorporating Proxy Costs into Cost Projections for Impairment Evaluations in a Limited, Internally Inconsistent Manner**

243.    In its 2016 year-end impairment evaluations, Exxon incorporated a proxy cost of GHG emissions into some of its cost projections for the first time, but even then did so in a limited and internally inconsistent manner that rendered its impairment-related representations materially misleading.

244.    First, Exxon applied existing, legislated costs associated with GHG emissions in conducting impairment evaluations for oil sands assets in Alberta rather than the proxy costs set out in its public statements and internal guidance.  Exxon thus assumed that existing costs would remain flat indefinitely into the future rather than applying a proxy cost.  As set forth above, this practice was contrary to Exxon's representations.

245.    Second, Exxon assumed for purposes of its year-end 2016 impairment evaluations that any proxy cost of GHG emissions associated with natural gas production would be fully recovered in the market and passed through to customers via higher prices.  As discussed above at ¶ 184, this means that Exxon was assuming that it would bear no costs resulting from the GHG emissions caused by its natural gas production, and that such emissions would have no effect on the value of its assets.  This rendered misleading the company's representations that it applied assumptions in its impairment evaluations that were consistent with its business processes and public communications, such as its statements concerning the "consistent" application of a proxy cost of GHG emissions.

246.    Exxon also applied this pass-through assumption in an internally inconsistent manner, as discussed above at ¶¶ 185-90.  Exxon did not incorporate its pass-through assumption into its natural gas demand or price projections in 2016, even though recovery in the market depends on raising prices, meaning that Exxon effectively assumed that its proxy cost would

**App.80**

simply disappear.  Moreover, Exxon assumed in 2016 that it would be able to pass through to its customers all of its GHG-related costs at its older, more GHG-intensive assets, even though passing through those assets' high GHG-related costs would render Exxon's product uncompetitive on the market.  Exxon recognized internally in 2017 that it would not be able to fully pass through GHG-related costs at those older assets, but never disclosed that it had applied an unrealistic pass-through assumption in 2016.

247.    Additionally, Exxon's purported justification for its pass-through assumption was based on conditions in North America, not conditions in other regions, yet Exxon nonetheless applied its pass-through assumption for natural gas assets outside of North America in its 2016 impairment assessments.

248.    Third, for its XTO natural gas assets, Exxon assumed in calculating proxy costs for impairment evaluation purposes that GHG emissions would decrease every year going forward.  To the extent that such reductions occur, they would likely require upfront costs, such as the cost of purchasing and installing more efficient equipment.  However, Exxon did not incorporate costs associated with achieving those GHG emissions reductions into its impairment evaluations for many of those assets.  Exxon thus assumed, without justification, that the costs associated with its GHG emissions would decline significantly over time without any upfront expenditures by Exxon.

249.    These undisclosed practices limited Exxon's application of a proxy cost of GHG emissions to the cost projections associated with its impairment evaluations in 2016.  In doing so, they rendered misleading Exxon's representations that it followed the impairment-related accounting standards and applied assumptions to its impairment evaluations that were consistent

**App.81**

with those set out in the company's public communications and applied for other business purposes.

### 4. Exxon's Impairment-Related Misrepresentations Are Material to Investors

250. Exxon's decision not to apply a proxy cost in its impairment analysis before 2016, and its decision to apply those costs in only a very limited manner in 2016, were particularly significant in light of the company's economic position. As oil and gas prices plunged in 2014 and 2015, Exxon took no price-related impairments, even as other major oil and gas companies did so. Indeed, Exxon stated publicly that it "does not view temporarily low prices or margins as a trigger event for conducting impairment tests." With oil and gas prices at low levels, Exxon relied on long-term cash flow models to forecast that certain of its assets, even if losing money currently and in the short-term, would ultimately generate cash flows that exceed their carrying values, and thus were not impaired or did not exhibit triggers for impairment evaluation.

251. Meanwhile, Exxon publicly represented that its proxy cost of GHG emissions rises over time, and assured investors that it was "confident that none of [its] hydrocarbon reserves are now or will become 'stranded'" and that "the company does not believe current investments in new reserves are exposed to the risk of stranded assets."

252. Exxon failed to disclose to investors that, despite this optimistic assessment, it did not even apply a proxy cost – the very mechanism the company purportedly used to manage climate change regulatory risk – to its GHG emissions in its impairment evaluations.

253. Exxon thus used long-term projections of profit to downplay short-term losses for impairment evaluation purposes. But it omitted from those long-term projections the proxy cost of GHG emissions that it had repeatedly touted to investors, all the while misleadingly assuring

**App.82**

Case 3:16-cv-03111-K   Document 121   Filed 07/31/20   Page 88 of 544   PageID 4340

investors that its assets were not at risk of being stranded due to rising costs associated with GHG emissions.

254.    Had Exxon applied its proxy cost of GHG emissions to the cost projections associated with its impairment evaluations in 2015 as it had represented, at least one of Exxon's major upstream assets in the United States would have been subject to a significant impairment.

255.    Moreover, according to Exxon's own analysis, if the company had not applied a pass-through assumption to the projected GHG emissions associated with natural gas production for its impairment evaluations in 2016, that same major U.S. asset would have been subject to a significant impairment (if it were not impaired in 2015).  In fact, this asset would have been subject to a significant impairment in 2016 even if Exxon had assumed that only half of the proxy cost of GHG emissions associated with natural gas production at that site could be passed through to consumers.

256.    Additionally, an analysis by Exxon indicates that, had the company not assumed that it would be able to pass through proxy costs to consumers by raising natural gas prices outside of North America, at least one of Exxon's major European upstream assets would have been impaired in 2016.

257.    Exxon's impairment practices are critical to an investor's understanding of the company's financial picture and attendant risks.  The materiality of Exxon's impairment practices is underscored by Exxon management's emphasis on the significance of the company's relative lack of write-downs.  For example, at a March 2016 meeting with equity research analysts in New York, then-CEO Tillerson distinguished Exxon from its competitors by stating that "[t]he quality of ExxonMobil's portfolio is also evident relative to significant, recent asset impairments by our competitor group."  Investors' understanding of the quality of Exxon's

**App.83**

portfolio was undermined by the company's misleading representations concerning its impairment evaluations.

### D.   Exxon's Representations About Its Consistent Application of Proxy Costs Were False and Misleading

258.    Exxon management also failed to implement internal controls or processes to ensure consistent application of proxy costs.

259.    As a result of this failure, Exxon's claims that it used a "consistent corporate planning basis" in applying its proxy cost to its investment decisions, business planning, and financial reporting, and that it "rigorously consider[ed] the risk of climate change in [its] planning bases and investments," were false and misleading.

260.    In effect, Exxon erected a Potemkin village to ward off investor proposals and inquiries about climate change regulatory risk.  The yearly *Outlook for Energy* reports, the 2014 *Managing the Risks* and *Energy and Climate* reports, and other publications presented a carefully constructed and rosy picture of Exxon's use of the publicly represented proxy cost to manage the economic risk posed by climate change.  But investors were never told that, for years, Exxon (i) repeatedly and deliberately chose not to incorporate such costs at all, or did so only to a limited extent, and (ii) did not monitor whether those costs were actually applied consistently throughout the company.

261.    The Exxon managers who had responsibility for GHG-related issues failed to ensure that the publicly represented proxy costs were consistently used in the company's investment decision-making, business planning, or financial reporting.

262.    For example, Exxon's Manager of Environmental Policy and Planning testified that he was unaware of anyone in the company who verified that costs associated with GHG emissions were actually applied by the business units.

**App.84**

263.    Likewise, Exxon's GHG Manager testified that he did not review cash flow models to ensure that costs associated with GHG emissions were properly incorporated.

264.    As a result of Exxon's failure to implement a process that matched its representations to investors, Exxon's publicly represented proxy costs were not consistently or rigorously applied, and were often not applied at all, in the company's business processes.

## III.    EXXON'S FRAUD REGARDING ITS USE OF A PROXY COST IN ITS DEMAND AND PRICE PROJECTIONS

265.    Exxon also did not apply a proxy cost of GHG emissions as represented in projecting oil and gas demand, oil and gas prices, or the company's revenues.

### A.    Exxon's Representations

266.    As set forth above, in its *Outlook for Energy* reports and other public statements, Exxon described its purported adoption of a rising proxy cost of GHG emissions as a means of incorporating its expectation of increasingly stringent climate regulations into the company's investment decisions, business planning, and financial reporting.

267.    One aspect of Exxon's business decisions, planning, and reporting is the projection of its revenues, which are influenced by the company's expectations as to future oil and gas prices. Because future climate policies may influence demand for oil and gas, which affects oil and gas prices, Exxon represented that it applied a proxy cost of GHG emissions in estimating demand, just as it represented that it applied a proxy cost in projecting its own costs. For example, at a 2015 meeting held at the New York Stock Exchange, then-CEO Rex Tillerson told research analysts that the company's "demand projections anticipate government policies will impose rising costs on carbon dioxide emissions."

**App.85**

268.    Exxon represented that it applied proxy costs in estimating demand for oil and gas in all significant economic sectors, and that proxy costs were incorporated into the company's project economics.

269.    However, Exxon's application of proxy costs to its demand, price, and revenue projections deviated from the company's representations in two important ways.  First, contrary to its representations, Exxon did not apply its proxy cost in estimating demand in the transportation sector.  Second, the projected oil and gas prices that Exxon applied in its economic models were set with little reference to the company's demand analysis.  As a result, Exxon's publicly represented proxy costs did not meaningfully influence its revenue projections, rendering the company's proxy cost-related representations misleading.

**B.    Exxon's Failure to Apply Its Proxy Cost in Projecting Demand in the Transportation Sector**

270.    Exxon has made numerous representations that it applied its proxy cost broadly across relevant economic sectors, including the transportation sector.

271.    For example, in its 2014 *Managing the Risks* report, Exxon stated that its proxy cost "seeks to reflect all types of actions and policies that governments may take over the Outlook period relating to the exploration, development, production, transportation or use of carbon-based fuels."

272.    Exxon made the same or similar statements about the broad scope of its application of a proxy cost in numerous publications, including its 2014, 2015 and 2016 responses to CDP, its 2015 Corporate Citizenship Report, and its 2016 proxy statement to shareholders.

273.    Likewise, in its 2013 *Outlook for Energy*, after describing its proxy cost, Exxon explained that "rising $CO_2$ costs will have a variety of impacts on . . . energy use in *every sector*

**App.86**

and region within any given country." (Emphasis added.) In that report, Exxon projected that energy demand will increase over the coming decades, and that this includes "[g]rowth in transportation sector demand."

274.    In practice, Exxon did not apply the publicly represented proxy cost to the transportation sector in projecting demand for oil and gas.[9] In May 2011, Exxon's Senior Energy Advisor explained internally that the company's proxy cost for future regulations was factored into demand projections only for "non-transport sectors." By failing to apply its proxy cost in the transportation sector as represented, Exxon overestimated demand for its products, because applying a cost of GHG emissions would have suppressed future demand for oil and gas. (*See* ¶ 186 above.)

275.    The transportation sector is important to Exxon's overall business. Exxon projects that oil, which accounts for roughly half of the company's reserves and resource base, will remain the world's "leading energy source," and that the transportation sector will be a key source of growth in oil demand. For example, in its 2017 Form 10-K, Exxon stated that it expects global demand for liquid fuels to grow by about 20% by 2040, and that it expects about 60% of this growth to derive from the transportation sector. Indeed, the transportation sector accounts for more than half of worldwide demand for crude oil. Despite the importance of the transportation sector to its overall business, Exxon did not apply the publicly represented proxy cost to demand projections in that sector, and never disclosed its failure to do so to investors.

---

[9] Exxon also did not apply the publicly represented proxy cost in projecting demand in the asphalt and lubricants sectors.

**App.87**

C.        **Exxon's Failure to Apply Its Proxy Cost in Projecting Oil and Gas Prices**

276.    Regardless of any limited role that proxy costs may have played in Exxon's oil and gas demand forecasts, that analysis did not meaningfully influence Exxon's oil and gas price projections.

277.    Exxon's representations that it applied a proxy cost of GHG emissions in estimating future demand for oil and gas would have led a reasonable investor to conclude that Exxon's oil and gas price projections also took into account such proxy costs, because demand forecasts would necessarily impact prices.

278.    However, in practice, Exxon did not set its oil and gas price projections, also called its Corporate Plan prices, by means of a formula or other quantitative process that incorporated its demand analysis.  Rather, setting Exxon's Corporate Plan Prices was the responsibility of then-CEO Rex Tillerson, and he did so based primarily on factors independent of the company's demand analysis.

279.    In a 2013 memorandum, the outgoing Planning Manager of Corporate Strategic Planning explained to his successor that Mr. Tillerson set price projections for crude oil at a level that would serve as a "signal" to the company:

> Be careful – the Brent price basis is [Tillerson]'s purview. Do not suggest that you know best.  You can make a suggestion or proposal if asked, but be humble about it.  **Rex's decision will be more about the signal that he wants to send the organization than about what we think the market will actually do**. (emphasis added)

280.    The outgoing Planning Manager similarly explained in another transition memorandum:

> Note that Rex [Tillerson] does not like us to suggest a crude price basis – just review the facts and finish the meeting with a reminder of last year's crude price basis and let him decide what he wants to do.

**App.88**

281.   Rex Tillerson's practice of setting oil and gas price projections in order to send a particular signal – rather than setting those projections based on demand projections that incorporated proxy costs – means that any link between Exxon's proxy cost and its actual economic decision-making was severed.

282.   In all of its public statements touting its proxy cost, Exxon never told investors that the proxy cost was disconnected from the company's actual business decisions, which renders those statements materially false and misleading.

283.   The actual oil and gas price projections that were ultimately approved did not meaningfully incorporate Exxon's publicly represented proxy costs.  Exxon's publicly represented proxy costs escalate in real (*i.e.,* pre-inflation) dollars over time.  By contrast, the company's long-term oil and gas price projections in the Corporate Plan plateau in real terms within a few years of the date of the projection.  For example, in its 2014 Corporate Plan, Exxon instructed its planners to assume that oil prices would plateau in 2015 and remain at that level indefinitely into the future.  Similarly, in its 2015 Corporate Plan, Exxon instructed its planners to apply flat oil and gas prices from "2020+" in their economic projections.  By contrast, Exxon's publicly represented proxy cost increased significantly in real terms after 2020, reaching $60 per ton in 2030 and $80 per ton in 2040.

284.   In testimony, Exxon employees have been unable to explain how the fact that the Corporate Plan oil and gas prices plateau in real dollars within a few years of the projection date could be consistent with proxy costs that increase significantly over the coming decades, if the Corporate Plan prices had indeed meaningfully incorporated Exxon's proxy cost.

285.   By failing to apply its proxy cost to demand projections in important sectors, and by failing to meaningfully incorporate such costs into its oil and gas price or revenue projections,

**App.89**

Exxon misled investors about the extent to which the proxy cost it publicly described was incorporated into its business decisions.

## IV. EXXON'S FRAUD REGARDING RISKS TO ITS BUSINESS POSED BY TWO DEGREE SCENARIO

286. In *Managing the Risks*, one of the two reports that Exxon published in March 2014 in response to shareholder concerns about climate risk, Exxon concluded that it was "confident that none of [its] hydrocarbon reserves are now or will become 'stranded,'" and that it "does not believe current investments in new reserves are exposed to the risk of stranded assets."

287. A key basis for this conclusion was Exxon's much-touted application of a proxy cost of GHG emissions, which purportedly ensured that Exxon's investment decisions, business planning, and financial reporting incorporated the company's projections of rising costs associated with GHG emissions due to increasingly stringent climate regulation.

288. A second important basis for Exxon's conclusion that it was not subject to stranded asset risk was an analysis that purportedly showed that governments would not impose the more stringent climate regulations that would be necessary to achieve a "two degree" scenario, and that governments thus would not impose additional regulations beyond those which Exxon claimed it already incorporated into its proxy costs. This analysis, which Exxon set out in *Managing the Risks* and in numerous other representations to investors, was materially misleading.

289. The "two degree" scenario refers to a scenario in which deep cuts in global GHG emissions are achieved to limit the increase in global temperature to below two degrees Celsius above pre-industrial levels. According to the Intergovernmental Panel on Climate Change ("IPCC"), a United Nations organization, the average GHG concentration in the atmosphere

**App.90**

should not exceed 450 parts per million (ppm) to have a likely chance of keeping global warming below two degrees Celsius.  The two degree scenario, also known as the "450 ppm" or "low carbon" scenario, has become an international climate policy goal.

290.    Numerous observers have questioned whether the exploitation of much of the world's existing fossil fuel reserves would be consistent with the two degree scenario.  For example, a November 2011 report by the nonprofit Carbon Tracker Initiative observed that achieving the two degree scenario would require that cumulative future GHG emissions be kept below a certain threshold – in effect, a "global carbon budget."  The emissions from combusting existing fossil fuel reserves, however, would far exceed that budget.  To achieve a two degree scenario, according to Carbon Tracker, only 20% of global reserves of oil, gas, and coal could be used, while the remaining 80% of fossil fuel reserves would be "subject to impairment" and "stranded."  Similarly, the International Energy Agency ("IEA") has concluded that, under a two degree scenario, substantial oil and gas reserves may be stranded.

291.    Exxon's investors have expressed concern that the company's oil and gas reserves are vulnerable to becoming stranded under a two degree scenario.  In the 2014 shareholder resolution that resulted in Exxon's release of its *Managing the Risks* report, the shareholders asked the company to issue a report on its "strategy to address the risk of stranded assets presented by global climate change, including analysis of long and short term financial and operational risks to the company."  As a result, in *Managing the Risks*, Exxon addressed the "concern expressed by some of [its] stakeholders" regarding "whether [] a 'low carbon scenario' could impact ExxonMobil's reserves and operations – *i.e.*, whether this would result in unburnable proved reserves of oil and natural gas."  Exxon made clear that, by "low carbon scenario," it was referring to the two degree scenario.

**App.91**

Case 3:16-cv-03111-K   Document 121   Filed 07/31/20   Page 97 of 544   PageID 4349

292.    Exxon concluded in *Managing the Risks* that a two degree scenario is "highly unlikely" to occur because such a scenario would impose enormous $CO_2$ costs on consumers, and that Exxon therefore does not face a risk of its assets becoming stranded.  This conclusion rested upon a deeply misleading analysis that was purportedly supported by government and academic data, which it was not.

### A.    Exxon's Representations

293.    In support of its conclusion that a two degree scenario would impose enormous costs on consumers, Exxon presented the following graphic in its *Managing the Risks* report:



**App.92**

294.     The left section of this graphic sets out three pathways for dollars per ton of $CO_2$ costs over the years 2020 through 2100.  According to the report, these pathways were "representative of scenarios with assumed climate policies that stabilize GHGs in the atmosphere at various levels, from 650 ppm CO2 down to 450 ppm CO2, a level approximating the level asserted to have a reasonable chance at meeting the 'low carbon scenario.'"

295.     The report then stated:  "In the right section of the [graphic], different levels of added CO2 are converted to estimated added annual energy costs for an average American family earning the median income. For example, by 2030 for the 450ppm CO2 stabilization pathway, the average American household would face an added CO2 cost of almost $2,350 per year for energy, amounting to about 5% of total before-tax median income. These costs would need to escalate steeply over time, and be more than double the 2030 level by mid-century."

296.     The horizontal lines representing dollars per ton of $CO_2$ on the left side of the graphic align with the columns on the right side projecting $CO_2$ cost impacts for the average American household.  For example, according to the graphic, under the two degree (450 ppm) scenario, the cost of $CO_2$ would rise to $1,000 per ton by 2090.  According to the graphic, this corresponds to increased yearly energy costs of $22,400, or 44% of median pre-tax income.

297.     Exxon asserted that the three "pathways" in this graphic were taken from the Massachusetts Institute of Technology's Integrated Global Systems Model ("MIT IGSM model") used in the 2007 U.S. Climate Change Science Program study ("2007 U.S. Report"),[10] and that the household cost analysis was "[b]ased on data from" three government agencies: the U.S. Energy Information Administration, the EPA, and the U.S. Census Bureau.

---

[10] The MIT IGSM model was one of three models presented in the 2007 U.S. Report, and it projected higher carbon prices under the two degree scenario than either of the other models.

**App.93**

**B.** **Exxon's Representations Were Misleading Because They Were Based on Assumptions Exxon Knew Were Unsupported and Unreasonable**

298.    Exxon's analysis of the $CO_2$ costs likely to result from a two degree scenario relied on unreasonable and undisclosed assumptions that resulted in a gross overstatement of projected costs under such a scenario.  Further, Exxon falsely implied that its analysis was supported by reputable academic and government sources, which it was not.

299.    First, Exxon's analysis assumed that American household energy use, the U.S. energy mix (*i.e.*, sources of energy), and attendant GHG emissions would remain at the same level through 2100, even if governments imposed climate policies sufficient to achieve a two degree scenario.  This assumption, which is not supported by any of the sources upon which Exxon purported to rely, is completely unreasonable.  The very point of climate regulation intended to achieve a two degree scenario is to reduce GHG emissions, which involves a reduction in energy consumption and a shift to cleaner sources of energy, such as renewables. Indeed, all three of the climate models presented in the 2007 U.S. Report, including the MIT IGSM model upon which Exxon purportedly relied, found that reductions in energy consumption "play an important role in all of the stabilization scenarios," along with displacement by renewables.  Yet Exxon, having determined that certain carbon costs would be necessary to achieve a two degree scenario, made the further undisclosed assumption that imposing those costs would not actually result in a two degree scenario after all, but that households would instead continue to consume energy and emit GHGs at exactly the same rate as before.  Because this scenario would require consumers to pay extremely high energy costs, reaching nearly half of median pre-tax income by 2090, Exxon concluded that governments would not impose regulations consistent with a two degree scenario in the first place.

**App.94**

300.    Second, in calculating the percentage of median pre-tax income that would be consumed by these energy cost projections, Exxon made the undisclosed assumption that American household income would remain the same through 2100 as it was in 2013. None of the data sources cited by Exxon projected that American household income would remain flat through 2100, and such an assumption is at odds with Exxon's projections of robust GDP growth elsewhere in *Managing the Risks*, as well as GDP growth projections in the MIT IGSM model.

301.    Third, in projecting carbon costs under a two degree scenario, Exxon made the undisclosed assumption that the revenues associated with carbon taxes would simply disappear, and would not be returned to American households in any fashion, such as through cuts to other taxes or improvements in government services. Yet elsewhere in *Managing the Risks*, Exxon recognized that the revenues associated with carbon taxes would not disappear, and proposed that carbon taxes should be "revenue-neutral" (*i.e.*, should be offset by reducing other taxes). Indeed, Exxon was aware of MIT research which it summarized internally as follows: "consumers may also *benefit* from a carbon tax policy, depending upon how the government redistributes revenues from carbon taxes or allowance auctions."

302.    By listing the MIT IGSM model as a source, Exxon implied that its estimates of additional $CO_2$ costs for average American households were consistent with that model. This was not true. While the carbon price projections on the left side of the graphic were derived from MIT's IGSM model, the household carbon cost projections on the right side of the graphic were calculated by Exxon. These cost projections were inconsistent with the MIT IGSM model in that they overstated projected costs by assuming no reduction in energy use or GHG emissions under a two degree scenario, and by assuming no growth in American household income through

**App.95**

2100. Exxon's projections were also inconsistent with other MIT research known to Exxon concerning the use of carbon tax revenue.

303.    Following the release of the *Managing the Risks* report, an MIT economist who worked on the IGSM model warned Exxon that its statements as to $CO_2$ cost impacts on the average American household under a two degree scenario were misleading.  Specifically, in July 2015, the MIT economist wrote to Exxon to discuss "the cost of climate policy in your shareholders report attributed to the IGSM results."  The MIT economist told Exxon that these numbers were "not numbers we report in that study" and "were extremely high," "especially the 40+%" figure for the percentage of pre-tax median income projected to be consumed by energy costs under the two degree scenario.  The MIT economist advised Exxon that, if this figure represented undiscounted costs as a percentage of income (as it does), then the analysis that Exxon presented was "misleading" in that it overstated the costs associated with a two degree scenario.

304.    Ignoring this warning as to the misleading nature of the graphic, Exxon continued to feature *Managing the Risks* on its corporate website, and its representatives continued to make numerous presentations to investors and other interested parties through at least June 2016 that included this misleading graphic.

305.    For example, in November 2015, Exxon's Manager of Environmental Policy and Planning gave presentations which included this graphic.  His talking points concluded that Exxon did not consider the 450 ppm scenario to be a "realistic, meaningful or practical case on which to plan our business," and that "MIT economists agree."  Those talking points also stated: "[a]t $200/ton, we are talking over $4,000 per year added cost, or nearly 10% of median income."  This purportedly direct connection between the carbon costs described on the left side

**App.96**

Case 3:16-cv-03111-K    Document 121    Filed 07/31/20    Page 102 of 544    PageID 4354

of the graphic and the effects on household income on the right side was misleading for the reasons described above.

306.    Exxon's investors paid close attention to the company's statements on this issue. For example, in a 2015 analysis of Exxon's climate-related risks, Bank of America Merrill Lynch took note of Exxon's view that a two degree scenario is "highly unlikely" and "would require $CO_2$ prices to rise above $200 per ton by 2050."

307.    Likewise, in a 2016 internal analysis of Exxon's climate change risks, Vanguard stated that although Exxon's portfolio does not appear to be "structured to withstand" a two degree scenario, Exxon's analysis concluded that such a scenario is unlikely.

308.    Having concluded that a two degree scenario is unlikely to occur, Exxon failed to conduct any meaningful analysis of the company's exposure to economic stranding in such a scenario, including, for example, whether the company's reserves would be cost competitive to develop and produce, as compared to competitors' reserves.

## V.    EXXON'S FRAUD CAUSED SIGNIFICANT HARM

309.    Investors in Exxon's equity and debt securities were harmed, and are still being harmed, as a result of Exxon's false and misleading statements and omissions of material fact.

310.    Exxon did not incorporate climate change regulatory risk into its business processes in the manner it represented to investors.  This failure resulted in the company having a materially different risk profile than it would have had if it had actually incorporated climate change regulatory risk into its business in the manner it represented to investors.

311.    In particular, Exxon's investments and asset valuations were, and remain, riskier than investors were led to believe, because the company did not apply the publicly represented proxy cost to its investment decisions, business planning, company reserves and resource base

**App.97**

assessments, impairment evaluations, and demand and price projections in a manner consistent with its representations.

312. Further, Exxon faced and continues to face greater risk associated with a two degree scenario than it represented to investors.

313. As a result, Exxon's securities are overvalued, and investors purchased or held Exxon securities at artificially inflated prices.

314. Exxon's failure to abide by its representations has also had the effect of moving the company's investments toward more GHG-intensive assets, and away from emissions-reducing investments. As a result, Exxon has brought and will bring more GHG-intensive oil and gas to market, such as its GHG-intensive oil sands assets, than it would have if it had abided by its representations. This trend is borne out by the increasing GHG intensity of Exxon's upstream assets over the past decade. In addition to having negative environmental consequences, the increased GHG intensity of Exxon's assets exposes the company to greater risk from climate change regulation than Exxon represented to investors.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
(Martin Act Securities Fraud – General Business Law §§ 352 *et seq.*)

315. The State repeats and re-alleges the paragraphs above as if fully stated herein.

316. Exxon's acts and practices alleged herein, including the company's misrepresentations and omissions concerning (i) its use of proxy costs in its cost projections, including in investment decision-making, business planning, oil and gas reserves and resource base assessments, and impairment evaluations; (ii) its consistent application of proxy costs; (iii) its use of proxy costs in its demand and price projections; and (iv) the risks to its business posed

**App.98**

by a two degree scenario, violated General Business Law §§ 352 *et seq.*, insofar as such acts,

practices, misstatements, and omissions employed deception, misrepresentations, concealment,

suppression, fraud, false pretenses, and false promises, and employed devices, schemes, and

artifices to defraud, regarding the issuance, distribution, exchange, sale, negotiation, or purchase

of securities within or from this state.

## SECOND CAUSE OF ACTION
(Persistent Fraud and Illegality – Executive Law § 63(12))

317.    The State repeats and re-alleges the paragraphs above as if fully stated herein.

318.    Exxon's acts and practices alleged herein, including the company's

misrepresentations and omissions concerning (i) its use of proxy costs in its cost projections,

including in investment decision-making, business planning, oil and gas reserves and resource

base assessments, and impairment evaluations; (ii) its consistent application of proxy costs; (iii)

its use of proxy costs in its demand and price projections; and (iv) the risks to its business posed

by a two degree scenario, violate § 63(12) of the Executive Law, in that Exxon engaged in

repeated fraudulent or illegal acts or otherwise demonstrated persistent fraud or illegality, and

repeatedly violated the Martin Act in the carrying on, conducting, or transaction of business

within New York.

319.    Exxon's repeated fraudulent acts and persistent fraud include devices, schemes,

and artifices to defraud, and deception, misrepresentations, concealment, suppression, false

pretenses, and false promises.

## THIRD CAUSE OF ACTION
(Actual Fraud)

320.    The State repeats and re-alleges the paragraphs above as if fully stated herein.

**App.99**

321.    As alleged herein, Exxon made material misrepresentations and omitted to disclose material facts concerning (i) its use of proxy costs in its cost projections, including in investment decision-making, business planning, oil and gas reserves and resource base assessments, and impairment evaluations; (ii) its consistent application of proxy costs; (iii) its use of proxy costs in its demand and price projections; and (iv) the risks to its business posed by a two degree scenario.

322.    As alleged herein, Exxon made those misrepresentations and omitted to disclose material facts intentionally, knowingly, or recklessly.

323.    Upon information and belief, investors did in fact rely on Exxon's misrepresentations and omissions in making investment decisions and such reliance was justifiable and reasonable.

324.    Those misrepresentations and omissions of material facts as alleged herein constitute actual fraud under New York common law.

325.    Exxon's investors suffered damages in connection with purchasing and retaining securities that were the direct and proximate result of Exxon's fraud.

**FOURTH CAUSE OF ACTION**
(Equitable Fraud)

326.    The State repeats and re-alleges the paragraphs above as if fully stated herein.

327.    As alleged herein, Exxon made material misrepresentations and omitted to disclose material facts concerning (i) its use of proxy costs in its cost projections, including in investment decision-making, business planning, oil and gas reserves and resource base assessments, and impairment evaluations; (ii) its consistent application of proxy costs; (iii) its use of proxy costs in its demand and price projections; and (iv) the risks to its business posed by a two degree scenario.

**App.100**

328.    Upon information and belief, investors did in fact rely on Exxon's misrepresentations and omissions in making investment and other business decisions and such reliance was justifiable and reasonable.

329.    Those misrepresentations and omissions of material facts as alleged herein constitute equitable fraud under New York common law.

## PRAYER FOR RELIEF

WHEREFORE, the State requests that this Court grant the following relief:

A.  Enjoining Exxon from engaging in any ongoing and future violations of New York law;

B.  Directing a comprehensive review of Exxon's failure to apply a proxy cost consistent with its representations, and the economic and financial consequences of that failure;

C.  Awarding damages caused, directly or indirectly, by the fraudulent and deceptive acts and repeated fraudulent acts and persistent illegality complained of herein, and applicable pre-judgment interest;

D.  Awarding disgorgement of all amounts obtained in connection with or as a result of the violations of law alleged herein, all moneys obtained in connection with or as a result of the fraud alleged herein, and all amounts by which Exxon has been unjustly enriched in connection with or as a result of the acts, practices, misrepresentations, and omissions alleged herein;

E.  Awarding restitution of all funds obtained from investors in connection with or as a result of the fraudulent and deceptive acts complained of herein;

**App.101**

Case 3:16-cv-03111-K    Document 121    Filed 07/31/20    Page 107 of 544    PageID 4359

F.  Awarding such other and further equitable relief as may be necessary to redress

Exxon's violations of New York law and its fraudulent and deceptive acts complained

of herein;

G.  Awarding the State its costs and fees, including attorneys' fees as provided by law;

and

H.  Granting such other and further relief as may be just and proper.


Dated: October 24, 2018
       New York, New York

                                        BARBARA D. UNDERWOOD
                                        Attorney General of the State of New York


                                        By: _____
                                            Jonathan Zweig
                                            Assistant Attorney General
                                            Investor Protection Bureau
                                            (212) 416-8222
                                            jonathan.zweig@ag.ny.gov


                                        By: _____
                                            Mandy DeRoche
                                            Assistant Attorney General
                                            Environmental Protection Bureau
                                            (212) 416-8446
                                            mandy.deroche@ag.ny.gov

                                            Steven Glassman
                                            Special Counsel
                                            Economic Justice Division

                                            Rita Burghardt McDonough
                                            Assistant Attorney General
                                            Investor Protection Bureau

                                            Matthew Eisenson
                                            Special Assistant Attorney General

90

**App.102**

                                        Benjamin Cole
                                          Project Attorney

                                          Joanna Zwosta
                                          Project Attorney

                                  Office of the Attorney General
                                  28 Liberty Street
                                  New York, New York 10005

                                  *Attorneys for Plaintiff*
                                  *People of the State of New York*

Of Counsel:

Manisha M. Sheth
Executive Deputy Attorney General
Economic Justice Division

Lemuel M. Srolovic
Bureau Chief
Environmental Protection Bureau

**App.103**

# Exhibit 2

Case 3:16-cv-03111-K    Document 121    Filed 07/31/20    Page 110 of 544    PageID 4362

# Zweig Aff.
# Exhibit 1

**App.105**



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

**SUBPOENA FOR PRODUCTION OF DOCUMENTS**
**THE PEOPLE OF THE STATE OF NEW YORK**

TO:    **S. Jack Balagia, Jr.**
**Vice-President and General Counsel**
**Exxon Mobil Corporation**
**Corporate Headquarters**
**5959 Las Colinas Boulevard**
**Irving, Texas 75039-2298**

**WE HEREBY COMMAND YOU**, pursuant to New York State Executive Law Section 63(12) and Section 2302(a) of the New York State Civil Practice Law and Rules, to deliver and turn over to Eric T. Schneiderman, the Attorney General of the State of New York, or a designated Assistant Attorney General, on the **4th day of December, 2015** by 10:00 a.m., or any agreed upon adjourned date or time, at the at the offices of the New York State Office of the Attorney General, 120 Broadway, 26th Floor, New York, New York 10271, all documents and information requested in the attached Schedule in accordance with the instructions and definitions contained therein in connection with an investigation to determine whether an action or proceeding should be instituted with respect to repeated fraud or illegality as set forth in the New York State Executive Law Article 5, Section 63(12), violations of the deceptive acts and practices law as set forth in New York State General Business Law Article 22-A, potential fraudulent practices in respect to stocks, bonds and other securities as set forth in New York State General Business Law Article 23-A, and any related violations, or any matter which the Attorney General deems pertinent thereto.

**PLEASE TAKE NOTICE** that under the provisions of Article 23 of the New York State Civil Practice Laws and Rules, you are bound by this subpoena to produce the documents requested on the date specified and any adjourned date. Pursuant to New York State Civil Practice Laws and Rules Section 2308(b)(1), your failure to do so subjects you to, in addition to any other lawful punishment, costs, penalties and damages sustained by the State of New York State as a result of your failure to so comply.

**PLEASE TAKE NOTICE** that the Attorney General deems the information and documents requested by this Subpoena to be relevant and material to an investigation and inquiry undertaken in the public interest.

**App.106**

Case 3:16-cv-03111-K    Document 121    Filed 07/31/20    Page 112 of 544    PageID 4364

**WITNESS, Honorable Eric T. Schneiderman,** Attorney General of the State of New York, this 4th day of November, 2015.

By: _____

Lemuel M. Srolovic
Kevin G. W. Olson
Mandy DeRoche

Office of the Attorney General
Environmental Protection Bureau

120 Broadway, 26th Floor
New York, New York 10271
(212) 416-8448 (telephone)
(212) 416-6007 (facsimile)

**App.107**

## SCHEDULE 1

### A.    General Definitions and Rules of Construction

1.    "All" means each and every.

2.    "Any" means any and all.

3.    "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Subpoena all information or Documents that might otherwise be construed to be outside of its scope.

4.    "Communication" means any conversation, discussion, letter, email, memorandum, meeting, note or other transmittal of information or message, whether transmitted in writing, orally, electronically or by any other means, and shall include any Document that abstracts, digests, transcribes, records or reflects any of the foregoing.  Except where otherwise stated, a request for "Communications" means a request for all such Communications.

5.    "Concerning" means, directly or indirectly, in whole or in part, relating to, referring to, describing, evidencing or constituting.

6.    "Custodian" means any Person or Entity that, as of the date of this Subpoena, maintained, possessed, or otherwise kept or controlled such Document.

7.    "Document" is used herein in the broadest sense of the term and means all records and other tangible media of expression of whatever nature however and wherever created, produced or stored (manually, mechanically, electronically or otherwise), including without limitation all versions whether draft or final, all annotated or nonconforming or other copies, electronic mail ("e-mail"), instant messages, text messages, Blackberry or other wireless device messages, voicemail, calendars, date books, appointment books, diaries, books, papers, files, notes, confirmations, accounts statements, correspondence, memoranda, reports, records, journals, registers, analyses, plans, manuals, policies, telegrams, faxes, telexes, wires, telephone logs, telephone messages, message slips, minutes, notes or records or transcriptions of conversations or Communications or meetings, tape recordings, videotapes, disks, and other electronic media, microfilm, microfiche, storage devices, press releases, contracts, agreements, notices and summaries. Any non-identical version of a Document constitutes a separate Document within this definition, including without limitation drafts or copies bearing any notation, edit, comment, marginalia, underscoring, highlighting, marking, or any other alteration of any kind resulting in any difference between two or more otherwise identical Documents.  In the case of Documents bearing any notation or other marking made by highlighting ink, the term Document means the original version bearing the highlighting ink, which original must be produced as opposed to any copy thereof.  Except where otherwise stated, a request for "Documents" means a request for all such Documents.

3

**App.108**

8. "Entity" means without limitation any corporation, company, limited liability company or corporation, partnership, limited partnership, association, or other firm or similar body, or any unit, division, agency, department, or similar subdivision thereof.

9. "Identify" or "Identity," as applied to any Document means the provision in writing of information sufficiently particular to enable the Attorney General to request the Document's production through subpoena or otherwise, including but not limited to: (a) Document type (letter, memo, etc.); (b) Document subject matter; (c) Document date; and (d) Document author(s), addressee(s) and recipient(s). In lieu of identifying a Document, the Attorney General will accept production of the Document, together with designation of the Document's Custodian, and identification of each Person You believe to have received a copy of the Document.

10. "Identify" or "Identity," as applied to any Entity, means the provision in writing of such Entity's legal name, any d/b/a, former, or other names, any parent, subsidiary, officers, employees, or agents thereof, and any address(es) and any telephone number(s) thereof.

11. "Identify" or "Identity," as applied to any natural person, means and includes the provision in writing of the natural person's name, title(s), any aliases, place(s) of employment, telephone number(s), e-mail address(es), mailing addresses and physical address(es).

12. "Person" means any natural person, or any Entity.

13. "Sent" or "received" as used herein means, in addition to their usual meanings, the transmittal or reception of a Document by physical, electronic or other delivery, whether by direct or indirect means.

14. "Subpoena" means this subpoena and any schedules, appendices, or attachments thereto.

15. The use of the singular form of any word used herein shall include the plural and vice versa. The use of any tense of any verb includes all other tenses of the verb.

16. The references to Communications, Custodians, Documents, Persons, and Entities in this Subpoena encompass all such relevant ones worldwide.

## B.   Particular Definitions

1. "You" or "Your" means ExxonMobil Corporation, ExxonMobil Oil Corporation, any present or former parents, subsidiaries, affiliates, directors, officers, partners, employees, agents, representatives, attorneys or other Persons acting on its behalf, and including predecessors or successors or any affiliates of the foregoing.

2. "Climate Change" means global warming, Climate Change, the greenhouse effect, a change in global average temperatures, sea level rise, increased concentrations of carbon dioxide and other Greenhouse Gases and/or any other potential effect on the earth's physical and biological systems as a result of anthropogenic emissions of carbon dioxide

**App.109**

and other Greenhouse Gases, in any way the concept is described by or to You.

3.  "Fossil Fuel" or "Fossil Fuels" means all energy sources formed from fossilized remains of dead organisms, including oil, gas, bitumen and natural gas, but excluding coal.  For purposes of this subpoena, the definition includes also fossil fuels blended with biofuels, such as corn ethanol blends of gasoline. The definition excludes renewable sources of energy production, such as hydroelectric, geothermal, solar, tidal, wind, and wood.

4.  "Greenhouse Gases" or "GHGs" meanscarbon dioxide, methane, nitrous oxide, hydroflurocarbons, perfluorocarbons and sulfur hexafloride.

5.   "Renewable Energy" means renewable sources of energy production, such as hydroelectric, geothermal, solar, tidal, wind, and wood.

## C.    Instructions

1.  Preservation of Relevant Documents and Information; Spoliation.  You are reminded of your obligations under law to preserve Documents and information relevant or potentially relevant to this Subpoena from destruction or loss, and of the consequences of, and penalties available for, spoliation of evidence.  No agreement, written or otherwise, purporting to modify, limit or otherwise vary the terms of this Subpoena, shall be construed in any way to narrow, qualify, eliminate or otherwise diminish your aforementioned preservation obligations.  Nor shall you act, in reliance upon any such agreement or otherwise, in any manner inconsistent with your preservation obligations under law.  No agreement purporting to modify, limit or otherwise vary your preservation obligations under law shall be construed as in any way narrowing, qualifying, eliminating or otherwise diminishing such aforementioned preservation obligations, nor shall you act in reliance upon any such agreement, unless an Assistant Attorney General confirms or acknowledges such agreement in writing, or makes such agreement a matter of record in open court.

2.  Possession, Custody, and Control.  The Subpoena calls for all responsive Documents or information in your possession, custody or control.  This includes, without limitation, Documents or information possessed or held by any of your officers, directors, employees, agents, representatives, divisions, affiliates, subsidiaries or Persons from whom you could request Documents or information.  If Documents or information responsive to a request in this Subpoena are in your control, but not in your possession or custody, you shall promptly Identify the Person with possession or custody.

3.  Documents No Longer in Your Possession.  If any Document requested herein was formerly in your possession, custody or control but is no longer available, or no longer exists, you shall submit a statement in writing under oath that:  (a) describes in detail the nature of such Document and its contents; (b) Identifies the Person(s) who prepared such Document and its contents; (c) Identifies all Persons who have seen or had possession of such Document; (d) specifies the date(s) on which such Document was prepared, transmitted or received; (e) specifies the date(s) on which such Document became unavailable; (f) specifies the reason why such Document is unavailable, including

5

**App.110**

without limitation whether it was misplaced, lost, destroyed or transferred; and if such Document has been destroyed or transferred, the conditions of and reasons for such destruction or transfer and the Identity of the Person(s) requesting and performing such destruction or transfer; and (g) Identifies all Persons with knowledge of any portion of the contents of the Document.

4. <u>No Documents Responsive to Subpoena Requests.</u>  If there are no Documents responsive to any particular Subpoena request, you shall so state in writing under oath in the Affidavit of Compliance attached hereto, identifying the paragraph number(s) of the Subpoena request concerned.

5. <u>Format of Production.</u>  You shall produce Documents, Communications, and information responsive to this Subpoena in electronic format that meets the specifications set out in Attachments 1 and 2.

6. <u>Existing Organization of Documents to be Preserved.</u>  Regardless of whether a production is in electronic or paper format, each Document shall be produced in the same form, sequence, organization or other order or layout in which it was maintained before production, including but not limited to production of any Document or other material indicating filing or other organization.  Such production shall include without limitation any file folder, file jacket, cover or similar organizational material, as well as any folder bearing any title or legend that contains no Document.  Documents that are physically attached to each other in your files shall be accompanied by a notation or information sufficient to indicate clearly such physical attachment.

7. <u>Document Numbering.</u>  All Documents responsive to this Subpoena, regardless of whether produced or withheld on ground of privilege or other legal doctrine, and regardless of whether production is in electronic or paper format, shall be numbered in the lower right corner of each page of such Document, without disrupting or altering the form, sequence, organization or other order or layout in which such Documents were maintained before production.  Such number shall comprise a prefix containing the producing Person's name or an abbreviation thereof, followed by a unique, sequential, identifying document control number.

8. <u>Privilege Placeholders.</u>  For each Document withheld from production on ground of privilege or other legal doctrine, regardless of whether a production is electronic or in hard copy, you shall insert one or more placeholder page(s) in the production bearing the same document control number(s) borne by the Document withheld, in the sequential place(s) originally occupied by the Document before it was removed from the production.

9. <u>Privilege.</u>  If You withhold or redact any Document responsive to this Subpoena on ground of privilege or other legal doctrine, you shall submit with the Documents produced a statement in writing under oath, stating:  (a) the document control number(s) of the Document withheld or redacted; (b) the type of Document; (c) the date of the Document; (d) the author(s) and recipient(s) of the Document; (e) the general subject matter of the Document; and (f) the legal ground for withholding or redacting the Document.  If the legal ground for withholding or redacting the Document is attorney-

**App.111**

client privilege, you shall indicate the name of the attorney(s) whose legal advice is sought or provided in the Document.

10. <u>Your Production Instructions to be Produced.</u> You shall produce a copy of all written or otherwise recorded instructions prepared by you concerning the steps taken to respond to this Subpoena. For any unrecorded instructions given, you shall provide a written statement under oath from the Person(s) who gave such instructions that details the specific content of the instructions and any Person(s) to whom the instructions were given.

11. <u>Cover Letter.</u> Accompanying any production(s) made pursuant to this Subpoena, You shall include a cover letter that shall at a minimum provide an index containing the following: (a) a description of the type and content of each Document produced therewith; (b) the paragraph number(s) of the Subpoena request to which each such Document is responsive; (c) the Identity of the Custodian(s) of each such Document; and (d) the document control number(s) of each such Document.

12. <u>Affidavit of Compliance.</u> A copy of the Affidavit of Compliance provided herewith shall be completed and executed by all natural persons supervising or participating in compliance with this Subpoena, and you shall submit such executed Affidavit(s) of Compliance with Your response to this Subpoena.

13. <u>Identification of Persons Preparing Production.</u> In a schedule attached to the Affidavit of Compliance provided herewith, you shall Identify the natural person(s) who prepared or assembled any productions or responses to this Subpoena. You shall further Identify the natural person(s) under whose personal supervision the preparation and assembly of productions and responses to this Subpoena occurred. You shall further Identify all other natural person(s) able competently to testify: (a) that such productions and responses are complete and correct to the best of such person's knowledge and belief; and (b) that any Documents produced are authentic, genuine and what they purport to be.

14. <u>Continuing Obligation to Produce.</u> This Subpoena imposes a continuing obligation to produce the Documents and information requested. Documents located, and information learned or acquired, at any time after your response is due shall be promptly produced at the place specified in this Subpoena.

15. <u>No Oral Modifications.</u> No agreement purporting to modify, limit or otherwise vary this Subpoena shall be valid or binding, and you shall not act in reliance upon any such agreement, unless an Assistant Attorney General confirms or acknowledges such agreement in writing, or makes such agreement a matter of record in open court.

16. <u>Time Period.</u> The term "Time Period 1" as used in this Subpoena shall be from January 1, 2005 through the date of the production. The term "Time Period 2" shall be from January 1, 1977 through the date of the production.

**App.112**

Case 3:16-cv-03111-K    Document 121    Filed 07/31/20    Page 118 of 544    PageID 4370

### D.    Documents to be Produced

1.    All Documents and Communications, within Time Period 2, Concerning any research, analysis, assessment, evaluation, modeling or other consideration performed by You, on Your behalf, or with funding provided by You Concerning the causes of Climate Change.

2.    All Documents and Communications, within Time Period 2, Concerning any research, analysis, assessment, evaluation, modeling (including the competency or accuracy of such models) or other consideration performed by You, on Your behalf, or with funding provided by You, Concerning the impacts of Climate Change, including but not limited to on air, water and land temperatures, sea-level rise, ocean acidification, extreme weather events, arctic ice, permafrost and shipping channels, precipitation, flooding, water supplies, desertification, agricultural and food supplies, built environments, migration, and security concerns, including the timing of such impacts.

3.    All Documents and Communications, within Time Period 2, Concerning the integration of Climate Change-related issues (including but not limited to (a) future demand for Fossil Fuels, (b) future emissions of Greenhouse Gases from Fossil Fuel extraction, production and use, (c) future demand for Renewable Energy, (d) future emissions of Greenhouse Gases from Renewable Energy extraction, production and use, (e) Greenhouse Gas emissions reduction goals, (f) the physical risks and opportunities of Climate Change, and (g) impact on Fossil Fuel reserves into Your business decisions, including but not limited to financial projections and analyses, operations projections and analyses, and strategic planning performed by You, on Your behalf, or with funding provided by You.

4.    All Documents and Communications, within Time Period 1, Concerning whether and how You disclose the impacts of Climate Change (including but not limited to regulatory risks and opportunities, physical risks and opportunities, Greenhouse Gas emissions and management, indirect risks and opportunities, International Energy Agency scenarios for energy consumption, and other carbon scenarios) in Your filings with the U.S. Securities and Exchange Commission and in Your public-facing and investor-facing reports including but not limited to Your *Outlook For Energy* reports, Your *Energy Trends, Greenhouse Gas Emissions, and Alternative Energy* reports, and Your *Energy and Carbon - Managing the Risks* Report.

5.    All Documents and Communications, within Time Period 1, presented to Your board of directors Concerning Climate Change

6.    All Documents and Communications Concerning Climate Change, within Time Period 1, prepared by or for trade associations or industry groups, or exchanged between You and trade associations or industry groups, or sent from or to trade associations or industry groups, including but not limited to the: (i) American Petroleum Institute; (ii) Petroleum Industry Environmental Conservation Association; (IPIECA); (iii) US Oil & Gas Association; (iv) Petroleum Marketers Association of America; and (v) Empire State Petroleum Association.

App.113

7.  All Documents and Communications, within Time Period 1, related to Your support or funding for organizations relating to communications or research of Climate Change, including decisions to cease funding or supporting such organizations.

8.  All Documents and Communications, within Time Period 1, created, recommended, sent, and/or distributed by You, on Your behalf, or with funding provided by You, Concerning marketing, advertising, and/or communication about Climate Change including but not limited to (a) policies, procedures, practices, memoranda and similar instructive or informational materials; (b) marketing or communication strategies or plans, (c) flyers, promotional materials, and informational materials; (d) scripts, Frequently Asked Questions, Q&As, and/or other guidance documents; (e) slide presentations, power points or videos; (f) written or printed notes from or video or audio recordings of speeches, seminars or conferences; (g) all Communications with and presentations to investors; and/or (h) press releases.

9.  All Documents and Communications, within Time Period 1, that are exemplars of all advertisements, flyers, promotional materials, and informational materials of any type, (including but not limited to web-postings, blog-postings, social media-postings, print advertisements, radio and television advertisements, brochures, posters, billboards, flyers and disclosures) used, published, or distributed by You, on Your behalf, or with funding provided by You, Concerning Climate Change including but not limited to (a) a copy of each print advertisement placed in New York State; (b) a DVD format copy of each television advertisement that ran in New York State; (c) an audio recording of each radio advertisement that ran in New York State and the audio portion of each internet advertisement; and (d) a printout, screenshot or copy of each advertisement, information, or communication provided via the internet, email, Facebook, Twitter, You Tube, or other electronic communications system.

10. All Documents and Communications, within Time Period 1, substantiating or refuting the claims made in the materials identified in response to Demand Nos. 4, 8 and 9.

11. All Documents and Communications sufficient to identify any New York State consumer who has complained to You, or to any state, county or municipal consumer protection agency located in New York State, Concerning Your actions with respect to Climate Change; and for each New York State consumer identified: (i) each complaint or request made by or on behalf of a consumer, (ii) all correspondence between the consumer, his or her representative, and You, (iii) recordings and notes of all conversations between the consumer and You, and (iv) the resolution of each complaint, if any.

**App.114**

## APPENDIX 1

### Electronic Document Production Specifications

Unless otherwise specified and agreed to by the Office of Attorney General, all responsive documents must be produced in LexisNexis® Concordance® format in accordance with the following instructions. Any questions regarding electronic document production should be directed to the Assistant Attorney General whose telephone number appears on the subpoena.

1.  Concordance Production Components. A Concordance production consists of the following component files, which must be produced in accordance with the specifications set forth below in Section 7.

    A.  *Metadata Load File.* A delimited text file that lists in columnar format the required metadata for each produced document.

    B.  *Extracted or OCR Text Files.* Document-level extracted text for each produced document or document-level optical character recognition ("OCR") text where extracted text is not available.

    C.  *Single-Page Image Files.* Individual petrified page images of the produced documents in tagged image format ("TIF"), with page-level Bates number endorsements.

    D.  *Opticon Load File.* A delimited text file that lists the single-page TIF files for each produced document and defines (i) the relative location of the TIF files on the production media and (ii) each document break.

    E.  *Native Files.* Native format versions of non-printable or non–print friendly produced documents.

2.  Production Folder Structure. The production must be organized according to the following standard folder structure:
    - data\ (contains production load files)
    - images\ (contains single-page TIF files, with subfolder organization) \0001, \0002, \0003…
    - native files\ (contains native files, with subfolder organization) \0001, \0002, \0003…
    - text\ (contains text files, with subfolder organization) \0001, \0002, \0003…

3.  De-Duplication. You must perform global de-duplication of stand-alone documents and email families against any prior productions pursuant to this or previously related subpoenas.

4.  Paper or Scanned Documents. Documents that exist only in paper format must be scanned to single-page TIF files and OCR'd. The resulting electronic files should be

**App.115**

pursued in Concordance format pursuant to these instructions. You must contact the Assistant Attorney General whose telephone number appears on the subpoena to discuss (i) any documents that cannot be scanned, and (ii) how information for scanned documents should be represented in the metadata load file.

5. <u>Structured Data</u>. Before producing structured data, including but not limited to relational databases, transactional data, and xml pages, you must first speak to the Assistant Attorney General whose telephone number appears on the subpoena. Spreadsheets are not considered structured data.

6. <u>Media and Encryption</u>. All documents must be produced on CD, DVD, or hard-drive media. All production media must be encrypted with a strong password, which must be delivered independently from the production media.

7. <u>Production File Requirements</u>.

   A. ***Metadata Load File***
   - Required file format:
     - ASCII or UTF-8
     - Windows formatted CR + LF end of line characters, including full CR + LF on last record in file.
     - .dat file extension
     - Field delimiter: (ASCII decimal character 20)
     - Text Qualifier: þ (ASCII decimal character 254). Date and pure numeric value fields do not require qualifiers.
     - Multiple value field delimiter: ; (ASCII decimal character 59)
   - The first line of the metadata load file must list all included fields. All required fields are listed in Attachment 2.
   - Fields with no values must be represented by empty columns maintaining delimiters and qualifiers.
   - *Note:* All documents must have page-level Bates numbering (except documents produced only in native format, which must be assigned a document-level Bates number). The metadata load file must list the beginning and ending Bates numbers (BEGDOC and ENDDOC) for each document. For document families, including but not limited to emails and attachments, compound documents, and uncompressed file containers, the metadata load file must also list the Bates range of the entire document family (ATTACHRANGE), beginning with the first Bates number (BEGDOC) of the "parent" document and ending with the last Bates number (ENDDOC) assigned to the last "child" in the document family.
   - Date and Time metadata must be provided in separate columns.
   - Accepted date formats:
     - mm/dd/yyyy
     - yyyy/mm/dd
     - yyyymmdd
   - Accepted time formats:
     - hh:mm:ss (if not in 24-hour format, you must indicate am/pm)

**App.116**

Case 3:16-cv-03111-K    Document 121    Filed 07/31/20    Page 122 of 544    PageID 4374

- o hh:mm:ss:mmm

**B.**  **_Extracted or OCR Text Files_**
- You must produce individual document-level text files containing the full extracted text for each produced document.
- When extracted text is not available (for instance, for image-only documents) you must provide individual document-level text files containing the document's full OCR text.
- The filename for each text file must match the document's beginning Bates number (BEGDOC) listed in the metadata load file.
- Text files must be divided into subfolders containing no more than 500 to 1000 files.

**C.**  **_Single-Page Image Files (Petrified Page Images)_**
- Where possible, all produced documents must be converted into single-page tagged image format ("TIF") files.  See Section 7.E below for instructions on producing native versions of documents you are unable to convert.
- Image documents that exist only in non-TIF formats must be converted into TIF files.  The original image format must be produced as a native file as described in Section 7.E below.
- For documents produced only in native format, you must provide a TIF placeholder that states "Document produced only in native format."
- Each single-page TIF file must be endorsed with a unique Bates number.
- The filename for each single-page TIF file must match the unique page-level Bates number (or document-level Bates number for documents produced only in native format).
- Required image file format:
  - o CCITT Group 4 compression
  - o 2-Bit black and white
  - o 300 dpi
  - o Either .tif or .tiff file extension.
- TIF files must be divided into subfolders containing no more than 500 to 1000 files.  Where possible documents should not span multiple subfolders.

**D.**  **_Opticon Load File_**
- Required file format:
  - o ASCII
  - o Windows formatted CR + LF end of line characters
  - o Field delimiter: , (ASCII decimal character 44)
  - o No Text Qualifier
  - o .opt file extension
- The comma-delimited Opticon load file must contain the following seven fields (as indicated below, values for certain fields may be left blank):
  - o ALIAS or IMAGEKEY – the unique Bates number assigned to each page of the production.
  - o VOLUME – this value is optional and may be left blank.

12

**App.117**

Case 3:16-cv-03111-K    Document 121    Filed 07/31/20    Page 123 of 544    PageID 4375

- o RELATIVE PATH – the filepath to each single-page image file on the production media.
- o DOCUMENT BREAK – defines the first page of a document. The only possible values for this field are "Y" or blank.
- o FOLDER BREAK – defines the first page of a folder. The only possible values for this field are "Y" or blank.
- o BOX BREAK – defines the first page of a box. The only possible values for this field are "Y" or blank.
- o PAGE COUNT – this value is optional and may be left blank.

- *Example*:
  ABC00001,,IMAGES\0001\ABC00001.tif,Y,,,2
  ABC00002,,IMAGES\0001\ABC00002.tif,,,,
  ABC00003,,IMAGES\0002\ABC00003.tif,Y,,,1
  ABC00004,,IMAGES\0002\ABC00004.tif,Y,,,1

E.    *Native Files*

- Non-printable or non–print friendly documents (including but not limited to spreadsheets, audio files, video files and documents for which color has significance to document fidelity) must be produced in their native format.
- The filename of each native file must match the document's beginning Bates number (BEGDOC) in the metadata load file and retain the original file extension.
- For documents produced only in native format, you must assign a single document-level Bates number and provide an image file placeholder that states "Document produced only in native format."
- The relative paths to all native files on the production media must be listed in the NATIVEFILE field of the metadata load file.
- Native files that are password-protected must be decrypted prior to conversion and produced in decrypted form. In cases where this cannot be achieved the document's password must be listed in the metadata load file. The password should be placed in the COMMENTS field with the format Password: <PASSWORD>.
- You may be required to supply a software license for proprietary documents produced only in native format.

13

**App.118**

## APPENDIX 2

### Required Fields for Metadata Load File

| FIELD NAME | FIELD DESCRIPTION | FIELD VALUE EXAMPLE[1] |
|---|---|---|
| DOCID | Unique document reference (can be used for de-duplication). | ABC0001 or ###.######.### |
| BEGDOC | Bates number assigned to the first page of the document. | ABC0001 |
| ENDDOC | Bates number assigned to the last page of the document. | ABC0002 |
| BEGATTACH | Bates number assigned to the first page of the parent document in a document family (*i.e.*, should be the same as BEGDOC of the parent document, or PARENTDOC). | ABC0001 |
| ENDATTACH | Bates number assigned to the last page of the last child document in a family (*i.e.*, should be the same as ENDDOC of the last child document). | ABC0008 |
| ATTACHRANGE | Bates range of entire document family. | ABC0001 - ABC0008 |
| PARENTDOC | BEGDOC of parent document. | ABC0001 |
| CHILDDOCS | List of BEGDOCs of all child documents, delimited by ";" when field has multiple values. | ABC0002; ABC0003; ABC0004… |
| COMMENTS | Additional document comments, such as passwords for encrypted files. | |
| NATIVEFILE | Relative file path of the native file on the production media. | .\Native_File\Folder\...\BEGDOC.ext |
| SOURCE | For scanned paper records this should be a description of the physical location of the original paper record.  For loose electronic files this should be the name of the file server or workstation where the files were gathered. | Company Name, Department Name, Location, Box Number… |
| CUSTODIAN | Owner of the document or file. | Firstname Lastname, Lastname, Firstname, User Name; Company Name, Department Name... |
| FROM | Sender of the email. | Firstname Lastname < FLastname @domain > |

---

[1] Examples represent possible values and not required format unless the field format is specified in Attachment 1.

14

**App.119**

| FIELD NAME | FIELD DESCRIPTION | FIELD VALUE EXAMPLE[1] |
|---|---|---|
| TO | All to: members or recipients, delimited by ";" when field has multiple values. | Firstname Lastname < FLastname @domain >; Firstname Lastname < FLastname @domain >; ... |
| CC | All cc: members, delimited by ";" when field has multiple values. | Firstname Lastname < FLastname @domain >; Firstname Lastname < FLastname @domain >; ... |
| BCC | All bcc: members, delimited by ";" when field has multiple values | Firstname Lastname < FLastname @domain >; Firstname Lastname < FLastname @domain >; ... |
| SUBJECT | Subject line of the email. | |
| DATERCVD | Date that an email was received. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd |
| TIMERCVD | Time that an email was received. | hh:mm:ss AM/PM or hh:mm:ss |
| DATESENT | Date that an email was sent. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd |
| TIMESENT | Time that an email was sent. | hh:mm:ss AM/PM or hh:mm:ss |
| CALBEGDATE | Date that a meeting begins. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd |
| CALBEGTIME | Time that a meeting begins. | hh:mm:ss AM/PM or hh:mm:ss |
| CALENDDATE | Date that a meeting ends. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd |
| CALENDTIME | Time that a meeting ends. | hh:mm:ss AM/PM or hh:mm:ss |
| CALENDARDUR | Duration of a meeting in hours. | 0.75, 1.5... |
| ATTACHMENTS | List of filenames of all attachments, delimited by ";" when field has multiple values. | AttachmentFileName.; AttachmentFileName.docx; AttachmentFileName.pdf;... |
| NUMATTACH | Number of attachments. | 1, 2, 3, 4.... |
| RECORDTYPE | General type of record. | IMAGE; LOOSE E-MAIL; E-MAIL; E-DOC; IMAGE ATTACHMENT; LOOSE E-MAIL ATTACHMENT; E-MAIL ATTACHMENT; E-DOC ATTACHMENT |
| FOLDERLOC | Original folder path of the produced document. | Drive:\Folder\...\...\ |
| FILENAME | Original filename of the produced document. | Filename.ext |
| DOCEXT | Original file extension. | html, xls, pdf |

15

**App.120**

| FIELD NAME | FIELD DESCRIPTION | FIELD VALUE EXAMPLE[1] |
|---|---|---|
| DOCTYPE | Name of the program that created the produced document. | Adobe Acrobat, Microsoft Word, Microsoft Excel,  Corel WordPerfect… |
| TITLE | Document title (if entered). | |
| AUTHOR | Name of the document author. | Firstname Lastname; Lastname, First Name; FLastname |
| REVISION | Number of revisions to a document. | 18 |
| DATECREATED | Date that a document was created. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd |
| TIMECREATED | Time that a document was created. | hh:mm:ss AM/PM or hh:mm:ss |
| DATEMOD | Date that a document was last modified. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd |
| TIMEMOD | Time that a document was last modified. | hh:mm:ss AM/PM or hh:mm:ss |
| FILESIZE | Original file size in bytes. | 128, 512, 1024… |
| PGCOUNT | Number of pages per document. | 1, 2, 10, 100… |
| IMPORTANCE | Email priority level if set. | Low, Normal, High |
| TIFFSTATUS | Generated by the Law Pre-discovery production tool (leave blank if inapplicable). | Y, C, E, W, N, P |
| DUPSTATUS | Generated by the Law Pre-discovery production tool (leave blank if inapplicable). | P |
| MD5HASH | MD5 hash value computed from native file (a/k/a file fingerprint). | BC1C5CA6C1945179FEE144F25F51087B |
| SHA1HASH | SHA1 hash value | B68F4F57223CA7DA3584BAD7ECF111B8044F8631 |
| MSGINDEX | Email message ID | |

16

**App.121**

## AFFIDAVIT OF COMPLIANCE WITH SUBPOENA

State of                                    }

County of                                   }

I, _____, being duly sworn, state as follows:

1.    I am employed by _____ in the position of _____;

2.    The enclosed production of documents and responses to the Subpoena of the Attorney General of the State of New York, dated November 4, 2015 (the "Subpoena") were prepared and assembled under my personal supervision;

3.    I made or caused to be made a diligent, complete and comprehensive search for all Documents and information requested by the Subpoena, in full accordance with the instructions and definitions set forth in the Subpoena;

4.    The enclosed production of documents and responses to the Subpoena are complete and correct to the best of my knowledge and belief;

5.    No Documents or information responsive to the Subpoena have been withheld from this production and response, other than responsive Documents or information withheld on the basis of a legal privilege or doctrine;

6.    All responsive Documents or information withheld on the basis of a legal privilege or doctrine have been identified on a privilege log composed and produced in accordance with the instructions in the Subpoena;

7.    The Documents contained in these productions and responses to the Subpoena are authentic, genuine and what they purport to be;

8.    Attached is a true and accurate record of all persons who prepared and assembled any productions and responses to the Subpoena, all persons under whose personal supervision the preparation and assembly of productions and responses to the Subpoena occurred, and all persons able competently to testify:  (a) that such productions and responses are complete and correct to the best of such person's knowledge and belief; and (b) that any Documents produced are authentic, genuine and what they purport to be; and

9.    Attached is a true and accurate statement of those requests under the Subpoena as to which no responsive Documents were located in the course of the aforementioned search.

_____          _____
Signature of Affiant                         Date


_____
Printed Name of Affiant

17

**App.122**

**\*\*\*\*\*\*\*\*\*\***

Subscribed and sworn to before me
this 4th day of December 2015.


_____
Notary Public


My commission expires:


_____

18

**App.123**

# Exhibit 3



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

### SUBPOENA DUCES TECUM

### THE PEOPLE OF THE STATE OF NEW YORK
### GREETINGS

**TO:**

PricewaterhouseCoopers LLP
300 Madison Avenue
New York, New York 10017

**YOU ARE HEREBY COMMANDED**, pursuant General Business Law § 352, Executive Law § 63(12), and § 2302(a) of the New York Civil Practice Law and Rules, to deliver and turn over to Eric T. Schneiderman, the Attorney General of the State of New York, or a designated Assistant Attorney General, on *the 2nd day of September, 2016, at 9:30 a.m.*, or any agreed upon adjourned date or time, at 120 Broadway, New York, New York 10271, all documents and information requested in the attached Schedule in accordance with the instructions and definitions contained therein.

**TAKE NOTICE** that the Attorney General deems the documents and information commanded by this Subpoena to be relevant and material to an investigation and inquiry undertaken in the public interest.

**TAKE FURTHER NOTICE** that Your disobedience of this Subpoena, by failing to produce documents and information on the date, time and place stated above or on any agreed upon adjourned date or time, *may subject You to prosecution for a misdemeanor or penalties and other lawful punishment* under General Business Law § 352 and § 2308 of the New York Civil Practice Law, and/or other statutes.

**TAKE FURTHER NOTICE** that You should not disclose the existence of this Subpoena, its contents, or any subsequent communications with the Office of the Attorney General while this investigation is pending. Disclosure of this Subpoena may impede a confidential investigation being conducted by the Attorney General. In the event You believe that You are required to disclose the existence of this Subpoena or any information related thereto, You shall notify the Assistant Attorney General listed below immediately and well in advance of Your disclosure of the same.

1

**App. 125**

**WITNESS, The Honorable Eric T. Schneiderman,** Attorney General of the State of New York, this 19th day of August, 2016.

By: _____

Katherine Milgram
Deputy Bureau Chief
Investor Protection Bureau
120 Broadway, 23rd Floor
New York, New York 10271
(212) 416-8222

By: _____

Jonathan Zweig
Assistant Attorney General
Investor Protection Bureau
120 Broadway, 23rd Floor
New York, New York 10271
(212) 416-8954

2

**App. 126**

## SCHEDULE

### A. General Definitions and Rules of Construction

1. "All" means each and every.

2. "Any" means any and all.

3. "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Subpoena all information or Documents that might otherwise be construed to be outside of its scope.

4. "Communication" means any conversation, discussion, letter, email, memorandum, meeting, note or other transmittal of information or message, whether transmitted in writing, orally, electronically or by any other means, and shall include any Document that abstracts, digests, transcribes, records or reflects any of the foregoing.

5. "Concerning" means, directly or indirectly, in whole or in part, relating to, referring to, describing, evidencing or constituting.

6. "Custodian" means any Person or Entity that, as of the date of this Subpoena, maintained, possessed, or otherwise kept or controlled such Document.

7. "Document" is used herein in the broadest sense of the term and means all records and other tangible media of expression of whatever nature however and wherever created, produced or stored (manually, mechanically, electronically or otherwise), including without limitation all versions whether draft or final, all annotated or nonconforming or other copies, electronic mail ("e-mail"), instant messages, text messages, Blackberry or other wireless device messages, voicemail, calendars, date books, appointment books, diaries, books, papers, work papers, files, desk files, permanent files, temporary files, notes, confirmations, account statements, correspondence, memoranda, reports, records, journals, registers, analyses, plans, manuals, policies, telegrams, faxes, telexes, wires, telephone logs, telephone messages, message slips, minutes, notes or records or transcriptions of conversations or Communications or meetings, tape recordings, videotapes, disks, other electronic media, microfilm, microfiche, storage devices, press releases, contracts, agreements, notices and summaries. Any non-identical version of a Document constitutes a separate Document within this definition, including without limitation drafts or copies bearing any notation, edit, comment, marginalia, underscoring, highlighting, marking, or any other alteration of any kind resulting in any difference between two or more otherwise identical Documents. In the case of Documents bearing any notation or other marking made by highlighting ink, the term Document means the original version bearing the highlighting ink, which original must be produced as opposed to any copy thereof.

8. "Entity" means without limitation any corporation, company, limited liability company or corporation, partnership, limited partnership, association, or other firm or similar body, or any unit, division, agency, department, or similar subdivision thereof.

3

**App. 127**

9.  "Identify" or "Identity," as applied to any Document, means the provision in writing of information sufficiently particular to enable the Attorney General to request the Document's production through subpoena or otherwise, including but not limited to: (a) Document type (letter, memorandum, etc.); (b) Document subject matter; (c) Document date; and (d) Document author(s), addressee(s) and recipient(s). In lieu of identifying a Document, the Attorney General will accept production of the Document, together with designation of the Document's Custodian, and identification of each Person You believe to have received a copy of the Document.

10. "Identify" or "Identity," as applied to any Entity, means the provision in writing of such Entity's legal name, any d/b/a, former, or other names, any parent, subsidiary, officers, employees, or agents thereof, and any address(es) and any telephone number(s) thereof.

11. "Identify" or "Identity," as applied to any natural person, means and includes the provision in writing of the natural person's name, title(s), any aliases, place(s) of employment, telephone number(s), e-mail address(es), mailing addresses and physical address(es).

12. "Person" means any natural person, or any Entity.

13. "Sent" or "received" as used herein means, in addition to their usual meanings, the transmittal or reception of a Document by physical, electronic or other delivery, whether by direct or indirect means.

14. "Subpoena" means this subpoena and any schedules or attachments thereto.

15. The use of the singular form of any word used herein shall include the plural and vice versa. The use of any tense of any verb includes all other tenses of the verb.

16. The references to Communications, Custodians, Documents, Persons, and Entities in this Subpoena encompass all such relevant ones worldwide.

### B. Particular Definitions

1.  "You," "Your," or "PwC" means PricewaterhouseCoopers LLP and Any present or former parents, subsidiaries, affiliates, directors, officers, partners, employees, agents, representatives, attorneys or other Persons acting on its behalf, and including predecessors or successors or Any affiliates of the foregoing.

2.  "Exxon" means ExxonMobil Corporation, ExxonMobil Oil Corporation, and Any present or former parents, subsidiaries, affiliates, directors, officers, partners, employees, agents, representatives, attorneys or other Persons acting on its behalf, and including predecessors or successors or Any affiliates of the foregoing.

3.  "CDP" means the organization formerly called Carbon Disclosure Project and Any present or former parents, subsidiaries, affiliates, directors, officers, partners, employees, agents, representatives, attorneys or other Persons acting on its behalf, including

4

**App. 128**

predecessors or successors or Any affiliates of the foregoing, and All associated reports, publications, and analysis.

4. "Climate Change" means climate and environmental system impacts, weather-related events, and Any other effect on the earth's physical, biological, and human systems (e.g., communities and built infrastructure) that may be related to anthropogenic emissions of carbon dioxide and other Greenhouse Gases, including but not limited to increasing air or water temperatures, global warming, rising sea levels, melting of sea ice and land-based ice including glaciers and ice sheets, ocean acidification, permafrost thawing, changes in precipitation patterns, intensity or frequency, droughts, coastal and riverine flooding, and extreme storms.

5. "E&P" means the exploration and production segment of the energy industry, including but not limited to discovering, augmenting, extracting, producing, recovering, and merchandising oil, gas, and other hydrocarbons, together with All other upstream activities and assets, and including but not limited to oil, gas, and other hydrocarbon reserves, resource base, and potential resource base.

6. "Fossil Fuel" means All energy sources formed from fossilized remains of dead organisms, including oil, gas, bitumen and natural gas. For purposes of this Subpoena, the definition includes also fossil fuels blended with biofuels, such as corn ethanol blends of gasoline. The definition excludes renewable sources of energy production, such as hydroelectric, geothermal, solar, tidal, wind, and biomass.

7. "Greenhouse Gases" means carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride.

8. "Renewable Energy" means renewable sources of energy production, such as hydroelectric, geothermal, solar, tidal, wind, and biomass.

## C. Instructions

1. <u>Preservation of Relevant Documents and Information; Spoliation.</u> You are reminded of Your obligations under law to preserve Documents and information relevant or potentially relevant to this Subpoena from destruction or loss, and of the consequences of, and penalties available for, spoliation of evidence. No agreement, written or otherwise, purporting to modify, limit or otherwise vary the terms of this Subpoena, shall be construed in any way to narrow, qualify, eliminate or otherwise diminish Your aforementioned preservation obligations. Nor shall You act, in reliance upon any such agreement or otherwise, in any manner inconsistent with Your preservation obligations under law. No agreement purporting to modify, limit or otherwise vary Your preservation obligations under law shall be construed as in any way narrowing, qualifying, eliminating or otherwise diminishing such aforementioned preservation obligations, nor shall You act in reliance upon any such agreement, unless an Assistant Attorney General confirms or acknowledges such agreement in writing, or makes such agreement a matter of record in open court.

5

**App. 129**

2.    Possession, Custody, and Control. The Subpoena calls for all responsive Documents or information in Your possession, custody or control. This includes, without limitation, Documents or information possessed or held by any of Your officers, directors, employees, agents, representatives, divisions, affiliates, subsidiaries or Persons from whom You could request Documents or information. If Documents or information responsive to a request in this Subpoena are in Your control, but not in Your possession or custody, You shall promptly Identify the Person with possession or custody.

3.    Documents No Longer in Your Possession. If any Document requested herein was formerly in Your possession, custody or control but is no longer available, or no longer exists, You shall submit a statement in writing under oath that: (a) describes in detail the nature of such Document and its contents; (b) Identifies the Person(s) who prepared such Document and its contents; (c) Identifies all Persons who have seen or had possession of such Document; (d) specifies the date(s) on which such Document was prepared, transmitted or received; (e) specifies the date(s) on which such Document became unavailable; (f) specifies the reason why such Document is unavailable, including without limitation whether it was misplaced, lost, destroyed or transferred; and if such Document has been destroyed or transferred, the conditions of and reasons for such destruction or transfer and the Identity of the Person(s) requesting and performing such destruction or transfer; and (g) Identifies all Persons with knowledge of any portion of the contents of the Document.

4.    No Documents Responsive to Subpoena Requests. If there are no Documents responsive to any particular Subpoena request, You shall so state in writing under oath in the Affidavit of Compliance attached hereto, identifying the paragraph number(s) of the Subpoena request concerned.

5.    Format of Production. You shall produce Documents and information responsive to this Subpoena in the format requested by the Office of the New York State Attorney General. Productions in electronic format shall meet the specifications set out in Attachments 1 and 2 hereof.

6.    Existing Organization of Documents to be Preserved. Regardless of whether a production is in electronic or paper format, each Document shall be produced in the same form, sequence, organization or other order or layout in which it was maintained before production, including but not limited to production of any Document or other material indicating filing or other organization. Such production shall include without limitation any file folder, file jacket, cover or similar organizational material, as well as any folder bearing any title or legend that contains no Document. Likewise, all Documents that are physically attached to each other in Your files shall remain so attached in any production; or if such production is electronic, shall be accompanied by notation or information sufficient to indicate clearly such physical attachment.

7.    Document Numbering. All Documents responsive to this Subpoena, regardless of whether produced or withheld on ground of privilege or other legal doctrine, and regardless of whether production is in electronic or paper format, shall be numbered in the lower right corner of each page of such Document, without disrupting or altering the

6

App. 130

form, sequence, organization or other order or layout in which such Documents were maintained before production. Such number shall comprise a prefix containing the producing Person's name or an abbreviation thereof, followed by a unique, sequential, identifying document control number.

8. Privilege Placeholders. For each Document withheld from production on ground of privilege or other legal doctrine, regardless of whether a production is electronic or in hard copy, You shall insert one or more placeholder page(s) in the production bearing the same document control number(s) borne by the Document withheld, in the sequential place(s) originally occupied by the Document before it was removed from the production.

9. Privilege. If You withhold any Document responsive to this Subpoena on ground of privilege or other legal doctrine, You shall submit with the Documents produced a statement in writing under oath, stating: (a) the document control number(s) of the Document withheld; (b) the type of Document; (c) the date of the Document; (d) the author(s) and recipient(s) of the Document; (e) the general subject matter of the Document; and (f) the legal ground for withholding the Document. If the legal ground for withholding the Document is attorney-client privilege, You shall indicate the name of the attorney(s) whose legal advice is sought or provided in the Document.

10. Your Production Instructions to be Produced. You shall produce a copy of all written or otherwise recorded instructions prepared by You concerning the steps taken to respond to this Subpoena. For any unrecorded instructions given, You shall provide a written statement under oath from the Person(s) who gave such instructions that details the specific content of the instructions and any Person(s) to whom the instructions were given.

11. Cover Letter. Accompanying any production(s) made pursuant to this Subpoena, You shall include a cover letter that shall at a minimum provide an index containing the following: (a) a description of the type and content of each Document produced therewith; (b) the paragraph number(s) of the Subpoena request to which each such Document is responsive; (c) the Identity of the Custodian(s) of each such Document; and (d) the document control number(s) of each such Document.

12. Affidavit of Compliance. A copy of the Affidavit of Compliance provided herewith shall be completed and executed by all natural persons supervising or participating in compliance with this Subpoena, and You shall submit such executed Affidavit(s) of Compliance with Your response to this Subpoena.

13. Identification of Persons Preparing Production. In a schedule attached to the Affidavit of Compliance provided herewith, You shall Identify the natural person(s) who prepared or assembled any productions or responses to this Subpoena. You shall further Identify the natural person(s) under whose personal supervision the preparation and assembly of productions and responses to this Subpoena occurred. You shall further Identify all other natural person(s) able competently to testify: (a) that such productions and responses are complete and correct to the best of such person's knowledge and belief; and (b) that any Documents produced are authentic, genuine and what they purport to be.

**App. 131**

14. <u>Continuing Obligation to Produce.</u> This Subpoena imposes a continuing obligation to produce the Documents and information requested. Documents located, and information learned or acquired, at any time after Your response is due shall be promptly produced at the place specified in this Subpoena.

15. <u>No Oral Modifications.</u> No agreement purporting to modify, limit or otherwise vary this Subpoena shall be valid or binding, and You shall not act in reliance upon any such agreement, unless an Assistant Attorney General confirms or acknowledges such agreement in writing, or makes such agreement a matter of record in open court.

16. <u>Time Period.</u> Unless otherwise specified, the time period for information, Documents, and Communications requested by this Subpoena is from January 1, 2010 (i.e. PwC's audits of financial statements for 2010) through the date of the production.

### D. Requests for Information

1. Identify All individuals and business groups or divisions at PwC that were involved in PwC's reviews and audits of Exxon's financial statements.

2. Identify All individuals and business groups or divisions at PwC that were involved in PwC's review of Exxon's decisions Concerning its oil, gas, and other hydrocarbon reserves, resource base, and potential resource base.

3. Identify All individuals and business groups or divisions at PwC that were involved in PwC's review of Exxon's decisions Concerning actual or potential E&P-related write-downs, impairment charges, impairment testing or analysis, or triggers for impairment testing or analysis.

4. Identify All individuals and business groups or divisions at PwC that were involved in PwC's review of Exxon's capital allocation and expenditure decisions based on actual or potential impacts of Climate Change or policies or regulations Concerning Climate Change.

5. Identify All individuals and business groups or divisions at Exxon with which PwC communicated Concerning Exxon's oil, gas, and other hydrocarbon reserves, resource base, and potential resource base.

6. Identify All individuals and business groups or divisions at Exxon with which PwC communicated Concerning actual or potential E&P-related write-downs, impairment charges, impairment testing or analysis, and triggers for impairment testing or analysis.

7. Identify All individuals and business groups or divisions at Exxon with which PwC communicated concerning Exxon's capital allocation and expenditure decisions based on actual or potential impacts of Climate Change or policies or regulations Concerning Climate Change.

**App. 132**

## E. Documents to be Produced

1. All Documents and Communications Concerning the valuation, accounting, booking, de-booking, and reporting of Exxon's oil, gas, and other hydrocarbon reserves, resource base, and potential resource base, and the time period within which Exxon expects to produce its reserves, resource base, and potential resource base.

2. All Documents and Communications Concerning the preparation or completion, or the potential preparation or completion, of Any audit of Exxon's oil, gas, and other hydrocarbon reserves, resource base, and potential resource base.

3. All Documents and Communications Concerning (a) Exxon's internal auditing of its database or system containing its estimates of oil, gas, and other hydrocarbon reserves, resource base, and potential resource base; (b) the processes and controls used by Exxon in the preparation of its estimates of such reserves, resource base, and potential resource base; and (c) the qualifications of the technical personnel responsible for overseeing the preparation of such estimates.

4. All Documents and Communications Concerning E&P-related write-downs, impairment charges, impairment testing or analysis, and triggers for impairment testing or analysis, actual or potential, with respect to Exxon, including but not limited to Exxon's late 2015 effort to assess its major long-lived assets most at risk for potential impairment.

5. All Documents and Communications Concerning Exxon's outlook or projections of oil, gas, and other hydrocarbon prices, including but not limited to Any outlook or projections Concerning the duration of Any price changes (such as Any classification of price changes as short-term, temporary, or long-term).

6. All Documents and Communications Concerning Exxon's consideration, analysis, determination, or application of a carbon price, shadow price of carbon, or proxy cost of carbon.

7. All Documents and Communications Concerning the impact or potential impact of Any of the following factors on Exxon's financial statements or its business generally, including operations and capital allocation and expenditures:

    a. changes or potential changes in the cost or price of carbon, including but not limited to Any proxy or shadow cost of carbon;

    b. actual or potential policies or regulations limiting or discouraging the emission of Greenhouse Gases;

    c. actual or potential policies or regulations limiting or discouraging the use or development of Fossil Fuels;

    d. actual or potential policies or regulations promoting or incentivizing the use or development of Renewable Energy;

**App. 133**

e. actual or potential policies or regulations Concerning Climate Change;

f. actual or potential effects of Climate Change; and/or

g. changes or potential changes in the price of oil, gas, and other hydrocarbons.

8. All Documents and Communications from PwC's audit files for Exxon Concerning Exxon's oil, gas, and other hydrocarbon reserves, resource base, and potential resource base; E&P-related write-downs, impairment charges, impairment testing or analysis, and triggers for impairment testing or analysis, actual or potential; and capital expenditures or allocation based on actual or potential impacts of Climate Change or policies or regulations Concerning Climate Change.

9. Indices of PwC's work papers, permanent files, and desk files Concerning PwC's audits of Exxon's financial statements.

10. All engagement letters Concerning Exxon's retention of PwC.

11. All management representation letters Concerning PwC's audits of Exxon's financial statements.

12. All Documents and Communications Concerning Exxon's CDP submissions and PwC's analysis of Exxon's CDP submissions.

**App. 134**

## ATTACHMENT 1
### Electronic Document Production Specifications

Unless otherwise specified and agreed to by the Office of the Attorney General, all responsive documents must be produced in LexisNexis® Concordance® format in accordance with the following instructions. Any questions regarding electronic document production should be directed to the Assistant Attorney General whose telephone number appears on the subpoena.

1. <u>Concordance Production Components</u>. A Concordance production consists of the following component files, which must be produced in accordance with the specifications set forth below in Section 7.

   A. *Native Files.* Native format versions of produced documents that are not redacted, named by their first Bates number.

   B. *Single-Page Image Files.* Individual petrified page images of the produced documents in tagged image format ("TIF"), with page-level Bates number endorsements.

   C. *Extracted or OCR Text Files.* Document-level extracted text for each produced document or document-level optical character recognition ("OCR") text where extracted text is not available.

   D. *Metadata Load File.* A delimited text file that lists in columnar format the required metadata for each produced document.

   E. *Opticon Load File.* A delimited text file that lists the single-page TIF files for each produced document and defines (i) the relative location of the TIF files on the production media and (ii) each document break.

2. <u>Production Folder Structure</u>. The production must be organized according to the following standard folder structure:
   - data\ (contains production load files)
   - images\ (contains single-page TIF files, with subfolder organization)
        \0001, \0002, \0003…
   - natives\ (contains native files, with subfolder organization)
        \0001, \0002, \0003…
   - text\ (contains text files, with subfolder organization)
        \0001, \0002, \0003…

3. <u>De-Duplication</u>. You must perform global de-duplication of stand-alone documents and email families against any prior productions pursuant to this or previously related subpoenas.

4. <u>Paper or Scanned Documents</u>. Documents that exist only in paper format must be scanned to single-page TIF files and OCR'd. The resulting electronic files should be pursued in Concordance format pursuant to these instructions. You must contact the

11

**App. 135**

Assistant Attorney General whose telephone number appears on the subpoena to discuss (i) any documents that cannot be scanned, and (ii) how information for scanned documents should be represented in the metadata load file.

5.    Structured Data.  Structured data includes but is not limited to relational databases, transactional data, and xml pages. Spreadsheets are not considered structured data. You must first speak to the Assistant Attorney General whose telephone number appears on the subpoena.

A.    Relational Databases

1.    Database tables should be provided in comma-separated or other machine-readable, non-proprietary format, with each table in a separate data file. Each data file must have an accompanying data dictionary that explains the meaning of each column name and explains the values of any codes used.

2.    Dates and numbers must be clearly and consistently formatted and, where relevant, units of measure should be explained in the data dictionary.

3.    Records must contain clear, unique identifiers, and the data dictionary must include explanations of how the files and records relate to one another.

6.    Media and Encryption.  All document sets over 2 GB must be produced on CD, DVD, or hard-drive media.  All production media must be encrypted with a strong password, which must be delivered independently from the production media.  Document sets under 2 GB may be delivered electronically.  The OAG offers a secure cloud storage option that can be set up to receive media on a one-time basis, or the OAG will download media from the providing party's server.

7.    Production File Requirements.

A.    *Native Files*
- Documents that do not contain redacted information must be produced in their native format.
- The filename of each native file must match the document's beginning Bates number (BEGDOC) in the metadata load file and retain the original file extension.
- For documents produced only in native format, and not additionally as single-page image files, you must assign a single document-level Bates number and optionally provide an image file placeholder that states "Document produced only in native format."
- The relative paths to all native files on the production media must be listed in the NATIVEFILE field of the metadata load file.
- Native files that are password-protected must be decrypted prior to conversion and produced in decrypted form.
- You may be required to supply a software license for proprietary documents

12

**App. 136**

produced only in native format.

**B.**    ***Single-Page Image Files (Petrified Page Images)***
- Where possible, all produced documents must be converted into single-page tagged image format ("TIF") files.
- Image documents that exist only in non-TIF formats must be converted into TIF files.
- For documents produced only in native format, you may provide a single, TIF placeholder that states "Document produced only in native format."
- Each single-page TIF file must be endorsed with a unique Bates number.
- The filename for each single-page TIF file must match the unique page-level Bates number (or document-level Bates number for documents produced only in native format).
- Required image file format:
    o CCITT Group 4 compression
    o 2-Bit black and white
    o 300 dpi
    o Either .tif or .tiff file extension.
- TIF files must be divided into subfolders containing no more than 5000 files. Documents should not span multiple subfolders, a document with more than 5000 pages should be kept in a single folder.

**C.**    ***Extracted or OCR Text Files***
- You must produce individual document-level text files containing the full extracted text for each produced document.
- When extracted text is not available (for instance, for image-only documents) you must provide individual document-level text files containing the document's full OCR text.
- The filename for each text file must match the document's beginning Bates number (BEGDOC) listed in the metadata load file.
- Text files must be divided into subfolders containing no more than 5000 files.

**D.**    ***Metadata Load File***
- Required file format:
    o UTF-8
    o .dat file extension
    o Field delimiter: (ASCII decimal character 20)
    o Text Qualifier: þ (ASCII decimal character 254). Multiple value field delimiter: ; (ASCII decimal character 59)
- The first line of the metadata load file must list all included fields. All required fields are listed in Attachment 2.
- Fields with no values must be represented by empty columns maintaining delimiters and qualifiers.
- *Note:* All documents must have page-level Bates numbering (except documents produced only in native format, which must be assigned a document-level Bates number). The metadata load file must list the beginning and ending Bates numbers (BEGDOC and ENDDOC) for each document.
- Accepted date formats:

13

**App. 137**

- o   mm/dd/yyyy
- o   yyyy/mm/dd
- o   yyyymmdd
- Accepted time formats:
  - o   hh:mm:ss (if not in 24-hour format, you must indicate am/pm)
  - o   hh:mm:ss:mmm

E.    ***Opticon Load File***
- Required file format:
  - o   Field delimiter: , (ASCII decimal character 44)
  - o   No Text Qualifier
  - o   .opt file extension
- The comma-delimited Opticon load file must contain the following seven fields (as indicated below, values for certain fields may be left blank):
  - o   ALIAS or IMAGEKEY – the unique Bates number assigned to each page of the production.
  - o   VOLUME – this value is optional and may be left blank.
  - o   RELATIVE PATH – the file path to each single-page image file on the production media.
  - o   DOCUMENT BREAK – defines the first page of a document.  The only possible values for this field are "Y" or blank.
  - o   FOLDER BREAK – defines the first page of a folder.  The only possible values for this field are "Y" or blank.
  - o   BOX BREAK – defines the first page of a box.  The only possible values for this field are "Y" or blank.
  - o   PAGE COUNT – this value is optional and may be left blank.
- ***Example***:
  ABC00001,,IMAGES\0001\ABC00001.tif,Y,,,2
  ABC00002,,IMAGES\0001\ABC00002.tif,,,,
  ABC00003,,IMAGES\0002\ABC00003.tif,Y,,,1
  ABC00004,,IMAGES\0002\ABC00004.tif,Y,,,1

14

## ATTACHMENT 2
### Required Fields for Metadata Load File

| FIELD NAME | FIELD DESCRIPTION | FIELD VALUE EXAMPLE[1] |
|---|---|---|
| BEGDOC | Bates number assigned to the first page of the document. | ABC0001 |
| ENDDOC | Bates number assigned to the last page of the document. | ABC0002 |
| BEGATTACH | Bates number assigned to the first page of the parent document in a document family (*i.e.*, should be the same as BEGDOC of the parent document, or PARENTDOC). | ABC0001 |
| ENDATTACH | Bates number assigned to the last page of the last child document in a family (*i.e.*, should be the same as ENDDOC of the last child document). | ABC0008 |
| PARENTDOC | BEGDOC of parent document. | ABC0001 |
| CHILDDOCS | List of BEGDOCs of all child documents, delimited by ";" when field has multiple values. | ABC0002; ABC0003; ABC0004… |
| COMMENTS | Additional document comments, such as passwords for encrypted files. | |
| NATIVEFILE | Relative file path of the native file on the production media. | .\Native_File\Folder\...\BEGDOC.ext |
| TEXTFILE | Relative file path of the plain text file on the production media. | .\Text_Folder\Folder\...\BEGDOC.txt |
| SOURCE | For scanned paper records this should be a description of the physical location of the original paper record. For loose electronic files this should be the name of the file server or workstation where the files were gathered. | Company Name, Department Name, Location, Box Number… |
| CUSTODIAN | Owner of the document or file. | Firstname Lastname, Lastname, Firstname, User Name; Company Name, Department Name... |
| FROM | Sender of the email. | Firstname Lastname < FLastname @domain > |
| TO | All to: members or recipients, delimited by ";" when field has multiple values. | Firstname Lastname < FLastname @domain >; Firstname Lastname < FLastname @domain >; … |

---

[1] Examples represent possible values and not required format unless the field format is specified in Attachment 1.

15

**App. 139**

| CC | All cc: members, delimited by ";" when field has multiple values. | Firstname Lastname < FLastname @domain >; Firstname Lastname < FLastname @domain >; … |
|---|---|---|
| BCC | All bcc: members, delimited by ";" when field has multiple values | Firstname Lastname < FLastname @domain >; Firstname Lastname < FLastname @domain >; … |
| SUBJECT | Subject line of the email. | |
| DATERCVD | Date and time that an email was received. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd; hh:mm:ss AM/PM or hh:mm:ss |
| DATESENT | Date and time that an email was sent. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd; hh:mm:ss AM/PM or hh:mm:ss |
| CALBEGDATE | Date that a meeting begins. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd; hh:mm:ss AM/PM or hh:mm:ss |
| CALENDDATE | Date that a meeting ends. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd; hh:mm:ss AM/PM or hh:mm:ss |
| ATTACHMENTS | List of filenames of all attachments, delimited by ";" when field has multiple values. | AttachmentFileName.; AttachmentFileName.docx; AttachmentFileName.pdf;… |
| NUMATTACH | Number of attachments. | |
| RECORDTYPE | General type of record. | IMAGE; LOOSE E-MAIL; E-MAIL; E-DOC; IMAGE ATTACHMENT; LOOSE E-MAIL ATTACHMENT; E-MAIL ATTACHMENT; E-DOC ATTACHMENT |
| FOLDERLOC | Original folder path of the produced document. | Drive:\Folder\...\...\ |
| FILENAME | Original filename of the produced document. | Filename.ext |
| DOCEXT | Original file extension. | html, xls, pdf |
| DOCTYPE | Name of the program that created the produced document. | Adobe Acrobat, Microsoft Word, Microsoft Excel, Corel WordPerfect… |
| TITLE | Document title (if entered). | |
| AUTHOR | Name of the document author. | |
| REVISION | Number of revisions to a document. | 18 |
| DATECREATED | Date and time that a document was created. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd; hh:mm:ss AM/PM or hh:mm:ss |

16

| DATEMOD | Date and time that a document was last modified. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd; hh:mm:ss AM/PM or hh:mm:ss |
|---|---|---|
| FILESIZE | Original file size in bytes. | |
| PGCOUNT | Number of pages per document. | |
| IMPORTANCE | Email priority level if set. | Low, Normal, High |
| MD5HASH | MD5 hash value computed from native file (a/k/a file fingerprint). | |
| SHA1HASH | SHA1 hash value | |
| MSGINDEX | Email message ID | |
| CONVERSATIONINDEX | Email Conversation Index | |

17

**App. 141**

## AFFIDAVIT OF COMPLIANCE WITH SUBPOENA

State of _____ }

County of _____ }

I, _____, being duly sworn, state as follows:

1.  I am employed by Respondent in the position of _____;

2.  Respondent's productions and responses to the Subpoena of the Attorney General of the State of New York, dated _____, 20____ (the "Subpoena") were prepared and assembled under my personal supervision;

3.  I made or caused to be made a diligent, complete and comprehensive search for all Documents and information requested by the Subpoena, in full accordance with the instructions and definitions set forth in the Subpoena;

4.  Respondent's productions and responses to the Subpoena are complete and correct to the best of my knowledge and belief;

5.  No Documents or information responsive to the Subpoena have been withheld from Respondent's production and response, other than responsive Documents or information withheld on the basis of a legal privilege or doctrine;

6.  All responsive Documents or information withheld on the basis of a legal privilege or doctrine have been identified on a privilege log;

7.  The Documents contained in Respondent's productions and responses to the Subpoena are authentic, genuine and what they purport to be;

8.  Attached is a true and accurate record of all persons who prepared and assembled any productions and responses to the Subpoena, all persons under whose personal supervision the preparation and assembly of productions and responses to the Subpoena occurred, and all persons able competently to testify: (a) that such productions and responses are complete and correct to the best of such person's knowledge and belief; and (b) that any Documents produced are authentic, genuine and what they purport to be; and

**App. 142**

9. Attached is a true and accurate statement of those requests under the Subpoena as to which no responsive Documents were located in the course of the aforementioned search.


_____          _____
           Signature of Affiant                                    Date


_____
         Printed Name of Affiant

*    *    *

Subscribed and sworn to before me this _____ day of _____, 20____.

_____, Notary Public

My commission expires: _____

19

**App. 143**

# Exhibit 4

# Oleske Aff.
# Exhibit 12

**App. 145**

HIGHLY CONFIDENTIAL

EMC_RAM 000001180

Page 1

- - - - - - - - - - - - - - - - - - - - - -x

In the Matter of the Investigation of

EXXON MOBIL CORPORATION

- - - - - - - - - - - - - - - - - - - - - -x

February 14, 2018

9:36 a.m.

EXAMINATION OF KIRSTEN

BANNISTER, held at the Office of the

Attorney General, 120 Broadway, New York,

New York, before Jamie Ann Stanton, a

Notary Public of the State of New York.

Volume I

CONFIDENTIAL

*      *      *

HIGHLY CONFIDENTIAL          EMC_RAM 000001181

Page 621

K. Bannister - Confidential
Conventional oil field and tools that the geoscientists use to estimate the original in place volumes.

Q    What is your understanding of how Exxon gets bitumen out of the ground?

A    There are different ways of extracting the bitumen.  So there's surface mining.  High level.  Surface mining.  And the other one that I am aware of is it -- well, there's actually several.  There's SAGD.

Q    Does that stand for Steam Assisted something?

A    Solvent Assisted Gravity Drainage.

Q    Okay.

A    There's also cyclic steam where they can inject steam to mobilize the oil.

Q    Is it fair to say that as a general matter mining means digging it up and putting it in a container and transporting it somewhere else, as opposed to these other methods involve in

HIGHLY CONFIDENTIAL                                    EMC_RAM 000001801

Page 622

K. Bannister - Confidential

some way liquifying or mixing the bitumen with liquid so that it can be extracted in some kind of fluid form?

A      Or changing the viscosity, like in the example of the steam injection. They are changing that if you warm up peanut butter, it can be liquid like olive oil, right?  Same, similar type of concept.

Q      Do you have any understanding of whether or not mining or otherwise extracting bitumen creates more GHG emissions per production unit than, say, crude oil?

A      I -- personally, I couldn't say.  I don't know.

Q      Are you familiar with something called realization relating to bitumen?

A      Yes.

Q      What does realization means?

A      Realization is after all the costs are applied to the extraction, that's the dollar per oil equivalent barrel that you would realize at the

HIGHLY CONFIDENTIAL                                EMC_RAM 000001802

Page 623

K. Bannister - Confidential

first transfer point of sale.

Q      Do you have any sense of the difference between how much Exxon realizes on a barrel of light Syncrude, and how much Exxon realizes on a barrel of bitumen?

A      I know bitumen is significantly discounted off of that.  And depending on whether or not we have contract terms for the oil or we have contract terms for the bitumen, that would dictate potential price differences, as well.

Q      But, I mean, in general, why is it -- putting aside business contract terms, what is the basis of your specific understanding that bitumen is significantly discounted from crude oil?

A      Well, it's based on the last couple of years, I should say.  So maybe that could change at some point where bitumen is worth or could be worth more, I don't know what projection is.  But the last few years of realization, the bitumen has been lower than that of the

HIGHLY CONFIDENTIAL                                    EMC_RAM 000001803

Page 624

K. Bannister - Confidential

SEC average Brent price.

Q    So sitting here now, you believe it's possible that somehow bitumen could be worth more, a barrel of bitumen worth more than a barrel of crude oil?

A    I don't know what the commodity prices are going to do.  That's not my area of expertise.

Q    Let me back up.  Is Kearl, to the best of your knowledge, a bitumen operation?

A    Yes.

Q    Has the company de-booked resources or reserves from Kearl?  Did it de-book reserves or resources from Kearl at the end of 2017?

A    I don't know what they did in 2017.  I recall what we did in 2016.

Q    How about in 2016?

A    On an SEC basis, yes.

Q    Do you remember the range of Proved that got de-booked?

A    It was a big de-book.  It was

HIGHLY CONFIDENTIAL                                        EMC_RAM 000001804

Page 625

K. Bannister - Confidential

over 3 billion barrels.

Q     And was anything declassified or moved down on classification or was it all de-bookings?

A     Well, I was speaking specifically to the SEC.

Q     I'm sorry, that's right.  So let me ask you separately.

A     Yes.

Q     Company Reserves, was anything de-booked?

A     I don't recall if Kearl what the changes were, whether they were positive or negative.  I am trying to recall.  2016, I want to say that is the year that we dropped in price on crude and I believe our bitumen might have dropped, as well.  And depending on what the cost structure of the project was doing, it's possible.  I don't recall.

Q     Is the reason why SEC Reserves could have been de-booked but not Company Reserves because the SEC had a lower price basis at that time?

HIGHLY CONFIDENTIAL                                    EMC_RAM 000001805

# Exhibit 5

# Oleske Aff.
# Exhibit 25

**App. 153**

HIGHLY CONFIDENTIAL

EMC_RAM 000003227

Page 1

OFFICE OF THE ATTORNEY GENERAL

OF THE STATE OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - x

In Re:

Investigation of ExxonMobil Corporation


- - - - - - - - - - - - - - - - - - - - - - - - x


June 27, 2017

9:00 a.m.

120 Broadway

New York, New York



EXAMINATION of WILLIAM M. COLTON, Vice President of Corporate Strategic Planning of ExxonMobil Corporation, pursuant to Section 352 of the General Business Law and Executive Law Section 6312 of the State of New York, before Brittany Saline, a Professional Shorthand Reporter and Notary Public of the State of New York.

*      *      *      *

HIGHLY CONFIDENTIAL                EMC_RAM 000003228

Page 482

William M. Colton

A     No.   I believe there was someone else at the job at that time.

Q     Who was that?

A     I believe the initial person, maybe it was -- I think it was -- who did that job?  I have to go back and look.  The name Ted Peerock comes to mind.  I'm trying to remember if Ted had left yet.  I'm not sure.

Q     You had referenced a wide range of prices?

A     Yes.

Q     Forty to 100?

A     Yes.

Q     That companies in Exxon were supposed to consider.

How does that work, in this sense, you know, suppose an investment would be profitable at $100, it might not be profitable at 40.  It might or might not be profitable at various prices within that range.

How does testing over that range inform the decision of whether to make an

HIGHLY CONFIDENTIAL                                    EMC_RAM 000003709

Page 483

William M. Colton

investment?

A      Well, remember, now, these are decisions that are made by the Management Committee, so as those economics are presented to the Management Committee, the members of the Management Committee then have to weigh all of that information that comes forward to them.  In particular, with regard to alternative investments that they may have available in terms of decision making and they just have to weigh all of that information.

This is where they apply their judgment as to whether or not the project looks like an attractable investment for the corporation or not.  Because they have to consider all things, not only, for instance, the -- the economics in that range of prices, but the risk of that project, what countries it's in, what the political risks are, what are the technical risks that might be involved.

So they have to consider a wide range of considerations to then come to a

HIGHLY CONFIDENTIAL    EMC_RAM 000003710

Page 484

William M. Colton
judgment whether they believe it's a suitable value proposition for the ExxonMobil shareholder.

Q    Is there a particular hurdle rate or rate of return that Exxon targets or hopes to meet when making these decisions?

A    We -- we have, over many years, tried to steer away from the concept of a fixed hurdle rate.  A fixed hurdle rate implies that all investments are the same, so you can just kind of make it almost a mathematical kind of decision.  And we really try to avoid that line of thinking, and each project is its own -- has its own personality and profile.  And so that you can't issue guidelines that every project should receive a certain return.

MR. ZWEIG:  Can you mark this 31.

(Document Bates-stamped PNYAG0186946 was marked for identification as WC Exhibit 31 as of this date.)

Q    Mr. Colton, you have been handed what's been marked WC31.  The Bates number

HIGHLY CONFIDENTIAL                                    EMC_RAM 000003711

is PNYAG0186946. It's a document, it appears to be a PowerPoint presentation. It is entitled "Asset Recoverability Review." Towards the bottom it says, "Review with PwC." The date on it is November 29th, 2016.

It's a lengthy document, so I won't ask you to review the entire thing, but are you familiar with this document?

A Yes, I am. I believe this is what you were asking about yesterday and so yes, I did attend this meeting.

I -- I -- as I see it now, I always thought about this as the XTO asset meeting, which is why perhaps I was confused yesterday.

Q Okay. And what's the purpose of this meeting?

A Well, again, this is really driven, you see the main presenter, beginning and end is the controller. So to me, it is driven by accounting rules that require you to test the viability of assets.

Page 486

William M. Colton

My recollection is that the main event here was testing whether these XTO -- I say XTO because there were other assets here, but to me -- the biggest part of this would be XTO assets and to test whether they had -- if I remember the accounting properly, was that they had to test whether they had positive cash flow over the life of the assets.

Q    And why would the XTO assets have been a particular focus?

A    My recollection is because natural gas prices had fallen so much in North America.

Q    Had asset recoverability review meetings taken place prior to that fall in natural gas prices?

A    Well, this is -- this is really again driven by accounting considerations, so I think you would have to ask the accountants in terms of what the triggers are that determine when you have to do one of these reviews.

Q    Right.  I guess my question is,

HIGHLY CONFIDENTIAL                                        EMC_RAM 000003713

Page 487

William M. Colton

simply given that the -- my question is simply whether you -- when you started -- when did you start attending these asset recoverability meetings?

A     I believe, I may not remember exactly, I seem to recall this was a second one that I attended.  I believe there was one the prior year also.

MR. TOAL:  Can we take a short break.

(A short recess was taken.)

MR. TOAL:  On the record.  Okay.

So there has been a series of questions about a document related to asset recoverability review.  We have argued and we believe that any investigation concerning the issues -- related to the issues of reserves and impairment are preempted, that those are within the exclusive providence of federal law.

We have no issue with the questions concerning the Energy Outlook or price basis, which are

HIGHLY CONFIDENTIAL                                    EMC_RAM 000003714

# Exhibit 6

# Zweig Aff.
# Exhibit 9

**App. 162**

FILED: NEW YORK COUNTY CLERK 06/19/2018 12:09 PM          INDEX NO. 451962/2016
NYSCEF DOC. NO. 255                                      RECEIVED NYSCEF: 06/19/2018



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL


THE PEOPLE OF THE STATE OF NEW YORK
SUBPOENA FOR PRODUCTION OF INFORMATION AND DOCUMENTS

TO:    **Exxon Mobil Corporation**
       **c/o Patrick J. Conlon, Esq.**
       **Corporate Headquarters**
       **5959 Las Colinas Boulevard**
       **Irving, Texas 75039-2298**


        YOU ARE HEREBY COMMANDED, pursuant General Business Law § 352, Executive Law § 63(12), and § 2302(a) of the New York Civil Practice Law and Rules, to deliver and turn over to Eric T. Schneiderman, the Attorney General of the State of New York, or a designated Assistant Attorney General, on ***the 22nd day of May, 2017, at 9:30 a.m.***, or any agreed upon adjourned date or time, at 120 Broadway, New York, New York 10271, all documents and information requested in the attached Schedule in accordance with the instructions and definitions contained therein.

        PLEASE TAKE NOTICE that the Attorney General deems the documents and information commanded by this Subpoena to be relevant and material to an investigation and inquiry undertaken in the public interest.

        PLEASE TAKE FURTHER NOTICE that Your disobedience of this Subpoena, by failing to produce documents and information on the date, time and place stated above or on any agreed upon adjourned date or time, may subject You to prosecution for a misdemeanor or penalties and other lawful punishment under General Business Law § 352 and § 2308 of the New York Civil Practice Law, and/or other statutes.

        WITNESS, **The Honorable Eric T. Schneiderman,** Attorney General of the State of New York, this 8th day of May, 2017.

        By: _____

               John Oleske
               Senior Enforcement Counsel
               Office of the Attorney General
               120 Broadway, 26th Floor
               New York, New York 10271
               (212) 416-8660 (telephone)
               (212) 416-6007 (facsimile)

## SCHEDULE

### A. General Definitions and Rules of Construction

1.    "All" means each and every.

2.    "Any" means any and all.

3.    "And" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Subpoena all information or Documents that might otherwise be construed to be outside of its scope.

4.    "Communication" means any conversation, discussion, letter, email, memorandum, meeting, note or other transmittal of information or message, whether transmitted in writing, orally, electronically or by any other means, and shall include any Document that abstracts, digests, transcribes, records or reflects any of the foregoing.

5.    "Concerning" means, directly or indirectly, in whole or in part, relating to, referring to, describing, evidencing or constituting.

6.    "Custodian" means any Person or Entity that, as of the date of this Subpoena, maintained, possessed, or otherwise kept or controlled such Document.

7.    "Document" is used herein in the broadest sense of the term and means all records and other tangible media of expression of whatever nature however and wherever created, produced or stored (manually, mechanically, electronically or otherwise), including without limitation all versions whether draft or final, all annotated or nonconforming or other copies, electronic mail ("e-mail"), instant messages, text messages, Blackberry or other wireless device messages, voicemail, calendars, date books, appointment books, diaries, books, papers, work papers, files, desk files, permanent files, temporary files, notes, confirmations, accounts statements, correspondence, memoranda, reports, records, journals, registers, analyses, plans, manuals, policies, telegrams, faxes, telexes, wires, telephone logs, telephone messages, message slips, minutes, notes or records or transcriptions of conversations or Communications or meetings, tape recordings, videotapes, disks, other electronic media, microfilm, microfiche, storage devices, press releases, contracts, agreements, notices, summaries, and written or electronic data, including but not limited to data from the Dataflex and Phoenix databases. Any non-identical version of a Document constitutes a separate Document within this definition, including without limitation drafts or copies bearing any notation, edit, comment, marginalia, underscoring, highlighting, marking, or any other alteration of any kind resulting in any difference between two or more otherwise identical Documents. In the case of Documents bearing any notation or other marking made by highlighting ink, the term Document means the original version bearing the highlighting ink, which original must be produced as opposed to any copy thereof.

8.    "Entity" means without limitation any corporation, company, limited liability company or corporation, partnership, limited partnership, association, or other firm or similar body, or any unit, division, agency, department, or similar subdivision thereof.

2

**App. 164**

9.    "Identify" or "Identity," as applied to any Document, means the provision in writing of information sufficiently particular to enable the Attorney General to request the Document's production through subpoena or otherwise, including but not limited to: (a) document control number or Bates number, if applicable, (b) Document type (letter, memorandum, etc.); (c) Document subject matter; (d) Document date; and (e) Document author(s), addressee(s) and recipient(s).  In lieu of identifying a Document, the Attorney General will accept production of the Document, together with designation of the Document's Custodian, and identification of each Person You believe to have received a copy of the Document.

10.    "Identify" or "Identity," as applied to any Entity, means the provision in writing of such Entity's legal name, any d/b/a, former, or other names, any parent, subsidiary, officers, employees, or agents thereof, and any address(es) and any telephone number(s) thereof.

11.    "Identify" or "Identity," as applied to any natural person, means and includes the provision in writing of the natural person's name, title(s), any aliases, place(s) of employment, telephone number(s), e-mail address(es), mailing addresses and physical address(es), and (if applicable) employment history at Exxon.

12.    "OAG" means the New York State Office of the Attorney General.

13.    "Person" means any natural person, or any Entity.

14.    "Sent" or "received" as used herein means, in addition to their usual meanings, the transmittal or reception of a Document by physical, electronic or other delivery, whether by direct or indirect means.

15.    "Subpoena" means this subpoena and any schedules or attachments thereto.

16.    The use of the singular form of any word used herein shall include the plural and vice versa.  The use of any tense of any verb includes all other tenses of the verb.

17.    The references to Communications, Custodians, Documents, Persons, and Entities in this Subpoena encompass all such relevant ones worldwide.

## B. Instructions

1.    <u>Preservation of Relevant Documents and Information; Spoliation.</u>  You are reminded of Your obligations under law to preserve Documents and information relevant or potentially relevant to this Subpoena from destruction or loss, and of the consequences of, and penalties available for, spoliation of evidence.  No agreement, written or otherwise, purporting to modify, limit or otherwise vary the terms of this Subpoena, shall be construed in any way to narrow, qualify, eliminate or otherwise diminish Your aforementioned preservation obligations.  Nor shall You act, in reliance upon any such agreement or otherwise, in any manner inconsistent with Your preservation obligations under law.  No agreement purporting to modify, limit or otherwise vary Your preservation obligations under law shall be construed as in any way narrowing,

3

**App. 165**

qualifying, eliminating or otherwise diminishing such aforementioned preservation obligations, nor shall You act in reliance upon any such agreement, unless an Assistant Attorney General confirms or acknowledges such agreement in writing, or makes such agreement a matter of record in open court.

2.   Possession, Custody, and Control.  The Subpoena calls for all responsive Documents or information in Your possession, custody or control.  This includes, without limitation, Documents or information possessed or held by any of Your officers, directors, employees, agents, representatives, divisions, affiliates, subsidiaries (including but not limited to Imperial Oil Limited) or Persons from whom You could request Documents or information.  If Documents or information responsive to a request in this Subpoena are in Your control, but not in Your possession or custody, You shall promptly Identify the Person with possession or custody.

3.   Documents No Longer in Your Possession.  If any Document requested herein was formerly in Your possession, custody or control but is no longer available, or no longer exists, You shall submit a statement in writing under oath that:  (a) describes in detail the nature of such Document and its contents; (b) Identifies the Person(s) who prepared such Document and its contents; (c) Identifies all Persons who have seen or had possession of such Document; (d) specifies the date(s) on which such Document was prepared, transmitted or received; (e) specifies the date(s) on which such Document became unavailable; (f) specifies the reason why such Document is unavailable, including without limitation whether it was misplaced, lost, destroyed or transferred; and if such Document has been destroyed or transferred, the conditions of and reasons for such destruction or transfer and the Identity of the Person(s) requesting and performing such destruction or transfer; and (g) Identifies all Persons with knowledge of any portion of the contents of the Document.

4.   No Documents Responsive to Subpoena Requests.  If there are no Documents responsive to any particular Subpoena request, You shall so state in writing under oath in the Affidavit of Compliance attached hereto, identifying the paragraph number(s) of the Subpoena request concerned.

5.   Format of Production.  You shall produce Documents and information responsive to this Subpoena in the format requested by the OAG.  Productions in electronic format shall meet the specifications set out in Attachments 1 and 2.

6.   Existing Organization of Documents to be Preserved.  Regardless of whether a production is in electronic or paper format, each Document shall be produced in the same form, sequence, organization or other order or layout in which it was maintained before production, including but not limited to production of any Document or other material indicating filing or other organization.  Such production shall include without limitation any file folder, file jacket, cover or similar organizational material, as well as any folder bearing any title or legend that contains no Document.  Likewise, all Documents that are physically attached to each other in Your files shall remain so attached in any production; or if such production is electronic, shall be accompanied by notation or information sufficient to indicate clearly such physical attachment.

4

**App. 166**

7.   Manner of Compliance – Custodians, Search Terms, and Technology-Assisted Review. Prior consultation with the OAG is required concerning selection of custodians for document searches (whether electronic or otherwise) or for use of search term filters, predictive coding or other forms of technology-assisted review. The OAG reserves the right to approve, disapprove, modify or supplement any proposed list of custodians, search terms, and/or review methodology. The selection or use of custodians, search term filters, and/or technology-assisted review in no way relieves You of Your obligation to fully respond to these requests for Documents or information.

8.   Document Numbering. All Documents responsive to this Subpoena, regardless of whether produced or withheld on ground of privilege or other legal doctrine, and regardless of whether production is in electronic or paper format, shall be numbered in the lower right corner of each page of such Document, without disrupting or altering the form, sequence, organization or other order or layout in which such Documents were maintained before production. Such number shall comprise a prefix containing the producing Person's name or an abbreviation thereof, followed by a unique, sequential, identifying document control number.

9.   Privilege Placeholders. For each Document withheld from production on ground of privilege or other legal doctrine, regardless of whether a production is electronic or in hard copy, You shall insert one or more placeholder page(s) in the production bearing the same document control number(s) borne by the Document withheld, in the sequential place(s) originally occupied by the Document before it was removed from the production.

10.   Privilege. If You withhold or redact any Document responsive to this Subpoena on ground of privilege or other legal doctrine, You shall submit with the Documents produced a statement in writing under oath, stating: (a) the document control number(s) of the Document withheld or redacted; (b) the type of Document; (c) the date of the Document; (d) the author(s) and recipient(s) of the Document; (e) the general subject matter of the Document; and (f) the legal ground for withholding or redacting the Document. If the legal ground for withholding or redacting the Document is attorney-client privilege, You shall indicate the name of the attorney(s) whose legal advice is sought or provided in the Document.

11.   Cover Letter, Index, and Identifying Information. Accompanying any production(s) made pursuant to this Subpoena, You shall include a cover letter that shall at a minimum provide an index containing the following: (a) a description of the type and content of each Document produced therewith; (b) the paragraph number(s) of the Subpoena request to which each such Document is responsive; (c) the Identity of the Custodian(s) of each such Document; and (d) the document control number(s) of each such Document. As further set forth in Attachment 2, information must also be included in the metadata and load files of each production concerning the identity of each Document's custodian, as well as information identifying the particular Document requests and/or information to which each document is responsive.

12.   Affidavit of Compliance. A copy of the Affidavit of Compliance provided herewith shall be completed and executed by all natural persons supervising or participating in

5

**App. 167**

compliance with this Subpoena, and You shall submit such executed Affidavit(s) of Compliance with Your response to this Subpoena.

13. **Identification of Persons Preparing Production.** In a schedule attached to the Affidavit of Compliance provided herewith, You shall Identify the natural person(s) who prepared or assembled any productions or responses to this Subpoena. You shall further Identify the natural person(s) under whose personal supervision the preparation and assembly of productions and responses to this Subpoena occurred. You shall further Identify all other natural person(s) able competently to testify: (a) that such productions and responses are complete and correct to the best of such person's knowledge and belief; and (b) that any Documents produced are authentic, genuine and what they purport to be.

14. **Your Production Instructions to be Produced.** You shall produce a copy of all written or otherwise recorded instructions prepared by You concerning the steps taken to respond to this Subpoena. For any unrecorded instructions given, You shall provide a written statement under oath from the Person(s) who gave such instructions that details the specific content of the instructions and any Person(s) to whom the instructions were given.

15. **Continuing Obligation to Produce.** This Subpoena imposes a continuing obligation to produce the Documents and information requested. Documents located, and information learned or acquired, at any time after Your response is due shall be promptly produced at the place specified in this Subpoena. Documents created after the date of the Subpoena shall also be promptly produced if requested by OAG.

16. **No Oral Modifications.** No agreement purporting to modify, limit or otherwise vary this Subpoena shall be valid or binding, and You shall not act in reliance upon any such agreement unless an Assistant Attorney General confirms or acknowledges such agreement in writing, or makes such agreement a matter of record in open court.

17. **Inflation.** For All of Your responses to the below Requests for Information that include dollar amounts, provide those amounts in both nominal and real (inflation-adjusted) terms, if applicable.

18. **Time Period.** Unless otherwise specified, the time period for information, Documents and Communications requested by this Subpoena is from January 1, 2005 through the date of the production.

## C. Particular Definitions

1. "You," "Your," or "Exxon" means Exxon Mobil Corporation, ExxonMobil Oil Corporation, and Any present or former parents, subsidiaries (including but not limited to Imperial Oil Limited), affiliates, directors, officers, partners, employees, agents, representatives, attorneys or other Persons acting on its behalf, and including predecessors or successors or Any affiliates of the foregoing.

2. "Actual GHG Cost" means Any cost, price, fee, or tax on GHG emissions imposed by

**App. 168**

Any governmental or regulatory body.

3. "Greenhouse Gases" or "GHGs" means carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride.

4. "Intensity," as applied to emissions, means any rate, percentage, amount, or formula, whether expressed in mathematical or narrative terms, used to determine the quantity of GHG emissions, actual or projected, to which a Proxy Cost or Actual GHG Cost is applied.

5. "Project" means Any oil, gas, or other hydrocarbon project, and its associated reserves or resource base, in which Exxon has Any working interest.

6. "Proxy Cost" means Any implied, imputed, shadow, or proxy cost, price, fee or tax on GHG emissions, including any such cost, price, fee, or tax applied as a proxy for potential policies that might be adopted by Any government or regulatory body over time to help stem GHG emissions.

7. "PwC" means PricewaterhouseCoopers LLP and Any present or former parents, subsidiaries, affiliates, directors, officers, partners, employees, agents, representatives, attorneys or other Persons acting on its behalf, and including predecessors or successors or Any affiliates of the foregoing.

8. "Scope 1," as applied to emissions, means GHG emissions from sources that are owned or controlled by You. Scope 1 emissions include, but are not limited to, emissions caused by the production of electricity, steam, or heat; manufacture or processing of chemicals; or transportation of people, products, or waste; and include fugitive emissions.

9. Scope 2," as applied to emissions, means GHG emissions associated with the generation of electricity, steam, or heat imported or purchased by You.

10. "Scope 3," as applied to emissions, means GHG emissions caused by Your activities that do not fall under Scope 1 or Scope 2. Scope 3 emissions include, but are not limited to, the use or disposal of products or services generated by You.

11. "Sensitivity Analysis" means Any analysis undertaken to determine the sensitivity of an economic model to variation in certain of its parameters or assumptions.

12. "Trigger" means an event or change in circumstances which indicates that the carrying value of an asset or asset group may not be recoverable.

7

**App. 169**

## D. Requests for Information

1.    Provide a list that identifies each instance in which Exxon made a decision to approve, defer, or decline the investment, development, funding, expansion, or divestment in or of a Project, with such list separated into two columns:

    (a)    Instances where Exxon applied a Proxy Cost to data, projections, forecasts, or models of the cash flow, profit or loss, revenue, capital expenditure, or operating expenditure relating to the relevant Project; and

    (b)    Instances where Exxon did not apply a Proxy Cost in such a manner.

For each such instance, Identify: (i) the name of the Project; (ii) the date of the decision; (iii) the Exxon subsidiary or affiliate associated with the Project, (iv) the individual(s) responsible for making the decision; and (v) the individual(s) responsible for approving the decision.

2.    For each instance listed in your response to Request for Information No. 1(a) above, provide the following information (in Excel table format):

    a.    The Proxy Cost figure applied by Exxon for each projected year, and the basis, if Any, for that figure;

    b.    The Intensity of Greenhouse Gas emissions to which the Proxy Cost was applied by Exxon for each projected year, and the basis, if Any, for that figure;

    c.    The scope(s) of Greenhouse Gas emissions to which the Proxy Cost was applied by Exxon for each projected year, including but not limited to (i) which Greenhouse Gases the Proxy Cost was applied to, and (ii) whether the Proxy Cost was applied to Scope 1, Scope 2, and/or Scope 3 emissions; and the basis, if Any, for the scope(s) selected;

    d.    The policies, procedures, or controls, if Any, governing the application of a Proxy Cost to each such investment, development, funding, expansion, or divestment decision;

    e.    The percentage and total effect of applying a Proxy Cost to the economics of each such investment, development, funding, expansion, or divestment decision, including but not limited to the impact on cash flow, cash flow rate, profit or loss, revenue, capital expenditure, operating expenditure, and demand for oil, gas, or other hydrocarbons;

    f.    Exxon's assumptions as to the percentage and amount of the Proxy Cost, if Any, that Exxon will be able to pass on to purchasers in each projected year, and the basis, if Any, for those assumptions;

8

**App. 170**

g. Exxon's assumptions as to the effects on demand for oil, gas, or other hydrocarbons caused by Any such pass-through to purchasers for each projected year, and the basis, if Any, for those assumptions; and

h. With respect to Any Proxy Cost Sensitivity Analysis, the same information requested in (a)-(g) above.

i. Identify Any Actual GHG Cost applicable to the Project at the time of such investment, development, funding, expansion, or divestment decision. To the extent that Any Actual GHG Cost was applicable to the relevant Project, identify the same information requested in (a)-(h) above with respect to such Actual GHG Cost.

3. Provide a list that identifies each instance in which Exxon made a decision as to whether an impairment or write-down as to Any Project should be taken, with such list separated into two columns:

    (a) Instances where Exxon applied a Proxy Cost to data, projections, forecasts, or models of the cash flow, profit or loss, revenue, capital expenditure, or operating expenditure relating to the relevant Project; and

    (b) Instances where Exxon did not apply a Proxy Cost in such a manner.

For each such instance, Identify: (i) the name of the Project; (ii) the date of the decision; (iii) the Exxon subsidiary or affiliate associated with the Project, (iv) the individual(s) responsible for making the decision; and (v) the individual(s) responsible for approving the decision.

4. Provide a list that identifies each instance in which Exxon made a decision as to whether a Trigger for impairment testing or analysis existed as to Any Project, with such list separated into two columns:

    (a) Instances where Exxon applied a Proxy Cost to data, projections, forecasts, or models of the cash flow, profit or loss, revenue, capital expenditure, or operating expenditure relating to the relevant Project; and

    (b) Instances where Exxon did not apply a Proxy Cost in such a manner.

For each such instance, Identify: (i) the name of the Project; (ii) the date of the decision; (iii) the Exxon subsidiary or affiliate associated with the Project, (iv) the individual(s) responsible for making the decision; and (v) the individual(s) responsible for approving the decision.

5. For each instance listed in your responses to Requests for Information Nos. 3(a) or 4(a), above, provide the following information (in Excel table format):

    a. The Proxy Cost figure applied by Exxon for each projected year, and the basis, if Any, for that figure;

9

**App. 171**

b.  The Intensity of Greenhouse Gas emissions to which the Proxy Cost was applied by Exxon for each projected year, and the basis, if Any, for that figure;

c.  The scope(s) of Greenhouse Gas emissions to which the Proxy Cost was applied by Exxon for each projected year, including but not limited to (i) which Greenhouse Gases the Proxy Cost was applied to, and (ii) whether the Proxy Cost was applied to Scope 1, Scope 2, and/or Scope 3 emissions; and the basis, if Any, for the scope(s) selected;

d.  The policies, procedures, or controls, if Any, governing the application of a Proxy Cost to each such impairment or impairment Trigger-related decision;

e.  The percentage and total effect of applying a Proxy Cost to the economics of each such impairment or impairment Trigger-related decision, including but not limited to the impact on cash flow, cash flow rate, profit or loss, revenue, capital expenditure, operating expenditure, and demand for oil, gas, or other hydrocarbons;

f.  Exxon's assumptions as to the percentage and amount of the Proxy Cost, if Any, that Exxon will be able to pass onto purchasers in each projected year, and the basis, if Any, for those assumptions;

g.  Exxon's assumptions as to the effects on demand for oil, gas, or other hydrocarbons caused by Any such pass-through to purchasers for each projected year, and the basis, if Any, for those assumptions; and

h.  With respect to Any Proxy Cost Sensitivity Analysis, the same information requested in (a)-(g) above.

i.  Identify Any differences between Exxon and PwC with respect to (a)-(h) above, and explain Any such differences in detail.

j.  Identify Any Actual GHG Cost applicable to the Project at the time of such impairment or impairment Trigger-related decision. To the extent that Any Actual GHG Cost was applicable to the relevant Project, identify the same information requested in (a)-(i) above with respect to such Actual GHG Cost.

6.  Provide a list that identifies each instance in which Exxon internally estimated its oil, gas, or other hydrocarbon reserves or resource base associated with Any Project (as distinct from the proved reserves calculations mandated by the U.S. Securities and Exchange Commission), with such list separated into two columns:

(a)  Instances where Exxon applied a Proxy Cost in connection with such estimates;

(b)  Instances where Exxon did not apply a Proxy Cost in such a manner.

For each such instance, Identify: (i) the name of the Project; (ii) the date of the estimate; (iii) the Exxon subsidiary or affiliate associated with the Project, (iv) the individual(s)

**App. 172**

responsible for making the estimate; and (v) the individual(s) responsible for approving the estimate.

7. For each instance listed in your response to Request for Information No. 6(a), provide the following information (in Excel table format):

   a. The Proxy Cost figure applied by Exxon for each projected year, and the basis, if Any, for that figure;

   b. The Intensity of Greenhouse Gas emissions to which the Proxy Cost was applied by Exxon for each projected year, and the basis, if Any, for that figure;

   c. The scope(s) of Greenhouse Gas emissions to which the Proxy Cost was applied by Exxon for each projected year, including but not limited to (i) which Greenhouse Gases the Proxy Cost was applied to, and (ii) whether the Proxy Cost was applied to Scope 1, Scope 2, and/or Scope 3 emissions; and the basis, if Any, for the scope(s) selected;

   d. The policies, procedures, or controls, if Any, governing the application of a Proxy Cost to such reserves or resource base estimation;

   e. The percentage and total effect of applying a Proxy Cost to Exxon's such reserves or resource base estimation, including but not limited to the impact on cash flow, cash flow rate, profit or loss, revenue, capital expenditure, operating expenditure, and demand for oil, gas, or other hydrocarbons;

   f. Exxon's assumptions as to the percentage and amount of the Proxy Cost, if Any, that Exxon will be able to pass on to purchasers in each projected year, and the basis, if Any, for those assumptions;

   g. Exxon's assumptions as to the effects on demand for oil, gas, or other hydrocarbons caused by Any such pass-through to purchasers for each projected year, and the basis, if Any, for those assumptions; and

   h. With respect to Any Proxy Cost Sensitivity Analysis, the same information requested in (a)-(g) above.

   i. Identify Any Actual GHG Cost applicable to the Project at the time of such reserves or resource base estimation. To the extent that Any Actual GHG Cost was applicable to the relevant Project, identify the same information requested in (a)-(h) above with respect to such Actual GHG Cost.

8. Identify the individual(s) at Exxon with personal knowledge of the information contained in Your responses to each of the Requests for Information above.

9. Identify the individuals at Exxon, including Any of its subsidiaries (including but not limited to Imperial Oil Limited), who served as members of the Upstream Reserves Committee, the EMPC Reserves Committee, the EMDC Reserves Committee and the

11

**App. 173**

Case 3:16-cv-03111-K    Document 121    Filed 07/31/20    Page 179 of 544    PageID 4431

IOL Reserves Management Committee (RMC) throughout the Time Period of this Subpoena, and specify which of these committee(s) each of these individuals served on and during what time period they so served.

12

**App. 174**

Case 3:16-cv-03111-K    Document 121    Filed 07/31/20    Page 180 of 544    PageID 4432

## E. Requests for Documents

1.  Produce, or identify by Bates number to the extent already produced, All Documents supporting Your responses to the Requests for Information above, including but not limited to Any such Documents reflecting the actual implementation of a Proxy Cost in spreadsheets or other formats containing calculations or formulas.

2.  All Documents and Communications responsive to Request for Documents Nos. 3, 4, or 5 of OAG's November 4, 2015 subpoena to Exxon, covering the period from November 4, 2015 through the date of production under this Subpoena, including, but not limited to, Documents and Communications relating to:

    (a)  *2016 Outlook for Energy: A View to 2040*, dated January 25, 2016;
    (b)  2015 Form 10-K, dated February 24, 2016;
    (c)  Notice of 2016 Annual Meeting and Proxy Statement, dated April 13, 2016;
    (d)  Annual Shareholders Meeting on May 25, 2016;
    (e)  *2017 Outlook for Energy: A View to 2040*, dated December 16, 2016;
    (f)  2016 Form 10-K, dated February 22, 2017;
    (g)  Notice of 2017 Annual Meeting and Proxy Statement, dated April 13, 2017; and/or;
    (h)  *2016 Energy and Carbon Summary*, dated April 13, 2017.

3.  All Documents and Communications of each individual listed in response to Request for Information No. 9 that are responsive to Request for Documents Nos. 3, 4, or 5 of OAG's November 4, 2015 subpoena to Exxon, or that are responsive to Request for Documents No. 2 above.

4.  All Documents and Communications Concerning the assessment of Exxon's long-lived assets for impairment or write-down, including but not limited to (a) Documents and Communications Concerning the identification or evaluation of Any actual or potential Triggers for impairment testing or analysis, (b) Documents and Communications associated with Exxon's internal audit function, and (c) All policies, procedures, or controls Concerning the assessment of Exxon's long-lived assets for impairment or write-down.

5.  All Documents and Communications provided to the U.S. Securities and Exchange Commission pursuant to its investigation of Exxon's practices relating to climate change, reserve calculations, and impairment.

6.  All Documents and Communications consisting of or Concerning Exxon's Communications with Any banks, underwriters, research analysts, or other financial firms or institutions Concerning Any of the topics described in this Subpoena or Request for Documents Nos. 3, 4, or 5 of OAG's November 4, 2015 subpoena to Exxon.

13

**App. 175**

## ATTACHMENT 1
### Electronic Document Production Specifications

Unless otherwise specified and agreed to by the Office of the Attorney General, all responsive documents must be produced in LexisNexis® Concordance® format in accordance with the following instructions. Any questions regarding electronic document production should be directed to the Assistant Attorney General whose telephone number appears on the subpoena.

1. <u>Concordance Production Components</u>. A Concordance production consists of the following component files, which must be produced in accordance with the specifications set forth below in Section 7.

   A. *Metadata Load File.* A delimited text file that lists in columnar format the required metadata for each produced document.

   B. *Extracted or OCR Text Files.* Document-level extracted text for each produced document or document-level optical character recognition ("OCR") text where extracted text is not available.

   C. *Single-Page Image Files.* Individual petrified page images of the produced documents in tagged image format ("TIF"), with page-level Bates number endorsements.

   D. *Opticon Load File.* A delimited text file that lists the single-page TIF files for each produced document and defines (i) the relative location of the TIF files on the production media and (ii) each document break.

   E. *Native Files.* Native format versions of produced documents that are not redacted, named by their first Bates number.

2. <u>Production Folder Structure</u>. The production must be organized according to the following standard folder structure:

   - data\ (contains production load files)

   - images\ (contains single-page TIF files, with subfolder organization)

     \0001, \0002, \0003...

   - native_files\ (contains native files, with subfolder organization)

     \0001, \0002, \0003...

   - text\ (contains text files, with subfolder organization)

     \0001, \0002, \0003...

3. <u>De-Duplication</u>. You must perform global de-duplication of stand-alone documents and

14

**App. 176**

email families against any prior productions pursuant to this or previously related subpoenas.

4.   <u>Paper or Scanned Documents</u>.  Documents that exist only in paper format must be scanned to single-page TIF files and OCR'd.  The resulting electronic files should be pursued in Concordance format pursuant to these instructions.  You must contact the Assistant Attorney General whose telephone number appears on the subpoena to discuss (i) any documents that cannot be scanned, and (ii) how information for scanned documents should be represented in the metadata load file.

5.   <u>Structured Data</u>.  Structured data includes but is not limited to relational databases, transactional data, and xml pages. Spreadsheets are not considered structured data. You must first speak to the Assistant Attorney General whose telephone number appears on the subpoena.  Spreadsheets are not considered structured data.

6.   <u>Media and Encryption</u>.  All document sets over 2 GB must be produced on CD, DVD, or hard-drive media.  All production media must be encrypted with a strong password, which must be delivered independently from the production media.  Document sets under 2 GB may be delivered electronically.  The OAG offers a secure cloud storage option that can be set up to receive media on a one-time basis, or the OAG will download media from the providing party's server.

7.   <u>Production File Requirements</u>.

   A.   ***Metadata Load File***

   - Required file format:

     o   ASCII or UTF-8

     o   Windows formatted CR + LF end of line characters, including full CR + LF on last record in file.

     o   .dat file extension

     o   Field delimiter:  (ASCII decimal character 20)

     o   Text Qualifier: þ (ASCII decimal character 254).  Date and pure numeric value fields do not require qualifiers.

     o   Multiple value field delimiter: ; (ASCII decimal character 59)

   - The first line of the metadata load file must list all included fields.  All required fields are listed in Attachment 2.

   - Fields with no values must be represented by empty columns maintaining delimiters and qualifiers.

15

**App. 177**

- *Note:* All documents must have page-level Bates numbering (except documents produced only in native format, which must be assigned a document-level Bates number). The metadata load file must list the beginning and ending Bates numbers (BEGDOC and ENDDOC) for each document. For document families, including but not limited to emails and attachments, compound documents, and uncompressed file containers, the metadata load file must also list the Bates range of the entire document family (ATTACHRANGE), beginning with the first Bates number (BEGDOC) of the "parent" document and ending with the last Bates number (ENDDOC) assigned to the last "child" in the document family.

- Date and Time metadata must be provided in separate columns.

- Accepted date formats:

  o mm/dd/yyyy

  o yyyy/mm/dd

  o yyyymmdd

- Accepted time formats:

  o hh:mm:ss (if not in 24-hour format, you must indicate am/pm)

  o hh:mm:ss:mmm

- Accepted FROM, TO, CC, and BCC formats:

  o Fully qualified domain name RF 821 (name@domain.com)

  o Fully qualified domain name RF 822 (Alias <name@domain.com>)

  o Qualified LDAP address (/O=ORG/OU=ORG UNIT/CN=RECIPIENTS/CN=NAME)

B.   *Extracted or OCR Text Files*

- You must produce individual document-level text files containing the full extracted text for each produced document.

- When extracted text is not available (for instance, for image-only documents) you must provide individual document-level text files containing the document's full OCR text.

- The filename for each text file must match the document's beginning Bates number (BEGDOC) listed in the metadata load file.

16

**App. 178**

- Text files must be divided into subfolders containing no more than 500 to 1000 files.

C. ***Single-Page Image Files (Petrified Page Images)***

- Where possible, all produced documents must be converted into single-page tagged image format ("TIF") files. See Section 7.E below for instructions on producing native versions of documents you are unable to convert.

- Image documents that exist only in non-TIF formats must be converted into TIF files. The original image format must be produced as a native file as described in Section 7.E below.

- For documents produced only in native format, you may provide a single, TIF placeholder that states "Document produced only in native format."

- Each single-page TIF file must be endorsed with a unique Bates number.

- The filename for each single-page TIF file must match the unique page-level Bates number (or document-level Bates number for documents produced only in native format).

- Required image file format:

  o CCITT Group 4 compression

  o 2-Bit black and white

  o 300 dpi

  o Either .tif or .tiff file extension.

- TIF files must be divided into subfolders containing no more than 500 to 1000 files. Where possible documents should not span multiple subfolders.

D. ***Opticon Load File***

- Required file format:

  o ASCII

  o Windows formatted CR + LF end of line characters

  o Field delimiter: , (ASCII decimal character 44)

  o No Text Qualifier

  o .opt file extension

17

**App. 179**

- The comma-delimited Opticon load file must contain the following seven fields (as indicated below, values for certain fields may be left blank):

    o ALIAS or IMAGEKEY – the unique Bates number assigned to each page of the production.

    o VOLUME – this value is optional and may be left blank.

    o RELATIVE PATH – the file path to each single-page image file on the production media.

    o DOCUMENT BREAK – defines the first page of a document. The only possible values for this field are "Y" or blank.

    o FOLDER BREAK – defines the first page of a folder. The only possible values for this field are "Y" or blank.

    o BOX BREAK – defines the first page of a box. The only possible values for this field are "Y" or blank.

    o PAGE COUNT – this value is optional and may be left blank.

- *Example*:

    ABC00001,,IMAGES\0001\ABC00001.tif,Y,,,2

    ABC00002,,IMAGES\0001\ABC00002.tif,,,,

    ABC00003,,IMAGES\0002\ABC00003.tif,Y,,,1

    ABC00004,,IMAGES\0002\ABC00004.tif,Y,,,1

E. *Native Files*

- Non-printable or non–print friendly documents (including but not limited to spreadsheets, audio files, video files and documents for which color has significance to document fidelity) must be produced in their native format.

- The filename of each native file must match the document's beginning Bates number (BEGDOC) in the metadata load file and retain the original file extension.

- For documents produced only in native format, and not additionally as single-page image files, you must assign a single document-level Bates number and optionally provide an image file placeholder that states "Document produced only in native format."

- The relative paths to all native files on the production media must be listed in

18

**App. 180**

the NATIVEFILE field of the metadata load file.

- Native files that are password-protected must be decrypted prior to conversion and produced in decrypted form. In cases where this cannot be achieved the document's password must be listed in the metadata load file. The password should be placed in the COMMENTS field with the format Password: <PASSWORD>.

- You may be required to supply a software license for proprietary documents produced only in native format.

19

**App. 181**

FILED: NEW YORK COUNTY CLERK 06/19/2018 12:09 PM
INDEX NO. 451962/2016
NYSCEF DOC. NO. 255
RECEIVED NYSCEF: 06/19/2018

| | | |
|---|---|---|
| ATTACHMENTS | List of filenames of all attachments, delimited by ";" when field has multiple values. | AttachmentFileName.; AttachmentFileName.docx; AttachmentFileName.pdf;… |
| NUMATTACH | Number of attachments. | |
| RECORDTYPE | General type of record. | IMAGE; LOOSE E-MAIL; E-MAIL; E-DOC; IMAGE ATTACHMENT; LOOSE E-MAIL ATTACHMENT; E-MAIL ATTACHMENT; E-DOC ATTACHMENT |
| FOLDERLOC | Original folder path of the produced document. | Drive:\Folder\…\…\ |
| FILENAME | Original filename of the produced document. | Filename.ext |
| DOCEXT | Original file extension. | html, xls, pdf |
| DOCTYPE | Name of the program that created the produced document. | Adobe Acrobat, Microsoft Word, Microsoft Excel,  Corel WordPerfect… |
| TITLE | Document title (if entered). | |
| AUTHOR | Name of the document author. | |
| REVISION | Number of revisions to a document. | 18 |
| DATECREATED | Date and time that a document was created. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd |
| TIMECREATED | Time that a document was created. | hh:mm:ss AM/PM or hh:mm:ss |
| DATEMOD | Date and time that a document was last modified. | mm/dd/yyyy, yyyy/mm/dd, or yyyymmdd |
| TIMEMOD | Time that a document was last modified. | hh:mm:ss AM/PM or hh:mm:ss |
| FILESIZE | Original file size in bytes. | |
| PGCOUNT | Number of pages per document. | |
| IMPORTANCE | Email priority level if set. | Low, Normal, High |

22

**App. 182**

Case 3:16-cv-03111-K   Document 121   Filed 07/31/20   Page 188 of 544   PageID 4440

## AFFIDAVIT OF COMPLIANCE WITH SUBPOENA

State of _____}

County of _____}

I, _____, being duly sworn, state as follows:

1. I am employed by Respondent in the position of _____;

2. Respondent's productions and responses to the Subpoena of the Attorney General of the State of New York, dated _____, 20____ (the "Subpoena") were prepared and assembled under my personal supervision;

3. I made or caused to be made a diligent, complete and comprehensive search for all Documents and information requested by the Subpoena, in full accordance with the instructions and definitions set forth in the Subpoena;

4. Respondent's productions and responses to the Subpoena are complete and correct to the best of my knowledge and belief;

5. No Documents or information responsive to the Subpoena have been withheld from Respondent's production and response, other than responsive Documents or information withheld on the basis of a legal privilege or doctrine;

6. All responsive Documents or information withheld on the basis of a legal privilege or doctrine have been identified on a privilege log composed and produced in accordance with the instructions in the Subpoena;

7. The Documents contained in Respondent's productions and responses to the Subpoena are authentic, genuine and what they purport to be;

24

**App. 183**

8. Attached is a true and accurate record of all persons who prepared and assembled any productions and responses to the Subpoena, all persons under whose personal supervision the preparation and assembly of productions and responses to the Subpoena occurred, and all persons able competently to testify: (a) that such productions and responses are complete and correct to the best of such person's knowledge and belief; and (b) that any Documents produced are authentic, genuine and what they purport to be; and

9. Attached is a true and accurate statement of those requests under the Subpoena as to which no responsive Documents were located in the course of the aforementioned search.

_____          _____

Signature of Affiant                              Date

_____

Printed Name of Affiant

\*    \*    \*

Subscribed and sworn to before me this _____ day of _____, 20____.

_____, Notary Public

My commission expires: _____

25

**App. 184**

# Exhibit 7

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

In the Matter of the Application of the

PEOPLE OF THE STATE OF NEW YORK, by
ERIC T. SCHNEIDERMAN,
Attorney General of the State of New York,

                                        Petitioner,

            - against –

PRICEWATERHOUSECOOPERS LLP and
EXXON MOBIL CORPORATION,

                                        Respondents.

Index No. 451962/2016

IAS Part 61
Hon. Barry R. Ostrager

Motion Sequence No. 4

**AFFIRMATION OF JOHN OLESKE IN OPPOSITION TO EXXON'S
MOTION TO QUASH AND IN SUPPORT OF THE OFFICE OF THE
ATTORNEY GENERAL'S CROSS-MOTION TO COMPEL**

JOHN OLESKE, under penalty of perjury, affirms:

1.      I am Senior Enforcement Counsel to the Office of the Attorney General of the

State of New York ("OAG"), counsel for Petitioner.  I have personal knowledge of the matters

set forth herein.

2.      I make this affirmation in opposition to Exxon Mobil Corporation's ("Exxon")

motion to quash OAG's investigative subpoenas, and in support of OAG's cross-motion to

compel Exxon's compliance with those subpoenas.[1]

3.      The facts below relate to three critical issues: (i) OAG's factual basis to believe

that Exxon may have violated New York law by making false and misleading representations

---

[1]    For the convenience of the Court and the parties, OAG addresses all facts relevant to both Exxon's motion and
       OAG's cross-motion in this affirmation in lieu of two separate submissions.

**App. 186**

about its risk-management practices, investment practices and valuation practices; (ii) Exxon's bad-faith pattern of obstruction and document destruction in response to OAG's November 4, 2015 subpoena duces tecum (the "2015 Subpoena"); and (iii) the relationship between the subpoenas OAG issued on May 8, 2017, OAG's ongoing inquiries, and the relief needed to allow OAG to proceed with its concededly proper investigation.

## I. OAG's Factual Basis for its Ongoing Investigation of Exxon

### A. OAG's Pre-Existing Monitoring Of Potentially-Misleading Corporate Representations Concerning The Impact Of Climate Change

4.      OAG is responsible for enforcing New York's anti-fraud laws, including General Business Law §§ 352 *et seq.* (the "Martin Act"), which empowers OAG to take remedial action to protect investors from false and misleading statements made in connection with the sale and purchase of securities.

5.      When a company makes disclosures about the impact of climate change and related government policies on that company's core business, New York law requires it do so accurately.  It may not present a picture to investors, regulators and the public that is materially at odds with what the company or its executives have concluded internally. OAG has conducted numerous investigations to ensure that corporate statements about environmental issues comply with New York laws governing commercial disclosures. For example:

- In 2008 and 2009, OAG announced the successful settlement of three investigations of potentially misleading statements by three companies operating in New York, Dynegy Inc., Excel Energy Inc. and AES Corporation, about the impact of climate change on their business.

- In 2014, OAG announced the successful settlement of two investigations of potentially misleading statements by two companies, Anadarko Petroleum Corp. and EOG Resources, Inc., concerning the financial impact of the use of hydraulic fracturing as part of the natural gas extraction process.

- In 2015, OAG announced the successful settlement of an investigation of Peabody Energy (formerly Peabody Coal). As a result of the settlement, Peabody was prohibited

**App. 187**

from making the following misleading statements to investors: (1) stating that it could not predict the potential impact of climate regulations on its business when, in fact, Peabody *had* projected internally that such regulations would have severe negative impacts on coal demand, and (2) claiming that an International Energy Agency report had found government action affecting demand for coal unlikely, and that such demand would remain high, when the report had not, in fact, drawn that conclusion.

**B.      The Publication Of "Energy And Carbon–Managing The Risks" And Other Representations Related To Exxon's Purported Proxy-Cost Analysis**

6.      For several years prior to 2014, shareholders of several major fossil-fuel energy companies doing business in New York began proposing shareholder resolutions calling for increased disclosures concerning potential risks to the companies' value posed by the risk of future climate-change-related regulations.

7.      In March 2014, Exxon negotiated the withdrawal of one such resolution proposed by a group of its shareholders in exchange for the company's agreement to publish a report concerning such risks.

8.      The report, *Energy and Carbon–Managing the Risks* ("the MTR Report"), was published later that month.  According to its opening paragraph, the MTR Report "seeks to address important questions raised recently by several stakeholder organizations on the topics of global energy demand and supply, climate change policy, and carbon asset risk."  A true and correct copy of *Energy and Carbon–Managing the Risks* is attached as Exhibit 1.

9.      In the MTR Report, Exxon represented that it "does not believe current investment in new reserves are exposed to the risk of stranded assets" and that it is "confident that none of our hydrocarbon reserves are now or will become 'stranded.'"  (Ex. 1, MTR Report at 1, 19.)

**App. 188**

10.    The MTR Report specifies how Exxon purports to manage risk relating to prospective climate-change-related regulation:

> We also address the potential for future climate-related controls, including the potential for restriction on emissions, through the use of a proxy cost of carbon. This proxy cost of carbon is embedded in our current *Outlook for Energy*, and has been a feature of the report for several years. The proxy cost seeks to reflect all types of actions and policies that governments may take over the Outlook period relating to the exploration, development, production, transportation or use of carbon-based fuels. Our proxy cost, which in some areas may approach $80/ton over the Outlook period, is not a suggestion that governments should apply specific taxes . . .   Perhaps most importantly, we require that all our business segments include, where appropriate, GHG costs in their economics when seeking funding for capital investments. *We require that investment proposals reflect the climate-related policy decisions we anticipate governments making during the Outlook period and therefore incorporate them as a factor in our specific investment decisions.*

(*Id.* at 17-18) (emphasis added).

11.    The MTR Report's proxy cost representations followed years of similar representations by Exxon. In its annual *Outlook for Energy* reports starting in 2008, Exxon stated that it anticipated that governments would impose a cost of greenhouse gas emissions (GHGs). Exxon Mobil Corp., *2008 The Outlook for Energy: A View To 2030*, at 12. Over time, these representations grew more specific. By the 2010 *Outlook for Energy*, Exxon set out specific GHG prices, on specific timelines, that it expected as a result of regulatory action. Exxon Mobil Corp., *2010 The Outlook for Energy: A View To 2040*, at 9, 29-31. These representations grew even more detailed in the 2012 *Outlook for Energy*, in which Exxon represented that these expectations were "integral to [its] forecasts" for hydrocarbon demand. Exxon Mobil Corp., *2012 The Outlook for Energy: A View To 2040*, at 30.

12.    After the MTR Report was published in March 2014, and continuing to the present, Exxon has represented that the core risk-management statements in the MTR Report

**App. 189**

concerning the application of a proxy cost of GHGs to investment decisions apply to Exxon's business practices over the past decade, reflecting company policy going back to 2007. In reports, speeches, and on its website, Exxon has frequently repeated the representations made in the MTR Report and referred investors back to representations made in the MTR Report.

13.     For example, in November 2014, Exxon published an article on its *Perspectives* website, in which it stated that "ExxonMobil's Outlook for Energy" assumes a proxy cost of carbon of $80 per ton. Exxon Mobil Corp., *More On Divestment: A Letter to Tim Wirth* (Nov. 6, 2014), http://www.exxonmobilperspectives.com/2014/11/06/more-on-divestment. In a December 2, 2015 article on the same website, Exxon stated that "ExxonMobil has included a proxy price on carbon in our business planning since 2007." Exxon Mobil Corp., *ExxonMobil and the Carbon Tax* (Dec. 2, 2015), https://energyfactor.exxonmobil.com/corporate-citizenship-sustainability/exxonmobil-and-the-carbon-tax/.

14.     Likewise, in a 2016 report entitled "Meeting Global Needs – Managing Climate Change Business Risks," Exxon stated that "in most OECD nations, we assume an implied cost of carbon dioxide ("CO2") emissions that will reach about $80 per metric ton in 2040," and that "this GHG proxy cost is integral to Exxon's planning." Exxon Mobil Corp., *Meeting Global Needs – Managing Climate Change Business Risks,* http://corporate.exxonmobil.com/en/current-issues/climate-policy/climate-perspectives/managing-climate-change-business-risks.

15.     Exxon's proxy notices to shareholders contained similar representations. In Exxon's April 13, 2016 notice of the company's 2016 annual shareholder meeting, Exxon repeated the representations in the MTR Report quoted *supra* at ¶ 10, and also represented that the "proxy cost of carbon is embedded in our *Outlook for Energy*, and has been a feature of the report since 2007." Exxon Mobil Corp., *Notice of 2016 Annual Meeting & Proxy Statement*

**App. 190**

(Apr. 13, 2016), http://cdn.exxonmobil.com/~/media/global/files/investor-reports/2016/2016_Proxy_Statement.pdf.

16.     On May 25, 2016, Exxon's then-Chairman and CEO Rex Tillerson told attendees at Exxon's annual shareholder meeting that the company's "price of carbon gets put into all of our economic models when we make investment decisions as well.  It's a proxy… So we choose to put it in as a cost.  *So we have accommodated that uncertainty in the future, and everything gets tested against it.*" (emphasis added).  A true and correct copy of the relevant portion of the transcript of this meeting is attached as Exhibit 2.

17.     In Exxon's April 13, 2017 notice of the company's 2017 annual shareholder meeting, Exxon recommended that shareholders vote against two proposals relating to the integration of climate-regulatory risk, referring shareholders to the MTR Report for a description of "how the Company integrates consideration of climate change risks into planning processes and investment evaluation." Exxon Mobil Corp., *Notice of 2017 Annual Meeting & Proxy Statement*, at 66 (Apr. 13, 2017), http://cdn.exxonmobil.com/~/media/global/files/investor-reports/2017/2017_proxy_statement.pdf.

18.     On May 31, 2017, Exxon shareholders voted in favor of a proposal that the company publish an annual assessment of the long-term financial impacts of climate change.  At the shareholder meeting itself, Exxon's CEO Darren Woods stated that Exxon's *Outlook for Energy* is consistent with the Paris Accord and that all of Exxon's businesses are required to include where appropriate an estimate of the costs associated with greenhouse gas emissions.

**App. 191**

19.     Exxon has repeated its proxy cost representations in multiple 10-Ks, multiple submissions to the Carbon Disclosure Project (CDP)[2], its annual *Outlook for Energy* public reports, and a separate report it issued in March 2017 entitled *2016 Energy and Carbon Summary*.

20.     Evidence reviewed by the OAG to date indicate that Exxon's major oil and gas projects often span multiple decades, and that the proxy cost of GHGs can have a material effect on the long-term profitability of Exxon's projects and the value of its assets.

### C.     *Evidence Indicates That Exxon's Internal Proxy Cost Policies Were Inconsistent With Its Representations*

21.     The investigation to date has uncovered evidence that, from 2010 through June 2014, the proxy cost Exxon set out in its internal policies was lower than the proxy cost the company publicly represented that it used in investment decisions.  In other words, Exxon represented to investors and the public that it was incorporating higher costs of GHG regulation into its business decisions than documents indicate that it actually was using, thereby potentially misleading investors and the public about the extent to which it was protecting its business from regulatory risks related to climate change.

22.     In particular, Exxon publicly stated in the MTR Report and its *Outlook for Energy* reports that for projects in developed countries, it applied proxy costs that reached $60/ton of GHGs by 2030, and $80/ton by 2040.  In fact, the proxy cost figures used for Exxon's internal planning and budgeting reached only $40/ton by 2030.  *See infra* at ¶¶ 23-25, Exs. 3-5.

---

[2]     The Carbon Disclosure Project ("CDP") is a United Kingdom-based nongovernmental organization that runs a global disclosure system that enables companies and governments to measure and manage their environmental impacts.  CDP's data enables its network of investors, supply chain purchasers and policy makers to link environmental integrity, fiduciary duty and public interest to make better-informed decisions on climate action.  Thousands of corporations voluntarily report their GHGs to the CDP.  Each year Exxon submits answers to questions about climate change posed by the CDP.

**App. 192**

23.     It appears that this discrepancy was known at Exxon's highest levels.  As one example, an email from Exxon's Corporate Greenhouse Gas Manager acknowledged as early as 2010 that the publicly disclosed proxy cost figures were "more realistic" than those that Exxon actually used.  A true and correct copy of this correspondence, EMC 000339155, is attached as Exhibit 3.

24.     As another example, a 2011 email states that CEO Rex Tillerson was "happy with the difference" because using a lower proxy cost was "conservative" from the perspective of investing in projects, like carbon capture and storage, that allow Exxon to claim emissions-reduction credits.  The email acknowledged, however, that using a lower cost than publicly disclosed was "not conservative . . . from the perspective of debiting actions that increase emissions," such as investing in oil and gas development projects.  A true and correct copy of this correspondence, EMC 000354827, is attached as Exhibit 4.

25.     It was not until June 2014 that Exxon sought to eliminate this glaring inconsistency between external and internal figures.  At that time, Exxon's new Corporate Greenhouse Gas Manager acknowledged in an internal presentation that the proxy costs that Exxon used internally were "non-conservative" with respect to projects that increase carbon emissions, and admitted that, in public reports, "we have implied that we use the [publicly-disclosed] basis for proxy cost of carbon when evaluating investments."  A true and correct copy of this presentation, EMC 000539921, is attached as Exhibit 5.

26.     According to documents produced from the custody of Jason Iwanika, a Development Planner at Imperial Oil Limited ("Imperial"), Exxon's majority-owned subsidiary in Canada, another planner at another Exxon affiliate referred to the 2014 alignment of external

**App. 193**

and internal proxy cost figures as a "huge change." A true and correct copy of this correspondence, EMC 000556782, is attached as Exhibit 6.

27.     Exxon did not inform investors about the undisclosed variation in its use of proxy-cost formulas when it represented in 2016 that it had been applying its publicly-touted proxy-cost analysis since 2007. *Supra* at ¶ 15.

### D.     Exxon's Documents Indicate That Exxon Often Did Not Apply Any Proxy Cost Of Ghgs

28.     Compounding the discrepancy between Exxon's public representations and its internal policies, it now seems apparent that Exxon has not applied a proxy cost of GHGs at all with respect to many of its oil and gas projects. This understanding is based both on documents Exxon has produced, and on documents that Exxon has failed to produce but that OAG would have expected to see if Exxon's much-touted proxy cost analysis was consistently implemented.

### 1.     Evidence Reveals A Corporate Decision To Abandon Proxy-Cost Analysis For Its Canadian Oil Sands Projects

29.     The investigation to date has uncovered evidence that indicates that, by 2015, the company faced a problem with respect to its multi-decade, multi-billion-dollar oil sands projects in Alberta, Canada. These projects, which have a significant impact on the company's bottom line, apparently have not been as profitable as Exxon expected. As described above, Exxon had in mid-2014 increased the proxy cost of GHGs in its internal analyses to match those that it had been touting to the public for years. This change would have affected the projected profitability of all of Exxon's projects, including its oil sands projects, and, according to evidence reviewed by OAG, may have rendered at least one of its major oil sands projects unprofitable over the life of the project.

**App. 194**

30.     Evidence reviewed to date indicates that the company's response was not to faithfully apply the proxy-cost analysis and recognize losses as appropriate.  Rather, evidence indicates that Exxon decided in the fall of 2015 to abandon the proxy-cost figures applicable to Alberta projects that were set out in its internal policies, and decided instead to apply the current, much lower GHG tax that existed under Alberta law at that time.

31.     The proxy cost analysis set out in Exxon's internal policies required the incorporation of an escalating GHG cost, reaching $80/ton of carbon dioxide (or CO2 equivalent in other GHGs) by 2040, into the company's economic forecasting for purposes of corporate decision-making.  Instead of applying this analysis, Exxon applied the Alberta GHG tax, which did not exceed $24/ton (U.S. currency), and held that figure flat indefinitely into the future.  Further, Exxon applied this cost of carbon to only a small percentage of emissions – 15% to 20% – specified under existing Alberta law, resulting in an effective cost of less than $4/ton.

32.     Applying a GHG tax that already exists is not a "proxy" for anything, and does not "address the potential for future climate-related controls," as Exxon repeatedly represented that its proxy cost of GHGs was intended to do.  (*See* ¶ 10 *supra*.)  The apparent discrepancy between Exxon's words and actions is particularly significant where, as here, the actual GHG costs Exxon applied were both significantly lower than its purported proxy costs, and applied only to a very limited percentage of its GHGs.

33.     Indeed, evidence shows that Jason Iwanika, the Imperial Development Planner discussed *supra* in ¶ 26, sought direction from Exxon concerning how to apply the GHG assumptions set out in the Corporate Plan Dataguide to the Canadian oil sands projects, and questioned Exxon's directions that he deviate from those assumptions.  Nonetheless, it appears

**App. 195**

that Exxon ignored his concerns and instructed him to disregard the proxy-cost assumptions set out in its internal policies.

### 2.  Exxon Has Produced No Documents Reflecting Consistent Application of Proxy-Cost Analysis to Investment Decisions

34.     It appears that Exxon's proxy-cost risk-management process may be a sham based on the fact that the company has failed to produce certain documents it would have had to create to accomplish its publicly-stated representations.

35.     Notwithstanding the numerous deficiencies in its subpoena compliance, Exxon has produced approximately 450,000 documents, including documents from a number of custodians who should have been involved in the application and management of the proxy-cost analysis described in Exxon's public representations.  These documents appear to be devoid of evidence that Exxon applied any consistent proxy-cost analysis – whether the publicly-stated figures or its secret internal version – to its major investment decisions.

36.     The two documents Exxon points to in its motion papers do not provide any evidence of Exxon actually doing what it told investors.  First, Exxon cites a two-page insert that it published annually in its Corporate Dataguide Appendix, which does little more than list the purportedly-applicable proxy costs across geographic regions and timeframes.  However, as set out above, it appears that this internal policy clashed with Exxon's public representations for years, and that Exxon did not even follow this policy in many instances.  Beyond these two pages, Exxon has not produced any company-wide or region-specific procedures, guidance, or analysis related to the proxy cost of GHGs, undermining any notion that Exxon implemented its touted proxy-cost analysis across a meaningfully wide spectrum of investment or planning decisions.  Further, evidence reviewed by OAG reveal a widespread lack of awareness among employees of the proxy cost policy, or how it should be applied.

**App. 196**

37.     Second, the single instance in which Exxon has affirmatively identified to OAG and this Court its purported application of the proxy-cost analysis concerned a single, unusual project in which applying the proxy cost was to the company's benefit.  For this project, Exxon sold CO2 to other operators rather than releasing it into the atmosphere, generating GHG credits rather than added costs.  Thus, the evidence shows that Exxon applied it proxy-cost analysis to generate additional profit, but failed to apply it in cases that would have reduced profits or increased losses.  This in no way constitutes the kind of risk-management exercise for future oil and gas development and production as described by Exxon's proxy-cost representations, and in any event concerns only a single project.  (Feb. 11, 2017 Toal Letter to OAG at 2; Mar. 16, 2017 Toal Letter to Court at 4.)  True and correct copies of this correspondence are attached as Exhibits 7 and 8.

### 3.     Evidence Indicates That It Excluded 90% of Emissions When Applying Its Purported Proxy-Cost Analysis

38.     Exxon represented to investors that its proxy-cost analysis included emission from the end use of its fossil fuels, *i.e.,* Scope 3 emissions, when it stated in the MTR Report (and elsewhere) that "[t]he proxy cost seeks to reflect all types of actions and policies that governments may take over the Outlook period relating to the… *transportation or use* of carbon-based fuels".  (*e.g.*, Ex. 1, MTR Report at 17.)

39.     Emissions from the end-use of fossil fuels, synonymous with Scope 3 emissions, account for approximately 90% of all fossil-fuel-related greenhouse gases, as Exxon acknowledged in its submission to the CDP.  (*See*, *e.g.*, Exxon's 2015 submission to the CDP at 23, Answer CC14.4c) ("approximately 90 percent of petroleum-related GHG emissions are generated when customers use our products and the remaining 10 percent are generated by

**App. 197**

industry operations.")  A true and correct copy of Exxon's 2015 submission to the Carbon

Disclosure Project is attached as Exhibit 9.

40.    Yet Exxon's documents indicate that even in the few instances where Exxon tried

to apply some semblance of a proxy-cost, Exxon failed to include costs relating to end use, or

Scope 3, emissions, thus ensuring that even in Exxon's most robust application of proxy cost it

failed to account for 90% of the "use" of its fossil fuels.  (*e.g.*, EMC 000548250.)  A true and

correct copy of one example, EMC 000548250, is attached as Exhibit 10.

> ### E.    *Documents Produced By Pwc And Exxon Indicate That Exxon Failed To Apply The Proxy-Cost Analysis To Its Impairment Decisions Prior To 2016*

41.    As set forth above, Exxon's internal policies concerning its application of a proxy

cost of GHGs were inconsistent with its representations to investors.  In addition, its actual

practices with respect to major investment decisions were inconsistent with both internal policies

and representations to investors.  The evidence OAG has reviewed to date indicates that, at least

until 2016, Exxon failed to apply a proxy cost of GHGs in determining whether its long-lived

assets, such as oil and gas reserves and resources, were impaired, rendering its representations

false and misleading.

### 1.    Standards Governing Impairment

42.    Financial Accounting Standards Board ("FASB") Accounting Standards

Codification ("ASC") 360 governs the accounting for the impairment of long-lived assets under

U.S. generally-accepted accounting principles ("GAAP").  A true and correct copy of relevant

excerpts from ASC 360 is attached as Exhibit 11. As set out below, Exxon represents in its

public filings that it follows the guidance set out in ASC 360.

**App. 198**

43.    ASC 360 sets out a three-step process for identifying and measuring the impairment of long-lived assets or asset groups.

44.    First, a company must routinely assess whether indicators of impairment are present.  Examples of such indicators, also known as "impairment triggers," include:

a.  a "significant decrease in the market price of a long-lived asset";

b.  a "significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset . . . including an adverse action or assessment by a regulator";

c.  an "accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of a long-lived asset"; and

d.  a "current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset[.]"

(Ex. 11, ASC 360-10-31-21.)  Exxon has repeatedly represented to investors and to the public that it meets these accounting requirements by "perform[ing] asset valuation analyses on an ongoing basis as a part of its asset management program" to determine whether events and circumstances such as those set out in ASC 360-10-31-21 are present.  (*See, e.g.*, Exxon's 2015 Form 10-K at 57, 69.)  A true and correct copy of Exxon's 2015 Form 10-K is attached as Exhibit 12.

45.    Second, if one or more impairment triggers are present, a company must test the asset in question to determine whether the balance sheet carrying amount of the asset exceeds the sum of the undiscounted future cash flows expected to result from the use and disposition of the asset.  (Ex. 11, ASC 360-10-35-17, 360-10-35-21.)  Exxon has represented to investors and to

**App. 199**

the public that it has complied with its obligations under this accounting requirement. (*See, e.g.,* Ex. 12, Exxon Mobil Corp., 2015 Form 10-K at 57, 70.)

46.    Third, if it is determined that the carrying amount of a long-lived asset is not recoverable, a company must determine the fair value of the asset and calculate an impairment loss based on this fair value. ASC 360-10-35-17. Exxon has represented to investors and to the public that it has complied with its obligations under this accounting requirement. (*See, e.g., id.* at 57, 70.)

47.    In developing future cash flow estimates for impairment analyses, accounting standards require that a company must "incorporate the entity's own assumptions . . . and shall consider all available evidence." (Ex. 11, ASC 360-10-35-30.) Further, "[t]he assumptions used in developing those estimates shall be reasonable in relation to the assumptions used in developing other information used by the entity for comparable periods, such as internal budgets and projections, accruals related to incentive compensation plans, or information communicated to others." *Id.* Exxon has represented to investors and to the public that it has met this obligation as well. (*See, e.g.,* Ex. 12, Exxon Mobil Corp., 2015 Form 10-K at 70) ("Cash flows used in impairment evaluations . . . make use of the Corporation's price, margin, volume, and cost assumptions developed in the annual planning and budgeting process, and are consistent with the criteria management uses to evaluate investment opportunities.").

### 2.    Exxon's Omission of Proxy Cost of GHGs in Impairment Decisions

48.    Because Exxon refused to produce documents relating to valuation of its assets for impairment purposes, OAG subpoenaed the company's accountants, PricewaterhouseCoopers LLP ("PwC") in October 2016, and has since received approximately 38,000 documents from PwC.

**App. 200**

49.    The evidence to date indicates no attempt at all, by Exxon or by PwC, to incorporate a proxy cost of GHGs into the economic models of cash flows used in determining whether a trigger for impairment testing existed or whether Exxon's assets were actually impaired prior to 2016. To the contrary, these documents indicate that Exxon and PwC only began incorporating proxy cost assumptions into some of Exxon's impairment-related accounting analyses in 2016, after OAG first subpoenaed Exxon.

50.    Exxon's apparent failure to incorporate a proxy cost of GHGs into its impairment-related decisions is particularly important in light of Exxon's stated accounting approach to low oil and gas prices. Exxon has stated that it "does not view temporarily low prices or margins as a trigger event for conducting impairment tests." (Ex. 12, Exxon Mobil Corp., 2015 Form 10-K at 57.) Exxon has also asserted that it instead considers prices over the "long term," *id*., and that its "assessment is that its operations will exhibit strong performance over the long term." (*Id.* at 42.) Indeed, documents produced by PwC show that, with oil and gas prices at low levels, Exxon relied on long-term cash flow models to forecast that certain of its projects, even if losing money currently and in the near-to-medium term, will ultimately generate cash flows that exceed their balance sheet carrying values, and thus are not impaired or do not exhibit triggers for impairment evaluation.

51.    Such forecasts must abide by Exxon's representations, and GAAP requirements, that the company use the same assumptions in its impairment decisions that it uses (or purports to use) in its other business decisions, including the application of a proxy cost of GHGs that grows over time. *See supra*. To the extent that Exxon did not do so, it seems clear that the company misled investors about the value of the company's assets and its risk management

**App. 201**

processes in light of the dual challenges of ongoing low oil and gas prices and growing GHG costs over time.

52.      Exxon's apparent failure to incorporate a proxy cost of GHGs into its impairment-related cash flow models is even more relevant given its public stance with respect to the question of whether its long-lived assets could become stranded or uneconomical to produce due to rising GHG costs.  In the MTR Report, Exxon represented that it was "confident that none of [its] hydrocarbon reserves are now or will become 'stranded'" (Ex. 1 at 1) and that "the company does not believe current investments in new reserves are exposed to the risk of stranded assets[.]" (*Id.* at 19.)  The MTR Report originally contained a footnote addressing impairment, but that footnote was removed at the request of David Rosenthal, Exxon's Vice President for Investor Relations, after he stated in a March 25, 2014 email: "[t]hat word gives folks on the third floor heartburn."  A true and correct copy of that correspondence, at EMC 001198245 is attached as Exhibit 13.

### 3.      The Importance of Production of Exxon's Impairment-Related Documents

53.      OAG has received impairment-related documents from PwC, but without documents from Exxon itself, OAG's window into Exxon's impairment-related decisions is limited.  Documents produced by PwC indicate that Exxon has not shared with PwC all relevant documents on this topic, including many of the cash flow models Exxon uses for impairment-related purposes.  In other cases, PwC was shown such documents, but Exxon did not permit PwC to retain them. Further, PwC does not appear to possess drafts of relevant Exxon documents such as impairment memoranda and asset recoverability reviews.  Nor does PwC possess related internal Exxon communications.  Such documents are reasonably related–indeed, highly relevant–to OAG's inquiry.

**App. 202**

54. Additionally, despite the First Department's May 23, 2017 Decision and Order unanimously affirming this Court's order granting OAG's October 14, 2016 petition to compel Exxon and PwC to comply with OAG's subpoena notwithstanding any purported accountant-client privilege, PwC has still not produced the documents that were withheld on that basis, as Exxon has sought and received a stay from the First Department. There is likely to be some (though not complete) overlap between the withheld PwC documents and responsive documents in Exxon's possession, and therefore requiring Exxon to produce such documents would avoid further delays.

## II. Exxon Failed to Conduct a Compliant Subpoena Response, Resulting in the Still-Unexplained Destruction of Documents from Key Custodians

55. Exxon's compliance with the original subpoena has been marked by delays, obstruction, and the destruction of untold numbers of documents from over a dozen key custodians.

56. The root of Exxon's apparent destruction of subpoenaed documents was the failure of its Law Department to observe basic requirements in document preservation, collection, production, and recovery. These failures have also contributed to numerous other delays and deficiencies in Exxon's document production.

57. In an attempt to understand the scope of these failures and their impact on the prospective completion of Exxon's document production, and as specifically ordered by the Court at the March 23, 2017 conference, OAG solicited affidavits and took testimony from two witnesses proffered by Exxon: Connie Feinstein of Exxon's Information Technology Department ("EMIT") and Michelle Hirshman of Paul, Weiss.

**App. 203**

58.    Neither witness could testify to the topics for testimony stated in the subpoenas issued to Exxon.  True and correct copies of the subpoenas for testimony issued to Exxon are attached as Exhibits 14 and 15.

59.    Indeed, the totality of these witnesses' testimony confirms Exxon's Law Department failed to search for, collect, and preserve documents responsive to the 2015 Subpoena, resulting in the destruction of unknown number of Exxon documents from key custodians.

60.    However, neither Ms. Feinstein nor Ms. Hirshman were able to provide key information about the scope of Exxon's past compliance failures or the company's conduct in attempting to recover the destroyed documents.

### A.    *Exxon's External Counsel Was Insufficiently Involved in the Process of Subpoenas Compliance*

61.    An important preliminary fact was confirmed in the witness testimony: Exxon's external counsel did not supervise important aspects of Exxon's subpoena compliance.

62.    Specifically, external counsel played no part in the process of interviewing potential Exxon document custodians, including top managers, their assistants, and other key custodians. (Ex. 17, May 3, 2017 Toal Letter to OAG, Ex. B; Hirshman Tr. 60-61.)  A true and correct copy of the testimony taken of Michele Hirshman, dated March 10, 2017 is attached as Exhibit 16.

63.    External counsel also failed to familiarize themselves with Exxon's information-technology department or Exxon's data storage and management practices.  (*See*, *e.g.*, Ex. 16, Hirshman Tr. 119-20, 123-24, 131-32, 159-61, 174-78.)

64.    External counsel failed to even learn the details of, let alone supervise, Exxon's preservation-hold process, failed to reiterate preservation instructions to potential custodians who

**App. 204**

received preservation holds, and failed to monitor those potential custodians' actual compliance with the preservation holds. (*See*, *e.g.*, Ex. 16, Hirshman Tr. 36-49, 50-52, 142-44.)

65.    In the absence of external supervision, Exxon's in-house Law Department repeatedly violated established compliance obligations.

### B.    *Exxon Failed to Interview Key Custodians, Contrary to Prior Representations to OAG*

66.    Exxon repeatedly represented in its correspondence with OAG that its procedure for document collection began, as required, with witness interviews to identify likely repositories of responsive documents. *See, e.g.,* Ex. 18, Apr. 18, 2016 Hirshman Letter to OAG, at 6-7 ("As we have repeatedly explained, ExxonMobil is conducting a custodian-by custodian search for documents. *Documents are collected from the data sources identified by a custodian as containing potentially responsive documents.*"); Ex. 19, Dec. 5, 2016 Toal Letter to Court, at 5 ("ExxonMobil crafted its custodian list through comprehensive research, witness interviews, and document review."); Ex. 20, Dec. 9, 2016 Hearing Tr. 23:13-16 (Toal: "We have asked custodians, we've interviewed custodians, we've asked them where they store documents, we asked them if they store documents on shared drives."); Ex. 21, Revised Hirshman Cert. ¶ 28 ("ExxonMobil identified the[] custodians through comprehensive research, witness interviews, and document review."). *Cf.* Ex. 17, May 3, 2017 Toal Letter to OAG at Ex. B (confirming that Management Committee members and their assistants were not interviewed until March or April of 2017, and some not at all). A true and correct copy of these letters are attached as Exhibits 17 through 21.

67.    As confirmed in the witness' testimony, Exxon did not interview any of its Management Committee members or their assistants to identify the locations of responsive documents prior to March 2017. (Ex. 16, Hirshman Tr. 62,146-49.)

**App. 205**

68.     Several such custodians, including former Chairman and CEO Rex Tillerson, had left the company by that time, and apparently they were never interviewed at all.  (Ex. 17, May 3, 2017 Toal Letter to OAG, Ex. B; Ex. 16, Hirshman Tr. 64-65.)

69.     Exxon also did not interview custodians of reserves-related documents until at least July or August of 2016, and in some cases, has still not done so.  (Ex. 17, May 3, 2017 Toal Letter to OAG, Ex. B.)

### C.    *Exxon Failed to Preserve Documents it Knew Were Potentially Relevant, Despite OAG's Repeated Questioning of Inadequate Preservation*

70.     Partly as a consequence of the its failure to interview key custodians, Exxon failed to place on preservation hold documents from those and other custodians.

71.     Exxon failed in this respect despite correspondence from OAG that Exxon's preservation efforts appeared inadequate.  (*See, e.g.*, Ex. 16, Hirshman Tr. 154-55.)

### 1.    Management-Committee Documents

72.     Exxon failed to preserve documents from multiple custodians who it knew might possess relevant documents relating to the communications and work of the company's Management Committee.

#### a)    *Wayne Tracker*

73.     Exxon knew at the time the 2015 Subpoena was issued that Mr. Tillerson used a secondary email account, wayne.tracker@exxonmobil.com, in addition to his "official" email account rex.w.tillerson@exxonmobil.com.

74.     Exxon knew that in its internal computer systems relating to identity-management, the company had assigned the wayne.tracker@exxonmobil.com email account not to Mr. Tillerson, but to an information-technology employee named Ramona Helble.

**App. 206**

75. Exxon did not place Ms. Helble on a preservation hold, or otherwise take any action to ensure that documents stored with respect to the wayne.tracker@exxonmobil.com email account would be preserved.

76. During Ms. Hirshman's testimony, she testified that she personally knew in "early 2016" that there existed a second email address for Rex Tillerson – the Wayne Tracker email address, and that she believed Exxon's failure to inform OAG of this alias email address would constitute "an interesting test of whether the Attorney General's office is reading the documents." (Ex. 16, Hirshman Tr. 134.)  However, Ms. Hirshman further testified that neither she nor her firm made any attempt to look further into the preservation, collection or production of documents of the Wayne Tracker email address at that time, leading to months of automatic destruction of relevant correspondence.  (*Id*. at 141-42.)

### b) *Management-Committee Assistants*

77. Exxon also knew that assistants to its Management-Committee members were highly knowledgeable of and involved in their principals' communications.

78. In previous litigations where Exxon preserved Management-Committee documents, it also placed management assistants on preservation hold.

79. Here, Exxon did not place any management assistants on preservation hold until March 2017.

### c) *Management-Committee Member Donald Humphreys*

80. Exxon's outside counsel affirmed that management custodians requested in the 2015 Subpoena were placed on hold and their documents collected.  This was not true.

81. Donald D. Humphreys served as a Senior Vice President on Exxon Mobil's Management Committee from January 1, 2006 to February 1, 2013.

**App. 207**

82. Based on Exxon's representations, Exxon appears to have made no effort to preserve or collect Mr. Humphreys' documents.

### d) *Imperial President Richard Kruger*

83. Exxon's outside counsel affirmed that management custodians requested in the 2015 Subpoena were placed on hold and their documents collected. OAG had also requested, and Exxon has produced and placed on hold responsive documents of employees of Exxon and its affiliates.

84. To date over 750 documents from the custody of Imperial employees have been produced to the OAG. Another almost 1800 documents to or from custodians with an 'esso.ca' email address (one of Imperial's domains) were also produced. *See also infra* ¶ 133.

85. Imperial President Kruger is shown in Exxon's documents as having routine contact with Exxon's Management Committee. In 2015, Mr. Kruger sent an email to the Management Committee promising detailed information about the impact of Alberta GHG regulations, including the low carbon tax Exxon used in place of a proxy cost, with respect to Exxon's oil sands projects, stating that Imperial was "turning our immediate focus to a detailed examination of the announcement and its impact on our existing operations and possible future projects in Alberta." A true and correct copy of this correspondence, EMC 001844415, is attached as Exhibit 22.

86. Despite that fact, Exxon did not place the documents of Mr. Kruger and his executive assistant on hold until April 2017, 18 months after the subpoena was issued, presumably resulting in the destruction of more than a year's worth of their documents.

**App. 208**

**2.      Reserves-Related Documents**

87.      Exxon also knew that the 2015 Subpoena called for, and that OAG had specifically requested, documents from custodians responsible for analyzing the company's oil and gas reserves estimates.

88.      Exxon did not place any such custodians on preservation hold until July 2016, and OAG believes that some relevant custodians have never been placed on hold.

89.      This is in part because Exxon has refused to identify members of various reserves-related committees that existed prior to 2016.  Because of Exxon's refusal, OAG cannot presently determine what potential reserves custodians' documents Exxon has failed to preserve. (*See* ¶ 126, *infra*).

**D.      *Potentially Relevant Documents from Key Custodians Have Been Destroyed***

90.      As a direct consequence of these failures, an unknown number of documents from Exxon's Management-Committee and reserves custodians have been destroyed.

91.      Specifically, Exxon has disclosed that its document-management software automatically "sweeps" (deletes) emails and attached documents from custodians after a period of 395 days, unless the subject email accounts are placed on a preservation hold.  (Anderson Ex. Q, Amended Feinstein Aff. ¶ 51, n.4.)  Non-email documents (electronic or paper) may also have been destroyed during this time by the key custodians not notified of the preservation hold.

92.      Because emails and attached documents from the wayne.tracker@exxonmobil.com email account, the management assistants, Mr. Humphreys, Mr. Kruger, and relevant custodians of reserve documents were not placed on a preservation hold until March 2017, at the earliest, at least a full year's worth of emails, attached documents and

**App. 209**

non-email documents from each of those sources during the pendency of the 2015 Subpoena

have been destroyed.

> **E.      Exxon Falsely Represented that it Conducted a Compliant Search for Management Documents While Its Document Destruction was Ongoing**

93.      Exxon represented that its document production protocol began with witness

interviews and otherwise conformed to its compliance obligations, including through the

application of agreed-upon Boolean search terms. (*See supra* at ¶ 66; *see also* Ex. 23, Dec. 22,

2015 Jansen Letter, at 1 ("[I]n your December 16, 2015 correspondence, you suggested several

modifications to the search terms that ExxonMobil is using to identify potentially relevant

electronic data. ExxonMobil confirms that we have incorporated all of your suggested

modifications."); Ex. 19, Dec. 5, 2016 Toal Letter to Court, at 5 n.4 ("Here, the parties did

'carefully craft' the set of search terms.").  A true and correct copy of December 22, 2015 Jansen

Letter is attached as Exhibits 23.

94.      In fact, as was only disclosed in March 2017, Exxon had actually conducted

document collection and production of Management-Committee documents in a wholly

undisclosed and non-compliant fashion prior to that time.

95.      Specifically, Exxon did not interview Management-Committee custodians, nor

their assistants, to identify likely locations of responsive documents.

96.      Instead, Exxon's Law Department gave still-undisclosed instructions directly to

the Management-Committee assistants directing them to collect paper documents and an

unspecified range of electronic documents.

97.      Separately, Exxon's Law Department purportedly instructed an EMIT employee

named Bob Lauck to conduct a noncompliant search of the individual management custodians'

documents in Microsoft Outlook, a method which has severe technical deficiencies in collecting

**App. 210**

all relevant documents – including those observed by courts[3] – rather than Exxon's own document collection software and processes.

98.    Based on what Exxon has been able to explain thus far, these searches did not employ the agreed-upon Boolean search terms,[4] and otherwise failed to meet basic standards for e-discovery compliance.

### F.    Exxon's Failure to Explain the Scope of the Document Destruction or its Remediation Efforts, Requires Testimony From Additional Witnesses

99.    Even though OAG made its specific need for witness testimony to assess the scope and remediation of Exxon's document destruction clear at the conference before the Court on March 23, 2017, in multiple letters and emails leading up to both witnesses' testimony, and in the noticed topics for testimony, Exxon failed to proffer witnesses who could explain the full scope of Exxon's document destruction and the details of how it came about, the nature and operation of Exxon's data backup systems, or the efforts Exxon has made to recover documents known to have been destroyed.

---

[3]    *See*, *e.g.*, *Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enforcement Agency*, 877 F. Supp. 2d 87, 106-07 (S.D.N.Y. 2012) ("Seemingly minor decisions – whether intentional or not – will have major consequences. Choosing 'subject field' rather than 'subject field and message body' during a search using the Microsoft Outlook email client will dramatically change its scope and results."); *see also T.A. Ahern Contrs. Corp. v. Dormitory Auth. of State of N.Y.*, 875 N.Y.S.2d 862, 865 (N.Y. Sup. Ct. N.Y. Cnty. 2009) ("Microsoft Outlook… does not allow for mailbox-wide searches which could potentially locate project-specific e-mails and/or documents."); *Burke v. Ryan*, No. OCN-L-1642-13, 2013 N.J. Super. Unpub. LEXIS 2331, at *7 (N.J. Law Div. Sept. 17, 2013) ("In order to search for records [defendant] uses the search engine which will only search the sender's name and subject line. She explained that Outlook will not search the actual attachment itself.")

[4]    The "simple" search terms used by Exxon to search documents in Outlook were in some cases narrower than the compound terms.  For example: "anthropogenic emissions" is not a simplified term for "anthropogenic"; "climate model" and "climate research" are not simplified terms for the following terms: climate! /5 (skeptic! or deni! or model! or research! or fund! or support! or warming or low or science); "climate change," "climate model," and "climate research" are not simplified terms for the following terms: climate /5 uncertain!; the terms "stranded asset" and "stranded reserve" will not collect the plurals of the following agreed-upon terms:  stranded /5 (asset! or reserve!).  (*See* Anderson Ex. Q, Amended Feinstein Aff. Ex. A.)

**App. 211**

100.    Only three paragraphs in the Feinstein Affidavit were based exclusively on Ms. Feinstein's personal knowledge.  In fact, 30 of 60 paragraphs in the Feinstein Affidavit listed other individuals, and not Ms. Feinstein, as having personal knowledge concerning the noticed topics for testimony.  A true and correct copy of the April 19, 2017 Toal Letter to OAG and its Exhibit A is attached as Exhibit 24.

101.    During her examination, Ms. Feinstein admitted that she did not know basic information concerning the identification, preservation, collection, destruction, or recovery of documents in connection with Exxon's response to the 2015 Subpoena.  On almost 200 occasions, Ms. Feinstein testified that she did not know the requested details on the six topics in OAG's subpoena.  *See, e.g.,* Feinstein Tr. 17, 27, 29, 42-43, 45-46, 49-50, 52, 54-55, 57-59, 62-63, 70, 74, 87, 89, 92-94, 96, 100, 102-03, 107, 117, 119-20, 127-29, 131-38, 141-42, 143, 148-49, 152, 155, 158-61, 164, 167, 169-76, 178, 183-85, 193, 195, 197, 199, 202-07, 209-12, 224, 226, 230, 232-37, 242-43, 246, 251, 253, 255-56, 259-62, 272-73, 275-78, 280, 282, 285-86, 289, 297-98, 300, 302.  A true and correct copy of Ms. Feinstein's testimony, taken April 26, 2017, is attached as Exhibit 25.

102.    Specifically, while Ms. Feinstein testified that she knew of CEO Tillerson's alias wayne.tracker@exxonmobil.com email account, and also knew that the company's new CEO Darren Woods was also assigned a secondary email account – j.e.gray@exxonmobil.com, she testified that she did not know details of the preservation, collection, destruction, or recovery of emails from those accounts.  She did know, however, that Exxon had assigned these accounts' identities to a different EMIT employee, Ramona Helble, who Ms. Feinstein testified worked closely with the Management Committee.  Ms. Feinstein testified that Ms. Helble would have the relevant information. (*See, e.g.,* Ex. 25, Feinstein Tr. 201-08, 265-67, 273-74.)

**App. 212**

103.     Ms. Feinstein also testified that she did not know details of Exxon's improper identification and search for Management Committee documents described in paragraphs 7 to 39 of her affidavit.  (Anderson Ex. Q, Revised Hirshman Cert. ¶ ¶ 7-39.)  Ms. Feinstein responded to dozens of OAG's questions seeking these details by stating that another EMIT employee, Bob Lauck, would have the relevant information. (*See*, *e.g.*, Ex. 25, Feinstein Tr. 73, 116, 126, 139-40, 148, 153-55, 171-182, 250-53.)  Indeed, Ms. Feinstein referred to Mr. Lauck nearly 50 times in her examination and Mr. Lauck was listed as having personal knowledge as to 15 of the paragraphs in Ms. Feinstein's affidavit.  (*Id*.; Ex. 24, Apr. 19, 2017 Toal Letter to OAG, Ex. A.)

104.     Ms. Feinstein also testified that she did not know details of Exxon's email preservation, automatic destruction, backup, and recovery systems and capabilities.  With respect to virtually every question OAG asked about these critical topics, Ms. Feinstein testified that another EMIT employee in the Email Collaboration Services unit, Cynthia Leong, would have the relevant information.  (*See*, *e.g.*, Ex. 25, Feinstein Tr. 60-62, 83-84, 93-94, 143, 151-52, 158-59, 222-23, 226.)  Indeed, Ms. Feinstein referred to Ms. Leong nearly 17 times in her examination and Ms. Leong was listed as having personal knowledge as to 11 of the paragraphs in Ms. Feinstein's affidavit.  (*Id*.; Ex. 24, Apr. 19, 2017 Toal Letter to OAG, Ex. A.)

105.     Finally, Ms. Feinstein testified that she did not know details of Exxon's instructions to its employees in connection with subpoena compliance.  In particular, while Ms. Feinstein was generally aware that Exxon had directed Management-Committee assistants to collect documents, she could not explain what those instructions were or what they were based on, given that Exxon never interviewed the custodians or the assistants.  When questioned on these topics, Ms. Feinstein testified that Daniel Bolia of Exxon's Law Department would have the relevant information. (*See*, *e.g.*, Ex. 25, Feinstein Tr. 73, 75-79, 168-69, 182-83.)  Indeed,

**App. 213**

Mr. Bolia was listed as having personal knowledge as to 29 of the paragraphs in Ms. Feinstein's affidavit. (Ex. 24, Apr. 19, 2017 Toal Letter to OAG, Ex. A.)

106.    For her part, Ms. Hirshman's testimony revealed that she does not know any specific information about Exxon's preservation, backup, or recovery of the documents destroyed by Exxon during the pendency of the subpoena, and she was unable to provide any of the information Ms. Feinstein did not have, and for which Ms. Feinstein referred OAG to the four other Exxon employees identified above. (*See*, *e.g.*, Ex. 16, Hirshman Tr. 162-65.)

### III.    OAG's May 8, 2017 Subpoenas Are Reasonably Related to OAG's Investigation

#### A.    *May 8, 2017 Subpoena Duces Tecum for Documents and Information*

107.    OAG's May 8, 2017 subpoena duces tecum includes requests for both information ("Interrogatories") and documents. (Anderson Ex. T.)

108.    The Interrogatories seek details about Exxon's purported application of a proxy cost of GHGs to its investment decisions and evaluation of assets, along with the identification of individuals assigned to various committees overseeing the company's reserves.

109.    The Interrogatories are targeted first at eliciting specific information as to whether Exxon applied a proxy cost analysis to its investment decisions, impairment decisions, and internal reserves estimates. (*See* Interrogatory Nos. 1, 3, 4, and 6.)

110.    The Interrogatories then follow up, in cases where Exxon did apply a proxy-cost analysis, with requests for information that may indicate practices that make Exxon's proxy cost representations meaningless and deceptive, such as: (i) applying a lower proxy cost than it publicly represented to investors; (ii) applying a proxy cost to only a fraction of GHG emissions from a given project; (iii) applying a proxy cost to only certain GHGs and not others; (iv) applying a proxy cost to only direct emissions as opposed to emissions stemming from end use

**App. 214**

of the oil and gas; and/or (v) assuming that it could pass-through most or all of the proxy cost to its customers, while unreasonably assuming that such pass-through would have no effect on demand for its products. (Interrogatory Nos. 2, 5, and 7.) OAG has evidence from its investigation that Exxon engaged in each these practices.

111.    If anything, Exxon's responses to the Interrogatories should narrow, rather than expand, the need for additional documents by focusing on instances in which Exxon actually applied proxy costs to its investment or impairment decisions.

112.    The document requests seek four major categories of documents.

113.    First, OAG seeks documents relating to the use and application of the proxy cost analysis from the post-November 2015 period. Such documents are relevant to Exxon's continuing proxy-cost-related representations, and any related changes in the company's practices.

114.    Second, OAG seeks documents that Exxon previously produced to the Securities and Exchange Commission ("SEC") relating to impairment decisions, reserves calculations, and climate change. Such documents are relevant to the evaluation of Exxon's apparent failure to use a proxy-cost analysis in valuing assets for impairment purposes.

115.    Third, OAG seeks documents that were exchanged between Exxon and banks or other financial institutions relating to impairment decisions, reserves calculations, and climate change. Such documents are relevant to the importance that investors ascribe to climate change issues in their investment decisions.

116.    Finally, OAG seeks documents related to the company's asset valuation and impairment practices for its long lived assets, particularly its hydrocarbon assets, again given

App. 215

Exxon's apparent failure to use a proxy-cost analysis in its valuation and impairment practices. Documents produced by PwC are insufficient in this regard, as set out in ¶¶ 41-49 above.

### B.    *May 8, 2017 Testimonial Subpoenas*

117.    Four of the testimonial subpoenas were issued for the witnesses discussed in ¶¶ 99-106, above, who were identified by Ms. Feinstein as having key information she was unable to provide about Exxon's improper preservation of and search for management documents, its consequent destruction of those documents, and its incomplete data-recovery efforts: Ms. Helble, Mr. Lauck, Ms. Leong and Mr. Bolia.  (Anderson Exs. U-X.)

118.    Four testimonial subpoenas were issued for fact witnesses employed directly by Exxon, all of whom are shown by Exxon's documents to have had responsibility for development and/or implementation of the proxy-cost analysis Exxon represented it applied (as well as knowledge as to other OAG theories of liability, including but not limited to other misstatements in the MTR Report[5]).

119.    The remaining testimonial subpoena was issued for Jason Iwanika, an employee of Exxon's majority-owned subsidiary Imperial.  A true and correct copy of the testimonial subpoena for Mr. Iwanika is attached as Exhibit 26.

120.    Exxon produced approximately 670 documents from Mr. Iwanika's custody. These documents show that Mr. Iwanika was centrally involved in the instances described supra

---

[5]    For example, among other things, OAG is investigating whether the "Substantial Costs for $CO_2$ Mitigation" data used by Exxon in the MTR Report was erroneously attributed to the Massachusetts Institute of Technology.  *See* Ex. 1, MTR Report at 9.  The MIT researcher whose study was cited in the MTR Report, John Reilly, informed the report's authors at Exxon as early as July 1, 2015 that critical figures used in the chart "[we]re not numbers we report in that study… that the chart's "numbers were extremely high," and that the overall impression created by the chart was "misleading."  A true and correct copy of this correspondence, EMC 001189007, is attached as Exhibit 27.   As Reilly explained to reporters just this week, his "work would not come up with that number or anywhere near it," and the data's presentation "may lend some readers to believe that that number is based on our work."  A true and correct copy of the May 30, 2017 E&E News, *MIT Researcher Says Exxon Report Inflated His Data* article is attached as Exhibit 28.

**App. 216**

at ¶ ¶ 26, 29-33, in which Exxon applied existing GHG taxes instead of the company's purported proxy costs to its Canadian oil sands assets, deviating from the company's representations and underrepresenting the company's risks.

### C.    OAG Attempted to Meet And Confer Regarding Exxon's Prospective Compliance with the May 8, 2017 Subpoenas

121.    Prior to Exxon filing this motion, OAG initiated and attempted to conduct a meet-and-confer session with Exxon concerning its prospective compliance with the subpoenas.

122.    Specifically, OAG raised the issue of a conference to discuss the subpoena on the afternoon of May 10, 2017, during an in-person discussion with Exxon's counsel after Ms. Hirshman's testimony had concluded for the day.

123.    Exxon's counsel responded on May 12, 2017 that it would be available only for a telephonic meet and confer, and no earlier than Thursday, May 18, 2017, two business days before the return date of the May 8, 2017 subpoena duces tecum.

124.    The parties conducted a teleconference on May 19, 2017 regarding Exxon's prospective compliance with the May 8, 2017 subpoenas.

125.    During that conference, Exxon refused to consider complying with *any* of the requests in the subpoena duces tecum.

126.    When OAG pointed out that Interrogatory 9 asked only for a list of names of individuals on Exxon's reserves-related committees that were predecessors to a similar committee that came into existence in 2015, Exxon refused, citing "overarching fundamental concerns."

127.    When OAG pointed out that Document Request No. 5 would require Exxon to do nothing more than copy a CD previously produced to the SEC, Exxon again declined, on the same basis.

**App. 217**

128.    When OAG asked whether Exxon would consider responding to any more limited requests, Exxon stated that it would only negotiate such limitations *after* OAG withdrew its subpoena.

129.    Exxon also stated that the record-witness subpoenas were unnecessary on the grounds that Ms. Feinstein's and Ms. Hirshman's affidavits and testimony complied with the Court's prior orders and purportedly satisfied all of OAG's needs concerning Exxon's subpoena compliance, and in particular, its admitted destruction of documents and its requisite recovery efforts.

130.    Finally, Exxon contended that despite producing many relevant documents from Mr. Iwanika on its own volition, it could not yet confirm whether Exxon would produce Mr. Iwanika for testimony.

131.    Less than an hour after this teleconference, Exxon filed this motion to quash the subpoena duces tecum and the four records-witness subpoenas for testimony from Ms. Helble, Mr. Lauck, Ms. Leong and Mr. Bolia

132.    After filing this motion, Exxon told OAG that it will also not comply with the subpoena for testimony for Mr. Iwanika.  Exxon followed up by letter confirming its position.

133.    As discussed *supra*, Exxon has produced hundreds of documents from Iwanika's custody (¶ 120), Exxon's Law Department interviewed him (Ex. 17, May 3, 2017 Toal Letter Ex. B), and Exxon has produced privilege logs for communications purportedly containing legal advice on which Mr. Iwanika and other Imperial employees appear.  Documents from other Imperial employees have been produced by Exxon, other Imperial employees have been interviewed by Exxon's Law Department, and 27 other Imperial employees have been placed on

**App. 218**

preservation hold by Exxon's Law Department. (Ex. 17, May 3, 2017 Toal Letter Ex. B; *supra* at ¶ 84.)

134.    After Exxon filed its motion, OAG sent a letter to Exxon asking the company to withdraw it, and to actually meet and confer in good faith regarding Exxon's prospective compliance.

135.    Exxon responded by again rejecting any obligation to make any effort at all to negotiate the scope or timing of Exxon's prospective responses before seeking to quash OAG's subpoenas on the grounds it has advanced here.

## IV.    <u>Additional Attachments</u>

136.    A true and correct copy of an excerpt of the Public Papers of Governor Lehman, dated August 15, 1933, is attached as Exhibit 29.  A true and correct copy of an excerpt of the Annual Report of the Attorney-General for the Year Ending Dec. 31, 1933 is attached as Exhibit 30.

137.    A true and correct copy of the former N.Y.C. Admin. Code § B1-5.0 is attached as Exhibit 31.

138.    A true and correct copy of the former New York State Executive Law § 11 is attached as Exhibit 32.

139.    A true and correct copy of a transcript of Exxon's fourth quarter 2016 earnings call is attached as Exhibit 33.

**App. 219**

140.    No previous application has been made to this Court or any other court for the relief requested herein.


Dated:  New York, New York
        June 2, 2017


_____/s_____
            John Oleske

**App. 220**

# Exhibit 8

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

In the Matter of the Application of the

PEOPLE OF THE STATE OF NEW YORK, by
ERIC T. SCHNEIDERMAN,
Attorney General of the State of New York,

                                Petitioner,

                  - against –

PRICEWATERHOUSECOOPERS LLP and
EXXON MOBIL CORPORATION,

                                Respondents.

Index No. 451962/2016

IAS Part 61
Hon. Barry R. Ostrager

Motion Sequence No. 4


**MEMORANDUM OF LAW IN OPPOSITION TO
EXXON'S MOTION TO QUASH AND IN SUPPORT OF
THE OFFICE OF THE ATTORNEY GENERAL'S
CROSS-MOTION TO COMPEL**


**App. 222**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ............................................................................................ 1

FACTUAL BACKGROUND ............................................................................................... 3

    A.    OAG's Investigation Concerns Exxon's Representations To Its Investors ................... 3

        1.   Exxon's Representations To Investors Regarding Its Proxy Cost Analysis ........... 3

        2.   Exxon's Internal Documents Do Not Support Its Public Representations ............. 6

    B.    OAG's Additional Subpoenas ................................................................................. 9

        1.   OAG's Second Subpoena Duces Tecum ............................................................. 9

        2.   OAG's Testimonial Subpoenas ......................................................................... 10

    C.    Exxon's Motion to Quash ...................................................................................... 12

ARGUMENT ..................................................................................................................... 13

    A.    Exxon Should Be Compelled To Comply With OAG's
        Second Subpoena *Duces Tecum* ......................................................................... 14

        1.   OAG's Subpoena Is Reasonably Related To Its Investigation ............................ 14

        2.   OAG's Subpoena Is Not Unduly Burdensome .................................................... 16

        3.   OAG Is Authorized To Issue Requests For Information or Interrogatories ......... 17

        4.   OAG's Subpoena Is Not Preempted By Federal Law ......................................... 19

    B.    This Court Should Compel the Testimony of the Records Witnesses .......................... 21

    C.    This Court Should Compel the Testimony of Jason Iwanika,
        An Imperial Oil Limited Witness .............................................................................. 23

CONCLUSION ................................................................................................................... 25

**App. 223**

## TABLE OF AUTHORITIES

### Cases

*A'Hearn v. Comm. on Unlawful Practice of Law*, 23 N.Y.2d 916 (1969) .................................. 14

*Abrams v. Thruway Food Mkt. & Shopping Ctr., Inc.*, 541 N.Y.S.2d 856 (2d Dep't 1989) . 14,15

*Airbnb, Inc. v. Schneiderman*, 44 Misc. 3d 351 (Sup. Ct. Albany Cnty. 2014) .............. 14, 16, 18

*Alfred E. Mann Living Tr. v. ETIRC Aviation S.a.r.L*, Misc. 3d 1211(A),
    2010 N.Y. Slip Op. 52476(U) (Sup. Ct. N.Y. Cnty. June 24, 2010) ............................... 16

*All-Waste Sys., Inc. v. Abrams*, 547 N.Y.S.2d 77 (2d Dep't 1989) ............................................ 19

*Am. Dental Coop., Inc. v. Attorney-General*, 514 N.Y.S.2d 228 (1st Dep't 1987) ..... 2, 14, 17, 18

*Anheuser-Busch, Inc. v. Abrams*, 71 N.Y.2d 327 (1988) ............................................ 2, 13, 14, 18

*Application of Slipyan*, 208 Misc. 515 (Sup. Ct. N.Y. Cnty. 1955) ........................................... 19

*Bank of Tokyo–Mitsubishi, New York Branch v. Kvaerner*, 175 Misc. 2d 408
    (Sup. Ct. N.Y. Cnty. 1998) ..................................................................................... 23

*City of Albany Indus. Dev. Agency v. N.Y. State Comm'n on Gov't Integrity*,
    144 Misc. 2d 342 (Sup. Ct. Albany Cnty. 1989) ................................................... 15

*Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519 (2009) ................................................... 21

*Cuomo v. Dreamland Amusements, Inc.*, 22 Misc. 3d 1107(A), 2
    009 N.Y. Slip. Op. 50062(U) (Sup. Ct. N.Y. Cnty. Jan. 6, 2009) ................................... 21

*Cuomo v. Dreamland Amusements, Inc.*, No. 08 Civ. 7100 (JGK),
    2008 WL 4369270 (S.D.N.Y. Sep. 22, 2008) ................................................................. 21

*Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936 (2016) ........................................................... 21

*Grande Prairie Energy LLC v. Alstom Power, Inc.*, 5 Misc. 3d 1002(A),
    2004 N.Y. Slip Op. 51156(U) (Sup. Ct. N.Y. Cnty. Oct. 4, 2004) ........................... 23, 25

*Grandview Dairy, Inc. v. Lefkowitz*, 76 A.D.2d 776 (1st Dep't 1980) ...................................... 18

*Hogan v. Cuomo*, 888 N.Y.S.2d 665 (3d Dep't 2009) ................................................................ 13

*Horn Constr. Co. v. Fraiman*, 309 N.Y.S.2d 377 (1st Dep't 1970) .......................................... 14

*In re Kushner*, 108 Misc. 2d 329 (Sup. Ct. N.Y. Cnty. 1981) ................................................... 18

*Liberty Mut. Ins. Co. v. N.Y. Comm'n on Human Rights*, 332 N.Y.S.2d 971
    (1st Dep't 1972) .................................................................................................... 19

*Mustaphalli Capital Partners Fund, LP v. People*, Index No. 650845/14,
    2014 WL 2417523 (Sup. Ct. N.Y. Cnty. May 23, 2014) ......................................... 15

**App. 224**

*N.Y. State Comm'n on Gov't Integrity v. Congel*, 142 Misc. 2d 9
 (Sup. Ct. N.Y. Cnty. 1988) ................................................................................ 16

*N.Y. State Joint Comm'n on Pub. Ethics v. Campaign for One N.Y., Inc.*,
 53 Misc. 3d 983 (Sup. Ct. Albany Cnty. 2016) ................................................. 16

*Oncor Commc'ns v. State*, 636 N.Y.S.2d 176 (3d Dep't 1996) .................................. 21

*People v. Applied Card Sys., Inc.*, 11 N.Y.3d 105 (2008) .......................................... 19

*People v. Forsyth*, 109 Misc. 2d 234 (Sup. Ct. N.Y. Cnty. 1981) .............................. 21

*People v. Greenberg*, 946 N.Y.S.2d 1 (1st Dep't 2012) ............................................. 19

*People v. Thain*, 24 Misc. 3d 377 (Sup. Ct. N.Y. Cnty. 2009) ................................... 18

*Roemer v. Cuomo*, 888 N.Y.S.2d 669 (3d Dep't 2009) .............................................. 14

*Standard Fruit & S.S. Co. v. Waterfront Comm'n of N.Y. Harbor*, 43 N.Y.2d 11 (1977) .......... 23

## Statutes

Executive Law § 63(12) ............................................................................................ 17, 18

General Business Law § 352(4) ................................................................................. 21

General Business Law § 352(1) ............................................................................... 2, 17

State Financial Law § 2(6-a) .................................................................................... 10

## Other Authorities

Financial Accounting Standards Board, Accounting Standards Codification 360-10-35-30 ..... 20

## Regulations

17 C.F.R. § 210.4-10 ................................................................................................. 20

17 C.F.R. § 229.1202 ................................................................................................ 20

Instruction to 17 C.F.R. § 229.1202 (Item 1202) ...................................................... 20

**App. 225**

## PRELIMINARY STATEMENT

The Office of the Attorney General ("OAG") respectfully submits this memorandum of law in opposition to Exxon Mobil Corporation's ("Exxon") motion to quash and in support of OAG's cross-motion to compel compliance with its subpoena duces tecum dated May 8, 2017, its testimonial subpoena to a fact witness from Exxon's majority-owned subsidiary, Imperial Oil Limited ("Imperial"), and four records witnesses.

OAG is investigating whether Exxon has been making false and misleading statements about specific safeguards it purports to have put in place to protect the company from risks posed by future climate change-related regulations. Specifically, Exxon has repeatedly represented to investors that the company applies a "proxy cost" to greenhouse gas emissions ("GHGs") when it makes investment decisions and performs asset valuations, and that because it does so, it can assure investors that none of Exxon's projects or assets will be materially impacted by future climate change-related regulations. Contrary to Exxon's unsupported assertion that nothing in its production to date justifies OAG's continued investigation into the accuracy of such representations, OAG has uncovered significant evidence of potential materially false and misleading statements by Exxon about its application of a proxy cost of GHGs to its investment and impairment[1] decisions, suggesting that the exercise described to investors may be a sham.

OAG's present subpoenas, which Exxon now seeks to quash, are highly relevant to determining whether Exxon has in fact been misleading investors, as its own documents suggest. The subpoena duces tecum seeks targeted information and documents needed to fill the gaps in the existing document productions concerning Exxon's risk-management practices related to the company's investments and asset valuations. The testimony of the records witnesses is critical to

---

[1] An impairment is a reduction in the recoverable amount of an asset below its book value. Affirmation of John Oleske, dated June 1, 2017 ("Oleske Aff. ¶ __" or "¶ __") ¶¶ 42-47.

**App. 226**

understanding and potentially remedying Exxon's still-unaccounted-for destruction of documents from key custodians, including the company's former Chairman and CEO. The testimony of the fact witness from Imperial is highly relevant to OAG's investigation given that Exxon's documents reflect that he was directed by Exxon not to apply a proxy cost of GHGs to its Canadian oil sands projects. As such, OAG's subpoenas easily meet the well-established legal standard in that they are reasonably related to OAG's investigation. *See Am. Dental Coop., Inc. v. Attorney-General*, 514 N.Y.S.2d 228, 232 (1st Dep't 1987).

Unable to contest the authority of the Attorney General, the factual basis for his investigation, or the relevance of the documents and information sought by the subpoena duces tecum, Exxon resorts to arguing that the subpoenas are unduly burdensome, make improper demands for information, and are preempted by federal law. None of these arguments has merit. Exxon does not even try to make the required showing to establish undue burden, OAG's requests for information are explicitly authorized by statute,[2] and none of OAG's prospective enforcement actions against Exxon under New York's anti-fraud laws are subject to federal preemption. Thus, Exxon falls far short of meeting the legal standard required to quash a subpoena. *See Anheuser-Busch, Inc. v. Abrams*, 71 N.Y.2d 327, 332 (1988) (holding "[a]n application to quash a subpoena [issued by OAG] should be granted only where the futility of the process to uncover anything legitimate is inevitable or obvious or where the information sought is utterly irrelevant to any proper inquiry.").

Exxon's motion to quash is the latest maneuver in its longstanding strategy to avoid and delay the production of documents, information, and testimony directly relevant to OAG's

---

[2] Gen. Bus. Law § 352(1) (OAG "may . . . require such other data and information as [it] may deem relevant[.]"); *Anheuser-Busch, Inc. v. Abrams*, 71 N.Y.2d 327, 330 (1988) (holding that OAG's interrogatories were valid).

**App. 227**

investigation.[3]  Despite Exxon's obstruction and obfuscation, OAG's investigation has persisted, and based on the evidence that Exxon *has* produced, the investigation has gained urgency.  That evidence suggests not only that Exxon's public statements about its risk management practices were false and misleading, but also that Exxon may *still* be in the midst of perpetrating an ongoing fraudulent scheme on investors and the public.  Accordingly, OAG's cross-motion to compel should be granted and Exxon's motion to quash should be denied in its entirety.

<div align="center">

**FACTUAL BACKGROUND**

</div>

**A.  OAG's Investigation Concerns Exxon's Representations To Its Investors**

    **1.  *Exxon's Representations To Investors Regarding Its Proxy Cost Analysi*s**

OAG is investigating the accuracy of Exxon's representations concerning its risk management practices that purport to address the impact of climate change and climate change regulations on its business and financial reporting.  One aspect of OAG's investigation concerns Exxon's numerous representations to investors that in its economic decision-making, including its investment decisions and asset valuations, the company applies a "proxy cost" of GHG emissions that reasonably approximates the range of potential future government actions with respect to climate change.  Although the specific language Exxon has used has changed over time, the overall message has remained the same:  because Exxon incorporates the added proxy

---

[3] Since November 2015, Exxon has (i) stonewalled the collection and production of relevant and responsive documents, requiring OAG to seek relief from this Court on five separate occasions; (ii) failed to preserve and consequently destroyed years of responsive documents from more than a dozen key management witnesses, including Exxon's former CEO; (iii) proffered witnesses for testimony who lacked basic knowledge about Exxon's preservation, collection, review, production, and recovery of relevant documents; (iv) commenced an unprecedented lawsuit in federal court to enjoin OAG's enforcement of its original subpoena on the grounds that it violates Exxon's constitutional rights; and (v) obstructed the production of documents from its independent auditor on the grounds of a non-existent privilege.

With respect to the latter, on May 23, 2017, the First Department affirmed this Court's order compelling subpoena compliance by Exxon and its independent auditor on the ground that New York law, which does not recognize any accountant-client privilege, governed the enforcement proceeding.  Continuing in its effort to avoid production of these documents from its independent auditor, Exxon has moved for reargument from the First Department and leave to appeal its decision to the Court of Appeals, and has obtained an emergency stay of enforcement during the motion's pendency.

**App. 228**

costs of GHGs in its decisions to undertake exploration and development projects, and incorporates these added costs in the valuation of its existing assets, the company can assure investors that none of Exxon's projects or assets will be materially affected by future climate change-related regulations.

Exxon has represented that it has been applying a proxy cost of GHGs to its business decisions since 2007. ¶ 13. Exxon further represents that its proxy cost of GHGs increases substantially over time, reaching as high as $80/ton of carbon dioxide equivalent (*i.e.*, CO2 or other GHGs) by 2040. ¶¶ 13-14. Because Exxon's major oil and gas projects often span decades, the proxy cost of GHGs can have a material effect on the long-term profitability of Exxon's projects and the value of its assets. ¶ 20.

On March 31, 2014, Exxon published a report entitled *Energy and Carbon—Managing the Risks* (the "MTR Report") in response to shareholder demands that the company assess the vulnerability of its assets to future climate regulation. Indeed, a shareholder group withdrew a proposed resolution that it intended to submit at the company's 2014 annual shareholders meeting in exchange for Exxon's commitment to publish such a report. ¶ 7. In the MTR Report, Exxon explained its purported use of proxy-cost analysis as follows:

> We also address the potential for future climate-related controls, including the potential for restriction on emissions, through the use of a proxy cost of carbon. This proxy cost of carbon is embedded in our current *Outlook for Energy*, and has been a feature of the report for several years. The proxy cost seeks to reflect all types of actions and policies that governments may take over the Outlook period relating to the exploration, development, production, transportation or use of carbon-based fuels. Our proxy cost, which in some areas may approach $80/ton over the Outlook period, is not a suggestion that governments should apply specific taxes. . . . . It is simply our effort to quantify what we believe government policies over the Outlook period could cost to our investment opportunities. Perhaps most importantly, we require that all our business segments include, where appropriate, GHG costs in their economics when seeking

**App. 229**

> funding for capital investments. *We require that investment proposals reflect the climate-related policy decisions we anticipate governments making during the Outlook period and therefore incorporate them as a factor in our specific investment decisions.*

¶ 10, Ex. 1 (emphasis added). After explaining this purported risk management practice, Exxon claimed that "[b]ased on this analysis, we are confident that none of our hydrocarbon reserves are now or will become 'stranded'" and that "the company does not believe current investments in new reserves are exposed to the risk of stranded assets[.]" ¶ 9, Ex. 1.

Since it published the MTR Report, Exxon has continued to represent to investors in various public filings, publications, and statements that it employs the proxy cost analysis in evaluating investment decisions. ¶¶ 12-17. Even after the issuance of OAG's initial subpoena in November 2015 (the "2015 Subpoena"), which specifically requested documents relating to the MTR Report, Exxon has continued to make such representations to the public and investors. For example, former Chairman and CEO Rex Tillerson told attendees of the company's May 25, 2016 annual shareholders meeting that "everything gets tested" against the purported proxy cost analysis. ¶ 16, Ex. 2. The official notice to shareholders for the same meeting stated that Exxon has been applying the proxy cost analysis to safeguard the company's value since 2007. ¶ 15. Exxon has repeated its proxy cost representations in multiple 10-Ks, multiple submissions to the Carbon Disclosure Project,[4] its annual *Outlook for Energy* public reports, a recent report it issued in March 2017 entitled *2016 Energy and Carbon Summary*, and in materials and statements

---

[4] The Carbon Disclosure Project ("CDP") is a United Kingdom-based nongovernmental organization that runs a global disclosure system that enables companies and governments to measure and manage their environmental impacts. CDP's data enables its network of investors, supply chain purchasers and policy makers to link environmental integrity, fiduciary duty and public interest to make better-informed decisions on climate action. Thousands of corporations voluntarily report their GHG emissions to the CDP. Each year Exxon submits answers to questions about climate change posed by the CDP.

**App. 230**

Case 3:16-cv-03111-K     Document 121     Filed 07/31/20     Page 236 of 544     PageID 4488

provided to investors in connection with the company's annual shareholder meeting held on May 31, 2017.[5] ¶¶ 17, 19.

Moreover, Exxon has also represented that, as required by Generally Accepted Accounting Principles ("GAAP"), the company applies the same assumptions when it evaluates its reserves and other assets for impairment as it does in the rest of its business determinations, including decisions on potential investments. ¶ 45, Ex. 12.

### 2.   *Exxon's Internal Documents Do Not Support Its Public Representations*

OAG's ongoing review of evidence, including the documents produced by Exxon in response to the 2015 Subpoena, has revealed that those documents contradict Exxon's representations about the application of a proxy cost of GHGs to the company's investment and asset valuation decisions may be false and misleading. ¶¶ 20-59.

Internal documents produced by Exxon reveal that from at least 2010 through approximately June 2014, Exxon told its investors it used one set of proxy-cost figures, when in fact the company's internal policies set forth a second set of lower proxy costs (and therefore a less risk-sensitive version) for use in its internal business planning.  ¶¶ 21-27.  Exxon actually recognized that its secret, internal figures understated the degree to which Exxon was taking into account the risks of climate change regulations, and thus, were not as conservative as its representations to investors suggested when applied to the vast majority of projects emitting GHGs.  ¶¶ 23-25, Exs. 3-5.  Nonetheless, as it admitted in an internal presentation in May 2014, Exxon continued to represent to investors and the public that it used the higher proxy cost reflected in its public disclosures.  ¶ 25, Ex. 5.  Exxon's documents show that former Chairman

---

[5] At the May 31, 2017 shareholder meeting, despite opposition from Exxon's management, the New York Comptroller's shareholder resolution seeking to require the company to publish an annual assessment of the long-term financial impacts of technological advances and climate change policies consistent with the globally agreed upon 2-degree Celsius target passed with a vote of 62.3% for and 37.7% against.  ¶ 18.

**App. 231**

and CEO Rex Tillerson was specifically informed of, and approved of, this inconsistency. ¶ 24, Ex. 4. Although Exxon ended this practice in 2014, and transitioned to using the publicly-stated proxy cost figures for internal analyses, ¶ 25, Ex. 5, Exxon did not tell investors about its secret internal set of proxy cost formulas when it represented in 2016 that it had been applying the proxy cost analysis since 2007, ¶ 27.

Moreover, it appears that Exxon did not even follow its deficient internal policies. OAG has not identified any documents in Exxon's production reflecting the consistent application of a proxy cost of GHGs to its investment and asset valuation decisions, whether in conformity with Exxon's publicly-stated representations or with its secret internal versions of proxy costs.[6] Rather, as to most such decisions, there appear to be no documents reflecting a proxy cost analysis at all. Indeed, despite OAG specifically asking for such information for nearly a year, Exxon has identified only a single, anomalous example. ¶ 37, Exs. 7-8.[7] In other instances, Exxon applied GHG costs that were a small fraction of the company's publicly disclosed proxy cost figures. For example, with regard to Exxon's oil sands investments in Alberta, Canada, documents show that instead of applying its publicly-stated proxy cost that rises to an endpoint as high as $80/ton in 2040, Exxon applied the much lower GHG taxes then in place in Alberta and held those figures flat indefinitely into the future. This substitution resulted in the alleged proxy cost of GHGs being reduced to a small fraction of what Exxon told investors would be applicable. ¶¶ 29-33. Exxon's use of the lower GHG taxes instead of its publicly-stated proxy costs is particularly telling because Exxon's own documents suggest that if Exxon had applied

---

[6] Exxon's assertion that it "has produced numerous documents responsive to the Attorney General's prior requests that reflect the actual application of the precise figures used in the policies to company-sponsored projects," Anderson Aff. ¶ 2, is unsupported by a cite to a single document.

[7] In that instance, Exxon applied a proxy cost to a project where Exxon was selling carbon dioxide to other operators, and thus, the application of the proxy cost increased the project's projected profitability. ¶¶ 37, Exs. 7-8.

**App. 232**

the proxy cost it promised to shareholders, at least one substantial oil sands project may have projected a financial loss, rather than a profit, over the course of the project's original timeline. ¶ 29.[8]

As to Exxon's general policies, OAG has located only one internal summary document published annually that reflects a company mandate to apply a proxy cost analysis to investment and valuation decisions.[9] ¶ 36 (two pages in the company's annual Corporate Plan Dataguide Appendix that does little more than list the purportedly-applicable proxy costs across geographic regions and timeframes). OAG has not located any specific documents in Exxon's production that provide any guidance on the application of this proxy cost policy. Indeed, the evidence indicates a widespread lack of awareness among employees of the proxy cost policy, or how it should be applied. *Id.*

Similarly, although Exxon represents that it applies the same assumptions to impairment decisions as it does with respect to other business decisions, including investment decisions, in accordance with GAAP, the few documents Exxon has produced to date do not reflect any attempt at all to apply a proxy cost analysis to impairment decisions, including as to oil and gas reserves. ¶ 49. Documents produced by Exxon's independent auditor, PricewaterhouseCoopers LLP ("PwC") suggest that Exxon simply did not do what it told investors – it did not apply a proxy cost to its valuation or impairment analyses, including to its evaluation of its reserves and other hydrocarbon assets, prior to 2016. ¶ 50.

---

[8] In addition, despite representing to investors that the proxy-cost analysis included prospective regulations on emissions caused by the "use" of fossil fuels such as electricity generation or motor-fuel combustion, also known as "Scope 3" emissions, ¶ 38, Exxon's documents indicate that even in the few instances where employees applied some form of a proxy cost analysis, the proxy-cost calculation omitted Scope 3 emissions. *Id.*, Ex. 10. These emissions account for 90% of all fossil-fuel greenhouse gases. ¶ 39.

[9] This is the same document that Exxon references in its motion to quash. Exxon's Brief in Support of Its Motion to Quash and For a Protective Order ("Exxon Br.") at 16.

**App. 233**

### B. OAG's Additional Subpoenas

On May 8, 2017, OAG issued a second subpoena duces tecum and nine testimonial subpoenas. ¶¶ 107, 117-19.

#### 1. *OAG's Second Subpoena Duces Tecum*

The subpoena duces tecum includes requests for information ("Interrogatories") and for documents. ¶ 107. The Interrogatories seek details about Exxon's purported application of its proxy cost analysis to its investment decisions and evaluation of assets, along with an identification of individuals assigned to various committees overseeing the company's reserves. ¶ 108. The Interrogatories are targeted to elicit specific information relevant to Exxon's purported application of proxy costs to all of its investment, valuation, and impairment decisions. ¶ 109 (Interrogatory Nos. 1, 3, 4, and 6.) Exxon either took the risk of climate change regulations into account or it didn't. If, as OAG's investigation to date suggests, Exxon did not apply a proxy cost in most instances, there will be no additional details for Exxon to provide in response to these Interrogatories. ¶¶ 109-116. If Exxon did in fact apply a proxy cost analysis to any of these decisions, OAG is entitled to information that would reveal details about whether, for example, Exxon: (i) applied a lower proxy cost than it publicly represented to investors; (ii) applied a proxy cost to only a fraction of GHG emissions from a given project; (iii) applied a proxy cost to only certain GHGs and not others; (iv) applied a proxy cost to only direct emissions as opposed to emissions stemming from end use of the oil and gas; and/or (v) assumed that it could pass-through most or all of the proxy cost to its customers, while unreasonably assuming that such pass-through would have no effect on demand for its products. The documents Exxon has produced to date appear to reflect each of these practices, any one of which could render Exxon's purported proxy-cost analysis a meaningless sham. ¶ 34. OAG's

**App. 234**

interrogatories call for information and data that would identify which of these practices were used with respect to any decisions for which Exxon claims that it applied a proxy cost of GHGs. ¶ 110 (Interrogatory Nos. 2, 5, & 7.)

The document requests seek four major categories of documents. First, OAG seeks documents relating to the use and application of a proxy cost of GHGs from the post-November 2015 period. Such documents are relevant to Exxon's continuing proxy-cost-related representations, and any related changes in the company's practices. ¶ 113. Second, OAG seeks documents that Exxon previously produced to the Securities and Exchange Commission ("SEC") relating to impairment decisions, reserves calculations, and climate change, a request that imposes no appreciable burden on Exxon. ¶ 114. Third, OAG seeks documents that were exchanged between Exxon and financial institutions relating to impairment decisions, reserves calculations, and climate change. Such documents would include communications with equity research departments that would form the basis for analyst reports and other information considered by investors in their investment decisions. ¶ 115. Finally, OAG seeks documents related to the company's asset valuation and impairment practices for its long lived assets,[10] particularly its hydrocarbon assets.[11] ¶ 115.

### 2. OAG's Testimonial Subpoenas

Five of the nine testimonial subpoenas seek testimony from fact witnesses. Four of these are for fact witnesses employed directly by Exxon, ¶ 118, and one is for a fact witness employed

---

[10] A long lived or fixed asset is any asset that a business expects to retain for at least one year. *See generally* N.Y. State Fin. Law § 2(6-a).

[11] Although PwC produced certain documents on these topics, it is necessary to obtain the requested documents from Exxon because the documents produced to date show that (1) Exxon does not share with PwC all relevant documents on this topic, including many of the cash flow models Exxon uses for impairment-related purposes; (2) in other cases, PwC was shown such documents, but Exxon did not permit PwC to retain them; (3) PwC does not possess drafts of relevant Exxon documents such as impairment memoranda and asset recoverability reviews; and (4) PwC does not possess related internal Exxon communications. ¶¶ 53-54.

**App. 235**

by Exxon's majority-owned subsidiary, Imperial Oil Limited ("Imperial") in Canada. ¶ 119. The remaining four testimonial subpoenas are for document custodians.

Confronted with Exxon's failure to preserve subpoenaed documents and the resulting destruction of untold numbers of documents from over a dozen key custodians, this Court ordered Exxon to produce an affidavit from a records custodian detailing Exxon's preservation, collection, production, and recovery of documents from Exxon's Management Committee and other sources of management documents. ¶ 57. Pursuant to this Court's March 23, 2017 order, a senior Exxon Information Technology employee, Connie Feinstein, submitted an affidavit describing the steps taken to preserve and search for Exxon's management documents, the failure to preserve such documents, the consequent destruction of those documents, and data-recovery efforts. *Id.* Exxon also offered the testimony of its outside counsel, Michele Hirshman, in response to an OAG subpoena concenring compliance with the 2015 Subpoena. *Id.*

The testimony of Ms. Feinstein and Ms. Hirshman made clear that Exxon failed to take the required steps to locate, preserve, and recover critical electronically-stored information from key custodians, including former Chairman and CEO Rex Tillerson. ¶¶ 55-65, 72-86, 99-106. For example, during Ms. Hirshman's testimony, she testified that she knew in "early 2016" about the second email address for Rex Tillerson – the Wayne Tracker email address –and that she did not disclose that email address to OAG, stating that it would "be an *interesting test* of whether the Attorney General's office is reading the documents." ¶ 76, Ex. 16 (Hirshman Tr.) at 134 (emphasis added). Ms. Hirshman further testified that neither she nor her firm made any attempt to look further into the preservation, collection or production of documents of the Wayne Tracker email address at that time. The consequence of this failure was months of automatic destruction of relevant correspondence involving Mr. Tillerson. *Id*. at 141-42.

**App. 236**

When OAG took the testimony of Ms. Feinstein about the information in her affidavit, it quickly became apparent that she knew little about Exxon's preservation, collection, production, and recovery of the management documents. ¶¶ 99-105. However, during the course of her testimony, she identified four records witnesses who were likely to have information relevant to OAG's questions. *Id.*[12] These four witnesses are the subject of four of OAG's nine testimonial subpoenas.

### C. Exxon's Motion to Quash

After serving these subpoenas, OAG attempted to engage in a meet-and-confer call with Exxon's counsel to discuss the company's compliance with the subpoenas. ¶ 121. During that meet-and-confer, Exxon refused to discuss complying with *any* of the requests in the subpoena duces tecum. ¶ 125.[13] When OAG asked whether Exxon would consider responding to narrowed requests, Exxon stated that it would only discuss production on more limited requests if OAG withdrew its subpoena. ¶ 128. Exxon also stated that the records witness subpoenas were unnecessary because the testimony of Ms. Feinstein and Ms. Hirshman provided sufficient information about Exxon's subpoena compliance, despite the fact that the testimony of both

---

[12] Ms. Feinstein was unable to provide any specifics for any of six of the topics in the subpoena and for which Exxon proffered her as a witness. Instead, in response to almost every request for specific information on the six topics, Ms. Feinstein identified other individuals as responsible for those areas. She testified that (i) Ms. Helble was responsible for the creation of the Wayne Tracker alias account; (ii) Mr. Lauck was responsible for the identification and preservation of Management Committee documents, and the completely different manner Exxon used to collect those documents; (iii) Ms. Leong was responsible for the automatic deletion "file sweep" tool, as well as the email servers and back up locations needed for forensic recovery of Wayne Tracker emails; and (iv) Mr. Bolia has personal knowledge of the matters set out in 29 of the 60 paragraphs in Ms. Feinstein's affidavit, including those concerning the implementation of the different search protocols employed for Management Committee custodians, implementation of the first, second, third, and fourth searches of Management Committee records, the discovery of Exxon's failure to exempt the Wayne Tracker email account from the "file sweep" tool, and attempts to remediate the loss of Wayne Tracker emails. ¶¶ 99-105.

[13] When OAG pointed out that Interrogatory No. 9 asked only for a list of names of individuals on indisputably relevant internal committees, Exxon refused to discuss complying with even that request, citing "overarching fundamental concerns." ¶ 126. When OAG also pointed out that document request No. 5 would require Exxon to do nothing more than provide OAG with a copy of a previous production made to the SEC, Exxon again declined, on the same basis. ¶ 127.

**App. 237**

revealed their lack of knowledge of key aspects of the preservation, collection, and production process, and Ms. Feinstein identified other individuals who were more directly involved in the process. ¶ 129.

Rather than engage in a good faith effort to address any objections relating to undue burden, over breadth, or relevance, Exxon instead filed its motion to quash the subpoena duces tecum and the four records witness subpoenas. Since filing its motion, Exxon has also asserted that it will not comply with the subpoena for testimony of the witness from Imperial on the purported ground that it lacks sufficient control over Imperial to compel the witness's attendance – despite the fact that Exxon produced documents from Imperial and this witness, many of which are highly relevant to whether Exxon applied a lower GHG tax as compared to the higher, publicly-stated, proxy cost of GHGs to its Canadian oil sands projects. ¶¶ 29-33.

## ARGUMENT

The Court of Appeals has held that "[a]n application to quash a subpoena [issued by OAG] should be granted only where the futility of the process to uncover anything legitimate is inevitable or obvious or where the information sought is *utterly irrelevant* to any proper inquiry." *Anheuser-Busch, Inc. v. Abrams*, 71 N.Y.2d 327, 332 (1988) (emphasis added) (internal citations, quotation marks, and brackets omitted); *see also id.* (where there is uncertainty about the legality of the conduct being investigated, the Attorney General has authority to issue a subpoena "unless the legality of the . . . practice is so well established . . . as to be free from doubt."); *Hogan v. Cuomo*, 888 N.Y.S.2d 665, 668 (3d Dep't 2009) (even "where legality of

**App. 238**

underlying conduct is arguable, [Attorney General's] power to investigate possible violations must be sustained").[14]  Exxon falls far short of meeting this standard.[15]

### A. Exxon Should Be Compelled To Comply With OAG's Second Subpoena *Duces Tecum*

OAG's subpoena duces tecum was carefully tailored to obtain the information and documents relevant to the apparent contradictions between Exxon's public representations concerning its risk-management practices and its actual internal practices.  Exxon's conclusory arguments that OAG's requests for information and documents have no factual basis, are unduly burdensome and disproportionate, and are preempted by federal law are meritless.

### *1. OAG's Subpoena Is Reasonably Related To Its Investigation*

Courts apply a presumption that the Attorney General is acting in good faith when commencing an investigation and issuing a subpoena.  *See, e.g.*, *Anheuser-Busch*, 71 N.Y.2d at 332; *Roemer v. Cuomo*, 888 N.Y.S.2d 669, 671 (3d Dep't 2009); *Abrams v. Thruway Food Mkt. & Shopping Ctr., Inc.*, 541 N.Y.S.2d 856, 858 (2d Dep't 1989); *Am. Dental Coop., Inc. v. Attorney-General*, 514 N.Y.S.2d 228, 232 (1st Dep't 1987).  "[A]ll that the Attorney-General

---

[14] This standard, rather than any rule of proportionality, governs the enforceability of OAG's subpoenas, and the cases cited by Exxon, *see* Exxon Br. at 15, are not to the contrary.  *See Airbnb, Inc. v. Schneiderman*, 44 Misc. 3d 351, 356 (Sup. Ct. Albany Cnty. 2014) (New York courts will limit a subpoena only to the extent requests are unrelated to the statute under which State was investigating); *Myerson v. Lentini Bros. Moving & Storage Co.,* 33 N.Y.2d 250, 258 (1973) (agency issuing subpoena is not "required to establish a strong and probative basis for investigation, let alone probable cause"); *A'Hearn v. Comm. on Unlawful Practice of Law*, 23 N.Y.2d 916, 919 (1969) (subpoena enforceable if there is "reasonable ground to believe that there was illegal" conduct); *Horn Constr. Co. v. Fraiman*, 309 N.Y.S.2d 377, 379 (1st Dep't 1970) (even "after extensive examination of witnesses," State need only show a "reasonable relationship" between subsequent document requests and objective of investigation). Here, the subpoena *duces tecum* is reasonably related to determining whether Exxon, consistent with its public statements, applied a proxy cost of GHGs to its investment and impairment decisions and its internal reserve estimates.

[15] All that is required to grant OAG's cross-motion to compel and deny Exxon's motion to quash is an OAG affirmation regarding its ongoing investigation, Here, OAG additionally presents certain of its investigative findings in this memorandum and accompanying affirmation to demonstrate the extent to which Exxon's assertion that there is no basis for OAG's investigation is entirely baseless. In fact, Exxon's own documents make clear that there is good reason for OAG to continue to investigate whether Exxon is engaged in an ongoing fraud.

**App. 239**

need show in support of his subpoena . . .  is his authority, the relevance of the items sought, and some factual basis for his investigation." *Id*.[16]

Here, there can be no question that the Attorney General has the authority to investigate violations of New York law,[17] and that misrepresentations by Exxon to the public and investors about Exxon's application of a proxy cost analysis may violate New York law, including the Martin Act and the Executive Law.  Moreover, the subpoena duces tecum is reasonably related to OAG's investigation.  OAG's investigation of Exxon, which was initiated as a result of Exxon's representations to the investing public about how it is managing the risks posed by climate change-related regulations to its business, has revealed substantial inconsistencies between Exxon's public statements and its internal practices.  OAG's requests were carefully crafted to obtain specific information and documents relevant to those inconsistencies.

The fact that OAG has already obtained documents from Exxon and others does not alter this standard, as New York courts continue to apply the same principles in evaluating follow-on subpoenas issued in ongoing investigations.  For example, in *Mustaphalli Capital Partners Fund, LP v. People*, Index No. 650845/14, 2014 WL 2417523 (Sup. Ct. N.Y. Cnty. May 23, 2014), the court applied this standard and enforced a second subpoena for documents in an ongoing Martin Act investigation, notwithstanding the recipient's claim that OAG already had sufficient information to determine whether there had been any actionable violations.[18]

---

[16] Notably, probable cause that an illegal act was committed is not required.  *See, e.g.*, *Roemer*, 888 N.Y.S.2d at 670 (Attorney General need only show "some factual basis for his investigation"); *Thruway Food Mkt.*, 541 N.Y.S.2d at 858 (Attorney General "is not required to establish the existence of probable cause" to issue a subpoena).

[17] Exxon does not dispute OAG's authority to issue the subpoenas.

[18] *See also City of Albany Indus. Dev. Agency v. N.Y. State Comm'n on Gov't Integrity,* 144 Misc. 2d 342, 344-45 (Sup. Ct. Albany Cnty. 1989) (refusing to quash State commission's subpoena, which required "searching through 'hundreds of thousands' of documents," with respect to an investigation that was already "well underway"; holding that the State had "satisfactorily established that the documents sought in each of the challenged paragraphs are reasonable in breadth and relevant and material to the issues under inquiry").

**App. 240**

**FILED: NEW YORK COUNTY CLERK 06/02/2017 07:50 AM** INDEX NO. 451962/2016

NYSCEF DOC. NO. 168     Case 3:16-cv-03111-K    Document 121    Filed 07/31/20    Page 246 of 544    PageID 4498    RECEIVED NYSCEF: 06/02/2017

### *2. OAG's Subpoena Is Not Unduly Burdensome*

Unable to challenge the authority of the Attorney General, the factual basis for his investigation, or the relevance of the documents and information sought by the subpoena, Exxon resorts to objecting to the subpoena on the ground that it imposes an undue burden, without setting forth any facts supporting such objection. The cases are clear that a subpoena recipient cannot simply make general claims that the subpoena is unduly burdensome, but rather must substantiate these claims. *Alfred E. Mann Living Tr. v. ETIRC Aviation S.a.r.L*, Misc. 3d 1211(A), 2010 N.Y. Slip Op. 52476(U), at *5 (Sup. Ct. N.Y. Cnty. June 24, 2010) (motion to quash denied where petitioner's "vague and conclusory assertions that the Subpoena is vastly overbroad and burdensome is not persuasive."); *N.Y. State Joint Comm'n on Pub. Ethics v. Campaign for One N.Y., Inc.*, 53 Misc. 3d 983, 1000 (Sup. Ct. Albany Cnty. 2016) ("Notwithstanding [petitioner's] complaints about the breadth of the subpoena, it has not made any showing compliance would present to [petitioner] an undue burden of time or money."); *Airbnb, Inc. v. Schneiderman*, 44 Misc. 3d 351, 359 (Sup. Ct. Albany Cnty. 2014) (holding that petitioner "failed to demonstrate that the subpoena is unduly burdensome" because it "failed to establish, other than via conclusory assertion, that [requested] information is not collected by petitioner or readily accessible by petitioner").[19]

Similarly, here, Exxon has made only conclusory allegations that the subpoena is overly broad and unduly burdensome, without providing any factual support for such allegations. Moreover, contrary to Exxon's claim that OAG is seeking records for "every oil and gas investment decision it has made over the last 12 years," OAG has limited its request to instances

---

[19] "The judicial remedy for an attack upon an overly broad subpoena . . . is not to quash the subpoena in its entirety, but to modify it so that the materials demanded are reasonably within the agency's subpoena power." *N.Y. State Comm'n on Gov't Integrity v. Congel*, 142 Misc. 2d 9, 16 (Sup. Ct. N.Y. Cnty. 1988).

**App. 241**

relating to Exxon's decision to apply proxy costs to its investment and impairment decisions. OAG expects that Exxon's responses to the Interrogatories will narrow, rather than expand, the need for additional documents because OAG's investigation to date indicates that there are few instances in which Exxon actually applied proxy costs to its investment or impairment decisions. ¶ 28. In any event, OAG has conveyed to Exxon that it is willing to narrow its document requests if Exxon identifies a more efficient means of responding to the subpoena. Accordingly, Exxon should be compelled to comply with OAG's subpoena duces tecum.[20]

### 3. OAG Is Authorized To Issue Requests For Information or Interrogatories

Exxon's claim that OAG lacks the authority to issue interrogatories is unavailing. OAG has the express statutory authority to request information from subpoena recipients. The Martin Act provides that, in addition to the Attorney General's power to require testimony and the production of books and records, OAG "may . . . require such other data and information as [it] may deem relevant[.]" Gen. Bus. Law § 352(1). It further provides that OAG may require a potential violator to file "a statement in writing . . . as to all the facts and circumstances concerning the subject matter, and for that purpose may prescribe forms upon which such statements shall be made."[21] *Id.* Executive Law § 63(12) likewise authorizes OAG to "take proof and make a determination of the relevant facts." In *Am. Dental Co-op., Inc. v. Attorney General*, the First Department, citing Executive Law § 63(12) and General Business Law § 343 (the "Donnelly Act"), confirmed that OAG's "investigatory power includes the right to issue

---

[20] Recognizing that it cannot satisfy the high legal standard for quashing OAG's subpoenas, Exxon moves, in the alternative, for a protective order limiting the subpoenas. Exxon's request for such relief also should be denied because it has failed to put forth any facts that support its claim of undue burden and it has failed to meet-and-confer in good faith to attempt to narrow the scope of the Subpoena.

[21] Whether Exxon's prospective responses are considered written testimony or responses to interrogatories, the result is the same: Exxon is legally obligated under the Martin Act to answer in writing the questions posed by OAG.

**App. 242**

subpoenas and serve interrogatories." 514 N.Y.S.2d at 279.[22]  The court in *People v. Thain* reached the same conclusion with respect to a Martin Act subpoena.  24 Misc. 3d 377, 389-90 (Sup. Ct. N.Y. Cnty. 2009) (holding that recipient of subpoena was required to compile and provide a list containing employee bonus-related information to OAG).

Courts have long upheld OAG's authority to issue interrogatories under its investigative powers, including subpoenas that include interrogatories with specific instructions designed to elicit written responses that address precisely the matter that OAG is investigating.  *See, e.g., Anheuser-Busch*, 71 N.Y.2d at 330 (holding that OAG's interrogatories were valid); *Grandview Dairy, Inc. v. Lefkowitz*, 76 A.D.2d 776, 777 (1st Dep't 1980) (holding that detailed instructions accompanying Donnelly Act interrogatories were "essential if interrogatories are to serve as a useful tool for gathering evidence against a corporate entity" and noting that "[w]ithout the instructions the interrogatories might well be stripped of all efficacy through evasiveness and nonresponsiveness by the corporate officer answering the interrogatories"); *Airbnb*, 44 Misc. 3d at 359 (holding that OAG's interrogatories, issued pursuant to Executive Law § 63(12), about numerous Airbnb hosts and specific rentals were not unduly burdensome); *In re Kushner*, 108

---

[22] The Donnelly Act, which sets out OAG's antitrust investigatory authority, includes the same language as the Martin Act authorizing OAG to require the production of "a statement in writing . . . as to all the facts and circumstances concerning the subject matter" and "such other data and information as he may deem relevant[.]" This language first appeared in the Martin Act when it was enacted in 1921, and was added to the Donnelly Act in 1933 for the express purpose of enlarging OAG's subpoena power to the extent provided for in the Martin Act. The Martin Act is thus at least as broad as the Donnelly Act in this respect.  *See* Public Papers of Governor Lehman, Aug. 15, 1933, at 160-61 (¶ 136, Ex. 29) (including recommendation by Governor Lehman to the Legislature that the Donnelly Act be amended "to enlarge the power of subpoena, examination and prosecution by the Attorney-General in the same manner as now provided in the Martin Act," to enable OAG "to conduct adequate investigations to ascertain the underlying facts concerning violations of the Donnelly Act"); Annual Report of the Attorney-General, 1934, at 51 (*Id.*, Ex. 30) (noting that the Donnelly Act amendment of the prior year "was patterned after the Martin Act").

**App. 243**

Misc. 2d 329, 332 (Sup. Ct. N.Y. Cnty. 1981) (upholding the validity of OAG subpoena with

interrogatories, which are "a useful tool for gathering evidence against a corporate entity").[23]

Exxon ignores this overwhelming authority and instead argues that it cannot be

compelled to create new documents to comply with the subpoena. However, all but two of the

cases it cites in support of this proposition (Exxon Br. at 18-19) pertain to civil discovery

obligations and do not involve investigative subpoenas from government agencies. In the

remaining two cases, the statute pursuant to which the subpoena was issued did not specifically

authorize interrogatories and requests for information at the time the subpoena was issued.[24]

### 4. OAG's Subpoena Is Not Preempted By Federal Law

Contrary to Exxon's contention, OAG's subpoena is not preempted by federal law. Any

preemption analysis is "guided by the starting presumption that Congress does not intend to

supplant state law unless its intent to do so is clear and manifest." *People v. Applied Card Sys.,*

*Inc.*, 11 N.Y.3d 105, 113 (2008) (internal quotation marks omitted). This presumption is

particularly strong with respect to state blue-sky laws such as the Martin Act, because federal

securities laws "presuppose an important role for state Attorneys General in investigating fraud

and bringing civil actions to enjoin wrongful conduct, vindicate the rights of those injured

thereby, deter future fraud, and maintain the public trust." *People v. Greenberg*, 946 N.Y.S.2d 1,

5 (1st Dep't 2012).

---

[23] *See also All-Waste Sys., Inc. v. Abrams*, 547 N.Y.S.2d 77, 78 (2d Dep't 1989) (holding that OAG's interrogatories were valid under the Donnelly Act).

[24] *Liberty Mut. Ins. Co. v. N.Y. Comm'n on Human Rights*, 332 N.Y.S.2d 971 (1st Dep't 1972) (decision concerning authority of City of New York Commission on Human Rights under former N.Y.C. Admin. Code § B1-5.0, *see* ¶ 137, Ex. 31); *Application of Slipyan*, 208 Misc. 515 (Sup. Ct. N.Y. Cnty. 1955) (decision concerning authority of Commissioner of Investigation under former Executive Law § 11, *see* ¶ 138, Ex. 32).

**App. 244**

Any potential claims by OAG, including those related to asset impairment, do not come close to conflicting with the federal regulations that Exxon cites, which concern the calculation and disclosure of proved reserves under a formula specified by the SEC.  As Exxon's own spokesperson highlighted in a recent earnings call, reserves reporting pursuant to SEC rules is distinct from evaluation of assets for potential impairment.[25]  Notably, although SEC rules require companies to report proved reserves in light of existing conditions (*see* 17 C.F.R. §§ 210.4-10, 229.1202), estimates of future cash flows for purposes of impairment testing "shall incorporate the entity's own assumptions . . . and shall consider all available evidence."  ¶ 47, Ex. 11 (Financial Accounting Standards Board, Accounting Standards Codification 360-10-35-30).

Exxon represents to investors and to the public that it follows this rule of consistency in evaluating whether its assets are impaired.[26]  But as set forth above, it appears that Exxon's impairment evaluations did not incorporate its publicly-touted assumptions about a proxy cost of GHGs prior to 2016.  Any claims stemming from Exxon's inconsistency in this respect would have little or nothing to do with SEC reserve reporting regulations, let alone conflict with such regulations.[27]  Indeed, the subpoena duces tecum specifies that OAG is not requesting

---

[25] *See* ¶ 139, Ex. 33 (Transcript of Earnings Call, Exxon Mobil Corp. Q4 2016 Results), at 23 ("I want to make sure that everybody's very clear that there is a separation between proved reserves reporting under the SEC rules and then the whole issue of asset impairments.") (remarks of Jeff Woodbury, Vice President of Investor Relations, Exxon).

[26] *See*, *e.g.*, ¶ 44, Ex. 12 (Exxon Mobil Corp., Form 10-K, 2015), at 57 ("Cash flows used in recoverability assessments are based on the Corporation's assumptions which are developed in the annual planning and budgeting process, and are consistent with the criteria management uses to evaluate investment opportunities.").

[27] Moreover, state and federal law on this point could not conflict even in theory, because the federal regulations that Exxon cites make clear that companies may disclose estimates of oil and gas resources other than the reserves calculations mandated by those regulations if such disclosure is required by state law.  Instruction to 17 C.F.R. § 229.1202 (Item 1202).

**App. 245**

information about Exxon's SEC reserves reporting process. (Anderson Aff. Ex. T at Interrogatory Nos. 6 & 7).[28]

Furthermore, OAG has not filed a complaint; thus far, it has only issued subpoenas, rendering Exxon's preemption argument premature in any event. *See Oncor Commc'ns v. State*, 636 N.Y.S.2d 176, 178 (3d Dep't 1996) (holding that, absent claims asserted in a complaint, "there can be no meaningful consideration of the preemption issue"); *Cuomo v. Dreamland Amusements, Inc.*, No. 08 Civ. 7100 (JGK), 2008 WL 4369270, at *8 (S.D.N.Y. Sep. 22, 2008) (holding that preemption issue could not be resolved because the potential claim that may have been preempted was "only one of several bases" for OAG's investigation); *Cuomo v. Dreamland Amusements, Inc.*, 22 Misc. 3d 1107(A), 2009 N.Y. Slip. Op. 50062(U), at *6-7 (Sup. Ct. N.Y. Cnty. Jan. 6, 2009) (same).[29]

**B. This Court Should Compel the Testimony of the Records Witnesses**

There can be no question that OAG has the right to ensure that responsive documents are preserved, collected, and produced in the course of the its investigation, and furthermore, to investigate any failures in that process as well as obstruction or frustration of its investigation.[30] Here, Exxon and its outside counsel have failed to observe basic requirements for the preservation, collection, production, and recovery of electronically-stored information.

---

[28] These requests concern Exxon's *internal* reserves estimates, which are not based on the SEC formula, but rather on Exxon's own assumptions, and which feed into its impairment decisions.

[29] The cases Exxon cites with respect to raising preemption as a defense to a subpoena (*see* Exxon Br. at 20-21) are inapposite. *Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936 (2016), did not involve investigatory subpoenas at all, but rather concerned reporting requirements in addition to those specified by ERISA. In *Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519, 535-36 (2009), the Court addressed whether state authority to issue subpoenas was preempted by federal law limiting visitorial powers over national banks. By contrast, Exxon does not assert a general immunity from state subpoenas, but only that OAG's potential claims may be preempted.

[30] *See* Gen. Bus. Law § 352(4); *see also People v. Forsyth*, 109 Misc. 2d 234, 237 (Sup. Ct. N.Y. Cnty. 1981) (upholding jury verdict that failing to obey a Martin Act subpoena violated § 352(4) because, inter alia, defense of impossibility is not a reasonable cause for failure to obey a subpoena "[w]here the defendant is responsible for his inability to comply").

**App. 246**

¶¶ 57-106.  These failures directly resulted in the destruction of months, and in many cases, more than a year's worth, of emails and other electronic documents belonging to key custodians including the company's top management and reserves analysts.  ¶¶ 72-92.  The testimony of Ms. Feinstein and Ms. Hirshman has revealed that, despite being proffered by Exxon as knowledgeable on these topics, they lack knowledge about many of the relevant details, including, crucially, information about Exxon's data-backup processes and its recovery efforts to date. ¶¶ 101-06.  Despite being proffered as a witness on the six topics in OAG's subpoena, on almost 200 occasions, Ms. Feinstein testified that she did not know the requested details, and nothing in Ms. Hirshman's testimony provides further elucidation on these points.  ¶¶ 103, 106.  Thus, OAG subpoenaed the four Exxon witnesses identified by Ms. Feinstein as being knowledgeable on such details.  ¶ 117.

Unable to contest the relevance of the testimony of these witnesses, Exxon contends that their testimony is cumulative, speculative, and unduly burdensome.  None of these objections has merit given that Ms. Feinstein did not know the answers to many of OAG's questions, and identified these four record custodians as likely to know the answers to such questions. ¶¶ 99-105.  Moreover, any undue burden to Exxon is outweighed by OAG's need for this relevant information about the full scope of Exxon's document destruction and ensuring the recovery of the destroyed documents.  Because OAG has established that (i) Ms. Feinstein was unable to provide certain information; (ii) the four newly-noticed witnesses are likely to provide the information that Ms. Feinstein was unable to provide; and (iii) the testimony of such witnesses is relevant to the investigation, this Court should compel Exxon to produce these witnesses for testimony.

**App. 247**

### C. This Court Should Compel the Testimony of Jason Iwanika, An Imperial Oil Limited Witness

Despite having produced over 670 documents from the custody of Jason Iwanika, an employee of Exxon's majority-owned subsidiary, Imperial, based in Canada, Exxon now refuses to produce Mr. Iwanika for testimony in this investigation, contending for the first time that it lacks control over its majority-owned subsidiary from which it has been producing documents for months. ¶¶ 84, 120, 132-33. Mr. Iwanika's testimony is highly relevant to OAG's investigation given that documents produced by Exxon indicate that he was directed by Exxon not to apply a proxy cost to Exxon's Canadian oil sands projects. ¶¶ 29-33.

Under New York law, a parent corporation can be required to produce documents or testimony from subsidiaries. For example, in *Grande Prairie Energy LLC v. Alstom Power, Inc.*, the court held that "a parent company . . . can be compelled to produce for deposition an employee of its foreign subsidiary," and required an American company to produce for testimony an employee of a Swiss affiliate. 5 Misc. 3d 1002(A), 2004 N.Y. Slip Op. 51156(U), at *3 (Sup. Ct. N.Y. Cnty. Oct. 4, 2004). Likewise, in *Bank of Tokyo–Mitsubishi, New York Branch v. Kvaerner*, the court held that "if a [company] subject to the court's *in personam* jurisdiction controls a foreign corporate entity the [company], by virtue of its control, should be obligated to produce any and all appropriate discovery under its aegis, including that under the control of its subsidiary, wherever the subsidiary may be located." 175 Misc. 2d 408, 411 (Sup. Ct. N.Y. Cnty. 1998) (requiring defendant to produce documents in the possession of its wholly-owned foreign subsidiary).[31]

---

[31] This principle applies equally to a majority-owned subsidiary that is, for relevant purposes, under the control of the parent corporation. *See Standard Fruit & S.S. Co. v. Waterfront Comm'n of N.Y. Harbor*, 43 N.Y.2d 11, 15 (1977) ("[s]o long as the person who participated in the questioned corporate activity is an officer or employee of the corporation, or is under its control or direction, it is the corporation's responsibility to produce that person pursuant to a subpoena served upon the corporation" even if that person is located in a foreign jurisdiction).

**App. 248**

Having spent months producing Mr. Iwanika's documents, Exxon now claims, implausibly, that it has no control over Imperial or Mr. Iwanika. Exxon's baseless assertion is refuted by Exxon's own documents, including those produced from Mr. Iwanika's files. Exxon's Corporate Plan documents, in which the company sets out corporate-level assumptions for the proxy cost of GHGs, include sub-sections for the Canadian provinces where Imperial operates. ¶¶ 33, 36. Numerous documents reflect that Mr. Iwanika sought direction and guidance from Exxon employees concerning how to apply this portion of the Exxon Corporate Plan in the course of his work. *See, e.g.*, ¶ 26, Ex. 6; ¶¶ 29-33. In certain instances, those Exxon employees advised Mr. Iwanika not to apply the proxy cost of GHGs that appears in the Corporate Plan, and instead, to apply only the much lower actual cost of carbon under existing Alberta law. ¶ 33. The documents produced by Exxon reveal that Mr. Iwanika pushed back and questioned those instructions, expressing his belief that he was bound to follow Exxon's Corporate Plan guidance. *Id*. Nonetheless, it appears that Mr. Iwanika relented and complied with Exxon's instructions to deviate from the company's internal policies. *Id*. These and other documents confirm that Exxon controls Imperial[32] and Mr. Iwanika with respect to matters at the core of OAG's investigation, and as such, Exxon cannot now refuse to produce Mr. Iwanika for testimony simply because he is located outside New York.

Additionally, Mr. Iwanika appears on Exxon's privilege logs, including for a communication he sent that purportedly contained legal advice. ¶ 133. Other Imperial employees appear on Exxon's privilege logs as well. *Id*.[33] Exxon's apparent contention that Mr.

---

[32] Besides this substantial document production, other indicia of Exxon's control over Imperial include the following: (i) Exxon produced documents from a second Imperial employee, Susan Swan, Oleske Aff. ¶ 133; (ii) Exxon's Law Department conducted custodial interviews of both Ms. Swan and Mr. Iwanika, *id.*; and (iii) at least 28 Imperial employees were placed on litigation hold by Exxon's Law Department, *id*.

[33] In addition to Iwanika, 27 other Imperial employees have been placed on preservation hold by Exxon's Law Department. ¶ 133.

**App. 249**

Iwanika's presence on a document does not break privilege is an implicit acknowledgment that he is under Exxon's control. *Grande Prairie Energy*, 5 Misc. 3d 1002(A), 2004 N.Y. Slip Op. 51156(U), at *3 (holding that party "cannot have it both ways" in this respect).

Accordingly, this Court should compel Exxon to produce Mr. Iwanika for testimony in response to OAG's subpoena.

## CONCLUSION

For the reasons set forth above, Exxon's motion to quash should be denied in its entirety, and OAG's cross-motion to compel compliance with OAG's subpoena duces tecum, its four subpoenas for the testimony of record custodians, and its subpoena for the testimony of Mr. Iwanika should be granted in its entirety.

**App. 250**

Dated: New York, New York
      June 2, 2017

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York

By: _____/s_____
    John Oleske
    Senior Enforcement Counsel

    Jonathan Zweig
    Assistant Attorney General

    Mandy DeRoche
    Assistant Attorney General

    Jordan Salberg
    Assistant Attorney General

120 Broadway
New York, New York 10271
Tel.: 212-416-8660

*Attorneys for Petitioner*
*People of the State of New York*

*Of Counsel:*

MANISHA M. SHETH
Executive Deputy Attorney General, Economic Justice Division

KATHERINE C. MILGRAM
Bureau Chief, Investor Protection Bureau

LEMUEL SROLOVIC
Bureau Chief, Environmental Protection Bureau

**App. 251**

# Exhibit 9

# Exhibit 1

**App. 253**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

|  |  |
|---|---|
| PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York | Index No. 452044/2018 |
| Plaintiff, | |
| v. | |
| EXXON MOBIL CORPORATION, | |
| Defendant. | |

**EXPERT REPORT OF ELI BARTOV**

**May 8, 2019**

**App. 254**

**TABLE OF CONTENTS**

I.      Qualifications.................................................................................................... 1

II.     Assignment...................................................................................................... 3

III.    Summary of Opinions...................................................................................... 4

IV.     ExxonMobil's 2015 Impairment Testing ........................................................ 6

    A.    Background on Impairment of Long-Lived Assets ................................ 6

    B.    Background on ExxonMobil's Impairment Testing ............................. 10

    C.    ExxonMobil's Omission of GHG Emission Proxy Costs from Its Cost Projections for its 2015 Impairment Testing was Inappropriate.......................... 17

    D.    Had ExxonMobil Properly Included GHG Emission Proxy Costs in Its Cost Projections for its 2015 Impairment Testing, ExxonMobil Would Have Recognized an Impairment of Mobile Bay ................................... 18

V.      Event Study Analysis on ExxonMobil's Stock Price ..................................... 22

    A.    Framework and Methodology for an Event Study Analysis................. 23

    B.    Identification of Corrective Disclosure Dates Related to ExxonMobil's Alleged Misrepresentations ................................................................. 24

    C.    Development of an Economic Model to Estimate ExxonMobil's Stock Price Movements ................................................................................... 26

    D.    The Impact of the Revelation of ExxonMobil's Alleged Misrepresentations on ExxonMobil's Stock Price................................. 28

**App. 255**

## I.    QUALIFICATIONS

1.    My name is Eli Bartov.  I have been a Full Professor of Accounting at New York University's ("NYU") Leonard N. Stern School of Business since 2001 and have taught in its Accounting Department since 1992.  From 1989 to 1992, I was an Assistant Professor of accounting at the University of Rochester's William E. Simon Graduate School of Business Administration.

2.    I received my Ph.D. degree in accounting from the University of California at Berkeley in 1989.  My honors from the University of California at Berkeley include a Coopers & Lybrand Foundation Doctoral Student Fellowship, a University of California at Berkeley Graduate School Grants and Waivers Fellowship, and a University of California at Berkeley Doctoral Student Fellowship.  I received my B.A. degrees in accounting and economics, respectively, from the Faculty of Management and the Faculty of Social Sciences of Tel-Aviv University in 1977, where I was honored by being included on The Rector's Honor List and The Dean's Honor List.  I was licensed as a certified public accountant ("CPA") in Israel in 1979, where I was a practicing accountant until 1985 dealing primarily with auditing, tax planning, and designing of financial accounting systems for small-to-medium-size organizations.

3.    At NYU's Stern School of Business, I teach courses in financial accounting and reporting, financial statement analysis, international accounting and financial statement analysis, and empirical research in financial accounting at the MBA, EMBA, and Ph.D. levels, and have been the recipient of numerous teaching awards.  In addition, I served as the Director of the Accounting Doctoral Program at NYU's Stern School of Business in the nine-year period from 2001 to 2010.  I have been supervising doctoral students since 1997 and have placed them as assistant professors of accounting at such prestigious universities as Stanford University's Graduate School of Business (Dr. Yonca Ertimur) and the Wharton School of the University of Pennsylvania (Dr. Karthik Balakrishnan).  I have also taught at the University of Rochester, the University of California at Berkeley, the University of California at Los Angeles, Institut Européen d'Administration des Affaires ("Insead"), and City University of Hong Kong.

**App. 256**

4. My research focuses on capital markets' use of accounting information, executive stock options, earnings manipulations, earnings expectation manipulations, accounting restatements, impairments of long-lived assets, and various aspects of equity valuation.

5. My research has been widely cited by other academics as well as by the financial press. I have been invited frequently to lecture on capital markets' use of accounting information, executive stock options, executive compensation, earnings manipulations, equity valuation, and related topics before academic audiences not only in the United States, but also in Canada, Asia, Europe, the Middle East, and Australia.

6. I served as a member of the Financial Accounting Standards Committee ("FASC") of the American Accounting Association ("AAA") in the three-year period from 2001 to 2004. This committee, whose members are appointed by the President of the AAA, advises the Financial Accounting Standards Board ("FASB") on contemporary accounting issues. During my tenure, we provided advice to the FASB on such accounting issues as share-based payments, accounting changes and error corrections, and business combinations.

7. I have served on a myriad of other AAA committees, including the 2004–2005 Deloitte & Touche Wildman Medal Award Committee, the 2002 International Accounting Section Mid-Year Meeting Committee, and the 2000–2001 Financial-Reporting-Issues Conference Committee. I have also served on a number of editorial boards of academic journals, including *The Accounting Review* and the *International Journal of Disclosure and Governance*, and have been an ad hoc reviewer for nearly all of the top-tier accounting and finance academic journals.

8. Since October 2007, I have served as a member of the Humanities, Social Sciences and Business Studies Panel of the Research Grants Council ("RGC") of Hong Kong, China, which provides advice to the Hong Kong government regarding the allocation of funds among academic research projects in Hong Kong.

9. I communicate regularly with the investing community by consulting with financial analysts and professional money managers from such firms as Citadel Investment Group, Goldman Sachs Distressed Proprietary Investing, Viking Global Investors, and SAC Capital Advisors. I have also been invited frequently to lecture before accountants, investors, bankers, financial analysts, CFOs, and money managers by such firms as Fidelity

**App. 257**

Investments, Wellington Management, Standard Chartered Bank, Schroder Salomon Smith Barney, and Prudential Securities.

10.  A more complete summary of my background, including my prior testimony, is included in **Appendix A**.

## II.  ASSIGNMENT

11.  I have been retained by counsel for the People of the State of New York ("Plaintiff") in the above-captioned litigation.  I understand that Plaintiff alleges that Defendant Exxon Mobil Corporation ("ExxonMobil") provided "false and misleading assurances" to investors concerning its management of the "economic risks posed to its business by the increasingly stringent policies and regulations that it expects governments to adopt to address climate change."[1]  Specifically, according to the Complaint, ExxonMobil represented that it applied proxy costs attributable to greenhouse gas ("GHG") emissions (hereafter, "GHG Emission Proxy Costs") to its business, including in its "investment decisions, business planning, company oil and gas reserves and resource base assessments, evaluations of whether long-term assets are impaired…and estimates of future demand for oil and gas."[2] Plaintiff alleges that, contrary to this representation, ExxonMobil did not apply the GHG Emission Proxy Costs it represented to investors, and applied no GHG Emission Proxy Costs to its cost projections for its impairment testing before 2016.[3]

12.  I have been asked by counsel to:

   a.  Assess whether ExxonMobil inappropriately omitted GHG Emission Proxy Costs from its cost projections for its 2015 impairment testing;

   b.  Assess whether and to what extent ExxonMobil would have incurred impairment losses had it included GHG Emission Proxy Costs in its cost projections for its 2015

---

[1]  *People of the State of New York, by Barbara D. Underwood, Attorney General of the State of New York v. Exxon Mobil Corporation*, Index No. 452044/2018, Complaint, filed October 24, 2018 ("Complaint"), ¶ 1.

[2]  Complaint, ¶ 2.

[3]  Complaint, ¶¶ 3 and 5.

**App. 258**

impairment testing. Specifically, I was asked to assess potential impairment losses on ExxonMobil's Mobile Bay asset ("Mobile Bay");[4] and

c. Assess the impact of ExxonMobil's alleged misrepresentations "concerning [its] management of the risks posed to its business by climate change regulation"[5] on its stock price.

13. In carrying out this assignment, I have reviewed legal filings submitted in this case, discovery documents, and publicly available documents. A list of the materials I have considered is included in **Appendix B**.

14. For my work on this matter, I am being compensated at my standard rate of $1,050 per hour. My compensation is not contingent upon the opinions I express or the outcome of this matter.

15. Employees of Analysis Group, an economic research and consulting firm, have assisted me in my assignment, working under my direction and supervision. Consistent with industry practice, I also receive compensation based on the professional fees earned by Analysis Group in conjunction with their support of me in this matter. This compensation is not contingent upon the opinions I express or the outcome of this matter.

## III.  SUMMARY OF OPINIONS

16. My opinions are based on my analysis to date, as well as my skills, knowledge, experience, education, and training. My conclusions and opinions are described in detail below, but can be summarized briefly as follows:

- ExxonMobil inappropriately omitted GHG Emission Proxy Costs from its cost projections for its 2015 impairment testing. ExxonMobil should have included

---

[4]  Mobile Bay is an offshore gas field operated by ExxonMobil. It is located off the coast of Alabama in the Gulf of Mexico, and produces both natural gas and natural gas liquids. I understand that Mobile Bay is one of ExxonMobil's upstream assets in the United States. My impairment analysis focuses on Mobile Bay as I understand that it is one of the assets for which data was produced and for which ExxonMobil's 2015 impairment testing identified relatively narrow headroom (*i.e.*, the excess of undiscounted cash flows over book value). *See* "U.S. Production - Long-lived Asset Impairment Assessment," PwC's ExxonMobil Upstream Engagement Team, February 2, 2015, PNYAG0001268, p. 5.

[5]  Complaint, ¶ 1.

**App. 259**

GHG Emission Proxy Costs in its cost projections for its 2015 impairment testing in light of: (i) ExxonMobil's public disclosures and internal policies regarding GHG Emission Proxy Costs and impairment testing and (ii) accounting guidance regarding the assumptions used in estimating future cash flows for the impairment testing of a long-lived asset.

- In particular, had ExxonMobil included GHG Emission Proxy Costs in its cost projections for its 2015 impairment testing of Mobile Bay, it would have concluded that the book value of Mobile Bay was not recoverable based on the project's remaining net undiscounted cash flows, and consequently recognized an after-tax impairment loss of $320 million to $478 million.

- Based on an event study analysis, I estimate that, between April 1, 2014 and January 19, 2016, the inflation in ExxonMobil's stock price related to ExxonMobil's alleged misrepresentations was $1.64 on a per-share basis. This estimate is conservative, as it does not account for the impact of two other potentially relevant disclosure dates: September 20, 2016 and June 2, 2017. If I were to include the September 20, 2016 and June 2, 2017 dates, which are statistically significant at the 10% level, then the per-share inflation in ExxonMobil's stock price between April 1, 2014 to January 19, 2016, between January 20, 2016 and September 19, 2016, and between September 20, 2016 and June 1, 2017 would be $4.25, $2.61, $1.16, respectively.

- In addition, based on an event study analysis, I estimate that, between April 1, 2014 and January 19, 2016, the inflation in ExxonMobil's market capitalization related to ExxonMobil's alleged misrepresentations was $6.9 billion. This estimate is conservative, as it does not account for the impact of two other potentially relevant disclosure dates: September 20, 2016 and June 2, 2017. If I were to include the September 20, 2016 and June 2, 2017 dates, which are statistically significant at the 10% level, then the inflation in ExxonMobil's market capitalization between April 1, 2014 to January 19, 2016, between January 20, 2016 and September 19, 2016, and between September 20, 2016 and June 1, 2017 would be $17.9 billion, $10.9 billion, $4.9 billion, respectively.

**App. 260**

## IV.    EXXONMOBIL'S 2015 IMPAIRMENT TESTING

17.    The first part of my report relates to my analysis of ExxonMobil's 2015 impairment testing for Mobile Bay.  I begin by describing the accounting guidance for the impairment of long-lived assets.  Next, I provide a brief overview of ExxonMobil's impairment testing by describing ExxonMobil's public disclosures and internal policies regarding GHG Emission Proxy Costs and impairment testing before and during the 2015 to 2017 period, and summarizing ExxonMobil's impairment testing for Mobile Bay during each of the years 2015, 2016, and 2017.  I then explain why ExxonMobil's omission of GHG Emission Proxy Costs from its cost projections for its 2015 impairment testing of Mobile Bay was inappropriate.  Lastly, I assess whether ExxonMobil would have recognized an impairment of Mobile Bay had it properly included GHG Emission Proxy Costs in its cost projections for its 2015 impairment testing.

### A.    Background on Impairment of Long-Lived Assets

18.    In this section, I provide a brief overview of the accounting guidance upon which I rely in forming my opinions.  United States Generally Accepted Accounting Principles ("U.S. GAAP") are the set of standards, conventions, and rules that companies, not-for-profit organizations, and state and local governments must follow in preparing their financial statements.[6]  The authoritative sources that comprise U.S. GAAP—and the hierarchy of those publications—have changed over time and are currently reflected in the FASB Accounting Standards Codification ("ASC").[7]  Topic 360 of the ASC (Property, Plant, and Equipment) provides "the pervasive guidance for recognizing and measuring the impairment of long-lived assets and for long-lived assets to be disposed of."[8]

---

[6]    FAF, "About GAAP," available at https://www.accountingfoundation.org/jsp/Foundation/Page/FAFBridgePage&cid=1176164538898#section_1, accessed April 14, 2019.

[7]    FASB, "About the Codification (v 4.10)," December 2014, available at https://asc.fasb.org/imageRoot/71/58741171.pdf, accessed May 3, 2019, p. 7.

[8]    ASC 360-10-05-2. Guidance for recognizing and measuring the impairment of unproven reserves is included in ASC 932 (Extractive Activities - Oil and Gas). *See* ASC 932-360-35-11.

6

**App. 261**

19.    Under ASC 360, an impairment loss is "recognized only if the carrying amount of a long-lived asset (asset group) is not recoverable and exceeds its fair value."[9]  The guidance for recognizing and measuring the impairment of long-lived assets consists of the following three steps:[10]

> Step 1: Consider whether indicators of impairment are present
>
> Step 2: Test the recoverability of the long-lived asset
>
> Step 3: Measure the impairment of the long-lived asset

Below, I describe each of these steps, including the assumptions required to estimate future cash flows and fair value for purposes of Steps 2 and 3, respectively.[11]

### 1.    Consider Indicators of Impairment

20.    Because it would be impractical to test all long-lived assets for impairment at the end of every reporting period, ASC 360 requires impairment testing only when events or changes in circumstances indicate that a long-lived asset's carrying value (*i.e.*, book value) may not be recoverable.[12]  Such events or changes in circumstances may include:[13]

---

[9]    ASC 360-10-35-17.

[10]    I am aware of certain accounting resources that present the guidance for recognizing and measuring the impairment of long-lived assets as a two-step process rather than the three-step process described above. *See*, *e.g.*, Spiceland, J. David, James F. Sepe, and Mark W. Nelson, *Intermediate Accounting*, 6th ed., (New York, New York: McGraw-Hill, 2011), p. 581.  Under the two-step process, the consideration of whether indicators of impairment are present is not a formal step but rather a continuous evaluation (*i.e.*, Steps 2 and 3 become Steps 1 and 2).  For ease of exposition, I refer to the three-step process throughout my report.

[11]    As I explain in Section IV.B below, ExxonMobil uses the same cash flow model for Steps 1 and 2 of its impairment testing.  Therefore, the description of the assumptions required to estimate future cash flows is relevant to Steps 1 and 2 of ExxonMobil's impairment testing.

[12]    Spiceland, J. David, James F. Sepe, and Mark W. Nelson, *Intermediate Accounting*, 6th ed., (New York, New York: McGraw-Hill, 2011), p. 581.

[13]    ASC 360-10-35-21.  As I explain in Section IV.B below, the impairment indicator that ExxonMobil considered in its impairment testing of Mobile Bay from 2015 through 2017 was the fifth impairment indicator listed above (*i.e.*, a current period operating or cash flow loss combined with a projection or forecast of continued losses).  *See* "U.S. Production - Long-lived Asset Impairment Assessment," PricewaterhouseCoopers LLP's ("PwC's") ExxonMobil Upstream Engagement Team, February 2, 2015, PNYAG0001268, p. 5; "Upstream Long-lived Asset Impairment Assessment," Memo from PwC's ExxonMobil Upstream Engagement Team to ExxonMobil Upstream Year End 2016 Audit

**App. 262**

- A significant decrease in the market price of a long-lived asset;

- A significant adverse change in the extent or manner in which a long-lived asset is being used or in its physical condition;

- A significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset, including an adverse action or assessment by a regulator;

- An accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of a long-lived asset;

- A current period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset; and

- A current expectation that, more likely than not, a long-lived asset will be sold or otherwise disposed of significantly before the end of its previously estimated useful life.

21.     If any impairment indicators are present, the entity must proceed to Step 2.

              *2.      Test the Recoverability*

22.     In Step 2, the entity must test the recoverability of the long-lived asset.  The carrying amount of a long-lived asset is deemed not recoverable if it "exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset[.]"[14]

23.     ASC 360 provides detailed guidance regarding estimates of future cash flows used to test the recoverability of a long-lived asset.  For example, estimates of future cash flows used to test the recoverability of a long-lived asset shall be made "for the remaining useful life of the asset"[15] and shall include only the future cash flows that are "directly associated with

---

Files, PNYAG0187251-304 at 264-265 and 267-268; "Upstream Long-lived Asset Impairment Assessment," Memo from PwC's ExxonMobil Upstream Engagement Team to ExxonMobil Upstream Year End 2017 Audit Files, PNYAG0594936-5007 at 4955-4957.

[14]     ASC 360-10-35-17.

[15]     For an asset group, the remaining useful life must be based on the remaining useful life of the primary asset of the group.  *See* ASC 360-10-35-31.

**App. 263**

Case 3:16-cv-03111-K     Document 121     Filed 07/31/20     Page 269 of 544     PageID 4521

and that are expected to arise as a direct result of the use and eventual disposition of the asset[.]"[16]

24.     In addition, estimates of future cash flows used to test the recoverability of a long-lived asset shall "incorporate the entity's own assumptions about its use of the asset and shall consider all available evidence."[17]   As a result, the estimates of future cash flows for purposes of testing the recoverability (*i.e.*, those based on entity-specific assumptions) may differ from the estimates of future cash flows for purposes of measuring the impairment loss (*i.e.*, those based on market assumptions).

25.     Specifically, the entity-specific assumptions used to test the recoverability of a long-lived asset must:

> … be reasonable in relation to the assumptions used in developing other information used by the entity for comparable periods, such as internal budgets and projections, accruals related to incentive compensation plans, or information communicated to others.[18]

26.     In Staff Accounting Bulletin ("SAB") No. 100, the U.S. Securities and Exchange Commission ("SEC") staff emphasized the importance of consistent entity-specific assumptions, stating that "cash flow projections used in the impairment analysis must be both *internally consistent* with the company's other projections and *externally consistent* with financial statements and other public disclosures" (emphasis added).[19]   Notably, the SEC staff "objected to the use of inconsistent assumptions" when an SEC registrant utilized one set of assumptions in developing cash flow projections for purposes of applying the

---

[16]     ASC 360-10-35-29.

[17]     ASC 360-10-35-30.

[18]     ASC 360-10-35-30.

[19]     Staff Accounting Bulletin ("SAB") No. 100, November 24, 1999, CC. Impairments, Interpretive Response to Question 7, available at https://www.sec.gov/interps/account/sab100.htm, accessed April 29, 2019. *See also* SAB Topic 5.CC, Impairments, Interpretive Response to Question 3, available at https://www.sec.gov/interps/account/sabcodet5.htm#CC, accessed April 29, 2019. *See also* ASC 360-10-S99-2.

**App. 264**

provisions of ASC 360, and utilized a second, more conservative set of assumptions for purposes of applying the provisions of ASC 740 (Income Taxes).[20]

27.   If it is determined that the carrying amount of the asset is not recoverable (*i.e.*, the carrying amount exceeds the sum of the undiscounted future cash flows), the entity must proceed to Step 3.

### 3.   Measure the Impairment Loss

28.   In Step 3, the entity must measure the impairment loss as the amount by which the carrying amount of the long-lived asset exceeds its fair value.[21]   A long-lived asset's fair value is determined using the guidance set forth in ASC 820 (Fair Value Measurement), which defines fair value as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."[22]

29.   ASC 360 clarifies that, for long-lived assets that have uncertainties both in timing and amount, an expected present value technique (*e.g.*, expected discounted cash flow analysis) "will often be the appropriate technique with which to estimate fair value."[23]

## B.   Background on ExxonMobil's Impairment Testing

30.   In this section, I provide a brief overview of ExxonMobil's impairment testing.  I begin by describing ExxonMobil's public disclosures and internal policies regarding GHG Emission Proxy Costs and impairment testing before and during the 2015 to 2017 period.  I then summarize ExxonMobil's impairment testing for Mobile Bay during each of the years 2015, 2016, and 2017.

---

[20]   SAB No. 100, November 24, 1999, CC. Impairments, Interpretive Response to Question 7, available at https://www.sec.gov/interps/account/sab100.htm, accessed April 29, 2019.  *See also* SAB Topic 5.CC, Impairments, Interpretive Response to Question 3, available at https://www.sec.gov/interps/account/sabcodet5.htm#CC, accessed April 29, 2019.  *See also* ASC 360-10-S99-2.

[21]   ASC 360-10-35-17.

[22]   ASC 820-10-35-2.

[23]   ASC 360-10-35-36.

**App. 265**

*1.     ExxonMobil's Public Disclosures and Internal Policies Regarding GHG Emission Proxy Costs*

31.     Before and during the 2015 to 2017 period, ExxonMobil made several public disclosures regarding its inclusion of GHG Emission Proxy Costs in its business planning.  For example, ExxonMobil's 2014 *Energy and Climate* report publicly disclosed that ExxonMobil required all business units to "use a consistent corporate planning basis, including the proxy cost of carbon … in evaluating capital expenditures and developing business plans."[24]  Similarly, ExxonMobil's 2015 Form 10-K stated that ExxonMobil "continue[s] to assume that governments will enact policies that impose rising costs on energy-related [carbon dioxide] emissions, which [ExxonMobil] assume[s] will reach an implied cost in OECD nations of about $80 per [ton] in 2040."[25]  ExxonMobil's 2016 and 2017 Form 10-Ks provided similar disclosures regarding ExxonMobil's assumptions relating to GHG Emission Proxy Costs.[26]

32.     Each year, ExxonMobil issues an internal Corporate Plan Dataguide and Appendices ("Dataguide") that provides internal guidance for its business planning, budgeting, and opportunity evaluations.[27]  From 2015 to 2017, ExxonMobil included internal guidance regarding GHG Emission Proxy Costs in its Dataguide.  In particular, the 2015 Dataguide specified that GHG Emission Proxy Costs be considered in budgeting decisions, and included in the budgeting and project considerations for ExxonMobil's U.S. assets

---

[24]  "Energy and Climate," ExxonMobil, March 31, 2014, available at https://cdn.exxonmobil.com/~/media/global/files/energy-and-environment/report---energy-and-climate.pdf, accessed March 25, 2019, p. 20. *See also* "Energy and Carbon - Managing the Risks," ExxonMobil, March 31, 2014, available at https://cdn.exxonmobil.com/~/media/global/files/energy-and-environment/report---energy-and-carbon---managing-the-risks.pdf, accessed March 25, 2019, p. 18; "ExxonMobil and the Carbon Tax," EnergyFactor by ExxonMobil, December 2, 2015, available at https://energyfactor.exxonmobil.com/corporate-citizenship-sustainability/exxonmobil-and-the-carbon-tax/, accessed April 24, 2019.

[25]  ExxonMobil SEC Form 10-K for the fiscal year ended December 31, 2015, p. 42.

[26]  ExxonMobil SEC Form 10-K for the fiscal year ended December 31, 2016, p. 42; ExxonMobil SEC Form 10-K for the fiscal year ended December 31, 2017, p. 42.

[27]  *See, e.g.*, Revision 4 of the ExxonMobil 2017 Corporate Plan Dataguide, p. 4.

11

**App. 266**

beginning in 2020.[28]  ExxonMobil's 2016 and 2017 Dataguides provided similar internal guidance regarding GHG Emission Proxy Costs.[29]

      2.     *ExxonMobil's Public Disclosures and Internal Policies Regarding Impairment Testing*

33. ExxonMobil's public disclosures during this period also explained its methodology for estimating cash flows used in its impairment testing.  ExxonMobil's 2015 Form 10-K stated that cash flows used in ExxonMobil's impairment testing "make use of [ExxonMobil's] price, margin, volume, and cost assumptions developed in the annual planning and budgeting process, and are consistent with the criteria management uses to evaluate investment opportunities."[30]  ExxonMobil's 2016 and 2017 Form 10-Ks provided similar disclosures regarding ExxonMobil's estimated cash flows for its impairment testing.[31]

34. ExxonMobil's internal guidelines describe a three-step process for purposes of recognizing and measuring impairment of its "producing" (*i.e.,* cash flow generating) assets.[32]  This three-step process, described in detail below, mirrors the accounting guidance set forth in ASC 360:[33]

---

[28] "Greenhouse Gas Emissions Budget and Project Considerations," Revision 4 of the Appendix to the ExxonMobil 2015 Corporate Plan Dataguide, pp. 31-32.

[29] "Greenhouse Gas Emissions Budget and Project Considerations," Revision 1 of the Appendix to the ExxonMobil 2016 Corporate Plan Dataguide, pp. 30-32; Revision 4 of the ExxonMobil 2017 Corporate Plan Dataguide, pp. 11-14.

[30] ExxonMobil SEC Form 10-K for the fiscal year ended December 31, 2015, p. 57. *See also* Examination of Joseph Horne, Manager of Accounting Policy at ExxonMobil, August 17-18, 2017, ("Horne Examination"), pp. 79-80.

[31] ExxonMobil SEC Form 10-K for the fiscal year ended December 31, 2016, p. 59; ExxonMobil SEC Form 10-K for the fiscal year ended December 31, 2017, p. 57.

[32] "Upstream Asset Recoverability Review," ExxonMobil, November 2015, PNYAG0330371-449 at 437. *See also* Horne Examination, pp. 35-36.

[33] "Upstream Asset Recoverability Review," ExxonMobil, November 2015, PNYAG0330371-449 at 437. *See also* "Asset Recoverability Review," ExxonMobil, November 29, 2016, PNYAG0543790-896 at 814; and "Asset Recoverability Analysis," ExxonMobil, December 15, 2017, PNYAG0590087-218 at 114.

**App. 267**

- Step 1: Determination of when to test: An impairment test should be performed when events or circumstances indicate that the carrying value of an asset group may not be recoverable, such as a:

  - Significant decrease in market value of an asset group;

  - Significant change in the utilization of an asset;

  - Adverse change in legal factors or business climate;

  - Significant construction cost overruns; or

  - History of operating and cash flow losses with similar forecasts for the future.

- Step 2: If Step 1 indicates testing should be performed, assess undiscounted cash flows using the best internal estimates of future prices and costs from use of the asset group.

  - Asset group is defined as lowest level for which identifiable, independent cash flows are available.

  - Cash flows include total proved and risk-adjusted probable and possible reserves and cost to develop.

- Step 3: If Step 2 indicates an impairment, measure impairment loss using market prices if an active market exists for the asset group; otherwise, use discounted cash flows with a discount rate commensurate with risk.

35.  Stephen Littleton, Assistant Controller at ExxonMobil, testified that the cash flow model used to determine whether events or circumstances indicate that the carrying value of an asset group may not be recoverable (Step 1) is the same cash flow model used to calculate undiscounted cash flows (Step 2).[34]

### 3.    ExxonMobil's Impairment Testing of Mobile Bay

36.  In light of weak industry prices, ExxonMobil conducted impairment testing on its upstream production assets (including Mobile Bay) in 2015, 2016, and 2017.[35] As explained in detail

---

[34]  Horne Examination, pp. 35-36; Examination of Stephen Littleton, Financial Reporting Manager at ExxonMobil, December 19-20, 2017 ("Littleton Examination"), pp. 61-64.

[35]  "Assessment of potential impairment triggers in 2015," ExxonMobil, November 2015, PNYAG0330371-449 at 375-376; "Asset Recoverability Review," ExxonMobil, November 29, 2016, PNYAG0543790-896 at 793 and 815; "Asset Recoverability Analysis," ExxonMobil, December 15, 2017, PNYAG0590087-218 at 090 and 118.

**App. 268**

below, while ExxonMobil included GHG Emission Proxy Costs in its cost projections for its 2016 and 2017 impairment testing of Mobile Bay, it did not include these costs in its cost projections when it conducted impairment testing on Mobile Bay in 2015.

### a)     2015 Impairment Testing

37.   During fiscal year 2015, in order to determine whether events or changes in circumstances indicated that Mobile Bay's carrying value may not be recoverable (Step 1 of impairment testing), ExxonMobil reviewed historical losses and a projection of future cash flows associated with Mobile Bay.[36]  As part of this review, ExxonMobil calculated the undiscounted future cash flows associated with Mobile Bay (thereby effectively completing Step 2 of impairment testing) and identified headroom of approximately $4 million.[37]  As a result of this analysis (and the headroom identified), ExxonMobil concluded that no impairment triggering event had occurred and did not calculate the fair value of Mobile Bay (Step 3 of impairment testing).[38]  PricewaterhouseCoopers LLP ("PwC"), ExxonMobil's auditor, reached the same conclusion after calculating the undiscounted future cash flows associated with Mobile Bay and identifying headroom of approximately $55 million.[39]

38.   Contrary to its public disclosures, it does not appear that ExxonMobil included GHG Emission Proxy Costs in its cost projections for its 2015 impairment testing.  Stephen Littleton testified that while GHG Emission Proxy Costs were included in ExxonMobil's impairment testing for 2016, they were not included in 2015.[40]  For example, as explained

---

[36]  "U.S. Production - Long-lived Asset Impairment Assessment," PwC's ExxonMobil Upstream Engagement Team, February 2, 2015, PNYAG0001268, p. 5.

[37]  "Upstream Asset Recoverability Review," ExxonMobil, November 2015, PNYAG0330371-449 at 443; ExxonMobil's Undiscounted Cash Flow Model for its 2015 Impairment Testing of Mobile Bay, PNYAG0178135.

[38]  "Upstream Asset Recoverability Review," ExxonMobil, November 2015, PNYAG0330371-449 at 439. *See also* ExxonMobil SEC Form 10-K for the fiscal year ended December 31, 2015, p. 57.

[39]  "U.S. Production - Long-lived Asset Impairment Assessment," PwC's ExxonMobil Upstream Engagement Team, February 2, 2015, PNYAG0001268, pp. 5 and 10.  Mobile Bay's net undiscounted cash flows as calculated by ExxonMobil are $51 million dollars lower than those calculated by PwC. *See* **Appendix C** for further detail.

[40]  Littleton Examination, pp. 129 and 142. *See also* Horne Examination, pp. 177-178.

**App. 269**

in more detail below, the cash flow models for ExxonMobil's 2016 and 2017 impairment testing of Mobile Bay included line items relating to GHG Emission Proxy Costs, while the 2015 cash flow model did not.[41]  This omission of the GHG Emission Proxy Costs in 2015 is significant because, as I explain in Section IV.D, had ExxonMobil included GHG Emission Proxy Costs in the cost projections for its 2015 impairment testing of Mobile Bay, it would have incurred a $74 million *decrease* in headroom.

### b)  2016 Impairment Testing

39.    During fiscal year 2016, ExxonMobil again undertook Step 1 of impairment testing by reviewing historical losses and a projection of future cash flows associated with Mobile Bay.[42]  As part of this review, ExxonMobil calculated the undiscounted future cash flows associated with Mobile Bay (thereby effectively completing Step 2 of impairment testing) and identified headroom of approximately $110 million.[43]  As a result of this analysis (and the headroom identified), ExxonMobil concluded that no impairment triggering event had occurred and did not calculate the fair value of Mobile Bay (Step 3 of impairment testing).[44]

---

[41]   ExxonMobil's Undiscounted Cash Flow Model for its 2015 Impairment Testing of Mobile Bay, PNYAG0178135; ExxonMobil's Undiscounted Cash Flow Model for its 2016 Impairment Testing of Mobile Bay, PNYAG0263352; ExxonMobil's Discounted Cash Flow Model for its 2017 Impairment Testing of Mobile Bay, PNYAG0592715. *See also* Examination of Robert Wright, Senior Manager at PwC, April 25-26, 2018 ("Wright Examination"), p. 190. Similarly, PwC's 2015 cash flow model did not include line items relating to GHG Emission Proxy Costs. *See* PwC's Undiscounted Cash Flow Model for its Audit of ExxonMobil's 2015 Impairment Testing of Mobile Bay, PNYAG0002790.

[42]   "Upstream Long-lived Asset Impairment Assessment," Memo from PwC's ExxonMobil Upstream Engagement Team to ExxonMobil Upstream Year End 2016 Audit Files, PNYAG0187251-304 at 264-265 and 267-268.

[43]   "Asset Recoverability Review," ExxonMobil, November 29, 2016, PNYAG0543790-896 at 838; ExxonMobil's Undiscounted Cash Flow Model for its 2016 Impairment Testing of Mobile Bay, PNYAG0263352. ExxonMobil's Asset Recoverability Review states Mobile Bay's net undiscounted cash flows were $100 million in excess of the project's book value, instead of $110 million.

[44]   "Upstream Long-lived Asset Impairment Assessment," Memo from PwC's ExxonMobil Upstream Engagement Team to ExxonMobil Upstream Year End 2016 Audit Files, PNYAG0187251-304 at 268.

**App. 270**

40.    ExxonMobil included GHG Emission Proxy Costs in its cost projections for its 2016 impairment testing of Mobile Bay.[45]  In particular, ExxonMobil's cash flow model for its 2016 impairment testing of Mobile Bay included line items for GHG Emission Proxy Costs, capital expenditures attributed to GHGs, and revenues associated with the GHG Emission Proxy Costs and capital expenditures attributed to GHGs that ExxonMobil could "pass through" to its natural gas consumers.[46]  ExxonMobil also stated in a 2016 presentation to PwC that GHG Emission Proxy Costs are "addressed per guidance from [the] Dataguide," which "incorporates effects of current and future potential policy action" related to GHGs.[47]

### c)    2017 Impairment Testing

41.    During fiscal year 2017, ExxonMobil again undertook Step 1 of impairment testing by reviewing historical losses and a projection of future cash flows associated with Mobile Bay.[48]  As part of this review, ExxonMobil calculated the undiscounted future cash flows associated with Mobile Bay (thereby effectively completing Step 2 of impairment testing) and identified *negative* headroom of approximately $590 million.[49]  As a result of this analysis (and the negative headroom identified), ExxonMobil concluded that an impairment triggering event had occurred and proceeded to calculate the fair value of Mobile Bay (Step 3 of impairment testing).[50]  ExxonMobil ultimately concluded that the

---

[45]    Littleton Examination, p. 142; Horne Examination, pp. 177-178.

[46]    ExxonMobil's Undiscounted Cash Flow Model for its 2016 Impairment Testing of Mobile Bay, PNYAG0263352; Wright Examination, p. 190; Horne Examination, pp. 188-189.

[47]    "Asset Recoverability Review," ExxonMobil, November 29, 2016, PNYAG0543790-896 at 820 and 821.

[48]    "Upstream Long-lived Asset Impairment Assessment," Memo from PwC's ExxonMobil Upstream Engagement Team to ExxonMobil Upstream Year End 2017 Audit Files, PNYAG0594936-5007 at 4955-4957.

[49]    "Asset Recoverability Analysis," ExxonMobil, December 15, 2017, PNYAG0590087-218 at 133.

[50]    "Upstream Long-lived Asset Impairment Assessment," Memo from PwC's ExxonMobil Upstream Engagement Team to ExxonMobil Upstream Year End 2017 Audit Files, PNYAG0594936-5007 at 4938, 4958-4959, and 4962.

16

**App. 271**

difference between Mobile Bay's fair value and its book value produced an after-tax impairment loss of $280 million.[51]

42.     Similar to its 2016 impairment testing, ExxonMobil included GHG Emission Proxy Costs in its cost projections for its 2017 impairment testing of Mobile Bay. ExxonMobil's discounted cash flow model for its 2017 impairment testing of Mobile Bay included a line item for GHG Emission Proxy Costs.[52] Similar to 2016, ExxonMobil also stated in a 2017 presentation to PwC that the GHG Emission Proxy Costs included in its undiscounted cash flow models are "addressed per guidance from [the] Dataguide," which "reflects the effects of future potential policy action."[53]

### C.     ExxonMobil's Omission of GHG Emission Proxy Costs from Its Cost Projections for its 2015 Impairment Testing was Inappropriate

43.     In this section, I explain why ExxonMobil's omission of GHG Emission Proxy Costs from its cost projections for its 2015 impairment testing was inappropriate. In particular, ExxonMobil should have included GHG Emission Proxy Costs in its cost projections for its 2015 impairment testing in light of: (i) ExxonMobil's public disclosures and internal policies regarding GHG Emission Proxy Costs and impairment testing and (ii) accounting guidance regarding the assumptions used in estimating future cash flows for the impairment testing of a long-lived asset.

44.     As described above in Section IV.B, ExxonMobil publicly disclosed that it required its business units to include GHG Emission Proxy Costs when evaluating capital expenditures and developing business plans, and included internal guidance for GHG Emission Proxy Costs in its 2015 Dataguide.[54] ExxonMobil also publicly disclosed that the assumptions

---

[51]     ExxonMobil's 2017 Asset Recoverability Fair Value Review Presentation, January 12, 2018, PNYAG0601281-316 at 291.

[52]     ExxonMobil's Discounted Cash Flow Model for its 2017 Impairment Testing of Mobile Bay, PNYAG0592715. In 2017, ExxonMobil included the GHG Emission Proxy Costs that it could pass through to natural gas consumers in its natural gas prices. As a result, ExxonMobil's discounted cash flow model for its 2017 impairment testing of Mobile Bay did not include line items for capital expenditures or revenues attributed to GHGs. *See* Littleton Examination, p. 180.

[53]     "Asset Recoverability Analysis," ExxonMobil, December 15, 2017, PNYAG0590087-218 at 164.

[54]     *See, e.g.*, "Energy and Climate," ExxonMobil, March 31, 2014, available at https://cdn.exxonmobil.com/~/media/global/files/energy-and-environment/report---energy-and-

---

17

**App. 272**

used in estimating future cash flows for its impairment testing relied on and were consistent with the assumptions used in other aspects of its business planning.[55]  This is consistent with ASC 360, which requires that estimates of future cash flows for impairment testing "be reasonable in relation to the assumptions used in developing other information used by the entity for comparable periods, such as…information communicated to others."[56]  This is further supported by SAB No. 100, which states that "cash flow projections used in the impairment analysis must be both *internally consistent* with the company's other projections and *externally consistent* with financial statements and other public disclosures" (emphasis added).[57]

45.     As I explain in more detail below, had ExxonMobil properly included GHG Emission Proxy Costs in its cost projections for its 2015 impairment testing, it would have concluded that the book value of Mobile Bay was not recoverable, and consequently recognized an after-tax impairment loss.

D.     **Had ExxonMobil Properly Included GHG Emission Proxy Costs in Its Cost Projections for its 2015 Impairment Testing, ExxonMobil Would Have Recognized an Impairment of Mobile Bay**

46.     In this section of my report, based on my experience, the accounting guidance, and my review of the information available to ExxonMobil during its 2015 impairment testing, I assess whether ExxonMobil would have recognized an impairment of Mobile Bay had it

---

climate.pdf, accessed March 25, 2019, p. 20; "Energy and Carbon - Managing the Risks," ExxonMobil, March 31, 2014, available at https://cdn.exxonmobil.com/~/media/global/files/energy-and-environment/report---energy-and-carbon---managing-the-risks.pdf, accessed March 25, 2019, p. 18; "ExxonMobil and the Carbon Tax," EnergyFactor by ExxonMobil, December 2, 2015, available at https://energyfactor.exxonmobil.com/corporate-citizenship-sustainability/exxonmobil-and-the-carbon-tax/, accessed March 21, 2019; "Greenhouse Gas Emissions Budget and Project Considerations," Revision 4 of the Appendix to the ExxonMobil 2015 Corporate Plan Dataguide, pp. 31-32.

[55]     *See, e.g.*, ExxonMobil SEC Form 10-K for the fiscal year ended December 31, 2015, p. 57.

[56]     ASC 360-10-35-30.

[57]     SAB No. 100, November 24, 1999, CC. Impairments, Interpretive Response to Question 7, available at https://www.sec.gov/interps/account/sab100.htm, accessed April 29, 2019. *See also* SAB Topic 5.CC, Impairments, Interpretive Response to Question 3, available at https://www.sec.gov/interps/account/sabcodet5.htm#CC, accessed April 29, 2019. *See also* ASC 360-10-S99-2.

**App. 273**

properly included GHG Emission Proxy Costs in its cost projections for its 2015 impairment testing. As part of this analysis, I follow ExxonMobil's internal policy for the impairment of long-lived assets described in Section IV.B above. *See* Exhibit 1 through Exhibit 3. A detailed description of the calculations set forth in Exhibit 1 through Exhibit 3 and the assumptions upon which those calculations are based is included in **Appendix C.**

> *1.     Including GHG Emission Proxy Costs in ExxonMobil's Cost Projections for its 2015 Impairment Testing of Mobile Bay Indicates that the Project's Book Value Was Not Recoverable*

47. In order to determine whether the inclusion of GHG Emission Proxy Costs in ExxonMobil's cost projections would have led ExxonMobil to conclude in 2015 that Mobile Bay's book value was not recoverable, I re-calculate the 2015 undiscounted cash flows associated with Mobile Bay (Step 2 of impairment testing). I adjust PwC's undiscounted cash flow model for its 2015 impairment testing of Mobile Bay, which identifies greater headroom than ExxonMobil's undiscounted cash flow model, thereby leading to a more conservative headroom calculation once GHG Emission Proxy Costs are incorporated in the cost projections.[58] I keep all line items in PwC's undiscounted cash flow model for its 2015 impairment testing of Mobile Bay unchanged, and include GHG Emission Proxy Costs by relying on ExxonMobil's methodology presented in its undiscounted cash flow model for its 2016 impairment testing of Mobile Bay.[59]

48. Exhibit 1 shows my adjustments to PwC's undiscounted cash flow model for its 2015 impairment testing of Mobile Bay. I incorporate GHG Emission Proxy Costs based on the GHG Emission Proxy Cost guidance contained in the 2015 Dataguide.[60] I also assume

---

[58]  PwC's Undiscounted Cash Flow Model for its Audit of ExxonMobil's 2015 Impairment Testing of Mobile Bay, PNYAG0002790; ExxonMobil's Undiscounted Cash Flow Model for its 2015 Impairment Testing of Mobile Bay, PNYAG0178135.

[59]  ExxonMobil's Undiscounted Cash Flow Model for its 2016 Impairment Testing of Mobile Bay, PNYAG0263352.

[60]  *See* "Greenhouse Gas Emissions Budget and Project Considerations," Revision 4 of the Appendix to the ExxonMobil 2015 Corporate Plan Dataguide, pp. 31-32; ExxonMobil's Undiscounted Cash Flow Model for its 2016 Impairment Testing of Mobile Bay, PNYAG0263352; "Greenhouse Gas

**App. 274**

Case 3:16-cv-03111-K    Document 121    Filed 07/31/20    Page 280 of 544    PageID 4532

that, similar to 2016, ExxonMobil is able to pass through GHG Emission Proxy Costs and capital expenditures attributed to GHGs to its natural gas consumers.[61]  After adjusting for GHG Emission Proxy Costs, I determine that Mobile Bay's book value of $1,280 million *exceeds* the project's undiscounted cash flows of $1,261 million, resulting in *negative* headroom of approximately $19 million (*i.e.*, Mobile Bay's book value was *not* recoverable).  In other words, including GHG Emission Proxy Costs in the cost projections for ExxonMobil's 2015 impairment testing of Mobile Bay results in a $74 million *decrease* in headroom, from $55 million to *negative* $19 million.[62]  ExxonMobil thus would have proceeded to calculate Mobile Bay's fair value and the resulting impairment loss (Step 3 of impairment testing).

> 2. *Including GHG Emission Proxy Costs in the Cost Projections for ExxonMobil's Impairment Testing of Mobile Bay Results in an After-Tax Impairment Loss*

49.    As discussed above, under ASC 360 and ExxonMobil's process for impairment testing, after determining that an asset's book value is not recoverable, ExxonMobil measures the impairment loss as the amount by which the carrying amount of its asset exceeds its fair value (Step 3 of impairment testing).[63]  In order to determine Mobile Bay's fair value and the resulting after-tax impairment loss in 2015, I prepare a discounted cash flow model.  In preparing this discounted cash flow model, I adapt ExxonMobil's methodology presented in its discounted cash flow model from its 2017 impairment testing of Mobile Bay (for

---

Emissions Budget and Project Considerations," Revision 1 of the Appendix to the ExxonMobil 2016 Corporate Plan Dataguide, pp. 30-32.

[61]    This pass through applies to natural gas consumers, and not liquids consumers.  *See* **Appendix C** for additional detail regarding ExxonMobil's pass through of GHG Emission Proxy Costs and capital expenditures attributed to GHGs to its natural gas consumers.  *See also* ExxonMobil's Undiscounted Cash Flow Model for its 2016 Impairment Testing of Mobile Bay, PNYAG0263352; Horne Examination, pp. 188-189.

[62]    Had I based my analysis on ExxonMobil's undiscounted cash flow model, the resulting decrease in headroom would have been larger, from $4 million to *negative* $69 million.  *See* ExxonMobil's Undiscounted Cash Flow Model for its 2015 Impairment Testing of Mobile Bay, PNYAG0178135.

[63]    ASC 360-10-35-17; "Upstream Asset Recoverability Review," ExxonMobil, November 2015, PNYAG0330371-449 at 437.

20

**App. 275**

FILED: NEW YORK COUNTY CLERK 10/04/2019 11:17 PM          INDEX NO. 452044/2018

NYSCEF DOC. NO. 362          Case 3:16-cv-03111-K     Document 121     Filed 07/31/20     Page 281 of 544     PageID 4533          RECEIVED NYSCEF: 10/04/2019

which ExxonMobil recognized an after-tax impairment loss).[64]  I rely on ExxonMobil's methodology for 2017 as 2017 was the only year in which ExxonMobil prepared and produced a discounted cash flow model for its impairment testing of Mobile Bay.

50.  Exhibit 2 and Exhibit 3 present the adjusted discounted cash flow model for Mobile Bay's 2015 impairment testing.  I begin with the undiscounted cash flows from Step 2 (Exhibit 1), and update prices and Unit GHG Emission Proxy Costs from those contained in ExxonMobil's 2015 Dataguide (ExxonMobil's assumptions) to third-party sources (market assumptions).[65]  Similar to ExxonMobil's 2017 impairment testing of Mobile Bay, I present both a low price case (Exhibit 2) and a high price case (Exhibit 3).[66]  I then proceed to calculate Mobile Bay's fair value as of 2015.  I assume that, similar to its 2016 impairment testing for other projects, ExxonMobil's statutory tax rate on its Mobile Bay project is 37.7%, and its after-tax discount rates are 5.5% and 8.0%.[67]  Under each of these assumptions, the sum of Mobile Bay's after-tax discounted cash flows ranges from $418 million to $532 million for the low price case, and $480 million to $609 million for the high price case.  I also assume that, consistent with ExxonMobil's methodology for its

---

[64]  ExxonMobil's Discounted Cash Flow Model for its 2017 Impairment Testing of Mobile Bay, PNYAG0592715.

[65]  *See* Third-Party Brent and Henry Hub Price Outlooks as of 2015, PNYAG0040606; U.S. Energy Information Administration, Annual Energy Outlook 2015, Natural Gas Supply, Disposition, and Prices, available at https://www.eia.gov/outlooks/aeo/data/browser/#/?id=13-AEO2015&cases=ref2015&sourcekey=0, accessed April 15, 2019; and U.S. Energy Information Administration, Annual Energy Outlook 2015, Petroleum and Other Liquids Prices, available at https://www.eia.gov/outlooks/aeo/data/browser/#/?id=12-AEO2015&cases=ref2015&sourcekey=0, accessed April 15, 2019; ExxonMobil's Discounted Cash Flow Model for its 2017 Impairment Testing of Cross Timbers Energy, PNYAG0600946.

[66]  ExxonMobil's Discounted Cash Flow Model for its 2017 Impairment Testing of Mobile Bay, PNYAG0592715.

[67]  *See, e.g.*, ExxonMobil's Discounted Cash Flow Models for its 2016 Impairment Testing of Heidelberg and Ram, PNYAG0493794; ExxonMobil's 2016 Asset Recoverability Fair Value Review Presentation, December 16, 2016, PNYAG0395764-788 at 771; ExxonMobil's 2017 Asset Recoverability Fair Value Review Presentation, January 12, 2018, PNYAG0601281-316 at 289 and 291.

**App. 276**

2017 impairment testing of Mobile Bay, ExxonMobil incurs depreciation tax savings (*i.e.*, a depreciation tax shield).[68]

51.     The sum of Mobile Bay's after-tax discounted cash flows, adjusted for the project's depreciation tax shield, results in a fair value for Mobile Bay of $512 million to $670 million for the low price case, and $589 million to $766 million for the high price case.  At a statutory tax rate of 37.7%, the difference between Mobile Bay's fair value and its 2015 book value of $1,280 million results in an after-tax impairment loss of $380 million to $478 million for the low price case, and $320 million to $430 million for the high price case.  It is thus my opinion that if ExxonMobil had included GHG Emission Proxy Costs in its cost projections for its impairment testing of Mobile Bay in 2015, it would have recognized an after-tax impairment loss of $320 million to $478 million in that year.

## V.     EVENT STUDY ANALYSIS ON EXXONMOBIL'S STOCK PRICE

52.     In the first part of my report, I explain how ExxonMobil should have included GHG Emission Proxy Costs in its cost projections for its 2015 impairment testing in light of its public disclosures, its internal policies, and accounting guidance.  As a result, I conclude that had ExxonMobil properly included GHG Emission Proxy Costs in its cost projects for its impairment testing of Mobile Bay in 2015, it would have recognized an after-tax impairment loss.  In the second part of my report, I assess whether ExxonMobil's alleged misrepresentations "concerning [its] management of the risks posed to its business by climate change regulation"[69] impacted its stock price.  ExxonMobil's alleged misrepresentations may have inflated ExxonMobil's stock price and caused investors to overvalue ExxonMobil's stock.  In particular, investors who purchased ExxonMobil's stock at the inflated prices potentially suffered economic harm as a result of the revelation of ExxonMobil's alleged misrepresentations.

53.     To assess the impact of ExxonMobil's alleged misrepresentations, I conduct an event study analysis.  I begin by describing the event study methodology more generally.  Next, I describe my process for identifying the dates on which ExxonMobil's alleged

---

[68]     ExxonMobil's Discounted Cash Flow Model for its 2017 Impairment Testing of Mobile Bay, PNYAG0592715.

[69]     Complaint, ¶ 1.

**App. 277**

misrepresentations were revealed to market participants (*i.e.*, "corrective disclosure dates"). I then describe the specifications of the regression model used to estimate the portion of ExxonMobil's stock price movement associated with the revelation of ExxonMobil's alleged misrepresentations. Lastly, I explain how I estimate the inflation in ExxonMobil's stock price related to ExxonMobil's alleged misrepresentations.

### A.    Framework and Methodology for an Event Study Analysis

54.    In this section, I describe the event study methodology more generally, as well as my methodology for conducting an event study on ExxonMobil's stock price. The event study is widely accepted in academic research as a methodology to analyze the reaction of market participants to information and is widely used in securities litigation to measure inflation in security prices.[70] More specifically, the event study methodology is the widely accepted statistical methodology to scientifically assess whether or not the public disclosure of information related to an allegation had an effect on the relevant stock price.[71]

55.    The events identified are those that could be considered "curative," *i.e.*, when the company's alleged misrepresentations become known to market participants. For this report, I use the term "corrective disclosure" to refer to public information that "corrects"

---

[70]    *See* Campbell, John Y., Andrew W. Lo, and A. Craig MacKinlay, *The Econometrics of Financial Markets*, 2nd ed., (Princeton, New Jersey: Princeton University Press, 1997), p. 149; MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35.1 (March 1997), pp. 13-39 at pp. 13 and 37; Weil, Roman L., et al., eds., *Litigation Services Handbook: The Role of the Financial Expert, 2002 Supplement,* 3rd ed., (Hoboken, New Jersey: Wiley, 2002), p. 17A-2. When used for analyzing securities, the event study methodology assumes that the security trades in an informational efficient market, *i.e.*, where the price of the security reflects all publicly available information at a given point in time. *See* Weil, Roman L., et al., eds., *Litigation Services Handbook: The Role of the Financial Expert,* 4th ed., (Hoboken, New Jersey: Wiley, 2007), p. 18-17.

[71]    For example, I understand that in a federal class action litigation involving similar allegations against ExxonMobil, ExxonMobil's expert economist used an event study to analyze whether alleged misrepresentations had an impact on ExxonMobil's stock price. *See Pedro Ramirez, Jr. v. Exxon Mobil Corporation, et al.*, Defendants' Memorandum of Law in Opposition to Lead Plaintiff's Motion for Class Certification, In the United States District Court for the Northern District of Texas, Dallas Division, Case No. 3:16-cv-3111-K, Exhibit 11 (Expert Report of Allen Ferrell, Ph.D., February 1, 2019) ¶ 18 ("In order to test the theory that new value-relevant public information should elicit a stock price reaction in an efficient market, there is a widely used and generally accepted statistical framework for testing whether there was in fact a stock price movement. This is the event study.").

---

**App. 278**

an alleged misrepresentation. If alleged misrepresentations cause inflation in a stock price, then a corrective disclosure will eliminate or reduce that associated inflation by providing new and/or additive information to the market. The impact of alleged misrepresentations could be revealed to market participants through multiple corrective disclosures. In that case, each corrective disclosure is a partial revelation of the alleged misrepresentations; the inflation estimate associated with each corrective disclosure reflects a partial impact of the alleged misrepresentations.

56.     The event study methodology proceeds through several steps. The first step is to identify corrective disclosure dates. The second step is to develop a regression model that estimates the relationship between changes in ExxonMobil's stock price to changes in other factors unrelated to the alleged misrepresentations.[72] This estimated relationship with other factors allows me to isolate the impact of the revelation of the alleged misrepresentations on ExxonMobil's stock price. The third and final step is to compute the difference between ExxonMobil's actual return on the corrective disclosure dates and the predicted return based on the regression model (*i.e.*, the abnormal return). The results from this analysis are used to estimate the amount of price inflation in ExxonMobil's stock that was removed upon certain corrective disclosures. I provide a detailed discussion of each of these steps in the sections that follow.

**B.      Identification of Corrective Disclosure Dates Related to ExxonMobil's Alleged Misrepresentations**

57.     In this section, I explain my process for identifying the corrective disclosure dates related to ExxonMobil's alleged misrepresentations. I understand from the Complaint that ExxonMobil's disclosures contained in its *Energy and Carbon - Managing the Risks* and *Energy and Climate* reports regarding its exposure to climate change regulations and management of those risks through the use of GHG Emission Proxy Costs are the basis for

---

[72]     A regression is a widely accepted statistical technique that measures the degree to which changes in the values of the dependent variable are attributable to changes in the associated independent variables. It is commonly used in event studies. *See* Campbell, John Y., Andrew W. Lo, and A. Craig MacKinlay, *The Econometrics of Financial Markets*, 2nd ed., (Princeton, New Jersey: Princeton University Press, 1997), pp. 149-180.

**App. 279**

ExxonMobil's alleged misrepresentations.[73]  For example, ExxonMobil publicly disclosed in its 2014 *Energy and Climate* report that it required all business units to "use a consistent corporate planning basis, including the proxy cost of carbon … in evaluating capital expenditures and developing business plans."[74]  I conduct systematic searches for events associated with the revelation of the alleged misrepresentations starting on April 1, 2014 (the day after ExxonMobil released the *Energy and Carbon - Managing the Risks* and the *Energy and Climate* reports).[75]  I end my systematic searches on October 24, 2018 (the day on which ExxonMobil was formally charged by the New York Attorney General's Office for the alleged misrepresentations).[76]  In particular, I conduct a search for specific events related to the dissemination of news information regarding the New York Attorney General's investigation into ExxonMobil's public statements concerning its climate change risk management.  I also conduct a more general search for events regarding government investigations into ExxonMobil's public statements about its climate change risk management.  Both categories of events can be viewed as providing additional public information to the investment community, which could affect ExxonMobil's stock price by revealing the alleged misrepresentations.

58.     I conduct a news search on Dow Jones Factiva for news articles published between April 1, 2014 and October 24, 2018 relating to ExxonMobil and containing the following keywords: "climate change," either "investigate" or "investigation," and either "risks" or "allegations."  I then limit the search to articles from major news publications that Factiva

---

[73]     Complaint, ¶ 75.

[74]     *See* "Energy and Climate," ExxonMobil, March 31, 2014, available at https://cdn.exxonmobil.com/~/media/global/files/energy-and-environment/report---energy-and-climate.pdf, accessed March 25, 2019, p. 20. *See also* "Energy and Carbon - Managing the Risks," ExxonMobil, March 31, 2014, available at https://cdn.exxonmobil.com/~/media/global/files/energy-and-environment/report---energy-and-carbon---managing-the-risks.pdf, accessed March 25, 2019, p. 18.

[75]     *See* "Energy and Carbon - Managing the Risks," ExxonMobil, March 31, 2014, available at https://cdn.exxonmobil.com/~/media/global/files/energy-and-environment/report---energy-and-carbon---managing-the-risks.pdf, accessed March 25, 2019; "Energy and Climate," ExxonMobil, March 31, 2014, available at https://cdn.exxonmobil.com/~/media/global/files/energy-and-environment/report---energy-and-climate.pdf, accessed March 25, 2019; Complaint, ¶ 75.

[76]     Complaint, p. 90.

**App. 280**

considers to be "Top Sources" (*i.e.*, Dow Jones Newswires, Press Release Wires, Reuters Newswires, The Wall Street Journal, and major news and business sources). This yields 318 articles. Based on my review of the headlines and summaries provided by Factiva for those 318 articles, I determine that 310 articles are either irrelevant or contain information regarding events already covered by articles published at an earlier time (*i.e.*, duplicate news).[77]

59.   As a result, I determine that the remaining eight articles relate to eight corrective disclosure dates: November 5, 2015, January 20, 2016, March 29, 2016, September 16, 2016, September 20, 2016, June 2, 2017, August 3, 2018, and October 24, 2018. To identify the earliest reported news of the events occurring on these dates, I conduct a supplemental search on Dow Jones Factiva for all news articles published on each corrective disclosure date relating to ExxonMobil. Exhibit 4 presents a summary of the eight corrective disclosure dates. As I explain in detail below, I then run a regression model to determine whether investors reacted to each of the corrective disclosure dates.

## C.   Development of an Economic Model to Estimate ExxonMobil's Stock Price Movements

60.   In this section, I discuss the regression model I use to estimate the portion of ExxonMobil's stock price movement related to revelations of ExxonMobil's alleged misrepresentations. I utilize a version of the market model ("Market Model"), a statistical model widely used

---

[77]   To remove the irrelevant and duplicate articles, I review the articles' headlines and excerpts provided by Factiva. Examples of irrelevant news articles (*i.e.*, news articles that do not appear to convey information relevant to the allegations) from the keyword search include: "Rockefeller Family Fund hits Exxon, divests from fossil fuels," Reuters News, March 24, 2016; "Exxon Mobile Backs FuelCell Effort to Advance Carbon Capture Technology," NYTimes.com Feed, May 5, 2016; and "Exxon to Show Its Green Side in Meeting with Pope Francis," Dow Jones Institutional News, June 8, 2018. Examples of duplicative news stories from the keyword search include: "Exxon Mobil Under Investigation in New York Over Climate Statements," NYTimes.com Feed, November 6, 2015 (repeating news initially reported on November 5, 2015); "Investigation broadens into whether Exxon Mobil misled public, investors on climate change," Washington Post.com, March 31, 2016 (repeating news initially reported on March 29, 2016); "New York official says Exxon climate numbers 'may be a sham,'" St. Louis Post-Dispatch, June 3, 2017 (repeating news initially reported on June 2, 2017).

26

**App. 281**

in studies of the market's response to corporate information events.[78] The Market Model states that the return on a security reflects market-wide effects captured by the return on a representative broad market portfolio, and idiosyncratic effects captured by the model residual.

61. In my version of the Market Model, I examine the relationship between ExxonMobil's daily stock return and returns of the overall stock market, crude oil futures, and natural gas futures.[79] Specifically, I include variables for the S&P 500 Index net of ExxonMobil's returns as a proxy for the broad U.S. stock market,[80] the West Texas Intermediate ("WTI") futures price index to control for price movements in the crude oil market,[81] and the Henry Hub Natural Gas futures price index to control for movements in the natural gas market.[82] I compute returns by comparing the closing price on each day to the previous day's closing price (*i.e.*, "close-to-close" returns).[83]

62. I use an Ordinary Least Squares ("OLS") regression and a rolling one-year estimation period for each corrective disclosure date to estimate my model.[84] For example, for

---

[78] Campbell, John Y., Andrew W. Lo, and A. Craig MacKinlay, *The Econometrics of Financial Markets*, 2nd ed., (Princeton, New Jersey: Princeton University Press, 1997), p. 158.

[79] More specifically, in the Market Model, I use the following regression to measure the relationship between ExxonMobil's daily stock returns and (i) a constant term, (ii) the daily returns of the overall S&P 500 Index net of ExxonMobil, (iii) the daily returns of the crude oil future price index, and (iv) the daily returns of the natural gas future price index:

$Exxon\ Daily\ Return_t = \alpha_1 + \beta_1\ S\&P\ 500\ Daily\ Return_t + \beta_2\ WTI\ Index\ Daily\ Return_t + \beta_3\ Henry\ Hub\ Index\ Daily\ Return_t + \varepsilon_t.$

[80] I use the Bloomberg ticker "SPTR Index" to obtain daily returns for the S&P 500 Index. I net out ExxonMobil returns from the S&P 500 Index using the following equation:

$(S\&P\ 500\ Daily\ Return_t - Exxon\ Market\ Capitalization\ Weight_{t-1} \times Exxon\ Daily\ Return_t)\ /\ (1 - Exxon\ Market\ Capitalization\ Weight_{t-1}).$

[81] I use the Bloomberg ticker "CL1 Comdty" for the West Texas Intermediate Index.

[82] I use the Bloomberg ticker "NG1 Comdty" for the Henry Hub Index.

[83] *See* Francis, Jennifer, Donald Pagach, and Jens Stephan, "The Stock Market Response to Earnings Announcements Released during Trading versus Nontrading Periods," *Journal of Accounting Research* 30.2 (Autumn 1992): 165-184.

[84] Campbell, John Y., Andrew W. Lo, and A. Craig MacKinlay, *The Econometrics of Financial Markets*, 2nd ed., (Princeton, New Jersey: Princeton University Press, 1997), pp. 155 and 158. I exclude all corrective disclosure dates in the one-year estimation period in my regression.

27

**App. 282**

November 5, 2015, I use an estimation period that spans the 12 months from November 5, 2014 to November 4, 2015. Based on the regression results, I compute the return on ExxonMobil's stock price on each corrective disclosure date and estimate the "abnormal return" on that date as the difference between ExxonMobil's actual stock price returns and the predicted returns. I then test the statistical significance of the abnormal return. I report results at the commonly accepted 5% significance level, as well as the 10% significance level, which can also provide useful information. *See* Exhibit 5.

### D. The Impact of the Revelation of ExxonMobil's Alleged Misrepresentations on ExxonMobil's Stock Price

63. In this section, I assess how the revelation of ExxonMobil's alleged misrepresentations impacted its stock price.

#### 1. *Identification of Significant Disclosure Dates*

64. Based on the event study regression results, there are three days on which ExxonMobil's stock price had a statistically significant abnormal return (one day at the 5% level: January 20, 2016, and two days with statistically significant abnormal returns at the 10% level: September 20, 2016 and June 2, 2017).[85] *See* Exhibit 5.

65. On January 20, 2016, the Los Angeles Times announced that California Attorney General Kamala D. Harris would be formally investigating whether "Exxon Mobil Corp. repeatedly lied to the public and its shareholders about the risk to its business from climate change—and whether such actions could amount to securities fraud and violations of environmental laws."[86] The event study analysis shows an underperformance in ExxonMobil's stock return on this day of 2.14%, which is statistically significant at the 5% level.

---

[85] In order to determine whether there are confounding events on the significant corrective disclosure dates, I conduct the following searches on Dow Jones Factiva for other potentially relevant news articles on or one trading day prior to each significant disclosure date: (1) I search for and review all articles for which the relevant company is ExxonMobil and (2) I search for and review all headlines of articles containing the text "Exxon." Based on these searches, I have not identified any potentially confounding events on the significant disclosure dates.

[86] Penn, Ivan, "California to investigate whether Exxon Mobil lied about climate-change risks," *Los Angeles Times*, January 20, 2016.

**App. 283**

66. Equity analysts took note of this news event. For example, on February 22, 2016, Natixis stated, "we note that California's prosecutor general is currently carrying out an investigation to determine whether Exxon intentionally misled the public and investors on the risks associated with climate change."[87] Similarly, Natixis later stated on March 31, 2016 that:[88]

> The grip is tightening, public investigations are ramping up into potential concealment from investors and the public of [ExxonMobil's] knowledge of climate change risks[.]…These beginnings echo the victorious battles staged by the DoJ against the tobacco industry in the 2000s. Could we see climate change being added to companies' lists of legal risks? At any rate, there has been a change in momentum and increased awareness in the US business sector concerning this issue, which had long been confined to a niche of investors in the US.

67. On September 20, 2016, news broke that ExxonMobil was being investigated by the SEC concerning its accounting practices related to the decline in global oil prices and how the company was accounting for the future costs of complying with climate change regulations when assessing its future asset values.[89] The event study analysis shows an underperformance in ExxonMobil's stock return on this day of 1.72%, which is statistically significant at the 10% level. Equity analysts also took note of this event. For example, a September 21, 2016 Daily Newsletter from CV Brokerage described the SEC's investigation, and commented on how ExxonMobil was the only major U.S. energy producer that had not taken a write-down or impairment charge since oil prices started to drop in 2014.[90]

68. On June 2, 2017, New York Attorney General Eric Schneiderman claimed in a court filing that "he had evidence of 'potential materially false and misleading statements by Exxon' that could have led investors to think the U.S. oil giant company properly assessed the risks

---

[87] Natixis Newsletter, "SRI Daily Watch," February 22, 2016, p. 2.

[88] Natixis Newsletter, "SRI Daily Watch," March 31, 2016, pp. 4-5.

[89] Dow Jones Newswires, "SEC Investigating Exxon on Climate Change, Accounting Practices," September 20, 2016; Dow Jones Newswires, "SEC Investigating Exxon on Valuing of Assets, Accounting," September 20, 2016.

[90] CV Brokerage, "Daily Intelligence Briefing," September 21, 2016.

**App. 284**

when it actually ignored a formula to estimate the impact of future environmental regulation on new deals."[91]   The event study analysis shows an underperformance in ExxonMobil's stock return on this day of 1.43%, which is statistically significant at the 10% level.  Equity analysts also took note of this event.  For example, on June 4, 2017, a Deutsche Bank analyst characterized this court filing as a "Major [Environmental, Social Governance] Event" for ExxonMobil.[92]

> 2.    *Impact of Significant Corrective Disclosure Dates on ExxonMobil's Stock Price*

69.    Based on the event study regression results, I estimate the impact of the revelation of ExxonMobil's alleged misrepresentations on its stock price.  The per-share price impact on that day is calculated by multiplying ExxonMobil's closing price from the previous trading day by the abnormal percentage return for that day estimated from the event study.[93]

70.    I estimate that ExxonMobil's stock price was inflated by $1.64 per share from April 1, 2014 to January 19, 2016.  If I were to include the September 20, 2016 and June 2, 2017 dates, which are statistically significant at the 10% level, then the per-share inflation in ExxonMobil's stock price between April 1, 2014 to January 19, 2016, between January 20, 2016 and September 19, 2016, and between September 20 and June 1, 2017 would be $4.25, $2.61, $1.16, respectively.  Exhibit 6 shows the estimated per-share stock price inflation based on this analysis.

71.    The per-share stock price inflation is then used to calculate the inflation in ExxonMobil's market capitalization.  I estimate that ExxonMobil's market capitalization was inflated by $6.9 billion from April 1, 2014 to January 19, 2016.  If I were to include the September 20,

---

[91]    Flitter, Emily, "New York prosecutor says Exxon misled investors on climate change," *Reuters*, June 2, 2017.

[92]    Deutsche Bank, "Trump/Paris Deal, ESG Index, Exxon Vote," June 4, 2017, p. 4.

[93]    I assume that the total inflation caused by the alleged misrepresentations is constant after April 1, 2014 up through the first disclosure date and between any subsequent disclosure dates.  *See, e.g.*, Alexander, Janet Cooper, "The Value of Bad News in Securities Class Actions," *UCLA Law Review* 41 (August 1994): 1421-1469, pp. 1433-1434: "The simplest (and most common) method is to assume that the value of the information remains constant throughout the class period … An alternative method … would be to assume that the amount attributable to the fraud is a constant percentage of the stock price, rather than a constant dollar amount, throughout the class period."

**App. 285**

2016 and June 2, 2017 dates, which are statistically significant at the 10% level, then the inflation in ExxonMobil's market capitalization between April 1, 2014 to January 19, 2016, between January 20, 2016 and September 19, 2016, and between September 20 and June 1, 2017 would be $17.9 billion, $10.9 billion, $4.9 billion, respectively.  Exhibit 7 shows the estimated market capitalization inflation based on this analysis.

_ELI BARTY_

ELI BARTOV, Ph.D.

May 8, 2019

31

**App. 286**

**FILED: NEW YORK COUNTY CLERK 10/04/2019 11:17 PM**　INDEX NO. 452044/2018

NYSCEF DOC. NO. 362　Case 3:16-cv-03111-K　Document 121　Filed 07/31/20　Page 292 of 544　PageID 4544　RECEIVED NYSCEF: 10/04/2019

**Exhibit 1**
**2015 Mobile Bay Undiscounted Cash Flow Model**
**Adjusted for GHG Emission Proxy Costs**

| Inputs | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 | 2037 | 2038 | 2039 | 2040 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [1] Liquids Production Total | 5.93 | 5.95 | 5.54 | 5.30 | 4.96 | 4.73 | 4.30 | 4.05 | 3.87 | 3.68 | 3.28 | 3.02 | 2.85 | 2.74 | 2.64 | 2.53 | 2.39 | 2.23 | 2.09 | 2.08 | 1.95 | 1.78 | 1.66 | 1.60 | 1.49 | 1.36 |
| [2] Gas Available For Sale Total | 96.67 | 103.22 | 95.98 | 92.05 | 86.03 | 96.16 | 87.21 | 81.53 | 77.14 | 72.76 | 65.06 | 59.48 | 56.25 | 53.82 | 51.34 | 49.07 | 46.32 | 43.11 | 40.42 | 39.98 | 37.47 | 34.40 | 32.12 | 30.60 | 28.75 | 26.38 |
| [3] Inflation Rate | 1.000 | 1.025 | 1.051 | 1.077 | 1.104 | 1.131 | 1.160 | 1.189 | 1.218 | 1.249 | 1.280 | 1.312 | 1.345 | 1.379 | 1.413 | 1.448 | 1.485 | 1.522 | 1.560 | 1.599 | 1.639 | 1.680 | 1.722 | 1.765 | 1.809 | 1.854 |
| [4] Henry Hub (Real) | 2.80 | 2.90 | 3.00 | 3.20 | 3.60 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 |
| [5] Henry Hub (Nom) | 2.80 | 2.97 | 3.15 | 3.45 | 3.97 | 4.53 | 4.64 | 4.75 | 4.87 | 5.00 | 5.12 | 5.25 | 5.38 | 5.51 | 5.65 | 5.79 | 5.94 | 6.09 | 6.24 | 6.39 | 6.55 | 6.72 | 6.89 | 7.06 | 7.23 | 7.42 |
| [6] **Gas Price (Nom) (5% Premium)** | **2.95** | **3.13** | **3.32** | **3.62** | **4.18** | **4.76** | **4.88** | **5.00** | **5.13** | **5.25** | **5.39** | **5.52** | **5.66** | **5.80** | **5.94** | **6.09** | **6.25** | **6.40** | **6.56** | **6.73** | **6.89** | **7.07** | **7.24** | **7.42** | **7.61** | **7.80** |
| [7] Brent (Real) | 50.00 | 60.00 | 60.00 | 65.00 | 70.00 | 80.00 | 80.00 | 80.00 | 80.00 | 80.00 | 80.00 | 80.00 | 80.00 | 80.00 | 80.00 | 80.00 | 80.00 | 80.00 | 80.00 | 80.00 | 80.00 | 80.00 | 80.00 | 80.00 | 80.00 | 80.00 |
| [8] Brent (Nom) | 50.00 | 61.50 | 63.04 | 70.00 | 77.27 | 90.51 | 92.78 | 95.09 | 97.47 | 99.91 | 102.41 | 104.97 | 107.59 | 110.28 | 113.04 | 115.86 | 118.76 | 121.73 | 124.77 | 127.89 | 131.09 | 134.37 | 137.73 | 141.17 | 144.70 | 148.32 |
| [9] **Liquids Price (Nom) (75% Discount)** | **12.73** | **15.66** | **16.05** | **17.82** | **19.67** | **23.05** | **23.62** | **24.21** | **24.82** | **25.44** | **26.07** | **26.73** | **27.39** | **28.08** | **28.78** | **29.50** | **30.24** | **30.99** | **31.77** | **32.56** | **33.38** | **34.21** | **35.07** | **35.94** | **36.84** | **37.76** |

| Cash Flows | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 | 2037 | 2038 | 2039 | 2040 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [10] Liquids Revenue | 27.56 | 34.04 | 32.48 | 34.50 | 35.64 | 39.81 | 37.10 | 35.82 | 35.08 | 34.19 | 31.24 | 29.48 | 28.52 | 28.10 | 27.75 | 27.26 | 26.40 | 25.24 | 24.25 | 24.74 | 23.77 | 22.24 | 21.26 | 21.00 | 20.05 | 18.76 |
| [11] Gas Revenue | 103.99 | 117.88 | 116.22 | 121.86 | 131.33 | 167.19 | 155.42 | 148.93 | 144.43 | 139.64 | 127.98 | 119.93 | 116.25 | 114.01 | 111.48 | 109.21 | 105.67 | 100.80 | 96.88 | 98.22 | 94.35 | 88.79 | 84.98 | 82.98 | 79.91 | 75.16 |
| [12] GHG Revenue (Gas only) | - | - | - | - | - | 5.10 | 5.74 | 6.42 | 7.04 | 7.71 | 8.43 | 9.11 | 9.90 | 10.57 | 11.25 | 12.00 | 12.39 | 12.85 | 13.32 | 13.69 | 14.16 | 14.80 | 15.27 | 15.77 | 16.20 | 16.76 |
| [13] **Total Revenue** | **131.55** | **151.91** | **148.70** | **156.36** | **166.97** | **212.10** | **198.25** | **191.16** | **186.55** | **181.54** | **167.65** | **158.52** | **154.66** | **152.68** | **150.48** | **148.47** | **144.45** | **138.90** | **134.45** | **136.65** | **132.28** | **125.83** | **121.51** | **119.76** | **116.16** | **110.68** |
| [14] Cash Opex | 107.76 | 117.53 | 112.03 | 110.11 | 105.49 | 119.89 | 111.46 | 106.85 | 103.67 | 100.27 | 91.88 | 86.13 | 83.48 | 81.89 | 80.11 | 78.49 | 75.95 | 72.46 | 69.64 | 70.62 | 67.84 | 63.83 | 61.08 | 59.68 | 57.45 | 54.02 |
| [15] Estimated GHG Emissions | - | - | - | - | - | 0.18 | 0.18 | 0.17 | 0.17 | 0.17 | 0.16 | 0.16 | 0.16 | 0.16 | 0.15 | 0.15 | 0.15 | 0.14 | 0.14 | 0.14 | 0.13 | 0.13 | 0.13 | 0.13 | 0.13 | 0.12 |
| [16] Unit GHG Emission Proxy Cost ($/Ton) | - | - | - | - | - | 24.33 | 29.46 | 34.71 | 40.33 | 46.08 | 52.23 | 58.52 | 65.23 | 72.10 | 79.41 | 86.90 | 92.04 | 97.38 | 102.94 | 108.71 | 114.70 | 120.93 | 127.40 | 134.11 | 141.08 | 148.32 |
| [17] GHG Estimated Costs - Liquids | - | - | - | - | - | 1.00 | 1.19 | 1.39 | 1.59 | 1.78 | 1.99 | 2.19 | 2.40 | 2.62 | 2.83 | 3.05 | 3.17 | 3.30 | 3.42 | 3.56 | 3.68 | 3.84 | 3.95 | 4.14 | 4.23 | 4.36 |
| [18] GHG Estimated Costs - Gas | - | - | - | - | - | 3.40 | 4.04 | 4.65 | 5.27 | 5.87 | 6.59 | 7.19 | 7.90 | 8.58 | 9.18 | 9.86 | 10.25 | 10.64 | 11.03 | 11.40 | 11.79 | 12.36 | 12.75 | 13.19 | 13.60 | 14.09 |
| [19] **Total Opex** | **107.76** | **117.53** | **112.03** | **110.11** | **105.49** | **124.30** | **116.70** | **112.88** | **110.52** | **107.92** | **100.47** | **95.51** | **93.79** | **93.10** | **92.13** | **91.41** | **89.38** | **86.40** | **84.09** | **85.59** | **83.32** | **80.02** | **77.79** | **77.00** | **75.28** | **72.47** |
| [20] Capex | 0.23 | 0.00 | 0.00 | 0.00 | 0.00 | 115.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| [21] Capex GHG - Liquids | - | - | - | - | - | 0.50 | 0.50 | 0.53 | 0.53 | 0.56 | 0.56 | 0.58 | 0.61 | 0.61 | 0.64 | 0.66 | 0.66 | 0.69 | 0.71 | 0.71 | 0.74 | 0.76 | 0.78 | 0.81 | 0.81 | 0.83 |
| [22] Capex GHG - Gas | - | - | - | - | - | 1.70 | 1.70 | 1.77 | 1.77 | 1.84 | 1.84 | 1.92 | 1.99 | 1.99 | 2.06 | 2.14 | 2.14 | 2.21 | 2.29 | 2.29 | 2.36 | 2.44 | 2.52 | 2.59 | 2.59 | 2.67 |
| [23] **Total Capex** | **0.23** | **0.00** | **0.00** | **0.00** | **0.00** | **117.20** | **2.20** | **2.30** | **2.30** | **2.40** | **2.40** | **2.50** | **2.60** | **2.60** | **2.70** | **2.80** | **2.80** | **2.90** | **3.00** | **3.00** | **3.10** | **3.20** | **3.30** | **3.40** | **3.40** | **3.50** |
| [24] **Annual Cash Flow ($M)** | **$23.56** | **$34.38** | **$36.67** | **$46.25** | **$61.48** | **($29.40)** | **$79.36** | **$75.98** | **$73.72** | **$71.22** | **$64.78** | **$60.50** | **$58.28** | **$56.99** | **$55.65** | **$54.27** | **$52.28** | **$49.60** | **$47.36** | **$48.06** | **$45.86** | **$42.61** | **$40.42** | **$39.35** | **$37.47** | **$34.71** |

| Results ($M) | |
|---|---|
| [25] Pre-Tax Cash Flow (2015-2040) | $1,261 |
| [26] Net Book Value | $1,280 |
| [27] **Headroom:** | **($19)** |

**Exhibit 1**
**2015 Mobile Bay Undiscounted Cash Flow Model**
**Adjusted for GHG Emission Proxy Costs**

**Notes:**

[1]  Liquids Production Total is shown in thousands of barrels per day.

[2]  Gas Available For Sale Total is shown in millions of cubic feet per day.

[3]  Inflation Rate is 2.5% compounded annually.

[4]  Henry Hub (Real) prices are shown in dollars per thousand cubic feet.

[5]  Henry Hub (Nom) prices are shown in dollars per thousand cubic feet and calculated as [3]×[4].

[6]  Gas Price (Nom) (5% Premium) is shown in dollars per thousand cubic feet and calculated as 1.05×[5].  In 2015, ExxonMobil applied a premium factor to its nominal prices for Henry Hub in order to calculate its prices for Mobile Bay's gas production.  As Mobile Bay gas production had historically traded at approximately 105% of the third-party market price of gas, ExxonMobil multiplied the nominal Henry Hub price for each year by 105%.

[7]  Brent (Real) prices are shown in dollars per barrel.

[8]  Brent (Nom) prices are shown in dollars per barrel and calculated as [3]×[7].

[9]  Liquids Price (Nom) (75% Discount) is shown is dollars per barrel and calculated as 0.25×[8].  In 2015, ExxonMobil applied a discount factor to its nominal prices for Brent in order to calculate its prices for Mobile Bay's liquid production.  As Mobile Bay liquid production had historically traded at approximately 25% of the third-party market price of oil, ExxonMobil multiplied the nominal Brent price for each year by 25%.

[10]  Liquids Revenue is shown in millions of dollars and calculated as 0.36525×[1]×[9].  ExxonMobil multiplied liquid production and price by 0.36525 in order to convert to millions of dollars per year.

[11]  Gas Revenue is shown in millions of dollars and calculated as 0.36525×[2]×[6].  ExxonMobil multiplied gas production and price by 0.36525 in order to convert to millions of dollars per year.

[12]  GHG Revenue (Gas only) is shown in millions of dollars and calculated as [18]+[22].  Revenue associated with the GHG Emission Proxy Costs and capital expenditures attributed to GHGs that ExxonMobil could pass through to its natural gas customers in 2016 is assumed to apply in 2015 as well.

[13]  Total Revenue is shown in millions of dollars and calculated as [10]+[11]+[12].

[14]  Cash Opex is shown in millions of dollars.

[15]  Estimated GHG Emissions are shown in millions of tons.  As no contemporaneous source was produced for Mobile Bay's 2015 Estimated GHG Emissions, 2015 Estimated GHG Emissions are assumed to be equal to 2016  GHG emissions projections, which are calculated by dividing the GHG Estimated Costs in ExxonMobil's undiscounted cash flow model for its 2016 impairment testing of Mobile Bay by the Unit GHG Emission Proxy Costs from the 2016 Dataguide.  The Unit GHG Emission Proxy Costs are inflated to nominal terms using ExxonMobil's 2.5% inflation rate, consistent with the inflation rate that ExxonMobil used in inflating Unit GHG Emission Proxy Costs for its 2016 impairment testing of its Southern North Sea and Central/Northern North Sea (U.K.) Assets, and consistent with the inflation assumptions in ExxonMobil's undiscounted cash flow model for its 2015 impairment testing of Mobile Bay.

[16]  Unit GHG Emission Proxy Cost is shown in dollars per ton.  The 2015 Dataguide specifies that GHG emission proxy costs should be incorporated for assets in the United States beginning in 2020.  The Unit GHG Emission Proxy Costs are inflated to nominal terms using ExxonMobil's 2.5% inflation rate, consistent with the inflation rate that ExxonMobil used in inflating Unit GHG Emission Proxy Costs for its 2016 impairment testing of its Southern North Sea and Central/Northern North Sea (U.K.) Assets and consistent with the inflation assumptions in ExxonMobil's undiscounted cash flow model for its 2015 impairment testing of Mobile Bay.

[17]  GHG Estimated Costs - Liquids are shown in millions of dollars and calculated as [1]/([1]+([2]/6))×[15]×[16].  In calculating GHG Estimated Costs - Liquids, ExxonMobil multiplied the Total GHG Estimated Costs ([15]×[16]) by the ratio of liquid production to total liquid and gas production for that year.  ExxonMobil divided Gas Available For Sale Total by six in order to standardize its units with Liquids Production Total, as ExxonMobil used the conversion rate of 6 million cubic feet = 1 thousand barrels.

[18]  GHG Estimated Costs - Gas are shown in millions of dollars and calculated as (([2]/6)/([1]+([2]/6)))×[15]×[16].  In calculating GHG Estimated Costs - Gas, ExxonMobil multiplied the Total GHG Estimated Costs ([15]×[16]) by the ratio of gas production to total liquid and gas production for that year.  ExxonMobil divided Gas Available For Sale Total by six in order to standardize its units with Liquids Production Total, as ExxonMobil used the conversion rate of 6 million cubic feet = 1 thousand barrels.

[19]  Total Opex is shown in millions of dollars and calculated as [14]+[17]+[18].

[20]  Capex is shown in millions of dollars.

[21]  Capex GHG - Liquids is shown in millions of dollars and calculated as [1]/([1]+([2]/6))×[Capex GHG from ExxonMobil's undiscounted cash flow model for its 2016 impairment testing of Mobile Bay].  In calculating Capex GHG - Liquids, ExxonMobil multiplied the Capex GHG by the ratio of liquid production to total liquid and gas production for that year.  ExxonMobil divided Gas Available For Sale Total by six in order to standardize its units with Liquids Production Total, as ExxonMobil used the conversion rate of 6 million cubic feet = 1 thousand barrels.  As no contemporaneous source was produced for Mobile Bay's 2015 Capex GHG, 2015 Capex GHG is assumed to be equal to the 2016 Capex GHG in ExxonMobil's undiscounted cash flow model for its 2016 impairment testing of Mobile Bay.

[22]  Capex GHG - Gas is shown in millions of dollars and calculated as (([2]/6)/([1]+([2]/6)))×[Capex GHG from ExxonMobil's undiscounted cash flow model for its 2016 impairment testing of Mobile Bay].  In calculating Capex GHG - Gas, ExxonMobil multiplied the Capex GHG by the ratio of gas production to total liquid and gas production for that year.  ExxonMobil divided Gas Available For Sale Total by six in order to standardize its units with Liquids Production Total, as ExxonMobil used the conversion rate of 6 million cubic feet = 1 thousand barrels.  As no contemporaneous source was produced for Mobile Bay's 2015 Capex GHG, 2015 Capex GHG is assumed to be equal to the 2016 Capex GHG in ExxonMobil's undiscounted cash flow model for its 2016 impairment testing of Mobile Bay.

[23]  Total Capex is shown in millions of dollars and calculated as [20]+[21]+[22].

[24]  Annual Cash Flow is shown in millions of dollars and calculated as [13]-[19]-[23].

[25]  Pre Tax Cash Flow (2015-2040) is shown in millions of dollars and calculated as the sum of the annual cash flows from 2015 to 2040.

[26]  Net Book Value is shown in millions of dollars.

[27]  Headroom is shown in millions of dollars and calculated as [25]-[26].

**App. 288**

**Exhibit 1**
**2015 Mobile Bay Undiscounted Cash Flow Model**
**Adjusted for GHG Emission Proxy Costs**

Sources:

(a)   PwC's Undiscounted Cash Flow Model for its Audit of ExxonMobil's 2015 Impairment Testing of Mobile Bay, PNYAG0002790.

(b)   ExxonMobil's Undiscounted Cash Flow Model for its 2016 Impairment Testing of Mobile Bay, PNYAG0263352.

(c)   "Greenhouse Gas Emissions Budget and Project Considerations," Revision 4 of the Appendix to the ExxonMobil 2015 Corporate Plan Dataguide, p. 31.

(d)   "Greenhouse Gas Emissions Budget and Project Considerations," Revision 1 of the Appendix to the ExxonMobil 2016 Corporate Plan Dataguide, p. 32.

(e)   ExxonMobil's Undiscounted Cash Flow Model for its 2016 Impairment Testing of its Southern North Sea and Central/Northern North Sea (U.K.) Assets, PNYAG0425500.

(f)   ExxonMobil, "ExxonMobil Earns $16.2 Billion in 2015; $2.8 Billion During Fourth Quarter," February 2, 2016, available at https://news.exxonmobil.com/press-release/exxonmobil-earns-162-billion-2015-28-billion-during-fourth-quarter, accessed on April 8, 2019.

**App. 289**

**Exhibit 2**
**2015 Mobile Bay Discounted Cash Flow Model**
**Low Price Case**

| | Inputs | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 | 2037 | 2038 | 2039 | 2040 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [1] | Liquids Production Total | 5.93 | 5.95 | 5.54 | 5.30 | 4.96 | 4.73 | 4.30 | 4.05 | 3.87 | 3.68 | 3.28 | 3.02 | 2.85 | 2.74 | 2.64 | 2.53 | 2.39 | 2.23 | 2.09 | 2.08 | 1.95 | 1.78 | 1.66 | 1.60 | 1.49 | 1.36 |
| [2] | Gas Available For Sale Total | 96.67 | 103.22 | 95.98 | 92.05 | 86.03 | 96.16 | 87.21 | 81.53 | 77.14 | 72.76 | 65.06 | 59.48 | 56.25 | 53.82 | 51.34 | 49.07 | 46.32 | 43.11 | 40.42 | 39.98 | 37.47 | 34.40 | 32.12 | 30.60 | 28.75 | 26.38 |
| [3] | Inflation Rate | 1.000 | 1.025 | 1.051 | 1.077 | 1.104 | 1.131 | 1.160 | 1.189 | 1.218 | 1.249 | 1.280 | 1.312 | 1.345 | 1.379 | 1.413 | 1.448 | 1.485 | 1.522 | 1.560 | 1.599 | 1.639 | 1.680 | 1.722 | 1.765 | 1.809 | 1.854 |
| [4] | Henry Hub (Real) | 2.80 | 2.99 | 3.32 | 3.40 | 3.54 | 3.78 | 3.83 | 3.91 | 4.02 | 4.04 | 4.10 | 4.14 | 4.28 | 4.44 | 4.57 | 4.61 | 4.61 | 4.61 | 4.61 | 4.61 | 4.61 | 4.61 | 4.61 | 4.61 | 4.61 | 4.61 |
| [5] | Henry Hub (Nom) | 2.80 | 3.07 | 3.48 | 3.67 | 3.90 | 4.27 | 4.45 | 4.64 | 4.89 | 5.05 | 5.25 | 5.43 | 5.76 | 6.13 | 6.46 | 6.67 | 6.84 | 7.01 | 7.18 | 7.36 | 7.55 | 7.73 | 7.93 | 8.13 | 8.33 | 8.54 |
| [6] | **Gas Price (Nom) (5% Premium)** | **2.95** | **3.23** | **3.67** | **3.86** | **4.11** | **4.50** | **4.68** | **4.88** | **5.15** | **5.31** | **5.52** | **5.72** | **6.06** | **6.44** | **6.79** | **7.02** | **7.19** | **7.37** | **7.55** | **7.74** | **7.94** | **8.14** | **8.34** | **8.55** | **8.76** | **8.98** |
| [7] | Brent (Real) | 54.86 | 61.94 | 71.88 | 72.77 | 80.37 | 76.14 | 79.58 | 85.09 | 91.24 | 96.42 | 100.46 | 101.27 | 101.79 | 102.05 | 102.03 | 101.99 | 102.07 | 102.12 | 102.56 | 102.95 | 103.51 | 103.47 | 103.62 | 103.95 | 104.64 | 105.10 |
| [8] | Brent (Nom) | 54.86 | 63.49 | 75.51 | 78.36 | 88.71 | 86.14 | 92.29 | 101.15 | 111.17 | 120.42 | 128.59 | 132.87 | 136.90 | 140.67 | 144.17 | 147.72 | 151.52 | 155.39 | 159.96 | 164.58 | 169.61 | 173.79 | 178.39 | 183.43 | 189.27 | 194.86 |
| [9] | **Liquids Price (Nom) (75% Discount)** | **13.97** | **16.16** | **19.23** | **19.95** | **22.59** | **21.93** | **23.50** | **25.75** | **28.31** | **30.66** | **32.74** | **33.83** | **34.85** | **35.82** | **36.71** | **37.61** | **38.58** | **39.56** | **40.73** | **41.90** | **43.19** | **44.25** | **45.42** | **46.70** | **48.19** | **49.61** |

| | Cash Flows | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 | 2037 | 2038 | 2039 | 2040 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [10] | Liquids Revenue | 30.24 | 35.13 | 38.90 | 38.62 | 40.92 | 37.89 | 36.90 | 38.10 | 40.01 | 41.21 | 39.22 | 37.32 | 36.28 | 35.84 | 35.39 | 34.76 | 33.68 | 32.22 | 31.09 | 31.83 | 30.76 | 28.77 | 27.54 | 27.29 | 26.23 | 24.64 |
| [11] | Gas Revenue | 104.17 | 121.61 | 128.50 | 129.65 | 129.04 | 157.89 | 148.95 | 145.43 | 144.98 | 141.06 | 131.16 | 124.19 | 124.49 | 126.65 | 127.38 | 125.73 | 121.65 | 116.05 | 111.53 | 113.08 | 108.63 | 102.22 | 97.83 | 95.53 | 92.00 | 86.53 |
| [12] | GHG Revenue (Gas only) | - | - | - | - | - | 4.18 | 4.65 | 5.17 | 5.62 | 6.13 | 6.08 | 6.27 | 6.54 | 6.71 | 6.92 | 7.17 | 7.39 | 7.69 | 7.99 | 8.20 | 8.49 | 8.87 | 9.16 | 9.46 | 9.68 | 10.02 |
| [13] | **Total Revenue** | **134.42** | **156.75** | **167.41** | **168.27** | **169.96** | **199.96** | **190.50** | **188.70** | **190.61** | **188.40** | **176.47** | **167.78** | **167.32** | **169.20** | **169.69** | **167.66** | **162.72** | **155.97** | **150.61** | **153.11** | **147.87** | **139.86** | **134.53** | **132.28** | **127.91** | **121.19** |
| [14] | Cash Opex | 107.76 | 117.53 | 112.03 | 110.11 | 105.49 | 119.89 | 111.46 | 106.85 | 103.67 | 100.27 | 91.88 | 86.13 | 83.48 | 81.89 | 80.11 | 78.49 | 75.95 | 72.46 | 69.64 | 70.62 | 67.84 | 63.83 | 61.08 | 59.68 | 57.45 | 54.02 |
| [15] | Estimated GHG Emissions | - | - | - | - | - | 0.18 | 0.18 | 0.17 | 0.17 | 0.17 | 0.16 | 0.16 | 0.16 | 0.16 | 0.15 | 0.15 | 0.15 | 0.14 | 0.14 | 0.14 | 0.13 | 0.13 | 0.13 | 0.13 | 0.13 | 0.12 |
| [16] | Unit GHG Emission Proxy Cost ($/Ton) | - | - | - | - | - | 17.76 | 21.51 | 25.35 | 29.45 | 33.65 | 33.56 | 35.44 | 37.54 | 39.66 | 41.96 | 44.30 | 47.17 | 50.13 | 53.18 | 56.32 | 59.55 | 62.88 | 66.31 | 69.86 | 73.52 | 77.30 |
| [17] | GHG Estimated Costs - Liquids | - | - | - | - | - | 0.73 | 0.87 | 1.01 | 1.16 | 1.30 | 1.28 | 1.33 | 1.38 | 1.44 | 1.50 | 1.56 | 1.63 | 1.70 | 1.77 | 1.84 | 1.91 | 2.00 | 2.06 | 2.15 | 2.20 | 2.27 |
| [18] | GHG Estimated Costs - Gas | - | - | - | - | - | 2.49 | 2.95 | 3.39 | 3.85 | 4.29 | 4.23 | 4.35 | 4.55 | 4.72 | 4.85 | 5.03 | 5.26 | 5.48 | 5.70 | 5.91 | 6.12 | 6.43 | 6.64 | 6.87 | 7.09 | 7.34 |
| [19] | **Total Opex** | **107.76** | **117.53** | **112.03** | **110.11** | **105.49** | **123.11** | **115.28** | **111.25** | **108.68** | **105.86** | **97.40** | **91.81** | **89.41** | **88.05** | **86.46** | **85.08** | **82.83** | **79.64** | **77.10** | **78.38** | **75.88** | **72.25** | **69.78** | **68.70** | **66.74** | **63.63** |
| [20] | Capex | 0.23 | 0.00 | 0.00 | 0.00 | 0.00 | 115.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| [21] | Capex GHG - Liquids | - | - | - | - | - | 0.50 | 0.50 | 0.53 | 0.53 | 0.56 | 0.56 | 0.58 | 0.61 | 0.61 | 0.64 | 0.66 | 0.66 | 0.69 | 0.71 | 0.71 | 0.74 | 0.76 | 0.78 | 0.81 | 0.81 | 0.83 |
| [22] | Capex GHG - Gas | - | - | - | - | - | 1.70 | 1.70 | 1.77 | 1.77 | 1.84 | 1.84 | 1.92 | 1.99 | 1.99 | 2.06 | 2.14 | 2.14 | 2.21 | 2.29 | 2.29 | 2.36 | 2.44 | 2.52 | 2.59 | 2.59 | 2.67 |
| [23] | **Total Capex** | **0.23** | **0.00** | **0.00** | **0.00** | **0.00** | **117.20** | **2.20** | **2.30** | **2.30** | **2.40** | **2.40** | **2.50** | **2.60** | **2.60** | **2.70** | **2.80** | **2.80** | **2.90** | **3.00** | **3.00** | **3.10** | **3.20** | **3.30** | **3.40** | **3.40** | **3.50** |
| [24] | **Annual Cash Flow ($M)** | **$26.42** | **$39.22** | **$55.38** | **$58.16** | **$64.47** | **($40.35)** | **$73.01** | **$75.14** | **$79.63** | **$80.14** | **$76.67** | **$73.47** | **$75.31** | **$78.55** | **$80.53** | **$79.78** | **$77.09** | **$73.43** | **$70.51** | **$71.73** | **$68.89** | **$64.41** | **$61.45** | **$60.18** | **$57.77** | **$54.06** |
| [25] | **After-Tax Annual Cash Flow ($M, at 37.7%)** | **$16.46** | **$24.43** | **$34.50** | **$36.23** | **$40.16** | **($25.14)** | **$45.49** | **$46.81** | **$49.61** | **$49.93** | **$47.76** | **$45.77** | **$46.92** | **$48.94** | **$50.17** | **$49.70** | **$48.03** | **$45.75** | **$43.93** | **$44.69** | **$42.92** | **$40.13** | **$38.28** | **$37.49** | **$35.99** | **$33.68** |

| | Results ($M) | | |
|---|---|---|---|
| [26] | After-Tax Discount Rate | 5.5% | 8.0% |
| [27] | **After-Tax Net Present Value** | **$532** | **$418** |
| [28] | Weighted Average Depreciation Tax Shield | 25.9% | 22.7% |
| [29] | **Fair Value** | **$670** | **$512** |
| [30] | Net Book Value | $1,280 | $1,280 |
| [31] | Pre-Tax Impairment Charge | ($610) | ($768) |
| [32] | **After-Tax Impairment Charge** | **($380)** | **($478)** |

**App. 290**

**Exhibit 2**
**2015 Mobile Bay Discounted Cash Flow Model**
**Low Price Case**

**Notes:**

[1]   Liquids Production Total is shown in thousands of barrels per day.

[2]   Gas Available For Sale Total is shown in millions of cubic feet per day.

[3]   Inflation Rate is 2.5% compounded annually.

[4]   Henry Hub (Real) prices are shown in dollars per thousand cubic feet. Henry Hub (Real) prices are an average of third-party price outlooks as of 2015 from Wood Mackenzie ("WoodMac"), Cambridge Energy Research Associates ("CERA"), and PIRA Energy Group ("PIRA"). WoodMac, CERA, and PIRA price outlooks as of 2015 for 2031–2040 were not produced in this matter, and are instead assumed to equal those for 2030.

[5]   Henry Hub (Nom) prices are shown in dollars per thousand cubic feet and calculated as [3]×[4].

[6]   Gas Price (Nom) (5% Premium) is shown in dollars per thousand cubic feet and calculated as 1.05×[5]. In 2015, ExxonMobil applied a premium factor to its nominal prices for Henry Hub in order to calculate its prices for Mobile Bay's gas production. As Mobile Bay gas production had historically traded at approximately 105% of the third-party market price of gas, ExxonMobil multiplied the nominal Henry Hub price for each year by 105%.

[7]   Brent (Real) prices are shown in dollars per barrel. Brent (Real) prices are an average of third-party price outlooks as of 2015 from CERA, PIRA, and FACTS Global Energy ("FGE"). Price outlooks from FGE as of 2015 for 2031–2040 and PIRA as of 2015 for 2036–2040 were not produced in this matter, and are instead assumed to equal that of 2030 and 2035, respectively.

[8]   Brent (Nom) prices are shown in dollars per barrel and calculated as [3]×[7].

[9]   Liquids Price (Nom) (75% Discount) is shown is dollars per barrel and calculated as 0.25×[8]. In 2015, ExxonMobil applied a discount factor to its nominal prices for Brent in order to calculate its prices for Mobile Bay's liquid production. As Mobile Bay liquid production had historically traded at approximately 25% of the third-party market price of oil, ExxonMobil multiplied the nominal Brent price for each year by 25%.

[10]  Liquids Revenue is shown in millions of dollars and calculated as 0.36525×[1]×[9]. ExxonMobil multiplied liquid production and price by 0.36525 in order to convert to millions of dollars per year.

[11]  Gas Revenue is shown in millions of dollars and calculated as 0.36525×[2]×[6]. ExxonMobil multiplied gas production and price by 0.36525 in order to convert to millions of dollars per year.

[12]  GHG Revenue (Gas only) is shown in millions of dollars and calculated as [18]+[22]. Revenue associated with the GHG Emission Proxy Costs and capital expenditures attributed to GHGs that ExxonMobil could pass through to its natural gas customers in 2016 is assumed to apply in 2015 as well.

[13]  Total Revenue is shown in millions of dollars and calculated as [10]+[11]+[12].

[14]  Cash Opex is shown in millions of dollars.

[15]  Estimated GHG Emissions are shown in millions of tons. As no contemporaneous source was produced for Mobile Bay's 2015 Estimated GHG Emissions, 2015 Estimated GHG Emissions are assumed to be equal to 2016 GHG emissions projections, which are calculated by dividing the GHG Estimated Costs in ExxonMobil's undiscounted cash flow model for its 2016 impairment testing of Mobile Bay by the Unit GHG Emission Proxy Costs from the 2016 Dataguide. The Unit GHG Emission Proxy Costs are inflated to nominal terms using ExxonMobil's 2.5% inflation rate, consistent with the inflation rate that ExxonMobil used in inflating Unit GHG Emission Proxy Costs for its 2016 impairment testing of its Southern North Sea and Central/Northern North Sea (U.K.) Assets, and consistent with the inflation assumptions in ExxonMobil's undiscounted cash flow model for its 2015 impairment testing of Mobile Bay.

[16]  Unit GHG Emission Proxy Cost is shown in dollars per ton. The 2015 Dataguide specifies that GHG emission proxy costs should be incorporated for assets in the United States beginning in 2020. No contemporaneous source was produced for third-party Unit GHG Emission Proxy Costs, and ExxonMobil's discounted cash flow model for its 2017 impairment testing of Mobile Bay does not contain fair value Unit GHG Emission Proxy Costs. As a result, I rely on third-party nominal Unit GHG Emission Proxy Costs from ExxonMobil's discounted cash flow model for its 2017 impairment testing of its Cross Timbers Energy asset to estimate fair value Unit GHG Emission Proxy Costs in 2015. To estimate this, I first calculate the ratio of these third-party nominal Unit GHG Emission Proxy Costs to the Unit GHG Emission Proxy Costs from ExxonMobil's 2017 Dataguide, inflated by 2.5%. I then apply this ratio to the Unit GHG Emission Proxy Costs from ExxonMobil's 2015 Dataguide, inflated by 2.5%, consistent with the inflation rate that ExxonMobil used in its 2015 undiscounted cash flow model. ExxonMobil's discounted cash flow model for its 2017 impairment testing of its Cross Timbers Energy did not contain third-party nominal Unit GHG Emission Proxy Costs for the years 2020 through 2023. For these years, I apply the ratio calculated in 2024 to the Unit GHG Emission Proxy Costs from ExxonMobil's 2015 Dataguide, inflated by 2.5%.

[17]  GHG Estimated Costs - Liquids are shown in millions of dollars and calculated as [1]/([1]+([2]/6))×[15]×[16]. In calculating GHG Estimated Costs - Liquids, ExxonMobil multiplied the Total GHG Estimated Costs ([15]×[16]) by the ratio of liquid production to total liquid and gas production for that year. ExxonMobil divided Gas Available For Sale Total by six in order to standardize its units with Liquids Production Total, as ExxonMobil used the conversion rate of 6 million cubic feet = 1 thousand barrels.

[18]  GHG Estimated Costs - Gas are shown in millions of dollars and calculated as (([2]/6)/([1]+([2]/6)))×[15]×[16]. In calculating GHG Estimated Costs - Gas, ExxonMobil multiplied the Total GHG Estimated Costs ([15]×[16]) by the ratio of gas production to total liquid and gas production for that year. ExxonMobil divided Gas Available For Sale Total by six in order to standardize its units with Liquids Production Total, as ExxonMobil used the conversion rate of 6 million cubic feet = 1 thousand barrels.

[19]  Total Opex is shown in millions of dollars and calculated as [14]+[17]+[18].

[20]  Capex is shown in millions of dollars.

[21]  Capex GHG - Liquids are shown in millions of dollars and calculated as [1]/([1]+([2]/6))×[Capex GHG from ExxonMobil's undiscounted cash flow model for its 2016 impairment testing of Mobile Bay]. In calculating Capex GHG - Liquids, ExxonMobil multiplied the Capex GHG by the ratio of liquid production to total liquid and gas production for that year. ExxonMobil divided Gas Available For Sale Total by six in order to standardize its units with Liquids Production Total, as ExxonMobil used the conversion rate of 6 million cubic feet = 1 thousand barrels. As no contemporaneous source was produced for Mobile Bay's 2015 Capex GHG, 2015 Capex GHG is assumed to be equal to the 2016 Capex GHG in ExxonMobil's undiscounted cash flow model for its 2016 impairment testing of Mobile Bay.

[22]  Capex GHG - Gas is shown in millions of dollars and calculated as (([2]/6)/([1]+([2]/6)))×[Capex GHG from ExxonMobil's undiscounted cash flow model for its 2016 impairment testing of Mobile Bay]. In calculating Capex GHG - Gas, ExxonMobil multiplied the Capex GHG by the ratio of gas production to total liquid and gas production for that year. ExxonMobil divided Gas Available For Sale Total by six in order to standardize its units with Liquids Production Total, as ExxonMobil used the conversion rate of 6 million cubic feet = 1 thousand barrels. As no contemporaneous source was produced for Mobile Bay's 2015 Capex GHG, 2015 Capex GHG is assumed to be equal to the 2016 Capex GHG in ExxonMobil's undiscounted cash flow model for its 2016 impairment testing of Mobile Bay.

[23]  Total Capex is shown in millions of dollars and calculated as [20]+[21]+[22].

[24]  Annual Cash Flow is shown in millions of dollars and calculated as [13]-[19]-[23].

[25]  After-Tax Cash Flow is shown in millions of dollars and calculated as (1-0.377)×[24]. The Statutory Tax Rate on Mobile Bay is assumed to be 37.7%, consistent with the statutory tax rate used in ExxonMobil's discounted cash flow models for its 2016 impairment testing of its Heidelberg and Ram projects.

[26]  After-Tax Discount Rates are assumed to be 5.5% and 8.0%, consistent with ExxonMobil's methodology for its 2016 and 2017 impairment testing.

[27]  After-Tax Net Present Value is shown in millions of dollars and calculated as the net present value of the after-tax annual cash flows at the After-Tax Discount Rates of 5.5% and 8.0%.

[28]  Weighted Average Depreciation Tax Shield is assumed to equal 80% of the tax shield resulting from production-based depreciation and 20% of the tax shield resulting from 7-year accelerated straight line depreciation, consistent with the methodology used in ExxonMobil's discounted cash flow model for its 2017 impairment testing of Mobile Bay. Both tax shields are calculated using Liquids Production Total, Gas Available for Sale Total, the statutory tax rate on Mobile Bay of 37.7%, and After-Tax Discount Rates of 5.5% and 8.0%.

[29]  Fair Value is shown in millions of dollars and calculated as [27]×(1+[28]).

[30]  Net Book Value is shown in millions of dollars.

[31]  Pre-Tax Impairment Charge is shown in millions of dollars and calculated as [29]-[30].

[32]  After-Tax Impairment Charge is shown in millions of dollars and calculated as (1-0.377)×[31].

**App. 291**

**Exhibit 2**
**2015 Mobile Bay Discounted Cash Flow Model**
**Low Price Case**

Sources:

(a)  PwC's Undiscounted Cash Flow Model for its Audit of ExxonMobil's 2015 Impairment Testing of Mobile Bay, PNYAG0002790.

(b)  ExxonMobil's Undiscounted Cash Flow Model for its 2016 Impairment Testing of Mobile Bay, PNYAG0263352.

(c)  Third-Party Brent and Henry Hub Price Outlooks as of 2015, PNYAG0040606.

(d)  ExxonMobil's Discounted Cash Flow Model for its 2017 Impairment Testing of Mobile Bay, PNYAG0592715.

(e)  ExxonMobil's Discounted Cash Flow Models for its 2016 Impairment Testing of Heidelberg and Ram, PNYAG0493794.

(f)  ExxonMobil's 2016 Asset Recoverability Fair Value Review Presentation, December 16, 2016, PNYAG0395764-788 at 771.

(g)  ExxonMobil's 2017 Asset Recoverability Fair Value Review Presentation, January 12, 2018, PNYAG0601281-316 at 289, 291, and 293.

(h)  "Greenhouse Gas Emissions Budget and Project Considerations," Revision 4 of the Appendix to the ExxonMobil 2015 Corporate Plan Dataguide, p. 31.

(i)  "Greenhouse Gas Emissions Budget and Project Considerations," Revision 1 of the Appendix to the ExxonMobil 2016 Corporate Plan Dataguide, p. 32.

(j)  Revision 4 of the ExxonMobil 2017 Corporate Plan Dataguide, PNYAG0590859, p. 14.

(k)  ExxonMobil's 2017 Discounted Cash Flow Model for Cross Timbers Energy, PNYAG0600946.

(l)  ExxonMobil's Undiscounted Cash Flow Model for its 2016 Impairment Testing of its Southern North Sea and Central/Northern North Sea (U.K.) Assets, PNYAG0425500.

(m)  ExxonMobil, "ExxonMobil Earns $16.2 Billion in 2015; $2.8 Billion During Fourth Quarter," February 2, 2016, available at https://news.exxonmobil.com/press-release/exxonmobil-earns-162-billion-2015-28-billion-during-fourth-quarter, accessed on April 8, 2019.

**App. 292**

**Exhibit 3**
**2015 Mobile Bay Discounted Cash Flow Model**
**High Price Case**

| | Inputs | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 | 2037 | 2038 | 2039 | 2040 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [1] | Liquids Production Total | 5.93 | 5.95 | 5.54 | 5.30 | 4.96 | 4.73 | 4.30 | 4.05 | 3.87 | 3.68 | 3.28 | 3.02 | 2.85 | 2.74 | 2.64 | 2.53 | 2.39 | 2.23 | 2.09 | 2.08 | 1.95 | 1.78 | 1.66 | 1.60 | 1.49 | 1.36 |
| [2] | Gas Available For Sale Total | 96.67 | 103.22 | 95.98 | 92.05 | 86.03 | 96.16 | 87.21 | 81.53 | 77.14 | 72.76 | 65.06 | 59.48 | 56.25 | 53.82 | 51.34 | 49.07 | 46.32 | 43.11 | 40.42 | 39.98 | 37.47 | 34.40 | 32.12 | 30.60 | 28.75 | 26.38 |
| [3] | Inflation Rate | 1.000 | 1.025 | 1.051 | 1.077 | 1.104 | 1.131 | 1.160 | 1.189 | 1.218 | 1.249 | 1.280 | 1.312 | 1.345 | 1.379 | 1.413 | 1.448 | 1.485 | 1.522 | 1.560 | 1.599 | 1.639 | 1.680 | 1.722 | 1.765 | 1.809 | 1.854 |
| [4] | Henry Hub (Real) | 3.06 | 3.20 | 3.46 | 3.62 | 3.80 | 4.06 | 4.12 | 4.18 | 4.29 | 4.33 | 4.39 | 4.46 | 4.55 | 4.66 | 4.76 | 4.77 | 4.81 | 4.85 | 4.88 | 4.91 | 4.93 | 4.96 | 4.97 | 5.00 | 5.07 | 5.17 |
| [5] | Henry Hub (Nom) | 3.06 | 3.28 | 3.63 | 3.90 | 4.20 | 4.59 | 4.78 | 4.97 | 5.23 | 5.40 | 5.62 | 5.85 | 6.12 | 6.43 | 6.72 | 6.91 | 7.15 | 7.37 | 7.61 | 7.85 | 8.08 | 8.33 | 8.56 | 8.82 | 9.18 | 9.58 |
| [6] | **Gas Price (Nom) (5% Premium)** | **3.22** | **3.45** | **3.82** | **4.10** | **4.41** | **4.83** | **5.03** | **5.23** | **5.50** | **5.68** | **5.91** | **6.15** | **6.44** | **6.76** | **7.07** | **7.27** | **7.52** | **7.76** | **8.00** | **8.26** | **8.50** | **8.76** | **9.00** | **9.28** | **9.65** | **10.08** |
| [7] | Brent (Real) | 55.54 | 64.75 | 73.42 | 73.94 | 79.88 | 76.93 | 79.90 | 84.45 | 89.49 | 93.80 | 97.26 | 98.34 | 99.22 | 99.91 | 100.42 | 100.94 | 101.58 | 102.20 | 103.14 | 104.00 | 105.04 | 105.65 | 106.38 | 107.32 | 108.64 | 109.71 |
| [8] | Brent (Nom) | 55.54 | 66.36 | 77.13 | 79.63 | 88.18 | 87.04 | 92.66 | 100.38 | 109.03 | 117.14 | 124.49 | 129.03 | 133.44 | 137.73 | 141.89 | 146.19 | 150.79 | 155.51 | 160.86 | 166.26 | 172.12 | 177.44 | 183.13 | 189.38 | 196.50 | 203.40 |
| [9] | **Liquids Price (Nom) (75% Discount)** | **14.14** | **16.90** | **19.64** | **20.27** | **22.45** | **22.16** | **23.59** | **25.56** | **27.76** | **29.82** | **31.70** | **32.85** | **33.97** | **35.07** | **36.13** | **37.22** | **38.39** | **39.59** | **40.96** | **42.33** | **43.82** | **45.18** | **46.63** | **48.22** | **50.03** | **51.79** |
| | **Cash Flows** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** | **2026** | **2027** | **2028** | **2029** | **2030** | **2031** | **2032** | **2033** | **2034** | **2035** | **2036** | **2037** | **2038** | **2039** | **2040** |
| [10] | Liquids Revenue | 30.62 | 36.73 | 39.74 | 39.25 | 40.67 | 38.29 | 37.05 | 37.81 | 39.24 | 39.09 | 37.97 | 36.24 | 35.37 | 35.10 | 34.84 | 34.40 | 33.51 | 32.25 | 31.26 | 32.16 | 31.21 | 29.37 | 28.27 | 28.18 | 27.23 | 25.72 |
| [11] | Gas Revenue | 113.63 | 129.90 | 134.03 | 137.97 | 138.69 | 169.54 | 160.20 | 155.81 | 155.07 | 151.06 | 140.36 | 133.66 | 132.33 | 132.92 | 132.62 | 130.25 | 127.16 | 122.14 | 118.15 | 120.56 | 116.38 | 110.09 | 105.58 | 103.74 | 101.35 | 97.14 |
| [12] | GHG Revenue (Gas only) | - | - | - | - | - | 4.18 | 4.65 | 5.17 | 5.62 | 6.13 | 6.08 | 6.27 | 6.54 | 6.71 | 6.92 | 7.17 | 7.39 | 7.69 | 7.99 | 8.20 | 8.49 | 8.87 | 9.16 | 9.46 | 9.68 | 10.02 |
| [13] | **Total Revenue** | **144.24** | **166.63** | **173.77** | **177.21** | **179.37** | **212.01** | **201.90** | **198.79** | **199.93** | **197.27** | **184.41** | **176.17** | **174.24** | **174.72** | **174.37** | **171.81** | **168.07** | **162.08** | **157.41** | **160.91** | **156.08** | **148.33** | **143.01** | **141.38** | **138.26** | **132.88** |
| [14] | Cash Opex | 107.76 | 117.53 | 112.03 | 110.11 | 105.49 | 119.89 | 111.46 | 106.85 | 103.67 | 100.27 | 91.88 | 86.13 | 83.48 | 81.89 | 80.11 | 78.49 | 75.95 | 72.46 | 69.64 | 70.62 | 67.84 | 63.83 | 61.08 | 59.68 | 57.45 | 54.02 |
| [15] | Estimated GHG Emissions | - | - | - | - | - | 0.18 | 0.18 | 0.17 | 0.17 | 0.17 | 0.16 | 0.16 | 0.16 | 0.16 | 0.15 | 0.15 | 0.15 | 0.14 | 0.14 | 0.14 | 0.13 | 0.13 | 0.13 | 0.13 | 0.13 | 0.12 |
| [16] | Unit GHG Emission Proxy Cost ($/Ton) | - | - | - | - | - | 17.76 | 21.51 | 25.35 | 29.45 | 33.65 | 33.56 | 35.44 | 37.54 | 39.66 | 41.96 | 44.30 | 47.17 | 50.13 | 53.18 | 56.32 | 59.55 | 62.88 | 66.31 | 69.86 | 73.52 | 77.30 |
| [17] | GHG Estimated Costs - Liquids | - | - | - | - | - | 0.73 | 0.87 | 1.01 | 1.16 | 1.30 | 1.28 | 1.33 | 1.38 | 1.44 | 1.50 | 1.56 | 1.63 | 1.70 | 1.77 | 1.84 | 1.91 | 2.00 | 2.06 | 2.15 | 2.20 | 2.27 |
| [18] | GHG Estimated Costs - Gas | - | - | - | - | - | 2.49 | 2.95 | 3.39 | 3.85 | 4.29 | 4.23 | 4.35 | 4.55 | 4.72 | 4.85 | 5.03 | 5.26 | 5.48 | 5.70 | 5.91 | 6.12 | 6.43 | 6.64 | 6.87 | 7.09 | 7.34 |
| [19] | **Total Opex** | **107.76** | **117.53** | **112.03** | **110.11** | **105.49** | **123.11** | **115.28** | **111.25** | **108.68** | **105.86** | **97.40** | **91.81** | **89.41** | **88.05** | **86.46** | **85.08** | **82.83** | **79.64** | **77.10** | **78.38** | **75.88** | **72.25** | **69.78** | **68.70** | **66.74** | **63.63** |
| [20] | Capex | 0.23 | 0.00 | 0.00 | 0.00 | 0.00 | 115.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| [21] | Capex GHG - Liquids | - | - | - | - | - | 0.50 | 0.50 | 0.53 | 0.53 | 0.56 | 0.56 | 0.58 | 0.61 | 0.61 | 0.64 | 0.66 | 0.66 | 0.69 | 0.71 | 0.71 | 0.74 | 0.76 | 0.78 | 0.81 | 0.81 | 0.83 |
| [22] | Capex GHG - Gas | - | - | - | - | - | 1.70 | 1.70 | 1.77 | 1.77 | 1.84 | 1.84 | 1.92 | 1.99 | 1.99 | 2.06 | 2.14 | 2.14 | 2.21 | 2.29 | 2.29 | 2.36 | 2.44 | 2.52 | 2.59 | 2.59 | 2.67 |
| [23] | **Total Capex** | **0.23** | **0.00** | **0.00** | **0.00** | **0.00** | **117.20** | **2.20** | **2.30** | **2.30** | **2.40** | **2.40** | **2.50** | **2.60** | **2.60** | **2.70** | **2.80** | **2.80** | **2.90** | **3.00** | **3.00** | **3.10** | **3.20** | **3.30** | **3.40** | **3.40** | **3.50** |
| [24] | **Annual Cash Flow ($M)** | **$36.25** | **$49.10** | **$61.74** | **$67.10** | **$73.88** | **($28.30)** | **$84.42** | **$85.24** | **$88.95** | **$89.02** | **$84.61** | **$81.86** | **$82.22** | **$84.07** | **$85.21** | **$83.93** | **$82.44** | **$79.54** | **$77.30** | **$79.54** | **$77.10** | **$72.89** | **$69.93** | **$69.28** | **$68.11** | **$65.75** |
| [25] | **After-Tax Annual Cash Flow ($M, at 37.7%)** | **$22.59** | **$30.59** | **$38.47** | **$41.80** | **$46.02** | **($17.63)** | **$52.59** | **$53.10** | **$55.42** | **$55.46** | **$52.71** | **$51.00** | **$51.23** | **$52.37** | **$53.09** | **$52.29** | **$51.36** | **$49.55** | **$48.16** | **$49.55** | **$48.03** | **$45.41** | **$43.57** | **$43.16** | **$42.43** | **$40.96** |

| | Results ($M) | | |
|---|---|---|---|
| [26] | After-Tax Discount Rate | 5.5% | 8.0% |
| [27] | **After-Tax Net Present Value** | **$609** | **$480** |
| [28] | Weighted Average Depreciation Tax Shield | 25.9% | 22.7% |
| [29] | **Fair Value** | **$766** | **$589** |
| [30] | Net Book Value | $1,280 | $1,280 |
| [31] | Pre-Tax Impairment Charge | ($514) | ($691) |
| [32] | **After-Tax Impairment Charge** | **($320)** | **($430)** |

**Exhibit 3**
**2015 Mobile Bay Discounted Cash Flow Model**
**High Price Case**

**Notes:**

[1]  Liquids Production Total is shown in thousands of barrels per day.

[2]  Gas Available For Sale Total is shown in millions of cubic feet per day.

[3]  Inflation Rate is 2.5% compounded annually.

[4]  Henry Hub (Real) prices are shown in dollars per thousand cubic feet. Henry Hub (Real) prices are an average of third-party price outlooks as of 2015 from WoodMac, CERA, PIRA, and the U.S. Energy Information Administration ("EIA"). WoodMac, CERA, and PIRA price outlooks as of 2015 for 2031–2040 were not produced in this matter, and are instead assumed to equal those for 2030. The EIA price outlook as of 2015 is from the EIA website in nominal terms and deflated to real terms using ExxonMobil's inflation rate of 2.5%.

[5]  Henry Hub (Nom) prices are shown in dollars per thousand cubic feet and calculated as $[3] \times [4]$.

[6]  Gas Price (Nom) (5% Premium) is shown in dollars per thousand cubic feet and calculated as $1.05 \times [5]$. In 2015, ExxonMobil applied a premium factor to its nominal prices for Henry Hub in order to calculate its prices for Mobile Bay's gas production. As Mobile Bay gas production had historically traded at approximately 105% of the third-party market price of gas, ExxonMobil multiplied the nominal Henry Hub price for each year by 105%.

[7]  Brent (Real) prices are shown in dollars per barrel. Brent (Real) prices are an average of third-party price outlooks as of 2015 from CERA, PIRA, FGE, and EIA. Price outlooks from FGE as of 2015 for 2031–2040 and PIRA as of 2015 for 2036–2040 were not produced in this matter, and are instead assumed to equal that of 2030 and 2035, respectively. The EIA price outlook as of 2015 is from the EIA website in nominal terms and deflated to real terms using ExxonMobil's inflation rate of 2.5%.

[8]  Brent (Nom) prices are shown in dollars per barrel and calculated as $[3] \times [7]$.

[9]  Liquids Price (Nom) (75% Discount) is shown is dollars per barrel and calculated as $0.25 \times [8]$. In 2015, ExxonMobil applied a discount factor to its nominal prices for Brent in order to calculate its prices for Mobile Bay's liquid production. As Mobile Bay liquid production had historically traded at approximately 25% of the third-party market price of oil, ExxonMobil multiplied the nominal Brent price for each year by 25%.

[10]  Liquids Revenue is shown in millions of dollars and calculated as $0.36525 \times [1] \times [9]$. ExxonMobil multiplied liquid production and price by 0.36525 in order to convert to millions of dollars per year.

[11]  Gas Revenue is shown in millions of dollars and calculated as $0.36525 \times [2] \times [6]$. ExxonMobil multiplied gas production and price by 0.36525 in order to convert to millions of dollars per year.

[12]  GHG Revenue (Gas only) is shown in millions of dollars and calculated as $[18]+[22]$. Revenue associated with the GHG Emission Proxy Costs and capital expenditures attributed to GHGs that ExxonMobil could pass through to its natural gas customers in 2016 is assumed to apply in 2015 as well.

[13]  Total Revenue is shown in millions of dollars and calculated as $[10]+[11]+[12]$.

[14]  Cash Opex is shown in millions of dollars.

[15]  Estimated GHG Emissions are shown in millions of tons. As no contemporaneous source was produced for Mobile Bay's 2015 Estimated GHG Emissions, 2015 Estimated GHG Emissions are assumed to be equal to 2016 GHG emissions projections, which are calculated by dividing the GHG Estimated Costs in ExxonMobil's undiscounted cash flow model for its 2016 impairment testing of Mobile Bay by the Unit GHG Emission Proxy Costs from the 2016 Dataguide. The Unit GHG Emission Proxy Costs are inflated to nominal terms using ExxonMobil's 2.5% inflation rate, consistent with the inflation rate that ExxonMobil used in inflating Unit GHG Emission Proxy Costs for its 2016 impairment testing of its Southern North Sea and Central/Northern North Sea (U.K.) Assets, and consistent with the inflation assumptions in ExxonMobil's undiscounted cash flow model for its 2015 impairment testing of Mobile Bay.

[16]  Unit GHG Emission Proxy Cost is shown in dollars per ton. The 2015 Dataguide specifies that GHG emission proxy costs should be incorporated for assets in the United States beginning in 2020. No contemporaneous source was produced for third-party Unit GHG Emission Proxy Costs, and ExxonMobil's discounted cash flow model for its 2017 impairment testing of Mobile Bay does not contain fair value Unit GHG Emission Proxy Costs. As a result, I rely on third-party nominal Unit GHG Emission Proxy Costs from ExxonMobil's discounted cash flow model for its 2017 impairment testing of its Cross Timbers Energy asset to estimate fair value Unit GHG Emission Proxy Costs in 2015. To estimate this, I first calculate the ratio of these third-party nominal Unit GHG Emission Proxy Costs to the Unit GHG Emission Proxy Costs from ExxonMobil's 2017 Dataguide, inflated by 2.5%. I then apply this ratio to the Unit GHG Emission Proxy Costs from ExxonMobil's 2015 Dataguide, inflated by 2.5%, consistent with the inflation rate that ExxonMobil used in its 2015 undiscounted cash flow model. ExxonMobil's discounted cash flow model for its 2017 impairment testing of its Cross Timbers Energy did not contain third-party nominal Unit GHG Emission Proxy Costs for the years 2020 through 2023. For these years, I apply the ratio calculated in 2024 to the Unit GHG Emission Proxy Costs from ExxonMobil's 2015 Dataguide, inflated by 2.5%.

[17]  GHG Estimated Costs - Liquids are shown in millions of dollars and calculated as $[1]/([1]+([2]/6)) \times [15] \times [16]$. In calculating GHG Estimated Costs - Liquids, ExxonMobil multiplied the Total GHG Estimated Costs ($[15] \times [16]$) by the ratio of liquid production to total liquid and gas production for that year. ExxonMobil divided Gas Available For Sale Total by six in order to standardize its units with Liquids Production Total, as ExxonMobil used the conversion rate of 6 million cubic feet = 1 thousand barrels.

[18]  GHG Estimated Costs - Gas are shown in millions of dollars and calculated as $(([2]/6)/([1]+([2]/6))) \times [15] \times [16]$. In calculating GHG Estimated Costs - Gas, ExxonMobil multiplied the Total GHG Estimated Costs ($[15] \times [16]$) by the ratio of gas production to total liquid and gas production for that year. ExxonMobil divided Gas Available For Sale Total by six in order to standardize its units with Liquids Production Total, as ExxonMobil used the conversion rate of 6 million cubic feet = 1 thousand barrels.

[19]  Total Opex is shown in millions of dollars and calculated as $[14]+[17]+[18]$.

[20]  Capex is shown in millions of dollars.

[21]  Capex GHG - Liquids is shown in millions of dollars and calculated as $[1]/([1]+([2]/6)) \times$ [Capex GHG from ExxonMobil's undiscounted cash flow model for its 2016 impairment testing of Mobile Bay]. In calculating Capex GHG - Liquids, ExxonMobil multiplied the Capex GHG by the ratio of liquid production to total liquid and gas production for that year. ExxonMobil divided Gas Available For Sale Total by six in order to standardize its units with Liquids Production Total, as ExxonMobil used the conversion rate of 6 million cubic feet = 1 thousand barrels. As no contemporaneous source was produced for Mobile Bay's 2015 Capex GHG, 2015 Capex GHG is assumed to be equal to the 2016 Capex GHG in ExxonMobil's undiscounted cash flow model for its 2016 impairment testing of Mobile Bay.

[22]  Capex GHG - Gas is shown in millions of dollars and calculated as $(([2]/6)/([1]+([2]/6))) \times$ [Capex GHG from ExxonMobil's undiscounted cash flow model for its 2016 impairment testing of Mobile Bay]. In calculating Capex GHG - Gas, ExxonMobil multiplied the Capex GHG by the ratio of gas production to total liquid and gas production for that year. ExxonMobil divided Gas Available For Sale Total by six in order to standardize its units with Liquids Production Total, as ExxonMobil used the conversion rate of 6 million cubic feet = 1 thousand barrels. As no contemporaneous source was produced for Mobile Bay's 2015 Capex GHG, 2015 Capex GHG is assumed to be equal to the 2016 Capex GHG in ExxonMobil's undiscounted cash flow model for its 2016 impairment testing of Mobile Bay.

[23]  Total Capex is shown in millions of dollars and calculated as $[20]+[21]+[22]$.

[24]  Annual Cash Flow is shown in millions of dollars and calculated as $[13]-[19]-[23]$.

[25]  After-Tax Cash Flow is shown in millions of dollars and calculated as $(1-0.377) \times [24]$. The Statutory Tax Rate on Mobile Bay is assumed to be 37.7%, consistent with the statutory tax rate used in ExxonMobil's discounted cash flow models for its 2016 impairment testing of its Heidelberg and Ram projects.

[26]  After-Tax Discount Rates are assumed to be 5.5% and 8.0%, consistent with ExxonMobil's methodology for its 2016 and 2017 impairment testing.

[27]  After-Tax Net Present Value is shown in millions of dollars and calculated as the net present value of the after-tax annual cash flows at the After-Tax Discount Rates of 5.5% and 8.0%.

[28]  Weighted Average Depreciation Tax Shield is assumed to equal 80% of the tax shield resulting from production-based depreciation and 20% of the tax shield resulting from 7-year accelerated straight line depreciation, consistent with the methodology used in ExxonMobil's discounted cash flow model for its 2017 impairment testing of Mobile Bay. Both tax shields are calculated using Liquids Production Total, Gas Available for Sale Total, the statutory tax rate on Mobile Bay of 37.7%, and After-Tax Discount Rates of 5.5% and 8.0%.

[29]  Fair Value is shown in millions of dollars and calculated as $[27] \times (1+[28])$.

[30]  Net Book Value is shown in millions of dollars.

[31]  Pre-Tax Impairment Charge is shown in millions of dollars and calculated as $[29]-[30]$.

[32]  After-Tax Impairment Charge is shown in millions of dollars and calculated as $(1-0.377) \times [31]$.

**App. 294**

**Exhibit 3**
**2015 Mobile Bay Discounted Cash Flow Model**
**High Price Case**

Sources:

(a)  PwC's Undiscounted Cash Flow Model for its Audit of ExxonMobil's 2015 Impairment Testing of Mobile Bay, PNYAG0002790.

(b)  ExxonMobil's Undiscounted Cash Flow Model for its 2016 Impairment Testing of Mobile Bay, PNYAG0263352.

(c)  Third-Party Brent and Henry Hub Price Outlooks as of 2015, PNYAG0040606.

(d)  ExxonMobil's Discounted Cash Flow Model for its 2017 Impairment Testing of Mobile Bay, PNYAG0592715.

(e)  ExxonMobil's Discounted Cash Flow Models for its 2016 Impairment Testing of Heidelberg and Ram, PNYAG0493794.

(f)  ExxonMobil's 2016 Asset Recoverability Fair Value Review Presentation, December 16, 2016, PNYAG0395764-788 at 771.

(g)  ExxonMobil's 2017 Asset Recoverability Fair Value Review Presentation, January 12, 2018, PNYAG0601281-316 at 289, 291, and 293.

(h)  "Greenhouse Gas Emissions Budget and Project Considerations," Revision 4 of the Appendix to the ExxonMobil 2015 Corporate Plan Dataguide, p. 31.

(i)  "Greenhouse Gas Emissions Budget and Project Considerations," Revision 1 of the Appendix to the ExxonMobil 2016 Corporate Plan Dataguide, p. 32.

(j)  Revision 4 of the ExxonMobil 2017 Corporate Plan Dataguide, PNYAG0590859, p. 14.

(k)  ExxonMobil's 2017 Discounted Cash Flow Model for Cross Timbers Energy, PNYAG0600946.

(l)  ExxonMobil's Undiscounted Cash Flow Model for its 2016 Impairment Testing of its Southern North Sea and Central/Northern North Sea (U.K.) Assets, PNYAG0425500.

(m)  ExxonMobil, "ExxonMobil Earns $16.2 Billion in 2015; $2.8 Billion During Fourth Quarter," February 2, 2016, available at https://news.exxonmobil.com/press-release/exxonmobil-earns-162-billion-2015-28-billion-during-fourth-quarter, accessed on April 8, 2019.

(n)  U.S. Energy Information Administration, Annual Energy Outlook 2015, Natural Gas Supply, Disposition, and Prices, available at https://www.eia.gov/outlooks/aeo/data/browser/#/?id=13-AEO2015&cases=ref2015&sourcekey=0, accessed on April 15, 2019.

(o)  U.S. Energy Information Administration, Annual Energy Outlook 2015, Petroleum and Other Liquids Prices, available at https://www.eia.gov/outlooks/aeo/data/browser/#/?id=12-AEO2015&cases=ref2015&sourcekey=0, accessed on April 15, 2019.

FILED: NEW YORK COUNTY CLERK 10/04/2019 11:17 PM INDEX NO. 452044/2018

NYSCEF DOC. NO. 362    Case 3:16-cv-03111-K    Document 121    Filed 07/31/20    Page 301 of 544    PageID 4553    RECEIVED NYSCEF: 10/04/2019

**Exhibit 4**
**Corrective Disclosure Dates for ExxonMobil**
*April 1, 2014 to October 24, 2018*

| # | Date[1] | Event Description[2] | Price[3] | Return[3] | Dollar Change |
|---|---------|----------------------|----------|-----------|---------------|
| 1. | 11/05/15 | [15:21] The NYAG announces an investigation into ExxonMobil for misleading the public about climate change. | $84.81 | (1.36%) | -$1.17 |
| 2. | 01/20/16 | [06:00] The California Attorney General's office formally announces its investigation into ExxonMobil. | $73.18 | (4.21%) | -$3.22 |
| 3. | 03/29/16 | [12:31] The State Attorneys General of the US Virgin Islands and Massachusetts launch their investigations into ExxonMobil. | $84.53 | 0.37% | $0.31 |
| 4. | 09/16/16 | [05:30] Dow Jones announces that the NYAG is investigating ExxonMobil's accounting practices related to its oil asset pricing. | $84.03 | (1.23%) | -$1.05 |
| 5. | 09/20/16 | [13:16] The SEC formally opens its investigation regarding ExxonMobil's accounting practices related to climate change regulations. | $82.54 | (1.54%) | -$1.29 |
| 6. | 06/02/17 | [07:55] In a court filing, the NYAG accuses ExxonMobil of misleading investors and files a motion to compel against ExxonMobil. | $79.50 | (1.49%) | -$1.20 |
| 7. | 08/03/18 | [12:45] The SEC drops its probe of ExxonMobil. | $80.20 | 0.36% | $0.29 |
| 8. | 10/24/18 | [13:09] The NYAG files its complaint against ExxonMobil. | $77.62 | (2.78%) | -$2.22 |

**App. 296**

**Notes:**

[1] For an explanation of the process used to identify corrective disclosure dates, see Section V.B of my report.

[2] All times are displayed in Eastern Time.

[3] "Price" is ExxonMobil's unadjusted closing price on the corrective disclosure date. "Return" is calculated as the daily percentage change in ExxonMobil's closing price using dividend adjusted stock prices. There were no other notable corporate actions (*i.e.* , stock splits), besides dividends, from April 1, 2014 to October 24, 2018.

**Sources:**

(a) Theflyonthewall.com, "15:21 EDT Exxon Mobil 'assessing response' to NY subpoena, CNBC reportsThe…," *Theflyonthewall.com* , November 5, 2015.

(b) Penn, Ivan, "California to investigate whether Exxon Mobil lied about climate-change risks," *Los Angeles Times* , January 20, 2016.

(c) Reuters News, "Massachusetts to launch probe of Exxon's climate change disclosures," *Reuters* , March 29, 2016.

(d) Reuters News, "NEW YORK ATTORNEY GENERAL ERIC SCHNEIDERMAN CONFIRMS THAT VIRGIN ISLANDS ALSO PLANS TO INVESTIGATE EXXON OVER CLIMATE CHANGE," *Reuters* , March 29, 2016.

(e) Olson, Bradley, "Exxon's Accounting Practices Are Investigated by New York Attorney General," *Dow Jones Newswires* , September 16, 2016.

(f) Dow Jones Institutional News, "SEC Investigating Exxon on Climate Change, Accounting Practices," *Dow Jones Newswires* , September 20, 2016.

(g) Dow Jones Institutional News, "New York AG Alleges Exxon Misled Investors on Climate," *Dow Jones Newswires* , June 2, 2017.

(h) Theflyonthewall.com, "12:45 EDT SEC ends Exxon Mobil accounting probe with no action taken, Bloomberg...," *Theflyonthewall.com* , August 3, 2018.

(i) Schwartz, John, "New York Sues Exxon Mobil, Saying It Deceived Shareholders on Climate Change," *The New York Times* , October 24, 2018.

(j) Factiva.

(k) Bloomberg LP.

**App. 297**

**Exhibit 5**
**Summary of Abnormal Returns on Corrective Disclosure Dates**
*Regression Period: 1 Year Prior to Each Event*

| # | Date[1] | Event Description[2] | Price[3] | Return[3] | Market Model[3][4] Abnormal Dollar Return | Market Model[3][4] Abnormal Percent Return |
|---|---------|----------------------|----------|-----------|------------------------|------------------------|
| 1. | 11/05/15 | [15:21] The NYAG announces an investigation into ExxonMobil for misleading the public about climate change. | $84.81 | (1.36%) | -$0.87 | (1.01%) [0.218] |
| 2. | 01/20/16 | [06:00] The California Attorney General's office formally announces its investigation into ExxonMobil. | $73.18 | (4.21%) | -$1.64 | (2.14%) ** [0.020] |
| 3. | 03/29/16 | [12:31] The State Attorneys General of the US Virgin Islands and Massachusetts launch their investigations into ExxonMobil. | $84.53 | 0.37% | -$0.07 | (0.08%) [0.935] |
| 4. | 09/16/16 | [05:30] Dow Jones announces that the NYAG is investigating ExxonMobil's accounting practices related to its oil asset pricing. | $84.03 | (1.23%) | -$0.65 | (0.76%) [0.439] |
| 5. | 09/20/16 | [13:16] The SEC formally opens its investigation regarding ExxonMobil's accounting practices related to climate change regulations. | $82.54 | (1.54%) | -$1.45 | (1.72%) * [0.082] |
| 6. | 06/02/17 | [07:55] In a court filing, the NYAG accuses ExxonMobil of misleading investors and files a motion to compel against ExxonMobil. | $79.50 | (1.49%) | -$1.16 | (1.43%) * [0.051] |
| 7. | 08/03/18 | [12:45] The SEC drops its probe of ExxonMobil. | $80.20 | 0.36% | $0.20 | 0.24% [0.763] |
| 8. | 10/24/18 | [13:09] The NYAG files its complaint against ExxonMobil. | $77.62 | (2.78%) | -$0.64 | (0.80%) [0.353] |
| | **Adjusted R-squared Range:** | | | | | 0.398 - 0.645 |

**Notes:**

[1] For an explanation of the process used to identify corrective disclosure dates, see Section V.B of my report.

[2] All times are displayed in Eastern Time.

[3] "Price" is ExxonMobil's unadjusted closing price on the corrective disclosure date. "Return" is calculated as the daily percentage change in ExxonMobil's closing price using dividend adjusted stock prices. "Abnormal Percent Return" is also calculated using dividend adjusted stock prices. There were no other notable corporate actions (*i.e.*, stock splits), besides dividends, from April 1, 2014 to October 24, 2018.

[4] ExxonMobil's abnormal returns are defined as the difference between ExxonMobil's actual return and the expected return predicted by my Market Model.

[5] The numbers in square brackets indicate the p-value with regard to the Student's t-test used to determine the statistical significance of the abnormal returns.

[6] *** indicates statistical significance at the 1% significance level, ** at the 5% significance level, and * at the 10% significance level.

**Sources:**

(a) Factiva.

(b) Bloomberg LP.

**App. 298**

## Exhibit 6
## Inflation in ExxonMobil's Stock Price

| Inflation Period | Significant Corrective Disclosure Date | Previous Day's Closing Price | Actual Percentage Return | Abnormal Percentage Return | Estimated Per-Share Inflation |
|---|---|---|---|---|---|
| *5% Significance Level* | | | | | |
| April 1, 2014 - January 19, 2016 | January 20, 2016 | $76.40 | -4.21% | -2.14% | $1.64 |
| *10% Significance Level* | | | | | |
| April 1, 2014 - January 19, 2016 | January 20, 2016 | $76.40 | -4.21% | -2.14% | $4.25 |
| January 20, 2016 - September 19, 2016 | September 20, 2016 | $83.83 | -1.54% | -1.72% | $2.61 |
| September 20, 2016 - June 1, 2017 | June 02, 2017 | $80.70 | -1.49% | -1.43% | $1.16 |

**Notes:**

[1] For a given Inflation Period, Estimated Per-Share Inflation is calculated as the sum of Previous Day's Closing Price times Abnormal Percentage Return across each Significant Corrective Disclosure Date after that Inflation Period.

[2] "Previous Day's Closing Price" is ExxonMobil's unadjusted closing price the day before the Significant Corrective Disclosure Date. "Actual Percentage Return" is calculated as the daily percentage change in ExxonMobil's closing price using dividend adjusted stock prices. "Abnormal Percent Return" is also calculated using dividend adjusted stock prices. There were no other notable corporate actions (*i.e.*, stock splits), besides dividends, from April 1, 2014 to October 24, 2018.

[3] ExxonMobil's abnormal returns are defined as the difference between ExxonMobil's actual return and the expected return predicted by my Market Model.

**Sources:**

(a) Bloomberg LP.
(b) Factiva.

**App. 299**

## Exhibit 7
## Inflation in ExxonMobil's Market Capitalization

| Inflation Period | Significant Corrective Disclosure Date | Estimated Per-Share Inflation | ExxonMobil's Shares Outstanding (thousands) | Inflation in ExxonMobil's Market Capitalization ($ billions) |
|---|---|---|---|---|
| | | [A] | [B] | [C] = [A] × [B] |
| *5% Significance Level* | | | | |
| April 1, 2014 - January 19, 2016 | January 20, 2016 | $1.64 | 4,204,027 | $6.89 |
| | | | | |
| *10% Significance Level* | | | | |
| April 1, 2014 - January 19, 2016 | January 20, 2016 | $4.25 | 4,204,027 | $17.87 |
| January 20, 2016 - September 19, 2016 | September 20, 2016 | $2.61 | 4,189,571 | $10.93 |
| September 20, 2016 - June 1, 2017 | June 02, 2017 | $1.16 | 4,266,423 | $4.95 |

**Notes:**

[1] Shares outstanding is net of insider holdings, includes short interest, and is as of each Significant Corrective Disclosure Date.

[2] Insider holdings data corresponds to the shares held by "Strategic Entities" and is obtained from Thomson One. Insider holdings data is only available as of the end of each calendar quarter; therefore, insider holdings data is as of the most recent calendar quarter end.

[3] Short Interest data is as of the most recent available date.

**Sources:**

(a) Bloomberg LP.

(b) Factiva.

(c) Thomson One.

**App. 300**

# Appendix A

## Curriculum Vitae and Prior Expert Testimony of Eli Bartov

*ELI BARTOV*

*Professor of Accounting*
*New York University*
*Leonard N. Stern School of Business*
*44 West 4th Street, Suite 10-96*
*New York, NY 10012*
*(212) 998-0016*
*ebartov@stern.nyu.edu*
*http://www.stern.nyu.edu/~ebartov/*

## DEGREES AND CERTIFICATES:

❖ Ph.D., Business Administration (Concentration in Accounting), Graduate School of Business Administration, University of California at Berkeley, 1985 – 1989.

❖ B.A., Accounting and Economics, Faculty of Management and Faculty of Social Sciences, Tel - Aviv University, Israel, 1974 – 1977.

❖ C.P.A. (Israel), 1979.

## ACADEMIC AFFILIATIONS:

❖ Professor of Accounting, Leonard N. Stern School of Business, New York University (at Stern since 1992), 2001 – Present.

❖ Visiting Associate Professor, Anderson Graduate School of Management, UCLA, Fall 1998.

❖ Visiting Assistant Professor, Walter A. Haas School of Business, University of California at Berkeley, Spring 1996.

❖ Assistant Professor, William E. Simon Graduate School of Business Administration, University of Rochester, 1989 - 1992.

## AWARDS, GRANTS, AND HONORS:

Recipient of the Executive MBA Class of August 2018 "Great Professor" award.

Recipient of the Executive MBA Class of August 2017 "Great Professor" award.

Recipient of the Executive MBA Class of August 2016 "Great Professor" award.

**App. 302**

Recipient of the Executive MBA Class of August 2015 "Great Professor" award.

KPMG Faculty Fellow, Leonard N. Stern School of Business, New York University, September 2014 – August 2017.

Recipient of the Executive MBA Class of August 2014 "Great Professor" award.

Recipient of the Executive MBA Class of August 2010 "Excellence in Teaching" award.

Research Professorship, Leonard N. Stern School of Business, New York University, September 2004 – August 2014.

Peat Marwick Faculty Fellowship, Leonard N. Stern School of Business, New York University, September 2001 – August 2004.

Andre Meyer Faculty Fellowship, Leonard N. Stern School of Business, New York University, September 1998 - August 2001.

Member of "Club 6" of NYU's Stern School of Business - Undergraduate College (excellence in teaching), Fall 1997 and Fall 1999.

Listed in the 30*th* Edition (1998) of *Who's Who in Finance and Industry*. New Providence, NJ: Marquis Who's Who®.

Member of "6.0 Club" of UC Berkeley's Haas School of Business (high student evaluations of teaching), Spring 1996.

PAC-10 Doctoral Consortium Fellow, February 1989.

Coopers & Lybrand Foundation Doctoral student fellowship, August 1986 - June 1989.

Graduate School Grants and Waivers, University of California at Berkeley, August 1985 - June 1989.

Doctoral Student Fellowship, University of California at Berkeley, August 1985 - June 1986.

The Rector's Honor List, Tel - Aviv University, September 1974 - June 1975.

The Dean's Honor List, Tel - Aviv University, September 1974 - June 1975.

**App. 303**

## PROFESSIONAL BUSINESS EXPERIENCE:

❖ Investment management: advising money managers and financial analysts on financial reporting, analysis, valuation, and quantitative trading strategies, 1996 - Present.

❖ Litigation support: consulting and testifying on issues related to financial reporting, executive compensation, insider trading, and valuation in securities fraud cases, contract disputes, and other litigation, 1996 – Present.

**Matters for which I provided an expert report and testified at deposition:**

United States Securities and Exchange Commission v. Mathias Francisco Sandoval Herrera, Maria D. Cidre, and Jose Antonio Miranda Gonzalez, United States District Court, Southern District of Florida, Miami Division. 2018.

PETCO Corporation Securities Litigation, United States District Court, Southern District of California, Case No. 05-CV-0823-H(RBB). 2008.

BASF Corporation v. Lyondell Chemical Company, Superior Court of New Jersey Law Division: Morris County, Docket No. MRS-L-01069-05. 2007.

Plumbers & Pipefitters National Pension Fund, et al. v. Cisco Systems, Inc., et al. United States District Court, Northern District of California, Case No. C-01-20418-JW (PVT). 2006.

**Lawsuits for which I served as a consultant, provided expert report, and/or testified:**

The State of Israel v. Dead Sea Works, Ltd. Arbitration, 2013. (Expert report and testimony at arbitration hearing.)

Amy Velez, et al., v. Novartis Pharmaceuticals Corporation, Novartis Corporation, and Thomas Ebeling, Case No. 04-cv-9194, United States District Court, Southern District of New York, Manhattan Division. 2010. (Consultation.)

Donna Binetti, Individually and on behalf of a class of all other persons similarly situated, v. Washington Mutual Bank, f/k/a Washington Mutual Bank, FA, United States District Court, Southern District Of New York, Docket No. 06 Civ. 1732 (KMK). (Consultation and fairness certification.)

United States of America v. Mitchel Guttenberg and David Tavdy, United States District Court, Southern District of New York, 2007. (Consultation.)

**App. 304**

The Comptroller of the State of New York as Trustee of the Common Retirement Fund v. General Growth Properties, Inc., 2007. (Expert report for arbitration hearing.)

New York Career Guidance Services v. Wells Fargo, Superior Court of New Jersey, Docket No. BER-L-1705-03. 2005. (Consultation.)

Stephen G. Gerzof and Richard E. Gerzof v. Lerner Sibling Partnership and FMV Smithtown Associates, Supreme Court of the State of New York, County of Nassau, Index No. 00-020703. (Consultation and affidavit.)

Tomas Greenberger et al., on Behalf of Themselves and All Others Similarly Situated v. Copelco Capital, Inc. and Copelco Credit Corp., Superior Court of New Jersey Law Division: Bergen County, Docket No. L-3107-98. 2001. (Expert report and testimony at mediation hearing.)

Michael Nasoff et al., on Behalf of Themselves and All Others Similarly Situated v. General Electric Corporation, General Electric Capital Auto Lease, Inc., and General Electric Capital Auto Financial Services, Inc., State of New York, Supreme Court of County of New York, Index No. 97/605609. 1999. (Expert report.)

Vincent L. Promuto et al., v. Waste Management, Inc., United States District Court, Southern District of New York, Index No. 98 Civ. 3552 (wcc). 1999. (Consultation.)

❖ Eli Bartov C.P.A. (Israel), 1979 - 1985. Self-employed. I was involved primarily in auditing, tax planning, and designing financial accounting systems for small- to medium-size business organizations.

❖ Sagi & Co. C.P.A.s (Israel), 1977 - 1979.


**RESEARCH INTERESTS:**

Employee stock options
Executive compensation
Insider trading
Accounting restatements
Accounting fraud
U.S. GAAP
Accounting-based equity trading strategies
Earnings management
Earnings expectations management
Equity valuation


**App. 305**

Capital markets' use of accounting information
Transfer pricing
Financial Accounting
Managerial Accounting

## TEACHING:

❖ Undergraduate: Have taught an introductory financial accounting course.

❖ MBA: Have taught financial accounting and reporting, financial statement analysis, and international accounting & financial statement analysis courses.

❖ Executive MBA: Have taught financial accounting and reporting courses.

❖ Custom Executive Education Program: Have taught Finance and Accounting for Non-Finance Executives; Principles of Credit Analysis; International Accounting.

❖ Ph.D.: Have taught empirical accounting research courses, served as a member on several dissertation committees, and chaired six committees.

Chairman of Dissertation Committees:

Ertimur, Yonca (First appointment: Stanford University Graduate School of Business), "Financial information environment and loss firms." (Graduated in September 2003, NYU).

Faurel, Lucile (First appointment: University of California at Irvine, The Paul Merage School of Business), "Market Valuation of Corporate Investments: Acquisitions versus R&D and Capital Expenditures." (Graduated in May 2008, NYU).

Balakrishnan, Karthik (First appointment: University of Pennsylvania, Wharton School of Business), "Credit market conditions and economy wide consequences of financial reporting quality." (Graduated in May 2010, NYU).

Shih, Aimee (First appointment: National University of Singapore Business School), "Analyst Coverage Attributes and Benchmark Beating Strategies." (Graduated in September 2011, NYU).

**App. 306**

Park, Sorah (First appointment: Ewha Womans University, Seoul Korea), "Financial Reporting Consequences of Excess Stock Option Compensation: Masking Excessive Risk-Taking Behavior." (Graduated in September 2012, NYU).

Kadach, Igor (First appointment: University of Navarra, IESE Business School, Spain), "Mutual Fund Trading Pressure and Management Earnings Forecasts." (Graduated in May 2016, NYU).

## PRESENTATIONS:

Invited Presenter at Faculty Workshops:

I have presented papers at the following universities: Arizona (1989), Australian Graduate School of Management (1999), Bocconi School of Management – Milan (2008, 2012), British Columbia (1989, 2010), California at Berkeley-Haas (1992, 1996, 2012, 2018), Chicago (1989, 1992), Cincinnati (1999, 2008), City-Hong Kong (1997, 2003), Columbia (1991), Columbia's Burton Workshop (2004), Concordia (2013) Cornell-Johnson (2004), CUNY-Baruch (1996), Duke-Fuqua (1989), Emory (2001), Florida Atlantic (2006), Florida International (2015), Florida State (2004), Georgia State (1997), Hebrew-Israel (1995, 1998, 2003, 2013), Houston (2002), Indiana-Kelley (2005), Kent State (1997), Minnesota-Carlson (2003), MIT-Sloan (1989, 1993, 1996, 2002), Nanyang Technological-Singapore (2000), National University of Singapore (2011, 2014), Northwestern-Notre Dame (2008), Kellogg (1989), New York-Stern (1989, 1991), Penn State (1999), Pennsylvania-Wharton (1994), Hong Kong Polytechnic-School of Accounting and Finance (2004, 2015, 2017), Rochester-Simon (1989, 2000), Rutgers-Camden (1994), Singapore Management (2005), SUNY at Buffalo (1991, 1994, 1998), Syracuse-Whitman (2011) Technology Sydney-Australia (2006, 2008, 2011, 2015), Tel-Aviv-Israel (1995, 1997), Temple University Fox School of Business (2013), Texas-Austin (1996), Toronto-Rotman (2003, 2011), UC Irvine Paul Merage School of Business (2010), UCLA-Anderson (1998), USC-Leventhal School of Accounting (1998), Washington St. Louis-Olin (1989, 1997, 2001), Windsor-Odette School of Business (2014).

Invited Contributor at Academic Conferences:

Invited Speaker, 2017 Cass Business School and CeFARR conference: "Corporate Communication Through Social Media, Financial Portals and Corporate Pages-trends, Challenges and the Future," London, England, September 15, 2017, "Can Twitter Help Predict Firm-Level Earnings and Stock Returns?"

**App. 307**

Key Note Speaker, The 2017 Journal of Contemporary Accounting and Economic Annual Symposium, Taipei, Taiwan, January 2017, "The Role Social Media Plays in the Capital Markets"

Invited Speaker, The 2017 Journal of Contemporary Accounting and Economic Doctoral Consortium: Earnings Management, Taipei, Taiwan, January 2017

Discussant, The 13th Annual Conference in Financial Economics Research by Eagle Labs, Arison School of Business Interdisciplinary Center, Herzliya, Israel, May 2016.

Invited Plenary Session Speaker, Journal of Contemporary Accounting and Economics and Seoul National University Joint Symposium: Quantitative and Qualitative Information and Stock-Price Anomalies, Seoul, South Korea, January 2010.

Invited Speaker, University of Cincinnati's College of Business 2009 Research Symposium: Global Corporate Governance, Cincinnati, Ohio, February 2009.

Panel Chair, HKICPA / JCAE Practitioners Forum: Is Fair Value Accounting to Blame for the Current Crisis?  Hong Kong, China, January 2009.

Invited Speaker, University of Technology Sydney School of Accounting's 32nd Distinguished International Visitors Lecture Series, Sydney, Australia, November 2008.

Invited Speaker, Journal of Contemporary Accounting & Economics Doctoral Consortium, Hong Kong, China, January 2008.

Invited Speaker, 2nd Journal of Contemporary Accounting & Economics Symposium, Hong Kong, China, January 2007.

Session Chair, 17th Conference on Financial Economic and Accounting, Atlanta, Georgia, November 2006.

Invited Panelist, Academe Meets Practice, Baruch College, November 2006.

Invited Speaker, Journal of Contemporary Accounting & Economics Doctoral Consortium, Xiamen, China, January 2006.

Invited Speaker, Asia-Pacific Journal of Accounting & Economics Doctoral Consortium, Guangzhou, China, January 2005.

**App. 308**

Discussant, 6th Asia-Pacific Journal of Accounting & Economics Symposium, Guangzhou, China, January 2005.

Invited Speaker, 5th Asia-Pacific Journal of Accounting & Economics Symposium, Kuala Lumpur, Malaysia, January 2004.

Discussant, 5th Asia-Pacific Journal of Accounting & Economics Symposium, Kuala Lumpur, Malaysia, January 2004.

Invited Speaker, Asia-Pacific Journal of Accounting & Economics Doctoral Consortium, Shanghai, China, January 2003.

Discussant, 4th Asia-Pacific Journal of Accounting & Economics Symposium, Shanghai, China, January 2003.

Invited Participant, The 2002 Journal of Accounting and Economics Conference, MIT, Cambridge, Massachusetts, October 2002.

Invited Participant, American Accounting Association's 2000-2001 Financial-Reporting-Issues Conference, Norwalk, Connecticut, December 2001.

Session Chair, 3rd Asia-Pacific Journal of Accounting & Economics Symposium, Hong Kong, January 2001.

Invited Participant, American Accounting Association's 1999-2000 Financial-Reporting-Issues Conference, Norwalk, Connecticut, December 2000.

Co-chair, the 2000 *JAAF* – KPMG Peat Marwick Conference: "The Economics of Financial Statements – Earnings Expectations," Montvale, New Jersey, August 2000.

Invited Participant, the 2000 Journal of Accounting Research Conference, University of Chicago, Chicago, Illinois, May 2000.

Invited Participant, The 2000 Journal of Accounting and Economics Conference, University of Rochester, Rochester, New York, April 2000.

Discussant, 2nd Asia-Pacific Journal of Accounting & Economics Symposium, Hong Kong, January 2000.

Session Moderator, 1999 AAA Annual Meeting, San Diego, California, August 1999.

**App. 309**

Discussant, 1st <u>Asia-Pacific Journal of Accounting & Economics</u> Symposium, Hong Kong, January 1999.

Session Chair, Ninth Annual Conference on Financial Economics and Accounting, New York University, New York, New York, November 1998.

Discussant, The Third Annual Conference on Financial Economics and Accounting, New York University, New York, New York, November 1992.

Session Moderator, 1991 KPMG Peat Marwick / John M. Olin Conference, Managerial Incentives and Corporate Performance: Effects of Executive Compensation, Organizational Structure, Takeovers, and Government Policy, University of Rochester, Rochester, New York, November 1991.

<u>Invited Presenter at Professional Money Managers In-House and Conferences</u>:

Invited Speaker, CFO Agorà, Milan, Italy, February 2008.

Invited Speaker, Davidson Kempner Partners, London, United Kingdom, August 2006.

Invited Speaker, Fidelity International, London, United Kingdom, August 2006.

Invited Speaker, Fidelity Investments, Boston, Massachusetts, November 2005.

Invited Speaker, Wellington Management, Boston, Massachusetts, November 2005.

Invited Speaker, Susquehanna International Group LLP Accounting Research Conference, New York, New York, March 2004.

Invited Speaker, Schroder Salomon Smith Barney's Annual Quantitative Research Conference, Lausanne, Switzerland, February 2001.

Invited Speaker, Prudential's Fifteenth Annual Quantitative Research Conference, Boston, Massachusetts, December 2000.

Invited Speaker, The Center for Investment Research's Sixth Annual Corporate Earnings Analysis Seminar, New York, New York, June 2000.

Invited Speaker, Spring 2000 Conference of the Chicago Quantitative Alliance, New York, New York, April 2000.

**App. 310**

Presentations at Academic Conferences:

The American Accounting Association (AAA) Annual Meeting, Washington DC, August 2018, "Corporate Social Responsibility and the Market Reaction to Negative Events: Evidence from Inadvertent and Fraudulent Accounting Announcements," (Presented by Antonio Marra).

The Asian Bureau of Finance and Economic Research 4th Annual Conference, Singapore, May 2016, "Can Twitter Help Predict Firm-Level Earnings and Stock Returns?"

The American Accounting Association (AAA) Annual Meeting, Atlanta, Georgia, August 2014, "Corporate social responsibility and the market pricing of corporate earnings," (Presented by Yan Li).

The Center of Corporate Governance and Financial Policy at Hong Kong Baptist University's International Corporate Governance Conference, Hong Kong, July 2014, "Corporate social responsibility and the market pricing of corporate earnings."

The Canadian Accounting Academic Association (CAAA) Annual Conference, Alberta, Canada, May 2014, "Corporate social responsibility and the market pricing of corporate earnings," (Presented by Yan Li).

The 2nd Asian Bureau of Finance and Economic Research (ABFER) Annual Conference, Singapore, May 2014, "The Pricing of Corporate Foreign Trade Risk."

American Accounting Association Annual Meeting, Washington, D.C., August 2012, "Location, Location, Location: An Empirical Investigation of Pre- and Post-SFAS No. 145 Market Reaction to Gains/Losses from Early Debt Extinguishment."

American Accounting Association Annual Meeting, New York, New York, August 2010, "Do Investors Use Executives' Stock Option Exercises as Signals for Future Firm Performance?  Evidence from the Post-SOX Era," (Presented by Lucile Faurel).

American Accounting Association Annual Meeting, New York, New York, August 2009, "Post Loss/Profit Announcement Drift."

American Accounting Association Annual Meeting, New York, New York, August 2009, "Is Qualitative Disclosure Informative?  Evidence from IPO Prospectus," (Presented by Karthik Balakrishnan).

**App. 311**

Discussant, the 2007 <u>Review of Accounting Studies</u> Conference, Tempe, Arizona, October 2007.

The 2004 <u>Journal of Accounting Research</u> Conference, University of Chicago, Chicago, Illinois, May 2004, "Stock Option Expense, Forward-Looking Information, and Implied Volatilities of Traded Options," (Presented by Doron Nissim).

American Accounting Association Annual Meeting, Honolulu, Hawaii, August 2003, "Risk, Mispricing, and Value Investing," (Presented by Myung-Sun Kim).

Discussant, the 2002 <u>Review of Accounting Studies</u> Conference, University of Michigan, Ann Harbor, Michigan, November 2002.

American Accounting Association Annual Meeting, San Antonio, Texas, August 2002, "Comparative Value Relevance among German, U.S., and International Accounting Standards: A German Stock Market Perspective," (Presented by Stephen Goldberg).

Australian Graduate School of Management's Accounting and Finance Research Camp, Sidney Australia, July 2002, "Comparative Value Relevance among German, U.S., and International Accounting Standards: A German Stock Market Perspective."

European Accounting Association Annual Meeting, Copenhagen, Denmark, April 2002, "Comparative Value Relevance among German, U.S., and International Accounting Standards: A German Stock Market Perspective," (Presented by Stephen Goldberg).

American Accounting Association Annual Meeting, Atlanta, Georgia, August 2001, "The Rewards for Meeting-or-Beating Earnings Expectations," (Presented by Dan Givoly).

The 2001 <u>Journal of Accounting Research</u> Conference, University of Chicago, Chicago, Illinois, May 2001, "Valuation of Internet Stocks – An IPO Perspective," (Presented by Partha Mohanram).

Joint Symposium of the Eleventh Annual Conference on Financial Economics and Accounting and the Seventh Mitsui Life Symposium on Global Financial Markets, University of Michigan, Ann Arbo,r Michigan, November 2000, "The Rewards for Meeting-or-Beating Earnings Expectations," (Presented by Dan Givoly).

**App. 312**

Joint Symposium of the Eleventh Annual Conference on Financial Economics and Accounting and the Seventh Mitsui Life Symposium on Global Financial Markets, University of Michigan, Ann Arbor, Michigan, November 2000, "Accruals management, investor sophistication, and equity valuation: Evidence from Form 10-Q Filings," (Presented by Steve Balsam).

American Accounting Association Annual Meeting, Philadelphia, Pennsylvania, August 2000, "Earnings quality, investor sophistication, and equity valuation: Evidence from Form 10-Q Filings," (Presented by Carol Marquardt).

Ninth Annual Conference on Financial Economics and Accounting, New York University, New York, New York, November 1998, "Discretionary Accruals Models, Audit Quality, and Audit Qualifications," (Presented by Judy Tsui).

American Accounting Association Annual Meeting, New Orleans, Louisiana, August 1998, "The Valuation-Relevance of Earnings and Cash Flows: an International Perspective," (Presented by Stephen Goldberg and Myung-Sun Kim).

Fourth Annual Accounting and Finance in Tel - Aviv 1998 Conference, August 1998, "Information, Transaction Costs, and Patterns in Stock Returns after Earnings Announcements."

American Accounting Association International Accounting Section 1998 Midyear Meeting, Chicago, Illinois, April 1998, "The Valuation-Relevance of Earnings and Cash Flows: an International Perspective."

The Conference on International Accounting Related Issues, School of Business, Rutgers University at Camden, New Jersey, May 1997, "Foreign Currency Exposure of Multinational Firms: Accounting Measures and Market Valuation."

Seventh Annual Conference on Financial Economics and Accounting, Rutgers University at New Brunswick, New Jersey, November 1996, "Stock Price Behavior Around Announcements of Write-offs."

The Sixth Annual Conference on Financial Economics and Accounting, University of Maryland at College Park, November 1995, "How Naive is the Stock Market's Use of Earnings Information?" (Presented by Ray Ball).

Second International Conference on Contemporary Accounting Issues, Taipei, Taiwan, July 1995, "Foreign Currency Exposure of Multinational Firms: Accounting Measures and Market Valuation."

**App. 313**

American Finance Association Annual Meeting, Washington, D.C., January 1995, "Exchange-Rate Variability and the Riskiness of U.S. Multinational Firms: Evidence from the Breakdown of the Bretton Woods System," (Presented by Gordon M. Bodnar).

The Fifth Annual Conference on Financial Economics and Accounting, University of Michigan, October 1994, "Alternative Accounting Methods, Information Asymmetry, and Liquidity: Theory and Evidence."

*JAAF*-KPMG Peat Marwick Conference, The Economics of Financial Statements, KPMG Quality Institute, Montvale, New Jersey, August 1994, "The Earnings Event-Time Seasonal and the Calendar-Time Seasonal in Stock Returns: Naive Use of Earnings Information or Announcement Timing Effect?" (Presented by Ray Ball).

American Finance Association Annual Meeting, Boston, Massachusetts, January 1994, "Firm Valuation, Earnings Expectations, and the Exchange-Rate Exposure Effect."

First International Conference on Contemporary Accounting Issues, Taipei, Taiwan, January 1994, "Alternative Accounting Methods, Information Asymmetry, and Liquidity: Theory and Evidence."

American Accounting Association Annual Meeting, Washington, D.C., August 1992, "The Timing of Asset Sales and Earnings Manipulations."

American Accounting Association Annual Meeting, Washington, D.C., August 1992, "Alternative Accounting Methods, Information Asymmetry, and Liquidity: Theory and Evidence," (Presented by Gordon M. Bodnar).

NBER Summer Institute, International Finance and Macro Economic Workshop, National Bureau of Economic Research, Cambridge, Massachusetts, July 1992, "Firm Valuation, Earnings Expectations, and the Exchange-Rate Exposure Effect," (Presented by Gordon M. Bodnar).

American Finance Association Annual Meeting, New Orleans, Louisiana, January 1992, "Patterns in Unexpected Earnings as an Explanation for Post-Announcement Drift."

The Second Annual Conference on Financial Economics and Accounting, SUNY at Buffalo, September 1991, "Patterns in Unexpected Earnings as an Explanation for Post-Announcement Drift."

**App. 314**

Annual Conference of the Western Finance Association, Santa Barbara, California, June 1990, "Open-Market Stock Repurchases as Signals for Earnings and Risk Changes."

## PRESS COVERAGE:

"Investors Punish Companies for Late Financial Statements," accountingtoday.com, November 30, 2017.

"Investors Punish Companies for Late Financial Statements," valuewalk.com, November 29, 2017.

"Shares Drop When Cos. File Late: Study," cfo.com, November 29, 2017.

"It's Paul Singer Versus Citigroup in a Bitter Bankruptcy Feud," Bloomberg.com, September 28, 2016.

"How Investors Are Using Social Media to Make Money," Fortune, December 7, 2015.

"Twitter Can Help You Cash In on Corporate Earnings," TheStreet.com, August 28, 2015.

"Perspective: Market Response to P&G Earnings Illustrate Changes," Associated Press State & Local Wire, May 7, 2004.

"Study Shows NYSE-Listed Companies Five Times as Profitable as Non-Listed Firms," The Exchange, Vol. 9(10), October 2002.

"Stocks Are Still an Oasis," The Wall Street Journal, July 25, 2002.

Heard on the Street: "'Pro Forma' Reports Continue Despite Enron," The Wall Street Journal, June 11, 2002.

"Anderson Suitors Bow Out Ernst & Young, Deloitte Scared off by legal Woes," Daily News, March 14, 2002.

"New Leaves: Enron Triggers a Slew of Proposed Fixes, But What will Stick?" The Wall Street Journal, March 7, 2002.

**App. 315**

"Don't Blame the Accountant: Some Companies Are Using GAAP To Meet Analysts' Earnings Expectations.  But How Much Do Investors Rely On the Accounting Data Anyway?"  National Post (Canada), March 8, 2001.

"Special Report: GE's Glowing Numbers,"  Money, November 2000.

"Managing earnings backfires, study finds,"  Philadelphia Inquirer, August 20, 2000.

"When cash flow is king,"  SmartMoney.com, November 18, 1999.


## EDITORIAL AND COMMITTEE APPOINTMENTS:

Editorial Appointments:

Advisory Board Member - The Japanese Accounting Review (2010 – Present).

Editorial Board Member – The Accounting Review (2003 - 2005).

Executive Editorial Board Member – International Journal of Disclosure and Governance (2003 - 2006).

Guest Editor - Journal of Accounting Auditing and Finance (Summer 2001 Issue).

Associate Editor - Journal of Contemporary Accounting & Economics (2005 - Present).

Associate Editor - Asia-Pacific Journal of Accounting & Economics (1999 - 2005).

Associate Editor - Journal of Accounting, Auditing and Finance (1995 - 2014).

Editorial Board Member - Journal of International Financial Management and Accounting (1997 - Present).


Committee Appointments:

Panel Member, the Business Studies Panel of the Research Grants Council (RGC) of Hong Kong, China (2007 – Present).


**App. 316**

Program Committee Member, 17th Conference on Financial Economic and Accounting, Atlanta, Georgia, November 2006.

Committee Member, American Accounting Association's 2004-2005 Deloitte & Touche Wildman Medal Award Committee.

Committee Member, American Accounting Association's 2002 International Accounting Section Mid-Year Meeting Committee.

Committee Member, American Accounting Association's Financial Accounting Standards Committee (2001 - 2004).

Committee Member, American Accounting Association and the Schmalenbach-Gesellschaft für Betriebswirtschaft e. V. (SG) Third Globalization Conference on Cross-Border Alliances and Business Combinations, to be held at Humboldt University in Berlin on June 2001.

Committee Member, American Accounting Association's 2000-2001 Financial-Reporting-Issues Conference Committee, Norwalk, Connecticut, December 2001.

Committee Member, American Accounting Association's 2001 International Accounting Section Mid-Year Meeting.

Committee Member, American Accounting Association's 2000 International Accounting Section Mid-Year Meeting.

Committee Member, 1993 American Accounting Association's International Section Annual Program.

Ad-Hoc Reviewer:

*Accounting Horizons, The Accounting Review, Asia-Pacific Journal of Accounting, Auditing: A Journal of Practice & Theory, Contemporary Accounting Research, The European Accounting Review, Financial Management, The International Journal of Accounting, The International Review of Financial Analysis, Japan and the World Economy, Journal of Accounting Auditing and Finance, Journal of Accounting and Economics, Journal of Accounting and Public Policy, Journal of Accounting Research, Journal of Business, Journal of Business Finance and Accounting, Journal of Economics and Business, The Journal of Finance, Journal of Financial Statement Analysis, Journal of International Financial Management and Accounting, Journal of International Money and Finance, Journal of Macroeconomics, Management International*

**App. 317**

Case 3:16-cv-03111-K     Document 121     Filed 07/31/20     Page 323 of 544     PageID 4575

*Review, Management Science, Managerial and Decision Economics, Management Science, Quarterly Journal of Business and Economics, Review of Accounting Studies,* AAA/KPMG international research conferences, AAA annual and regional meetings.

I have also served as a referee of Grants Applications for the Research Grants Council of Hong Kong and for the Swiss National Science Foundation.

## NEW YORK UNIVERSITY - SERVICE:

School Level:

Member, Core Course Committee, 2014 – 2016.

Member, Visiting Scholars Committee, 2010 – 2012.

Member, 2007 Stern's "Team China" – Stern's Presence in China Study.

Stern School Representative, NYU's 2007 Teaching Working Group - Classroom Utilization Study.

Member, The Center for Innovation in Teaching and Learning's Faculty Board of Advisors, 2006 – 2013.

Member, Dean's Faculty Advisory Committee, 2003 – 2006; 2007 – 2010.

Chair / Member, Faculty Council, 2006 – 2009.

Member, Global Business Curriculum Committee, 2004 – 2009.

Member, Research Resources Committee, 2001 - 2002.

Department Level:

Coordinator, Accounting Doctoral Program, 2001 - 2010.

Chair, Recruiting Committee, 2003 – 2005; 2009 – 2010.

Member, Recruiting Committee, 1999 – 2001.

**App. 318**

Member, Executive Committee, 1999 - 2002.

Member, P & T Committee, 1997 - Present.

**PUBLICATIONS:**

Journal Articles:

1. "Can Twitter Help Predict Firm-Level Earnings and Stock Returns?" The Accounting Review 93(3), July 2018, pp. 25-57, with Lucile Faurel and Partha Mohanram.

2. "SEC Filings, Regulatory Deadlines, and Capital Market Consequences," forthcoming in Accounting Horizons 31(4), December 2017, pp. 109-132, with Yaniv Konchitchki.

3. "Sarbanes-Oxley Act and Patterns in Stock Returns around Executive Stock Option Exercises," Accounting & Finance 56(2), June 2016, pp. 297-332, with Lucile Faurel.

4. "Does Income Statement Placement Matter to Investors?  The Case of Gains/Losses from Early Debt Extinguishment," The Accounting Review 89(6), November 2014, pp. 2021-2056, with Partha Mohanram.

5. "Post Loss / Profit Announcement Drift," Journal of Accounting and Economics 50, 2010, pp. 20-41, with Karthik Balakrishnan and Lucile Faurel.

6. "Mechanisms to Meet/Beat Analyst Earnings Expectations in the Pre- and Post-Sarbanes-Oxley Eras," Journal of Accounting, Auditing and Finance 24(4), Fall 2009, pp. 505-534, with Dan Cohen.

7. "Discussion of 'Investor Recognition and Stock Returns,'" Review of Accounting Studies 13, September 2008, pp. 362-368.

8. "Managerial Discretion and the Economic Determinants of the Disclosed Volatility Parameter for Valuing ESOs," Review of Accounting Studies 12, March 2007, pp. 155-179, with Doron Nissim and Partha Mohanram.

**App. 319**

9. "Comparative Value Relevance among German, U.S., and International Accounting Standards: A German Stock Market Perspective," <u>Journal of Accounting, Auditing and Finance</u> 20, Spring 2005, pp. 95-120, with Stephen Goldberg and Myung-Sun Kim.

10. "Risk, Mispricing, and Value Investing," <u>Review of Quantitative Finance and Accounting</u> 23, December 2004, pp. 353-376, with Myung-Sun Kim.

11. "Private Information, Earnings Manipulations, and Executive Stock Option Exercises," <u>The Accounting Review</u> 79, October 2004, pp. 889 – 920, with Partha Mohanram.

12. "Discussion of 'Investor Sophistication and the Mispricing of Accruals,'" <u>Review of Accounting Studies</u> 8, 2003, pp. 277 – 281.

13. "Accruals management, investor sophistication, and equity valuation: Evidence from Form 10-Q Filings," <u>Journal of Accounting Research</u> 40, September 2002, pp. 987 – 1012, with Steve Balsam and Carol Marquardt. Abstracted in *The CFA Digest*, May 2003, Volume 33, No. 2, pp. 29-30.

14. "The Rewards for Meeting-or-Beating Earnings Expectations," <u>Journal of Accounting and Economics</u> 33, June 2002, pp. 173 - 204, with Dan Givoly and Carla Hayn.

15. "Valuation of Internet Stocks – An IPO Perspective," <u>Journal of Accounting Research</u> 40, May 2002, pp. 321 - 346, with Partha Mohanram and Chandra Seethamraju.

16. "The Valuation-Relevance of Earnings and Cash Flows: an International Perspective," <u>Journal of International Financial Management & Accounting</u> 12, Summer 2001, pp. 103 - 132, with Stephen Goldberg and Myung-Sun Kim.

17. "Discretionary Accruals Models and Audit Qualifications," <u>Journal of Accounting and Economics</u> 30, December 2000, pp. 421 - 452, with Ferdinand A. Gul, and Judy S.L. Tsui.

18. "Investor Sophistication and Patterns in Stock Returns after Earnings Announcements," <u>The Accounting Review</u> 75, January 2000, pp. 43 - 63, with Suresh Radhakrishnan and Itzhak Krinsky. Reprinted in <u>The Psychology of World Equity Markets</u>, edited by Werner De Bondt. Northampton, Massachusetts: Edward Elgar Publishing Ltd.

**App. 320**

19. "Stock Price Behavior around Announcements of Write-Offs," Review of Accounting Studies 3, 1998, pp. 327 – 346, with Frederick W. Lindahl and William E. Ricks.

20. "Evidence on How Companies Choose between Cash Dividends and Open-Market Repurchases," Journal of Applied Corporate Finance 11, Spring 1998, pp. 89 - 96, with Itzhak Krinsky and Jason Lee.

21. "Foreign Currency Exposure of Multinational Firms: Accounting Measures and Market Valuation," Contemporary Accounting Research 14, Winter 1997, pp. 623 - 652.

22. "Exchange Rate Variability and the Riskiness of U.S. Multinational Firms: Evidence from the Breakdown of the Bretton Woods System," Journal of Financial Economics 42, September 1996, pp. 105 - 132, with Gordon M. Bodnar and Aditja Kaul.  Abstracted in The Journal of Finance 50, July 1995, pp. 949 - 950.

23. "Alternative Accounting Methods, Information Asymmetry, and Liquidity: Theory and Evidence," The Accounting Review 71, July 1996, pp. 397 - 418, with Gordon M. Bodnar.

24. "How Naive is the Stock Market's Use of Earnings Information?" Journal of Accounting and Economics 21, June 1996, pp. 319 - 337, with Ray Ball.

25. "Foreign Currency Translation Reporting and the Exchange-Rate Exposure Effect," Journal of International Financial Management & Accounting 6, Summer 1995, pp. 93 - 114, with Gordon M. Bodnar.

26. "The Earnings Event-Time Seasonal and the Calendar-Time Seasonal in Stock Returns: Naive Use of Earnings Information or Announcement Timing Effect?" Journal of Accounting, Auditing and Finance 10, Fall 1995, pp. 677 - 698, with Ray Ball.

27. "Firm Valuation, Earnings Expectations, and the Exchange-Rate Exposure Effect," The Journal of Finance 49, December 1994, pp. 1755 - 1785, with Gordon M. Bodnar.  Abstracted in The Journal of Finance 49, July 1994, p. 1049, and in The CFA Digest, Spring 1995, pp. 22 - 23.

28. "The Timing of Asset Sales and Earnings Manipulations," The Accounting Review 68, October 1993, pp. 840 - 855.

**App. 321**

29. "Patterns in Unexpected Earnings as an Explanation for Post-Announcement Drift," <u>The Accounting Review</u> 67, July 1992, pp. 610 - 622.

30. "Open-Market Stock Repurchases as Signals for Earnings and Risk Changes," <u>Journal of Accounting and Economics</u> 14, September 1991, pp. 275 - 294. Abstracted in *The CFA Digest*, Winter 1992, pp. 26 - 27.

<u>Academic Comment Letters to the FASB (with AAA/FASB Financial Accounting Standards Committee):</u>

1. "Response to FASB Exposure Draft on Share-Based Payment: An Amendment of FASB Statements No. 123 and No. 95," <u>Accounting Horizons</u> 19, June 2005, pp. 101 – 114.

2. Response to FASB Exposure Draft: Accounting Changes and Errors Corrections," <u>Accounting Horizons</u> 18, December 2004, pp. 255 – 261.

3. "Evaluation of the IASB's Proposed Accounting and Disclosure Requirements for Share-Based Payment," <u>Accounting Horizons</u> 18, March 2004, pp. 65-76.

4. "Commentary on the IASB's Exposure Draft on Business Combinations," <u>Accounting Horizons</u> 18, March 2004, pp. 55-64.

5. "Implications of Accounting Research for the FASB's Initiatives on Disclosure of Information about Intangible Assets," <u>Accounting Horizons</u> 17, June 2003, pp. 175 – 185.

6. "Comments on the FASB's Proposals on Consolidating Special-Purpose Entities and Related Standards-Setting Issues," <u>Accounting Horizons</u> 17, June 2003, pp. 161 – 173.

7. "Recommendations on the Disclosure of Nonfinancial Performance Measures," <u>Accounting Horizons</u> 16, December 2002, pp. 353 – 362.

8. "Evaluation of the FASB's Proposed Accounting and Disclosure Requirements for Guarantors," <u>Accounting Horizons</u> 17, March 2003, pp. 73 – 90.

9. "Evaluating Concepts-Based vs. Rules-Based Approaches to Standard Setting," <u>Accounting Horizons</u> 17, March 2003, pp. 51 – 58.

Book Chapter:

"Executive Compensation in the Litigation Setting," Chapter 31 in *Litigation Services Handbook: The Role of the Financial Expert,* 5th Edition, Editors: R.L. Weil, P.B. Frank, C.W. Hughes, and M.J. Wagner. NJ: John Wiley & Sons, Inc., August 2012, ISBN: 978-1-1181-1639-5, with Lynda H. Schwartz.

"Executive Compensation in the Litigation Setting," Chapter 36 in *Litigation Services Handbook: The Role of the Financial Expert,* 6th Edition, Editors: R.L. Weil, D.G. Lentz, and E.A. Evans. NJ: John Wiley & Sons, Inc., 2017, ISBN: 978-1-119-16632-0, with Lynda H. Schwartz.

Blogs:

"How Missing SEC Filing Deadlines Affects a Company's Stock Value," The CLS Blue Sky Blog, Columbia Law School's Blog on Corporations and the Capital Markets, with Yaniv Konchitchki, November 27, 2017, available at http://clsbluesky.law.columbia.edu/2017/11/27/how-missing-sec-filing-deadlines-affects-a-companys-stock-value/#.Wh0L8TtQHeJ.email.

Working Papers:

"Overbidding in Mergers and Acquisitions: An Accounting Perspective," April 2019, with Agnes Cheng and Hong Wu.

"Earnings Management, Timeliness, and Corporate Information Systems," April 2019, with Andrea Dossi, Antonio Marra, and Angela Pettinicchio.

"Corporate Social Responsibility and the Market Reaction to Negative Events: Evidence from Inadvertent and Fraudulent Restatement Announcements," March 2019, with Antonio Marra and Francesco Momenté.

"Corporate Social Responsibility and the Market Pricing of Corporate Earnings," February 2016, with Yan Li.

"Cognitive Bias, Conflict of Interests, and Analysts' Use of Qualitative Earnings Information: Evidence from the IPO Prospectus's Risk Factors Section," February 2015, with Karthik Balakrishnan.

"Return-Earnings Regressions: An Integrated Approach," November 2011, with Stephen Lynn and Joshua Ronen.

**App. 323**

"Investors' Valuation of Recognition versus Disclosure: Accounting for Employee Stock Options," April 2009, with Carla Hayn.

"Stock Returns, Cognitive Bias, and the Stock Price Behavior around Going Concern Uncertainty Disclosure: Evidence from Pre- and Post-Accounting Scandals Eras" June 2006, with Ferdinand A. Gul and Judy S.L. Tsui.

"Disclosure versus Recognition of Option Expense: An Empirical Investigation of SFAS No. 148 and Stock Returns," November 2004, with Steven Balsam and Jennifer Yin.

Other Publications:

"The Cheek-to-Cheek Diameter in the Ultrasonographic Assessment of Fetal Growth," *American Journal of Obstetrics & Gynecology* 165, October 1991, pp. 846 - 852, with J.S. Abramowicz, D.M. Sherer, and J.R. Woods Jr.

**App. 324**

# Appendix B

## Materials Considered

## APPENDIX B
### Materials Considered

### Legal Documents

1. *People of the State of New York, by Barbara D. Underwood, Attorney General of the State of New York v. PriceWaterhouseCoopers LLP and Exxon Mobil Corporation*, Index No. 451962/2016, Exxon Mobil Corporation's Brief in Opposition to the New York Attorney General's Motion to Compel, filed July 9, 2018

2. *People of the State of New York, by Barbara D. Underwood, Attorney General of the State of New York v. Exxon Mobil Corporation*, Index No. 452044/2018, Complaint, filed October 24, 2018

3. *Pedro Ramirez, Jr. v. Exxon Mobil Corporation, et al.,* Defendants' Memorandum of Law in Opposition to Lead Plaintiff's Motion for Class Certification, In the United States District Court for the Northern District of Texas, Dallas Division, Case No. 3:16-cv-3111-K, Exhibit 11 (Expert Report of Allen Ferrell, Ph.D., February 1, 2019)

### Examinations and Associated Exhibits

4. Examination of Guy Powell, July 27-28, 2017
5. Examination of Joseph Horne, August 17-18, 2017
6. Examination of Mark Shores, December 7-8, 2017
7. Examination of Stephen Littleton, December 19-20, 2017
8. Examination of Robert Wright, April 25-26, 2018
9. Examination of Richard Auter, May 16-17, 2018
10. Deposition of Michael O'Riordan, May 31-June 1, 2018
11. Examination of Kyle Liner, June 6-7, 2018
12. Deposition of David Rosenthal, April 11, 2019

### SEC Filings

13. ExxonMobil SEC Form 10-K for the fiscal year ended December 31, 2015
14. ExxonMobil SEC Form 10-K for the fiscal year ended December 31, 2016
15. ExxonMobil SEC Form 10-K for the fiscal year ended December 31, 2017

### Publicly Available Documents

16. Alexander, Janet Cooper, "The Value of Bad News in Securities Class Actions," *UCLA Law Review* 41 (August 1994): 1421-1469
17. ASC 360
18. ASC 820
19. ASC 932
20. Campbell, John Y., Andrew W. Lo, and A. Craig MacKinlay, *The Econometrics of Financial Markets*, 2nd ed., (Princeton, New Jersey: Princeton University Press, 1997)
21. Dellavigna, Stella, and Joshua M. Pollet, "Investor Inattention and Friday Earnings Announcements," *The Journal of Finance* 64.2 (April 2009): 709-749
22. EnergyFactor by ExxonMobil, "ExxonMobil and the Carbon Tax," December 2, 2015, available at https://energyfactor.exxonmobil.com/corporate-citizenship-sustainability/exxonmobil-and-the-carbon-tax/, accessed March 21, 2019

**App. 326**

23.  ExxonMobil, "Energy and Carbon - Managing the Risks," March 31, 2014, available at https://cdn.exxonmobil.com/~/media/global/files/energy-and-environment/report---energy-and-carbon---managing-the-risks.pdf, accessed March 25, 2019

24.  ExxonMobil, "Energy and Climate," March 31, 2014, available at https://cdn.exxonmobil.com/~/media/global/files/energy-and-environment/report---energy-and-climate.pdf, accessed March 25, 2019

25.  ExxonMobil, "ExxonMobil Earns $16.2 Billion in 2015; $2.8 Billion During Fourth Quarter," February 2, 2016, available at https://news.exxonmobil.com/press-release/exxonmobil-earns-162-billion-2015-28-billion-during-fourth-quarter, accessed April 8, 2019

26.  ExxonMobil, Analyst Meeting Presentation and Q&A Session Transcript, March 2, 2016, available at https://corporate.exxonmobil.com/-/media/Global/Files/investor-relations/analyst-meetings/2016-Analyst-Meeting-Transcript-pdf.pdf, accessed March 14, 2019

27.  FAF, "About GAAP," available at https://www.accountingfoundation.org/jsp/Foundation/Page/FAFBridgePage&cid=1176164538898#section_1, accessed April 14, 2019

28.  FASB, "About the Codification (v 4.10)," December 2014, available at https://asc.fasb.org/imageRoot/71/58741171.pdf, accessed May 3, 2019

29.  Federal Judicial Center, *Reference Manual on Scientific Evidence,* 3rd ed., (Washington, DC: National Academies Press, 2011)

30.  Francis, Jennifer, Donald Pagach, and Jens Stephan, "The Stock Market Response to Earnings Announcements Released during Trading versus Nontrading Periods," *Journal of Accounting Research* 30.2 (Autumn 1992): 165-184

31.  "Heidelberg Field, Gulf of Mexico," Offshore-Technology, available at https://www.offshore-technology.com/projects/heidelberg-field-gulf-mexico-us/, accessed May 6, 2019

32.  Interagency Working Group on Social Cost of Carbon, United States Government, "Technical Support Document: Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis – Under Executive Order 12866," July 2015, available at https://obamawhitehouse.archives.gov/sites/default/files/omb/inforeg/scc-tsd-final-july-2015.pdf, accessed May 6, 2019

33.  MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35.1 (March 1997): 13-39

34.  "Ram Powell Oil and Gas Field Project," Offshore-Technology, available at https://www.offshore-technology.com/projects/rampowell/, accessed May 6, 2019

35.  SAB No. 100, November 24, 1999, CC. Impairments, Interpretive Response to Question 7, available at https://www.sec.gov/interps/account/sab100.htm, accessed April 29, 2019

36.  SAB Topic 5.CC, Impairments, Interpretive Response to Question 3, available at https://www.sec.gov/interps/account/sabcodet5.htm#CC, accessed April 29, 2019

37.  Spiceland, J. David, James F. Sepe, and Mark W. Nelson, *Intermediate Accounting*, 6th ed., (New York, New York: McGraw-Hill, 2011)

38.  Synapse Energy Economics, Inc., "Spring 2016 National Carbon Dioxide Price Forecast," March 16, 2016, available at http://www.synapse-energy.com/sites/default/files/2016-Synapse-CO2-Price-Forecast-66-008_0.pdf, accessed May 6, 2019

39.  U.S. Energy Information Administration, Annual Energy Outlook 2015, Natural Gas Supply, Disposition, and Prices, available at https://www.eia.gov/outlooks/aeo/data/browser/#/?id=13-AEO2015&cases=ref2015&sourcekey=0, accessed April 15, 2019

**App. 327**

40. U.S. Energy Information Administration, Annual Energy Outlook 2015, Petroleum and Other Liquids Prices, available at https://www.eia.gov/outlooks/aeo/data/browser/#/?id=12-AEO2015&cases=ref2015&sourcekey=0, accessed April 15, 2019

41. Wasserstein, Ronald and Nicole Lazar, "The ASA's Statement on *p*- Values: Context Process, and Purpose," *The American Statistician,* 70.2 (2016): 129-133

42. Weil, Roman L., et al., eds., *Litigation Services Handbook: The Role of the Financial Expert, 2002 Supplement,* 3rd ed., (Hoboken, New Jersey: Wiley, 2002)

43. Weil, Roman L., et al., eds., *Litigation Services Handbook: The Role of the Financial Expert,* 4th ed., (Hoboken, New Jersey: Wiley, 2007)

## Articles Contained in Factiva Searches

44. Dow Jones Factiva Search for articles containing the text "climate change," either "investigation," or "investigate," and either "risks" or allegations" with the date range April 1, 2014 through October 24, 2018. Includes results from Top Sources, All Authors, All Subjects, All Industries, and All regions. Restricts to results for which "Company" is Exxon Mobil Corporation, and for which "Language" is English.

45. Dow Jones Factiva Search for articles on November 5, 2015, January 19, 2016, January 20, 2016, March 29, 2016, September 16, 2016, September 19, 2016, September 20, 2016, June 1, 2017, June 2, 2017, August 3, 2018, or October 24, 2018. Includes results from All Sources, All Authors, All Subjects, All Industries, and All Regions. Restricts to results for which "Company" is Exxon Mobil Corporation, and for which "Language" is English.

46. Dow Jones Factiva Search for articles containing the text "Exxon" on January 19, 2016, January 20, 2016, September 19, 2016, September 20, 2016, June 1, 2017, or June 2, 2017. Includes results from All Sources, All Authors, All Subjects, All Industries, and All Regions. Restricts to results for which "Language" is English.

## Analyst Reports

47. Natixis Newsletter, "SRI Daily Watch," February 22, 2016
48. Natixis Newsletter, "SRI Daily Watch," March 31, 2016
49. CV Brokerage, "Daily Intelligence Briefing," September 21, 2016
50. Deutsche Bank, "Trump/Paris Deal, ESG Index, Exxon Vote," June 4, 2017
51. Wells Fargo Securities, "XOM: Some Smoke But Likely No Fire; Lowering Valuation Range," September 20, 2016

## Data Sources

52. Bloomberg L.P.
53. Thomson One
54. Dow Jones Factiva

## Produced Documents

55. 2015 CP Dataguide Appendices
56. 2016 CP Dataguide Appendices
57. 2017 CP Dataguide Appendices
58. EMC 001198245

**App. 328**

59.   EMC 002679001
60.   EMC 002879325
61.   EMC 002887246
62.   EMC 003150586
63.   EMC 003327864
64.   EMC 003697497
65.   EMC 003697563
66.   EMC 003697568
67.   EMC 003697570
68.   EMC 003697572
69.   EMC 003697573
70.   EMC 003697574
71.   EMC 003697575
72.   EMC 003697576
73.   EMC 003697579
74.   EMC 003697580
75.   EMC 003697581
76.   EMC 003697582
77.   EMC 003697583
78.   EMC 003697587
79.   EMC 003697588
80.   EMC 003697597
81.   EMC 003697598
82.   EMC 003697599
83.   EMC 003697600
84.   EMC 003697601
85.   EMC 003697608
86.   EMC 003697612
87.   EMC 003697614
88.   EMC 003697615
89.   EMC 003697616
90.   EMC 003697626
91.   EMC 003697627
92.   EMC 003697670
93.   EMC 003697673
94.   EMC 003697674
95.   EMC 003697717
96.   EMC 003697946
97.   EMC 003973954
98.   EMC 003976219
99.   EMC 003976220
100.  EMC 004046554
101.  EMC 004046555
102.  EMC 004046556
103.  EMC 004046557
104.  EMC 004046558

**App. 329**

105. EMC 004046559
106. EMC 004046560
107. EMC 004046561
108. EMC 004046562
109. EMC 004046563
110. EMC 004046564
111. EMC 004046565
112. EMC 004046566
113. EMC 004046567
114. EMC 004046568
115. EMC 004046569
116. EMC 004046570
117. EMC 004046571
118. EMC 004046572
119. EMC 004046576
120. EMC 004046577
121. EMC 004046578
122. EMC 004046579
123. EMC 004046580
124. PNYAG0001268
125. PNYAG0001269
126. PNYAG0001270
127. PNYAG0001342
128. PNYAG0001670
129. PNYAG0002789
130. PNYAG0002790
131. PNYAG0025698
132. PNYAG0025699
133. PNYAG0025700
134. PNYAG0025701
135. PNYAG0025702
136. PNYAG0025703
137. PNYAG0034893
138. PNYAG0034896
139. PNYAG0040603
140. PNYAG0040604
141. PNYAG0040606
142. PNYAG0072922
143. PNYAG0072924
144. PNYAG0174874
145. PNYAG0175889
146. PNYAG0176277
147. PNYAG0176278
148. PNYAG0176526
149. PNYAG0176527
150. PNYAG0178132

**App. 330**

151. PNYAG0178134
152. PNYAG0178135
153. PNYAG0178209
154. PNYAG0182167
155. PNYAG0183143
156. PNYAG0183144
157. PNYAG0185456
158. PNYAG0186875
159. PNYAG0187251
160. PNYAG0187305
161. PNYAG0187339
162. PNYAG0187363
163. PNYAG0198618
164. PNYAG0199237
165. PNYAG0207884
166. PNYAG0207885
167. PNYAG0208535
168. PNYAG0208536
169. PNYAG0215362
170. PNYAG0215363
171. PNYAG0249416
172. PNYAG0249417
173. PNYAG0249427
174. PNYAG0249429
175. PNYAG0263352
176. PNYAG0292667
177. PNYAG0303611
178. PNYAG0308676
179. PNYAG0308677
180. PNYAG0309339
181. PNYAG0309977
182. PNYAG0309978
183. PNYAG0309981
184. PNYAG0311353
185. PNYAG0311354
186. PNYAG0312805
187. PNYAG0313515
188. PNYAG0313516
189. PNYAG0330371
190. PNYAG0335024
191. PNYAG0343042
192. PNYAG0395764
193. PNYAG0395882
194. PNYAG0425500
195. PNYAG0426934
196. PNYAG0426935

**App. 331**

197. PNYAG0427755
198. PNYAG0427756
199. PNYAG0458062
200. PNYAG0458063
201. PNYAG0467792
202. PNYAG0467793
203. PNYAG0483278
204. PNYAG0483279
205. PNYAG0492274
206. PNYAG0493794
207. PNYAG0493795
208. PNYAG0493890
209. PNYAG0494264
210. PNYAG0497360
211. PNYAG0497446
212. PNYAG0503402
213. PNYAG0503403
214. PNYAG0503571
215. PNYAG0511254
216. PNYAG0512107
217. PNYAG0514154
218. PNYAG0516873
219. PNYAG0517827
220. PNYAG0517840
221. PNYAG0518769
222. PNYAG0518778
223. PNYAG0519455
224. PNYAG0519636
225. PNYAG0519639
226. PNYAG0523304
227. PNYAG0523357
228. PNYAG0528065
229. PNYAG0530736
230. PNYAG0537349
231. PNYAG0543330
232. PNYAG0543788
233. PNYAG0543790
234. PNYAG0546170
235. PNYAG0546282
236. PNYAG0546283
237. PNYAG0548413
238. PNYAG0548414
239. PNYAG0548415
240. PNYAG0550672
241. PNYAG0550678
242. PNYAG0550682

**App. 332**

243. PNYAG0550928
244. PNYAG0551077
245. PNYAG0551212
246. PNYAG0552957
247. PNYAG0554440
248. PNYAG0556762
249. PNYAG0558167
250. PNYAG0559645
251. PNYAG0559646
252. PNYAG0559966
253. PNYAG0572025
254. PNYAG0572088
255. PNYAG0572102
256. PNYAG0581109
257. PNYAG0581123
258. PNYAG0583491
259. PNYAG0583536
260. PNYAG0583537
261. PNYAG0585165
262. PNYAG0585166
263. PNYAG0585457
264. PNYAG0585460
265. PNYAG0585878
266. PNYAG0585879
267. PNYAG0588304
268. PNYAG0588305
269. PNYAG0589456
270. PNYAG0589458
271. PNYAG0589813
272. PNYAG0589815
273. PNYAG0590087
274. PNYAG0590859
275. PNYAG0591617
276. PNYAG0591619
277. PNYAG0591623
278. PNYAG0591624
279. PNYAG0591801
280. PNYAG0591803
281. PNYAG0591984
282. PNYAG0591985
283. PNYAG0591986
284. PNYAG0592714
285. PNYAG0592715
286. PNYAG0592795
287. PNYAG0592797
288. PNYAG0593304

**App. 333**

289. PNYAG0593306
290. PNYAG0594895
291. PNYAG0594924
292. PNYAG0594936
293. PNYAG0595008
294. PNYAG0599379
295. PNYAG0599380
296. PNYAG0600811
297. PNYAG0600833
298. PNYAG0600914
299. PNYAG0600946
300. PNYAG0600965
301. PNYAG0601117
302. PNYAG0601281

# Appendix C

## Adjustments to Cash Flow Models

## APPENDIX C: ADJUSTMENTS TO CASH FLOW MODELS

1. This Appendix provides a detailed description of the adjusted undiscounted cash flow model ("Exhibit 1") and the adjusted discounted cash flow models ("Exhibits 2 and 3") associated with ExxonMobil's 2015 impairment testing of Mobile Bay. Specifically, it describes the assumptions made in adjusting the cash flow models and the justifications for those assumptions.

## I.     EXHIBIT 1

2. In order to determine whether the inclusion of GHG Emission Proxy Costs in ExxonMobil's cost projections would have led ExxonMobil to conclude in 2015 that Mobile Bay's book value was not recoverable, I re-calculate the 2015 undiscounted cash flows associated with Mobile Bay (Step 2 of impairment testing). Below, I describe various assumptions made in calculating the adjusted undiscounted cash flow model shown in Exhibit 1.

### A.     Adoption of PwC's Undiscounted Cash Flow Model

3. I begin my re-calculation of the 2015 undiscounted cash flows associated with Mobile Bay with PwC's undiscounted cash flow model. This approach is conservative because PwC's undiscounted cash flow model identifies greater headroom than ExxonMobil's undiscounted cash flow model.[1]

---

[1] Mobile Bay's net undiscounted cash flows as calculated by PwC are $51 million dollars *higher* than those calculated by ExxonMobil due to the following differences: 1) ExxonMobil used a real price for Brent oil of $54 per barrel, corresponding to the "Full Year" price contained in the 2015 Dataguide, while PwC used a real price for Brent oil of $50 per barrel, corresponding to the "Rest of Year" price contained in the 2015 Dataguide; 2) PwC's model adjusts ExxonMobil's nominal cash operating expenditures by excluding the costs associated with natural gas used to power equipment at Mobile Bay; and 3) ExxonMobil included nominal capital expenditures of $130 million in 2020, while PwC included nominal capital expenditures of $115 million in 2020. *See* ExxonMobil's Undiscounted Cash Flow Model for its 2015 Impairment Testing of Mobile Bay, PNYAG0178135; PwC's Undiscounted Cash Flow Model for its Audit of ExxonMobil's 2015 Impairment Testing of Mobile Bay, PNYAG0002790; ExxonMobil 2015 Corporate Plan Dataguide, EMC 003327864-890 at 873; Horne Examination, pp. 152-153 and 358.

**App. 336**

FILED: NEW YORK COUNTY CLERK 10/04/2019 11:17 PM          INDEX NO. 452044/2018

NYSCEF DOC. NO. 362          Case 3:16-cv-03111-K     Document 121     Filed 07/31/20     Page 342 of 544     PageID 4594          RECEIVED NYSCEF: 10/04/2019

**B.      Adjustments to PwC's Undiscounted Cash Flow Model**

4.      I adjust PwC's undiscounted cash flow model to include line items associated with GHG Emission Proxy Costs (line items [12] GHG Revenue (Gas only), [15] Estimated GHG Emissions, [16] Unit GHG Emission Proxy Cost ($/Ton), [17] GHG Estimated Costs - Liquids, [18] GHG Estimated Costs - Gas, [21] Capex GHG - Liquids, and [22] Capex GHG - Gas).  I base my calculations of the above line items on ExxonMobil's methodology in its undiscounted cash flow model for its 2016 impairment testing of Mobile Bay for the following reasons:

- First, the production levels for the years 2018 through 2039 in ExxonMobil's 2015 undiscounted cash flow model are more similar to those in ExxonMobil's 2016 undiscounted cash flow model than those in ExxonMobil's 2017 discounted cash flow model (*i.e.*, the difference in total production between 2015 and 2016 is smaller than the difference in total production between 2015 and 2017).[2]  Therefore, I assume that the GHG emissions projections in 2015 (which are dependent on production) are more similar to GHG emissions projections in 2016 than GHG emissions projections in 2017.

- Second, ExxonMobil's 2016 undiscounted cash flow model includes revenues associated with the GHG Emission Proxy Costs and capital expenditures attributed to GHGs that ExxonMobil could pass through to its natural gas customers.[3]  This

---

[2]      While the difference in liquids production between 2015 and 2017 (26.2 thousands of barrels per day) is roughly the same as the difference in liquids production between 2015 and 2016 (27.2 thousands of barrels per day), the difference in gas production between 2015 and 2017 (-194.7 million cubic feet per day) is much greater than the difference in gas production between 2015 and 2016 (-118.0 million cubic feet per day).  For purposes of this comparison, I use ExxonMobil's 2017 discounted cash flow model because the useful life of Mobile Bay is significantly reduced in ExxonMobil's 2017 undiscounted cash flow model.  Therefore, the production levels in ExxonMobil's 2017 undiscounted cash flow model are not comparable to those in ExxonMobil's 2015 and 2016 undiscounted cash flow models.  *See* PwC's Undiscounted Cash Flow Model for its Audit of ExxonMobil's 2015 Impairment Testing of Mobile Bay, PNYAG0002790; ExxonMobil's Undiscounted Cash Flow Model for its 2016 Impairment Testing of Mobile Bay, PNYAG0263352; ExxonMobil's Undiscounted Cash Flow Model for its 2017 Impairment Testing of Mobile Bay, PNYAG0601117; ExxonMobil's Discounted Cash Flow Model for its 2017 Impairment Testing of Mobile Bay, PNYAG0592715.

[3]      ExxonMobil's Undiscounted Cash Flow Model for its 2016 Impairment Testing of Mobile Bay, PNYAG0263352; Horne Examination, pp. 188-189.  In 2017, ExxonMobil included the GHG

**App. 337**

approach is conservative because it assumes that a portion of GHG Emission Proxy Costs and capital expenditures attributed to GHGs are ultimately passed on to the consumer in the form of higher prices (*i.e.*, the net effect of these costs to ExxonMobil is zero).[4]

5.    I calculate GHG emissions projections in 2016 by dividing the total GHG Emission Proxy Costs in ExxonMobil's 2016 undiscounted cash flow model by the Unit GHG Emission Proxy Costs from the 2016 Dataguide.  Because the Unit GHG Emission Proxy Costs from the 2016 Dataguide are real costs, I convert them to nominal costs using a 2.5% inflation rate, consistent with the inflation rate that ExxonMobil used for inflating Unit GHG Emission Proxy Costs in its undiscounted cash flow model for its 2016 impairment testing of its Southern North Sea and Central/Northern North Sea (U.K.) asset, and consistent with the inflation assumptions in ExxonMobil's undiscounted cash flow model for its 2015 impairment testing of Mobile Bay.[5]  I then calculate total GHG Emission Proxy Costs for 2015 by multiplying the GHG emissions projections in 2016 by the Unit GHG Emission Proxy Costs from the 2015 Dataguide, inflated by 2.5%.  Because no contemporaneous source was produced for Mobile Bay's 2015 capital expenditures attributed to GHGs, 2015

---

Emission Proxy Costs that it could pass through to natural gas consumers in its natural gas prices. As a result, ExxonMobil's discounted cash flow model for its 2017 impairment testing of Mobile Bay did not include line items for capital expenditures or revenues attributed to GHGs, and therefore cannot be used if I assume revenue "pass through" for 2015. *See* Littleton Examination, p. 180.

[4]    This pass-through applies to natural gas consumers, and not liquids consumers.  If in 2015 ExxonMobil would *not* have been able to pass through GHG Emission Proxy Costs and capital expenditures attributed to GHGs to its natural gas consumers, ExxonMobil's undiscounted cash flows would be substantially lower, resulting in lower headroom and a higher after-tax impairment loss.

[5]    ExxonMobil's Undiscounted Cash Flow Model for its 2016 Impairment Testing of its Southern North Sea and Central/Northern North Sea (U.K.) Assets, PNYAG0425500; PwC's Undiscounted Cash Flow Model for its Audit of ExxonMobil's 2015 Impairment Testing of Mobile Bay, PNYAG0002790.  ExxonMobil's undiscounted cash flow model for its 2016 impairment testing of Mobile Bay applies a 1.25% inflation rate to operating expenses.  Applying this inflation rate to Unit GHG Emission Proxy Costs produces a higher impairment charge; as a result, the 2.5% inflation rate that I assume as part of my adjustments to PwC's undiscounted cash flow model is conservative.

capital expenditures attributed to GHGs are assumed to be equal to 2016 capital expenditures attributed to GHGs.[6]

## II.    EXHIBITS 2 AND 3

6.    In order to determine Mobile Bay's fair value and the resulting after-tax impairment loss in 2015, I prepare a discounted cash flow model (Step 3 of impairment testing). I begin with undiscounted cash flows and update liquids and gas prices and Unit GHG Emission Proxy Costs from ExxonMobil's assumptions to market assumptions.[7] I then proceed to calculate Mobile Bay's fair value and resulting after-tax impairment loss as of 2015. Below, I describe various assumptions made in presenting the adjusted discounted cash flow models shown in Exhibits 2 and 3.

### A.    Base Cash Flow Model

7.    The methodology for calculating the after-tax impairment loss shown in Exhibits 2 and 3 is adapted from ExxonMobil's discounted cash flow model for its 2017 impairment testing of Mobile Bay.[8] In addition, the undiscounted cash flows shown in Exhibits 2 and 3 are adapted from the adjusted undiscounted cash flow model shown in Exhibit 1.

8.    I begin by adjusting the undiscounted cash flows shown in Exhibit 1. I assume that, with the exception of liquids and gas prices (line items [4] Henry Hub (Real), [5] Henry Hub (Nom), [7] Brent (Real), and [8] Brent (Nom)) and Unit GHG Emission Proxy Costs (line item [16] Unit GHG Emission Proxy Cost ($/Ton)), all input line items in Exhibits 2 and 3

---

[6]    ExxonMobil's Undiscounted Cash Flow Model for its 2016 Impairment Testing of Mobile Bay, PNYAG0263352.

[7]    Stephen Littleton testified that the discounted cash flow model used in ExxonMobil's impairment testing incorporates a third-party participant's view of prices, as opposed to ExxonMobil's view of prices. As explained in further detail below, the discounted cash flow models shown in Exhibits 2 and 3 substitute the liquids and gas prices from Exhibit 1 with third-party price outlooks. Littleton Examination, pp. 63-64.

[8]    *See* ExxonMobil's Discounted Cash Flow Model for its 2017 Impairment Testing of Mobile Bay, PNYAG0592715.

**App. 339**

remain unchanged from those in Exhibit 1.[9]  Additionally, I assume that all calculated line items in Exhibits 2 and 3 are calculated in the same manner as those in Exhibit 1.[10]  I base these assumptions on PwC's discounted cash flow model for its audit of ExxonMobil's 2017 impairment testing of Mobile Bay, in which PwC noted, "[b]eyond price, Management's remaining assumptions, including operating expenses, remained unchanged from the undiscounted Step 1 model prepared."[11]

9.    I also assume that, while ExxonMobil's discounted cash flow model for its 2017 impairment testing of Mobile Bay includes line items that are not present in Exhibits 2 and 3, had ExxonMobil proceeded to Step 3 of its impairment testing for Mobile Bay in 2015, it would not have included these line items in its discounted cash flow model.[12]  These line items were also included in ExxonMobil's undiscounted cash flow model for its 2017 impairment testing of Mobile Bay, indicating that no new line items were added between ExxonMobil's undiscounted and discounted cash flow models when it conducted impairment testing on Mobile Bay in 2017.[13]  Additionally, certain of these line items were attributed to contracts that became effective in 2016 (*i.e.*, line items relating to slop oil) or

---

[9]    These input line items are: [1] Liquids Production Total, [2] Gas Available for Sale Total, [3] Inflation Rate, [14] Cash Opex, [15] Estimated GHG Emissions, [20] Capex, [21] Capex GHG - Liquids, and [22] Capex GHG - Gas.

[10]    These calculated line items are: [6] Gas Price (Nom) (5% Premium), [9] Liquids Price (Nom) (75% Discount), [10] Liquids Revenue, [11] Gas Revenue, [12] GHG Revenue (Gas only), [13] Total Revenue, [17] GHG Estimated Costs - Liquids, [18] GHG Estimated Costs - Gas, [19] Total Opex, [23] Total Capex, and [24] Annual Cash Flow ($M).

[11]    PwC's Discounted Cash Flow Model for its Audit of ExxonMobil's 2017 Impairment Testing of Mobile Bay, PNYAG0600811.

[12]    These line items include Slop Oil Avail for Sale, Slop Oil Price (Nom) $/bbl, Sulfur KLTs, Sulfur Guidance, Opex Escalation, Slop Oil Rev. (Nom), NHC - Sulfur Revenue (Nom), Processing Fee Rev. (Nom), COGEN Revenue (Nom), Transportation, and Future Abandonment Expenses. *See* ExxonMobil's Discounted Cash Flow Model for its 2017 Impairment Testing of Mobile Bay, PNYAG0592715.

[13]    *See* ExxonMobil's Undiscounted Cash Flow Model for its 2017 Impairment Testing of Mobile Bay, PNYAG0601117; ExxonMobil's Discounted Cash Flow Model for its 2017 Impairment Testing of Mobile Bay, PNYAG0592715.

**App. 340**

were deemed immaterial by PwC in 2016 (*e.g.*, line items pertaining to sulfur and processing fees).[14]

### B. Liquids and Gas Prices

10. The undiscounted cash flows shown in Exhibits 2 and 3 rely on third-party price outlooks to update prices from ExxonMobil's assumptions to market assumptions (line items [4] Henry Hub (Real), [5] Henry Hub (Nom), [7] Brent (Real), and [8] Brent (Nom)). I rely on third-party price outlooks from Cambridge Energy Research Associates ("CERA"), the U.S. Energy Information Administration ("EIA"), FACTS Global Energy ("FGE"), PIRA Energy Group ("PIRA"), and Wood Mackenzie ("WoodMac").[15] ExxonMobil similarly relied on these third parties for price outlooks in its 2017 impairment testing of Mobile Bay.[16] Additionally, during its 2015 audit, PwC relied on these third parties for price outlooks when assessing whether ExxonMobil's plan prices were consistent with external views.[17]

11. I assume that the CERA, FGE, PIRA, and WoodMac price outlooks correspond to real prices. Because the EIA price outlook produced by ExxonMobil is closely aligned with the EIA real price outlook as of 2015 obtained from EIA's website, the produced EIA price outlook (and, therefore, the produced CERA, FGE, PIRA, and WoodMac price outlooks)

---

[14]   *See* ExxonMobil's Undiscounted Cash Flow Model for its 2016 Impairment Testing of Mobile Bay, PNYAG0263352; PwC's Undiscounted Cash Flow Model for its Audit of ExxonMobil's 2016 Impairment Testing of Mobile Bay, PNYAG0600833.

[15]   Third-Party Brent and Henry Hub Price Outlooks as of 2015, PNYAG0040606. I obtain EIA's nominal price outlooks from its website. *See* U.S. Energy Information Administration, Annual Energy Outlook 2015, Natural Gas Supply, Disposition, and Prices, available at https://www.eia.gov/outlooks/aeo/data/browser/#/?id=13-AEO2015&cases=ref2015&sourcekey=0, accessed April 15, 2019; U.S. Energy Information Administration, Annual Energy Outlook 2015, Petroleum and Other Liquids Prices, available at https://www.eia.gov/outlooks/aeo/data/browser/#/?id=12-AEO2015&cases=ref2015&sourcekey=0, accessed April 15, 2019.

[16]   ExxonMobil's Discounted Cash Flow Model for its 2017 Impairment Testing of Mobile Bay, PNYAG0592715.

[17]   Email from Richard Auter to Sandra Melocik, "Slides," January 16, 2016, PNYAG0040603; PwC Slides Prepared for ExxonMobil, PNYAG0040604, p. 8; Third-Party Brent and Henry Hub Price Outlooks as of 2015, PNYAG0040606.

**App. 341**

do not appear to include inflation.[18]  To convert real price outlooks to nominal price outlooks for the CERA, FGE, PIRA, and WoodMac price outlooks, I use an inflation rate of 2.5%, the same inflation rate contained in PwC's undiscounted cash flow model for its 2015 impairment testing of Mobile Bay.[19]  This approach is conservative because the 2.5% inflation rate is equal to or higher than the inflation rates used by ExxonMobil in projecting nominal price outlooks to 2040 in its discounted cash flow model for its 2017 impairment testing of Mobile Bay.[20]  For the years in which third-party price outlooks were not produced by ExxonMobil, I assume that the real price outlook from the year prior remains constant for the remaining years.[21]  This approach is consistent with that used by ExxonMobil in projecting nominal price outlooks in its discounted cash flow model for its 2017 impairment testing of Mobile Bay.[22]

---

[18]  Third-Party Brent and Henry Hub Price Outlooks as of 2015, PNYAG0040606; U.S. Energy Information Administration, Annual Energy Outlook 2015, Natural Gas Supply, Disposition, and Prices, available at https://www.eia.gov/outlooks/aeo/data/browser/#/?id=13-AEO2015&cases=ref2015&sourcekey=0, accessed April 15, 2019; U.S. Energy Information Administration, Annual Energy Outlook 2015, Petroleum and Other Liquids Prices, available at https://www.eia.gov/outlooks/aeo/data/browser/#/?id=12-AEO2015&cases=ref2015&sourcekey=0, accessed April 15, 2019.

[19]  PwC's Undiscounted Cash Flow Model for its Audit of ExxonMobil's 2015 Impairment Testing of Mobile Bay, PNYAG0002790.  I obtain nominal EIA price outlooks from its website.  *See* U.S. Energy Information Administration, Annual Energy Outlook 2015, Natural Gas Supply, Disposition, and Prices, available at https://www.eia.gov/outlooks/aeo/data/browser/#/?id=13-AEO2015&cases=ref2015&sourcekey=0, accessed April 15, 2019; U.S. Energy Information Administration, Annual Energy Outlook 2015, Petroleum and Other Liquids Prices, available at https://www.eia.gov/outlooks/aeo/data/browser/#/?id=12-AEO2015&cases=ref2015&sourcekey=0, accessed April 15, 2019.

[20]  In particular, ExxonMobil uses a 2.0% inflation rate for projecting WoodMac nominal price outlooks for 2036 to 2040. *See* ExxonMobil's Discounted Cash Flow Model for its 2017 Impairment Testing of Mobile Bay, PNYAG0592715.

[21]  ExxonMobil did not produce real Brent price outlooks for PIRA or FGE for 2036 through 2040 and 2031 through 2040, respectively. Additionally, ExxonMobil did not produce real Henry Hub price outlooks for WoodMac, CERA, or PIRA for 2031 through 2040. *See* Third-Party Brent and Henry Hub Price Outlooks as of 2015, PNYAG0040606.

[22]  In particular, ExxonMobil assumes that the real price outlook remains constant when projecting WoodMac nominal price outlooks for 2036 to 2040. *See* ExxonMobil's Discounted Cash Flow Model for its 2017 Impairment Testing of Mobile Bay, PNYAG0592715.

**App. 342**

12. I present both a low price case (Exhibit 2) and a high price case (Exhibit 3), consistent with ExxonMobil's methodology in its 2017 impairment testing of Mobile Bay.[23] Exhibit 2 contains a simple average of third-party price outlooks from all sources except EIA, while Exhibit 3 contains a simple average of third-party price outlooks from all sources.

### C. Unit GHG Emission Proxy Costs

13. The undiscounted cash flows shown in Exhibits 2 and 3 rely on third-party Unit GHG Emission Proxy Costs to update cost projections from ExxonMobil's assumptions to market assumptions (line item [16] Unit GHG Emission Proxy Cost ($/Ton)).[24] No contemporaneous source was produced for third-party Unit GHG Emission Proxy Costs, and ExxonMobil's discounted cash flow model for its 2017 impairment testing of Mobile Bay does not contain fair value Unit GHG Emission Proxy Costs. As a result, I rely on third-party nominal Unit GHG Emission Proxy Costs from ExxonMobil's discounted cash flow model for its 2017 impairment testing of its Cross Timbers Energy asset to estimate fair value Unit GHG Emission Proxy Costs in 2015.[25] To estimate this, I first calculate the ratio of these third-party nominal Unit GHG Emission Proxy Costs to the Unit GHG Emission Proxy Costs from ExxonMobil's 2017 Dataguide, inflated by 2.5%.[26] I then apply this ratio to the Unit GHG Emission Proxy Costs from ExxonMobil's 2015 Dataguide, inflated by 2.5%, consistent with the inflation rate that ExxonMobil used in its 2015 undiscounted cash flow model.[27] ExxonMobil's discounted cash flow model for its

---

[23] *See* ExxonMobil's Discounted Cash Flow Model for its 2017 Impairment Testing of Mobile Bay, PNYAG0592715.

[24] *See, e.g.*, ExxonMobil's 2017 Asset Recoverability Fair Value Review Presentation, January 12, 2018, PNYAG0601281-316 at 293: "Discounted after-tax GHG cost impact of ~$40M based on [third-party] estimated cost."

[25] ExxonMobil's Discounted Cash Flow Model for its 2017 Impairment Testing of Cross Timbers Energy, PNYAG0600946. This discounted cash flow model specifies that the values contained in line item GHG Tax OECD Tier 1 ($/Tonne) Nominal "com[e] from 'GHG costs for fair value.xls' file provided by Accounting Policy."

[26] ExxonMobil 2017 Corporate Plan Dataguide Appendices, Exhibit 17 to the Examination of Richard Auter, May 16–17, 2018, p. 17.

[27] PwC's Undiscounted Cash Flow Model for its Audit of ExxonMobil's 2015 Impairment Testing of Mobile Bay, PNYAG0002790.

**App. 343**

2017 impairment testing of its Cross Timbers Energy did not contain third-party nominal Unit GHG Emission Proxy Costs for the years 2020 through 2023. For these years, I apply the ratio calculated in 2024 to the Unit GHG Emission Proxy Costs from ExxonMobil's 2015 Dataguide, inflated by 2.5%.

### D.    Statutory Tax Rate

14.    Line items [25] After-Tax Annual Cash Flow ($M, at 37.7%), [28] Weighted Average Depreciation Tax Shield, and [32] After-Tax Impairment Charge rely on a statutory tax rate, which I assume to be 37.7%. ExxonMobil used a statutory tax rate of 37.7% in its 2016 impairment testing for its Heidelberg and Ram projects, which are also located in the Gulf of Mexico.[28] This statutory tax rate is nearly equal to the implied statutory tax rate of 37.8% used by ExxonMobil in its 2017 impairment testing of Mobile Bay.[29]

### E.    After-Tax Discount Rate

15.    Line items [27] After-Tax Net Present Value and [28] Weighted Average Depreciation Tax Shield rely on line item [26] After-Tax Discount Rate, which I assume to be 5.5% and 8.0%. This approach is consistent with ExxonMobil's methodology for its 2016 and 2017 impairment testing.[30]

### F.    Tax Gross-Up

16.    Line item [28] Weighted Average Depreciation Tax Shield corresponds to the tax gross-up percentage for the depreciation tax shield, and is calculated in a manner consistent with ExxonMobil's discounted cash flow model for its 2017 impairment testing of Mobile

---

[28]    ExxonMobil's Discounted Cash Flow Models for its 2016 Impairment Testing of Heidelberg and Ram, PNYAG0493794; "Heidelberg Field, Gulf of Mexico," Offshore-Technology, available at https://www.offshore-technology.com/projects/heidelberg-field-gulf-mexico-us/, accessed on May 6, 2019; "Ram Powell Oil and Gas Field Project," Offshore-Technology, available at https://www.offshore-technology.com/projects/rampowell/, accessed on May 6, 2019.

[29]    The implied statutory tax rate of 37.8% is calculated as 1 – (Estimated Earnings Impact (AT) ($M) / (Estimated Earnings Impact (BT) ($M)). ExxonMobil's 2017 Asset Recoverability Fair Value Review Presentation, January 12, 2018, PNYAG0601281-316 at 291.

[30]    ExxonMobil's 2016 Asset Recoverability Fair Value Review Presentation, December 16, 2016, PNYAG0395764-788 at 771; ExxonMobil's 2017 Asset Recoverability Fair Value Review Presentation, January 12, 2018, PNYAG0601281-316 at 289.

**App. 344**

Bay.[31]  Specifically, it is a weighted average consisting of 80% of the tax gross-up percentage resulting from production-based depreciation, and 20% of the tax gross-up percentage resulting from seven-year accelerated straight line depreciation.  The tax gross-up percentage resulting from production-based depreciation is calculated as the sum of the annual tax shields resulting from this depreciation, which are the product of (i) a particular year's production as a percentage of the project's production over its useful life, and (ii) a particular year's discount factor.[32]  The tax gross-up percentage resulting from seven-year straight line accelerated depreciation is calculated as the sum of the annual tax shields resulting from this depreciation, which are the product of (i) 100% divided by seven and (ii) a particular year's discount factor.[33]  The tax gross-up percentage relies on the same statutory tax rate of 37.7%, after-tax discount rates of 5.5% and 8.0%, and liquids and gas production from Exhibit 1.  This approach is conservative because it increases the fair value of Mobile Bay, thereby decreasing the resulting after-tax impairment loss.

---

[31]   *See* ExxonMobil's Discounted Cash Flow Model for its 2017 Impairment Testing of Mobile Bay, PNYAG0592715.

[32]   The discount factor is equal to the inverse of $(1 + \text{discount rate})^{\text{year} - 2015}$.

[33]   Similar to production-based depreciation, the discount factor is equal to the inverse of $(1 + \text{discount rate})^{\text{year} - 2015}$.

**App. 345**

# Exhibit 10

1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:  CIVIL TERM PART 61
- - - - - - - - - - - - - - - - - - - - - - - - X

PEOPLE OF THE STATE OF NEW YORK,
BY LETITIA JAMES,
Attorney General of the State of New York,

                        Plaintiff,
                                        INDEX NUMBER:
        - against -                       452044/18

EXXON MOBIL CORPORATION,

                        Defendant.

 - - - - - - - - - - - - - - - - - - - - - - - X
                        60 Centre Street
                        New York, New York
                        October 22, 2019


BEFORE:

            HONORABLE BARRY OSTRAGER, Justice


APPEARANCES:

    STATE OF NEW YORK
     Office of the Attorney General
    Attorneys for the Plaintiffs
    28 Liberty Street
    New York, New York 10005
    BY:   KEVIN WALLACE, ESQ., Of Counsel
          KIM A. BERGER, ESQ., Of Counsel
          JONATHAN C. ZWEIG, ESQ., Of Counsel
          MARY KAY DUNNING, ESQ., Of Counsel

APPEARANCES CONTINUED:

            MONICA S. HORVATH - SENIOR COURT REPORTER

**App. 347**

2

**Opening Statement - Plaintiff**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Attorneys for the Defendants
1285 Avenue of the Americas
New York, New York 10019
BY:   THEODORE V. WELLS, JR., ESQ.,
      DANIEL J. TOAL, ESQ.,
      NORA AHMED, ESQ.,


PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Attorneys for the Defendants
2001 K Street, NW
Washington, DC  10019
BY:  JUSTIN ANDERSON, ESQ.,


EXXON MOBIL
 Coordinator of
  Compliance Litigation and Investigations
 22777 Springwoods
 Spring, TX 77389
BY:  PATRICK J. CONLON


                         MONICA HORVATH
                         BONNIE PICCIRILLO
                      SENIOR COURT REPORTERS

**App. 348**

**Opening-Plaintiff**

employees that the impact of the higher costs was significant.

That brings us to damages and the relief we are seeking.

First, we are seeking a comprehensive review of the carbon costs used at Exxon and the impact they had on the company's investments.  Because Exxon resisted a deeper examination of its cost models at every turn, we still don't know the full scope of the problem.  That is why, as relief in this matter, we are seeking full and complete disclosures and analysis going back to the fiscal year 2014, as well as supervised disclosures going forward for the next four years.

Having been misled on these issues, investors are entitled to an accurate picture of Exxon's protection against carbon asset risk.

Second, we are also asking for restitution for investors harmed by the artificial inflation of Exxon's share price.

Dr. Bartov will testify to this, as well.  He utilized event study to tease out the impact of Exxon's false statements on investors.  The kind of event study he ran is well accepted academically and standard practice in securities fraud actions.  His study demonstrated a statistically identifiable impact on the share price when

# Exhibit 11

# Exhibit A

**App. 351**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| PEOPLE OF THE STATE OF NEW YORK, By LETITIA JAMES, Attorney General of the State of New York | Index No. 452044/2018 |
| Plaintiff, | |
| v. | |
| EXXON MOBIL CORPORATION, | |
| Defendants. | |

**EXPERT REPORT OF PETER M. BOUKOUZIS**
**MAY 8, 2019**

**App. 352**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

## TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................................1

    A.   Qualifications ................................................................................................1

    B.   Summary of Allegations ...............................................................................3

    C.   Assignment ....................................................................................................5

II.   SUMMARY OF OPINIONS ...................................................................................7

III.  OVERVIEW OF THE OIL AND GAS INDUSTRY, EXXONMOBIL, AND KEY CLIMATE CHANGE REGULATIONS ........................................13

    A.   Overview of the Oil and Gas Industry ........................................................13

    B.   Overview of ExxonMobil ............................................................................22

    C.   Overview of Key Climate Change Regulations...........................................27

IV.  CLIMATE CHANGE REGULATORY RISK IS A RELEVANT FACTOR IN THE ASSESSMENT OF OIL AND GAS COMPANIES GENERALLY ....................32

    A.   Overview of Factors Considered by the Investment Community in Evaluating Oil and Gas Companies ................................................................32

    B.   Climate Change Regulatory Risk is a Consideration for the Investment Community in Its Assessment of Oil and Gas Companies...........................35

       1.   The Investment Community Recognizes that the Oil and Gas Industry Faces Significant Climate Change Regulatory Risk.............................35

       2.   Environmental, Social, and Governance ("ESG") Concerns Have Caused Some Investors to Divest Holdings in Fossil Fuel Investments .............39

       3.   Oil and Gas Companies and Their Shareholders Have Considered and Taken Measures to Manage Climate Change Regulatory Risk .............43

V.   CLIMATE CHANGE REGULATORY RISK IS A FACTOR IN THE INVESTMENT COMMUNITY'S ASSESSMENT OF EXXONMOBIL...........................47

    A.   ExxonMobil Faces Significant Climate Change Regulatory Risk...............47

    B.   ExxonMobil Has Consistently Acknowledged the Need to Account for Climate Change Regulatory Risk in Public Disclosures...............................50

    C.   Shareholder Proposals and Commentary by the Investment Community Demonstrate that Climate Change Regulatory Risk Is a Relevant Consideration in Their Assessment of ExxonMobil....................................54

       1.   Shareholder Proposals Demonstrate the Importance of ExxonMobil's Climate Change Risk Disclosures to Investors............................54

**App. 353**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

2.  Commentary from ExxonMobil's Investors Indicates that They Considered ExxonMobil's Exposure to Climate Change Regulatory Risk .................................................................................. 58

3.  Commentary from Equity Research Analysts Indicates that They Considered Climate Change Regulatory Risk in Their Assessment of ExxonMobil ......................................................................... 60

VI.   EXXONMOBIL'S APPLICATION OF GHG EMISSION PROXY COST IN ITS BUSINESS PLANNING AND INVESTMENT DECISIONS WAS INCONSISTENT WITH ITS PUBLIC DISCLOSURE .......................................... 65

A.  ExxonMobil's Oil and Gas Demand Projections Did Not Consistently Adopt Its Publicly-Disclosed GHG Emission Proxy Cost ........................... 67

1.  Overview of ExxonMobil's Energy Outlook Demand Projection Process ............................................................................................. 67

2.  ExxonMobil Did Not Consistently Apply Its Publicly-Disclosed GHG Emission Proxy Cost in Its Demand Projections ...................... 70

B.  ExxonMobil Did Not Apply Its Publicly-Disclosed GHG Emission Proxy Cost Consistently in Corporate Planning and Investment Decision Financial Models ......................................................................... 73

1.  Overview of ExxonMobil's Corporate Planning and Investment Decision Review Processes ................................................................. 73

2.  ExxonMobil Did Not Consistently Apply Its Publicly-Disclosed Proxy Costs in Its Financial Models .................................................. 75

3.  Applying Publicly-Disclosed GHG Emission Proxy Cost in Its Financial Models Significantly Impacts Projected Cash Flows of ExxonMobil's Projects ...................................................................... 83

VII.  ESTIMATE OF AGGREGATE DAMAGES TO EXXONMOBIL SHAREHOLDERS ................................................................................................ 90

A.  Estimation of Institutional Purchases and Sales in the Inflation Period .............. 92

B.  Estimation of Aggregate Damages to ExxonMobil's Shareholders ................. 94

**App. 354**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

## I.    INTRODUCTION

### A.    Qualifications

1. My name is Peter Boukouzis, and I am the business chair and assistant professor of business at the University of Saint Katherine. Additionally, I provide consulting services on a variety of strategic matters, including valuations, mergers and acquisitions, business development, and ongoing litigation. I have a Bachelor of Science in Chemical Engineering from the University of Illinois at Urbana/Champaign and a Masters of Business Administration with concentrations in accounting, economics, and finance from the University of Chicago's Booth School of Business.

2. I am a former senior energy mergers and acquisitions ("M&A") investment banker with 18 years of investment banking experience, primarily in the oil and gas sector. In my most recent position, I led U.S. energy M&A for BMO Capital Markets Corp. ("BMO"), from which I retired in 2016. At BMO, I also served as a member of the firm's fairness committee where I was part of a team that reviewed the analytics and authorized the release of fairness opinions for M&A transactions. Before BMO, I worked for Rothschild Inc. from 2001 to 2009. Prior to working as an investment banker, I was employed as a chemical engineer for oil and gas and oil refining companies, including Conoco, Inc., Pacific Refining Company, and Clark Refining and Marketing.

3. I have experience with transactions encompassing the entire value chain of the oil and gas industry, including oil and gas exploration and production, crude oil and natural gas transportation, crude oil refining, refined product transportation and distribution, and retail gasoline.

1

**App. 355**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

4.  In my roles as an investment banker and a chemical engineer in the oil and gas industry, my duties included, *inter alia*, assessing the public market dynamics and investor sentiment of oil and gas companies, performing analyses regarding companies' shareholdings, financial modeling, and the valuation of oil and gas companies.

5.  As an M&A investment banker, one of my responsibilities was to monitor and evaluate the public markets for and public market perception of oil and gas companies. This task involved the analysis of a wide range of oil and gas industry reports and equity research analyst reports to evaluate their individual and collective views of both specific oil and gas companies and the oil and gas industry as a whole. My responsibilities also involved researching the disclosures of individual oil and gas companies, which included reviewing items such as financial statements, documents filed with the Securities and Exchange Commission, press releases, earnings calls, investor presentations, and news releases. In addition, in the context of an M&A transaction, utilizing publicly available information I analyzed the current and historical shareholder bases of public companies, noting changes in their holdings over time to estimate the potential entry basis of their holdings through analysis of market and trading data.

6.  During my 18 years as an M&A investment banker and also subsequently as a consultant, I constructed, modified, and reviewed hundreds of financial and operating models, including models related to the oil and gas industry. These models included net present value ("NPV") analyses, three-statement financial models combining the income statement, balance sheet, and statement of cash flows, oil and gas company operating and financial cash flow models, oil and gas project operating and financial cash flow models, statistical calculations and regressions, and budgets and forecasts.

**App. 356**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

7.    Over the course of my career, these models formed the basis of project and company valuations, including fairness opinions vetted by the fairness committees of my employers, and the acquisitions, divestitures, and mergers of companies, divisions, and assets involving both public and private companies with potential transaction values ranging from approximately $5 million to approximately $90 billion. These valuations utilized multiple primary valuation methodologies such as discounted cash flow analysis, net asset value analysis, comparable companies analysis, precedent transactions analysis, and discounted distribution analysis.

8.    A copy of my curriculum vitae, which provides additional details of my professional background, is attached to this report as **Appendix A**.

## B.    Summary of Allegations

9.    The People of the State of New York ("Plaintiff") alleges that Exxon Mobil Corporation ("ExxonMobil") provided false and misleading statements to its investors, industry analysts and the broader investment community (collectively, the "Investment Community") regarding its management of "economic risks posed to its business by the increasingly stringent policies and regulations that it expects governments to adopt to address climate change."[1] Plaintiff further alleges that "instead of managing those risks in the manner it represented to investors, ExxonMobil employed internal practices that were inconsistent with its representations, were undisclosed to investors and exposed the

---

[1]    Complaint, *People of the State of New York v. Exxon Mobil Corporation*, Index No. 452044/2018, October 24, 2018 (hereafter, "Complaint"), p. 1.

3

**App. 357**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

company to greater risk from climate change regulation than investors were led to believe."[2]

10.    According to the Complaint, to simulate the impact of climate change regulations, ExxonMobil claimed to apply publicly disclosed "proxy costs" for greenhouse gas ("GHG") emissions[3] from its business operations in its business planning, investment decisions, assessment of its oil and gas reserves and resource base, evaluation of long-term asset impairment, and estimates of future demand for oil and gas.[4,5] However, despite recognizing internally that its publicly disclosed GHG Emission Proxy Cost was likely to more accurately reflect the risk of future climate change regulations, ExxonMobil instead, in almost all years, applied a lower or no GHG Emission Proxy Cost in its financial projections and assessments. Specifically, the Complaint alleges that ExxonMobil's representations regarding its adoption of a GHG Emission Proxy Cost deviated from its internal practices in the following manner:[6,7]

---

[2]    Complaint, p. 1.

[3]    GHG are gases that trap heat in the atmosphere and contribute to climate change. Carbon dioxide ("$CO_2$") makes up around three-quarters of GHG emissions followed by methane at 17 percent. In this report, I use the term "GHG Emissions" to refer to both $CO_2$ and other GHG emissions. *See* Ritchie, Hannah and Max Roser, "$CO_2$ and Other Greenhouse Gas Emissions," https://ourworldindata.org/co2-and-other-greenhouse-gas-emissions.

[4]    Hereafter, I use the term "GHG Emission Proxy Cost" to refer generally to both ExxonMobil's publicly-disclosed proxy cost and the internal proxy cost it used to estimate the projected cost of GHG Emissions from its business operations and the consumption of oil and gas products by end users.

[5]    Complaint, pp. 1-2.

[6]    Complaint, pp. 2-3.

[7]    The Plaintiff also alleges that, prior to 2016, ExxonMobil did not apply a GHG Emission Proxy Cost in evaluating whether long-lived assets were impaired. I understand that Plaintiff's expert Professor Eli Bartov will opine on whether ExxonMobil omitted the GHG Emission Proxy Cost from its impairment testing prior to 2016 and whether and to what extent ExxonMobil would have incurred impairment losses if it had included the GHG Emission Proxy Cost in its 2015 impairment model for its Mobile Bay asset. *See* Expert Report of Eli

**App. 358**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

- In its investment decisions, business planning, and assessment of company's oil and gas reserves, ExxonMobil for many years applied either "(i) a lower, undisclosed [GHG Emission Proxy Cost] contained in internal corporate guidance; (ii) an even lower cost based on existing regulations held flat for decades into the future, in lieu of any [GHG Emission Proxy Cost]; or (iii) no cost associated with GHG [E]missions at all."

- In its demand projections for oil and gas, ExxonMobil did not apply "[a GHG Emission Proxy Cost] to the transportation sector, which accounts for more than half of worldwide demand for crude oil."

- ExxonMobil's representation that its business faced little risk under the "two degree scenario" "compared to pre-industrial levels" was based on assumptions that were "unreasonable and unsupported" by sources relied on for the analysis.[8]

## C.    Assignment

11.    I have been retained by the Plaintiff to provide expert analysis and testimony in the above-captioned action. Specifically, I have been asked to:

- Opine on the factors that are considered by the Investment Community in evaluating oil and gas companies such as ExxonMobil, particularly the risks faced by such companies due to climate change regulations, and the importance of accounting for such risks in business planning and investment decisions of such companies;

- Evaluate the extent to which ExxonMobil's public disclosures regarding its management of economic risks posed by climate change regulation and policies over the relevant period[9] in this matter factored into the Investment Community's evaluation of the company;

- Evaluate whether ExxonMobil appropriately applied its publicly disclosed GHG Emission Proxy Cost in its projections of fuel demand for the overall oil and gas industry;

---

Bartov, *People of the State of New York v. Exxon Mobil Corporation*, Index No. 452044/2018, May 8, 2019 (hereafter the "Bartov Report").

[8]    The two degree scenario refers to a scenario "in which the production and consumption of fossil fuels is severely curtailed in order to limit the increase in global temperature to below two degrees Celsius compared to pre-industrial levels." Complaint, p. 3.

[9]    For purposes of this report, I have focused on 2010-2017 as the relevant period unless otherwise noted.

**App. 359**

Contains Confidential Material

Subject to Stipulation and Order for the Production and Exchange of Confidential Information

- Evaluate whether ExxonMobil appropriately applied its publicly disclosed GHG Emission Proxy Cost in making corporate planning and investment decisions for a set of oil and gas assets, and estimate the impact on the projected cash flows from those assets in cases where publicly disclosed GHG Emission Proxy Cost were not properly applied; and

- Calculate the potential number of shares held by ExxonMobil's institutional shareholders that were negatively impacted by ExxonMobil's alleged misrepresentations regarding its application of publicly disclosed GHG Emission Proxy Cost, and estimate the potential aggregate damages suffered by ExxonMobil's shareholders due to ExxonMobil's alleged misrepresentations.

12.     In preparing this report and forming my opinions in this matter, I have relied on my experience as an investment banker and as a chemical engineer in the oil and gas industry. I have also reviewed and considered documents and other materials produced in this matter or obtained from public sources. These materials include analyst and industry reports, publicly available financial data, shareholder proposals for ExxonMobil and its peer companies, public disclosures made by ExxonMobil and its peer companies regarding climate change risk, publicly available news articles, ExxonMobil's financial statements and filings, ExxonMobil employee interview and deposition transcripts, internal corporate planning and investment decision financial models, the Bartov Report, and other internal documents produced in this matter. A complete list of sources that I have considered in forming my opinions in this matter is provided in **Appendix B**. I may amend or supplement my opinions and report, if appropriate, based on any additional discovery, or in response to opinions or reports of other experts in this matter.

13.     The current hourly rate for my work is $825. Of this amount, I receive $620 per hour. Eleven Canterbury, a firm that handles the administrative work associated with this engagement, receives $205 per hour. Some of the analysis underlying my conclusions in this report was performed by others working under my direction and supervision. Neither

6

**App. 360**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

my compensation nor that of my support team is contingent upon my findings, the testimony I may give, or the outcome of this litigation. My work in this matter is ongoing, and I reserve the right to supplement my analysis and opinions should more information become available to me and/or in response to any report submitted on behalf of the Defendant in response to my analysis and opinions.

## II.    SUMMARY OF OPINIONS

14.    In recent years, governments around the world have begun to introduce commitments and regulations to address threats posed by climate change. Many policymakers and industry observers expect these regulations to become increasingly stringent in the coming years.

15.    The oil and gas industry, in particular, is GHG Emission-intensive and therefore faces significant risk from such climate change regulations ("Climate Change Regulatory Risk"), which are likely to affect the cash flows, growth, and investment returns of oil and gas companies such as ExxonMobil. The Investment Community has become more cognizant of these risks and considers Climate Change Regulatory Risk as a relevant factor in their assessment of potential investments, particularly investments in oil and gas companies. Moreover, recognizing such risks, many investors in the industry have been trying to reduce their investment exposure to Climate Change Regulatory Risk or encourage the companies in which they invest to actively manage their own exposure to these risks.

7

**App. 361**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

16.    ExxonMobil's oil and gas business and investments involve long-term GHG Emission-intensive assets that are likely to face significant Climate Change Regulatory Risk.[10] ExxonMobil itself has consistently acknowledged the need to account for the costs and impacts Climate Change Regulatory Risk would have on its business and has represented to the Investment Community through its public disclosures that it uses a GHG Emission Proxy Cost in its business planning and investment decision processes. Shareholder proposals and commentaries by the Investment Community over the relevant period indicate that ExxonMobil's public disclosures regarding its management of Climate Change Regulatory Risk formed a basis for the Investment Community's evaluation of ExxonMobil.

17.    I have reviewed how ExxonMobil accounted for Climate Change Regulatory Risk and costs associated with GHG Emissions in its fuel demand projections for the oil and gas industry, and its corporate planning and investment decision financial models. Based on this review, I find that ExxonMobil's practices of accounting for Climate Change Regulatory Risk and GHG Emission costs were inconsistent with its public disclosures regarding these risks and costs.

18.    As part of its annual "Energy Outlook" planning process, ExxonMobil projected the GHG Emission Proxy Cost and the total end user fuel demand for the overall global oil and gas industry. Based on this process, ExxonMobil then disclosed its view about the

---

[10]    For example, I understand that Professor Bartov has concluded based on his analysis that "[h]ad ExxonMobil included GHG Emission Proxy Costs in its cost projections for its 2015 impairment testing of Mobile Bay, it would have concluded that the book value of Mobile Bay was not recoverable based on the project's remaining net undiscounted cash flows, and consequently recognized an after-tax impairment loss of $320 million to $478 million." Bartov Report, ¶16.

8

**App. 362**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

GHG Emission Proxy Cost and future fuel demand for the overall global oil and gas industry to the Investment Community in its annual "*Outlook for Energy*" reports. However, in its internal demand projections for the overall global oil and gas industry, ExxonMobil did not consistently apply the GHG Emission Proxy Cost that it publicly disclosed.

19.    Specifically, in evaluating the projected end user demand from the transportation sector, ExxonMobil did not directly apply any GHG Emission Proxy Cost, as it did for the other non-transportation sectors where it added the GHG Emission Proxy Cost to the fuel price assumptions it used to project demand. Instead, in the light duty segment, ExxonMobil only considered potential vehicle fuel efficiency standards that vehicle manufacturers may be required to meet, and in other segments such as heavy duty vehicles, aviation, marine, and rail, it only considered anticipated fuel efficiency improvements. This approach was inconsistent with ExxonMobil's public representations and ignored the fact that the end users in the transportation sector could also face higher fuel prices due to GHG Emission costs. If it had consistently applied the GHG Emission Proxy Cost to its demand projections in the transportation sector, ExxonMobil would have projected lower end user demand for oil products from the sector. Additionally, given the fact that the transportation sector is expected to represent more than half of the worldwide demand for crude oil, ExxonMobil's failure to appropriately account for fuel demand in this sector would likely also have had a substantial impact on its overall global crude oil demand projections. Since ExxonMobil states that it uses these demand projections to inform its business planning and investment decisions, by projecting an inflated outlook for global fuel demand ExxonMobil consequently also likely inflated the demand for its products.

9

**App. 363**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

Such inflated projections would have likely positively biased the Investment Community's assessment and valuation of ExxonMobil.

20.     Furthermore, based on my years of experience analyzing and valuing oil and gas companies, ExxonMobil's public disclosures related to its GHG Emission Proxy Cost would have likely led the Investment Community to conclude that the company was applying the publicly disclosed cost consistently in its corporate planning and investment decisions in the geographies where it expected increasingly stringent climate change regulations. However, based on my review of ExxonMobil's financial models, ExxonMobil's actual practices in many cases were contrary to its public representations. Specifically, in the financial models used for corporate planning and investment decision processes that I reviewed, ExxonMobil applied either a GHG Emission Proxy Cost that was lower than ExxonMobil's publicly disclosed costs or no GHG Emission Proxy Cost at all for the GHG Emissions it projected for the vast majority of the assets or investments.

21.     To demonstrate the potential impact of ExxonMobil's inconsistent application of its GHG Emission Proxy Cost, I reviewed a set of 72 of ExxonMobil's financial models and, where possible, adjusted the estimated GHG Emission costs in these models by applying ExxonMobil's publicly disclosed GHG Emission Proxy Cost.[11] For the 27 models that I was able to adjust, my analysis shows that applying GHG Emission Proxy Cost estimates

---

[11]     As part of these adjustments, for 5 models where ExxonMobil only calculated the GHG Emission Proxy Costs for a portion of the total projected GHG Emissions for a given asset, I applied the GHG Emission Proxy Cost to the entirety of the projected total GHG Emissions.

**App. 364**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

that were publicly disclosed instead of the estimates based on internal guidance or then-existing regulation has a significant impact on the total projected undiscounted cash flows, NPV and Internal Rate of Return ("IRR").[12] In aggregate, applying the publicly disclosed GHG Emission Proxy Costs to these 27 models reduced the projected total undiscounted cash flows by $70 billion (i.e., 7.2 percent), total NPV by $5 billion (i.e., 3.9 percent) and the average IRR by 0.6 percentage points.[13]

22.    Such a reduction in projected cash flows and returns for ExxonMobil's assets demonstrates that by not consistently applying its publicly disclosed GHG Emission Proxy Cost in its project economics, ExxonMobil inflated the outlook for its business. In particular, many of the projects with the largest impact from the corrections are ExxonMobil's oil sands projects, such as Kearl and Firebag. Oil sands account for a significant portion of ExxonMobil's total oil and gas reserves, are GHG Emission-intensive, and have low margins, making them particularly vulnerable to Climate Change Regulatory Risk. Given ExxonMobil's representations regarding GHG Emission Proxy Costs, the Investment Community likely assumed that GHG Emission Proxy Costs were already being incorporated into the project economics for such assets. This could have caused the Investment Community to unknowingly assume the risk that low margin

[12]    Another name for IRR is the discounted-cash-flow rate of return ("DCFR"). ExxonMobil uses the term DCFR to refer to IRR in its financial models. *See, e.g.*, Brealey, Richard A., Stewart C. Myers and Franklin Allen, *Principles of Corporate Finance*, 10th ed., 2011, p. 108.

[13]    I note that for 18 models, ExxonMobil did not explicitly apply a GHG Emission Proxy Cost or project any GHG Emissions for the underlying assets. As a result, I was unable to adjust these models for the omission of the GHG Emission Proxy Cost. In addition, the 27 models for which I was able to apply the publicly disclosed GHG Emission Proxy Cost represent only a subset of the universe of ExxonMobil projects and assets. Thus, my analysis likely understates the impact from ExxonMobil's alleged misrepresentation regarding its adoption of a GHG Emission Proxy Cost.

11

**App. 365**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

assets with high GHG Emissions such as oil sands would become uneconomic and stranded once this GHG Emission Proxy Cost was included. Based on my professional experience, such an inflated outlook, in turn, would have likely positively biased the valuation of ExxonMobil. If, in contrast, ExxonMobil had consistently accounted for the GHG Emission Proxy Cost as it publicly represented, ExxonMobil's Management Committee should have been presented less optimistic business projections and investment economics, including reductions in the returns from its assets. Then, the Management Committee would have communicated this less optimistic outlook to the Investment Community, and would not have biased up the Investment Community's assessment and valuation of ExxonMobil.

23.     Additionally, I was asked by counsel to calculate the potential number of ExxonMobil shares that were negatively impacted and estimate the potential aggregate damages suffered by ExxonMobil's shareholders resulting from the company's alleged misrepresentations regarding its adoption of GHG Emissions Proxy Costs. I analyzed the institutional shareholder data for ExxonMobil and utilized the impact per share that the disclosure of ExxonMobil's alleged misrepresentations had on its stock price (*i.e.,* "inflation") estimated by Professor Bartov to estimate the potential aggregate damages to ExxonMobil's shareholders.[14] In aggregate, I estimate the damage to ExxonMobil shareholders range from $476 million to $1.60 billion, depending on the inflation per share estimate used. Because my analysis only considers the quarterly shareholding for institutional shareholders for which I have publicly available data and ignores

---

[14]     *See* Bartov Report, ¶16 and Section V.D.

12

**App. 366**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

institutional or non-institutional shareholders and likely a portion of those institutional shareholders for which I have no data, my estimate of potential aggregate damages likely understate the total damages suffered by all ExxonMobil shareholders due to the alleged misrepresentations. Additionally, as I use the quarterly institutional shareholding data, my analysis also does not take into account any intra-quarter change in shareholdings or trading within a given individual institution, which also likely results in an understatement of the total damages suffered by all ExxonMobil shareholders due to the alleged misrepresentations.

### III. OVERVIEW OF THE OIL AND GAS INDUSTRY, EXXONMOBIL, AND KEY CLIMATE CHANGE REGULATIONS

24.     In this section, I begin by providing an overview of the oil and gas industry in which ExxonMobil operates, ExxonMobil's business, and the recent key climate change regulations. This background provides the backdrop in which ExxonMobil operates and context for the discussion in the remaining sections of the report regarding ExxonMobil's disclosure and management of Climate Change Regulatory Risk.

### A.     Overview of the Oil and Gas Industry

25.     The oil and gas industry is one of the most important segments of the global economy.[15] In 2018, five of the top 10 global companies by revenue were oil and gas companies.[16]

---

[15]    "Global Oil Industry and Market - Statistics & Facts," Statista, https://www.statista.com/topics/1783/global-oil-industry-and-market/.

[16]    "Global 500," Fortune, http://fortune.com/global500/.

**App. 367**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

Additionally, in the same year, natural gas and crude oil accounted for approximately 63 percent of global energy production and about 67 percent of global energy consumption.[17]

26.    Both global oil consumption and supply have been growing over the past several years, increasing by 5 percent and 4 percent between 2014 and 2017, respectively.[18] The U.S., China, and India have been the most significant contributors to the growth in global oil consumption.[19] On the supply side, rapid growth in production from non-OPEC countries, including the U.S., has driven the increase in global supply.[20] In fact, over the period 2006 to 2016 only Iraq had a higher oil production growth rate than the U.S., which grew at 6.1 percent per annum compared to the OECD overall oil production growth rate of 1.8 percent per annum.[21]

27.    Demand for oil may not, however, continue to grow in the future, and may even begin to decline.[22] As I discuss in the sections below, as governments enact policies discouraging

---

[17]    "Monthly Energy Review: Tables 1.2 and 1.3," U.S. Energy Information Administration ("EIA"), April 2019, pp. 5-7, https://www.eia.gov/totalenergy/data/monthly/pdf/mer.pdf.

[18]    Global demand for oil increased from 93.1 million barrels per day to 97.8 million barrels per day between 2014 and 2017. Global supply of oil increased from 93.6 million barrels per day to over 97.4 million barrels per day during the same period. "Oil Market Report: Table 1," International Energy Agency ("IEA"), March 15, 2018, p. 1, https://www.iea.org/media/omrreports/tables/2018-03-15.pdf.

[19]    "Global Energy & CO2 Status Report," p. 3, IEA, 2018, https://www.iea.org/geco/oil/.

[20]    Cooper, Amanda, "Global Oil Supply to Swamp Demand in 2019 Despite Output Cuts: IEA," Reuters, February 13, 2019, https://www.reuters.com/article/us-iea-oil/global-oil-supply-to-swamp-demand-in-2019-despite-output-cuts-iea-idUSKCN1Q20WK.

[21]    "BP Statistical Review of World Energy," BP, June 2018, p. 14, https://www.bp.com/content/dam/bp/business-sites/en/global/corporate/pdfs/energy-economics/statistical-review/bp-stats-review-2018-full-report.pdf.

[22]    *See, e.g.*, Cunningham, Nick, "Bank of America: Oil Demand Growth to Hit Zero within a Decade," Oil Price, February 5, 2019, https://oilprice.com/Energy/Energy-General/Bank-Of-America-Oil-Demand-Growth-To-Hit-Zero-Within-A-Decade.html. *See also* discussion in Section VI.A.1.

**App. 368**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

GHG emissions, consumers are likely to demand less oil and more fuels with lower GHG Emissions such as natural gas.[23] With this in mind, some industry participants predict that oil demand growth rates will slow in the coming decades, with those rates actually becoming negative among OECD countries.[24]

28.    Global consumption and supply of natural gas have already been rising, increasing by 7 percent and 6.2 percent between 2014 and 2017, respectively.[25] The U.S. was the largest driver of higher natural gas consumption.[26] On the supply side, in 2017, the U.S. and OECD countries as a whole accounted for approximately 20 percent and 36 percent of the total production, respectively.[27]

---

[23]    *See, e.g.*, Davis, Carolyn, "Worldwide Natural Gas Consumption to Overtake Oil by 2026, Says DNV GL," September 10, 2018, https://www.naturalgasintel.com/articles/115725-worldwide-natural-gas-consumption-to-overtake-oil-by-2026-says-dnv-gl. *See also* "The Natural Gas Gamble: a Risky Bet on America's Clean Energy Future (2015)," The Union of Concerned Scientists, https://www.ucsusa.org/clean-energy/coal-and-other-fossil-fuels/natural-gas-gamble-risky-bet-on-clean-energy-future.

[24]    "World Oil Outlook 2040," Organization of the Petroleum Exporting Countries, 2017, pp. 13-14 https://www.opec.org/opec_web/flipbook/WOO2017/WOO2017/assets/common/downloads/WOO%202017.pdf.

[25]    Global demand for natural gas increased from 3.51 trillion cubic meters to 3.76 trillion cubic meters between 2014 and 2017. Global supply of natural gas increased from 3.55 trillion cubic meters to over 3.77 trillion cubic meters during the same period. "Natural Gas Statistics," IEA, https://www.iea.org/statistics/naturalgas/.

[26]    "Global Energy & CO2 Status Report," IEA, 2018, https://www.iea.org/geco/gas/.

[27]    The U.S. was responsible for 734.5 billion cubic metres, and OECD countries were responsible for 1313.6 billion cubic meters out of a total of 3680.4. "BP Statistical Review of World Energy," BP, June 2018, p. 28, https://www.bp.com/content/dam/bp/business-sites/en/global/corporate/pdfs/energy-economics/statistical-review/bp-stats-review-2018-full-report.pdf.

15

**App. 369**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

29.    As shown in Figure 1 below, the oil and gas industry is often divided into multiple segments, with many companies specializing in a particular segment and others, such as ExxonMobil, operating across multiple segments. GHGs are emitted in every segment.[28]

**Figure 1: Overview of the Oil and Gas Industry[29]**



a.    **Exploration and Production ("E&P" or "Upstream"):** Companies operating in this segment explore for crude oil and natural gas reserves, develop oil and gas fields, and extract crude oil and gas.[30] GHG Emissions from the E&P segment originate from two main sources: (i) the energy required to extract and pretreat the oil and (ii) flaring and venting and fugitive losses of associative volatile hydrocarbons.[31] The extraction of heavy oils from sources such as the oil sands

---

28    Forrest, Jackie and Marcus Rocque, "Crude Oil Investing in a Carbon Constrained World: 2017 Update," ARC Energy Research Institute, October 2017, p. 11, https://www.arcenergyinstitute.com/wp-content/uploads/Crude-Oil-Investing-in-a-Carbon-Constrained-World-2017-Update.pdf.

29    Figure 1 is based off of "Strategic Report," BP, 2013, pp. 2-3.

30    "Chapter 41. Oil and Gas Industry," IRS, https://www.irs.gov/irm/part4/irm_04-041-001.

31    Edwards, Robert, Jean-François Larivé, David Rickeard, and Wemer Weindorf, "Well-to-Wheels Analysis of Future Automotive Fuels and Powertrains in the European Context," European Commission, 2014, p. 21.

16

**App. 370**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

are particularly GHG Emission-intensive because of the large energy input required to produce and process the fuel.[32]

b. **Midstream:** This segment of the value chain is often defined to include gas plants, liquefied natural gas ("LNG") production and regasification, and oil and gas pipeline transportation systems. The midstream segment accomplishes the transportation of crude oil to crude storage facilities and to crude oil refineries, the further processing of natural gas and natural gas liquids, and the transportation of refined oil products, natural gas, and chemicals to end markets.[33] In addition to GHG Emissions generated from mobile sources, the midstream sector generates GHG Emissions from compressor exhausts, tank vents, natural gas processing, and fugitive emissions.[34]

c. **Refining or Manufacturing:** This segment consists of crude oil refineries. An oil refinery is a complex combination of process plants, the objective of which is to turn crude oil into marketable products, including fuels, lubricants, and petrochemicals, of the right quality and quantity.[35] GHG Emissions from the refining segment include emissions from stationary combustion units located

---

[32] Edwards, Robert, Jean-François Larivé, David Rickeard, and Wemer Weindorf, "Well-to-Wheels Analysis of Future Automotive Fuels and Powertrains in the European Context," European Commission, 2014, p. 26.

[33] Devold, Havard, "Oil and Gas Production Handbook," ABB, pp. 16-18, https://library.e.abb.com/public/34d5b70e18f7d6c8c1257be500438ac3/Oil%20and%20gas%20production%20handbook%20ed3x0_web.pdf.

[34] "Oil & Gas – Midstream," Sustainability Accounting Standards Board ("SASB"), June 2014, p. 9, https://www.sasb.org/wp-content/uploads/2014/06/NR0102_ProvisionalStandard_OGMidstream.pdf.

[35] Edwards, Robert, Jean-François Larivé, David Rickeard, and Wemer Weindorf, "Well-to-Wheels Analysis of Future Automotive Fuels and Powertrains in the European Context," European Commission, 2014, p. 27; "Strategic Report," BP, 2013, pp. 2-3.

**App. 371**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

within the refinery and emissions from venting, flares, and fugitive leaks from

equipment (e.g., valves, flanges, pumps).[36]

d. **Marketing:** This segment consists of the wholesale and retail distribution of

refined petroleum products to end users, including through retail gasoline stations.

Together, refining and marketing are commonly known as "downstream."[37]

30.    As shown in Figure 2 below, GHG Emissions are produced in each segment of the value

chain. Additionally, the final stage in the lifecycle of oil and gas is the consumption of

refined oil products and natural gas by end users. While the combustion of fossil fuels

generates the majority of GHG Emissions over the entire lifecycle of oil, the GHG

Emissions produced during the E&P and Refining of oil are not insignificant in terms of

absolute emissions quantity. [38] It is important to note that the total GHG Emissions over

the entire value chain and the relative proportion of GHG Emissions shown from each

segment in Figure 2 are based on the U.S. refined average crude in 2014. Each specific

crude oil has a different total GHG Emission over its lifecycle and creates different

proportions from each segment of the sector.[39] Certain crudes, such as Canadian oil

sands, have greater total GHG Emissions than the U.S. refined average crude.[40]

---

[36]   "Greenhouse Gas Reporting Program 2016: Refineries," United States Environmental Protection Agency, https://www.epa.gov/ghgreporting/ghgrp-2016-refineries.

[37]   "Marketing and Distribution," Library of Congress Business Reference Services Issue 5/6, 2006, http://www.loc.gov/rr/business/BERA/issue5/marketing.html.

[38]   "Assessing Global Oils," Oil-Climate Index, oci.carnegieendowment.org/.

[39]   Forrest, Jackie and Marcus Rocque, "Crude Oil Investing in a Carbon Constrained World: 2017 Update," ARC Energy Research Institute, October 2017, p. 10, https://www.arcenergyinstitute.com/wp-content/uploads/Crude-Oil-Investing-in-a-Carbon-Constrained-World-2017-Update.pdf.

[40]   "Oil Sands, Greenhouse Gases, and US Oil Supply: Getting the Numbers Right," IHS CERA, 2010, p. 8, https://cdn.ihs.com/ihs/cera/Oil-Sands-Greenhouses-Gases-and-US-Oil-Supply.pdf.

**App. 372**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

**Figure 2: Overview of GHG Emissions Across the Oil Industry[41]**



31.     The oil and gas industry accounts for a significant amount of global GHG Emissions, which have been increasing worldwide. In 2017, total GHG Emissions produced 50.9 billion tons of $CO_2$ equivalent, double the levels in 1970.[42] Combustion of oil and natural gas accounts for 49 percent of global $CO_2$ emissions, and oil and natural gas accounts for

---

[41]   Figure 2 is adapted from two sources, and shows the percentage of emissions at each stage of the value chain for crude oil. Emissions shown based on 2014 U.S. refined average. $CO_2$, $CH_4$, and $N_2O$ are the chemical symbols for carbon dioxide, methane, and nitrous oxide gasses respectively. Forrest, Jackie and Marcus Rocque, "Crude Oil Investing in a Carbon Constrained World: 2017 Update," ARC Energy Research Institute, October 2017, p. 11, https://www.arcenergyinstitute.com/wp-content/uploads/Crude-Oil-Investing-in-a-Carbon-Constrained-World-2017-Update.pdf;"Estimating Petroleum Industry Value Chain (Scope 3) Greenhouse Gas Emissions," IPIECA, p. 14, https://www.api.org/~/media/Files/EHS/climate-change/Scope-3-emissions-reporting-guidance-2016.pdf.

[42]   Olivier, Jos G.J. and Jeroen A.H.W. Peters, "Trends in Global $CO_2$ and Total Greenhouse Gas Emissions 2018 Report," PBL Netherlands Environmental Assessment Agency, December 2018, pp. 11-12, https://www.pbl.nl/sites/default/files/cms/publicaties/pbl-2018-trends-in-global-co2-and-total-greenhouse-gas-emissons-2018-report_3125.pdf.

**App. 373**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

24 percent of global methane emissions.[43] By industry sector, energy (which includes combustion-related and fugitive emissions from the energy, manufacturing and construction industries) and transportation are two of the largest sources of GHG Emissions, accounting for 53.1 percent (23.09 billion tons) and 12.8 percent (5.55 billion tons) of emissions in 2010, respectively.[44] The IEA projects overall energy-related GHG Emissions to increase 21 percent by 2030 relative to 2014 levels if current climate change policies stay in place.[45]

32.    The oil and gas industry is composed of numerous producers around the world. The industry includes a few large companies, including ExxonMobil, that operate globally in both the upstream and downstream segments. Table 1 below shows the top oil and gas producers (either publicly held or state-owned/controlled) based on revenues in 2017.

---

[43]    Olivier, Jos G.J. and Jeroen A.H.W. Peters, "Trends in Global $CO_2$ and Total Greenhouse Gas Emissions 2018 Report," PBL Netherlands Environmental Assessment Agency, December 2018, p. 9, https://www.pbl.nl/sites/default/files/cms/publicaties/pbl-2018-trends-in-global-co2-and-total-greenhouse-gas-emissons-2018-report_3125.pdf.

[44]    Energy sector emissions include "public heat and electricity production; other energy industries; fugitive emissions from solid fuels, oil and gas, manufacturing industries and construction." These estimates combine estimated 2010 emissions of carbon dioxide and nitrous oxide with 2008 estimates of emissions of methane. 2010 estimates of emissions of methane were not available. Ritchie, Hannah and Max Roser, "$CO_2$ and Other Greenhouse Gas Emissions," https://ourworldindata.org/co2-and-other-greenhouse-gas-emissions.

[45]    "World Energy Outlook 2018," IEA, https://www.iea.org/weo/energyandclimatechange/.

20

**App. 374**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

## Table 1: Top Oil and Gas Producers by 2017 Revenues[46]

| | Company | Country | 2017 Revenue ($ Billions)[47] |
|---|---|---|---|
| **Publicly-Owned** | | | |
| 1 | Royal Dutch Shell ("Shell") | Netherlands | 305.2 |
| 2 | BP plc ("BP") | UK | 238.4 |
| 3 | ExxonMobil | USA | 237.2 |
| 4 | Total S.A. ("Total") | France | 149.1 |
| 5 | Chevron Corporation ("Chevron") | USA | 127.5 |
| 6 | PJSC Lukoil Oil Company ("Lukoil") | Russia | 97.8 |
| 7 | Eni S.p.A ("Eni") | Italy | 73.3 |
| **State-Owned/Controlled [48]** | | | |
| 1 | China Petrochemical Corporation (Sinopec)[49] | China | 341.2 |
| 2 | China National Petroleum Corporation[50] | China | 332.9 |
| 3 | Saudi Arabian Oil Company (Aramco) | Saudi Arabia | 252.7 |
| 4 | PJSC Gazprom | Russia | 107.9 |
| 5 | PJSC Rosneft Oil Company | Russia | 92.7 |
| 6 | China National Offshore Oil Corporation | China | 78.3 |

[46]  This table includes all companies listed on S&P Capital IQ under the primary industry classifications "Integrated Oil and Gas" and "Oil and Gas Exploration" and with 2017 revenues over $70 billion. Revenues listed are those of the entire company. Companies are classified as state-owned if S&P Capital IQ confirmed at least 50 percent public ownership. Revenue data come from S&P Capital IQ.

[47]  Revenues are converted from each company's reported currency to USD using average 2017 exchange rates from the IRS, https://www.irs.gov/individuals/international-taxpayers/yearly-average-currency-exchange-rates.

[48]  National Iranian Oil Company's revenue is not available on S&P Capital IQ and is last estimated at $110 Billion by Oil & Gas iQ. Dutta, Sumit, "Top 10 Oil & Gas Companies: National Iranian Oil Co (NIOC)," Oil & Gas iQ, January 10, 2018, https://www.oilandgasiq.com/strategy-management-and-information/articles/top-10-oil-gas-companies-number-3-national-iranian.

[49]  China Petrochemical Corporation owned 71.3 percent of China Petroleum and Chemical Corporation (as of December 31, 2017), which had 2017 revenue of $362.6 billion.

[50]  China National Petroleum Corporation owned 82.7 percent of PetroChina Company (as of December 31, 2017), which had 2017 revenue of $309.8 billion.

21

**App. 375**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

| 7 | Petróleo Brasileiro S.A. ("Petrobras")[51] | Brazil | 77.8 |
| 8 | Sinochem Corporation[52] | China | 72.7 |
| 9 | Petróleos Mexicanos ("Pemex") | Mexico | 71.0 |

### B.      Overview of ExxonMobil

33.    In 1999, Exxon Corporation merged with Mobil Oil Corporation, each originally formed as part of the 1911 split-up of Standard Oil Company Inc., to form Exxon Mobil Corporation, which is publicly traded on the New York Stock Exchange under the ticker "XOM." As of December 31, 2018, ExxonMobil had a market capitalization of $289 billion, making it the 12th largest publicly traded company and the largest publicly traded oil and gas company in the world.[53]

34.    ExxonMobil reports its operations in three operating segments.[54]

    a.    **Upstream:** In 2018, earnings from ExxonMobil's upstream segment were approximately $14 billion, representing 60 percent of its global earnings.[55] As of December 31, 2018, the company had an estimated 15.7 billion barrels of liquids and 51.8 trillion cubic feet of proved natural gas reserves, with daily production

---

[51]   Although the Brazilian federal government owned only 28.67 percent of Petrobras's total shares, the company is included as a "State-Owned" producer because the Brazilian government possessed majority voting control of the company. It owned 50.26 percent of the company's common shares, which are Petrobras's only voting shares. Petróleo Brasiliero, Form 20-F for the Fiscal Year 2017, p. 137.

[52]   Sinochem Corporation's parent company, Sinochem Group, does not have revenue information available for 2017 on S&P Capital IQ.

[53]   S&P Capital IQ.

[54]   "2018 Financial & Operating Review," ExxonMobil, p. 27.

[55]   Global earnings is calculated as the sum of upstream, downstream, and chemical earnings. "2018 Results and Highlights," ExxonMobil, April 2, 2019, https://corporate.Exxonmobil.com/en/Investors/Annual-Report/financial-operating-highlights.

22

**App. 376**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

of 2.3 million barrels of liquids and 9.4 billion cubic feet of natural gas.[56]

ExxonMobil has a total resource base of 97 billion barrels of oil equivalent and

has an active upstream presence in 41 countries on six continents.[57]

Approximately 78 percent of ExxonMobil's $26 billion of capital expenditures in

2018 were invested in the upstream segment.[58]

b. **Downstream:** ExxonMobil is one of the world's largest refiners with nearly 5

million barrels per day of distillation capacity across 21 refineries.[59] ExxonMobil

also has an extensive network of over 20,800 retail service stations under the

Esso, Exxon, and Mobil brands.[60] In 2018, earnings from its downstream segment

were approximately $6 billion, representing 26 percent of its global earnings.[61] In

2018, its global petroleum product sales were 5.5 million barrels per day.[62]

---

[56]  "2018 Financial & Operating Review," ExxonMobil, April 2, 2019, https://corporate.exxonmobil.com/-/media/Global/Files/annual-report/2018-Financial-and-Operating-Review.pdf,   pp. 96-100.

[57]  ExxonMobil represented that it had a resource base of 97 billion barrels of oil equivalent (boe) as of 2017. "2017 Financial & Operating Review," ExxonMobil, p. 36, https://corporate.exxonmobil.com/-/media/global/files/annual-report/2017-financial-and-operating-review.pdf; "2018 Financial & Operating Review," ExxonMobil, April 2, 2019, https://corporate.exxonmobil.com/-/media/Global/Files/annual-report/2018-Financial-and-Operating-Review.pdf, pp. 26-27.

[58]  Total upstream capital and exploration expenditures in the upstream segment amounted to $20.19 billion. "2018 Financial & Operating Review," ExxonMobil, April 2, 2019, https://corporate.exxonmobil.com/-/media/Global/Files/annual-report/2018-Financial-and-Operating-Review.pdf, p. 88.

[59]  ExxonMobil, Form 10-K for the Fiscal Year 2018, p. 44.

[60]  ExxonMobil, Form 10-K for the Fiscal Year 2018, p. 25.

[61]  Global earnings is calculated as the sum of upstream, downstream, and chemical earnings. "2018 Results and Highlights," ExxonMobil, April 2, 2019, https://corporate.exxonmobil.com/investors/annual-report/results-and-highlights.

[62]  "2018 Financial & Operating Review," ExxonMobil, pp. 104-107.

**App. 377**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

c. **Chemicals:** ExxonMobil Chemical is one of the largest chemical manufacturing companies in the world.[63] The Chemicals segment includes ExxonMobil's business operations related to the processing of feedstock from upstream and downstream operations to manufacture a wide range of hydrocarbon-based chemical products. More than 90 percent of ExxonMobil's chemical capacity is integrated with ExxonMobil refineries or natural gas processing plants.[64] In 2018, earnings from ExxonMobil's chemical business segment was approximately $3 billion, representing 14 percent of global earnings.[65]

35. Currently, ExxonMobil's most significant upstream portfolio of assets by resource base and production are in the Americas.[66] The Americas, primarily the United States and Canada, contributed approximately 44 percent of ExxonMobil's overall 2018 daily liquids production and 30 percent of ExxonMobil's overall 2018 daily natural gas production.[67] Oil sands contributed approximately 16 percent of 2018 total liquids

---

[63] Tullo, Alexander H., "C&EN's Global Top 50 Chemical Companies: Chemical Profits Continue to Rise as the Global Economy Booms," Chemical & Engineering News, July 30, 2018, https://cen.acs.org/business/finance/CENs-Global-Top-50-chemical/96/i31. *See also* "Powering Progress Around the World," ExxonMobil Chemical, https://www.exxonmobilchemical.com/en/exxonmobil-chemical/about-us.

[64] "Powering Progress Around the World," ExxonMobil Chemical, https://www.exxonmobilchemical.com/en/exxonmobil-chemical/about-us.

[65] Global earnings is calculated as the sum of upstream, downstream, and chemical earnings. "2018 Results and Highlights," ExxonMobil, April 2, 2019, https://corporate.exxonmobil.com/investors/annual-report/results-and-highlights.

[66] "2018 Financial & Operating Review," ExxonMobil, April 2, 2019, https://corporate.exxonmobil.com/-/media/Global/Files/annual-report/2018-Financial-and-Operating-Review.pdf, p. 42.

[67] "2018 Financial & Operating Review," ExxonMobil, April 2, 2019, https://corporate.exxonmobil.com/-/media/Global/Files/annual-report/2018-Financial-and-Operating-Review.pdf, pp. 98-99.

24

**App. 378**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

production.[68] In particular, company-operated Kearl and Cold Lake are ExxonMobil's key Canadian oil sands assets. Kearl production increased almost 16 percent from 2017 to 2018 to an average of 206,000 gross barrels per day and is expected to produce 240,000 gross barrels per day in 2020, and Cold Lake is one of the largest in-situ, heavy-oil projects in the world with 147,000 barrels per day of production.[69] In the U.S., the Permian basin was the most significant contributor to U.S. oil production in 2018, with the Bakken, Alaska, Gulf of Mexico, and California being the other significant contributors.[70] Additionally, ExxonMobil has a significant natural gas E&P business, including positions in key U.S. unconventional basins, following its acquisition of XTO Energy in 2010 for $41 billion.[71]

36.     Similarly, the U.S. contains ExxonMobil's most significant proportion of refining capacity, accounting for over 35 percent of ExxonMobil's global refining capacity, while its largest single refinery at 592,000 barrels per day is located in Singapore.[72] ExxonMobil's major downstream projects include the 250,000 barrel per day light-crude expansion of the Beaumont Refinery, which will increase capacity by 68 percent, infrastructure investments connecting crude oil and natural gas production in the Permian

---

[68]   ExxonMobil, Form 10-K for the Fiscal Year 2018, pp. 9, 14.

[69]   "2018 Financial & Operating Review," ExxonMobil, April 2, 2019, https://corporate.exxonmobil.com/-/media/Global/Files/annual-report/2018-Financial-and-Operating-Review.pdf, p. 44.

[70]   "2018 Financial & Operating Review," ExxonMobil, April 2, 2019, https://corporate.exxonmobil.com/-/media/Global/Files/annual-report/2018-Financial-and-Operating-Review.pdf, p. 42.

[71]   Gelsi, Steve, "Exxon Mobil to Buy XTO Energy in $41 Billion Deal," MarketWatch, December 14, 2009, https://www.marketwatch.com/story/exxon-mobil-to-buy-xto-energy-in-41-billion-deal-2009-12-14.

[72]   "2018 Financial & Operating Review," ExxonMobil, April 2, 2019, https://corporate.exxonmobil.com/-/media/Global/Files/annual-report/2018-Financial-and-Operating-Review.pdf, pp. 104-105.

25

**App. 379**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

basin to Gulf Coast refineries, and major refinery investments in Antwerp and Rotterdam.[73] From 2014-2018, ExxonMobil spent approximately $138 billion on capital and exploration expenditures, 79 percent of which was allocated to upstream and over 33 percent spent in the U.S.[74]

37.     Since 2008, ExxonMobil's global estimated net GHG Emissions (in $CO_2$ equivalents) has ranged between 122 and 128 million metric tons per year, with the vast majority of the emissions arising from upstream and downstream operations. For instance, in 2017, 48 percent and 35 percent of ExxonMobil's total GHG Emissions were from upstream and downstream operations, respectively.[75] According to the Political Economy Research Institute, ExxonMobil ranks as the 12th largest U.S. company with regard to the quantity of $CO_2$ equivalent GHG Emissions and the top GHG emitter among oil and gas companies.[76] The majority of ExxonMobil's direct emissions occur in the Americas.[77]

---

[73]   "2018 Financial & Operating Review," ExxonMobil, April 2, 2019, https://corporate.exxonmobil.com/-/media/Global/Files/annual-report/2018-Financial-and-Operating-Review.pdf, pp. 72, 105.

[74]   The first percentage represents the 2014-2018 sum of "Total Upstream," divided by the 2014-2018 sum of "Total Capital and Exploration Expenditures." The second percentage represents the 2014-2018 sum of "United States" total capital and exploration expenditures divided by the 2014-2018 sum of "Total Worldwide" total capital and exploration expenditures. "2018 Financial & Operating Review," ExxonMobil, April 2, 2019, https://corporate.exxonmobil.com/-/media/Global/Files/annual-report/2018-Financial-and-Operating-Review.pdf, pp. 88-89.

[75]   "Energy & Carbon Summary," ExxonMobil, February 14, 2019, https://corporate.exxonmobil.com/-/media/Global/Files/energy-and-carbon-summary/Energy-and-carbon-summary.pdf, p. 30

[76]   "Greenhouse 100 Polluters Index (2018 Report, Based on 2015 Data)," Political Economy Research Institute, https://www.peri.umass.edu/greenhouse-100-polluters-index-2018-report-based-on-2015-data.

[77]   ExxonMobil's response to the CDP's Climate Change Module, 2017.

26

**App. 380**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

### C.    Overview of Key Climate Change Regulations

38.    To combat what is believed to be climate change driven by human activities, governments around the world have introduced commitments and regulations focused on GHG Emissions to address risks posed by climate change. Many policymakers and industry observers expect these regulations to become increasingly stringent in the coming years.[78] Rex Tillerson, ExxonMobil's former Chairman and Chief Executive Officer, has acknowledged that the company shares this opinion, noting that "the outlook anticipates that stringent government policies will increase the cost of $CO_2$ emissions over time."[79]

39.    In 1992, an international treaty was adopted through the UN Framework Convention of Climate Change at the United Nations Conference of the Parties ("Conference") whose objective was to stabilize "[GHG] concentrations in the atmosphere at a level that would prevent dangerous [human activity-generated] interference with the climate system."[80] The 1997 Kyoto Protocol, the third session of the Conference, bound members to curtail

---

[78]    *See, e.g.*, Rigby, Jon "European Oil and Gas 2019 Outlook - More of the Same," UBS, December 17, 2018, p. 11 ("the most likely trajectory for oil demand means we would miss the implied targets consistent with the Paris Accord. [To meet those targets, p]oliticians and policy makers may try to bend [the demand] curve by introducing more consequential measures on the use of oil and gas."). *See also* Leis, Jorge, "Managing the Energy Transition: Three Scenarios for Planning," Bain & Company, March 12, 2019, https://www.bain.com/contentassets/bf6052e8095448bf9574cbfe48fd25bb/bain_brief-managing_the_energy_transition_three_scenarios_for_planning.pdf ("carbon pricing estimates are becoming more aggressive.").

[79]    ExxonMobil Shareholder Meeting, May 25, 2016, p. 8.

[80]    "United Nations Framework Convention on Climate Change," United Nations, 1992, p. 9, http://unfccc.int/files/essential_background/background_publications_htmlpdf/application/pdf/conveng.pdf. "Conference of the Parties (COP)," United Nations, https://unfccc.int/process/bodies/supreme-bodies/conference-of-the-parties-cop.

**App. 381**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

human activity-generated GHG Emissions to "not exceed their assigned amounts."[81]

More recently, at the 21st session, members adopted the 2015 Paris Agreement (also known as "COP 21"), which aims to keep the global temperature increase below two degrees Celsius above pre-industrial levels by "undertak[ing] rapid reductions [in GHG Emissions]."[82] Currently, 185 countries have ratified the Paris Agreement, and despite the U.S. government's decision to withdraw from the agreement to date 24 U.S. states have joined the U.S. Climate Alliance and are committed to supporting the Paris Agreement.[83]

40.      There has been an over 20-fold increase in domestic climate change laws and policies across 164 countries since the 1997 Kyoto Protocol.[84] The World Bank counted 51 regional, national, or sub-national GHG Emission pricing initiatives as of May 2018 that cover approximately 20 percent of global GHG Emissions.[85,86] For example, in January 2014, a law went into effect in Mexico that levied a carbon tax on fossil fuel

---

[81]  "Report of The Conference Of The Parties On Its Third Session, Held At Kyoto, Article 3," United Nations, March 25, 1998, p. 9.

[82]  "Paris Agreement," United Nations, 2015, Article 4.

[83]  "Paris Agreement – Status of Ratification," United Nations, https://unfccc.int/process/the-paris-agreement/status-of-ratification; "Governors" United States Climate Alliance, https://www.usclimatealliance.org/governors-1.

[84]  Nachmany, Michal, Sam Fankhauser, Joana Setzer, and Alina Averchenkova, "Global Trends in Climate Change Legislation and Litigation," 2017, p. 8, http://www.lse.ac.uk/GranthamInstitute/wp-content/uploads/2017/04/Global-trends-in-climate-change-legislation-and-litigation-WEB.pdf.

[85]  "State and Trends of Carbon Pricing 2018," World Bank, May 2018, p. 8, https://openknowledge.worldbank.org/bitstream/handle/10986/29687/9781464812927.pdf?sequence=5&isAllowed=y.

[86]  The largest such initiative is the European Union's ("EU") Emissions Trading Scheme, which was introduced in 2005 and involves 31 countries. Several subnational emissions schemes also operate in the U.S. and China, while states like Japan, France, and Mexico have all launched carbon taxes in the past decade. *See, e.g.*, "EU Emissions Trading System (EU ETS)," European Commission, https://ec.europa.eu/clima/policies/ets_en. *See also* "State and Trends of Carbon Pricing 2018," World Bank, pp. 9–10.

**App. 382**

Contains Confidential Material

Subject to Stipulation and Order for the Production and Exchange of Confidential Information

production.[87] Moreover, in the EU, as of December 2018, 18 out of 28 member nations incorporated a $CO_2$ tax on passenger vehicles, including one-time registration taxes and annual road taxes based on $CO_2$ emissions.[88]

41.    One such regional climate change law is the Alberta (Canada) 2003 Climate Change and Emissions Management Act, whose target was "a reduction by December 31, 2020 of specified [GHG] emissions relative to Gross Domestic Product to an amount that is equal to or less than 50% of 1990 levels."[89]

42.    Another region that has enacted laws to curb GHG Emissions and manage climate change risk is Catalonia in Spain. In 2016, Catalonia introduced a carbon tax on road vehicles that would take effect in 2018 where owners would pay an annual tax based on the level of greenhouse gas emissions of their vehicles.[90] The region then introduced the "Climate Change Bill" in 2018 to tax business activities and large vessels that produce pollution by taxing businesses approximately $10 per ton of $CO_2$ emitted, which will rise to approximately $30 per ton in 2025, and large vessels approximately $1,000 per ton of nitrogen oxide emitted. The goal of the Climate Change Bill is to reduce emissions 65

---

[87]    "Mexico: a Market Based Climate Policy Case Study," EDF and IETA, January 2018, p. 3.

[88]    All EU countries except Bulgaria, Czech Republic, Denmark, Estonia, Hungary, Italy, Lithuania, Poland, Romania, and Slovakia have a tax on passenger vehicles that accounts for carbon dioxide emissions in some capacity. "$CO_2$ Based Motor Vehicle Taxes in the EU," European Automobile Manufacturers Association, 2018, https://www.acea.be/uploads/publications/CO2_tax_overview_2018.pdf.

[89]    "Climate Change and Emissions Management Act," Province of Alberta, 2003, p. 6.

[90]    Szabo, Mike, "Spain's Catalonia Introduces Carbon Tax for Road Vehicles," Carbon Pulse, January 28, 2016, https://carbon-pulse.com/14839/.

**App. 383**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

percent by 2040 and 100 percent by 2050.[91] In addition, in December 2018 the EU enacted stricter $CO_2$ emissions regulations that aim to reduce average $CO_2$ emissions from new passenger cars and light-commercial vehicles by 15 percent in 2025 and by 37.5 percent in 2030 from their 2021 baseline.[92] The regulations will be measured using a new test that more accurately measures vehicle fuel consumption and emissions,[93] demonstrating the importance of both fuel economy and absolute GHG Emissions in controlling climate change and the actions of governments to impact each aspect of GHG Emissions separately.

43.     However, many countries are far from reaching their post-2020 emissions reduction targets agreed to in the Paris Agreement.[94] For instance, as of 2017, the EU had cut $CO_2$ emissions to 22 percent below 1990 levels, but it has targeted a 40 percent reduction by 2030.[95] As a result, climate change regulations and GHG Emissions reduction policies are widely expected to intensify worldwide in the coming decades.[96] China, the world's

---

[91]   "Catalonia Passes Climate Change Law to Reduce Emissions by 100% by 2050," The Climate Group, August 3, 2017, https://www.theclimategroup.org/news/catalonia-passes-climate-change-law-reduce-emissions-100-2050.

[92]   "CO2 Emission Standards for Passenger Cars and Light-Commercial Vehicles in the European Union," International Council on Clean Transportation, January 2019, p. 1.

[93]   "Getting Ready for WLTP," European Automobile Manufacturers Association, p. 1.

[94]   *See, e.g.*, "Warming Projections: Global Update," Climate Action Tracker, December 2018, p. 1. *See also* "Emissions Gap Report 2018," United Nations Environment Programme, November 2018, p. 8, https://www.unenvironment.org/resources/emissions-gap-report-2018 ("At present, G20 countries are collectively not on track to meet their unconditional NDCs for 2030.").

[95]   "EU and the Paris Climate Agreement: Taking Stock of Progress at Katowice COP," European Commission, October 26, 2018, p. 1.

[96]   Bain & Company ("Bain") noted in a 2019 report, "carbon regulations have gained traction in both Asia and the Americas; as countries begin to use carbon pricing as a measurement of climate change risk, carbon pricing estimates are becoming more aggressive." Leis, Jorge, "Managing the Energy Transition: Three Scenarios for Planning," Bain & Company, March 12, 2019

**App. 384**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

biggest carbon emitter today, approved a national emissions trading scheme in 2017, while a coalition of nine U.S. East Coast states plans to cap transportation emissions.[97] Similarly, in Alberta, Canada, a provincial carbon tax of $20 per ton of $CO_2$ went into effect in January 2017 and rose to $30 in 2018.[98] This regulation, was meant to "add rigour" and incentivize "decarbonization of Alberta's industry at an accelerated rate" relative to the previous regulation.[99] Additionally, in the decade up to 2017, the number of governments with vehicle fuel economy standards increased from four to ten.[100] In addition to an expected increase in the number of governments adopting such fuel economy standards, fuel economy standards themselves are expected to get stricter in the future.[101] While the purpose of these increased fuel economy standards is to reduce the

https://www.bain.com/contentassets/bf6052e8095448bf9574cbfe48fd25bb/bain_brief-managing_the_energy_transition_three_scenarios_for_planning.pdf.

[97] Xu, Muyu and Josephine Mason, "China Aims for Emission Trading Scheme in Big Step vs. Global Warming," Reuters, December 19, 2017, https://www.reuters.com/article/us-china-carbon/china-aims-for-emission-trading-scheme-in-big-step-vs-global-warming-idUSKBN1ED0R6; Transportation & Climate Initiative, "Transportation & Climate Initiative Statement," December 18, 2018, https://www.georgetownclimate.org/files/Final_TCI-statement_20181218_formatted.pdf.

[98] "Working to Make Life Better: Fiscal Plan," Province of Alberta, March 16, 2017, p. 99, https://open.alberta.ca/dataset/aa40ded0-75b3-48fe-9bbf-ea33802b8825/resource/da23ee3c-b79c-4971-8f75-e28ab7684983/download/fiscal-plan-complete.pdf.

[99] Saric, Dana, Lorne Carson, and Courtney Bohn, "Carbon Competitiveness Incentive Regulation Replaces and Adds Rigour to Alberta's Existing Industrial Carbon Emissions Regulation," Osler, December 22, 2017, https://www.osler.com/en/resources/regulations/2017/carbon-competitiveness-incentive-regulation-replac.

[100] Yang, Zifei and Anup Bandivadekar, "2017 Global Update: Light-Duty Vehicle Greenhouse Gas and Fuel Economy Standards," The International Council on Clean Transportation, June 23, 2017, https://www.theicct.org/publications/2017-global-update-LDV-GHG-FE-standards.

[101] See, e.g., "ASEAN Countries Adopt Fuel Economy Roadmap," Global Fuel Economy Initiative, November 20, 2018, https://www.globalfueleconomy.org/blog/2018/november/asean-countries-adopt-fuel-economy-roadmap. See also "Fuel Economy Improvements are Projected to Reduce Future Gasoline Use," EIA, May 23, 2017, https://www.eia.gov/todayinenergy/detail.php?id=31332.

31

**App. 385**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

consumption of refined products and therefore curb crude oil consumption, the standards indirectly impact the overall quantity of GHG Emissions as well.[102]

44.     Meanwhile, reflecting a more stringent regulatory environment, a growing number of businesses are also responding by incorporating GHG Emission costs into their long-range planning. A May 2018 World Bank report noted over 1,300 companies worldwide that were using or planned to use internal GHG Emission costs in their decision-making, including more than 100 Fortune 500 Global Companies.[103] These also include major oil and gas companies that have publicly disclosed that they use a proxy cost for GHG Emissions in their planning and investment decisions. I discuss these proxy cost for GHG Emissions disclosures by oil and gas companies in further detail in Section IV.B.3 below.

**IV.     CLIMATE CHANGE REGULATORY RISK IS A RELEVANT FACTOR IN THE ASSESSMENT OF OIL AND GAS COMPANIES GENERALLY**

    **A.     Overview of Factors Considered by the Investment Community in Evaluating Oil and Gas Companies**

45.     The Investment Community's evaluation of oil and gas companies takes into account a broad range of factors. These include not only company-specific metrics but also industry trends, regulatory risk, and other external risk factors that may influence the performance of companies in the oil and gas sector, including ExxonMobil.

---

[102]  *See, e.g.*, "Corporate Average Fuel Economy (CAFE) Standards," U.S. Department of Transportation, https://www.transportation.gov/mission/sustainability/corporate-average-fuel-economy-cafe-standards. *See also* "Corporate Average Fuel Economy (CAFE) Standards," Alliance to Save Energy, July 27, 2018, https://www.ase.org/resources/corporate-average-fuel-economy-cafe-standards.

[103]  "State and Trends of Carbon Pricing 2018," World Bank, May 2018, p. 55 https://openknowledge.worldbank.org/bitstream/handle/10986/29687/9781464812927.pdf?sequence=5&isAllowed=y.

**App. 386**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

46.    For example, equity research analysts covering oil and gas companies typically develop stock price targets. In developing these targets, the analysts consider quantifiable metrics such as the current price of oil and gas products, oil and gas proved reserves, current and projected capital expenditures, existing production capacity, operational costs, production growth, operating margins, total oil and gas resource base, and the generation of Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") and free cash flows.[104] To gain a complete picture of the business, however, analysts also typically consider additional risk factors in their evaluation that could impact the future operations and profitability of oil and gas companies. Such factors may include, among others, external supply and demand factors that could influence the market price of oil and gas products, quality of a company's management, restrictions imposed by the U.S. or other jurisdictions on doing business, risk that the company may not be able to find and develop new reserves economically, inaccuracies in reserves or resource base estimates or assumptions underlying those estimates, and regulatory risks that could affect the company's business.[105]

---

[104]    *See, e.g*, Rigby, Jon *et al.,* "European Oil and Gas: 2019 Outlook: More of the Same," UBS, December 17, 2018, pp. 10-11, 72-73, 81. *See also* Darby, Sean, Kenneth Chan, and Dodo Cheng, "Global Equity Strategy: US Outlook: The Return of US Competitiveness," Jefferies, January 9, 2012, pp. 106-107; Margolin, Sam, Jason Gabelman, and Brian Zhang, "Exxon Mobil Corporation: Notes from the Road," Cowen, June 25, 2018, p. 9.

[105]    *See, e.g.*, ExxonMobil, Form 10-K for the Fiscal Year 2017, pp. 2-4; Rigby, Jon et. al., "European Oil and Gas: 2019 Outlook: More of the Same," UBS, December 17, 2018, pp. 10-11, 81. *See also* Lai, Elaine and Laban Yu, "Integrated Oil Cash Dry, But There's No Stopping the Supermajor; Initiate Sinopec Group Cost," Jefferies, February 16, 2016; QEP Resources, Inc., Form 10-K for the Fiscal Year 2018, p. 35; Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year 2018, p. 41; Sankey, Paul, David T. Clark, and Silvio Micheloto, "XOM-XTO Hearing; Oil Industry Keeps Rising in DC," Deutsche Bank, January 21, 2010, p. 1.

33

**App. 387**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

47. Moreover, the oil and gas industry faces unique risks due to the long time horizon of many of its assets. Oil and gas reserves are produced over a multi-year time frame, with many reserves, such as ExxonMobil's oil sands Kearl project in Canada, producing for upwards of 40 years.[106] Due to the long-term nature of the resource extraction, every project initiated and each well drilled will face significant risk due to the uncertainty of future pricing, potential cost escalation, or potential technical or operational challenges that could result in the resource not being produced. Also, oil and gas companies face the risk of a constantly depleting asset base, which presents risks as to the long-term viability of a company. For instance, as stated above, a common future risk present in all oil and gas companies is the ability to replace hydrocarbon reserves that have been produced. If an oil company is unable to replace its depleted reserves, that failure will exert a direct impact on the future financial performance of the company as it will have no oil or gas to sell in order to generate revenues. Similarly, long-term assets are also more vulnerable to potential future regulatory changes that may impose additional costs on oil and gas companies, which can make the production of their hydrocarbon reserves prohibitively expensive.[107] As a result, the Investment Community's assessment of oil and gas companies typically not only takes into account current risk factors but also long-term risk factors that may impact the business.

---

[106] *See, e.g.*, "Kearl," Imperial, https://www.imperialoil.ca/en-ca/company/operations/oil-sands/kearl. *See also* "ExxonMobil Announces Kearl Expansion Project Starts Production Ahead of Schedule," ExxonMobil, June 16, 2015, https://news.exxonmobil.com/press-release/exxonmobil-announces-kearl-expansion-project-starts-production-ahead-schedule.

[107] *See infra* section V.A.

**App. 388**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

**B.** **Climate Change Regulatory Risk is a Consideration for the Investment Community in Its Assessment of Oil and Gas Companies**

*1.    The Investment Community Recognizes that the Oil and Gas Industry Faces Significant Climate Change Regulatory Risk*

48.    Climate Change Regulatory Risk is one long-term risk factor that the Investment Community considers in its evaluation of oil and gas companies. As discussed in Section III.C, many governments around the world have enacted climate change regulations, and such regulations are projected to become increasingly stringent in the future. The oil and gas industry, as a GHG Emission-intensive industry, faces particularly high risk from climate change regulations. These regulations are likely to impose significant costs on the operations of oil and gas companies such as ExxonMobil, thereby impacting their future operating cash flows, profitability growth, and investment returns.[108]

49.    The Investment Community has consistently recognized this heightened Climate Change Regulatory Risk faced by the industry and over the years commented on the importance of considering such risk in the assessment of oil and gas companies. For example:

- A 2010 Bain report noted that "oil producers, as a group, are vulnerable to carbon-constraining policies" and "oil firms whose output is dominated by

---

[108] Past environmental regulations, such as the Clean Air Act Amendments of 1990, have illustrated the impact that future climate change regulations may exert on the oil and gas industry. Those regulations forced oil refiners to reduce emissions of air pollutants, leading to the closure of nearly a quarter of U.S. refineries between 1990 and 2000. The Clean Air Act also contributed to approximately $128 billion in total compliance costs of U.S. federal environmental regulations between 1990 and 2012.

*See* "1990 Clean Air Act Amendment Summary: Title I," U.S. Environmental Protection Agency, https://www.epa.gov/clean-air-act-overview/1990-clean-air-act-amendment-summary-title-i. *See also* Rhodes, Anne, "Hostile Operating Climate Augurs Further Closures for U.S. Refiners," *Oil & Gas Journal*, March 10, 1997, https://www.ogj.com/articles/print/volume-95/issue-10/in-this-issue/refining/hostile-operating-climate-augurs-further-closures-for-us-refiners.html; "The Refining Industry in the New Millennium," *World Refining & Fuels Today*, January 1, 2001; "Over-Regulation of the Nation's Refineries," Institute for Energy Research, May 2, 2012, p. 666.

**App. 389**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

producing at or near the market clearing price prior to $CO_2$ regulations will find their business severely threatened by such regulations."[109]

- In 2013, Ceres noted that "[t]here is now a widespread view that it is not in the best interest of investors for companies to expend further capital on low return projects. Government policies to reduce GHG emissions would be likely to further reduce the returns of these projects."[110]

- In 2015, the California Public Employees Retirement System ("CalPERS") and California State Teachers Retirement System ("CalSTRS"), both ExxonMobil shareholders at the time, jointly wrote about the risk of climate change regulations, forecasting that it was "likely that some type of carbon emissions legislation will be introduced at the federal level."[111]

- In 2016, BlackRock stated, "we believe all investors should incorporate climate change awareness into their investment processes."[112] Later, in 2017, BlackRock expressed that it believed "that enhanced, meaningful [climate change] disclosures [were] an important step towards building understanding of the impact on individual companies, sectors and investment strategies," and promised to "engage companies most exposed to climate risk to understand their views on" climate-related financial disclosures.[113]

---

[109] Leis, Jorge and Kurt Zenz House, "The Green Edge: Why Carbon Competitiveness Matters," Bain & Company, 2010, https://www.bain.com/insights/green-edge-why-carbon-competitiveness-matters/.

[110] EMC 000510874-876, Ceres letter to Rex Tillerson, September 9, 2013, at EMC000510876.

[111] Accordingly, these funds include environmental ("activities that…deplet[e] or reduc[e] air quality") and climate change (an investment's "attention to the impacts of climate change, including attention to relevant climate policy considerations") risks in their list of risk factors that they consider for their investments.

"The Importance of Corporate Engagement on Climate Change," CalPERS and CALSTRS, p 2. S&P Capital IQ; "Investment Policy for Mitigating Environmental, Social, and Governance Risks (ESG)," CALSTRS, 2018, p. A-23, https://www.calstrs.com/sites/main/files/file-attachments/calstrs_esg_policy.pdf.

[112] Prior to this statement, in 2015, BlackRock Investment Institute had stated "we think it is prudent to appreciate the regulatory momentum behind [global warming and its causes]. Governments are moving to curb and eventually reduce greenhouse gas emissions."

"The Price of Climate Change: Global Warming's Impact on Portfolios," BlackRock Investment Institute, October 2015, p. 3, https://www.blackrock.com/corporate/literature/whitepaper/bii-pricing-climate-risk-international.pdf. "Adapting Portfolios to Climate Change: Implications and Sstrategies for All Investors," BlackRock Investment Institute, August, 2016, p. 2, https://www.blackrock.com/corporate/literature/whitepaper/bii-climate-change-2016-us.pdf.

[113] "Our Engagement Priorities for 2017-2018," BlackRock, archived March 22, 2017, https://web.archive.org/web/20170322043929/https://www.blackrock.com/corporate/en-us/about-us/investment-stewardship/engagement-priorities.

App. 390

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

- In 2016, BMO Capital Markets commented that "adapting to climate change is putting pressure on the [oil and gas] sector" and that "climate change threatens stranding resources long term."[114]

- In 2017, after the Paris climate change agreement, Deutsche Bank analysts stated that "[a]s disclosure by the companies on emissions improves and with COP21 now ratified, it seems prescient … to think more about the potential implications for the oil and gas sector… For an industry that is a substantial emitter the financial costs have the potential to be very material."[115]

- In 2017, Vanguard, a major ExxonMobil investor, noted that "climate change poses risks to investors in certain sectors, such as oil and gas."[116]

- Similarly, in 2017, New York State Comptroller Thomas P. DiNapoli stated that "[c]limate change is one of the greatest threats to [the New York State Common Retirement Fund ("NYSCRF")]'s long-term value."[117]

- In 2018, UBS stated even more directly: "climate change and the impact of energy transition is a potentially existential issue for the oil and gas world."[118]

50.     The Investment Community is particularly concerned that higher costs resulting from climate change regulations could have a significant impact on oil and gas reserves extracted from non-conventional sources such as oil sands, shale, and offshore operations. These sources are typically more GHG Emission-intensive and have lower

---

[114] Warn, Brendan and Nikolas Stefanou, "ExxonMobil: Gold Standard: Initiating with Market Perform Rating, $78 Target Price," BMO, December 1, 2016, p. 11.

[115] Herrmann, Lucas and Tom Robinson, "European Integrated Oil: 2017 Outlook: Hitting a Sweet Spot," Deutsche Bank, December 6, 2016, p. 46. "COP21" refers to the 2015 Paris Climate Conference where the Paris Agreement was adopted. *See, e.g.,* "Find out More about COP21," Sustainable Innovation Forum 2015, http://www.cop21paris.org/about/cop21. *See also* discussion *infra* Section III.C.

[116] S&P Capital IQ. "Standards Board," Sustainability Accounting Standards Board, https://www.sasb.org/governance/standards-board/; VGI1920, Internal Vanguard memorandum, May 23, 2017, p. 3.

[117] "NYS Comptroller DiNapoli: ExxonMobil Agrees to Assess Impacts of Climate Change," Office of the New York State Comptroller, December 12, 2017, https://www.osc.state.ny.us/press/releases/dec17/121217.htm.

[118] Rigby, Jon, Henri Patricot, and John Delos Santos, "ExxonMobil Corp.: Zigging Not Zagging," UBS, September 7, 2018, p. 37.

37

**App. 391**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

margins.[119,120] Therefore, any additional costs related to GHG Emissions could cause such projects to be economically unviable and the assets to be "stranded."[121] The stranded asset risk has been highlighted by both industry analysts and some of ExxonMobil's major investors.[122] For example:

- A 2014 Société Générale report explains, "the high cost of supply of some new oil sands projects makes them marginal and returns are very vulnerable to cost escalation and oil price," and that "[a]pplying the stranded asset lens to these companies' high cost and high carbon projects does raise serious questions about the viability of the long-term business strategies of many fossil energy companies."[123]

- In 2014, Norges Bank, which manages The Government Pension Fund of Norway, is the world's largest sovereign wealth fund today, and owned ExxonMobil's stock at the time,[124] stated that "[t]he production of oil from oil

---

[119] *See, e.g.*, Gordon, Deborah, "Understanding Unconventional Oil," The Carnegie Papers, May 2012, pp. 1-2, https://carnegieendowment.org/files/unconventional_oil.pdf ("unconventional oils will likely deliver a higher volume of heavier hydrocarbons, require more intensive processing and additives, and yield more byproducts that contain large amounts of carbon."). *See also* Brammer, Marc and Yulia Reuter, "The Viability of Non-Conventional Oil Development," Innovest Strategic Value Advisors, March 2009, p. 2 ("Non-conventional oil (NCO) development, however, is only profitable within a very thin margin space.")

[120] The Carbon Asset Risk letter, which was signed in 2013 by over 75 investors representing $3 trillion in assets under management, conveys concern about these high-emissions assets. Specifically, the letter intends "[t]o prevent shareholder capital from being wasted on developing high-carbon and high-cost fossil fuel reserves that are 'unburnable' if the world is to avoid catastrophic climate change or may prove uneconomic if prices decline." "Carbon Asset Risk: A Review of Progress and Opportunities," Ceres, p. 5; "Carbon Asset Risk: A Review of Progress and Opportunities," Ceres, https://www.ceres.org/resources/reports/carbon-asset-risk-review-progress-and-opportunities.

[121] Stranded assets are assets "that lose value or turn into liabilities before the end of their expected economic life. In the context of fossil fuels, this means those that will not be burned - they remain stranded in the ground." Paun, Ashim, Zoe Knight, and Wai-Shin Chan, "Stranded Assets: What Next?," HSBC, April 16, 2015, pp. 1, 23.

[122] As I noted in Section III.B, oil sands projects are some of the most significant ExxonMobil assets.

[123] Whooley, Niamh *et al.,* "US Tight Oil (Shale) vs Canadian Oil Sands - Stranded Asset Risk - Cost of Supply, GHG Emissions, Water," Société Générale, September 2014, pp. 5, 7.

[124] Meredith, Sam, "World's Largest Sovereign Wealth Fund to Scrap Oil and Gas Stocks," CNBC, March 8, 2019, https://www.cnbc.com/2019/03/08/norway-worlds-largest-sovereign-wealth-fund-to-scrap-energy-stocks.html. S&P Capital IQ.

38

**App. 392**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

sands may be exposed to risk in the event of climate-related regulatory changes."[125]

- In 2016, BlackRock, a major ExxonMobil investor, also stated that stranded asset risk might arise if "[g]overnments […] 'tax' fossil fuels to an extent that it is no longer feasible to develop them."[126]

- In 2017, State Street, another major ExxonMobil investor, came to a similar conclusion, stating that consideration of climate risk in long-term strategy is "particularly important for companies in the oil and gas [and other extraction-based] sectors where long investment horizons could render assets stranded." Because of that risk, "carbon price assumptions are important because [they…] provide insight into how companies account for climate risk in the planning process[, and …] are key in helping companies identify potential stranded assets and mitigating the risk of investing in assets that may become stranded in the future."[127]

2.    *Environmental, Social, and Governance ("ESG") Concerns Have Caused Some Investors to Divest Holdings in Fossil Fuel Investments*

51.    Some investors are motivated not only by investment returns but also by greater concern for the sustainability and ethical impact of their investment decisions.[128] As the ESG

---

[125] "Responsible Investment: Government Pension Fund Global," Norges Bank Investment Management, 2014, p. 71, https://www.nbim.no/globalassets/reports/2014/2014-responsible-investment.pdf.

[126] "Adapting Portfolios to Climate Change: Implications and Strategies for All Investors," BlackRock Investment Institute, September 2016, p. 6, https://www.blackrock.com/corporate/literature/whitepaper/bii-climate-change-2016-us.pdf.

[127] "SSGA's Perspective on Effective Climate Change Disclosure," State Street Global Advisors, August 7, 2017, pp. 1-2, https://www.ssga.com/investment-topics/environmental-social-governance/2017/perspectives-on-effective-climate-change-disclosure.pdf.

[128] For example, in 2013, State Street stated "[p]rotecting and preserving our natural resources helps us to increase efficiency, attract and retain clients, save money, and engage employees." "The Way Ahead: Corporate Responsibility 2013 Report," State Street, 2013, p. 3, http://www.statestreet.com/content/dam/statestreet/documents/values/2013_CR_Report.pdf.

In 2015, Morgan Stanley declared "[w]e believe that understanding E, S and G risks and opportunities can only enhance investment decisions. As such, this added layer of analysis should be relevant and interesting for all investors, whether or not they have an SRI [Socially Responsible Investing] mandate." Alsford, Jessica *et al.,* "Embedding Sustainability into Valuation," Morgan Stanley, January 27, 2015, p. 4.

Similarly, in 2016, BlackRock noted "[p]olicy makers, asset owners, and the public at large are focused on ESG factors as a means to promote sustainable business practices and products. Investment professionals increasingly see its potential links to company operational strength, efficiency, and management of long-term

---

39

**App. 393**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

approach generally espoused by these investors becomes more prevalent and accepted in the Investment Community, the oil and gas industry may face further risk stemming from investors' aversion to investing in GHG Emission-intensive businesses and industries.[129]

52.   Such ESG concerns, along with investors' considerations about Climate Change Regulatory Risk, have caused major institutional investors to consider reducing the exposure of their investment portfolios to companies that depend on fossil fuels. For instance, according to a report on the divestment movement, as of September 2018, "nearly 1,000 institutional investors with $6.24 trillion in assets have committed to divest from fossil fuels, up from $52 billion four years ago."[130]

53.   Several institutional investors, which include some of ExxonMobil's investors, have reduced their exposure to GHG Emission-intensive investments or have considered doing so. In fact, in 2014 UN secretary general Ban Ki-moon stated: "I have been urging

---

financial risks." "Exploring ESG: A Practitioner's Perspective," BlackRock, June 2016, p. 1, https://www.blackrock.com/corporate/literature/whitepaper/viewpoint-exploring-esg-a-practitioners-perspective-june-2016.pdf.

[129] In 2018, Oliver Wyman's Global Head of Energy opined that "climate change considerations, other environmental issues and litigatory concerns are increasingly shaping investment fund decisions, with $6 trillion of funds (led by the insurance sector with $3 trillion) committed to divestment from fossil fuel equity classes. Major energy companies have cited this divestment as a material risk to their business and are doing significant development in renewables." Austin, Francois, "Is The Energy Industry Meeting Its Sustainability Goals?," Oliver Wyman, November 5, 2018, https://www.oliverwyman.com/our-expertise/insights/2018/nov/is-the-energy-industry-meeting-its-sustainability-goals.html.

[130] "The Global Fossil Fuel Divestment and Clean Energy Investment Movement: 2018 Report," Arabella Advisors, September 5, 2018, p. 1, https://www.arabellaadvisors.com/wp-content/uploads/2018/09/Global-Divestment-Report-2018.pdf.

40

**App. 394**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

companies like pension funds or insurance companies to reduce their investments in a

fossil-fuel based economy."[131]

54.    Major universities are one such category of institutional investors that have considered

divesting from oil and gas companies in their endowment funds. For example:

- In 2012, Unity College became the first institution of higher learning to divest its endowment from investments in fossil fuels.[132]

- In 2015, the University of California ("UC") system, an ExxonMobil investor, sold off its endowment and pension fund holdings in coal and oil sands companies "in response to both environmental concerns and rising financial risk in those industries."[133] Moreover, in 2018, the UC's Chief Investment Officer announced a broader directive to reduce holdings in fossil fuels, including oil and gas companies, stating "fossil fuels…is a financial risk we do not want to take in the context of real assets. We will fundamentally reduce those holdings."[134]

- In 2016, the Dartmouth College Advisory Committee on Investor Responsibility, which makes investment recommendations to Dartmouth College, another ExxonMobil investor, noted that "[t]he future of fossil fuels is undeniably limited and early divestment positions Dartmouth as a leader and might avoid losses down the road."[135]

---

[131]  "UN Secretary General Advises Pension Funds to Divest from Fossil Fuels," Pension Funds Online, November 6, 2014, http://www.pensionfundsonline.co.uk/content/pension-funds-insider/investment/un-secretary-general-advises-pension-funds-to-divest-from-fossil-fuels/1559.

[132]  "Divestment," Unity College, https://www.unity.edu/about/sustainability-science/fossil-fuel-divestment/.

[133]  S&P Capital IQ; Gordon, Larry, "UC Sells Off $200 Million in Coal and Oil Sands Investments," Los Angeles Times, September 9, 2015.

[134]  Jacobius, Arleen, "Fossil Fuels to be History for UC Investment Office," Pensions & Investments, April 2, 2018, https://www.pionline.com/article/20180402/PRINT/180409989/fossil-fuels-to-be-history-for-uc-investment-office.

[135]  "Catalog of Reasons for and Against Fossil Fuel Divestment by Dartmouth," Dartmouth College Advisory Committee on Investor Responsibility https://www.dartmouth.edu/~president/announcements/carbon_pro_and_con.pdf. "Executive Summary Prepared for the Dartmouth Community Fiscal 2017," Dartmouth College Advisory Committee on Investor Responsibility, p. 14. *See also* "Mission," Dartmouth College Advisory Committee on Investor Responsibility, https://www.dartmouth.edu/~finance/committees/acir.html.

**App. 395**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

- In 2019, Middlebury College announced that it "will begin a phase-out of direct fossil fuel investments in the endowment [that will] eliminate such investments entirely."[136]

55.    Similarly, recent legislation has also put pressure on public pension funds, yet another

category of institutional investors to divest from GHG Emission-intensive assets.

Selected examples include:

- In 2017, "CalPERS completed divesting stock in 14 thermal coal companies," in response to a California law that required CalPERS and CALSTRS to divest from investments in coal by July 2017.[137]

- In 2018, Ireland passed a bill that required its national investment fund to sell all investments in coal, oil, gas, and peat.[138]

- On January 22, 2019, the New York State Senate put forward a bill for the 2019-2020 legislative session, that would "prohibit the State Comptroller from investing monies of the Common Retirement Fund … in the Carbon Underground 200, an aggregated list of the top 100 coal and top 100 oil/gas (fossil fuel) publicly traded companies, as defined by the carbon content in the companies' proven reserves." The list of companies includes ExxonMobil.[139]

56.    Major asset managers have also framed divestment from fossil fuels and GHG Emission-

intensive companies as a way to accommodate investor demand. For example:

---

[136] "Middlebury Announces Energy2028 Plan to Address Threat of Climate Change," January 29, 2019, http://www.middlebury.edu/newsroom/archive/2019-news/node/611978.

[137] Diamond, Randy, "CalPERS Reveals it Divested from Most Thermal Coal Companies," Pensions & Investments, August 7, 2017, https://www.pionline.com/article/20170807/ONLINE/170809876/calpers-reveals-it-divested-from-most-thermal-coal-companies.

[138] Carrington, Damian, "Ireland Becomes World's First Country to Divest from Fossil Fuels," The Guardian, July 12, 2018, https://www.theguardian.com/environment/2018/jul/12/ireland-becomes-worlds-first-country-to-divest-from-fossil-fuels.

[139] New York State Senate, "Senate Bill S2126," https://www.nysenate.gov/legislation/bills/2019/s2126. "DivestInvest – the Carbon Underground 200," Fossil Free Indexes, http://fossilfreeindexes.com/divestinvest/.

**App. 396**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

- In 2016, BlackRock explained that "[m]any asset owners address climate change by adjusting existing portfolios [including] some exclusion of resources or utility companies."[140]

- In 2016, State Street began offering two fossil-fuel-reserves-free ETFs [Exchange Traded Funds], which the company had "[d]eveloped to address growing client demand for ESG strategies and help investors divest from companies owning fossil fuel reserves."[141]

- In late 2017, the large France-based insurer AXA announced that it initiated "the divestment of over Euro 700 million from the main oil sands producers and associated pipelines, and the discontinuation of further investments in these businesses" because "oil sands are … an extremely carbon-intensive form of energy and a serious cause of environmental pollution."[142]

3. *Oil and Gas Companies and Their Shareholders Have Considered and Taken Measures to Manage Climate Change Regulatory Risk*

57. Given the concerns of the Investment Community regarding Climate Change Regulatory Risk and demands for additional information on managing this risk, it is not surprising that oil and gas companies have also made frequent disclosures regarding the risks posed to their business by climate change regulations. For instance, a 2017 analysis of the annual SEC filings of the 100 largest publicly traded U.S. oil and gas companies found

---

[140] "Adapting Portfolios to Climate Change: Implications and Strategies for All Investors," BlackRock Investment Institute, August 2016, p. 9, https://www.blackrock.com/corporate/literature/whitepaper/bii-climate-change-2016-us.pdf.

[141] "State Street Global Advisors Expands Suite of Environmental, Social and Governance (ESG) ETFs," State Street, October 25, 2016, https://newsroom.statestreet.com/press-release/corporate/state-street-global-advisors-expands-suite-environmental-social-and-governan.

[142] "AXA Accelerates its Commitment to Fight Climate Change," AXA, December 12, 2017, https://group.axa.com/en/newsroom/press-releases/axa-accelerates-its-commitment-to-fight-climate-change.

**App. 397**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

that more than 90 percent of those companies cited "[i]mpact of climate change/greenhouse gas legislation" as a risk factor to their business.[143]

58.    Additionally, Exhibit 1 shows the scores assigned by Carbon Disclosure Project ("CDP") to ExxonMobil and its peer companies in the oil and gas industry based on the comprehensiveness of disclosures related to climate change, awareness, and leadership on environmental issues.[144] As can be seen from the exhibit, CDP has rated ExxonMobil and its peers including Chevron, BP, ENI, Royal Dutch Shell, and Total, some of the largest publicly-traded oil and gas companies, since as early as 2010 based on their disclosures on climate change related issues.[145] These companies, furthermore, have generally complied with CDP's requests for detailed climate change disclosures. Moreover, industry analysts have encouraged such disclosures on climate change related issues, especially companies' use of proxy cost for GHG Emissions to account for Climate Change Regulatory Risk.[146] As Exhibit 2 demonstrates, CDP has requested information from ExxonMobil and many of its peers regarding their accounting of GHG Emission costs. The exhibit shows that these companies have usually responded by acknowledging

---

[143]    "2017 BDO Oil and Gas Risk Factor Report," BDO, p. 1, https://www.bdo.com/getattachment/a1bf67be-1beb-42b1-8f0c-f3db2446c6ed/attachment.aspx?2017-Oil-Gas-Riskfactor-Report-Brochure_WEB.pdf.

[144]    CDP is a charity which runs a disclosure system that allows companies "to measure and manage their environmental impacts." "Our Vision and Mission," CDP, https://www.cdp.net/en/info/about-us.

[145]    I discuss the specific climate change related disclosure made by ExxonMobil during the relevant period in further detail in Section V.B.

[146]    *See, e.g.*, "A Framework for 2 Degrees Scenario Analysis: A Guide for Oil and Gas Companies and Investors for Navigating the Energy Transition," Ceres, 2016, p. 32, https://www.ceres.org/sites/default/files/reports/2017-03/Framework_Jan%2010%2017.pdf ("[t]o evaluate how well a company is positioned to change course as carbon externalities get re-priced…investors may want to consider questions such as…[d]oes the company use a carbon price in deliberations on capital projects.").

**App. 398**

Contains Confidential Material

Subject to Stipulation and Order for the Production and Exchange of Confidential Information

that they account for GHG Emission costs through the use of proxy costs in their business planning.[147] In turn, equity research analysts have taken note of these proxy cost disclosures related to GHG Emissions by the companies in their assessments.[148]

59.  However, despite oil and gas companies' disclosures on Climate Change Regulatory Risk, their shareholders have still demanded more information about the companies' actions to account for and manage climate change related risks. Exhibit 3 provides a summary of the number of shareholder proposals related to climate change risks that were put up for a vote from 2007-2018 by shareholders for BP, Chevron, and Shell as well as ExxonMobil. Oil and gas company shareholders have voted on climate change related proposals every year since 2007, and the number of proposals has increased over time. Shareholder proposals are not limited to these oil "majors" as climate change proposals have also been submitted at oil and gas companies such as Anadarko Petroleum

---

[147]  Chevron represents that it "recognizes that climate change is a growing area of interest for our investors and stakeholders […] and we are responding" to those concerns. "Climate Change Resilience: A Framework for Decision Making," Chevron, March 2018, p. 1, https://www.chevron.com/-/media/shared-media/documents/climate-change-resilience.pdf. Similarly, Shell's Vice President of $CO_2$ has described the practice of including a proxy cost for GHG Emission in investment appraisal as something that "improves the investment's robustness to future CO2 regulation." Gillespie, Angus, "Case Study: Shell's CO2 Project Screening Value," in *GHG Market Report*, International Emissions Trading Association, 2015, p. 36, https://www.ieta.org/resources/Resources/GHG_Report/2015/IETA_GHG_Report_2015_web.pdf.

[148]  In fact, 11 of the 16 investment banks whose reports I analyze in Section V.C.3 include discussion of oil and gas companies' use of a proxy cost for GHG Emissions in at least one research report. For example, in 2015, HSBC compared proxy costs for GHG Emissions for a number of oil and gas companies, including ExxonMobil ("may approach USD80/tonne"), BP ("USD40/tCO$_{2e}$"), Shell ("USD40/tonne"), and Total ("EUR25/tonne"). Knight, Zoe, Wai-Shin Chan, and Ashim Paun, "Keeping it Cool: Moving Towards Global Carbon Pricing," HSBC, September 2015, p. 11. Similarly, in 2018, UBS, noted carbon prices for a number of oil and gas companies, including Eni ("$40/t at 2015 inflated"), Galp ("$40/ton"), and Total ("$30-40/t") as examples of oil companies increasingly "highlighting efforts to target reducing their own GHG emissions." UBS further noted that several other companies, including Chevron, incorporate a proxy cost for GHG Emissions. Rigby, Jon *et al.,* "European Oil and Gas: 2019 Outlook: More of the Same," UBS, December 17, 2018, pp. 73-75.

**App. 399**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

Corporation, Chesapeake Energy Corporation, ConocoPhillips, Devon Energy

Corporation, Kinder Morgan, Inc., Noble Energy, Inc., and Occidental Petroleum

Corporation ("Occidental"), demonstrating that the concerns of these risks are truly

sector-wide.[149]

60.    A selected listing of these climate change related shareholder proposals in the oil and gas

industry is provided in Exhibits 4.A-C. Some of the notable proposals include:

- In 2015, a coalition of investors submitted identical resolutions to both BP and Shell asking that the companies strengthen their climate change disclosures. The resolutions, titled "Strategic Resilience for 2035 and Beyond," included specific requests for reporting on items such as "asset portfolio resilience" and "public policy positions relating to climate change."[150] Ultimately, both Shell and BP supported the resolution, which passed at both companies with more than 98 percent of shares voting for the shareholder proposals.[151]

- In 2016, Chevron shareholders proposed a resolution that the company publish an annual assessment of the long-term impacts of plausible climate change scenarios on Chevron's reserve and resource portfolio. While this proposal did not receive majority support, Institutional Shareholder Services ("ISS"), a well-known proxy solicitor firm, supported the measure and it received 41 percent of the shareholder vote.[152] In 2017, the proponents withdrew this proposal after Chevron issued a climate change report that one of the proponents viewed as "a 'first step' toward explaining to investors how the company assesses climate change scenarios [in] its strategic planning efforts."[153]

---

[149]  Anadarko Petroleum Corporation, Form DEF 14A, 2018, p. 74; Chesapeake Energy Corporation, Form DEF 14A, 2018, p. 81; ConocoPhillips, Form DEF 14A, 2017, p. 85; Devon Energy Corporation, Form DEF 14A, 2014, pp. 75-76; Kinder Morgan, Inc., Form DEF 14A, 2018, pp. 59-60; Noble Energy, Inc., Form DEF 14A, 2018, p. 24; Occidental, Form DEF 14A, 2017, p. 58.

[150]  "Notice of BP Annual General Meeting," BP, 2015, p. 4. "Notice of Annual General Meeting," Shell, 2015, p. 5.

[151]  ISS Voting Analytics data for 2015. "Notice of BP Annual General Meeting," BP, 2015, pp. 4, 29; "Notice of Annual General Meeting," Shell, 2015, p. 5.

[152]  Chevron, Form DEF 14A, 2016, p. 70; ISS Voting Analytics data for 2016.

[153]  "Update: Wespath and Hermes Withdraw Chevron 'Stress-Test' Proposal," Wespath, May 2, 2017, https://www.wespath.org/news/update-wespath-and-hermes-withdraw-chevron-stress-test-proposal/.

**App. 400**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

- In another example from 2017, shareholders of Occidental proposed a resolution asking the company to publish a climate change impact assessment that explains topics such as "how capital planning and business strategies incorporate analyses of the short- and long-term financial risks of a lower carbon economy."[154] Occidental's three largest shareholders— Vanguard, BlackRock, and State Street— supported the motion despite the company's Board of Directors' recommendation that shareholders oppose it, and the resolution passed with 67 percent favorable votes.[155]

61.    These company disclosures and shareholder proposals, as well as the widespread acknowledgment of Climate Change Regulatory Risk among the Investment Community, demonstrate that climate change regulation represents a salient risk factor in the assessment of oil and gas companies.

## V.    CLIMATE CHANGE REGULATORY RISK IS A FACTOR IN THE INVESTMENT COMMUNITY'S ASSESSMENT OF EXXONMOBIL

### A.    ExxonMobil Faces Significant Climate Change Regulatory Risk

62.    ExxonMobil is no exception to the significant Climate Change Regulatory Risk facing oil and gas companies. In fact, ExxonMobil has itself consistently identified climate change regulations as a risk to the business.[156]

---

[154]    Occidental, DEF 14A, 2017, p. 58.

[155]    Keitz, Anders, "Occidental to Produce Climate Risk Report in 2018," The Street, December 15, 2017, https://www.thestreet.com/story/14421477/1/occidental-to-produce-climate-risk-report-in-2018.html. Orol, Ronald, "Exxon, Occidental Remain in Index Fund Crosshairs over Climate Change," The Street, August 24, 2017, https://www.thestreet.com/story/14283512/1/state-street-views-statoil-climate-report-as-model-for-u-s-energy-firms.html.

[156]    ExxonMobil has explained in its financial filings that "regulatory frameworks to reduce greenhouse gas emissions … could make our products more expensive, lengthen project implementations times, and reduce demand for hydrocarbons. … Current and pending greenhouse gas regulations may also increase our compliance costs." ExxonMobil, Form 10-K/A, filed February 28, 2010, p. 4. Similar language appears in additional ExxonMobil annual filings. ExxonMobil, Forms 10-K for the Fiscal Years 2011 (p. 3), 2012 (p. 3), 2013 (p. 3), 2014 (p. 3), 2015 (p. 3) 2016 (p. 3), 2017 (p.3), and 2018 (p. 3).

**App. 401**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

63.    As discussed in the previous section, climate change regulations pose a particular concern for a company like ExxonMobil whose success depends on investments in capital intensive long-term carbon-based assets.[157] Additionally, ExxonMobil's management has publicly stated that it focuses on maximizing shareholder value over the longer term.[158] Many of ExxonMobil's largest shareholders, which include large asset managers such as BlackRock, State Street, and Vanguard, and university endowments and public pension funds, also share this long-term outlook.[159] Given this long-term outlook, and the fact that future climate change regulations are likely to get stricter in the future, Climate Change Regulatory Risk is likely to have a significant impact on investment returns for both the company and its shareholders.

64.    Moreover, many of ExxonMobil's current investments are in GHG Emission-intensive projects that extract oil and gas reserves from non-conventional sources. Any additional costs related to GHG Emissions could cause such GHG Emission-intensive projects with

---

[157]    ExxonMobil, Form 10-K for the Fiscal Year 2018, p. 4 ("The long-term success of ExxonMobil's Upstream, Downstream, and Chemical businesses depends on complex, long-term, capital intensive projects.").

[158]    Rex Tillerson, ExxonMobil's former Chairman and CEO, has acknowledged that ExxonMobil's businesses operate based on long-term considerations, arguing that the company does not "get overly exercised about what's going on in any given quarter or any given year," but instead focuses on maximizing "value for the shareholder over the next 30 years." Mr. Tillerson has also stated, "At ExxonMobil we focus on the long term." "Transcript of Exxon Mobil Analyst Meeting," Thomson Reuters, March 2, 2016, p. 20; Hearing before the House Subcommittee on Energy and Environment of the Committee on Energy and Commerce: The ExxonMobil-XTO Merger: Impact on U.S. Energy Markets, January 20, 2010 (hereafter, "ExxonMobil-XTO Hearing"), p. 25.

[159]    *See, e.g.*, Edkins, Michelle, "BlackRock Investment Stewardship Engagement Priorities for 2019," January 31, 2019, https://corpgov.law.harvard.edu/2019/01/31/blackrock-investment-stewardship-engagement-priorities-for-2019/. *See also* Letter from State Street President and CEO to the Company's board, January 15, 2019, https://www.ssga.com/investment-topics/environmental-social-governance/2019/01/2019%20Proxy%20Letter-Aligning%20Corporate%20Culture%20with%20Long-Term%20Strategy.pdf; "Vanguard's Voice on Societal Risks," Vanguard, https://about.vanguard.com/investment-stewardship/perspectives-and-commentary/voice-on-societal-risks.html.

**App. 402**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

low margins to be economically unviable and cause the assets to be stranded.[160]

Acknowledging the risk of climate change regulations to its operations, ExxonMobil's Vice President of Environmental Policy and Planning acknowledged in an internal presentation that "high costs on GHG [E]missions" would be a "major concern for our refining and chemical business…but also for our LNG and heavy oil production."[161]

65. ExxonMobil's oil sands assets are particularly at risk from climate change regulations given that "oil sands provide the worst margins in [ExxonMobil's] portfolio" and higher-than-average GHG Emissions.[162] Oil sands projects such as Cold Lake and Kearl produce more GHG Emissions than other conventional sources, in part, because it requires substantial energy to generate the steam for injection into the reservoir, to transport the oil sands, and to separate the oil from the sand.[163] In addition, energy can be required to further upgrade the bitumen into salable synthetic crude oil.[164] Oil sands projects that use the cyclic steam stimulation ("CSS") process, such as Cold Lake, are among the highest-emitting projects, generating approximately double the well-to-retail pump emissions

---

[160] For example, I understand that Professor Bartov has concluded based on his analysis that "[h]ad ExxonMobil included GHG Emission Proxy Costs in its cost projections for its 2015 impairment testing of Mobile Bay, it would have concluded that the book value of Mobile Bay was not recoverable based on the project's remaining net undiscounted cash flows, and consequently recognized an after-tax impairment loss of $320 million to $478 million." *See* Bartov Report, ¶16.

[161] EMC 000371210, "Escalating Pressures on Environmental Performance" presentation, September 1, 2011, at EMC 000371226. *See also Energy and Carbon – Managing the Risks*, ExxonMobil, March 31, 2014, p. 30.

[162] Warn, Brendan and Nikolas Stefanou, "Gold Standard: Initiating with Market Perform and $78 Target Price," BMO, December 1, 2016, p. 18.

[163] "GHG Emissions," Canadian Association of Petroleum Producers, https://www.canadasoilsands.ca/en/explore-topics/ghg-emissions.

[164] The more energy that is used in the production process, for assets such as oil sands, the more GHG Emissions are produced through the combustion of fuels to make that energy. *See, e.g.*, "Greenhouse Gas Emissions," Syncrude, https://www.syncrude.ca/environment/energy-and-climate-change/greenhouse-gas-emissions/.

**App. 403**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

than compared to the average U.S. refined crude oil. Even oil sands projects that do not use the CSS process generate significantly more well-to-retail pump emissions than the average U.S. refined crude.[165] A number of ExxonMobil's other oil reserves, like those in Alaska and California, also generate substantial GHG Emissions.[166] Additionally, GHGs are also emitted in ExxonMobil's operations through flaring during oil recovery and methane leakage in natural gas production.[167] Goldman Sachs summarized the influence of oil sands on ExxonMobil's GHG Emissions, stating that "[g]iven the strong exposure to oil sands in Canada (including its stake in Imperial Oil), ExxonMobil could lower its 2017 GHG emissions by 11 [percent] by 2030 by exiting this high-carbon segment."[168]

### B.    ExxonMobil Has Consistently Acknowledged the Need to Account for Climate Change Regulatory Risk in Public Disclosures

66.    Given these significant risks, it is not a surprise that ExxonMobil has consistently made public disclosures acknowledging the need to account for Climate Change Regulatory Risk in assessing its business. Exhibits 5.A-B provide a detailed timeline of

---

[165]  These emissions comparisons are based on 2005 emissions data. *See, e.g.,* "Cold Lake," Imperial Oil, https://www.imperialoil.ca/en-ca/company/operations/oil-sands/cold-lake. *See also* Burkhard. James *et al.,* "Oil Sands, Greenhouse Gases, and European Oil Supply," IHS, September 2010, p. 11.

[166]  *Energy and Carbon – Managing the Risks*, ExxonMobil, March 31, 2014, p. 30.

[167]  *See, e.g.*, Brown, Katie, "Stanford Researchers Discuss How to Reduce Major Cause of Oil and Gas Production Emissions," Stanford News, August 30, 2018, https://news.stanford.edu/2018/08/30/country-ranking-oil-production-emissions/. *See also* "Mitigating Emissions in Our Operations," ExxonMobil, October 18, 2018, https://corporate.exxonmobil.com/en/Community-engagement/sustainability-report/managing-risks-of-climate-change/mitigating-emissions-in-our-operations#flaring;"Overview of Greenhouse Gases: Methane Emissions," U.S. Environmental Protection Agency, https://www.epa.gov/ghgemissions/overview-greenhouse-gases.

[168]  Della Vigna, Michele *et al.,* "Re-Imagining Big Oils," Goldman Sachs, October 8, 2018, p. 33.

**App. 404**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

ExxonMobil's public disclosures related to Climate Change Regulatory Risk, with select examples discussed in further detail below.

67.     Since at least 2010, ExxonMobil has warned in its financial filings that climate change regulations "could make our products more expensive, lengthen project implementation times, and reduce demand for hydrocarbons, as well as shifting hydrocarbon demand toward sources with lower GHG Emissions such as natural gas."[169] In response to this potential shift in hydrocarbon demand, increasing its natural gas reserves and resources to make ExxonMobil more adaptable to these future climate change regulations was one of the key strategic directives of the company's acquisition of XTO.[170]

68.     To account for those risks, ExxonMobil has also consistently represented that it has applied a GHG Emission Proxy Cost in its business planning since 2007.[171] Furthermore, since at least 2010, ExxonMobil has published a projected GHG Emission Proxy Cost stemming from climate change regulations. These representations culminated in March 31, 2014, with the release of the "Energy and Carbon - Managing the Risks" and "Energy and Climate" reports, which were highly publicized and provided a more fulsome description of ExxonMobil's practices. These disclosures include:

---

[169]  ExxonMobil, Form 10-K/A, filed February 28, 2010, p. 4; ExxonMobil, Forms 10-K for the Fiscal Years 2011 (p. 3), 2012 (p. 3), 2013 (p. 3), 2014 (p. 3), 2015 (p. 3) 2016 (p. 3), 2017 (p.3), and 2018 (p. 3).

[170]  ExxonMobil-XTO Hearing, p. 41 (United States Representative Jay Inslee: "Am I correct in assuming that your decision to enter into this acquisition in part is induced or motivated at least in part in a belief that we will be in some version of a carbon constrained world in the future in some sense? Is that one of your motivations?" [Rex Tillerson, ExxonMobil Chairman and CEO]: "…So it was in a consideration.").

[171]  Cohen, Ken "ExxonMobil and the Carbon Tax," Energy Factor, December 2, 2015, https://energyfactor.exxonmobil.com/corporate-citizenship-sustainability/exxonmobil-and-the-carbon-tax.

51

**App. 405**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

- The 2010 *Outlook for Energy* report, in which the company stated that it expected that government climate change policies would "be equivalent to adding $CO_2$ costs of about \$30 per ton in the OECD" by 2020, and \$60 per ton by 2030.[172]

- The 2012 *Outlook for Energy* report, in which ExxonMobil anticipated "OECD $CO_2$ costs reaching about \$80/ton by 2040." The company also projected that "Non OECD countries also will begin adding CO2 costs around 2030. By 2040, we see China reaching \$30/ton and many other Non OECD nations approaching \$20/ton."[173]

- The 2013 *Outlook for Energy* report, which disclosed that ExxonMobil applied a different GHG Emission Proxy Cost depending on whether a project was located in an OECD country (\$40-80/ton), a leading non-OECD country (\$20-40/ton), or a trailing non-OECD country (less than \$20/ton).[174]

- The 2014 *Energy and Carbon - Managing the Risks* report, in which ExxonMobil stated that it applied a projected GHG Emission Proxy Cost to all its "significant proposed projects" and across "all our business segments." In addition, this report declared that "[ExxonMobil] address[es] the potential for future climate-related controls, including the potential for restriction on emissions, through the use of a proxy cost of carbon[, which] is embedded in our current *Outlook for Energy*, and [...] seeks to reflect all types of actions and policies that governments may take over the Outlook period relating to the exploration, development, production, transportation or use of carbon-based fuels," clearly indicating that ExxonMobil applies a consistent proxy cost throughout the entire lifecycle of oil and natural gas.[175]

- The 2014 *Energy and Climate* report, in which ExxonMobil stated that it "requires that all business units use a consistent corporate planning basis, including the proxy cost of carbon [...], in evaluating capital expenditures and developing business plans." The report further noted a \$30 per ton 2040 projection for China and Mexico.[176]

---

[172] *The Outlook for Energy: A View to 2030*, ExxonMobil, 2010, (hereafter, *2010 Outlook for Energy*), p. 29.

[173] *The Outlook for Energy: A View to 2040*, ExxonMobil, 2012, (hereafter, *2012 Outlook for Energy*), p. 30.

[174] *The Outlook for Energy*; *The Outlook for Energy: A View to 2040*, ExxonMobil, 2013, (hereafter, *2013 Outlook for Energy*), p. 34.

[175] *Energy and Carbon – Managing the Risks*, ExxonMobil, March 31, 2014, pp. 17, 18, 21.

[176] *Energy and Climate*, ExxonMobil, March 31, 2014, pp. 6, 20.

52

**App. 406**

Contains Confidential Material

Subject to Stipulation and Order for the Production and Exchange of Confidential Information

69.    While these disclosures only mention a few specific GHG Emission Proxy Cost estimates for a subset of years and regions, I understand that these estimates were based on detailed carbon price schedules that were put together by ExxonMobil's as part of its annual "Energy Outlook" business planning process.[177]

70.    Additionally, in the Congressional Hearing regarding the XTO transaction, ExxonMobil's Chairman and Chief Executive Officer stated: "in all of [ExxonMobil's] investment decisions […and] economic modeling, [ExxonMobil] put[s] a carbon price in [its] economic decisions and project[ed] something for the future so that [it] at least [was] considering what the effects of our investment might be in the years to come."[178] Moreover, at ExxonMobil's 2016 Annual Shareholder Meeting, ExxonMobil's Chairman and Chief Executive Officer commented that "unlike many of our competitors, we have for many years included a price of carbon in our outlook. And that price of carbon gets put into all of our economic models when we make investment decisions as well. It's a proxy. We don't know how else to model what future policy impact might be. But whatever policies are, ultimately they come back to either your revenues or your costs. So we choose to put it in as a cost."[179]

---

[177]    Examination of Todd Onderdonk (*Senior Energy Advisor, Economics & Energy, Corporate Strategic Planning, 2000-Present*), November 7-8, 2017, (hereafter, "Todd Onderdonk Tr.") pp. 290-291 ("Q And that's the kind of data that gets published in some kind of top line form in the public Energy Outlook and there's more detailed data and analysis in Exxon's internal version of the Outlook report, correct? A There is higher level demand"), pp. 400-401 ("This is a fairly detailed suite of data that's provided for internal organizations. […] It includes a broader set of data from the Energy Outlook and detail than what we've published in the external report."). *See, e.g.*, EMC 003212721, ExxonMobil 2012 EO GHG Emission Proxy Cost Basis, or EMC 002948182, ExxonMobil 2014 EO GHG Emission Proxy Cost Basis. I discuss ExxonMobil's Energy Outlook planning process in further detail in Section VI.A.1 *infra*.

[178]    ExxonMobil-XTO Hearing, p. 41.

[179]    "Transcript of ExxonMobil Corporation Shareholders Meeting," Thomson Reuters, May 25, 2016, p. 29.

**App. 407**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

71.     Based on my experience analyzing and valuing oil and gas companies, such public disclosures and statements would have likely led the Investment Community to conclude that ExxonMobil was consistently applying its publicly disclosed GHG Emission Proxy Cost to all of its business planning and investment decisions in the geographies where it expected increasingly stringent climate change regulations, particularly given the comments by ExxonMobil's Chief Executive Officer that explicitly state that GHG Emission Proxy Costs are applied to "*all* of [ExxonMobil's] investment decisions" and "economic models" in the preceding paragraph (emphasis added).[180] As I discuss in further detail in the next section, such disclosures were a relevant consideration in the Investment Community's assessment of ExxonMobil.

C.      **Shareholder Proposals and Commentary by the Investment Community Demonstrate that Climate Change Regulatory Risk Is a Relevant Consideration in Their Assessment of ExxonMobil**

1.      *Shareholder Proposals Demonstrate the Importance of ExxonMobil's Climate Change Risk Disclosures to Investors*

72.     Over the years, ExxonMobil's shareholders have consistently submitted proposals to the company demanding visibility into ExxonMobil's exposure to climate change related risk and disclosures regarding its strategies for managing those risks. These proposals demonstrate that ExxonMobil's shareholders have been concerned about ExxonMobil's exposure to and management of climate change related risk.

73.     Exhibit 6 provides a list of the 13 shareholder proposals related to ExxonMobil's exposure to and management of climate change risk that were put up for a vote between

---

[180]   "Transcript of ExxonMobil Corporation Shareholders Meeting," Thomson Reuters, May 25, 2016, p. 29.

54

**App. 408**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

2007 and 2018. It shows that ExxonMobil shareholders voted on at least one such proposal every year from 2007 to 2017 and that the proposals often received substantial shareholder support, with two such proposals eventually passing with a majority shareholder vote. Many of these proposals also received support from influential proxy vote advisors such as ISS, Glass, Lewis & Co. ("Glass Lewis"), or UK-based Pensions & Investment Research Consultants Limited ("PIRC").

74.     Additionally, Exhibit 7 shows that there were at least nine other shareholder proposals from 2007-2018 that were withdrawn before being put up for a vote. Such proposals often led to a dialogue between the shareholders and ExxonMobil before being withdrawn. In some cases, these negotiations led to ExxonMobil taking actions or making disclosures relating to the proposals without even requiring a shareholder vote.[181]

75.     Below I discuss some of these shareholder proposals in further detail. These examples illustrate the fact that such proposals received support from a broad group of ExxonMobil shareholders, indicating that climate change risk was a consideration in investors' assessment of the company.

- Every year from 2007-2015, shareholders put forth a proposal for ExxonMobil to set and publish GHG Emissions reduction targets. Though this proposal never received a majority vote, it still received up to 31 percent of shareholder support between 2007 and 2014.[182] The proposal, furthermore, received annual

---

[181]   *See, e.g.*, Exhibit 7.

[182]   Manhattan Institute, Proxy Monitor, http://www.proxymonitor.org/ (company "XOM", proposal "GREENHOUSE GAS EMISSIONS GOALS", proponent "Sisters of St. Dominic", 2007-2014).

55

**App. 409**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

endorsements from 2007 to 2014 from ISS.[183] In 2015, ISS withdrew support for the proposal following ExxonMobil's publication of the *Energy and Climate* and *Energy and Carbon - Managing the Risks* reports in 2014 prompted by another shareholder proposal. ISS's withdrawal of support was not because it considered the information no longer necessary; instead, ISS argued that following the publication of these reports, the company provided sufficient information to allow shareholders to assess the company's management of GHG Emissions.[184]

- Shareholders also sought enhanced transparency regarding ExxonMobil's approach to climate change risk through another proposal in 2010 and 2011, asking ExxonMobil to issue a report about the risks associated with its Canadian oil sands investments given doubts about long-term economic viability of the assets due to high extraction costs and the risk of rising GHG Emission costs and oil price fluctuations.[185] Although the measure did not pass in either year, the proposal was endorsed by ISS and received affirmative votes from holders of more than a quarter of ExxonMobil stock shares in both 2010 and 2011.[186] In its analysis of this proposal, ISS commented "[i]t would be beneficial for ExxonMobil to provide deeper insight to its shareholders into how it assesses the financial viability of oil sands development, including its assumptions of a price for carbon or financial impacts of carbon taxing regulations in the U.S. and/or Canada."[187]

- Later, in December 2013, shareholders from the Christopher Reynolds Foundation and Arjuna Capital submitted separate proposals reiterating shareholders' desire for more information about ExxonMobil's exposure to climate change risk. Specifically, the proposals asked ExxonMobil's Board of Directors to release reports about the company's strategic planning and long-term

---

[183] "Exxon Mobil Corporation," ISS, 2007-2014. ISS provides information and voting recommendations to shareholders in advance of company shareholder meetings. "The Global Leader in Corporate Governance & Responsible Investment," ISS, https://www.issgovernance.com/about/about-iss/.

[184] "Exxon Mobil Corporation," ISS, 2015, p. 33 ("The company provides sufficient information regarding its greenhouse gas emissions to allow shareholders to assess the company's management of these emissions and related performance").

[185] "Transcript of ExxonMobil Corporation Shareholders Meeting," Thomson Reuters, May 26, 2010, pp. 16–17.

[186] Presenting the proposal at the 2010 shareholder meeting, proponents from Green Century Capital Management cited "doubts about the long-term economic viability of oil sands development given the high cost of extraction and converting oil sands along with risk of future profitability presented by the rise in carbon cost and oil price fluctuation." ExxonMobil, Form DEF14A, 2010, pp. 62–63; ExxonMobil, Form DEF14A, 2011, pp. 64–65; "Exxon Mobil Corporation," ISS, 2010, p. 27; "ExxonMobil Corporation," ISS, 2011, p. 38; 2010 Shareholder Meeting, p. 32; "Transcript of ExxonMobil Corporation Shareholders Meeting," Thomson Reuters, May 25, 2011, p. 34.

[187] "Exxon Mobil Corporation," ISS, 2011, p. 38.

App. 410

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

risk exposure on climate change.[188] These proposals were never voted on because ExxonMobil negotiated directly with each shareholder to drop the resolution in exchange for issuing reports that would satisfy the shareholders' concerns.[189] These reports — *Energy and Climate* and "*Energy and Carbon - Managing the Risks*" — were released on March 31, 2014.[190]

- In 2015, a collection of New York City pension funds submitted a "proxy access" proposal to amend ExxonMobil's bylaws and allow shareholders the right to nominate candidates for ExxonMobil's board.[191] At the 2015 shareholder meeting, the proponents announced that "ExxonMobil received this proposal due to its exposure to risks related to climate change."[192] The proxy access proposal also received support from ISS and other influential proxy vote advisors, including Glass Lewis and PIRC.[193] The proposal received affirmative shareholder votes representing 49.4 percent of company stock in 2015 and subsequently passed in 2016 with a 61.9 percent vote share.[194]

- In another 2016 proposal, the NYSCRF and the Church of England led a group of shareholders requesting an annual report from the Board on the long-term portfolio impacts of climate change.[195] The proposal, with support from ISS and Glass Lewis as well as institutional investors managing over $10 trillion in funds, including State Street, received affirmative votes from 38.1 percent of ExxonMobil stock shares that voted.[196] The same proposal was subsequently passed in 2017 with 62.1 percent voting in favor. ExxonMobil's two largest

---

[188] EMC 000525249, Dec. 11, 2013 letter from N. Lamb, Arjuna Capital to D. Rosenthal, ExxonMobil (cover letter to shareholder proposal); EMC 000525250 "Report on Carbon Asset Risk," Dec. 11, 2013; EMC 002402347 2014 Shareholder Proposal Summary: Item Report on Climate Risk; Mar. 17, 2014 SEC letter to ExxonMobil at Ex. A, at 33 (Dec. 9, 2013, Viederman letter to Rosenthal).

[189] "Transcript of ExxonMobil Corporation Shareholders Meeting," Thomson Reuters, May 28, 2014, p. 17; "Shareholders: ExxonMobil Takes Crucial Step of Acknowledging Carbon Asset Risk ... But More is Needed," Arjuna Capital, March 31, 2014, http://arjuna-capital.com/news/shareholders-exxonmobil-takes-crucial-step-of-acknowledging-carbon-asset-risk-but-more-is-needed/.

[190] "ExxonMobil Releases Reports to Shareholders on Managing Climate Risk," ExxonMobil, March 31, 2014, https://news.exxonmobil.com/press-release/exxonmobil-releases-reports-shareholders-managing-climate-risk.

[191] ExxonMobil, Form DEF14A, 2015, pp. 64–65.

[192] "Transcript of ExxonMobil Corporation Shareholders Meeting," Thomson Reuters, May 27, 2015, p. 17.

[193] "Exxon Mobil Corporation," ISS, 2015 (p. 21) and 2016 (p. 27); Burr, Barry, "Glass Lewis in Favor of Climate-Change Risk, Proxy Access Proposals at Exxon Mobil," MSCI, May 6, 2016; "PIRC Report for 2016," April 29, 2016, p. 5.

[194] 2015 Shareholders Meeting, p. 37; "Transcript of ExxonMobil Corporation Shareholders Meeting," Thomson Reuters, May 25, 2016, p. 33.

[195] ExxonMobil, Form DEF14A, 2016, pp. 69–70.

[196] 2016 Shareholder Meeting, p. 20; "ExxonMobil Corporation," ISS, 2016, pp. 2, 53; ISS Voting Analytics.

**App. 411**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

shareholders, Vanguard and BlackRock, joined ISS, Glass Lewis, and State Street that year in supporting the proposal.[197]

> ### 2. Commentary from ExxonMobil's Investors Indicates that They Considered ExxonMobil's Exposure to Climate Change Regulatory Risk

76. In addition to considering climate change related risk in their investment process, as discussed above in Section IV.B, a number of ExxonMobil's largest institutional investors have also highlighted the importance of considering such risk in their assessment of ExxonMobil specifically.

77. Investor commentary demonstrates that large institutional investors specifically considered ExxonMobil's representations regarding its use of its GHG Emission Proxy Cost in their assessments of the company. For example, Vanguard, in an analysis of ExxonMobil's vulnerability to Climate Change Regulatory Risk, specifically noted ExxonMobil's use of GHG Emission Proxy Cost in an "effort to quantify what [it] believes government policies over the Outlook period could cost to [its] investment opportunities."[198] Similarly, in State Street's notes regarding a 2017 meeting with ExxonMobil, State Street noted that "the price of carbon is used [by ExxonMobil] as a modeling tool and [ExxonMobil] has used this since 2007."[199]

---

[197] ExxonMobil, Form DEF14A, 2017, pp. 62–63; ISS Voting Analytics voting records; "ExxonMobil Corporation," ISS, 2017, p. 51. VGI1920, May 23, 2017 Internal Vanguard memorandum supporting proxy proposal for enhanced climate disclosure, p. 2; "Victory for ExxonMobil Shareholders as Climate Change Disclosure Resolution Receives Majority Support Despite Company Opposition," The Church of England, May 31, 2017, https://www.churchofengland.org/more/media-centre/news/victory-exxonmobil-shareholders-climate-change-disclosure-resolution.

[198] VGI1211, 2016 memorandum "Exxon E&S Analysis" (quoting *Energy and Carbon - Managing the Risk*, p. 18); VGI0938-0941, "In House Climate Change Risk Assessment (CVX & XOM)."

[199] SSC_NYAG_0001948, 3/17/2017 summary of meeting between State Street and ExxonMobil (Woodbury, Trelenberg, and Luettgen) p. 4.

**App. 412**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

78.     Additionally, as discussed above in Section V.C.1, BlackRock, State Street, and Vanguard supported a resolution that ExxonMobil "publish an annual assessment of the long-term portfolio impacts of technological advances and global climate change policies…and should analyze the impacts [of] the globally agreed upon 2 degree target." BlackRock explained that it voted for that proposal only after extensive discussion with ExxonMobil management on climate risk failed to convince the company to make sufficient disclosures about its approach to climate risk and that the reason for the engagement was its "assessment that there is potential for material economic ramifications for shareholders."[200] BlackRock's sustained engagement with ExxonMobil is yet another example that illustrates investors' interest in ExxonMobil's climate change related disclosures.

79.     Other major institutional shareholders have also closely monitored ExxonMobil's measures to mitigate the risks of climate change. For instance, in 2013, CalSTRS requested a "dialogue [with ExxonMobil] on fossil fuel reserve calculation and valuation in light of the Carbon Tracker report titled *Unburned Carbon 2013-Wasted Capital and Stranded Assets*," which stated that 60-80 percent of reserves held by publicly listed

---

[200] "Supporting a Shareholder Proposal Following Extensive Management Engagement," BlackRock https://www.blackrock.com/corporate/literature/press-release/blk-vote-bulletin-exxon-may-2017.pdf ("BlackRock has been engaging in direct and private dialogue with Exxon over several years on a wide range of governance issues that we believe have long-term economic implications for investors, ... including on the management and reporting of climate-related risk. […] In addition, we have repeatedly requested to meet with independent board directors over the past two years to better understand the board's oversight of the company's long-term strategy and capital allocation priorities amidst major strategic challenges and regulatory inquiry (including but not be *[sic]* limited to oversight of climate risk). The company declined to make directors available, citing a non-engagement policy between independent board members and shareholders."); BlackRock, Long term Sustainable Investment Questionnaire, p. 6.

**App. 413**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

companies may become stranded.[201] Also in 2013, Walden Asset Management wrote a letter to Rex Tillerson urging ExxonMobil "to limit the greenhouse gas emissions from its operations," because of Walden's belief that "fossil fuel companies are particularly at risk" from climate change and climate change regulation.[202] In yet another example, the NYSCRF expressed satisfaction that its 2017 shareholder proposal had passed and promised to "continue to monitor ExxonMobil's response to climate change as we urge the company, and others in the energy sector, to find ways that they can adapt to the growing lower carbon economy."[203]

        3.       *Commentary from Equity Research Analysts Indicates that They Considered Climate Change Regulatory Risk in Their Assessment of ExxonMobil*

80.     Similar to ExxonMobil's investors, commentary from equity research analysts covering ExxonMobil's stock also indicates that they consider Climate Change Regulatory Risk in their assessment of the company. These equity analysts have consistently highlighted the risk of climate change to ExxonMobil's business, considering the possibility of reduced demand, higher costs, and stranded assets due to future regulations. Many analysts, moreover, have taken note of ExxonMobil's Climate Change Regulatory Risk disclosures and commented specifically on ExxonMobil's use of GHG Emission Proxy Cost in its financial planning models.

---

[201] EMC 001403266, "2013 Institutional Shareholder Call - CalSTRS," CalSTRS.

[202] EMC 000538036-037, Letter from Walden Asset Management to Rex Tillerson, September 27, 2013.

[203] "NYS Comptroller DiNapoli: ExxonMobil Agrees to Assess Impacts of Climate Change," Office of the New York State Comptroller, December 12, 2017, https://www.osc.state.ny.us/press/releases/dec17/121217.htm.

**App. 414**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

81.    In fact, at least 15 of the 16 major investment banks covering ExxonMobil whose reports I reviewed have discussed Climate Change Regulatory Risk faced by ExxonMobil since 2010. The 16 investment banks were selected as they had covered ExxonMobil for the longest period starting in 2010.[204] I identified 99 reports published by these banks as having relevant discussion regarding ExxonMobil's Climate Change Regulatory Risk or GHG Emission Proxy Cost. Out of these 99 reports, 53 were published in 2016 or earlier, suggesting that analysts were interested in ExxonMobil's exposure to Climate Change Regulatory Risk while alleged misrepresentations regarding ExxonMobil's use of GHG Emission Proxy Cost were ongoing. Exhibit 8 provides a list of relevant quotes from these analysts, and in the sections below I discuss some of the key ones in further detail.

> ### a.    Analysts Have Highlighted ExxonMobil's Exposure to Climate Change Regulatory Risk

82.    Since as early as 2010, analysts have expressed their concerns about the potential for climate change regulations to negatively affect ExxonMobil's business prospects. For example:

- In 2010, RBC was concerned that "ExxonMobil's downstream earnings could be lowered by costs related to greenhouse gas emission legislation […]."[205]

- In 2016, Société Générale worried that "[f]uture climate change regulations or taxes that limit the company's ability to exploit reserves, make them prohibitively

---

[204]    The length of coverage of each bank since 2010 was determined by looking at the date of the earliest and latest report published by each bank and available through Thomson One's Investext subscription. These banks include Barclays, Bank of Montreal ("BMO"), Cowen & Company, Credit Suisse, Deutsche Bank, Evercore ISI, HSBC, Jefferies, JPMorgan, Macquarie, Morgan Stanley, Oppenheimer, RBC, Société Générale, UBS, and Wells Fargo.

[205]    Rousseau, Jacques, "Initiating Coverage: Looking Past the XTO Acquisition," RBC, April 22, 2010, p. 4.

61

**App. 415**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

expensive to extract, or significantly curtail demand for end petroleum products, could materially impact the company's value."[206]

- Later in 2016, BMO Capital Markets included climate change among its "weaknesses and threats" to ExxonMobil, stating that it was "a tough job being an oil major these days, especially so if you are the biggest" because "climate change threatens stranding resources long term."[207]

83.    Beyond merely noting the company's exposure to Climate Change Regulatory Risks, equity research analysts have also asked ExxonMobil to release more details about those risks to its GHG Emission-intensive assets.[208] Given the importance of oil sands production to ExxonMobil's overall portfolio, it is not surprising that the analysts highlight the potential threat of current and future GHG Emission regulations for these projects.[209]

           *b.      Analysts Have Taken Notice of ExxonMobil's Disclosures Related to Climate Change Regulatory Risk*

---

[206] Herrlin, John *et al.,* "ExxonMobil: Increase TP, as Market Re-Rates Sector on Higher Oil Prices," Société Générale, March 22, 2016, p. 1.

[207] Warn, Brendan and Nikolas Stefanou, "Gold Standard: Initiating with Market Perform and $78 Target Price," BMO, December 1, 2016, p. 11.

[208] For example, in a 2011 analyst report, Barclays expressed a desire to learn more about how GHG Emission Proxy Cost could affect the Kearl project, asking, "Kearl oil sands development – what is the unit operating cost? What additional cost have you built in for the expected new carbon tax scheme?" Cheng, Paul Y., Christina Cheng, and Danielle Diamond, "Exxon Mobil Corp.: Analyst Day Preview," Barclays, March 7, 2011, p. 3. It appears that the Barclays analysts had still not received an adequate answer to these questions in 2012, when the analysts repeated them verbatim in another report in that year. Cheng, Paul Y., Eli Bauman, and Anthony Kit, "Exxon Mobil Corp.: Analyst Day Preview," Barclays, March 5, 2012, p. 4.

As I discuss below, analysts also requested additional information about ExxonMobil's use of GHG Emission Proxy Cost on company earnings calls in 2015 and 2016. 2015 Q2 Transcript of Exxon Mobil Corp. Earnings Call, Thomson Reuters, July 31, 2015, p. 18; 2016 Q2 Transcript of Exxon Mobil Corp. Earnings Call, Thomson Reuters, July 29, 2016, p. 25.

[209] For example, BMO analyst noted, "oil sands provide the worst margins in [ExxonMobil's] portfolio" making them [perhaps the most] sensitive to GHG cost regulations. *See* Warn, Brendan and Nikolas Stefanou, "ExxonMobil: Gold Standard: Initiating with Market Perform Rating, $78 Target Price," BMO, December 1, 2016, p. 18.

**App. 416**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

84.     When ExxonMobil has complied with analyst and investor requests to provide additional clarity on its approach to Climate Change Regulatory Risk, analysts have taken notice of such disclosures.

- Following the release of the *Energy and Carbon – Managing the Risks* and *Energy and Climate* reports in 2014, Standard & Poor's Rating Services acknowledged "ExxonMobil recently became the first oil and gas producer to agree to publish details of its climate risk exposure from stranded assets…a sign of the growing acceptance among companies and investors that climate and carbon risks are increasingly material to corporate performance and value."[210]

- In 2014, UBS also wrote "ExxonMobil released its reports [*Energy and Carbon – Managing the Risks* and *Energy and Climate*] yesterday to shareholders on managing climate risk. The company says that its hydrocarbon reserves are unlikely to become 'stranded' because of regulations to limit climate change. It says limiting the temperature increase to 2°C would be too costly given the growing energy needs."[211]

85.     In particular, analysts have considered ExxonMobil's representations regarding its use of GHG Emission Proxy Cost to account for those risks. For instance, numerous analysts have cited ExxonMobil's representations regarding its use of publicly disclosed GHG Emission Proxy Cost over the years.[212] Moreover, analysts have found ExxonMobil's use of GHG Emission Proxy Cost to be a reassuring measure of ExxonMobil's exposure to climate change regulations and highlighted the importance of including such a measure

---

[210]  "Special Report: Climate Change: Preparing for the Long Term," *Credit Week*, S&P, May 28, 2014, p. 32.

[211]  Rigby, Jon, Amy Wong, and Marina Postnikova, "Daily Oil News: Key Headlines," UBS, April 1, 2014, p. 3.

[212]  *See, e.g.*, Knight, Zoe, Wai-Shin Chan, and Ashim Paun, "Keeping It Cool: Moving Towards Global Carbon Pricing," HSBC, September 2015, p. 11. *See also* Sankey, Paul, David T. Clark, and Silvio Micheloto, "ExxonMobil: XOM-XTO Hearing; Oil Industry Keeps Rising in DC," Deutsche Bank, January 21, 2010, p. 1; Coster, Paul, Mark Strouse, and Paul J. Chung, "Alt Energy: COP21 Paris Climate Conference - Lead, Follow or Get Out of the Way," JPMorgan, December 16, 2015, p. 4; Read, Roger D. and Lauren Hendrix, "XOM: Investor Meeting Highlights," Wells Fargo, May 30, 2016, p. 2.

**App. 417**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

comprehensively in company's business planning. For example, in 2016 Wells Fargo

stated:

> To guard against future expenses related to GHG regulations, a
> direct carbon tax or carbon trading schemes, [ExxonMobil] places
> a proxy cost of carbon on all of its future developments.
> Depending on the project and its location, the proxy cost of carbon
> ranges from $20 to $80 per ton by 2040. This approach reduces the
> risks associated with future CO2 emissions and incentivizes
> [ExxonMobil] to reduce overall emissions of all future projects.
> Also, all future project economics will not be negatively affected
> by future GHG rules, regulations and taxes. This approach also
> helps [ExxonMobil] avoid the risk of stranded investments.[213]

86.    Based on ExxonMobil's representations regarding GHG Emission Proxy Cost, Wells

Fargo analysts also believed ExxonMobil was "ahead of the curve on pricing in climate

risks"[214] and in 2017, reiterated the importance of taking into account the GHG Emission

Proxy Cost in all "long-lived projects to ensure full-cycle returns are fairly evaluated on

an environmental basis as well as financial and operational."[215]

87.    Additionally, analysts have also often shown an interest in better understanding how

GHG Emission Proxy Cost is applied in ExxonMobil's business planning and investment

decisions, indicating that they followed ExxonMobil's statements about its use of GHG

Emission Proxy Cost in its business decisions. For example, in a 2015 earnings call, an

---

[213]   Read, Roger D. and Lauren Hendrix, "XOM: Investor Meeting Highlights," Wells Fargo, May 30, 2016, p. 2.

[214]   Read, Roger D. and Lauren Hendrix, "XOM: Some Smoke But Likely No Fire; Lowering Valuation Range," Wells Fargo, September 20, 2016, p. 1.

[215]   Read, Roger D. and Lauren Hendrix, "XOM: Sellside Lunch Highlights," Wells Fargo, August 17, 2017, p. 2. Moreover, in preparation for a meeting with ExxonMobil investors, ExxonMobil management commented that "[w]e test our upstream projects based on the scope 1 emissions [direct emissions from the project] they will create," Guy Powell, Tr., exhibit 10.

64

**App. 418**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

analyst from Tudor, Pickering, Holt & Company sought to understand how the company accounted for potential increases in GHG Emission costs in evaluating its oil sands projects.[216] Similarly, in a 2016 earnings call, an analyst from Raymond James & Associates, Inc. asked whether ExxonMobil incorporated GHG Emission Proxy Cost in its "project economics planning." In response, ExxonMobil's Vice President of Investor Relations & Secretary said "if you look in our energy outlook…you'll see that we've included for – now for many years a, what we call a proxy cost of carbon." Thus, ExxonMobil's own representative tied the same GHG Emission Proxy Cost to ExxonMobil's planning functions and Energy Outlook.[217]

## VI. EXXONMOBIL'S APPLICATION OF GHG EMISSION PROXY COST IN ITS BUSINESS PLANNING AND INVESTMENT DECISIONS WAS INCONSISTENT WITH ITS PUBLIC DISCLOSURE

88. I find that ExxonMobil's practices of accounting for Climate Change Regulatory Risk and its GHG Emission Proxy Costs were inconsistent with its public disclosures regarding these risks and costs. As discussed in Section V.B, ExxonMobil has represented that it has consistently applied a GHG Emission Proxy Cost in its business

---

[216] 2015 Q2 Transcript of ExxonMobil Earnings Call, Thomson Reuters, July 31, 2015, p. 18 ("When you look at your oil sands projects, they're relatively high cost impacted by potential carbon pricing, and higher taxes coming through. […] given those are your key areas, how comfortable are you with those areas and the potential growth there."). Equity research analysts from 17 firms participated on this earnings call.

[217] 2016 Q2 Transcript of ExxonMobil Earnings Call, Thomson Reuters, July 29, 2016, p. 25 ("[… w]ithin Exxon's project economics planning, do you incorporate a future carbon price?" ExxonMobil's VP of IR & Secretary responded: "[I]f you look in our energy outlook, which we've got posted on our Company website, you'll see that we've included for -- now for many years a, what we call a proxy cost of carbon. And over the outlook period out to 2040, that number grows to as high as $80 per ton. But you'll see it in our energy outlook, if you go ahead and take a look at it."). Equity research analysts from 16 firms participated on this earnings call.

**App. 419**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

planning since 2007,[218] and since at least 2010, the company has published estimates of future GHG Emission Proxy Cost.[219] I understand that these estimates are based on ExxonMobil's detailed GHG Emission Proxy Cost schedules prepared as part of its Energy Outlook business planning process and, over time, these estimates covered more and more geographic areas. Additionally, in its 2014 public disclosures in the *Energy and Carbon - Managing the Risks* and *Energy and Climate* reports, ExxonMobil represented that it has employed a "consistent corporate planning basis" and applied a projected GHG Emission Proxy Cost to all of its "significant proposed projects" and across "all [its] business segments."[220]

89.     Moreover, as discussed in the previous section, ExxonMobil's disclosures regarding its exposure to Climate Change Regulatory Risk and its use of a GHG Emission Proxy Cost in its business planning were relevant to the Investment Community's assessment of ExxonMobil's business. Based on my review of commentary from the Investment Community and my prior experience analyzing and valuing oil and gas companies, ExxonMobil's public disclosures related to GHG Emission Proxy Cost would have likely led the Investment Community to conclude that ExxonMobil was consistently applying these costs to all of its business planning and investment decisions.

90.     However, based on my review of ExxonMobil's internal business planning documents and corporate planning and investment decision financial models, I find that

---

[218]   Cohen, Ken "ExxonMobil and the Carbon Tax," Energy Factor, December 2, 2015, https://energyfactor.exxonmobil.com/corporate-citizenship-sustainability/exxonmobil-and-the-carbon-tax.

[219]   *See supra* Section V.B.

[220]   *Energy and Carbon – Managing the Risks*, ExxonMobil, March 31, 2014, pp. 18, 21; *Energy and Climate*, ExxonMobil, March 31, 2014, pp. 6, 20.

66

**App. 420**

Case 3:16-cv-03111-K   Document 121   Filed 07/31/20   Page 426 of 544   PageID 4678

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

ExxonMobil's practices of accounting for GHG Emission Proxy Cost were inconsistent with its public representations in at least two areas. First, ExxonMobil did not apply the GHG Emission Proxy Cost consistently in its annual end user demand projections for the overall global oil and gas industry. Second, in the set of corporate planning and investment decision financial models I reviewed, in almost all years, ExxonMobil applied either a GHG Emission Proxy Cost that was lower than what it had publicly disclosed, or no GHG Emission Proxy Cost at all. I discuss these inconsistencies in ExxonMobil's application of GHG Emission Proxy Cost in further detail below.

### A.   ExxonMobil's Oil and Gas Demand Projections Did Not Consistently Adopt Its Publicly-Disclosed GHG Emission Proxy Cost

#### 1.   Overview of ExxonMobil's Energy Outlook Demand Projection Process

91.   As discussed previously, fossil fuels generate GHG Emissions not only when they are extracted and refined to produce oil and gas products, but also when end users consume those products. Correspondingly, stricter climate change regulations could be aimed at imposing higher costs on the consumption of refined products and directly curbing the end user demand for such oil and gas products. Numerous industry analysts have predicted that such stricter climate change regulations should lead to declining fuel demand in the coming years.[221]

---

[221] *See, e.g.*, Herrmann, Lucas and Tom Robinson, "European Integrated Oil 2017 Outlook: Hitting a Sweet Spot," Deutsche Bank, December 6, 2016, p. 46 ("[…] as host countries ratify the Paris COP21 accord […] the question is no longer will supply constrain demand, but rather when will oil demand move into decline[…]."). *See also* Rigby, Jon "European Oil and Gas 2019 Outlook - More of the Same," UBS, December 17, 2018, p. 11 ("[T]he most likely trajectory for oil demand means we would miss the implied targets consistent with the Paris

**App. 421**

FILED: NEW YORK COUNTY CLERK 10/04/2019 11:06 PM

NYSCEF DOC. NO. 355

INDEX NO. 452044/2018

RECEIVED NYSCEF: 10/04/2019

Case 3:16-cv-03111-K    Document 121    Filed 07/31/20    Page 427 of 544    PageID 4679

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

92. ExxonMobil itself recognizes the impact such climate change regulations could have on end user fuel demand.[222] For instance, ExxonMobil's 2014 *Outlook for Energy* stated that "[n]atural gas is likely to grow in use as a transportation fuel, with its attractiveness enhanced by its relatively low emissions."[223] Another ExxonMobil report in 2018 estimated that if climate change regulations become sufficiently stringent to meet the Paris Agreement's two-degree target, it would result in a 0.4 percent decrease in demand for oil every year. That is an especially noteworthy decline, considering future population and GDP growth should boost demand for all fuels.[224]

93. As a result, ExxonMobil undertakes an annual review process called Energy Outlook that develops its projections for "global fuel demand by assessing demand and supply at country, sector and fuel level."[225] This review process is carried out by ExxonMobil's Energy Outlook Group in conjunction with the Environmental Policy and Planning Group.[226] ExxonMobil subsequently publicly discloses the results of this process in its annual *Outlook for Energy* reports, which it has published every year since 2006.[227, 228] In

---

Accord. [To meet those targets, p]oliticians and policy makers may try to bend [the demand] curve by introducing more consequential measures on the use of oil and gas.").

[222] *2018 Energy and Carbon Summary*, ExxonMobil, p. 8.

[223] *The Outlook for Energy: A View to 2040*, ExxonMobil, 2014, (hereafter, *2014 Outlook for Energy*), p. 22.

[224] *2018 Energy and Carbon Summary*, ExxonMobil, p. 8.

[225] EMC 002532516, March 14, 2011 email from Todd Onderdonk to Jennifer Linker re: energy outlook questions, p. 1.

[226] Both the Energy Outlook Group and Environmental Policy and Planning Groups are within ExxonMobil's Corporate Strategic Planning Group. Examination of William Colton (*VP, Corporate Strategic Planning, 2009-present)*, June 27-28, 2017, (hereafter, "William Colton Tr."), pp. 19-21; Todd Onderdonk Tr., p. 351.

[227] Todd Onderdonk Tr., p. 37; *2014 Outlook for Energy*, p. 2.

[228] In 2011, ExxonMobil updated its naming conventions for the *Outlook for Energy* report – usually published in Q4 – to reflect the upcoming year, as opposed to the current year. The 2010 *Outlook for Energy* was published

68

**App. 422**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

addition, ExxonMobil senior management conducts presentations to investors, governments, and industry groups using the data contained in these annual reports.[229] ExxonMobil has publicly stated that the "outlook" developed from the Energy Outlook process "forms the foundation for the company's business strategies and helps guide investment decisions."[230]

94.     The Energy Outlook process covers the major global industry sectors that drive fuel demand, including residential, commercial, agricultural, chemical, energy industry, heavy industry, and transportation sectors.[231] The sector-level demand projections are based on a broad range of drivers that vary across sectors. These drivers include factors such as the number of households, GDP growth forecasts, and historical demand data for different countries and regions.[232]

95.     Additionally, as part of the Energy Outlook process, ExxonMobil also constructs detailed GHG Emission Proxy Cost projections, which according to ExxonMobil, intend to "address[] the potential for future climate change policy, including the potential for restrictions on emissions" and "seek[] to reflect potential policies governments may

---

in late 2010, but later *Outlook for Energy* reports were published at the end of the year prior to which they were dated.

[229]   Todd Onderdonk Tr., pp. 43-44.

[230]   "2015 Corporate Citizenship Report," p. 38.

[231]   EMC 002855106, Memo from Todd Onderdonk, December 1, 2016, p. 1.

[232]   EMC 002532516, Email from Todd Onderdonk to Jennifer Linker re: energy outlook questions, March 14, 2011, p. 1.

**App. 423**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

employ related to the exploration, development, production, transportation and use of

carbon-based fuels."[233]

96.    To model the potential impact of future climate change regulations on sector-level end

user fuel demand, ExxonMobil claims that it added the forecasted GHG Emission Proxy

Cost to the fuel price assumptions it used in its demand projections.[234] Then based on the

resulting adjusted fuel prices and assumptions regarding demand price elasticity for the

sectors, ExxonMobil estimated the projected end user fuel demand for each sector and

country.[235] However, as I discuss below, ExxonMobil did not apply the GHG Emission

Proxy Cost consistently in its demand projections or corporate planning and investment

decisions.

2.    *ExxonMobil Did Not Consistently Apply Its Publicly-Disclosed GHG Emission Proxy Cost in Its Demand Projections*

97.    For most other sectors, ExxonMobil added the forecasted GHG Emission Proxy Cost to

its fuel price assumptions it used in the Energy Outlook process.[236]  For the transportation

sector, however, ExxonMobil did not add any GHG Emission Proxy Cost to the projected

fuel prices as it did for the other sectors.[237]

---

[233]  EMC 002871205, "GHG Overview Comments," 2016, p. 1.

[234]  EMC 002855106, Memo from Todd Onderdonk, December 1, 2016, p. 1.

[235]  EMC 002855106, Memo from Todd Onderdonk, December 1, 2016, p. 1.

[236]  Todd Onderdonk Tr., pp. 257-268.

[237]  *See, e.g.*, EMC 002855106, Memo from Todd Onderdonk, December 1, 2016. *See also* Todd Onderdonk Tr., pp. 257-268.

70

**App. 424**

Case 3:16-cv-03111-K    Document 121    Filed 07/31/20    Page 430 of 544    PageID 4682

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

98.    Instead, for the segments within the transportation sector, ExxonMobil only accounted for the potential impact of climate change regulations on sector demand resulting from anticipated fuel efficiency improvements for different types of vehicles.[238] For instance, in the light duty segment of the sector, ExxonMobil's demand projections were based on the anticipated effects of existing and potential future vehicle efficiency standards that car manufacturers may be required to meet in certain countries.[239] These vehicle efficiency standards, such as the 2012 U.S. Corporate Average Fuel Economy ("CAFE") standards, require new cars to achieve certain minimum fuel efficiency targets.[240] Similarly, in other segments such as heavy duty, aviation, marine, and rail, ExxonMobil only considered anticipated fuel efficiency improvements due to anticipated requirements or improved technology.[241] ExxonMobil claims that any GHG Emissions-related effect on fuel demand for the sector should, to a large degree, already have been reflected in such fuel efficiency requirements or improvements.[242]

---

[238]   *See, e.g.,* EMC 003212719, "2011 Energy Outlook Key Drivers and Guidelines by Sector," at worksheet entitled "Price and CO2 Modelling." *See also* Todd Onderdonk Tr., pp. 257-268.

[239]   Furthermore, for some other regions in which ExxonMobil did not "have adequate data," ExxonMobil did not model even the impact of fuel efficiency regulation in its demand projections. Thus, for these countries, the potential effect of future climate change regulations does not appear to factor directly into ExxonMobil's demand projections for the sector at all. Todd Onderdonk Tr., pp. 257-262.

[240]   Halpert, Julie, "What if U.S. Fuel Economy Standards Went Away?" Ensia, June 21, 2018, https://ensia.com/features/fuel-standards/.

[241]   *See, e.g.,* EMC 003739418, "2017 Energy Outlook Transportation Deeper Dive," August 2, 2016, p. 14. *See also* Todd Onderdonk Tr., pp. 266-267 ("Q. Besides light duty vehicles, what sectors do you, instead of using the proxy cost, use a similar regulatory analysis to what you described with the CAFE standards? A. The heavy duty sector, basically trucks and buses, we use an energy intensity indicator of projected demand in the future. Similar approach for the aviation sector. The marine sector, as well, is one where we looked at potential efficiency gains affecting the overall demand for marine fuels. The rail sector, trains. Again, we're looking overall energy intensity gains relative to the GDP and/or population.").

[242]   *See, e.g.,* EMC 002855106, Memo from Todd Onderdonk, December 1, 2016 ("In the transportation sectors, at this point we currently assume that CO2 costs are reflected to a large degree by efficiency standards (e.g. CAFE

71

**App. 425**

Contains Confidential Material

Subject to Stipulation and Order for the Production and Exchange of Confidential Information

99.     ExxonMobil's rationale, however, for not considering the GHG Emission Proxy Cost in its demand projection for the transportation sector is flawed and internally inconsistent. This rationale fails to account for the fact that end users in the transportation sector could also face higher fuel prices due to GHG Emission costs, consistent with ExxonMobil's view of other sectors. The fact that such products may be used more efficiently by the transportation sector and therefore emit fewer GHGs per mile driven or traveled does not prevent governments from potentially proposing other regulations that increase the price of such products to curb consumption and in turn reduce GHG Emissions even further.[243]

100.    Had ExxonMobil applied GHG Emission Proxy Cost to its transportation sector, as it did for the other sectors, it would have projected a higher "all-in" price that end users in the sector could face and consequently lower end user demand for that sector.[244] Moreover, given the fact that the transportation sector is expected to represent more than half of the worldwide demand for crude oil, ExxonMobil's failure to appropriately account for fuel demand in this sector would likely also have had a substantial impact on its overall global

---

in the U.S.)."). *See also* EMC 002532516, Email from Todd Onderdonk to Jennifer Linker re: energy outlook questions, March 14, 2011, ("our views for the future are predicated to a large degree by actual and/or anticipated policies (e.g. CAFE in U.S., and CO2 g/km targets in Europe). I'll also note that we generally assume continued efficiency gains beyond those identified in the near-to-mid-term by light duty vehicle mandates."); Onderdonk Tr., pp. 266-267.

[243]  ExxonMobil's GHG Emission Proxy Cost is meant to "comprehensively reflect potential policies governments may employ related to managing the risks of climate change," and to "reflect all types of actions and policies that governments may take." The company's indirect and incomplete accounting for climate change regulatory risk in the transportation sector, on the other hand, only reflects a limited set of those potential government policies. "Climate Change 2017 - Exxon Mobil Corporation, CDP, 2017 at CC2.2d; *Energy and Carbon – Managing the Risks*, ExxonMobil, March 31, 2014, p. 17.

[244]  I note that a higher "all-in" price could be due to taxes imposed on the end user and does not imply that ExxonMobil receives higher revenue than it would with a lower "all-in" price.

72

**App. 426**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

fuel demand projections.[245] Since ExxonMobil uses these demand calculations to inform its business planning and investment decisions, an inflated outlook on the fuel demand in the transportation sector would also have, consequently, likely led ExxonMobil to also project an inflated demand for its products.[246] Based on my experience analyzing and valuing oil and gas companies, such inflated projections would have likely positively biased the Investment Community's assessment and valuation of ExxonMobil.

**B.    ExxonMobil Did Not Apply Its Publicly-Disclosed GHG Emission Proxy Cost Consistently in Corporate Planning and Investment Decision Financial Models**

*1.    Overview of ExxonMobil's Corporate Planning and Investment Decision Review Processes*

101.    In addition to its annual Energy Outlook process, ExxonMobil also carried out reviews of capital budgeting plans and portfolio assets as part of its annual corporate planning process and evaluated potential investment opportunities as part of its investment decision process.[247]

102.    As part of ExxonMobil's corporate planning and investment decision processes, it used financial models to calculate future cash flows and financial returns for each asset and

---

[245]  EMC 003739418, PowerPoint presentation titled, "2017 Energy Outlook: Transportation Deeper Dive," August 2, 2016, notes to p. 7.

[246]  *See, e.g.,* William Colton Tr., p. 77 ("the Energy Outlook will tell us how much crude oil the world needs through the forecast horizon, and then we separately take that and put it into a model to say, well, if the world needs this much crude oil, where the supply is going to come from, we're able to run a model looking at the cost of those supplies and we use that to match against the demands and develop a curve looking at a price forecast, which we look at. […] it's fundamentally driven by a supply/demand model. […] that becomes guidance for the businesses as they try to understand what the return for their projects will be in terms of what the prices are.").

[247]  Examination of Mark Shores, (*Planning Manager for Corporate Strategic Planning, 2014-present*), December 7-8, 2017 (hereafter, "Mark Shores Tr."), pp. 46-49.

**App. 427**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

potential investment.[248] Many assumptions that underlie these financial models were based on corporate planning and guidance documents ("Dataguides") that were revised annually.[249] The Dataguides were designed to highlight key objectives and strategic directions for ExxonMobil's businesses and contained guidance on key financial and operating parameters that were intended to help frame objectives for ExxonMobil's businesses over the planning period.[250] ExxonMobil's business line managers were expected to follow the Dataguides unless they had been granted an exception.[251]

103.    One of the parameters included in the Dataguides was ExxonMobil's internal GHG Emission Proxy Cost schedules, which projected the estimated dollar cost per ton of GHG Emissions into the future. These projected costs varied for different regions around the world and were designed to reflect the projected effects of both current and potential future climate change regulations.[252] These internal schedules were revised annually, and it was expected that the financial models used by ExxonMobil for its corporate planning and investment decision processes would contain a specific line item for GHG Emission Proxy Costs.[253]

---

[248]    William Colton Tr., p. 38.

[249]    William Colton Tr., pp. 85-86, 89; Mark Shores Tr., p. 73.

[250]    *See, e.g.*, 2015 ExxonMobil Corporate Planning Dataguide p. 5 ("The 2015 Plan should highlight the key objectives and strategic direction for each company. However, the focus of the Plan should remain on how those strategies will be implemented over the plan period and the anticipated results. The 2015 Plan is the vehicle for establishing each Company's financial and operating stewardship objectives for the year 2016 and for establishing the context for endorsement of the Company's original budget and capital expenditure.").

[251]    William Colton Tr., pp. 179-80, 276.

[252]    *See, e.g.*, 2015 ExxonMobil Corporate Planning Dataguide Appendices, p. 31. *See also* Examination of Robert Bailes, (*Corporate GHG Manager, 2009-2014*), July 19-20, 2017, p. 72.

[253]    William Colton Tr., pp. 246-247.

**App. 428**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

2. *ExxonMobil Did Not Consistently Apply Its Publicly-Disclosed Proxy Costs in Its Financial Models*

104. As discussed in Section V.B, ExxonMobil has publicly stated that as part of its corporate planning and investment decision processes it "requires that all business units use a consistent corporate planning basis, including the proxy cost of carbon […], in evaluating capital expenditures and developing business plans."[254] Moreover, ExxonMobil has also stated that it applied a projected GHG Emission Proxy Cost to all its "significant proposed projects" and across "all our business segments."[255] Based on my experience analyzing and valuing oil and gas companies, ExxonMobil's public disclosures and statements would have led the Investment Community to likely conclude that ExxonMobil was consistently applying its publicly disclosed GHG Emission Proxy Cost to its business planning and investment decisions.[256] However, ExxonMobil's corporate

---

[254] *Energy and Climate*, ExxonMobil, March 31, 2014, p. 20.

[255] *Energy and Carbon – Managing the Risks*, ExxonMobil, March 31, 2014, pp. 18, 21.

[256] I understand that ExxonMobil's reserves modeling exercise was part of its corporate planning process, and should have also incorporated the GHG Emission Proxy Cost. *See, e.g.*, Deposition of Richard Ducharme (*Global Reserves Manager, 2016-present*), April 2, 2019, p. 53 ("Q. And why does Exxon assess Company Reserves? A. Because it's an outcome from our Company Planning process."), pp. 56-57 ("Q. And how are those reserve models used in Exxon's business planning process? A. They built our models with inputs. Those inputs are what goes into the Company Plan. Q. Is the Company Plan the same as the Corporate Plan? A. It is, yes. Q. And that's the annual corporate planning process? A. That's correct."), pp. 60-61 ("Q. And are GHG costs incorporated into reserves models? […] A. So the plan, the Company Plan is built following the Corporate Dataguide as input. […] Q. And you said that GHG costs are listed in the Corporate Dataguide; is that correct? A. Correct. Q. So are GHG costs incorporated into reserves models? […] A. Again, they're incorporating the guidance from the Corporate Dataguide."). *See also* Commercial Division Rule 11-f Deposition of ExxonMobil, by Brant Edwards (*ExxonMobil's Vice President of Upstream Development and Planning*), April 30, 2019 pp. 303-304 ("Q. Mr. Edwards, we have been discussing reserves and resources. What is the purpose of Exxon's classification of volumes of oil and gas into reserves and resources, putting aside regulatory requirements? … A. Well, it's part of our annual planning and budget exercise.")

75

**App. 429**

Case 3:16-cv-03111-K    Document 121    Filed 07/31/20    Page 435 of 544    PageID 4687

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

planning and investment decision financial models that I reviewed apply the GHG

Emission Proxy Cost in a manner contrary to its public representations.

105.    First, the GHG Emission Proxy Cost schedules that were included in the Dataguides were

significantly lower in many years than those that were publicly disclosed by

ExxonMobil.[257] To illustrate this difference, in Exhibit 9.A-B I compare the GHG

Emission Proxy Cost schedules for OECD non-EU countries in the internal Dataguides to

those created through the Energy Outlook process for the years 2011 through 2017.[258,259]

106.    As the exhibits demonstrate, the GHG Emission Proxy Cost schedules in the Dataguides

before 2014 were significantly lower and only go out to 2030 compared to 2050 in the

corresponding Energy Outlook schedules. For example, the 2013 Dataguide schedule

projected OECD non-EU GHG Emission Proxy Cost of $20 and $40 per ton in 2020 and

---

[257]    As discussed in Section VI.A.11, the GHG Emission Proxy Cost that ExxonMobil publicly disclosed in its *Outlook for Energy* and other publications was based on the GHG Emission Proxy Cost estimates it put together as part of the Energy Outlook review process.

[258]    To adjust for this change in the *Outlook for Energy* naming convention, I use the data file received in relation to the 2010 *Outlook for Energy* report for the 2011 external GHG Emission Proxy Cost schedule. For the 2012-2017 GHG Emission Proxy Cost schedules, I use the data files received in relation to the *Outlook for Energy* report dated from that year.

[259]    I show the OECD non-EU cost schedules as an illustrative example because the majority of the ExxonMobil financial models I reviewed are associated with ExxonMobil assets located in non-EU OECD countries. However, similar disparities between internal and publicly disclosed GHG Emission Proxy Cost schedules exist for the OECD EU and non-OECD schedules. For example, for OECD EU countries the 2013 Dataguide schedule projected GHG Emission Proxy Cost of $20 and $40 per ton in 2020 and 2030, respectively. By contrast, the 2013 Energy Outlook schedule reported GHG Emission Proxy Cost of $40 and $60 per ton in 2020 and 2030, respectively, and projected the costs to increase to $80 and $100 per ton by 2040 and 2050. Similarly, for non-OECD countries, ExxonMobil publicly disclosed GHG Emission Proxy Costs for both "leading" and "trailing" non-OECD nations (where "leading" and "trailing" refer to the likelihood of future climate change regulation) from 2011-2015, whereas the internal Dataguides for these years did not mandate the use of GHG Emission Proxy Cost for non-OECD nations. *Outlook for Energy* reports, ExxonMobil, 2011-2017; Energy Outlook Proxy Cost Bases, ExxonMobil, 2011-2017, EMC 001893315, EMC 003212721, EMC 002507099, EMC 002948182, EMC 002948186, EMC 002948185, EMC 002948164, Corporate Plan Dataguides for 2011-2017.

76

App. 430

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

2030, respectively, and only projected costs out to 2030. By contrast, the 2013 Energy

Outlook schedule reported OECD non-EU GHG Emission Proxy Cost of $36 and $60 per

ton in 2020 and 2030, respectively, and projected the costs to increase to $80 and $100

per ton by 2040 and 2050, respectively.

107.    Additionally, even after ExxonMobil purportedly aligned the GHG Emission Proxy Cost

schedules used for OECD countries in the internal Dataguides with those publicly

disclosed in the Energy Outlook in 2014, differences between the two schedules persisted

both in the near-term and the longer-term. [260] Also, the 2015 Dataguide schedule only

included projections up to 2040 while the 2015 Energy Outlook schedule went out to

2050.

108.    Based on my experience analyzing and valuing oil and gas companies, the Investment

Community would have likely interpreted ExxonMobil's public disclosures to mean that

it was consistently applying the publicly disclosed GHG Emission Proxy Cost to its

business planning and investment decision models. For instance, at ExxonMobil's 2016

Annual Shareholder Meeting, ExxonMobil's Chairman and Chief Executive Officer

commented that "unlike many of our competitors, we have for many years included a

price of carbon in our outlook. And that price of carbon gets put into all of our economic

models when we make investment decisions as well. It's a proxy. We don't know how

---

[260]    For instance, the 2015 Dataguide schedule projected a GHG Emission Proxy Cost of approximately $20 per ton
for most OECD non-EU countries in 2020, whereas the Energy Outlook schedule reported a GHG Emission
Proxy Cost of approximately $24 for those countries in 2020. The 2015 Dataguide, moreover, did not include a
GHG Emission Proxy Cost for non-OECD countries, whereas the Energy Outlook schedule reported a GHG
Emission Proxy Cost rising to $60 per ton for some countries by 2050. *See also,* William Colton Tr., pp. 205-
206.

**App. 431**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

else to model what future policy impact might be. But whatever policies are, ultimately they come back to either your revenues or your costs. So we choose to put it in as a cost."[261] ExxonMobil's employees themselves admitted that the *Energy and Climate* and *Energy and Carbon – Managing the Risks* reports "implied that [ExxonMobil uses] the [Energy Outlook] basis for proxy cost of carbon when evaluating investments."[262]

109.  Based on my experience, the Investment Community would not have interpreted such statements to mean that ExxonMobil applied a different set of cost schedules that were undisclosed to the market and, more importantly, would not have considered the two cost schedules to be different concepts as ExxonMobil contends that it did in its processes. In fact, there is evidence that even ExxonMobil's employees did not consider the two concepts to be different. For example, Robert Luettgen, ExxonMobil's Manager of the Office of the Secretary, wrote that "we [ExxonMobil] believe the correctness of our *Outlook*, including the proxy cost assumptions contained within it; so much so, that we base our investment decisions on it."[263] ExxonMobil's former GHG Managers, Guy Powell (2014–2018) and Robert Bailes (2009–2014), similarly were unable to articulate a

---

[261]  "Transcript of ExxonMobil Corporation Shareholders Meeting," Thomson Reuters, May 25, 2016, p. 29.

[262]  *See* EMC 000539921, PowerPoint presentation to Management Committee, at EMC 000539923 ("While using a lower cost basis in the CP provides a conservative view for evaluating energy conservation / emissions reduction investments, it provides an non-conservative view for evaluating capacity growth investments that involve GHG emission creation (combustion / venting / flaring etc.) […] In recent reports released by EM ("Energy and Climate" and "Energy and Carbon - Managing the risk") we have implied that we use the EO basis for proxy cost of carbon when evaluating investments.").

[263]  Examination of Robert Luettgen, (*Manager, Office of the Secretary, 2010-present*), December 12-13, 2017, Exhibit 2, at EMC 001198405-8406.

**App. 432**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

reason why the internal and external GHG Emission Proxy Costs should be different.[264]

And even ExxonMobil's Chief Executive Officer has explicitly presented GHG Emission

Proxy Costs as a single concept.[265]

110.  Second, even if one were to set aside the differences in the two schedules, how

ExxonMobil incorporated GHG Emission Proxy Cost in its internal models was also

inconsistent. For example, ExxonMobil guided business units to include the GHG

Emission Proxy Cost in the following manner before 2016:[266]

- "From 2016 to 2020, apply [the Dataguide GHG Emission Proxy Cost] to ongoing operational emissions and project economics for only those jurisdictions with existing policy/regulations."

- "From 2020 and beyond, apply [the Dataguide GHG Emission Proxy Cost] to project economics for OECD countries only."

- "For non-OECD countries, consider sensitivity case in project economics reflecting [the Dataguide GHG Emission Proxy Cost] only if future policy action reasonably anticipated in a given country."

111.  Such internal guidance was again contrary to ExxonMobil's public representations. As

discussed previously, ExxonMobil has publicly represented that it has consistently

applied the GHG Emission Proxy Cost in its business planning and investment decisions.

For example, in BlackRock's notes regarding a 2015 meeting with ExxonMobil,

BlackRock noted that ExxonMobil "[i]nclude[s] a proxy cost of carbon for all [of

---

[264]  Guy Powell Tr., p. 267 ("I was asking him [Bailes] as to, you know, why are these things separated and what's the logic for the separation. Q And what did he tell you? A As I recall, he didn't really know.").

[265]  ExxonMobil-XTO Hearing, p. 41 (""in all of [ExxonMobil's] investment decisions […and] economic modeling, [ExxonMobil] put[s] a carbon price in [its] economic decisions and project[ed] something for the future so that [it] at least [was] considering what the effects of our investment might be in the years to come").

[266]  EMC 002871205, GHG Overview Comments-2016, p. 1.

**App. 433**

Contains Confidential Material

Subject to Stipulation and Order for the Production and Exchange of Confidential Information

ExxonMobil's] investment decisions (varies by region)."[267] Similarly, ExxonMobil has publicly stated that "in the developing world, we apply a range of proxy costs with the more wealthy countries, like China and Mexico, reaching about $30/ton in 2040."[268]

112. Based on my experience analyzing and valuing oil and gas companies, the Investment Community would not have likely expected that ExxonMobil would instead apply the GHG Emission Proxy Cost to only those jurisdictions with existing regulations in the near term, and only OECD countries in the longer term. ExxonMobil had constructed detailed GHG Emission Proxy Cost schedules that included near-term and long-term cost projections for both OECD and non-OECD countries as part of the Energy Outlook process from at least 2011. This fact raises further questions as to why ExxonMobil did not apply those cost schedules to its business planning and investment decisions consistently.

113. Moreover, based on my professional experience, using such inconsistent assumptions across different business planning exercises and models could lead to potentially sub-optimal and inconsistent decisions. By allowing its modelers to exercise so much discretion in their corporate planning and investment modeling decisions, ExxonMobil made it very likely that some models would not account for the GHG Emission Proxy Cost appropriately. For instance, in its Kearl models, ExxonMobil included a GHG Emission Proxy Cost for only a portion of projected emissions for the asset based on

---

[267]   BLK-EXXON-000363, October 12, 2015, company meeting notes.

[268]   *Energy and Climate*, ExxonMobil, March 31, 2014, p. 6.

80

**App. 434**

Contains Confidential Material

Subject to Stipulation and Order for the Production and Exchange of Confidential Information

then-existing Alberta legislation rather than its internal Dataguide or publicly disclosed cost schedules.[269] Similarly, some models, such as the 2012 Point Thomson (Point Thomson Initial Production System) model, included no GHG Emission Proxy Cost at all.[270] Additionally, in the models that I adjusted, where internal Dataguide schedules were used, the GHG Emission Proxy Cost was held constant from 2030 until the end of the projected life of the asset, while the Energy Outlook cost schedules assumed an increase of approximately 67 percent (on a real basis) between 2030 and 2050.

114.    Such inconsistent modeling was again contrary to ExxonMobil's representations to the Investment Community. ExxonMobil has made clear that the GHG Emission Proxy Cost must be directly applied to individual project economics as a cost.[271] Only applying a GHG Emission Proxy Cost indirectly, through costs applied to end user energy demand that may impact the oil price assumptions used in the calculation of project economics, was inconsistent with those disclosures. There was no reason to believe that somehow the producers of crude oil and natural gas and the refiners would be exempted from incurring

---

[269]    *See, e.g.*, EMC 002875747, Jul. 4, 2016, "2016 Corporate Plan Dataguide - Revision 1" ("Last year, the [Corporate Plan] guidance resulted in massive GHG costs in the out years so alternate methodology was applied. I suspect something similar will be required this year."); *See also* EMC 002879540, Jul. 14, 2016, "Questions Regarding GHG Guidance in 2016 Corporate Dataguide Rev 1," ("Currently the [Kearl] model is still only following 'legislated' GHG guidance (Alberta) as part of a management decision last year . . . versus the global strat[egic] planning guidance.").

[270]    EMC 004046576, Point Thomson (Point Thomson Initial Production System) Model.

[271]    "Transcript of ExxonMobil Corporation Shareholders Meeting," Thomson Reuters May 25, 2016, p. 29 (Rex Tillerson: "We have, unlike many of our competitors, we have for many years included a price of carbon in our outlook. And that price of carbon gets put into all of our economic models when we make investment decisions as well. It's a proxy. We don't know how else to model what future policy impacts might be. But whatever policies are, ultimately they come back to either your revenues or your cost. So we choose to put it in as a cost.").

**App. 435**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

costs resulting from GHG Emissions created during these processes.[272] In fact, ExxonMobil's management stated that "as we [ExxonMobil] look at [GHG Emissions], they have a general princip[le] that the [accountability] of those emissions should be on the actual emitter."[273]

115.    Again, based on ExxonMobil's disclosures and statements and my experience analyzing and valuing oil and gas companies, the Investment Community would have likely expected ExxonMobil to apply the GHG Emission Proxy Cost to all emissions generated from a given project. It would not have expected ExxonMobil to instead only apply its GHG Emission Proxy Cost based on a fraction of the projected emissions or no GHG Emission Proxy Cost at all. As discussed previously, based on my experience and review of commentary from the Investment Community, the Investment Community was particularly concerned with the impact of GHG Emission Proxy Cost and the stranded asset risk for ExxonMobil's GHG Emission-intensive assets such as the oil sands projects.[274] By not incorporating the GHG Emission Proxy Cost for the full amount of the

---

[272]    *See, e.g.*, EMC 000957128, February 6, 2009 email from Tom Eizember ("ExxonMobil would be disadvantaged by an unlevel playing field among energy sources or among companies - for example, if domestic coal received favorable treatment in the name of "energy security" or if smaller oil/gas firms received favorable treatment. It is difficult to imagine a realistic unlevel playing field that would benefit ExxonMobil. One of the advantages of a GHG tax over a cap-and-trade system is that ease of application and transparency of a tax should favor broad, equitable treatment of all energy sources and companies versus cap and trade.").

[273]    Guy Powell Tr., p. 467.

[274]    *See* discussion *supra* Section V.C.3. *See also* A Changing Climate: The Fossil Fuel Debate," Morgan Stanley Institute for Sustainable Investing, 2016, p. 8, https://www.morganstanley.com/pub/content/dam/msdotcom/articles/fossil-fuels/A-Changing%20Climate_The%20Fossil_Fuel_Debate.pdf (oil and gas investment trends are heightening Climate Change Regulatory Risk, as producers shift to "costlier and riskier sources of energy. Already, approximately 60 [percent] of U.S. oil and gas is derived from less conventional sources such as tar sands, shale and offshore operations. As climate policy comes to force in the lead-up to 2020, the true costs of fossil fuels may increase.")

82

**App. 436**

Contains Confidential Material

Subject to Stipulation and Order for the Production and Exchange of Confidential Information

projected emissions, ExxonMobil was not consistently accounting for the impact of potential climate change regulations on the project economics of such GHG Emission-intensive assets.[275]

> 3. *Applying Publicly-Disclosed GHG Emission Proxy Cost in Its Financial Models Significantly Impacts Projected Cash Flows of ExxonMobil's Projects*

116. To illustrate the potential impact of ExxonMobil's inconsistent application of GHG Emission Proxy Cost, I reviewed a set of ExxonMobil's financial models used in its corporate planning or investment decision process and adjusted the models, where possible, to use ExxonMobil's publicly disclosed GHG Emission Proxy Cost.

117. I requested from Plaintiff all relevant corporate planning and investment decision financial models currently available in this matter. I received a total of 72 Excel spreadsheets.[276] Exhibit 10 shows the full list of these spreadsheets with the relevant information I used to identify the models for my review.

118. As shown in Table 2, out of the 72 spreadsheets made available to me, I excluded 17 spreadsheets that were files containing only inputs used in corresponding financial models (rather than the models themselves) that were not relevant to GHG Emission Proxy Cost calculations. I further excluded 10 models that were created *after* the

---

[275] *See* EMC 000539921, PowerPoint presentation to Management Committee, at EMC 000539923 ("While using a lower cost basis in the CP provides a conservative view for evaluating energy conservation / emissions reduction investments, it provides a non-conservative view for evaluating capacity growth investments that involve GHG emission creation (combustion / venting / flaring etc.)").

[276] The count of the total number of Excel files I received excludes any impairment-related models.

**App. 437**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

announcement of Plaintiff's investigation into ExxonMobil on November 5, 2015, as

ExxonMobil may have altered its modeling practices in response to the investigation.

**Table 2: Waterfall of ExxonMobil Projects**

|   |   | Total Count |
|---|---|---|
| 1 | Total number of files | 72 |
| 2 | Excluding input files | 55 |
| 3 | Excluding models after investigation start date (2015)[277] | 45 |
| 4 | Excluding models without GHG Emissions projections or costs in projected cash flows | 27 |
| 5 | Limiting to investment models | 8 |

119.    Of the remaining 45 models, 18 models did not include any apparent GHG emission

projections or GHG Emission Proxy Cost estimates in the projected cash flows. For these

models, due to a lack of projected GHG Emissions data or GHG Emission Proxy Cost

estimates in the projected cash flows, I was unable to apply ExxonMobil's publicly

disclosed GHG Emission Proxy Cost to the models.[278] In addition, the models for which I

was able to apply the publicly disclosed GHG Emission Proxy Cost represent only a

subset of the universe of ExxonMobil projects and assets. As a result, my analysis

---

[277]    Plaintiff's investigation began in November of 2015, but I include all 2015 models, even if some of them may have been modified in 2015 after the start of the investigation. *See, e.g.*, Gillis, Justin and Clifford Krauss, "Exxon Mobil Investigated for Possible Climate Change Lies by New York Attorney General," New York Times, November 5, 2015, https://www.nytimes.com/2015/11/06/science/exxon-mobil-under-investigation-in-new-york-over-climate-statements.html.

[278]    Three of the 18 models excluded at this stage, Horn River (EMC 004046559), Kearl (Debottleneck) (Advance Commitment 1) (EMC 003697670), and Baytown (Chemical Plant Metallocene Polyaolefin (MPAO)) (EMC 004276057) contain GHG Emission cost line items, but those line items do not flow through to the final cash flow figures. One other of the 18 models, Baton Rouge (Sulfur Capacity Expansion) (EMC 004046579) contains GHG Emission cost line items, but does not contain final cash flow figures.

**App. 438**

Contains Confidential Material

Subject to Stipulation and Order for the Production and Exchange of Confidential Information

described below likely understates the impact from ExxonMobil's inconsistent application of GHG Emission Proxy Cost in the produced models.

120.    Finally, for the remaining 27 models, I made the adjustments described below.[279] The total impact on the models from these corrections is summarized in Table 3 below.

**Table 3: Summary of Impact on Projected Cash Flows, NPV and IRR from Corrections[280]**

|  | UCF ($mm USD) | NPV ($mm USD) | UCF (%) | NPV (%) | Avg. IRR (%) |
|---|---|---|---|---|---|
| Impact based on GHG Emission Proxy Cost corrections | ($44,508) | ($2,485) | -4.6% | -1.9% | -0.6% |
| Impact based on GHG Emission Proxy Cost and percentage emissions corrections | ($70,249) | ($4,987) | -7.2% | -3.9% | -0.6% |
| Impact based on GHG Emission Proxy Cost corrections (*Investment models only*) | ($11,208) | ($864) | -3.4% | -2.0% | -0.2% |
| Impact based on GHG Emission Proxy Cost and percentage emissions corrections (*Investment models only*) | ($18,796) | ($1,631) | -5.7% | -3.9% | -0.3% |

121.    First, I reviewed the models and identified the GHG Emission Proxy Cost schedules used in the model. I then updated these cost schedules with ExxonMobil's publicly disclosed

---

[279]    In making these adjustments, I took the models as produced and only looked at the modeling case that was presented by ExxonMobil in these models. I note that there are many other assumptions in the models that affect the impact and consistency of GHG Emission Proxy Costs on the models' outputs. Some of the models, for instance, apply different inflation adjustments to GHG Emission Proxy Costs than to other cost variables. For example, in one model, EMC 003697626 (Kearl; Case 6 – Firebag Phases 1 & 2 Upper) GHG Emission Proxy Costs are only escalated by 50 percent of the consumer price index. I have not altered such assumptions for purposes of my analysis.

[280]    UCF stands for the undiscounted cash flow, NPV stands for the net present value, and IRR stands for the internal rate of return. UCF is the sum of all future cash flows of a project. NPV is the sum of future cash flows discounted to their present value using a discount rate. IRR is the discount rate that would make the NPV of a given set of cash flows equal zero. *See, e.g.*, Brealey, Richard A., Stewart C. Myers and Franklin Allen, *Principles of Corporate Finance*, 10th ed., 2011, pp. 23-26, 108.

**App. 439**

FILED: NEW YORK COUNTY CLERK 10/04/2019 11:06 PM          INDEX NO. 452044/2018

NYSCEF DOC. NO. 355          Case 3:16-cv-03111-K    Document 121    Filed 07/31/20    Page 445 of 544    PageID 4697          RECEIVED NYSCEF: 10/04/2019

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

GHG Emission Proxy Cost schedules that were created during the Energy Outlook process carried out in the year before the date of a given model. All other input parameters in the models were left unchanged. Across all 27 models that I reviewed, this adjustment reduces the total projected UCF by $44.5 billion (i.e., 4.6 percent), NPV by $2.5 billion (i.e., 1.9] percent), and the average IRR by 0.6 percent. Exhibit 11 shows the impact of this correction for each model.

122.  Second, for five models where ExxonMobil only estimated the GHG Emission Proxy Cost on a fraction of total projected GHG Emissions from the projects or assets, I applied ExxonMobil's publicly disclosed Energy Outlook GHG Emission Proxy Cost schedule to 100 percent of the projected GHG Emissions. Compared to the original models, this has the effect of reducing the total projected UCF by $70 billion (i.e., 7.2 percent), NPV by $5.0 billion (i.e., 3.9 percent), and the average IRR by 0.6 percent. Exhibit 12 shows the application of ExxonMobil's publicly disclosed GHG Emission Proxy Cost.

123.  Many of the projects with the largest impact due to the application of the publicly disclosed cost are ExxonMobil's oil sands projects. For example, out of the models I reviewed, the ones with the largest impact are the models associated with the Kearl oil sands projects. I have reviewed seven Kearl projects and adjusting the GHG Emission Proxy Cost and applying these costs to 100 percent of emissions yields a $3.8 billion reduction in NPV. Another large project is Firebag, and with the applications discussed above, its NPV decreases by $220 million. The models associated with Clyden, once corrected, reduce its NPV by $131 million. The models associated with Corner, once corrected, reduce its NPV by $143 million. Finally, the models associated with Clarke Creek, once corrected, reduce its NPV by $107 million.

**App. 440**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

124.    As discussed previously, ExxonMobil's oil sands projects, which account for a significant portion of its oil reserves, are GHG Emission-intensive and particularly vulnerable to climate change risk due to their low margins. Given the outsized importance of oil sands projects to ExxonMobil's business, the Investment Community has also been especially concerned that these assets could become stranded due to increased climate change regulations.[281]

125.    Similar potential impact from ExxonMobil's inconsistent application of GHG Emission Proxy Cost can also be seen if only the 8 investment decision models are used.[282]First, by applying the Energy Outlook GHG Emission Proxy Cost schedule, without changing any other input parameters, reduces the total projected UCF by $11.2 billion (i.e., 3.4 percent), NPV by $0.9 billion (i.e., 2.0 percent), and the average IRR by 0.2 percent. Second, for the two of these models where ExxonMobil only estimated the GHG Emission Proxy Cost on a fraction of total projected GHG Emissions from the projects or assets, I applied ExxonMobil's publicly disclosed Energy Outlook GHG Emission Proxy Cost schedule to 100 percent of the projected GHG Emissions. Compared to the original models, this has the effect of reducing the total projected UCF by $18.8 billion (i.e., 5.7 percent), NPV by $1.6 billion (i.e., 3.9 percent), and the average IRR by 0.3 percent.

---

[281]   *See* discussion *supra* Section V.C.3.

[282]   I understand that the Defendant has argued that it only ever publicly disclosed that it used GHG Emission Proxy Cost in investment decisions, but not "corporate acquisitions, its resource base, company reserves, or impairment assessments." I therefore conduct a sensitivity analysis in which I only adjust investment models which were identified as "full funding" or "advanced commitment" models by ExxonMobil. Complaint, pp. A2-A3.

**App. 441**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

Exhibits 13–14 shows the impact on each model within this subset by applying the publicly disclosed cost.

126.    Thus, as demonstrated by these analyses, applying the Energy Outlook GHG Emission Proxy Cost to ExxonMobil's business planning and investment decision models reduces the projected cash flows and returns for ExxonMobil's assets. Thus, by not applying its publicly disclosed GHG Emission Proxy Cost consistently in its project economics, ExxonMobil inflated the outlook for its business.[283] The members of ExxonMobil's Management Committee ("MC Members"), including its Chairman, were provided company business plans and potential capital investments that served as the basis of their knowledge of the operational and financial plans of the company.[284] MC Members were also presented projections from the Energy Outlook process.[285] Given the inconsistencies regarding ExxonMobil's treatment of GHG Emissions Proxy Costs, the information in these materials was likely overstated.

127.    The MC Members, moreover, in addition to the Corporate Secretary, were the primary ExxonMobil employees who spoke with equity research analysts.[286] In the MC Members' discussions with equity analysts, they relayed certain operational and financial guidance

---

[283]    Applying the publicly disclosed GHG Emission Proxy Costs to 100 percent of emissions would have increased operating expenses and reduced the projected profitability for some large projects. Deposition of Dan Hoy, (*Imperial Oil Project Manager, 2005-2018, Imperial Oil North America Production Projects Centre of Excellence Supervisor, 2018-present* ), April 25, 2019, p. 123 ("A. If -- if the price in the dataguide was applied to 100 percent of emissions, that would increase Opex. Q. MR. WALLACE: And what impact would increasing Opex have on earnings? A. It would reduce earnings.").

[284]    *See, e.g.,* Deposition of Thomas Eizember, (*ExxonMobil Corporate Planning Manager, 2004-2014*), April 17, 2019, pp. 26-27. *See also* Mark Shores Tr. pp. 48-49.

[285]    Todd Onderdonk Tr., pp. 88-89 and 492.

[286]    Mark Shores Tr. p. 30.

88

**App. 442**

Case 3:16-cv-03111-K    Document 121    Filed 07/31/20    Page 448 of 544    PageID 4700

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

regarding the future performance of the company.[287] In addition, data from these materials were included in ExxonMobil's Analyst Meeting presentations, which were widely attended by equity analysts.[288] Thus, the inflated outlook presented in ExxonMobil's corporate planning and investment modeling would likely have been conveyed to the Investment Community through the MC Members.

128.   In addition, as a consequence of ExxonMobil's representations regarding its use of GHG Emission Proxy Cost, the Investment Community would have likely based its assessment of the company's future operational and financial attributes, in part, on the fact that ExxonMobil was accounting for Climate Change Regulatory Risk through its use of GHG Emission Proxy Costs. As discussed above, this would be particularly important for assets such as oil sands that already had low-margins and were GHG Emissions intensive. For such assets, the Investment Community likely received a false sense of security by ExxonMobil's representation that GHG Emission Proxy Costs were being incorporated into the project economics, and therefore may have unknowingly taken on additional risk with respect to the assets becoming uneconomic or stranded if GHG Emission Proxy Costs were added to existing operating costs.

129.   The exclusion of GHG Emission Proxy Costs and the inflated company outlook, therefore, would have likely positively biased Investment Community's assessments and valuations of ExxonMobil. Based on my experience analyzing and valuing oil and gas

---

[287]   WFS000001-WFS000024, email from Colleen Hansen (Wells Fargo) re: "Reminder – Exxon Mobil HQ Meeting Next Thursday, May 26," at WFS000022.

[288]   *See, e.g.,* "Transcript of Exxon Mobil Analyst Meeting," Thomson Reuters, March 6, 2013, p. 9. *See* also ExxonMobil Analyst Meeting presentation, March 2, 2016, p. 19; ExxonMobil Analyst Meeting presentation, March 1, 2017, p. 57.

**App. 443**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

companies, had ExxonMobil consistently accounted for GHG Emission Proxy Cost as it publicly represented, reductions in the returns from its assets, in particular, the oil sands projects, would have likely had a negative impact on Investment Community's assessment and valuation of ExxonMobil.

## VII.    ESTIMATE OF AGGREGATE DAMAGES TO EXXONMOBIL SHAREHOLDERS

130.    I have been asked by counsel to calculate the potential number of ExxonMobil shares that were negatively impacted and provide an estimate of the potential aggregate damages suffered by ExxonMobil's shareholders resulting from the disclosures of the company's alleged misrepresentations regarding its adoption of GHG Emissions Proxy Cost.[289]

131.    To conduct this analysis, I have reviewed and analyzed publicly available institutional investor shareholding data for ExxonMobil shareholders for the purposes of quantifying the potential number of shares impacted by the disclosures of ExxonMobil's alleged misrepresentations.[290] The results from this analysis are then applied to the inflation per

---

[289]    I offer no opinion regarding the proper categorization of the legal relief to which the NYAG is entitled (*e.g.*, damages or restitution).

[290]    Institutional investor shareholding data have been used by academics to analyze trading activity. *See, e.g.,* Brunnermeier, Markus and Stefan Nagel, "Hedge Funds and the Technology Bubble," *The Journal of Finance,* Vol. LIX, No. 5, October 2004, pp. 2013-2040. Based on my professional experience, I am also aware of these data being used by business professional for similar purposes. In some contexts, a claims adjudication process can be used to calculate aggregate damages suffered by those shareholders who purchased stock at an inflated prices (as estimated by an events study). In these contexts, the need to estimate aggregate damages is mitigated by the existence of individual claimants who can verify the date and size of their purchase of the affected stock. However, I understand in the current matter this individualized data (embodied in individual claims) is not available. To the extent additional data become available, I reserve the right to update my estimates.

90

**App. 444**

INDEX NO. 452044/2018

Case 3:16-cv-03111-K    Document 121    Filed 07/31/20    Page 450 of 544    PageID 4702

RECEIVED NYSCEF: 10/04/2019

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

share to provide an estimate of the potential aggregate damages suffered by ExxonMobil's shareholders.[291]

132.   Per-share damages in this matter can be calculated as the inflation per share at the time of purchase less the inflation at the time of sale (or the inflation at the time of purchase if the share was not ultimately sold as of the end of the "Inflation Period" as defined below).[292] Specifically, if the share was sold before the start of the Inflation Period on April 1, 2014, then there are no damages.[293] However, if the security was purchased during the Inflation Period and sold after the inflation on ExxonMobil's stock price had dissipated, then per-share damages would be equal to the inflation per share at the time of purchase minus the inflation per share at the time of sale. For example, assume that a given investor purchased a share between April 1, 2014, and January 19, 2016 at a price that was inflated by $4.25 per share. If the investor later sold the share between January 20, 2016 and September 19, 2016 at a price that was inflated by $2.61, then the per-share loss to the investor is equal to $1.64, which is equal to $4.25 minus $2.61.

---

[291]   Specifically, Professor Eli Bartov estimates the reduction in the inflation per share on ExxonMobil's stock price due to corrective disclosures regarding ExxonMobil's alleged misrepresentation using an econometric model. *See* Bartov Report, ¶16 and Section V.

[292]   This methodology is referred to as the "out-of-pocket" method. Gold, Kevin L., Eric Korman and Ahmer Nabi, "Federal Securities Acts and Areas of Expert Analysis," *Litigation Services Handbook, The Role of the Financial Expert*, 6th ed., Ed. Roman L. Weil, Daniel G. Lentz, and Elizabeth A. Evans, John Wiley & Sons, Inc., 2017, Ch. 27, pp. 12-17.

[293]   Professor Bartov used April 1, 2014, as the start of the Inflation Period when ExxonMobil's stock price was inflated due to alleged misrepresentation. ExxonMobil released the *Energy and Carbon - Managing the Risks* and the *Energy and Climate* reports on March 31, 2014, which included the most significant disclosure from ExxonMobil regarding its exposure to climate change regulations and management of those risks through its use of GHG Emission Proxy Costs. The end of the Inflation Period is the last date that Professor Bartov found the stock price to be inflated in his model. *See* Bartov Report, Section V.D.

91

**App. 445**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

### A.    Estimation of Institutional Purchases and Sales in the Inflation Period

133.    In the following section, I describe the methodology used to estimate the number of shares purchased at inflated prices for a given period. For purposes of this analysis, I rely on and take as given the period set forth in the event study analysis performed by Professor Eli Bartov.[294] The period during which Professor Bartov's analysis finds ExxonMobil's stock price to be inflated (*i.e.,* the "Inflation Period") and the corresponding estimate of price inflation on a per-share basis during the period are shown in Table 4 below.[295]  I report two sets of results: (1) when the three significant event dates (January 20, 2016, September 20, 2016, and June 2, 2017) in Professor Bartov's analysis are used, and (2) when only the January 20, 2016 event date is used.[296]

**Table 4 - Professor Bartov's Estimated Inflation Per Share**

| Inflation Period | Estimated Impact Per Share |
|---|---|
| *Using Three Significant Event Dates in Bartov Report* | |
| April 1, 2014 to January 19, 2016 | $4.25 |
| January 20, 2016 to September 19, 2016 | $2.61 |
| September 20, 2016 to June 1, 2017 | $1.16 |
| *Using One Significant Event Date in Bartov Report* | |
| April 1, 2014 to January 19, 2016 | $1.64 |

---

[294]    *See* Bartov Report, ¶16 and Section V.D.

[295]    *See* Bartov Report, ¶16 and Section V.D.

[296]    Professor Bartov found three significant event dates at the 90% confidence interval and one event date at 95% confidence level. *See* Bartov Report, ¶16 and Section V.D.

92

**App. 446**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

134.  To estimate the number of shares purchased by investors during the Inflation Period, I analyze the quarter-end shareholdings of ExxonMobil's stock by institutional shareholders as reported by Thomson One. These data are based on institutional shareholders' SEC Form 13F filings. The total amount of shares held by institutional ExxonMobil shareholders at the end of each quarter from April 1, 2014, to June 2, 2017 is shown in Exhibit 15.

135.  Using quarter-end shareholdings for each institutional shareholder, I then estimate the net number of shares that were either bought or sold during the quarter by the institutional shareholder. If the shareholdings at the end of a quarter declined relative to the shareholdings of the preceding quarter, I take the amount of the decline to reflect that in net, the shareholder sold shares in the latter quarter. Similarly, if the shareholdings at the end of a quarter increased relative to the shareholdings of the preceding quarter, I take the amount of the increase to reflect that in net, the shareholder bought shares in the latter quarter.

136.  Then, I estimate the number of "Impacted Shares" (*i.e.,* those shares bought during the Inflation Period and then sold within the Inflation Period or sold or held after the end of the Inflation Period). To estimate the number of Impacted Shares for each individual institutional ExxonMobil investor whose 13F data are available, I use the last-in-first-out ("LIFO") method to match the shares assumed to be sold during a given quarter within the Inflation Period (as well as the shares assumed to be retained at the end of the Inflation Period) to the shares assumed to be purchased during previous quarters. Under the LIFO method, each sale of ExxonMobil stock during the Inflation Period is matched

93

**App. 447**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

to the shares purchased in previous quarters, starting with the most recent quarter.[297]

Table 5 below shows the total number of Impacted Shares during the Inflation Period as a percentage of average number of outstanding shares during the period, using the LIFO method.

### Table 5 - Estimated Number of Impacted Shares and Number of Shares Outstanding

| Inflation Period | Impacted Shares | Average Shares Outstanding [298] | Impacted Shares as Percentage of Average Shares Outstanding |
|---|---|---|---|
| April 1, 2014 to January 19, 2016 | 290,203,705 | 4,255,994,704 | 6.8% |
| January 20, 2016 to September 19, 2016 | 130,370,872 | 4,187,203,601 | 3.1% |
| September 20, 2016 to June 1, 2017 | 205,629,572 | 4,194,926,025 | 4.9% |

### B.    Estimation of Aggregate Damages to ExxonMobil's Shareholders

137.    I estimate the potential aggregate damages to ExxonMobil's shareholders using the estimated number of Impacted Shares and the estimated inflation on a per-share basis. Given that quarterly shareholding data is publicly available for certain of ExxonMobil's institutional investors only, my approach here does not necessarily cover all institutional investors who owned ExxonMobil's stock during the Inflation Period and certainly does not cover Impacted Shares bought by non-institutional investors. Additionally, as I use the quarterly institutional shareholding data, my analysis also does not take into account any intra-quarter changes in shareholdings or trading within a given individual institution. As a result, my estimate of potential aggregate damages likely understates the total

---

[297]   The LIFO matching methodology is illustrated in further detail with an example in Appendix C.

[298]   Average shares outstanding includes average short interest and is net of average insider holdings for each period. Average shares outstanding is calculated by averaging daily shares outstanding data from Bloomberg. Average short interest is calculated by averaging bi-weekly shares outstanding data from Bloomberg. Insider holdings are calculated by averaging quarterly insider holding data from Thomson One.

**App. 448**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

damages suffered by all ExxonMobil shareholders due to ExxonMobil's alleged misrepresentations and therefore is conservative.

138.   For the Impacted Shares, as discussed previously, damages per share are considered to be the difference between the estimated inflation per share at the time of purchase and the estimated inflation per share at the time of sale or, if held after the Inflation Period, zero. For each institutional investor, I sum the losses calculated for the Impacted Shares to estimate its total damages. Summing together the estimated total damages across the institutional investors for which data was available provides an estimate of aggregate damages.

139.   Table 6 below shows the estimated damages to ExxonMobil's shareholders. Based on the inflation per share obtained from Professor Bartov's regression model, I estimate aggregate damages resulting from the disclosures on the three statistically significant event dates (January 20, 2016, September 20, 2016, and June 2, 2017) to be $1.60 billion.[299] If I were to use the even more conservative estimated inflation per share for the single event date of January 20, 2016 as reported in the Bartov Report, the estimated aggregated damages to institutional shareholders would be $476 million.

---

[299]  I also considered first-in-first-out ("FIFO") and the weighted average shares ("Weighted Average") method to match shares sold in the Inflation Period. Under the FIFO method, each sale of ExxonMobil stock during the Inflation Period is first matched to the shares purchased before the start of the Inflation Period. Then, once the shares purchased before the Inflation Period have been exhausted for matching, each sale is matched to the shares purchased during each quarter in the Inflation Period starting with the first quarter in the Inflation Period. Under the Weighted Average method the shares sold in the Inflation Period are matched on a pro-rata basis to all the shares purchased prior to each share sold being considered. Conservatively, in the report I present the results from LIFO method which yields the lowest estimate of potential aggregate damages. I show the damage estimates based on all three matching methodologies in Appendix D.

**App. 449**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

### Table 6 - Estimated Aggregate Damages to Institutional Shareholders

| Inflation Period | Total Damages From Impacted Shares (millions)[300] |
|---|---:|
| *Using Three Significant Event Dates in Bartov Report* | |
| April 1, 2014 to January 19, 2016 | $1,090 |
| January 20, 2016 to September 19, 2016 | $275 |
| September 20, 2016 to June 1, 2017 | $239 |
| **Total Potential Aggregate Damages** | **$1,603** |
| *Using One Significant Event Date in Bartov Report* | |
| April 1, 2014 to January 19, 2016 | $476 |
| **Total Potential Aggregate Damages** | **$476** |

Peter M. Boukouzis

May 8, 2019

---

[300] Damages in each Inflation Period are based on shares purchased during that period. These shares are then sold in a later period or held through the post-Inflation Period.

96

**App. 450**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

## APPENDIX A

### PETER (PETE) M. BOUKOUZIS
CURRICULUM VITAE
3280 Avenida La Cima, Carlsbad, CA 92009
+1 917-817-0455 (mobile); boukouzis@hotmail.com

EDUCATION

| | |
|---|---|
| University of Chicago Booth School of Business | Chicago, IL |
| Masters of Business Administration (MBA) | March 1998 |

    Concentrations in Accounting, Economics, and Finance

| | |
|---|---|
| University of Illinois | Urbana/Champaign, IL |
| Bachelors of Science (B.S.) in Chemical Engineering | May 1990 |

EMPLOYMENT

| | |
|---|---|
| Self-Employed | Carlsbad, CA |
| Independent Consultant | 2018–present |

    Consult on a variety of strategic matters, including valuation, mergers and acquisitions, business strategy, capital raising, business development, and business plan counseling

    Serve as an expert witness regarding oil and gas matters on teams representing plaintiffs and defendants

| | |
|---|---|
| University of Saint Katherine | San Marcos, CA |
| Business Department Chair and Assistant Professor of Business | 2018–present |

    Liberal arts undergraduate university founded in 2010; received accreditation from WSCUC in 2016

    Current enrollment of approximately 200 students; over 40% are business majors

    Academic advisor to all business majors

    Manage staff of approximately ten adjunct professors

    Teach a number of courses, including finance, accounting, management, and capstone

    Actively involved in recruiting prospective students

| | |
|---|---|
| BMO Capital Markets (Bank of Montreal) | Houston, TX |
| Managing Director and Head of U.S. Energy Mergers and Acquisitions (M&A) | |
| 2009–2016 | |

    Led BMO's U.S. Energy M&A practice; responsible for pipeline and storage, exploration and production, utilities, coal (MLP), refining, oilfield services, and gasoline transportation and retail sectors; accountable for $10+ million budget; retired from BMO in 2016

    Served as a Member of the Investment Banking Fairness Committee

    Responsible for origination and execution of M&A mandates worldwide

    Led and managed up to 25 investment bankers on multiple, simultaneous projects

A-1

**App. 451**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

Member of the senior investment banking team responsible for the hiring and training of mid- and junior-level investment bankers; led investment banker recruiting efforts in many of the top undergraduate universities and MBA schools in the United States

Directed the preparation of detailed historical financial statements and future financial projections, including capital expenditures and working capital, for use in selling memoranda and valuation calculations

Prepared board materials and led discussions with corporate boards of directors to propose, vet, and execute transaction projects

Developed strategies and tactics to increase the probability of achieving successful transactions

Executed both domestic and cross-border transactions with corporate (private, public, and government-owned) around the world and private equity clients; also deeply involved in the financings of transactions

Collaborated with other groups within the bank (energy coverage group, debt capital markets, equity capital markets, country offices) to provide clients with a comprehensive investment banking solution

| | |
|---|---|
| **Rothschild, Inc.** | New York, NY |
| Director, Merger & Acquisitions Group | 2001–2009 |

Worked on and executed a range of M&A and advisory assignments in the natural resources, healthcare, media, industrials, and other sectors

Executed both domestic and cross-border transactions

Collaborated with colleagues worldwide to provide clients high-quality advisory services

Additional 18-month role as staffer; staffed and managed 25 junior bankers

| | |
|---|---|
| **Broadmark Capital Corporation** | Seattle, WA |
| Director – Private Placements | 2000–2001 |

Responsible for origination and execution of financings for early-stage technology and telecommunication companies

| | |
|---|---|
| **UBS** | New York, NY |
| Associate Director, Oil and Gas Group and Generalist Group | 1998–2000 |

Responsible for day-to-day management and execution of M&A transactions and equity and debt financings

| | |
|---|---|
| **Clark Refining and Marketing** | Blue Island, IL |
| Refinery Process Engineer | 1995–1997 |

| | |
|---|---|
| **Pacific Refining Company** | Hercules, CA |
| Refinery Process Engineer | 1993–1995 |

| | |
|---|---|
| **Conoco, Inc.** | Ponca City, OK/Billings, MT |
| Process Design Engineer | 1990–1993 |

SELECTED TRANSACTION EXPERIENCE (closed)

A-2

**App. 452**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

BMO Capital Markets

Selected transactions include:

- ArcLight Capital's acquisition of Gulf Oil (pipeline and infrastructure)
- PKN ORLEN's (Poland) acquisition of FX Energy (upstream oil and gas)
- Alpha Coal's acquisition of EDF's (France) interest in Pennsylvania Land Resources Holding Company (upstream oil and gas)
- Gaz Metro's (Canada) acquisition of Central Vermont Public Service (utilities)
- Westmoreland Resource Partners LP's acquisition of Kemmerer Mine from Westmorland Coal Company (coal)
- ArcLight Capital's acquisition of PPC (pipeline and infrastructure)
- Oil India's (India) formation of a joint venture (30% interest) with Carrizo Oil and Gas regarding its Niobrara assets (upstream oil and gas)
- Westmoreland Coal Company's acquisition of the General Partner of Oxford Resource Partners and contribution of royalty-bearing coal reserves to Oxford Resource Partners, LP (coal)
- Mid-Atlantic Convenience Stores's (owned by Catterton) sale to Sunoco/ETP (gasoline transportation and retail)
- AltaGas's (Canada) acquisition of SEMCO Holding Corporation (owned by Bessemer) (utilities)
- ArcLight Capital's acquisition of a 50% interest in Eureka Pipeline (pipeline and infrastructure)
- Linn Energy's acquisitions of Hugoton and Jonah assets from BP (upstream oil and gas)
- Concho Resources's acquisition of Three Rivers (upstream oil and gas)
- Cerberus Capital's acquisition of a majority interest in Keane Energy (services)
- Magnum Hunter's acquisitions of NuLoch Resources Canada and NGAS Resources (upstream oil and gas)
- Atinum's (South Korea) formation of a joint venture (50% interest) with Gastar Resources regarding its Marcellus assets (upstream oil and gas)
- KKR's acquisition of Samson Resources (upstream oil and gas; pipeline)

Rothschild Inc.

Selected transactions include:

- Advice regarding structuring of Trident Resources Corporation's (Canada) "rescue" financing (upstream oil and gas)
- Sterling Energy plc's (U.K.) acquisition of Whittier Energy Corporation (upstream oil and gas)
- Advice to New York-based hedge fund regarding its investment in a large cap US exploration and production company (upstream oil and gas)
- Compagnie Generale de Geophysique's (France) acquisition of Veritas DGC Inc. (oilfield services)
- SloanLED's majority sale to Harbour Group (industrial products)
- Thermo Electron Corporation's merger with Fisher Scientific International (healthcare)

A-3

**App. 453**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

- o Kelso & Company's acquisition of Hallmark Entertainment LLC from Hallmark Cards, Inc. (media)
- o Sale of Ultraframe plc (including Four Season Sunrooms; U.K.) to Latium Holdings Limited (consumer products)
- o Sale of AMVEST Oil & Gas and AMVEST Corporation to Constellation Energy Partners LLC and CONSOL Energy, respectively (upstream oil and gas; coal)
- o Valuation of Royal Dutch/Shell's South African refining business (downstream)
- o Thermo Electron's acquisition of Kendro Laboratory Products from SPX Corporation (healthcare)

Broadmark Capital Corporation

Selected transactions include:
- o Series A funding for gigabit Ethernet company
- o Series A funding for VoDSL telecom company

UBS

Selected transactions include:
- o Sale of BP's AC20 refined products pipeline to Colonial Pipeline Company (pipeline and infrastructure)
- o Sale of BP's Alliance refinery to Tosco Corporation (refining)
- o Secondary stock offering for Laser Vision Centers Inc. (healthcare)
- o Advisory to Petroleos de Venezuela S.A. (PdVSA; Venezuela) regarding its Ruhr Oel GmbH joint venture in Germany (refining)

OTHER NOTABLE MANDATED ASSIGNMENTS

Selected assignments include:

Delivered fairness opinions and valuations to multiple North American corporations regarding transaction or proposed transactions

North American pipeline company's all-stock offer for Williams Companies (pipeline and infrastructure)

US E&P company's unsolicited all-stock offer for Arena Resources (upstream oil and gas)

US pipeline company's unsolicited stock-and-cash offer for SemGroup Corp and Rose Rock Midstream, its controlled MLP (pipeline and infrastructure)

Proposed sale of Magnum Hunter's majority interest in the Eureka Hunter pipeline (pipeline and infrastructure)

China National Offshore Oil Corporation's unsolicited public cash offer for Unocal Corporation (upstream oil and gas)

Potential all-stock sale of public pipeline MLP (pipeline and infrastructure)

COURSES TAUGHT AT THE UNIVERSITY OF SAINT KATHERINE

A-4

**App. 454**

Case 3:16-cv-03111-K    Document 121    Filed 07/31/20    Page 460 of 544    PageID 4712

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

Corporate Finance (Textbook: Ross, S., Westerfield, R., & Jordan, B. Principles of Corporate Finance)

Financial Accounting (Textbook: Phillips, F., Libby, R., & Libby, P. Fundamentals of Financial Accounting)

Managerial Accounting (Textbook: Brewer, P., Garrison, R., & Noreen, E. Introduction to Managerial Accounting)

Foundations of Management (Textbook: Williams, D. MGMT: Principles of Management)

Senior Capstone (Textbook: Shelton, H. The Secrets to Writing a Successful Business Plan)

**App. 455**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

## APPENDIX B

## MATERIALS CONSIDERED

### Legal Documents

Expert Report of Eli Bartov, People of the State of New York v. Exxon Mobil Corporation, Index No. 452044/2018, May 8, 2019.

Exxon Mobil Corporation's Brief in Opposition to the New York Attorney General's Motion to Compel, People of the State of New York v. Exxon Mobil Corporation, Index No. 451962/2016, July 9, 2018.

Exxon Mobil Corporation's Responses and Objections to the Attorney General's Interrogatories, People of the State of New York v. Exxon Mobil Corporation, Index No. 451962/2016, October 1, 2018.

Exxon Mobil Corporation's Responses and Objections to the Attorney General's Contention Interrogatories, People of the State of New York v. Exxon Mobil Corporation, Index No. 452044/2018, May 1, 2019.

People of the State of New York v. Exxon Mobil Corporation, Index No. 452044/2018, October 24, 2018.

### Depositions and Associated Exhibits

Examination of Jason Iwanika, September 7 - 8, 2018.

Examination of Todd Onderdonk, November 7-8, 2017.

Examination of Mark Shores, December 7-8, 2017.

Examination of Robert Luettgen, December 12-13, 2017.

Examination of Kirsten Bannister, February 14-15, 2018.

Examination of Peter Trelenberg, July 20, 2017.

Examination of Guy Powell, July 27, 2017.

Examination of Norma Fisk, January 31 - February 1, 2018.

Examination of Richard Ducharme, April 2, 2019.

Examination of Thomas Richard Eizember, April 17, 2019.

Deposition of Dan Hoy, April 25, 2019.

Deposition of Brant Edwards, April 30, 2019.

**App. 456**

Case 3:16-cv-03111-K    Document 121    Filed 07/31/20    Page 462 of 544    PageID 4714

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

Examination of Robert Bailes, July 19-20, 2017.

Examination of William Colton, June 27-28, 2017.

Bates Stamped and Other Produced Documents

BLK-EXXON-000363

BOA-NYAG-Exxon-000002199

Corporate Plan Dataguides and Appendices for 2011-2017.

EMC 000371210

EMC 000387651

EMC 000510874

EMC 000525249

EMC 000525250

EMC 000538036

EMC 000539921

EMC 000957128

EMC 001403266

EMC 001594743

EMC 001596274

EMC 001598610

EMC 001604454

EMC 001608351

EMC 001613011

EMC 001621806

EMC 001764946

EMC 001893315

B-2

**App. 457**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

EMC 002402347

EMC 002507099

EMC 002532516

EMC 002632510

EMC 002855106

EMC 002871205

EMC 002875747

EMC 002879540

EMC 002948164

EMC 002948182

EMC 002948185

EMC 002948186

EMC 003000676

EMC 003030969

EMC 003175912

EMC 003203566

EMC 003212719

EMC 003212721

EMC 003262194

EMC 003317583

EMC 003327864

EMC 003680301

EMC 003697671

EMC 003739418

**App. 458**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

EMC 003739513

PNYAG0155640

PNYAG0245665

PNYAG0590859

SSC_NYAG_0001948

VGI0938

VGI1204

VGI1211

VGI1920

WFS000001

Letter from Justin Anderson to Kevin Wallace, Re: People of the State of New York v. Exxon Mobil Corporation, Index No. 452044/2018, April 12, 2019.

Letter from Nora Ahmed to John Oleske and Katherine Milgram, Re: New York State Attorney General Subpoena Directed to Exxon Mobil Corporation, July 9, 2018.

Letter from Nora Ahmed to Jonathan Zweig and Manisha Sheth, October 12, 2018.

Letter from Nora Ahmed to Manisha Sheth and Jonathan Zweig, Re: New York State Attorney General Subpoena Directed to Exxon Mobil Corporation, September 28, 2018.

Letter from SEC to ExxonMobil, Mar. 17, 2014.

## Financial Models

EMC 002679001

EMC 002879325

EMC 003150586

EMC 003697497

EMC 003697563

EMC 003697568

**App. 459**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

EMC 003697570

EMC 003697572

EMC 003697573

EMC 003697574

EMC 003697575

EMC 003697576

EMC 003697579

EMC 003697580

EMC 003697581

EMC 003697582

EMC 003697583

EMC 003697587

EMC 003697588

EMC 003697597

EMC 003697598

EMC 003697599

EMC 003697600

EMC 003697601

EMC 003697608

EMC 003697612

EMC 003697614

EMC 003697615

EMC 003697616

EMC 003697626

**App. 460**

Case 3:16-cv-03111-K    Document 121    Filed 07/31/20    Page 466 of 544    PageID 4718

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

EMC 003697627

EMC 003697670

EMC 003697673

EMC 003697674

EMC 003697717

EMC 003697946

EMC 003973954

EMC 003976219

EMC 003976220

EMC 004046554

EMC 004046555

EMC 004046556

EMC 004046557

EMC 004046558

EMC 004046559

EMC 004046560

EMC 004046561

EMC 004046562

EMC 004046563

EMC 004046564

EMC 004046565

EMC 004046566

EMC 004046567

EMC 00404 6568

**App. 461**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

EMC 004046569

EMC 004046570

EMC 004046571

EMC 004046572

EMC 004046576

EMC 004046577

EMC 004046578

EMC 004046579

EMC 004046580

EMC 004322515

EMC 004322516

EMC 004322517

EMC 004322518

EMC 004322890

IMO 00007662

IMO_00003599

PNYAG0335024

PNYAG0343042

Analyst and ISS Reports

"Special Report: Climate Change: Preparing for the Long Term," Credit Week, S&P, May 28, 2014.

"Renewables, TCFD and Shareholder Proposals," Morgan Stanley Research.

"BP Annual Voting Results and ISS Recommendation," ISS, April 16, 2015.

"Chevron Annual Voting Results and ISS Recommendation," ISS, May 25, 2016.

"Exxon Mobil Corp.," ISS Report, May 10, 2012.

**App. 462**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

"Exxon Mobil Corp.," ISS Report, May 13, 2009.

"Exxon Mobil Corp.," ISS Report, May 16, 2007.

"Exxon Mobil Corp.," ISS Report, May 25, 2016.

"Exxon Mobil Corp.," ISS Report, May 26, 2010.

"Exxon Mobil Corp.," ISS Report, May 27, 2015.

"Exxon Mobil Corp.," ISS Report, May 28, 2014.

"Exxon Mobil Corp.," ISS Report, May 29, 2013.

"Exxon Mobil Corp.," ISS Report, May 30, 2018.

"Exxon Mobil Corp.," ISS Report, May 31, 2017.

"Exxon Mobil Corp.," ISS Report, May 5, 2011.

"Exxon Mobil Corp.," ISS Report, May 7, 2008.

"ISS Full List of Shareholder Proposals to Exxon 2007-2018," ISS.

"Shell Annual Voting Results and ISS Recommendation," ISS, May 19, 2015.

"Steel and Mining daily - 24, Mar," Credit Suisse, March 24, 2014.

"The Global Leader in Corporate Governance & Responsible Investment," ISS,
https://www.issgovernance.com/about/about-iss/.

Alsford, Jessica et al., "Embedding Sustainability into Valuation," Morgan Stanley, January 29, 2015.

Brough, Martin, "DeCAF your portfolio-from volume to value in decarbonisation," Deutsche Bank,
March 27, 2017.

Cheng, Paul Y., Christina Cheng, and Danielle Diamond, "Exxon Mobil Corp.: Analyst Day Preview,"
Barclays, March 7, 2011.

Cheng, Paul Y., Eli Bauman, and Anthony Kit, "Exxon Mobil Corp.: Analyst Day Preview," Barclays,
March 5, 2012.

Cook, Caroline, "Energy Transition: DeCAF: Espresso Shot #15," Deutsche Bank, October 31, 2018.

Coster, Paul, Mark Strouse, and Paul J. Chung, "Alt Energy: COP21 Paris Climate Conference - Lead,
Follow or Get Out of the Way," J.P. Morgan, December 16, 2015.

**App. 463**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

Darby, Sean, Kenneth Chan, and Dodo Cheng, "Global Equity Strategy: US Outlook: The Return of US Competitiveness," Jefferies, January 9, 2012.

Gheit, Fadel, Robert Du Boff, and Daniel Katzenberg, "ExxonMobil Corporation: High Free Cash Flow to Increase Share Repurchase," Oppenheimer, April 8, 2011.

Gheit, Fadel, Timothy Rezvan, and Daniel Katzenberg, "ExxonMobil Corporation: Unconventional Gas is Key to Future Growth," Oppenheimer, August 2, 2010.

Glover, Phineas and Sheridan Duffy, "ESG Eye: Market Forces vs Trump," Macquarie, June 6, 2017.

Herbert Bill, et al., "Macro-Energy," Simmons & Company, September 23, 2016.

Herrlin, John and Joshua Sheppard, "ExxonMobil: 12m Target Downgrade: Lower TP on Lower Expected Commodity Prices," Société Générale, January 13, 2016.

Herrlin, John and Joshua Sheppard, "ExxonMobil: 4Q15 and 2015 Results: In-Line with SGe, Higher Volumes, Lower Tax Rate," Société Générale, February 2, 2016.

Herrlin, John and Mark Kogel, "ExxonMobil: $2.8bn for 21.25 Net Tcf of Gas Resources ($0.13/Mcfe); No LNG Development Costs or Plans Discussed," Société Générale, March 9, 2017.

Herrlin, John and Mark Kogel, "ExxonMobil: 1Q17 Reported EPS: $0.95 Reflects Higher Pricing, Cost Control, and Facility Up Time," Société Générale, April 28, 2017.

Herrlin, John and Mark Kogel, "ExxonMobil: 2Q16 EPS Basically Flat with 1Q16, but Cash Flow + 10%. Canadian Fires, Lower R&M, and Forex Offset Higher Upstream Pricing," Société Générale, July 29, 2016.

Herrlin, John and Mark Kogel, "ExxonMobil: 3 for 4 with Rank DeepH20 Wildcatting in Guyana is Impressive, but Not Much Market Reaction," Société Générale, March 30, 2017.

Herrlin, John and Mark Kogel, "ExxonMobil: 3Q16 EPS Better than Street Consensus Given Sales Gain; Lower Cap-Ex and Better QOQ EPS," Société Générale, October 28, 2016.

Herrlin, John and Mark Kogel, "ExxonMobil: 4Q16 EPS Included a $2bn Gas Impairment, $0.39 in Tax Adj. & $0.14 of C&F Gains," Société Générale, January 31, 2017.

Herrlin, John and Mark Kogel, "ExxonMobil: A 250,000 Acre Delaware Purchase: $5.6 Billion (Non-Contingent) for 3.4BBOE Resource Potential," Société Générale, January 17, 2017.

**App. 464**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

Herrlin, John and Mark Kogel, "ExxonMobil: Deal for IOC: All XOM Stock if No Certified Contingent Reserves; Possible Sept. Close," Société Générale, July 21, 2016.

Herrlin, John and Mark Kogel, "ExxonMobil: EPS Downgrade," Société Générale, April 6, 2017.

Herrlin, John and Mark Kogel, "ExxonMobil: Increasing 2017 EPS Estimate Given Stronger Pricing. Market Will Focus on the Change at the Helm," Société Générale, January 11, 2017.

Herrlin, John and Mark Kogel, "ExxonMobil: Model Update," Société Générale, November 15, 2016.

Herrlin, John and Mark Kogel, "ExxonMobil: More Long-Term, Upstream Capex with 'Short-Cycle' Emphasis, May Not Mollify Naysayers," Société Générale, March 2, 2017.

Herrlin, John and Mark Kogel, "ExxonMobil: Still the Biggest and the Best. Long-Term Portfolio Balance and Shareholder Returns are the Key Drivers," Société Générale, August 12, 2016.

Herrlin, John and Mark Kogel, "ExxonMobil: Two for 3 on Wildcats in Guyana, Given Payara-1 Discovery with 95' of pay, 10 miles from Liza," Société Générale, January 13, 2017.

Herrlin, John and Mark Kogel, "ExxonMobil: XOM's Large Reserve Hit the Most Negative in 30 Years. It Reflects Kearl's Pricing Sensitivity, but It Won't Hurt Output," Société Générale, February 23, 2017.

Herrlin, John and Zack Ajzenman, "ExxonMobil: 1Q18 Adj. EPS Beat. We Expected a Greater Hit from PNG, Canadian Oil Differentials, and Weaker Product Demand," Société Générale, April 27, 2018.

Herrlin, John and Zack Ajzenman, "ExxonMobil: 2Q18 Disapoints. Turnaround-Related Lost Margin-Capture Opportunities, Up & Downstream, and For-Ex Hits. Laggings RDS," Société Générale, July 27, 2018.

Herrlin, John and Zack Ajzenman, "ExxonMobil: 3Q17 EPS of $0.93/Share a Beat and Despite $0.04/ Share Lost to Harvey. EPS +19% QOQ and +48% YOY," Société Générale, October 27, 2017.

Herrlin, John and Zack Ajzenman, "ExxonMobil: 4Q17 Adjusted EPS of $0.88 a Miss, Given Impairments. Reported EPS of $1.97 Reflected US Tax Reforms Deferred Tax Gains," Société Générale, February 2, 2018.

Herrlin, John and Zack Ajzenman, "ExxonMobil: A 4Q EPS Reported Beat from Asset Sales. QoQ BOE/ d +5.9% with Good US Basis Capture, but Weaker Relative Brent Pricing," Société Générale, February 4, 2019.

**App. 465**

Case 3:16-cv-03111-K     Document 121     Filed 07/31/20     Page 471 of 544     PageID 4723

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

Herrlin, John and Zack Ajzenman, "ExxonMobil: Given Higher 2018 Oil Prices, We Are Increasing Our EPS/DCFPS Estimtaes and Target Price," Société Générale, January 24, 2018.

Herrlin, John and Zack Ajzenman, "ExxonMobil: Increasing TP to Reflect Estimate Changes, Positive View of Current Upstream Program," Société Générale, July 19, 2018.

Herrlin, John and Zack Ajzenman, "ExxonMobil: Investing for Long-Term EPS/DCF Growth; A Contra-Cyclical Strategy, Across All Business Units," Société Générale, March 7, 2019.

Herrlin, John and Zack Ajzenman, "ExxonMobil: Little Market Reaction to the Turbot-1 Discovery Offshore Guyana, Some 30 Miles from Liza," Société Générale, October 5, 2017.

Herrlin, John and Zack Ajzenman, "ExxonMobil: Reducing Target Price and EPS/DCFPS Estimates," Société Générale, December 18, 2018.

Herrlin, John and Zack Ajzenman, "ExxonMobil: Resource Capture, Technology, Focused Development & Corporate Synergies Emphasized at Houston Analyst Day," Société Générale, April 17, 2018.

Herrlin, John and Zack Ajzenman, "ExxonMobil: Revising EPS Projections," Société Générale, August 21, 2018.

Herrlin, John and Zack Ajzenman, "ExxonMobil: Revising EPS Projections," Société Générale, May 30, 2018.

Herrlin, John and Zack Ajzenman, "ExxonMobil: Revising EPS/DCFPS Estimates," Société Générale, October 8, 2018.

Herrlin, John and Zack Ajzenman, "ExxonMobil: Strong E&P, Solid R&M, Lower Corp Expenses & Tax Rate Benefits Offset Weaker Chemicals Segment. A Good Quarter," Société Générale, November 2, 2018.

Herrlin, John and Zack Ajzenman, "ExxonMobil: Systematic/Scientific Approach Will Lift Profitability Via Greater Upstream Recovery & Higher Margin Product Yields," Société Générale, October 3, 2018.

Herrlin, John and Zack Ajzenman, "ExxonMobil: The Largest Global IOC with the Best Chemicals & R&M Operations, but Most Questioned E&P," Société Générale, September 29, 2017.

Herrlin, John and Zack Ajzenman, "ExxonMobil: Value vs Volumes Upstream, Greater Capex and LT Returns Goals May Cause Street to Question Business Model," Société Générale, March 12, 2018.

**App. 466**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

Herrlin, John and Zack Ajzenman, "ExxonMobil: XOM Improving Communication to Enhance Understanding of LT Strategy," Société Générale, September 21, 2018.

Herrlin, John, "ExxonMobil: NY Sellside Meet & Greet with CEO Broke No New Ground, but Emphasized Long-Term Investment Creation Focus," Société Générale, August 17, 2017.

Herrlin, John, "ExxonMobil: Reducing Target Price to $95 (-10.5%) Given a Slower Oil Market Rebalancing," Société Générale, July 14, 2017.

Herrlin, John, "ExxonMobil: Street EPS Miss Likely to Be Overlooked. Capex Continuing to Decline as Global Business Portfolio Grows," Société Générale, July 28, 2017.

Herrlin, John, Joshua Sheppard, and Mark Kogel, "ExxonMobil: Analyst Meeting: Not Last Analyst Day for Current CEO, Story Unchanged," Société Générale, March 3, 2016.

Herrlin, John, Joshua Sheppard, and Mark Kogel, "ExxonMobil: Increase TP, as Market Re-Rates Sector on Higher Oil Prices," Société Générale, March 22, 2016.

Herrlin, John, Joshua Sheppard, and Mark Kogel, "ExxonMobil: Increasing TP as Cash Flow Neutrality Seen at Current Strip," Société Générale, May 13, 2016.

Herrlin, John, Joshua Sheppard, and Mark Kogel, "ExxonMobil: Liza-2 Confirms Liza Discovery, with 800 MMBOE to 1.4 BBOE on 1 structure; There are More," Société Générale, June 30, 2016.

Herrlin, John, Joshua Sheppard, and Mark Kogel, "ExxonMobil: Quarterly Results: Beat on Chemicals Segment Offsets Weak Upstream Realizations," Société Générale, April 29, 2016.

Herrlin, John and Mark Kogel, "Oil & Gas: Americas IOCs & E&Ps," Société Générale, September 22, 2016.

Herrmann, Lucas and Tom Robinson, "European Integrated Oil: 2017 Outlook: Hitting a Sweet Spot," Deutsche Bank, December 6, 2016.

Knight, Zoe, Wai-Shin Chan, and Ashim Paun, "Keeping it Cool: Moving Towards Global Carbon Pricing," HSBC, March 2015.

Knight, Zoe, Wai-Shin Chan, and Ashim Paun, "Keeping it Cool: Moving Towards Global Carbon Pricing," HSBC, September 2015.

Knight, Zoe, Wai-Shin Chan, and Ashim Paun,"Keeping it cool: Assessing climate risk," HSBC Global Research, September 2016.

B-12

**App. 467**

Case 3:16-cv-03111-K     Document 121     Filed 07/31/20     Page 473 of 544     PageID 4725

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

Lai, Elaine and Laban Yu, "Integrated Oil Cash Dry, But There's No Stopping the Supermajor; Initiate Sinopec Group Cost," Jefferies, February 16, 2016.

Lucas, Fred and Richard Folland, "European politics of shale gas," J.P. Morgan Cazenove, January 10, 2014.

Margolin, Sam, Jason Gabelman, and Brian Zhang, "Analyst Day Preview: Moving Past 4Q17," Cowen, March 1, 2018.

Margolin, Sam, Jason Gabelman, and Brian Zhang, "Analyst Day: Enhanced Disclosure of Long Term Targets," Cowen, March 7, 2018.

Margolin, Sam, Jason Gabelman, and Brian Zhang, "Exxon Mobil Corporation: Notes from the Road," Cowen, June 25, 2018.

Minyard, Katherine Lucas, Igor Grinman, and Timothy Li, "Exxon Mobil Corp: Looking Ahead to the 2013 Analyst Meeting," J.P. Morgan, March 4, 2013.

Paun, Ashim, Zoe Knight, and Wai-Shin Chan, "Stranded Assets: What Next?," HSBC, April 16, 2015.

Rana, Mujtaba and Richard Kersley, "Credit Suisse ESG Spotlight: Weekly Bulletin: Themes in Energy Efficiency," Credit Suisse, April 9, 2014.

Rats, Martjin, "Sustainable and Responsible: ESG Framework - Oil & Gas," Morgan Stanley, October 14, 2014.

Read, Roger D. and Lauren Hendrix, "XOM: Investor Meeting Highlights," Wells Fargo, May 30, 2016.

Read, Roger D. and Lauren Hendrix, "XOM: Sellside Lunch Highlights," Wells Fargo, August 17, 2017.

Read, Roger D. and Lauren Hendrix, "XOM: Some Smoke But Likely No Fire; Lowering Valuation Range," Wells Fargo, September 20, 2016.

Read, Roger D., and Lauren Hendrix, "Exxon Mobil Corporation: XOM: Initiation of Coverage with a Market Perform Rating," Wells Fargo, June 20, 2013.

Read, Roger D., and Lauren Hendrix, "Exxon Mobil Corporation: XOM: Sellside Lunch Highlights," Wells Fargo, August 17, 2017.

Read, Roger D., and Lauren Hendrix, "Exxon Mobil Corporation: XOM: Some Smoke but Likely No Fire; Lowering Valuation Range," Wells Fargo, September 20, 2016.

**App. 468**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

Rigby, Jon et al., "European Oil & Gas: Sustainable investing - hedge or opportunity?," UBS Global Research, June 15, 2018.

Rigby, Jon et al., "European Oil & Gas: Through the looking-glass: taking stock of energy outlooks," UBS Global Research, June 15, 2015.

Rigby, Jon et al., "European Oil and Gas: 2019 Outlook: More of the Same," UBS, December 17, 2018.

Rigby, Jon, "Global Integrated Oil & Gas 4Q18 Preview: Fighting the Tape," UBS, January 30, 2019.

Rigby, Jon, "Global Integrated Oil & Gas Analyser," UBS, September 9, 2015.

Rigby, Jon, "Global Integrated Oil & Gas Analyser," UBS, September 27, 2012.

Rigby, Jon, "Global Integrated Oil & Gas Fundamentals. LNG market update: Dealing with the deluge," UBS, July 13, 2015.

Rigby, Jon, Amy Wong, and Marina Postnikova, "Daily Oil News: Key Headlines," UBS, April 1, 2014.

Rigby, Jon, Henri Patricot, and John Delos Santos, "ExxonMobil Corp.: Zigging Not Zagging," UBS, September 7, 2018.

Robins, Nick et al., "Oil & Carbon revisited: Value at risk from 'unburnable' reserves," HSBC, January 25, 2013.

Rousseau, Jacques and Delia Morris, "Exxon Mobil Corporation:  2Q11 Earnings Below Expectations Due to Lower Upstream Results," RBC, July 28, 2011.

Rousseau, Jacques and Delia Morris, "Exxon Mobil Corporation:  Earnings Beat Consensus; Strong Upstream and Chemicals Results," RBC, April 28, 2011.

Rousseau, Jacques and Delia Morris, "Exxon Mobil Corporation:  Solid Quarterly Earnings, but Upstream Production Volumes Drop 4%," RBC, October 27, 2011.

Rousseau, Jacques and Delia Morris, "Exxon Mobil Corporation: 4Q11 Earnings Below Expectations Due to Weak Downstream and Chemicals Earnings," RBC, January 31, 2012.

Rousseau, Jacques and Delia Morris, "Exxon Mobil Corporation: Earnings Top Consensus; Strong Upstream Results," RBC, January 31, 2011.

Rousseau, Jacques and Delia Morris, "Exxon Mobil Corporation: Fine-Tuning 1Q11 Earnings Estimate," RBC, April 13, 2011.

**App. 469**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

Rousseau, Jacques and Delia Morris, "Exxon Mobil Corporation: Fine-Tuning 4Q11 Earnings Estimate," RBC, January 11, 2012.

Rousseau, Jacques, "Exxon Mobil Corporation: Downgrade to Sector Perform Due to Reduced U.S. Natural Gas Price Forecasts," RBC, September 14, 2010.

Rousseau, Jacques, "Exxon Mobil Corporation: Earnings Below Expectations; Downstream Weakness Negates Chemical Strength," RBC, April 29, 2010.

Rousseau, Jacques, "Exxon Mobil Corporation: Flight to Quality: Upgrading to Outperform," RBC, May 24, 2010.

Rousseau, Jacques, "Exxon Mobil Corporation: Lowering 2010-11 Earnings Estimates and Price Target," RBC, July 20, 2010.

Rousseau, Jacques, "Exxon Mobil Corporation: Top Consensus; Share Repurchases Rising in 4Q10," RBC, October 28, 2010.

Rousseau, Jacques, "ExxonMobil Corporation: Initiating Coverage: Looking Past the XTO Acquisition," RBC, April 22, 2010.

Sankey, Paul, David T. Clark, and Silvio Micheloto, "ExxonMobil: The Big Unit's Analyst Meeting 2010," Deutsche Bank, March 12, 2010.

Sankey, Paul, David T. Clark, and Silvio Micheloto, "ExxonMobil: XOM-XTO Hearing; Oil Industry Keeps Rising in DC," Deutsche Bank, January 21, 2010.

Sankey, Paul, David T. Clark, and Silvio Micheloto, "Integrated Oil & Refiners: Labor, Diamonds, and Catalysts," Deutsche Bank, September 4, 2011.

Sankey, Paul, David T. Clark, and Silvio Micheloto, "Integrated Oil: Painting by Numbers," Deutsche Bank, October 12, 2011.

Sankey, Paul, David T. Clark, and Silvio Micheloto, "North American Integrateds: The Question of Cash - Q3 Earnings Calls," Deutsche Bank, October 24, 2011.

Sankey, Paul, David T. Clark, and Silvio Micheloto, "US Integrated Oil: Battling the Cross-Currents," Deutsche Bank, March 16, 2011.

Sankey, Paul, David T. Clark, and Silvio Micheloto, "US Integrated Oil: Painting by Numbers," Deutsche Bank, July 11, 2011.

**App. 470**

INDEX NO. 452044/2018
RECEIVED NYSCEF: 10/04/2019

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

Sankey, Paul, David T. Clark, and Silvio Micheloto, "US Integrated Oils 2011: Death of the Oil Major…," Deutsche Bank, March 8, 2011.

Sankey, Paul, David T. Clark, and Silvio Micheloto, "US Integrated Oils: Are We There Yet? No, but We're at Multiple Compression," Deutsche Bank, April 10, 2011.

Sankey, Paul, David T. Clark, and Winnie Nip, "Global Oils: More Risk: Exposure Middle East/ North Africa II," Deutsche Bank, February 22, 2011.

Sankey, Paul, et al., "North American Integrateds: OPEC Pressures Oil Leverage - Buy It," Deutsche Bank, December 12, 2011.

Sankey, Paul, et al., "North American Major Oils: Iraq and a Hard Place," Deutsche Bank, January 3, 2012.

Sankey, Paul, et al., "The Closet Refiners Q4," Deutsche Bank, January 11, 2012.

Shah, Vishal, Rachel Lei, and Tyler-I Goldman, "Trump/Paris Deal, ESG Index, Exxon Vote," Deutsche Bank, June 4, 2017.

Shepley, Andre, "Exxon Mobil (XOM): Un-Natural Capital Valuation? New York AG makes case for fraud in Exxon calculations of stranded asset risk," Truvalue Labs, November 13, 2018.

Warn, Brendan and Nikolas Stefanou, "Exxon Mobil Corp: First Take: Permian, Guyana and Now Mozambique in Focus," BMO, April 28, 2017.

Warn, Brendan and Nikolas Stefanou, "Exxon Mobil Corp: Getting More Serious About the Permian," BMO, January 17, 2017.

Warn, Brendan and Nikolas Stefanou, "Exxon Mobil Corp: Increasing Capex Could Become a Catch-22…," BMO, February 1, 2017.

Warn, Brendan and Nikolas Stefanou, "Exxon Mobil Corp: Old Wine… New Bottle: Darren Woods to Replace Rex Tillerson as Chairman & CEO," BMO, December 15, 2016.

Warn, Brendan and Nikolas Stefanou, "Exxon Mobil Corp: Weaker Chemicals Contribute to Exxon's Miss," BMO, July 31, 2017.

Warn, Brendan and Nikolas Stefanou, "Exxon Mobil Corp: What Surprised Us? Takeaways from the 2017 XOM Analyst Day," BMO, March 2, 2017.

**App. 471**

FILED: NEW YORK COUNTY CLERK 10/04/2019 11:06 PM
INDEX NO. 452044/2018
NYSCEF DOC. NO. 355
RECEIVED NYSCEF: 10/04/2019

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

Warn, Brendan and Nikolas Stefanou, "Gold Standard: Initiating with Market Perform Rating and $78 Target Price," BMO, December 1, 2016.

Warn, Brendan, et al., "Exxon Mobil Corp: Liza: Deep Attraction," BMO, June 18, 2017.

West, James, et al., "Global Oilfield Services, Equipment & Drilling Monthly: July 2016," Evercore ISI, July 5, 2016.

Whooley, Niamh, et al., "US Tight Oil (Shale) vs Canadian Oil Sands - Stranded Asset Risk - Cost of Supply, GHG Emissions, Water," Société Générale, September 22, 2014.

Zlotnicka, Eva T., et al., "Signs of a Low-Carbon Future in Oil & Gas Corporate Governance," Morgan Stanley, August 9, 2017.

Event Transcripts

"Transcript of ExxonMobil Corporation Shareholders Meeting," Thomson Reuters, May 30, 2007.

"Transcript of ExxonMobil Corporation Shareholders Meeting," Thomson Reuters, May 26, 2010.

"Transcript of ExxonMobil Corporation Shareholders Meeting," Thomson Reuters, May 25, 2011.

"Transcript of ExxonMobil Corporation Shareholders Meeting," Thomson Reuters, May 28, 2014.

"Transcript of ExxonMobil Corporation Shareholders Meeting," Thomson Reuters, May 27, 2015.

"Transcript of ExxonMobil Corporation Shareholders Meeting," Thomson Reuters, May 25, 2016.

"Edited Transcript: XOM- Q2 2015 Exxon Mobil Corp. Earnings Call," Thomson Reuters, July 31, 2015.

"Edited Transcript: XOM- Q2 2016 Exxon Mobil Corp. Earnings Call," Thomson Reuters, July 29, 2016.

"Edited Transcript: XOM- Exxon Mobil Corp Analyst Meeting," Thomson Reuters, March 2, 2016.

Hearing before the House Subcommittee on Energy and Environment of the Committee on Energy and Commerce: The ExxonMobil-XTO Merger: Impact on U.S. Energy Markets, January 20, 2010.

"Presentations and Q&A Session: Analyst Meeting, New York, NY," ExxonMobil, March 6, 2013.

"Presentations and Q&A Session: Analyst Meeting, New York, NY," ExxonMobil, March 5, 2014.

"Presentations and Q&A Session: Analyst Meeting, New York, NY," ExxonMobil, March 4, 2015.

"Presentations and Q&A Session: Analyst Meeting, New York, NY," ExxonMobil, March 2, 2016.

**App. 472**

Case 3:16-cv-03111-K    Document 121    Filed 07/31/20    Page 478 of 544    PageID 4730

Contains Confidential Material

Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

Analyst Meeting Transcript, ExxonMobil, March 1, 2017.

**App. 473**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

Publicly Available Documents

Regulatory Filings

Anadarko Petroleum Corporation, Form 10-K for the Fiscal Year 2018.

Anadarko Petroleum Corporation, Form DEF 14A, 2018.

Chesapeake Energy Corporation, Form DEF 14A, filed May 6, 2018.

Chevron, Form DEF 14A, 2007

Chevron, Form DEF 14A, 2008

Chevron, Form DEF 14A, 2009

Chevron, Form DEF 14A, 2010

Chevron, Form DEF 14A, 2011

Chevron, Form DEF 14A, 2012

Chevron, Form DEF 14A, 2013

Chevron, Form DEF 14A, 2014

Chevron, Form DEF 14A, 2015

Chevron, Form DEF 14A, 2016

Chevron, Form DEF 14A, 2017

Chevron, Form DEF 14A, 2018.

Chevron, Form DEF 14A, 2019.

Devon Energy Corporation, Form DEF 14A.

ConocoPhillips, Form DEF 14A, 2017.

ExxonMobil Final Debt Prospectus, 1999.

ExxonMobil Final Debt Prospectus, 2014.

ExxonMobil Final Debt Prospectus, 2015.

ExxonMobil Final Debt Prospectus, 2016.

**App. 474**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

ExxonMobil, Form 10-K/A, filed February 28, 2010.

ExxonMobil, Form 424B2, filed March 5, 2015.

ExxonMobil, Form 424B2, filed March 18, 2014.

ExxonMobil, Form 424B2, filed March 2, 2016.

ExxonMobil, Form DEF14A, 2007.

ExxonMobil, Form DEF14A, 2008.

ExxonMobil, Form DEF14A, 2009.

ExxonMobil, Form DEF14A, 2010.

ExxonMobil, Form DEF14A, 2011.

ExxonMobil, Form DEF14A, 2012.

ExxonMobil, Form DEF14A, 2013.

ExxonMobil, Form DEF14A, 2014.

ExxonMobil, Form DEF14A, 2015.

ExxonMobil, Form DEF14A, 2016.

ExxonMobil, Form DEF14A, 2017.

ExxonMobil, Form DEF14A, 2018.

ExxonMobil, Form 10-K for the Fiscal Year 2010

ExxonMobil, Form 10-K for the Fiscal Year 2011.

ExxonMobil, Form 10-K for the Fiscal Year 2012.

ExxonMobil, Form 10-K for the Fiscal Year 2013.

ExxonMobil, Form 10-K for the Fiscal Year 2014.

ExxonMobil, Form 10-K for the Fiscal Year 2015.

ExxonMobil, Form 10-K for the Fiscal Year 2016.

ExxonMobil, Form 10-K for the Fiscal Year 2017.

Case 3:16-cv-03111-K    Document 121    Filed 07/31/20    Page 481 of 544    PageID 4733

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

ExxonMobil, Form 10-K for the Fiscal Year 2018.

Kinder Morgan Inc., Form DEF 14A, 2018.

Noble Energy Inc., Form DEF 14A, 2018.

Occidental, Form DEF 14A, 2017.

Petróleo Brasiliero, Form 20-F for the Fiscal Year 2017.

QEP Resources, Inc., Form 10-K for the Fiscal Year 2018.


ExxonMobil Reports

"2013 Corporate Citizenship Report," ExxonMobil.

"2015 Corporate Citizenship Report," ExxonMobil.

"2017 Financial & Operating Review," ExxonMobil, https://corporate.exxonmobil.com/-/media/global/files/annual-report/2017-financial-and-operating-review.pdf.

"2018 Energy and Carbon Summary," ExxonMobil, https://corporate.exxonmobil.com/-/media/Global/Files/energy-and-carbon-summary/2018-Energy-and-Carbon-Summary_archive.pdf.

"2018 Financial & Operating Review," ExxonMobil, April 2, 2019, https://corporate.exxonmobil.com/-/media/Global/Files/annual-report/2018-Financial-and-Operating-Review.pdf.

"2018 Results and Highlights," ExxonMobil, April 2, 2019, https://corporate.exxonmobil.com/en/Investors/Annual-Report/financial-operating-highlights.

"Energy & Carbon Summary," ExxonMobil, February 14, 2019, https://corporate.exxonmobil.com/-/media/Global/Files/energy-and-carbon-summary/Energy-and-carbon-summary.pdf

"Meeting Global Needs - Managing Climate Change Business Risk," ExxonMobil, published 2016 or earlier.

"Mitigating Emissions in Our Operations," ExxonMobil, October 18, 2018, https://corporate.exxonmobil.com/en/Community-engagement/sustainability-report/managing-risks-of-climate-change/mitigating-emissions-in-our-operations#flaring.

"Notice of 2016 Annual Meeting and Proxy Statement," ExxonMobil April 13, 2016.

**App. 476**

Contains Confidential Material

Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

Cohen, Ken, "More on Divestment: A letter to Tim Wirth," ExxonMobil, November 6, 2014, http://www.exxonmobilperspectives.com/2014/11/06/more-on-divestment-a-letter-to-tim-wirth/.

Energy and Carbon – Managing the Risks, ExxonMobil, March 31, 2014.

Energy and Climate, ExxonMobil, March 31, 2014.

ExxonMobil CDP Responses, 2010-2017.

Outlook for Energy reports, ExxonMobil, 2010-2017.

"2013 Analyst Meeting Presentation: New York Stock Exchange," ExxonMobil, March 6, 2013.

"2015 Analyst Meeting Presentation: New York Stock Exchange," ExxonMobil, March 4, 2015.

"2016 Analyst Meeting Presentation: New York Stock Exchange," ExxonMobil, March 2, 2016.

"2017 Analyst Meeting Presentation: New York Stock Exchange," ExxonMobil, March 1, 2017.


## Other Publicly Available Documents

"1990 Clean Air Act Amendment Summary: Title I," U.S. Environmental Protection Agency, https://www.epa.gov/clean-air-act-overview/1990-clean-air-act-amendment-summary-title-i.

"2 degrees of separation - Transition risk for oil and gas in a low carbon world," Carbon Tracker, June 20, 2017, https://www.carbontracker.org/reports/2-degrees-of-separation-transition-risk-for-oil-and-gas-in-a-low-carbon-world-2/.

"2010 AGM Poll Results," BP, 2010 https://www.bp.com/content/dam/bp/business-sites/en/global/corporate/pdfs/investors/bp-agm-poll-results-2010.pdf.

"2017 BDO Oil and Gas Risk Factor Report," BDO, 2017, https://www.bdo.com/getattachment/a1bf67be-1beb-42b1-8f0c-f3db2446c6ed/attachment.aspx?2017-Oil-Gas-Riskfactor-Report-Brochure_WEB.pdf.

"2017 Year-End Environmental Update for the Oil & Gas Industry," Gibson Dunn, January 22, 2018, https://www.gibsondunn.com/2017-year-end-environmental-update-for-the-oil-gas-industry/.

"A Changing Climate: The Fossil Fuel Debate," 2016, Morgan Stanley Institute for Sustainable Investing, https://www.morganstanley.com/pub/content/dam/msdotcom/articles/fossil-fuels/A-Changing%20Climate_The%20Fossil_Fuel_Debate.pdf.

**App. 477**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

"A Framework for 2 Degrees Scenario Analysis - A Guide for Oil and Gas Companies and Investors for Navigating the Energy Transition," Ceres, 2016, https://www.ceres.org/sites/default/files/reports/2017-03/Framework_Jan%2010%2017.pdf.

"Adapting Portfolios to Climate Change: Implications and Strategies for All Investors," BlackRock Investment Institute, August, 2016, https://www.blackrock.com/corporate/literature/whitepaper/bii-climate-change-2016-us.pdf.

"Annual Stewardship Report," State Street Global Advisors, 2014, https://www.ssga.com/investment-topics/environmental-social-governance/2016/Annual-Stewardship-Report-2014.pdf.

"ASEAN Countries Adopt Fuel Economy Roadmap," Global Fuel Economy Initiative, November 20, 2018, https://www.globalfueleconomy.org/blog/2018/november/asean-countries-adopt-fuel-economy-roadmap.

"AXA Accelerates its Commitment to Fight Climate Change," AXA, December 12, 2017, https://group.axa.com/en/newsroom/press-releases/axa-accelerates-its-commitment-to-fight-climate-change.

"BP Statistical Review of World Energy," BP, June 2018, https://www.bp.com/content/dam/bp/business-sites/en/global/corporate/pdfs/energy-economics/statistical-review/bp-stats-review-2018-full-report.pdf.

"Carbon Asset Risk: A Review of Progress and Opportunities," Ceres, https://www.ceres.org/resources/reports/carbon-asset-risk-review-progress-and-opportunities.

"Carbon Disclosure Project 2010: Global 500 Report," Carbon Disclosure Project, 2010, https://www.circleofblue.org/wp-content/uploads/2010/11/CDP-2010-G500.pdf.

"Catalog of Reasons for and Against Fossil Fuel Divestment by Dartmouth," Dartmouth College Advisory Committee on Investor Responsibility, https://www.dartmouth.edu/~president/announcements/carbon_pro_and_con.pdf.

"Catalonia Passes Climate Change Law to Reduce Emissions by 100% by 2050," The Climate Group, August 3, 2017, https://www.theclimategroup.org/news/catalonia-passes-climate-change-law-reduce-emissions-100-2050.

"CDP Climate Change Report 2016: United Kingdom Edition," Carbon Disclosure Project, October 2016.

"Chapter 41. Oil and Gas Industry," IRS, https://www.irs.gov/irm/part4/irm_04-041-001.

"Climate Change 2016 Information Request Exxon Mobil Corporation," CDP.

B-23

**App. 478**

Case 3:16-cv-03111-K    Document 121    Filed 07/31/20    Page 484 of 544    PageID 4736

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

"Climate Change 2017 - Exxon Mobil Corporation," CDP, 2017.

"Climate Change 2017 Information Request Chevron Corporation," CDP, November 28, 2017.

"Climate Change 2017 Information Request Total," CDP.

"Climate Change 2017 Information Request: Chevron Corporation," CDP, 2017.

"Climate Change and Emissions Management Act," Province of Alberta, 2003

"Climate Change Resilience: A Framework for Decision Making," Chevron, March 2018, https://www.chevron.com/-/media/shared-media/documents/climate-change-resilience.pdf.

"CO2 Based Motor Vehicle Taxes in the EU," European Automobile Manufacturers Association, 2018, https://www.acea.be/uploads/publications/CO2_tax_overview_2018.pdf.

"CO2 Emission Standards for Passenger Cars and Light-Commercial Vehicles in the European Union," International Council on Clean Transportation, January 2019

"Cold Lake," Imperial Oil, https://www.imperialoil.ca/en-ca/company/operations/oil-sands/cold-lake.

"Conference of the Parties (COP)," United Nations, https://unfccc.int/process/bodies/supreme-bodies/conference-of-the-parties-cop.

"Congressional Record--Senate," May 22, 2018.

"Corporate Average Fuel Economy (CAFE) Standards," Alliance to Save Energy, July 27, 2018, https://www.ase.org/resources/corporate-average-fuel-economy-cafe-standards.

"Corporate Average Fuel Economy (CAFE) Standards," U.S. Department of Transportation, https://www.transportation.gov/mission/sustainability/corporate-average-fuel-economy-cafe-standards.

"DivestInvest – the Carbon Underground 200," Fossil Free Indexes, http://fossilfreeindexes.com/divestinvest/.

"Divestment," Unity College, https://www.unity.edu/about/sustainability-science/fossil-fuel-divestment/.

"Emissions Gap Report 2018," United Nations Environment Programme, November 2018, https://www.unenvironment.org/resources/emissions-gap-report-2018.

"Energy Visions: Customers, Carbon and Costs - A new business model now?," PWC, 2016.

"Environmental Performance: Oil Sands Emission Intensity," Government of Alberta, September 2018.

**App. 479**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

"Estimating Petroleum Industry Value Chain (Scope 3) Greenhouse Gas Emissions," IPIECA, https://www.api.org/~/media/Files/EHS/climate-change/Scope-3-emissions-reporting-guidance-2016.pdf

"EU and the Paris Climate Agreement: Taking Stock of Progress at Katowice COP," European Commission, October 26, 2018, https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=COM:2018:716:FIN.

"EU Emissions Trading System (EU ETS)," European Commission, https://ec.europa.eu/clima/policies/ets_en.

"European Oil Majors Spending Up to 7% on Low Carbon but Wider Industry Needs to Step Up," Carbon Disclosure Project, November 12, 2018, https://www.cdp.net/en/articles/investor/european-oil-majors-spending-up-to-7-on-low-carbonbut-wider-industry-needs-to-step-up.

"Executive Summary Prepared for the Dartmouth Community Fiscal 2017," Dartmouth College Advisory Committee on Investor Responsibility.

"Exploring ESG: A Practitioner's Perspective," Blackrock, June 2016, https://www.blackrock.com/corporate/literature/whitepaper/viewpoint-exploring-esg-a-practitioners-perspective-june-2016.pdf.

"ExxonMobil Announces Kearl Expansion Project Starts Production Ahead of Schedule," ExxonMobil, June 16, 2015, https://news.exxonmobil.com/press-release/exxonmobil-announces-kearl-expansion-project-starts-production-ahead-schedule.

"ExxonMobil Releases Reports to Shareholders on Managing Climate Risk," ExxonMobil, March 31, 2014, https://news.exxonmobil.com/press-release/exxonmobil-releases-reports-shareholders-managing-climate-risk.

"Find out More about COP21," Sustainable Innovation Forum 2015, http://www.cop21paris.org/about/cop21.

"Fuel Economy Improvements are Projected to Reduce Future Gasoline Use," EIA, May 23, 2017, https://www.eia.gov/todayinenergy/detail.php?id=31332.

"Getting Ready for WLTP," European Automobile Manufacturers Association, https://wltpfacts.eu/wp-content/uploads/2017/04/WLTP_Leaflet_FA_web.pdf.

"GHG Emissions," Canadian Association of Petroleum Producers, https://www.canadasoilsands.ca/en/explore-topics/ghg-emissions.

**App. 480**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

"GIA Sportlight Series - Utilities/alternative energy," Wellington Management, October 2018, https://www.wellington.com/en/insights/gia-spotlight-series-utilities-alternative-energy/?_.

"Global 500," Fortune, http://fortune.com/global500/.

"Global Energy & CO2 Status Report," IEA, 2018, https://www.iea.org/geco/gas/.

"Global Energy & CO2 Status Report," IEA, 2018, https://www.iea.org/geco/oil/.

"Governors" United States Climate Alliance, https://www.usclimatealliance.org/governors-1.

"Green Initiative Task Force: 2015 Annual Report," CalSTRS, June 20, 2015.

"Greenhouse 100 Polluters Index (2018 Report, Based on 2015 Data)," Political Economy Research Institute, https://www.peri.umass.edu/greenhouse-100-polluters-index-2018-report-based-on-2015-data

"Greenhouse Gas Emissions," Syncrude, https://www.syncrude.ca/environment/energy-and-climate-change/greenhouse-gas-emissions/.

"Greenhouse Gas Reporting Program 2016: Refineries," United States Environmental Protection Agency, https://www.epa.gov/ghgreporting/ghgrp-2016-refineries.

"How great a financial risk do carbon costs pose to upstream oil and gas companies?," Wood Mackenzie, October 26, 2017.

"How will BP respond to global change?," BP, 2017.

"Integrating Climate Into Our Strategy," Total, September 2018.

"Investment Policy for Mitigating Environmental, Social, and Governance Risks (ESG)," 2018, CALSTRS, 2018, available at https://www.calstrs.com/sites/main/files/file-attachments/calstrs_esg_policy.pdf.

"Investment Stewardship: 2017 Annual Report," Vanguard, 2017.

"Investor Expectations: Oil and Gas Company Strategy - Supporting investor engagement on carbon asset risk" Institutional Investors Group on Climate Change.

"Investors got the signal," Global Investor Coalition on Climate Change, November 2018.

"Kearl," Imperial, https://www.imperialoil.ca/en-ca/company/operations/oil-sands/kearl.

"Key Climate Vote Survey: 2016," 50/50 Climate Project.

**App. 481**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

"Marketing and Distribution," Library of Congress Business Reference Services, Issue 5/6, 2006, http://www.loc.gov/rr/business/BERA/issue5/marketing.html.

"Merger Proposal," XTO Energy, May 20, 2010.

"Mexico: a Market Based Climate Policy Case Study," EDF and IETA, January 2018

"Middlebury Announces Energy2028 Plan to Address Threat of Climate Change," January 29, 2019, http://www.middlebury.edu/newsroom/archive/2019-news/node/611978.

"Mission," Dartmouth College Advisory Committee on Investor Responsibility, https://www.dartmouth.edu/~finance/committees/acir.html.

"Monthly Energy Review: Tables 1.2 and 1.3," U.S. Energy Information Administration ("EIA"), April 2019, https://www.eia.gov/totalenergy/data/monthly/pdf/mer.pdf.

"Notice of Annual General Meeting 2017," Origin Energy Limited, September 14, 2017.

"Notice of Annual General Meeting," Shell, 2015.

"NYS Comptroller DiNapoli: ExxonMobil Agrees to Assess Impacts of Climate Change," Office of the New York State Comptroller, December 12, 2017, https://www.osc.state.ny.us/press/releases/dec17/121217.htm.

"Observation and Exclusion of Companies," Norges Bank, https://www.nbim.no/en/the-fund/responsible-investment/exclusion-of-companies/.

"Oil & Gas – Midstream," Sustainability Accounting Standards Board ("SASB"), June 2014, https://www.sasb.org/wp-content/uploads/2014/06/NR0102_ProvisionalStandard_OGMidstream.pdf.

"Oil Market Report: Table 1," International Energy Agency ("IEA"), March 15, 2018, https://www.iea.org/media/omrreports/tables/2018-03-15.pdf.

"Oil Sands Emissions Limit Act," Province of Alberta, December 14, 2016.

"Oil Sands, Greenhouse Gases, and US Oil Supply: Getting the Numbers Right," IHS CERA, 2010, https://cdn.ihs.com/ihs/cera/Oil-Sands-Greenhouses-Gases-and-US-Oil-Supply.pdf.

"Our Engagement Priorities for 2017-2018," BlackRock, accessed March 22, 2017, https://web.archive.org/web/20170322043929/https://www.blackrock.com/corporate/en-us/about-us/investment-stewardship/engagement-priorities.

"Our Vision and Mission," CDP, https://www.cdp.net/en/info/about-us.

**App. 482**

Case 3:16-cv-03111-K    Document 121    Filed 07/31/20    Page 488 of 544    PageID 4740

Contains Confidential Material

Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

"Over-Regulation of the Nation's Refineries," Institute for Energy Research, May 3, 2012.

"Overview of Greenhouse Gases: Methane Emissions," U.S. Environmental Protection Agency, https://www.epa.gov/ghgemissions/overview-greenhouse-gases.

"Pan Canadian Framework on Clean Growth and Climate Change: Canada's Plan to Address Climate Change and Grow the Economy,"2016.

"Paris Agreement – Status of Ratification," United Nations, https://unfccc.int/process/the-paris-agreement/status-of-ratification

"Paris Agreement Article 4," United Nations, 2015.

"Perspectives For The Energy Transition: Investment Needs For a Low-Carbon Energy System," International Energy Agency, 2017

"Powering Progress Around the World," ExxonMobil Chemical, https://www.exxonmobilchemical.com/en/exxonmobil-chemical/about-us.

"Proxy Paper: Exxon Mobil Corporation. 2017 Annual Meeting," Glass Lewis, May 12, 2017.

"Questionnaire by the High Level Expert Group on The Sustainable Finance Interim Report," BlackRock, September 7, 2017.

"Reducing Methane Emissions Across the Natural Gas Value Chain: Guiding Principles," November 2017.

"Report of The Conference Of The Parties On Its Third Session, Held At Kyoto, Article 3," United Nations, March 25, 1998.

"Responsible Investment: Government Pension Fund Global," Norges Bank Investment Management, 2014.

"Shareholder Initiatives of the New York City Pension Fund," New York City Pension Funds, 2015, https://comptroller.nyc.gov/wpcontent/uploads/documents/2015_Shareowner_Initiatives_Postseason_Report.pdf.

"Shareholders: ExxonMobil Takes Crucial Step of Acknowledging Carbon Asset Risk ... But More is Needed," Arjuna Capital, March 31, 2014, http://arjuna-capital.com/news/shareholders-exxonmobil-takes-crucial-step-of-acknowledging-carbon-asset-risk-but-more-is-needed/.

**App. 483**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

"SSGA's Perspectives on Effective Climate Change Disclosure," State Street Global Advisors, August 7, 2017, https://www.ssga.com/investment-topics/environmental-social-governance/2017/perspectives-on-effective-climate-change-disclosure.pdf.

"Standards Board," Sustainability Accounting Standards Board, https://www.sasb.org/governance/standards-board/.

"State and Trends of Carbon Pricing 2018," World Bank, May 2018, https://openknowledge.worldbank.org/bitstream/handle/10986/29687/9781464812927.pdf?sequence=5&isAllowed=y.

"State Street Global Advisors Expands Suite of Environmental, Social and Governance (ESG) ETFs," State Street, October 25, 2016, https://newsroom.statestreet.com/press-release/corporate/state-street-global-advisors-expands-suite-environmental-social-and-governan.

"Strategic Report," BP, 2013.

"Support for three shareholder proposals in Exxon Mobil," Norges Bank, March 3, 2016.

"Supporting a Shareholder Proposal Following Extensive Management Engagement," BlackRock https://www.blackrock.com/corporate/literature/press-release/blk-vote-bulletin-exxon-may-2017.pdf.

"Sustainability goes mainstream: Insights into investor views," pwc, May, 2014, https://businessfacilities.com/wp-content/uploads/2014/05/pwc-sustainability-goes-mainstream-investor-views.pdf.

"Sustainability Topics for Sectors: What do stakeholders want to know?: 1 - Oil and Gas," Global Reporting Initiative, 2013, https://www.globalreporting.org/resourcelibrary/sustainability-topics.pdf.

"Sustainable Investing, Investment Perspectives on Corporate Engagement & Proxy Voting J.P. Morgan Asset Management," J.P. Morgan Asset Management, Q2, 2017.

"The Global Fossil Fuel Divestment and Clean Energy Investment Movement: 2018 Report," Arabella Advisors, September 5, 2018, https://www.arabellaadvisors.com/wp-content/uploads/2018/09/Global-Divestment-Report-2018.pdf.

"The Importance of Corporate Engagement on Climate Change," CalPERS and CALSTRS, (circa February 2015).

**App. 484**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

"The Natural Gas Gamble: a Risky Bet on America's Clean Energy Future (2015)," The Union of Concerned Scientists, https://www.ucsusa.org/clean-energy/coal-and-other-fossil-fuels/natural-gas-gamble-risky-bet-on-clean-energy-future.

"The Oliver Wyman Energy Journal, Volume 1," Oliver Wyman, 2014.

"The Price of Climate Change: Global Warming's Impact on Portfolios," BlackRock Investment Institute, October 2015, https://www.blackrock.com/corporate/literature/whitepaper/bii-pricing-climate-risk-international.pdf.

"The Refining Industry in the New Millennium," World Refining & Fuels Today, January 1, 2001.

"The Way Ahead: Corporate Responsibility 2013 Report," State Street, 2013, http://www.statestreet.com/content/dam/statestreet/documents/values/2013_CR_Report.pdf

"UN Secretary General Advises Pension Funds to Divest from Fossil Fuels," Pension Funds Online, November 6, 2014, http://www.pensionfundsonline.co.uk/content/pension-funds-insider/investment/un-secretary-general-advises-pension-funds-to-divest-from-fossil-fuels/1559.

"Unburnable Carbon - Are the world's financial markets carrying a carbon bubble," Carbon Tracker Initiative.

"United Nations Framework Convention on Climate Change," United Nations, 1992, http://unfccc.int/files/essential_background/background_publications_htmlpdf/application/pdf/conveng.pdf.

"Update: Wespath and Hermes Withdraw Chevron 'Stress-Test' Proposal," Wespath, May 2, 2017, https://www.wespath.org/news/update-wespath-and-hermes-withdraw-chevron-stress-test-proposal/.

"Vanguard's Voice on Societal Risks," Vanguard, https://about.vanguard.com/investment-stewardship/perspectives-and-commentary/voice-on-societal-risks.html.

"Victory for ExxonMobil Shareholders as Climate Change Disclosure Resolution Receives Majority Support Despite Company Opposition," The Church of England, May 31, 2017, https://www.churchofengland.org/more/media-centre/news/victory-exxonmobil-shareholders-climate-change-disclosure-resolution.

"Warming Projections: Global Update," Climate Action Tracker, December 2018.

**App. 485**

Contains Confidential Material

Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

"Working to Make Life Better: Fiscal Plan," Province of Alberta, March 16, 2017, https://open.alberta.ca/dataset/aa40ded0-75b3-48fe-9bbf-ea33802b8825/resource/da23ee3c-b79c-4971-8f75-e28ab7684983/download/fiscal-plan-complete.pdf.

"World Energy Outlook 2018," IEA, https://www.iea.org/weo/energyandclimatechange/.

"World Oil Outlook 2040," Organization of the Petroleum Exporting Countries, 2017, https://www.opec.org/opec_web/flipbook/WOO2017/WOO2017/assets/common/downloads/WOO%202017.pdf.

Ahluwalia, Manjyot Bhan, "The Business of Pricing Carbon: How Companies Are Pricing Carbon To Mitigate Risks And Prepare For a Low-Carbon Future," Center For Climate and Energy Solutions, September 2017.

Austin, Francois, "Is The Energy Industry Meeting Its Sustainability Goals?," Oliver Wyman, November 5, 2018, https://www.oliverwyman.com/our-expertise/insights/2018/nov/is-the-energy-industry-meeting-its-sustainability-goals.html.

Biscardini, Giorgio et al., "Oil and Gas Trends 2018-19: Strategy shaped by volatility," strategy&, 2018.

BlackRock, "BlackRock Investment Stewardship's approach to engagement on climate risk," January 31, 2019, p. 1, https://www.blackrock.com/corporate/literature/publication/blk-commentary-engaging-on-climate-risk.pdf.

BlackRock, Long term Sustainable Investment Questionnaire.

BP, Notices of Meeting, 2007-2018.

Brammer, Marc and Yulia Reuter, "The Viability of Non-Conventional Oil Development," Innovest Strategic Value Advisors, March 2009, https://insideclimatenews.org/sites/default/files/Viability%20of%20Non-Conventional%20Oil.pdf.

Brealey, Richard A., Stewart C. Myers and Franklin Allen, Principles of Corporate Finance, 10th ed., 2011.

Brown, Katie, "Stanford Researchers Discuss How to Reduce Major Cause of Oil and Gas Production Emissions," Stanford News, August 30, 2018, https://news.stanford.edu/2018/08/30/country-ranking-oil-production-emissions/.

Brownstein, Andrew R., "Rule 14a-8 Shareholder Proposals and the Government Shutdown," Harvard Law School Forum on Corporate Governance and Financial Regulation, January 19, 2019,

B-31

**App. 486**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

https://corpgov.law.harvard.edu/2019/01/19/rule-14a-8-shareholder-proposals-and-the-government-shutdown/.

Brunnermeier, Markus and Stefan Nagel, "Hedge Funds and the Technology Bubble," The Journal of Finance, Vol. LIX, No. 5, October 2004

Burkhard, James, Jackie Forrest, and Samantha Gross, "Oil Sands, Greenhouse Gases, and European Oil Supply," IHS, September 2011, https://cdn.ihs.com/ihs/cera/Oil-Sands-Greenhouse-Gases-and-European-Oil-Supply.pdf.

Burr, Barry, "Glass Lewis in Favor of Climate-Change Risk, Proxy Access Proposals at Exxon Mobil," MSCI, May 6, 2016.

Byrd, John and Elizabeth S. Cooperman, "Shareholder Activism for Stranded Asset Risk: An Analysis of Investor Reactions for Fossil Fuel Companies," International Review of Accounting, Banking and Finance, Spring 2017.

Carrington, Damian, "Ireland Becomes World's First Country to Divest from Fossil Fuels," The Guardian, July 12, 2018, https://www.theguardian.com/environment/2018/jul/12/ireland-becomes-worlds-first-country-to-divest-from-fossil-fuels.

CDP Climate Change questionnaire responses from Royal Dutch Shell, BP, Eni, Chevron, Total, and ExxonMobil from 2010-2018, CDP.net.

ClimateBiz Staff, "Shareholders Convince Chevron to Track Product Carbon Content," GreenBiz, May 27, 2009, https://www.greenbiz.com/article/shareholdersconvince-chevron-track-product-carbon-content.

Cohen, Ken "ExxonMobil and the Carbon Tax," Energy Factor, December 2, 2015, https://energyfactor.exxonmobil.com/corporate-citizenship-sustainability/exxonmobil-and-the-carbon-tax.

Cooper, Amanda, "Global Oil Supply to Swamp Demand in 2019 Despite Output Cuts: IEA," Reuters, February 13, 2019, https://www.reuters.com/article/us-iea-oil/global-oil-supply-to-swamp-demand-in-2019-despite-output-cuts-iea-idUSKCN1Q20WK.

Cunningham, Nick, "Bank of America: Oil Demand Growth to Hit Zero within a Decade," Oil Price, February 5, 2019, https://oilprice.com/Energy/Energy-General/Bank-Of-America-Oil-Demand-Growth-To-Hit-Zero-Within-A-Decade.html.

**App. 487**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

Davis, Carolyn, "Worldwide Natural Gas Consumption to Overtake Oil by 2026, Says DNV GL," September 10, 2018, https://www.naturalgasintel.com/articles/115725-worldwide-natural-gas-consumption-to-overtake-oil-by-2026-says-dnv-gl.

Della Vigna, Michele, et al., "Re-Imagining Big Oils," Goldman Sachs, October 8, 2018, https://www.goldmansachs.com/insights/pages/re-imagining-big-oils.html.

Devold, Havard, "Oil and Gas Production Handbook," ABB, https://library.e.abb.com/public/34d5b70e18f7d6c8c1257be500438ac3/Oil%20and%20gas%20production%20handbook%20ed3x0_web.pdf.

Diamond, Randy, "CalPERS Reveals it Divested from Most Thermal Coal Companies," Pensions & Investments, August 7, 2017, https://www.pionline.com/article/20170807/ONLINE/170809876/calpers-reveals-it-divested-from-most-thermal-coal-companies.

Dutta, Sumit, "Top 10 Oil & Gas Companies: National Iranian Oil Co (NIOC)," Oil & Gas iQ, January 10, 2018, https://www.oilandgasiq.com/strategy-management-and-information/articles/top-10-oil-gas-companies-number-3-national-iranian.

Edkins, Michelle, "BlackRock Investment Stewardship Engagement Priorities for 2019," January 31, 2019, https://corpgov.law.harvard.edu/2019/01/31/blackrock-investment-stewardship-engagement-priorities-for-2019/.

Edwards, Robert, et al., "Well-to-Wheels Analysis of Future Automotive Fuels and Powertrains in the European Context," European Commission, 2014.

Forrest, Jackie and Marcus Rocque, "Crude Oil Investing in a Carbon Constrained World: 2017 Update," ARC Energy Research Institute, October 2017, https://www.arcenergyinstitute.com/wp- content/uploads/Crude-Oil-Investing-in-a-Carbon-Constrained-World-2017-Update.pdf.

French, Janet, "Alberta's Path to a Carbon Tax: A Timeline," March 7, 2019. https://edmontonjournal.com/news/politics/alberta-carbon-tax-timeline.

Gelsi, Steve, "Exxon Mobil to Buy XTO Energy in $41 Billion Deal," MarketWatch, December 14, 2009, https://www.marketwatch.com/story/exxon-mobil-to-buy-xto-energy-in-41-billion-deal-2009-12-14.

Gillespie, Angus, "Case Study: Shell's CO2 Project Screening Value," in GHG Market Report, 2015, International Emissions Trading Association, 2015, p. 36, https://www.ieta.org/resources/Resources/GHG_Report/2015/IETA_GHG_Report_2015_web.pdf.

**App. 488**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

Gillis, Justin and Clifford Krauss, "Exxon Mobil Investigated for Possible Climate Change Lies by New York Attorney General," New York Times, November 5, 2015, https://www.nytimes.com/2015/11/06/science/exxon-mobil-under-investigation-in-new-york-over-climate-statements.html.

Gordon, Deborah, "Understanding Unconventional Oil," The Carnegie Papers, May 2012, https://carnegieendowment.org/files/unconventional_oil.pdf.

Gordon, Larry, "UC Sells Off $200 Million in Coal and Oil Sands Investments," Los Angeles Times, September 9, 2015, https://www.latimes.com/local/education/la-me-ln-uc-coal-20150909-story.html.

Halpert, Julie, "What if U.S. Fuel Economy Standards Went Away?" Ensia, June 21, 2018, https://ensia.com/features/fuel-standards/.

Horster, Maximilian and Papadopoulos, Kosmas, "Climate Change and Proxy Voting in the U.S. and Europe," Harvard Law School Forum on Corporate Governance and Financial Regulation, January 7, 2019, https://corpgov.law.harvard.edu/2019/01/07/climate-change-and-proxy-voting-in-the-u-s-and-europe/.

Jacobius, Arleen, "Fossil Fuels to be History for UC Investment Office," Pensions & Investments, April 2, 2018, https://www.pionline.com/article/20180402/PRINT/180409989/fossil-fuels-to-be-history-for-uc-investment-office.

Keitz, Anders, "Occidental to Produce Climate Risk Report in 2018," The Street, December 15, 2017, https://www.thestreet.com/story/14421477/1/occidental-to-produce-climate-risk-report-in-2018.html.

Leis, Jorge and Kurt Zenz House, "The Green Edge: Why Carbon Competitiveness Matters," Bain & Company, 2010, https://www.bain.com/insights/green-edge-why-carbon-competitiveness-matters/.

Leis, Jorge, "Managing the Energy Transition: Three Scenarios for Planning," Bain & Company, March 12, 2019, https://www.bain.com/contentassets/bf6052e8095448bf9574cbfe48fd25bb/bain_brief-managing_the_energy_transition_three_scenarios_for_planning.pdf

Letter from State Street President and CEO to the Company's board, January 15, 2019, https://www.ssga.com/investment-topics/environmental-social-governance/2019/01/2019%20Proxy%20Letter-Aligning%20Corporate%20Culture%20with%20Long-Term%20Strategy.pdf.

**App. 489**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

Mason, Melanie, "Bill to divest state's public pensions from coal heads to Gov. Jerry Brown," LA Times, September 2, 2015, https://www.latimes.com/local/political/la-me-pc-coal-divestment-bill-20150902-story.html.

Meredith, Sam, "World's Largest Sovereign Wealth Fund to Scrap Oil and Gas Stocks," CNBC, March 8, 2019, https://www.cnbc.com/2019/03/08/norway-worlds-largest-sovereign-wealth-fund-to-scrap-energy-stocks.html.

Nachmany, Michal, et al., "Global Trends in Climate Change Legislation and Litigation," 2017, http://www.lse.ac.uk/GranthamInstitute/wp-content/uploads/2017/04/Global-trends-in-climate-change-legislation-and-litigation-WEB.pdf.

New York State Senate, "Senate Bill S2126," https://www.nysenate.gov/legislation/bills/2019/s2126.

Olivier, Jos G.J. and Jeroen A.H.W. Peters, "Trends in Global CO2 and Total Greenhouse Gas Emissions 2018 Report," PBL Netherlands Environmental Assessment Agency, December 2018, https://www.pbl.nl/sites/default/files/cms/publicaties/pbl-2018-trends-in-global-co2-and-total-greenhouse-gas-emissons-2018-report_3125.pdf

Orol, Ronald, "Exxon, Occidental Remain in Index Fund Crosshairs over Climate Change," The Street, August 24, 2017, https://www.thestreet.com/story/14283512/1/state-street-views-statoil-climate-report-as-model-for-u-s-energy-firms.html.

PIRC Report for 2016, April 29, 2016.

Redmond, Simon and Michael Wilkins, "What A Carbon-Constrained Future Could Mean For Oil Companies' Creditworthiness," Standard & Poor Ratings Services, March 1, 2013.

Rhodes, Anne, "Hostile Operating Climate Augurs Further Closures for U.S. Refiners," Oil & Gas Journal, March 10, 1997, https://www.ogj.com/articles/print/volume-95/issue-10/in-this-issue/refining/hostile-operating-climate-augurs-further-closures-for-us-refiners.html.

Ritchie, Hannah and Max Roser, "CO2 and Other Greenhouse Gas Emissions," https://ourworldindata.org/co2-and-other-greenhouse-gas-emissions.

Saric, Dana, Lorne Carson, and Courtney Bohn, "Carbon Competitiveness Incentive Regulation Replaces and Adds Rigour to Alberta's Existing Industrial Carbon Emissions Regulation," Osler, December 22, 2017, https://www.osler.com/en/resources/regulations/2017/carbon-competitiveness-incentive-regulation-replac.

**App. 490**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

Shell, Notices of Meeting, 2007-2019.

Stewart, Nyree, "11% of Shareholders Revolt over Shell Tar Sands Resolution," Investments & Pensions Europe, May 19, 2010, https://www.ipe.com/news/11-of-shareholders-revolt-overshell-tar-sands-resolution/35417.fullarticle.

Szabo, Mike, "Spain's Catalonia Introduces Carbon Tax for Road Vehicles," Carbon Pulse, January 28, 2016, https://carbon-pulse.com/14839/.

Transportation & Climate Initiative, "Transportation & Climate Initiative Statement," December 18, 2018, https://www.georgetownclimate.org/files/Final_TCI-statement_20181218_formatted.pdf.

Tullo, Alexander H., "C&EN's Global Top 50 Chemical Companies: Chemical Profits Continue to Rise as the Global Economy Booms," Chemical & Engineering News, July 30, 2018, https://cen.acs.org/business/finance/CENs-Global-Top-50-chemical/96/i31

Xu, Muyu and Josephine Mason, "China Aims for Emission Trading Scheme in Big Step vs. Global Warming," Reuters, December 19, 2017, https://www.reuters.com/article/us-china-carbon/china-aims-for-emission-trading-scheme-in-big-step-vs-global-warming-idUSKBN1ED0R6.

Yang, Zifei and Anup Bandivadekar, "2017 Global Update: Light-Duty Vehicle Greenhouse Gas and Fuel Economy Standards," The International Council on Clean Transportation, June 23, 2017, https://www.theicct.org/publications/2017-global-update-LDV-GHG-FE-standards.

Zhang, Katie and Kasidet Trerayapiwat, "Report to the President on the Considerations Involved in Divesting the Dartmouth College Endowment from Directly Held Fossil-Fuel Related Assets," Dartmouth College Advisory Committee on Investor Responsibility, April 2016.

Gold, Kevin L., Eric Korman and Ahmer Nabi, "Federal Securities Acts and Areas of Expert Analysis," Litigation Services Handbook, The Role of the Financial Expert, 6th ed., Ed. Roman L. Weil, Daniel G. Lentz, and Elizabeth A. Evans, John Wiley & Sons, Inc., 2017, Ch. 27, pp. 12-17

Data Sources

"Assessing Global Oils," Oil-Climate Index, oci.carnegieendowment.org/.

"Global Oil Industry and Market - Statistics & Facts," Statista, https://www.statista.com/topics/1783/global-oil-industry-and-market/.

**App. 491**

Case 3:16-cv-03111-K   Document 121   Filed 07/31/20   Page 497 of 544   PageID 4749

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information.

"Natural Gas Statistics," IEA, https://www.iea.org/statistics/naturalgas/.

Carbon Disclosure Project Scores, available at CDP.net.

IRS, https://www.irs.gov/individuals/international-taxpayers/yearly-average-currency-exchange-rates.

ISS Voting Analytics.

Manhattan Institute, Proxy Monitor, http://www.proxymonitor.org/.

S&P CapitalIQ.

**App. 492**

Case 3:16-cv-03111-K    Document 121    Filed 07/31/20    Page 498 of 544    PageID 4750

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

APPENDIX C

Illustrative Example of LIFO Matching Methodology

1.      Below I provide a brief illustrative example of LIFO methodology I use to match the share sales in the Inflation Period to prior purchases.

2.      To begin, assume that the Inflation Period includes the second, third and fourth quarter of 2014. Based on the changes in the number of shares held by a given institutional investor at the end of each quarter net purchases (increase in shareholding) and net sales (decrease in shareholdings) for each quarter can be estimated.

| | Q1 2014 | Q2 2014 | Q3 2014 | Q4 2014 | Q1 2015 |
|---|---|---|---|---|---|
| Quarter End Shareholding for Investor A | 160,000,000 | 162,500,000 | 162,650,000 | 162,000,000 | 161,500,000 |
| Purchases & Sales | 160,000,000 | 2,500,000 | 150,000 | -650,000 | -500,000 |

3.      In this illustrative example, I apply the LIFO methodology in the following manner:

First, I begin by matching the sale of 650,000 shares during the fourth quarter of 2014 to the most recent purchase prior to this sale in the third quarter of 2014. As 150,000 shares were purchased in the third quarter, after matching, there would be 500,000 shares sold in the fourth quarter of 2014 that remain unmatched.

| | Q1 2014 | Q2 2014 | Q3 2014 | Q4 2014 | Q1 2015 |
|---|---|---|---|---|---|
| Quarter End Shareholding for Investor A | 160,000,000 | 162,500,000 | 162,650,000 | 162,000,000 | 162,000,000 |
| Purchases & Sales | 160,000,000 | 2,500,000 | 150,000 | -650,000 | 0 |
| LIFO - Step 1 | 160,000,000 | 2,500,000 | 0 | -500,000 | 0 |

**App. 493**

Contains Confidential Material

Subject to Stipulation and Order for the Production and Exchange of Confidential Information

Next, I take the remaining unmatched sold shares and match it to the next most recent purchase, which in this case would be 2,500,000 shares purchased during the second quarter of 2014. After the matching process, this would leave 2,000,000 shares that were purchased during the inflation period that were not sold.

|  | Q1 2014 | Q2 2014 | Q3 2014 | Q4 2014 | Q1 2015 |
|---|---|---|---|---|---|
| Quarter End Shareholding for Investor A | 160,000,000 | 162,500,000 | 162,650,000 | 162,000,000 | 162,000,000 |
| Purchases & Sales | 160,000,000 | 2,500,000 | 150,000 | -650,000 | 0 |
| LIFO - Step 1 | 160,000,000 | 2,500,000 | 0 | -500,000 | 0 |
| LIFO - Step 2 | 160,000,000 | 2,000,000 | 0 | 0 | 0 |

4.      As a result, using the LIFO methodology, for Investor A the remaining 2,000,000 shares

that were purchased during the Inflation Period would be considered as Impacted Shares.

C-2

**App. 494**

Contains Confidential Material
Subject to Stipulation and Order for the Production and Exchange of Confidential Information

## APPENDIX D

### Estimated Aggregate Damages to Institutional Shareholders

| Inflation Period | Estimated Impact Per Share | Damages From Impacted Shares (millions) | | |
|---|---|---|---|---|
| | | LIFO | Weighted Average | FIFO |
| **Using Three Significant Event Dates in Bartov Report** | | | | |
| April 1, 2014 to January 19, 2016 | $4.25 | $1,090 | $1,533 | $1,747 |
| January 20, 2016 to September 19, 2016 | $2.61 | $275 | $364 | $407 |
| September 20, 2016 to June 1, 2017 | $1.16 | $239 | $286 | $305 |
| Total Potential Aggregate Damages | | $1,603 | $2,182 | $2,459 |
| | | | | |
| **Using One Significant Event Date in Bartov Report** | | | | |
| April 1, 2014 to January 19, 2016 | $1.64 | $476 | $658 | $740 |
| Total Potential Aggregate Damages | | $476 | $658 | $740 |

Notes:

[1] Damages in each Inflation Period are based on shares purchased during that period. These shares are then sold in a later period or held through the post-Inflation Period.

Sources:

[1] Thompson One.
[2] Bartov Report.

**App. 495**

**Exhibit 1**
## CDP – Climate Change Aggregate & Performance Scores

| Year | ExxonMobil | Chevron | Shell | BP | Eni | Total | Lukoil |
|------|-----------|---------|-------|-----|-----|-------|--------|
| 2018 | F | F | C | F | A- | A- | D |
| 2017 | C | B | B | A- | A- | A- | D |
| 2016 | C | B | A- | B | A | B | D |
| 2015 | C | B | B | B | B | C | Not Scored |
| 2014 | C | A- | B | B | B | C | Not Scored |
| 2013 | B | A- | B | C | B | C | NA |
| 2012 | C | B | B | C | A | B | NA |
| 2011 | B | B | A- | B | B | B | NA |
| 2010 | C | B | A | B | A | B | Not Scored |

**Notes:**

[1] CDP scores from 2016 onward aggregate scores of the level of detail and comprehensiveness of companies' CDP disclosures, awareness of climate change issues, management methods, and progress towards action taken on climate change as reported in responses to CDP.

[2] From 2016 onward, an F indicates failure to provide sufficient information to the CDP to be evaluated. Disclosure, awareness, management, and leadership are evaluated cumulatively (with letter grades D, C, B, and A corresponding to those characteristics, respectively). In order to be evaluated on a given characteristic, the company must score sufficiently well on the characteristic corresponding to the tier directly below.

[3] Prior to 2016, a performance score of A indicates integration of climate-related priorities into business strategy, good climate change management and stakeholder communications, and substantive action to reduce emissions. A performance score of B indicates a recognition of the importance of climate change risk management, but limited provision of information in certain key performance areas, which limits CDP's ability to conduct a thorough evaluation. A performance score of C indicates some climate change action, and a performance score of D indicates that a company recognizes the importance of participating in the CDP, but has disclosed limited evidence of actions taken on mitigation or adaption.

[4] CDP scores given 2015 and earlier are not directly comparable with CDP scores given 2016 and later.

[5] BP, Chevron, and ExxonMobil received F grades in 2018 because they did not respond to the CDP's 2018 climate change questionnaire. The CDP "encourage[s] investors to raise this lack of transparency in discussions with company management."

[6] Lukoil declined to participate in the CDP climate change response in 2013, and did not respond in 2011 and 2012.

**Sources:**

[1] CDP, CDP.net.

[2] "CDP Climate Change Report 2016: United Kingdom Edition, Carbon Disclosure Project," CDP, October 2016.

[3] "Carbon Disclosure Project 2010: Global 500 Report," CDP, 2010.

[4] "European Oil Majors Spending Up to 7% on Low Carbon but Wider Industry Needs to Step Up," CDP, November 12, 2018, https://www.cdp.net/en/articles/investor/european-oil-majors-spending-up-to-7-on-low-carbon-but-wider-industry-needs-to-step-up.

1/ 41

**App. 496**

**Exhibit 2**
**Oil and Gas Company Proxy Costs for GHG Emissions**
**Disclosed to CDP (per ton prices)**

| Year | ExxonMobil | Chevron | Shell | BP | Eni | Total | Lukoil |
|---|---|---|---|---|---|---|---|
| 2018 | NA | NA | **$40** (sensitivity may exceed **$100**) | NA | **$40** | **$30** to **$40** or actual (long term costs) | No proxy cost for GHG Emission |
| 2017 | Notes use of GHG Emission Proxy Cost in Energy Outlook and investment process | Regional, economic, and policy basis | **$40** (with sensitivity analysis) | **$40**, **$80** stress test (industrialized countries) | **€40** (uniform cost) | **$30** to **$40** or actual (long term costs), historically **€25** | No proxy cost for GHG Emission |
| 2016 | Approaches **$80** by 2040 in some geographies (included in Outlook) | Regional, economic, and policy basis | **$40** (with sensitivity analysis) | **$40** (industrialized countries) | Set to main markets scenario, **$40** for sensitivity analysis | **$30** to **$40** or actual (long term costs),  historic **€25** | NA |
| 2015 | Approaches **$80** by 2040 in some geographies (included in Outlook) | Regional, economic, and policy basis | **$40** | **$40** (industrialized countries) | Set to main markets scenario, **$40** for sensitivity analysis | **€25** (medium term base case) | NA |
| 2014 | Approaches **$80** in some areas (embedded in Outlook) | Regional, economic, and policy basis | **$40** | **$40** (industrialized countries) | Based on Euro Emissions Trading and Kyoto framework | **€25** (medium term base case) | NA |
| 2013 | About **$80** by 2040 (For purposes of Outlook) | Law, policy and regulation basis | **$40** | **$40** (industrialized countries) | Based on Euro Emissions Trading and Kyoto framework | **€25** (medium term base case) | NA |
| 2012 | **$60** by 2030 (for purpose of Outlook) | Law, policy and regulation basis | **$40** | **$40** (industrialized countries) | Based on Euro Emissions Trading and Kyoto framework | **€25** (medium term sensitivity) | NA |
| 2011 | **$30** by 2020, **$60** in 2030 (in OECD countries, for purpose of outlook) | Law, policy and regulation basis | **$40** | **$40** (material emissions projects in industrialized countries) | Based on Euro Emissions Trading and Kyoto framework | **€ 25** | NA |
| 2010 | Describes Climate Change Regulatory Risks, but not how they're internally accounted. | Law, policy and regulation basis | **$40** | **$40** (material emissions projects in industrialized countries) | Based on Euro Emissions Trading and Kyoto framework | **€ 25** | No information reported |

**Notes:**
[1] ExxonMobil reports in 'metric tons' from 2010-2013 and 'tons' from 2014-2016; Shell reports in 'tonnes' for all years; BP reports in 'tonnes' for all years; Eni reports in 'tonnes' for 2017 and 2018, units in other years ambiguous; Total reports in 'tonnes' for all years.
[2] If no numerical proxy cost for GHG Emission is listed for a given year, the company did not disclose a numerical proxy cost for GHG Emission figure to CDP that year.
[3] Disclosures were not available for ExxonMobil, Chevron, and BP for 2018.

**Source:**
[1] Company responses to the CDP's Climate Change Module from Shell, BP, Eni, Chevron, Total, Lukoil, and ExxonMobil, 2010-2018 (where available).

**App. 497**

Draft: 05/08/2019

Privileged & Confidential

Case 3:16-cv-03111-K      Document 121      Filed 07/31/20      Page 503 of 544      PageID 4755

**Exhibit 3**
### Number of Shareholder Proposals Voted Upon Concerning Climate Change Regulatory Risk per Year
### 2007-2018



**Notes:**

[1] This chart accounts for all Chevron, ExxonMobil, Shell, and BP shareholder proposals voted upon from 2007-2018 that express investor concern about Climate Change Regulatory Risk.

[2] Shareholder resolution filings are relatively scarce in Europe compared to the US due to higher disclosure among European Companies, high ownership requirements, and a cultural tendency to prefer engagement as a way to instigate change among European investors.

**Sources:**

[1] Chevron, Forms DEF 14A, 2007-2018.

[2] ExxonMobil, Forms DEF 14A, 2007-2018.

[3] "Notice of Annual General Meeting," Shell, 2007-2018.

[4] "Notices of BP Annual General Meeting," BP, 2007-2018.

[5] Horster, Maximilian and Kosmas Papadopoulos, "Climate Change and Proxy Voting in the U.S. and Europe," Harvard Law School Forum on Corporate Governance and Financial Regulation, January 7, 2019, https://corpgov.law.harvard.edu/2019/01/07/climate-change-and-proxy-voting-in-the-u-s-and-europe/.

**App. 498**

## Exhibit 4.A
## Shell: Shareholder Resolutions
## Related to Climate Change Regulatory Risk (2007–18)

| Resolution Subject | Resolution | Year | Outcome | Vote Share | Board Stance | ISS Stance |
|---|---|---|---|---|---|---|
| Canadian Oil Sands | A request for the Board to prepare a report discussing the long-term economic, legal, and reputational risks to the Company from its investments in the oil sands. | 2010 | Defeated | 5.4% | Against | Against |
| Strategic Resilience for 2035 and Beyond | A request that the 2016 annual report includes further information about Shell's approach to handling the risks and opportunities of climate change. | 2015 | Passed | 98.9% | For | For |
| Renewables Transition | A request that Shell prepare a strategy within the year to become a renewable energy company by investing the profits from fossil fuels in renewables. | 2016 | Defeated | 2.8% | Against | Against |
| Targets for GHG Emissions Reductions | A request for Shell to set targets for greenhouse gas emissions reductions that are aligned with the Paris Agreement goal of limiting global warming to well below 2°C. | 2017<br>2018 | Defeated<br>Defeated | 6.3%<br>5.5% | Against<br>Against | Against<br>Against |

**Notes:**

[1] This table contains all resolutions voted upon from 2007–18 that express investor concern about Climate Change Regulatory Risk.

[2] There were no resolutions in 2007–09 or 2011–14 expressing investor concern about Climate Change Regulatory Risk.

[3] Vote shares are calculated using the numbers of votes "For" divided by the total number of all votes "For" and "Against" (excluding abstentions).

[4] In 2019, the shareholder resolution on Targets for GHG Emissions Reductions also appears in the Notice of Annual General Meeting. The board again recommends that shareholders vote against this resolution.

**Sources:**

[1] "Notice of Annual General Meeting," Shell, 2007–2019.

[2] ISS Voting Analytics.

[3] Stewart, Nyree, "11% of Shareholders Revolt over Shell Tar Sands Resolution," Investments & Pensions Europe, May 19, 2010, https://www.ipe.com/news/11-of-shareholders-revolt-over-shell-tar-sands-resolution/35417.fullarticle.

**App. 499**

## Exhibit 4.B
## BP: Shareholder Resolutions
## Related to Climate Change Regulatory Risk (2007–18)

| Resolution Subject | Resolution | Year | Outcome | Vote Share | Board Stance | ISS Stance |
|---|---|---|---|---|---|---|
| Sunrise Oil Sands Project | A request to circulate a report setting out the assumptions made by the company in deciding to proceed with the Sunrise Project (oil sands) regarding future carbon prices, oil price volatility, demand for oil, anticipated regulation of greenhouse gas emissions and legal and reputational risks arising from local environmental damage and impairment of traditional livelihoods. | 2010 | Defeated | 6.2% | Against | Against |
| Strategic Resilience for 2035 and Beyond | A request, given the recognized risks and opportunities associated with climate change, for annual reporting from 2016 of ongoing operational emissions management; asset portfolio resilience to the IEA's scenarios; low-carbon energy R&D and investment strategies; relevant strategic key performance indicators and executive incentives; and public policy relating to climate change. | 2015 | Passed | 98.3% | For | For |

**Notes:**

[1] This table contains all resolutions voted upon from 2007–18 that express investor concern about Climate Change Regulatory Risk.

[2] There were no resolutions in 2007–09, 2011–14, or 2016-2018 expressing investor concern about Climate Change Regulatory Risk.

[3] Vote shares are calculated using the numbers of votes "For" divided by the total number of all votes "For" and "Against" (excluding abstentions).

[4] BP's 2019 Notice of Meeting included a resolution requesting additional transparency on how BP's capital expenditures account for a future consistent with the Paris Agreement's climate goals, and the development and reporting on clear metrics related to product carbon intensity. The board supports this resolution. BP's 2019 Notice of Meeting also included a resolution that BP align its targets with the Paris Climate Agreement, and to invest accordingly in the energy transition to a net-zero-emission energy system. The board does not support this resolution.

**Sources:**

[1] "Notice of BP Annual General Meeting," BP, 2007–2019.

[2] ISS Voting Analytics.

[3] "2010 AGM Poll Results," BP, 2010 https://www.bp.com/content/dam/bp/business-sites/en/global/corporate/pdfs/investors/bp-agm-poll-results-2010.pdf.

**App. 500**

**Exhibit 4.C**
**Chevron: Shareholder Proposals**
**Related to Climate Change Regulatory Risk (2007–18)**

| Proposal Title[2] | Resolution | Year | Outcome | Vote Share | ISS Stance |
|---|---|---|---|---|---|
| Stockholder Proposal on the Proposal to Report on Host Country Environmental Laws/ Stockholder Proposal Regarding Report on Host Country Laws | A request that the board report on the policies and procedures that guide Chevron's assessment of host country regulations with respect to their adequacy to protect human health, the environment, and Chevron's reputation. | 2007 2008 2009 | Defeated Defeated Defeated | 8.6% 8.3% 8.8% | Against Against Against |
| Stockholder Proposal Regarding Targets for Reducing Greenhouse Gas Emissions/ Stockholder Proposal Regarding Greenhouse Gas Emissions/ Proposal to Report on Greenhouse Gas Emissions | A request that the Board adopt long-term, quantitative, company-wide targets for reducing GHG emissions in products and operations (for the 2015 & 2016 proposals, considering the global commitment to limit warming to 2 degrees C, the 2007 proposal stipulates a target of 'below 1990 levels'), and issue a report on its plans to achieve that target. | 2007 2008 2015[4] 2016 | Defeated Defeated Defeated Defeated | 8.5% 10.4% 8.2% 7.9% | Against Against Against Against |
| Stockholder Proposal Regarding Reporting on Environmental Impact of Oil Sands Operations in Canadian Boreal Forest | A request that a board committee report on the environmental damage that would result from Chevron's expanding oil sands operations in the Canadian boreal forest. The report should consider the implications of a policy of discontinuing these expansions. | 2008 | Defeated | 28.6% | For |
| Stockholder Proposal Regarding Financial Risks From Climate Change | A request that the board prepare a report on the financial risks from climate change and their impacts on shareowner value over time, and actions the board deems necessary to protect business interests and value. Recommended issues to include in analysis: emissions management, physical risks for business and operations, US and global regulatory risks, 'material risks', reputation/ brand/ legal risks, water scarcity, and positive brand opportunities. | 2010 2011 | Defeated Defeated | 8.6% 7.3% | Against Against |

**App. 501**

**Exhibit 4.C**
**Chevron: Shareholder Proposals**
**Related to Climate Change Regulatory Risk (2007–18)**

| Proposal Title[2] | Resolution | Year | Outcome | Vote Share | ISS Stance |
|---|---|---|---|---|---|
| Stockholder Proposal Regarding Proxy Access Right[5] | A request for the Board to include a "proxy access" bylaw to allow qualifying shareholders to submit nominations for director positions. | 2015 | Passed | 55.3% | For |
| Stockholder Proposal Regarding Dividend Policy | A request that Chevron commit to increasing the amount authorized for capital distributions to shareholders as a prudent use of investor capital in light of the climate change related risks of stranded carbon assets. | 2015 2016 | Defeated Defeated | 3.2% 3.5% | Against Against |
| Stockholder Proposal Regarding Report on Reserve Replacements | A request that in its CSR report, Chevron annually quantify and report its reserve replacements in BTUs by resource category to assist Chevron in responding to climate-changed induced market changes. | 2016 | Defeated | 6.8% | Against |
| Stockholder Proposal Regarding Report on Climate Change Impact Assessment | A request that Chevron, with board oversight, publish an annual assessment of long-term (to 2035) portfolio impacts of climate change policies, including how capital planning and business strategies incorporate analyses of the short and long term financial risks of a lower carbon economy, and outlining impacts of different demand and price scenarios (including the 2 degrees C scenario) for Chevron's existing reserves and resource portfolio. | 2016 | Defeated | 40.8% | For |

**App. 502**

**Exhibit 4.C**
**Chevron: Shareholder Proposals**
**Related to Climate Change Regulatory Risk (2007–18)**

| Proposal Title[2] | Resolution | Year | Outcome | Vote Share | ISS Stance |
|---|---|---|---|---|---|
| Stockholder Proposal Regarding Report on Transition to a Low Carbon Economy | A request that Chevron issue a report assessing how it can respond to climate change and the resultant transition to a low carbon economy, by evaluating the feasibility of altering the Chevron's energy mix, selling off highest carbon-risk assets, and acquiring companies with outstanding assets in low carbon or renewable energy. | 2017 | Defeated | 26.0% | For |
| Stockholder Proposal Regarding Report on Transition to a Low Carbon Business Model | A request for the board to oversee the issue of a report describing how Chevron could adapt its business model to align with a decarbonizing economy by altering its energy mix to reduce fossil fuel dependence, in order to reduce societal GHG emissions and protect shareholder value. | 2018 | Defeated | 8.1% | Against |
| Stockholder Proposal Regarding Report on Methane Emissions | A request that Chevron provide a report using quantitative indicators on the company's actions beyond regulatory requirements to minimize methane emissions from hydraulic fracturing operations | 2018 | Defeated | 45.0% | For |
| Stockholder Proposal Regarding Independent Chairman[6] | A request that the Board of Directors adopt a policy to require the Chair of the Board of Directors to be an independent member of the board. | 2018 | Defeated | 24.0% | Against |

**App. 503**

FILED: NEW YORK COUNTY CLERK 10/04/2019 11:06 PM
NYSCEF DOC. NO. 355

**Exhibit 4.C**
**Chevron: Shareholder Proposals**
**Related to Climate Change Regulatory Risk (2007–18)**

---

**Notes:**

[1] This table contains all proposals voted upon from 2007–18 that express investor concern about Climate Change Regulatory risk. Proposals listed on Chevron's DEF 14A filings that were withdrawn prior to voting are not included.

[2] Titles are as they appear in the Chevron DEF 14A filings.

[3] Vote shares are calculated using the numbers of votes "For" divided by the total number of all votes "For" and "Against" (excluding abstentions).

[4] In 2009, a similar shareholder proposal was withdrawn by the same primary proponent, after the proponent acknowledged Chevron's progress in tracking carbon at the time.

[5] An identically worded proxy access bylaw proposal was linked to climate change regulatory risk by the same proponents at the 2015 ExxonMobil annual shareholder meeting. They stated that "ExxonMobil received this proposal due to its exposure to risk related to climate change." See Thomson Reuters, Transcript of ExxonMobil Corporation Shareholders Meeting, May 27, 2015, p. 17. The New York City Comptroller, which votes the proponents' proxies, released a paper on the proposal, which was introduced at 75 Companies, in which both ExxonMobil and Chevron governance focus areas are listed as "Fossil Fuel."

[6] In 2018 and 2019, this proposal regarding an independent chairman was linked to climate change, noting that Chevron faces increased "climate-related tort claims and similar litigation," and that climate change is a "massive risk that is already manifesting and set to intensify in the long run via regulation." In 2017, 2015, 2014, 2012, 2008, and 2007, proposals regarding separating the CEO and chairman positions were also raised.

[7] In 2019 Chevron received 3 proposals related to climate change regulatory risk: a stockholder proposal regarding a report on reducing Chevron's carbon footprint, a stockholder proposal regarding a board committee on climate change, and a stockholder proposal regarding an independent chairman.

[8] There were no proposals in 2012, 2013, or 2014 expressing investor concern about Climate Change Regulatory Risk.

**Sources:**

[1] Chevron, Forms DEF 14A, 2007-2019.

[2] ISS Voting Analytics.

[3] ClimateBiz Staff, "Shareholders Convince Chevron to Track Product Carbon Content," GreenBiz, May 27, 2009, https://www.greenbiz.com/article/shareholders-convince-chevron-track-product-carbon-content.

[4] Transcript of ExxonMobil Corporation Shareholders Meeting, Thomson Reuters, May 27, 2015, p. 17.

[5] "Shareholder Initiatives of the New York City Pension Fund," New York City Pension Funds, 2015, https://comptroller.nyc.gov/wp-content/uploads/documents/2015_Shareowner_Initiatives_Postseason_Report.pdf.

**Exhibit 5.A**
**Key ExxonMobil GHG Emission Proxy Cost Disclosures**
**2010-2017**



**Notes:**

[1] This timeline presents select key disclosures of Exxon's GHG Emission Proxy Costs between 2010 and 2017.

[2] Exact date of publication could not be determined based on available materials from ExxonMobil.

**Sources:**

[1] *The Outlook for Energy: A View to 2030*, Exxon, 2010.

[2] *The Outlook for Energy: A View to 2040*, Exxon, 2012, 2013, 2016.

[3] *Energy and Climate*, Exxon, March 31, 2014.

[4] *Energy and Carbon - Managing the Risks*, Exxon, March 31, 2014.

[5] Trelenberg, Peter W., "Managing Climate Risks and Greenhouse Gas Stabilization Challenges," November 2015. (PNYAG0245665)

[6] Gardner, Rob, "The Outlook for Energy: A view to 2040" Exxon presentation to the International Energy Forum, February, 2016.

[7] Summary of meeting between State Street and Exxon (Woodbury, Trelenberg, and Luettgen), March 17, 2017. (SSC_NYAG_0001948)

**App. 505**

## Exhibit 5.B
## Detailed Selection of ExxonMobil's GHG Emission Proxy Cost Disclosures
## 2010-2017

| Document | Quote | Date |
|---|---|---|
| 2010 *Outlook for Energy* | "ExxonMobil anticipates that, by 2020, adoption of these policies will be equivalent to adding $CO_2$ costs of about $30 per ton in the OECD. At this level, natural gas becomes a lower-cost source of electricity than coal, while nuclear and wind become increasingly competitive. This shift becomes even more pronounced if $CO_2$ costs rise to $60 per ton, which is where we anticipate policies in the OECD will drive costs by 2030." (p. 29) | January 27, 2011 |
| 2012 *Outlook for Energy* | "But with a cost of $CO_2$ – either direct or indirect – at $60 per ton (what ExxonMobil expects to see in OECD countries by 2030), coal would be more expensive than natural gas, nuclear and wind power." (p. 29)<br><br>"Integral to these forecasts is an expectation that governments will set policies that will impose a cost on $CO_2$ emissions [...] ExxonMobil sees OECD $CO_2$ costs reaching about $80/ton by 2040. Non OECD countries also will begin adding $CO_2$ costs around 2030. By 2040, we see China reaching $30/ton and many other Non OECD nations approaching $20/ton." (p. 30) | December 8, 2011 |
| CDP Response 2011 | "For the purposes of the Outlook, ExxonMobil anticipates that by 2020, adoption of these policies will be equivalent to adding $CO_2$ costs of about $30 per metric ton in OECD countries, rising to $60 per metric ton by 2030." | 2011 |
| 2013 *Outlook for Energy* | Map of the world shows GHG Emission Proxy Costs of "More than $40 per ton" in OECD countries, "$20-$40 per ton" in leading non-OECD countries, and "Less than $20 per ton" in trailing non-OECD countries. (p. 34)<br><br>"ExxonMobil expects the implied cost of $CO_2$ emissions to reach about $80 per ton in 2040. OECD nations will continue to lead the way in adopting these policies, with developing nations gradually following, led by China." (p. 34) | December 11, 2012 |
| CDP Response 2012 | "The Outlook for Energy: A View to 2040, our long-term forecast of supply and demand trends, projects global energy demand in 2040 to be about 30% higher than it was in 2010—even with substantial gains in efficiency. Meeting this rising demand for energy to support economic growth and prosperity, while minimizing environmental impact, is ExxonMobil's mission and is a key dual challenge facing governments and societies worldwide. The scale and nature of this challenge is described in the Outlook, which we use to help guide our investment decisions. We also share it publicly to encourage broader understanding of energy issues. For the purposes of the Outlook, ExxonMobil anticipates that by 2020, adoption of climate change policies will be equivalent to adding $CO_2$ costs of about $60 per metric ton by 2030." | 2012 |

**App. 506**

**Exhibit 5.B**
**Detailed Selection of ExxonMobil's GHG Emission Proxy Cost Disclosures**
**2010-2017**

| Document | Quote | Date |
|---|---|---|
| 2014 *Outlook for Energy* | Chart of Average U.S. cost of electricity generation in 2030 by fuel source builds in a "$60/Tonne of $CO_2$" sensitivity analysis. (p. 31)<br><br>"To help model the potential impacts of a broad mosaic of future GHG policies, we use a simple cost of carbon as a proxy mechanism. For example, in most OECD nations, we assume an implied cost of $CO_2$ emissions that will reach about $80 per tonne in 2040. OECD nations are likely to continue to lead the way in adopting these policies, with developing nations gradually following, led by China." (p.32) | December 12, 2013 |
| CDP Response 2013 | "The Outlook for Energy: A View to 2040, our long-term forecast of supply and demand trends, projects global energy demand in 2040 to be about 35% higher than it was in 2010—even with substantial gains in efficiency. Meeting this rising demand for energy to support economic growth and prosperity, while minimizing environmental impact, is ExxonMobil's mission and is a key dual challenge facing governments and societies worldwide. The scale and nature of this challenge is described in the Outlook, which we use to help guide our investment decisions. We also share it publicly to encourage broader understanding of energy issues. For the purposes of the Outlook, ExxonMobil anticipates that adoption of climate change policies will be equivalent to adding $CO_2$ costs of about $80 per metric ton by 2040. OECD countries will continue to lead the way in adopting these policies, with developing nations gradually following, led by China." | 2013 |
| Corporate Citizenship Report: 2013 | "To help model the potential impacts of a broad mosaic of future GHG policies, we use a simple cost of carbon as a proxy mechanism. For example, in most OECD nations, we assume an implied cost of $CO_2$ emissions that will reach about $80 per metric ton in 2040. OECD nations are likely to continue to lead the way in adopting these policies, with developing nations gradually following, led by China." (p. 54) | May 28, 2014 |

12/ 41

**App. 507**

**Exhibit 5.B**
**Detailed Selection of ExxonMobil's GHG Emission Proxy Cost Disclosures**
**2010-2017**

| Document | Quote | Date |
|---|---|---|
| *Energy and Climate* | "Future policies related to limiting GHG emissions remain uncertain and likely will vary over time and from country to country. However, for our Outlook we use a cost of carbon as a proxy to model a wide variety of potential policies that might be adopted by governments to help stem GHG emissions. For example, in the OECD nations, we apply a range of proxy costs with the more wealthy countries, like China and Mexico, reaching about $30/ton in 2040 [...]This GHG proxy cost is integral to ExxonMobil's planning[...]" (pp. 5-6)<br><br>"The company employs a robust process for evaluating investment opportunities and managing our portfolio of operating assets. ExxonMobil requires that all business units use a consistent corporate planning basis, including the proxy cost of carbon discussed above, in evaluating capital expenditures and developing business plans." (p. 20)<br><br>Map of the world shows GHG Emission Proxy Costs of "More than $40 per ton" in OECD countries, "$20-$40 per ton" in leading non-OECD countries, and "Less than $20 per ton" in trailing non-OECD countries. (p. 6) | March 31, 2014 |

**App. 508**

# Exhibit 5.B
## Detailed Selection of ExxonMobil's GHG Emission Proxy Cost Disclosures
## 2010-2017

| Document | Quote | Date |
|---|---|---|
| *Energy and Carbon - Managing the Risks* | Map of the world shows GHG Emission Proxy Costs of "More than $40 per ton" in OECD countries, "$20-$40 per ton" in leading non-OECD countries, and "Less than $20 per ton" in trailing non-OECD countries. (p. 17)<br><br>"We also address the potential for future climate-related controls, including the potential for restriction on emissions, through the use of a proxy cost of carbon. This proxy cost of carbon is embedded in our current *Outlook for Energy* , and has been a feature of the report for several years. The proxy cost seeks to reflect all types of actions and policies that governments may take over the Outlook period relating to the exploration, development, production, transportation or use of carbon-based fuels. Our proxy cost, which in some areas may approach $80/ton over the Outlook period, is not a suggestion that governments should apply specific taxes. It is also not the same as a "social cost of carbon," which we believe involves countless more assumptions and subjective speculation on future climate impacts. It is simply our effort to quantify what we believe government policies over the Outlook period could cost to our investment opportunities. Perhaps most importantly, we require that all our business segments include, where appropriate, GHG costs in their economics when seeking funding for capital investments." (pp. 17-18)<br><br>"We also require that all significant proposed projects include a cost of carbon – which reflects our best assessment of costs associated with potential GHG regulations over the Outlook period – when being evaluated for investment." (p. 21) | March 31, 2014 |
| CDP Response 2014 | "ExxonMobil addresses the potential for future climate-related controls, including the potential for restriction on emissions, through the use of a proxy cost of carbon. This proxy cost of carbon is embedded in our current Outlook for Energy, and has been a feature of the report for several years. The proxy cost seeks to reflect all types of actions and policies that governments may take over the Outlook period relating to the exploration, development, production, transportation or use of carbon-based fuels. Our proxy cost, which in some areas may approach $80/ton over our Outlook period, is our effort to quantify what we believe government policies could cost to our investment opportunities. Perhaps most importantly, we require that all our business segments include, where appropriate, GHG costs in their economics when seeking funding for capital investments. We require that investment proposals reflect the climate-related policy decisions we anticipate governments making during the Outlook period and therefore incorporate them as a factor in our specific investment decisions." | 2014 |
| More on Divestment | "We fully expect governments to take various actions to constrain carbon emissions in coming years.  Our increased investment in cleaner-burning natural gas has been guided in part by this assumption. ExxonMobil's Outlook for Energy assumes a proxy cost of carbon of $80 per ton, significantly above the current average worldwide." | November 6, 2014 |
| Managing Climate Risks & Greenhouse Gas Stabilization Challenges | Chart entitled "Energy-related $CO_2$ Emissions Peak by 2030" show GHG Emission Proxy Costs of ~$30/ tonne by 2020 in the OECD, ~$60/ tonne by 2030 in the OECD, $80/ tonne by 2040 in the OECD, and between ~$5/ tonne and ~$35 in the non-OECD by 2040. | November 2015 |
| ExxonMobil and the Carbon Tax | "One key point we make in many of these briefings is that ExxonMobil has included a proxy price on carbon in our business planning since 2007. This enables us to analyze the impact of a price on carbon on various investment opportunities. This proxy cost, which in some regions may approach $80 per ton, seeks to reflect all types of actions and policies that governments may take." | December 2, 2015 |

**App. 509**

**Exhibit 5.B**
## Detailed Selection of ExxonMobil's GHG Emission Proxy Cost Disclosures
## 2010-2017

| Document | Quote | Date |
|---|---|---|
| CDP Response 2015 | "We update our long-term energy outlook each year — taking into account the most up-to-date demographic, economic and technological information available. This analysis serves as a foundation for our long-term business strategies and investments. We address the potential for future climate change policy, including the potential for restrictions on emissions, by estimating a proxy cost of carbon. This cost, which in some geographies may approach $80 per ton by 2040, has been included in our Outlook for several years. This approach seeks to reflect potential policies governments may employ related to the exploration, development, production, transportation or use of carbon-based fuels. We believe our view on the potential for future policy action is realistic and, by no means represents a "business as usual" case. We require all of our business lines to include, where appropriate, an estimate of GHG-related emissions costs in their economics when seeking funding for capital investments." | 2015 |
| Meeting Global Needs - Managing Climate Change Business Risk | "We use a simple cost of carbon as a proxy mechanism to help model the potential impacts of a broad mosaic of future GHG policies. For example, in most OECD nations, we assume an implied cost of $CO_2$ emissions that will reach about $80 per metric ton in 2040. Developing nations will have a wide range of policy costs with the wealthiest ones reaching about $35 per metric ton. This GHG proxy cost is integral to ExxonMobil's planning [...]" | 2016 or earlier |
| 2016 *Outlook for Energy* | "For purposes of *The Outlook* , we continue to assume that governments will enact policies that impose rising costs on energy-related $CO_2$ emissions, reaching an implied cost in OECD nations of about $80 per tonne in 2040. China and other leading non-OECD nations are expected to trail OECD policy initiatives." (p. 49) | Early 2016 or late 2015[2] |
| The Outlook for Energy: A View to 2040 (presentation by Rob Gardner to the International Energy Forum) | Map of the world shows GHG Emission Proxy Costs of "2040 $CO_2$ 'Proxy' Cost" of "~80 $/ton" in OECD countries, "<10 $/ton" "~20 $/ton" in some non-OECD countries, "~35 $/ton" in Mexico, China, and Turkey, and "< 10 $/ton" in trailing non-OECD countries. | Presented to the International Energy Forum in February 2016 |
| 2016 Proxy statement | "The Company addresses the potential for future climate-related policy, including the potential for restriction on emissions, through the use of a proxy cost of carbon.  The proxy cost seeks to reasonably reflect the types of actions and policies that governments may take over the outlook period relating to the exploration, development, production, transportation or use of carbon-based fuels.  This proxy cost of carbon is embedded in our Outlook for Energy, and has been a feature of the report since 2007.  All business segments are required to include, where appropriate, an estimate of the costs associated with greenhouse gas emissions in their economics when seeking funding for capital investments." (p. 66) | April 13, 2016 |

## Exhibit 5.B
## Detailed Selection of ExxonMobil's GHG Emission Proxy Cost Disclosures
## 2010-2017

| Document | Quote | Date |
|---|---|---|
| 2016 Annual Shareholders Meeting | "We have, unlike many of our competitors, we have for many years included a price of carbon in our outlook. And that price of carbon gets put into all of our economic models when we make investment decisions as well. It's a proxy. We don't know how else to model what future policy impacts might be. But whatever policies are, ultimately they come back to either your revenues or your cost. So we choose to put it in as a cost. So we have accommodated that uncertainty in the future, and everything gets tested against it." (p. 29) | May 25, 2016 |
| 2015 Corporate Citizenship Report | "The *Outlook* forms the foundation for the company's business strategies and helps guide our investment decisions [...] ExxonMobil addresses the potential for future climate change policy, including the potential for restrictions on emissions, by estimating a proxy cost of carbon. This cost, which in some geographies may approach $80 per ton by 2040, has been included in our Outlook for several years." (p. 38) | July 6, 2016 |
| Q2 2016 ExxonMobil Earnings Call | "[I]f you look in our energy outlook, which we've got posted on our Company website, you'll see that we've included for -- now for many years a, what we call a proxy cost of carbon. And over the outlook period out to 2040, that number grows to as high as $80 per ton. But you'll see it in our energy outlook, if you go a head and take a look at it." (p. 25, Quote from Jeff Woodbury, VP of IR and Secretary) | July 29, 2016 |
| CDP Response 2016 | "ExxonMobil's long-range annual forecast, The Outlook for Energy, examines energy supply and demand trends for approximately 100 countries, 15 demand sectors and 20 different energy types. The Outlook forms the foundation for the company's business strategies and helps guide our investment decisions. In response to projected increases in global fuel and electricity demand, our 2016 Outlook estimates that global energy-related $CO_2$ emissions will peak around 2030 and then begin to decline. A host of trends contribute to this downturn — including slowing population growth, maturing economies and a shift to cleaner fuels like natural gas and renewables — some voluntary and some the result of policy. ExxonMobil addresses the potential for future climate change policy, including the potential for restrictions on emissions, by estimating a proxy cost of carbon. This cost, which in some geographies may approach $80 per ton by 2040, has been included in our Outlook for several years. This approach seeks to reflect potential policies governments may employ related to the exploration, development, production, transportation or use of carbon-based fuels. We believe our view on the potential for future policy action is realistic and by no means represents a "business-as-usual" case. We require all of our business lines to include, where appropriate, an estimate of greenhouse gas-related emissions costs in their economics when seeking funding for capital investments." | 2016 |
| ExxonMobil meeting with State Street Global Advisors | ExxonMobil representatives note that a GHG Emission Proxy Cost has been used since 2007, set at $5 for least developed countries and between $20-$80 for OECD countries, for example. | March 17, 2017 |

**App. 511**

# Exhibit 5.B
## Detailed Selection of ExxonMobil's GHG Emission Proxy Cost Disclosures
## 2010-2017

| Document | Quote | Date |
|---|---|---|

**Notes:**

[1] Disclosures of GHG Emission Proxy Costs from ExxonMobil publications, presentations, questionnaire responses, and meetings.

[2] Date range for this publication based on the date the *Outlook for Energy* was published in prior and following years.

**Sources:**

[1] *2010-2016 Outlook for Energy* (no report was titled with 2011 due to changes in the Outlook's naming convention, 2015 report was not considered, 2017 report does not appear to mention GHG Emission Proxy Cost projections).

[2] ExxonMobil Responses to CDP's Climate Change Module, 2010-2016.

[3] "Corporate Citizenship Report," ExxonMobil 2013 and 2015.

[4] *Energy and Climate* , ExxonMobil, March 31, 2014.

[5] *Energy and Carbon - Managing the Risks* , ExxonMobil, March 31, 2014.

[6] Cohen, Ken, "More on Divestment: A letter to Tim Writh," ExxonMobil. Posted November 6, 2014.

[7] PNYAG0245665, Trelenberg, Peter W., "Managing Climate Risks and Greenhouse Gas Stabilization Challenges," ExxonMobil November 2015.

[8] Cohen, Ken, "ExxonMobil and the Carbon Tax," ExxonMobil EnergyFactor, Posted December 2, 2015.

[9] "Meeting Global Needs - Managing Climate Change Business Risk," ExxonMobil, published 2016 or earlier.

[10] "Notice of 2016 Annual Meeting and Proxy Statement," ExxonMobil, April 13, 2016.

[11] "Transcript of ExxonMobil Corporation Shareholders Meeting," Thomson Reuters, May 25, 2016.

[12] "XOM - Q2 2016 Exxon Mobil Corp Earnings Call," Thomson Reuters, July 29, 2016.

[13] SSC_NYAG_0001948, 3/17/2017 Summary of meeting between State Street and ExxonMobil (Woodbury, Trelenberg, and Luettgen), March 17, 2017.

**App. 512**

**Exhibit 6**
**ExxonMobil: Shareholder Proposals**
**Related to Climate Change Regulatory Risk (2007–18)**

| Proposal Title | Resolution | Year | Outcome | Vote Share | ISS Stance |
|---|---|---|---|---|---|
| Board Chairman and CEO[3][4] | A request for the Board to amend the bylaws to appoint an independent director as Board Chairman and bar the company CEO from serving concurrently as Board Chairman. | 2007 | Defeated | 40.0% | For |
| | | 2008 | Defeated | 39.5% | For |
| | | 2016 | Defeated | 38.7% | For |
| Renewable Energy Investment Levels | A request for the Board to adopt a policy to boost global investment in the renewables sector. | 2007 | Defeated | 7.3% | Against |
| | | 2008 | Defeated | 27.5% | For |
| | | 2009 | Defeated | 27.3% | For |
| Greenhouse Gas Emissions Goals | A request for the Board to adopt quantitative goals for reducing GHG Emissions and report to shareholders on its plans to achieving those goals. | 2007 | Defeated | 31.1% | For |
| | | 2008 | Defeated | 30.9% | For |
| | | 2009 | Defeated | 29.0% | For |
| | | 2010 | Defeated | 27.2% | For |
| | | 2011 | Defeated | 26.5% | For |
| | | 2012 | Defeated | 27.1% | For |
| | | 2013 | Defeated | 26.7% | For |
| | | 2014 | Defeated | 22.0% | For |
| | | 2015 | Defeated | 9.6% | Against |
| Planning Assumptions | A request for the Board to issue a report on the risk that fossil fuel demand drops significantly below ExxonMobil projections in the next 20 years, and on the impacts of such a drop for strategic planning. | 2010 | Defeated | 7.8% | Against |
| Canadian Oil Sands | A request for the Board to prepare a report discussing the long-term environmental, social, and economic risks to the Company from its investments in the oil sands. | 2010 | Defeated | 9.1% | For |
| | | 2011 | Defeated | 27.1% | For |
| Report on Energy Technology | A request for the Board to prepare a report on how ExxonMobil can become an environmentally sustainable energy company. | 2008 | Defeated | 9.4% | Against |
| | | 2010 | Defeated | 6.7% | Against |
| | | 2011 | Defeated | 6.1% | Against |

**App. 513**

**Exhibit 6**
**ExxonMobil: Shareholder Proposals**
**Related to Climate Change Regulatory Risk (2007–18)**

| Proposal Title | Resolution | Year | Outcome | Vote Share | ISS Stance |
|---|---|---|---|---|---|
| Climate Expert on Board | A request for the Board to nominate at least one candidate with strong environmental experience to become an independent director (as serving members' terms expire). | 2015 2016 | Defeated Defeated | 21.0% 20.9% | For For |
| Proxy Access Bylaw[5] | A request for the Board to include a "proxy access" bylaw to allow qualifying shareholders to submit nominations for director positions. | 2015 2016 | Defeated Passed | 49.4% 61.9% | For For |
| Report Reserve Replacements in BTUs[6] | A request that ExxonMobil begin reporting its reserves in BTU equivalents in annual reports in annual reports or equivalent annual documents. | 2016 | Defeated | 5.6% | Against |
| Report on Impact of Climate Change Policies | A request for the Board to publish an annual assessment of long-term portfolio impacts of climate change. | 2016 2017 | Defeated Passed | 38.1% 62.1% | For For |
| Policy to Limit Global Warming to 2° C | A request for the Board to adopt a policy that acknowledges the need to control average temperature increases to 2 degrees. | 2016 | Defeated | 18.5% | For |
| Increase Capital Distributions | A request that ExxonMobil commit to increasing capital distributions to shareholders to secure shareholder value against climate-related risk of stranded assets. | 2016 2017 | Defeated Defeated | 4.1% 3.8% | Against Against |
| Report on Methane Emissions | A request that Exxon issue an annual report on company actions to reduce methane emissions from fracking operations. | 2017 | Defeated | 38.7% | For |

19/ 41

**App. 514**

**Exhibit 6**
**ExxonMobil: Shareholder Proposals**
**Related to Climate Change Regulatory Risk (2007–18)**

**Notes:**

[1] This table contains all proposals voted upon from 2007–18 that express investor concern about Climate Change Regulatory Risk or whose proponents express such concern while advocating for the proposal at the annual shareholder meeting.

[2] There were no proposals in 2018 expressing investor concern about climate change regulatory risk.

[3] The Board Chairman proposal was linked to climate change regulatory risk by proponents at the 2007 annual shareholder meeting. Supporters speaking on behalf of the primary proponent explained: "The Connecticut Pension Fund and other major shareholders have requested a meeting with Michael Boskin, Chair of our Public Issues Committee and we have been turned down five times. Now our purpose for the meeting is quite simple. To have constructive dialogue with Professor Boskin on climate change, and the implication for sustaining our company's stellar performance out into the future. Now climate change may be about our planet's future, but it's also about the financial implication to compan[ies] such as ExxonMobil....As the result, we have every right to know what the company is doing, and how it will protect their -- our company's bottom line." See Thomson Reuters, Transcript of ExxonMobil Corporation Shareholders Meeting, May 30, 2007, p. 14. Likewise, the 2016 proposal was linked to climate change regulatory risk by an investment manager from CalPERS speaking on behalf of the  proponent at the 2016 annual meeting: "Now is a time of great change, great risk and great opportunity for Exxon and the energy sector. Many other governments -- many other companies, large shareowners and governments all agree that the COP21 Paris agreement sets us on a path towards a low-carbon economy." See Thomson Reuters Street Events, Edited Transcript: XOM - Exxon Mobil Corp Annual Shareholders Meeting, May 25, 2016, p. 13.

[4] In 2019, a similar proposal to mandate an independent chairman was linked to climate change regulatory risk in a supporting statement that referenced "the unprecedented challenges facing global energy companies regarding climate change, as they make important transitions to a low carbon economy."

[5] The proxy access bylaw proposal was linked to climate change regulatory risk by proponents at the annual shareholder meeting. The proponents stated that "ExxonMobil received this proposal due to its exposure to risk related to climate change." See source [5], page 17.

[6] The reserve replacements reporting proposal was linked to climate change regulatory risk in the proposal text. Proponents stated that denominating reserve replacements in oil and gas units "incentiviz[es] the production and development of new oil and gas reserves. ... This fuel specific reporting metric does not allow management the latitude needed to optimize enterprise goals in a carbon constrained environment." See ExxonMobil, Form DEF 14A, 2016, p. 71.

[7] In 2019, a proposal requesting that the Board charter a new committee on climate change to evaluate ExxonMobil's strategic vision and responses to climate change, given the disruption oil companies face to their business driven by, among other climate change related factors, global imperatives to limit global warming.

**Exhibit 6**
**ExxonMobil: Shareholder Proposals**
**Related to Climate Change Regulatory Risk (2007–18)**

**Sources:**

[1] ISS Reports, 2007–17.

[2] ExxonMobil, Form DEF 14A, 2007–19.

[3] "Transcript of ExxonMobil Corporation Shareholders Meeting," Thomson Reuters, May 30, 2007.

[4] "Transcript of ExxonMobil Corporation Shareholders Meeting," Thomson Reuters, May 27, 2015.

[5] "Edited Transcript: XOM - Exxon Mobil Corp Annual Shareholders Meeting," Thomson Reuters, May 25, 2016.

[6] ISS Voting Analytics.

[7] Proxy Monitor (Manhattan Institute for Policy Research)

**App. 516**

**Exhibit 7**
**ExxonMobil: Withdrawn Shareholder Proposals**
**Related to Climate Change Regulatory Risk (2007–18)**

| Proposal Title | Resolution | Year | Reason for Withdrawal |
|---|---|---|---|
| Energy Independence | A request for the Board to prepare a report to shareholders on how ExxonMobil can become an industry leader in the technology needed to make the U.S. energy independent in an environmentally sustainable fashion. | 2009 | "I accept [ExxonMobil's request that I withdraw the proposal], in exchange that I or my designated representative will be given up to three minutes to speak at the next annual meeting of XOM at the very beginning of the Question and Answer period. In addition the Company has promised that if I do not perceive adequate movement toward the goals of the resolution submitted this year I will be able to submit it next year without a SEC challenge from XOM, except for such technicalities around time deadline or not enough stock, not the substance of the proposal."<br>-- *Proponent letter to ExxonMobil, March 6, 2009* |
| Climate Change Financial Risks | A request for the Board to prepare a report to shareholders on the financial risks of climate change and actions needed to protect long-term shareholder value. | 2010 | "Steve Viederman [of the Christopher Reynolds Foundation] did acknowledge that [the Foundation] had meetings with the Corporate Secretary, David Rosenthal, and different colleagues and he felt like they were very productive. And then as a result of those meetings and the dialogue, [they] withdrew the resolution."<br>-- *Statement by Sister Susan Mika (The Needmor Fund) made on behalf of proponent at 2010 shareholder meeting, May 26, 2010* |
| Climate Future Task Force | A request for the Board to set up a Climate Future Task Force to study how ExxonMobil will factor climate change into its internal risk models and develop alternatives to its reliance on fossil fuels. | 2012 | "Last Thursday, February 2, I had an extensive conversation with David Henry, Jim Pearson, and David Rosenthal [of ExxonMobil] regarding the resolution and the challenge XOM had filed with the SEC asking for a 'no action' letter. Previous to this XOM had agreed to talk with me and the co-filers about its response to the content of the resolution. ... Because of all of these factors and Exxon Mobil's commitment to discuss the resolution and upon further examination of the issues involved to share with the shareholders and the broader public what [*sic*] we have requested in the resolution, I hereby withdraw the resolution."<br>-- *Proponent letter to ExxonMobil, February 6, 2012* |
| Planning Assumptions | A request for the Board to issue a report on the risk that fossil fuel demand drops significantly below ExxonMobil projections in the next 30 years, and on the impacts of such a drop for strategic planning. | 2012 | [No reason stated in source materials consulted.] |
| Climate Change Policy Advocacy | A request for the Board to prepare a report on ExxonMobil's public policy advocacy activities on climate change and energy policy. | 2014 | [No reason stated in source materials consulted.] |

**App. 517**

## Exhibit 7
## ExxonMobil: Withdrawn Shareholder Proposals
## Related to Climate Change Regulatory Risk (2007–18)

| Proposal Title | Resolution | Year | Reason for Withdrawal |
|---|---|---|---|
| Climate Change Adaptation Plan | A request for the Board to issue a report on how climate change affects ExxonMobil's strategic plan. | 2014 | "The Christopher Reynolds Foundation withdrew its resolution report on climate change assumptions is for strategic planning following constructive discussions of Corporate Secretary, David Rosenthal and his colleagues on December 17, 2013. And subsequent discussions and exchanges of letters that resulted in Exxon's energy and climate report posted on your website and what you also have available out in the lobby." <br> -- *Statement by Frank Rauscher (Aquinas Associates) made on behalf of proponent at 2014 shareholder meeting, May 28, 2014* |
| Financial Risks of Climate Change | A request for the Board to issue a report on ExxonMobil's exposure to risk from climate change, including in the form of stranded oil and gas assets. | 2014 | "In a much-anticipated report to shareholders today on stranded carbon asset risk, ExxonMobil expressed the view that there is limited basis for concern. Shareholder advocates Arjuna Capital and As You Sow– which withdrew a shareholder resolution when ExxonMobil agreed to release the report — expressed disappointment with aspects of the response, but noted that it is a historic first step forward ..." <br> -- *Press Release, Arjuna Capital, March 31, 2014* |
| Sustainability Metrics in Executive Pay | A request for the Board to link executive compensation to company performance on sustainability metrics and environmental impacts from Company operations. | 2015 | "Thanks for your help in pulling together such a well informed team to discuss the issue of executive comp and Sustainability [*sic*]. We appreciate your openness in sharing information and receiving feedback. … In light of the information shared in [ExxonMobil's] letter to the SEC, the responses to our points on the call and the company's willingness to continue a dialogue about ways to strengthen transparency going forward, the Needmor Fund as the lead filer is glad to withdraw the shareholder proposal." <br> -- *Email from proponent representative Timothy Smith to ExxonMobil representative Brian D. Tinsley, February 3, 2015* |

**Exhibit 7**
**ExxonMobil: Withdrawn Shareholder Proposals**
**Related to Climate Change Regulatory Risk (2007–18)**

| Proposal Title | Resolution | Year | Reason for Withdrawal |
|---|---|---|---|
| Review Public Policy Advocacy | A request for the Board to commission a review of Exxon public policy advocacy on energy and climate change. | 2015 | "Thank you for the informative conference call on climate and ExxonMobil public policy positions. In light of this dialogue and the points raised in your No Action letter regarding the overlap with a resolution on lobbying disclosure, the resolution submitted by Ken Steiner is withdrawn." *-- Email from proponent representative John Chevedden to Exxon representative Brian D. Tinsley, February 11, 2015* |

**Notes:**

[1] This list includes withdrawn shareholder proposals that express investor concerns about ExxonMobil's Climate Change Regulatory Risk exposure. It draws from proposals identified in public SEC communications with ExxonMobil; shareholder meeting transcripts; news articles; and documents produced in discovery. Comprehensive data about all withdrawn shareholder resolutions and their content are not publicly available.

[2] ExxonMobil letters to the SEC cited in these comments refer to Exxon requests for SEC approval to omit certain shareholder resolutions from its proxy ballot, per SEC Rule 14a-8. See, e.g., Andrew R. Brownstein, David A. Katz, and Sabastian V. Niles, "Rule14a-8 Shareholder Proposals and the Government Shutdown," Harvard Law School Forum on Corporate Governance and Financial Regulation, *available at* https://corpgov.law.harvard.edu/2019/01/19/rule-14a-8-shareholder-proposals-and-the-government-shutdown/.

**Sources:**

[1] March 23, 2009 SEC letter to Exxon (March 6, 2009 Province of St. Joseph of the Capuchin Order letter to Exxon), https://www.sec.gov/divisions/corpfin/cf-noaction/14a-8/2009/provinceofstjoseph032309-14a8.pdf.

[2] "Transcript of ExxonMobil Corporation Shareholders Meeting," Thomson Reuters, May 26, 2010, p. 26.

[3] March 21, 2011 SEC letter to Exxon (March 16, 2011 Hitchcock Law Firm letter to Exxon), https://www.sec.gov/divisions/corpfin/cf-noaction/14a-8/2011/amalgamatedlongview032111-14a8.pdf.

[4] February 10, 2012 SEC letter to Exxon (February 6, 2012 Province of St. Joseph of the Capuchin order letter to Exxon), https://www.sec.gov/divisions/corpfin/cf-noaction/14a-8/2012/provinceofstjoseph021012-14a8.pdf.

[5] "Transcript of ExxonMobil Corporation Shareholders Meeting," S&P CapitalIQ, May 28, 2014, p. 17.

[6] "Shareholders: ExxonMobil Takes Crucial Step of Acknowledging Carbon Asset Risk ... But More is Needed," Arjuna Capital, March 31, 2014, http://arjuna-capital.com/news/shareholders-exxonmobil-takes-crucial-step-of-acknowledging-carbon-asset-risk-but-more-is-needed/.

[7] February 4, 2015 SEC letter to Exxon (February 3, 2015, Timothy Smith email to Brian D. Tinsley), https://www.sec.gov/divisions/corpfin/cf-noaction/14a-8/2015/needmorfundetal020415-14a8.pdf.

[8] February 12, 2015 SEC letter to Exxon (February 11, 2015, John Chevedden email to Brian D. Tinsley), https://www.sec.gov/divisions/corpfin/cf-noaction/14a-8/2015/kennethsteiner021215-14a8.pdf.

[9] Brownstein, Andrew R., David A. Katz, and Sabastian V. Niles, "Rule14a-8 Shareholder Proposals and the Government Shutdown," Harvard Law School Forum on Corporate Governance and Financial Regulation, January 19, 2019, https://corpgov.law.harvard.edu/2019/01/19/rule-14a-8-shareholder-proposals-and-the-government-shutdown/.

## Exhibit 8
## Equity Research Analyst Commentary on ExxonMobil Climate Change Regulatory Risks

| Analyst [1] | Date | Selected Excerpts |
|---|---|---|
| **Barclays** | 3/5/2012 | "Kearl oil sands development – what is the unit operating cost? What additional cost have you built in for the expected new carbon tax scheme?" [2] (p. 4) |
| **BMO** | 12/1/2016 | "Climate change. It is a tough job being an oil major these days, especially so if you are the biggest. Climate change threatens stranding resources long term, while near-term balancing of the oil markets puts an opposing threat on resource renewal and fighting field declines and then making the best of industry costs conditions to deliver FCF." (p. 11)

"Climate change pressures. Adapting to climate change is putting pressure on the sector. Exxon has not taken a positive leadership role in the climate change debate. We appreciate that as an oil company it should stick to its core competencies of delivering oil & gas projects in the most efficient manner; however, we see companies such as Total better positioned. The election of Trump in the U.S. may take some of the immediate pressures off Exxon; however, we think that ultimately the pressure to adapt will only increase." (p. 11)

"U.S. Energy Policy: It is not clear what the new President Elect's strategy will be for power generation and coal suppliers, which can be a threat to Exxon due to its Henry Hub exposure." (p. 11)

"Investment risks include project execution, persistent LNG market oversupply concerns, lack of a clear climate change initiative, non-OECD production, and failure to grow the resource base organically. SEC proved reserves writedowns are near-term risks." [3] (p. 99) |
| **Cowen & Company** | 3/1/2018 | "We believe XOM must do three things to affect a positive outcome from its analyst day (3/7/18): 1) demonstrate efficiency in Permian development in line with independents, 2) illustrate integration value of downstream growth, and 3) tie together carbon reduction efforts with the core business." (p. 1) |
|  | 3/7/2018 | "The afternoon session was a panel on the long term global energy demand outlook and efforts to reduce carbon emissions. Emissions reduction can be achieved a variety of ways, but direct efforts include R&D efforts in fuel cells for carbon capture and oils produced from algae, a CO2 consumer. As it relates to a current investment in XOM shares, both efforts will likely not be commercialized until the 2030s, however we see synergies in the core business from both initiatives and we are particularly interested in fuel cell carbon capture, as wide adoption would increase lng demand materially over the investible horizon before 2040." (p. 3) |
| **Credit Suisse** | 4/9/2014 | "Exxon says oil reserves in no danger from climate rules (Apr 1, 2014) Exxon Mobil Corp. said its oil and natural gas reserves won't become stranded and lose their value as a result of carbon restrictions aimed at addressing climate change." (p. 11) |

**App. 520**

## Exhibit 8
## Equity Research Analyst Commentary on ExxonMobil Climate Change Regulatory Risks

| Analyst [1] | Date | Selected Excerpts |
|---|---|---|
| **Deutsche Bank** | 1/21/2010 | "Anyone who knows XOM well knows Tillerson accepts global warming [.] Tillerson revealed XOM's 'price deck' (thought non-existent?) includes a price for carbon; they recognise human activity contributes to global warming but as a science and engineering company they do not recognise a dependable model for past, let alone forecast, emissions impacts. They support the honest solution that many politicians do not: carbon tax. Natgas and efficiency are two key mitigators of risk; cap and trade is not, because of excessive cost and complexity. They seek the XTO deal to gain scale in their forecast biggest absolute demand growth fuel." (p. 1) |
| | 1/11/2012 | "Further risk at home lies in a Democratic Congress determined to ramp up renewable energy and make 'big oil' finance it. Other downside risks to our neutral rating include shrinking access abroad, falling demand, an expensive acquisition, and potential US tax and renewable fuel legislation."[4] (p. 18) |
| | 6/4/2017 | [Discussing a 2017 proxy vote in favor of additional climate disclosures] "The vote underpins the shift in investor sentiment as it pertains to environmental cost analysis. Perhaps what was once an easily disregarded notion is now a key analytical factor that large asset owners are proactively seeking answers to. We do note however, that the agreement is not binding. In our view, a paradigm shift to a low carbon economy necessitates steps like these to occur, and we see this as perhaps a catalyst going forward." (p. 4) |
| | 10/31/2018 | "DB ESG conference: physical climate risk. Increasingly real. Pressure for more disclosure and mitigation actions" (p. 1)<br><br>[Following discussion of NY AG complaint] "We understand that many of these assumptions are around $40/tCO2, but there is clearly little transparency as to how they are used, and to what extent they are assumed to be tax deductible. Moreover, it is our understanding that while these prices may be deployed in specific project economics, they are rarely used when modelling future demand curves and market prices for oil and gas – a clear inconsistency (however complicated the oil market may be)." (p. 14)<br><br>"Investors concerned about the potential for stranded assets or excessive book values are also focusing on the inconsistency between the oil prices used to benchmark final investment decisions (often in the $40-50/bbl range) and those used in the long term tests of balance sheet values (currently $60-70/bbl). Auditors may now find themselves tending towards greater prudence in closing (*and disclosing*) this gap." (p. 14) |
| **Evercore ISI** | 7/5/2016 | "The future of the major international oil companies (IOCs) - BP, Chevron, ExxonMobil, Shell and Total - is in doubt. The business model that sustained them during the 20th century is no longer fit for purpose. As a result, they are faced with the choice of managing a gentle decline by downsizing or risking a rapid collapse by trying to carry on business as usual. [...] The petroleum industry faces numerous strategic challenges, rising to the level of apocalyptic. Climate change means fossil fuels must be left in the ground, according to some, and new technologies like electric vehicles will displace demand for oil and gas…" (p. 5) |
| **HSBC** | Sep-2015 | "ExxonMobil addresses the potential for future climate-related controls, through the use of a proxy cost of carbon, which may approach USD80/tonne." (p. 11) |

**App. 521**

### Exhibit 8
### Equity Research Analyst Commentary on ExxonMobil Climate Change Regulatory Risks

| Analyst [1] | Date | Selected Excerpts |
|---|---|---|
| JPMorgan | 3/4/2013 | "We believe XOM's annual Outlook for Energy publication is particularly instructive in understanding XOM's perspective on the long-term energy picture, which ultimately drives its investment decisions." (p. 2) |
| | 12/16/2015 | "Industry observers note that corporates and financial firms were "out in force" in Paris, shaping national and international initiatives, giving momentum and texture to initiatives such as carbon pricing. Just as Climate Change Denial might be bad for the planet, so COP21 denial might be bad for investors..." (p. 2) |
| | | "Global oil companies generally committed to using internal carbon pricing (e.g. Exxon Mobile $80- sic), and to reduce CO2 emissions." (p. 4) |
| Macquarie | 6/6/2017 | "Recent CDP research found that close to half of Fortune 500 companies have one or more climate change targets, with 15% specifically targeting a level of investment in clean energy. This has been catalysed by the growing chorus of investors engaging with companies to seek improvements in climate change performance. A good recent example of this was the 62% shareholder support for a shareholder resolution requiring Exxon to publish an annual assessment of climate policies. The Investor Group on Climate Change coordinated more than 280 investors with over $17 Trillion in assets under management to sign a joint letter calling on Governments to implement the Paris Agreement." (p. 5) |
| Morgan Stanley | 8/9/2017 | "At least 14 of 19 top oil & gas companies include environmental metrics in executive compensation, though there is no consensus on implementation. In N. America, among the top 10 oil & gas companies, all but 2 (Exxon, Occidental) have at least some environmental component in their short-term cash goals. By contrast, in Europe, 3 of the top 9 companies (Shell, BP, OMV) have introduced environment as part of longer-term criteria (where we think it belongs), and 4 others include it in the annual cash bonus." (p. 1) |
| | | "The two US companies without environment exec comp metrics also faced strongest climate change proposal votes and lowest Say on Pay approvals (Exxon, Occidental). Meanwhile, 7 of the 8 N. American companies with executive compensation plans incorporating some climate metrics did not face climate change shareholder resolution votes >25% last year (except Chevron)." (p. 1) |
| | | "The most recent US proxy season stands out for notable shareholder resolution votes on climate change – namely those that passed with a majority in favor of fossil fuel companies reporting on carbon asset risk, such as Exxon (62% votes for) and Occidental (67% votes for) – all contrary to their managements' recommendations to vote against." (p. 3) |
| | | "Other than Exxon and Occidental, the remainder of the top 10 US oil & gas companies by market cap have at least some explicit environmental metric, usually within annual bonus cash." (p. 7) |
| | | "Recently, Swedish pension fund AP7 targeted companies it believes are violating the Paris climate agreement – which included ExxonMobil, Gazprom, TransCanada, Westar, Entergy, and Southern Corp. This has become a routine screening in their investment process." (p. 10) |

**App. 522**

**Exhibit 8**
## Equity Research Analyst Commentary on ExxonMobil Climate Change Regulatory Risks

| Analyst [1] | Date | Selected Excerpts |
|---|---|---|
| **Oppenheimer** | 4/8/2011 | "XOM believes uncertainties about future government policies including environmental regulations on emissions, oil spills, hydraulic fracturing, restricting access to potential hydrocarbon resources, as well as changes in fiscal regimes, pose a greater risk than reserve replacement or volatile oil and gas prices and refining margins." (p. 1) |
| **RBC** | 4/22/2010 | "With almost 2.0 million bpd of U.S. refining capacity, ExxonMobil's downstream earnings could be lowered by costs related to greenhouse gas emission legislation, which is being debated in Washington, D.C. Additionally, potential tax law changes could negatively affect Upstream earnings and cash flow."[5] (p. 4) |
| **Société Générale** | Sep-2014 | "According to findings from CDP's (Carbon Disclosure Project), ExxonMobil and Shell have integrated an 'internal carbon price' as a core element in their ongoing business strategies; ExxonMobil is assuming a cost of $60 per metric ton by 2030, while Shell uses a price of $40 per ton. However, further disclosure and analysis of cost of supply and carbon intensity is needed for investors to understand which projects might be at risk...Current and future CO2 regulation policies of the markets into which the company's products will be sold are evaluated including, for example, the possible impact of low carbon fuel standards." (p. 28) |
| | 3/22/2016 | "Any material changes to regulations that limit the company's ability to exploit reserves or make it prohibitively expensive to do so could impact the company's value. Future climate change regulations or taxes that limit the company's ability to exploit reserves, make them prohibitively expensive to extract, or significantly curtail demand for end petroleum products, could materially impact the company's value."[6] (p. 1) |
| | 9/21/2018 | "Management is fully cognizant of the need to deliver energy for growing global economic growth while reducing its environmental impacts. Already, XOM is a leader in carbon sequestration, has plans to reduce methane emissions by 15% and flaring by 20% by 2020, and has just joined the Oil & Gas Climate Initiative. So, XOM is investing and operating in a manner to profit in a world in which energy efficiency, de-carbonization trends, and political policy decisions will affect future hydrocarbon consumption." (p. 1) |

## Exhibit 8
## Equity Research Analyst Commentary on ExxonMobil Climate Change Regulatory Risks

| Analyst [1] | Date | Selected Excerpts |
|---|---|---|
| UBS | 4/1/2014 | "ExxonMobil released its reports yesterday to shareholders on managing climate risk. The company says that its hydrocarbon reserves are unlikely to become 'stranded' because of regulations to limit climate change. It says limiting the temperature increase to 2°C would be too costly given the growing energy needs. ExxonMobil expects carbon fuels to continue to play a key role in the energy mix (~75% through 2040). Exxon also gives more details on its plans to reduce its own emissions. (Exxon, UBS)" (p. 3) |
| | 9/7/2018 | "Firstly, XOM's more constructive engagement in the debate around climate change at the outlook for the oil and gas market makes the strategy more credible because investors will see it as having been formulated in a view of the world that accords with their own – that climate change and the impact of energy transition is a potentially existential issue for the oil and gas world; That while the market evolution may mean all the resources get produced out there may be price impacts along the way. Therefore being positioned in the best, lowest cost projects is a critical strategic position which we do believe XOM has made convincingly (XOM's base case $60/bbl real price assumption suggests robust returns even in the context of slowing demand). We see little risk of 'stranded assets' emerging out of the current investment plan. We have reviewed current longer-term energy market thinking in a separate note." (p. 37)<br><br>"[CEO Darren] Woods' ExxonMobil is carrying on the trend under Tillerson and addressing more constructively issues of climate change and ESG issues." (p. 39) |
| Wells Fargo | 6/20/2013 | "Proposals with regard to the removal of intangible drilling credits (IDC) and other incentives, GHG emissions, fracking regulations, and derivative contract regulations are just some of the issues that may negatively affect the E&P industry, in our opinion." (p. 6) |
| | 5/30/2016 | "XOM and the oil and gas sector face a series of challenges related to conventional emissions and increasing requirements to reduce GHG emissions. XOM is focused on the reduction of GHG emissions as well as carbon capture and storage as permanent solutions to reduce $CO_2$ levels. While we did not attend the annual shareholder meeting on Wednesday, May 25, 2016, all of these topics were widely discussed." (p. 2)<br><br>"To guard against future expenses related to GHG regulations, a direct carbon tax or carbon trading schemes, XOM places a proxy cost of carbon on all of its future developments. Depending on the project and its location, the proxy cost of carbon ranges from $20 to $80 per ton by 2040. This approach reduces the risks associated with future $CO_2$ emissions and incentivizes XOM to reduce overall emissions of all future projects. Also, all future project economics will not be negatively affected by future GHG rules, regulations and taxes. This approach also helps XOM avoid the risk of stranded investments." (p. 2) |

**App. 524**

## Exhibit 8
## Equity Research Analyst Commentary on ExxonMobil Climate Change Regulatory Risks

| Analyst [1] | Date | Selected Excerpts |
|---|---|---|
| **Wells Fargo** (continued) | 9/20/2016 | "We rate the likelihood of a negative outcome from a reported SEC investigation into ExxonMobil's accounting/climate practices as very slight. However, in our view the headline risks associated with an SEC investigation create enough investor angst to damage ExxonMobil's reputation and impact its share price performance during the investigation period. Thus we are reducing our target P/E multiple to 18x from 20x our 2018 EPS estimate and reducing our valuation range to $93-103 from $103-114. Our rating remains Outperform." (p. 1)<br><br>"ExxonMobil found itself in the news earlier this year from investigations by various international and states' attorneys general of its actions/inactions related to man-made climate change (though the climate has been remarkably stable during the time of man compared to its pre-mankind days)." (p. 1)<br><br>"On May 26, 2016, we hosted a group of investors at ExxonMobil's HQ and discussed climate risks including stranded assets. As discussed then, XOM places a proxy cost of carbon on all of its future developments. Depending on the project and its location, the proxy cost of carbon ranges from $20 to $80 per ton by 2040. This approach reduces the risks associated with future $CO_2$ emissions and incentivizes XOM to reduce overall emissions of all future projects. Thus we believe ExxonMobil is ahead of the curve on pricing in climate risks." (p. 1) |
| | 8/17/2017 | "[Exxon] remains the leading energy company in our view." (p. 1)<br><br>"All XOM projects are assessed an internal carbon tax (on a per ton basis) to take into account carbon intensity. This is very important for long-lived projects to ensure full-cycle returns are fairly evaluated on an environmental basis as well as financial and operational. While the technology does not exist commercially today, carbon capture and storage (CCS) should be a component of long-term $CO_2$ solutions in XOM's view." (p. 2) |

**Notes:**

[1] This commentary was selected from equity research analyst reports from the 16 investment banks whose coverage of Exxon spanned the longest period since 2010 that were available through Thomson One's Investext subscription. That includes Barclays, Bank of Montreal ("BMO"), Cowen & Company, Credit Suisse, Deutsche Bank, Evercore ISI, HSBC, Jefferies, JPMorgan, Macquarie, Morgan Stanley, Oppenheimer, RBC, Société Générale, UBS, and Wells Fargo. Commentary is drawn from reports from these banks which discussed ExxonMobil's climate change regulatory risk or GHG Emission Proxy Costs.

[2] This question appears in at least one other Barclays report in 2011.

[3] This risk appears in at least seven other BMO reports between 2016 and 2017.

[4] This risk appears in at least 12 other Deutsche Bank reports between 2010 and 2012 (11 of which are not included in this exhibit).

[5] This risk appears in at least 12 other RBC reports between 2010 and 2012.

[6] This risk appears in at least 43 other Société Générale reports between 2016 and 2019 (42 of which are not included in this exhibit).

**Sources:**

[1] Thomson One.

[2] BOA-NYAG-EXXON-000002199.

**Exhibit 9.A**
## ExxonMobil Internal and Publicly Disclosed GHG Emission Proxy Cost Schedules
### OECD Non-EU Nations
### 2011–2013



**Notes:**

[1] The specific nations subject to the GHG Emissions Proxy Cost schedules above may vary slightly between years.

**Sources:**

[1] Corporate Planning Dataguides for 2011–2013.

[2] Energy Outlook reports for 2011–2013.

**Exhibit 9.B**
**ExxonMobil Internal and Publicly Disclosed GHG Emission Proxy Cost Schedules**
**OECD Non-EU Nations**
**2014–2017**



**Notes:**

[1] The specific nations subject to the GHG Emissions Proxy Cost schedules above may vary slightly between years.

**Sources:**

[1] Corporate Planning Dataguides for 2014–2017.
[2] Energy Outlook reports for 2014–2017.

**App. 527**

# Exhibit 10
## ExxonMobil Financial Models Considered

| No. | Project, Asset, or Investment[1] | Year | Bates Number | Type[2] | Original Source of GHG Emission Proxy Cost | Original % of Emissions to which Cost is Applied |
|---|---|---|---|---|---|---|
| **Models Selected for Analysis** | | | | | | |
| 1 | Antwerp (Europe Residual Upgrade) | 2014 | EMC 004046554 | Investment | Unknown | 100% (above threshold)[6] |
| 2 | Aspen (Advance Commitment 2) | 2014 | EMC 003697673 | Investment | Dataguide 2013 | 100% |
| 3 | Beaumont (SCANfiner) | 2014 | EMC 004046572 | Investment | Dataguide 2014 (with adjustments)[4] | 100% |
| 4 | Cold Lake (Nabiye) | 2012 | EMC 004046570 | Investment | Dataguide 2010 (with adjustments)[4] | 100% |
| 5 | Kearl (De-Oxygenation) | 2015 | EMC 004046565 | Investment | Dataguide 2013 | 100% |
| 6 | Kearl (Initial Development Cogeneration) | 2013 | EMC 004046561 | Investment | Legislated Costs | 100% (above threshold)[6] |
| 7 | Kearl (Phase 2 Expansion) | 2012 | EMC 004046560 | Investment | Dataguide 2009 | 100% |
| 8 | Rotterdam (Refinery Advanced Hydrocracker) | 2015 | EMC 004322890 | Investment | Unknown | 100% |
| 9 | Clarke Creek (Phase 1) | 2014 | EMC 003697597 | Corporate Planning | Dataguide 2013 | 100% |
| 10 | Clarke Creek (Phase 2) | 2014 | EMC 003697587 | Corporate Planning | Dataguide 2013 | 100% |
| 11 | Clarke Creek (Phase 3) | 2014 | EMC 003697588 | Corporate Planning | Dataguide 2013 | 100% |
| 12 | Clyden (Phase 1) | 2014 | EMC 003697598 | Corporate Planning | Dataguide 2013 | 100% |
| 13 | Clyden (Phase 2) | 2014 | EMC 003697573 | Corporate Planning | Dataguide 2013 | 100% |
| 14 | Clyden (Phase 3) | 2014 | EMC 003697575 | Corporate Planning | Dataguide 2013 | 100% |
| 15 | Corner (Phase 1) | 2014 | EMC 003697599 | Corporate Planning | Dataguide 2013 | 100% |
| 16 | Corner (Phase 2) | 2014 | EMC 003697579 | Corporate Planning | Dataguide 2013 | 100% |
| 17 | Corner (Phase 3) | 2014 | EMC 003697581 | Corporate Planning | Dataguide 2013 | 100% |
| 18 | Firebag | 2014 | EMC 003697626 | Corporate Planning | Dataguide 2008 | 100% |
| 19 | Grand Rapids (Phase 1) | 2014 | EMC 003697600 | Corporate Planning | Dataguide 2013 | 100% |
| 20 | Grand Rapids (Phase 2) | 2014 | EMC 003697601 | Corporate Planning | Dataguide 2013 | 100% |
| 21 | Grand Rapids (2014 Corporate Plan) | 2014 | EMC 003697583 | Corporate Planning | Dataguide 2013 | 100% |
| 22 | Kearl (Initial Development, Expansion Project, and Plant Debottleneck) | 2015 | EMC 003697717 | Corporate Planning | Corporate SSHE (June 2015)[5] | 20% |
| 23 | Kearl (2013 P&B) | 2013 | EMC 003697627 | Corporate Planning | Dataguide 2012 | 100% |
| 24 | Muskeg | 2014 | EMC 003697563 | Corporate Planning | Dataguide 2013 | 100% |
| 25 | Kearl (Economic Model Validation) | 2013 | EMC 003697946 | Economic Model Validation | Dataguide 2013 | 100% |
| 26 | Aspen (Reserves) | 2015 | EMC 003976219 | Other[3] | Unknown | 20% |
| 27 | Kearl (Economic Model - CP15 FA October - CAF Reserves, YEO update, 255 in 2025) | 2015 | IMO_00003599 | Other[3] | Corporate SSHE (June 2015)[5] | 20% |
| **Input Models** | | | | | | |
| 1 | Aspen (Advance Commitment 2) | 2014 | EMC 003697674 | Input | | |
| 2 | Aspen (Advance Commitment 3) | 2015 | EMC 002879325 | Input | | |
| 3 | Aspen (Reserves) | 2015 | EMC 003976220 | Input | | |
| 4 | Baytown (Refinery Lubes Expansion) | 2013 | EMC 004322516 | Input | | |
| 5 | Clarke Creek (Phase 1) | 2014 | EMC 003697612 | Input | | |
| 6 | Clarke Creek (Phase 2) | 2014 | EMC 003697568 | Input | | |
| 7 | Clarke Creek (Phase 3) | 2014 | EMC 003697570 | Input | | |
| 8 | Clyden (Phase 1) | 2014 | EMC 003697572 | Input | | |
| 9 | Clyden (Phase 2) | 2014 | EMC 003697574 | Input | | |
| 10 | Clyden (Phase 3) | 2014 | EMC 003697576 | Input | | |
| 11 | Corner (Phase 1) | 2014 | EMC 003697614 | Input | | |
| 12 | Corner (Phase 2) | 2014 | EMC 003697580 | Input | | |
| 13 | Corner (Phase 3) | 2014 | EMC 003697582 | Input | | |
| 14 | Grand Rapids (Phase 1) | 2014 | EMC 003697615 | Input | | |
| 15 | Grand Rapids (Phase 2) | 2014 | EMC 003697616 | Input | | |
| 16 | Grand Rapids (Midzaghe) (2015 Corporate Plan) | 2015 | EMC 003697497 | Input | | |
| 17 | Muskeg | 2014 | EMC 003697608 | Input | | |
| **Models Created in 2016 or Later** | | | | | | |
| 1 | Aspen | 2018 | EMC 004046571 | Investment | | |
| 2 | Beaumont (Polyethylene Expansion) | 2016 | EMC 004322515 | Investment | | |
| 3 | Cepu (Banyu Urip Supplement) | 2016 | EMC 004046564 | Investment | | |
| 4 | Gorgon (PM-SURF) | 2018 | EMC 004046557 | Investment | | |
| 5 | Guyana (Liza Phase 1) | 2017 | EMC 004046568 | Investment | | |
| 6 | Guyana (Gate 2, Advance Commitment 1) | 2016 | EMC 003973954 | Investment | | |
| 7 | Julia (Development Well) | 2016 | EMC 004046566 | Investment | | |
| 8 | Tengiz (Kazakhstan) (Tengiz Expansion Project, Advance Commitment #7) | 2016 | EMC 003150586 | Investment | | |
| 9 | XTO Assets (2016 Corporate Plan) | 2016 | PNYAG0335024 | Corporate Planning | | |
| 10 | Kearl (Economic Model - CP16 RVP) | 2016 | IMO_00007662 | Corporate Planning | | |

App. 528

Case 3:16-cv-03111-K    Document 121    Filed 07/31/20    Page 534 of 544    PageID 4786

# Exhibit 10
## ExxonMobil Financial Models Considered

| No. | Project, Asset, or Investment[1] | Year | Bates Number | Type[2] | Original Source of GHG Emission Proxy Cost | Original % of Emissions to which Cost is Applied |
|---|---|---|---|---|---|---|
| **Models without Explicit GHG Emissions Proxy Costs in Net Cash Flows** | | | | | | |
| 1 | Baytown (Chemical Plant Metallocene Polyalphaolefin (MPAO)) | 2011 | EMC 004322518 | Investment | | |
| 2 | Baton Rouge (Sulfur Capacity Expansion) | 2014 | EMC 004046578 | Investment | | |
| 3 | Baton Rouge (Sulfur Capacity Expansion) | 2014 | EMC 004046579 | Investment | | |
| 4 | Beaumont (Refinery Crude Unit A Flexibility/Energy Conservation) | 2015 | EMC 004322517 | Investment | | |
| 5 | Cepu (Banyu Urip) | 2011 | EMC 004046558 | Investment | | |
| 6 | Hebron (Hebron Project) | 2012 | EMC 004046567 | Investment | | |
| 7 | Horn River (Horn River Pilot) | 2011 | EMC 004046559 | Investment | | |
| 8 | Julia | 2013 | EMC 004046569 | Investment | | |
| 9 | Kearl (Debottleneck) (Advance Commitment 1) | 2014 | EMC 003697670 | Investment | | |
| 10 | Point Thomson (Point Thomson Initial Production System) | 2012 | EMC 004046576 | Investment | | |
| 11 | Rotterdam (Hydrogen Supply) | 2010 | EMC 002679001 | Investment | | |
| 12 | Sakhalin (Arkutun-Dagi Field Development) | 2010 | EMC 004046555 | Investment | | |
| 13 | Sakhalin (Chayvo Production Facility Expansion) | 2010 | EMC 004046556 | Investment | | |
| 14 | Sakhalin (Odoptu Stage 2) | 2014 | EMC 004046563 | Investment | | |
| 15 | Syncrude (Mildred Lake Mine Replacement) | 2012 | EMC 004046562 | Investment | | |
| 16 | Syncrude (Syncrude Aurora North Mine Relocation) | 2012 | EMC 004046577 | Investment | | |
| 17 | Tapis (Tapis Enhanced Oil Recovery and Rejuvenation) | 2011 | EMC 004046580 | Investment | | |
| 18 | XTO Assets (2015 Corporate Plan) | 2015 | PNYAG0343042 | Corporate Planning | | |
| | **Total Number of Models Received** | | 72 | | | |
| | **Total Number of Models Included in Sample** | | 27 | | | |

**Notes:**

[1] Table excludes four impairment models received from counsel, as well as three models received from counsel that are earlier versions of other models in this table.

[2] Inferred based on information provided by ExxonMobil. Models are classified as "investment" if they are labeled as "full funding" or "advance commitment" models by ExxonMobil. See sources [1–3].

[3] Models cannot be classified as "investment," "corporate planning," "input," or "economic model validation," based on ExxonMobil documentation or information from the models themselves. However, ExxonMobil documentation and information from the models indicate that these models are involved in reserves assessments. See source [1].

[4] Models make minor adjustments to Dataguide-specified schedules for certain years at the start or end of the applied cost schedules.

[5] Models cite June 2015 information from the Corporate Safety, Security, Health, and Environment (SSHE) department as the source of their cost schedule. See source [6].

[6] Models have GHG Emissions Proxy Costs applied in full, but only on emissions above a certain threshold.

**Sources:**

[1] Defendant's Responses and Objections to the Attorney General's Contention Interrogatories, *People of the State of New York v. Exxon Mobil Corporation* , Index No. 452044/2018, May 1, 2019, Appendix

[2] Exxon Mobil Corporation's Responses and Objections to the Attorney General's Interrogatories, *People of the State of New York v. Exxon Mobil Corporation* , Index No. 451962/2016, October 1, 2018.

[3] Letter from Justin Anderson to Kevin Wallace, *Re: People of the State of New York v. Exxon Mobil Corporation* , Index No. 452044/2018, April 12, 2019, Appendix A.

[4] Letter from Nora Ahmed to Manisha Sheth and Jonathan Zweig, *Re: New York State Attorney General Subpoena Directed to Exxon Mobil Corporation* , September 28, 2018.

[5] Letter from Nora Ahmed to John Oleske and Katherine Milgram, *Re: New York State Attorney General Subpoena Directed to Exxon Mobil Corporation* , July 9, 2018.

[6] Deposition of Dan Hoy *(Imperial Oil Project Manager, 2005-2018)* , April 25, 2019, p. 73.

[7] EMC 001621806, Internal ExxonMobil spreadsheets and charts on certain Alberta assets.

[8] EMC 003680301, 2016 Strategic Framing Discussion, February 8, 2016, p. 23.

[9] EMC 003697671, Internal ExxonMobil Email from Lucie Cornish, August 15, 2014.

[10] EMC 001594743, ExxonMobil Corporate Plan Dataguide for 2008 - Revision 2, Appendices, September 24, 2008.

[11] EMC 001596274, ExxonMobil Corporate Plan Dataguide for 2009 - Revision 1, Appendices, July 8, 2009.

[12] EMC 001598610, ExxonMobil Corporate Plan Dataguide for 2010 - Revision 2, Appendices, October 18, 2010, p. 37.

[13] EMC 001613011, ExxonMobil Corporate Plan Dataguide for 2012 - Revision 1b, Appendices, September 5, 2012, p. 34.

[14] EMC 001764946, ExxonMobil Corporate Plan Dataguide for 2013 - Revision 3, Appendices, December 30, 2013, pp. 31–32.

[15] EMC 001608351, ExxonMobil Corporate Plan Dataguide for 2014 - Revision 3, Appendices, December 30, 2014, pp. 31–32.

## Exhibit 11
## Cash Flow Analysis of ExxonMobil Projects
## GHG Emission Proxy Cost Adjustment

| Project, Asset, or Investment[1] | Year | Type[2] | Original Model | | | Updated Cost Schedule[4] | | | Difference Between Original and Updated Model | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | UCF ($mm USD) | NPV ($mm USD) | IRR (%) | UCF ($mm USD) | NPV ($mm USD) | IRR (%) | UCF ($mm USD) | NPV ($mm USD) | UCF (%) | NPV (%) | IRR (%) |
| Antwerp (Europe Residual Upgrade) | 2014 | Investment | $6,841 | $1,212 | 17.3% | $6,801 | $1,200 | 17.2% | ($40) | ($11) | -0.6% | -0.9% | -0.1% |
| Aspen (Advance Commitment 2) | 2014 | Investment | $9,444 | $497 | 15.6% | $8,639 | $403 | 15.0% | ($804) | ($94) | -8.5% | -18.9% | -0.6% |
| Aspen (Reserves) | 2015 | Other[3] | $16,273 | $1,545 | 23.1% | $16,060 | $1,526 | 23.0% | ($214) | ($19) | -1.3% | -1.2% | -0.1% |
| Beaumont (SCANfiner) | 2014 | Investment | $2,877 | $275 | 23.8% | $2,872 | $274 | 23.7% | ($5) | ($2) | -0.2% | -0.6% | -0.1% |
| Clarke Creek (Phase 1) | 2014 | Corporate Planning | $8,595 | ($26) | 11.4% | $7,228 | ($71) | 10.3% | ($1,368) | ($45) | -15.9% | -171.9% | -1.1% |
| Clarke Creek (Phase 2) | 2014 | Corporate Planning | $9,419 | $122 | 18.0% | $8,057 | $90 | 16.7% | ($1,363) | ($32) | -14.5% | -26.3% | -1.4% |
| Clarke Creek (Phase 3) | 2014 | Corporate Planning | $9,619 | $111 | 18.0% | $8,193 | $80 | 16.6% | ($1,427) | ($31) | -14.8% | -27.6% | -1.4% |
| Clyden (Phase 1) | 2014 | Corporate Planning | $9,679 | $63 | 13.1% | $8,522 | $15 | 12.3% | ($1,157) | ($48) | -12.0% | -76.4% | -0.8% |
| Clyden (Phase 2) | 2014 | Corporate Planning | $9,864 | $196 | 16.9% | $8,751 | $154 | 16.0% | ($1,113) | ($42) | -11.3% | -21.5% | -0.9% |
| Clyden (Phase 3) | 2014 | Corporate Planning | $10,092 | $180 | 16.9% | $8,919 | $140 | 16.0% | ($1,174) | ($41) | -11.6% | -22.5% | -0.9% |
| Cold Lake (Nabiye) | 2012 | Investment | $2,928 | ($177) | 10.2% | $2,322 | ($229) | 9.5% | ($606) | ($52) | -20.7% | -29.4% | -0.7% |
| Corner (Phase 1) | 2014 | Corporate Planning | $9,036 | $83 | 13.1% | $8,068 | $30 | 12.4% | ($968) | ($53) | -10.7% | -63.8% | -0.7% |
| Corner (Phase 2) | 2014 | Corporate Planning | $9,426 | $232 | 16.8% | $8,433 | $187 | 16.0% | ($994) | ($46) | -10.5% | -19.8% | -0.8% |
| Corner (Phase 3) | 2014 | Corporate Planning | $9,643 | $214 | 16.9% | $8,591 | $170 | 16.0% | ($1,053) | ($44) | -10.9% | -20.6% | -0.9% |
| Firebag | 2014 | Corporate Planning | $136,504 | ($2,199) | 8.7% | $129,372 | ($2,419) | 8.3% | ($7,132) | ($220) | -5.2% | -10.0% | -0.4% |
| Grand Rapids (2014 Corporate Plan) | 2014 | Corporate Planning | $1,541 | ($60) | 10.3% | $1,399 | ($77) | 9.7% | ($142) | ($17) | -9.2% | -28.3% | -0.5% |
| Grand Rapids (Phase 1) | 2014 | Corporate Planning | $7,833 | ($51) | 11.3% | $6,822 | ($106) | 10.6% | ($1,011) | ($54) | -12.9% | -105.8% | -0.8% |
| Grand Rapids (Phase 2) | 2014 | Corporate Planning | $8,452 | $119 | 14.1% | $7,384 | $67 | 13.2% | ($1,069) | ($52) | -12.6% | -43.9% | -0.9% |
| Kearl (2013 P&B) | 2013 | Corporate Planning | $104,904 | ($17,769) | 7.2% | $100,843 | ($18,005) | 7.1% | ($4,061) | ($236) | -3.9% | -1.3% | -0.1% |
| Kearl (De-Oxygenation) | 2015 | Investment | $109,566 | ($23,615) | 6.7% | $104,207 | ($24,080) | 6.6% | ($5,359) | ($465) | -4.9% | -2.0% | -0.1% |
| Kearl (Economic Model - CP15 FA October - CAF Reserves, YEO update, 255 in 2025) | 2015 | Other[3] | $63,153 | ($26,495) | 4.7% | $61,803 | ($26,600) | 4.7% | ($1,350) | ($105) | -2.1% | -0.4% | -0.1% |
| Kearl (Economic Model Validation) | 2013 | Economic Model Validation | $110,966 | ($16,556) | 7.6% | $106,400 | ($16,946) | 7.4% | ($4,566) | ($390) | -4.1% | -2.4% | -0.1% |
| Kearl (Initial Development Cogeneration) | 2013 | Investment | $122,874 | ($8,565) | 9.2% | $122,075 | ($8,623) | 9.2% | ($799) | ($58) | -0.7% | -0.7% | 0.0% |
| Kearl (Initial Development, Expansion Project, and Plant Debottleneck) | 2015 | Corporate Planning | $94,290 | ($26,508) | 5.5% | $92,513 | ($26,618) | 5.4% | ($1,777) | ($110) | -1.9% | -0.4% | -0.1% |
| Kearl (Phase 2 Expansion) | 2012 | Investment | $65,563 | ($13,286) | 5.8% | $62,017 | ($13,460) | 5.7% | ($3,546) | ($175) | -5.4% | -1.3% | -0.2% |
| Muskeg | 2014 | Corporate Planning | $9,096 | $86 | 15.2% | $7,734 | $50 | 14.0% | ($1,363) | ($36) | -15.0% | -41.8% | -1.3% |
| Rotterdam (Refinery Advanced Hydrocracker) | 2015 | Investment | $11,472 | $1,357 | 22.5% | $11,423 | $1,349 | 22.4% | ($49) | ($8) | -0.4% | -0.6% | -0.1% |
| **Total / Average** | | | **$969,953** | **($129,015)** | **13.3%** | **$925,445** | **($131,500)** | **12.8%** | **($44,508)** | **($2,485)** | **-4.6%** | **-1.9%** | **-0.6%** |

**App. 530**

## Exhibit 11
## Cash Flow Analysis of ExxonMobil Projects
## GHG Emission Proxy Cost Adjustment

**Notes:**

[1] Includes projects that were created before 2016 and that contain a GHG Emission Proxy Cost in projected cash flows.

[2] Inferred based on information provided by ExxonMobil. Models are classified as "investment" if they are labeled as "full funding" or "advance commitment" models by ExxonMobil. *See* Sources [1–3]

[3] Models cannot be classified as "investment," "corporate planning," "input," or "economic model validation," based on ExxonMobil documentation or information from the models themselves. However, ExxonMobil documentation and information from the models indicate that these models are involved in reserves assessments. *See* Source [1].

[4] Updated GHG Emission Proxy Cost basis is taken from external Energy Outlook schedules a year prior to the model year.

**Sources:**

[1] Exxon Mobil Corporation's Responses and Objections to the Attorney General's Contention Interrogatories, *People of the State of New York v. Exxon Mobil Corporation* , Index No. 452044/2018, May 1, 2019, Appendix

[2] Exxon Mobil Corporation's Responses and Objections to the Attorney General's Interrogatories, *People of the State of New York v. Exxon Mobil Corporation* , Index No. 451962/2016, October 1, 2018.

[3] Letter from Justin Anderson to Kevin Wallace, *Re: People of the State of New York v. Exxon Mobil Corporation* , Index No. 452044/2018, April 12, 2019, Appendix A.

[4] Letter from Nora Ahmed to Manisha Sheth and Jonathan Zweig, *Re: New York State Attorney General Subpoena Directed to Exxon Mobil Corporation* , September 28, 2018.

[5] Letter from Nora Ahmed to John Oleske and Katherine Milgram, *Re: New York State Attorney General Subpoena Directed to Exxon Mobil Corporation* , July 9, 2018.

[6] EMC 001621806, Internal ExxonMobil spreadsheets and charts on certain Alberta assets.

[7] EMC 003680301, 2016 Strategic Framing Discussion, February 8, 2016, p. 23.

[8] EMC 003697671, Internal ExxonMobil Email from Lucie Cornish, August 15, 2014.

[9] *See* Exhibit VI.2 for a list of each model's Bates number.

**App. 531**

## Exhibit 12
## Cash Flow Analysis of ExxonMobil Projects
## GHG Emission Proxy Cost and Percentage Emissions Adjustment

| Project, Asset, or Investment[1] | Year | Type[2] | Original Model | | | Updated Costs and Emissions[4] | | | Difference Between Original and Updated Model | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | UCF ($mm USD) | NPV ($mm USD) | IRR (%) | UCF ($mm USD) | NPV ($mm USD) | IRR (%) | UCF ($mm USD) | NPV ($mm USD) | UCF (%) | NPV (%) | IRR (%) |
| Antwerp (Europe Residual Upgrade) | 2014 | Investment | $6,841 | $1,212 | 17.3% | $6,591 | $1,143 | 16.9% | ($250) | ($69) | -3.7% | -5.7% | -0.3% |
| Aspen (Advance Commitment 2) | 2014 | Investment | $9,444 | $497 | 15.6% | $8,639 | $403 | 15.0% | ($804) | ($94) | -8.5% | -18.9% | -0.6% |
| Aspen (Reserves) | 2015 | Other[3] | $16,273 | $1,545 | 23.1% | $14,761 | $1,386 | 22.2% | ($1,512) | ($159) | -9.3% | -10.3% | -0.8% |
| Beaumont (SCANfiner) | 2014 | Investment | $2,877 | $275 | 23.8% | $2,872 | $274 | 23.7% | ($5) | ($2) | -0.2% | -0.6% | -0.1% |
| Clarke Creek (Phase 1) | 2014 | Corporate Planning | $8,595 | ($26) | 11.4% | $7,228 | ($71) | 10.3% | ($1,368) | ($45) | -15.9% | -171.9% | -1.1% |
| Clarke Creek (Phase 2) | 2014 | Corporate Planning | $9,419 | $122 | 18.0% | $8,057 | $90 | 16.7% | ($1,363) | ($32) | -14.5% | -26.3% | -1.4% |
| Clarke Creek (Phase 3) | 2014 | Corporate Planning | $9,619 | $111 | 18.0% | $8,193 | $80 | 16.6% | ($1,427) | ($31) | -14.8% | -27.6% | -1.4% |
| Clyden (Phase 1) | 2014 | Corporate Planning | $9,679 | $63 | 13.1% | $8,522 | $15 | 12.3% | ($1,157) | ($48) | -12.0% | -76.4% | -0.8% |
| Clyden (Phase 2) | 2014 | Corporate Planning | $9,864 | $196 | 16.9% | $8,751 | $154 | 16.0% | ($1,113) | ($42) | -11.3% | -21.5% | -0.9% |
| Clyden (Phase 3) | 2014 | Corporate Planning | $10,092 | $180 | 16.9% | $8,919 | $140 | 16.0% | ($1,174) | ($41) | -11.6% | -22.5% | -0.9% |
| Cold Lake (Nabiye) | 2012 | Investment | $2,928 | ($177) | 10.2% | $2,322 | ($229) | 9.5% | ($606) | ($52) | -20.7% | -29.4% | -0.7% |
| Corner (Phase 1) | 2014 | Corporate Planning | $9,036 | $83 | 13.1% | $8,068 | $30 | 12.4% | ($968) | ($53) | -10.7% | -63.8% | -0.7% |
| Corner (Phase 2) | 2014 | Corporate Planning | $9,426 | $232 | 16.8% | $8,433 | $187 | 16.0% | ($994) | ($46) | -10.5% | -19.8% | -0.8% |
| Corner (Phase 3) | 2014 | Corporate Planning | $9,643 | $214 | 16.9% | $8,591 | $170 | 16.0% | ($1,053) | ($44) | -10.9% | -20.6% | -0.9% |
| Firebag | 2014 | Corporate Planning | $136,504 | ($2,199) | 8.7% | $129,372 | ($2,419) | 8.3% | ($7,132) | ($220) | -5.2% | -10.0% | -0.4% |
| Grand Rapids (2014 Corporate Plan) | 2014 | Corporate Planning | $1,541 | ($60) | 10.3% | $1,399 | ($77) | 9.7% | ($142) | ($17) | -9.2% | -28.3% | -0.5% |
| Grand Rapids (Phase 1) | 2014 | Corporate Planning | $7,833 | ($51) | 11.3% | $6,822 | ($106) | 10.6% | ($1,011) | ($54) | -12.9% | -105.8% | -0.8% |
| Grand Rapids (Phase 2) | 2014 | Corporate Planning | $8,452 | $119 | 14.1% | $7,384 | $67 | 13.2% | ($1,069) | ($52) | -12.6% | -43.9% | -0.9% |
| Kearl (2013 P&B) | 2013 | Corporate Planning | $104,904 | ($17,769) | 7.2% | $100,843 | ($18,005) | 7.1% | ($4,061) | ($236) | -3.9% | -1.3% | -0.1% |
| Kearl (De-Oxygenation) | 2015 | Investment | $109,566 | ($23,615) | 6.7% | $104,207 | ($24,080) | 6.6% | ($5,359) | ($465) | -4.9% | -2.0% | -0.1% |
| Kearl (Economic Model - CP15 FA October - CAF Reserves, YEO update, 255 in 2025) | 2015 | Other[3] | $63,153 | ($26,495) | 4.7% | $54,696 | ($27,390) | 4.3% | ($8,457) | ($895) | -13.4% | -3.4% | -0.5% |
| Kearl (Economic Model Validation) | 2013 | Economic Model Validation | $110,966 | ($16,556) | 7.6% | $106,400 | ($16,946) | 7.4% | ($4,566) | ($390) | -4.1% | -2.4% | -0.1% |
| Kearl (Initial Development Cogeneration) | 2013 | Investment | $122,874 | ($8,565) | 9.2% | $114,698 | ($9,332) | 8.9% | ($8,177) | ($767) | -6.7% | -9.0% | -0.3% |
| Kearl (Initial Development, Expansion Project, and Plant Debottleneck) | 2015 | Corporate Planning | $94,290 | ($26,508) | 5.5% | $82,765 | ($27,423) | 5.1% | ($11,525) | ($915) | -12.2% | -3.5% | -0.4% |
| Kearl (Phase 2 Expansion) | 2012 | Investment | $65,563 | ($13,286) | 5.8% | $62,017 | ($13,460) | 5.7% | ($3,546) | ($175) | -5.4% | -1.3% | -0.2% |
| Muskeg | 2014 | Corporate Planning | $9,096 | $86 | 15.2% | $7,734 | $50 | 14.0% | ($1,363) | ($36) | -15.0% | -41.8% | -1.3% |
| Rotterdam (Refinery Advanced Hydrocracker) | 2015 | Investment | $11,472 | $1,357 | 22.5% | $11,423 | $1,349 | 22.4% | ($49) | ($8) | -0.4% | -0.6% | -0.1% |
| **Total / Average** | | | **$969,953** | **($129,015)** | **13.3%** | **$899,704** | **($134,002)** | **12.7%** | **($70,249)** | **($4,987)** | **-7.2%** | **-3.9%** | **-0.6%** |

**App. 532**

## Exhibit 12
## Cash Flow Analysis of ExxonMobil Projects
## GHG Emission Proxy Cost and Percentage Emissions Adjustment

**Notes:**

[1] Includes projects that were created before 2016 and that contain a GHG Emission Proxy Cost in projected cash flows.

[2] Inferred based on information provided by ExxonMobil. Models are classified as "investment" if they are labeled as "full funding" or "advance commitment" models by ExxonMobil. *See* Sources [1–3]

[3] Models cannot be classified as "investment," "corporate planning," "input," or "economic model validation," based on ExxonMobil documentation or information from the models themselves. However, ExxonMobil documentation and information from the models indicate that these models are involved in reserves assessments. *See* Source [1].

[4] Updated GHG Emission Proxy Cost basis is taken from external Energy Outlook schedules a year prior to the model year.

**Sources:**

[1] Exxon Mobil Corporation's Responses and Objections to the Attorney General's Contention Interrogatories, *People of the State of New York v. Exxon Mobil Corporation* , Index No. 452044/2018, May 1, 2019, Appendix

[2] Exxon Mobil Corporation's Responses and Objections to the Attorney General's Interrogatories, *People of the State of New York v. Exxon Mobil Corporation* , Index No. 451962/2016, October 1, 2018.

[3] Letter from Justin Anderson to Kevin Wallace, *Re: People of the State of New York v. Exxon Mobil Corporation* , Index No. 452044/2018, April 12, 2019, Appendix A.

[4] Letter from Nora Ahmed to Manisha Sheth and Jonathan Zweig, *Re: New York State Attorney General Subpoena Directed to Exxon Mobil Corporation* , September 28, 2018.

[5] Letter from Nora Ahmed to John Oleske and Katherine Milgram, *Re: New York State Attorney General Subpoena Directed to Exxon Mobil Corporation* , July 9, 2018.

[6] EMC 001621806, Internal ExxonMobil spreadsheets and charts on certain Alberta assets.

[7] EMC 003680301, 2016 Strategic Framing Discussion, February 8, 2016, p. 23.

[8] EMC 003697671, Internal ExxonMobil Email from Lucie Cornish, August 15, 2014.

[9] *See* Exhibit VI.2 for a list of each model's Bates number.

**App. 533**

# Exhibit 13
## Cash Flow Analysis of ExxonMobil Investment Projects
## GHG Emission Proxy Cost Adjustment

| Project, Asset, or Investment[1] | Year | Type[2] | Original Model | | | Updated Cost Schedule[3] | | | Difference Between Original and Updated Model | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | UCF ($mm USD) | NPV ($mm USD) | IRR (%) | UCF ($mm USD) | NPV ($mm USD) | IRR (%) | UCF ($mm USD) | NPV ($mm USD) | UCF (%) | NPV (%) | IRR (%) |
| Antwerp (Europe Residual Upgrade) | 2014 | Investment | $6,841 | $1,212 | 17.3% | $6,801 | $1,200 | 17.2% | ($40) | ($11) | -0.6% | -0.9% | -0.1% |
| Aspen (Advance Commitment 2) | 2014 | Investment | $9,444 | $497 | 15.6% | $8,639 | $403 | 15.0% | ($804) | ($94) | -8.5% | -18.9% | -0.6% |
| Beaumont (SCANfiner) | 2014 | Investment | $2,877 | $275 | 23.8% | $2,872 | $274 | 23.7% | ($5) | ($2) | -0.2% | -0.6% | -0.1% |
| Cold Lake (Nabiye) | 2012 | Investment | $2,928 | ($177) | 10.2% | $2,322 | ($229) | 9.5% | ($606) | ($52) | -20.7% | -29.4% | -0.7% |
| Kearl (De-Oxygenation) | 2015 | Investment | $109,566 | ($23,615) | 6.7% | $104,207 | ($24,080) | 6.6% | ($5,359) | ($465) | -4.9% | -2.0% | -0.1% |
| Kearl (Initial Development Cogeneration) | 2013 | Investment | $122,874 | ($8,565) | 9.2% | $122,075 | ($8,623) | 9.2% | ($799) | ($58) | -0.7% | -0.7% | 0.0% |
| Kearl (Phase 2 Expansion) | 2012 | Investment | $65,563 | ($13,286) | 5.8% | $62,017 | ($13,460) | 5.7% | ($3,546) | ($175) | -5.4% | -1.3% | -0.2% |
| Rotterdam (Refinery Advanced Hydrocracker) | 2015 | Investment | $11,472 | $1,357 | 22.5% | $11,423 | $1,349 | 22.4% | ($49) | ($8) | -0.4% | -0.6% | -0.1% |
| **Total / Average** | | | **$331,565** | **($42,301)** | **13.9%** | **$320,357** | **($43,166)** | **13.6%** | **($11,208)** | **($864)** | **-3.4%** | **-2.0%** | **-0.2%** |

**Notes:**

[1] Includes projects that were created before 2016 and that contain a GHG Emission Proxy Cost in projected cash flows.

[2] Inferred based on information provided by ExxonMobil. Models are classified as "investment" if they are labeled as "full funding" or "advance commitment" models by ExxonMobil. *See* Sources [1–3]

[3] Updated GHG Emission Proxy Cost basis is taken from external Energy Outlook schedules a year prior to the model year.

**Source:**

[1] *See* Exhibit VI.3.

App. 534

FILED: NEW YORK COUNTY CLERK 10/04/2019 11:06 PM
INDEX NO. 452044/2018

NYSCEF DOC. NO. 355          Case 3:16-cv-03111-K    Document 121    Filed 07/31/20    Page 540 of 544    PageID 4792          RECEIVED NYSCEF: 10/04/2019

## Exhibit 14
## Cash Flow Analysis of ExxonMobil Investment Projects
## GHG Emission Proxy Cost and Percentage Emissions Adjustment

| Project, Asset, or Investment[1] | Year | Type[2] | Original Model | | | Updated Costs and Emissions[3] | | | Difference Between Original and Updated Model | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | UCF ($mm USD) | NPV ($mm USD) | IRR (%) | UCF ($mm USD) | NPV ($mm USD) | IRR (%) | UCF ($mm USD) | NPV ($mm USD) | UCF (%) | NPV (%) | IRR (%) |
| Antwerp (Europe Residual Upgrade) | 2014 | Investment | $6,841 | $1,212 | 17.3% | $6,591 | $1,143 | 16.9% | ($250) | ($69) | -3.7% | -5.7% | -0.3% |
| Aspen (Advance Commitment 2) | 2014 | Investment | $9,444 | $497 | 15.6% | $8,639 | $403 | 15.0% | ($804) | ($94) | -8.5% | -18.9% | -0.6% |
| Beaumont (SCANfiner) | 2014 | Investment | $2,877 | $275 | 23.8% | $2,872 | $274 | 23.7% | ($5) | ($2) | -0.2% | -0.6% | -0.1% |
| Cold Lake (Nabiye) | 2012 | Investment | $2,928 | ($177) | 10.2% | $2,322 | ($229) | 9.5% | ($606) | ($52) | -20.7% | -29.4% | -0.7% |
| Kearl (De-Oxygenation) | 2015 | Investment | $109,566 | ($23,615) | 6.7% | $104,207 | ($24,080) | 6.6% | ($5,359) | ($465) | -4.9% | -2.0% | -0.1% |
| Kearl (Initial Development Cogeneration) | 2013 | Investment | $122,874 | ($8,565) | 9.2% | $114,698 | ($9,332) | 8.9% | ($8,177) | ($767) | -6.7% | -9.0% | -0.3% |
| Kearl (Phase 2 Expansion) | 2012 | Investment | $65,563 | ($13,286) | 5.8% | $62,017 | ($13,460) | 5.7% | ($3,546) | ($175) | -5.4% | -1.3% | -0.2% |
| Rotterdam (Refinery Advanced Hydrocracker) | 2015 | Investment | $11,472 | $1,357 | 22.5% | $11,423 | $1,349 | 22.4% | ($49) | ($8) | -0.4% | -0.6% | -0.1% |
| **Total / Average** | | | **$331,565** | **($42,301)** | **13.9%** | **$312,769** | **($43,932)** | **13.6%** | **($18,796)** | **($1,631)** | **-5.7%** | **-3.9%** | **-0.3%** |

**Notes:**

[1] Includes projects that were created before 2016 and that contain a GHG Emission Proxy Cost in projected cash flows.

[2] Inferred based on information provided by ExxonMobil. Models are classified as "investment" if they are labeled as "full funding" or "advance commitment" models by ExxonMobil. *See* Sources [1–3]

[3] Updated GHG Emission Proxy Cost basis is taken from external Energy Outlook schedules a year prior to the model year.

**Source:**

[1] *See* Exhibit VI.4.

40/ 41

**App. 535**

**Exhibit 15**
**ExxonMobil Quarterly Institutional Holdings**
**April 1, 2014 to June 2, 2017**

| Reporting Period | Shares Outstanding | Total Institutional Holdings |
|---|---|---|
| Q1 2014 | 4,361,669,417 | 2,220,289,038 |
| Q2 2014 | 4,333,273,520 | 2,203,241,243 |
| Q3 2014 | 4,288,139,742 | 2,183,157,673 |
| Q4 2014 | 4,261,070,316 | 2,153,407,559 |
| Q1 2015 | 4,223,192,807 | 2,127,202,631 |
| Q2 2015 | 4,206,481,567 | 2,108,204,129 |
| Q3 2015 | 4,223,164,229 | 2,130,599,109 |
| Q4 2015 | 4,202,291,931 | 2,141,240,578 |
| Q1 2016 | 4,185,445,540 | 2,140,324,809 |
| Q2 2016 | 4,182,895,478 | 2,172,679,815 |
| Q3 2016 | 4,193,763,973 | 2,199,858,376 |
| Q4 2016 | 4,179,692,295 | 2,219,482,360 |
| Q1 2017 | 4,168,605,051 | 2,245,889,822 |
| Q2 2017 | 4,268,985,084 | 2,249,342,863 |
| Q3 2017 | 4,271,995,217 | 2,270,648,488 |

**Notes:**

[1] Total Institutional Holdings are the total institutional holdings of
ExxonMobil shares reported by Thomson One.  Due to data limitations, this
total is not exactly equal to the sum of all individual firm holdings of
ExxonMobil shares reported by Thomson One.

[2] Shares Outstanding is net of insider holdings, and includes short interest.

**Sources:**

[1] Thomson One.
[2] Bloomberg L.P.

41/ 41

**App. 536**

# Exhibit B

**Plaintiff's Reliance on NYAG's Allegations**

| Topic | Amended Complaint |
|---|---|
| Specific references to the Oleske Affirmation or its exhibits (28 paragraphs) | 7, 137, 138, 139, 140, 141, 142, 143, 144, 145, 147, 191, 192, 243, 244, 245, 250, 254, 259, 261, 264, 284, 361, 371, 389, 399, 404, 405 |
| Proxy costs and GHG costs (98 paragraphs) | 5, 6, 7, 8, 9, 128, 129, 130, 131, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 145, 147, 175, 176, 177, 185, 191, 192, 193, 194, 201, 239, 246, 247, 248, 249, 250, 251, 252, 253, 254, 257, 258, 259, 260, 261, 262, 263, 264, 265, 266, 267, 268, 269, 281, 282, 283, 284, 285, 286, 293, 294, 295, 296, 297, 302, 303, 304, 305, 306, 309, 310, 313, 314, 315, 316, 317, 318, 354, 355, 356, 357, 359, 360, 361, 362, 363, 364, 365, 371, 372, 377, 385, 386, 399, 421 |
| Application of proxy and GHG costs in the asset valuation process (45 paragraphs) | 7, 8, 128, 129, 130, 138, 147, 201, 239, 246, 247, 251, 252, 253, 254, 257, 258, 259, 260, 261, 262, 263, 264, 265, 266, 267, 283, 284, 293, 294, 304, 305, 306, 318, 354, 356, 357, 358, 359, 361, 363, 377, 385, 388, 421 |
| Oil sands projects in Canada (49 paragraphs) | 8, 128, 129, 130, 131, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 248, 249, 250, 253, 254, 268, 269, 283, 284, 285, 286, 293, 294, 304, 305, 306, 309, 310, 354, 355, 356, 357, 358, 359, 360, 361, 362, 363, 364, 365, 421 |
| De-booking of proved reserves at the Kearl project (48 paragraphs) | 14, 20, 22, 23, 169, 175, 176, 177, 178, 179, 180, 181, 182, 183, 184, 228, 229, 230, 234, 238, 247, 276, 280, 286, 292, 301, 310, 318, 347, 348, 349, 350, 351, 352, 360, 421, 437, 438, 439, 440, 441, 442, 447, 448, 449, 450, 451, 452 |
| The purported need to impair RMDG assets (106 paragraphs) | 14, 15, 16, 17, 19, 22, 80, 90, 124, 125, 126, 127, 138, 145, 147, 148, 149, 150, 151, 152, 153, 154, 155, 156, 157, 158, 159, 160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 185, 186, 187, 188, 189, 190, 191, 192, 193, 194, 201, 215, 247, 248, 249, 250, 251, 252, 253, |

**App.538**

| Topic | Amended Complaint |
|-------|-------------------|
|       | 254, 270, 271, 272, 273, 274, 275, 276, 277, 278, 279, 280, 281, 282, 283, 284, 289, 290, 291, 292, 293, 294, 298, 299, 300, 301, 305, 306, 307, 308, 311, 312, 313, 314, 316, 317, 318, 366, 367, 368, 369, 370, 371, 372, 373, 374, 375, 376, 421, 424 |