IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |
|---|---|
| PEDRO RAMIREZ, JR., Individually and on Behalf of All Others Similarly Situated,<br><br>             Plaintiff,<br><br>             v.<br><br>EXXON MOBIL CORPORATION, REX W. TILLERSON, ANDREW P. SWIGER, JEFFREY J. WOODBURY, and DAVID S. ROSENTHAL,<br><br>             Defendants. | Case No. 3:16-cv-3111-K |

**DEFENDANTS' SUPPLEMENTAL SUBMISSION
REGARDING ASSET IMPAIRMENT QUESTION RAISED BY THE COURT**

At the Court's request, Defendants Exxon Mobil Corporation ("ExxonMobil"), Rex W. Tillerson, Andrew P. Swiger, Jeffrey J. Woodbury, and David Rosenthal respectfully provide this supplemental submission to address a question the Court raised during the October 19, 2021 oral argument on Defendants' motion for reconsideration (ECF No. 122). During the oral argument, Defendants explained that Plaintiff's allegation that ExxonMobil should have recognized impairments to its Rocky Mountain dry gas assets as of year-end 2015 because certain competitors recognized impairments to their own assets at that time was not plausible because, among other reasons, the competitors were not comparable to ExxonMobil and used a different accounting methodology. (Hr'g Tr. at 97–99.) The Court then asked Defendants to supplement the record to provide more detail. (*Id.* at 99:1–5.)

*     *     *

As shown in Defendants' briefing and at oral argument, absent the discredited allegations Plaintiff borrowed from the New York Attorney General, Plaintiff's impairment-related claims rest largely on its allegation that ExxonMobil should have impaired its Rocky Mountain dry gas assets as of year-end 2015 because three supposed peer companies impaired other Rocky Mountain dry gas assets at that time.[1] (*See* ECF No. 139 at 5–6; Hr'g Tr. at 97–99.) As a matter of law, such allegations do not plausibly allege a violation of the securities laws.

**Comparisons to Actions of Supposed "Peer" Companies Are Insufficient to Plead a Material Misstatement or Omission.** Plaintiffs cannot plausibly plead a securities fraud claim for failure to impair corporate assets based on allegations that (i) purported competitors

---

[1] At oral argument, Plaintiff again conceded that its Rocky Mountain Dry Gas impairment claim "has some overlap with New York" because the Complaint alleges "[i]f you would have used those proxy costs [of carbon], that would have been another avenue to get to impairment." (Hr'g Tr. at 66:6–10; *see also id.* at 50:5–6 (admitting that "there's some overlap" with NYAG's allegations concerning proxy costs of carbon and GHG costs as to the impairment claim.)

contemporaneously impaired different assets or (ii) commodity prices were low. *In re Exxon Mobil Corp. Sec. Litig.*, 387 F. Supp. 2d 407, 426–27 (D.N.J. 2005), *aff'd*, 500 F.3d 189 (3d Cir. 2007). In *Exxon Mobil*, as here, the plaintiffs "claim[ed] that their expert . . . can demonstrate that Exxon had a duty to record [certain] impairments" because "the state of oil prices in 1998 and the actions of Exxon's competitors mandated such action." *Id.* The court dismissed this impairment claim as a matter of law, concluding that "[t]his Court cannot find that such allegations are sufficient to state a claim under the applicable pleading requirements." *Id.* The case for dismissal is even more compelling here because—although Plaintiff labels the three companies to which it attempts to compare ExxonMobil as "Peer Rocky Mountain Dry Gas Operators"—none was remotely a peer of ExxonMobil.[2]

**Two of the Three Supposed "Peer" Companies Used A Different Accounting Methodology Than ExxonMobil.** In the Complaint, Plaintiff identifies three purported "peer" companies that recognized year-end 2015 impairments to certain of their Rocky Mountain dry gas operations: (i) Ultra Petroleum Corp. ("Ultra Petroleum"); (ii) Vanguard Natural Resources, LLC ("Vanguard"); and Breitburn Energy Partners LP ("Breitburn"). (Compl. ¶ 163; App. 9.) Two of these supposed peer firms—Ultra Petroleum and Vanguard—did not use the same accounting methodology as ExxonMobil to conduct its impairment assessments. That difference alone

---

[2]   Besides these three companies, the Complaint does not identify any other alleged peer companies of ExxonMobil with Rocky Mountain dry gas assets that it claims recognized year-end 2015 impairments. At oral argument and in slide 15 of its October 19, 2021 presentation, Plaintiff, nonetheless attempted to muddy the waters by asserting that several large oil and gas companies also impaired assets in 2014 and 2015, namely Royal Dutch Shell plc; Total S.A.; BP plc; Eni SPA; Chevron Corp.; and ConocoPhillips. (App. 8.) But the Complaint itself admits that those impairments related primarily (if not exclusively) to those companies' respective *Canadian oil sands* assets, not Rocky Mountain dry *natural gas* assets. (ECF No. 36 ("Compl.") ¶¶ 157–162.) Notably, Plaintiff nowhere alleges that ExxonMobil should have impaired any of its Canadian oil sands assets, nor could it plausibly do so. Nor can Plaintiff plausibly allege ExxonMobil should have impaired its Rocky Mountain dry gas assets simply because other companies impaired different assets that produced a different commodity in a different region.

