# EXHIBIT 3

10-K 1 d127875d10k.htm 10-K

**Table of Contents**

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549
# Form 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

    **For the fiscal year ended December 31, 2015**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

    **For the transition period from        to**

**Commission file number 001-33614**

# ULTRA PETROLEUM CORP.

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Yukon, Canada** | **N/A** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. employer identification number)* |
| **400 North Sam Houston Parkway East, Suite 1200, Houston, Texas** | **77060** |
| *(Address of principal executive offices)* | *(Zip code)* |

**(281) 876-0120**
*(Registrant's telephone number, including area code)*

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Shares, without par value | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    YES ☑    NO ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    YES ☐    NO ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    YES ☑    NO ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    YES ☑    NO ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (Section 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.    ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☑    Accelerated filer ☐    Non-accelerated filer ☐    Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).    YES ☐    NO ☑

# App. 18

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant was $1,918,659,990 as of June 30, 2015 (based on the last reported sales price of $12.52 of such stock on the New York Stock Exchange on such date).

The number of common shares, without par value, of Ultra Petroleum Corp., outstanding as of February 9, 2016 was 153,255,989.

Documents incorporated by reference: The definitive Proxy Statement for the 2016 Annual Meeting of Stockholders, which will be filed with the Securities and Exchange Commission within 120 days after December 31, 2015, is incorporated by reference in Part III of this Form 10-K.

**App. 19**

**Table of Contents**

Seeking bankruptcy court protection could have a material adverse effect on our business, financial condition, results of operations and liquidity. So long as a Chapter 11 proceeding continues, our senior management would be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing on our business operations. Bankruptcy court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of our business. In addition, during the period of time we are involved in a bankruptcy proceeding, our customers and suppliers might lose confidence in our ability to reorganize our business successfully and may seek to establish alternative commercial relationships.

Additionally, all of our indebtedness is senior to the existing common stock in our capital structure. As a result, we believe that seeking bankruptcy court protection under a Chapter 11 proceeding (or the Canadian equivalent) could cause the shares of our existing common stock to be canceled, result in a limited recovery, if any, for shareholders of our common stock, and would place shareholders of our common stock at significant risk of losing all of their investment in our shares.

***Our substantial indebtedness, liquidity issues and potential to seek restructuring transactions may have a material adverse effect on our business and operations.***

Our substantial indebtedness, liquidity issues and efforts to negotiate restructuring transactions may result in uncertainty about our business and cause, among other things:

- third parties to lose confidence in our ability to explore and produce oil and natural gas, resulting in a significant decline in our revenues, profitability and cash flow;

- difficulty retaining, attracting or replacing key employees;

- employees to be distracted from performance of their duties or more easily attracted to other career opportunities; and

- our suppliers, vendors, hedge counterparties and service providers to renegotiate the terms of our agreements, terminate their relationship with us or require financial assurances from us.

These events may have a material adverse effect on our business and operations.

***During 2015 we recorded a $3.1 billion non-cash write-down of the carrying value of our proved oil and gas properties as a result of ceiling test limitations. If oil and natural gas prices stay at current levels or decrease further, we may be required to record additional write-downs of the carrying value of our oil and gas properties in the future.***

We follow the full cost method of accounting for our oil and gas properties. A separate cost center is maintained for expenditures applicable to each country in which we conduct exploration and/or production activities. Under the full cost method, the net book value of properties on a country-by-country basis, less related deferred income taxes, may not exceed a calculated "ceiling." The ceiling is the estimated after tax future net revenues from proved oil and gas properties, discounted at 10% per year. Discounted future net revenues are estimated using oil and natural gas spot prices based on the average price during the preceding 12-month period determined as an un-weighted, arithmetic average of the first-day-of-the-month price for each month within such period, except for changes which are fixed and determinable by existing contracts. The net book value is compared to the ceiling on a quarterly basis. The excess, if any, of the net book value above the ceiling is required to be written off as an expense. Under SEC full cost accounting rules, any write-off recorded may not be reversed even if higher oil and natural gas prices increase the ceiling applicable to future periods. Future price decreases could result in reductions in the carrying value of such assets and an equivalent charge to earnings.

For instance, during 2015, we recorded a $3.1 billion non-cash write-down of the carrying value of our proved oil and gas properties as a result of ceiling test limitations, which is reflected with the ceiling test and

27

**App. 20**

Table of Contents

other impairments in our Consolidated Statements of Operations accompanying this report. Further impairments of the carrying value of our oil and gas properties may occur if commodity prices remain at current levels or continue to fall in the future. For example, not taking into account subsequent drilling results, production, changes in oil and natural gas prices, and changes in future development and operating costs, if the commodity price used to calculate our discounted future net revenues had been 10% lower than the price we used to perform our ceiling test calculation at December 31, 2015, the write-down we recorded would have been approximately $400.0 million larger.

