# EXHIBIT 4

Case 3:16-cv-03111-K    Document 158-5    Filed 11/17/21    Page 2 of 10    PageID 5983



# FUNDAMENTALS OF
# OIL & GAS
# ACCOUNTING

## 6TH EDITION

### CHARLOTTE J. WRIGHT



App. 26

**Disclaimer**
The recommendations, advice, descriptions, and the methods in this book are presented solely for educational purposes. The author and publisher assume no liability whatsoever for any loss or damage that results from the use of any of the material in this book. Use of the material in this book is solely at the risk of the user.

Copyright © 2017 by
PennWell Corporation
1421 South Sheridan Road
Tulsa, Oklahoma 74112-6600 USA

800.752.9764
+1.918.831.9421
sales@pennwell.com
www.pennwellbooks.com
www.pennwell.com

Marketing Manager: Sarah De Vos
National Account Executive: Barbara McGee Coons

Director: Matthew Dresher
Managing Editor: Stephen Hill
Production Manager: Sheila Brock
Production Editor: Tony Quinn
Book Designer: Susan E. Ormston
Cover Designer: Karla Womack

Library of Congress Cataloging-in-Publication Data

Names: Wright, Charlotte J., author. | Gallun, Rebecca A. Fundamentals of oil and gas accounting.
Title: Fundamentals of oil and gas accounting / Charlotte J. Wright, PhD, CPA.
Description: Sixth Edition. | Tulsa, OK : PennWell, 2016. | Revised edition of Fundamentals of oil & gas accounting, 2008. | Includes bibliographical references and index.
Identifiers: LCCN 2015049702 | ISBN 9781593703639
LCCN 1593706766 (eBook-10) | ISBN 9781593706760 (eBook-13)
Subjects: LCSH: Petroleum industry and trade--Accounting. | Gas industry--Accounting.
Classification: LCC HF5686.P3 W7495 2016 | DDC 657/.862--dc23
LC record available at http://lccn.loc.gov/2015049702

All rights reserved. No part of this book may be reproduced, stored in a retrieval system, or transcribed in any form or by any means, electronic or mechanical, including photocopying and recording, without the prior written permission of the publisher.

**App. 27**

## Calculations

| | | |
|---|---|---|
| Present value of future net revenue | | $1,300,0000 |
| Cost of properties not being amortized | | 75,000 |
| Lower of cost or estimated fair value of unproved properties included in costs being amortized | | 65,000 |
| Tax effects: | | |
| Total of above items | | $1,440,000 |
| Less: Tax basis of properties | $(1,200,000) | |
| Statutory depletion | (30,000) | |
| NOL carryforward | (50,000) | (1,280,000) |
| Future taxable income | | $ 160,000 |
| Tax rate | | ×     46% |
| Tax payable at statutory rate | | $ (73,600) |
| ITC | | 7,000 |
| Foreign tax credit carryforward | | 3,000 |
| Estimated preference tax | | (2,000) |
| Total tax effects | | (65,600) |
| Cost center ceiling | | $ 1,374,400 |
| Less: Net book basis | | (1,510,000) |
| *Required Write-Off*, net of tax[†] | | $ (135,600) |

[†]For accounting purposes, the gross write-off should be recorded to adjust both the oil and gas properties account and the related deferred income taxes.

An exemption to the cost ceiling limitation may be obtained when the cost of purchased reserves in place exceeds the present value of estimated future net revenues from the sale of such reserves. The primary reason for paying more for reserves in place than the expected future benefit as calculated per SEC rules is that the purchaser expects oil and gas prices to escalate. Further, a value is usually placed on probable and possible reserves. In such cases, the excess cost would not be written off if an exemption is obtained from the SEC.

## Impairment testing

Full cost companies are subject to the ceiling test requirements contained in *Reg. S-X Rule 4-10*. ASC 360, "Impairment or Disposal of Long-Lived Assets," does not apply to companies using the SEC full cost rules, as indicated in *ASC 360-10-15-5*. This is because the SEC ceiling test in *Reg. S-X Rule 4-10* is a more conservative measure. Once a full cost company applies that test, retesting using the *ASC 360* criteria is unnecessary.

