# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

PEDRO RAMIREZ, JR., Individually and on
Behalf of All Others Similarly Situated,

Plaintiff,

v.

EXXON MOBIL CORPORATION, REX W.
TILLERSON, ANDREW P. SWIGER,
JEFFREY J. WOODBURY, and DAVID S.
ROSENTHAL,

Defendants.

Case No. 3:16-cv-3111-K

**DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR SUPPLEMENTAL
SUBMISSION REGARDING ASSET IMPAIRMENT QUESTION
<u>RAISED BY THE COURT</u>**

Plaintiff's Response (ECF No. 159, "PB") does not seriously dispute Defendants' showing in their Supplemental Submission (ECF No. 157, "Supp. Sub."). Plaintiff instead (i) continues to rely on inapposite, generalized allegations about impairments taken by other energy companies, (ii) claims factual disputes when there are none, and (iii) asserts waiver, ignoring Fifth Circuit case law to the contrary.

**Plaintiff's Generalized Allegations and Reliance on Impairments by Other Companies Are Insufficient to State a Claim.** Plaintiff contends ExxonMobil should have impaired its Rocky Mountain dry gas assets as of year-end 2015 because three supposed "peer" companies impaired their own dry gas assets in the region. But Plaintiff does not, and cannot, dispute that two of the companies (Ultra Petroleum Corp. and Vanguard Natural Resources, LLC) used a different accounting methodology that made impairments more likely,[1] Supp. Sub. 2-4, or that, unlike ExxonMobil, all three companies were in precarious financial situations, which rendered them incapable of surviving any sustained decline in energy prices, *id.* 4–6.

Plaintiff also argues that the Complaint's allegations that energy companies *other than* the three purported "Peer Rocky Mountain Dry Gas Operators" impaired assets in 2015 means ExxonMobil should have also impaired its Rocky Mountain dry gas assets in 2015. (PB 2 (referencing impairments by Royal Dutch Shell plc; Total S.A.; BP plc; Eni SPA; Chevron Corp.; and ConocoPhillips).) But Plaintiff's response inaccurately claims that these companies impaired "North American gas properties similar to Exxon's RMDG assets." (*Id.*) As Defendants explained previously (Supp. Sub. 2 n.2), these companies impaired their *Canadian oil sands assets*, making Plaintiff's attempted comparisons inapt. (ECF No. 36 ("Compl.") ¶¶ 157–162.) For example, the

---

[1] Plaintiff also does not dispute that Defendants accurately described the fundamental differences in the two accounting methodologies.

$2 billion impairment by Royal Dutch Shell plc that the Complaint principally relies on concerned an oil sands asset in Western Canada.[2]  (*Id.* ¶ 159.)  And, in all events, Shell's impairment of that asset does not remotely suggest that ExxonMobil should have impaired its Rocky Mountain dry gas assets because Shell's impairment was based on the company's decision to *abandon* operations, as both the Complaint and *Wall Street Journal* article referenced in it make clear.  (*Id.* ¶ 159; Reply App. 5.)  Unlike Shell, Plaintiff does not (and cannot) allege that ExxonMobil had decided to abandon its Rocky Mountain dry gas assets.

In its response, Plaintiff for the first time cites Royal Dutch Shell plc's 2015 Annual Report on Form 20-F for the proposition that Shell recognized impairments of North American gas properties "similar" to ExxonMobil's.  (PB 2.)  But neither Plaintiff nor Shell's Form 20-F explains why these gas properties are supposedly "similar" to ExxonMobil's or claims that they were in the Rocky Mountain region.  (Reply App. 14.)  And critically, the Complaint contains no allegations about impairment of these North American gas properties, and Plaintiff's response cannot amend the Complaint.  *Cont'l Auto. Sys., Inc.* v. *Avanci, LLC*, 485 F. Supp. 3d 712, 725 (N.D. Tex. 2020) (holding that plaintiff "cannot amend the [Complaint] . . . with new factual allegations in its Response") (Lynn, C.J.); *Acosta* v. *Tex. Dep't of Crim. Just.*, No. 3:21-cv-0816-B, 2021 WL 5395997, at *5 (N.D. Tex. Nov. 18, 2021) (similar) (Boyle, J.).

Moreover, Plaintiff fails to acknowledge that Shell *also* used a different accounting methodology than ExxonMobil.  In particular, as a non-US entity, Shell reported its financial results under the International Financial Reporting Standards ("IFRS"), not US GAAP.  (Reply App. 11.)  As commentators have noted, "IFRS-based impairment model[s] might lead to the

---

[2]    Notably, the Complaint does not identify any particular asset impairment by Total, BP, Eni Chevron, or ConocoPhillips, much less one of any asset purportedly "similar" to ExxonMobil's Rocky Mountain dry gas assets.

recognition of impairments of long-lived assets held for use earlier than would be required under US GAAP." (Reply App. 17 (*IFRS and US GAAP: Similarities and Differences* 55 (Oct. 2014).) Among other reasons, after determining that an impairment test is required (i.e., an impairment "trigger" under GAAP or an impairment "indicator" under IFRS), the two tests differ because IFRS (specifically IAS 36) requires only one further test that compares the carrying value of the asset to the asset's recoverable value. (*Id.*) By contrast, ASC 360 under US GAAP does not proceed to that particular test unless the carrying value of the asset is first determined to be less than its projected future undiscounted cash flows. (Supp. Sub. 3 & n.4.) Moreover, unlike ASC 360, IFRS allows companies to *reverse* impairments in certain scenarios if conditions improve. (Reply App. 18 (*IFRS and US GAAP: Similarities and Differences* 56 (Oct. 2014); Reply App. 21–23.) By contrast, under ASC 360, any impairment is permanent. (Reply App. 18.)

Plaintiff further argues that the totality of its vague and generalized allegations concerning "declining gas prices, declining productions costs, and Exxon[Mobil]'s upcoming $12 billion bond offering" somehow plausibly alleges that ExxonMobil's Rocky Mountain dry gas assets were impaired as of year-end 2015. (PB 2.) Tellingly, Plaintiff cites no case finding that such generalized allegations can support a plausible misstatement. Nor does Plaintiff address the authority confirming that declining gas prices cannot satisfy Plaintiff's pleading burden. *See In re Exxon Mobil Corp. Sec. Litig.*, 387 F. Supp. 2d 407, 426–27 (D.N.J. 2005) (holding allegations based on "state of oil prices" do not suffice to plead securities violation as to purported impairment), *aff'd*, 500 F.3d 189 (3d Cir. 2007).[3]

---

[3] Plaintiff's reliance on the Complaint's allegations that (i) natural gas spot prices were higher in 2016 than 2015 (PB 2), and (ii) ExxonMobil's average production costs by oil-equivalent barrel for all of its U.S. consolidated subsidiaries were lower in 2016 than 2015 (PB 2; Compl. 36 ¶ 189 & Ex. B ¶ 98) are entirely beside the point. Indeed, Plaintiff's allegations ignore that US GAAP requires companies that employ the successful efforts methodology, such as ExxonMobil, to use their own estimates of *future* prices and costs *over the life of* the relevant asset in any impairment assessment. (*See* Supp. Sub. 3–4

**The Supplemental Submission Does Not Raise Factual Disputes.**  Plaintiff's claim of factual disputes fails because the relevant facts are beyond dispute, based on documents and information incorporated into the Complaint and subject to judicial notice by this Court.[4]  Plaintiff argues that the Court cannot consider whether ASC 360 required ExxonMobil to use its own estimates and assumptions concerning future energy prices.  But Plaintiff cannot dispute that the Court can consider the excerpts of ASC 360 (App. Ex. 6) that Defendants proffered, particularly given that Plaintiff incorporated ASC 360 into its Complaint by reference.  (Compl. ¶¶ 169, 271, 299, 308, 312, 318, 325–330, 335, 364, 365, 366–376.)  And, in any event, courts have recognized that "[j]udicial notice is appropriate for . . . accounting rules as they are 'capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned.'"  *In re Yahoo! Inc. Sec. Litig.*, No. 11-cv-02732 CRB, 2012 WL 3282819, at *2 n.2 (N.D. Cal. Aug.

