IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| PEDRO RAMIREZ, JR., Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>EXXON MOBIL CORPORATION, REX W. TILLERSON, ANDREW P. SWIGER, JEFFREY J. WOODBURY, and DAVID S. ROSENTHAL,<br><br>Defendants. | Case No. 3:16-cv-3111-K |

**DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION
TO EXCLUDE THE TESTIMONY OF STEVEN P. FEINSTEIN**

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

HAYNES AND BOONE, LLP
2801 N. Harwood Street, Suite 2300
Dallas, TX 75219
(214) 651-5000

*Counsel for Exxon Mobil Corporation, Andrew P.
Swiger, and David S. Rosenthal*

SQUIRE PATTON BOGGS
2200 Ross Avenue, Suite 4100W
Dallas, TX 75201
(214) 758-1505

*Counsel for Rex W. Tillerson*

**Table of Contents**

                                                                                              **Page**

PRELIMINARY STATEMENT ....................................................................................... 1

ARGUMENT .................................................................................................................... 5

I.      Feinstein's Opinions Cannot Reliably Show Loss Causation or Damages for
        Disclosures Relating to the Impairment of ExxonMobil's RMDG Assets ........................ 6

        A.      Feinstein's Loss Causation Opinion Is Not Relevant in Light of the
                Court's Class Certification Ruling ......................................................... 7

        B.      Feinstein's Event Study Is Methodologically Flawed and Unreliable .................... 8

        C.      Feinstein's Opinion Is Irrelevant Because the January 31, 2017 Disclosure
                Does Not Correct the 2015 RMDG Impairment Analysis .................................. 10

II.     Feinstein's Opinions Cannot Reliably Show Loss Causation or Damages for
        Disclosures Relating to Kearl Proved Reserves .................................................. 11

        A.      Feinstein Analyzed an Unpleaded Theory, Not the Pleaded Theory .................... 12

        B.      Feinstein Has Not Performed Any Causation Analysis Connecting the
                October 28, 2016 Disclosure to the Alleged Misstatements ................................ 13

III.    Feinstein's Disaggregation Methodology Is Nothing More than Unreliable *Ipse
        Dixit*, and Controlling Law Requires Its Rejection ........................................... 16

IV.     Feinstein's Opinions Regarding the Cost of a Credit Rating Downgrade Are
        Unreliable and Irrelevant ....................................................................... 20

        A.      Feinstein's Opinions Regarding the Cost of a Credit Rating Downgrade
                Are Unreliable and Should Be Excluded ..................................................... 20

        B.      Feinstein's Cost-of-Downgrade Opinion Is Irrelevant and Should Be
                Excluded ....................................................................................... 22

CONCLUSION ................................................................................................................. 24

## Table of Authorities

**Page(s)**

**Cases**

*Catogas* v. *Cyberonics, Inc.*,
   292 F. App'x 311 (5th Cir. 2008) ........................................................................................11

*Daubert* v. *Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993).................................................................................................1, 2, 5, 6

*In re Dell, Inc. Sec. Litig.*,
   591 F. Supp. 2d 877 (W.D. Tex. 2008)................................................................................11

*DeWolff, Boberg & Associates, Inc.* v. *Pethick*,
   No. 3:20-CV-3649-L, 2024 WL 1396267 (N.D. Tex. Mar. 31, 2024) ..............................16, 18

*In re Dura Pharms., Inc. Sec. Litig.*,
   452 F. Supp. 2d 1005 (S.D. Cal. 2006).................................................................................7

*In re Firstenergy Corp.*,
   Nos. 2:20-CV-3785, 2:20-CV-4287, 2022 WL 681320
   (S.D. Ohio Mar. 7, 2022) ...................................................................................................7, 8

*In re Oracle Corp. Sec. Litig.*,
   No. C 01-00988-SI, 2009 WL 1709050 (N.D. Cal. June 19, 2009) .......................................14

*In re Vale Sec. Litig.*,
   No. 19-CV-526-RJD-SJB, 2022 WL 122593 (E.D.N.Y. Jan. 11, 2022).......................4, 19, 20

*In re Zonagen, Inc. Sec. Litig.*,
   322 F. Supp. 2d 764 (S.D. Tex. 2003) .............................................................................14, 15

*Good* v. *Fluor Daniel Corp.*,
   222 F. Supp. 2d 1236 (E.D. Wash. 2002)...........................................................................14

*Greenberg* v. *Crossroads Sys., Inc.*,
   364 F.3d 657 (5th Cir. 2004) ..............................................................................................11

*Guzman* v. *State Farm Lloyds*,
   456 F. Supp. 3d 846 (S.D. Tex. 2020) .................................................................................15

*Jackson* v. *Gautreaux*,
   3 F.4th 182 (5th Cir. 2021) ................................................................................................13

*Knight* v. *Kirby Inland Marine Inc.*,
   482 F.3d 347 (5th Cir. 2007) ...........................................................................................5, 21

*Kumho Tire Co.* v. *Carmichael*,
526 U.S. 137 (1999) ........................................................................................5

*Lighthouse Fin. Grp.* v. *Royal Bank of Scotland Grp., PLC*,
No. 11 Civ. 398(GBD), 2013 WL 4405538 (S.D.N.Y. Aug. 5, 2013) ....................................7

*N. Port Firefighters' Pension—Loc. Option Plan* v. *Temple-Inland, Inc.*,
936 F. Supp. 2d 722 (N.D. Tex. 2013) .................................................................11

*Orthoflex, Inc.* v. *ThermoTek, Inc.*,
986 F. Supp. 2d 776 (N.D. Tex. 2013) .................................................................16

*Oscar Private Equity Invs.* v. *Allegiance Telecom, Inc.*,
487 F.3d 261 (5th Cir. 2007) ....................................................................... *passim*

*Parrish* v. *Freightliner, LLC*,
471 F. Supp. 2d 1262 (M.D. Fla. 2006) .................................................................13

*Pipitone* v. *Biomatrix, Inc.*,
288 F.3d 239 (5th Cir. 2002) .............................................................................8

*Pittman* v. *U.S. Bank NA*,
840 F. App'x 788 (5th Cir. 2021) ........................................................................13

*Rolex Watch U.S.A., Inc.* v. *Capetown Diamond Corp.*,
No. 1:03-CV-3001-CC, 2009 WL 10669248 (N.D. Ga. Mar. 30, 2009)...............................13

*Rolls-Royce Corp.* v. *Heros, Inc.*,
No. 3:07-CV-0739-D, 2010 WL 184313 (N.D. Tex. Jan. 14, 2010)...................................23

**Other Authorities**

Federal Rule of Evidence 702...............................................................................1, 2, 5

Pursuant to *Daubert* v. *Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and Federal Rule of Evidence 702, Defendants Exxon Mobil Corporation ("ExxonMobil"), Rex W. Tillerson, Andrew P. Swiger, and David S. Rosenthal (the "Individual Defendants," and with ExxonMobil, "Defendants") hereby move the Court to exclude the testimony of Steven P. Feinstein, Ph.D., CFA.

