IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |
|---|---|
| PEDRO RAMIREZ, JR., Individually and on Behalf of All Others Similarly Situated,<br><br>       Plaintiff,<br><br>       v.<br><br>EXXON MOBIL CORPORATION, REX W. TILLERSON, ANDREW P. SWIGER, and DAVID S. ROSENTHAL,<br><br>       Defendants. | Case No. 3:16-cv-03111-K |

**APPENDIX IN SUPPORT OF DEFENDANTS' MOTION
TO EXCLUDE THE TESTIMONY OF STEVEN P. FEINSTEIN**

| Exhibit | Description | App. Page(s) |
|---|---|---|
| | Declaration of Paul D. Brachman in Support of Defendant's Motion to Exclude the Testimony of Steven P. Feinstein | App. 1 – App. 3 |
| 1 | Expert Report of Steven P. Feinstein, dated October 11, 2024 | App. 4 – App. 131 |
| 2 | Expert Reply Report of Steven P. Feinstein, dated January 10, 2025 | App. 132 – App. 208 |
| 3 | Excerpts from Transcript of Steven P. Feinstein Deposition, dated January 22, 2025 | App. 209 – App. 235 |
| 4 | Expert Report of Allen Ferrell, PH. D., dated December 10, 2024 | App. 236 – App. 293 |
| 5 | Excerpts from Transcript of Allen Ferrell, PH. D. Deposition, dated January 27, 2025 | App. 294 – App. 303 |
| 6 | Steven P. Feinstein Revised Additional Interest Expense Calculations | App. 304 |
| 7 | Expert Report of Anthony Saunders, dated December 10, 2024 | App. 305 – App. 370 |
| 8 | Expert Sur-Reply Report of Anthony Saunders, dated January 28, 2025 | App. 371 – App. 395 |
| 9 | Excerpts from Transcript of D. Paul Regan Deposition, dated January 29, 2025 | App. 396 – App. 400 |

Dated:   February 21, 2025

Respectfully submitted,


/s/_Daniel J. Toal_____          /s/_D. Patrick Long_____
Theodore V. Wells, Jr. (*pro hac vice*)   D. Patrick Long
Daniel J. Kramer (*pro hac vice*)         Texas State Bar No. 12515500
Audra J. Soloway (*pro hac vice*)         SQUIRE PATTON BOGGS
Daniel J. Toal (*pro hac vice*)           2200 Ross Avenue, Suite 4100W
Paul D. Brachman (*pro hac vice*)         Dallas, TX 75201
Matthew D. Stachel (*pro hac vice*)       Telephone: (214) 758-1505
Samuel M. Kleiner (*pro hac vice*)        Facsimile: (214) 758-1550
Lyuba Shamailova (*pro hac vice*)         patrick.long@squirepb.com
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP                 *Counsel for Rex W. Tillerson*
1285 Avenue of the Americas
New York, NY  10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
twells@paulweiss.com
dkramer@paulweiss.com
asoloway@paulweiss.com
dtoal@paulweiss.com
pbrachman@paulweiss.com
mstachel@paulweiss.com
skleiner@paulweiss.com
lshamailova@paulweiss.com


/s/_Jason Bloom_____
Nina Cortell
Texas State Bar No. 04844500
Jason Bloom
Texas State Bar No. 24045511
HAYNES AND BOONE, LLP
2801 N. Harwood Street, Suite 2300
Dallas, TX 75219
Telephone: (214) 651-5000
Facsimile: (214) 651-5940
nina.cortell@haynesboone.com
jason.bloom@haynesboone.com

*Counsel for Exxon Mobil Corporation,*
*Andrew P. Swiger,*
*and David S. Rosenthal*


3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |
|---|---|
| PEDRO RAMIREZ, JR., Individually and on Behalf of All Others Similarly Situated,<br><br>                        Plaintiff,<br><br>                    v.<br><br>EXXON MOBIL CORPORATION, REX W. TILLERSON, ANDREW P. SWIGER, and DAVID S. ROSENTHAL,<br><br>                        Defendants. | Case No. 3:16-cv-03111-K |

## DECLARATION OF PAUL D. BRACHMAN IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF STEVEN P. FEINSTEIN

Pursuant to 28 U.S.C. § 1746, I, Paul D. Brachman, declare as follows:

1.      I am over twenty-one years of age and I am competent to make this Declaration. I have personal knowledge of the facts set forth in this Declaration.

2.      I am a partner in the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP. My office is located at 2001 K Street, NW, Washington, DC 20006-1047.

3.      I am a member in good standing with the New York State Bar and the Bar of the District of Columbia. I am admitted to practice before this Court *pro hac vice*.

4.      Attached hereto as Exhibit 1 is a true and correct copy of the Expert Report of Steven P. Feinstein, dated October 11, 2024.

5.      Attached hereto as Exhibit 2 is a true and correct copy of the Expert Reply Report of Steven P. Feinstein, dated January 10, 2025.

6.      Attached hereto as Exhibit 3 is a true and correct copy of excerpts from the transcript of the deposition of Steven P. Feinstein, which was taken on January 22, 2025.

**App. 1**

7.    Attached hereto as Exhibit 4 is a true and correct copy of the Expert Report of Allen Ferrell, dated December 10, 2024.

8.    Attached hereto as Exhibit 5 is a true and correct copy of excerpts from the transcript of the deposition of Allen Ferrell, which was taken on January 27, 2025.

9.    Attached hereto as Exhibit 6 is a true and correct copy of Steven P. Feinstein's revised additional interest expense calculation, introduced as Exhibit 6 at Steven P. Feinstein's January 22, 2025 deposition.

10.    Attached hereto as Exhibit 7 is a true and correct copy of the Expert Report of Anthony Saunders, dated December 10, 2024.

11.    Attached hereto as Exhibit 8 is a true and correct copy of the Expert Sur-Reply Report of Anthony Saunders, dated January 28, 2025.

12.    Attached hereto as Exhibit 9 is a true and correct copy of excerpts from the transcript of the deposition of D. Paul Regan, which was taken on January 29, 2025.

**App. 2**

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Washington, DC

February 21, 2025

_____
PAUL D. BRACHMAN

**App. 3**

# Exhibit 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| PEDRO RAMIREZ, JR., Individually and on Behalf of All Others Similarly Situated, | § | Civil Action No. 3:16-cv-03111-K |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| EXXON MOBIL CORPORATION, REX W. TILLERSON, ANDREW P. SWIGER, JEFFREY J. WOODBURY and DAVID S. ROSENTHAL, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |
| | § | |

**App. 4**

REPORT ON LOSS CAUSATION AND DAMAGES

PROFESSOR STEVEN P. FEINSTEIN, PH.D., CFA

OCTOBER 11, 2024

**CONFIDENTIAL**

**TABLE OF CONTENTS**

I.      SCOPE OF REPORT.................................................................................................1

II.     CREDENTIALS ........................................................................................................2

III.    CONCLUSIONS........................................................................................................4

IV.     LEAD PLAINTIFF'S ALLEGATIONS.....................................................................6

V.      FACTUAL BACKGROUND ....................................................................................8

     A.      About Exxon ................................................................................................8

     B.      About Exxon's Oil and Gas Reserves..........................................................9

          1.      Estimating Exxon's Oil and Gas Reserves .....................................9

          2.      Valuing Exxon's Oil and Gas Reserves.........................................11

     C.      Timeline of Events.....................................................................................12

          1.      Pre-Class Period Events: Oil and Natural Gas Prices Decline in 2014 and 2015 – Exxon Does Not Revise Reserves.................................12

          2.      24 February 2016: Exxon Files Form 10-K for FY 2015 ...........18

          3.      2 March 2016: Exxon Holds Its Annual Analyst Meeting and Completes A $12.0 Billion Debt Offering.................................21

          4.      26-27 April 2016: S&P Downgrades Exxon's Credit Rating; Company Increases Dividend ....................................................22

          5.      29 April 2016: Exxon Announces Q1 2016 Financial Results.................23

          6.      29 July 2016: Exxon Announces Q2 2016 Financial Results....................24

          7.      20 September 2016: S&P Raises Its Oil Price Assumptions for the Remainder of 2016..................................................................26

          8.      28 October 2016: Exxon Announces Q3 2016 Financial Results.............26

          9.      Post-Class Period Events: Oil and Gas Prices Recover; Exxon Recognizes Impairment of Its RMDG Assets and De-Books Reserves at Kearl ......................................................................36

VI.     LOSS CAUSATION..................................................................................................41

     A.      Analytical Methodology .............................................................................41

          1.      Establishing Economic Materiality..................................................41

          2.      Empirical Analysis of Loss Causation............................................42

     B.      Executing the Loss Causation Analysis for Exxon Stock...................................43

          1.      Financial Principles Confirm the Economic Materiality of the Alleged Misrepresentations and Omissions.....................................44

          2.      Company Statements Compel a Conclusion of Loss Causation...............46

**App. 5**

3.      Analyst and News Media Commentary Underscores the Economic
        Materiality of the Alleged Misrepresentations and Omissions..................47

4.      Event Study for Assessing Loss Causation and Damages .........................48

5.      Event Study Results and Analysis ..........................................................53

VII.    SECTION 10(b) DAMAGES ......................................................................................54

        A.      Out-of-Pocket Damages....................................................................................54

        B.      Quantifying Losses Precipitated by Corrective Disclosures in Order to
                Construct the Inflation Ribbon.........................................................................56

                1.      Losses Precipitated By Corrective Disclosures Is Dissipation of
                        Artificial Inflation ..................................................................................56

                2.      Per Share Decline Caused by the 28 October 2016 Corrective
                        Disclosure ...............................................................................................57

                3.      Per Share Decline Caused by the 31 January 2017 Corrective
                        Disclosure ...............................................................................................61

        C.      Artificial Inflation During the Class Period.....................................................62

        D.      Per Share Damages ..........................................................................................62

VIII.   THE COST OF LOSING A "AAA" RATING.............................................................63

IX.     LIMITING FACTORS AND OTHER ASSUMPTIONS...............................................65

X.      APPENDIX-1: LOGARITHMIC RETURNS ...............................................................66

**App. 6**

### I.    SCOPE OF REPORT

1.    This project and report address the common stock of Exxon Mobil Corporation ("Exxon" or the "Company"). Robbins Geller Rudman & Dowd LLP, Lead Counsel for Lead Plaintiff, asked me to determine whether Class members suffered losses as a result of the alleged misrepresentations and omissions described in the Consolidated Complaint for Violations of the Federal Securities Laws (the "Complaint"), filed 26 July 2017.

2.    Counsel also asked me to compute damages, if any, suffered by Class members from their investments in Exxon common stock made during the period from 24 February 2016 through 28 October 2016, inclusive (the "Class Period").[1] Specifically, I was asked to quantify per share damages suffered by Class members in connection with their claims under Section 10(b) of the Securities Exchange Act of 1934 and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 adopted thereunder (collectively, "Section 10(b)").

3.    I was also asked to calculate the additional interest expense that Exxon would have paid over the life of the Exxon notes offered in March 2016, had the Company's credit been rated AA+ at the time of the offering rather than AAA.

4.    To make these determinations, I analyzed a wide variety of information and documents, including Company press releases, conference call transcripts, equity analyst reports, news articles, SEC filings, daily prices and trading volume of Exxon stock, the performance of the overall stock market, and the performance of Exxon's industry sector, as well as other pertinent data and documents. I also read the Court's Memorandum Opinion and Order ("Memorandum Opinion and Order"), filed 21 August 2023.

5.    I examined and considered documents produced in this action, including the Expert Report of Frank C. Torchio, dated 21 December 2018 (the "Torchio Report"), and the Expert Report of Allen Ferrell, Ph.D., dated 1 February 2019 (the "Ferrell Report"). Exhibit-1 hereto lists the documents I considered in preparing this report and arriving at the opinions expressed herein.

---

[1] In its Memorandum Opinion and Order, dated 21 August 2023, p. 56, the Court modified the proposed class period to 24 February 2016 through 28 October 2016. This report accordingly defines "Class Period" to be 24 February 2016 to 28 October 2016.

1

**App. 7**

6.  For the analyses herein, I assumed Lead Plaintiff will be able to prove its factual allegations.[2] I also accepted the Court's determination that the market in which Exxon stock traded was proved to be efficient throughout the Class Period.

7.  This report presents my methodology, findings, and conclusions relating to loss causation and the quantification of per share damages based on the information presently available to me.

8.  I reserve the right to amend, refine, or supplement my analyses and opinions in the event that I become aware of additional information, evidence, arguments, or analyses that bear on my work in this matter.

## II.   CREDENTIALS

9.  I am an Associate Professor of Finance at Babson College, and the Founder and President of Crowninshield Financial Research, Inc., a financial economics consulting firm.

10. I hold a Ph.D. in Economics from Yale University, a Master of Philosophy degree in Economics from Yale University, a Master of Arts degree in Economics from Yale University, and a Bachelor of Arts degree in Economics from Pomona College. I also hold the Chartered Financial Analyst ("CFA") designation, granted by the CFA Institute.

11. At Babson College, I have taught undergraduate and MBA-level courses in Capital Markets, Investments, Equity Analysis, Fixed Income Analysis, Derivatives, Financial Management, Options and Futures, Risk Management, Quantitative Methods, and Security Valuation. I have also taught executive courses on investments and corporate financial management for numerous corporations. The other courses I have taught are listed in my curriculum vitae, which is attached as Exhibit-2.

12. I have held the Chair in Applied Investments at Babson College and served as the Director of the Stephen D. Cutler Investment Management Center, a research and education center dedicated to the study and teaching of investments and capital markets.

---

[2] Assuming the factual allegations is a generally accepted practice in loss causation and damages analysis. *See*, *e.g.*, "In almost all cases, the damages expert proceeds on the hypothesis that the defendant committed the harmful act and that the act was unlawful" ("Reference Guide on Estimation of Economic Damages," by Mark Allen et al., *Reference Manual on Scientific Evidence*, 3rd Edition, 2011, p. 432).

**App. 8**

13.    Prior to joining the faculty at Babson College, I taught at Boston University. Preceding my academic posts, I was an Economist at the Federal Reserve Bank of Atlanta where my primary responsibilities were to monitor financial markets, analyze proposed regulation, and advise the Bank President in preparation for his participation in meetings of the Federal Open Market Committee – the government body responsible for monetary policy in the United States ("U.S.").

14.    I have published in the field of finance. My finance articles have appeared in the *Atlanta Federal Reserve Bank Economic Review*, *Derivatives Quarterly*, *Derivatives Weekly*, *The Engineering Economist*, *The Journal of Risk*, *The American Bankruptcy Institute Journal*, *The Journal of Financial Planning*, *The Journal of Forensic Economics*, *Managerial Finance*, *Risk Management*, *Primus*, and *The Review of Quantitative Finance and Accounting*. I am the author of *Finance and Accounting for Project Management*, published by the American Management Association. I wrote two chapters in the book *The Portable MBA in Finance and Accounting* – one on corporate financial planning and the other on risk management. I have presented research at the annual conventions of the American Finance Association, the Academy of Financial Services, the Boston Area Finance Symposium, the Multinational Finance Society, the Financial Management Association, the Taxpayers Against Fraud Education Fund Conference, and the International Conference on Applied Business Research, and the National Association of Certified Valuators and Analysts (NACVA) Business Valuation and Financial Litigation Super Conference. Papers I co-authored have been presented at the Eastern Finance Association meetings and the Midwestern Finance Association meetings. A list of all the publications I authored in the past ten years can be found in my curriculum vitae, which is attached as Exhibit-2.

15.    I have been selected to review papers for numerous finance journals and conferences. Specifically, I have reviewed finance textbook manuscripts for Prentice-Hall, Elsevier, Blackwell, and Southwestern Publishing. I have been quoted on matters relating to finance and investments in *The Wall Street Journal*, *The Washington Post*, *The New York Times*, *The Financial Times*, *The Boston Globe*, and *Bloomberg News*. Further, my research relating to financial analysis and valuation has been discussed in *The Wall Street Journal*, *Bond Buyer*, and *Grant's Municipal Bond Observer*.

**App. 9**

16. I am a member of the American Finance Association, the Financial Management Association, the National Association of Forensic Economics, the CFA Institute the CFA Society Boston, the North American Case Research Association, and NACVA. I have served as a member of the CFA Society Boston education committee and ethics subcommittee. I also served on the Fixed Income Specialization Examination Committee of the CFA Institute.

17. The CFA designation is the premier credential for financial analysts worldwide. In order to receive this credential, applicants must pass a series of three exams covering such topics as economics, equity analysis, financial valuation, business analysis, quantitative methods, investment analysis, portfolio management, risk management, financial accounting, and ethical and professional standards. For over ten years, I taught in the Boston University CFA Review Program and the CFA Society Boston Review Program – two of the leading review programs that prepared candidates for the CFA exams. In both of these programs, I taught candidates at the most advanced level of the CFA curriculum.

18. In addition to my teaching, research, and academic community responsibilities, I practice extensively as a financial consultant. My clients are primarily law firms that are prominent in securities litigation. Past clients also include the SEC, the Internal Revenue Service, the Attorney General of the State of Illinois, and the National Association of Securities Dealers. As an expert in financial economics, over more than 25 years, I have conducted analyses and presented opinions related to financial markets, valuation, and damages in more than 200 cases. Exhibit-3 lists my prior testimony over the past four years.

19. I am the sole owner of the consulting firm Crowninshield Financial Research, Inc., which receives compensation for the work performed by me and the staff who assist me. My firm is compensated at a rate of $995 per hour for my work and a range of lower rates for analysts and other personnel who assist me on this case. My compensation is not contingent on my findings or on the outcome of this matter.

### III.   CONCLUSIONS

20. The alleged misrepresentations and omissions caused the price of Exxon stock to be artificially inflated over the course of the Class Period. When events and announcements ultimately informed investors and the public that they had been misled, and provided to them the truth that had previously been concealed by the alleged misrepresentations and omissions,

**App. 10**

the artificial inflation dissipated, causing the price of Exxon stock to decline, thereby causing investors to sustain losses. The misrepresentations and omissions thus caused investors to suffer damages.

21. The corrective disclosures informed the market about i) the lack of profitability of the Company's bitumen operations at Kearl Lake ("Kearl") resulting in a removal of 3.6 billion barrels of proved reserves (approximately 14% of the Company's overall proved reserves), and ii) impairment of the Company's Rocky Mountain dry gas assets ("Rocky Mountain" or "RMDG"), requiring the Company to take a $2.0 billion charge against earnings.

22. These disclosures corrected the misinformation and artificial price inflation caused by the alleged misrepresentations and omissions, causing the price of Exxon stock to decline, in turn causing investors to sustain losses.

23. Given that Exxon stock traded in an efficient market, it follows that had the adverse facts that were concealed from the public been alternatively timely disclosed, the price of Exxon stock would not have been artificially inflated, but rather would have been priced significantly lower in the market during the Class Period.

24. These conclusions are based on fundamental principles of finance, analysis of Company statements, news articles, analyst reports, and event study analysis. Event study analysis, which considered potentially confounding information, proves that the alleged misrepresentations and omissions caused the price of Exxon stock to be artificially inflated, and that the corrective disclosures caused the price declines and investor losses.

25. Based on the analysis presented herein, it is my opinion that corrective disclosures caused $2.39 of the $2.43 residual price decline in Exxon stock on 28 October 2016, and $1.05 of the $1.23 residual price decline on 31 January 2017. I note that the stock price reaction on both days, measured close to close, was statistically significant at above the 95% confidence level.

26. Any investor who purchased Exxon stock during the Class Period when the prices of those shares were artificially inflated and held those shares beyond a corrective disclosure suffered a loss that was caused by the alleged misrepresentations and omissions.

27. Defendants' misrepresentations and omissions caused the market price of Exxon stock to be artificially inflated by $3.44 per share. The corrective disclosures dissipated this inflation, causing investors to suffer losses of up to $3.44 per share. A conservative estimate of Exxon

**App. 11**

damages range up to $3.44 per share, depending on the timing of the stock purchase and sale. The damage sustained by each respective investor depends on when the investor purchased and sold shares of Exxon stock.

28. Based on the financial analysis presented herein, I have determined that had Exxon's credit rating been "AA+" at the time of the March 2016 offering, rather than "AAA," Exxon would have had to offer a 0.13% increase in yield to receive the $12 billion in proceeds. The 0.13% increase in yield would have resulted in a total increase in interest expense of $831.95 million over the life of the notes.

## IV.    LEAD PLAINTIFF'S ALLEGATIONS

29. Lead Plaintiff alleges that, over the course of the Class Period, Defendants made materially false and misleading statements and omissions concerning the profitability and legitimate status as proved reserves of the Company's operations at Kearl and impairment of certain of its dry gas assets in the Rocky Mountains.[3] According to Lead Plaintiff, from the start of the Class Period, Defendants failed to disclose and properly account for losses that required reserve write-downs and/or impairment charges.[4] According to Lead Plaintiff, Defendants did so in order to preserve favorable terms in a $12.0 billion bond offering.[5]

30. Lead Plaintiff contends that by year-end 2015, operations at Kearl, which represented approximately 14% of Exxon's proved reserves portfolio, no longer legitimately qualified as a "proved"[6] reserve.[7] Additionally, Lead Plaintiff contends that a significant portion of the

---

[3] Complaint, ¶¶14, 169.

[4] Complaint, ¶¶15, 201.

[5] Complaint, ¶¶15, 201.

[6] "Proved oil and gas reserves are the estimated quantities of crude oil, natural gas, and natural gas liquids which geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions, i.e., prices and costs as of the date the estimate is made. Prices include consideration of changes in existing prices provided by contractual arrangements, but not on escalations based upon future conditions" (SEC Rule 4-10 (a) of Regulation S-X of the Securities Exchange Act of 1934 and https://www.sec.gov/divisions/corpfin/guidance/cfoilgasinterps.htm).

[7] Complaint, ¶14.

6

**App. 12**

Company's RMDG operations no longer justified their "carrying value"[8] on Exxon's financial statements and, as a result, the Company was required to record a significant asset impairment charge.[9] Defendants also allegedly concealed and omitted from its 2015 Form 10-K the operating losses at Kearl and the impairment of the Rocky Mountain assets.[10]

31.   Plaintiff alleges that Exxon misled the market regarding the profitability of Kearl by disclosing that its Canadian bitumen operations' average production price was well over $5 above the average production cost when in fact Kearl (which accounted for 75% of Exxon's Bitumen reserves) was not profitable, was suffering large losses for every barrel produced, and was increasing its share of the overall volume produced, and thus its losses could no longer be concealed by any profits obtained from Exxon's other Canadian bitumen operations at Cold Lake.[11]

32.   According to Lead Plaintiff, investors continued to be misled until the truth was disclosed on 28 October 2016 and 31 January 2017.[12]

- On 28 October 2016, Exxon announced its Q3 2016 earnings and disclosed that it "might be forced to de-book nearly 20% of its oil and gas reserves including 3.6 billion barrels of oil equivalents at Kearl" if energy prices did not improve and that the Company would be conducting an impairment assessment of its assets in the Rocky Mountain Region.[13]

---

[8] The "carrying amount" or "carrying value" is the original cost of an asset less the accumulated amount of any depreciation or amortization. As stated in Exxon's 2015 Form 10-K: "An asset group would be impaired if its undiscounted cash flows were less than the asset's carrying value. Impairments are measured by the amount by which the carrying value exceeds fair value" (Exxon Mobil Corporation, Form 10-K for the fiscal year ended 31 December 2015, filed 24 February 2016, p. 57).

[9] Complaint, ¶14.

[10] Complaint, ¶14.

[11] Complaint, ¶16.

[12] I understand that the Court found there was a lack of price impact evident in the 31 January 2017 alleged corrective disclosure: "The Court concludes that Defendants have rebutted the Basic presumption by a preponderance of the evidence by showing a lack of price impact with respect to the fourth quarter earnings release. The fourth quarter release is the only earnings release alleged to be a Corrective Disclosure that is not associated with a statistically significant negative price reaction on a close-to-open basis or even a close-to-close basis." (Memorandum Opinion and Order, p. 52). However, utilizing long-recognized econometric analysis, Exxon's stock price decline on 31 January 2017, measured from close of trading on 30 January 2017 to close of trading on 31 January 2017, was statistically significant at the 95% confidence level.

[13] Complaint, ¶437.

**App. 13**

- On 31 January 2017, Exxon disclosed a $2.0 billion impairment charge related to the Company's Rocky Mountain natural gas assets.[14]

33. The value a company ascribes to its assets in its accounting is a function of profitability and the cash flows the Company expects to be derived from the assets. Plaintiffs allege that by not de-booking and recognizing impairment in a timely manner the Company misled investors about the profitability of certain assets over the course of the Class Period. Ultimately, the de-booking and impairment revealed the truth to the market about the diminished profitability of certain Company assets. Even though de-booking and impairment are one-time nonrecurring adjustments they inform the marketplace of ongoing diminished profitability, and therefore according to economic principles have a large impact on valuation.

## V.    FACTUAL BACKGROUND

### A.    About Exxon

34. Exxon is a multinational oil and gas company engaged in the exploration, production, transportation, and sale of crude oil, natural gas, and petroleum products.[15]

35. Exxon's operations comprised three reportable business segments: Upstream, Downstream, and Chemical.[16] The Upstream segment composed the Company's exploration, development, and production of crude oil and included natural gas marketing and research.[17] The Downstream segment composed the Company's refining, logistics, and marketing operations.[18] The Chemical segment composed the Company's manufacturing and selling of petrochemical products.[19]

---

[14] Complaint, ¶¶446-448.

[15] Exxon Mobil Corporation, Form 10-K for the fiscal year ended 31 December 2015, filed 24 February 2016, p. 1; and Exxon Mobil Corporation, Form 10-K for the fiscal year ended 31 December 2016, filed 22 February 2017, p. 1.

[16] Exxon Mobil Corporation, Form 10-K for the fiscal year ended 31 December 2016, filed 22 February 2017, p. 97.

[17] Exxon Mobil Corporation, Form 10-K for the fiscal year ended 31 December 2016, filed 22 February 2017, p. 42.

[18] "About 35 percent of the Corporation's intersegment sales represent Upstream production sold to the Downstream" (Exxon Mobil Corporation, Form 10-K for the fiscal year ended 31 December 2016, filed 22 February 2017, pp. 42-43, 56; and Exxon Mobil Corporation, Form 10-K for the fiscal year ended 31 December 2017, filed 28 February 2018, pp. 43 and 54).

[19] Exxon Mobil Corporation, Form 10-K for the fiscal year ended 31 December 2016, filed 22 February 2017, p. 25.

**App. 14**

36. Exxon's operating revenues in fiscal year ("FY") 2014, 2015, and 2016 were $394.1 billion, $259.5 billion, and $218.6 billion, respectively.[20] For FY 2014, 2015, and 2016, the Upstream segment generated 9.4% ($37.1 billion), 9.2% ($24.0 billion), and 9.2% ($20.2 billion) of Exxon's revenues, respectively.[21]

37. Exxon's total earnings in FY 2014, 2015, and 2016 were $32.5 billion, $16.2 billion, and $7.8 billion, respectively.[22] For FY 2014, 2015, and 2016, the Upstream segment earnings generated 84.6% ($27.5 billion), 43.8% ($7.1 billion), and 2.5% ($196 million) of Exxon's earnings, respectively.[23]

### B. About Exxon's Oil and Gas Reserves

#### 1. Estimating Exxon's Oil and Gas Reserves

38. Companies engaged in exploration and production ("E&P") are required to classify oil and gas reservoirs as "proved" or "unproved" reserves.[24] The SEC requires publicly traded companies engaged in E&P to report in annual filings an estimate of proved reserves.[25] The SEC defines proved oil and gas reserves as "those quantities of oil and gas, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible."[26] To qualify as proved, a reserves' actual or expected cost of extraction must be less than the 12-month historical average of first-of-the-month oil or gas prices.[27] If the cost of extraction exceeds the 12-month average price of oil or gas, these proved reserves would be reclassified as unproved reserves, or "de-booked."[28]

---

[20] Exxon Mobil Corporation, Form 10-K for the fiscal year ended 31 December 2016, filed 22 February 2017, p. 98.

[21] Computations performed by Crowninshield Financial Research, Inc. (Exxon Mobil Corporation, Form 10-K for the fiscal year ended 31 December 2016, filed 22 February 2017, p. 98).

[22] Exxon Mobil Corporation, Form 10-K for the fiscal year ended 31 December 2016, filed 22 February 2017, p. 36.

[23] Computations performed by Crowninshield Financial Research, Inc. (Exxon Mobil Corporation, Form 10-K for the fiscal year ended 31 December 2016, filed 22 February 2017, p. 36).

[24] SEC Regulation S-X Rule 4-10(a)(22)(v).

[25] SEC Modernization of Oil and Gas Reporting Release Nos. 33-8995; 34-59192; FR-78; File No. S7-15-08.

[26] SEC Modernization of Oil and Gas Reporting Release Nos. 33-8995; 34-59192; FR-78; File No. S7-15-08, p.11.

[27] SEC Modernization of Oil and Gas Reporting Release Nos. 33-8995; 34-59192; FR-78; File No. S7-15-08.

[28] "These Giants Bet on the Oilsands, but Now They're Cashing Out," by Carl Meyer, *Canada's National Observer: Climate News*, 16 March 2017.

**App. 15**

39. Analysts and investors examine proved oil and gas reserves to determine future oil and gas production, profitability, and cost of extraction.[29]

40. As of year-end 2015, Exxon reported that it had 24.8 billion oil-equivalent barrels of proved reserves.[30]

41. Exxon's upstream bitumen[31] projects consisted primarily of its operations at Kearl and Cold Lake in Alberta, Canada (collectively referred herein as the "Canadian Bitumen Operations").[32] The Kearl operation is an open-pit mine, part of a joint venture between the Company's majority-owned subsidiary Imperial Oil Limited ("Imperial") and its 100% owned subsidiary ExxonMobil Canada.[33]

42. As of year-end 2015, dry natural gas comprised approximately 41% of Exxon's reported proved reserves.[34] In 2010, Exxon acquired over 45 trillion cubic feet of gas resources, including shale gas, tight gas, coal bed methane, and shale oil, through its purchase of XTO

[29] "Valuation of Proved vs. Probable Oil and Gas Reserves," by Bård Misund & Petter Osmundsen, *Cogent Economics & Finance*, 2017, Vol. 5, No. 1, DOI: 10.1080/23322039.2017.1385443, p. 1 and 3. ("A source of confusion for investors in oil companies, is that reserves quantities and values are uncertain estimates. Reserves are typically classified according to probabilities of recovery from underground reservoirs. All US-listed companies are required to disclose proved reserves but not probable reserves, thus leaving out potentially important information for investors and financial analysts … . Only the recoverable amounts can be monetized to future cash flows and therefore considered as inventory").

[30] Exxon Mobil Corporation, Form 10-K for the fiscal year ended 31 December 2015, filed 24 February 2016, pp. 5 and 45. A barrel of oil equivalent (BOE) is "a unit of measure for energy content that equates one barrel of crude oil to 6000 cubic feet of natural gas or 1.5 barrels of natural gas liquids." *Dictionary of Energy*, by Cutler Cleveland and Christopher Morris, Elsevier, 2nd Edition, 2015, p. 45.

[31] Bitumen is a thick oil that is found mixed with sand, clay, and water – collectively, known as oil sands deposits. ("What are Oil Sands?" *Canadian Association of Petroleum Producers*, 2024, accessible at https://www.capp.ca/en/oil-natural-gas-you/oil-natural-gas-canada/oil-sands/).

[32] Exxon Mobil Corporation, Form 10-K for the fiscal year ended 31 December 2017, filed 28 February 2018, pp. 7-8; Exxon Mobil Corporation, Form 10-K for the fiscal year ended 31 December 2016, filed 22 February 2017, p. 8; and "Exxon Mobil Announces Cold Lake Project Expansion Starts Production on Schedule," *Business Wire*, Company press release, 11 May 2015.

[33] Exxon Mobil Corporation, Form 10-K for the fiscal year ended 31 December 2016, filed 22 February 2017, p.13; and "Exxon's Kearl Expansion Startup To Boost Its Upstream Production and Profitability," Trefis, analyst report, 22 June 2015, p. 1 ("The Kearl Oil Sands project, located 70 kilometers north of Fort McMurray, is a joint venture between Imperial Oil, which holds a 70.96% stake in the project, and Exxon Mobil Canada, a wholly owned subsidiary of Exxon Mobil, that holds the remaining 29%. Since Exxon also holds a majority (69.6%) stake in Imperial Oil, its net share of diluted bitumen from the Kearl project stands at over 78%. The project has an estimated 4.6 billion barrels of recoverable bitumen resource, and is expected to remain in production for as much as 40 years").

[34] Computations performed by Crowninshield Financial Research. Gas is converted to an oil-equivalent basis at six million cubic feet per one thousand barrels. Exxon reports natural gas liquids separately from (dry) natural gas. Exxon Mobil Corporation, Form 10-K for the fiscal year ended 31 December 2015, filed 24 February 2016, pp. 5 and 45.

**App. 16**

Energy, Inc. ("XTO").[35] This acquisition made Exxon the largest domestic natural gas producer in the U.S.[36] As of year-end 2015, Exxon held natural gas resources in the U.S. and abroad, including nearly 1.7 million acres of land for dry gas production in the U.S. Rocky Mountain region, comprising Exxon's Rocky Mountain operations.[37]

2.    Valuing Exxon's Oil and Gas Reserves

43.    While oil and natural gas reserves are considered the primary productive asset for an oil and gas company, reserves are not independently presented on the balance sheet as an asset.[38] Nonetheless, the Financial Accounting Standards Board ("FASB") mandates companies engaging in E&P to track the value of their oil and gas assets (i.e., properties with reserves), either every reporting period, or following a determination by management depending on the type of accounting they used (i.e., either "successful efforts" or "full cost" accounting).[39,40] Using either method companies are required to report carrying values of the properties with oil or gas reserves on the balance sheet and evaluate the fair value of their oil and gas reserves relative to their carrying values. If the fair value of the properties with oil or gas reserves

---

[35] "Exxon Mobil Corporation; Exxon Mobil Corporation and XTO Energy Inc. Announce Agreement," *Energy Weekly News*, 1 January 2010.

[36] "Exxon Bets Big on Gas With Deal For XTO," by Russell Gold, *The Wall Street Journal*, 15 December 2009 12:32PM; "Our History," *XTO Energy*, https://www.xtoenergy.com/company/who-we-are/our-history; *Energy Finance and Economics: Analysis and Valuation, Risk Management, and the Future of Energy*, by Betty Simkins and Russell Simkins, John Wiley & Sons, Inc., 2013, p. 496; Complaint, ¶120.

[37] *S&P Capital IQ*; Complaint, ¶120; Exxon Mobil Corporation, Form 10-K for the fiscal year ended 31 December 2015, filed 24 February 2016, p. 5.

[38] *Fundamentals of Oil and Gas Accounting*, by Charlotte Wright, PennWell Corporation, 6th Edition, 2017, p. 77.

[39] Deloitte, *Oil & Gas Spotlight Impairment and Valuation Considerations Related to Oil and Gas Assets*, Issue 4, January 2014.

[40] Exxon followed the successful-efforts method. Exxon Mobil Corporation, Form 10-K for the fiscal year ended 31 December 2017, filed 28 February 2018, p. 69; and Exxon Mobil Corporation, Form 10-K for the fiscal year ended 31 December 2016, filed 22 February 2017, p. 71.

**App. 17**

falls below the reported carrying value, companies are required to record an impairment as a charge against earnings.[41,42]

44.    Exxon reported net capitalized costs for producing assets of $83.4 billion in the U.S. and $36.1 billion in Canada/South America as of 31 December 2015, and $76.6 billion in the U.S. and $37.0 billion in Canada/South America as of 31 December 2016.[43]

### C.    Timeline of Events

45.    A review of the following events provides context for understanding Lead Plaintiff's allegations and the Company's experience during the Class Period.

1.    <u>Pre-Class Period Events: Oil and Natural Gas Prices Decline in 2014 and 2015 – Exxon Does Not Revise Reserves</u>

46.    In 2015, leading up to the start of the Class Period, oil and natural gas prices declined. The price of West Texas Intermediate ("WTI"), a benchmark for U.S. oil, reached $107.95 per barrel in 2014 then fell 65% to $37.13 per barrel by the end of 2015. The price fell further to $30.35 by 24 February 2016, the start of the Class Period.[44] Spot prices of Western Canada

---

[41] An asset's carrying value refers to the historical cost of the asset less depreciation or amortization. Exxon reports that "the Corporation's accounting and financial reporting fairly reflect its straightforward business model involving the extracting, refining and marketing of hydrocarbons and hydrocarbon-based products. The preparation of financial statements in conformity with U.S. Generally Accepted Accounting Principles (GAAP) requires management to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues and expenses and the disclosure of contingent assets and liabilities." (Exxon Mobil Corporation, Form 10-K for the fiscal year ended 31 December 2015, filed 24 February 2016, p. 56).

[42] Exxon states that "An asset group is impaired if its undiscounted cash flows are less than the asset's carrying value. Impairments are measured by the amount by which the carrying value exceeds fair value. Fair value is based on market prices if an active market exits for the asset group, or discounted cash flows using a discount rate commensurate with the risk." (Exxon Mobil Corporation, Form 10-K for the fiscal year ended 31 December 2016, filed 22 February 2017, p. 59). As reported by Exxon in its 2016 Form 10-K: "The impairment charge is recognized in the line 'Depreciation and depletion' on the Consolidated Statement of Income and recorded in 'Accumulated depreciation and depletion.'" (Exxon Mobil Corporation, Form 10-K for the fiscal year ended 31 December 2016, filed 22 February 2017, p. 79).

[43] Exxon Mobil Corporation, Form 10-K for the fiscal year ended 31 December 2016, filed 22 February 2017, p 106; and Exxon Mobil Corporation, Form 10-K for the fiscal year ended 31 December 2015, filed 24 February 2016, p. 101.

[44] U.S. Energy Information Administration, "Petroleum & Other Liquids: Cushing, OK WTI Spot Price FOB."

**App. 18**

Select ("WCS") and Louisiana Henry Hub ("Henry Hub"), benchmarks for Alberta bitumen production and natural gas, respectively, followed similar paths.[45]

47.    Figure-1 below shows the decline of oil and natural gas prices before and during the Class Period, and the price rebound after the Class Period.

**Figure-1: WTI, WCS, and Henry Hub Spot Oil Prices, 31 December 2014 - 31 January 2017[46]**



---

[45] "Let's talk royalties: not all oil is equal: explaining price differences," Government of Alberta, 1 October 2015, available at https://open.alberta.ca/publications/let-s-talk-royalties-not-all-oil-is-equal-explaining-price-differences. Lighter oils generally receive higher prices than heavier oils because they are easier and cheaper to process in refineries. The oil in WCS is much heavier than WTI and is priced at a discount.

[46] Daily West Texas Intermediate and Henry Hub prices obtained from U.S. Energy Information Administration. Monthly Western Canadian Select prices obtained from Alberta Energy.

**App. 19**

48. Due to the protracted decline in oil and natural gas prices, many of Exxon's peers began de-booking reserves and recognized impairments of underperforming assets. For example, between 2014 and 2016, Chevron Corporation ("Chevron"), Royal Dutch Shell PLC ("Shell"), Total S.A., and BP Plc ("BP") recorded over $50 billion in write-downs and impairments of their global reserves.[47] Citing declining commodity prices in 2015, *The Wall Street Journal* reported that "U.S. oil-and-gas producers have written down the value of their drilling fields by more in 2015 than any full year in history."[48] *The Wall Street Journal* reported that in the first six months of 2015, 66 E&P companies had taken $59.8 billion in impairment charges, exceeding the previous high of $49 billion in 2008.[49]

49. Exxon did not take any impairments while prices declined from December 2014 to the start of the Class Period, with CEO Rex Tillerson assuring the market that "We don't do write-downs. If you look at our history, we do not write our investments down."[50]

> a. *12 February 2015: Total S.A. Announces Impairment of Canadian Oil Sands Assets*

50. On 12 February 2015, Total S.A., a global integrated oil and gas company, announced a $6.5 billion impairment of its Canadian oil sands assets.[51]

> b. *24 September 2015: Standard & Poor's Revises Its Crude Oil And Natural Gas Price Assumptions Lower*

51. On 24 September 2015, credit rating agency Standard & Poor's ("S&P") lowered its price assumptions for crude emollient and natural gas, reflecting "a shift in the near-term futures

---

[47] "Write-Downs Abound for Oil Producers," by Ryan Dezember, *The Wall Street Journal*, 13 September 2015.

[48] "Write-Downs Abound for Oil Producers," by Ryan Dezember, *The Wall Street Journal*, 13 September 2015.

[49] "Write-Downs Abound for Oil Producers," by Ryan Dezember, *The Wall Street Journal*, 13 September 2015; and "Impairment charges at record levels for North American E&P peer group (IHS Herold)," by Paul O'Donnell, *S&P Global*, 1 September 2015, accessible at https://www.spglobal.com/commodityinsights/en/ci/research-analysis/impairment-charges-at-record-levels-for-north-american-ep-peer-group-ihs-herold.html.

[50] Complaint, ¶90 (citing Energy Intelligence, "Q&A: Exxon's Tillerson Weighs In on M&A, Investing Through the Cycle," 9 September 2015).

[51] "Total takes $6.5 Bln Impairment in Q4 as Profits Fall," *Reuters*, 12 February 2015 2:11 AM; and "France's Total Plans to Cut Jobs, Sell Assets After Big Loss," by Inti Landauro and Selina Williams, *The Wall Street Journal*, 12 February 2015.

**App. 20**

price curves." S&P apprised that it planned "to review the exploration and production (E&P) issuers that we rate under these new assumptions."[52]

> c.    *6 October 2015: S&P Revises Its Outlook for Exxon from Stable to Negative*

52.    On 6 October 2015, S&P revised its credit rating outlook for Exxon from stable to negative. The agency explained, "The negative outlook reflects Standard & Poor's Ratings Services' expectation that projected credit measures for Exxon Mobil Corp. will be weak for the ratings over the next two years." S&P warned that they "would consider a downgrade" if the Company's credit measures were not to improve. "Lack of improvement could result from lower oil and natural gas prices, weaker production, or operating underperformance by the upstream or downstream business segments compared with our base case. In our view, the company's greatest business challenge is replacing its ongoing production and it has a very successful track record in this endeavor … . The long life (about 16 years) of Exxon Mobil's reserves also mitigates depletion risk."[53]

> d.    *27 October 2015: Shell Abandons the Carmon Creek Bitumen Project, Incurring a $2.0 Billion Impairment Charge*

53.    On 27 October 2015, Shell announced that it was abandoning the Carmon Creek project, a large bitumen project in western Canada, and would take a $2.0 billion impairment.[54] The Carmon Creek project, like Exxon's Kearl operation, was an oil sands operation in Alberta, Canada.[55]

---

[52] "Standard & Poor's Revises Its Crude Oil And Natural Gas Price Assumptions," *S&P Global Ratings*, Ratings Direct, 24 September 2015.

[53] "Summary: Exxon Mobil Corp.," by Ben Tsocanos and Christine Besset, S&P Global Ratings, RatingsDirect, 6 October 2015.

[54] "Royal Dutch Shell to Abandon Carmon Creek Oil-Sands Project," by Chester Dawson, *The Wall Street Journal*, 27 October 2015.

[55] "Royal Dutch Shell to Abandon Carmon Creek Oil-Sands Project," by Chester Dawson, *The Wall Street Journal*, 27 October 2015.

**App. 21**

54. At that time, news media reported that the fall in oil prices had led many companies to delay or cancel oil sands projects:

> "New projects in the oil sands are among the world's most expensive sources of crude, and the region has been hit hard by the slump in prices that began in the summer of 2014. Companies announced 16 delays or cancellations of oil sands projects between January and July this year, according to Peter Tertzakian of ARC Financial."
> **"Shell Takes $2bn Charge on Canada Oil Sands Project," by Ed Crooks, *Financial Times*, 27 October 2015.**

> e.   *29 October 2015: Anadarko Petroleum Announces Impairment of Proved and Unproved Reserves*

55. On 27 October 2015, Anadarko Petroleum ("Anadarko") announced it was recognizing impairments of its proved and unproved oil and natural gas reserves.[56] Anadarko recognized total impairments of $5.1 billion in 2015.[57] Of this amount, $1.2 billion was related to unproved properties.[58] Of the total impairment charge recognized in 2015, $1.04 billion was for midstream oil and natural gas operations and properties in the Rockies.[59]

> f.   *30 October 2015: Exxon Announces Quarterly Earnings*

56. On 30 October 2015, a few days after Shell's announced impairment of a similar oil sands field, Exxon announced Q3 2015 financial results and held a conference call with analysts.[60]

---

[56] Anadarko Petroleum Corporation, Form 10-Q for the fiscal quarter ended 30 September 2015, filed 27 October 2015, p. 9; "Facing Adversity, Anadarko Seeks to Preserve Value," by Casey Sattler, *The Oil Daily*, 29 October 2015.

[57] Anadarko Petroleum Corporation, Form 10-K for the fiscal year ended 31 December 2015, filed 17 February 2016, p. 54.

[58] Anadarko Petroleum Corporation, Form 10-K for the fiscal year ended 31 December 2015, filed 17 February 2016, p. 63.

[59] Anadarko Petroleum Corporation, Form 10-K for the fiscal year ended 31 December 2015, filed 17 February 2016, p. 65.

[60] "Exxon Mobil Earns $4.2 Billion in Third Quarter of 2015," *Business Wire*, 30 October 2015 8:00 AM.

**App. 22**

During the conference call, analysts questioned if Exxon would see any upcoming impairments.[61]

> g.  *5 November 2015: Breitburn Energy Partners LP Announces Impairment Charges on Oil and Gas Assets in Colorado and Wyoming*

57. On 5 November 2015, Breitburn Energy Partners, which had oil and gas assets located in Wyoming and Colorado during the Class Period, announced an impairment charge of $1.4 billion of long-lived assets caused primarily by the decrease in oil and gas prices.[62] Breitburn would eventually record a total impairment charge of $2.4 billion for FY 2015, of its oil and gas assets, of which $147.9 million was related to assets in the Rocky Mountains.[63]

> h.  *2 February 2016: Exxon Announces Quarterly Earnings – Credit Rating Actions*

58. On 2 February 2016, the Company announced Q4 and FY 2015 financial results and held a conference call with analysts.[64] During the conference call, analysts asked the Company about its outlook for Kearl. Exxon's Vice President of Investor Relations Jeff Woodbury ("VP Woodbury") assured analysts that while profitability was compressed given current commodity prices, Exxon's team in Canada was doing a great job lowering costs.

> "[Sam Margolin – Cowen:] In the press release you called out some of the project startups and what seemed like a net overall favorable mix effect on income. I think that maybe Western Canada is included in the startups, but not maybe a contributor to mixed income enhancements. Can you talk about Western Canada, the heavy levels of pressure we're seeing on heavy oil out there and maybe frame an outlook for us?

---

[61] "Q3 2015 Exxon Mobil Corp Earnings Call," *Thomson Reuters*, conference call transcript, 30 October 2015, 9:30 AM, p. 14.

[62] "Breitburn Energy Partners Reports Third Quarter 2015 Results," *Business Wire*, 5 November 2015 6:00 AM; and Breitburn Energy Partners LP, Form 10-Q for the quarterly period ended 30 September 2015, filed 5 November 2015, p. 3.

[63] Breitburn Energy Partners LP, Form 10-K for the fiscal year ended 31 December 2015, filed 26 February 2016, p. 69.

[64] "Exxon Mobil Earns $16.2 Billion in 2015; $2.8 Billion During Fourth Quarter," *Business Wire*, 2 February 2016 8:00 AM.

**App. 23**

[VP Woodbury:] Yes, sure. I mean, no doubt profitability is compressed in this price environment. As I have said before, we remain very focused on the fundamentals, and I tell you that the team there in Canada have done just an exceptional job in driving the cost structure down and enhancing reliability. We are not by any means where we want to be. In fact, I would tell you that we're never satisfied with the status quo. We will continue to work that, recognizing that we feel very good about the resource potential, not only in Kearl, but in Western Canada and in our portfolio. We think that over the long-term the asset's going to be high value that focuses around maintaining cash profit and maximizing long-term value in the asset."
**"Q4 2015 Exxon Mobil Corp Earnings Call,"** *Thomson Reuters***, conference call, 2 February 2016 9:30 AM, p. 8.**

59.    On 2 February 2016, S&P placed Exxon's long-term corporate credit rating on CreditWatch with negative implications.[65] S&P stated that the "placement reflects the expectation that credit measures will be weak for the ratings through 2018 under our price assumptions."[66] At the same time, S&P also "cut the ratings of 10 U.S. oil and gas exploration and production companies, citing the sharp drop in crude oil prices."[67]

### 2.    24 February 2016: Exxon Files Form 10-K for FY 2015

60.    On 24 February 2016, after the close of trading, the Company filed its FY 2015 Form 10-K with the SEC.[68] The filing provided a "Summary of Oil and Gas Reserves at Year-End 2015."[69] The Company reported that as of 31 December 2015, total proved reserves were 24,759 million oil-equivalent barrels (or 24.8 billion oil-equivalent barrels ("GOEB")).[70] Of the reported total proved reserves, 17.9 GOEB were declared to be developed proved

[65] "Rating Actions Taken On 20 U.S. Investment-Grade Exploration & Production Companies After S&P Revises Price Assumptions," by Thomas Watters and Ben Tsocanos, *Standard & Poor's*, 2 February 2016.

[66] "Rating Actions Taken On 20 U.S. Investment-Grade Exploration & Production Companies After S&P Revises Price Assumptions," by Thomas Watters and Ben Tsocanos, *Standard & Poor's*, 2 February 2016.

[67] "S&P Cuts Ratings of 10 U.S. Oil Companies," by Maria Armental, *The Wall Street Journal*, 2 February 2016.

[68] Exxon Mobil Corporation, Form 10-K for fiscal year ended 31 December 2015, filed 24 February 2016, accepted 4:09 PM.

[69] Exxon Mobil Corporation, Form 10-K for fiscal year ended 31 December 2015, filed 24 February 2016, p. 5.

[70] According to the Company "gas is converted to an oil- equivalent basis at six million cubic feet per one thousand barrels." (Exxon Mobil Corporation, Form 10-K for fiscal year ended 31 December 2015, filed 24 February 2016, p. 5).

**App. 24**

reserves.[71] The Company reported that bitumen from Canada made up 4,108 million barrels ("M/bbls"), or 22.9% of the Company's total developed proved reserves.[72]

61.     In its Form 10-K, the Company explained that its development activities during FY 2015 caused the transfer of 2.7 GOEB from proved undeveloped reserves as of the end of FY 2014 to proved developed reserves.[73] The largest transfers were related to the Kearl Expansion project which produced bitumen.

> "At year-end 2015, approximately 6.8 billion oil-equivalent barrels (GOEB) of ExxonMobil's proved reserves were classified as proved undeveloped. This represents 27 percent of the 24.8 GOEB reported in proved reserves. This compares to the 8.8 GOEB of proved undeveloped reserves reported at the end of 2014. During the year, ExxonMobil conducted development activities in over 100 fields that resulted in the transfer of approximately 2.7 GOEB from proved undeveloped to proved developed reserves by year-end. **The largest transfers were related to Kearl Expansion project start-up and drilling activity in the United States**. Mainly due to low prices during 2015, the Corporation reclassified approximately 1 GOEB of proved undeveloped reserves, primarily natural gas reserves in the United States, which no longer meet the SEC definition of proved reserves."
> **Exxon Mobil Corporation, Form 10-K for fiscal year ended 31 December 2015, filed 24 February 2016, p. 7 (emphasis added).**

62.     The Company presented detailed data on average production prices and average production costs for each geographic area.[74] For FY 2015, the reported average production price per barrel of bitumen was $25.07.[75] The reported average production cost per barrel of bitumen was $19.20, indicating an average profit per barrel of bitumen production of approximately $5.87 (equal to the difference between the $25.07 average production price and the $19.20 average production cost per barrel).[76]

---

[71] Exxon Mobil Corporation, Form 10-K for fiscal year ended 31 December 2015, filed 24 February 2016, p. 5.

[72] Exxon Mobil Corporation, Form 10-K for fiscal year ended 31 December 2015, filed 24 February 2016, p. 5.

[73] Exxon Mobil Corporation, Form 10-K for fiscal year ended 31 December 2015, filed 24 February 2016, p. 7.

[74] Exxon Mobil Corporation, Form 10-K for fiscal year ended 31 December 2015, filed 24 February 2016, p. 9.

[75] Exxon Mobil Corporation, Form 10-K for fiscal year ended 31 December 2015, filed 24 February 2016, p. 9.

[76] Exxon Mobil Corporation, Form 10-K for fiscal year ended 31 December 2015, filed 24 February 2016, p. 9.

19

**App. 25**

63. In the section of the Form 10-K titled "Market Risks, Inflation and Other Uncertainties,"[77] Exxon discussed the potential impact of fluctuating oil and gas prices and assured the market that:

> "The Corporation has an active asset management program in which underperforming assets are either improved to acceptable levels or considered for divestment. The asset management program includes a disciplined, regular review to ensure that all assets are contributing to the Corporation's strategic objectives. The result is an efficient capital base, and the Corporation has seldom had to write down the carrying value of assets, even during periods of low commodity prices."
> **Exxon Mobil Corporation, Form 10-K for fiscal year ended 31 December 2015, filed 24 February 2016, p. 55.**

64. Unbeknownst to investors, Kearl, which roughly accounted for 75% of Exxon's Canadian bitumen reserves, was operating at a loss per barrel produced.[78] According to an analysis prepared for a meeting with CEO Tillerson, in 2015 Kearl was losing hundreds of millions of dollars.[79] In a December 2015 internal Company presentation titled "Americas F&O – Delivering the Plan," Kearl was reportedly losing $6.64 per barrel sold in December 2015 and YTD Kearl had lost $7.34 per barrel sold.[80]

65. The Company reported an average production cost per barrel of bitumen of $19.20 and price per barrel of bitumen of $25.07, which indicated an average implied profit per barrel of bitumen production of approximately $5.87. Plaintiffs allege that the implied profit of $5.87 per barrel was misleading as it failed to reveal to investors the inferior cost structure of Kearl, and the fact that in FY 2015 the Company was losing $7.34 per barrel of bitumen from Kearl. Ultimately, the de-booking revealed the truth to the market about the diminished profitability of Kearl. Even though the de-booking is a one-time nonrecurring adjustment it informed the

---

[77] Exxon Mobil Corporation, Form 10-K for fiscal year ended 31 December 2015, filed 24 February 2016, p. 54.

[78] Deposition of Vincent L. Prestipino, dated 11 September 2024, at 112:10-15, 126:15-23, and 184:23-185:4; and Complaint, ¶97.

[79] Internal Company Email, "RE: PROP:December Kearl Information," 23 January 2016, Prestipino Exhibit 19 [EMC_RAMIREZ_000009451-6 at 5]; and "Financial & Operating Review December 2015," internal Company presentation, December 2015, Prestipino Exhibit 18 [EMC_RAMIREZ_000008874-909, at 902].

[80] "Americas F&O - Delivering the Plan," internal Company presentation, December 2015, Prestipino Exhibit 9 [EMC_RAMIREZ 000008612-69 at 33]; Deposition of Vincent L. Prestipino, dated 11 September 2024, at 105:2-11; and 108:2-112:15.

**App. 26**

marketplace of ongoing diminished profitability, and therefore according to economic principles has a large impact on valuation.

> ### 3. 2 March 2016: Exxon Holds Its Annual Analyst Meeting and Completes A $12.0 Billion Debt Offering

66. On 2 March 2016, the Company held its 2016 analyst meeting in New York.[81] CEO Tillerson touted the Company's operation and capital efficiency, and the quality of Exxon's portfolio.[82] CEO Tillerson also highlighted the strength of Exxon's North American assets.

> "Sustained leadership and capital efficiency reflects our commitment to a disciplined investment approach, effective project management and innovative technologies to grow a well-balanced portfolio. Our efficient asset base, enhanced by new investments, positions the Corporation for long-term performance across a broad range of conditions. ***The quality of ExxonMobil's portfolio is also evident relative to significant recent asset impairments by our competitor group. Not shown are North American pure play E&P companies, which, if you look at the last couple of years, took impairments of over $120 billion; and if you look at the last eight years, took impairments of over $200 billion. Now, while these impairments will improve competitor return on capital employed performance in the future years, they represent a significant destruction of shareholder assets***. Our investment discipline delivers industry-leading returns and a portfolio that is durable across a wide range of commodity prices. Effective project execution provides the lowest installed capital cost, which, along with optimized operations, creates a long-term value that simply outpaces our competitors."
> **"Exxon Mobil Corp Analyst Meeting,"** *Thomson Reuters*, **conference call transcript, 2 March 2016 9:00 AM, p. 7 (emphasis added).**

67. On 2 March 2016, after the close of trading, Exxon filed a prospectus supplement for an eight-tranche, $12 billion debt offering, which received a AAA rating from S&P.[83] The $12 billion debt offering represented the Company's largest bond sale on record.[84] The offering comprised six fixed-rate notes and two floating-rate notes of varying maturities, coupon

---

[81] "Exxon Mobil Corp Analyst Meeting," *Thomson Reuters*, conference call transcript, 2 March 2016 9:00 AM.

[82] "Exxon Mobil Corp Analyst Meeting," *Thomson Reuters*, conference call transcript, 2 March 2016 9:00 AM, p. 7.

[83] Exxon Mobil Corporation, Form 424B2, filed 2 March 2016; and "After a Half-Century at AAA, Exxon Gets Downgraded -- Market Talk," *Dow Jones Newswires*, 26 April 2016.

[84] "Exxon Sells $12 Billion in Bonds to Build War Chest," by Aleksandra Gjorgievska, *Bloomberg*, 1 March 2016.

21

**App. 27**

rates, and face values (collectively, "Exxon Notes"). Table-1 presents the Exxon Notes and their terms.

**Table-1: Exxon Notes Issued 2 March 2016[85]**

|  | Interest Rate | Maturity | Years to Maturity | Amount |
|---|---|---|---|---|
| [1] | 1.439% | 1-Mar-2018 | 2 | $1,000,000,000 |
| [2] | 1.708% | 1-Mar-2019 | 3 | $1,250,000,000 |
| [3] | 2.222% | 1-Mar-2021 | 5 | $2,500,000,000 |
| [4] | 2.726% | 1-Mar-2023 | 7 | $1,250,000,000 |
| [5] | 3.043% | 1-Mar-2026 | 10 | $2,500,000,000 |
| [6] | 4.114% | 1-Mar-2046 | 30 | $2,500,000,000 |
| [7] | 3mo Libor + 0.600% | 28-Feb-2018 | 2 | $750,000,000 |
| [8] | 3mo Libor + 0.780% | 1-Mar-2019 | 3 | $250,000,000 |
| [9] |  |  |  | $12,000,000,000 |

      4.      <u>26-27 April 2016: S&P Downgrades Exxon's Credit Rating; Company Increases Dividend</u>

68. On 26 April 2016, less than two months after Exxon's biggest debt offering ever, S&P downgraded Exxon's credit rating to AA+ from AAA.[86] S&P also lowered the credit rating associated with Exxon's unsecured debt to AA+ from AAA.[87] In its announcement, S&P stated:

> "We forecast that Exxon Mobil's credit measures, including free operating cash flow (FOCF) to debt and discretionary cash flow (DCF) to debt, will remain below expectations for the 'AAA' rating through 2018. … The company's debt level has more than doubled in recent years, reflecting high capital spending on major projects in a high commodity price environment and dividends and share repurchases that substantially exceeded internally generated cash flow."

---

[85] Exxon Mobil Corporation, Form 424B2, filed 2 March 2016.

[86] "S&P Lowers Exxon Mobil Ratings To 'AA+'; Outlook Stable," *Dow Jones Newswires*, 26 April 2016.

[87] "Exxon Mobil Corp. Corporate Credit Rating Lowered to 'AA+' from 'AAA'; Outlook Stable," by Ben Tsocanos and Christine Besset, *S&P RatingsDirect*, 26 April 2016.

**App. 28**

**"Exxon Mobil Corp. Corporate Credit Rating Lowered to 'AA+' from 'AAA'; Outlook Stable," by Ben B Tsocanos and Christine Besset, S&P RatingsDirect, 26 April 2016.**

69.    The next day, 27 April 2016, the Company announced it would increase its dividend by 3.00%.[88] It was the 34th straight year which the Company increased its dividend.[89]

70.    According to its recently filed Form 10-K annual report, Exxon's FY 2015 cash flow from operations after investing activities was $6.52 billion.[90] This amount was less than the $12.1 billion the Company would need to pay for the annualized declared dividend. Exxon's cash flow from operations would be solely insufficient to service the declared dividend. Without the cash flows from the March 2016 Note offering, Exxon would not have been able to increase its dividend, and it likely would have had to delay or reduce its previously declared dividend payments. A dividend reduction would have caused Exxon to lose its vaunted "Dividend Aristocrat" title, a status bestowed only on a highly exclusive list of companies that had raised their dividend for 25 consecutive years.[91]

### 5.    29 April 2016: Exxon Announces Q1 2016 Financial Results

71.    On 29 April 2016, before the market opened, the Company announced quarterly earnings and held a conference call with investors.[92] For the quarter, the Company reported net income of $1.8 billion, or EPS of $0.43 per share, a year-over-year decline of 63.0%.[93] The Company attributed the decline in earnings to "sharply lower commodity prices and weaker refining margins" which "were partly offset by strong Chemical results."[94]

---

[88] "A Day After Credit Downgrade by S&P, Exxon Hikes Dividend," *Associated Press*, 27 April 2016 2:40 PM.

[89] "A Day After Credit Downgrade by S&P, Exxon Hikes Dividend," *Associated Press*, 27 April 2016 2:40 PM.

[90] Exxon Mobil Corporation, Form 10-K for fiscal year ended 31 December 2015, filed 24 February 2016, p. 49.

[91] "Dividend Aristocrats," *Nasdaq*, available at https://www.nasdaq.com/stocks/investing-lists/dividend-aristocrats, last accessed 26 September 2024.

[92] "Exxon Mobil Earns $1.8 Billion in First Quarter of 2016," *Business Wire*, Company press release, 29 April 2016 8:00 AM; and "Q1 2016 Exxon Mobil Corp Earnings Call," *Thomson Reuters*, conference call transcript, 29 April 2016 9:30 AM.

[93] "Exxon Mobil Earns $1.8 Billion in First Quarter of 2016," *Business Wire*, Company press release, 29 April 2016 8:00 AM.

[94] "Exxon Mobil Earns $1.8 Billion in First Quarter of 2016," *Business Wire*, Company press release, 29 April 2016 8:00 AM.

**App. 29**

72. During the earnings conference call, Wolfe Research analyst Paul Sankey asked about the loses in the Company's U.S. Upstream business. VP Woodbury assured analysts that the Company had durable assets that were profitable in low price environments.

> "[Paul Sankey – Wolfe Research:] Okay, Jeff, because of time constraints, I'll just jump into the other one. You again, mentioned return on capital employed. **I really struggle with you losing money in the upstream on an earnings basis, particularly in the US, and how you reconcile that with the measure of the return on capital employed**. Typically we don't look at that, we look at the cash flow measure. Can you help us with the DD&A upstream particularly in the US so we can get to the cash returns that you're making as opposed to these losses upstream.
>
> [VP Woodbury:] We've got a very strong portfolio in the upstream, and remember that we invest with a long-term view that's informed by our long-term energy demand outlook. All of our assets were managed to maximize returns through the life cycle with the objective of maintaining positive cash flow in low price environments. We'll continue to focus on those things that we control, cost, reliability, operational integrity. **Importantly, we'll invest in attractive opportunities throughout the cycle that further enhance the asset profitability, and we see significant value in our assets, so, yes, there is a low price. We're in a low price period like we've been in the past. As I've said we've really designed these assets to be very durable during a low price environment**. They continued to generate – our producing assets continue to generate cash flow, and over the long-term we will continue to demonstrate, industry leading returns on capital employed." **"Q1 2016 Exxon Mobil Corp Earnings Call,"** *Thomson Reuters*, **conference call transcript, 29 April 2016 9:30 AM, p. 17 (emphasis added).**

### 6.    29 July 2016: Exxon Announces Q2 2016 Financial Results

73. On 29 July 2016, before the market opened, the Company announced quarterly earnings and held a conference call with investors.[95] For the quarter, the Company reported net income of $1.7 billion, or EPS of $0.41, a year-over-year decline of 59.0%.[96]

---

[95] "Exxon Mobil Earns $1.7 Billion in Second Quarter of 2016," *Business Wire*, Company press release, 29 July 2016 8:00 AM; and "Q2 2016 Exxon Mobil Corp Earnings Call," *Thomson Reuters,* conference call transcript, 29 July 2016 9:30 AM.

[96] "Exxon Mobil Earns $1.7 Billion in Second Quarter of 2016," *Business Wire*, Company press release, 29 July 2016 8:00 AM.

**App. 30**

74.   Analysts updated their price targets following the Company's quarterly earnings release.

"Similar to Big Oil peers but unique for XOM, 2Q was a sizeable miss on EPS and FCF, leading to a down day (-1.4%) in an up energy tape (XLE + 1%). Incremental color on the call suggested several one-time variables were at play in the miss, though a full quantification was not provided. Capex continued its below guidance vector in 2Q; and, we are lowering our full year outlook again as a result. We have updated our model for the 2Q miss and lowered our Dec-16 price target to $92/share (from $95/share) and remain Neutral."
**"Atypically Large Miss, Lowering Estimates/PT," by Phil Gresh et al., JP Morgan, analyst report, 29 July 2016, p. 1.**

"Key takeaways from 2Q16 results and the conference call: 1) reiterated 2016 capex guidance of $23.2bn (down 25% YoY) but inferred spending would likely come in below budget due to market savings, efficiency gains, & commencing projects on time & on budget; 2) made no change to its 2016 production growth range of ~4.0-4.2 MMBoed (flat YoY); 3) initial seismic images of Skipjack point to comparable resource potential as its Liza discovery (0.8-1.4 BBoe) offshore Guyana; 4) noted there is a 'strong case' that the gas from the recent InterOil acquisition in Papua New Guinea will ultimately go to its existing facility at PNG LNG (rather than a separate LNG project); & 5) we lowered 2016-17E EPS from $2.79/$3.77 to $2.38/$3.59 on lower Upstream earnings for 2016 & Downstream earnings for 2017. Volumes slipped 0.6% YoY, below expectations 2Q upstream production slipped 0.6% YoY to 3.957 MMBoed, below consensus & UBSe of ~4.07 MMBoed & ~4.02 MMBoed, respectively. Notably, worldwide liquids volumes rose 2% YoY while natgas volumes declined 4% YoY. Adjusted for divestments, production was roughly unchanged YoY. 2Q capex declined 38% YoY to $5.2bn (below UBSe $5.4bn) with 1H16 capex at ~$10.3bn which implies spending is trending below pace of the FY budget of $23.2bn. While we forecast $22 billion in capex, we still expect XOM to have an $8.5 billion free cash flow deficit this year. 2Q EPS and CFPS fall well short of expectations on weak E&P and R&M 2Q16 EPS fell 59% YoY to $0.41, well below consensus and UBSe of $0.64 and $0.73, respectively. EPS surprisingly declined 6% QoQ despite the sharp QoQ increase in oil prices and higher US and European refining margins. Upstream earnings plunged 86% YoY to $294MM, well below consensus' $966MM accounting for $0.16/share of the downside surprise. R&M earnings fell 45% YoY and 9% QoQ to ~$825MM, 21% below consensus

25

**App. 31**

and accounting for $0.05/share of the downside surprise. Chemical earnings of ~$1.2bn were little changed YoY & in line with expectations. 2Q cash flow from ops of $4.5bn was sharply below UBSe of $5.1bn and consensus of $7.3bn. Valuation: premium to peers and historical multiples We've lowered our PT from $90 to $86, still based on a normalized relative P/E ~0.90x (in line with 5-yr avg) but reflecting our lower 2016-17 EPS estimates."

**"2Q EPS/CFPS Well Below Expectations on Weak E&P & R&M; Reducing Estimates and Target," by William Fetherson et al., UBS, analyst report, 31 July 2016, p. 1.**

### 7.    20 September 2016: S&P Raises Its Oil Price Assumptions for the Remainder of 2016

75.    On 20 September 2016, S&P updated its short-term price assumptions for WTI crude oil.[97] S&P did not change its price assumptions for Henry Hub natural gas prices. The agency also assessed that industry deflation had lowered the long-term cost to produce a marginal barrel of oil.

### 8.    28 October 2016: Exxon Announces Q3 2016 Financial Results

76.    On 28 October 2016, Exxon announced 3Q 2016 financial results and held a conference call with investors.[98] The Company reported 3Q 2016 earnings of $2.65 billion, or $0.63 per share,[99] which was above consensus estimates of $0.58 per share.[100] However, while earnings per share beat analysts' expectation due to some asset sales, quarterly production was below analysts' expectation.[101] Despite the production miss in the quarter, the Company reiterated its annual production guidance.[102] Exxon also reported that FY 2016 capex would

---

[97] "S&P Global Ratings Raises Its Oil Price Assumptions for the Rest of 2016, And Assigns Oil and Natural Gas Prices for 2019," by Simon Redmond and Thomas Watters, S&P Global Ratings, Rating Direct, 20 September 2016.

[98] "Exxon Mobil Earns $2.7 Billion In Third Quarter Of 2016," *Business Wire*, Company press release, 28 October 2016 8:00 AM.

[99] "Exxon Mobil Earns $2.7 Billion In Third Quarter Of 2016," *Business Wire*, Company press release, 28 October 2016 8:00 AM.

[100] "Exxon Mobil Earns $2.7 Billion In Third Quarter of 2016," *Business Wire*, 28 October 2016 8:00 AM; and "Exxon Mobil Profit Continues Slide Despite Crude Rebound," *Financial Times*, 28 October 2016.

[101] "3Q EPS Beats on R&M Asset Sale Gain But Cash Flow and Production Below Expectations," by William Featherston et al., UBS, analyst report, 28 October 2016, p. 3.

[102] "Q3 2016 Exxon Mobil Corp Earnings Call," *Thomson Reuters*, conference call transcript, 28 October 2016, 9:30 AM, p. 6.

26

**App. 32**

be between $20 billion and $21 billion, below the previously budgeted amount of $23 billion.[103] Analysts viewed the Company's ability to control costs as a positive.[104]

> *a.    Exxon Discloses Likely Reserve De-booking of Kearl and Year-End Impairment Testing*

77.    In addition to the above financial results, the Company acknowledged that it would have to de-book 4.6 billion oil-equivalent barrels (including 3.6 billion barrels of bitumen at Kearl and 1 billion oil-equivalent barrels of natural gas at operations in North America) *if* the average price of oil and gas in the first nine months of 2016 persisted for the remainder of the year.

> "***If the average prices seen during the first nine months of 2016 persist for the remainder of the year***, under the SEC definition of proved reserves, certain quantities of oil, such as those associated with the Kearl oil sands operations in Canada, will not qualify as proved reserves at year-end 2016. In addition, if these average prices persist, the projected end-of-field-life for estimating reserves will accelerate for certain liquids and natural gas operations in North America, resulting in a reduction of proved reserves at year-end 2016. Quantities that could be required to be de-booked as proved reserves on an SEC basis amount to approximately 3.6 billion barrels of bitumen at Kearl, and about 1 billion oil-equivalent barrels in other North America operations. Among the factors that would result in these reserves being re-booked as proved reserves at some point in the future are a recovery in average price levels, a further decline in costs, and / or operating efficiencies."
>
> **"ExxonMobil Earns $2.7 Billion in Third Quarter of 2016,"** *Business Wire***, Company press release, 28 October 2016 8:00AM (emphasis added).**

---

[103] "Impairments Imminent," by Jason Gammel and Marc Kofler, Jefferies, analyst report, 31 October 2016, p. 1.

[104] RBC noted "XOM continues to show impressive efficiencies and cost savings with 3Q16 capex of $4.2B ($14.5B YTD)" ("The Only Free Cash Flow Around," by Brad Heffern and Jie Yong, RBC Capital Markets, analyst report, 31 October 2016). Cowen noted that although spending in Q4 is expected to increase, "the annual spending continues to reflect execution on cost savings," and "see the company's ~$2.50/boe full cash deficit (including the dividend and a $2Bn working capital loss) closing in the near term, continuing to position the stock as a strong defensive play" ("Moving Toward Cash Breakeven," by Sam Margolin, Tanner Strunk, and Jason Gabelman, Cowen, analyst report, 28 October 2016).

**App. 33**

78. The Company also informed the market that it would perform an assessment of its major long-lived assets for potential impairment, including natural gas assets in North America, which comprised the RDMG operations.

> "In light of continued weakness in the upstream industry environment during 2016, and as part of its annual planning and budgeting process which is currently in progress, the corporation will perform an assessment of its major long-lived assets, similar to the exercise undertaken in late 2015, including North America natural gas assets and certain other assets across the remainder of its operations. The assessment will reflect crude and natural gas price outlooks consistent with those that management uses to evaluate investment opportunities and generally consistent with the long-term price forecasts published by third-party industry and government experts. Development of future undiscounted cash flow estimates requires significant management judgment, particularly in cases where an asset's life is expected to extend decades into the future. An asset group would be impaired if its estimated undiscounted cash flows were less than the asset's carrying value, and impairment would be measured by the amount by which the carrying value exceeds fair value. The corporation will complete its asset recoverability assessment and analyze the conclusions of that assessment in connection with the preparation and review of the corporation's year-end financial statements for inclusion in its 2016 Form 10-K. Until these activities are complete, it is not practicable to reasonably estimate the existence or range of potential future impairments related to the corporation's long- lived assets."
> **"ExxonMobil Earns $2.7 Billion In Third Quarter Of 2016,"** *Business Wire*, **Company press release, 28 October 2016 8:00 AM**.

79. Analysts commented on Exxon's announcement that it would likely have to de-book approximately 19.0% of its proved reserves, and their commentary was decidedly negative. For example, Jefferies published a report titled, "Impairments Imminent."[105] Morgan Stanley published a report titled, "3Q16: Missed and Likely Impaired":

---

[105] "Impairments Imminent," by Jason Gammel and Marc Kofler, Jefferies, analyst report, 31 October 2016, p. 1.

**App. 34**

> "In the aftermath of SEC and NY Attorney General announced probes of XOM's valuation of reserves and low commodity prices in 2016, XOM addressed the issue of potential write-downs. Were crude prices to stay in-line with YTD SEC price deck (~$42/bl, based on the price on the first of each month) reserves associated with Kearl (3.6Bn bl) and other NAm assets (1Bn boe) would be at risk."
> **"3Q16: Missed and Likely Impaired," Evan Calio et al., Morgan Stanley, analyst report, 31 October 2016, p. 1.**

80. Raymond James described the de-booking news as the day's "most surprising revelation." RBC wrote, "the Kearl revision in particular is concerning, as it indicates the current economics of the project are challenged."

> "Much more serious is the prospect that up to 4.6 billion Bbls (a whopping 18% of companywide proved reserves), the bulk of it at Kearl, may have to be debooked based on YTD oil prices. This was today's most surprising revelation."
> **"3Q16 Output at 7-Year Low; More Selling Pressure on Deck w/IOC Buyout," by Pavel Molchanov and Luana Siegfried, Raymond James, analyst report, 28 October 2016, p. 1.**

> "XOM noted that it could see a substantial YE16 proved reserves reduction unless there is a strong recovery in oil prices by year-end. Kearl could see a reduction of 3.6 Bboe, while other North American reserves could be reduced by 1.0 Bboe. While these will not directly impact financial performance, we believe the Kearl revision in particular is concerning, as it indicates the current economics of the project are challenged."
> **"The Only Free Cash Flow Around," by Brad Heffern and Jie Yong, RBC Capital Markets, analyst report, 31 October 2016, p. 1.**

81. Numerous news articles focused on the development.

> "Exxon Mobil Corp. profit sank as the world's largest publicly traded oil company posted its lowest production in seven years and warned the prolonged slump in energy markets may force a write off of 19 percent of its reserves."
> **"Exxon Profit Slides as Oil-Market Slump Threatens Reserves (1)," *Bloomberg*, 28 October 2016, 8:21 AM.**

**App. 35**

"CHICAGO, Oct 28 (Reuters Breakingviews} - Exxon Mobil's reserves conundrum could be a harbinger of Big Oil's next crisis. The $360 billion U.S. crude producer warned on Friday that it may finally join rivals in writing down assets whacked by low oil prices. Cost cuts did at least help Exxon, and rival Chevron, beat estimates for third-quarter results, announced on Friday. But with crude hovering around $50 a barrel, it's a mediocre recovery."
**"Exxon reserves tap into Big Oil's next crisis – Reuters Breakingviews," by Kevin Allison,** *Reuters***, 28 October 2016, 11:42 AM.**


"HOUSTON, Oct 28 (Reuters) - Exxon Mobil Corp, whose oil field assets are being investigated by the U.S. government, warned on Friday it may need to slash proved reserves on its books by nearly 20 percent if oil prices stay low for the rest of 2016. The news pushed the company's share price down 2.3 percent to $84.93 in afternoon trading, on an otherwise upbeat day that saw Exxon and Chevron post quarterly profits that beat Wall Street expectations."
**"Exxon warns low oil prices may dent reserves nearly 20pct – Reuters News," by Ernest Scheyder and Terry Wade,** *LSEG***, 28 October 2016 12:40 PM.**


"Exxon Mobil Corp. warned it may be facing the biggest reserves revision in its history as production sank to a seven-year low and profit slid amid a prolonged slump in energy markets. About 3.6 billion barrels of reserves in the Canadian oil sands and the equivalent of another 1 billion barrels of oil in other North American fields may be in jeopardy if the average energy prices seen during the first nine months of 2016 persist, Exxon said in a statement on Friday. That would equate to 19 percent of Exxon's reserves and would be the largest de-booking since the 1999 merger that created the company in its modern forms."
**"Exxon Facing Historic Reserves Reduction as Slump Persists (3),"** *Bloomberg***, 28 October 2016 4:16 PM.**


"HOUSTON — Exxon Mobil, in a concession to market and regulatory pressures, said Friday that it might be forced to write down the value of some of its oil and gas assets in Canada and elsewhere if energy prices remain low through the end of the year. The announcement, which accompanied the company's release of another quarter of lackluster earnings, was an apparent reversal of Exxon Mobil's stance in recent years. The company has long insisted that it has been adequately accounting for the value of its oil and gas reserves — even as many other petroleum companies have taken big write-offs to reflect a two-year price slump. On

**App. 36**

Friday, though, the company acknowledged that it faced what could be the biggest accounting revision of reserves in its history. Exxon Mobil might have to concede that 3.6 billion barrels of oil-sand reserves and one billion barrels of other North American reserves are currently not profitable to produce."

**"Exxon Concedes It May Need to Declare Lower Value for Oil in Ground," by Clifford Krauss, *The New York Times*, 28 October 2016.**

82. UBS published a report that expressed concern over Exxon's evaluation process for impairment assessments.

"The company also plans to conduct impairment assessments again this year for its major long-lived assets (under successful efforts accounting, US GAAP requires companies to take an impairment charge if an asset's estimated undiscounted cash flows are less than its carrying value). While it performed a similar analysis in 2015, it took no writedowns despite the precipitous YoY decline in oil prices, raising questions over its evaluation process which (as XOM acknowledged in its statement) is highly subject to management discretion."

**"3Q EPS Beats on R&M Asset Sale Gain But Cash Flow and Production Below Expectations," by William Featherston et al., UBS, analyst report, 28 October 2016, p. 3.**

> b. *Exxon Explained the Oil and Gas Benchmark Used to Determine De-Booking Reserves and Asset Impairments*

83. During the conference call, Exxon explained that for their reporting of oil and gas proved reserves, the "pricing basis is a historical 12-month average of first day of the month prices in a given year."[106]

84. Wells Fargo analyst Roger Read asked the Company what benchmark should be used to determine the value for the Kearl assets. Specifically, he asked about the Kearl assets, "Is the indicator there best to use a bitumen price or to use WCS price and that's just for us to do

---

[106] "Q3 2016 Exxon Mobil Corp Earnings Call," *Thomson Reuters*, conference call transcript, 28 October 2016, 9:30 AM, p. 4.

**App. 37**

our calculations?"[107] VP Woodbury responded that the "WCS benchmark is probably reasonable."[108]

85.    Exxon also averred that it uses crude and natural gas outlooks in assessing assets for impairments.

> "Given that year-to-date crude prices are down further from 2015 by almost 25% on the SEC pricing basis, we anticipate that certain quantities of currently booked reserves, such as those associated with our Canadian oil sands, will not qualify as crude reserves at year-end 2016. In addition, if these price levels persist, reserves associated with end-of-field life production for certain other liquids and natural gas operations in North America also may not qualify. However, as you know, amounts required to be de-booked on an SEC basis are subject to being rebooked in the future when price levels recover, or when future operating or cost efficiencies are implemented. We do not expect the de-booking of reported reserves under the SEC definitions to affect operations of these assets, or to alter our outlook for future production volumes. And you can find further details of our reserves reporting in our 2015 10-K. Now regarding asset impairments. We follow US GAAP successful efforts, and under this standard assessments are made using crude and natural gas price outlooks consistent with those that Management uses to evaluate investment opportunities. This is different than the SEC price basis for reserves that I just described. As detailed in our 2015 10-K, last year, we undertook an effort to assess our major long-life assets most at risk for potential impact. The price basis used in this assessment was generally consistent with long-term price forecasts published by third-party industry and government experts. The results of this analysis indicated that the future undiscounted cash flows associated with these assets exceeded their carrying value. Again, this is detailed in our 2015 10-K. In light of continued weakness in the upstream industry environment and in connection with our annual planning and budgeting process, we will again perform an assessment of our major long-life assets. Similar to the exercise undertaken in 2015. We will complete this assessment in the fourth quarter, and report any impacts in our year-end financial statements."
> **"Q3 2016 Exxon Mobil Corp Earnings Call," *Thomson Reuters*, conference call transcript, 28 October 2016 9:30 AM, pp. 4-5.**

---

[107] "Q3 2016 Exxon Mobil Corp Earnings Call," *Thomson Reuters*, conference call transcript, 28 October 2016, 9:30 AM, p. 19.

[108] "Q3 2016 Exxon Mobil Corp Earnings Call," *Thomson Reuters*, conference call transcript, 28 October 2016, 9:30 AM, p. 19.

**App. 38**

86. Credit Suisse observed that the reserve de-booking and asset impairment were directly related to the drop in oil and gas prices, which had occurred well before the Company's response, not other unrelated factors.

> "It was good to see XOM get on the front foot and remind investors of the reserve booking and impairment policies followed at the company (more detail can be found in the 10-K). In the 3Q presentation slides, XOM flagged that a reserves reduction was likely (with the potential to rebook as prices rose) and that an impairment assessment was planned. In 2015, due to the fall in natural gas prices, XOM did make a negative adjustment to the US natural gas reserves of over 1bn boe. There were also modest revisions to North American oil. On the call, XOM flagged a potential need to debook reserves, e.g. the Canadian oil sands. Canada has a sizeable resource base – 4.6bn boe. Not all of this would necessarily be de-booked – the 3.6bn boe Kearl was the focus on conference call questions. We stress that Kearl itself is operating well. As reliability improves, the gap between calendar day production and stream day capacity at Kearl could close, adding to production. **The de-booking is just the mathematical application of the SEC's 1st of the month pricing rule at the bottom of the cycle (2016 will likely average $44/bbl WTI on SEC rules and WCS average $31/bbl). As commodity prices rise, then these reserves could be re-booked. Perhaps of more interest is the potential for impairments**. We would focus on two areas – the US and Canada as these account for a larger share of upstream capitalized costs. The impairment test compares undiscounted cashflows versus asset value. These regions are also the regions where capitalized costs are at a higher multiple of the 2015 cashflow (net income plus DD&A plus exploration expense from the regional upstream analysis in the 10-K). … No doubt paper inches will be filled with commentary should XOM decide to de-book or impair asset carrying value. **Impairments would impact metrics like P/Book which some investors do follow**. However, **our view of XOM's current cashflow delivery and the value of future investments will be unaffected**. As we stated earlier, XOM has a broad inventory of resources and integrated downstream opportunities from which to deliver value. We just find the shares fully valued versus other global energy investments."
> **"Same Deep Inventory, Impairment/Debooking Is Just Noise to Navigate," by Edward Westlake et al., Credit Suisse, analyst report, 30 October 2016, pp. 6-9 (emphasis added).**

33

**App. 39**

87. Credit Suisse valued Exxon's Canadian oil and gas assets, estimating that without de-booking any reserves, the fair market value of the Canadian assets was approximately $31 billion.[109] This valuation was approximately $5 billion below the carrying value of the assets reported by Exxon.[110]

*c.      Other Factors Impact Q3 Financial Results*

88. As illustrated by analyst reports, aside from disclosing the likely de-booking of proved reserves at Kearl and impairment of RMDG assets, Exxon's Q3 financial results contained several additional pieces of positive and negative information. For example, Exxon indicated it would evaluate assets outside of North America for impairment, and reported a decline in oil equivalent and natural gas liquid production. However, analysts also stated that Exxon's Q3 financial results contained material positive news, including stronger-than-expected performance in Exxon's Downstream segment (including a gain on divestment) and in Exxon's Corporate segment (attributed to a reduction in Exxon's effective tax).

> "3Q EPS beats on R&M asset sale gain and lower tax rate; CFPS below consensus 3Q EPS fell 37% YoY to $0.63, above consensus and UBSe of $0.58 and $0.59, respectively. Upstream earnings fell ~54% YoY to ~$620MM, well below consensus ~$928MM on lower liquids volumes & weaker price realizations. R&M earnings fell 40% YoY to ~$1.2 billion, well above UBSe $900MM & consensus $800MM aided by a $380MM asset sale gain ($0.09/share benefit). Chemical segment earnings of ~$1.2bn were little changed YoY and in line with expectations. 3Q cash flow from operations of $5.3bn was well below our $6.6bn forecast and consensus of $7.3 billion. … Other key takeaways from 3Q results 1) Yesterday XOM announced a 'significant' oil discovery at Owowo (27% w.i.) with potential resource of 0.5-1 BBbls offshore Nigeria; 2) Offshore Guyana, the successful Liza-3 appraisal well results in the Stabroek block (45% w.i.) confirmed recoverable resources estimate to the upper end of the previously announced 0.8-1.4 BBoe range. It is now drilling an exploration well at the Payara prospect ~10 miles northeast of Liza, with results expected by late January; and 3) XOM highlighted that based on lower oil prices, it is at risk of de-booking up to 4.6 BBoe of its 22.8 BBoe of proved reserves.

[109] "Same Deep Inventory, Impairment/Debooking Is Just Noise to Navigate," by Edward Westlake et al., Credit Suisse, analyst report, 30 October 2016, p. 9.

[110] "Same Deep Inventory, Impairment/Debooking Is Just Noise to Navigate," by Edward Westlake et al., Credit Suisse, analyst report, 30 October 2016, p. 9.

**App. 40**

Valuation: premium to peers and historical multiples Our $86 PT is based on a normalized relative PE of 0.90x (in line with its 5-year avg).”
**“3Q EPS Beats on R&M Asset Sale Gain But Cash Flow and Production Below Expectations,” by William Featherston et al., UBS, analyst report, 28 October 2016, p. 1.**

“ExxonMobil’s 3Q EPS was $0.54/shr., lower than Evercore ISI at $0.55 and consensus estimates of $0.58. The negative variance was driven by lower than expected upstream production and liquids realizations, as well as weaker domestic refining margins. Non-operating items in 3Q related to the sale of retail service stations in Canada (-$0.09). 2016 Reserve De-bookings Possible – ExxonMobil management cautioned that, based on the current 25% decline Y/Y in oil priced on an SEC basis, the company may experience further reserve de-bookings for 2016 (including Canadian Oil Sands assets). In addition, management stated that if the current commodity environment persists, reserves associated with end of field life production for other North American operations may also be impacted. … Our normalized EPS estimate is $5.80/sh. Applying the historical relative PE multiple of 110%, we attain target price of $95/share. Dividend yield is 3.5%. RDS, BP, XOM and CVX will benefit from higher oil prices, lower costs and higher capital discipline near-term. Significant earnings growth is likely in 2017. Super-Major valuations are near multi-decade lows (P/B) and with dividend yields near 5% and opportunities to recapture lost value present; we remain Overweight Big Oil. Neutral S&P R&M. (See Link: Crude Oil: Taking the Pledge).”
**“XOM: Results Below Expectations; Reserves De-Booking Possible; Buy XOM,” by Doug Terreson et al., Evercore ISI, analyst report, 31 October 2016, p. 1.**

“Earnings results: XOM reported 3Q16 EPS of $0.63, a 9% beat to consensus of $0.58 and in line with our estimate of $0.63. XOM’s 3Q16 earnings call is taking place at 9:30 AM ET. Critical takeaways: ● The beat was entirely due to stronger-than-expected performance in International Downstream and in Corporate. XOM noted that the International Downstream figure includes a gain on divestment, so those results were likely not as strong. Without these tailwinds, we think EPS would have been closer to $0.50. ● Nearly all regions had liquids production lower than our expectations, but Africa specifically was close to 100 kbbl/d below our estimate, apparently as a result of larger than expected disruptions in Nigeria. ● Capex was much lower than our expectations at $4.2 billion, although cash flow from operations ex asset sales was also lower at $5.3 billion ($6.3 billion with asset sales). We will look for color on any working

35

**App. 41**

capital impacts on this figure to reconcile with our $7.3 billion estimate. ● XOM noted that if average prices seen in the first nine months of 2016 persist, proved reserves of 3.6 billion barrels at Kearl and 1.0 billion barrels in other North American operations are at risk of being de-booked."
**"XOM – 3Q16 EPS 9% Beat, but Underlying Results Appear Weaker," by Brad Heffern, RBC Capital Markets, analyst report, 28 October 2016, p. 1.**

"XOM continues to realize cost savings, with 3Q16 capex coming in 32% below our estimate. Capital spend reductions are occurring in tandem with exploration success in Guyana and Nigeria, along with a newly disclosed evaluation of a petro-chemical project in the Gulf of Mexico. Maintain Outperform and $100 tgt noting solid execution and defensive characteristics within the industry. … On the conf call, XOM addressed its proved reserves calculation, noting a possible de-booking of proved reserves in its Western Canada footprint, which as of YE15 booked ~4.1Bn boe of proved bitumen reserves. As is the case the US natural gas reserves de-booked YE14, a write down would be subject to be re-booked at higher commodity prices on a trailing average basis. While we view XOM shares as broadly a defensive position within the space, we note commodity price leverage in the form of reserve replacement, particularly in the context of SEC attention to the matter."
**"Moving Toward Cash Breakeven," by Sam Margolin et al., Cowen, analyst report, 28 October 2016, p. 1.**

> 9.    Post-Class Period Events: Oil and Gas Prices Recover; Exxon Recognizes Impairment of Its RMDG Assets and De-Books Reserves at Kearl
>
>    a.    *Oil and Gas Prices Recover*

89.    In its Q3 2016 earnings release, the Company stated that "if the average prices seen during the first nine months of 2016 persist for the remainder of the year," it would have to de-book reserves at Kearl.[111] As shown in Table-2, crude oil and natural gas prices did not persist, and they did not decline. Oil and natural gas prices grew steadily. Nonetheless, in January 2017 Exxon de-booked the entire proved reserves related to Kearl. Rising oil and gas benchmark prices reasonably should have made it less likely that Exxon would need to de-book reserves, if in fact de-booking would only be required if benchmark prices persisted.

---

[111] "Exxon Mobil Earns $2.7 Billion In Third Quarter Of 2016," *Business Wire*, Company press release, 28 October 2016 8:00 AM.

**App. 42**

90.   Table-2 below shows the daily spot price of WCS on the first day of the month as well as the year-to-date rolling average of WCS monthly spot prices in 2016.

**Table-2: WCS Daily Spot Prices on First Day of Month and Average YTD**

| Month | WCS Daily Spot Price in Effect on First Day of Month (USD/bbl) | Monthly Average to Date WCS Price (USD/bbl) |
|---|---|---|
| January 2016 | $17.88 | $17.88 |
| February 2016 | $16.30 | $17.09 |
| March 2016 | $23.46 | $19.21 |
| April 2016 | $27.88 | $21.38 |
| May 2016 | $32.52 | $23.61 |
| June 2016 | $36.47 | $25.75 |
| July 2016 | $32.80 | $26.76 |
| August 2016 | $30.90 | $27.28 |
| September 2016 | $30.62 | $27.65 |
| October 2016 | **$35.83** | **$28.47** |
| November 2016 | **$31.89** | **$28.78** |
| December 2016 | **$37.18** | **$29.48** |

91.   Table-2 shows that between the times of the Company's Q3 and Q4 2016 earnings announcements, the benchmark prices of oil and gas increased. The effective WCS price increased 5.38% between 1 November 2016 and 1 January 2017, while the effective Henry Hub price increased 20.07% between 1 November 2016 and 1 January 2017. The year-to-date trailing average increased 5.89% between the Company's Q3 and Q4 2016 earnings announcement. That is, benchmark prices of oil and gas did not persist between the Company's Q3 2016 announcement and the end of the year.

92.   Furthermore, as shown in Figure-2 below, the Henry Hub futures price (a gauge of the market expectation of future natural gas prices) also increased from Q3 2016 through the end of the year.

**App. 43**

**Figure-2: Henry Hub Future Prices, One Month Contracts (28 October 2016 - 31 December 2016)**



> b.    *31 January 2017: Exxon Announces Q4 and FY 2016 Earnings and Announces $2.03 Billion Asset Write-Down*

93.    On 31 January 2017, before the market opened, Exxon announced financial results for Q4 2016 and FY 2016.[112] At the start of trade Exxon held a conference call with analysts.[113] The Company reported Q4 EPS of $0.41 per share and adjusted EPS of $0.71 per share, slightly beating consensus estimated EPS of $0.70 per share.[114] During the conference call and in the press release, the Company also announced that it would take a $2.0 billion asset impairment charge, "largely related to dry gas operations in the Rocky Mountains region."[115]

---

[112] "Exxon Mobil Earns $7.8 Billion in 2016; $1.7 Billion During Fourth Quarter," *Business Wire*, Company press release, 31 January 2017 8:00 AM.

[113] "Q4 2016 Exxon Mobil Corp Earnings Call," *Refinitiv Eikon*, conference call transcript, 31 January 2017 9:30 AM.

[114] "Exxon Mobil Earnings 40% Lower than Expected," by Ed Crooks, *Financial Times,* 31 January 2017.

[115] "Q4 2016 Exxon Mobil Corp Earnings Call," *Refinitiv Eikon*, conference call transcript, 31 January 2017 9:30 AM, p. 2; "Exxon Mobil Earns $7.8 Billion in 2016; $1.7 Billion During Fourth Quarter," *Business Wire*, Company press release, 31 January 2017 8:00 AM, p.1.

**App. 44**

94.    During the conference call, analysts asked the Company whether the recovery in oil and gas prices since the Company Q3 2016 announcement would be sufficient to keep the reserves on the books without an impairment. Despite the increase in oil and gas prices since the 28 October 2016 announcement, the Company expected their "final year-end reserves…to reflect most of the SEC pricing impact."[116] That is, they advised the market that most of the Kearl reserves would be de-booked.

> "[Jason Gammel – Jefferies:] Thanks, hi, Jeff. Jeff, I know that in that the third-quarter press release you had talked about the potential for needing to take some negative revisions to proved reserves in the oil sands. And clearly, at least in the quarter, you haven't taken any financial impairments to those assets. Can you talk about whether would you would still view those proved reserves as potentially needing to be written down? Or whether the price recovery into the end of the year was sufficient to allow those to remain on the books?
>
> [VP Woodbury:] Yes, it's a good question. Again, I want to make sure that everybody is very clear that there is a separation between proved reserves reporting under this, you see rules, and then the whole issue of asset impairments. And really what you're asking, Jason, is clearly the question about proved reserves. In the third quarter, we indicated, because we thought it was prudent at the time, given where crude prices were, that we indicated that we were likely going to take as much as 4.6 billion barrels out of proved and put them in our resource base, and I will remind you that I emphasized at that time that even though we make that transfer, there is no change to our operations or how we manage the business, those assets going forward. We will be announcing our final year-end reserves here in the next couple of weeks, as we typically do. In short, we do expect to reflect most of the SEC pricing impact that we discussed in the third quarter. But I will also note that we anticipate that there will be some partial offsets to those numbers. So stay tuned. We will be finalizing that shortly, and we will be releasing that information here in the next two weeks."
> **"Q4 2016 Exxon Mobil Corp Earnings Call,"** *Refinitiv Eikon*, **conference call transcript, 31 January 2017 9:30 AM, pp. 15-16.**

---

[116] "Q4 2016 Exxon Mobil Corp Earnings Call," *Refinitiv Eikon*, conference call transcript, 31 January 2017 9:30 AM, p.16.

**App. 45**

95. Following the conference call, analysts commented on Exxon's performance and the potential impairment charges.

"XOM 4Q16 EPS was $0.89 after adjusting for a $2.0b impairment in the US Upstream, versus our estimate of $0.68 and the consensus of $0.70. However, adjusted earnings included a $522m gain on the sale of its Canadian service stations (proceeds were $2.1b). Further, the company recorded a non-quantified favorable tax adjustment in the Corporate segment, where there was a $609m favorable variance compared to our estimate. Excluding these one-time items would have brought EPS in line with or perhaps below consensus. … No financial impairment on oil sands. **XOM recorded a $2.0b impairment on dry natural gas assets in the Rockies, but there was no financial impairment on its Canadian oil sands assets. XOM indicated in 3Q that oil sands may not qualify as proved reserves at year end. The lack of a financial impairment does not eliminate the risk of a reserve write-down however**. The company currently recognizes 3.6b boe at the Kearl project, about 15% of the total corporate proved reserves. We note that any reserve write-down would not affect the operations or future cash flows of the oil sands operations."
**"Joining the Short Cycle Trend," by Jason Gammel and Marc Kofler, Jefferies, analyst report, 1 February 2017, p. 1 (emphasis added).**

"We think **XOM's 4Q16 result will have a negative impact on the shares' near-term performance, following the N.A. gas asset impairment, soft 4Q16 production, and hazy 4Q16 EPS miss**. We look to the March 1 Analyst Day as a potential catalyst for XOM to shift the narrative toward long-term growth prospects, as well as provide perspective on cash flow priorities in a rising oil price environment. **Impairments & Reserves: Investors were likely at least somewhat surprised by the ~$2bn asset impairment, especially considering XOM's prior unchanged stance on impairments as of the 3Q16 earnings update following the launch of the SEC's probe**. The write-down resulted from XOM lowering its long-term price deck (for both crude and gas) used to test for asset impairments. The impairments were mostly related to dry gas operations undeveloped acreage in the Rocky Mountain region. Management indicated that the entire portfolio has been reviewed and no further review is expected in 2017. As noted previously, **proved reserves will likely be reduced once announced in the near term, specifically related to Western Canada assets**. However, the shift of up to 4.6 bboe is expected to be partially offset by some additions. More importantly, since the market does not believe last year's market will represent the long-term average for oil prices, we don't think investors will be too alarmed by the proved reserve decline."
**"Disappointing 'Clean' EPS and Production Performance," by Paul Cheng et al., Barclays, analyst report, 1 February 2017, p. 1 (emphasis added).**

**App. 46**

96.  On 22 February 2017, Exxon filed its FY 2016 Form 10-K.[117] The Company confirmed that it de-booked "the entire 3.5 billion barrels of bitumen at Kearl."[118]

## VI.    LOSS CAUSATION

### A.    Analytical Methodology

#### 1.    Establishing Economic Materiality

97.  One step in assessing if alleged misrepresentations and omissions caused investor losses is to examine financial principles, company statements, and commentary by market participants in order to ascertain if the subject matter of the alleged misrepresentations and omissions constitutes economically material information.[119] If the statements are economically material, it follows that in an efficient market they would impact the valuation of the subject security and its market price.

98.  A review of financial principles, company statements, and statements by market participants can also establish whether the misrepresentations and omissions were decidedly positive in nature, and conversely, if the concealed or omitted truthful information was decidedly negative with respect to the valuation of the subject security. In an efficient market, positive misrepresentations, and the concealment of negative information, would artificially inflate or maintain inflation in the subject security's market price. In an efficient market, revealing adverse facts previously unknown to the market, and correcting positive misrepresentations with their truthful but negative counterparts, would generally cause a security price decline. Such a decline and concomitant investor losses can be economically substantial even if the security price decline happens to be below the high threshold for statistical significance.

---

[117] Exxon Mobil Corporation, Form 10-K for the year ended 31 December 2016, filed 22 February 2017.

[118] Exxon Mobil Corporation, Form 10-K for the year ended 31 December 2016, filed 22 February 2017, p. 58.

[119] I understand that materiality has a legal definition in matters such as this one. As the term is used in financial analysis and in this report, "economic materiality" means the importance of information, announcements, and/or events to investors and the market, such that these items would affect the valuation of a security and investors' demand for the security. Whether specific information is important for valuation purposes is a central focus of financial economics. Therefore, the question of economic materiality, given this definition, is squarely within the realm of financial economics and consequently within my area of expertise and the purview of a finance expert.

**App. 47**

99. Investors who overpaid on account of artificial inflation that was introduced or maintained by the alleged misrepresentations and omissions, and hold the security when a corrective disclosure dissipates some or all of the artificial inflation, suffer a loss caused by the alleged misrepresentations and omissions. Thus, establishing that the misrepresentations and omissions constituted economically material information that is positive in nature, that the concealed or omitted truth was economically material and negative, and that all or some of the truth ultimately was revealed, is compelling proof of loss causation.

## 2. Empirical Analysis of Loss Causation

100. In addition to establishing economic materiality based on economic principles and the commentary of market participants, analysis of loss causation also typically comprises empirical analysis to determine whether the revelation of the previously concealed truth observably caused a security price decline. When misrepresentations and omissions are consistent with investors' prior beliefs, because they accord with the norm for that company, with previously understood conditions, or with prior representations, there usually will be no observable security price movement caused by the misrepresentations or omissions when made. However, in such cases, the economic effect of the misrepresentations and omissions can be observed empirically when they are corrected, as the correction will run contrary to investors' prior understanding of the company's condition. A corrective disclosure changes the mix of public information and thereby elicits a security price change. Event study and additional financial analysis can therefore be applied to determine whether the alleged misrepresentations and omissions caused investors to suffer losses by testing whether or not the subject security price fell as a result of one or more corrective disclosures.

101. In this manner, an event study can determine whether revelatory information was a substantial cause of a security price decline. An event study controls for the effects of market and sector factors and thereby measures how much a security price rises or falls in response to new, company-specific information. Essentially, an event study is a controlled experiment that allows one to observe the market's valuation of a security with and without newly provided information.

**App. 48**

102. Prior to a corrective disclosure, the security is valued in the marketplace without the corrective information. After the event, the security is valued with the newly disclosed information. An event study can thusly determine whether a corrective disclosure caused the security price to decline, and therefore can also determine whether the alleged misrepresentations and omissions had previously artificially inflated the security price.

103. Once an event study has established that there was a security price reaction to company-specific information on a corrective disclosure date, to establish loss causation one must determine whether allegation-related information, as opposed to other unrelated company information, was a substantial cause of the security price change. An initial step here is to determine whether there was a release of non-allegation related information on the same day as the corrective disclosure. Financial analysis, including valuation analysis, can account for and remove the effect, if any, of any evident confounding information that is unrelated to the alleged fraud. By controlling for confounding information, if any, one can determine whether the revelation of the alleged fraudulently misrepresented or concealed information was a substantial cause of the security price decline.

104. If it is established that the subject security traded in an efficient market, the alleged misrepresentations and omissions were economically material, the misrepresentations were positive in nature while the concealed or omitted information was negative, and the market price of the subject security fell as a result of a corrective disclosure, then loss causation is proved.

### B.     Executing the Loss Causation Analysis for Exxon Stock

105. As presented above, Defendants allegedly misled investors as to the profitability of the Company's Canadian bitumen operations at Kearl and its legitimate status as a proved reserve, and failed to timely record an impairment charge for the Company's RMDG assets.[120]

106. In particular, Lead Plaintiff alleges that Defendants misrepresented and omitted facts concerning, among other things, that "Exxon clearly would have known at the time it filed its 2015 Form 10-K and 2016 Form 10-Q reports that the Company's estimates of the Kearl

---

[120] Complaint, ¶¶14, 16, 246-247, 276, 282, 286, 292.

**App. 49**

Operation's proved reserves were likely to negatively change within the next 12 months and that the change would have a materially negative impact on Exxon's future earnings and assets,"[121] and that Exxon's "2015 Form 10-K also concealed and omitted the Company's significant asset impairments concerning its Rocky Mountain dry gas operations."[122]

107. According to Lead Plaintiff, investors learned that they had been misled about the condition and capabilities of the Company, and in turn the true value of the Company, through a series of corrective disclosure events that transpired over the course of the Class Period. Ultimately, Company announcements and admissions confirmed that the representations had been false and misleading.

108. Generally accepted financial principles confirm that the alleged misrepresentations and omissions were highly economically material and inflationary. Company statements and contemporaneous commentary from market participants (including equity analysts) further confirm economic materiality and that the misrepresentations and omissions would artificially inflate the price of Exxon stock. Finally, event study analysis focusing on the reaction of the Exxon stock price to the corrective disclosures proves loss causation empirically. Disclosures correcting the misrepresentations and omissions caused the price of Exxon stock to decline, precipitating investor losses.

    1.    <u>Financial Principles Confirm the Economic Materiality of the Alleged Misrepresentations and Omissions</u>

109. Reserves are important determinants of a gas and oil company's value, and consequently the value of that company's securities. As explained in the literature: "The primary assets of oil and gas companies are their entitlements to future production from reserves."[123]

> "Finding and producing oil and gas is **the central objective** of E&P operations. Successful discovery, development, and production of oil and gas reserves is **fundamental to the long-term survival of any E&P company**. Oil and gas reserves **represent the primary source of future cash flow for an E&P company that affect virtually every aspect of**

[121] Complaint, ¶351.

[122] Complaint, ¶16.

[123] "Oil and Gas Company Production, Reserves, and Valuation," by Mark Kaiser, *Journal of Sustainable Energy Engineering*, 2013, Vol. 1, No. 3, p. 236.

**App. 50**

**financial accounting and reporting**. Additionally, tax accounting, contract accounting, and managerial (internal) accounting are all affected by reserves in one way or another. For example, reserve information affects financial accounting in the following ways: • The decision as to whether a well is classified as exploratory or development is based on the assignment of proved reserves. • The treatment of certain costs as capital versus expense is determined based on whether additional quantities of proved reserves as expected to result from the expenditure. • Proved and proved development reserves are used in computing unit-of-production depreciation, depletion, and amortization. • Classification of property acquisition costs as being unproved versus proved is based on the discovery of proved reserves. • Certain transactions require that fair value of oil and gas properties be estimated (i.e., asset swaps, business combinations). **Reserves are the foundation of any estimation of fair value for an oil and gas property**. • Impairment of oil and gas properties by companies using either the successful efforts or the full cost method. • The SEC requires public companies to make extensive disclosures of reserve information, including reserve quantities and a standardized measure of reserve values."
*Fundamentals of Oil and Gas Accounting*, **by Charlotte Wright, PennWell Corporation, 6th Edition, 2017, p. 77 (emphasis added).**


"A crucial component of financial statement analysis for oil and gas companies is evaluation of upstream operations. This involves computing the energy ratios that are specific to extraction industries. Replacing reserves is the lifeblood of an oil and gas company, whether it is integrated (operates in upstream and downstream) or independent (upstream only). … We also need to know if a company is replacing the reserves that are being depleted through production and also if the reserves are being replaced through the drill bit or by acquisition."
*Energy Finance and Economics: Analysis and Valuation, Risk Management, and the Future of Energy*, **by Betty Simkins and Russell Simkins, John Wiley & Sons, Inc., 2013, pp. 207 and 216.**


"The value of an exploration and production company is primarily dependent upon its oil and gas reserves, its anticipated production, forecasted commodity pricing and operating and development costs. These unique company factors, along with contemporaneous market conditions, team to form the foundation of any oil and gas company valuation."
**"Valuation of Exploration & Production Companies," by Rick Jenson and Chris Bedwell,** *Petroleum Accounting and Financial Management Journal*, **2012, Vol. 31, No. 3, p. 93.**


"The primary value of any company is derived from its cash flows and earnings, which are dependent upon the quantity and quality of the product that it provides, along with the sales price. Oil and gas companies derive their earnings from producing commodities that serve other businesses and

**App. 51**

consumers in the economy. Production is derived from reserves and the inventory of capital assets, production equipment, infrastructure, and acreage. Reserves lie below the surface and have not yet been produced but are economically and technically viable to extract. … The primary assets of oil and gas companies are their entitlements to future production from reserves. … Production is the causal result of reserves and an important measure of performance because it determines gross revenue, and when combined with costs, the cash flow and profitability of a property."
**"Oil and Gas Company Production, Reserves, and Valuation," by Mark Kaiser, *Journal of Sustainable Energy Engineering*, 2013, Vol. 1, No. 3, pp. 237-238 and 240-241.**

"When analyzing historical financial statements, it is useful to include historical production volumes as well as the average hydrocarbon prices received for the periods in question. Since hydrocarbons are a commodity, the physical volumes indicate whether the company is producing more or less, regardless of revenue increases resulting from price increases."
**"Oil and Gas Company Valuations," by Alex Howard and Alan Harp, *Business Valuation Review*, 2009, Vol. 28, No. 1, p. 31.**

110. Fundamental generally accepted principles of finance espoused in the academic and professional literature dictate that the misrepresentations and omissions that served to conceal the true worse conditions of Exxon and its assets would have artificially inflated the price of Exxon stock. According to these principles, investors would ultimately suffer losses when disclosures revealed the previously misrepresented and concealed true conditions and values.

## 2.   Company Statements Compel a Conclusion of Loss Causation

111. Consistent with the fundamental valuation principles referenced above, the Company repeatedly made statements that confirmed the economic materiality of the alleged misrepresentations and omissions. Statements made by the Company itself underscore the economic materiality of oil and gas reserves, asset impairments, and the impact reserves have on the Company's financial performance and value. For example:

**App. 52**

"Evaluations of oil and gas reserves are important to the effective management of upstream assets. They are an integral part of investment decisions about oil and gas properties such as whether development should proceed. Oil and gas reserve quantities are also used as the basis to calculate unit-of-production depreciation rates and to evaluate impairment."

**Exxon Mobil Corporation, Form 10-K for the fiscal year ended 31 December 2015, filed 24 February 2016, p. 56.**

3.      Analyst and News Media Commentary Underscores the Economic Materiality of the Alleged Misrepresentations and Omissions

112. Coverage and commentary from analysts and the news media before the corrective disclosures further confirm that oil and gas reserves, de-booking reserves, and asset impairments are economically material and important to investors in general, and were so with respect to Exxon stock in particular.

113. Analysts closely followed news regarding Exxon's reserves, de-booking, and impairments:

"The ability to fully replace reserves at reasonable finding and development (F&D) costs is the key challenge for ExxonMobil and the other integrated majors, given their large production bases and the natural production decline rates."

**"Update After The Recent Change of Outlook to Negative," by Peter Speer and Steven Wood,** *Moody's Investor Service***, analyst report, 1 April 2016, p. 2.**

"Our valuation methodology includes two approaches: intrinsic value approach and a relative value approach. Our fair value calculations utilize discounted cash flow (DCF) methodology as well our segment sum-of-the-parts (SOTP) analysis. We also base our intrinsic valuation on disclosed reserve/resource/other asset information and comparable asset transactions. Our relative value approach relies upon P/E, P/CF and EV/EBITDA as the most relevant metrics."

**"Quarter Beat on Tax; Suppressed M&A Indications," by Sam Margolin et al., Cowen, analyst report, 29 April 2016, p. 5.**

"**SG view** Minimally, XOM is paying $2.6 billion for IOC for 6.2 Tcfe of equivalent reserves or $0.42/Mcf, if there are no contingent reserves certified. If the full 10 Tcfe of reserves are certified, a cash payment of $26.87 would be made, or an incremental $1.3 billion, meaning $3.9 billion total, or $0.39/Mcfe."

**"Deal for IOC: all XOM stock if no certified contingent reserves; possible Sept. close," by John Herrlin and Mark Kogel, Societe Generale, analyst report, 21 July 2016, p. 1.**

47

**App. 53**

4.        Event Study for Assessing Loss Causation and Damages

114.  The event study I conducted proves that the alleged misrepresentations and omissions caused investor losses. When Exxon's corrective disclosures revealed to the public that the Company's condition and value were not what they had been previously represented to be, the stock price fell significantly. The event study results prove that the Company and its stock had been overvalued and were so on account of the conditions and valuation that had been misrepresented since the start of the Class Period.

115.  Event study analysis is one of the most commonly used analytic methodologies employed by finance researchers. MacKinlay [1997] presents a description and examples of the methodology and writes of its general acceptance and wide use in academic research.[124] Gold et al. [2017] write about how the methodology is generally accepted and widely used in forensic applications.[125]

116.  An event study investigates whether a stock price reacted to the release of new information. A statistically significant stock price reaction in response to the release of new information indicates that the new information caused the change in price. An event study also measures how much a stock price rises or falls in response to new, company-specific information.

117.  One component of an event study is statistical regression analysis that determines how much of an observed stock price change is explained by market and industry sector factors, rather than company-specific information, so that those influences can be statistically factored out. The portion of a stock price change that cannot be attributed to market or sector factors is called the residual stock price movement or "residual return." The event study isolates and quantifies the residual return and tests whether the residual return can reasonably be explained as merely a random fluctuation in price.

118.  The statistical significance of a stock return on an identified event date indicates that the residual return cannot reasonably be attributed to market and sector factors, or to random volatility, but rather was caused by the arrival of new company-specific information.

---

[124] "Event Studies in Economics and Finance," by A. Craig MacKinlay, *Journal of Economic Literature*, Vol. 35, 1997.

[125] "Federal Securities Acts and Areas of Expert Analysis," by Kevin Gold et al., Chapter 27 of the *Litigation Services Handbook: The Role of the Financial Expert*, 6th Edition, edited by Roman Weil et al., John Wiley & Sons, Inc., 2017.

**App. 54**

*a.        Identification of Corrective Disclosure Events*

119. I reviewed a wide variety of information sources, including Company announcements, Company conference call transcripts, news articles, press releases, analyst reports, and SEC filings to determine when information correcting the alleged misrepresentations and omissions was disseminated. I identified the following corrective disclosure dates on which the market received information correcting the alleged misrepresentations and omissions.[126] Relevant revelatory information was provided to the market on 28 October 2016 and 31 January 2017, which includes (without limitation) the following:

**(1)        28 October 2016**

120. Prior to the start of trading on 28 October 2016, Exxon announced financial results for Q3 2016 and held a conference call with investors.[127] The Company announced that it might be forced to de-book 3.6 billion barrels of reserves at Kearl and 1.0 billion of oil-equivalent barrels of natural gas of North American reserves. The 3.6 billion barrels of reserves at Kearl represented nearly 15% of the Company's total proved reserves.[128] Exxon also revealed that it would test its long-lived assets, including its RMDG assets for impairment. Given the Company's prior reassurances that it has superior assets such that it would not be required to recognize impairments, unlike many of its industry peers, these disclosures were new, valuation-relevant, and corrective information.[129]

---

[126] To the extent that the decline in the prices of the Company's securities on other dates during the Class Period stemmed from news that informed investors of the condition of the Company and the value of Exxon, the estimation of damages is conservatively low because I excluded the losses on all other days from allegation-related damages.

[127] "Exxon Mobil Earns $2.7 Billion In Third Quarter Of 2016," *Business Wire*, 28 October 2016 8:00 AM; and "Q3 2016 Exxon Mobil Corp Earnings Call," *Thomson Reuters*, conference call transcript, 28 October 2016 9:30 AM.

[128] "Exxon Mobil Earns $2.7 Billion In Third Quarter Of 2016," *Business Wire*, 28 October 2016 8:00 AM; and "Q3 2016 Exxon Mobil Corp Earnings Call," *Thomson Reuters*, conference call transcript, 28 October 2016 9:30 AM.

[129] See e.g., "Much more serious is the prospect that up to 4.6 billion Bbls (a whopping 18% of companywide proved reserves), the bulk of it at Kearl, may have to be debooked based on YTD oil prices. This was today's most surprising revelation." ("3Q16 Output at 7-Year Low; More Selling Pressure on Deck w/IOC Buyout," by Pavel Molchanov and Luana Siegfried, Raymond James, analyst report, 28 October 2016, p. 1).

**App. 55**

**(2)      31 January 2017**

121.   Prior to the start of trading on 31 January 2017, Exxon announced financial results for Q4 2016 and FY 2016.[130] At the start of trading, Exxon held a conference call with investors.[131] Despite the rebound in energy prices since Exxon's prior earnings announcement, the Company announced that it would be taking an impairment charge of $2.0 billion related to its Rocky Mountain operations.[132] Despite the increase in oil and gas prices since the 28 October 2016 announcement, during the conference call, VP Woodbury explained that the Company expected their "final year-end reserves…to reflect most of the SEC pricing impact."[133] That is, they advised the market that most of the Kearl reserves would be de-booked.

122.   These announcements revealed to investors and analysts that Exxon's condition and value were less than previously represented by the Company. These corrections to previously made alleged misrepresentations and omissions were new, value-relevant, adverse information.

   *b.      Isolating the Impact of Company-Specific Information*

123.   Event study analysis determines how much of the Exxon stock price changes following each event were driven by Company-specific information as opposed to market and industry sector factors.

124.   The event study method, which is generally accepted and widely used in econometric modeling, involves running a regression to determine how the price of a company's stock typically behaved in relation to the overall stock market and its industry sector, and then using the regression model to determine how much of each event day's actual return is explained by those market and sector effects. The portion of the stock return that is attributable to market and sector factors is called the explained return.

---

[130] "Exxon Mobil Earns $7.8 Billion in 2016; $1.7 Billion During Fourth Quarter," *Business Wire*, 31 January 2017 8:00 AM.

[131] "Q4 2016 Exxon Mobil Corp Earnings Call," *Refinitiv Eikon*, conference call transcript, 31 January 2017.

[132] "Exxon Mobil Earns $7.8 Billion in 2016; $1.7 Billion During Fourth Quarter," *Business Wire*, 31 January 2017 8:00 AM; "Q4 2016 Exxon Mobil Corp Earnings Call," *Refinitiv Eikon*, conference call transcript, 31 January 2017.

[133] "Q4 2016 Exxon Mobil Corp Earnings Call," *Refinitiv Eikon*, conference call transcript, 31 January 2017 9:30 AM, p. 16.

**App. 56**

125. The explained return is subtracted from the actual return to isolate the residual return, which is the stock's return after controlling for market and industry sector effects.

126. I ran regressions modeling the return of Exxon's stock price as a function of i) a constant term, ii) the return of the overall stock market, and iii) an industry sector return.

127. For the overall stock market factor, I used the CRSP NYSE/AMEX/NASDAQ/ARCA Market Index (the "Market Index"), which is a generally accepted and widely used measure of market performance. The Market Index appropriately incorporates payment of dividends by the constituent companies.

128. For the industry sector factor, I constructed an index (the "Sector Index") from the stock returns of the same collection of companies that Exxon identified as its industry sector peers. The constituents selected by Exxon as representative of its industry sector were BP p.l.c., Chevron Corporation, Shell plc, and Total S.A.[134] Using the subject company's self-selected industry sector peers to control for industry sector factors is my standard practice of industry index selection.

129. I weighted constituents in the Sector Index by market capitalization, as did the Company in its construction of its reported sector index.[135]

130. All returns used in the regressions are logarithmic returns – i.e., the natural logarithm of the ratio of the current day's closing price or intra-day price to the previous day's closing price. Logarithmic returns are commonly used in event studies and equity analysis because of various computational advantages. Appendix-1 presents the mathematical formula for the logarithmic return and a discussion of the measure.

131. Exxon stock trading data are presented in Exhibit-4. Exhibit-5 presents the Market Index and Sector Index data.

---

[134] Exxon Mobil Corporation, Form DEF 14A, filed 13 April 2016, p. 30; and Exxon Mobil Corporation, Annual Report to Security Holders (ARS) for the fiscal year ending 31 December 2022, filed on 13 April 2023, p. 135.

[135] During the relevant time period, two different classes of ordinary shares (A and B shares) were publicly traded. Both classes held identical rights except in relation to the source of dividend income, and both classes were used to compute Shell's market capitalization. Royal Dutch Shell Plc Annual Report on Form 20-F for the year ending 31 December 2016, filed 9 March 2017; and Royal Dutch Shell Plc Annual Report on Form 20-F for the year ending 31 December 2015, filed 10 March 2016.

**App. 57**

132. To ensure that the regression estimation periods and estimates would be relatively contemporaneous with the events being tested, I ran rolling regressions. That is, to test whether each event date had a statistically significant residual return, I estimated the regression model using the 252 trading days preceding the respective event date. There are typically 252 trading days in a year, and one full year of data is a generally accepted estimation period length for event study regression. This type of "rolling regression," where the estimation period ends immediately prior to, or surrounds, the event in question is appropriate when assessing whether an event caused loss.[136]

133. I used dummy variables to control for potentially abnormal returns on i) the earnings announcement dates, and ii) the corrective disclosure events.[137] Using dummy variables to control for potentially atypical observations in a regression, especially when those observation dates are the subject of the event study analysis, so that the model parameters reflect the typical price dynamics for that security, is a widely used and generally accepted methodology, as noted in the academic and finance literature.[138]

134. Exxon stock regression results are presented in Exhibit-6.

135. For each corrective disclosure event date, I computed the explained portion of Exxon's stock return by adding i) the estimated regression intercept term, ii) the day's Market Index return multiplied by the Market Index coefficient, and iii) the day's Sector Index return multiplied by the Sector Index coefficient.

136. I then computed the residual return for each event date by subtracting the explained return from the actual return.

---

[136] "Materiality and Magnitude: Event Studies in the Courtroom," by David Tabak and Frederick Dunbar in *Litigation Services Handbook: The Role of the Financial Expert*, 3rd Edition, edited by Roman Weil et al., John Wiley & Sons, Inc., 2001, p. 19.5.

[137] Because the 31 January 2017 corrective disclosure event was after the Class Period, it did not appear in any regression estimation period.

[138] "Event Studies with a Contaminated Estimation Period," by Nihat Aktas et al., *Journal of Corporate Finance*, Vol. 13, No. 1, 2007; and "Testing for Market Efficiency: A Comparison of the Cumulative Average Residual Methodology and Intervention Analysis," by David Larcker et al., *Journal of Financial & Quantitative Analysis*, Vol. 15, No. 2, 1980.

**App. 58**

c.    *t-Test*

137.    For each event date, I conducted a statistical test called a *t*-test to determine whether the residual return of Exxon stock on that date was statistically significant. Statistical significance means that the return, after controlling for the market and sector effects, was of such magnitude that it cannot reasonably be attributed to random volatility but must have been caused by company-specific information. A *t*-test compares the residual return on an event date to the typical residual returns exhibited over the regression estimation period.[139] If the event date residual return is far greater (positively or negatively) than the typical residual return, and exceeds the threshold where volatility might reasonably be the cause of an ordinary day's residual return, then the *t*-test indicates that the event residual return is deemed statistically significant. Statistical significance of a tested event means that the event return could not reasonably have been caused by random volatility, so, with market and sector factors also accounted for, the event day residual stock price movement must have been caused by information about the company.

138.    The results of the event study for Exxon's stock focusing on the corrective disclosure event dates are summarized below and presented in Exhibit-7.

5.    <u>Event Study Results and Analysis</u>

a.    *28 October 2016*

139.    On 28 October 2016, the price of Exxon stock fell 2.49% (on a logarithmic return basis). The Market Index return that day was -0.26%. The Sector Index return that day was 0.54%. Based on the regression, the explained return on Exxon stock was 0.34%. The difference between the actual return of -2.49%, and the explained return of 0.34% is a statistically significant residual decline of 2.84%, which is equivalent to a decline of $2.43 per share. The residual

---

[139] This test is called the *t*-test because it involves the computation of a *t*-statistic, which is the event day residual return divided by the standard deviation of residual returns from the control period, i.e., the regression estimation data comprising all other days. If the absolute value of the *t*-statistic is greater than the critical *t*-statistic value (±1.96 for large samples), the likelihood that the residual return could have been caused by random volatility alone is less than 5%. This is generally accepted to be so unlikely that the random volatility explanation can be rejected, and the security return for that day is deemed statistically significant at the 95% confidence level. If the absolute value of the *t*-statistic is greater than the critical *t*-statistic value of 2.58 for large samples, the likelihood that the residual return could have been caused by random volatility alone is less than 1%, which is generally accepted to be so unlikely that the random volatility explanation can be rejected, and the security return for that day is deemed statistically significant at the 99% confidence level.

**App. 59**

return is associated with a *t*-statistic of -3.57, corresponding to statistical significance at the 99.95 % confidence level.

140. The Exxon stock price residual decline was 2.84%, which is statistically significant, and equivalent to a stock price decline of $2.43 per share.

### b.   31 January 2017

141. On 31 January 2017, the price of Exxon stock fell 1.15% (on a logarithmic return basis). The Market Index return that day was 0.08%. The Sector Index return that day was 0.53%. Based on the regression, the explained return on Exxon stock was 0.31%. The difference between the actual return of -1.15% and the explained return of 0.31% is a statistically significant residual return of -1.46%, equivalent to a decline of $1.23 per share. This residual return is associated with a *t*-statistic of -2.08 which is statistically significant at the 96.14% confidence level.

142. The Exxon stock residual return was -1.46%, which is statistically significant, and equivalent to a decline of $1.23 per share.


## VII.   SECTION 10(b) DAMAGES

### A.   Out-of-Pocket Damages

143. The "out-of-pocket" measure of damages traditionally applied in 10b-5 cases is the difference between the actual purchase price of the security and what would have been the purchase price had there been no alleged fraud (the "but-for price"). This difference, the difference between what a security's price actually was at a point in time and what the price would have been absent the alleged fraud, is "artificial inflation."

> "[M]any courts have adopted the out-of-pocket rule as the traditional measure of damages in Rule 10b-5 cases. The out-of-pocket measure rule defines damages as 'the difference between the contract price, or the price paid, and the real or actual value at the date of the sale, together with such outlays as are attributable to the defendant's conduct. Or, in other words,

**App. 60**

the difference between the amount parted with and the value of the thing received.' Typically, courts measure this as the plaintiff's purchase price less the true value at the time of the transaction. The true value is the price of the security in the absence of fraud or misrepresentation."
**"Federal Securities Acts and Areas of Expert Analysis," by Kevin Gold et al., Chapter 27 of the *Litigation Services Handbook: The Role of the Financial Expert*, 6th Edition, edited by Roman Weil et al., John Wiley & Sons, Inc., 2017, p. 27.6 (internal citations omitted).**

144.    The Supreme Court, in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), clarified that recoverable damages are not the entire amount by which an investor overpaid for a security on account of fraud, which is the artificial inflation at the time of purchase, but rather how much of that artificial inflation was actually lost by the investor during their holding period. Therefore, recoverable damages are the amount by which fraud-induced inflation dissipated after the investors' purchase, subject to certain statutory and case law limitations.

145.    The Private Securities Litigation Reform Act of 1995 ("PSLRA") provides the following further limitation on recoverable damages relating to a 90-day "bounce-back rule:"

> "[T]he award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market."
> **15 U.S.C. §78u-4(e)(1).**

146.    For Class members who sell within the 90-day period referred to in the statute, the PSLRA limitation on damages is "the difference between the purchase or sale price paid or received" and "the mean trading price of the security during the period beginning immediately after dissemination of information correcting the misstatement or omission and ending on the date on which" the security is sold.[140]

---

[140] 15 U.S.C. §78u-4(e)(2).

**App. 61**

147.    The mean per share trading price of Exxon stock during the 90 days beginning on 31 January 2017 is $82.08. Exxon stock closing prices from 31 January 2017 through 28 April 2017 are included in Exhibit-4.[141] The PSLRA 90-day bounce-back rule limitation can be applied formulaically to the calculation of per security damages for all Class members.

**B.    Quantifying Losses Precipitated by Corrective Disclosures in Order to Construct the Inflation Ribbon**

1.    <u>Losses Precipitated By Corrective Disclosures Is Dissipation of Artificial Inflation</u>

148.    Section 10(b) damages are a function of how much the alleged misrepresentations and omissions artificially inflated a security price and how much the security price fell in value when the artificial inflation dissipated. To compute damages for all Class members, therefore, one must compute an inflation ribbon, which is the time series of artificial inflation caused by the alleged fraud.

149.    The inflation ribbon in this case can be constructed by working chronologically backwards from the market's 31 January 2017 reaction to the final corrective disclosure. When a security price falls on account of a corrective disclosure, inflation dissipates. Inflation prior to a corrective disclosure must be greater than the inflation following the disclosure. The residual price decline elicited by the corrective disclosure (which excludes any decline attributable to confounding information) measures how much artificial inflation dissipated due to the corrective disclosure, and therefore also measures the additional artificial inflation that had been in the security price prior to the disclosure. The inflation just prior to a partially corrective disclosure must be the sum of the inflation the disclosure dissipated plus any inflation remaining afterward.

150.    Using the fraud-related price declines elicited by corrective disclosures to measure the amount of inflation that was in a security price is a widely used and generally accepted methodology.[142]

---

[141] 29-30 April 2017 are weekend days, as such the PSLRA 90-day bounce back rule mean trading price was averaged through 28 April 2017.

[142] "Federal Securities Acts and Areas of Expert Analysis," by Kevin Gold et al., Chapter 27 of the *Litigation Services Handbook: The Role of the Financial Expert*, 6th Edition, edited by Roman Weil et al., John Wiley & Sons, Inc., 2017.

**App. 62**

151. While the event study established that the price of Exxon stock fell in reaction to Company-specific information on the corrective disclosure dates, to measure the magnitude of the respective declines caused by the corrective disclosures, one must consider whether there was also Company-specific non-allegation-related information simultaneously disseminated on those days. The negative valuation effect of adverse confounding information, if any, should be removed to isolate the valuation effect of the corrective disclosures.

152. If confounding information has a positive valuation effect, such that it countervails against the negative valuation effect of the corrective disclosures, non-removal of the positive confounding information effect produces a conservatively low measure of the decline caused by the corrective disclosures.

2.    Per Share Decline Caused by the 28 October 2016 Corrective Disclosure

153. According to the event study, the residual return for Exxon stock on 28 October 2016 was a statistically significant -2.84%, or -$2.43 per share. From its statistical significance one may conclude that the 28 October 2016 residual Exxon stock price decline was caused by Company-specific information.

154. I examined the Company news that emerged between the close of trading on 27 October 2016 and the close of trading on 28 October 2016 in order to assess whether any other news besides the corrective disclosures could have contributed to the residual share price decline on 28 October 2016. That is, I searched for confounding information.

155. As discussed in §V.C. above, there were several pieces of Company-specific news released in connection with the Company's Q3 2016 earnings announcement. The fact that the corrective disclosures were made in the context of a quarterly earnings announcement means that the corrective information was released simultaneously with several other pieces of non-fraud related, valuation-relevant news. Examination of the other news (i.e., non-allegation-related information) that was released in connection with the quarterly earnings announcement indicates that the additional, potentially confounding, information was, on net, positive, and therefore could not have contributed to the negative price reaction on 28 October 2016.

**App. 63**

156. In particular, Exxon's reported 3Q 2016 EPS was $0.63,[143] which was five cents per share above the consensus estimate of $0.58 per share.[144] This five cent unexpected positive surprise was confirmed in several analyst reports.[145] However, some analysts noted that the reported $0.63 EPS was in part driven by Exxon's sale of certain Canadian assets, and that after adjusting the reported Q3 2016 earnings for this $380 million asset sale gain, the remaining adjusted Q3 2016 earnings were below the consensus estimate.[146] That is, the adjusted Q3 EPS without the earnings from the asset sale was $0.54, which was $0.04 below the consensus estimate.

157. However, the non-fraud-related factors that negatively impacted Q3 earnings were non-recurring, and therefore had only a small impact on the stock valuation. Prior to the Company's Q3 2016 earnings announcement, consensus FY 2016 EPS was $2.19 per share.[147] Following the Q3 earnings announcement, the consensus FY 2016 EPS estimate *increased* to $2.23 per share.[148] The fact that consensus FY 2016 EPS increased following the 28 October 2016 Q3 earnings announcement, despite EPS being lower than expected after removing the asset sale, indicates that the items that weighed down the Company's Q3 2016 EPS were compensated for by positive effects and in the aggregate were non-recurring. Being not only non-recurring, but also being expected to be completely reversed over the remainder of the FY indicates that any negative earnings effects disclosed in the Q3 earnings announcement would have had at most a *de minimis* effect on the Exxon stock price, if any negative effect at all.

---

[143] "Exxon Mobil Earns $2.7 Billion In Third Quarter Of 2016," *Business Wire*, Company press release, 28 October 2016 8:00 AM.

[144] "Exxon Mobil Earns $2.7 Billion In Third Quarter of 2016," *Business Wire*, 28 October 2016 8:00 AM; and "Exxon Mobil Profit Continues Slide Despite Crude Rebound," *Financial Times*, 28 October 2016.

[145] *See*, *e.g.*, "3Q16 Quick Take – ALERT," by Phil Gresh et al., JPMorgan, analyst report, 28 October 2016, p. 1; "3Q EPS Beats on R&M Asset Sale Gain but Cash Flow and Production below Expectations," by William Featherston et al., UBS, analyst report, 28 October 2016, p. 1; and "3Q16 EPS Better than Street Consensus Given Sales Gain; Lower Cap-ex and Better QOQ EPS," by John Herrlin and Mark Kogel, Societe Generale, analyst report, 28 October 2016, p. 1.

[146] "XOM: Results Below Expectations; Reserves De-Booking Possible; Buy XOM," by Doug Terreson et al., Evercore, analyst report, 31 October 2016, p. 1.

[147] Consensus estimates as of 25 October 2016, obtained from *LSEG Workspace*.

[148] Consensus estimates as of 8 November 2016, obtained from *LSEG Workspace*.

**App. 64**

158. Examination of the disclosed factors that individually weighed negatively on Q3 earnings confirms that they were non-recurring or unsurprising, as well as having been completely countervailed by positive earnings item disclosures.

159. For example, during Exxon's 28 October 2016 earnings release, the Company disclosed that low production levels and low realized sales prices negatively impacted its Upstream segment earnings for the quarter.[149] With respect to the low production levels, Exxon stated that the cause was primarily disruptions in its Nigeria operations.[150] Notably, the disruptions in Nigeria were not new news[151] and impacted Exxon's peers as well.[152]

---

[149] "Exxon Mobil Earns $2.7 Billion In Third Quarter Of 2016," *Business Wire*, Company press release, 28 October 2016 8:00 AM.

[150] "Exxon Mobil Earns $2.7 Billion In Third Quarter Of 2016," *Business Wire*, Company press release, 28 October 2016 8:00 AM.

[151] During the Company's Q2 2016 earnings conference call, the Company noted that it had declared a force majeure in early July 2016 and was investigating disruptions in Nigeria ("Q2 2016 Exxon Mobil Corp Earnings Call," *Thomson Reuters*, conference call transcript, 29 July 2016, 9:30 ET, p. 11).

Moreover, analysts acknowledged that the incidents in Nigeria were well publicized and additional deterioration of the situation was expected. For example, "Canada wildfires impact volumes and also XOM's large Canadian refining business. Nigeria oil volumes fell short due to well publicized incidents" ("A Disrupted Print (Nigeria/Canada). CFFO of $6.5bn vs CS at $7.5bn," by Edward Westlake et al., Credit Suisse, 29 July 2016). Analysts expected Canada to rebound (e.g., "should see a rebound from a weak 2Q16 with liquids production likely to rebound significantly from Canadian wildfire impacts" ("XOM – 3Q16 Earnings Preview; Expecting a $0.05 Beat to Consensus," by Brad Heffern, RBC Capital Markets, analyst report, 26 October 2016)) but anticipated disruptions to be ongoing in Nigeria. For example, Barclays reported that supply considerations include "ongoing pipeline outage issues in Nigeria" (2 May 2016) and later "Both Nigeria and Venezuela seem unlikely to surprise the market to the upside, as *adverse domestic conditions will likely continue to deteriorate before they begin to improve*" (1 August 2016) ("Upstream Posts Rare Loss: Integrated Model to the Rescue," by Paul Cheng et al., Barclays, analyst report, 2 May 2016; and "2Q Miss on Int. Gas Prices, One-Offs," by Paul Cheng et al., Barclays, analyst report, 1 August 2016).

[152] Two of Exxon's industry peers, Chevron and Total S.A, also reported similar production disruptions in Nigeria. On the same day that Exxon reported its third quarter earnings, Chevron announced its own, stating: "Production increases from major capital projects, shale and tight properties, and base business in multiple areas were largely offset by normal field declines, a major planned turnaround at Tengizchevroil, the effects of civil unrest in Nigeria, and production entitlement effects in several locations" ("Chevron Reports Third Quarter Net Income of $1.3 Billion," *Platts Commodity News*, Company press release, 28 October 2016). Nigeria was also discussed on the conference call, with an analyst asking: "Just a quick one about Nigeria. You mentioned losing 28,000 a day in Q3. What kind of recovery have you seen on your Nigerian assets so far this quarter and what is embedded in the exit rate guidance that you gave for the year?" and Chevron's CFO responding: "Well, I think we have two factors going on. We have had some instances of sabotage as we have talked about. We had a more recent one here in the last couple of days. So that is obviously a detriment that is impacting Nigerian production" ("Q3 2016 Chevron Corp Earnings Call," *Thomson Reuters*, conference call transcript, 28 October 2016, 11:00 AM ET, p. 18). Total S.A. also announced production issues attributable to Nigeria ("Q3 2016 Total SA Earnings Call," *Thomson Reuters*, conference call transcript, 28 October 2016, 8:00 AM ET, p. 5). See also, "How the Nigeria Crisis Affects Energy Companies," Zacks, 1 June 2016, accessible at https://www.nasdaq.com/articles/how-nigeria-crisis-affects-energy-companies-2016-06-01.

**App. 65**

160. Similarly, the low realized sales prices in the quarter mentioned by the Company (i.e., lowered commodity prices) was not a surprise to the market, and thus could not have contributed to the observed miss in Upstream segment earnings and the Company's adjusted earnings miss as a whole. That commodity prices were low was not new information, so lower realized sale prices could not have been a surprise. Commodity prices are public information that investors can observe continuously. Investors did not learn about lower commodity prices from Exxon's earnings announcement. Furthermore, commodity prices are industry-wide factors that affect the business conditions of all firms operating in the industry, and therefore any impact would be captured and controlled for by the industry sector factor in the event study regression.

161. Exxon's 28 October 2016 earnings release also discussed low refining margins and how they had an effect on Exxon's earnings results.[153] But, this factor was more than compensated for by other positive factors in the same segment. Exxon reported Downstream segment (the segment to which refining margins pertain) earnings of $1,229 million compared to consensus estimates of $796 million.[154] The reported Downstream segment earnings included the asset sale gain of $380 million. Removing the $380 million from the asset sale from the reported segment earnings of $1,229 million leaves $849 million in Downstream earnings, which beat the consensus estimate for the segment by $53 million. Thus, any isolated negatives in the Downstream segment, such as lower-than-expected refining margins, were more than compensated for by positive developments.

162. In sum, based on i) the nature of the information disclosed on 28 October 2016, which partially corrected the alleged misrepresentations and omissions, ii) financial valuation principles, iii) analyst and media commentary, iv) the fact that reported Q3 2016 EPS was above consensus estimates, v) the fact that FY 2016 EPS consensus increased despite any temporary disappointing items in the Company's reported Q3 2016 EPS, vi) the fact that factors adversely affecting Q3 2016 EPS were non-recurring, I conclude that non-allegation information disclosed simultaneously with the corrective disclosures on 28 October 2016

[153] "Exxon Mobil Earns $2.7 Billion In Third Quarter of 2016," *Business Wire*, Company press release, 28 October 2016 8:00 AM.

[154] "ExxonMobil Corp. 3Q EPS Beats on R&M Asset Sale Gain but Cash Flow and Production Below Expectations," by William Featherston et al., UBS, analyst report, 28 October 2016, pp. 1 and 20.

**App. 66**

had no net negative confounding effect on the stock price.  To be conservative, however, I acknowledge that it is possible that the non-recurring $0.04 miss in adjusted EPS, even though it was expected to be more than made up in the following quarter, could have had a negative $0.04 impact on the stock price when announced. Thus, I conservatively estimate that of the $2.43 statistically significant residual stock price decline, $0.04 can be attributed to confounding information, with the remaining $2.39 representing dissipation of artificial inflation that was caused by the alleged misrepresentations and omissions.

### 3.    Per Share Decline Caused by the 31 January 2017 Corrective Disclosure

163.  According to the event study, the residual return for Exxon stock on 31 January 2017 was a statistically significant 1.46% decline, equivalent to a loss of $1.23 per share. From its statistical significance one may conclude that the 31 January 2017 residual Exxon stock price decline was caused by Company-specific information.

164.  I examined all Company news that emerged between the close of trading on 30 January 2017 and the close of trading on 31 January 2017, in order to assess whether any other news besides the corrective disclosures could have contributed to the residual share price decline on 31 January 2017. That is, I searched for confounding information.

165.  I identified no *public,* negative, confounding information that contributed to the 31 January 2017 residual stock price decline.[155] An internal document produced in connection with this litigation apportions the announced impairment across seven different assets, three of which were not RMDG assets.[156] In addition, counsel informed me that Lead Plaintiff is not alleging that one of the RMDG assets, Green River, was impaired at the start of the Class Period. Thus, only three of the four RMDG assets listed in this internal Company document were impacted by the alleged fraud. The allegation-related assets accounted for 85.9% of the total

---

[155] As noted by Simmons & Company, "On the 4Q call (see highlights here), much of the discussion centered around evolving positives of the XOM story." ("4Q'16 Earnings - We Remain on the Sidelines," by Guy Baber et al., Simmons & Company, analyst report, 1 February 2017). Evercore ISI reported that "Exxon Mobil's 4Q adjusted EPS was $0.71/shr., in line with consensus estimates at $0.70. Non-operating items in the quarter included impairments (+$0.49) and gains from asset sales (-$0.18). The result includes a favorable non-US tax item which we estimate benefited the quarter by +0.15/shr." ("XOM – Results in-line; Buy XOM," by Doug Terreson et al., Evercore ISI, analyst report, 31 January 2017).

[156] *See* EMC_RAM_000000313.

**App. 67**

impairment (both on a before- and after-tax basis). While the Company publicly informed investors that the $2.0 billion asset impairment charge was "largely related to dry gas operations in the Rocky Mountains region,"[157] to provide a conservative measure of damages, I exclude the portion of the impairment assigned in the internal Company document to non-allegation related assets.

166. I therefore conclude that the corrective disclosure on 31 January 2017 caused 85.9% of the Exxon stock residual price decline that day, which amounts to $1.05 of the $1.23 residual per share price decline.

### C.  Artificial Inflation During the Class Period

167. From the corrective disclosures, the market learned the truth about the Company's condition and value, which allegedly had previously been fraudulently misrepresented. Had analysts and investors been fully and honestly apprised by the Company at the start of the Class Period, rather than misled by the alleged misrepresentations and omissions, the stock price would have been lower at the outset of and throughout the Class Period, just as the stock price fell to a lower price when the truth was learned.

168. The artificial inflation in the price of Exxon stock at the start of the Class Period was $3.44 per share. Per share artificial inflation fell by $2.39 on 28 October 2016, and $1.05 on 31 January 2017, as the impairment and de-booking announcements dissipated the artificial inflation, which inflation was due to the impairment and de-booking not having been taken previously.

169. Exhibit-8 presents the inflation ribbon for Exxon stock.

### D.  Per Share Damages

170. Based on the foregoing analysis and statutory formulas, Section 10(b) damages range up to $3.44 per share, excluding prejudgment interest. A particular investor's per share damages depend on when during the Class Period the investor purchased the shares and if and when the investor subsequently sold those shares. Class members who sold their shares prior to the first corrective disclosure suffered no recoverable losses on those shares. Class members

---

[157] "Exxon Mobil Earns $7.8 Billion in 2016; $1.7 Billion During Fourth Quarter," *Business Wire*, Company press release, 31 January 2017 8:00 AM, p. 1.

**App. 68**

whose holding periods spanned no corrective disclosure similarly suffered no recoverable loss. Class members who bought at an artificially inflated price and sustained a loss when a corrective disclosure dissipated all or some of the artificial inflation suffered damages caused by the alleged misrepresentations and omissions.

171. As an example of how per share damages are computed for a particular investor, consider an investor who purchased Exxon stock on 15 June 2016 for $90.16 per share and sold those shares at the close of trading on 31 January 2017 for $83.89 per share. The artificial inflation on 15 June 2016 was $3.44 per share. At the close of trading on 31 January 2017, artificial inflation was zero, as all artificial inflation had been dissipated by the corrective disclosures by then. The reduction in artificial inflation over this investor's holding period is this investor's economic/inflation loss, which equals $3.44 per share. The investor's investment loss is $6.27 per share, equal to the $90.16 per share purchase price minus the $83.89 per share sale price. The recoverable per share damages are the lesser of the $3.44 per share economic/inflation loss and the $6.27 per share investment loss, which is $3.44 per share.

## VIII.   THE COST OF LOSING A "AAA" RATING

172. I was asked by counsel to estimate how much greater the Company's debt service on the Exxon Notes issued in the March 2016 offering would be over their life if they had been rated AA+ rather than AAA at the time of their issuance, holding all other features of the Notes constant. A lower credit rating would have required a higher note yield and thus higher interest expense.

173. As detailed below, consistent with generally accepted financial principles, the S&P rating methodology, and analyst commentary, Exxon's asset write-down of $2.0 billion and de-booking of approximately 19% of its proved reserves would have negatively impacted characteristics considered important by credit rating agencies for assessing credit quality. Using the credit spreads prevailing at the time of issuance, I estimate that had the Exxon Notes carried a lower/riskier credit rating, investors would have required a higher yield. Assuming the Notes would still have been issued at par, such that they would have generated the same proceeds for Exxon, the coupon rates would have had to be 13 basis points (0.13%) higher. Paying the higher coupons would have cost Exxon $831.95 million in additional interest expense over the life of the Notes.

**App. 69**

174. To determine the increase in the Note yields if Exxon had issued the Notes at a "AA+" credit rating instead of "AAA", I analyzed prevailing option-adjusted spreads at the time of the March 2016 offering. Option-adjusted spreads measure a constant spread of a particular credit-risky note yield relative to the government yield curve. The option adjusted spread accounts for the optionality that is embedded in some bonds (such as call features), thus allowing for the comparison of the credit riskiness of many different notes.

175. I obtained from Federal Reserve Economic Data ("FRED") the "AAA US Corporate Index Option-Adjusted Spread," which is representative of the option-adjusted spread of U.S. dollar denominated debt issues with a "AAA" credit rating.[158] I also obtained from FRED the same index for "AA" issues.[159] The option-adjusted spread for AAA-rated issues at the time of the March 2016 offering was 0.91%.[160] The option-adjusted spread for AA-rated issues at the time of the March 2016 offering was 1.17%.[161]

176. FRED does not publish an option-adjusted spread index for "AA+" issuers. So, to determine a representative option-adjusted spread for a AA+ rating, I interpolated linearly between the "AAA" and the "AA" option-adjusted spreads. Linear interpolation to achieve intermediate credit ratings is a generally accepted and commonly used methodology in the finance literature.[162] Using this methodology, the estimated option-adjusted spread for "AA+" issues was 1.04%.[163]

---

[158] "ICE BofA AAA US Corporate Index Option-Adjusted Spread [BAMLC0A1CAAA]," *Ice Data Indices LLC*, retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/BAMLC0A1CAAA, accessed on 26 August 2024.

[159] "ICE BofA AA US Corporate Index Option-Adjusted Spread [BAMLC0A2CAA]," *Ice Data Indices, LLC*, retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/BAMLC0A2CAA, accessed on 26 August 2024.

[160] "ICE BofA AAA US Corporate Index Option-Adjusted Spread [BAMLC0A1CAAA]," *Ice Data Indices LLC*, retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/BAMLC0A1CAAA, accessed on 26 August 2024.

[161] "ICE BofA AA US Corporate Index Option-Adjusted Spread [BAMLC0A2CAA]," *Ice Data Indices, LLC*, retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/BAMLC0A2CAA, accessed on 26 August 2024.

[162] "Linear interpolation is used for intermediary ratings (e.g., 'BBB+' or 'A-') in the final analysis" (Criteria | Structure Finance | CMBS: European CMBS Methodology And Assumptions," *S&P Global*, 26 July 2024).

[163] Equal to the midpoint between the "AAA" Option-adjusted spread of 0.91% and the "AA" Option-adjusted spread of 1.17%. "ICE BofA AAA US Corporate Index Option-Adjusted Spread [BAMLC0A1CAAA]," *Ice Data Indices LLC*, retrieved from FRED, Federal Reserve Bank of St. Louis;

**App. 70**

177. The difference between the respective option-adjusted spreads for "AA+" and "AAA" issues was 0.13% (1.04% - 0.91%). Consequently, had the Exxon Notes been issued with a "AA+" rating instead of a "AAA" rating, the required yield from the Notes would have had to be 0.13% greater (also referred to as 13 basis points). Applying this higher coupon yield to all contractual cash flows out to maturity, the higher yield would have cost Exxon $831.95 million in greater interest expense.

## IX.    LIMITING FACTORS AND OTHER ASSUMPTIONS

178. This report is furnished solely for the purpose of court proceedings in the above-referenced matter and may not be used or referred to for any other purpose. The analysis and opinions contained in this report are based on information available as of the date of this report. I reserve the right to amend, refine, or supplement this report in the event that I become aware of additional information, evidence, arguments, or analyses which bear on my work on this matter.

Steven P. Feinstein, Ph.D., CFA

https://fred.stlouisfed.org/series/BAMLC0A1CAAA, last accessed August 26, 2024; and "ICE BofA AA US Corporate Index Option-Adjusted Spread [BAMLC0A2CAA]," *Ice Data Indices, LLC*, retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/BAMLC0A2CAA, last accessed August 26, 2024.

**App. 71**

### X.    APPENDIX-1: LOGARITHMIC RETURNS

A-1.    Logarithmic returns, rather than percent change returns, are commonly used in security return regressions and event study analysis and were used in the regression modeling here. The formula for a logarithmic return is:

$$R_t = \ln\left(\frac{P_t + d_t}{P_{t-1}}\right)$$

> where:
> $R_t$ is the logarithmic return on day t;
> $P_t$ is the security price at the end of day t;
> $P_{t-1}$ is the security price from the previous day, day t-1;
> $d_t$ is the dividend on day t, if any.

A-2.    The formula for converting a logarithmic return into a dollar return is:

$$DR_t = P_{t-1} \cdot (e^{R_t} - 1)$$

> where:
> $DR_t$ is the dollar return on day t;
> $P_{t-1}$ is the security price from the previous day, day t-1;
> e is natural e (approximately 2.7);
> $R_t$ is the logarithmic return on day t.

A-3.    If a security price falls from $20 to $18, the percent change in price is -10%, equal to the $2 decline divided by the original $20 price. The logarithmic return, however, is -10.54%, equal to ln($18/$20).

A-4.    The logarithmic return relates a price change to an average of the original, final, and intervening prices over the course of a price decline. As such, for large price declines, it is possible for a logarithmic price decline to exceed 100%, since the price decline may be greater than the average of the beginning and ending prices.

A-5.    An attractive feature of a logarithmic return is that it can be decomposed into contributing factors linearly. That is, the portion of a logarithmic return caused by company-specific information is isolated by subtracting from the total logarithmic return the portion of the total return caused by market and sector factors.

66

**App. 72**

**Exhibit-1**
**Documents and Other Information Considered**

**CASE LEGAL DOCUMENTS**

- Consolidated Complaint for Violations of the Federal Securities Laws, filed 26 July 2017.
- Memorandum Opinion and Order, dated 21 August 2023.

**DEPOSITION TRANSCRIPTS**

- Deposition of Vincent L. Prestipino, dated 11 September 2024.

**EXPERT REPORTS**

- Expert Report of Frank C. Torchio, dated 21 December 2018.
- Expert Report of Allen Ferrell, Ph.D., dated 1 February 2019.

**NEWS ARTICLES AND PRESS RELEASES**

- Factiva news articles from 24 February 2016 to 28 October 2016, downloaded using the following search parameters: All Sources; All Authors; Company: Exxon Mobil Corporation; All Subjects; All Industries; All Regions.
- Factiva news articles from 28 October 2016 to 31 January 2017, downloaded using the following search parameters: Dow Jones Newswires Or Major News and Business Sources Or Press Release Wires Or Reuters Newswires Or The Wall Street Journal - All sources; All Authors; Company: Exxon Mobil Corporation; All Subjects; All Industries; All Regions.
- "Exxon Mobil Corporation and XTO Energy Inc. Announce Agreement," *Business Wire*, 14 December 2009.
- "Exxon Bets Big on Gas with Deal For XTO," by Russell Gold, *Wall Street Journal*, 15 December 2009.
- "Total takes $6.5 Bln Impairment in Q4 as Profits Fall," *Reuters*, 12 February 2015.
- "France's Total Plans to Cut Jobs, Sell Assets After Big Loss," by Inti Landauro and Selina Williams, Wall Street Journal, 12 February 2015.
- "Exxon Mobil Announces Cold Lake Project Expansion Starts Production on Schedule," *Business Wire*, 11 May 2015.
- "Write-Downs Abound for Oil Producers," by Ryan Dezember, *Wall Street Journal*, 13 September 2015.
- "Royal Dutch Shell to Abandon Carmon Creek Oil-Sands Project," by Chester Dawson, *Wall Street Journal*, 27 October 2015.

**App. 73**

**Exhibit-1**
**Documents and Other Information Considered**

- "Shell Takes $2bn Charge on Canada Oil Sands Project," by Ed Crooks, *Financial Times*, 27 October 2015.
- "Facing Adversity, Anadarko Seeks to Preserve Value," *The Oil Daily*, 29 October 2015.
- "S&P Cuts Ratings of 10 U.S. Oil Companies," by Maria Armental, *Wall Street Journal*, 2 February 2016.
- "Exxon reserves tap into Big Oil's next crisis – Reuters Breakingviews," by Kevin Allison, *Reuters*, 28 October 2016, 11:42 AM.
- "Exxon Mobil Profit Continues Slide Despite Crude Rebound," *Financial Times*, 28 October 2016.
- "Exxon Profit Slides as Oil-Market Slump Threatens Reserves (1)," *Bloomberg*, 28 October 2016.
- "Exxon warns low oil prices may dent reserves nearly 20pct – Reuters News," by Ernest Scheyder and Terry Wade, *LSEG*, 28 October 2016, 12:40 PM.
- "Exxon Facing Historic Reserves Reduction as Slump Persists (3)," *Bloomberg*, 28 October 2016, 4:16 PM.
- "Exxon Concedes It May Need to Declare Lower Value for Oil in Ground," by Clifford Krauss, *The New York Times*, 28 October 2016.
- "Exxon Mobil Earns $7.8 Billion in 2016; $1.7 Billion During Fourth Quarter," *Business Wire*, Company press release, 31 January 2017.
- "Exxon Mobil Earnings 40% Lower than Expected," by Ed Crooks, *Financial Times*, 31 January 2017.
- "These Giants Bet on the Oilsands, but Now They're Cashing Out," by Carl Meyer, *Canada's National Observer: Climate News*, 16 March 2017.

**ANALYST REPORTS**

- 2014.01.02 Streetwise Reports
- 2014.01.09 Cowen And Company
- 2014.01.10 S&P Capital IQ - Stars Report
- 2014.01.15 S&P Capital IQ - Stars Report
- 2014.01.17 Cowen And Company
- 2014.01.27 Barclays
- 2014.01.29 Trefis
- 2014.01.30 UBS Research
- 2014.01.30 RBC Capital Markets (Canada)
- 2014.01.30 Wells Fargo Securities, LLC
- 2014.01.30 RBC Capital Markets (Canada)
- 2014.01.30 Wells Fargo Securities, LLC
- 2014.01.30 Morningstar Credit Research
- 2014.01.30 Societe Generale

**App. 74**

**Exhibit-1**
**Documents and Other Information Considered**

App. 75

- 2014.01.31 UBS Research
- 2014.01.31 Oppenheimer And Co
- 2014.01.31 Cowen And Company
- 2014.01.31 HSBC Global Research
- 2014.01.31 Morgan Stanley
- 2014.01.31 Barclays
- 2014.02.07 Oppenheimer And Co
- 2014.02.18 Morningstar Credit Research
- 2014.02.21 UBS Research
- 2014.02.21 Barclays
- 2014.02.21 RBC Capital Markets (Canada)
- 2014.02.24 Morningstar Credit Research
- 2014.02.27 UBS Research
- 2014.02.28 Trefis
- 2014.03.03 Barclays
- 2014.03.05 UBS Research
- 2014.03.05 Wells Fargo Securities, LLC
- 2014.03.05 S&P Capital IQ - Stars Report
- 2014.03.05 RBC Capital Markets (Canada)
- 2014.03.06 Societe Generale
- 2014.03.06 Argus Institutional Partners
- 2014.03.06 Barclays
- 2014.03.06 Morningstar Credit Research
- 2014.03.06 Cowen And Company
- 2014.03.06 RBC Capital Markets (Canada)
- 2014.03.06 Morgan Stanley
- 2014.03.06 HSBC Global Research
- 2014.03.06 Credit Suisse - North America
- 2014.03.07 S&P Capital IQ - Stars Report
- 2014.03.10 Trefis
- 2014.03.21 Morningstar Credit Research
- 2014.03.24 Trefis
- 2014.03.24 Morningstar Thematic Research
- 2014.03.31 Trefis
- 2014.04.01 NBG Securities Greece
- 2014.04.02 BMO Capital Markets
- 2014.04.08 Jefferies
- 2014.04.10 Streetwise Reports
- 2014.04.29 Barclays
- 2014.04.29 Barclays

**Exhibit-1**
**Documents and Other Information Considered**

- 2014.04.29 Trefis
- 2014.05.01 UBS Research
- 2014.05.01 UBS Research
- 2014.05.01 Morningstar Credit Research
- 2014.05.01 BMO Capital Markets
- 2014.05.01 Societe Generale
- 2014.05.01 Morgan Stanley
- 2014.05.01 Oppenheimer And Co
- 2014.05.01 RBC Capital Markets (Canada)
- 2014.05.01 RBC Capital Markets (Canada)
- 2014.05.02 Barclays
- 2014.05.02 Jefferies
- 2014.05.02 S&P Capital IQ - Stars Report
- 2014.05.02 Credit Suisse - North America
- 2014.05.02 Cowen And Company
- 2014.05.06 HSBC Global Research
- 2014.05.14 S&P Capital IQ - Stars Report
- 2014.05.27 Oppenheimer And Co
- 2014.05.27 Trefis
- 2014.05.28 Trefis
- 2014.05.28 Morningstar Credit Research
- 2014.06.03 Societe Generale
- 2014.06.12 RBC Capital Markets (Canada)
- 2014.06.13 Trefis
- 2014.06.16 Morningstar Credit Research
- 2014.06.19 NBG Securities Greece
- 2014.06.23 Trefis
- 2014.07.11 Trefis
- 2014.07.16 Cowen And Company
- 2014.07.21 Wells Fargo Securities, LLC
- 2014.07.29 Trefis
- 2014.07.29 Barclays
- 2014.07.31 UBS Research
- 2014.07.31 BMO Capital Markets
- 2014.07.31 Societe Generale
- 2014.07.31 Oppenheimer And Co
- 2014.07.31 Morgan Stanley
- 2014.07.31 RBC Capital Markets (Canada)
- 2014.07.31 RBC Capital Markets (Canada)
- 2014.07.31 Deutsche Bank Research

70

**App. 76**

**Exhibit-1**
**Documents and Other Information Considered**

- 2014.08.01 UBS Research
- 2014.08.01 Morningstar Credit Research
- 2014.08.01 Wells Fargo Securities, LLC
- 2014.08.02 S&P Capital IQ - Stars Report
- 2014.08.04 RBC Capital Markets (Canada)
- 2014.08.04 Barclays
- 2014.08.04 Barclays
- 2014.08.14 Credit Suisse - North America
- 2014.08.21 Trefis
- 2014.08.26 Wells Fargo Securities, LLC
- 2014.09.02 Oppenheimer And Co
- 2014.09.05 Trefis
- 2014.09.11 Trefis
- 2014.09.23 JPMorgan
- 2014.09.25 Trefis
- 2014.09.26 Trefis
- 2014.09.29 Wells Fargo Securities, LLC
- 2014.09.30 Trefis
- 2014.10.02 RBC Capital Markets (Canada)
- 2014.10.02 Societe Generale
- 2014.10.06 Trefis
- 2014.10.15 Morningstar Credit Research
- 2014.10.17 Oppenheimer And Co
- 2014.10.29 Barclays
- 2014.10.29 Morningstar Credit Research
- 2014.10.30 JPMorgan
- 2014.10.30 Trefis
- 2014.10.31 UBS Research
- 2014.10.31 UBS Research
- 2014.10.31 Societe Generale
- 2014.10.31 Oppenheimer And Co
- 2014.10.31 Morgan Stanley
- 2014.10.31 BMO Capital Markets
- 2014.10.31 S&P Capital IQ - Stars Report
- 2014.10.31 Wells Fargo Securities, LLC
- 2014.10.31 JPMorgan
- 2014.10.31 Deutsche Bank Research
- 2014.11.03 Jefferies
- 2014.11.03 S&P Capital IQ - Stars Report
- 2014.11.03 Trefis

71

**App. 77**

**Exhibit-1**
**Documents and Other Information Considered**

- 2014.11.03 RBC Capital Markets (Canada)
- 2014.11.03 Cowen And Company
- 2014.11.03 Credit Suisse - North America
- 2014.11.03 JPMorgan
- 2014.11.03 Barclays
- 2014.11.03 Morningstar Credit Research
- 2014.11.04 Morningstar Credit Research
- 2014.11.14 Credit Suisse - North America
- 2014.12.02 Morningstar Credit Research
- 2014.12.03 Morningstar Credit Research
- 2014.12.03 Oppenheimer And Co
- 2014.12.11 UBS Research
- 2014.12.15 BMO Capital Markets
- 2014.12.17 Trefis
- 2014.12.17 Crispidea
- 2014.12.22 Directors Deals Ltd.
- 2014.12.24 Trefis
- 2015.01.05 Oppenheimer And Co
- 2015.01.05 Oppenheimer And Co
- 2015.01.19 RBC Capital Markets (Canada)
- 2015.01.30 Trefis
- 2015.01.30 RBC Capital Markets (Canada)
- 2015.01.30 JPMorgan
- 2015.01.30 Barclays
- 2015.02.02 UBS Research
- 2015.02.02 UBS Research
- 2015.02.02 Societe Generale
- 2015.02.02 Jefferies
- 2015.02.02 Morgan Stanley
- 2015.02.02 RBC Capital Markets (Canada)
- 2015.02.02 Oppenheimer And Co
- 2015.02.02 Evercore ISI
- 2015.02.02 BMO Capital Markets
- 2015.02.02 Wells Fargo Securities, LLC
- 2015.02.02 RBC Capital Markets (Canada)
- 2015.02.02 Wells Fargo Securities, LLC
- 2015.02.02 JPMorgan
- 2015.02.02 Deutsche Bank Research
- 2015.02.03 Morningstar Credit Research
- 2015.02.03 Credit Suisse - North America

**App. 78**

**Exhibit-1**
**Documents and Other Information Considered**

- 2015.02.03 Cowen And Company
- 2015.02.03 JPMorgan
- 2015.02.03 Barclays
- 2015.02.03 S&P Capital IQ - Stars Report
- 2015.02.10 Trefis
- 2015.02.12 Barclays
- 2015.02.23 UBS Research
- 2015.02.26 UBS Research
- 2015.02.27 Jefferies
- 2015.02.27 Cowen And Company
- 2015.03.02 Oppenheimer And Co
- 2015.03.02 JPMorgan
- 2015.03.02 Barclays
- 2015.03.02 Trefis
- 2015.03.03 Oppenheimer And Co
- 2015.03.04 UBS Research
- 2015.03.04 RBC Capital Markets (Canada)
- 2015.03.04 BMO Capital Markets
- 2015.03.04 RBC Capital Markets (Canada)
- 2015.03.04 JPMorgan
- 2015.03.05 Societe Generale
- 2015.03.05 Wells Fargo Securities, LLC
- 2015.03.05 Morgan Stanley
- 2015.03.05 Cowen And Company
- 2015.03.05 Credit Suisse - North America
- 2015.03.05 Barclays
- 2015.03.05 Deutsche Bank Research
- 2015.03.05 Evercore ISI
- 2015.03.06 Morningstar Credit Research
- 2015.03.06 Trefis
- 2015.03.12 Morningstar Credit Research
- 2015.03.13 National Bank Financial
- 2015.04.06 Trefis
- 2015.04.10 Morningstar Credit Research
- 2015.04.12 Oppenheimer And Co
- 2015.04.13 Barclays
- 2015.04.20 Cowen And Company
- 2015.04.27 Barclays
- 2015.04.28 Trefis
- 2015.04.29 RBC Capital Markets (Canada)

**App. 79**

**Exhibit-1**
**Documents and Other Information Considered**

- 2015.04.29 RBC Capital Markets (Canada)
- 2015.04.29 JPMorgan
- 2015.04.30 UBS Research
- 2015.04.30 UBS Research
- 2015.04.30 RBC Capital Markets (Canada)
- 2015.04.30 RBC Capital Markets (Canada)
- 2015.04.30 Morningstar Credit Research
- 2015.04.30 JPMorgan
- 2015.04.30 Societe Generale
- 2015.04.30 S&P Capital IQ - Stars Report
- 2015.04.30 Morgan Stanley
- 2015.05.01 Credit Suisse - North America
- 2015.05.01 Deutsche Bank Research
- 2015.05.01 JPMorgan
- 2015.05.01 Barclays
- 2015.05.01 Evercore ISI
- 2015.05.01 Oppenheimer And Co
- 2015.05.01 Jefferies
- 2015.05.01 Wells Fargo Securities, LLC
- 2015.05.05 Morningstar Credit Research
- 2015.05.19 Oppenheimer And Co
- 2015.05.21 Morningstar Credit Research
- 2015.06.12 Cowen And Company
- 2015.06.16 Societe Generale
- 2015.06.18 Cowen And Company
- 2015.06.22 Trefis
- 2015.07.07 Morningstar Inc.
- 2015.07.07 Morningstar Credit Research
- 2015.07.13 Barclays
- 2015.07.28 Barclays
- 2015.07.29 JPMorgan
- 2015.07.29 RBC Capital Markets (Canada)
- 2015.07.31 S&P Capital IQ - Stars Report
- 2015.07.31 Morningstar Credit Research
- 2015.07.31 JPMorgan
- 2015.07.31 Deutsche Bank Research
- 2015.07.31 RBC Capital Markets (Canada)
- 2015.07.31 UBS Research
- 2015.07.31 Societe Generale
- 2015.07.31 UBS Research

**App. 80**

**Exhibit-1**
**Documents and Other Information Considered**

- 2015.07.31 Wells Fargo Securities, LLC
- 2015.07.31 JPMorgan
- 2015.07.31 RBC Capital Markets (Canada)
- 2015.08.02 Credit Suisse - North America
- 2015.08.03 Jefferies
- 2015.08.03 Morgan Stanley
- 2015.08.03 Oppenheimer And Co
- 2015.08.03 Barclays
- 2015.08.03 Evercore ISI
- 2015.08.04 Trefis
- 2015.08.04 Morningstar Inc.
- 2015.08.05 Morningstar Inc.
- 2015.08.06 RBC Capital Markets (Canada)
- 2015.08.12 Stock Traders Daily Research
- 2015.08.21 Societe Generale
- 2015.09.01 Barclays
- 2015.09.02 Morningstar Inc.
- 2015.09.03 Morningstar Inc.
- 2015.09.08 Oppenheimer And Co
- 2015.09.11 Morningstar Inc.
- 2015.09.11 Morningstar Inc.
- 2015.09.11 Morningstar Inc.
- 2015.09.11 Morningstar Credit Research
- 2015.09.12 Morningstar Inc.
- 2015.09.14 Morningstar Credit Research
- 2015.09.14 Cowen And Company
- 2015.09.14 Morningstar Inc.
- 2015.09.16 RBC Capital Markets (Canada)
- 2015.09.17 JPMorgan
- 2015.09.18 Morningstar Inc.
- 2015.09.18 Morningstar Credit Research
- 2015.09.22 Macquarie Research
- 2015.09.24 Cowen And Company
- 2015.09.25 Morningstar Inc.
- 2015.10.02 Moody's Investors Services
- 2015.10.03 Morningstar Inc.
- 2015.10.26 Barclays
- 2015.10.26 Morningstar Credit Research
- 2015.10.26 Morningstar Inc.
- 2015.10.27 Barclays

75

**App. 81**

**Exhibit-1**
**Documents and Other Information Considered**

App. 82

- 2015.10.28 RBC Capital Markets (Canada)
- 2015.10.29 JPMorgan
- 2015.10.30 UBS Research
- 2015.10.30 UBS Research
- 2015.10.30 RBC Capital Markets (Canada)
- 2015.10.30 Wells Fargo Securities, LLC
- 2015.10.30 RBC Capital Markets (Canada)
- 2015.10.30 Cowen And Company
- 2015.10.30 JPMorgan
- 2015.10.30 JPMorgan
- 2015.10.30 Societe Generale
- 2015.11.01 Morgan Stanley
- 2015.11.02 Morningstar Credit Research
- 2015.11.02 Morningstar Inc.
- 2015.11.02 Evercore ISI
- 2015.11.02 Trefis
- 2015.11.02 Oppenheimer And Co
- 2015.11.02 Credit Suisse - North America
- 2015.11.02 Jefferies
- 2015.11.02 Barclays
- 2015.11.03 Morningstar Inc.
- 2015.11.04 Morningstar Credit Research
- 2015.11.04 Trefis
- 2015.11.05 S&P Capital IQ - Stars Report
- 2015.11.12 Morningstar Inc.
- 2015.11.20 Societe Generale
- 2015.11.27 Acquisdata
- 2015.11.28 Trefis
- 2015.11.30 Oppenheimer And Co
- 2015.12.04 Societe Generale
- 2015.12.08 Streetwise Reports
- 2015.12.14 Barclays
- 2015.12.17 Morningstar Credit Research
- 2015.12.17 Morningstar Inc.
- 2015.12.24 Asbury Research
- 2016.01.11 Oppenheimer And Co
- 2016.01.13 Societe Generale
- 2016.01.13 Management Cv Report
- 2016.01.15 Morningstar Credit Research
- 2016.01.16 Morningstar Inc.

**Exhibit-1**
**Documents and Other Information Considered**

- 2016.01.25 Berman Sarrazin
- 2016.01.28 Barclays
- 2016.01.29 RBC Capital Markets (Canada)
- 2016.02.01 JPMorgan
- 2016.02.02 Deutsche Bank Research
- 2016.02.02 Cowen And Company
- 2016.02.02 Societe Generale
- 2016.02.02 S&P Capital IQ - Stars Report
- 2016.02.02 Morgan Stanley
- 2016.02.02 Wells Fargo Securities, LLC
- 2016.02.02 RBC Capital Markets (Canada)
- 2016.02.02 Wells Fargo Securities, LLC
- 2016.02.02 RBC Capital Markets (Canada)
- 2016.02.02 UBS Research
- 2016.02.02 JPMorgan
- 2016.02.02 UBS Research
- 2016.02.02 JPMorgan
- 2016.02.03 Morningstar Credit Research
- 2016.02.03 Jefferies
- 2016.02.03 Credit Suisse - North America
- 2016.02.03 Barclays
- 2016.02.03 Morningstar Inc.
- 2016.02.03 Evercore ISI
- 2016.02.10 Morningstar Credit Research
- 2016.02.10 Acquisdata
- 2016.02.10 Morningstar Inc.
- 2016.02.11 Credit Suisse - North America
- 2016.02.19 UBS Research
- 2016.02.24 RBC Capital Markets (Canada)
- 2016.02.26 UBS Research
- 2016.02.29 JPMorgan
- 2016.02.29 Barclays
- 2016.03.02 UBS Research
- 2016.03.02 RBC Capital Markets (Canada)
- 2016.03.02 Wells Fargo Securities, LLC
- 2016.03.02 Piper Jaffray - Company Report
- 2016.03.02 JPMorgan
- 2016.03.02 Cowen And Company
- 2016.03.03 HSBC Global Research
- 2016.03.03 Barclays

**App. 83**

**Exhibit-1**
**Documents and Other Information Considered**

- 2016.03.03 Deutsche Bank Research
- 2016.03.03 Morningstar Inc.
- 2016.03.03 Morningstar Inc.
- 2016.03.03 Evercore ISI
- 2016.03.03 Societe Generale
- 2016.03.03 Jefferies
- 2016.03.03 Morgan Stanley
- 2016.03.03 Credit Suisse - North America
- 2016.03.03 Morningstar Credit Research
- 2016.03.14 Tematica Research
- 2016.03.22 Societe Generale
- 2016.04.01 Moody's Investors Services
- 2016.04.06 Morningstar Credit Research
- 2016.04.06 Morningstar Inc.
- 2016.04.06 Morningstar Inc.
- 2016.04.06 Morningstar Inc.
- 2016.04.06 Morningstar Inc.
- 2016.04.07 Morningstar Inc.
- 2016.04.15 Credit Suisse - North America
- 2016.04.25 Barclays
- 2016.04.25 Berman Sarrazin
- 2016.04.27 JPMorgan
- 2016.04.27 RBC Capital Markets (Canada)
- 2016.04.27 RBC Capital Markets (Canada)
- 2016.04.27 Barclays
- 2016.04.29 S&P Capital IQ - Stars Report
- 2016.04.29 Wells Fargo Securities, LLC
- 2016.04.29 RBC Capital Markets (Canada)
- 2016.04.29 Morgan Stanley
- 2016.04.29 Wells Fargo Securities, LLC
- 2016.04.29 RBC Capital Markets (Canada)
- 2016.04.29 JPMorgan
- 2016.04.29 UBS Research
- 2016.04.29 JPMorgan
- 2016.04.29 Cowen And Company
- 2016.04.29 Piper Jaffray - Company Report
- 2016.04.29 UBS Research
- 2016.04.29 Morningstar Inc.
- 2016.04.29 Morningstar Credit Research
- 2016.04.29 Societe Generale

78

**App. 84**

**Exhibit-1**
**Documents and Other Information Considered**

- 2016.05.02 Piper Jaffray - Company Report
- 2016.05.02 Barclays
- 2016.05.02 Credit Suisse - North America
- 2016.05.02 Deutsche Bank Research
- 2016.05.02 Evercore ISI
- 2016.05.02 Jefferies
- 2016.05.12 Evercore ISI
- 2016.05.13 Societe Generale
- 2016.05.30 Wells Fargo Securities, LLC
- 2016.06.04 theScreener
- 2016.06.13 Moody's Analytics
- 2016.06.21 Piper Jaffray - Industry Report
- 2016.06.29 Wells Fargo Securities, LLC
- 2016.06.30 Societe Generale
- 2016.06.30 Wells Fargo Securities, LLC
- 2016.06.30 RBC Capital Markets (Canada)
- 2016.06.30 Jefferies
- 2016.07.11 S&P Capital IQ - Stars Report
- 2016.07.18 Piper Jaffray - Company Report
- 2016.07.18 RBC Capital Markets (Canada)
- 2016.07.18 Jefferies
- 2016.07.21 Societe Generale
- 2016.07.21 UBS Research
- 2016.07.22 Deutsche Bank Research
- 2016.07.26 Barclays
- 2016.07.27 JPMorgan
- 2016.07.27 RBC Capital Markets (Canada)
- 2016.07.29 Societe Generale
- 2016.07.29 S&P Capital IQ - Stars Report
- 2016.07.29 Morgan Stanley
- 2016.07.29 Piper Jaffray - Company Report
- 2016.07.29 Credit Suisse - North America
- 2016.07.29 RBC Capital Markets (Canada)
- 2016.07.29 Credit Suisse - North America
- 2016.07.29 JPMorgan
- 2016.07.29 Cowen And Company
- 2016.07.29 Deutsche Bank Research
- 2016.07.29 UBS Research
- 2016.07.29 JPMorgan
- 2016.07.31 UBS Research

**App. 85**

**Exhibit-1**
**Documents and Other Information Considered**

- 2016.08.01 Morningstar Credit Research
- 2016.08.01 Piper Jaffray - Company Report
- 2016.08.01 RBC Capital Markets (Canada)
- 2016.08.01 Jefferies
- 2016.08.01 Barclays
- 2016.08.01 Morningstar Inc.
- 2016.08.01 Evercore ISI
- 2016.08.05 RBC Capital Markets (Canada)
- 2016.08.12 Societe Generale
- 2016.08.15 RBC Capital Markets (Canada)
- 2016.08.26 Directors Deals Ltd.
- 2016.09.28 Morningstar Credit Research
- 2016.09.29 Morningstar Credit Research
- 2016.09.29 Morningstar Inc.
- 2016.10.04 Morningstar Credit Research
- 2016.10.04 Morningstar Inc.
- 2016.10.11 Barclays
- 2016.10.13 Barclays
- 2016.10.20 JPMorgan
- 2016.10.25 Barclays
- 2016.10.26 RBC Capital Markets (Canada)
- 2016.10.27 S&P Capital IQ - Stars Report
- 2016.10.27 RBC Capital Markets (Canada)
- 2016.10.28 Cowen And Company
- 2016.10.28 UBS Research
- 2016.10.28 Societe Generale
- 2016.10.28 S&P Capital IQ - Stars Report
- 2016.10.28 UBS Research
- 2016.10.28 Deutsche Bank Research
- 2016.10.28 JPMorgan
- 2016.10.28 Piper Jaffray - Company Report
- 2016.10.28 JPMorgan
- 2016.10.28 RBC Capital Markets (Canada)
- 2016.10.30 Credit Suisse - North America
- 2016.10.31 Evercore ISI
- 2016.10.31 Jefferies
- 2016.10.31 Piper Jaffray - Company Report
- 2016.10.31 Morningstar Inc.
- 2016.10.31 RBC Capital Markets (Canada)
- 2016.10.31 Morgan Stanley

**App. 86**

**Exhibit-1**
**Documents and Other Information Considered**

- 2016.10.31 Morningstar Credit Research
- 2016.11.03 Macquarie Research
- 2016.11.04 Stock Traders Daily Research
- 2016.11.07 Acquisdata
- 2016.11.11 Morningstar Credit Research
- 2016.11.11 Morningstar Inc.
- 2016.11.15 Societe Generale
- 2016.12.01 BMO Capital Markets
- 2016.12.02 Trefis
- 2016.12.05 Trefis
- 2016.12.07 theScreener
- 2016.12.15 BMO Capital Markets
- 2016.12.16 Trefis
- 2016.12.28 RBC Capital Markets (Canada)
- 2016.12.28 UBS Research
- 2016.12.28 RBC Capital Markets (Canada)
- 2017.01.11 UBS Research
- 2017.01.12 RBC Capital Markets (Canada)
- 2017.01.13 Acquisdata
- 2017.01.17 Barclays
- 2017.01.17 Evercore ISI
- 2017.01.17 Credit Suisse - North America
- 2017.01.17 Jefferies
- 2017.01.17 Piper Jaffray - Company Report
- 2017.01.17 BMO Capital Markets
- 2017.01.17 The Zephirin Group
- 2017.01.17 J.J.B. Hilliard, W.L. Lyons, Inc.
- 2017.01.17 Trefis
- 2017.01.18 Evercore ISI
- 2017.01.18 Deutsche Bank Research
- 2017.01.18 JPMorgan
- 2017.01.18 RBC Capital Markets (Canada)
- 2017.01.19 Cowen and Company
- 2017.01.25 Jefferies
- 2017.01.26 Piper Jaffray - Company Report
- 2017.01.27 Wells Fargo Securities, LLC
- 2017.01.31 Societe Generale
- 2017.01.31 Morningstar Inc.
- 2017.01.31 Evercore ISI
- 2017.01.31 BMO Capital Markets

**App. 87**

**Exhibit-1**
**Documents and Other Information Considered**

- 2017.01.31 Jefferies
- 2017.01.31 J.J.B. Hilliard, W.L. Lyons, Inc.
- 2017.01.31 Morningstar Credit Research
- 2017.01.31 CFRA Research
- 2017.01.31 Piper Jaffray - Company Report
- 2017.01.31 Evercore ISI
- 2017.01.31 Cowen and Company
- 2017.01.31 CFRA Research
- 2017.01.31 Piper Jaffray - Company Report
- 2017.01.31 Wells Fargo Securities, LLC
- 2017.01.31 JPMorgan
- 2017.01.31 RBC Capital Markets (Canada)
- 2017.02.01 Morgan Stanley
- 2017.02.01 Deutsche Bank Research
- 2017.02.01 Societe Generale
- 2017.02.01 UBS Research
- 2017.02.01 RBC Capital Markets (Canada)
- 2017.02.01 JPMorgan
- 2017.02.01 Barclays
- 2017.02.01 RBC Capital Markets (Canada)
- 2017.02.01 Argus Institutional Partners
- 2017.02.01 Piper Jaffray
- 2017.02.01 BMO Capital Markets
- 2017.02.01 Jefferies
- 2017.02.01 Evercore ISI
- 2017.02.01 Credit Suisse
- 2017.02.08 Acquisdata
- 2017.02.08 JPMorgan
- 2017.02.22 Societe Generale
- 2017.02.22 RBC Capital Markets (Canada)
- 2017.02.23 Imara S.P Reid (PTY) Ltd
- 2017.02.23 BMO Capital Markets
- 2017.03.02 Morningstar Credit Research
- 2017.03.02 Morgan Stanley
- 2017.03.02 BMO Capital Markets
- 2017.03.02 Credit Suisse - North America
- 2017.03.02 Deutsche Bank Research
- 2017.03.02 Barclays
- 2017.03.02 Evercore ISI
- 2017.03.02 Morningstar Inc.

**App. 88**

**Exhibit-1**
**Documents and Other Information Considered**

- 2017.03.03 Societe Generale
- 2017.03.08 HSBC Global Research
- 2017.03.09 Societe Generale
- 2017.03.09 RBC Capital Markets (Canada)
- 2017.03.09 Cowen And Company
- 2017.03.09 Piper Jaffray - Company Report
- 2017.03.10 Credit Suisse - North America
- 2017.03.10 Deutsche Bank Research
- 2017.03.14 Morningstar Inc.
- 2017.03.14 Morningstar Credit Research
- 2017.03.17 Stock Traders Daily Research
- 2017.03.26 Tematica Research
- 2017.03.30 Societe Generale
- 2017.03.30 RBC Capital Markets (Canada)
- 2017.04.05 Macquarie Research
- 2017.04.06 Societe Generale
- 2017.04.07 Morningstar Inc.
- 2017.04.17 JPMorgan
- 2017.04.19 Trefis
- 2017.04.19 Barclays
- 2017.04.25 Barclays
- 2017.04.26 Wells Fargo Securities, LLC
- 2017.04.26 RBC Capital Markets (Canada)
- 2017.04.26 RBC Capital Markets (Canada)
- 2017.04.26 Morningstar Credit Research
- 2017.04.27 Morningstar Inc.
- 2017.04.28 Wells Fargo Securities, LLC
- 2017.04.28 BMO Capital Markets
- 2017.04.28 RBC Capital Markets (Canada)
- 2017.04.28 UBS Research
- 2017.04.28 JPMorgan
- 2017.04.28 Piper Jaffray - Company Report
- 2017.04.28 UBS Research
- 2017.04.28 JPMorgan
- 2017.04.28 Deutsche Bank Research
- 2017.04.28 Morningstar Inc.
- 2017.04.28 Evercore ISI
- 2017.04.28 Morningstar Credit Research
- 2017.04.28 Societe Generale
- 2017.04.29 CFRA Research

**App. 89**

**Exhibit-1**
**Documents and Other Information Considered**

- 2017.04.30 Morgan Stanley
- 2017.05.01 RBC Capital Markets (Canada)
- 2017.05.01 Jefferies
- 2017.05.01 Piper Jaffray - Company Report
- 2017.05.01 Cowen And Company
- 2017.05.01 Barclays
- 2017.05.01 Evercore ISI
- 2017.05.01 Morningstar Inc.
- 2017.05.01 Morningstar Credit Research
- 2017.05.03 Acquisdata
- 2017.05.16 Barclays
- 2017.06.07 Piper Jaffray - Company Report
- 2017.06.15 Cowen and Company
- 2017.06.16 J.J.B. Hilliard, W.L. Lyons, Inc.
- 2017.06.18 Barclays
- 2017.07.06 Credit Suisse - North America
- 2017.07.06 Piper Jaffray - Company Report
- 2017.07.14 Evercore ISI
- 2017.07.19 JPMorgan
- 2017.07.20 UBS Research
- 2017.07.25 Piper Jaffray - Company Report
- 2017.07.26 Cowen and Company
- 2017.07.28 JPMorgan
- 2017.07.28 Deutsche Bank Research
- 2017.07.28 UBS Research
- 2017.07.28 Wells Fargo Securities, LLC
- 2017.07.28 Jefferies
- 2017.07.28 Morgan Stanley
- 2017.07.28 RBC Capital Markets (Canada)
- 2017.07.28 S&P Capital IQ - STARS Report
- 2017.07.28 Wells Fargo Securities, LLC
- 2017.07.28 RBC Capital Markets (Canada)
- 2017.07.28 Piper Jaffray - Company Report
- 2017.07.28 RBC Capital Markets (Canada)
- 2017.07.28 Barclays
- 2017.07.30 JPMorgan
- 2017.07.31 Cowen and Company
- 2017.07.31 Evercore ISI
- 2017.07.31 Deutsche Bank Research
- 2017.07.31 UBS Research

**App. 90**

**Exhibit-1**
**Documents and Other Information Considered**

- 2017.07.31 Morgan Stanley
- 2017.07.31 Piper Jaffray - Company Report
- 2017.07.31 Credit Suisse - North America
- 2017.08.17 UBS Research
- 2017.08.17 Piper Jaffray - Company Report
- 2017.08.17 JPMorgan
- 2017.08.17 RBC Capital Markets (Canada)
- 2017.08.17 Jefferies
- 2017.08.18 BMO Capital Markets
- 2017.08.18 Societe Generale
- 2017.08.18 Societe Generale
- 2017.08.21 RBC Capital Markets (Canada)
- 2017.08.25 Societe Generale
- 2017.08.28 Argus Institutional Partners
- 2017.09.01 RBC Capital Markets (Canada)


**SEC FILINGS**

- Exxon Mobil Corporation, Form 10-K for fiscal year ended 31 December 2014, filed 25 February 2015.
- Exxon Mobil Corporation, Form DEF 14A, filed 14 April 2015.
- Exxon Mobil Corporation, Form 10-Q for the quarterly period ended 31 March 2015, filed 6 May 2015.
- Exxon Mobil Corporation, Form 10-Q for the quarterly period ended 30 June 2015, filed 5 August 2015.
- Exxon Mobil Corporation, Form 10-Q for the quarterly period ended 30 September 2015, filed 4 November 2015.
- Brietburn Energy Partners LP, Form 10-Q for the quarterly period ended 30 September 2015, filed 5 November 2015.
- Anadarko Petroleum Corporation, Form 10-Q for the fiscal quarter ended 30 September 2015, filed 27 October 2015.
- Exxon Mobil Corporation, Form 8-K, filed 2 February 2016.
- Anadarko Petroleum Corporation, Form 10-K for the fiscal year ended 31 December 2015, filed 17 February 2016.
- Exxon Mobil Corporation, Form 8-K, filed 19 February 2016.
- Exxon Mobil Corporation, Form 10-K for fiscal year ended 31 December 2015, filed 24 February 2016.
- Brietburn Energy Partners LP, Form 10-K for the fiscal year ended 31 December 2015, filed 26 February 2016.
- Exxon Mobil Corporation, Form 424B2, filed 2 March 2016.

**App. 91**

**Exhibit-1**
**Documents and Other Information Considered**

- Exxon Mobil Corporation, Form 8-K, filed 3 March 2016.
- Exxon Mobil Corporation, Form 8-K, filed 8 March 2016.
- Royal Dutch Shell Plc Annual Report on Form 20-F for the year ending 31 December 2015, filed 10 March 2016.
- Exxon Mobil Corporation, Form DEF 14A, filed 13 April 2016.
- Exxon Mobil Corporation, Form 10-Q for the quarterly period ended 31 March 2016, filed 4 May 2016.
- Exxon Mobil Corporation, Form 8-K, filed 29 April 2016.
- Exxon Mobil Corporation, Form 8-K, filed 31 May 2016.
- Exxon Mobil Corporation, Form 8-K, filed 29 July 2016.
- Exxon Mobil Corporation, Form 10-Q for the quarterly period ended 30 June 2016, filed 3 August 2016.
- Exxon Mobil Corporation, Form 8-K, filed 28 October 2016.
- Exxon Mobil Corporation, Form 8-K, filed 1 November 2016.
- Exxon Mobil Corporation, Form 10-Q for the quarterly period ended 30 September 2016, filed 3 November 2016.
- Exxon Mobil Corporation, Form 8-K, filed 6 December 2016.
- Exxon Mobil Corporation, Form 8-K, filed 16 December 2016.
- Exxon Mobil Corporation, Form 8-K, filed 4 January 2017.
- Exxon Mobil Corporation, Form 8-K, filed 17 January 2017.
- Exxon Mobil Corporation, Form 8-K, filed 26 January 2017.
- Exxon Mobil Corporation, Form 8-K, filed 31 January 2017.
- Exxon Mobil Corporation, Form 10-K for fiscal year ended 31 December 2016, filed 22 February 2017.
- Royal Dutch Shell Plc Annual Report on Form 20-F for the year ending 31 December 2016, filed 9 March 2017.
- Exxon Mobil Corporation, Form DEF 14A, filed 13 April 2017.
- Exxon Mobil Corporation, Annual Report to Shareholders (ARS) for the fiscal year ending 31 December 2022, filed on 13 April 2023.


**PRODUCED DOCUMENTS**

- EMC_RAM_000000313.
- EMC_RAMIREZ 000008612.
- EMC_RAMIREZ_000008874.
- EMC_RAMIREZ_000009451.

**App. 92**

**Exhibit-1**
**Documents and Other Information Considered**

**CONFERENCE CALL TRANSCRIPTS**

- "Q3 2015 Exxon Mobil Corp Earnings Call," Thomson Reuters, conference call transcript, 30 October 2015.
- "Q4 2015 Exxon Mobil Corp Earnings Call," *Thomson Reuters*, conference call transcript, 2 February 2016.
- "Exxon Mobil Corp Analyst Meeting," *Thomson Reuters*, conference call transcript, 2 March 2016.
- "Exxon Mobil Corp Conference Call on Executive Compensation," *Thomson Reuters*, conference call transcript, 12 May 2016.
- "Exxon Mobil Corp Annual Shareholders Meeting," *Thomson Reuters*, conference call transcript, 25 May 2016.
- "Q1 2016 Exxon Mobil Corp Earnings Call," *Thomson Reuters*, conference call transcript, 29 April 2016.
- "Q2 2016 Exxon Mobil Corp Earnings Call," *Thomson Reuters*, conference call transcript, 29 July 2016.
- "Q3 2016 Total SA Earnings Call," *Thomson Reuters*, conference call transcript, 28 October 2016.
- "Q3 2016 Chevron Corp Earnings Call," *Thomson Reuters*, conference call transcript, 28 October 2016.
- "Q3 2016 Exxon Mobil Corp Earnings Call," *Thomson Reuters*, conference call transcript, 28 October 2016.
- "Q4 2016 Exxon Mobil Corp Earnings Call," *Refinitiv Eikon*, conference call transcript, 31 January 2017.

**ACADEMIC AND PROFESSIONAL LITERATURE**

- Aktas, Nihat, Eric de Bodt, and Jean-Gabriel Cousin, "Event Studies with a Contaminated Estimation Period," *Journal of Corporate Finance*, Vol. 13, 2007.
- Allen, Mark, Robert Hall, and Victoria Lazear, "Reference Guide on Estimation of Economic Damages," *Reference Manual on Scientific Evidence*, 3rd Edition, 2011.
- Campbell, John, Andrew Lo, and A. Craig MacKinlay, "Event-Study Analysis," Chapter 4 of *The Econometrics of Financial Markets*, Princeton University Press, 1997.
- Cleveland, Cutler and Christopher Morris, *Dictionary of Energy*, Elsevier, 2nd Edition, 2015.
- Gold, Kevin, Eric Korman, and Ahmer Nabi, "Federal Securities Acts and Areas of Expert Analysis," Chapter 27 of the *Litigation Services Handbook*: *The Role of the Financial Expert*, 6th Edition, edited by Roman Weil, Daniel Lentz, and Elizabeth Evans, John Wiley & Sons, Inc., 2017.

**App. 93**

**Exhibit-1**
**Documents and Other Information Considered**

- Howard, Alex and Alan Harp, "Oil and Gas Company Valuations," *Business Valuation Review*, 2009, Vol. 28, No. 1.
- Jenson, Rick and Chris Bedwell, "Valuation of Exploration & Production Companies," *Petroleum Accounting and Financial Management Journal*, Vol. 31, No. 3, 2012.
- Kaiser, Mark, "Oil and Gas Company Production, Reserves, and Valuation," *Journal of Sustainable Energy Engineering*, Vol. 1, No. 3, 2013.
- Larcker, David, Lawrence Gordon, and George Pinches, "Testing for Market Efficiency: A Comparison of the Cumulative Average Residual Methodology and Intervention Analysis," *Journal of Financial and Quantitative Analysis*, Vol. 15, No. 2, 1980.
- MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35, 1997.
- Misund, Bård and Petter Osmundsen, "Valuation of Proved vs. Probable Oil and Gas Reserves," *Cogent Economics & Finance*, Vol. 5, No. 1, 2017.
- Simkins, Betty and Russell Simkins, *Energy Finance and Economics: Analysis and Valuation, Risk Management, and the Future of Energy*, John Wiley & Sons, Inc., 2013.
- Wright, Charlotte, *Fundamentals of Oil and Gas Accounting*, PennWell Corporation, 6th Edition, 2017.

**DATA AND DATABASES**

- Bloomberg
- Center for Research in Security Prices (CRSP)
- EDGAR
- Factiva
- Federal Reserve Economic Data (FRED)
- Refinitiv Eikon / LSEG Workspace
- S&P Global

**LEGAL CASES**

- *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005).

**OTHER**

- 15 U.S.C. §78u-4(e)(1).
- 17 CFR §229.201.
- "Corporate Ratings Methodology," Standard & Poor's Ratings Services, McGraw Hill Financial, 2014.

**App. 94**

**Exhibit-1**
**Documents and Other Information Considered**

- Deloitte, *Oil & Gas Spotlight Impairment and Valuation Considerations Related to Oil and Gas Assets*, Issue 4, January 2014.
- "Dividend Aristocrats," *Nasdaq*, available at https://www.nasdaq.com/stocks/investing-lists/dividend-aristocrats, last accessed 26 September 2024.
- "Exxon Mobil Corp. Corporate Credit Rating Lowered to 'AA+' from 'AAA'; Outlook Stable," by Ben B Tsocanos and Christine Besset, *S&P RatingsDirect*, 26 April 2016.
- "How the Nigeria Crisis Affects Energy Companies," Zacks, 1 June 2016, accessible at https://www.nasdaq.com/articles/how-nigeria-crisis-affects-energy-companies-2016-06-01.

89

**App. 95**

**Exhibit-1**
**Documents and Other Information Considered**

- "Impairment charges at record Levels for North American E&P peer group (IHS Herold)," by Paul O'Donnell, *S&P Global*, 1 September 2015, accessible at https://www.spglobal.com/commodityinsights/en/ci/research-analysis/impairment-charges-at-record-levels-for-north-american-ep-peer-group-ihs-herold.html.
- "Let's talk royalties: not all oil is equal: explaining price differences," Government of Alberta, 15 October 2015, available at https://open.alberta.ca/publications/let-s-talk-royalties-not-all-oil-is-equal-explaining-price-differences.
- "Our History," *XTO Energy*, accessible at https://www.xtoenergy.com/company/who-we-are/our-history.
- "Rating Actions Taken On 20 U.S. Investment-Grade Exploration & Production Companies After S&P Revises Price Assumptions," by Thomas Watters and Ben Tsocanos, *Standard & Poor's*, 2 February 2016.
- SEC Modernization of Oil and Gas Reporting Release Nos. 33-8995; 34-59192; FR-78; File No. S7-15-08.
- SEC Regulation S-X Rule 4-10(a)(22)(v).
- "Standard & Poor's Revises Its Crude Oil And Natural Gas Price Assumptions," *S&P Global Ratings*, Ratings Direct, 24 September 2015.
- "Summary: Exxon Mobil Corp.," by Ben Tsocanos and Christine Besset, *S&P Global Ratings*, RatingsDirect, 6 October 2015.
- U.S. Energy Information Administration, "Petroleum & Other Liquids: Cushing, OK WTI Spot Price FOB," U.S. Energy Information Administration.
- "What are Oil Sands?" *Canadian Association of Petroleum Producers*, 2024, accessible at https://www.capp.ca/en/oil-natural-gas-you/oil-natural-gas-canada/oil-sands/
- Any other documents cited in the report.

**App. 96**

**App. 97**

Babson College
Finance Division
Babson Park, MA 02457
781-239-5275
Feinstein@Babson.edu

## EDUCATION

1989    YALE UNIVERSITY
Ph.D. in Economics (Concentration in Finance)

1986    YALE UNIVERSITY
M.Phil. in Economics

1983    YALE UNIVERSITY
M.A. in Economics

1981    POMONA COLLEGE
B.A. in Economics (Phi Beta Kappa, *cum laude*)

## TEACHING EXPERIENCE

1996 - present        BABSON COLLEGE
Babson Park, MA
Full-time Faculty, Finance Division
Associate Professor (2000-present)
Donald P. Babson Chair in Applied Investments (2002-2010)
Faculty Director of the Babson College Fund (2002-2009)
Director of the Stephen D. Cutler Investment Management Center
(2002-2007)
Assistant Professor (1996-2000)

1990 - 1995          BOSTON UNIVERSITY SCHOOL OF MANAGEMENT
Boston, MA
Full-time Faculty, Department of Finance

1993 - 1994          WASHINGTON UNIVERSITY, OLIN SCHOOL OF BUSINESS
St. Louis, MO
Visiting Assistant Professor, Department of Finance

91

**BUSINESS EXPERIENCE**

2008 - present  CROWNINSHIELD FINANCIAL RESEARCH, INC.
       Brookline, MA
       President and Senior Expert

1996 - 2008   THE MICHEL-SHAKED GROUP
       Boston, MA
       Senior Expert (2001 - 2008)
       Affiliated Expert (1996 - 2001)

1987 - 1990   FEDERAL RESERVE BANK OF ATLANTA
       Economist

**PROFESSIONAL DESIGNATIONS**

1998 Awarded the Chartered Financial Analyst designation by the Association for Investment Management and Research.

**RESEARCH AWARDS**

1999 Greater Boston Real Estate Board/Real Estate Finance Association – Research Grant and Featured Speaker at Real Estate Finance Association Meetings.

**PAPERS AND PUBLICATIONS**

"The Class Certification of Exchange-Listed Options in Securities Class-Action Litigation," (with Don Chance and Onnig Dombalagian) forthcoming in *University of Pennsylvania Journal of Business Law*, 2024.

"Securities Litigation Event Studies in the Covid Volatility Regime," (with Miguel Villanueva) *Journal of Forensic Economics*, (2024) 31 (1): 5-25.

"Stock Price Reactivity to Earnings Announcements: The Role of the *Cammer*/*Krogman* Factors," (with Miguel Villanueva) *Review of Quantitative Finance and Accounting*, vol. 57, no. 1, 2021.

"What A Solar Eclipse Has To Do With Market Efficiency," (with Daniel Bettencourt) *Law360.com*, 2017.

**App. 98**

"Underestimation of Securities Fraud Aggregate Damages Due to Inter-Fund Trades," (with Gang Hu, Mark Marcus, and Zann Ali) *Journal of Forensic Economics*, September 2013, Vol. 24, No. 2, 161-173.

"Lehman Equity Research Tipping: Evidence in the Stock Price Data," Working paper, March 2010. Cited in *New York Times* May 19, 2012, and made available on the *New York Times* website.

"Distortion in Corporate Valuation: Implications of Capital Structure Changes," (with Allen Michel and Jacob Oded) *Managerial Finance*, 2011, Vol. 37(8), 681-696.

"Market Signals of Investment Unsuitability," (with Alexander Liss and Steven Achatz) Law360.com, June 3, 2010. Available from http://www.law360.com/articles/170690.

"Planning Capital Expenditure," in *The Portable MBA in Financing and Accounting*, J. L. Livingstone and T. Grossman, editors, New York: Wiley, 3rd edition 2001, and 4th edition 2009.

"Financial Management of Risks," in *The Portable MBA in Financing and Accounting*, J. L. Livingstone and T. Grossman, editors, New York: Wiley, 2nd edition 1997, 3rd edition 2001, and 4th edition 2009.

"Fraud-on-the-Market Theory: Is a Market Efficient?" (with Allen Michel and Israel Shaked) *American Bankruptcy Institute Journal*, May 2005.

"Valuation of Credit Guarantees," (with Allen J. Michel and Israel Shaked) *Journal of Forensic Economics* 17(1), pp. 17-37, 2005.

"A Better Understanding of why NPV Undervalues Managerial Flexibility," (with Diane Lander) in *The Engineering Economist*, 2002, Volume 47, Number 4.

"Teaching the Strong-Form Efficient Market Hypothesis: A Classroom Experiment," *Journal of Financial Education*, fall 2000.

*A Future for Real Estate Futures: Potential Applications of Derivatives in Real Estate Investment and Finance* (with Linda Stoller). Monograph. Boston: Real Estate Finance Association / Greater Boston Real Estate Board, May 2000.

"The Risk Budget: Using Your Human Resources," (with John Marthinsen and John Edmunds) *Risk Management*, April 2000.

"Scenario Learning: A Powerful Tool for the 21st Century Planner," (with Jeffrey Ellis and Dennis Stearns) *The Journal of Financial Planning*, April 2000.

**App. 99**

"Protecting Future Product Liability Claimants in the Case of Bankruptcy," (with Allen Michel and Israel Shaked) *American Bankruptcy Institute Journal*, January 2000.

"Measuring Risk with the Bodie Put When Stocks Exhibit Mean Reversion," *The Journal of Risk*, Vol. 1, No. 3, 1999.

"Just-in-Time Mathematics: Integrating the Teaching of Finance Theory and Mathematics," (with Gordon Prichett) *Primus*, Vol. IX, No. 2, June 1999.

*Atlanta Park Medical Center v. Hamlin Asset Management.* (with Natalie Taylor). Babson Case Collection, Harvard Business School Press, 1998.

"Dealing with Delta," *Derivatives Week*, VII, No. 44, November 2, 1998.

"Expected Return in Option Pricing: A Non-Mathematical Explanation," *Derivatives Week*, VII, No. 35, August 31, 1998.

"When Hedges Fail: The Put Paradox and its Solution," *Derivatives Quarterly*, Vol. 4, No. 2, Winter 1997.

*Finance and Accounting for Project Management*. New York: American Management Association, 1996.

"International Investing," in *Irwin's Directory of Emerging Market Brokerages*.  New York: Irwin, 1996.

"The Hull and White Implied Volatility," Boston University Working Paper #92-51, 1992.

"Immunizing Against Interest Rate Risk Using the Macaulay Duration Statistic: An Assessment," (with Don Smith) in *Financial Systems and Risk Management*, the proceedings of the US-Japan Forum on Financial Strategy in the 1990s, sponsored by Osaka Foundation of International Exchange and Boston University, August 1991.

"Covered Call Options: A Proposal to Ease LDC Debt," (with Peter Abken) *Federal Reserve Bank of Atlanta Economic Review*, March/April 1990.  Reprinted in *Financial Derivatives: New Instruments and Their Uses*. Atlanta: Federal Reserve Bank.

"Forecasting Stock-Market Volatility Using Options on Index Futures," *Federal Reserve Bank of Atlanta Economic Review*, May/June 1989.  Reprinted in *Financial Derivatives: New Instruments and Their Uses*. Atlanta: Federal Reserve Bank.

**App. 100**

"The Black-Scholes Formula is Nearly Linear in Sigma for At-the-Money Options; Therefore Implied Volatilities from At-the-Money Options are Virtually Unbiased," Federal Reserve Bank of Atlanta Working Paper #88-9, December 1988.

"The Effect of the 'Triple Witching Hour' on Stock Market Volatility," (with William Goetzmann) *Federal Reserve Bank of Atlanta Economic Review*, September/October 1988. Reprinted in *Financial Derivatives: New Instruments and Their Uses*. Atlanta: Federal Reserve Bank.

"Stock Market Volatility," *Federal Reserve Bank of Atlanta Economic Review*, November/December 1987.

Book review of *In Who's Interest: International Banking and American Foreign Policy*, by Benjamin J. Cohen, Yale University Press, in *Federal Reserve Bank of Atlanta Economic Review*, Summer 1987.


## PRESENTATIONS

"Proving and Disproving Market Efficiency for Appraisal Hearings," at the NACVA/CTI Business Valuation and Financial Litigation Super Conference, July 2023.

"SPAC Public Warrant Valuation Using Iterative Monte Carlo Simulation," (with Ayussh Ahuja, Achraf Krafssi, and Dukalion Tsapalas) at the Financial Management Association Annual Meeting, October 2021.

"Stock Price Reactivity to Earnings Announcements: A Cross-Sectional Analysis of the *Cammer/Krogman* Factors," (with Miguel Villanueva) at the Boston Area Finance Symposium, April 2018.

"Stock Price Reactivity to Earnings Announcements: A Cross-Sectional Analysis of the *Cammer/Krogman* Factors," (with Miguel Villanueva) at the Eastern Finance Association Conference, April 2018.

"Determining the Defendant's Ability to Pay," at Taxpayers Against Fraud Education Fund Conference, October 2010.

"The Computation of Damages in Securities Fraud Cases," at the Grant and Eisenhofer Institutional Investor Conference, December 2002.

"The Role of the Financial Expert in Complex Litigation," at the Financial Management Association Conference, October 2000.

**App. 101**

"Entrepreneurial Incentives and Resource Allocation Among Corporate Venturing Initiatives," (with Joel Shulman and U. Srinivasa Rangan), Babson Entrepreneurship Research Conference, May 2000.

"Application of Real Options in Purchasing Strategies," (with Juan Orozco), presented at the International Applied Business Research Conference, March 2000.

"A Future for Real Estate Futures," (with Linda Stoller) at the Fairfield County chapter of the Real Estate Finance Association, November 1999, and at the Greater Boston Real Estate Board, November 2000.

"Atlanta Park Medical Center v. Hamlin Asset Management," (with Natalie Taylor) at the 1999 convention of the North American Case Research Association.

"Using Future Worlds™ in the Financial Planning Process," (with Jeffrey Ellis) at the Institute of Certified Financial Planners Masters Retreat, October 1999.

"Toward a Better Understanding of Real Options: A Weighted Average Discount Rate Approach," at the 1999 Financial Management Association Conference, the 1999 European Financial Management Association Conference, and the 1999 Multinational Finance Society Conference.

"Just-In-Time Mathematics: Integrating the Teaching of Finance Theory and Mathematics," (with Gordon Prichett) at the 1999 Financial Management Association Conference.

"Alternative Dow Investments for the Individual Investor: Diamonds, Synthetics, and the Real Thing," at the 1999 Academy of Financial Services Convention.

"Evidence of Yield Burning in Municipal Refundings," at Financial Management Association Convention, October 1997; Government Finance Officers Association, 1997; and Northeast Regional Convention of the National Association of State Treasurers, 1997.

"Teaching the Strong-Form Efficient Market Hypothesis," at Conference on Classroom Experiments in the Teaching of Economics at University of Virginia, September 1995.

"Efficient Consolidation of Implied Standard Deviations," (with Shaikh Hamid) at Midwest Finance Association, March 1995.

"A Test of Intertemporal Averaging of Implied Volatilities," (with Shaikh Hamid) at Eastern Finance Association, April 1995.

**App. 102**

"Taking Advantage of Volatility:  Non-linear Forecasting and Options Strategies," (with Hassan Ahmed) at Chicago Board of Trade / Chicago Board Options Exchange Conference on Risk Management, February 1992.

"Immunizing Against Interest Rate Risk Using the Macaulay Duration Statistic: An Assessment," (with Don Smith) at Japan-U.S. Conference on Financial Strategies in the 1990s, Osaka, Japan, August 1991.

"The Hull and White Implied Volatility," at American Finance Association Convention, December 1990.


**REVIEWED ARTICLES AND BOOKS FOR:**

Harvard Business School Publishing
Elsevier
Journal of Economic Education
Journal of Forensic Economics
Journal of Risk
Financial Review
North American Case Research Association
Financial Management
Journal of Business
Journal of Money, Credit and Banking
Quarterly Review of Economics and Finance
Blackwell
Prentice Hall
Southwestern Publishing


**COURSES TAUGHT**

Advanced Derivative Securities (MBA)
Babson College Fund (Undergraduate and MBA)
Capital Markets (MBA)
Continuous-Time Finance (Doctoral)
Corporate Finance (MBA and Executive)
Corporate Financial Strategy (MBA)
Cross-Functional Management (Integrated curriculum, Undergraduate) Equity Markets (MBA)
Derivatives: Theory and Practice (MBA)
Financial Reporting and Corporate Finance (MBA)
Financial Management (MBA)
Fixed Income Analysis (Undergraduate and MBA)

**App. 103**

Introduction to Derivative Securities (Executive)
International Finance (Executive)
Integrated Management (Undergraduate)
Investments (MBA and Executive)
Mod B: Decision Making and Applications, Finance stream (MBA)
Options and Futures (Undergraduate)
Risk Management (MBA)
Portfolio Theory / Management Information Systems (Executive)
Quantitative Methods for Investment Management (Undergraduate and MBA)
Security Valuation (Undergraduate and MBA)

## TEACHING AWARDS

Reid Teaching Award, Washington University, Olin School of Business, 1993-94.

## SELECT LIST OF MEDIA CITATIONS

"Is Insider Trading Part of the Fabric?" by Gretchen Morgenson, *The New York Times*, May 19, 2012.

"Bankers Rigging Municipal Contract Bids Admit to Cover-Up Lies," by William Selway and Martin Z. Braun, *Bloomberg Markets Magazine*, November 24, 2010.

"Hospital Move Presents Buy-Out Groups with New Risks," by Francesco Guerra, Christopher Bowe, and Rebecca Knight, *Financial Times*, July 15, 2006.

"Funds of Knowledge Add Value," by Rebecca Knight, *Financial Times*, March 12, 2006.

"City's Financial Picture Worse Than Ever, Sanders Says," by Matthew T. Hall, *San Diego Union-Tribune*, January 7, 2006.

"Downer: Stock Market Takes Another Dive," by John Chesto, *Boston Herald*, July 23, 2002.

"Banks, Developers, Are Main Beneficiaries," [editorial column] by Steven Feinstein, *The Boston Globe*, March 31, 2002, p. C4.

"Washington Investing: What Michael Saylor is Really Worth," by Jerry Knight, *The Washington Post*, March 6, 2000.

"IBM Retools Pensions," by Stephanie Armour, *USA Today*, May 4, 1999.

**App. 104**

"L.A. MTA's Law Firm Says Lissack Strategy Will be a Replay," by Andrea Figler, *Bond Buyer,* September 30, 1998.

"Fed Key Player in Rescue of Floundering Hedge Fund," by Andrew Fraser, Associated Press, September 25, 1998.

"Top Banks Plan Bailout for Fund," by Andrew Fraser, Associated Press, September 24, 1998.

"Clarion Call to the Small Investor," by Jo-Ann Johnston, *The Boston Globe*, March 4, 1998.

"L.A. Authority Study Shows Rampant Yield Burning Abuse," by Michael Stanton, *The Bond Buyer*, April 22, 1997.

"Dispute Over Yield Burning Dominates GFOA Session," by Michael Stanton, *The Bond Buyer*, January 29, 1997.

"Men Behaving Badly (Yield Burning)," *Grants Municipal Bond Observer*, January 24, 1997.

"Municipal Bond Dealers Face Scrutiny," by Peter Truell, *The New York Times*, December 17, 1996.

"Iowa Market Takes Stock of Presidential Candidates," by Stanley W. Angrist, *The Wall Street Journal*, August 28, 1995.

"Looking for Clues in Options Prices," by Sylvia Nasar, *The New York Times*, July 18, 1991.

"For Fed, A New Set of Tea Leaves," by Sylvia Nasar, *The New York Times*, July 5, 1991.

## MEMBERSHIP IN PROFESSIONAL SOCIETIES

American Finance Association
CFA Society Boston
Chartered Financial Analyst Institute
Financial Management Association
Foundation for Advancement of Research in Financial Economics (founding member)
National Association of Forensic Economics
North American Case Research Association

99

**App. 105**

**Exhibit-3**

**Steven P. Feinstein, Ph.D., CFA**
**Testimony Provided in the Last Four Years**

In re Johnson & Johnson Securities Litigation
Civil Action No. 3:18-cv-01833-FLW-TJB
United States District Court
District of New Jersey
Deposition Testimony
October 2020

In re Envision Healthcare Corporation Securities Litigation
Civil Action No. 3:17-cv-01112
United States District Court
Middle District of Tennessee
Nashville Division
Deposition Testimony
January 2021

In re Novo Nordisk Securities Litigation
Civil Action No. 3:17-cv-209-BRM-LHG
United States District Court
District of New Jersey
Deposition Testimony
February 2021

In re Jeld-Wen Holding, Inc. Securities Litigation
Civil Action No. 3:20-cv-00112-JAG
United States District Court
Eastern District of Virginia
Richmond Division
Deposition Testimony
January 2021
Deposition Testimony
February 2021

In re Vale S.A. Securities Litigation
Civil Action No. 19-cv-526-RJD-SJB
United States District Court
Eastern District of New York
Deposition Testimony
March 2021
Deposition Testimony
September 2023

**App. 106**

Exhibit-3

**Steven P. Feinstein, Ph.D., CFA**
**Testimony Provided in the Last Four Years**

In re Endo International PLC Securities Litigation
Case No. 2:17-cv-05114-MMB
United States District Court
Eastern District of Pennsylvania
Deposition Testimony
July 2021

In re McKesson Corporation Securities Litigation
Master File No. 3:18-cv-06525-CRB
United States District Court
Northern District of California
Deposition Testimony
August 2021

In re Perrigo Company PLC Securities Litigation
Master File No. 2:18-cv-02074
United States District Court
District of New Jersey
Deposition Testimony
October 2021

In re Wells Fargo & Company Securities Litigation
Master File No. 3:18-cv-03948-JD
United States District Court
Northern District of California
Deposition Testimony
November 2021

In re Microchip Technology, Inc. Securities Litigation
Case No. 2:18-cv-02914-JJT
United States District Court
District of Arizona
Deposition Testimony
October 2020
Deposition Testimony
January 2022

In re Super Micro Computer, Inc. Securities Litigation
Master File No. 4:18-cv-00838-JST
United States District Court
Northern District of California
Deposition Testimony
January 2022

**App. 107**

Exhibit-3

**Steven P. Feinstein, Ph.D., CFA**
**Testimony Provided in the Last Four Years**

In re Cardinal Health, Inc. Securities Litigation
Master File No. 2:19-cv-03347
United States District Court
Southern District of Ohio
Eastern Division
Deposition Testimony
May 2022

In re Gannett Co., Inc. ERISA Litigation
Civil Action No. 1:18-cv-00325-AJT-JFA
United States District Court
Eastern District of Virginia
Alexandria Division
Deposition Testimony
May 2022

In re Apple Inc. Securities Litigation
Case No. 4:19-cv-02033-YGR
United States District Court
Northern District of California
Oakland Division
Deposition Testimony
June 2021
Deposition Testimony
July 2022

In re Sealed Air Co., Securities Litigation
Case No. 1:19-cv-10161-LLS
United States District Court
Southern District of New York
Deposition Testimony
July 2022

In re Aegean Marine Petroleum Network, Inc. Securities Litigation
Case No. 18 Civ. 4993 (NRB)
United States District Court
Southern District of New York
Deposition Testimony
November 2022

102

**App. 108**

**Exhibit-3**

**Steven P. Feinstein, Ph.D., CFA**
**Testimony Provided in the Last Four Years**

In re Synchrony Financial Securities Litigation
Case No. 3:18-cv-01818-VAB
United States District Court
District of Connecticut
Deposition Testimony
December 2022

In re Cabot Oil & Gas Corporation Securities Litigation
Case No. 4:21-cv-02045
United States District Court
Southern District of Texas
Deposition Testimony
June 2023

In re Mallinckrodt Public Limited Company Securities Litigation
Civil Action No. 20-10100(AET)(TJB)
United States District Court
District of New Jersey
Deposition Testimony
July 2023

In re Acadia Pharmaceuticals Inc. Securities Litigation
Case No. 3:21-cv-00762-WQH-MSB
United States District Court
Southern District of California
Deposition Testimony
October 2023

In re Kirkland Lake Gold Ltd. Securities Litigation
Case No. 20-cv-04953
United States District Court
Southern District of New York
Deposition Testimony
March 2023
Deposition Testimony
October 2023

In re Vale S.A. Securities Litigation
Case No. 19-cv-526-RJD-SJB
United States District Court
Eastern District of New York
Deposition Testimony
October 2023

**App. 109**

Exhibit-3

**Steven P. Feinstein, Ph.D., CFA**
**Testimony Provided in the Last Four Years**

In re Alta Mesa Resources, Inc.
Case No. 4:19-cv-00957
United States District Court
Southern District of Texas
Houston Division
Deposition Testimony
November 2023

In re Ripple Labs Inc. Litigation
Case No. 4:18-cv-06753-PJH
United States District Court
Northern District of California
Deposition Testimony
January 2023
Deposition Testimony
December 2023

In re EQT Corporation Securities Litigation
Master File No. 2:19-cv-00754-MPK
United States District Court
Western District of Pennsylvania
Deposition Testimony
May 2021
Deposition Testimony
July 2021
Deposition Testimony
July 2023
Deposition Testimony
March 2024

In re Valeant Pharmaceuticals International, Inc. Securities Litigation
Master No. 3:15-cv-07658-MAS-LHG
United States District Court
District of New Jersey
Deposition Testimony
May 2024

**App. 110**

**Exhibit-3**

**Steven P. Feinstein, Ph.D., CFA**
**Testimony Provided in the Last Four Years**

In re Vale S.A. Securities Litigation
Case No. 19-cv-526-RJD-SJB
United States District Court
Eastern District of New York
Deposition Testimony
March 2021
Deposition Testimony
October 2023
Testimony at Evidentiary Hearing
August 2024

Alicia Marshall, et al v. Prestamos CDFI, LLC
Case No. 5:21-ev-04337-JMG
United States District Court
Eastern District of Pennsylvania
Deposition Testimony
August 2024

In re Cassava Sciences, Inc. Securities Litigation
Master File No. 1:21-cv-00751-DAE
United States District Court
Western District of Texas
Austin Division
Deposition Testimony
June 2024
Deposition Testimony
September 2024

In re Waste Management Securities Litigation
Civil Action No. 1:22-cv-04838-LGS
United States District Court
Southern District of New York
Deposition Testimony
September 2024

105

**App. 111**

**Exhibit-4**

**Exxon Mobil Stock Prices, Dividends, Volume, and Returns**

28 October 2015 through 31 January 2017

| Date | XOM Closing Price | XOM Dividend | XOM Closing Bid | XOM Closing Ask | XOM Trading Volume | XOM Logarithmic Return |
|---|---|---|---|---|---|---|
| 10/28/2015 | $82.28 | - | $82.25 | $82.26 | 12,473,034 | |
| 10/29/2015 | $82.23 | - | $82.23 | $82.25 | 10,341,163 | -0.06% |
| 10/30/2015 | $82.74 | - | $82.82 | $82.85 | 18,758,594 | 0.62% |
| 11/2/2015 | $85.28 | - | $85.29 | $85.30 | 21,266,523 | 3.02% |
| 11/3/2015 | $86.85 | - | $86.85 | $86.86 | 20,115,909 | 1.82% |
| 11/4/2015 | $85.98 | - | $85.99 | $86.00 | 14,245,441 | -1.01% |
| 11/5/2015 | $84.81 | - | $84.82 | $84.83 | 12,291,124 | -1.37% |
| 11/6/2015 | $84.47 | - | $84.47 | $84.48 | 12,491,678 | -0.40% |
| 11/9/2015 | $81.95 | $0.73 | $81.95 | $81.96 | 13,551,176 | -2.14% |
| 11/10/2015 | $82.35 | - | $82.37 | $82.38 | 14,238,006 | 0.49% |
| 11/11/2015 | $81.62 | - | $81.59 | $81.60 | 9,598,043 | -0.89% |
| 11/12/2015 | $79.41 | - | $79.40 | $79.41 | 16,050,638 | -2.75% |
| 11/13/2015 | $78.10 | - | $78.07 | $78.09 | 17,527,266 | -1.66% |
| 11/16/2015 | $80.90 | - | $80.88 | $80.89 | 14,548,134 | 3.52% |
| 11/17/2015 | $79.96 | - | $79.95 | $79.96 | 10,011,689 | -1.17% |
| 11/18/2015 | $80.74 | - | $80.73 | $80.74 | 10,884,594 | 0.97% |
| 11/19/2015 | $80.30 | - | $80.29 | $80.30 | 9,453,285 | -0.55% |
| 11/20/2015 | $79.79 | - | $79.76 | $79.77 | 10,144,448 | -0.64% |
| 11/23/2015 | $80.28 | - | $80.29 | $80.30 | 11,868,403 | 0.61% |
| 11/24/2015 | $81.88 | - | $81.92 | $81.93 | 15,055,512 | 1.97% |
| 11/25/2015 | $81.25 | - | $81.26 | $81.27 | 8,980,425 | -0.77% |
| 11/27/2015 | $81.23 | - | $81.23 | $81.24 | 4,156,645 | -0.02% |
| 11/30/2015 | $81.66 | - | $81.79 | $81.80 | 17,729,175 | 0.53% |
| 12/1/2015 | $81.89 | - | $81.88 | $81.89 | 13,916,981 | 0.28% |
| 12/2/2015 | $79.55 | - | $79.56 | $79.58 | 16,299,981 | -2.90% |
| 12/3/2015 | $78.41 | - | $78.42 | $78.43 | 14,870,252 | -1.44% |
| 12/4/2015 | $78.86 | - | $78.82 | $78.84 | 20,156,434 | 0.57% |
| 12/7/2015 | $76.80 | - | $76.80 | $76.81 | 17,676,103 | -2.65% |
| 12/8/2015 | $74.63 | - | $74.63 | $74.64 | 24,217,600 | -2.87% |
| 12/9/2015 | $75.63 | - | $75.63 | $75.65 | 22,036,336 | 1.33% |
| 12/10/2015 | $75.69 | - | $75.69 | $75.70 | 20,142,376 | 0.08% |
| 12/11/2015 | $74.34 | - | $74.47 | $74.48 | 20,473,141 | -1.80% |
| 12/14/2015 | $76.03 | - | $76.04 | $76.06 | 21,976,535 | 2.25% |
| 12/15/2015 | $79.43 | - | $79.43 | $79.44 | 24,366,833 | 4.37% |
| 12/16/2015 | $79.15 | - | $79.13 | $79.14 | 17,233,853 | -0.35% |
| 12/17/2015 | $77.96 | - | $77.97 | $77.98 | 17,362,915 | -1.51% |
| 12/18/2015 | $77.28 | - | $77.30 | $77.31 | 28,835,969 | -0.88% |
| 12/21/2015 | $77.26 | - | $77.25 | $77.26 | 14,460,450 | -0.03% |
| 12/22/2015 | $77.65 | - | $77.62 | $77.63 | 13,855,761 | 0.50% |
| 12/23/2015 | $80.19 | - | $80.18 | $80.19 | 15,184,195 | 3.22% |
| 12/24/2015 | $79.33 | - | $79.30 | $79.31 | 5,848,311 | -1.08% |
| 12/28/2015 | $78.74 | - | $78.74 | $78.75 | 9,715,843 | -0.75% |
| 12/29/2015 | $79.16 | - | $79.15 | $79.16 | 8,838,979 | 0.53% |
| 12/30/2015 | $78.11 | - | $78.13 | $78.14 | 9,314,646 | -1.34% |
| 12/31/2015 | $77.95 | - | $77.92 | $77.94 | 10,285,519 | -0.21% |

**App. 112**

**Exhibit-4**

**Exxon Mobil Stock Prices, Dividends, Volume, and Returns**

28 October 2015 through 31 January 2017

| Date | XOM Closing Price | XOM Dividend | XOM Closing Bid | XOM Closing Ask | XOM Trading Volume | XOM Logarithmic Return |
|------|------|------|------|------|------|------|
| 1/4/2016 | $77.46 | - | $77.45 | $77.46 | 20,400,084 | -0.63% |
| 1/5/2016 | $78.12 | - | $78.10 | $78.12 | 11,993,500 | 0.85% |
| 1/6/2016 | $77.47 | - | $77.49 | $77.50 | 18,826,900 | -0.84% |
| 1/7/2016 | $76.23 | - | $76.24 | $76.26 | 21,263,761 | -1.61% |
| 1/8/2016 | $74.69 | - | $74.66 | $74.67 | 19,033,628 | -2.04% |
| 1/11/2016 | $73.69 | - | $73.67 | $73.68 | 21,352,955 | -1.35% |
| 1/12/2016 | $75.20 | - | $75.23 | $75.24 | 21,864,130 | 2.03% |
| 1/13/2016 | $75.65 | - | $75.67 | $75.68 | 26,052,729 | 0.60% |
| 1/14/2016 | $79.12 | - | $79.03 | $79.04 | 33,806,670 | 4.48% |
| 1/15/2016 | $77.58 | - | $77.56 | $77.57 | 28,342,063 | -1.97% |
| 1/19/2016 | $76.40 | - | $76.35 | $76.36 | 22,684,537 | -1.53% |
| 1/20/2016 | $73.18 | - | $73.16 | $73.18 | 33,300,754 | -4.31% |
| 1/21/2016 | $74.10 | - | $74.07 | $74.08 | 22,265,576 | 1.25% |
| 1/22/2016 | $76.57 | - | $76.55 | $76.56 | 22,530,323 | 3.28% |
| 1/25/2016 | $73.98 | - | $73.99 | $74.00 | 17,086,643 | -3.44% |
| 1/26/2016 | $76.70 | - | $76.69 | $76.70 | 18,724,704 | 3.61% |
| 1/27/2016 | $75.29 | - | $75.29 | $75.30 | 18,106,113 | -1.86% |
| 1/28/2016 | $76.99 | - | $76.96 | $76.97 | 16,157,715 | 2.23% |
| 1/29/2016 | $77.85 | - | $77.58 | $77.59 | 25,161,887 | 1.11% |
| 2/1/2016 | $76.29 | - | $76.23 | $76.26 | 16,754,164 | -2.02% |
| 2/2/2016 | $74.59 | - | $74.59 | $74.61 | 21,404,223 | -2.25% |
| 2/3/2016 | $78.48 | - | $78.46 | $78.47 | 25,873,717 | 5.08% |
| 2/4/2016 | $79.83 | - | $79.81 | $79.82 | 23,658,665 | 1.71% |
| 2/5/2016 | $80.08 | - | $80.07 | $80.08 | 26,719,850 | 0.31% |
| 2/8/2016 | $81.16 | - | $81.18 | $81.19 | 26,601,176 | 1.34% |
| 2/9/2016 | $80.08 | $0.73 | $80.12 | $80.14 | 18,418,094 | -0.43% |
| 2/10/2016 | $79.35 | - | $79.37 | $79.38 | 16,610,943 | -0.92% |
| 2/11/2016 | $79.60 | - | $79.59 | $79.60 | 19,331,627 | 0.31% |
| 2/12/2016 | $81.03 | - | $81.00 | $81.03 | 16,687,846 | 1.78% |
| 2/16/2016 | $81.22 | - | $81.21 | $81.22 | 15,912,159 | 0.23% |
| 2/17/2016 | $82.00 | - | $81.97 | $81.98 | 17,006,669 | 0.96% |
| 2/18/2016 | $82.45 | - | $82.42 | $82.43 | 14,873,699 | 0.55% |
| 2/19/2016 | $82.50 | - | $82.49 | $82.50 | 13,615,902 | 0.06% |
| 2/22/2016 | $82.39 | - | $82.36 | $82.38 | 14,595,198 | -0.13% |
| 2/23/2016 | $81.23 | - | $81.23 | $81.24 | 11,041,630 | -1.42% |
| 2/24/2016 | $81.52 | - | $81.46 | $81.47 | 13,777,543 | 0.36% |
| 2/25/2016 | $82.01 | - | $82.03 | $82.05 | 13,706,441 | 0.60% |
| 2/26/2016 | $81.75 | - | $81.71 | $81.72 | 14,343,253 | -0.32% |
| 2/29/2016 | $80.15 | - | $80.15 | $80.16 | 18,903,553 | -1.98% |
| 3/1/2016 | $81.28 | - | $81.28 | $81.29 | 15,730,643 | 1.40% |
| 3/2/2016 | $82.70 | - | $82.69 | $82.70 | 14,094,352 | 1.73% |
| 3/3/2016 | $82.40 | - | $82.39 | $82.40 | 13,216,192 | -0.36% |
| 3/4/2016 | $82.29 | - | $82.26 | $82.28 | 18,402,742 | -0.13% |
| 3/7/2016 | $84.46 | - | $84.45 | $84.46 | 18,945,555 | 2.60% |
| 3/8/2016 | $82.63 | - | $82.62 | $82.65 | 14,003,912 | -2.19% |

**App. 113**

**Exhibit-4**

**Exxon Mobil Stock Prices, Dividends, Volume, and Returns**

28 October 2015 through 31 January 2017

| Date | XOM Closing Price | XOM Dividend | XOM Closing Bid | XOM Closing Ask | XOM Trading Volume | XOM Logarithmic Return |
|---|---|---|---|---|---|---|
| 3/9/2016 | $82.40 | - | $82.33 | $82.34 | 14,139,276 | -0.28% |
| 3/10/2016 | $82.18 | - | $82.18 | $82.19 | 15,898,276 | -0.27% |
| 3/11/2016 | $82.19 | - | $82.19 | $82.21 | 15,370,176 | 0.01% |
| 3/14/2016 | $82.41 | - | $82.38 | $82.39 | 13,344,595 | 0.27% |
| 3/15/2016 | $82.82 | - | $82.81 | $82.82 | 9,213,045 | 0.50% |
| 3/16/2016 | $82.87 | - | $82.90 | $82.91 | 11,492,063 | 0.06% |
| 3/17/2016 | $84.10 | - | $84.06 | $84.08 | 13,673,859 | 1.47% |
| 3/18/2016 | $84.20 | - | $84.20 | $84.21 | 19,637,014 | 0.12% |
| 3/21/2016 | $83.62 | - | $83.61 | $83.62 | 8,385,359 | -0.69% |
| 3/22/2016 | $84.12 | - | $84.13 | $84.14 | 13,005,080 | 0.60% |
| 3/23/2016 | $83.75 | - | $83.78 | $83.79 | 12,748,876 | -0.44% |
| 3/24/2016 | $83.98 | - | $83.97 | $83.98 | 9,368,327 | 0.27% |
| 3/28/2016 | $84.22 | - | $84.21 | $84.22 | 7,490,353 | 0.29% |
| 3/29/2016 | $84.53 | - | $84.51 | $84.52 | 9,977,887 | 0.37% |
| 3/30/2016 | $84.52 | - | $84.51 | $84.52 | 10,807,029 | -0.01% |
| 3/31/2016 | $83.59 | - | $83.60 | $83.63 | 13,896,906 | -1.11% |
| 4/1/2016 | $82.96 | - | $83.02 | $83.03 | 12,235,334 | -0.76% |
| 4/4/2016 | $83.16 | - | $83.13 | $83.14 | 8,050,167 | 0.24% |
| 4/5/2016 | $82.21 | - | $82.21 | $82.23 | 10,446,841 | -1.15% |
| 4/6/2016 | $83.31 | - | $83.32 | $83.33 | 9,320,161 | 1.33% |
| 4/7/2016 | $82.37 | - | $82.38 | $82.39 | 8,267,069 | -1.13% |
| 4/8/2016 | $83.21 | - | $83.19 | $83.20 | 9,376,167 | 1.01% |
| 4/11/2016 | $83.32 | - | $83.32 | $83.33 | 9,924,974 | 0.13% |
| 4/12/2016 | $84.35 | - | $84.30 | $84.34 | 9,986,128 | 1.23% |
| 4/13/2016 | $84.83 | - | $84.82 | $84.83 | 9,235,668 | 0.57% |
| 4/14/2016 | $85.43 | - | $85.40 | $85.41 | 10,625,784 | 0.70% |
| 4/15/2016 | $84.97 | - | $84.97 | $84.98 | 11,280,211 | -0.54% |
| 4/18/2016 | $85.78 | - | $85.74 | $85.75 | 9,096,983 | 0.95% |
| 4/19/2016 | $86.21 | - | $86.19 | $86.21 | 10,354,460 | 0.50% |
| 4/20/2016 | $86.80 | - | $86.79 | $86.80 | 15,247,074 | 0.68% |
| 4/21/2016 | $86.79 | - | $86.80 | $86.81 | 12,075,295 | -0.01% |
| 4/22/2016 | $87.53 | - | $87.52 | $87.53 | 9,150,823 | 0.85% |
| 4/25/2016 | $87.33 | - | $87.33 | $87.34 | 8,076,440 | -0.23% |
| 4/26/2016 | $87.63 | - | $87.60 | $87.61 | 9,425,865 | 0.34% |
| 4/27/2016 | $88.46 | - | $88.47 | $88.48 | 10,463,503 | 0.94% |
| 4/28/2016 | $88.03 | - | $88.08 | $88.10 | 11,276,191 | -0.49% |
| 4/29/2016 | $88.40 | - | $88.48 | $88.49 | 17,885,945 | 0.42% |
| 5/2/2016 | $89.13 | - | $89.11 | $89.12 | 10,273,739 | 0.82% |
| 5/3/2016 | $88.11 | - | $88.11 | $88.12 | 10,137,435 | -1.15% |
| 5/4/2016 | $87.94 | - | $87.93 | $87.94 | 10,601,143 | -0.19% |
| 5/5/2016 | $88.04 | - | $88.03 | $88.04 | 8,721,081 | 0.11% |
| 5/6/2016 | $88.51 | - | $88.51 | $88.53 | 7,968,354 | 0.53% |
| 5/9/2016 | $88.57 | - | $88.56 | $88.57 | 11,159,506 | 0.07% |
| 5/10/2016 | $89.99 | - | $89.98 | $89.99 | 12,509,083 | 1.59% |
| 5/11/2016 | $88.81 | $0.75 | $88.83 | $88.84 | 11,660,167 | -0.48% |

**App. 114**

**Exhibit-4**

**Exxon Mobil Stock Prices, Dividends, Volume, and Returns**

28 October 2015 through 31 January 2017

| Date | XOM Closing Price | XOM Dividend | XOM Closing Bid | XOM Closing Ask | XOM Trading Volume | XOM Logarithmic Return |
|---|---|---|---|---|---|---|
| 5/12/2016 | $89.67 | - | $89.67 | $89.68 | 10,720,505 | 0.96% |
| 5/13/2016 | $88.66 | - | $88.64 | $88.65 | 9,721,139 | -1.13% |
| 5/16/2016 | $89.57 | - | $89.56 | $89.57 | 8,638,664 | 1.02% |
| 5/17/2016 | $89.53 | - | $89.52 | $89.53 | 9,835,599 | -0.04% |
| 5/18/2016 | $89.35 | - | $89.33 | $89.34 | 9,680,277 | -0.20% |
| 5/19/2016 | $90.11 | - | $90.10 | $90.11 | 14,397,937 | 0.85% |
| 5/20/2016 | $89.74 | - | $89.72 | $89.73 | 13,191,925 | -0.41% |
| 5/23/2016 | $89.60 | - | $89.58 | $89.60 | 11,766,051 | -0.16% |
| 5/24/2016 | $89.67 | - | $89.67 | $89.69 | 10,056,575 | 0.08% |
| 5/25/2016 | $90.26 | - | $90.23 | $90.25 | 9,581,349 | 0.66% |
| 5/26/2016 | $89.80 | - | $89.79 | $89.80 | 7,867,901 | -0.51% |
| 5/27/2016 | $90.01 | - | $90.02 | $90.03 | 7,505,941 | 0.23% |
| 5/31/2016 | $89.02 | - | $88.97 | $88.99 | 13,178,770 | -1.11% |
| 6/1/2016 | $89.24 | - | $89.23 | $89.24 | 7,994,794 | 0.25% |
| 6/2/2016 | $88.53 | - | $88.50 | $88.51 | 9,837,535 | -0.80% |
| 6/3/2016 | $88.37 | - | $88.36 | $88.37 | 9,367,092 | -0.18% |
| 6/6/2016 | $89.34 | - | $89.32 | $89.34 | 8,572,963 | 1.09% |
| 6/7/2016 | $90.71 | - | $90.72 | $90.73 | 12,889,082 | 1.52% |
| 6/8/2016 | $90.79 | - | $90.78 | $90.79 | 9,982,959 | 0.09% |
| 6/9/2016 | $90.67 | - | $90.67 | $90.68 | 8,974,331 | -0.13% |
| 6/10/2016 | $89.98 | - | $89.99 | $90.00 | 10,353,815 | -0.76% |
| 6/13/2016 | $90.59 | - | $90.60 | $90.61 | 11,369,954 | 0.68% |
| 6/14/2016 | $90.43 | - | $90.42 | $90.43 | 10,161,030 | -0.18% |
| 6/15/2016 | $90.16 | - | $90.18 | $90.19 | 10,655,773 | -0.30% |
| 6/16/2016 | $91.22 | - | $91.25 | $91.26 | 12,824,808 | 1.17% |
| 6/17/2016 | $90.72 | - | $90.72 | $90.74 | 17,483,223 | -0.55% |
| 6/20/2016 | $91.12 | - | $91.12 | $91.14 | 9,388,528 | 0.44% |
| 6/21/2016 | $91.53 | - | $91.50 | $91.51 | 8,557,451 | 0.45% |
| 6/22/2016 | $91.17 | - | $91.16 | $91.17 | 8,785,428 | -0.39% |
| 6/23/2016 | $91.80 | - | $91.78 | $91.79 | 9,464,500 | 0.69% |
| 6/24/2016 | $89.39 | - | $89.40 | $89.41 | 20,010,494 | -2.66% |
| 6/27/2016 | $88.86 | - | $88.90 | $88.91 | 14,395,728 | -0.59% |
| 6/28/2016 | $90.91 | - | $90.89 | $90.91 | 13,254,272 | 2.28% |
| 6/29/2016 | $92.46 | - | $92.43 | $92.44 | 13,920,631 | 1.69% |
| 6/30/2016 | $93.74 | - | $93.73 | $93.74 | 14,073,677 | 1.37% |
| 7/1/2016 | $93.84 | - | $93.78 | $93.80 | 9,946,278 | 0.11% |
| 7/5/2016 | $93.02 | - | $92.97 | $92.99 | 10,744,051 | -0.88% |
| 7/6/2016 | $94.09 | - | $94.08 | $94.09 | 13,144,408 | 1.14% |
| 7/7/2016 | $92.96 | - | $92.95 | $92.96 | 12,240,670 | -1.21% |
| 7/8/2016 | $93.54 | - | $93.50 | $93.51 | 9,807,645 | 0.62% |
| 7/11/2016 | $93.89 | - | $93.85 | $93.86 | 8,335,705 | 0.37% |
| 7/12/2016 | $94.95 | - | $94.90 | $94.91 | 9,870,813 | 1.12% |
| 7/13/2016 | $94.88 | - | $94.86 | $94.87 | 9,458,206 | -0.07% |
| 7/14/2016 | $94.95 | - | $94.93 | $94.94 | 9,293,450 | 0.07% |
| 7/15/2016 | $95.12 | - | $95.06 | $95.07 | 10,334,453 | 0.18% |

**App. 115**

**Exhibit-4**

**Exxon Mobil Stock Prices, Dividends, Volume, and Returns**

28 October 2015 through 31 January 2017

| Date | XOM Closing Price | XOM Dividend | XOM Closing Bid | XOM Closing Ask | XOM Trading Volume | XOM Logarithmic Return |
|------|------|------|------|------|------|------|
| 7/18/2016 | $94.82 | - | $94.85 | $94.86 | 9,865,850 | -0.32% |
| 7/19/2016 | $94.47 | - | $94.48 | $94.49 | 5,901,792 | -0.37% |
| 7/20/2016 | $93.93 | - | $93.92 | $93.93 | 7,383,789 | -0.57% |
| 7/21/2016 | $93.85 | - | $93.83 | $93.85 | 7,759,624 | -0.09% |
| 7/22/2016 | $94.01 | - | $93.99 | $94.00 | 7,139,681 | 0.17% |
| 7/25/2016 | $92.20 | - | $92.23 | $92.24 | 10,845,892 | -1.94% |
| 7/26/2016 | $91.53 | - | $91.53 | $91.54 | 12,143,539 | -0.73% |
| 7/27/2016 | $90.91 | - | $90.91 | $90.93 | 10,037,885 | -0.68% |
| 7/28/2016 | $90.20 | - | $90.15 | $90.18 | 12,439,249 | -0.78% |
| 7/29/2016 | $88.95 | - | $88.86 | $88.87 | 23,928,098 | -1.40% |
| 8/1/2016 | $85.86 | - | $85.88 | $85.92 | 22,908,390 | -3.54% |
| 8/2/2016 | $87.04 | - | $87.04 | $87.06 | 18,919,157 | 1.36% |
| 8/3/2016 | $87.49 | - | $87.46 | $87.47 | 14,632,941 | 0.52% |
| 8/4/2016 | $87.48 | - | $87.45 | $87.47 | 13,451,350 | -0.01% |
| 8/5/2016 | $87.56 | - | $87.52 | $87.54 | 9,617,289 | 0.09% |
| 8/8/2016 | $88.59 | - | $88.55 | $88.56 | 10,492,709 | 1.17% |
| 8/9/2016 | $88.70 | - | $88.72 | $88.73 | 9,654,554 | 0.12% |
| 8/10/2016 | $86.41 | $0.75 | $86.39 | $86.41 | 12,714,814 | -1.75% |
| 8/11/2016 | $86.72 | - | $86.72 | $86.73 | 11,616,032 | 0.36% |
| 8/12/2016 | $87.85 | - | $87.80 | $87.81 | 9,986,924 | 1.29% |
| 8/15/2016 | $87.81 | - | $87.80 | $87.81 | 6,432,580 | -0.05% |
| 8/16/2016 | $87.92 | - | $87.93 | $87.94 | 6,817,932 | 0.13% |
| 8/17/2016 | $88.11 | - | $88.08 | $88.09 | 7,104,565 | 0.22% |
| 8/18/2016 | $88.91 | - | $88.88 | $88.89 | 10,342,730 | 0.90% |
| 8/19/2016 | $87.80 | - | $87.80 | $87.81 | 8,615,269 | -1.26% |
| 8/22/2016 | $87.99 | - | $88.00 | $88.01 | 8,235,406 | 0.22% |
| 8/23/2016 | $87.72 | - | $87.71 | $87.72 | 6,514,786 | -0.31% |
| 8/24/2016 | $88.02 | - | $88.02 | $88.03 | 7,985,437 | 0.34% |
| 8/25/2016 | $87.46 | - | $87.48 | $87.50 | 6,935,261 | -0.64% |
| 8/26/2016 | $87.27 | - | $87.28 | $87.29 | 6,474,424 | -0.22% |
| 8/29/2016 | $87.84 | - | $87.86 | $87.87 | 7,027,164 | 0.65% |
| 8/30/2016 | $87.52 | - | $87.53 | $87.54 | 6,441,118 | -0.36% |
| 8/31/2016 | $87.14 | - | $87.12 | $87.13 | 12,491,437 | -0.44% |
| 9/1/2016 | $86.84 | - | $86.82 | $86.83 | 8,434,729 | -0.34% |
| 9/2/2016 | $87.42 | - | $87.40 | $87.41 | 7,099,643 | 0.67% |
| 9/6/2016 | $88.57 | - | $88.60 | $88.61 | 9,851,167 | 1.31% |
| 9/7/2016 | $88.24 | - | $88.23 | $88.24 | 7,470,375 | -0.37% |
| 9/8/2016 | $89.05 | - | $89.05 | $89.06 | 9,579,545 | 0.91% |
| 9/9/2016 | $86.84 | - | $86.84 | $86.85 | 12,820,202 | -2.51% |
| 9/12/2016 | $87.29 | - | $87.29 | $87.30 | 10,889,025 | 0.52% |
| 9/13/2016 | $85.21 | - | $85.21 | $85.22 | 13,214,321 | -2.41% |
| 9/14/2016 | $84.60 | - | $84.58 | $84.59 | 13,957,013 | -0.72% |
| 9/15/2016 | $85.08 | - | $85.07 | $85.08 | 9,251,913 | 0.57% |
| 9/16/2016 | $84.03 | - | $84.02 | $84.03 | 21,538,409 | -1.24% |
| 9/19/2016 | $83.83 | - | $83.83 | $83.84 | 7,929,097 | -0.24% |

110

**App. 116**

**Exhibit-4**

**Exxon Mobil Stock Prices, Dividends, Volume, and Returns**

28 October 2015 through 31 January 2017

| Date | XOM Closing Price | XOM Dividend | XOM Closing Bid | XOM Closing Ask | XOM Trading Volume | XOM Logarithmic Return |
|---|---|---|---|---|---|---|
| 9/20/2016 | $82.54 | - | $82.54 | $82.55 | 17,521,975 | -1.55% |
| 9/21/2016 | $83.30 | - | $83.28 | $83.29 | 15,055,917 | 0.92% |
| 9/22/2016 | $83.54 | - | $83.52 | $83.53 | 10,738,519 | 0.29% |
| 9/23/2016 | $83.45 | - | $83.46 | $83.47 | 12,667,106 | -0.11% |
| 9/26/2016 | $83.06 | - | $83.07 | $83.08 | 10,860,320 | -0.47% |
| 9/27/2016 | $83.24 | - | $83.22 | $83.23 | 9,595,020 | 0.22% |
| 9/28/2016 | $86.90 | - | $86.91 | $86.94 | 28,117,871 | 4.30% |
| 9/29/2016 | $86.46 | - | $86.46 | $86.47 | 19,082,873 | -0.51% |
| 9/30/2016 | $87.28 | - | $87.28 | $87.30 | 15,961,506 | 0.94% |
| 10/3/2016 | $87.05 | - | $87.02 | $87.03 | 7,111,178 | -0.26% |
| 10/4/2016 | $86.25 | - | $86.27 | $86.28 | 8,222,033 | -0.92% |
| 10/5/2016 | $87.00 | - | $86.98 | $86.99 | 8,796,215 | 0.87% |
| 10/6/2016 | $87.04 | - | $87.06 | $87.07 | 7,718,259 | 0.05% |
| 10/7/2016 | $86.74 | - | $86.73 | $86.74 | 6,614,908 | -0.35% |
| 10/10/2016 | $88.44 | - | $88.44 | $88.45 | 10,060,038 | 1.94% |
| 10/11/2016 | $87.74 | - | $87.76 | $87.77 | 9,309,029 | -0.79% |
| 10/12/2016 | $87.13 | - | $87.12 | $87.13 | 8,172,591 | -0.70% |
| 10/13/2016 | $86.56 | - | $86.60 | $86.61 | 9,890,258 | -0.66% |
| 10/14/2016 | $86.54 | - | $86.54 | $86.55 | 7,991,654 | -0.02% |
| 10/17/2016 | $86.54 | - | $86.52 | $86.53 | 7,263,061 | 0.00% |
| 10/18/2016 | $86.77 | - | $86.76 | $86.77 | 5,429,319 | 0.27% |
| 10/19/2016 | $87.17 | - | $87.19 | $87.20 | 9,373,416 | 0.46% |
| 10/20/2016 | $87.21 | - | $87.20 | $87.21 | 6,866,873 | 0.05% |
| 10/21/2016 | $86.62 | - | $86.61 | $86.62 | 10,736,170 | -0.68% |
| 10/24/2016 | $86.91 | - | $86.90 | $86.91 | 8,354,850 | 0.33% |
| 10/25/2016 | $86.72 | - | $86.72 | $86.74 | 6,835,886 | -0.22% |
| 10/26/2016 | $87.09 | - | $87.10 | $87.11 | 8,488,064 | 0.43% |
| 10/27/2016 | $86.92 | - | $86.92 | $86.93 | 9,071,099 | -0.20% |
| 10/28/2016 | $84.78 | - | $84.77 | $84.78 | 19,072,186 | -2.49% |
| 10/31/2016 | $83.32 | - | $83.30 | $83.31 | 16,663,771 | -1.74% |
| 11/1/2016 | $83.65 | - | $83.67 | $83.70 | 13,050,607 | 0.40% |
| 11/2/2016 | $83.45 | - | $83.46 | $83.47 | 11,226,097 | -0.24% |
| 11/3/2016 | $83.66 | - | $83.68 | $83.69 | 8,836,546 | 0.25% |
| 11/4/2016 | $83.57 | - | $83.59 | $83.60 | 13,877,124 | -0.11% |
| 11/7/2016 | $85.45 | - | $85.44 | $85.45 | 13,576,246 | 2.22% |
| 11/8/2016 | $85.31 | $0.75 | $85.32 | $85.33 | 9,735,164 | 0.71% |
| 11/9/2016 | $86.25 | - | $86.23 | $86.24 | 15,901,269 | 1.10% |
| 11/10/2016 | $87.05 | - | $87.06 | $87.07 | 14,106,227 | 0.92% |
| 11/11/2016 | $85.67 | - | $85.63 | $85.64 | 13,812,176 | -1.60% |
| 11/14/2016 | $85.28 | - | $85.28 | $85.29 | 12,607,502 | -0.46% |
| 11/15/2016 | $86.82 | - | $86.81 | $86.82 | 12,883,542 | 1.79% |
| 11/16/2016 | $85.75 | - | $85.74 | $85.75 | 8,201,169 | -1.24% |
| 11/17/2016 | $85.23 | - | $85.22 | $85.23 | 8,200,464 | -0.61% |
| 11/18/2016 | $85.28 | - | $85.26 | $85.27 | 8,457,804 | 0.06% |
| 11/21/2016 | $86.49 | - | $86.48 | $86.49 | 8,861,469 | 1.41% |

**App. 117**

**Exhibit-4**

**Exxon Mobil Stock Prices, Dividends, Volume, and Returns**

28 October 2015 through 31 January 2017

| Date | XOM Closing Price | XOM Dividend | XOM Closing Bid | XOM Closing Ask | XOM Trading Volume | XOM Logarithmic Return |
|---|---|---|---|---|---|---|
| 11/22/2016 | $86.68 | - | $86.67 | $86.68 | 9,390,248 | 0.22% |
| 11/23/2016 | $86.92 | - | $86.91 | $86.92 | 6,061,281 | 0.28% |
| 11/25/2016 | $87.12 | - | $87.09 | $87.11 | 5,043,042 | 0.23% |
| 11/28/2016 | $86.47 | - | $86.49 | $86.50 | 7,449,634 | -0.75% |
| 11/29/2016 | $85.90 | - | $85.90 | $85.92 | 9,181,096 | -0.66% |
| 11/30/2016 | $87.30 | - | $87.31 | $87.32 | 22,696,209 | 1.62% |
| 12/1/2016 | $87.24 | - | $87.25 | $87.26 | 13,005,560 | -0.07% |
| 12/2/2016 | $87.04 | - | $87.04 | $87.05 | 9,706,646 | -0.23% |
| 12/5/2016 | $87.48 | - | $87.41 | $87.42 | 11,741,074 | 0.50% |
| 12/6/2016 | $87.56 | - | $87.55 | $87.56 | 11,293,620 | 0.09% |
| 12/7/2016 | $88.07 | - | $88.04 | $88.05 | 11,182,628 | 0.58% |
| 12/8/2016 | $88.32 | - | $88.31 | $88.32 | 9,086,715 | 0.28% |
| 12/9/2016 | $89.00 | - | $88.99 | $89.00 | 8,021,683 | 0.77% |
| 12/12/2016 | $90.98 | - | $90.98 | $91.00 | 15,545,409 | 2.20% |
| 12/13/2016 | $92.58 | - | $92.58 | $92.59 | 18,829,345 | 1.74% |
| 12/14/2016 | $90.58 | - | $90.58 | $90.59 | 16,325,355 | -2.18% |
| 12/15/2016 | $90.89 | - | $90.87 | $90.88 | 11,155,111 | 0.34% |
| 12/16/2016 | $91.18 | - | $91.15 | $91.16 | 20,560,435 | 0.32% |
| 12/19/2016 | $90.42 | - | $90.42 | $90.43 | 9,674,437 | -0.84% |
| 12/20/2016 | $90.43 | - | $90.43 | $90.44 | 7,221,041 | 0.01% |
| 12/21/2016 | $90.28 | - | $90.31 | $90.32 | 7,308,044 | -0.17% |
| 12/22/2016 | $90.87 | - | $90.86 | $90.87 | 8,003,106 | 0.65% |
| 12/23/2016 | $90.71 | - | $90.70 | $90.71 | 4,266,541 | -0.18% |
| 12/27/2016 | $90.75 | - | $90.74 | $90.75 | 4,960,556 | 0.04% |
| 12/28/2016 | $90.30 | - | $90.30 | $90.32 | 6,745,940 | -0.50% |
| 12/29/2016 | $90.35 | - | $90.31 | $90.33 | 6,684,661 | 0.06% |
| 12/30/2016 | $90.26 | - | $90.26 | $90.28 | 9,117,830 | -0.10% |
| 1/3/2017 | $90.89 | - | $90.88 | $90.89 | 10,360,622 | 0.70% |
| 1/4/2017 | $89.89 | - | $89.86 | $89.87 | 9,434,240 | -1.11% |
| 1/5/2017 | $88.55 | - | $88.54 | $88.55 | 14,443,183 | -1.50% |
| 1/6/2017 | $88.50 | - | $88.51 | $88.52 | 16,518,128 | -0.06% |
| 1/9/2017 | $87.04 | - | $87.07 | $87.08 | 13,762,259 | -1.66% |
| 1/10/2017 | $85.93 | - | $85.94 | $85.95 | 13,283,083 | -1.28% |
| 1/11/2017 | $86.81 | - | $86.79 | $86.80 | 11,183,689 | 1.02% |
| 1/12/2017 | $86.34 | - | $86.33 | $86.34 | 10,407,049 | -0.54% |
| 1/13/2017 | $86.35 | - | $86.34 | $86.35 | 8,415,603 | 0.01% |
| 1/17/2017 | $87.36 | - | $87.35 | $87.36 | 13,237,348 | 1.16% |
| 1/18/2017 | $86.28 | - | $86.27 | $86.28 | 11,831,695 | -1.24% |
| 1/19/2017 | $84.73 | - | $84.70 | $84.71 | 16,382,903 | -1.81% |
| 1/20/2017 | $85.89 | - | $85.88 | $85.89 | 18,739,659 | 1.36% |
| 1/23/2017 | $84.97 | - | $84.99 | $85.00 | 11,433,897 | -1.08% |
| 1/24/2017 | $85.09 | - | $85.09 | $85.10 | 11,858,111 | 0.14% |
| 1/25/2017 | $85.34 | - | $85.36 | $85.37 | 9,578,522 | 0.29% |
| 1/26/2017 | $85.60 | - | $85.59 | $85.60 | 8,779,446 | 0.30% |
| 1/27/2017 | $85.51 | - | $85.49 | $85.50 | 10,947,882 | -0.11% |

**App. 118**

**Exhibit-4**

**Exxon Mobil Stock Prices, Dividends, Volume, and Returns**

28 October 2015 through 31 January 2017

| Date | XOM Closing Price | XOM Dividend | XOM Closing Bid | XOM Closing Ask | XOM Trading Volume | XOM Logarithmic Return |
|---|---|---|---|---|---|---|
| 1/30/2017 | $84.86 | - | $84.81 | $84.86 | 12,789,183 | -0.76% |
| 1/31/2017 | $83.89 | - | $83.88 | $83.89 | 19,128,106 | -1.15% |
| 2/1/2017 | $82.94 | - | $82.94 | $82.95 | 15,111,832 | -1.14% |
| 2/2/2017 | $83.45 | - | $83.44 | $83.45 | 12,200,100 | 0.61% |
| 2/3/2017 | $83.54 | - | $83.53 | $83.54 | 12,746,286 | 0.11% |
| 2/6/2017 | $83.31 | - | $83.30 | $83.31 | 9,938,198 | -0.28% |
| 2/7/2017 | $82.77 | - | $82.73 | $82.74 | 11,705,199 | -0.65% |
| 2/8/2017 | $81.48 | $0.75 | $81.47 | $81.48 | 14,006,281 | -0.65% |
| 2/9/2017 | $81.84 | - | $81.83 | $81.84 | 9,602,988 | 0.44% |
| 2/10/2017 | $82.52 | - | $82.51 | $82.52 | 8,739,814 | 0.83% |
| 2/13/2017 | $83.00 | - | $83.00 | $83.01 | 9,071,638 | 0.58% |
| 2/14/2017 | $82.82 | - | $82.81 | $82.82 | 11,370,525 | -0.22% |
| 2/15/2017 | $83.16 | - | $83.14 | $83.15 | 11,768,513 | 0.41% |
| 2/16/2017 | $82.30 | - | $82.28 | $82.29 | 10,614,956 | -1.04% |
| 2/17/2017 | $81.76 | - | $81.72 | $81.73 | 15,645,973 | -0.66% |
| 2/21/2017 | $81.89 | - | $81.87 | $81.88 | 16,419,612 | 0.16% |
| 2/22/2017 | $80.93 | - | $80.92 | $80.93 | 12,917,374 | -1.18% |
| 2/23/2017 | $81.78 | - | $81.76 | $81.77 | 13,847,038 | 1.04% |
| 2/24/2017 | $81.08 | - | $81.06 | $81.08 | 11,338,715 | -0.86% |
| 2/27/2017 | $81.54 | - | $81.55 | $81.56 | 13,465,948 | 0.57% |
| 2/28/2017 | $81.32 | - | $81.32 | $81.33 | 16,834,163 | -0.27% |
| 3/1/2017 | $83.02 | - | $82.99 | $83.01 | 17,482,122 | 2.07% |
| 3/2/2017 | $83.30 | - | $83.30 | $83.31 | 14,170,309 | 0.34% |
| 3/3/2017 | $82.46 | - | $82.45 | $82.46 | 12,304,096 | -1.01% |
| 3/6/2017 | $82.83 | - | $82.82 | $82.83 | 9,617,240 | 0.45% |
| 3/7/2017 | $82.52 | - | $82.49 | $82.51 | 12,711,508 | -0.37% |
| 3/8/2017 | $81.03 | - | $81.03 | $81.04 | 16,817,743 | -1.82% |
| 3/9/2017 | $81.67 | - | $81.67 | $81.68 | 14,721,795 | 0.79% |
| 3/10/2017 | $81.61 | - | $81.61 | $81.63 | 11,355,151 | -0.07% |
| 3/13/2017 | $81.42 | - | $81.42 | $81.43 | 9,571,361 | -0.23% |
| 3/14/2017 | $80.99 | - | $81.00 | $81.01 | 11,335,678 | -0.53% |
| 3/15/2017 | $82.00 | - | $81.99 | $82.00 | 11,970,300 | 1.24% |
| 3/16/2017 | $82.07 | - | $82.05 | $82.06 | 9,923,804 | 0.09% |
| 3/17/2017 | $82.00 | - | $81.98 | $81.99 | 18,834,129 | -0.09% |
| 3/20/2017 | $82.00 | - | $81.99 | $82.00 | 7,700,258 | 0.00% |
| 3/21/2017 | $81.83 | - | $81.82 | $81.83 | 13,387,665 | -0.21% |
| 3/22/2017 | $81.76 | - | $81.77 | $81.78 | 11,168,417 | -0.09% |
| 3/23/2017 | $81.86 | - | $81.85 | $81.86 | 8,927,991 | 0.12% |
| 3/24/2017 | $81.23 | - | $81.23 | $81.26 | 9,128,489 | -0.77% |
| 3/27/2017 | $81.25 | - | $81.24 | $81.25 | 8,481,162 | 0.02% |
| 3/28/2017 | $81.84 | - | $81.84 | $81.85 | 11,028,598 | 0.72% |
| 3/29/2017 | $82.02 | - | $82.02 | $82.03 | 8,495,457 | 0.22% |
| 3/30/2017 | $83.70 | - | $83.67 | $83.68 | 44,704,931 | 2.03% |
| 3/31/2017 | $82.01 | - | $82.00 | $82.01 | 21,750,398 | -2.04% |
| 4/3/2017 | $82.07 | - | $82.08 | $82.09 | 11,438,652 | 0.07% |

**App. 119**

**Exhibit-4**

**Exxon Mobil Stock Prices, Dividends, Volume, and Returns**

28 October 2015 through 31 January 2017

| Date | XOM Closing Price | XOM Dividend | XOM Closing Bid | XOM Closing Ask | XOM Trading Volume | XOM Logarithmic Return |
|------|------|------|------|------|------|------|
| 4/4/2017 | $82.37 | - | $82.35 | $82.36 | 9,270,872 | 0.36% |
| 4/5/2017 | $82.53 | - | $82.53 | $82.53 | 13,809,062 | 0.19% |
| 4/6/2017 | $83.01 | - | $83.01 | $83.02 | 9,554,910 | 0.58% |
| 4/7/2017 | $82.76 | - | $82.78 | $82.79 | 8,909,620 | -0.30% |
| 4/10/2017 | $83.13 | - | $83.12 | $83.13 | 8,885,298 | 0.45% |
| 4/11/2017 | $82.84 | - | $82.84 | $82.85 | 8,576,521 | -0.35% |
| 4/12/2017 | $82.97 | - | $82.95 | $82.96 | 9,516,100 | 0.16% |
| 4/13/2017 | $81.69 | - | $81.69 | $81.70 | 8,667,873 | -1.55% |
| 4/17/2017 | $81.58 | - | $81.58 | $81.59 | 9,577,168 | -0.13% |
| 4/18/2017 | $81.05 | - | $81.04 | $81.05 | 8,821,414 | -0.65% |
| 4/19/2017 | $80.49 | - | $80.47 | $80.48 | 10,764,437 | -0.69% |
| 4/20/2017 | $81.01 | - | $81.05 | $81.06 | 11,649,051 | 0.64% |
| 4/21/2017 | $80.69 | - | $80.69 | $80.70 | 9,816,669 | -0.40% |
| 4/24/2017 | $81.11 | - | $81.09 | $81.10 | 8,729,701 | 0.52% |
| 4/25/2017 | $81.73 | - | $81.73 | $81.74 | 10,733,813 | 0.76% |
| 4/26/2017 | $81.40 | - | $81.41 | $81.42 | 9,445,925 | -0.40% |
| 4/27/2017 | $81.26 | - | $81.28 | $81.29 | 12,385,262 | -0.17% |
| 4/28/2017 | $81.65 | - | $81.62 | $81.63 | 12,072,169 | 0.48% |

**Source:** CRSP. Computations performed by Crowninshield Financial Research, Inc.

**App. 120**

**Exhibit-5**

**Market Index and Sector Index**

29 October 2015 through 31 January 2017

| Date | Market Index Logarithmic Return | Sector Index Logarithmic Return |
|---|---|---|
| 10/29/2015 | -0.22% | -0.35% |
| 10/30/2015 | -0.40% | 0.53% |
| 11/2/2015 | 1.24% | 2.91% |
| 11/3/2015 | 0.31% | 2.53% |
| 11/4/2015 | -0.34% | -0.95% |
| 11/5/2015 | -0.14% | -2.16% |
| 11/6/2015 | -0.04% | -0.75% |
| 11/9/2015 | -0.96% | -1.01% |
| 11/10/2015 | 0.13% | -0.01% |
| 11/11/2015 | -0.41% | -1.24% |
| 11/12/2015 | -1.46% | -2.32% |
| 11/13/2015 | -0.98% | -0.67% |
| 11/16/2015 | 1.37% | 3.09% |
| 11/17/2015 | -0.14% | -0.45% |
| 11/18/2015 | 1.52% | 2.05% |
| 11/19/2015 | -0.10% | -0.15% |
| 11/20/2015 | 0.30% | -2.13% |
| 11/23/2015 | -0.07% | -0.25% |
| 11/24/2015 | 0.23% | 1.56% |
| 11/25/2015 | 0.12% | -0.34% |
| 11/27/2015 | 0.08% | -0.04% |
| 11/30/2015 | -0.39% | 0.07% |
| 12/1/2015 | 0.95% | 0.79% |
| 12/2/2015 | -1.08% | -2.03% |
| 12/3/2015 | -1.44% | -1.24% |
| 12/4/2015 | 1.63% | -0.60% |
| 12/7/2015 | -0.98% | -3.54% |
| 12/8/2015 | -0.61% | -0.86% |
| 12/9/2015 | -0.67% | 1.66% |
| 12/10/2015 | 0.21% | 0.24% |
| 12/11/2015 | -2.00% | -3.22% |
| 12/14/2015 | 0.16% | 0.27% |
| 12/15/2015 | 1.13% | 2.35% |
| 12/16/2015 | 1.48% | 0.46% |
| 12/17/2015 | -1.47% | -2.70% |
| 12/18/2015 | -1.52% | -0.34% |
| 12/21/2015 | 0.71% | -0.24% |
| 12/22/2015 | 0.88% | 1.35% |
| 12/23/2015 | 1.36% | 4.58% |
| 12/24/2015 | -0.08% | -1.38% |
| 12/28/2015 | -0.33% | -1.37% |

**App. 121**

**Exhibit-5**

**Market Index and Sector Index**

29 October 2015 through 31 January 2017

| Date | Market Index Logarithmic Return | Sector Index Logarithmic Return |
|---|---|---|
| 12/29/2015 | 1.00% | 1.10% |
| 12/30/2015 | -0.74% | -1.39% |
| 12/31/2015 | -0.82% | -0.31% |
| 1/4/2016 | -1.50% | -0.70% |
| 1/5/2016 | 0.14% | -0.43% |
| 1/6/2016 | -1.39% | -3.11% |
| 1/7/2016 | -2.42% | -3.52% |
| 1/8/2016 | -1.10% | -2.54% |
| 1/11/2016 | -0.17% | -0.60% |
| 1/12/2016 | 0.61% | 0.34% |
| 1/13/2016 | -2.62% | -1.21% |
| 1/14/2016 | 1.53% | 5.87% |
| 1/15/2016 | -2.19% | -4.05% |
| 1/19/2016 | -0.24% | -1.14% |
| 1/20/2016 | -1.07% | -3.25% |
| 1/21/2016 | 0.56% | 2.83% |
| 1/22/2016 | 2.22% | 3.98% |
| 1/25/2016 | -1.68% | -2.94% |
| 1/26/2016 | 1.58% | 4.09% |
| 1/27/2016 | -1.06% | 0.17% |
| 1/28/2016 | 0.50% | 3.09% |
| 1/29/2016 | 2.43% | 1.01% |
| 2/1/2016 | -0.03% | -1.52% |
| 2/2/2016 | -2.02% | -5.54% |
| 2/3/2016 | 0.57% | 3.49% |
| 2/4/2016 | 0.36% | 2.04% |
| 2/5/2016 | -1.98% | -0.94% |
| 2/8/2016 | -1.71% | 0.40% |
| 2/9/2016 | -0.31% | -3.71% |
| 2/10/2016 | 0.03% | -0.61% |
| 2/11/2016 | -1.21% | -0.28% |
| 2/12/2016 | 2.00% | 4.07% |
| 2/16/2016 | 1.75% | 0.82% |
| 2/17/2016 | 1.80% | 3.50% |
| 2/18/2016 | -0.42% | -0.85% |
| 2/19/2016 | -0.02% | -0.17% |
| 2/22/2016 | 1.42% | 2.17% |
| 2/23/2016 | -1.19% | -4.22% |
| 2/24/2016 | 0.50% | -0.10% |
| 2/25/2016 | 1.10% | 0.93% |
| 2/26/2016 | 0.03% | 0.35% |

**App. 122**

**Exhibit-5**

**Market Index and Sector Index**

29 October 2015 through 31 January 2017

| Date | Market Index Logarithmic Return | Sector Index Logarithmic Return |
|---|---|---|
| 2/29/2016 | -0.59% | -0.29% |
| 3/1/2016 | 2.22% | 2.28% |
| 3/2/2016 | 0.57% | 1.35% |
| 3/3/2016 | 0.56% | 1.07% |
| 3/4/2016 | 0.42% | 0.96% |
| 3/7/2016 | 0.32% | 1.24% |
| 3/8/2016 | -1.36% | -2.60% |
| 3/9/2016 | 0.55% | 2.30% |
| 3/10/2016 | -0.13% | -0.80% |
| 3/11/2016 | 1.73% | 2.11% |
| 3/14/2016 | -0.16% | -0.80% |
| 3/15/2016 | -0.45% | -0.73% |
| 3/16/2016 | 0.75% | 2.01% |
| 3/17/2016 | 0.82% | 2.26% |
| 3/18/2016 | 0.39% | -0.14% |
| 3/21/2016 | 0.05% | -1.26% |
| 3/22/2016 | -0.04% | -1.03% |
| 3/23/2016 | -0.95% | -1.81% |
| 3/24/2016 | -0.01% | 0.79% |
| 3/28/2016 | 0.08% | -0.18% |
| 3/29/2016 | 1.10% | 0.38% |
| 3/30/2016 | 0.45% | 1.25% |
| 3/31/2016 | -0.09% | -1.11% |
| 4/1/2016 | 0.47% | -1.75% |
| 4/4/2016 | -0.44% | -0.11% |
| 4/5/2016 | -1.01% | -1.66% |
| 4/6/2016 | 1.10% | 1.91% |
| 4/7/2016 | -1.17% | -0.60% |
| 4/8/2016 | 0.43% | 2.97% |
| 4/11/2016 | -0.18% | 0.10% |
| 4/12/2016 | 1.04% | 2.48% |
| 4/13/2016 | 1.13% | 0.85% |
| 4/14/2016 | -0.05% | 0.38% |
| 4/15/2016 | -0.06% | -0.58% |
| 4/18/2016 | 0.68% | 0.66% |
| 4/19/2016 | 0.45% | 1.82% |
| 4/20/2016 | 0.12% | 0.64% |
| 4/21/2016 | -0.53% | -0.16% |
| 4/22/2016 | 0.18% | 0.61% |
| 4/25/2016 | -0.28% | -1.25% |
| 4/26/2016 | 0.34% | 1.78% |

**App. 123**

**Exhibit-5**

**Market Index and Sector Index**

29 October 2015 through 31 January 2017

| Date | Market Index Logarithmic Return | Sector Index Logarithmic Return |
|---|---|---|
| 4/27/2016 | 0.26% | 1.84% |
| 4/28/2016 | -0.86% | -1.03% |
| 4/29/2016 | -0.45% | -0.05% |
| 5/2/2016 | 0.67% | 0.45% |
| 5/3/2016 | -1.12% | -2.67% |
| 5/4/2016 | -0.62% | -1.61% |
| 5/5/2016 | -0.04% | 0.56% |
| 5/6/2016 | 0.35% | 0.41% |
| 5/9/2016 | -0.02% | -1.81% |
| 5/10/2016 | 1.22% | 1.61% |
| 5/11/2016 | -0.83% | -0.13% |
| 5/12/2016 | -0.08% | 0.57% |
| 5/13/2016 | -0.80% | -1.70% |
| 5/16/2016 | 1.02% | 1.98% |
| 5/17/2016 | -0.86% | -0.20% |
| 5/18/2016 | -0.08% | -0.70% |
| 5/19/2016 | -0.38% | -0.55% |
| 5/20/2016 | 0.76% | 0.07% |
| 5/23/2016 | -0.18% | -0.97% |
| 5/24/2016 | 1.30% | 0.92% |
| 5/25/2016 | 0.73% | 2.32% |
| 5/26/2016 | -0.02% | -0.51% |
| 5/27/2016 | 0.44% | -0.31% |
| 5/31/2016 | -0.03% | -1.73% |
| 6/1/2016 | 0.24% | 0.09% |
| 6/2/2016 | 0.36% | -0.22% |
| 6/3/2016 | -0.20% | 0.80% |
| 6/6/2016 | 0.61% | 0.94% |
| 6/7/2016 | 0.21% | 2.72% |
| 6/8/2016 | 0.36% | 0.88% |
| 6/9/2016 | -0.28% | -0.84% |
| 6/10/2016 | -1.13% | -1.85% |
| 6/13/2016 | -0.82% | -0.89% |
| 6/14/2016 | -0.28% | -2.04% |
| 6/15/2016 | -0.05% | -0.21% |
| 6/16/2016 | 0.19% | 1.41% |
| 6/17/2016 | -0.18% | 2.00% |
| 6/20/2016 | 0.73% | 1.77% |
| 6/21/2016 | 0.23% | 1.49% |
| 6/22/2016 | -0.19% | -0.69% |
| 6/23/2016 | 1.43% | 2.80% |

118

**App. 124**

**Exhibit-5**

**Market Index and Sector Index**

29 October 2015 through 31 January 2017

| Date | Market Index Logarithmic Return | Sector Index Logarithmic Return |
|---|---|---|
| 6/24/2016 | -3.74% | -5.83% |
| 6/27/2016 | -2.06% | -1.64% |
| 6/28/2016 | 1.79% | 2.38% |
| 6/29/2016 | 1.75% | 3.17% |
| 6/30/2016 | 1.31% | 1.53% |
| 7/1/2016 | 0.30% | 0.59% |
| 7/5/2016 | -0.83% | -1.15% |
| 7/6/2016 | 0.54% | -0.07% |
| 7/7/2016 | -0.07% | -1.08% |
| 7/8/2016 | 1.54% | 1.30% |
| 7/11/2016 | 0.42% | 0.67% |
| 7/12/2016 | 0.79% | 1.74% |
| 7/13/2016 | -0.02% | -0.40% |
| 7/14/2016 | 0.47% | 0.28% |
| 7/15/2016 | -0.08% | -0.23% |
| 7/18/2016 | 0.26% | -0.34% |
| 7/19/2016 | -0.24% | -0.47% |
| 7/20/2016 | 0.46% | -0.23% |
| 7/21/2016 | -0.33% | -0.26% |
| 7/22/2016 | 0.45% | 0.20% |
| 7/25/2016 | -0.32% | -2.69% |
| 7/26/2016 | 0.16% | 0.47% |
| 7/27/2016 | -0.12% | -0.22% |
| 7/28/2016 | 0.17% | -1.26% |
| 7/29/2016 | 0.26% | 0.23% |
| 8/1/2016 | -0.23% | -3.66% |
| 8/2/2016 | -0.71% | 0.39% |
| 8/3/2016 | 0.44% | 0.43% |
| 8/4/2016 | 0.08% | 0.34% |
| 8/5/2016 | 0.80% | 0.40% |
| 8/8/2016 | 0.01% | 0.36% |
| 8/9/2016 | 0.11% | 0.21% |
| 8/10/2016 | -0.26% | -0.95% |
| 8/11/2016 | 0.48% | 1.68% |
| 8/12/2016 | -0.05% | 0.21% |
| 8/15/2016 | 0.40% | 0.51% |
| 8/16/2016 | -0.55% | 0.81% |
| 8/17/2016 | 0.10% | 0.37% |
| 8/18/2016 | 0.34% | 1.04% |
| 8/19/2016 | -0.18% | -1.28% |
| 8/22/2016 | -0.04% | -1.03% |

119

**App. 125**

**Exhibit-5**

**Market Index and Sector Index**

29 October 2015 through 31 January 2017

| Date | Market Index Logarithmic Return | Sector Index Logarithmic Return |
|---|---|---|
| 8/23/2016 | 0.28% | 0.09% |
| 8/24/2016 | -0.61% | -0.05% |
| 8/25/2016 | -0.07% | -0.18% |
| 8/26/2016 | -0.18% | 0.00% |
| 8/29/2016 | 0.52% | 0.24% |
| 8/30/2016 | -0.15% | -0.06% |
| 8/31/2016 | -0.26% | -1.37% |
| 9/1/2016 | 0.07% | -0.44% |
| 9/2/2016 | 0.59% | 1.84% |
| 9/6/2016 | 0.34% | 1.19% |
| 9/7/2016 | 0.08% | 0.52% |
| 9/8/2016 | -0.21% | 0.94% |
| 9/9/2016 | -2.53% | -2.74% |
| 9/12/2016 | 1.33% | 0.62% |
| 9/13/2016 | -1.60% | -3.03% |
| 9/14/2016 | -0.05% | -1.10% |
| 9/15/2016 | 1.01% | 0.81% |
| 9/16/2016 | -0.39% | -1.65% |
| 9/19/2016 | 0.14% | 0.58% |
| 9/20/2016 | -0.04% | -0.66% |
| 9/21/2016 | 1.18% | 1.91% |
| 9/22/2016 | 0.78% | 1.31% |
| 9/23/2016 | -0.60% | -1.22% |
| 9/26/2016 | -0.83% | -0.83% |
| 9/27/2016 | 0.51% | -0.30% |
| 9/28/2016 | 0.67% | 3.26% |
| 9/29/2016 | -0.93% | 0.62% |
| 9/30/2016 | 0.78% | 0.72% |
| 10/3/2016 | -0.31% | 0.23% |
| 10/4/2016 | -0.56% | 0.09% |
| 10/5/2016 | 0.49% | 1.23% |
| 10/6/2016 | -0.08% | -0.32% |
| 10/7/2016 | -0.38% | 0.12% |
| 10/10/2016 | 0.56% | 1.73% |
| 10/11/2016 | -1.27% | -1.66% |
| 10/12/2016 | 0.09% | -0.32% |
| 10/13/2016 | -0.33% | -0.79% |
| 10/14/2016 | -0.03% | 0.41% |
| 10/17/2016 | -0.25% | -0.62% |
| 10/18/2016 | 0.65% | 0.79% |
| 10/19/2016 | 0.30% | 0.33% |

120

**App. 126**

**Exhibit-5**

**Market Index and Sector Index**

29 October 2015 through 31 January 2017

| Date | Market Index Logarithmic Return | Sector Index Logarithmic Return |
|---|---|---|
| 10/20/2016 | -0.16% | -0.03% |
| 10/21/2016 | -0.01% | -0.28% |
| 10/24/2016 | 0.44% | -0.40% |
| 10/25/2016 | -0.44% | -0.03% |
| 10/26/2016 | -0.28% | -0.46% |
| 10/27/2016 | -0.40% | 0.11% |
| 10/28/2016 | -0.26% | 0.54% |
| 10/31/2016 | 0.04% | -0.15% |
| 11/1/2016 | -0.68% | 1.38% |
| 11/2/2016 | -0.77% | -1.57% |
| 11/3/2016 | -0.40% | -0.04% |
| 11/4/2016 | -0.12% | -0.85% |
| 11/7/2016 | 2.07% | 1.89% |
| 11/8/2016 | 0.39% | 0.28% |
| 11/9/2016 | 1.20% | 0.59% |
| 11/10/2016 | 0.20% | 0.20% |
| 11/11/2016 | 0.03% | -2.44% |
| 11/14/2016 | 0.24% | -0.70% |
| 11/15/2016 | 0.79% | 2.26% |
| 11/16/2016 | -0.15% | -0.71% |
| 11/17/2016 | 0.46% | 0.13% |
| 11/18/2016 | -0.14% | 0.12% |
| 11/21/2016 | 0.77% | 1.90% |
| 11/22/2016 | 0.30% | 0.48% |
| 11/23/2016 | 0.09% | -0.49% |
| 11/25/2016 | 0.36% | -0.00% |
| 11/28/2016 | -0.60% | -1.24% |
| 11/29/2016 | 0.10% | -0.35% |
| 11/30/2016 | -0.16% | 3.06% |
| 12/1/2016 | -0.42% | 1.22% |
| 12/2/2016 | 0.07% | 0.07% |
| 12/5/2016 | 0.73% | 0.35% |
| 12/6/2016 | 0.48% | 0.12% |
| 12/7/2016 | 1.23% | 1.21% |
| 12/8/2016 | 0.37% | 0.28% |
| 12/9/2016 | 0.39% | 0.11% |
| 12/12/2016 | -0.25% | 1.23% |
| 12/13/2016 | 0.58% | 1.00% |
| 12/14/2016 | -0.97% | -1.73% |
| 12/15/2016 | 0.36% | 0.57% |
| 12/16/2016 | -0.12% | 1.22% |

**App. 127**

**Exhibit-5**

**Market Index and Sector Index**

29 October 2015 through 31 January 2017

| Date | Market Index Logarithmic Return | Sector Index Logarithmic Return |
|---|---|---|
| 12/19/2016 | 0.21% | -0.51% |
| 12/20/2016 | 0.43% | 0.16% |
| 12/21/2016 | -0.25% | 0.30% |
| 12/22/2016 | -0.27% | 0.45% |
| 12/23/2016 | 0.18% | -0.04% |
| 12/27/2016 | 0.25% | 0.20% |
| 12/28/2016 | -0.80% | -0.19% |
| 12/29/2016 | 0.06% | 0.40% |
| 12/30/2016 | -0.41% | -0.03% |
| 1/3/2017 | 0.82% | 0.78% |
| 1/4/2017 | 0.86% | 0.48% |
| 1/5/2017 | -0.10% | 0.43% |
| 1/6/2017 | 0.23% | -0.91% |
| 1/9/2017 | -0.39% | -1.41% |
| 1/10/2017 | 0.13% | -0.47% |
| 1/11/2017 | 0.32% | 1.30% |
| 1/12/2017 | -0.25% | 0.51% |
| 1/13/2017 | 0.28% | -0.18% |
| 1/17/2017 | -0.37% | -0.07% |
| 1/18/2017 | 0.14% | -0.75% |
| 1/19/2017 | -0.39% | -0.67% |
| 1/20/2017 | 0.36% | 0.36% |
| 1/23/2017 | -0.19% | -0.28% |
| 1/24/2017 | 0.84% | 0.85% |
| 1/25/2017 | 0.81% | 0.58% |
| 1/26/2017 | -0.12% | -0.87% |
| 1/27/2017 | -0.16% | -1.12% |
| 1/30/2017 | -0.71% | -1.77% |
| 1/31/2017 | 0.08% | 0.53% |

**Sources:** Market Index (CRSP), Sector Index (Bloomberg, dividend information obtained from CRSP), and computations performed by Crowninshield Financial Research, Inc.

**App. 128**

## Exhibit-6
### Exxon Mobil Regression Results

Estimation Period: 29 October 2015 through 27 October 2016

| Regression Statistics | |
|---|---|
| R Squared | 0.650 |
| Adjusted R Squared | 0.641 |
| Standard Error | 0.80% |
| Observations | 252 |

| | Coefficient | Standard Error | $t$-statistic |
|---|---|---|---|
| Intercept | 0.02% | 0.05% | 0.45 |
| Market Index | 0.054 | 0.084 | 0.64 |
| Sector Index | 0.619 | 0.046 | 13.56 |
| 30 October 2015 | 0.49% | 0.80% | 0.62 |
| 2 February 2016 | 1.26% | 0.81% | 1.55 |
| 29 April 2016 | 0.45% | 0.80% | 0.57 |
| 29 July 2016 | -1.58% | 0.80% | -1.98 |

Estimation Period: 1 February 2016 through 30 January 2017

| Regression Statistics | |
|---|---|
| R Squared | 0.563 |
| Adjusted R Squared | 0.553 |
| Standard Error | 0.70% |
| Observations | 252 |

| | Coefficient | Standard Error | $t$-statistic |
|---|---|---|---|
| Intercept | 0.02% | 0.04% | 0.36 |
| Market Index | 0.011 | 0.083 | 0.14 |
| Sector Index | 0.549 | 0.045 | 12.09 |
| 2 February 2016 | 0.80% | 0.73% | 1.10 |
| 29 April 2016 | 0.43% | 0.70% | 0.62 |
| 29 July 2016 | -1.54% | 0.70% | -2.19 |
| 28 October 2016 | -2.80% | 0.70% | -3.98 |

**App. 129**

## Exhibit-7

### Exxon Mobil Stock Event Study Results

| Date | XOM Closing Price | XOM Prior Day Closing Price | XOM Logarithmic Return | Market Index Logarithmic Return | Sector Index Logarithmic Return | XOM Explained Return | XOM Residual Return | XOM Dollar Residual Return | XOM Residual Return $t$-Statistic |
|------|-------------------|-----------------------------|------------------------|---------------------------------|---------------------------------|----------------------|---------------------|----------------------------|-----------------------------------|
| 10/28/2016 | $84.78 | $86.92 | -2.49% | -0.26% | 0.54% | 0.34% | -2.84% | -$2.43 | (3.57) * |
| 1/31/2017 | $83.89 | $84.86 | -1.15% | 0.08% | 0.53% | 0.31% | -1.46% | -$1.23 | (2.08) * |

**Source:** Computations performed by Crowninshield Financial Research, Inc.

**Note**: "*" indicates statistical significance at a confidence level greater than 95%.

**App. 130**

**Exhibit-8**

**Exxon Mobil Stock Artificial Inflation**

| Date | Inflation |
|------|-----------|
| 2/24/2016 - 10/27/2016 | $3.44 |
| 10/28/2016 - 1/30/2017 | $1.05 |
| 1/31/2017 and thereafter | $0.00 |

125

**App. 131**

# Exhibit 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| PEDRO RAMIREZ, JR., Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>EXXON MOBIL CORPORATION, REX W. TILLERSON, ANDREW P. SWIGER, JEFFREY J. WOODBURY and DAVID S. ROSENTHAL,<br><br>Defendants. | § § § § § § § § § § § § § § § | Civil Action No. 3:16-cv-03111-K |

REPLY REPORT ON LOSS CAUSATION AND DAMAGES

PROFESSOR STEVEN P. FEINSTEIN, PH.D., CFA

JANUARY 10, 2025

**CONFIDENTIAL**

**App. 132**

**TABLE OF CONTENTS**

I.  INTRODUCTION AND SUMMARY OF PRIOR WORK IN THIS MATTER ..............1

II.  SCOPE OF PROJECT AND REPORT ...................................................................2

III.  CONCLUSIONS...................................................................................................3

IV.  CRITIQUE OF THE FERRELL REBUTTAL REPORT ...................................4

    A.  Dr. Ferrell's Assertion That There Is No Evidence of Inflation Introduction Is Misguided, Ignores Plaintiff's Allegations, and Overlooks Ample Evidence...................................................................................4

    B.  Dr. Ferrell Inappropriately Rejects Rather Than Accepts as Assumptions Plaintiff's Factual Allegations ...................................................7

    C.  Analysis of the 28 October 2016 Corrective Disclosure ......................11

        1.  My Analysis of the 28 October 2016 Corrective Disclosure Presented in the Feinstein Report Is Correct and Complete ......................11

        2.  Dr. Ferrell Takes Issue with My Treatment of Confounding Information and Attribution Analysis...........................................12

    D.  Analysis of the 31 January 2017 Corrective Disclosure........................26

        1.  My Analysis of the 31 January 2017 Corrective Disclosure Presented in the Feinstein Report Is Correct and Complete ......................26

        2.  My Industry Index Selection Is Appropriate and Was Selected Using the Selection Methodology I Regularly Employ............................28

        3.  If One Were to Use the Ferrell Industry Index to Evaluate the 28 October 2016 Corrective Disclosure, Damages Would Be Substantially Higher................................................................35

        4.  Dr. Ferrell's Close to Open Regression Was Concocted for This Litigation....................................................................................36

        5.  Dr. Ferrell's Assertion that the Impairment Was Not New and Did Not Cause the 31 January 2017 Price Decline Is Unfounded...................41

        6.  Dr. Ferrell's Assertion That I Did Not Analyze and Disaggregate Confounding Information Is Erroneous ......................................44

        7.  Dr. Ferrell Erroneously Contends that Earnings Announced on 31 January 2017 Were a Miss that Disappointed Analysts, and That This Miss is Why the Stock Price Fell........................................45

    E.  My Inflation Ribbon Was Computed Correctly and Is Supported by the Facts of the Case, the Academic Literature, and Proper Analysis........................47

    F.  Dr. Ferrell Confirms My Analysis of the Cost of Losing Exxon's AAA Rating.....................................................................................50

**App. 133**

G. Dr. Ferrell Erroneously Contends that The Write-Down and De-Booking Would Not Have Warranted a Credit Downgrade ..................................................51

V. CRITIQUE OF THE SAUNDERS REPORT ........................................................53

A. Dr. Saunders' Exposition of Exxon's Split Rating Is Moot..................................54

B. Dr. Saunders' Assertion that AAA and AA+ Rated Bonds Have the Same Default Probability Is Erroneous and Misleading..................................................56

C. Dr. Saunders' Analysis of Exxon Being Placed on CreditWatch Is Uninformative and Misleading ..............................................................................58

D. Dr. Saunders' Exposition About How the Exxon Notes Remained a Strong Investment Choice Irrespective of the Credit Downgrade Is Unavailing..............60

E. Dr. Saunders Agrees That Option Adjusted Spreads Is a Commonly Used Methodology to Calculate Bond Yields................................................................62

F. Dr. Saunders Erroneously Suggests That Market Benchmarks Are Uninformative ......................................................................................................63

G. Dr. Saunders Is Wrong to Suggest There Is No Economic Foundation for Linear Interpolation ............................................................................................65

H. Dr. Saunders' Criticism of my Quantification of the Additional Interest Expense At Maturity Is Unfounded ......................................................................68

VI. LIMITING FACTORS AND OTHER ASSUMPTIONS.....................................69

**App. 134**

## I.    INTRODUCTION AND SUMMARY OF PRIOR WORK IN THIS MATTER

1.    On 11 October 2024, I submitted the Report on Loss Causation and Damages ("Feinstein Report").[1] As explained in that report, I determined based on my analysis and the assumption that Lead Plaintiff will prove its factual allegations, that Class members suffered losses as a result of the alleged misrepresentations and omissions.[2] I quantified the Section 10(b) damages Class members sustained per share as a result of the alleged misrepresentations and omissions.

2.    Specifically, in the Feinstein Report, I explained:

   i.    The corrective disclosures informed the market about a) the lack of profitability of the Company's bitumen operations at Kearl Lake ("Kearl") resulting in removal of 3.6 billion barrels of proved reserves (approximately 14% of the Company's overall proved reserves), and b) impairment of the Company's Rocky Mountain dry gas assets ("Rocky Mountain" or "RMDG"), requiring the Company to take a $2.0 billion charge against earnings.[3]

   ii.    Given that Exxon stock traded in an efficient market, it follows that had the adverse facts that were concealed from the public been alternatively timely disclosed, Exxon stock would have been priced significantly lower in the market during the Class Period, and thus would not have been artificially inflated.

   iii.    Investors who purchased or otherwise acquired Exxon shares during the Class Period suffered economic losses that were caused by the alleged false and misleading statements and omissions.[4]

   iv.    Corrective disclosures caused $2.39 of the $2.43 per share residual price decline in Exxon stock on 28 October 2016, and $1.05 of the $1.23 per share residual price

---

[1] Unless otherwise indicated, capitalized terms used in this report have the meaning ascribed to them in the Feinstein Report.

[2] Feinstein Report, ¶¶6, and 20.

[3] Feinstein Report, ¶21.

[4] Feinstein Report, ¶¶22, and 177.

**App. 135**

decline on 31 January 2017. The stock price declines on both days, measured close to close, were statistically significant at above the 95% confidence level.[5]

v.   Defendants' misrepresentations and omissions caused the market price of Exxon stock to be artificially inflated by $3.44 per share. The corrective disclosures dissipated this inflation. For each Class member, damages range up to $3.44 per share, depending on the timing of the respective investor's Exxon stock purchase and sale.[6]

3.   I also determined that had Exxon's credit rating been "AA+" rather than "AAA" at the time of the March 2016 offering, Exxon would have had to offer a 0.13% increase in yield to receive the $12 billion in note sale proceeds. The 0.13% increase in yield would have resulted in a total increase in interest expense of $831.95 million over the life of the notes.[7]

## II.   SCOPE OF PROJECT AND REPORT

4.   Robbins Geller Rudman & Dowd LLP, Lead Counsel for the Lead Plaintiff, asked me to consider, evaluate, and respond to the arguments and conclusions in the following expert reports submitted on behalf of Defendants in this matter (collectively, "Defendants' Experts' Reports"): i) Expert Report of Allen Ferrell, Ph.D., dated 10 December 2024 (the "Ferrell Rebuttal Report"); and ii) Expert Report of Anthony Saunders, Ph.D., dated 10 December 2024 (the "Saunders Report").

5.   The stated scope of each of Defendants' Experts' Reports are as follows:

i.   Dr. Ferrell was asked "to assess whether Plaintiff has reliably established that it was damaged by alleged misrepresentations made by ExxonMobil, and to review and comment on the Feinstein Report."[8]

ii.   Dr. Saunders was asked "to review a report by Plaintiff's proffered expert, Dr. Steven P. Feinstein, and to respond to his opinion that, had ExxonMobil's March

---

[5] Feinstein Report, ¶25.

[6] Feinstein Report, ¶27.

[7] Feinstein Report, ¶28.

[8] Ferrell Rebuttal Report, ¶11.

**App. 136**

2016 offering been rated AA+ rather than AAA, ExxonMobil's debt service on the issued notes (the 'Notes') would have required a higher note yield and thus higher interest expense."[9]

6. This reply report presents my responses to the Ferrell Rebuttal Report and the Saunders Report.

7. I reviewed and relied upon all of the data and documents cited and listed in my previous report. Additional data and documents considered are listed in Exhibit-1 of this report. My credentials and compensation are presented in the Feinstein Report, as is a list of testimony I provided during the four years preceding that report.

8. My work on this matter is ongoing. I reserve the right to amend, refine, or supplement my analyses and opinions in the event that I become aware of additional information, evidence, arguments, or analyses that bear on my work in this matter.

## III.    CONCLUSIONS

9. None of Defendants' Experts' Reports provide any basis for revising my findings and conclusions regarding loss causation and damages. None of Defendants' Experts' Reports prove that any losses sustained by investors were caused by factors other than the alleged misrepresentations and omissions. They levy no valid challenge to my analyses or conclusions.

10. My analyses conform to widely used and generally accepted methodologies, are grounded in fundamental principles of finance and economics, and are correctly executed. My loss causation analysis compels the conclusion that the alleged misrepresentations and omissions caused investor losses. The alleged misrepresentations and omissions artificially inflated the price of Exxon stock. The corrective disclosure events dissipated that artificial inflation, causing Exxon's stock price to fall, and thereby caused investor losses.

11. The quantification of damages presented in the Feinstein Report is scientific, consistent with market efficiency, and accords with Plaintiff's allegations, facts of the case, and generally accepted valuation principles. I properly considered whether there was

---

[9] Saunders Report, ¶8.

3

confounding information disclosed simultaneously with the corrective disclosures. I appropriately excluded from my measures of inflation and damages the price effect of confounding information that contributed to the stock price declines on the corrective disclosure event dates.

12. As I explained in the Feinstein Report, the alleged misrepresentations and omissions, which misled investors about the profitability (or lack thereof) of the Company's Kearl bitumen operation and at RMDG were economically material to investors.[10]

## IV.    CRITIQUE OF THE FERRELL REBUTTAL REPORT

### A.    Dr. Ferrell's Assertion That There Is No Evidence of Inflation Introduction Is Misguided, Ignores Plaintiff's Allegations, and Overlooks Ample Evidence

13. Exxon's stock traded in an efficient market.[11] Abundant evidence establishes that the alleged misrepresentations and omissions were economically material.[12] The conditions concealed by the alleged misrepresentations and omissions were negative. It follows that Exxon's alleged materially false and misleading statements and omissions concerning the profitability and legitimate status as proved reserves of the Company's operations at Kearl, and impairment of certain of its Rocky Mountain dry gas assets, caused the price of Exxon's stock to be artificially inflated.

14. Dr. Ferrell faults my analysis for purportedly "fail[ing] to show that any alleged misrepresentations caused inflation to enter into ExxonMobil's stock price by virtue of causing a statistically significant price increase in ExxonMobil's stock."[13] Dr. Ferrell asserts that "[l]ike Plaintiff, Dr. Feinstein solely relies on the back-end (i.e., at the end of the Class Period) price drops associated with the alleged corrective disclosure dates to

---

[10] Feinstein Report, §VI.B.

[11] Feinstein Report, ¶6; and Ferrell Rebuttal Report, ¶17.

[12] Feinstein Report, ¶¶105-113; and Ferrell Rebuttal Report, ¶18.

[13] Ferrell Rebuttal Report, ¶18.

**App. 138**

claim, as a self-fulfilling prophecy, that the front-end alleged misrepresentations maintained inflation that was dissipated when the truth was revealed."[14]

15. Dr. Ferrell's criticism is incorrect. He is wrong to suggest that the introduction of artificial inflation will always manifest as an observable significant stock price increase. Misrepresentations and omissions can introduce and maintain artificial inflation by concealing an adverse condition or development that would otherwise have caused the stock price to fall, as was the case in the instant case.

16. Consistent with these principles, I conducted the empirical analysis that is appropriate for the facts and circumstances of the instant case. The event study analysis I conducted shows that the correction of the alleged misrepresentations and omissions caused the price of Exxon stock to decline. This finding proves that the alleged misrepresentations and omissions had caused artificial inflation.[15]

17. Dr. Ferrell's criticism is based on the erroneous premises that the introduction of artificial inflation necessarily manifests as an observable increase in the stock price, and that in order to prove there was artificial inflation it is necessary to prove empirically that the materially false and misleading statements and omissions caused observable increases in Exxon's stock price when made. He fails to consider that misstatements consistent with market expectations, and misrepresentations and omissions that conceal adverse conditions or developments, would maintain the stock price, keep it from falling, and thereby introduce artificial inflation. Only new information and information inconsistent with prior market expectations would be expected to cause a price change.[16]

18. In the instant case, the materially false and misleading statements and omissions allegedly deceived analysts and investors by concealing important information, such that one would not expect statistically significant stock price movements at the time of the misrepresentations and omissions, or over the duration of the concealment. Instead, the concealment maintained the mix of public information as it was previously, so the price impact was maintenance of the price level where it was previously. Thus, by keeping the

---

[14] Ferrell Rebuttal Report, ¶21.

[15] Feinstein Report, ¶¶ 24, 108. 114, 139-142.

[16] Feinstein Report, ¶¶100-101; *see, e.g.*, "Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias," by Alon Brav and J.B. Heaton, *Washington University Law Review*, Vol. 93, No. 2, 2015.

**App. 139**

price of Exxon's stock from falling, the alleged materially false and misleading statements and omissions introduced artificial inflation by propping up the price of Exxon's stock when it otherwise would have fallen. That support fell away when later disclosures ultimately corrected the materially false and misleading statements and omissions.

19. From the start of the Class Period, Defendants failed to disclose and properly account for losses that required reserve write-downs and/or impairment charges.[17] It cannot reasonably be disputed that if the Company had disclosed in its Form 10-K for the fiscal year ended 2015 that: (i) Kearl was suffering operating losses;[18] (ii) operations at Kearl, which represented approximately 14% of Exxon's proved reserves portfolio, no longer legitimately qualified as a "proved"[19] reserve;[20] and, (iii) a significant portion of the Company's RMDG operations no longer justified their "carrying value"[21] on Exxon's financial statements and, as a result, the Company was required to record a significant asset impairment charge,[22] that Exxon's stock price would have declined at that time. If these adverse facts had been timely disclosed, Exxon's stock price would have declined at that time, as the price did ultimately fall when the corresponding revelatory disclosures were later made.

---

[17] Feinstein Report, ¶29; Complaint, ¶¶15, 201.

[18] Feinstein Report, FN 79.

[19] "Proved oil and gas reserves are the estimated quantities of crude oil, natural gas, and natural gas liquids which geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions, i.e., prices and costs as of the date the estimate is made. Prices include consideration of changes in existing prices provided by contractual arrangements, but not on escalations based upon future conditions" (SEC Rule 4-10 (a) of Regulation S-X of the Securities Exchange Act of 1934 and https://www.sec.gov/divisions/corpfin/guidance/cfoilgasinterps.htm).

[20] Complaint, ¶14.

[21] The "carrying amount" or "carrying value" is the original cost of an asset less the accumulated amount of any depreciation or amortization. As stated in Exxon's 2015 Form 10-K: "An asset group would be impaired if its undiscounted cash flows were less than the asset's carrying value. Impairments are measured by the amount by which the carrying value exceeds fair value" (Exxon Mobil Corporation, Form 10-K for the fiscal year ended 31 December 2015, filed 24 February 2016, p. 57).

[22] Complaint, ¶14.

**App. 140**

**B.      Dr. Ferrell Inappropriately Rejects Rather Than Accepts as Assumptions Plaintiff's Factual Allegations**

20.    Rather than accepting as assumptions Plaintiff's factual allegations, as is appropriate for a forensic finance expert assessing loss causation and damages, Dr. Ferrell disputes Plaintiff's allegation that Defendants had made misrepresentations and omissions that misled the market. Specifically, Dr. Ferrell asserts, contrary to Plaintiff's allegations, that the alleged misrepresentations and omissions were actually truthful statements, fully informative, and not misleading. Rather than assessing the financial economic implications of the alleged misrepresentations and omissions, Dr. Ferrell steps outside the role of a finance expert and disputes that Defendants did in fact omit information that had the effect of concealing operating losses at Kearl, the fact that the Kearl reserves no longer legitimately qualified as proved reserves, and that the condition of the Rocky Mountain assets necessitated recognition of impairment.[23]

21.    Dr. Ferrell's adoption of Defendants' legal arguments as to facts and liability is the basis for his opinion that the 28 October 2016 and 31 January 2017 corrective disclosures constituted proper timely disclosure.[24] Weighing in on the case merits in this manner is outside the proper role of a forensic finance expert. Dr. Ferrell's disputing Plaintiff's factual allegations and claim of liability does not constitute valid criticism of my financial analysis, which determined loss causation and quantified damages based on assuming Plaintiff's allegations.

22.    Dr. Ferrell asserts that the corrective disclosure on 28 October 2016, which precipitated a statistically significant stock price decline, was not corrective of anything previously misrepresented or omitted. Dr. Ferrell incorrectly contends that there is "no reliable economic basis to establish" that the announcements on 28 October 2016 "regarding a potential de-booking of proved reserves and an asset impairment review have any connection to ExxonMobil's allegedly misleading disclosures concerning its year-end 2015 proved reserves and asset impairment review."[25] Dr. Ferrell opines that "any price

---

[23] Complaint, ¶14.

[24] Ferrell Rebuttal Report, ¶¶15.b, 15.d, 22-33, 44-51.

[25] Ferrell Rebuttal Report, ¶15.b.

**App. 141**

decline on October 28, 2016 cannot be linked to the alleged misrepresentations."[26] Dr. Ferrell repeatedly but incorrectly claims throughout his report that the 28 October 2016 and 31 January 2017 corrective disclosure events were actually proper timely disclosures.

23.    Dr. Ferrell overlooks the indisputable fundamental principle that an energy company's valuation and thus its stock price depend critically on the condition and value of its reserves and properties. I explained these principles in the Feinstein Report, and supported that they are generally accepted with excerpts from the finance literature.[27]

24.    Inherent in Dr. Ferrell's argument is the fundamental mistake that he rejects rather than accepts Plaintiff's theory of liability and the factual allegations that the Company concealed rather than revealed material information. As explained in the Feinstein Report, an economic analysis of loss causation assumes Plaintiff's factual allegations to be true and determines if the alleged misrepresentations, omissions, and corrective disclosures consequently affected the stock price.[28]

25.    The proper financial economic analysis is straightforward, but missing from the Ferrell Rebuttal Report. If a company possesses information about existing adverse conditions, which conditions impair the company's profitability and reserves, and conceals or misrepresents those facts, the market price of that company's securities will be artificially inflated. When the company subsequently reveals the truth about its condition and asset value, which allegedly had previously been fraudulently misrepresented, the misinformation is corrected, the artificial inflation dissipates, the stock price declines, and investors suffer losses. This scenario is what the Plaintiff alleges occurred in this case.

26.    Dr. Ferrell argues that because Exxon never explicitly admitted to having made misrepresentations and omissions, and never corrected its FY 2015 Form 10-K, that there could not have ever been misrepresentations or omissions that the identified corrective disclosures corrected. Dr. Ferrell erroneously opines:

---

[26] Ferrell Rebuttal Report, ¶15.b.

[27] Feinstein Report, ¶¶109-110.

[28] Feinstein Report, FN 2 (Assuming the factual allegations is a generally accepted practice in loss causation and damages analysis. *See, e.g.*, "In almost all cases, the damages expert proceeds on the hypothesis that the defendant committed the harmful act and that the act was unlawful" ("Reference Guide on Estimation of Economic Damages," by Mark Allen et al., *Reference Manual on Scientific Evidence*, 3rd Edition, 2011, p. 432)).

**App. 142**

> "Since the purported corrective disclosures, ExxonMobil has not restated any of its financial statements for 2015, has not retroactively de-booked its Kearl proved reserves as of year-end 2015, and has not retroactively recognized impairment charges on its RMDG assets as of year-end 2015, directly contradicting Plaintiff's claims that ExxonMobil's 2015 Form 10-K de-booking and impairment disclosures were revealed to be false and misleading by the alleged corrective disclosures."
> **Ferrell Rebuttal Report, ¶15.b.**

27.     Dr. Ferrell fails to appreciate that a disclosure need not be a mirror image retraction to be corrective of a prior misrepresentation. Similarly, it is my understanding that a corrective disclosure need not acknowledge guilt to be corrective of alleged misrepresentations and omissions.[29] Courts have acknowledged this fact grounded in generally accepted financial economic principles, according to which, investors continually update their understanding of a company's condition and valuation based on the arrival of all new relevant information, and the vehicle for the informative data can take a variety of forms. For example, the court in *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16-Civ.-6728 (CM)(RWL), 2019 WL 3001084 (S.D.N.Y. July 10, 2019), said a disclosure need not "take the form of a 'flashing neon light,' with an explicit message stating that it is intended to cure an earlier fraudulent statement, in order for it to qualify as corrective."[30] The court emphasized that "'[t]here is no requirement that the corrective disclosure take a particular form or be of a

---

[29] *See e.g.*, *Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254 (2d Cir. 2020); and "As Judge Holwell put it in Vivendi, although '[a] corrective disclosure is traditionally an admission by the company that one or more of its previous statements were false or misleading followed by a corrected, truthful and complete version of those statements[,] … the [disclosure] event need not take this form … to prove loss causation.'… It is precisely '[b]ecause corporate wrongdoers rarely admit that they committed fraud' that 'the 'relevant truth' required under *Dura* is not that a fraud was committed per se, but that the 'truth' about the company's underlying condition, when revealed, causes the 'economic loss.'" ("Loss Causation on Trial in Rule 10B-5 Litigation a Decade After Dura," by Matthew Mustokoff and Margaret Mazzeo, *Rutgers University Law Review*, Vol. 70:175, 2017, pp. 196-197 (internal citations omitted).

[30] *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16-Civ.-6728 (CM)(RWL), 2019 WL 3001084 at *14 (S.D.N.Y. July 10, 2019) (citation omitted).

**App. 143**

particular quality,' such that it be a 'mirror image tantamount to a confession of fraud.'"[31] Other courts have reached similar conclusions, consistent with economic principles.[32]

28.  Dr. Ferrell's emphasis on the form of the disclosures rather than the message conveyed produces his erroneous opinion that no relevant disclosures were previously possible, and that the stock price declines elicited by the corrective disclosures were not the dissipation of artificial inflation. According to financial economic principles, a corrective disclosure need not be a mirror image of the alleged misrepresentations or omissions to reveal to investors the truth that was concealed by the alleged misrepresentations and omissions. That this principle was operative in this case is confirmed by analysts' reactions to Company disclosures, where I observed that investors did not require a mirror-image disclosure or an admission of guilt to conclude that this was new material information related to the same issues surrounding its prior 2015 year-end statements.[33] The stock price

---

[31] *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16-Civ.-6728 (CM)(RWL), 2019 WL 3001084 (S.D.N.Y. July 10, 2019) (citation omitted).

[32] *See, e.g.*, *Larry Freudenberg v. E\*Trade Financial Corporation*, No. 07 Civ. 8538, United States District Court Southern District of New York, Opinion, filed 11 May 2010; *In re Harman International Industries, Inc. Securities Litigation*, No. 14–7017, United States Court of Appeals District of Columbia, Opinion, filed 23 June 2015; *In re Vale S.A. Securities Litigation*, United States District Court Southern District of New York, Opinion and Order, No. 1:15-cv-9539-GHW, signed 23 March 2017; *Massachusetts Retirement Systems v. CVS Caremark Corporation*, United States Court of Appeals First Circuit, Opinion, No. 12-1900, filed 24 May 2013; *Public Employees' Retirement System of Mississippi v. Amedisys, Inc.*, United States Court of Appeals Fifth Circuit, Opinion, No. 13-30580, filed 2 October 2014; *Pieter Van Dongen v. CNinsure Inc.*, United States District Court Southern District of New York, Decision and Order, No. 11 Civ. 7320(VM), filed 24 June 2013; and *Sheet Metal Workers Local 32 Pension Fund v. Terex Corporation*, United States District Court District of Connecticut, Ruling and Order, No. 3:09-CV-2083(RNC), signed 31 March 2018.

[33] *See, e.g.*, "3Q EPS Beats on R&M Asset Sale Gain But Cash Flow and Production Below Expectations," by William Featherston et al., UBS, analyst report, 28 October 2016, p. 3 ("While it performed a similar analysis in 2015, it took no writedowns despite the precipitous YoY decline in oil prices, raising questions over its evaluation process which (as XOM acknowledged in its statement) is highly subject to management discretion."); "Messy 4Q, Waiting on Reserves and Analyst Day," by Phil Gresh et al., J.P. Morgan, analyst report, 31 January 2017, p. 1 ("The company took a long-awaited asset impairment in 4Q (~$2.0B) in domestic upstream."); "Gold Standard: Initiating With Market Perform and $78 Target Price," by Brendan Warn and Nikolas Stefanou, BMO Capital Markets, analyst report, 1 December 2016, p. 25 ("As the booking / de-booking of reserves is subject to historical oil prices, the investor community is more interested in the likelihood and magnitude of an impairment, or, in the case of Exxon, the lack thereof."); "Exxon Reports Q3 Results, but Reserve Reporting Becomes the Focal Point," by Allen Good, Morningstar, analyst report, 31 October 2016, p. 1 ("Of greater interest was Exxon's attempt to address the growing controversy surrounding its reserve reporting and lack of asset impairments. The company has come under scrutiny by the SEC and others for its lack of asset impairments during the current cycle despite the sustained decline in oil prices and billions of impairments recorded by peers."); and "Impairments Imminent," by Jason Gammel and Marc Kofler, Jefferies, analyst report, 31 October 2016, p. 1 ("XOM is currently being investigated by the SEC on its accounting for impairments in its oil and gas operations; XOM is unique in not having recognized any impairments during the oil price downturn.").

**App. 144**

fell as investors learned from later Company announcements what the alleged misrepresentations and omissions had obscured. The disclosure announcements and surrounding particulars would not have been surprising and thus would not have caused further loss if the truth that was concealed by the alleged misrepresentations and omissions had been previously disclosed. That is, but for the alleged misrepresentations and omissions, Exxon's stock price would have been lower throughout the entire Class Period, and thus would not have declined as it did on 28 October 2016 and 31 January 2017.

### C.    Analysis of the 28 October 2016 Corrective Disclosure

#### 1.    My Analysis of the 28 October 2016 Corrective Disclosure Presented in the Feinstein Report Is Correct and Complete

29.    As explained in the Feinstein Report, I tested and determined that the residual return (the portion of the stock price movement that is not caused by market and industry sector effects) on 28 October 2016, an identified corrective disclosure event date, was statistically significant.[34] This finding indicates that Company-specific information caused the $2.43 per share residual price decline in Exxon stock that occurred that day.

30.    I examined and considered all information released between the close of trading on 27 October 2016 and the close on 28 October 2016 to identify if there was any valuation-relevant confounding Company-specific information that may have contributed to the 28 October 2016 residual return, besides the Company's announcements made on 28 October 2016. There was no such information outside the Company's announcements.

31.    I then performed a comprehensive review of the Company's 28 October 2016 announcements to evaluate the relationship of each component to the alleged misrepresentations and omissions. The purpose of this analysis was to determine which information in the Company's announcements constituted corrective disclosure and which did not.[35] I evaluated the price impact of the information that was unrelated to the allegations and thus not corrective. I measured and excluded from my computation of

---

[34] Feinstein Report, ¶153.

[35] Feinstein Report, §VII.B.2.

**App. 145**

inflation and damages a conservative (conservatively high) estimate of the price impact of the information that was not corrective of the alleged misrepresentations and omissions.[36]

32.    In the Feinstein Report, I explained that based on i) the nature of the information disclosed on 28 October 2016, ii) financial valuation principles, iii) analyst and media commentary, iv) the fact that reported Q3 2016 EPS was above consensus estimates, v) the fact that the subsequent consensus forecast of FY 2016 EPS increased despite any temporary disappointing items affecting the Company's reported Q3 2016 EPS, and vi) the fact that factors adversely affecting Q3 2016 EPS were non-recurring, I concluded that virtually all of the price decline on 28 October 2016 is attributable to the allegation-related corrective disclosures.[37]

33.    This analysis also determined that the non-allegation information disclosed simultaneously with the corrective disclosures in the Company's announcements on 28 October 2016 most likely had no net negative effect on the stock price. To be conservative, however, I acknowledged that it is possible that the non-recurring $0.04 miss in adjusted Q3 2016 EPS, even though the market expected this shortfall to be more than made up in the following quarter, could have had a negative $0.04 impact on the stock price when announced.[38] Thus, I concluded that corrective disclosure caused $2.39 of the $2.43 per share residual price decline in Exxon stock on 28 October 2016.

### 2.    Dr. Ferrell Takes Issue with My Treatment of Confounding Information and Attribution Analysis

34.    Dr. Ferrell takes issue with my treatment of confounding information in the 28 October 2016 Company announcements.[39] Dr. Ferrell argues that analysts highlighted "negative developments at the company that had nothing to do with the potential de-booking and impairment analysis, including Q3 2016 EPS and profits that fell short of analyst expectations after accounting for one-time gains, and lower production."[40]

---

[36] Feinstein Report, ¶162.

[37] Feinstein Report, ¶162.

[38] Feinstein Report, ¶162.

[39] Ferrell Rebuttal Report, §VII.

[40] Ferrell Rebuttal Report, ¶40.

**App. 146**

35.   Dr. Ferrell is wrong. Analysts may have mentioned a variety of items, but their primary focus was generally on the corrective disclosure portions of the Company announcement. That is, analysts focused on the Company disclosures that it would likely have to de-book 3.6 billion barrels of bitumen at Kearl and that it would perform an assessment of its major long-lived assets for potential impairment, including natural gas assets in North America. News articles too, largely focused on these corrective disclosure portions of the earnings announcement. These allegation-related disclosures were the major news in the Company's announcement.[41] Moreover, my analysis establishes that the other items Dr. Ferrell identifies had only a minor impact on reported quarterly earnings and no adverse impact on expected earnings for the entire year.

36.   Dr. Ferrell incorrectly contends that the price decline on 28 October 2016 can be explained by the other elements of the Company's announcement, in particular, political developments that disrupted the Company's operations in Nigeria. I determined that the news about Nigeria and other mentioned developments had little effect on Exxon's stock price, if any. The fact that the market's consensus estimate for FY 2016 earnings for Exxon rose after the 28 October 2016 announcement indicates that the situation in Nigeria, together with other minor items mentioned, were on net already known or expected, and therefore already accounted for in the market's earnings forecast and the valuation of Exxon stock, or that these items were nonrecurring such that they would have a *de minimis* impact on the stock price.

37.   Dr. Ferrell responds by attempting to discredit the Institutional Brokers' Estimate System (widely known in the finance industry as "I/B/E/S") consensus earnings estimates, despite the fact that I/B/E/S is the generally accepted and widely used industry standard source for measuring the market's consensus earnings estimates.

---

[41] Feinstein Report, §V.C.8. and §VII.B.2.

**App. 147**

**a.**   **Dr. Ferrell Eschews the Widely Used and Generally Accepted Source of Consensus Estimates in Favor of an Inferior Alternative and a Faulty Measure of His Own Invention**

38.   Dr. Ferrell opines that the news about Nigeria and other non-allegation-related items in the 28 October 2016 Company announcement were surprising negative news, and would have a previously unaccounted for recurring impact on Exxon's earnings and valuation. As such, Dr. Ferrell argues that these other items mentioned in the Company's earnings announcement should have a multiplied impact on Exxon's stock price, rather than a one-time impact equal to their net impact on currently reported income. But to support his opinion, Dr. Ferrell had to reject I/B/E/S as a reliable source of consensus earnings forecasts.

39.   As explained in the Feinstein Report, to gauge whether the factors affecting earnings disclosed in the 28 October 2016 earnings announcement were recurring or non-recurring, I obtained I/B/E/S consensus estimates from *LSEG Workspace* (I/B/E/S is owned by LSEG Workspace).[42] As documented below, I/B/E/S is a reliable data source for consensus estimates and is highly regarded and widely used by academic researchers and investment professionals. In fact, Dr. Ferrell himself has routinely used I/B/E/S in his academic research.[43]

40.   I compared the consensus estimate for FY 2016 EPS prior to the Company's Q3 2016 earnings announcement ($2.19 per share)[44] to the consensus estimate for FY 2016 EPS after the announcement ($2.23 per share).[45] I noted that the consensus estimate for FY 2016 EPS increased following the 28 October 2016 Q3 earnings announcement, despite Q3 2016 EPS being lower than expected after removing the impact of an asset sale. This increase in forecasted earnings indicates that the items that might have weighed down the Company's

---

[42] Feinstein Report, ¶157.

[43] "Forward-casting 10b-5 Damages: A Comparison to Other Methods," by Allen Ferrell and Atanu Saha, *The Journal of Corporation Law*, 2012, Vol. 37, No. 2, p. 378; "Thirty Years of Shareholder Rights and Stock Returns," by Allen Ferrell and Martijn Cremers, *AFA 2013 San Diego Meeting Paper*, 12 March 2012, p. 18; and "Corporate Litigation, Governance, and the Role of Law Firms," by Allen Ferrell et al., *European Corporate Governance Institute - Law Working Paper*, No. 607, 4 October 2021, p. 12.

[44] Feinstein Report, ¶157; Consensus estimates as of 25 October 2016, obtained from *LSEG Workspace*.

[45] Feinstein Report, ¶157; Consensus estimates as of 8 November 2016, obtained from *LSEG Workspace*.

14

**App. 148**

reported Q3 2016 EPS were compensated for by positive effects and in the aggregate were non-recurring.

41. Dr. Ferrell speculates that the increase in the I/B/E/S consensus forecast for FY 2016 EPS after the 28 October 2016 announcement may have been due to the number of contributing analysts falling from 25 prior on 25 October 2016 to 15 contributing analysts on 8 November 2016.[46] That is, without any proof, Dr. Ferrell conjectures that the change in the number of analysts included in the I/B/E/S consensus following the Company's Q3 2016 earnings announcement may be why the I/B/E/S consensus FY 2016 EPS estimate increased.[47] Of note, Dr. Ferrell does not dispute that the I/B/E/S consensus earnings estimate did increase. Rather, he contends that the increase in the consensus earnings forecast may be an unreliable spurious result – an error undetected by the industry standard provider of such data or anybody else but himself.[48]

42. Dr. Ferrell's speculation challenging the validity of the I/B/E/S consensus estimates fails for several reasons, in addition to the fact that I/B/E/S is a well-regarded source for reliable consensus earnings estimates while Dr. Ferrell is not. According to LSEG, there are many reasons why an analyst's estimate would be excluded from the consensus, including that an: (i) "Estimate has not been updated (revised/ confirmed) within 3 business days of the company issued guidance;" (ii) "Estimate for the subsequent quarters/ annual of a fiscal year has not been updated (revised/ confirmed) within 5 business days of the recent earnings results of that fiscal year;" (iii) "Estimates within a fiscal year is partially unrevised (quarterly estimate not revised on revising annual estimate or vice-versa);" and (iv) "Estimate has not been updated for 180 days."[49] As explained above, if an analyst does not confirm or update their estimate following an earnings announcement, that analyst's estimate is considered stale and excluded from consensus. Therefore, the included estimates after an earnings announcement are all freshly revised to reflect newly disclosed

---

[46] Ferrell Rebuttal Report, ¶36.

[47] Ferrell Rebuttal Report, ¶15.c.

[48] Ferrell Rebuttal Report, ¶15.c.

[49] "What are the rules for excluding analysts from the consensus estimates?" LSEG FAQ.

**App. 149**

information. This safeguard ensures the reliability of I/B/E/S consensus estimates, especially for the purpose used here in my analysis.

43. Notably, according to I/B/E/S, on 23 November 2016, when the number of contributing analysts increased to 20, the consensus EPS estimate for FY 2016 was $2.23 per share, the same consensus estimate that prevailed when the I/B/E/S consensus estimate comprised 15 analysts right after the 28 October 2016 announcement. Thus, Dr. Ferrell's speculation that the observed increased in the consensus estimate was a spurious result caused by the number of contributing analysts, rather than an accurate result reflecting analysts updating their estimates based on the Company's announcement on 28 October 2016, is demonstrably wrong.

44. Dismissing the I/B/E/S estimates that undercut his attack, Dr. Ferrell obtains consensus estimates from an alternative source, FactSet, and he also constructs his own consensus estimates using a methodology of his own devising. But this maneuvering is unavailing for Dr. Ferrell. The FactSet consensus estimates and Dr. Ferrell's own consensus estimates are not more reliable than those from I/B/E/S. In fact, they are inferior.

45. With his alternative numbers, Dr. Ferrell purportedly shows that the consensus estimate of Exxon's FY 2016 EPS declined following the Q3 earnings announcement. However, Dr. Ferrell fails to recognize or mention the deficiencies in FactSet's consensus estimates, which make them unreliable for this application. FactSet's methodology is to manually extract forecasts from analyst reports, rather than requiring analysts to submit estimates as I/B/E/S does. Not only are FactSet's constituent components not screened as rigorously as are the I/B/E/S constituent submissions, but FactSet's methodology allows inclusion of stale estimates. The academic literature warns that FactSet's methodology for extracting estimates increases the "risk that FactSet employees may misinterpret analysts' PDFs and/or incorrectly enter the data they contain."[50]

46. I/B/E/S is recognized to be the most commonly used forecast data provider. For example, Larocque et al. (2023) explain that they "focus on I/B/E/S as a representative FDP [Forecast Data Provider] as it is the most commonly used FDP in academic research, as well as the

---

[50] "Explaining Firms' Earnings Announcement Stock Returns Using FactSet and I/B/E/S Data Feeds," by John Hand et al., *Review of Accounting Studies*, Vol. 27, No. 4, 23 March 2021, FN 4.

**App. 150**

FDP with the broadest coverage throughout our sample period."[51] As the following quotes attest, I/B/E/S estimates are highly regarded and used more frequently in academic research than any other consensus forecasting data service.

> "Academic researchers often rely on I/B/E/S for consensus forecasts and street earnings; for example, an I/B/E/S Research Bibliography of research about analysts and earnings cites 575 published papers, many of which use I/B/E/S data (I/B/E/S [2000]). Some research, including Mikhail, Walther, and Willis [1997], uses Zacks data, while other research, such as Cheng, Hodder, and Watkins [2021] and Hand et al. [2022], uses FactSet."
> **"Consensus? An Examination of Differences in Earnings Information Across Forecast Data Providers," by Stephannie Larocque et al., *SSRN*, December 2023, FN 5.**

> "Researchers typically obtain analyst earnings forecasts from I/B/E/S because this database is readily available and considered a superior source of data (Bradshaw 2011; Ramnath et al. 2005; Brown et al. 1987b). … Researchers rely on I/B/E/S for consensus earnings forecasts in a variety of research contexts, including studies of earnings surprises (e.g., Landsman et al. 2012), meeting-or-beating the market's earnings expectations (e.g., Reichelt and Wang 2010), estimating the cost of capital (e.g., Dhaliwal et al. 2016), and measuring the news in management's earnings guidance (e.g., Yang 2012)."
> **"Analysts' Annual Earnings Forecasts and Changes to the I/B/E/S Database," by Andrew Call et al., *Review of Accounting Studies*, Vol. 26, No. 1, 16 September 2020, pp. 2 and 27.**

> "As one of the earliest sources of analyst data made publicly available, I/B/E/S (originally, Institutional Brokers Estimate System) is the data source for much of the research on analysts' forecasts."
> **"Security Analyst Independence," by Jennifer Francis et al., *Research Foundation of CFA Institute*, 1 August 2004, p. 18.**

47.  Larocque et al. (2023) found that "*ceteris paribus*, **the average value-relevance of the FactSet earnings surprise is significantly lower than that of I/B/E/S, even after controlling for differences in FDP-firm-quarter characteristics**."[52] This finding supports

---

[51] "Consensus? An Examination of Differences in Earnings Information Across Forecast Data Providers," by Stephannie Larocque et al., *SSRN*, December 2023, p. 4.

[52] "Consensus? An Examination of Differences in Earnings Information Across Forecast Data Providers," by Stephannie Larocque et al., *SSRN*, December 2023, FN 7 (emphasis added).

**App. 151**

the I/B/E/S numbers as being the more appropriate source for measuring changes in earnings forecasts that affect stock valuation.

48. Dr. Ferrell also constructs his own measure of the market's consensus estimate for FY 2016 EPS, which purportedly shows that analysts on average decreased their earnings estimates following Exxon's Q3 2016 earnings announcement. Dr. Ferrell explains that based on a review of all of the analyst reports available to him, "the average and median EPS estimate by individual analysts declined in response to ExxonMobil's 3Q 2016 earnings announcement, directly contradicting Dr. Feinstein's claim that EPS estimates increased in FY 2016."[53] However, that Dr. Ferrell's measure of consensus estimate is fatally flawed and unreliable is evident in how it deviates substantially from both the I/B/E/S measure and the FactSet measure, both after and before the 28 October 2016 Company announcement. Dr. Ferrell's own measure of earnings forecasts is out of step with the FactSet measure, which he claims is reliable, and also with the I/B/E/S measure during the timeframe preceding when Dr. Ferrell contends there was any problem with I/B/E/S estimates.

49. Prior to 28 October 2016, Dr. Ferrell's own concocted FY 2016 EPS consensus estimate was $2.28 per share,[54] which was $0.09 per share greater than the $2.19 per share consensus reported by *both* I/B/E/S and FactSet.[55] Dr. Ferrell offers no explanation for this large difference.

50. Similarly, after the 28 October 2016 earnings announcement, Dr. Ferrell's concocted measure of the market's consensus estimate for FY 2016 EPS was $2.27 per share,[56] which was again higher than both the I/B/E/S and FactSet measures for that period. Dr. Ferrell's consensus forecast number ($2.27 per share) was $0.04 per share higher than the $2.23 per share consensus forecast provided by I/B/E/S, and $0.08 per share greater than the FactSet forecast figure of $2.19 per share.[57] These divergences, large by the standards of per share

---

[53] Ferrell Rebuttal Report, ¶38.

[54] Ferrell Rebuttal Report, Exhibit D.

[55] Ferrell Rebuttal Report, Exhibit C; and Feinstein Report, ¶157.

[56] Ferrell Rebuttal Report, Exhibit D.

[57] Ferrell Rebuttal Report, Exhibit C; and Feinstein Report, ¶157.

**App. 152**

earnings changes and surprises, expose Dr. Ferrell's concocted methodology and forecast figures as unreliable.

51. Dr. Ferrell offers no explanation for the wide divergence between his concocted consensus estimates and the consensus estimates published by data providers. The obvious explanation, however, is that Dr. Ferrell's alternative consensus forecast figures are wrong. His incorrect alternative earnings forecast figures are the foundation of his criticism of my valuation of the confounding information in the 28 October 2016 earnings announcement. His numbers are wrong, and his criticism is equally erroneous.

52. It is noteworthy that even if one were to use the FactSet consensus figures, the change from before the 28 October 2016 earnings announcement to afterward is less than one cent per share. In fact, rounding to the penny, there was no change, as the before and after consensus forecasts were both $2.19 per share. In Dr. Ferrell's Exhibit-C, he presents a zero for the computed change in FactSet's consensus forecasts. In the backup to that exhibit, he shows a decline of $0.003 per share, far less than one cent. That the FactSet consensus forecasts show virtually no change, this source too supports my analysis and conclusion that the various confounding items mentioned in the 28 October 2016 earnings announcement had no material recurring effect.

### b. To No Avail, Dr. Ferrell Turns to Longer-Term Forecasts

53. Dr. Ferrell argues that "[t]o the extent the EPS change was recurring, one would have to account for the impact of the confounding information on the present value of future cash flows and cannot merely use a one-quarter change as Dr. Feinstein has."[58] That is, Dr. Ferrell points out that if the confounding factors were expected to have a recurring impact on earnings, their valuation impact would be a multiple of their recurring impact on earnings. But, this multiplication would require proof that the items were on net recurring and had a lasting impact on expected future earnings, which is false in the present case.

54. The premise of Dr. Ferrell's criticism (that consensus FY 2016 EPS declined following the Company's Q3 2016 earnings announcement) is unfounded. As shown above, using the industry standard for consensus estimates the market's forecast for Exxon's FY 2016 EPS

---

[58] Ferrell Rebuttal Report, ¶39.

**App. 153**

clearly increased following the Company Q3 2016 earnings announcement. It did not decrease.

55.    Attempting to move attention and price reaction attribution off of the corrective disclosures in the 28 October 2016 earnings announcement and onto the various other topics mentioned in the announcement, which by my accounting had no or negligible price impact, Dr. Ferrell shifts his focus from the FY 2016 estimated earnings to the longer-term FY 2017 earnings forecasts.[59] This pivot does not help his case.

56.    According to I/B/E/S, prior to the Company's Q3 2016 earnings announcement, the market's consensus forecast for FY 2017 EPS was $4.32 per share.[60] Following the earnings announcement, the consensus FY 2017 EPS estimate *increased* to $4.36 per share.[61] The fact that consensus FY 2017 EPS increased following the 28 October 2016 Q3 earnings announcement, indisputably establishes that the items that marginally weighed down the Company's reported Q3 2016 EPS were non-recurring.

57.    Even if one were to accept the premise of Dr. Ferrell's argument, that the confounding items in the earnings announcement had recurring effects, his purported valuation analysis based on that assumption and using the FactSet consensus forecasts for the longer-term FY 2017 produces obviously unreliable results.

58.    Using the inferior FactSet FY 2017 EPS consensus estimate, Dr. Ferrell purportedly computes that the valuation impact of the non-allegation-related negative earnings news ranged between $1.14 per share and $5.93 per share.[62] The lack of precision in the broad width of Dr. Ferrell's valuation range, and its incomparability to the reality of prior Exxon

---

[59] Ferrell Rebuttal Report, ¶39.

[60] Consensus estimates as of 25 October 2016, obtained from *LSEG Workspace*.

[61] Consensus estimates as of 8 November 2016, obtained from *LSEG Workspace*.

[62] Ferrell Rebuttal Report, ¶39; "To illustrate the potential magnitude of the impact of the confounding information, I use the change in EPS estimate for FY 2017 – i.e., the first full year after the October 28, 2016 disclosure – and the price-to-earnings ratio on October 25, 2016 – i.e., prior to the alleged corrective disclosure. On October 25, 2016, ExxonMobil's price to earnings ratio was 19.95x based on the average FY 2017 estimate and 20.45x based on the median FY 2017 estimate reported in Exhibit C.55 Thus, a $0.06 decline in the average FY 2017 EPS estimates implies a $1.14 reduction in price (i.e., $0.06 multiplied by 19.95x) and a $0.29 decline in the median FY 2017 EPS estimate implies a $5.93 reduction in price (i.e., $0.29 multiplied by 20.45x)."

**App. 154**

stock price movements, demonstrates the unreliability of his method and results. For example, the top end of the range is:

i.    5.2 times larger than the lower end of the range;

ii.   2.4 times greater than the total residual price decline on 28 October 2016, a portion of which his analysis is intended to explain; and

iii.  1.9 times more negative than the ***largest observed one-day stock price decline that ever occurred during the Class Period***.

59.   In sum, according to I/B/E/S the FY 2017 EPS increased following the 28 October 2016 Q3 earnings announcement, this establishes that the items that marginally weighed down the Company's reported Q3 2016 EPS were non-recurring. Dr. Ferrell relies on inferior estimates and his valuation analysis produces obviously unreliable results.

### c.    I Appropriately Considered the News About Developments in Nigeria

60.   Dr. Ferrell contends that the Company's update about conditions in Nigeria was new news in the 28 October 2016 earnings announcement, and this new news was responsible for a large amount of Exxon's stock price decline that occurred that day.[63]

61.   Dr. Ferrell is wrong. First, as explained in the Feinstein Report, the disruptions in Nigeria were not new news.[64] During the Company's Q2 2016 earnings conference call, Exxon noted that it had declared a force majeure in early July 2016 (which was after the start of Q3) based on its investigation of disruptions in Nigeria.[65] Moreover, analysts acknowledged that the incidents in Nigeria were previously well publicized and deterioration of the situation was expected. In the Feinstein Report,[66] I cited analyst reports from July 2016 that noted that "Nigeria oil volumes fell short due to well publicized

---

[63] Ferrell Rebuttal Report, ¶41.

[64] Feinstein Report, ¶159.

[65] "Q2 2016 Exxon Mobil Corp Earnings Call," *Thomson Reuters*, conference call transcript, 29 July 2016 9:30 ET, p. 11.

[66] Feinstein Report, ¶159.

**App. 155**

incidents."[67] Similarly, Barclays reported in May 2016 that supply considerations include "ongoing pipeline outage issues in Nigeria."[68] In August 2016 Barclays noted that "Both Nigeria and Venezuela seem unlikely to surprise the market to the upside, as ***adverse domestic conditions will likely continue to deteriorate before they begin to improve.***"[69]

62.   In the Feinstein Report, I also noted that the issues in Nigeria impacted Exxon's peers as well, and thus to the extent there was any change in the conditions, these changes would be an industry sector effect that was captured by the industry sector variable in the regression analysis.[70] Specifically, two of Exxon's industry peers, Chevron and Total S.A., reported similar production disruptions in Nigeria. On the same day that Exxon reported its Q3 2016 earnings, Chevron announced its Q3 2016 earnings stating that:

> "Production increases from major capital projects, shale and tight properties, and base business in multiple areas were largely offset by normal field declines, a major planned turnaround at Tengizchevroil, the effects of civil unrest in Nigeria, and production entitlement effects in several locations."
>
> **"Chevron Reports Third Quarter Net Income of $1.3 Billion,"** ***Platts Commodity News,*** **Company press release, 28 October 2016.**

---

[67] "A Disrupted Print (Nigeria/Canada). CFFO of $6.5bn vs CS at $7.5bn," by Edward Westlake et al., Credit Suisse, analyst report, 29 July 2016, p. 1.

[68] "Upstream Posts Rare Loss: Integrated Model to the Rescue," by Paul Cheng et al., Barclays, analyst report, 2 May 2016, p. 4.

[69] "2Q Miss on Int. Gas Prices, One-Offs," by Paul Cheng et al., Barclays, analyst report, 1 August 2016, p. 3.

[70] Feinstein Report, ¶159.

22

63.     Nigeria was also discussed during Chevron's earnings conference call when an analyst asked the company about Nigeria:

> "Just a quick one about Nigeria. You mentioned losing 28,000 a day in Q3. What kind of recovery have you seen on your Nigerian assets so far this quarter and what is embedded in the exit rate guidance that you gave for the year?"
>
> "[Chevron's CFO Pat Yarrington]: Well, I think we have two factors going on. We have had some instances of sabotage as we have talked about. We had a more recent one here in the last couple of days. So that is obviously a detriment that is impacting Nigerian production."
> **"Q3 2016 Chevron Corp Earnings Call," *Thomson Reuters*, conference call transcript, 28 October 2016, 11:00 AM ET, p. 18.**

64.     Similarly, Total S.A. also announced production issues attributable to Nigeria:

> "On Nigeria, the security condition impacting production are mainly related to periodical shutdown on the onshore pipeline due to illegal connection and bunkering. The impact for this quarter was about 30,000 barrels per day. I have to say that the offshore facilities are not impacted. Very frankly speaking, I don't have any perspective to see and to know what's going to happen next quarter. It seems that the situation is improving. But, that's it. It's just a feeling, and I will not beat on that."
> **"Q3 2016 Total SA Earnings Call," *Thomson Reuters*, conference call transcript, 28 October 2016, 8:00 AM ET, p. 5.**

65.     Of note, as discussed below, Dr. Ferrell tries to exclude Total S.A. from the regression model industry index, which would spuriously move some of that common industry effect to an unexplained component of Exxon's residual return. The industry index I used includes Total S.A. as a constituent, and therefore appropriately captures and controls for common industry developments affecting both companies, such as conditions in Nigeria.

23

**App. 157**

66.     The disruptions in Nigeria were also reported on by the U.S. Energy Information Administration ("EIA") in August 2016.[71] In the Ferrell Rebuttal Report, Dr. Ferrell relied on information from the EIA.[72] According to an EIA report in August 2016:

> "Crude oil production disruptions in Nigeria reached 750,000 barrels per day (b/d) in May 2016, the highest level since at least January 2009. The increased disruptions come as militants continue to focus attacks on oil and natural gas infrastructure in the West African region. Nigeria is a member of the Organization of the Petroleum Exporting Countries (OPEC) and was Africa's largest oil producer until Angola's oil production surpassed Nigeria's earlier this year.
>
> Nigeria's crude oil production disruptions are concentrated in the Niger Delta region, an oil-rich area bordering the Gulf of Guinea that is the mainstay of the country's crude oil production. Since the beginning of 2016, the Niger Delta Avengers (NDA) have conducted many attacks on oil and natural gas infrastructure throughout the region. Although not the only militant group conducting attacks in the region, the NDA is currently the most active."
> **"Crude Oil Disruptions in Nigeria Increase as a Result of Militant Attacks," by Melanie Berkey, EIA Report, 18 August 2016.**

---

[71] "Crude Oil Disruptions in Nigeria Increase as a Result of Militant Attacks," by Melanie Berkey, EIA Report, 18 August 2016 (available at https://www.eia.gov/todayinenergy/detail.php?id=27572#, last accessed on 7 January 2025).

[72] *See, e.g.*, Ferrell Rebuttal Report, ¶15.

**App. 158**

67.     The EIA report contained the following graphic:[73]



**Nigeria crude oil production and disruptions (Jan 2012 - May 2016)**

**Source:** U.S. Energy Information Administration, *Short-Term Energy Outlook*, August 2016

68.     The production issues in Nigeria were reported on prior to and during Q3 2016 and were already well known to the market. Production issues in Nigeria were also disclosed by Exxon's industry peers on 28 October 2016, the effect of which, if any, was appropriately removed from the Company's residual return by the regression analysis. Production issues in Nigeria were reported on by the EIA in August 2016, which is during Q3 2016 and thus allowed investors and analysts to incorporate this news in their prior expectations for Q3 2016 results before the Q3 2016 earnings announcement. Clearly, this information was widely reported on and priced into Exxon's stock prior to 28 October 2016.

69.     To the extent that the market learned some new incremental information about oil production in Nigeria from Exxon or its industry peers on 28 October 2016, this industry information would have been captured by movements in the industry index and removed from Exxon's residual return that day. Moreover, the Company's update on Nigeria, together with other potentially confounding news, elicited no decline in short- or long-term forecasts for Exxon's earnings.[74] Therefore, conditions in Nigeria were not responsible for any portion of the 28 October 2016 residual price decline.

---

[73] "Crude Oil Disruptions in Nigeria Increase as a Result of Militant Attacks," by Melanie Berkey, EIA Report, 18 August 2016 (available at https://www.eia.gov/todayinenergy/detail.php?id=27572#, last accessed on 7 January 2025).

[74] Feinstein Report, ¶162.

**App. 159**

70. As shown above and in the Feinstein Report, it was the allegation-related information that reasonably caused all of the stock price decline on 28 October 2016. To be conservative, however, I attributed $0.04 per share of the residual price decline on 28 October 2016 to confounding factors, this offset is the total amount of the impact these factors had on the reported current quarter's net income. Dr. Ferrell did not and cannot identify confounding information that contributed more than $0.04 per share to the residual stock price decline on 28 October 2016.

**D.      Analysis of the 31 January 2017 Corrective Disclosure**

**1.      My Analysis of the 31 January 2017 Corrective Disclosure Presented in the Feinstein Report Is Correct and Complete**

71. The Company announced Q4 2016 and FY 2016 earnings on 31 January 2017. The earnings announcement comprised corrective disclosures, as described in the Feinstein Report.[75]

72. As explained in the Feinstein Report, I tested and determined that the residual return (the portion of the stock price movement that is not caused by market and industry sector effects) on 31 January 2017 was statistically significant.[76] I therefore concluded that Company-specific information caused the $1.23 per share residual price decline in Exxon stock that occurred that day.

73. I examined and considered all information released between the close of trading on 30 January 2017 and the close on 31 January 2017 to identify if there was any valuation-relevant confounding Company-specific information that may have contributed to the 31 January 2017 residual return, aside from the contents of the Company's earnings announcement. There was none.[77]

---

[75] Feinstein Report, ¶¶121-122.

[76] Feinstein Report, ¶¶163-166.

[77] Feinstein Report, ¶¶164-165.

**App. 160**

74.  I then performed a comprehensive examination of the Company's earnings announcement to evaluate the relationship of each component to the alleged misrepresentations and omissions. The purpose of this analysis was to determine which information in the Company's earnings announcements constituted corrective disclosure and which did not.[78]

75.  I then evaluated the price impact of the information that was unrelated to the allegations and thus not corrective. I measured and excluded from my computation of inflation and damages the price impact of the information that was not corrective of the alleged misrepresentations and omissions.

76.  While I did not identify any *public*, negative, confounding information that contributed to the 31 January 2017 residual stock price decline, I noted that an internal document produced in connection with this litigation apportions the announced $2.0 billion impairment charge across seven different assets, three of which were not RMDG assets. This portion of the announced impairment charge is not fraud-related, and the impact of this portion on Exxon's stock price does not represent loss attributable to the alleged fraud.[79]

77.  Plaintiff's counsel informed me that Plaintiff is not alleging that one of the four RMDG assets, Green River, was impaired at the start of the Class Period. Thus, only the recognized impairment for the other three RMDG assets constituted corrective disclosure related to the alleged fraud. While the Company publicly informed investors that the $2.0 billion asset impairment charge was "largely related to dry gas operations in the Rocky Mountains region," I excluded the portion of the impairment charge assigned in the internal Company document to non-allegation related assets.[80] I concluded that allegation related assets accounted for 85.9% of the total impairment (both on a before and after-tax basis). I therefore conclude that the corrective disclosure on 31 January 2017 caused 85.9% of the Exxon stock residual price decline that day, which amounts to $1.05 of the $1.23 residual per share price decline.[81]

---

[78] Feinstein Report, §VII.B.3.

[79] Feinstein Report, ¶165.

[80] Feinstein Report, ¶165.

[81] Feinstein Report, ¶¶165-166.

**App. 161**

78.    Dr. Ferrell levies three criticisms on my analysis of the 31 January 2017 corrective disclosure. Specifically, Dr. Ferrell contends that: (i) I used an inferior industry sector index in the event study regression model; (ii) I did not demonstrate that the 31 January 2017 residual stock price movement was caused by the fraud-related disclosures; and (iii) I did not attempt "to disaggregate alleged fraud-related and non-fraud-related stock price movements on that date."[82]

### 2.    My Industry Index Selection Is Appropriate and Was Selected Using the Selection Methodology I Regularly Employ

79.    One step in conducting an event study is to control for the effects of market-wide and industry news on the company's stock price, so that one can isolate the effect of company-specific news. The generally accepted and widely used method for doing this is to run a regression, which is a statistical analysis that measures the relationship between the company's stock price movements on the one hand and movements in a stock market index and an industry sector index on the other. Once measured, the confounding effects of market-wide and industry news can be removed, isolating the stock price reaction to company-specific news only. For this analysis, it is necessary to identify an industry index that reflects news in the company's industry sector.

80.    To control for industry sector factors, I constructed the Sector Index using the same collection of companies that Exxon identified as its industry sector peers and the same weighting scheme Exxon employed. [83] The constituents selected by Exxon as representative of its industry sector were BP p.l.c., Chevron Corporation, Shell plc, and Total S.A.[84] Using the subject company's self-selected industry sector peers to control for industry sector factors is my standard practice for choosing or constructing an industry sector index.

---

[82] Ferrell Rebuttal Report, ¶51.

[83] Feinstein Report, ¶128.

[84] Exxon Mobil Corporation, Form DEF 14A, filed 13 April 2016, p. 30; and Exxon Mobil Corporation, Annual Report to Security Holders (ARS) for the fiscal year ending 31 December 2022, filed on 13 April 2023, p. 135.

**App. 162**

81.    Dr. Ferrell is wrong when he alleges that my industry sector index "appears cherry-picked in order to generate a negative and statistically significant price movement" on 31 January 2017.[85] Dr. Ferrell's allegation is unfounded and refuted by the facts.

82.    Of note, Dr. Ferrell only raises his criticism of my industry sector index when criticizing my analysis of the 31 January 2017 corrective disclosure event, and he raised no such criticism when critiquing my analysis of the 28 October 2016. I used the same industry index in both analyses.

### a.    My Industry Index Selection Was Not Cherry-Picked, Rather It Was Selected Using the Selection Methodology I Regularly Employ, and Is Consistent with the Company's Own Choice of Industry Index

83.    Choice of industry index is often an area of disagreement between experts in securities litigation, as it can potentially incorporate subjective judgement. As explained in the Feinstein Report,[86] using the subject company's self-selected industry sector peers to control for industry sector factors is my standard practice of industry index selection. My standard protocol for selecting an industry index is to eliminate subjectivity by using the same industry index that the company selected to satisfy the disclosure requirements of SEC Regulation S-K.

84.    In 17 CFR § 229.201 - (Item 201), Regulation S-K states that in its SEC filings, a public company must present a comparison of its own stock performance to the performance of its industry sector. According to Regulation S-K, the choices for an industry index available to the company are: "A published industry or line-of-business index;" "Peer issuers selected in good faith;" and "Issuers with similar market capitalization, but only if the registrant does not use a published industry or line-of-business index and does not believe it can reasonably identify a peer group."[87]

---

[85] Ferrell Rebuttal Report, ¶46.

[86] Feinstein Report, ¶128.

[87] 17 CFR §229.201.

**App. 163**

85.    While Regulation S-K invites companies to do so, Exxon presented no explanation or detail contending the Company had any problems in identifying the four companies (BP p.l.c., Chevron Corporation, Shell plc, and Total S.A.)[88] as representative of its industry, or any deficiencies whatsoever in this index as the best representation of Exxon's industry sector.

86.    Using the same industry index that the company chooses to represent its industry sector for Regulation S-K is an objective protocol. This objective methodology precludes the possibility of competing experts manipulating statistical results by subjectively cherry-picking an alternative index that produces spurious results more favorable to their side, which is apparently exactly what Dr. Ferrell is proposing. Because he abandons the objective protocol for selecting an industry index, it is Dr. Ferrell who appears to be subjectively selecting (or cherry-picking) an index that favors the results he seeks to produce.

87.    For these reasons, except in rare extenuating circumstances, I always use the industry index identified by the company for Regulation S-K as the industry index for my event study analyses. An extenuating circumstance where I would not use the company's selected industry index would be when the index data is not available, or when the subject company chooses not to provide an industry index to satisfy Regulation S-K. No such extenuating circumstance existed in this case.

88.    Dr. Ferrell asserts that in this case I deviated from my standard practice for industry index selection.[89] His assertion is absolutely untrue. I explained in the Feinstein Report, I always use the industry index that the subject company uses in its SEC filings, except when impossible to do so for some extenuating reason.

89.    Dr. Ferrell characterizes that my industry index is one that "[I] create[d] by weighting the returns of BP p.l.c., Chevron Corporation, Shell plc, and Total S.A by their market capitalization."[90] While this was the computational process for constructing the index, I cannot claim to have "created" this index. The index was constructed using the same constituent companies selected by Exxon, and followed the same weighting algorithm as

---

[88] Exxon Mobil Corporation, Form DEF 14A, filed 13 April 2016, p. 30; and Exxon Mobil Corporation, Annual Report to Security Holders (ARS) for the fiscal year ending 31 December 2022, filed on 13 April 2023, p. 135.

[89] Ferrell Rebuttal Report, ¶46.

[90] Ferrell Rebuttal Report, ¶47.

**App. 164**

that used by Exxon. Dr. Ferrell overlooks or fails to mention that this industry index is exactly the one that Exxon put forth as representative of its industry sector.[91]

90.   Importantly, in past cases not only did Dr. Ferrell not dispute my industry index selection or weighting methodology, but he adopted my industry indices for his own analysis.

> "I reviewed the market model Professor Feinstein used in his event study analysis. To control for movements in the overall stock market, he used the CRSP Market Total Return Index. To control for movements in Baxter's industry, he used the S&P 500 Health Care Index, to which the Company had compared its stock price performance. ***I use these same market and peer indices in my regression model***."
> **Declaration of Professor Allen Ferrell, in *City of Lakeland Employees Pension Plan, vs. Baxter International Inc., et al.*, No. 1:10-cv-06016, dated 25 July 2014, ¶14 (emphasis added) (internal citations omitted).**

> "Like Professor Feinstein's event study analysis, I used: (1) a GLS regression; (2) ***his market and peer indices***; and (3) dummy variables to control for certain 8-K disclosure dates and the nine purported corrective disclosure dates."
> **Report of Professor Allen Ferrell, in *Fosbre vs. Las Vegas Sands Corp., et al.*, 2:10-cv-00765, dated 2 October 2015, FN 14 (emphasis added).**

91.   In both of these cases I selected the industry index using the same methodology employed in the instant matter. This refutes Dr. Ferrell's contention that I cherry-picked the industry index in the current case.

92.   In a prior case, Dr. Ferrell advocated for using the industry indexes identified by the subject company and set forth in the company's annual report. That is, he used the same methodology that I did for selecting an industry index. In the Report of Professor Allen Ferrell in the case *City of Westland Police and Fire Retirement System vs. Metlife Inc.*, *et al*, 12 Civ. 0256, Dr. Ferrell argued that the Plaintiff should have used both the indices presented in Metlife's 2011 Annual Report.

---

[91] Exxon Mobil Corporation, Form DEF 14A, filed 13 April 2016, p. 30; and Exxon Mobil Corporation, Annual Report to Security Holders (ARS) for the fiscal year ending 31 December 2022, filed on 13 April 2023, p. 135.

**App. 165**

"The first basic flaw in Plaintiff's event study analyses concerns the industry index used to control for contemporaneous price movements among MetLife's peer group. … As explained in the Complaint, Plaintiff uses the S&P 500 index to control for market movements and the S&P 500 Insurance Industry index to control for industry movements 'per MetLife's 2011 Annual Report.' However, the 2011 Annual Report also compares the Company's stock price movements to those of the S&P 500 Financials Sector index. Plaintiff does not explain why it ignored the S&P 500 Financials Sector index as an explanatory variable in its event study analyses. ***Plaintiff's failure to include the S&P 500 Financials Sector index in addition to the S&P 500 Insurance Industry index as an industry control in its event study analyses is a serious flaw that results in an incomplete measure of MetLife's peer companies***."
**Report of Professor Allen Ferrell, in *City of Westland Police and Fire Retirement System vs. Metlife Inc., et al*, 12 Civ. 0256, dated 19 October 2017, Appendix C, ¶¶2-3 (emphasis added).**

93. Recently, in a report filed on 22 November 2023, subsequent to his submitting his Class Certification Report in this case, Dr. Ferrell used the peer index identified by the subject company in its Form 10-K, which is my methodology that Dr. Ferrell criticizes.

"An event study requires a regression analysis to estimate the historical relationship between the returns on ChemoCentryx's stock price and the returns on a market index and an industry index. For the market index, I use the Nasdaq Composite Index, excluding ChemoCentryx. ***For the industry index, I use the Nasdaq Biotechnology Index, excluding ChemoCentryx. Nasdaq Composite and Nasdaq Biotechnology are the indices that ChemoCentryx used to benchmark its stock price performance in its 2019 Form 10-K. 2019 Form 10-K, at 64***."
**Expert Report of Allen Ferrell, Ph.D., in *Homyk v. ChemoCentryx, Inc. et al.*, 4:21-cv-03343 (Cal. N.D.), dated 22 November 2023, FN 154 (emphasis added).**

### b.    Selecting an Industry Index on the Basis of Fit Is Inappropriate Results-Driven Data Mining

94. Dr. Ferrell incorrectly contends that for an event study, the selected industry index should be the index that explains the largest share of the company's stock price movements as being caused by industry effects rather than company information.[92] This is precisely what he means when he asserts my index is "inferior" and that the choice of index should be made on the basis of fit.

---

[92] Ferrell Rebuttal Report, ¶47.

32

**App. 166**

95.   It is noteworthy that in this case, Dr. Ferrell looked for the one industry index that explained away the greatest amount of the Company's stock price movements as being caused by the industry factor. Choosing the regression model inputs that attribute the greatest amount of Exxon stock price movement to market and industry effects is the same as choosing the regression model that attributes the least amount of Exxon stock price movement to Company information. Cherry-picking the industry index in this way to explain away the greatest amount of company-specific price movement as being an industry effect may spuriously bias event study results away from finding statistically significant reactions to corrective disclosures.

96.   Campbell, Lo, and MacKinlay (1997) warn against the type of overfitting that Dr. Ferrell is suggesting: "[t]he most effective means of reducing the impact of overfitting and data-snooping is to impose some discipline on the specification search by a priori theoretical considerations."[93]

97.   The better approach than Dr. Ferrell's results-driven "fit" methodology is to choose the industry index on the basis of which index best represents the Company's industry sector, preferably, as determined by the subject company itself. This is what I did. The methodology I applied in this case, the same methodology I regularly apply and which is consistent with the literature and proper financial analysis, is to specify the industry index for the regression analysis on this basis, *a priori*, before running the regression analysis.

### c.   Dr. Ferrell Adopts a Too Narrow Industry Sector Index

98.   Dr. Ferrell argues that his choice selection of Exxon's industry peers is superior to the industry peers selected by Exxon itself. Dr. Ferrell's index is a market capitalization-weighted index composed of just two companies, Chevron and Occidental Petroleum.[94] Dr. Ferrell argues that his industry index is superior to the one identified by Exxon, which I used, on account of the higher adjusted r-squared statistic (a measure of

---

[93] "The Econometrics of Financial Markets," by John Campbell, Andrew Lo, and A. Craig Mackinlay, *The Econometrics of Financial Markets*, Princeton University Press, 1997.

[94] The Expert Report of Allen Ferrell, Ph.D., dated 1 February 2019 (the "Ferrell Report" or "Ferrell 2019 Report"), FN 3.

**App. 167**

fit) produced by his regression when estimated over a particular estimation period (also of his own choosing).

99. Dr. Ferrell constructs his purportedly superior index using just two constituent companies, weighted by their relative market capitalization sizes. Dr. Ferrell neglects to consider Chevron is significantly larger than Occidental in terms of market capitalization, and consequently explains nearly all of his index returns. In effect, therefore, Dr. Ferrell uses Chevron as his industry sector index.

100. I ran a regression to determine how much of the movement in Dr. Ferrell's industry index is explained by Chevron's returns. Specifically, I ran a regression modeling the daily returns of Dr. Ferrell's industry sector index return as a function of a constant term and the daily returns on Chevron stock. I estimated the regression over the 252 trading days preceding 31 January 2017 corrective disclosure, the same estimation period adopted by Dr. Ferrell for evaluating the size and significance of Exxon's 31 January 2017 residual return.[95] The adjusted r-squared of this regression shows that 98.3% of Dr. Ferrell's index return is explained by Chevron alone. The regression coefficient for the Chevron return variable in this regression was estimated to be 1.01, and not statistically significantly different from a coefficient of 1. These results mean that Dr. Ferrell's industry sector index is essentially tantamount to using a single company, Chevron, as if it represented by itself the entire industry sector. Dr. Ferrell's treatment deviates from what Exxon determined was a proper representative of the industry sector, and it defies the definition of what an *industry sector* index is.

101. Moreover, the statistics literature warns against using a too narrow index in event study analysis. Very close single peers often move in sympathy with one another, because market participants may expect that positive or negative company-specific developments announced for one particular company raise the likelihood that the same developments may be experienced by the close competitors. This simultaneity effect may be why Dr. Ferrell found that his essentially single-stock sector index had a good fit next to Exxon's returns.

102. A sector index that correctly controls for sector news should be one for which the sector news causes both the sector index group index and the company stock to move. For a

---

[95] Ferrell Rebuttal Report, ¶48; Dr. Ferrell's index data obtained from "event_study_input_Ferrell.xlsx," tab "S5IOILTR Reconstruction."

**App. 168**

properly selected industry sector index, the causation should run from the sector news to both the sector index and the company stock, not from company news to the sector index. But when the industry sector index is composed of very few peers, or a single peer, the causation may be in the opposite direction – company-specific news may cause the inadequate industry sector index to move. Composing the industry sector index from a broader group of companies mitigates that simultaneity effect that would otherwise render the regression and event study results to be unreliable.

103.    For these reasons, a too narrow peer index will generally suffer from an econometric problem known as "simultaneity" which renders the regression results unreliable. The right-hand-side variables in a regression model are supposed to be exogenous, meaning their movements cause but are not caused by the left-hand-side dependent variable (i.e., Exxon stock returns). When the causation runs in the opposite direction, such as when the level of a narrow peer index comprising only a couple of Exxon's U.S. competitors are impacted by the changing fortunes of Exxon's business, the resulting econometric problem invalidates the regression.[96] A broader peer index avoids the econometric problem of simultaneity.

104.    In sum, Dr. Ferrell's critique of my industry index selection is erroneous and misleading. My use of the industry index identified by the Company as being representative of its peers in the instant matter is both correct and consistent with my standard practice, which Dr. Ferrell has endorsed and adopted in past cases. Dr. Ferrell's use of what is essentially a single-company sector index is statistically invalid and contrary to his prior index selection criteria. It is Dr. Ferrell who adopts a results driven methodology in the current matter that produces unreliable results and is at odds with his practice in many other cases.

### 3.    If One Were to Use the Ferrell Industry Index to Evaluate the 28 October 2016 Corrective Disclosure, Damages Would Be Substantially Higher

105.    While Dr. Ferrell criticizes the industry sector index I used in the context of his attack on my analysis of the January 2017 corrective disclosure, it is noteworthy that if one were to

---

[96] *See, e.g.*, *A Guide to Econometrics*, by Peter Kennedy, Blackwell Publishing, 6th Edition, 2008, pp. 139-140, and Chapter 12.

**App. 169**

use the industry sector index Dr. Ferrell proposes as superior, the residual return on Exxon stock on 28 October 2016 would be estimated to be substantially higher, resulting in substantially greater damages.

106. Dr. Ferrell did not criticize the results of my purportedly "inferior" regression model for the 28 October 2016 corrective disclosure date. My purportedly "inferior" regression attributes more of the Exxon stock price decline that day to market and industry sector factors than does Dr. Ferrell's alternative regression specification. According to my regression, Exxon's residual return was -$2.43 per share on 28 October 2016.[97] The residual return according to Dr. Ferrell's regression is much more negative at -$3.86 per share.[98]

107. Attributing $0.04 per share of the $3.86 residual price decline indicated by Dr. Ferrell's regression to confounding information, the remaining residual decline attributable to the fraud-related corrective disclosure according to Dr. Ferrell's regression is $3.82 per share. This $3.82 per share fraud-related loss is much greater than the $2.39 per share loss that I determined was caused by the alleged fraud that day.[99] Perhaps this difference is why Dr. Ferrell criticizes my regression model only as it pertains to the January 2017 disclosure and is willing to accept it for analysis of the October 2016 disclosure.

### 4. Dr. Ferrell's Close to Open Regression Was Concocted for This Litigation

108. In the Ferrell 2019 Report, Dr. Ferrell conducts both "close to open" and "close to close" regressions. In the Ferrell 2019 Report, Dr. Ferrell says that for disclosures that occurred after hours, he conducted a close-to-open regression.

---

[97] Feinstein Report, ¶139.

[98] EMC_RAM 001656297, tab "Appendix C.1.B."

[99] Feinstein Report, ¶162.

**App. 170**

"To begin, Exhibit 2 contains the results of the event study regression using both 'close to open' (i.e. over-night) and 'close to close' (i.e. one-day) event windows. ***For the alleged corrective disclosures that occur over-night, I look at the results of the 'close to open' event window***. For alleged corrective disclosures that occur during market hours or that do not have a specific time of day, I look at the results of the 'close to close' event window."
**Ferrell 2019 Report, ¶34 (emphasis added).**

109.   Close to close regression are generally accepted and widely used to capture information effects following corrective disclosures, even when those disclosures are made outside of regular market hours. Dr. Ferrell's close-to-open regression methodology deviates from the generally accepted and most commonly used event study practice, deviates from the methodology he has approved and applied in prior cases, and in the instant matter, is a design that misses the market's reaction to conference calls held after the market's open, including conference calls held on the corrective disclosure dates.

110.   Dr. Ferrell's use of a "close to open" regression methodology appears to be limited to the instant matter, and is not the methodology he has used in past cases. A review of recent reports authored and submitted by Dr. Ferrell, many of which were filed subsequent to his class certification report in this matter, shows that his close-to-open regression was devised solely for the current litigation. The facts and circumstances of the instant matter do not justify changing the regression methodology, for the additional reason that because the misrepresentations, omissions, and corrective disclosures in this case include Company statements made during conference calls held after the market's open.

111.   In his many other reports, Dr. Ferrell measures the impact of disclosures made outside of trading hours on a close-to-close basis, not on the close-to-open basis he advocates here. For example, in his report in the matter *In re Kraft Heinz Securities Litigation*, 1:19-cv-01339 (N.D. Ill.), Dr. Ferrell accepts that plaintiff's expert was correct to test the impact of misstatements and corrective disclosures made after market hours on a close-to-close basis.[100] In a November 2023 report filed in the *ChemoCentryx* securities litigation, Dr. Ferrell explained that "***[f]or disclosures made after market hours, I use***

---

[100] Rebuttal Expert Report of Allen Ferrell, Ph.D., *In re Kraft Heinz Securities Litigation*, 1:19-cv-01339 (N.D. Ill.), dated 20 May 2022, Table-1.

**App. 171**

***ChemoCentryx's return on the first trading day following the disclosure date in my event study analysis***.[101] The following are more quotes from Dr. Ferrell's reports in cases where he endorsed and applied the close-to-close regression methodology.

> "An event window that compares the closing price on the prior day to the closing price on the day the new information was disclosed is typical. The Feinstein Report filed by Plaintiff likewise uses this typical market-close to market-close time window for all of the event studies conducted therein."
> **Expert Report of Allen Ferrell, Ph.D., in *In re Grupo Televisa Securities Litigation*, No. 1:18-CV-01979 (S.D.N.Y), dated 15 January 2020, ¶22.**

> "For events that occur after the close of trading, I use a close-to-close window from the close of trading on the event date to the close of trading on the following day."
> **Expert Report of Allen Ferrell, Ph.D., in *In re Grupo Televisa Securities Litigation*, No. 1:18-CV-01979 (S.D.N.Y), dated 15 January 2020, Table 8 Sources and Notes [18].**

> "As noted above, Plaintiff alleges that the *Washington Post* article published on February 27, 2017, corrected the Company's prior alleged misstatements regarding the Harassment Claim. Based on his event study, Dr. Hartzmark concludes, and I do not dispute, that Signet's return after accounting for market and industry effects, i.e., its residual return, is statistically significant on February 28, 2017, the first trading date after the publication of the *Washington Post* article."
> **Expert Report of Allen Ferrell, Ph.D., in *In re Signet Jewelers Limited Securities Litigation*, No. 1:16-CV-06728 (S.D.N.Y), dated 26 April 2019, ¶25.**

> "Citigroup Global Markets, "Model Update," October 6, 2011. This report lists the closing price on October 6, 2011, demonstrating that it was issued after the market closed on this date and thus could have affected MetLife's stock price on October 7, 2011."
> **Second Rebuttal Report of Professor Allen Ferrell, in *City of Westland Police and Fire Retirement System, vs. Metlife, Inc., et al.*, No. 12 Civ. 0256 (S.D.N.Y), dated 16 November 2018, FN 50.**

---

[101] Expert Report of Allen Ferrell, Ph.D., in *Homyk v. ChemoCentryx, Inc. et al.*, No. 4:21-cv-03343 (N.D. Cal.), dated 22 November 2023, FN 154.

**App. 172**

"After market close on May 4, 2017, ConocoPhillips updated its first-quarter 2017 earnings as a result of Anadarko's 'decision to impair the carrying value of Shenandoah in the Gulf of Mexico.' ConocoPhillips recorded an additional pre-tax dry hole expense of $242 million and a pre-tax expense of $51 million for leasehold impairment. However, on May 5, 2017, there was no statistically significant price change in the stock prices of Anadarko, ConocoPhillips, or Cobalt."
**Expert Report of Allen Ferrell, Ph.D., in *Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corporation et al.*, No. 4:20-cv-00576 (S.D. Tex.), dated 10 December 2021, ¶61.**

"Plaintiffs claim that in response to a Thomas Weisel report dated September 10, 2008, 'LVS's stock price declined 10.84% from $41.32 to $36.84 …' on this date. Complaint ¶ 427. However, this report was published after the market close on September 10, 2008, and therefore after the decline to which Plaintiffs refer had already occurred. Note that the report references the Company's September 10, 2008 closing price of $36.84, and thus could not have been published prior to the market close on this day. See Exhibit 18 at 1. I find that, based on my replication of Professor Feinstein's event study applied to September 11, 2008 – the correct price reaction date for the Thomas Weisel report – LVS's residual return is -2.27% with a t-statistic of -0.89 and so is not statistically significant."
**Declaration of Professor Allen Ferrell, in *Fosbre vs. Las Vegas Sands Corp., et al.*, No. 2:10-cv-00765 (D. Nev.), dated 9 January 2015, ¶39.**

112.  Not only do Dr. Ferrell's past reports contradict his use of the close-to-open regression methodology in his event studies, but I was unable to find any other case where Dr. Ferrell used that methodology. That the methodology Dr. Ferrell applies in the instant case appears to be devised only for this instant case, even though the facts and circumstances of the instant case warrant using the usual close-to-close methodology, raises the specter that Dr. Ferrell's change of methodology was improperly results driven.

113.  Dr. Ferrell's close-to-open regression methodology fails to consider the important information provided by the Company during its earnings conference calls with analysts and investors that commenced at the start of trading.[102] For example, the 28 October 2016 and 31 January 2017 conference calls each began at 9:30 AM ET, the start of stock market

---

[102] "Q1 2016 Exxon Mobil Corp Earnings Call," *Thomson Reuters*, conference call transcript, 29 April 2016 9:30 AM; "Q2 2016 Exxon Mobil Corp Earnings Call," *Thomson Reuters*, conference call transcript, 29 July 2016 9:30 AM; "Q3 2016 Exxon Mobil Corp Earnings Call," *Thomson Reuters*, conference call transcript, 28 October 2016 9:30 AM; and "Q4 2016 Exxon Mobil Corp Earnings Call," *Thomson Reuters*, conference call transcript, 31 January 2017 9:30 AM.

**App. 173**

trading. These conference calls did not end until 10:45 AM ET and 10:50 AM ET, respectively.[103] Dr. Ferrell's analysis is at odds with the academic and practitioner research which find that conference calls provide important information to investors.[104]

114.    In particular, Dr. Ferrell's close-to-open regression for the 31 January 2017 corrective disclosure ignores the new information revealed during the conference call.[105,106] A review of the conference call transcript reveals that during the conference call, analysts sought additional information about the asset impairment, and the Company provided it.

> "[Jason Gammel – Jefferies]: Thanks, hi, Jeff. Jeff, I know that in that the third-quarter press release you had talked about the potential for needing to take some negative revisions to proved reserves in the oil sands. *And clearly, at least in the quarter, you haven't taken any financial impairments to those assets. Can you talk about whether would you would still view those proved reserves as potentially needing to be written down?* Or whether the price recovery into the end of the year was sufficient to allow those to remain on the books?
> [VP Woodbury]: Yes, it's a good question. Again, I want to make sure that everybody is very clear that there is a separation between proved reserves reporting under this, you see rules, and *then the whole issue of asset impairments*. And really what you're asking, Jason, is clearly the question about proved reserves. In the third quarter, we indicated, because we thought it was prudent at the time, given where crude prices were, that we

---

[103] "Q3 2016 Exxon Mobil Corp Earnings Call," *Thomson Reuters*, conference call transcript, 28 October 2016 9:30 AM; and "Q4 2016 Exxon Mobil Corp Earnings Call," *Thomson Reuters*, conference call transcript, 31 January 2017 9:30 AM.

[104] For example, National Investor Relations Institute's "Standards of Practice for Investor Relations" states that "conference calls/webcasts are typically used as forums in which companies provide additional 'color' in order to expand on information contained in news releases issued prior to conference calls and to respond to call/webcast participants' questions." National Investor Relations Institute. *Standards of Practice for Investor Relations*, March 2004, p. 52.] *See e.g.*, "Information Transfer and Conference Calls," by Francios Brochet et al., *Review of Accounting Studies*, Vol. 23, No. 3, 17 April 2018, pp. 907-957; and "Does Silence Speak? An Empirical Analysis of Disclosure Choices During Conference Calls," by Stephan Hollander et al., *Journal of Accounting Research*, Vol. 48, No. 3, 31 December 2009, pp. 531-563.

[105] In ¶45 of the Ferrell Report, Dr. Ferrell presents an excerpt from a Simmons & Company analyst report from 31 January 2017 titled "ExxonMobil Corp. (XOM) – *Initial Conference Call Takeaways*" (emphasis added.)

[106] *See, e.g.*, "An Empirical Examination of Conference Calls as a Voluntary Disclosure Medium," by Richard Frankel et al., *Journal of Accounting Research*, Vol. 37, No. 1, Spring 1999, pp. 133-150; and Complaint ¶234. "The Loss Causation Requirement for Rule 10b-5 Causes of- Action: The Implication of Dura Pharmaceuticals v. Broudo," by Allen Ferrell and Atanu Saha, *Harvard Law and Economics Discussion Paper,* No. 596 states that "[i]f the stock price reaction in the days, weeks and months following a corrective disclosure are due to the market inferring additional information about the misrepresentation's implications for a firm's valuation, then these stock price movements occurring after the corrective disclosure date identified by the plaintiffs should analytically be deemed to be additional corrective disclosures."

**App. 174**

indicated that we were likely going to take as much as 4.6 billion barrels out of proved and put them in our resource base, and I will remind you that I emphasized at that time that even though we make that transfer, there is no change to our operations or how we manage the business, those assets going forward. We will be announcing our final year-end reserves here in the next couple of weeks, as we typically do. In short, we do expect to reflect most of the SEC pricing impact that we discussed in the third quarter. But I will also note that we anticipate that there will be some partial offsets to those numbers. So stay tuned. We will be finalizing that shortly, and we will be releasing that information here in the next two weeks."

**"Q4 2016 Exxon Mobil Corp Earnings Call,"** *Thomson Reuters*, **conference call transcript, 31 January 2017, 9:30 AM, pp. 15-16 (emphasis added).**

115.    Dr. Ferrell's analysis using close-to-open price movements is flawed as it also disregards that the according to the finance literature, opening prices are arrived at differently from trading prices during the trading day, and those opening prices may consequently contain anomalous perturbations. Academic studies have documented anomalies in trading during the start of a trading session.[107]

### 5.    Dr. Ferrell's Assertion that the Impairment Was Not New and Did Not Cause the 31 January 2017 Price Decline Is Unfounded

116.    Dr. Ferrell argues that the information released on 31 January 2017 about the RMDG asset impairment was stale, and the stock price decline on 31 January 2017 was instead due to the purported negative earnings announcement.[108] Dr. Ferrell is wrong. Prior to the Company's 31 January 2017 earnings announcement, the market was not aware whether an impairment would be taken, the size of such an impairment, and what assets specifically would be impaired. On 28 October 2016, Exxon's disclosure simply noted that the Company would test its long-lived assets for impairment.[109] Even though oil and natural gas prices increased steadily since the Company's Q3 2016 earnings announcement, Exxon

---

[107] *See, e.g.*, "A Transaction's Data Study of Weekly and Intradaily Patterns in Stock Returns," by Lawrence Harris, *Journal of Financial Economics*, Vol. 16, No. 1, May 1986, pp. 99-117.

[108] Ferrell Rebuttal Report, ¶¶44-45 and 50.

[109] Feinstein Report, ¶78.

41

**App. 175**

still took a $2.0 billion impairment of the Company's RMDG gas assets.[110] Thus, the recognition of a $2.0 billion impairment of the RMDG assets was new information.

117.  That the impairment was new negative information, which caused the negative residual stock price decline on 31 January 2017, is confirmed by analyst commentary following the Company's announcement.

> "XOM 4Q16 EPS was $0.89 after adjusting for a $2.0b impairment in the US Upstream, versus our estimate of $0.68 and the consensus of $0.70. However, adjusted earnings included a $522m gain on the sale of its Canadian service stations (proceeds were $2.1b). Further, the company recorded a non-quantified favorable tax adjustment in the Corporate segment, where there was a $609m favorable variance compared to our estimate. Excluding these one-time items would have brought EPS in line with or perhaps below consensus. … No financial impairment on oil sands. *XOM recorded a $2.0b impairment on dry natural gas assets in the Rockies, but there was no financial impairment on its Canadian oil sands assets. XOM indicated in 3Q that oil sands may not qualify as proved reserves at year-end. The lack of a financial impairment does not eliminate the risk of a reserve write-down however*. The company currently recognizes 3.6b boe at the Kearl project, about 15% of the total corporate proved reserves. We note that any reserve write-down would not affect the operations or future cash flows of the oil sands operations."
> **"Joining the Short Cycle Trend," by Jason Gammel and Marc Kofler, Jefferies, analyst report, 1 February 2017, p. 1 (emphasis added).**

> "Results were better than expected when excluding nat gas impairment in the U.S. While upcoming reserve de-booking will likely create NT headwind for the stock, FCF profile and advantaged cost of capital should provide flexibility offsetting potential impact and act as a catalyst going forward."
> **"Permian Spending, Reserve Replacement, and M&A Likely Analyst Day Topics," by Sam Margolin et al., Cowen, analyst report, 31 January 2017, p. 1.**

---

[110] Feinstein Report, ¶¶90-92.

**App. 176**

"Reserves Update with 10-K. We expect XOM will report disappointing reserve replacement in its 2016 10-K filing. While the $2.0 billion write-down of dry gas assets was a separate event from determining reserves, we do believe it is a good indicator of the challenges to grow reserves in a low-price environment."
**"XOM: Higher Vols and Share Count--Modest Val Range and EPS Adjs.," by Roger Read and Lauren Hendrix, Wells Fargo, analyst report, 31 January 2017, p. 1.**

"The magnitude of incremental growth potential from the Permian acquisition was a positive surprise (sustainable ~350kboepd). However, investors are likely still to be wary near-term around reserve revisions risk, with color expected in the next few weeks. We remain Neutral and tweak down our Dec 2017 price target to $93/share from $94."
**"Messy 4Q, Waiting on Reserves and Analyst Day," by Phil Gresh et al., J.P. Morgan, analyst report, 31 January 2017, p. 1.**

"While 2016 exploration discoveries in Guyana, Nigeria and PNG as well as attractive upcoming potential offshore Mexico, Cyprus and PNG should partially offset declines, XOM's size and scale create reserve replacement challenges that continue to outweigh positive exploration developments."
**"Permian Spending, Reserve Replacement, and M&A Likely Analyst Day Topics," by Sam Margolin et al., Cowen, analyst report, 31 January 2017, p. 1.**

"No color was given on the 2016 RRR, which may not resolve near-term concerns from investors in reserve revisions."
**"4Q16 Quick Take – ALERT," by Phil Gresh et al., J.P. Morgan, analyst report, 31 January 2017, p. 1.**

"2016 Reserve Report – typically released late Feb (released Feb 19 last year). While meaningful downward revisions have been well telegraphed and should not come as a surprise, the release could still pick up attention and is unlikely to be viewed in a positive light."
**"4Q'16 Earnings - We Remain on the Sidelines," by Guy Baber et al., Simmons & Company, analyst report, 1 February 2017, p. 2.**

"*4Q16 adjusted beat, but also the first impairment in 20+ years. Adjusted EPS of $0.89 topped our estimate of $0.71 and consensus of $0.70*. But what that adjusted number backs out - a U.S. dry gas impairment charge - is historically significant, marking Exxon's first such charge in over two decades. *Recall, Rex Tillerson had said as recently as 2015: 'We don't do writedowns.' As one of his new cabinet colleagues might say: 'oops.'*"
**"4Q16: Tillerson Era Ends with One Thing He Vowed Would Never Happen," by Pavel Molchanov et al., Raymond James, analyst report, 31 January 2017, p. 1 (emphasis added).**

43

**App. 177**

118.   Dr. Ferrell's assertion that the impairment news was not a new and surprising negative development is at odds with analysts' commentary. Analyst commentary supports my attribution of the stock price decline on 31 January 2017 to the impairment news.

### 6.    Dr. Ferrell's Assertion That I Did Not Analyze and Disaggregate Confounding Information Is Erroneous

119.   Dr. Ferrell erroneously argues that I did not "attempt to disaggregate alleged fraud-related and non-fraud-related stock price movements on" 31 January 2017.[111] Dr. Ferrell's assertion is patently false. As explained in the Feinstein Report, I searched for but found no valuation-relevant Company-specific news outside the Company's earnings announcement and conference call affecting the price response on 31 January 2017.[112] I also examined the elements of the earnings announcement and conference call and found no *public* valuation-relevant information disclosure aside from the allegation-related corrective disclosure. As shown above and in the Feinstein Report, the news of the impairment caused Exxon's stock price decline on 31 January 2017.

120.   I clearly disaggregated the non-allegation related impairment charges. As explained in the Feinstein Report, I excluded the portion of the impairment assigned in the internal Company document to non-allegation related assets.[113] Based on this analysis, I concluded that the corrective disclosure on 31 January 2017 caused 85.9% of the Exxon stock residual price decline that day, which amounts to $1.05 of the $1.23 residual per share price decline.[114]

---

[111] Ferrell Rebuttal Report, ¶51.

[112] Feinstein Report, ¶¶164-165.

[113] Feinstein Report, ¶165.

[114] Feinstein Report, ¶166.

**App. 178**

**7.    Dr. Ferrell Erroneously Contends that Earnings Announced on 31 January 2017 Were a Miss that Disappointed Analysts, and That This Miss is Why the Stock Price Fell**

121.    Dr. Ferrell contends:

> "Dr. Feinstein fails to address that the price decline is associated with the Company's announcement of information unrelated to the alleged corrective disclosures. In particular, ExxonMobil disclosed a 40% reduction in earnings relative to the 4Q 2015 and a 39% reduction in EPS. Consistent with this, analysts reacted negatively to the disclosure of such information and commented that ExxonMobil's earnings fell short of expectations."
> **Ferrell Rebuttal Report, ¶50 (internal citations omitted).**

122.    Dr. Ferrell is wrong. The Q4 and FY 2017 earnings announced on 31 January 2017 did not constitute an earnings miss that disappointed analysts and therefore could not have caused the stock price decline that day. Dr. Ferrell compares the announced earnings to the earnings in prior periods, but he does not compare the announced earnings to the market's expectation. He never makes that comparison. While he does cite to a smattering of analysts who themselves had forecasted higher earnings, he ignores the greater population of analysts who commented that the reported earnings were equal to or above what they expected. This consensus positive surprise in earnings is reflected in the analyst reports published after the earnings announcement. The following analyst commentary was excerpted from reports considered by Dr. Ferrell either in the Ferrell 2019 Report or the Ferrell Rebuttal Report.

i.    Evercore ISI, "XOM - Results In-line; Buy XOM," 31 January 2017; ("ExxonMobil's 4Q adjusted EPS was $0.71/shr., in line with consensus estimates at $0.70.")

ii.    Jefferies, "Material Beat, No Oil Sands Impairment," 31 January 2017; ("XOM *adjusted EPS of $0.89 were a material beat* versus our estimate of $0.68 and the consensus of $0.70.")

iii.    Raymond James, "4Q16: Tillerson Era Ends With One Thing He Vowed Would Never Happen," 31 January 2017; ("4Q16 adjusted beat, but also the first impairment in 20+ years. Adjusted EPS of $0.89 topped our estimate of $0.71 and consensus of $0.70.)"

**App. 179**

iv. RBC Capital Markets, "XOM - 4Q16 Adjusted EPS 27% Beat on Lower Corporate Expenses," 31 January 2017; ("XOM reported adjusted 4Q16 EPS of $0.89, a 27% beat to consensus of $0.70 and a 24% beat to our estimate of $0.72.")

v. UBS, "2017 Capex Above Expectations; 4Q16 EPS Beats on R&M Asset Sale Gain & Favorable Tax Items," 31 January 2017; ("4Q clean EPS (which excludes a $2bn writedown related to Rockies dry gas assets) rose 34% YoY to $0.89, above consensus & UBSe of $0.70 & $0.71, respectively.")

vi. Credit Suisse, "Disclosure Should Improve, XOM Feeling Good About the Next Wave of Investment," 1 February 2017.

vii. Morningstar, "Exxon Earnings Slide on Rare Impairment Charge," 1 February 2017. ("Earnings fell to $1.7 billion from $2.8 billion the year before, primarily because of a decline in upstream earnings resulting from the $2.0 billion impairment charge related to dry gas operations in the Rocky Mountain region. Without the impairment charge, upstream earnings actually improved from the prior year on a mix of higher commodity prices and lower operating expenses.")

viii. Morgan Stanley, "In-line Results, Permian Outlook in Focus," 31 January 2017; ("XOM reported headline 4Q16 EPS of $0.41. Adjusting for $2.027Bn ($.49/sh) of impairment of dry gas assets in the Rockies and 206MM ($0.05/sh) and gain on sale on Canadian downstream assets raises EPS to $0.83 vs. $0.71 MS and $0.70 Consensus.")

ix. Cowen and Company, "Permian Spending, Reserve Replacement, and M&A Likely Analyst Day Topics," 31 January 2017; ("Results were better than expected when excluding nat gas impairment in the U.S.")

x. J.P. Morgan, "4Q16 Quick Take - ALERT," 31 January 2017; ("EPS Summary: Adjusted EPS (ex-impairment) $0.89 (JPMe: $0.65; Street: $0.70).")

123. Contrary to Dr. Ferrell's assertion that analysts viewed the Company's announcement as a negative development, analysts viewed the Company's earnings results as positive and clearly viewed the impairment announcement on 31 January 2017 as a negative development that was expected to have a negative impact on the Company's stock price.

124. Dr. Ferrell's assertion that the earnings announced on 31 January 2017 were disappointing and that I failed to consider that the purported miss may have been responsible for the stock

46

**App. 180**

price decline is based on his unrepresentative selection of only on five analyst reports out of the dozens published after the earnings announcement.[115] In "Appendix B: Materials Considered" of the Ferrell 2019 Report, Dr. Ferrell lists 22 different analyst reports published in response to the Company's 31 January 2017 earnings announcement, but he is silent as to the contents of the reports he disregarded to make his argument. Again, Dr. Ferrell's selective analysis is uninformative and unreliable. Dr. Ferrell's assertion that I did not consider confounding information is false.

### E.  My Inflation Ribbon Was Computed Correctly and Is Supported by the Facts of the Case, the Academic Literature, and Proper Analysis

125.  The inflation ribbon presented in the Feinstein Report is based on generally accepted principles of finance and valuation, on analysis of Company statements, news articles, analyst reports, and on event study analysis, which considered and accounted for market effects, sector effects, and potentially confounding information.[116]

126.  As explained in the Feinstein Report, the artificial inflation in the price of Exxon stock at the start of the Class Period was $3.44 per share, measured by the stock price declines that occurred when the corrective disclosures where made. I estimate that had analysts and investors been fully and honestly apprised by the Company in its Form 10-K for the fiscal year ended 2015 that: (i) Kearl was suffering operating losses;[117] (ii) operations at Kearl, which represented approximately 14% of Exxon's proved reserves portfolio, no longer legitimately qualified as a "proved" reserve; and, (iii) a significant portion of the Company's RMDG operations no longer justified their "carrying value" on Exxon's financial statements and, as a result, the Company was required to record a significant asset impairment charge, the stock price would have fallen by $3.44 per share at the start of the Class Period to reflect this adverse information.[118]

127.  Dr. Ferrell criticizes my inflation ribbon with the same specious arguments he directs at my loss causation analysis. That is, Dr. Ferrell takes issue with the Plaintiff's factual

---

[115] Ferrell Rebuttal Report, Materials Considered.

[116] Feinstein Report, §§VI and VII.

[117] Feinstein Report, FN 79.

[118] Feinstein Report, ¶27.

**App. 181**

allegations more so than with my financial analysis. Dr. Ferrell contends that the information disclosed on the corrective disclosures at the end and after the Class Period was not known or knowable at the start of the Class Period.

> "In February 2016, most of the price data that informed the disclosure on October 28, 2016 would not have been available—and indeed was not knowable. Thus, there is no reliable economic basis to assume that ExxonMobil could have known in early 2016 that it would have to disclose a potential de-booking of proved reserves at its Kearl project as of year-end 2016, much less have provided those exact amounts."
> **Ferrell Rebuttal Report, ¶54.**

> "ExxonMobil could not have known at the start of the Class Period in February 2016 how the upstream industry would fare throughout 2016, let alone what its long-term price projections for natural gas prices would be at year-end 2016."
> **Ferrell Rebuttal Report, ¶55.**

128. My construction of the artificial inflation ribbon is supported by my loss causation analysis, by valuation analysis, and generally accepted financial principles. With full and accurate disclosure instead of alleged misrepresentations and omissions, market participants would not have been deceived by the Company's misrepresentations and omissions regarding the profitability of Kearl, the amount of proved reserves, and the carrying value of the Company's RMDG operations. Market participants would have instead known the true impact of the operating losses at Kearl, that 14% of Exxon's proved reserves portfolio no longer legitimately qualified as a "proved" reserve, and that a significant portion of the Company's RMDG operations no longer justified their "carrying value." But for the misrepresentations and omissions, the proved reserve portfolio, and asset value throughout the Class Period would have reflected the true conditions and prospects of the Company. The artificial inflation that dissipated at the end and after the Class Period therefore does measure the artificial inflation in the Company's stock price while the misrepresentations and omissions remained uncorrected throughout the Class Period.

129. Dr. Ferrell contends that the price declines on the alleged corrective disclosure dates cannot be used to measure inflation in Exxon's stock price earlier because when the "market is on notice of a risk, an increase in the likelihood of that risk may cause the stock price to

**App. 182**

decline, but that decline would reflect the market's recalibration of a known, previously disclosed risk, rather than a reaction to new information."[119] He offers no valid proof or support for his conjecture that the corrective disclosures represented or comprised realizations of known risks, and he ignores all evidence that his conjecture is false. Nonetheless, Dr. Ferrell claims that it necessarily follows that some or all of the residual stock price declines precipitated by the corrective disclosure events were caused by materializations of publicly known risks.[120]

130.    Dr. Ferrell is wrong because the negative announcements that constituted the corrective disclosures in this case were not random adverse risky events outside the control of the Company. Rather, the corrective disclosures in this case were revelations entirely within the control of the Company. Essentially, this is not a materialization of the risk case, but rather is a case about the Company concealing current conditions from the investing public. According to the Plaintiff's allegations, the Company could have disclosed at the start of the Class Period the poor conditions that were concealed throughout the Class Period by misrepresentations and omissions, and which the market learned about from the corrective disclosures. Dr. Ferrell's criticism does not apply to this case.

131.    Dr. Ferrell's criticism is fallacious also because it conflates an acknowledgment that a potential risk exists (he claims the market was previously warned) with a disclosure that Exxon's condition and value were such that poor performance and adverse consequences were occurring and should be expected (a disclosure Plaintiff's alleges had not previously happened).

132.    It is only by disputing the factual basis of the alleged misrepresentations and omissions, and disregarding that the Company allegedly made misrepresentations in SEC filings and on conference calls, that Dr. Ferrell can even postulate that the alleged corrective disclosures were materializations of known risks. The corrective disclosures were not a materialization of a known risk, but rather revealed the concealed truth about the Company's condition.

---

[119] Ferrell Rebuttal Report, ¶56.

[120] Ferrell Rebuttal Report, ¶56.

**App. 183**

133.  While Dr. Ferrell points to examples of investors acknowledging risks associated with the oil and gas reserves and profitability, these investors were kept in the dark about the Company's true condition by virtue of the alleged misrepresentations and omissions. What investors suspected could occur would have been known to have already occurred, but for the misrepresentations and omissions. While I agree that analysts and investors knew the risks that oil and gas prices posed to Exxon, Dr. Ferrell fails to appreciate that it is misleading to only point out the possibility of a risk when that risk is already realized and adversely impacting the Company's performance. My analysis of the evidence establishes that the economically material substance of the corrective disclosure events would not have been surprising to the market but for the alleged misrepresentations and omissions.

134.  Dr. Ferrell's argument that earlier disclosures were impossible takes issue with the Plaintiff's allegations more so than with my financial analysis. My inflation ribbon is based on Plaintiff's establishing that the Company should have de-booked Kearl and impaired RMDG at the start of the Class Period. Assuming Plaintiff proves the facts of its case, Dr. Ferrell's opinion is moot.

### F.  Dr. Ferrell Confirms My Analysis of the Cost of Losing Exxon's AAA Rating

135.  In the Feinstein Report, I opined that (i) a lower credit rating would have required a higher note yield and thus higher interest expense; (ii) the total additional interest expense that would have been incurred over the life of the Notes would have been $832 million; and (iii) consistent with the S&P rating methodology, reserves are considered important by credit rating agencies for assessing credit quality.

136.  Dr. Ferrell does not dispute that it is a fundamental tenet of finance that a lower credit rating would require a higher note yield and thus incur higher interest expense. Dr. Ferrell does not dispute that had the bonds been issued with a AA+ rating rather than a AAA rating, the increase in the interest expense would amount to $832 million expressed in future value terms. He does not dispute the financial principles and analysis underlying my computation of this $832 million of additional interest expense over the life of the Notes. He does not advocate for a different approach or conduct different analysis. Dr. Ferrell concurs that my calculation was done correctly and adopts all the components of my analysis, save one related that is related only to presentation.

**App. 184**

137. Dr. Ferrell's primary criticism is that the more appropriate presentation of the increased interest expense is to show the present value of the total additional interest expense, rather than the higher interest payments expressed in future value terms over the life of the Notes.[121]

138. Dr. Ferrell's alternative choice of manner of presentation has no bearing on my analysis or its implications. The fact remains and my conclusion is sound. Had the Company's credit rating been AA+ rather than AAA at the time of the Note issuance, the total additional interest expense incurred over the life of the Notes would have been $832 million expressed in future value terms.

### G.      Dr. Ferrell Erroneously Contends that The Write-Down and De-Booking Would Not Have Warranted a Credit Downgrade

139. Dr. Ferrell disputes that a $2.0 billion write-down and de-booking of 19% of proved reserves would have impacted the characteristics considered important by credit rating agencies for assessing credit quality.[122] Dr. Ferrell argues that "the inaction by credit rating agencies [following the corrective disclosures] contradicts Dr. Feinstein's claim" that credit rating agencies considered asset values and reserves important.[123]

140. Contrary to Dr. Ferrell's assertion, these conditions and metrics are indeed considered important by rating agencies. This is not solely my own conclusion, as the credit rating agency Moody's stated this fact explicitly.

> "Proved Reserves (MMboe) The amount of proved reserves, which are oil and gas reserves below the surface that have not yet been produced and that are economically viable to extract, is an important indicator of both the current and future value of an integrated oil and gas company. This metric represents the scale of a company's primary upstream assets.
> …
> Scale is measured (or estimated in the case of forward-looking expectations) based on average daily production, proved reserves and total crude distillation capacity. Companies may report these metrics on an annual basis only, rather than on a quarterly basis. In these cases, we typically use the most recent annual number for subsequent quarters until the updated annual

---

[121] Ferrell Rebuttal Report, ¶63.

[122] Ferrell Rebuttal Report, ¶62.

[123] Ferrell Rebuttal Report, ¶60.

**App. 185**

number is available. For integrated oil and gas companies, we consider these metrics to be more stable measures of scale than more traditional metrics, such as assets and revenue, where accounting differences and commodity price fluctuations can reduce comparability and create volatility"
**"Rating Methodology Integrated Oil and Gas," by Moody's Ratings, 23 September 2022, p. 6.**

141.    In two presentations prepared by S&P credit analyst Ben Tsocanos for Exxon, Mr. Tsocanos included a slide titled "Key Credit Factors for Oil & Gas, E&P." In that slide, S&P noted that information about the Company's reserves is the most important credit factor.[124]

## Key Credit Factors for Oil & Gas, E&P

**Country Risk: Low**          **Industry Risk: Intermediate**

**Competitive Position:** Commodity Focus/Scale Driven

| Competitive Advantage (10%) | Scale, scope, diversity (55%) | Operating Efficiency (35%) | Profitability |
|---|---|---|---|
| • Growth prospects in acreage (favorable IRR) | • Reserve size (economies of scale) | • Cash operating costs and unit F&D and FD&A costs | • Confirms or modifies the preliminary competitive position assessment |
| • Mix of liquids and gas produced | • Reserve quality (PD%, RLI, RRR) | • Unit netbacks | • Level + volatility of profitability |
| • Unit revenues realized | • Geographic diversity | • Unlevered costs | • Relative to S&P US E&P peer universe |
| • Extent of vertical integration | • Current production and future growth prospects | • Recycle ratios | |

142.    S&P's published ratings criteria for oil and gas companies explain that the ratings agency puts "particular emphasis on the size, quality, and mix of its reserves base."

> "In assessing the competitive position of an E&P company, *we put particular emphasis on the size, quality, and mix of its reserves base*; the growth prospects inherent in its oil and gas reserves portfolio; its full cycle cost profile; and associated profitability. We view a company's ability to generate sufficient cash flow to replace and grow its reserves (at both peaks

---

[124] "Standard & Poor's Ratings Services Presentation to ExxonMobil Corp.," by Ben Tsocanos, *Standard & Poor's Ratings Services*, 30 April 2015, p. 4 [SPGI-0000208_0001-7 at 4]; and "Standard & Poor's Ratings Services Presentation ExxonMobil To Corp.," by Ben Tsocanos, *Standard & Poor's Ratings Services*, 22 September 2015, p. 4 [SPGI-0000277_0001-7 at 4].

**App. 186**

and troughs of the hydrocarbon price cycle) as the principal factors in our assessment of its financial risk profile, given the industry's capital-intensive nature and the need to continually replace produced reserves."
**"Criteria | Corporates | Industrials: Key Credit Factors for The Oil and Gas Exploration and Production Industry," *S&P Global*, 12 December 2013, p. 1 (emphasis added).**

"Companies in the oil and gas exploration and production (E&P) sector depend on the availability of suitable reserves that can be profitably extracted. Competitive advantage for these upstream companies largely depends on their ability to manage the risks associated with replacing and increasing reserves. … Hydrocarbon reserves, as an E&P company's main assets, are critical to our assessment of the company's scale, scope, and diversity."
**"Sector-Specific Provisions: Corporate and Infrastructure Section 24 | Oil and Gas Exploration and Production," *S&P Global*, 4 April 2024, pp. 120 and 122.**

## V.   CRITIQUE OF THE SAUNDERS REPORT

143. The scope of the Saunders Report was to respond to my "opinion that, had ExxonMobil's March 2016 offering been rated AA+ rather than AAA, ExxonMobil's debt service on the issued notes (the 'Notes') would have required a higher note yield and thus higher interest expense."[125] That is, Dr. Saunders' scope is to refute the fundamental risk-return tradeoff tenet of finance, according to which, a lower credit rating requires a higher note yield and thus higher interest expense. As explained below, the Saunders Report contains a number of other assertions that are unfounded and at odds with generally accepted principles of finance.

144. Notwithstanding the critique proffered in the Saunders Report, Dr. Saunders agrees that using option-adjusted spreads ("OAS") to determine the increase in the Exxon Note yield is a "commonly used metholog[y]" to calculate bond yields.[126] Dr. Saunders' criticisms of the implementation of the option-adjusted spreads methodology is at odds with

---

[125] Saunders Report, ¶8.

[126] Saunders Report, ¶56; "There are several commonly used methodologies to calculate bond yields. These measures include the OAS used by Dr. Feinstein, which attempts to account for embedded call options and is computed using projections and assumptions of future interest rates."

**App. 187**

Defendants other expert, Dr. Ferrell, who accepts and relies on my methodology in the Ferrell Rebuttal Report.[127]

### A.    Dr. Saunders' Exposition of Exxon's Split Rating Is Moot

145.    Opinion 1 of the Saunders Report is that I "fail[ed] to acknowledge that ExxonMobil had a 'split' credit rating, as opposed to a unanimous AA+ rating."[128] As a result, Dr. Saunders contends that I "overstate[] the impact of S&P's downgrade on the yields of ExxonMobil's bond offering, if such an impact existed at all."[129]

146.    Here, Dr. Saunders must be referring to the fact that after Exxon's credit rating was downgraded in April 2016, it carried a split rating. S&P rated Exxon at AA+ while Moody's still rated Exxon at Aaa. Dr. Saunders apparently is contending that I should have investigated what the higher interest expense would have been if Exxon had received that split rating prior to the issuance of the Notes in March 2016. As it turns out, however, the result would be the same as what I presented, because, as the note yield index provider explains, its AA+ index yields (which I applied) are the appropriate benchmark for a note with such a split rating.

147.    I based my assessment of what Exxon's Note yield would have been by referring to the benchmark yields in the ICE [Intercontinental Exchange] Data Indices ("IDI"). As explained in the Feinstein Report, I obtained the IDI data from the Federal Reserve Economic Data ("FRED") database.[130] In their Bond Index Methodology documentation, the IDI provider explains that when constructing its indices, note yields from issuers with a split AA+ and Aaa rating would be assigned to the AA+ index. The AA+ index yield is thus the appropriate yield applicable to a note with a AA+ and Aaa split rating.

---

[127] Ferrell Rebuttal Report, ¶¶62-63.

[128] Saunders Report, ¶18.

[129] Saunders Report, ¶18.

[130] Feinstein Report, ¶175.

**App. 188**

148.   The IDI provider explains as follows:

> "Composite ratings are the simple averages of ratings from Moody's, S&P and Fitch. Ratings must be public and any expected or anticipated ratings are not used. The composite rating is calculated by assigning a numeric equivalent to the ratings in each agency's scale (Table 4). The average of the numeric equivalents for each agency that rates a bond is rounded to the nearest integer and then converted back to an equivalent composite rating using the scale in Table 4. If only two of the designated agencies rate a bond, the composite rating is based on an average of the two. Likewise, if only one of the designated agencies rates a bond, the composite rating is based on that one rating. Provisional or estimated ratings are excluded from the composite rating calculation."
>
> **"Bond Index Methodologies," Intercontinental Exchange, 10 June 2024, p. 43.**

**Table 4: Ratings Scale for Calculating Composite Rating[131]**

| Numeric | Composite | Moody's | S&P | Fitch |
|---|---|---|---|---|
| 1 | AAA | Aaa | AAA | AAA |
| 2 | AA1 | Aa1 | AA+ | AA+ |
| 3 | AA2 | Aa2 | AA | AA |
| 4 | AA3 | Aa3 | AA- | AA- |
| 5 | A1 | A1 | A+ | A+ |
| 6 | A2 | A2 | A | A |
| 7 | A3 | A3 | A- | A- |
| 8 | BBB1 | Baa1 | BBB+ | BBB+ |
| 9 | BBB2 | Baa2 | BBB | BBB |
| 10 | BBB3 | Baa3 | BBB- | BBB- |
| 11 | BB1 | Ba1 | BB+ | BB+ |
| 12 | BB2 | Ba2 | BB | BB |
| 13 | BB3 | Ba3 | BB- | BB- |
| 14 | B1 | B1 | B+ | B+ |
| 15 | B2 | B2 | B | B |
| 16 | B3 | B3 | B- | B- |
| 17 | CCC1 | Caa1 | CCC+ | CCC+ |
| 18 | CCC2 | Caa2 | CCC | CCC |
| 19 | CCC3 | Caa3 | CCC- | CCC- |
| 20 | CC | Ca | CC | CC |
| 21 | C | C | C | C |
| 22 | D | | D | D |

---

[131] Reproduced from "Bond Index Methodologies," Intercontinental Exchange, Inc., 10 June 2024, p. 43.

**App. 189**

149.    Applying the methodology and data used by IDI presented in Table 4 above to the "split rated" Exxon Notes results in a composite rating of "AA+." Specifically, Moody's "Aaa" rating would be assigned the "numeric equivalent" of 1, and S&P's "AA+" rating would be assigned the "numeric equivalent" of 2. The simple average of 2 and 1, equals 1.5, which in accordance with IDI's methodology rounds up to 2. The numeric equivalent of 2 is equal to a composite rating of "AA+." Thus, according to IDI's methodology, Exxon's Notes would have been included in the AA+ index.

### B.    Dr. Saunders' Assertion that AAA and AA+ Rated Bonds Have the Same Default Probability Is Erroneous and Misleading

150.    For Opinion 2 of the Saunders Report, Dr. Saunders argues that my calculations rely on the untested assumption that lower credit ratings lead to higher yields.[132] Dr. Saunders erroneously contends that "default rates for both AAA- and AA+-rated corporate bonds have historically been zero."[133] He explains that AAA-rated and AA+-rated bonds have "indistinguishable credit risks."[134] Dr. Saunders is wrong. The default probabilities can both be rounded to zero, but they are not zero. It is generally understood that even corporate bonds with AAA ratings are not risk-free. And lower rated bonds have greater risk. Dr. Saunders' proffered opinion that "AAA" and "AA+" are both risk-free and have indistinguishable credit risk is so outside the norms of generally accepted principles of finance as to draw into question his credibility as a finance expert.

151.    With his preposterous opinion, Dr. Saunders challenges the very reason for the existence of the "AA+" intermediate rating. The AA+ rating exists to describe notes with greater credit risk than those rated AAA.[135] Dr. Saunders assertion that AAA and AA+ are essentially the same is at odds with why the Credit Rating Agencies ("CRA"), like S&P and Moody's, developed these distinct ratings in the first place, and why the ratings agency bother to downgrade bonds from AAA to AA+ when warranted. The very existence of these different credit ratings speaks to their importance.

---

[132] Saunders Report, ¶28.

[133] Saunders Report, ¶28.

[134] Saunders Report, ¶28.

[135] Saunders Report, ¶28.

**App. 190**

152. Dr. Saunders ignores the extensive literature on credit ratings. Exxon's rating downgrade from AAA to AA+ reflects a perceived increase in S&P's estimation of Exxon's credit risk. This is consistent with academic research that credit ratings provide important information which is incorporated into bond yields.

153. Dr. Saunders overlooks that credit ratings reflect default risk and provide crucial information to the market that influences bond prices and yields. The downgrade of Exxon from AAA to AA+ signaled an increase in credit risk, with the change in rating capturing this nuanced information that impacts investor decisions. Contrary to Dr. Saunders' claim that the credit risks of AAA and AA+ bonds are "indistinguishable," substantial literature shows that credit ratings provide insight into a firm's creditworthiness, including private and forward-looking information not readily available to the broader market.

> "The finding of a significant direct link between ratings and yields for both S&P and Moody's ratings using a different sample and model than previous researchers (EYR, 1987) provides further evidence that ratings contain important nonpublic information."
> **"Bond Ratings, Bond Yields and Financial Information," by David Ziebart and Sara Reiter, *Contemporary Accounting Research*, Vol. 9, No. 1, Fall 1992, p. 280.**

> "On the other hand, Griffin and Sanvicente (1982, p. 104) hypothesize that the rating process 'may be a vehicle for communication of private knowledge to investors and creditors.' Standard and Poor's (1979), Belkaoui (1983), and Sherwood (1976) all claim that rating agencies receive a considerable quantity of sensitive information, including the firm's capital spending and financing plans and projections of future income and balance sheets, which are held in strictest confidence. Consequently, ratings could provide a means of conveying relevant 'inside' information to the bond market without providing the details to the entire marketplace (especially the firm's competitors). In addition, obtaining and evaluating even public information may be difficult and costly so that it may be more efficient for specialized agencies to evaluate the creditworthiness of a firm or bond issue than for all (or most) potential purchasers to do so."
> **"The Information Content on Bond Ratings," by Louis Ederington et al., *Journal of Financial Research*, Vol. 10. No. 3, Fall 1987, p. 212.**

154. Furthermore, Dr. Saunders' opinion disregards the significant body of research indicating that changes in credit ratings influence bond yields. Studies have found a clear correlation between bond ratings and yields, even when default rates are low. For example:

**App. 191**

"Using a non-linear least squares procedure, the yield-to-maturity is related to Moody's rating, Standard and Poor's (S&P) rating, and accounting measures of creditworthiness such as coverage and leverage. Market yields are found to be significantly correlated with both the ratings and a set of readily available financial accounting statistics. These results indicate (1) that market participants base their evaluations of an issue's creditworthiness on more than the agencies' ratings and (2) that the ratings bring some information to the market above and beyond that contained in the set of accounting variables."

**"The Informational Content of Bond Ratings," by Louis Ederington et al.,** *Journal of Financial Research*, **Vol. 10. No. 3, Fall 1987, p. 211.**

155.    According to this and other studies, market yields are significantly correlated with ratings, meaning that even the small (though non-zero) difference in default risk between AAA and AA+ bonds affects yield determination. A downgrade from AAA to AA+ by S&P provides the market with updated information, warranting an adjustment in bond yield to reflect the increase in risk.

### C.    Dr. Saunders' Analysis of Exxon Being Placed on CreditWatch Is Uninformative and Misleading

156.    Dr. Saunders states that "the market was well aware of a potential S&P downgrade after ExxonMobil was placed on CreditWatch ahead of its March 2016 offering but found it inconsequential."[136] Dr. Saunders argues that because S&P revised Exxon's outlook to "negative" in October 2015 and placed the Company on CreditWatch in February 2016 that the market deemed the potential downgraded as inconsequential.[137] To support his argument, Dr. Saunders cites news articles commenting on the possibility of Exxon losing its AAA rating and performs an event study of certain Exxon Notes (not the notes issued in March 2016) following S&P's change in outlook and when S&P placed Exxon on CreditWatch. Dr. Saunders' analysis in no way undermines my finding that lower rated bonds have higher interest rates, and if the credit watch resulted in a downgrade, then the note yield would have been higher. A potential downgrade is not at all the same thing as an actual downgrade, and can be expected to have a different effect on yield.

---

[136] Saunders Report, §VII.

[137] Saunders Report, ¶32-35.

**App. 192**

157. Dr. Saunders cites multiple news articles reporting on Exxon's potential downgrade as support "that the market was well aware of the potential downgrade…"[138] Dr. Saunders overlooks that the news media's widespread reporting and commenting on the possibility of a future downgrade speak to the importance of maintaining a "coveted triple A rating."[139]

158. Market participants closely monitored Exxon's credit rating before, during and after the downgrade.

> "Credit Rating Is Something to Watch. S&P placed XOM's long-term 'AAA' credit rating on *Creditwatch* today and expects to come to a conclusion within 90 days. Even if the rating is reduced by one notch, we believe XOM would maintain sufficient access to capital market."
> **"XOM: All Eyes on The Analyst Day," by Roger Read and Lauren Hendrix, Wells Fargo, analyst report, 2 February 2016.**

> "Exxon Mobil Corp. was demoted from the top credit rating by Standard & Poor's for the first time since the Great Depression as the collapse of the biggest oil-market rally in history strangled cash flows. … ***The downgrade will not only raise Exxon's cost to borrow money but may also erode its status among oil-rich governments as a premier partner with which to do business.*** As Exxon Vice President of Investor Relations Jeffrey Woodbury said in February, the company's AAA rating has been a key selling point when competing for drilling licenses."
> **"Exxon Mobil Loses Top Credit Rating Held Since Depression," by Joe Carroll, *Bloomberg*, 26 April 2016 (emphasis added).**

159. Contrary to Dr. Saunders' opinion, the many news articles published about Exxon potentially losing its AAA credit rating indicate that these events were not inconsequential. That Dr. Saunders is unable to find a statistically significant negative return in the price of Exxon's bonds following Exxon being given a negative outlook or being placed on CreditWatch, does not undermine my analysis in any way. Simply put, it is irrefutable that a lower credit rating increases the cost of a company's debt.

---

[138] Saunders Report, ¶37.

[139] Saunders Report, ¶36.

**App. 193**

**D.      Dr. Saunders' Exposition About How the Exxon Notes Remained a Strong Investment Choice Irrespective of the Credit Downgrade Is Unavailing**

160.    Dr. Saunders' Opinion 4 that the Exxon Notes "remained a strong investment choice irrespective of the credit downgrade" is unremarkable and uninformative.[140] Opinion 4 of the Saunders Report misses the mark. I never offered the opinion that an investment in the Exxon Notes when they had a AA+ rating was a poor investment. Rather, I explained that a note with a lower credit rating is riskier than the same note with a higher credit rating, and if issued at a lower credit rating would increase the interest expense associated with those notes. However, that the Exxon Notes had an AA+ rating for most of the Class Period does not mean that they were not a good investment choice, with a yield appropriate for the assessed risk.

161.    In support, Dr. Saunders compares Exxon's March 2016 offering and August 2019 offering to similar maturity U.S. Treasury securities.[141] Dr. Saunders finds that when Exxon was rated "AAA" the notes issued in March 2016 had a larger spread to Treasuries than the notes issued in August 2019 when Exxon was rated "AA+."[142] Dr. Saunders concludes that this analysis demonstrates the "non-effect of S&P's downgrade on ExxonMobil's bond yield…"[143]

162.    Dr. Saunders's analysis is lacking and his conclusion is wrong. Comparing the yield spread over Treasuries in two different time frames for two different credit ratings is uninformative and misleading. The analysis in the Feinstein Report compares prevailing OAS for two credit ratings ***contemporaneously***.[144] Dr. Saunders ignores the extensive literature that details that spreads to Treasuries can change over time for the market as a whole, even for an index for a particular fixed rating, and even for a notes whose ratings did not change.

---

[140] Saunders Report, §VIII.

[141] Saunders Report, ¶55.

[142] Saunders Report, ¶55.

[143] Saunders Report, ¶55.

[144] Feinstein Report, §VIII.

**App. 194**

"Bond yields—the returns investors receive on bonds—are moving targets. They go up when bond prices go down and vice versa. Likewise, bond spreads get wider or tighter depending on several factors, including supply and demand, credit risk and the overall state of the economy. Because a credit spread represents the relationship between a bond and a comparable Treasury bond, a spread may change because of factors affecting the bond itself, the Treasury bond against which it's measured, or both.

…

Tough economic times also tend to shift credit spreads for corporate bonds higher. When the economy gets rocky, investors seek safe havens, such as U.S. Treasury bonds, which sends their yields lower. By watching bond spreads, investors can get a pretty good idea of overall risk sentiment in the financial markets."

**"Spread the Word: What You Need to Know About Bond Spreads," 8 May 2024, *FINRA*, accessed at www.finra.org/investors/insights/spread-word-what-you-need-know-about-bond-spreads, last accessed 7 January 2025.**

163.    The flaw in Dr. Saunders' analysis is illuminated by consideration of Exxon's own note issuance experience. Dr. Saunders ignores that Exxon issued $8 billion in notes in March 2015, one year prior to the March 2016 note offering, while still "AAA" rated. Following Dr. Saunders' own methodology, one would expect there to be no change in the spread to similar maturity Treasuries if the credit rating did not change. This, however, was not the case. Table-1 below compares the March 2015 and March 2016 note offerings using the same metrics Dr. Saunders employs and shows that the spread to Treasuries was different for the two same-rated offerings.

**Table-1: Spread to Benchmark Treasury for Exxon Bonds Issued in 2015 and 2016[145]**

|  | March 2015 Offering (Rated AAA) | March 2016 Offering (Rated AAA) |
|---|---|---|
| 3-Year Fix Rate | 23 bps | 80 bps |
| 5-Year Fix Rate | 30 bps | 100 bps |
| 7-Year Fix Rate | 45 bps | 120 bps |
| 10-Year Fix Rate | 58 bps | 130 bps |
| 30-Year Fix Rate | 85 bps | 150 bps |

---

[145] Exxon Mobil Corporation, Form FWP, filed 4 March 2015, p. 2; and Exxon Mobil Corporation, Form FWP, filed 1 March 2016, p. 3.

**App. 195**

164. Again, it is a fundamental tenet of finance that a lower credit rating requires a higher cost of borrowing and thus higher interest expense. Investors are not indifferent between higher and lower rated notes. They must be induced to buy the lower rated bonds by a higher yield.

### E. Dr. Saunders Agrees That Option Adjusted Spreads Is a Commonly Used Methodology to Calculate Bond Yields

165. Dr. Saunders agrees that using OAS to determine the increase in the Exxon Note yields is a "commonly used methodolog[y]" to calculate bond yields.[146] Dr. Saunders argues that I did not justify why I used this common methodology over other common bond yield measures.[147] Dr. Saunders identifies three alternative methods to calculate the additional interest expense: yield-to-maturity ("YTM"), yield-to-call ("YTC"), and yield-to-worst ("YTW"). However, Dr. Saunders does not attempt to execute any of his proposed alternative approaches, rendering his criticism moot.[148]

166. As explained in the Feinstein Report, OAS accounts for the "optionality that is embedded in some bonds (such as call features), thus allowing for the comparison of the credit riskiness of many different notes."[149] In fact, Dr. Saunders acknowledges that "[n]otably, OAS looks at several possible redemption dates, along with possible interest rate paths, and then uses an averaging approach to calculate the expected yield for the bond."[150] The OAS index used in the Feinstein Report incorporates the market's assessment of the most-likely path of future interest rates for a particular credit rating, and therefore the most likely option exercise scenario.[151] For bonds with callable features, the most-likely path of future interest rates allows for one to determine whether a call feature will be executed or

---

[146] "There are several commonly used methodologies to calculate bond yields. These measures include the OAS used by Dr. Feinstein, which attempts to account for embedded call options and is computed using projections and assumptions of future interest rates." (Saunders Report, ¶56.)

[147] Saunders Report, ¶56.

[148] Saunders Report, ¶56.

[149] Feinstein Report, ¶174.

[150] Saunders Report, ¶67.

[151] "Introduction: Why OAS Analysis?" by Tom Miller, *Introduction to Option Adjusted Spread Analysis*, Bloomberg Press New York, 2007, p. 3: "OAS analysis uses statistical analysis to make reasonable assumptions about the most likely redemption scenario. This is possible because OAS analysis includes a sophisticated model of the likely term structure of interest rates;" and p. 14: OAS analysis "account for the risks posed by an uncertain redemption date by providing an objective measure of performance that is independent of any assumed redemption date."

**App. 196**

not. Static yield measures, such as YTW or YTC assume that interest rates take a particular path dictating that the call feature will be exercised.[152] YTM, on the other hand, does not consider call features, and assumes that the path of interest rates will be such that the call feature will <u>not</u> be exercised.[153] The market's assessment at any given time of the most-likely path of future interest rates (i.e., what is incorporated into OAS) provides the market's consensus estimation of the likelihood of option exercise.

167.    OAS is the best approach to account for changes in credit risk while considering the redemption features of the subject notes and comparison notes. Not only does Dr. Saunders fail to demonstrate that any of his proposed alterative measures are superior, but he offers no challenge to OAS being the best methodology to determine the increase in the Exxon Note yields in the instant matter.

### F.    Dr. Saunders Erroneously Suggests That Market Benchmarks Are Uninformative

168.    Opinion 6 of the Saunders Report attacks the use of market benchmarks or indices for analyzing individual securities. Dr. Saunders argues that "[t]he AAA and AA OAS measures Dr. Feinstein relies upon reflect market averages and provide limited insight into individual bonds."[154] Dr. Saunders' criticism is akin to saying that even though Microsoft is a component of the S&P 500 you cannot compare Microsoft stock's performance to the performance of the market benchmark, because the market benchmark contains an average

---

[152] "Introduction: Why OAS analysis?" by Tom Miller, *Introduction to Option Adjusted Spread Analysis*, Bloomberg Press New York, 2007, pp. 2-3: "OAS analysis was designed to provide more reliable results than its analytical predecessor, yield-to-worst analysis. Callable and putable bonds are still, today, widely quoted on a yield-to-worst basis. This method, however, contains many assumptions that lead to incorrect valuation. Yield-to-worst analysis assumes that any bond trading above par will be called in the future—but this requires that interest rates in the future stay below the bond's coupon rate—which may or may not occur. Furthermore, yield-to-worst analysis also suggests that the bond will be held to the specified date and all coupons may be reinvested at the calculated yield. This seldom happens for active investors in the bond markets."

[153] "Using Duration and Convexity in the Analysis of Callable Bonds," by Mark Dunetz and James Mahoney, *Financial Analysts Journal*, Vol. 44, No. 3, May - June 1998, pp. 53-54: "The price-yield behavior of callable bonds, however, departs from that of non-callable bonds because the cash flows are uncertain. In current research and analysis, this problem is typically simplified by treating the callable bond as though it is trading either to call or to maturity, depending on its current price and call characteristics. This approach may be acceptable for bonds deep 'in the money' or entirely 'out of the money,' but it is less than satisfactory because it makes non concessions to market conditions, market volatility or the specifics of the call features."

[154] Saunders Report, ¶77.

63

of all stocks within the S&P 500 index, whereas Microsoft has unique idiosyncratic characteristics.

169. The use of benchmarks in financial analysis is pervasive. Stocks are commonly valued based on the valuations of benchmarks. Notes are routinely valued by discounting the contractual cash flows by a benchmark yield, where the benchmark is selected on the basis of the credit rating. As discussed above, and as accepted by Dr. Ferrell, statistical analysis uses benchmarks to control for market and sector factors. Attacking the use of benchmarks to gauge how a bond yield would change if its credit rating changes is another of Dr. Saunders' untenable opinions.

170. Dr. Saunders states that the market index does not consider the individual features of each of the bonds.[155] This is the advantage of using the market benchmark, as it surveys many different bonds with the same credit rating. The market benchmark will not exactly resemble any particular subject bond being analyzed, however the market benchmark provides a reasonable proxy for comparison purposes.

171. Dr. Saunders' assertion that comparing individual bonds to a market benchmark is inappropriate because a market benchmark is an average of the constituents, such that the market benchmark does not perfectly reflect the characteristics of a particular bond issuance is indefensible. Not only do bond market participants regularly compare the spreads of individual bonds to market benchmarks, they compare the spread of one market benchmark to other market benchmarks. The following excerpts from the literature support this proposition.

---

[155] Saunders Report, ¶80.

**App. 198**

"Nationally recognized statistical rating organizations (NRSROs), such as Standard & Poor's and Moody's, rate the creditworthiness of a wide range of issuers. They are the prominent sources of information that investors use to make credit risk assessment. Meanwhile, numerous market participants assess the credit quality of fixed income securities using information that includes but is not limited to stated credit ratings. As a result, market prices of bonds or, equivalently, bond yields should reflect the aggregate expectations and market assessment of credit risk in real time."
**"Credit Spreads, Rating Downgrades, and Downside Performance: A Market-Informed Approach to Monitoring Credit Risk," by Wei Dai et al,** *SSRN Electronic Journal***, 26 March 2020, p. 2.**

"For fixed-income instruments that are not actively traded and therefore do not have an observable price, it is common to use an estimation process known as matrix pricing or evaluated pricing. Matrix pricing makes use of observable liquid benchmark yields such as Treasuries of similar maturity and duration as well as the benchmark spreads of bonds with comparable times to maturity, credit quality, and sector or security type in order to estimate the current market yield and price."
**"Liability-Driven and Index-Based Strategies," by James Adams and Donald Smith,** *Fixed Income and Equity Portfolio Management CFA Level III Curriculum***, CFA Institute, 2017, p. 95.**

"A second type of security characteristic-based method for defining systematic risk exposures involves the use of index portfolios (e.g., S&P 500, Wilshire 5000) as common factors. The intuition behind this approach is that, if the indexes themselves are designed to emphasize certain investment characteristics, they can act as proxies for the underlying exposure that determines returns to that characteristic."
**"Multifactor Models of Risk and Return," by Frank Reilly and Keith Brown,** *Investment Analysis Portfolio Management***, 7ᵗʰ Edition, 2002, p. 296.**

### G.    Dr. Saunders Is Wrong to Suggest There Is No Economic Foundation for Linear Interpolation

172.    Opinion 7 of the Saunders Report is that "there is no statistical or economic rationale to support Dr. Feinstein's assumption that the AA+ index OAS would lie exactly at the midpoint between the AAA OAS and the AA OAS."[156] Dr. Saunders contends that because one of the sources I provided to show that linear interpolation was a generally accepted and widely used methodology in finance to achieve intermediate credit ratings references a

---

[156] Saunders Report, ¶83.

**App. 199**

mortgage backed debt security, rather than a corporate bond, it follows that linear interpolation "cannot be reliably utilized" for the Exxon Notes. [157] Once again, Dr. Saunders proffers an opinion outside the mainstream of generally accepted finance principles and practices.

173.    Contrary to Dr. Saunders' opinion, linear interpolation is a generally accepted and widely used technique in financial analysis and practice, particularly when precise benchmarks or values are not readily available. Dr. Saunders ignores the extensive literature on credit ratings, IDI's methodology, [158] S&P's [159] methodology, as well as Moody's [160] methodology.

174.    As noted in an article authored by Professor Donald Chance, Professor Onnig Dombalagian, and myself, which is forthcoming in the *University of Pennsylvania Journal of Business Law*, linear interpolation is commonly employed in bond markets, such as for calculating accrued interest and determining benchmark rates for maturities that do not have an exact match. This method is standard practice and delivers sufficiently accurate estimates in most applications.

> "Interpolation is widely used in the financial world. In bond markets, accrued interest is the total amount of interest that has been accumulated since the last payment day. It is always calculated by linear interpolation even though interest does not accrue linearly. Also, in bond markets, there are benchmark interest rates, such as the yield on a 10-year US Treasury bond. It is rare, however, that a precisely 10-year Treasury bond exists, so benchmark yields are interpolated from the rates on maturities that surround 10 years. In option markets, implied volatility is graphed against moneyness, and the value of implied volatility for hypothetical strikes

---

[157] Saunders Report, ¶84.

[158] *See, e.g.,* IDI performs linear interpolation to derive the nominal Treasury yield for a TIPS (Treasury Inflation-Protected Security) when the exact maturity date for the TIPS does not match any available nominal Treasury instrument ("ICE U.S. Dollar Inflation Index Family," *ICE Benchmark Administration*, 13 July 2022, p. 6).

[159] *See, e.g.,* S&P uses linear interpolation to calculate the haircut percentage for ratings that fall between two rating categories ("Criteria | Structured Finance | General: Data Center Securitizations: Global Methodology and Assumptions," *S&P Global*, 13 June 2024).

[160] *See, e.g.,* Moody's employs linear interpolation to estimate the implied rating when a normalized metric falls between two rating nodes ("Moody's Credit Rating Prediction Model," by Albert Metz and Richard Cantor, *Moody's Special Comment*, November 2006, pp. 4-5); and Moody's uses linear interpolation to estimate the spread for a rating class that falls between observed rating categories, by interpolating between the nearest known values ("Moody's market Implied Ratings: Description and Methodology," by Yikai Wang et al., *Moody's Analytics*, 2019, p. 7).

**App. 200**

between those that trade is determined by interpolation. Nonlinear interpolation can be used for greater precision, but linear interpolation is likely to provide very close results."
**"The Class Certification of Exchange-Listed Options in Securities Class-Action Litigation," Don Chance, Steven Feinstein, and Onnig Dombalagian, forthcoming in *University of Pennsylvania Journal of Business Law*, 2024, p. 42.**

175. Dr. Saunders' incorrect assertion that there is no statistical or economic rationale for treating the AA+ OAS as the midpoint between the AA and AAA OAS ignores substantial empirical evidence supporting the pricing of split-rated bonds in this manner. As demonstrated by Jewell and Livingston (1998), the market typically prices bonds with a credit rating between a two ratings based on the average of the two ratings. Cantor et al. (1997) also explain that the yields of such bonds are best estimated by averaging the two ratings, rather than relying solely on the higher or lower rating. Their study also finds that using the average rating results in the lowest error and the most efficient forecast precision.

"We present several new empirical findings about split ratings, based on a large sample of industrial bonds issued from 1980 through mid-1993. First, when split ratings occur in industrial bonds, neither Moody's nor S&P gives the higher rating a statistically significant percentage of time. Thus, neither rating agency is consistently more lenient. Second, when split ratings occur, the bond yield on the split-rated bond lies between the typical yields for the higher rating and the lower rating. In effect, the market price is set by the average of the two ratings."
**"Split Ratings, Bond Yields, and Underwriter Spreads," by Jeff Jewell and Miles Livingston, *The Journal of Financial Research*, Vol. 21, No. 2, 1998, pp. 186-187, and 197.**

"The average rating rule consistently provides the lowest RMSE and mean-adjusted RMSE, regardless of the number of ratings notches being considered. … We show that when bonds are split-rated by Moody's and Standard and Poor's, both ratings affect their yields. Pricing models that rely either on Moody's or Standard and Poor's ratings (but not both) produce unbiased but highly inefficient estimates. If models rely instead on simply the higher or lower of the two ratings (but not both), greater bias is introduced with insignificant gains in efficiency. Overall, the best results in terms of bias and forecast precision are obtained when yields are inferred from the average of the two things. This finding also holds across subsamples distinguished by the extent of the rating-notch differential."
**"Split ratings and the Pricing of Credit Risk," by Richard Cantor et al., *Federal Reserve Bank of New York Research Paper*, No. 9711, March 1997, pp. 12 and 15.**

67

**App. 201**

176. Dr. Saunders' opinion that linear interpolation is not reliable is erroneous and at odds with the published finance literature.

### H. Dr. Saunders' Criticism of my Quantification of the Additional Interest Expense At Maturity Is Unfounded

177. Opinion 8 of the Saunders Report is that my calculation of the additional interest expense is incorrect.[161] Dr. Saunders contends that I "fail[] to address the fact that some of the at-issue ExxonMobil bonds were callable before maturity, and further improperly values the interest payments."[162] Dr. Saunders does not dispute that I *computed* the additional interest expense over the life of the notes correctly, but rather insists that I should have taken the present value of the additional interest expense in order to *value* them.[163] That criticism is misguided as my objective was to compute the additional amount of interest expressed in future value terms (i.e., at maturity), not assess the present value of that higher interest expense. Dr. Saunders misunderstands the purpose of my analysis. Dr. Saunders' choice of presentation has no bearing on my conclusion that the future value of the additional interest expense over the life of the Notes would be $831.95 million.

178. Regarding Dr. Saunders' comments about the call feature in Exxon's Notes, one of the main benefits of using OAS to compute the additional interest expense is that it accounts for call features. Importantly, a callable bond does not mean that the bond is going to be called with 100% certainty. One benefit of using OAS is that it provides the market's assessment of the likelihood of call features being exercised – i.e., the likelihood that a bond is called.

179. In Table 5 of the Saunders Report, Dr. Saunders assumes that all four bonds with call features are called on the first callable date.[164] The Saunders Report demonstrates that this was not the case for two of the Exxon Notes, which matured without being called early. In his report, Dr. Saunders states that "[t]wo of these bonds, 30231GAV4 and 30231GAR3,

---

[161] Saunders Report, ¶¶85-90.

[162] Saunders Report, ¶85.

[163] Saunders Report, ¶¶88-90.

[164] Saunders Report, Table 5.

**App. 202**

have matured without being called."[165] Moreover, to date, neither of the other two bonds have been called early.

## VI.    LIMITING FACTORS AND OTHER ASSUMPTIONS

180.    This report is furnished solely for the purpose of court proceedings in the above referenced matter and may not be used or referred to for any other purpose. The analysis and opinions contained in this report are based on information available as of the date of this report. I reserve the right to supplement or amend this report if additional information becomes available to me.

Steven P. Feinstein, Ph.D., CFA

---

[165] Saunders Report, FN 135.

69

**App. 203**

**Exhibit-1**
**Documents and Other Information Considered**
**In Addition to Those Cited in the Feinstein Report**

## EXPERT REPORTS

- Report on Loss Causation and Damages, Professor Steven P. Feinstein, Ph.D., CFA, dated 11 October 2024.
- Expert Report of Allen Ferrell, Ph.D., dated 10 December 2024.
- Expert Report of Anthony Saunders, Ph.D., dated 10 December 2024.

## NEWS ARTICLES AND PRESS RELEASES

- "Exxon Mobil Loses Top Credit Rating Held Since Depression," by Joe Carroll, *Bloomberg*, 26 April 2016.
- "Chevron Reports Third Quarter Net Income of $1.3 Billion," *Platts Commodity News*, Company press release, 28 October 2016.

## ANALYST REPORTS

- 2017.01.31 J.P. Morgan
- 2017.01.31 Morgan Stanley
- 2017.01.31 Raymond James
- 2017.01.31 UBS
- 2017.02.01 Morningstar

## SEC FILINGS

- Exxon Mobil Corporation, Form FWP, filed 4 March 2015.
- Exxon Mobil Corporation, Form FWP, filed 1 March 2016.

## PRODUCED DOCUMENTS

- EMC_RAM 001656297
- SPGI-0000208_0001-7
- SPGI-0000277_0001-7

**App. 204**

**Exhibit-1**
## Documents and Other Information Considered
## In Addition to Those Cited in the Feinstein Report

### ACADEMIC AND PROFESSIONAL LITERATURE

- Adams, James and Donald Smith, "Liability-Driven and Index-Based Strategies," *Fixed Income and Equity Portfolio Management CFA Level III Curriculum*, CFA Institute, 2018.
- Brav, Alon and J.B. Heaton, "Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias," *Washington University Law Review*, Vol. 93, No. 2, 2015.
- Brochet, Francois, Kalin Kolev, and Alina Lerman, "Information Transfer and Conference Calls," *Review of Accounting Studies*, Vol. 23, 17 April 2018.
- Call, Andrew, Max Hewitt, Jessica Watkins, and Teri Lombardi Yohn, "Analysts' Annual Earnings Forecasts and Changes to the I/B/E/S Database," *Review of Accounting Studies*, Vol. 26, No. 1, 16 September 2020.
- Cantor, Richard, Frank Packer, and Kevin Cole, "Split ratings and the Pricing of Credit Risk," *Federal Reserve Bank of New York Research Paper*, No. 9711, March 1997.
- Chance, Don, Steven Feinstein, and Onnig Dombalagian, "The Class Certification of Exchange-Listed Options in Securities Class-Action Litigation," forthcoming in *University of Pennsylvania Journal of Business Law*, 2024.
- Dai, Wei, Alan Hutchison, and Samuel Yusun Wang, "Credit Spreads, Rating Downgrades, and Downside Performance: A Market-Informed Approach to Monitoring Credit Risk," *SSRN Electronic Journal*, 26 March 2020.
- Dunetz, Mark and James Mahoney, "Using Duration and Convexity in the Analysis of Callable Bonds," *Financial Analysts Journal*, Vol. 44, No. 3, May - June 1998.
- Ederington, Louis, Jess Yawitz and Brian Roberts, "The Information Content on Bond Ratings," *Journal of Financial Research*, Vol. 10. No. 3, Fall 1987.
- Ferrell, Allen, Alberto Manconi, Ekaterina Neretina, William Powley, and Luc Renneboog, "Corporate Litigation, Governance, and the Role of Law Firms," *European Corporate Governance Institute - Law Working Paper*, No. 607, 4 October 2021.
- Ferrell, Allen and Atanu Saha, "Forward-casting 10b-5 Damages: A Comparison to Other Methods," *The Journal of Corporation Law*, 2012, Vol. 37, No. 2.
- Ferrell, Allen and Atanu Saha, "The Loss Causation Requirement for Rule 10b-5 Causes of- Action: The Implication of Dura Pharmaceuticals v. Broudo," *Harvard Law and Economics Discussion Paper,* No. 596, August 2007.
- Ferrell, Allen and Martijn Cremers, "Thirty Years of Shareholder Rights and Stock Returns," *AFA 2013 San Diego Meeting Paper*, 12 March 2012.
- Francis, Jennifer, Qi Chen, Donna Philbrick, and Richard Willis, "Security Analyst Independence," *Research Foundation of CFA Institute*, 1 August 2004.

**App. 205**

**Exhibit-1**
**Documents and Other Information Considered**
**In Addition to Those Cited in the Feinstein Report**

- Frankel, Richard, Marilyn Johnson, and Douglas Skinner, "An Empirical Examination of Conference Calls as a Voluntary Disclosure Medium," *Journal of Accounting Research*, Vol. 37, No. 1, Spring 1999.
- Hand, John, Henry Laurion, Alastair Lawrence and Nicholas Martin, "Explaining Firms' Earnings Announcement Stock Returns Using FactSet and I/B/E/S Data Feeds," *Review of Accounting Studies*, Vol. 27, No. 4, 23 March 2021.
- Harris, Lawrence, "A Transaction's Data Study of Weekly and Intradaily Patterns in Stock Returns," *Journal of Financial Economics*, Vol. 16, No. 1, May 1986.
- Hollander, Stephan, Maarten Pronk, and Erik Roelofsen, "Does Silence Speak? An Empirical Analysis of Disclosure Choices During Conference Calls," *Journal of Accounting Research*, Vol. 48, No. 3, 2009.
- Jewell, Jeff and Miles Livingston, "Split Ratings, Bond Yields, and Underwriter Spreads," *the Journal of Financial Research*, Vol. XXI, No. 2, 1998.
- Kennedy, Peter, *A Guide to Econometrics*, Blackwell Publishing, 6th Edition, 2008.
- Larocque, Stephannie, Jessica Watkins, and Eric Weisbrod, "Consensus? An Examination of Differences in Earnings Information Across Forecast Data Providers," *SSRN*, December 2023.
- Miller, Tom, "Introduction: Why OAS Analysis?" *Introduction to Option Adjusted Spread Analysis*, Bloomberg Press New York, 2007.
- Mustokoff, Matthew, and Margaret Mazzeo, "Loss Causation on Trial in Rule 10B-5 Litigation a Decade After Dura," *Rutgers University Law Review*, Vol. 70:175, 2017.
- Reilly, Frank and Keith Brown, "Multifactor Models of Risk and Return," *Investment Analysis Portfolio Management*, 7th Edition, 2002.
- Ziebart, David and Sara Reiter, "Bond Ratings, Bond Yields and Financial Information," *Contemporary Accounting Research*, Vol. 9, No. 1, Fall 1992.

**LEGAL CASES**

- *Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.,* 955 F.3d 254 (2d Cir. 2020).
- *In re Harman International Industries, Inc. Securities Litigation,* No. 14–7017, United States Court of Appeals District of Columbia, Opinion, filed 23 June 2015.
- *In re Signet Jewelers Ltd. Sec. Litig.,* No. 16-Civ.-6728 (CM)(RWL), 2019 WL 3001084 (S.D.N.Y. July 10, 2019).
- *In re Vale S.A. Securities Litigation,* United States District Court Southern District of New York, Opinion and Order, No. 1:15-cv-9539-GHW, signed 23 March 2017.
- *Larry Freudenberg v. E*Trade Financial Corporation,* No. 07 Civ. 8538, United States District Court Southern District of New York, Opinion, filed 11 May 2010.

**App. 206**

**Exhibit-1**
**Documents and Other Information Considered**
**In Addition to Those Cited in the Feinstein Report**

- *Massachusetts Retirement Systems v. CVS Caremark Corporation,* United States Court of Appeals First Circuit, Opinion, No. 12-1900, filed 24 May 2013.
- *Pieter Van Dongen v. CNinsure Inc.,* United States District Court Southern District of New York, Decision and Order, No. 11 Civ. 7320(VM), filed 24 June 2013.
- *Public Employees' Retirement System of Mississippi v. Amedisys, Inc.,* United States Court of Appeals Fifth Circuit, Opinion, No. 13-30580, filed 2 October 2014.
- *Sheet Metal Workers Local 32 Pension Fund v. Terex Corporation,* United States District Court District of Connecticut, Ruling and Order, No. 3:09-CV-2083(RNC), signed 31 March 2018.


**OTHER LEGAL CASE DOCUMENTS**

- Declaration of Professor Allen Ferrell, in *City of Lakeland Employees Pension Plan, vs. Baxter International Inc., et al.*, 1:10-cv-06016, dated 25 July 2014.
- Declaration of Professor Allen Ferrell, in *Fosbre vs. Las Vegas Sands Corp.*, et al., 2:10-cv-00765, dated 9 January 2015.
- Expert Report of Allen Ferrell, Ph.D., in *Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corporation et al.*, No. 4:20-cv-00576 (S.D. Tex.), dated 10 December 2021.
- Expert Report of Allen Ferrell, Ph.D., in *Homyk v. ChemoCentryx, Inc. et al.*, 4:21-cv-03343 (Cal. N.D.), dated 22 November 2023.
- Expert Report of Allen Ferrell, Ph.D., in *In re Grupo Televisa Securities Litigation*, 1:18-CV-01979, dated 15 January 2020.
- Expert Report of Allen Ferrell, Ph.D., in *In re Signet Jewelers Limited Securities Litigation*, 16-CV-06728, dated 26 April 2019.
- Rebuttal Expert Report of Allen Ferrell, Ph.D., *In re Kraft Heinz Securities Litigation*, 1:19-cv-01339 (N.D. Ill.), dated 20 May 2022.
- Report of Professor Allen Ferrell, in *City of Westland Police and Fire Retirement System vs. Metlife Inc., et al*, 12 Civ. 0256, dated 19 October 2017.
- Report of Professor Allen Ferrell, in *Fosbre vs. Las Vegas Sands Corp., et al.,* 2:10-cv-00765, dated 2 October 2015.
- Second Rebuttal Report of Professor Allen Ferrell, in *City of Westland Police and Fire Retirement System, vs. Metlife, Inc., et al.,* No. 12 Civ. 0256, dated 16 November 2018.

73

**Exhibit-1**
**Documents and Other Information Considered**
**In Addition to Those Cited in the Feinstein Report**

**OTHER**

- "Bond Index Methodologies," *Intercontinental Exchange*, 10 June 2024.
- "Criteria | Corporates | Industrials: Key Credit Factors for The Oil and Gas Exploration and Production Industry," *S&P Global*, 12 December 2013.
- "Criteria | Structured Finance | General: Data Center Securitizations: Global Methodology and Assumptions," *S&P Global*, 13 June 2024.
- "Crude Oil Disruptions in Nigeria Increase as a Result of Militant Attacks," by Melanie Berkey, EIA Report, 18 August 2016 (available at https://www.eia.gov/todayinenergy /detail.php?id=27572#, last accessed on 7 January 2025).
- https://www.sec.gov/divisions/corpfin/guidance/cfoilgasinterps.htm.
- "ICE U.S. Dollar Inflation Index Family," *ICE Benchmark Administration*, 13 July 2022.
- "Moody's Credit Rating Prediction Model," by Albert Metz and Richard Cantor, *Moody's Special Comment*, November 2006.
- "Moody's Market Implied Ratings: Description and Methodology," by Yikai Wang, Damien Moore, Douglas Dwyer, *Moody's Analytics Whitepaper*, 2019.
- "Rating Methodology Integrated Oil and Gas," *Moody's Ratings*, 23 September 2022.
- SEC Rule 4-10 (a) of Regulation S-X of the Securities Exchange Act of 1934.
- "Sector-Specific Provisions: Corporate and Infrastructure Section 24 | Oil and Gas Exploration and Production," *S&P Global*, 4 April 2024.
- "Spread the Word: What You Need to Know About Bond Spreads," 8 May 2024, *FINRA*, accessed at www.finra.org/investors/insights/spread-word-what-you-need-know-about-bond-spreads, last accessed 7 January 2025.
- "Standards of practice for Investor Relations," National Investor Relations Institute, March 2004.
- "What are the rules for excluding analysts from the consensus estimates?" LSEG FAQ, last visited 31 December 2024.
- Any other documents cited in the report.

74

**App. 208**

# Exhibit 3

Page 1

VOLUME: I
PAGES: 1 to 324
EXHIBITS:  1 to 7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

Civil Action No. 3:16-CV-03111-K

PEDRO RAMIREZ, JR.,                    )
INDIVIDUALLY AND ON BEHALF       )
OF ALL OTHERS SIMILARLY          )
SITUATED,                               )
                    Plaintiffs,       )
                                             )
vs.                                          )
                                             )
EXXON MOBIL CORPORATION,      )
ET AL,                                      )
                    Defendants.       )

VIDEOTAPED DEPOSITION OF STEVEN P. FEINSTEIN, Ph.D., called as a witness on behalf of the Defendants, pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Jeanette N. Maracas, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of WilmerHale, LLP, 60 State Street, Boston, Massachusetts, on Wednesday, January 22, 2025, commencing at 9:17 a.m.

**App. 209**

Page 2

APPEARANCES:

ROBBINS GELLER RUDMAN & DOWD, LLP
By: Scott H. Saham, Esq.
By: Spencer Burkholz, Esq.
By: T. Alex B. Folkerth, Esq.
655 West Broadway
San Diego, CA 92101
For the Plaintiffs.
Ssaham@rgrdlaw.com
Sburkholz@rgrdlaw.com
Afolkerth@rgrdlaw.com

PAUL WEISS RIFKIND WHARTON & GARRISON
By: Audra J. Soloway, Esq.
By: Emily Miller, Esq.
1285 Avenue of the Americas
New York, NY 10019
For the Defendants.
Asoloway@paulweiss.com
Emiller@paulweiss.com

Bob Giannini, Videographer.

ALSO PRESENT VIA ZOOM:

Patrice Childress
David Ceasar

Page 3

I N D E X
Testimony of:        Direct   Cross
Steven P. Feinstein, Ph.D.
(by Ms. Soloway)          5

E X H I B I T S

No.          Description          Page

Exhibit 1   10/11/24 Report on
            Loss Causation and Damages
            of Steven P. Feinstein,
            Ph.D.              10

Exhibit 2   1/10/25 Reply Report
            of Steven P. Feinstein,
            Ph.D.              35

Exhibit 3   ExxonMobil 2015
            Form 10-K.         57
Exhibit 4   12/10/24 Expert
            Report of Allen
            Ferrell, Ph.D.     174
Exhibit 5   12/21/18 Expert
            Report of Frank C.
            Torchio.           217
Exhibit 6   Annual Coupon
            document.          264

Exhibit 7   12/10/24 Expert
            Report of Anthony
            Saunders, Ph.D.    276

Page 4

P R O C E E D I N G S

VIDEOGRAPHER:  Good morning.  We are on the record.  This is the videographer speaking, Bob Giannini.  I'm with the court reporter, Jeanette Maracas with Veritext Legal Solutions.  Today is January 22nd, 2025, the time is 9:17 a.m.  We are here at WilmerHale located in Boston, Massachusetts, to take the video deposition of Steven Feinstein in the matter of Pedro Ramirez, Jr. versus ExxonMobil Corporation, et al.

Will counsel introduce themselves for the record.

MR. SAHAM:  Scott Saham for the plaintiffs.

MR. FOLKERTH:  Alex Folkerth for the plaintiffs.

MR. BURKHOLZ:  Spencer Burkholz for the plaintiffs.

MS. SOLOWAY:  Good morning.  Audra Soloway from Paul Weiss for the defendants.

MS. MILLER:  Emily Miller for the defendants.

VIDEOGRAPHER:  Patrice Childress and David Caesar are online.  Will the court

Page 5

reporter please swear in the witness.

STEVEN P. FEINSTEIN, Ph.D.

A witness called for examination by counsel for the Defendants, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. SOLOWAY:

Q.  Good morning Dr. Feinstein.  How are you?

A.  Good, thank you.

Q.  Is there anything that would prevent you from giving truthful testimony today?

A.  No.

Q.  Let's just start with some background information.  What do you consider your primary area of professional expertise?

A.  Finance, finance, financial economics, econometrics, statistics and then numerous sub-areas within those fields.

Q.  Are you a lawyer?

A.  No.

Q.  Do you have any formal legal training?

A.  No.

Q.  Are you offering legal opinions in this matter?

2 (Pages 2 - 5)

Page 34

Q. How did you select documents to review in order to prepare your opinions in this case?

A. It's research and analysis. There's a process to research and analysis, understanding the question, considering how one might answer the questions, acquiring the data and documents that would be relevant to answering the question. That's what I did.

Q. With respect to -- there are certain documents cited in your report that were produced by Exxon in the case that are not publicly available, correct?

MR. SAHAM: Again, I'm going to object. Those are the ones referenced in the missing pages of the exhibit. You might even have an extra copy.

MS. SOLOWAY: They're also in the footnotes.

Q. I'm asking generally, you're aware that you cited documents that were produced by ExxonMobil in this case, correct?

A. I have an exhibit in my report called Documents and Other Information Considered

Page 35

and that's going to be the best way for me to answer the question accurately, is to refer to that, so I'd really like to see the rest of that exhibit.

Q. Why don't we mark the reply report.

MR. SAHAM: We might even have one that doesn't have writing on it.

MS. SOLOWAY: This is fine. We'll sort it out on a break.

MR. SAHAM: Okay.

(Exhibit 2 marked for identification.)

Q. I'm going to hand you a document we've marked as Exhibit 2. Is that your reply report in this case?

A. Yes.

Q. I just want to make sure -- hang on. You're about to mix up the exhibits. No, no, no, don't put that down. That is the exhibit to your reply report, correct?

A. This is the exhibit to the first report.

Q. I just handed that to you.

A. No, this is what you handed me.

Q. No. I handed you two documents. Pick that piece of paper up, please. Good. Now put

Page 36

it with the other one. Thank you. And now close the other document so you don't confuse them.

MR. SAHAM: This one?

MS. SOLOWAY: Yes, please. Thank you.

A. Got it.

Q. Okay. Are these the two reports that you submitted in this case, sir?

A. Yes.

Q. And if you look at the reply report and there's a list of documents considered there as well, it's Exhibit 1. Do you see that? It's attached. Turn the next page. Do you see that?

A. It's not attached.

Q. Excuse me. It's the attachment to your report, correct? This is Exhibit 1?

A. Yes, it is.

Q. Okay. Do you see at the bottom it says Produced Documents?

A. Yes.

Q. These are documents with Bates numbers, correct?

A. Yes.

Page 37

Q. Do you understand these to be documents that had been produced by parties in the litigation?

A. That's my understanding.

Q. How did you select documents for review that are documents that are produced by the parties in the litigation and not public documents?

A. Well, in the course of the research and analysis, I consider what information I would want to have to either form an opinion or confirm an opinion, and typically I would ask counsel, plaintiffs' counsel, if they know of any documents that bear on the question that I might have. I might explain to them the question and they might say there's some documents that bear on that. In the course of reading those documents, I might either be satisfied that it's complete or understand that it's incomplete. I might return and ask for a more complete production of documents on a topic. Sometimes -- and so that is one way documents arrive to me.

Also, I do believe access to a data

10 (Pages 34 - 37)

Page 38

bank is provided so that my staff can serve that same purpose. I would ask them we should get documents that refer to this or that and they would search the data bank for documents that are appropriate or related to what I'm asking about.

Q. Does your staff have access to all the documents produced in the case?

A. Yes -- no, no. They have access to all the same documents I have, if that's what you mean. I do believe they have access to the documents produced in this case.

Q. And the ones that you've considered are ones you list in your reports, correct?

A. Right.

Q. Sitting here today, is there anything about either your first report or your second report that you believe, sitting here now, is incorrect?

A. Yes. There's a revision I want to make.

Q. What's that?

A. It would be on Page 54 of the reply report.

Q. Okay.

A. In Paragraph 146, I'd want to strike the last sentence of 146.

Page 39

Q. Why are we striking the last sentence of 146?

A. Well, the criticism from Dr. Saunders was that I should have been answering a different question, which I explained was an inappropriate criticism. I answered correctly the question I was asked. He challenged the question, not the answer. So I explain that in the report.

When doing the analysis, I had come to the opinion that it wouldn't matter if I was asked a different question, but in preparing for the deposition and considering what I wrote and the conclusions I arrived at, it became obvious that if a different question was asked, it would require a different answer. So I wrote here it turns out, however, the result would be the same as what I presented, and it actually would not be.

Q. What would it be?

A. Well, I think there's support in the literature for the principle that a bond that has a split rating, meaning in this case it would be, let's say, AAA from one

Page 40

credit rating agency and AA+ from a different rating agency, that when determining what the additional spread or yield is required on a split rating bond, you would average the spreads from those two indices instead of taking the spread from the lower rating index.

So the result is still that there would be hundreds of millions of dollars of extra interest expense that Exxon could have expected to have paid if they had gotten a downgrade to a split rating from their AAA rating, but it's not the same number, the $800 million-plus that I found was the correct answer to the question that I was asked which is what if they were downgraded to AA+.

Q. I just want to make sure I understand this. When you calculated the $832 million number, the question that you were answering was assume Exxon was downgraded to AA+ by both of the credit rating agencies that covered it or only by one of the credit rating agencies that covered it?

A. By both, essentially by both. The question

Page 41

was a little more parsimonious than that. It was assume it was downgraded to AA+, not assume it was downgraded to a split rating that the data providers would assign to a AA+ index, but assume it was downgraded to a AA+.

Q. And so are you withdrawing your opinion that 832 million is the difference in future value of the interest that would be generated on the bonds?

A. No, absolutely not. In fact, that's what I was trying to explain when I explained what the issue here is. The answer to the question I was asked is still the 800 million-plus. If I was asked a different question which is assume that Exxon was downgraded to a split rating, the correct answer is 400 million-plus.

Q. So are you now offering an opinion that subject to that revision of the question, the amount of interest Exxon would have paid over the course of the bonds is 400 million-plus?

A. You're not -- no, that's not it. It's what I said it was, not what you said it was.

11 (Pages 38 - 41)

Page 42

Q. Have you put together a supplemental report to explain where that 400-plus-million-dollar number comes from?

A. No, but Dr. Saunders -- I mean, it's implicit in the revision I've just given you just now. You would take the average -- if the question was revised, then the answer is revised. That's what my opinion is. I'm adding to my opinion that if I was asked a different question, I would give a different answer.

Q. And I'm asking have you put that anywhere on a piece of paper and produced it in this litigation?

A. Not yet.

Q. Are you going to?

A. It depends on what you and counsel decide.

Q. Okay. We'll come back to that. Other than the sentence you just told me that you would strike, is there anything else in either your first report or your second report in this case that you would like to correct?

A. There's always a typo here or there, but nothing substantial.

Q. Okay. Your opinions have not changed?

Page 43

A. Correct. Well, except for that one.

Q. Any other opinions have changed?

A. No.

Q. And are you proposing in this case to offer any opinions other than the ones in your report?

A. If asked, including if asked today, I'll answer to the best of my ability.

Q. Do you propose to come to trial and offer opinions that are not included in either of the reports that you submitted?

A. Not yet. As I sit here now, these reports contain my opinions. Depends on what you ask today, yeah, or what other work might be requested by you or plaintiffs' counsel between now and trial.

Q. Sitting here right now, you have no present plan to offer opinions that are not included in your reports, correct?

A. That's right.

Q. What did you do to prepare for your deposition?

A. I read all the documents, as many as I could, reviewed them, read them, read the reports, my reports, checked computations, consulted

Page 44

with my staff and met with plaintiffs' counsel for a meeting yesterday.

Q. How long did you meet with plaintiffs' counsel yesterday?

A. Approximately five hours.

Q. Are you okay? Do you want to keep going? Do you want a break?

A. I'm fine. Thanks for asking. Let's go a little while longer.

Q. Great.

A. 10 or 15 minutes.

Q. Okay. I want to turn to an understanding of your understanding of the allegations in this case. So you're here as a loss causation and damages expert, correct?

A. I'm here as a finance expert offering opinions about loss causation and damages, the opinions that derive from my analysis of loss causation and damages in this case.

Q. Okay. Do you have an understanding, sitting here today, that the judge in the case has issued a ruling on class certification?

A. I do.

Q. What's your understanding regarding the class that was certified in this case?

Page 45

A. That it extends from February 24, 2016 to October 28, 2016.

Q. I think it's Note 1 of your report if you're looking for it.

A. And that surviving allegations involve issues of Exxon's profitability, reserves and impairments.

Q. We'll come back to that in a minute. Do you understand that the judge ruled in this case that there was no statistically significant reaction to the January 31st, 2017 announcement?

A. I don't know if you would call it a ruling. The judge expressed in a very well-written order that he was persuaded by that or he came, that he observed that the experts that had previously been engaged, Mr. Torchio and Ferrell, thought so. I don't think it was a ruling. There was a ruling based on that understanding, but I don't think it was a ruling about the facts.

Q. What was the ruling it was based on that understanding?

A. That the class period should be terminated on October 28th, 2016.

12 (Pages 42 - 45)

Page 46

Q. So the class does not include the dates between October 28th and January 31st, correct?

A. Depends on -- the class never includes dates. The class includes people, parties.

Q. So the class doesn't include investors who acquired securities between October 28th and January 31st, correct?

A. That's my understanding.

Q. And what is your understanding of why the judge excluded that time period from his class certification order?

A. The judge explained it. He thought that there was no statistically significant reaction to the January 31st, 2017 disclosure about impairments and he based that understanding on his reading of Mr. Torchio's report and Allen Ferrell's report. Those reports were wrong about that issue, and we'll probably talk about that today.

Q. So just to go back, is it your understanding that the judge reached the conclusion that both, that there was no statistically significant stock price movement on January 31st and that the stock price movement should

Page 47

be measured on a close-to-open basis instead of a close-to-close basis?

MR. SAHAM: Objection, calls for a legal conclusion.

A. Yeah, could we look at the document? I recall for sure the statistical significance prong of the basis for the opinion, but I'm pretty sure that he considered Mr. Torchio's analysis that went beyond the opening on January 31st, but ruled the way he did on the class period nonetheless because of non-significance. That's what I recall, but it's in the document. You can show it to me and I'll show you where it is.

Q. So notwithstanding that the judge excluded the January 31st, 2017 disclosure, you have included it in your expert report, correct?

A. Absolutely. It was appropriate to do so based on my expert analysis.

Q. And are you proposing to testify to a jury in the class action about the January 31st, 2017 date?

A. I'll answer any questions that are asked today and then about it, and my answers

Page 48

will be consistent with what I wrote in my report.

Q. And your damages analysis includes damages that result from the purported corrective disclosure on January 31st, correct?

A. Yes.

Q. Were you instructed by lead plaintiff's counsel to include the January 31st, 2017 alleged corrective disclosure in your report?

A. No.

Q. Were you asked by lead plaintiff's counsel to assess the January 31st, 2017 alleged corrective disclosure?

A. I don't think so. I'm not sure. The reason why I'm hesitating in the answer is it was my decision. I don't recall whether my -- I don't recall whether they also suggested it, but it was my decision to do so.

Q. I understand it's your decision. I'm asking whether you were asked by lead plaintiff's counsel to assess the January 31st, 2017 alleged corrective disclosure?

A. I don't -- I don't recall. It was my decision to evaluate damages and that was a necessary part of that analysis. It

Page 49

wouldn't have made a difference if they did or didn't. I just don't recall if they did or didn't, and the reason I don't recall is because it would have been irrelevant.

Q. You had already reviewed Mr. Torchio's analysis at the time that you completed your expert report in this case, correct?

A. Yes.

Q. And you'd already reviewed the class action decision by the judge when you worked on your report in this case, correct?

A. Yes.

Q. You assume in your opinions that the plaintiff will be able to prove the factual allegations, correct?

A. Yes.

Q. And you're not here offering an opinion on whether statements are false or whether defendants had a fraudulent state of mind or the other elements of plaintiffs' claim, you're not here to give an opinion on the merits of those, correct?

A. That's right.

Q. Okay. I want to just understand what your understanding is of what the plaintiffs'

13 (Pages 46 - 49)

Page 50

theory is. And before you said that you understood it was profitability, reserves and impairments, but I want to break those out and ask you what is your understanding for each of those. So why don't we go one by one. On reserves, what is your understanding of what the plaintiffs' theory is in this case?

A. Plaintiffs' allege that the company should have de-booked the Kearl assets as of or by the start of the class period and that it was misleading not to.

Q. So I want to just drill down on that. What is your understanding of what exactly -- let me just rephrase.

The beginning of the class period is February 28th, correct, 2015 -- 2016?

MR. SAHAM: 24th, I believe, not 28th.

MS. SOLOWAY: Sorry.

MR. SAHAM: You can start over.

Q. Let me start over. Actually, just give me one second. It may help to have your report in front of you. Let me rephrase that question.

Page 51

The first day of the class period is February 28, 2016, correct?

A. February 24th, 2016.

Q. Sorry.

A. As of when the 10-K was filed which was on February 24th, 2016.

Q. Apologies. Thank you for correcting me.

And that 10-K you just referenced, that's the 10-K for the full year 2015?

A. Yes, fiscal year, but it coincides with calendar year.

Q. Okay. And the allegation in this case is that the first alleged misstatement or omission in the case becomes public in that 10-K, correct?

A. That's right.

Q. And with respect to the reserves theory that you were just talking about, what is your understanding of what the alleged false or misleading statement or omission is?

A. That the Kearl assets, properties, should have been de-booked and disclosed as de-booked in that document.

Q. So turn to your first report, please.

MS. SOLOWAY: How do you guys

Page 52

propose we do this? Do you want to swap out a totally new copy or do I just --

MR. BURKHOLZ: Go off the record.

MS. SOLOWAY: Let's go off the record.

VIDEOGRAPHER: The time is 10:15. We're off the record.

(Break taken)

VIDEOGRAPHER: The time is 10:36. We're back on the record.

BY MS. SOLOWAY:

Q. So while we were off the record, Dr. Feinstein, we swapped out your Exhibit 1 for Exhibit 1 that has all the pages. Can you just confirm that you've just had an opportunity to look at it and it now has all the pages?

A. Yes.

Q. And Exhibit 2 is now clipped together so that all the pages are together, correct?

A. Yes.

Q. Okay. And there was one question we were going to come back to which is, I had asked you whether you reviewed the disclosures of Imperial Oil and you said you didn't believe

Page 53

so, but you wanted to look at your report. Can you now answer that question?

MR. SAHAM: Objection to form.

Q. Let me just ask it in an open-ended way. Did you review the disclosures of Imperial Oil in forming the opinions in your report?

A. I read what other experts had said about it, but not the primary source.

Q. So before the break we were talking about what your understanding is of the fraud theory that the plaintiffs have alleged. Do you recall that?

A. Yes.

Q. And you were describing your understanding of the plaintiffs' theory about the proved reserves at Kearl. Do you recall that?

A. Yes.

Q. I believe what you said, and you'll correct me if I've got this wrong, is that it's your understanding that the plaintiffs have pled that as of the end of 2015, Kearl no longer legitimately qualified as proved reserves. Do I have that right?

MR. SAHAM: Objection to form, calls for a legal conclusion.

14 (Pages 50 - 53)

Page 62

every barrel produced at Kearl, and that is not represented on Page 9 and the numbers that would indicate a profitability of bitumen per barrel is, therefore, misleading.

Q. Which numbers in particular on Page 9 are you referencing?

A. They're small, but I'll tell you where they are. If you look at Page 9, you have words in the left-hand column. You've got numbers in a column where the heading is United States, and then you've got numbers in the third column which says Canada/South America. As you start from the top of that column and work your way down, you end up with a number that is alongside an indicator or legend, bitumen per barrel. And it says -- scroll down some more. Average cost per barrel bitumen says $19.2 per barrel. And moving down the column further, there's something that says average production prices, bitumen per barrel, and the number there is 25.07. So the spread between 25.07 and 19.20 would give the misimpression to the market that the bitumen operations were profitable and plaintiffs are alleging they

Page 63

were not.

Q. Are plaintiffs alleging that all of the bitumen operations were not profitable?

A. No, but Kearl is 75 percent of Canada, of what would be covered here in Canada, South America bitumen production. So with profit numbers that high, financial analysts, investors, equity analysts would be given the misimpression that Kearl was profitable, whereas the truth, according to plaintiffs, is that it was not.

One moment. I have this written in my report and I just want to refer back to the wording that I used, if I can find it. Paragraph 62 addresses what I was just describing. I'll read from it. It says, "the company presented detailed data on average production prices and average production costs for each geographic region" -- I'm sorry, "for each geographic area," and I cite to this document. "For fiscal year 2015, the reported average production price per barrel of bitumen was 25.07." What I mean by that is it was reported to be 25.07. The reported average production

Page 64

cost per barrel of bitumen was 19.20 and that's the reported number, indicating an average profit per barrel of bitumen production of approximately $5.87 equal to the difference between the $25.07 average production price and the $19.20 average production cost per barrel. Plaintiffs are alleging that was misleading and concealed the true conditions at Kearl.

Q. Is it your understanding that plaintiffs' theory that the $19.20 or the $25.07 are themselves incorrect?

A. Well, my understanding is they believe these numbers were misleading. The spread between them, I believe, they say is false and misleading.

Q. So let me focus like a laser on one of these numbers. The average production cost per barrel of bitumen that you drew my attention to before was 19.20. Do you see that in the table?

A. I see it in the table and also in my Paragraph 62.

Q. Is it your understanding of plaintiffs' theory that that number 19.20 is incorrectly

Page 65

calculated?

A. I'm going to stand by my answer that I gave you. What they're alleging is that the spread between cost and price is false and misleading. Which of these numbers is more false, I don't recall at the moment. It doesn't really matter. What matters is the spread.

Q. That's what I'm trying to get at. Is it your understanding of plaintiffs' theory that either of these numbers are actually inaccurately calculated?

A. The answer I gave is the complete answer. It's the spread between the two numbers that they are alleging is false and misleading. Which number is more false, I don't know if that's something they're alleging, but I do know that it doesn't matter based on their allegations. Their allegation is that the spread between the two numbers is false and misleading.

Q. Sitting here today, can you tell me what the average production cost per barrel for bitumen should have been under plaintiffs' theory if not 19.20?

17 (Pages 62 - 65)

**App. 216**

Page 66

A. Some number that would have indicated a different spread. The answer is yes, to the extent that, as it's relevant for financial analytic purposes and for calculating loss causation and damages, some number that would then produce a spread that wasn't positive showing a profit. It should have been a number that somehow indicated that Kearl was not profitable.

Q. But sitting here today, you can't tell me what 19.20 should have been, correct?

A. That's correct, and I explained that what matters is the spread, not the number.

Q. And sitting here today, you can't tell me what 25.07 should have been, correct?

A. I can give the same answer I gave before. I can tell you that it should have been some number that, together with the number they gave for cost, would indicate to the market or inform the market that Kearl wasn't profitable.

Q. I think you've just walked me through the two Kearl theories, right? One is the proved reserves on Page 5 we looked at together,

Page 67

correct? And the other is this table on Page 9 that we just looked at together. Is there anything else about Kearl, to your understanding, that plaintiffs alleged was misrepresented in this case?

A. There's a lot of color you can add to those two misrepresentations. It's relevant that -- if you're asking are there more misrepresentations or affirmative misrepresentations, no. Are there more omissions? Probably. Kearl represented a large portion of the company's reserves and the allegation is that these numbers concealed that this field, this operation, these assets that the company had previously presented as their future were not profitable.

Q. So I'm not asking this in an abstract way. I'm asking this in a concrete way. We've looked at two tables together and you've explained to me your understanding of plaintiffs' theory for why they're false or misleading. Is there anything else that, to your understanding, plaintiffs allege about Kearl was false or misleading in the

Page 68

2015 10-K?

A. I think we hit the highlights.

Q. Okay. You mentioned omissions a moment ago. Do you have an understanding that plaintiffs' theory is that there was some information that was required to be provided but wasn't provided?

MR. SAHAM: Objection to form.

A. I did see that. There's somewhere it's alleged that -- I also know it as a financial analyst that there are ways that the company could have informed the marketplace about the lack of profitability and need for de-booking at Kearl, so the fact that the company didn't do that would suggest that there were omissions.

Every single day during the class period before the market knew that Kearl had to be de-booked the market was kept in the dark about lack of profitability at Kearl.

Q. Does part of your damages analysis in this case include that type of omission that you just referenced?

A. Well, I recognize that the misrepresentations

Page 69

were not corrected until the de-booking, and I explained that I take the calculated artificial inflation caused by the misrepresentations back to the start of the class period. Clearly that's premised on that misrepresentation, that things that could have been said to correct the misrepresentations were omitted and not said throughout the entire class period until the October 2016 corrective disclosure.

Q. Do you have particular dates in mind on which you believe those omissions happened?

A. There's a legal definition of "omission" and then there's a lay person or a financial, an analyst definition of "omission." My analysis tells me that the market was kept in the dark about the lack of profitability at Kearl for several months. So on every single one of those days the company omitted, this is not in a legal sense of the word, but at least in the vernacular or financial analytics sense of the word, the company omitted informing the market about the true profitability and lack thereof and the need for de-booking at Kearl.

18 (Pages 66 - 69)

Page 86

are the category names. What goes in that category we haven't discussed.

Q. Okay. Is there anything else you'd like to add to the category names?

A. Yes. Everything in my report.

Q. Let's move on to impairments. You mentioned earlier that you also analyzed plaintiffs' theory that ExxonMobil should have taken impairments. Is that of the Rocky Mountain Dry Gas assets?

A. Yeah, plaintiffs are alleging that the impairments that ultimately were taken with respect to three of the four RMDG assets were taken late, that they should have been taken by the start of the class period.

Q. Is it your understanding that plaintiffs' theory is that the Form 2015 10-K that we were just looking at together is false or misleading because it does not communicate the impairment of those Rocky Mountain Dry Gas assets?

A. Yes.

Q. And what aspect of the Form 10-K do you understand is false or misleading by virtue of that?

Page 87

A. That they didn't take the -- that they didn't recognize an impairment on those assets. Plaintiffs are alleging that those assets should have been recognized as impaired.

Q. Are there specific words in the 10-K that, to your understanding, the plaintiffs are alleging are false and misleading based on this Rocky Mountain Dry Gas asset impairment issue?

A. Well, that it's missing, that the impairment is not taken. And yes, book value, book value is reduced when impairments are taken, and the book values were not reduced to recognize the impairment that plaintiffs are alleging should have been recognized.

Q. And how much, to your understanding, do plaintiffs allege the book value should have been reduced by as of the end of 2015?

A. Well, it's a number commensurate with what the impairment ultimately was, which was, I think, about 85 percent of $2 billion.

Q. When, to your understanding, did the public first learn about this alleged fraud?

A. When the impairment was taken.

Page 88

Q. When was that?

A. That was January 31st, 2017.

Q. Is there any other time when the public learned that Exxon made false or misleading statements or omissions about impairments in connection with the Rocky Mountain Dry Gas assets?

MR. SAHAM: Objection to form.

A. They may have learned more after that date about specifics, but on that day there was an impairment announced pre-trading and there was discussion about the impairment once trading started, and that's when what plaintiffs are alleging the bulk of what they're alleging was concealed was disclosed. There may have been other nuance later, but there hadn't been any up to that point, and I analyzed that day to see how the market reacted to those announced impairments.

Q. Is it your understanding that the alleged false or misleading statements about the Rocky Mountain Dry Gas impairments were corrected by any information that was released on October 28, 2016?

A. If you look carefully at the company's

Page 89

language when they talk about impairments, no, the market did not learn what they ultimately learned. They learned -- they were told that the company always checks for impairment at the end of the year and they were told that gas prices had gone down, but they did not learn about the impairments until the impairments were taken.

Q. To your understanding, is the October 28, 2016 disclosure by Exxon a corrective disclosure of the alleged false and misleading statements about the Rocky Mountain Dry Gas impairment issue?

A. No, it is not.

Q. And so for the purpose of your analysis, you treat the January 31st, 2017 disclosure as the alleged corrective disclosure for the alleged fraud relating to the Rocky Mountain Dry Gas impairment issue?

A. Yes.

Q. I just want to spend a minute on that. So, again, going back to the conversation we had earlier, Exxon has to report annually on Form 10-K, remember?

A. That's right.

23 (Pages 86 - 89)

Page 90

Q. Okay. Did Exxon ever disclose that the impairment analysis it had conducted for full year 2015 was incorrect in any way?

MR. SAHAM: Objection to form.

A. They haven't admitted to the allegations, as far as I know.

Q. Is there any public disclosure -- even putting aside whether they've made admissions, is there any public disclosure that you're aware of that has revealed that the 2015 impairment analysis was improperly reported?

A. One moment.

(Pause)

MS. SOLOWAY: I'll just put on the record the witness is taking a pause to read from the document.

A. Okay. So can I hear your question again? I think the answer is on Page 40, but let me review it.

Q. Page 40 of what?

A. Let me hear the question again, please.

MS. SOLOWAY: Madam Court Reporter, could you please do that?

(Question read)

Page 91

A. Well, I mean, Barclays analysts reported with these words.

Q. What page? Tell me where you're reading, please.

A. Page 40, Paragraph 95, the second block quote.

Q. Of your report?

A. Yes.

Q. Just let me get there. I'm not asking you to read your report out loud. I'm capable of reading it myself. Just give me a minute.

MR. SAHAM: Do you still want him to answer that question?

MS. SOLOWAY: Hang on. I just want to get there.

Q. I'm at Paragraph 95 of your report. And could you just direct me to where you're looking on the page?

A. The bolded words in the middle, there's bolded at the top, the bottom and the middle. It's the middle bolded words.

Q. Okay. And where in those bolded words does it indicate that the impairment of the natural gas assets in the Rockies was effective as of year end 2015?

Page 92

A. Well, it says here that investors were surprised especially because of the company's unchanged stance on impairments previously.

Q. Where are you looking?

A. Where I told you.

Q. Can you read the words out loud.

A. "Impairments and reserves. Investors were likely at least somewhat surprised by the $2 billion asset impairment especially considering ExxonMobil's prior unchanged stance on impairments as of the third quarter 2016 earnings update following the launch of the SEC's probe."

Q. So this refers back to a third quarter update, does it not?

A. Right.

Q. When was that?

A. That was in October.

Q. This says third quarter 2016.

A. Right. October 2016 would have been the third quarter earnings update.

Q. I'm sorry. I wasn't following what you were saying. I'm asking whether there's any public disclosure that you're aware of that recognizes that as of the year

Page 93

end 2015, Exxon's impairment analysis was inaccurate or otherwise improperly reported?

A. You used the word "any." The fact that this analyst is pointing out that people are surprised because impairments weren't taken sooner and there was indications that there was no, the company represented there was no need to take impairments sooner, that's an indication that investors understood that impairments should have been taken sooner.

Q. Can you point to anyone who recognized that impairments should have been taken as early as the year end 2015 in particular?

A. No. Plaintiffs are alleging that and plaintiffs have their expert accountant concurring.

Q. Other than plaintiffs, can you identify anyone who you're aware of who publicly stated that the impairment of the Rocky Mountain Dry Gas assets for 2016 somehow means that the 2015 impairment analysis was incorrect?

MR. SAHAM: Objection to form.

A. If we just cabin or confine my answer to

24 (Pages 90 - 93)

Page 94

address exactly the words of the question you asked, I think implicit in analyst commentary, there's surprise which is an indication that there was some suspicion that impairment should have been taken sooner, but I didn't see anything that direct, the way you phrased it.

Q. Nothing specifically linking back to 2015?

A. Oh, no, it all links back to the past, but I don't want to say there's nothing linking back to 2015. That's not correct at all. It all links back to the past. There's surprise that -- people were not expecting impairment especially of a major asset like Rocky Mountain Dry Gas. That also implies that they feel they may have, they should have been informed sooner.

Q. Okay. I'm just, again, going back to core principles here. Can you identify any analyst or other public disclosure who concluded that the impairment of the Rocky Mountain Dry Gas assets in 2016 means that the 2015 impairment analysis was inaccurate in some way?

MR. SAHAM: Objection to form.

Page 95

A. I think I answered that question. I hear what you're trying to establish with your question, but I think it's misleading.

When investors and analysts say they were surprised by a disclosure, that is an indication that they feel that they were previously misinformed or uninformed, and so that's an indication that there should have been better disclosure sooner.

Q. But sometimes when the market is surprised, there's no indication that it should have been disclosed sonner, correct? Let me rephrase the question.

It's not always true that just because the market is surprised, that that means that something should have been disclosed earlier, correct?

A. I would agree that that's true except in this particular case, this quote on Page 40 of my report says that the reason for the surprise is what the company had told people sooner.

Q. Okay. I want to ask you a question about -- and you can turn to Paragraph 162 of your report.

Page 96

A. Paragraph 162?

Q. Mm-hmm.

A. I'm there.

Q. Okay. In your Paragraph 162 you reference the number $2.63, correct?

MR. SAHAM: Objection.

Q. I misread that. Withdraw that question. Apologies.

In that paragraph, at the end you reference the number $2.39. Do you see that?

A. I do.

Q. What does $2.39 represent?

A. That's the amount of the decline in the stock price that was caused by the disclosure of the Kearl, the Kearl de-booking and everything it implied.

Q. Is there any portion of that $2.39 that you attribute to issues relating to the Rocky Mountain Dry Gas impairment issue?

A. No.

Q. So that number, $2.39, is entirely Kearl, in your view?

A. Yes.

Q. And if I draw your attention to Paragraph 166 of your report.

Page 97

A. Yes.

Q. You reference $1.05 in that paragraph?

A. I do.

Q. What does $1.05 represent?

A. That's the decline caused -- decline in the ExxonMobil stock price caused by the disclosure of the impairment of just those Rocky Mountain Dry Gas assets that plaintiffs are alleging should have been impaired earlier.

Q. Okay. Is there any part of the $1.05 that you ascribe to anything Kearl-related?

A. No.

Can we take a break?

Q. Of course, absolutely.

VIDEOGRAPHER: The time is 11:35. We're off the record.

(Break taken)

VIDEOGRAPHER: The time is 11:56. We're back on the record.

BY MS. SOLOWAY:

Q. So I wanted to just go back to the table on Page 9, Exhibit 3 of the 10-K. Let me know when you're there.

A. Okay.

25 (Pages 94 - 97)

Page 98

Q. When we spoke earlier, I think you used the word "categories" to describe the two theories about Kearl. You said there's one category that relates to this profitability issue and then we also talked about the proved reserves issue. Do you remember that?

MR. SAHAM: Objection to form.

A. I don't think I said it exactly that way. Both misrepresentations misinformed the market about the same thing.

Q. Which is?

A. That Kearl wasn't profitable.

Q. With respect to this table, you mentioned the spread between the 19.20 and the 25.07. Do you remember that?

A. Yes.

Q. Do you know what regulations govern the presentation of these numbers?

A. No.

Q. Do you know whether CAPEX is included in the calculation of these numbers?

A. I think they're not, but I'm not an accountant. I'm not sure.

Q. What about depreciation?

Page 99

A. Same thing.

Q. Not sure?

A. No, I'm pretty sure it's not. They're not in there. It's -- well, price is an index price minus certain costs and those costs do not include depreciation in CAPEX, so those numbers would not be in here.

Q. So is this a cash flow analysis, then?

A. This is a mandated analysis on per-barrel profitability, basically, cost of producing versus the price the company would receive with some adjustments and some structure how those numbers are calculated.

Q. Mandated by whom?

A. I think it's the SEC.

Q. Have you personally looked into how these numbers were calculated?

A. No.

Q. Are you offering an opinion as part of your expert report that they were calculated inaccurately?

A. You asked me exactly that question before. I'm not offering an accounting opinion, but I am expressing that I do know how the numbers and presentation like this would

Page 100

be received and interpreted by financial analysts, equity analysts, valuation experts, and I understand that there is an accounting expert who has concluded the numbers were wrong.

Q. So if you assume -- I just want to make sure. So you're assuming that the plaintiffs are able to prove through other evidence including their accounting expert that these numbers are wrong? You assume that for purposes of causation and damages?

MR. SAHAM: Objection to form.

A. That they were misleading. I believe their allegation is they were false and misleading, but yeah, I think that's their allegation. These numbers are, constitute a false and misleading affirmative statement.

Q. And how much, if any, of your damages calculation for Kearl do you attribute to these particular numbers in the table at Page 9 being false or misleading?

A. Well, the truth about Kearl could have been disclosed in a number of different ways, so the fact -- because any disclosure would have informed the market about the

Page 101

truth, a variety of disclosures could have informed the market about the truth so it's $2.39 per share.

Q. Is there any subset of the $2.39 per share that you attribute to the alleged misleading nature of the spread between the 19.20 and the 25.07?

MR. SAHAM: Objection to form.

A. I'm accepting as an assumption that it's proved that these numbers are, in fact, false and misleading, or false, rather, and I'm accepting that the truth about Kearl was different from what's represented by these numbers. I didn't go and visit Kearl myself so I'm accepting that the condition was different than what was represented by these numbers, and my conclusion is that because of these numbers, the market was not expecting the de-booking and that if the de-booking had occurred earlier as plaintiffs are alleging it should have occurred, the stock price would have fallen $2.39 then when the market learned the truth about Kearl not being profitable.

Q. If the court were to hold that the

26 (Pages 98 - 101)

Page 102

information presented in Table 9 is accurate and wasn't required to be presented in any different way, would that change your damages calculation for Kearl, the 2.39?

MR. SAHAM: Objection to form, calls for a legal conclusion.

A. Well, not really because, as I just explained, the damages occur because the market was misled about the lack of profitability of Kearl. If the court decides that this document didn't have to be any different, the proved reserves document according to plaintiffs could have also disclosed that same truth. That's on Page 5.

Q. So just to be clear, you don't have a breakdown of that $2.39 as between the alleged misstatements on Page 9 and, for example, the alleged misstatements on Page 5 of the Form 10-K?

A. The way I would express it is both alleged misstatements and all the omissions fortified the concealment of the true condition of Kearl, and had either of them been more perspicuous or transparent or informative or had there been another document that could

Page 103

have informed the marketplace of that important fact, the inflation would have come out of the stock price on the day of that disclosure rather than when it did.

Q. So I just want to make sure we're totally clear on this. I want you to imagine a situation where at summary judgment the court looks at the table on Page 9 of the 2015 Form 10-K and says, this information was presented in accordance with all SEC rules and GAAP and is not false or misleading. So that argument drops out of the case. Are you with me?

A. I understand.

Q. Okay. What is the damages number that you would propose to present to the jury in that situation for Kearl-related liability?

A. So if the court says that this document did not have to be the document to expose the truth, there's another document that should have and could have, the damages would be the same.

Q. Are you aware of any public disclosure either by Exxon or any other public commentary from anyone else that discloses

Page 104

that with respect to the 2015 10-K that contained this $19.20 and this $25.07, that these numbers were incorrectly calculated?

A. I didn't do research into that area. I mean, as I said in my report, I relied on the assumption that plaintiffs would prove their factual allegations which is that the truth was other than what these numbers portray.

Q. Dr. Feinstein, you are a causation expert in this case, correct?

A. I assess loss causation, I assess that the alleged misrepresentations and omissions caused investor losses, and part of that analysis said that I would assume the factual allegations, not the liability, but the factual allegations, plaintiffs' factual allegations.

Q. Isn't it also the job of a causation expert to review public disclosures to determine when or if the truth has been revealed?

A. I did that. I did not see the truth revealed about Kearl being unprofitable elsewhere to the extent that was disclosed by a de-booking of the entire property.

Page 105

Q. So you didn't find any corrective disclosure with respect to the chart on Page 9 of the reported average production cost per barrel for bitumen; you didn't find anything public that corrected that, correct?

MR. SAHAM: Objection to form, misstates prior testimony.

A. Yeah, it's the spread between the cost and the price that is what's misleading. And I never said that either the cost by itself was wrong or that the price by itself was wrong. I did say that the spread between the two of them is what's alleged to be false and misleading, and then my financial expertise comes into play, that would cause a financial analyst to not know that Kearl was not profitable, a major important property of the company.

Q. When did the public learn that the spread between the 19.20 and the 25.07 was misleading, as you just described it?

A. They learned that the -- the conditions that they were led to believe were the case by these numbers and others, they revised their understanding of those conditions

27 (Pages 102 - 105)

**App. 222**

Page 106

once there was the de-booking.

Q. And that was in the October 2016 alleged corrective disclosure?

A. Yes.

Q. And you agree with me that that disclosure was for information current as of 2016, correct?

MR. SAHAM: Objection to form, asked and answered.

A. It informed the market that at least as of that date, Kearl was not profitable. Plaintiffs are alleging that same disclosure could have been made for earlier dates.

Q. But did that disclosure, the one in October of 2016, disclose to the market that Kearl had not been profitable in 2015 as of the end of the year?

MR. SAHAM: Objection, asked and answered.

A. I think there's an inference. One can infer that operations are supposed to be getting more efficient, not less efficient. Oil prices did rebound somewhat, so I think one can infer from the facts that disclosure probably could have been made earlier, but

Page 107

I didn't see any -- as I sit here, I don't recall commentary that specifically said that they should have been told sooner.

Q. So sitting here today, you can't point to any analyst or any other market commentary that made the inference that the information provided in October of 2016 was also true as of the end of 2015?

MR. SAHAM: Objection to form.

A. That's what plaintiffs are saying they're going to prove. That's the assumption I relied upon for calculating damages. I didn't see analysts explicitly saying that, but I did see analysts saying oil prices have recovered somewhat, the company said they'll be getting more efficient at Kearl, not less efficient.

Q. Again, I'm asking a very particular question which is whether you can identify any analyst or other market commentary that drew the inference you just referenced that the profitability of Kearl that you say was revealed in October of 2016 was also true as at the end of 2015?

MR. SAHAM: Objection to form.

Page 108

A. What changed was the market's understanding of the conditions at Kearl. Before the disclosure, they didn't know it was not profitable. After the disclosure, they do know it was not profitable. That's what changed. I didn't see any analyst saying that we think -- I didn't see analysts that said that Kearl changed or Kearl didn't change; I didn't see that. I said that what changed was their understanding of conditions at Kearl. That's what changed.

Q. Just take a look at Paragraph 64 of your report. Let me know when you're there.

A. Okay.

Q. Are you offering the opinion in this case based on the documents you cite in Paragraph 64 that Kearl was not profitable?

A. That's not an independent opinion of mine. I'm assuming that actual allegation, but I cite to support that, would support that factual allegation.

Q. But you're not actually offering an expert opinion that you -- for example, you haven't gone and analyzed all the relevant documents to whether Kearl was profitable and draw a

Page 109

conclusion?

A. Well, I mean, if the numbers, if that spread was supposed to be negative and it was reported as positive but if the correct spread would have reported as negative, I know as a financial analyst to interpret that as lack of profitability, and that's how analysts would, other analysts should and would interpret it the same way. It's not like any financial analyst is necessarily going to -- some do, that's true. We rely on the numbers that are produced from the company, me and financial analysts in general.

Q. I'm asking a very narrow question which is whether you yourself are offering the opinion based on the documents you looked at that Kearl was not profitable?

A. I don't think it's a fair way to ask the question. I didn't calculate -- I'm not an accountant, I didn't do the accounting numbers. I am offering the opinion that if I and any other financial analyst seeing negative numbers there would conclude that Kearl was not profitable would independently

28 (Pages 106 - 109)

Page 146

someone could point to, I can explain why on net it couldn't have had more than a 4-cent impact on the stock price except for the de-booking announcement.

Q. Okay.

A. So the de-booking announcement was the big news that caused the stock price to fall significantly.

Q. Tell me, does your $2.39 calculation take into account the disruptions in Nigeria?

A. Yes.

Q. In what way?

A. Well, I observed -- well, okay. The company announced what daily production levels were for the company as a whole for the past quarter and they were within guidance, but at the lower end of guidance. But then I observed that the company did not change its guidance for a total year of production. So the upshot of that miss or any other negative news was the 4-cent miss, and I pointed out that that 4-cent miss was non-recurring. At least with respect to Nigeria, it was essentially expected because production did come in within guidance and

Page 147

then the company then reaffirmed its full-year production guidance number.

So if Nigeria did have an impact on earnings and production, it wouldn't be a lasting impact or cause the company and analysts to revise their production forecast downward for the future.

Q. Is it your position that the news about Nigeria was not new?

A. Yeah, essentially, it wasn't. What was going on there wasn't news. I explain that in my report. It wasn't new. People had known about it. It was warned about. It was discussed by analysts. It was discussed by other companies.

Essentially the new part of it is that, essentially the update. For the most part, it was consistent with analyst expectations when the company attributed being at the low end of their production guidance in part to it.

Q. I just want to try to focus for a second on the company's release of information about Nigeria on October 28th.

What, if anything, about the

Page 148

company's announcement about Nigeria was new that day?

A. That the company felt that it was, of all the things they could have talked about going around the world where Exxon is involved all around the world, that was something they wanted to talk about in their earnings announcement as being notable as they released their performance numbers.

Q. What else?

A. That's basically it. Production was at the low end of the quarter guidance, it didn't fall below quarter guidance, but it was at the low end of quarter guidance, but it did not have a lasting effect on company guidance for production or on the market's consensus forecast for the company's earnings for the rest of the year. So I concluded that it may have had an effect, but the effect was non-recurring.

Q. So if Nigeria had an effect, you believe that you already took that into account in the 0.04-cent deduction, or I should say the 4-cent reduction that you made?

A. Yeah, and the miss was 4 cents and when

Page 149

you're analyzing -- this is financial evaluation principles. If you're analyzing whether a 4-cent miss has a big impact on the stock price or a small impact on the stock price, according to the tenets of financial valuation, you would assess whether it's a recurring effect or a non-recurring effect, does it have a lasting effect on the company going forward into the distant future or is it a one-time thing.

And because guidance wasn't changed, production guidance wasn't changed and because earnings forecasts went up, I determined that any effect that Nigeria had was either anticipated or non-recurring. Either way it would have a small de minimis impact on the stock price. All these factors combine to at most contribute a 4-cent decline in the stock price.

Q. Is it your opinion that the disruptions in Nigeria were viewed by analysts as not having any continuing impact?

A. Well, certainly the company thought so. They reaffirmed guidance. Yeah, I think that's the conclusion, that no continuing

38 (Pages 146 - 149)

Page 150

impact that wasn't already baked into the stock price, no new continuing impact that wasn't already previously anticipated.

Q. Other than the fact that the company didn't change production guidance, is there any other evidence you have to support the proposition that there were no continued impacts expected from Nigeria?

A. Yes.

Q. What?

A. Well, that it had been widely reported in the news. I mentioned a lot of these just a moment ago. What was going on in Nigeria was not unknown. Other companies had reported also what was going on in Nigeria. People knew what Exxon's exposure to Nigeria was. Earnings forecasts rose and not fell. I'm not saying Nigeria is not important. I'm saying that any lasting impact had already previously been known and baked into the price. There was no revision to any lasting forecast. There was no revision to any lasting effect.

Q. So you have not in your 4-cent reduction, you don't have an allocation within that

Page 151

4 cents for Nigeria versus other production issues?

A. That's right, because production guidance was reaffirmed and earnings forecasts went up.

Q. So, again, I want to make sure I'm following this. You're not allocating any of that 4-cent decrease to Nigeria at all, then?

A. Sure, I am.

Q. How much?

A. In the mix with all other information that may have been negative, all factors that were negative combined had at most a 4-cent impact.

Q. Can you break out for me how much impact you ascribe to Nigeria?

A. No. I didn't, it wasn't necessary to. The metrics are not disaggregated that -- the metrics that go into the valuation are not disaggregated, but the valuation metric is what it is and produces a conclusion of 4 cents.

Q. Okay. Turn to Paragraph 77 of your report, please.

A. Yeah.

Page 152

Q. Do you see the paragraph that you block quote in that Paragraph 77?

A. Yes.

Q. That's the language that constitutes the alleged October 28th corrective disclosure, correct?

A. Yes.

Q. And you're ascribing $2.39 of the decline on that day to the disclosure about Kearl that's in this paragraph, correct?

A. Yes.

Q. Do you see that after the disclosure about Kearl, it mentions one billion oil-equivalent barrels in other North America operations that could be required to be de-booked as proved reserves?

A. Yes.

Q. Is it your understanding that that one billion oil-equivalent barrels at other North America operations relate to the fraud in this case?

A. It does not.

Q. Have you taken into account that disclosure in your assessment of the stock price reaction on October 28th?

Page 153

A. Yes.

Q. In what way?

A. I looked carefully at what the company said about it, I looked at what analysts said about it, and based on the questions that were asked by analysts and the answers given by the company and the commentary that analysts put forth explaining that other, the entire mix of information, I determined that that's not responsible for any of the $2.43 drop that occurred that day caused by company news.

Q. What commentary?

A. On Page 33, for example, sort of -- I'll tell you how many lines down. One, two, three, four, five, six, seven, eight, nine, ten, 11, "Kearl was the focus on conference call questions." So that was the focus. That's what surprised people. There it is. The other billion the company explained was end-of-field-life adjustments, the same magnitude that they had taken the previous year. It didn't capture the concern, attention or imagination of analysts nearly as much as Kearl, or at all compared to

39 (Pages 150 - 153)

Page 154

Kearl.

Kearl being a de-booking of one of the company's most important assets, if not the most important asset, was the focus of analysts' attention, not that other billion which was the same number in the previous year and explained by the company to be end-of-field-life adjustments.

Q. Other than the citation in Paragraph 86, did you identify any other commentary that supports the proposition that the additional one billion of de-booked proved reserves didn't have any market impact?

A. Yeah, there was maybe, I think, two-dozen analyst reports in the -- consistent within these analyst reports is the commentary that what was surprising and new and valuation-relevant was Kearl.

Q. You mentioned earlier that the -- you came to the conclusion in subtracting the 4 cents that that was appropriate because the production disappointment was not recurring. That's what you said earlier, correct?

A. Well, I didn't call it a disappointment. It came in at the low end of guidance. It

Page 155

came in within the guidance still even with Nigeria, but at the low end of the guidance, and guidance was reaffirmed. So even if it was disappointing, reaffirming the annual guidance means that the disappointment will be made up in the following quarter and that announcement was made a third of the way into the following quarter.

And that's not the only reason. There's also the earnings effect. Analysts revised earnings for the full year going forward to be higher than what they had forecasted before the announcement, so that's why it may have had a one-time effect, but it wouldn't be a recurring factor so it wouldn't have a recurring -- it wouldn't have the valuation effect of a recurring factor.

Q. For what year, in your view, did analysts forecast upwards?

A. 2016 and 2017, so the immediate, the rest of the year they were in and the next year.

Q. Let's focus on 2016. You're talking about the analysis that you conducted of the -- I

Page 156

want to make sure I'm pronouncing this correctly. I/B/E/S data?

A. That's what people refer to it.

Q. I B E S?

A. Yes.

Q. And the I/B/E/S data is the basis for your analysis that the 2016 earnings per share estimates by analysts went up, correct?

A. Yes.

Q. Have you had a chance to review the analysis that Dr. Ferrell did of that I/B/E/S data?

A. Oh, yes.

Q. Are you aware that Dr. Ferrell found that there were 25 analysts who provided inputs to I/B/E/S on October 25th, 2016?

A. I'm aware.

Q. And that Dr. Ferrell found that 15 analysts provided inputs to I/B/E/S on November 8th, 2016?

A. That might not even be the correct way to characterize what I/B/E/S did, but I'm aware that he said that, but he's kind of wrong.

Q. Okay. Well, tell me, are you aware of how many analysts had provided inputs to I/B/E/S on October 25, 2016 if it wasn't 25? Is it

Page 157

a different number?

A. The 25 I'm not objecting to, but I/B/E/S screens analyst submissions for currency, whether they're current or whether they're stale, so it's altogether possible that analysts who didn't update forecasts after the October 28th earnings announcement were screened out by I/B/E/S. It wouldn't be that they didn't provide them. It would be that I/B/E/S determined them to be stale and not updated.

Q. So let's just unpack that a little bit. The first date that you looked at, if I'm getting this right, is October 25, 2015.

A. What page are we on now in the reply report?

Q. I think this is in your opening report, actually.

A. Okay.

Q. If there's some other page you want to look at, can you just tell me?

A. I know it's in the reply report because that's where I compared my numbers to his numbers.

Q. Sure, let's go to that page. What page are you on?

40 (Pages 154 - 157)

Page 214

an econometric design using an objective methodology and consistently using it such as using the company's choice would satisfy that criterion for correctness.

Q. So I want to make sure I got this right. You believe that Mr. Torchio, in constructing his index, self-selected companies in order to achieve a certain result?

A. That's my recollection, that he said he chose it on the basis of fit, that he thought there were a number of -- as did Ferrell, that there were a number of off-the-shelf canned indices and that which ones he used he picked on the basis of fit.

Q. What does that mean? What is your understanding of how he changed an index based on fit?

A. Changed, you said?

Q. I think you just said --

A. Chose.

Q. He chose an index, and then are you suggesting that he modified the index in some way?

A. I think he did. I mean, most people do. If you're going to use an off-the-shelf

Page 215

index, they would remove the subject company. I don't recall specifically his report. Do you have it here? Can I look at it? Why don't we look at his report.

Q. Hang on a second. I'd like to know what your understanding is of what he did because you told me pretty strenuously that it was wrong.

A. Oh, yes.

Q. And I'd like to understand why.

MR. SAHAM: Objection to form, and if you want to ask about what Torchio did, show him his report.

MS. SOLOWAY: Is it "Torchio" with a "cha"?

MR. SAHAM: I'm not even sure if it's "Torchio." I think it's "Torchio," but I think it's fair if you ask him questions about what Torchio did, that you show him the report.

MS. SOLOWAY: Okay. Objection noted.

Q. You said it's your understanding -- I just want to make sure I'm getting this right -- that he selected an index. Do you mean

Page 216

like an industry index to use for comparative purposes?

MR. SAHAM: Objection to form.

A. Yes.

Q. And what index did he select?

A. I don't recall, but it was one that was produced by one of the data providers.

Q. And do you know the name of that index?

A. Can I see his report? It's in the report.

Q. Hang on a second. I just want to understand what your understanding is of what he did.

MR. SAHAM: Again, I object to foundation. It's unfair. It's not a memory test. If you're asking him about what Torchio did and you've got Torchio's report sitting there, show it to him.

Q. What did he do after he selected an existing index?

A. I read his report. I understood what he -- I understood as I read his report that what he chose to do is wrong. If you want me to be more specific, I really have to refresh my memory by looking at his report.

Q. We'll give you his report.

MS. SOLOWAY: Let me mark this.

Page 217

We're up to Exhibit 5.

(Exhibit 5 marked for identification.)

A. (Witness examines document)

Q. Dr. Feinstein, are you able to point me to the place in the report where this error was committed?

MR. SAHAM: Objection to form. Take your time reviewing the report.

A. (Witness examines document)

In Paragraph 47 he refers us to Appendix B, so I'm turning to Appendix B. Appendix B is on Page B1, which I guess the number is on the top of the page, Page 115. Note he also cites to Campbell, Lo and MacKinlay on Page 117 which is B3.

Q. Okay. Well, this filibustering is impressive.

MR. SAHAM: Let him review the document.

Q. I think the question on the table is can you please show me where in Mr. Torchio's report he made the error that you're telling me about?

MR. SAHAM: Ms. Soloway, you

55 (Pages 214 - 217)

Page 218

asked him to identify it. He's going to take the time to review the report so he can answer your question, so stop interrupting him or withdraw the question. He's entitled the time to review the report to answer your question and you interrupting him is going to make it take longer.

A. Paragraph 22 is the answer to your question, Paragraph 22 on Page B8. It's exactly consistent with what I testified to earlier.

Q. Paragraph 22 on Page B8, I'm there.

A. Also --

Q. Before we move off of that, tell me what is improper about what is described in Paragraph 22.

MR. SAHAM: Objection to form.

A. In his words, he said "I," meaning him, "tested multiple S&P 500 industry indexes related to oil and gas including Bloomberg identifier," in parentheses, "total return indexes used if available; S&P 500" -- do you want me to read them all?

Q. No. I just wanted you to --

A. He tested multiple indices and removed Exxon, which was appropriate, but then selected

Page 219

the ones used for his analysis based on fit. That's in Paragraph 23. Based on fit means he picked his model based on what the model produced, not based on a priori considerations.

Q. If you look at the paragraph underneath that, he talks about "to determine which market and industry proxies to use, I examined the R-squared and adjusted R-squared statistics." Do you see that?

A. Yes.

Q. What is an R-squared a measure of?

A. It's a measure of fit, meaning for each model, how closely does it -- how much, how much of the company's stock return variation does the model explain. So by picking the highest R-squared model, you're attributing as much as possible across all the choices of indices, as much as possible of the company's movements to market and sector whereas many of those movements really should be attributed to company-specific information.

Q. So are you in Footnote 14 where he says "the specification with this industry index

Page 220

had the highest R-squared and adjusted R-squared"?

A. Where are you reading?

Q. Footnote 14.

A. Of which report?

Q. Of what you were just reading to me, Paragraph 23 of Torchio's report.

A. His Footnote 14 was on the next page, right?

Q. Page B9.

A. That's right.

Q. So I just want to make sure I understand what your criticism is. I think what he's saying here is that in Footnote 14, the specification with this industry index had the highest R-squared and adjusted R-squared?

A. Right. And I want to point out that you would not know that until after you've run the regression. You wouldn't know that before you ran the regression.

Q. Unless I'm misunderstanding, I think he's saying he ran a whole bunch of different information and then he's saying the specification with this industry index had the highest R-squared and adjusted R-squared. Am I getting that right, what

Page 221

he did?

A. You read it right, but you interpreted it wrong if you said my interpretation was not accurate.

Q. What's your interpretation of what he did?

A. He ran many regressions and then looked at the results of those many regressions, and based on the results of those many regressions, decided which market and sector index to use.

Q. When you say "results," what do you mean? Like what do you think he was looking at when you say "results"?

A. The output, the output of the regression.

Q. You mean whether or not statistical significance was achieved on any given day?

MR. SAHAM: Objection to form.

A. Well, it's related, but it's fit. It's which model -- highest R-squared -- R-squared is a ratio that shows how much of the variation in the dependent variable can be explained by the model that you chose. The higher the R-squared tells that you -- if it's the highest R-squared, it means you're attributing most of all possible models,

56 (Pages 218 - 221)

Page 222

it's the model that attributes most of the movement in the company stock price to non-company information.

Q. What does a lower R-squared mean?

A. That would mean that less of the movement is being attributed to market and sector information and, therefore, more would be attributed, possibly appropriately if your specification is correct, to company information. So choosing on the basis of R-squared is choosing on the basis of the result of the regression rather than considerations like the market thinks this is the best representation of its industry.

Q. So I just want to be clear. You believe it's improper to look at the output of this R-squared before you select an index?

A. Yes.

Q. And I just want to make sure I'm also clear --

A. In this application, if that's what you're trying -- if we're trying to figure out how much of a day or a period stock price movements were caused by company information versus market and sector information.

Page 223

Q. I just want to be really clear. If the only thing Mr. Torchio looked at when he ran this analysis was the R-squared or the adjusted R-squared, but didn't go further to look at whether on the alleged corrective disclosure date there was a statistically significant decline or not, would that still be improper, in your view?

A. Yes.

Q. I just want to make sure. Do we agree that a lower R-squared means that it's more likely to find statistical significance?

A. Of what?

Q. Of the information that you're testing for on any given day.

A. The company-specific information?

Q. Yes.

A. I would say it's more likely than not that you'd be attributing -- if you're choosing your model specification on the basis of R-squared, then you're likely picking an independent variable, a right-hand-side variable that has a high correlation and may be the wrong causation direction, and that would more likely with a higher R-squared

Page 224

find non-significance on various days.

Q. So just --

A. It's not always, but more likely.

Q. So higher R-squared, less likely to find statistical significance?

A. Not always. I said, I would say probably in more applications than fewer applications that's the result you would find. Let me be more clear about this. You're going to find exceptions. I mean, that's the whole thing with data. The data exists and we come afterwards, after the data has been produced and try to analyze it. So you would -- you're more likely to make the mistake of simultaneity if you pick your independent variables on the basis of fit. You're more likely to find variables that seem to fit the data because in this case Exxon is causing the sector index to move rather than the sector is causing -- rather than picking up the sector effect that causes Exxon to move. That's one mistake you're more likely to make if you pick your specification and variables on the basis of fit. It's not the only mistake, but

Page 225

that's one of the mistakes that you're more likely to make. You might not make it, but you're more likely to make that mistake.

Q. Okay. So --

A. I just want to point out that I read an excerpt from the literature that said don't do this, don't over-pick the model, pick your model specification based on the basis concepts, not on the basis of fit.

Q. Okay. I hear you. So I want you to turn to, go back to Dr. Ferrell's report and turn to Page 30. Actually, I'm going to have you go to 29, Paragraph 47.

A. I'm sorry. What page now?

Q. Page 29, bottom, very bottom of the page which is in Paragraph 47.

A. Got it.

Q. Dr. Ferrell writes, "specifically," this is the very last line on the page, "specifically, for January 31, 2017, Dr. Feinstein's close-to-close adjusted R-squared of 53.6 percent is lower than my and Mr. Torchio's close-to-close regression models adjusted R-squared of 56.3 percent and 55.3 percent." Do you see that?

57 (Pages 222 - 225)

Page 226

A. I do.

Q. Is the data in that sentence correct?

A. I don't know. What's wrong in that sentence is that that's the basis for picking the model specification. I didn't check to see -- I didn't do -- I don't recall -- I probably looked at it at some point, but I don't recall if I verified his R-squared number.

Q. Sitting here today, you have no basis to dispute that the adjusted R-squared on the close-to-close basis of your model is lower than Mr. Torchio's, correct?

A. It's not confirmed or -- I'm not going to confirm or deny.

Q. Is there any place you can look this up?

A. Well, I mean, I could. It's not appropriate -- it's not that I would, though. This is not the basis for how you pick a model in a regression for an event study.

Q. So I'm going to move off of the topic of how you pick a model. I'm just focused on the R-squared right now. Do you have any basis to dispute that your close-to-close adjusted R-squared was 53.6 percent which

Page 227

is lower than Mr. Torchio's and Dr. Ferrell's?

A. No, I don't have a basis for disputing it, as I sit here now.

Q. Dr. Ferrell goes on to say, "this means that Dr. Feinstein's conclusion relies on a regression model that does a worse job of predicting ExxonMobil's price movements than my regression model and Mr. Torchio's model." Do you see that?

A. Yes. And boy, is that wrong.

Q. Tell me on what basis that's wrong.

A. We're not trying to predict anything. We're trying to explain. All of the data has already happened, for one. And the second thing is his model, because it was picked in order to have a higher R-squared, doesn't reliably explain Exxon's stock price movements.

I'll just give you an example. I can take Exxon's stock price movements themselves, I can take those returns, I can add a little bit of noise to it, just random noise, a little tiny bit, and use that as my right-hand-side variable and I'll get

Page 228

an R-squared close to one. It doesn't mean that that's a good model. It would be a terrible model. That's essentially what he's done.

Q. Okay. So I just want to make sure we're on the same page here. Before we looked at this paragraph, I think you agreed with me that a lower R-squared means that a model is more likely to identify a statistically significant result, correct?

A. No. In some circumstances it's more.

Q. I think you said there could be exceptions, but generally yes?

MR. SAHAM: Objection to form.

A. Well, let's see. Yeah, I would think that it's more likely to get the correct answer if it was picked a priori on the basis of concepts rather than effect.

Q. That's not my question. My question is -- and I'm pretty sure you told me this before and it's in the transcript -- that a lower R-squared as a general matter means that it is more likely to find statistical significance in your result, correct?

A. If the reason -- let me think about it

Page 229

a second.

Q. Do you want to withdraw your earlier testimony, Dr. Feinstein?

A. No, no, I don't. I think the problem here is in the word, use of the word "likely" which you and I both used. You're more likely to find -- yeah, I'd say that the facts are what they are. The question is which model is best at detecting the true facts, and the one with the lower R-squared because it attributes less of the movement to the market in the sector is going to attribute more of the movements, the stock price movement to company information which might be the correct answer, which is the correct answer if the model was picked a priori based on concepts rather than fit.

So the model, yes, the model will, but it will be appropriately so. It would be more likely to detect. That's it. The model -- if the model is specified correctly, it will be more likely to detect correct statistically significant movements.

Q. Okay. You did not do a close-to-open study for January 31st, correct?

58 (Pages 226 - 229)

Page 230

A. Yes.

Q. You only performed a close-to-close study?

A. Which was appropriate given the facts of this case and, frankly, consistent with the judge's order as well.

Q. Let's put the judge's order to the side. I think we can let the judge interpret his own order. Can we agree to that?

A. I'll answer your questions.

Q. Okay. Dr. Ferrell in his report shows that if he took your methodology and extended it to apply it to a close to open, that there would be no statistical significance for January 31st, isn't that right?

A. I don't recall, again, because you're asking me to verify results of a test that is poorly constructed. Why would you do close-to-open when important news came out during the next trading day related to the disclosure we're trying to test?

Q. Dr. Feinstein, I understand that you disagree with the judge's ruling that close-to-open is appropriate here, I get it. Let's put that to the side for a moment.

I'm asking you whether -- and if

Page 231

you'd like, you can look at Page 31 of Dr. Ferrell's report. I'm asking you whether it is correct that if we run your regression using your inputs and assumptions on a close-to-open basis, it is not, it does not get a statistically significant stock price movement on January 31st for close-to-open?

MR. SAHAM: Objection to form.

A. What are you asking me?

Q. Look at Page 31 of Dr. Ferrell's report.

A. I think you did mischaracterize the judge's order.

Q. And I'm happy that we can let the judge decide what the judge ordered on another day. This is a narrow question. Do you see Exhibit E of Dr. Ferrell's report?

A. I do.

Q. It's called Feinstein Regression Model Close-to-Open Event Study on January 31st, 2017. Do you see that?

A. Yes.

Q. Do you understand that Dr. Ferrell is using your methodology and your regression and he's performing a close-to-open event study on January 31st?

Page 232

A. I'll take your word for it. I didn't verify this result because it was -- what negative word should I pick? It's not well-motivated, irrelevant.

Q. It's irrelevant?

A. Absolutely.

Q. Okay. So sitting here today, do you have any basis to dispute that if we run your regression model on a close-to-open on January 31st, 2017, the result is not statistically significant?

A. I did not test my model on a close-to-open basis because the news came out, important news related to the disclosure came out during trading on January 31st, 2017.

Q. What time did the news come out?

A. Well, the press release was before the open, but the conference call started at 9:30 and extended for about an hour and there was important information, questions and answers about the impairment.

Q. Okay. And the press release came out before the market opened, correct?

A. The conference call was after the market opened.

Page 233

Q. Going back to Dr. Ferrell's report, you've had this for a month, correct?

A. I critiqued his report, and the critique of this test is that he runs it on the wrong period.

Q. And if you assume for the moment that we want to understand whether there's a statistically significant price movement from close to open, do you have any basis to dispute his finding?

A. I can't verify his finding or dispute it.

Q. I'm going to have to tell you, I have the same problem when we show up at trial in this case, are you going to take the stand and say this was done incorrectly? Is the math wrong or isn't it wrong?

MR. SAHAM: Objection to form.

A. I'll say I didn't verify his result, that it's just the wrong test to run. Close to open when the news came out after the open, doesn't make sense.

Q. Do you have anything, sitting here today, that you can point to in this analysis that you can say "I am aware that this was calculated incorrectly"?

59 (Pages 230 - 233)

Page 234

A. Yes.

Q. What?

A. Here he says the adjusted R-squared is 67.9 percent and moments ago you were criticizing my model for having a 53 percent R-squared. Which is it? 53 or 67?

Q. I think you may be confusing close-to-open and close-to-close, but putting that aside.

A. No, no, that's the basis for understanding that there's a problem with the specification.

Q. Do you have any other reason to dispute that on a close-to-open basis using your regression, the outcome is not statistically significant?

A. As I sit here now, no. I can't confirm. I didn't confirm it.

MR. BURKHOLZ: We've been going for about an hour.

MS. SOLOWAY: Sure.

VIDEOGRAPHER: The time is 3:50. We're off the record.

(Break taken)

VIDEOGRAPHER: The time is 4:04. We're back on the record.

Page 235

BY MS. SOLOWAY:

Q. Dr. Feinstein, I'd like to turn to the analysis that you did to address potential confounding information for the January 31st, 2017 date that you examined.

My understanding is that you made a deduction from your damages calculation for the Green River impairment. Do I have that right?

A. Yes.

Q. Apart from the Green River impairment, did you make any adjustments to take into account confounding information on January 31st?

A. Yes.

Q. What was that? Tell me what paragraph of your report you're in.

A. 163 through 166. So the regression indicated that $1.23 of the company-specific information on January 31st, 2017, including information disclosed during trading that day caused the stock price to fall $1.23 per share and identified no public negative confounding information, but I was informed by counsel, plaintiffs' counsel that an internal document produced in connection

Page 236

with this litigation found that seven different assets, the impairment, the two billion, $2.03 billion in impairment was spread across seven different assets. One of those was Green River and there was an amount given for Green River and I was told that Green River, that counsel doesn't intend to prove or at this point cannot prove or something of that sort, cannot attribute fraud to the Green River disclosure, impairment disclosure, but also two other assets.

So there were seven properties that accounted for the $2.03 billion of impairment, two were not at RMDG, and one of RMDG's assets is not alleged to have been impaired as of the start of the class period. So it's not just Green River. It's Green River and two other assets.

Q. The 85.9 percent that you say is allegation-related at the bottom of the page on 61, how did you identify the 85.9 percent? Where did that particular number come from?

A. Footnote 156, that document.

Page 237

Q. Just to understand the math here, did you do this on a pro-rata basis, meaning you figured out what the total size of the impairment was, and then you said, well, I'm going to dollar for dollar do a reduction that only takes into account the same share as the amount of the impairment?

MR. SAHAM: Objection to form.

A. Essentially, right. 85.9 percent of the impairment is attributable to the three allegation-related RMDG assets and, therefore, I attributed 85.9 percent of the stock price, of the residual stock price decline to the alleged fraud involving those three properties.

Q. So you made a quantitative judgment?

A. Yes.

Q. You did not make a qualitative adjustment?

A. Right.

Q. For example, you didn't take into account how important the Rocky Mountain Dry Gas assets were vis-à-vis any other assets that had been impaired that day?

A. I did the calculation the way I explained.

Q. So no, correct?

60 (Pages 234 - 237)

Page 262

If the 30-year bonds were callable and they were called before their 30-year maturity, how, if all, would that impact the calculation of the 832 million additional interest expense that you calculated?

A. My understanding is they weren't called. They have not been called.

Q. This year right now is 2025, right?

A. Yes.

Q. And the 30-year bond that was issued in 2016 is still outstanding if it hasn't been called, correct?

A. That's right.

Q. At some point in the next some number of years, it could be called, correct?

A. It could be.

Q. My question for you is, if that were to happen, how, if at all, would that impact the 832 million of additional interest expense that you calculated?

A. It would be less.

Q. How would you have to reduce it?

A. Well, there would be fewer coupons paid and so there would be fewer coupons to which that spread. The spread dictated by the

Page 263

credit risk would also have to be paid, but the calculation was on the assumption that they were not called, and so for a number of the bonds have been called.

Q. And then just to go back to the 832 million and how it was calculated, when you ascertained the spread you just referred to, I want to just understand what you were doing. Were you trying to figure out what the additional interest expense would be if Exxon was downgraded by S&P only or if Exxon was downgraded by S&P and Moody's?

A. The calculation that's in my report is an estimate of the higher interest expense if it was downgraded by both.

Q. And have you done a calculation for additional interest expense, in your view, if only S&P had downgraded Exxon at the time of the March offering?

A. Yes, now I have.

Q. And is that the page that your counsel handed to me on a break?

A. Yes.

MS. SOLOWAY: Let's mark this just so it's in the record.

Page 264

(Exhibit 6 marked for identification.)

Q. I'm handing you what's been marked Exhibit 6. Does this document which you provided to us modify your opinion that you're offering in this case?

A. With respect to that one sentence that I asked to be stricken earlier today, but not with respect to answering the question that I was originally asked.

Q. Let me just make sure I understand this. The question you believe you were originally asked was what would the additional interest expense be, in your view, if Exxon had been downgraded by both Moody's and S&P before the March 2016 offering?

A. That's right.

Q. Is it your understanding that the plaintiffs in this case allege that Exxon was at risk of being downgraded by Moody's before the bond offering?

MR. SAHAM: Objection to form, calls for speculation.

A. I don't -- you're asking are they alleging that?

Page 265

Q. I'm asking what is your understanding of the allegation here. Are the plaintiffs alleging that Exxon was at risk of being downgraded by Moody's before the March 2016 bond rating?

A. I don't recall.

Q. Do you know the answer?

A. We talked about what their allegations are and I didn't include them as one of them. So the allegations, as I understood them, were how I answered the question earlier. I would have to look at the complaint or their other documents.

Q. So sitting here today, you don't recall whether the plaintiffs allege that Exxon was at risk of Moody's downgrading them before the March 2016 bond offering?

A. I think every company is always at risk of a downgrade.

Q. I'm asking what the plaintiffs allege, though. Do the plaintiffs make that allegations?

A. I don't know.

Q. This is new calculation that you provided?

A. Yes.

67 (Pages 262 - 265)

Page 266

Q. So this calculation is a situation where there's a split rating, correct?

A. This is a calculation of what the extra interest expense would be on a future-value basis out to maturity for each of the bonds if it was a split rating downgrade.

Q. Okay. Does that calculation take into account in any way any implications of S&P putting Exxon on a negative credit watch?

A. Yes.

Q. How does it do that?

A. Well, I saw defense experts say that they looked at the marketing reaction to credit watch and saw no reaction whatsoever from the market which tells me that the market was not expecting a downgrade as a result of being put on credit watch.

Q. You're talking about Dr. Saunders' report?

A. Right.

Q. And Dr. Saunders did an event study and examined whether the announcement of a negative credit watch by S&P had a statistically significant negative impact on Exxon's bonds, correct?

A. Yeah, he said that it didn't, and so --

Page 267

he offered some explanation, but the best explanation was the market was not expecting a company that had a AAA rating since the Depression to be downgraded.

Q. Okay.

A. That's the best explanation for why there was no reaction then, and then there was a downgrade later.

Q. Are you aware that Dr. Saunders also performed an event study and looked at the date of the downgrade?

A. Yeah, but that's not going to tell you what one would expect the higher interest to be at the time of issue. That would tell you on an intertemporal time series basis the results of everything that happened between the issuance and that day.

Q. Let's back up here, Dr. Feinstein. Dr. Saunders did an event study and he looked at both the day of the negative credit watch and also the day of the actual downgrade, correct?

A. Yes.

Q. And on neither of those dates did he find a negative statistically significant

Page 268

movement, correct?

A. Right. The result of his econometric or his regression analysis was not that the movement in the yield was so pronounced as to stand out as being statistically significant.

Q. And you're citing that as support for the proposition that the market didn't care about the negative credit watch, correct?

A. I didn't say they don't care. I said they weren't expecting it.

Q. But the actual downgrade itself also didn't have a negative statistically significant reaction, correct?

A. That doesn't prove that the market didn't care. What it proves is that if there was -- there may have been a reaction. We talked about this earlier today. There may have been a reaction, but you're talking about six and a half basis points or 13 basis points, enough to represent a lot of money, but not enough to stand out against the background noise and volatility of the entire market over a several-month period.

Q. So speaking totally analytically -- let's

Page 269

just take a step back.

You don't disagree with the findings of Dr. Saunders' event study on either of those dates, do you?

A. Correct. His event study did not detect a significant reaction. It doesn't mean there was no reaction at all.

Q. Do you have any concerns about the way he ran his event study? Did you find any mistakes in his regression? Do you have a problem with any of his assumptions? Do you have any issues with his event study?

A. I wasn't able to replicate it. I might still try, but I have no reason to say he did it wrong. What I observed is that the better explanation for the credit watch result is that given the fact that Exxon has had a AAA rating for decades, is that the market was not expecting a downgrade. And the explanation for why you don't see a significant reaction according to his regression is that that's not a tool that would necessarily find a six-and-a-half or 13-basis-point change in yield, would not detect it. It could have happened, but it

68 (Pages 266 - 269)

Page 318

investors.

Q. Is it your position that Exxon was going bankrupt?

A. No. That's why I would call it a desperate act. To dig into the balance sheet and sell assets in order to pay a dividend, that's something that companies going bankrupt would do. It's not something you would expect Exxon to do. What they did do, apparently, is borrow money to pay the dividend.

Q. Okay. What is a dividend?

A. I answered that just a few questions ago. A dividend is a cash payment to equity investors, usually a percentage of earned income.

Q. Is a dividend one way that a company shares value from its operations with its shareholders?

A. Well, they pay out earned income on a pro-rata basis to investors prorated by how much equity each investor owns.

Q. So yes, it's one way that shareholders can get value from their investment in Exxon stock, correct?

A. Yes, or a realized value.

Page 319

Q. And another one is share buybacks, correct?

A. Yes.

Q. How do share buybacks give value to Exxon shareholders?

A. Well, people who owned the equity receive cash from the company similarly on a prorated basis commensurate with how much of the equity they previously owned.

Q. And are you -- have you looked into whether Exxon engaged in share buybacks?

A. No.

MS. SOLOWAY: I'm going to take just five minutes to make sure I have no more questions and come back.

MR. SAHAM: Okay.

VIDEOGRAPHER: The time is 6:05. We're off the record.

(Break taken)

VIDEOGRAPHER: The time is 6:10. We're back on the record.

MS. SOLOWAY: Dr. Feinstein, we have no further questions at this time. Thank you for your time. All set?

MR. SAHAM: Yeah, we're done.

VIDEOGRAPHER: The time is 6:10.

Page 320

We're off the record.

(Whereupon the deposition was concluded at 6:10 p.m.)

Page 321

COMMONWEALTH OF MASSACHUSETTS)
SUFFOLK, SS. )

I, Jeanette Maracas, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 22nd day of January, 2025, at 9:17 a.m., the person hereinbefore named, who was by me duly sworn to testify to the truth and nothing but the truth of his knowledge touching and concerning the matters in controversy in this cause; that he was thereupon examined upon his oath, and his examination reduced to typewriting under my direction; and that the deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any attorney or counsel employed by the parties hereto or financially interested in the action.

In witness whereof, I have hereunto set my hand this 29th day of January, 2025.

Notary Public
My commission expires 7/29/27

81 (Pages 318 - 321)

# Exhibit 4

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

PEDRO RAMIREZ, JR., Individually and on
Behalf of All Others Similarly Situated,

       *Plaintiff*,

v.

EXXON MOBIL CORPORATION, REX W.
TILLERSON, ANDREW P. SWIGER,
JEFFREY J. WOODBURY and DAVID S.
ROSENTHAL,

       *Defendants*.

Civil Action No. 3:16-cv-03111-K

<u>CLASS ACTION</u>

EXPERT REPORT OF ALLEN FERRELL, PH.D.

**December 10, 2024**

**App. 236**

**Table of Contents**

I.   Qualifications........................................................................................................ 1

II.   Background ............................................................................................................ 1

    A.   Class Certification Phase.............................................................................. 1

    B.   Loss Causation Phase ................................................................................... 3

III.   Assignment ........................................................................................................... 4

IV.   Summary of Opinions .......................................................................................... 5

V.   Dr. Feinstein Fails to Demonstrate That the Alleged Misrepresentations Caused Inflation to Enter ExxonMobil Stock by Virtue of Causing a Statistically Significant Price Increase ....... 10

VI.   There is No Reliable Economic Basis to Establish that ExxonMobil's October 28, 2016 De-Booking and Impairment Announcements Have Any Connection to ExxonMobil's 2015 Reserves and Impairment Disclosures. ....................................................................... 12

VII.   Dr. Feinstein's Conclusion that the Portion of the Residual Price Decline on October 28, 2016 that was Caused By the Negative Earnings-Related News is $0.04 is Based on a Flawed and Unreliable Analysis ................................................................................... 20

VIII.   Dr. Feinstein Disregards the Court's Decision That There was No Price Impact of the January 31, 2017 Alleged Corrective Disclosure By Proffering an Inferior Regression Model To Concoct a Negative and Statistically Significant Price Movement on January 31, 2017 ............ 28

IX.   Dr. Feinstein Has Not Demonstrated That Damages Can Be Reliably Measured in This Case   32

X.   Dr. Feinstein's Analysis of the Cost of Losing ExxonMobil's AAA Rating Is Flawed.... 34

**App. 237**

## I.   Qualifications

1.      I am an economist and the Greenfield Professor of Securities Law at Harvard Law School. I received a Ph.D. in economics from the Massachusetts Institute of Technology with fields in econometrics and finance and a J.D. from Harvard Law School. After law school I clerked for Judge Silberman of the United States Court of Appeals for the D.C. Circuit and Justice Kennedy of the Supreme Court of the United States.

2.      I am also a faculty associate at the Kennedy School of Government at Harvard, a fellow at Columbia University's Program on the Law and Economics of Capital Markets, a research associate at the European Corporate Governance Institute, a research associate at the National Bureau of Economic Research, and a visiting professor at Stanford. I formerly was a member of the Board of Economic Advisors to the Financial Industry Regulatory Authority ("FINRA"), an academic fellow at FINRA, Chairperson of Harvard's Advisory Committee on Shareholder Responsibility (which was responsible for advising the Harvard Corporation on how to vote shares held by its endowment), a member of the American Bar Association Task Force on Corporate Governance and of the American Law Institute Project on the Application of U.S. Financial Regulations to Foreign Firms and Cross-Border Transactions, and an executive member of the American Law School section on securities regulation.

3.      I have testified before the U.S. Senate Subcommittee on Securities, Insurance, and Investment and presented to, among others, the Securities and Exchange Commission ("SEC"), the World Bank, the International Monetary Fund, the U.S. Structured Products Association, and the National Bureau of Economic Research. I have published approximately 30 articles in leading law and finance journals. I have also been an expert witness in a variety of corporate and securities matters, including matters involving mergers & acquisitions and damages. My expert testimony in the last four years, publications in the last ten years, and academic work are summarized on my curriculum vitae, which is attached hereto as **Appendix A**.

## II.   Background

### A.   Class Certification Phase

4.      Plaintiff Greater Pennsylvania Carpenters Pension Fund filed its operative complaint on July 26, 2017 which, among other things, alleged that ExxonMobil Corporation ("ExxonMobil" or "Exxon") and the individual defendants made misrepresentations about

1

**App. 238**

ExxonMobil's proved reserves at its Kearl, Canada bitumen operations and the impairment of certain of its Rocky Mountain Dry Gas ("RMDG") assets.[1] Plaintiff claims that the truth regarding these alleged misrepresentations was revealed on: October 28, 2016, when ExxonMobil announced that (i) "[i]f the average prices seen during the first nine months of 2016 persist for the remainder of the year, under the SEC's definition of proved reserves, certain quantities of oil, such as those associated with the Kearl oil sands operations in Canada, will not qualify as proved reserves at year-end 2016" and (ii) "[i]n light of continued weakness in the upstream industry environment during 2016, and as part of its annual planning and budgeting process which is currently in progress, [ExxonMobil] will perform an assessment of its major long-lived assets, similar to the exercise undertaken in late 2015, including North America natural gas assets and certain other assets across the remainder of its operations"; and January 31, 2017, when ExxonMobil disclosed that it would recognize a "U.S. Upstream asset impairment charge of about $2 billion mainly related to dry gas operations with undeveloped acreage in the Rocky Mountains region of the U.S" and that most of the quantities of oil associated with the Kearl oil sands operation in Canada would not qualify as proved reserves under the SEC's definition at year-end 2016.[2]  Plaintiff initially sought a Class Period between March 31, 2014 and January 30, 2017.[3]

5.      I submitted a class certification report on February 1, 2019 and opined "that neither the alleged misrepresentations nor their purported correction had a price impact on ExxonMobil's stock."[4]

6.      On August 21, 2023, the Court granted in part and denied in part Plaintiff's motion for class certification, ruling that Defendants had demonstrated a lack of price impact for

---

[1] Consolidated Complaint for Violations of the Federal Securities Laws filed July 26, 2017 ("Complaint"), ¶¶ 20-24.

[2] Complaint, ¶¶ 20-24, 232-234; Exxon Mobil Form 8-K dated October 28, 2016, p. 5; Report on Loss Causation and Damages, Professor Steven P. Feinstein, Ph.D., CFA, October 11, 2024 ("Feinstein Report"), ¶ 32. As discussed, below, Plaintiff originally claimed that there were seven corrective disclosure dates in total but the Court ruled that Defendants demonstrated a lack of price impact for all of the corrective disclosure dates except for October 28, 2016.

[3] Complaint, ¶ 1.

[4] Expert Report of Allen Ferrell, Ph.D. dated February 1, 2019 ("Ferrell Class Certification Report"), ¶ 11.

2

**App. 239**

all of the alleged corrective disclosures except one, Exxon's October 28, 2016 earnings announcement.[5]

7.       Regarding the January 31, 2017 purported corrective disclosure, the Court found lack of price impact, stating that it was "the only earnings release alleged to be a Corrective Disclosure that is not associated with a statistically significant negative price reaction on a close-to-open basis or even a close-to-close basis," and that "Dr. Ferrell analyzed Exxon Mobil's price using a close-to-open window and found no statistically significant negative price reaction to the fourth quarter release."[6] The Court further found that the "failure of the fourth quarter release to significantly affect Exxon Mobil's stock price when measured over a more appropriate window is unsurprising since the market was on notice of the impairments and de-bookings announced in the fourth quarter release as a result of ExxonMobil's disclosures in its third quarter earnings release."[7]

8.       The Court ultimately certified a class consisting of those "persons who purchased or otherwise acquired" ExxonMobil stock between "February 24, 2016 and October 28, 2016."[8]

### B.       Loss Causation Phase

9.       On October 11, 2024, Plaintiff submitted the Report on Loss Causation and Damages of Professor Steven P. Feinstein, Ph.D., CFA ("Feinstein Report"). In that report, Dr. Feinstein states that he was asked to "determine whether Class members suffered losses as a result of the alleged misrepresentations and omissions described in the [Complaint],"[9] and to "compute damages, if any, suffered by Class members from their investments in Exxon common stock made during the period 24 February 2016 through 28 October 2016, inclusive (the 'Class

---

[5] Memorandum Opinion and Order, *Ramirez v. Exxon Mobil Corporation, et al.*, No. 3:16-CV-03111-K (N.D. T.X.), filed August 21, 2023 ("Class Certification Decision"), p. 55-56.

[6] Class Certification Decision dated August 21, 2023, p. 52. The Court also noted that my close-to-close event study revealed no statistically significant price reaction.

[7] Class Certification Decision dated August 21, 2023, p. 52.

[8] Class Certification Decision dated August 21, 2023, p. 56.

[9] Feinstein Report, ¶ 1.

**App. 240**

Period')."[10] Dr. Feinstein was also asked to "calculate the additional interest expense that Exxon would have paid over the life of the Exxon notes offered in March 2016, had the Company's credit been rated AA+ at the time of the offering rather than AAA."[11]

10.    Dr. Feinstein reaches the following conclusions:

- "The alleged misrepresentations and omissions caused the price of Exxon stock to be artificially inflated over the course of the Class Period;"[12]

- "The corrective disclosures informed the market about i) the lack of profitability of the Company's bitumen operations at Kearl Lake ("Kearl") resulting in a removal of 3.6 billion barrels of proved reserves (approximately 14% of the Company's overall proved reserves), and ii) impairment of the Company's Rocky Mountain dry gas assets ("Rocky Mountain" or "RMDG"), requiring the Company to take a $2.0 billion charge against earnings. These disclosures corrected the misinformation and the artificial price inflation caused by the alleged misrepresentations and omissions, causing the price of Exxon stock to decline, in turn causing investors to sustain losses…[I]t is [his] opinion that corrective disclosures caused $2.39 of the $2.43 residual price decline in Exxon stock on 28 October 2016, and $1.05 of the $1.23 residual price decline on 31 January 2017;"[13] and

- "…had Exxon's credit rating been 'AA+' at the time of the March 2016 offering, rather than 'AAA,' Exxon would have had to offer a 0.13% increase in yield to receive the $12 billion in proceeds. The 0.13% increase in yield would have resulted in a total increase in interest expense of $831.95 million over the life of the notes."[14]

## III.    Assignment

11.    I have been retained by Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel for defendants ExxonMobil, Rex W. Tillerson, Andrew P. Swiger, David S. Rosenthal, and Jeffrey J. Woodbury, to assess whether Plaintiff has reliably established that it was damaged by alleged misrepresentations made by ExxonMobil, and to review and comment on the Feinstein Report.

12.    I have been assisted by Compass Lexecon staff in this matter. My analyses, opinions, and conclusions are based solely on the work performed by me, and those under my

---

[10] Feinstein Report, ¶ 2. Dr. Feinstein acknowledges that the Court's Class Certification Decision dated August 21, 2023 only certified a Class Period beginning on February 24, 2016 and ending on October 28, 2016. Feinstein Report, note 1.

[11] Feinstein Report, ¶ 3.

[12] Feinstein Report, ¶ 20.

[13] Feinstein Report, ¶¶ 21-22, 25.

[14] Feinstein Report, ¶ 28.

4

**App. 241**

supervision, through the date of this report. I am being compensated for my work on this matter at an hourly rate of $1,500, including for any testimony I may provide in this matter. I receive other compensation from Compass Lexecon based on a portion of staff billings. My compensation is not contingent upon my opinions, testimony, or conclusions, or upon the outcome of this matter.

13.     The materials I have considered in reaching the opinions and conclusions set out in this report are listed in **Appendix B**.

14.     The opinions and conclusions expressed in this report are subject to change or modification including if additional relevant information becomes available which bears on the analysis, opinions, or conclusions contained herein. For example, I may also seek to respond to opinions or analyses proffered by other experts or questioning from counsel at deposition.

## IV.     Summary of Opinions

15.     Based on my review, analysis, experience, and training, I have reached the following principal conclusions:

    a.  Dr. Feinstein fails to demonstrate that the alleged misrepresentations caused inflation to enter ExxonMobil stock by virtue of causing statistically significant price increases, as there were no statistically significant price increases on any of the alleged misrepresentation dates.

    b.  There is no reliable economic basis to establish that ExxonMobil's October 28, 2016 announcements regarding a potential de-booking of proved reserves and an asset impairment review have any connection to ExxonMobil's allegedly misleading disclosures concerning its year-end 2015 proved reserves and asset impairment review. Therefore, any price decline on October 28, 2016 cannot be linked to the alleged misrepresentations.

        i.  For the Kearl proved reserves de-booking, ExxonMobil disclosed on October 28, 2016 that "[i]f the average prices seen during the first nine months of 2016 persist for the remainder of the year, under the SEC definition of proved reserves, certain quantities of oil, such as those associated with the Kearl oil sands operations in Canada, *will not qualify* as proved reserves at year-end 2016" and that "[q]uantities that could be required to be de-booked as proved reserves on an SEC basis amount to approximately 3.6 billion barrels of bitumen at Kearl, and about 1 billion oil-equivalent barrels in other North America operations."[15] The Company's disclosures made clear that whether quantities of oil or gas qualified as proved reserves under the SEC's definition, which is evaluated annually, is based in part on the average first-

---

[15]  Exxon Mobil Form 8-K dated October 28, 2016, p. 5 (emphasis added).

**App. 242**

day-of-the-month price for each month during the calendar year and depends on the relationship between several factors (i.e., average price levels, costs, and operating efficiencies).[16] The Company did not disclose any connection between the potential de-booking announced on October 28, 2016, which addressed the proved reserves assessments for year-end 2016, with the Company's reserves assessments for year-end 2015, which were disclosed on February 24, 2016.

ii. For the asset impairment charge, ExxonMobil disclosed that, due to prevailing market conditions during 2016, it would perform impairment analyses for inclusion in its 2016 Form 10-K.[17] The Company also disclosed that the assessment will reflect crude and natural gas price outlooks consistent with those that management uses to evaluate investment opportunities, which were generally consistent with the long-term price forecasts published by third-party industry and government experts.[18] The Company also stated that until such analyses are complete, "it is not practicable to reasonably estimate the existence or range of potential future impairments related to the corporation's long-lived assets."[19] The Company did not disclose any connection between the forthcoming asset impairment review ExxonMobil announced on October 28, 2016 with the asset impairment review it had undertaken as of year-end 2015.

iii. The announcement of the 2016 potential de-booking and asset impairment review are related to a variety of factors that were prevailing in 2016. One such factor is crude oil and natural gas prices – i.e., the actual average first-day-of-the-month oil prices for each month in 2016 for the SEC proved reserves assessment and ExxonMobil's outlook for natural gas prices for the asset impairment analysis.

A. Average oil prices for the 12 months in 2015 were much higher than the average oil prices during the first nine months in 2016. Thus, based on average oil prices in 2015 and the lower average oil price in the first nine months of 2016, there is no reliable economic basis to assume a connection between a de-booking in 2015 and the announcement of a potential Kearl proved reserves de-booking on October 28, 2016.

B. In November 2015, the U.S. Energy Information Administration forecasted that the Henry Hub natural gas price, the relevant benchmark for the RMDG assets, would average $2.69/MMBtu

---

[16] ExxonMobil Form 8-K dated October 28, 2016, p. 5.

[17] ExxonMobil Form 8-K dated October 28, 2016, p. 5.

[18] ExxonMobil Form 8-K dated October 28, 2016, p. 5.

[19] ExxonMobil Form 8-K dated October 28, 2016, p. 5.

**App. 243**

in 2015 and \$3.00/b in 2016[20] – i.e., an 11.5% increase. However, Henry Hub natural gas prices in the first nine months of 2016 were actually lower than in 2015. Thus, based on the natural gas price outlook in 2015 and the different market conditions in 2016, there is no reliable economic basis to assume that there is a connection between an impairment assessment conducted in 2015 and the potential impairment announcement on October 28, 2016.

    iv.    Based on my review of analyst reports following the October 28, 2016 announcement, there were no analysts that mentioned any connection between ExxonMobil's potential Kearl proved reserves de-booking and asset impairment review disclosures on October 28, 2016 with ExxonMobil's 2015 proved reserves assessment and asset impairment review disclosures.

    v.    Since the purported corrective disclosures, ExxonMobil has not restated any of its financial statements for 2015, has not retroactively de-booked its Kearl proved reserves as of year-end 2015, and has not retroactively recognized impairment charges on its RMDG assets as of year-end 2015, directly contradicting Plaintiff's claims that ExxonMobil's 2015 Form 10-K de-booking and impairment disclosures were revealed to be false and misleading by the alleged corrective disclosures.

c.    Dr. Feinstein's conclusion that the portion of the residual price decline on October 28, 2016 that was caused by the negative earnings-related news (*i.e.*, what Dr. Feinstein claims to be non-alleged fraud related news or confounding information) is only \$0.04 is based on a flawed and unreliable analysis.

    i.    Dr. Feinstein's conclusion that the confounding information was non-recurring solely relies on the purported increase in the fiscal year 2016 EPS (FY 2016 EPS) estimate, but he does not assess changes in EPS estimates for subsequent full-year periods (e.g., FY 2017 to FY 2020). By contrast, the EPS estimates over those full-year periods declined, indicating that the negative earnings-related news had a much bigger impact than what Dr. Feinstein suggests.

    ii.    Dr. Feinstein relies upon the LSEG database to show that the average FY 2016 EPS estimate by analysts increased between October 25, 2016 and November 8, 2016. But, the LSEG FY 2016 EPS estimates were based on 25 analysts contributing on October 25, 2016 and only 15 analysts contributing on November 8, 2016 – i.e., a reduction of 10 analysts. Dr. Feinstein did not provide the individual analyst estimates and I do not believe that the LSEG database contains the individual analyst estimates. Therefore, Dr. Feinstein fails to establish that the change in average FY 2016 EPS estimates is not due to the change in the number of analysts who are included in the database, rather than the change of their individual estimates. Using a similar

---

[20] U.S. Energy Information Administration, Short-Term Energy Outlook (STEO), November 2015, https://www.eia.gov/outlooks/steo/archives/nov15.pdf, p. 10.

7

**App. 244**

commonly-used financial data vendor (FactSet) that reported virtually the same number of analysts contributing to the EPS estimates on October 25, 2016 and November 8, 2016, I find the mean and median analyst estimates from FY 2016 to FY 2020, show that analysts *reduced* their EPS estimates for ExxonMobil, which contradicts Dr. Feinstein's conclusion that the adverse earnings-related news only had a one-time impact. In addition, I also reviewed all of the analyst reports available to me that commented on ExxonMobil's 3Q 2016 earnings release and found that the average FY 2016 (i.e., the year Dr. Feinstein analyzes) estimate declined for these analysts.

    iii.    Dr. Feinstein also ignores the numerous negative developments that ExxonMobil announced on October 28, 2016 that are unrelated to Plaintiff's claims. As a result, Dr. Feinstein's causation and damages analyses includes price declines caused by non-fraud-related information.

d.  Consistent with the Court's previous ruling in this case that there was no price impact from the January 31, 2017 alleged corrective disclosure (which Dr. Feinstein briefly acknowledges but seems to ignore for purposes of his analysis), I find that the information disclosed on January 31, 2017 was stale and, thus, would not affect ExxonMobil's stock price. Consistent with the above, the Court (just like I did) found the lack of statistically significant stock price reaction on this date.

    i.    Dr. Feinstein's analysis of the January 31, 2017 purported corrective disclosure is contrary to the Court's conclusion as well as analyst commentary that the information disclosed on January 31, 2017 was stale.

    ii.    Dr. Feinstein proffers a new regression model using an industry index he selects to create a negative and significant price movement in ExxonMobil's stock on January 31, 2017 based on a close-to-close event window. Dr. Feinstein's regression model has a lower adjusted R-squared (i.e., a measure of the explanatory power of the market and industry indices selected) than my regression model and even the model of plaintiff's class certification expert, Mr. Torchio. This means that Dr. Feinstein's market and industry factors explain less of ExxonMobil's returns, which leads to a larger residual return. This larger residual return results in Dr. Feinstein's finding of a statistically significant price movement; inconsistent with the lack of statistically significant price movement Mr. Torchio and I found for January 31, 2017.

    iii.    Dr. Feinstein's analysis also ignores that the Court has found that a close-to-open event window is more appropriate for disclosures that are made outside of market hours, such as the January 31, 2017 alleged corrective disclosure. I used Dr. Feinstein's new regression model and applied it to a close-to-open event window and, consistent with the Court's ruling and the results of my own event study, I found that ExxonMobil's price movement on January 31, 2017 was *not* statistically significant.

    iv.    Moreover, Dr. Feinstein fails to address the negative information ExxonMobil disclosed about its performance on that date that was unrelated to the de-booking and impairment announcements.

8

**App. 245**

e. Dr. Feinstein has not demonstrated that damages can be reliably measured in this case. Even if one assumes that the residual price declines on October 28, 2016 and January 31, 2017 measure the revelation of the truth on the alleged corrective disclosure dates, Dr. Feinstein fails to consider that such residual price declines cannot be used to measure inflation in ExxonMobil's stock at the start of the Class Period.

    i. Dr. Feinstein's damages model assumes that the amount of inflation in ExxonMobil's stock during the entire Class Period can be measured by the decline on the two corrective disclosure dates, and remained constant for the duration of the entire class period. This assumes that the information disclosed in October 2016 and January 2017 could have been disclosed as early as February 2016.

    ii. For example, the announcement on October 28, 2016 concerned the potential Kearl proved reserves de-booking and an asset impairment review of, among others, its North American natural gas operations as of year-end 2016 – meaning that there was some probability of a Kearl proved reserves de-booking and an asset impairment charge relating to the Company's North American natural gas operations as of year-end 2016. Dr. Feinstein has not analyzed, let alone established, the probability of a proved reserves de-booking and asset impairment charge on October 28, 2016 and what the probability of a proved reserves de-booking and asset impairment charge would have been earlier in the Class Period, which could be zero or a different level than it was on October 28, 2016. Without doing such an analysis, Dr. Feinstein cannot establish that the price decline on October 28, 2016 associated with the alleged corrective disclosure (if any) would measure the inflation embedded in ExxonMobil stock at the start of the Class Period.

f. Dr. Feinstein's analysis of the cost of losing ExxonMobil's AAA rating is flawed.

    i. The events Dr. Feinstein assumes would have precipitated a credit ratings downgrade were publicly disclosed; yet the rating agencies ***did not*** downgrade ExxonMobil's credit rating after those disclosures were made.

    ii. An event study of four out of the five bonds issued by ExxonMobil in March 2016 for which TRACE pricing was available on at least 96% of trading days and for which I obtained matching-maturity on February 29, 2016 was performed to determine whether the prices of the bonds experienced statistically significant negative returns on either October 28, 2016 or January 31, 2017. The event study shows that prices ***did not*** experience a statistically significant reduction in response to either of the alleged corrective disclosures, further contradicting Dr. Feinstein's implicit assumption that the information released on those dates had an impact on ExxonMobil's credit quality.

    iii. Even if one assumes that a downgrade in ExxonMobil's credit rating from AAA to AA+ would result in a 13 basis point increase in the coupon rate of the bonds issued in March 2016, Dr. Feinstein's calculation does not reflect the increase in interest expense associated with a 13 basis point increase as of

9

**App. 246**

March 2016. Instead, for each of the eight bonds issued in March 2016, Dr. Feinstein calculates the increase in the value of coupon and principal payments, *at maturity* (i.e., the value years into the future), if the bond had a coupon rate that was 0.13% higher than it actually was. Dr. Feinstein's calculation thus magnifies the difference in interest rate payments the longer the maturity. For example, for the bond with a 30-year maturity, Dr. Feinstein calculates a difference in value *in 2046* of $660 million – i.e., the difference from this one bond alone contributes 79% of his $832 million total.

    iv.    As a matter of economics, investment decisions are based on the present value of the investments. Dr. Feinstein's compounded value calculation does not reflect the present value as of March 2016 of the impact of paying a coupon rate that is 13 basis points higher. The present value of the cost to ExxonMobil of making higher interest payments is equal to, for each bond, the incremental interest payments that ExxonMobil would have paid at the higher interest rate, minus the tax benefits from those higher interest payments, and discounting the after-tax payment streams to the issue date in March 2016. This calculation shows that a 13 basis point increase in interest expense would cost ExxonMobil $77.5 million, or 0.02% of ExxonMobil's market cap on the day before the bond issuance.

16.    I provide more detail and support for my opinions in the sections below.

## V.    Dr. Feinstein Fails to Demonstrate That the Alleged Misrepresentations Caused Inflation to Enter ExxonMobil Stock by Virtue of Causing a Statistically Significant Price Increase

17.    Plaintiff alleges that ExxonMobil made misrepresentations on four unique trading dates during the Class Period.[21] A fifth alleged misrepresentation date, November 3, 2016, falls outside of the revised Class Period as ruled by the court, but as, shown in Appendix C, did not have a statistically significant positive reaction in ExxonMobil's stock. To the extent that Plaintiff and Dr. Feinstein contend that Defendants made misrepresentations during the Class Period on these unique dates, and that such alleged misrepresentations contained new value-relevant information, basic economic principles, including the efficient market theory which Dr.

---

[21] Complaint ¶¶ 246-317, discusses several alleged misrepresentation dates. However, only four of these dates are within the Class Period as defined in the Class Certification Decision, do not refer solely to carbon proxy costs and are not only corrective disclosure dates. October 28, 2016, which is both a misrepresentation date and a corrective disclosure is not on the table because it is addressed elsewhere in the report. As I understand, the Court ruled in the Class Certification Decision that Defendants have rebutted the alleged price impact of the alleged misrepresentations about the carbon proxy costs. Even still, three of the four remaining misrepresentation dates relate in part to carbon proxy costs.

**App. 247**

Feinstein contends applies to ExxonMobil, would imply that the stock price would have increased in a statistically significant manner on those dates. To confirm whether this is true, Dr. Feinstein thus should have analyzed those dates to establish whether the alleged misrepresentations created inflation or increased inflation by eliciting an increase in ExxonMobil's stock price.

18.   Dr. Feinstein does not perform the above analysis and, thus, fails to show that any alleged misrepresentations caused inflation to enter into ExxonMobil's stock price by virtue of causing a statistically significant price increase in ExxonMobil's stock. Instead, he bases his conclusion of economic materiality of the alleged misrepresentations on his assessment of abstract financial principles, company statements, analyst and media commentary, and ExxonMobil's supposed stock price reaction to the alleged corrective disclosures.[22] Furthermore, Dr. Feinstein does not disaggregate the purported price declines on the alleged corrective disclosure dates and connect those price declines to each unique alleged misrepresentation.

19.   In contrast, I analyzed the alleged misrepresentation dates using a standard event study framework to determine whether information disclosed on those dates created inflation by eliciting an increase in ExxonMobil's stock price.

20.   As shown in **Appendix C**, none of the alleged misrepresentations resulted in a positive and statistically significant residual return. Given this, none of the alleged misrepresentations had a price impact by virtue of causing a positive and statistically significant stock price reaction.[23]

21.   I understand that Plaintiff and Dr. Feinstein are likely to contend that the alleged misrepresentations "maintained" inflation in ExxonMobil's stock price. Dr. Feinstein does not provide any scientific or economic analysis to support such contention. Like Plaintiff, Dr. Feinstein solely relies on the back-end (i.e., at the end of the Class Period) price drops associated with the alleged corrective disclosure dates to claim, as a self-fulfilling prophecy, that the front-

---

[22] Feinstein Report, ¶¶ 109-142.

[23] For the alleged misrepresentations, I reviewed news articles, SEC filings and analyst reports following the alleged misrepresentations to determine whether there was new, negative information disclosed by ExxonMobil concurrently with, but unrelated to, the alleged misrepresentation that could have contributed to the lack of a statistically significant positive reaction (i.e., confounding information). *See* **Appendix B**. I did not find any confounding news on any of the four dates.

11

**App. 248**

end alleged misrepresentations maintained inflation that was dissipated when the truth was revealed. As I discuss below, the price drops on the alleged corrective disclosure dates are not associated with the alleged misrepresentations. Therefore, Dr. Feinstein has also failed to establish that the alleged misrepresentations maintained inflation.

**VI.     There is No Reliable Economic Basis to Establish that ExxonMobil's October 28, 2016 De-Booking and Impairment Announcements Have Any Connection to ExxonMobil's 2015 Reserves and Impairment Disclosures.**

22.     Plaintiff claims that ExxonMobil's October 28, 2016 announcement regarding a potential Kearl proved reserves de-booking and an asset impairment review of the Company's North American natural gas operations revealed the "truth" regarding ExxonMobil's alleged fraud[24] because, according to Plaintiff, the October 28, 2016 announcement indicated that ExxonMobil should have de-booked the Kearl reserves and recognized an impairment charge concerning the RMDG assets by year-end 2015.[25] Plaintiff's claim does not make economic sense, as the October 28, 2016 announcement states that ExxonMobil may need to de-book reserves and was analyzing impairments *in 2016* and makes no mention whatsoever about reserve amounts or asset values in 2015. As a result, Plaintiff has no reliable economic basis to establish that ExxonMobil's October 28, 2016 de-booking and impairment related announcements have any connection to ExxonMobil's allegedly misleading 2015 proved reserves and asset impairment review disclosures. As a result, any price decline on October 28, 2016 cannot be linked to the alleged misrepresentations.

23.     ExxonMobil stated the following regarding a potential de-booking of the Kearl proved reserves in 2016:

> "Average year-to-date crude prices have been significantly affected by the very low prices experienced during the first quarter of 2016, but have recovered considerably since that time. **If the average prices seen during the first nine months of 2016 persist for the remainder of the year, under the SEC definition of proved reserves, certain quantities of oil, such as those associated with the Kearl oil sands operations in Canada, will not qualify as proved reserves at year-end 2016**. In addition, if these average prices persist, the projected end-of-field-life for estimating reserves will accelerate for certain liquids and natural gas operations in North America, resulting in a reduction of proved reserves at year-end 2016. **Quantities that could be required to be**

---

[24] Complaint, ¶ 231.

[25] Complaint, ¶¶ 14, 22.

**App. 249**

**de-booked as proved reserves on an SEC basis amount to approximately 3.6 billion barrels of bitumen at Kearl, and about 1 billion oil-equivalent barrels in other North America operations.**"[26]

24.    In addition, ExxonMobil stated the following regarding potential asset impairments as of year-end 2016:

> "**In light of continued weakness in the upstream industry environment during 2016, and as part of its annual planning and budgeting process which is currently in progress, the corporation will perform an assessment of its major long-lived assets, similar to the exercise undertaken in late 2015, including North America natural gas assets and certain other assets across the remainder of its operations**. **The assessment will reflect crude and natural gas price outlooks consistent with those that management uses to evaluate investment opportunities and generally consistent with the long-term price forecasts published by third-party industry and government experts.** Development of future undiscounted cash flow estimates requires significant management judgment, particularly in cases where an asset's life is expected to extend decades into the future. An asset group would be impaired if its estimated undiscounted cash flows were less than the asset's carrying value, and impairment would be measured by the amount by which the carrying value exceeds fair value. **The corporation will complete its asset recoverability assessment and analyze the conclusions of that assessment in connection with the preparation and review of the corporation's year-end financial statements for inclusion in its 2016 Form 10-K.**"[27]

25.    As shown above, Plaintiff's purported "corrective disclosures" did not correct or restate the proved reserves or asset impairment assessments that had been conducted and disclosed in the 2015 Form 10-K, but rather are solely related to proved reserves and asset impairment assessments as of year-end 2016. Indeed, ExxonMobil did not disclose any connection between the potential Kearl proved reserves de-booking and the asset impairment review announced on October 28, 2016 and the proved reserves assessment or asset impairment review it disclosed that it conducted as of year-end 2015. As a result, the October 28, 2016 announcement has no relation to and no bearing on what ExxonMobil should have announced regarding its proved reserves or asset impairment review in its 2015 Form 10-K.

26.    In addition, whether to de-book proved reserves is related to certain economic factors that are prevailing as of the time of the assessment.[28] One such factor, as discussed in the

---

[26] ExxonMobil Form 8-K dated October 28, 2016, p. 5 (emphasis added).

[27] ExxonMobil Form 8-K dated October 28, 2016, p. 5 (emphasis added).

[28] For example, proved oil and gas reserves are defined by the SEC as reserves that "can be estimated with reasonable certainty to be economically producible—from a given date forward, from known reservoirs, and under existing economic conditions…" See,

**App. 250**

October 28, 2016 announcement, is historical crude oil prices. According to the SEC, companies "must use a 12-month average price, calculated as the unweighted arithmetic average of the first-day-of-the-month price for each month within the 12-month period prior to the end of the reporting period…"[29] to determine whether reserves need to be de-booked. For impairments, ExxonMobil stated that one of the factors it evaluates is the "crude and natural gas price outlooks consistent with those that management uses to evaluate investment opportunities and generally consistent with the long-term price forecasts published by third-party industry and government experts."[30] I understand that the relevant price benchmarks for the Kearl reserves and the RMDG assets are the WTI[31] price and the Henry Hub natural gas price, respectively.

27.       As shown in **Exhibit A** below, the average first-day-of-the-month oil prices for each of the 12 months in 2015 were substantially higher than the average first-day-of-the-month oil prices during the first nine months in 2016 (i.e., the period of time that ExxonMobil stated it considered before disclosing in October 2016 that a potential Kearl proved reserves de-booking may be required as of year-end 2016). In particular, the exhibit shows that the average WTI oil price from January through December 2015 was $50.00/bbl, which was ***19.1% higher*** than the average oil price from January through September 2016 of $40.47/bbl. Thus, based on average first-day-of-the-month oil prices in 2015 and the lower average first-day-of-the-month oil price in the first nine months of 2016, there is no reliable economic basis to assume a connection

---

SECURITIES AND EXCHANGE COMMISSION 17 CFR Parts 210, 211, 229, and 249 [Release Nos. 33-8995; 34-59192; FR-78; File No. S7-15-08] RIN 3235-AK00 MODERNIZATION OF OIL AND GAS REPORTING dated December 31, 2008 ("SEC MODERNIZATION"), p. 11. Regarding impairments, ExxonMobil states that it considers several factors when determining whether to test an asset for impairment, including, among other things "a significant decrease in the market price of a long-lived asset," "a significant adverse change in the extent or manner in which an asset is being used or in its physical condition," or "an accumulation of project costs significantly in excess of the amount originally expected. See, ExxonMobil Form 10-K for the year ended December 31, 2016, p. 58.

[29] SEC MODERNIZATION, p. 12.

[30] ExxonMobil Form 8-K dated October 28, 2016, p. 5.

[31] WTI refers to West Texas Intermediate. *See*, https://fred.stlouisfed.org/series/DCOILWTICO.

**App. 251**

between a de-booking in 2015 and the potential de-booking announcement on October 28, 2016.[32]

**Exhibit A**
**WTI Daily Spot Price on First Day of the Month**
**January 2015 – December 2016**

| Month | US $ / bbl | |
|---|---|---|
| | 2015 | 2016 |
| January | $52.72 | $36.81 |
| February | $49.25 | $31.62 |
| March | $49.59 | $34.39 |
| April | $50.12 | $35.36 |
| May | $59.10 | $44.75 |
| June | $60.24 | $49.07 |
| July | $56.94 | $49.02 |
| August | $45.25 | $40.05 |
| September | $45.38 | $43.17 |
| October | $44.75 | $48.80 |
| November | $46.12 | $46.66 |
| December | $40.58 | $51.08 |
| **Average (January to December)** | **$50.00** | **$42.57** |
| **Average (January to September)** | | **$40.47** |

Source: Daily Crude Oil Prices: West Texas Intermediate (WTI) - Cushing, Oklahoma (DCOILWTICO) from FRED Economic Data. https://fred.stlouisfed.org/series/DCOILWTICO.

28.    For impairments, ExxonMobil stated that one of the factors (among others) it uses to determine whether to perform an impairment test is "crude and natural gas price outlooks consistent with those that management uses to evaluate investment opportunities and generally consistent with the long-term price forecasts published by third-party industry and government experts."[33] The market was thus aware that fluctuations in price outlooks may cause ExxonMobil to reevaluate its impairment analyses. In November 2015, the U.S. Energy Information Administration forecasted the Henry Hub natural gas price to average $2.69/MMBtu in 2015 and

---

[32] The above is consistent with commentary from a Credit Suisse analyst cited by Dr. Feinstein that stated that the potential de-booking "is just the mathematical application of the SEC's 1st of the month pricing rule at the bottom of the cycle (2016 will likely average $44/bbl WTI on SEC rules and WCS average $31/bbl)." *See*, Feinstein Report, ¶ 86.

[33] ExxonMobil Form 8-K dated October 28, 2016, p. 5.

15

**App. 252**

$3.00/MMBtu in 2016[34]--i.e., an 11.5% increase. However, the average Henry Hub natural gas price between January 1, 2016 and October 27, 2016, the day before the alleged corrective disclosure, was $2.38, or 20.7% lower than the EIA's outlook of $3.00.[35] Thus, based on the gas price outlook in 2015 and the different market conditions in 2016, there is no reliable economic basis to assume that investors would perceive a connection between an impairment conclusion reached in 2015 and the potential impairment announcement on October 28, 2016.[36]

29.    In addition, statements by equity analysts, including analysts cited by Dr. Feinstein, contradict Plaintiff's current claim that the 2016 disclosures revealed that ExxonMobil's 2015 Form 10-K should have reflected a Kearl proved reserves de-booking and impairment charges relating to the RMDG assets. For example, based on my review of reports written by 18 analysts following ExxonMobil's October 28, 2016 announcement,[37] I did not find any analysts who expressed the view that ExxonMobil should have de-booked the Kearl proved reserves or recognized an impairment charge relating to its RMDG assets in 2015.[38] In other words, they did not interpret the new information to suggest that ExxonMobil's prior disclosures had been incorrect when issued. To the contrary, at least one analyst expressly recognized that write-downs and asset impairments for 2016 would be based on pricing and other information

---

[34] U.S. Energy Information Administration, Short-Term Energy Outlook (STEO), November 2015, https://www.eia.gov/outlooks/steo/archives/nov15.pdf, p. 10.

[35] Bloomberg.

[36] ExxonMobil states that there are other factors that ExxonMobil considers when it evaluates potential impairment indicators. I understand that the evaluation of these factors also would have differed in 2016 relative to 2015. *See, e.g.*, ExxonMobil Form 10-K for the fiscal year ended December 31, 2015, p. 57.

[37] I obtained all analyst reports on ExxonMobil from LSEG, FactSet, and Capital IQ from October 28, 2016 through October 31, 2016 that discussed the 3Q 2016 earnings release. I found a total of 24 analyst reports written by 18 analysts. *See* Appendix B.

[38] Dr. Feinstein cites one UBS analyst report from October 28, 2016 stating that "While it performed a similar analysis in 2015, it took no writedowns despite the precipitous YoY decline in oil prices, raising questions over its evaluation process which (as XOM acknowledged in its statement) is highly subject to management discretion." *See*, "3Q EPS Beats on R&M Asset Sale Gain But Cash Flow and Production Below Expectations," UBS, October 28, 2016. However, the UBS analyst did not opine that ExxonMobil should have taken an impairment in 2015.

**App. 253**

available in 2016, which would necessarily be different from the information and analyses conducted in 2015:

- **"A Word on Impairment Hullabaloo: We felt XOM did a nice job on the call of mitigating confusion around reserve write downs and asset impairments, a topic that has received too much press attention in our view. XOM clarified that they have already taken proved reserve writedowns, and they flagged that further write downs are likely this year. This should not be a surprise to anybody, as these revisions are based on a 12 month historical pricing basis, calculated annually, consistent with SEC reporting standards**. Asset impairments, on the other hand, have not been taken this down-cycle by XOM in substantial measure. Impairment testing is conducting using long-term commodity price assumptions, consistent with those that management uses to evaluate investment opportunities and typically reasonably consistent with price forecasts published by 3rd parties. **XOM did not book asset impairments at the end of 2015, as they were unnecessary per their long-term cash flow analysis. However, they will again conduct impairment testing during 4Q of this year in light of YTD commodity price weakness, as one would expect. If they need to impair assets, they will do so then. They very well may. In our view, the investigation into XOM's accounting practices lacks substance."**[39]

30.     Other analysts commented on the potential for de-booking of proved reserve and asset impairments, but did not suggest that the new revelation suggested any impropriety by ExxonMobil, much less that its prior disclosures had been false. For example:

- "Of greater interest was Exxon's attempt to address the growing controversy surrounding its reserve reporting and lack of asset impairments . . . Garnering the most attention was Exxon's disclosure that 4.6 billion barrels of reserves (3.6 billion associated with the Kearl oil sands project and 1 billion in North American liquids and natural gas), or 19% of its 2015 year-end total, may be debooked, given the low prices realized in the year to date . . . **While generating headlines, the disclosure is essentially the same, with the exception of the specific amounts, as what was included in its 2015 10-K . . . The absence of impairment charges is likely to be the issue of greater interest to regulators, but while seemingly odd, we do not suspect any impropriety."**[40]

- **"The Street might focus on today's call on the EPS beat's genesis (asset sales and lower tax rate) and also the comment about potential net reserve reduction during 2016. Overall, we think operations were on track and believe that XOM has the assets and balance sheet capacity to deliver long**

---

[39] "Extent of Premium Valuation Becoming More Difficult to Sustain," Simmons & Company, October 31, 2016 (emphasis added).

[40] "Exxon Reports Q3 Results, but Reserve Reporting Becomes the Focal Point," Morningstar Equity Research, October 31, 2016 (emphasis added).

17

**App. 254**

**term growth and shareholder value**. We remain encouraged at XOM's recent upstream discoveries because they will be executed at a time of low CDS/OFS and E&C costs."[41]

- "**We view potential reserve debookings and impairments as noise that do not impact our future value of the shares. However, they are an investor conversation which we touch on inside** . . . It was good to see XOM get on the front foot and **remind investors of the reserve booking and impairment policies followed at the company (more detail can be found in the 10-K) . . . No doubt paper inches will be filled with commentary should XOM decide to de-book or impair asset carrying value. Impairments would impact metrics like P/Book which some investors do follow. However, our view of XOM's current cashflow delivery and the value of future investments will be unaffected.** As we stated earlier, XOM has a broad inventory of resources and integrated downstream opportunities from which to deliver value. We just find the shares fully valued versus other global energy investments."[42]

- "**A word on reserve accounting: we don't see any issues. One question that came up frequently on the road was a discussion around XOM's reserve accounting and lack of reserve write downs compared with peers.** To put this in context, the charts below show first, how XOM's write downs have been modest versus the other major oils. However, a glance at capital employed per barrel also suggests that XOM is substantially more capital efficient versus peers although this is somewhat circular as XOM has not written off material reserves."[43]

31. Moreover, Dr. Feinstein's report selectively quotes a handful of analysts that he claims opined that the announcement was "decidedly negative," and omits from consideration other statements by the same analysts that contradict his claims.[44] For example:

- Dr. Feinstein quotes an October 31, 2016 Morgan Stanley analyst who states that if crude prices stay low, "reserves associated with Kearl…would be at risk," but the same analyst also states that, while impairment and write-down risks are "overhangs, " the "impact…should be much more modest given challenged economics. XOM noted that the same reserves would be eligible to be rebooked

---

[41] "3Q16 EPS better than Street consensus given sales gain; lower cap-ex and better QOQ EPS," Societe Generale, October 28, 2016 (emphasis added).

[42] "Same Deep Inventory, Impairment/Debooking Is Just Noise to Navigate," Credit Suisse, October 30, 2016 (emphasis added).

[43] "Tales from the road: Designed for decades, not quarters; underlining XOM's durability," Bank of America Merrill Lynch, October 10, 2016 (emphasis added). This report was referenced in Bank of America Merrill Lynch's report, "3Q16 Earnings recap: weak quarter, but no read through to the medium term outlook," published on October 28, 2016 when discussing the de-booking and impairment announcement.

[44] Feinstein Report, ¶¶ 79-80.

**App. 255**

and that potential write-downs would have no impact on operations and on our price forecast would return. Separately, in connection with its annual budgeting process, XOM plans to perform an assessment of the balance sheet value of its major long-life assets for potential impairments…We believe major write downs are unlikely, given a more constructive commodity price outlook relative to a year ago, better than expected efficiencies capture in the course of the year (see lower capex), and general conservatism of XOM's initial resource and value estimates."[45]

- Dr. Feinstein quotes a Raymond James analyst who states that the possible de-booking of reserves was "today's most surprising revelation," but the analyst only says that it is "much more serious" than the potential for impairment which the analyst stated was "headline risk" and that "we wouldn't lose sleep over this."[46] Indeed, the Raymond James analyst does not conclude that ExxonMobil should have debooked reserves or taken impairments in 2015. In addition, Raymond James highlighted negative aspects of ExxonMobil's performance, including production levels that fell short of expectations due to disruptions in Nigeria and also commented that the closing of the InterOil purchase "should worsen the relative underperformance" of ExxonMobil's stock relative to peers.[47]

32.    In addition, Dr. Feinstein ignores that several analysts did not even mention the potential de-booking and impairment tests at all, let alone opine that they caused ExxonMobil's price to decline or that ExxonMobil should have debooked reserves or taken impairments as of year-end 2015.[48]

33.    Indeed, since the purported corrective disclosures, ExxonMobil has not restated any of its financial statements for 2015, has not retroactively de-booked its Kearl proved reserves as of year-end 2015, and has not retroactively recognized impairment charges on its RMDG assets as of year-end 2015, directly contradicting Plaintiff's claims that ExxonMobil's 2015 Form 10-K de-booking and impairment disclosures were false and misleading.

---

[45] "3Q16: Missed and Likely Impaired," Morgan Stanley, October 31, 2016.

[46] "3Q16 Output at 7-Year Low; More Selling Pressure on Deck w/IOC Buyout," Raymond James, October 28, 2016.

[47] "3Q16 Output at 7-Year Low; More Selling Pressure on Deck w/IOC Buyout," Raymond James, October 28, 2016.

[48] See, e.g., "Upstream Miss Overshadows Headline Beat," Deutsche Bank, October 28, 2016; "Another Tough Quarter," J.P. Morgan, October 28, 2016; "CVX/XOM: Post-Q3 Adjustments," Wells Fargo, October 28, 2016.

19

**App. 256**

**VII.    Dr. Feinstein's Conclusion that the Portion of the Residual Price Decline on October 28, 2016 that was Caused By the Negative Earnings-Related News is $0.04 is Based on a Flawed and Unreliable Analysis**

34.    Dr. Feinstein calculates a residual price decline of $2.43 per share on October 28, 2016.[49] He then analyzes the earnings news unrelated to Plaintiff's fraud allegations (i.e., other news that Dr. Feinstein finds to be non-alleged fraud-related news or confounding information) on that date and concludes that such earnings related news was non-recurring and only had a $0.04 per share impact.[50] He then concludes that the remaining $2.39 per share must be related to the alleged corrective disclosure related to the likely Kearl proved reserves de-booking and the potential impairment of the RMDG assets on that day.[51] Dr. Feinstein's analysis of the confounding information, however, is flawed and unreliable. Therefore, he has not reliably demonstrated that any portion ExxonMobil's price decline was caused by the correction of the alleged misrepresentations, as opposed to the confounding information released at the same time.

35.    Dr. Feinstein's analysis of the confounding information solely relies on the purported increase in analysts' average fiscal year 2016 EPS (FY 2016 EPS) estimates as reported by LSEG.[52] Dr. Feinstein claims that there was a negative $0.04 per share "surprise" in 3Q 2016 that "can be attributed to confounding information"[53] and thus may also result in a reduction in FY 2016 estimates. However, he claims that because the FY 2016 analyst EPS estimates *increased*, then this must mean that the negative 3Q 2016 EPS surprise of $0.04 per share was non-recurring. This analysis, however, is flawed and unreliable. As an initial matter, Dr. Feinstein evaluated only one quarter following the negative EPS surprise in 3Q 2016.  But looking only one quarter ahead is not dispositive of whether the impact of the confounding information is non-recurring or recurring. I therefore applied Dr. Feinstein's methodology, using his source (LSEG), to evaluate whether analysts' estimates for future quarters changed following the 3Q 2016 EPS surprise. **Exhibit B** shows that the changes in median FY 2017 EPS estimates

---

[49] Feinstein Report, ¶¶ 25, 139-140, 153 and Exhibit-7.

[50] Feinstein Report, ¶¶ 154-157, 162.

[51] Feinstein Report, ¶ 162.

[52] LSEG is a publicly available financial database that includes, among other things, analyst estimate data.

[53] Feinstein Report, ¶ 156, 162.

**App. 257**

and the changes in the mean and median FY 2018, 2019, and 2020 EPS estimates are negative, which suggests that the negative earnings-related news for 3Q 2016 had a recurring impact, which is inconsistent with Dr. Feinstein's claim that the impact of the confounding information was non-recurring. Dr. Feinstein's conclusion that the market valued the $0.04 negative EPS surprise as limited to that precise amount is therefore demonstrably wrong.

**Exhibit B**
**Change in EPS Estimates per LSEG**
**October 25, 2016 to November 8, 2016**

|  |  | As of | | | |
|---|---|---|---|---|---|
|  |  | **10/25/16** | **11/8/16** | **Change $** | **Change %** |
| **FY 2016 EPS** | Average | $2.19 | $2.23 | $0.05 | 2.19% |
|  | Median | $2.18 | $2.26 | $0.08 | 3.67% |
|  | # of Estimates | 25 | 15 |  |  |
| **FY 2017 EPS** | Average | $4.32 | $4.36 | $0.04 | 0.94% |
|  | Median | $4.14 | $4.08 | -$0.06 | -1.38% |
|  | # of Estimates | 26 | 18 |  |  |
| **FY 2018 EPS** | Average | $5.38 | $5.33 | -$0.05 | -0.89% |
|  | Median | $5.33 | $5.19 | -$0.05 | -0.86% |
|  | # of Estimates | 19 | 14 |  |  |
| **FY 2019 EPS** | Average | $5.31 | $5.21 | -$0.10 | -1.96% |
|  | Median | $5.04 | $4.80 | -$0.24 | -4.76% |
|  | # of Estimates | 5 | 5 |  |  |
| **FY 2020 EPS** | Average | $5.38 | $5.32 | -$0.06 | -1.12% |
|  | Median | $5.22 | $5.09 | -$0.13 | -2.49% |
|  | # of Estimates | 4 | 4 |  |  |

Notes: Dr. Feinstein only reports the average FY 2016 EPS estimates.
Source: LSEG Workspace Data & Analytics.

36.      As discussed above, Dr. Feinstein relies upon the LSEG database to show that the average FY 2016 EPS estimate by analysts increased between October 25, 2016 and November 8, 2016. But, the LSEG FY 2016 EPS estimates were based on 25 analysts contributing on October 25, 2016 and only 15 analysts contributing on November 8, 2016 – i.e., a reduction of 10 analysts. Dr. Feinstein did not provide the individual analyst estimates and I do not believe

21

**App. 258**

that the LSEG database contains the individual analyst estimates.[54] Thus, it appears that he did not conduct the necessary analysis to establish that the change in average FY 2016 EPS estimates he is relying on is not due to the change in the number of analysts who are included in the database, rather than the change of their individual estimates.

37.    I obtained estimates for ExxonMobil's EPS for FY 2016 to FY 2020 from FactSet, a widely-used financial database that, like LSEG, also contains analyst EPS estimates, but can have a different universe of analysts than other databases. As shown in **Exhibit C** below, FactSet had virtually no change in the number of analysts providing estimates (except for a one analyst increase in FY 2018). The exhibit also shows that, using FactSet data, the average and median EPS estimates for FY 2016 to FY 2020 all show that analysts *reduced* their EPS estimate for ExxonMobil; further contradicting Dr. Feinstein's claim that the confounding information was non-recurring.

---

[54] I understand from LSEG that they do not provide detailed analyst estimates as far back as 2016.

22

**App. 259**

**Exhibit C**
**Change in EPS Estimates per FactSet**
**October 25, 2016 to November 8, 2016**

| | | As of | | | |
| --- | --- | --- | --- | --- | --- |
| | | **10/25/16** | **11/8/16** | **Change $** | **Change %** |
| **FY 2016 EPS** | Average | $2.19 | $2.19 | -$0.00 | -0.16% |
| | Median | $2.18 | $2.17 | -$0.01 | -0.46% |
| | # of Estimates | 25 | 25 | | |
| **FY 2017 EPS** | Average | $4.35 | $4.29 | -$0.06 | -1.32% |
| | Median | $4.24 | $3.95 | -$0.29 | -6.84% |
| | # of Estimates | 25 | 25 | | |
| **FY 2018 EPS** | Average | $5.27 | $5.19 | -$0.08 | -1.48% |
| | Median | $5.22 | $5.14 | -$0.08 | -1.44% |
| | # of Estimates | 18 | 19 | | |
| **FY 2019 EPS** | Average | $5.42 | $5.31 | -$0.11 | -1.94% |
| | Median | $5.29 | $5.05 | -$0.24 | -4.54% |
| | # of Estimates | 4 | 4 | | |
| **FY 2020 EPS** | Average | $5.06 | $4.99 | -$0.07 | -1.38% |
| | Median | $5.06 | $4.99 | -$0.07 | -1.38% |
| | # of Estimates | 2 | 2 | | |

Source: FactSet.

38.     In addition to reviewing analyst estimates reported by LSEG and FactSet, I reviewed all of the analyst reports available to us that covered ExxonMobil's 3Q 2016 earnings announcement to see whether they revised their EPS estimates. As **Exhibit D** shows, the average and median EPS estimate by individual analysts *declined* in response to ExxonMobil's 3Q 2016 earnings announcement, directly contradicting Dr. Feinstein's claim that EPS estimates increased in FY 2016.

23

**App. 260**

**Exhibit D**
**Summary of Equity Analyst's Change in 2016 EPS Estimates**
**October 28, 2016 to October 31, 2016**

| No. | Analyst | FY16 Estimate | | Change | |
| --- | --- | --- | --- | --- | --- |
| | | Prior | Current | $ | % |
| 1 | BofA Merrill Lynch | $2.50 | $2.44 | -$0.06 | -2.40% |
| 2 | Barclays | $2.35 | $2.15 | -$0.20 | -8.51% |
| 3 | Cantor Fitzgerald | N/A | N/A | N/A | N/A |
| 4 | Citi | $1.99 | $1.99 | $0.00 | 0.00% |
| 5 | Cowen and Company | $2.06 | $2.20 | $0.14 | 6.80% |
| 6 | Credit Suisse | $1.99 | $1.92 | -$0.07 | -3.52% |
| 7 | Deutsche Bank | N/A | N/A | N/A | N/A |
| 8 | Evercore ISI | N/A | N/A | N/A | N/A |
| 9 | J.P. Morgan | $2.30 | $2.34 | $0.04 | 1.74% |
| 10 | Jefferies | $2.16 | $2.17 | $0.01 | 0.46% |
| 11 | Morgan Stanley | N/A | N/A | N/A | N/A |
| 12 | Morningstar | $2.43 | $2.43 | $0.00 | 0.00% |
| 13 | Raymond James | $2.54 | $2.58 | $0.04 | 1.57% |
| 14 | RBC Capital Markets | $2.34 | $2.28 | -$0.06 | -2.56% |
| 15 | Simmons & Company | $2.18 | $2.26 | $0.08 | 3.67% |
| 16 | Societe Generale | $2.57 | $2.55 | -$0.02 | -0.78% |
| 17 | UBS | $2.15 | $2.16 | $0.01 | 0.47% |
| 18 | Wells Fargo | $2.30 | $2.26 | -$0.04 | -1.74% |
| | **Average** | **$2.28** | **$2.27** | **-$0.01** | **-0.41%** |
| | **Median** | **$2.30** | **$2.26** | **-$0.04** | **-1.74%** |

Notes: N/A denotes analysts that did not provide EPS estimates. Average and median estimates reflects the average and median of all estimates. The average and median changes are the differences between the average and median estimates.
Source: Analyst reports listed on Appendix B that are dated between October 28, 2016 and October 31, 2016.

39.     To the extent the EPS change was recurring, one would have to account for the impact of the confounding information on the present value of future cash flows and cannot merely use a one-quarter change as Dr. Feinstein has. To illustrate the potential magnitude of the impact of the confounding information, I use the change in EPS estimate for FY 2017 – i.e., the first full year after the October 28, 2016 disclosure – and the price-to-earnings ratio on October 25, 2016 – i.e., prior to the alleged corrective disclosure. On October 25, 2016, ExxonMobil's price to earnings ratio was 19.95x based on the average FY 2017 estimate and 20.45x based on

24

**App. 261**

the median FY 2017 estimate reported in Exhibit C.[55] Thus, a $0.06 decline in the average FY 2017 EPS estimates implies a $1.14 reduction in price (i.e., $0.06 multiplied by 19.95x) and a $0.29 decline in the median FY 2017 EPS estimate implies a $5.93 reduction in price (i.e., $0.29 multiplied by 20.45x). Dr. Feinstein's $2.43 per share residual price on October 28, 2016 is well within that range. This means that the entire price decline cited by Dr. Feinstein may be fully explained by the non-fraud-related negative earnings news, and not simply the $0.04 that Dr. Feinstein wrongly attributes to the negative earnings news.

40.     Moreover, Dr. Feinstein ignores other information disclosed contemporaneously by ExxonMobil that was also unrelated to the likely Kearl proved reserves de-booking and potential RMDG asset impairment disclosures. For example, Dr. Feinstein fails to consider that several analysts highlighted the negative developments at the company that had nothing to do with the potential de-booking and impairment analysis, including Q3 2016 EPS and profits that fell short of analyst expectations after accounting for one-time gains, and lower production. Some analysts suggested that the negative performance news had a negative impact on ExxonMobil's stock price. For example:

- "Our Take: Lot of moving pieces in the XOM result, but **EPS quality looks light and CFO missed,** while capex handily beat again. By segment, a downstream asset sale and lower corporate drove the upside versus consensus, while Chems was in line and International Upstream missed. All in, **while the result was better than last quarter's historic miss, it was still a tough result**. **Shares could be down a bit today**."[56]

- "Clean 3Q16 EPS of $0.63 headline beat $0.58 consensus. XOM's 3Q16 adjusted EPS of ~$.66 is a headline beat versus consensus at $0.58 (BofAMLe $0.66) – but **we expect weak response from the market on a weak production number** that skewed the mix to lower taxes. **E&P earning[s] were weak versus expectations on production that fell 3% yoy, mainly on outages in Nigeria; but other areas were weak also.**"[57]

- "**Upstream Miss Overshadows Headline Beat, Cost Reductions**. Despite a headline beat driven by impressive int'l refining earnings ($1Bn vs. DBe $600mm) and lower than expected corp expense ($370 vs. DBe $600mm), **weakness/mixed results across the rest of the portfolio highlight both progress and challenges in the current environment…**/E&P profitability: **Total production (3811 Mboe/d) came in below our est. (3954 Mboe/d) driven largely by a liquids miss (58% of total production vs. DBe**

---

[55] ExxonMobil's closing stock price was $86.72 on October 25, 2016.  $86.72/$4.35 = 19.94x; $86.72/$4.24 = 20.45x. *See*, Exhibit C.

[56] "3Q16 Quick Take – ALERT," J.P. Morgan, October 28, 2016 (emphasis added).

[57] "3Q16 First Look: headline beat on tax (mix) masks E&P miss on low production," Bank of America, October 28, 2016 (emphasis added).

**App. 262**

**60%) both domestic (9 Mbbls/d QoQ sequential decrease) and abroad (Nigeria outages, maintenance at Tengiz/Sakhalin-I, and a slower than expected recovery in Canada shut-in volumes from the wildfires in 2Q**. E&P profitability came in below **expectations** ($620 mm vs. DBe $722 mm) chiefly driven by weak intl liquids vols (-6% vs. Dbe) partially offset by better intl realizations."[58]

- **"Despite the headline EPS beat, this was a tough quarter for XOM, as the beat was likely inflated by asset sales gains and the earnings mix was weak**. Cash flow was light relative to expectations (although working cap could have been a driver) and **production was light** as well, partially the result of downtime in Nigeria. Notably, capex was down a massive 45% y/y for 3Q - well below expectations and a shockingly large reduction. XOM is Neutral rated…**Weaker Production: Total production of 3,811 kboed (-2.7% y/y) was weaker than expected, missing Consensus by 4.5%.** The production decline was attributed to higher downtime, especially in Nigeria."[59]

- "3Q EPS beats on R&M asset sale gain and lower tax rate; **CFPS below consensus 3Q EPS fell 37% YoY to $0.63**, above consensus and UBSe of $0.58 and $0.59, respectively. **Upstream earnings fell ~54% YoY to ~$620MM, well below consensus ~$928MM on lower liquids volumes & weaker price realizations**. R&M earnings fell 40% YoY to ~$1.2 billion, well above UBSe $900MM & consensus $800MM aided by a $380MM asset sale gain ($0.09/share benefit). Chemical segment earnings of ~$1.2bn were little changed YoY and in line with expectations. **3Q cash flow from operations of $5.3bn was well below our $6.6bn forecast and consensus of $7.3 billion**."[60]

- **"We think XOM's 3Q16 result will have a slightly negative impact on the shares' near-term performance. Results were relatively unimpressive** – while headline EPS of $0.63 beat consensus of $0.58 and was in line with our $0.63 est., when adjusting for the $410 mn (related to IMO's asset sale gains) recognized in International Downstream, or ~$0.10/share, the adjusted EPS would be slightly below the consensus…**Following also contributed to the negative reaction: (1) Mega-cap peers, such as CVX and COP, are gaining traction following better 3Q16 results; (2) Mix of earnings seems less optimal. Overall upstream fell short by ~$300 mn vs. consensus. Even though the miss was predominantly bridged through the total downstream beat (adj. for IMO asset sales) of ~$50 mn and lower corporate expenses, more emphasis is often placed on upstream, in our view; and (3) 3Q16 total production of 3.81 mmboe/d seems particularly light (we est. 4.02 mmboe/d)—even when considering the variance mostly emanated from unplanned Nigeria downtime (a 151 mb/d variance**

---

[58] "Upstream Miss Overshadows Headline Beat, Deutsche Bank," October 28, 2016 (emphasis added).

[59] "3Q'16 Quick Look - Another Tough Quarter," Simmons & Company, October 28, 2016 (emphasis added).

[60] "3Q EPS Beats on R&M Asset Sale Gain But Cash Flow and Production Below Expectations," UBS, October 28, 2016 (emphasis added).

**App. 263**

**vs. our est.).** Even excluding the Nigeria issues, production still seems 50-100 mboe/d short."[61]

41.     ExxonMobil also announced that production levels in Nigeria declined due to "unplanned downtime" at the Nigeria Pipeline.[62]  Dr. Feinstein explains away ExxonMobil's low production levels because he claims that the disruptions in its Nigeria operations were "not new news[] and impacted Exxon's peers as well."[63] However, numerous analysts, including ones cited by Dr. Feinstein, specifically state that the magnitude of the disruptions in Nigeria were worse than expected, directly contradicting his claim that the disruptions were not new news and therefore could not have caused ExxonMobil's stock to drop. For example:

- "Nearly all regions had liquids production lower than our expectations, but Africa specifically was close to 100 kbbl/d below our estimate, apparently as a result of **larger than expected disruptions in Nigeria**."[64]

- "The main variances with SGe were international upstream and also US R&M forecasts. We were simply too aggressive, irrespective of **unexpected production outages in Nigeria**."[65]

- Production/E&P profitability: **Total production (3811 Mboe/d) came in below our est**. (3954 Mboe/d) **driven largely by a liquids miss** (58% of total production vs. DBe 60%) both domestic (9 Mbbls/d QoQ sequential decrease) and **abroad (Nigeria outages, maintenance at Tengiz/Sakhalin-I, and a slower than expected recovery in Canada shut-in volumes from the wildfires in 2Q).**[66]

- "Weaker Production: **Total production of 3,811 kboed (-2.7% y/y) was weaker than expected**, missing Consensus by 4.5%. **The production decline was attributed to higher downtime, especially in Nigeria**."[67]

- "**Nigeria spurs steep output drop to lowest level since 2009**. Production of 3,811 MBoe/d was 6% below our model, and down 2.7% y/y (worse than 2Q's 0.6%

---

[61] "Upstream Miss, Prefer SU and COP," Barclays, October 31, 2016.

[62] ExxonMobil Form 8-K dated October 28, 2016, p. 1.

[63] Feinstein Report, ¶ 159.

[64] "XOM - 3Q16 EPS 9% Beat, but Underlying Results Appear Weaker," RBC Capital Markets, October 28, 2016 (emphasis added).

[65] "3Q16 EPS better than Street consensus given sales gain; lower cap-ex and better QOQ EPS," Societe Generale, October 28, 2016 (emphasis added).

[66] "Upstream Miss Overshadows Headline Beat," Deutsche Bank, October 28, 2016 (emphasis added).

[67] "3Q'16 Quick Look - Another Tough Quarter," Simmons & Company, October 28, 2016 (emphasis added).

**App. 264**

decline). In contrast to the pattern of recent years, the culprit was liquids output, not gas. **The worse-than-expected impact of Nigerian outages pushed African liquids down 27% y/y, wiping out the 3% uplift in U.S. liquids (the second quarter with Julia in the Gulf of Mexico) and 10% recovery in European gas**."[68]

42.     Therefore, Dr. Feinstein has not reliably established that any of ExxonMobil's stock price decline on October 28, 2016 was caused by the alleged misrepresentations. Dr. Feinstein's deduction of $0.04 to account for negative information unrelated to the alleged misrepresentations that were announced on October 28, 2016 is also based on unreliable and flawed methodologies.

43.     In addition, Dr. Feinstein's methodology does not analyze (much less attempt to separate) the portion of the claimed stock price decline that Dr. Feinstein attributes to the warning about the potential Kearl proved reserves de-booking, and the announcement that ExxonMobil would conduct an asset impairment review that included the RMDG assets. This implies that Dr. Feinstein's damages would be the same even if the Court found both or only one of Plaintiff's claims were actionable. Such a result does not make economic sense, which underscores that Dr. Feinstein's analysis is unsound.

**VIII.   Dr. Feinstein Disregards the Court's Decision That There was No Price Impact of the January 31, 2017 Alleged Corrective Disclosure By Proffering an Inferior Regression Model To Concoct a Negative and Statistically Significant Price Movement on January 31, 2017**

44.     Dr. Feinstein's analysis of the January 31, 2017 purported corrective disclosure directly conflicts with the Court's prior ruling, at class certification, that the information contained in the January 31, 2017 alleged corrective disclosure was stale and did not cause a statistically significant stock price decline. Moreover, the Court found that the "failure of the fourth quarter [January 31, 2017] release to significantly affect Exxon Mobil's stock price . . . is unsurprising since the market was on notice of the impairments and de-bookings announced in the fourth quarter release as a result of Exxon Mobil's disclosures in its third quarter earnings release."[69]

---

[68] "3Q16 Output at 7-Year Low; More Selling Pressure on Deck w/IOC Buyout," Raymond James, October 28, 2016 (emphasis added).

[69] Class Certification Decision, at 52.

**App. 265**

45.    Numerous analysts discussing the de-booking and impairment similarly recognized that they were not new news, and some opined that the impairment was lower than anticipated, which directly contradicts Dr. Feinstein's claim that the January 31, 2017 announcement caused ExxonMobil's stock to decline. For example:

- **"Impairment better than expected. The impairment of $2027Bn, associated with dry gas assets in the Rockies, was likely smaller than expected**."[70]

- "In the next couple of weeks, XOM will release its 2016 reserves report. **XOM will still likely de-book -4.6 BBOE of reserves associated with its Canadain [sic] Oil Sands operation. This was telegraphed on the last conference call**. However, XOM has also highlighted that there could be some positive offsets to the telegraphed downward revision. **As a reminder, the de-booking of reserves has no influence on how XOM runs its business, or their view on the true economics of the asset**. Stay tuned."[71]

46.    In addition, the Court had previously found that the alleged corrective disclosure on January 31, 2017 had no price impact.[72] However, despite acknowledging the Court's decision,[73] Dr. Feinstein disregards it by fashioning a new regression model using an industry index comprised of stocks that appears cherry-picked in order to generate a negative and statistically significant price movement in ExxonMobil's stock on January 31, 2017, as measured from close to close.[74]

47.    Dr. Feinstein proffers an *inferior* regression model to the one that both I and Plaintiff's class certification expert, Mr. Torchio, had presented. Dr. Feinstein uses an industry index that he creates by weighting the returns of BP p.l.c., Chevron Corporation, Shell plc, and Total S.A by their market capitalization.[75] However, using this industry index generates a lower adjusted R-squared (i.e., a measure of the explanatory power of the market and industry indices selected) than the regression model Mr. Torchio and I used. Specifically, for January 31, 2017,

---

[70] "In-line Results Permian Outlook in Focus," Morgan Stanley, January 31, 2017 (emphasis added).

[71] "ExxonMobil Corp. (XOM) – Initial Conference Call Takeaways," Simmons & Company, January 31, 2017 (emphasis added).

[72] Class Certification Decision, at 52.

[73] Feinstein Report, note 12.

[74] Feinstein Report, ¶¶ 25, 128, 163.

[75] Feinstein Report, ¶ 128-129.

29

**App. 266**

Dr. Feinstein's close-to-close adjusted R-squared of 53.6% is *lower* than my and Mr. Torchio's close-to-close regression model's adjusted R-squared of 56.3% and 55.3%.[76] This means that Dr. Feinstein's conclusion relies on a regression model that does a worse job of predicting ExxonMobil's price movements than my regression model and Mr. Torchio's model. Both models found that the price movement in ExxonMobil's stock on January 31, 2017, based on a close-to-close event window, was *not* statistically significant. Because Dr. Feinstein's model does a worse job predicting ExxonMobil's returns, his model predicts a larger residual price change (i.e., ExxonMobil's price change portion not explained by the market and industry indexes selected), which increases the likelihood of finding statistical significance. In contrast, when using a model with a superior ability to predict returns, as with my model and Mr. Torchio's model, the residual price change is smaller. By using an inferior model, Dr. Feinstein, by definition, creates a less accurate residual price change and a higher chance of yielding a statistically significant residual price change.

48.    In addition, Dr. Feinstein does not do a "close-to-open" event study, which is appropriate (for the reasons in my prior report, and as the Court previously ruled) given that the alleged corrective disclosure on this date occurred outside of market hours. As **Exhibit E** shows, even applying Dr. Feinstein's inferior regression model, had Dr. Feinstein performed a close-to-open, he would have found – as I did – that ExxonMobil's stock price movement was *not* statistically significant.

---

[76] Because the Feinstein, Torchio, and my regression model includes different number of indicator variables and including indicator variables inflate the adjusted R-squared, the adjusted R-squared reported above is re-calculated to exclude dates during the estimation period on which there were indicator variables. This adjustment does not affect the residual return and t-statistic, but makes the adjusted R-squared between the regression models comparable.

30

**App. 267**

**Exhibit E**
**Feinstein Regression Model**
**Close-to-Open Event Study on January 31, 2017**

| Residual Return | t-Statistic | Stat Sig? | Adj. R-Squared |
|---|---|---|---|
| -0.06% | -0.16 | No | 67.9% |

Notes and sources: For his market index, Dr. Feinstein uses the CRSP NYSE/AMEX/NASDAQ/ARCA Market Index. *See* Feinstein Report, ¶ 127. Open prices for Dr. Feinstein's market index is not available. I re-ran Dr. Feinstein's close-to-close results using the S&P Total Return Index (i.e., my market index per Ferrell Class Certification Report, ¶ 22) instead and found that the residual return for January 31, 2017 had a difference of 0.01% from Dr. Feinstein's reported residual return. Thus, I used the close-to-open logarithmic returns for the S&P Total Return Index as the market index return in the above analysis. For the industry index, following the methodology in Feinstein Report, ¶¶ 128-129, I calculated the close-to-open logarithmic returns as the market capitalization-weighted close-to-open returns of BP p.l.c., Chevron Corporation, Shell plc, and Total S.A. Following Feinstein's approach, I also included indicator variables on the earnings announcement dates and alleged corrective disclosure dates (Feinstein Report, ¶ 133). The adjusted R-squared reported above is calculated by excluding dates during the estimation period on which there were indicator variables.

49.     Therefore, Dr. Feinstein has not provided a reliable economic basis to establish that the alleged corrective disclosure on January 31, 2017 elicited a statistically significant and negative price movement in ExxonMobil's stock.

50.     Moreover, even if one were to wrongly assume that there was a statistically significant price decline on January 31, 2017, Dr. Feinstein fails to address that the price decline is associated with the Company's announcement of information unrelated to the alleged corrective disclosures. In particular, ExxonMobil disclosed a 40% reduction in earnings relative to the 4Q 2015 and a 39% reduction in EPS.[77] Consistent with this, analysts reacted negatively to the disclosure of such information and commented that ExxonMobil's earnings fell short of expectations. For example:

- "**Even adjusting for the impairment in U.S. Upstream, quarterly results reflected a miss**… In addition to the weak EPS, XOM's upstream oil and gas production was disappointing at 4,121 mboe/d (000s boe/d) or 3% lower y/y and 3.5% below our estimate of 4,271 mboe/d."[78]

- "4Q16 earnings recap: **we call 'clean' EPS around $0.60** XOM's 4Q16 adjusted EPS of ~$0.89 was a headline beat **versus consensus at $0.70** (BofAMLe $0.75), after adjusting for $2bn impairment related to a ceiling test of its dry gas assets in the

---

[77] Exxon Mobil Form 8-K dated January 31, 2017, p. 1.

[78] "Disappointing 'Clean' EPS and Production Performance," Barclays, February 1, 2017 (emphasis added).

31

**App. 268**

Rockies. However, adjusted earnings also included a number of undisclosed tax benefits and asset gains mainly from International downstream (Canada). **Versus consensus, positive corporate items account for 16c of the beat, with non-recurring downstream items netting to a gain of 13c, leaving the 'clean' EPS at closer to $0.60.**[79]

- 4Q16 Results: Headline EPS of $.41/sh was a miss vs. DBe/cons estimates of $.67/$.70/sh. **Excluding corporate segment results and adjusting for a $2Bn impairment in US upstream (Rockies) and a $522mm asset sale gain in Intl R&M (Imperial Oil retail sale), earnings for Upstream/R&M/Chemicals were a broad miss across the board** ($.02)/($.07)/($.01) per sh vs. DB ests.[80]

51.     Dr. Feinstein's analysis of the January 31, 2017 stock price movement neither demonstrates that it was caused by the fraud-related disclosures, nor does his damages calculation attempt to disaggregate alleged fraud-related and non-fraud-related stock price movements on that date.

### IX.    Dr. Feinstein Has Not Demonstrated That Damages Can Be Reliably Measured in This Case

52.     Dr. Feinstein has not demonstrated that damages can be reliably measured in this case. Per-share damages in securities litigation cases are measured by the artificial inflation at the time the shares were purchased, and, if they were sold, minus the artificial inflation at the time those shares were sold. Thus, one has to be able to arrive at a reliable measure of artificial inflation on each day during the Class Period (i.e., an "inflation ribbon"). If the price decline associated with the alleged corrective disclosure at the end of the Class Period is used, it is crucial that the alleged corrective disclosure actually corrects the alleged misrepresentations and does not reveal information that could not have been known and disclosed at the time of the alleged misrepresentation; otherwise, the stock price reaction to the alleged corrective disclosure cannot be used as a measure of the artificial inflation on earlier dates during the Class Period. In addition, to establish damages, it is necessary to demonstrate that the alleged misrepresentations constituted value-relevant information either by virtue of introducing artificial inflation or

---

[79] "4Q16 Earnings recap: benign quarter turns attention to the March 1st strategy review," Bank of America Merrill Lynch, January 31, 2017 (emphasis added).

[80] "Cash Turning the Corner, While Earnings Lag Behind," Deutsche Bank, January 31, 2017 (emphasis added).

**App. 269**

omitted value-relevant information that was disclosed later, which, as I demonstrated above in **Sections V to VIII**, Dr. Feinstein has not done.

53.    Dr. Feinstein claims that artificial inflation at the start of the Class Period through October 27, 2016 was $3.44 per share and from October 28, 2016 through January 30, 2017 was $1.05 per share.[81] As an initial matter, Dr. Feinstein's conclusion that there was artificial inflation from October 28, 2016 through January 30, 2017 directly contradicts the Court's order that the Class Period ends on October 28, 2016, which the Court noted as "***the date of the sole alleged Corrective Disclosure whose impact on Exxon Mobil's stock price Defendants failed to rebut***."[82]

54.    Moreover, as discussed above (*see supra* **Section VI**), Dr. Feinstein fails to establish that the disclosure of a potential Kearl proved reserves de-booking (including the estimated amount of the de-booked reserves) made on October 28, 2016 could have been disclosed in 2015 or earlier in 2016. As discussed above, whether reserves need to be de-booked as proved reserves depends on, among other things, the average of the first of the month prices for the 12 months preceding the reporting period. Thus, the potential de-booking announcement made in October 2016 regarding a potential de-booking at the end of 2016 was by definition based on information from January 2016 to September 2016. In February 2016, most of the price data that informed the disclosure on October 28, 2016 would not have been available—and indeed was not knowable. Thus, there is no reliable economic basis to assume that ExxonMobil could have known in early 2016 that it would have to disclose a potential de-booking of proved reserves at its Kearl project as of year-end 2016, much less have provided those exact amounts.

55.    The same is true for the impairment charge. As ExxonMobil stated, the decision to test for impairment was due to "continued weakness in the upstream industry environment during 2016."[83] Thus, ExxonMobil could not have known at the start of the Class Period in February 2016 how the upstream industry would fare throughout 2016, let alone what its long-term price projections for natural gas prices would be at year-end 2016. Thus, there is no reliable

---

[81] Feinstein Report, ¶ 168 and Exhibit-8.

[82] Class Certification Decision, at 56 (emphasis added).

[83] Exxon Mobil Form 8-K dated October 28, 2016, p. 5.

33

**App. 270**

economic basis to assume that ExxonMobil could have known in early 2016 that it would need to test for impairment in late 2016—much less that it would need to recognize an impairment.

56.     Finally, even if one assumes that the residual stock price declines on October 28, 2016 and January 31, 2017 measure the revelation of the truth on the alleged corrective disclosure dates, Dr. Feinstein fails to consider that such residual price declines cannot be used to measure inflation in ExxonMobil's stock at the start of the Class Period. In particular, Dr. Feinstein implicitly assumes that the $3.44 inflation that was allegedly removed on October 28, 2016 and January 31, 2017 was present in ExxonMobil's stock throughout the Class Period. However, as discussed above, whether reserves need to be de-booked as proved reserves and whether one needs to test for impairment, much less recognize an impairment, depends on many factors and economic conditions at the time. Therefore, the ***probability*** of de-booking reserves or testing for impairments changes over time depending on the prevailing economic conditions. For example, the announcement on October 28, 2016 was about a ***potential*** Kearl proved reserves de-booking and potential asset impairment charge relating to the RMDG assets as of year-end 2016 - i.e., there was some probability (less than 100%) of a proved reserves de-booking and asset impairment as of year-end 2016. Dr. Feinstein has not analyzed, let alone established, the probability of a proved reserves de-booking and/or an asset impairment on October 28, 2016 and what the probability of a proved reserves de-booking and asset impairment would have been earlier in the Class Period, which could be zero or a different level than it was on October 28, 2016. Without doing such an analysis, Dr. Feinstein cannot establish that the stock price decline on October 28, 2016 associated with the alleged corrective disclosure (if any) could be used to measure the inflation embedded in ExxonMobil stock at the start of the Class Period. Dr. Feinstein also does not account for the prior warnings by ExxonMobil that it may need to de-book proved reserves or impair its assets. When the market is on notice of a risk, an increase in the likelihood of that risk may cause the stock price to decline, but that decline would reflect the market's recalibration of a known, previously disclosed risk, rather than a reaction to new information.

## X.     Dr. Feinstein's Analysis of the Cost of Losing ExxonMobil's AAA Rating Is Flawed

57.     Dr. Feinstein states that he was asked to "estimate how much greater the Company's debt service on the Exxon Notes issued in the March 2016 offering would be over

34

**App. 271**

their life if they had been rated AA+ rather than AAA at the time of their issuance, holding all other features of the Notes constant."[84] Dr. Feinstein calculates a spread between AAA and AA+ issues of 13 basis points and calculates that ExxonMobil would have paid an addition $831.95 million in interest expense over the life of the Notes.[85] As explained below, Dr. Feinstein's analysis is fundamentally flawed.

58.    On February 29, 2016, ExxonMobil issued $12 billion in debt in eight notes ranging in maturity from approximately two years to 30 years.[86] At the time, ExxonMobil had a AAA debt rating from S&P, Moody's, and Fitch.

59.    On April 26, 2016, S&P downgraded ExxonMobil to AA+ from AAA.[87] However, this downgrade was six months **before** the first alleged corrective disclosure.  Thus, the S&P downgrade from AAA to AA+ necessarily could not have been due to the alleged corrective disclosures. Moody's and Fitch, on the other hand, did not downgrade ExxonMobil from its AAA rating even after the alleged corrective disclosures.

60.    Dr. Feinstein asserts that "Exxon's asset write-down of $2.0 billion and de-booking of approximately 19% of its proved reserves would have negatively impacted characteristics considered important by credit rating agencies for assessing credit quality."[88] If Dr. Feinstein's claim were true, then one would expect that credit rating agencies would downgrade ExxonMobil's credit rating following the alleged corrective disclosures, because the events that Dr. Feinstein assumes would have precipitated a credit ratings downgrade were publicly disclosed. However, the inaction by credit rating agencies contradicts Dr. Feinstein's claim.

61.    In addition, to empirically test Dr. Feinstein's assumption that the alleged corrective disclosures would negatively impact ExxonMobil's credit quality, I performed a bond event study on four out of the five bonds issued by ExxonMobil in March 2016 for which TRACE pricing was available on at least 96% of trading days and for which I obtained

---

[84] Feinstein Report, ¶ 172.

[85] Feinstein Report, ¶ 173.

[86] ExxonMobil Form 8-K dated February 29, 2016, p. 2.

[87] "S&P Lowers Exxon Mobil Ratings To 'AA+'; Outlook Stable," Dow Jones Newswires, April 26, 2016.

[88] Feinstein Report, ¶ 173.

**App. 272**

matching-maturity on February 29, 2016 to determine whether the prices of the bonds experienced statistically significant negative returns on either October 28, 2016 or January 31, 2017.[89] The bond event study finds the residual returns for the four bonds on October 28, 2016 and January 31, 2017 were not statistically significant.[90]

62.    Ignoring the above and even if one assumes a 13 basis point spread between AAA and AA+ Notes, Dr. Feinstein's calculation does not reflect the increase in interest expense associated with a 13 basis point increase as of March 2016. Instead, for each of the eight bonds issued in March 2016, Dr. Feinstein calculates the increase in the value of coupon and principal payments, **_at maturity_** (i.e., the value years into the future), if the bond had a coupon rate that was 0.13% higher than it actually was. He performs the above calculation for each of the eight bonds issued in March 2016, but those bonds have **_maturities of 2, 3, 5, 7, 10, and 30 years_**. Therefore, the $832 million Dr. Feinstein calculates is the sum of the differences in compounded values at the different maturity dates of the bonds (i.e., not at the same point in time). All else being equal, Dr. Feinstein's calculation magnifies the difference in interest rate payments the longer the maturity. For example, one of the bonds at issue had a 30-year maturity. Thus, Dr.

---

[89] Of the 8 bonds issued in March 2016, the following five bonds had TRACE prices available on at least 96.6% of trading days from February 29, 2016 through January 31, 2017: (i) 1.708% due March 2019, (ii) 2.222% due March 2021, (iii) 2.726% due March 2023, (iv) 3.043% due March 2026., and (v) 4.114% due March 2046.

The residual returns are based on a regression of the bond's return, based on changes in the daily volume-weighted average prices ("VWAP") on the returns of an ICE BofA Corporate Bond Index with maturity and rating similar to the subject bond from the issue date through January 30, 2017. In particular, we used a AAA bond index until April 26, 2016 and a AA bond index after. We did not conduct an event study on the 30-year bond (i.e., 4.114% due March 2046) because there was not an ICE BofA Corporate Bond Index with comparable maturity bond (i.e., the longest maturity was 15+ years). Thus, of the remaining four bonds, the 10-year bond is the bond with the longest maturity.

I added indicator variables to the regression model for April 26, 2016 (i.e., date of the S&P downgrade), October 28, 2016, and January 31, 2017.

[90] The residual return (t-statistic) of the three-year bond on October 28, 2016 and January 31, 2017 are 0.04% (0.31) and 0.33% (0.25), respectively. The residual return (t-statistic) of the five-year bond on October 28, 2016 and January 31, 2017 are -0.013% (-0.09) and -0.018% (-0.12), respectively. The residual return (t-statistic) of the seven-year bond on October 28, 2016 and January 31, 2017 are -0.13% (-0.57) and -0.27% (-1.21), respectively. The residual return (t-statistic) of the 10-year bond on October 28, 2016 and January 31, 2017 are 0.14% (0.50) and -0.31% (-1.13), respectively.

**App. 273**

Feinstein calculates that the future value (i.e., *in 2046*) of the increase coupon and principal payments of a bond with a coupon rate that was 0.13% higher than it actually was, is $660 million – i.e., the increase in coupon payments from this one bond alone is 79% of his $832 million total estimate of increased interest.

63.    As a matter of economics, investment decisions are based on the present value of the investments. Dr. Feinstein's compounded value calculation does not reflect the present value as of March 2016 of the impact of paying a coupon rate that is 13 basis points higher. The present value of the cost to ExxonMobil of making higher interest payments is equal to, for each bond, the incremental interest payments that ExxonMobil would have paid at the higher interest rate, minus the tax benefits from those higher interest payments, and discounting the after-tax payment streams to the issue date in March 2016. This calculation shows that a 13 basis point increase in interest expense would cost ExxonMobil $77.5 million, or 0.02% of ExxonMobil's $343.3 billion market cap on the day before the bond issuance.

_____

Allen Ferrell, PhD.
December 10, 2024

37

**App. 274**

1

## Appendix A

December, 2024

### Allen Ferrell

Harvard Law School
Cambridge, Massachusetts  02138
Telephone: (617) 495-8961
Email: fferrell@law.harvard.edu

**CURRENT POSITIONS**

*Greenfield Professor of Securities Law*, Harvard Law School

*Visiting Professor,* Stanford Law School

*National Bureau of Economic Research,* Research Associate

*Fellow*, Columbia University's Program on the Law and Economics of Capital Markets

*Faculty Associate*, Kennedy School of Government

*Research Associate*, European Corporate Governance Institute

**EDUCATION**

*Massachusetts Institute of Technology*, Ph.D. in Economics, 2005
Fields in econometrics and finance

*Harvard Law School,* J.D., 1995, *Magna Cum Laude*

- Recipient of the *Sears Prize* (award given to the two students with the highest grades)
- Editor, *Harvard Law Review*

*Brown University,* B.A. and M.A., 1992, *Magna Cum Laude*

**PREVIOUS POSITIONS**

*Harvard University Fellow*
Harvard Law School, 1997

*Law Clerk*, Justice Anthony M. Kennedy
Supreme Court of the United States; 1996 Term

**App. 275**

2

*Law Clerk*, Honorable Laurence H. Silberman
United States Court of Appeals for the District of Columbia; 1995 Term

### COURSES TAUGHT

*Blockchain & Cryptocurrencies*
*Corporate Finance*
*Law and Finance*
*Securities Litigation & Regulation*
*Contracts*

### REFEREE FOR FOLLOWING JOURNALS

*American Law and Economics Review*
*Journal of Corporation Finance*
*Journal of Finance*
*Journal of Financial Perspectives*
*Journal of Law and Economics*
*Journal of Law, Economics and Organization*
*Journal of Legal Studies*
*Quarterly Journal of Economics*

### CONSULTING AREAS

Price Impact and Securities Damages, Valuation, Mergers & Acquisitions

### Papers

"Are Star Law Firms Better Law Firms?" with Manconi, Neretina, Powley & Renneboog, revise and resubmit at the *Journal of Accounting Research* (2024)

"Hidden History of Securities Damages", 1 University of Chicago Business Law Review 97 (2022)

"How Accurate are Matrix Bond Prices?" with Drew Roper & Yibai Shu, Working Paper (2018)

"New Special Study of the Securities Markets: Intermediaries" with John Morley in SECURITIES MARKET ISSUES FOR THE 21ST CENTURY (2018) (editors Fox, Glosten, Greene and Patel)

"Socially Responsible Firms," with Hao Liang and Luc Renneboog, 122 *Journal of Financial Economics* 586-606 (2016) (winner of Moskowitz Prize for outstanding quantitative research)

"Price Impact, Materiality, and *Halliburton II*" with Drew Roper, 93 *Washington University Law Review* 553 (2016)

**App. 276**

"Introducing the CFGM Corporate Governance Database: Variable Construction and Comparison" with Cremers, Gompers and Andrew Metrick, Working Paper

"The Benefits and Costs of Indices in Empirical Corporate Governance Research," *in* OXFORD HANDBOOK ON CORPORATE LAW AND GOVERNANCE (2016)

"Thirty Years of Shareholder Rights and Stock Returns," with Martijn Cremers, *revise and resubmit Journal of Financial Economics*

"Thirty Years of Shareholder Rights and Firm Valuation," with Martijn Cremers, 69 *Journal of Finance* 1167 (2014)

"Rethinking *Basic*," with Lucian Bebchuk, 69 *Business Lawyer* 671 (2014)

"Calculating Damages in ERISA Litigation," with Atanu Saha, 1 *Journal of Financial Perspectives* 93 (2013)

"Forward-casting 10b-5 Damages: A Comparison to other Methods", with Atanu Saha, 37 *Journal of Corporation Law* 365 (2011)

"Event Study Analysis: Correctly Measuring the Dollar Impact of an Event" with Atanu Saha, Working Paper (2011)

"Legal and Economic Issues in Litigation arising from the 2007-2008 Credit Crisis," with Jennifer Bethel and Gang Hu, *in* PRUDENT LENDING RESTORED: SECURITIZATION AFTER THE MORTGAGE MELTDOWN (2009)

"Securities Litigation and the Housing Market Downturn," with Atanu Saha, 35 *Journal of Corporation Law* 97 (2009)

"The Supreme Court's 2005-2008 Securities Law Trio: *Dura Pharmaceuticals, Tellabs*, and *Stoneridge*," 9 *Engage* 32 (2009)

"What Matters in Corporate Governance?" with Lucian Bebchuk & Alma Cohen, 22 *Review of Financial Studies* 783 (2009)

"Do Exchanges, CCPs, and CSDs have Market Power?," *in* GOVERNANCE OF FINANCIAL MARKET INFRASTRUCTURE INSTITUTIONS (Ruben Lee) (2009)

"An Asymmetric Payoff-Based Explanation of IPO 'Underpricing'," Working Paper, with Atanu Saha (2008)

"The Law and Finance of Broker-Dealer Mark-Ups," commissioned study for NASD using proprietary database (2008)

"Majority Voting" *in* REPORT OF THE COMMITTEE ON CAPITAL MARKETS REGULATION (2008)

"The Loss Causation Requirement for Rule 10B-5 Causes of Action: The Implications of *Dura Pharmaceuticals v. Broudo*," with Atanu Saha, 63 BUSINESS LAWYER 163 (2007)

"Mandated Disclosure and Stock Returns:  Evidence from the Over-the-Counter Market," 36 *Journal of Legal Studies* 1 (June, 2007)

"Policy Issues Raised by Structured Products," with Jennifer Bethel, *in* BROOKINGS –NOMURA PAPERS IN FINANCIAL SERVICES (2007)

"The Case for Mandatory Disclosure in Securities Regulation around the World," 2 *Brooklyn Journal of Business Law* 81 (2007)

"U.S. Securities Regulation in a World of Global Exchanges," with Reena Aggarwal and Jonathan Katz, *in* EXCHANGES: CHALLENGES AND IMPLICATIONS (2007)

"Shareholder Rights" *in* REPORT OF THE COMMITTEE ON CAPITAL MARKETS REGULATION (2007)

"Creditor Rights: A U.S. Perspective," 22 *Angler- und Glaubigerschutz bei Handelsgesellschaften* 49 (2006)

"Measuring the Effects of Mandated Disclosure," 1 *Berkeley Business Law Journal* 369 (2004)

"If We Understand the Mechanisms, Why Don't We Understand the Output?", 37 *Journal of Corporation Law* 503 (2003)

"Why European Takeover Law Matters," *in* REFORMING COMPANY AND TAKEOVER LAW IN EUROPE (2003)

"Does the Evidence Favor State Competition in Corporate Law?", with Alma Cohen & Lucian Bebchuk, 90 *California L. Rev.* 1775 (2002)

"Corporate Charitable Giving," with Victor Brudney, 69 *Univ. Of Chicago Law Review* 1191 (2002)

"A Comment on Electronic versus Floor-Based Securities Trading," *Journal of Institutional and Theoretical Economics* (Spring 2002)

"Much Ado About Order Flow," *Regulation Magazine* (Spring 2002)

"On Takeover Law and Regulatory Competition," with Lucian Bebchuk, 57 *Business Lawyer* 1047 (2002)

 "Federal Intervention to Enhance Shareholder Choice," with Lucian Bebchuk, 87 *Virginia Law Review* 993 (2001)

**App. 278**

5

"A New Approach to Regulatory Competition in Takeover Law," with Lucian Bebchuk, 87 *Virginia Law Review* 111 (2001)

"A Proposal for Solving the 'Payment for Order Flow' Problem," 74 *Southern California Law Review* 1027 (2001)

"Federalism and Takeover Law: The Race to Protect Managers from Takeovers," with Lucian Bebchuk, 99 *Columbia L. Rev.* 1168 (1999)

### TESTIMONY LAST FOUR YEARS

*Homyk v. ChemoCentryx*, Case No. 4:21-CV-03343-JST, Expert reports and depositions on January 6, 2024 and December 4, 2024

*Alesco Preferred Funding et al v. ACP re LTD et al,* Index Case No. 655881/2017, Expert reports and deposition on August 9, 2024

*BLST Northstar v. Santander*, Case No. 22-cv-2210, Expert reports and deposition on August 2, 2024

*In re P3 Health Group Holdings, LLC*, Case No. 2021-0518-JTL, Expert reports and depositions on August 26, 2021 and May 29, 2024

*Gelt Trading v. Co-Diagnostics*, Case No. 2:20-CV-00368-CMR, Expert report and deposition on March 1, 2024

*In re Ripple Labs Litigation*, Case No. 4:18-CV-06753-PJH, Expert report and deposition on October 16, 2023

*Chabot v. Walgreens*, Case No. 1:18-CV-02118-CCC-KM, Expert report and deposition on October 6, 2023

*XOG Litigation Trust v. Kelley*, Case No. 01-22-0002-3114, Expert report and deposition on August 31, 2023 and testimony on October 25, 2023

*CRCM v. Getty Images Holdings*, Case No. 1:23-CV-01074-JSR, Expert report and deposition on August 14, 2023

*Halperin & Davis, Co-Trustees of Appvion Liquidating Trust v. Richards et al.*, Case No. 17-12082, Expert report and deposition on August 9, 2023

*IBM v. GlobalFoundries U.S. Inc.*, Case Index No. 653625/2021, Expert report and deposition on June 27, 2023

*In re Anadarko Petroleum Corporation Securities Litigation*, C.A. No. 4:20-CV-00576, Expert report and deposition on March 2, 2023

**App. 279**

6

*In Re Madison Square Garden Entertainment Corp. Stockholders Litigation*, C.A. No. 2021-0468-KSJM, Expert report and deposition on February 22, 2023

*Politan Capital Management v. Masimo Corporation et al*, C.A. No. 2022-0948-NAC, Expert report and deposition on February 5, 2023

*Restanca v. House of Lithium*, C.A. No. 2022-0690-PAF, Expert report and deposition on November 21, 2022 and testimony on December 7, 2022

*Roberts et al. v. Zuora*, Case No. 3:19-cv-03422-SI, Expert report and testimony on October 25, 2022

*United States v. Milton*, 21 Crim. 478, Expert testimony on September 30 & October 3, 2022

*FSG Services v. Flutter*, Ref. No. 1425034540, Expert report and testimony on June 29, 2022

*In re Kraft Heinz Securities Litigation*, Case No. 1:19-cv-01339, Expert report and deposition on June 23, 2022

*Ramirez v. Exxon Mobil Corporation et al.*, Case No. 3:16-cv-031110K, Expert report and deposition on March 22, 2019 and trial testimony June 7, 2022

*SEC v. AT&T Inc. et al,* 21 Civ. 1951, Expert report and deposition on April 15, 2022

*Securitized Asset Funding 2011-2 v. CIBC*, Case Index No. 653911/2015, Expert report and deposition on July 30, 2021 and trial testimony March 18 and 21, 2022

*SEC v. Ripple*, Case No.20-CV-10832, Expert report and deposition on February 23, 2022

*Chabot et al. v. Walgreens*, M.D. Pa 1:18-cv-02118, Expert report and deposition on January 18, 2022

*EIG Energy Fund v. Keppel Offshore & Marine LTD*, Case No.18-cv-01047-PGG, Expert report and deposition on December 9, 2021

*Purple Mountain Trust v. Wells Fargo et al.*, Case No. 3:18-cv-03948-JD, Expert report and deposition on December 3, 2021

*In re Robinhood Litigation,* Case No. Case No. 3:20-cv-01626-JD, Expert reports and deposition on September 30, 2021

**App. 280**

**Appendix B: Materials Relied Upon**

**Case-Related Documents**

1.  Consolidated Complaint for Violations of the Federal Securities Laws, filed July 26, 2017

2.  Memorandum Opinion and Order, *Ramirez v. Exxon Mobil Corporation, et al.,* U.S.D.C. (N.D., Texas, Dallas Division), C.A. No. 3:16-CV-03111-K, filed August 21, 2023

3.  Report on Loss Causation and Damages, Professor Steven P. Feinstein, Ph.D., CFA, October 11, 2024

4.  Expert Report of Allen Ferrell, Ph.D., February 1, 2019

5.  Expert Report of Frank C. Torchio, December 21, 2018

**SEC Filings**

6.  ExxonMobil Form 8-K dated February 29, 2016

7.  ExxonMobil Form 8-K dated April 29, 2016

8.  ExxonMobil Form 8-K dated July 29, 2016

9.  ExxonMobil Form 8-K dated October 28, 2016

10. ExxonMobil Form 10-K for the year ended December 31, 2015 (filed February 24, 2016)

11. ExxonMobil Form 10-K for the year ended December 31, 2016 (filed February 22, 2017)

12. ExxonMobil Form 10-Q for the quarterly period ended September 30, 2016 (filed November 3, 2016)

13. ExxonMobil Form 424B2 filed March 2, 2016

**Analyst Reports**

14. "XOM – Highlights From 2015 10-K Filing," RBC Capital Markets, February 24, 2016

15. "Analyst update focus on balance sheet preservation, downplays M&A," Citi Research, March 2, 2016

16. "Analyst Day Takeaways," J.P. Morgan, March 2, 2016

17. "Keeping It Flat," RBC Capital Markets, March 2, 2016

18. "Key Observations from XOM Analyst Day," Simmons & Company, March 2, 2016

19. "Highlights from XOM Analyst Meeting: Cash Flow Growth, Grow the Divi, no Corporate M&A . . . Yet," UBS Securities, March 2, 2016

20. "XOM: Analyst Day Takeaways; Slightly Raising Val Range," Wells Fargo, March 2, 2016

21. "1Q16 Quick Take – ALERT," J.P. Morgan, April 29, 2016

22. "Positive FCF and Favorable Capex," J.P. Morgan, April 29, 2016

**App. 281**

23. "1Q16 Beat Driven by Downstream Resilience," Morgan Stanley, April 29, 2016

24. "Exxon's Earnings Tumble on Lower Prices; Still Highest Quality Integrated, but Shares Fully Valued," Morningstar Equity Research, April 29, 2016

25. "XOM - 1Q16 EPS 39% Beat On Strong Chemicals," RBC Capital Markets, April 29, 2016

26. "Capex Savings Are Really Rolling," RBC Capital Markets, April 29, 2016

27. "1Q'16 Quick Look - Chemicals Beat, Lower Capex," Simmons & Company, April 29, 2016

28. "Quarterly results: Beat on chemicals segment offsets weak upstream realizations," Societe Generale, April 29, 2016

29. "1Q EPS Beats Entirely on Chemicals But Cash Flow Was Light," UBS Securities, April 29, 2016

30. "1Q EPS Beats Entirely on Chemicals But Cash Flow Was Light; No Change to 2016 Guidance," UBS Securities, April 29, 2016

31. "XOM: ExxonMobil First Look Q1 2016 Results," Wells Fargo, April 29, 2016

32. "CVX/XOM: Wrapping Up Q1 2016 Results," Wells Fargo, April 29, 2016

33. "A Disrupted Print (Nigeria/Canada). CFFO of $6.5bn vs CS at $7.5bn," Credit Suisse, July 29, 2016

34. "2Q Had Temporary Negatives, Value Remains the Bigger Constraint," Credit Suisse, July 29, 2016

35. "Even the King Has an Off Day Every Now and Then," Deutsche Bank, July 29, 2016

36. "Atypically Large Miss, Lowering Estimates/PT," J.P. Morgan, July 29, 2016

37. "2Q16 Quick Take – Alert," J.P. Morgan, July 29, 2016

38. "Major Miss yet Resource Grows," Morgan Stanley, July 29, 2016

39. "XOM - 2Q16 EPS 36% Miss," RBC Capital Markets, July 29, 2016

40. "2Q'16 Quick Look: Tough Quarter," Simmons & Company, July 29, 2016

41. "2Q16 EPS basically flat with 1Q16, but cash flow + 10%. Canadian fires, lower R&M, and forex offset higher upstream pricing," Societe Generale, July 29, 2016

42. "2Q EPS/CFPS Well Below Expectations on Weak E&P & R&M," UBS Securities, July 29, 2016

43. "Tales from the road: Designed for decades, not quarters; underlining XOM's durability," Bank of America Merrill Lynch, October 10, 2016

44. "3Q16 Earnings recap: weak quarter, but no read through to the medium term outlook," Bank of America Merrill Lynch, October 28, 2016

45. "3Q16 First Look: headline beat on tax (mix) masks E&P miss on low production," Bank of America, October 28, 2016

46. "Daily Note, A market commentary outlining critical economic and company developments," Cantor Fitzgerald, October 28, 2016

2

**App. 282**

47. "Moving Toward Cash Breakeven," Cowen and Company, October 28, 2016

48. "Upstream Miss Overshadows Headline Beat," Deutsche Bank, October 28, 2016

49. "3Q16 Quick Take – ALERT," J.P. Morgan, October 28, 2016

50. "Another Tough Quarter," J.P. Morgan, October 28, 2016

51. "3Q16 Output at 7-Year Low; More Selling Pressure on Deck w/IOC Buyout," Raymond James, October 28, 2016

52. "XOM - 3Q16 EPS 9% Beat, but Underlying Results Appear Weaker," RBC Capital Markets, October 28, 2016

53. "3Q'16 Quick Look - Another Tough Quarter," Simmons & Company, October 28, 2016

54. "3Q16 EPS better than Street consensus given sales gain; lower cap-ex and better QOQ EPS," Societe Generale, October 28, 2016

55. "3Q EPS Beats on R&M Asset Sale Gain But Cash Flow and Production Below Expectations," UBS Securities, October 28, 2016

56. "3Q EPS Beats on R&M Asset Sale Gain But Cash Flow and Production Well Below Expectations," UBS Securities, October 28, 2016

57. "CVX/XOM: Post-Q3 Adjustments," Wells Fargo, October 28, 2016

58. "ExxonMobil Corp. (XOM) Results: 3Q16 Sees Further Spending Cuts," Citi Research, October 30, 2016

59. "Same Deep Inventory, Impairment/Debooking Is Just Noise to Navigate," Credit Suisse, October 30, 2016

60. "Upstream Miss, Prefer SU and COP," Barclays, October 31, 2016

61. "XOM: Results Below Expectations; Reserves De-Booking Possible; Buy XOM," Evercore ISI, October 31, 2016

62. "ExxonMobil (XOM) Impairments Imminent," Jefferies, October 31, 2016

63. "3Q16: Missed and Likely Impaired," Morgan Stanley, October 31, 2016

64. "Exxon Reports Q3 Results, but Reserve Reporting Becomes the Focal Point," Morningstar Equity Research, October 31, 2016

65. "Exxon is well-positioned to compete in a world with diminishing resources," Morningstar Equity Research, October 31, 2016

66. "ExxonMobil Corporation The Only Free Cash Flow Around," RBC Capital Markets, October 31, 2016

67. "Extent of Premium Valuation Becoming More Difficult to Sustain," Simmons & Company, October 31, 2016

68. "Tronox Read Through, Ethanol Outlook, XOM Project Notes & Other Items," Macquarie Research, November 3, 2016

69. "4Q16 Earnings recap: benign quarter turns attention to the March 1st strategy review," Bank of America Merrill Lynch, January 31, 2017

3

**App. 283**

Case 3:16-cv-03111-K   Document 226   Filed 02/21/25   Page 291 of 412   PageID 7163

70. "Cash Turning the Corner, While Earnings Lag Behind," Deutsche Bank January 31, 2017

71. "Exxon Mobil Corporation In-line Results Permian Outlook in Focus," Morgan Stanley, January 31, 2017

72. "ExxonMobil Corp. (XOM) – Initial Conference Call Takeaways," Simmons & Company, January 31, 2017

73. "Disappointing 'Clean' EPS and Production Performance," Barclays, February 1, 2017

### News Articles

74. "Exclusive: New York asks SEC to force climate vote onto Exxon proxy," Reuters News, February 24, 2016

75. Teresa Rivers, "Exxon, ConocoPhillips Are Wells Fargo's Top Energy Picks -- Barron's Blog," Dow Jones Newswires, February 24, 2016

76. "New York requests SEC force Exxon to add climate vote onto proxy," Theflyonthewall.com, February 24, 2016

77. "S&P Energy Index Down About 1.9 Percent Amidst Oil Price Slide; Exxon, Chevron Among Biggest Drags on the Index," Reuters News, February 24, 2016

78. Michael Virtanen, "NY seeks Exxon Mobil assessment on effects of warming limits," Associated Press Newswires, February 24, 2016

79. Vipal Monga, "Few Sustainability Proposals Gain Traction, Bolstering Exxon," Dow Jones Institutional News, February 24, 2016

80. Mamta Badkar, "Moody's warns it may cut Exxon's Aaa rating," Financial Times, February 24, 2016

81. "BRIEF-Exxon says flaring due to planned work on units at Torrance, Calif. Refinery," Reuters News, February 25, 2016

82. Mike Cherney, "Exxon Offers $12 Billion Bond Issue," Dow Jones Newswires, February 29, 2016

83. "Exxon Mobil Sells Bond But Cost Has Increased," Dow Jones Institutional News, March 1, 2016

84. "Exxon Mobil May Be Building War Chest -- Market Talk," Dow Jones Institutional News, March 1, 2016

85. "Exxon Baytown refinery production remains cut back – sources," Reuters News, March 1, 2016

86. Debra Hale-Shelton, "Landowners' filing challenges dismissal of Exxon oil-spill suit," The Arkansas Democrat Gazette, March 1, 2016

87. "Exxon Baytown shutting hydrotreater, RHC units for work – sources," Reuters News, March 1, 2016

88. "Exxon Mobil to host analyst meeting with a conference call hookup," Theflyonthewall.com, March 1, 2016

89. "Exxon Mobil bonds jump on first day of trading," Reuters News, March 1, 2016

4

**App. 284**

90. "Breaking Views – Exxon supertanker cruises on stormy financial sees," Reuters News, March 1, 2016

91. Mike Cherney, "Global Finance: Exxon Mobil Sells Bonds But Cost Has Increased," The Wall Street Journal, March 1, 2016

92. "Exxon Mobil: Anticipates Cap Spending Of $23B In 2016, Down 25% from 2015," Dow Jones Newswires, March 1, 2016

93. "Exxon Mobil: On Track To Start Up 10 New Upstream Projects In 2016 And 2017," Dow Jones Newswires, March 2, 2016

94. "Exxon Mobil sees FY16 capital spending $23B, down 25%," Theflyonthewall.com, March 2, 2016

95. "Exxon Planning Less-Than-Sector 25% Capex Cut -- Market Talk," Dow Jones Institutional News, March 2, 2016

96. "Exxon Mobil to cut 2016 capital spending by 25% to $2.3 billion," Dow Jones Newswires, March 2, 2016

97. "Exxon Mobil expects global energy demand to grow 25% by 2040," Theflyonthewall.com, March 2, 2016

98. "Exxon Mobil is on track to start up 10 additional projects by end of 2017," Theflyonthewall.com, March 2, 2016

99. "Exxon Mobil targets upstream volumes of 4-4.2 Moebd through 2020," Theflyonthewall.com, March 2, 2016

100. "Exxon Reaffirms Plans to Cut 2016 Capital Spending," Dow Jones Institutional News, March 2, 2016

101. "Exxon Mobil eyes acquisitions, forecasts lowered spending," Reuters News, March 2, 2016

102. "Exxon Mobil sees production up slightly as spending stalls," Reuters News, March 2, 2016

103. "Exxon CEO Finds Value Hard to Find in US Oil Patch -- Market Talk," Dow Jones Institutional News, March 2, 2016

104. Richard Blackden, "Exxon CEO plays down M&A hunt after bond sale," Financial Times, March 2, 2016

105. "Exxon Backs Plans to Cut 2016 Capital Spending," Dow Jones Institutional News, March 2, 2016

106. David Koenig, "CEO says Exxon ready for acquisitions, investing in business," Associated Press Newswires, March 2, 2016

107. "DJIA Rises 34.24 Points (0.2%) to 16899.32; Exxon Mobil Among Biggest Gainers," Dow Jones Newswires, March 2, 2016

108. "BRIEF-Exxon Mobil production mix will be more oily," Reuters News, March 2, 2016

109. "UPDATE 3-Exxon Mobil eyes acquisitions, forecasts lowered spending," Reuters News, March 2, 2016

5

**App. 285**

110. Tess Stynes, "Exxon Reaffirms Plans to Cut 2016 Capital Spending; Oil giant plans capital expenditures of roughly $23 billion this year," The Wall Street Journal Online, March 2, 2016

111. "ExxonMobil Corporation Analyst/Investor Day," S&P Capital IQ, March 2, 2016

112. "S&P Lowers Exxon Mobil Ratings To 'AA+'; Outlook Stable," Dow Jones Newswires, April 26, 2016

113. "Exxon May Begin Trucking California Crude -- Market Talk," Dow Jones Institutional News, April 28, 2016

114. "Exxon Mobil April weekly volatility elevated into Q1 and outlook," Theflyonthewall.com, April 28, 2016

115. Steven Russolillo, "Exxon Mobil Still Has Fuel in the Tank -- Ahead of the Tape," Dow Jones Institutional News, April 28, 2016

116. Debra Hale-Shelton, "Exxon pays $2.63M fine for spill, chafes at terms," The Arkansas Democrat Gazette, April 28, 2016

117. "Exxon Mobil technical comments ahead of earnings," Theflyonthewall.com, April 28, 2016

118. "UPDATE: What to expect from Exxon's earnings," Dow Jones Newswires, April 28, 2016

119. "Exxon Mobil pays $2.63M fine for pipeline spill in Mayflower," Associated Press Newswires, April 28, 2016

120. Steven Russolillo, "Exxon Mobil Still Has Fuel in the Tank; Despite losing its coveted triple-A rating, there is still a lot to like about oil-and-gas giant Exxon Mobil ahead of Friday's earnings report," The Wall Street Journal Online, March 2, 2016

121. "Exxon Mobil may be attractive prospect ahead of quarterly earnings, WSJ says," Theflyonthewall.com, April 29, 2016

122. Claudia Assis, "What to expect from Exxon's earnings; Debt downgrade, oil prices expected to be in focus," MarketWatch, April 29, 2016

123. "Exxon Mobil 1Q EPS 43c >XOM," Dow Jones Newswires, April 29, 2016

124. "Exxon Mobil 1Q Net $1.81B >XOM," Dow Jones Newswires, April 29, 2016

125. "Exxon Mobil 1Q Rev $48.71B >XOM," Dow Jones Newswires, April 29, 2016

126. "Exxon Mobil says sharply lower commodity prices offset by strong Chemical result," Theflyonthewall.com, April 29, 2016

127. "Exxon Mobil Files 8K - Regulation FD >XOM," Dow Jones Institutional News, April 29, 2016

128. "Exxon Mobil 1Q Hurt By Lower Commodity Prices, Weaker Refining Margins >XOM," Dow Jones Newswires, April 29, 2016

129. "Exxon Mobil Bought Back 9M Shares for $726M in 1Q >XOM," Dow Jones Newswires, April 29, 2016

130. "Exxon Mobil: 1Q Buybacks to Offset Dilution from Benefit Plans, Programs >XOM," Dow Jones Newswires, April 29, 2016

131. "Exxon Mobil: No Current Buyback Plans to Reduce Shares Outstanding >XOM," Dow Jones Newswires, April 29, 2016

6

**App. 286**

132. "Exxon Mobil: Will Continue Buybacks To Offset Dilution From Plans," Dow Jones Newswires, April 29, 2016

133. "Exxon Beats, Posts Lowest Profit Since 1999 -- Market Talk," Dow Jones Institutional News, April 29, 2016

134. "Exxon Mobil reports Upstream production up 1.8% in Q1," Theflyonthewall.com, April 29, 2016

135. "Exxon Mobil reports Q1 capital and exploration expenditures down 33%," Theflyonthewall.com, April 29, 2016

136. "Exxon Mobil profit and revenue slide sharply, but still top estimates," Dow Jones Newswires, April 29, 2016

137. Anne Steele, "Exxon Mobil Profits Plunge 63%," Dow Jones Institutional News, April 29, 2016

138. "Chemicals Bail Out Exxon's 1Q Earnings -- Market Talk," Dow Jones Institutional News, April 29, 2016

139. "Exxon Mobil Posts Smallest Profit Since 1999 Merger," Dow Jones Institutional News, April 29, 2016

140. "Exxon Mobil profit beats expectations on big cost cuts," Reuters News, April 29, 2016

141. "BRIEF-Exxon Mobil reports Q1 earnings per share $0.43," Reuters News, April 29, 2016

142. "Exxon Mobil first-quarter profit drops 63 percent," Reuters News, April 29, 2016

143. Anne Steele, "Exxon Mobil Posts Smallest Profit Since 1999 Merger -- Update," Dow Jones Institutional News, April 29, 2016

144. Teresa Rivers, "Morning Movers: Exxon Gains, Chevron, Gilead Fall -- Barron's Blog," Dow Jones Institutional News, April 29, 2016

145. "Exxon Mobil says global economic weakness persisted in Q1," Theflyonthewall.com, April 29, 2016

146. "Exxon Mobil says ability to access capital remains strong," Theflyonthewall.com, April 29, 2016

147. Bradley Olson and Anne Steele, "Exxon Mobil Posts Smallest Profit Since 1999 Merger -- 2nd Update," Dow Jones Institutional News, April 29, 2016

148. "Exxon Mobil plans more exploratory wells off Guyana," Theflyonthewall.com, April 29, 2016

149. "UPDATE 1-Exxon Mobil profit beats expectations on big cost cuts," Reuters News, April 29, 2016

150. "Stocks slumping despite continued climb in oil, Exxon beat," Theflyonthewall.com, April 29, 2016

151. "Exxon's E&P Business Logs 1st Loss Since Merger -- Market Talk," Dow Jones Institutional News, April 29, 2016

152. "Refining's silver lining loses luster at Exxon and Chevron," Reuters News, April 29, 2016

153. "BRIEF-Exxon Mobil says remains committed to growing its dividend," Reuters News, April 29, 2016

**App. 287**

154. David Koenig, "Exxon's 1Q profit plunges 63 percent on lower oil prices," Associated Press Newswires, April 29, 2016

155. Spencer Jakab, "Big Oil, Big Mistake: Investors Overpay for Income at Exxon -- Heard on the Street," Dow Jones Institutional News, April 29, 2016

156. "Exxon Mobil Q1 2016 Results -- Earnings Call Transcript >XOM," Dow Jones Institutional News, April 29, 2016

157. "Exxon's Canadian Unit Unhappy with Mandated Carbon Cap -- Market Talk," Dow Jones Institutional News, April 29, 2016

158. Adam Shell, "What to watch ; What Exxon Mobil, Chevron say will be key," USA Today, April 29, 2016

159. Rochelle Toplensky, "Exxon beat fails to bolster energy stocks," Financial Times, April 29, 2016

160. Bradley Olson and Anne Steele, "Exxon Mobil's Profit Plunges 63%; Despite sharp declines in revenue and earnings, oil company's results still top views," The Wall Street Journal Online, April 29, 2016

161. David Koenig, "Exxon sees smallest profit in 16 years, Chevron posts loss," Associated Press Newswires, April 29, 2016

162. Ed Crooks, "Exxon and Chevron hit by crude price rout," Financial Times, April 29, 2016

163. "Breaking Views – Exxon Mobil reaches bottom of the oil barrel," Reuters News, April 29, 2016

164. "Chemicals Bail Out Exxon 's 1Q Earnings -- Market Talk," Dow Jones Institutional News, April 29, 2016

165. Clifford Krauss, "Low Oil Prices Pinch Exxon and Chevron Earnings," NYTimes.com, April 29, 2016

166. Steven Russolillo, "Exxon Still Has Fuel in Its Tank," The Wall Street Journal, April 29, 2016

167. "SABIC decision on Exxon petrochemicals venture likely by Q2 2017 - acting CEO," Reuters News, July 28, 2016

168. "Exxon Mobil technical comments ahead of earnings," Theflyonthewall.com, July 28, 2016

169. Steven Russolillo, "Yield Plays: Exxon, Chevron Put to the Test," Dow Jones Institutional News, July 28, 2016

170. "Exxon Mobil, Chevron look susceptible as oil slide resumes, WSJ says," Theflyonthewall.com, July 29, 2016

171. "Exxon Mobil 2Q EPS 41c >XOM," Dow Jones Newswires, July 29, 2016

172. "Exxon Mobil 2Q Net $1.7B >XOM," Dow Jones Newswires, July 29, 2016

173. "Exxon Mobil 2Q Rev $57.69B >XOM," Dow Jones Newswires, July 29, 2016

174. "Exxon Mobil reports Q2 EPS 41c, consensus 64c," Theflyonthewall.com, July 29, 2016

175. "Exxon Mobil: Reduced Earnings Reflect Sharply Lower Commodity Prices, Weaker Refining Margins," Dow Jones Newswires, July 29, 2016

8

**App. 288**

176. "Exxon Mobil CEO says Q2 results reflect 'volatile industry environment',"
Theflyonthewall.com, July 29, 2016

177. "Exxon Mobil reports Q2 production essentially flat with prior year quarter,"
Theflyonthewall.com, July 29, 2016

178. "Exxon does not currently plan to buy shares to reduce shares outstanding,"
Theflyonthewall.com, July 29, 2016

179. "Exxon Earnings Surprisingly Fall Below 1Q's -- Market Talk," Dow Jones Institutional News,
July 29, 2016

180. Anne Steele, "Exxon Profit and Revenue Slide Again," Dow Jones Institutional News, July 29,
2016

181. Ben Levisohn, "Morning Movers: Exxon Sinks on Earnings Miss; AbbVie Gains -- Barron's
Blog," Dow Jones Institutional News, July 29, 2016

182. Kevin Kingsbury, "Exxon Earnings Fall Below Its Low-Water Mark," Dow Jones Institutional
News, July 29, 2016

183. "Exxon Mobil profit misses expectations; stock slides," Reuters News, July 29, 2016

184. "Exxon Mobil profit tumbles 59 pct in 2nd quarter," Reuters News, July 29, 2016

185. "Exxon Mobil Corp. (XOM) Ind: 86.50-89.50 Last 90.20," Dow Jones Institutional News, July
29, 2016

186. "Exxon Mobil says Permian, Bakken wells produce 10% profit at $40 oil,"
Theflyonthewall.com, July 29, 2016

187. Anne Steele, "Exxon Mobil Profit Falls to a New Low," Dow Jones Institutional News, July 29,
2016

188. "BRIEF-Exxon says has significant debt capacity that it can leverage, very strong balance
sheet," Reuters News, July 29, 2016

189. "Exxon, Chevron Show Scope of Downstream Trouble -- Market Talk," Dow Jones Institutional
News, July 29, 2016

190. David Koenig. "Exxon reports smallest profit since 1999," Associated Press Newswires, July 29,
2016

191. "Exxon's US Production Arm in Red for 6 Quarters -- Market Talk," Dow Jones Institutional
News, July 29, 2016

192. "Exxon Mobil Q2 2016 Results -- Earnings Call Transcript >XOM," Dow Jones Institutional
News, July 29, 2016

193. "Oil rout erodes second-quarter profits for U.S. majors Exxon, Chevron," Reuters News, July
29, 2016

194. Andrew Ward, "Exxon profits drop 59% as oil woes spread to refining," Financial Times, July
29, 2016

195. Andrew Ward, "Exxon and Chevron cap torrid week for oil majors," Financial Times, July 29,
2016

9

**App. 289**

196. David Koenig. "Cheaper oil sends Exxon, Chevron to worst quarter in years," Associated Press Newswires, July 29, 2016

197. "BUZZ-U.S. STOCKS ON THE MOVE-Alphabet, Xerox, Exxon, Seres Therapeutics, Cigna," Reuters News, July 29, 2016

198. "BUZZ-Exxon, Chevron: Down on weak results," Reuters News, July 29, 2016

199. "BUZZ-U.S. STOCKS ON THE MOVE-Exxon, Chevron, Alphabet, Wynn Resorts, Seres Therapeutics," Reuters News, July 29, 2016

200. "BUZZ-Exxon, Alphabet, Amazon, Seres Therapeutics, Cigna," Reuters News, July 29, 2016

201. "Breaking Views – Oil recovery proves slippery for Exxon and Chevron," Reuters News, July 29, 2016

202. "Exxon Mobil and Stericycle stumble; Alphabet and Newell jump," Associated Press Newswires, July 29, 2016

203. Nathan Bomey, "Exxon, Chevron earnings sink as oil tumbles," USA Today Online, July 29, 2016

204. Steven Russolillo, "Exxon Mobil, Chevron Are Put to the Test," The Wall Street Journal, July 29, 2016

205. Claudia Assis, "What to watch for in Exxon earnings; Refining, production are foremost as energy giant reports Friday," MarketWatch, July 29, 2016

206. Steven Russolillo, "Exxon Mobil, Chevron Risky Yield Plays," Dow Jones Institutional News, July 29, 2016

207. "Exxon Earnings Surprisingly Fall Below 1Q's -- Market Talk," Dow Jones Institutional News, July 29, 2016

208. "Exxon Mobil Files 8K - Regulation FD >XOM," Dow Jones Institutional News, July 29, 2016

209. "Exxon's US Production Arm in Red for 6 Quarters -- Market Talk," Dow Jones Institutional News, July 29, 2016

210. Spencer Jakab, "Exxon's Tank Still Fuller Than Peers," Dow Jones Institutional News, July 29, 2016

211. Claudia Assis and Myra P. Saefong, "Defying low crude prices, Exxon, Chevron stay the course; Oil majors did not offer an outlook on crude oil prices," MarketWatch, July 29, 2016

212. Bradley Olson and Selina Williams, "Low Crude Prices Hammer Big Oil Companies; Exxon, Chevron results highlight challenge of operating as crude prices near lows," The Wall Street Journal Online, July 29, 2016

213. "World Bio Based Lubricants Market Report 2014-2022 - Analysis, Technologies & Forecasts - Vendors: Shell, UBL, Exxon Mobil - Research and Markets," Business Wire, November 3, 2016


**Other Documents**

214. "ExxonMobil Earns $1.8 Billion in First Quarter of 2016," ExxonMobil press release, April 29, 2016

10

**App. 290**

215. SECURITIES AND EXCHANGE COMMISSION 17 CFR Parts 210, 211, 229, and 249 [Release Nos. 33-8995; 34-59192; FR-78; File No. S7-15-08] RIN 3235-AK00 MODERNIZATION OF OIL AND GAS REPORTING, dated December 31, 2008, https://www.sec.gov/files/rules/final/2008/33-8995.pdf

216. U.S. Energy Information Administration, Short-Term Energy Outlook (STEO), November 2015, https://www.eia.gov/outlooks/steo/archives/nov15.pdf

217. Daily Crude Oil Prices: West Texas Intermediate (WTI) - Cushing, Oklahoma (DCOILWTICO) from FRED Economic Data. https://fred.stlouisfed.org/series/DCOILWTICO

**Data**

218. LSEG Workspace Data & Analytics

219. FactSet

220. Bloomberg

All other documents cited in the report and appendices.

11

**App. 291**

**Appendix C**
**Regression Results for Misrepresentation Dates**

| | Date/ Time* | Reaction Date | Event | Misrep. (Compl. ¶)** | Statistics | Close-to-Close Results | Close-to-Open Results |
|---|---|---|---|---|---|---|---|
| 1 | 02/24/16 4:09 PM | 02/25/16 | ExxonMobil files 2015 Form 10-K. (Compl. ¶¶ 277-287) | 247 (i) – (v) | Residual % t-Stat Stat Sig and Pos? | 0.21% 0.28 No | -0.37% -1.10 No |
| 2 | 03/01/16 8:49 PM & 03/02/16 9:00 AM | 03/02/16 | ExxonMobil files final prospectus for the March 2016 debt offering and holds 2016 analyst meeting. (Compl. ¶¶ 288-292) | 247 (i) – (v) | Residual % t-Stat Stat Sig and Pos? | 0.82% 1.08 No | 0.27% 0.81 No |
| 3 | 04/29/16 8:00 AM 04/29/16 9:30 AM | 04/29/16 | ExxonMobil releases 1Q 2016 earnings and holds earnings conference call. (Compl. ¶¶ 298-301) | 247 (i) – (v) | Residual % t-Stat Stat Sig and Pos? | 0.54% 0.69 No | |
| 4 | 07/29/16 8:00 AM | 07/29/16 | ExxonMobil releases 2Q 2016 earnings. (307-308) | 247 (v) | Residual % t-Stat Stat Sig and Pos? | -1.92% -2.48 No | |
| 5 | 11/03/16 11:10 AM | 11/03/16 | ExxonMobil releases 3Q 2016 Form 10-Q. (Compl. ¶¶ 315-317) | 247 (v) | Residual % t-Stat Stat Sig and Pos? | 0.31% 0.44 No | |

\* For SEC Filings, the timestamp comes from the "Accepted" field on the SEC Edgar database.

\*\* Classification of alleged misstatements and omissions is based on ¶ 247 (i) – (v) of the Complaint, which lists five types of Alleged Misstatements: two of the misstatements relate to proxy costs – i.e., items (i) and (ii), two relate to the Kearl reserves – i.e., items (iii) and (iv), and one relates to the RMDG asset value – i.e., item (v). The misstatements are as follows: (i) "Exxon's actual investment and asset valuation processes did not incorporate GHG or carbon 'proxy costs' in a manner that was consistent with the Company's public representations or Exxon's own internal policies . . . (ii) Exxon did not incorporate GHG or carbon 'proxy costs' into their asset impairment evaluation processes . . . (iii) Exxon's Canadian Bitumen Operations were operating at a loss . . . (iv) Exxon knew the Kearl Operation could not satisfy the SEC definition for proved reserves at year-end 2016, absent an extraordinary – and, by Exxon's own internal estimates, unexpected – rise in the price of oil . . . and (v) A significant portion of Exxon's Rocky Mountain dry gas operations were impaired by no later than year-end 2015, thus requiring the Company to record an asset impairment charge in its financial statements . . . " The Complaint erroneously refers to these paragraphs in later sections as ¶ 247 (a) – (e). However, in this table, I have used the original ¶ 247 (i) – (v) numbering convention.

Sources:
[1] ExxonMobil Corp., Form 10-K for the fiscal year ended December 31, 2015 (filed February 24, 2016).
[2] ExxonMobil Corp., Form 424B2 (filed March 2, 2016); S&P Capital IQ, "Exxon Mobil Corporation Analyst/Investor Day," March 2, 2016.
[3] "ExxonMobil Earns $1.8 Billion in First Quarter of 2016," ExxonMobil press release, April 29, 2016; S&P Capital IQ, "Exxon Mobil Corporation Analyst/Investor Day," March 2, 2016.

**App. 292**

[4] "ExxonMobil Earns $1.7 Billion in Second Quarter of 2016," ExxonMobil press release, July 29, 2016.
[5] ExxonMobil Corp., Form 10-Q for the quarterly period ended September 30, 2016 (filed November 3, 2016).

Close-to-close and close-to-open results per Ferrell Class Certification Report Appendix C.

2

**App. 293**

# Exhibit 5

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

---------------------------------x

PEDRO RAMIREZ, JR.,

Individually and on Behalf of

All Others Similarly Situated,

Plaintiff,

-against-

Civil Action No.:

3:16-cv-03111-K

EXXON MOBIL CORPORATION, et al.,

Defendants.

---------------------------------x

January 27, 2025

9:07 a.m.

VIDEOTAPED DEPOSITION of FRANK ALLEN FERRELL, held at the law offices of Paul Weiss Rifkind Wharton & Garrison, LLP, 1285 Avenue of the Americas, New York, New York, before Judith Thaten, a Certified Livenote Reporter and Notary Public of the State of New York.

Page 1

**App. 294**

APPEARANCES

ON BEHALF OF PLAINTIFF
  ROBBINS GELLER RUDMAN & DOWD LLP
  655 West Broadway, Suite 1900
  San Diego, California, 92101
  BY:  NATHAN LINDELL, ESQ.
    nlindell@rgrdlaw.com
    ALEX FOLKERTH, ESQ.
    AFolkerth@rgrdlaw.com
ON BEHALF OF DEFENDANT
  PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  1285 Avenue of the Americas
  New York, New York 10019
  BY:  AUDRA SOLOWAY, ESQ.
    ASoloway@paulweiss.com
    EMILY MILLER, ESQ.
    emiller@paulweiss.com
    DAVID CEASAR, Law Clerk

ALSO PRESENT:
  MICHAEL CHEUNG, Legal Video Specialist
  Veritext Legal Solutions

  JESSICA M. DANIELS, ESQ., In-house
  Counsel, Exxon

  PATRICK LONG, ESQ.
  representing Rex Tillerson (via Zoom)

Page 2

IT IS HEREBY STIPULATED AND AGREED, by and among counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except to the form of the question, shall be reserved to the time of trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before the court.

* * * *

Page 3

FERRELL

VIDEOGRAPHER:  Good morning. We are going on the record at 9:07 a.m. EST on January 27th, 2025.

Please note that the microphones are sensitive and may pick up whispering and private conversations.  Please mute your phones at this time.

Audio and video recording will continue to take place unless all parties agree go off the record.

This is Media Unit 1 of the video-recorded deposition of Allen Ferrell in the matter of Ramirez, Jr., Pedro, versus Exxon Mobil Corporation, et al., filed in the United States District Court, Northern District of Texas, Dallas division.  Case Number 16-cv-03111-K.

The location of this deposition is 1285 Avenue of the

Page 4

FERRELL

Americas, New York, New York 10019.

My name is Michael Cheung, representing Veritext Legal Solutions, and I'm the videographer.  The court reporter is Judy Thaten with the firm Veritext Legal Solutions.

I'm not authorized to administer an oath.  I'm not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to the proceeding, please state them at the time of your appearance.

Counsel and all present will now state their appearance and affiliations for the record, beginning with the noticing attorney.

MR. LINDELL:  Nathan Lindell from Robbins Geller Rudman & Dowd

Page 5

2 (Pages 2 - 5)

FERRELL

on behalf of lead plaintiff and the class.

MR. FOLKERTH: Alex Folkerth from Robbins Geller on behalf of lead plaintiff in the class.

MS. SOLOWAY: Audra Soloway from Paul Weiss on behalf of defendants.

MS. MILLER: Emily Miller from Paul Weiss on behalf of defendants.

MS. DANIELS: Jessica Daniels on behalf of Exxon.

MR. CEASAR: David Ceasar from Paul Weiss on behalf of defendants.

VIDEOGRAPHER: Will the court reporter please swear in the witness, and then counsel may proceed.

F-R-A-N-K A-L-L-E-N F-E-R-R-E-L-L, Having been duly sworn by a Notary Public within and for the State of New York, stated an address as 16 Hancock Street, Lexington,

Page 6

FERRELL

Massachusetts, was examined and testified as follows:

EXAMINATION BY MR. LINDELL:

Q   Good morning, Professor Ferrell. Good to see you again.

A   Nice to see you.

Q   Okay. Obviously, I know you've been deposed many times before, including once in this case. But just to make sure we're all on the same page, I'd like to go over a few of the ground rules for today, if that's okay.

So the first thing we do -- I'm sorry. The first thing is that we do have a court reporter here, who is going to be trying to keep a record of everything that is said here today. In order for her to get a clean record, it's very important that we not speak over one another and that you answer each of my questions with an audible response.

Do you understand that?

Page 7

FERRELL

A   Yes.

Q   Okay. So if you could, please, do your best to make sure that I'm completely done asking my question before you begin your answer. I will do my best to make sure you are completely done with your answer before I begin a new question.

Does that make sense?

A   That's fair.

Q   Okay. Also, as a reminder, your testimony here is given under oath. Even though we were not in a courtroom today, your testimony is given the same force and effect as if we were. It's also subject to the penalty of perjury.

Do you understand that?

A   Yes.

Q   Lastly, if, at any point today, you need to take a break, please just let me know, and I will do my best to accommodate that. You will be required to answer any pending question

Page 8

FERRELL

before we break.

And it's possible I may ask to finish a certain line of questioning before we break, but I will do my best to accommodate your request.

Does that sound fair?

A   Yes.

Q   Are you currently taking any medication that could affect your memory or otherwise impair your ability to testify truthfully and honestly today?

A   No.

Q   Is there any other reason why we would -- you would be prevented from giving complete and accurate testimony today?

A   No.

Q   And do you recall providing deposition testimony in this case back in March 2019?

A   Yes.

Q   And the testimony you provided at that time was given under

Page 9

3 (Pages 6 - 9)

FERRELL

analysis related to the assignment set forth in paragraph 11?

A   I assumed the theory of reliability.  I assumed the alleged misrepresentations.

So as I understand Dr. Feinstein's causation and damage analysis, he is assuming the theory of liability to be that there should have been, according to the theory of liability, according to the theory of misrepresentations and omissions here, an impairment in 2015, and a debooking in 2015, and that the losses accrual as reported in the 2016 10-K that's reporting in 2015 was misleading.

So that's my -- so just to reiterate, that's my assumption.  I'm not taking issue with any of that.  But that's my understanding of what Dr. Feinstein's causation in damage analysis is purportedly measuring those three theories of liability or misrepresentations and omissions.

Page 46

FERRELL

Q   So in conducting your analysis, you assumed that Kearl was, in fact, operating a loss in 2015 and throughout the class period, correct?

A   I assumed the complaint.  And I think this is-- paragraph 192 or so of the complaint.  But there is a claim about lack of profitability at Kearl.

And, again, Dr. Feinstein, who I am assessing here, reports to measure causation and damages as it relates to that.

And, very importantly -- and this is something came up in his deposition -- he equates that information, the information that should and could have been disclosed, according to the theory of liability, about lack of profitability at Kearl as having the same informational content as what was concealed by the failure to debook the oil reserves in 2015 as reflected in the 2016 10-K.

Q   And in conducting your

Page 47

FERRELL

analysis in connection with Exhibit 401, you assumed that Kearl operation did not, in fact, legitimately satisfy the SEC's proved reserve definition by year-end 2015, correct?

A   Correct.

Q   Okay.  And in conducting your analysis, you also assumed that the specific Rocky Mountain Dry Gas assets that Plaintiffs alleged to have been impaired at year-end 2015 were, in fact, impaired at that time, correct?

A   Correct.

It's a separate question.  Just to be clear here, what information is corrective of those alleged misrepresentations.  That's a separate question.

So you assume liability.  You don't assume causation and damages.

Q   And you've also -- you previously testified in this case that the market for Exxon Mobil stock was

Page 48

FERRELL

highly, highly efficient during the class period?

A   I think it was one "highly," but I agree with that.

Q   I think the trial testimony -- the June 22nd had two "highlys" in it, but --

A   I stand corrected.  I -- I stand corrected.  Thank you.

Q   In any event, you agree and you testified previously that the market for Exxon's stock was, at the very least, highly efficient during the class period, correct?

A   I agree with that.

Q   That's another assumption you relied on in performing your analysis in connection with Exhibit 401, correct?

A   Assumption -- well, so it is true that an assumption of fraud on the market can be fraud classes -- class actions when you get to causation damages is efficient markets.  So I do

Page 49

13 (Pages 46 - 49)

FERRELL

agree that's the predicate for this type of litigation.

But I also agree with the fact that it is efficient. I do agree affirmatively that not just as an assumption, but that is, in fact, true.

Q   That's a fair clarification. Appreciate that.

So let me try to clarify, then. Not categorizing it as an assumption, but the fact that Exxon Mobil's stock traded in a highly efficient market was one of the underlying predicates of the analysis you performed in Exhibit 401, correct?

A   Correct, in the following sentence.

So for the closed-to-open, that is the aftermarket disclosures would be priced at open, that is a view that I have based on the academic paper that we discussed previously and that's cited in my class cert report.

So in terms of the efficiency

Page 50

FERRELL

of the market, I think this closed/open versus closed-to-closed issue now, I would say that it actually doesn't make a difference, that if you do a proper event study for January 31st, it's the same result. But I do think it's fair to say that the efficiency of the opening price is something that I do utilize.

Q   And you have also previously testified in this case that one of the attributes of a highly efficient market is that an announcement of information that is already known to the market cannot cause a stock price to decline because that news has already been priced into the securities price, correct?

A   I agree with that.

Q   And you have also previously testified in this case that one would not expect to see a positive stock price reaction where a misrepresentation is alleged based on

Page 51

FERRELL

an omission of a material fact, correct?

A   I agree with that.

Q   And it's also true that one would not expect to see a positive stock price reaction in a highly efficient market, where a misrepresentation simply confirms the market's existing expectations, correct?

A   I agree with that.

That's why a front-end analysis is not sufficient.

Q   And you would agree that a misrepresentation can introduce artificial inflation by concealing adverse information, the disclosure of which would otherwise have caused the stock price to decline, correct?

A   I agree with that.

And just to be concrete here. An example I give my class is if The Street, Wall Street, expects $100 in profits, and my -- in reality, I have

Page 52

FERRELL

$50 in profits, and I lie and I say that's 100, that would be a situation where you would not observe a stock price reaction.

Q   So in that case, you wouldn't necessarily see an increase in the stock price. But the misrepresentation, nonetheless, would have the effect of introducing artificial inflations, correct?

A   That's right.

MS. SOLOWAY:  Objection. Calls for a legal conclusion.

A   So the way I would characterize is you would not have inflation introduced by virtue of a stock price increase. But I agree that a confirmatory lie of value-relevant information, the $100 in profits versus $50 in profits, could introduce inflation in that type of scenario.

Q   And do you agree that reserve levels are an important determinant of an oil and gas company's value?

Page 53

14 (Pages 50 - 53)

FERRELL

"depends on the facts and circumstances," what is the process you employ in these cases to determine which industry index you are going to use?

A   Well, every facts and circumstances are different.  So in this case, there was a preexisting event study, and now there is a proposed new events study.  So the question that arises is, is the new event study, is the new industry control better?  It can be better.  The 10-K can be a legitimate source for an industry control.

The question here is, is it better.  So the facts and circumstances of this case, and what I've done in the past when you have this sort of issues, is you look at to adjust the R-squared.

Q   I guess what I am wondering is do you have a standard practice that you employ when conducting your event studies that gives you an objective

Page 134

FERRELL

criteria or process that you can employ in order to avoid subjectivity from case to case?

A   Again, depends on the facts and circumstances.  So, for example, if there is an event study by the plaintiff's expert, it looks like it's appropriate, and I might just adopt that event study, assuming it's correct, for purposes analysis because that's not the center of dispute.

So, again, it's sometimes the case that the proposed event study is appropriate, looks appropriate.  I agree that it's reasonable, and I might adopt it.  Now, we may have a difference in the event windows for the purposes of the analysis.

You know, one issue that's come up in the past is, is the index that the company -- is the index that's being proposed, if it's the plaintiff's expert, is it overbroad, or is there more -- is there an index that you

Page 135

FERRELL

could add or an index that might be more appropriately capturing the industry effect.

So, again, I don't think there is any academic literature that says there is sort of a formula, but rather consistent with the academic literature, and what I have done in the past when there is two competing industry controls, is to look at the adjusted R-squared.

And, again, I think that -- that is an objective approach, and it's consistent with the academic literature.

Q   And so in this case, your process was to choose the same industry index selected by Mr. Torchio, correct?

A   Yes.  Well, the process was I reviewed what he did.  He was using these existing indices by S&P.  So it's objective in that sense, the sense we talked about earlier.

I thought that was

Page 136

FERRELL

appropriate.  And so I did adopt that for purposes of the class certification analysis.

Q   And so when you adopted that at the class certification stage, did you engage in any process to determine that his selection of the industry index was more appropriate than other -- other potential industry indexes?

A   So I reviewed what he said about his selection.  He was using these preexisting indices, which, again, is a standard way to do this.

As I remember, he was looking at adjusted R-squareds.  Again, it's something that I had done and it's consistent with the academic literature.  And so I thought it was appropriate.  And there was -- to adopt that for purposes of the class certification analysis.

Again, the event study that was proffered in the -- I guess, the

Page 137

35 (Pages 134 - 137)

FERRELL

class cert report.

Q   And at the time, did you consider applying the same industry index identified by Exxon in its SEC filings?

A   No, I did not.  So the analysis I did in the report in class cert is reflected there.  I did not separately run the 10-Ks.  I know that the plaintiff's expert looked at a number of indices.  I forget the number, but there is a whole menu of indexes that he looked it, these preexisting indices, and looking at which one had more explanatory power.

And I thought that was an appropriate and reasonable thing to do.

Q   So his process involved the -- I am talking about Mr. Torchio.

Mr. Torchio's process involved running multiple regression models, using different industry indices, and then selecting the industry index based on the results of

Page 138

FERRELL

those models, correct?

MS. SOLOWAY:  Objection.  Misstates the testimony.

A   No.  I mean, he is your expert.  So you could ask him directly.

But in his class cert report, he talks about his selection of these industry indices, these preexisting industry indices.  And he looks at -- he does look, as I remember, about the explanatory power.

And so I thought the industry control that he had, based on this existing index, was a reasonable and a protocol.

It's -- by the way, I should add that it's the same industry index that I used in the New York Attorney General versus Exxon matter.  So not only have I used this industry control in this matter, I've used it in that matter as well.

So it's very consistent with other work I've done in other matters

Page 139

FERRELL

involving Exxon.

And I would also add in that case the New York Attorney General's -- my memory is New York Attorney General's expert, Dr. Bartov, from NYU Stern, also used that industry control.

Q   And in paragraph 47 of your report, you contend that Professor Feinstein's regression model is inferior, the one used by yourself and Mr. Torchio at the class certification stage?

A   Yes.

Q   And the basis for that contention is that his R -- adjusted R-squared, as it relates to the January 31, 2017, disclosure, is lower than yours and Mr. Torchio's, correct?

A   Yes.

Q   And you claim that the lower adjusted R-squared for his model means that it does a worse job of predicting Exxon Mobil's price movements, correct?

A   Explaining the variants in

Page 140

FERRELL

the price movements over -- not the event -- not the date of the event, but during the estimation period.

Q   But you specifically state that in your report, paragraph 47, that because it has a lower adjusted R-squared, you state, "This means that Dr. Feinstein's conclusion relies on a regression model that does a worse job of predicting Exxon Mobil's price movements than my regression model and Mr. Torchio's model."

Do you see that?

A   I do, in the sense -- "worse job" in the sense that it explains less -- this is the meaning of adjusted R-squared, which I thought Dr. Feinstein, in his deposition, properly described the variants in the returns during the estimation window -- estimation period.

Q   But having a higher adjusted R-squared isn't definitionally equivalent to a model having a superior

Page 141

36 (Pages 138 - 141)

FERRELL
open. And so that was the academic basis.

Now, I don't know if Dr. Feinstein agrees with my reading of that paper or not, but that was the basis. It is true that in the past I have used closed-to-closed. And, in fact, I use closed-to-closed for October 28th.

Q   And --

A   But, again, I don't think this closed-to-open/closed-to-closed matters, because with the proper event study, A, January 31st, regardless, is statistically insignificant.

And, B, at least I have a question reading the judge's opinion as to why this is an issue to begin with. Dr. Feinstein and I both agree that October 28th is statistically significant.

Q   And -- well, do you agree that for January 31st, 2017, using a closed-to-open event window would fail

FERRELL
to capture any impact on the earnings call that commenced at open of trading that day?

A   By definition, yes.

Q   Okay. And you testified at the class certification hearing in this case that if one did want to capture the impact of the earnings call that commenced at the open of trading on January 31st, 2017, the appropriate way to do so would be to use a closed-to-closed event window for that date, correct?

A   That's correct.

Q   And your report does not take issue with the accuracy of the calculations Professor Feinstein performed concerning the total increase in the company's debt service on the March 2016 Exxon notes over the life of the notes if they had been rated AA+ rather than AAA, correct?

MS. SOLOWAY: Objection.

A   That's not correct. So just

FERRELL
one clarification and then correction, if I could.

I'm assuming for purposes of my analysis that it's 13 basis points or 6.5 basis points. I'm not opining on that. I'm not saying that's the right number. But assuming 13 basis points or 6.5 basis points, what does the calculation look like. So I just wanted to make that assumption clear.

The second thing is I do take -- so there are two issues with this calculation. One is what you referred to, is that he doesn't present-value this. So he's taking a 30-year bond and going out to the distant future. And so I think that does -- you highlighted that in your question.

But the other thing I take issue with is the compounding. So what he does in the bond calculation is, let say, it's a five-year -- let's say it's five years. And Exxon is going pay

FERRELL
$100 Year 1, another $100 Year 2. I'm just doing a stylized example. He takes that $100 in Year 1 and grows that at the yield to maturity.

So he's compounding coupon payments going forward to the term -- the maturity term.

That's not right because if the question is what's Exxon's cost, what's the cost to Exxon, the cost to Exxon in this -- of the bond of this simple hypo is $100 in Year 1, $100 in Year 2, $100 in Year 3. You don't compound it forward. You bring it back in present value.

So the reason why I disagreed with your question is I don't agree with the compounding that he has in addition to the lack of present value.

Q   Okay. And so did you conduct an analysis -- okay. So your analysis takes out both the compounding -- it takes out the compounding and then relates it to back to present value,

42 (Pages 162 - 165)

**App. 301**

FERRELL

correct?

A  Yes.

Q  Okay.  And I want to make sure I understand your last answer, though.

Would you agree that -- so you agree that he did the math correctly for the analysis he was endeavoring to conduct, correct?

You just disagree with his decision to conduct it that way.  Is that -- am I understanding that correct?

MS. SOLOWAY:  Objection.  Misstates the testimony.

A  I guess I disagree with the idea of compounding coupon statements.

Q  Okay.

A  If the question is the cost of Exxon of an additional 13 basis points or 6.5 basis points.  And I would think that you would normally think of future values in present value terms.

Page 166

FERRELL

So I guess Dr. Feinstein says it's presentation, but he doesn't present-value anything.

Q  And just to confirm, though, so your analysis that you conducted in paragraph 62 to 63 of your report, so that assumes --

A  I'm sorry.  I'm on the wrong report.

Q  401.

MS. SOLOWAY:  Exhibit 401.

Q  401, paragraph 62 and 63.

A  Let me just take a quick look, if I could.

Oh, and he doesn't do the tax benefit too.  So yes.  So the analysis is in 62 and 63, and I'm assuming the 13 basis points, or I guess now it's the 6.5 basis points.  So he compounds it doesn't present-value it.

I do a present value of 13 basis points -- you can make it 6.5 basis points, half of that -- the after-tax cost of debt to Exxon.

Page 167

FERRELL

Q  And your analysis determined that if you did assume a 13-basis-point increase the present value calculation of that cost to Exxon taken out the compounding would still be 75 -- or 77.5 million at the time of offering, correct?

That's your conclusion?

A  The day before the bond issuance.

Q  Okay.

A  Which would be the end of February.

Q  Okay.

A  In other words, that's the present value of the assumed 13 basis points.

MR. LINDELL:  Okay.  Why don't we go off the record?

(Whereupon, a discussion was held off the record.)

VIDEOGRAPHER:  Time is 12:32 p.m. EST.  We're going off the record.

Page 168

FERRELL

(Whereupon, a brief recess was taken.)

VIDEOGRAPHER:  Time is 12:39 p.m. EST.  We're going back on the record.

Q  Okay.  Welcome back.

Just one quick clarification question.

When you were testifying earlier about the use of adjusted R-squareds to -- as a metric to be used in determining which regression models are most effective or most appropriate, you mentioned, I think, some academic literature supporting that view.  And I just -- I don't see any referenced in your report regarding that issue.

So I was wondering if you could describe the academic literature you are referring to, identify it for us, and maybe point us to -- if it's included in your Appendix B anywhere.

A  Give me one second.

Q  So to help you out, if we're

Page 169

43 (Pages 166 - 169)

CERTIFICATION

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )

I, JUDITH THATEN, Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That FRANK ALLEN FERRELL, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that this transcript of such examination is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 29th day of January, 2025.

_JUDITH THATEN_

Page 174

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections.   You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty(30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

Page 176

INDEX

WITNESS                              PAGE
FRANK ALLEN FERRELL
  Examination by:
    MR. LINDELL                7

EXHIBITS

(Retained by Veritext Legal Solutions)
FERRELL                             PAGE
Exhibit 400 Expert report of Allen Ferrell,     11
        Ph.D., dated February 1, 2019
Exhibit 401 Expert report of Allen Ferrell,     12
        Ph.D., dated December 10, 2024
Exhibit 402 Compass Lexecon memorandum to     42
        Daniel Toal
Exhibit 403 Reply Report on Loss Causation     96
        and Damages, by Professor Steven
        P. Feinstein, Ph.D., CFA, dated
        January 10, 2025
Exhibit 404 Declaration of Professor Allen     118
        Ferrell
Exhibit 405 Expert Report of Allen Ferrell,     130
        Ph.D. dated November 22, 2023

Page 175

ERRATA

I wish to make the following changes,

for the following reasons:

PAGE LINE

___ ___ CHANGE:_____

REASON:_____

___ ___ CHANGE:_____

REASON:_____

___ ___ CHANGE:_____

REASON:_____

___ ___ CHANGE: _____

REASON:_____

___ ___ CHANGE: _____

REASON:_____

___ ___ CHANGE: _____

REASON:_____

_____    _____
WITNESS' SIGNATURE         DATE

Page 177

45 (Pages 174 - 177)

**App. 303**

# Exhibit 6

| ISIN | Pricing Date | Interest Accrual Start | Maturity | YearFrac | Par Amount | Frequency | AAA_OAS | AA_OAS | Annual Coupon Difference | Coupon | Coupon_Amt | Actual YTM | Increased YTM | Actual FV | Increased FV | Difference |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30231G AS1 | 2/29/2016 | 3/3/2016 | 2/28/2018 | 1.986111 | $ 750,000,000.00 | 0.25 | 0.91% | 1.17% | 0.065% | 0.60% | $ 1,125,000.00 | 0.60% | 0.67% | ($767,968,376.18) | ($769,926,198.86) | ($1,957,822.68) |
| 30231G AQ5 | 2/29/2016 | 3/3/2016 | 3/1/2019 | 2.994444 | $ 250,000,000.00 | 0.25 | 0.91% | 1.17% | 0.065% | 0.78% | $ 487,500.00 | 0.78% | 0.85% | ($261,804,144.66) | ($262,799,261.36) | ($995,116.70) |
| 30231G AU6 | 2/29/2016 | 3/3/2016 | 3/1/2018 | 1.994444 | $ 1,000,000,000.00 | 0.50 | 0.91% | 1.17% | 0.065% | 1.44% | $ 7,195,000.00 | 1.44% | 1.50% | ($1,058,020,256.67) | ($1,060,670,469.83) | ($2,650,213.16) |
| 30231G AP7 | 2/29/2016 | 3/3/2016 | 3/1/2019 | 2.994444 | $ 1,250,000,000.00 | 0.50 | 0.91% | 1.17% | 0.065% | 1.71% | $ 10,675,000.00 | 1.71% | 1.77% | ($1,380,617,708.64) | ($1,385,698,640.10) | ($5,080,931.46) |
| 30231G AV4 | 2/29/2016 | 3/3/2016 | 3/1/2021 | 4.994444 | $ 2,500,000,000.00 | 0.50 | 0.91% | 1.17% | 0.065% | 2.22% | $ 27,775,000.00 | 2.22% | 2.29% | ($3,083,425,749.05) | ($3,101,378,473.61) | ($17,952,724.55) |
| 30231G AR3 | 2/29/2016 | 3/3/2016 | 3/1/2023 | 6.994444 | $ 1,250,000,000.00 | 0.50 | 0.91% | 1.17% | 0.065% | 2.73% | $ 17,037,500.00 | 2.73% | 2.79% | ($1,771,252,767.65) | ($1,784,832,110.11) | ($13,579,342.46) |
| 30231G AT9 | 2/29/2016 | 3/3/2016 | 3/1/2026 | 9.994444 | $ 2,500,000,000.00 | 0.50 | 0.91% | 1.17% | 0.065% | 3.04% | $ 38,037,500.00 | 3.04% | 3.11% | ($4,261,727,363.26) | ($4,305,127,608.98) | ($43,400,245.72) |
| 30231G AW2 | 2/29/2016 | 3/3/2016 | 3/1/2046 | 29.99444 | $ 2,500,000,000.00 | 0.50 | 0.91% | 1.17% | 0.065% | 4.11% | $ 51,425,000.00 | 4.11% | 4.18% | ($14,460,538,148.90) | ($14,787,604,651.25) | ($327,066,502.35) |
| | | | | | | | | | | | | | | | | ($412,682,899) |



PENGAD 800-631-6989

EXHIBIT

6

7-22-25

App. 304

# Exhibit 7

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

---------------------------------------------------------------- x
          :

PEDRO RAMIREZ, JR., Individually and on
Behalf of All Others Similarly Situated,     :

          :

        Plaintiff,     :
          : Civil Action No. 3:16-cv-03111-K

        v.     :

          :

EXXON MOBIL CORPORATION, REX W.
TILLERSON, ANDREW P. SWIGER,     :
JEFFREY J. WOODBURY and DAVID S.     :
ROSENTHAL,     :

          :

        Defendants.     :

          :
---------------------------------------------------------------- x

**EXPERT REPORT OF ANTHONY SAUNDERS, PH.D.**

**DECEMBER 10, 2024**

**CONFIDENTIAL**

**App. 305**

CONTENTS

I.     Qualifications and Experience................................................................................2

II.    Case Background and Assignment .........................................................................3

III.   Summary of Dr. Feinstein's Analysis of "The Cost of Losing a 'AAA' Rating" ......................5

IV.    Summary of Opinions .............................................................................................6

V.     Opinion 1: ExxonMobil Had a Split Rating in the Relevant Time Period, Not a Unanimous AA+ Rating, as Incorrectly Assumed by Dr. Feinstein............................................8

VI.    Opinion 2: Dr. Feinstein's Analysis Ignores that Default Rates for Both AAA- and AA+-Rated Corporate Bonds Have Been Historically Zero and There May Be No Price Impact of the Offering Had The Notes Been Rated AA+................................................11

VII.   Opinion 3: The Market Was Well Aware of a Potential S&P Downgrade After ExxonMobil Was Placed on CreditWatch Ahead of Its March 2016 Offering But Found It Inconsequential. ...............................................................................14

VIII.  Opinion 4: ExxonMobil Bonds Remained a Strong Investment Choice Irrespective of the Credit Downgrade, and Empirical Analysis Shows that Returns on ExxonMobil's Bonds Were Not Statistically Affected by S&P's Downgrade.................................................19

IX.    Opinion 5: Dr. Feinstein's Choice of OAS Over Alternative Yield Calculation Methods Is Not Explained and Is Not Justified, Given the Measure's Limitations. ..............23

       A.    Dr. Feinstein Does Not Justify His Usage of OAS Over Alternative, Commonly Used Methods for Calculating Yields.............................................................23

       B.    OAS Does Not Effectively Account for Credit Events. ..............................................28

       C.    The OAS Value Is Sensitive to Model Assumptions, and Dr. Feinstein Has Not Performed Any Sensitivity Analyses. ..........................................................29

       D.    OAS Model Predictions Do Not Equal Actual Realized Returns..........................................32

X.     Opinion 6: Market Averages Provide Limited Insight into Individual Bonds, and Average OAS Based on Few Data Points Is Prone to Large Standard Errors. .......................32

XI.    Opinion 7: There Is No Economic Foundation to Support a Linear Interpolation of AA+ OAS Between AAA and AA OAS. ..........................................................................34

XII.   Opinion 8: Dr. Feinstein's Calculation of Additional Interest Expense to ExxonMobil Is Incorrect. ..........................................................................................35

CONFIDENTIAL

**App. 306**

## I.    QUALIFICATIONS AND EXPERIENCE

1.    I serve as the John M. Schiff Professor of Finance at NYU Stern Business School. I received my Ph.D. from the London School of Economics and have taught both undergraduate and graduate level courses at NYU since 1978. Throughout my academic career, my teaching and research have specialized in financial institutions, financial markets, and international banking. I have served as a visiting professor all over the world, including INSEAD, the Stockholm School of Economics, and the University of Melbourne.

2.    I have held positions on the Board of Academic Consultants of the Federal Reserve Board of Governors as well as the Council of Research Advisors for the Federal National Mortgage Association. In addition, I have been a visiting scholar at the Comptroller of the Currency and at the International Monetary Fund. I was an editor of the *Journal of Banking and Finance*, and I am the editor of the *Journal of Financial Markets*, *Instruments and Institutions* and have been an associate editor of eight other journals, including *Financial Management* and the *Journal of Money, Credit and Banking*. I have been invited as a keynote speaker to numerous conferences around the world.

3.    My research has been published in all of the major finance and banking journals and in several books. I have been ranked Number 1 as the "Most Prolific Author" in 16 core finance journals over the past 50 years[1] and my research has been ranked Number 2 over the last 75 years in publishing in the top 10 finance journals.[2] I have also published a dozen books and monographs. My *Financial Institutions Management* textbook had sold more than 200,000 copies and been studied by over one million students, according to the publisher McGraw-Hill in May 2018.

---

[1] Cooley, Philip L. and Jean L. Heck. "Prolific Authors in The Finance Literature: A Half Century of Contributions." *Journal of Finance Literature* 1 (2005). I have also been considered as the most prolific author in the finance literature's top seven journals for 1959-2008. *See* Heck, Jean L. and Cooley, Philip L. "Most Prolific Authors in the Finance Literature: 1959-2008." *Saint Joseph's University and Trinity University* (2009). <https://ssrn.com/abstract=1355675> (accessed Nov. 11, 2024).

[2] Chung, Kee H. and Choonsik Lee. "Conservatism and Representativeness Heuristic in Peer Reviews: Evidence from The Finance Literature 1946-2020." *Journal of Banking & Finance* 160 (2024): 107093.

CONFIDENTIAL

**App. 307**

4.  I have testified as an expert witness numerous times at trial or arbitration, or by deposition, for both plaintiffs and defendants, in disputes concerning rating agencies, structured finance products, credit market conditions, and mortgage-backed securities. My Curriculum Vitae, which includes a complete listing of my academic publications, and a description of my expert witness testimony over the past four years, is attached as **Appendix A:** *Curriculum Vitae*.

## II.    CASE BACKGROUND AND ASSIGNMENT

5.  This is a federal securities class action brought by Greater Pennsylvania Carpenter Pension Fund ("Plaintiff"), on behalf of itself and all others similarly situated, against Exxon Mobil Corporation ("ExxonMobil"), its former Chairman of the Board and Chief Executive Officer, Rex W. Tillerson, its former Senior Vice President and Principal Financial Officer, Andrew P. Swiger, its former Vice President of Investor Relations and Secretary, Jeffrey J. Woodbury, and its former Vice President, Controller and Principal Accounting Officer, David S. Rosenthal (collectively, "Defendants").[3]

6.  ExxonMobil completed a $12 billion public debt offering in March 2016. **Table 1**: *ExxonMobil Notes Issued March 2016* below includes a list of ExxonMobil bonds issued in March 2016 and certain of their characteristics, including time to maturity and coupon rate.

---

[3] Consolidated Complaint for Violations of the Federal Securities Laws. *Pedro Ramirez, Jr. v. Exxon Mobil Corp.,* et al. (N.D. Tex. No. 3:16-cv-03111-K) (July 26, 2017) ("Am. Compl.") ¶ 1.

CONFIDENTIAL

**App. 308**

**Table 1**: ExxonMobil Notes Issued March 2016[4]

| CUSIP | Interest Rate | Maturity | Maturity Type | Years to Maturity | Amount |
|---|---|---|---|---|---|
| 30231GAU6 | 1.439% | 3/1/2018 | At Maturity | 2 | $1,000,000,000 |
| 30231GAP7 | 1.708% | 3/1/2019 | At Maturity | 2 | $1,250,000,000 |
| 30231GAV4 | 2.222% | 3/1/2021 | Callable | 5 | $2,500,000,000 |
| 30231GAR3 | 2.726% | 3/1/2023 | Callable | 7 | $1,250,000,000 |
| 30231GAT9 | 3.043% | 3/1/2026 | Callable | 10 | $2,500,000,000 |
| 30231GAW2 | 4.114% | 3/1/2046 | Callable | 30 | $2,500,000,000 |
| 30231GAS1 | 3M U.S. LIBOR + 0.600% | 2/28/2018 | At Maturity | 2 | $750,000,000 |
| 30231GAQ5 | 3M U.S. LIBOR + 0.780% | 3/1/2019 | At Maturity | 3 | $250,000,000 |
| **Total** | | | | | **$12,000,000,000** |

7. Approximately a month later, on April 26, 2016, the credit rating agency Standard & Poor's ("S&P") downgraded ExxonMobil's long-term corporate credit rating from AAA to AA+. S&P had previously revised ExxonMobil's outlook to negative in October 2015 and subsequently placed ExxonMobil on its "CreditWatch" on February 2, 2016.[5] Plaintiff alleges that the Defendants made materially false and misleading statements, and failed to disclose material facts, in violation of the federal securities laws, in order to, among other things, preserve ExxonMobil's AAA S&P credit rating at the time of its public debt offering.[6]

8. I have been retained on behalf of ExxonMobil, through its counsel Paul, Weiss, Rifkind, Wharton & Garrison LLP, to review a report by Plaintiff's proffered expert, Dr. Steven P. Feinstein, and to respond to his opinion that, had ExxonMobil's March 2016 offering been rated AA+ rather than AAA, ExxonMobil's debt service on the issued notes (the "Notes") would have required a higher note yield and thus higher interest expense.[7]

---

[4] Exxon Mobil Corporation. *Prospectus Supplement* (Feb. 29, 2016) at S-3. *See also* "Pricing Term Sheet." *Bank of America.* (BofA_00000036); "Pricing Term Sheet." *Bank of America.* (BofA_00000038).

[5] Am. Compl. ¶¶ 18, 200, n.30.

[6] *Id.* ¶¶ 1, 15, 201.

[7] Feinstein, Steven P. "Report on Loss Causation and Damages." *Pedro Ramirez, Jr. v. Exxon Mobil Corp.,* et al. (N.D. Tex. No. 3:16-cv-03111-K) (Oct. 11, 2024) ("Feinstein Report") ¶¶ 172–77.

                    CONFIDENTIAL

9.  A complete list of the documents and data that I rely upon in reaching my conclusions in this matter is provided in **Appendix B**: *Materials Relied Upon*.

10. The current hourly rate for my work is $750. My compensation is not affected by my findings or the outcome of this litigation. I supervised and directed a team at Vega Economics to assist me in this assignment. Their compensation is not affected by my findings or the outcome of this litigation.

11. I reserve the right to amend or supplement my opinions and report, if appropriate, based on any additional discovery or facts that become available to me, or in response to opinions or reports of other experts in this matter.

### III.    SUMMARY OF DR. FEINSTEIN'S ANALYSIS OF "THE COST OF LOSING A 'AAA' RATING"

12. Dr. Feinstein states that he was asked to "estimate how much greater the Company's debt service on the Exxon[Mobil] Notes issued in the March 2016 offering would be over their life if they had been rated AA+ rather than AAA at the time of their issuance, holding all other features of the Notes constant."[8]

13. In doing his calculation, Dr. Feinstein assumes that "had the [ExxonMobil] Notes carried a lower/riskier credit rating, investors would have required a higher yield"[9] without providing support.

14. Another assumption Dr. Feinstein makes is that the market-wide index of option-adjusted spread ("OAS") between AAA- and AA+-rated bonds can accurately represent the difference in yields between the actual (AAA) and counterfactual (AA+) yields for ExxonMobil's March 2016 offering.

15. For the market-index for the AAA-rated bonds, Dr. Feinstein selected the "AAA US Corporate Index Option-Adjusted Spread," created by Ice Data Indices LLC and published

---

[8] *Id.* ¶ 172.
[9] *Id.* ¶ 173.

CONFIDENTIAL

**App. 310**

on the Federal Reserve Economic Data ("FRED"), which he contends is "representative of the option-adjusted spread of U.S. dollar denominated debt issues with a 'AAA' credit rating."[10]

16. That similar market-wide index is not available for AA+-rated bonds from FRED. Therefore, Dr. Feinstein obtained from FRED the similar index for AA issues[11] and then "interpolated linearly between the 'AAA' and the 'AA' option-adjusted spreads"[12] to estimate the OAS for AA+-rated bonds.

17. Dr. Feinstein concluded that "[t]he difference between the respective option-adjusted spreads for 'AA+' and 'AAA' issues was 0.13%" and that, "had the [ExxonMobil] Notes been issued with a 'AA+' rating instead of a 'AAA' rating, the required yield from the Notes would have had to be 0.13% greater[,]" which "would have cost [ExxonMobil] $831.95 million in greater interest expense."[13]

### IV.   SUMMARY OF OPINIONS

18. Based on my review of the Feinstein Report and the record, my experience, and my professional judgement, I conclude that Dr. Feinstein's calculation of the purported "cost of losing a 'AAA' rating"[14] is unreliable for the following reasons:

- Dr. Feinstein fails to acknowledge that ExxonMobil had a "split" credit rating, as opposed to a unanimous AA+ rating. Credit ratings agency Moody's continued to rate ExxonMobil Aaa, which is equivalent to S&P's AAA rating. Because he assumes a unanimous rating, rather than a split rating, Dr. Feinstein overstates the impact of S&P's downgrade on the yields of ExxonMobil's bond offering, if such an impact existed at all.

---

[10] *Id.* ¶ 175.
[11] *Id.* ¶ 175.
[12] *Id.* ¶ 176.
[13] *Id.* ¶ 177.
[14] *Id.* ¶¶ 172–77.

CONFIDENTIAL

- Dr. Feinstein fails to address that the one-year default rates for both AAA and AA+ corporate bonds have historically been zero, indicating effectively no credit risk in the short term. Further, the cumulative default rates for both AAA and AA+ corporate bonds over a 10-year time horizon are negligible—less than one percent— demonstrating minimal credit risk even in the long term.

- Dr. Feinstein fails to take into account that the market was well aware of a potential credit downgrade ahead of ExxonMobil's bond offering, based on S&P having placed ExxonMobil on CreditWatch in February 2016 prior to the offering in March 2016.

- Dr. Feinstein fails to consider countervailing facts showing that ExxonMobil bonds remained a strong investment irrespective of S&P's downgrade. S&P's downgrade was deemed to be inconsequential by market participants, as I demonstrated through an event study.

- Dr. Feinstein relies on OAS as his yield metric, failing to consider other commonly used yield measures. Dr. Feinstein does not explain his choice to use this method to calculate yields, and he fails to address the fact that other methods are favored by financial agencies such as FINRA. OAS does not effectively account for credit events, and Dr. Feinstein utilizes a single OAS model and does not perform sensitivity analyses to account for model assumptions. For example, Bloomberg offers five alternative models to calculate OAS for any bond. In addition, OAS predicted through modeling is almost never equal to the actual return realized.

- Dr. Feinstein relies upon a market rating class average OAS, ignoring individual bond characteristics, such as coupons and maturities. Because it assumes the same OAS impact to bonds of very different characteristics, Dr. Feinstein's approach is economically unsound. Additionally, Dr. Feinstein fails to consider the fact that market average OAS for AAA and AA are prone to large standard errors due to the limited number of AAA and AA companies.

- Dr. Feinstein's opinion is unsound because there is no economic foundation supporting his use of linear interpolation to estimate the yield of AA+ ratings.

CONFIDENTIAL

**App. 312**

- Dr. Feinstein ignores the potential callability of ExxonMobil bonds in calculating his "additional interest expense over the life of the Notes."[15] Dr. Feinstein's calculation is also economically unsound because it does not account for the time value of money properly. As a result, Dr. Feinstein's calculated interest payments are overstated and incorrect.

19. My full opinions and conclusions are contained in the body of this report.

### V.    OPINION 1: EXXONMOBIL HAD A SPLIT RATING IN THE RELEVANT TIME PERIOD, NOT A UNANIMOUS AA+ RATING, AS INCORRECTLY ASSUMED BY DR. FEINSTEIN.

20. Dr. Feinstein purports to analyze a counterfactual scenario in which ExxonMobil's credit rating was AA+ at the time of the March 2016 bond offering. To do so, he compares the difference between the OAS for an AAA issue (the reality) versus his "estimated" OAS for an AA+ issue (the counterfactual).

21. Dr. Feinstein's counterfactual assumption of an AA+ rating is presumably based on S&P's subsequent downgrading of ExxonMobil's corporate credit rating, from AAA to AA+, on April 26, 2016.[16] Dr. Feinstein's assumption is flawed, however, because it fails to take into account that ExxonMobil's corporate credit rating as of April 2016 was a split rating, and not simply a unanimous "AA+" rating that Dr. Feinstein models.

22. In the United States, firms issuing public bonds receive ratings from the two major rating agencies, S&P and Moody's.[17] These rating agencies often disagree about the credit rating for companies, resulting in a so-called "split rating." For instance, a company could be rated AA+ by S&P and Aaa by Moody's. Split ratings are a common occurrence; roughly 13 percent of bond ratings are split at the letter level (e.g., AAA vs AA), and about half are split at the notch level (e.g., AA+ vs AA).[18]

---

[15] *Id.* ¶ 173.
[16] *See id.* ¶ 68.
[17] Livingston, Miles and Lei Zhou. "Split Bond Ratings and Information Opacity Premiums." *Financial Management* 39.2 (2010): 515–32, 515.
[18] *Id.* 515.

CONFIDENTIAL

**App. 313**

23.  Moody's kept ExxonMobil's rating at Aaa throughout 2016.[19] Following S&P's placement of ExxonMobil on CreditWatch in late February 2016, Moody's publicly reaffirmed ExxonMobil's Aaa rating.[20] When S&P downgraded ExxonMobil on April 26, 2016,[21] Moody's retained the Aaa rating.

24.  In retaining ExxonMobil's Aaa rating, Moody's noted ExxonMobil's "differentially large proved reserve and production scale," citing reserves "almost twice that of its Aa-rated integrated peers[.]"[22] According to the U.S. Energy Information Administration, proved reserves are estimated volumes of hydrocarbon resources that demonstrate with reasonable certainty that they are recoverable under current operating and economic conditions.[23] The reserve-replacement ratio, and reserve volumes generally, are used by investors as indicators of a company's long-term ability to maintain output and the stability of its business model.[24]

---

[19] *See* "Exxon Capital Corp. Ratings & Assessments." *Moody's.* <https://www.moodys.com/credit-ratings/EXXON-CAPITAL-CORP-credit-rating-273300/ratings/view-by-class> (accessed Dec. 5, 2024).

[20] "Rating Action: Moody's Affirms ExxonMobil's Aaa Rating, Outlook Changed to Negative." *Moody's* (Feb. 25, 2016). <https://www.moodys.com/research/Moodys-affirms-ExxonMobils-Aaa-rating-outlook-changed-to-negative-Rating-Action--PR_344377> (accessed Nov. 20, 2024); "Rating Actions Taken on 20 U.S. Investment-Grade Exploration & Production Companies After S&P Revises Price Assumptions." *S&P Global* (Feb. 2, 2016). <https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/type/HTML/id/1580384> (accessed Nov. 15, 2024).

[21] S&P downgraded ExxonMobil's rating to AA+ as it expected ExxonMobil's credit measures (e.g., various cash flow to debt ratios that show a corporation's ability to pay its debts) to remain below S&P's expectations for the AAA rating through 2018. *See* "Committee Package." *S&P Global Ratings* (SPGI-0000055_0001, 0006).

[22] "Rating Action: Moody's Affirms ExxonMobil's Aaa Rating, Outlook Changed to Negative." *Moody's* (Feb. 25, 2016). <https://www.moodys.com/research/Moodys-affirms-ExxonMobils-Aaa-rating-outlook-changed-to-negative-Rating-Action--PR_344377> (accessed Nov. 20, 2024).

[23] "U.S. Crude Oil and Natural Gas Proved Reserves, Year-End 2022." *U.S. Energy Information Administration* (Apr. 29, 2024). <https://www.eia.gov/naturalgas/crudeoilreserves> (accessed Dec. 9, 2024).

[24] Olson, Bradley. "Exxon Fails to Replace Oil, Gas Production for First Time in 22 Years." *The Wall Street Journal* (Feb. 19, 2016). <https://www.wsj.com/articles/exxon-fails-to-replace-oil-gas-production-for-first-time-in-22-years-1455926914?msockid=17ea39415358632501912c6252dc62d8> (accessed Nov. 27, 2024) ("[r]eserve barrels have long acted as a signal to investors about the stability of the business model."); Carroll, Joe. "Exxon Fails to Replace Production for First Time in 22 Years." *Bloomberg* (Feb. 19, 2016). <https://www.bloomberg.com/news/articles/2016-02-19/exxon-fails-to-replace-production-for-first-time-in-22-years> (accessed Nov. 27, 2024) ("[t]he reserve-replacement ratio is a key measure for oil producers and the investors and analysts who follow them: it's one indicator of a company's long-term ability to maintain or expand crude and gas output.").

CONFIDENTIAL

**App. 314**

25. In particular, Moody's rating methodologies for the relevant period listed a proved reserve requirement of 10,000 million barrels of oil equivalent (mmboe) to meet the threshold for the Aaa rating.[25] ExxonMobil was well above this threshold, as Moody's documented that ExxonMobil had proved reserves of 24,759 mmboe by year end 2015 and 19,974.17 mmboe by year end 2016.[26] Even with the potential loss in proved reserves reported by ExxonMobil on October, 28, 2016 at Kearl oil sands operations in Canada and other North American operations, its proved reserves would still have been well above the threshold set by Moody's.[27] Further, Moody's analysis led it to conclude that ExxonMobil's integrated business model and strong balance sheet provided resiliency during volatile commodity price cycles.[28]

26. ExxonMobil's split rating was reported by multiple news outlets. On April 26, 2016, the day of ExxonMobil's downgrade, the *Associated Press* reported that although S&P lowered ExxonMobil's rating by one notch to AA+, Moody's "said in February that it was keeping its top 'Aaa' rating on Exxon."[29] The *Wall Street Journal* reported that although ExxonMobil was stripped of its AAA credit rating by S&P, Moody's "affirmed its triple-A rating for Exxon" on February 1, 2016, and further "stood by that rating" on April 1, 2016.[30]

---

[25] "Global Integrated Oil & Gas Industry." *Moody's Investors Service* (Oct. 3, 2016). <https://www.moodys.com/research/doc--PBC_1038500> (accessed Dec. 4, 2024) at 8; "Global Integrated Oil & Gas Industry." *Moody's Investors Service* (Apr. 30, 2014). <https://www.moodys.com/research/doc--PBC_161078> (accessed Dec. 6, 2024).

[26] "Moody's Rating Methodology Grid: Integrated Oil & Gas." *Moody's.* (MDYS RAM 000119) at "Scenario Analysis."

[27] ExxonMobil reported that the quantities that were subject to potential debooking were "3.6 billion barrels of bitumen at Kearl, and about 1 billion oil-equivalent barrels in other North America operations." *See* Exxon Mobil Corporation. *Form 8-K* (Oct. 28, 2016). <https://investor.exxonmobil.com/sec-filings/all-sec-filings/content/0000034088-16-000093/0000034088-16-000093.pdf> (accessed Dec. 4, 2024) at 5. Thus, the 2016 year end proved reserves set by Moody's would change by 4,600 mmboe to 15,374.17 mmboe.

[28] "Rating Action: Moody's Affirms ExxonMobil's Aaa Rating, Outlook Changed to Negative." *Moody's* (Feb. 25, 2016). <https://www.moodys.com/research/Moodys-affirms-ExxonMobils-Aaa-rating-outlook-changed-to-negative-Rating-Action--PR_344377> (accessed Nov. 20, 2024).

[29] Pisani, Joseph and David Koenig. "Stung by Low Oil Prices, Exxon Loses 'AAA' Rating From S&P." *Associated Press* (Apr. 26, 2016). <https://apnews.com/stung-by-low-oil-prices-exxon-loses-aaa-rating-from-s-p-d7e77574ef1d4023a37de881142eca11> (accessed Nov. 20, 2024).

[30] Ailworth, Erin and Austen Hufford. "Exxon Loses Its Triple-A Rating." *The Wall Street Journal* (Apr. 27, 2016). <https://www.wsj.com/articles/s-p-strips-exxon-of-triple-a-credit-rating-1461687007?msockid=17ea39415358632501912c6252dc62d8> (accessed Nov. 22, 2024).

    CONFIDENTIAL

27. Instead of accounting for ExxonMobil's split AA+/AAA rating, Dr. Feinstein's analysis simply assumes that ExxonMobil's rating was unanimously AA+. Dr. Feinstein's analysis therefore overstates the impact of S&P's downgrade on the yields of ExxonMobil's bond offering, if such an impact existed at all.

**VI.    OPINION 2: DR. FEINSTEIN'S ANALYSIS IGNORES THAT DEFAULT RATES FOR BOTH AAA- AND AA+-RATED CORPORATE BONDS HAVE BEEN HISTORICALLY ZERO AND THERE MAY BE NO PRICE IMPACT OF THE OFFERING HAD THE NOTES BEEN RATED AA+.**

28. Dr. Feinstein's calculations rely on the assumption that a lower credit rating necessarily leads to a higher yield, but he has not tested this assumption. As detailed below, default rates for both AAA- and AA+-rated corporate bonds have historically been zero. Consequently, there may not have been any significant difference between the prices of AAA versus AA+ bonds due to their indistinguishable credit risks, which I confirmed through empirical analyses discussed in Section VIII below.

29. Both AAA and AA+ credit ratings are indicative of exceptional credit quality and financial stability, reflecting an extremely low likelihood that an issuing company will default on its repayment obligations. According to S&P's own study, the one-year U.S. corporate default rate for **both** AAA and AA+ corporate bonds has been zero every year since 1981.[31] This "zero default" record reinforces the fact that AAA- and AA+-rated bonds represent the lowest credit risk available in corporate bond markets. *See* **Figure 1**: *One-Year Default Rates for U.S. Corporate Bonds Rated AAA, 1981-2023* and **Figure 2**: *One-Year Default Rates for U.S. Corporate Bonds Rated AA+, 1981-2023.*

---

[31] "Default, Transition, and Recovery: 2023 Annual U.S. Corporate Default and Rating Transition Study." *S&P Global.* <https://www.spglobal.com/ratings/en/research/articles/240528-default-transition-and-recovery-2023-annual-u-s-corporate-default-and-rating-transition-study-13114000> (accessed Nov. 12, 2024) at Table 5.

CONFIDENTIAL

**App. 316**

**Figure 1**: One-Year Default Rates for U.S. Corporate Bonds Rated AAA, 1981-2023[32]



**Figure 2**: One-Year Default Rates for U.S. Corporate Bonds Rated AA+, 1981-2023[33]



30. Indeed, AAA and AA+ bonds have incredibly low default rates, even over longer time horizons.[34] S&P's study also analyzed the cumulative default rates, which represent the total

-12-

CONFIDENTIAL

**App. 317**

default rates accumulated over time.[35] **Figure 3**: *Average Cumulative Default Rate for U.S. AAA- and AA+-Rated Corporate Bonds* shows that the cumulative default rate for both AAA and AA+ bonds has been consistently lower than one percent over a ten-year period. There are also time horizons for which the cumulative default rate for AAA bonds is actually marginally higher than for AA+ bonds.

**Figure 3**: Average Cumulative Default Rate for U.S. AAA- and AA+-Rated Corporate Bonds[36]



31. Both AAA and AA+ ratings offer exceptionally low long-term default risks and therefore have effectively zero credit risk. In other words, bonds with AAA and AA+ ratings are nearly equivalent in terms of credit safety for investors. This near equivalence calls into

---

[32] *Id.* at Table 5.
[33] *Id.* at Table 5.
[34] *Id.* at Table 13.
[35] *Id.* at 50.
[36] *Id.* at Table 13.

CONFIDENTIAL

**App. 318**

question Dr. Feinstein's central thesis that bond markets would have reacted materially differently had ExxonMobil been rated AA+ instead of AAA.

**VII.  OPINION 3: THE MARKET WAS WELL AWARE OF A POTENTIAL S&P DOWNGRADE AFTER EXXONMOBIL WAS PLACED ON CREDITWATCH AHEAD OF ITS MARCH 2016 OFFERING BUT FOUND IT INCONSEQUENTIAL.**

32. On October 2, 2015, S&P maintained ExxonMobil's AAA rating but revised its outlook to "negative,"[37] signaling potential future risks to ExxonMobil's rating.[38] According to S&P, an "outlook assesses the potential direction of a long-term credit rating over the intermediate term (typically six months to two years)."[39] To determine a ratings outlook, S&P considers any changes in economic or fundamental business conditions.[40] Revised outlook is not a necessary precursor of a ratings change, however a negative outlook indicates that a rating may be lowered.[41] Specifically, a negative outlook means the potential exists for a ratings action over the following 12 to 24 months absent any improvements.[42]

33. The market was aware of the change in outlook, as *Bloomberg* reported that both "Exxon Mobil Corp. and Chevron Corp. were among several U.S. oil and natural gas producers that

---

[37] "Rating Actions Taken on 25 U.S. Oil and Gas Exploration and Production Companies After S&P Revises Price Assumptions." *S&P Global* (Oct. 14, 2015). <https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/type/HTML/id/1464192> (accessed Dec. 6, 2024). *See also* "Ratings Process Initiation: CreditWatch Resolution and General Usage." *S&P Ratings Services* (SPGI-0000019_0001 & -0008); "Summary: Exxon Mobil Corp." *S&P Ratings Services* (Oct. 6, 2015) (SPGI-0000113_0001, -0003).

[38] "S&P Global Ratings Definitions." *S&P Global Ratings* (Aug. 18, 2016). <https://www.maalot.co.il/Publications/GMT20160823145849.pdf> (accessed Nov. 27, 2024) at 7; Five months prior, S&P had revised its assessment of ExxonMobil's liquidity from "strong" to "adequate" based on projections for the following 12–18 months. *See* "Research Update: ExxonMobil Corp. Liquidity Score Revised To 'Adequate' From 'Strong'; 'AAA' Corporate Credit Rating Affirmed." *S&P Ratings Services* (May 27, 2015) (SPGI-0000117_0001, -0002).

[39] "S&P Global Ratings Definitions." *S&P Global Ratings* (Aug. 18, 2016). <https://www.maalot.co.il/Publications/GMT20160823145849.pdf> (accessed Nov. 27, 2024) at 7.

[40] *Id.* at 7.

[41] *Id.* at 7.

[42] "S&P Negative Outlook Response Statement." *ExxonMobil* (Oct. 2015) (EMC_RAMIREZ 000029533); Robert N. Schleckser Dep. Ex. 200.01 (EMC_RAMIREZ 000007797) ("S&P's negative outlook implies 12–24 month window to take action - downgrade/change O/L to Stable").

CONFIDENTIAL

**App. 319**

had their outlooks or ratings cut by Standard & Poor's."[43] S&P maintained this negative outlook in its January ratings recommendation for ExxonMobil.[44]

34. S&P's expectation that ExxonMobil's credit measures would be weak under S&P's price assumptions led the credit rating agency to place ExxonMobil on negative CreditWatch on February 2, 2016.[45] According to S&P, placing a rating on CreditWatch signals a potential future change in the rating, and a "negative" CreditWatch means a rating may be lowered.[46] S&P uses CreditWatch when the likelihood of rating action within the next 90 days is substantial.[47] S&P will only place a rating on CreditWatch if it determines there is "at least a one-in-two likelihood of a rating change within 90 days."[48]

35. Following the CreditWatch placement, media outlets warned the market about the potential downgrade. For instance, *USA Today*, in a February 3, 2016 article titled "Exxon Mobil Nearly Stripped of AAA Rating," stated that "[l]osing Exxon as a AAA rated stock would be the latest blow to the ranks of companies able to reach perfect and stable balance sheet."[49] Another *USA Today* article reported that S&P was "reviewing ExxonMobil" and placed it on CreditWatch amid credit downgrades for 13 oil companies.[50] *CNN Business* reported that "[t]he world's largest publicly-traded oil company, ExxonMobil could lose its AAA status

---

[43] Van Loon, Jeremy. "Exxon, Chevron Outlooks Cut to Negative by S&P in Oil Slump." *Bloomberg* (Oct. 2, 2015). <https://www.bloomberg.com/news/articles/2015-10-02/exxon-chevron-outlooks-negative-chesapeake-rating-cut-by-s-p> (accessed Nov. 20, 2024).

[44] "Ratings Process Initiation: CreditWatch Resolution and General Usage." *S&P Ratings Services* (SPGI_0000022_0001, -0008).

[45] "Rating Actions Taken on 20 U.S. Investment-Grade Exploration & Production Companies After S&P Revises Price Assumptions." *S&P Global* (Feb. 2, 2016). <https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/type/HTML/id/1580384> (accessed Nov. 15, 2024).

[46] "Use of CreditWatch and Outlooks." *S&P Ratings Services* (Sept. 14, 2009). <MT20131212112758c.pdf> (accessed Nov. 11, 2024) at 3.

[47] *Id.* at 3.

[48] *Id.* at 2.

[49] Krantz, Matt. "Exxon Mobil Nearly Stripped of AAA Rating." *USA Today* (Feb. 3, 2016). <https://www.usatoday.com/story/money/markets/2016/02/03/exxon-mobil-close-losing-aaa-rating/79758646/> (accessed Nov. 15, 2024).

[50] Davidson, Paul. "S&P Downgrades Oil Companies' Credit Ratings." *USA Today* (Feb. 3, 2016). <https://www.usatoday.com/story/money/2016/02/03/sp-downgrades-oil-companies-credit-ratings/79750954> (accessed Nov. 15, 2024).

CONFIDENTIAL

**App. 320**

within the next 90 days" according to S&P.[51] *Bloomberg* also published a news story titled "Exxon Faces First Downgrade Since Depression as Oil Rout Worsens" on February 2, 2016 immediately after the CreditWatch placement, but before ExxonMobil's actual downgrade.[52] In addition, *The Wall Street Journal* reported that the S&P cut the ratings of ten U.S. oil companies, also noting that ExxonMobil faced a potential downgrade.[53]

36.   S&P's placement of ExxonMobil on CreditWatch was also reported in connection with ExxonMobil's planned March 2016 bond offering. For example, a *Bloomberg* report titled "Exxon Said Planning $12 Billion Bond Sale to Build War Chest" stated that "Standard & Poor's placed the company on credit watch with negative implications on Feb. 2[.]"[54] The *Financial Times* also reported that ExxonMobil "sold $12bn of bonds, its biggest such offering," that "comes as the oil major risks losing its coveted triple A rating," due to S&P's placement of ExxonMobil "on review for a possible downgrade of its AAA status."[55] *The Wall Street Journal* reported that ExxonMobil was to sell "$12 billion of new bonds," but was "at risk of losing its triple-A rating" after S&P announced it was "was reviewing the company's rating and could downgrade it by one notch within 90 days."[56]

37.   The evidence suggests that the market was well aware of the potential downgrade indicated by the Credit Watch placement shortly after the February 2, 2016 announcement by S&P.

---

[51] Egan, Matt. "Oil Crash Could Kill Exxon's Perfect AAA Rating." *CNN Business* (Feb. 2, 2016). <https://money.cnn.com/2016/02/02/investing/exxonmobil-aaa-credit-rating-downgrade-oil/index.html> (accessed Nov. 15, 2024).

[52] Carroll, Joe. "Exxon Faces First Downgrade Since Depression as Oil Rout Worsens." *Bloomberg* (Feb. 2, 2016). <https://www.bloomberg.com/news/articles/2016-02-02/chevron-hess-join-ranks-of-downgraded-crude-oil-explorers> (accessed Nov. 14, 2024).

[53] Armental, Maria. "S&P Cuts Ratings of 10 U.S. Oil Companies." *The Wall Street Journal* (Feb. 2, 2016). <https://www.wsj.com/articles/s-p-cuts-ratings-of-10-u-s-oil-companies-1454448174> (accessed Oct. 11, 2024).

[54] Gjorgievska, Aleksandra. "Exxon Said Planning $12 Billion Bond Sale to Build War Chest." *Bloomberg* (Feb. 29, 2016). Bloomberg, L.P. (accessed Nov. 21, 2024).

[55] Bullock, Nicole and Ed Crooks. "ExxonMobil Sells $12bn of Bonds Amid Rise in Borrowings." *Financial Times* (Feb. 29, 2016). <https://www.ft.com/content/78e76856-df38-11e5-b072-006d8d362ba3> (accessed Nov. 21, 2024).

[56] Cherney, Mike. "Exxon Offers $12 Billion Bond Issue." *The Wall Street Journal* (Feb. 29, 2016). <https://www.wsj.com/articles/exxon-offers-12-billion-bond-issue-1456781873?msockid=17ea39415358632501912c6252dc62d8> (accessed Nov. 21, 2024).

CONFIDENTIAL

**App. 321**

38.   If the market reacted to the potential downgrade negatively, one would expect to see an abnormal increase in ExxonMobil's bond yields, alongside a corresponding abnormal decrease in prices and returns, following the announcement. To assess the market's reaction to the potential downgrade following S&P's CreditWatch announcement, I conducted an event study.

39.   To conduct this event study, I used a canonical mean-adjusted returns model.[57] It is "the most frequently used method of calculating abnormal bond returns."[58] I performed the event study using the following steps:

40.   First, I selected an estimation period consisting of the 60 trading days preceding February 2, 2016. This estimation period length is commonly used in academic studies.[59] I calculated the returns for ExxonMobil's bonds during the 60-day estimation period and on the event day.[60] Because bonds typically trade less frequently than stocks and individual bonds may not trade on certain days, returns were calculated over holding periods, accounting for accrued interest and coupon payment during the holding periods.

41.   Next, I matched each of ExxonMobil's bonds with a Treasury bond with the closest maturity date and coupon rate.[61] I calculated the premium bond return for each bond based on the

---

[57] *See* Handjinicolaou, George and Avner Kalay. "Wealth Redistributions or Changes in Firm Value: An Analysis of Returns to Bondholders and Stockholders Around Dividend Announcements." *Journal of Financial Economics* 13.1 (1984): 35–63. This paper has been cited more than 400 times according to Google Scholar. *See* "Google Scholar Search." *Google Scholar.* <https://scholar.google.com/ scholar?hl=en&as_sdt=0%2C32&q=Handjinicolaou%2C+George%2C+and+Avner+Kalay.+%E2%80%9 CWealth+Redistributions+or+Changes+in+Firm+Value%3A+An+Analysis+of+Returns+to+Bondholders +and+Stockholders+Around+Dividend+Announcements.%E2%80%9D+&btnG=> (accessed Nov. 24, 2024).
[58] Bessembinder, Hendrik, et al. "Measuring Abnormal Bond Performance." *The Review of Financial Studies* 22.10 (2008): 4219–58, 4232.
[59] *See, e.g.*, Handjinicolaou, George and Avner Kalay. "Wealth Redistributions or Changes in Firm Value: An Analysis of Returns to Bondholders and Stockholders Around Dividend Announcements." *Journal of Financial Economics* 13.1 (1984): 35–63.
[60] *Id.* 42–45.
[61] I excluded ExxonMobil bonds with floating rates in my analysis because there are no comparable Treasury bonds.

CONFIDENTIAL

**App. 322**

historical return on the ExxonMobil bond minus the return on the matched Treasury bond.[62] This isolates the issuer-specific effects that affect ExxonMobil bond yields from broader macroeconomic factors that affect both ExxonMobil bond yields and Treasury yields in the periods prior to the March 2016 offering.

42. I then calculated the excess premium bond returns as the difference between the premium bond returns and their average over the 60-day estimation period on the event date and all days during the estimation period, and further standardized the excess premium bond returns so that they followed a univariate Student's $t$ distribution[63] with a mean of zero for statistical convenience.[64] That is, the excess premium bond returns are expected to be zero on average. On any given day, if the excess premium bond returns are not zero, we can apply the Student's $t$ distribution to test statistically whether such deviation is due to chance or not.

43. Finally, I aggregated these excess standardized returns into daily excess portfolio returns at the firm level.[65] I then tested whether ExxonMobil's excess standardized portfolio return was significantly less than zero on February 2, 2016.

44. My analysis found that ExxonMobil's excess standardized portfolio return was not significantly less than zero on February 2, 2016. Thus, the February 2 CreditWatch placement did not have a significantly negative impact on ExxonMobil's bond returns and prices, indicating that the market deemed a potential S&P downgrade following ExxonMobil's placement on CreditWatch in February 2016 inconsequential.

---

[62] Handjinicolaou, George and Avner Kalay. "Wealth Redistributions or Changes in Firm Value: An Analysis of Returns to Bondholders and Stockholders Around Dividend Announcements." *Journal of Financial Economics* 13.1 (1984): 35–63, 43.

[63] The Student's $t$ distribution is derived from the normal distribution and is the "most popular model for economic and financial data." *See* "A Review of Student's $t$ Distribution and Its Generalizations." *Empirical Economics* 58 (Sept. 28, 2018): 1461–90, 1461.

[64] Handjinicolaou, George and Avner Kalay. "Wealth Redistributions or Changes in Firm Value: An Analysis of Returns to Bondholders and Stockholders Around Dividend Announcements." *Journal of Financial Economics* 13.1 (1984): 35–63, 44–45.

[65] *Id.* 45. I followed Handjinicolaou and Kalay's method to weight each traded bond equally. I reserve the right to modify the weighting if required.

**App. 323**

45. I conducted another event study to examine whether the market reacted negatively when S&P revised ExxonMobil's outlook to negative on October 2, 2015.[66] Like the CreditWatch placement, I did not find a significant negative effect.

46. In short, the market was well aware of S&P's placement of ExxonMobil on CreditWatch at the time of the bond issuance but deemed the potential downgrade inconsequential, as demonstrated by my event study.

## VIII.    OPINION 4: EXXONMOBIL BONDS REMAINED A STRONG INVESTMENT CHOICE IRRESPECTIVE OF THE CREDIT DOWNGRADE, AND EMPIRICAL ANALYSIS SHOWS THAT RETURNS ON EXXONMOBIL'S BONDS WERE NOT STATISTICALLY AFFECTED BY S&P'S DOWNGRADE.

47. In the March 2016 bond offering, ExxonMobil had the lowest spreads for an energy issuer despite its placement on CreditWatch.[67] Specifically, all of the fixed rate bonds in the offering were trading 65 to 150 basis points above their respective maturity matched Treasuries, which former vice president and treasurer of ExxonMobil Robert N. Schleckser considered "attractive spreads" that reflected the strength of ExxonMobil's balance sheet.[68] In other words, the rates at which ExxonMobil could borrow money remained low even with indications to the market that its credit rating was likely to be downgraded.

48. Even after S&P downgraded ExxonMobil from AAA to AA+, ExxonMobil remained a strong investment. Following the downgrade, the *Associated Press* reported that the one-notch downgrade was "more likely to bruise Exxon's corporate pride than significantly raise its borrowing costs."[69] Mr. Schleckser also expressed the expectation that there would be no meaningful or measurable difference in the interest rate ExxonMobil would have to pay

---

[66] I selected October 5, 2015 as the event date for the event study as the outlook change was announced after the market closed on Friday, October 2, 2015. However, there is still no significant negative effect if I select October 2, 2015.

[67] Robert N. Schleckser Dep. Ex. 206 (Mar. 1, 2016) (EMC_RAMIREZ 000037522); Dep. Tr. of Robert N. Schleckser dated Dec. 3, 2024 (Uncertified Rough Draft) ("Schleckser Dep. Tr.") 100:16–101:13.

[68] Robert N. Schleckser Dep. Ex. 206 (Mar. 1, 2016) (EMC_RAMIREZ 000037522); Schleckser Dep. Tr. 17:18–25.

[69] Pisani, Joseph and David Koenig. "Stung by Low Oil Prices, Exxon Loses 'AAA' Rating From S&P." *Associated Press* (Apr. 26, 2016). <https://apnews.com/stung-by-low-oil-prices-exxon-loses-aaa-rating-from-s-p-d7e77574ef1d4023a37de881142eca11> (accessed Nov. 20, 2024).

CONFIDENTIAL

**App. 324**

between bonds issued AAA or AA+.[70] The *Associated Press* further reported that an analyst at Edward Jones stated that "[e]ven at 'AA+' [ExxonMobil] has the highest credit rating of any energy company and it is higher than pretty much all of corporate America."[71]

49. Additionally, ExxonMobil senior vice president and principal financial officer Andrew P. Swiger testified that the effect of the credit downgrade on interest rates could be neutral depending on the market; a downgrade from AAA to AA+ does not guarantee a negative effect on the interest rate of the offering.[72]

50. Investors agreed, as *The New York Times* reported that "investors shrugged off the downgrade to AA+, still a stellar rating, and slightly bid up Exxon Mobil's stock price on Tuesday to close at $87.63."[73] In addition to the strong stock price, according to S&P's Credit Commentary, "ExxonMobil's long term bonds have [] continued to strengthen" after the S&P downgrade.[74] As an example, "[i]ts 2.709 [percent] coupon bond maturing in 2025 has seen its spread over treasuries (a measure of risk) fall to 61 [basis points], from 121 [basis points] in mid February."[75] *See* **Figure 4**: *Yield Over Treasuries for ExxonMobil 2.709% 2025 Bond*.

---

[70] Schleckser Dep. Tr. 102:12–22.

[71] Pisani, Joseph and David Koenig. "Stung by Low Oil Prices, Exxon Loses 'AAA' Rating From S&P." *Associated Press* (Apr. 26, 2016). <https://apnews.com/stung-by-low-oil-prices-exxon-loses-aaa-rating-from-s-p-d7e77574ef1d4023a37de881142eca11> (accessed Nov. 20, 2024).

[72] Dep. Tr. of Andrew Swiger dated Dec. 4, 2024 (Uncertified Rough Draft) ("Swiger Dep. Tr.") at 10:11–22, 199:9–200:14

[73] Krauss, Clifford. "Exxon Mobil's Sterling Credit Is Downgraded by Standard & Poor's." *The New York Times* (Apr. 26, 2016). <https://www.nytimes.com/2016/04/27/business/energy-environment/exxon-mobils-sterling-credit-is-downgraded-by-standard-poors.html> (accessed Nov. 20, 2024).

[74] "ExxonMobil Loses AAA Rating; Investors Rush to EM." *S&P Global* (Apr. 29, 2016). <https://www.spglobal.com/marketintelligence/en/mi/research-analysis/29042016-credit-exxonmobil-loses-aaa-rating-investors-rush-to-em.html> (accessed Dec. 4, 2024).

[75] *Id.*

CONFIDENTIAL

**App. 325**

**Figure 4**: Yield Over Treasuries for ExxonMobil 2.709% 2025 Bond[76]



51.   The remaining AAA bonds offered by Microsoft and Johnson & Johnson were trading 30 basis points higher, further demonstrating the strength of ExxonMobil despite the downgrade.[77] Dr. Feinstein fails to address both that investments with an AA+ rating have effectively zero credit risk in the short run (as discussed above) and that ExxonMobil specifically remained a strong bond for investors to purchase.

52.   **Figure 5**: *S&P Ratings of Investment Grade U.S. Listed Companies as of April 27, 2016* presents the number of U.S. listed companies that offer investment grade bonds at each credit rating. Given that few companies offer AAA and AA+ bonds, they are both considered "preferred habitats" by fund management institutions, such as pension funds, due to their investment restrictions.[78] Thus, both AAA- and AA+-rated bonds are continuously

---

[76] The comparable treasury I selected for this particular ExxonMobil bond is CUSIP No. 912828J27.
[77] "ExxonMobil Loses AAA Rating; Investors Rush to EM." *S&P Global* (Apr. 29, 2016). <https://www.spglobal.com/marketintelligence/en/mi/research-analysis/29042016-credit-exxonmobil-loses-aaa-rating-investors-rush-to-em.html> (accessed Dec. 4, 2024).
[78] *See* "Investor's Guide to Pensions." *Bank of America* (Jan. 2024). <https://business.bofa.com/content/dam/flagship/workplace-benefits/id20_0905/documents/investors-guide-to-pensions.pdf> (accessed Dec.

-21-                                                                          CONFIDENTIAL

**App. 326**

in high demand and ExxonMobil bonds remained a strong investment irrespective of the downgrade.

**Figure 5**: S&P Ratings of Investment Grade U.S. Listed Companies as of April 27, 2016[79]



| | |
|---|---|
| AAA | 2 |
| AA+ | 3 |
| AA | 6 |
| AA- | 16 |
| A+ | 24 |
| A | 53 |
| A- | 68 |
| BBB+ | 100 |
| BBB | 130 |

53.  To test empirically the market's reaction to S&P's downgrade, I conducted another event study, following the same methodology, with April 26, 2016 as the event day, the date when S&P downgraded ExxonMobil's credit from AAA to AA+. I found that ExxonMobil's excess standardized portfolio return was not significantly less than zero on April 26, 2016. In other words, returns (or yields) on ExxonMobil's bonds were not adversely affected on that day by the downgrade announcement.

54.  Importantly, based on the results of my empirical analyses, Dr. Feinstein's assumption that a lower credit rating would require a higher yield does not apply to ExxonMobil's March-issued bonds, and therefore his assumptions and calculations are without basis.

---

6, 2024) at 3 (noting that a pension fund's obligation is "like a hypothetical short position in a structured portfolio of AA corporate bonds" and thus an "offsetting portfolio" of AA corporates bonds minimizes a pension fund's risk, whereas allocations outside of this introduce risk).

[79] Bloomberg, L.P. (accessed Dec. 8, 2024). For instances where a company had two ratings, I utilized the highest rating of the two.

CONFIDENTIAL

**App. 327**

55. The non-effect of S&P's downgrade on ExxonMobil's bond yield is further demonstrated by a comparison of ExxonMobil's bonds issued in 2016 that carried an AAA rating, and its offering in 2019 that carried an AA+ rating. Specifically, I compared the "Spread to Benchmark Treasury," which is a bond's yield net of the yield on comparable Treasury bonds, between the 2016 and the 2019 offerings. If a lower S&P rating would effectuate an increase in bond yields as Dr. Feinstein claims, then ExxonMobil's 2019 issues would carry a higher spread over Treasuries, compared to its 2016 offering. This is not the case. Instead, I found that ExxonMobil's 2019 offerings had lower treasury spreads, despite a lower S&P rating, as shown in **Table 2**: *Spread to Benchmark Treasury for ExxonMobil Bonds Issued in 2016 and 2019*.

**Table 2**: Spread to Benchmark Treasury for ExxonMobil Bonds Issued in 2016 and 2019[80]

|  | 2016 Offering (Rated AAA) | 2019 Offering (Rated AA+) |
|---|---|---|
| 3-Year Fix Rate | 80 bps | 30 bps |
| 5-Year Fix Rate | 100 bps | 45 bps |
| 7-Year Fix Rate | 120 bps | 65 bps |
| 10-Year Fix Rate | 130 bps | 75 bps |
| 30-Year Fix Rate | 150 bps | 95 bps |

## IX.   OPINION 5: DR. FEINSTEIN'S CHOICE OF OAS OVER ALTERNATIVE YIELD CALCULATION METHODS IS NOT EXPLAINED AND IS NOT JUSTIFIED, GIVEN THE MEASURE'S LIMITATIONS.

### A.  Dr. Feinstein Does Not Justify His Usage of OAS Over Alternative, Commonly Used Methods for Calculating Yields.

56. There are several commonly used methodologies to calculate bond yields. These measures include the OAS used by Dr. Feinstein, which attempts to account for embedded call options

---

[80] Exxon Mobil Corporation. *Pricing Term Sheet* (Feb. 29, 2016). <https://www.sec.gov/Archives/edgar/data/34088/000119312516486405/d135825dfwp.htm> (accessed Dec. 5, 2024); Exxon Mobil Corporation. *Pricing Term Sheet* (Aug. 13, 2019). <https://www.sec.gov/Archives/edgar/data/34088/000119312519220122/d790468dfwp.htm> (accessed Dec. 5, 2024).

   CONFIDENTIAL

**App. 328**

and is computed using projections and assumptions of future interest rates.[81] Additional methods include yield-to-maturity ("YTM"), yield-to-call ("YTC"), and yield-to-worst ("YTW").[82] Dr. Feinstein does not justify his usage of OAS or consider how using these other commonly used measures might have changed his conclusions.

57. YTM is the "most popular measure of yield in the bond market,"[83] and relies on the assumption that a bond will be redeemed on the final date of maturity. YTM incorporates all three potential sources of an investor's dollar return on a bond: (i) coupon interest, (ii) reinvestment income, and (iii) capital gains or losses.[84]

58. YTC, on the other hand, calculates the internal rate of return to the next call date irrespective of whether the bond has been called.[85] Callable bonds give the issuer the option to purchase back its bonds at a set price before the maturity date, thus giving the issuer the option to refinance its debt at a better interest rate.[86] When a bond is callable, it is custom and practice

---

[81] "Issue Brief: Benefits and Limitations of Option-Adjusted Spread Analysis." *California Debt and Investment Advisory Commission* (2020). <https://www.treasurer.ca.gov/cdiac/publications/issue-brief/2020/20-10.pdf> (accessed Nov. 14, 2024) at 1.

[82] *Id.* at 2.

[83] Fabozzi, Frank J., ed. "Bonds: Investment Features and Risks." *Handbook of Finance, Financial Markets and Instruments, Volume 1*. Hoboken: John Wiley & Sons, Inc. (2008): 207–220, 214. *See also* Choudhry, Moorad. *An Introduction to Bond Markets, Fourth Edition*. West Sussex: John Wiley & Sons Ltd (2010) at 24 (states that YTM is "the most frequently used measure of bond return."); "Issue Brief: Benefits and Limitations of Option-Adjusted Spread Analysis." *California Debt and Investment Advisory Commission* (2020). <https://www.treasurer.ca.gov/cdiac/publications/issue-brief/2020/20-10.pdf> (accessed Nov. 14, 2024) at 2.

[84] Fabozzi, Frank J., ed. "Bonds: Investment Features and Risks." *Handbook of Finance, Financial Markets and Instruments, Volume 1*. Hoboken: John Wiley & Sons, Inc. (2008): 207–220, 214. *See also* "Issue Brief: Benefits and Limitations of Option-Adjusted Spread Analysis." *California Debt and Investment Advisory Commission* (2020). <https://www.treasurer.ca.gov/cdiac/publications/issue-brief/2020/20-10.pdf> (accessed Nov. 14, 2024) at 2.

[85] "Issue Brief: Benefits and Limitations of Option-Adjusted Spread Analysis." *California Debt and Investment Advisory Commission* (2020). <https://www.treasurer.ca.gov/cdiac/publications/issue-brief/2020/20-10.pdf> (accessed Nov. 14, 2024) at 2. *See also* Fabozzi, Frank J., ed. "Bonds: Investment Features and Risks." *Handbook of Finance, Financial Markets and Instruments, Volume 1*. Hoboken: John Wiley & Sons, Inc. (2008): 207–220, 215.

[86] "Callable Bonds: Be Aware That Your Issuer May Come Calling." *FINRA* (Apr. 19, 2024). <https://www.finra.org/investors/insights/callable-bonds-your-issuer-may-come-calling> (accessed Dec. 4, 2024).

CONFIDENTIAL

**App. 329**

to calculate a YTC in addition to a YTM.[87] Similar to YTM, YTC considers all three sources of potential returns.[88]

59.  Another option, YTW, reflects the lowest yield based on internal rates of return for all possible redemption dates and is the measure that an investor should always ask to see on all bond purchases, whether callable or not.[89] YTW is the preferred yield estimation of the Financial Industry Regulatory Authority ("FINRA"), as it "share[s] the lower of Yield to Call (retirement of the bond at a date prior to maturity) or Yield to Maturity."[90] FINRA explains that YTW provides the most conservative potential return on a bond,[91] stating further that "you should know it for every callable security."[92] Despite the fact that FINRA, a U.S. financial authority, uses YTW as its preferred methodology, Dr. Feinstein solely relies upon OAS, and provides no rationale for this choice.

60.  In fact, the flaw of Dr. Feinstein's premise becomes evident if we utilize YTW. Using Dr. Feinstein's "ad-hoc" linear interpolation approach, AA+ bonds on February 29, 2016 (the pricing date) would have been only two basis points higher than AAA bonds instead of 13 basis points as estimated using OAS. *See* **Figure 6**: *U.S. Corporate Index Semi-Annual YTW* and **Figure 7**: *U.S. Corporate Index AAA & AA YTW Spread.* As I note below, there is no theoretical or empirical justification for U.S. corporate bonds rated AA+ to have yields halfway between those rated AAA and AA.

---

[87] Fabozzi, Frank J., ed. "Bonds: Investment Features and Risks." *Handbook of Finance, Financial Markets and Instruments, Volume 1*. Hoboken: John Wiley & Sons, Inc. (2008): 207–220, 215 ("When a bond is callable, the practice has been to calculate a *yield to call* as well as a yield to maturity.").

[88] *Id.* 215.

[89] "Issue Brief: Benefits and Limitations of Option-Adjusted Spread Analysis." *California Debt and Investment Advisory Commission* (2020). <https://www.treasurer.ca.gov/cdiac/publications/issue-brief/2020/20-10.pdf> (accessed Nov. 14, 2024) at 1.

[90] "Corporate and Agency Bond Data Glossary." *FINRA.* <https://www.finra.org/finra-data/fixed-income/corp-and-agency/glossary> (accessed Nov. 19, 2024).

[91] *Id.*

[92] "Understanding Bond Yield and Return." *FINRA* (Aug. 11, 2022). <https://www.finra.org/investors/insights/bond-yield-return> (accessed Nov. 19, 2024).

CONFIDENTIAL

**App. 330**

**Figure 6**: U.S. Corporate Index Semi-Annual YTW[93]



---

[93] ICE BofA AAA US Corporate Index Semi-Annual Yield to Worst (BAMLC0A1CAAASYTW). *Federal Reserve Bank of St. Louis.* <https://fred.stlouisfed.org/series/BAMLC0A1CAAASYTW> (accessed Nov. 19, 2024); ICE BofA AA US Corporate Index Semi-Annual Yield to Worst (BAMLC0A2CAASYTW). *Federal Reserve Bank of St. Louis.* <https://fred.stlouisfed.org/series/BAMLC0A2CAASYTW> (accessed Nov. 19, 2024).

CONFIDENTIAL

**App. 331**

**Figure 7**: U.S. Corporate Index AAA & AA YTW Spread[94]



61. **Figure 7**: *U.S. Corporate Index AAA & AA YTW Spread* also illustrates the important fact that AAA-rated corporate bonds do not always have a lower YTW than AA-rated bonds. Thus, the central finding of Dr. Feinstein's analysis—that AAA-rated corporate bonds uniformly have lower yields than AA+-rated bonds——is flawed.

62. Dr. Feinstein fails to explain why he did not select or even consider any alterative yield measurements despite their frequent use in practice and their preferred use by regulators such as FINRA. This failure casts doubt on the soundness of Dr. Feinstein's conclusions.

---

[94] ICE BofA AAA US Corporate Index Semi-Annual Yield to Worst (BAMLC0A1CAAASYTW). *Federal Reserve Bank of St. Louis.* <https://fred.stlouisfed.org/series/BAMLC0A1CAAASYTW> (accessed Nov. 19, 2024); ICE BofA AA US Corporate Index Semi-Annual Yield to Worst (BAMLC0A2CAASYTW). *Federal Reserve Bank of St. Louis.* <https://fred.stlouisfed.org/series/BAMLC0A2CAASYTW> (accessed Nov. 19, 2024).

CONFIDENTIAL

**App. 332**

**B. OAS Does Not Effectively Account for Credit Events.**

63. The OAS measure used in Dr. Feinstein's analysis does not effectively account for credit events,[95] which are essential to credit ratings. Generally, the OAS model "cannot capture the effects of events that are not dependent on the interest rate process,"[96] including credit rating changes.

64. A creditor's creditworthiness is factored into the price and yield of a bond upon issuance. OAS, on the other hand, does not include potential changes to credit rating.[97] Although "a [credit] downgrading may not be completely independent of the interest rate level," OAS is unlikely to capture a change in credit rating as a function of the interest rate path and thus OAS cannot properly model the effects of the event.[98]

65. Further, OAS does not incorporate other events which can influence both interest rates and credit risk.[99] For example, OAS ignores Federal Reserve monetary policy actions.[100] Instead, OAS considers "potential yield differences due to the possibility of changing interest rates in the future," but cannot predict the rise or fall of interest rates, and thus investors are advised to consider "exogenous changes to interest rates" that will likely affect the "redemption for callable bonds."[101]

---

[95] "Issue Brief: Benefits and Limitations of Option-Adjusted Spread Analysis." *California Debt and Investment Advisory Commission* (2020). <https://www.treasurer.ca.gov/cdiac/publications/issue-brief/2020/20-10.pdf> (accessed Nov. 14, 2024) at 6 ("An issuer's creditworthiness will usually be reflected in the price and yield of the bond when it is issued, but OAS does not factor in other potential risks, such as changes to credit ratings.").

[96] Kopprasch, Robert W. "Option-Adjusted Spread Analysis: Going Down the Wrong Path?" *Financial Analysts Journal* (May-June 1994): 42–47, 46.

[97] "Issue Brief: Benefits and Limitations of Option-Adjusted Spread Analysis." *California Debt and Investment Advisory Commission* (2020). <https://www.treasurer.ca.gov/cdiac/publications/issue-brief/2020/20-10.pdf> (accessed Nov. 14, 2024) at 6 ("An issuer's creditworthiness will usually be reflected in the price and yield of the bond when it is issued, but OAS does not factor in other potential risks, such as changes to credit ratings.").

[98] Kopprasch, Robert W. "Option-Adjusted Spread Analysis: Going Down the Wrong Path?" *Financial Analysts Journal* (May-June 1994): 42–47, 46.

[99] "Issue Brief: Benefits and Limitations of Option-Adjusted Spread Analysis." *California Debt and Investment Advisory Commission* (2020). <https://www.treasurer.ca.gov/cdiac/publications/issue-brief/2020/20-10.pdf> (accessed Nov. 14, 2024) at 7.

[100] *Id.* at 7.

[101] *Id.* at 7.

CONFIDENTIAL

**App. 333**

66.  As a result, OAS is a poor measure of changes in credit risk. As such, it is an economically unreliable metric for analyzing the changing credit risk of ExxonMobil's bonds as Dr. Feinstein does.

### C.  The OAS Value Is Sensitive to Model Assumptions, and Dr. Feinstein Has Not Performed Any Sensitivity Analyses.

67.  OAS relies on a set of assumptions in calculating yield. Notably, OAS looks at several possible redemption dates, along with possible interest rate paths, and then uses an averaging approach to calculate the expected yield for the bond.[102] Consequently, the resulting OAS value is sensitive to the underlying model and assumptions and can have limitations to its applications.[103]

68.  The OAS measurement relies on assumptions about interest rate volatility.[104] The volatility parameter selected may lead to an overestimated or underestimated OAS value, depending on actual volatility measurements.[105] **Table 3**: *OAS for ExxonMobil Bonds Using a Log-Normal Model and Varying Volatility* shows how OAS may vary within the Log-Normal Model, solely based on changes in volatility (represented by "V").[106]  Dr. Feinstein did not provide any details on the volatility assumption associated with the OAS he used and did not examine whether that volatility assumption would be consistent with what ExxonMobil's bonds have experienced.

---

[102] Kopprasch, Robert W. "Option-Adjusted Spread Analysis: Going Down the Wrong Path?" *Financial Analysts Journal* (May-June 1994): 42–47, 1.

[103] "Issue Brief: Benefits and Limitations of Option-Adjusted Spread Analysis." *California Debt and Investment Advisory Commission* (2020). <https://www.treasurer.ca.gov/cdiac/publications/issue-brief/2020/20-10.pdf> (accessed Nov. 14, 2024) at 3-4. *See also* Babbel, David F. and Stavros A. Zenios. "Pitfalls in the Analysis of Option-Adjusted Spreads." *Financial Analysts Journal* 48.4 (July-Aug. 1992): 65–69, 66.

[104] Babbel, David F. and Stavros A. Zenios. "Pitfalls in the Analysis of Option-Adjusted Spreads." *Financial Analysts Journal* 48.4 (July-Aug. 1992): 65–69, 65.

[105] "Issue Brief: Benefits and Limitations of Option-Adjusted Spread Analysis." *California Debt and Investment Advisory Commission* (2020). <https://www.treasurer.ca.gov/cdiac/publications/issue-brief/2020/20-10.pdf> (accessed Nov. 14, 2024) at 5.

[106] A negative OAS value means that a bond is offering a lower yield than a comparable risk-free security. This is the case for three of the four bonds across a range of volatility assumptions under a Log-Normal model.

CONFIDENTIAL

**App. 334**

**Table 3**: OAS for ExxonMobil Bonds Using a Log-Normal Model and Varying Volatility[107]

| CUSIP | V = 14 | V = 50 | V = 75 | V = 100 | V = 140 |
|---|---|---|---|---|---|
| 30231GAV4 | -163.6 | -165.2 | -165.9 | -166.5 | -167 |
| 30231GAR3 | -109.5 | -112 | -113 | -113.7 | -114.4 |
| 30231GAT9 | -77 | -79.67 | -80.66 | -81.28 | -81.92 |
| 30231GAW2 | 43.58 | 42.64 | 42.34 | 42.15 | 41.95 |

69. Furthermore, different OAS models will render different results. For example, a Bloomberg terminal allows users to see the OAS value from five different models of the distribution of interest rates.[108] Generally, the ability for investors to select from multiple models indicates that "the OAS value for any particular bond will depend on which model is used," and thus "[t]he dependency of OAS estimates on the underlying model has implications on investor decision-making."[109]

70. **Table 4**: *OAS for ExxonMobil Bonds Using Different Models* presents OAS for fixed callable ExxonMobil Notes across various models. All other factors are held constant (price, curve, volatility, benchmark settle date[110]) with a settlement date of March 4, 2016. Dr. Feinstein does not conduct any sensitivity analysis for his OAS.

---

[107] Bloomberg, L.P. (accessed Nov. 25, 2024).

[108] "Issue Brief: Benefits and Limitations of Option-Adjusted Spread Analysis." *California Debt and Investment Advisory Commission* (2020). <https://www.treasurer.ca.gov/cdiac/publications/issue-brief/2020/20-10.pdf> (accessed Nov. 14, 2024) at 3.

[109] *Id.* at 3.

[110] The benchmark settlement date must occur following the issue date of the benchmark bond. Thus, each at-issue bond in the table may have a different benchmark settlement date.

CONFIDENTIAL

**App. 335**

**Table 4**: OAS for ExxonMobil Bonds Using Different Models[111, 112]

| CUSIP | Log-Normal | Log-Normal With Mean Reversion | Normal With Mean Reversion | Linear Gauss Markov |
|---|---|---|---|---|
| 30231GAV4 | -163.6 | -163.6 | -180.1 | -163.2 |
| 30231GAR3 | -109.5 | -109.4 | -137.2 | -109.2 |
| 30231GAT9 | -77 | -76.83 | -109 | -76.79 |
| 30231GAW2 | 43.58 | 43.77 | 228.6 | 43.46 |

71.  Given that OAS requires multiple assumptions that directly impact its value, it is critical that individuals utilizing the measure consider these assumptions, and the resulting changes to the OAS values, because such changes can be substantial,[113] and it is common for analysts to consider alternative OAS values. Dr. Feinstein, however, fails to analyze how alternative assumptions might impact his conclusions.

72.  In addition to the general limitations of the OAS model, Dr. Feinstein includes only one OAS measure from FRED[114] in his analysis and that index is based on rating classes, not individual ExxonMobil bonds.

73.  In sum, Dr. Feinstein's inclusion of only one OAS analysis, which relates to rating classes and not individual ExxonMobil bonds, and his failure to consider how alternative assumptions might affect his results, render his conclusions economically unsound.

---

[111] Volatility is set to 14 for this exercise, because "industry practices used by broker-dealers and investment advisors over several years have led to a convention of consistently overwriting the volatility value to 14 when pricing and selling bonds." *See* "Issue Brief: Benefits and Limitations of Option-Adjusted Spread Analysis." *California Debt and Investment Advisory Commission* (2020). <https://www.treasurer.ca.gov/cdiac/publications/issue-brief/2020/20-10.pdf> (accessed Nov. 14, 2024) at 5.

[112] Bloomberg, L.P. (accessed Nov. 25, 2024).

[113] *See* Babbel, David F. and Stavros A. Zenios. "Pitfalls in the Analysis of Option-Adjusted Spreads." *Financial Analysts Journal* 48.4 (July-Aug. 1992): 65–69, 69.

[114] Dr. Feinstein used the "ICE BofA AAA US Corporate Index Option-Adjusted Spread," created by Ice Data Indices LLC and published on FRED for AAA and AA ratings. *See* Feinstein Report ¶ 175 & nn. 158–61.

CONFIDENTIAL

**App. 336**

### D. OAS Model Predictions Do Not Equal Actual Realized Returns.

74. In addition to their sensitivity to model parameters, OAS model predictions do not match realized returns in the real world. Instead, an OAS value is better thought of as the security's return over an "average" possible future interest rate path, not the actual interest rate path that occurs in practice.[115] As part of that "averaging," OAS is computed by simulating many possible future interest rate paths, each representing interest rate movements that may or may not be realized in practice. A model is then used to calculate a single OAS value such that the theoretical security price, averaged over the different simulated paths, matches the actual security price observed in the market.[116]

75. Because of this "averaging" in calculating OAS, "it is extremely unlikely that a security will actually earn its calculated OAS."[117] Instead, a security may realize either a higher or lower return than the one implied by the OAS models, with the results depending on the particular path of interest rates that actually occurs.[118]

76. This feature of OAS models, along with their sensitivity to model parameters, is yet another reason that Dr. Feinstein's reliance on one single OAS model based on indices is unwarranted, and calls into question his results.

## X. OPINION 6: MARKET AVERAGES PROVIDE LIMITED INSIGHT INTO INDIVIDUAL BONDS, AND AVERAGE OAS BASED ON FEW DATA POINTS IS PRONE TO LARGE STANDARD ERRORS.

77. The AAA and AA OAS measures Dr. Feinstein relies upon reflect market averages and provide limited insight into individual bonds.

---

[115] Kopprasch, Robert W. "Option-Adjusted Spread Analysis: Going Down the Wrong Path?" *Financial Analysts Journal* (May-June 1994): 42–47, 43 ("Because it's the result of an averaging process, OAS represents a summary of what the future may hold, not a promise.").

[116] Babbel, David F. and Stavros A. Zenios. "Pitfalls in the Analysis of Option-Adjusted Spreads." *Financial Analysts Journal* 48.4 (July-Aug. 1992): 65–69, 65.

[117] Kopprasch, Robert W. "Option-Adjusted Spread Analysis: Going Down the Wrong Path?" *Financial Analysts Journal* (May-June 1994): 42–47, 43.

[118] *Id.* 43.

CONFIDENTIAL

**App. 337**

78. The OAS measures relied upon by Dr. Feinstein in his analysis[119] are the AAA and AA "subset[s] of the ICE BofA US Corporate Master Index tracking the performance of US dollar denominated investment grade rated corporate debt publicly issued in the US domestic market."[120] This OAS measure reflects a daily market average of all U.S. corporate bonds and thus is not representative of the OAS value of any particular bond.

79. Dr. Feinstein applies the market average difference between OAS for AAA- and AA-rated issuers on February 29, 2016, which was aggregated over both ExxonMobil and non-ExxonMobil bonds, to the individual bonds issued by ExxonMobil.[121] While a market average may be useful in certain circumstances, it does not reflect the nuances of a particular bond such as any one of the ExxonMobil bonds issued in March 2016.

80. Because of varying bond characteristics, a bond rating market average OAS rarely captures the unique risk factors of any individual bond, such as its maturity date, coupon, and callable features, which all impact the OAS value on an individual bond. Applying the spread derived from bond rating market average OAS to individual bonds with different coupon rates, call features, and times to maturity yields results that are not meaningful for an individual ExxonMobil bond.

81. Bonds, even within the same rating category, can have very different characteristics. This is demonstrated by ExxonMobil's bonds issued in March 2016, which vary in maturity date, coupon, amount, and callable features. For example, the term to maturity, or the time period over which a bondholder can expect to receive interest payments before the principal is paid in full, varies between each individual bond and directly impacts the yield.[122] ExxonMobil's bonds issued in March 2016 with the shortest term to maturity had a maturity date of March

---

[119] Feinstein Report ¶ 175.

[120] "ICE BofA AAA US Corporate Index Option-Adjusted Spread (BAMLC0A1CAAA) - Notes Section." *FRED.* <https://fred.stlouisfed.org/series/BAMLC0A1CAAA> (accessed Nov. 18, 2024); "ICE BofA AA US Corporate Index Option-Adjusted Spread (BAMLC0A2CAA) - Notes Section." *FRED.* <https://fred.stlouisfed.org/series/BAMLC0A2CAA> (accessed Nov. 18, 2024).

[121] *See* Feinstein Report supporting material, "Bond_Calculation.xlsx."

[122] Fabozzi, Frank J., ed. "Bonds: Investment Features and Risks." *Handbook of Finance, Financial Markets and Instruments, Volume 1*. Hoboken: John Wiley & Sons, Inc. (2008): 207–220, 208–09.

CONFIDENTIAL

**App. 338**

1, 2018, while the longest has a maturity date of March 1, 2046.[123] This demonstrates how even within the same bond offering the characteristics of the bonds may be significantly different.

82. Even if it were appropriate to rely on the bond rating market average to infer the OAS value of an individual bond (which it is not), the number of companies rated AAA has been steadily declining. In the 1980s, there were roughly 60 AAA companies, but by March 2016, there were only two left other than ExxonMobil (Johnson & Johnson and Microsoft),[124] and as a result there are a small number of data points in the AAA market average OAS used by Dr. Feinstein. When calculating an average based on such a limited number of data points, the resulting estimate will have a large standard error.[125] The standard error measures the variability of a sample statistic, in this case the average, in relation to the population it is estimating.[126] A large standard error undermines the reliability of the average, and makes comparisons between the average and any individual bond even more unreliable.

### XI. OPINION 7: THERE IS NO ECONOMIC FOUNDATION TO SUPPORT A LINEAR INTERPOLATION OF AA+ OAS BETWEEN AAA AND AA OAS.

83. Beyond the substantial issues with Dr. Feinstein's analysis due to his use of OAS and market averages, there are additional issues with how Dr. Feinstein purports to estimate an AA+ OAS. In the absence of an OAS value for the AA+ bond rating class, Dr. Feinstein "interpolated linearly" between the AA index OAS and the AAA index OAS to derive his AA+ index OAS.[127] However, there is no statistical or economic rationale to support Dr.

---

[123] Exxon Mobil Corporation. *Pricing Term Sheet* (Feb. 29, 2016). <https://www.sec.gov/Archives/edgar/data/34088/000119312516486405/d135825dfwp.htm> (accessed Dec. 5, 2024).
[124] Egan, Matt. "Oil Crash Could Kill Exxon's Perfect AAA Rating." *CNN Business* (Feb. 2, 2016). <https://money.cnn.com/2016/02/02/investing/exxonmobil-aaa-credit-rating-downgrade-oil/index.html> (accessed Nov. 15, 2024); Groth, Aimee. "4 U.S. Companies Are Now Rated Higher Than the Government." *Business Insider* (Aug. 6, 2011). <https://www.businessinsider.com/aaa-rating-us-companies-2011-8> (accessed Nov. 20, 2024).
[125] The standard error shrinks to zero as a sample size grows. Wooldridge, Jeffrey M. *Introductory Econometrics, A Modern Approach, Fifth Edition.* Mason: South-Western (2012) at 777.
[126] The standard error is the best estimate of the standard deviation of a sampling distribution to a specific parameter, in this case the average or mean. *See id.* at 777.
[127] Feinstein Report ¶ 176.

CONFIDENTIAL

**App. 339**

Feinstein's assumption that the AA+ index OAS would lie exactly at the midpoint between the AAA OAS and the AA OAS.

84. Dr. Feinstein claims that linear interpolation to achieve intermediate credit ratings is a "generally accepted and commonly used methodology in the finance literature."[128] However, the S&P Global Ratings' methodology and criteria cited by Dr. Feinstein to support his approach relates to a transaction analysis for commercial mortgage-backed securities ("CMBS") that did not use OAS. Moreover, that methodology was specifically for "rating European commercial mortgage-backed securities," not U.S. corporate bonds.[129] Because this methodology was not intended for U.S. corporate bonds and CMBS are very different instruments than corporate bonds,[130] it cannot be reliably utilized in the context of calculating the OAS of ExxonMobil's March 2016 corporate bonds.

## XII.   OPINION 8: DR. FEINSTEIN'S CALCULATION OF ADDITIONAL INTEREST EXPENSE TO EXXONMOBIL IS INCORRECT.

85. Dr. Feinstein opines that "had the Exxon Notes been issued with a 'AA+' rating instead of a 'AAA' rating, the required yield from the Notes would have had to be 0.13% greater[.]"[131] He then applies "this higher coupon yield to all contractual cash flows [on the March 2016 Exxon notes] out to maturity," and concludes that "the higher yield would have cost Exxon $831.95 million in greater interest expense."[132] Dr Feinstein's approach inappropriately fails to address the fact that some of the at-issue ExxonMobil bonds were callable before maturity, and further improperly values the interest payments.

86. Dr. Feinstein did not address the fact that four of ExxonMobil's bonds that were issued in March 2016 could be called early. In fact, ExxonMobil can redeem any of these four bonds

---

[128] *Id.* ¶ 176.
[129] "Criteria | Structured Finance | CMBS: European CMBS Methodology and Assumptions." *S&P Global* (July 26, 2024). <https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/sourceId/13157087> (accessed Nov. 18, 2024).
[130] One example of why CMBS are different from corporate bonds is that the former may be subject to "prepayment risk" depending on the CMBS tranche and the path of interest rates.
[131] Feinstein Report ¶ 177.
[132] *Id.* ¶ 177.

CONFIDENTIAL

**App. 340**

at any time before maturity.[133] If interest rates fell and those bonds were called early, it would have reduced ExxonMobil's interest payments.

87. In doing his calculations, Dr. Feinstein essentially assumes that none of these callable bonds would be redeemed prior to maturity. As illustrated below, changing this assumption affects his calculations. **Table 5**: *Dr. Feinstein's Interest Calculation Using Alternative Hypothetical Call Dates* shows relevant interest payments calculated until a bond's called on the hypothetical call date and compares them to the interest payments calculated by Dr. Feinstein until the maturity date.[134] Holding everything else the same, the increase in interest payments calculated under Dr. Feinstein's methodology would be reduced by $28,566,485 if one instead assumes that all four of these bonds were or will be called on these hypothetical call dates.[135]

**Table 5**: Dr. Feinstein's Interest Calculation Using Alternative Hypothetical Call Dates[136]

| CUSIP | Maturity Date | Hypothetical Call Date | Feinstein Calculated Increased Interest Payment at Maturity | Feinstein Calculated Increased Interest Payment at Hypothetical Call Date | Feinstein Overstated Amount |
|---|---|---|---|---|---|
| 30231GAV4 | 3/1/2021 | 2/1/2021 | ($35,957,378.00) | ($35,290,480.51) | ($666,897.50) |
| 30231GAR3 | 3/1/2023 | 1/1/2023 | ($27,215,337.52) | ($26,444,392.18) | ($770,945.33) |
| 30231GAT9 | 3/1/2026 | 12/1/2025 | ($87,065,035.66) | ($84,235,189.21) | ($2,829,846.45) |
| 30231GAW2 | 3/1/2046 | 9/1/2045 | ($660,333,016.91) | ($636,034,221.16) | ($24,298,795.75) |
| **Total** | | | | | **($28,566,485)** |

---

[133] The redemption prices vary depending on the redemption date. Exxon Mobil Corporation. *Prospectus Supplement* (Feb. 29, 2016).

[134] This calculation is for illustrative purpose only and does not constitute endorsement of Dr. Feinstein's methodology, which is flawed and unreliable in my opinion. The hypothetical dates I selected are "par call dates" on which ExxonMobil can redeem at a price equal to 100 percent of the principal amount.

[135] Two of these bonds, 30231GAV4 and 30231GAR3, have matured without being called. However, Dr. Feinstein has not done any analysis on whether these two bonds would have been called if they were issued with his counterfactual interest rates.

[136] Feinstein Report supporting material, "Bond_Calculation.xlsx."

CONFIDENTIAL

**App. 341**

88. In addition to failing to address bond callability, Dr. Feinstein's calculation also improperly fails to adjust for the time value of money. The time value of money is a fundamental principle in economics and finance, which states that a dollar today is worth more than a dollar next year (because a dollar today can earn interest over that year). Therefore, for example, one cannot simply add a dollar today to a dollar next year to get two dollars.[137] Yet, this is exactly what Dr. Feinstein did.

89. Specifically, Dr. Feinstein calculates the future value ("FV") of interest payments as of the maturity date of each bond. Each of the eight bonds he analyzes has a different maturity date, ranging from February 29, 2018, to March 1, 2046. Consequently, his calculated "future values" of interest payments represent dollar values for different future dates. In other words, Dr. Feinstein's calculation effectively adds 2018 dollars to 2046 dollars in 2046, a calculation that fails to properly reflect the time value of money.

90. Instead of adding up FVs at different dates like Dr. Feinstein did (which is inappropriate), the proper way to adjust for the time value of money is to calculate the present value ("PV") of future cash flows. PV represents the amount that, if received today, would be viewed as equivalent to those future cash flows. For example, if someone were due to receive $1,000 in five years' time, this would be worth $783.53 in PV using a rate of return of five percent compounded annually, under the assumption that the value will grow between now and the future date (in five years) when the payment was due.

Dated: December 10, 2024

Anthony Saunders, Ph.D.

---

[137] Brealey, Richard A., Stewart C. Myers, and Franklin Allen. *Principles of Corporate Finance, Thirteenth Edition.* New York, NY: McGraw-Hill Education (2020) at 20.

    CONFIDENTIAL

**App. 342**

# Appendix A

## Curriculum Vitae

October 2024

## Professor Anthony Saunders

**Office**

Department of Finance
Kaufman Management Center
Stern School of Business, New York University
44 West 4th St., Rm. 9-91
New York, N.Y. 10012
(212) 998-0711 (office)
(212) 998-0312 (office/secretary)
(212) 995-4232 (fax)
E-mail: asaunder@stern.nyu.edu
Website: http://www.stern.nyu.edu/~asaunder
SSRN Author Page is:
http://ssrn.com/author=17647

**Primary Areas of Interest**

Financial institutions, international finance/banking and financial economics.

**Education**

London School of Economics, 1968-71, BS, 1971, Monetary Economics
London School of Economics, 1971-72, MS, 1972, Money and Finance
London School of Economics, 1976-81, Ph.D., 1981, Thesis title:
     "The Behavior and Performance of the London Clearing Banks, 1965-1977"

**Current Position**

Stern School of Business, New York University
John M. Schiff, Professor of Finance
Management Committee, Department of Finance

**Previous Positions**

Chairman of the Department of Finance (1995-96 and 97-2007)
Stern School of Business, New York University
Assistant Professor of Finance (1978-1982)
Associate Professor of Finance (1982-1987)
Professor of Finance (1987- )
Professor of International Business and Finance (1988- )

**App. 344**

Director of Undergraduate Studies in Finance (1983-1985)
Acting Director of the Salomon Brothers Center for the Study of Financial Institutions (September 1984-85)
Associate Director of the Salomon Brothers Center for the Study of Financial Institutions (1985-)

Courses taught: Money and Banking: BS
Risk Management in Financial Institutions: MBA
Seminar in Banking: Ph.D.
Introduction to Finance: MBA
Credit Risk: EMBA
NYU Executive Programs on Risk Management

**Current Advisory Positions**

President – Financial Management Association (2011)
Nobel Prize in Economics, Nomination Committee (2000- )
Investment Advisory Board, Zurich Financial Services (2003-2017)

**Visiting Positions – Non-Academic**

Comptroller of Currency
IMF
Federal Reserve Board of Governors
Federal Reserve Board of Philadelphia
Federal Reserve Board of New York

**Visiting Positions – Academic**

Pembroke Visiting Chaired Professor of International Finance, University of Cambridge
Stockholm School of Economics (Sweden)
INSEAD (France)
City University (London)
University of Melbourne (Australia)
ISEAS (Singapore)
University of Bocconi (Italy)
University of Otago (New Zealand)
HKUST (Hong Kong)
University of St. Andres (Argentina)
ALBA (Greece)
London School of Economics

**Consulting Experience (selected)**

| | |
|---|---|
| 2024 Quinn Emanuel | Iraqi Telecom vs. IBL Bank, Lebanon (Expert Witness) |
| 2024 BPI/Gibson Dunn | Critique of Fed Proposal for Basel 3 Implementation in the US. |
| 2023 Lovell etal | Manipulation of the Oil Futures Price by Vega traders (expert witness) |
| 2022 Lovell etal | Fixing of the Australian Bank Rate (expert witness) |

**App. 345**

| | | |
|---|---|---|
| 2020 | Bartlitt Beck | Apr vs. General Electric(expert witness). |
| 2018 | Leiff Cabraser | Libor Fixing |
| 2018 | Quinn Emanuel | Refinancing Corp., Mortgage Servicing Claims (expert witness). |
| 2018 | Levi and Korsinsky | Altisource Residential Corp. |
| 2018-2024 | Scott and Scott | Pricing fixing in Odd Lots, SSA Securities, Fannie and Freddie Securities (Consultant). |
| 2017 | Hogan Lovells | Market for Second Lien Mortgages (Consultant). |
| 2017 | Quinn Emanuel | HEMT vs DLJ/SPS (expert witness). |
| 2016 | Quinn Emanuel | FHFA v. RBS. (deposition testimony). |
| 2016 | Bryan Cave | Citizens Central Bancorp vs FDIC (Consultant). |
| 2016 | Bartlitt-Beck, et al. | MassMutual vs Credit Suisse et al. (expert witness). |
| 2016 | Korein Tillery, et al. | NCUA vs RBS, NCUA vs UBS, NCUA vs CS (expert witness). |
| 2015 | Quinn Emanuel, LLP | MassMutual vs Countrywide, MassMutual vs DB DB Structured Products (Deposition testimony). |
| 2014 | U.S. Dept. of Justice | Starr Int'l Co. v. US (Fed. C1.) (Deposition and Trial testimony). |
| 2014 | Wolf Haldenstein et al. | Zelouf vs Zelouf (NY Sup Ct.) (Trial testimony). |
| 2014 | Quinn Emanuel, LLP | FHFA v. Goldman, Sachs & Co. et al. (S.D.N.Y) FHFA v. Nomura Inc. (S.D.N.Y) (deposition testimony). |
| 2014 | Levi and Korsinsky | Ausikaitis v. Kiani, et al. (D. Del.) (deposition testimony). |
| 2013 | Levi and Korsinsky | OCZ Technology Inc. (expert witness). |
| 2012 | Leiff Cabraser Heimann and Bernstein | LIBOR Manipulation (consultant). |
| 2012 | Internal Revenue Service | Bank of New York Mellon Corp. v. IRS (U.S. Tax Ct. NY). |
| | | Structured Finance transactions by BONY (expert |

witness) (deposition & trial testimony).

| | | |
|---|---|---|
| 2012 | Horwitz, Horwitz, and Paradis | Bank of America's acquisition of Merrill Lynch (expert witness; Bank of America shareholder derivative action). |
| 2012 | Securities and Exchange Commission | SEC vs. Directors of Indymac (C.D. Cal.) (expert witness) (deposition testimony). |
| 2011 | Gardant Communications | Takeover of Bank of Moscow (consulting report). |
| 2011-2014 | Burg Simpson | Pursuit Partners vs. UBS (Conn. Super. Ct.) (expert witness – synthetic MBS value triggers) (deposition & trial testimony). |
| 2011 | Stephenson Harwood (UK) | BTA vs. Republic of Kazakhstan (International arbitration – expert witness bank solvency). |
| 2011 | Quinn, Emmanuel, et al. | ADIA vs. Citicorp (Consultant; price paid for Citicorp shares). |
| 2011 | White and Case | Calyon vs. Black Diamond (Expert witness; rights of majority owners in a syndicated loan liquidation). |
| 2011 | Patterson Belknap | Ambac vs. Bata (expert witness, value of swaps). |
| 2011 | Herbert Smith (Hong Kong) | New Cotai vs. East Asia Satellite Television (expert witness, conditions in the loan syndication market during the crisis). |
| 2010 | Australian Government | Australian Tax Authority vs. G.E. (expert witness, parent debt guarantee fees). |
| 2009-2010 | Boise, Schiller and Flexner | Lehman vs. Barclays (Bank. S.D.N.Y.). (expert witness, solvency of Lehman) (deposition testimony). |
| 2009 and 2013 | Black and Fine, et al. | New Mexico Pension Fund cases on MBS (expert witness, value of mortgage backed securities). |
| 2009 | Bass, Berry and Sims and Sullivan and Cromwell | Regions Bank Class Action (expert witness, the performance of Morgan Keegan Bond Funds during the Current Credit Crisis). |

**App. 347**

| | | |
|---|---|---|
| 2008 | Donovan and Associates | Sovereign Bank vs. Santander (Pennsylvania) (expert witness, Merger premium paid for Sovereign Bank by Santander during the crisis), (trial testimony). |
| 2008 | Czech Republic Bank | Foreign Bank Acquisition of Domestic (Czech) (Int'l Ct. Arb. London), (expert witness, International arbitration). |
| 2008 | Canada Customs and Revenue Agency | GE Capital Canada vs. Canada Customs and Revenue) (Toronto, Canada) (expert witness, regarding payment of debt guarantee fees to GEC by GEC Canada) (trial testimony). |
| 2008-2011 | Morrison and Foerster | Olympus Capital vs. Loan Star (Int'l Ct. Arb. Singapore) (expert witness, international arbitration over purchase of shares in a credit card company) (arbitration testimony). |
| 2007 | Boies, Schiller & Flexner | Genesco vs. Finish Line (UBS) (Tenn. Ch. Ct.) (expert witness Credit Market conditions and loan commitments during the crisis) (trial testimony). |
| 2007 | Andrews Kurth | Mirant (MCAR) Bankruptcy Trustees vs Trustees vs. Southern Company (expert witness, solvency of Mirant) (deposition testimony). |
| 2007 | Bernstein, Leibhard | UGCOM vs. LMI Minority share purchase (expert witness, value of Minority share purchase) (deposition testimony). |
| 2007 | Mark Krishner/Refco (Bankruptcy Trustee)/Milbank, Tweed et al. | Thomas Lee, et al. and others (consultant on solvency issues). |
| 2007 | Parker Freedland et al. | Class action vs. Iridium, (expert witness; fraud on the Market), (deposition testimony). |
| 2007 | Hogan and Hartson | CSFB vs. Calyon Bank Loans and Securitization (consultant). |
| 2006 | Black and Fine | Class action vs. JP Morgan (expert witness, Copper Prices and structured finance), (deposition |

**App. 348**

testimony).

| 2006 | Crotchett, Pitre, Simon and McCarthy | Silvercreek vs. Salomon, Smith, Barney et al. (expert witness). |
|------|--------------------------------------|-----------------------------------------------------------------|
| 2006 | Greer, Herz, and Adams | Structured Finance Products, Texas Pension Funds, Enron and Banks (expert witness) (deposition testimony). |
| 2006 | Milberg Weiss | PMA class action (expert witness). |
| 2006 | Grant and Eisenhofer | Structured Finance Products, Ohio Pension Funds, Enron and Banks (expert witness) (deposition testimony). |
| 2006 | Pepe and Hazard | Structured Finance Products, CRRA, Enron and Banks (expert witness). |
| 2006 | Pepe and Hazard | Enron's Creditworthiness (expert witness) (deposition testimony). |
| 2006-2011 | Government of New Zealand (IRD) | Structured Finance Products, Sovereign Insurance, Westpac, Deutsche Bank and BNZ multiple cases (expert witness). |
| 2005 | Debevoise Plimpton | Valuation of Life Insurance Contracts (consultant). |
| 2005 | Pepe and Hazard | Enron and the rating agencies (consultant). |
| 2005-2006 | King and Spalding | Reports on restructuring of Hynix (expert witness). |
| 2005 | Department of Justice | Goodwill and FIRREA, Carteret Savings Bank and Ambase (Fed. Cl.) (expert witness) (deposition & trial testimony). |
| 2005 | Milberg Weiss | Asia Pulp and Paper class action (expert witness) (deposition testimony). |
| 2004 | Department of Justice | ENRON: Bayly et al., Nigerian Barges – criminal case (S.D. Tex.) (expert witness) (trial testimony). |
| 2003-2004 | Department of Justice | Goodwill and FIRREA, Perpetual Savings Bank (Fed. Cl.) (expert witness) (deposition testimony). |
| 2004 | Milberg Weiss | Nortel class action (expert witness) (deposition |

**App. 349**

| | | |
|---|---|---|
| | | testimony). |
| 2003 | Hale and Dorr | |
| | | Hynix dumping of DRAMS (expert witness). |
| 2001-2006 | Department of Justice | Losses Related to the Goodwill Provisions of the Financial Institutions, Reform and Recovery, 5th-3rd, and D and N Banks (Fed. Cl.) (expert witness) (deposition & trial testimony). |

**Research**

Ranked No. 2 over the last 75 years in publishing in the top 10 finance journals. K. Chung et al., "Conservatism and Representative Heuristic in Peer Reviews: Evidence from he Finance Literature" )SSRN WP August 2023).

Ranked No.1 as the "Most Prolific Author" in 16 core Finance Journals over 50 years…see, P.L. Cooley and J.L. Heck, "Prolific Authors in the Finance Literature: A Half Century of Contributions", Journal of Finance Literature, Vol 1, Winter 2005, pp. 46-69 and the most prolific author in the Finance Literatures top seven journals for 1959-2008 in Jean L. Heck and Philip L. Cooley, "Most Prolific Authors in the Finance Literature: 1959-2008, (http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1355675). Top researcher of Formal Collaboration in Financial Economics, 1998-2008 in George and Rose "Mirror Mirror on the Wall who is the Most Central of them All", ERSA working paper, January 2016.

**Publications(selected)**
**(i)      Journals**

"Bank Specialization" (with Bickle and Palatore), *Journal of Finance* (forthcoming)

"What's in the Spread? The Predictive Power of Loan verses Bond Spreads" (with Steffen, Sprina and Streitz), *Review of Financial Studies* (forthcoming).

"Do Corporate Depositors Risk Everything for Nothing", (with Imbierowicz and Steffen). *Journal of Money, Credit, and Banking.* (forthcoming)

"Fed Information Shocks and the Market for Corporate Control: Predictive Causal Effects "(with Barbopoulos et al), Journal of Corporate Finance (forthcoming).

"The Real Economic Costs of the Bank Tax" (with Borsuk et al.), *Journal of Financial Stability* (forthcoming).

"Private Information Dissemination in the Secondary Loan Market" (with Shao et al.), *Journal of Financial Markets 2024*.

"Cross Sectional Dispersion of Corporate Earnings and Bank Performance", *Journal of Banking and Finance, 2022.*

"Explicit Deposit Insurance Design: International Effects on Bank Lending during the Global Financial Crisis" (with Hasan et al.), *Journal of Financial Intermediation 2022.*

"Underwriting as Certification of Bank Bonds (with Carbo-Valverde and Rodriguez), *Journal of Corporate Finance*, 2022.

"The Wolves of Wall Street: Managerial Attributes and Bank Business Models" (with Hagendorff et al.), *Journal of Financial Intermediation*, 2022.

"Is Bailout Insurance and Tall Risk Priced in Bank Equities? (with Del Viva et al.), *Journal of*

**App. 350**

"International Lending: The Role of Lender's Home Country" (with Dai and Beyhaghi), Journal of Money Credit and Banking 2021.

"U.S. Government TARP Bailout and Bank Lottery Behavior" (with Viva et al.), Journal of Corporate Finance. 2021

"Brexit and the Contraction of Syndicated Lending" (with Berg et al.), Journal of Financial Economics. 2021

"Bank Relationship Loss: The Moderating Effect of Information Opacity", Journal of Banking and Finance. 2020

"Big Banks, Low Margins: What is the Future of Banking?", *Journal of Financial Markets and Institutions*, 2020.

"Trends in Corporate Borrowing" (With Berg and Steffen), *Annual Review of Financial Economics* (forthcoming).

"Macroeconomics News and Acquirer Returns in M and A's: The Impact of Investor Alertness" (with Barbopoulos), *Journal of Corporate Finance*, 2020.

"Non-core Banking. Performance and Risk" (With Schmid and Walter), *Journal of Financial Stability*, 2020.

"The Impact of Monetary Policy on M&A Outcomes" (with Barbopoulos), *Journal of Corporate Finance*, 2020.

"Do Hedge Funds Trade on Private Information" (with Klein et al.), *Journal of Portfolio Management*, 2019.

"Bank Monitoring and CEO Risk-Taking Incentives", *Journal of Banking and Finance*, 2018.

"Syndication, Interconnectedness and Systemic Risk" (with Steffen et al.), *Journal of Financial Stability*, 2019.

"Hedge Funds in M and A: Is there Exploitation of Private Information?" (with Massoud et al.), *Journal of Corporate Finance*, 2018.

"Covenant Violations and Dynamic Loan Contracting" (with Imbierowicz, et al.), *Journal of Corporate Finance*, 2017.

"Why and How Do Banks Lay Off Credit Risk?" (with Beyhaghi and Massoud), J*ournal of Corporate Finance*, 2017.

"Mind the Gap: The Difference between US and European Loan Rates" (with Berg, Steffen and Strietz), *Review of Financial Studies*, 2017.

"The Total Cost of Corporate Borrowing: Don't Forget the Fees" (with Berg and Steffen), *Journal of Finance*, 2016.

"Do Transactional Loans Behave Differently from Relationship Loans" (with Li and Shao), *Journal of Money Credit and Banking*, 2015.

**App. 351**

"Should Short Selling of Stock be Restricted?" (with Massoud, Hassan and Song), Journal of Banking and Finance, 2015.

"Regulation Fair Disclousure and Credit Markets, (with Li and Shao), Journal of Banking and Finance, 2015.

"Is Basel Turning Banks Into Public Utilities?", *Journal of Financial Perspectives*, 2014.

"The Regulatory Experience in the US and the Lessons for a European Banking Union", *Journal of Financial Perspectives*, 2014.

"Are Banks still Special when there is a Secondary Markey for Bank Loans?" (with A. Gande), *Journal of Finance*, 2012.

"The Role of Lending Banks in Forced CEO Turnovers" (with S. Ozelge), *Journal of Money, Credit and Banking*, 2012.

"The Role of Banks in Dividend Policy" (with L. Allen, et al.), *Financial Management*, 2012.

"The Impact of Wealth on Financial Markets: Evidence from Credit Card Non-Payment" (with N. Massoud and B. Scholnick), *Journal of Financial Stability*, 2012.

"Financial Architecture, Systemic Risk and Universal Banking" (with I. Walter), *Financial Markets and Portfolio Management*, 2012.

"The Costs of Being Private: Evidence from the Loan Market" (with S. Steffen), *Review of Financial Studies*, 2011.

"Do Hedge Funds Trade on Private Information? Evidence from Syndicated Lending and Short Selling" (with N. Massoud, D. Nandy and K. Song), *Journal of Financial Economics*, 2011 (Second prize for the FAMA-DFA Award for the best paper in Corporate Finance and Asset Pricing in *JFE* for 2011).

"Lending Relationships and Loan Contract Terms" (with S. Bharath, S. Dahiya and A. Srinivasan), *Review of Financial Studies*, 2011.

"Bank Debt versus Bond Debt: Evidence from Secondary Market Prices" (with E. Altman and A. Gande), *Journal of Money Credit and Banking*, 2010.

"Are Initial Returns and Underwriting Spreads Complements or Substitutes?" (with D. Palia and D. Kim), *Financial Management*, 2010

"The Cost of Being Late: The Case of Credit Card Penalty Fees" (with N. Massoud and B. Scholnick), *Journal of Financial Stability*, 2010.

"Bank Debt and Corporate Governance" (with V. Ivashina, et al.), *Review of Financial Studies,* 2009.

"The Long Run Behavior of Underwriting Spreads" (with D. Palia and D. Kim), *Journal of Financial and Quantitative Analysis,* 2009.

**App. 352**

"The Economics of Credit Cards, Debt Cards and ATMs: A Survey and Some New Evidence" (with N. Massoud and B. Scholnick), *Journal of Banking and Finance*, 2008.

"So What Do I Get? The Bank's View of Lending Relationships" (with S. Bharath, S. Dahiya and A. Srinivasan), *Journal of Financial Economics*, 2007.

"The Impact of Institutional Ownership on Corporate Operating Performance" (with A. Marcus, M. Cornett and H. Tehranian), *Journal of Banking and Finance*, 2007.

"The Use of ATMs in Bank Strategy: Is There a Customer Relationship Effect?" (with N. Massoud and B. Scholnick), *Journal of Business,* 2006.

"Should Banks Be Diversified? Evidence from Individual Bank Loan Portfolios" (with V. Acharya and I. Hasan), *Journal of Business*, 2006.

"Bank Borrowers and Loan Sales: New Evidence on the Uniqueness of Bank Loans" (with S. Dahiya and M. Puri), *Journal of Business*, 2004.

"Commercial Bank Underwriting of Credit - Enhanced Bonds: Are There Benefits to the Issuer" (with R. Stover), *Journal of International Money and Finance*, 2004.

"Incorporating Systematic Influences into Risk Measurement: A Survey of the Literature" (with L. Allen), *Journal of Financial Services Research*, 2004.

"The Role of Financial Advisors in Mergers and Acquisitions" (with L. Allen and J. Jagtiani and S. Peristiani), *Journal of Money, Credit and Banking*, 2004.

"Financial Distress and Bank Lending Relationships" (with S. Dahiya and A. Srinivasan), *Journal of Finance*, 2003.

"Issues in the Credit Risk Modeling of Retail Markets" (with L. Allen and G. Delong), *Journal of Banking and Finance,* 2003.

"The Effects of Cross-Border Bank Mergers on Bank Risk and Value" (with Y. Amihud and G. DeLong), *Journal of International Money and Finance*, 2003.

"Are Emerging-Market Equities a Separate Asset Class?" (with I. Walter), *Journal of Portfolio Management*, Spring 2002.

**App. 353**

"Credit Ratings and the BIS Capital Adequacy Reform Agenda" (with E. Altman), *Journal of Banking and Finance*, May 2002.

"Price Formation in the OTC Corporate Bond Markets: A Field Study of the Inter-Dealer Market" (with A. Srinivasan and I. Walter), *Journal of Economics and Business*, January/February 2002.

"An Analysis of Bank Charter Value and Its Risk Constraining Incentives", *Journal of Financial Services Research*, 2001.

"An Analysis and Critique of the BIS Proposal on Capital Adequacy and Ratings", *Journal of Banking and Finance,* 2001.

"The Determinants of Bank Interest Margins: An International Study" (with L. Schumacher), *Journal of International Money and Finance*, 2000.

"Low Inflation: The Behavior of Financial Markets and Institutions", *Journal of Money, Credit and Banking,* 2000.

"Financial Fragility and Mexico 1994 Peso Crisis: An Event Window Analysis of Market Valuation Effects" (with B. Wilson and G. Caprio), *Journal of Money, Credit and Banking*, 2000.

"A Theory of Bank Regulation and Management Compensation" (with K. John and L. Senbet), *Review of Financial Studies*, 2000.

"Mexico's 'Tequila' Bank Crisis: Devaluation or Diversification Problems" (with B. Wilson and G. Caprio), *The Economic Journal,* 2000.

"Bank Entry Competition and the Market for Corporate Securities Underwriting" (with A. Gande and M. Puri), *Journal of Financial Economics*, 1999. (Winner of the Fama - DFA award for the best paper in Corporate Finance and Asset Pricing in the JFE for 1999).

"Bank Capital Structure: A Comparative Analysis of US, UK, and Canada" (with B. Wilson), *Journal of Banking and Finance*, 1999.

"Highly Leveraged Loan Transaction Spreads" (with L. Angbazo and J.P. Mei), *Journal of Banking and Finance*, 1998.

**App. 354**

"The Effects of Bank Mergers and acquisitions on small business Lending" (with A. Berger, et al.), *Journal of Financial Economics*, 1998.

"Credit Risk Measurement: Developments over the last 20 years" (with E. Altman), *Journal of Banking and Finance,* 1998.

"Bank Underwriting of Debt Securities: Modern Evidence" (with A. Gande, M. Puri and I. Walter), *Review of Financial Studies*, 1997.

"An Investigation of the Performance of the U.S. Property-Casualty Insurance Industry" (with N.K. Chidambaran and T. Pugel), *Journal of Risk and Insurance*, 1997.

"Contagious Bank Runs and Panics: Evidence from the 1929-33 Period" (with B. Wilson), *Journal of Financial Intermediation*, 1997.

"Excessive Gambling with Unfavorable Odds: Financial Institutions and Real Estate Investments" (with J.P. Mei), *Review of Economics and Statistics*, 1997.

"Alternative Models for Clearance and Settlement: The Case of the Single European Capital Market" (with I. Giddy and I. Walter), *Journal of Money, Credit and Banking*, 1996.

"Bank Equity Stakes in Borrowing Firms and Financial Distress" (with M. Berlin and K. John), *Review of Financial Studies*, 1996.

"If History Could be Re-run: Pricing Deposit Insurance in 1933" (with B. Wilson), *Journal of Financial Intermediation*, 1995.

"Bank Risk and Too Big to Fail Guarantees: An Asset Pricing Perspective" (with J.P. Mei), *Journal of Real Estate Finance and Economics*, 1995.

"The Effect of Bank Capital Requirements on Bank Off-Balance Sheet Financial Innovations" *Journal of Banking and Finance,* 1995.

"When Does the Prime Rate Change" (with L. Mester), *Journal of Banking and Finance*, 1995.

"Deposit Insurance and Regulatory Forbearance: Are Caps on Insured Deposits Optimal?" (with J.F. Dreyfus and L. Allen), *Journal of Money, Credit and Banking*, 1994.

"Universal Banking and Firm Risk Taking" (with K. John and T. John), *Journal of Banking and Finance*, 1994.

"Banking and Commerce: An Overview of the Policy Issues" *Journal of Banking and Finance*, 1994.

"Time Variation of Risk Premiums for Insurance Companies" (with J.P. Mei), *Journal of Risk and Insurance*, 1994.

"Managers, Owners and the Pricing of Risky Debt: An Empirical Analysis" (with E. Bagnani, N. Milonas, and N. Travlos), *Journal of Finance*, 1994.

"Banking Sector and Restructuring in Eastern Europe" (with A. Sommariva), *Journal of Banking and Finance*, 1993.

"Forbearance and Valuation of Deposit Insurance as a Callable Put" (with L. Allen), *Journal of Banking and Finance*, 1993.

"Prime Rate Changes: Is There an Advantage in Being First?" (with P. Nabar and S. Park), *Journal of Business*, 1993.

"Bank Window-Dressing: Theory and Evidence" (with L. Allen), J*ournal of Banking and Finance*, 1992.

"The Pricing of Retail Deposits: Concentration and Information" (with Allen and Udell), *Journal of Financial Intermediation*, 1992.

"Deposit Insurance Reform" (with Berlin, Udell), *Journal of Banking and Finance*, August 1991.
"Additions to Bank Loan-Loss Reserves: Good News or Bad New?" (with T. Grammatikos), *Journal of Monetary Economics*, 1990.

"Ownership Control, Regulation and Bank Risk-Taking" (with Strock and Travlos), *Journal of Finance*, 1990.

"Are Banks Special: The Separation of Banking from Commerce and Interest Rate Risk" (with Yourougou), *Journal of Economics and Business, 1990.*

"The Underpricing of New Issues in Singapore" (with J. Lim), *Journal of Banking and Finance*, 1990.

**App. 356**

"Bank Size, Collateral and Net Purchase Behavior in the Federal Funds Market: Empirical Evidence" (with Allen and Peristiani), *Journal of Business*, 1989.

"The Effects of Shifts in Monetary Policy and Reserve Accounting Regimes on Bank Reserve Management in the Federal Funds Market" (with T. Urich), *Journal of Banking and Finance,* 1989.

"The Effects of DIDMCA on the Profitability and Risk of Large Commercial Banks and Thrift Institutions" (with J. Aharony and I. Swary), *Journal of Banking and Finance,* 1988.

"The Hedging Performance of ECU Futures" (with S. Sienkiewicz), *Journal of Futures Markets,* 1988.

"Intra- and Inter-Industry Effects of Bank Securities Market Activities: The Case of Discount Brokerage" (with M. Smirlock), *Journal of Financial and Quantitative Analysis*, 1987.

"New Tests of the Parity Hypothesis and Fiscal Policy Effects" (with J. Merrick), *Journal of Monetary Economics,* 1986.

"The Returns and Risks of U.S. Banks' Foreign Currency Activities" (with T. Grammatikos and I. Swary), *Journal of Finance,* 1986.

"The Determinants of Country Risk: A Selective Survey of the Literature" *Journal of Banking and Finance (Supplement)*, 1986.

"An Examination of the Contagion Effect in the International Loan Market", *Journal of Banking and Finance (Supplement)*, 1986.

"The Effects of a Shift in Monetary Policy Regime on the Profitability and Risk of Commercial Banks" (with J. Aharony and I. Swary)*, Journal of Monetary Economics*, 1986.

"The Large-Small Bank Dichotomy in the Federal Funds Market" (with L. Allen), *Journal of Banking and Finance,* 1986.

"Futures Price Variability: A Test of Maturity and Volume Effects" (with T. Grammatikos), *Journal of Business,* 1986.

**App. 357**

"A Micro-Model of the Federal Funds Market" (with T. Ho), *Journal of Finance,* 1985.

"The Effects of the International Banking Act on Domestic Bank Profitability and Risk" (with J. Aharony and I. Swary), *Journal of Money, Credit and Banking,* 1985.

"Bank Regulation and Monetary Policy" *Journal of Money, Credit and Banking,* 1985.

"On Constructing the Group Utility Function of a Loan Syndicate" (with D. Gandhi and R. Hausman), *Journal of Banking and Finance,* 1985.

"On the Constancy of the International Real Rate of Interest" (with R. Tress), *Journal of Monetary Economics,* 1984.

"Fixed Rate Loan Commitments, Takedown Risk and the Dynamics of Hedging with Futures" (with T. Ho), *Journal of Financial and Quantitative Analysis,* 1983.

"Asymmetric Information, Regulatory Lag and the Value of Incentive Contracts" (with K. John), *Journal of Finance,* 1983.

"Stability and the Hedging Performance of Foreign Exchange Futures" (with T. Grammatikos), *Journal of Futures Markets,* 1983.

"The Determinants of Bank Interest Margins: Theory and Empirical Evidence" (with T. Ho), *Journal of Financial and Quantitative Analysis*, November 1981.

"The Growth of Organizational Forms of Foreign Banks in the U.S." (with L. Goldberg), *Journal of Money, Credit and Banking,* August 1981.

"The Investors' Gains from International Portfolio Investment" (with D. Gandhi, et al.), *Journal of Banking and Finance,* June 1981.

"A Catastrophe Model of Bank Failure" (with T. Ho), *Journal of Finance,* December 1980.

"Determinants of Foreign Bank Activity in the United States" *Journal of Banking and Finance,* December 1980.

"The Causes of U.S. Bank Expansion Overseas: The Case of Great Britain" (with L. Goldberg), *Journal of Money, Credit and Banking,* November 1980.

**App. 358**

"A Stochastic Dominance Analysis of Unit Trust Performance" (with R. Woodward and C. Ward), *Journal of Financial and Quantitative Analysis*, June 1980.

"Bid Behavior and the Determination of Treasury Bill Rates" (with C. Ward), *Oxford Bulletin of Economics and Statistics,* August 1979.

"Risk, Regulation and Performance of Clearing Banks, 1965-1975" (with C. Ward), *Journal of Industrial Economics,* December 1976.

### (ii) Books/Monographs

"201,792 total units sold since 1994. Given used books we estimate that over 1,000,000 students, have learned from your books."
Email from Charles Synovect, Director, McGraw-Hill regarding sales of my **Financial Institutions Management** textbook, 5/11/2018.

*Reflections on Financial Institutions: In and Out of Crisis,* World Scientific Press, 2011.

*Financial Institutions Management: A Risk Management Approach*, Irwin/McGraw-Hill, (1st edition), 1994 (2nd edition), 1996 (3rd edition), 1999 (4th edition), 2002 (5th edition), 2005 (6th edition), 2007, (7th edition), 2010. (8th edition), 2014, (9th edition) 2017, (10th edition) 2020, (11th edition) 2023.

*Credit Risk Measurement: Value at Risk and Other New Paradigms*, John Wiley and Sons, (1st edition), 1999 (2nd edition), 2002, (3rd edition) 2010.

*Financial Markets and Institutions: A Modern Perspective* (with M. Cornett), Irwin/McGraw-Hill, (1st edition), 2000 (2nd edition), 2003, (3rd edition) 2006, (4th edition), 2008, (5th edition) 2012, (6th edition), 2014, (7th edition) 2019, (8th edition) 2021, (9th edition) 2024.

*Technology and the Regulation of Financial Markets* (with L. White), Lexington Books, 1985 (reprinted by Beard Books, 2003).

*Understanding Market, Credit and Operational Risk* (with K. Boudoukh and L. Allen) Blackwell, (1st edition), 2003.

*Fundamentals of Financial Institutions Management* (with M. Cornett), Irwin/McGraw-Hill, (1st edition), 1999.

*China's Emerging Capital Markets* (with A. Kumar, etal), Financial Times Publishing, 1997.

*Financial System Design: Universal Banking Considered* (with I. Walter), Irwin, 1996.

*Universal Banking in the U.S.?* (with I. Walter), Oxford University Press, 1994.

**App. 359**

*The Management and Regulation of Banks:* A Book of Reading (with G. Udell and L. White), Bristlecone Books, 1992.

*IPO's and Venture Capitalists: A Test of the Dynamic Strategy Hypothesis* (with J. Lim), ICFA, 1990.

*Off Balance Sheet Activities* (with J. Ronen and A. Sondhi), Dow-Jones, 1990.

### (iii)    Articles in Book (selected)

"Risk Management in Banking" (with L. Allen), in The Oxford Handbook of Banking by Berger et al (eds.), OUP, 2010 (first ed.), 2015 (2nd ed.), 2020 (3rd ed.), 2024 (4th ed).

"A Survey of Cyclical Effects in Credit Risk Models in Credit Ratings" (M. Ong (ed.)), Risk Books: London, 2003.

"Clearance and Settlement" (with I. Giddy and I. Walter) in *The European Equity Markets*, B. Steil (ed), RIIA, London, 1996.

"The Reconfiguration of Banking and Capital Markets in Eastern Europe" (with I. Walter) in *The Transformation of the Socialist Economies,* H. Siebert (ed.) J.C.B. Mohr, Tubingen, Germany, 1992.

"Bank Deregulation and Monetary Policy" and "Discount Brokers" in the *New Palgrave Dictionary of Money and Finance,* 1993.

"German Banking and Monetary Policy." in C. Barfied and M. Perlman (eds.) *Capital Markets and Trade: The U.S. Faces a United Europe,* AEI: Washington, D.C. 1992.

"Why Are So Many New Issues Underpriced?" *Federal Reserve Bank of Philadelphia Review,* 1990.

"Forward Foreign Exchange Markets in Developing Countries" in R. O'Brien and T. Datta (eds.), *International Economics and Financial Markets,* O.U.P., 1989.

"SESDAQ: The Early Evidence" (with J. Lim) in Chang and Rhee (eds.), *Pacific Basin Capital Markets Research,* Elsevier, 1989.

"Bank Holding Companies: Structure, Performance and Reform" in W. Haraf (ed.), *Restructuring the Financial System*, AEI: Washington, D.C. 1989.

**App. 360**

"LDC Debt Rescheduling" (with M. Subrahmanyam), *Federal Reserve Bank of Philadelphia Review*, November/December, 1988.

"The Inter Bank-Market, Contagion Effects and Financial Crisis" in Portes and Swaboda (ed.), *Threats to International Financial stability*, CEPR and CUP, 1987.

"Seasonality in the Federal Funds Market: The Weekend Game and Other Effect" (with T. Urich) in E. Dimson (ed.), Evidence *on Stock Market Anomalies*, North-Holland, 1987.

"Conflicts of Interest: The Case of Securities Activities of Commercial Banks", *Federal Reserve Bank of Philadelphia Review*, August/September, 1985.

"An Economic Perspective on Bank Uniqueness and Corporate Securities Activities" in I. Walter (ed.), *Deregulating Wall Street*, John Wiley and Sons, 1985.

"Conflicts of Interest: The Case of Commercial *Bank* and Their Corporate Securities Underwriting Affiliates" in I. Walter (ed.), *Deregulating Wall Street*, John Wiley and Sons, 1985.

"A Catastrophe Theory in Banking and Finance" (with T. Ho) in G. Szego and A. Cellina (eds.), *New Techniques for Economic Analysis,* Academic Press, 1982.

"The Effect of a Dual Exchange Market on Spot and Commodity Prices in the US and UK" (with D. Emanual), *Proceedings of the International Research Seminar on Futures Markets*, Chicago Board of Trade, 1981.

### (iv)    Working Papers

"The Myth of the Lead Arranger" (with Bickle et al.), Federal Reserve Bank of New York. *Journal of Finance* (R and R 3rd Round).

"Market Efficiency in the Age of Machine Learning" (with Dai et al). Yuri Akai Best Paper Award, Dept. of Finance, NYU, AFA 2022

"Climate-Related Disclosure Commitment of the Lenders, Credit Rationing and Borrower Environmental Performance" (with Hasan et al.), SFS Cavalcade (Asia), WFA 2023, AEA 2024, Review of Accounting Studies, (R and R).
"Corporate Tax Changes and Credit Cards" (with Hasan et al.), Journal of Money Credit and Banking (R and R).

**App. 361**

"Gender of Firm Decision Makers and with Firm Disparity" (with Hasan et al.), AEA 2024.

"The "Hairy Premium"" (with Georgievska ea al.) AFA 2024, WFA 2024, EFA 2024, NFA 2024.

"Covenant-AI- New Insights into Covenant Violations (with Steffen et al.), NBER 2024, AFA 2025.

"For Whom Do Fed Information Shocks Matter?" (with Barbopoulos et al)

**Editorial Positions (Selected)**

Editor, Journal of Banking and Finance (1994 - 2007)
Editor, Financial Markets, Instruments and Institutions (1992- )
Editor, Salomon Brothers Center Monograph in Finance and Economics (1984-1991)
Advisory Editor, Journal of Money, Credit and Banking (2001- )
Associate Editor, Journal of Money, Credit and Banking (1995-2001)
Associate Editor, Financial Management (1993 - 2006)

**Research Fellowships**

Yamaichi Senior Research Fellow in Finance (1988-1991)
Salomon Brothers Center Research Fellow (1986-1987)
Bank and Financial Analysts Research Fellow (1987-1988)

**Ph.D. Supervision**

V. Ivashina (Chair), C. Harm (Chair), J. Lim (Chair), A. Moskowitz, D. Palia (Chair), J. Doukas, H. Thomas, M. Puri (Chair), B. Soubra, P. Yourougou (Chair), A. Gande, N. Travlos, J. Meehan, T. Grammatikos, S. Dahiya (Chair), A. Cebenoyan (Chair), A. Mozumdar, E. Kraizberg (Chair), G. DeLong (Chair), G. Vasudevan, H. Sim (Chair), J. Rungkasiri, L. Angbazo (Chair), N. Horrell (Chair), V. Gargalas (Chair), A. Srinivasan (Chair), S. Bharath (Chair),V. Acharya, T.T. Ram Mohan, J. Sunder, L. Allen (Chair), F. Alvaraz (Chair), D. Ross (Chair), Y. Lu (Chair), S. Ozelge (Chair), M. Zemel (Chair), K. Waldock (Chair), M. Gopal. E.Nertina (Tilburg), Sung Lee, A. Bhardwaj, S. Hillenbrand, Q. Fleckenstein, F. Hinzen (Co-chair), Y. Cabossioras, N. Zarra.

**App. 362**

**Keynote Speaker**

Sydney Banking Conference (Sydney) 2023.
FEBS Conference, Crete (2023) and distinguished Scholar Award for Outstanding Contributions to Finance and Banking.
Australian Finance Conference (2023).
1st Sustainable Finance Meeting, Naples (2023).
ADEIMF Conference, Perugia (2020).
World Finance Conference, Santiago (2019).
IRMC Conference, Paris, (2018).


IFMA Conference, Indonesia, (2018).
6th Annual Corporate Finance Conference U.K., Manchester
(2018).
Ann Ryde Conference on Financial Intermediation, Lund, (2017).
Altman Annual Lecture on Credit Risk, Warsaw, (2017).
International Conference on Finance and Economic Policy, Poznan
(2017).
European Banking and Finance Conference, Bologna, (2016).
Conference on Finance, Peking University, Fudan University, UIBE, Tianjin University (2016).
Conference on Syndicated Loans, LBS, London (2015).
Bank of England, FRB and Reserve Bank of Australia, Conference on Systemic Risk
(2014).
Spanish Finance Association, Spain (2011).
International Conference on Banking and Finance, Cyprus
(2011).
Northern Finance Association (Toronto), October (2007).
Henry Thornton Lecture (London), October (2007).
Campus for Finance, WHU, Otto Beisheim School of Mgmt, Germany, January (2007), (2013), (2020).
*Journal of Banking and Finance*, 30th Anniversary Conference, Beijing (2006).
Citigroup Distinguished Speaker, University of Edinburgh, November (2006).
Risk Management Conference, Hofstra University, NY (2006).
Italian Quantitative Economics and Finance Association (AMESAS), Italy
(2004).
Pacific Basin Finance, Accounting and Economics Conference, Taiwan (2003).
Australasian Finance Association, Sydney, Australia (2017, 2012, 2006, 2004, 2003, 2002).
Multinational Finance Association, Cyprus (2002).
Symposium on Finance, Banking and Insurance, Karlsruhe, Germany
(2002).
Spanish Finance Association, Segovia, Spain (2001).

**App. 363**

<u>Appendix B</u>

Materials Relied Upon

## Materials Relied Upon[1]

### Legal

17 C.F.R. § 210.

Consolidated Complaint for Violations of the Federal Securities Laws. *Pedro Ramirez, Jr. v. Exxon Mobil Corp.,* et al. (N.D. Tex. No. 3:16-cv-03111-K) (July 26, 2017).

### Expert Reports

Feinstein, Steven P. "Report on Loss Causation and Damages." *Pedro Ramirez, Jr. v. Exxon Mobil Corp.,* et al. (N.D. Tex. No. 3:16-cv-03111-K) (Oct. 11, 2024) and supporting materials.

### Depositions

Dep. Tr. of Robert N. Schleckser dated Dec. 3, 2024 (Uncertified Rough Draft).

Dep. Tr. of Andrew Swiger dated Dec. 4, 2024 (Uncertified Rough Draft).

#### Deposition Exhibits

Robert N. Schleckser Dep. Ex. 200.01 (EMC_RAMIREZ 000007797).

Robert N. Schleckser Dep. Ex. 206 (Mar. 1, 2016) (EMC_RAMIREZ 000037522).

### Relevant Produced Documents

"Committee Package." *S&P Global Ratings* (SPGI-0000055_0001).

"Moody's Rating Methodology Grid: Integrated Oil & Gas." *Moody's.* (MDYS RAM 000119).

"Pricing Term Sheet." *Bank of America.* (BofA_00000036).

"Pricing Term Sheet." *Bank of America.* (BofA_00000038).

"Ratings Process Initiation: CreditWatch Resolution and General Usage." *S&P Ratings Services* (SPGI-0000019_0001).

"Ratings Process Initiation: CreditWatch Resolution and General Usage." *S&P Ratings Services* (SPGI_0000022_0001).

---

[1] In preparing my report, I replied upon the materials listed here along with any items cited or referenced in the body and footnotes of my report.

**App. 365**

"Research Update: ExxonMobil Corp. Liquidity Score Revised To 'Adequate' From 'Strong'; 'AAA' Corporate Credit Rating Affirmed." *S&P Ratings Services* (May 27, 2015) (SPGI-0000117_0001).

"S&P Negative Outlook Response Statement." *ExxonMobil* (Oct. 2015) (EMC_RAMIREZ 000029533).

"Summary: Exxon Mobil Corp." *S&P Ratings Services* (Oct. 6, 2015) (SPGI-0000113_0001).

## Data Sources

Bloomberg, L.P. (accessed Nov. 25, 2024).

Bloomberg, L.P. (accessed Dec. 8, 2024).

"Default, Transition, and Recovery: 2023 Annual U.S. Corporate Default and Rating Transition Study." *S&P Global*. <https://www.spglobal.com/ratings/en/research/articles/240528-default-transition-and-recovery-2023-annual-u-s-corporate-default-and-rating-transition-study-13114000> (accessed Nov. 12, 2024).

Exxon Mobil Corporation. *Pricing Term Sheet* (Feb. 29, 2016). <https://www.sec.gov/Archives/edgar/data/34088/000119312516486405/d135825dfwp.htm> (accessed Dec. 5, 2024).

Exxon Mobil Corporation. *Pricing Term Sheet* (Aug. 13, 2019). <https://www.sec.gov/Archives/edgar/data/34088/000119312519220122/d790468dfwp.htm> (accessed Dec. 5, 2024).

Exxon Mobil Corporation. *Prospectus Supplement* (Feb. 29, 2016).

ICE BofA AAA US Corporate Index Semi-Annual Yield to Worst (BAMLC0A1CAAASYTW). *Federal Reserve Bank of St. Louis.* <https://fred.stlouisfed.org/series/BAMLC0A1CAAASYTW> (accessed Nov. 19, 2024).

ICE BofA AA US Corporate Index Semi-Annual Yield to Worst (BAMLC0A2CAASYTW). *Federal Reserve Bank of St. Louis.* <https://fred.stlouisfed.org/series/BAMLC0A2CAASYTW> (accessed Nov. 19, 2024).

## Publications

Ailworth, Erin and Austen Hufford. "Exxon Loses Its Triple-A Rating." *The Wall Street Journal* (Apr. 27, 2016). <https://www.wsj.com/articles/s-p-strips-exxon-of-triple-a-credit-rating-1461687007?msockid=17ea39415358632501912c6252dc62d8> (accessed Nov. 22, 2024).

"A Review of Student's *t* Distribution and Its Generalizations." *Empirical Economics* 58 (Sept. 28, 2018): 1461–90.

**App. 366**

Armental, Maria. "S&P Cuts Ratings of 10 U.S. Oil Companies." *The Wall Street Journal* (Feb. 2, 2016). <https://www.wsj.com/articles/s-p-cuts-ratings-of-10-u-s-oil-companies-1454448174> (accessed Oct. 11, 2024).

Babbel, David F. and Stavros A. Zenios. "Pitfalls in the Analysis of Option-Adjusted Spreads." *Financial Analysts Journal* 48.4 (July-Aug. 1992): 65–69.

Bessembinder, Hendrik, et al. "Measuring Abnormal Bond Performance." *The Review of Financial Studies* 22.10 (2008): 4219–58.

Brealey, Richard A., Stewart C. Myers, and Franklin Allen. *Principles of Corporate Finance, Thirteenth Edition.* New York, NY: McGraw-Hill Education (2020).

Bullock, Nicole and Ed Crooks. "ExxonMobil Sells $12bn of Bonds Amid Rise in Borrowings." *Financial Times* (Feb. 29, 2016). <https://www.ft.com/content/78e76856-df38-11e5-b072-006d8d362ba3> (accessed Nov. 21, 2024).

"Callable Bonds: Be Aware That Your Issuer May Come Calling." *FINRA* (Apr. 19, 2024). <https://www.finra.org/investors/insights/callable-bonds-your-issuer-may-come-calling> (accessed Dec. 4, 2024).

Carroll, Joe. "Exxon Faces First Downgrade Since Depression as Oil Rout Worsens." *Bloomberg* (Feb. 2, 2016)*.* <https://www.bloomberg.com/news/articles/2016-02-02/chevron-hess-join-ranks-of-downgraded-crude-oil-explorers> (accessed Nov. 14, 2024).

Carroll, Joe. "Exxon Fails to Replace Production for First Time in 22 Years." *Bloomberg* (Feb. 19, 2016). <https://www.bloomberg.com/news/articles/2016-02-19/exxon-fails-to-replace-production-for-first-time-in-22-years> (accessed Nov. 27, 2024).

Cherney, Mike. "Exxon Offers $12 Billion Bond Issue." *The Wall Street Journal* (Feb. 29, 2016). <https://www.wsj.com/articles/exxon-offers-12-billion-bond-issue-1456781873?msockid=17ea39415358632501912c6252dc62d8> (accessed Nov. 21, 2024).

Choudhry, Moorad. *An Introduction to Bond Markets, Fourth Edition*. West Sussex: John Wiley & Sons Ltd (2010).

Chung, Kee H. and Choonsik Lee. "Conservatism and Representativeness Heuristic in Peer Reviews: Evidence from The Finance Literature 1946-2020." *Journal of Banking & Finance* 160 (2024): 107093.

Cooley, Philip L. and Jean L. Heck. "Prolific Authors in The Finance Literature: A Half Century of Contributions." *Journal of Finance Literature* 1 (2005).

"Corporate and Agency Bond Data Glossary." *FINRA*. <https://www.finra.org/finra-data/fixed-income/corp-and-agency/glossary> (accessed Nov. 19, 2024).

"Criteria | Structured Finance | CMBS: European CMBS Methodology and Assumptions." *S&P Global* (July 26, 2024). <https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/sourceId/13157087> (accessed Nov. 18, 2024).

Davidson, Paul. "S&P Downgrades Oil Companies' Credit Ratings." *USA Today* (Feb. 3, 2016). <https://www.usatoday.com/story/money/2016/02/03/sp-downgrades-oil-companies-credit-ratings/79750954> (accessed Nov. 15, 2024).

Egan, Matt. "Oil Crash Could Kill Exxon's Perfect AAA Rating." *CNN Business* (Feb. 2, 2016). <https://money.cnn.com/2016/02/02/investing/exxonmobil-aaa-credit-rating-downgrade-oil/index.html> (accessed Nov. 15, 2024).

"Exxon Capital Corp. Ratings & Assessments." *Moody's.* <https://www.moodys.com/credit-ratings/EXXON-CAPITAL-CORP-credit-rating-273300/ratings/view-by-class> (accessed Dec. 5, 2024).

Exxon Mobil Corporation. *Form 8-K* (Oct. 28, 2016). <https://investor.exxonmobil.com/sec-filings/all-sec-filings/content/0000034088-16-000093/0000034088-16-000093.pdf> (accessed Dec. 4, 2024).

"ExxonMobil Loses AAA Rating; Investors Rush to EM." *S&P Global* (Apr. 29, 2016). <https://www.spglobal.com/marketintelligence/en/mi/research-analysis/29042016-credit-exxonmobil-loses-aaa-rating-investors-rush-to-em.html> (accessed Dec. 4, 2024).

Fabozzi, Frank J., ed. "Bonds: Investment Features and Risks." *Handbook of Finance, Financial Markets and Instruments, Volume 1.* Hoboken: John Wiley & Sons, Inc. (2008): 207–220.

Gjorgievska, Aleksandra. "Exxon Said Planning $12 Billion Bond Sale to Build War Chest." *Bloomberg* (Feb. 29, 2016). Bloomberg, L.P. (accessed Nov. 21, 2024).

"Global Integrated Oil & Gas Industry." *Moody's Investors Service* (Apr. 30, 2014). <https://www.moodys.com/research/doc--PBC_161078> (accessed Dec. 6, 2024).

"Global Integrated Oil & Gas Industry." *Moody's Investors Service* (Oct. 3, 2016). <https://www.moodys.com/research/doc--PBC_1038500> (accessed Dec. 4, 2024).

"Google Scholar Search." *Google Scholar.* <https://scholar.google.com/scholar?hl=en&as_sdt=0%2C32&q=Handjinicolaou%2C+George%2C+and+Avner+Kalay.+%E2%80%9CWealth+Redistributions+or+Changes+in+Firm+Value%3A+An+Analysis+of+Returns+to+Bondholders+and+Stockholders+Around+Dividend+Announcements.%E2%80%9D+&btnG=> (accessed Nov. 24, 2024).

Groth, Aimee. "4 U.S. Companies Are Now Rated Higher Than the Government." *Business Insider* (Aug. 6, 2011). <https://www.businessinsider.com/aaa-rating-us-companies-2011-8> (accessed Nov. 20, 2024).

**App. 368**

Handjinicolaou, George and Avner Kalay. "Wealth Redistributions or Changes in Firm Value: An Analysis of Returns to Bondholders and Stockholders Around Dividend Announcements." *Journal of Financial Economics* 13.1 (1984): 35–63.

Heck, Jean L. and Cooley, Philip L. "Most Prolific Authors in the Finance Literature: 1959-2008." *Saint Joseph's University and Trinity University* (2009). <https://ssrn.com/abstract=1355675> (accessed Nov. 11, 2024).

"ICE BofA AAA US Corporate Index Option-Adjusted Spread (BAMLC0A1CAAA) - Notes Section." *FRED.* <https://fred.stlouisfed.org/series/BAMLC0A1CAAA> (accessed Nov. 18, 2024).

"ICE BofA AA US Corporate Index Option-Adjusted Spread (BAMLC0A2CAA) - Notes Section." *FRED.* <https://fred.stlouisfed.org/series/BAMLC0A2CAA> (accessed Nov. 18, 2024).

"Investor's Guide to Pensions." *Bank of America* (Jan. 2024). <https://business.bofa.com/content/dam/flagship/workplace-benefits/id20_0905/documents/investors-guide-to-pensions.pdf> (accessed Dec. 6, 2024).

"Issue Brief: Benefits and Limitations of Option-Adjusted Spread Analysis." *California Debt and Investment Advisory Commission* (2020). <https://www.treasurer.ca.gov/cdiac/publications/issue-brief/2020/20-10.pdf> (accessed Nov. 14, 2024).

Kopprasch, Robert W. "Option-Adjusted Spread Analysis: Going Down the Wrong Path?" *Financial Analysts Journal* (May-June 1994): 42–47.

Krantz, Matt. "Exxon Mobil Nearly Stripped of AAA Rating." *USA Today* (Feb. 3, 2016). <https://www.usatoday.com/story/money/markets/2016/02/03/exxon-mobil-close-losing-aaa-rating/79758646/> (accessed Nov. 15, 2024).

Krauss, Clifford. "Exxon Mobil's Sterling Credit Is Downgraded by Standard & Poor's." *The New York Times* (Apr. 26, 2016). <https://www.nytimes.com/2016/04/27/business/energy-environment/exxon-mobils-sterling-credit-is-downgraded-by-standard-poors.html> (accessed Nov. 20, 2024).

Livingston, Miles and Lei Zhou. "Split Bond Ratings and Information Opacity Premiums." *Financial Management* 39.2 (2010): 515–32.

Olson, Bradley. "Exxon Fails to Replace Oil, Gas Production for First Time in 22 Years." *The Wall Street Journal* (Feb. 19, 2016). <https://www.wsj.com/articles/exxon-fails-to-replace-oil-gas-production-for-first-time-in-22-years-1455926914?msockid=17ea39415358632501912c6252dc62d8> (accessed Nov. 27, 2024).

**App. 369**

Pisani, Joseph and David Koenig. "Stung by Low Oil Prices, Exxon Loses 'AAA' Rating From S&P." *Associated Press* (Apr. 26, 2016). <https://apnews.com/stung-by-low-oil-prices-exxon-loses-aaa-rating-from-s-p-d7e77574ef1d4023a37de881142eca11> (accessed Nov. 20, 2024).

"Rating Action: Moody's Affirms ExxonMobil's Aaa Rating, Outlook Changed to Negative." *Moody's* (Feb. 25, 2016). <https://www.moodys.com/research/Moodys-affirms-ExxonMobils-Aaa-rating-outlook-changed-to-negative-Rating-Action--PR_344377> (accessed Nov. 20, 2024).

"Rating Actions Taken on 20 U.S. Investment-Grade Exploration & Production Companies After S&P Revises Price Assumptions." *S&P Global* (Feb. 2, 2016). <https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/type/HTML/id/1580384> (accessed Nov. 15, 2024).

"Rating Actions Taken on 25 U.S. Oil and Gas Exploration and Production Companies After S&P Revises Price Assumptions." *S&P Global* (Oct. 14, 2015). <https://disclosure.spglobal.com/ratings/en/regulatory/article/-/view/type/HTML/id/1464192> (accessed Dec. 6, 2024).

"S&P Global Ratings Definitions." *S&P Global Ratings* (Aug. 18, 2016). <https://www.maalot.co.il/Publications/GMT20160823145849.pdf> (accessed Nov. 27, 2024).

"Understanding Bond Yield and Return." *FINRA* (Aug. 11, 2022). <https://www.finra.org/investors/insights/bond-yield-return> (accessed Nov. 19, 2024).

"Use of CreditWatch and Outlooks." *S&P Ratings Services* (Sept. 14, 2009). <MT20131212112758c.pdf> (accessed Nov. 11, 2024).

"U.S. Crude Oil and Natural Gas Proved Reserves, Year-End 2022." *U.S. Energy Information Administration* (Apr. 29, 2024). <https://www.eia.gov/naturalgas/crudeoilreserves> (accessed Dec. 9, 2024).

Van Loon, Jeremy. "Exxon, Chevron Outlooks Cut to Negative by S&P in Oil Slump." *Bloomberg* (Oct. 2, 2015). <https://www.bloomberg.com/news/articles/2015-10-02/exxon-chevron-outlooks-negative-chesapeake-rating-cut-by-s-p> (accessed Nov. 20, 2024).

Wooldridge, Jeffrey M. *Introductory Econometrics, A Modern Approach, Fifth Edition.* Mason: South-Western (2012).

**App. 370**

# Exhibit 8

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

---------------------------------------------------------------- x
                                                                 :
PEDRO RAMIREZ, JR., Individually and on                          :
Behalf of All Others Similarly Situated,                         :
                                                                 :
                    Plaintiff,                                   :
                                                                 : Civil Action No. 3:16-cv-03111-K
            v.                                                   :
                                                                 :
EXXON MOBIL CORPORATION, REX W.                                  :
TILLERSON, ANDREW P. SWIGER,                                     :
JEFFREY J. WOODBURY and DAVID S.                                 :
ROSENTHAL,                                                       :
                                                                 :
                    Defendants.                                  :
                                                                 :
---------------------------------------------------------------- x

**S‍UR-REPLY OF A‍NTHONY S‍AUNDERS, P‍H.D.**

**J‍ANUARY 28, 2025**

**C‍ONFIDENTIAL**

# App. 371

CONTENTS

II.     Qualifications and Experience ...................................................................................... 2

I.      Case Background and Assignment ................................................................................ 2

II.     Summary of Opinions .................................................................................................. 3

III.    Opinion 1: Dr. Feinstein Reduced His Calculated Additional Interest Expense by
        Half in Response to My Criticisms, but His Methodology Remains Fundamentally
        Unsound ....................................................................................................................... 5

IV.     Opinion 2: Dr. Feinstein's Assumptions Regarding S&P's Reason for Rating
        Downgrade and the Material Difference Between AAA and AA+ Are at Odds with
        S&P's Testimony, Relevant Data, and Recent Regulatory Changes. ........................... 6

V.      Opinion 3: Dr. Feinstein Did Not Contest the Results of My Outlook and
        CreditWatch Placement Event Studies ....................................................................... 10

VI.     Opinion 4: Dr. Feinstein Did Not Contest the Results of My Downgrade Event Study
        and His New Analysis of ExxonMobil's Bond Offerings in 2015 and 2016 Supports
        My Conclusion. ........................................................................................................... 11

VII.    Opinion 5: Dr. Feinstein Failed to Refute My Criticisms Related to His Use of OAS.
        .................................................................................................................................... 13

VIII.   Opinion 6: Dr. Feinstein Simply Reiterated the Same Incorrect Conclusion That
        Market Average OAS Can Measure Yields of Individual Bonds ................................ 15

IX.     Opinion 7: Dr. Feinstein's Linear Interpolation Is Unsupported by the Literature He
        Cited, Including His Own Research .............................................................................. 17

X.      Opinion 8: Dr. Feinstein's Calculation of Additional Interest Expense to ExxonMobil
        Is Incorrect as a Matter of Economics ....................................................................... 19

**App. 372**

## II.    QUALIFICATIONS AND EXPERIENCE

1.    I serve as the John M. Schiff Professor of Finance at NYU Stern Business School. I received my Ph.D. from the London School of Economics and have taught both undergraduate and graduate level courses at NYU since 1978. Throughout my academic career, my teaching and research have specialized in financial institutions, financial markets, and international banking. I have testified as an expert witness numerous times at trial or arbitration, or by deposition, for both plaintiffs and defendants, in disputes concerning rating agencies, structured finance products, credit market conditions, and mortgage-backed securities.

## I.    CASE BACKGROUND AND ASSIGNMENT

2.    This is a federal securities class action brought by Greater Pennsylvania Carpenter Pension Fund ("Plaintiff"), on behalf of itself and all others similarly situated, against Exxon Mobil Corporation ("ExxonMobil"), its former Chairman of the Board and Chief Executive Officer, Rex W. Tillerson, its former Senior Vice President and Principal Financial Officer, Andrew P. Swiger, its former Vice President of Investor Relations and Secretary, Jeffrey J. Woodbury, and its former Vice President, Controller and Principal Accounting Officer, David S. Rosenthal (collectively, "Defendants").[1]

3.    I have been retained on behalf of ExxonMobil, through its counsel Paul, Weiss, Rifkind, Wharton & Garrison LLP, to review a report by Plaintiff's proffered expert, Dr. Steven P. Feinstein ("Feinstein Report"), and to respond to his opinion that, had ExxonMobil's March 2016 offering been rated AA+ rather than AAA, ExxonMobil's debt service on the issued notes (the "Notes") would have required a higher note yield and thus higher interest expense.[2] I submitted my expert report ("Saunders Rebuttal Report") on December 10, 2024.[3]

---

[1] Consolidated Complaint for Violations of the Federal Securities Laws. *Pedro Ramirez, Jr. v. Exxon Mobil Corp.,* et al. (N.D. Tex. No. 3:16-cv-03111-K) (July 26, 2017) ¶ 1.

[2] Feinstein, Steven P. Report on Loss Causation and Damages. *Pedro Ramirez, Jr. v. Exxon Mobil Corp.,* et al. (N.D. Tex. No. 3:16-cv-03111-K) (Oct. 11, 2024) ¶¶ 172–77.

[3] Saunders, Anthony. Expert Report of Anthony Saunders, Ph.D. *Pedro Ramirez, Jr. v. Exxon Mobil Corp.,* et al. (N.D. Tex. No. 3:16-cv-03111-K) (Dec. 10, 2024).

**App. 373**

4.  On January 10, 2025, Dr. Feinstein submitted a reply report ("Feinstein Reply Report")[4] to respond to my rebuttal report. I have been asked by Counsel to review the Feinstein Reply Report and respond to certain opinions therein. In addition, I understand that fact discovery is ongoing, and since my prior report was submitted, the parties have taken the deposition of a representative from Standard & Poor's ("S&P"), which I have now had an opportunity to review. My opinions in this matter are further supported by that additional S&P testimony.

5.  A complete list of the documents and data that I rely upon in reaching my conclusions in this matter is provided in **Appendix A**: *Materials Relied Upon.*

6.  The current hourly rate for my work is $750. My compensation is not affected by my findings or the outcome of this litigation. I supervised and directed a team at Vega Economics to assist me in this assignment. Their compensation is not affected by my findings or the outcome of this litigation.

7.  I reserve the right to amend or supplement my opinions and report, if appropriate, based on any additional discovery or facts that become available to me, or in response to opinions or reports of other experts in this matter.

## II.  SUMMARY OF OPINIONS

8.  Dr. Feinstein's criticisms in his reply report do not undermine the opinions expressed in my rebuttal report. Based on my review of the Feinstein Reply Report, the record, and my experience and professional judgement, I further conclude that:

    - In response to my criticism that he ignored ExxonMobil's split rating, Dr. Feinstein made a correction to his reply report during his deposition, and produced a new analysis reducing his calculation of additional interest expense from $832 million to $413 million. Despite this change, his methodology is still fundamentally unsound due to many other shortcomings.

---

[4] Feinstein, Steven P. Reply Report on Loss Causation and Damages. *Pedro Ramirez, Jr. v. Exxon Mobil Corp.,* et al. (N.D. Tex. No. 3:16-cv-03111-K) (Jan. 10, 2025).

**App. 374**

- Dr. Feinstein's assumptions that (i) ExxonMobil's 2016 offering would have been rated AA+ by S&P had the market learned about the purported "corrective disclosures" regarding the Kearl proved reserve and Rocky Mountain impairment; and (ii) ExxonMobil's bonds would have carried a higher interest rate, are contradicted by testimony of S&P's representative, which Dr. Feinstein still had not read at the time of his own deposition.[5]

- Dr. Feinstein continues to ignore the fact that there is no material difference between AAA and AA+.

- Dr. Feinstein did not contest the results of my event studies, which show that none of the credit events (outlook change, CreditWatch placement, and downgrade) had a statistically significant impact on ExxonMobil's bond returns.

- Dr. Feinstein's analysis comparing ExxonMobil's 2015 and 2016 bond offerings does not support his conclusion. Even with the same credit rating, bond yields could be different as spreads can change with the level of rates and size of an issue, among other things.

- Dr. Feinstein failed to refute any of my criticisms of his use of a market average OAS to measure yields of ExxonMobil's bonds.

- Dr. Feinstein's proffered justification of his linear interpolation is unavailing, and his own writing concluded that linear interpolation is an inferior method.

- Dr. Feinstein's other responses are without basis or otherwise uncompelling, and do not affect my opinions.

---

[5] Dep. Tr. of Steven Feinstein dated Jan. 22, 2025 (Uncertified Rough Draft) ("Feinstein Dep. Tr.") 244:4–6.

**App. 375**

III.    **OPINION 1: DR. FEINSTEIN REDUCED HIS CALCULATED ADDITIONAL INTEREST EXPENSE BY HALF IN RESPONSE TO MY CRITICISMS, BUT HIS METHODOLOGY REMAINS FUNDAMENTALLY UNSOUND.**

9.    In my rebuttal report, I criticized Dr. Feinstein's failure to acknowledge that in April 2016 ExxonMobil had a split credit rating as opposed to a unanimous AA+ rating.[6] In his reply report, Dr. Feinstein insisted that the AA+ index yields he applied were the appropriate benchmark for a note with a split AA+ and Aaa rating, because "note yields from issues with a split AA+ and Aaa rating would be assigned to the AA+ index" based on the provider's Bond Index Methodology documentation.[7]

10.    However, in his deposition on January 22, 2025, Dr. Feinstein made a correction to his reply report and removed the last sentence of paragraph 146, which stated "[a]s it turns out, however, the result would be the same as what I presented, because, as the note yield index provider explains, its AA+ index yields (which I applied) are the appropriate benchmark for a note with such a split rating."[8] In the deposition, Dr. Feinstein contended that a split rating would use the average spread rather than that of the lower rating. As a result, Dr. Feinstein provided a revised calculation of additional interest expense from $832 million[9] to $413 million.[10]

11.    However, in his revised calculations, Dr. Feinstein did not apply the proper weighting to the inferior and superior ratings, instead assuming that they are weighted equally. Some research has found that when bonds have split ratings, the higher of the two ratings sets bond yields. In that case, ExxonMobil's split rating would have the same yield as a unanimous AAA rating. For example, an article by Paul Hsueh and David Kidwell found that "there is no interest cost difference between split rated bond issues and bond issues in the adjacent higher credit rating category."[11] Similarly, an article by Sara Reiter and David Ziebart

---

[6] Saunders Rebuttal Report Section V.
[7] Feinstein Reply Report ¶ 147.
[8] *Id.* ¶ 146.
[9] Feinstein Report ¶ 28.
[10] Steven Feinstein Dep. Ex. 6.
[11] Hsueh, L. Paul and David S. Kidwell. "Bond Ratings: Are Two Better Than One?" *Financial Management* 17.1 (1988): 46–53, 52.

**App. 376**

concluded that "yields are consistent with the higher rating in the case of split ratings."[12] In other words, ExxonMobil's 2016 offering would have carried the same interest rate had it been rated unanimously AAA instead of a split Aaa/AA+ rating.

12. For this and other reasons I set forth in my rebuttal report and will further expand in this report, Dr. Feinstein's methodology remains fundamentally unsound despite his last-minute revision of his calculations.

#### IV. OPINION 2: DR. FEINSTEIN'S ASSUMPTIONS REGARDING S&P'S REASON FOR RATING DOWNGRADE AND THE MATERIAL DIFFERENCE BETWEEN AAA AND AA+ ARE AT ODDS WITH S&P'S TESTIMONY, RELEVANT DATA, AND RECENT REGULATORY CHANGES.

13. In my rebuttal report, I showed that Dr. Feinstein's analysis ignored that the default rates for both AAA- and AA+-rated corporate bonds have been historically zero.[13] In response, Dr. Feinstein claimed with little support that "default probabilities can be rounded to zero but are not zero," and that it is generally understood that corporate bonds are not risk free.[14] He further contended that the existence of AA+ as a rating category *per se* indicates a material difference in credit risks between AAA and AA+.[15] Dr. Feinstein also cited two academic publications to purportedly support his broad claim that "credit ratings provide insight into a firm's creditworthiness, including private and forward-looking information not readily available to the broader market."[16]

14. Dr. Feinstein's arguments are both unconvincing and factually inaccurate. It is important to note that the historical one-year default rates for AAA and AA+ U.S. corporate bonds from 1981 to 2023 were *exactly zero*, and were not merely rounded down to zero. It is similarly a matter of fact that in some time periods the 10-year cumulative default rates for AAA have been above AA+ and that otherwise these default rates have often been empirically and

---

[12] Reiter, Sara A. and David A. Ziebart. "Bond Yields, Ratings, and Financial Information: Evidence from Public Utility Issues." *Financial Review* 26.1 (Feb. 1991): 45–73, 45.
[13] Saunders Rebuttal Report Section VI.
[14] Feinstein Reply Report ¶ 150.
[15] *Id.* ¶¶ 150–151.
[16] *Id.* ¶ 153.

historically indistinguishable. These are facts, not assertions or assumptions, that are simply ignored by Dr. Feinstein.

15. Furthermore, while bond yields may correlate with ratings across broad rating classes (e.g., comparing AAA to BBB), Dr. Feinstein missed that small rating changes, such as the change from AAA to AA+, are often inconsequential to investors (and even more so when it is a split rating). Dr. Feinstein simply assumed, without support, that ExxonMobil's notes would have required higher yields had they been rated AA+ instead of AAA.

16. The two academic articles Dr. Feinstein cited as support do not change these conclusions, as they only establish a correlation across very broad rating classes and support the fact that there is no meaningful difference between AAA and AA+. The 1992 article written by David Ziebart and Sara Reiter[17] explicitly did not differentiate between AAA- and AA-rated bonds (let alone AA+-rated ones), and instead grouped all such bonds into a single rating class for their empirical analysis.[18] The 1987 article by Louis Ederington and his coauthors[19] did not find any statistically meaningful difference in yields among AAA-, AA-, and A-rated bonds.[20]

17. I further note that the two articles cited by Dr. Feinstein were each published more than three decades ago, and there is evidence that the importance of traditional rating agencies as information providers has significantly declined in the years since.[21] This is due to a multitude of reasons including: (i) the collapse of Enron, which maintained investment grade

---

[17] *See id.* ¶ 153.
[18] Feinstein Reply Report supporting materials, Ziebart, David A. and Sara A. Reiter. "Bond Ratings, Bond Yields and Financial Information." *Contemporary Accounting Research* 9.1 (1992): 252–282, 265 ("In addition, it is necessary to include both AAA and AA bonds in a single rating category to obtain solutions for the simultaneous equation estimation.").
[19] *See* Feinstein Reply Report ¶ 153.
[20] Feinstein Reply Report supporting materials, Ederington, Louis H., Jess B. Yawitz and Brian E. Roberts. "The Information Content of Bond Ratings." *The Journal of Financial Research* 10.3 (1987): 211–226, 219.
[21] "Credit Rating Agencies and Their Regulation." *Congressional Research Service* (Apr. 9, 2012) <https://crsreports.congress.gov/product/pdf/R/R40613> (accessed Jan. 21, 2025) at "Summary."

ratings until four days prior to bankruptcy,[22] and that Lehman Brothers was rated A at the time of its bankruptcy in September of 2008;[23] (ii) the misclassification of risk by the rating agencies during the 2008 financial crisis;[24] and (iii) material changes in reporting requirements since the financial crisis and the passage of the Dodd-Frank Act of 2011.[25]

18. Since the passage of the Dodd-Frank Act, ratings may no longer be relied upon in certain regulatory contexts. Specifically, the use of credit ratings to inform bank capital requirements is now prohibited,[26] due to perceived conflicts of interest in supplier-side paid ratings. The findings and conclusions giving rise to the Dodd-Frank Act further undermine Dr. Feinstein's reliance on credit rating as the basis of his opinion that a downgrade from AAA to AA+ would automatically translate into higher bond yields.

---

[22] *Rating the Raters: Enron and the Credit Rating Agencies*, *Sen. Hearing 107–471, Before S. Comm. On Gov. Affairs* (Mar. 20, 2002) (Prepared Statement of Senator Thompson) ("Similarly, each of the three credit rating agencies on our first panel maintained investment grade ratings until just four days before Enron declared bankruptcy."). *See also* "Credit Rating Agencies and Their Regulation." *Congressional Research Service* (Apr. 9, 2012) <https://crsreports.congress.gov/product/pdf/R/R40613> (accessed Jan. 21, 2025) ("Companies like Enron and WorldCom retained their high credit ratings until a few days before they filed for bankruptcy.").

[23] Linnane, Clara. "S&P Offers Rare Defense of Lehman 'A' Rating." *Reuters* (Sept. 24, 2008). <https://www.reuters.com/article/markets/us/sp-offers-rare-defense-of-lehman-a-rating-idUSN24460408> (accessed Jan. 27, 2025).

[24] "Credit Rating Agencies and Their Regulation." *Congressional Research Service* (Apr. 9, 2012) <https://crsreports.congress.gov/product/pdf/R/R40613> (accessed Jan. 21, 2025) ("More recently, many mortgage-backed securities initially rated AAA have defaulted or have been sharply downgraded. In both situations, investors who relied on the ratings suffered heavy losses."); Soroushian, John. "Credit Ratings in Financial Regulation: What's Changed Since the Dodd-Frank Act?" *Office of Financial Research* (Apr. 21, 2016). <https://www.financialresearch.gov/briefs/files/OFRbr_2016-04_Credit-Ratings.pdf> (accessed Jan. 21, 2025) at 2 (discussing the inflated ratings and the decline in credit rating standards prior to 2008).

[25] Soroushian, John. "Credit Ratings in Financial Regulation: What's Changed Since the Dodd-Frank Act?" *Office of Financial Research* (Apr. 21, 2016). <https://www.financialresearch.gov/briefs/files/OFRbr_2016-04_Credit-Ratings.pdf> (accessed Jan. 21, 2025) at 3 (describing the three alternative means for evaluating credit used by regulators instead of credit ratings after the passage of the Dodd-Frank Act).

[26] Alternatives to the Use of External Credit Ratings in the Regulations of the OCC, 77 Fed. Reg. 35254 (June 13, 2012) ("Importantly, the proposal did not include a requirement that a national bank consider external credit ratings to make an 'investment grade' determination."); Soroushian, John. "Credit Ratings in Financial Regulation: What's Changed Since the Dodd-Frank Act?" *Office of Financial Research* (Apr. 21, 2016). <https://www.financialresearch.gov/briefs/files/OFRbr_2016-04_Credit-Ratings.pdf> (accessed Jan. 21, 2025) at 5 ("The Dodd-Frank Act called for eliminating credit ratings from federal financial regulation and substituting alternative standards of creditworthiness.").

19. Indeed, the perceived credibility of rating agencies has declined substantially in the past three decades. Research has found that since the financial crisis, "sophisticated market participants [have] decreas[ed] their reliance on corporate credit ratings[.]"[27]

20. Additionally, several new rating agencies and systems have emerged on both the supplier side (e.g., Kroll Bond Rating Agency[28]) and on the investor side. This includes the KMV model,[29] which has been widely used to assess corporate default risks of firms worldwide.[30] The emergence of new rating agencies and systems is likely to have further reduced investors' reliance on ratings by S&P when making investment decisions.

21. Further, testimony from Ben B. Tsocanos, a director at S&P and the primary analyst responsible for ExxonMobil's credit rating, challenges Dr. Feinstein's assumptions. Mr. Tsocanos testified that he is unaware of any study examining whether there is a measurable difference between the borrowing costs for AAA- and AA+-rated issuers.[31] He also confirmed that there are only a small number of AAA- and AA+-rated companies,[32] calling into question Dr. Feinstein's assumption that the terms of debt would be different between the two ratings.

22. In his opening report, Dr. Feinstein asserted that "Exxon[Mobil]'s asset write-down of $2.0 billion and de-booking of approximately 19% of its proved reserves would have negatively

---

[27] DeHaan, Ed. "The Financial Crisis and Corporate Credit Ratings." *The Accounting Review* 92.4 (2017): 161–189, 161.

[28] Kroll Bond Rating Agency is a global full-service rating agency. "Company Overview." *Kroll Bond Rating Agency.* <https://www.kbra.com/company/overview> (accessed Jan. 17, 2025).

[29] Moody's platform leveraging the KMV model "is used to deploy risk models across a bank's global lending network and to manage the data requirements of the credit rating process." "Moody's KMV Internal Rating Platform and the Basel II IRB Approaches." *Moody's KMV* (Mar. 31, 2005). <https://www.moodys.com/sites/products/ProductAttachments/Internal%20Rating%20Platform%20and%20the%20Basel%20II%20IRB%20Approaches%20English.pdf> (accessed Jan. 21, 2025).

[30] "RiskCalc™ US Banks Fact Sheet." *Moody's.* <https://www.moodys.com/sites/products/ProductAttachments/RiskCalc%20Version%201.0%20U.S.%20Banks.pdf> (accessed Jan. 20, 2025) ("The CRD has information from 4 million financial statements on 1 million firms and 70,000 defaults for private companies and was built in partnership with over 40 financial institutions globally. This depth of data allows RiskCalc to yield unique insight into the fundamental drivers of default for private firms across a wide array of countries, accounting for more than 75% of global GDP.").

[31] Dep. Tr. of Ben B. Tsocanos dated Jan. 14, 2025 ("Tsocanos Dep. Tr.") 173:7–11.

[32] In 2015 there were three AAA-rated, two AA+-rated, and nine AA-rated companies. *Id.* 167:5–17.

**App. 380**

impacted characteristics considered important by credit rating agencies for assessing credit quality."[33] This claim is also refuted by the testimony of Mr. Tsocanos, who explained that S&P's rating action "was primarily driven by financial concerns. [ExxonMobil's] reserves were still well within [S&P's] expectations for the rating."[34]

23. According to Mr. Tsocanos, S&P never communicated that ExxonMobil's credit rating would be impacted by asset impairment of any kind, as "[r]eserves were not the focus of [its] analysis at [that] point"[35] and that the proved reserve de-bookings at Kearl Oil Sands "appeared to be price related de-bookings" that S&P views "less negatively than other kinds of de-bookings."[36] Mr. Tsocanos's testimony challenges Dr. Feinstein's assumption that, had the market learned about the purported "corrective disclosures" about the Kearl proved reserve and Rocky Mountain impairment, ExxonMobil's March 2016 bond offering would have received AA+ ratings by S&P instead of AAA.

## V.   OPINION 3: DR. FEINSTEIN DID NOT CONTEST THE RESULTS OF MY OUTLOOK AND CREDITWATCH PLACEMENT EVENT STUDIES.

24. In my rebuttal report, I showed that the market was aware of a potential downgrade of ExxonMobil by S&P well prior to the March 2016 offering, given that ExxonMobil was placed on CreditWatch on February 2, 2016.[37] I also described the results of my empirical event studies, which showed that neither S&P's outlook revision nor the placement on CreditWatch had a statistically significant impact on ExxonMobil's bond returns.[38]

25. Despite not performing any empirical analysis of his own, Dr. Feinstein contended that my findings "in no way undermine[] [his] finding that lower rated bonds have higher interest rates" and that "[a] potential downgrade is not at all the same thing as an actual downgrade, and can be expected to have a different effect on yield."[39] He also claimed, without support,

---

[33] Feinstein Report ¶ 173.
[34] Tsocanos Dep. Tr. 248:14–249:12.
[35] *Id.* 253:17–254:6.
[36] *Id.* 272:5–17.
[37] Saunders Rebuttal Report Section VII.
[38] *Id.* ¶¶ 44–45.
[39] Feinstein Reply Report ¶ 156.

**App. 381**

that the news articles published regarding ExxonMobil's potential loss of its AAA credit rating reflected that "these events were not inconsequential."[40] He concluded that "[the fact that the Saunders Rebuttal Report was] unable to find a statistically significant negative return in the price of Exxon's bonds following Exxon being given a negative outlook or being placed on CreditWatch[] does not undermine [his] analysis in any way."[41]

26. Dr. Feinstein also did not contest that a CreditWatch event implies at least a 50 percent chance of a rating change in the next 90 days.[42] Indeed, S&P's Mr. Tsocanos testified that a CreditWatch event implies a chance of downgrade "greater than 50 percent."[43] The significant risk of a downgrade in the very near future would have quickly been incorporated into the market for bonds. That the market did not react to this risk, as measured by ExxonMobil's bond returns remaining statistically unchanged, shows that the CreditWatch placement and potential future downgrade were viewed as immaterial by investors.

27. Because Dr. Feinstein did not disagree with the results of my event studies,[44] he offers no empirical basis to dispute my conclusion that the market did not react to news about ExxonMobil's potential downgrade.

**VI.    OPINION 4: DR. FEINSTEIN DID NOT CONTEST THE RESULTS OF MY DOWNGRADE EVENT STUDY AND HIS NEW ANALYSIS OF EXXONMOBIL'S BOND OFFERINGS IN 2015 AND 2016 SUPPORTS MY CONCLUSION.**

28. In my rebuttal report, I presented the results of my third event study, which showed that that returns on ExxonMobil's bonds were statistically unaffected by the downgrade that occurred on April 26, 2016.[45] Dr. Feinstein did not disagree with the conclusions of this event study.[46]

---

[40] *Id.* ¶ 159.
[41] *Id.* ¶ 159.
[42] *See* Saunders Rebuttal Report ¶ 34.
[43] Tsocanos Dep. Tr. 130:9–18.
[44] Feinstein Dep. Tr. 254:14–19.
[45] Saunders Rebuttal Report Section VIII.
[46] Feinstein Dep. Tr. 254:14–19.

29. My rebuttal report also compared ExxonMobil's 2016 and 2019 bond offerings, which further showed that a downgrade in rating need not necessarily lead to higher yields.

30. In response, Dr. Feinstein claimed that my analysis comparing the Treasury spreads of ExxonMobil bonds issued in 2016 and 2019 was "uninformative and misleading" because it was "[c]omparing the yield spread over Treasuries in two different time frames for two different credit ratings[.]"[47]

31. Dr. Feinstein presented an analysis comparing Treasury spreads of ExxonMobil's bonds issued in March 2015 and March 2016, finding that those spreads were higher for the March 2016 bonds despite both offerings having received AAA ratings.[48] Dr. Feinstein claimed that the difference in these spreads shows flaws in my own analysis.

32. Such analysis does not, in fact, support his opinions that a hypothetical lower credit rating (from AAA to AA+) would result in ExxonMobil paying higher interest rates on their 2016 bond offering. Notably, both the 2015 and 2016 offerings Dr. Feinstein analyzed were rated AAA. Therefore, there was no change in credit rating to speak of in the first place.

33. Moreover, the higher Treasury spread for the 2016 offering likely reflected differences in characteristics other than credit rating, such as issue size and coupon rates. The size of issuance was 50 percent higher in 2016 ($12 billion versus $8 billion in 2015),[49] and thus supply and demand would have led to lower price and higher yield to absorb the supply in 2016. The 2016 offerings also had higher coupon rates,[50] implying higher yields when issued at par.

[47] Feinstein Reply Report ¶ 162.
[48] *Id.* ¶ 163 and Table 1.
[49] Exxon Mobil Corporation. *Pricing Term Sheet* (Mar. 3, 2015). <https://www.sec.gov/Archives/edgar/data/34088/000119312515075580/d881148dfwp.htm> (accessed Jan. 14, 2025); Exxon Mobil Corporation. *Pricing Term Sheet* (Feb. 29, 2016). <https://www.sec.gov/Archives/edgar/data/34088/000119312516486405/d135825dfwp.htm> (accessed Dec. 5, 2024).
[50] Exxon Mobil Corporation. *Pricing Term Sheet* (Mar. 3, 2015). <https://www.sec.gov/Archives/edgar/data/34088/000119312515075580/d881148dfwp.htm> (accessed Jan. 14, 2025); Exxon Mobil Corporation. *Pricing Term Sheet* (Feb. 29, 2016).

**App. 383**

34. S&P understood that many factors other than bond rating affect borrowing costs for issuers. Mr. Tsocanos testified that in addition to bond characteristics, outside factors such as overall interest rates, liquidity in the market, the supply and demand for fixed income, and timing of the offering are all factors that may affect terms available to a bond issuer.[51] Notably, he agreed that the size of the offering, holding all other variables constant, may impact the level of demand for, and terms of, an offering.[52]

35. Contrary to his claims, Dr. Feinstein's comparison of the 2015 and 2016 offerings is not evidence of flaws in my analysis. Rather, Dr. Feinstein's analysis shows that bond yields may change even if credit rating does not. In fact, both Dr. Feinstein's analysis and my own analysis cut against the central thesis in Dr. Feinstein's reports, namely, a downgrade in bond rating would necessarily result in higher interest payments for ExxonMobil.

## VII.   OPINION 5: DR. FEINSTEIN FAILED TO REFUTE MY CRITICISMS RELATED TO HIS USE OF OAS.

36. In my rebuttal report, I criticized Dr. Feinstein's choice of option-adjusted spreads ("OAS") over alternative yield calculation methods, which was unjustified in light of the limitations of OAS.[53]

37. In his rebuttal, Dr. Feinstein did not contest my opinion that OAS model projections are never equal to the realized future yield. This limits the usefulness of OAS models for projecting bond yields.

38. Instead, Dr. Feinstein complained that I did not attempt to implement the identified alternative yield calculation methods, which, in Dr. Feinstein's opinion, "render[ed] [my] criticism moot."[54] He also claimed, without support, that OAS is the best approach to

<https://www.sec.gov/Archives/edgar/data/34088/000119312516486405/d135825dfwp.htm> (accessed Dec. 5, 2024).
[51] Tsocanos Dep. Tr. 177:2–21.
[52] *Id.* 177:22–178:9.
[53] Saunders Rebuttal Report Section IX.
[54] Feinstein Reply Report ¶ 165.

**App. 384**

account for changes in credit risk, and that I offered no challenge to OAS being the best methodology.[55]

39. Dr. Feinstein is incorrect that OAS is the "best approach to account for changes in credit risk while considering the redemption features of the subject notes and comparison notes[.]"[56] As I described in my rebuttal report, OAS is computed by simulating many possible future interest rate paths.[57] It does not allow for discrete changes in credit risk such as a rating change (i.e., the paths do not account for a credit quality change in the future).[58] OAS is not the best approach to use to measure a change in credit risk.[59] Even if one ignored these obvious limitations of OAS, Dr. Feinstein also did not explain why he used the same OAS for both callable and non-callable bonds, as non-callable bonds, by definition, do not have call features.

40. Furthermore, as I showed in my rebuttal report, OAS models are sensitive to parameter values, including the value of interest rate volatility ("V").[60] OAS may overstate bond yields if the parameter value for V understates the true variability of interest rates.[61] Dr. Feinstein did not disclose the value of V that leads to his estimated increase of 13 basis points in the OAS, nor was the value stated in the ICE Data Indices ("IDI") Bond Index Methodology document he cited.

41. As I also noted in my rebuttal report, OAS can be calculated at least five different ways depending on the interest rate distribution assumption, and the OAS value is sensitive to model selection.[62] IDI's Bond Index Methodology indicates that it uses one specific

---

[55] Feinstein Reply Report ¶ 167.
[56] *Id.* ¶ 167.
[57] Saunders Rebuttal Report ¶ 74.
[58] *Id.* ¶ 64.
[59] *See id.* ¶ 64. *See also* "Issue Brief: Benefits and Limitations of Option-Adjusted Spread Analysis." *California Debt and Investment Advisory Commission* (2020). <https://www.treasurer.ca.gov/cdiac/publications/issue-brief/2020/20-10.pdf> (accessed Nov. 14, 2024) at 6 ("An issuer's creditworthiness will usually be reflected in the price and yield of the bond when it is issued, but OAS does not factor in other potential risks, such as changes to credit ratings.").
[60] Saunders Rebuttal Report ¶ 68.
[61] *Id.* ¶ 69 and Table 3.
[62] *Id.* ¶ 69.

**App. 385**

distribution assumption for interest rates (Gaussian).[63] That the OAS index Dr. Feinstein used is based on only one of five possible alternative models, combined with the undisclosed value of the volatility parameter, call into question the validity of Dr. Feinstein's conclusions of a 13 basis points increase in OAS.

42. Yield-to-worst ("YTW") or yield-to-maturity ("YTM")—alternative yield methods that Dr. Feinstein ignored—can allow for integrating the effects of credit shocks. Indeed, both YTW and YTM can handle credit shocks by using scenario analysis to calculate a spread over risk-free rates.

43. As for Dr. Feinstein's complaint that "Dr. Saunders does not attempt to execute any of his proposed alternative approaches,"[64] it is simply not true. As I stated in the my rebuttal report, had Dr. Feinstein used YTW instead of OAS, the "AA+ bonds [] would have been only two basis points higher than AAA bonds instead of 13 basis points as estimated using OAS."[65] Using YTW instead of OAS results in a reduction of $705 million in Dr. Feinstein's additional interest payment calculation (from $831 million, as calculated by Dr. Feinstein, to $126 million).[66]

## VIII.   OPINION 6: DR. FEINSTEIN SIMPLY REITERATED THE SAME INCORRECT CONCLUSION THAT MARKET AVERAGE OAS CAN MEASURE YIELDS OF INDIVIDUAL BONDS.

44. In my rebuttal report, I opined that the OAS measures used by Dr. Feinstein reflect market averages and therefore provide limited insight to individual bonds, and pointed out that an average OAS based on few data points is prone to large standard errors.[67]

---

[63] "Bond Index Methodologies." *Intercontinental Exchange, Inc.* (June 10, 2024) at 41.
[64] Feinstein Reply ¶ 165.
[65] Saunders Rebuttal Report ¶ 60.
[66] *See* Supporting Materials. This calculation is for illustrative purpose only and does not constitute my endorsement of Dr. Feinstein's methodology, which is flawed and unreliable in my opinion.
[67] Saunders Rebuttal Report Section X.

**App. 386**

45. Dr. Feinstein agreed with me that "the market benchmark will not exactly resemble any particular subject bond being analyzed," but nevertheless concluded that the "market benchmark provides a reasonable proxy for comparison purposes."[68]

46. Dr. Feinstein's argument that it is appropriate to use a single-rating-class-average yield to approximate yields for all bonds in the same rating class, irrespective of coupon, maturity, firm specific characteristics, and call option, is nonsense.

47. The academic literature Dr. Feinstein cited does not support his claim either. The 2010 article authored by Wei Dai and coauthors[69] stated that "market prices of bonds or, equivalently, bond yields should reflect aggregate expectations and market assessment of credit risk in real time."[70] The 2002 book authored by Frank Reilly and Keith Brown discussed the use of a market portfolio as a proxy for systematic risks. Neither is related to, let alone supports, the use of rating class average yield to estimate yields of individual bonds.

48. The 2017 article authored by James Adams and Donald Smith[71] stated that "[f]or fixed-income instruments that are not actively traded and therefore do not have an observable price," it is common to use "matrix pricing" that combines "observable liquid benchmark yields" and "benchmark spread of bonds with comparable times to maturity, credit quality, and sector or security type in order to estimate the current market yield and price."[72] The discussion of matrix pricing is irrelevant in this case because ExxonMobil's bonds were actively traded.[73] Furthermore, Dr. Feinstein has not shown, or even analyzed, whether

[68] Feinstein Reply Report ¶¶ 170–171.
[69] *See id.* ¶ 171.
[70] Feinstein Reply Report supporting materials, Wei, Dai, Alan Hutchinson and Samuel Wang. "Credit Spreads, Rating Downgrades, and Downside Performance: A Market-Informed Approach to Monitoring Credit Risk." *SSRN* (Mar. 2020) at 2.
[71] *See* Feinstein Reply Report ¶ 171.
[72] Feinstein Reply Report supporting materials, Adams, James and Donald Smith. "Liability-Driven and Index-Based Strategies." *Fixed Income and Equity Portfolio Management CFA Level III Curriculum.* John Wiley & Sons (2018) at 95.
[73] The corporate bond trade activity data published by FINRA shows that there were 506 trades for ExxonMobil's bonds between March 1, 2016, and May 1, 2016. "Corporate and Agency Bond Trade Activity." *FINRA.* <https://www.finra.org/finra-data/fixed-income/corp-and-agency/trade> (accessed Jan. 20, 2025).

**App. 387**

bonds included in his benchmark index are comparable to the ExxonMobil's bonds he attempted to estimate yields for.

### IX.   OPINION 7: DR. FEINSTEIN'S LINEAR INTERPOLATION IS UNSUPPORTED BY THE LITERATURE HE CITED, INCLUDING HIS OWN RESEARCH.

49.   In my rebuttal report, I opined that there is "no statistical or economic rationale to support Dr. Feinstein's assumption that the AA+ index OAS would lie exactly at the midpoint between the AAA OAS and the AA OAS."[74] Dr. Feinstein responded that linear interpolation is a "generally accepted and widely used technique[.]"[75] To support his claims, he cited an article co-authored by himself and two additional academic publications.

50.   I find Dr. Feinstein's responses uncompelling, and my opinion is unchanged—there is no economic basis for linear interpolation between the AAA OAS and the AA OAS other than its apparent convenience.

51.   In fact, Dr. Feinstein's own forthcoming paper supports my conclusion and contradicts his own. In that paper, he wrote that nonlinear interpolation provides "greater precision" than linear interpolation.[76]

52.   It is well understood in the finance literature that yield curves, which capture the relationship between the interest rate and maturity of a bond, are nonlinear.[77] Dr. Feinstein's simplistic approach of averaging two market indices (AAA and AA) ignored this important interaction between maturity and interest rate. A reliable analysis would have required estimating non-

---

[74] Saunders Rebuttal Report Section XI.
[75] Feinstein Reply Report ¶ 173.
[76] *Id.* ¶ 174.
[77] Nelson, Charles R. and Andrew F. Siegel. "Parsimonious Modeling of Yield Curves." *Journal of Business* (1987): 473–489, 474; Tuckman, Bruce. "Generalizations and Curve Fitting." *Fixed Income Securities, Tools for Today's Markets, Second Edition*. Hoboken: John Wiley & Sons (2002): 53–86, 63 ("A common but unsatisfactory technique of estimating an entire discount function from market data is called *linear yield interpolation*."). The two most common ways to fit a non-linear yield curve are cubic polynomial or cubic polynomial spline. *See, e.g.*, Tuckman, Bruce. "Generalizations and Curve Fitting." *Fixed Income Securities, Tools for Today's Markets, Second Edition*. Hoboken: John Wiley & Sons (2002): 53–86, 70.

**App. 388**

linear yield curves for AAA and AA and then computing yield spreads at any maturity (e.g., 1 year, 2 years, … 30 years).

53.   Furthermore, Dr. Feinstein mischaracterized the two academic articles that purportedly support his claims. Neither paper concluded, as Dr. Feinstein contended, that the exact mid-point of two ratings is appropriate for estimating the intermediate rating.[78] Instead, these papers concluded that one should consider both ratings for bonds with split ratings.

54.   The 1998 article by Jeff Jewell and Miles Livingston stated that "the market is placing value on both ratings when a split rating occurs in these categories."[79] Dr. Feinstein cited a paragraph[80] from the article, which stated "when split ratings occur, … the market price is set by the average of the two ratings."[81] Dr. Feinstein appeared to interpret "average of the two ratings" to mean the mathematical mean of two ratings. Specifically, he appears to believe that, based on this article, ExxonMobil's split ratings of Aaa (by Moody's) and AA+ (by S&P) should be averaged out to be AA+.[82] Consequently, he wrongly concluded that his calculation of a 13 basis points increase in interest rate from AAA to AA+ was supported. He admitted this mistake in his deposition.

55.   The 1997 article by Richard Cantor and coauthors[83] stated that "[i]f models rely [] on simply the higher or lower of the two ratings (but not both), greater bias is introduced[.]"[84] This further confirms my criticism of Dr. Feinstein's failure to account for ExxonMobil's split rating in his calculations.

---

[78] Feinstein Reply Report ¶ 175.

[79] Feinstein Reply Report supporting materials, Jewell, Jeff and Miles Livingston. "Split Ratings, Bond Yields, and Underwriter Spreads." *The Journal of Financial Research* 21.2 (1998):185–204 at 197.

[80] *See* Feinstein Reply Report ¶ 175.

[81] Feinstein Reply Report supporting materials, Jewell, Jeff and Miles Livingston. "Split Ratings, Bond Yields, and Underwriter Spreads." *The Journal of Financial Research* 21.2 (1998):185–204 at 187.

[82] *See* Feinstein Reply Report ¶ 175.

[83] *See id.* ¶ 175.

[84] Feinstein Reply Report supporting materials, Cantor Richard, Frank Packer and Kevin Cole. "Split Ratings and the Pricing of Credit Risk." *Federal Reserve Bank of New York, Research Paper No. 9711* (Mar. 1997).

**App. 389**

X.    **OPINION 8: DR. FEINSTEIN'S CALCULATION OF ADDITIONAL INTEREST EXPENSE TO EXXONMOBIL IS INCORRECT AS A MATTER OF ECONOMICS.**

56.    In my rebuttal report, I opined that Dr. Feinstein's calculation of additional interest expense to ExxonMobil was incorrect, as it "inappropriately fails to address the fact that some of the at-issue ExxonMobil bonds were callable before maturity, and further improperly values the interest payments."[85] Dr. Feinstein responded that this "criticism is misguided as my objective was to compute the additional amount of interest expressed in future value terms (i.e., at maturity), not assess the present value of that higher interest expense."[86] Dr. Feinstein also claimed that the use of OAS to compute the additional interest expense accounts for callability of the bonds.[87] Nothing in the Feinstein Reply Report, however, undermines my prior conclusions.

57.    In his opening report, Dr. Feinstein stated that he was asked to "estimate how much greater the Company's debt service on the Exxon[Mobil] Notes issued in the March 2016 offering would be over their life if they had been rated AA+ rather than AAA *at the time of their issuance*[.]"[88] Such analysis was retrospective. At the time of issuance in 2016, the possibility existed that some of the callable bonds would be called early by ExxonMobil, especially if market interest rates were to decrease. For this reason, a proper analysis of total interest payment obligations to ExxonMobil requires consideration of scenarios in which bonds are called. Dr. Feinstein did not do that.

58.    While I do not disagree with Dr. Feinstein that OAS "accounts for call features,"[89] he applied the same adjustment in OAS of 13 basis points to *all* ExxonMobil's bonds, regardless of whether a bond was or was not callable. Even if his OAS measure properly accounts for call features for the four callable ExxonMobil bonds (which Dr. Feinstein has not shown), questions would remain about why the same adjustment is appropriate for the other four non-callable bonds.

---

[85] Saunders Rebuttal Report Section XII.
[86] Feinstein Reply Report ¶ 177.
[87] *Id.* ¶ 178.
[88] Feinstein Report ¶ 172 (emphasis added).
[89] Feinstein Reply Report ¶ 178.

**App. 390**

59. Dr. Feinstein also provided no defense of his future value calculation other than stating that his objective "was to compute the additional amount of interest expressed in future terms."[90] Be that as it may, it does not excuse the fallacy in Dr. Feinstein's calculation that I pointed out in my rebuttal report, that he was "adding a dollar today to a dollar next year to get two dollars,"[91] failing to properly adjust for the time value of money.

Dated: January 28, 2025

_____

Anthony Saunders, Ph.D.

---

[90] *Id.* ¶ 177.
[91] Saunders Rebuttal Report ¶ 88.

   CONFIDENTIAL

**App. 391**

<u>Appendix A</u>

Materials Relied Upon

## Materials Relied Upon[1]

### Legal

Alternatives to the Use of External Credit Ratings in the Regulations of the OCC, 77 Fed. Reg. 35254 (June 13, 2012).

Consolidated Complaint for Violations of the Federal Securities Laws. *Pedro Ramirez, Jr. v. Exxon Mobil Corp.,* et al*.* (N.D. Tex. No. 3:16-cv-03111-K) (July 26, 2017).

### Expert Reports

Feinstein, Steven P. Reply Report on Loss Causation and Damages. *Pedro Ramirez, Jr. v. Exxon Mobil Corp.,* et al. (N.D. Tex. No. 3:16-cv-03111-K) (Jan. 10, 2025).

Feinstein, Steven P. Report on Loss Causation and Damages. *Pedro Ramirez, Jr. v. Exxon Mobil Corp.,* et al. (N.D. Tex. No. 3:16-cv-03111-K) (Oct. 11, 2024).

Saunders, Anthony. Expert Report of Anthony Saunders, Ph.D. *Pedro Ramirez, Jr. v. Exxon Mobil Corp.,* et al. (N.D. Tex. No. 3:16-cv-03111-K) (Dec. 10, 2024).

### Depositions

Dep. Tr. of Ben B. Tsocanos dated Jan. 14, 2025.

Dep. Tr. of Steven Feinstein dated Jan. 22, 2025 (Uncertified Rough Draft).

#### Deposition Exhibits

Steven Feinstein Dep. Ex. 6.

### Publications

Adams, James and Donald Smith. "Liability-Driven and Index-Based Strategies." *Fixed Income and Equity Portfolio Management CFA Level III Curriculum*. John Wiley & Sons (2018).

"Bond Index Methodologies." *Intercontinental Exchange, Inc.* (June 10, 2024).

Cantor Richard, Frank Packer and Kevin Cole. "Split Ratings and the Pricing of Credit Risk." *Federal Reserve Bank of New York, Research Paper No. 9711* (Mar. 1997).

"Company Overview." *Kroll Bond Rating Agency.* <https://www.kbra.com/company/overview> (accessed Jan. 17, 2025).

---

[1] In preparing my report, I relied upon the documents listed here along with any items cited or referenced in the body and footnotes of my report.

**App. 393**

"Corporate and Agency Bond Trade Activity." *FINRA*. <https://www.finra.org/finra-data/fixed-income/corp-and-agency/trade> (accessed Jan. 20, 2025).

"Credit Rating Agencies and Their Regulation." *Congressional Research Service* (Apr. 9, 2012) <https://crsreports.congress.gov/product/pdf/R/R40613> (accessed Jan. 21, 2025).

DeHaan, Ed. "The Financial Crisis and Corporate Credit Ratings." *The Accounting Review* 92.4 (2017): 161–189.

Ederington, Louis H., Jess B. Yawitz and Brian E. Roberts. "The Information Content of Bond Ratings." *The Journal of Financial Research* 10.3 (1987): 211–226.

Exxon Mobil Corporation. *Pricing Term Sheet* (Feb. 29, 2016). <https://www.sec.gov/Archives/edgar/data/34088/000119312516486405/d135825dfwp.htm> (accessed Dec. 5, 2024).

Exxon Mobil Corporation. *Pricing Term Sheet* (Mar. 3, 2015). <https://www.sec.gov/Archives/edgar/data/34088/000119312515075580/d881148dfwp.htm> (accessed Jan. 14, 2025).

Hsueh, L. Paul and David S. Kidwell. "Bond Ratings: Are Two Better Than One?" *Financial Management* 17.1 (1988): 46–53.

"Issue Brief: Benefits and Limitations of Option-Adjusted Spread Analysis." *California Debt and Investment Advisory Commission* (2020). <https://www.treasurer.ca.gov/cdiac/publications/issue-brief/2020/20-10.pdf> (accessed Nov. 14, 2024).

Jewell, Jeff and Miles Livingston. "Split Ratings, Bond Yields, and Underwriter Spreads." *The Journal of Financial Research* 21.2 (1998):185–204,

Linnane, Clara. "S&P Offers Rare Defense of Lehman 'A' Rating." *Reuters* (Sept. 24, 2008). <https://www.reuters.com/article/markets/us-sp-offers-rare-defense-of-lehman-a-rating-idUSN24460408> (accessed Jan. 27, 2025).

"Moody's KMV Internal Rating Platform and the Basel II IRB Approaches." *Moody's KMV* (Mar. 31, 2005). <https://www.moodys.com/sites/products/ProductAttachments/Internal%20Rating%20Platform%20and%20the%20Basel%20II%20IRB%20Approaches%20English.pdf> (accessed Jan. 21, 2025).

Nelson, Charles R. and Andrew F. Siegel. "Parsimonious Modeling of Yield Curves." *Journal of Business* (1987): 473–489.

*Rating the Raters: Enron and the Credit Rating Agencies*, Sen. Hearing 107–471, Before S. Comm. On Gov. Affairs (Mar. 20, 2002) (Prepared Statement of Senator Thompson).

**App. 394**

Reiter, Sara A. and David A. Ziebart. "Bond Yields, Ratings, and Financial Information: Evidence from Public Utility Issues." *Financial Review* 26.1 (Feb. 1991): 45–73.

"RiskCalc™ US Banks Fact Sheet." *Moody's.* <https://www.moodys.com/sites/products/ProductAttachments/RiskCalc%20Version%20 1.0%20U.S.%20Banks.pdf> (accessed Jan. 20, 2025).

Soroushian, John. "Credit Ratings in Financial Regulation: What's Changed Since the Dodd-Frank Act?" *Office of Financial Research* (Apr. 21, 2016). <https://www.financialresearch.gov/briefs/files/OFRbr_2016-04_Credit-Ratings.pdf> (accessed Jan. 21, 2025).

Tuckman, Bruce. "Generalizations and Curve Fitting." *Fixed Income Securities, Tools for Today's Markets, Second Edition*. Hoboken: John Wiley & Sons (2002): 53–86.

Wei, Dai, Alan Hutchinson and Samuel Wang. "Credit Spreads, Rating Downgrades, and Downside Performance: A Market-Informed Approach to Monitoring Credit Risk." *SSRN* (Mar. 2020).

Ziebart, David A. and Sara A. Reiter. "Bond Ratings, Bond Yields and Financial Information." *Contemporary Accounting Research* 9.1 (1992): 252–282.

# Exhibit 9

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

PEDRO RAMIREZ, JR.,                     )

Individually and on Behalf of   )

All Others Similarly Situated,  )

                                        )

          Plaintiff,            )

                                        )

          v.                            ) Civil Action No.

                                        ) 3:16-CV-03111-K

EXXON MOBIL CORPORATION, REX W. )

TILLERSON, ANDREW P. SWIGER,    )

JEFFREY J. WOODBURY, and        )

DAVID S. ROSENTHAL,             )

                                        )

          Defendants.           )

_____ )

VIDEO-RECORDED DEPOSITION OF D. PAUL REGAN

Wednesday, January 29, 2025

San Francisco, California

Stenographically Reported By:

Hanna Kim, CLR, CSR No. 13083

**App. 396**

Page 10

INDEX OF EXHIBITS  (CONTINUED)

REGAN DEPOSITION EXHIBITS                    PAGE
Exhibit 20    "America's F&O - Delivering      196
     the Plan," "December 2015";
     Bates nos. EMC_RAM_SEC
     000009968 through EMC_RAM_SEC
     000010025
Exhibit 21    "Commission Guidance Regarding    210
     Management's Discussion and
     Analysis of Financial
     Condition and Results of
     Operations" from Federal
     Register 17 CFR Parts 211,
     231, and 241; 10 pages
Exhibit 22    Document entitled "Assessment    237
     of Potential Impairment
     Triggers"; EMC_RAM 000000001
     through EMC_RAM 000000079
Exhibit 23    "35 Subsequent Measurement"; 8    247
     pages
               --o0o--

Page 12

Veritext Legal Solutions, and I am the videographer.

I am not authorized to administer an oath. I am not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to proceeding, 09:11:31 please state them at the time of your appearance.

Counsel and all present have been noted for the record.

Will the court reporter please introduce yourself and administer the oath to the witness. 09:11:39

THE COURT REPORTER:  Good morning.  This is Hanna Kim, Certified Shorthand Reporter, License Number 13083.

I'm going to administer the oath to the witness.

///

Page 11

San Francisco, California
Wednesday, January 29, 2025
9:10 a.m., Pacific Standard Time
          --o0o--

THE VIDEOGRAPHER:  Good morning.  We are going on the record at 9:10 a.m., on January 29th of 2025.

Please note that the microphones are sensitive and may pick up whispering and private conversations. 09:10:18

Please mute your phones at this time.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is the Media Unit 1 of the 09:10:26 video-recorded deposition of D. Paul Regan, taken by counsel for Defendant, in the matter of Pedro Ramirez, Jr., versus Exxon Mobil Corporation, et al., filed in the United States District Court, Northern District of Texas; Case Number: 09:10:47 3:16-cv-03111-K.

The location of the deposition is 535 Mission Street, 25th Floor, San Francisco, California.

My name is Vinny Bezerra, representing 09:11:08

Page 13

D. PAUL REGAN, having been duly administered an oath, was examined and testified as follows:

EXAMINATION
BY MR. TOAL:
Q.  Good morning, Mr. Regan.
A.  Good morning, Mr. Toal.
Q.  Mr. Regan, are you aware of any reason you wouldn't be able to testify truthfully today? 09:12:13
A.  No.
Q.  Let me mark for you as Regan Exhibit 1 a copy of the opening expert report that you submitted in this case on October 10th, 2024.
(Regan Deposition Exhibit 1 was marked for 09:12:44 identification.)
BY MR. TOAL:
Q.  Mr. Regan, do you recognize this as the report that you submitted in this case?
A.  Yes. 09:12:54
Q.  And is that your signature on page 136?
A.  Yes.
Q.  Okay.
MR. TOAL:  I'm going to mark as Regan Exhibit 2 a copy of the reply report that you 09:13:15

4 (Pages 10 - 13)

Page 250

putting together forecasts, as indicated in my original report and my reply report.

Q. Does Exxon Mobil say NYMEX strip prices should be used to put together forecasts for long-lived assets?    17:41:17

A. Well, what -- I'd have to do a -- a word search for Exxon's comments and assessment of NYMEX. But my recollection in the 2015 data guide, it -- it complements and speaks highly of NYMEX. And you can use it for a period of time, and then you have to    17:41:46 use an inflator, because after -- after approximately five years, they don't -- they recommend an inflator rather than NYMEX.

Q. Do you know what percentage of the production at the three Rocky Mountain dry gas    17:42:03 assets you analyzed in your report was to be produced beyond 2020?

A. I haven't made that calculation. But it's -- it's something that resides within the spreadsheet, and it could be done.    17:42:26

Q. Would it surprise you to learn that for a -- Uintah's asset, about 94 percent of the production was to take place after 2020?

A. No. 'Cause the periods in those forecasts are long, and -- and much of -- much of the -- in --    17:42:47

Page 251

in the calculations that -- that were made by Exxon, they accelerated the pace of the increase in the price of gas so that the production -- and then -- then they increased it by significantly more than inflation so that revenue would be very much    17:43:23 benefited by those assumptions.

Q. Have you analyzed the extent to which natural gas prices track the rate of overall inflation?

A. Well, you could see that in my analysis,    17:43:41 out of the compound annual growth rate assumed in the Exxon calculations versus the compound annual growth rate from the various years, I don't think it was keeping up with inflation. It was -- it was significantly below inflation.    17:44:13

Q. And there are years where natural --

A. It was a -- it was a negative.

Q. And there are years where natural gas prices increased significantly more than the overall rate of inflation; correct?    17:44:28

A. Maybe one year.

Q. Only one year in the history of natural gas prices has that happened?

A. No. I'm looking at -- at the -- the chart that goes back approximately ten years.    17:44:37

Page 252

Q. Is it your -- is it your opinion --

A. There was -- if you look at page 91, Paragraph 182, that's a persistent decline, a significant decline. That is not keeping up with inflation --    17:44:59

Q. Do --

A. -- from -- from 2014 to 2016. And if you look at -- at 1- -- at 185, well, you -- you might have beat inflation in 2007.

Q. Do past prices for natural gas predict    17:45:17 future prices for natural gas?

A. Well, I think in most instances when you read the documents that relate to somebody trying to predict, they typically say past prices are not an -- not an -- not an indicator of what future    17:45:39 prices will be. But they're an important indicator.

Q. That's your -- that's your opinion as an accountant?

A. An opinion as to somebody that has prepared a lot of forecasts of various commodities    17:45:57 and products and services.

Q. Is it your opinion that Exxon Mobil, notwithstanding its use of opportunity case prices to evaluate investments, could have decided to use projections based on NYMEX strip prices plus an    17:46:19

Page 253

inflation escalator to conduct its impairment analysis?

A. That it could have decided to do that?

Q. Yeah. Would that have been permissible under the rules in your view?    17:46:36

A. Yes.

Q. And would it also be permissible under the rules, in your view, for Exxon Mobil to use the actual projections it used to evaluate investment opportunities?    17:46:44

A. Let me -- with -- to evaluate investment opportunities?

Q. Yes.

A. I think it -- it's something that they would -- they could have considered if they chose    17:47:00 to.

Q. And that would have been permissible under the rules; correct?

A. Yes.

MR. TOAL: All right.    17:47:16

Why don't we go off the record.

THE VIDEOGRAPHER: This is the end of Media Number 6. We are off the record at 5:47 p.m.

(Off the record.)

THE VIDEOGRAPHER: This is beginning of    17:51:06

64 (Pages 250 - 253)

**App. 398**

Page 254

Media Number 7. We are back on record at 5:51 p.m.

BY MR. TOAL:

Q. Mr. Regan, you understand that PwC audited Exxon Mobil's impairment analysis for 2015; correct?

A. Yes. It was included in their audit procedures.

Q. And PwC produced an extensive memo documenting its review and its analysis; correct?

A. Yes.

Q. And you're aware that PWC concluded in that in the analysis that we agree with the determination that there are no assets for which a material impairment should be recorded and that a trigger event has not occurred; correct?

A. Yes, that was the conclusion. However, it did accept the prices that were used in the company plan and in the -- and -- and you can -- that was -- that's the key difference between, you know, the work that I've done and the analysis that I've done and what Exxon did and what PwC was reviewing. It accepted the company's pricing plan.

Q. And --

A. And you'll see consistent criticism within the PCAOB inspection reports, criticizing Pricewaterhouse of accepting that kind of an

Page 255

assumption in other impairment analysis of oil and gas companies, which may include Exxon, but it doesn't identify the companies.

Q. And PwC confirmed that Exxon Mobil was using prices for its projected natural gas prices that were reasonable in relation to those that were used to evaluate investment opportunities; right?

MR. SAHAM: Objection. Form. Foundation.

THE WITNESS: It -- it didn't assess the reasonableness. It accepted them.

BY MR. TOAL:

Q. And it determined they were using the same projected natural gas prices that it used to evaluate investment opportunities; right?

A. That's my recollection. It made that determination, but it did not assess that in comparison to other available information and do an analysis of the reasonableness of the pricing used in the projections.

Q. Now, you say in your report that auditing standards established by the PCAOB recognized that an audit- -- auditor's unqualified opinion does not provide absolute assurance that financial statements are free of material misstatement; correct?

A. Correct.

Page 256

Q. But the auditing standards do establish that an auditor's unqualified opinion provides reasonable assurance that financial statements are free of material misstatements; right?

A. Yes. The financial statements taken as a whole, not as to piecemeal components of those financial statements. The opinion is on the financial statements as a whole.

Q. And to the best of your knowledge, Pricewaterhouse has never withdrawn its unqualified opinion with respect to Exxon Mobil's 2015 financials; correct?

A. Correct.

MR. TOAL: I have nothing further.

THE WITNESS: All righty.

THE COURT REPORTER: Off the record?

MR. TOAL: Off the record.

THE VIDEOGRAPHER: We are off the record at 5:54 p.m. This concludes today's testimony given by D. Paul Regan. The total number of media used was seven and will be retained by Veritext Legal Solutions.

(Off the video record.)

THE COURT REPORTER: Counsel? Scott, would you like a rough?

Page 257

MR. SAHAM: Yes. Just whatever you send them.

THE COURT REPORTER: On the final, too?

MR. SAHAM: Yes.

(Proceedings concluded, 5:55 p.m., on January 29, 2025.)

65 (Pages 254 - 257)

Page 258

CERTIFICATE OF REPORTER

I, Hanna Kim, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, not in anywise interested in the outcome thereof.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

In witness whereof, I have hereunto subscribed

Dated:

Hanna Kim
CLR, CSR No. 13083

Page 259

Scott H. Saham, Esq.
scotts@rgrdlaw.com
January 31, 2025
RE:   Ramirez, Jr., Pedro v. Exxon Mobil Corporation, Et Al
1/29/2025, D. Paul Regan (#7102054)
The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at cs-ny@veritext.com

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

Page 260

Ramirez, Jr., Pedro v. Exxon Mobil Corporation, Et Al
D. Paul Regan (#7102054)
E R R A T A   S H E E T
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____

_____  _____

D. Paul Regan                Date

Page 261

Ramirez, Jr., Pedro v. Exxon Mobil Corporation, Et Al
D. Paul Regan (#7102054)
ACKNOWLEDGEMENT OF DEPONENT
I, D. Paul Regan, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____  _____

D. Paul Regan                Date
*If notary is required
SUBSCRIBED AND SWORN TO BEFORE ME THIS
_____ DAY OF _____, 20____.


_____
NOTARY PUBLIC

66 (Pages 258 - 261)

**App. 400**