IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| PEDRO RAMIREZ, JR., Individually and on Behalf of All Others Similarly Situated,<br><br>   Plaintiff,<br><br>   v.<br><br>EXXON MOBIL CORPORATION, REX W. TILLERSON, ANDREW P. SWIGER, and DAVID S. ROSENTHAL,<br><br>   Defendants. | Case No. 3:16-cv-3111-K |

**DEFENDANTS' BRIEF IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT**

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

HAYNES AND BOONE, LLP
2801 N. Harwood Street, Suite 2300
Dallas, TX 75219
(214) 651-5000

*Counsel for Exxon Mobil Corporation, Andrew P.
Swiger, and David S. Rosenthal*

SQUIRE PATTON BOGGS
2200 Ross Avenue, Suite 4100W
Dallas, TX 75201
(214) 758-1505

*Counsel for Rex W. Tillerson*

**TABLE OF CONTENTS**

SUMMARY OF THE ARGUMENT................................................................................... 1

LEGAL STANDARD AT SUMMARY JUDGMENT.................................................. 8

ARGUMENT.................................................................................................................... 8

I.    The Undisputed Facts Refute Plaintiff's Kearl Proved Reserves Theory........................ 9

    A.    Statement of Undisputed Facts Concerning Kearl Proved Reserves Claim........... 9

    B.    The Undisputed Facts Show the Enhanced Risk Disclosure Was Not Materially Misleading.................................................................................................. 15

    C.    The Undisputed Facts Show That Plaintiff Cannot Prove Scienter..................... 19

    D.    The Undisputed Facts Show That Plaintiff Cannot Prove Loss Causation.......... 22

II.   The Undisputed Facts Show That Defendants Did Not Mislead Investors About the Profitability of the Canadian Bitumen Operations........................................................... 24

III.  The Undisputed Facts Show That Defendants Did Not Engage in Fraud Concerning the RMDG Impairment................................................................................................... 25

    A.    Statement of Undisputed Facts Concerning the Alleged RMDG Impairment Analyses................................................................................................... 26

    B.    The Undisputed Facts Show That ExxonMobil's RMDG-Impairment-Related Disclosures Were Not False......................................................................... 30

    C.    The Undisputed Facts Show That Defendants Did Not Act with Scienter.......... 32

    D.    The Undisputed Facts Show That Plaintiff Cannot Prove Loss Causation.......... 32

IV.   Plaintiff's Unpled Theories Are Improper and, in Any Case, Meritless......................... 36

    A.    Plaintiff's Attempts to Proffer Two New Theories of the Case Are Improper.... 36

    B.    Plaintiff's Unpled Kearl Reserves Theory Is Meritless..................................... 39

    C.    Plaintiff's Unpled Kearl Profitability Theory Is Meritless................................ 45

CONCLUSION............................................................................................................... 49

## TABLE OF AUTHORITIES

**Cases**                                                                                                  **Page(s)**

*ABC Arbitrage Plaintiffs Grp.* v. *Tchuruk*,
   291 F.3d 336 (5th Cir. 2002) .................................................................................. 38

*In re Aceto Corp. Sec. Litig.*,
   No. 2:18-CV-2425, 2019 WL 3606745 (E.D.N.Y. Aug. 6, 2019) ...................................... 32

*In re Alamosa Holdings, Inc.*,
   382 F. Supp. 2d 832 (N.D. Tex. 2005) ............................................................................. 32

*In re Alta Mesa Res., Inc. Sec. Litig.*,
   2024 WL 3760481 (S.D. Tex. Aug. 12, 2024) ............................................................ 2, 16

*Anderson* v. *Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ........................................................................................................ 8

*Bayle* v. *Allstate Ins. Co.*,
   615 F.3d 350 (5th Cir. 2010) ........................................................................................... 8

*Bellard* v. *Gautreaux*,
   675 F.3d 454 (5th Cir. 2012) ........................................................................................... 8

*In re: BP p.l.c. Sec. Litig.*,
   No. 4:10-MD-2185, 2016 WL 3090779 (S.D. Tex. May 31, 2016) ................................. 32

*Caro* v. *City of Dallas*,
   17 F. Supp. 2d 618 (N.D. Tex. 1998) .............................................................................. 38

*Catogas* v. *Cyberonics, Inc.*,
   292 F. App'x 311 (5th Cir. 2008) ...................................................................... 35, 45, 48

*Christianson* v. *Colt Indus. Operating Corp.*,
   486 U.S. 800 (1988) ...................................................................................................... 46

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys.* v. *Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017) ......................................................................................... 32

*Coates* v. *Heartland Wireless Commc'ns, Inc.*,
   26 F. Supp. 2d 910 (N.D. Tex. 1998) .............................................................................. 31

*Danis* v. *USN Commc'ns, Inc.*,
   121 F. Supp. 2d 1183 (N.D. Ill. 2000) ............................................................................ 25

*In re Dell, Inc. Sec. Litig.*,
   591 F. Supp. 2d 877 (W.D. Tex. 2008) ..................................................................... 35, 45

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
  No. 1446, 2016 WL 4095973 (S.D. Tex. Aug. 2, 2016).......................................... 32

*Fener* v. *Operating Eng'rs Const. Indus. & Misc. Pension Fund (LOCAL 66)*,
  579 F.3d 401 (5th Cir. 2009)................................................................. 4, 23

*In re Firstenergy Corp.*,
  Nos. 2:20-CV-3785, 2:20-CV-4287, 2022 WL 681320 (S.D. Ohio Mar. 7,
  2022)................................................................................................. 36

*Greenberg* v. *Crossroads Sys., Inc.*,
  364 F.3d 657 (5th Cir. 2004)............................................................*passim*

*Heinze* v. *Tesco Corp.*,
  971 F.3d 475 (5th Cir. 2020).................................................................. 17

*Ind. Elec. Workers' Pension Tr. Fund IBEW* v. *Shaw Grp., Inc.*,
  537 F.3d 527 (5th Cir. 2008)........................................................ 20, 33, 44

*Jackson* v. *Gautreaux*,
  3 F.4th 182 (5th Cir. 2021)................................................................. 7, 38

*Jacobowitz* v. *Range Res. Corp.*,
  596 F. Supp. 3d 659 (N.D. Tex. 2022)......................................................... 8

*Kapps* v. *Torch Offshore, Inc.*,
  379 F.3d 207 (5th Cir. 2004)................................................................. 47

*Lighthouse Fin. Grp.* v. *Royal Bank of Scotland Grp., PLC*,
  No. 11 Civ. 398, 2013 WL 4405538 (S.D.N.Y. Aug. 5, 2013)............................... 35

*Loiacano* v. *DISA Glob. Sols., Inc.*,
  659 F. App'x 772 (5th Cir. 2016) ............................................................ 43

*Lormand* v. *US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009)........................................................ 15, 17, 22

*Ludlow* v. *BP, P.L.C.*,
  800 F.3d 674 (5th Cir. 2015).................................................................. 22

*Macquarie Infrastructure Corp.* v. *Moab Partners, L.P.*,
  601 U.S. 257 (2024)........................................................................ 9, 18, 46

*F.D.I.C.* v. *McFarland*,
  243 F.3d 876 (5th Cir. 2001).................................................................. 45

*N. Port Firefighters' Pension--Loc. Option Plan* v. *Temple-Inland, Inc.*,
  936 F. Supp. 2d 722 (N.D. Tex. 2013)..................................................... 34, 45

iii

*Naglich* v. *Applied Optoelectronics*,
    436 F. Supp. 3d 954 (S.D. Tex. 2020)..................................................................... 18

*Neiman* v. *Bulmahn*,
    854 F.3d 741 (5th Cir. 2017)........................................................................... 4, 21

*Okla. Firefighters Pension & Ret. Sys.* v. *Six Flags Ent. Corp.*,
    58 F.4th 195 (5th Cir. 2023)...........................................................................*passim*

*Omnicare, Inc.* v. *Laborers District Council Construction Industry Pension Fund*,
    575 U.S. 175 (2015)...................................................................................... 32, 44

*Owens* v. *Jastrow*,
    789 F.3d 529 (5th Cir. 2015)............................................................................ 6, 20

*Pittman* v. *U.S. Bank NA*,
    840 F. App'x 788 (5th Cir. 2021) ......................................................................... 38

*Reitz* v. *Woods*,
    85 F.4th 780 (5th Cir. 2023).............................................................................. 8, 23

*Ret. Sys. of Mich.* v. *Pier 1 Imports, Inc.*,
    935 F.3d 424 (5th Cir. 2019)........................................................................... 21, 44

*Sec. & Exch. Comm'n v. Bowen*,
    No. 3:22-CV-1415-S, 2024 WL 3462359 (N.D. Tex. July 17, 2024)................................. 47

*U.S. S.E.C.* v. *Snyder*,
    292 F. App'x 391 (5th Cir. 2008) ................................................................ 6, 20, 33

*Southland Sec. Corp.* v. *INSpire Ins. Sols., Inc.*,
    365 F.3d 353 (5th Cir. 2004)........................................................................... 20, 32

*In re St. Jude Med., Inc., Sec. Litig.*,
    629 F. Supp. 2d 915 (D. Minn. 2009) .................................................................... 38

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).......................................................................................... 19

*In re Williams Sec. Lit.-WCG Subclass*,
    558 F.3d 1130 (10th Cir. 2009) ........................................................................... 23

*In re Zonagen, Inc. Sec. Litig.*,
    322 F. Supp. 2d 764 (S.D. Tex. 2003).................................................................... 23

**Statutes**

15 U.S.C. § 77z-2(i)(1) ................................................................................................ 32

15 U.S.C. § 78u-4 ................................................................................................ 22, 38

15 U.S.C. § 78u-5(c)(1)(A) ...................................................................................... 3, 17

**Other Authorities**

17 C.F.R. § 210.4-10 ...................................................................................... 9, 39, 40, 41

17 C.F.R. § 240.10b-5 ...................................................................................... 8, 9, 18, 46

17 C.F.R. § 229.1204 ............................................................................................... 24, 46

Fed. R. Civ. P. 9(b) ..................................................................................................... 38

Fed. R. Civ. P. 56 ......................................................................................................... 8

## SUMMARY OF THE ARGUMENT

Plaintiff accuses Defendants Exxon Mobil Corporation ("ExxonMobil" or the "Company") and three former senior executives (the "Individual Defendants") of committing securities fraud under Section 10(b) of the Securities Exchange Act. Defendants now move for summary judgment because Plaintiff cannot prove those serious allegations.

Simply put, there is not a shred of evidence that Defendants engaged in securities fraud. Plaintiff fails to establish a triable issue of fact that could prove that Defendants had any intent to deceive, manipulate, or defraud, as required for scienter. To the contrary, as in the New York Attorney General ("NYAG") lawsuit on which Plaintiff modeled its claims, the evidence shows that ExxonMobil and the Individual Defendants followed rigorous internal processes, thoughtfully considered and applied the relevant accounting guidance, were uniformly committed to making accurate public disclosures, and sought to appropriately inform investors by *enhancing* the Company's disclosures in the relevant time period. While Plaintiff now second-guesses Defendants' accounting judgments, that is not fraud. And as in the NYAG lawsuit from which this case derives, such claims cannot survive the undisputed evidence or controlling law. In short, in the words of ExxonMobil's former CEO Rex Tillerson, the evidence shows that ExxonMobil's mandate was to "disclose what the SEC requires you to disclose. . . . We're going to make that disclosure." App. 301–02 at 73:21–74:3.

Following this Court's motion to dismiss decision and class certification order, Plaintiff's fraud claims have withered to the allegations that, in February 2016, Defendants (1) misrepresented the risk that ExxonMobil would have to de-book its proved reserves at Kearl at year-end, (2) violated ASC 275 by failing to disclose the alleged unprofitability of the Canadian bitumen operations, and (3) failed to disclose that certain Rocky Mountain Dry Gas ("RMDG") assets were supposedly impaired as of year-end 2015. And following class certification, Plaintiff

is left with a single alleged corrective disclosure: the October 28, 2016 announcement of third quarter earnings. These remaining claims are meritless, both because the evidence does not support them, and because, as a matter of law, Plaintiff cannot satisfy the required elements for its Section 10(b) claim. In fact, these legal defects alone require dismissal.

**Failed Theory #1: Plaintiff's "Tepid Warning" Theory**. Plaintiff alleges that, in February 2016, ExxonMobil issued a "tepid warning" that the proved reserves for Kearl could be de-booked at year-end 2016, when it allegedly knew a de-booking was "virtually certain." No evidence shows the challenged disclosure (A) was materially false or misleading, (B) was made with scienter, or (C) caused Plaintiff's alleged losses. Each of these defects independently requires dismissal.

