UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| PEDRO RAMIREZ, JR., Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>EXXON MOBIL CORPORATION, et al.,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 3:16-cv-03111-K<br><br><u>CLASS ACTION</u> |

**LEAD PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF STEVEN P. FEINSTEIN**

4911-5871-2615.v1

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...................................................................................................................1

II.     LEGAL STANDARD............................................................................................................2

III.    ARGUMENT........................................................................................................................3

      A.      Dr. Feinstein Is Highly Qualified to Offer Opinions on Loss Causation, Damages, and Finance-Related Matters ....................................................................3

      B.      Dr. Feinstein's Loss Causation and Damages Opinions Concerning Plaintiff's Kearl Claims Are Relevant and Reliable ..................................................5

           1.      Defendants' "Unpleaded Theory" Argument Is Baseless...........................7

           2.      Defendants' Meritless Critiques of Dr. Feinstein's Methodology Do Not Support Exclusion ...........................................................................10

      C.      Dr. Feinstein's Loss Causation and Damages Opinions Concerning Plaintiff's RMDG Claim Are Relevant and Reliable ...........................................13

           1.      The Court's Class Certification Ruling Has No Effect on Dr. Feinstein's Loss Causation Opinion ...........................................................14

           2.      Defendants' Meritless Critiques of Dr. Feinstein's Methodology Do Not Support Exclusion ...........................................................................16

      D.      Dr. Feinstein's Loss Causation and Damages Methodology Reliably Accounts for Potentially Confounding Information .............................................20

      E.      Dr. Feinstein's Opinion Regarding the Cost of a Credit Downgrade Is Relevant and Reliable ........................................................................................21

IV.     CONCLUSION...................................................................................................................25

- i -

4911-5871-2615.v1

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
    572 F.3d 221 (5th Cir. 2009) ...............................................................2, 14, 15, 19

*Bell v. Ascendant Sols., Inc.*,
    422 F.3d 307 (5th Cir. 2005) .........................................................................15

*Buettgen v. Harless*,
    2011 WL 1938130 (N.D. Tex. May 19, 2011) ...........................................1, 4, 9, 21

*Carpenters Health & Welfare Fund v. Coca-Cola Co.*,
    2008 WL 4737173 (N.D. Ga. Mar. 14, 2008)..................................................4, 18

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)................................................................................ *passim*

*Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*,
    2023 WL 6300569 (S.D. Tex. Sept. 27, 2023) ......................................................4

*Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*,
    620 F. Supp. 3d 603 (S.D. Tex. 2022) ...............................................................19

*DeWolff, Boberg & Assocs., Inc. v. Pethick*,
    2024 WL 1396267 (N.D. Tex. Mar. 31, 2024).....................................................21

*FindWhat Inv. Grp. v. FindWhat.com*,
    658 F.3d 1282 (11th Cir. 2011) .................................................................1, 5, 6

*Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,
    99 F.4th 770 (5th Cir. 2024) .............................................................................5

*Goode v. City of Southaven*,
    2019 WL 1089510 (N.D. Miss. Mar. 7, 2019) .......................................................9

*GSI Tech., Inc. v. Cypress Semiconductor Corp.*,
    2015 WL 364796 (N.D. Cal. Jan. 27, 2015).....................................................11, 25

*Guzman v. State Farm Lloyds*,
    456 F. Supp. 3d 846 (S.D. Tex. 2020) ...............................................................12

*Hsu v. Puma Biotechnology, Inc.*,
    2018 WL 4956520 (C.D. Cal. Oct. 5, 2018)......................................................4, 13

*In re Cassava Scis., Inc. Sec. Litig.*,
    2024 WL 4824243 (W.D. Tex. Nov. 15, 2024)............................................... *passim*

- ii -

**Page**

*In re Com. Fin. Servs., Inc.*,
    350 B.R. 520 (Bankr. N.D. Okla. 2005) ...................................................................23

*In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prods. Liab. Litig.*,
    2014 WL 3557345 (N.D. Tex. July 18, 2014) ................................................... *passim*

*In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prods. Liab. Litig.*,
    2016 WL 9560113 (N.D. Tex. Oct. 3, 2016) .........................................................23

*In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prods. Liab. Litig.*,
    2019 WL 13193930 (N.D. Tex. Jan. 10, 2019) ................................................. *passim*

*In re Dura Pharms., Inc. Sec. Litig.*,
    452 F. Supp. 2d 1005 (S.D. Cal. 2006) ................................................................16

*In re EQT Corp. Sec. Litig.*,
    2022 WL 3293518 (W.D. Pa. Aug. 11, 2022) ......................................................19

*In re FirstEnergy Corp. Sec. Litig.*,
    2022 WL 681320 (S.D. Ohio Mar. 7, 2022) .........................................................16

*In re Groupon, Inc. Sec. Litig.*,
    2015 WL 1043321 (N.D. Ill. Mar. 5, 2015) ..............................................1, 4, 5, 21

*In re Motorola Sec. Litig.*,
    505 F. Supp. 2d 501 (N.D. Ill. 2007) ...................................................................16

*In re Novo Nordisk Sec. Litig.*,
    2020 WL 502176 (D.N.J. Jan. 31, 2020) ........................................................1, 4, 5

*In re Oracle Corp. Sec. Litig.*,
    2009 WL 1709050 (N.D. Cal. June 19, 2009),
    *aff'd*, 627 F.3d 376 (9th Cir. 2010) .................................................................11, 12

*In re Twitter, Inc. Sec. Litig.*,
    2020 WL 13863616 (N.D. Cal. Jan. 28, 2020) ................................................. *passim*

*In re Vale S.A. Sec. Litig.*,
    2022 WL 122593 (E.D.N.Y. Jan. 11, 2022) .........................................................21

*In re Vivendi Universal, S.A. Sec. Litig.*,
    2009 WL 10695884 (S.D.N.Y. Apr. 6, 2009) ....................................................7, 11

*In re Zonagen, Inc. Sec. Litig.*,
    322 F. Supp. 2d 764 (S.D. Tex. 2003) ............................................................11, 12

*Jackson v. Gautreaux*,
    3 F.4th 182 (5th Cir. 2021) .....................................................................................9

4911-5871-2615.v1

**Page**

*KB Partners I, L.P. v. Barbier*,
  2013 WL 2443217 (W.D. Tex. June 4, 2013) ...............................................................23, 24

*Knight v. Kirby Inland Marine Inc.*,
  482 F.3d 347 (5th Cir. 2007) .......................................................................................25

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999)....................................................................................................2, 3

*Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*,
  2019 WL 2482399 (N.D. Ga. June 12, 2019)........................................................1, 4, 17, 18

*Orthoflex, Inc. v. ThermoTek, Inc.*,
  986 F. Supp. 2d 776 (N.D. Tex. 2013) ...........................................................................12

*Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*,
  487 F.3d 261 (5th Cir. 2007) .......................................................................................21

*Parrish v. Freightliner, LLC*,
  471 F. Supp. 2d 1262 (M.D. Fla. 2006)...........................................................................9

*Pittman v. U.S. Bank NA*,
  840 F. App'x 788 (5th Cir. 2021) ...................................................................................9

*Primrose Operating Co. v. Nat'l Am. Ins. Co.*,
  382 F.3d 546 (5th Cir. 2004) ....................................................................................3, 7, 14

*Puga v. RCX Sols., Inc.*,
  922 F.3d 285 (5th Cir. 2019) ............................................................................... *passim*

*Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*,
  769 F.3d 313 (5th Cir. 2014) .......................................................................................13

*Rolex Watch U.S.A., Inc. v. Capetown Diamond Corp.*,
  2009 WL 10669248 (N.D. Ga. Mar. 30, 2009).................................................................9

*Rolls-Royce Corp. v. Heros, Inc.*,
  2010 WL 184313 (N.D. Tex. Jan. 14, 2010) ...................................................................25

*Smilovits v. First Solar, Inc.*,
  2019 WL 7282026 (D. Ariz. Dec. 27, 2019) ............................................................. *passim*

*Snellink v. Gulf Res., Inc.*,
  870 F. Supp. 2d 930 (C.D. Cal. 2012) ...........................................................................15

*Unger v. Amedisys Inc.*,
  401 F.3d 316 (5th Cir. 2005) .......................................................................................15

4911-5871-2615.v1

**Page**

*Wattle v. Barko Hydraulics LLC,*
   107 F. App'x 396 (5th Cir. 2004) ........................................................................24

*Willis v. Kia Motors Corp.,*
   2009 WL 1974474 (N.D. Miss. July 8, 2009) ..........................................................2

4911-5871-2615.v1

Lead Plaintiff Greater Pennsylvania Carpenters Pension Fund ("Plaintiff") respectfully submits this memorandum in opposition to Defendants' Motion to Exclude the Testimony of Steven P. Feinstein (ECF 224) ("Motion").[1]

