UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

|  |  |  |
|---|---|---|
| PEDRO RAMIREZ, JR., Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>EXXON MOBIL CORPORATION, et al.,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 3:16-cv-03111-K<br><br>CLASS ACTION |

**LEAD PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF D. PAUL REGAN**

4911-6787-1523.v1

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ....................................................................................................1

II.     LEGAL STANDARD............................................................................................4

III.    ARGUMENT ........................................................................................................5

      A.   Mr. Regan Is Qualified to Provide the Opinions Offered.......................................5

      B.   Mr. Regan's Kearl Proved Reserves Opinions Are Relevant and Reliable.............5

      C.   Mr. Regan's Item 303 Opinions Are Relevant and Reliable ................................11

      D.   Mr. Regan's RMDG Impairment Opinions Are Relevant and Reliable................16

IV.     CONCLUSION....................................................................................................20

4911-6787-1523.v1

# TABLE OF AUTHORITIES

**Page**

## CASES

*Aubrey v. Barlin*,
2015 WL 6002260 (W.D. Tex. Oct. 14, 2015)..........................................................................14

*Avomeen Holdings, LLC v. Thanedar*,
2019 WL 3491620 (E.D. Mich. Aug. 1, 2019) ..........................................................................3

*Carvelli v. Ocwen Fin. Corp.*,
934 F.3d 1307 (11th Cir. 2019) ...............................................................................................15

*Daubert v. Merrill Dow Pharms, Inc.*,
509 U.S. 579 (1993)......................................................................................................... *passim*

*Gansman v. Tanenbaum*,
2024 WL 694111 (N.D. Cal. Feb. 20, 2024) .....................................................................15, 19

*Goode v. City of Southaven*,
2019 WL 1089510 (N.D. Miss. Mar. 7, 2019) ...........................................................................7

*GSI Tech., Inc. v. Cypress Semiconductor Corp.*,
2015 WL 364796 (N.D. Cal. Jan. 27, 2015)...............................................................................7

*Highland Cap. Mgmt., L.P. v. Schneider*,
379 F. Supp. 2d 461 (S.D.N.Y. 2005).....................................................................................14

*In re Daou Sys., Inc., Sec. Litig.*,
2008 WL 11508932 (S.D. Cal. May 13, 2008).........................................................................13

*In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prods. Liab. Litig.*,
2014 WL 12576294 (N.D. Tex. Sept. 16, 2014)..................................................................11, 19

*In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prods. Liab. Litig.*,
2014 WL 3557345 (N.D. Tex. July 18, 2014) ................................................................. *passim*

*In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prods. Liab. Litig.*,
2016 WL 6271474 (N.D. Tex. Jan. 5, 2016) .........................................................6, 8, 13, 17

*In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prods. Liab. Litig.*,
2016 WL 9560113 (N.D. Tex. Oct. 3, 2016)............................................................................17

*In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prods. Liab. Litig.*,
2019 WL 13193930 (N.D. Tex. Jan. 10, 2019) .........................................................2, 4, 6, 10

*In re Novatel Wireless Sec. Litig.*,
2011 WL 5827198 (S.D. Cal. Nov. 17, 2011) ...................................................................14, 17

4911-6787-1523.v1

**Page**

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) ........................................................................................15

*In re Refco Inc. Sec. Litig.*,
   2012 WL 7007795 (S.D.N.Y. Nov. 29, 2012) .................................................................15

*In re REMEC Inc. Sec. Litig.*,
   702 F. Supp. 2d 1202 (S.D. Cal. 2010) ..............................................................2, 8, 17, 19

*In re Under Armour Sec. Litig.*,
   730 F. Supp. 3d 172 (D. Md. 2024) ...........................................................................13, 14

*J&M Indus., Inc. v. Raven Indus., Inc.*,
   457 F. Supp. 3d 1022 (D. Kan. 2020) ............................................................................15

*Kafenbaum v. GTECH Holdings Corp.*,
   217 F. Supp. 2d 238 (D.R.I. 2002) ................................................................................15

*Kirola v. City & Cnty. of S.F.*,
   2010 WL 3476681 (N.D. Cal. Sept. 2, 2010) ..................................................................7

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1999) ..........................................................................................................4

*Malone v. Microdyne Corp.*,
   26 F.3d 471 (4th Cir. 1994) ...........................................................................................15

*Parrish v. Freightliner, LLC*,
   471 F. Supp. 2d 1262 (M.D. Fla. 2006) ...........................................................................8

*Pipitone v. Biomatrix, Inc.*,
   288 F.3d 239 (5th Cir. 2002) ..........................................................................................15

*Puga v. RCX Sols., Inc.*,
   922 F.3d 285 (5th Cir. 2019) ...........................................................................................5

*Rolex Watch U.S.A., Inc. v. Capetown Diamond Corp.*,
   2009 WL 10669248 (N.D. Ga. Mar. 30, 2009) ................................................................8

*SEC v. Bankatlantic Bancorp, Inc.*,
   2013 WL 12009694 (S.D. Fla. Nov. 14, 2013) ................................................................8

*SEC v. Caserta*,
   75 F. Supp. 2d 79 (E.D.N.Y. 1999) ...........................................................................2, 17

- iii -

**Page**

*SEC v. Conaway*,
  2009 WL 1583546 (E.D. Mich. June 5, 2009)........................................................................12

*SEC v. Guenthner*,
  395 F. Supp. 2d 835 (D. Neb. 2005).................................................................................2, 17

*SEC v. Johnson*,
  525 F. Supp. 2d 70 (D.D.C. 2007) ........................................................................................1

*SEC v. Life Partners Holdings, Inc.*,
  2013 WL 12076933 (W.D. Tex. Oct. 23, 2013) ...................................................................10

*SEC v. Lucent Techs., Inc.*,
  610 F. Supp. 2d 342 (D.N.J. 2009) ..................................................................................6, 18

*SEC v. Stansbury Holdings Corp.*,
  2007 WL 1970531 (D. Colo. June 29, 2007)........................................................................13

*SEC v. Todd*,
  2006 WL 5201386 (S.D. Cal. Oct. 17, 2006) ................................................................12, 14

*Smilovits v. First Solar, Inc.*,
  2019 WL 6875492 (D. Ariz. Dec. 17, 2019) ............................................................10, 13, 14

*United States v. Hatfield*,
  2010 WL 1948236 (E.D.N.Y. May 12, 2010) .................................................................13, 15

*United States v. Javidan*,
  2013 WL 1563212 (E.D. Mich. Apr. 15, 2013),
  *aff'd sub nom. United States v. Meda*,
  812 F.3d 502 (6th Cir. 2015) ................................................................................................1

*United States v. Martoma*,
  993 F. Supp. 2d 452 (S.D.N.Y. 2014)..................................................................................13

*United States v. Rigas*,
  490 F.3d 208 (2d Cir. 2007)................................................................................................13

*Wattle v. Barko Hydraulics LLC*,
  107 F. App'x 396 (5th Cir. 2004) ........................................................................................17

