UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| PEDRO RAMIREZ, JR., Individually and on Behalf of All Others Similarly Situated, | § § § | Civil Action No. 3:16-cv-03111-K |
| | § | CLASS ACTION |
| Plaintiff, | § § | |
| | § | |
| vs. | § § | |
| | § | |
| EXXON MOBIL CORPORATION, et al., | § § | |
| | § | |
| Defendants. | § § | |
| | § | |

**LEAD PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

4914-3047-7603.v1

**TABLE OF CONTENTS**

                                                                                    **Page**

I.      INTRODUCTION ...........................................................................................1

II.     LEGAL STANDARD....................................................................................3

III.    ARGUMENT..................................................................................................3

        A.      Summary Judgment on Plaintiff's Kearl-Related Claims Is Not Warranted...........3

                1.      Plaintiff Has Presented Sufficient Evidence of Falsity and Scienter
                        for the Kearl Profitability Claim...................................................................4

                        a.      Defendants Had Actual Knowledge that Exxon's 2015
                                Form 10-K Omitted Material Facts About Kearl, Rendering
                                the Publicly Reported Average Production Price and Cost
                                of Canadian Bitumen Misleading .....................................................4

                        b.      Defendants Received Sufficient Notice of the Kearl
                                Profitability Claim, Which Is Consistent with the
                                Complaint's Allegations ................................................................11

                2.      Plaintiff Has Presented Sufficient Evidence of Falsity and Scienter
                        for the Kearl Proved Reserves Claim.........................................................13

                        a.      Defendants Knowingly Misrepresented that the Canadian
                                Bitumen Reserves at Kearl Qualified as Proved Reserves at
                                Year-End 2015 ...............................................................................13

                        b.      It Was Misleading for Defendants to Warn that the Kearl
                                Reserves "Could" Be De-Booked When the Purported Risk
                                Had Already Come to Fruition .......................................................19

                        c.      Defendants Received Sufficient Notice of the Kearl Proved
                                Reserves Claim, Which Is Consistent with the Complaint's
                                Allegations ....................................................................................22

                3.      Defendants' Conduct Also Violated Generally Accepted
                        Accounting Principles.................................................................................25

                4.      Plaintiff Has Presented Sufficient Evidence of Loss Causation for
                        the Kearl-Related Claims............................................................................26

        B.      Summary Judgment on Plaintiff's RMDG Impairment Claim Is Not
                Warranted.................................................................................................34

                1.      Companies Like Exxon Must Test Long-Lived Assets for
                        Impairment When "Impairment Indicators" Exist......................................34

                2.      In 2015, Exxon Ignored Multiple Impairment Indicators.........................35

                3.      Exxon's RMDG Assets Were Impaired by Year-End 2015 .....................37

4914-3047-7603.v1

**Page**

a.     Exxon Concealed Its RMDG Impairment by Utilizing Unreasonable Price Assumptions ...................................................37

b.     Defendants Admitted the RMDG Assets Were Impaired in 2016 After Prices Recovered ..........................................................39

4.     Plaintiff Has Presented Sufficient Evidence of Loss Causation for the RMDG Impairment Claim ....................................................41

C.     Although Unnecessary Given Defendants' Actual Knowledge, Plaintiff Has Produced Compelling Evidence of Defendants' Motive to Maintain Exxon's AAA Credit Rating...................................................................45

IV.     CONCLUSION...............................................................................................50

4914-3047-7603.v1

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
572 F.3d 221 (5th Cir. 2009) ........................................................................ *passim*

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002) ........................................................................................8

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ...................................................................................................3

*Bell v. Ascendant Sols., Inc.*,
422 F.3d 307 (5th Cir. 2005) ....................................................................................42

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ....................................................................................20

*Brody v. Zix Corp.*,
2006 WL 2739352 (N.D. Tex. Sept. 26, 2006) ..........................................................8

*Buettgen v. Harless*,
2011 WL 1938130 (N.D. Tex. May 19, 2011) ............................................... *passim*

*Caro v. City of Dallas*,
17 F. Supp. 2d 618 (N.D. Tex. 1998) .......................................................................24

*Catogas v. Cyberonics, Inc.*,
292 F. App'x 311 (5th Cir. 2008) .............................................................................32

*Chabot v. Walgreens Boots All., Inc.*,
2023 WL 2908827 (M.D. Pa. Mar. 31, 2023) ..........................................................13

*Cory v. Stewart*,
103 F.4th 1067 (5th Cir. 2024) ..................................................................................3

*Cutrera v. Bd. of Supervisors of La. State Univ.*,
429 F.3d 108 (5th Cir. 2005) ....................................................................................24

*Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*,
620 F. Supp. 3d 603 (S.D. Tex. 2022) .................................................................31, 43

*Desert Palace, Inc. v. Costa*,
539 U.S. 90 (2003) ...................................................................................................49

*Equal Emp. Opportunity Comm'n v. Mod. Grp., Ltd.*,
725 F. Supp. 3d 577 (E.D. Tex. 2024) .....................................................................25

4914-3047-7603.v1

**Page**

*FindWhat Inv. Grp. v. FindWhat.com*,
  658 F.3d 1282 (11th Cir. 2011) ......................................................................................29

*Greenberg v. Crossroads Sys., Inc.*,
  364 F.3d 657 (5th Cir. 2004) ..........................................................................................32

*Handzlik v. United States*,
  93 F. App'x 15 (5th Cir. 2004) ..................................................................................13, 24

*Heinze v. Tesco Corp.*,
  971 F.3d 475 (5th Cir. 2020) ..........................................................................................20

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021) .............................................................................................20

*In re Alta Mesa Res., Inc. Sec. Litig.*,
  2024 WL 3760481 (S.D. Tex. Aug. 12, 2024) ................................................................20

*In re Alta Mesa Res., Inc. Sec. Litig.*,
  No. 4:19-cv-00957 (S.D. Tex. Jan. 17, 2025)............................................................20, 21

*In re Anadarko Petroleum Corp. Sec. Litig.*,
  2023 WL 2733401 (S.D. Tex. Mar. 31, 2023),
  *reconsideration denied*, 2023 WL 4308750
  (S.D. Tex. June 30, 2023) ...............................................................................................48

*In re BP p.l.c. Sec. Litig.*,
  2016 WL 3090779 (S.D. Tex. May 31, 2016)..................................................................40

*In re Cassava Scis., Inc. Sec. Litig.*,
  2024 WL 4824243 (W.D. Tex. Nov. 15, 2024)................................................................27

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
  2021 WL 3727095 (S.D.N.Y. Aug. 23, 2021)...............................................................8, 35

*In re Dell Inc., Sec. Litig.*,
  591 F. Supp. 2d 877 (W.D. Tex. 2008)............................................................................32

*In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant Prods. Liab. Litig.*,
  2014 WL 3557345 (N.D. Tex. July 18, 2014)..................................................................33

*In re Dura Pharms., Inc. Sec. Litig.*,
  452 F. Supp. 2d 1005 (S.D. Cal. 2006)............................................................................44

*In re FirstEnergy Corp. Sec. Litig.*,
  2022 WL 681320 (S.D. Ohio Mar. 7, 2022).....................................................................44

4914-3047-7603.v1

**Page**

*In re Genworth Fin. Inc. Sec. Litig.*,
  103 F. Supp. 3d 759 (E.D. Va. 2015) ...................................................................................16

*In re Groupon, Inc. Sec. Litig.*,
  2015 WL 1043321 (N.D. Ill. Mar. 5, 2015)......................................................................30, 33

*In re Motorola Sec. Litig.*,
  505 F. Supp. 2d 501 (N.D. Ill. 2007) ...................................................................................44

*In re Novatel Wireless Sec. Litig.*,
  830 F. Supp. 2d 996 (S.D. Cal. 2011)..............................................................................40, 49

*In re St. Jude Med., Inc., Sec. Litig.*,
  629 F. Supp. 2d 915 (D. Minn. 2009) ...................................................................................12

*In re Twitter, Inc. Sec. Litig.*,
  2020 WL 13863616 (N.D. Cal. Jan. 28, 2020)............................................................29, 30, 33

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
  2023 WL 9748644 (D.N.J. May 22, 2023) ...........................................................................13

*In re Venator Materials PLC Sec. Litig.*,
  547 F. Supp. 3d 624 (S.D. Tex. 2021) ...................................................................................45

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016)..................................................................................................22

*In re Winship*,
  397 U.S. 358 (1970)...............................................................................................................49

*Inhale, Inc. v. Gravitron, LLC*,
  2023 WL 6532554 (W.D. Tex. Sept. 8, 2023)...................................................................30, 43

*Jackson v. Gautreaux*,
  3 F.4th 182 (5th Cir. 2021) ...................................................................................................24

*Jaffe v. Household Int'l Inc.*,
  2009 WL 10811914 (N.D. Ill. Mar. 16, 2009).......................................................................12

*Kapps v. Torch Offshore, Inc.*,
  379 F.3d 207 (5th Cir. 2004) ................................................................................................26

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) .......................................................................................... *passim*

*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
  601 U.S. 257 (2024).......................................................................................................4, 7, 8

- v -

**Page**

*Makor Issues & Rts., Ltd. v. Tellabs, Inc.*,
   437 F.3d 588 (7th Cir. 2006),
   *vacated on other grounds*, 551 U.S. 308 (2007)...................................................................8

*Miles-Hickman v. David Powers Homes, Inc.*,
   589 F. Supp. 2d 849 (S.D. Tex. 2008) ...................................................................25

*Morris v. State Farm Fire & Cas. Co.*,
   740 F. Supp. 3d 491 (W.D. La. 2024)....................................................................25

*N. Port Firefighters' Pension--Loc. Option Plan v. Temple-Inland, Inc.*,
   936 F. Supp. 2d 722 (N.D. Tex. 2013) ...................................................................32

*Naglich v. Applied Optoelectonics*,
   436 F. Supp. 3d 954 (S.D. Tex. 2020) ...................................................................20

*Nat'l Screen Serv. Corp. v. Poster Exch., Inc.*,
   305 F.2d 647 (5th Cir. 1962) .................................................................................3

*Neiman v. Bulmahn*,
   854 F.3d 741 (5th Cir. 2017) ...............................................................................19

*Ochoa v. United States*,
   2021 WL 3711374 (N.D. Tex. Aug. 20, 2021).........................................................9

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
   58 F.4th 195 (5th Cir. 2023) ..........................................................................20, 21

*Olivier v. Exxon Mobil Corp.*,
   2022 WL 3574354 (M.D. La. Apr. 12, 2022)...........................................................21

*Parmelee v. Santander Consumer USA Holdings, Inc.*,
   2018 WL 276338 (N.D. Tex. Jan. 3, 2018) ..................................................... *passim*

*Pittman v. U.S. Bank NA*,
   840 F. App'x 788 (5th Cir. 2021) ..........................................................................24

*Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*,
   769 F.3d 313 (5th Cir. 2014) ................................................................... *passim*

*Ret. Sys. of Mich. v. Pier 1 Imps., Inc.*,
   935 F.3d 424 (5th Cir. 2019) ...............................................................................20

*SEC v. Blackburn*,
   431 F. Supp. 3d 774 (E.D. La. 2019),
   *aff'd*, 15 F.4th 676 (5th Cir. 2021)...................................................................19, 45

4914-3047-7603.v1

**Page**

*SEC v. Bowen*,
2024 WL 3462359 (N.D. Tex. July 17, 2024) ...................................................................8

*SEC v. EagleEye Asset Mgmt.*,
975 F. Supp. 2d 151 (D. Mass. 2013) .................................................................45

*SEC v. Life Partners Holdings, Inc.*,
41 F. Supp. 3d 550 (W.D. Tex. 2013) ................................................................40

*SEC v. Sierra Brokerage Servs., Inc.*,
608 F. Supp. 2d 923 (S.D. Ohio 2009),
*aff'd*, 712 F.3d 321 (6th Cir. 2013) .................................................................24

*Smilovits v. First Solar, Inc.*,
2019 WL 7282026 (D. Ariz. Dec. 27, 2019) ....................................30, 33, 34, 35

*Snellink v. Gulf Res., Inc.*,
870 F. Supp. 2d 930 (C.D. Cal. 2012) ...............................................................44

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
365 F.3d 353 (5th Cir. 2004) .......................................................................2, 45

*Spitzberg v. Hous. Am. Energy Corp.*,
758 F.3d 676 (5th Cir. 2014) ............................................................................45

*St. Paul Mercury Ins. Co. v. Williamson*,
224 F.3d 425 (5th Cir. 2000) ............................................................................24

*Underland v. Alter*,
2011 WL 4017908 (E.D. Pa. Sept. 9, 2011) .....................................................16

*Unger v. Amedisys Inc.*,
401 F.3d 316 (5th Cir. 2005) ............................................................................42

*United States ex rel. Canion v. Randall & Blake*,
817 F.2d 1188 (5th Cir. 1987) ..........................................................................24

*United States v. Durham*,
512 F.2d 1281 (5th Cir. 1975) ..........................................................................49

*United States v. Giraldi*,
86 F.3d 1368 (5th Cir. 1996) ............................................................................49

*York Cnty. ex rel. Cnty. of York Ret. Fund v. HP, Inc.*,
65 F.4th 459 (9th Cir. 2023) .............................................................................45

4914-3047-7603.v1

**Page**

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
  §78j(b)........................................................................................................................3
  §78t(a)........................................................................................................................3

Federal Rules of Civil Procedure
  Rule 10(b) ..................................................................................................................2
  Rule 10b-5............................................................................................................25, 34
  Rule 10b-5(b)..........................................................................................................3, 4, 7
  Rule 15(b)(2)............................................................................................................24
  Rule 23 ......................................................................................................................42
  Rule 56......................................................................................................................27
  Rule 56(a)..................................................................................................................3

4914-3047-7603.v1

**GLOSSARY**

| | |
|---|---|
| 2015 Form 10-K | Exxon's Form 10-K reporting the Company's financial results for the period ending December 31, 2015 |
| ASC | Accounting Standards Codification |
| Bbl | Barrel |
| CEO | Chief Executive Officer |
| Class | All persons who purchased or otherwise acquired Exxon's publicly traded common stock between February 24, 2016 and October 28, 2016, inclusive, and were damaged thereby |
| Class Period | February 24, 2016 through October 28, 2016, inclusive |
| Complaint or Cpt. | Consolidated Complaint for Violations of the Federal Securities Laws (ECF 36) |
| Defendants | Exxon Mobil Corporation, Rex W. Tillerson, Andrew P. Swiger, and David S. Rosenthal |
| Defendants' Appendix or Def. Appx. | Appendix in Support of Defendants' Motion for Summary Judgment (ECF 233, ECF 233-1, ECF 233-2) |
| EMPC | ExxonMobil Production Company |
| EPS | Earnings Per Share |
| Exchange Act | Securities Exchange Act of 1934 |
| Exxon or the Company | Exxon Mobil Corporation |
| F&O | Financial and Operating |
| FASB | Financial Accounting Standards Board |
| Feinstein Daubert Opp. | Lead Plaintiff's Response in Opposition to Defendants' Motion to Exclude the Testimony of Steven P. Feinstein, filed concurrently herewith |
| GAAP | Generally Accepted Accounting Principles |
| January 31 Disclosure | Exxon's January 31, 2017 disclosure that the Company would be recording an "asset impairment charge of about $2 billion mainly related to dry gas operations with undeveloped acreage in the Rocky Mountains region of the U.S.," which would reduce reported earnings by 20% |
| Kearl | Exxon's open-pit mining operation at Kearl Lake |
| KEP | Kearl Expansion Project |
| Individual Defendants | Rex W. Tillerson, Andrew P. Swiger, and David S. Rosenthal |
| MD&A | Management's Discussion and Analysis |
| MMBtu | Million British Thermal Unit |

- ix -

4914-3047-7603.v1

**GLOSSARY**

| Motion or MSJ | Defendants' Brief in Support of Their Motion for Summary Judgment (ECF 232) |
|---|---|
| NYMEX | New York Mercantile Exchange |
| October 26 Chairman's Review | Chairman's Review regarding Kearl's SEC reserve status requested by Tillerson on October 26, 2015 |
| October 28 Disclosure | Exxon's October 28, 2015 disclosure that all of Kearl's 3.6 billion barrels of bitumen proved reserves would not satisfy the SEC definition of proved reserves "[i]f the average prices seen during the first nine months of 2016 persist for the remainder of the year" |
| OEB | Oil Equivalent Barrel |
| PFO | Principal Financial Officer |
| Plaintiff | Lead Plaintiff Greater Pennsylvania Carpenters Pension Fund |
| PSLRA | Private Securities Litigation Reform Act of 1995 |
| PwC | PricewaterhouseCoopers LLP |
| RMDG | Rocky Mountain Dry Gas |
| Rosenthal | Defendant David S. Rosenthal |
| SEC | United States Securities and Exchange Commission |
| Swiger | Defendant Andrew P. Swiger |
| Tillerson | Defendant Rex W. Tillerson |
| VP | Vice President |
| WCS | Western Canadian Select (marker price) |
| WTI | West Texas Intermediate (marker price) |
| XTO | XTO Energy Inc. |
| YE | Year-End |

4914-3047-7603.v1

Lead Plaintiff Greater Pennsylvania Carpenters Pension Fund respectfully submits this memorandum of law in opposition to Defendants' Motion for Summary Judgment (ECF 231) and Brief in Support of Their Motion for Summary Judgment (ECF 232).

