# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |
|---|---|
| PEDRO RAMIREZ, JR., Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. EXXON MOBIL CORPORATION, REX W. TILLERSON, ANDREW P. SWIGER, and DAVID S. ROSENTHAL, Defendants. | Case No. 3:16-cv-03111-K |

**SUPPLEMENTAL APPENDIX IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

| Exhibit | Description | App. Page(s) |
|---|---|---|
| 1 | Transcript of Rex Tillerson Interview with Barbara Shook and Tom Wallin, dated August 27, 2015 [EMC_RAM_NYAG 001926545] | Supp. App. 1–72 |
| 2 | Excerpts from Transcript of Ben Tsocanos Deposition, dated January 14, 2025 | Supp. App. 73–77 |

Dated:   March 28, 2025

Respectfully submitted,


/s/ Daniel J. Toal                    
Theodore V. Wells, Jr. (*pro hac vice*)
Daniel J. Kramer (*pro hac vice*)
Audra J. Soloway (*pro hac vice*)
Daniel J. Toal (*pro hac vice*)
Paul D. Brachman (*pro hac vice*)
Matthew D. Stachel (*pro hac vice*)
Samuel M. Kleiner (*pro hac vice*)
Lyuba Shamailova (*pro hac vice*)
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
twells@paulweiss.com
dkramer@paulweiss.com
asoloway@paulweiss.com
dtoal@paulweiss.com
pbrachman@paulweiss.com
mstachel@paulweiss.com
skleiner@paulweiss.com
lshamailova@paulweiss.com


/s/ Jason Bloom                    
Nina Cortell
Texas State Bar No. 04844500
Jason Bloom
Texas State Bar No. 24045511
HAYNES AND BOONE, LLP
2801 N. Harwood Street, Suite 2300
Dallas, TX 75219
Telephone: (214) 651-5000
Facsimile: (214) 651-5940
nina.cortell@haynesboone.com
jason.bloom@haynesboone.com

*Counsel for Exxon Mobil Corporation,*
*Andrew P. Swiger,*
*and David S. Rosenthal*

/s/ D. Patrick Long                    
D. Patrick Long
Texas State Bar No. 12515500
SQUIRE PATTON BOGGS 2200
Ross Avenue, Suite 4100W
Dallas, TX 75201
Telephone: (214) 758-1505
Facsimile: (214) 758-1550
patrick.long@squirepb.com


*Counsel for Rex W. Tillerson*

# Exhibit 1

REX TILLERSON INTERVIEW

WITH BARBARA SHOOK AND TOM WALLIN

08/27/2015

TRANSCRIBED BY KAREN L. SHELTON, CSR

ON SEPTEMBER 2, 2015

ABC COURT REPORTERS    214.303.0ABC (0222)

**Supp. App. 1**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252921
EMC_RAM_NYAG 001926545

MR. WALLIN:  Should we get -- are we starting, Barbara?

MS. SHOOK:  Yeah, we're starting.

MR. WALLIN:  Okay.  Okay.  We'll turn this on.

MR. TILLERSON:  Might as well kick it off. Hopefully the --

MR. WALLIN:  Before we start, I just had to say one thing, that I'm going to be at the Oil & Money Con -- Barbara is as well -- at the Oil & Money Conference in October, and I'm going to be introducing you and your keynote speech at the conference.

MR. TILLERSON:  Okay.

MR. WALLIN:  And I'll see you that morning and, you know, before and do a -- we'll do a little Q&A afterwards.

MR. TILLERSON:  Okay.

MR. WALLIN:  That's sort of the standard format of that.

MR. TILLERSON:  Sure.

MR. WALLIN:  So just to let you know and, you know, make that connection.

MR. TILLERSON:  All right.

MS. SHOOK:  And there will probably be a

ABC COURT REPORTERS    214.303.0ABC (0222)

**Supp. App. 2**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252922
EMC_RAM_NYAG 001926546

scrum after your speech, but whether you want to hold a formal Q&A with the media is up to you.

MR. TILLERSON:  Okay.  All right.

MR. WALLIN:  Yeah, actually Patrick Pouyanne from Total is speaking directly after you, so it should be possible, if you want, to just get off and, you know, move out or whatever you want to do --

MR. TILLERSON:  Okay.

MR. WALLIN:  -- the choreography of that. We talked to your guys in London about that recently, so --

MR. TILLERSON:  Yeah.  We'll sort that out between now and then.

UNIDENTIFIED MALE:  Absolutely.

MR. WALLIN:  Okay.  Well, let me get this thing started here.

MR. TILLERSON:  Hopefully the mower guy, he'll finish up here pretty quick and won't have -- you won't have a mower in the background.  It looks like he's getting close.

MS. SHOOK:  I think he did up here close already.

But, yeah, this reminds me a lot of 1986, and I remember -- and '88 too, and I wrote a story for the

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 3**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)      EMC 001252923
EMC_RAM_NYAG 001926547

Houston Chronicle about OPEC.  The headline was "OPEC Official Says $5 Oil Possible."  And I talked to my husband the next day.  He said, if you don't change your story, they're not going to let you get off the airplane when you come back.

MR. TILLERSON:  Right.

MS. SHOOK:  But is this another -- is this just another cycle, or are we looking at structural change again?  Is it -- you know, especially with OPEC giving up the role of managing the market that it's had since '73?

MR. TILLERSON:  Well, I -- and I'll touch on that last comment you made because I would not conclude that OPEC has given up its role in managing the market. Rather, I think what they're doing is part of the process is how they need to manage in this different environment now.

Yeah, I mean, a lot of people have commented this is starting to feel a little bit like the Eighties. I think everyone understands kind of what triggered this is a confluence of a lot of things, pretty weak, relatively weak global economic activity in general. I mean, even though the U.S. is operating somewhere around 2 percent GDP, coming out of recession that's

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 4**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252924
EMC_RAM_NYAG 001926548

pretty weak.  Europe, pretty weak.  China had to roll at some point.  So it's just -- it's, you know, a lot of things on the demand side, then coming right into the teeth of this consistent, significant growth in supply, largely coming out of North America, although some coming out of the return of Iraq in a rather stable and predictable fashion.  I know as hard as it is to believe that could happen and with what's going on over there, they have been rather consistent in growing that production.

So it's really -- it's just fundamentals, you know, supply and demand, getting themselves out of balance again.  And this is the nature of this industry.  It's the nature of a lot of commodities.  And we have a long history.  And we talk about this all -- throughout my entire career we've talked about the thing that people never seem to understand or appreciate about the energy industry are the long cycle times for us to be able to respond on the supply side.  And when we do respond, therefore, we tend to always overshoot because we just can't turn it on a dime.  It doesn't work that way.

And so it's not -- you know, this is not a new phenomena.  And I think the -- how deep it stays,

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 5**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252925
EMC_RAM_NYAG 001926549

how long, is hard for any of us to say because a lot of participants are and do have optionality around how they want to -- how they want to deal with this, which kind of comes back to your OPEC comment of, you know, have they surrendered. And I don't think they have surrendered at all. I think they have recognized what they're dealing with, and their alternatives were to do what they traditionally have done when we go through these little cycles, and that's manage their production to sustain a price band.

And I think they were -- they, too, rightly judged what I just described and how out of balance this thing was and concluded that that wasn't going to get them anywhere other than to really have to curtail their production.

So I think -- I think what they're really doing, and I've commented on this publicly elsewhere, is I think it's just -- it's classic price discovery that is largely the Saudis have decided they need to undertake this. This is the future of the kingdom, how they're going to manage their resources, what level of capacity do they need to maintain. And they have to continually invest to maintain capacity that they do not produce. This is something that a lot of people

ABC COURT REPORTERS  214.303.0ABC (0222)

**Supp. App. 6**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)  EMC 001252926
EMC_RAM_NYAG 001926550

overlook.

And I remind folks of when prices went out of -- out of whack, got up to the $140 range, the Saudis and Ali Al-Naimi, who's been around as long as any of us, he's remembers it too, recognized that was not good. And that happened because the world looked at the spare capacity and it was gone. It had evaporated. Saudis had everything on they could produce. So the king authorized them to add 2 million barrels a day of capacity with the intent of shutting it in.

And I tell policymakers in Washington who bash these guys all the time, you don't understand, the best friends you've got. No other nation in the world would invest billions and billions of dollars to develop 2 million barrels a day of oil-producing capacity to shut it in. That's the reason they did it, because they had to demonstrate to the markets that the spare had been restored. Otherwise, they can't play that role.

MR. WALLIN: Right.

MR. TILLERSON: So now they've invested all this money, they've got this spare, and now I think they're asking themselves, gee, was that a -- boy, did we make a big mistake there? Because now all this North

ABC COURT REPORTERS    214.303.0ABC (0222)

**Supp. App. 7**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252927
EMC_RAM_NYAG 001926551

American stuff came.  So they have to understand what is the pricing structure today in order to make decisions about how much spare, if any, do they feel they need to manage in the future in order to continue, Barbara, back to your question, continue to play their role.

So I don't think they have changed their view that they have this role that they need to play and they want to play, but it's rather how do they play it.

MR. WALLIN:  Right.

MR. TILLERSON:  And it is not -- that's not obvious.  It's not even obvious to me.  So I think it's -- it is -- it's going to be very informative to all of us as to understanding the price discovery, and it's just back to where are the marginal barrels and how -- and how elastic are they.  And so, you know, I think a lot of people thought, okay, we'll get to 60 and everything will become obvious.  I never held that view, quite frankly, and I commented early on that I think people are going to be pretty darn surprised at how resilient this thing is.  That's what I told the OPEC meeting when I spoke to them in June.  So I said you need to be ready for this to take awhile.

And so I think the fact that we've gone

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 8**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252928
EMC_RAM_NYAG 001926552

through a little bit of these price convulsions this year, going down, popping back up, going back down, shouldn't be a surprise to anyone because that's what we're doing.

And I think the only new element that I see, Barbara, this time around that wasn't there in the previous cycles we've been through that is part of this cycle is the availability of financing, you know, the low cost of money, the amount of private equity money that is easily raised because it doesn't cost anything, you know, with these low interest rates.  And that's what we saw the first little pop-up, you know, earlier this year, then a lot of the conventional players who were in pretty bad shape financially suddenly got an infusion.

MR. WALLIN:  Right.

MR. TILLERSON:  They either were able to raise some money from banks or they raised it from private equity or they went to the equity markets and issued shares, which stunned me.

MR. WALLIN:  Yeah.

MR. TILLERSON:  I mean, I was just stunned. So I think it's because we're in this -- we're also part of this general environment in global equity markets

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 9**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252929
EMC_RAM_NYAG 001926553

and investment climate of very, very low-cost financing, so you can take a lot of risk. And that's what people are doing. There's a lot of cash looking for someplace to go and they look at this and say, boy, look, this is down 50 percent, this has got to be a good investment, pour it in there. You know, the money's costing me 2 to 3 percent. Throw it in there, what the heck.

So I think that's the -- that's the piece that is going to cause this -- how this all plays out. That's why I think it's going to take a little while. And I -- and when I talked with some folks again back in June, I told them, this is the piece that's different. And I can't tell you how -- when do people get burned enough that they say I've had it, don't call me anymore.

