IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |
|---|---|
| PEDRO RAMIREZ, JR., Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>      v.<br><br>EXXON MOBIL CORPORATION, REX W. TILLERSON, ANDREW P. SWIGER, and DAVID S. ROSENTHAL,<br><br>        Defendants. | Case No. 3:16-cv-03111-K |

**DEFENDANTS' REPLY BRIEF IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT**

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

HAYNES AND BOONE, LLP
2801 N. Harwood Street, Suite 2300
Dallas, TX 75219
(214) 651-5000

*Counsel for Exxon Mobil Corporation, Andrew P.
Swiger, and David S. Rosenthal*

SQUIRE PATTON BOGGS
2200 Ross Avenue, Suite 4100W
Dallas, TX 75201
(214) 758-1505

*Counsel for Rex W. Tillerson*

## TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT ..................................................................................................... 1

ARGUMENT ............................................................................................................................... 5

I.    Plaintiff's Pleaded Theories Fail as a Matter of Fact and Law ........................................... 5

    A.   Plaintiff Has Abandoned Its Pleaded Kearl Proved Reserves Theory ........................... 5

    B.   Plaintiff Has Offered No Evidence That the Page 9 Table Violated GAAP .................. 8

    C.   No Facts Preclude Summary Judgment on Defendants' RMDG Disclosures ............... 9

        1.   There Is No Genuine Dispute That the RMDG Assets Were Not Impaired
            at Year-End 2015 ..................................................................................................... 9

        2.   Plaintiff Fails to Identify Any Evidence of Scienter ........................................... 12

        3.   The Alleged Corrective Disclosure Post-Dates the Class Period,
            "Corrects" Nothing, and Was Already Excluded from the Classwide Claim ...... 15

II.   Plaintiff's Unpled Theories Are Improper—and Fail as a Matter of Fact and Law ............ 16

    A.   Plaintiff's Unpled Theories Are Improper and Should Be Disregarded ...................... 16

    B.   There Is No Genuine Dispute That ExxonMobil Properly Estimated
        Its 2015 Proved Reserves ............................................................................................ 19

    C.   Defendants' Accurate, SEC-Mandated Disclosures Cannot Constitute Fraud ............. 22

CONCLUSION .......................................................................................................................... 25

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*ABC Arbitrage Plaintiffs Grp.* v. *Tchuruk*,
    291 F.3d 336 (5th Cir. 2002).................................................................................. 17

*In re Aetna, Inc. Sec. Litig.*,
    617 F.3d 272 (3d Cir. 2010)..................................................................................... 7

*Alaska Electrical Pension Fund* v. *Flowserve Corporation*,
    572 F.3d 221, 233 (5th Cir. 2009)......................................................................... 15

*In re Alphabet, Inc. Securities Litigation*,
    1 F.4th 687 (9th Cir. 2021)..................................................................................... 20

*Apple Barrel Prods., Inc.* v. *Beard*,
    730 F.2d 384 (5th Cir. 1984).................................................................................. 18

*In re Baker Hughes Sec. Litig.*,
    136 F. Supp. 2d 630 (S.D. Tex. 2001), *aff'd*, 292 F.3d 424 (5th Cir. 2002).......................... 8

*In re: BP p.l.c. Sec. Litig.*,
    2016 WL 3090779 (S.D. Tex. May 31, 2016) ....................................................... 21

*In re Browning-Ferris Industries, Inc. Sec. Litig.*,
    876 F. Supp. 870 (S.D. Tex. 1995) ....................................................................... 11

*Bye* v. *MGM Resorts Int'l, Inc.*,
    49 F.4th 918 (5th Cir. 2022), *cert. dismissed*, 143 S. Ct. 1102 (2023)................................. 17

*Carlton* v. *Cannon*,
    184 F. Supp. 3d 428 (S.D. Tex. 2016)...................................................................... 7

*Carvelli* v. *Ocwen Fin. Corp.*,
    934 F.3d 1307 (11th Cir. 2019) ............................................................................... 7

*Chabot* v. *Walgreens Boots All., Inc.*,
    2023 WL 2908827 (M.D. Pa. Mar. 31, 2023)........................................................ 17

*In re Chicago Bridge & Iron Co. N.V. Securities Litigation*,
    2021 WL 3727095 (S.D.N.Y. Aug. 23, 2021) ...................................................... 25

*York Cnty. ex rel. Cnty. of York Ret. Fund* v. *HP, Inc.*,
    65 F.4th 459 (9th Cir. 2023)................................................................................... 13

**CASES**                                                                                                      **Page(s)**

*Del. Cnty. Emps. Ret. Sys.* v. *Cabot Oil & Gas Corp.*,
620 F. Supp. 3d 603 (S.D. Tex. 2022)................................................................. 16

*Diamond Servs. Corp.* v. *RLB Contracting, Inc.*,
113 F.4th 430 (5th Cir. 2024) ........................................................................... 5

*Ennis Transp. Co., Inc.* v. *Richter*,
2011 WL 3702727 (N.D. Tex. Aug. 22, 2011) .................................................. 18

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
2016 WL 4095973 (S.D. Tex. Aug. 2, 2016), *aff'd sub nom. Giancarlo* v. *UBS
Fin. Servs., Inc.*, 725 F. App'x 278 (5th Cir. 2018)............................................ 12

*Fener* v. *Operating Eng'rs Const. Indus. & Misc. Pension Fund (LOCAL 66)*,
579 F.3d 401 (5th Cir. 2009)............................................................................. 7

*In re Genworth Fin. Inc. Sec. Litig.*,
103 F. Supp. 3d 759 (E.D. Va. 2015).............................................................. 21

*Gilley* v. *Protective Life Ins. Co.*,
17 F.3d 775 (5th Cir. 1994)............................................................................... 5

*Ind. Elec. Workers' Pension Tr. Fund IBEW* v. *Shaw Grp., Inc.*,
537 F.3d 527 (5th Cir. 2008).............................................................. 20, 21, 24

*Jackson* v. *Gautreaux*,
3 F.4th 182 (5th Cir. 2021)............................................................................. 18

*Johnson* v. *Miller*,
126 F.4th 1020 (5th Cir. 2025)....................................................................... 18

*In re Kosmos Energy Ltd. Sec. Litig.*,
299 F.R.D. 133 (N.D. Tex. 2014) ................................................................... 17

*SEC* v. *Life Partners Holdings*,
41 F. Supp. 3d 550 (W.D. Tex. 2013)............................................................. 11

*Lormand* v. *US Unwired, Inc*,
565 F.3d 228 (5th Cir. 2008)........................................................................... 25

*Lormand* v. *US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009)........................................................................... 25

*Macquarie Infrastructure Corp.* v. *Moab Partners, L.P.*,
601 U.S. 257 (2024)........................................................................................ 23

*Marshall on Behalf of Marshall* v. *E. Carroll Par. Hosp. Serv. Dist.*,
134 F.3d 319 (5th Cir. 1998)............................................................................. 8

**CASES**                                                                      **Page(s)**

*Maso Cap. Invs. Ltd.* v. *E-House (China) Holdings Ltd.*,
  2024 WL 2890968 (2d Cir. June 10, 2024) ...................................................... 23

*N. Port Firefighters' Pension-Loc. Option Plan* v. *Temple-Inland, Inc.*,
  936 F. Supp. 2d 722 (N.D. Tex. 2013) .................................................... 16, 22

*Okla. Firefighters Pension & Ret. Sys.* v. *Six Flags Ent. Corp.*,
  58 F.4th 195 (5th Cir. 2023) ...................................................................... 6, 24

*Pub. Emps. Ret. Sys. of Miss.* v. *Amedisys, Inc.*,
  769 F.3d 313 (5th Cir. 2014) ......................................................................... 22

*Ret. Sys. of Mich.* v. *Pier 1 Imports, Inc.*,
  935 F.3d 424 (5th Cir. 2019) ......................................................................... 24

*Slayton* v. *Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010) ............................................................................ 7

*Southland Sec. Corp.* v. *INSpire Ins. Sols., Inc.*,
  365 F.3d 353 (5th Cir. 2004) ..................................................................... 7, 12

*In re St. Jude Med., Inc., Sec. Litig.*,
  629 F. Supp. 2d 915 (D. Minn. 2009) ............................................................ 17

*Tuchman* v. *DSC Commc'ns Corp.*,
  14 F.3d 1061 (5th Cir. 1994) ......................................................................... 13

*Underland* v. *Alter*,
  2011 WL 4017908 (E.D. Pa. Sept. 9, 2011) ................................................... 21

*In re Venator Materials PLC Sec. Litig.*,
  547 F. Supp. 3d 624 (S.D. Tex. 2021) ........................................................... 13

*In re Vivendi, S.A. Securities Litigation*,
  838 F.3d 223 (2d Cir. 2016) .......................................................................... 17

*Wochos* v. *Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2021) ......................................................................... 7

**STATUTES**

15 U.S.C. § 78u-4(b)(1) .................................................................................. 17

15 U.S.C. § 78u–5(c)(1) .................................................................................... 7

CASES                                                                                              **Page(s)**

OTHER AUTHORITIES

17 C.F.R. § 210.4-10 ................................................................................................ 19, 22

17 C.F.R. § 229.1204.......................................................................................... 8, 23, 24, 25

74 Fed. Reg. 2158 (Jan. 14, 2009)................................................................................. 23

Fed. R. Civ. P. 15 ...................................................................................................... 3, 18, 19

Fed. R. Civ. P. 23 ............................................................................................................. 4

Fed. R. Civ. P. 56 ............................................................................................................. 5

H.R. Rep. No. 104-369 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 1995 WL
709276 ...................................................................................................................... 7

## SUMMARY OF ARGUMENT

Faced with the unraveling of its claims, Plaintiff seeks to survive summary judgment by mischaracterizing the factual record and attempting to litigate theories of liability it never pleaded. Plaintiff understandably wants a do-over now that years of discovery have demonstrated the infirmity of its claims. But that is not how litigation works. And no amount of obfuscation can conceal that Defendants are entitled to summary judgment. This Court should grant Defendants' motion for summary judgment (the "Motion" or "Mot.") and dismiss this case.

