IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| PEDRO RAMIREZ, JR., Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>EXXON MOBIL CORPORATION, REX W. TILLERSON, ANDREW P. SWIGER, and DAVID S. ROSENTHAL,<br><br>Defendants. | Case No. 3:16-cv-3111-K |

## DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

HAYNES AND BOONE, LLP
2801 N. Harwood Street, Suite 2300
Dallas, TX 75219
(214) 651-5000

KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

LATHAM & WATKINS LLP
100 Crescent Court, Suite 7084
Dallas, TX 75201
(713) 546-5400

*Counsel for Exxon Mobil Corporation, Andrew P. Swiger, and David S. Rosenthal*

SQUIRE PATTON BOGGS
2200 Ross Avenue, Suite 4100W
Dallas, TX 75201
(214) 758-1505

*Counsel for Rex W. Tillerson*

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

LEGAL STANDARDS ...........................................................................................................3

ARGUMENT..........................................................................................................................7

I.    Plaintiff's RMDG Claim Fails as a Matter of Law................................................8

      A.    No Reasonable Jury Could Find Any Materially False or Misleading
            Statement............................................................................................................8

            1.    The RMDG Impairment Analysis Is Not Actionable Under the PSLRA
                  Safe Harbor for Forward-Looking Statements. ...........................................8

            2.    The RMDG Impairment Analysis Was Not False or Misleading..................12

      B.    No Reasonable Jury Could Find Scienter. .............................................................14

      C.    No Reasonable Jury Could Find Loss Causation....................................................15

      D.    No Reasonable Jury Could Find Reliance. .............................................................18

            1.    Plaintiff Cannot Prove Class-Wide Reliance Because There Is a Fatal
                  Mismatch Between the Alleged Misstatements and the Alleged
                  Corrective Disclosures. ................................................................................18

             2.    The Court's Class Certification Order Forecloses Class-wide Reliance
                  on the RMDG Impairments Claim...............................................................20

      E.    No Reasonable Jury Could Find Damages. ............................................................21

II.    Plaintiff's Page 9 Table Claim Fails as a Matter of Law.................................................22

      A.    No Reasonable Jury Could Find Any Materially False or Misleading
            Statement............................................................................................................22

      B.    No Reasonable Jury Could Find Scienter. .............................................................23

      C.    No Reasonable Jury Could Find Loss Causation....................................................25

      D.    No Reasonable Jury Could Find Reliance. .............................................................26

      E.    No Reasonable Jury Could Find Damages. ............................................................27

III.    Plaintiff's Kearl Proved Reserves Claim Fails as a Matter of Law. ..................................28

    A.    No Reasonable Jury Could Find Any Materially False or Misleading Statement.....................................................................................................................28

    B.    No Reasonable Jury Could Find Scienter. ...........................................................31

    C.    No Reasonable Jury Could Find Loss Causation....................................................32

    D.    No Reasonable Jury Could Find Reliance. ...........................................................33

    E.    No Reasonable Jury Could Find Damages. ...........................................................33

IV.    Plaintiff Failed to Establish Market Efficiency Through Expert Evidence for Any of Its Claims, and Thus Cannot Establish Reliance. ....................................................................33

V.    Plaintiff Has Abandoned Its Pleaded Kearl Claims in Favor of Claims that Were Neither Pleaded nor Certified for Class Treatment...........................................................................34

    A.    Plaintiff's Pleaded Page 9 Table Theory Based on ASC 275 Fails as a Matter of Law. .....................................................................................................................35

    B.    Plaintiff's Pleaded "Tepid Warning" Kearl Proved Reserves Theory Fails as a Matter of Law. ......................................................................................................35

    C.    Plaintiff's Page 9 Table and Proved Reserves Theories Were Neither Pleaded nor Certified for Class Treatment, and Thus Cannot Support Liability. ...............37

CONCLUSION.................................................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABC Arbitrage Pls.' Grp. v. Tchuruk*,
 291 F.3d 336 (5th Cir. 2002) ...................................................................................................38

*Alaska Elec. Pension Fund v. Flotek Indus., Inc.*,
 915 F.3d 975 (5th Cir. 2019) ..............................................................................................6, 20

*In re Alta Mesa Res., Inc. Sec. Litig.*,
 No. 4:19-CV-957, 2024 WL 3760481 (S.D. Tex. Aug. 12, 2024) ..........................................37

*Berger v. Beletic*,
 248 F. Supp. 2d 597 (N.D. Tex. 2003) ...................................................................................23

*In re Browning-Ferris Indus., Inc. Sec. Litig.*,
 876 F. Supp. 870 (S.D. Tex. 1995) .........................................................................................13

*In re Calpine Corp. Sec. Litig.*,
 288 F. Supp. 2d 1054 (N.D. Cal. 2003) ..................................................................................23

*Cammer v. Bloom*,
 711 F. Supp. 1264 (D.N.J. 1989) ............................................................................................34

*Coates v. Heartland Wireless Commc'ns, Inc.*,
 26 F. Supp. 2d 910 (N.D. Tex. 1998) .....................................................................................13

*Danis v. USN Commc'ns, Inc.*,
 121 F. Supp. 2d 1183 (N.D. Ill. 2000) ....................................................................................35

*In re Dell, Inc. Sec. Litig.*,
 591 F. Supp. 2d 877 (W.D. Tex. 2008)...............................................................................16, 26

*Erica P. John Fund, Inc. v. Halliburton Co.*,
 563 U.S. 804 (2011)...............................................................................................................6, 18

*Fener v. Operating Eng'rs Const. Indus. & Misc. Pension Fund (LOCAL 66)*,
 579 F.3d 401 (5th Cir. 2009) ................................................................................7, 18, 35, 37

*Fine v. Am. Solar King Corp.*,
 919 F.2d 290 (5th Cir. 1990) ..................................................................................................28

*Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*,
 53 F. Supp. 3d 882 (E.D. La. 2014)........................................................................................22

*In re Firstenergy Corp.*,
  Nos. 2:20-CV-3785, 2:20-CV-4287,
  2022 WL 681320 (S.D. Ohio Mar. 7, 2022)..............................................................16

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
  594 U.S. 113 (2021)........................................................................7, 18, 19, 33

*Greebel v. FTP Software, Inc.*,
  194 F.3d 185 (1st Cir. 1999)..................................................................13

*Greenberg v. Crossroads Systems, Inc.*,
  364 F.3d 657 (5th Cir. 2004) ........................................................... *passim*

*Harris v. IVAX Corp.*,
  182 F.3d 799 (11th Cir. 1999) ...............................................................11

*Harris v. IVAX Corp.*,
  998 F. Supp. 1449 (S.D. Fla. 199) ...........................................................10

*Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
  537 F.3d 527 (5th Cir. 2008) ........................................................... *passim*

*Iron Workers Loc. No. 25 Pension Fund v. Oshkosh Corp.*,
  No. 08-C-797, 2010 WL 1287058 (E.D. Wis. Mar. 30, 2010) .................................9

*Jacobowitz v. Range Res. Corp.*,
  596 F. Supp. 3d 659 (N.D. Tex. 2022) ................................................4, 29

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011)..........................................................................5, 14

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) .............................................................34

*Kurtzman v. Compaq Computer Corp.*,
  No. CIV.A. 99-1011, 2002 WL 32442832 (S.D. Tex. Mar. 30, 2002)....................................11

*Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*,
  No. 11 Civ. 398, 2013 WL 4405538 (S.D.N.Y. Aug. 5, 2013) .............................................16

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) .........................................................7, 24

*Ludlow v. BP, P.L.C.*,
  800 F.3d 674 (5th Cir. 2015) ....................................................................7

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
  601 U.S. 257 (2024)................................................................................4, 23

iv

*Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*,
    935 F.3d 424, 429 (5th Cir. 2019) ..................................................................4

*N. Port Firefighters' Pension--Loc. Option Plan v. Temple-Inland Inc.*,
    936 F. Supp. 2d 722 (N.D. Tex. 2013) ...........................................................26

*Naglich v. Applied Optoelectronics*,
    436 F. Supp. 3d 954 (S.D. Tex. 2020) ...........................................................11

*Nathenson v. Zonagen Inc.*,
    267 F.3d 400 (5th Cir. 2001) ..........................................................................5

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
    58 F.4th 195 (5th Cir. 2023) .................................................................. *passim*

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015).........................................................................................5

*Oscar Priv. Equity Invs. v. Allegiance Telecom, Inc.*,
    487 F.3d 261 (5th Cir. 2007) ..............................................................7, 21, 28

*Owens v. Jastrow*,
    789 F.3d 529 (5th Cir. 2015) ...............................................................14, 15, 32

*Press v. Quick & Reilly, Inc.*,
    218 F.3d 121 (2d Cir. 2000)...........................................................................23

*In re Sec. Litig. BMC Software, Inc.*,
    183 F. Supp. 2d 860 (S.D. Tex. 2001) ...........................................................12

*Slayton v. Am. Exp. Co.*,
    604 F.3d 758 (2d Cir. 2010)......................................................................10, 11

*Smith v. Cir. City Stores, Inc.*,
    286 F. Supp. 2d 707 (E.D. Va. 2003) ..............................................................9

*S.E.C. v. Snyder*,
    292 F. App'x 391 (5th Cir. 2008) ..............................................................14, 32

*Southland Sec. Corp. v. INSpire Ins. Sols.*,
    Inc., 365 F.3d 353, 371 (5th Cir. 2004) ................................................ *passim*

*Spitzberg v. Houston Am. Energy Corp.*,
    758 F.3d 676 (5th Cir. 2014) .........................................................................21

*In re St. Jude Med., Inc., Sec. Litig.*,
    629 F. Supp. 2d 915 (D. Minn. 2009)............................................................38

*Unger v. Amedisys Inc.*,
 401 F.3d 316 (5th Cir. 2005) ........................................................................................34

*Wantou v. Wal-Mart Stores Tex., L.L.C.*,
 23 F.4th 422 (5th Cir. 2022) ...........................................................................................3

**Statutes**

15 U.S.C. § 78u-5 ................................................................................................4, 8, 10, 36

**Other Authorities**

17 C.F.R. § 240.10b-5.....................................................................................................4, 5, 12

17 C.F.R. § 210.4-10(a)(22)(v)..............................................................................................32

17 C.F.R. § 229.1204(b) .......................................................................................................22

Fed. R. Civ. P. 50(a) .........................................................................................................1, 3

Pursuant to Federal Rule of Civil Procedure 50(a), Defendants Exxon Mobil Corporation, Rex W. Tillerson, Andrew P. Swiger, and David S. Rosenthal (collectively, "Defendants") move for judgment as a matter of law on all claims asserted by Lead Plaintiff Eastern Atlantic States Carpenters Pension Fund and the Class[1] (collectively, "Plaintiff").