2

explains why those firms were required to recognize impairments as of year-end 2015, but ExxonMobil was not. As reflected in their SEC filings, Ultra Petroleum and Vanguard used "full cost" accounting, which is governed by SEC Regulation S-X 4-10. (App. 13; App. 22.) "Full cost" companies must conduct impairment assessments based on a "ceiling test." Under that test, Ultra Petroleum and Vanguard were required to use *actual* "end-of-period prices" in their impairment assessments. Charlotte J. Wright, *Fundamentals of Oil & Gas Accounting* 272 (6th ed. 2016). (App. 29.) Both companies recognized impairments for this reason. Vanguard recorded a "*ceiling test impairment* of oil and natural gas properties for the year ended December 31, 2015 of $1.8 billion *as a result of a decline in realized oil and natural gas prices*" that was directly "calculated based on 12-month average prices for oil and natural gas." (App. 14 (emphases added).) Similarly, Ultra Petroleum recorded a $3.1 billion impairment "*as a result of ceiling test limitations*." (App. 20, 22 (emphasis added).)

By contrast, ExxonMobil uses the "successful efforts" methodology. (App. 39.) Unlike the ceiling test, the successful efforts methodology does not use actual "end of period prices" for impairment assessments.[3] Instead, if companies using the successful efforts methodology first determine that an impairment trigger existed (Step 1), they are required by Accounting Standard Codification 360 to then use their own estimates and assumptions concerning *future* prices over the life of the relevant asset to assess impairment (Step 2).[4] *Fundamentals of Oil & Gas*

---

[3] The successful efforts approach is governed by Accounting Standard Codifications ("ASC") that are issued by the Financial Accounting Standards Board—the entity responsible for establishing and governing U.S. Generally Accepted Accounting Principles (i.e., GAAP accounting). Successful efforts companies follow ASC 360 in conducting impairment assessments.

[4] ASC 360 sets out a three-step impairment assessment. In Step 1, companies assess whether an "impairment trigger" has occurred. (App. 45–46 (ASC 360-10-35-21).) If so, companies proceed to Step 2 in which they test whether an asset's carrying value exceeds its projected future undiscounted cash flows. (App. 45 (ASC 360-10-35-17).) If Step 2 reveals the asset's carrying value exceeds its expected future undiscounted cash flows, companies must proceed to Step 3 where they estimate the

*Accounting* at 351–52.  (App. 32–33.)  Although ExxonMobil concluded at Step 1 that no trigger event occurred as of year-end 2015,[5] it nevertheless conducted an assessment similar to the one prescribed under Step 2 of ASC 360 in order to confirm that its assets were not impaired.  (App. 37.)  That further assessment, which reflected ExxonMobil's long-term price forecasts as required by ASC 360, revealed that "the future undiscounted cash flows associated with these assets substantially exceed[ed] the carrying value of the assets," confirming no impairment.  (*Id.*)  And ExxonMobil's independent auditor found that ExxonMobil's "long-term outlook on the pricing environment[] for both crude and gas," was "consistent with that of other third party price projections."  (App. 63–64.)

Because of the ceiling test's requirement to use actual, end-of-period prices, it is well-recognized among commentators (and Plaintiff's own expert, Charlotte Wright) that it "is more likely that a full cost accounting company will face impairment charges during periods when commodity prices are very low" than a successful efforts company.  *Pitfalls in Oil & Gas Accounting*, THE RATIONAL WALK (Sept. 11, 2012), *available at* https://www.rationalwalk.com/pitfalls-in-oil-gas-accounting/.  (App.114.)[6]  As an accounting textbook authored by plaintiff's expert explained, for companies that use full cost accounting, potentially huge impairments "depend in part on how fortunate a company is in relation to the

---

asset's fair value.  (*Id.*)  If the asset's fair market value is less than its carrying value, then companies must recognize an impairment charge.  (*Id.*)

[5]  Here, ExxonMobil concluded no trigger event had occurred under Step 1 of ASC 360 as of year-end 2015 because, as it publicly reported, it did "not view temporarily low prices or margins [in 2015] as a trigger event for conducting impairment tests."  (App. 39.)  ExxonMobil's year-end 2015 impairment assessment, including the underlying assumptions and conclusions, was reviewed by its independent auditor, PricewaterhouseCoopers, which did not take exception to ExxonMobil's conclusion that there was no impairment trigger for any major long-lived asset in 2015.  (App. 84, 94.)