***Our reserve estimates may turn out to be incorrect if the assumptions upon which these estimates are based are inaccurate. Any material inaccuracies in these reserve estimates or underlying assumptions will materially affect the quantities and present value of our reserves.***

There are numerous uncertainties inherent in estimating quantities of proved reserves and projected future rates of production and timing of development expenditures, including many factors beyond our control. The reserve data and standardized measures set forth herein represent only estimates. Reserve engineering is a subjective process of estimating underground accumulations of oil and natural gas that cannot be measured in an exact way and the accuracy of any reserve estimate is a function of the quality of available data and of engineering and geological interpretation and judgment. As a result, estimates of different engineers often vary. In addition, drilling, testing and production data acquired subsequent to the date of an estimate may justify revising such estimates. Accordingly, reserve estimates are often different from the quantities of oil, natural gas and NGLs that are ultimately recovered. Further, the estimated future net revenues from proved reserves and the present value thereof are based upon certain assumptions, including geologic success, the timing and identification of future drilling locations, commodity prices, future production levels, costs and the ability to finance future development that may not prove correct over time. Predictions of future production levels, development schedules (particularly with regard to non-operated properties), commodity prices and future operating costs are subject to great uncertainty, and the meaningfulness of such estimates is highly dependent upon the accuracy of the assumptions upon which they are based.

The present value of net proved reserves included in this report should not be considered as the market value of the reserves attributable to our properties. In accordance with SEC requirements, we base the present value, discounted at 10%, of the pre-tax future net cash flows attributable to our net proved reserves on the average oil and natural gas prices during the 12-month period before the ending date of the period covered by this report determined as an un-weighted, arithmetic average of the first-day-of-the-month price for each month within such period, adjusted for quality and transportation fees. The costs to produce the reserves remain constant at the costs prevailing on the date of the estimate. Actual current and future commodity prices and costs may be materially higher or lower, and higher future costs and/or lower future commodity prices may impact whether development of our reserves in the future occurs as scheduled or at all. In addition, the 10% discount factor, which the SEC requires us to use in calculating our discounted future net revenues for reporting purposes, may not be the most appropriate discount factor based on our cost of capital from time to time and/or the risks associated with our business.

***Competitive industry conditions may negatively affect our ability to conduct operations.***

We compete with numerous other companies in virtually all facets of our business. Our competitors in development, exploration, acquisitions and production include major integrated oil and natural gas companies as well as numerous independents, including many that have significantly greater resources. Therefore, competitors may be able to pay more for desirable leases and evaluate, bid for and purchase a greater number of properties or prospects than our financial or personnel resources permit. We also compete for the materials, equipment and services that are necessary for the exploration, development and operation of our properties. Our ability to increase reserves in the future will be dependent on our ability to select and acquire suitable prospects for future exploration and development.

**App. 21**

**Table of Contents**

*Full Cost Method of Accounting.*    The Company uses the full cost method of accounting for exploration and development activities as defined by the Securities and Exchange Commission ("SEC") Release No. 33-8995, Modernization of Oil and Gas Reporting Requirements ("SEC Release No. 33-8995") and Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 932, Extractive Additives — Oil and Gas ("FASB ASC 932"). Under this method of accounting, the costs of unsuccessful, as well as successful, exploration and development activities are capitalized as oil and gas properties. This includes any internal costs that are directly related to exploration and development activities but does not include any costs related to production, general corporate overhead or similar activities. The carrying amount of oil and natural gas properties also includes estimated asset retirement costs recorded on the fair value of the asset retirement obligation when incurred. Gain or loss or other disposition of oil and natural gas properties is not recognized, unless the gain or loss would significantly alter the relationship between capitalized costs and proved reserves of oil and natural gas attributable to a country.

The sum of net capitalized costs and estimated future development costs of oil and natural gas properties are amortized using the units-of-production method based on the Company's proved reserves. Oil and natural gas reserves and production are converted into equivalent units based on relative energy content. Asset retirement costs are included in the base costs for calculating depletion.

Under the full cost method, costs of unevaluated properties and major development projects expected to require significant future costs may be excluded from capitalized costs being amortized. The Company excludes significant costs until proved reserves are found or until it is determined that the costs are impaired. The Company reviews its unproved leasehold costs quarterly or when management determines that events or circumstances indicate that the recorded carrying value of the unevaluated properties may not be recoverable. The fair values of unproved properties are evaluated utilizing a discounted net cash flows model based on management's assumptions of future oil and gas production, commodity prices, operating and development costs; as well as appropriate discount rates. The estimated prices used in the cash flow analysis are determined by management based on forward price curves for the related commodities, adjusted for average historical location and quality differentials. Estimates of cash flows related to probable and possible reserves are reduced by additional risk weighting factors. The amount of any impairment is transferred to the capitalized costs being amortized.