## Assessment of the ceiling test

Costs are capitalized under the full cost method without regard to future benefits. The SEC consequently felt that the capitalized costs of a full cost company could well exceed

**App. 28**

272 ◆ FUNDAMENTALS OF OIL & GAS ACCOUNTING

its future net revenues and therefore mandated the full cost ceiling test. The full cost ceiling test is an unusual and rigid test in many respects. First, the test must be performed quarterly using current (end-of-period prices), but restoration of quarterly write-downs is not allowed even if prices improve before the end of the annual year. This rule is especially harsh for companies producing predominantly natural gas. Gas pricing is highly seasonal, with the lowest prices occurring in the summer months. Regardless, permanent write-downs must be made at quarter-end even if the average gas price for the year or the year-end price is expected to be much higher than the seasonal quarter-end price. Oil prices, while not seasonal, are highly volatile. The price of oil can be significantly different just weeks before or after period-end as compared to the period-end price. Accordingly, significant impairment losses depend in part on how fortunate a company is in relation to the timing of its period-end as compared to the current monetary oil price.

Second, in order to compute the cost ceiling, the amount and timing of production of proved reserves must be obtained from petroleum engineers. Only proved reserves are considered when computing the cost ceiling. Even though probable and possible reserves will normally be transferred to the proved category at some future date, the ceiling test places no value on these reserves.

## Post–balance sheet events and the ceiling test

Two types of events occurring after year-end but prior to publication of the financial statements can have a major impact on the full cost ceiling test. First, if proved reserves are discovered after year-end but before the financial statements are published, the ceiling test should be revised to include the new reserves. This is the type of subsequent event for which GAAP requires an adjustment to the financial statements, since the reserves existed at the balance sheet date but were unknown at that time. Second, the SEC apparently allows some changes in the price of oil or gas after year-end but before the financial statements are issued to be used in calculating the full cost ceiling test. However, because a change in price is not an underlying condition as of the balance sheet date, the allowed treatment by the SEC is inconsistent with GAAP. GAAP allows an adjustment to the financial statements only when the subsequent event provides evidence of a condition that existed at the balance sheet date.

# Problems

1. When oil and gas are produced jointly, what basis or unit of measure is allowed for full cost amortization? When oil and gas are produced jointly, what basis or unit of measure is allowed for successful efforts amortization?

2. Which special costs or reserves must or may be included in amortization for full cost? Which costs or reserves must or may be included for successful efforts?

3. Which special costs or reserves must or may be excluded from amortization for full cost? Which costs or reserves must or may be excluded for successful efforts?

**App. 29**

# 11 | Impairment and Disposal of Long-Lived Assets

Since it is possible for the net carrying value of a long-lived asset to exceed its net realizable value, both the FASB and the SEC require that long-lived assets be tested for impairment. The FASB guidance for impairment testing appears in *ASC 360-10-35*, "Subsequent Measurement: Impairment or Disposal of Long-Lived Assets." *ASC 360-10-35* does not apply to companies using the full cost method (see *ASC 360-10-15-5*). Instead, those companies are to utilize the ceiling test as prescribed in *Reg. S-X Rule 4-10*. The full cost ceiling test is discussed in detail in chapter 8. Companies using the successful efforts method are to follow the guidance in *ASC 360-10-35* in assessing impairment related to proved properties, wells, and equipment and facilities. Unproved properties are to be evaluated for impairment using the guidance in *ASC 932-360-35*. Chapter 5 provides a thorough discussion of the successful efforts provisions relating to impairment of unproved properties. Therefore, the discussion in this chapter applies only to proved properties and other oil and gas assets accounted for using the successful efforts method.

## Scope

*ASC 360-10-35* applies to long-lived assets that are held for use or are to be disposed of, including capital leases of lessees, long-lived assets of lessors subject to operating leases, proved oil and gas properties that are accounted for using the successful efforts method, and long-term prepaid assets. According to *ASC 360-10-15-5*, the FASB guidance in *ASC 360-10-35* does not apply to goodwill, intangible assets not being amortized that are held and used, servicing assets, or financial instruments. In addition, *ASC 360-10-35* does not apply to deferred policy acquisition costs, deferred tax assets, unproved oil and gas properties accounted for using the successful efforts method of accounting, or oil and gas properties accounted for using the full cost method.

## Asset Groups

One of the more critical aspects of ASC 360-10-35 is the determination of the "asset" to be tested for impairment. According to *ASC 360-10-35-23*, long-lived assets are to be

349

**App. 30**

350 ◆ FUNDAMENTALS OF OIL & GAS ACCOUNTING

grouped with other assets and liabilities at the lowest level for which the identifiable cash flows of that asset group are largely independent of the cash flows of other assets and liabilities. According to *ASC 932-360-35-8*, producing oil and gas properties are typically evaluated on a field-by-field basis. This is because the cash flows of individual wells are typically not independent from the cash flows of other wells in the field, whereas the cash flows related to fields are often independent of the cash flows of other assets.