---

& n.4; ECF No. 158 ("App.") 45–47 (ASC 360-10-35-17; ASC 360-10-35-30; ASC 360-10-35-31; ASC 360-10-35-33).)  As a result, Plaintiff's claims about both lower natural gas spot prices and higher production costs in 2015 than in 2016 do not plausibly allege that ExxonMobil should have impaired any of its Rocky Mountain dry gas assets in 2015.  Plaintiff also failed to plausibly allege that ExxonMobil should have recognized an impairment trigger event based on the Complaint's allegations of temporarily lower natural gas prices.  Plaintiff ignores that because of frequent short-term fluctuations in energy prices, ExxonMobil has long disclosed that it does not view temporarily low prices as an impairment trigger.  (Supp. Sub. 4 n.5.)  And, as earlier briefed and noted at oral argument, Plaintiff's generalized motive allegations relating to ExxonMobil's March 2016 debt offering and desire to maintain its AAA credit rating fails to state a strong inference of scienter under Fifth Circuit case law.  *See Ind. Elec. Workers' Pension Tr. Fund IBEW* v. *Shaw Grp., Inc.*, 537 F.3d 527, 544 (5th Cir. 2008) (holding that the desire "'to maintain a high credit rating is *universally held* among corporations and their executives and consequently *does not contribute significantly to an inference of scienter*'") (emphases added) (citation omitted).

[4]  Plaintiff cannot dispute that the Court may take judicial notice of the public securities filings and chart of information derived therefrom (App. Exs. 2–3, 5, 10–11), publicly reported credit ratings (*id.* Exs. 12–14); and publicly available bankruptcy court records (*id.* Exs. 15–17).  *See Funk* v. *Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (taking judicial notice of "matters of public record"); *MAZ Encryption Techs., LLC* v. *BlackBerry Ltd.*, 347 F. Supp. 3d 283, 293 (N.D. Tex. 2018) ("The contents of the case records of [two lawsuits] are just the type of records that the Court may take judicial notice of.").  Nor can Plaintiff reasonably dispute the contents of the accounting textbook authored by its own expert Charlotte Wright (App. Ex. 4) and referenced in her declaration (ECF No. 36-2 at ¶ 2), the contents of the two accounting articles Defendants submitted in full or excerpted format (App. Exs. 8–9), or the excerpt from Plaintiff's own slide deck (*id.* Ex. 1).

4

10, 2012) (citation omitted) (citing cases), *aff'd*, 611 F. App'x 387 (9th Cir. 2015).  Moreover, the Complaint *tacitly acknowledges* that ASC 360 required ExxonMobil to use its own estimates and assumptions about future prices.  (Compl. ¶ 364 ("[P]ursuant to ASC 360-10-35-30, *Exxon was required to use* all available evidence, including *assumptions used in long-range budgeting and planning processes*, when developing future cash flow estimates for impairment analysis.") (emphases added).)  Finally, Plaintiff argues that the Court should not consider ExxonMobil's actual impairment assessment in 2015, which confirmed the absence of any impairment.  (PB 3.) But Defendants did not provide ExxonMobil's impairment assessment in the Supplemental Submission.[5]

**Defendants' Have Not Waived Any Argument.**  Unable to muster any meaningful substantive response to Defendants' Supplemental Submission, Plaintiff instead asks the Court to ignore it, claiming that Defendants waived all arguments by not advancing them earlier.  (PB 3.) As an initial matter, Plaintiff's waiver argument is meritless because the Fifth Circuit has held that this Court is entitled to reconsider an interlocutory order "for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law." *Austin* v. *Kroger Tex., L.P.*, 864 F.3d 326, 336 (5th Cir. 2017) (citations omitted); *accord* Fed. R. Civ. P. 54(b).  And here, Defendants supplemented the record at the Court's direction.[6]  (Hr'g Tr. at 99:1-5.)

---

[5]  To the contrary, Defendants explained how ExxonMobil's assessment, as it was disclosed in its 2015 Form 10-K, comported with the ASC 360 test to show the difference between a successful efforts methodology and a full cost methodology.  Separately, Defendants provided a copy of JX-961 from the NYAG Action, which is a report from ExxonMobil's independent auditor that took no exception to ExxonMobil's 2015 impairment assessment.  (App. Ex. 7.)  But the Court need not consider that document in granting reconsideration under the standards for reviewing a motion to dismiss.

[6]  Plaintiff also mistakenly contends that the Supplemental Submission is improper because it is purportedly too detailed and not simply in chart form.  (PB 1.)  Plaintiff ignores that the Court asked

In all events, Plaintiff mischaracterizes the waiver rule. The waiver rule's underlying policy is to ensure that a party opponent is not unfairly disadvantaged. *Cousin* v. *Trans Union Corp.*, 246 F.3d 359, 373 n.22 (5th Cir. 2001) (explaining that the "procedural bar concerning initial briefs was properly developed and utilized" to avoid the "situation where an appellant raises a completely new issue in its reply brief, *disadvantaging* the appellee") (emphasis added). Absent such unfairness, the waiver rule does not prevent consideration of arguments. *See id.* (finding "little or no prejudice" where the reply brief advanced new "responsive arguments to the appellee's own contentions"); *United States* v. *Rodriguez*, 602 F.3d 346, 361 (5th Cir. 2010) (considering argument raised in reply brief because issue was raised in opponent's answering brief, ensuring "there is no prejudice" to the opponent). Here, the Supplemental Submission responded to arguments Plaintiff presented at oral argument and in Plaintiff's slide deck.[7] Nor is there any unfairness to Plaintiff because Plaintiff has fully responded.

*   *   *

The Complaint's flawed impairment allegations thus cannot sustain Plaintiff's claims. That leaves Plaintiff to rely on the New York Attorney General's discredited allegations about proxy costs of carbon and GHG costs, which also do not plead a plausible misstatement or omission concerning ExxonMobil's Rocky Mountain dry gas assets. For these reasons, and the reasons previously briefed and argued to the Court, Defendants respectfully request that this Court grant their motion for reconsideration and dismiss the Complaint in its entirety.