## PRELIMINARY STATEMENT

The Court should exclude the testimony of Dr. Steven P. Feinstein, lead plaintiff Greater Pennsylvania Carpenters Pension Fund's ("Plaintiff") loss causation and damages expert.  His opinions are unreliable and irrelevant, and they contradict this Court's prior rulings.  None of his conclusions should be considered at summary judgment, much less submitted to a jury.

In this class action, Plaintiff alleges that Defendants made false and misleading statements in the Form 10-K for 2015 (filed in February 2016) by (1) failing adequately to warn investors of the risk that ExxonMobil could de-book proved reserves at Kearl at year-end 2016, (2) failing to disclose the alleged unprofitability of ExxonMobil's Canadian bitumen operations, and (3) misrepresenting that certain Rocky Mountain Dry Gas ("RMDG") assets were not impaired as of year-end 2015.  According to Plaintiff, Defendants concealed this information from investors in February 2016 in order to maintain ExxonMobil's AAA credit rating in advance of a March 2016 bond offering (the "alleged motive").

Feinstein's assigned job was twofold:  ***First***, Feinstein purports to measure losses per share to class members supposedly caused by the allegedly fraudulent disclosures, to demonstrate the necessary elements of loss causation and damages.  Feinstein purports to calculate losses per share (*i.e.*, the artificial inflation of the stock allegedly caused by fraud) by measuring the back-end decline after October 28, 2016—the only corrective disclosure date that this Court included in its class certification ruling.  Dkt. 178 at 56.  And, ***ignoring the Court's class certification order entirely***, Feinstein also purports to calculate losses per share for January 31, 2017—a corrective

disclosure that this Court *excluded* in its class certification order.  *Id.*  at 51–52.  **Second**, Feinstein

purports to calculate the additional interest that ExxonMobil would have paid bondholders in the

"but for" scenario that its credit rating had been reduced prior to the March 2016 bond offering, in

support of the alleged motive.  Feinstein claims that, in the hypothetical scenario that ExxonMobil

had been downgraded from AAA to AA+ before the bond offering, it would have incurred $832

million of additional interest expense over 30 years on its bonds.

None of Feinstein's opinions are relevant to proving Plaintiff's allegations, and his

methodology and conclusions do not meet the standards for admissibility under Federal Rule of

Evidence 702 and *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  His

testimony should be excluded in its entirety.

***Feinstein's Opinions About the RMDG Asset Impairment Should Be Excluded***.  Even

though the Court rejected the January 31, 2017 corrective disclosure date at class certification,

Feinstein opines that any and all losses caused by Defendants' alleged failure to disclose the

purported RMDG asset impairment is measured by the drop in ExxonMobil's share value that

occurred on January 31, 2017.  App. 220 at 96:24–97:13.  Feinstein's opinion is inadmissible for

multiple reasons.

To begin with, Feinstein's use of the January 31, 2017 earnings release as a corrective

disclosure flatly contradicts this Court's prior rulings.  At the class certification stage, the Court

evaluated the expert evidence presented by Defendants' expert Dr. Allen Ferrell and Feinstein's

predecessor, Mr. Frank Torchio, and found no price impact from January 31, 2017.  Accordingly,

it excluded that disclosure from its class certification order.  Feinstein cannot prove loss causation

and damages from a supposed corrective disclosure that did not move the market and which

2

occurred outside the class period—and that was excluded from the certified class. *Infra* Section I.A.

Feinstein now contends that the Court got it wrong at class certification because his new, inferior event study shows that the January 31 earnings release actually *did* have a statistically significant impact on ExxonMobil's stock price when calculated on a close-to-close basis, *i.e.*, comparing ExxonMobil's stock price after the markets closed on January 31, 2017 to the price at the previous day's market close.  App. 11 ¶ 25; *see also* App. 231 at 230:2–232:15.  But the Court has already held that a close-to-close analysis is not appropriate.  *See* Dkt. 178 at 40.  Plaintiff cannot undo the Court's class certification ruling by relying on a methodologically inferior event study that analyzes the close-to-close period that the Court has already rejected.  *Infra* Section I.B.

Even if Feinstein could reliably show a statistically significant price impact associated with the January 31, 2017 earnings release, his opinion still would not be relevant to proving Plaintiff's allegations.  That is because the January 31, 2017 earnings release reported that ExxonMobil was taking an impairment on its RMDG assets as of year-end *2016*—but said nothing about whether those assets were impaired as of year-end *2015*, as Plaintiff alleges.  Feinstein *assumes*—without applying any actual methodology—that the year-end 2016 impairment means that the assets were also impaired at year-end 2015.  But his baseless assumption—which is contrary to the factual record—is not an admissible opinion and cannot support loss causation.  *Infra* Section I.C.

***Feinstein's Opinions About the Kearl Assets Should Be Excluded***.  Feinstein's opinions also cannot prove that class members incurred losses from Defendants' allegedly inadequate warning in February 2016 that Kearl proved reserves could be de-booked at year-end.  ***Indeed, Feinstein did not analyze that question at all***.  That Feinstein did not analyze the pleaded Kearl theory alone renders his opinion irrelevant.  Instead, Feinstein analyzed a new theory, nowhere

pleaded in Plaintiff's complaint, that ExxonMobil should have de-booked its Kearl proved reserves at year-end **2015** and reported the de-booking in its 2015 Form 10-K filing. *Infra* Section II.A

Not only is his new Kearl opinion irrelevant to the pleaded claim, but it is inadmissible for additional reasons. In particular, the alleged corrective disclosure concerns the likelihood that Kearl proved reserves would be de-booked at year-end **2016**, which does not reveal anything about whether Kearl proved reserves should have been de-booked at year end **2015**. Feinstein again assumes a connection, applying no methodology whatsoever. *Infra* Section II.B.