**(A)      No Materially Misleading Statement**. Proved reserves are required to be assessed using "*historical* prices—generally, the average of the first-day-of-the-month prices for the *twelve* months prior to the assessment—and current costs." Dkt. No. 178 at 7 (emphases added). When ExxonMobil issued the allegedly misleading warning in February 2016, it had ***only 1-2 months*** of pricing and cost information for 2016. Absent a crystal ball, neither ExxonMobil nor anyone else could have had "virtual certainty" that year-end de-bookings would occur. And the evidence confirms that ExxonMobil, in fact, did ***not*** view de-booking as "virtually certain" in February 2016. Summary judgment is properly granted where, as here, Plaintiff cannot identify evidence that the event described in the forward-looking risk disclosure had already transpired. *See In re Alta Mesa Res., Inc. Sec. Litig.*, 2024 WL 3760481, at *8 (S.D. Tex. Aug. 12, 2024). Further, after this Court decided the motion to dismiss, the Fifth Circuit has held that forward-looking statements are immune from liability under the safe harbor of the Private Securities Litigation Reform Act ("PSLRA") if accompanied by warnings that are "company-specific" and include "a realistic

2

description of the risks applicable to the particular circumstances"—like those Defendants made here regarding the potential for proved reserves de-bookings. *Okla. Firefighters Pension & Ret. Sys.* v. *Six Flags Ent. Corp.*, 58 F.4th 195, 211 (5th Cir. 2023) (quoting *Southland Sec. Corp.* v. *INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004)); 15 U.S.C. § 78u-5(c)(1)(A).

**(B)**     **No Scienter**.  Plaintiff also has failed to establish a genuine dispute of material fact with respect to scienter.  Plaintiff survived at the motion to dismiss stage by alleging that Defendants made the alleged misrepresentations in order to prevent a downgrade of ExxonMobil's AAA credit rating prior to a March 2016 debt offering.  That scienter theory imploded in discovery. The credit rating agencies, S&P and Moody's, produced documents and gave testimony showing that Kearl proved reserves de-bookings would have had *no impact* on ExxonMobil's credit ratings. And discovery failed to turn up a single internal document at ExxonMobil, or any testimony, suggesting that Defendants thought otherwise.  There is thus no evidence linking a purported desire to maintain ExxonMobil's AAA credit rating to ExxonMobil's analysis of, or statements regarding, its proved reserves at Kearl.

And the remaining evidence squarely and irrefutably defeats scienter.  Because the challenged statement is forward-looking, Plaintiff must prove under the PSLRA that the Individual Defendants who approved its inclusion in the Form 10-K had "actual knowledge" that it purportedly was false—which the Fifth Circuit has described as a "demanding" standard. *Six Flags Ent. Corp.*, 58 F.4th at 214–15.  There is no evidence here that the Individual Defendants— who relied on internal subject matter experts—had "actual knowledge" that the warning about a potential de-booking of proved reserves was false.  To the contrary, the fact that ExxonMobil took steps to supplement its risk disclosures to warn about potential Kearl de-bookings *negates* scienter.

3

After all, "[i]t would have made little sense for Defendants to simultaneously disclose to, and mislead, the public" about the risk. *Neiman* v. *Bulmahn*, 854 F.3d 741, 750 (5th Cir. 2017).

**(C)** **No Loss Causation**. The "tepid warning" claim also cannot survive summary judgment because Plaintiff offers no expert evidence to support loss causation. "[T]he testimony of an expert—along with some kind of analytical research or event study—is required to show loss causation." *Fener* v. *Operating Eng'rs Const. Indus. & Misc. Pension Fund (LOCAL 66)*, 579 F.3d 401, 409 (5th Cir. 2009). Plaintiff's loss causation and damages expert is Steven P. Feinstein—***but he did not even analyze Plaintiff's pleaded theory*** about the allegedly "tepid warning" of a potential de-booking of Kearl proved reserves at year-end 2016. And, even if Feinstein had opined on losses supposedly connected to the "tepid warning," his opinions are inadmissible for the reasons set forth in Defendants' *Daubert* motions, filed simultaneously with this motion for summary judgment, and Plaintiff thus cannot rely on them in opposition to summary judgment.

**Failed Theory #2: Plaintiff's 2015 Canadian Bitumen Unprofitability Theory**. The Court previously dismissed Plaintiff's claim, asserted under Item 303 of Regulation S-K, that Defendants had failed to disclose a trend of supposed "unprofitability" of ExxonMobil's Canadian bitumen operations in ExxonMobil's 2015 Form 10-K. But the Court permitted Plaintiff to proceed on the narrow claim that ExxonMobil's disclosures may have violated ASC 275 of Generally Accepted Accounting Principles ("GAAP"). Plaintiff, which bears the burden of proof, has adduced no evidence that ASC 275 was violated. Indeed, Plaintiff's accounting expert D. Paul Regan did not even mention ASC 275 in his report and confirmed that he offered no opinion on it. Plaintiff thus cannot avoid summary judgment on this theory either.

4

**Failed Theory #3: Plaintiff's 2015 RMDG Impairment Theory**.  Plaintiff also alleges that ExxonMobil fraudulently failed to recognize an impairment of certain of its RMDG assets as of year-end 2015.  Plaintiff cannot meet its burden to establish a genuine dispute of material fact on this theory because the uncontroverted evidence shows (A) Defendants accurately disclosed that the RMDG assets were not impaired as of year-end 2015, (B) Defendants did not act with scienter, and (C) Plaintiff suffered no losses from the alleged misstatement.

**(A)    No Misleading Statement**.  ExxonMobil's internal accounting team conducted an impairment analysis of the RMDG assets for year-end 2015 under ASC 360.  The analysis was memorialized in an extensive whitepaper, which concluded that no impairment had occurred because each RMDG asset's estimated undiscounted future cash flows exceeded the carrying value of the asset, among other reasons.  Consistent with its long-standing practice and the requirements of ASC 360, ExxonMobil relied on its internal "corporate plan"—which ExxonMobil uses to evaluate investment opportunities in the ordinary course of business—as the source for prices used to estimate future cash flows.  App. 349.  The analysis was reviewed and approved by ExxonMobil's independent auditors at PricewaterhouseCoopers ("PwC").  And it was reviewed with the Individual Defendants, all of whom reviewed the work of internal accounting experts and external auditors in disclosing that these assets were not impaired.  This RMDG impairment analysis has *never* been restated or corrected, nor has PwC withdrawn its audit opinion.

Unable to refute any of these facts, Plaintiff instead asserts that it was unreasonable for ExxonMobil to use its corporate plan prices to estimate future cash flows.  But ASC 360 *required* ExxonMobil to use the same price assumptions it uses to run the business.  Plaintiff's own accounting expert, Regan, conceded it was "permissible under the rules . . . for ExxonMobil to use

the actual projections it used to evaluate investment opportunities." App. 264 at 252:22–253:19. This concession alone warrants summary judgment.

**(B)** **No Scienter**. Plaintiff also fails to establish any issue of material fact as to scienter. As noted above, Plaintiff's credit-rating theory of scienter has been dismantled. There is no evidence whatsoever that earlier impairment of the RMDG assets would have affected ExxonMobil's credit ratings, nor is there a scrap of proof linking Defendants' purported desire to maintain ExxonMobil's credit rating to the impairment analysis the Company conducted. And Plaintiff's scienter theory on impairments fails for a third reason: Plaintiff cannot prove that any Defendant had "actual knowledge" that the impairment analysis was wrong. ExxonMobil had robust internal controls, documented its impairment analysis meticulously, and reviewed its analysis with outside auditors who concurred in ExxonMobil's judgment. Even assuming, contrary to fact, that ExxonMobil should have used different assumptions to estimate cash flow, as Plaintiff claims, that would not show *intentional fraud*. Senior management relied on the expertise of ExxonMobil's own accounting experts and PwC, which tends to *negate* scienter under Fifth Circuit law. *See, e.g.*, *Owens* v. *Jastrow*, 789 F.3d 529, 545 (5th Cir. 2015); *U.S. S.E.C.* v. *Snyder*, 292 F. App'x 391, 406 (5th Cir. 2008).

**(C)** **No Loss Causation**. Plaintiff's RMDG impairment claim also fails for lack of loss causation. ExxonMobil has never restated, withdrawn, or otherwise corrected its disclosed *2015* impairment analysis for the RMDG assets. Likewise, its auditors have never withdrawn their unqualified audit opinion. Merely because ExxonMobil later reported an impairment of certain RMDG assets as of year-end *2016*—when the outcome of the subsequent year's analysis dictated reporting an impairment—says nothing at all about the validity of the prior year's analysis. And, as Plaintiff's expert Feinstein admitted, no industry analyst or other public commentary drew any

such connection.  The evidence establishes nothing more than that when ExxonMobil conducted the same process at two different points in time with two different sets of pricing information, it came to two different results.  Loss causation is not satisfied where, as here, the purported corrective disclosure "does not report any concern that [the earlier disclosures] may be incorrect." *Greenberg* v. *Crossroads Sys., Inc.*, 364 F.3d 657, 668 (5th Cir. 2004).

Feinstein nevertheless attempts to show loss causation based on the drop in ExxonMobil's stock price on January 31, 2017, when the year-end 2016 impairment was disclosed.  That makes no sense for the reasons just described.  But Feinstein's analysis also runs headlong into this Court's class certification ruling, which held that the stock drop on January 31 was not statistically significant on either a close-to-open or close-to-close basis. Dkt. No. 178 at 52.  This Court already excluded the January 31 date. *Id.*  Feinstein's deeply flawed analysis cannot undermine the Court's prior ruling, and the January 31 stock drop thus cannot provide a basis to prove loss causation.

**Summary Judgment Should Be Granted on Plaintiff's Unpled Theories.**  Doubtless because its pleaded theories have collapsed, Plaintiff has attempted to inject new, unpled fraud theories into the case through its expert reports.  The most significant of these new theories was *expressly disavowed* by Plaintiff in a letter to Defendants in 2023.  *See* App. 686.  But no matter. Fifth Circuit law is clear that Plaintiff is not permitted to pull a "surprise switcheroo" and adopt new theories to oppose summary judgment. *Jackson* v. *Gautreaux*, 3 F.4th 182, 189 (5th Cir. 2021).  Plaintiff's gambit to rescue its deficient fraud claims with unpled theories offered up at the eleventh hour should not be countenanced.  And while not required to do so, Defendants nonetheless address these unpled theories in Part IV, *infra*.  These new theories do nothing to salvage Plaintiff's attempt to identify some fraud claim to pursue.  None could survive summary judgment, even if they had actually been pleaded.

**LEGAL STANDARD AT SUMMARY JUDGMENT**

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Plaintiff bears the burden of showing a genuine issue for trial "by presenting evidence of ***specific facts***." *Bellard* v. *Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012) (emphasis added). "Conclusory allegations and unsubstantiated assertions will not satisfy the plaintiff's burden." *Id*. Because Defendants do not bear the burden, Defendants can meet this standard by "merely demonstrat[ing] an absence of evidentiary support in the record for the non-movant's case." *Bayle* v. *Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir. 2010).

Plaintiff cannot satisfy its burden through inadmissible evidence. *Bellard*, 675 F.3d at 460 ("[T]he evidence proffered by the plaintiff to satisfy his burden of proof must be competent and admissible at trial."); *see also* Fed. R. Civ. P. 56(c)(2). Likewise, expert opinions successfully challenged under *Daubert*—which requires exclusion of Plaintiff's experts here—may not be considered at summary judgment. *See Reitz* v. *Woods*, 85 F.4th 780, 787–89 (5th Cir. 2023); *see also* Defs. *Daubert* Mots.

**ARGUMENT**

Rule 10b-5, which implements Section 10(b) of the Exchange Act, forbids the making of an "untrue statement of a material fact" or the omission of a material fact "necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b-5. To establish liability under Section 10(b) and Rule 10b-5, Plaintiff must prove, *inter alia*, that Defendants (1) made a materially false or misleading statement, (2) with scienter, (3) on which Plaintiff relied, and (4) caused Plaintiff's economic losses (i.e., loss causation and damages). *Jacobowitz* v. *Range Res. Corp.*, 596 F. Supp. 3d 659, 672 (N.D. Tex. 2022) (citing *Mun. Emps.' Ret. Sys. of Mich.* v. *Pier 1 Imports, Inc.*, 935 F.3d 424, 429 (5th Cir. 2019)). "Pure omissions"—i.e., information that was

8

withheld in the absence of a false or misleading statement—are not actionable under Rule 10b-5. *Macquarie Infrastructure Corp.* v. *Moab Partners, L.P.*, 601 U.S. 257, 260 (2024).

### I. The Undisputed Facts Refute Plaintiff's Kearl Proved Reserves Theory

Plaintiff's first theory concerns the "proved reserves" at Kearl, a Canadian bitumen mining operation. Proved reserves are the "quantities of oil and gas, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible." 17 C.F.R. § 210.4-10(a)(22). Under Securities & Exchange Commission ("SEC") rules, ExxonMobil must report its total proved reserves annually in its Form 10-K, and must use (i) an unweighted average of the first-day-of-the-month prices for each month of the year, 17 C.F.R. § 210.4-10(a)(22)(v), and (ii) the "costs of operation," which the SEC does not define.

Plaintiff's pleaded claim, for which the Court certified a class, is that Defendants misled shareholders by presenting the risk of a year-end 2016 de-booking of Kearl reserves as merely possible when they secretly understood the "near certainty" of that event. Compl. ¶ 184, Dkt. No. 36; *see also id.* ¶¶ 247(iv), 286, 348; Dkt. No. 53 at 7; Dkt. No. 178 at 9. The evidence and controlling law do not support this alleged fraud, and summary judgment should be granted.

### A. Statement of Undisputed Facts Concerning Kearl Proved Reserves Claim

ExxonMobil reports its total proved reserves annually in its Form 10-Ks in accordance with the rules and regulations prescribed by the SEC. Since 2007, ExxonMobil had included a warning that proved reserves are subject to "revisions," which "can include upward or downward changes in previously estimated volumes of proved reserves for existing fields" due to factors including volatility in prices and costs. *See, e.g.*, App. 207; App. 200; App. 193.