## I.    INTRODUCTION

Defendants' Motion offers no justifiable grounds for excluding the opinions of Plaintiff's loss causation and damages expert, Professor Steven P. Feinstein, Ph.D., CFA.  Dr. Feinstein's qualifications to provide the opinions he offers in this case are beyond reproach – and Defendants make no attempt to challenge them.  In addition, his opinions unquestionably "rest[] on a reliable foundation and [are] relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  Indeed, the methodologies underlying Dr. Feinstein's opinions are widely accepted and have routinely been found to be reliable by courts throughout the country, including this one. *See, e.g.*, *Buettgen v. Harless*, 2011 WL 1938130, at *8 (N.D. Tex. May 19, 2011) (Kinkeade, J.); *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1313 n.31 (11th Cir. 2011); *In re Cassava Scis., Inc. Sec. Litig.*, 2024 WL 4824243, at *14-*15 (W.D. Tex. Nov. 15, 2024); *In re Twitter, Inc. Sec. Litig.*, 2020 WL 13863616, at *7-*11 (N.D. Cal. Jan. 28, 2020); *In re Novo Nordisk Sec. Litig.*, 2020 WL 502176, at *3-*4 (D.N.J. Jan. 31, 2020); *Smilovits v. First Solar, Inc.*, 2019 WL 7282026, at *5-*9 (D. Ariz. Dec. 27, 2019); *Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 2019 WL 2482399, at *2-*4 (N.D. Ga. June 12, 2019); *In re Groupon, Inc. Sec. Litig.*, 2015 WL 1043321, at *11 (N.D. Ill. Mar. 5, 2015).  These same methodologies have also been utilized and endorsed in numerous other cases by Defendants' own rebuttal expert, Professor Allen Ferrell ("Ferrell").

As detailed herein, Defendants' purported criticisms of the methodologies employed by Dr. Feinstein are specious.  Moreover, as this Court has recognized, such criticisms go only "to the

---

[1]    "Defendants" are Exxon Mobil Corporation ("Exxon" or the "Company"), Rex W. Tillerson, Andrew P. Swiger, and David S. Rosenthal.  "Defs' Mem." refers to Defendants' Brief in Support of Their Motion to Exclude the Testimony of Steven P. Feinstein (ECF 225).  Unless otherwise noted, emphasis is added and citations and footnotes are omitted.

4911-5871-2615.v1

*weight rather than the admissibility* of [Dr. Feinstein's] testimony." *In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prods. Liab. Litig.*, 2014 WL 3557345, at *12 (N.D. Tex. July 18, 2014) ("*DePuy 2014*") (Kinkeade, J).

Nor do any of Defendants' baseless technical arguments render Dr. Feinstein's opinions irrelevant. Contrary to Defendants' misguided assertions, Dr. Feinstein's opinions are not improperly based upon "unpleaded" theories or precluded by the Court's previous findings in connection with its class certifications ruling. Indeed, as the Fifth Circuit has expressly held, "a district court's findings in connection with a holding on class certification ***do not resolve loss-causation issues on the merits, even when – as here – the two issues are practically identical***." *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 233 (5th Cir. 2009).

In short, Defendants provide no valid basis for excluding the relevant and reliable opinions of Plaintiff's well-qualified expert, Dr. Feinstein. As such, the Motion should be denied.

## II.    LEGAL STANDARD

When considering the admissibility of expert testimony, the Court assesses whether the testimony is relevant and reliable. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (citing *Daubert*, 509 U.S. at 597). "The Court has broad discretion in determining the admissibility of expert evidence under *Daubert*." *In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prods. Liab. Litig.*, 2019 WL 13193930, at *2 (N.D. Tex. Jan. 10, 2019) ("*DePuy 2019*") (Kinkeade, J.). "Essentially, the court is the gate-keeper charged with determining whether the expert's testimony is reliable and relevant enough to ***not be junk science*** . . . ." *Willis v. Kia Motors Corp.*, 2009 WL 1974474, at *1 (N.D. Miss. July 8, 2009). "[T]he rejection of expert testimony is the ***exception rather than the rule***." *DePuy 2014*, 2014 WL 3557345, at *5 (noting that "[a] review of cases within the Fifth Circuit in which expert opinions have been deemed unreliable and inadmissible reveals ***extreme circumstances of unreliability***").

- 2 -

"The expert's opinions do not have to be either infallible or uncontradicted to be admissible; the question of whether the expert's opinions are correct is reserved for the fact finder." *DePuy 2019*, 2019 WL 13193930, at *3. As such, when assessing admissibility under *Daubert*, a court's focus must be "solely on principles and methodology, not on the conclusions that they generate." 509 U.S. at 595. The reliability requirement is satisfied where an expert's "testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho*, 526 U.S. at 149. Relevance is satisfied where the "'proffered expert bring[s] to the jury more than the lawyers can offer in argument,'" and the "'threshold is low.'" *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 293-94 (5th Cir. 2019).

"'As a general rule, questions relating to the bases and sources of an expert's opinion affect the **weight** to be assigned that opinion rather than its **admissibility** and should be left for the jury's consideration.'" *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004) (emphasis in original). "*Daubert* makes clear that the appropriate means of attacking admissible, albeit shaky, evidence is through vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *DePuy 2019*, 2019 WL 13193930, at *3 (citing *Daubert*, 509 U.S. at 596); *see also Primrose*, 382 F.3d at 562 ("It is the role of the adversarial system, not the court, to highlight weak evidence . . . .").

## III.  ARGUMENT

### A.  Dr. Feinstein Is Highly Qualified to Offer Opinions on Loss Causation, Damages, and Finance-Related Matters

Dr. Feinstein's qualifications to offer expert testimony concerning loss causation and damages are exemplary. *See* Defs' App. 8-Defs' App. 10, Defs' App. 97-Defs' App. 105 (10/11/24 Report on Loss Causation and Damages, Professor Steven P. Feinstein, Ph.D., CFA ("Feinstein

- 3 -

Rpt."), ¶¶9-19 & Ex. 2).[2] Defendants make no attempt to contend otherwise. *See generally* Defs' Mem. Nor could they, given Dr. Feinstein's credentials, which include, *inter alia*, a Ph.D. in Economics from Yale University, the Chartered Financial Analyst ("CFA") designation, and decades of experience teaching undergraduate, MBA-level, and executive courses on numerous topics in the fields of economics and finance. *See* Defs' App. 8-Defs' App. 10, Defs' App. 97-Defs' App. 105 (Feinstein Rpt., ¶¶9-19 & Ex. 2). He has worked as an economist for the Federal Reserve Bank of Atlanta, authored dozens of finance- and economics-related publications, and practiced extensively as a financial consultant for clients that have included the U.S. Securities and Exchange Commission ("SEC"), the Internal Revenue Service, and the National Association of Securities Dealers. *Id.* He has offered expert opinions in more than 200 cases, and his testimony concerning matters related to the opinions he offers here has been credited by numerous courts, including this one. *Id.*[3] Indeed, ***none*** of Dr. Feinstein's opinions regarding loss causation or the quantification of damages in a securities fraud litigation have ***ever*** been excluded. He is also amply qualified to opine on the cost of a credit downgrade given, *inter alia*, his experience teaching fixed-income analysis, writing the curriculum for the CFA Institute's fixed income designation, and authoring textbook chapters on corporate financial planning. *See* Defs' App. 8-Defs' App. 10 (Feinstein Rpt., ¶¶9-18); App. 251- App. 252, App. 254-App. 255 (Feinstein Depo. Tr. at 251:3-252:3, 254:15-255:4).

---

[2]    "Defs' App." refers to pages to the Appendix in Support of Defendants' Motion to Exclude the Testimony of Steven P. Feinstein (ECF 226). "App." refers to pages to the Appendix in Support of Lead Plaintiff's Response in Opposition to Defendants' Motion to Exclude the Testimony of Steven P. Feinstein, filed concurrently herewith.

[3]    *See also, e.g.*, *Harless*, 2011 WL 1938130; *Cassava*, 2024 WL 4824243; *Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, 2023 WL 6300569 (S.D. Tex. Sept. 27, 2023); *Twitter*, 2020 WL 13863616; *Novo*, 2020 WL 502176; *First Solar*, 2019 WL 7282026; *Monroe Cnty.*, 2019 WL 2482399; *Hsu v. Puma Biotechnology, Inc.*, 2018 WL 4956520 (C.D. Cal. Oct. 5, 2018); *Groupon*, 2015 WL 1043321; *Carpenters Health & Welfare Fund v. Coca-Cola Co.*, 2008 WL 4737173 (N.D. Ga. Mar. 14, 2008).