*Willis v. Kia Motors Corp.*,
  2009 WL 1974474 (N.D. Miss. July 8, 2009) ........................................................................4

4911-6787-1523.v1

**Page**

**STATUTES, RULES, AND REGULATIONS**

Federal Rules of Evidence
 Rule 702 .......................................................................................................................1, 2
 Rule 703 ..........................................................................................................................10
 Rule 704 ..........................................................................................................................15

4911-6787-1523.v1

## I. INTRODUCTION

The opinions of Lead Plaintiff Greater Pennsylvania Carpenter's Pension Fund's ("Plaintiff") accounting expert, D. Paul Regan, are admissible under Federal Rule of Evidence 702. Mr. Regan's credentials are unassailable, his testimony is relevant, and the methodologies he employs are valid. Mr. Regan is a CPA with **over 50 years** of accounting and auditing experience. He is designated by the American Institute of Certified Public Accountants ("AICPA") as Certified in Financial Forensics. He has been retained by and testified on multiple occasions for the U.S. Securities and Exchange Commission ("SEC"), the Public Company Accounting Oversight Board, and the Federal Deposit Insurance Corporation. Mr. Regan has provided expert testimony in more than 125 trials and arbitrations. Mr. Regan has taught or presented dozens of courses on accounting topics to AICPA members, college students, and federal law enforcement. He has been awarded the Distinguished Service Award by the California Society of CPAs, their highest honor, given annually to one of their 45,000 members, for his career of distinguished service to the accounting profession.

Mr. Regan's testimony is relevant because it will help the jury understand unfamiliar accounting concepts which are "not within the general knowledge of the factfinder." *In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prods. Liab. Litig.*, 2014 WL 3557345, at *9 (N.D. Tex. July 18, 2014) ("*DePuy 2014*") (Kinkeade, J.); *see also SEC v. Johnson*, 525 F. Supp. 2d 70, 78 (D.D.C. 2007) ("[a]n average juror may not be familiar with . . . technical meaning[s] under GAAP"); *United States v. Javidan*, 2013 WL 1563212, at *2 (E.D. Mich. Apr. 15, 2013) ("The Court finds that it is beyond explanation that the field of tax or accounting is sufficiently complex to be considered beyond the knowledge of the average person and would, therefore, aid the jury in understanding Acure's expenditures and revenue."), *aff'd sub nom. United States v. Meda*, 812 F.3d 502 (6th Cir. 2015). Both sides have proffered accounting experts because this case involves complex accounting issues. Indeed, courts routinely admit expert testimony from qualified

4911-6787-1523.v1

accountants to help the trier of fact assess liability in securities cases.  *See, e.g.*, *SEC v. Guenthner*, 395 F. Supp. 2d 835, 846 (D. Neb. 2005) ("Establishing that an accounting practice or method is inconsistent with GAAP requires expert testimony.") (collecting cases); *SEC v. Caserta*, 75 F. Supp. 2d 79, 91 (E.D.N.Y. 1999) ("Whether GAAP has been violated is a fact-specific issue. . . . Frequently, this determination turns on expert testimony.") (collecting cases).  To assess the evidence, the jury will need to be educated on relevant Generally Accepted Accounting Principles ("GAAP") and SEC rules, including the Financial Accounting Standard Board's Accounting Standards Codification ("ASC") 932, Staff Accounting Bulletin ("SAB") 99, and others.  Defendants Exxon Mobil Corporation ("Exxon"), Rex W. Tillerson, Andrew P. Swiger, and David S. Rosenthal (collectively, "Defendants") do not contend that these issues are within the ken of an average juror. Given the accounting issues presented, Mr. Regan's testimony will undoubtedly assist the trier of fact.

Mr. Regan's expert accounting opinions are also reliable.  Each of Mr. Regan's opinions is based upon his 50 years of experience in the accounting field, his review of the relevant documents and deposition testimony, and his understanding and application of the relevant accounting standards and literature.  Thus, Mr. Regan's opinions are reliable because he applies "specialized knowledge to a review of documentary evidence" – which, as the Court has previously recognized, is a "proper methodology."  *In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prods. Liab. Litig.*, 2019 WL 13193930, at *4 (N.D. Tex. Jan. 10, 2019) ("*DePuy 2019*") (Kinkeade, J.); *see also In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1217 (S.D. Cal. 2010) (rejecting challenge to the reliability of Mr. Regan's expert opinion).  Mr. Regan's analysis was exhaustive, and it satisfies the reliability requirement under Rule 702 and *Daubert v. Merrill Dow Pharms, Inc.*, 509 U.S. 579 (1993).

Faced with Mr. Regan's damning opinions – which not only create genuine issues of material fact sufficient to preclude summary judgment, but also demonstrate the strength of Plaintiff's claims

- 2 -

for trial – Defendants seek to exclude Mr. Regan's expert testimony in its *entirety*. *See* Defendants' Brief in Support of Their Motion to Exclude Testimony of D. Paul Regan (ECF 228) ("Defs' Mem.") at 1. But Defendants grasp at straws.

*First*, their attacks on Mr. Regan's opinions regarding Exxon's proved reserves at Kearl rely on mischaracterizations. For example, Defendants' argument that Plaintiff failed to plead the claim ignores the plain language of the complaint. *See* Consolidated Complaint for Violations of the Federal Securities Laws (ECF 36), ¶¶277-280. Their contention that Mr. Regan did not "interpret or apply the SEC pricing rules as incorporated by ASC 932-10-S99" or "opine that ASC 932-10-S99 *prohibited* the proved reserves estimate that was actually performed in 2015" (Defs' Mem. at 2 (emphasis in original)), is belied by Mr. Regan's actual opinion. *See, e.g.*, Defs' App. 54 (Expert Report of D. Paul Regan, CPA/CFA ("Regan Rpt."), ¶108).[1] And their claim that Mr. Regan supposedly "admitted" that he failed to analyze whether Exxon properly calculated its proved reserves mischaracterizes his deposition testimony – as explained below, Defendants asked him whether he independently calculated the *inputs* for what he opines was the proper methodology (there would be no reason to do this), not whether he performed his own analysis regarding whether Exxon's 2015 proved reserves calculation violated applicable SEC rules and related accounting standards.

*Second*, Defendants distort Mr. Regan's opinion that the trend of recurring lack of profitability at Kearl was material under relevant *accounting* standards, suggesting he invades the provinces of the judge and jury in the face of the weight of authority holding that "accounting materiality" opinions are admissible. *See, e.g.*, *Avomeen Holdings, LLC v. Thanedar*, 2019 WL 3491620, at *3 (E.D. Mich. Aug. 1, 2019). And Defendants' relevance argument also misses the

---

[1] "Defs' App." refers to pages to the Appendix in Support of Defendants' Motion to Exclude the Testimony of D. Paul Regan (ECF 229). "App." refers to pages to the Appendix in Support of Lead Plaintiff's Response in Opposition to Defendants' Motion to Exclude Testimony of D. Paul Regan, filed concurrently herewith.