## I.    INTRODUCTION

This securities class action involves a straightforward fraud.  Leading into the Class Period, oil and gas prices around the world embarked on a precipitous and prolonged decline that led to Exxon's oil and gas competitors taking over $93 billion in write downs and impairments (including with respect to Canadian tar sand and dry gas assets similar to Exxon's Kearl reserves and Rocky Mountain Dry Gas ("RMDG") assets, respectively).  Nevertheless, despite being affected by the same pricing slump, Exxon uniquely and steadfastly refused to write down its Kearl reserves or RMDG assets.  Exxon's anti-write down rhetoric came from the very top of the organization, with Defendant Tillerson making clear that, while he was CEO of Exxon, "***we don't do write downs***."  And in fact, the write downs at issue in this case were delayed a full year and did not take place until after Tillerson left the Company to become the U.S. Secretary of State in January 2017.  App. 2598; App. 11 (Tillerson Depo. Tr. at 11:10-16).

On February 24, 2016, instead of admitting what they knew to be true – that Exxon's massive Kearl reserves were not profitable and did not qualify as proved reserves, and that the RMDG assets were impaired – Defendants filed with the SEC Exxon's Form 10-K reporting the Company's financial results for the period ending December 31, 2015 ("2015 Form 10-K"), which contained misleading statements about Kearl's profitability and the Company's proved reserves and earnings. App. 1400.  Each Individual Defendant signed the 2015 Form 10-K.  App. 1400-App. 1401.  These misstatements on pages 5, 6, 9, and 35 of the 2015 Form 10-K (App. 1290, App. 1291, App. 1294, and App. 1320) (as alleged in ¶¶277, 285, 343, and 376 of the Complaint) were false and/or misleading, as Defendants concealed material facts concerning the following three key issues:

- 1 -

- Exxon's enormous Canadian bitumen operation at Kearl Lake, which constituted 87% of Exxon's Canadian bitumen proved developed reserves and nearly 15% of Exxon's total corporate proved reserves worldwide, was unprofitable and suffering ***massive operating losses***;

- Kearl's 3.6 billion barrels of reserves ***no longer legitimately satisfied*** the SEC's definition for "proved reserves"; and

- the capitalized acquisition, exploration, and development costs associated with Exxon's XTO's RMDG operations were no longer recoverable, requiring an approximate $2 billion "impairment charge" that would have reduced the Company's 2015 annual earnings.

The evidence establishes that the Individual Defendants had actual knowledge of these omitted facts and thus acted with scienter. And while their knowledge is sufficient on its own to prove scienter, the record also demonstrates that Defendants were motivated to delay the inevitable write downs and impairments to protect Exxon's coveted AAA credit rating and complete a massive $12 billion bond offering on March 2, 2016 on the most favorable terms.[1]

Eventually, Defendants (belatedly) admitted the truth. First, on October 28, 2016, Exxon disclosed it would likely de-book Kearl's entire 3.6 billion barrels of proved reserves because Kearl was not profitable under governing SEC regulations, and that Exxon would be conducting impairment testing. App. 765, ¶120; App. 1412. Then, on January 31, 2017, Defendants disclosed that Exxon would be taking an impairment charge of $2.0 billion related to its RMDG operations, reducing earnings by 20%. App. 766, ¶121; App. 1428. These announcements, after controlling for industry and market effects, and conservatively accounting for the potential impacts of confounding information, caused the price of Exxon shares to decline by $3.44 per share, thereby removing the artificial inflation caused by Defendants' fraud from the share price and causing Plaintiff and the Class to suffer losses as a result. *See* App. 777-App. 779, ¶¶163-171.

---

[1]    Because they are Exxon's highest ranking executives, the Individual Defendants' scienter is imputable to Exxon. *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004) ("For purposes of determining whether a statement made by the corporation was made by it with the requisite Rule 10(b) scienter we believe it appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement . . . ."). Emphasis is added and citations and footnotes are omitted throughout unless otherwise indicated.

- 2 -

4914-3047-7603.v1

The wealth of evidence Plaintiff has adduced is more than sufficient to prove at trial that Defendants violated §§10(b) and 20(a) of the Exchange Act. Defendants nonetheless claim that the facts entitle them to summary judgment. But slapping the term "undisputed" on their preferred set of facts does not make them so. Rather, Defendants' Motion at best presents a counterfactual narrative that is contradicted and disputed by testimony from the Individual Defendants, their employees, and their experts, as well as documentary evidence. The resulting host of triable issues of material fact renders summary judgment inappropriate. Defendants' Motion should be denied.

## II.   LEGAL STANDARD

Summary judgment is appropriate only if the evidence, viewed in the light most favorable to the nonmoving party (here, Plaintiff), shows "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). Defendants, as the moving parties, bear the "heavy" burden of showing the absence of a genuine issue of any material fact. *Nat'l Screen Serv. Corp. v. Poster Exch., Inc.*, 305 F.2d 647, 651 (5th Cir. 1962); *see Cory v. Stewart*, 103 F.4th 1067, 1079 (5th Cir. 2024) (per curiam). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In addition, the court "'resolve[s] factual controversies in favor of the nonmoving party.'" *Cory*, 103 F.4th at 1077-79. "As long as the nonmovant's evidence 'reasonably lead[s]' to the 'not implausible' conclusion that all the necessary legal elements are (or are not) met, summary judgement is improper." *Id.* at 1079. Accordingly, summary judgment should be granted "cautiously." *Nat'l Screen Serv.*, 305 F.2d at 651; *see Anderson*, 477 U.S. at 255.

## III.   ARGUMENT

### A.   Summary Judgment on Plaintiff's Kearl-Related Claims Is Not Warranted

As the Supreme Court recently reiterated, "Rule 10b-5(b) . . . prohibits omitting material

- 3 -

facts necessary to make the 'statements made . . . not misleading.'  Put differently, it requires disclosure of information necessary to ensure that statements already made are clear and complete . . . ." *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 264 (2024). In other words, "'a duty to speak the full truth arises when a defendant undertakes a duty to say anything.'"  *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 249 (5th Cir. 2009).  Thus, once a defendant has spoken, "'he must disclose material, firm-specific adverse facts that affect the validity or plausibility of that'" statement.  *Id.*

Defendants here violated Rule 10b-5(b) when they made statements that Exxon's Canadian bitumen was profitable and qualified as proved reserves at YE 2015.  These statements were rendered misleading by Defendants' omission of related material facts that demonstrate that ***87% of Exxon's Canadian bitumen proved developed reserves***, located at Kearl Lake, were suffering massive losses, not profitable, and did not qualify as proved reserves at YE 2015.  In other words, Defendants did exactly what Rule 10b-5(b) proscribes by making "'representations that state the truth only so far as it goes, while omitting critical qualifying information.'" *Macquarie*, 601 U.S. at 263.  As explained below, the record is replete with triable issues of fact galore as to Defendants' classic half-truths.  Summary judgment should therefore be denied.

### 1.    Plaintiff Has Presented Sufficient Evidence of Falsity and Scienter for the Kearl Profitability Claim

#### a.    Defendants Had Actual Knowledge that Exxon's 2015 Form 10-K Omitted Material Facts About Kearl, Rendering the Publicly Reported Average Production Price and Cost of Canadian Bitumen Misleading

Exxon's 2015 Form 10-K misleadingly reported that Canadian bitumen's average production price was \$25.07 per barrel and its average production cost was \$19.20 per barrel.[2]  App. 1294.  In

---

[2]    Page 5 of the 2015 Form 10-K reports total proved developed reserves for "Canada/South America" bitumen as 4.1 billion.  App. 1290.  Exxon has no proved developed bitumen reserves in South America; thus, all 4.1 billion barrels of proved developed bitumen reserves are in Canada.  App. 3487 (Horne Depo. Tr. at 120:23).

- 4 -

other words, Defendants reported that in 2015, Canadian bitumen was generating a profit of $5.87 per barrel ($25.07 - $19.20 = $5.87).  Cpt., ¶343; App. 85 (Tillerson Depo. Tr. at 85:3-8).

In truth, Defendants were each aware that bitumen mined at Kearl could not be sold at $25.07 per barrel nor for a profit of $5.87 per barrel as represented in the 2015 Form 10-K.  App. 1294. Instead, Defendants had actual knowledge that Kearl was *losing over $8.11 in cash profit* for every barrel sold during the first half of 2015.  App. 1519.  These losses came to Defendant Rosenthal's and Defendant Swiger's "attention [in late 2015] as part of the normal course of business involved in *year-end reviews*" and were "shared with Mr. Tillerson as well."  App. 205-App. 206, App. 208-App. 209, App. 211 (Swiger Depo. Tr. at 46:2-47:5, 49:22-50:23, 52:1-6); *see also* App. 442-App. 447 (Rosenthal Depo. Tr. at 27:25-29:5, 30:25-32:1); App. 26-App. 27 (Tillerson Depo. Tr. at 26:13-27:7).  Tillerson's knowledge was unequivocal:

> Q.  *So you [were] being informed that for the first half of 2015, every barrel of bitumen being produced at Kearl was losing $8.11 a barrel correct?*
>
> A.  *Yes.  As of June 2015, correct*.

App. 33 (Tillerson Depo. Tr. at 33:10-16).  These losses (left) stand in stark contrast to the positive margins Defendants publicly reported on page 9 of Exxon's 2015 Form 10-K (right):

App. 1519, App. 1294.[3]

---

[3]    Notably, Defendants focused their YE review with senior management and PwC on the first six months of 2015, possibly to avoid further expenses and losses associated with the Kearl Expansion Project ("KEP") and further declines

4914-3047-7603.v1

Defendants also had actual knowledge that Kearl's reality grew bleaker in the months leading up to the 2015 Form 10-K's filing as average production prices (referred to internally as "realizations" and "netback") for Kearl bitumen continued to plummet. App. 295-App. 296 (Swiger Depo. Tr. at 136:22-137:3) ("average production prices" are "akin" to "realizations"); App. 3938 (Schuessler Depo. Tr. at 56:15-20) (netback and realization are "approximate for sure"). By October 2015, Defendants were each informed that *Kearl was "challenged to demonstrate positive cash flow*." App. 1530; App. 244 (Swiger Depo. Tr. at 85:16-23); App. 18-App. 19 (Tillerson Depo. Tr. at 18:24-19:16); App. 446 (Rosenthal Depo. Tr. at 31:14-17). Just before the Class Period started, the Management Committee (on which Tillerson and Swiger both sat (App. 176-App. 178 (Swiger Depo. Tr. at 17:12-19:4)) was informed that Kearl suffered losses of $134 million for November 2015 and December 2015, with realizations plummeting to between $11.52 and $16.33 per barrel – a far cry from the $25.07 average production price for Canadian bitumen touted in the Company's 2015 Form 10-K. App. 1536, App. 1559 (reported to Swiger on January 22, 2016); App. 284 (Swiger Depo. Tr. at 125:1-6). In January 2016, Kearl bitumen realizations dropped even further, down to a mere *$4.43 per barrel* for losses of $17.72 per barrel and $81 million that month. App. 1586. Indeed, Defendants were informed *two days before the 2015 Form 10-K was filed* that bitumen from Kearl was able to be sold for only $4 per barrel – far below the reported $25.07 price per barrel of Canadian bitumen:

---

in bitumen realizations. In any event, Defendants do not and cannot contest that Kearl suffered operating losses of at least $7.34 per barrel for 2015 as a whole. App. 1731; App. 1691-App. 1806.

- 6 -



App. 1559; App. 1624, App. 1652; App. 59 (Tillerson Depo. Tr. at 59:1-10) (Tillerson testifying that he was informed of $4 per barrel netback at Kearl two days before signing the 2015 Form 10-K); *see also* App. 1847 (January 2016 F&O Review reporting to the Management Committee on February 18, 2016 that January 2016 Kearl realizations were $4.43 per barrel).  As Swiger admitted, he "would not" "expect Kearl to be making money at $4 a barrel."  App. 290 (Swiger Depo. Tr. at 131:9-17).

In short, the statement made on page 9 of the 2015 Form 10-K reporting Canadian bitumen's average production price of $25.07 and average cost of $19.20, implying a profit of $5.87 per barrel, violated Rule 10b-5(b) by omitting the material fact that 87% of Exxon's Canadian bitumen proved developed reserves were unprofitable and losing hundreds of millions of dollars in 2015, after realizations plummeted to $11 in December 2015 and as low as $4 at the time the 2015 Form 10-K was filed.  *Macquarie*, 601 U.S. at 264; *Lormand*, 565 F.3d at 249.  Having repeatedly been advised of Kearl's massive losses prior to signing the 2015 Form 10-K, "a compelling inference of scienter" is raised because the Individual Defendants "***knew*** at the outset [facts that] would be detrimental to the company and that they intentionally made contrary public representations and omitted this

material information from their public disclosures." *Lormand*, 565 F.3d at 251, 253.[4]  Defendants concede that scienter can be established by a showing that a defendant has "'***actual knowledge***.'"  MSJ at 20 (emphasis in original).  Their assertion that more is required is belied by this concession and the case law.  *See id.* at 48.

Defendants are incorrect that they had no duty to speak about Kearl under *Macquarie*.  *Id.* at 46-47.  A reasonable jury could conclude that a duty arose when Defendants made statements about Canadian bitumen while Kearl constituted ***87%*** of Exxon's Canadian bitumen proved developed reserves.  *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2021 WL 3727095 (S.D.N.Y. Aug. 23, 2021), is instructive.  The plaintiffs argued that the defendant company, CBI, was able to conceal negative cash flows from the Nuclear Projects and resulting goodwill impairments by making disclosures only as to the "Power unit, of which the Nuclear unit was one component."  *Id.* at *6.  Defendants claimed that GAAP permitted them "to merge reporting units in this manner," "CBI's external auditors reviewed its disclosures and deemed them reasonable," and "the SEC closed an investigation into CBI's accounting practices after noting that it had not reached any conclusion as to the propriety of those practices."  *Id.*  Nevertheless, the court determined that, "at most," "a material dispute of fact exists" and denied summary judgment.  *Id.*[5]

The purported completeness of Defendants' Canadian bitumen disclosures is further undermined by Tillerson's and Rosenthal's knowledge, as they and Exxon prepared the 2015 Form 10-K, that the "[p]rice environment throughout 2015/16 has generated . . . unprecedented SEC scrutiny of oil & gas companies" and that Exxon's "[s]tatus as one of [the] few, if not only, major

---

4    *See also Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) ("that the defendants published statements when they ***knew*** facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter"); *Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 603 (7th Cir. 2006), *vacated on other grounds*, 551 U.S. 308 (2007); *Brody v. Zix Corp.*, 2006 WL 2739352, at *7 (N.D. Tex. Sept. 26, 2006) (finding scienter sufficiently pled where defendants allegedly received reports and information that rendered their statements false and misleading).