MR. WALLIN: This goes to actually the next question that we were going to ask is like what do you think the greatest risks are in this downturn. I mean, you'd rate that sort of financial easy access to money the greatest risk? Is that --

MR. TILLERSON: Well, the greatest -- for people like us, the greatest risk is just how long.

MR. WALLIN: Right.

ABC COURT REPORTERS    214.303.0ABC (0222)

**Supp. App. 10**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252930
EMC_RAM_NYAG 001926554

MR. TILLERSON:  How long.  And that -- and the part that's maybe the risk of being able to anticipate that is this availability of low financing, easy capital that's available to people.

Now, as many have begun to write and observe, we may be -- are we going to come to the reckoning in the second half of this year as people have to update their reserves and then their coverage ratios all go to -- they get flipped upside down and they can't go out and raise any more money.  That's it.  They're done.  You know, the availability of the hedging market was not there in the Eighties, Barbara.  You know, we didn't have --

MS. SHOOK:  Yeah.

MR. TILLERSON:  You couldn't do that.  You couldn't sell forward and get yourself an injection of cash.  So there were just -- there's so many more financial tools available to people today that make this different along the periphery.  I don't think -- fundamentally it doesn't change anything, but how you emerge from it has -- is different.

MR. WALLIN:  I see.

MR. TILLERSON:  Because none of that was available in the Eighties.

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 11**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252931
EMC_RAM_NYAG 001926555

MR. WALLIN:  Right.

MR. TILLERSON:  People -- you lived with your cash flow.  And that's why you had the massive layoffs.  We went through it, massive layoffs with us. It was --

MR. WALLIN:  Extraordinarily higher interest rates and stuff.

MR. TILLERSON:  It was ugly.  Yeah, very high interest rates in the Eighties.  You couldn't -- even if you had access, you couldn't afford it.

MS. SHOOK:  Yeah.

MR. TILLERSON:  So it's just -- this is a very different -- has many different elements to it which says how we come out of it's very hard to predict because people are behaving -- in my view, capital is not behaving rationally.  But I understand why.  It's because people are saying, well, I leave it in the money market where I'm actually negative interest rate?  Do I put it in a -- I can't get a CD that will pay me more than 0.1 percent.  What the heck.  Let's put some of it in here, I might get rich.  And I think that piece is different this time.

MR. WALLIN:  Interesting.  Yeah.

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 12**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)      EMC 001252932
EMC_RAM_NYAG 001926556

MS. SHOOK: Yeah. Okay. Okay.

Well, ExxonMobil's still pressing ahead with a lot of large upstream projects that -- well, they were already in the pipeline.

MR. TILLERSON: Right.

MS. SHOOK: They're coming on between now and 2017. But what are you going to do after 2017? What's in the pipeline there?

MR. TILLERSON: Well, we still have this very, very deep inventory. The resource base, over 90 billion barrels is still the resource base. When we -- when we put those resources in our resource base, you know, there's a large portion of that that would -- that we can't develop today, but we hold it because we believe it will be commercial.

And if you look at the history, and I can go back and look at the history of that resource base, ultimately those things make their way up the list because we develop technology capabilities, we find other ways to develop those to make them commercial. Sometimes we're able to renegotiate terms, fiscal terms around those resources because countries want it developed.

So we have a lot of things in the

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 13**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252933
EMC_RAM_NYAG 001926557

resource -- we've always had things in the resource base that at today's environment you'd say, well, I can't go develop that.  But we keep them because we have demonstrated consistently, certainly over the 40 plus years of my career, that we find the elements necessary to see them developed.  And I could say that about Sakhalin offshore Russia.  I mean, that thing was undevelopable when we got it.  It had no economics, and now it's one of our most profitable operations.

So we have that same inventory out there, and the process we use is unchanged.  The only thing that changes is the price that we're telling people to test it against, you know.  And we've always used a very broad range of pricing because we know we can't predict when things turn, what the future is.  And where our -- where the attractiveness of those things moves back and forth on us is -- is because when you get into different price environments, you're now into different cost environments as well.  And so the piece that we have to be very, very careful with is when we're in the high price environment like we've been for the last few years, we know that the capital that goes into those resources is going to be high because the environment is a high-cost environment.  And it's

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 14**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)   EMC 001252934
EMC_RAM_NYAG 001926558

unlike your cash cost, which is variable. Once you put the investment dollars in there, if the price goes down, those investment dollars are stuck, you know, you get to live with that. We don't do write-downs.

I mean, if you look at our history, we do not write investments down. And we follow the accounting standards. But a lot of other people are very quick to want to write investments down because then it kind of improves things going forward. Well, it's part of our disciplined approach to investing is everybody around here understands, you make that investment, you're going to get to live with that for the rest of your career, and so if you had to -- if you have invested in a high-cost environment and things go south, you better have anticipated your ability to work on the things you can work on to sustain the profitability of that investment, which means the variable cost, and how you're going to -- so how are you going to get it out of the variable cost because your fixed costs are there and we're not going to change that for you. You know, we're not going to bail you out by writing that down.

That's kind of the message to our organization, and they all understand that. I mean, that's -- I grew up with that. And it's -- it's hard,

ABC COURT REPORTERS    214.303.0ABC (0222)

**Supp. App. 15**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252935
EMC_RAM_NYAG 001926559

but it does cause the organization to get very focused then around those assets that we developed in a high-cost environment. And when you move to this environment, okay, how are we going to make it work at $50, $40, whatever. We got to make this work. And they get very focused then because they know the -- you know, there's no safety net coming in or nobody's coming in here to help them out on the fixed cost side. They're stuck with that.

MR. WALLIN: Yeah. Well, to maybe even -- you know, that whole scenario's even tougher with megaprojects. I mean, we've had in the last 10 to 15 years a lot more megaprojects in the industry and, you know, there have been a lot of problems across the industry and, you know, getting those done on time and on budget. And, you know, Exxon's a partner in Kashagan, you know, which is probably the sort of, you know, prime example.

MR. TILLERSON: Poster child for dysfunctionality.

MR. WALLIN: That's right. Well, you said it. I didn't.

MR. TILLERSON: It's okay. I've said it to my partners consistently.

ABC COURT REPORTERS    214.303.0ABC (0222)

**Supp. App. 16**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252936
EMC_RAM_NYAG 001926560

MR. WALLIN:  So what's being done, you know, to address this in megaprojects?  I mean, you know, is this getting fixed?

MR. TILLERSON:  Well, I think -- I'll talk about us first.  In the projects that we operate where we're in control, we have done very well.  We've delivered them on time.  We've delivered them on budget.  And that's -- you know, and that's because we have a part -- we have a organization, ExxonMobil Development Company, that was created back at the time of the merger because we were looking forward and we could see the opportunity set that we had out of the ExxonMobil merger was a lot of megaprojects.

And when we looked at our past, we saw the same thing.  We're not very good at this.  We don't seem to be able to get them done on time, we don't seem to be able to get them done on cost, and they don't seem to start up and run very well.  So we were like everybody else.

And so at the time of the merger, we made the very -- actually the year before the merger made the very conscious decision that we had to create project expertise that no one else had because we cannot rely upon the contractors.  We can't rely upon the KBRs.  We

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 17**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)      EMC 001252937
EMC_RAM_NYAG 001926561

can't rely upon the AMEX.  We can't rely upon the Fluors to do it.  And nor should we.  We're the investor.  We need them to do what they do, but we have to own the overall execution and performance of this thing.

So we created the development company and over now the -- since the merger, actually was again created in 1999, that organization has developed a capability and an expertise that I am -- I can say with certainty no one can come close to, no one.  And when they say they're going to do something, they do it.  And when they run into a problem, they know how to re-baseline it and fix it.  And that's -- I mean, and the most recent shining example is Papua New Guinea. You know, nobody thought that project could even be done.  Started up early, started up on budget. Sakhalin, people said it couldn't be done.  Started up on time, started up on budget.  It's one of the most profitable operations we have.

All of that capability, though, didn't just happen.  It was developed with a lot of focus, a lot of effort, and a lot of investment in people, you know, and a recognition of what they can do.  So they -- we have an internal capability that no one else has, and we see that.  And the reason we know that and I can say

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 18**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)     EMC 001252938
EMC_RAM_NYAG 001926562

with confidence is because we are participants in projects that we do not operate.  And we put some of our people in there at the early stages to try to help. And it is always interesting to me that we don't get full uptake on that, because we're an investor there too.  We like to see those things perform better.  But everybody has pride of ownership.  They push back. They want it done their way.  And so we watch them make the mistakes that we know they're going to make, and we pay for them.

And you can go through the list of non-operated projects we're in, and none of them are on time, few of them are on budget, and they all struggle.  And it frustrates me to no end.  But all you can do is offer your -- offer your input.  We don't control.  We don't have controlling interest in those things, so we can't block, you know, we can't force people to do things.

MR. WALLIN:  Right, right.

MR. TILLERSON:  But there's a litany of these things out there, and every one of them when we look back could have been done a lot different, a lot better, and we all would have made a whole lot more money.  And it is a distinguishing capability that we

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 19**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252939
EMC_RAM_NYAG 001926563

have that no one else has.  Now, others have nibbled around the edges of creating it, but they've never been willing to go all in, because it took -- it takes an all-in commitment to do that and you've got to stick with it.  People just aren't willing to do it.

MS. SHOOK:  Well, let's talk about a good story, and that's the U.S. shale story.  That has changed the world.  What -- what's your take on that? How has it -- how do you see it having changed the world? I mean, the U.S. is now on the verge of becoming potentially a significant exporter.  We already export to Canada.  We're about to export to Mexico.  We could be a full exporter in the next couple of years.

MR. TILLERSON:  Yeah.  Yeah, our outlook would suggest that on a net -- I mean, net, you take import, export, everything, that we will be a net exporter by the end of the decade.  Now, a lot of that will depend certainly on the environment.  But the resource base has now been well established.  It's there, there's no question it's there, and we understand what it takes to develop it.  And people will continue to get the unit cost of that development down so that it will be -- it will compete.

Will all of it compete at all pricing?  No,

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 20**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)   EMC 001252940
EMC_RAM_NYAG 001926564

you know, but a significant portion of it is competitive even at today's pricing.  We have a lot of resource holdings in the unconventionals here in the U.S., and they are profitable at today's prices.

MR. WALLIN:  You think it's sustainable at these prices, you know, on --

MR. TILLERSON:  A portion of it is.

MR. WALLIN:  Yeah.

MR. TILLERSON:  Now, there's a portion of it -- you know, because I know, as y'all appreciate, these are not all created equal.  Even within plays they are -- it's not all the same.  There is higher-quality portions of the Bakken, Permian, all of these.  But there are large, large resources in place that will compete today.

And the unevenness, kind of back to some of the earlier conversation, the unevenness in how this all emerges is more a cash flow issue than it is a quality of the investment opportunity itself.  People are just going to have their cash flows are out of whack for a while until -- until it lines out.

But it is clearly -- it's here.  It's proven.  It's reliable.  And in fact, I think that is one of the things that OPEC is, I think, and I can't

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 21**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252941
EMC_RAM_NYAG 001926565

speak for them, but if I were them, that I would be wanting to understand out of this exercise is, okay, how -- what is the elasticity on North American unconventional.  If you have a -- if you have a price -- if your price range is 40 to 50, what happens?  If your price range is 50 to 60, what happens?  If it's 60 to 70, what happens?  Because if you go back to what I said earlier about the  mark -- the markets are looking at the supply side and they're asking how resilient is that and can I see that there's capacity available should demand suddenly tick up.  And if they see that, then they're calm.  If they don't see it, they get nervous and everything gets out of -- out of whack on the other side.