**Plaintiff's Pleaded Theories Fail as a Matter of Fact and Law**. Plaintiff's Complaint threw a lot at the wall. But only three of its theories stuck after the Court's rulings on the motion to dismiss and class certification. The surviving theories are that:

- ExxonMobil's warning in its 2015 Form 10-K that it might be required to de-book proved reserves at Kearl[1] at year-end 2016 was "too tepid considering prevailing oil prices and the high likelihood of a future de-booking." Dkt. No. 178 at 9.

- ExxonMobil allegedly violated GAAP standards in how it disclosed 2015 production prices and costs for the Canadian bitumen operations on Page 9 of its 2015 Form 10-K. *Id.* at 8.

- ExxonMobil "failed to properly recognize an impairment charge" for its RMDG assets in its 2015 Form 10-K. *Id.* at 11.

Plaintiff argued Defendants committed this supposed fraud to avoid a downgrade of ExxonMobil's AAA credit rating in advance of a March 2016 bond offering. And Plaintiff claims the class suffered losses because ExxonMobil's stock price declined in response to subsequent disclosures about Kearl and the RMDG assets. None of these theories withstand scrutiny.

To begin, all of Plaintiff's claims fail because Plaintiff cannot prove scienter. Plaintiff's Opposition cites *no evidence* showing that any ExxonMobil employee responsible for disclosures

---

[1] Abbreviated and capitalized terms have the same meaning as in the Motion. Dkt. No. 232. Defendants will refer to Plaintiff's opposition to the Motion as the "Opposition" or "Opp." Dkt. No. 248. Defendants will refer to their reply in support of their motion to exclude the testimony of Steven P. Feinstein as the "Feinstein Reply."

about the Kearl or RMDG assets was concerned with propping up ExxonMobil's credit rating. No smoking gun documents. No admissions during depositions. No whistleblower. Nothing. Tellingly, Plaintiff relegates its defense of this centerpiece of its fraud theory to the last five pages of its Opposition, and cites no evidence that anyone at ExxonMobil responsible for Kearl's proved reserves analysis or the RMDG impairment assessment gave even a passing thought to either the Company's credit rating or the implications for any bond offering. Plaintiff offers nothing more than supposition and innuendo, which is insufficient to survive summary judgment.

Plaintiff instead claims that Defendants knew ExxonMobil's disclosures were false but made them anyway. Opp. at 4–11, 19, 35. None of the evidence Plaintiff cites supports that alternative scienter theory. The record shows the exact opposite: *i.e.*, that the Individual Defendants were consistently shown reports from internal subject-matter experts that were entirely consistent with the Company's public disclosures. The record thus refutes scienter and that failure of proof alone warrants summary judgment on all of Plaintiff's claims.

Plaintiff's pleaded theories also fail for other, independent reasons. Plaintiff does not even address, much less attempt to defend, its "tepid warning" theory about potentially reclassifying Kearl's proved reserves. That claim is thus conceded and should be dismissed. Indeed, Plaintiff's causation and damages expert never even analyzed the "tepid warning" theory. And binding Fifth Circuit law requires dismissal of forward-looking statements covered by the PSLRA's safe harbor.

Plaintiff's claim about the profitability of ExxonMobil's Canadian bitumen operations also fails for lack of proof. Plaintiff's accounting expert never analyzed whether ExxonMobil's disclosures complied with ASC 275, a point Plaintiff does not contest. And Plaintiff does not claim—as the Court observed at class certification—that "the average profit implied by [the] 2015 10-K was inaccurate." Dkt. No. 178 at 8. Plaintiff instead argues that ExxonMobil should have

2

ignored SEC regulations and disclosed the profitability of its Canadian bitumen assets differently from the method prescribed by the SEC regulations.  That is nonsense.

Finally, this Court should dismiss Plaintiff's RMDG assets claim because the Opposition raises no dispute as to the accuracy of ExxonMobil's disclosures, scienter, or loss causation. ExxonMobil conducted an analysis in 2015 that concluded that the RMDG assets were unimpaired, and Plaintiff's accounting expert, Regan, admitted ExxonMobil's analysis was "permissible under the rules." Mot. at 31.  Plaintiff cites no evidence that any Individual Defendant knew of a need to impair the RMDG assets, yet lied about it.  And Plaintiff's damages expert purports to find loss causation by measuring an alleged corrective disclosure that (i) this Court *excluded* from this case at class certification, and (ii) does nothing to correct the allegedly misleading disclosures.

For those and other reasons discussed below, this Court should grant the Motion and dismiss Plaintiff's pleaded theories of liability.

**Plaintiff's Unpled Theories Fail as a Matter of Fact and Law**.  Plaintiff spends much of its Opposition defending alternative theories that were neither alleged in its Complaint nor certified to proceed on a classwide basis.  Specifically, Plaintiff now argues that ExxonMobil's disclosure about the risk of reserves de-bookings at year-end 2016 was misleading because Kearl should have been de-booked at year-end *2015*.  Plaintiff also argues that ExxonMobil was required to make specific disclosures about *Kearl*'s production costs and prices, separate and apart from its disclosures about Canadian bitumen operations.  The Court should reject these new theories.

Plaintiff cannot replead its case in its Opposition.  Indeed, Fifth Circuit law forbids it.  Yet Plaintiff invokes Rule 15(b)(2) and argues that new theories may proceed because Defendants consented to litigating them.  But that rule is inapplicable where, as here, Defendants have made their lack of consent unmistakable. Mot. at 36–39.  Plaintiff alternatively argues the Court should

3

consider these new theories—untested at either the motion-to-dismiss or class certification stage—because it provided "notice" of them.  That is wrong.  In October 2023, Defendants raised the prospect that Plaintiff was pursuing the Unpled Kearl Proved Reserves Theory.  Plaintiff then expressly disclaimed the theory, writing that it was *not* asserting "that Exxon 'should have de-booked its proved reserves at Kearl as of year-end 2015.'"  App. 686.  Purported "notice" of Plaintiff's new theories is also irrelevant.  To get to trial on a securities fraud claim on behalf of a class of investors, Plaintiff must first survive a motion to dismiss under the PSLRA's heightened pleading standard and then show that the claims satisfy Rule 23.  Plaintiff has done neither on its unpled theories, and may not sidestep these fundamental procedural requirements.

In any event, Plaintiff's unpled theories fail on the merits.  The Unpled Kearl Profitability Theory fails because the undisputed facts show that ExxonMobil complied to the letter with SEC regulations when it disclosed its Canadian bitumen assets' production prices and costs, and no evidence suggests that anyone at ExxonMobil sought to conceal Kearl's profitability.  Those disclosures are not rendered misleading by omission because ExxonMobil had no obligation to disclose asset-specific data and made no affirmative statements about Kearl's profitability.  Likewise, the Unpled Kearl Proved Reserves Theory fails because there is no evidence (1) that ExxonMobil failed to comply with relevant regulations when estimating Kearl's 2015 proved reserves, (2) that ExxonMobil's disclosure of Kearl de-bookings at year-end *2016* "corrected" any alleged misstatement as to *2015*, or (3) that ExxonMobil executives made the 2015 disclosure despite believing that the 2015 proved reserves analysis was incorrect or misleading.  For these and other reasons discussed below, this Court should dismiss Plaintiff's unpled theories of liability.

4

## ARGUMENT

### I.    Plaintiff's Pleaded Theories Fail as a Matter of Fact and Law

#### A.    Plaintiff Has Abandoned Its Pleaded Kearl Proved Reserves Theory

From the inception of this case, Plaintiff has alleged that ExxonMobil "knew that its Kearl Operation would not satisfy the SEC definition for proved reserves at year-end 2016."  Compl. ¶ 347.  Plaintiff has claimed that the Enhanced Risk Disclosure in ExxonMobil's 2015 Form 10-K was misleadingly "tepid" because year-end 2016 de-booking was, in fact, "all but certain." *Id.* ¶¶ 22, 231, 310, 347–48. Plaintiff advanced this theory and the Court accepted it at the motion-to-dismiss[2] and class certification stages.[3]  But after discovery, the undisputed facts now show that the so-called "tepid warning" was neither false nor made with scienter.  Mot. at 9–21.