## INTRODUCTION

After a full presentation of Plaintiff's case, the record is devoid of legally sufficient evidence on the essential elements of any securities fraud claim.  Even allowing every reasonable inference, no jury could find that any challenged statement was false, that any Defendant acted with the requisite scienter, that any alleged corrective disclosure actually corrected anything about ExxonMobil's 2015 Form 10-K, or that Plaintiff has presented any reliable evidence of loss causation or damages.  Three features of the record make these conclusions inescapable.

***First***, Defendants unquestionably followed the applicable SEC and accounting rules. The trial evidence establishes that ExxonMobil's proved reserves estimate was prepared by specialized reservoir engineers using longstanding, documented methodologies, consistent with SEC rules. Similarly, the Rocky Mountain Dry Gas ("RMDG") assets' impairment analysis was conducted by internal accounting specialists in compliance with ASC 360, memorialized in a detailed whitepaper, and audited by PricewaterhouseCoopers ("PwC")—which issued an unqualified opinion that PwC has never corrected or withdrawn.  To top it off, Plaintiff's own expert concedes that ExxonMobil's accounting judgments were "permissible under the rules."  And ExxonMobil's production prices and production costs table (the "Page 9 Table") accurately reported the data that

---

[1]    The "Class" is defined as "[a]ll persons who purchased or otherwise acquired Exxon Mobil Corporation common stock between February 24, 2016, and October 28, 2016," except for "Defendants and their families, the officers and directors of Exxon Mobil, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest." ECF 178 at 56.  For reasons that Defendants have raised before and address again below, none of the theories Plaintiff has presented at trial were *both* pleaded and certified as a class claim.  Thus, even apart from the other legal and evidentiary failures, no valid class claims exist.

the SEC required, in the format the SEC mandated.  ExxonMobil also proactively enhanced risk disclosures in the 2015 Form 10-K to warn investors about the very risks Plaintiff now claims were concealed.  On this record, no reasonable jury could find that any challenged statement was false or misleading.

*Second*, there is no evidence that any Defendant directed the alteration of any analytical result, sought to improperly influence the outcome of any reserves estimation or impairment analysis, or believed that any disclosure in the 2015 Form 10-K was false or misleading.  Nothing in the record could support any finding that any Defendant subjectively did not believe the challenged statements.  No evidence shows any discrepancy between what Defendants knew about the disclosed information and what was actually disclosed.  Not one person involved in assessing and reporting the challenged statements disagreed with the information that was stated in the 2015 Form 10-K—not then, and not now.  And the institutional structure of ExxonMobil's processes— with reserves estimation segregated from the bond-offering team, impairment analysis reviewed by PwC, and disclosures prepared and reviewed by multiple professionals—forecloses any reasonable inference that any Defendant harbored any actual knowledge of falsity or intent to deceive.  No "weighing of the evidence" or "credibility determinations" could change any of these facts or the legally fatal evidentiary gaps they expose in Plaintiff's case.

*Third,* Plaintiff cannot possibly prevail on loss causation.  None of the so-called "corrective disclosures" corrects any alleged misstatements.  The October 28, 2016 announcement that Kearl's proved reserves would be de-booked was based on 2016 estimates, and did not correct 2015 estimates.  Likewise, the January 31, 2017 announcement that the RMDG assets were impaired in 2016 did not correct the 2015 impairment assessment.  As the Fifth Circuit held in *Greenberg v. Crossroads Systems, Inc.*, 364 F.3d 657 (5th Cir. 2004), a disclosure about one period's results

2

that makes "no reference at all" to an earlier period cannot be a corrective disclosure for the earlier period. That holding is directly on point and is fatal to Plaintiff's claims. And, as to the Page 9 Table, there is *no corrective disclosure at all*. Further, Plaintiff presents no reliable disaggregation of confounding information and no damages model that is untethered from these fatal deficiencies.

*Finally*, Plaintiff chose to abandon the theories that had survived the motion to dismiss and class certification—i.e., the "tepid warning" theory, the ASC 275 theory, and any claim under Section 20(a). Judgment should be entered as to Plaintiff's claims based on these abandoned theories.

The Court should render judgment as a matter of law dismissing all claims with prejudice.

## LEGAL STANDARDS

Plaintiff asserts three theories arising from ExxonMobil's 2015 Form 10-K, alleging that: (1) Defendants made misrepresentations by fraudulently failing to impair ExxonMobil's RMDG assets as of year-end 2015; (2) Defendants improperly "omitted" Kearl losses from the table on page 9 that reported average production prices and production costs for bitumen operations by geographical region; and (3) Defendants misrepresented ExxonMobil's estimated bitumen proved reserves as of year-end 2015 for Canada/South America. Each of these claims is subject to the following legal standards.

**Rule 50**: Judgment as a matter of law is proper if, after a party has been fully heard on an issue, "a reasonable jury would not have a legally sufficient evidentiary basis to find for a party on that issue." Fed. R. Civ. P. 50(a). The Court considers "all of the evidence, drawing all reasonable inferences and resolving all credibility determinations in the light most favorable to the non-moving party." *See Wantou v. Wal-Mart Stores Tex., L.L.C.*, 23 F.4th 422, 431 (5th Cir. 2022).

3

The central question is whether "the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Id.*

**Rule 10b-5 Elements**: To establish liability under Section 10(b) and Rule 10b-5, Plaintiff must prove, among other things, that Defendants (1) made a materially false or misleading statement, (2) with scienter, (3) on which Plaintiff relied, and (4) caused Plaintiff's economic losses (i.e., loss causation and damages). *Jacobowitz v. Range Res. Corp.*, 596 F. Supp. 3d 659, 672 (N.D. Tex. 2022) (citing *Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*, 935 F.3d 424, 429 (5th Cir. 2019)).

**Materially False or Misleading Statement**: As to the first element, Plaintiff must prove that Defendants either made a materially untrue statement of fact, or omitted to state a material fact necessary in order to make another statement not misleading, in light of the circumstances under which it was made. *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024). Under binding Supreme Court precedent, "pure omissions" are not actionable, so Defendants cannot be liable for withholding information without also making a false or misleading statement. *Id.* at 260.

Additionally, certain types of statements are not actionable unless certain additional requirements are met. A statement that is forward looking is not actionable under the PSLRA safe harbor if the statement was either (1) accompanied by meaningful cautionary language, or (2) was not made with actual knowledge that it was false. 15 U.S.C. § 78u-5(c)(1); *see also Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 211 (5th Cir. 2023); *Southland Sec. Corp. v. INSpire Ins. Sols.*, Inc., 365 F.3d 353, 371 (5th Cir. 2004). Where, as here, the forward-looking statement was made by a business entity, it is immune from liability under the second prong unless the statement was made "by or with the approval of an executive officer of

that entity with actual knowledge by that officer that the statement was false or misleading." *Southland*, 365 F.3d at 371–72.  Opinion statements, including subjective accounting judgments like impairment analyses and proved reserves estimations, are not actionable unless they are ***both*** objectively false ***and*** the speaker did not subjectively believe the opinion when the statement was made.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185–86 (2015).

**Scienter:** As to the second element, scienter, Plaintiff must prove that Defendants acted with intent to deceive, manipulate, or defraud.  This is a demanding standard—it requires Plaintiff to prove that Defendants made the alleged misstatements with actual knowledge that the statements were false or misleading at the time they were made.  *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 409 (5th Cir. 2001).[2]  Additionally, to prove scienter as to ExxonMobil, Plaintiff must prove that at least one of the Individual Defendants acted with the requisite intent because—as the sole signatories to the 2015 Form 10-K—they are the only individuals who can be said to have "made" the alleged misstatements.  *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142–43 (2011) (holding that only the "maker" of a statement can be liable under Rule 10b-5 and that "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it").  The Individual Defendants are the only individuals identified in the Complaint who are alleged to have made the challenged statements.  Further, scienter cannot be established by collectively aggregating the knowledge of multiple employees with different pieces of information.  Rather, "[f]or purposes of determining whether a statement made by the corporation was made by it with the requisite Rule 10(b) scienter

---

[2]   While Plaintiff is not pursuing recklessness-based scienter in this case and agrees that "actual knowledge" of falsity is required to establish scienter here, ECF No. 307 at 3, the record falls far short of proving recklessness in any event, for the same reasons discussed.

we believe it appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information of language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Southland*, 365 F.3d at 366; *see also Alaska Elec. Pension Fund v. Flotek Indus., Inc.*, 915 F.3d 975, 982 (5th Cir. 2019) (citing *Southland*); *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008) (same).

**Reliance:** To satisfy the third element, reliance, Plaintiff invokes the fraud-on-the-market presumption, which presumes that Lead Plaintiff and the Class relied on the integrity of the market price in deciding to purchase ExxonMobil stock. To prove the elements of the presumption, Plaintiff must show that: (1) Defendants made a materially false or misleading statement; (2) ExxonMobil stock traded in an efficient market; (3) investors reasonably relied on that market as an accurate reflection of the market value of the stock; and (4) Plaintiff traded ExxonMobil stock between the time the false or misleading statement was made and when the truth was revealed. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 811 (2011); *Greenberg*, 364 F.3d at 661. The presumption is rebutted by "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at fair market price[.]" *Greenberg*, 364 F.3d at 661–62. Thus, even if Plaintiff establishes this presumption, it cannot satisfy the reliance element if the allegedly false or misleading statement did not affect the market price of ExxonMobil stock. And, in inflation-maintenance cases like this one, where Plaintiff seeks to prove the amount of inflation by looking solely to the price decline following an alleged corrective disclosure on the back end, any inference that a statement affected the market price of ExxonMobil stock "break[s] down when there is a mismatch between

6

the contents of the misrepresentation and the corrective disclosure." *See Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 123 (2021).

**Loss Causation and Damages:**  Finally, Plaintiff must establish a "causal relationship between the fraudulent statements or omissions and plaintiff's economic loss." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 258 (5th Cir. 2009).  This requires Plaintiff to prove that the stock price dropped after a corrective disclosure, that is, a release of information that reveals to the market the pertinent truth that was previously misrepresented or concealed by the alleged fraud. *See Ludlow v. BP, P.L.C.*, 800 F.3d 674, 691 (5th Cir. 2015). "[T]he testimony of an expert— along with some kind of analytical research or event study—is required to show loss causation." *Fener v. Operating Eng'rs Const. Indus. & Misc. Pension Fund (LOCAL 66)*, 579 F.3d 401, 409 (5th Cir. 2009). The expert's analysis must reliably disaggregate fraud-related losses from confounding information.  *See Oscar Priv. Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261, 271 (5th Cir. 2007).