[6]  Indeed, according to a study by Ernst & Young, a disproportionate amount of full cost companies recorded impairments in 2015:  "Full cost companies accounted for 74% of the total impairments reported in 2015 even though only 28% of the study companies follow full cost accounting."  (App. 120.)

4

timing of its period-end as compared to the current monetary oil price," which is "especially harsh for companies producing *predominantly natural gas*." *Fundamentals of Oil & Gas Accounting* at 272 (emphasis added). (App. 29.)

**The Three Supposed "Peer" Companies Were Not Financially Comparable to ExxonMobil.** Unlike ExxonMobil, none of the three supposed peer companies was positioned to survive *any* sustained decline in prices for natural gas. As of year-end 2015, the financial health of each of these supposed "peer" companies was in serious doubt. In its 2015 Form 10-K, Ultra Petroleum reported total assets of $0.97 billion and total liabilities in excess of $3.67 billion. (App. 23.) Vanguard reported total assets of $2.71 billion and total liabilities of approximately $2.80 billion. (App. 15.) And Breitburn reported total assets of $4.87 billion and total liabilities of $3.47 billion. (App. 126–127.) By contrast, ExxonMobil had total assets of $336.76 billion and total liabilities of $159.95 billion. (App. 38.) The financial disparity can be seen in the attached chart. (App. 129.)

All three of the supposed "peer" companies had credit ratings deemed "speculative," which meant they had limited ability to borrow to promote the health of their projects. Breitburn, Vanguard, and Ultra Petroleum all had credit ratings no higher than B+. (App. 131–132; App. 134–135; App. 137–138.) By contrast, as the Complaint acknowledges, ExxonMobil had maintained a strong investment-grade credit rating (AAA or AA+) for decades, including during the relevant 2014-2017 time period. (Compl. ¶ 18.)

Confirming these financial disparities between ExxonMobil and the three supposed "peer" firms, Ultra Petroleum, Breitburn, and Vanguard each filed voluntary bankruptcy petitions shortly after year-end 2015. Ultra Petroleum and affiliated debtors filed their petitions on April 29, 2016. (App. 140–158.) Approximately two weeks later, on May 15, 2016, Breitburn and affiliated

debtors filed their petitions.  (App. 160–174.)  And on February 1, 2017, Vanguard and affiliated debtors filed their petitions.  (App. 176–206.)  By contrast, ExxonMobil had positive shareholder equity at year-end 2015 of approximately $176.81 billion.  (App. 38.)

\*        \*        \*

Without NYAG's discredited allegations concerning proxy costs of carbon and GHG costs, Plaintiff's Rocky Mountain Dry Gas impairment claim is based solely on the alleged actions of other companies who impaired their own assets and the state of commodity prices at that time. Neither of these thin allegations suffices to plead a plausible misstatement or omission under the federal securities laws.  In particular, none of the three alleged "peer" companies to which Plaintiff points are remotely comparable to ExxonMobil.  Two of them follow an entirely different accounting methodology that requires use of actual *current* commodity prices, whereas ExxonMobil was required to use its own estimates of *future* prices.  Moreover, unlike ExxonMobil, none of the three companies was positioned to withstand *any* sustained decline in commodity prices.  For these reasons, and those previously advanced in its motion for reconsideration and at the October 19, 2021 oral argument, Defendants respectfully request that this Court grant their motion for reconsideration and dismiss the Complaint in its entirety.

6

Dated:  November 17, 2021

Respectfully submitted,


/s/ Daniel J. Kramer
Theodore V. Wells, Jr. (*pro hac vice*)
Daniel J. Kramer (*pro hac vice*)
Daniel J. Toal (*pro hac vice*)
Justin Anderson (*pro hac vice*)
Matthew D. Stachel (*pro hac vice*)
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
twells@paulweiss.com
dkramer@paulweiss.com
dtoal@paulweiss.com
janderson@paulweiss.com
mstachel@paulweiss.com

/s/ D. Patrick Long
D. Patrick Long
Texas State Bar No. 12515500
SQUIRE PATTON BOGGS
2000 McKinney Ave., Suite 1700
Dallas, TX 75201
Telephone: (214) 758-1505
Facsimile: (214) 758-1550
patrick.long@squirepb.com

*Counsel for Rex W. Tillerson*


/s/ Nina Cortell
Nina Cortell
Texas State Bar No. 04844500
HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700
Dallas, TX 75219
Telephone: (214) 651-5000
Facsimile: (214) 651-5940
nina.cortell@haynesboone.com

*Counsel for Exxon Mobil Corporation,*
*Andrew P. Swiger, Jeffrey J. Woodbury,*
*and David S. Rosenthal*

7

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been served by electronic CM/ECF filing, on this 17th day of November, 2021.

*/s/ Daniel J. Kramer*
Daniel J. Kramer