*Write-down of Oil and Gas Properties.*    Companies that use the full cost method of accounting for oil and natural gas exploration and development activities are required to perform a ceiling test calculation each quarter. The full cost ceiling test is an impairment test prescribed by SEC Regulation S-X Rule 4-10. The ceiling test is performed quarterly, on a country-by-country basis, utilizing the average of prices in effect on the first day of the month for the preceding twelve month period in accordance with SEC Release No. 33-8995. The ceiling limits such pooled costs to the aggregate of the present value of future net revenues attributable to proved crude oil and natural gas reserves discounted at 10%, plus the lower of cost or market value of unproved properties, less any associated tax effects. If such capitalized costs exceed the ceiling, the Company will record a write-down to the extent of such excess as a non-cash charge to earnings. Any such write-down will reduce earnings in the period of occurrence and results in a lower depletion, depreciation and amortization ("DD&A") rate in future periods. A write-down may not be reversed in future periods even though higher oil and natural gas prices may subsequently increase the ceiling.

During 2015, the Company recorded a $3.1 billion non-cash write-down of the carrying value of the Company's proved oil and gas properties as a result of ceiling test limitations, which is reflected with ceiling test and other impairments in the accompanying Consolidated Statements of Operations. The ceiling test was calculated based upon the average of quoted market prices in effect on the first day of the month for the preceding twelve month period at December 31, 2015 for Henry Hub natural gas and West Texas Intermediate oil, adjusted for market differentials. The Company did not have any write-downs related to the full cost ceiling limitation in 2014 or 2013.

53

**App. 22**

**Table of Contents**

**ULTRA PETROLEUM CORP.**

**CONSOLIDATED BALANCE SHEETS**

| | December 31, 2015 | December 31, 2014 |
|---|---|---|
| | (Amounts in thousands of U. S. dollars, except share data) | |
| **ASSETS** | | |
| Current Assets: | | |
| Cash and cash equivalents | $ 4,143 | $ 8,919 |
| Restricted cash | 115 | 117 |
| Oil and gas revenue receivable | 61,881 | 111,915 |
| Joint interest billing and other receivables | 11,356 | 32,502 |
| Derivative assets | — | 104,190 |
| Income tax receivable | 5,150 | 6,246 |
| Inventory | 4,269 | 10,216 |
| Deferred financing costs | 20,477 | — |
| Other current assets | 3,270 | 3,033 |
| Total current assets | 110,661 | 277,138 |
| Oil and gas properties, net, using the full cost method of accounting: | | |
| Proven | 851,145 | 3,636,643 |
| Unproven properties not being amortized | — | 242,294 |
| Property, plant and equipment | 8,844 | 12,186 |
| Deferred income taxes | 1 | 30,640 |
| Other | 835 | 26,789 |
| Total assets | $ 971,486 | $4,225,690 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 93,415 | $ 77,580 |
| Accrued liabilities | 72,428 | 89,865 |
| Production taxes payable | 52,273 | 55,585 |
| Current portion of long-term debt | 3,390,000 | 100,000 |
| Interest payable | 42,657 | 46,098 |
| Deferred income tax liabilities | — | 30,638 |
| Capital cost accrual | 20,571 | 45,952 |
| Total current liabilities | 3,671,344 | 445,718 |
| Long-term debt | — | 3,278,000 |
| Deferred income tax liabilities | — | 992 |
| Deferred gain on sale of liquids gathering system | 126,295 | 136,848 |
| Other long-term obligations | 165,784 | 152,472 |
| Commitments and contingencies (Note 11) | | |
| Shareholders' equity: | | |
| Common stock — no par value; authorized — unlimited; issued and outstanding shares — 153,255,989 and 152,896,315, at December 31, 2015 and 2014, respectively | 502,050 | 495,913 |
| Treasury stock | (176) | (6,213) |
| Retained (loss) | (3,493,811) | (278,040) |
| Total shareholders' (deficit) equity | (2,991,937) | 211,660 |
| Total liabilities and shareholders' equity | $ 971,486 | $4,225,690 |

See accompanying notes to consolidated financial statements.

**App. 23**

**Table of Contents**

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

ULTRA PETROLEUM CORP.

By: /s/   Michael D. Watford
Name:   Michael D. Watford
Title:     Chairman of the Board,
            Chief Executive Officer,and President

Date: February 29, 2016

Pursuant to the requirements of the Securities and Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| *Signature* | *Title* | *Date* |
|---|---|---|
| /s/   Michael D. Watford<br>Michael D. Watford | Chairman of the Board,<br>Chief Executive Officer, and President<br>(principal executive officer) | February 29, 2016 |
| /s/   Garland R. Shaw<br>Garland R. Shaw | Senior Vice President and<br>Chief Financial Officer<br>(principal financial officer) | February 29, 2016 |
| /s/   Maree K. Delgado<br>Maree K. Delgado | Corporate Controller<br>(principal accounting officer) | February 29, 2016 |
| /s/   W. Charles Helton<br>W. Charles Helton | Director | February 29, 2016 |
| /s/   Stephen J. McDaniel<br>Stephen J. McDaniel | Director | February 29, 2016 |
| /s/   Roger A. Brown<br>Roger A. Brown | Director | February 29, 2016 |
| /s/   Michael J. Keeffe<br>Michael J. Keeffe | Director | February 29, 2016 |

118

**App. 24**