It is not unusual for multiple fields to be linked together through the use of common storage, processing, or transportation facilities, or one or more fields may be linked to certain downstream transportation and refining activities. In such cases, *ASC 932-360-35-8* indicates that a logical grouping of assets is appropriate, including grouping fields with shared infrastructure together with shared facilities into a single asset group for impairment purposes. When wells and facilities are connected in a manner requiring allocation of production back to the individual wells or facilities, the wells and facilities are considered to be linked by common cash flows and would be grouped together for impairment purposes. An example of a single asset that might not qualify for grouping is a gas processing plant that receives gas from numerous fields (owned by the plant owners), as well as gas from nonowners that is processed on a contract basis. In the remainder of the chapter, either a single asset impaired individually or assets grouped together for impairment purposes are normally referred to simply as the *asset*.

## Estimating and Computing Impairment

According to *ASC 360-10-20*, impairment is "the condition that exists when the carrying amount of a long-lived asset (asset group) exceeds its fair value." To determine whether a long-lived asset *to be held and used* is impaired, *ASC 360-10-35* requires the use of a three-step approach to recognize and measure an impairment loss. First, *ASC 360-10-35* requires that a company test a long-lived asset for impairment only if certain impairment "indicators" are present. This is often referred to as a "trigger event," meaning that some event has occurred or circumstances have changed so as to indicate that the carrying value of the asset may not be recoverable. If a trigger event has occurred, the next step is to test to see if an asset is impaired. This involves comparing the carrying value of the asset to the undiscounted future net cash flows associated with the asset. If the undiscounted future net cash flows are higher than the carrying value of the asset, no impairment is indicated, and no further action is required. However, if the carrying value exceeds the undiscounted future net cash flows, the asset is impaired, and impairment must be measured and recorded. The final step involves computing and recording an impairment loss. Impairment losses are measured by comparing the carrying value of the asset to the **fair value** of the asset. These steps are discussed below.

### Indications of impairment (trigger events)

A company is not required to test each long-lived asset for impairment at each balance sheet date. Rather, *ASC 360-10-35-21* requires that a company test a long-lived asset for impairment only if events or circumstances indicate that the asset's carrying value may

**App. 31**

not be recoverable. Examples of such events or circumstances include the following, according to *ASC 360-10-35-21*:

1. There is a significant decrease in the market price of a long-lived asset (asset group).

2. A significant adverse change occurs in the extent or manner in which a long-lived asset (asset group) is being used or in its physical condition.

3. There is a significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset (asset group), including an adverse action or assessment by a regulator.

4. Costs accumulate significantly in excess of the amount originally expected for the acquisition or construction of a long-lived asset (asset group).

5. There is a current period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset (asset group).

6. There is a current expectation that, more likely than not, a long-lived asset (asset group) will be sold or otherwise disposed of significantly before the end of its previously expected useful life. The term *more likely than not* refers to a level of likelihood that is more than 50%.

In oil and gas operations, a temporary decline in the price of oil would not be sufficient to require testing for impairment unless the decline in price is deemed to be permanent or long lasting. On the other hand, a hostile or unfavorable action by the government of a country in which a company is operating would likely indicate the need to assess the properties in that country for impairment.

## Testing for recoverability

If events or circumstances indicate a long-lived asset's carrying value may not be recoverable, then the asset must be assessed for impairment by comparing its carrying value to the undiscounted expected future net cash flows estimated to be generated by the asset. To determine the estimated net cash flows, a company should consider only the expected cash inflows less associated expected cash outflows (excluding interest expense) that are directly attributable to and are a direct result of the use and eventual disposition of the asset. *ASC 360-10-35* provides additional guidance on estimating future net cash flows focusing on the following:

a. The estimation approach

b. The estimation periods

c. Types of asset-related expenditures to consider

**Estimation approach.** Estimated future net cash flows should be based on the remaining service potential of the asset. The service potential of an asset consists of the cash flow–generating capacity or physical output capacity of the asset. A company should incorpo-

**App. 32**

rate its own assumptions about the use of the asset. The assumptions used in developing the estimate should be reasonable in relation to the assumptions used in developing other information used by the company for similar periods. Other information would include information used in preparing internal budgets and projections or information communicated to others. Presumably, this information would include reasonable assumptions regarding trends in future prices and costs. If proved and probable reserves are utilized in formulating the company's internal budgeting and planning, then cash flows from the recovery and sale of those reserves would be included in future cash flow projections.