---

Defendants to "figure[] out a way to show it," with a chart being an example of how to do so, and further said that "I know it's not easy." (Hr'g Tr. at 98:17–19, 99:1, 99:7–8.)

[7] And, as Plaintiff's response tacitly acknowledges (PB 3 n.3), Defendants have consistently noted in response to Plaintiff's arguments that the alleged actions of purported "competitors" cannot plausibly plead a violation of the federal securities laws. (*See* ECF Nos. 46 at 14–15 & 139 at 5–6.)

6

Dated:  _____

Respectfully submitted,


/s/ Daniel J. Kramer
Theodore V. Wells, Jr. (*pro hac vice*)
Daniel J. Kramer (*pro hac vice*)
Daniel J. Toal (*pro hac vice*)
Justin Anderson (*pro hac vice*)
Matthew D. Stachel (*pro hac vice*)
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
twells@paulweiss.com
dkramer@paulweiss.com
dtoal@paulweiss.com
janderson@paulweiss.com
mstachel@paulweiss.com

/s/ D. Patrick Long
D. Patrick Long
Texas State Bar No. 12515500
SQUIRE PATTON BOGGS
2000 McKinney Ave., Suite 1700
Dallas, TX 75201
Telephone: (214) 758-1505
Facsimile: (214) 758-1550
patrick.long@squirepb.com

*Counsel for Rex W. Tillerson*


/s/ Nina Cortell
Nina Cortell
Texas State Bar No. 04844500
HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700
Dallas, TX 75219
Telephone: (214) 651-5000
Facsimile: (214) 651-5940
nina.cortell@haynesboone.com

*Counsel for Exxon Mobil Corporation,*
*Andrew P. Swiger, Jeffrey J. Woodbury,*
*and David S. Rosenthal*

7

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has been

served by electronic CM/ECF filing, on this _____ day of _____, _____.


/s/ *Daniel J. Kramer*
Daniel J. Kramer

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |
|---|---|
| PEDRO RAMIREZ, JR., Individually and on Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>            v.<br><br>EXXON MOBIL CORPORATION, REX W. TILLERSON, ANDREW P. SWIGER, JEFFREY J. WOODBURY, and DAVID S. ROSENTHAL,<br><br>               Defendants. | Case No. 3:16-cv-03111-K |

**APPENDIX IN SUPPORT OF DEFENDANTS' REPLY IN FURTHER SUPPORT OF
THEIR SUPPLEMENTAL SUBMISSION REGARDING
<u>ASSET IMPAIRMENT QUESTION RAISED BY THE COURT</u>**

| Exhibit | Description | App. Page(s) |
|---------|-------------|--------------|
| A | Declaration of Matthew D. Stachel in Support of Defendants' Reply in Further Support of Their Supplemental Submission Regarding Asset Impairment Question Raised by the Court | App. 1 – App. 3 |
| 1 | Article titled *Royal Dutch Shell to Abandon Carmon Creek Oil-Sands Project* by Chester Dawson, Wall Street Journal, dated October 27, 2015 | App. 4 – App. 7 |
| 2 | Excerpts of Royal Dutch Shell plc's Form 20-F dated March 9, 2016 | App. 8 – App. 14 |
| 3 | Article titled *IFRS and US GAAP: similarities and differences* by PricewaterhouseCoopers dated October 2014 | App. 15 – App. 18 |
| 4 | Excerpts of IAS 36 – Impairment of Assets | App. 19 – App. 23 |

2

Dated:  December 3, 2021

Respectfully submitted,

/s/ Daniel J. Kramer                                   /s/ D. Patrick Long
Theodore V. Wells, Jr. (*pro hac vice*)               D. Patrick Long
Daniel J. Kramer (*pro hac vice*)                      Texas State Bar No. 12515500
Daniel J. Toal (*pro hac vice*)                        SQUIRE PATTON BOGGS
Justin Anderson (*pro hac vice*)                       2000 McKinney Ave., Suite 1700
Matthew D. Stachel (*pro hac vice*)                    Dallas, TX 75201
PAUL, WEISS, RIFKIND,                                  Tel: (214) 758-1505
  WHARTON & GARRISON LLP                               Fax: (214) 758-1550
1285 Avenue of the Americas                            patrick.long@squirepb.com
New York, NY 10019-6064
Tel: (212) 373-3000                                    *Counsel for Rex W. Tillerson*
Fax: (212) 757-3990
twells@paulweiss.com
dkramer@paulweiss.com
dtoal@paulweiss.com
janderson@paulweiss.com
mstachel@paulweiss.com

/s/ Nina Cortell
Nina Cortell
Texas State Bar No. 04844500
HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700
Dallas, TX 75219
Tel: (214) 651-5000
Fax: (214) 651-5940
nina.cortell@haynesboone.com

*Counsel for Exxon Mobil Corporation,*
*Andrew P. Swiger, Jeffrey J. Woodbury, and*
*David S. Rosenthal*

3

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has been

served by electronic CM/ECF filing, on this 3rd day of December, 2021.


/s/ Daniel J. Kramer
Daniel J. Kramer

# EXHIBIT A

App. 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |
|---|---|
| PEDRO RAMIREZ, JR., Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>EXXON MOBIL CORPORATION, REX W. TILLERSON, ANDREW P. SWIGER, JEFFREY J. WOODBURY, and DAVID S. ROSENTHAL,<br><br>Defendants. | Case No. 3:16-cv-3111-K |

**DECLARATION OF MATTHEW D. STACHEL IN SUPPORT OF DEFENDANTS'
REPLY IN FURTHER SUPPORT OF THEIR SUPPLEMENTAL SUBMISSION
REGARDING ASSET IMPAIRMENT QUESTION RAISED BY THE COURT**

**App. 2**

Pursuant to 28 U.S.C. § 1746, I, Matthew D. Stachel, declare as follows:

1.      I am over twenty-one years of age and I am fully competent to make this Declaration. I have personal knowledge of the facts set forth in this Declaration.

2.      I am an associate at the law firm Paul, Weiss, Rifkind, Wharton & Garrison LLP. My office is located at 500 Delaware Avenue, Suite 200, Post Office Box 32, Wilmington, DE 19899-0032.

3.      I am a member in good standing with the State Bar of Delaware. I am admitted to practice before this Court *pro hac vice*.

4.      Attached hereto as Exhibit 1 is a true and correct copy of an article titled *Royal Dutch Shell to Abandon Carmon Creek Oil-Sands Project* by Chester Dawson, Wall Street Journal, dated October 27, 2015.

5.      Attached hereto as Exhibit 2 is a true and correct copy of excerpts of Royal Dutch Shell plc's Form 20-F dated March 9, 2016.

6.      Attached hereto as Exhibit 3 is a true and correct copy of excerpts of an article titled *IFRS and US GAAP: similarities and differences* by PricewaterhouseCoopers dated October 2014.