<u>***Feinstein's "Methodology" of Disaggregation Must Be Rejected under Controlling Law***</u>. For both alleged disclosure dates, Feinstein fails to apply a reliable methodology to disaggregate confounding information (*i.e.*, information that may have caused or contributed to a price decline that is not related to the purported fraud). Feinstein purports to have read certain analyst reports, and—based only on his own "say-so"—concludes that confounding information had little or no impact on ExxonMobil's stock price. But his approach is contrary to binding Fifth Circuit law, under which an expert may not simply rely on a subjective review of analyst reports—conducted without any verifiable methodology—to support his conclusion. *Oscar Private Equity Invs.* v. *Allegiance Telecom, Inc.*, 487 F.3d 261, 271 (5th Cir. 2007), *abrogated on other grounds by Erica P. John Fund, Inc.* v. *Halliburton Co.*, 563 U.S. 804 (2011). Courts routinely exclude opinions like this one that are based on no more than an expert's subjective *ipse dixit*. In fact, another court has previously rejected Feinstein's opinion due to his use of a similarly defective methodology. *In re Vale Sec. Litig.*, No. 19-CV-526-RJD-SJB, 2022 WL 122593, at *12 (E.D.N.Y. Jan. 11, 2022), *report and recommendation adopted*, No. 19CV526RJDSJB, 2022 WL 969724 (E.D.N.Y. Mar. 31, 2022). His opinion should be excluded here, too. *Infra* Section III.

4

***Feinstein's Opinion on Credit Downgrade Costs Should Be Excluded***.   Finally, Feinstein's opinions about the supposed cost to ExxonMobil of a credit-rating downgrade should be excluded because they are both irrelevant and unreliable.  Feinstein's opinion is presumably meant to lend credence to Plaintiff's scienter theory, that ExxonMobil had a motive to mislead investors in order to prop up its AAA rating in advance of the company's March 2016 bond offering.  But Feinstein's "calculations" prop up Plaintiff's scienter theory not a wit, because there is no evidence that anyone within ExxonMobil undertook a similar analysis in advance of the bond offering, much less acted on such a motive to alter the disclosures about proved reserves or impairments.  To the contrary, as explained in Defendants' accompanying Motion for Summary Judgment ("Defs.' Mot. Sum. J."), the undisputed facts show that those at ExxonMobil responsible for the allegedly misleading disclosures worked in separate divisions from those responsible for the bond offering; no one within ExxonMobil connected proved reserves de-bookings or impairments with a possible credit rating downgrade; and de-bookings and impairments did not ultimately impact ExxonMobil's credit rating.  In any event, Feinstein's calculation should be rejected because he applies a methodology that has never been accepted for calculating corporate bond rates and is contrary to academic literature on the subject.  *Infra* Section IV.

## ARGUMENT

Federal Rule of Evidence 702 requires the district court to act as a gatekeeper, ensuring "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. To be reliable, expert testimony must have "a reliable basis in the knowledge and experience of the relevant discipline." *Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137, 149 (1999).  Expert evidence must "be reliable at each and every step or else it is inadmissible."  *Knight* v. *Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007).  And the expert's opinion must "assist the trier of fact to understand the evidence or to determine a fact in

issue." *Daubert*, 509 U.S. at 591. Opinions which are irrelevant, or which do not "fit" the theory of the case, are not admissible. *Id.*

**I.  Feinstein's Opinions Cannot Reliably Show Loss Causation or Damages for Disclosures Relating to the Impairment of ExxonMobil's RMDG Assets**

Plaintiff alleges that Defendants misled investors by failing to disclose in ExxonMobil's 2015 Form 10-K that the RMDG assets were impaired as of year-end 2015. As proof of loss causation and damages, Feinstein relies solely on the change in ExxonMobil's share price on January 31, 2017, the date on which ExxonMobil announced its Q4 and FY 2016 earnings. Prior to the start of trading on that day, ExxonMobil announced, among other things, that the Company "would be taking an impairment charge of $2.0 billion related to its Rocky Mountain operations." App. 56 ¶ 121. Feinstein purports to conduct an event study that shows—from the close of trading on January 30 to the close of trading on January 31—a "statistically significant 1.46% decline, equivalent to a loss of $1.23 per share" in ExxonMobil's share price that day. App. 61 ¶ 163. Because non-RMDG asset impairments were also announced that day, Feinstein makes a pro rata reduction for those assets, and attributes $1.05 to ExxonMobil's failure to disclose that RMDG assets were supposedly impaired as of year-end 2015. App. 61–62 ¶¶ 163–66; App. 220 at 96:24–97:13. But Feinstein makes no adjustment at all for any non-impairment news announced in the earnings release. *See* App. 61–62 ¶¶ 165–66.

Feinstein's opinion is not relevant because the Court already found that defendants had rebutted price impact for the January 31, 2017 earnings release and excluded it from the certified Class, and, in any event, Feinstein's methodology suffers from a number of flaws rendering it unreliable.

6

**A.      Feinstein's Loss Causation Opinion Is Not Relevant in Light of the Court's Class Certification Ruling**

In its class certification ruling, this Court found that the January 31, 2017 press release was "not associated with a statistically significant negative price reaction on a close-to-open basis or even a close-to-close basis." Dkt. 178 at 52. Because there was "*a lack of price impact*" (and, therefore, no reliance) from the alleged corrective disclosure that day, the Court excluded it from the class definition. Dkt. 178 at 52. The Court also excluded investors who purchased after October 28, 2016. Dkt. 178 at 56 (certifying class of "[a]ll persons who purchased or otherwise acquired Exxon Mobil Corporation common stock between February 24, 2016, and *October 28, 2016 (the date of the sole alleged Corrective Disclosure whose impact on Exxon Mobil's stock price Defendants failed to rebut)*") (emphasis added). Plaintiff has never moved to reconsider the Court's class certification decision, nor filed a new motion for class certification. As a result, Defendants have rebutted the presumption of reliance for the Class, and the Class, as certified, does not include the January 31 disclosure.

Feinstein's opinions regarding the January 31, 2017 disclosure also are not relevant to proving loss causation because they post-date the class period. "[I]nformation cannot serve as a corrective disclosure if it was not disclosed during the class period." *Lighthouse Fin. Grp.* v. *Royal Bank of Scotland Grp.*, PLC, No. 11 Civ. 398(GBD), 2013 WL 4405538, at *10 (S.D.N.Y. Aug. 5, 2013), *aff'd sub nom. IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund* v. *Royal Bank of Scotland Grp., PLC*, 783 F.3d 383 (2d Cir. 2015).[1] Courts regularly "find loss causation lacking where plaintiffs' first concrete knowledge of the scheme or misstatement postdates the

---

[1]   Although several courts have recognized an exception to this rule in cases involving "a protracted series of partial disclosures," those cases are inapposite here. *In re Firstenergy Corp.*, Nos. 2:20-CV-3785, 2:20-CV-4287, 2022 WL 681320, at *29 (S.D. Ohio Mar. 7, 2022); *see also In re Dura Pharms., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1023 (S.D. Cal. 2006).