In 2015, however, ExxonMobil augmented its usual disclosure given then-low oil and gas prices. Rather than say less in the disclosure (as Plaintiff's allegation might lead one to believe) ExxonMobil undertook a thoughtful and deliberate decision ***to enhance*** the disclosure. The

decision to do so was the result of work conducted by ExxonMobil accounting professionals led by Joseph Horne, the accounting policy group manager, working closely with Sandra Melocik, a senior accounting policy advisor who had previously served at the SEC. App. 1–2 ¶¶ 2–3, 5–6; App. 279 at 96:6–19. Horne regularly attended the meetings of the American Petroleum Institute ("API") Accounting Subcommittee, including meetings held in 2015. App. 500; App. 1–2 ¶ 4. At a 2015 API meeting, an SEC representative who led accounting reviews for oil and gas companies "spoke at length about expectations for public companies in the sector," App. 500, including "what types of disclosure / lack of disclosure they look for" App. 677.

Informed by these meetings and his experience, in early December 2015, Horne drafted an "Enhancement Review" reflecting "potential enhancements to this year's 10-K." App. 503. In his first draft of the Enhancement Review, circulated on December 8, 2015, Horne prepared a table including 17 proposed enhancements to the 10-K reflecting the "low price environment" and its consequences, among other considerations. App. 504–08. For proved reserves, Horne suggested that ExxonMobil insert the following bolded language to its standard disclosure:

> ***When oil and gas prices are low, under the SEC definition of proved reserves, certain quantities of oil and natural gas, primarily relating to oil sands operations in Canada and natural gas operations in North America could temporarily not qualify as proved reserves.*** Amounts required to be de-booked as proved reserves on an SEC basis will likely be re-booked as proved reserves at some point in the future when price levels recover. . . . We do not expect any temporary changes in reported proved reserves under SEC definitions to affect the operation of the underlying projects or to alter our outlook for future production volumes.

App. 6 (emphasis added); App. 2 ¶ 6. Horne referred to this version of the enhanced disclosure as the "Specific" version because it made specific reference to particular assets, including the "oil sands operations in Canada." App. 669. Horne also drafted for consideration a "Generic" version that referred only to "certain quantities of oil and natural gas" without reference to specific assets. *Id.* Horne ultimately recommended implementation of the "Specific" version. App. 522.

10

After gathering comments on the draft disclosure from his colleagues, e.g., App. 423, Horne elevated the proposed disclosure to senior management.  He met with the Company's Controller, David Rosenthal, about the Enhancement Review on or around December 11, 2015.  App. 503.   In January 2016, Rosenthal reviewed the Enhancement Review with Horne in preparation for a meeting with the Company's senior executives.  App. 279–80 at 96:22–97:4, 101:11–15; *see* App. 676.

On January 29, 2016, Rosenthal met with Tillerson and principal financial officer Andrew Swiger to discuss the proposed enhancements.  App. 512.  Rosenthal presented a redline against the prior 10-K recommending the addition of the enhanced, "specific" language, App. 522.  Tillerson and Swiger reviewed and approved the enhancements.  App. 79.

On February 24, 2016, ExxonMobil filed its 2015 Form 10-K.  App. 24–140.  The language on proved reserves was substantively the same as Horne's December 8 draft:

> When crude oil and natural gas prices are in the range seen in late 2015 and early 2016 for an extended period of time, under the SEC definition of proved reserves, certain quantities of oil and natural gas, such as oil sands operations in Canada and natural gas operations in North America could temporarily not qualify as proved reserves.

(the "Enhanced Risk Disclosure"), App. 79; *see also* App. 31, 124–25 (repeating warning).  This Enhanced Risk Disclosure is the disclosure challenged as misleading in this case.  Compl. ¶¶ 285–86.

Discovery has produced zero documents or testimony supporting Plaintiff's claim that ExxonMobil executives, including the Individual Defendants, misled shareholders with the Enhanced Risk Disclosure.  Plaintiff has not identified any shareholder, research analyst, or market commentator who claims to have been misled by it.  To the contrary, Plaintiff's own investment advisor disclaimed making any decisions about whether to invest in ExxonMobil's stock based on the de-booking of proved reserves.  App. 287–88 at 137:23–138:8, App. 293 at 291:20–292:6.

11

Discovery has also produced zero documents or testimony supporting Plaintiff's claim that Defendants acted with intent to deceive shareholders in drafting the Enhanced Risk Disclosure. Quite to the contrary, the internal documents explained that the "[p]rice environment throughout 2015/16" had generated "substantial financial and general media attention," that "careful reconsideration of certain 10-K disclosures is appropriate," and that the proposed enhanced disclosure "[a]ddresses [the] need to adequately 'foreshadow' material events that could reasonably occur." App. 677, 678, 680. ExxonMobil accounting policy professionals flagged a need to "foreshadow" the potential proved reserves de-booking for 2016, App. 680, and ExxonMobil senior management, including the Individual Defendants, reviewed and approved the professionals' recommendation.

After issuing its Enhanced Risk Disclosure, ExxonMobil continued to closely monitor oil prices and assess whether additional interim warnings were merited before year-end 2016. By the end of the third quarter, ExxonMobil understood that it may be appropriate to include quantitative information in a public disclosure, since "11 of 12 months for pricing will be known at 3Q 10-Q filing." App. 511. By contrast, disclosure of such quantitative information would have been wholly speculative when ExxonMobil issued its 2015 Form 10-K in February 2016, because the Company at that time had only two months of pricing data and one month of cost data for 2016. *See* App. 2 ¶ 7.

In October 2016, ExxonMobil decided to issue a further warning. On October 20, 2016, Upstream Controller Vincent Prestipino wrote an email stating that the "Controller[s] are proposing to include commentary on potential year-end reserve debooks in ExxonMobil's 3Q'16 Form 10-Q." *See* App. 675. Prestipino observed that "[d]espite the fact that reserves de-book will not occur until year-end, SEC regulations require management to discuss potential material

12

scenarios that could occur in the near term, post the date of the financial statements (Sep. 30, 2016) and include a quantitative disclosure if reasonably available." *Id*. With now ten months of known SEC prices and nine months of costs available for the year-end 2016 proved reserves, Prestipino noted that the data "would suggest that it is likely that we would need to de-book all of Kearl proved reserves." *Id*. Stephen Littleton, the Company's Assistant Controller, noted that he was "glad we added the foreshadowing in the [2015] 10K." App. 654.

Consistent with the recommendation of the Controllers group, and with approval from senior management, on October 28, 2016, ExxonMobil issued a press release containing its third quarter 2016 earnings, which also enhanced its typical proved reserves disclosure. ExxonMobil stated:

> As disclosed in ExxonMobil's 2015 Form 10-K, low crude oil and natural gas prices can impact the corporation's reserves as reported under Securities and Exchange Commission (SEC) rules. Average year-to-date crude prices have been significantly affected by the very low prices experienced during the first quarter of 2016, but have recovered considerably since that time. ***If the average prices seen during the first nine months of 2016 persist for the remainder of the year, under the SEC definition of proved reserves, certain quantities of oil, such as those associated with the Kearl oil sands operations in Canada, will not qualify as proved reserves at year-end 2016. . . . Quantities that could be required to be de-booked as proved reserves on an SEC basis amount to approximately 3.6 billion barrels of bitumen at Kearl,*** and about 1 billion oil-equivalent barrels in other North America operations.

(the "October 28 Disclosure") (emphasis added), App. 144–45. Plaintiff originally pleaded that this October 28 Disclosure was an actionable misrepresentation that "revealed only a fraction of the truth," Compl. ¶¶ 231, 309–10, but now claims that it is the sole "corrective disclosure" for the alleged proved reserves misstatement, App. 920 ¶ 120; App. 326 at 72:12–17.

In early 2017, when ExxonMobil announced its final assessments of proved reserves for full-year 2016, it de-booked 3.5 billion barrels of bitumen for the Kearl asset. App. 212. Notwithstanding the de-booking, Kearl continued to operate, and ExxonMobil recorded around 20

13

billion barrels of proved reserves. *Id.* ExxonMobil's total proved reserves remained "the largest among the supermajors, (the five largest non-state-owned oil companies in the world)." App. 761.

Plaintiff pleaded—and the Court accepted at the motion to dismiss stage—that ExxonMobil delayed disclosing the possibility of year-end Kearl de-bookings because a change to ExxonMobil's proved reserves assessment would have negatively impacted its AAA S&P credit rating, which Plaintiff claimed ExxonMobil needed to maintain ahead of a March 2016 bond offering. Dkt. No. 62 at 32–33. Discovery has fully debunked that allegation.

For one, Plaintiff has identified no evidence that any ExxonMobil employee sought to misstate proved reserves to inflate the Company's credit rating before the debt offering. To the contrary, the group at ExxonMobil responsible for oversight of the proved reserves estimation process across ExxonMobil affiliates—the Global Reserves Group ("GRG")—was wholly segregated from the group handling the bond offering and discussions with the credit rating agency. The proved reserves assessment was performed by ExxonMobil's affiliate, Imperial Oil Limited ("IOL")—a separate public company that owns the majority of the Kearl assets—with oversight from the GRG. *See* App. 31–32; App. 340–41 at 23:13–27:11. By contrast, the Planning and Financial Markets ("PFM") team within the Treasurer's office oversaw the debt offerings and the Company's relationship with rating agencies. *See* App. 312–13 at 45:22–46:8, App. 317 at 98:5–5. The GRG and IOL did not communicate with the PFM team about the bond offering (much less about a potential downgrade in the credit rating); indeed, they were only alerted that the bond offering was occurring on the day of the offering. *See* App. 609. Conversely, the PFM team was not involved in the Kearl proved reserves assessment; it was aware only of the information disclosed in the 2015 10-K. *See* App. 315 at 92:12–22, App. 320 at 110:13–18. There is no evidence that any ExxonMobil employee involved in the discussions with credit rating

14

agencies or responsible for the bond offering instructed ExxonMobil employees involved with the proved reserves disclosures to misrepresent or omit information from the Form 10-K to conceal information from ratings agencies (or anyone else). App. 2–3 ¶ 8.

Third-party discovery also disproves Plaintiff's theory that ExxonMobil's S&P AAA rating hinged on proved reserves. As S&P's corporate representative explained, ExxonMobil's proved reserves—with or without Kearl—"were still well within our expectations for the [AAA] rating." App. 240 at 248:25–249:2. Discovery from Moody's similarly showed that ExxonMobil's proved reserves surpassed Moody's requirement for an "Aaa" credit rating by nearly *10 billion* barrels of oil equivalent proved reserves even after the Kearl de-booking. App. 704 (an Aaa rating requires 10 billion barrels of oil equivalent proved reserves); App. 732 (same); App. 212 (ExxonMobil recorded around 20 billion barrels in its 2016 10-K); *see also* App. 1370–73. It is unsurprising, then, that both ratings agencies met the later news of the Kearl proved reserves de-booking with a shrug—taking no negative ratings action at all.[1]

## B. The Undisputed Facts Show the Enhanced Risk Disclosure Was Not Materially Misleading

The Enhanced Risk Disclosure was not materially misleading for several reasons:

*First*, Plaintiff's theory appears to rely on cases holding that a risk disclosure may be misleading if it presents as hypothetical a risk that is "almost certain[]." *Lormand* v. *US Unwired, Inc.*, 565 F.3d 228, 252 (5th Cir. 2009). But the undisputed facts show that de-booking of Kearl reserves at year-end 2016 was not, and could not have been, "almost certain" to occur as of February 2016 for a simple reason: the annual year-end proved reserves assessment must be based

---

[1]    S&P noted that de-booking in May 2017, but took no ratings action at all. App. 761 (May 2017 research update from S&P noting that despite the de-bookings "the company *continues to produce bitumen at Kearl*, and could *recognize the reserves as proved again in the future*" (emphases added)). Moody's noted the de-booking, maintained its rating, and increased ExxonMobil's outlook from "Negative" to "Stable" based on information current as of June 2017. App. 748.

on 12 months of pricing and cost information.  Dkt. 178 at 7.  As of February 2016, with only one month of cost information and two months of price information, ExxonMobil could not possibly have assessed the need for a de-booking with "virtual certainty."

*Second*, assuming *arguendo* that "virtual certainty" **could** be achieved based on only 1–2 months of data, Plaintiff has not adduced any evidence that the ExxonMobil accounting professionals responsible for the Enhanced Risk Disclosure **did** view a Kearl de-booking as a "virtual certainty" as of February 2016.  To the contrary, Horne understood that prices and costs at Kearl, which was in a new start-up phase, were very much in flux.  App. 2 ¶ 7; *see, e.g.*, App. 611, 621 (April 2016 deck explaining that IOL was "aggressively pursuing cost reductions" at Kearl).  Absent proof that the Defendants actually viewed de-booking as a certainty in February 2016, Plaintiff's claim is meritless.