- 4 -

4911-5871-2615.v1

### B.    Dr. Feinstein's Loss Causation and Damages Opinions Concerning Plaintiff's Kearl Claims Are Relevant and Reliable

As he has done in numerous other securities fraud cases, Dr. Feinstein offers loss causation and damages opinions that are based upon his: (1) application of fundamental financial principles; (2) examination of public statements by Exxon and market participants; and (3) empirical analysis employing the widely accepted and commonly used event study methodology.  Defs' App. 47-Defs' App. 69 (Feinstein Rpt., ¶¶97-171); *see also, e.g.*, *First Solar*, 2019 WL 7282026, at *5-*9; *Twitter*, 2020 WL 13863616, at *7-*11.[4]  "An event study 'is a statistical regression analysis that examines the effect of an event . . . on a dependent variable, such as a corporation's stock price.'"  *Cassava*, 2024 WL 4824243, at *14 n.12 (quoting *Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 99 F.4th 770, 773 n.1 (5th Cir. 2024)).  "Event studies, such as the study employed in [Dr.] Feinstein's Report, are ***routinely accepted*** by courts in securities fraud cases as a means by which to conduct loss causation analyses."  *Twitter*, 2020 WL 13863616, at *9.[5]

Here, Dr. Feinstein employed the widely accepted event study methodology to reach the following conclusions concerning Plaintiff's Kearl claims: (1) information released by Exxon before the open of trading on October 28, 2016 was related to, and corrective of, the allegedly concealed truth regarding Kearl's lack of profitability and failure to legitimately qualify as a proved reserve; (2) the residual return for Exxon's stock price (*i.e.*, the amount of stock price movement attributable to Company-specific information) on October 28, 2016 was -2.84%, which is statistically significant at the ***99.5% confidence level*** and equivalent to a decline of $2.43 per share; (3) non-fraud-related

---

[4]    *Cf. Cassava*, 2024 WL 4824243, at *15 ("Courts have found similar event studies by Dr. Feinstein reliable to show a causal relationship between the release of company-specific news and movement in that company's stock price."); *Novo*, 2020 WL 502176, at *3 ("Dr. Feinstein's event study approach has been approved as a methodology in previous cases."); *Groupon*, 2015 WL 1043321, at *11 ("The Court finds that Plaintiff has established by a preponderance of evidence that Dr. Feinstein's event study methodology met *Daubert's* exacting standards.").

[5]    *See also, e.g.*, *Cassava*, 2024 WL 4824243, at *14 n.12 ("Event studies are ***'widely accepted' evidence*** to show the impact of a particular event on a stock price."); *FindWhat*, 658 F.3d at 1313 n.31 ("The methodology of event studies has been sustained by many circuits."); *First Solar*, 2019 WL 7282026, at *5 ("Event studies are widely accepted and have been characterized as '***standard operating procedure*** in federal securities litigation.'").

4911-5871-2615.v1

information (*i.e.*, potentially confounding information) disclosed on October 28, 2016 reasonably

"had no net negative confounding effect on [Exxon's] stock price"; and (4) at most, non-fraud-

related information was responsible for no more than $0.04 of the stock price decline, meaning the

corrective information disclosed on October 28, 2016 was conservatively responsible for at least

$2.39 of Exxon's statistically significant $2.43 residual stock price decline on October 28, 2016,

causing significant economic losses to Plaintiff and the Class as a result.  *See* Defs' App. 10-Defs'

App. 12, Defs' App. 26-Defs. App. 27, Defs' App. 32-Defs' App. 37, Defs' App. 49-Defs' App. 50,

Defs' App. 55, Defs' App. 59-Defs' App. 60, Defs' App. 63-Defs' App. 67, Defs' App. 130

(Feinstein Rpt., ¶¶20-27, 64-65, 76-81, 105-108, 119-120, 139-140, 153-162 & Ex. 7); Defs' App.

145-Defs' App. 160 (1/10/25 Reply Report on Loss Causation and Damages, Professor Steven P.

Feinstein, Ph.D., CFA ("Feinstein Reply"), ¶¶29-70); *see generally* App. 141-App. 152 (Feinstein

Depo. Tr. at 141-152).[6]

These opinions are unquestionably both relevant and reliable.  As noted above, the event

study methodology underlying Dr. Feinstein's opinions – which numerous courts have found Dr.

Feinstein eminently qualified to conduct – is "'standard operating procedure in federal securities

litigation'" and has routinely been found by courts to satisfy *Daubert*'s reliability threshold.  *First*

*Solar*, 2019 WL 7282026, at *5; *see also, e.g.*, *FindWhat*, 658 F.3d at 1313 n.31; *Cassava*, 2024 WL

4824243, at *14 n.12; *Twitter*, 2020 WL 13863616, at *9.  Moreover, courts have repeatedly held

that expert opinions based on such methodology are not only relevant to establishing loss causation

---

[6]    Notably, Defendants' expert, Ferrell, agrees that Exxon's residual decline on October 28, 2016 is statistically significant at a confidence level greater than 95% under both the customary close-to-close event window analysis and Ferrell's concocted close-to-open window analysis.  Appendix in Support of Defendants' Opposition to Lead Plaintiff's Motion for Class Certification (ECF 98) ("CC Appendix") at App. 181, App. 184 (2/1/19 Export Report of Allen Ferrell, Ph.D. ("2019 Ferrell Rpt.") at Appendices C.1.B., C.2.B.).  Moreover, Ferrell's event study determined that, when examined using the customary close-to-close analysis, Exxon's residual return on October 28, 2016 was -4.44%, which is equivalent a stock price decline of ***$3.82 per share*** – an even greater residual decline than the $2.43 per share found by Dr. Feinstein's analysis.  CC Appendix at App. 181 (2019 Ferrell Rpt. at Appendix C.1.B.).

4911-5871-2615.v1

and damages in securities fraud cases, they are "almost obligatory." *In re Vivendi Universal, S.A. Sec. Litig.*, 2009 WL 10695884, at *9 (S.D.N.Y. Apr. 6, 2009).

As detailed below, Defendants' criticisms of Dr. Feinstein's opinions are baseless. Moreover, even if such critiques had merit, they would speak to the weight, not the admissibility, of Dr. Feinstein's opinions. *See Primrose*, 382 F.3d at 562; *Puga*, 922 F.3d at 294; *DePuy 2019*, 2019 WL 13193930, at *5; *DePuy 2014*, 2014 WL 3557345, at *13. While such criticisms may be raised by Defendants' cross-examination and presentation of evidence, they do not provide a basis for excluding Dr. Feinstein's opinions. *See Cassava*, 2024 WL 4824243, at *15 ("'The Court need not exclude expert testimony simply because another expert claims to be able to poke holes in his opponent's methods. . . . Defendants' criticisms of [Dr.] Feinstein's report can be 'brought out through vigorous cross-examination and the presentation of contrary evidence.'"); *accord DePuy 2019*, 2019 WL 13193930, at *3 (citing *Daubert*, 509 U.S. at 596).

### 1.    Defendants' "Unpleaded Theory" Argument Is Baseless

Defendants' argument that Dr. Feinstein's Kearl opinions should be excluded because they pertain to an "unpleaded theory" is baseless for a myriad of reasons. *See* Defs' Mem. at 12-13.

As an initial matter, Defendants mischaracterize Dr. Feinstein's analysis of Plaintiff's Kearl claims. As detailed in his report, Dr. Feinstein's analysis focused on Plaintiff's claims that "Defendants made materially false and misleading statements and omissions concerning the profitability and legitimate status as proved reserves of the Company's operations at Kearl." Defs' App. 12 (Feinstein Rpt., ¶29). Specifically, the concealed truth analyzed by Dr. Feinstein was that Kearl: (1) "was not profitable," but instead "was suffering large losses for every barrel produced"; and (2) "no longer legitimately qualified as a 'proved' reserve" by year-end 2015. Defs' App. 12-Defs' 14 (Feinstein Rpt., ¶¶30-33). Defendants' "unpleaded theory" argument completely ignores the first of these two related concealed truths and focuses solely on Dr. Feinstein's analysis of the

- 7 -

latter. *See* Defs' Mem. at 12. As such, even if Defendants' argument had any merit (which is does not, for the reasons detailed below), it would not provide any basis for excluding Dr. Feinstein's opinions regarding Defendants' fraudulent concealment of Kearl's lack of profitability.[7]

Second, as explained in Plaintiff's concurrently filed OMSJ, Defendants' contention that Plaintiff has pivoted to put forward new Kearl-related theories in response to Defendants' motion for summary judgment is incorrect. *See* OMSJ, §§III.A.1.b., III.A.2.c. To the contrary, all of the misrepresentations underlying Plaintiff's Kearl claims (including the specific theories analyzed by Dr. Feinstein regarding Kearl's lack of profitability and failure to qualify as a proved reserve by year-end 2015) were expressly alleged in the Complaint to be materially false and misleading. *Id.*; *see also* Complaint, ¶¶277, 280, 285-286, 343. Moreover, Defendants have long been on notice of the specific theories analyzed by Dr. Feinstein through extensive briefing, an evidentiary hearing, and comprehensive discovery directly pertaining to such theories. *See* OMSJ, §§III.A.1.b., III.A.2.c. Indeed, far from pivoting to these theories in response to Defendants' motion for summary judgment, Plaintiff's Kearl-related theories were fully spelled out in Plaintiff's expert reports, which were served on Defendants ***more than three months before the close of discovery*** and more than four months before Defendants filed their motion for summary judgment. *See generally* Defs' App. 4-Defs' App. 131; Appendix in Support of Defendants' Motion to Exclude the Testimony of D. Paul Regan (ECF 229) at App. 4-App. 218. Not only did Defendants have ample time to take discovery regarding these theories, they in fact ***submitted their own rebuttal expert reports*** directly responding to Plaintiff's claims more than a month before the close of discovery. As such, Defendants' feigned