- 3 -

4911-6787-1523.v1

mark. Rather, Mr. Regan's opinion that Exxon failed to comply with accounting-related disclosure rules is relevant to Plaintiff's half-truth claim regarding the profitability of Exxon's bitumen operations.

***Third***, Defendants' attack on the reliability of Mr. Regan's opinion that Exxon employed unreasonable price plan assumptions in its 2015 evaluation of its XTO Energy Inc. ("XTO") long-lived assets for impairment simply goes to the weight a jury might give Mr. Regan's testimony, and not to its admissibility. *See, e.g.*, *DePuy 2014*, 2014 WL 3557345, at \*12 (defendants' attacks on plaintiffs' expert's opinions "merely a battle of the experts" that "goes to the weight rather than the admissibility of her testimony").

Defendants' motion should be denied.

## II.     LEGAL STANDARD

When considering whether to admit expert testimony into evidence, the Court assesses whether the testimony is reliable and relevant. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (citing *Daubert*, 509 U.S. at 579). "The Court has broad discretion in determining the admissibility of expert evidence under *Daubert*." *DePuy 2019*, 2019 WL 13193930, at \*2. "Essentially, the court is the gate-keeper charged with determining whether the expert's testimony is reliable and relevant enough to not be junk science . . . ." *Willis v. Kia Motors Corp.*, 2009 WL 1974474, at \*1 (N.D. Miss. July 8, 2009); *see also DePuy 2014*, 2014 WL 3557345, at \*5 ("[T]he rejection of expert testimony is the exception rather than the rule.").

The reliability requirement is satisfied where an expert's "testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho*, 526 U.S. at 149.[2] "The expert's opinions do not have to be either infallible or uncontradicted to be admissible; the question of whether the expert's opinions are correct is reserved for the fact finder." *DePuy 2019*, 2019 WL

---

[2]     Unless otherwise noted, citations are omitted and emphasis is added.

13193930, at *3.  As for relevance, "the court's main focus should be on determining whether the expert's opinion will assist the trier of fact," and the "'helpfulness threshold is low.'" *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 293-94 (5th Cir. 2019).

### III.   ARGUMENT

#### A.   Mr. Regan Is Qualified to Provide the Opinions Offered

Defendants do not dispute that Mr. Regan is a well-qualified accounting expert.  Nor could they, as his academic and professional credentials render him eminently qualified to offer the reports, opinions, and testimony he offers in this case.  Even the most cursory review of Mr. Regan's *curriculum vitae* reveals that his extensive knowledge, skill, experience, and education in the accounting and auditing fields qualify him to provide expert accounting testimony in this litigation. *See* Defs' App. 211-Defs' App. 218 (Regan Rpt., Ex. B).  Mr. Regan has practiced as a CPA for over 50 years, including serving as the engagement partner and concurring partner on audits of public companies. *Id.*  He has provided accounting and/or auditing consulting services in more than 1,000 complex litigation matters.  Defs' App. 11-Defs' App. 12 (Regan Rpt., ¶12).  He has been qualified to testify on various accounting and accounting fraud matters in more than 125 cases.  Defs' App. 12 (Regan Rpt., ¶14).  Significantly, Mr. Regan's testimony typically pertained to the same issues on which he opines here, *i.e.*, GAAP and SEC financial reporting and disclosure requirements.  Defs' App. 11-Defs' App. 12 (Regan Rpt., ¶12).  There is no question that Mr. Regan is qualified to give the opinions that he has proffered in this case.

#### B.   Mr. Regan's Kearl Proved Reserves Opinions Are Relevant and Reliable

Mr. Regan opines that Exxon's calculation of its proved reserves at Kearl in 2015 violated applicable SEC rules and related accounting standards.  *See, e.g.*, Defs' App. 7-Defs' App. 9 (Regan Rpt., ¶1).  As Mr. Regan explains, Exxon was required to provide oil and gas reserve disclosures according to a formula prescribed by the SEC.  Defs' App. 37-Defs' App. 41 (Regan Rpt., ¶¶72-80).

- 5 -

This formula involves comparing the "SEC price" of the product – calculated as the 12-month average of the first-day-of-the-month price for a relevant crude oil benchmark (Exxon chose to use West Texas Intermediate or "WTI"), less "price reductions for quality, diluent, and transport costs" – to the annualized unit lifting costs to determine whether the reserves are "economically producible," *i.e.*, profitable.  Defs' App. 37-Defs' App. 41, Defs' App. 45-Defs' App. 46 (Regan Rpt., ¶¶72-80, 94).  Mr. Regan opines that Exxon's 2015 SEC price calculation for its bitumen reserves at Kearl improperly limited the price reductions to costs associated with sales in Canadian markets, rather than using "actual costs" for the price reductions.  Defs' App. 45-Defs' App. 51 (Regan Rpt., ¶¶93-101).  The actual costs were greater because a significant portion of Exxon's 2015 Kearl bitumen sales were in U.S. markets, with concomitantly higher transportation costs.  *Id.*  Mr. Regan calculates the proper 2015 SEC price – using the actual costs for the price reductions – to be $24.66, $4.04 lower than Exxon's inflated SEC price of $28.70.  Defs' App. 51-Defs' App. 52 (Regan Rpt., ¶¶102-104).  Critically, because this properly-calculated 2015 SEC price is lower than the 2015 annualized unit lifting costs of at least $27.90, Mr. Regan opines that the Kearl reserves were not "economically producible" and thus should have been de-booked as of December 31, 2015.  Defs' App. 37-Defs' App. 38, Defs' App. 52-Defs' App. 54 (Regan Rpt., ¶¶74, 105-108).

Mr. Regan's opinion is based on his review of the relevant rules and standards and application of "his specialized knowledge to review facts and documentary evidence produced by Defendants." *DePuy 2019*, 2019 WL 13193930, at *4.  Thus, Mr. Regan's opinion is both the result of a "proper methodology" (*id.*) and "helpful to the factfinder."  *In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prods. Liab. Litig.*, 2016 WL 6271474, at *4 (N.D. Tex. Jan. 5, 2016) ("*DePuy 2016*") (Kinkeade, J.); *see also SEC v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 352 (D.N.J. 2009) ("The Court finds no *Daubert* basis to exclude Ms. Hoffman's opinion.  Ms. Hoffman relied on the factual record and applied sound accounting principles to reach her opinion.").  As

- 6 -

other courts have previously held, "when an expert like Regan is qualified to undertake the economic calculations described in his report" – which Defendants do not challenge – there is no "reason[] to exclude his opinion under *Daubert*."  *GSI Tech., Inc. v. Cypress Semiconductor Corp.*, 2015 WL 364796, at *4 (N.D. Cal. Jan. 27, 2015) (rejecting motion to exclude Mr. Regan's testimony); *see also Kirola v. City & Cnty. of S.F.*, 2010 WL 3476681, at *10 (N.D. Cal. Sept. 2, 2010) (same).