5    In contrast, the challenged statement in Defendants' case ("Baker's 'years of oil and gas experience'") was completely "unrelated" to the alleged omitted facts (Baker's "criminal history").  *SEC v. Bowen*, 2024 WL 3462359, at *6 (N.D. Tex. July 17, 2024).

4914-3047-7603.v1

industry players without major reserves debook (esp. Canadian oil sands) draws attention." App. 1675-App. 1676; *see also* App. 1687 (Exxon's competitors had already taken *over $93 billion* in impairments and write-offs, including in Canadian tar sands).[6]   They also knew that the SEC expected *quantitative* disclosures if the Company failed to de-book its Kearl reserves at YE 2015. *See* App. 1675-App. 1676 ("MD&A must (i) place prior year results in context of business environment and (ii) discuss trends, uncertainties, and reasonably possible outcomes, *quantitatively* if possible, as of filing date"); App. 68-App. 74 (Tillerson Depo. Tr. at 68:3-74:8); App. 537-App. 541 (Rosenthal Depo. Tr. at 122:4-126:22).   Given their awareness of the SEC's scrutiny and expectation of quantitative disclosures, Defendants indisputably had a duty to disclose Kearl's massive losses when they touted Canadian bitumen's profitability. *See* App. 893-App. 928.   At a minimum, an issue of fact is raised as to the completeness of their Canadian bitumen statements. *Ochoa v. United States*, 2021 WL 3711374, at *7 (N.D. Tex. Aug. 20, 2021) ("'A factual dispute is best settled by a battle of the experts before the fact finder, not by judicial fiat.   Where two credible experts disagree, it is the job of the fact finder . . . to determine which source is more credible and reliable.'").

Defendants also wrongly claim that Kearl was cash flow positive in 2015.   MSJ at 47-49. First, the testimony and document they cite reflects on its face that Kearl's 2015 year-to-date "Operating Unit Earnings" was -$7.34 per oil equivalent barrel ("OEB").   Def. Appx. 461; App. 1731.   Second, the record is replete with instances where the Management Committee was informed of Kearl's increasing monthly *cash losses* prior to the 2015 Form 10-K's filing.   In particular, the Management Committee learned:

- on August 21, 2015 that Kearl suffered cash losses of *$63 million* in July 2015 (App. 1807, App. 1824);

---

6   App. 730-App. 732, ¶¶50-55 (Total S.A. announces impairment of Canadian oil sands of $6.5 billion on February 12, 2015; Shell abandons Carmon Creek bitumen project and takes $2 billion impairment on October 27, 2015).

- on or around September 20, 2015 that Kearl suffered cash losses of *$60 million* in August 2015 (App. 3192);

- on or around November 18, 2015 that Kearl suffered cash losses of *$108 million* and *$45 million* in September 2015 and October 2015, respectively (App. 3211);

- on January 22, 2016 that Kearl suffered cash losses of *$74 million* and *$60 million* in November 2015 and December 2015, respectively (App. 1536, App. 1559);

- at the end of 2015 that Kearl suffered cash losses of *$162 million* in the first half of 2015 (App. 1519); and

- on February 18, 2016 – six days before the 2015 Form 10-K was filed – that Kearl suffered cash losses of *$120 million* in January 2016 (App. 1847).[7]

In total, Kearl was cash flow negative to the tune of *$572 million* for 2015. Kearl continued to hemorrhage cash in December 2015, January 2016, and February 2016 as realizations at Kearl plummeted further, to as low as $4 per barrel, resulting in additional cash losses of *$180 million for the two months immediately preceding the Class Period*. *See* App. 1624, App. 1652; App. 1847.[8]

Defendants' self-serving explanation that the Kearl Expansion Project solely caused negative operating earnings fares no better, as it is unsupported by the document to which they point, which says nothing about "one-time expenses associated with" KEP "that would depreciate over time." MSJ at 47 (citing Def. Appx. 538). Defendants' experts also offer no opinion on this issue specifically or Kearl's profitability (or lack thereof) generally. At any rate, their assertion makes no sense given that one-time, new capital expenditures do not impact operating earnings. Their argument is also contradicted by the fact that Kearl was losing money during 2015 both before *and* after KEP came on line – Kearl lost $8.11 per barrel for the first half of 2015 (before KEP came on line) and lost $7.34 per barrel for the entire year (including the six months during which KEP was operable). App. 1519; App. 1731 (demonstrating that, even after KEP was completed in June, Kearl

---

[7]   App. 176-App. 178 (Swiger Depo. Tr. at 17:12-19:4) (stating that the Management Committee was "the reader" of the monthly F&O reports).

[8]   *See also* App. 3357; App. 3359; App. 4175-App. 4176 (Prestipino Depo. Tr. at 184:10-185:4).

4914-3047-7603.v1

continued suffering "negative operating earnings" every month from August through December 2015).  Rosenthal conceded Kearl's lack of profitability during 2015:

> Q.      And it's indicating that each of these measures we look at, whether it's per oil equivalent barrel, the loss there was negative $7.34, or estimated operating cash generation, the loss there is $177 million, correct?
>
> A.      That's what it says, yes.
>
> Q.      So it's indicating a negative profitability for 2015 for Kearl.
>
> A.      Yes.

App. 564 (Rosenthal Depo. Tr. at 149:11-20); *see also* App. 562 (Rosenthal Depo. Tr. at 147:16-20). Thus, no matter which metric is compared, Kearl was not profitable.  Finally, Defendants are flatly wrong that Mr. Regan admitted Kearl was profitable in July, August, and September 2015.  MSJ at 47; *see* App. 902, ¶121.[9]  Defendants' misguided interpretation of the documents at best creates an issue of fact that does not entitle them to summary judgment.

**b.      Defendants Received Sufficient Notice of the Kearl Profitability Claim, Which Is Consistent with the Complaint's Allegations**

Unable to obtain summary judgment on the merits, Defendants feign surprise at Plaintiff's Kearl profitability claim, arguing the claim need not be adjudicated on the merits because it was purportedly not alleged in the Complaint.  MSJ at 36-38.  Defendants' assertions are meritless.

The Complaint pleads that Exxon's 2015 Form 10-K misleadingly implied a $5.87 profit per barrel of Canadian bitumen.  Cpt., ¶343.  This misrepresentation was center stage when Plaintiff sought class certification and Defendants sought reconsideration of the Court's order on the motion to dismiss.  Plaintiff argued repeatedly in its papers that, "on October 29, 2015, Tillerson and Rosenthal were informed but failed to disclose that ***Kearl was losing over $8 per every barrel*** of oil equivalent produced."  ECF 89-3 at 3 (emphasis in original); *see* ECF 133 at 2, 9, 18 (same).

---

9       Defendants rely heavily on purported concessions by Mr. Regan.  MSJ at 43-44.  These are addressed in detail in Lead Plaintiff's Response in Opposition to Defendants' Motion to Exclude Testimony of D. Paul Regan, filed concurrently herewith.

- 11 -

Plaintiff reiterated this point at the October 19, 2021 hearing on Defendants' motion for reconsideration:

> [T]hey're simple, straightforward claims, Your Honor, and they're in the complaint. And now we have evidence of them from the documents they gave us.
>
>             \*          \*         \*
>
> And as of 2015, these are documents that all the executives have, Mr. Tillerson, the other senior managers. . . . They know at year-end 2015 they're losing $8.00 a barrel [on Kearl bitumen] and they have to disclose that, particularly because they say bitumen, they're selling it for 25 and it's costing them 19. Implied profit of $5.87. That's a lie. And that violates the securities laws, Your Honor.

ECF 154 at 57:5-20; *id.* at 51:15-17, 52:5-11, 54:12, 57:24-58:4, 66:1-5, 74:17-22, 109:1-6 (same). Plaintiff summarized its claim again at the June 7, 2022 class certification hearing. ECF 176 at 35:4-5 ("MR. SAHAM: [Kearl]'s losing money, ***$8.00 a barrel***."); *id.* at 14:25-15:1, 20:15, 23:15, 30:12-14, 195:24-25 (same). Defendants' expert conceded this point recently, admitting during his January 27, 2025 deposition that "there is a claim [in the Complaint] about the lack of profitability at Kearl." ECF 226 at App. 297 (Ferrell Depo. Tr. at 47:6-9).

In short, the Complaint alleged the statement that is at issue for the Kearl profitability claim (as well as those at issue for the Kearl proved reserves claim, *see* §III.A.2.c., *infra*), distinguishing the instant matter from *In re St. Jude Med., Inc., Sec. Litig.*, 629 F. Supp. 2d 915 (D. Minn. 2009), the only securities case Defendants cite to support their "unpled theory" argument. MSJ at 38. The court in *St. Jude* declined to consider a new theory proffered at summary judgment that "relie[d] on statements made by defendants on March 7, 2006, and March 9, 2006" where "***[t]here [wa]s neither a reference nor an allusion to these statements in the amended complaint***" and where the new theory "***wholly abandon[ed]***" that which was pled in the complaint. 629 F. Supp. 2d at 920-21. In addition, Defendants have had years of notice of Plaintiff's Kearl profitability claim. This is more than adequate to entitle Plaintiff to adjudication on the merits. *See Jaffe v. Household Int'l Inc.*, 2009 WL 10811914, at *1 (N.D. Ill. Mar. 16, 2009) ("We are beyond the pleading stage in this case

- 12 -

and the question now becomes what can plaintiffs prove. . . .  The Court is convinced that the challenged statements were sufficiently identified by type and date and that defendants were sufficiently informed to allow for proper preparation for trial . . . .”); *see also In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, 2023 WL 9748644, at *31 (D.N.J. May 22, 2023) (finding defendants were "on notice of the subject statements"); *Chabot v. Walgreens Boots All., Inc.*, 2023 WL 2908827, at *14 n.7 (M.D. Pa. Mar. 31, 2023) (holding "Plaintiffs provided sufficient notice").[10]  And because their attacks on the merits fail, as explained in §III.A.1.a., *supra*, and §III.A.3., *infra*, summary judgment on the Kearl profitability claim should be denied.

### 2. Plaintiff Has Presented Sufficient Evidence of Falsity and Scienter for the Kearl Proved Reserves Claim

#### a. Defendants Knowingly Misrepresented that the Canadian Bitumen Reserves at Kearl Qualified as Proved Reserves at Year-End 2015

Page 5 of Exxon's 2015 Form 10-K publicly reported the total amount of Canadian bitumen proved developed reserves (4.1 billion) and the total amount of proved reserves (24.7 billion).  App. 1290; Cpt., ¶277.  Kearl's 3.6 billion barrels represented a substantial proportion of these reported figures – more than 87% of proved developed Canadian bitumen reserves and nearly 15% of all of Exxon's proved reserves.  But at the time these statements were made, Defendants were aware that Kearl's reserves did not legitimately qualify as proved reserves.

Reserves can be considered "proved" only if they are "economically producible," meaning they generate revenue that exceeds the costs of operation.  App. 1858.  If revenue, as measured by the "SEC price," is less than a reserve's unit "lifting cost," "that reserve or that barrel doesn't qualify as a proved reserve barrel."  App. 3508 (Horne Depo. Tr. at 141:1-8); App. 17 (Tillerson Depo. Tr.

---

[10]     Moreover, as discussed in §III.A.2.c., *infra*, "when 'both parties squarely address[] [a claim] in their summary judgment briefs,' it may be argued that the complaint was constructively amended." *Handzlik v. United States*, 93 F. App'x 15, 17 (5th Cir. 2004).  That is the case here, given Defendants' in-depth, merits-based argument against Plaintiff's purportedly "unpled" Kearl profitability claim.

4914-3047-7603.v1

at 17:12-15) (Tillerson agreeing that proved reserves must be "economically producible at existing costs"); *see* App. 1529; App. 1919; App. 891-App. 892, ¶¶106-108; App. 3652 (Strawbridge Tr. at 76:5-10).

To calculate the SEC price, Exxon was required to start with an industry marker price, which was calculated using the 12-month average of the first-day-of-the-month price.  App. 4521-App. 4522; App. 1858; *see* App. 2075.  For Kearl, Exxon utilized the West Texas Intermediate ("WTI") marker price.  The costs of transportation, diluent, and quality/market differentials were then subtracted from the averaged first-day-of-the-month WTI price.  App. 1534; App. 2019; App. 2063; App. 3791 (Strawbridge Depo. Tr. at 215:13-20).  This resulted in the SEC price.

In calculating the SEC price, Exxon was required to comply with the requirements of the Financial Accounting Standards Board, which required Exxon to use "actual price and operating costs data."  App. 3667; App. 3715; App. 3759 (Strawbridge Depo. Tr. at 91:1-8, 139:7-11, 183:12-15); *see* App. 4141-App. 4143 (Prestipino Depo. Tr. at 150:4-9, 152:7-15); App. 1858.  As Swiger admitted at his deposition, "***the transportation cost doesn't vary based on the SEC or the actual basis.  You use the actual transportation***."  App. 275-App. 276, App. 279 (Swiger Depo. Tr. at 116:24-117:7, 120:6-11) ("***Q.  In the SEC analysis, you're going to want to use the actual cost involved, whether it's transportation, diluent, or any other cost, correct?  A.  That is correct***.").

In 2015, however, to avoid de-booking Exxon's massively important Kearl proved reserves, Defendants knowingly disregarded this requirement by failing to use Kearl's actual transportation and diluent costs when calculating its SEC price.  Had Defendants used Kearl's actual costs, as they were required to, the Kearl reserves would not have satisfied the proved reserves definition at YE 2015.

Internal documents indicate that Kearl's actual transportation costs for its "mix of sales at Edmonton and [the U.S. Gulf Coast]" were approximately $7 per barrel in Q1 2015:

- 14 -



App. 2075.

On August 22, 2015, Swiger was informed that Kearl's actual transportation costs, which included costs associated with sales to the "Gulf Coast," were "stable."  App. 2064.  During his deposition, Swiger testified that the information he received at that time indicated that Kearl's actual transportation costs throughout the first half of 2015 were in the range of "$5 or $6 per barrel."  App. 224 (Swiger Depo. Tr. at 65:7-11).  But less than three months later, on November 12, 2015, Exxon's Management Committee – which included both Swiger and Tillerson – was informed that Kearl's actual year-to-date transportation costs were, in fact, $7 per barrel.  App. 2156; App. 240 (Swiger Depo. Tr. at 81:6-9) ("Q. . . . [Y]ou were informed in November 2015 that the year-to-date transportation cost for Kearl was $7, correct?  A.  Yes.").

- 15 -

As detailed below, despite knowing that Kearl's *actual* transportation costs were *$7 per barrel* during 2015, Defendants assessed Kearl's 2015 proved reserve status using a significantly lower transportation cost amount, thereby manipulating Kearl's proved reserve assessment in order to avoid de-booking Kearl's 3.6 billion barrels of proved reserves at YE 2015.  App. 882-App. 892. Specifically, when performing Kearl's proved reserves assessment, Defendants eliminated all costs associated with Kearl's U.S. sales, resulting in a significantly lower transportation cost of approximately *$1.30 per barrel* – an amount that represented *only approximately 20%* of Kearl's actual transportation costs.  As the evidence confirms, not only were Defendants aware of this manipulation, they in fact directed it.  App. 1531; App. 1534-App. 1535; App. 2117.[11]

As detailed above, Defendants were aware by mid-2015 that Kearl was suffering large operating losses and challenged to demonstrate positive cash flow.  *See* §III.A.1.a., *supra*. Accordingly, Tillerson requested a "Chairman's Review" regarding "Kearl's SEC reserve status" on October 26, 2015 ("October 26 Chairman's Review").  App. 3731-3732 (Strawbridge Depo. Tr. at 155:15-156:10).  The review was attended by multiple Exxon senior executives, including Tillerson, Swiger, Rosenthal, and Exxon's Global Reserves Manager, William Strawbridge, who presented information at the meeting.  App. 1526.  According to Strawbridge, Tillerson requested the meeting because he wanted "to understand the details" of "Kearl's SEC reserve status."  App. 3731-3732; App. 3776 (Strawbridge Depo. Tr. at 155:15-156:10, 200:15-22).