So one of the questions is, well, is North America now the new -- the new spare?  And North American -- the industry, at least when things were running at a kind of steady state, demonstrated we can add a million barrels a day in a year.  Now, if you shut it down for a while, it won't be in a year, but it won't take long.  You give it the right price signal and boom, here it comes.

And so if I'm OPEC, I'd like to understand that because maybe if I can convince the market that

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 22**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)   EMC 001252942
EMC_RAM_NYAG 001926566

don't worry, North America can turn a million barrels a day on in a year, two years, if we give it the right price signals so you don't have to get crazy and shoot through this, and then they, OPEC, don't have to develop that.

MR. WALLIN:  Yeah.

MR. TILLERSON:  You know, so that's what's changed.  And back to your question, what has North American tight oil and unconventionals done, it has demonstrated the resource base is enormous, it's demonstrated it can be developed technically, and it's demonstrated that it was still on a cost curve that was going down when all of this happened.  And this will probably stimulate even further efficiencies.

So I think that it is -- it's recognized now globally.  It's recognized it's not going to go away. And I don't -- and all of this talk about -- about OPEC trying to kill North America is just nonsense.  It's not in their interest to do that at all.  What they want to do is understand it, but they don't want to kill it. I mean, Naimi once said to me, "I'm very happy this has happened, it takes the pressure off of us."  Now, he didn't antici -- this was back when it was about 8 million barrels a day or less, seven and a half.  I

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 23**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252943
EMC_RAM_NYAG 001926567

don't think he anticipated it going to 9.4, but I didn't either, so -- none of us were quite sure where it was going to go.

MS. SHOOK: I'll tell Allen something that he can pass along to you when -- when we're not so pressed for time, but a story that I had.

MR. WALLIN: Let me -- let me pick up another question here --

MS. SHOOK: Sure.

MR. WALLIN: -- just to change a little bit, talk about ExxonMobil a little bit. And, you know, it's apparent that you're not cutting back, particularly on your investment budget, you know, the way that, you know, some of your peers are in national oil companies and so forth. I mean, that sort of raises the question of how is this spending going to be financed in this environment, and, you know, are you going to need to raise capital in the debt and equity market, are you going to eliminate share buybacks, is the dividend, is that -- you know, is that -- is there any thought of that being under threat or --

MR. TILLERSON: Well, you know, we did -- we only update things once a year, in March. We never give forward guidance because we think that's foolish. We

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 24**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)   EMC 001252944
EMC_RAM_NYAG 001926568

had -- you know, we had indicated that CAPEX would be down this year.  It was down last year coming off of our peak of all these huge projects that were in the portfolio that we needed to get done, kind of recapitalize the upstream in this decade.  So we're down -- I think through the first half of the year we're down about 12 percent, invested just a little bit under $16 billion.  Our number coming into the year we said was around 34.  It may trend a little bit under that given this environment we're in.

We're just now -- next month we'll be starting our planning and budgeting process for 2016.  And I know the organization, they're looking first at, you know, what are we going to extract cost wise so you do the same level of activity for just lower cost so that could -- you know, that will deliver some lower capital spending.  But they're also looking real hard at their inventory of opportunities, I know, and asking themselves does it make sense to do this right now; if it's not a lost opportunity and my holding cost is very low, maybe I don't need to do this, you know.  So it's part of that.  Our approach has always been a very selective approach to investment decision-making.  Always have more available to you than you -- than you

ABC COURT REPORTERS    214.303.0ABC (0222)

**Supp. App. 25**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252945
EMC_RAM_NYAG 001926569

have to do or want to do so you can pick the very best. And then the stuff that doesn't get moved forward this year, tell the organization find a way to make it better, let them spend some time on technology, other things.

So I don't know where we'll be next year. I'm sure it will continue to trend lower for no other reason than we're in a different cost environment.  So you kind of look at the first half of the year.  I think we earned a little over $9 billion.  We generated around 18 billion in operating -- cash flow from operations and asset sales, and that was by and large operational cash flow.  We paid $8 billion to the shareholder, dividends and share buybacks, and we're still buying the shares back, and 16 billion in CAPEX.

So if you do the math on that, we went to the debt markets and financed a part of the capital program this year because it's very attractive to us.  And we're triple A.  Debt market's pretty cheap money to us.  And certainly the things we're investing in are well above the cost of that capital.  So we did take advantage of that situation this year because we're in this transition.

And, as Barbara observed, we have a lot of

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 26**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)        EMC 001252946
EMC_RAM_NYAG 001926570

the projects are these big megaprojects, so you need to finish them, so you've got to fund the finishing of those.  And then the rest of the capital program that has -- where you have to make final decisions on or has a lot of variability in it, we'll see where the -- where the organization comes back in this process and where do we feel is the right -- what's the right investment level.

So, kind of to the bottom of your question, I've always viewed our financing structure as being one of I will borrow -- I'll go to the debt markets when I have good investment opportunities.  I prefer not to go to the debt markets to pay for the dividend because I don't think I need to.  You know, so -- and cash flow, the cash flow comes in, part of that belongs to the shareholder.  I'm going to give it to them.  We'll look at our investment opportunities, and if we like them enough, the financing will be there.  The capital markets are always happy to loan ExxonMobil money to go invest in things that are for the future.  And that's -- just philosophically that's my view of how we finance this place.  And, you know, during the past decade we've not had to go to the capital markets because the cash flows were just so healthy.

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 27**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252947
EMC_RAM_NYAG 001926571

So we did go to the debt markets this year because we saw our investment program was certainly attractive enough to do that.  And then if that becomes an issue, we'll just be looking at that investment program.  Okay, well, where do we -- where do we draw the line?  This is all we're going to go do.  And in particular where we know we can hold the opportunities and not lose them, they're not going anywhere.

MR. WALLIN:  Yeah.

MR. TILLERSON:  You know, wait another year, try to find a -- make them more attractive, which is what -- what is going on in that portfolio today, even with a lot of our non-operated projects.  The other operators are doing the same thing.  We've agreed let's go back, let's rebase this, let's see if we can't get some more cost out of this thing.  It's back to that here's your fixed dollars going in.

MR. WALLIN:  Right.

MR. TILLERSON:  Let's make sure we get them as low as we can because we're going to live with it.

MR. WALLIN:  Right.

MS. SHOOK:  Well, what about rationalizing operations here?  You -- as you said, you let a lot of people go back in the Eighties.  What have you learned

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 28**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252948
EMC_RAM_NYAG 001926572

from that that you don't want to lose your best and brightest?

MR. TILLERSON:  Yeah, we learned we didn't ever want to do that again.  It was extremely painful for everyone.  You know, we stopped recruiting on campuses.  It hurt our standing with the young workforce that was coming in.  And I say this broadly as an industry, and we were certainly part of that, that, as you know, we went through a period where it was hard to attract talent back into our industry because they saw what happened, you know, and they heard from their friends.

And so we -- what we learned out of that and what I personally learned out of that, because I was in a middle management position where I had to call a lot of people in and let them go, and it was -- it was most unpleasant time of my life, is that we just never were going to get ourselves in that position again.

So numerically, if you look at where we were at the time of the Exxon and Mobil merger, and I think we had about 130,000 employees, today we run a bigger operation with less than 75,000.  So we've gotten -- and our contractor workforce really hasn't changed much.  If you just kind of on average all over

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 29**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252949
EMC_RAM_NYAG 001926573

the world, all in, you know, we got a couple hundred thousand contractors on any given day working on projects and maintenance things and whatnot.

So I think we have always kept this organization very lean, very efficient, and then stay engaged with the emerging workforce so we can always attract the best and brightest people. And so that is our intention is that we don't -- we see no need for an adjustment in our workforce levels because I think we're at a very efficient level now.

We -- because of the way we are structured, again coming out of the merger with our global functional companies, we have the ability to redeploy people very rapidly to higher value work. So if something is slowing down over here because of this environment, we don't need to let those people go. We have other places that will immediately shift them and redeploy them. And that's not just within the E&P sector. We move people from the E&P sector into the refining sector, the chemical sector. And during the time we were in that peak upstream time, we were moving people from refining in chemicals into the E&P sector, from engineers to scientists to project managers to operating people. And that's the way we built this

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 30**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252950
EMC_RAM_NYAG 001926574

thing out of the merger is recognizing we had to have the ability to redeploy our talent very quickly and we couldn't let the organizational structure become an obstacle to that.

And the old -- the old geographic hierarchical structure we had, it was an obstacle.  It was very difficult to move people from one place to another because organizations protected and held on to them, which then meant you were carrying too many people, because you always had a segment out there that was not really high --

MR. WALLIN:  Fully used, yeah.

MR. TILLERSON:  -- highly -- highly utilized.  So we now utilize everybody.  And in fact, the move to the campus in Houston now has just further facilitated that because everybody is on the same site now.  And so the ability to --

MS. SHOOK:  So they just move from office to office.

MR. TILLERSON:  Yeah.  And so it's really, it is very easy as we get into these downturns where the upstream's in a downturn, downstream in chemicals is in an upturn.  If you look at our investment portfolio today, we have a lot of downstream in chemical

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 31**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252951
EMC_RAM_NYAG 001926575

projects, big projects underway.  As you can imagine, we're taking a lot of these upstream project people with all this expertise and get them deployed over here, make these things successful.

So as we look at our workforce, we think we're in good shape.  We don't feel an urgency to have to do anything there.  We're going to maintain a presence on the campuses and stay engaged with the emerging talent. You know, we probably won't hire as many people, but we do not want to abandon --

MR. WALLIN:  Yeah.

MR. TILLERSON:  -- the emerging workforce because we -- we've been through that and it was hard. Fortunately, technology saved us, made us more efficient.

MR. WALLIN:  Yeah.  What about -- let's talk a little bit about mergers and acquisitions.  I mean, it's always been, you know, an avenue of growth for the company in the past, and there are a lot of expectations out there that, you know, with this downturn that ExxonMobil will take advantage of this current environment and, you know, move towards some acquisitions.

And do you think that -- first of all, is that

ABC COURT REPORTERS    214.303.0ABC (0222)

**Supp. App. 32**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252952
EMC_RAM_NYAG 001926576

perception valid and is -- you know, and what are your kind of current criteria for possible acquisitions, if that's true?

MR. TILLERSON:  Well, I mean, the perception is valid certainly anytime this happens, and the history would say that's -- that that's going to happen.  You know, at this stage we've done very small little asset deals, you know, people that are having trouble.  As they're trying to survive, we get -- we get calls, a lot of calls every week, as you can imagine. So we're looking at a lot of assets where people are just trying to raise cash, you know, trying to keep their company together, keep their people employed. And we've done a few little small asset deals that have been very attractive.

And so that -- today that seems to be the space that's offering what I would call transactions that are appropriately valued.  When you -- when you move up to like company levels, there's still a gap between valuations that sellers would see and valuations that we would see.