Unable to show otherwise, Plaintiff has abandoned this theory.  Plaintiff's failure warrants summary judgment in Defendants' favor because it is well established that "an argument is waived if the party fails to make the argument in response to summary judgment."  *Gilley* v. *Protective Life Ins. Co.*, 17 F.3d 775, 781 n.13 (5th Cir. 1994); *see also Diamond Servs. Corp.* v. *RLB Contracting, Inc.*, 113 F.4th 430, 443 (5th Cir. 2024).

*First*, Plaintiff does not dispute that the evidence shows that ExxonMobil chose to *enhance* its proved-reserves disclosure to proactively provide more information to the market in light of the then-low price environment.[4]  While Plaintiff had argued throughout the case that the disclosure

---

[2] Plaintiff argued that ExxonMobil was aware "throughout 2016 that the Kearl . . . reserves would no longer satisfy the SEC definition . . . *at year-end 2016*, absent an extraordinary – and, by Exxon's own estimates, unexpected – rise in the price of oil." Dkt. No. 53 at 20 (emphasis added).  In its motion-to-dismiss order, the Court stated that "[t]he Amended Complaint alleges ExxonMobil knew at the time it released its 2015 Form 10-K and throughout 2016 that its Kearl Operations would not satisfy the SEC's definition of proved reserves by year-end 2016." Dkt. No. 62 at 25.

[3] *See* Dkt. No. 87 at 20 (at class certification, contending that "Exxon's failure to disclose its proved reserves at Kearl were all but certain to be de-booked by year-end 2016 was materially misleading"); Dkt. No. 178 at 9 (describing Plaintiff as alleging that "the warning was too tepid considering prevailing oil prices").

[4] Instead, Plaintiff argues the Court should ignore Joseph Horne's declaration showing these facts. Opp. at 21 n.20. But affidavits are admissible summary judgment evidence. Fed. R. Civ. P. 56(c)(1)(A). And Plaintiff does not explain how Horne's declaration "is contradicted by other evidence in the record, including his sworn testimony." Opp. at 21

5

was a "tepid . . . warning," Dkt. No. 53 at 7, discovery made clear that this was an *augmented* disclosure that reflected the two months of data that ExxonMobil had at the time of the 2015 Form 10-K. Mot. at 9–15. Conceding the point, Plaintiff now abandons its pleaded theory and instead argues that the Enhanced Risk Disclosure is misleading because, "as of October 2015, Kearl could not satisfy the SEC definition for proved reserves" and that its proved reserves should have been de-booked at year-end *2015*—a completely different theory of liability. Opp. at 17. That new, unpled theory is procedurally barred and fails for its own reasons. *Infra* Section II.A–B. It also does not create a material dispute about Plaintiff's pleaded theory concerning 2016.[5]

*Second*, Plaintiff does not dispute that, under its pleaded theory, the Enhanced Risk Disclosure is forward-looking and accompanied by meaningful cautionary language. It therefore is protected under the PSLRA safe harbor. Mot. at 17–19; *see Okla. Firefighters Pension & Ret. Sys.* v. *Six Flags Ent. Corp.*, 58 F.4th 195, 211 (5th Cir. 2023) (PSLRA safe harbor applies where forward-looking statement is "company-specific" with "a realistic description of the risks applicable to the particular circumstances").

Plaintiff attempts to avoid dismissal under the safe harbor by pivoting to the Unpled Kearl Proved Reserves Theory, which concerns ExxonMobil's proved reserves estimation for 2015. Plaintiff goes so far as to argue that the Enhanced Risk Disclosure is not forward-looking. Opp. at 20–21. But the Enhanced Risk Disclosure plainly addresses future estimates of year-end *2016* proved reserves, which is why the Court previously held that this disclosure was "forward-looking." Dkt. No. 62 at 26–27. And Plaintiff's argument that the cautionary language was not

---

n.20. This is because it is consistent with the evidence. *See* Mot. at 12. Even setting aside the declaration, the record is clear on these issues and replete with evidence of Defendants' good faith. *See, e.g.*, App. 654, 677, 678, 680.
[5] As Defendants explained in their opening brief, ExxonMobil was required to estimate its proved reserves annually, using data from the preceding year. Mot. at 9. The *2015* estimate and the *2016* estimate therefore necessarily relied on different data. The Enhanced Risk Disclosure unquestionably warned about 2016, not 2015. And the 2015 estimate did not preordain any particular outcome in 2016.

meaningful because it did not disclose a risk of de-booking for 2015 relies on the unpled theory (addressed *infra* Section II.A) and does not engage with the enhanced cautionary language added for 2016. Opp. at 21. This argument —which relies entirely on its unpled assertion that Kearl assets did not qualify as proved reserves in 2015—only underscores that Plaintiff has abandoned its pleaded theory, and, in any event, fails to convert the forward-looking "tepid warning" into a present statement of fact.[6]

Finally, with respect to loss causation, Plaintiff does not dispute that its damages expert analyzed only the Unpled Kearl Proved Reserves Theory (*i.e.*, that Kearl should have been de-booked in 2015) and conducted no analysis specific to the supposed "tepid warning." Mot. at 22–23. Nor does Plaintiff dispute that "the testimony of an expert . . . is required to show loss causation." *See, e.g., Fener* v. *Operating Eng'rs Const. Indus. & Misc. Pension Fund (LOCAL 66)*, 579 F.3d 401, 409 (5th Cir. 2009). Rather, Plaintiff argues that its expert's analysis of the unpled theory is sufficient to establish loss causation for Plaintiff's original pleaded theory. Opp. at 30. This argument, again, conflates 2015 and 2016 proved reserves estimates and fails to respond to Defendants' loss causation arguments, thereby conceding them. Mot. at 22–23.

In short, Plaintiff has not sought to oppose summary judgment regarding the pleaded Kearl proved reserves theory it has maintained throughout this case. Instead, Plaintiff repeatedly leans on its unpled theories—which are procedurally barred and meritless, *see infra* Section II.A–B—to

---

[6] Plaintiff also argues that "actual knowledge" is established. This is incorrect, *see infra* Section II.B, but also legally irrelevant: the PSLRA safe harbor is written in the disjunctive and applies to forward-looking statements accompanied by meaningful cautionary language irrespective of whether actual knowledge is separately established. *See Southland Sec. Corp.* v. *INSpire Ins. Sols., Inc.*, 365 F.3d 353, 371 (5th Cir. 2004) (noting that the safe harbor has "two independent prongs"); 15 U.S.C. § 78u–5(c)(1) (separating subparts with "or"); *accord Carlton* v. *Cannon*, 184 F. Supp. 3d 428, 453 (S.D. Tex. 2016); *Slayton* v. *Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010); *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 278–79 (3d Cir. 2010); *Carvelli* v. *Ocwen Fin. Corp.*, 934 F.3d 1307, 1326 (11th Cir. 2019); *Wochos* v. *Tesla, Inc.*, 985 F.3d 1180, 1190 (9th Cir. 2021); *see also* H.R. Rep. No. 104–369, at 44 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 743, 1995 WL 709276 (Conference Report explaining that a court may dismiss a securities-fraud claim "without examining the state of mind of the defendant" if there is a meaningful cautionary statement).

keep its case alive.  For all these reasons, the Court should grant summary judgment on Plaintiff's fraud claim concerning the Enhanced Risk Disclosure.

**B.      Plaintiff Has Offered No Evidence That the Page 9 Table Violated GAAP**

Plaintiff does not refute that its Item 303 claim—which centered on Defendants' failure to disclose that "the Canadian Bitumen Operations had been operating at a loss for at least three months"—was dismissed, and that the Court permitted Plaintiff to proceed only on the narrow theory that Defendants had thereby violated ASC 275.  Dkt. No. 62 at 24; Mot. at 24–25.

The Opposition identifies no evidence supporting this ASC 275 theory at summary judgment.  Mot. at 24–25.  Plaintiff's accounting expert was silent on the subject, and admitted that he did not opine on the topic.  App. 260 at 209:2–21.  While he testified that ASC 275 was "consistent with" his opinions, App. 260 at 209:2–8, such conclusory rhetoric does not create a triable issue of fact.  *Marshall on Behalf of Marshall* v. *E. Carroll Par. Hosp. Serv. Dist.*, 134 F.3d 319, 324 (5th Cir. 1998); *see also In re Baker Hughes Sec. Litig.*, 136 F. Supp. 2d 630, 649 (S.D. Tex. 2001) (dismissing claim where plaintiff offered "no particularized facts relating to the specific way in which the Defendants' accounting strayed from GAAP"), *aff'd*, 292 F.3d 424 (5th Cir. 2002).  Defendants' expert Abington is the only expert who analyzed whether ExxonMobil complied with ASC 275, concluding that ExxonMobil's disclosures were consistent with ASC 275 because "ExxonMobil disclosed known trends (i.e., the price volatility in 2015) impacting its financial results and foreshadowing potential material future events (i.e., its 2016 reserve disclosures)."  App. 1496 ¶ 159.  With no expert opinion supporting its ASC 275 claim, Plaintiff is reduced to arguing that Defendants committed fraud by reporting ***accurate*** production prices and costs in the form the SEC requires.  *See* Opp. at 25–26; Dkt. No. 178 at 8; 17 C.F.R. § 229.1204 ("Item 1204").  Plaintiff cites no supporting caselaw, no corrective disclosure, and no relevant evidence of scienter.  *See infra* Section II.C.  This Court thus should grant summary judgment.