Applying these standards here, no reasonable juror could find liability on any claim.  For example, as discussed below, Plaintiff's entire theory of loss causation depends on two earnings announcements from late 2016 and early 2017 that reported ExxonMobil's *2016 results*.  Neither announcement said a word about the accuracy of ExxonMobil's *2015 disclosures*.  As the Fifth Circuit held in *Greenberg*, a disclosure about one period's results that makes "no reference at all" to an earlier period cannot be a corrective disclosure for the earlier period.  364 F.3d at 668.  That holding is directly on point and is independently fatal to Plaintiff's claims.

## ARGUMENT

None of Plaintiff's three fraud claims satisfies the applicable legal standards.  By law, the challenged statements are not actionable as materially false or misleading statements; no

reasonable jury could find that Defendants acted with scienter; each depends on loss causation and reliance theories that, applying Supreme Court precedent, suffer from a fatal disconnect between the alleged misstatements and the alleged corrective disclosures; and, with respect to causation and damages, Plaintiff does not meet the legal standard to establish that any alleged damages are attributable to Defendants' purported fraud rather than other causes. Any one of these deficiencies independently supports judgment as a matter of law in favor of Defendants.

## I.    Plaintiff's RMDG Claim Fails as a Matter of Law.

Plaintiff's RMDG claim fails because it is foreclosed under the PSLRA and controlling precedent, and there is no supporting evidence from which a reasonable jury could find liability.

### A.    No Reasonable Jury Could Find Any Materially False or Misleading Statement.

Plaintiff has no evidence that any Defendant made a materially false or misleading statement about RMDG impairments in the 2015 Form 10-K. Plaintiff claims that Defendants failed to include an asset impairment charge concerning the RMDG assets in earnings reported in ExxonMobil's 2015 Form 10-K. *See* ECF No. 307-1 at 26; ECF No. 36 ¶¶ 270–71.

#### 1.    The RMDG Impairment Analysis Is Not Actionable Under the PSLRA Safe Harbor for Forward-Looking Statements.

Under the PSLRA safe harbor, a forward-looking statement is not actionable if it is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A). This safe harbor applies irrespective of "the defendant's state of mind." *Southland*, 365 F.3d at 371 (the PSLRA "safe harbor has two independent prongs"); *see also Six Flags*, 58 F.4th at 211 (forward-looking statements "are entitled to the safe harbor protection if Defendants can show they were *either* accompanied by meaningful cautionary language *or* Plaintiff failed to plead Defendants' 'actual knowledge' of their falsity" (emphases added)). Simply put, the

existence of meaningful cautionary language is a complete defense to securities fraud for a forward-looking statement.

There is no question here that the alleged misrepresentation of the RMDG impairment is forward-looking.  Plaintiff has repeatedly conceded as much.  App. 163 (4/30 Vol. 3A Tr. 22:1–6) (Plaintiff's counsel: "Is it fair to say . . . ***the impairment analysis you're looking out a number of years*** to see whether or not the properties are impaired and need to be -- whether or not the properties need to be impaired and written down?" (emphasis added)).[3]  The parties also agree that the impairment analysis is governed by ASC 360 and requires an entity to estimate future undiscounted cash flows over the remaining useful life of the asset—often spanning decades—and to compare those projected cash flows to the asset's carrying value.  *See* ECF No. 248 at 34 (Plaintiff's opposition to summary judgment describing impairment process as follows: "When an asset's forecasted future net cash flows are no longer expected to exceed its capitalized costs, the asset is said to be 'impaired' because such costs are no longer expected to be fully recoverable.").

It is therefore unsurprising that numerous courts have recognized that an impairment analysis is forward-looking.  *See, e.g.*, *Iron Workers Loc. No. 25 Pension Fund v. Oshkosh Corp.*, No. 08-C-797, 2010 WL 1287058, at *14 (E.D. Wis. Mar. 30, 2010) ("Recognition of an *impairment involves an accounting judgment about the future*: to take an impairment is an admission that future prospects do not justify carrying the asset on the books at its present value, whereas maintaining one's goodwill evaluation is a prediction that the company's prospects for earnings are sound." (emphasis added)); *Smith v. Cir. City Stores, Inc.*, 286 F. Supp. 2d 707, 722 (E.D. Va. 2003) (statements about lease impairments were forward-looking statements protected

---

[3]    *See also* App. 98 (4/29 Vol. 2A Tr. 52:20–53:1) (Plaintiff's counsel describing "the line that was used by the company in its impairment testing" and asking if the line "would generate more cash flows ***going forward***" (emphasis added)).

by the PSLRA safe harbor); *Harris v. IVAX Corp.*, 998 F. Supp. 1449 (S.D. Fla. 1998) (alleged failure to disclose a goodwill impairment was forward-looking because it "reflected the judgment of the corporation that goodwill was strong and that no such writeoff would be necessary"), *aff'd*, 182 F.3d 799 (11th Cir. 1999); *see also Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766-67 (2d Cir. 2010) (statements estimating future losses on investments are protected by the PSLRA safe harbor).

Here, Plaintiff challenges Defendants' statement of earnings for 2015 on page 35 of the Form 10-K on the basis that it assumed no impairment from the forward-looking RMDG impairment analysis. This is covered by the PSLRA safe harbor because it is "a statement *containing* a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items," as well as "any statement of the assumptions underlying or relating to" such projections. 15 U.S.C. § 78u-5(i)(1)(A), (D) (emphasis added).

Because the alleged misrepresentation about the RMDG asset impairment was forward-looking, it is not actionable if it is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). ExxonMobil's 2015 Form 10-K satisfied this requirement. It cautioned that ExxonMobil's recoverability analysis was based on price, volume, and cost projections developed "in the annual planning and budgeting process," while warning in direct and company-specific terms that "[s]hould increases in long-term prices not materialize, certain of the Corporation's assets will be at risk for impairment." App. 1052 (PX 66 at 59). These cautionary statements identified the precise risk that later materialized in 2016—*i.e.*, the RMDG assets could become impaired if price assumptions did not bear out—and did so in "company-

specific" terms that included "a realistic description of the risks applicable to the particular circumstances." *See Six Flags*, 58 F.4th at 211.  Indeed, the cautionary statement "identif[ied] the precise risks that [the company] later experienced." *See Naglich v. Applied Optoelectronics*, 436 F. Supp. 3d 954, 973 (S.D. Tex. 2020).

Plaintiff appears to claim that because the 2015 *earnings* statement was purportedly not forward-looking, and the impairment charge impacted earnings, the *impairment* issue does not involve a forward-looking statement.  *See* App. 32 (4/28 Vol. 1A Tr. 42:14–18) (Plaintiff's opening statement: "[ExxonMobil] should have reported 14 billion, still a lot, because they needed to take this right write-down to the Rocky Mountain XTO natural gas assets because they were losing so much money.").  This argument is wrong.  As Plaintiff has repeatedly explained, Plaintiff's substantive qualms are with ExxonMobil's *impairment analysis*—the results of which were discussed in the MD&A on page 57.  Although Plaintiff would prefer to disregard the thorough discussion of the Company's impairment testing on page 57, App. 1052 (PX 66 at 59), the fact-finder is required to conduct "a review of the entire statement, beyond an isolated line or phrase."[4]  *Kurtzman v. Compaq Computer Corp.*, No. CIV.A. 99-1011, 2002 WL 32442832, at *29 (S.D. Tex. Mar. 30, 2002) (citing *Harris v. IVAX Corp.*, 182 F.3d 799, 806–07 (11th Cir. 1999)).  Where that review "demonstrates that it is a mixed statement, containing both historical observations and prognostications based on those observations, the entire statement qualifies as forward-looking for safe harbor purposes." *Id.*  Here, because any reasonable reader of the Form 10-K would consider the impairment-related disclosures and earnings disclosure in tandem,

---

[4]    The fulsome disclosure on page 57, App. 1052 (PX 66 at 59), appears in the MD&A section of the Form 10-K. As the Second Circuit has held, "the legislative history of this provision makes plain that a statement may receive safe harbor protection even where it is in an MD&A that is part of a required disclosure to the SEC." *Slayton*, 604 F.3d at 767.

Plaintiff's impairment claim implicates a forward-looking statement.  *See* App. 182 (4/30 Vol. 3A 98:22–99:5) (Rosenthal testifying that an impairment charge "goes to earnings").

Not only is the challenged statement about the RMDG impairment analysis protected by the PSLRA safe harbor, it is also protected by the "bespeaks caution" doctrine, which "survived the enactment of the PSLRA and protects optimistic projections accompanied by cautionary language containing relevance or assumptions." *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 895 (S.D. Tex. 2001).  This doctrine applies even if the cautionary language is "not contained in the same *document* as the alleged misstatements," so long as "the cautionary language was sufficiently related in time and substance to the purported misstatements."  *Id.* (emphasis added).  Here, the cautionary language **is** contained in the same document, and plainly warns of the very risks that materialized later.

In short, the RMDG impairment analysis cannot form the basis for any Rule 10b-5 claim because it is forward-looking and was accompanied by meaningful cautionary language.  Thus, it is not actionable under the PSLRA safe harbor or the bespeaks caution doctrine as a matter of law.

### 2. The RMDG Impairment Analysis Was Not False or Misleading.

The undisputed evidence also shows that ExxonMobil's internal accounting team conducted an extensive impairment analysis for year-end 2015 under ASC 360's required three-step process, and this analysis was documented in a whitepaper.  *See* App. 915 (PX 65); App. 133 (4/29 Vol. 2B Tr. 43:15–45:5); App. 182–83 (4/30 Vol. 3A Tr. 100:7–102:12).  To assess whether temporarily low prices in 2015 constituted an impairment trigger, ExxonMobil undertook a precautionary asset recoverability assessment under ASC 360 Step Two, and it concluded that the undiscounted future cash flows exceeded the net book value as to each of the RMDG assets, such that there was no triggering event.  App. 142 (4/29 Vol. 2B Tr. 80:2–5); App. 180–81 (4/30 Vol. 3A Tr. 92:13–93:9).  ExxonMobil's conclusions were then reviewed by its independent auditor,

PwC, which took no exceptions.  *See* App. 714 (DX 808).  This finding was also consistent with ExxonMobil's 2015 Form 10-K, which explicitly told the market that "the Corporation does not view temporarily low prices or margins as a trigger event for conducting impairment tests."  App. 1052 (PX 66 at 59).