**Estimation periods.** The cash flow estimation periods are limited to the individual asset's (or primary asset's, if an asset group) remaining estimated useful life to the company. The primary asset is the most significant component asset from which the asset group derives its cash flow–generating activities.

Estimates of future cash flows used to test for recoverability of the asset should be limited to the remaining amount of time that the asset will be used by the entity. For example, many international oil and gas contracts, specifically production sharing contracts (PSCs), contain a maximum production period effectively terminating the contract after a specific number of years of production, e.g., 15 years. An oil and gas producer operating under a PSC should consider whether the contract has a maximum production period. If so, the producer's interest in the field automatically terminates at the end of the production period, even if production from the area is expected to continue beyond the maximum period. In this case, for purposes of *ASC 360-10-35*, the producer can only include its share of expected future net cash flows from production of the reserves that would be recoverable prior to the end of its contractual rights to operate.

**Types of asset-related expenditures to consider.** For an asset that is complete or substantially complete, *ASC 360-10-35* requires a company to base the estimates of future cash flows on the long-lived asset's existing service potential at the date it is tested for impairment. A company should include cash outflows associated with future expenditures necessary to maintain an asset's existing service potential, including those expenditures that replace the service potential of a component part of an asset (e.g., repairing an existing elevator in a building). However, *ASC 360-10-35* prohibits including in the estimates of future cash flows those amounts associated with future capital expenditures that would increase the long-lived asset's service potential.

If an asset will require substantial future development expenditures in order to generate the estimated future cash inflows, the cost of the future development must be considered when projecting cash outflows. For example, consider an oil and gas field that is currently producing but will require secondary recovery, such as waterflooding, prior to reaching maximum recovery. The future cash outlay for the secondary recovery project would properly be included in projecting the future cash flows associated with the asset.

To test recoverability for a long-lived asset that is not yet complete and is under development, a company should base the estimates of future cash flows on the asset's expected service potential when development is substantially complete. The estimates should include cash flows related to all future expenditures to substantially complete the asset, including interest payments it would capitalize under *ASC 835-20*.

**App. 33**

## Measuring impairment

The third and final step is to measure the amount of the impairment loss. The amount of the impairment loss a company should recognize is the amount by which the carrying value of the asset exceeds its fair value. *ASC 360-10-35* defines the fair value of an asset as the amount at which the asset could be bought or sold in a current transaction between willing parties, i.e., other than in a forced or liquidation sale. Quoted market prices in active markets are the best evidence of fair value, so a company should use quoted market prices as the basis for measurement, if available. Absent quoted market prices, a company should base the measurement on the best information available, including present value techniques. For oil and gas companies, the best measurement technique is normally the discounted future net cash flows associated with the asset.

---

## EXAMPLE—Testing and Recording Impairment

Tawhoe Oil Company operates three fields in the Gulf of Mexico. Recently, the government enacted stringent new environmental regulations causing a significant change in the economic and operating environment. Tawhoe Oil must screen for impairment for all three fields. The following information is available regarding each field:

|  | North Field | South Field | West Field |
|---|---|---|---|
| Net carrying value | $1,500,000 | $1,600,000 | $5,000,000 |
| Expected undiscounted future net cash flows | 1,450,000 | 2,600,000 | 4,200,000 |
| Fair value (discounted future net cash flows) | 850,000 | 1,000,000 | 1,500,000 |

**Recoverability Test:**

|  | North Field | South Field | West Field |
|---|---|---|---|
| Expected undiscounted future net cash flows | $1,450,000 | $2,600,000 | $4,200,000 |
| Net carrying value | 1,500,000 | 1,600,000 | 5,000,000 |
| Difference | $ (50,000) | $1,000,000 | $ (800,000) |
| Impairment indicated? | Yes | No | Yes |

**Measurement of Impairment:**

|  | North Field | West Field |
|---|---|---|
| Discounted future net cash flow | $ 850,000 | $ 1,500,000 |
| Net carrying value | 1,500,000 | 5,000,000 |
| Loss | $ (650,000) | $(3,500,000) |

### Entry

| | | |
|---|---|---|
| Impairment loss.......................................... | 4,150,000 | |
|   Allowance for impairment—North Field................... | | 650,000 |
|   Allowance for impairment—West Field ................... | | 3,500,000 |

---

**App. 34**