7.      Attached hereto as Exhibit 4 is a true and correct copy of excerpts of IAS 36 – Impairment of Assets.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 3, 2021
          Wilmington, Delaware

_____
Matthew D. Stachel

2

**App. 3**

# EXHIBIT 1

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/royal-dutch-shell-to-abandon-carmen-creek-oil-sands-project-1445987863

BUSINESS

# Royal Dutch Shell to Abandon Carmon Creek Oil-Sands Project

Energy giant will take a $2 billion write-down; cites uncertain business environment



Royal Dutch Shell PLC CEO Ben van Beurden. The chief executive said the energy giant is reviewing its longer-term upstream options world-wide.
PHOTO: AGENCE FRANCE-PRESSE/GETTY IMAGES

*By [Chester Dawson](#)*

October 27, 2015

CALGARY, Alberta— Royal Dutch Shell PLC said Tuesday it would abandon the construction of a major oil-sands project in Western Canada and take a $2 billion write-down, a stark reflection of the challenging economics for unconventional oil projects amid a sharp slump in crude prices.

The energy giant said it would discontinue its 80,000 barrel-a-day Carmon Creek oil-sands project, citing an uncertain business environment and highlighting concerns about sufficient pipeline capacity to ship oil-sands crude to markets.

Several proposed pipeline projects connecting northern Alberta's oil sands to refiners in the U.S. and elsewhere have been delayed by regulatory issues, including the Keystone XL pipeline to the U.S. Gulf Coast.

**App. 5**

"We are making changes to Shell's portfolio mix by reviewing our longer-term upstream options world-wide, and managing affordability and exposure in the current world of lower oil prices. This is forcing tough choices at Shell," Ben van Beurden, Royal Dutch Shell's chief executive, said in a statement.

Shell, which produces 250,000 barrels of oil a day from its oil-sands mines, first announced plans to go ahead with Carmon Creek in 2013, and it was expected to start up in 2017. Earlier this year, the company signaled problems with the cost and design of the facility when it pushed back the planned start date by two years to 2019.

The move by Shell comes after several other undeveloped oil-sands projects have been deferred due to cost issues and raises questions about how much of Canada's oil-sands, the world's third-largest source of untapped crude, can be recovered profitably. Earlier this year, three major Canadian energy companies said they would shelve plans for new or expanded oil-sands projects and last year France's Total SA and Statoil AS A of Norway indefinitely postponed projects even before the collapse of crude prices.

Oil sands are some of the highest-cost producers of crude in the world, and have been hard hit by lower prices. They have also faced the prospect of difficulty accessing markets because of the lack of pipelines, and uncertainty about the prospect for tougher regulations on carbon dioxide emissions in Canada.

The president of Shell Canada, Lorraine Mitchelmore, said last year that the company's oil-sands business needs Brent crude, the global oil benchmark, to trade above $70 a barrel to meet internal yardsticks for profitability. But prices for Brent have slumped in recent months and have traded below $50 a barrel.

Most oil-sands projects cost billions of dollars and take years to develop, so companies have been reluctant to abandon sites already under construction or in operation. Instead, a number of future developments have been delayed pending a rebound in crude oil prices.

Shell said it would keep the leases to Carmon Creek and some equipment "while continuing to study the options for this asset." It plans to make the $2 billion impairment against its third quarter results, and de-book some 418 million barrels of proved reserves associated with the 100% Shell-owned project.

**App. 6**

In January, Shell become the first major oil-sands producer to announce job cuts, saying it planned to trim 5% to 10% of its 3,000 workers in Western Canada.

"It is too early to quantify staff and contractor impacts" from the decision to abandon Carmon Creek, said Tara Lemay, a spokeswoman for Shell's Canadian subsidiary. The company will shift workers to decommissioning and reclamation at the site, she said.

Shell owns a 60% stake in its core oil sands mining operations with Chevron Corp. , and Marathon Oil Corp. splitting the remainder. These consist of two strip mines, known as Jackpine and Muskeg River, in Alberta.

Carmon Creek and another Shell oil-sands operation called Peace River is designed for horizontally-drilled wells instead of surface mining. The extraction technology uses steam-assisted gravity drainage, or SAGD, which involves melting hardened oil embedded in sand deposits underground with steam.

Of the roughly two million barrels a day that Canada currently produces from its oil sands, about half is mined and the remainder is recovered by SAGD and similar methods. But those deeply buried deposits account for about 80% of Canada's reserves-the world's third-largest source of untapped crude.

**Write to** Chester Dawson at chester.dawson@wsj.com

**Corrections & Amplifications:**
Shell is abandoning construction of its Carmon Creek oil-sands project. An earlier version of this article incorrectly referred to the project as Carmen Creek. (Oct. 28, 2015)

Copyright © 2021 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

**App. 7**

App. 8

# EXHIBIT 2

App. 8

20-F 1 d943478d20f.htm 20-F

**Table of Contents**

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## Form 20-F

ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended December 31, 2015
Commission file number 001-32575

# Royal Dutch Shell plc

*(Exact name of registrant as specified in its charter)*
England and Wales
*(Jurisdiction of incorporation or organisation)*
Carel van Bylandtlaan 30, 2596 HR, The Hague, The Netherlands
Tel. no: 011 31 70 377 9111
royaldutchshell.shareholders@shell.com
*(Address of principal executive offices)*
Securities registered pursuant to Section 12(b) of the Act

| Title of Each Class | Name of Each Exchange on Which Registered |
| --- | --- |
| American Depositary Shares representing two A ordinary shares of the issuer with a nominal value of €0.07 each | New York Stock Exchange |
| American Depositary Shares representing two B ordinary shares of the issuer with a nominal value of €0.07 each | New York Stock Exchange |
| Floating Rate Guaranteed Notes due 2016 | New York Stock Exchange |
| 0.9% Guaranteed Notes due 2016 | New York Stock Exchange |
| 1.125% Guaranteed Notes due 2017 | New York Stock Exchange |
| 5.2% Guaranteed Notes due 2017 | New York Stock Exchange |
| Floating Rate Guaranteed Notes due 2017 | New York Stock Exchange |
| 1.25% Guaranteed Notes due 2017 | New York Stock Exchange |
| 1.9% Guaranteed Notes due 2018 | New York Stock Exchange |
| 2.0% Guaranteed Notes due 2018 | New York Stock Exchange |
| Floating Rate Guaranteed Notes due 2018 | New York Stock Exchange |
| 1.625% Guaranteed Notes due 2018 | New York Stock Exchange |
| 4.3% Guaranteed Notes due 2019 | New York Stock Exchange |
| 4.375% Guaranteed Notes due 2020 | New York Stock Exchange |
| 2.125% Guaranteed Notes due 2020 | New York Stock Exchange |
| 2.25% Guaranteed Notes due 2020 | New York Stock Exchange |
| Floating Rate Guaranteed Notes due 2020 | New York Stock Exchange |
| 2.375% Guaranteed Notes due 2022 | New York Stock Exchange |
| 2.25% Guaranteed Notes due 2023 | New York Stock Exchange |
| 3.4% Guaranteed Notes due 2023 | New York Stock Exchange |
| 3.25% Guaranteed Notes due 2025 | New York Stock Exchange |
| 4.125% Guaranteed Notes due 2035 | New York Stock Exchange |
| 6.375% Guaranteed Notes due 2038 | New York Stock Exchange |
| 5.5% Guaranteed Notes due 2040 | New York Stock Exchange |
| 3.625% Guaranteed Notes due 2042 | New York Stock Exchange |
| 4.55% Guaranteed Notes due 2043 | New York Stock Exchange |
| 4.375% Guaranteed Notes due 2045 | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: none
Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act: none

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report.