7

class period." *Firstenergy Corp.*, 2022 WL 681320 at \*29 & n.39 (collecting cases). That is what Plaintiff alleges here: that "investors continued to be misled until the truth [about the RMDG impairment] was disclosed on . . . 31 January 2017." App. 7–8 ¶ 32; App. 218 at 87:6–89:20. This "singular, unitary disclosure"—which caused no price impact and occurred outside the class period—is not relevant to loss causation here. *Firstenergy Corp.*, 2022 WL 681320 at \*29; *see also Pipitone* v. *Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002) (to be relevant, expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue."). Absent "proof that the misstatement *actually moved* the market," *Oscar*, 487 F.3d at 265, Feinstein's analysis of the January 31, 2017 disclosure is irrelevant. Dkt. 178 at 22–29, 51–52.

### B.    Feinstein's Event Study Is Methodologically Flawed and Unreliable

Feinstein's opinions provide no reliable basis to revisit—much less reverse—the Court's earlier substantive conclusions about the January 31 disclosure.

At class certification, Plaintiff offered testimony from a different expert, Mr. Torchio, who performed an event study and opined that there was no statistically significant price movement in ExxonMobil's stock price on January 31, 2017, but found that there were statistically significant negative returns using a two-day window. Dkt. 88-1 ¶¶ 88, 90. Defendants' expert, Dr. Ferrell, likewise found no statistically significant price movement on January 31, 2017, using either a close-to-close or a close-to-open window. Dkt. 178 at 52. In its ruling on class certification, the Court rejected Torchio's use of a two-day event window, holding that "a two-day window is not appropriate for assessing price impact in the highly efficient market for Exxon Mobil's stock," and concluded there was no price impact on either a close-to-close or close-to-open basis. Dkt. 178 at 52.

Feinstein now claims the Court and his predecessor, Torchio, got it all wrong. He testified that he had reviewed both Torchio's report and the Court's class certification ruling prior to

8

conducting his analysis, App. 214 at 49:5–12, and disagreed with Torchio's index selection, App. 227–29 at 216:19–222:3.  Aware of Torchio's index selection (and its conclusion), Feinstein constructs a new, different industry index—which he created by weighting the returns of BP p.l.c, Chevron Corporation, Shell plc, and Total S.A.  But Feinstein's model results in a lower adjusted "R-squared" value than the index used by Torchio, as well as the index used by Dr. Ferrell, which means the model does "a worse job of predicting ExxonMobil's price movements."  App. 250 ¶ 47.  And, even using his inferior model, Feinstein's regression finds a statistically significant residual price change only when he performs a "close-to-close" analysis of ExxonMobil's stock price, App. 11 ¶ 25; *see also* App. 231 at 230:2–232:15, and no statistically significant price change from "close to open," App. 267–68 ¶ 48 & Ex. E.

Applying Feinstein's close-to-close analysis would again contradict the Court's class certification ruling, which found that a close-to-open window is appropriate to assess news that is easily digestible and revealed prior to the market open.  *See* Dkt. No. 178 at 40.  As Dr. Ferrell explains, a close-to-open event study is particularly appropriate for ExxonMobil because academic literature shows that ExxonMobil stock is highly efficient, such that it reflects new information on a close-to-open basis.  App. 298 at 50:19–51:10.

Feinstein cannot deny that the alleged corrective disclosure regarding the $2 billion impairment was made prior to the market opening on January 31, 2017.  App. 231 at 232:16–25. He simply disagrees with the Court's class certification ruling, arguing that a close-to-open regression ignores information revealed during a conference call held after markets opened.  But Feinstein fails to identify any new information related to the alleged fraud that was revealed on that call.  *See* App. 175–75 ¶ 114; App. 231 at 232:16–25.  Because there is none.  *See* App. 266 ¶ 45.  And, had Feinstein performed the close-to-open analysis required by the Court's class

certification ruling, even his inferior model shows that ExxonMobil's stock price movement was not statistically significant on January 31, 2017. App. 267–68 ¶ 48 & Ex. E.

In sum, Feinstein's inferior model and methodologically improper close-to-close analysis of the January 31, 2017 disclosure are unreliable and should not be considered as evidence of loss causation or damages.

**C.    Feinstein's Opinion Is Irrelevant Because the January 31, 2017 Disclosure Does Not Correct the 2015 RMDG Impairment Analysis**

Even if Feinstein could reliably show price impact caused by ExxonMobil's January 31, 2017 disclosure, and even assuming the January 31 disclosure had not been excluded by the Court at class certification, his analysis still would not be relevant to proving loss causation and damages for one simple reason:  ExxonMobil's January 31, 2017 disclosure says nothing about and does not "correct" ExxonMobil's alleged failure to disclose that the RMDG assets were impaired at year-end *2015*.  And rather than applying an actual methodology to assessing loss causation, Feinstein impermissibly assumes it.

The January 31 Disclosure addresses the *2016* impairment analysis, not the previously-issued *2015* impairment analysis.  ExxonMobil was clear in its disclosures that it conducted its impairments assessments on an annual basis; recognizing an impairment for 2016 does not signal that the assets were impaired the prior year.  And ExxonMobil has never restated its 2015 impairment analysis, and ExxonMobil's independent auditor, PwC, has never withdrawn its opinion that the RMDG assets were not impaired at year-end 2015.  App. 219 at 90:1–6; App. 399 at 256:1–13.  The January 31 Disclosure thus is not "corrective" of the 2015 impairment analysis. *See N. Port Firefighters' Pension—Loc. Option Plan* v. *Temple-Inland, Inc.*, 936 F. Supp. 2d 722, 763 (N.D. Tex. 2013) (statements not corrective where "nothing in the[] disclosures indicate[d] that prior valuations were incorrect or that Guaranty should have recorded an [impairment] in prior

SEC filings"); *In re Dell, Inc. Sec. Litig.*, 591 F. Supp. 2d 877, 909 (W.D. Tex. 2008) (statements not corrective because they did "no more than announce Dell's earnings or expected earnings" and did not "reveal[] or specifically correct[] any prior fraud or misrepresentation"). In the Fifth Circuit, as elsewhere, a public disclosure for a specific time period does not "correct" disclosures relating to earlier time periods where it "does not report any concern that [the earlier disclosures] may be incorrect." *Greenberg* v. *Crossroads Sys., Inc.*, 364 F.3d 657, 668 (5th Cir. 2004) (third-quarter revenue statement was not corrective of first- and second-quarter statements); *see* Defs.' Mot. Sum. J. 35.