The recent summary judgment ruling in *In re Alta Mesa Resources, Inc. Securities Litigation* is instructive.  2024 WL 3760481 (S.D. Tex. Aug. 12, 2024).  In that case, a shareholder of oil and gas company Alta Mesa—represented by the same law firm, accounting expert, and damages expert as Plaintiff in this case—challenged as misleading a risk disclosure stating that "if third-party pipelines or other midstream facilities . . . become partially or fully unavailable . . . our gross profit and cash flow could be adversely affected."  *Id*. at *5.  The court granted summary judgment because plaintiff failed to adduce evidence that midstream facilities were already unavailable when the risk disclosure issued.  *Id*. at *6.  Further, the court found that Alta Mesa had warned that a reduction in upstream production could adversely affect the company, including by warning that production had been reduced in the months immediately preceding the 10-K filing.  *Id*. at *8.  That reasoning applies with equal force here: ExxonMobil did not—and could not—definitively know in February that it would be required to de-book Kearl at year-end, but explicitly

16

warned investors that de-bookings could occur if oil prices remained at the same low levels as late 2015 and early 2016.[2]  Under Fifth Circuit law, ExxonMobil was not required to predict what were then only potential de-bookings based on speculation alone.  *Heinze* v. *Tesco Corp.*, 971 F.3d 475, 482 (5th Cir. 2020) (explaining defendant "certainly had no obligation to include additional *projections* based on potentially inaccurate assumptions about *future* price trends").

   *Third,* summary judgment should also be granted for the independent reason that the Enhanced Risk Disclosure is not actionable under the PSLRA safe harbor for forward-looking statements accompanied by "meaningful cautionary statements."  15 U.S.C. § 78u-5(c)(1)(A). This Court previously held that the Enhanced Risk Disclosure is forward-looking but declined to apply the safe harbor as "the basis for dismissal as a matter of law."  Dkt. No. 62 at 27.  But that holding "does not foreclose the safe harbor's possible applicability in latter stages of these proceedings."  *Lormand*, 565 F.3d at 248 n.11.  Now, following discovery, and given the legal standard more recently articulated by the Fifth Circuit in 2023, it is clear that the safe harbor applies: the Enhanced Risk Disclosure is "company-specific" and includes "a realistic description of the risks applicable to the particular circumstances."  *Okla. Firefighters Pension & Ret. Sys.* v. *Six Flags Ent. Corp.*, 58 F.4th 195, 211 (5th Cir. 2023) (quoting *Southland Sec. Corp.* v. *INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004)).

   As addressed above, ExxonMobil had noted for years in its annual 10-K filings that proved reserves were subject to "[r]evisions [which] can include upward or downward changes in previously estimated volumes of proved reserves[.]"  *E.g.*, App. 207.  But the 2015 Form 10-K

---

[2]    App. 65 at 42 ("The upstream industry environment has been challenged throughout 2015 with abundant crude oil supply causing crude oil prices to decrease to levels not seen since 2004, while natural gas prices remained depressed."); App. 79 ("When crude oil and natural gas prices are in the range seen in late 2015 and early 2016 for an extended period of time, under the SEC definition of proved reserves, certain quantities of oil and natural gas, such as oil sands operations in Canada and natural gas operations in North America could temporarily not qualify as proved reserves.").

17

*added a specific cautionary statement* that if "crude oil and natural gas prices are in the range seen in late 2015 and early 2016 for an extended period of time, under the SEC definition of proved reserves" then assets including the "oil sands operations in Canada" might not "qualify as proved reserves." App. 79. This disclosure identifies both the particular circumstances (a drop in crude and natural gas prices) and the company-specific ramifications (the potential de-booking of Canadian oil sands operations). That these are the exact risks that later materialized is fatal to Plaintiff's contention that the statement was not meaningful. *Naglich* v. *Applied Optoelectronics*, 436 F. Supp. 3d 954, 973 (S.D. Tex. 2020) (cautionary statement meaningful where it "identif[ied] the precise risks that [the company] later experienced"). Plaintiff may argue that the Enhanced Risk Disclosure was not "meaningful" because it did not project the *quantity* of potential de-bookings. But that argument demands more than the Circuit required in *Six Flags*, which calls only for "company-specific" risk disclosures tailored to the "particular circumstances." 58 F.4th at 211 (quoting *Southland Sec. Corp.* v. *INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004)).[3] Moreover, even Plaintiff's own accounting expert offers *no opinion* that the Enhanced Risk Disclosure was required to quantify potential de-bookings based on only 1–2 months of results. *See generally* Regan Rep. Nor could he, as such quantification was not performed by any of ExxonMobil's peers in the oil and gas industry: of seven peer companies, between 2014 and 2016, *none* included a quantitative projection of potential year-end de-bookings in their Form 10-Ks filed early in the year. *See* App. 858–68. Indeed, ExxonMobil issued the most specific warning

---

[3]    Nor has Plaintiff established that GAAP required quantitative disclosure. While the Complaint cites ASC 932-270-50-1, that provision states that disclosures about proved reserves "*are not required in interim financial reports.* However, interim financial reports shall include information about a major discovery or other favorable or adverse event that causes a significant change from the information presented in the most recent annual financial report concerning oil and gas reserve quantities." Compl. ¶ 335 (emphasis added). Plaintiff's accounting expert makes no argument that the 10-Qs issued by ExxonMobil between February and October 2016 violated ASC 932. And, even if he did, this argument would be foreclosed by the Supreme Court's 2024 decision that "pure omissions" are not actionable under Rule 10b-5. *Macquarie Infrastructure Corp.* v. *Moab Partners, L.P.*, 601 U.S. 257, 260 (2024); *see infra* Part IV.C.

of its peers by explicitly referencing specific at-risk assets in the 2015 10-K (the "oil sands operations in Canada"). *Id.*; *see* Table 1, *supra*.

Table 1 – Comparison of ExxonMobil and Peer 10-Ks

| Filing | Language | Citation |
|---|---|---|
| ExxonMobil 2015 10-K | "When crude oil and natural gas prices are in the range seen in late 2015 and early 2016 for an extended period of time, under the SEC definition of proved reserves, certain quantities of oil and natural gas, **such as oil sands operations in Canada and natural gas operations in North America** could temporarily not qualify as proved reserves." (emphasis added) | App. 79 |
| ConocoPhillips 2015 10-K | "Proved reserve estimates require economic production based on historical 12-month, first-of-month, average prices and current costs. Therefore, our proved reserves generally decrease as prices decline and increase as prices rise. Additionally, as we undertake cash conservation efforts, our reserve replacement efforts could be delayed thus limiting our ability to replace depleted reserves." | App. 859–60 |
| Chevron 2015 10-K | "Extended periods of low prices for crude oil can have a material adverse impact on the company's results of operations, financial condition and liquidity. Among other things, the company's upstream earnings, cash flows, and capital and exploratory expenditure programs could be negatively affected, as could its production and proved reserves." | App. 858 |
| Marathon 2015 10-K | "Beginning in the second half of 2014, the crude oil and natural gas benchmarks began to decline and these declines continued through 2015 and into 2016. Commodity prices are likely to remain volatile based on global supply and demand and could decline further. Sustained reduced commodity prices could have a material effect on the quantity and future cash flows of our proved reserves." | App. 861 |
| Occidental 2015 10-K | "Several factors could change Occidental's proved oil and gas reserves . . . In other cases, particularly with long-lived properties, lower product prices may lead to a situation where production of a portion of proved reserves becomes uneconomical." | App. 863–64 |

## C. The Undisputed Facts Show That Plaintiff Cannot Prove Scienter

Plaintiff also comes up empty-handed on scienter, the "mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319

(2007). Because the Enhanced Risk Disclosure is forward-looking and was made by "a business entity," the PSLRA requires Plaintiff to prove that it was made "by or with the approval of an executive officer of that entity with *actual knowledge* by that officer that the statement was false or misleading." *Southland*, 365 F.3d at 371–72 (emphasis added). This standard is "demanding" and "[l]iability arises only upon proof of knowing falsity." *Six Flags Ent. Corp.*, 58 F.4th at 214–15. Even recklessness would not suffice. *Id.*

Plaintiff has adduced no evidence that the Individual Defendants who approved the Enhanced Risk Disclosure had *actual knowledge* that it was misleading. Rather, the challenged disclosure was written by ExxonMobil accounting experts who commenced the Enhancement Review to consider what disclosures were appropriate to add in light of the low-price environment. That thoughtful, deliberative process is the very opposite of fraud. The Individual Defendants approved the language after considering their internal experts' recommendation. Senior management is entitled to rely on the representations and opinions of their subject-matter specialist employees. *See Owens* v. *Jastrow*, 789 F.3d 529, 545 (5th Cir. 2015) (no scienter where Defendants "relied on the AAA ratings and believed that [the company's] internal models were accurate"); *Ind. Elec. Workers' Pension Tr. Fund IBEW* v. *Shaw Grp., Inc.*, 537 F.3d 527, 545 (5th Cir. 2008) (finding no scienter from allegation that officer signed a Sarbanes-Oxley certification prepared by others); *U.S. S.E.C.* v. *Snyder*, 292 F. App'x 391, 406 (5th Cir. 2008) (reliance on an accountant's opinion "provide[s] an explanation of the defendant's conduct tending to negate" scienter).

In addition, the fact that ExxonMobil *added* more specifics to its proved reserves risk disclosure negates scienter because the warning made the public aware of the risk related to the Canadian oil sands specifically. "It would have made little sense for Defendants to simultaneously

20

disclose to, and mislead, the public" about potential de-bookings at its Canadian bitumen oil sands operations. *Neiman* v. *Bulmahn*, 854 F.3d 741, 750 (5th Cir. 2017); *see also Mun. Emps.' Ret. Sys. of Mich.* v. *Pier 1 Imports, Inc.*, 935 F.3d 424, 432 (5th Cir. 2019) (finding no scienter where company made "several public disclosures" about the relevant problem). The very existence of the Enhanced Risk Disclosure undermines scienter.

Finally, Plaintiff's original scienter theory—which hinged on Defendants' purported motive to maintain ExxonMobil's AAA rating before the March 2016 bond offering—has imploded. After years of discovery, not a single document or witness's testimony supports that any ExxonMobil employee responsible for the Enhanced Risk Disclosure was seeking fraudulently to prop up ExxonMobil's AAA credit rating in advance of the March 2016 bond offering. To the contrary, within ExxonMobil, the credit rating and bond offering were handled by an entirely separate team, which had no involvement in proved reserves estimations. *See supra* Part I.A. And third-party discovery has shown that a de-booking of Kearl's proved reserves would not have changed how S&P and Moody's assessed ExxonMobil's credit rating.[4] *See supra id.*

Because Plaintiff cannot show that Defendants had actual knowledge that the Enhanced Risk Disclosure was false but nonetheless issued it to deceive shareholders, Plaintiff cannot prove scienter. Summary judgment should be granted.

---

[4]   Discovery has also disproven Plaintiff's allegation that "ExxonMobil was in dire need of an infusion of capital" from the debt offering in order to pay "high-priority" shareholder dividends. Dkt. No. 62 at 32–33. As ExxonMobil executives testified, the Company had a wealth of options available to pay its dividend: it could have cut capital expenditures, or sold assets, or issued more commercial paper. *See* App. 306 at 127:14–129:1 (Tillerson explaining that the Company has "a lot of ways" to fund dividends, including "fund[ing] them with asset sales and generat[ing] cash" or "fund[ing] them from borrowing"); App. 230 at 201:4–8 (Swiger explaining same); *cf.* App. 237 at 183:6–184:21 (listing ways ExxonMobil could have increased its cash position). And as both Tillerson and Swiger explained, the dividend is paid out of cash, not earnings—and ExxonMobil had multiple options other than the debt offering to generate sufficient cash to cover the dividend at the time. *See* App. 306 at 127:14–22; App. 229 at 195:15–196:22.

**D. The Undisputed Facts Show That Plaintiff Cannot Prove Loss Causation**

To establish loss causation, a plaintiff has "the burden of proving" that the alleged fraud "caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). Because "[t]he securities laws do not provide 'broad insurance against market losses,'" the plaintiff must show "a clear causal link between the misrepresentation and the economic loss." *Ludlow* v. *BP, P.L.C.*, 800 F.3d 674, 690 (5th Cir. 2015) (quoting *Dura Pharms*. v. *Broudo*, 544 U.S. 336, 345 (2005)).

Specifically, the Fifth Circuit requires a plaintiff proceeding under a corrective-disclosure theory to prove at summary judgment:

> (1) that the negative "truthful" information causing the decrease in price is related to an allegedly false, non-confirmatory positive statement made earlier and (2) that it is more probable than not that it was this negative statement, and not other unrelated negative statements, that caused a significant amount of the decline.

*Greenberg* v. *Crossroads Sys., Inc.*, 364 F.3d 657, 666 (5th Cir. 2004); *see Lormand*, 565 F.3d at 255–56 & nn.19–20 (5th Cir. 2009) (explaining that *Greenberg*'s "related to" accords with *Dura*'s "relevant to" standard).