---

[7]   Defendants' failure to acknowledge this aspect of Dr. Feinstein's analysis is not surprising, as it completely undermines their argument that Dr. Feinstein analyzed an "unpleaded theory," given that the Kearl profitability claim is unquestionably alleged in the Consolidated Complaint for Violations of the Federal Securities Laws (ECF 36) ("Complaint") and has been the focus of substantial briefing and oral argument in this case. *See* Lead Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment ("OMSJ"), §III.A.1.b., filed concurrently herewith; *see also* App. 368 (1/27/25 Ferrell Depo. Tr. at 47:6-9) ("there is a claim [in the Complaint] about [the] lack of profitability at Kearl").

surprise at the purportedly "new theor[ies]" underlying Dr. Feinstein's analysis rings hollow. *See Goode v. City of Southaven*, 2019 WL 1089510, at \*4-\*5 (N.D. Miss. Mar. 7, 2019) (denying motion to exclude expert opinions where defendants were "provided fair notice" regarding the underlying claim, and thus, there was "no prejudicial effect in the jury hearing about [the opinions]").[8]

Third, as also detailed in Plaintiff's OMSJ, the concealed truth analyzed by Dr. Feinstein – that Kearl was not profitable and failed to legitimately qualify as a proved reserve at year-end 2015 – necessarily rendered Defendants' "tepid warnings" in the 2015 Form 10-K materially false and misleading. *See* OMSJ, §III.A.4.; *see also* App. 102-App. 103 (Feinstein Depo. Tr. at 102:20-103:4). Indeed, had Defendants disclosed this concealed information (*i.e.*, that Kearl no longer qualified as a proved reserve because it was not profitable under SEC regulations) at the start of the class period, there would have been no reason for Exxon to disclose any "warnings" regarding the "possibility" of de-booking Kearl's proved reserves at year-end 2016. Thus, contrary to Defendants' assertions, Dr. Feinstein's opinion that a significant part of the stock price decline on October 28, 2016 was caused by Exxon's disclosure of information that was related to, and corrective of, the concealed truth concerning Kearl's lack of profitability and failure to qualify as a proved reserve unquestionably constitutes relevant proof of loss causation for Defendants' materially false and misleading "warnings" in Exxon's 2015 Form 10-K. *See* Defs' App. 11-Defs' App. 14, Defs' App. 26-Defs' App. 27, Defs' App. 55, Defs' App. 66-Defs' App. 67 (Feinstein Rpt., ¶¶21-22, 33, 65, 120, 162); *see also Harless*, 2011 WL 1938130, at \*7 ("A 'corrective disclosure' is a truth, related to

---

[8] For the above reasons, Defendants' cases are inapposite. *See* Defs' Mem. at 13 (citing *Jackson v. Gautreaux*, 3 F.4th 182, 188 (5th Cir. 2021) (rejecting claim that was, unlike here, "**raised only in response to a motion for summary judgment**"); *Pittman v. U.S. Bank NA*, 840 F. App'x 788, 789-90 (5th Cir. 2021) (same); *Rolex Watch U.S.A., Inc. v. Capetown Diamond Corp.*, 2009 WL 10669248, at \*7 (N.D. Ga. Mar. 30, 2009) (excluding expert report where, unlike here, the opposing party was not "provided notice" of the claim underlying the report and allowing an amendment to assert the new claim "would require the Court to re-open the fact discovery period"); *Parrish v. Freightliner, LLC*, 471 F. Supp. 2d 1262, 1266-70 (M.D. Fla. 2006) (excluding plaintiff's expert report where, unlike here, plaintiff "fail[ed] to prosecute th[e] case and receiv[ed] not one, but two, extensions of case deadlines" on the basis of plaintiff's express representations regarding specific expert reports that would be submitted in support of its theory of the case, before "surprising defendant and the Court with [a] completely new theory" of liability)).

- 9 -

a defendant's fraud, that has emerged and proximately caused the depreciation in share price and the plaintiff's economic loss.").

### 2. Defendants' Meritless Critiques of Dr. Feinstein's Methodology Do Not Support Exclusion

Defendants' argument that Dr. Feinstein's Kearl-related opinions should be excluded because he purportedly "reli[es] on unsupported assumptions in lieu of conducting a causation analysis" is misguided and meritless. *See* Defs' Mem. at 13-15.

First, Defendants' assertion that Dr. Feinstein "'assume[s] the very fact he is being proffered to prove, *i.e.* that the [allegedly fraudulent] statements caused Plaintiffs' damages'" is incorrect and based upon a mischaracterization of his analysis and deposition testimony. *Id.* at 13-14. As detailed above, Dr. Feinstein's causation analysis is supported by, among other things, his application of the event study methodology, which is "***routinely accepted*** by courts in securities fraud cases as a means by which to conduct loss causation analyses." *Twitter*, 2020 WL 13863616, at *9. As Dr. Feinstein explains, in conducting such analyses, it is a generally accepted practice to "assume[] [that the plaintiff] will be able to prove its factual allegations." Defs' App. 8 (Feinstein Rpt., ¶6 & n.2); *see also* App. 49, App. 100-App. 101 (Feinstein Depo. Tr. at 49:13-23, 100:7-101:24). Contrary to Defendants' assertions, this generally accepted practice – which has been recognized by numerous courts, as well as Defendants' own rebuttal expert, Ferrell, who ***applied the same practice in this case*** – is ***not*** akin to assuming proof of a causal connection. *See* App. 499 (3/22/19 Ferrell Depo. Tr. at 40:12-15) ("the assumption of the analysis has to be that the theory of liability is true; that the allegations in the complaint are accurate"); *Twitter*, 2020 WL 13863616, at *9 (rejecting argument that Dr. Feinstein "assumes the causal connections he purports to prove" based upon finding that, like here, Dr. "Feinstein conducted event study analyses . . . before reaching his conclusion that

- 10 -

Defendants' alleged 'misrepresentations and omissions . . . were a substantial cause of the losses suffered'").[9]

Defendants' cases are inapposite. *See* Defs' Mem. at 14. In *In re Zonagen, Inc. Sec. Litig.*, 322 F. Supp. 2d 764 (S.D. Tex. 2003), for example, the plaintiffs "presented ***no evidence*** that Zonagen's stock price actually decreased because [the corrective disclosure] revealed the falsity of the [alleged misstatements], and ***not because the report revealed some other falsehood or other negative information about the company***." *Id.* at 776. There, plaintiffs' loss causation expert admitted "that his only efforts to eliminate the possibility that other factors may have affected Zonagen's stock price were those related to verifying whether the court was correct in its rulings that certain public statements did not affect the stock price." *Id.* at 782. But the court found that those efforts "misconstrued the court's rulings." *Id.* Thus, because plaintiffs' expert did not "undertake an independent analysis to determine whether and how much any other event might have increased or decreased Zonagen's stock price," his "expert opinion [did] not constitute evidence of loss causation." *Id.* Similarly, in *In re Oracle Corp. Sec. Litig.*, 2009 WL 1709050 (N.D. Cal. June 19, 2009), *aff'd*, 627 F.3d 376 (9th Cir. 2010), the court found that plaintiff's expert – who was opining on matters regarding the falsity of defendants' misrepresentations, ***not loss causation*** – "point[ed] to ***no evidence*** supporting [his] conclusion." *Id.* at \*28.

Unlike the experts in *Zonagen* and *Oracle*, Dr. Feinstein's opinions are supported by his independent analysis of the underlying facts, including his: (1) application of fundamental financial principles; (2) examination of public statements by Exxon and market participants; and (3) empirical

---

[9]   *See also, e.g.*, *First Solar*, 2019 WL 7282026, at \*7-\*9 (denying motion to exclude Dr. Feinstein's loss causation and damages opinions where Dr. "Feinstein assume[d] Plaintiffs will be able to provide . . . proof" regarding "the ***liability*** case they will present to the jury") (emphasis in original); *Vivendi*, 2009 WL 10695884, at \*3 (describing factual assumptions made by plaintiff's loss causation expert "[b]efore reaching his causal analysis"); *GSI Tech., Inc. v. Cypress Semiconductor Corp.*, 2015 WL 364796, at \*4 (N.D. Cal. Jan. 27, 2015) ("It will be [plaintiff's] burden at trial to establish the factual bases for [its expert's] assumptions. If [plaintiff] does not do so, [defendants] can cross-examine [the expert] to identify any deficiency.").