Defendants' arguments for the exclusion of Mr. Regan's opinion are meritless.  First, as explained in Plaintiff's concurrently-filed opposition to Defendants' motion for summary judgment, Defendants' contention that Mr. Regan's opinion regarding the Kearl de-booking does not relate to any theory pleaded in the Consolidated Complaint for Violations of the Federal Securities Laws (ECF 36) (the "Complaint") is incorrect.  In fact, Plaintiff pleaded that Defendants' proved reserves disclosures in the 2015 Form 10-K "were materially misleading to investors in light of Defendants' failure to disclose that, *at the time*, the Canadian Bitumen Operations were operating at a loss."  *See* Complaint (ECF 36), ¶¶277-280; *see also Goode v. City of Southaven*, 2019 WL 1089510, at *4-*5 (N.D. Miss. Mar. 7, 2019) (denying motion to exclude expert opinion related to a claim purportedly "not set forth in the Amended Complaint" because "the amended complaint provided fair notice" and "[t]hus, this evidence is relevant").  Even if one accepts Defendants' mischaracterization of Plaintiff's pleading, Defendants' conclusory assertion that Mr. "Regan simply has ***nothing*** to say" regarding the "'near certainty'" that the Kearl reserves would have to be de-booked at year-end 2016 is wrong.  Defs' Mem. at 4-5 (emphasis in original).  If anything, Mr. Regan's opinion that the Kearl reserves should have been de-booked as of year-end 2015 demonstrates it ***was*** certain in February 2016 that the Kearl reserves would have to be de-booked.  Indeed, Mr. Regan directly opines that even "[i]n the absence of a reserve de-booking as required at December 31, 2015," "the increased likelihood of Exxon's 2015 Kearl-related proved reserves no longer qualifying as a result of decreased profitability was made evident within Exxon during 2015."  Defs' App. 70-Defs' App. 77

- 7 -

4911-6787-1523.v1

(Regan Rpt., ¶¶134-143).  Thus, Mr. Regan's opinion is "directly relevant to the claims at issue and would assist the jury in this matter." *DePuy 2016*, 2016 WL 6271474, at *10.[3]

Second, Defendants' argument that Mr. Regan did not opine on whether relevant SEC rules and related accounting standards required Exxon to de-book its Kearl reserves as of year-end 2015 is spurious.  *See, e.g.*, Defs' App. 54 (Regan Rpt., ¶108) ("Exxon was required to de-book its asserted 3.6 billion barrels of proved reserves as of December 31, 2015.  In violation of SEC rules, Exxon failed to do so.").  Courts have previously rejected similar challenges to Mr. Regan's opinions.  *See REMEC*, 702 F. Supp. 2d at 1220 ("The Court OVERRULES the objection because the allegations are belied by the report itself.").  As described above, Mr. "Regan explains precisely why he believes [Exxon] used inappropriate [inputs to its 2015 SEC price calculation] and then supports his reasons for selecting alternative inputs." *Id.*

Defendants mischaracterize Mr. Regan's opinions and testimony in a number of ways to concoct their argument.  For example, Defendants assert that Mr. Regan merely "assumed that it would have been appropriate to apply" Exxon's 2016 methodology to the 2015 SEC price calculations.  Defs' Mem. at 5-8.  But Mr. Regan did not "assume" that Exxon's SEC price calculations in 2016 (when it did de-book its Kearl reserves) were appropriate – rather, he applied his accounting expertise to the relevant SEC rules and accounting standards and the evidence and ***opined*** that Exxon's 2016 calculations were proper and its 2015 calculations were improper.  Defs' App. 41-Defs' App. 49 (Regan Rpt., ¶¶82-98); *see also SEC v. Bankatlantic Bancorp, Inc.*, 2013 WL 12009694, at *7 (S.D. Fla. Nov. 14, 2013) ("[B]ecause she applied her professional experience to

---

[3]  Defendants' cases are inapposite because, unlike Plaintiff, the claimants in those cases failed to give appropriate notice of the claims on which their proffered experts opined. *See* Defs' Mem. at 5 (citing *Parrish v. Freightliner, LLC*, 471 F. Supp. 2d 1262, 1268 n.3 (M.D. Fla. 2006) ("Here, plaintiff wholly failed to prosecute the case for two plus years, then presented an entirely new theory of liability at the eleventh hour of the twice extended expert deadline."); *Rolex Watch U.S.A., Inc. v. Capetown Diamond Corp.*, 2009 WL 10669248, at *7 (N.D. Ga. Mar. 30, 2009) ("Even a liberal construction of Defendants' First Amended Counterclaims to Plaintiff's First Amended Complaint does not indicate that Defendants provided notice to Plaintiff that Defendants are alleging an 'enhancement' market . . . .")).

4911-6787-1523.v1

formulate her opinion, [the accounting expert] did not just weigh the facts as a lay jury would."). And as Mr. Regan explained in his report and deposition, Exxon's 2016 SEC price calculations are relevant because they show that even Defendants acknowledge the SEC price calculation should include actual costs as price reductions. *See* Defs' App. 44 (Regan Rpt., ¶89) ("Exxon acknowledged that its 2015 Kearl bitumen SEC price calculations and related costs did not properly include Kearl bitumen prices realized in markets outside of Canada"); Defs' App. 373 (Regan Depo. Tr. at 74:9-15) ("Q. Sir, are you offering an opinion based on the SEC regulations or how Exxon Mobil operationalized them? A. My calculation is guided by 932 - ASC 932, the SEC regulations, and the testimony and operationalization of that – of – of those documents as corrected by Exxon in 2016.").

Defendants' discussion of the "terminal point" and "profits or losses downstream of the plant gate" is simply a red herring. Defs' Mem. at 7. As Mr. Regan wrote and repeatedly testified, the SEC price calculation must incorporate actual costs. *See, e.g.*, Defs' App. 49-Defs' App. 50 (Regan Rpt., ¶¶99-100); Defs' App. 373 (Regan Depo. Tr. at 76:18-77:20) (per regulation, "you need to look at the transactions involving the realization which generates the selling price" . . . "[a]nd in [subsection] b, you need to consider the actual costs for – of the diluent, of the quality adjustments, and the transportation that is involved"); Defs' App. 379 (Regan Depo. Tr. at 111:11-17) ("What I have done in my report and in my analysis is to look at determinations that Exxon made of the real – the realization that it received and the determinations that it made of its realization net of cost of diluent, trans- – actual cost of diluent, transportation and quality differentials."). Defendants resort to a smoke-and-mirrors tactic related to the recording of what the actual costs *were* because they cannot meaningfully dispute that actual costs are supposed to be used in the SEC price calculation. *See, e.g.*, App. 28 (Swiger Depo. Tr. at 120:6-11) (Exxon 's Principal Financial Officer: "[Q.] In the SEC analysis, you're going to want to use the actual cost involved, whether it's transportation,