During the October 26 Chairman's Review, Defendants assessed Kearl's proved reserves status using a transportation cost of $1.27 per barrel, which was *$5.73 per barrel lower than Kearl's*

---

[11]   Defendants' claim that their proved reserves statements are opinions is off the mark.  MSJ at 44; *see In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 778-79 (E.D. Va. 2015) ("Defendants' statements regarding the adequacy of reserves in the instant case are not necessarily statements of opinion.  Defendants' statements do not contain the words 'believe' or 'think,' but instead suggest a greater sense of certainty."); *see also, e.g.*, *Underland v. Alter*, 2011 WL 4017908, at *9 (E.D. Pa. Sept. 9, 2011) ("nonconformance to a stated methodology to arrive at a loan loss reserve amount is a measurable objective fact").  Even if an opinion, Defendants could not have honestly held it in light of their directed manipulation of the reserves calculation.  *See Genworth*, 103 F. Supp. 3d at 779 (reserves statements actionable, in relevant part, because defendants knew that an out-of-date claim duration figure was being used to calculate reserves).

4914-3047-7603.v1

***actual transportation cost of $7.00 per barrel***.  App. 1534.  Materials used during the meeting confirm that the drastically reduced transportation cost improperly excluded all costs associated with U.S. sales.  App. 1531; App. 1534-App. 1535; *see also* App. 23 (Tillerson Depo. Tr. at 23:18-21) ("Q.  So it appears that sales to the US are being excluded from the SEC price, according to this document, correct?  A.  That's what it says.").[12]  Using this improperly deflated transportation cost, Defendants calculated Kearl's SEC price to be $29.20 per barrel, ***just $0.70 per barrel higher*** than Kearl's 2015 unit lifting cost of $28.50 per barrel.  App. 1532.  Had Defendants used Kearl's actual transportation cost, as Defendants knew they were required to, Kearl's properly calculated SEC price would have been ***$23.47 per barrel*** ($29.20 - $5.73 = $23.47), ***more than $5 per barrel lower*** than Kearl's $28.50 per barrel lifting cost, thus indicating that Kearl's reserves did not satisfy the SEC definition for proved reserves.  *See* App. 3508 (Horne Depo. Tr. at 141:1-8); App. 3652 (Strawbridge Depo. Tr. at 76:5-10).

The above evidence confirms Defendants' awareness that, as of October 2015, Kearl could not satisfy the SEC definition for proved reserves if the assessment was performed using actual transportation costs, as required by SEC regulations.  Moreover, evidence also confirms that, during the October 26 Chairman's Review, the Management Committee directed Strawbridge to perform Kearl's YE 2015 proved reserve assessment using this knowingly improper approach.  App. 3822-App. 3824 (Strawbridge Depo. Tr. at 246:11-248:3) (testimony from Strawbridge confirming

---

[12]   Defendants may argue that the exclusion of costs associated with U.S. sales was permissible due to the limited volume of Kearl U.S. sales prior to KEP's launch in mid-2015.  But any such assertion is false (or, at best, creates an issue of fact), given the evidence confirming Kearl's substantial volume of U.S. sales pre-KEP.  *See* App. 4450 at 4; App. 4472 at 4; App. 4497 (listing largest volume buyers of Kearl "thru Dec '14" as made up largely of U.S. refiners located in Detroit, Whiting, Garyville, Pine Bend, Pt. Arthur, and Joliet).  In essence, Defendants wanted to have their cake and eat it too by using the higher industry marker (WTI) as the starting point, but deducting only the much lower differential costs associated with selling bitumen locally in Edmonton in Alberta, Canada, at the much-lower-than-WTI Western Canadian Select ("WCS") marker price.  App. 1534 (stating that Kearl SEC price calculation used "WTI marker price" and "Differential – WCS"); *see* App. 1793 (showing WTI and WCS monthly prices during 2015).  This shenanigan allowed Defendants to avoid de-booking Kearl at YE 2015 by inflating Kearl's SEC price above its lifting costs.  App. 883, ¶91; App. 890-App. 892, ¶¶105-108.

- 17 -

4914-3047-7603.v1

that "the management committee told [him] in [the] October 26 meeting" that Exxon "would be using the Canadian sales model for 2015").

For its YE 2016 assessment, conducted after the Company completed its massive $12 billion bond offering, Defendants abandoned this plainly improper approach and assessed Kearl's SEC proved reserve status using Kearl's actual costs, which ultimately led to Kearl's de-booking in 2016. App. 2117; *see also* App. 882, ¶89; App. 888-App. 889, ¶101.  In connection with the YE 2016 assessment, Exxon personnel prepared a presentation, and included the following charts containing a summary of Kearl's final YE 2015 SEC price calculation, actual average realizations, and unit lifting cost:



App. 2117, App. 2119.  As these charts confirm, Kearl's final YE 2015 *actual* transportation and diluent costs were ***$5.88 per barrel and $5.36 per barrel***, respectively.  App. 2117.  The transportation and diluent costs used for Kearl's final YE 2015 SEC price calculation, however, were significantly lower: ***$1.32 per barrel and $4.89 per barrel***, respectively.  *Id.*[13]  As the information in

---

[13]   Although the "quality" cost used to calculate Kearl's YE 2015 SEC price was higher than the actual YE 2015 "quality" cost (*id.*), the benefit from this difference is more than made up for by the difference between the actual and SEC bases for the transportation and diluent costs, as demonstrated by the calculation described in n.14, *infra*.

4914-3047-7603.v1

these charts confirms, had Defendants calculated Kearl's YE 2015 SEC price using Kearl's ***actual*** YE 2015 costs, as they knew they were required to, the proper YE 2015 SEC price would have been $25.72 per barrel. *Id.*[14] This price is ***significantly lower*** than Kearl's final YE 2015 unit lifting cost ($27.90 per barrel), thus confirming that Kearl's reserves would not have satisfied the SEC's definition of proved reserves at YE 2015 without Defendants' fraudulent efforts to manipulate the SEC price calculation by excluding the actual costs associated with Kearl's U.S. sales. App. 2119; *see also* App. 1731; App. 883, ¶91; App. 887-App. 892, ¶¶99-109.

The above evidence of Defendants' actual knowledge is sufficient to prove scienter at trial. *Lormand*, 565 F.3d at 251. It certainly is sufficient to defeat summary judgment. *SEC v. Blackburn*, 431 F. Supp. 3d 774, 807 (E.D. La. 2019) ("When scienter is at issue, ***courts rarely grant summary judgment because of the element's subjective nature***."), *aff'd*, 15 F.4th 676 (5th Cir. 2021).[15]

**b.      It Was Misleading for Defendants to Warn that the Kearl Reserves "Could" Be De-Booked When the Purported Risk Had Already Come to Fruition**

Exxon's 2015 Form 10-K also stated:

> When crude oil and natural gas prices are in the range seen in late 2015 and early 2016 for an extended period of time, under the SEC definition of proved reserves, certain quantities of oil and natural gas, such as oil sands operations in Canada and natural gas operations in North America ***could*** temporarily not qualify as proved reserves.

App. 1291; Cpt., ¶285. But, as explained above in §III.A.2.a, Kearl bitumen did ***not*** qualify as proved reserves at the time Defendants issued this purported warning.[16] "Risk disclosures that

---

[14]   The price is calculated by subtracting Kearl's actual YE 2015 costs for quality ($13.32/Bbl), transportation ($5.88/Bbl), and diluent ($5.36/Bbl) from the final YE 2015 WTI first-of-month price ($50.28/Bbl). App. 2117.

[15]   In light of the overwhelming evidence of Defendants' actual knowledge, Defendants' purported reliance on "internal experts" does not absolve them of liability. MSJ at 20. At best, it creates an issue of fact for the jury.

[16]   Because the risk warning did not reveal the true, unprofitable state of Kearl's affairs, the warning itself does not undermine Defendants' scienter as they erroneously contend. MSJ at 20-21. Their cases are easily distinguished. *See Neiman v. Bulmahn*, 854 F.3d 741, 747-48 (5th Cir. 2017) (no scienter for statement made in September where truth was revealed in November, as "Plaintiffs have not alleged that Reese had a particular reason to lie in September that would have vanished by November," in contrast to the evidence of Defendants' motive here, *see* §III.C., *infra*); *Neiman*, 854

- 19 -

'speak[] entirely of as-yet-unrealized risks and contingencies' and do not 'alert[] the reader that some of these risks may already have come to fruition' can mislead reasonable investors." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021) (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985-87 (9th Cir. 2008)); *see Lormand*, 565 F.3d at 249.[17]

Defendants claim the statement is *per se* not actionable because only two months of 2016 had transpired. MSJ at 15-16. This argument misses the point. As Defendants themselves admitted, ***oil prices in late 2015 and early 2016*** were the catalyst for the "enhanced" warning. MSJ at 11, 13. As detailed at length above, Kearl was ***not*** profitable at the prices "seen in late 2015 and early 2016" and, at the time Exxon issued the 2015 Form 10-K, Kearl did "***not*** qualify as proved reserves." App. 1291; Cpt., ¶285; *see Lormand*, 565 F.3d at 252.[18] At the very least, a question of fact is raised.

Defendants are also wrong that the statement is protected by the PSLRA safe harbor. MSJ at 17. Indeed, their principal authority – which found that the safe harbor did ***not*** apply, and reversed and remanded the district court's dismissal of the complaint – supports Plaintiff. *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 210-17 (5th Cir. 2023). The safe harbor applies only if: "the statement is identified as forward-looking ***and*** 'is accompanied by meaningful

---

F.3d at 750 (no scienter where company warned that it "had negative working capital" and was "financing" its cash and service needs); *Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imps., Inc.*, 935 F.3d 424, 432 (5th Cir. 2019) (no scienter where defendants made "several public disclosures of Pier 1's high-inventory problem").

[17] Defendants' contention that Plaintiff's investment manager was not misled by the concealed Kearl facts rings hollow. MSJ at 11. The investment manager testified that when it purchased Exxon shares on Plaintiff's behalf, it "was not aware that 3.6 billion barrels of bitumen at Kearl no longer qualified as proved reserves" or that "Exxon's Rocky Mountain dry gas assets were impaired." App. 4681, App. 4683 (Matts Depo. Tr. at 301:9-15, 303:4-18). The investment manager also testified that these facts "may have" "been important to [its] investment process with respect to the Exxon common stock it purchased for [Plaintiff] in 2016." App. 4684-App. 4685 (Matts Depo. Tr. at 304:20-305:10).

[18] Because the challenged statement speaks in terms of past prices and their impact on proved reserves, *In re Alta Mesa Res., Inc. Sec. Litig.*, 2024 WL 3760481 (S.D. Tex. Aug. 12, 2024), *Heinze v. Tesco Corp.*, 971 F.3d 475, 482 (5th Cir. 2020), and *Naglich v. Applied Optoelectonics*, 436 F. Supp. 3d 954, 973 (S.D. Tex. 2020), are factually distinguishable, as each concerned circumstances that had not yet transpired. MSJ at 16-17. Defendants' citation to *Alta Mesa* is particularly curious given that the decision Defendants cite left intact the class period and the majority of statements and defendants. The case ultimately went to trial and resulted in a $126.3 million settlement for the class. *See In re Alta Mesa Res., Inc. Sec. Litig.*, No. 4:19-cv-00957, ECF 1020 at Ex. A-1 at 1 (S.D. Tex. Jan. 17, 2025).

4914-3047-7603.v1

cautionary statements'; *or* . . . the plaintiff fails to plead that the statement 'was made with actual knowledge . . . that [it] was false or misleading.'" *Id*. at 210.[19]  First, the statement is not forward-looking because "the crux of Plaintiff's fraud claim is that Defendants misled investors about the Company's *present* [status of Kearl's reserves]." *Id.* at 211 (emphasis in original); *see id.* at 217. Second, assuming *arguendo* that the challenged statement is forward looking, the statement's language does not "address[] the actual risk at issue," *i.e.*, that Kearl's reserves did not qualify as proved reserves at the time the 2015 Form 10-K was filed.  *Id.* at 212.  Finally, as discussed at length above in §III.A.1.a. and III.A.2.a., there is a wealth of evidence establishing Defendants' actual knowledge that Kearl was not profitable, and therefore did not qualify as proved reserves, at 2015 prices.  *See Six Flags*, 58 F.4th at 211-12.[20]

Incredibly, Defendants sing their own praises for issuing "the most specific warning of its peers by explicitly referencing specific at-risk assets in the 2015 [Form] 10-K."  MSJ at 18-19. Defendants deserve no credit.  Naturally, Exxon's competitors did not need to warn of potential de-bookings given that *they had already recognized that over $90 billion of their assets were impaired or needed to be de-booked*.  *See* App. 1687-App. 1690; App. 4712-App. 4723; App. 4737-App. 4740.  In fact, Total S.A. and Shell recognized *$8.5 billion in impairments of Canadian oil sands assets* before Exxon issued its "enhanced" warning.  App. 730-731, ¶¶50, 53.

---

[19]    The safe harbor also does not apply if "the statement is 'immaterial.'"  *Id.*  Defendants do not challenge materiality.

[20]    Defendants rely heavily on a declaration obtained from Accounting Policy Manager Joseph Horne that is signed five months after his deposition.  *See* MSJ at 16.  Because Defendants were present at Horne's September 17, 2024 deposition and opted to ask him no questions at the time, and because Plaintiff has not had an opportunity to depose Horne on this late declaration, it should not be considered at this stage.  *See, e.g.*, *Olivier v. Exxon Mobil Corp.*, 2022 WL 3574354, at *3 (M.D. La. Apr. 12, 2022) (striking affidavit at summary judgment that was filed by Exxon "in bad faith").  Even if considered, as a current Exxon executive, Horne is biased and his declaration is contradicted by other evidence in the record, including his sworn testimony.  Thus, at most, his declaration raises issues of material fact for the jury to consider.

4914-3047-7603.v1

c.    **Defendants Received Sufficient Notice of the Kearl Proved Reserves Claim, Which Is Consistent with the Complaint's Allegations**

As with the Kearl profitability claim, Defendants claim they are entitled to summary judgment on the Kearl reserves claim because it was purportedly not alleged in the Complaint. MSJ at 36-38. Defendants are wrong.

Page 5 of the 2015 Form 10-K, which reports Exxon's 2015 Canadian bitumen proved developed reserves (4.1 billion) and worldwide proved reserves (24.7 billion), is reproduced verbatim in the Complaint under the heading "Defendants' 2016 Misstatements and Omissions." Cpt., ¶277. The Complaint alleges that Defendants misled investors about "***the value of the reserve assets at issue***" and that the statements were misleading "in light of Defendants' failure to disclose that, ***at the time***, the Canadian Bitumen Operations were operating at a loss." *Id.*, ¶280. Profitability necessarily impacts whether reserves qualify as proved, given that reserves cannot so qualify unless they are "economically producible." This link is made clear in the Complaint, as an additional reason that the statements contained in ¶277 of the Complaint were misleading was Defendants' omission that Kearl was unlikely to qualify as proved reserves at YE 2016. *Id.*, ¶280. That the Complaint identifies the precise misstatement at issue and reasons the statement is false that are closely related to the instant theory more than satisfies the pleading requirements. *Cf. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 242 n.11 (2d Cir. 2016) ("We identify no such requirement in the PSLRA, which sets out certain pleading standards so as to prevent securities-fraud plaintiffs from filing costly securities class-action suits on the basis of a barely formed hunch, but ***nowhere binds such plaintiffs to the precise set of alleged misstatements identified in their complaint throughout the entire course of litigation***.").