And again, I think that disconnect exists for some of the reasons we were talking earlier.  They've been able to raise money and hold their valuations up,

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 33**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)   EMC 001252953
EMC_RAM_NYAG 001926577

particularly if they're publicly traded.  They want to raise the money, hold their valuations up.  They've been able to hedge their production forward so they're demonstrating cash flow.  Some of that's going to have to kind of work its way out before valuations get in line with what we think are appropriate for the long term because, you know, if we do something, you got to do it with a view that it's a 30-year decision you're making.

So what's -- what it looks like today is not particularly interesting to us.  We don't worry -- we don't spend a lot of time looking at the value that the metrics might give you today.  We think much more -- we're thinking about, well, what will we do with this over the next 20 to 30 years to add value to it. And if we can't add value to it, then we're not interested.

MR. WALLIN:  Right.

MR. TILLERSON:  I mean, why would we do that? Just -- we're not a portfolio investor.  We are strictly value investors, and so we're looking for opportunities where we say, you know, gee, if we had that, there's synergy benefits, there's technology we can add to it that they don't have.  We will create

ABC COURT REPORTERS  214.303.0ABC (0222)

**Supp. App. 34**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)  EMC 001252954
EMC_RAM_NYAG 001926578

value out of that.  If those elements aren't there, then why would we do it?

So, those are the fundamentals, and I think the time is just -- it doesn't seem to have arrived yet where there's much that --

MR. WALLIN:  But there could be, as you say, larger acquisitions in the future --

MR. TILLERSON:  We'll see how --

MR. WALLIN:  -- if the opportunities --

MR. TILLERSON:  We'll see how this environment plays out.

MR. WALLIN:  Right.

MR. TILLERSON:  Who knows, maybe OPEC changes its mind, all of a sudden everybody gets healthy again and that's the end of that.

MS. SHOOK:  I don't know.  Only if a few countries get really desperate.

MR. WALLIN:  Do you want to ask about the cost question?

MS. SHOOK:  Yeah, let's -- the current downturn, I mean, the cost of our services seem to be going down significantly, and maybe Schlumberger can cut you some full -- some full-service deals now that they own Cameron.

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 35**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252955
EMC_RAM_NYAG 001926579

MR. TILLERSON:  They're pretty tough to deal with.  I don't know.

MS. SHOOK:  Well, I don't -- you know, now maybe it can be everything from seismic to blowout preventers to --

MR. TILLERSON:  Yeah.

MS. SHOOK:  -- everything except the actual drilling itself.  You know, what kind of savings are you achieving now versus what it was even a year ago?

MR. TILLERSON:  Well, the first place you see it is in North America because that whole -- the whole structure of the service arrangement is shorter term.  So when things change, you can capture cost reductions more quickly.  You know, a lot of the global, globally in the deepwater you've got long-term contracts or you've got multiyear contracts with people in place.  But it has afforded the opportunity to go back to some of those deepwater -- you know, deepwater drillers are in pretty tough shape right now.  We don't want to see them -- obviously we don't want to see any of those guys get in trouble and go under because if we need them.

But it does offer an opportunity to restructure some contracts and get some savings now

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 36**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252956
EMC_RAM_NYAG 001926580

or -- or commit to honor the contract if it's about, you know, maybe it's going to run through the year or whatever, honor the contract and let's go ahead and talk about, okay, how do we put the next deal in place so you've got certainty. You've got another couple of years on your contract but it's going to be at this kind of a rate where you're actually going to -- we're going to take a little bit of this and shape it forward or something like that.

So it really is very dependent upon the service sector and the nature of the work they're doing, and it's a little bit like the difference between the megaprojects and the North American drilling. But each of the organizations, so each of them have to take an approach that, you know, that is consistent with that type of work activity.

So, XTO, you know, they've been all over it from the very beginning. They had a few contracts that were like a year in length, not many, so they quickly have captured the kind of savings you're hearing others talk about. You know, 30 percent, 40 percent is not unusual in certain segments of the service providers in the North American unconventional drilling space.

Overseas it has a little bit longer tail to

ABC COURT REPORTERS    214.303.0ABC (0222)

**Supp. App. 37**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252957
EMC_RAM_NYAG 001926581

it because you're in these longer-term contracts and they're -- and they are a bit more com -- the contracts are more complex, you know, because some of those have to go back to governments to be approved.  So when you want to amend the contract, you've got to take it back to the host government and get it approved because it's part of a production sharing agreement or a joint venture agreement.

But we are -- we are clearly, you know, seeing the effects of this across the entire spectrum from deepwater drilling to subsea equipment to EPC contractors.  Everyone is having to adjust.  And I think -- you know, we like to do that in a healthy way because we know we need -- we need all of these players to survive, because we will -- we will move back to some other climate, business climate where we do need to be able to continue to invest and we need to be successful. We need to have people that know what they're doing that can help us manage that risk.  We don't want to see them go away.

So we -- it is a very -- you know, it's a very collaborative, hard-nosed, because everybody's trying to, you know, do the best they can, but we also -- I think the people that are on our counterparties in these

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 38**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252958
EMC_RAM_NYAG 001926582

agreements understand now over the last decade even with us that we have a real respect for the role they play and we need them and we need them to be healthy and we're not here to -- we're not here to put them under water.

MR. WALLIN:  Uh-huh.  Okay.  Moving on, I wanted to see, talk a little bit about the fact that, you know, the whole climate change topic here really.  You wanted to open that up a little bit.  And, you know, your peers, European oil company, major oil company peers came out jointly earlier this year in favor of a carbon price, but Exxon obviously did not join that.

And the question is why and, you know, how does ExxonMobil think the issue of climate change should be addressed?

MR. TILLERSON:  Well, we didn't join the European letter because we didn't -- first, we didn't see anything new in there.  We've articulated our position pretty clearly now.  I guess I first articulated it almost eight years ago at the Wilson Center in Washington, and it's not changed.  And when I looked at the European companies' proposals, it lacked a lot of specificity.  It was kind of aspirational.  We've been very specific ourselves.

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 39**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252959
EMC_RAM_NYAG 001926583

So, you know, again, as I said, nothing's changed with us over the last decade really. You know, we do view the climate change issue is a risk. It is a serious risk. We are in the risk management business, so we approach it just like we manage all other elements of risk in our world.

We believe you have to continue to understand the fundamentals of what's going on, which means invest in the science, support the advancement of the scientific understanding, acknowledge what you know, acknowledge what you don't know, and acknowledge what the range of uncertainties are. And that's how you manage risk is to understand all -- there are all -- there's a range of uncertainty around every risk you manage. There is no such thing as certainty.

And that word, I cringe every time I hear people say it's certain. That's just bologna. It is science, and there are ranges of uncertainty around it. And there's nothing wrong with acknowledging that so that we can fully investigate what our alternatives are within that range of uncertainty. And that has always been our approach.

And we have been engaged in the climate science for more than three decades now we've been

ABC COURT REPORTERS    214.303.0ABC (0222)

**Supp. App. 40**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252960
EMC_RAM_NYAG 001926584

engaged.  We have been engaged in the U.N. IPCC panel as a member, our scientists have been since it was founded in 1988.  Our scientists have peer-reviewed ever -- all IPCC reports.  So, you know, we understand this at a level that probably most people don't, because we have to.  We do.  We understand.  It's a risk for us as an enterprise, but it's also a risk for society.

So we have always viewed that we have to -- it starts with understanding what we know, understanding what we don't know, and developing some view of the ranges of uncertainty around that.  And in fact, if you look at the IPCC reports, not the executive summary, which is a political document, but look at the IPCC scientific reports.  That's exactly what they say.  They demonstrate there's a range of uncertainty around this.

Now, what do you want to do with that?  How do you want to manage that?  There's a serious risk there.  There's some ranges of uncertainty.  How do you want to manage it?  And in managing that risk, we think you always have to put into the balance the cost and the benefits, that there will be a cost to societies and economies.  As you undertake steps to manage that risk, what are the benefits?  And that's -- that's an

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 41**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252961
EMC_RAM_NYAG 001926585

iterative process of how do you want to go through that.

And these -- the thing that I think is unfortunate about this issue in our society today and in the political realm is, it is a polarized debate. It's all or nothing. And that is just nonsense. I mean, that is no way to manage a risk.

So, you know, we say the first thing you ought to do then in dealing with that risk is take all the steps that make sense. Okay. What makes sense? Energy efficiency makes sense. It makes economic sense. You get more efficient, you get lower carbon emissions, and it's good -- it's good economic sense. So we've always invested a lot of our efforts into energy efficiencies both in terms of working with manufacturers, whether it's auto manufacturers to industrial manufacturers, is what can we do in the way we provide products that can help you with energy efficiency. We've always invested in technologies around alternative ways to take the carbon molecule and convert it to something else that's less impactful. We've invested in that for years and many collaborative efforts.

What are the things that make economic sense, do that first. Okay. Then beyond that, what could you

ABC COURT REPORTERS    214.303.0ABC (0222)

**Supp. App. 42**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252962
EMC_RAM_NYAG 001926586

do to incentivize people's behavioral choices through policy.  And we -- you know, we have never favored mandates.  And I think -- I tell people the greatest experiment out there, if people want to look at it, is the United States since 1992 -- if you compare the United States from '92 to today is carbon emissions are down, not insignificantly, but -- and they are down significantly over a period of time when the economy has doubled in size and we have 50 million more energy consumers in this country.  We've never had a carbon policy.  We didn't do -- didn't need one.  It was all done through other mechanisms including cafe standards that incentivized energy efficiency in automobiles, through the use of natural gas in power generation because it made economic sense.  All of it was really done because people decided that makes sense.

Europe, on the other hand, has had a very heavy handed -- they've had a carbon trading program for years, which to my -- best I can tell has never produced anything from an improvement standpoint.  So now they've migrated very heavy-handed mandates on renewables and feed-in tariffs, and what have they got? They've not been able to lower their carbon emissions.

So, the policy side of it becomes one of

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 43**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)   EMC 001252963
EMC_RAM_NYAG 001926587

how -- okay, how do you want to do that.  So we take a very principled approach to the policy side and we say first it needs to be something that would establish if you want to think of it as a price on carbon to the economy, to which people then can measure a benefit. It needs to be very -- you need to have a uniform to the economy so that you don't have these distortions that go on when you start mandating and picking winners and losers.  You need to have something that the market gets to decide.  It gets to pick what it likes, and it does that in a very transparent way so everybody can see what's going on, that it is administratively very efficient so you don't impose additional costs administratively to the policy, because that's just taking very needed capital resources out to pay for nothing in the administrative overhead, which generates nothing.

And in the end it can be done in a large scale and it contains the elements that other countries from around the world could look at that and say, okay, I see how we can make that work in our country, maybe not exactly the way you're doing it, but we can follow these principles and it'll work here.

The conclusion of all that back eight years

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 44**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252964
EMC_RAM_NYAG 001926588

ago when I gave that speech to the Wilson Center, I said we look at that, all those elements, and we conclude that a carbon tax, a revenue-neutral carbon tax achieves all of those things.  Now, the reason we get a lot of pushback on that is -- we get pushback from two standpoints.  One, people who don't agree in revenue neutrality.  And we would make it revenue neutral by taking whatever tax is imposed on the -- is being collected, return it through employment taxes.  Okay.  So you lower payroll taxes, you lower people's payments into the entitlement system, however you want to do it, but you take the burden off of the jobs so that you -- whatever impact you're having on jobs because you have a carbon tax, you try to restore that by making it less costly to create jobs in the -- in the system.