8

### C.  No Facts Preclude Summary Judgment on Defendants' RMDG Disclosures

This Court should grant summary judgment on Plaintiff's RMDG-related claim.

1.  There Is No Genuine Dispute That the RMDG Assets Were Not Impaired at Year-End 2015

There is no genuine dispute that ExxonMobil's 2015 impairment disclosure was based on the conclusions of internal analyses by ExxonMobil accounting experts showing that the RMDG assets were not impaired at year-end 2015. Plaintiff does not dispute that ExxonMobil did not find a trigger at Step 1 of the ASC 360 analysis. Under GAAP, that could have ended the impairment inquiry. But ExxonMobil nonetheless took a conservative approach and conducted a recoverability analysis using the same price assumptions it used to evaluate investment opportunities, as GAAP requires. Mot. at 31. By Regan's own admission, that analysis was "permissible under the rules." App. 264 at 252:22–253:19. ExxonMobil's independent auditor agreed with this analysis. Mot. at 33. The Court's inquiry should end there. A disclosure reflecting an accounting judgment that both sides' experts *agree* was permissible under GAAP is not rendered misleading just because Plaintiff would have conducted the analysis differently.

In an effort to defeat summary judgment, however, Plaintiff attempts to second-guess ExxonMobil's judgments—an approach that cannot create a genuine dispute of material fact.

*First*, Plaintiff argues that ExxonMobil should have recognized an impairment trigger in 2015 based on the low price environment and purported operating losses. Opp. at 35–37. Plaintiff impermissibly seeks to substitute its own judgment, years later, for that of ExxonMobil's accounting experts and auditors. The contemporaneous evidence is undisputed that ExxonMobil did not consider "temporarily low prices" a trigger and transparently said as much to the market.[7]

---

[7] Neither ExxonMobil's auditor nor the SEC took exception to this position. *See* App. 438. Plaintiff points to a PowerPoint noting that it would "be difficult to argue to [the] SEC that [a trigger] has NOT occurred." Pl. App. 3360. But Plaintiff fails to mention that the SEC discussed with ExxonMobil via comment letters why ExxonMobil did not

9

*See* App. 200–01, 207–08; *see also* App. 344.  And the document Plaintiff cites for the point that low prices were "sustained" says nothing about natural gas's *long-term* price forecasts, which are what matter under ASC 360.  *See* Pl. App. 2244 (showing only a short-term "natural gas price basis" through 2017); Pl. App. 2252; *infra* note 12.  Plaintiff similarly offers no evidence that the RMDG assets experienced "current-period operating loss[es] *combined with* a history and forecast of . . . losses," citing only a 2012 interview in which Defendant Tillerson noted that natural gas suppliers were "losing our shirts" in in the past.  Opp. at 36 (citing Pl. App. 2270) (emphasis added); *see* Pl. App. 1498 (showing no forecasts of insufficient cash flow or operating losses for RMDG assets).[8]

*Second*, Plaintiff's trigger argument is irrelevant because ExxonMobil took a "belt and suspenders" approach, conducting the 2015 Recoverability Analysis despite determining there was no impairment trigger.  Mot. at 31.  And that analysis complied with GAAP.  Plaintiff does not dispute that ASC 360 *required* ExxonMobil to use in the 2015 Recoverability Analysis the price projections it developed as part of its annual corporate planning process.  App. 661 (ASC 360-10-35-30).  And Regan concedes that use of those projections was "permissible under the rules." App. 264 at 252:22–253:19; *see* Mot. at 27.  Plaintiff (like Regan) cannot meaningfully dispute that ExxonMobil complied with ASC 360 when it used those projections.[9]  *See* Opp. at 37–40; App. 349; Mot. at 27.  That concession should end the inquiry.

---

recognize a trigger in 2015 and opted not to further investigate, apparently satisfied with ExxonMobil's explanation. *See* SEC Correspondence (Oct. 24, 2016), https://tinyurl.com/EMSECLetters; SEC Correspondence (Jan. 30, 2017), https://tinyurl.com/EMSECResponse.

[8] Plaintiff's reference to other companies' impairments in 2014 and 2015 of their own Rocky Mountain assets is irrelevant.  Those assets had different carrying values, different projected cash flows, and (in some cases) were analyzed under different accounting standards.  App. 1507–08 ¶ 185–86; Pl. App. 1687, 2405.

[9] Citing Regan's report, Plaintiff asserts that ExxonMobil used NYMEX natural gas strip prices instead of its internal price projections for investment planning purposes.  Opp. at 38 n.29.  But Regan merely concluded that ExxonMobil used strip prices to assess certain assets' current fair value, not that ExxonMobil used strip prices for long-term planning or budgeting.  *Id.* (citing Pl. App. 964–65 ¶ 226; *id.* 972–73 ¶ 245–46).  ASC 360 requires that "the assumptions used [for recoverability assessments] be reasonable in relation to the assumptions used in developing

*Third,* Plaintiff asserts that the prices ExxonMobil used in its business planning were "unreasonable." Opp. at 37–39. But "[s]econd-guessing" ExxonMobil's forward-looking price forecasts "is simply not a basis for securities fraud." *In re Browning-Ferris Industries, Inc. Sec. Litig.*, 876 F. Supp. 870, 901 (S.D. Tex. 1995).[10] In any event, Plaintiff's criticisms fail.

Plaintiff argues that ExxonMobil had not updated the prices used in the 2015 Recoverability Analysis since May 2015, Opp. at 37, but that is wrong. In fact, the management committee approved the price projections that were used in the 2015 Recoverability Analysis in early *September* 2015. *See* Pl. App. 2577; Pl. App. 3523–24 at 156:16–157:6.

Plaintiff next argues that ExxonMobil "manipulat[ed]" its long-term price projections. Opp. at 39. But this is an egregious mischaracterization of the record. Plaintiff's cited testimony and emails from Joseph Horne, ExxonMobil's then accounting policy manager, indicate instead that Horne provided placeholder "estimate[s]" or "prox[ies]" to the accountants performing the 2015 Recoverability Analysis to "work off" until the planning group finalized its projections. Pl. App. 2576–81; *see* Pl. App. 3524–25 at 157:23–158:7. That those placeholders were different from the projections the management committee ultimately approved for use in the 2015 Recoverability Analysis is of no import because it was not Horne's job to forecast natural gas prices, and he was not attempting to do so.[11] Pl. App. 2576–81.

---

other information used by the entity *for comparable* periods, such as *internal budgets and projections.*" App. 661. That ExxonMobil used strip prices to assess fair value is irrelevant. Joseph Horne explained that NYMEX strip prices lack liquidity beyond the short term and thus are only suitable for assessing short-term price sensitivities, and that the 2015 Recoverability Analysis required use of long-term forecasts. *See, e.g.*, Pl. App. 3445 at 78:17–22 (describing strip prices as "reasonably active trading" for "maybe two or three years"); *id.* at 80:15–21.

[10] Plaintiff's reliance on *SEC* v. *Life Partners Holdings* is misplaced. 41 F. Supp. 3d 550, 556 (W.D. Tex. 2013); Opp at 40. That case concerned a defendant's knowledge of a factual inaccuracy in its public statements regarding the sale of life insurance policies in a secondary market. *Id.* Here, there is no evidence that Defendants disbelieved the accuracy of the internal price projections ExxonMobil used for its 2015 Recoverability Analysis.

[11] Plaintiff asserts "the Management Committee . . . dictated that the price assumptions reach $4 by 2020 in order to avoid impairment," citing Horne's testimony. Opp. at 39. Another mischaracterization. Horne never testified that the management committee *dictated* this result; he testified only that "reaching $4 . . . was the Management Committee's assessment." Pl. App. 3525–26 at 158:25–159:3.

Plaintiff further argues ExxonMobil must have manipulated the 2015 price projections because it took an impairment in 2016 "even though production costs for [the RMDG] assets were lower and spot prices were dramatically higher than at YE 2015." Opp. at 39. But it is internal long-term projections—not "spot prices"—that must be used under ASC 360.[12] Every year, ExxonMobil's corporate planning experts developed internal price projections that it used for investment planning purposes. Pl. App. 2286. The results of this exercise changed from year to year. There is no dispute that ExxonMobil used internal price projections in 2016 just as it did in its 2015 Recoverability Analysis. *See, e.g.*, Pl. App. 2614. The results of a recoverability analysis in one year are independent of the results of another. Mot. at 34–35. That the RMDG assets were not recoverable in *2016* thus says nothing about whether those assets were recoverable in *2015*.