At bottom, Plaintiff's theory hinges on impermissible fraud-by-hindsight.  *See, e.g.*, *Coates v. Heartland Wireless Commc'ns, Inc.*, 26 F. Supp. 2d 910, 921–22 (N.D. Tex. 1998).  For instance, Plaintiff contends that ExxonMobil used the "wrong" price assumptions to estimate future cash flows, but ASC 360 required ExxonMobil to use the same price assumptions it uses to run the business—which is exactly what ExxonMobil did.  *See* App. 695 (DX 70); App. 915 (PX 65); App. 832 (DX 898 at 27); App. 140 (4/29 Vol. 2B Tr. 70:6–19); App. 181 (4/30 Vol. 3A Tr. 93:16–94:5).  Plaintiff "[s]econd-guessing" ExxonMobil's forward-looking price forecasts "is simply not a basis for securities fraud."  *In re Browning-Ferris Indus., Inc. Sec. Litig.*, 876 F. Supp. 870, 901 (S.D. Tex. 1995).  Plaintiff also points to other oil and gas companies that impaired their assets in 2015, but a different company reaching a different judgment about different assets—often under different accounting standards—cannot provide a reasonable jury with any legally sufficient basis to find that ExxonMobil's RMDG impairment analysis was false or misleading.  *See Shaw Grp.*, 537 F.3d at 536 (instructing that GAAP "tolerate[s] a range of 'reasonable' treatments, leaving the choice among alternatives to management" and that a plaintiff "cannot transform inherently nuanced conclusions into fraudulent misstatements or omissions simply by saying that there were abuses or misuses of the GAAP rules" (quoting *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 205 (1st Cir. 1999))).

Accordingly, no reasonable jury could find that any Defendant made a false or misleading statement about RMDG impairment in the 2015 Form 10-K.

### B.    No Reasonable Jury Could Find Scienter.

Nor could any reasonable juror conclude that Defendants had any actual knowledge of fraud.  Because an impairment analysis is both forward-looking and a statement of opinion, Plaintiff's fraud claim must satisfy both the PSLRA and *Omnicare*.  *See supra* Part I.A.  Plaintiff has no evidence to meet those standards.  *See supra* Part I.A..

Plaintiff also has no evidence from which a reasonable jury could find that any Defendant subjectively believed the RMDG assets were impaired at year-end 2015.  ExxonMobil's impairment analysis and conclusion were the products of a robust, documented process, and the result was reviewed by independent auditors at PwC who took no exception.  *See* DX 808; *see also S.E.C. v. Snyder*, 292 F. App'x 391*, 406 (5th Cir. 2008) (reliance on an accountant's opinion "provide[s] an explanation of the defendant's conduct tending to negate" scienter).  The Individual Defendants testified that they relied on the expertise of accounting professionals and the auditor.[5] App. 106 (4/29 Vol. 2A Tr. 84:19–85:2); App. 168 (4/30 Vol. 3A Tr. 42:19–43:4); App. 191 (4/30 Vol. 3B Tr. 5:13–6:7).  On this record, no reasonable juror could find the necessary scienter.  *See, e.g.*, *Owens v. Jastrow*, 789 F.3d 529, 545 (5th Cir. 2015); *Snyder*, 292 F. App'x at 406; *Shaw Grp.*, 537 F.3d at 536 (concluding plaintiffs failed to allege a sufficient basis for scienter when there was a series of "inherently nuanced" accounting issues that were handled within "a range of 'reasonable' treatments, leaving the choice among alternatives to management." (citation modified)).  And Plaintiff cannot, as a matter of law, prove scienter as to ExxonMobil by imputing the intent of any employee other than the Individual Defendant.  *See Janus*, 564 U.S. at 142–43.

---

[5]    No reasonable juror could discredit this uncontradicted testimony.  Plaintiff sought to establish scienter based on an interview snippet in which Defendant Tillerson stated, "if you look at our history, we do not write investments down."  App. 242 (5/1 Vol. 4B Tr. 58:7–23).  But the full quote shows the opposite of fraud.  Tillerson went on to explain that ExxonMobil "follow[s] the accounting standards" and that its approach reflects a "disciplined approach to investing" under which employees are expected to anticipate and sustain the profitability of their investments over the long term.  *Id.*  A cherry-picked excerpt of Tillerson's statement cannot create a reasonable inference of scienter.

14

Plaintiff's motive theory about protecting ExxonMobil's credit rating also fails. *See* ECF No. 62 at 32–33. Plaintiff furnished no evidence that an earlier impairment of the RMDG assets would have affected ExxonMobil's credit ratings, and the groups responsible for the impairment analyses were entirely separate from the department handling the bond offering. *E.g.*, App. 323 (5/4 Vol. 5B Tr. 87:18–88:7). And as this Court explained in its motion-to-dismiss ruling, scienter "may not be footed solely on motives universal to corporate executives." ECF No. 62 at 32 (citing *Shaw Grp.*, 537 F.3d at 544).

### C.    No Reasonable Jury Could Find Loss Causation.

Plaintiff also cannot establish loss causation because the alleged "corrective disclosures" are not corrective. Loss causation requires a "causal connection between the material misrepresentation and the loss." *Owens*, 789 F.3d at 535 (internal quotation omitted). Under controlling Fifth Circuit law, Plaintiff "must demonstrate: (1) that the negative 'truthful' information causing the decrease in price is related to an allegedly false, non-confirmatory positive statement made earlier and (2) that it is more probable than not that it was this negative statement, and not other unrelated negative statements, that caused a significant amount of the decline." *Greenberg*, 364 F.3d at 666. Plaintiff did not and cannot satisfy either requirement.

Plaintiff's entire loss causation theory for its RMDG claim depends on an alleged corrective disclosure in the January 31, 2017 earnings report (the "January 31 Announcement"). The January 31 Announcement reported a *year-end 2016* impairment charge resulting from the "fourth quarter 2016 asset recoverability assessment." App. 1156 (PX 227 at 10). The January 31 Announcement thus addressed a *2016 analysis*—a different year, with different data, and different conditions from 2015. It did not refer to—much less correct—anything about an impairment analysis *in 2015*. ExxonMobil has never restated its 2015 impairment analysis, and PwC has never withdrawn or qualified its audit opinion. Plaintiff cannot establish loss causation for the RMDG

15

claim because the January 31 Announcement reported a year-end *2016* impairment charge for RMDG, but said nothing about its impairment status in *2015*.

In addition, and independently, Plaintiff cannot rely on the January 31 Announcement as a corrective disclosure because the disclosure had no statistically significant price impact on ExxonMobil's stock.  This Court already found that the January 31 Announcement was "not associated with a statistically significant negative price reaction on a close-to-open basis or even a close-to-close basis" and excluded it from the certified class.  ECF No. 178 at 52; *see also id.* at 56 ("As the end date for the class period, the Court sets October 28, 2016—the date of the sole alleged Corrective Disclosure whose impact on Exxon Mobil's stock price Defendants failed to rebut.").  A disclosure that produced no statistically significant price impact cannot establish loss causation as a matter of law.

Further, Plaintiff cannot rest its fraud claim on a purported corrective disclosure that post-dates the class period. Where information is disclosed "after the close of the alleged class period," courts have held that such information "could not have caused the Plaintiffs any loss."  *In re Dell, Inc. Sec. Litig.*, 591 F. Supp. 2d 877, 910 910 (W.D. Tex. 2008).[6]

There is no dispute that under the superior regression model used by Plaintiff's original expert, Mr. Torchio, and adopted by Defendants' expert, there is no statistically significant price movement associated with the January 31 Announcement using either a close-to-close or close-to-

---

[6]     *see also Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*, No. 11 Civ. 398, 2013 WL 4405538, at *10 (S.D.N.Y. Aug. 5, 2013) ("[I]nformation cannot serve as a corrective disclosure if it was not disclosed during the class period."), *aff'd sub nom. IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383 (2d Cir. 2015).  Although some courts have recognized an exception to this rule in cases involving "a protracted series of partial disclosures," those cases are inapposite here, where Plaintiff identifies a single corrective disclosure of the alleged RMDG impairment fraud. *In re Firstenergy Corp.*, Nos. 2:20-CV-3785, 2:20-CV-4287, 2022 WL 681320, at *29 & n.39 (S.D. Ohio Mar. 7, 2022) (loss causation is "lacking where plaintiffs' first concrete knowledge of the scheme or misstatement postdates the class period").

open window.  App. 493 (Feinstein Tr. 46:13–47:12).[7]  As this Court agreed during the pre-trial conference, "the plaintiffs don't get to do a do-over because they get a different witness who comes in with a different model." App. 11 (4/27 Pretrial Conf. Tr. 27:18–22).  And even using Feinstein's new inferior model, his regression finds a statistically significant residual price change only when he performs a close-to-close analysis—a methodology this Court properly rejected at class certification.  App. 538–59 (Feinstein Tr. 229:24–232:15).

The absence of any statistically significant price reaction is not surprising because the 2016 RMDG impairment was not new or unexpected information when it was disclosed in January 2017.  ExxonMobil had publicly disclosed for years that it did not consider temporarily low prices to be an impairment trigger. *See, e.g.*, App. 1052 (PX 66 at 59).  And ExxonMobil specifically warned investors in October 2016 that it would be conducting an impairment assessment for year-end 2016, which could result in an impairment of certain assets, including RMDG.  App. 1135 (PX 125 at 9) ("In light of continued weakness in the upstream industry environment during 2016, . . . the corporation will perform an assessment of its major long-lived assets . . . including North America natural gas assets" in connection with its 2016 year-end reporting).  Analyst commentary discussing the January 31 Announcement makes clear that the impairment was not new or unexpected news.  *See* App. 685 (DX 63) ("Impairment better than expected. The impairment of $2.027Bn, associated with dry gas assets in the Rockies, was likely smaller than expected.").

Plaintiff's expert Feinstein does not dispute that the alleged corrective disclosure regarding the $2 billion impairment was made prior to the market opening on January 31, 2017.  App. 539 (Feinstein Tr. 232:16–18).  Instead, he simply ignores the Court's class certification ruling, and does not perform a close-to-open regression analysis.  *Id.* at 232:7–15.  Feinstein's analysis is

---

[7]    Defendants cite to deposition testimony in this motion where the trial transcripts were not yet available at the time of filing.

insufficient as a matter of law to support the necessary findings of loss causation and damages. Without competent expert testimony, no reasonable jury could find loss causation for the RMDG claim. *See Fener*, 579 F.3d at 409.