Outstanding as of December 31, 2015:
3,965,989,512 A ordinary shares with a nominal value of €0.07 each.
2,431,531,014 B ordinary shares with a nominal value of €0.07 each.

| | | |
| --- | --- | --- |
| Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. | ☑ Yes | ☐ No |
| If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. | ☐ Yes | ☑ No |
| Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. | ☑ Yes | ☐ No |
| Indicate by check mark whether the registrant has submitted electronically and posted on its corporate website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). | ☑ Yes | ☐ No |

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☑     Accelerated filer ☐     Non-accelerated filer ☐

| | |
| --- | --- |
| Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing: | U.S. GAAP ☐ |
| International Financial Reporting Standards as issued by the International Accounting Standards Board. | ☑     Other ☐ |
| If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow. | Item 17 ☐     Item 18 ☐ |
| If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the | ☐ Yes     ☑ No |

**App. 9**

Exchange Act).

Copies of notices and communications from the Securities and Exchange Commission should be sent to:

Royal Dutch Shell plc
Carel van Bylandtlaan 30
2596 HR, The Hague, The Netherlands
Attn: Michiel Brandjes

**App. 10**

**Table of Contents**

INTRODUCTION                                                                            05

SHELL ANNUAL REPORT AND FORM 20-F 2015                        ABOUT THIS REPORT

# ABOUT THIS REPORT

The Royal Dutch Shell plc Annual Report and Form 20-F (this Report) serves as the Annual Report and Accounts in accordance with UK requirements and as the Annual Report on Form 20-F as filed with the US Securities and Exchange Commission (SEC) for the year ended December 31, 2015, for Royal Dutch Shell plc (the Company) and its subsidiaries (collectively referred to as Shell). This Report presents the Consolidated Financial Statements of Shell (pages 115-152), the Parent Company Financial Statements of Shell (pages 173-181) and the Financial Statements of the Royal Dutch Shell Dividend Access Trust (pages 173-181). Cross references to Form 20-F are set out on pages 02-03 of this Report.

Information in this Report in respect of Shell's performance in 2015 and position at December 31, 2015, excludes the activities of BG Group plc, which was acquired on February 15, 2016.

Financial reporting terms used in this Report are in accordance with International Financial Reporting Standards (IFRS). The Consolidated Financial Statements comprise the financial statements of the Company and its subsidiaries. "Subsidiaries" and "Shell subsidiaries" refer to those entities over which the Company has control, either directly or indirectly. Entities and unincorporated arrangements over which Shell has joint control are generally referred to as "joint ventures" and "joint operations" respectively, and entities over which Shell has significant influence but neither control nor joint control are referred to as "associates". "Joint ventures" and "joint operations" are collectively referred to as "joint arrangements".

In addition to the term "Shell", in this Report "we", "us" and "our" are also used to refer to the Company and its subsidiaries in general or to those who work for them. These terms are also used where no useful purpose is served by identifying the particular entity or entities. The term "Shell interest" is used for convenience to indicate the direct and/or indirect ownership interest held by Shell in an entity or unincorporated joint arrangement, after exclusion of all third-party interests. The companies in which Royal Dutch Shell plc has a direct or indirect interest are separate entities.

Except as otherwise specified, the figures shown in the tables in this Report are in respect of subsidiaries only, without deduction of any non-controlling interest. However, the term "Shell share" is used for convenience to refer to the volumes of hydrocarbons that are produced, processed or sold through subsidiaries, joint ventures and associates. All of a subsidiary's production, processing or sales volumes (including the share of joint operations) are included in the Shell share, even if Shell owns less than 100% of the subsidiary. In the case of joint ventures and associates, however, Shell-share figures are limited only to Shell's entitlement. In all cases, royalty payments in kind are deducted from the Shell share.

The financial statements contained in this Report have been prepared in accordance with the provisions of the Companies Act 2006 and with IFRS as adopted by the European Union. As applied to the financial statements, there are no material differences from IFRS as issued by the International Accounting Standards Board (IASB); therefore, the financial statements have been prepared in accordance with IFRS as issued by the IASB. IFRS as defined above includes interpretations issued by the IFRS Interpretations Committee.

than statements of historical fact are, or may be deemed to be, forward-looking statements. Forward-looking statements are statements of future expectations that are based on management's current expectations and assumptions and involve known and unknown risks and uncertainties that could cause actual results, performance or events to differ materially from those expressed or implied in these statements. Forward-looking statements include, among other things, statements concerning the potential exposure of Shell to market risks and statements expressing management's expectations, beliefs, estimates, forecasts, projections and assumptions. These forward-looking statements are identified by their use of terms and phrases such as "anticipate", "believe", "could", "estimate", "expect", "goals", "intend", "may", "objectives", "outlook", "plan", "probably", "project", "risks", "schedule", "seek", "should", "target", "will" and similar terms and phrases. There are a number of factors that could affect the future operations of Shell and could cause those results to differ materially from those expressed in the forward-looking statements included in this Report, including (without limitation): (a) price fluctuations in crude oil and natural gas; (b) changes in demand for Shell's products; (c) currency fluctuations; (d) drilling and production results; (e) reserves estimates; (f) loss of market share and industry competition; (g) environmental and physical risks; (h) risks associated with the identification of suitable potential acquisition properties and targets, and successful negotiation and completion of such transactions; (i) the risk of doing business in developing countries and countries subject to international sanctions; (j) legislative, fiscal and regulatory developments including regulatory measures addressing climate change; (k) economic and financial market conditions in various countries and regions; (l) political risks, including the risks of expropriation and renegotiation of the terms of contracts with governmental entities, delays or advancements in the approval of projects and delays in the reimbursement for shared costs; and (m) changes in trading conditions. Also see "Risk factors" on pages 08-12 for additional risks and further discussion. All forward-looking statements contained in this Report are expressly qualified in their entirety by the cautionary statements contained or referred to in this section. Readers should not place undue reliance on forward-looking statements. Each forward-looking statement speaks only as of the date of this Report. Neither the Company nor any of its subsidiaries undertake any obligation to publicly update or revise any forward-looking statement as a result of new information, future events or other information. In light of these risks, results could differ materially from those stated, implied or inferred from the forward-looking statements contained in this Report.

This Report contains references to Shell's website and to the Shell Sustainability Report. These references are for the readers' convenience only. Shell is not incorporating by reference any information posted on www.shell.com or in the Shell Sustainability Report.

## DOCUMENTS ON DISPLAY

Documents concerning the Company, or its predecessors for reporting purposes, which are referred to in this Report have been filed with the SEC and may be examined and copied at the public reference facility maintained by the SEC at 100 F Street, N.E., Room 1580, Washington, DC 20549, USA. For further information on the operation of the public reference room and the copy charges, call the SEC at 1-800-SEC-0330. All of the SEC filings made electronically by Shell are available to the public on the SEC website at www.sec.gov (commission file number 001-32575). This Report is also available, free of charge, at www.shell.com/annualreport or at the offices of Shell in The Hague, the

**App. 11**

12/3/21, 3:14 PM                                                    20-F

Except as otherwise noted, the figures shown in this Report are stated in US dollars. As used herein all references to "dollars" or "$" are to the US currency.