Feinstein purports to opine on loss causation, but does not offer any actual methodology to assess loss causation. He could not identify any analyst who connected the 2016 impairment of the RMDG assets to the earlier 2015 assessment. *See* App. 219–20 at 93:18–95:9. He testified that because certain analysts expressed "surprise" about the impairment, "[t]hat also implies that [the market] . . . should have been informed sooner" but conceded that that he did not identify any "direct" connection in the market commentary. App. 220 at 94:15–17. Here, because the January 31 Disclosure "does not report any concern" that the RMDG impairment-related disclosures in the 2015 10-K were wrong—and Feinstein does not apply any methodology to conclude otherwise— the January 31 disclosure "cannot form the basis for a fraud-on-the-market claim." *Greenberg*, 364 F.3d at 668; *see also Catogas* v. *Cyberonics, Inc.*, 292 F. App'x 311, 315–16 (5th Cir. 2008) (disclosure not corrective where it did "nothing to correct the inaccuracy of such statements or bring to light any of the alleged fraud by defendants").

## II.    Feinstein's Opinions Cannot Reliably Show Loss Causation or Damages for Disclosures Relating to Kearl Proved Reserves

On October 28, 2016, ExxonMobil announced its financial results for the third quarter of 2016, including an announcement that the company "might be forced to de-book 3.6 billion barrels

11

of reserves at Kearl and 1.0 billion of oil-equivalent barrels of natural gas of North American reserves." App. 55 ¶ 120. Feinstein performs an event study, which he uses to conclude that "the residual return for Exxon stock on 28 October 2016 was a statistically significant -2.84%, or -$2.43 per share" and that "[f]rom its statistical significance one may conclude that the 28 October 2016 residual Exxon stock price decline was caused by Company-specific information." App. 63 ¶ 153. Feinstein attributes only $0.04 of that amount to confounding information, and "the remaining $2.39" to "dissipation of artificial inflation that was caused by the alleged misrepresentations and omissions." App. 65–67 ¶¶ 158, 162. Specifically, Feinstein attributes the entire $2.39 reduction to the alleged Kearl-related misrepresentations and omissions. App. 220 at 96:12–23.

A.    **Feinstein Analyzed an Unpleaded Theory, Not the Pleaded Theory**

Feinstein's opinion is irrelevant and should be excluded because he analyzes a theory that is not pleaded in Plaintiff's complaint. Feinstein assumes that "by year-end 2015, operations at Kearl . . . no longer legitimately qualified as a 'proved' reserve," App. 12–13 ¶ 30; App. 215 at 50:6–12, and further assumes that the October 28, 2016 warning that Kearl reserves might be de-booked at year-end *2016* somehow "corrected" ExxonMobil's failure to de-book Kearl proved reserves at year-end *2015*. That theory appears nowhere in Plaintiff's complaint. Instead, the complaint alleges that the 2015 10-K was a "tepid warning[]" about the possibility of de-booking of the proved reserves *at year-end 2016*, which purportedly "fail[ed] to inform investors of the true state of affairs – namely, that the de-booking of the Kearl Operation's proved reserves was all but guaranteed." Dkt. 36 ¶ 348. As explained in Defendants' summary judgment brief, Plaintiff has not previously advanced the theory that ExxonMobil should have de-booked the Kearl proved reserves as of year-end 2015, and to the contrary, has specifically disclaimed that theory. Defs.' Mot. Sum. J. 37.

12

Binding Fifth Circuit precedent is clear that Plaintiff may not now pivot to put forward this new theory in opposing summary judgment. *Jackson* v. *Gautreaux*, 3 F.4th 182, 188 (5th Cir. 2021) ("It is well settled in [the Fifth Circuit] that '[a] claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court.'"); *Pittman* v. *U.S. Bank NA*, 840 F. App'x 788, 789–90 (5th Cir. 2021) ("Our precedent precludes a plaintiff from advancing a new claim or reframing a previously presented one in response to a motion for summary judgment."). Feinstein's opinions as to the October 28, 2016 disclosure are thus irrelevant. *Rolex Watch U.S.A., Inc.* v. *Capetown Diamond Corp.*, No. 1:03-CV-3001-CC, 2009 WL 10669248, at \*7 (N.D. Ga. Mar. 30, 2009) (finding that expert report addressing unpleaded theory was irrelevant and granting motion to exclude); *Parrish* v. *Freightliner, LLC*, 471 F. Supp. 2d 1262, 1266 (M.D. Fla. 2006) (excluding expert report where "[t]hrough [the] expert report, plaintiff entirely changed her theory of the case").

### B.    Feinstein Has Not Performed Any Causation Analysis Connecting the October 28, 2016 Disclosure to the Alleged Misstatements

Even if Feinstein's analysis of the unpleaded Kearl theory was relevant (it is not), it suffers other fatal defects. Feinstein's new theory is that the October 28, 2016 disclosure revealed the alleged fraud, but he conducted no analysis to explain how ExxonMobil's disclosure about the potential for Kearl de-bookings at *year-end 2016* corrected any alleged misrepresentations about Kearl proved reserves at *year-end 2015*. App. 223 at 107:4–12. In fact, Feinstein claims that he was not required to do so in order to offer an opinion on loss causation because his analysis "assume[s] Lead Plaintiff will be able to prove its factual allegations." App. 8 ¶ 6; *see* App. 222 at 103:23–104:18. He contends that "[a]ssuming the factual allegations is a generally accepted practice in loss causation and damages analysis." App. 8 ¶ 6 n.2. But an expert cannot "assume[] the very fact he is being proffered to prove, i.e. that the [allegedly fraudulent] statements caused