Plaintiff cannot prove loss causation for the allegedly misleading Enhanced Risk Disclosure for several reasons:

*First*, Plaintiff's expert Steven P. Feinstein did not analyze Plaintiff's pleaded fraud theory that the Enhanced Risk Disclosure was too "tepid." Rather, in assessing causation and measuring purported damages, Feinstein analyzed a ***different*** theory: that ExxonMobil had purportedly incorrectly estimated its proved reserves for year-end 2015, and Kearl should have been de-booked then rather than at year-end 2016. App. 877–78 ¶ 30 ("Lead Plaintiff contends that by year-end 2015, operations at Kearl . . . no longer legitimately qualified as a 'proved' reserve."). While that theory suffers other fatal defects (*see infra* Part IV.B), the consequence of Feinstein analyzing that

22

alternative theory is that he has not analyzed causation and damages for Plaintiff's actual, pleaded theory about the Enhanced Risk Disclosure. This defect alone means Plaintiff cannot prevail at summary judgment. *See Fener* v. *Operating Eng'rs Const. Indus. & Misc. Pension Fund (LOCAL 66)*, 579 F.3d 401, 409 (5th Cir. 2009) ("[T]he testimony of an expert—along with some kind of analytical research or event study—is required to show loss causation"); *In re Zonagen, Inc. Sec. Litig.*, 322 F. Supp. 2d 764, 781–82 (S.D. Tex. 2003) (granting summary judgment where plaintiff's expert did "not opine directly" whether the alleged misstatements had any effect on the stock); *In re Williams Sec. Lit.-WCG Subclass*, 558 F.3d 1130, 1143 (10th Cir. 2009) (affirming grant of summary judgment and holding that, without reliable expert testimony, there was "simply no way for a juror to determine whether the alleged fraud caused any portion of Plaintiffs' loss.").

*Second*, by separate *Daubert* motion, Defendants move to exclude Feinstein's testimony, and any excluded opinions may not be considered at summary judgment. *Reitz* v. *Woods*, 85 F.4th 780, 787–88 (5th Cir. 2023). Without Feinstein, Plaintiff is unable to prove causation and damages, and summary judgment should be granted. *See Fener*, 579 F.3d at 409.

*Third*, for the reasons in Defendants' *Daubert* motion, even if Feinstein's opinion is considered, he has not disaggregated the effects of the allegedly fraud-related statements in the purported corrective disclosure from "other unrelated negative statements" also released on October 28. *Greenberg*, 364 F.3d at 666; *see* Feinstein *Daubert* Mot. at 16–20. Failure to disaggregate non-fraud-related reasons for the stock drop is another "fatal flaw" that supports summary judgment. *Williams Sec. Lit.*, 558 F.3d at 1143.

**II.    The Undisputed Facts Show That Defendants Did Not Mislead Investors About the Profitability of the Canadian Bitumen Operations**

Plaintiff alleges that ExxonMobil violated SEC Regulation S-K Item 303 and GAAP rule ASC 275 [5] by misleadingly "fail[ing] to disclose" that the Canadian bitumen operations—comprising ExxonMobil's Kearl and Cold Lake operations—purportedly were operating at a loss for the three months preceding the February 2016 filing of the 2015 Form 10-K. Compl. ¶¶ 342–43. In particular, Plaintiff describes as misleading the table at page 9 of ExxonMobil's 2015 Form 10-K (the "Page 9 Table"). [6] *Id*. ¶ 343. The Page 9 Table provides a $25.07 "production price" per barrel for bitumen for the Canadian bitumen operations, and a $19.20 "production cost" per barrel. *See* App. 34. Plaintiff does not allege that the production prices and production costs listed for Canadian bitumen operations were incorrectly reported, but rather asserts that ExxonMobil had a separate obligation to disclose a three-month "trend" of losses for "the Canadian Bitumen Operations." *See* Compl. ¶ 344 (alleging that "the significant losses incurred by the Canadian Bitumen Operations beginning no later than mid-November 2015 . . . [were] required to be disclosed" under Item 303 and ASC 275).

In ruling on the motion to dismiss, the Court held that Plaintiff had not "plead[ed] a material misstatement based on ExxonMobil's alleged failure to comply with Item 303" because "the allegation that the Canadian Bitumen Operations operated at a loss for three months does not establish a trend for purposes of Item 303 disclosures." Dkt. No. 62 at 24 (citing *Kapps* v. *Torch Offshore, Inc*., 379 F.3d 207, 221 (5th Cir. 2004)). The Court, however, noted that Defendants had not addressed ASC 275, and permitted that theory to proceed. Dkt. No. 62 at 24–25.

---

[5]    ASC 275 "requires discussion of estimates when, based on known information available before the financial statements are issued or are available to be issued . . . , it is reasonably possible that the estimate will change in the near term and the effect of the change will be material." Compl. ¶ 337.

[6]    The data on the Page 9 Table was disclosed pursuant to the requirements of SEC Regulation S-K, Item 1204, which required ExxonMobil to disclose, at the level of "geographical area," the "average sales price" and "average production costs" per unit of bitumen produced. 17 C.F.R. § 229.1204 ("Item 1204"); App. 34.

Plaintiff has no proof to support its remaining theory under ASC 275. Plaintiff's accounting expert is completely silent on ASC 275; by his own admission, neither of his reports expressly offered any opinion on ExxonMobil's compliance with ASC 275. *See* App. 260 at 209:2–21 ("Q: Have you offered any opinion in your expert reports regarding ASC 275? A: No. . . . it's not in my report."); *see generally* App. 997–1361. This concession supports summary judgment on Plaintiff's claims under GAAP. *See Danis* v. *USN Commc'ns, Inc.*, 121 F. Supp. 2d 1183, 1192 (N.D. Ill. 2000) (granting summary judgment where plaintiff's experts did "not provide any evidence of material GAAP violations"). Plaintiff also adduced no evidence that any Defendant had scienter to commit the alleged ASC 275 violation, or that such a purported violation caused any investor losses.[7] Summary judgment for this claim should be granted.

III. **The Undisputed Facts Show That Defendants Did Not Engage in Fraud Concerning the RMDG Impairment**

Plaintiff alleges that ExxonMobil fraudulently failed to recognize an impairment of its Rocky Mountain Dry Gas ("RMDG") assets as of year-end 2015, rendering its 2015 Form 10-K false and misleading. *See* Compl. ¶ 282.

Summary judgment should be granted on this claim for the independent reason that it hinges on Plaintiff disregarding the Court's class certification order. As addressed in Defendants' *Daubert* motion, Plaintiff's newly retained causation and damages expert, Feinstein, bases his entire causation and damages analysis for the alleged RMDG-impairment fraud upon the January 31, 2017 disclosure—which the Court held was not statistically significant on either a close-to-open or close-to-close basis. Dkt. No. 178 at 51–52; *see generally* App. 869–996. Because

---

[7]  Feinstein also does not identify any corrective disclosure or damages associated with an alleged violation of ASC 275. He contends that the misleading nature of the Page 9 Table was revealed by the projected de-booking of Kearl, revealed on October 28, 2016. App. 878–79 ¶¶ 31–32. But the estimated de-booking of Kearl for 2016 reveals nothing new about the 2015 financial information for Kearl and Cold Lake contained in the Page 9 Table. *See infra* Part III.D (explaining law that corrective disclosure must concern the subject of the allegedly false earlier statement).

Defendants rebutted price impact, the Class cannot establish reliance through the presumption of the fraud-on-the-market theory. *See* Feinstein *Daubert* Mot. at 7–8. Plaintiff cannot avoid summary judgment relying on its RMDG impairment theory for this reason alone.

Summary judgment is also proper because Plaintiff failed to adduce evidence that (1) ExxonMobil's 2015 impairment analysis was incorrect, (2) Defendants acted with scienter, or (3) Plaintiff suffered any loss from this alleged misstatement. All of these are required elements of Plaintiff's claim, and the failure to satisfy any one element means summary judgment is proper.

### A. Statement of Undisputed Facts Concerning the Alleged RMDG Impairment Analyses

Companies that follow GAAP's "successful efforts" accounting methodology, like ExxonMobil, follow the rules for impairment evaluations found in ASC 360. ASC 360 prescribes a three-step process:

- At Step 1, a company evaluates indicators of potential asset impairment to determine if a "triggering event" has occurred. App. 659–60 at 360-10-35-21. If a triggering event is determined to have occurred, a company is required to move to Step 2.

- At Step 2, a company assesses whether an asset is impaired. In what is often referred to as a "recoverability" analysis, the company examines whether an asset's book value (also called "carrying value") exceeds its estimated future undiscounted cash flows. App. 659 at 360-10-35-17. If the asset's book value is greater than its future undiscounted cash flows, the asset is impaired. Otherwise, there is no impairment. In estimating future undiscounted cash flows, ASC 360 requires the company to "***incorporate the entity's own assumptions*** about its use of the asset (asset group)." App. 661 at 360-10-35-30 (emphasis added). In other words, the company must use the same assumptions that it uses to run the business to conduct the impairment test.

26

- If the asset is impaired under Step 2, the company proceeds to Step 3 to measure the impairment loss, i.e., the amount by which the value of the asset exceeds its fair value. App. 659 at 360-10-35-17.

Discovery has shown that ExxonMobil performed an exhaustive review at Step 1 to determine whether a triggering event occurred for various assets, including the RMDG assets (the "2015 Trigger Analysis"), ultimately determining that none occurred in 2015.  App. 1520–23; App. 347–50.  Because it did not identify a triggering event for the RMDG assets, ExxonMobil was not required to proceed to Step 2 under ASC 360-10-35-17.  Nonetheless, ExxonMobil performed a Step 2-type recoverability analysis of the RMDG assets (the "2015 Recoverability Analysis") anyway.  *See* App. 92–93.

Consistent with the requirement in ASC 360 to "incorporate the entity's own assumptions" in estimating future cash flows, App. 661, ExxonMobil utilized price projections in the 2015 Recoverability Analysis developed as part of its annual corporate planning process.  The price projections that ExxonMobil utilized had been developed to "assess[] ***long-term investment opportunities***" and were based on a "rigorous, annual . . . assess[ment] [of] the worldwide, long-term supply and demand balance for energy sources."  App. 349 (emphasis added).  These price projections were "consistent, or even conservative, when compared to the long-term price forecasts published by several reputable industry groups such as WoodMac[enzie], EIA, IEA, IHS-CERA, and PIRA."  App. 349.  And this process followed the exact same methodology ExxonMobil had used for many years for impairment analyses, as reflected in its public disclosures.  *See, e.g.*, App. 207–08; App. 200–01; App. 194.

Based on the 2015 Recoverability Analysis, ExxonMobil concluded that the undiscounted cash flows of these assets exceeded their carrying value.  *See* App. 345 ("undiscounted cash flows

27

exceeds NBV [net book value] in all divisions"). ExxonMobil did not proceed to Step 3 on that basis.

ExxonMobil accounting professionals documented this analysis in an "Impairments Whitepaper." *See* App. 344–50. The results were reviewed with senior management at ExxonMobil, including the Individual Defendants, and ExxonMobil's independent auditor, PwC. App. 354. PwC agreed with ExxonMobil's conclusions, reporting to the Audit Committee during its fiscal year 2015 presentation that ExxonMobil's "analysis supported the conclusion that the Upstream assets were recoverable and no trigger had occurred." App. 438. PwC specifically "expressed no concerns with [the] recoverability of [ExxonMobil's] assets" notwithstanding "the [2015] low crude price environment." App. 427. In January 2016, PwC issued a memorandum documenting its audit of ExxonMobil's 2015 impairment analyses. *See* App. 1582–99. PwC has never issued a correction of its audit opinion.

ExxonMobil was transparent with the investing public about its methodology and added additional information to the 2015 10-K about the process. As part of the Enhancement Review discussed *supra* at Part I.A, Horne recommended ExxonMobil augment its impairment-related disclosures in its 2015 Form 10-K. App. 7–9. Specifically, Horne recommended adding the following statement to the 10-K's MD&A section:

> ***In light of continued weakness in oil and gas prices in late 2015, the Corporation undertook an effort to assess the recoverability of its major long-lived assets most at risk for potential impairment.*** The results of this assessment indicate that the future undiscounted cash flows associated with these assets substantially exceed the carrying value of the assets. As indicated above, the price, volume, and operating and capital cost assumptions used in the cash flow projections are consistent with amounts used in the annual planning and budgeting process. . . . The long-term price outlooks used for the Corporation's projections are generally consistent with the long-term price forecasts published by third-party industry experts. ***Critical to the long-term recoverability of certain assets is the assumption that either by supply and demand changes, or due to general inflation, prices will***

28

> ***rise in the future. Should increases in long-term prices not materialize, certain of the Corporation's assets will be at risk for substantial impairment.***

App. 9 (emphases added).

Horne also recommended adding enhanced explanations about the Company's use of its internal price projections for its impairment analyses.  App. 8–9 (suggesting that the 2015 10-K state that ExxonMobil's impairment evaluations used "the Corporation's price, margin, volume and cost assumptions developed in the annual planning and budgeting process" which were "consistent with the criteria management uses to evaluate investment opportunities"); App. 682 (suggesting that the 10-K "emphasiz[e] that assumptions are consistent with annual plan"); *see also* App. 279 at 95:1–100:18.

On or around January 29, 2016, the Individual Defendants and other executives reviewed and approved a redline of Horne's proposed enhancements to the 10-K.  *See* App. 512; App. 522–25.  On February 24, 2016, ExxonMobil filed with the SEC its 2015 Form 10-K, including nearly verbatim the impairment-related language suggested by Horne as part of the Enhancement Review. App. 79–80.

ExxonMobil has never re-performed, corrected, or restated its 2015 analysis, nor the disclosures it made in its 2015 Form 10-K regarding impairments.  Nor has it otherwise publicly communicated that the RMDG assets were impaired at year-end 2015.