4911-5871-2615.v1

analysis employing the widely accepted event study methodology, which – unlike the expert in *Zonagen* – included a thorough examination and disaggregation of potentially confounding information. *See* Defs' App. 47-Defs' App. 69 (Feinstein Rpt., ¶¶97-171); Defs' App. 145-Defs' App. 160 (Feinstein Reply, ¶¶29-70); *see also Twitter*, 2020 WL 13863616, at *9 (distinguishing Dr. Feinstein's analysis from *Oracle* based upon finding that Dr. Feinstein's "event study analyses . . . grounds his opinions in sufficient statistical analysis"); *see also* §III.D., *infra*.[10]

Defendants' additional assertion that Dr. Feinstein's "review yielded no support for the proposition that the market connected the 2016 disclosure with the 2015 year-end results" is also incorrect. Defs' Mem. at 14. To the contrary, Dr. Feinstein's report cites a *New York Times* article that described the likely de-booking of Kearl's proved reserves as "'an ***apparent reversal*** of Exxon['s] stance in recent years . . . that it has been ***adequately accounting*** for the value of its oil and gas reserves – even as many other petroleum companies have taken big write-offs to reflect a two-year price slump.'" Defs' App. 35-Defs' App. 37 (Feinstein Rpt., ¶81).

Moreover, Defendants' argument misconstrues the role of a loss causation expert. "The questions of what causes the stock price to decline following corrective disclosures . . . 'are ***ultimate questions for the trier of fact on the merits***.'" *Cassava*, 2024 WL 4824243, at *17. The expert's role is to "assist the trier of fact" in answering such questions. *See DePuy 2019*, 2019 WL 13193930, at *3; *see also Puga*, 922 F.3d at 293. Here, Dr. Feinstein's analysis clearly does so by opining, based upon his application of reliable econometric methodologies, that: (1) information released by Exxon on October 28, 2016 was related to, and corrective of, the allegedly concealed truth regarding Kearl's lack of profitability and failure to legitimately qualify as a proved reserve;

---

[10]   The other cases cited by Defendants are similarly inapposite. *See* Defs' Mem. at 15 (citing *Guzman v. State Farm Lloyds*, 456 F. Supp. 3d 846, 854 (S.D. Tex. 2020) (excluding, in non-securities case, opinions from insurance claims adjuster that were "not supported by any evidence," "contradicted by the actual facts," and "not based upon any reliable theory or methodology"); *Orthoflex, Inc. v. ThermoTek, Inc*., 986 F. Supp. 2d 776, 798 (N.D. Tex. 2013) (excluding, in non-securities case, opinions from damages expert who "fail[ed] to identify the specific methodology that [he] used in forming his opinions")).

and (2) the release of such information was responsible for a substantial part of the statistically significant stock price decline on October 28, 2016 that caused significant economic losses to Plaintiff and the Class. *See* Defs' App. 10-Defs' App. 12, Defs' App. 26-Defs. App. 27, Defs' App. 32-Defs' App. 37, Defs' App. 49-Defs' App. 50, Defs' App. 55, Defs' App. 59-Defs' App. 60, Defs' App. 63-Defs' App. 67, Defs' App. 130 (Feinstein Rpt., ¶¶20-27, 64-65, 76-81, 105-108, 119-120, 139-140, 153-162 & Ex. 7); *see also Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014) (setting forth elements of proof for loss causation).

Defendants' criticisms of Dr. Feinstein's opinions disagree with his ***conclusions*** – not his methodology – and amount to nothing more than "a ***battle of the experts***," which "goes to the ***weight*** rather than the admissibility of [Dr. Feinstein's] testimony." *DePuy 2014*, 2014 WL 3557345, at *12; *see also, e.g.*, *First Solar*, 2019 WL 7282026, at *8 (denying motion to exclude where "Defendants' arguments go more to the correctness of [Dr.] Feinstein's conclusions than the method by which he reaches them"); *Puma*, 2018 WL 4956520, at *4 (denying motion to exclude where "Defendants might have evidence that refutes Dr. Feinstein's conclusions, but they can expose such inconsistencies at trial").

### C.   Dr. Feinstein's Loss Causation and Damages Opinions Concerning Plaintiff's RMDG Claim Are Relevant and Reliable

Similar to his analysis concerning Plaintiff's Kearl-related claims, Dr. Feinstein relied on his substantial expertise applying the widely accepted event study methodology to reach the following conclusions regarding Plaintiff's Rocky Mountain Dry Gas ("RMDG") claim: (1) information released by Exxon before the open of trading on January 31, 2017 was related to, and corrective of, the allegedly concealed truth that the RMDG assets were impaired; (2) the residual return for Exxon's stock price on January 31, 2017 was -1.46%, which is statistically significant at a confidence level ***greater than 96%*** and equivalent to a decline of $1.23 per share; and (3) potentially confounding non-fraud-related information was responsible for no more than $0.18 of the stock price

decline, meaning that the corrective information disclosed on January 31, 2017 was conservatively responsible for at least $1.05 of Exxon's statistically significant $1.23 residual stock price decline on January 31, 2017, causing significant economic losses to Plaintiff and the Class as a result. *See* Defs' App. 10-Defs' App. 12, Defs' App. 44-Defs' App. 47, Defs' App. 49-Defs' App. 50, Defs' App. 55-Defs' App. 60, Defs' App. 67-Defs' App. 68, Defs' App. 130 (Feinstein Rpt., ¶¶20-27, 93-96, 105-108, 119, 121-138, 141-142, 163-166 & Ex. 7); Defs' App. 160-Defs' App. 181 (Feinstein Reply, ¶¶71-124); *see generally* App. 235-App. 244 (Feinstein Depo. Tr. at 235-244).

Like Dr. Feinstein's Kearl-related opinions, his opinions regarding Plaintiff's RMDG claim are undoubtedly both relevant and reliable. Defendants' attacks on the opinions are baseless. In any event, they speak only to the weight a jury might afford such opinions, not their admissibility. *See, e.g.*, *Primrose*, 382 F.3d at 562; *Puga*, 922 F.3d at 294; *DePuy 2019*, 2019 WL 13193930, at *5; *DePuy 2014*, 2014 WL 3557345, at *13. Because such matters are more appropriately addressed by cross-examination and Defendants' presentation of evidence, they do not provide a basis for excluding Dr. Feinstein's RMDG-related opinions. *See, e.g.*, *Cassava*, 2024 WL 4824243, at *15; *DePuy 2019*, 2019 WL 13193930, at *3.

### 1. The Court's Class Certification Ruling Has No Effect on Dr. Feinstein's Loss Causation Opinion

Defendants' assertion that Dr. Feinstein's loss causation opinion regarding Plaintiff's RMDG claim is "not relevant in light of the Court's class certification ruling" is incorrect. Defs' Mem. at 7. To the contrary, the Fifth Circuit has expressly held that "a district court's findings in connection with a holding on class certification ***do not resolve loss-causation issues on the merits, even when – as here – the two issues are practically identical*.*" *Flowserve*, 572 F.3d at 233. As the *Flowserve* court recognized, class certification holdings are made "under the preponderance-of-the-evidence standard," but the question at summary judgment is "whether a ***reasonable jury could find*** loss causation by a preponderance of the evidence" – "a ***substantially less stringent standard***." *Id*. at

- 14 -

228, 233-34.  As such, the Court's "holdings under Rule 23's preponderance requirement [do] not govern the merits of [Plaintiff's] claims."  *See id.* at 233-34 (reversing district court's holding that "its 'loss causation holding in its denial of class certification [was] dispositive of Plaintiffs' Exchange Act claims as a matter of law'").[11]

Consistent with *Flowserve*, in ruling on Defendants' motion for summary judgment, the Court must consider the record before it now – **not** the record that was presented to it at class certification.  572 F.3d at 233-34.  Here, that record includes Dr. Feinstein's opinions based on his event study analysis, which – as Defendants' expert admitted during his deposition – is a completely different analysis than either party presented at the class certification stage.  *See* App. 436 (1/27/25 Ferrell Depo Tr. at 115:6-22).  Moreover, Dr. Feinstein's analysis is based upon widely accepted, reliable methodologies that have been employed by **Defendants' own expert** on numerous previous occasions.  *See* Defs' App. 160-Defs' App. 181 (Feinstein Reply, ¶¶71-124); *see also* App. 439, App. 442, App. 448, App. 474 (1/27/25 Ferrell Depo. Tr. at 118:4-7, 121:23-25, 127:6-8, 153:7-15); §III.C.2., *infra*.  As further detailed below, Defendants' misguided criticisms provide no basis upon which to exclude such opinions – and, consistent with *Flowserve*, neither does their invocation of the Court's previous findings in connection with class certification.  572 F.3d at 233-34.

Additionally, the fact that the January 31, 2017 corrective disclosure post-dates the class period does not preclude Dr. Feinstein's opinions from constituting relevant, admissible proof of loss causation for Plaintiff's RMDG claim.  *See* Defs' Mem. at 7-8.  As numerous courts have recognized, it is not necessary for a corrective disclosure to occur during the class period.  *See Snellink v. Gulf Res., Inc.*, 870 F. Supp. 2d 930, 942 (C.D. Cal. 2012) ("[defendants'] suggestion that Plaintiffs cannot suffer any loss as a result of fraud that was not disclosed until after the close of the

---

[11]   *See also Bell v. Ascendant Sols., Inc.*, 422 F.3d 307, 312 (5th Cir. 2005) ("'The findings made for resolving [the] class action certification motion serve[d] the court **only** in its determination of whether the requirements of Rule 23 [were] demonstrated.'") (emphasis in original); *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005) ("the court's determination for class certification purposes may be revised (or wholly rejected) by the ultimate factfinder").