- 9 -

diluent, or any other cost, correct? A. That is correct."). At bottom, Defendants' argument seeks to fault Mr. Regan for relying on Defendants' own calculations of the actual costs for sales of Kearl bitumen to the U.S. – but applying his expertise to "Defendants' own documents and admissions" is exactly what Mr. Regan is supposed to do. *DePuy 2019*, 2019 WL 13193930, at \*4; *see also Smilovits v. First Solar, Inc.*, 2019 WL 6875492, at \*8 (D. Ariz. Dec. 17, 2019) (rejecting attack on Mr. Regan's opinions because "Rule 703 'specifically provides that '[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of''").[4]

Finally, the premise of Defendants' argument that Mr. Regan's opinion involved the "retroactive application of the 2016 methodology to 2015 data" is belied by Defendants' own accounting expert, William B. Abington ("Abington"). *See, e.g.*, App 3 (Abington Depo. Tr. at 73:4-8) ("I would say they didn't change their methodology. . . . That they added additional data points in 2016 is the way that I would say that.").[5] In fact, Abington agreed that if there were "significant sales in 2015 going from Canada to the United States" then he "would say that they didn't have all the data . . . that they needed to include in the methodology." App. 11 (Abington Depo. Tr. at 86:1-17); *see also* App. 11-App. 13 (Abington Depo. Tr. at 86:18-88:21) ("It doesn't change the methodology, but they have – ***would have not utilized it properly***."). Of course, Mr.

---

4    Much of Mr. Regan's deposition testimony cited by Defendants has to do with what the actual costs were – which, as explained above, he was not required to calculate himself – rather than Mr. Regan's opinion that Exxon was required to use the actual costs in the SEC price calculation. *See* Defs' Mem. at 5-7 (citing Defs' App. 372-Defs' App. 374 (Regan Depo. Tr. at 71:8-78:12) ("I think you need to look at the transactions involving the realization which generates the selling price."); Defs' App. 378-Defs' App. 379 (Regan Depo. Tr. at 107:17-113:22) ("But in terms of the complexities associated with ***determining*** the amount realized, that's something I've relied on Exxon to have provided me in their own documents and calculations."); Defs' App. 384 (Regan Depo. Tr. at 135:11-25) ("Q. Do you know if [the U.S. Gulf Coast is] the place at which the sale price was realized? A. No, I haven't drilled into Exxon's accounting records to see whether or not that's the case.")). Other testimony cited by Defendants misses the mark because it relates to "'lifting costs,'" which are different from the costs used as price reductions in the SEC price analysis. Defs' Mem. at 6 (citing Defs' App. 386-Defs' App. 387 (Regan Depo. Tr. at 169:17-170:7)).

5    Because the "methodology" – calculating the SEC price according to the applicable rules and regulations – was the same in both 2015 and 2016, and Exxon simply chose not to include certain required inputs to avoid de-booking as of year-end 2015, *SEC v. Life Partners Holdings, Inc.*, 2013 WL 12076933 (W.D. Tex. Oct. 23, 2013), is inapposite. *See* Defs' Mem. at 8 (citing *Life Partners*, 2013 WL 12076933, at \*2).

4911-6787-1523.v1

Regan shows that there were significant sales of Kearl to the U.S. in 2015, and opines that Exxon's failure to include actual costs associated with these sales in its 2015 SEC price methodology rendered its calculations improper. Defs' App. 48-Defs' App. 54 (Regan Rpt., ¶¶97-108).[6] At any rate, even taken at face value, Defendants' argument merely "debates the accuracy of [Mr. Regan's] opinion, not the reliability, which is more appropriately an attack made on the weight of the testimony at trial rather than its admissibility." *In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prods. Liab. Litig.*, 2014 WL 12576294, at \*4 (N.D. Tex. Sept. 16, 2014) ("*DePuy 2014 II*") (Kinkeade, J.) (rejecting attack on opinion "that the physiological profile first used by DePuy was a much more accurate test for real world friction and wear on the Pinnacle Device than the simplified profile actually used by DePuy").

## C.    Mr. Regan's Item 303 Opinions Are Relevant and Reliable

Mr. Regan applied his expertise to financial and accounting documents, emails, and testimony, as well as applicable accounting standards and SEC guidance, to form his opinion that SEC regulations governing the Management Discussion and Analysis ("MD&A") disclosures in Exxon's public filings – specifically, Item 303 of SEC Regulation S-K ("Item 303") – required Exxon to disclose the recurring lack of profitability of its Canadian bitumen operations at Kearl. Defs' App. 34-Defs' App. 36, Defs' App. 55-Defs' App. 90 (Regan Rpt., ¶¶67-71, 110-168). Specifically, Mr. Regan opines that Item 303 required Exxon to disclose the following in its 2015 Form 10-K: (i) "Kearl's recurring losses did, and were 'reasonably likely' to have a material

---

[6]    Notably, Abington testified that he was (incorrectly) informed that there were only "nominal" sales of Kearl bitumen to U.S. markets in 2015. App. 5-App. 7 (Abington Depo. Tr. at 75:12-77:7) ("On my – number of my interviews, we asked the question about 2015 sales, were there 2015 sales. I read depositions, and it's unclear as to how many sales occurred in 2015 and where those title would have transferred, would it have been first point of sale, for instance, it's unclear to me. Mr. Strawbridge, I think, said that he recalled nominal sales, in other words very little sales occurring in the U.S. in 2015 . . . ."). When he was shown evidence that sales to U.S. markets *exceeded* sales to Canadian markets in certain periods during 2015, Abington conceded that "I don't remember seeing this." App. 16-App. 22 (Abington Depo. Tr. at 304:23-310:13) ("Q. And so, for example, if we look at the period between June 2015 and August 2015, the blue bar designating Kearl to the United States Gulf Coast is bigger than the red bar going to Edmonton Hardesty. Do you see that? A. I see that the blue bar is bigger than the red bar."); *see also* App. 37.

4911-6787-1523.v1

negative effect on the Company's Upstream earnings and related profitability"; (ii) "Kearl's continuing operating losses significantly contrasted with Exxon's profitable Cold Lake bitumen operations for which materially fewer proved reserves existed"; and (iii) even if the Kearl reserves were not de-booked (as they should have been), that Kearl suffered recurring operating losses throughout 2015, driven in substantial part by losses associated with shipments to U.S. markets, which threatened the Kearl reserves' status as economically producible. Defs' App. 57-Defs' App. 58, Defs' App. 70-Defs' App. 77 (Regan Rpt., ¶¶112, 134-143). Because the relevant accounting rules and standards only require the disclosure of information that is material, Mr. Regan evaluates whether these issues were material and finds that, based on the quantitative and qualitative factors set forth in SAB 99 and related GAAP standards, they were. Defs' App. 83-Defs' App. 90 (Regan Rpt., ¶¶156-168).