Defendants now quibble that the Complaint alleged Kearl was unlikely to qualify as proved reserves at YE 2016 as opposed to YE 2015 and thus Plaintiff cannot pursue the latter theory. MSJ

- 22 -

at 36-37. Their hairsplitting is disingenuous. As Defendants themselves summarized this action for the Court on October 4, 2023:

> Following this Court's August 21, 2023 memorandum opinion and order on Plaintiff's class certification motion, *only two narrow and straightforward issues remain in the case*. First, Plaintiff claims that ExxonMobil should have impaired its Rocky Mountain Dry Gas assets as of year-end 2015, rather than the following year. Second, *Plaintiff argues that ExxonMobil should have de-booked its proved reserves at Kearl <u>as of year-end 2015, rather than the following year</u>*.

ECF 179 at 9. They ignore their own summation of the case, instead claiming that Plaintiff disavowed the theory that Kearl should have been de-booked at YE 2015. MSJ at 37. But the letter to which they point was exchanged at the outset of discovery in response to Defendants' attempts to exclude from their Kearl-related productions documents relevant to Exxon's YE 2016 analysis or the Kearl profitability theory that was the focus of the class certification hearing. It was also written before Defendants had produced key documents that made clear the impropriety of Exxon's 2015 Kearl reserves calculations, which were not produced to Plaintiff until August 14, 2024 – *ten months after* Plaintiff's correspondence. *See* App. 2081-App. 2134; App. 4706-App. 4707.

Even if Defendants were correct that the Kearl reserves claim was not alleged in the Complaint (they are incorrect), summary judgment is inappropriate where, as here, Defendants have long been on notice of Plaintiff's theory and had ample opportunity to take discovery concerning it. Defendants received Mr. Regan's expert report on October 11, 2024, which detailed at length Plaintiff's theory that Kearl's reserves should have been de-booked at YE 2015. App. 879-App. 892, ¶¶82-109. After receiving Mr. Regan's report, Defendants had *over three months* to take discovery on Plaintiff's theory. They were clearly aware of the theory, retained William Abington to offer an expert opinion on the matter, and asked questions relating to the 2015 calculation of Kearl's proved reserves. *See* Def. Appx. 1428-1581; *see also, e.g.*, App. 708-App. 709 (Rosenthal Depo. Tr. at 293:1-294:9). Such abundant notice easily distinguishes this litigation from Defendants' authorities,

- 23 -

4914-3047-7603.v1

where the plaintiffs pulled a "'surprise switcheroo'" and introduced entirely new theories for the first time in opposition to summary judgment or even later on appeal.[21]  MSJ at 7, 38; *see SEC v. Sierra Brokerage Servs., Inc.*, 608 F. Supp. 2d 923, 953-54 (S.D. Ohio 2009) (rejecting argument that complaint did not give defendants "fair notice" of claim where the complaint gave them "adequate notice of the claims against them" and they received "additional notice of the basis of the SEC's Section 5 claims" via briefing that "occurred shortly before the close of discovery"), *aff'd*, 712 F.3d 321 (6th Cir. 2013).  Given that the Kearl reserves claim is alleged in the Complaint and that the parties have conducted comprehensive discovery on the theory, Defendants' purported surprise rings hollow.

At any rate, "[t]he function of a complaint is to give the defendant fair notice of the plaintiff's claim and the grounds upon which the plaintiff relies." *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 434 (5th Cir. 2000).  "When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." Fed. R. Civ. P. 15(b)(2). This rule applies at the summary judgment stage, as well as at trial. *See, e.g.*, *United States ex rel. Canion v. Randall & Blake*, 817 F.2d 1188, 1193 (5th Cir. 1987). "Thus, when 'both parties squarely address[] [a claim] in their summary judgment briefs,' it may be argued that the complaint was constructively amended." *Handzlik*, 93 F. App'x at 17.  That is the case here, where Defendants retained an expert on the subject and have mounted a robust, 13-

---

[21]    *See Jackson v. Gautreaux*, 3 F.4th 182, 189 (5th Cir. 2021) (summary judgment appropriate where plaintiff's pleaded theory was that sheriff "failed to adequately train his officers to avoid ***excessive force***" but plaintiff introduced claim that sheriff "failed to adequately train his officers to deal with ***mentally unstable individuals***" for the first time in opposing summary judgment) (emphasis in original); *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) (declining to consider "new factual theory [that] was not raised in her complaint, nor raised in her opposition to Appellee's motion for summary judgment," but rather was raised "for the first time on appeal"); *Pittman v. U.S. Bank NA*, 840 F. App'x 788, 789 (5th Cir. 2021) (rejecting new theory, raised for the first time at summary judgment, because plaintiff's "complaint 'focuse[d] on SPS's alleged lack of authority to enforce the Deed of Trust, not whether the individual who conducted the foreclosure sale . . . was a [properly appointed] substitute trustee'"); *Caro v. City of Dallas*, 17 F. Supp. 2d 618, 627 n.6 (N.D. Tex. 1998) (declining to consider "claim [that] is not sufficiently 'like or related' to the allegations in Caro's [EEOC] charge").

4914-3047-7603.v1

page attack on Plaintiff's Kearl reserves and profitability claims (which nevertheless fails, as explained in §III.A.1.-2.b., *supra* and §III.A.3. *infra*).  MSJ at 36-49; *Miles-Hickman v. David Powers Homes, Inc.*, 589 F. Supp. 2d 849, 867-68 (S.D. Tex. 2008) ("The parties [sic] arguments during discovery hearings in this case demonstrate DPH understood Hickman to assert a retaliation claim in this Court.  In addition, it appears that the parties conducted discovery pertaining to such a claim.  Thus, DPH had fair notice of Hickman's federal court retaliation claim and the parties impliedly consented to litigation of it.").  Summary judgment on the Kearl reserves claim should be denied.

### 3. Defendants' Conduct Also Violated Generally Accepted Accounting Principles

Defendants' conduct also violated Rule 10b-5 by independently violating GAAP, which required Exxon to disclose Kearl's significant and increasing losses during 2015 that rendered the statements on pages 5 and 9 of the 2015 Form 10-K misleading.  In particular, ASC 275 "requires discussion of estimates when, based on known information available before the financial statements are issued or are available to be issued . . . , it is reasonably possible that the estimate will change in the near term and the effect of the change will be material."  Cpt., ¶337.  As Defendants' own accounting expert Abington conceded, "ASC 275 requires transparent reporting of potential risks that could impact a company's financial position."  Def. Appx. 1495, ¶157; *see* MSJ at 24 n.5.  Abington's concession is fatal to Defendants' bid for summary judgment, as Exxon failed to comply with the referenced GAAP or SEC requirements.  *See Morris v. State Farm Fire & Cas. Co.*, 740 F. Supp. 3d 491, 507-08 (W.D. La. 2024) (denying summary judgment where defendant's experts' concessions left open a question of fact reserved for the jury); *Equal Emp. Opportunity Comm'n v. Mod. Grp., Ltd.*, 725 F. Supp. 3d 577, 626 (E.D. Tex. 2024) (holding similarly).

During 2015, Kearl's profitability collapsed.  §III.A.1.a., *supra*.  That collapse accelerated in the months leading up to the 2015 Form 10-K's filing, with Kearl losing $17.72 per barrel in January

- 25 -

2016 and $25.85 per barrel in February 2016.  App. 1586; App. 2194.  Despite being aware of these material risks, uncertainties, and losses that were trending more and more negative immediately before the Class Period, Defendants concealed them, reporting only that Canadian bitumen production prices in 2015 were $25.07 and average costs were $19.20.  Indeed, Tillerson admitted that Exxon's 2015 Form 10-K's reporting of Canadian bitumen's profitability did not communicate that 87% of Exxon's Canadian bitumen proved developed reserves were suffering large losses:

> Q.  So if Kearl itself was losing $7 a barrel, that information is not communicated in this chart, is it?
>
> \*       \*       \*
>
> A.  I think as I've acknowledged, Kearl is not broken out on this table.

App. 85 (Tillerson Depo. Tr. at 85:3-21).[22]

Defendants' assertion that the Court's order dismissing Plaintiff's Item 303 claim forecloses this theory misses the mark as it ignores the other GAAP provisions that the Court upheld – namely ASC 275 and 932.  MSJ at 45-46.  Furthermore, even if it is no longer being alleged as an independent legal theory, Item 303 nevertheless provides context to accountants and auditors as to what needs to be detailed in a company's financial statements, and an accounting expert can still reference it as context in his analysis of accounting issues presented in this case.[23]

### 4.       Plaintiff Has Presented Sufficient Evidence of Loss Causation for the Kearl-Related Claims

To prove loss causation, a plaintiff must demonstrate a "causal relationship between the fraudulent statements or omissions and plaintiff's economic loss." *Lormand*, 565 F.3d at 258.  To do

---

[22]   Defendants were also required to disclose the losses at Kearl pursuant to ASC 932, which required Exxon to use actual costs when determining proved reserves.  App. 877, ¶77.  As explained in §III.A.2.a., *supra*, Exxon did not, thus violating ASC 932.  Defendants' footnoted challenge to Plaintiff's contention that they violated ASC 932 fails for the obvious reason that the 2015 Form 10-K is not an "'interim financial report[].'"  MSJ at 18 n.3 (emphasis omitted).

[23]   *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207 (5th Cir. 2004), sheds no light on whether the sustained price declines and losses suffered at Kearl in this case constitute a trend, as that case involved price decreases over "five and one-third months" where "approximately three-fourths of the 60% drop in price" occurred during just two months and had "not significantly impacted Torch's gross revenue."  *Id.* at 213, 217-21.

- 26 -

so, the evidence must establish "a material misrepresentation or omission, followed by the leaking out of relevant or related truth about the fraud that caused a significant part of the depreciation of the stock and plaintiff's economic loss." *Id.*; *accord Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 320-21 (5th Cir. 2014); *Buettgen v. Harless*, 2011 WL 1938130, at *7 (N.D. Tex. May 19, 2011) (Kinkeade, J.) (citing *Lormand*, 565 F.3d at 256).

"'To be corrective, [a] disclosure need not precisely mirror [an] earlier misrepresentation.'" *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 229-30 (5th Cir. 2009) (per curiam). Instead, a plaintiff need only establish that "the truth that emerged was *'related to' or 'relevant to'* the defendants' fraud and earlier misstatements." *Amedisys*, 769 F.3d at 321; *see also Flowserve*, 572 F.3d at 230 ("to establish loss causation this disclosed information must reflect part of the 'relevant truth' – the truth obscured by the fraudulent statements"). "The test for relevant truth simply means that the truth disclosed must make the existence of the actionable fraud more probable than it would be without that alleged fact." *Amedisys*, 769 F.3d at 321 (citing *Lormand*, 565 F.3d at 256 n.20).[24]

Questions concerning proof of loss causation "'are ultimate questions for the trier of fact on the merits.'" *In re Cassava Scis., Inc. Sec. Litig.*, 2024 WL 4824243, at *15 (W.D. Tex. Nov. 15, 2024). As such, "[w]hen assessing a defendant's Rule 56 motion for summary judgment, a district court is required to inquire whether a reasonable jury could find loss causation by a preponderance of the evidence." *Flowserve*, 572 F.3d at 228.

Here, the evidence readily establishes that "a genuine fact issue exists . . . because a reasonable trier of fact could at the least conclude that [Defendants' fraudulent misrepresentations regarding Kearl] caused *some portion* of [the] loss after the 'relevant truth'" was disclosed on

---

[24]  *See also Parmelee v. Santander Consumer USA Holdings, Inc.*, 2018 WL 276338, at *6 (N.D. Tex. Jan. 3, 2018) (Kinkeade, J.) ("[A] corrective disclosure must be 'related to' or 'relevant to' the alleged fraud, meaning the disclosed information must make the existence of the alleged fraud 'more probable than it would be without that alleged fact.'").

October 28, 2016. *Id.* at 233. Specifically, as detailed above, Defendants' misrepresentations concealed the truth that Kearl was suffering significant losses and did not legitimately qualify as a proved reserve. *See* §III.A.1.a., III.A.2.a., *supra*. This truth remained concealed from investors until October 28, 2016, when Exxon disclosed that all of Kearl's 3.6 billion barrels of bitumen proved reserves would not satisfy the SEC definition of proved reserves "[i]f the average prices seen during the first nine months of 2016 persist for the remainder of the year." App. 1404-App. 1423 at App. 1412 (the "October 28 Disclosure"). In response to this news, the price of Exxon stock declined significantly, causing substantial economic losses to Plaintiff and the Class as a result. App. 736-App. 737, ¶¶64-65; App. 742-App. 747, ¶¶76-81; App. 765, ¶¶119-120; App. 769-App. 770, ¶¶139-140; App. 773-App. 777, ¶¶153-162.

By revealing that Kearl's reserves were unlikely to qualify as proved reserves because they were not "economically producible" under SEC regulations, the October 28 Disclosure was clearly "corrective" of Defendants' fraudulent misrepresentations, as it "reflect[ed] part of . . . the truth obscured by [Defendants'] fraudulent statements." *Flowserve*, 572 F.3d at 230; *see also* App. 725, ¶38 (citing SEC Modernization of Oil and Gas Reporting Release Nos. 33-8995; 34-59192; FR-78; File No. S7-15-08, p.11); App. 721, ¶¶21-22; App. 724, ¶33; App. 736-App. 737, ¶65; App. 765, ¶120; §III.A.2.a., *supra*.

Indeed, the connection between the October 28 Disclosure and the truth previously obscured by Defendants' fraud is confirmed by analyst and news reports concerning the announcement. An October 28, 2016 *New York Times* article, for example, described the announcement as "'an ***apparent reversal*** of [Exxon's] stance in recent years . . . that it has been ***adequately accounting*** for the value of its oil and gas reserves – even as many other petroleum companies have taken big write-offs to reflect a two-year price slump.'" App. 745-App. 747, ¶81 (citing Clifford Krauss, *Exxon Concedes It May Need to Declare Lower Value for Oil in Ground*, N.Y. Times, Oct. 28, 2016). That

- 28 -

same report went on to state that Exxon was facing "what could be the biggest accounting revision of reserves in its history," given that Exxon "might have to concede that 3.6 billion barrels of oil-sands reserves . . . are currently *not profitable to produce*."  Similarly, on October 31, 2016, an analyst report from RBS Capital Markets noted that "the Kearl revision in particular is concerning, as it indicates the current *economics of the project are challenged*."  App. 745, ¶80 (citing Brad Heffern & Jie Yong, *The Only Free Cash Flow Around*, RBC Capital Markets, Oct. 31, 2016, at 1).

At the very least, a reasonable trier of fact could conclude that the October 28 Disclosure made the fact that Defendants had fraudulently concealed Kearl's lack of profitability and failure to qualify as a proved reserve "more probable than it would be without" the disclosure.  *Amedisys*, 769 F.3d at 321.  As such, the disclosure was without question "corrective" of Defendants' fraudulent misrepresentations regarding Kearl.  *See Santander*, 2018 WL 276338, at *6.

In addition, the evidence confirms that the October 28 Disclosure "caused a significant part of the depreciation of the stock and plaintiff's economic loss."  *Lormand*, 565 F.3d at 258.  Plaintiff's loss causation and damages expert, Professor Steven P. Feinstein, Ph.D., CFA, conducted a detailed and comprehensive event study based on widely accepted, reliable methodologies that are "'used routinely in the academic literature to determine whether the release of particular information has a significant effect on a company's stock price.'"  *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1313 (11th Cir. 2011); *In re Twitter, Inc. Sec. Litig.*, 2020 WL 13863616, at *9 (N.D. Cal. Jan. 28, 2020) ("Event studies, such as the study employed in [Dr.] Feinstein's Report, are routinely accepted by courts in securities fraud cases as a means by which to conduct loss causation analyses.").  The results of Dr. Feinstein's empirical analysis establish that, on October 28, 2016, the residual return for Exxon's stock price (*i.e.*, the amount of stock price movement attributable to Company-specific information) was -2.84%, which is statistically significant at the **99.5%**

- 29 -

*confidence level* and equivalent to a decline of ***$2.43 per share***.  App. 769-App. 770, ¶139; App. 773, ¶153; App. 840.[25]

Dr. Feinstein also conducted a thorough examination of all Exxon-related news that emerged between the close of trading on October 27, 2016 and the close of trading on October 28, 2016, in order to assess whether the disclosure of any non-fraud-related information could have contributed to Exxon's statistically significant residual decline on October 28, 2016.  App. 773-App. 777, ¶¶154-162.  In conducting this analysis, which considered several pieces of information disclosed on October 28, 2016, Dr. Feinstein employed the same analytical tools and methodology that numerous courts, including this one, have previously found to be reliable.  *See Harless*, 2011 WL 1938130, at *8 (rejecting argument that Dr. Feinstein failed to "account for a number of factors" regarding "other negative disclosures"); *see also, e.g.*, *Twitter*, 2020 WL 13863616, at *9; *Smilovits v. First Solar, Inc.*, 2019 WL 7282026, at *9 (D. Ariz. Dec. 27, 2019); *In re Groupon, Inc. Sec. Litig.*, 2015 WL 1043321, at *6, *11 (N.D. Ill. Mar. 5, 2015).