So that -- that's why we came out for a carbon tax eight years ago.  So the European companies that wrote this letter, I guess they're catching up finally, but they don't have those specifics around it.  And I have -- I've met with them.  I met with all those CEOs. Every one of them approached me and said why won't you sign, and I said because you guys don't know how to make it work yet.  Tell me how it's going to work.  They

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 45**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)   EMC 001252965
EMC_RAM_NYAG 001926589

couldn't tell me.  They didn't have any specifics around it.  They just said governments ought to go do this.  I said, well, that's really helpful.

So we had -- you know, we have put that forward and I have talked about it to people in the Senate all the way back to when John Kerry was trying to get climate legislation passed.  And we've shared our views.  I think my reservation on it, my only reservation on it I think is the same that most other people have, and that's they don't trust the government.  We don't trust our politicians.  We don't trust our elected leaders to do what they say they're going to do.  And so when we say it's revenue neutral, that means you take the money in and you give it right back, that they'll take the money in and they won't give it back.

And I can't dis -- I can't -- I can't debate that one with them.  They're right.  They're right.  I mean, they should be distrustful because the government has earned that distrust with the way they've dealt with the revenues.  They never use them for what they collect them for, I mean, which is why we've got the fiscal problems we have in the country.

So, I'm happy to advocate for a carbon tax

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 46**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252966
EMC_RAM_NYAG 001926590

as being the best solution, but I understand why people

have serious reservations about ever implementing it.

I do too.  I have the same reservations, but I still

think it's the best answer.

MR. WALLIN:  Thanks.  That's good.

MS. SHOOK:  Yeah, that is, that is.

You've said Exxon has chosen not to lose

money by investing in renewables.

MR. TILLERSON:  We did that already, and we

don't want to do it again.  We lost money.

MS. SHOOK:  But you've -- you have looked at

some alternatives.  Are you still looking at

alternatives --

MR. TILLERSON:  Yes.

MS. SHOOK:  -- like biofuels and lithium ion

batteries and things like that?

MR. TILLERSON:  Yeah, we're -- we've got a

number of programs that we continue to invest in with

partners.  Al -- you know, algal biofuels are still

what we think are the case to beat in terms of biofuels,

but we have taken a different approach than a lot of

people have taken.  We've said that the current

approach, you just can't get there scale wise, you can't

get there cost wise, because whatever alternatives

ABC COURT REPORTERS    214.303.0ABC (0222)

**Supp. App. 47**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252967
EMC_RAM_NYAG 001926591

we're going to fund, they need to -- they need to be first.  They have to have the characteristic that they can be scalable, brought to enormous scale, and done so at a cost that people can afford without -- without any special gimmicks around the taxes or the mandates.  So with our algae biofuels program, as you may remember when we announced it, we teamed up with Synthetic Genomics.

MS. SHOOK:  Right, Craig Venter.

MR. TILLERSON:  Right, you know, great intellectual capacity around how to remap the genes and do some things.  And so we're basically working with them on trying to create a synthetic algae that has different characteristics than algaes that produce the oils today.  And then we would do that in a fashion that will allow us to control the environment around that synthetic algae and through a reactor design, which we're very good at, and that we would build these reactors inside refineries where the oils would come -- be produced and go right into the feedstock to the refineries.  You eliminate all the infrastructure cost.  That's the only way you can get this thing to scale.

It is -- what we have learned out of that

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 48**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252968
EMC_RAM_NYAG 001926592

research, which has been underway for several years now, is it is really hard to do.  It's really hard to do.  And we brought in some more resources, some of the best biologists in this field that we could find to work -- help Venter understand why some of the things they were doing genetically weren't producing the result that we predicted.  Well, the biologists looked at it and said, well, because you're violating some of the fundamental laws of nature.  Well, okay.  We didn't know that.

So now, you know, we get -- so that's what you do.  You get more scientific expertise on it, and we're continuing to work with them on that.  It is going to be a very long process to achieve breakthrough. They're -- we're learning an enormous amount.  And again, what we're learning is it's really hard to do. Doesn't mean it can't be done or we'd quit.  You know, we haven't quit because we still think that holds a lot of promise.  But it's -- you know, it's a long way out there, but that's what you work on.

We're still supporting all of the efforts that we had started with Stanford, the Global Climate Energy Project, and that's where some of the battery investigative work is going on.  And the problem with

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 49**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252969
EMC_RAM_NYAG 001926593

the battery is it just hasn't changed fundamentally since it was invented 200 years ago.  I mean, it's an anode, a cathode, and an electrolyte.  Someone has to have a breakthrough on the architecture of that battery so that you can get the kind of improvements out of it you need, and no one has figured that one out.

Stanford's doing some really interesting stuff, but it -- and it's at an anode level, and the problem is again you have to overcome these issues of stability.  You end up with processes that at some point when you start trying to make them, they become unstable.  But again, we think there's -- we think there's promise there, so we'll keep supporting that.

So we're working on the renewable side at the breakthrough level.  We just -- you know, we tinkered around and we support a lot of investigative areas with our scientists working with academic institutions, working with private institutions, national labs, so that we're sure we fully understand the science. Because we want to know how high the hurdle is, you know, because to be dismissive of something when you really don't understand the science is foolish.  So we're engaged because we want to know how hard is this going to be to do so we know how to adjust our role in the

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 50**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)     EMC 001252970
EMC_RAM_NYAG 001926594

future.

And that's the reason we stay engaged with so much of it is so we know we're informed as to the progress, scientific progress that's being made.  All the things that are being mandated out there today, these are all old technologies.  They've been around for decades.  Yeah, people have done things to make them a little more efficient, get a little bit more out of them, but fundamentally they're not sustainable.  I mean, they just don't give you the scale that you need to change the equation the way people want it changed.

And I think the frustrating thing to me and the disappointing thing is that our policymakers, I guess -- I guess the nature of being an elected official, you want to make something happen now, and that's how we end up with these mandates.  We're going to mandate 10,000 more windmills and I'm a winner.  Well, that's -- okay, so we've got 10,000 more old technologies out there.  And in many ways it inefficiently redistributes the capital to support technologies that are not the answer.  And in doing so, it inhibits the breakthroughs that are needed, because if I can make money today because the government wants to give me a special program, I'll put my money there.

ABC COURT REPORTERS    214.303.0ABC (0222)

**Supp. App. 51**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252971
EMC_RAM_NYAG 001926595

Why would I spend it trying to achieve some high-risk breakthrough?  And I think those mandates are holding technology advancement back.  But they play well, public loves them, away we go.

MR. WALLIN:  Well, we're running out of time here.  Can I ask -- I want to ask about -- are we done?

MR. TILLERSON:  Yeah, it's okay.

MS. SHOOK:  Well, we've got four questions we want to wrap up with.

MR. WALLIN:  Well, I have one back to oil and gas.

MR. TILLERSON:  I'll try to be -- I'll try to be more succinct in my responses.

MS. SHOOK:  All right.

MR. WALLIN:  Back to oil and gas for a second.  Thanks for giving us a little more time here.  But, you know, Canadian heavy oil is fetching some of the lowest prices in the world right now and it even is struggling at higher prices.  And so is that the marginal barrel?  What is the marginal barrel?  Is that -- you know --

MR. TILLERSON:  Well, there's probably some of those Canadian oil sand barrels that are the marginal barrel.  As you know, we just started up a major

ABC COURT REPORTERS    214.303.0ABC (0222)

**Supp. App. 52**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252972
EMC_RAM_NYAG 001926596

project, Kearl, second phase.  We've always viewed the oil sands as the only way you can compete across this -- these kind of volatile price ranges is it better be big.  You have to have scale working on your behalf. And so that's why we never do small things.  You know, syn crude is big.  Cold Lake is big.  Kearl is big, because doing a 30- or 40,000-barrel-a-day oil sand project is going to get you nowhere.  You are -- you are literally, you know, at the whims of the market because you just -- you can't get efficiencies, can't get enough efficiencies on a unit basis.

So with Kearl, and again it's a great example of what I was talking about earlier, you know, we built it, it appeared when it was a fairly high-cost environment.  We think we -- we think we drove the costs down as low as we could get them, but we know we're going to live with this legacy cost.  And so now the whole organization as we're bringing the next expansion phase up, doubling the capacity out, they are all over the variable costs now.  And they've already -- I mean, they're just -- they're just driving it down.  And this is what they -- they always do.  They'll drive it down, they'll drive it down, they'll drive it down.  And they know they have to get Kearl to operate where it makes

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 53**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)      EMC 001252973
EMC_RAM_NYAG 001926597

money in a price environment that looks like today. Now, you know, when your netbacks are even below that, because as you know --

MR. WALLIN:  Yeah.

MR. TILLERSON:  And a lot of that, as you know, it's highly variable a lot of what's going on with infrastructure, pipelines have problems, refinery has a problem.  We don't get too overexercised.  Again, we have a -- we take a view, okay, we're over the long term, we're probably going to operate in a price environment that's across a range like this.  You guys need to make sure we're making money at the bottom of that range. And when we get to the top of that range, you made a lot of money.

So we tell our folks, build this thing for the bottom of the cycle so that we'll be okay.  We won't -- you know, we won't be the prettiest girl on the stock exchange, but we'll be all right, we'll continue to pay our dividends, shareholders will be happy, and when we come out of the cycle we'll be all-stars.  Just don't get yourself in a position where you're in trouble at the bottom of the cycle.  And so that's the way we build all our investment decisions around here.

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 54**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252974
EMC_RAM_NYAG 001926598

MR. WALLIN:  And can you speculate on, you know, where you think, you know, the marginal barrel is right now?  What kind of -- you know, what's -- you know, this price discovery question you started out with?

MR. TILLERSON:  I'm sure there are some oil sands, I'm sure there's some tight oil, and I'm sure there are some deepwater environments around the world where discoveries have been made.  And again, when you're in this low price environment, the problem is scale.  It is -- you just have to have enough barrels sitting under that capital investment that has to be made to make it work.

And so if you're -- you know, if you're sitting on 150 or 200-million-barrel-a-day deepwater discovery, you probably are trying to figure out how I can hold onto that at low cost, the lowest possible holding cost until things get a little better or I have some kind of breakthrough on how to develop that with different technologies.

So I think the marginal barrel, it doesn't reside in any one of these types of resources.  There are marginal barrels in every one of them, and the question is so what piece of that type of resource can

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 55**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)     EMC 001252975
EMC_RAM_NYAG 001926599

perform in this low price environment.  And there's a piece of all of them that will because of the scale. If their scale is large enough, they'll -- they'll make it.  They may not -- like I said, they may not be real pretty, but they'll make it and they'll make it through to when this thing finally turns and people make a little money then.

MR. WALLIN:  Yeah.

MR. TILLERSON:  It's the nature of what we do.

MR. WALLIN:  Do you want to ask -- do we have time for one more?

MR. TILLERSON:  Yeah, go ahead.

MS. SHOOK:  Well, we've got --

MR. WALLIN:  Barbara could go on, yeah, we have a long list here.

MR. TILLERSON:  You said four, so that's one.

MS. SHOOK:  Okay.