### 2.     Plaintiff Fails to Identify Any Evidence of Scienter

Because an impairment analysis is both forward-looking and a statement of opinion, Plaintiff must prove that (i) the 2015 impairment analyses were disclosed "by or with approval of an executive officer . . . with *actual knowledge* . . . that the statement was false or misleading," *Southland*, 365 F.3d at 371–72, and (ii) the Individual Defendants "did not actually hold the opinions expressed." *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 2016 WL 4095973, at *30 & n.42 (S.D. Tex. Aug. 2, 2016), *aff'd sub nom. Giancarlo* v. *UBS Fin. Servs., Inc.*, 725 F. App'x 278 (5th Cir. 2018); *see* Mot. at 32–34. Plaintiff concedes that it must meet this high standard but inaccurately claims "the record is replete with evidence of the Individual Defendants' actual knowledge" of falsity. Opp. at 45. In reality, there is no evidence that any ExxonMobil employee, much less any Individual Defendant, thought the RMDG assets were impaired as of year-end 2015. The record is consistent that ExxonMobil carefully applied the accounting

---

[12] It was appropriate to use long-term price projections in the undiscounted cash flow analysis because the RMDG assets had projected life spans of multiple decades. App. 1511 ¶¶ 192–93.

standards, memorialized its conclusions that the RMDG assets were *not* impaired, and presented those same conclusions to management.[13] *See* Mot. at 32–34; *see also Tuchman* v. *DSC Commc'ns Corp.*, 14 F.3d 1061, 1069 (5th Cir. 1994) (holding plaintiffs could not satisfy their burden on scienter without "alleg[ing] any facts that show that [defendant's alleged] statements were belied by his actual knowledge of contradictory facts"). This failure warrants summary judgment.

Plaintiff alternatively offers a feeble defense of its original scienter narrative—that ExxonMobil needed to maintain its AAA credit rating in advance of a bond offering—but that theory has been eviscerated. Plaintiff cites evidence suggesting that the Individual Defendants cared about ExxonMobil's excellent credit rating, as any executive would,[14] and that it was important for ExxonMobil to issue a regular dividend.[15] Opp. at 46–47. But Plaintiff cites no evidence that the Individual Defendants believed that taking impairments (or de-booking proved reserves) would threaten ExxonMobil's credit rating or its ability to pay a dividend. As S&P's corporate representative unequivocally testified, S&P never told ExxonMobil that it had to maintain "a lack of asset impairments" or a "threshold number" of proved reserves to keep its AAA rating. Supp. App. 75 at 254:9–14; App. 240 at 249:13–21.

---

[13] Plaintiff's cited authorities—both motion-to-dismiss cases—are easily distinguished. *See* Opp. at 45. In both *York Cnty. ex rel. Cnty. of York Ret. Fund* v. *HP, Inc.*, 65 F.4th 459 (9th Cir. 2023), and *In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 663 (S.D. Tex. 2021), the defendants were alleged to have reviewed internal information that directly contradicted their public statements. *See York*, 65 F.4th at 462–63; *Venator*, 547 F. Supp. 3d at 664. Here, by contrast, there is no evidence that the Individual Defendants were ever told—much less chose to ignore— that the RMDG assets were impaired at year-end 2015.

[14] Of course ExxonMobil prided itself on its AAA credit rating—it was one of three companies with a AAA rating at the time. But the Company viewed its rating as "a badge of honor" that otherwise had "no impact on [its] business or [its] business relationships." App. 306 at 126:3–10; *see* Dkt. No. 62 at 32–33 (citing *Ind. Elec. Workers' Pension Tr. Fund IBEW* v. *Shaw Grp., Inc.*, 537 F.3d 527, 544 (5th Cir. 2008) ("Scienter . . . may not be footed solely on motives universal to corporate executives")).

[15] ExxonMobil did not *need* the 2016 debt offering to issue its dividend and had flexibility on its balance sheet to generate cash for a dividend without it. *See* App. 229 at 195:15–196:1 ("Q. Would you agree with me that without the bond offering . . . there would have been a $7 billion cash deficit . . . ? A. There are many ways to manage cash in the corporation. *You could pull a number of different levers to deal with it.* The point of the bond offering was to *build up cash for use in managing in what was a temporary low-price environment*."); Pl. App. 142–45 at 142:25–145:16 (testifying that "borrowing of some sort" was not necessarily "required . . . to pay for . . . the dividend").

Further, Plaintiff identifies nothing to suggest that the credit rating agencies would have downgraded ExxonMobil had it impaired the RMDG assets in 2015, or that ExxonMobil had any reason to believe a downgrade would follow. In fact, the record shows the exact opposite. *See* Supp. App. 74 at 253:17–21 (S&P did not inform ExxonMobil that "its credit rating would be impacted by some particular impairment of some particular asset"). Nor does Plaintiff have any evidence that the downgrade would have affected borrowing costs for ExxonMobil's March 2016 bond offering.[16] The market was well aware that an S&P downgrade was coming: on February 1, 2016, S&P announced that it was placing ExxonMobil's AAA rating on "CreditWatch Negative," indicating a substantial risk of downgrade within 90 days. Pl. App. 2869; App. 889 ¶ 59. And Plaintiff ignores that Moody's *never downgraded ExxonMobil at all*, including after ExxonMobil announced impairments in 2017. *See* App. 1370–72 ¶¶ 22–25.

Finally, and predictably, Plaintiff leans heavily on its favorite soundbite: an interview snippet in which Rex Tillerson said that "we don't do write downs." Opp. at 48 (citing Pl. App. 2598). That proves nothing other than Plaintiff's willingness to distort the record. The full context makes clear that Defendant Tillerson emphasized that ExxonMobil complies with the accounting standards: "If you look at our history, we do not write investments down. ***And we follow the accounting standards***." Supp. App. 15 (emphasis added).[17] Following the accounting standards is precisely what ExxonMobil did in its 2015 Recoverability Analysis, as Plaintiff's own expert conceded. A misleading excerpt of Defendant Tillerson's speech does not change that.

---

[16] Plaintiff cites due diligence questions that the debt underwriters asked of ExxonMobil, dated just two days before the 2015 Form 10-K was filed, as evidence that ExxonMobil sought to conceal de-bookings and impairments. Pl. App. 3154. But ExxonMobil's accountants had been working on potential enhancements to the 2015 Form 10-K since early December 2015—months before the underwriters submitted their questions. Mot. at 10. There is no evidence that ExxonMobil scrambled to rewrite its Form 10-K in two days after receiving the underwriters' inquiries.
[17] Defendant Tillerson explained that he believed in "work[ing] on the things you can work on to sustain the profitability of that investment" instead of "quick[ly] . . . bail[ing it] out by writing it down." Pl. App. 2598.

14

       3.       The Alleged Corrective Disclosure Post-Dates the Class Period,
                "Corrects" Nothing, and Was Already Excluded from the Classwide Claim

This Court also should grant summary judgment because Plaintiff cannot show loss causation. Mot. at 34.

*First*, this Court already excluded the January 31 Disclosure upon which Plaintiff attempts to rely, ruling that Defendants rebutted the presumption of reliance by showing a lack of price impact. Dkt. No. 178 at 52. Plaintiff cannot now revive it as the sole corrective disclosure for the RMDG claim. Plaintiff cites *Alaska Electrical Pension Fund* v. *Flowserve Corporation* to argue that class certification rulings are not dispositive of loss causation at the merits stage. 572 F.3d 221, 233 (5th Cir. 2009); Opp. at 42. But Plaintiff misreads *Flowserve*. Because Defendants rebutted the element of reliance with respect to the January 31 disclosure, it has been excluded from the classwide claims, and *Flowserve* has no applicability to this situation. *See* Feinstein Reply at 2–3. Thus the upshot of the Court's prior rulings is that the evidence on which Plaintiff relies is irrelevant to the classwide claims.

*Second*, Plaintiff cannot rely on an alleged corrective disclosure that post-dates the class period. Mot. at 35–36. Plaintiff cites out-of-circuit cases involving "a protracted series of partial disclosures," some of which post-date the class period, leaking *further* details of the alleged fraud that were *already* disclosed during the class period. *See* Opp. at 44. But those cases are inapposite because, under Plaintiff's proffered theory, the *first* and *only* correction of the alleged misstatements regarding the RMDG assets occurred outside the class period. Opp. at 41. Plaintiff's expert, Feinstein, concedes this. Feinstein Reply at 4; *see also* App. 329 at 96:9–23 (conceding that the alleged $2.39-per-share stock drop on October 28, 2016 "is entirely Kearl").