### D. No Reasonable Jury Could Find Reliance.

Plaintiff also cannot prove class-wide reliance for this claim as a matter of law. Plaintiff seeks to invoke the fraud-on-the-market presumption, rather than prove actual reliance on the alleged misrepresentations. The fraud-on-the-market presumption is premised on the idea that "an investor presumptively relies on a misrepresentation so long as it was reflected in the market price at the time of his transaction." *Goldman*, 594 U.S. at 118. But "plaintiffs asserting a fraud-on-the-market theory are not entitled to the presumption of reliance where the alleged misrepresentations do not affect the market price of the stock." *Greenberg*, 364 F.3d at 660.[8]

Lacking any presumption of reliance, Plaintiff could only possibly proceed on actual reliance—but it had adduced no evidence of actual reliance at all. There is no evidence that Lead Plaintiff or its investment advisor reviewed, relied upon, or even considered the disclosures in the 2015 Form 10-K that Plaintiff now challenges. Without evidence that Lead Plaintiff actually relied on any alleged misrepresentation, the reliance element is not satisfied. *See Halliburton*, 563 U.S. at 810–11.

#### 1. Plaintiff Cannot Prove Class-Wide Reliance Because There Is a Fatal Mismatch Between the Alleged Misstatements and the Alleged Corrective Disclosures.

Plaintiff cannot invoke the fraud-on-the-market presumption because it has no evidence that the alleged RMDG misstatement caused any inflation in ExxonMobil's stock price. The results of Feinstein's regression show that there was no statistically significant positive price

---

[8]    Plaintiff also has not proven that the market for ExxonMobil stock was efficient, which is an essential element of the presumption and is an independent reason why Plaintiff cannot prove class-wide reliance. *See infra* Part IV.

movement when the alleged misstatements were made in the Form 10-K for 2015. Feinstein concedes as much—but he asserts that the alleged misrepresentation *maintained* inflation that already existed in ExxonMobil's stock price. Plaintiff thus proceeds on an "inflation-maintenance theory" by contending "that price impact is the amount of price inflation maintained by an alleged misrepresentation—in other words, the amount that the stock's price would have fallen without the false statement." *Goldman*, 594 U.S. at 123.

Under *Goldman*, which the Supreme Court held is "particularly" applicable in inflation-maintenance cases like this one, the inference "that the back-end price drop equals front-end inflation . . . break[s] down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Id.* Here, the mismatch is stark: the January 31 Announcement concerned only year-end 2016 impairments; it said nothing about the 2015 impairment analysis.

The Fifth Circuit addressed a very similar situation in *Greenberg*. 364 F.3d at 666. The plaintiffs there alleged, in part, that Crossroads Systems made false statements about its first- and second-quarter financial results. *Id.* at 668. When Crossroads later announced that its third-quarter revenues would fall as much as two-thirds below estimates—causing a steep decline in its stock price—the plaintiffs argued that this announcement proved the earlier quarterly statements had been false. *Id.* The Fifth Circuit disagreed. The third-quarter revenue shortfall, the court held, "does not report any concern that Crossroad's first and second quarter earnings may be incorrect." *Id.* Because Crossroad's third-quarter announcement made "no reference at all to Crossroad's first and second fiscal quarters," there was "no relationship" between the third-quarter disclosure and the earlier allegedly false statements—and so those earlier statements "cannot form the basis for a fraud-on-the-market claim." *Id.*

So too here. Plaintiff's entire loss causation theory depends on an alleged corrective disclosure that discusses ExxonMobil's 2016 results. The January 31 Announcement did not "report any concern" that the statements in ExxonMobil's 2015 Form 10-K "may be incorrect." 364 F.3d at 668. As a result, this disclosure cannot support any reasonable inference of front-end price inflation. *Goldman* and *Greenberg* thus dictate that Plaintiff cannot prove the presumption of reliance.

### 2.    The Court's Class Certification Order Forecloses Class-wide Reliance on the RMDG Impairments Claim.

Plaintiff cannot establish class-wide reliance for its RMDG claim for an additional, independent reason. In its class certification ruling, the Court found that the January 31 announcement was "not associated with a statistically significant negative price reaction." ECF No. 178 at 52.[9] The Court accordingly certified a class to proceed on the RMDG and Kearl claims based only on the October 28, 2016 announcement (the "October 28 Announcement")—"the sole alleged Corrective Disclosure whose impact on Exxon Mobil's stock price Defendants failed to rebut." *Id.* at 56. At trial, however, Plaintiff tied ***all damages*** for the RMDG claim to the excluded January 31 Announcement and disclaimed damages tied to the "sole" surviving October 28 Announcement. *See, e.g.*, App. 38 (4/28 Vol. 1A Tr. 65:5–67:5); App. 503 (Feinstein Tr. 88:20–89:14) ("Q. To your understanding, is the October 28, 2016 disclosure by Exxon a corrective disclosure of the alleged false and misleading statements about the Rocky Mountain Dry Gas impairment issue? A. No, it is not."). The result is that Plaintiff has not established (and cannot

---

[9]    *Alaska Electrical Pension Fund v. Flowserve Corporation*, 572 F.3d 221 (5th Cir. 2009), is not to the contrary for the reasons explained in Defendants' supplemental trial brief, which Defendants incorporate by reference herein. ECF No. 350. Additionally, although the *Flowserve* court noted that the Court's class certification holdings "do not resolve *loss-causation* issues on the merits," 572 F.3d at 233 (emphasis added), the Circuit did not permit re-litigation of *reliance* at the merits stage. *Id.* at 229 (explaining that the lead plaintiff's "burden of establishing loss causation . . . was independent of Alaska's obligation to establish reliance on the merits"). Plaintiff improperly conflates these "distinct" requirements. *Id.*; *see, e.g.*, App. 87 (4/29 Vol. 2A Tr. 7:3–5) (Plaintiff's counsel suggesting that "Loss causation is the element to be determined here").

establish) reliance on the January 31 Announcement, and therefore no reasonable jury could rule in its favor on the RMDG claim. *See Greenberg*, 364 F.3d at 666 (explaining that the "presumption of reliance is based upon *actual movement* of the stock price").

Because this Court has already considered—and rejected—Plaintiff's request to expand the class period to include the January 31 Announcement, and notwithstanding Plaintiff's improper attempts to rely on the January 31 Announcement in its case in chief at trial, the jury is precluded from a finding of liability as to this theory. Defendants are thus entitled to judgment as a matter of law on the RMDG claim.

### E. No Reasonable Jury Could Find Damages.

Additionally, no reasonable jury could find damages associated with the RMDG claim because Plaintiff failed to disaggregate any fraud-related losses from unrelated negative information. The Fifth Circuit requires a plaintiff to show that "it is more probable than not that it was [a specific] negative statement, and not other unrelated negative statements, that caused a significant amount of the decline." *Greenberg*, 364 F.3d at 666; *see Oscar*, 487 F.3d at 271. Plaintiff has not done so here and so fails to provide a reliable estimate of purported damages.[10]

Feinstein's analysis of the January 31 Announcement failed to account for ExxonMobil's contemporaneous disclosure of a 40% reduction in earnings and a 39% reduction in EPS relative to Q4 2015. App. 541 (Feinstein Tr. 238:9–25). This negative confounding information must be addressed—but Feinstein ignores it. This is insufficient as a matter of law to establish the requisite disaggregation. *See Oscar*, 487 F.3d at 271; *Greenberg*, 364 F.3d at 666–67.

Because Plaintiff fails to prove multiple elements of its RMDG impairments claim, no reasonable jury could find in Plaintiff's favor on this claim.

---

[10] Plaintiff's failure to disaggregate losses from non-fraud-related news also means that plaintiff cannot prove loss causation. *Spitzberg* v. *Houston Am. Energy Corp.*, 758 F.3d 676, 688 & n.18 (5th Cir. 2014).

## II.     Plaintiff's Page 9 Table Claim Fails as a Matter of Law.

Plaintiff's claim based on the Page 9 Table providing Canadian bitumen average production prices and costs also fails on every element.

### A.     No Reasonable Jury Could Find Any Materially False or Misleading Statement.

Plaintiff claims that the Page 9 Table was misleading because—by presenting production costs and prices by geographic region—it failed to show losses at the Kearl field specifically. ECF No. 307-1 at 25. But Plaintiff has not disputed—and cannot dispute—that Defendants followed the SEC regulation that governs this chart, and that the numbers presented are correct. As a matter of law, this Page 9 Table is not actionable.

Under Item 1204, "[d]isclosure shall be made by geographical area and for each country and field that contains **15% or more** of "total proved reserves."   17 C.F.R. § 229.1204(b) (emphasis added).   Plaintiff admits that Kearl constituted only 14.54 percent of total proved reserves.  *See* ECF No. 248 at 2, 13 (stating on summary judgment that Kearl constituted "nearly 15%" of ExxonMobil's proved reserves); App. 57, 83 (4/28 Vol. 1B Tr. 15:19–25, 119:9–22); App. 237 (5/1 Vol. 4B Tr. 39:13–21).  Kearl thus indisputably was not 15% or more of total proved reserves, and ExxonMobil complied with the Item 1204.  Moreover, there is no dispute that the Page 9 Table contained accurate production price and cost information. *See* App. 507 (Feinstein Tr. 105:8–12) ("I never said that either the cost by itself was wrong or that the price by itself was wrong"); ECF No. 178 at 8 (acknowledging as part of class certification that "Plaintiff does not allege that the average profit implied by 2015 10-K was inaccurate").

So, in effect, Plaintiff's theory is that Defendants committed fraud *by adhering to SEC regulations*.  The Page 9 Table cannot be false or misleading, as a matter of law, if it complies with the letter of SEC rules. *See Firefighters Pension & Relief Fund of the City of New Orleans*

22

*v. Bulmahn*, 53 F. Supp. 3d 882, 906–09 (E.D. La. 2014) (disclosures regarding reserves were not false or misleading due to defendants' alleged delay in making the disclosure, where disclosure was made in accordance with Regulation S-K, which imposed "no obligation" to make the disclosure sooner); *In re Calpine Corp. Sec. Litig.*, 288 F. Supp. 2d 1054, 1084 (N.D. Cal. 2003) (rejecting attempt to "hold defendants liable for engaging in a practice that was expressly approved by the SEC"); *see also Press v. Quick & Reilly, Inc.*, 218 F.3d 121, 131–32 (2d Cir. 2000) ("[W]e will not undermine the SEC's interpretation of its regulation by requiring even greater disclosure"). And while Plaintiff may have liked to know more about Kearl's performance, that cannot form the basis for a securities fraud claim: "Corporations have no duty to disclose a fact merely because a reasonable investor might really like to know that fact." *Berger v. Beletic*, 248 F. Supp. 2d 597, 603 (N.D. Tex. 2003). Instead, Plaintiff must prove that Defendants either (1) made a materially untrue statement of fact, or (2) omitted to state a material fact necessary in order to make another statement not misleading, in light of the circumstances under which it was made. *See Macquarie*, 601 U.S. at 263.[11] Plaintiff may not pivot to a "pure omission" theory, because such an argument is foreclosed by *Macquarie*. *Id.* at 260.