This Report contains forward-looking statements (within the meaning of the US Private Securities Litigation Reform Act of 1995) concerning the financial condition, results of operations and businesses of Shell. All statements other

Netherlands and London, United Kingdom. Copies of this Report also may be obtained, free of charge, by mail.

**App. 12**

**Table of Contents**

120          FINANCIAL STATEMENTS AND SUPPLEMENTS

CONSOLIDATED FINANCIAL STATEMENTS                                        SHELL ANNUAL REPORT AND FORM 20-F 2015

# NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

## 1 BASIS OF PREPARATION

The Consolidated Financial Statements of Royal Dutch Shell plc (the Company) and its subsidiaries (collectively referred to as Shell) have been prepared in accordance with the provisions of the Companies Act 2006 (the Act) and Article 4 of the International Accounting Standards (IAS) Regulation, and therefore in accordance with International Financial Reporting Standards (IFRS) as adopted by the European Union. As applied to Shell, there are no material differences from IFRS as issued by the International Accounting Standards Board (IASB); therefore, the Consolidated Financial Statements have been prepared in accordance with IFRS as issued by the IASB.

As described in the accounting policies in Note 2, the Consolidated Financial Statements have been prepared under the historical cost convention except for certain items measured at fair value. Those accounting policies have been applied consistently in all periods.

The Consolidated Financial Statements were approved and authorised for issue by the Board of Directors on March 9, 2016.

## 2 KEY ACCOUNTING POLICIES, JUDGEMENTS AND ESTIMATES

### Nature of the Consolidated Financial Statements

The Consolidated Financial Statements are presented in US dollars (dollars) and comprise the financial statements of the Company and its subsidiaries, being those entities over which the Company has control, either directly or indirectly, through exposure or rights to their variable returns and the ability to affect those returns through its power over the entities. Information about subsidiaries at December 31, 2015, is set out in Exhibit 8.

Subsidiaries are consolidated from the date on which control is obtained until the date that such control ceases, using consistent accounting policies. All inter-company balances and transactions, including unrealised profits arising from such transactions, are eliminated. Unrealised losses are also eliminated unless the transaction provides evidence of an impairment of the asset transferred. Non-controlling interest represents the proportion of income, other comprehensive income and net assets in subsidiaries that is not attributable to the Company's shareholders.

### Currency translation

Foreign currency transactions are translated using the exchange rate at the dates of the transactions or valuation where items are re-measured. Foreign exchange gains and losses resulting from the settlement of such transactions and from the translation at quarter-end exchange rates of monetary assets and liabilities denominated in foreign currencies (including those in respect of inter-company balances unless related to loans of a long-term investment nature) are recognised in income, except when recognised in other comprehensive income in respect of cash flow hedges, and presented within interest and other income or within purchases where not related to financing. Share capital issued in currencies other than the dollar is translated at the exchange rate at the date of issue.

On consolidation, assets and liabilities of non-dollar entities are translated to dollars at year-end rates of exchange, while their statements of income, other comprehensive income and cash flows are translated at quarterly average rates. The resulting translation differences are recognised as currency translation differences within other comprehensive income. Upon disposal of all or part of an interest in, or upon liquidation of, an entity, the appropriate portion of cumulative currency translation differences related to that entity are generally recognised in income.

### Revenue recognition

Revenue from sales of oil, natural gas, chemicals and other products is recognised at the fair value of consideration received or receivable, after deducting sales taxes, excise duties and similar levies, when the significant risks and rewards of ownership have been transferred, which is when title passes to the customer. For sales by Upstream operations, this generally occurs when product is physically transferred into a vessel, pipe or other delivery mechanism; for sales by refining operations it is either when product is placed onboard a vessel or offloaded from the vessel, depending on the contractually agreed terms; and for wholesale sales of oil products and chemicals it is either at the point of delivery or the point of receipt, depending on contractual conditions.

Revenue resulting from hydrocarbon production from properties in which Shell has an interest with partners in joint arrangements is recognised on the basis of Shell's working interest (entitlement method). Revenue resulting from the production of oil and natural gas under production-sharing contracts (PSCs) is recognised for those amounts relating to Shell's cost recoveries and Shell's share of the remaining production. Gains and losses on derivative contracts and the revenue and costs associated with other contracts that are classified as held for trading purposes are reported on a net basis in the Consolidated Statement of Income. Purchases and sales of hydrocarbons under exchange contracts that are necessary to obtain or reposition feedstocks for refinery operations are presented net in the Consolidated Statement of Income.

### Research and development

Development costs that are expected to generate probable future economic benefits are capitalised as intangible assets. All other research and development expenditure is recognised in income as incurred.

### Exploration costs

Hydrocarbon exploration costs are accounted for under the successful efforts method: exploration costs are recognised in income when incurred, except that exploratory drilling costs are included in property, plant and equipment pending determination of proved reserves. Exploration costs capitalised in respect of exploration wells that are more than 12 months old are written off unless: (a) proved reserves are booked; or (b) (i) they have found commercially producible quantities of reserves and (ii) they are subject to further exploration or appraisal activity in that either drilling of additional exploratory wells is underway or firmly planned for the near future or other activities are being undertaken to sufficiently progress the assessing of reserves and the economic and operating viability of the project.

**App. 13**

**Table of Contents**

FINANCIAL STATEMENTS AND SUPPLEMENTS    **131**

SHELL ANNUAL REPORT AND FORM 20-F 2015                    CONSOLIDATED FINANCIAL STATEMENTS

| IMPAIRMENTS | | | $ MILLION |
| --- | --- | --- | --- |
| | 2015 | 2014 | 2013 |
| Impairment losses [A] | | | |
| Exploration and production assets | 8,387 | 3,585 | 4,528 |
| Manufacturing, supply and distribution | 458 | 3,099 | 305 |
| Other | 165 | 299 | 532 |
| Total | 9,010 | 6,983 | 5,365 |
| Impairment reversals [A] | | | |
| Exploration and production assets | – | 100 | 17 |
| Other | 3 | 244 | – |
| Total | 3 | 344 | 17 |

[A] Presented by segment in Note 4, together with impairment losses and reversals in respect of intangible assets.

Following the revisions to Shell's long-term oil and gas price outlook in 2015, relevant assets were identified for an impairment review resulting in impairment charges in 2015 of $4.4 billion, principally related to Upstream North American shale properties. In the calculation of the value in use, cash flows were adjusted for risks specific to the related assets and the nominal pre-tax discount rate applied was 6%. Further future downward revisions to Shell's oil and gas price outlook by 10% or more would lead to further impairments which, in aggregate, are likely to be material. Also in Upstream in 2015, Shell ceased Alaska drilling activities for the foreseeable future and the Carmon Creek project in Canada, resulting in impairment charges of $1.8 billion and $2.2 billion respectively.