13

Plaintiffs' damages." *See In re Zonagen, Inc. Sec. Litig.*, 322 F. Supp. 2d 764, 781–82 (S.D. Tex. 2003) (disregarding expert opinion founded on causation assumption); *see also In re Oracle Corp. Sec. Litig.*, No. C 01-00988-SI, 2009 WL 1709050, at *28 (N.D. Cal. June 19, 2009) (excluding expert testimony where expert "assumes what he sets out to prove"), *aff'd sub nom. In re Oracle Corp. Sec. Litig*, 627 F.3d 376 (9th Cir. 2010); *Good* v. *Fluor Daniel Corp.*, 222 F. Supp. 2d 1236, 1243 (E.D. Wash. 2002) (excluding expert testimony where expert "assumes the fact to be proved").  Indeed, in *In re Zonagen*, the court found that the record was "almost entirely devoid of any proof of loss causation" where the plaintiff's expert, like Feinstein here, did "not opine directly that the Defendants' misstatements about the [alleged fraud] caused Zonagen's stock price to increase and that the truth about those misstatements caused the stock price to decrease." 322 F. Supp. 2d at 781.  Instead, the expert in that case "merely relied on and verified court rulings to determine which statements affected the stock price." *Id.* at 782.  The court found that this "does not constitute evidence of loss causation" and that the expert's opinion was therefore not relevant. *Id.*  The same is true of Feinstein's attempt to rely on Plaintiff's allegations instead of conducting an independent causation analysis here.

Not only did Feinstein assume the fact to be proved, but he admits that his review yielded no support for the proposition that the market connected the 2016 disclosure with the 2015 year-end results.  Importantly, Feinstein admitted that he could not identify a single analyst report or other market commentary that drew a connection between the October 28, 2016 disclosure about year-end de-bookings for 2016, and ExxonMobil's earlier 2015 proved reserve reporting.  App. 223 at 107:4–108:11.  Feinstein also admits that he cannot identify what, specifically, was misleading about ExxonMobil's 2015 proved reserves calculations and simply "accepted as an assumption that it's proved that these numbers are, in fact, false and misleading." App. 221 at

14

99:19–101:24; *see also* App. 216–17 at 64:17–66:22. Nor could Feinstein explain how the October 28, 2016 disclosure—which was related to ExxonMobil's 2016 proved reserves analysis—could have corrected any alleged misstatement in the company's 2015 analysis. When pressed, he could say only that the alleged corrective disclosure "informed the market that at least as of that date, Kearl was not profitable"—*i.e.*, it reported the status of Kearl as of October 2016. App. 223 at 106:5–107:3. Feinstein also testified that "one can infer" that the "disclosure probably could have been made earlier," though he could identify no support for that assertion, other than that it is "what plaintiffs are saying they're going to prove." App. 223 at 106:5–107:11. But "an expert's opinion cannot substitute for facts." *Guzman* v. *State Farm Lloyds*, 456 F. Supp. 3d 846, 854 (S.D. Tex. 2020). As Dr. Ferrell explains in his report, there is no reliable economic basis to support Plaintiff's theory that the October 28, 2016 announcement regarding a potential Kearl proved reserves de-booking as of year-end 2016 revealed the supposed "truth" that ExxonMobil should have de-booked the Kearl reserves as of year-end 2015. App. 249–56 ¶¶ 22–33. "An expert opinion that contradicts indisputable record facts is unreasonable and thus, unreliable." *Guzman*, 456 F. Supp. 3d at 855.

Feinstein's reliance on unsupported assumptions in lieu of conducting a causation analysis renders his opinion both irrelevant and unreliable. *In re Zonagen*, 322 F. Supp. 2d at 778 (concluding that "[a]ttorney argument is not evidence" and that expert who "merely assumed" the truth of allegations without any factual evidence in support offered "conjecture . . . not a valid opinion supported by fact and theory"); *Orthoflex, Inc.* v. *ThermoTek, Inc.*, 986 F. Supp. 2d 776, 798 (N.D. Tex. 2013) ("[A]n expert cannot forgo his own independent analysis and rely exclusively on what an interested party tells him.").

**III.     Feinstein's Disaggregation Methodology Is Nothing More than Unreliable *Ipse Dixit*, and Controlling Law Requires Its Rejection**

Under Fifth Circuit law, to establish loss causation, plaintiff must introduce expert analysis of causation and damages that separates, or disaggregates, fraud-related losses from non-fraud-related losses. As the Fifth Circuit held in *Oscar Private Equity Investments* v. *Allegiance Telecom, Inc.*, an expert may not simply read analyst reports written by industry observers, and then opine based on *ipse dixit* that the commentary supports his conclusion. Rather, the expert must introduce an actual methodology to support his opinion. 487 F.3d at 271. Dr. Feinstein fails to do that here, for either October 28 or January 31.

**October 28, 2016 Disclosure**. Feinstein admits that several other pieces of non-fraud-related confounding information were released with the Company's earnings announcement on October 28, 2016. App. 63–67 ¶¶ 155–62. But his report makes only a cursory attempt at disaggregation, relying on his own *ipse dixit* to conclude that the other news contained in the 2016 Q3 10-Q was "on net, positive, and therefore could not have contributed to the negative price reaction on 28 October 2016." App. 63 ¶ 155. He fails to offer any verifiable methodology used to arrive at this conclusion.

Even where an expert is "relying solely or primarily on experience . . . [he or she] must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *DeWolff, Boberg & Associates, Inc.* v. *Pethick*, No. 3:20-CV-3649-L, 2024 WL 1396267, at *5 (N.D. Tex. Mar. 31, 2024). The "'trial court's gatekeeping function requires more than simply taking the expert's word for it' that the claimed basis supports the opinion." *Id.* (quoting Fed. R. Evid. 702 Advisory Committee's notes to 2000 amendments).

16

Feinstein acknowledges that the new, Company-specific information released on October 28 included a $0.04 miss in adjusted earnings per share (EPS), low production levels due to disruptions in Nigerian operations, low realized sales prices, and low refining margins—all of which he concedes was unrelated to the potential for the Canadian mining operation at Kearl de-booking announced that day. App. 64–67 ¶¶ 156–61.  But, apart from deducting the $0.04 to reflect that quarterly EPS miss, he summarily concludes, on the basis of reading a few analyst reports, that each potentially confounding factor is "non-recurring or unsurprising, as well as having been completely countervailed by positive earnings item disclosures." App. 65 ¶ 158.