Plaintiff alleges that the October 28 Disclosure revealed that the RMDG impairment analysis for 2015 was incorrect.  But that disclosure addressed the impairment analysis for 2016, not 2015.  As relevant here, in the "Forward-looking Statements" section, ExxonMobil stated:

> ***In light of continued weakness in the upstream industry environment <u>during 2016</u>, and as part of its annual planning and budgeting process which is currently in progress, the corporation will perform an assessment of its major long-lived assets, similar to the exercise undertaken in late 2015, including North America natural gas assets and certain other assets across the remainder of its operations. The assessment will reflect crude and natural gas price outlooks consistent with***

29

*those that management uses to evaluate investment opportunities and generally consistent with the long-term price forecasts published by third-party industry and government experts.* Development of future undiscounted cash flow estimates requires significant management judgment, particularly in cases where an asset's life is expected to extend decades into the future. An asset group would be impaired if its estimated undiscounted cash flows were less than the asset's carrying value, and impairment would be measured by the amount by which the carrying value exceeds fair value. *The corporation will complete its asset recoverability assessment and analyze the conclusions of that assessment in connection with the preparation and review of the corporation's year-end financial statements for inclusion in its* <u>*2016 Form 10-K*</u>. *Until these activities are complete, it is not practicable to reasonably estimate the existence or range of potential future impairments related to the corporation's long-lived assets.*

App. 145 (emphases added). The disclosure referred to an "asset recoverability assessment" that was being prepared "for inclusion in its 2016 Form 10-K," but in no way revised the conclusions from the "exercise undertaken in late 2015." *Id.*

On January 31, 2017, ExxonMobil released its Q4 2016 earnings report and announced that it would be taking an asset impairment charge of around $2 billion for year-end 2016, largely related to its RMDG assets. *See* App. 776–77. ExxonMobil noted that this was an "[i]mpairment charge resulting from the *fourth quarter 2016 asset recoverability assessment.*" *Id.* at 777 (emphasis added). It did not refer to—much less correct—the exercise that had been undertaken in 2015. And, as this Court held, this disclosure was "not associated with a statistically significant negative price reaction on a close-to-open basis or even a close-to-close basis." Dkt. No. 178 at 52.

### B. The Undisputed Facts Show That ExxonMobil's RMDG-Impairment-Related Disclosures Were Not False

The Court originally permitted Plaintiff to proceed on the RMDG theory on the basis that Defendants' impairment analysis allegedly violated GAAP by failing to include a proxy cost of carbon, Dkt. No. 62 at 20–22, but, at class certification, the Court eliminated this issue from the case, Dkt. No. 178 at 48–50. Plaintiff then pivoted, asserting that the RMDG impairment analysis

30

used the wrong assumptions to estimate future cash flows. But, Plaintiff's expert has now admitted that Defendants' assumptions were permissible under GAAP. Plaintiff can identify no fraud, and summary judgment must be granted.

The undisputed evidence establishes that ExxonMobil's 2015 impairment analysis for its RMDG assets fully complied with ASC 360. While no triggering event was determined to have occurred at Step 1, ExxonMobil nonetheless conducted a recoverability analysis that followed GAAP by using the cash flow assumptions from its internal plan that it used to run its business. This use of internal plan assumptions is mandated by ASC 360: "[e]stimates of future cash flows used to test the recoverability of a long-lived asset (asset group) *shall incorporate the entity's own assumptions* about its use of the asset (asset group) . . ."). App. 661 at 360-10-35-30 (emphasis added); *see also* App. 349 (describing use of plan assumptions in recoverability analysis). Plaintiff's accounting expert, Regan, has admitted that it was "permissible under the rules" for ExxonMobil to use these internal price projections in its impairment analyses. App. 264 at 252:22–253:19. That admission is dispositive of Plaintiff's entire RMDG impairment fraud theory, and confirms that ExxonMobil said nothing false or misleading when it told investors that the RMDG assets were not impaired at year-end 2015.

Regan has suggested that ExxonMobil would have reached a different conclusion if it had conducted the impairment analysis using different forward-looking assumptions. This opinion is inadmissible for the reasons in Defendants' *Daubert* motion. But even if the opinion were admissible, it fails to create a genuine issue of material fact. Plaintiff is impermissibly asking the Court to depart from the required standard and substitute its own hindsight judgments about the assumptions ExxonMobil should use to invest its capital for ExxonMobil's actual, contemporaneous judgments. *See Coates* v. *Heartland Wireless Commc'ns, Inc.*, 26 F. Supp. 2d

31

910, 921–22 (N.D. Tex. 1998) ("Plaintiffs may not plead fraud by hindsight" by claiming that "defendants must have known earlier that such a charge and write-down would be required"); *In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 866 (N.D. Tex. 2005) ("forward projections which ultimately fail to materialize cannot form the basis for a securities fraud action"). Courts have "routinely rejected . . . as a basis for securities fraud" contentions by plaintiffs that a company "should have impaired its [assets] earlier than it did" as "mere disagreement with [the company's] accounting judgment." *In re Aceto Corp. Sec. Litig.*, No. 2:18-CV-2425, 2019 WL 3606745, at *7 (E.D.N.Y. Aug. 6, 2019).

### C. The Undisputed Facts Show That Defendants Did Not Act with Scienter

Plaintiff also has not proven scienter on its impairment claim. Because an impairment analysis is both forward-looking and a statement of opinion, Plaintiff's fraud claim must clear both the PSLRA safe harbor and *Omnicare, Inc.* v. *Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015). Under the PSLRA safe harbor for forward-looking statements, 15 U.S.C. § 77z-2(i)(1), Plaintiff must meet the "demanding" standard of proving that the 2015 impairment analysis was disclosed "by or with the approval of an executive officer . . . with ***actual knowledge*** . . . that the statement was false or misleading." *Southland*, 365 F.3d at 371–72 (emphasis added); *accord Six Flags Ent. Corp.*, 58 F.4th at 214–15; *see supra* Part I.C. Likewise, because an impairment analysis reflects the company's judgment in making forward-looking assumptions, it is an opinion.[8] An "honestly held" opinion is not actionable under *Omnicare*, 575 U.S. at 185–86, so Plaintiff must prove that Defendants "did not actually hold the opinion expressed," *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, No. 1446, 2016 WL

---

[8]    *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys.* v. *Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017); *In re Aceto Corp. Sec. Litig.*, No. 2:18-CV-2425, 2019 WL 3606745 (E.D.N.Y. Aug. 6, 2019); *In re: BP p.l.c. Sec. Litig.*, No. 4:10-MD-2185, 2016 WL 3090779 (S.D. Tex. May 31, 2016).

4095973, at \*30 & n.42 (S.D. Tex. Aug. 2, 2016), *aff'd sub nom. Giancarlo* v. *UBS Fin. Servs., Inc.*, 725 F. App'x 278 (5th Cir. 2018).

The evidence does not support any such finding. The record shows that, in conducting its 2015 analysis, ExxonMobil personnel (1) carefully applied the multi-step analysis of ASC 360, (2) memorialized their processes and conclusions in the Impairments Whitepaper, and (3) augmented the 2015 10-K disclosures to ensure investors were fully informed. The Individual Defendants reviewed and approved the results of the robust impairment process conducted by subject-matter experts at the Company. App. 347, 354; *see also* App. 271–72 at 208:16–210:8; App. 225–26 at 45:18–47:5; App. 299 at 26:13–28:7, App. 303 at 101:6–23. Reliance by senior management on subject-matter experts undercuts scienter. *See supra* Part I.C (citing cases).

Moreover, the conclusions of the 2015 analysis were also subjected to external review by ExxonMobil's independent auditor, PwC, which issued an audit opinion agreeing with ExxonMobil's conclusions that PwC has never corrected, restated, or withdrawn. *See* Abington 1478 ¶¶ 117–18, App. 1535–36 ¶¶ 235–53; App. 265 at 256:1–13 (conceding that PwC had "never withdrawn its unqualified opinion with respect to ExxonMobil's 2015 financials"). PwC also reviewed and approved the Corporation's impairment process, characterizing it as a "robust" one that was "operating effectively." App. 1714, 1719. The Individual Defendants' reliance on PwC also negates scienter. *See Snyder*, 292 F. App'x at 406. And, as the Fifth Circuit has explained, scienter is further undercut where, as here, the accounting judgment has never been withdrawn or qualified by the auditors. *Ind. Elec. Workers' Pension Tr. Fund IBEW*, 537 F.3d at 535–36.

33

In short, the evidence depicts a series of "inherently nuanced" accounting issues, but those that were handled within "a range of 'reasonable' treatments, leaving the choice among alternatives to management." *Id.* at 536. It does not depict a fraud.[9]

**D. The Undisputed Facts Show That Plaintiff Cannot Prove Loss Causation**

Plaintiff's RMDG impairments claim fails for the independent reason that Plaintiff cannot establish loss causation. As noted above, Plaintiff has put in no evidence of loss causation or damages associated with the October 28 Disclosure. *Supra* Part III.A. Instead, Plaintiff relies entirely on the January 31, 2017 disclosure—a theory that directly contradicts this Court's class certification decision. *See* Dkt. No. 178 at 56 (holding that the October 28 Disclosure was the "sole alleged [c]orrective [d]isclosure" in the case). For the reasons in Defendants' *Daubert* motions, the Court should reject this attempt to re-litigate the January 31 Disclosure.

Loss causation also is not proven for additional reasons.

*First*, the January 31 Disclosure addresses the *2016* impairment analysis, not the previously issued *2015* impairment analysis. ExxonMobil was clear in its disclosures that it conducted its impairments assessments on an annual basis, and simply because it recognized an impairment as of year-end 2016 does not signal that the assets should have been impaired the prior year. *See N. Port Firefighters' Pension--Loc. Option Plan* v. *Temple-Inland, Inc.*, 936 F. Supp. 2d 722, 762–63 (N.D. Tex. 2013) (statements not corrective where "nothing in the[] disclosures indicate[d] that prior valuations were incorrect or that Guaranty should have recorded an [impairment] in *prior*

---

[9]    As previously addressed, Plaintiff's motive theory based on potential downgrade of the AAA credit rating in advance of the bond offering has also proved unsupportable. *See supra* Part I.C. There is no evidence connecting the credit rating to the impairment analysis. Like the proved reserves estimation process, the impairment analyses were performed by groups at ExxonMobil that were entirely separate from the department handling the bond offering. *See* App. 227 at 96:21–97:6; App. 278 at 91:17–95:9. And the public disclosures related to the 2015 impairment analyses were drafted by accounting professionals uninvolved with the Company's debt offerings or credit rating. App. 2–3 ¶ 8.

SEC filings"); *In re Dell, Inc. Sec. Litig.*, 591 F. Supp. 2d 877, 909 (W.D. Tex. 2008) (statements not corrective because they did "no more than announce Dell's earnings or expected earnings" and did not "reveal[] or specifically correct[] any prior fraud or misrepresentation").

Indeed, Feinstein could not identify any analyst who connected the 2016 impairment of the RMDG assets to the earlier 2015 assessment. *See* App. 328 at 93:18–95:9. In the Fifth Circuit, as elsewhere, a public disclosure for a specific time period does not "correct" disclosures relating to earlier time periods where it "does not report any concern that [the earlier disclosures] may be incorrect." *Greenberg* v. *Crossroads Sys., Inc.*, 364 F.3d 657, 668 (5th Cir. 2004) (third-quarter revenue statement was not corrective of first- and second-quarter statements). Here, because the January 31 Disclosure "does not report any concern" that the RMDG impairment-related disclosures in the 2015 10-K were wrong, the January 31 Disclosure "cannot form the basis for a fraud-on-the-market claim." *Greenberg*, 364 F.3d at 668; *see also Catogas* v. *Cyberonics, Inc.*, 292 F. App'x 311, 315–16 (5th Cir. 2008) (disclosure not corrective where it did "nothing to correct the inaccuracy of such statements or bring to light any of the alleged fraud by defendants").

*Second*, Feinstein's opinions concerning the January 31 Disclosure—including his new, flawed regression model and his methodologically unsupportable failure to disaggregate fraud-related losses from non-fraud-related losses—should be excluded for the reasons set forth in Defendants' *Daubert* motion. *See generally* Feinstein *Daubert* Mot.

*Third*, Plaintiff cannot rest its fraud claim on a purported corrective disclosure that post-dates the class period. Where information is disclosed "after the close of the alleged class period," courts have held that such information "could not have caused the Plaintiffs any loss." *Dell*, 591 F. Supp. 2d at 910; *see also Lighthouse Fin. Grp.* v. *Royal Bank of Scotland Grp., PLC*, No. 11 Civ. 398, 2013 WL 4405538, at *10 (S.D.N.Y. Aug. 5, 2013) ("[I]nformation cannot serve as a

35

corrective disclosure if it was not disclosed during the class period."), *aff'd sub nom. IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund* v. *Royal Bank of Scotland Grp., PLC*, 783 F.3d 383 (2d Cir. 2015). Although some courts have recognized an exception to this rule in cases involving "a protracted series of partial disclosures," those cases are inapposite here, where Feinstein cites only a single corrective disclosure of the alleged RMDG impairment fraud. *In re Firstenergy Corp.*, Nos. 2:20-CV-3785, 2:20-CV-4287, 2022 WL 681320, at \*29 & n.39 (S.D. Ohio Mar. 7, 2022) (loss causation is "lacking where plaintiffs' *first* concrete knowledge of the scheme or misstatement postdates the class period").

## IV.    Plaintiff's Unpled Theories Are Improper and, in Any Case, Meritless

Unable to prove the claims pleaded in its Complaint, Plaintiff now appears to be pursuing two new, unpled theories of liability relating to Kearl's proved reserves and Kearl's profitability. Such unpled theories are improper and should not be considered by this Court. But even if this Court were to consider them, Plaintiff has failed to adduce evidence sufficient to survive summary judgment.