4911-5871-2615.v1

class period is incorrect"); *In re Dura Pharms., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1023 (S.D. Cal. 2006) (rejecting the notion that loss causation is absent when the corrective disclosures occur after the close of the class period); *In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 560-61 (N.D. Ill. 2007) (same).[12]

### 2. Defendants' Meritless Critiques of Dr. Feinstein's Methodology Do Not Support Exclusion

Dr. Feinstein's RMDG-related opinions are supported by his sound application of fundamental econometric principles and widely accepted methodologies. As with his Kearl-related opinions, Defendants' attempts to poke holes in Dr. Feinstein's methodology do not support exclusion of Dr. Feinstein's opinions.

First, Defendants' attempts to criticize Dr. Feinstein's industry sector index for his regression model are baseless. *See* Defs' Mem. at 9. As Dr. Feinstein explains, in order to run a statistical regression analysis of a company's stock price movements, "it is necessary to identify an industry index that reflects news in the company's industry sector," so that confounding effects of industry news can be removed from the analysis of the company's stock price reactions. Defs' App. 162 (Feinstein Reply Rpt., ¶79). As further explained by Dr. Feinstein, "[u]sing the subject company's self-selected industry sector peers to control for industry sector factors" – which is what he did in this case – "is [his] standard practice of industry index selection." Defs' App. 57 (Feinstein Rpt.,

---

[12]   Contrary to Defendants' assertions, this is not a case where Plaintiff's "'first concrete knowledge of the scheme or misstatement postdates the class period.'" Defs' Mem. at 7-8 (quoting *In re FirstEnergy Corp. Sec. Litig.*, 2022 WL 681320, at \*29 (S.D. Ohio Mar. 7, 2022)). Rather, although the concealed truth regarding the impaired RMDG assets was not revealed until January 31, 2017, the October 28, 2016 corrective disclosure informed the market of Exxon's "'apparent reversal of [its] stance'" that "'it has been adequately accounting for the value of its oil and gas reserves,'" while also clearly alerting investors to the fact that Exxon would be conducting impairment assessments at year-end. *See* Defs' App. 34-Defs' App. 37 (Feinstein Rpt., ¶¶78, 81-82). "Where, as here, details of wrongdoing emerge in the Class Period and [subsequent] disclosures continues beyond it, no rule prohibits loss causation as to the later events." *FirstEnergy*, 2022 WL 681320, at \*29.

4911-5871-2615.v1

¶128); Defs' App. 163-Defs' App. 165 (Feinstein Reply, ¶¶83, 87-89).[13]  The reason Dr. Feinstein employs this practice "is to eliminate subjectivity by using the same industry index that the company selected to satisfy the disclosure requirements of SEC Regulation S-K."  Defs' App. 163 (Feinstein Reply, ¶83).[14]  Defendants' expert, Ferrell, has used this same approach when selecting industry indices in numerous other cases – and, in fact, has **criticized other experts for failing to use this approach**.  Defs' App. 165-Defs' App. 166 (Feinstein Reply, ¶¶90-93).

During his deposition, Ferrell: (1) agreed that Dr. Feinstein's event study analysis correctly utilized Exxon's self-selected industry sector peers to control for industry sector factors (App. 437-App. 438 (1/27/25 Ferrell Depo. Tr. at 116:15-117:3)); (2) testified that he has employed that same methodology in other cases (App. 439, App. 442, App. 448 (1/27/25 Ferrell Depo. Tr. at 118:4-7, 121:23-25, 127:6-8)); and (3) further testified: "I don't think there is anything inherently wrong with that.  I don't criticize Dr. Feinstein for that."  App. 442-App. 443 (1/27/25 Ferrell Depo. Tr. at 121:25-122:3).[15]  But despite testifying that there is nothing "inherently wrong" with Dr. Feinstein's approach, and that it is "fine," Ferrell contends that it is his "view" that the industry control he utilizes for his event study "is a better one."  App. 454 (1/27/25 Ferrell Depo. Tr. at 133:8-14).  As explained by Dr. Feinstein, Ferrell is incorrect because his industry index is too narrow and the product of an inappropriately results-driven selection process.  Defs' App. 166-Defs' App. 169

---

[13]    *See also, e.g.*, *Monroe Cnty.*, 2019 WL 2482399, at *4 (N.D. Ga. June 12, 2019) (noting, in opinion denying motion to exclude Dr. Feinstein's testimony, that "Dr. Feinstein's standard methodology utilizes the index the target company has identified in its SEC filings for purposes of complying with SEC Regulation S-K").

[14]    *See also* Defs' App. 164 (Feinstein Reply, ¶86) ("[t]his objective methodology precludes the possibility of competing experts manipulating statistical results by subjectively cherry-picking an alternative index that produces spurious results more favorable to their side").

[15]    *See also* App. 444 (1/27/25 Ferrell Depo. Tr. at 123:5-9) ("I certainly agree with the proposition that you can use, and it can be appropriate to use, . . . 10-K companies.  And I never suggested otherwise."); App. 448 (1/27/25 Ferrell Depo. Tr. at 127:9-12) ("I never criticized Dr. Feinstein for having, as a candidate for industry control, looking at 10-Ks. I think that's fine.").

- 17 -

4911-5871-2615.v1

(Feinstein Reply, ¶¶94-104).[16]  More importantly, however, Ferrell's contention that his industry index is the "better one" cannot provide a basis for excluding Dr. Feinstein's opinions as unreliable, particularly given Ferrell's admission that there is nothing "inherently wrong" with Dr. Feinstein's "fine" approach and that he has, in fact, employed the same approach in numerous other cases.  *See, e.g.*, *DePuy 2014*, 2014 WL 3557345, at *14 ("disagreement about how [a qualified expert] executed the steps in [a widely accepted methodology] goes to the weight not the admissibility of [his] testimony").[17]

Defendants' additional argument – that Dr. Feinstein's analysis is unreliable because he examines Exxon's residual return for the January 31, 2017 corrective disclosure using the customary close-to-close event window analysis – similarly fails to support exclusion.  *See* Defs' Mem. at 9-10. As an initial matter, Defendants' assertion that Dr. Feinstein's analysis "contradict[s] the Court's class certification ruling, which found that a close-to-open window is appropriate to assess news that is easily digestible and revealed prior to the market open" is incorrect.  *Id*. at 9 (citing ECF 178 at 40).  In fact, the portion of the Court's ruling Defendants misleadingly cite ***does not address*** the January 31, 2017 disclosure at all, but instead sets forth findings expressly limited a different disclosure.  *See* ECF 178 at 40 ("If the use of a close-to-open window ***is ever appropriate***, it would probably be for something like the alleged January 20, 2016, Corrective Disclosure . . . .").  With

---

[16]   Notably, applying Ferrell's preferred industry index to Dr. Feinstein's event study analysis would significantly ***increase*** Exxon's residual stock price decline on October 28, 2016 (from -$2.43 per share to -$3.86 per share), resulting in substantially greater damages related to that corrective disclosure.  This further undermines any assertion that Dr. Feinstein selected his industry index for inappropriately results-driven purposes.  Defs' App. 169-Defs' App. 170 (Feinstein Reply, ¶¶105-107).

[17]   *See also Monroe Cnty.*, 2019 WL 2482399, at *4 (finding, in opinion denying motion to exclude Dr. Feinstein's testimony, that "the choice of index will go to the weight of the evidence rather than the admissibility"); *Coca-Cola*, 2008 WL 4737173, at *3 (finding, in opinion denying motion to exclude Dr. Feinstein's testimony, that defendants' argument regarding Dr. Feinstein's industry index selection "raises a question of weight and not admissibility" because "the choice of variables in conducting a statistical analysis is a question of fact rather than a question of method").

- 18 -

4911-5871-2615.v1

regard to the January 31, 2017 disclosure, the Court's only previous finding was that a ***two-day*** event window was inappropriate. *Id*. at 52.[18]

Moreover, Defendants' disagreement with Dr. Feinstein's event windows cannot provide a basis for excluding Dr. Feinstein's opinions. *DePuy 2014*, 2014 WL 3557345, at \*12 ("[A] battle of the experts . . . goes to the weight rather than the admissibility of [expert] testimony."). This is particularly true given Ferrell's unequivocal testimony that it is "***customary***" to use close-to-close event windows to examine the impact of information disclosed after regular trading hours. App. 474 (1/27/25 Ferrell Depo. Tr. at 153:7-15) ("Q[.] And you have previously testified in this case that it is customary to use close[]-to-close[] event windows to examine the impact of information disclosed outside of regular trading hours, correct? . . . A[.] I agree with that."). Indeed, Dr. Feinstein notes that Ferrell's alternative close-to-open event window methodology appears to be "devised solely for the current litigation," as Dr. Feinstein was "unable to find any other case where Dr. Ferrell used that methodology." Defs' App. 171-Defs' App. 173 (Feinstein Reply, ¶¶110-112). Regardless, Ferrell's admission that the close-to-close methodology is "customary" for disclosures that occur outside of regular trading hours – like the January 31, 2017 disclosure – precludes Defendants' argument from serving as a basis for excluding Dr. Feinstein's opinions as unreliable. *See, e.g.*, *DePuy 2014*, 2014 WL 3557345, at \*14; *In re EQT Corp. Sec. Litig.*, 2022 WL 3293518, at \*12 (W.D. Pa. Aug. 11, 2022) ("'When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility.'").[19]

---

18   In any event, as noted *supra*, the Court's "findings in connection with [its] holding on class certification do not resolve loss-causation issues on the merits, even when – as here – the two issues are practically identical." *Flowserve*, 572 F.3d at 233.