Mr. Regan's opinions are properly presented expert testimony because "MD & A disclosures . . . are well within the accounting disciplines that form the bulk of [Mr. Regan's] vast experience." *SEC v. Conaway*, 2009 WL 1583546, at *1, *3 (E.D. Mich. June 5, 2009) (denying motion to exclude accounting expert opinion "on disclosure requirements and materiality under Item 303"). Accordingly, Mr. Regan sets forth the accounting-related provisions of the SEC's MD&A financial reporting rules and GAAP standards underlying his opinions. *See, e.g.*, Defs' App. 34-Defs' App. 36, Defs' App. 82-Defs' App. 86 (Regan Rpt., ¶¶67-71, 155-161); *see also SEC v. Todd*, 2006 WL 5201386, at *3 (S.D. Cal. Oct. 17, 2006) ("That standard under GAAP is set forth in Staff Accounting Bulletin 99 ('SAB 99'), which calls for the consideration of both quantitative and qualitative factors in determining materiality. . . . [T]he concepts of materiality set forth above are complex and the average juror would benefit from expert opinion on the subject.").

Although Defendants concede that Mr. Regan is qualified to opine on MD&A disclosures, they contend that his opinion should nevertheless be excluded because it is purportedly an

- 12 -

impermissible legal conclusion. Defs' Mem. at 8-9. But courts consistently reject this argument because materiality is an accounting concept that is properly the subject of expert testimony: "[I]n a federal securities fraud case, jurors are not required to 'accept the accountants' evaluation' about 'whether a given fact was material.' So Mr. [Regan's] proposed testimony **neither goes to any ultimate issue nor usurps the jury's role**." *United States v. Hatfield*, 2010 WL 1948236, at *2 (E.D.N.Y. May 12, 2010) (quoting *United States v. Rigas*, 490 F.3d 208, 220 (2d Cir. 2007)); *see also United States v. Martoma*, 993 F. Supp. 2d 452, 457 (S.D.N.Y. 2014) ("Expert testimony concerning materiality is often introduced in cases involving allegations that a company misrepresented or wrongfully withheld information from investors."); *In re Daou Sys., Inc., Sec. Litig.*, 2008 WL 11508932, at *3 (S.D. Cal. May 13, 2008) ("A trial on the issue of liability would hinge on accounting expert opinions regarding proper accounting methods and the materiality of the alleged misreporting . . . ."); *SEC v. Stansbury Holdings Corp.*, 2007 WL 1970531, at *3 (D. Colo. June 29, 2007) ("Graff's discussion of materiality is made in relation to GAAP and Generally Accepted Auditing Standards (GAAS). . . . To the extent Graff's materiality analysis under GAAP and GAAS does not mirror a materiality analysis under the securities laws, those differences are ripe also for cross examination and presentation of contrary evidence and argument."). Thus, "it is [Mr. Regan's] review, analysis, and opinions of the contents of Defendants' documents which are reflected in the [materiality opinions], and it is his admissible expert opinion on applicable regulations and standards which is reflected in the purportedly improper legal conclusions." *DePuy 2016*, 2016 WL 6271474, at *7.

Defendants mischaracterize *First Solar*, 2019 WL 6875492, at *9, and *In re Under Armour Sec. Litig.*, 730 F. Supp. 3d 172, 180 (D. Md. 2024) – both of which **admitted** Mr. Regan's expert

- 13 -

testimony, including on materiality in the accounting context[7] – in an attempt to buttress their argument. Defs' Mem. at 9. In *First Solar*, as Defendants admit (*id.* at 9 n.2), plaintiffs voluntarily withdrew Mr. Regan's opinion – thus, the court's ruling was based on plaintiffs' waiver of any argument supporting Mr. Regan's opinion, not the purported inadmissibility of the opinion. *See First Solar*, 2019 WL 6875492, at *9. Similarly, plaintiffs in *Under Armour* withdrew Mr. Regan's Item 303 opinion because an intervening decision by the Supreme Court complicated their claim. *See* Transcript of Proceedings at 154:20-155:25, *In re Under Armour Sec. Litig.*, No. 1:17-cv-00388-RDB (D. Md. Apr. 18, 2024), ECF 390. Defendants omit the *Under Armour* court's actual holding: "[T]his Court need not address these arguments further." *Under Armour*, 730 F. Supp. 3d at 180. Defendants' flimsy support underscores the weakness of their argument. The Court should follow the weight of authority holding that opinions such as Mr. Regan's "do not constitute inadmissible legal conclusions." *Todd*, 2006 WL 5201386, at *3.[8]

Defendants' relevance argument is also meritless. In its order on Defendants' motion to dismiss, the Court held that Plaintiff's allegations did "not establish a trend for purposes of Item 303 disclosures" – but the Court **sustained** Plaintiff's claim that Defendants misleadingly failed to disclose Kearl's lack of profitability when "the 2015 Form 10-K allegedly implied the Canadian Bitumen Operations were operating at a profit of over $5 per barrel," as well as Plaintiff's

---

[7]    For example, in *Under Armour*, Mr. Regan quantified defendants' pull forwards and determined – separate from his opinion on Item 303 – that the pull forwards were material; these opinions were admitted. *Compare* Expert Report of D. Paul Regan, CAA/CFF at 74-77, *In re Under Armour Sec. Litig.*, No. 1:17-cv-00388-RDB (D. Md. Dec. 22, 2023), ECF 361-12 (Mr. Regan opines that "the pull forwards used by Under Armour in each quarter were material"), *with Under Armour*, 730 F. Supp. 3d at 180 ("This Court is unpersuaded that Regan's pull forward quantifications are unreliable and invade the province of the jury . . . .").

[8]    Defendants' remaining authority is inapposite. *See* Defs' Mem. at 9 (citing *Aubrey v. Barlin*, 2015 WL 6002260, at *2, *12-*13 (W.D. Tex. Oct. 14, 2015) (excluding proffered expert opinion that defendants violated the "TSA" where plaintiffs alleged "Violations of the Texas Securities Act"); *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 471 (S.D.N.Y. 2005) (excluding proffered expert testimony of **attorney** who would have opined on materiality under "**Rule 10b-5**"); *In re Novatel Wireless Sec. Litig.*, 2011 WL 5827198, at *9 (S.D. Cal. Nov. 17, 2011) ("Whether Novatel's press release is actionable under §18 of the Exchange Act is a question of law for the Court.")).