Based on his thorough analysis, Dr. Feinstein concluded that the non-fraud-related information disclosed on October 28, 2016 "had no net negative confounding effect on [Exxon's] stock price."  App. 776-App. 777, ¶162.  Nonetheless, in order to account for the possibility that Exxon's disclosure of a non-recurring adjusted EPS miss could have had a negative $0.04 impact on Exxon's stock price, Dr. Feinstein conservatively estimated that the corrective information disclosed on October 28, 2016 was responsible for $2.39 of Exxon's statistically significant $2.43 residual stock price decline on October 28, 2016, causing significant economic losses to Plaintiff and the Class as a result.  App. 721, ¶¶25-26; App. 776-App. 777, ¶162; *see also Inhale, Inc. v. Gravitron,*

---

[25]   Defendants' expert, Allen Ferrell, agrees that Exxon's residual decline on October 28, 2016 is statistically significant at a confidence level greater than 95% under both the customary close-to-close event window analysis and Ferrell's concocted close-to-open window analysis (which he has apparently never previously used to evaluate any stock other than Exxon's).  ECF 98-12 at App. 181, App. 184, App. 1246-App. 1248, ¶¶110-112.  In fact, Ferrell's event study determined that, when examined using the customary close-to-close analysis, Exxon's residual decline on October 28, 2016 was 4.44% – an even greater residual decline than the 2.84% that Dr. Feinstein found.  ECF 98-12 at App. 181.

- 30 -

*LLC*, 2023 WL 6532554, at *2 (W.D. Tex. Sept. 8, 2023) ("'summary judgment is inappropriate where an expert's testimony supports the non-moving party's case'").

In short, Plaintiff has established loss causation for its Kearl-related claims by offering reliable evidence:

> "(1) identifying a 'corrective disclosure' (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by [Defendants'] fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure – as opposed to other possible depressive factors – that caused at least a 'substantial' amount of price drop."

*Amedisys*, 769 F.3d at 321.

Defendants' misguided arguments to the contrary are each unavailing. First, Defendants' argument that Plaintiff cannot prove loss causation because Exxon has never "restated or corrected" its 2015 proved reserve disclosures is incorrect. MSJ at 44-45. "A corrective disclosure ***need not be a direct admission that a prior statement was false***." *Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, 620 F. Supp. 3d 603, 634 (S.D. Tex. 2022) (citing *Flowserve*, 572 F.3d at 230). Indeed, as this Court and others, including the Fifth Circuit, have noted, "'a defendant could defeat liability by refusing to admit the falsity of its prior misstatements' ***if the standard was whether or not a defendant has confessed***." *Harless*, 2011 WL 1938130, at *8 (citing *Flowserve*, 572 F.3d at 230).

As detailed above, the information revealed by the October 28 Disclosure was clearly "related to" and "relevant to" the truth previously concealed by Defendants' misrepresentations, which is all that is required for a disclosure to be "corrective." *See Amedisys*, 769 F.3d at 321; *Lormand*, 565 F.3d at 258; *Santander*, 2018 WL 276338, at *6. Moreover, contrary to Defendants' assertions, Plaintiff has identified evidence supporting this connection, including market commentary interpreting the disclosure as "an ***apparent reversal*** of [Exxon's] stance in recent

- 31 -

years . . . that it has been **adequately accounting** for the value of its oil and gas reserves." App. 746, ¶81.[26]

Defendants' related argument that the October 28 Disclosure was not corrective of Defendants' misrepresentations concealing Kearl's lack of profitability similarly fails.  *See* MSJ at 48-49 (arguing (wrongly) that Dr. Feinstein's analysis "illogically mix[es] apples and oranges" because "proved reserves are an entirely different metric from 'profitability'").  The Fifth Circuit has flatly **rejected** the notion that, in order to prove loss causation, "a plaintiff must show a 'fact-for-fact' disclosure of information that fully corrected prior misstatements."  *Flowserve*, 572 F.3d at 229-30 (rejecting argument that "a fraud causes a loss only if the loss follows a corrective statement that specifically reveals the fraud").  Moreover, Defendants' argument ignores Plaintiff's evidence that market participants **directly tied** the disclosure of Kearl's likely de-booking to its lack of profitability.  *See, e.g.*, App. 745-App. 747, ¶¶80-81.  Such evidence clearly establishes, at a minimum, genuine issues of material fact regarding whether the October 28 Disclosure was "related to" or "relevant to" Defendants' fraudulent concealment of Kearl's lack of profitability.  *See Amedisys*, 769 F.3d at 321; *Lormand*, 565 F.3d at 258; *Santander*, 2018 WL 276338, at *6.

Defendants' additional argument that Dr. Feinstein "did not analyze Plaintiff's pleaded fraud theory that the Enhanced Risk Disclosure was too 'tepid'" is nothing more than a red herring.  *See* MSJ at 22-23.  As detailed above, the evidence gathered through discovery confirms Defendants' fraudulent concealment of Kearl's failure to satisfy the SEC definition for proved reserves at YE 2015, which rendered Defendants' misrepresentations in Exxon's 2015 Form 10-K regarding the amount of the Company's proved reserves materially misleading.  §III.A.2.a., *supra*.  This same

---

[26]    Because such evidence is sufficient to, at a minimum, raise a genuine issue of material facts as to whether the October 28 Disclosure created "'concern'" that Defendants' previous representations "'may be incorrect,'" the cases Defendants cite do not support summary judgment.  *See* MSJ at 45 (quoting *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 668 (5th Cir. 2004), and citing *Catogas v. Cyberonics, Inc.*, 292 F. App'x 311, 315-16 (5th Cir. 2008); *N. Port Firefighters' Pension--Loc. Option Plan v. Temple-Inland, Inc.*, 936 F. Supp. 2d 722, 762-63 (N.D. Tex. 2013); *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 909 (W.D. Tex. 2008)).

- 32 -

evidence also ***necessarily*** renders false and misleading Defendants' purported warnings in that same document that "oil sands operations in Canada" could potentially not satisfy the proved reserves definition. *See* Cpt., ¶¶277, 285; §III.A.2.b., *supra*. Indeed, had Defendants disclosed the concealed information (*i.e.*, that Kearl no longer qualified as a proved reserve because it was not profitable under SEC regulations) at YE 2015, there would have been no reason for Exxon to disclose any "warnings" regarding the "possibility" of de-booking Kearl's proved reserves. As such, Dr. Feinstein's opinion that a significant part of the stock price decline on October 28, 2016 was caused by Exxon's disclosure of information that was related to, and corrective of, the concealed truth concerning Kearl's lack of profitability and failure to qualify as a proved reserve plainly constitutes proof of loss causation for Defendants' materially false and misleading "warnings" in Exxon's 2015 Form 10-K. *See* App. 721, ¶¶21-22; App. 724, ¶33; App. 736-App. 737, ¶65; App. 765, ¶120; App. 776-App. 777, ¶162; *see also Amedisys*, 769 F.3d at 321; *Lormand*, 565 F.3d at 258; *Harless*, 2011 WL 1938130, at *7.

Finally, contrary to Defendants' arguments, Dr. Feinstein ***has*** reliably "disaggregated the effects of the allegedly fraud-related statements in the purported corrective disclosure from 'other unrelated negative statements.'" *See* MSJ at 23. As detailed above and in Plaintiff's Feinstein Daubert Opp., Dr. Feinstein's analysis included a thorough examination of all potentially confounding non-fraud-related information, applying well-established financial principles that numerous courts – including this one – have found to be reliable. *See* Feinstein Daubert Opp., §III.D.; *see also, e.g., Harless*, 2011 WL 1938130, at *8; *Twitter*, 2020 WL 13863616, at *9; *First Solar*, 2019 WL 7282026, at *9; *Groupon*, 2015 WL 1043321, at *6, *11. Defendants' criticisms concern Dr. Feinstein's ***conclusions***, not his expertise or the reliability of his methodology. *See* Feinstein Daubert Opp., §III.D. At most, such criticisms go "to the ***weight rather than the admissibility*** of [Feinstein's] testimony." *In re DePuy Orthopaedics, Inc. Pinnacle Hip Implant*

*Prods. Liab. Litig.*, 2014 WL 3557345, at *12 (N.D. Tex. July 18, 2014) (Kinkeade, J); *see also, e.g.*, *First Solar*, 2019 WL 7282026, at *9 ("criticisms that Feinstein discounted the confounding information and exaggerated the impact of the alleged fraud go to his credibility and the weight of his opinions, not their admissibility").  Nor is there any other valid basis upon which to exclude Dr. Feinstein's testimony.  *See generally* Feinstein Daubert Opp.  As such, Defendants' argument that "Plaintiff is unable to prove [loss] causation and damages" without Dr. Feinstein's testimony fails. *See* MSJ at 23.

**B.    Summary Judgment on Plaintiff's RMDG Impairment Claim Is Not Warranted**

Defendants also violated Rule 10b-5 by failing to recognize an impairment of Exxon's RMDG assets as of YE 2015, rendering certain financial statements in the Company's 2015 Form 10-K material misrepresentations.  *See* Cpt., ¶376; ECF 62 at 19.

**1.    Companies Like Exxon Must Test Long-Lived Assets for Impairment When "Impairment Indicators" Exist**

When an asset's forecasted future net cash flows are no longer expected to exceed its capitalized costs, the asset is said to be "impaired" because such costs are no longer expected to be fully recoverable.  The asset must then be written down to its actual fair value through the recording of an impairment charge against the company's earnings.  ASC 360 (a GAAP standard) provides that the presence of an "impairment indicator" is a trigger that requires a company to perform a specific test for impairment; the test involves projecting future cash flows (companies generally use a 30-year future cash flow analysis) to determine whether the asset is indeed impaired, and then measuring the amount of the impairment.  Defs. Appx. 656-664; *see also* App. 1690; App. 928-App. 931, ¶¶169-173.

4914-3047-7603.v1

## 2.       In 2015, Exxon Ignored Multiple Impairment Indicators

In 2015, Exxon experienced multiple impairment triggers relating to its RMDG assets that required the Company to test for impairment – yet Defendants ignored these triggers to fraudulently avoid recording an impairment. *See, e.g.*, *Chi. Bridge*, 2021 WL 3727095, at *6 ("[A] material dispute of fact exists as to whether the Goodwill Statements were in fact misstatements and whether Defendants acted with scienter, considering the countervailing evidence that . . . CBI reported no goodwill impairments during the Class Period despite evidence of potential impairments.").

*First*, Exxon experienced "*[d]ecreases in oil and/or gas pricing*" and "*[l]ower expected future oil and gas prices*." App. 930, ¶172. Natural gas prices collapsed throughout 2014 and 2015, with the Henry Hub benchmark spot price for natural gas dropping an incredible *80%* from the February 2014 price of $8.15/MMBtu to only $1.63/MMBtu in December 2015. *See* App. 934-App. 935, ¶¶180-181; *see also* App. 2233 (Tillerson discusses "response to low price environment" at April 2015 Board of Directors meeting). Additionally, Tillerson and Rosenthal recognized internally that "a step change in internal price outlook could be construed as [a trigger]." App. 2281 (Rosenthal (DSR) and Tillerson (RWT) "Low Price Environment Impairment Considerations Talking points," dated May 14, 2015). And the over 20% year-over-year drop in the Exxon 2015 data guide "Extended Plan Financials" – from $5.20 to $4.00 for future natural gas prices – represented such a substantial reduction in internal price outlook, *i.e.*, step change. App. 2291; *see also* App. 634 (Rosenthal Depo. Tr. at 219:20-25) ("Q. Well, if you had an extended pricing step change of $5 per natural gas unit to $4 of natural gas – natural gas unit, 5 to 4 – *$5 to $4, could that be a trigger*? A. Yes. That could – *that could be considered a trigger*."); App. 944-App. 948, ¶¶200-208. Yet Defendants failed to recognize a trigger.

Defendants justified their do-nothing approach by asserting (*e.g.*, to Exxon's independent auditor, PwC) that "short-term price volatility" is not an impairment trigger. App. 935-App. 936,

- 35 -

¶¶183-185.  But this excuse does not hold water.  In fact, Defendants recognized in June 2015 that Exxon was in a "*sustained low price environment*."  App. 2252 (guidance communication sent to Swiger and Rosenthal).  According to Joseph Horne, Exxon considered "a significant change to the long-term price outlook as published in the data guide . . . not temporary."  Horne testified "we would consider that not temporary" and this "*could be a trigger*."  App. 3426 (Horne Depo. Tr. at 59:3-12).  Or, as Rosenthal bluntly put it to Tillerson in November 2015, given this "*reduction in EM's long term US natural gas price outlook*," it "*would be difficult to argue to SEC that [a trigger] has NOT occurred*."  App. 3360.

Notably, when Exxon ultimately acknowledged that an impairment trigger *did* exist during 4Q 2016, the average spot price of Henry Hub natural gas was $3.04/MMBtu – significantly higher than the $2.28/MMBtu and $1.85/MMBtu spot prices at December 31, 2015 and February 24, 2016, respectively, relevant to the FY 2015 analysis.  App. 937, ¶186.  Indeed, the Company stated that the impairment it recognized as of YE 2016 was caused in part by "a reduction in the mid-point of the ranges of the corporation's long-term oil and natural gas prices developed as part of its annual planning and budgeting cycle."  App. 1433.  Yet, the step change in the extended plan financials in 2016 was only $0.50 – *half* that which was experienced during 2015 when no impairment trigger purportedly existed.  *See* App. 644, App. 651 (Rosenthal Depo. Tr. at 229:10-19, 236:19-22).

*Second*, Exxon experienced "*a current-period operating loss combined with a history and forecast of operating or cash flow losses*."  App. 929-App. 930, ¶171.  Notably, in 2012 – the last time daily prices fell below $2.00/MMBtu – Tillerson recognized: "*We are all losing our shirts today.  You know, we're making no money.  It's all in the red*."  App. 2270.  And Tillerson, Swiger, and Rosenthal were aware that as a result of the low 2015 prices, *XTO suffered $1.3 billion in losses in 2015*.  App. 1559; App. 285 (Swiger Depo. Tr. at 126:2-9); App. 31 (Tillerson Depo. Tr. at 31:22-

- 36 -

25); App. 1514; App. 569 (Rosenthal Depo. Tr. at 154:13-24); App. 3288; App. 940-App. 942, ¶¶190-195.  Thus, Defendants ignored *multiple* triggers.

Faced with the challenging price environment, Exxon's competitors took massive impairment write-offs in 2014 and 2015.  *See* App. 1687 (stating that competitors took $93.7 billion in impairments during 2014-2015); App. 683 (Rosenthal Depo. Tr. at 268:5-8) ("Q.  And for 2014 and 2015, in aggregate, Exxon's competitors experienced impairments of $93.7 billion, correct?  A.  That is correct.").  In the RMDG region specifically, Breitburn, Ultra Petroleum, and Vanguard recognized impairment charges of *$2.4 billion*, *$3.1 billion*, and *$1.8 billion*, respectively, during 2015 due to the decline in natural gas prices.  App. 4744; App. 4748; App. 4752.  Nevertheless, Exxon recognized *zero dollars* in impairments during 2014 and 2015.