MR. WALLIN:  Okay.  Okay.  We'll do it that way.

MR. TILLERSON:  So high grade your inventory.

MS. SHOOK:  Well, actually --

ABC COURT REPORTERS    214.303.0ABC (0222)

**Supp. App. 56**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252976
EMC_RAM_NYAG 001926600

MR. WALLIN:  Be selective about your portfolio.

MR. TILLERSON:  Be selective.

MS. SHOOK:  His made it five.  We had four, four on the last page.  There's four checks on the last page.

MR. TILLERSON:  Well, pick your best three.

MS. SHOOK:  We can't get out of here without talking about Russia.

MR. TILLERSON:  Okay.

MS. SHOOK:  And what's -- considering the sanctions, what is the future of Russia for ExxonMobil and then for the industry as a whole?

MR. TILLERSON:  I think it's still good longer term.  I mean, Russia is still endowed with enormous oil and natural gas resources, both discovered undeveloped as well as yet to be discovered.  So it is -- it is never going to not be important to the rest of the world from an energy supply standpoint.

I mean, as you know, they depend on -- pick a day.  They or the Saudis are the largest oil producers in the world.  Our experience in Russia has been good.  We've been there over 20 years now.  Don't want to say they're the easiest place in the world to deal with,

ABC COURT REPORTERS    214.303.0ABC (0222)

**Supp. App. 57**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252977
EMC_RAM_NYAG 001926601

but I could say that about here as well, the U.S.  But we have had a great deal of success in Russia, both technically and financially.  You know, it's -- from time to time governments have disagreements.  We've been through sanctions in other parts of the world, you know, certainly, Libya.  We've been through them, you know, in Iran.  We'll see how that comes out.

So for us, for a company that's been around, you know, over 130 years now, we wait.  We wait.  We may -- you know, we're not the government.  We don't have a dog in that fight.  As a -- as a policy matter, we have long -- we have long said that we do not think economic sanctions are particularly effective because they tend to harm the companies of the sanc -- the countries that are sanctioning more than they harm the country they're sanctioning.  And I think that's proving to be the case this time around as well.

I mean, you know, American, European, non-Russian investors who are subject to the sanctions are being hurt worse than the Russians are.  Governments, though, find that a tool they want to use, they're going to use it, you know.  We're going to comply, and we do comply.  We're fully in compliance.

You know, the current sanctions do not

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 58**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)   EMC 001252978
EMC_RAM_NYAG 001926602

have -- do not affect our Sakhalin-1 operations and we've continued to invest.  We just started up this last year the Arkutun-Dagi development.  It was the third of the major fields that were to be developed. Very successfully, on time, on budget.  So we're -- we're continuing our activities there unaffected by the sanctions.  All the strategic cooperation there is that we were -- we had underway with Rosneft, the Arctic drilling, the deepwater Black Sea, and the investigation of their tight oil, is on hold.  So it just -- we just -- we stop all activity and we wait and we wait.

And, you know, we hope -- we hope our partners in the government of Russia will be patient enough that when this is all over we can resume that. We understand that, you know, they could come to a different conclusion at some point, decide they need to move on with others who are not subject to the sanctions.  And that's -- that's the biggest risk for us is that we could be -- we could be displaced and replaced by someone else.  We hope everybody will hang in there and when this is all over we'll all go back to work and develop those extremely important energy resources that are going to be useful to the rest of

ABC COURT REPORTERS    214.303.0ABC (0222)

**Supp. App. 59**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252979
EMC_RAM_NYAG 001926603

the world to have.

MR. WALLIN:  Do you want to ask your Venezuela question?

MS. SHOOK:  You pick the next question and I'll pick the last one.

MR. WALLIN:  Okay.  All right.

Well, let me ask about Iraq then.  I think, you know, how attractive is Iraq now both in the south and also in the KRG area?  I mean, I think there's -- you know, there are certainly questions about whether that's becoming too difficult a place.

MR. TILLERSON:  Well, it's -- you know, again, Iraq, start with the characterization that it has enormous resources again.  It has a lot of discovered undeveloped resources.  It's got some exploration yet to be done.  As you know, we've got one concession in the south under the original contracts, West Qurna 1, which we later renegotiated, which the government of Iraq when we agreed to participate, when I met with them, I said, all right, I will participate with an understanding that we're going to have to come back and change this deal.  I said, you understand this doesn't work long term.  And I said, however long it takes you to figure that out, we're all going to come

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 60**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)     EMC 001252980
EMC_RAM_NYAG 001926604

back and talk about this, and we have.  And so we have made a number of -- as they have for everybody, made a number of changes which now make it more -- it makes it work financially.

The north, up in Kurdistan, as you know, different fiscal terms.  It's traditional PSCs, and so we're happy with that structure because that's the kind of risk management structure we like when you're entering an area that has the kind of inherent risks that Iraq has.

The government has been very responsive around our security concerns.  We have had to take people completely out from time to time in the south while the government had time to kind of restore things to our satisfaction, but they've been very responsive. They are very sensitive to the fact that we have to be able to protect our people.

So we've continued to work.  We've had some pauses in activity where we just -- we couldn't in good conscious send our people in there.  As you know, most -- the operation under the contracts, it's really carried out by the Southern Oil Company.  We're really there with a lot of our engineers and our operating people to kind of supervise some of that and help them

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 61**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)     EMC 001252981
EMC_RAM_NYAG 001926605

be -- help them be very efficient and effective at it. So when we're not there, you know, they're kind of on their own to keep it going.

Again, this is very -- you go into these things with a very long-term view that eventually the country will sort things out and the environment will improve. And there's other opportunities, and they talk to us about other opportunities all the time. For us it's just a question of how much of this do we want to try to manage the risk to our people around and the risk -- there's not a lot of capital risk because in the south, the way the deals are written, you get your money back almost immediately. So you don't have a lot of exposure of trapped money in the country as long as they -- you know, and they have -- they've kept up. They had a little pause in there, but they -- they made it up. We're current. So I would say the government is, you know, they're doing everything we could ask them to do with everything they're dealing with.

In the north some of our areas are inaccessible because of the situation with ISIS. They are hotspots on the map. The Iraqi government does not have control of some of the areas that are our blocks, and they've been very good again. You know, they

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 62**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252982
EMC_RAM_NYAG 001926606

understand we can't work, we can't work, don't worry about the clock.  You know, we'll all figure this out.  They've been very accommodative.

But we have gone back to work on a couple of blocks in the north.  We're currently on Alqosh block testing the well we drilled there and doing some drill stem testing.  And again, they've been very good from a security standpoint, provide us what we need.

So, you know, it's a tough place.  The most important thing to us is, again, being able to protect our people.  The day -- the day we conclude we can't protect the people, we get them out.  We have a conversation with the government about, you know, this is what we think needs to happen for us to return, and they've -- they've al -- those have always been very constructive conversations.  So it's a very long-term play that, you know, we all hope at some point things will get resolved.

MR. WALLIN:  Yeah.

MR. TILLERSON:  And we want to be around there and have developed the relationships and they know what we can do and they know how we -- they know how we operate and they know, you know, that we build a -- we can build a hundred-year relationship around

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 63**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252983
EMC_RAM_NYAG 001926607

here if that's what everybody wants to do.

MS. SHOOK:  Okay.  My last question.

MR. WALLIN:  Last question, Barbara.

MS. SHOOK:  All right.  Can you give us an idea of your LNG priorities and which projects are on your front burner?  You got nine -- you have nine of them in various stages of development.

MR. TILLERSON:  We've got a great -- we've got a great portfolio from which to choose.

MS. SHOOK:  Yeah, you --

MR. TILLERSON:  As you can imagine, they have their own cost of supply curve.

MS. SHOOK:  Canada, Alaska, U.S. Gulf Coast, PNG LNG expansion, possible Russia.

MR. TILLERSON:  Gorgon Jansz --

MS. SHOOK:  Gorgon Jansz.

MR. TILLERSON:  -- down in Australia, Scarborough in Australia.

MS. SHOOK:  Yeah, all of those.

MR. TILLERSON:  We've got a big line-up, and they're all different.

MS. SHOOK:  They're all different, right.

MR. TILLERSON:  They're all different. They all deal with different host governments, so

ABC COURT REPORTERS    214.303.0ABC (0222)

**Supp. App. 64**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252984
EMC_RAM_NYAG 001926608

they -- you know, the pace of progress around those, they all have to overcome their own hurdles.  Most of them, if we take our long-term view of, you know, what we think the demand's going to be and what kind of commercial structures are likely to be available to us, most of them that's not the issue.  Some are more attractive than others, so we clearly would rather move the ones that are most attractive first.

Some -- a lot of it is, it's waiting on government fiscals.  That's the case really in Alaska where we're waiting on government fiscals.  It's really part of the case in Canada, you're waiting on government fiscals.  Some of it's waiting to work through regulatory processes.  Here in the U.S. we're still waiting on our FERC permit or our DOE permit to export to non-free trade.

So they all have different elements.  The project teams that have responsibilities for those, that's what they do.  I mean, they're out -- they're sequencing how do we move these things along.  And you have to take into consideration your partners and at what pace are your partners prepared to go, because everybody's got to pay their way, you know, or line up their financing to pay their way.  So in some cases that

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 65**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252985
EMC_RAM_NYAG 001926609

can become something that slows or speeds things up.
And if that's the obstacle and we're really ready to
go, then we try to work with them as to how we can make
that -- overcome that obstacle.

So I wouldn't want to tell you what's going
to be the first out of the box because they're
all -- they're all being moved to overcome the
obstacles and improve their economic viability, their
profitability outlook.  Everybody's working on that,
that same thing, each of the project teams that have
those.  And in here we just -- we get an update on that
from time to time and we may give them some guidance
on, look, it looks like this government's just not going
to do anything for a while, so if you got -- if you need
these people somewhere else, I'd redeploy them and keep
this on slow simmer.  Don't lose it.  We won't lose it,
you know.  But it gets back to how you hold these things
at a very low holding cost and maintain your -- you
know, you've got to maintain your relationships and
explain to people, look, it's just we're waiting on you.
When y'all get this sorted out, let us know.  It's not
that we don't want to do it.  We haven't lost interest,
but we can't -- we can't move any further until y'all
figure this out.  And those -- that's a lot of time the

ABC COURT REPORTERS    214.303.0ABC (0222)

**Supp. App. 66**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252986
EMC_RAM_NYAG 001926610

conversation you have with governments and how can we help you figure it out.  We're happy to be part of that.

So, I mean, it is -- it's a nice blessing of riches in that regard because we've got lots of choices that we can -- we can kind of pick and choose which we'd like to go.  And, you know, there's opportunities there to high grade that portfolio too.

MR. WALLIN:  So even in this low oil price environment, you still -- there's still opportunities to choose?  It's not --

MR. TILLERSON:  Oh, yeah.

MR. WALLIN:  Doesn't -- you know, there's an abundance of choices out there, yeah.

MR. TILLERSON:  Yeah.  Even, you know, when the folks bring them in and they'll -- you know, they'll have them kind of seriatimed.  We always look at those things that are at the margin and that's where we probe and ask them, well, what would it take to move that up, because maybe we can -- you know, we'll look at the situation around that and say, gosh, that's one that we could really move.  Everybody's ready to go, government's ready to go.  All right, go back and figure out how you can make that thing more attractive. And then that's what our teams are so good at is they'll

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 67**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)   EMC 001252987
EMC_RAM_NYAG 001926611

go back and they'll come back, okay, well, we could -- we could change this piece of the engineering or we could change this piece of the kit and we could go to a phased approach.