*Finally*, and in all events, the January 31 Disclosure does not "correct" anything about the alleged 2015 Form 10-K misstatement. Mot. at 34–35. The disclosure addresses the 2016

impairment analysis, not 2015.  *Id*.  Plaintiff argues that a corrective disclosure "need not be a direct admission that a prior statement was false." *Del. Cnty. Emps. Ret. Sys.* v. *Cabot Oil & Gas Corp.*, 620 F. Supp. 3d 603, 634 (S.D. Tex. 2022).  But *Cabot* acknowledges that "a corrective disclosure must at least be 'relevant to' a prior misrepresentation." *Id.* (citing *Lormand* v. *US Unwired, Inc*, 565 F.3d 228, 256 n.20 (5th Cir. 2008)).  Here, the January 31 Disclosure is irrelevant to the 2015 impairment analyses because an impairment for one year does not reveal that an impairment was required the year before.[18]  *See N. Port Firefighters' Pension-Loc. Option Plan* v. *Temple-Inland, Inc*., 936 F. Supp. 2d 722, 762–63 (N.D. Tex. 2013) (explaining that a corrective disclosure must do more than "merely 'touch upon'" a prior statement; it must "suggest that [the] prior statements were false").

## II.    Plaintiff's Unpled Theories Are Improper—and Fail as a Matter of Fact and Law

### A.    Plaintiff's Unpled Theories Are Improper and Should Be Disregarded

Unable to salvage the case it pled in its Complaint and presented at class certification, Plaintiff pivots to two unpled theories relating to Kearl: that the 2015 Form 10-K was misleading because (i) Kearl's reserves did not qualify as proved at year-end 2015 and should have been de-booked then, and (ii) ExxonMobil failed to disclose that Kearl was purportedly unprofitable.

Recognizing that it is impermissible to now assert an unpled theory, Plaintiff claims the Unpled Kearl Proved Reserves Theory is "closely related" to a pleaded theory because Plaintiff reproduced in its Complaint the 2015 10-K's table disclosing ExxonMobil's total proved reserves (the "Page 5 Table").  *See* Opp. at 22.  But the PSLRA requires that a complaint alleging securities fraud include "the reason . . . why the statement is misleading."  15 U.S.C. § 78u-4(b)(1); *ABC*

---

[18] Tellingly, Plaintiff fails to identify a single analyst who described the January 31 Disclosure about 2016 as "correcting" Defendants' 2015 impairment analyses. *See* Mot. at 35.  Plaintiff claims that one analyst was "surprised" by the impairment charge—but that analyst did not refer to the prior year's RMDG impairment disclosure from the 2015 Form 10-K, let alone suggest it was *wrong*. *See* Opp. at 43; Dkt. No. 225 at 11.

16

*Arbitrage Plaintiffs Grp.* v. *Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002).  Nowhere in the Complaint does Plaintiff allege that the Page 5 Table was misleading because "Kearl's reserves should have been de-booked at YE 2015."  Opp. at 23; *see* Compl. ¶ 280 (alleging, to the contrary, Kearl "was unlikely to satisfy the SEC definition for proved reserves at year-end *2016*") (emphasis added).

Plaintiff similarly argues that the Unpled Kearl Profitability Theory was pleaded because Plaintiff alleged that the *Canadian bitumen operations* had been operating at a loss for *at least three months*.  Opp. at 11–13 (citing Compl. ¶¶ 342–46).  But Plaintiff's new theory expressly depends upon purported losses at **Kearl specifically**, not the Canadian bitumen operations.  Opp. at 5.  "Neither the defendant nor the district court [were] required to read into the carefully stated complaint . . . a wholly different claim that was not pled."  *Bye* v. *MGM Resorts Int'l, Inc.*, 49 F.4th 918, 926 (5th Cir. 2022), *cert. dismissed*, 143 S. Ct. 1102 (2023).

In any event, it is undisputed that Plaintiff did not present either theory to the Court on class certification.  To the contrary, the Court explained that Plaintiff was seeking certification on its "tepid warning" theory, Dkt. 178 at 9 ("the warning was too tepid"), and on its theory that ExxonMobil should have disclosed that its Canadian bitumen operations as a whole were unprofitable, *id.* at 8–10 (describing "Defendants' failure to disclose the Canadian Bitumen Operations' losses").  Plaintiff cannot hope to survive summary judgment and proceed to trial on classwide claims that the Court has not certified for classwide treatment.[19]  *See In re Kosmos*

---

[19] Plaintiff's out-of-circuit cases are unpersuasive.  *In re Vivendi, S.A. Securities Litigation* involved a proposed verdict form that included several new misstatements similar to those alleged in the complaint, and the court observed in a footnote that the PSLRA does not bind plaintiffs to the precise misstatements in their complaint in that situation. 838 F.3d 223, 242 n.11 (2d Cir. 2016); *see also Chabot* v. *Walgreens Boots All., Inc.*, 2023 WL 2908827, *14 n.7 (M.D. Pa. Mar. 31, 2023) (permitting plaintiffs to add a new misstatement that was already "quoted at length in their complaint").  But here, Plaintiff here is not seeking to add new misstatements to support those it pleaded; it is switching at summary judgment to *an entirely new theory it previously disclaimed*.  That is not allowed.  *See In re St. Jude Med., Inc., Sec. Litig.*, 629 F. Supp. 2d 915, 921 (D. Minn. 2009) (granting summary judgment where plaintiff's opposition went "far beyond 'merely' offering additional statements supposedly similar to those in the amended complaint" and instead "wholly abandon[ed] the amended complaint's channel stuffing theory").  To the contrary, it is "well settled .

17

*Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 138–41 (N.D. Tex. 2014) (detailing the "rigorous analysis [] necessary in class certification proceedings," particularly securities class actions).

Plaintiff argues its unpled claims should go forward because Defendants were put on "fair notice" when Plaintiff's experts opined on the unpled theories. Opp. at 24. But "notice" is not the point where, as here, the unpled theories have never been tested by the Court at either the motion-to-dismiss stage or class certification.[20] And even if "fair notice" were relevant, Plaintiff has not provided it. Plaintiff points to an October 4, 2023 joint status report as evidence of Defendants' purported knowledge of Plaintiff's intent to pursue the unpled reserves theory at summary judgment. Opp. at 23 (citing Dkt. No. 179 at 9). But Plaintiff misrepresents the timeline. ***Two weeks later***, Plaintiff ***expressly disavowed*** this theory in a letter to Defendants' counsel, asserting that Defendants had "mischaracterize[d] Plaintiff's claim[]" and declaring that "***Plaintiff does not allege that Exxon 'should have de-booked its proved reserves at Kearl as of year-end 2015***.'" App. 685–86. In other words, Plaintiff went out of its way to disclaim the unpled proved reserves theory it now seeks to advance. Plaintiff should not be permitted to pull a "surprise switcheroo" to escape summary judgment.[21]  *Jackson*, 3 F.4th at 189.

Finally, Plaintiff invokes Rule 15(b)(2), which permits courts to try issues not raised in the pleadings if "tried by the parties' express or implied *consent.*" *Apple Barrel Prods., Inc.* v. *Beard*, 730 F.2d 384, 389 (5th Cir. 1984) (explaining that under Rule 15(b), an issue may be tried by

---

. . that a claim . . . not raised in the complaint but . . . only in response to a motion for summary judgment is not properly before the court." *Jackson* v. *Gautreaux*, 3 F.4th 182, 188 (5th Cir. 2021) (cleaned up).

[20] As the Fifth Circuit has recently noted, "notice" is relevant to whether "a new legal theory of relief" introduced in an amended pleading relates back to the original pleading. *Johnson* v. *Miller*, 126 F.4th 1020, 1027 (5th Cir. 2025). But notice does not relieve Plaintiff of its duty to amend the complaint in the first place.

[21] Plaintiff's invocation of the discovery process to justify this introduction of a new theory is misplaced factually and legally. Opp. at 23. Defendants produced hundreds of thousands of documents before class certification. Regardless, the receipt of discovery on a theory not raised in the Complaint cannot serve as the basis for adding in the theory unless Plaintiff has sought leave to amend. *See Ennis Transp. Co., Inc.* v. *Richter*, 2011 WL 3702727, at *2 n.2 (N.D. Tex. Aug. 22, 2011) (holding at summary judgment that "Plaintiff cannot assert new theories of liability at this late stage of litigation, especially without seeking leave to amend its complaint").

18

implied consent if it is "presented and argued *without objection* by opposing counsel") (emphasis added).  This Rule does not apply here.  ExxonMobil has not consented to litigation of this new theory and, indeed, has made its lack of consent unmistakably clear.  *See* Mot. at 36–38 (arguing that the "unpled theories are improper and should not be considered by this Court").

Had Plaintiff wanted the Court to consider its unpled theories, it should have moved to amend its complaint and moved to modify the Court's class certification order.  Because Plaintiff has not done so, the Court should decline to consider Plaintiff's unpled theories.

## B.    There Is No Genuine Dispute That ExxonMobil Properly Estimated Its 2015 Proved Reserves

Even if the Court were to consider Plaintiff's Unpled Kearl Proved Reserves Theory, the Court still should grant summary judgment for multiple independent reasons.

*First*, Defendants did not misstate Kearl's 2015 proved reserves.  Plaintiff does not dispute that ExxonMobil had in place appropriate controls, processes, and policies for estimating proved reserves.  Mot. at 43; *see generally* Opp.  And Plaintiff does not dispute that ExxonMobil performed the 2015 proved reserves estimate using the same methodology it had employed for years at Kearl and its other Canadian bitumen asset, Cold Lake.  Mot. at 41; *see generally* Opp.