For these reasons, the claim based on the Page 9 Table fails as a matter of law.

### B. No Reasonable Jury Could Find Scienter.

Further, no reasonable jury could find that Plaintiff established scienter. ExxonMobil presented the Page 9 Table in the ***same format for years, as required by the SEC***. *See*, *e.g.*, App. 703 (DX 120 at 13) (ExxonMobil 2009 Form 10-K); App. 705 (DX 137 at 13) (ExxonMobil 2010 Form 10-K); App. 707 (DX 158 at 11) (ExxonMobil 2011 Form 10-K); App. 709 (DX 183 at 11)

---

[11] Plaintiff fares no better with any attempt to reframe this as an Item 303 claim. The Court previously dismissed Plaintiff's Item 303 claim, properly holding that "Plaintiff failed to plead a material misstatement based on ExxonMobil's alleged failure to comply with Item 303." ECF No. 62 at 22-24. That ruling was correct then and now, and Plaintiff has not reasserted an Item 303 claim.

(ExxonMobil 2012 Form 10-K); App. 711 (DX 208 at 11) (ExxonMobil 2013 Form 10-K); App. 713 (DX 256 at 11) (ExxonMobil 2014 Form 10-K).There is no evidence that Defendants actually believed the Page 9 Table—or any disclosure in the 2015 Form 10-K—was misleading. *See, e.g.*, App. 133 (4/29 Vol. 2B Tr. 42:19–24) (Swiger testifying that he "[a]bsolutely" believes "all the information in that 10-K that [he] signed in February of 2016 was accurate"); App. 168 (4/30 Vol. 3A Tr. 41:14–17) (Rosenthal testifying that if he "had believed that that 120-page document contained anything that was false or misleading," he "would not have signed that document"); App. 286 (5/4 Vol. 5A Tr. 91:10–13) (Tillerson testifying that "[w]hen the . . . 2015 Form 10-K was filed" he did not "personally believe any statement in there was false or misleading"); App. 328 (5/4 Vol. 5B Tr. 108:5–18) (Tillerson testifying that he "did nothing improper, nor did anyone else in ExxonMobil Corporation[,]" "in connection with any of [his] work with the 2015 10-K" and that they "followed all the rules" and "all the standards.").

Citing various internal reports that address profitability metrics at various times in 2015 for Kearl, Plaintiff has suggested that Defendants were aware of losses at Kearl. *See, e.g.*, App. 33 (4/28 Vol. 1A Tr. 47:10–48:1). But that is both wrong and irrelevant. Plaintiff has no evidence that any Defendant believed ExxonMobil was required to separately address Kearl or Kearl-specific losses in the Page 9 Table—or anywhere in the Form 10-K—but intentionally failed to do so. Defendants' receipt of internal financial reports is no evidence that any Defendant believed the Page 9 Table was misleading because it did not separately break out Kearl results. That logical leap is one that no reasonable jury could make.

*Lormand* underscores the shortcomings in Plaintiff's case. *See* 565 F.3d 228, 254. Even at the motion-to-dismiss stage, the *Lormand* plaintiff came armed with "numerous contemporaneous documents, such as internal emails and memos," and "admissions from the

24

defendants . . . regarding their state of mind." *Id.* This established that the defendants knew certain programs would be "disastrous" and "protested [them] privately while they touted them positively in public." *Id.* Here, Plaintiff has **nothing** to indicate that Defendants actually knew and believed that the Page 9 Table was false or misleading. Indeed, there is no evidence that the challenged statements in the Page 9 Table were false or misleading.

A reasonable jury could find only that Defendants believed the Form 10-K, and the Page 9 Table therein, was accurate. This alone defeats this claim as a matter of law.

## C.    No Reasonable Jury Could Find Loss Causation.

Plaintiff cannot establish loss causation for this claim either. Plaintiff relies on the October 28 Announcement for its Kearl claims. But the October 28 Announcement disclosed only that, based on 2016 price data, certain proved reserves might not qualify as proved **at year-end 2016**. App. 1135 (PX 125 at 9) ("if the average prices seen during the first nine months of 2016 persist for the remainder of the year, under the SEC definition of proved reserves, certain quantities of oil, such as those associated with the Kearl oil sands operations in Canada, will not qualify as proved reserves **at year-end 2016**" including "3.6 billion barrels of bitumen at Kearl"). The disclosure about **proved reserves estimations** does not correct the alleged misstatement about the Page 9 Table concerning production prices and costs. Indeed, the Page 9 Table has never been corrected. As Swiger explained, a disclosure about the possible de-booking of proved reserves does not impact the previously-reported production prices and costs at all, nor is it a disclosure about an asset's profitability. *See* App. 127–28 (4/29 Vol. 2B Tr. 20:15–21:20) (Swiger explaining that the SEC proved reserves "cash flow test" and an asset's book earnings are "two different things"); *id.* 80:9–81:11 (Swiger explaining that it is possible to have a "book loss" for an asset that passes the SEC proved reserves test). Because the October 28 Announcement did not "report

25

any concern" with the Kearl asset's production prices and costs in 2015, no reasonable jury could find loss causation. *Greenberg*, 364 F.3d at 668.

The October 28 Announcement also did not correct the Page 9 Table because the allegedly "corrective" information concerned 2016 results, not a backward-looking correction of any 2015 information—and the 2016 analysis was based on entirely different data, from an entirely different year. The October 28 Announcement did not say anything about ExxonMobil's ***2015 results***, much less correct the accuracy of anything reported for 2015. Plaintiff can point to no analyst, no market observer, and not even Plaintiff's own investment advisor, who viewed the October 28 Announcement as any indication that ExxonMobil made an earlier misstatement. *See* App. 508 (Feinstein Tr. 107:4–108:11) (Plaintiff's expert admitting at deposition that he could not identify a single analyst report or other market commentary that drew a connection between the two); *Greenberg*, 364 F.3d at 668; *see also N. Port Firefighters' Pension--Loc. Option Plan v. Temple-Inland Inc.*, 936 F. Supp. 2d 722, 762–63 (N.D. Tex. 2013) (holding that loss causation did not exist when "the corrective statements Plaintiffs identify do nothing to suggest that its prior statements were false"); *In re Dell*, 591 F. Supp. 2d at 909 (concluding that the "statements identified by the Plaintiffs fail to reveal the falsity of any of Dell's prior representations, and therefore do not qualify as a corrective disclosure").

The October 28 Announcement—which disclosed that Kearl proved reserves could be de-booked at year-end ***2016*** if low prices persisted—said nothing about Canadian bitumen production prices and costs during ***2015***. Plaintiff introduced no evidence that any analyst or market observer ever connected the two.

### D.   No Reasonable Jury Could Find Reliance.

For the same reasons described *supra* Part I.D.1, Plaintiff cannot prove the fraud-on-the-market presumption of reliance as to the Page 9 Table claim because no evidence supports that the

26

alleged misstatement caused any inflation in ExxonMobil's stock price. As explained above, it is undisputed that the results of Feinstein's regression show that there was no statistically significant price movement in response to the 2015 Form 10-K filing, and Plaintiff relies entirely on an inflation-maintenance theory. *Goldman* thus controls, and the inference "that the back-end price drop equals front-end inflation . . . break[s] down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Id.*; *see also Greenberg*, 364 F.3d at 666. As with the January 31 Announcement, the mismatch as to the October 28 Announcement is clear because it concerned potential year-end 2016 de-bookings and said nothing at all about 2015 production prices and costs, much less anything about the Page 9 Table specifically. *See supra* Part II.C.

Plaintiff also has not proved actual reliance as to this claim because there is no evidence that Lead Plaintiff or its investment advisor reviewed, relied upon, or even considered the challenged disclosures in the 2015 Form 10-K.

### E.     No Reasonable Jury Could Find Damages.

Finally, no reasonable jury could find damages associated with the Page 9 Table claim because Plaintiff's loss causation expert failed to disaggregate damages in at least two ways by failing to: (1) disaggregate the impact of unrelated negative information in the October 2016 Announcement; and (2) disaggregate damages associated with the Page 9 Table and Kearl proved reserves claims *from each other*.

The October 28 Announcement involved multiple pieces of non-fraud-related negative information, including a $0.04 earnings-per-share ("EPS") miss, low production from Nigerian disruptions, low realized sales prices, low refining margins, and a potential de-booking of 1 billion oil-equivalent barrels of proved reserves in other North American operations wholly unrelated to any alleged fraud. App. 517 (Feinstein Tr. 142:15–144:14). Feinstein deducted a mere $0.04 for

27

the EPS miss and otherwise relied on nothing more than his own subjective reading of cherry-picked analyst reports (without any verifiable or replicable framework). App. 517–18 (*Id.* at 145:19–146:8). Feinstein also attributed the full alleged $2.39 stock drop to both the Page 9 Table theory **and** the proved reserves theory, without disaggregating between them. App. 507 (*Id.* at 102:15–103:22). Plaintiff thus fails to show that "it is more probable than not that it was [the alleged misstatement], and not other unrelated negative statements, that caused a significant amount of the decline." *Greenberg*, 364 F.3d at 666; *see Oscar*, 487 F.3d at 271.

Plaintiff cannot prove the elements of its Page 9 Table claim, and accordingly, no reasonable jury could find in Plaintiff's favor on this claim.

### III. Plaintiff's Kearl Proved Reserves Claim Fails as a Matter of Law.

Plaintiff has no legally viable claim that the bitumen proved reserves disclosure in ExxonMobil's 2015 Form 10-K was fraudulent. This claim also fails by every metric for the following reasons.

#### A. No Reasonable Jury Could Find Any Materially False or Misleading Statement.

Plaintiff alleges that Defendants made a material misrepresentation by including 3.6 billion barrels of bitumen at Kearl as proved developed reserves in the Disclosure of Reserves reported in ExxonMobil's 2015 Form 10-K. The Kearl proved reserves analysis is an opinion which, under the Supreme Court's holding in *Omnicare*, is actionable only if it is both subjectively **and** objectively false. 575 U.S. at 185–86. Neither is true here.

Because ExxonMobil's proved reserves estimation process fully complied with SEC rules, it was not objectively false as a matter of law. *See Fine v. Am. Solar King Corp.*, 919 F.2d 290, 297 (5th Cir. 1990) (explaining that accounting judgment is not misleading as a matter of law if accountant's procedures were "within the universe of acceptable practices under GAAP");

28

*Jacobowitz v. Range Res. Corp.*, 596 F. Supp. 3d 659, 678 (N.D. Tex. 2022) (accounting line item was not actionable where plaintiff "failed to identify any basis for contending that [defendant's] accounting was erroneous").