In response to changes to future capital expenditure plans, an impairment review of tight-gas properties in North America was carried out in 2014, resulting in impairment charges of $2.7 billion in Upstream in respect of a number of US properties. Also in 2014, an impairment review of the refining portfolio was carried out in response to the continuation of weak refining margins across the industry, resulting in impairment charges of $2.8 billion in Downstream. Impairment losses in 2013 arose principally in Upstream in respect of the US tight-gas and liquids-rich shale portfolio.

| CAPITALISED EXPLORATION DRILLING COSTS | | | $ MILLION |
| --- | --- | --- | --- |
| | 2015 | 2014 | 2013 |
| At January 1 | 8,465 | 8,377 | 7,886 |
| Additions pending determination of proved reserves | 3,276 | 4,370 | 5,978 |
| Amounts charged to expense | (2,771) | (1,881) | (2,742) |
| Reclassifications to productive wells on determination of proved reserves | (991) | (2,116) | (2,231) |
| Other movements | (144) | (285) | (514) |
| At December 31 | 7,835 | 8,465 | 8,377 |

Exploration drilling costs capitalised for periods greater than one year at December 31, 2015, analysed according to the most recent year of activity, are presented in the table below. They comprise $869 million relating to 15 projects where drilling activities were underway or firmly planned for the future and $3,852 million relating to 38 projects awaiting development concepts.

| | Projects | | Wells | |
| --- | --- | --- | --- | --- |
| | Number | $ MILLION | Number | $ MILLION |
| Between 1 and 5 years | 42 | 4,364 | 237 | 3,554 |
| Between 6 and 10 years | 10 | 332 | 44 | 1,050 |
| Between 11 and 15 years | 1 | 25 | 6 | 117 |
| Total | 53 | 4,721 | 287 | 4,721 |

**App. 14**

# EXHIBIT 3

# IFRS and US GAAP:
# similarities and differences

*October 2014*



pwc

**App. 16**

| Impact | US GAAP | IFRS |
|---|---|---|
| **Long-lived assets** | | |
| **Impairment of long-lived assets held for use—general**<br><br>The IFRS-based impairment model might lead to the recognition of impairments of long-lived assets held for use earlier than would be required under US GAAP.<br><br>There are also differences related to such matters as what qualifies as an impairment indicator and how recoveries in previously impaired assets get treated. | US GAAP requires a two-step impairment test and measurement model as follows:<br><br>Step 1—The carrying amount is first compared with the undiscounted cash flows. If the carrying amount is lower than the undiscounted cash flows, no impairment loss is recognized, although it might be necessary to review depreciation (or amortization) estimates and methods for the related asset.<br><br>Step 2—If the carrying amount is higher than the undiscounted cash flows, an impairment loss is measured as the difference between the carrying amount and fair value. Fair value is defined as the price that would be received to sell an asset in an orderly transaction between market participants at the measurement date (an exit price). Fair value should be based on the assumptions of market participants and not those of the reporting entity.<br><br>Changes in market interest rates are not considered impairment indicators. | IFRS uses a one-step impairment test. The carrying amount of an asset is compared with the recoverable amount. The recoverable amount is the higher of (1) the asset's fair value less costs of disposal or (2) the asset's value in use.<br><br>In practice, individual assets do not usually meet the definition of a CGU. As a result, assets are rarely tested for impairment individually but are tested within a group of assets.<br><br>Fair value less costs of disposal represents the amount obtainable from the sale of an asset or CGU in an arm's-length transaction between knowledgeable, willing parties less the costs of disposal. The IFRS reference to knowledgeable, willing parties is generally viewed as being consistent with the market participant assumptions noted under US GAAP.<br><br>Value in use represents entity-specific or CGU-specific future pretax cash flows discounted to present value by using a pretax, market-determined rate that reflects the current assessment of the time value of money and the risks specific to the asset or CGU for which the cash flow estimates have not been adjusted.<br><br>Changes in market interest rates can potentially trigger impairment and, hence, are impairment indicators. |

**App. 17**

| Impact | US GAAP | IFRS |
|---|---|---|
| Impairment of long-lived assets held for use—general (continued) | The reversal of impairments is prohibited.<br><br>**Determining the appropriate market—** A reporting entity is required to identify and evaluate the markets into which an asset may be sold or a liability transferred. In establishing fair value, a reporting entity must determine whether there is a principal market or, in its absence, a most advantageous market. However, in measuring the fair value of nonfinancial assets and liabilities, in many cases, there will not be observable data or a reference market. As a result, management will have to develop a hypothetical market for the asset or liability.<br><br>**Application of valuation techniques—** The calculation of fair value no longer will default to a present value technique. Although present value techniques might be appropriate, the reporting entity must consider all appropriate valuation techniques in the circumstances.<br><br>If the asset is recoverable based on undiscounted cash flows, the discounting or fair value type determinations are not applicable. | If certain criteria are met, the reversal of impairments, other than those of good-will, is permitted.<br><br>For noncurrent, nonfinancial assets (excluding investment properties and biological assets) carried at fair value instead of depreciated cost, impairment losses related to the revaluation are recorded in other comprehensive income to the extent of prior upward revalu-ations, with any further losses being reflected in the income statement. |
| **Impairment of long-lived assets—cash flow estimates**<br><br>As noted above, impairment testing under US GAAP starts with undiscounted cash flows, whereas the starting point under IFRS is discounted cash flows. Aside from that difference, IFRS is more prescrip-tive with respect to how the cash flows themselves are identified for purposes of calculating value in use. | Future cash flow estimates used in an impairment analysis should include:<br><br>• All cash inflows expected from the use of the long-lived asset (asset group) over its remaining useful life, based on its existing service potential<br><br>• Any cash outflows necessary to obtain those cash inflows, including future expenditures to maintain (but not improve) the long-lived asset (asset group)<br><br>• Cash flows associated with the even-tual disposition, including selling costs, of the long-lived asset (asset group) | Cash flow estimates used to calculate value in use under IFRS should include:<br><br>• Cash inflows from the continuing use of the asset or the activities of the CGU<br><br>• Cash outflows necessarily incurred to generate the cash inflows from continuing use of the asset or CGU (including cash outflows to prepare the asset for use) and that are directly attributable to the asset or CGU<br><br>• Cash outflows that are indirectly attributable (such as those relating to central overheads) but that can be allo-cated on a reasonable and consistent basis to the asset or CGU |

PwC

**App. 18**

# EXHIBIT 4

**IAS 36**

# Impairment of Assets

In April 2001 the International Accounting Standards Board (Board) adopted IAS 36 *Impairment of Assets*, which had originally been issued by the International Accounting Standards Committee in June 1998. That standard consolidated all the requirements on how to assess for recoverability of an asset. These requirements were contained in IAS 16 *Property, Plant and Equipment*, IAS 22 *Business Combinations*, IAS 28 *Accounting for Associates* and IAS 31 *Financial Reporting of Interests in Joint Ventures*.

The Board revised IAS 36 in March 2004 as part of the first phase of its business combinations project. In January 2008 the Board amended IAS 36 again as part of the second phase of its business combinations project.

In May 2013 IAS 36 was amended by *Recoverable Amount Disclosures for Non-Financial Assets* (Amendments to IAS 36). The amendments required the disclosure of information about the recoverable amount of impaired assets, if that amount is based on fair value less costs of disposal and the disclosure of additional information about that fair value measurement.