Feinstein's treatment of this confounding information is conclusory and reliant on cherrypicked analyst reports.  He asserts, for example, that "the disruptions in Nigeria were not new news and impacted Exxon's peers as well."  App. 65 ¶ 159 & nn.151–52.  But "numerous analysts, including ones cited by Feinstein, specifically state that the magnitude of the disruptions in Nigeria were worse than expected."  App. 264–65 ¶ 41.  Feinstein ignores that entirely.  And although not addressed in his report, Feinstein acknowledged at his deposition that the October 28 announcement revealed that, in addition to the potential Kearl de-booking, ExxonMobil could be required to de-book 1 billion oil-equivalent barrels of proved reserves in other North American operations, which he conceded was wholly unrelated to the alleged fraud.  App. 225 at 152:12–22.  Feinstein again was content to cherry pick only information that supported his conclusion.  He pointed to only selective analyst commentary to conclude that this other potential de-booking was not as important to the market as the Kearl de-booking, and that it was not responsible for any of the stock price decline that day.  App. 225–26 at 152:23–154:18.  Feinstein has identified no methodology for determining which analyst reports to credit in reaching his conclusion or how much value to ascribe to any given report.  He relies solely on his own subjective reading of the

17

reports to conclude that "[a]nalysts may have mentioned a variety of items, but their primary focus was generally on the corrective disclosure portions of the Company announcement" and that as a result, "the news about Nigeria and other mentioned developments had little effect on Exxon's stock price, if any."  App. 147 ¶¶ 35–36; *see also* App. 224–25 at 149:20–150:23.

This Court need not "simply take his . . . 'word for it' that he correctly applied the methodology or that the claimed bases support his opinion."  *DeWolff*, 2024 WL 1396267, at *14. Indeed, the Fifth Circuit rejected a similarly subjective analysis in *Oscar Private Equity Investments* v. *Allegiance Telecom, Inc*.  There, as here, plaintiff's expert conducted an event study "supporting a finding that [the company's] stock reacted to the entire bundle of negative information contained in the [quarterly] announcement."  *Oscar*, 487 F.3d at 271.  The Fifth Circuit explained that this was insufficient: "this reaction suggests only market efficiency, not loss causation, for there is no evidence linking the culpable disclosure to the stock-price movement." *Id.*  To bolster her conclusions, plaintiff's expert in *Oscar* then "offer[ed] as evidence only the raw opinion of analysts" that the alleged misstatement was to blame for the stock drop.  *Id.*  This, too, was not enough: the court of appeals held that "analyst speculation about materiality, while better informed than a layman," was inadequate to establish loss causation.  Feinstein's methodology suffers from the same fatal subjective *ipse dixit*.

This is not the first time Feinstein has used this defective methodology.  In *In re Vale Securities Litigation*, Feinstein purported to identify relevant news dates for his event study by reviewing thousands of news headlines and analyst reports, but "he provide[d] no framework— other than a vague, qualitative description he provided in his deposition—for how he assessed whether the news on each day was unexpected and/or on balance either positive or negative." 2022 WL 122593, at *12.  In that case, as here, Feinstein parsed analyst statements to assess whether

18

news was value-relevant and positive or negative "using no identifiable criteria or anything other than purely subjective analysis masquerading as a kind of objective assessment." *Id.* at *12. The court concluded that "[w]ithout providing such a framework, his selection of dates is not replicable or verifiable and is thus inappropriate." *Id.* The same is true here.

Further, Feinstein's analysis leading to the $0.04 reduction to account for the EPS miss is severely flawed and unreliable. Feinstein opines that a reduction of $0.04 per share is appropriate because the EPS miss was viewed by the market as a one-time, non-recurring event. He then supports his conclusion that the EPS miss was non-recurring by reviewing analysts' 2016 EPS estimates, and purportedly finding that analysts increased their estimates in the quarter following the disclosure. App. 64 ¶ 157; App. 148–49 ¶¶ 39–40. But Dr. Feinstein examines only a single quarter following the disclosure, even though he is attempting to determine whether analysts lowered their long-term EPS estimates. This is not a valid methodology. As Dr. Ferrell demonstrates, applying Feinstein's methodology and using his same data source, following the October 28 announcement, analysts lowered their median FY 2017 EPS estimates and median and mean EPS estimates for FY 2018, 2019, and 2020. This undisputed evidence shows that the negative news for 3Q 2016 *did* have a recurring impact. App. 257–58, ¶ 35 & Ex. B. Therefore, Feinstein's methodology for disaggregating only $0.04 to account for the EPS miss is demonstrably unreliable.

**January 31, 2017 Disclosure**. Feinstein also fails to conduct a disaggregation analysis that can reliably separate the impact of the purported corrective disclosure from the impact of other value-relevant information released on January 31, 2017. Feinstein simply asserts that he "identified no *public*, negative, confounding information that contributed to the 31 January 2017 residual stock price decline." App. 67–68 ¶ 165. But the only support for that assertion is

Feinstein's own *ipse dixit*, and that is not enough. *Oscar*, 487 F.3d at 271. Dr. Ferrell, however, identified other negative news announced the same day: "ExxonMobil disclosed a 40% reduction in earnings relative to the 4Q 2015 and a 39% reduction in EPS" which elicited negative analyst reactions. App. 268–69, ¶ 50. Feinstein's conclusion that news of the earning miss was not value-relevant information relies on "no identifiable criteria or anything other than purely subjective analysis masquerading as a kind of objective assessment." *In re Vale,* 2022 WL 122593 at *12. For this additional reason, and under the authorities cited above, Feinstein's opinions as to the January 31, 2017 alleged corrective disclosure are unreliable and should be excluded.

## IV. Feinstein's Opinions Regarding the Cost of a Credit Rating Downgrade Are Unreliable and Irrelevant

### A. Feinstein's Opinions Regarding the Cost of a Credit Rating Downgrade Are Unreliable and Should Be Excluded

Feinstein opines that, if ExxonMobil received a credit rating of AA+ rather than AAA, then the March 2016 bond offering "would have cost Exxon $831.95 million in additional interest expense over the life of the Notes." App. 69 ¶ 173. At his deposition, Feinstein revised this opinion, explaining that this calculation assumed that ExxonMobil's rating would be downgraded to AA+ by both ratings agencies, which he conceded is not what is alleged to have happened. App. 212–13 at 38:20–42:15; App. 233 at 263:5–15. He reduced his calculation of the additional interest expense resulting from a split rating—*i.e.*, a downgrade to AA+ by S&P but no change from Moody's—to $412.68 million, essentially cutting his prior estimate in half. App. 233–34 at 263:16–266:6; App. 304. But even that halved figure suffers from several defects that render his opinion unreliable. *Knight* v. *Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (an expert's analysis must "be reliable at each and every step or else it is inadmissible").