### A. Plaintiff's Attempts to Proffer Two New Theories of the Case Are Improper

On October 11, 2024, Plaintiff served Regan's expert report on Defendants, asserting two new theories of liability entirely absent from the Complaint.

*First*, Regan's report suggests that Plaintiff is now pursuing a previously unpled theory of liability premised on the notion that ExxonMobil should have de-booked Kearl proved reserves at year-end 2015 instead of year-end 2016 (the "Unpled Kearl Reserves Theory"). Plaintiff's counsel asked Regan to opine on whether ExxonMobil's "disclosed proved reserves related to Exxon's Canadian Kearl bitumen of approximately 3.6 billion barrels of bitumen *as of December 31, 2015* was required to be de-booked to zero." App. 1000 (emphasis added). Regan opined that

36

ExxonMobil was required to "de-book all of Kearl's SEC bitumen proved reserves as of December 31, 2015." *Id.*

The Unpled Kearl Reserves Theory is nowhere in the Complaint. Paragraph 247 of the Complaint lists each reason why the statements on proved reserves were allegedly misleading, but it does not state that ExxonMobil should have de-booked the Kearl reserves in the 2015 Form 10-K. Rather, the Complaint admits that by year-end 2015, Kearl reserves were "just barely *satisfying* the SEC's definition for proved reserves." Compl. ¶ 169 (emphasis added). Likewise, over years of litigation, Plaintiff has repeatedly represented to the Court and Defendants that its Kearl theory challenged Defendants' purported disclosures regarding "proved reserves *at year-end 2016*." Dkt. 128 at 9 (emphasis added); Dkt. 87 at 20 (representing at class certification that Plaintiff pursued fraud theory concerning "Exxon's failure to disclose its proved reserves at Kearl were all but certain to be de-booked by year-end 2016 was materially misleading"). And, in an October 19, 2023 letter to Defendant's counsel, Plaintiff expressly disavowed its newly adopted theory, stating that Plaintiff "*does not allege that Exxon[Mobil] 'should have de-booked its proved reserves at Kearl as of year-end 2015'*; but rather, that Defendants materially misled investors by concealing the virtual certainty that Kearl's proved reserves would need to be de-booked 'at year-end 2016.'" *See* App. 686 (emphasis added). Plaintiff never amended its Complaint to add the Unpled Kearl Reserves Theory. The Court should not consider it at this late stage of a case that has been pending for years.

*Second*, Regan's report asserts yet another previously unpled theory of liability absent from the Complaint, this time suggesting that ExxonMobil should have publicly disclosed details related to the profitability of Kearl's operations (the "Unpled Kearl Profitability Theory"). While the Complaint alleged that ExxonMobil should have disclosed three months of purported losses at the

37

*Canadian bitumen operations*, *see* Compl. ¶ 342; *supra* Part II, Regan's report asserts that ExxonMobil should have disclosed information regarding purported operating losses *at the Kearl asset* over a different time period.  App. 1048–51.

Plaintiff cannot survive summary judgment on the basis of these new, unpled theories. Introducing a new theory of liability for the "first time" in opposition to summary judgment is "precisely the sort of surprise switcheroo that our precedents forbid." *Jackson* v. *Gautreaux*, 3 F.4th 182, 189 (5th Cir. 2021).  "It is well settled in [the Fifth] Circuit that '[a] claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court.'"  *Id*. at 188 (quoting *Cutrera* v. *Bd. of Sup'rs of La. State Univ*., 429 F.3d 108, 113 (5th Cir. 2005)) (alteration in original).  The Fifth Circuit expressly "precludes a plaintiff from advancing a new claim or reframing a previously presented one in response to a motion for summary judgment." *Pittman* v. *U.S. Bank NA*, 840 F. App'x 788, 789–90 (5th Cir. 2021); *accord Caro* v. *City of Dallas*, 17 F. Supp. 2d 618, 632 n.6 (N.D. Tex. 1998) ("plaintiff cannot amend [its] complaint by briefs submitted in opposition to later motions.").

Moreover, the PSLRA heightens the pleading requirement under Federal Rule of Civil Procedure 9(b) by requiring that a plaintiff "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1)(B).  To meet this heightened pleading requirement, a plaintiff must "explain the reason or reasons why the statement is misleading, *i.e.,* why the statement is fraudulent." *ABC Arbitrage Plaintiffs Grp.* v. *Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002).  After having "survived a motion to dismiss in light of the theories they, themselves, chose[,] [Plaintiff] may not now evade Congress's PSLRA mandates by switching horses midstream and pursuing a new theory." *In re St. Jude Med., Inc., Sec. Litig*., 629 F. Supp. 2d 915, 921 (D. Minn. 2009).

For these reasons, the Unpled Kearl Reserves and Unpled Kearl Profitability Theories should be summarily rejected.

### B. Plaintiff's Unpled Kearl Reserves Theory Is Meritless

Even if considered, Plaintiff's Unpled Kearl Reserves Theory does not raise a triable issue of fact in support of a fraud claim. It arises from Plaintiff's expert Regan, who is not qualified to proffer an opinion on oil and gas proved reserves, so his opinion regarding the Unpled Kearl Reserves Theory should be excluded. *See* App. 245–46 at 17:13–18:1. In any event, Regan's theory simply second-guesses ExxonMobil's accounting judgments—a far cry from a fraud claim. To Regan, that ExxonMobil updated its estimation methodology in 2016 suggests that the methodology used to estimate Kearl's proved reserves *in 2015* was flawed and rendered inaccurate results. No evidence supports that theory. Instead, the evidence shows that: (1) ExxonMobil's GRG and IOL's reserves group undertook a year-long exercise to estimate Kearl's proved reserves, employing reasoned, longstanding, and well-documented policies and procedures; (2) throughout 2015, ExxonMobil's GRG and IOL's reserves group expected Kearl's reserves to qualify as proved at year-end 2015; and (3) in late 2015 and early 2016, ExxonMobil's senior management was advised that Kearl's reserves were poised to qualify—and in fact did qualify—as proved at year-end 2015.

1.     *Undisputed Facts Concerning the Estimation of Kearl's 2015 Proved Reserves*

In 2009, the SEC revised the regulations that govern oil and gas disclosure requirements, including disclosure of proved reserves. App. 851 (the "SEC Rule"). The SEC defines proved reserves as "quantities of oil and gas, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be *economically producible*." 17 C.F.R. § 210.4-10(a)(22) (emphasis added). The SEC defines a quantity of oil or gas as "economically

producible" if it "generates *revenue* that exceeds, or is reasonably expected to exceed, the *costs of the operation*." 17 C.F.R. § 210.4-10(a)(22)(v) (emphases added).

Neither the revenue nor the costs of the operation are defined by the SEC. *See* App 1452–53 ¶¶ 52–55. Revenue is based on the "first-day-of-the-month price for each month" "during the 12-month period prior to the ending date of the period covered by the report[.]" 17 C.F.R. § 210.4-10(a)(22)(v); App. 1452 ¶ 52. However, the SEC does not provide guidance on how to estimate the "price" on the first day of the month where an established benchmark price (like West Texas Intermediate) does not exist. Similarly, the SEC does not define the "costs of the operation." The SEC noted that "[r]ather than defining an extensive glossary of terms in our rules and attempting to constantly update those definitions, we advise companies to look to *definitions that are commonly accepted within the oil and gas industry* to the extent such definitions are not in, or inconsistent with, our rules." App. 854–55 (emphasis added). There is no other SEC regulation that regulates how oil and gas companies are to prepare disclosures of proved reserves. *See* App. 250 at 83:11–84:4.

The estimation of proved reserves requires the exercise of judgment by the persons making the estimations. Regan notes that his report is conducted in conformity with standards set by the American Institute of Certified Public Accountants ("AICPA"), an accounting body that he has been a member of since 1970. App. 1205. AICPA notes that:

> It is important to note that reserve information is imprecise because of the inherent uncertainties in, and the limited nature of, the data upon which the reserve estimate is predicated. Moreover, the methods and data used in estimating reserve information are necessarily often indirect or analogical in character rather than direct or deductive. The persons estimating reserve information make ***numerous judgments*** based solely on their educational background, training, and experience.

App. 846 (the "AICPA Guidance") (emphasis added); App. 1453–54 ¶ 56. The AICPA Guidance also notes that "[r]eserve estimates are prepared by persons with the ***requisite specialized knowledge and experience*** to estimate oil and gas reserve quantities." App. 845 (emphasis added).

ExxonMobil's GRG was led by William Strawbridge, who has "more than 30 years of experience in reservoir engineering and reserves assessment and has a degree in Engineering." App. 31. Strawbridge served on the Society of Petroleum Engineers' Oil and Gas Reserves Committee, which is the industry body that sets "definitions, terms, recommended practices, and standards" for proved reserves estimates. App. 771. Informed by his experience and industry practice, Strawbridge and the GRG developed a documented methodology that its affiliate, IOL—the entity that operated the Kearl asset—used to estimate proved reserves in 2015. *See* App. 527–30 (prescribing "price" estimation process).

The 2015 methodology for estimating proved reserves—which Regan now questions as fraudulent—had been in place since 2008. Specifically, to determine the first-of-the-month price for the Kearl asset in 2015, IOL's reserves team followed a "process [that] was developed several decades back for Cold Lake (and similar for Syncrude), and has been used for Kearl pricing since 2008." App. 593.[10] Likewise, to determine costs for Kearl in 2015, GRG and IOL's reserves group utilized a longstanding and well-documented process. GRG noted that the "costs of the operation," which is the term in the regulation, is "[n]ot defined by the SEC, but excludes depreciation, so assessed to represent Direct Cash Operating Costs." App. 595. ExxonMobil's definition was "commonly accepted within the oil and gas industry." App. 854–55. The Society

---

[10]   IOL's reserves team used the first-of-the-month "West Texas Intermediate (WTI) NYMEX marker price," an oil and gas industry benchmark for crude oil, as a starting point. *See* App. 529. Then, IOL's reserves team deducted quality, diluent, and transportation "differentials" to estimate the "plant gate price," or the SEC price at the "terminal point." *See id.*; App. 592–93. IOL's reserves team estimated prices at the plant gate because of the SEC's prescription that the "value of the products that generate revenue . . . be determined at the terminal point of oil and gas producing activities." 17 C.F.R. § 210.4-10(a)(10); App. 592; *see also* App. 1452 ¶ 53. Accordingly, "any profit or loss downstream of the [plant] gate [was] excluded from" the SEC price. App. 592.

41

of Petroleum Engineers provides that the costs of the operation are the "cash costs that will actually be eliminated if project production ceases."   *See* App. 799; App. 1461 ¶ 80.

In 2015, as the GRG and IOL's reserves group followed these longstanding and documented processes for estimating proved reserves at Kearl, there is no evidence that any concerns with the methodology were raised to ExxonMobil's senior executives.  Nor is there any evidence whatsoever that executives directed employees to make fraudulent statements.  On October 26, 2015, Strawbridge met with the Individual Defendants, among others, to discuss Kearl's proved reserves outlook for the year-end.  App. 602.  At this meeting, the year-end outlook indicated that Kearl's reserves would qualify as proved at year-end 2015.  App. 598 ("Outlook – price ~1/bbl > costs").  At year end, utilizing the documented processes, IOL's reserves group, with oversight from the GRG, estimated that the SEC price for Kearl exceeded its unit lifting cost and, as such, the reserves there qualified as proved. [11]  On January 25, 2016, the GRG presented Individual Defendants with Kearl's final proved reserves estimations. *See* App. 538.  Defendant Tillerson "took no exceptions to the proposal as presented."  App. 537.

Regan offers no opinion on whether the model that ExxonMobil utilized in 2015 complied with the SEC Rule.  App. 252 at 111:3–113:22.  That determination requires an understanding of whether the definitions that ExxonMobil employed for the price and the cost of operations were "commonly accepted within the oil and gas industry."  App. 854–55.  Regan offers no evidence whatsoever that they were not.  Indeed, he concedes that he would not be able to opine on the standards that are "commonly accepted within the oil and gas industry" at all, since oil and gas accounting is a "niche" area and Regan "never claimed to be an expert in a particular niche[.]"  App. 245–46 at 17:13–18:1.  Regan concedes that he had not been "asked to express an opinion

---

[11]     The final SEC price for Kearl at year-end 2015 was $28.70 per barrel.  App. 571, 574.  The 2015 average unit lifting cost for Kearl was determined to be $26.50 per barrel.  App. 574.

on what the SEC rules themselves require" beyond stating that the price is based on the "first day of the month." App. 252 at 13:2–22. Beyond that, he concedes that there are "complexities" and he does not "express an opinion on what price" ExxonMobil should have used in the proved reserves estimates. App. 252 at 111:11–23, 113:2–22. He acknowledged that there is "***some vagueness***" in the SEC Rule. App. 247 at 73:11–16 (emphasis added).