19   As detailed in Plaintiff's OMSJ, Defendants' additional argument that Dr. Feinstein's RMDG-related opinions are irrelevant because the January 31, 2017 disclosure purportedly "did not correct" Defendants' alleged misrepresentations (Defs' Mem. at 10-11) fails because it misstates the law and ignores Plaintiff's evidence. *See* OMSJ, §III.B.4.; *see also* *Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, 620 F. Supp. 3d 603, 634 (S.D. Tex. 2022) (citing *Flowserve*, 572

4911-5871-2615.v1

### D.    Dr. Feinstein's Loss Causation and Damages Methodology Reliably Accounts for Potentially Confounding Information

Defendants' argument that Dr. Feinstein's analysis fails to reliably account for and disaggregate potentially confounding non-fraud-related information is incorrect – and, in any event, cannot provide a basis for excluding Dr. Feinstein's opinions. *See* Defs' Mem. at 16-20. As described above and further detailed in Dr. Feinstein's reports, Dr. Feinstein conducted a thorough examination of all potentially confounding Exxon-related news that emerged on both corrective disclosure dates to determine whether any such information contributed to Exxon's residual stock price declines on those dates. Defs' App. 63-Defs' App. 68 (Feinstein Rpt., ¶¶153-166); Defs' App. 146-Defs' App. 160, Defs' App. 178-Defs' App. 181 (Feinstein Reply, ¶¶34-70, 119-124). Based on this comprehensive analysis, Dr. Feinstein applied appropriate discounts to the amount of Exxon's residual stock price declines that were attributable to the corrective information disclosed on both October 28, 2016 and January 31, 2017. Defs' App. 66-Defs' App. 68 (Feinstein Rpt., ¶¶162, 166); Defs' App. 145-Defs' App. 147, Defs' App. 178 (Feinstein Reply, ¶¶29-37, 119-120).

Defendants' assertion that such conclusions are supported by nothing more than Dr. Feinstein's *ipse dixit* is wrong. To the contrary, as Dr. Feinstein explains in painstaking detail, his opinions are based upon the application of his expertise and specialized knowledge of fundamental financial principles – including quantitative analysis of financial metrics – to various underlying facts, including: (1) Exxon's own public statements; (2) commentary and analysis from market participants, such as investment analysts and news outlets; and (3) preeminent data sources, such as I/B/E/S consensus earnings per share estimates. Defs' App. 63-Defs' App. 68 (Feinstein Rpt., ¶¶153-166); Defs' App. 146-Defs' App. 160, Defs' App. 178-Defs' App 181 (Feinstein Reply, ¶¶34-70, 119-124). Numerous courts have found Dr. Feinstein's application of this same methodology to

---

F.3d at 230) ("A corrective disclosure **need not be a direct admission that a prior statement was false**."); Def's App. 54 (Feinstein Rpt., ¶117). Moreover, as detailed *supra*, Dr. Feinstein's opinions are based upon his expert application of widely accepted methodologies, not assumptions. *See* §III.B.2, *supra*.

4911-5871-2615.v1

be sufficiently reliable.  *See, e.g.*, *First Solar*, 2019 WL 7282026, at *9; *Twitter*, 2020 WL 13863616, at *9; *Groupon*, 2015 WL 1043321, at *6, *11; *Harless*, 2011 WL 1938130, at *8. Moreover, as courts have routinely recognized, Defendants' criticisms regarding Dr. Feinstein's specific execution of this methodology go to the weight, not the admissibility, of his opinions, and therefore cannot serve as a basis for excluding his testimony.  *See, e.g.*, *First Solar*, 2019 WL 7282026, at *9 ("criticisms that [Dr.] Feinstein discounted the confounding information and exaggerated the impact of the alleged fraud go to his credibility and the weight of his opinions, not their admissibility"); *Twitter*, 2020 WL 13863616, at *9 ("While Defendants 'certainly may argue to the jury that [Dr. Feinstein] did not reliably filter out other confounding variables that would have affected the stock price,' they have 'not shown that [Dr. Feinstein's] opinion is so unreliable that it must be excluded.'"); *accord Puga*, 922 F.3d at 295-96 ("If [an expert] missed any important facts, the oversight should go to the weight of his opinion, not its admissibility.").[20]

### E.    Dr. Feinstein's Opinion Regarding the Cost of a Credit Downgrade Is Relevant and Reliable

Finally, Dr. Feinstein offers an opinion related to Plaintiff's allegation that Defendants were motivated to conceal the relevant truth regarding Kearl and Exxon's RMDG assets to avoid a credit downgrade prior to the March 2016 bond offering.  Dr. Feinstein applies his financial expertise to opine that Exxon's interest expense for the bonds issued in the March 2016 offering would have

---

[20]    Defendants' cases do not support exclusion.  *See* Defs' Mem. at 16-20.  In *Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261 (5th Cir. 2007), the court found that the plaintiff's expert had provided "no evidence linking the ***culpable*** disclosure to the stock-price movement" because she made no "empirically-based showing that the corrective disclosure was more than just present at the scene." *Id.* at 271 (emphasis in original).  Here, by contrast, Dr. Feinstein conducted a thorough empirical analysis, based on widely accepted methodologies, which identified the specific portion of the stock price decline that was linked to the disclosure of corrective information, as detailed above. *DeWolff, Boberg & Assocs., Inc. v. Pethick*, 2024 WL 1396267 (N.D. Tex. Mar. 31, 2024), is similarly inapposite. Unlike Dr. Feinstein, the expert in that case failed to "set forth the steps for this methodology" or offer any evidence that the methodology he used was "generally accepted or recognized in his field or industry." *Id.* at *13-*14.  Lastly, Defendants' reliance on *In re Vale S.A. Sec. Litig.*, 2022 WL 122593 (E.D.N.Y. Jan. 11, 2022), is misplaced.  There, the court's opinion concerned Dr. Feinstein's selection of event dates, ***not*** his analysis of confounding information. *Id.* at *11.  More importantly, although that case did ***not*** involve a motion to exclude Dr. Feinstein's testimony, the *Vale* court expressly noted that "in the context of *Daubert* motions, where the question is whether to exclude the expert analysis entirely or not . . . [courts] conclude that the flaws, like the ones identified, ***go to weight, not admissibility***." *Id.* at *14.

4911-5871-2615.v1

been hundreds of millions of dollars greater over the life of the bonds had the downgrade occurred prior to the offering. Defs' App. 69-Defs' App. 71 (Feinstein Rpt., ¶¶172-177). To do so, Dr. Feinstein obtained, from Federal Reserve Economic Data ("FRED"), the Intercontinental Exchange U.S. Corporate Index Option-Adjusted Spread for both AAA and AA bonds at the time of the offering. Defs' App. 70 (Feinstein Rpt., ¶¶174-175). As Dr. Feinstein explains, "[o]ption-adjusted spreads measure a constant spread of a particular credit-risky note yield relative to the government yield curve" – thus, the indexes Dr. Feinstein used are representative of prevailing yields for differently rated bonds at the time of the offering. Defs' App. 70 (Feinstein Rpt., ¶174). Because FRED does not publish an index for AA+-rated U.S. corporate bonds, Dr. Feinstein applied the commonly used methodology of linear interpolation to estimate the spread for AA+-rated bonds. Defs' App. 70 (Feinstein Rpt., ¶176). This allowed him to measure the difference in yield between AAA-rated and AA+-rated bonds as of March 2016. Defs' App. 70-Defs' App. 71 (Feinstein Rpt., ¶¶176-177).

Specifically, Dr. Feinstein found that the Exxon bonds issued in March 2016 would have required a yield that was 13 basis points higher had they been issued with the AA+ rating. Defs' App. 71 (Feinstein Rpt., ¶177). To arrive at a dollar figure, Dr. Feinstein applied this higher coupon yield to all contractual cash flows out to maturity and found "the higher yield would have cost Exxon $831.95 million in greater interest expense." *Id.* At his deposition, Dr. Feinstein further noted that, while his opinion correctly calculated the additional interest expense for a counter-factual in which the Exxon offering was issued with a unanimous AA+ rating, a slightly different calculation would be necessary to address a counter-factual in which the offering was issued with a split rating (*i.e.*, AA+ by S&P and Aaa by Moody's). *See* App. 39-App. 41 (Feinstein Depo. Tr. at 39:3-41:18). Dr. Feinstein performed this adjusted calculation and found that the higher yield associated with a split

- 22 -

rating would have cost Exxon $412.68 million in greater interest expense.  App. 507; App. 266 (Feinstein Depo. Tr. at 266:1-6).