- 14 -

allegations regarding the Kearl reserves.  ECF 62 at 22-29.  Mr. Regan's opinion that Item 303 required Exxon to disclose, *inter alia*, Kearl's recurring lack of profitability and its contrast with Exxon's profitable but much smaller Cold Lake bitumen operations is relevant to these remaining claims.  *See, e.g.*, *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1332 (11th Cir. 2019) (quoting *Malone v. Microdyne Corp.*, 26 F.3d 471, 478 (4th Cir. 1994)) ("courts have often treated violations of financial accounting standards as 'indicative' of securities fraud"); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014) (quoting *Kafenbaum v. GTECH Holdings Corp.*, 217 F. Supp. 2d 238, 249 (D.R.I. 2002)) (Item 303 relevant to Rule 10b-5 claim because "'the disclosure rules are probative of what defendants are otherwise obliged to disclose but do not, themselves, provide an independent duty of disclosure'"); *Hatfield*, 2010 WL 1948236, at *2 ("Compliance with applicable accounting standards . . . 'neither establishes nor shields guilt in a securities fraud case.' . . . **But it is still relevant**."); *cf. Gansman v. Tanenbaum*, 2024 WL 694111, at *1 (N.D. Cal. Feb. 20, 2024) ("The Court further finds that Regan's use of GAAP does not require exclusion.  Although Plaintiff is correct that GAAP are not the controlling principles for purposes of insolvency, GAAP may still be relevant to the insolvency determination.").[9]  Notably, Defendants' own accounting expert opines on whether Exxon's disclosures complied with ASC 275 – a GAAP provision similar to Item 303 that requires the disclosure of "known trends" impacting "financial results and foreshadowing potential material future events" to "provide transparency to investors."  *See* Appendix in Support of

---

[9]  Defendants' authority for this argument is inapposite because, as explained above, Plaintiff does not proffer Mr. Regan's Item 303 opinion to support a dismissed claim.  *See* Defs' Mem. at 10 (citing *In re Refco Inc. Sec. Litig.*, 2012 WL 7007795, at *4 (S.D.N.Y. Nov. 29, 2012) ("Opinions About the Merits of Dismissed Claims"); *J&M Indus., Inc. v. Raven Indus., Inc.*, 457 F. Supp. 3d 1022, 1043 (D. Kan. 2020) ("Defendant's response fails to identify the relevance of any such opinions.")).  And Defendants mischaracterize the holding of *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239 (5th Cir. 2002).  *Id.* at 245.  ("Dr. Millet's testimony on causation is not helpful to the fact-finder because of his inability to conclude that it was more likely than not that the Synvisc caused the infection in Pipitone's knee.  A perfectly equivocal opinion does not make any fact more or less probable and is irrelevant under the Federal Rules of Evidence.").  In addition, Defendants' arguments contradict each other.  Defendants' second argument acknowledges that there is no claim for a violation of Item 303 currently in the case; thus, Defendants' first argument is wrong because Mr. Regan's opinion that Defendants violated Item 303 necessarily does not "tell the jury what result to reach" with respect to any claim.  Fed. R. Evid. 704 advisory committee's note to 1972 proposed rules.

- 15 -

Defendants' Motion for Summary Judgment (ECF 233) ("MSJ Appendix") at App. 1495-App. 1499 (Expert Rebuttal Report of William B. Abington ("Abington Rpt."), ¶¶156-162).

###    D.    Mr. Regan's RMDG Impairment Opinions Are Relevant and Reliable

Finally, Mr. Regan opines that Exxon violated GAAP by materially overstating its XTO-related assets (specifically, Rocky Mountain Dry Gas or "RMDG" operations) as a result of its failure to appropriately determine, recognize, and disclose material impairment losses of approximately $3.4 billion as of December 31, 2015. *See, e.g.*, Defs' App. 7-Defs' App. 9 (Regan Rpt., ¶1). Testing for impairment under GAAP is a three-step process: Steps 0, 1, and 2. *Id.* Step 0 involves an evaluation of whether an impairment trigger has occurred based on current conditions; Step 1 involves estimating an asset's projected cash flows and comparing them to its carrying value (*i.e.*, capitalized costs) to determine whether the asset is impaired (*i.e.*, carrying value exceeds projected cash flows); and Step 2 involves comparing the asset's fair value to its book value to determine the amount of the impairment. Defs' App. 91-Defs' App. 93 (Regan Rpt., ¶¶171-173).

Regarding Step 0, Mr. Regan opines that Exxon ignored multiple "triggers" that should have prompted it to conduct a formal impairment analysis, despite internal commentary that such triggers existed. Defs' App. 94-Defs' App. 121 (Regan Rpt., ¶¶176-217). As Mr. Regan explains, Exxon's failure to recognize an impairment trigger was based in large part on an "asset recoverability test" conducted around June 2015 (essentially a Step 1-lite (*e.g.*, Defs' App. 121-Defs' App. 124 (Regan Rpt., ¶¶218-220))) – but this test suffered from important flaws, most notably Exxon's use of unrealistically high price assumptions that allowed it to improperly determine that its RMDG assets' projected cash flows exceeded their carrying value. Defs' App. 112-Defs' App. 121 (Regan Rpt., ¶¶212-217). Indeed, Exxon belatedly acknowledged as much by recognizing an impairment trigger in 2016 when, ironically, natural gas prices were actually *higher*. Defs' App. 99-Defs' App. 109, Defs' App. 110 (Regan Rpt., ¶¶186, 207). Regarding Steps 1 and 2, Mr. Regan opines that, had

- 16 -

Exxon performed a proper impairment assessment using reasonable price assumptions as required under GAAP, it would have concluded that certain RMDG assets were impaired and recorded a material $3.4 billion impairment.  Defs' App. 121-Defs' App. 142 (Regan Rpt., ¶¶218-265).

Mr. Regan's opinion regarding Exxon's failure to comply with GAAP is a quintessential accounting expert opinion the likes of which is routinely accepted by courts around the country.  *See, e.g.*, *Guenthner*, 395 F. Supp. 2d at 846; *Caserta*, 75 F. Supp. 2d at 91.  Even Defendants' own authority (Defs' Mem. at 9) recognizes that "***Mr. Regan's . . . opinion address[ing] whether Defendants complied with SEC and GAAP requirements is both reliable and admissible***." *Novatel*, 2011 WL 5827198, at *3.  And more specifically, a *Daubert* challenge to Mr. Regan's opinions has previously been rejected where, as here, Mr. "Regan conducted his own . . . impairment analysis" to evaluate whether a company "used assumptions, estimates, and forecasts . . . that complied with GAAP."  *REMEC*, 702 F. Supp. 2d at 1220.

Defendants broadly contend that Mr. Regan's RMDG impairment opinion is incorrect.  On its face, Defendants' argument – that Mr. Regan "fails to apply a key, relevant GAAP provision" and "ignores what GAAP actually requires" (Defs' Mem. at 10-11) – is simply a "disagreement about how [Mr. Regan] executed the steps in the process," which "goes to the weight not the admissibility of this testimony."  *DePuy 2014*, 2014 WL 3557345, at *14; *see also DePuy 2016*, 2016 WL 6271474, at *10 ("To the extent Defendants contend that Dr. Burstein's testimony does not accurately rely on or misstates the scientific literature available on these topics, such a contention is more appropriately addressed through cross-examination.").  Defendants' argument thus "conflate[s] the reliability of the report with its ***correctness***." *Wattle v. Barko Hydraulics LLC*, 107 F. App'x 396, 398 (5th Cir. 2004) (emphasis in original) ("But as this Court has noted, under *Daubert* one 'need not prove to the judge that the expert's testimony is correct.'"); *cf. In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prods. Liab. Litig.*, 2016 WL 9560113, at *8 (N.D. Tex. Oct. 3, 2016)

(Kinkeade, J.) ("Defendants argue that the Court's previous review of this issue misunderstood Defendants to contest the accuracy of Dr. Jewell's analysis, rather than the methodology.  To the contrary . . . Defendants' position is more appropriately an attack made on the weight of the testimony at trial rather than its admissibility.").