### 3.    Exxon's RMDG Assets Were Impaired by Year-End 2015

#### a.    Exxon Concealed Its RMDG Impairment by Utilizing Unreasonable Price Assumptions

Exxon papered over its conclusion that no impairment trigger existed – both internally, and to its auditor, PwC – in large part by referencing an "asset recoverability test" that it performed around June 2015.  App. 950-App. 951, ¶212; App. 959-App. 962, ¶¶218-221; MSJ at 27.  But using this *mid*-2015 test to justify its no-trigger conclusion as of the *end* of 2015 compared apples to oranges.  Specifically, the asset recoverability test incorporated price assumptions, *i.e.*, projections, that were based on Henry Hub spot prices as of May 2015 – ignoring the subsequent precipitous drop in prices.  App. 950-App. 959, ¶¶212-217.  For example, the plan price assumptions Exxon used estimated a 2016 price of $2.97 – *over 60% higher than* the actual spot price of $1.85 on February 24, 2016, the day Exxon issued its 2015 Form 10-K.  App. 1113-App. 1118, ¶94.  Thus, Exxon

- 37 -

concealed that its RMDG assets were impaired by utilizing unreasonably optimistic price assumptions that failed to account for the continued degradation of natural gas prices.[27]

These unreasonable assumptions violated GAAP and ignored the accepted industry standard of utilizing Henry Hub strip pricing (internally referred to as "strip prices" or "NYMEX") for impairment calculation.[28]   App. 950-App. 959, ¶¶212-217.  PwC noted that "***[p]ricing should be generally utilize the strip prices***."  App. 2340.  And Exxon's own 2015 data guide recognized that the Company was required to utilize strip pricing as a sensitivity analysis.  App. 2290 (requiring NYMEX market-based sensitivity analysis to test the reasonability of the plan price); *see also* App. 658 (Rosenthal Depo. Tr. at 243:12-16) ("Q. . . .  So you're supposed to use the NYMEX for that purpose?  A.  It's saying for evaluating opportunities, you should use this as a sensitivity case to look at.").  Moreover, Exxon regularly utilized Henry Hub strip pricing to run its business.[29]

Had Exxon utilized pricing that was at least in range of strip pricing in 2015, it would have recognized the same impairment that it recognized in 2016 – when its plan pricing was tested to be consistent with strip prices.  *See, e.g.*, App. 937, ¶186; App. 959, ¶217; App. 972, ¶244(d); App. 975, ¶252; App. 1124-App. 1127, ¶¶106-109; App. 1134-App. 1135, ¶¶120-122.  In addition, had Exxon conducted the required sensitivity analysis utilizing strip pricing in 2015, as it did in 2016, it

---

[27]   The use of higher price assumptions decreased the likelihood of an impairment.  App. 3405 (Horne Depo. Tr. at 38:15-17) ("Q. So if higher prices are used, it would decrease the likelihood of an impairment, correct?  A.  In general, yes.").  In contrast, using lower prices increased the likelihood of an impairment.  App. 3405 (Horne Depo. Tr. at 38:18-20) ("Q.  And if lower prices are used, it would increase the likelihood of an impairment, correct?  A.  All other things equal, yes.").

[28]   Henry Hub "spot" prices are daily actual prices; Henry Hub "strip" prices are forecasts based on futures contracts.

[29]   Contrary to Defendants' claim that Exxon's asset recoverability test used the "assumptions from its internal plan that it used to run its business" (MSJ at 27, 31), Plaintiff adduces evidence showing that Exxon used ***strip*** prices to, *e.g.*, value acquisitions (App. 964-App. 965, ¶226) and assess the fair value of its assets – including XTO itself.  *See* App. 3552 (Horne Depo. Tr. at 185:16-18) ("Q. My question, in estimating fair value to XTO in 2014, you utilized strip prices, correct?  A. Yes."); App. 972-App. 973, ¶¶245-246; *see also* App. 2470 (applying NYMEX sensitivity check to 2016 RMDG impairment analysis).  Further, Mr. Regan's testimony  agreeing it is "'permissible under the rules'" to use assumptions "used to evaluate investment opportunities" is not "dispositive" of anything.  MSJ at 5-6, 31; Def. Appx. 264 at 253:7-19.  Mr. Regan merely agreed that GAAP does not categorically forbid the use of such assumptions; this does not undercut his opinion that the specific projections Exxon used were unreasonable and thus violated GAAP.  *See, e.g.*, App. 1108-App. 1111, ¶¶84-88.

4914-3047-7603.v1

would have observed that the prices utilized were unreasonably high when compared to market-based strip pricing. App. 1125, ¶107; App. 2470; App. 2290; App. 2531.

Defendants also inflated the projected cash flows used in the asset recoverability test by manipulating the *pace* at which forecasted prices would increase to the (unreasonable) forecasted long-term price of $4. App. 952-App. 959, ¶216. Horne projected Exxon would not reach the long-term price until sometime between *2025 and 2035*. App. 2576; App. 3538-App. 3539 (Horne Depo. Tr. at 171:22-172:14). He referred to these years as the "bookends" of his analysis. App. 2576. Nevertheless, the Management Committee – which included Tillerson and Swiger – dictated that the price assumptions reach $4 by *2020* in order to avoid impairment. App. 3525-App. 3526 (Horne Depo. Tr. at 158:10-159:3) ("*Reaching $4 by 2020 for Henry Hub was the management committee's assessment, yeah*."). Even using Defendants' unreasonably high long-term price of $4, had Defendants adopted the mid-range of Horne's bookends (*i.e.*, 2030) as the date upon which the long-term plan price would be reached, three of the four RMDG assets would have been impaired. App. 1119-App. 1122, ¶¶99-102.

### b. Defendants Admitted the RMDG Assets Were Impaired in 2016 After Prices Recovered

As explained above, despite the persistent, historically low natural gas prices in 2015 and XTO's $1.3 billion "current period operating loss" – both of which constituted impairment triggers under ASC 360 – Exxon publicly claimed that no impairment trigger existed in late 2015 or even early 2016. Yet, after the Company completed its massive $12 billion bond offering, Exxon belatedly acknowledged at YE 2016 that impairment conditions suddenly existed and conducted the required impairment analysis, even though production costs for these dry gas assets were lower and spot prices were dramatically *higher* than at YE 2015. Indeed, at YE 2016, natural gas prices reached as high as $3.71/MMBtu compared to prices as low as $2.28/MMBtu at YE 2015. App.

- 39 -

864-App. 866, ¶¶49-52.  In other words, while Exxon claimed there were no impairment triggers requiring comprehensive impairment testing at YE 2015 (before its bond offering), the Company found the opposite and conducted full testing for impairment at YE 2016 (after its bond offering), when the macroeconomic circumstances were significantly more favorable for these assets.

Further, even with the benefit of higher natural gas prices, Exxon's YE 2016 analysis unequivocally established that the RMDG assets were impaired and a *$2 billion charge to earnings* was announced on January 31, 2017.  App. 1428.  The YE 2016 analysis forecasted natural gas prices for the majority of the future cash flow analysis at *$3.50/MMBtu* – as opposed to the *$4.00/MMBtu* long-term price used in the Company's 2015 analysis, when actual spot prices were significantly lower.  App. 2623, App. 2711.  Exxon's 2016 impairment analysis also corrected for the 2015 manipulation of the pace at which prices would increase, reaching the long-term price *four years later* than it was hit in the 2015 assumptions.  App. 407 (Swiger Depo. Tr. at 248:7-9).  A timely analysis in 2015, using legitimate assumptions reflecting that period's far lower prices, would have likewise resulted in the determination that the RMDG assets were impaired.  App. 937, ¶186; App. 959, ¶217; App. 972, ¶244(d); App. 975, ¶252; App. 1124-App. 1127, ¶¶106-109; App. 1134-App. 1135, ¶¶120-122.

In sum, Defendants' manipulation and results-driven failure to utilize reasonable price assumptions in violation of GAAP improperly allowed Exxon to avoid recording an impairment of its RMDG assets at YE 2015.  Thus, "there is evidence in the record which suggests that Defendants knew that the [2015 impairment analysis utilized unreasonable price assumptions], and that . . . evidence suffices to create a genuine issue of material fact as to [Plaintiff's] impairment claims." *SEC v. Life Partners Holdings, Inc.*, 41 F. Supp. 3d 550, 561 (W.D. Tex. 2013).[30]

---

[30]   Defendants' cases are inapposite.  *See* MSJ at 31-33.  Notably, nearly *all* of them address motions to dismiss, where the standard is *more demanding* than that applicable here.  *See In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1017 (S.D. Cal. 2011).  And Defendants' lone summary judgment case allowed plaintiffs to proceed to trial.  *In re BP*

- 40 -

### 4.    Plaintiff Has Presented Sufficient Evidence of Loss Causation for the RMDG Impairment Claim

As detailed above, Defendants' fraudulent misrepresentations concealed that Exxon's RMDG assets were impaired by approximately $2 billion by YE 2015.  Consistent with the principles set forth in §III.A.4., *supra*, Plaintiff will be able to prove loss causation for such misrepresentations by offering reliable evidence:

> "(1) identifying a 'corrective disclosure' (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by [Defendants'] fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure – as opposed to other possible depressive factors – that caused at least a 'substantial' amount of price drop."

*Amedisys*, 769 F.3d at 320-21.

The pertinent truth concealed by Defendants' fraudulent misrepresentations concerning Exxon's RMDG assets was revealed on the morning of January 31, 2017, when Exxon disclosed that, despite a significant rise in the price of natural gas over the past year, the Company would be recording an "asset impairment charge of about $2 billion mainly related to dry gas operations with undeveloped acreage in the Rocky Mountains region of the U.S.," which would reduce reported earnings by 20%.  App. 1428 (the "January 31 Disclosure").  This disclosure was clearly "corrective," as it revealed the very truth Plaintiff alleges to have been concealed by Defendants' fraudulent misrepresentations – that the RMDG assets were impaired.  *Amedisys*, 769 F.3d at 321; *Lormand*, 565 F.3d at 258.

Moreover, the results of Dr. Feinstein's event study confirm that the January 31 Disclosure "caused a significant part of the depreciation of the stock and plaintiff's economic loss." *Lormand*,

---

*p.l.c. Sec. Litig.*, 2016 WL 3090779, at *33 (S.D. Tex. May 31, 2016).  Further, the Court has already rejected Defendants' impairments-are-opinions argument (MSJ at 32-33). ECF 62 at 21.  Finally, Defendants' reliance on PwC should be rejected because Defendants refused to recognize an impairment trigger to allow them to ***avoid*** "auditors and regulators to challenge and second-guess our judgment."  App. 2582; *see also* App. 4258 (Prestipino Depo. Tr. at 267:1-9) ("I was able to shut down PwC Canada."); App. 1132, ¶¶48-50, 117(d).

565 F.3d at 258; *see also* App. 770, ¶141; App. 777-App. 778, ¶¶163-166; App. 840.  Specifically, Dr. Feinstein's expert analysis determined that the residual return for Exxon's stock price on January 31, 2017 was -1.46%, which is statistically significant at a confidence level ***greater than 95%*** and equivalent to a decline of ***$1.23 per share***.  *See* App. 770, ¶141; App. 840.  In addition, Dr. Feinstein conducted a thorough analysis of all potentially confounding non-fraud-related information that emerged between the close of trading on January 30, 2017 and the close of trading on January 31, 2017, and conservatively concluded that the corrective information disclosed on January 31, 2017 was responsible for $1.05 of Exxon's statistically significant $1.23 residual stock price decline on January 31, 2017.  *Id.*

The above evidence is plainly sufficient to establish loss causation for Plaintiff's RMDG-related claim.  *See Amedisys*, 769 F.3d at 320-21; *Lormand*, 565 F.3d at 258; *Santander*, 2018 WL 276338, at *6; *Harless*, 2011 WL 1938130, at *7-*8.  Defendants' arguments to the contrary each fail.  *See* MSJ at 34-36.

First, Defendants' contention that loss causation is barred by the Court's class certification decision is incorrect.  *Id.* at 34.  As the Fifth Circuit has expressly recognized, "a district court's findings in connection with a holding on class certification ***do not resolve loss-causation issues on the merits, even when – as here – the two issues are practically identical***." *Flowserve*, 572 F.3d at 233.[31]  Consistent with *Flowserve*, the Court's "holdings under Rule 23's preponderance requirement [do] not govern the merits of [Plaintiff's] claims."  572 F.3d at 233.  As such, in ruling on Defendants' motion for summary judgment, the Court must consider the record before it now – ***not*** the record that was presented to it at class certification.  *Id.*  And the record currently before the

---

[31]    *See also Bell v. Ascendant Sols., Inc.*, 422 F.3d 307, 312 (5th Cir. 2005) ("'The findings made for resolving [the] class action certification motion serve[d] the court ***only*** in its determination of whether the requirements of Rule 23 [were] demonstrated.'") (emphasis in original); *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005) ("the court's determination for class certification purposes may be revised (or wholly rejected) by the ultimate factfinder").

Court includes Dr. Feinstein's analysis, which is based on widely accepted, reliable methodologies that have been employed by Defendants' own expert on numerous previous occasions, and clearly establishes – at a minimum – that "a genuine fact issue exists on the material element of loss causation . . . because a reasonable trier of fact could at the least conclude that [Defendants' fraudulent misrepresentations regarding Exxon's RMDG assets] caused *some portion* of [the] loss after the 'relevant truth'" was disclosed on January 31, 2017. *Id*.; *see also Inhale*, 2023 WL 6532554, at *2 ("'summary judgment is inappropriate where an expert's testimony supports the non-moving party's case'").[32]

Second, Defendants' argument that Plaintiff cannot prove loss causation for its RMDG claim because the January 31 Disclosure stopped short of confessing Defendants' fraud fails for the same reasons articulated above regarding Plaintiff's Kearl claims. *See* MSJ at 34-35. Specifically, "[a] corrective disclosure *need not be a direct admission that a prior statement was false*." *Cabot*, 620 F. Supp. 3d at 634; *see also Flowserve*, 572 F.3d at 230; *Harless*, 2011 WL 1938130, at *7. Moreover, contrary to Defendants' incorrect assertions, Plaintiff has identified evidence tying the January 31 Disclosure to Exxon's previous misrepresentations. *See* App. 1251-App. 1252, ¶117 (citing analyst report noting that the RMDG impairment was "the first impairment in 20+ years," while further highlighting that "*Rex Tillerson had said as recently as 2015: 'We don't do writedowns'*"). As with Plaintiff's Kearl claims, this evidence is clearly sufficient to at least establish a genuine issue of material fact as to whether the January 31 Disclosure was "related to" or "relevant to" Defendants' fraudulent concealment of the RMDG assets' impairment at YE 2015, thus

---

[32] Defendants' critiques of Dr. Feinstein's event study analysis for the January 31 Disclosure – which utilized Exxon's self-selected peer index and examined the impact of the disclosure using a close-to-close event window – are baseless. Feinstein Daubert Opp., §III.C.2. Indeed, during his deposition, Ferrell testified that he has used these same methodologies on numerous previous occasions and that it is "*customary*" to use close-to-close event windows to examine the impact of information disclosed after regular trading hours. *Id*.

- 43 -

precluding summary judgment on this issue. *See Amedisys*, 769 F.3d at 321; *Lormand*, 565 F.3d at 258; *Santander*, 2018 WL 276338, at \*6.