You see us do a lot of phasing in projects because that's how we get the first step.  Once you get the first step done, then the others, they're really attractive.  So our folks are very good at also dissecting and saying, well, we could take the first step, which means we've got not quite as much capital outlay, and it'll generate an acceptable return and that'll get us going and then we can go from there.  So a lot of times they come back with other options of how to develop it that -- we'll say fine, it looks good, let's go do that.

MS. SHOOK:  Well, you've got a problem with Governor Walker up there who seems to think he can run the whole show by himself out of a one-person office.

MR. TILLERSON:  Yeah, yeah, he's -- this is Alaska.  For -- I've been working on Alaska gas since 1985.

MS. SHOOK:  I've been writing about it for longer than that.

MR. TILLERSON:  I first worked on it -- I

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 68**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252988
EMC_RAM_NYAG 001926612

spent four months -- three months in Ottawa while they were in session.  We were trying to get some amendments to the old ANGTA agreement, the Alaska Natural Gas Transportation treaty between the United States and Canada when it was going to be a pipeline.

MR. WALLIN:  Right, right.

MR. TILLERSON:  It was the coldest three months I ever spent.  I was right in the middle of winter.  I didn't know Ottawa could be so cold.  So I have a long history with this and I always tell every governor of Alaska, you're not waiting on us, you're waiting on you.  And every governor comes in, decides they've got a different way of doing this, which is why it never happens.  You can't take a project that's going to take five, six, seven years to execute and it's going to require 50 or 60 billion of capital and every two years decide you've got a different way you want to do it.

And so I just -- we've had -- we had two good chances to get it done in the last ten years, and as soon as you had an election, that ended it.  So, you know, Alaska's their own worst enemy.

MR. WALLIN:  Well, I think we've way overstayed our --

ABC COURT REPORTERS    214.303.0ABC (0222)

**Supp. App. 69**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)     EMC 001252989
EMC_RAM_NYAG 001926613

MS. SHOOK:  Yeah.

MR. WALLIN:  -- time, and I really appreciate you giving us the extra questions and everything and I look forward to seeing you in October.

MR. TILLERSON:  Hopefully it was helpful.

MR. WALLIN:  We both do.

MR. TILLERSON:  Yeah, good.

MR. WALLIN:  Thank you very much.

MR. TILLERSON:  It's good to see you.  Yeah, we'll see you in London.

MS. SHOOK:  Yeah.

MR. TILLERSON:  Good to see you, Barbara.

MS. SHOOK:  Good to see you.

MR. TILLERSON:  Okay.

(End Audio File)

ABC COURT REPORTERS   214.303.0ABC (0222)

**Supp. App. 70**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252990
EMC_RAM_NYAG 001926614

STATE OF TEXAS      )

COUNTY OF DALLAS   )

THIS IS TO CERTIFY THAT I, KAREN L. SHELTON, a Certified Shorthand Reporter in and for the State of Texas, reported in shorthand the above proceedings via audio file as set forth in the caption hereof, and that the above and foregoing pages contain a full, true, and correct transcript of said audio file to the best of my ability.

Certified to on this the 2nd day of September, 2015.

_____
Karen L. Shelton, Texas CSR #7050
Expiration Date: 12/31/2016
ABC Court Reporters
CRCB Firm Registration No. 491
The Nathaniel Barrett Building II
903 E. 18th Street, Suite 115
Plano, Texas 75074

ABC COURT REPORTERS    214.303.0ABC (0222)

**Supp. App. 71**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252991
EMC_RAM_NYAG 001926615

```
                        214.303.0ABC (0222)
                        214.303.0202 (fax)
                        972.398.2227
```

ABC COURT REPORTERS    214.303.0ABC (0222)

**Supp. App. 72**

Confidential / FOIL Treatment Requested by Exxon Mobil Corp. Pursuant to Pub. Officers Law § 87(2)    EMC 001252992
EMC_RAM_NYAG 001926616

# Exhibit 2

CONFIDENTIAL - BEN B. TSOCANOS

Page 6. Let's just make sure we're looking at the same thing.

Do you see a table there?

A. Yes.

Q. Okay. And do you see that at the bottom of that table it says, "total proved reserves"?

A. Yes.

Q. And then do you see all the way to the right, do you see the number "19,974"?

A. Yes.

Q. Okay. And that means 19,974,000,000 barrel equivalence?

A. Right.

Q. Is this consistent with your recollection of Exxon's proved reserves as of the end of 2016?

A. Yes.

Q. Okay. And how does this compare with other oil companies at this time?

A. It is still the largest of the independent global oil and gas

Page 234

CONFIDENTIAL - BEN B. TSOCANOS

companies.

Q. Okay. So did S&P have a requirement that Exxon in order to maintain its AAA rating needed to maintain a specific amount of proved reserves?

A. No.

Q. So there was no numerical threshold that S&P was looking for?

A. No.

Q. Okay. Did you ever tell Exxon that if its reserves ever dropped below a certain threshold, it would impact its credit rating?

MR. GOLDSTEIN: Object to form.

A. No.

Q. Did you understand the question?

A. Yes.

Q. Okay. I'm going to ask you to put the 2016 document to the side for a minute.

Go back to the 2015 10-K.

Page 235

CONFIDENTIAL - BEN B. TSOCANOS

A. Okay.

Q. If I could have you go to Page 103. I want to ask you some questions about these disclosures.

A. Okay.

Q. Are you on Page 103?

A. Yes.

Q. Okay. And at the top it says, "oil and gas reserves"?

A. Right.

Q. Okay. And then the first sentence there says, "The following information describes changes during the years and balances of provided oil and gas reserves at yearend 2013, 2014 and 2015"; is that correct?

A. Yes.

Q. Okay. And because this is the 2015-K, is it correct that they're including two prior years?

A. Yeah.

MR. GOLDSTEIN: Objection.

Q. Do you understand the question?

Page 236

CONFIDENTIAL - BEN B. TSOCANOS

A. Yes.

Q. Okay. So is it -- in your experience, is it customary that companies provide information about the several years prior in their Form 10-Ks?

A. Two years prior, yeah.

Q. Okay. And then they're also providing information about current year?

A. Right.

Q. Which is 2015, correct?

A. Yes.

Q. Okay. So I want to ask you a couple of questions about your understanding of proved reserves.

So, if you go down to the paragraph that begins with, "In accordance with the Securities and Exchange Commission's rules."

Do you see that?

A. Yes.

Q. Did you have an understanding that oil and gas companies were required to report proved reserves consistent with certain regulations?

Page 237

60 (Pages 234 - 237)

CONFIDENTIAL - BEN B. TSOCANOS

A. Uh-huh.

Q. So, if you turn to Page 57. Tell me when you're there.

A. Yeah.

Q. Okay. Do you see that there is a heading that's called, "Impact of Oil and Gas Reserves, Prices and Margin on Testing for Impairment"?

A. Yup.

Q. Do you have an understanding of the type of work that Exxon did around performing impairment assessments?

A. Generally speaking. I mean, I'm not an expert on it but, yeah.

Q. At a high level, what's your understanding?

MR. GOLDSTEIN: Object to form.

A. That the company would have been doing analysis to determine whether their reserves qualified for an impairment under lower prices.

Q. Okay. And if you look at the bottom, you'll see where it says, "In

Page 250

CONFIDENTIAL - BEN B. TSOCANOS

light of continued weakness in the upstream industry environment in late 2015, the corporation undertook an effort to assess its major long-lived assets most at risk for potential impairment."

Do you see that?

A. Yes.

Q. It goes on to say, "The results of this assessment confirm the absence of a trigger event to indicate that the future undiscounted cash flows associated with these assets substantially exceed the carrying value of the assets."

Do you see that?

A. Yes.

Q. What is your understanding of what that means?

MR. GOLDSTEIN: Object to form.

Q. Let me rephrase.

What is your understanding, if any, of what that means?

A. That the company had run their analysis and that they did not see any

Page 251

CONFIDENTIAL - BEN B. TSOCANOS

requirement to take an impairment.

Q. Okay. I want to draw your attention to the last sentence.

Do you see where it says, "Due to the inherent difficulty in predicting future commodity prices and the relationship between industry prices and costs, it is not practicable to reasonably estimate a range of potential future impairments related to the corporation's long-lived assets."

Do you see that?

A. Yup.

Q. What is your understanding, if any, of what that means?

A. The company was not giving guidance on the likelihood of future impairments.

Q. So, just to make sure I understand that...

They're advising that as of the issuance of this K for 2015, they have not identified an impairment, correct?

MR. GOLDSTEIN: Object to

Page 252

CONFIDENTIAL - BEN B. TSOCANOS

form.

Q. Is that right?

A. Yes.

Q. Is that your understanding of what the first sentence means?

A. That's my understanding.

Q. And then with respect to the sentence we were just looking at, the last sentence in that paragraph, what, if any, understanding do you have of what company is communicating with respect to the possibility for future impairment?

A. That there is risk and that they're not eliminating the possibility that there will be impairment.

Q. Okay. And did you ever communicate to Exxon that its credit rating would be impacted by some particular impairment of some particular asset?

A. No.

Q. You never sort of said to them, like, if you impair, you know, Asset A, we're going to have a credit

Page 253

64 (Pages 250 - 253)

CONFIDENTIAL - BEN B. TSOCANOS

rating problem? 13:46:45

MR. GOLDSTEIN: Object to 13:46:46 form. 13:46:47

A. Reserves were not the focus 13:46:47 of our analysis at this point or they 13:46:49 were our top priority for the rating at 13:46:53 this point. 13:46:56

Q. And, to that end, you didn't 13:46:56 communicate any cutoffs to Exxon that it 13:46:58 had to maintain, for example, a lack of 13:47:00 asset impairments to maintain its AAA 13:47:03 rating, correct? 13:47:06

A. Correct. 13:47:06

Q. I'm going to show you -- 13:47:11 let's mark -- sorry. 13:47:21

Are you doing okay? 13:47:24

I think we just have a couple more 13:47:25 documents to go. 13:47:28

A. No, I'm fine. 13:47:28

Q. Okay, great. 13:47:30

Oh, before we actually flip to the 13:47:32 new document... 13:47:40

Going back to the 10-K for a second 13:47:41 -- you don't have to open it -- the 13:47:42

Page 254

CONFIDENTIAL - BEN B. TSOCANOS

paragraph we were just looking at about 13:47:44 impairments. 13:47:46

A. Uh-huh. 13:47:46

Q. Have you ever learned that, 13:47:47 in fact, Exxon improperly performed an 13:47:48 impairment analysis for 2015? 13:47:51

MR. GOLDSTEIN: Object to 13:47:52 form. 13:47:53

A. No. 13:47:53

MS. SOLOWAY: This is 13:48:00 multiple? Oh, okay. 13:48:00

So we're going to mark as 13:48:02 Exhibit 299... 13:48:05

(Deposition Exhibit 299, 13:48:11 12/28/16 Exxon Mobil news release, 13:48:11 was marked for identification.) 13:48:20