Instead, Plaintiff challenges ExxonMobil's estimation of SEC price at Edmonton, Alberta notwithstanding it was a product of ExxonMobil's GRG manager, William Strawbridge's informed assessment based on the prescriptions of the SEC Rule.[22]  *See* 17 C.F.R. § 210.4-10(a)(10) ("The value of the products that generate revenue shall be determined at the terminal point of oil and gas producing activities . . . ."); App. 592; *see* App. 1452 ¶ 53, 1459 ¶¶ 72–73;

---

[22] Strawbridge's judgment was informed by over "30 years of experience in reservoir engineering" and service on the Society of Petroleum Engineers Oil and Gas Reserves Committee, a committee charged with "overseeing [] programs dealing with oil and gas reserves and resources matters, *including reserves and resources definitions, terms, recommend practices, and standards*." App. 771 (emphasis added); *see id.* 31. Plaintiff disputes none of this.

19

Mot. at 41 n.10.[23]   Accordingly, "any profit or loss downstream of [Edmonton] was excluded from" SEC price.  App. 592.  Using that long-standing methodology, Kearl's reserves qualified as proved in 2015.  Plaintiff offers no evidence whatsoever that ExxonMobil's "application of sophisticated standards" governing proved reserves fell outside the "broad scope for judgment and informed estimation" permitted under the SEC Rule.  *Shaw*, 537 F.3d at 536.[24]   Indeed, Regan admitted he had not applied the SEC Rule to the facts of this case.  *See* Dkt. No. 228 at 5–8; Mot. at 42–43.

Even if, contrary to fact and law, ExxonMobil's 2015 reserves estimate was incorrect, it would not render the February 2016 Enhanced Risk Disclosure regarding the risk of *future* de-booking at *year-end 2016* false or misleading.  That disclosure relates to a different analysis in a different year conducted under different conditions and is not a commentary on whether Kearl's reserves qualified as proved in 2015.[25]

*Second*, this Court should grant summary judgment on the Unpled Kearl Proved Reserves Theory because there is no evidence that any Defendant acted with scienter.  Plaintiff asserts that "Defendants were aware that Kearl's reserves did not legitimately qualify as proved reserves."

---

[23] Plaintiff contends that, in estimating the SEC price by reference to third-party Canadian sales and not U.S. sales, Defendants "eliminated all costs associated with Kearl's U.S. sales."  Opp. at 16.  But ExxonMobil did not *exclude* costs associated with Kearl's U.S. sales because, to date as of year-end 2015, ExxonMobil had never *included* them. *Since 2008*, ExxonMobil considered only third-party Canadian sales when estimating Kearl's SEC price.  *See* Mot. at 41 (citing App. 593); *see also* App. 1457–59 at ¶¶ 67–74; Pl. App. 3760 at 184:3–6.  That ExxonMobil included costs for U.S. sales in 2016 after determining that U.S. sales had recently grown in volume does not mean that the 2015 methodology was incorrect.  And there is no evidence suggesting that any Individual Defendant thought, in February 2016, that the prior SEC price methodology was somehow being deployed fraudulently for the 2015 proved reserves estimate.

[24] Plaintiff asserts that ExxonMobil "was required to comply with the requirements of the Financial Accounting Standards Board, which required Exxon to use 'actual price and operating costs data.'"  Opp. at 14.  But Plaintiff's expert does not opine on what this standard requires, much less how Defendants purportedly violated it.  And Plaintiff does not dispute that the SEC Rule gives companies discretion when estimating proved reserves, Mot. at 40–43, nor that Strawbridge and ExxonMobil's GRG were eminently qualified to carry out the process.  Mot. at 41.  As such, Plaintiff has failed to create a dispute of fact over whether ExxonMobil's methodology complied with the SEC Rule.

[25] *In re Alphabet, Inc. Securities Litigation* is inapposite.  1 F.4th 687 (9th Cir. 2021); Opp. at 20.  The *Alphabet* court addressed "[r]isk disclosures that speak entirely of as-yet-unrealized risks" even though "some of these risks may already have come to fruition."  1 F.4th at 703 (cleaned up).  Here, the Enhanced Risk Disclosure warned of the risk of future de-booking in 2016, not of "risks [that had] already . . . come to fruition."

Opp. at 13, 17, 19.   But ExxonMobil's proved reserves estimates were inherently subjective,[26] Mot. at 44, and the record shows that the Individual Defendants subjectively believed Kearl's reserves would (and did) qualify as proved at year-end.  *See* App. 598 (forecasting year-end Kearl reserves status as proved); App. 571, 574.  Plaintiff asserts that the Individual Defendants knew of U.S. sales' increased costs, Opp. at 14–19, but Plaintiff points to no evidence that connects the dots between the existence of those costs and the accuracy of the 2015 SEC proved reserves estimate—much less any document suggesting that the Individual Defendants believed such downstream costs needed to be accounted for in the estimates.[27]  *See, e.g.*, *Shaw*, 537 F.3d at 540 (no scienter where defendant received "monthly reports on the progress of contracts," but there were no allegations that they "included information at odds with [defendant's] public statements").

Plaintiff contends that the Individual Defendants directed ExxonMobil's reserves experts, the GRG, to manipulate SEC price.  Opp. at 16.  But as support, Plaintiff only cites presentations that the GRG made to senior management that show the GRG expected Kearl's reserves to qualify as proved; none include any directives to manipulate Kearl's SEC price.  Opp. at 16 (citing Pl. App. 1531–35; Pl. App. 2117).   There was no "manipulation."   To the contrary, in 2015, ExxonMobil performed its proved reserves estimate by applying the ***same methodology*** it had used since 2008.  *See supra* note 23.  Plaintiff asserts that "the Management Committee directed Strawbridge to perform Kearl's YE 2015 proved reserve assessment using [a] knowingly improper

---

[26] Plaintiff's argument that *Omnicare* does not apply is mistaken.  Neither of the cases Plaintiff cites concerned statements involving the kind of subjective judgments required of proved reserves estimations.  Opp. at 16 n.11; *see In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 778–79 (E.D. Va. 2015) (involving statements about a corporation's reserves for long-term care insurance claims); *Underland* v. *Alter*, 2011 WL 4017908, at *9 (E.D. Pa. Sept. 9, 2011) (involving statements regarding loan loss reserves); *see also In re: BP p.l.c. Sec. Litig.*, 2016 WL 3090779, at *8–10 (S.D. Tex. May 31, 2016) ("[e]stimates and projections are classic examples of opinions").

[27] And, as argued *supra*, Plaintiff's motive theory has imploded.  *See supra* Section I.C.2; Supp. App. 73 at 235:3–18 (testifying that S&P did not "have a requirement that Exxon in order to maintain its AAA rating needed to maintain a specific amount of proved reserves" and that S&P never informed ExxonMobil personnel that a reserves de-booking "would impact its credit rating"); App. 240 at 248:14–249:12; Supp. App. 75 at 254:5–14; Mot. at 15.

21

approach," Opp. at 17, but that gets it backwards.   In reality, Strawbridge testified that the management committee "was told and accepted" that "no changes should be done" to how Kearl reserves were estimated in 2015 but that the GRG "would re-evaluate for 2016 . . . based on an increase[d] percent of U.S. sales."  Pl. App. 3822–23 at 246:24–247:18.[28]

*Third*, this Court should grant summary judgment on the Unpled Kearl Proved Reserves Theory because Plaintiff has no proof of loss causation.  Mot. at 45.  Plaintiff argues that the October 28 Disclosure revealed the "truth" that ExxonMobil had misstated proved reserves for 2015.  Opp. at 31.  But that disclosure concerned the upcoming *2016* proved reserves analysis, which was based on 12 months of data from *2016* (not 2015) and made no corrections to the 2015 estimates.[29]  *See Temple-Inland*, 936 F. Supp. 2d at 762–63 (statements not corrective where "nothing in the[] disclosures indicate[d] that prior valuations were incorrect or that Guaranty should have recorded an [impairment] in prior SEC filings").[30]

## C.   Defendants' Accurate, SEC-Mandated Disclosures Cannot Constitute Fraud

The Unpled Kearl Profitability Theory asserts that Defendants committed securities fraud by disclosing *accurate* data in the Page 9 Table in the form Defendants were ***required to under SEC regulations***.  Opp. at 4–11; *see* Dkt. No. 178 at 8.  That theory cannot survive summary judgment.

---

[28] Plaintiff argues that there is a "wealth of evidence establishing Defendants' actual knowledge that Kearl was not profitable and therefore did not qualify as proved reserves." Opp. at 21. But whether Kearl was "profitable" is not the question the SEC Rule poses. *See* 17 C.F.R. § 210.4-10(a)(22). And, as Plaintiff's accounting expert admits, Kearl was cash-flow positive in 2015. *See* App. 258 at 198:14–199:3; App. 461.