The evidence has shown that ExxonMobil's proved reserves estimation followed longstanding, documented procedures; internal subject-matter specialists consistently concluded that Kearl's bitumen reserves qualified as proved; and senior management were consistently advised that the reserves qualified as proved. ExxonMobil's Global Reserves Group (GRG) and the reserves group at Imperial Oil (IOL) undertook a year-long exercise to estimate Kearl's proved reserves using reasoned, established, and well-documented policies and procedures. App. 114 (4/29 Vol. 2A Tr. 114:12–115:4); App. 125 (4/29 Vol. 2B Tr. 10:20–11:8). Throughout 2015, ExxonMobil's GRG and IOL's reserves group expected—and ultimately determined—that Kearl's reserves qualified as proved at year-end 2015. App. 124, 130, 131 (4/29 Vol. 2B Tr. 8:21–25, 31:13–32:10, 34:5–16). On October 26, 2015, the outlook presented to Defendants indicated that Kearl's reserves would qualify as proved. App. 1116 (PX 117); App. 128 (4/29 Vol. 2B Tr. 21:24-23:5). And on January 25, 2016, the GRG presented Defendants with Kearl's final proved reserves estimations. ECF No. 233-1 at App. 573–74.

Plaintiff's own expert Regan did not dispute that ExxonMobil had appropriate controls, processes, and policies. App. 359 (Regan Tr. 95:23–96:1). Nor did Regan dispute that the GRG, IOL's reserves team, and senior management all understood Kearl's reserves to qualify as proved. App. 359, 382 (Regan Tr. 95:18–96:1, 188:3–5); App. 1209 (5/6 Vol. 7B Tr. 29:8-13) (conceding that ExxonMobil management was presented an estimated SEC price of $28.70 at year-end 2015); App. 1205 (5/6 Vol. 7B Tr. 13:1-9) (agreeing that all ExxonMobil witnesses testified that the analyses were correct and compliant with the rules). Instead, Regan offered his own opinion about

29

what ExxonMobil *could have done*—but his hindsight opinion is no evidence that what ExxonMobil *actually did* was wrong. Regan could not testify that ExxonMobil's proved reserves calculation failed to comply with applicable SEC rules. App. 363 (Regan Tr. 113:6–22); App. 1209 (5/6 Vol. 7B Tr. 31:15-21) (testifying that the SEC does not specify that a company must use full-year average costs). And, to the contrary, Regan testified that the 2015 proved reserves estimation had never been corrected or restated. App. 1213–14 (5/6 Vol 7B Tr. 46:4–7; 46:15–47:5). That alone is fatal to Plaintiff's claim.

Plaintiff also lacks any legally sufficient evidence that Defendants subjectively disbelieved that Kearl's reserves qualified as proved at year-end 2015. Plaintiff has no evidence that ExxonMobil's GRG or IOL's reserves team provided any information to Defendants that was different from what was ultimately disclosed. Instead, the evidence establishes that the GRG presented Defendants with data consistently showing that Kearl's reserves qualified as proved. *See, e.g.*, App. 125 (4/29 Vol. 2B Tr. 8:21–25) (Swiger testifying that he was never told that Kearl reserves would not qualify as proved); App. 1168 (PX 538) (December 2015 email from Strawbridge to Swiger noting that "we look to be in good shape to preserve our Kearl SEC proved reserves"). The management committee was also told and accepted that no changes should be made to how Kearl reserves were estimated in 2015, and that the GRG would re-evaluate for 2016 based on an increase in U.S. sales. *See, e.g.*, PX 88 (October 2015 email from Casteel relaying that the GRG "is thinking through the implications of the growing [percentage] of sales into the U.S. for the process going forward"); App. 194 (4/30 Vol. 3B Tr. 20:3–9) (Rosenthal testifying that he understood the email "to mean for the process going forward the next year"). That is the opposite of fraud: it is the continuation of a longstanding methodology with a commitment to reassess based on evolving circumstances.

30

Plaintiff has pointed to the Defendants' awareness of costs related to Kearl's U.S. sales, but Plaintiff has no evidence connecting that awareness ***to the accuracy of the 2015 SEC proved reserves estimate***—much less any document suggesting that Defendants believed such costs needed to be accounted for differently. *See Shaw Grp.*, 537 F.3d at 540 (no scienter when defendant received "monthly reports on the progress of contracts" but there were no allegations they "included information at odds with [defendant's] public statements"); *see also, e.g.*, App. 73 (4/29 Vol. 1B Tr. 80:5–9) (Swiger explaining that "[t]he methodology excluded U.S., not because they were more expensive but because Edmonton was deemed to be the appropriate market point for the SEC analysis"). Indeed, Mr. Madden—ExxonMobil's Vice President of Supply and Transportation, who oversaw the buying and selling of Kearl blend—testified that Edmonton was "the most established market" and "the most representative market" for Kearl bitumen, and that the U.S. Gulf Coast market, by contrast, was "fairly new" and "developing," with "a lot of refineries buying it who had never bought it before," such that he would not have agreed it was a more representative market. App. 1245–46, 1249–50 (5/1 Vol. 4A Tr. 47:14–49:2, 64:10–65:4).

No reasonable jury could find that Defendants knew or believed that the 2015 proved reserves estimate was wrong.

### B.     No Reasonable Jury Could Find Scienter.

For the same reasons, no reasonable jury could find that Defendants had "actual knowledge" that ExxonMobil's proved reserves disclosure was false. A reasonable jury would also be compelled to find that Defendants reasonably relied on the analysis of subject-matter specialists at ExxonMobil and IOL, as well as input from ExxonMobil's external auditor, PwC,

which negates any legally sufficient basis for finding the necessary scienter.[12] *See Owens*, 789 F.3d at 545; *Snyder*, 292 F. App'x at 406.

Plaintiff's position boils down to a dispute over the proper methodology for estimating the "costs of operation" under SEC rules—a term the SEC did not define. *See* 17 C.F.R. § 210.4-10(a)(22)(v). ExxonMobil's methodology was reviewed and implemented by professionals with expertise in proved reserves estimation, following longstanding and documented procedures. *See, e.g.*, App. 1001–02 (PX 66 at 8–9); App. 124 (4/29 Vol. 2B Tr. 6:7–15) (Swiger describing the role of the GRG). Those professionals were also segregated from the group handling ExxonMobil's debt offering and discussions with credit rating agencies. App. 192 (4/30 Vol. 3B Tr. 11:3-6) (Rosenthal testifying that "the Global Reserves Group was completely separate from the Controllers group"); App. 1001 (PX 66 at 8) (Form 10-K explaining that the GRG "is separate from the operating organization").

No reasonable jury could find that Defendants had any intent to deceive, mislead, or defraud, nor any actual knowledge that the proved reserves estimate was false.

### C. No Reasonable Jury Could Find Loss Causation.

For the reasons above, Plaintiff's loss causation theory for this claim is fatally flawed. The October 28 Announcement, addressing the potential de-booking of reserves at *year-end 2016*, made no correction to the *2015* proved reserves estimate. As Plaintiff's own expert Regan testified, to this day, there has never been a correction of the 2015 Kearl proved reserves estimation. App. 1213–14 (5/6 Vol 7B Tr. 46:4–7; 46:15–47:5). Loss causation cannot be established. *See supra* Part II.C.

---

[12] IOL maintained its own reserves estimation team, and no evidence was presented that any IOL employee harbored any concern about the 2015 proved reserves estimate, much less communicated any such concern to Defendants. *See, e.g.*, App. 124 (4/29 Vol. 2B Tr. 5:17–24) (Swiger explaining that the proved reserves estimates "initiate in IOL"). Indeed, Plaintiff did not call a single IOL witness.

### D.     No Reasonable Jury Could Find Reliance.

For the same reasons explained above, Plaintiff cannot invoke the fraud-on-the-market presumption of reliance as to its Kearl proved reserves claim because there is a fatal mismatch between the alleged misstatement and the alleged corrective disclosure. *See supra* Part II.D.1. The October 28 Announcement concerned potential year-end 2016 de-bookings, and it made no correction or expression about ExxonMobil's 2015 proved reserves estimates. The October 28 Announcement therefore cannot support any reasonable inference of front-end price inflation. *Goldman*, 594 U.S. at 123; *Greenberg*, 364 F.3d at 666.

Nor can Plaintiff prove actual reliance because, as with Plaintiff's other theories, there is no evidence that Lead Plaintiff or its investment advisor reviewed, relied upon, or even considered the challenged disclosures in the 2015 Form 10-K.

### E.     No Reasonable Jury Could Find Damages.

Finally, for the reasons described above, no reasonable jury could ascribe damages to the Kearl proved reserves theory: Plaintiff's expert failed to disaggregate alleged fraud-related losses from unrelated negative information, and his failure to disaggregate between Plaintiff's two Kearl-related theories is an additional, independently fatal deficiency. App. 507 (Feinstein Tr. 102:15–103:2); *see supra* Part II.E.

As with Plaintiff's other claims, Plaintiff's failure to prove the elements of its Kearl proved reserves claims means that no reasonable jury could find in Plaintiff's favor on this claim.

### IV.     Plaintiff Failed to Establish Market Efficiency Through Expert Evidence for Any of Its Claims, and Thus Cannot Establish Reliance.

Reliance is an element of all of Plaintiff's fraud claims. Because Plaintiff did not rely on the challenged statements, it relies on the presumption of the fraud-on-the-market doctrine. But this doctrine requires Plaintiff to prove that the market is efficient. Typically, a Plaintiff would

33

establish market efficiency through the *Cammer* and *Krogman* factors. *See Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005) (listing market efficiency factors derived from *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), and *Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001). In this case, Plaintiff relied upon its expert Torchio at class certification to make this showing. But it did not call Torchio during its case at trial. And, its other expert Feinstein, did not disclose in his expert report any opinion on market efficiency, much less meet the *Cammer* and *Krogman* factors. Defendants raised this issue twice: Defendants moved *in limine* to preclude Plaintiff's experts from offering opinions that were not included in their expert reports, which the Court denied. ECF No. 290 at 20–21; App. 13 (4/27 Pretrial Conf. Tr. 33:10–18).

Further, after seeing Plaintiff's demonstrative slides (obtained just before the Feinstein testimony), Defendants objected to Feinstein offering an opinion on market efficiency that was not included in his expert report. The Court overruled that objection. App. 1222 (5/6 Vol. 7B Tr. 84:10-20). Feinstein's testimony on market efficiency is thus doubly problematic: first, it was presented to the jury even though Feinstein did not disclose an opinion on market efficiency, and second, his testimony was cursory and did not satisfy *Cammer* and *Krogman.* Essentially, Feinstein assumed market efficiency without disclosing a proper opinion or offering the required evidence. For this reason alone, Plaintiff did not establish reliance and judgment as a matter of law is required.