Other Standards have made minor consequential amendments to IAS 36. They include IFRS 10 *Consolidated Financial Statements* (issued May 2011), IFRS 11 *Joint Arrangements* (issued May 2011), IFRS 13 *Fair Value Measurement* (issued May 2011), IFRS 9 *Financial Instruments* (Hedge Accounting and amendments to IFRS 9, IFRS 7 and IAS 39) (issued November 2013), IFRS 15 *Revenue from Contracts with Customers* (issued May 2014), *Agriculture: Bearer Plants* (Amendments to IAS 16 and IAS 41) (issued June 2014), IFRS 9 *Financial Instruments* (issued July 2014), IFRS 17 *Insurance Contracts* (issued May 2017), *Amendments to References to the Conceptual Framework in IFRS Standards* (issued March 2018) and *Amendments to IFRS 17* (issued June 2020).

© IFRS Foundation

**App. 20**

IAS 36

*...continued*

| Example |
| --- |
| Assumption 2: budgets/forecasts approved by management reflect a commitment of management to replace the machine and sell it in the near future. Cash flows from continuing use of the machine until its disposal are estimated to be negligible. |
| *The machine's value in use can be estimated to be close to its fair value less costs of disposal. Therefore, the recoverable amount of the machine can be determined and no consideration is given to the cash-generating unit to which the machine belongs (ie the production line). Because the machine's fair value less costs of disposal is less than its carrying amount, an impairment loss is recognised for the machine.* |

108    **After the requirements in paragraphs 104 and 105 have been applied, a liability shall be recognised for any remaining amount of an impairment loss for a cash-generating unit if, and only if, that is required by another IFRS.**

## Reversing an impairment loss

109    Paragraphs 110–116 set out the requirements for reversing an impairment loss recognised for an asset or a cash-generating unit in prior periods. These requirements use the term 'an asset' but apply equally to an individual asset or a cash-generating unit. Additional requirements for an individual asset are set out in paragraphs 117–121, for a cash-generating unit in paragraphs 122 and 123 and for goodwill in paragraphs 124 and 125.

110    **An entity shall assess at the end of each reporting period whether there is any indication that an impairment loss recognised in prior periods for an asset other than goodwill may no longer exist or may have decreased. If any such indication exists, the entity shall estimate the recoverable amount of that asset.**

111    **In assessing whether there is any indication that an impairment loss recognised in prior periods for an asset other than goodwill may no longer exist or may have decreased, an entity shall consider, as a minimum, the following indications:**

**External sources of information**

(a)    **there are observable indications that the asset's value has increased significantly during the period.**

(b)    **significant changes with a favourable effect on the entity have taken place during the period, or will take place in the near future, in the technological, market, economic or legal environment in which the entity operates or in the market to which the asset is dedicated.**

**App. 21**

IAS 36

    (c)    **market interest rates or other market rates of return on investments have decreased during the period, and those decreases are likely to affect the discount rate used in calculating the asset's value in use and increase the asset's recoverable amount materially.**

**Internal sources of information**

    (d)    **significant changes with a favourable effect on the entity have taken place during the period, or are expected to take place in the near future, in the extent to which, or manner in which, the asset is used or is expected to be used. These changes include costs incurred during the period to improve or enhance the asset's performance or restructure the operation to which the asset belongs.**

    (e)    **evidence is available from internal reporting that indicates that the economic performance of the asset is, or will be, better than expected.**

112    Indications of a potential decrease in an impairment loss in paragraph 111 mainly mirror the indications of a potential impairment loss in paragraph 12.

113    If there is an indication that an impairment loss recognised for an asset other than goodwill may no longer exist or may have decreased, this may indicate that the remaining useful life, the depreciation (amortisation) method or the residual value may need to be reviewed and adjusted in accordance with the IFRS applicable to the asset, even if no impairment loss is reversed for the asset.

114    **An impairment loss recognised in prior periods for an asset other than goodwill shall be reversed if, and only if, there has been a change in the estimates used to determine the asset's recoverable amount since the last impairment loss was recognised. If this is the case, the carrying amount of the asset shall, except as described in paragraph 117, be increased to its recoverable amount. That increase is a reversal of an impairment loss.**

115    A reversal of an impairment loss reflects an increase in the estimated service potential of an asset, either from use or from sale, since the date when an entity last recognised an impairment loss for that asset. Paragraph 130 requires an entity to identify the change in estimates that causes the increase in estimated service potential. Examples of changes in estimates include:

    (a)    a change in the basis for recoverable amount (ie whether recoverable amount is based on fair value less costs of disposal or value in use);

    (b)    if recoverable amount was based on value in use, a change in the amount or timing of estimated future cash flows or in the discount rate; or

    (c)    if recoverable amount was based on fair value less costs of disposal, a change in estimate of the components of fair value less costs of disposal.

**App. 22**

IAS 36

116    An asset's value in use may become greater than the asset's carrying amount simply because the present value of future cash inflows increases as they become closer. However, the service potential of the asset has not increased. Therefore, an impairment loss is not reversed just because of the passage of time (sometimes called the 'unwinding' of the discount), even if the recoverable amount of the asset becomes higher than its carrying amount.

## Reversing an impairment loss for an individual asset

117    **The increased carrying amount of an asset other than goodwill attributable to a reversal of an impairment loss shall not exceed the carrying amount that would have been determined (net of amortisation or depreciation) had no impairment loss been recognised for the asset in prior years.**

118    Any increase in the carrying amount of an asset other than goodwill above the carrying amount that would have been determined (net of amortisation or depreciation) had no impairment loss been recognised for the asset in prior years is a revaluation. In accounting for such a revaluation, an entity applies the IFRS applicable to the asset.

119    **A reversal of an impairment loss for an asset other than goodwill shall be recognised immediately in profit or loss, unless the asset is carried at revalued amount in accordance with another IFRS (for example, the revaluation model in IAS 16). Any reversal of an impairment loss of a revalued asset shall be treated as a revaluation increase in accordance with that other IFRS.**

120    A reversal of an impairment loss on a revalued asset is recognised in other comprehensive income and increases the revaluation surplus for that asset. However, to the extent that an impairment loss on the same revalued asset was previously recognised in profit or loss, a reversal of that impairment loss is also recognised in profit or loss.

121    **After a reversal of an impairment loss is recognised, the depreciation (amortisation) charge for the asset shall be adjusted in future periods to allocate the asset's revised carrying amount, less its residual value (if any), on a systematic basis over its remaining useful life.**

## Reversing an impairment loss for a cash-generating unit

122    **A reversal of an impairment loss for a cash-generating unit shall be allocated to the assets of the unit, except for goodwill, pro rata with the carrying amounts of those assets. These increases in carrying amounts shall be treated as reversals of impairment losses for individual assets and recognised in accordance with paragraph 119.**

123    **In allocating a reversal of an impairment loss for a cash-generating unit in accordance with paragraph 122, the carrying amount of an asset shall not be increased above the lower of:**

(a)    **its recoverable amount (if determinable); and**

© IFRS Foundation                    A1445

**App. 23**