First, to calculate the $832 million (or $413 million) of additional interest, Feinstein makes the assumption that the AA+ index option adjusted spreads ("OAS") would lie exactly at the

midpoint between the AAA OAS and the AA OAS. But as Defendants' expert Dr. Saunders explains, there is no economic basis to apply linear interpolation in this context (*i.e.*, to simply select the midpoint between two bond ratings). App. 339–40 ¶¶ 83–84; App. 388 ¶¶ 49–50. For corporate bonds, "yield curves, which capture the relationship between the interest rate and maturity of a bond, are nonlinear" and, thus, linear interpolation is not supported by the academic literature. App. 388–389 ¶¶ 52–55. Indeed, Feinstein's own forthcoming research acknowledges that nonlinear interpolation provides "greater precision" than linear interpolation. App. 388 ¶ 51. Feinstein cites no academic research that supports linear interpolation to calculate yields for AA+ corporate bonds.[2] Feinstein's use of linear interpolation thus is not a reliable methodology.

Second, Feinstein's calculation ignores the fundamental principle that future income streams must be adjusted to account for the time/value of money. To yield a large figure of $832 million (or $413 million), Feinstein added interest expense over the 30 years of the bonds as if all of that interest was payable on day 1. App. 273-74 ¶ 62. As Defendants' expert Dr. Ferrell explains, "[a]s a matter of economics, investment decisions are based on the present value of the investments." App. 274 ¶ 63; *see also* App. 342 ¶ 88 ("The time value of money is a fundamental principle in economics and finance, which states that a dollar today is worth more than a dollar next year (because a dollar today can earn interest over that year). Therefore, for example, one cannot simply add a dollar today to a dollar next year to get two dollars."). Even assuming, *arguendo,* that Feinstein accurately calculated the bond yields (he did not), the present value of the assumed higher interest rates would be only $77.5 million, not $832 million—equivalent to only "0.02% of ExxonMobil's $343.3 billion market cap on the day before the bond issuance."

---

[2]    Although Feinstein purports to cite to sources endorsing his use of linear interpolation, App. 200 ¶ 173 n. 158–59, none of the cited articles relate to corporate bonds, and none support the use of linear interpolation to calculate bond yields between two credit ratings, as Feinstein has done here.

21

App. 274 ¶ 63; App. 302 at 166:20–168:18. Feinstein mixes apples and oranges by adding 30 years of future interest expense together, and ignoring the time value of money—rendering his opinion entirely unreliable.

Third, Feinstein's additional interest expense calculation inappropriately compounds the expected interest payments through the bonds' maturity. App. 301 at 164:21–165:20. Rather than account for the interest paid in each year of the bond's life, Feinstein's calculation compounds the coupon payments going through the maturity term, thus inflating the number. *Id.* As Defendants' expert Dr. Ferrell explained, Feinstein's decision to compound coupon payments in performing his calculation lacks an economic basis. App. 301-02 at 164:21–166:18.

### B. Feinstein's Cost-of-Downgrade Opinion Is Irrelevant and Should Be Excluded

Even if Feinstein had correctly and reliably calculated the cost to ExxonMobil of a credit downgrade in connection with the March 2016 bond offering, his opinion would be irrelevant to this case and should be excluded.

Plaintiff alleged that Defendants misled investors about RMDG impairments and the possibility of Kearl proved reserves de-bookings in order to preserve ExxonMobil's AAA rating in advance of the bond offering. As explained in Defendants' summary judgment brief, that theory is not supported by the facts. To the contrary, the undisputed record developed in discovery shows no evidence that any ExxonMobil employee sought to misstate proved reserves or impairments to inflate the company's credit rating before the debt offering, and the groups within the company that oversaw proved reserve and impairment analyses were different from the group that oversaw the debt offerings and the Corporation's relationship with rating agencies. Defs.' Mot. Sum. J. 14–15.

22

But, more importantly, no evidence in the record shows that anyone at ExxonMobil conducted Feinstein's "cost of downgrade" calculation, or subjectively believed that a ratings downgrade would cost the company hundreds of millions of dollars, as Feinstein asserts. Feinstein's opinion—flawed as it is—thus cannot provide any relevant proof of Defendants' state of mind, or shed light on the rationale for the alleged misstatements. "Testimony is irrelevant . . . when an expert offers a conclusion based on assumptions unsupported by the facts of the case." *Rolls-Royce Corp.* v. *Heros, Inc.*, No. 3:07-CV-0739-D, 2010 WL 184313, *6 (N.D. Tex. Jan. 14, 2010). Feinstein's opinion is simply an (incorrect) *post hoc* calculation that, for all the record shows, was never in the mind of any Defendant when the allegedly misleading disclosures were made. Because Feinstein's calculation is not probative of, it is irrelevant and should be excluded.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court grant this Motion in its entirety and exclude the report, opinions, and testimony of Steven P. Feinstein from this case.

Dated:  February 21, 2025

Respectfully submitted,

/s/ Daniel J. Toal
Theodore V. Wells, Jr. (pro hac vice)
Daniel J. Kramer (pro hac vice)
Audra J. Soloway (pro hac vice)
Daniel J. Toal (pro hac vice)
Paul D. Brachman (pro hac vice)
Matthew D. Stachel (pro hac vice)
Samuel M. Kleiner (pro hac vice)
Lyuba Shamailova (pro hac vice)
PAUL, WEISS, RIFKIND,
    WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
twells@paulweiss.com
dkramer@paulweiss.com
asoloway@paulweiss.com
dtoal@paulweiss.com
pbrachman@paulweiss.com
mstachel@paulweiss.com
skleiner@paulweiss.com
lshamailova@paulweiss.com

/s/ D. Patrick Long
D. Patrick Long
Texas State Bar No. 12515500
SQUIRE PATTON BOGGS
2200 Ross Avenue, Sute 4100W
Dallas, TX 75201
Telephone: (214) 758-1505
Facsimile: (214) 758-1550
patrick.long@squirepb.com

*Counsel for Rex W. Tillerson*

/s/ Jason Bloom
Nina Cortell
Texas State Bar No. 04844500
Jason Bloom
Texas State Bar No. 24045511
HAYNES AND BOONE, LLP
2801 N. Harwood Street, Sute 2300
Dallas, TX 75219
Telephone: (214) 651-5000

24

Facsimile: (214) 651-5940
nina.cortell@haynesboone.com
jason.bloom@haynesboone.com

*Counsel for Exxon Mobil Corporation,*
*Andrew P. Swiger, Jeffrey J. Woodbury,*
*and David S. Rosenthal*

25