2.   *Regan's Reports Do Not Create an Issue of Triable Fact Regarding the Accuracy of Kearl's 2015 Proved Reserves Estimations, and Plaintiff Thus Can Identify No Misstatement*

As described in further detail in Defendants' *Daubert* Motion, Regan's criticisms of the Kearl 2015 proved reserves estimations amount to an attempt to substitute his own judgments for those of seasoned professionals with expertise in estimating proved reserves. Regan does not dispute that ExxonMobil had in place appropriate controls, processes, and policies for estimating proved reserves. Regan does not dispute that ExxonMobil's GRG, IOL's reserves team, and ExxonMobil's senior management all understood Kearl's reserves to qualify as proved at year-end under the SEC Rule. Fatal to Plaintiff's position, Regan does not actually opine on whether ExxonMobil's application complied with the SEC Rule—he admits that he "[hadn't] dug into how Exxon interpreted the various complexities of the SEC pricing." *See* App. 252 at 111:3–113:18. The fact that Regan—with *no* practical experience estimating oil and gas proved reserves—would have used a different process to estimate proved reserves falls far short of what Plaintiff's claims would need to survive summary judgment. At most, Regan offers "credentials and a subjective opinion," but "an expert's testimony that 'it is so' does not suffice to preclude summary judgment." *Loiacano* v. *DISA Glob. Sols., Inc.*, 659 F. App'x 772, 777 (5th Cir. 2016) (quoting *Orthopedic & Sports Inj. Clinic* v. *Wang Lab'ys, Inc.*, 922 F.2d 220, 225 (5th Cir. 1991)). While Regan may offer an opinion on how he would have done the calculation, he does not actually offer an opinion on whether ExxonMobil complied with the SEC regulation, and he ignores that "the application

43

of sophisticated accounting standards . . . leave[s] broad scope for judgment and informed estimation; this is another way of saying that determinations on such matters can differ reasonably and sizably." *Ind. Elec. Workers' Pension Tr. Fund IBEW*, 537 F.3d at 536.

### 3.    *Plaintiff Cannot Prove Scienter for the Unpled Kearl Reserves Theory*

There is no evidence that Defendants believed the year-end 2015 proved reserves estimation to be false when ExxonMobil issued its Form 10-K for 2015.  In particular, Plaintiff has pointed to no evidence that ExxonMobil's GRG or IOL's reserves team provided information to senior management that was different from what was ultimately disclosed in the 2015 10-K. *See Mun. Employees' Ret. Sys. of Mich.* v. *Pier 1 Imports, Inc.*, 935 F.3d 424, 434 (5th Cir. 2019) (no scienter where plaintiff failed to prove that any internal reports "revealed the information that is relevant here"); *see* App. 539–88; App. 536.  Instead, the evidence depicts the use of thoughtful, reasoned, long-standing, and well-documented policies and procedures to estimate Kearl's proved reserves, carried out with care by specialized professionals.  *See supra* Part IV.B.1.  Because ExxonMobil's estimate of proved reserves—including its judgments to estimate price and costs— were inherently subjective, Plaintiff must prove that Defendants subjectively disbelieved their 2015 Kearl proved reserves estimate in order to establish scienter.  *Omnicare*, 575 U.S. at 185–86 (an "honestly held" opinion is not actionable).  There is no evidence to support such a finding. Further, as discussed *supra* Part I.C, Plaintiff has identified no evidence that ExxonMobil or the Individual Defendants had any motive to misstate proved reserves.

### 4.    *Plaintiff Cannot Prove Loss Causation for the Unpled Kearl Reserves Theory*

Plaintiff never alleged a corrective disclosure associated with Kearl's 2015 proved reserves estimations.  ExxonMobil's disclosures regarding Kearl's proved reserves in its 2015 10-K have

44

*never been restated or corrected*, either voluntarily or at the behest of the SEC, a fact that Regan concedes. App. 255–56 at 189:25–190:17.

Plaintiff has therefore made no attempt to identify a public revelation alerting the market that ExxonMobil's (correct) 2015 proved reserves estimates were actually wrong. Plaintiff can point to no one, not even Plaintiff's own investment advisor, who viewed the October 28 Disclosure as evidence that ExxonMobil had committed fraud. *See* App. 325–26 at 69:11–72:3; App. 291 at 275:21–276:2. The October 28 Disclosure (and the 2016 10-K) did "not report any concern" that the proved reserves disclosures in the 2015 10-K "may be incorrect." *Greenberg*, 364 F.3d at 668 (finding disclosure not "corrective" on this basis).[12] ExxonMobil's statements simply did "nothing to correct the inaccuracy of such statements or bring to light any of the alleged fraud by defendants." *Catogas*, 292 F. App'x at 315–16.

## C. Plaintiff's Unpled Kearl Profitability Theory Is Meritless

Plaintiff's Unpled Kearl Profitability Theory, even if it were properly before the Court, provides no basis to deny summary judgment, because it is wholly meritless.

Regan's report suggests Plaintiff is now attempting to revive the Item 303 claim this Court previously dismissed, by asserting that ExxonMobil's 2015 Form 10-K's MD&A should have included disclosures about a trend of purported losses at Kearl. App. 1048–83. In ruling on Defendants' motion to dismiss, this Court explicitly dismissed Plaintiff's Item 303 claim, thus making it the law of the case that such a claim is foreclosed. Dkt. No. 62 at 22–24 ("Thus, [Plaintiff] failed to plead a material misstatement based on ExxonMobil's alleged failure to comply with Item 303."). "[A] decision on an issue of law made at one stage of a case becomes a binding precedent to be followed in successive stages of the same litigation." *F.D.I.C.* v. *McFarland*, 243

---

[12]   *See also N. Port Firefighters' Pension--Loc. Option Plan* v. *Temple-Inland, Inc*., 936 F. Supp. 2d 722, 762–63 (N.D. Tex. 2013); *In re Dell, Inc. Sec. Litig.*, 591 F. Supp. 2d 877, 909 (W.D. Tex. 2008).

F.3d 876, 884 (5th Cir. 2001); *accord Christianson* v. *Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) ("[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.").

Plaintiff's attempt to revive its Item 303-based claim should be rejected for additional reasons as well:

*First*, since the motion to dismiss was decided, the Supreme Court issued an intervening and dispositive decision in *Macquarie Infrastructure Corp.* v. *Moab Partners, L.P.*, 601 U.S. 257, 260, 264 (2024). *Macquarie* addressed whether the alleged failure to disclose information, such as trends required by Item 303 of Regulation S-K, can support a claim under Rule 10b-5 in the absence of an otherwise misleading statement. The Supreme Court held that "pure omission" claims are not actionable under Rule 10b-5. *Id.* Instead, a plaintiff must identify an affirmative statement actually made by a defendant that is rendered misleading by the omission of material facts. *Id.*

That holding compels summary judgment here. ExxonMobil did not make ***any*** alleged misleading statements about Kearl's profitability: the challenged Page 9 Table does not mention "Kearl" at all, nor does it discuss profitability. Rather, it provides indisputably accurate production price and production costs per barrel for Canadian bitumen operations reported pursuant to Regulation S-K, Item 1204, as discussed *supra* Part II. App. 34. Even Plaintiff's accounting expert, Regan, could identify *no* statements made by ExxonMobil that the Kearl asset was profitable during the relevant time period; Regan could only point to "words" that he claims "resulted in the—question of not knowing whether there were profits or if there were losses." App. 262 at 216:9–14. When pressed, he speculated that "somebody could interpret that statement as

indicating that there were profits within Kearl." App. 262 at 216:15–20.[13] This conjecture cannot salvage Plaintiff's omission-based claim.

Since ExxonMobil did not make any affirmative statement about Kearl's profitability, *Macquarie* forecloses Plaintiff's claim. As a court in this district noted, applying *Macquarie*, "a duty to speak the full truth *on a particular subject* arises when a defendant undertakes to say anything *on that particular subject.*" *Sec. & Exch. Comm'n v. Bowen*, No. 3:22-CV-1415-S, 2024 WL 3462359, at *6 (N.D. Tex. July 17, 2024) (citation omitted) (emphases in original).

*Second*, even if *Macquarie* did not foreclose this claim, discovery has revealed that the Kearl asset, standing alone, was generating positive cash flow in 2015. *See* App. 461 (reporting year-to-date realizations as of December 2015 for Kearl as $24.27 per barrel, and cash operating expenses as $24.16 per barrel, indicating that Kearl was cash-flow positive by $0.11 per barrel). Regan concedes this fact. *See* App. 258 at 198:14–199:3 ("Q. . . . . [D]oes that mean that Kearl in 2015 was cash flow positive? A. . . . Yes."). Plaintiff has focused on a different metric, suggesting that Kearl had negative operating earnings for ***part*** of 2015. *See* App. 1057–58 ¶¶ 121–22. But those negative operating earnings are explained by one-time expenses associated with the Kearl Expansion Project, which was completed in June 2015 and required major one-time capital expenditures that would depreciate over time. *See* App. 538. As Regan admits, Kearl was ***profitable*** in July, August, and September of 2015, App. 1057 ¶ 121, so there was no "trend" to report. *See Kapps* v. *Torch Offshore, Inc.*, 379 F.3d 207, 212 (5th Cir. 2004) (suggesting that "a one or two year time period" is also insufficient to establish "a trend"). Accordingly, since Kearl was cash-flow positive in 2015, ***and*** its operations experienced positive operating earnings from

---

[13]   And while Regan dedicates a substantial portion of his report to statements by ExxonMobil regarding the Kearl operations, he does not identify *any* statements wherein ExxonMobil explicitly stated that the Kearl asset was profitable. *See, e.g.*, App. 1010–17, 1052–56.

47

July to September of 2015, there was no "trend" to report at all. *See, e.g.*, App. 1057–58 ¶¶ 121–22; *see* App. 461.

*Third*, on scienter, Plaintiff has not identified any documents suggesting that Defendants had any intent to deceive shareholders by presenting the information in the Page 9 Table. In fact, ExxonMobil had presented the information in the same format for years before 2015. *See, e.g.*, App. 198–99; App. 205–06. And, as addressed above, Plaintiff fails to present any scienter theory for why Defendants would mislead investors about Kearl. *See supra* Part I.C.

*Finally*, Plaintiff fails to identify any corrective disclosure of the Unpled Kearl Profitability Theory, and thus cannot prove loss causation. A corrective disclosure must "correct the inaccuracy" of a prior statement or "bring to light" something about the "alleged fraud." *Catogas*, 292 F. App'x at 315–16; *see also Greenberg*, 364 F.3d at 668. But Plaintiff's causation and damages expert, Feinstein, cannot identify any corrective disclosure that ever revealed the Page 9 Table to be false. *See* App. 332 at 107:18–108:11. The information included in the Page 9 Table was never restated, and even when ExxonMobil published information regarding the Canadian bitumen operations' production prices and costs in its 2016 Form 10-K the following year, the price-cost spread remained positive. App. 212. The purported falsity of the Page 9 Table has thus never been revealed. Feinstein testified that the "corrective disclosure" of Kearl's purported lack of profitability was the October 28 Disclosure estimating full-year 2016 de-booking of 3.6 billion barrels of proved reserves for Kearl. *See* App. 331–32 at 105:1–106:4. But proved reserves are an entirely different metric from "profitability," and are assessed separately from the information disclosed in the Page 9 Table. Feinstein cites no evidence that any analyst or market observer ever connected the 2015 information in the Page 9 Table with the October 28 Disclosure, which

48

projected a potential de-booking of Kearl proved reserves.  *See* App. 325 at 69:11–72:3.  He is thus illogically mixing apples and oranges.  *See* Feinstein *Daubert* Mot. at 13–16.

### CONCLUSION

For the reasons set forth above, Plaintiff cannot prove its claims under Section 10(b) of the Exchange Act, and absent primary liability, cannot prove its 20(a) control claim either.  Defendants respectfully request that their motion for summary judgment be granted, and judgment be entered dismissing all of Plaintiff's claims with prejudice.

Dated:   February 21, 2025

Respectfully submitted,


*/s/ Daniel J. Toal*
Theodore V. Wells, Jr. (*pro hac vice*)
Daniel J. Kramer (*pro hac vice*)
Audra J. Soloway (*pro hac vice*)
Daniel J. Toal (*pro hac vice*)
Paul D. Brachman (*pro hac vice*)
Matthew D. Stachel (*pro hac vice*)
Samuel M. Kleiner (*pro hac vice*)
Lyuba Shamailova (*pro hac vice*)
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
twells@paulweiss.com
dkramer@paulweiss.com
asoloway@paulweiss.com
dtoal@paulweiss.com
pbrachman@paulweiss.com
mstachel@paulweiss.com
skleiner@paulweiss.com
lshamailova@paulweiss.com

*/s/ D. Patrick Long*
D. Patrick Long
Texas State Bar No. 12515500
SQUIRE PATTON BOGGS
2200 Ross Avenue, Suite 4100W
Dallas, TX 75201
Telephone: (214) 758-1505
Facsimile: (214) 758-1550
patrick.long@squirepb.com

*Counsel for Rex W. Tillerson*


*/s/  Jason Bloom*
Nina Cortell
Texas State Bar No. 04844500
Jason Bloom
Texas State Bar No. 24045511
HAYNES AND BOONE, LLP
2801 N. Harwood Street, Suite 2300
Dallas, TX 75219
Telephone: (214) 651-5000
Facsimile: (214) 651-5940
nina.cortell@haynesboone.com
jason.bloom@haynesboone.com

*Counsel for Exxon Mobil Corporation,*
*Andrew P. Swiger,*
*and David S. Rosenthal*

50

51

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been

served by electronic CM/ECF filing, on this 21st day of February, 2025.

/s/ Daniel J. Toal
Daniel J. Toal