Dr. Feinstein's opinion is reliable because he applies "recognized and logical methods," his "underlying economic assumptions have some evidentiary foundation and are not unrealistic or unreasonable in light of the evidence relied upon," and his "conclusions logically follow from a well-explained path of data, leaving no 'analytical gap' between the facts relied upon and the opinion rendered." *In re Com. Fin. Servs., Inc.*, 350 B.R. 520, 558-59 (Bankr. N.D. Okla. 2005); *see also In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prods. Liab. Litig.*, 2016 WL 9560113, at *10 (N.D. Tex. Oct. 3, 2016) (Kinkeade, J.) (rejecting *Daubert* challenge because expert's "opinions are based on his 'knowledge, skill, experience, training, [and] education' and are 'more than subjective belief or unsupported speculation'").  Moreover, Dr. Feinstein's opinion will assist the jury because his quantification of the additional interest expense that would have resulted had Exxon been downgraded prior to the March 2016 offering is relevant "information not within the general knowledge of the factfinder."  *DePuy 2014*, 2014 WL 3557345, at *9.

Defendants' criticisms of Dr. Feinstein's opinion are meritless.  "Tellingly, [Defendants] do[] not contest [Dr. Feinstein's] qualifications to offer expert testimony in this case."  *KB Partners I, L.P. v. Barbier*, 2013 WL 2443217, at *5 (W.D. Tex. June 4, 2013).  And Defendants' attacks on the reliability of Dr. Feinstein's opinion simply parrot their own experts.  *See* Defs' Mem. at 21-22 ("as Defendants' expert Dr. Saunders explains"; "[a]s Defendants' expert Dr. Ferrell explains"; "[a]s Defendants' expert Dr. Ferrell explained").  Defendants' arguments, therefore, amount to "merely a battle of the experts" – which is "not grounds for a *Daubert* challenge."  *DePuy 2014*, 2014 WL 3557345, at *12.  "That experts disagree on how to conduct studies or what factors to consider does not show that [Dr.] Feinstein's [analysis is] unreliable.  Defendants' criticisms of [Dr.] Feinstein's report can be 'brought out through vigorous cross-examination and presentation of contrary

- 23 -

evidence.'" *In re Cassava*, 2024 WL 4824243, at *15 ("'The Court need not exclude expert testimony simply because another expert claims to be able to poke holes in his opponent's methods.'") (quoting *Barbier*, 2013 WL 2443217, at *9).

Moreover, Dr. Feinstein has amply explained why each of Defendants' criticisms of his methodology are wrong. First, his use of linear interpolation is "supported by references to academic literature and industry practices." *Barbier*, 2013 WL 2443217, at *10; *see also* Defs' App. 70 (Feinstein Rpt., ¶176 n.162); Defs' App. 199-Defs' App. 202 (Feinstein Reply, ¶¶172-176).[21] Second, Defendants' argument regarding the time value of money "is related only to presentation." Defs' App. 184-Defs' App. 185 (Feinstein Reply, ¶¶136-138) ("Ferrell's primary criticism is that the more appropriate presentation of the increased interest expense is to show the present value of the total additional interest expense, rather than the higher interest payments expressed in future value terms over the life of the Notes. Dr. Ferrell's alternative choice of manner of presentation has no bearing on my analysis or its implications."). Defendants' third criticism is yet another disagreement regarding the correctness of Dr. Feinstein's calculations. In fact, Defendants' expert does not opine that Dr. Feinstein's methodology "lacks an economic basis" (Defs' Mem. at 22) – he simply says it is "not right." App. 486 (1/27/25 Ferrell Depo. Tr. at 165:9-16). This argument does not merit exclusion; rather, "the question of whether the expert's opinions are correct is reserved for the fact finder." *DePuy 2019*, 2019 WL 13193930, at *3 (citing *Wattle v. Barko Hydraulics LLC*, 107 F.

---

[21]  Defendants mischaracterize Dr. Feinstein's forthcoming article, in which he writes: "'It is always calculated by linear interpolation even though interest does not accrue linearly. . . . Nonlinear interpolation can be used for greater precision, but linear interpolation is likely to provide very close results.'" Defs' App. 200-Defs' App. 201 (Feinstein Reply, ¶174). Indeed, Defendants' own expert, Anthony Saunders, cites a textbook that teaches students to use linear interpolation to calculate the yield to maturity for a bond "[b]etween nonlinear yield curves." App. 504 (Saunders Depo. Tr. at 192:10-14); App. 513. Defendants do not explain why their hairsplitting proposed distinction of Dr. Feinstein's sources – that purportedly "none of the cited articles relate to corporate bonds" (Defs' Mem. at 21 n.2) – would make a difference to his analysis.

App'x 396, 398 (5th Cir. 2004)).[22]

Defendants' relevance argument should also be rejected because it is actually an attack on Plaintiff's proof, not Dr. Feinstein's opinion.  To the extent Defendants challenge the facts underlying Dr. Feinstein's opinion, "[i]t will be [Plaintiff's] burden at trial to establish the factual bases for [Dr. Feinstein's] assumptions.  If [Plaintiff] does not do so, [Defendants] can cross-examine [Dr. Feinstein] to identify any deficiency." *GSI*, 2015 WL 364796, at *4; *see also DePuy 2014*, 2014 WL 3557345, at *13 ("Further, the factual basis for an expert's findings goes to the weight of his testimony not the admissibility.").  More fundamentally, the problem with Defendants' argument is that whether or not, *e.g.*, any Exxon employee "subjectively believed that a ratings downgrade would cost the company hundreds of millions of dollars" (Defs' Mem. at 23), is ***not*** a fact that underlies Dr. Feinstein's opinion.[23]  Rather, Dr. Feinstein calculated the additional interest expense that Exxon would have paid had its March 2016 offering been issued with a AA+ (or split) rating.  Defs' App. 69, Defs' App. 71 (Feinstein Rpt., ¶¶172, 177).  This opinion is relevant because it quantifies Defendants' pecuniary motive to avoid a credit downgrade prior to the offering.  Plaintiff sets out its proof related to this issue in its OMSJ, and Defendants' criticisms of that proof have no bearing on the admissibility of Dr. Feinstein's opinion.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that Defendants' Motion be denied.

DATED:  March 14, 2025                                    Respectfully submitted,

s/ Joe Kendall
JOE KENDALL

---

[22]    Because, as explained above, Dr. Feinstein's methodology ***is*** reliable at "each and every step," *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007), is inapposite.  *See* Defs' Mem. at 20.

[23]    Defendants' case, *Rolls-Royce Corp. v. Heros, Inc.*, 2010 WL 184313, at *6 (N.D. Tex. Jan. 14, 2010), is inapposite because Dr. Feinstein's opinion is not "based on" any of the facts Defendants present as purportedly lacking proof. *See* Defs' Mem. at 22-23.

- 25 -

4911-5871-2615.v1

KENDALL LAW GROUP, PLLC
JOE KENDALL (Texas Bar No. 11260700)
3811 Turtle Creek Blvd., Suite 825
Dallas, TX  75219
Telephone:  214/744-3000
214/744-3015 (fax)
jkendall@kendalllawgroup.com

BALON B. BRADLEY LAW FIRM
BALON B. BRADLEY (Texas Bar No. 02821700)
11910 Greenville Avenue, Suite 220
Dallas, TX  75243
Telephone:  972/991-1582
972/755-0424 (fax)
balon@bbradleylaw.com

Local Counsel

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS (CA Bar No. 168593)
MICHAEL J. DOWD (CA Bar No. 135628)
SPENCER A. BURKHOLZ (CA Bar No. 147029)
SCOTT H. SAHAM (CA Bar No. 188355)
SAM S. SHELDON (CA Bar No. 190502)
JONAH H. GOLDSTEIN (CA Bar No. 193777)
NATHAN R. LINDELL (CA Bar No. 248668)
SARA B. POLYCHRON (CA Bar No. 244685)
ERIKA L. OLIVER (CA Bar No. 306614)
T. ALEX B. FOLKERTH (CA Bar No. 338140)
JUSTIN G. OETTING (CA Bar No. 350807)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
miked@rgrdlaw.com
spenceb@rgrdlaw.com
scotts@rgrdlaw.com
ssheldon@rgrdlaw.com
jonahg@rgrdlaw.com
nlindell@rgrdlaw.com
spolychron@rgrdlaw.com
eoliver@rgrdlaw.com
afolkerth@rgrdlaw.com
joetting@rgrdlaw.com

Lead Counsel for Plaintiff

- 26 -

4911-5871-2615.v1