Defendants' argument simply mirrors the opinions of their accounting expert, Abington. *Compare* Defs' Mem. at 11 (arguing that Exxon's 2015 price plan estimates were appropriate), *with* MSJ Appendix at App. 1505 (Abington Rpt., ¶¶177-178) (same).  Thus, Defendants' "criticism of [Mr. Regan's] opinion is again just a battle of the experts and goes to the weight rather than the admissibility of [his] testimony.  A difference of opinion is not grounds for a *Daubert* challenge." *DePuy 2014*, 2014 WL 3557345, at *12; *see also Lucent Techs.*, 610 F. Supp. 2d at 351-52 (denying motion to strike accounting expert in "classic battle of the experts").  In any event, Mr. Regan explains in his reports why Defendants and Abington are wrong: under GAAP, the price assumptions used must be reasonable in light of "'all available information'" (Defs' App. 270-Defs' App. 273 (Expert Reply Report of D. Paul Regan, CPA/CFF ("Regan Reply"), ¶¶84-88), and the price assumptions Exxon used in its asset recoverability test were unreasonable to support a judgment that no impairment trigger existed in December 2015 because, *inter alia*, they had not been adjusted to current Henry Hub spot prices since May 2015, ignoring the subsequent precipitous drop in prices through the end of the year (Defs' App. 112-Defs' App. 121 (Regan Rpt., ¶¶212-217)).  In fact, Mr. Regan notes that Exxon was obligated to consider all available information "through the issuance of its financial statements," *i.e.*, February 24, 2016, and that the prices Exxon used were ***60% higher*** than the Henry Hub spot price on that date.  Defs' App. 272-Defs' App. 273 (Regan Reply, ¶¶87-88); Defs' App. 114 (Regan Rpt., ¶216(a)).[10]

---

[10]   Additionally, Mr. Regan marshals extensive evidence and analysis to refute Defendants' contention that its projections were "'consistent, or even conservative, when compared to long-term price forecasts published by several reputable industry groups'" (Defs' Mem. at 12).  *See, e.g.*, Defs' App. 127-Defs' App. 134 (Regan Rpt., ¶¶228-243);

4911-6787-1523.v1

Lastly, Defendants criticize Mr. Regan's qualifications, arguing that he is "not an expert in forecasting natural gas prices" (Defs' Mem. at 12) – "but, he does not need to be." *DePuy 2014*, 2014 WL 3557345, at \*13 ("expert in measurement" who "measured the volume of material that was worn away from the Pinnacle Devices" need not be "an expert in friction and wear"). Rather, as explained above, Mr. Regan is amply qualified to offer opinions on Exxon's compliance with GAAP. *See, e.g.*, *Gansman*, 2024 WL 694111, at \*1 (rejecting challenge to Mr. Regan's GAAP opinions); *REMEC*, 702 F. Supp. 2d at 1220 (rejecting challenge to Mr. Regan's opinion regarding whether "forecasts" used in "impairment analysis" complied with GAAP). At most, Defendants' challenge to Mr. Regan's qualifications as an expert in forecasting natural gas prices attacks the "factual basis" for his opinions, because the forecasts are simply an input to the ***accounting*** procedures on which Mr. Regan opines – and such an attack "goes to the weight of his testimony not the admissibility." *DePuy 2014*, 2014 WL 3557345, at \*13. Moreover, "[w]hile an expert need not have experience in the specific specialty at issue as long as he has sufficient expertise that his opinion is reliable and relevant . . . [Mr. Regan] does have experience in the specialty area in this case." *DePuy 2014 II*, 2014 WL 12576294, at \*4; *see also* Defs' App. 12 (Regan Rpt., ¶13) ("The companies whose financial statements I have analyzed have included accounting for and disclosure of oil exploration and development costs, including those with offshore operations in the Gulf of Mexico, as well as exploration and development of oil and gas properties in the mainland of the United States.").

---

Defs' App. 281-Defs' App. 286 (Regan Reply, ¶¶97-105). Further, Defendants mischaracterize Mr. Regan's testimony. Defs' Mem. at 10-11 (citing Defs' App. 393, Defs' App. 396 (Regan Depo. Tr. at 236:9-19, 252:22-253:19)). Mr. Regan merely agreed that, categorically, using forecasts developed for evaluating investment opportunities might be permissible; this does not undercut his opinion that the specific price assumptions Exxon used were unreasonable and thus violated GAAP. *See* Defs' App. 395 (Regan Depo. Tr. at 248:7-21) ("[W]hen you consider all available evidence, the pricing assumptions used were not reasonable."); Defs' App. 112-Defs' App. 121 (Regan Rpt., ¶¶212-217).

- 19 -

4911-6787-1523.v1

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion should be denied.

DATED:  March 14, 2025                Respectfully submitted,

KENDALL LAW GROUP, PLLC
JOE KENDALL (Texas Bar No. 11260700)


                                         s/ Joe Kendall
                                       JOE KENDALL

3811 Turtle Creek Blvd., Suite 825
Dallas, TX  75219
Telephone:  214/744-3000
214/744-3015 (fax)
jkendall@kendalllawgroup.com

BALON B. BRADLEY LAW FIRM
BALON B. BRADLEY (Texas Bar No. 02821700)
11910 Greenville Avenue, Suite 220
Dallas, TX  75243
Telephone:  972/991-1582
972/755-0424 (fax)
balon@bbradleylaw.com

Local Counsel

- 20 -

4911-6787-1523.v1

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS (CA Bar No. 168593)
MICHAEL J. DOWD (CA Bar No. 135628)
SPENCER A. BURKHOLZ (CA Bar No. 147029)
SCOTT H. SAHAM (CA Bar No. 188355)
SAM S. SHELDON (CA Bar No. 190502)
JONAH H. GOLDSTEIN (CA Bar No. 193777)
NATHAN R. LINDELL (CA Bar No. 248668)
SARA B. POLYCHRON (CA Bar No. 244685)
ERIKA L. OLIVER (CA Bar No. 306614)
T. ALEX B. FOLKERTH (CA Bar No. 338140)
JUSTIN G. OETTING (CA Bar No. 350807)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
miked@rgrdlaw.com
spenceb@rgrdlaw.com
scotts@rgrdlaw.com
ssheldon@rgrdlaw.com
jonahg@rgrdlaw.com
nlindell@rgrdlaw.com
spolychron@rgrdlaw.com
eoliver@rgrdlaw.com
afolkerth@rgrdlaw.com
joetting@rgrdlaw.com

Lead Counsel for Plaintiff

- 21 -

4911-6787-1523.v1