Third, the fact that the January 31 Disclosure post-dates the Class Period does not preclude Plaintiff from proving loss causation. *See* MSJ at 35-36. As numerous courts have recognized, it is not necessary for a corrective disclosure to occur during the Class Period. *See Snellink v. Gulf Res., Inc.*, 870 F. Supp. 2d 930, 942 (C.D. Cal. 2012) ("[Defendant's] suggestion that Plaintiffs cannot suffer any loss as a result of fraud that was not disclosed until after the close of the class period is incorrect."); *In re Dura Pharms., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1023 (S.D. Cal. 2006) (rejecting the notion that loss causation is absent when the corrective disclosures occur after the close of the class period); *In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 560-61 (N.D. Ill. 2007) (same).[33] Thus, Plaintiff has set forth evidence establishing that the January 31 Disclosure revealed "relevant or related truth about the fraud that caused a significant part of the depreciation of the stock and plaintiff's economic loss." *Lormand*, 565 F.3d at 258. That is sufficient to defeat Defendants' motion for summary judgment.

Finally, for the reasons detailed above and in Plaintiff's opposition to Defendants' *Daubert* motion, there is no valid basis upon which to exclude Dr. Feinstein's testimony. *See* MSJ at 35; *see also generally* Feinstein Daubert Opp.; §III.A.4., *supra*.

---

[33]    Contrary to Defendants' assertions, this is not a case where Plaintiff's "'***first*** concrete knowledge of the scheme or misstatement postdates the class period.'" MSJ at 36 (emphasis in original) (quoting *In re FirstEnergy Corp. Sec. Litig.*, 2022 WL 681320, at \*29 (S.D. Ohio Mar. 7, 2022)). Rather, although the concealed truth regarding the impaired RMDG assets was not revealed until January 31, 2017, the October 28 Disclosure informed the market of Exxon's "'apparent reversal of [its] stance'" that "'it has been adequately accounting for the value of its oil and gas reserves,'" while also clearly alerting investors to the fact that Exxon would be conducting impairment assessments at year-end. *See* App. 744-App. 747, ¶¶78, 81-82. "Where, as here, details of wrongdoing emerge in the Class Period and [subsequent] disclosures continues beyond it, no rule prohibits loss causation as to the later events." *FirstEnergy*, 2022 WL 681320, at \*29.

4914-3047-7603.v1

**C.    Although Unnecessary Given Defendants' Actual Knowledge, Plaintiff Has Produced Compelling Evidence of Defendants' Motive to Maintain Exxon's AAA Credit Rating**

In the Fifth Circuit, "the PSLRA state of mind requirement is severe recklessness or ***actual knowledge***." *Southland*, 365 F.3d at 365.  "When scienter is at issue, ***courts rarely grant summary judgment because of the element's subjective nature***." *Blackburn*, 431 F. Supp. 3d at 807; *see also SEC v. EagleEye Asset Mgmt.*, 975 F. Supp. 2d 151, 159 (D. Mass. 2013) ("Few things seem more appropriately the province of a jury than the inference of a defendant's mental state.").

This is not one of those "rare[]" situations where summary judgment is appropriate. *Blackburn*, 431 F. Supp. 3d at 807.  As detailed above in §III.A.1.a., III.A.2.a., and III.B., the record is replete with evidence of the Individual Defendants' actual knowledge , which evidence is more than sufficient to defeat summary judgment.  *Lormand*, 565 F.3d at 253; *see also York Cnty. ex rel. Cnty. of York Ret. Fund v. HP, Inc.*, 65 F.4th 459, 467-68 (9th Cir. 2023) (where defendants "disclosed information . . . that contradicted [their] own internal data," "'a strong inference' that [they] '***knowingly misled***' the public as to the state of the company" is raised); *In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 663 (S.D. Tex. 2021) (finding "ample allegation of scienter" existed where officer defendants "had regular access to information" regarding the at-issue facility).[34]  Accordingly, "[a]lthough motive allegations might 'meaningfully enhance the strength of the inference of scienter,'" scienter "does not depend on such an enhancement in the present case." *Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 685 (5th Cir. 2014).  Nevertheless, Plaintiff has adduced evidence of Defendants' substantial motive to commit the alleged fraud.

The global decline in oil and gas prices in 2014 and 2015 led Exxon's competitors to collectively recognize tens of billions of dollars in impairments, including with regard to projects in the same Canadian and Rocky Mountain regions in which Exxon was operating.  App. 1824; App.

---

[34]    Defendants' assertion that Plaintiff has not established the scienter of lower-level employees is no answer to Plaintiff's proffered proof of the Individual Defendants' actual knowledge.  MSJ at 14-15, 21.

2851-App. 2852; App. 3364; App. 3365.  Exxon uniquely refused to recognize any write downs during the same time period, telling the public that the Company was able to avoid the "write-down trap" due to its "active asset management program" and "conservat[ism] on when and how much is capitalized."  App. 2853; App. 1340; *see also* App. 4687-App. 4688 (Matts Depo. Tr. at 307:16-308:6) (Plaintiff's investment manager testifying that she understood "Exxon [as] saying, here's why there's no write-downs, *it's because we do it better, we're more conservative, we don't need to*.").

In truth, Defendants were aware that Exxon was *not* immune to the challenges its competitors faced as a result of the historic oil and gas price declines, and by the end of 2015, Exxon had become a company with declining profits and rapidly rising levels of debt, and was teetering on the brink of losing its treasured AAA credit rating.  *See* App. 2859; App. 2862; App. 2865; App. 2869.  Exxon's AAA rating was important to the Company because it "help[ed] assure that we had access to – *advantaged access to financial markets*," meaning that "when we needed to issue debt, that when we went to the market, the rates and the size of the financings we could achieve would be at the – the best of the industry's."  App. 4317-App. 4318 (Schleckser Depo. Tr. at 31:25-32:13).[35]

This was particularly true in 2015 and 2016.  Exxon prided itself on its shareholder dividends, with Tillerson going so far as to describe the dividends as "a high priority" and "why we are important to people."  Cpt., ¶¶85, 396; *see also* App. 356-App. 358 (Swiger Depo. Tr. at 197:20-199:4) ("Q.  Why was it important to continue paying an increasing dividend?  A.  Well, it's important to our shareholders.").[36]  But in 2015 and 2016, Exxon's commitment to shareholder dividends was unsustainable, as the Company had insufficient cash from operations to pay them and

---

[35]    Indeed, Defendants believed that Exxon's "AAA rating is important to our business model" (App. 3083; App. 121 (Tillerson Depo. Tr. at 121:2-14)) and was "more about *corporate identity* than it was about specific creditworthiness." App. 4317 (Schleckser Depo. Tr. at 31:10-23).  Both Tillerson and Swiger described the AAA rating as "something the company was very proud of, having had it for many, many years."  App. 376 (Swiger Depo. Tr. at 217:2-11); *see also* App. 120 (Tillerson Depo. Tr. at 120:15-22) ("Q.  And you were proud of that [*i.e.*, that Exxon was one of only three companies with a AAA credit rating in 2015 and early 2016]?  A. Well, yes, we were, of course.").

[36]    *See also* App. 3102 (listing Exxon's three "finance planning principles," one of which was "[r]eliable and growing dividends"); App. 2872, App. 2874 ("Dividends . . . *very high priority*").

- 46 -

desperately needed to borrow cash.  App. 2893 (recognizing "Net Cash Generation" insufficient to cover the dividend); App. 2938 (recognizing that net cash generation of $7 billion "is sufficient to cover about half the expected dividend").[37]  Accordingly, Exxon began the process for its $12 billion debt offering in late 2015.  App. 4385 (Schleckser Depo. Tr. at 99:6-11).  The offering was the single largest offering in Exxon's history and in fact was the "largest energy deal in history."  App. 3162.  As analysts recognized, Exxon's "capex was slightly more than net CF from ops, and borrowing was needed to cover the dividend."  App. 3116; *see also, e.g.*, App. 3112.

Defendants were aware that disclosing any of the concealed facts regarding Exxon's troubled Kearl and RMDG assets would put the Company's already-tenuous AAA credit rating in significant jeopardy.  For instance, ratings agency Standard & Poor's told Exxon that it considered "Reserve size" and "Reserve quality (PD [Proved Developed] %" to be "*[k]ey [c]redit [f]actors for [o]il & [g]as, E&P*."  App. 3127.  Ratings agency Moody's similarly considered "Proved Reserves" to be a "Key Indicator[]."  App. 3132, App. 3136, App. 3140, App. 3144.  Accordingly, Exxon had to be hush about the impending write downs, as the 3.6 billion barrels of proved reserves at Kearl alone constituted over 20% of Exxon's proved developed reserves.[38]  The banks that underwrote Exxon's $12 billion offering also indicated to the Company that any "material 'write-downs' or impairments that are currently being deliberated" were important information and needed to be disclosed to them during the due diligence process.  App. 3154.

---

[37]  *See also* App. 3103 (chart reflecting negative net cash flow in 2015 and for the 2016 outlook "After Dividends"); App. 2873 ("Dividends – never been in such a stressed position"); App. 3007-App. 3008.  While Defendants contend that they had several options to pay the dividend (MSJ at 21 n.4), the option they in fact exploited was borrowing money. App. 360 (Swiger Depo. Tr. at 201:10-16) ("Q.  But the lever that was pulled to continuing paying the increasing dividend in 1Q '16 was the bond offering, correct? A.  With a low – with a – with a low-price environment in mind and the need to continue investing, that was a – a decision around cash management, yes."); App. 2876 ("Shareholder Returns: Additional debt was assumed to fund shareholder returns.").

[38]  Given this evidence, Defendants' contrary facts that de-booking Kearl would not have impacted Exxon's credit rating create a fact dispute; they do not entitle Defendants to summary judgment.  MSJ at 15, 21.

- 47 -

Any decline in Exxon's credit rating prior to completing its $12 billion debt offering would have had significant negative implications for Exxon.  App. 4701 (Feinstein Depo. Tr. at 40:8-13). Given the offering's sheer size, any credit rating downgrade would necessarily have cost Exxon hundreds of millions of dollars in additional borrowing costs.  App. 4701 (Feinstein Depo. Tr. at 40:8-13).  This is logical, given the common sense proposition that, "[i]n general," "the more creditworthy an issuer is, the lower the interest rate that the issuer would typically have to pay to attract investors."  *See also* App. 4392 (Schleckser Depo. Tr. at 106:12-18) (Schleckser agreeing with the proposition).[39]

Tillerson set a tone that the Company would not do write downs, boldly declaring: "***We don't do write downs***.  If you look at our history, we do not write our investments down. . . .  We are not going to bail you out by writing it down.  That is the message to our organization."  App. 2598; *see also* App. 2604 (An email from Rosenthal stated: "***Lets leave off the impairment footnote.  That word gives the folks on the third floor [Exxon's C Suite] heartburn***."); App. 3402-App. 3403 (Horne Depo. Tr. at 35:18-36:22) (Horne also recognizes this dynamic).  Thus, while the Company (like its competitors) was impacted by the global price declines, Exxon uniquely and steadfastly refused to recognize any impairments or write downs in this period.  It was only ***after Tillerson retired from Exxon to become the Secretary of State*** – and after Exxon completed its $12 billion

---

[39]   Defendants should be prohibited from arguing that there is no evidence supporting that a rating downgrade would increase Exxon's borrowing costs, as Defendants have withheld documents on this topic from discovery, claiming that documents on the subject matter are privileged.  *See, e.g.*, App. 4708-App. 4710 (withholding February 26, 2016 email entitled "FW: Avg. Commercial Paper Rate for Bond Issuance").  Because Defendants have shielded such information from discovery, they should be prohibited from offering affirmative testimony on this topic and from arguing or commenting on the absence of such evidence. *Cf. In re Anadarko Petroleum Corp. Sec. Litig.*, 2023 WL 2733401, at *3 (S.D. Tex. Mar. 31, 2023) ("The Fifth Circuit holds that 'when a party entitled to claim the attorney-client privilege uses confidential information against his adversary (the sword), he implicitly waives its use protectively (the shield) under that privilege.'"), *reconsideration denied*, 2023 WL 4308750 (S.D. Tex. June 30, 2023).

4914-3047-7603.v1

offering on March 2, 2016 – that the Company finally, and belatedly, wrote down its Kearl reserves and impaired its RMDG assets. *See* App. 11 (Tillerson Depo. Tr. at 11:10-16).[40]

The trier of fact could certainly conclude, based upon the circumstantial evidence presented, that Defendants were motivated to conceal the facts regarding Exxon's Kearl and RMDG assets until after the debt offering was completed. *See United States v. Durham*, 512 F.2d 1281, 1285 (5th Cir. 1975) (affirming jury instruction that "'it is rarely possible, if at all, ever to indicate intent other than by circumstantial evidence, for while a witness may see or hear, and so be able to give direct testimony of what the defendant does or fails to do, of course, there can be no eye witness account as to the state of mind with which the acts were done or omitted'"). Even in a criminal case, where the prosecutor bears the highest burden of proof in the justice system, circumstantial evidence demonstrating a defendant's motive is sufficient to establish intent. *See, e.g.*, *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) ("[W]e have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required."); *United States v. Giraldi*, 86 F.3d 1368, 1374 (5th Cir. 1996) (a defendant's "mental state is almost always proved by circumstantial evidence from which the jury must infer guilt beyond a reasonable doubt").

Of course, proof beyond a reasonable doubt is a much higher standard than the preponderance standard applicable here. *See, e.g.*, *In re Winship*, 397 U.S. 358, 367 (1970). In denying Defendants' motion to dismiss, the Court recognized that Plaintiff's motive allegations support scienter. ECF 62 at 33. The evidence now proves what Plaintiff pled and easily clears the "less stringent" standard that applies at this stage of the case. *See Novatel*, 830 F. Supp. 2d at 1017

---

[40]    Defendants argue regarding both Kearl and RMDG that they innocently made "subjective" exercises of "judgment" (MSJ at 32, 44) – but at summary judgment, the Court should not accept Defendants' proposed inference that, by mere coincidence, their subjective decisions just happened to simultaneously avoid *two* multi-billion-dollar write downs while Tillerson was in charge and before completing their massive debt offering.

- 49 -

("[A]t summary judgment, *the standard is less stringent* – the PSLRA requirement of pleading a 'strong' inference of scienter 'puts securities fraud claims in the interesting posture of requiring plaintiffs to plead more than they must prove at trial, where a simple inference of scienter is sufficient to support a jury's verdict.'").

## IV.    CONCLUSION

For the above stated reasons, summary judgment must be denied.

DATED:  March 14, 2025                    Respectfully submitted,

                                          KENDALL LAW GROUP, PLLC
                                          JOE KENDALL (Texas Bar No. 11260700)


                                                 s/ Joe Kendall
                                          JOE KENDALL

                                          3811 Turtle Creek Blvd., Suite 825
                                          Dallas, TX  75219
                                          Telephone:  214/744-3000
                                          214/744-3015 (fax)
                                          jkendall@kendalllawgroup.com

                                          BALON B. BRADLEY LAW FIRM
                                          BALON B. BRADLEY (Texas Bar No. 02821700)
                                          11910 Greenville Avenue, Suite 220
                                          Dallas, TX  75243
                                          Telephone:  972/991-1582
                                          972/755-0424 (fax)
                                          balon@bbradleylaw.com

                                          Local Counsel

- 50 -

4914-3047-7603.v1

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS (CA Bar No. 168593)
MICHAEL J. DOWD (CA Bar No. 135628)
SPENCER A. BURKHOLZ (CA Bar No. 147029)
SCOTT H. SAHAM (CA Bar No. 188355)
SAM S. SHELDON (CA Bar No. 190502)
JONAH H. GOLDSTEIN (CA Bar No. 193777)
NATHAN R. LINDELL (CA Bar No. 248668)
SARA B. POLYCHRON (CA Bar No. 244685)
ERIKA L. OLIVER (CA Bar No. 306614)
T. ALEX B. FOLKERTH (CA Bar No. 338140)
JUSTIN G. OETTING (CA Bar No. 350807)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
miked@rgrdlaw.com
spenceb@rgrdlaw.com
scotts@rgrdlaw.com
ssheldon@rgrdlaw.com
jonahg@rgrdlaw.com
nlindell@rgrdlaw.com
spolychron@rgrdlaw.com
eoliver@rgrdlaw.com
afolkerth@rgrdlaw.com
joetting@rgrdlaw.com

Lead Counsel for Plaintiff

- 51 -

4914-3047-7603.v1