MS. SOLOWAY: You got it, 13:48:20 Jonah? 13:48:20

MR. GOLDSTEIN: Thanks. 13:48:24

Q. So we just marked as 13:48:24 Exhibit 299 an Exxon Mobil news release. 13:48:26 And at the top it's -- we'll just read 13:48:29 the title for the record, "Exxon Mobil 13:48:32 Earns 2.7 Billion in Third Quarter of 13:48:33

Page 255

CONFIDENTIAL - BEN B. TSOCANOS

2016." 13:48:35

A. Right. 13:48:36

Q. Is this a third quarter 13:48:36 earnings release? 13:48:38

A. It looks to be, yeah. 13:48:38

Q. Is this the type of 13:48:40 information that is part of your role at 13:48:41 S&P you would have reviewed from Exxon 13:48:43 Mobil? 13:48:45

A. Yes. 13:48:45

Q. Okay. I want to draw your 13:48:45 attention -- obviously, take the time you 13:48:47 need to look at the document, but I want 13:48:49 to draw your attention to Page 5. 13:48:51

A. Okay. 13:48:56

Q. You know, take a minute to 13:48:59 just read the paragraph at the top there 13:49:02 that starts with, "As disclosed in Exxon 13:49:04 Mobil's 2015 Form 10-K." 13:49:07

Do you see that paragraph? 13:49:10

A. Yup. 13:49:11

Q. Okay. I'll give you a minute 13:49:12 to read it and then we'll come back to 13:49:13 it. 13:49:16

Page 256

CONFIDENTIAL - BEN B. TSOCANOS

A. (The witness complies.) 13:49:16

Q. Are you ready? 13:49:45

A. Yup. 13:49:46

Q. Okay. So, just a couple of 13:49:47 questions about this paragraph. 13:49:48

There is a sentence here that says, 13:49:50 "If the average price is seen during the 13:49:52 first nine months of 2016 persist for the 13:49:54 remainder of the year, under the SEC 13:49:56 definition of proved reserves, certain 13:49:59 quantities of oil, such as those 13:50:01 associated with the Kearl oil sands 13:50:03 operations in Canada, will not qualify as 13:50:05 proved reserves at yearend 2016." 13:50:08

Do you see that? 13:50:10

A. Yes. 13:50:11

Q. Did S&P take any ratings 13:50:13 action based on the disclosure of that 13:50:16 information? 13:50:18

A. No. 13:50:19

Q. Underneath that it says, 13:50:20 "Quanties that could be required to be 13:50:22 de-booked as proved reserves on an SEC 13:50:24 basis amount to, approximately, 13:50:27

Page 257

65 (Pages 254 - 257)

CONFIDENTIAL - BEN B. TSOCANOS

3.6 billion barrels of bitumen at Kearl." 13:50:29

Do you see that?    13:50:32

A.  Yes.    13:50:32

Q.  And it says, "and about 1    13:50:32 billion oil equivalent barrels of other" 13:50:33 --    13:50:33

THE STENOGRAPHER:  Can you    13:50:33 just read a little bit slower?    13:50:33

MS. SOLOWAY:  Yeah, I'm    13:50:33 sorry, I'll slow down.    13:50:37

Q.  "And about 1 billion oil    13:50:37 equivalent barrels in other North America 13:50:39 operations."    13:50:41

Do you see that?    13:50:42

A.  Yes.    13:50:42

Q.  Okay.  So this is a reference  13:50:47 to a possible de-booking of proved    13:50:49 reserves on an SEC basis of 3.6 billion    13:50:55 barrels of bitumen at Kearl.    13:50:58

Do you see that?    13:51:00

A.  Yes.    13:51:01

Q.  Did S&P take any ratings    13:51:02 action on the basis of that disclosure?  13:51:04

A.  No.    13:51:06

Page 258

CONFIDENTIAL - BEN B. TSOCANOS

Q.  Okay.  The last sentence here  13:51:07 says -- in that paragraph -- says, "We do  13:51:12 not expect the de-booking of reported    13:51:14 proved reserves under SEC definitions to  13:51:16 affect the operation of the underlying    13:51:19 project or to alter our outlook for    13:51:21 future production volumes."    13:51:23

Do you see that?    13:51:25

A.  Yes.    13:51:25

Q.  What, if any, understanding    13:51:26 do you have of what that means?    13:51:27

A.  My understanding is that even  13:51:30 if the reserves were de-booked or required 13:51:32 to be de-booked under SEC -- on an SEC    13:51:36 basis, the company planned to continue to  13:51:41 operations of that project.    13:51:44

Q.  Okay.  And is that consistent  13:51:45 with your understanding of how de-bookings 13:51:46 of -- well, let me reframe.    13:51:49

Do you have an understanding at all  13:51:51 that when proved reserves are de-booked,  13:51:53 there's the potential in the future to    13:51:58 re-book them?    13:52:01

MR. GOLDSTEIN:  Object to    13:52:01

Page 259

CONFIDENTIAL - BEN B. TSOCANOS

form.    13:52:02

A.  Yes, if prices improve.    13:52:02

Q.  And what understanding, if    13:52:04 any, did you have about whether these    13:52:07 particular Kearl bitumen reserves could    13:52:08 be re-booked?    13:52:12

A.  My understanding was that    13:52:13 they could be re-booked if prices    13:52:14 increased or operating costs went down.  13:52:17

Q.  And do you have an    13:52:21 understanding of whether the de-booking  13:52:23 of the assets affects their operation in  13:52:25 any way?    13:52:28

MR. GOLDSTEIN:  Object to    13:52:28 form.    13:52:29

A.  I don't believe it does, you  13:52:29 know.    13:52:31

Q.  So you do have an    13:52:31 understanding?    13:52:33

A.  My -- my limited understanding 13:52:33 is that it does not affect their    13:52:36 operations.    13:52:37

Q.  Got it.    13:52:38

The paragraph underneath that,    13:52:41

Page 260

CONFIDENTIAL - BEN B. TSOCANOS

there is a sentence -- I'm just going to  13:52:42 read one sentence from it.  It says, "In  13:52:44 light of continued weakness in the    13:52:47 upstream industry environment" --    13:52:49

A.  Sorry, what -- okay, I got it. 13:52:51

Q.  Hang on.  Let me give you a    13:52:53 minute to get there.  We're still on    13:52:55 Page 5 and we're in the paragraph under  13:52:57 the one we were just looking at.    13:52:59

A.  Right.    13:53:00

Q.  Okay.  Let me just read that  13:53:00 sentence and I'll try to slow down.    13:53:02

"In light of continued weakness in  13:53:03 the upstream industry environment during  13:53:05 2016 and as part of its annual planning  13:53:07 and budgeting process, which is currently 13:53:10 in progress, the corporation will perform 13:53:12 an assessment of its major long-lived    13:53:14 assets, similar to the exercise    13:53:17 undertaken in late 2015 including North  13:53:20 America natural gas assets and certain    13:53:24 other assets across the remainder of its  13:53:25 operations."    13:53:28

Do you see that?    13:53:29

Page 261

66 (Pages 258 - 261)

**Supp. App. 76**

CONFIDENTIAL - BEN B. TSOCANOS

A. Yes. 13:53:30

Q. What, if any, understanding 13:53:30 do you have of what that disclosure means? 13:53:32

A. That there's a potential for 13:53:37 impairments, if certain conditions are 13:53:41 met. 13:53:48

Q. And did S&P take any ratings 13:53:48 action based on that disclosure? 13:53:51

A. No. 13:53:53

MS. SOLOWAY: Okay. I think 13:54:19 we have one more document. This 13:54:21 one. 13:54:22

We're up to Exhibit 300. 13:54:37

(Deposition Exhibit 300, 13:54:42 RatingsDirect "Key Credit Factors 13:54:42 for the Oil and Gas Exploration 13:54:42 and Production Industry," was 13:54:42 marked for identification.) 13:54:45

A. Thank you. 13:54:45

Q. Thank you. 13:54:45

So, again, take your time, if you 13:54:49 want to flip through the document. 13:54:51

Do you recognize this document? 13:54:54

A. Yes. 13:54:57

Page 262

CONFIDENTIAL - BEN B. TSOCANOS

THE STENOGRAPHER: Your 13:55:03 secretary is outside waiting for 13:55:04 you for papers. 13:55:05

(There is a discussion off 13:55:05 the record.) 13:55:09

Q. The title of this document -- 13:55:09 well, this is an S&P Global Ratings 13:55:12 document, correct? 13:55:15

A. Yeah. 13:55:16

Q. And the title is, "Key Credit 13:55:16 Factors for the Oil and Gas Exploration 13:55:19 and Production Industry"? 13:55:21

A. Right. 13:55:22

Q. Okay. And you're, actually, 13:55:23 listed under "Primary Credit Analyst." 13:55:25

Do you see that? 13:55:27

A. Yes. 13:55:28

Q. Is this a document you're 13:55:28 familiar with? 13:55:30

A. Yes. 13:55:30

Q. Is this a document that was 13:55:31 created by S&C -- S&P in the ordinary 13:55:32 course of its business? 13:55:35

A. Yes. 13:55:36

Page 263

CONFIDENTIAL - BEN B. TSOCANOS

Q. I want to just -- I want to 13:55:40 ask you a couple of questions about 13:55:41 various portions of the document; if you 13:55:42 turn to Paragraph 47. 13:55:45

A. Paragraph 47 you said? 13:55:54

Q. Yes. 13:55:56

And feel free to, like, read around 13:55:57 it or look at the context. I'm not 13:55:58 rushing you. 13:56:00

Paragraph 47 says, "The US SEC and 13:56:02 equivalent authorities in other areas 13:56:06 define the standards for different 13:56:08 categories of reported reserves." And 13:56:10 then there is a reference, "see 13:56:13 accounting and analytical adjustments. 13:56:14 But we recognize that there is still a 13:56:16 measure of management discretion in the 13:56:19 application of these standards." 13:56:21

Do you see that? 13:56:22

A. Yes. 13:56:23

Q. Do you have an understanding 13:56:24 of what types of discretion management 13:56:25 exercises in applying the SEC standards 13:56:28 for proved reserves? 13:56:32

Page 264

CONFIDENTIAL - BEN B. TSOCANOS

MR. GOLDSTEIN: Object to 13:56:33 form. 13:56:33

A. Yeah, I'm trying to think of 13:56:40 where -- there are, certainly, ways that 13:56:42 companies can be more aggressive or less 13:56:49 aggressive about booking reserves based 13:56:52 on their intention to invest capital. I 13:56:54 think that's mostly what the language is 13:57:00 getting at. 13:57:07

Q. So, even though -- and it 13:57:07 says here that the SEC defines the 13:57:10 standard. 13:57:12

Do you see that? 13:57:13

A. Yeah. 13:57:14

Q. There's -- if I'm 13:57:14 understanding this correctly, S&P is 13:57:16 saying that there is still some -- if I'm 13:57:19 getting this right -- judgments that 13:57:22 management has to make? 13:57:23

A. Yeah, there's some flexibility 13:57:24 within that framework proscribed by the 13:57:26 SEC. 13:57:30

Q. Okay. I want to have you 13:57:31 flip to Paragraph 52 next. 13:57:36

Page 265

67 (Pages 262 - 265)