[29] Plaintiff tries to link the 2016 disclosure and the 2015 estimate by pointing to two market commentaries. *See* Opp. at 28–29. Neither establishes a connection: the cited RBC Capital Markets analyst described the 2016 disclosure as "indicat[ing that] ***the current*** economics of the project are challenged." Opp. at 29. Likewise, the cited *New York Times* article merely noted that ExxonMobil may have to concede that 3.6 billion barrels "are ***currently*** not profitable to produce." Opp. at 28–29 (emphases added). Both sources thus recognize that the de-booking is based on current conditions, which is the ***opposite*** of concluding or disclosing the prior-year 2015 proved reserves had been misstated.

[30] *Pub. Emps. Ret. Sys. of Miss.* v. *Amedisys, Inc.*, which Plaintiff cites, Opp. at 27, 29, 31, 41, actually hurts Plaintiff's position because it concerns the standard for pleading loss causation at the motion-to-dismiss stage, and held that the "evidentiary burden at the initial pleadings stage is much less stringent." 769 F.3d 313, 321 n.2 (5th Cir. 2014).

22

*First*, this theory fails because this disclosure was mandated by an SEC regulation, Item 1204, which dictates the Page 9 Table's contents. *See* 17 C.F.R. § 229.1204. Under Item 1204, companies must disclose "average sales price . . . per unit of oil . . . produced," and "the average production cost, not including ad valorem and severance taxes, per unit of production." *Id.* § 229.1204(b). The data is disclosed "***by geographical area***" unless a country or field "contains 15% or more of the registrant's total proved reserves . . . ." *Id.* § 229.1204(a). Indeed, the SEC *expressly rejected* requiring field-specific disclosures that Plaintiff now demands for Kearl alone, explaining that a "***disclosure that is too detailed may detract from the overall disclosure***." 74 Fed. Reg. 2158, 2171 (Jan. 14, 2009). And Plaintiff does not dispute that Page 9 Table's information was accurate, as the Court has noted. Dkt. No. 178 at 8. In effect, Plaintiff thus claims that Defendants committed fraud by *adhering to SEC regulations*. That cannot be the law.

*Second*, the Supreme Court's recent *Macquarie* decision, which prohibits securities fraud claims based on "pure omissions," also forecloses this claim. *Macquarie Infrastructure Corp.* v. *Moab Partners, L.P.*, 601 U.S. 257, 260, 264 (2024). Plaintiff argues that because Kearl constituted 87% of ExxonMobil's Canadian bitumen proved reserves, it had a "duty" to speak about Kearl specifically.[31] Opp. at 8. But because ExxonMobil made no disclosure about Kearl's profitability whatsoever, Plaintiff is advancing a "pure omission" claim, which *Macquarie* forecloses. Mot. at 46–47; *see, e.g.*, *Maso Cap. Invs. Ltd.* v. *E-House (China) Holdings Ltd.*, 2024 WL 2890968, at *4 (2d Cir. June 10, 2024) (affirming dismissal, post-*Macquarie*, of plaintiff's claim that defendant had an "independent duty" to disclose a new set of projections).

*Third*, Plaintiff identifies no evidence that the Page 9 Table was actually misleading to any investor. For one, the Page 9 Table does not mention "profitability" at all; it discloses concededly

---

[31] As discussed in Defendants' reply brief in support of the motion to exclude Regan's testimony, Plaintiff points to no evidence that ExxonMobil violated GAAP standard by not disclosing alleged operating losses at Kearl in 2015.

accurate average production prices and costs for 2015, *as required by Item 1204*.  Mot. at 46.  Plaintiff points to no analyst who interpreted the Page 9 Table to be a statement on the "profitability" of specific assets, much less Kearl alone.  Nor does Plaintiff identify support for its argument that investors would assume these "averages" meant that every Canadian asset within the category was profitable.  Instead, Regan only speculates that "somebody could interpret" the Table "as indicating that there were profits within Kearl."  App. 262 at 216:15–20.  Allowing this claim to proceed on nothing more than speculation would prevent any company from disclosing "averages" for fear of a fraud claim.

*Fourth*, the Unpled Kearl Profitability Theory fails because there is no evidence that Defendants actually believed the Page 9 Table—included annually in ExxonMobil's Form 10-Ks in the same format, as required by the SEC—was misleading, or that a discussion of Kearl's profitability should be included.  *See Shaw*, 537 F.3d at 540 (no scienter where there were no allegations that defendants had information "at odds with [defendants'] public statements"); *see also Mun. Emps.' Ret. Sys. of Mich.* v. *Pier 1 Imports, Inc.*, 935 F.3d 424, 432 (5th Cir. 2019).  Citing various internal reports that address various profitability metrics at various times in 2015 for Kearl, Plaintiff asserts that Defendants were "repeatedly . . . advised of Kearl's massive losses."  Opp. at 7.  This is wrong, as well as irrelevant.  *See supra* note 28.  Plaintiff does not cite a single document suggesting that any Defendant believed that ExxonMobil was required to separately address Kearl in the Page 9 Table but intentionally failed to do so.  Plaintiff must establish that Defendants "***made the statements*** [in the Page 9 Table] ***with 'actual knowledge' of their misleading qualities***."  *Six Flags*, 58 F.4th at 212 (emphasis added).

*Lormand* v. *US Unwired, Inc.*, on which Plaintiff relies, underscores the shortcomings in Plaintiff's case.  565 F.3d 228 (5th Cir. 2009); Opp. at 7–8.  Even at the motion-to-dismiss stage,

24

the *Lormand* plaintiff came armed with "numerous contemporaneous documents, such as internal emails and memos," and "admissions from the defendants . . . regarding their state of mind." *Lormand*, 565 F.3d at 254. This established that defendants knew certain programs would be "disastrous" and "protested [them] privately while they touted them positively in public." *Id.* Here, Plaintiff identifies no smoking gun, no whistleblower, *nothing* to indicate that Defendants knew that the Page 9 Table was false because it did not specifically break out Kearl results.[32]

*Finally*, the Unpled Kearl Profitability Theory fails because Plaintiff cannot establish loss causation. Plaintiff argues that the Page 9 Table was "corrected" by the October 28 Disclosure. But that disclosure revealed nothing new or corrective about the 2015 production price and cost data in the Page 9 Table. In fact, when ExxonMobil reported its 2016 financial results in January 2017, it included an updated table that likewise revealed a positive spread for the Canadian bitumen operations for full-year 2016. Mot. at 48; App. 216. The supposed misstatement of the Page 9 Table has thus ***never*** been revealed to be false—because it was not.

## CONCLUSION

Defendants respectfully request that the Court grant their Motion for Summary Judgment and dismiss all of Plaintiff's remaining claims with prejudice.

---

[32] Nor does *In re Chicago Bridge & Iron Co. N.V. Securities Litigation*, an unpublished out-of-circuit case that precedes *Macquarie*, help Plaintiff. 2021 WL 3727095 (S.D.N.Y. Aug. 23, 2021); Opp. at 8. There, the defendants were not bound by an SEC regulation; free to construct their reporting as they saw fit, the *Chicago Bridge* defendants "elected" to create a novel reporting unit to hide the loss from a subunit and "avoid recording [the associated] estimated negative cash flows." *Chicago Bridge*, 2021 WL 3727095, at *6–7. Here, by contrast, Defendants were *required* under Item 1204 to disclose data at the level of geographic area. *See* Mot. at 46, 48. Unlike in *Chicago Bridge*, there is no inference of scienter to be drawn from ExxonMobil's compliance with the SEC-mandated grouping of assets.

Dated: March 28, 2025

Respectfully submitted,


*/s/ Daniel J. Toal*                                    */s/ D. Patrick Long*
Theodore V. Wells, Jr. (*pro hac vice*)                 D. Patrick Long
Daniel J. Kramer (*pro hac vice*)                       Texas State Bar No. 12515500
Daniel J. Toal (*pro hac vice*)                         SQUIRE PATTON BOGGS
Audra J. Soloway (*pro hac vice*)                       2000 McKinney Ave., Suite 1700
Paul D. Brachman (*pro hac vice*)                       Dallas, TX 75201
Matthew D. Stachel (*pro hac vice*)                     Telephone: (214) 758-1505
Samuel Kleiner (*pro hac vice*)                         Facsimile: (214) 758-1550
Lyuba Shamailova (*pro hac vice*)                       patrick.long@squirepb.com
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP                      *Counsel for Rex W. Tillerson*
1285 Avenue of the Americas
New York, NY  10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
twells@paulweiss.com
dkramer@paulweiss.com
dtoal@paulweiss.com
asoloway@paulweiss.com
pbrachman@paulweiss.com
mstachel@paulweiss.com
skleiner@paulweiss.com
lshamailova@paulweiss.com



*/s/ Jason Bloom*
Nina Cortell
Texas State Bar No. 04844500
Jason Bloom
Texas State Bar No. 24045511
HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700
Dallas, TX 75219
Telephone: (214) 651-5000
Facsimile: (214) 651-5940
nina.cortell@haynesboone.com
jason.bloom@haynesboone.com

*Counsel for Exxon Mobil Corporation,*
*Andrew P. Swiger, and David S. Rosenthal*


26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing document has been

served by electronic CM/ECF filing, on this twenty-eighth day of March, 2025.

*/s/ Daniel J. Toal*
Daniel J. Toal

27