## V.    Plaintiff Has Abandoned Its Pleaded Kearl Claims in Favor of Claims that Were Neither Pleaded nor Certified for Class Treatment.

Plaintiff chose to abandon theories that had survived the motion to dismiss and class certification—*i.e.*, the "tepid warning" theory, the ASC 275 theory, and any claim under Section 20(a)—and replaced them with unpled theories that were never tested under the PSLRA's heightened pleading requirements and never certified for class treatment. Plaintiff's abandoned

34

theories cannot support any judgment in Plaintiff's favor, including because these theories fail on their merits as a matter of law.  Further, the claims Plaintiff sought to prove at trial are procedurally barred because they were neither pleaded nor certified for class treatment and therefore cannot support a determination of liability by the jury.

### A.   Plaintiff's Pleaded Page 9 Table Theory Based on ASC 275 Fails as a Matter of Law.

Plaintiff's only surviving *pleaded* claim concerning the Page 9 Table is an allegation that ExxonMobil violated ASC 275 in its disclosure of average production prices and costs for bitumen. But Plaintiff has no evidence from which a reasonable jury could find liability on this basis.

*No expert testimony*.  Plaintiff's own expert did not mention ASC 275 in his report and confirmed at his deposition that he offered no opinion on it.  App. 387 (Regan Tr. 208:20–209:10). Given the lack of any expert testimony on this issue, no reasonable jury could find for Plaintiff on this theory.  *See Fener*, 579 F.3d at 409; *see also Danis v. USN Commc'ns, Inc.*, 121 F. Supp. 2d 1183, 1192 (N.D. Ill. 2000) (granting summary judgment where plaintiff's experts did "not provide any evidence of material GAAP or GAAS violations").  It also has not even asked the Court to include this claim on its verdict form.

*No scienter*.  Plaintiff did not adduce any evidence that any Defendant had scienter to commit an ASC 275 violation.

*No loss causation*.  Neither Plaintiff's expert nor any other witness identified *any* corrective disclosure associated with an alleged violation of ASC 275.  *See, e.g.*, *supra* Part II.C. This failure is fatal to establishing loss causation.  *See Fener*, 579 F.3d at 409.

### B.   Plaintiff's Pleaded "Tepid Warning" Kearl Proved Reserves Theory Fails as a Matter of Law.

Plaintiff's Complaint alleged that the 2015 Form 10-K was materially false and misleading by warning that "certain quantities of oil and natural gas, such as oil sands operations in Canada

. . . could temporarily not qualify as proved reserves." ECF No. 36 ¶¶ 285–86. This theory—which the Court described as the "tepid warning" theory, *see* ECF No. 178 at 9—fails as a matter of law. Plaintiff recognizes as much—it has not even asked to include this claim on its verdict form.

*PSLRA safe harbor*. First, the PSLRA safe harbor applies and defeats this claim. The risk disclosure about de-booking proved reserves qualifies as a "forward-looking statement" under the PSLRA. *See* ECF No. 62 at 26–27; 15 U.S.C. § 78u-5(i)(1)(A)–(F) (defining forward-looking statements). And this disclosure was unquestionably accompanied by meaningful cautionary language under governing precedent. The Fifth Circuit requires only that cautionary language be "company-specific" and include "a realistic description of the risks applicable to the particular circumstances." *See Six Flags*, 58 F.4th at 211 (internal quotation marks and citation omitted). The risk disclosure here easily met that standard: it identified both the particular circumstances (a drop in crude and natural gas prices) and the company-specific ramifications (the potential de-booking of Canadian oil sands). The evidence established that ExxonMobil actually ***enhanced*** its proved reserves risk disclosure to specifically reference Canadian oil sands and potential implications for the same. *See* App. 141 (4/29 Vol. 2B Tr. 73:2–74:4); App. 178 (4/30 Vol. 3A Tr. 81:3–20).

*No falsity*. Plaintiff also cannot prove any misrepresentation because a de-booking of Kearl's proved reserves was not—and could not have been—"virtually certain" in February 2016 (when the 2015 Form 10-K was issued). That is so for a simple reason: the proved reserves assessment required 12 months of pricing and cost data, and ExxonMobil had only one to two months of such data when the 2015 Form 10-K was filed. App. 131 (4/29 Vol. 2B Tr. 33:5–15); App. 32 (4/28 Vol. 1A Tr. 43:2–9). Defendants were not required under GAAP to provide

36

quantitative disclosure of potential proved reserves de-booking for 2016 in the 2015 Form 10-K, and any such disclosure would have been entirely speculative at the time the 2015 Form 10-K was filed. *See* App. 914 (ASC 932-270-50-1: proved reserves "are not required in interim financial reports"). Without any proof that any Defendant actually viewed de-booking as a certainty in February 2016, Plaintiff's claim fails. *See In re Alta Mesa Res., Inc. Sec. Litig.*, No. 4:19-CV-957, 2024 WL 3760481, at \*6–8 (S.D. Tex. Aug. 12, 2024).

*No scienter*. Plaintiff also cannot establish scienter because the challenged statement is forward-looking, and Plaintiff has no proof of "actual knowledge" that it was false or misleading. *See Six Flags*, 58 F.4th at 214–15; *Southland*, 365 F.3d at 371–72. The professionals who prepared and reviewed the language undertook a careful, deliberate process. App. 139 (4/29 Vol. 2B Tr. 66:10–67:16); App. 175, 177 (4/30 Vol. 3A Tr. 72:6–18, 78:20–79:4). And Defendants approved the enhanced risk disclosure after accepting the recommendations of those internal subject-matter specialists. There are no facts from which any reasonable jury could find that Defendants had any intent to deceive, mislead, or defraud or any actual knowledge that there was any falsehood, error, or irregularity. *See Shaw Grp.*, 537 F.3d at 545.

*No loss causation*. Plaintiff's expert did not analyze the "tepid warning" theory on any basis, including for loss causation. This failure is independently fatal. *See Fener*, 579 F.3d at 409.

### C. Plaintiff's Page 9 Table and Proved Reserves Theories Were Neither Pleaded nor Certified for Class Treatment, and Thus Cannot Support Liability.

Plaintiff never pleaded that ExxonMobil should have de-booked Kearl's bitumen proved reserves *at year-end 2015*. Instead, Plaintiff's pleaded theory alleged that Kearl's proved reserves were "just barely *satisfying* the SEC's definition for proved reserves" by year-end 2015 and de-booking those reserves was "all but certain" *at year-end 2016*. ECF No. 36 ¶ 169 (emphasis added). Plaintiff expressly disavowed the theory it now asserts at trial in a letter dated October 19,

37

2023, in which Plaintiff stated it "***does not allege that Exxon 'should have de-booked its proved reserves at Kearl as of year-end 2015*.'"  ECF No. 233-1 at App. 686.

Accordingly, Plaintiff should not be permitted to present an unpled and uncertified claim to the jury.  *See In re St. Jude Med., Inc., Sec. Litig.*, 629 F. Supp. 2d 915, 921 (D. Minn. 2009) ("Plaintiffs survived a motion to dismiss in light of the theories they, themselves, chose; they may not now evade Congress's PSLRA mandates by switching horses midstream and pursuing a new theory."); *see also ABC Arbitrage Pls.' Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002) (discussing pleading requirements under the PSLRA).  Defendants are thus entitled to judgment as a matter of law on this claim.

Finally, as with the proved reserves claim, Plaintiff never pled the theory it asserted at trial regarding the Page 9 Table, nor did this Court certify the claim to the class.  *See generally* ECF No. 178.  For this basic procedural reason, and as already discussed, *supra* Part II, the jury is precluded from a finding of liability as to this theory, and Defendants are also entitled to judgment as a matter of law on this claim.  *See In re St. Jude Med., Inc., Sec. Litig.*, 629 F. Supp. 2d at 921.

## **CONCLUSION**

For the reasons stated above, Defendants respectfully submit that their motion for judgment as a matter of law should be granted on all claims and that judgment should be rendered for Defendants.

Dated:   May 7, 2026

Respectfully submitted,


/s/ Daniel J. Toal
Theodore V. Wells, Jr. (*pro hac vice*)
Daniel J. Toal (*pro hac vice*)
Audra J. Soloway (*pro hac vice*)
Paul D. Brachman (*pro hac vice*)
Lyuba Shamailova (*pro hac vice*)
PAUL, WEISS, RIFKIND,
   WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
twells@paulweiss.com
asoloway@paulweiss.com
dtoal@paulweiss.com
pbrachman@paulweiss.com
lshamailova@paulweiss.com


/s/ Jason N. Jordan
Nina Cortell
Texas State Bar No. 04844500
Jason Bloom
Texas State Bar No. 24045511
Jason Neil Jordan
Texas State Bar No. 24078760
HAYNES AND BOONE, LLP
2801 N. Harwood Street, Suite 2300
Dallas, TX 75219
Telephone: (214) 651-5000
Facsimile: (214) 651-5940
nina.cortell@haynesboone.com
jason.bloom@haynesboone.com
jason.jordan@haynesboone.com

*Counsel for Exxon Mobil Corporation,*
*Andrew P. Swiger,*
*and David S. Rosenthal*

/s/ Thomas M. Melsheimer
Thomas M. Melsheimer
Texas Bar No. 24128331
KING & SPALDING LLP
Texas Bar No. 13922550
2601 Olive Street, Suite 2300
Dallas, TX 75201
Telephone: (214) 764-4600
Facsimile: (214) 764-4601
tmelsheimer@kslaw.com


/s/ Scott C. Thomas
Scott C. Thomas
Texas Bar No. 24046964
LATHAM & WATKINS LLP
100 Crescent Court, Suite 7084
Dallas, TX 75201
Telephone: (713) 546-5400
Facsimile: (713) 546-5401
scott.thomas@lw.com


*Counsel for Exxon Mobil Corporation,*
*Andrew P. Swiger,*
*and David S. Rosenthal*


/s/ D. Patrick Long
D. Patrick Long
Texas State Bar No. 12515500
SQUIRE PATTON BOGGS
2200 Ross Avenue, Suite 4100W
Dallas, TX 75201
Telephone: (214) 758-1505
Facsimile: (214) 758-1550
patrick.long@squirepb.com

*Counsel for Rex W. Tillerson*

39

40

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been served by electronic CM/ECF filing, on this 7th day of May, 2026.

*/s/ Daniel J. Toal*
Daniel J. Toal