IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| PEDRO RAMIREZ, JR., Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> EXXON MOBIL CORPORATION, REX W. TILLERSON, ANDREW P. SWIGER, and DAVID S. ROSENTHAL, <br><br> Defendants. | Case No. 3:16-cv-03111-K |

**APPENDIX IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT AS A <u>MATTER OF LAW</u>**

| Exhibit | Description | App. Page |
|---|---|---|
| | Declaration of Lyuba Shamailova in Support of Defendants' Motion for Judgment as a Matter of Law | App. 1 |
| 1 | Transcript of Pretrial Conference (4/27/2026) | App. 5 |
| 2 | Trial Transcript Volume 1-A (4/28/2026) | App. 22 |
| 3 | Trial Transcript Volume 1-B (4/28/2026) | App. 54 |
| 4 | Trial Transcript Volume 2-A (4/29/2026) | App. 86 |
| 5 | Trial Transcript Volume 2-B (4/29/2026) | App. 123 |
| 6 | Trial Transcript Volume 3-A (4/30/2026) | App. 158 |
| 7 | Trial Transcript Volume 3-B (4/30/2026) | App. 190 |
| 8 | Trial Transcript Volume 4-B (5/1/2026) | App. 228 |
| 9 | Trial Transcript Volume 5-A (5/4/2026) | App. 264 |
| 10 | Trial Transcript Volume 5-B (5/4/2026) | App. 302 |
| 11 | Deposition Transcript of D. Paul Regan (1/29/2025) | App. 335 |
| 12 | Deposition Transcript of Steven P. Feinstein, Ph.D. (1/22/2025) | App. 481 |
| 13 | DX 62 : UBS report titled "2017 Capex Above Expectations; 4Q16 EPS Beats on R&M Asset Sale Gain & Favorable Tax Items" | App. 654 |
| 14 | DX 63 : Morgan Stanley report titled "In-line Results1 Permian Outlook in Focus" | App. 685 |
| 15 | DX 70 : Financial Accounting Standards Board, Accounting Standards Codification 360-10-35 | App. 695 |
| 16 | Excerpt of DX 120 : ExxonMobil 2009 Form 10-K | App. 702 |
| 17 | Excerpt of DX 137 : ExxonMobil 2010 Form 10-K | App. 704 |
| 18 | Excerpt of DX 158 : ExxonMobil 2011 Form 10-K | App. 706 |

| 19 | Excerpt of DX 183 : ExxonMobil 2012 Form 10-K | App. 708 |
|----|-----------------------------------------------|----------|
| 20 | Excerpt of DX 208 : ExxonMobil 2013 Form 10-K | App. 710 |
| 21 | Excerpt of DX 256 : ExxonMobil 2014 Form 10-K | App. 712 |
| 22 | DX 808 : Email from  M. Ary to R. Auter, subject: "Upstream Impairment Memos," attaching documents [PRAM0000509] | App. 714 |
| 23 | DX 898 : Slidedeck titled "Asset Recoverability Review, Review with PwC" [PRAM0005293] | App. 806 |
| 24 | DX 1231 : Financial Accounting Standards Board, Accounting Standards Codification 932-270-50-1 | App. 914 |
| 25 | PX 65 : Assessment of Potential Impairment Triggers [EMC_RAM 000000001] | App. 915 |
| 26 | PX 66 : ExxonMobil 2015 Form 10-K [EMC_RAMIREZ 000115801] | App. 994 |
| 27 | PX 88 : Email from David Rosenthal to Beth Casteel, subject: RE: PROP:Kearl 2015 SEC Reserves - Oct 26 Chairman's Review Draft Package [EMC_RAMIREZ 000030973] | App. 1114 |
| 28 | PX 117 : Email from William Strawbridge to Andrew Swiger, et al., subject: PROP:10/26 Kearl Reserves Update Proforma and Review Package, attaching documents [EMC_RAMIREZ 000056281] | App. 1116 |
| 29 | PX 125 : Exxon Mobil Corporation Form 8-K and press release: ExxonMobil Earns $2.7 Billion in Third Quarter of 2016 [EMC_RAM 001649431] | App. 1127 |
| 30 | PX 227 : Exxon Mobil Corporation Form 8-K and press release: ExxonMobil Earns $7.8 Billion in 2016; $1.7 Billion During Fourth Quarter | App. 1147 |
| 31 | PX 538 : Email from William Strawbridge to Andrew Swiger, et al., subject: PROP:RE: US Gas - SEC Pricing, attaching document [EMC_RAMIREZ 000032893] | App. 1168 |
| 32 | Trial Transcript Volume 7-A (5/6/2026) | App. 1174 |
| 33 | Trial Transcript Volume 7-B (5/6/2026) | App. 1203 |
| 34 | Trial Transcript Volume 4-A (5/1/2026) | App. 1234 |

Dated: May 7, 2026

Respectfully submitted,

| | |
|---|---|
| */s/  Daniel J. Toal* | */s/ /s/ Thomas M. Melsheimer* |
| Theodore V. Wells, Jr. (*pro hac vice*) | Thomas M. Melsheimer |
| Audra J. Soloway (*pro hac vice*) | Texas Bar No. 13922550 |
| Daniel J. Toal (*pro hac vice*) | Austin E. Saathoff |
| Paul D. Brachman (*pro hac vice*) | Texas Bar No. 24128331 |
| Lyuba Shamailova (*pro hac vice*) | Emily Wilkinson |
| PAUL, WEISS, RIFKIND, | Texas Bar No. 24125457 |
|   WHARTON & GARRISON LLP | Taylor Hinojosa |
| 1285 Avenue of the Americas | Texas Bar No. 24132805 |
| New York, NY 10019-6064 | KING & SPALDING LLP |
| Telephone: (212) 373-3000 | 2601 Olive Street, Suite 2300 |
| Facsimile: (212) 757-3990 | Dallas, Texas 75201 |
| twells@paulweiss.com | Telephone: (214) 764-4600 |
| asoloway@paulweiss.com | Facsimile: (214) 764-4601 |
| dtoal@paulweiss.com | tmelsheimer@kslaw.com |
| pbrachman@paulweiss.com | asaathoff@kslaw.com |
| lshamailova@paulweiss.com | ewilkinson@kslaw.com |
| | thinojosa@kslaw.com |

| | |
|---|---|
| */s/  Nina Cortell* | */s/  Scott C. Thomas* |
| Nina Cortell | Scott C. Thomas |
| Texas State Bar No. 04844500 | Texas Bar No. 24046964 |
| Jason Bloom | LATHAM & WATKINS LLP |
| Texas State Bar No. 24045511 | 100 Crescent Court, Suite 7084 |
| Jason N. Jordan | Dallas, TX 75201 |
| Texas State Bar No. 24078760 | Telephone: (713) 546-5400 |
| HAYNES AND BOONE, LLP | Facsimile: (713) 546-5401 |
| 2801 N. Harwood Street, Suite 2300 | scott.thomas@lw.com |
| Dallas, TX 75219 | |
| Telephone: (214) 651-5000 | *Counsel for Exxon Mobil Corporation,* |
| Facsimile: (214) 651-5940 | *Andrew P. Swiger, and David S. Rosenthal* |
| nina.cortell@haynesboone.com | |
| jason.bloom@haynesboone.com | |
| jason.jordan@haynesboone.com | */s/  D. Patrick Long* |
| | D. Patrick Long |
| | Texas State Bar No. 12515500 |
| | SQUIRE PATTON BOGGS |
| *Counsel for Exxon Mobil Corporation,* | 2200 Ross Avenue, Suite 4100W |
| *Andrew P. Swiger,* | Dallas, TX 75201 |
| *and David S. Rosenthal* | Telephone: (214) 758-1505 |
| | Facsimile: (214) 758-1550 |
| | patrick.long@squirepb.com |
| | |
| | *Counsel for Rex W. Tillerson* |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |
|---|---|
| PEDRO RAMIREZ, JR., Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> EXXON MOBIL CORPORATION, REX W. TILLERSON, ANDREW P. SWIGER, and DAVID S. ROSENTHAL, <br><br> Defendants. | Case No. 3:16-cv-03111-K |

**DECLARATION OF LYUBA SHAMAILOVA IN SUPPORT OF
DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW**

Pursuant to 28 U.S.C. § 1746, I, Lyuba Shamailova, declare as follows:

1.     I am over twenty-one years of age, and I am competent to make this Declaration.  I have personal knowledge of the facts set forth in this Declaration.  I respectfully submit this Declaration in support of Defendants' Motion for Judgment as a Matter of Law.

2.     I am an associate in the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP.  My office is located at 1285 6th Ave, New York, NY 10019.

3.     I am a member in good standing with the New York State Bar.  I am admitted to practice before this Court *pro hac vice*.

4.     Attached hereto as Exhibit 1 is a true and correct copy of the Pretrial Conference transcript in this case, dated April 27, 2026.

5.     Attached hereto as Exhibit 2 is a true and correct copy of Volume 1A of the Trial Transcript in this case, dated April 28, 2026.

6.     Attached hereto as Exhibit 3 is a true and correct copy of Volume 1B of the Trial Transcript in this case, dated April 28, 2026.

**App. 1**

7.      Attached hereto as Exhibit 4 is a true and correct copy of Volume 2A of the Trial Transcript in this case, dated April 29, 2026.

8.      Attached hereto as Exhibit 5 is a true and correct copy of Volume 2B of the Trial Transcript in this case, dated April 29, 2026.

9.      Attached hereto as Exhibit 6 is a true and correct copy of Volume 3A of the Trial Transcript in this case, dated April 30, 2026.

10.      Attached hereto as Exhibit 7 is a true and correct copy of Volume 3B of the Trial Transcript in this case, dated April 30, 2026.

11.      Attached hereto as Exhibit 8 is a true and correct copy of Volume 4B of the Trial Transcript in this case, dated May 1, 2026.

12.      Attached hereto as Exhibit 9 is a true and correct copy of Volume 5A of the Trial Transcript in this case, dated May 4, 2026.

13.      Attached hereto as Exhibit 10 is a true and correct copy of Volume 5B of the Trial Transcript in this case, dated May 4, 2026.

14.      Attached hereto as Exhibit 11 is a true and correct copy of the deposition transcript of D. Paul Regan, taken on January 29, 2025.

15.      Attached hereto as Exhibit 12 is a true and correct copy of the deposition transcript of Steven P. Feinstein, taken on January 22, 2025.

16.      Attached hereto as Exhibit 13 is a true and correct copy of DX 62, a UBS report titled "2017 Capex Above Expectations; 4Q16 EPS Beats on R&M Asset Sale Gain & Favorable Tax Items."

17.      Attached hereto as Exhibit 14 is a true and correct copy of DX 63, a Morgan Stanley report titled "In-line Results Permian Outlook in Focus."

**App. 2**

18.    Attached hereto as Exhibit 15 is a true and correct copy of DX 70, Financial Accounting Standards Board, Accounting Standards Codification 360-10-35.

19.    Attached hereto as Exhibit 16 is a true and correct copy of an excerpt of DX 120, ExxonMobil's 2009 Form 10-K.

20.    Attached hereto as Exhibit 17 is a true and correct copy of an excerpt of DX 137, ExxonMobil's 2010 Form 10-K.

21.    Attached hereto as Exhibit 18 is a true and correct copy of an excerpt of DX 158, ExxonMobil's 2011 Form 10-K.

22.    Attached hereto as Exhibit 19 is a true and correct copy of an excerpt of DX 183, ExxonMobil's 2012 Form 10-K.

23.    Attached hereto as Exhibit 20 is a true and correct copy of an excerpt of DX 309, ExxonMobil's 2013 Form 10-K.

24.    Attached hereto as Exhibit 21 is a true and correct copy of an excerpt of DX 256, ExxonMobil's 2014 Form 10-K.

25.    Attached hereto as Exhibit 22 is a true and correct copy of DX 808.

26.    Attached hereto as Exhibit 23 is a true and correct copy of DX 898.

27.    Attached hereto as Exhibit 24 is a true and correct copy of DX 1231.

28.    Attached hereto as Exhibit 25 is a true and correct copy of PX 65.

29.    Attached hereto as Exhibit 26 is a true and correct copy of PX 66.

30.    Attached hereto as Exhibit 27 is a true and correct copy of PX 88.

31.    Attached hereto as Exhibit 28 is a true and correct copy of PX 117.

32.    Attached hereto as Exhibit 29 is a true and correct copy of PX 125.

33.    Attached hereto as Exhibit 30 is a true and correct copy of PX 117.

**App. 3**

4

34.     Attached hereto as Exhibit 31 is a true and correct copy of PX 538.

35.     Attached hereto as Exhibit 32 is a true and correct copy of the rough transcript of Volume 6A of the Trial Transcript in this case, dated May 6, 2026.

36.     Attached hereto as Exhibit 33 is a true and correct copy of the rough transcript of Volume 6B of the Trial Transcript in this case, dated May 6, 2026.

37.     Attached hereto as Exhibit 34 is a true and correct copy of Volume 4A of the Trial Transcript in this case, dated May 1, 2026.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Dallas, Texas

May 7, 2026

LYUBA SHAMAILOVA

**App. 4**

# Exhibit 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

PEDRO RAMIREZ, JR., Individually )
and on Behalf of All Others )
Similarly Situated, and GREATER )
PENNSYLVANIA CARPENTERS PENSION )
FUND, )
)
          Plaintiffs, )
)
)
   vs. )  No.  3:16-CV-03111-K
)
EXXON MOBILE CORPORATION, )  CLASS ACTION
REX W. TILLERSON, ANDREW P. SWIGER, )
JEFFREY J. WOODBURY, DAVID S. )
ROSENTHAL, )
)
         Defendants. )
_____)

PRETRIAL CONFERENCE
BEFORE THE HONORABLE ED KINKEADE
UNITED STATES DISTRICT JUDGE
APRIL 27, 2026
DALLAS, TEXAS

FOR THE PLAINTIFFS:

JOE KENDALL
KENDALL LAW GROUP
3811 Turtle Creek Boulevard, Suite 825 Suite 880
Dallas, TX  75229
(214) 744-3300

SCOTT H. SAHAM
NATHAN R. LINDELL
SAM SHELDON
ERIKA OLIVER
T. ALEX B. FOLKERTH
SARA BIERL POLYCHRON
SPENCER A. BURKHOLZ
ROBBINS GELLER RUDMAN & DOWD, LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
(619) 231-1058

---

(Rex Tillerson)

PATRICE CHILDRESS
(Party Representative)

Proceedings reported by mechanical stenography,
transcript produced by computer-aided transcription.

_____

PAMELA J. WILSON, RMR, CRR
Federal Official Court Reporter
1100 Commerce Street, 13th Floor
Dallas, Texas 75242
pam_wilson@txnd.uscourts.gov
(214) 662-1557

---

BALON B. BRADLEY
BALON B. BRADLEY LAW FIRM
11910 Greenville Avenue, Suite 220
Dallas, TX  75243
(972) 991-1582

MICHAEL SWIDERSKI
(Party Representative)

FOR THE DEFENDANTS:

THOMAS M. MELSHEIMER
AUSTIN E. SAATHOFF
EMILY WILKINSON
DAVID T. HINOJOSA
KING & SPALDING, LLP
2601 Olive Street, Suite 2300
Dallas, TX  75201
(214) 764-4446

NINA CORTELL
JASON JORDAN
HAYNES and BOONE, LLP
2801 N. Harwood Street, Suite 2300
Dallas, TX  75201
(214) 651-5000

AUDRA J. SOLOWAY
DANIEL TOAL
THEODORE V. WELLS
LYUBA SHAMAILOVA
AMITAV CHAKRABORTY
DAPHNE THOMPSON
PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

SCOTT C. THOMAS
LATHAM & WATKINS
100 Crescent Court, Suite 7084
Dallas TX  75201
(713) 546-5400

D. PATRICK LONG
SQUIRE PATTON BOGGS
2200 Ross Avenue, Suite 4100w
Dallas TX  75201
(214)758-1500

---

4

PRETRIAL CONFERENCE - APRIL 27, 2026

**P R O C E E D I N G S**

THE SECURITY OFFICER:  All rise and come to order.

United States District Court in and for the Northern District of Texas at Dallas is now in session, the Honorable United States District Judge Ed Kinkeade presiding.

Let us pray.

God bless these United States and this Honorable Court.

Please be seated.

THE COURT:  Okay.  We're about to start a jury trial, Ramirez and others versus Exxon and others, cause number 3:16-CV-03111-K.

For the lawyers that are here for the plaintiffs, we've got Mr. Kendall, you here?

MR. KENDALL:  I'm here, Your Honor.

THE COURT:  Mr. Bradley is here?

MR. BRADLEY:  Yes, Your Honor.

THE COURT:  Mr. Burkholz is here.

Are you going to be lead or somebody else?

MR. BURKHOLZ:  Mr. Saham is.

THE COURT:  Scott Saham, you're going to be the lead?

MR. SAHAM:  Yes, sir.

THE COURT:  And Mr. Sheldon?

MR. SHELDON:  Yes, sir.

App. 5

THE COURT: And Mr. Swiderski?

MR. SWIDERSKI: Yes.

THE COURT: Okay. And you're the representative for the class. Correct?

MR. SWIDERSKI: Correct.

THE COURT: Okay. All right.

And for the defense we've got Mr. Melsheimer?

MR. MELSHEIMER: Good morning, Your Honor.

THE COURT: And you're still with King & Spalding this morning?

MR. MELSHEIMER: Yes, sir.

THE COURT: Okay. I just wanted to check. Just wanted to make sure. I didn't know.

MR. MELSHEIMER: I'll update you at the end of the week, Your Honor.

THE COURT: Thank you.

Thank you.

And Mr. Thomas.

MR. THOMAS: Good morning, Your Honor.

THE COURT: Now, who are you representing?

MR. THOMAS: I represent the defendants ExxonMobile and all three --

THE COURT: You're just helping out from Latham & Watkins? You're not a King & Spalding?

MR. THOMAS: No. I decided to go out away from

---

Mr. Melsheimer.

THE COURT: God bless you.

MR. THOMAS: Can I get that transcript?

THE COURT: You can.

Mr. Wells, good to see you again.

MR. WELLS. Good morning, Your Honor.

THE COURT: I was going to say white hair, there's still some white hair on the side. I see it there.

Your practice, everything going all right?

Always good to see you.

Mr. Toal, good to see you.

MR TOAL: Good morning, Your Honor.

THE COURT: You've been here before.

MR TOAL: I've been here many times.

THE COURT: How many cases have we had with Exxon?

MR TOAL: I could probably count them.

THE COURT: Because all the other judges had Exxon stock --

MR. BURKHOLZ: I think you told us you invest in real estate instead.

THE COURT: I do invest in real estate. Probably wasn't a smart move but it is what I did. There you go. I do watch that stock go up and down and wonder what would have happened in my life. I'm okay. I'm doing fine in real estate.

---

And Audra Soloway, where are you?

MR. SOLOWAY: Good morning, Your Honor.

THE COURT: Who are you with?

MR. SOLOWAY: I'm with Paul Weiss.

THE COURT: You're with Mr. Wells.

MR. SOLOWAY: I am.

THE COURT: And Pat Long.

MR. LONG: Good to see you, Your Honor.

THE COURT: Another white-haired man. Good to see you.

You're representing Mr. Tillerson, correct?

MR. LONG: I am.

THE COURT: Mr. Tillerson still live in this area?

MR. LONG: Yes, Your Honor. He's in Southlake.

THE COURT: He used to live in my neighborhood. He did live where I lived when the Hertz were in Irving.

MR. MELSHEIMER: We will bring that out in sworn testimony.

THE COURT: That house is for sale. There have been a couple of people there. A nice house.

And Ms. Childress, you work with Exxon?

MS. CHILDRESS: That's right. I'm in-house at Exxon.

THE COURT: Were you in Irving?

MS. CHILDRESS: I was not. I'm always at our

---

Houston campus.

THE COURT: Is there nobody left anymore?

MS. CHILDRESS: That's right.

THE COURT: You fired them all?

MS. CHILDRESS: They happily came.

THE COURT: There was a fellow named Smith who used to be out there who was a really active little man in Irving, great guy, lawyer with y'all. I remember that. He died and I just thought the world of him.

And then Mr. Tillerson I doubt is here.

He's not here, is he?

All right. And Mr. Swiger or Mr. Rosenthal, they're not here but they will be here?

MR. MELSHEIMER: They will absolutely be here, Your Honor, later this morning.

THE COURT: Okay. All right. Then we've got some other lawyers here.

Let's see, Mr. Saathoff?

No, not here.

Emily Wilkinson?

Not here.

David Hinojosa?

I'm never going to get this one.

Lyuba Shamailova?

No?

App. 6

9

Amitav Chakraborty?

Gosh, nobody named Smith anymore in the world.

Daphne Thompson?

MS. THOMPSON:  Good morning, Your Honor.

THE COURT:  How are you?

MS. THOMPSON:  I'm with Paul Weiss.

THE COURT:  And Ms. Cortell I know who you're with.

MS. CORTELL:  Yes, Your Honor.  Haynes & Boone.

And also Jason Jordan also here with Haynes & Boone.

THE COURT:  How many years have you been with Haynes & Boone?

MS. CORTELL:  Almost 50.

THE COURT:  Do you remember Dick Haynes?

MS. CORTELL:  Of course.  That's who hired me.

THE COURT:  You won't know this, but he and I had a case on the same side.  He represented Episcopalians and I represented the Baptists and we were against the terrible government trying to tax our church camps, and that's how I got to know him.

MS. CORTELL:  I did not know he ever litigated.

THE COURT:  He did.  He did.

And Jason Jordan?

MR. JORDAN:  Yes, Your Honor.

THE COURT:  You told me you didn't play basketball?

MR. JORDAN:  I did not.

10

THE COURT:  Did you ever do anything with your tallness?

MR. JORDAN:  I played in high school.  I couldn't take it any further than that.  I'm tall enough, if I had athletic ability I would not be doing this for a living

THE COURT:  If I was as tall as you, I would still be playing in some place Stan, something Stan, but I would be trying anyway.

All right.  Good.

And Ms. Daniel Sloan, you're here somewhere.

Neil Powell.  Dezerae West.  Jason Barnes.  Casey Gooden, Brian Patterson, Alison -- Alison Wong, Latoya York, Jessica Daniels and Gena Morgan.

MS. DANIELS:  Jessica Daniels, Your Honor.  Good morning.

THE COURT:  Good to see you, Ms. Daniels.

All right.  Okay.  I think that's everybody.

And everybody is ready for trial, correct?

MR. MELSHEIMER:  We are, Your Honor.

MR. SAHAM:  Yes, Your Honor.

MR. BRADLEY:  There may be some other lawyers on our side.

THE COURT:  Maybe I don't have them down here.  Let me write them down.

Oh, I'm sorry.

11

Nathan Lindell?

MR. LINDELL:  Yes.  Good morning, Your Honor.

THE COURT:  Okay.  Who are you with?

MR. LINDELL:  Robbins Geller.

THE COURT:  Sara Polychron.  Who are you with?

MS. POLYCHRON:  Robbins Geller.

THE COURT:  Erika Oliver.

MS. OLIVER:  As well with Robbins Geller.

THE COURT:  And T. Alex Folkerth.

MR. FOLKERTH:  Robbins Geller.

THE COURT:  I'm sorry I missed you.  It was the bottom of the page.

And then you've got Michael Torres, Brad Lewis, Kirsten McCormack and Kaylee Angulo who are going to do the real work when we get going.  Correct?

So good.  Thank you, Mr. Bradley, for letting me know that.  I also want to thank you, that's the best haircut I've ever seen on you, Mr. Bradley.

Okay.  All right.  Let's get all of the things out of the way that we can before we select a jury.

You want to do the motions in limine first?

Is that okay with y'all?

MR. SAHAM:  Yes, Your Honor.

MR. MELSHEIMER:  Yes, Your Honor.

THE COURT:  All right.  You looked like you were

12

going to say something, Mr. Melsheimer.

MR. MELSHEIMER:  I always look like that, Your Honor, but I wasn't going to say anything.

THE COURT:  Oh, okay.  You're just always ready, just in case.

All right.  The Plaintiff's motion in limine.  So let me go over those with y'all in my notes on this.

1, I think all of y'all agree that the SEC and the New York AG's investigations are not admissible.

Everybody agree on that?

MR. SAHAM:  Yes, Your Honor, to the extent it's -- postdates the class period, but there are documents that the -- both sides have agreed to be preadmitted that do reference at least the SEC, not an investigation, but certainly reference the SEC.

THE COURT:  But not the case itself, not what's going on?

MR. SAHAM:  No.  Of course not, Your Honor.

No one I think wants that.

THE COURT:  Okay.  You know, I'm pretty familiar with that case.  I was going to make it be tried here and the Fifth Circuit said otherwise and then Exxon tried it in New York.  And y'all won, correct?

MR. BURKHOLZ:  That's correct, Your Honor.

THE COURT:  Yeah.  I remember that.  And then the

**App. 7**

13

AG himself got removed, if I recall, for many dastardly deeds that he had been up to.

MR. BURKHOLZ:  That is also correct.

THE COURT:  I guess he's glad he didn't come down here and face Texas justice.  I don't know what happened to him.  But he should never be an elected official again based on what I have read about him, if it's true.  I'm sure you agree.

MR. BURKHOLZ:  I absolutely agree.

Your Honor, we do have a bit of a disagreement.  I think we both agree that there shouldn't be references to the SEC investigation, the New York Attorney General trial, claims that were dismissed, like proxy costs and GHG costs, but there are references to process issues in the documents.

We have proposed to plaintiffs that we redact those references.  Otherwise, if they're not redacted, I think we're in a position where we can't have stray references to those investigations and that trial in the document without being able to explain the resolution of those events.

THE COURT:  Stop.  You agree to redactions?

MR. SAHAM:  Your Honor, could I make two points?

THE COURT:  Is that a yes, no?

MR. SAHAM:  Well, we offered to make redactions.

THE COURT:  I didn't ask that.  Do you agree to redactions, yes or no?

14

MR. SAHAM:  We could redact.

THE COURT:  I didn't ask that.  Boy, y'all are going to fight me the whole trial.

Do you agree to his redactions?

MR. SAHAM:  He has not proposed any redactions to me, Your Honor.  We offered over a month ago for them to send us redactions; we haven't received any.

THE COURT:  Okay.  Why haven't y'all done that?

MR. BURKHOLZ:  We proposed a stipulation where we would work in good faith to make the necessary redactions.  I think the plaintiffs are taking the position that we should have gone through all 1500 exhibits and proposed redactions.  We think whoever is proposing the exhibit should redact the necessary references.  We can have discussions after the fact, if we think the redactions should have been a little bit more extensive or a little less extensive and before those documents go to the jury, which would be the most efficient way to do it.

THE COURT:  Well, the most efficient way to do it is I wouldn't have had to deal with it.  Wouldn't you agree?

MR. BURKHOLZ:  Yes, I would agree.

THE COURT:  So y'all are going to have to fight about that then when we get there.  And the less that you have to fight about it the happier -- easier I will be to deal with.  Otherwise I'll be dealing with y'all right over

15

here in the -- in the area where I will talk to you in a very close distance.  Okay?  I will decide.

So my suggestion is y'all work real hard on that.

MR. SAHAM:  That's a yes, Your Honor.  That's an absolute yes.  We will agree to that.

THE COURT:  A yes without any qualifications?

MR. SAHAM:  No qualification.

THE COURT:  Thank you, Lord.

MR. SAHAM:  I would like to make an additional point.

THE COURT:  I knew you couldn't do it.

MR. SAHAM:  Nothing about redactions though.

Our motion in limine 1, I think although we have an agreement about the SEC and AG not having to do with this case, we think there's a hard stop after this class period.  They want to bring in evidence about Exxon stock price and the price of oil.

THE COURT:  I agree with you about that.  That's going to come in.

Okay.  So I grant in part your request that the -- it be excluded.  Yes, it will be excluded.  But I'm going to let them use testimony for impeachment, as long as they don't reference the regulation itself.  I'll let you do that.

Rest of it I deny without prejudice, but you can reurge it.  Okay?

16

Just because I rule this way now doesn't mean I overrule forever that way.  Don't be discouraged.

MR. SAHAM:  I would just cite you to the Kmart case where the Fifth Circuit specifically said that this type of post class period or post relevant evidence is very -- very little probative effect and is highly likely to mislead the jury.

THE COURT:  Thank you for that.

Limine 2, I'm denying it.

Limine 3, deny.  But, again, you can reurge that later.

4, deny.

5, deny.

6, deny.

7 is a maybe.  I'm sounding like y'all now.

Oh, depends on whether it's a whistleblower or it's somebody that's testifying for Exxon on whether you lead them or not, are they your witness or their witness.  That's all --

MR. SAHAM:  Understood.

THE COURT:  That's what I'm ruling there.  You know.

Okay.  And then on 8, about not being able to communicate with your lawyers, I've never adopted that.  Both sides can talk to your witnesses any time you can talk to 'em, preferably not while they're on the witness stand.  You

App. 8

know, don't interrupt what we're doing, but otherwise that's why y'all have lawyers. So both sides can do that.

And then you can cross-examine, hey, did you talk to your lawyer after that, did he say you really messed up or whatever. Fine. That's part of what we do at trial.

Limine number 9, that one, make all your witnesses available, no. I do want you to do this. Both sides let each side know the -- 24- or 48-hour rule, I'm going to let it be either one, this is what we're going to be doing tomorrow. So we don't have gaps. Okay?

Y'all understand what I'm saying there?

MR. BURKHOLZ: Your Honor, could it -- could I ask one thing on the -- on the notice?

There are a number of witnesses in this case who are actually in Canada, so we had the competing proposals in terms of notice.

THE COURT: Are you going to bring them during your case in chief?

MR. BURKHOLZ: The plaintiffs want to call a lot of our witnesses during their case.

THE COURT: You need to let them know as early as you can. People in Canada, you know, they got to get on some airline or something, so don't give 'em one day notice on that.

MR. SAHAM: Yes, Your Honor. I believe there's

only one Canadian witness and we're going to give notice of that at the end of today.

THE COURT: And you don't need 'em tomorrow?

MR. SAHAM: No.

MR. BURKHOLZ: And the competing proposals on notice, plaintiffs had proposed 72 hours. We had proposed that there be an order of witnesses five days before trial, obviously, that's essentially moot, but we'd like to at least keep the 72-hour notice on both sides.

THE COURT: That's fine.

9, 10, 11. Three peremptory challenges. Yes. And y'all are aligned with Mr. Tillerson, so I'm not giving you six.

MR. LONG: That's correct, Your Honor.

THE COURT: 12, disparaging class action contingency fees. No. Y'all can't throw shade at plaintiff's lawyers. Okay?

How do you like that word "shade"?

MR. MELSHEIMER: Wouldn't think of it, Your Honor.

THE COURT: Not you, because you're sometimes on that side.

MR. MELSHEIMER: Yes, Your Honor.

THE COURT: What were you going to say?

MR. SOLOWAY: Thank you, Your Honor. I think we're all agreed that we're not going to --

THE COURT: You've got one of the greatest court reporter's ever in the history of court reporting here today.

She lived through with me -- with five trials over five years, eight weeks each.

MR. MELSHEIMER: Your Honor, can I put on the record that Ms. Pam was with Judge Fitzwater when I was in U.S. Attorney's Office, that's how lengthy her service -- her commendable service has been.

THE COURT: She sure was. Judge Fitzwater, who went to Baylor with yours truly is willing to share her with me. It's a Baylor thing.

So 12, I granted.

13, grant.

14, grant.

15, deny.

16, deny.

All right. Defendant's motions.

1, the part about climate change and proxy costs, grant.

MR. MELSHEIMER: Your Honor --

THE COURT: And then I also deny without prejudice to reurging the part on the 303 evidence, but you can object at the time.

MR. MELSHEIMER: Your Honor --

THE COURT: So -- and the reason is because that evidence is probative both of live and dismissed claims, so

I'll let you go into that. I'll let them go into that at the time. So y'all -- but y'all can object at the time. That's what we're talking about. It doesn't solely relate to a dismissed claim, it could be relevant to the lack of profitability at Kearl Cold Lake. Okay. So be ready to object at the time and I'll look at it again.

Does that make sense?

If it doesn't, ask me later and I'll clarify it.

MR. SOLOWAY: Your Honor, I apologize, before we get too far --

THE COURT: Don't apologize. That's your job.

MR. SOLOWAY: But I'm interrupting. I think 13 you just dressed.

THE COURT: I'm not there.

Oh, we're going back?

MR. SOLOWAY: Yes. We're going back, with apologies. I think we want to make sure we understand the scope of your ruling on this, Your Honor.

So the plaintiffs have positioned this motion in limine as seeking to exclude evidence and argument about the case's procedural history and I think in particular about claims that it does not intend to pursue. I think as a general matter defendants are not interested in telling the jury about abandoned theories or claims that have been dismissed in this case, but there's I think one area of dispute here

that is particularly important.

THE COURT: Okay.

MR. SOLOWAY: There are certain admissions in the complaint and admissions that the plaintiff's experts have made in this case.

THE COURT: You can go into that. If you get an admission, that comes in.

MR. SOLOWAY: Got it. Thank you, Your Honor.

MR. SAHAM: Your Honor, I think Ms. Soloway is referring to an expert who had a declaration attached to a complaint that Your Honor struck and never considered. They have not participated in the litigation in the last ten years.

THE COURT: Is that right?

MR. SOLOWAY: So, Your Honor, the plaintiffs had an affidavit attached to their complaint by an expert that they had retained at the time, Ms. Wright. Ms. Wright is not coming to trial, but certain of her opinions are in conflict with aspects of the case they intend to present, and her affidavit was attached --

THE COURT: Well, when we get there we'll fight about it then.

MR. MELSHEIMER: Might we -- as to motions in limine 2 and 3 there are kind of broader issues around that that Ms. Cortell was going to address with the court, would

now be a good time --

THE COURT: She, like, is welcome to address at any time. It would probably be better to let her sit at the table. Since I've known her now for longer than any of y'all that would have been good. That's okay.

She's very thoughtful and will not be fussy. I know her.

MS. CORTELL: Your Honor, I'll try to be brief.

THE COURT: All right. Let me find it. I kind of lost track there for a minute.

MS. CORTELL: This overlaps really. I have some legal issues.

THE COURT: Are you on 2?

MS. CORTELL: Yeah, 2 and 3. I want to talk with the court about some legal issues --

THE COURT: Make sure you talk into that microphone.

MS. CORTELL: Sorry. Can you hear me now?

THE COURT: I can.

MS. CORTELL: This overlaps with the motions in limine. There's just some legal underlying threshold issues that we need to present to the court and get your ruling on --

THE COURT: Okay.

MS. CORTELL: And we really think both sides will

benefit from that, because we need you to clarify what the claims are to be tried.

I know you said we could object, but to preserve that there would have to be so many objections throughout the trial that I don't think that's practical, so a ruling today would be very helpful on that.

THE COURT: Okay.

MS. CORTELL: It would streamline the trial and just overall create more efficiency I think for the court and for the parties.

By way of background, I think the court recalls there are three claims in this case, one regarding the Rocky Mountain dry gas in Colorado and then the Kearl bitumen up in Canada. We believe, and this is pretty fundamental, that there's a fatal disconnect with the claims they are now urging. And when I say "now urging" I'm saying claims that were not in their complaint, claims they are now urging, that there's fatal disconnect between those claims and rulings by this court. And if I just could go into that briefly -- again, it impacts the MILs.

THE COURT: You bet.

MS. CORTELL: First, and most glaring, has to do with the Rocky Mountain dry gas and the reason is that it's irrevocably tied to a 2017 disclosure that they're calling a collective disclosure that this court ruled at class

certification is not a corrective disclosure for purposes of this case. So it should be a hard stop there.

THE COURT: January 31.

MS. CORTELL: Good for you, Your Honor.

THE COURT: We've been working on this, too.

MS. CORTELL: I can tell.

THE COURT: We've got scary smart lawyers, too.

MS. CORTELL: I'm super impressed.

At class cert you held it is not associated with statistically significant negative price reaction, and so you threw it out as a corrective disclosure for purposes of this case. And now they're trying to circumvent the class cert ruling where you rejected the January 2017 announcement and re -- reapply it here to their reinvented Rocky Mountain claim.

THE COURT: All right.

MS. CORTELL: We don't think they can. But there's an additional problem they have got. Their expert ties damages only to the January 17 disclosure that they're not entitled to rely on and has disclaimed damages relating to the only corrective disclosure that's still in the case, which is the October 28, 2016. So we think this is just a fatal disconnect, Your Honor, with this court's ruling on the January 31, 2017 filing that they rely on.

With regard to the Kearl claims, and I'll go through it

25

quickly, there's a further disconnect because they're relying on claims that are not in their complaint, that were not a part of the class certification process and were not certified by this court, and we just don't think they can do it.

So as to the proved reserve theory they're now relying on year-end 2015 but their complaint relies on a different year, Your Honor, 2016. So they have switched the years they're relying on for that claim. This is not the subject of that class certification order. We don't think they can switch their claims at this point.

In terms of the Kearl profitability theory they used to rely on four months, November 2015 through April 2016, which is a four-month period, and now they're claiming lack of profitability, should have been disclosed for the entire year 2015. So, again, we have disconnects in this case because they're relying on claims that were not in their complaint, not certified by this court, and therefore not proper for class treatment.

The 303 I think you've reserved for further --

THE COURT: Yes.

MS. CORTELL: -- discussion. All I'll say there, again, we think there's a disconnect, because this court dismissed that claim at the dismissal stage of that case and now they're offering expert testimony that backdoors the 303

26

back into the case, and we don't think they can do that.

I'll end as I started. I think the most important thing, Your Honor, honestly, is that we get a ruling that will help the whole case. It will help them. It will help us.

THE COURT: And if I'm wrong you can correct it later?

MS. CORTELL: Well, I didn't say that, Your Honor.

THE COURT: Heaven forbid. But I am very serious. No. I agree with you. And let me tell you where I am on it.

MS. CORTELL: Okay.

THE COURT: I think even though the disclosure occurred outside the class period it's still relevant to loss causation, because the findings regarding reliance and loss causation and class certification I don't think, unless I'm wrong on this, have bearing on the merits. I'm relying on, I want you to know, correct me if I'm wrong before we get to it, this Alaska Electric case, 572 F.3d at 229. So I think you can still challenge market efficiency, but I think plaintiffs may attempt to establish loss causation, including through the use of the January 31, 2017 disclosure.

So I think this motion on that regard is denied, but you can reurge it. I'm ruling against you at this time, but if I'm wrong, when they try to get there, then correct me, and just raise it at this time. So that's the case I'm relying

27

on, Ms. Cortell, and if you and those other scary smart lawyers with you correct me -- okay?

MS. CORTELL: Probably for another time, but scary smart lawyers are at this table to fully discuss Flowserve, which I have a vague memory of, having been in the case.

We don't think it's --

THE COURT: I get it. I struggle with that. I'm not going to kid you. I think that's a tough issue. And believe it or not, I could be wrong about that. And so let me know. I'm telling you what I'm relying on and so we'll look at that again.

MS. CORTELL: Thank you, Your Honor.

That's perfect.

MR. BURKHOLZ: Your Honor, if I could just give you a view of Flowserve, I think what Flowserve says, I think the Fifth Circuit's decision, is the class cert -- class certification determination pursuant to Rule 23 has to be made by the court. It is conclusive for purposes of class certification, the plaintiffs don't get to do a do-over because they get a different witness who comes in with a different model.

THE COURT: Well, I agree with that.

MR. BURKHOLZ: Okay. So you have determined in your class certification ruling that there's no price impact associated with the January 2017 corrective disclosure, so we

28

rebutted the presumption of reliance and it can't proceed on a classwide basis.

At most they could try and demonstrate individual reliance on behalf of the named plaintiff, but they haven't -- they haven't asserted that theory of individual reliance. They -- in their complaint, in their jury charge they say they're relying on the fraud-in-the-market presumption. Your finding has already determined -- determined that they're not entitled to rely on a fraud-on-the-market presumption as to that --

THE COURT: As to the class certification, not as to merits.

MR. BURKHOLZ: That's correct.

THE COURT: And so we're going to still fight about that when we get there

MR. BURKHOLZ: Thank you, Your Honor.

THE COURT: All right. 3 -- you want to say something about 3, Ms. Cortell?

MS. CORTELL: Let's see.

Yes, Your Honor, that has to do with the Kearl claims. Right?

MR. BURKHOLZ: Yeah.

MS. CORTELL: Yeah. So the Kearl claims are the ones I talked about where they changed the year --

THE COURT: Yes.

App. 11

29

MS. CORTELL: On the reserve claim, in their complaint they're talking about 2016 and now they're talking about -- sorry.

Should I start completely over?

THE COURT: No. I heard you.

MS. CORTELL: Okay. So one of the claims, again, is different than what they had in their complaint, which is what this court certified. And so on the reserve claim, as I said, they're relying on --

THE COURT: You think they're unpled?

MS. CORTELL: Unpled and uncertified. So if they're going to go to trial on those claims it has to be individual claims, it can't be class, because these claims were not before the court when you certified a class in this case. So if they go forward individually -- but they can't go forward as a class. They were not part of the class certification order. Neither Kearl claim.

THE COURT: I disagree. I think those are pled.

All right. Exclude Darryl Egbert. No, I'm not excluding him.

And he's the whistleblower, right?

MR. SAHAM: Yes, Your Honor. He's the one --

THE COURT: Just yes or no.

MR. SAHAM: Exxon employee who spoke --

THE COURT: Is that a yes?

PAMELA J. WILSON, CSR/RMR/CRR
U.S. DISTRICT COURT - 214.662.1557

30

MR. SAHAM: Yes, Your Honor.

MR. MELSHEIMER: No.

THE COURT: He's not a whistleblower?

MR. MELSHEIMER: He's not a whistleblower. There's not a whistle to blow anywhere around him.

THE COURT: Okay. Whatever he is, I'm going to let him testify.

He's a former Exxon employee, we can agree on that?

MR. MELSHEIMER: Yes, sir.

MR. SAHAM: Yes, sir.

THE COURT: I can't believe I got y'all to agree on something.

5, okay, these are other oil and gas corporations on their assets '14, '15, '16, I'm denying that. I do think -- I think it makes a difference. And they want to contrast those decisions -- and we'll, you know -- I think that goes to weight versus admissibility. And y'all can reurge it, those objections, at the time.

All right. 6. Oh, this is on the Headington Royalty Trust, and I'm -- I think it could be relevant to whatever misstatements on the natural gas operations in Rocky, so I'm denying that, but you can make an objection at the time and I'll look at it again.

On this limine 7, they really want to use just this one line. They can't go into all these other things about Exxon

PAMELA J. WILSON, CSR/RMR/CRR
U.S. DISTRICT COURT - 214.662.1557

31

was -- because of their human rights --

MR. SAHAM: Well, --

THE COURT: Are you going to listen? But this business about replace reserves, whatever, you can go into that. So I'm warning you, y'all start, you know, going into that other, I'll stop you.

Okay. 8, deny. And this is regarding Mr. Tillerson and he had this other email address. If you still want to address it at the time he's called, let me know. At this time I'm denying that. But maybe there's -- maybe there's something that I don't know about that, that you need to tell me, judge, that shouldn't come in because of this or that.

MR. LONG: That's fine, Your Honor. Thank you.

THE COURT: All right. And then limine 9, yeah, we may still have to fight about this at the time, but how far y'all want to go into that, I mean, y'all want some of that in the New York trial and they want some of it, right.

And you just want different things?

MR. BURKHOLZ: This is actually the issue with the redactions that we addressed previously.

THE COURT: Is it?

MR. BURKHOLZ: I think we both agree the New York Attorney General case shouldn't come in.

THE COURT: Y'all work on those redactions and I'll rule on them.

PAMELA J. WILSON, CSR/RMR/CRR
U.S. DISTRICT COURT - 214.662.1557

32

MR. SAHAM: We will, Your Honor. But what's good for the goose should be good for the gander. They shouldn't be able to ask about other litigations they have been involved in if we can't ask --

THE COURT: Bring that goose in and we'll see.

MR. BURKHOLZ: I would disagree with that last comment.

THE COURT: May or may not be goose and gander. I used to make those same arguments, too, you know, whatever, Your Honor, these are grapefruits, not oranges, whatever. Those are great arguments to make, I just don't because those analogies sometimes work, sometimes they don't. And so we'll see when we get there if it's really goose and gander. And remind me when we get there and, judge, I told you it was. Okay?

MR. SAHAM: Yes, Your Honor.

THE COURT: Y'all work on those redactions.

Do you have somebody working on those now?

MR. BURKHOLZ: We'll get somebody started right away. I think it would make most sense if whoever is offering a document take a crack at redactions. It's not terribly controversial what should be redacted.

THE COURT: Okay.

MR. BURKHOLZ: We don't know what documents they're offering, of course.

PAMELA J. WILSON, CSR/RMR/CRR
U.S. DISTRICT COURT - 214.662.1557

App. 12

33

THE COURT:  What were y'all going to say?

MR. SAHAM:  We'll do that.  If we feel there's an appropriate redaction on a document we'll have it in there.

What were you going to say?

THE COURT:  When we have juries in here I don't want five lawyers jumping up.  Just one at a time.  Don't do that to them.  You can do whatever you want with me, within limits.

Okay.  What number are we on?  Are we down to 10?

MR. BURKHOLZ:  We're on 10, Your Honor.

THE COURT:  We're what?

MR. BURKHOLZ:  We're on number 10.

THE COURT:  This is your credit rating?

MR. BURKHOLZ:  Well, this is -- this is a motion that experts should be confined to the opinions they expressed in the -- in the report, shouldn't be able to introduce new analyses that were not the subject of their expert reports.

THE COURT:  I'm denying that.

Okay.  11, 6, exclude regarding intentions, motivations, states of mind, that's overbroad.  Y'all are going to have to object at the time on that.  I mean, maybe, but you're going to have to pin it down a little more than that.

Okay?

And their compensation what -- do y'all really need

---

34

that?

MR. SAHAM:  Yes, Your Honor, I believe the two individual defendants, it's in their proxy, it's publicly available information, the jury is entitled to know how much compensation they were making during the years at issue.

THE COURT:  And Mr. -- go ahead.

MR. MELSHEIMER:  Careful.

Mr. Tillerson and Mr. Rosenthal and Mr. Swiger, Your Honor, the fact of compensation certainly is relevant to bias, but the cases that we've cited are pretty good that the amount of it has the risk of being unduly prejudicial.  So we would simply ask that -- and also, Your Honor, it's important to remember, this isn't a case where the defendants traded stock.  So the typical case where this comes up is that somebody -- that there's some false statement and then someone benefits --

THE COURT:  Yeah, you have an outlaw --

MR. MELSHEIMER:  We don't have that here.  There's no allegation that anyone traded stock.

THE COURT:  You're just saying because they got paid a lot that might prejudice the jury?

MR. MELSHEIMER:  The amount I think is more prejudicial than probative.  All they need to show is some bias.  They can show you were employed by Exxon, you were a CEO, and they were compensating you.  I think if you go into

---

35

the amounts that would be very unfair to the witnesses.

MR. SAHAM:  Your Honor, based on --

THE COURT:  I'm going to let you do it.

Okay.  This business about being able to pay a large judgment, I think Exxon when we started this trial was the largest company in the world.  Are they even in the top 20 today?

I mean, looking at Nvidia and -- I don't know.  I don't really care.  I'm just saying the world has changed and it's not -- it's just not the same.  I mean -- I mean, I've had Facebook in front of me.  They're bigger.  Nvidia is bigger.  Apple is bigger.  Probably a bunch of these other companies.  I don't know.  **Maybe whatever Peter Thiel is doing is probably bigger.  Musk is bigger.  All those are bigger.  I know they're bigger.  Even the one that Palmer Luckey is head of now.  Y'all probably don't know what that is, Peter Thiel put the money up for that.  They make drones used in the Ukraine.  They even make drone submarines.  Kind of a different -- I'm not sure -- I think if I were defendants I'd put that in, but that's just me.  I'm not representing Exxon.  It's not the same, everything is different.

MR. MELSHEIMER:  Well, we agree with that, Your Honor, of course, but it's also the case that we just don't want them throwing around the relative wealth of the corporation as an argument that somehow they can take it --

---

36

THE COURT:  Well, let me tell you how I want you to answer that.  I'm going to let them put that in, but you can answer it and say, wait a minute, in relation to other companies, this case is --

MR. MELSHEIMER:  Just a poor widow?

THE COURT:  I wouldn't use that term.  I would say maybe a South Irving boy versus something, you know, a poor widow.  I wouldn't use -- that's going a little far.  Okay?

I don't think that's going to work.  But you might be able to -- I'm just saying you can answer it, and I think you ought to answer it forcefully.  They have every right to go into the financials, but it's just not the same.  I mean, the numbers are so big now.

Here's what I would say, they're not sending any rockets to the moon.  You know, they're not.  They're out there looking for more oil and gas.  I'm assuming.  They just bought the company down the street from where I live, Pioneer, so they're doing that, and -- and should be.  That's the business they're supposed to be in.

MR. MELSHEIMER:  All right.  Thank you, Your Honor.

THE COURT:  Sorry.  I kind of got carried away there.  Maybe my analogy is not any better than yours.

MR. MELSHEIMER:  Yours was better, Your Honor.

THE COURT:  Oh, yeah, that's what you're going to say.

**App. 13**

Newspaper articles that come with a -- yeah. Yeah. Limited not offered for truth of the matter, yes. Grant on 15.

Size of your legal team, yeah. But you've taken my whole conference room, but that's not the first time. I don't think they will do that. They got a pretty good-sized team themselves.

There's no way to determine admissibility of the . . .

Oh, summary charts. You know, that kind of depends. It kind of depends on what you're going to try -- if you're trying to slip in things that aren't admissible in a summary chart, no, I'm not going to let you do that.

Who's got summary charts, both y'all? Both sides?

MR. SAHAM: Yes.

THE COURT: You do, too?

MR. MELSHEIMER: Your Honor, we have what we believe are proper 1006 summaries and we believe their charts are -- you can see what I'm --

THE COURT: Well, let me look at them at the time. But I'm warning you, I mean, I've had this over and over again. I didn't ride in on a load of vegetables today, so I know you're attempted to include things in there that I would exclude otherwise. Look at 'em. Look at 'em hard and make sure that you're not trying to do that, because I'd hate for you to have to redo your chart. I'm assuming some kind of

---

big thing, or is it on the computer?

MR. SAHAM: Both, Your Honor. But we will look at them very carefully.

THE COURT: I mean that. They will be objecting saying, see, judge, here's what they're doing. And you do the same with them.

I'm sure you wouldn't try to put any excluded evidence in yours, would you, Mr. Melsheimer?

MR. MELSHEIMER: I would not, Your Honor.

THE COURT: Okay. All right. All right. Good. I think that's it.

MR. MELSHEIMER: Your Honor, can I raise just a procedural issue about --

THE COURT: Yes

MR. MELSHEIMER: -- one of the court's rulings?

So I appreciate what the court has said about objecting when the evidence comes in and we'll do that appropriately and efficiently.

THE COURT: Yeah, let's take a break with the jury. Let's don't do it in front of them.

MR. MELSHEIMER: So they are going to open on these things. I've never objected to anyone's opening statement. I don't intend to make this the first one.

So can we get an understanding that we don't have to stand up to object if they argue or preview something that we

---

have asked the court to keep out?

THE COURT: You want me to just be watching and --

MR. MELSHEIMER: We'll object after it's done. I just don't want to interrupt --

THE COURT: That's fine with me. Whether that procedurally is enough for the Fifth Circuit, that's a risk you take.

MR. MELSHEIMER: But it's fine with Your Honor?

THE COURT: It's fine with me. I just know the Fifth Circuit has got a bunch of young, tough judges over there, so get ready, and some older ones that are pretty tough, too, and some others in the middle.

But, anyway, we'll start about this time every day.

We'll break at about 10 -- 10:00 to 10:30.

I don't like y'all just approaching the bench every five minutes, please don't do that.

If I need to talk to y'all about something, I will bring you around here. I don't put that on the record, but I'm willing to put it on the record later if there's something said you go "I need to put that in the record," fine. I'm not trying to keep y'all from putting anything you want in there. I just don't do it while we're right there.

Let's see, what else?

We -- oh, y'all know that Stretch Armstrong rule?

MR. MELSHEIMER: Your Honor, might I ask about

---

clarification of the rule?

THE COURT: Yes. You want to get up there and I'll show you?

MR. MELSHEIMER: May I?

THE COURT: Yes.

MR. MELSHEIMER: Where are we measuring from?

THE COURT: Get over here.

MR. MELSHEIMER: Are we measuring from here (indicating)?

THE COURT: Yes.

MR. MELSHEIMER: That was my question.

I didn't know if we were measuring from here (indicating).

THE COURT: I really should call it the Mark Lanier rule, lawyers that would get into the box if I would let them.

MR. MELSHEIMER: Thank you, Your Honor.

THE COURT: I don't think there's any other -- all right. Now, let's go into exhibits.

Y'all didn't agree to very many exhibits. It's kind of like y'all didn't do your redactions. What were y'all doing while y'all were charging a bazillion dollars on both sides?

It's okay. I'll live with it. I've been living with this case since I was tall and good looking. It's been a while.

App. 14

41

MR. MELSHEIMER:  You still are.

THE COURT:  What?

MR. MELSHEIMER:  You still are.

THE COURT:  Yeah.

MR. SAHAM:  Your Honor, one suggestion I would have with the exhibits that may eliminate a bunch of Mr. Melsheimer's objections, Your Honor, ruled on the profitability about Kearl and that's in the case, and they have objected 401, 403 to about 50 reports that show Kearl was not profitable, and I'm not sure if Mr. Melsheimer --

THE COURT:  When you get there tell me that.

MR. SAHAM:  I will.  And there will be one right at the beginning with Mr. Swiger.

THE COURT:  We'll do that.  We'll do that.

If it's going to be long and deal with a bunch, just say, "Your Honor, we may need to let the jury out during this part" anything like that, and we'll do it.

Okay.  So all of the exhibits that y'all have agreed to are -- let me see if I can find that list.  Just a second.

I don't think I have that case.  Nope, I don't.  Do I?

Do I have it?

This?

Could y'all have typed it any smaller?  I mean, this is pretty big print.  I mean, I might be able to -- I'm going to call down to A&M where my mother-in-law ran the electron

PAMELA J. WILSON, CSR/RMR/CRR
U.S. DISTRICT COURT - 214.662.1557

42

microscope and try and have her look at this where I can read it.  Gosh, y'all.  Unbelievable.

Any, these exhibits, all this is what were agreed, both sides, it was filed on your agreed exhibit list, you don't have to go into and you don't have to -- I will tell the jury those in that list means they're already admitted into evidence.  I'm going to tell the jury that.  Okay?

MR. SAHAM:  That's fine.

MR. MELSHEIMER:  Yes, Your Honor.

THE COURT:  That list is it.  Those are all admitted into evidence.

Now, here's the question.  Do you want them admitted now?

What if you don't use 'em?

Do you want 'em as part of -- part of the -- even though you don't make reference to 'em?

MR. SAHAM:  That's fine with us, Your Honor.

Yes, Your Honor.

MR. MELSHEIMER:  Your Honor, our view is if the exhibit is not used at the end of the trial, if no one has talked about it --

THE COURT:  That's what I'm talking about.

MR. MELSHEIMER:  -- it should be excluded.

THE COURT:  Why wouldn't you exclude that?

The jury has never heard about it.

PAMELA J. WILSON, CSR/RMR/CRR
U.S. DISTRICT COURT - 214.662.1557

43

MR. SAHAM:  I said, Your Honor, yes, that's fine with us as well.  Either way.

THE COURT:  Then that's what we'll do.  I thought that's what both sides would want.

Even though they're preadmitted, if you don't use them they're not really part of the trial.  We agree on that.

MR. MELSHEIMER:  It's just a mess in the record --

THE COURT:  It's what?

MR. MELSHEIMER:  It's a mess on appeal if you have a situation --

THE COURT:  It is a mess on appeal.  Remind me at the end, I'll renew that and make sure the Fifth Circuit understands and I've got it in the record.

Okay.  Let's see.  Anything else?

The rule has been invoked, so y'all know what the rule is.  But I did say you can talk to -- lawyers can talk to their witnesses, they just can't hang around the courtroom.

Let me think what else.

Okay.  Let me talk to you first off the record, then I'm going to put it on the record.

(Discussion off the record in open court.)

(Back on the record.)

THE COURT:  Both sides agree they will supplement the jurors' pay a hundred dollars a day for each day they serve, including deliberations, and you will pay for their

PAMELA J. WILSON, CSR/RMR/CRR
U.S. DISTRICT COURT - 214.662.1557

44

lunch.  You will split that 50/50.  And the government pays $50 a day and then it goes to $60.  And then I've appointed James Stanton as a Special Master for this very limited purpose of this, and that he can talk to each of y'all separately if you have a question about any of this.  I doubt you will, but if you do.  Other than that, there's not really anything about that that he will be doing.  I do not intend for him to make any money out of this.  He's doing it as a service to the court.

Mr. Bradley, are you standing up because you need something?

MR. BRADLEY:  A clarification, Your Honor.

And I apologize for being extremely poor in math, but will that be compensation in the amount of $150 or 160 or $100 total with what both sides are --

THE COURT:  I probably didn't make that clear.

You each will pay half of a hundred dollars, regardless of what the government is paying.

MR. BRADLEY:  Yes, Your Honor.

THE COURT:  Anything else on that?

I don't think so.

Okay.  Let's go into anything else that y'all want from me.

On your opening statements what did I tell y'all you could have?

PAMELA J. WILSON, CSR/RMR/CRR
U.S. DISTRICT COURT - 214.662.1557

App. 15

45

No.  No.  Don't push it.

MR. MELSHEIMER:  You said 40 minutes, Your Honor.

THE COURT:  You asked for 90, didn't you?

MR. SAHAM:  I did, Your Honor.  But I was corrected by a judge that 40 is appropriate.

THE COURT:  Look, if y'all will move the case along, I'll give you 45 minutes each.

MR. SAHAM:  Done.

THE COURT:  But you got to move the dad-gum case along.  Okay?

MR. MELSHEIMER:  We're going to make it, Your Honor.  We don't need the extra five minutes to do that.

THE COURT:  All right.  I'm going to give you five just because I like you.

MR. MELSHEIMER:  Thank you.

MR. SAHAM:  Thank you, Your Honor.

MR. MELSHEIMER:  Why are you giving it to him?

THE COURT:  I'm only giving it to him because he hasn't harassed me.  No.

Off the record.

(Discussion off the record in open court.)

(Back on the record.)

MR. MELSHEIMER:  Are the jurors allowed to take notes?

THE COURT:  They can.  Sure.

46

MR. MELSHEIMER:  Will the court provide them with pen and paper?

THE COURT:  I will.

Are y'all's accommodations okay?

MR. SAHAM:  Yes, Your Honor.

THE COURT:  Y'all can bring bottled water in there.

And talk to your witnesses about the jury chair.  That chair is uncomfortable.  It doesn't move.  It spins around, but it doesn't go back and forth, so they will have to lean up a little bit into the microphone, like this (indicating).  You might tell them that.  I'm sorry there's no other way to make that work.

And with regard to charts, and how you're going to show 'em that aren't on the big screen here, let me know how y'all intend to try to do that, so that Pam can still see 'em, I can see 'em, and the jurors can see 'em, but we don't block other people.

The other thing I'm going to let you do, if the other side is showing something and for whatever reason you can't see it and you need to get up and walk around, I'll tell the jury that's fine.  Y'all get up and walk around.  Okay?

MR. MELSHEIMER:  Thank you, Your Honor.

THE COURT:  What else?

MR. MELSHEIMER:  Your Honor, I wonder if we might agree that given that we're going to spend the afternoon on

47

the jury selection process that we would just agree to do --

THE COURT:  Yeah.  We won't do them today.  We don't have time to do them today.  As much as I would like to, I don't know that we'll get it done.

Now, let me tell you my conclusion with regard to owning Exxon stock.  So y'all correct me if I'm wrong -- if I'm wrong about this.  So you scary smart book-lawyers, Ms. Cortell, and her ilk -- ilk isn't the right word -- her other very scary smart lawyers, if you've ever owned Exxon stock that doesn't exclude you, unless it's during the period that we're talking about here.  Okay?

So those people will be in a class by themselves, well, because you did, whatever, you know, we'll talk to them separately.  They will be in the same sort of box as those that -- like me, who have never owned Exxon stock.  But do you have some bad feeling about Exxon -- or Mr. Tillerson, did he race his car out of your neighborhood or did you run into him down at Horseshoe Bay or one of these other places that he hung out -- I just happen to know he had a house at Horseshoe Bay next to a house I rented one time.

Now, if they own stock today, they're out, done, case on point, can't serve.  Period.  That makes it reversible.  I've got a point.  I'll give it to you.

I think that's the three buckets.

Any more buckets?

48

I don't think so.  So if y'all disagree with that, let me know.  That's why we've got all these -- this whole courtroom will be full of people.

Yes, I'm the one doing the voir dire.  And if any of the jurors begin to preach, I will stop them.  Well, judge, let me tell you my opinion what I think about those big oil companies or anything like that, I will stop them.  We'll talk about it up here at the bench.  How that works is the lawyers have to stand wherever they have to stand, but the juror, prospective person, the venireperson, will need to face Pam.  That's the way it works.  And y'all figure out where you're going to stand.  I don't care where you stand, as long as we can hear you.

I don't know what else I need to -- I need to ask y'all.  Anything?

Yes, sir, Mr. Bradley.

MR. BRADLEY:  Judge, I have one other question.  I apologize if this seems too simple.  But will the jurors be able to take their notes into the deliberation room?

THE COURT:  Yes.

Okay.  There's bound to be some more stuff y'all want to know.

I'm okay with that.

Make sure you talk into those microphones, because -- and I'm going to turn these air conditioners off over here.

**App. 16**

I'm going to try -- let's see, right now it's -- it's 73 in here. It will get warmer. But I will turn them off when the jurors -- because you won't be able to hear them.

MR. BURKHOLZ: Quick question about the juror questionnaire. Are we going to get questionnaires with their names and addresses on them?

THE COURT: Yes. Absolutely.

You don't get to keep those after the trial.

MR. BURKHOLZ: Understood.

THE COURT: They all come back to me.

MR. MELSHEIMER: Your Honor, I just wanted to clarify that Ms. Childress is the corporate representative for Exxon during the trial, so she'll be here as the corporate rep and we'd like her introduced as the representative.

THE COURT: I will. Great. I absolutely will.

Do you want me to only represent some of the lawyers, not all the lawyers?

MR. MELSHEIMER: Well, our --

THE COURT: I don't care. Just give me a list.

How about y'all's side too?

Whoever you want to introduce.

MR. BURKHOLZ: We have our client, the plaintiff.

THE COURT: I know you do. But give me a list of whoever you want me to introduce. I went through everybody,

---

like those precious folks in the back who are doing all the heavy lifting. I'm still chivalrous. I saw some guys standing around and some ladies having to carry heavy things. I don't care how far we go on feminism, guys, get off your duff and do some stuff. Okay?

I'm just telling you.

Okay. Anything else?

Oh, y'all want me to take judicial notice of a bunch of stuff. I'm not going that far and doing that judicial notice. It's too far.

What's the matter, Ronnie?

MR. MELSHEIMER: Oh, yes. I have something, Your Honor, that Mr. Jacobson kindly reminded me of.

THE COURT: Ronnie Jacobson has saved many a lawyer.

MR. MELSHEIMER: And I appreciate it deeply.

Your Honor, we have two props that are --

THE COURT: You want to use that jar of whatever?

MR. MELSHEIMER: It's a jar of bitumen and it's a core sample from the Rocky Mountain fields. Will you alert the people --

THE COURT: Ronnie will.

Do you have props you want to use?

MR. SAHAM: Yes. And we also have a barrel --

THE COURT: Okay. I have to tell y'all, I made a

---

little trip to Alaska and went to see the judge who tried the Exxon Valdez and he had something in a jar, I guess probably like yours but different -- in a different context there on his desk. And, you know, whatever. He didn't have any ducks on there that had been wiped down, but whatever. Exxon has been involved in a lot of different law making. And we appreciate it. Very much.

MR. MELSHEIMER: We're here to help, Your Honor.

THE COURT: Thank you.

I can't think of anything else.

I'm going to miss trying Exxon cases after this. It has been -- it's been a very interesting time for me. The pilots' case was one of my favorites. Who got to fly?

I don't know if any of y'all handled that.

Did you handle that?

MR. BURKHOLZ: I did not, Your Honor.

THE COURT: I don't know who handled that for y'all, that was an interesting case. I don't know who the other ones have been. All kinds of stuff.

I guess I'll see y'all again on other companies, correct? Maybe?

MR. SAHAM: Yes, Your Honor.

THE COURT: All right. Okay. Well, good.

You know you can use your rooms and eat in there. I'm fine with that. Just try at the end of the day to clean it

---

up a little bit. Okay. And if I hear the Doors music coming out of there, I'll know I need to intervene. Okay?

Other than that, I don't care what y'all do back there. And the chairs don't really fit in the big room how they should, so kind of be thoughtful about how you bang those around. I don't think there's anything else in there.

Oh, what about these -- business on this judicial notice? It goes too far. I'm not going to judicially notice a whole book. When you get ready for this I'll judicially notice certain things, but I can't do a whole book.

MR. MELSHEIMER: Your Honor, would it be permissible to preview regulations in opening that we expect the court will take notice of or that the witnesses will talk about.

THE COURT: I would assume you don't care about that. You're going to go into the same stuff.

MR. SAHAM: As long as they're allowed to do it and we're allowed to do it.

THE COURT: Oh, no. I'm going to give them a leg up. Of course you're allowed to do it.

MR. BURKHOLZ: Your Honor, I hate to keep going, I know we've got to get the jury up here, but there's three judicially admitted stipulated facts. Is there a particular way that you want us to present that witness --

THE COURT: I will read that to the jury. Okay?

**App. 17**

And those stipulations, y'all agree to them, they are admitted, yes?

MR. BURKHOLZ:  That's correct, Your Honor.

THE COURT:  All right.  I don't think I have those right in front of me, but we'll kind of go from there.

And y'all have worked on the charge with my staff and we've got all that I think done.  Right?

MR. SAHAM:  We've submitted competing instructions.

THE COURT:  Yeah.  Should.  Competing.

Okay.  All right.  Okay.  Good.  All right.  Well, we'll -- we'll get the jury up here.  Maybe we can get -- I don't know, can we get anything done before lunch?

I hope so.  I hope so.

I've got to be out of here by about 11:30 for my noon meeting.

Okay.  Thank y'all.

THE SECURITY OFFICER:  All rise.

(Recess taken at 10:15.)

PAMELA J. WILSON, CSR/RMR/CRR
U.S. DISTRICT COURT - 214.662.1557

AG 12:9, 12:25, 15:14
ago 14:6
agree 12:8, 12:10, 13:8, 13:9, 13:11, 13:20, 13:24, 14:4, 14:20, 14:21, 15:5, 15:18, 26:2, 27:14, 29:25, 30:3, 31:14, 35:11, 40:8, 42:18, 43:10, 46:12, 46:13, 52:10
agreed 12:13, 18:22, 41:6, 41:16, 41:17
agreement 15:14
ahead 33:20
air 48:12
airline 17:21
Alaska 26:10, 50:11
alert 50:5
Alex 1:43, 11:9
aligned 18:10
Allison 10:12
allegation 34:8
allowed 46:10, 52:1, 52:2, 52:4
Almost 9:12
already 27:25, 41:19
although 15:13
Americas 2:35
Amitav 2:32, 9:1
amount 33:24, 34:11, 44:1
amounts 34:15
analogies 32:4
analogy 36:11
analyses 33:8
ANDREW 1:18
Angulo 11:14
announcement 24:7

answer 35:16, 35:17, 35:24, 35:25
anyway 10:8, 39:2
apologies 20:14
apologize 20:6, 20:8, 43:25, 48:5
appeal 42:21, 42:23
Apple 35:1
appointed 43:14
appreciate 38:5, 50:1, 50:17
approaching 39:4
appropriate 32:20, 44:17
appropriately 38:6
area 7:13, 15:1, 20:22
argue 38:14
argument 20:17, 35:14
arguments 32:1, 32:3
Armstrong 39:13
around 21:20, 29:22, 35:13, 39:7, 43:4, 45:20, 46:7, 46:8, 49:14, 51:16
articles 36:15
aspects 21:15
asserted 27:22
assets 30:6
associated 24:3, 27:17
assume 51:24
assuming 36:5, 37:14
athletic 10:5
attached 21:7, 21:12, 21:16
attempt 26:12
attempted 37:11

Attorney 13:12, 19:4, 31:15
Audra 2:28, 7:1
AUSTIN 2:13
available 17:5, 33:18
Avenue 2:3, 2:35, 2:47
away 5:25, 32:12, 36:10

< B >
B. 1:43, 2:1, 2:2
Back 20:12, 20:13, 25:19, 43:9, 45:9, 45:21, 48:22, 49:12, 51:13
backdoors 25:18
background 23:5
bad 47:3
BALON 2:1, 2:2
bang 51:15
Baptists 9:17
Barnes 10:11
barrel 50:9
based 13:6, 34:16
basis 27:19
basketball 9:24
Bay 47:5, 47:7
Baylor 19:7, 19:8
bazillion 40:10
bearing 26:8
begin 47:17
beginning 41:1
Behalf 1:7, 27:21
believe 17:23, 23:8, 27:1, 30:3, 33:16, 37:5, 37:6
bench 39:4, 47:20
benefit 22:20
benefits 34:5
best 11:17

bet 23:15
better 21:24, 36:11, 36:12
bias 33:23, 34:13
BIERL 1:44
big 36:2, 37:14, 41:12, 46:1, 47:18, 51:14
bigger 34:25, 35:1, 35:3, 35:4
bit 13:10, 14:15, 45:22, 51:11
bitumen 23:7, 50:4
bless 4:8, 6:2
block 46:3
blow 29:22
BOGGS 2:46
book 51:19, 51:20
book-lawyers 46:19
Boone 2:23, 9:8, 9:9, 9:11
bottled 45:18
bottom 11:12
bought 36:5
Boulevard 1:35
bound 48:8
box 40:4, 47:1
Boy 14:2, 35:21
Brad 11:13
BRADLEY 2:1, 2:2, 4:16, 4:17, 10:21, 11:16, 11:18, 43:22, 43:24, 44:6, 48:3, 48:4
break 38:8, 39:3
Brian 10:12
brief 22:3
briefly 23:13
Bring 7:17, 15:16, 17:15,

54

< Dates >
April 2016, 25:6
APRIL 27, 2026 1:28, 4:1
four month, November 2015 25:6
January 17 24:13
January 2017 24:7, 27:17
January 31, 2017 24:18, 26:13
January 31. 23:22
May 31:25, 39:18
October 28, 2016. 24:16
$100 44:1
$150 44:1
$50 43:14
$60 43:14
(214)758-1500 2:49
**maybe 35:2

< 0 >
00 39:3

< 1 >
1 12:8, 15:13, 19:15
10 18:9, 32:25, 33:1, 33:3, 39:3
100 2:41
10019-6064 2:36
1006 37:6
10:1515.) 53:2
11 18:9, 33:10, 52:23
1100 3:14
11910 2:3
12 18:12, 19:9
1285 2:35

13 19:10, 20:9
13th 3:14
14 19:11, 30:6
15 19:12, 30:6, 36:17
1500 14:12
16 19:13, 30:6
16-CV-03111-K 4:12
160 44:1
1900 1:47

< 2 >
2 16:9, 21:20, 22:8, 22:9
20 34:20
2015 24:25, 25:9
2016 25:1, 28:19
2017 23:18
212 2:37
214 1:37, 2:19, 2:26, 3:17
220 2:3
2200 2:47
229 26:10
23 27:9
2300 2:17, 2:24
231-1058 1:49
24- 17:6
2601 2:17
2801 2:24

< 3 >
3 16:10, 21:20, 22:9, 28:9, 28:10
30 39:3, 52:23
303 19:18, 25:13, 25:18
373-3000 2:37
3811 1:35
3: 1:15, 4:12

< 4 >
4 16:11

40 44:14, 44:17
401 40:22
403 40:22
4100w 2:47
45 44:19
48-hour 17:6

< 5 >
5 16:12, 30:5
50 9:12, 40:22
50/50 43:13
546-5400 2:43
572 26:10

< 6 >
6 16:13, 30:11, 33:10
6-CV-03111-K 1:15
619 1:49
651-5000 2:26
655 1:47
662-1557 3:17

< 7 >
7 16:14, 30:16
7084 2:41
713 2:43
72 18:4
72-hour 18:7
73 48:13
744-3300 1:37
75201 2:18, 2:25, 2:42, 2:48
75229 1:36
75242 3:15
75243 2:4
764-4446 2:19

< 8 >
8 16:20, 30:24
825 1:35
880 1:35

< 9 >
9 17:4, 18:9, 31:6
90 44:15
92101 1:48
972 2:5
991-1582 2:5

< A >
A&M 41:13
A. 1:45
abandoned 20:21
ability 10:5
able 13:19, 16:20, 31:20, 33:7, 34:18, 35:24, 41:12, 48:6, 48:15
absolute 15:5
Absolutely 8:14, 13:9, 48:19, 49:2
accommodations 45:16
ACTION 1:17, 18:12
active 8:7
actually 17:13, 31:11
additional 15:9, 24:12
address 21:21, 21:23, 30:25
addressed 31:12
addresses 48:18
admissibility 30:9, 36:22
admissible 12:9, 36:25
admission 21:4
admissions 20:25, 21:1
admitted 41:19, 41:23, 41:25, 52:7, 52:11
adopted 16:21
affidavit 21:12, 21:16
afternoon 46:12

56

31:22, 39:6, 45:18
broader 21:20
Broadway 1:47
buckets 47:11, 47:12
bunch 35:1, 38:24, 40:19, 41:3, 49:19
Burkholz 1:45, 4:18
business 30:21, 34:18, 36:7, 51:17

< C >
C. 2:39
CA 1:48
call 17:17, 40:3, 41:13
called 31:1
calling 23:18
camps 9:18
campus 8:1
Canada 17:13, 17:20, 23:7
Canadian 17:24
car 47:4
care 34:23, 47:24, 49:6, 49:15, 51:13, 51:24
Careful 33:21
carefully 37:17
CARPENTERS 1:9
carried 36:10
carry 49:14
case 9:16, 12:5, 12:16, 12:21, 15:15, 16:3, 17:12, 17:16, 17:18, 20:17, 20:22, 21:2, 21:15, 23:6, 23:21, 24:6, 24:15, 25:9, 25:17, 25:19, 25:22, 26:10, 26:17,

26:22, 29:6, 31:15, 34:2, 34:3, 35:12, 35:18, 40:12, 40:21, 41:8, 44:18, 44:21, 47:8, 50:23, 51:3
cases 6:15, 33:24, 50:21
Casey 10:11
causation 26:6, 26:7, 26:12
cause 4:11
CEO 34:14
cert 24:3, 24:6, 27:8
certain 20:25, 21:14, 51:20
certainly 12:15, 33:23
certification 23:20, 24:22, 25:3, 26:7, 27:9, 27:11, 27:16, 28:3, 29:8
certified 24:22, 25:11, 28:25, 29:6
chair 45:19, 45:20
chairs 51:14
Chakraborty 2:32, 9:1
challenge 26:11
challenges 18:9
change 19:15
changed 28:16, 34:23
charge 27:23, 52:15
charging 40:10
chart 37:1, 37:14
charts 36:23, 37:2, 37:6, 45:25
check 5:12
chief 17:16

Childress 3:3, 7:21, 7:22, 7:25, 8:3, 8:5, 48:24
chivalrous 49:13
church 9:18
Circuit 12:22, 16:4, 27:8, 38:20, 38:24, 42:24
circumvent 24:6
cite 16:3
cited 33:24
claim 20:1, 24:9, 25:2, 25:17, 28:18, 28:25, 29:9
claiming 25:7
claims 13:12, 19:22, 20:18, 20:21, 22:21, 23:6, 23:9, 23:10, 23:11, 23:12, 24:19, 24:21, 25:4, 25:10, 28:12, 28:15, 28:23, 29:4, 29:5
clarification 39:15, 43:24
clarify 20:5, 22:20, 48:24
CLASS 1:17, 5:4, 12:12, 15:15, 16:5, 18:12, 23:19, 24:3, 24:6, 24:22, 25:3, 25:12, 26:7, 27:8, 27:10, 27:16, 28:3, 28:24, 29:6, 29:8, 46:24
classwide 27:19
clean 51:10
clear 44:3
client 49:9
climate 19:15

close 15:1
Cold 20:2
collective 23:19
Colorado 23:7
comes 21:4, 27:12, 34:3, 38:6
coming 21:14, 51:11
commendable 19:5
comment 31:24
Commerce 3:14
communicate 16:20
companies 35:1, 35:18, 47:18, 51:5
company 34:20, 36:6
compensating 34:14
compensation 33:15, 33:19, 33:23, 44:1
Competing 17:13, 18:3, 52:17, 52:18
complaint 21:1, 21:8, 21:12, 23:11, 24:21, 24:25, 25:10, 27:23, 28:19, 28:24
completely 28:21
computer 37:15
computer-aided 3:8
conclusion 46:17
conclusive 27:10
conditioners 48:12
CONFERENCE 1:25, 4:1, 36:19
confined 33:6

conflict 21: 14
considered 21: 8
context 50: 13
contingency 18: 12
contrast 30: 7
controversial 32: 14
core 50: 5
corporate 48: 24, 48: 25
CORPORATION 1: 17, 35: 14
corporations 30: 5
Correct 5: 4, 5: 5, 7: 11, 10: 18, 11: 15, 12: 23, 12: 24, 13: 3, 18: 11, 25: 23, 26: 9, 26: 16, 26: 19, 28: 5, 46: 18, 51: 5, 52: 12
corrected 44: 16
corrective 23: 20, 24: 5, 24: 15, 27: 17
Cortell 2: 21, 9: 7, 9: 8, 9: 12, 9: 14, 9: 20, 21: 21, 22: 3, 22: 6, 22: 9, 22: 12, 22: 14, 22: 19, 23: 2, 23: 16, 23: 23, 23: 25, 24: 2, 24: 11, 25: 15, 25: 25, 26: 3, 26: 18, 26: 20, 27: 4, 28: 10, 28: 11, 28: 15, 28: 18, 28: 23, 29: 3, 46: 19
costs 13: 13, 19: 15
count 6: 16
couple 7: 20
course 9: 14, 12: 18, 32: 17,

35: 12, 52: 4
court. 43: 8, 45: 8
courtroom 43: 4, 47: 14
crack 32: 13
create 23: 3
credit 33: 4
Creek 1: 35
Crescent 2: 41
cross-examine 17: 1
CRR 3: 12

< D >
D. 2: 45
dad-gum 44: 21
Dallas 1: 3, 1: 29, 1: 36, 2: 4, 2: 18, 2: 25, 2: 42, 2: 48, 3: 15, 4: 5
damages 24: 13, 24: 14
Daniel 2: 29, 10: 10
Daniels 10: 13, 10: 14, 10: 16
Daphne 2: 33, 9: 3
Darryl 29: 11
dastardly 13: 1
David 1: 19, 2: 15, 8: 22
day 17: 21, 39: 2, 43: 11, 43: 14, 51: 10
days 18: 5
deal 14: 20, 14: 24, 41: 3
dealing 14: 25
decide 15: 2
decided 5: 25
decision 27: 8
decisions 30: 8
declaration 21: 7
deeds 13: 1
deeply 50: 1

Defendant 19: 14
DEFENDANTS 1: 22, 2: 10, 5: 21, 20: 20, 33: 17, 34: 2, 35: 8
defense 5: 7
deliberation 48: 6
deliberations 43: 12
demonstrate 27: 20
denied 26: 14
deny 15: 24, 16: 10, 16: 11, 16: 12, 16: 13, 19: 12, 19: 13, 19: 17, 30: 24
denying 16: 9, 30: 6, 30: 14, 31: 2, 33: 9
depends 16: 15, 36: 23, 36: 24
desk 50: 14
determination 27: 9
determine 36: 22
determined 27: 15, 27: 25
Dezerae 10: 11
Dick 9: 13
died 8: 8
Diego 1: 48
difference 30: 7
different 24: 25, 27: 12, 27: 13, 28: 24, 31: 10, 35: 8, 35: 10, 50: 13, 50: 16
dire 47: 16
disagree 29: 10, 31: 23, 47: 13
disagreement 13: 10
disclaimed 24: 14
disclosed 25: 8
disclosure

23: 18, 23: 19, 23: 20, 24: 5, 24: 13, 24: 15, 26: 4, 26: 13, 27: 17
disconnect 23: 9, 23: 12, 24: 17, 24: 20, 25: 16
disconnects 25: 9
discouraged 16: 2
discuss 26: 21
Discussion 25: 15, 43: 8, 45: 8
discussions 14: 14
dismissal 25: 17
dismissed 13: 13, 19: 22, 20: 1, 20: 21, 25: 17
disparaging 18: 12
dispute 20: 22
distance 15: 2
District 1: 1, 1: 2, 1: 27, 4: 4, 4: 5, 4: 6
DIVISION 1: 3
do-over 27: 11
document 13: 18, 32: 13, 32: 20
documents 12: 12, 13: 14, 14: 17, 32: 16
doing 6: 24, 10: 5, 16: 24, 17: 7, 35: 2, 36: 7, 37: 19, 40: 9, 43: 19, 43: 20, 47: 16, 49: 12, 49: 20
dollars 40: 10, 43: 11, 44: 4
Done 14: 8, 38: 17, 44: 20, 46: 16, 47: 8,

fraud-in-the-ma rket 27: 24
fraud-on-the-ma rket 28: 1
front 34: 25, 38: 9, 52: 14
full 47: 15
fully 26: 21
FUND 1: 10
fundamental 23: 8
fussy 22: 2

< G >
gander 31: 19, 31: 25, 32: 5
gaps 17: 8
GARRISON 2: 34
gas 23: 7, 23: 17, 30: 5, 30: 13, 36: 5
Geller 1: 46, 11: 4, 11: 6, 11: 8, 11: 10
Gena 10: 13
General 13: 12, 20: 19, 31: 15
GHG 13: 13
give 17: 21, 17: 24, 27: 6, 44: 19, 44: 25, 47: 10, 49: 6, 49: 10, 52: 3
given 46: 12
giving 18: 10, 45: 4, 45: 5
glad 13: 4
glaring 23: 16
God 4: 8, 6: 2
good-sized 36: 20
Gooden 10: 11
goose 31: 19, 31: 22, 31: 25, 32: 5
Gosh 9: 2, 41: 15
government 9: 18, 43: 13, 44: 5

Grant 15: 20, 19: 10, 19: 11, 19: 15, 36: 16
granted 19: 9
grapefruits 32: 2
Great 8: 8, 32: 3, 49: 2
GREATER 1: 8
greatest 18: 23
Greenville 2: 3
GROUP 1: 34
guess 13: 4, 50: 12, 51: 5
guy 8: 8
guys 49: 13, 49: 15

< H >
H. 1: 39
hair 6: 7, 6: 8
haircut 11: 17
half 44: 4
handle 50: 25
handled 50: 24, 51: 2
hang 43: 4
happen 47: 6
happened 6: 24, 13: 5
happier 14: 24
happily 8: 5
harassed 45: 6
hard 15: 3, 15: 15, 23: 21, 37: 12
Harwood 2: 24
hate 37: 13, 52: 5
Haynes 2: 23, 9: 8, 9: 9, 9: 11, 9: 13
head 22: 12, 47: 24, 48: 15, 51: 11
heard 28: 22,

42: 12
Heaven 26: 1
heavy 49: 13, 49: 14
held 24: 3
help 25: 21, 25: 22, 50: 18
helpful 22: 25
helping 5: 23
Hertz 7: 16
high 10: 3
highly 16: 6
Hinojosa 2: 15, 8: 22
hired 9: 14
history 18: 24, 20: 18
honestly 25: 21
Honorable 1: 26, 4: 5, 4: 8
hope 52: 22
Horseshoe 47: 5, 47: 6
hours 18: 4
house 7: 19, 7: 20, 47: 6, 47: 7
Houston 8: 1
human 30: 18
hundred 43: 11, 44: 4
hung 47: 6

< I >
Ilk 46: 20
impact 27: 16
impacts 23: 14
impeachment 15: 22
important 20: 23, 25: 20, 34: 1
impressed 24: 2
in-house 7: 22
in. 15: 19, 21: 4, 31: 15, 36: 8
include 37: 11
including

26: 12, 43: 12
indicating 39: 23, 40: 2, 45: 22
individual 27: 20, 27: 22, 29: 4, 33: 17
individually 1: 6, 29: 7
information 33: 18
instead 6: 20
instructions 52: 17
intend 20: 19, 21: 15, 38: 12, 43: 19, 46: 2
intentions 33: 10
interested 20: 20
interesting 50: 22, 51: 3
interrupt 16: 24, 38: 18
interrupting 20: 9
intervene 51: 12
introduce 33: 7, 49: 8, 49: 11
introduced 49: 1
invest 6: 19, 6: 21
investigation 12: 14, 13: 12
investigations 12: 9, 13: 18
invoked 43: 2
involved 31: 20, 50: 16
irrevocably 23: 18
Irving 7: 16, 7: 24, 8: 7, 35: 21
issue 26: 25, 31: 11, 33: 19, 38: 2
issues 13: 14, 21: 20, 22: 7,

52: 16, 52: 21
Doors 51: 11
doubt 8: 10, 43: 17
DOWD 1: 46
down 6: 23, 10: 23, 10: 24, 13: 4, 32: 25, 33: 13, 36: 6, 41: 13, 47: 5, 50: 15
dressed 20: 10
drone 35: 7
drones 35: 6
dry 23: 7, 23: 17
ducks 50: 14
duff 49: 16
during 17: 15, 17: 18, 33: 19, 41: 4, 46: 22, 48: 25

< E >
E. 2: 13
early 17: 19
easier 14: 24
eat 51: 9
Ed 1: 26, 4: 6
effect 16: 6
efficiency 23: 3, 26: 11
efficient 14: 17, 14: 19
efficiently 38: 7
Egbert 29: 11
eight 19: 1
Either 17: 7, 42: 14
elected 13: 6
Electric 26: 10
electron 41: 13
eliminate 40: 19
em 16: 22, 17: 21, 18: 1, 37: 12, 42: 1, 42: 2, 42: 3, 46: 1, 46: 2, 46: 3

email 30: 25
Emily 2: 14, 8: 20
employed 34: 13
employee 29: 16, 29: 25
end 5: 14, 17: 25, 25: 20, 42: 7, 42: 24, 51: 10
enough 10: 4, 38: 20
entire 25: 8
entitled 24: 14, 28: 1, 33: 18
Episcopalians 9: 16
Erika 1: 42, 11: 7
essentially 18: 6
establish 26: 12
estate 6: 20, 6: 21, 6: 25
events 13: 19
Everybody 10: 17, 10: 18, 12: 10, 49: 11
everything 6: 9, 35: 10
evidence 15: 16, 16: 5, 19: 18, 19: 22, 20: 17, 37: 21, 38: 6, 41: 20, 41: 24
Exclude 20: 17, 29: 11, 33: 10, 37: 12, 42: 11, 46: 22
excluded 15: 21, 37: 21, 42: 10
excluding 29: 11
exhibit 14: 13, 41: 17, 42: 7
exhibits 14: 12, 40: 7, 40: 8, 40: 19, 41: 6, 41: 16
expect 51: 22
expert 21: 7,

21: 12, 24: 12, 25: 18, 33: 8
experts 21: 1, 33: 6
explain 13: 19
expressed 33: 6
extensive 14: 16
extent 12: 11
extra 44: 24
extremely 43: 25
Exxon 1: 17, 4: 11, 6: 15, 6: 17, 7: 21, 7: 23, 12: 22, 15: 16, 16: 16, 29: 16, 29: 25, 30: 17, 34: 13, 34: 19, 35: 9, 46: 18, 46: 21, 47: 2, 47: 3, 48: 25, 50: 12, 50: 15, 50: 21
Exxonmobile 5: 21

< F >
F.3d 26: 10
face 13: 5, 47: 22
Facebook 34: 25
fact 14: 14, 33: 23
facts 52: 7
faith 14: 10
false 34: 4
familiar 12: 20
far 20: 1, 31: 7, 35: 22, 49: 15, 49: 20, 49: 21, 51: 18
fatal 23: 9, 23: 12, 24: 16
favorites 50: 23
Federal 3: 13
feel 32: 19
feeling 47: 3
fees 18: 13
fellow 8: 6
feminism 49: 15

fields 50: 5
Fifth 12: 22, 16: 4, 27: 8, 38: 20, 38: 24, 42: 24
fight 14: 3, 14: 22, 14: 24, 21: 17, 28: 6, 31: 7
figure 47: 23
filed 41: 17
filing 24: 18
financials 36: 1
find 22: 4, 41: 7
finding 27: 25
findings 26: 6
Fine 6: 24, 17: 3, 18: 8, 31: 5, 38: 19, 38: 22, 38: 23, 39: 9, 41: 21, 42: 4, 42: 13, 46: 8, 51: 10
fired 8: 4
FIRM 2: 2
First 11: 21, 23: 16, 36: 19, 38: 12, 43: 6
fit 51: 14
Fitzwater 19: 3, 19: 6
five 18: 5, 18: 25, 32: 23, 39: 4, 44: 24, 44: 25
Floor 3: 14
Flowserve 26: 21, 27: 7
fly 50: 23
FOLKERTH 1: 43, 11: 9, 11: 10
folks 49: 12
forbid 26: 1
forcefully 35: 25
forever 16: 2
former 29: 25
forth 45: 21
forward 29: 7
four-month 25: 7

22: 10, 22: 15
itself 12: 16, 15: 23

< J >
J. 1: 19, 2: 28, 3: 12
Jacobson 49: 24, 49: 25
James 43: 15
Jar 50: 3, 50: 4, 50: 12
Jason 2: 22, 9: 9, 9: 22, 10: 11
JEFFREY 1: 19
Jessica 10: 12, 10: 14
Job 20: 8
JOE 1: 33
JORDAN 2: 22, 9: 9, 9: 22, 9: 23, 9: 25, 10: 3
JR 1: 6
Judge 1: 27, 4: 6, 19: 3, 19: 6, 31: 3, 32: 6, 37: 19, 44: 17, 47: 17, 48: 4, 50: 11
Judges 6: 17, 38: 24
Judgment 34: 19, 49: 20, 51: 17
Judicial 49: 19, 49: 20, 51: 17
Judicially 51: 18, 51: 19, 52: 7
Jumping 32: 23
juries 32: 22
juror 47: 21, 48: 16
Jurors 43: 11, 45: 10, 46: 3, 47: 17, 48: 5, 48: 15
Jury 4: 10, 11: 20, 14: 17,

16: 7, 20: 20, 27: 23, 33: 18, 34: 10, 38: 8, 41: 4, 41: 18, 41: 20, 42: 12, 45: 19, 46: 8, 46: 13, 52: 6, 52: 9, 52: 20
Justice 13: 5

< K >
Kaylee 11: 14
Kearl 20: 2, 23: 7, 24: 19, 25: 5, 28: 12, 28: 15, 29: 9, 40: 21, 40: 22
keep 18: 7, 38: 15, 39: 10, 48: 20, 52: 5
KENDALL 1: 33, 1: 34, 4: 14, 4: 15
kid 26: 25
Kind 21: 20, 22: 4, 35: 7, 36: 10, 36: 23, 36: 24, 37: 14, 40: 8, 51: 15, 52: 14
kindly 49: 24
kinds 51: 4
King 2: 16, 5: 9, 5: 24
Kinkeade 1: 26, 4: 6
Kirsten 11: 13
Kmart 16: 3
known 21: 25

< L >
lack 20: 1, 25: 7
ladies 49: 14
Lake 20: 2
Lanier 40: 3
large 34: 18
largest 34: 20
last 21: 9,

31: 23
later 8: 15, 16: 10, 20: 5, 25: 24, 39: 8
Latham 2: 40, 5: 23
Latoya 10: 12
LAW 1: 34, 2: 2, 50: 16
lawyer 8: 8, 17: 2, 49: 25
lawyers 4: 13, 8: 17, 10: 21, 16: 21, 16: 25, 18: 13, 24: 1, 26: 19, 26: 21, 32: 23, 40: 4, 43: 3, 46: 21, 47: 20, 49: 3, 49: 4
lead 4: 19, 4: 22, 16: 16
lean 45: 21
least 12: 14, 18: 6
left 8: 2
leg 52: 3
legal 22: 7, 22: 10, 22: 15, 36: 18
lengthy 19: 4
less 14: 16, 14: 23
letting 11: 16
Lewis 11: 13
life 6: 24
lifting 49: 13
likely 16: 6
Limine 11: 21, 12: 6, 15: 13, 16: 9, 16: 10, 17: 4, 20: 16, 21: 19, 22: 15, 30: 16, 31: 6
Limited 36: 16, 43: 15
limits 32: 24
LINDELL 1: 40, 11: 1, 11: 2, 11: 4

line 30: 17
list 41: 7, 41: 17, 41: 19, 41: 23, 49: 6, 49: 10
listen 30: 20
litigated 9: 20
litigation 21: 9
litigations 31: 20
little 8: 7, 14: 15, 14: 16, 16: 6, 33: 13, 35: 22, 45: 22, 50: 11, 51: 11
live 7: 13, 7: 15, 7: 16, 19: 22, 36: 6, 40: 11
lived 7: 16, 18: 25
living 10: 5, 40: 11
LLP 1: 46, 2: 16, 2: 23, 2: 34
load 37: 10
LONG 2: 45, 7: 7, 7: 8, 7: 12, 7: 14, 15: 22, 18: 11, 31: 5, 41: 3, 47: 24, 52: 1
longer 21: 25
Look 12: 2, 20: 3, 27: 2, 30: 15, 37: 8, 37: 12, 37: 16, 41: 14, 44: 18
looked 11: 25
looking 34: 22, 36: 5, 40: 12
Lord 15: 8
loss 26: 5, 26: 6, 26: 12
lost 22: 5
lot 17: 17, 34: 10, 50: 16
Luckey 35: 4
lunch 43: 13, 52: 21

App. 19

Lyuba 2: 31, 8: 24

< M >
M. 2: 12
man 7: 9, 8: 7
Mark 40: 3
market 26: 11
Master 43: 15
math 43: 25
matter 20: 19, 36: 16, 49: 22
Mccormack 11: 14
mean 16: 1, 31: 8, 33: 12, 34: 22, 34: 24, 36: 1, 37: 9, 37: 18, 41: 11, 41: 12
means 41: 19
measuring 39: 20, 39: 22, 40: 1
mechanical 3: 7
meeting 52: 24
MELSHEIMER 2: 12, 5: 7, 6: 1, 12: 1, 37: 22, 40: 20, 40: 23, 45: 4
memory 26: 22
merits 26: 8, 28: 4
mess 42: 19, 42: 21, 42: 23
messed 17: 2
Michael 2: 7, 11: 13
microphone 22: 11, 45: 22
microphones 48: 11
microscope 41: 14
middle 39: 1
Mils 23: 14
mind 33: 11
minute 22: 5, 35: 17

minutes 39: 5, 44: 14, 44: 19, 44: 24
mislead 16: 6
missed 11: 11
misstatements 30: 13
MOBILE 1: 17
model 27: 13
money 35: 6, 43: 20
month 14: 6
moon 36: 4
Morgan 10: 13
morning 5: 8, 5: 10, 5: 19, 6: 6, 6: 12, 7: 2, 8: 15, 9: 4, 10: 15, 11: 2
mother-in-law 41: 13
motion 12: 6, 15: 13, 20: 16, 26: 14, 33: 5
motions 11: 21, 19: 14, 21: 19, 22: 14
motivations 33: 10
Mountain 23: 6, 23: 17, 24: 8, 50: 5
move 6: 22, 44: 18, 44: 21, 45: 20
MR. BURKHOLZ 4: 20, 6: 19, 12: 24, 13: 3, 13: 9, 14: 9, 14: 21, 17: 10, 17: 17, 18: 3, 27: 6, 27: 15, 28: 5, 28: 8, 28: 14, 31: 11, 31: 14, 31: 23, 32: 11, 32: 16, 33: 1, 33: 3, 33: 5, 48: 16, 48: 21, 49: 9,

51: 1, 52: 5, 52: 12
MR. SAHAM 4: 23, 10: 20, 12: 11, 12: 18, 13: 21, 13: 23, 14: 1, 14: 5, 15: 4, 15: 7, 15: 9, 15: 12, 16: 18, 17: 23, 18: 2, 21: 6, 29: 14, 29: 16, 29: 18, 30: 2, 31: 18, 32: 8, 32: 19, 33: 16, 37: 3, 37: 16, 40: 18, 40: 25, 41: 21, 42: 4, 42: 13, 44: 16, 44: 20, 45: 3, 45: 17, 50: 9, 51: 7, 52: 1, 52: 17
music 51: 11
Musk 35: 3

< N >
N. 2: 24
named 8: 6, 9: 2, 27: 21
names 48: 18
Nathan 1: 40, 11: 1
natural 30: 13
necessary 14: 10, 14: 14
need 17: 19, 18: 1, 22: 16, 22: 20, 31: 3, 33: 15, 34: 12, 39: 6, 39: 9, 41: 4, 43: 22, 44: 24, 46: 7, 47: 22, 48: 1, 51: 12
negative 24: 4
neighborhood 7: 15, 47: 4
Nell 10: 11
Neither 29: 9

New 2: 36, 12: 8, 12: 22, 13: 12, 31: 9, 31: 14, 33: 7
Newspaper 36: 15
next 47: 7
nice 7: 20
NINA 2: 21
No. 1: 15, 5: 25, 12: 18, 17: 5, 18: 2, 18: 13, 26: 2, 28: 22, 29: 15, 29: 19, 44: 13, 45: 6, 52: 3
nobody 8: 2, 9: 2
noon 52: 23
Nope 41: 8
Northern 1: 2, 4: 4
notes 12: 7, 45: 11, 48: 6
Nothing 15: 12
notice 17: 11, 17: 14, 17: 21, 17: 24, 18: 4, 18: 7, 49: 19, 49: 20, 51: 17, 51: 18, 51: 19, 51: 23
number 4: 12, 17: 4, 17: 12, 32: 25, 33: 3
numbers 36: 2
Nvidia 34: 22, 34: 25
NY 2: 36

< O >
object 19: 18, 19: 24, 20: 3, 22: 22, 33: 12, 38: 14, 38: 17
objected 38: 11, 40: 22
objecting 37: 18, 38: 5
objection 30: 14
objections

44: 3, 50: 12
probative 16: 6, 19: 22, 34: 12
problem 24: 12
procedural 20: 18, 38: 2
procedurally 38: 20
proceed 27: 18
Proceedings 3: 7
process 13: 14, 24: 22, 46: 13
produced 3: 8
profitability 20: 2, 25: 5, 25: 8, 40: 21
profitable 40: 23
proper 25: 11, 37: 6
proposals 17: 13, 18: 3
proposed 13: 15, 14: 5, 14: 9, 14: 12, 18: 4
proposing 14: 13
props 50: 2, 50: 8
prospective 47: 21
proved 24: 24
provide 45: 13
proxy 13: 13, 19: 15, 33: 17
publicly 33: 17
purpose 43: 16
purposes 23: 20, 24: 5, 27: 10
pursuant 27: 9
pursue 20: 19
push 44: 13
put 19: 2, 35: 6, 35: 9, 35: 16, 37: 21, 39: 7, 39: 8, 39: 9, 43: 7
putting 39: 10

< Q >

qualification 15: 7
qualifications 15: 6
question 39: 25, 41: 25, 43: 17, 48: 4, 48: 16
questionnaire 48: 17
questionnaires 48: 17
Quick 48: 16
quickly 24: 20

< R >
R. 1: 40
race 47: 4
raise 26: 17, 38: 1
Ramirez 1: 6, 4: 11
ran 41: 13
rating 33: 4
re 24: 8
reaction 24: 4
read 13: 7, 41: 14, 52: 9
ready 10: 18, 12: 4, 20: 2, 38: 25, 51: 19
real 6: 20, 6: 21, 6: 24, 11: 14, 15: 3
really 8: 7, 17: 2, 22: 6, 22: 19, 30: 16, 32: 5, 33: 15, 34: 23, 40: 3, 42: 18, 43: 18, 51: 14
reapply 24: 8
reason 19: 21, 23: 17, 46: 6
rebutted 27: 18
recall 13: 1
recalls 23: 5
received 14: 7
Recess 53: 2
record 19: 2,

39: 7, 39: 8, 39: 9, 42: 19, 42: 25, 43: 6, 43: 7, 43: 8, 45: 7, 45: 8
record. 43: 9, 45: 9
redact 13: 15, 14: 1, 14: 13
redacted 13: 16, 32: 14
redaction 32: 20
redactions 13: 20, 13: 23, 13: 25, 14: 4, 14: 5, 14: 7, 14: 10, 14: 12, 14: 15, 15: 12, 31: 12, 31: 16, 32: 9, 32: 13, 40: 9
redo 37: 14
reference 12: 14, 12: 15, 15: 23, 42: 3
references 13: 11, 13: 14, 13: 16, 13: 17, 14: 14
referring 21: 7
regard 24: 19, 26: 14, 45: 25, 46: 17
regarding 23: 6, 26: 6, 30: 24, 33: 10
regardless 44: 4
regulation 15: 23
regulations 51: 22
reinvented 24: 8
rejected 24: 7
relate 19: 25
relating 24: 14
relation 35: 17
relative 35: 13
relevant 16: 5, 20: 1, 26: 5, 30: 12, 33: 23

reliance 26: 6, 27: 18, 27: 21, 27: 22
relies 24: 25
rely 24: 14, 24: 18, 25: 6, 28: 1
relying 24: 20, 24: 24, 25: 2, 25: 10, 26: 8, 26: 17, 27: 2, 27: 24, 29: 1
remember 8: 8, 9: 13, 12: 25, 34: 2
Remind 32: 6, 42: 23
reminded 49: 24
removed 13: 1
renew 42: 24
rented 47: 7
rep 48: 25
replace 30: 21
report 33: 7
reported 3: 7
Reporter 3: 13, 18: 24
reporting 18: 24
reports 33: 8, 40: 22
represent 5: 21, 49: 3
Representative 2: 8, 3: 4, 5: 3, 48: 24, 49: 1
represented 9: 16, 9: 17
representing 5: 20, 7: 11, 35: 9
request 15: 20
reserve 24: 24, 28: 18, 28: 25
reserved 25: 13
reserves 30: 21
resolution 13: 19
Rest 15: 24
retained 21: 13
reurge 15: 24,

22: 23, 30: 10, 40: 20
obviously 18: 6
occurred 26: 5
offered 13: 23, 14: 6, 36: 16
offering 25: 18, 32: 12, 32: 17
Office 19: 4
OFFICER 4: 3, 53: 1
Official 3: 13, 13: 6
oil 15: 17, 30: 5, 36: 5, 47: 18
older 38: 25
Olive 2: 17
OLIVER 1: 42, 11: 7, 11: 8
one 8: 23, 12: 19, 17: 4, 17: 7, 17: 11, 17: 21, 17: 24, 18: 23, 20: 22, 23: 6, 28: 23, 29: 14, 30: 16, 32: 23, 35: 4, 38: 4, 38: 12, 40: 18, 40: 25, 42: 7, 47: 5, 47: 7, 47: 16, 48: 4, 50: 23
ones 28: 16, 38: 25, 51: 3
open 38: 10, 43: 8, 45: 8
opening 38: 11, 44: 11, 51: 22
operations 30: 13
opinion 47: 18
opinions 21: 14, 33: 6
oranges 32: 2
order 4: 3, 18: 5, 25: 3, 29: 9
Others 1: 7, 4: 11, 39: 1

Otherwise 12: 22, 13: 16, 14: 25, 16: 24, 37: 12
ought 35: 25
outlaw 34: 6
outside 26: 5
overall 23: 3
overbroad 33: 11
overlaps 22: 6, 22: 14
overrule 16: 1
own 47: 8
owned 46: 21, 47: 2
owning 46: 17

< P >
P. 1: 18
page 11: 12
paid 34: 9
Palmer 35: 4
Pam 19: 3, 46: 2, 47: 22
pam_wilson@txnd.uscourts.gov 3: 16
PAMELA 3: 12
paper 45: 14
part 15: 20, 17: 3, 19: 15, 19: 18, 24: 22, 29: 8, 41: 4, 42: 2, 42: 18
participated 21: 9
particular 20: 18, 52: 7
particularly 20: 23
parties 23: 4
Party 2: 8, 3: 4
Pat 7: 7
PATRICE 3: 3
PATRICK 2: 45
Patterson 10: 12
PATTON 2: 46
Paul 2: 34, 7: 4, 9: 6

pay 34: 18, 43: 11, 43: 12, 44: 4
paying 44: 5
pays 43: 13
PEDRO 1: 6
pen 45: 14
PENNSYLVANIA 1: 9
PENSION 1: 9
People 7: 20, 17: 20, 46: 4, 46: 24, 47: 15, 50: 6
peremptory 18: 9
perfect 27: 5
Period 12: 12, 15: 15, 16: 5, 25: 7, 26: 5, 46: 22, 47: 9
permissible 51: 21
person 47: 22
Peter 35: 2, 35: 5
pilots 50: 22
pin 33: 13
Pioneer 36: 6
place 10: 7
places 47: 5
Plaintiff 12: 6, 18: 13, 21: 1, 27: 21, 49: 9
PLAINTIFFS 1: 12, 1: 31, 4: 13, 13: 15, 14: 11, 17: 17, 18: 4, 20: 16, 21: 11, 26: 11, 27: 11
play 9: 24
played 10: 3
playing 10: 7
Please 4: 9, 39: 5
pled 29: 10
point 15: 10, 25: 4, 47: 9, 47: 10
points 13: 21

POLYCHRON 1: 44, 11: 5, 11: 6
poor 35: 19, 35: 21, 43: 25
position 13: 17, 14: 11
positioned 20: 16
post 16: 5
postdates 12: 12
Powell 10: 11
practical 22: 24
practice 6: 9
pray 4: 7
preach 47: 17
preadmitted 12: 13, 42: 17
precious 49: 12
preferably 16: 23
prejudice 15: 24, 19: 17, 34: 10
prejudicial 33: 25, 34: 12
present 21: 15, 22: 16, 52: 8
preserve 22: 22
presiding 4: 6
presumption 27: 18, 27: 24, 28: 1
PRETRIAL 1: 25, 4: 1
pretty 12: 20, 23: 8, 33: 24, 36: 20, 38: 25, 41: 12
preview 38: 14, 51: 22
previously 31: 12
price 15: 16, 15: 17, 24: 4, 27: 16
print 41: 12
Probably 6: 16, 6: 21, 21: 24, 26: 20, 35: 1, 35: 3, 35: 5,

16: 10, 26: 15, 30: 9
reurging 19: 18
reversible 47: 9
Rex 1: 18, 3: 1
ride 37: 10
RIFKIND 2: 34
rights 30: 18
rise 4: 3, 53: 1
risk 33: 25, 38: 20
RMR 3: 12
Robbins 1: 46, 11: 4, 11: 6, 11: 8, 11: 10
rockets 36: 3
Rocky 23: 6, 23: 17, 24: 8, 30: 13, 50: 5
Ronnie 49: 22, 49: 25, 50: 7
room 36: 19, 48: 6, 51: 14
rooms 51: 9
Rosenthal 1: 20, 8: 12, 33: 22
Ross 2: 47
Royalty 30: 11
RUDMAN 1: 46
Rule 16: 1, 17: 6, 27: 9, 31: 17, 39: 13, 39: 15, 40: 4, 43: 2
ruled 23: 19, 40: 20
ruling 16: 19, 20: 15, 22: 16, 22: 24, 24: 7, 24: 17, 25: 21, 26: 15, 27: 16
rulings 23: 12, 38: 4
run 47: 4

< S >
S. 1: 19, 19: 3
Saathoff 2: 13, 8: 18

SAHAM 1: 39, 4: 20, 4: 21, 11: 23, 16: 3, 30: 19, 34: 16
sale 7: 19
SAM 1: 41
sample 50: 5
San 1: 48
Sara 1: 44, 11: 5
saved 49: 25
saw 49: 13
saying 17: 9, 23: 10, 34: 9, 34: 23, 35: 24, 37: 19
says 27: 7
scary 24: 1, 26: 18, 26: 20, 46: 19, 46: 20
school 10: 3
scope 20: 15
Scott 1: 39, 2: 39, 4: 21
screen 46: 1
seated 4: 9
SEC 12: 8, 12: 14, 12: 15, 13: 11, 15: 14
second 41: 7
SECURITY 4: 3, 53: 1
seeking 20: 17
seems 48: 5
seen 11: 18
select 11: 20
selection 46: 13
send 14: 6
sending 36: 3
sense 20: 4, 32: 12
separately 43: 17, 47: 1
serious 26: 1
serve 43: 12, 47: 9
service 19: 4, 19: 5, 43: 21
session 26: 1
shade 18: 13, 18: 15

Shamailova 2: 31, 8: 24
share 19: 7
she'll 48: 25
SHELDON 1: 41, 4: 24, 4: 25
shouldn't 13: 11, 31: 4, 31: 15, 31: 19, 33: 7
show 34: 12, 34: 13, 39: 17, 40: 22, 45: 25
showing 46: 6
slide 6: 8, 9: 16, 10: 22, 17: 6, 18: 18, 46: 6, 49: 7
slides 12: 13, 16: 21, 16: 25, 17: 5, 18: 7, 22: 19, 37: 2, 40: 10, 41: 17, 42: 16, 43: 10, 44: 2
significant 24: 4
Similarly 1: 8
simple 48: 5
simply 34: 1
sir 4: 23, 4: 25, 5: 11, 30: 1, 30: 2, 48: 3
sit 21: 24
Situated 1: 8
situation 42: 22
six 18: 10
Size 36: 18
slip 36: 25
Sloan 10: 10
smaller 41: 11
smart 6: 22, 24: 1, 26: 18, 26: 21, 46: 19, 46: 21
Smith 8: 6, 9: 2
solely 19: 25
SOLOWAY 2: 28, 7: 1, 7: 2, 7: 4, 7: 6, 18: 21,

20: 6, 20: 9, 20: 13, 20: 25, 21: 5, 21: 6, 21: 11
somebody 4: 19, 16: 16, 32: 10, 32: 11, 34: 3
somehow 35: 14
someone 34: 4
sometimes 18: 17, 32: 4
somewhere 10: 10
Sorry 10: 25, 11: 11, 22: 12, 28: 20, 36: 12, 45: 23
sort 47: 1
sounding 16: 14
South 35: 21
Southlake 7: 14
Spalding 2: 16, 5: 9, 5: 24
Special 43: 15
specifically 16: 4
SPENCER 1: 45
spend 46: 12
spins 45: 20
split 43: 13
spoke 29: 16
SQUIRE 2: 46
staff 52: 15
stage 25: 17
Stan 10: 7
stand 16: 23, 38: 14, 47: 21, 47: 24
standing 43: 22, 49: 14
Stanton 43: 15
start 4: 10, 28: 21, 30: 22, 39: 2
started 25: 20, 32: 11, 34: 19
statement 34: 4, 38: 11
statements 44: 11
States 1: 1,

1:27, 4:4, 4:6, 4:8, 33:11
**statistically** 24:4
**stenography** 3:7
**stipulated** 52:7
**stipulation** 14:9
**stipulations** 52:10
**stock** 6:18, 6:23, 15:16, 34:2, 34:8, 46:18, 46:21, 47:2, 47:8
**Stop** 13:20, 15:15, 23:21, 30:23, 47:17, 47:19
**stray** 13:17
**streamline** 23:2
**Street** 2:17, 2:24, 3:14, 36:6
**Stretch** 39:13
**struck** 21:8
**struggle** 26:24
**stuff** 48:8, 49:16, 49:20, 51:4, 51:25
**subject** 25:2, 33:8
**submarines** 35:7
**submitted** 52:17
**suggestion** 15:3, 40:18
**Suite** 1:35, 1:47, 2:3, 2:17, 2:24, 2:41, 2:47
**summaries** 37:6
**summary** 36:23, 36:25, 37:2
**super** 24:2
**supplement** 43:10
**supposed** 36:8
**SWIDERSKI** 2:7, 5:1, 5:2, 5:5
**Swiger** 1:18, 8:12, 33:22, 41:1
**switch** 25:3
**switched** 25:1
**sworn** 7:17

< T >
**T.** 1:43, 2:15, 11:9
**table** 21:25, 26:21
**talked** 28:16, 42:8
**tall** 10:4, 10:6, 40:12
**tallness** 10:2
**tax** 9:18
**team** 36:18, 36:20
**ten** 21:9
**term** 35:20
**terms** 17:13, 25:5
**terrible** 9:17
**terribly** 32:13
**testify** 29:24
**testifying** 16:16
**testimony** 7:18, 15:22, 25:18
**Texas** 1:2, 1:29, 3:15, 4:5, 13:5
**themselves** 36:21, 46:24
**THEODORE** 2:30
**theories** 20:21
**theory** 24:24, 25:5, 27:22
**Thiel** 35:2, 35:5
**THOMAS** 2:12, 2:39, 5:18, 5:19, 5:21, 5:25, 6:3
**THOMPSON** 2:33, 9:3, 9:4, 9:6
**though** 15:12, 26:4, 42:2, 42:17
**thoughtful** 22:2, 51:15
**Three** 5:22, 18:9, 23:6, 47:11, 52:6
**threshold** 22:15
**threw** 24:5
**throughout** 22:23
**throw** 18:13
**throwing** 35:13
**tied** 23:18
**ties** 24:12
**Tillerson** 1:18, 3:1, 7:11, 7:13, 8:10, 18:10, 30:24, 33:22, 47:3
**TOAL** 2:29, 6:11, 6:12, 6:14, 6:16
**today** 17:25, 18:24, 22:24, 34:21, 37:10, 46:14, 46:15, 47:8
**tomorrow** 17:7, 18:1
**top** 34:20
**Torres** 11:13
**total** 44:2
**tough** 26:25, 38:24, 39:1
**track** 22:5
**traded** 34:2, 34:8
**transcript** 3:8, 6:3
**transcription** 3:8
**treatment** 25:12
**trial** 4:11, 10:18, 13:12, 13:18, 14:3, 17:3, 18:5, 21:14, 22:23, 23:2, 29:4, 31:9, 34:19, 42:7, 42:18, 48:20, 48:25
**trials** 18:25
**tried** 12:21, 12:22, 22:21, 50:11
**trip** 50:11
**true** 13:7
**truly** 19:7
**Trust** 30:12
**truth** 36:16
**try** 22:3, 26:16, 27:20, 36:24, 37:21, 41:14, 46:2, 48:13, 51:10
**trying** 9:18, 10:8, 24:6, 36:25, 37:13, 39:10, 50:21
**turn** 48:12, 48:14
**Turtle** 1:35
**two** 13:21, 33:16, 50:2
**TX** 1:36, 2:4, 2:18, 2:25, 2:42, 2:48
**type** 16:4
**typed** 41:11
**typical** 34:3

< U >
**Ukraine** 35:7
**Unbelievable** 41:15
**uncertified** 29:3
**uncomfortable** 45:20
**underlying** 22:15
**understand** 17:9, 20:14
**understanding** 38:13
**understands** 42:25
**Understood** 16:18, 48:21

C E R T I F I C A T I O N

I, PAMELA J. WILSON, CSR, certify that the foregoing is a transcript from the record of the proceedings in the foregoing entitled matter.

I further certify that the transcript fees format comply with those prescribed by the Court and the Judicial Conference of the United States.

This the 27th day of April, 2026.

s/Pamela J. Wilson

_____
PAMELA J. WILSON, RMR, CRR
Official Court Reporter
The Northern District of Texas
Dallas Division

**unduly** 33:25
**unfair** 34:15
**United** 1:1, 1:27, 4:4, 4:6, 4:8
**unless** 26:7, 46:22
**Unpled** 29:2, 29:3
**update** 5:14
**urging** 23:9, 23:10, 23:11

< V >
**V.** 2:30
**vague** 26:22
**Valdez** 50:12
**vegetables** 37:10
**venireperson** 47:22
**versus** 4:11, 30:9, 35:21
**view** 27:7, 42:6
**voir** 47:16
**vs** 1:15

< W >
**W.** 1:18
**wait** 35:17
**walk** 46:7, 46:8
**wanted** 5:12, 5:13, 48:23
**wants** 12:19
**warmer** 48:14
**warning** 30:22, 37:9
**watch** 6:23
**watching** 38:16
**water** 45:18
**Watkins** 2:40, 5:24
**wealth** 35:13
**week** 5:15
**weeks** 19:1
**weight** 30:9
**Weiss** 2:34, 7:4, 9:6
**welcome** 21:23
**Wells** 2:30, 6:5, 6:6, 7:5
**West** 1:47, 10:11
**WHARTON** 2:34
**Whatever** 17:3, 29:23, 30:12, 30:21, 32:1, 32:2, 32:24, 35:2, 46:6, 46:25, 50:3, 50:14, 50:15
**wherever** 47:21
**Whether** 16:15, 16:16, 38:19
**whistle** 29:22
**whistleblower** 16:15, 29:13, 29:20, 29:21
**white** 6:7, 6:8
**white-haired** 7:9
**Whoever** 14:13, 32:12, 49:8, 49:11
**whole** 14:3, 25:22, 36:18, 47:14, 51:18, 51:20
**widow** 35:19, 35:22
**Wilkinson** 2:14, 8:20
**willing** 19:7, 39:8
**WILSON** 3:12
**wiped** 50:15
**within** 32:24
**without** 13:18, 15:6, 15:24, 19:17
**witness** 16:17, 16:23, 17:24, 27:12, 52:8
**witnesses** 16:22, 17:4, 17:12, 17:18, 18:5, 34:15, 43:4, 45:19, 51:23
**won** 12:23
**wonder** 6:23, 46:11
**Wong** 10:12
**WOODBURY** 1:19
**word** 18:15, 46:20
**work** 7:21, 11:14, 14:10, 15:3, 31:16, 32:4, 32:9, 35:23, 45:24
**worked** 52:15
**working** 23:24, 32:10
**works** 47:20, 47:23
**world** 8:9, 9:2, 34:20, 34:23
**Wright** 21:13
**write** 10:24

< Y >
**year** 24:25, 25:8, 28:16
**year-end** 24:25
**years** 9:10, 19:1, 21:9, 25:1, 33:19
**York** 2:36, 10:12, 12:9, 12:23, 13:12, 31:9, 31:14
**young** 38:24

**App. 21**

# Exhibit 2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

PEDRO RAMIREZ, JR., Individually
and on Behalf of All Others
Similarly Situated, and GREATER
PENNSYLVANIA CARPENTERS PENSION
FUND,

          Plaintiffs,

      vs.            No. 3:16-CV-03111-K

EXXON MOBILE CORPORATION,    CLASS ACTION
REX W. TILLERSON, ANDREW P. SWIGER,
JEFFREY J. WOODBURY, DAVID S.
ROSENTHAL,

          Defendants.
_____

VOLUME 1A
BEFORE THE HONORABLE ED KINKEADE
UNITED STATES DISTRICT JUDGE
APRIL 28, 2026
DALLAS, TEXAS

FOR THE PLAINTIFFS:

    JOE KENDALL
    KENDALL LAW GROUP
    3811 Turtle Creek Boulevard, Suite 825 Suite 880
    Dallas, TX  75229
    (214) 744-3300

    SCOTT H. SAHAM
    NATHAN R. LINDELL
    SAM SHELDON
    ERIKA OLIVER
    T. ALEX B. FOLKERTH
    SARA BIERL POLYCHRON
    SPENCER A. BURKHOLZ
    ROBBINS GELLER RUDMAN & DOWD, LLP
    655 West Broadway, Suite 1900
    San Diego, CA  92101
    (619) 231-1058

BALON B. BRADLEY
BALON B. BRADLEY LAW FIRM
11910 Greenville Avenue, Suite 220
Dallas, TX  75243
(972) 991-1582

MICHAEL SWIDERSKI
(Party Representative)

FOR THE DEFENDANTS:

    THOMAS M. MELSHEIMER
    AUSTIN E. SAATHOFF
    EMILY WILKINSON
    DAVID T. HINOJOSA
    KING & SPALDING, LLP
    2601 Olive Street, Suite 2300
    Dallas, TX  75201
    (214) 764-4446

    NINA CORTELL
    JASON JORDAN
    HAYNES and BOONE, LLP
    2801 N. Harwood Street, Suite 2300
    Dallas, TX  75201
    (214) 651-5000

    AUDRA J. SOLOWAY
    DANIEL TOAL
    THEODORE V. WELLS
    LYUBA SHAMAILOVA
    AMITAV CHAKRABORTY
    DAPHNE THOMPSON
    PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
    1285 Avenue of the Americas
    New York, NY  10019-6064
    (212) 373-3000

    SCOTT C. THOMAS
    LATHAM & WATKINS
    100 Crescent Court, Suite 7084
    Dallas TX  75201
    (713) 546-5400

    D. PATRICK LONG
    SQUIRE PATTON BOGGS
    2200 Ross Avenue, Suite 4100w
    Dallas TX  75201
    (214)758-1500

(Rex Tillerson)

PATRICE CHILDRESS
(Party Representative)

Proceedings reported by mechanical stenography,
transcript produced by computer-aided transcription.

--------------------------------------------------------

PAMELA J. WILSON, RMR, CRR
Federal Official Court Reporter
1100 Commerce Street, 13th Floor
Dallas, Texas 75242
pam_wilson@txnd.uscourts.gov
(214) 662-1557

---

VOLUME 1A - APRIL 28, 2026

**P R O C E E D I N G S**

(Outside the presence of the jury.)

THE COURT:  Okay.  Ms. Cortell, you're ready?

MS. CORTELL:  Yes, Your Honor.  Thank you.

THE COURT:  Do I need to let those folks finish?

MS. CORTELL:  Are we ready over there?

THE COURT:  Mr. Saham, are y'all ready to address whatever these legal issues are?

MR. SAHAM:  Yes, we're ready, Your Honor.

THE COURT:  Okay.  Go ahead.

Have y'all been through and done all the redactions that need to be done for the whole trial?

Not yet is the answer, correct?

MR. BURKHOLZ:  Not yet is the answer.

THE COURT:  But we're working hard to get it done soon?

MR. BURKHOLZ:  We're working and our proposal yesterday was whoever is -- I think what we agreed on is whoever is offering the document will make a proposed redaction of the material that you identified yesterday, so . . .

THE COURT:  Yeah, but how do we do it and not waste a bunch of time?

MR. MELSHEIMER:  So I think it's just a good faith

effort by counsel --

THE COURT: To do it in advance? Y'all will mark them out before I see it?

MR. BURKHOLZ: Correct. Whoever is offering the document into evidence.

MR. SAHAM: Your Honor, we won't publish anything that says investigation or whatnot and I think if there needs to be a formal struck redaction before it goes back to the jury we'll agree with them what it needs to be.

THE COURT: You won't show it up here?

MR. SAHAM: Correct. We'll only publish portions of the document.

THE COURT: Okay. Is that okay with you?

MR. BURKHOLZ: That's fine with us.

THE COURT: Okay. That's fine. I just don't want a bunch of delays.

MR. BURKHOLZ: And we don't either.

MR. SAHAM: Your Honor, the other thing --

THE COURT: You'll see me like I am on sentencing day if that happens.

MR. BURKHOLZ: I don't want to see that.

THE COURT: I know you don't. I'll explain the guidelines are much higher for civil lawyers.

MR. SAHAM: Your Honor, the other thing I would point out is we have about a hundred agreed-to exhibits.

There's a stipulation. They're premarked. There's no redactions in those.

THE COURT: The ones that we've already admitted?

MR. SAHAM: Correct, Your Honor.

THE COURT: No, I know that.

MR. SAHAM: Just wanted to clarify that.

THE COURT: Okay. Great. Great. Okay. Thanks, guys.

Ms. Cortell.

MS. CORTELL: Your Honor, we would gratefully accept your invitation from yesterday that we talk a little bit more about the Flowserve case, which we have analyzed up and down and all around and we have concluded the following.

THE COURT: Great.

MS. CORTELL: There is partial truth to the plaintiff's position that there is -- there can be a revisitation at the merit stage of the -- of the reliance loss causation on the claim after class cert, so but -- kind of like --

THE COURT: The but, there it goes.

MS. CORTELL: There it goes. It's Paul Harvey, Your Honor, the other half of the story. Only you and I will remember that. Everybody else is too young.

THE COURT: I've met Paul Harvey. I did. I was a little boy. He was at the Southern Baptist Convention and my dad said you need to meet this fellow. I remember as a little child I was in Miami and I got to meet him. He had a great voice. If I had that voice I would have been king by now.

MS. CORTELL: Well, he had a great phase --

THE COURT: He did, didn't he?

MR. BURKHOLZ: -- the other half of the story, which applies here completely, because the other half of the story is that retrial of that merits issue only pertains to the individual claim, not the class claim. And we've directed the court to the operative language in the trial brief that we filed last night.

And if you think about it this makes perfect sense. The court is the gatekeeper at the Rule 23 class cert hearing. You decide what's the class claim and what's not. That's not for the jury to decide. That's for you to decide. Once that is decided, that's a hard stop. No class claim -- any claim that was not certified for class in the class cert order does not go forward upon a classwide basis.

So the only claim they have at this point under Rocky Mountain dry gas is an individual claim and as to that they would have to show reliance, which they cannot. We provided you with the evidence in the trial brief. So we object to any evidence or argument on the Rocky Mountain claim. We believe it should be out of this case and would ask the court for a ruling on that.

If -- you probably haven't had a chance. We filed the brief at 10:00 o'clock last night. We worked hard to get it in a little --

THE COURT: I was right on top of that.

MS. CORTELL: But the brief sets it out quite well, better than I ever can. But that's the point, Your Honor.

THE COURT: I'll look at it and I'll let you know.

MS. CORTELL: Okay.

THE COURT: But let me read it and get my scary smart lawyers looking at it, too.

MS. CORTELL: Would very much appreciate that, Your Honor.

Also just for the record, since you gave us license to object --

THE COURT: Oh, no. You have license to object to anything.

May I say this to begin with?

MS. CORTELL: Yeah.

THE COURT: I inherited one of these security cases from Barefoot Sanders, who is one of the great judges of forever, and so I went with him on how he did it and the Fifth Circuit reversed me. And, okay, I went the other way and they reversed me again. And then Sandra O'Connor was on the Fifth Circuit and she got reversed. And I was -- I don't

know if you've read the opinion. I finally wrote them and I said I don't care which way it is, but if you'll let me know. I think the circuit courts, and I don't mind saying this, have not given as much guidance to we poor down here trial judges we need on this very difficult issue.

I'm just telling you, it's a struggle. And if I don't rule your way it's not -- you can probably get me reversed, sobeit. It will be the sixth time on this. It is a very difficult issue. And I don't mind saying it's a close call whatever I decide to rule. If that helps you, if I've ruled against you, great. If it doesn't, I may rule for you. But, anyway --

MS. CORTELL: Your Honor, I would just say if you would take our brief under consideration.

THE COURT: I will.

MS. CORTELL: It's not just our interpretation of the case. We've cited an article to you which is on all fours with our interpretation of the case and I believe the language is clear on its face.

THE COURT: Okay. I'll look at that.

MS. CORTELL: It makes perfect sense. Rule 23, when one goes through class certification that is a critical juncture of the case and this court's holding there and here, you know, taking out the 2017 disclosure it stays in place as it relates to class certification. There can be no class

claim based on that once this court rules.

And theoretically if they can prove reliance they can go to merits on their individual claim only.

If I may, then I'll turn it over to Mr. Saham.

We also want to just renew our objections, Your Honor, to any argument or evidence being presented on the unpled Kearl claims as well as the item 303.

THE COURT: Okay. I'm going to rule the same way on that. Thank you. Overrule your objection.

MS. CORTELL: Thank you, Your Honor. Appreciate your courtesy.

THE COURT: No, quit. Thank you.

MR. SAHAM: Your Honor, just 10 seconds. I agree there's a lot of cloudiness in the circuit and supreme court, but one thing both the Supreme Court and the Fifth Circuit are mighty clear on, loss causation not an element in class certification, loss causation is an element of a 10b5 claim, and that's the distinction I think Ms. Cortell is not speaking to.

THE COURT: You might have gotten that in in 10 seconds. Very good. Thank you, Mr. Saham.

MS. CORTELL: Thank you, Your Honor. I'm going to cede now to the trial team.

THE COURT: Okay. I'd rather you sit up there at the front, but I'm okay with that.

MS. CORTELL: You'll see a lot of me, Your Honor.

THE COURT: Okay. All right. Everybody that needs to go to the restroom may go to the restroom. We need to get cranking up here.

All right. I am going to explain to the jury about y'all having to put your case on during the plaintiff's case. Okay?

Do you remember when we talked about that?

Oh, I know. Y'all aren't listening to me. It's just like at home.

MR. MELSHEIMER: I'm sorry, Your Honor.

THE COURT: I'm going to tell them about you having to put your case on --

MR. MELSHEIMER: Yes.

THE COURT: -- that's all I was saying.

MR. MELSHEIMER: Yes.

THE COURT: Nothing significant.

MR. MELSHEIMER: When the court speaks it's weighted with significance, Your Honor.

THE COURT: Could I have that etched in a wall?

MR. MELSHEIMER: Your Honor, might I raise some objections to the plaintiff's slides so we can get those out of the way.

THE COURT: Sure. I don't know what they are.

Can we shoot them up here on the screen?

MR. MELSHEIMER: Yeah, we can do that.

Okay. So, Your Honor, as I understood the rule was you weren't allowed to show anything that wasn't admitted, and so -- I'm going to need to get this.

MR. SAHAM: Just call out the number and Michael will bring it up for you.

MR. MELSHEIMER: Yeah. It's 7.

THE COURT: And off the record.

(Discussion off the record in open court.)

MR. MELSHEIMER: Okay. So, Your Honor, we would just object as this is an unadmitted summary exhibit and it's -- they can say it but they shouldn't be able to show it.

And the same thing with 8 -- 7 and 8 are the same objection.

THE COURT: Okay.

MR. MELSHEIMER: I'm just going to flip through their deck, Your Honor.

THE COURT: Yeah. Sure. Go through it. Everything that is objectionable, let me know.

MR. MELSHEIMER: Same thing with 16.

THE COURT: Okay.

MR. MELSHEIMER: If we could show that one.

THE COURT: Will y'all do me another favor?

Explain to the jury what bitumen is and those kind of

things?

MR. SAHAM:  Yes, sir.

THE COURT:  Don't assume.  Don't assume

MR. SAHAM:  It's high on the list.

THE COURT:  We had a prospective juror yesterday did not know what the word "evidence" was.  So y'all make sure.  You're great lawyers, you know that, but you're going to assume things, don't.

Okay.  Go ahead.

MR. MELSHEIMER:  Your Honor, item 20, slide 20.

THE COURT:  Which one is that?  There it is.

MR. MELSHEIMER:  No, I'm sorry.  It's --

THE COURT:  Not that one.

MR. MELSHEIMER:  Yeah, that's not my 20.  Okay. That's -- that's 20.  I got two 20s.

So, Your Honor, this is an excerpt from an unadmitted exhibit.

THE COURT:  Okay.  This is something y'all objected to?

MR. MELSHEIMER:  Yes.

THE COURT:  Okay.

MR. MELSHEIMER:  So let's see here,

THE COURT:  What are we talking about XTO?

Why is that --

MR. MELSHEIMER:  XTO is the company that owned --

THE COURT:  No, I know what XTO is.

How does that apply here?  They owned these reserves?

MR. MELSHEIMER:  They were whom we purchased these undeveloped fields from.

THE COURT:  Oh, Okay.  That's how you got all those fields?

MR. SAHAM:  No, Your Honor.  XTO is the entity within Exxon that owns the assets and it's losing a hundred billion dollars.

THE COURT:  But they bought XTO, that was a Fort Worth company.

MR. SAHAM:  But they call XTO -- that division of Exxon is in the class period in Exxon's documents is called XTO.  But that's still how they refer to it in their --

MR. MELSHEIMER:  I don't know why we're arguing about that.

THE COURT:  Yeah, don't argue about that.

XTO as I recall was an operation of a Baylor guy.  I think I know him from Fort Worth.  I forgot his name right now, but anyway.

MR. MELSHEIMER:  Okay.  So, Your Honor, and then 31.  This is also from --

THE COURT:  That's that barrel right there (indicating).

MR. MELSHEIMER:  Well, Your Honor, I will say the

objection here is this is -- this is -- this is a physical representation of something we've objected to in evidence, so they're trying to get around that by saying it's just a demonstrative.

This is -- this is a slide here that's a picture of that that again is from an objected-to exhibit.

Okay.  I'm almost done, Your Honor.  And, Your Honor, if -- for example, just so you'll understand that there's a consistency here, there's plenty of things that they're using from admitted exhibits that we're not objecting to because the rule was that you could use anything in your opening that was admitted, and so slides, you know, 35, 36, all those slides we are not objecting to under that principle.

Okay.  Okay.  So -- okay.  Hold on.  Yeah, so 44, Your Honor, is at least in part from PX 216, which is objected to.

And we're almost there, judge.

And, again, there are slides that are from exhibits that are admitted, so -- slide 49, this is just -- this is a picture and a quotation from a news article that we've -- that we've objected to, although the thing on the right we've not objected to.  So we've -- we've -- we've tried to be precise about it where we can.

THE COURT:  Okay.

MR. MELSHEIMER:  This one, Your Honor, 52, the court said something about being king, this is an article that we've objected to.  It's not in evidence.  They ought not be able to show it like that.

THE COURT:  Why is the word "King" in there?

MR. MELSHEIMER:  Well, I don't know.  We'll have to ask Mr. Tillerson when he takes the stand I guess.

But, anyway, those are our objections, Your Honor.  The simple principle is we followed the rules of not using anything in our opening showing it that was objected to and they should be held to the same rule.

THE COURT:  Okay.  Mr. Saham.

MR. SAHAM:  Your Honor, first and foremost, the first slides Mr. Melsheimer showed are simply calculations from the 10-K and 8-K.  These documents, it's just math from documents that have been preadmitted.

215, that barrel with the numbers on it --

THE COURT:  Wait.  Wait.  Stop.  Is that true?

MR. MELSHEIMER:  PX 66, that's the 10-K, so that is in evidence.

MR. SAHAM:  All three of those documents are in evidence, Your Honor.

MR. MELSHEIMER:  Okay.  So, Your Honor --

THE COURT:  Okay.  That's in -- Okay.  All right. I get it.  Those are in, I'm going to let him do that.

Next

MR. SAHAM:  This slide with the barrel, Exhibit

PAMELA J.  WILSON,  CSR/RMR/CRR

**App. 25**

215, they withdrew their objection to it, that's in as well.

Then we get to these reports --

THE COURT: Stop. Is that true?

MR. SAHAM: 215. It's a preadmitted document, Your Honor.

MR. MELSHEIMER: I will take counsel's representation.

THE COURT: Okay. Okay. Then it's admitted. That's -- you can go to that --

MR. SAHAM: Then -- then -- then we get to the documents about Kearl losses. They have had; this -- we've approached them about 30 times about this. You've ruled on summary judgment that Kearl losses are part of the case, XTO houses Rocky Mountain. That's our whole case, judge. They have objected to our top 50 documents. On 401 and 403 they say Kearl is losing money. That's our case, and they have objected to them. And now we don't have the slide replicating the document, but of course we're going to argue that. If we can't argue that we have nothing to do, the trial will last one day.

MR. MELSHEIMER: Great.

THE COURT: Whoa, whoa, don't tempt me. Whoa, whoa, whoa, Mr. Saham.

MR. MELSHEIMER: The rule is pretty simple. They can't use the exhibits in their opening if they're not agreed

to. They can argue that. They can't show the exhibits. That's the whole point of this. We've objected to that. They can try to get those documents in, we'll object, you'll rule, but for the opening that's off limits. Not the -- not the statements, but they can't show the documents.

MR. SAHAM: Your Honor, first of all, we haven't replicated the full document, but why don't we do the three documents right now, they can articulate their 401, 403 --

THE COURT: Okay. We'll do that.

MR. MELSHEIMER: Respectfully, Your Honor, we shouldn't do that. The whole premise of this was based on if we don't agree -- they had a chance to agree on a lot of our documents and they didn't agree either.

We're about to do this opening, it shouldn't be the case at the last minute they should say we're going to change the rule for these three documents. That's not fair.

MR. SAHAM: We never agreed to that, nor would I ever.

MR. MELSHEIMER: Your Honor -- I'm sorry. I misstated. It's not agreement. You told us that if it's not agreed you can't use it in opening as an exhibit.

THE COURT: Well, unless it gets admitted.

MR. MELSHEIMER: If it gets admitted with a witness and it hasn't been admitted yet.

THE COURT: Let's address it. Can you get it in

without a witness or no?

MR. SAHAM: Your Honor, their objection is 401, 403. No sort of hearsay. They have stipulated to authenticity. They have only objected to 401, 403, because they had their argument that there was these unpled claims. You denied it at summary judgment, you denied it again when Ms. Cortell argued it yesterday.

The sole objection to these three documents are 401, 403, and their objection is Kearl profitability is not part of the case.

THE COURT: Okay. Hit it.

MR. MELSHEIMER: Your Honor, our objection is that we did this whole process on the basis of if something was preadmitted it could be in the opening, if it wasn't, it wasn't. So we've relied on that.

It may be that this document comes in with Mr. Swiger. It may be. They're saying they're going to begin it with him. We're going to make our objection. I've got a pretty good indication what the court is going to rule on it, but, again, we relied on the court's direction about how to do this.

THE COURT: Well, blame the court. I'm going to allow that.

What else?

MR. SAHAM: That's all. Thank you very much.

THE COURT: Okay.

MR. SAHAM: I have one objection to Mr. Melsheimer's slide as long as we're doing objections. Slide 9.

THE COURT: What's his slide?

MR. SAHAM: Do you want me to just show it to you, Your Honor --

THE COURT: Okay. Put it up there on the screen. Can y'all put it up there?

MR. SAHAM: We had ours ready to go.

THE COURT: You did what?

MR. SAHAM: It's this slide.

This case is about 2015 and 2016. They want to put in stock price movements from 2026, the Iran war, the Ukraine war. Of course that effects sales prices and oil prices. This case is about 2015-2016 not 2026. That would be our objection.

MR. MELSHEIMER: Oil prices very widely over time --

THE COURT: All right. I'll let you use it.

MR. MELSHEIMER: Thank you.

THE COURT: Okay. What else?

MR. SAHAM: That's it, Your Honor.

Thank you very much.

THE COURT: Okay. All right. Is there anything

PAMELA J. WILSON, CSR/RMR/CRR

**App. 26**

else before we do the opening statements?

How long are y'all going to need for your opening statements?

After we talked about reducing the trial I'm assuming that's two-thirds, you're going to cut two-thirds out of your opening statement. I'm just making that -- I'm just using that kind of -- I'm not a mathematician, I'm just --

MR. MELSHEIMER: It's a one-day trial, judge

THE COURT: Boy, thank you, Lord.

I'm assuming, what was it 40 --

MR. MELSHEIMER: 45 minutes is what you said when you fortuitously added five minutes.

THE COURT: I'm going to let you do that. But when we get to 35 I may start coughing a little bit. There may be some of that. No, I'm glad to let you do it.

Make sure y'all are talking -- seriously, it's hard, because the way this courtroom is set up, you'll have to work hard, and y'all are both too tall, you're just too tall for these microphones and so you're going to have to talk into them.

And that microphone moves around.

MR. MELSHEIMER: Your Honor, can I just alert the court that you're probably going to want a few moments for a set change after he finishes.

THE COURT: Sure.

MR. MELSHEIMER: So just a couple of minute break. I'm not asking for --

THE COURT: I'll send them back out for a second or two and then we'll get going after that.

But I've got to swear the jury in right now.

MR. MELSHEIMER: And you've got some preliminary instructions to give them.

THE COURT: And I've got all the preliminary instructions. And I've got to swear them in right now.

MR. MELSHEIMER: Okay. Thank you, Your Honor.

THE COURT: Okay. Gosh. I love this. I love my job. It's been a while. I've had this same robe 50 years. This robe was given to me by Dee Brown Walker. I didn't have a robe. I showed up January 1 to get sworn in and I forgot to buy a robe and I'm running around the courthouse and Dee Brown Walker is there on January 1 and he goes I've got a bunch, just pick one out, and this is it.

MR. MELSHEIMER: He swore in my brother as a lawyer in the '70s, can you believe that?

THE COURT: I can believe it, because I was -- off the record.

(Discussion off the record in open court.)

(Jury enters the courtroom.)

THE COURT: Okay. We're going to give you an oath here. This is the last oath that you're going to get.

Raise your right hand.

(Jury sworn.)

THE COURT: Y'all be seated.

I won't say who brought the donuts, but I'll try to do that a little more often. I promised Mr. Jeffers that I would do that, so if we get donuts Mr. Jeffers is responsible for that. He also said that he would make sure y'all all get upgrades on American Airlines.

You don't even work for American Airlines. I know it. But there you go.

And y'all have got paper and pen. And it's not that cold in here today, but it may be colder, you just never no, so make sure you bring sweaters. Okay?

Now that you've been sworn in let me give you some instructions.

First of all, I want to explain something that's going to happen, and the lawyers all agree to this, and that is the defense will have to put their case on if there is a witness already on the witness stand that the plaintiffs have called. They can't wait until their side of the case and call the person back.

They have to -- it's to save time. So they will do their case at the same time if that witness is called by the plaintiff. So just understand that's kind of the way that -- that it will work.

And the lawyers will help you with that. They're really good lawyers, so you won't have a -- have a problem with that.

And with regard to evidence, a lot of the exhibits have already been agreed to. If they haven't, I will rule on 'em and I'll tell you about that. And I'll either say sustained or overruled. You've seen that on TV. They get it wrong about 90 percent of the time on TV. Hopefully I'm a little more -- get it a little more right than that. And then you'll know, and I'll explain that in just a minute, what that means.

I think that's most of those things.

If you can't hear at any point, if you'll just kind of raise your hand, let me know that the voice is too soft right here, I'll try to stay on top of that, but that -- that -- or if you can't see or anything like that, let me know.

But take all the notes you want to take. We'll talk about that in a little bit. But don't take so many notes that you can't listen. I mean, I take notes too. And so we'll go from there.

All right. You've been sworn in to try the case. As the judge I will decide all questions of law and procedure. You don't get to be the judge of that. But you will be the arbiters of the facts, and that's where we'll go from there.

You're the judges of the facts. At the end of the trial

I will instruct you on the rules of law that you must apply to the facts as you find them.

Throughout these instructions I may refer to the lead plaintiff and class representative Eastern Atlantic States Carpenters Pension Fund as the Pension Fund or as Lead Plaintiff. Usually I'll use Lead Plaintiff. Please know that Lead Plaintiff is formally known as Greater Pennsylvania Carpenters Pension Fund. I may refer to the class of Exxon shareholders represented by Lead Plaintiff as the class. Together I may refer to Lead Plaintiff in the class as Plaintiffs. That's probably what I'll do it. It's easier that way.

Further, I may refer to the defendant ExxonMobile Corporation as Exxon.

The defendant, Mr. Tillerson, Rex Tillerson as Mr. Tillerson. Defendant Andrew Swiger as Mr. Swiger, defendant David A. Rosenthal as Mr. Rosenthal. Together I may refer to them as Defendants.

And throughout trial I will -- I will call people by their last names. I don't use first names. It wouldn't be appropriate either on plaintiff or defense side.

This lawsuit has been brought as a class action and it's a lawsuit that's brought by one or more persons called class representatives on behalf of a larger group of people who have similar legal claims called a class. A class action lawsuit allows the claims of many people to be resolved at the same time rather than requiring each individual to separately file a lawsuit.

In this case the class includes all persons who purchased or otherwise acquired Exxon common stock between February 24th, 2016 and October 28th, 2016, inclusive. This period is called the class period. At the end of the trial you'll have a copy of this, of what I'm reading.

Certain shareholders are excluded from the class, such as the defendants and members of their immediate families. At this trial the class is represented by Lead Plaintiff Easter Atlantic State Carpenters Pension Fund whom I appointed to represent the class in this case.

You should assess the evidence presented and decide the issues as though Lead Plaintiff was presenting this case solely on its own behalf. In other words, you must not infer anything about the merits of the case simply because it's a class action, but it is important for you to understand that whatever verdict you reach, that decision will bind each and every member of the class, including Lead Plaintiff.

You may take notes during the trial. Don't allow your note taking to distract you from listening to the testimony. Your notes are an aid to your memory. If your memory should later than different than your notes, you should rely on your memory.

Do not be unduly influenced by the notes of other jurors. A juror's notes are not entitled to any greater weight than each juror's recollection of the testimony.

Unless the trial is -- until -- excuse me -- until the trial is over do not discuss this case with anyone and do not permit anyone to discuss the case in your presence. This includes your spouse, children, relatives, friends, coworkers, and people with whom you commute to court each day.

During your jury service you must not communicate any information about this case by any means, by conversation or with the tools of technology. For example, do not talk face-to-face or use any electronic device or media such as the telephone, a cell or smartphone, camera, recording device, a computer, internet, any internet service, any text or messaging service, any internet chatroom, blog, website, such as, Facebook, MySpace, YouTube, NapChat, Instagram, TikTok or X, formerly known as Twitter, or any other way to communicate to anyone any information about this case until I accept your verdict or excuse -- excuse you as a juror. That would also include gaming -- sometimes those game consoles can communicate. Don't use those to do it either.

Do not even discuss the case with other jurors until the end of the case when you retire to deliberate, so not even among yourselves.

It's unfair to discuss the case before all the evidence is in because you may become an advocate for one side or the other and that's not appropriate. The parties, witnesses, attorneys and persons associated with the case are not allowed to communicate with you. So don't be offended if they pass you in the hall. They're not being snooty. If they talk to you they get in trouble with me. And I promise you nobody wants that. And you may not speak with anyone else in and around the courthouse, other than your fellow jurors or court personnel.

Do not make any independent investigation of this case. Okay. Don't go looking things up or go to the library or any of that.

You must rely solely on what you see and hear in the courtroom. Do not try to learn anything about the case from any other source. In particular, you may not use any electronic device or media, such as a telephone, cell phone, smartphone, tablet, or computer, to research any issue touching on this case. Don't go online or read any newspaper account of this trial or listen to any radio or television newscast about it. Do not visit or view any place discussed in this case. Do not use internet programs or other devices to search for or to view any place discussed in the testimony.

In sum, you may not research any information about this

case, the law, or the people involved, including the parties, the witnesses, the lawyers, or me, until after you've been excused as jurors. In other words, everything that you need to -- to consider should be what you hear from this witness stand or documentary evidence that's offered.

There's some issues of law or procedure that I must decide that the attorneys and I must discuss, like this morning, there were several of those. And they're not part of what you must decide and they're not properly discussed in your presence. To avoid having you leave the courtroom and to save time I may discuss that with them at the bench. It will be over here to my right. Don't listen to what we are discussing. I won't do it in front of the microphone. But if it's going to take more time then I'll send you out and -- until -- until we can resolve those issues. And I'll try to keep those interruptions as few and as brief as possible, but it's going to happen. I'm sorry.

During the trial the lawyers may make objections to questions asked or answers given. It simply means -- here's what the lawyer is doing: They're requesting that I make a decision on a particular rule of law. Don't draw any conclusion from those objections or from my rulings on the objections. These relate only to the legal questions that I must determine and should not influence your thinking.

If I sustain an objection to a question, the witness is

not allowed to answer it. Do not attempt to guess what answer might have been given had I allowed the question to be answered. If I sustain an objection to any evidence or if I order evidence to be stricken, it must be entirely ignored.

If I overrule an objection, treat that answer like any other. In other words, you do -- you do consider that.

The evidence you are to consider consists of the testimony of witnesses, documents, other exhibits admitted into evidence, and listen to this, and any fair inferences and reasonable conclusions you can draw from the facts and circumstances that have been proven.

When testimony or an exhibit is admitted for a limited purpose you may consider that testimony or exhibit only for that specific limited purpose for which it was limited. And I'll make that clear at the time.

Generally speaking, there are two types of evidence. One is direct evidence, such as the testimony of an eyewitness. The other is indirect or circumstantial evidence. Circumstantial evidence is evidence that proves a fact from which you can logically conclude another fact exists. As a general rule the law makes no distinction between direct and circumstantial evidence but simply requires that you find the facts from a preponderance of the evidence, both direct and circumstantial.

Now, I'm going to see if I define preponderance.

Preponderance of the evidence, if you took the scales of justice it means that you believe it just any bit more than you don't believe it. That's just tipping the scales, anything over 50 percent. Has nothing to do with criminal cases, which is a much, much higher beyond a reasonable doubt. You've probably heard that on television from time to time. We're not talking about that.

Okay. A stipulation is an agreement. Certain -- they will stipulate to certain things. That means they agree.

When there is no dispute about certain facts the lawyers may agree or stipulate to those facts. You must accept a stipulated fact as evidence and treat the fact as having been proven here in court.

The parties have agreed to stipulate the following facts are not in dispute and will require no proof at trial. So these are stipulations.

Lead plaintiff purchased 11,150 shares of Exxon stock on May 12, 2016, 2700 shares of Exxon stock on June 17th, 2016, and 5,775 shares of Exxon stock on July 28th, 2016.

Lead Plaintiff sold 1350 shares of Exxon stock on June 27th 2016 and 3,725 shares of Exxon stock on September 20th 2016.

During the class period between period 24th, 2016 and October 28th 2016 Exxon stock traded on the New York Stock Exchange.

Defendants Rex W. Tillerson, Andrew P. Swiger, and David S. Rosenthal signed Exxon's 2015 Form 10-K for the fiscal year ending December 31, 2015. And you will hear about what 10-Ks are. That's something required by the Securities and Exchange Commission.

The trial will now begin. Lawyers for each side will make opening statements. I've given them 45 minutes to do that, each.

Opening statements are intended to assist you in understanding the significance of the evidence that will be presented. The opening statements are not evidence. After the opening statements the plaintiffs will present their case through witness testimony and documentary or other evidence. Next the defense will have an opportunity to present their case.

Now, remember, I've already told you that the defendants will put on at least a good portion of their case during the plaintiff's case, if those witnesses are called, so we don't bring 'em back later, those witnesses.

The plaintiffs may then present rebuttal evidence after the defendants offer whatever evidence they've offered.

After all the evidence is introduced I will instruct you on the law that applies in the case. In other words, I'm going to read something like what you may reading right now, and the lawyers will then make closing arguments. Closing

**App. 29**

arguments are not evidence but rather the lawyers' interpretations of what the evidence has shown or not shown.

Finally you will go into the jury room to deliberate to reach a verdict, but not now.  Keep an open mind during the entire trial.  Do not decide the case until you've heard all the evidence, the closing arguments, and my instructions.

Mr. Saham.

MR. SAHAM:  Thank you very much, Your Honor.

THE COURT:  You bet.

Ladies and gentlemen, first off, I would just like to thank you in advance.  Jury service, as the judge stressed yesterday, is just a tremendously important part of our way of life and our country and without you we couldn't do any of this.  And I sincerely tell you standing up here and having the honor to present the evidence on behalf of this class is one of the most important things I believe I've ever done in my life.

This case is about events that occurred in 2015 and 2016 and what's it about is the bosses at Exxon, those three gentlemen back there, they were the bosses back in 2015 and 2016, they hid the losses at the company's two most important two largest assets.  They had this giant strip mine of oil sands way up in Alberta, Canada, the northern part of the Alberta province and for every barrel they produced from that mine they lost $8.  They hid that information.

The other thing they hid was they had purchased -- Mr. Tillerson had spent $30 billion in 2010 buying a natural gas operation here in Texas, was owned by a company here in Texas called XTO.  And he was criticized from the outset for paying too much for that asset.  But by the time you got to 2015 that asset was losing over a hundred million dollars a month.  A total of $1.3 billion for 2015.  Now, there's no -- there's going to be no dispute that defendants knew about the losses for these two assets and they hid them.

They had an annual report that the SEC, the Securities and Exchange Commission, required.  It's a report card.  It's a big giant document.  It's an annual report.  It's filed every year and it's supposed to have the material information.  And you will see, ladies and gentlemen, this is a preadmitted document, nowhere in this document, nowhere do they mention those losses.  But they knew.  They knew about the losses.

And the reason they didn't put them in this annual report, or one of the reasons, is five days after that annual report was made public the company was borrowing $12 billion, and they didn't want that bad news out in the marketplace because it might have created scuttle or increased the borrowing -- interest they would have to pay on that deal and that's why they didn't disclose it.

They knew about it.  They got highlight reports, and we'll show you those, every single month highlighting these two huge assets and how poor they were doing.  But they hid that information from the Pennsylvania Carpenters and all other investors who purchased that stock during our class period.  And as a result, those class members, the Carpenters and everyone else who bought the stock, overpaid for the stock by $3.44 for every share.  And that's why we're here today, to resolve the dispute in this case.

And now I'm just going to quickly run through what the evidence you're going to see over this next two weeks will show.

Now, first off, as the judge told you, this is a securities fraud class action.  The parties are the Lead Plaintiff, the Carpenters Pension Fund -- and who they are, you will hear from Mr. Swiger, who is an administrator of that fund, for several thousands carpenters in the state of Pennsylvania.  Employers contribute to their retirement and they hire investment managers to invest in the stock market, other ways, to make sure those people when they get injured or when they ultimately have to retire they have money to live on.

Also, in addition to the Carpenters, this case was brought on behalf of everyone else who purchased in this period from February 24, 2016 to October 28, 2016.  So it includes 401(k) plans, pension funds, people, you name it, whoever bought the stock in this period, all those people, this information was hid from them and they overpaid for the stock.

The defendants in this case are Exxon, one of the world's largest corporations.  They basically dig up or mine energy, oil, gas from the ground, sometimes refine it, sell it to customers.  That's what it is.

And their three most senior executives, the CEO, Mr. Rex Tillerson, the principal financial officer, Mr. Andrew Swiger, and David Rosenthal, he was called the controller, that's essentially the chief accounting person at the company, and each of these gentlemen signed this 10-K that omitted critical facts and mislead investors.

Now, again, just to summarize what this case is about, it's about returning losses to investors, including the retirement savings for people like the Carpenters who lost out as a result of this false information and omitted information provided in this 10-K document.  It's for those class members to return to them the amount they overpaid for the Exxon stock.

And what this is about, again, in just one sentence, it's the fact that Exxon hid losses at its largest two assets.  That information was required to be in this document.  They talked about positive things about these assets but never disclosed the losses.

Now, we need to talk about the basics here. I learned this stuff because I'm working on this case for 10 years, didn't know any of this.

But what is produced at Kearl?

Kearl is way out in Canada, in Alberta. Exxon was really good before they got at Kearl of putting a straw in the ground, like an oil well, and just pulling out oil, but the problem you have is all the good oil, the really easily sold oil is getting used up and you got to replace your inventory of oil as you go around.

And one of Mr. Tillerson's big strategies is he put $24 billion -- and we'll show you what it looks like, into mining it's called tar sands, you mix it with something called diluent and what you get is something called bitumen. The thing with bitumen, you can sell it but you got to mix it with this diluent and it's really far away and it's a much lower quality than the rest of the oil that Exxon had. It's worth about half. So that's the bitumen and that's what's mined at this Kearl operation.

Now, as I said, because it's not a sweet Texas crude, it's a sour crude, it's far less valuable. It's about worth roughly half. There's these other kinds of oil, the really good oil, they sometimes call it WTI, which is a West Texas Intermediate sweet crude, sometimes they call it Brent, which is like the English version, but that's just the really good

stuff. Comes out easy and sells for more money.

Another problem with this Kearl bitumen operation was it's super, super far away from everything. Not only is it sand that you sort of pull up with trucks out of the ground, it's almost like a mix between coal and oil, I might be describing that wrong, but it's sand, you got it to mix it with this diluent, which isn't cheap, it costs like five or $6 a barrel just to get it to flow through a pipeline or go in a rail car so you can get it somewhere. And then you got to transport it. Like I said, it's way up in Alberta, Canada. A lot of the customers obviously are down here near the Gulf Coast, in Houston, Louisiana, that's where a lot of refineries are. So it's very expensive to get that bitumen all the way from Canada to the United States or wherever else it's going to be bought and sold. And that's another reason this bitumen is not quite as valuable, the transport. It's got to go a really long way.

Now, that being said, the inventory at these companies, big oil companies, they call them proved reserves. Kearl is the biggest one Exxon's got. Number 1. Numero uno. It's the biggest one. 3.6 billion barrels. So the future of the company, their biggest single asset in 2015, is Kearl, this bitumen.

And these charts will show you a little bit how it fits into the picture of what Exxon's got. All the proved

reserves at the whole company, they have got about 24 billion, 3.6 comes from Kearl, that's approximately 15 percent of the whole company's proved reserves going forward, the future of the company.

Then you've got another sort of metric -- and these are all things that are communicated in the 10-K and everybody knew about. Not folks like us, but oil people.

So developed reserves, the difference between a proved developed and a proved reserve is the developed you've actually already spent the money to get it out. It's come out. You can sell it right away. Kearl became a developed reserve in 2013 and when Kearl became a developed reserve as of this time period in the annual report we're talking about it's 20 percent of the proved developed reserves.

Next, another way they looked at reserves, are liquids. So there's liquids, which would include this bitumen, which barely a liquid but it's a liquid, and regular oil. And then gases are like natural gas, but they wanted to look at -- because liquids you sell for a lot more than gas, almost like in some, depending on how you look at it, almost 10 times as much. So they want to look at their liquids by itself. Kearl is 24 percent. Almost a quarter of the company's liquids are at Kearl. That's their inventory.

This is another fact that's very important for how the 10-K was misleading, this bitumen, this stuff up in Canada,

Kearl is 88 percent of that, almost all of what Exxon has is at Kearl, the inventory of the bitumen.

Now, again, just to repeat, this case is about the bosses hiding the losses at Kearl. They also took those 3.6 billion barrels, basically -- we're going to get into this, this will be a little bit of a more fun part of the case a bit later on, but these proved reserves, the inventory, the SEC, the Securities and Exchange Commission, has really specific rules about when you can include them in your 10-K. These didn't include. They shouldn't have been included. And the rule simply boils down to if it's not economically producible, if it's not profitable, it shouldn't be a proved reserve. These barrels are losing about 8 bucks a barrel. They should not have been included, and that's one of the reasons why this 10-K document, this annual report, was false and misleading.

The last thing that is omitted from this 10-K is that XTO business. It was losing so much money, and they had so much overpaid for it in 2010, now we're in 2015 and they're losing a billion three on their XTO business. It was on Exxon's books for too much. They needed to do something called a write-down and that would actually reduce their earnings by $2 billion. This document failed to disclose that as well. Five days before the $12 billion borrowings. And there's going to be lots of numbers in this case. I'm

not kidding you. It's a little bit of number soup. But what I always do, and what is most helpful for me to look at this case -- and you're going to hear from every single witness that this is the rule, it's the rule, I'm not telling you it, and what I say isn't really evidence, but you're going to hear it from the witnesses, once you have a proved developed reserve you got to use the actual cost. You don't get to make up cost, remove cost willy-nilly. You got use the actual cost. So this case rule, truly, when you get down to it, is simple as ABC. And if you follow the ABCs -- the bosses at Exxon ignored the ABCs or conveniently forgot their ABCs. But if you follow the ABCs, it's really quite simple. If Exxon used their actual bitumen cost they would have disclosed these losses in this annual report and it may have negatively impacted their borrowing cost, how much interest they would have had to pay on this $12 billion offering.

I'm just going to leave that there.

Next, what is -- and the judge told you this a little bit. What is this annual report I'm talking about, this big fat heavy document?

It's really a report card. It's a little more complicated than your kid's report card that might be one page, but it's to report to investors, the Securities and Exchange Commission, we -- our financial markets are the best in the world. We get investors everywhere. It's to make

sure that everyone who's investing is on a level playing field and that's why every single company that's a publicly-traded company, like Exxon was and is, has to file this document. And there's -- material information, the key information has to be in here. And if your two biggest assets are losing money that's got to be in there, and it wasn't, and that's really what the case is about.

Now, again, like I said, that document is misleading, the annual report, because it did not disclose the losses at Kearl. It included those barrels. They shouldn't have been in there, those 3.6 billion barrels, because they were not economically producible, couldn't be brought out of the ground at a profit, and the bosses at Exxon knew it.

Finally, they overstated their earnings. Exxon reported $16 billion in earnings in 2015. It should have reported 14 billion, still a lot, because they needed to take this right write-down to the Rocky Mountain XTO natural gas assets because they were losing so much money. You're going to hear a lot about how there's triggers and impairments, but it's really they were losing so much money. They had overpaid for this asset back in 2010. And we'll get into that a little bit later. I don't want to jump forward. We're talking about Kearl right now.

And, again, just talking about the 10-K. There's rules. And you're going to hear from accountants, you're going to

hear from Exxon people. What needs to be in a 10-K simply are the profits and losses, what I did that year. So this document gets filed with -- and made public in February of 2016 because it's talking about the prior year. So I know it's a little confusing. It's the 2015 annual report but it's filed in February because the company has got to put it together, you know, it's a fat document, and get it out publicly. They get almost two months to do that at the end of the year. So what's got to be in there is the profit and losses, that's about the current historical performance, and then with an oil and gas company your future. Your future of proved reserves, your inventory, because, of course, every year they're sucking some oil out of the ground and if you sucked it all out and didn't have anything left you're worth nothing the next year, right. So the proved reserves are really the future. And like I said, the biggest single proved reserve, 3.6 billion barrels is at Kearl.

Now, the importance of reserves, they recognize this internally. Every year the SEC requires them to report -- and they call this annual report, I don't know why they call it that, but it's called the 10-K. That's what they call it, an annual report or a 10-K. In this 10-K the defendants, Exxon, are required to report the proved reserves, and that's because the SEC told them and they recognize it, people in the oil and gas know it, it's the key measure of

sustainability. Exxon reported $16 billion in profits but if they used up everything no profits the next year. So you got to give them your proved reserves and those can only be ones that are economically producible. If they're not profitable, if you're losing money in each of those barrels, you can't include them. We'll get into that in a little bit of what I say is the fun part of how they manipulated the game, how they played the game to put these in their 10-K when they shouldn't have been in there.

Now, Exxon under Mr. Tillerson, one of his strategies -- he really had two strategies for replacing the reserves, the oil that was getting sucked out of the ground, it was Kearl and then this XTO acquisition.

I'm going to talk about Kearl first. So the proved reserves they were replacing this really easy, putting an oil well in the ground, suck it up like a straw. You'll hear people talk about that. Remember -- everybody is probably too young for the Beverly Hillbillies but when you do it that way it's black gold. It really is. It's like printing money and that's why Exxon is so successful.

But there's not that much of that left, of that black gold you just stick the thing in and suck it out. So Mr. Tillerson's strategy -- one of his strategies was Kearl. The problem with Kearl -- so in certain years -- Kearl, the replacement of reserves, say if you used up 10 barrels, 7.6

**App. 32**

of those barrels in certain years leading up to this 2015 period are coming from Kearl. So it really is. It's a huge thing. It's a huge measure of sustainability and they don't want people to know when it's losing money.

So Kearl accounted for 76 percent of the reserves. The problems are it's expense to mine and the company had invested 23.7 billion. Part of the reason it's expensive to mine is you're not just sticking an oil well in the ground and sucking it up. You got to -- this thing is like miles and miles wide up in Northern Alberta. They clear-cut forests, and it's just a giant, giant strip mine.

The other problem with that is you're not just sucking it up. You need all this equipment. They have got to use these giant trucks. It's unbelievable the size of these things. That's a man standing next to the tire. I think each of those tires costs a hundred thousand dollars. These things -- I tried to do a CarFax on them or whatever, but they're like eight or $9 million for each of these trucks and they have tons of them up there. You will probably hear from an Exxon witness about just how many they have up there. This is one of the defendant's exhibits. But it's just -- it's a massive operation up there and it's extremely, extremely expensive to operate.

Now, in 2013, that's when the bitumen came on line. Oil prices are super high. It was okay when bitumen -- it sells for about half of what the Brent or WTI sells for. When bitumen -- you can get $62 a barrel you're okay, but in this case in 2016 we're in what's called a sustained low-price environment and bitumen is down to $25. And the people there, they're looking every month, it's a highlight in their report that goes to the Management Committee. Now, Mr. Tillerson and Mr. Swiger sat on the Management Committee. Those are the folks who run Exxon. And every month the Management Committee would get a report showing the losses at Kearl and showing the losses at XTO. And it was a highlights report. It's not like -- you're thinking of, I don't know, if you're a football fan that's not watching the whole game, it's watching the one minute highlight or ESPN or whatever. It's just the Readers Digest version. The most important facts go in these highlight reports and every month they're being told about Kearl's losses and then we will see the XTO losses as well.

Now, Exxon has got competitors up there in those tar sands, Shell, Royal Dutch Shell, I don't know you maybe have seen that's a big Dutch, Total, it's not total, that's a big French oil company. They have got assets up there. And what do they do when confronted with these low prices? This is telling, ladies and gentlemen, they take massive write-downs. They write-down those barrels. They don't include those barrels. And they take write-downs, billions of dollars in write-downs. They follow the rules. Exxon did not follow the rules.

And they had meetings about this, many, many meetings. So Mr. Rosenthal convened the first meeting in May of 2015, so five months into the year. They know they have got these low prices. The prices have collapsed running approximately 55 percent below the prior year. They know they have got a problem.

And what do they say?

This is a little bit corporate speak. Internally they describe the losses -- they don't say we're bleeding money or anything. They say we're challenged to demonstrate positive cash flows. We'll see exactly what that means. This is a report shortly after that meeting that goes to Mr. Tillerson. This is what it means to be challenged to demonstrate positive cash flows.

You see Kearl, this is the highlights for the first six months of the year, lost $162 million, $8.11 a barrel for -- or 8.11 for every barrel they suck out of the ground that's cash profit. They also look at it by book profit, which is a little different. 108 -- Those brackets around it, those are losses, not gains. Whenever there's a bracket that's like a minus sign. I learned that too. So they're losing in book profit 187 million for the first half of the year, $9.37 for every barrel they take out of the ground at Kearl. Not going good.

Also, every month in the same document they get the lowdown on XTO, how's XTO doing. Well, for the first eight months of the year, this is August around the time, we'll see in a second, Mr. Tillerson makes some public statements. They have lost already $800 million. There's by my math eight months through August, that's over a hundred million dollars a month in this XTO business. It's losing money.

So Mr. Tillerson knows all that stuff. He also knows that the competitors are taking these write-downs. He publicly satisfies -- he doesn't say we're going to do the same thing. He said we're better than everyone else, we don't need to do write-downs. He got the information. He knew it was losing money. You don't get to choose whether you're going to do write-downs. If you're losing money that's not economically-producible you got to write-down those barrels.

Now -- that's all well and good. That's the first six months of the year, right? So we knew it was losing $180 million for the first six months of the year. Well they get a lot of problems after the first six months. The price of oil collapses. So realization, that's a fancy word for the price you received, how much money you got after you paid for transporting it to where it goes and paying for that diluent. This barrel is a little bit of a cheat sheet on that.

So the cost, you take off the top, to get to our realization, you got to take your transportation costs, your quality costs -- and, again, this stuff is not nearly as good as the WTI because of its viscous nature.  It's more like a black peanut butter than a flowing oil.  But don't try and eat it.  And then you got to pay for that diluent, which is also quite costly.

That's a helpful way, like the ABCs.  But looking up at this, so here's the situation, the first half of the year, you're starting in July now, the beginning of the second half, look at those prices.  Realization July goes down.  It was 42, it goes to 35, August 21.  This is what they're getting, their revenues now per barrel.  Then September they're only getting 19.  October they're getting 23.  November they're getting 16.  December, so the last month of the year, they're only getting $11 a barrel for this stuff.

Remember in the middle of the year they weren't getting $8 a barrel they were getting like 30 or 40 and they're losing 8.

What's happening when you're at 11?  Well, it says right next to it you lost $60 million just in the month of December.  In the November of November you have $74 million, October you lost 45 million, September you loss 108 million, and so on and so forth.  So for that second half of the year in total they lost -- depending -- I don't want to overwhelm anyone with numbers -- numbers soup, but well over $400 million Kearl loss in the second half of the year.

Now, like I said -- and this is uncontroverted.  I mean, it's a document.  We can read it.  I'll ask every witness about it.  That information isn't in here.  They don't tell anyone that Kearl is losing money.  They say the opposite.  They put those barrels on page 5 of this whole thing.  Page 5 they put those 3.6 billion barrels and they can't be there unless they're economically producible.  I assert those barrels could not possibly be economically producible given the losses suffered for each one.

And again -- here's page 5.  That's how page 5 looks blowing up really big.  Here's -- sorry.  Snafu here.  And here's page 5, the middle part, blown it up.  So those 4 -- 4108 that's 4.1 billion barrels of bitumen they -- they included, there's no bitumen in South America at this point in time, so it's Canadian bitumen.  3.6 of those 4.1 billion barrels are from Kearl.  They shouldn't have been there because they weren't economically producible, they were losing money.  So they really should have only reported 500 million barrels.  That's an overstatement of I think about 700 percent.  Not a small range.

Second, the whole, the bottom number, they had about 24.7 billion barrels of proved reserve for the whole company, and that's not just the developed ones, we looked at it different ways, that's everything, they should have only reported 21 billion, which is about a 17 percent overstatement.

Now, as I said, they didn't report that.  And what makes this even more egregious, they knew the SEC, the regulators, the Securities and Exchange Commission, communicated that to its executives because all those other competitors were writing it down.  They told them specifically you either write that down and if you don't we want what's called a quantity -- quantity -- I can't even say it.  They want to have them transquantified for them.  They want quantitative disclosures.  That's numbers basically.  And they knew it.  A guy named Mr. Horne, the SEC talked to him.  He told Mr. Rosenthal.  And in January, right when they're getting -- preparing this 10-K document, Mr. Rosenthal told Mr. Tillerson that the SEC expected greater disclosures about this, and they didn't give it.

Now, why didn't defendants disclose it?

We talked about this a little bit.  They didn't disclose it because that 10-K, that annual report, was filed on February 24th, five days later, on February 29th, the company was closing -- it was borrowing $12 billion.  It's called a bond offering, but it's basically they're borrowing money.  Because of the low oil prices they didn't make as much as they usually make.  They need that money for operations or to pay the dividends, because Exxon pays dividends to shareholders.  So it was really important they get that money and they were worried if they put out this bad news about their two biggest assets they might get a downgrade to their credit rating and have to pay more interest.

We all sort of can relate to that.  You go in to buy a car and one person has a credit rating of this and they're going to buy a Ford F-150 or Ford Fiesta, whatever it is you want to buy, one person might have to pay 50 or a $100 more because there credit rating isn't as good.  And it's the same with companies.  There's entities called credit ratings entities and they rate the companies like other credit rating agencies rank -- rate us.  And the reality here in 2015, Exxon hadn't taken any write-downs and they hadn't been downgraded by the credit agencies and they had the mint, the AAA rating, the best.  None of their other competitors had that.  And each of those other competitors had taken write-downs, like we saw, they wrote down -- Shell and Total wrote down their bitumen assets and they were downgraded by these credit rating agencies as a result.  All three of the main competitors, write-downs and downgrades.

Exxon no write-down, no downgrade, keep their AAA rating.  And what does that mean?

That means they paid lower interest than the other folks did.  And you'll see the bosses over there, they're

**App. 34**

monitoring this really closely. They're -- in February, and these are documents that you'll see, in February -- February 2nd, so this is 22 days before the 10-K and, let me see, 26 days before the bond offering close, they write an email that both Mr. Swiger and Mr. Tillerson get and it says the rating agencies, that's Standard and Poor's, that's one of the rating agencies that rates these companies, will review our full-year results and 10-K filing prior to making a final determination.

So they knew -- they knew that S&P was going to look at this document and if they put in bad news might cost them -- and you're going to hear expert testimony about this. You and I go to buy the F-10 maybe 50, $75 more there's a little bit of dispute but it could be as much as 800 or 900 million in interest depending on how their rating changes. It was big money, right? It's not a little small impact.

Okay. S&P in the exact same document, Mr. Swiger and Mr. Tillerson are also told they're monitoring. S&P cut Chevron's rating and recently downgraded Shell and Total, the same three companies that we're looking at. They're monitoring the competitors' write-downs, they're monitoring what happens to them, because they know this could be important to them. They're on some watch list already. They're one of three companies in the world that has this AAA rating but because oil prices are so low they're on this

watch list. So they know they teetering a bit, add a little bit of bad news for almost three million in assets that could have put them over the edge and cost them a lot of money in borrowing cost. And after they do the bond offering, February 29th, so this is a lookback, they're -- these -- these -- they're called underwriters, the people that help them get the -- the loan, essentially, they're banks, and they summarize what just happened. And what do they say?

XOM, that's Exxon's ticket symbol like when you got the stock exchange back in the old days, Exxon is just known as -- xOM because it merged with -- Exxon -- used to be Exxon and they merged with Mobile so now it's XOM. That means Exxon whenever you see XOM.

It says "XOM also benefited from its AAA credit rating." So this is a lookback. "While most of its peers suffered downgrades by Moody's and Standard and Poor's" -- those are the two rating agencies -- "Exxon's AAA ratings were affirmed," making XOM the only integrated credit not to suffer a downgrade.

So looking back their own underwriter said they benefitted from keeping this AAA rating. One of the reasons -- and, again, we don't need to prove a motive. We just need to prove they knew the information and it was important and they didn't put it in that document, but I don't need to know why. I think y'all are entitled to know

why, and this is one of the reasons why. But the judge will instruct you on the law, not me. The why ain't necessary. It's indicative. The lawsuit occurred.

Now, this is what I call the fun part of the case: When can you include these proved reserves?

And this is the manipulation. This is the games that they went to internally to justify to their own underlings why we're putting those barrels in there.

Okay. So the rule is it's got to be economically producible. And you'll hear there's fancy back and forth but you got to be making money to be economically producible. It's not economically producible -- it's got to be economically producible at current conditions. That doesn't mean you might not make money in the future when oil prices go up but the SEC wants investors to know is it economically producible now. And if it is, you can put in that proved reserves column on page 5; and if it isn't, you can't. That's the simple, again, getting back to the ABCs. And you've got to use the actual bitumen cost. No one is going to dispute that you can use fake costs or willy-nilly costs. You've got to use your costs in doing this calculation.

Now, we talked about that May meeting a little bit. Bitumen was down 55 percent. Kearl was losing $8 a barrel told to Mr. Tillerson's shortly thereof. What's really telling there, this is fascinating, at that May meeting -- so

there's two parts to Kearl, there's what's called KID, the initial development, and then there's what's called KEP, the expansion. The expansion to Kearl was coming on line in the middle of 2015. So it was doubling the production. It was sort of a -- a disadvantage -- disadvantageous situation because we saw those oil prices are collapsing exactly when they're doubling their production.

So what do they do -- what do they think of? They don't do this but they think about should we idle KEP, should we shut it down. Well, you have a profitable operation, ladies and gentlemen -- I'm not like some sort of genius financially, but if you're making money from those barrels, why would you shut it down? It makes no sense. And they thought about doing it. They didn't because there were technical reasons for it, but the fact that they're considering shutting it down speaks volumes.

Now, we've got that barrel there still. This is the barrel, it's a 3D representation. You'll see it also represented in documents. And what do they do? What was the trick?

Well, there's the SEC proved reserves calculation and then there's the actual. The big trick here is they only use a $1.32 for transportation when their actual transportation was at least $5.88. Now, how you're going to ask -- who's the Houdini? How do you get 5.88 to 1.32?

Well, this is what they did. About half the barrels were being sold on the U.S. Gulf Coast right up -- once this KEP came online, and you got to get them there. And it cost -- if you get them there by rail it could cost as much as $16 a barrel and if you're gonna get 'em there via pipeline it's going to cost, I don't know, we'll see the numbers in a second. I think it was 11 or 12. But it only cost $1.32 to get it to Edmonton. Some of the product they sell in Edmonton, and they just say, well, we'll just use the Edmonton cost for all of it. And you don't get to do it. You've got to use your actual cost. You can't willy-nilly say we're only going to use the cost to Edmonton and we're going to exclude the rest. You can't do it. It's not fair and it violates the rules.

And why did they do it? They did it because if you only have to take off $1.32 for transportation you can get to 28.70 for your SEC price, when your actual price, you will see it in a minute, Mr. Swiger was well aware, they all were well aware of what their actual price was, you have to compare that to your lifting cost. And lifting costs are what it costs to get it out of the ground. And, obviously, 28.70, if you don't use those transportation costs, gets above the lifting costs (unintelligible). But if you use the actual costs, which, of course, you have to use, remember, the ABCs, we're not going to forget our ABCs, actual bitumen

costs, everyone is going to tell you you've got to use them, and if you as your actual costs your realization, the amount you get, your revenues are below. You're losing money. They knew they were losing money. They get reports every month showing they're losing money. But they use the 28.70 internally to justify keeping those barrels on page 5 of the 10-K.

Now, here's probably the most damning testimony in the case. At his deposition, you will hear him again, Mr. Swiger today from that stand, I asked him: I just want to make sure I have this right. In the SEC analysis, that's the determination of proved reserves, you're going to want to use the actual cost involved, whether it's transportation, diluent, or any other cost, correct?

Answer: That is correct.

He knew the rules. I mean, these are very sophisticated gentlemen. They were not ignorant of the rules. They knew the rules. And they didn't use the actual bitumen costs. Don't let anyone, no matter what you hear from Mr. Melsheimer, he's an amazing lawyer, don't lose track of the ABCs.

And, again, another bit of really important testimony, you will hear it again from the stand, I asked Mr. Swiger: But you were informed in November of 2015 that the year-to-date, first eleven months of 2015, transportation

costs for Kearl was $7, correct?

Answer: Yes.

How do you use $1.32 for your transportation cost in the SEC test when you know the actual transportation costs, when you average the $16 shipping by rail to the United States and the $1.32 for the ones you sell in Edmonton, how do you use the $1.32 when you know it's 7?

Well, the answer to that, ladies and gentlemen -- we don't check our common sense at the door. The answer to that is you don't unless you want to commit fraud, and that's what happened here.

Now, this is just another visual. It -- it's about 370 miles from the Kearl oil sands up there in Alberta to Edmonton and it costs about $1.32 for the barrels you sell in Edmonton, that's for transportation. Obviously it's much shorter. But if you're going to go by train all the way to the Gulf Coast, and you're going to see in a second in the months leading up to the main meeting where the bosses discuss this, 50 percent of the oil was going just right there to the Gulf Coast it cost 16.50. So you've got to average all our costs. It's a business, they know what their costs are. And when you average it all together, in November it's $7, they cut it down a little bit so it's 5.88 by the end of the year, but it's not $1.32. And if you use $5.88 or $7 those barrels simply don't qualify as proved reserves.

Now, as I said the bosses, all three of these guys, they have a big meeting in October. It's October 26, 2015, and they make the decision there that they're not going to use the actual transportation costs to ship Kearl -- bitumen barrels to the United States. The meeting is about -- these are the attendees. Each of the three defendants, also a guy, Andy Madden, and you'll -- you will hear from him later. He's the transportation man. He comes there to that meeting and he's got an email -- we don't -- nobody remembers at least at the deposition, you know, what happened with that email, but he has an email dated three days before that lays out exactly all the costs. And we'll see that email in a second. But he's at that meeting too. All three of these guys are at the meeting. The reason for the meeting - this is the slide deck from the meeting - is to discuss Kearl proved reserves, the SEC outlook, page 5 of the 10-K they're discussing.

You can see here on two pages, it's a short deck. They only use the cost -- and this is just for one month. That's why it's not $1.32. It's $1.27. We're just going to use the cost to ship the Kearl blend from Fort McMurray, that's where Kearl is, they call it Fort McMurray, that's a little town that's closest to the Edmonton market. They're only going to use those. They're quite explicit. We're going to exclude all the U.S. sales. We're not going to include those. Their

**App. 36**

actual cost is way more expensive to get it to the U.S. and that's where most of the barrels are going and they don't include it.

Why not? Because it's way more expensive and you've got to deduct that transportation cost from your realization. And this was an example. This is the email I'm talking about and it's dated three days before that meeting. It's an Andy Madden email. These are the barrels they include. Again, it's just for one month so it's a little numbers soup, it's not exactly. But the transportation for that month he's showing them $1.70 if you ship it only to Edmonton and you realize your revenues for those ones $25. The ones they exclude now, if you ship it via the Keystone Pipeline to the U.S. Gulf Coast you got to pay $12 to the people who run the pipeline and you only realize $17. You get a little set-off because you can sell it for a tad more in Texas but not enough to make it worthwhile.

And then what's excluded -- of course they would sell it out in Edmonton if they could, but if the stuff is coming out, it can't sit there. It's got to go somewhere. They sell as much as they can in Edmonton, but remember starting in May and June this KEP comes online and doubles their volume, right? So they have to sell it elsewhere. The next choice is the pipeline. They get as much as they can pipeline space because it only costs $12 but they're stuck selling a lot of it via rail, shipping it via rail, which is $16 bucks. And when you average that all together it's $6.

So shipments to the United States -- this chart is quite telling. That meeting is in October, the blue, so this is third-party Kearl volumes by point of sale. Point of sale, where it's sold. The three months immediately before that October meeting, July, August, September, the blue, that's the half -- half of it is going to the Gulf Coast. And they don't count any of those transportation costs. They only use -- oh, we'll just use -- we'll just use the Edmonton ones because they look better.

Now, this is a graphic document that Mr. Swiger received in August, the blue showing him that transportation costs then were $6 a barrel. And then the -- part of the deck from the meeting, with the $1.27, he knows. He's getting updates, gets a big update in August. He gets a big update in November. He knows the transportation costs in total are six or $7 and they're only using $1.27.

And then ultimately in December, this is the -- you know if you got to raise alarm bells, he gets a report, the highlights report that he gets every month, shows for the whole year. Now we're not talking about part of the year or whatever. This is for the whole year. Kearl actual realizations, the revenue, so it's the revenue after you deduct for transportation, quality, and diluent, that's just the way they do it there, the actual number is 24.28. And he's also told in an email at the exact same time, within days really, that for the SEC they're going to use 28.70. Well, you just can't do that. You can't use 28.70 when you're actually quite a bit lower, and that's what this case is about.

Again, I keep putting this up here but it's the ABCs, actual bitumen costs. You don't use fake bitumen costs. You don't willy-nilly exclude half the barrels you're selling because it looks better for you. You're not allowed to do that. And that's what happened here.

Those barrels, as I said, did not qualify as proved reserves. There was an overstatement. They were losing money. A 700 percent overstatement of the Canada bitumen and a 17 percent overall overstatement. Those barrels should not have been on page 5. That was misleading to investors because those were not economically producible at existing conditions.

Now, the SEC remember told them they wanted quantitative, I finally said it right, quantitative disclosures. They wanted numbers. That's not what Exxon did. Instead they put a warning in that 10-K. The warning says: If prices remain low in the future these barrels could not, might not -- or -- or -- I want to read it exactly because I always get it wrong. These barrels could temporarily not qualify as proved reserves if these prices continue in the future. You can't warn someone that something that's already happened might happen in the future. Just to take a Texas analogy, it would be like warning there's rusty hinges on that barn, the horse might get out when the horse is already 30 miles away. That's what they did. They said these barrels might not qualify if prices stay low when they already didn't qualify and you included 'em improperly on page 5 of your 10-K.

And each of these defendants, the three bosses at Exxon, they signed this 10-K and they certified that there were no misrepresentations or omissions in the document. They certified it. They signed it as the three most senior officers of the company.

Now, how were the plaintiffs injured, these class members?

Well, eight months later -- eight months later, after the bond offering, so eight months after the bond offering, essentially, they disclose these barrels no long qualify as proved reserves, in October of 2016.

THE COURT: You're kind of getting close to your --

MR. SAHAM: My 45?

THE COURT: You're at 46.

MR. SAHAM: Two more minutes, Your Honor, just so I can get to XTO?

**App. 37**

THE COURT: As fast as you talk, I bet you can do it.

MR. SAHAM: I'm going to go fast now.

THE COURT: What do you mean now?

MR. SAHAM: So the people who bought the stock during the class period paid 2.30 too much. The news media as soon as it came out Exxon shares are trading lower because they warned of the debooking of these barrels. This is the first inkling that people get that Kearl's economics are -- of that project are challenged. It's the first inkling that investors know that Kearl is not making money. The stock goes down instantaneously $2.39 a share. And you're gonna hear from both experts -- PLAINTIFF has an expert, defendant has an expert. They both agree this is going to be a lot of science and economics but what they both agree on is as an efficient market, no one disputes this is an efficient market, you can use statistical analysis to get rid of other noise to determine what caused the stock to decline. And you're going to hear a lot of the expert testimony on it. But because it's an efficient market you could prove that this Kearl disclosure in October, eight months too late, caused the stock to go down $2.39, so everyone who bought it between February and October paid $2.39 too much.

Very quickly on this XTO business, Mr. Tillerson paid $31 billion for this asset. Again, it was to replace

reserves that were going away and in certain years 80 percent of the replacement came from this natural gas. When he bought it natural gas was selling for 4- to $5 a unit. By the time you get to our class period, this -- well, before our class period, but 2015, natural gas prices are under $2.50 and that's why XTO natural gas business had lost $1.3 billion.

The prices collapse. They're about 1.70 when that 10-K, that annual report, comes out, when they keep -- they don't announce the Write-down of the XTO business that's losing all this money. It's hit a record low right before the bond offering. No disclosure that these things aren't worth what we paid for them.

Then Mr. Tillerson resigns for the company. The prices are up, they have almost doubled. He leaves the company and that's when they take this impairment charge, this write-down. It makes no sense. You paid for these -- this natural gas. And here this next slide helps with this and then I'm going to be done in two slides later.

4.38 is when they buy it. That's when he makes the $31 billion investment to replace reserves. 2015 you hit $1.74 on natural gas. Mr. Tillerson says, no, not going to write it down even though we're at record lows right before that bond offering, remember, buying the $12 billion. Then Mr. Tillerson leaves, leaves the company. New CEO at 3/31

almost the price doubles, he takes the write-down. And that write-down occurs on January 31st, 2017. They tell people we've got to write-down the value of that XTO assets by $2 billion and that, again, the market, the stock, does gown $1.05.

Now, ladies and gentlemen of the jury, I've already gone too long so I'm going to stop. I thank you for listening to me. Really what this is case is about, the boss has got to follow the same rules as everybody else. The bosses at those other companies followed it and they took the write-downs and because these Exxon bosses didn't follow the rules, the class, the Pennsylvania Carpenter's Retirement Fund lost a total of $3.44 a share. Thank you for listening to me today.

All right. We'll take a break. Don't talk about the case. They have got to set up differently. Thank y'all.

Go ahead with the jury.

(Jury exits the courtroom for a short recess.)

THE COURT: All right. I'm ready.

THE SECURITY OFFICER: All rise for the jury.

(Jury enters the courtroom.)

THE COURT: Y'all be seated.

Thank you.

Mr. Melsheimer.

MR. MELSHEIMER: May it please the court.

THE COURT: Yes, sir.

MR. MELSHEIMER: Over the next two or three weeks you will learn a few things. First, no fraud has been committed. Not by these three gentlemen, not by anyone at ExxonMobile.

Second, you will learn that these men and the people with whom they worked followed the rules. We will show you that with document after document, witness after witness. Following the rules isn't fraud.

Finally, the evidence will show that the plaintiffs are trying to turn the normal ups and downs of the stock market into intentional fraud. But normal fluctuations in a stock price are not fraud and no amount of lawyer argument can make them so.

So good morning. I'm Tom Melsheimer. And I, with my colleagues here, represent Mr. Rex Tillerson, Mr. Andy Swiger and Mr. David Rosenthal, along with the people of ExxonMobile.

When you see the evidence and hear the evidence and when you get the law from Judge Kinkeade you will see that there was no fraud. There never was a fraud.

Now, you will hear from many witnesses in this case, through documents they created and from the witness stand, the men and women of ExxonMobile who actually did the work here, the engineers who ran the calculations, the accountants who crunched the numbers, the reserves professionals who

**App. 38**

actually applied the rules, the auditors who made sure the work was done right. Every single one of those people, every single one of those people, will tell you that they followed the rules. No one lied. No one cheated. And no one hid anything from anyone.

Plaintiffs will not produce a single witness who was involved in any of these facts to tell you that they were pressured to falsify a number, that they were told to reach an improper result, or that they were asked to hide or conceal anything or disregard the rules.

Plaintiffs will not show you a single document, not an email, not a text message, not a memo, showing that Mr. Tillerson or Mr. Swiger or Mr. Rosenthal said anything like "Make these numbers work. Don't follow the rules." Those documents don't exist because that never happened.

And you will hear from these three gentlemen themselves, Mr. Rosenthal, Mr. Tillerson and Mr. Swiger. And they will take the stand and they will look you in the eye and they will tell you they did nothing wrong, that they followed the rules and they did it the right way. That's what you'll hear during this trial.

Now, you've heard the accusations, let tell you a bit about the law. And the law is important. Now, Judge Kinkeade is going to tell you what the law is at the end of the trial, but I want to talk about two important elements for you to keep in mind.

First, the plaintiffs have to prove a material misrepresentation, a material false statement. And then, secondly, they have to prove that that was meant to deceive, manipulate, or defraud. Not a judgment call that didn't pan out. They must prove the state of mind of Mr. Tillerson and Mr. Swiger and Mr. Rosenthal.

They have got to prove that these men knew and that the ExxonMobile people knew the truth and they chose to lie anyone. Now, that is a high bar. And it should be a high bar, because when you accuse someone of fraud you are attacking their integrity, you're attacking their reputation, and you're attacking these men and the individuals they worked with.

You will hear the evidence in this case, and you might think, well, maybe Exxon could have disclosed more information or used a different methodology or reached a different conclusion. That's not fraud. Fraud requires -- what they're asking you to believe, when you put the law next to their accusations, they're asking you to believe that the people of ExxonMobile, these gentlemen, knew the truth, chose to deliberately hide it from investors, that they sat down and they said, in effect, we know this is wrong but we're going to do it anyway. Deliberate deception, not a business decision that someone might have made. So please keep those

requirements in mind as you hear the evidence in this case.

So understand this case we all are going to need to understand this 10-K document. Now, the-10-K-is an annual report, as you heard. It's -- every public company has to file this with a federal agency called the Securities and Exchange Commission. Now, the SEC dictates what goes in this document, the structure of it, and when it comes out. Companies can't make up their own format. Some information is just math. Other times it's a judgment call and the SEC expects companies to make good judgments. It's not a marketing piece. It's not a -- and it's far from the only information that shareholders got about the company every year. And it's certainly not a crystal ball.

Now, when you see the work that went into this document you'll see why there was no fraud. So I want to look at this for just a minute. This document was created over many months. It involved hundreds of people, thousands of hours, 120 pages and 30,000 words. And in addition to all this work, the internal process that Exxon undertook, it also engaged Pricewaterhouse Coopers, one of the largest independent auditing firms in the world. And those auditors play a critical role of ensuring what the company is doing in its internal controls and processes. And you're going to hear more about Pricewaterhouse later.

Let me be clear. The people of ExxonMobile, these three gentlemen right here, they stand by every word of this. They stood by it in 2015 and they stand by it today.

All right. So let's talk a little bit about the oil and gas business, because to understand what goes into this document you really have to understand a little bit about the oil and gas business. And the main thing I want to focus on is that prices vary widely for oil -- for oil.

So if you look at this chart from January of 1974 to March of 2026 there's sort of two things at play here. One is lots of ups and downs. Right?

But it's trending, generally, over many, many years to prices higher. The price is higher today than it was in 1974. But you know this. You see this at the pump. We're seeing it right now with high oil prices. We saw it when there was -- when Russia invaded the Ukraine. We saw low prices during COVID, and there were indeed low prices in 2015. That's the industry, that's the context Exxon has to operate in where you never really know what these prices are going to be in the future.

So let's talk about Exxon. It's based here in Texas, headquartered in Texas. Everyone knows it's one of the Largest energy companies in the world. It's been around 140 years or more, got 50,000 employees in 56 countries, thousands of assets, and it has 91 billion oil-equivalent barrels in its resource base back in 2015.

PAMELA J. WILSON, CSR/RMR/CRR

**App. 39**

Now, all those assets and all those different lines of business, the plaintiffs have chosen to focus on two of them, this Kearl oil sands operation in Canada and this Rocky Mountain dry gas assets in the Rocky Mountains of the United States, two assets out of thousands. And before we talk about that I want to talk a little bit about how this trial is going to go. You already heard it from Judge Kinkeade. The plaintiff will always go first. We will always go second. They will call their witnesses first. They will get to make an opening statement first. They will get to make the closing argument first. We will go second.

Then we get our turn with the witnesses. Now, once the plaintiffs have finished their whole case then we can call witnesses. But here's something important and different, and the judge has mentioned this to you already, the plaintiffs have no fact witness who was involved in any of this who says that anyone at Exxon did anything wrong. Okay?

So what they will do is they're going to call our witnesses and they're going to try to prove that through our witnesses.

And I think Andy Swiger right back there is going to be the very first witness, so you will hear from him. And, frankly, that's A-okay by me, because these folks are going to talk to you about what they did and how they did it and how they didn't hide or conceal anything or do anything

intentional or deliberate to deceive anyone.

Now, the plaintiffs lawyers get to ask questions of our witnesses first. And because of the way they ask the questions they may not get to fully explain everything they did. We'll do that when we get up to ask questions.

But here's what matters. Mr. Swiger and every Exxon witness they call is going to tell you that they gave everything their most honest, careful assessment. They didn't hide anything. They didn't cheat. They didn't do anything wrong. And I think when you hear from all the witnesses, and when you see how the rules were followed, when you see the processes that were in place, when you see the months of work and the meetings and the conversations and the debates and discussions and all the teams that came up with the information to put in this 10-K, you will appreciate the idea expressed in a paraphrase of on old proverb: In the counsel of many -- in the counsel of many there is wisdom.

When the plaintiffs are finished we'll call additional witnesses. And I'm going to preview some of them for you today. I'm just going to ask you for your patience as you go along, because we will always go second.

Now, let's start talking about Kearl. Here's what's important to know about Kearl. It is a mining operation in Canada. Okay. It produces something called bitumen, and it is a thick, tar-like substance. And it's used -- if you've

been driving around Dallas lately you've seen bitumen. It's used in asphalt that is often used to patch roads, so that's what it looks like.

Now, the operation, the mine itself is 20,000 football fields, 20,000 football fields, that's how big it was. And it was a start-up operation in 2015. So when you hear Kearl, when you hear Kearl and bitumen, I want you to think start-up. And no one expects a start-up to be immediately profitable. There was something called the Kearl Expansion Project. $9 billion was invested in 2013, '14, and '15 and the expansion project went online in 2015. So this was a multibillion dollar operation that was still ramping up in 2015 and early challenges were to be expected. But remember, this was a 40-year asset. This wasn't something that they expected to be done with in a year or two or three. This was a 30- to 40-year asset. So no one was worried about some of the initial challenges.

Now, what do plaintiffs say about Kearl?

You heard it. They say that our 10-K was misleading because we didn't disclose that Kearl was losing money. So let me tell you the rule -- what the rules require. The rules do not require profits and losses to be laid out by the SEC by individual assets. You're going to hear that the SEC requires the companies to report average production prices and average production costs by geographic area. It's not an

asset-by-asset thing. And that is on page 9 of this 10-K. That's exactly what Exxon did on page 9.

You will also see and -- you'll also see where we disclosed Canadian losses in 2015 in the 10-K. You will see here on page 99 where there are $896 million in losses in Canada and South America. You remember you heard him say Canada, that's bitumen, well, there's the losses disclosed right there on page 99.

So ABC -- ABC, always be careful. Always be careful to check the evidence to the documents, to the people and to the testimony. Always be careful. We're going to be careful and we want you to follow that same approach as you hear all the evidence.

Now, plaintiffs also claim that we presented our message to the outside world about Kearl while telling a different story internally. The evidence will show you that that's just not true. You will hear from our witnesses who will explain that Exxon's internal management views were consistent with our public statements. We were not saying anything different. Plaintiffs are comparing internal what's called F&O reports prepared under one set of rules and for a different purpose with something that the SEC requires, which is a different set of rules and a different purpose. It's like comparing apples and oranges. So they're not just messing up their ABCs. The evidence will show that they're

**App. 40**

distorting the facts. So always be careful. Andy Swiger and other witnesses will walk you through this process about Kearl, the start-up process and they will explain why those numbers came from.

All right. Let's go to the second issue about Kearl and that's this proved reserves issue and this notion of estimated proved reserves.

Now, plaintiff's say, well, you lied about that because Kearl didn't qualify as proved reserves in 2015. The evidence is going to show the opposite.

So what are estimated proved reserves? So they're not like a bank account. You can look in your bank account and see how much money you have. You can't do that with an estimate of proved reserves. Estimated proved reserves are an estimate of how much of this is in the ground that can be economically pulled out of the ground over time. Everyone in the industry agrees that estimating this kind of reserve has enormous uncertainties and it's complicated. So, as a result, what counts as a proved reserve, and this is the rule, and we're showing you the rules over and over again because we follow them, it depends on market conditions.

What are the proved reserves? What can be estimated with reasonable certainty under existing economic conditions. So what -- what that means is whether the price you can get for some bitumen is more than what the cost of getting it out of the ground. That's going to depend on market conditions. When prices are high sometimes reserves get booked, when prices are lower sometimes reserves are debooked, but all of the time the operation keeps running. Kearl never shut down, they never stopped operating for long periods of time. It kept running.

So how does a company like Exxon estimate whether it has proved reserves? How do you do that? It's not something you scribble on a napkin or put on poster board. Here's what it looks like. The folks at Imperial in Canada do a lot of the groundwork. They have reserve teams that do some initial review. They kick it up to the committee at Imperial for additional review, and then an additional review, and then finally makes it to something called the ExxonMobile Global Reserves Group review and finally up to senior management.

Now that group was headed by this gentleman. His name is Bill Strawbridge. He's right out there in the audience, I believe, Mr. Strawbridge. He's going to testify. He's a 30-year veteran of reservoir engineering. He served on the industry body that literally writes the standards for how you estimate these things. He'll explain to you how this process works and how he worked for months, month after month after month in 2015 to get this test right because Exxon followed the rules.

You'll also hear if from Deidre Norman. She's up in Canada. She's going to come down and talk about she ran these numbers day to day. She'll tell you the same thing. Every time they ran the estimate for Kearl in 2015 it passed as a proved reserve. To be sure, professionals identified concerns, braced them through proper channels, debated, discussed them exactly as you would expect, because in the counsel of many there is wisdom. And the message throughout remained the same, Kearl passed the proved reserves test and that's what was reported to Mr. Swiger and Mr. Tillerson and Mr. Rosenthal.

Now, here's what you won't see -- and I've said this before -- you will not see a single email or a single document saying -- where someone at Exxon says "Make sure Kearl passes." You will not hear a single witness testify that anyone, not Mr. Tillerson, not Mr. Swiger, not Mr. Rosenthal, told them, "hey, you fix those numbers. You hide that data. We got to make sure Kearl passes." There's nothing like that, because it didn't happen.

Now, how does the plaintiff try to deal with this?

This is a big challenge for their theory. How did they try to deal with it?

Well, they say we used the wrong methodology, that we should have included some different transportation costs or updated the formula that Mr. Strawbridge and his group was using. But you're going to hear that ExxonMobile employees here in the United States and up in Canada carefully considered how to look at those Gulf Coast costs, how to look at those transportation costs, and concluded that under the SEC rules the correct approach was to do what they had been doing for years and use the pricing in Canada.

The evidence will show that we followed the rules. The evidence will show that they are distorting the rules to make this case fit their theory. ABC, always be careful.

And remember -- what is required here is not a close call, not a, "well, I might have done it differently," not a, "you should think of it a different way." It requires that they prove deliberate deception. They have got to prove to you that these men sat down and decided to lie. And I'm telling you, there's going to be no evidence of that at all.

Exxon didn't hide anything. You heard that over again, hide, hide, hide. We didn't hide a darn thing. We did the opposite.

If you look in the 2015 10-K you will see seven different warnings about conditions that may lead to the impairment or write-down of assets or to the debooking of reserve.

Look at this one.

When crude oil and natural gas prices are in the range seen in late 2015 certain quantities of oil and natural gas, such as oil sands operations in Canada, may not qualify as

proved reserves. That is a warning about what exactly ended up happening. That's not concealment. That's telling the shareholders what could happen in the future.

And what did happen?

Well, in 2016, when the prices stayed low, low, low, Kearl was in fact debooked.

But what happened when prices went up in 2018?

Kearl was rebooked, because that is the nature of these kinds of assets in the test that the SEC requires you to follow. But nothing ever changed at Kearl. It kept working. It kept producing. The trucks kept rolling. The people kept going to work. That is consistent with the rules.

And I ask you to use your common sense, too. Does this sound like a fraud case, a company that warned investors about the very thing that happened, followed the process they had used for years and then debooked the next year when the test showed that they should debook?

That does not sound like fraud.

All right. The last claim is about these natural gas assets in the Rocky Mountains. Now, these were fields that were largely undeveloped. Now, I'll make it very clear. This has nothing to do with Kearl. Okay. The Kearl is this black bitumen, this asphalt-like substance, and this is undeveloped gas fields in the Rocky Mountains. And here's a core sample (indicating) actually pulled out from thousands of feet under the ground. Okay. This is shale. And if you work really hard, with a lot of technology and a lot of people, a lot of hard work, you can pull petroleum out of this kind of shale. It's not like putting a straw in the ground. That's not how it works. That was never how it worked. But this is very different from the bitumen operation that was operating in Canada.

That sample, by the way, this thing right here (indicating), they tell me it's millions of years old, thousands of feet under the ground.

Okay. What's different besides the fact that they're different resources?

Here's something very important. Impairment is for a -- under the U.S. rules once you write something down for impairment it doesn't come back. You don't write it back up under the U.S. rules, unlike debooking and Kearl, where something can be booked and debooked and then redebooked. Now, I'm going to keep both of these things right on my desk here as we go throughout this trial to try to keep these things straight, because they are different issues with different tests.

Impairment is an accounting term. And we'll go through the details in the trial, but here's the headline. Every asset on a company's book has what's called a book value. Over time as conditions change the company must ask is this asset still worth what we have on our books. If it's not, if the expected future cash flows are lower than what you have on your books, you have to write it down or impair it. But if it's higher, if the future cash flows are higher, then no impairment is required.

And here's the key, and maybe it's obvious from just that explanation, this depends on the future. It depends on projections that you're making about what this asset is going to do in the future. And to do that you have to understand the expected life of the asset.

The expected life of these fields, these undeveloped fields, gas fields in the Rocky Mountains, that was 30, 40 years worth. So Exxon had to make projections, which they update over the years, of what are natural gas prices going to be a year from now, five years, ten years. You saw from that chart that's hard to do, because we know that oil prices and gas prices can change, but that's what the rules says you have to do. And here is the rule: Estimates of future cash flows shall incorporate the entity's own assumptions. So Exxon has to make assumptions and projections, estimates, that are the same ones they're using for their own company. So you can't say, well, I'm not going to write this off because I'm super optimistic about this asset. You have to use what you're using to run the business, and that is exactly what Exxon did.

Now, plaintiffs are going to say, well, you didn't use the right prices, your assumptions were too optimistic, but Exxon didn't get to choose what assumptions to use. It had to follow its own assumptions and forecasts. And that's what it did.

And Think about this, you've heard me say common sense, I'll say it throughout the trial, Exxon was using these same estimates to make their own investments. So if they were inflating forecasts then they were in effect sabotaging themselves. They would be making foolish decisions with other monies if they were inflating their own forecast. That doesn't make any sense and that's not what happened here.

So just like with Kearl, you're going to hear that Exxon followed a bottom-up process.

So why do I keep saying bottom-up?

This is not someone at the top saying "You do it this way." These are the people in the field. These are the working people, the engineers, the geoscientists, the geologists, the accountants. They're in the field. They start at XTO Energy, which is a division of the company, and they work their way up to the accounting policy group, the controller's office, finally up to the chairman's review, and in this case also with the review by the independent auditors at Pricewaterhouse.

So you're going to hear from a man named Joe Horne

sometime in this trial and he was Exxon's accounting policy manager. And you're going to hear from Randy Cleveland as well, who managed these assets every day. He was on the ground. They did the analysis. So before any executive -- before Mr. Tillerson -- bosses they call them, before Mr. Tillerson or Mr. Swiger saw any of this -- any of this analysis they did the work themselves.

You're going to hear Mr. Horne talk about preparing -- preparing a 70-page report -- a 70-page report documenting whether or not these assets needed to be written down or impaired, and he concluded that they did not have to written down or impaired in 2015.

So what's the plaintiff's response here?

Well, they found this quote from Mr. Tillerson in a public interview that he gave in 2015 where he said we don't do write-downs. Now, they made it sound like that was some sort of command to cook the books or do something wrong. But you don't have to guess, because you're going to hear Rex Tillerson himself. If they don't call him, I promise you I'm going to put him on the stand.

And you're going to learn a lot about Mr. Tillerson. You're going to learn that he started working at age 13 for 75 cents an hour. He got the lowest level engineering job there was at Exxon and after four years he became CEO of the company. I think you're really going to enjoy getting to

know him. And as he will explain, what the full context of these words show is this: When times get tough, when things are challenging, don't give up; don't just give up on an asset, say let's just write it down to zero and then we'll claim we made a big profit next year; keep working the asset, look for efficiencies, reduce costs, find a way -- you've invested your shareholders' money, find a way to make money from that asset; don't give up. So we don't do reflexively write-downs. We don't do write-downs that way.

What did he also say? That we follow the accounting standards. He was always clear about that. This wasn't some secret statement he made. This was a public interview for anyone to read. And that is what you will hear from Mr. Tillerson.

And the record will show, the evidence will show, that we followed those rules. Sometimes Exxon wrote assets down, tens or hundreds of millions of dollars. Whenever the rules required. And in 2016, when the next years analysis, the next years analysis, revealed that these assets needed to be written down, Mr. Tillerson was still there. He didn't object or stop it from happening in any way. He endorsed that conclusion.

And you heard that other companies took write-downs. And I'm here to tell you that there's no accounting rule, as we all know from our parents, that just because everyone else

is doing it we should do it too. That's not how kids work, that's not how accounting works. These other companies were operating in some cases under different rules. Shell, for example, is a foreign company. They're Dutch. They have their own set of special rules in Europe. BP, also a foreign company. But whatever they were, they had different price projections. They had their own internal forecasts. They used those forecasts. They had different assets. They did not own the exact same things that we owned, so they had to make their own independent decision.

Now, who else was involved in this process for Exxon?

You're going to hear about Pricewaterhouse. I mentioned this at the beginning. They review and test Exxon's work. They are what's called certified public accountants. Their business is being independent. And if they're not independent, if they're not independent, they can lose their license. They had 20 different people at Exxon's campus here in Dallas. They had over a hundred people crunching the numbers, asking questions, doing tests, talking to people.

You're going to hear from this gentleman, Mr. Auter, and he's going to talk about their conclusion that Pricewaterhouse reached that ExxonMobile had effective accounting controls, that ExxonMobile followed the impairment accounting rules, and that there was no impairment of the assets in 2015.

So remember, this is all the hard work that all those people at Exxon did from the bottom-up all the way to the top of the company and then you had this independent accounting firm coming in and doing their work and they're going to explain to you what they did and how they took no exception to what Exxon had done.

So after all this work was done the very document that the plaintiffs say was fraudulent, Exxon said this, it told investors in plain English in the 2015 10-K critical to the long-term recoverability of certain assets, "It's the assumption that either by supply and demand changes, or due to general inflation, prices will rise in the future. Should increases in long-term prices not materialize, certain of the corporation's assets will be at risk for impairment."

They say, well, you've need to say it more definitive, you need to say it right then, right now. The law is you have got to prove that that was an intentional fraudulent misstatement somewhere in here. Then how can there be any intentional fraud in these statements when they are telling anyone that wants to read about it that, hey, if these prices stay low some of these assets are going to have to be impaired.

And that wasn't the only warning. As we've talked about, you saw warning after warning. And you will see these both with Mr. Swiger and with others.

PAMELA J. WILSON, CSR/RMR/CRR

**App. 43**

And what happened the very next year?

Following the same process, looking at their internal assumptions at the time, it was concluded that Exxon needed to write the assets down, and that's exactly what they did.

So I'm going to ask you, does it sound like fraud?

A company warns its investors about a risk and then it did exactly what it said it might do. That's a company that followed the rules, told the truth, and did the right thing.

Now, they have this motive theory. They say the lie behind what they talk about is fraud. They claim that Exxon committed this massive fraud to protect its credit rating. Now, remember its credit rating was AAA and went down to AA+. So that's what they're saying was this motive. We're going to ask you to use your common sense and listen to the evidence.

You will hear from Bob Schleckser. Mr. Schleckser was Exxon's treasurer in 2015. He'll tell you why this theory doesn't make any sense, how debookings or impairments are not driving the rating agencies' concerns and how the market already knew because of various things in the market that a downgrade was possible.

You will also hear from Ben Tsocanos. And he will tell you that Standards and Poor's did not downgrade Exxon's credit rating because of anything to do with the company's debookings or impairments.

Mr. Tillerson and others will explain to you what S&P wanted us to do to keep that AAA credit rating and we decided, no, we're going to do what we think is best for our business and our shareholders, and in this event it was to issue a bond. So we weren't going to let these rating agencies tell us how we should run our business. But, look, you'll hear from -- all that, you'll sort it out.

Here's the most obvious problem, and you heard it -- you heard it from the plaintiff's lawyer. Who benefited from this fraud?

What he said just a minute ago was the bond offering was used to pay dividends. Now that means according to them that we borrowed this money to give it to shareholders, the same ones that they say Exxon has defrauded. So under their theory Exxon committed fraud to benefit the very people they were supposedly cheating. That doesn't make any sense and the evidence will show you that that simply did not happen.

So that brings us to the plaintiffs themselves. Their own testimony is not going to support this theory of fraud. You will see sworn deposition from a woman named Mary Jane Matts. Ms. Matts is the advisor that the plaintiff fund -- that plaintiff's fund Foundry pays to make investment decisions. She'll tell you three things. She'll say that she made no investment decisions based on the debooking of proved reserves. She'll tell you that the plaintiff never

concluded -- their investment advisor never thought that ExxonMobile had committed fraud. They were the ones that were helping making the investment decisions.

And finally she'll say that no one ever told her at Foundry, again this investment fund that was making these decisions, to sell its holdings or to not buy anymore stock. So if there's really a massive fraud going on don't you think somebody would have told her something different?

That doesn't make any sense.

You will also hear from this gentleman, Mr. Swiderski. He's here somewhere. He was the plaintiff's funds controller. He has a master's in finance and he's in charge of tracking the fund's performance. Plaintiffs lawyers just told you how critical, critical, these bitumen reserves were, but the evidence will show that Mr. Swiderski didn't even know what bitumen was. He didn't even know what a proved reserve was. So, again, how can a fraud be predicated on something like that?

That's what you get when you try to twist and distort the facts into a theory.

Finally, I want to come close to ending with this.

This is very important.

I want you to study this timeline. It may not make a lot of sense at this exact moment but I think it will as the case goes on.

So remember the 2015 10-K was issued in February of 2016. Remember it's for all the year of 2015 and they have to be working on it in November and December because some things can happen in December that need be reported and can change things that happened earlier in the year. You will hear Mr. Strawbridge talk a little bit about that.

But in any event, they made these warnings in 2016 about can temporarily not qualify for proved reserves up in Canada, that's Kearl, or certain of the assets will be at risk for impairment. And 77 days later these people bought their first stock. So they bought with their eyes wide open. Now they claim fraud because the exact risks that were described actually materialized. This is what I said at the beginning. This is what happens when you try to take the normal fluctuations and the inherent unpredictability of the stock market, especially in a field as -- where you can have so many different changes as the oil and gas industry, this is what happens when you try to twist those facts into a financial windfall. It doesn't make any sense.

So, good news, I'm not going to go over time, I'm going to give you some time back, but I'm going to say -- I'm going to end with this. I, too, am going to thank you for your time.

I cannot tell you how much we appreciate, how much Mr. Tillerson and others appreciate the time that you're

**App. 44**

spending. Now, some of what you will hear and what you have heard is going to be unfamiliar. I suspect a lot of it is. Some of it is going to be complex. But we're going to do our best, our very best, to make it understandable, and we're going to move as quickly as we can possibly move. But every day that you sit here and you listen to the testimony and you look at the exhibits, I'm going to ask you to do something that you've done your whole lives. And it's not complicated. I'm going to ask you to take the measure of the people that you meet. Assess their hard work. Assess the hard questions they asked. Assess their desire to follow the rules, their commitment to doing things the right way. Assess that. Because I am convinced when you take the measure of these people, which we're all good at doing, you will conclude that no fraud was committed by any of those three gentlemen or by anyone at ExxonMobile. Take the measure of these people.

Thank you for your time. We look forward to seeing you as the trial progresses.

THE COURT: Thank you.

MR. Your Honor, may we approach?

THE COURT: No. Y'all wait in the jury room. I'm going to see if lunch is here. I don't know. If it is here I'll let you do that, or if it's close, if it's somewhere in the building coming up, or how long that's going to take.

But don't talk about the case.

93

And let me see where we are before we bring in the first witness.

Okay. Thank y'all.

THE SECURITY OFFICER: All rise for the jury.

(Jury exits the courtroom.)

THE COURT: Thank you. You need to approach or do it from there?

MR. SAHAM: I think there's two problems with Mr. Melsheimer's opening statement, one of which I think needs some sort of corrective instruction from the court. As the lawyers on this side -- the hundreds of lawyers on this side, know we requested text messages and they didn't produce any. So the preference to text messages by Mr. Melsheimer, which I assume was accidental, needs to be corrected by the court. The absence of text messages is not our fault.

And secondly the court ordered that fact witnesses would be cleared from the courtroom during this case and Mr. Strawbridge, who is a fact witness --

THE COURT: Well, but I'm assuming these experts --

MR. SAHAM: He's not an expert, Your Honor. He's --

THE COURT: Do you want to let me finish or do you want to finish?

MR. SAHAM: I'm sorry. I'm finished.

THE COURT: That you're going to let them hear the

94

other experts, or whatever he was saying. There's no testimony going on right now, it's just listening to this opening statement.

So, yeah, I generally think that the rule applies when witnesses start testifying.

MR. SAHAM: Excellent.

THE COURT: So everybody knows that that's going to be the rule, other than -- don't you want experts in here listening to the other experts?

MR. SAHAM: We had agreed to experts, but my point was Mr. Strawbridge is not an expert, he's a percipient witness.

THE COURT: But this is just opening statement.

MR. SAHAM: Understood.

THE COURT: It's just y'all you talking. I know it's very important to lawyers. And it's important to the jury. I don't mean that y'all aren't important people, but we're talking about with witnesses.

Now, what about the text? Help me.

MR. MELSHEIMER: Your Honor, first of all if they want to bring out something about text messages, they could have gotten text messages from any witnesses, ex-employees, things of that nature. I didn't say anything about that. Anybody can produce a text message about anything. If they want to bring out that we didn't produce text messages I

95

think that could be said, but I think the statement was broad enough to talk about they could have -- they have an ExxonMobile employee on their witness list, they could have gotten his text messages.

THE COURT: You can say look they didn't produce text messages. I'll let you say that.

MR. SAHAM: Thank you, Your Honor.

THE COURT: You can say we asked and they said -- did y'all agree and they didn't produce them?

MR. SAHAM: No. No. We wanted them and they refused.

MR. TOAL: Your Honor, can I --

THE COURT: Stop. Did I order them or did you ask me to get them?

MR. SAHAM: We did not come to the court with that but we requested them and didn't get them.

THE COURT: Well, you should have come to me. I'm the only guy that can make them do things they don't want to do.

Okay. Who was saying what?

MR TOAL: I'm sorry, Your Honor. Dan Toal.

ExxonMobile does not use text messages to have business communications as part of their policy, that's why when they asked for text messages we explained that to them, there would be no responsive documents, and that's why they weren't

96

PAMELA J. WILSON, CSR/RMR/CRR

**App. 45**

produced.  There's no reasonable likelihood --

THE COURT:  I would have made you produce them. I'll tell you why:  I don't care if it's your policy or not, I'll guarantee you there's text messages flying around that company and I would have made you do it.  So I'm going to let him respond whatever.  It's just a different form of email. It just is.  I understand that y'all don't want to make a policy.  I get it.  I get all that.  Doesn't matter.  They didn't come to me.  You don't need to worry about it.

Everybody is a big boy, big girls in here.  You know, you come to me and I'll doing whatever I'm going to do.  I may agree with you, I may disagree with you.  But whatever. They didn't do that.  So I'll let him say, look, they didn't produce that and you can say, hey, they didn't go to the court and ask.

MR. MELSHEIMER:  Okay.  So when is that going to happen?

THE COURT:  Whenever he wants to say it.

MR. MELSHEIMER:  Okay.  And I get to respond?

THE COURT:  Maybe.  What are you going to say?

MR. MELSHEIMER:  What you just said.

THE COURT:  What?

Well, you didn't go to the court and ask, you can say that.

MR. MELSHEIMER:  Excuse me, Your Honor?

INDEX - VOLUME 1A

| Defendant's Opening Statements | Page | Line |
|---|---|---|
| MR. SAHAM ............................................ | 33 | 9 |
| MR. MELSHEIMER ....................................... | 67 | 23 |

THE COURT:  You can say, Your Honor, they didn't ever ask, come to you, we didn't want -- it's not our policy. You can say that.  And you didn't come to the court and ask.

MR. MELSHEIMER:  I'll say that.  Absolutely.  Thank you.

THE COURT:  Okay.  Anything else?

MR. SAHAM:  If it wasn't --

THE COURT:  Stop.

MR. SAHAM:  If it wasn't their policy why is he referring to the lack of text messages.  That's even worse. It infers a -- you know, a lack of something that they're saying --

THE COURT:  Do y'all really want to say all this in front of the jury?

MR. SAHAM:  No.

THE COURT:  They're going to go -- they're going to go I don't even understand what any of that means.

MR. MELSHEIMER:  Thank you, Your Honor.

THE COURT:  Off the record.

(Discussion off the record in open court.)

(Recess taken at taken at 11:39.)

(Proceedings continued in Volume 1B.)

< Dates >
$1.05.   67:5
$1.27.   60:20, 62:18
$1.32.   59:24, 60:20
$5.88.   56:24
$74 million, October 49:22
16.  December, 49:15
16.50.   59:20
19.  October 49:14
23.  November 49:14
24.28.   63:1
28.70.   63:3
35, August 21. 49:12
45 million, September 49:23
APRIL 28, 2026 1:28, 4:1
August 48:4
August,  48:7, 62:13
December 92:3, 92:4
December 31, 2015.   32:3
December, 62:19
February 43:6, 53:2, 65:23
February 24, 2016 35:24
February 24th, 2016 26:6
February 24th, five day 51:21
February 29th, 51:1, 54:5
February 2nd, 53:2
February of 2016 43:3
February of 2016.   92:1

February, 53:1
January 1 22:14, 22:16
January 31st, 2017.   67:2
January of 1974 72:8
January, 51:14
July 49:10, 49:11
July 28th, 2016.   31:19
July, August, September, 62:7
June 61:22
June 17th, 51:22, 61:14
June 27th 2016 31:20
March of 2026 72:9
May 8:18, 55:22, 55:25, 61:22, 67:24
May 12, 2016, 2700 31:18
May of 2015, 47:4
November 59:22, 92:3
November of 2015 58:24
November of 2015, 60:2
November 49:22
October 62:7, 65:23
October 26, 2015, 60:2
October 28, 2016. 62:14
October 28th 2016 31:24
October 28th, 2016, 26:6
October of 2016.   64:20
October, 62:4
October, eight month 65:21

September 49:13
September 20th 2016. 31:21
$1.27 62:15
$1.3 34:7, 66:6
$1.32 56:23, 57:8, 57:16, 59:3, 59:6, 59:7, 59:14
$1.70 61:11
$1.74 66:21
$100 52:9
$11 49:16
$12 34:20, 40:24, 41:16, 51:22, 61:14, 61:25, 66:24
$16 42:15, 44:1, 57:5, 59:5, 62:2
$162 47:18
$17 61:15
$180 48:19
$2 40:23, 67:3
$2.39 65:12, 65:22, 65:23
$24 37:11
$25 46:4, 61:12
$3.44 35:7, 67:13
$30 34:2
$31 65:25, 66:20
$400 50:1
$5 66:3
$5.88 59:24
$6 38:8, 62:2, 62:14
$60 49:21
$62 46:2
$7 59:1, 59:23, 59:25, 62:18
$75 53:13
$8 33:25, 49:18, 55:23
$8.11 47:18
$800 48:6
$896 76:5

$9 45:18, 75:10
$9.37 47:24
(214)758-1500 2:49
< 0 >
00 8:3
000 71:18, 72:23, 75:4, 75:5
< 1 >
1 38:20
1.32 56:25
1.70 66:8
10 8:3, 10:13, 10:20, 37:2, 39:20, 44:25
10-K 16:13, 16:17, 32:2, 36:12, 36:18, 39:6, 39:25, 40:9, 40:15, 40:17, 42:24, 43:1, 43:21, 43:22, 44:8, 51:15, 51:20, 53:3, 53:8, 58:7, 60:16, 63:22, 64:9, 64:11, 66:8, 71:3, 74:15, 75:19, 76:1, 76:4, 80:18, 88:9, 92:1
10-ks 32:4
100 2:41
10019-6064 2:36
108 47:21, 49:23
10b5 10:17
11 31:17, 49:20, 57:7
1100 3:14
11910 2:3
11:3939.) 98:21
12 57:7
120 71:18

**1285** 2:35
**13** 85:22
**1350** 31:20
**13th** 3:14
**14** 42:15, 75:10
**140** 72:22
**15** 39:2, 75:10
**150** 31:17
**16** 12:21
**17** 51:2, 63:15
**187** 47:24
**1900** 1:47
**1974** 72:13
**1A** 1:25, 4:1, 99:1
**1B.** 98:22

**< 2 >**
**2.30** 65:6
**20** 13:10, 13:14, 13:15, 39:14, 75:4, 75:5, 87:17
**2010** 34:2, 40:19, 42:21
**2013** 39:12, 45:24, 75:10
**2015** 20:13, 32:2, 33:18, 33:20, 34:6, 34:7, 38:22, 40:19, 42:15, 43:5, 45:1, 52:13, 56:4, 58:25, 66:5, 66:21, 72:2, 72:17, 72:25, 75:6, 75:11, 75:13, 76:4, 77:9, 78:23, 79:3, 80:18, 80:24, 85:12, 85:15, 87:25, 88:9, 89:17, 92:1, 92:2
**2015-2016** 20:16
**2016** 20:13, 31:23, 33:18, 33:21, 46:3, 81:5, 86:18, 92:7
**2017** 9:24
**2018** 81:7
**2026** 20:14, 20:16
**20s** 13:15
**21** 51:2
**212** 2:37
**214** 1:37, 2:19, 2:26, 3:17
**215** 16:15, 17:1, 17:4
**216** 15:15
**22** 53:3
**220** 2:3
**2200** 2:47
**23** 7:14, 9:21, 99:8
**23.7** 45:7
**2300** 2:17, 2:24
**231-1058** 1:49
**24** 39:1, 39:22
**24.7** 50:24
**24th** 31:23
**26** 53:3
**2601** 2:17
**28.70** 57:17, 57:22, 58:5, 63:4
**2801** 2:24

**< 3 >**
**3** 31:21
**3.6** 38:21, 39:2, 40:4, 42:11, 43:17, 50:8, 50:17
**3/31** 66:25
**30** 17:12, 49:18, 64:6, 71:18, 83:12
**30-** 75:16
**30-year** 78:19
**303** 10:7
**31** 14:22
**33** 99:6
**35** 15:12, 21:14
**36** 15:12

**370** 59:12
**373-3000** 2:37
**3811** 1:35
**3:** 1:15
**3D** 56:18

**< 4 >**
**4** 50:14
**4-** 66:3
**4.1** 50:15, 50:17
**4.38** 66:20
**40** 21:10, 49:18, 83:12
**40-year** 75:14, 75:16
**401** 17:15, 18:8, 19:2, 19:4, 19:8
**401(k** 35:25
**403** 17:15, 18:8, 19:3, 19:4, 19:9
**4100w** 2:47
**4108** 50:15
**42** 49:12
**44** 15:14
**45** 21:11, 32:7, 64:22
**46** 64:23
**49** 15:18

**< 5 >**
**5** 31:19, 50:7, 50:12, 50:14, 55:17, 58:6, 60:16, 63:16, 64:9
**5.88** 56:25, 59:23
**50** 17:15, 22:12, 31:4, 52:9, 53:13, 59:19, 72:23
**500** 50:20
**52** 15:24
**546-5400** 2:43
**55** 47:7, 55:23

**56** 72:23

**< 6 >**
**6-CV-03111-K** 1:15
**619** 1:49
**651-5000** 2:26
**655** 1:47
**66** 16:17
**662-1557** 3:17
**67** 99:8

**< 7 >**
**7** 12:7, 12:14, 59:7
**7.6** 44:25
**70-page** 85:9
**700** 50:22, 63:14
**7084** 2:41
**70s** 22:19
**713** 2:43
**725** 31:21
**744-3300** 1:37
**75** 85:23
**75201** 2:18, 2:25, 2:42, 2:48
**75229** 1:36
**75242** 3:15
**75243** 2:4
**76** 45:5
**764-4446** 2:19
**77** 92:10
**775** 31:19

**< 8 >**
**8** 12:14, 40:13, 49:19
**8-K** 16:13
**8.11** 47:19
**80** 66:1
**800** 53:14
**825** 1:35
**88** 40:1
**880** 1:35

25:1
appointed 26:13
Appreciate 8:12, 10:10, 74:15, 92:24, 92:25
approach 76:12, 80:4, 93:20, 94:6
approached 17:12
appropriate 25:21, 28:3
approximately 39:2, 47:6
arbiters 24:24
area 75:25
argue 14:17, 17:18, 17:19, 18:1
argued 19:7
arguing 14:15
argument 7:24, 10:6, 19:5, 68:12, 73:11
arguments 32:25, 33:1, 33:6
around 6:13, 15:3, 21:21, 22:15, 28:9, 37:10, 47:21, 48:4, 72:22, 75:1, 97:4
article 9:17, 15:19, 15:25
articulate 18:8
asphalt 75:2
asphalt-like 81:23
assert 50:9
Assess 26:14, 93:10, 93:11, 93:12
assessment 74:8
asset 34:5, 34:6, 38:22, 42:21, 65:25, 75:14, 75:16, 82:24, 83:1, 83:8, 83:10, 83:23, 86:4, 86:5, 86:8
asset-by-asset 76:1
assets 14:8, 33:22, 34:9, 35:2, 36:23, 36:25, 42:6, 42:17, 46:21, 52:4, 52:19, 54:2, 67:3, 72:24, 73:1, 73:4, 73:5, 75:23, 80:20, 81:9, 81:20, 85:3, 85:10, 86:16, 86:19, 87:8, 87:25, 88:10, 88:14, 88:21, 89:4, 92:9
assist 32:9
associated 28:4
assume 13:3, 13:8, 94:14
assuming 21:4, 21:10, 94:19
assumption 88:11
assumptions 83:19, 83:20, 84:2, 84:3, 84:4, 89:3
Atlantic 25:4, 26:12
attacking 70:12, 70:13
attempt 30:1
attendees 60:6
attorneys 28:4, 29:7
audience 78:17
auditing 71:21
auditors 69:1, 71:21, 84:23
AUDRA 2:28
August 62:16
AUSTIN 2:13
Auter 87:20
authenticity 19:4
Avenue 2:3, 2:35, 2:47
average 59:5, 59:21, 59:22, 62:2, 75:24, 75:25
avoid 29:10
aware 57:18, 57:19
away 37:16, 38:3, 39:11, 64:6, 66:1

**< B >**
B. 1:43, 2:1, 2:2
back 5:8, 22:3, 23:21, 32:19, 33:20, 42:21, 54:10, 54:20, 55:10, 55:18, 72:25, 73:21, 82:15, 92:21
bad 34:21, 52:3, 53:11, 54:2
ball 71:13
BALON 2:1, 2:2
bank 77:12
banks 54:7
Baptist 6:25
bar 70:10, 70:11
Barefoot 8:21
barn 64:5
barrel 14:23, 16:15, 16:25, 33:24, 38:8, 40:13, 46:2, 47:18, 47:19, 47:25, 48:25, 49:13, 49:16, 49:18, 55:23, 56:17, 56:18, 57:5, 62:14
barrels 38:21, 40:5, 40:13, 42:10, 42:11, 43:17, 44:5, 44:25, 45:1, 46:24, 46:25, 48:17, 50:7, 50:8, 50:10, 50:15, 50:18, 50:21, 50:24, 55:8, 56:12, 57:1, 58:6, 59:14, 59:25, 60:5, 61:2, 61:8, 63:9, 63:12, 63:15, 63:23, 64:1, 64:7, 64:19, 65:8, 72:25
base 72:25
based 10:1, 18:11, 72:20, 90:24
basically 36:5, 40:5, 51:12, 51:23
basics 37:1
basis 7:19, 19:13
Baylor 14:18
became 39:11, 39:12, 85:24
become 28:2
begin 8:18, 19:17, 32:6
beginning 49:10, 87:13, 92:13
Behalf 1:7, 25:24, 26:16, 33:15, 35:23
behind 89:10
believe 7:25, 9:18, 22:19, 22:20, 31:2, 31:3, 33:16, 70:19, 70:20, 78:18
bells 62:20
below 47:7, 58:3

**< 9 >**
9 20:4, 76:1, 76:2, 99:6
90 24:8
900 53:14
91 72:24
92101 1:48
972 2:5
99 76:5, 76:8
991-1582 2:5

**< A >**
A-okay 73:23
A. 1:45, 25:17
AA+ 89:12
AAA 52:16, 52:22, 53:24, 54:14, 54:17, 54:21, 89:12, 90:2
ABC 41:10, 76:9, 80:8
Abcs 41:10, 41:11, 41:12, 49:8, 55:18, 57:25, 58:21, 63:7, 76:25
able 12:12, 16:2
above 57:23
absence 94:15
Absolutely 98:4
accept 6:11, 27:20, 31:11
accidental 94:14
according 90:12
account 28:20, 77:12
accountants 42:25, 68:24, 84:19, 87:14
accounted 45:5
accounting 36:11, 82:22, 84:21, 85:1, 86:10, 86:24, 87:2, 87:23, 87:24, 88:3
accusations 69:22, 70:20
accuse 70:11
acquired 26:5
acquisition 44:13
ACTION 1:17, 25:22, 25:25, 26:18, 35:13
actual 41:7, 41:9, 41:13, 55:19, 56:22, 56:23, 57:11, 57:17, 57:19, 57:24, 57:25, 58:2, 58:13, 58:18, 59:4, 60:4, 61:1, 62:23, 63:1, 63:8
actually 39:10, 40:22, 63:5, 68:23, 69:1, 81:25, 92:13
add 54:1
added 21:12
addition 35:22, 71:18
additional 74:18, 78:13
address 4:8, 18:25
administrator 35:15
admitted 6:3, 12:3, 15:10, 15:12, 15:18, 17:8, 18:22, 18:23, 18:24, 30:8, 30:12
advance 5:2, 33:11
advisor 90:21, 91:1
advocate 28:2
affirmed 54:18
age 85:22
agencies 52:13, 52:15, 52:20, 53:6, 53:7, 54:17, 89:19, 90:6
agency 71:5
ago 90:11
agree 5:9, 10:13, 18:12, 18:13, 23:17, 31:9, 31:11, 65:14, 65:15, 96:9, 97:12
agreed 4:19, 17:25, 18:17, 18:21, 24:5, 31:14, 95:10
agreed-to 5:25
agreement 18:20, 31:8
agrees 77:17
ahead 4:11, 13:9, 67:16
aid 26:23
ain't 55:2
Airlines 23:8, 23:9
alarm 62:20
Alberta 33:23, 33:24, 37:5, 38:10, 45:10, 59:13
alert 21:22
ALEX 1:43
allow 19:23, 26:21
allowed 12:3, 28:5, 30:1, 30:2, 63:10
allows 26:1
Almost 15:7, 15:16, 38:5, 39:19, 39:20, 39:22, 40:1, 43:8, 54:2, 66:15, 67:1
already 66:3, 23:19, 24:5, 32:16, 39:10, 48:6, 53:23, 64:3, 64:6, 64:8, 67:6, 73:7, 73:15, 89:20
although 15:20
amazing 58:20
America 50:16, 76:6
American 23:8, 23:9
Americas 2:35
AMITAV 2:32
among 27:25
amount 36:19, 58:2, 68:12
analogy 64:4
analysis 58:11, 65:17, 85:4, 85:7, 86:18, 86:19
analyzed 6:12
Andrew 1:18, 25:16, 32:1, 36:9
Andy 60:7, 61:7, 68:15, 73:21, 77:1
announce 66:10
annual 34:10, 34:12, 34:18, 34:19, 39:13, 40:15, 41:14, 41:19, 42:9, 43:5, 43:20, 43:22, 51:20, 66:9, 71:3
Answer 4:14, 4:15, 30:1, 30:2, 30:5, 58:15, 59:2, 59:8, 59:9
answered 30:3
answers 29:19
Anybody 95:24
anyway 9:12, 14:20, 16:6, 70:24
apples 76:24
applied 69:1
applies 7:8, 32:23, 95:4
apply 14:2

Ben 89:22
bench 29:11
benefit 90:15
benefited 54:14, 90:9
benefitted 54:21
besides 82:11
best 41:24, 52:16, 90:3, 93:4
bet 33:9, 65:1
better 8:7, 48:12, 62:11, 63:10
Beverly 44:18
beyond 31:5
BIERL 1:44
big 34:12, 37:11, 38:19, 41:19, 46:20, 50:13, 53:16, 56:22, 60:2, 62:16, 75:5, 79:20, 86:5, 97:10
biggest 38:20, 38:21, 38:22, 42:5, 43:16, 52:4
Bill 78:17
billion 14:9, 34:2, 34:7, 34:20, 37:12, 38:21, 39:2, 40:5, 40:20, 40:23, 40:24, 41:16, 42:11, 42:15, 42:16, 43:17, 44:1, 45:7, 50:8, 50:15, 50:17, 50:24, 51:2, 51:22, 65:25, 66:7, 66:21, 66:24, 67:4, 72:24, 75:10
billions 46:25
bind 26:19
bit 6:12, 21:14, 24:18, 31:2, 38:24, 40:6, 40:7, 41:1, 41:19, 42:22, 44:6, 47:10, 48:25, 51:19, 53:14, 54:1, 54:2, 55:22, 58:22, 59:23, 63:5, 69:22, 72:3, 72:5, 73:6, 92:6
Bitumen 12:25, 37:14, 37:15, 37:18, 38:2, 38:13, 38:16, 38:23, 39:16, 39:25, 40:2, 41:13, 45:24, 45:25, 46:2, 46:4, 50:15, 50:16, 50:17, 52:19, 55:19, 55:23, 57:25, 58:18, 60:4, 63:8, 63:14, 74:24, 75:1, 75:7, 76:7, 77:25, 81:23, 82:6, 91:14, 91:16
black 44:19, 44:21, 49:5, 81:23
blame 19:22
bleeding 47:11
blend 60:21
blog 27:16
blowing 50:13
blown 50:14
blue 62:4, 62:7, 62:13
board 78:9
Bob 89:16
body 78:20
BOGGS 2:46
boils 40:11
bond 51:23, 53:4, 54:4, 64:18, 66:11, 66:24, 90:5, 90:11
book 47:20, 47:23, 82:24, 82:17
booked 78:2, 82:17
books 40:21, 83:1, 83:3, 85:17
BOONE 2:23
borrowed 90:13
borrowing 34:20, 34:23, 41:15, 51:22, 51:23, 54:4
borrowings 40:24
boss 67:8
bosses 33:19, 33:20, 40:4, 41:11, 42:13, 52:25, 59:18, 60:1, 64:10, 67:9, 67:11, 85:5
bottom 50:23
bottom-up 84:14, 84:15, 88:2
bought 14:10, 35:6, 36:1, 38:15, 65:5, 65:22, 66:3, 92:10, 92:11
Boulevard 1:35
Boy 6:25, 21:9, 97:10
BP 87:5
braced 79:5
bracket 47:22
brackets 47:21
BRADLEY 2:1, 2:2
break 22:1, 67:14
Brent 37:24, 46:1
brief 7:12, 7:23, 8:3, 8:6, 9:14, 29:16
bring 12:6, 23:13, 32:19, 94:1, 95:21, 95:25
brings 90:18
broad 96:1
Broadway 1:47
brother 22:18
brought 23:4, 25:22, 25:23, 35:23, 42:12
Brown 22:13, 22:16
bucks 40:13, 62:2
building 93:24
bunch 4:24, 5:16, 22:17
BURKHOLZ 1:45
business 40:18, 40:20, 48:8, 59:21, 65:24, 66:6, 66:10, 70:24, 72:4, 72:6, 73:2, 83:24, 87:15, 90:4, 90:6, 96:22
butter 49:5
buy 22:15, 52:6, 52:8, 52:9, 53:13, 66:20, 91:6
buying 34:2, 66:24

**< C >**
C. 2:39
CA 1:48
calculation 55:21, 56:21
calculations 16:12, 68:24
call 9:9, 12:5, 14:12, 23:20, 25:19, 37:23, 37:24, 38:19, 43:20, 43:21

55:4, 60:22, 70:5, 71:9, 73:9, 73:13, 73:18, 74:7, 74:18, 80:10, 85:5, 85:19
called 14:13, 23:19, 23:23, 25:23, 25:25, 26:7, 32:18, 34:4, 36:10, 37:13, 37:14, 40:22, 43:21, 46:3, 51:9, 51:22, 52:11, 54:6, 56:1, 56:2, 71:5, 74:24, 75:9, 76:21, 78:14, 82:24, 87:14
camera 27:14
campus 87:17
Canada 33:23, 37:5, 38:11, 38:14, 39:25, 63:14, 73:3, 74:24, 76:6, 76:7, 78:10, 79:1, 80:1, 80:5, 80:25, 82:7, 92:8
Canadian 50:17, 76:4
car 38:9, 52:7
card 34:11, 41:21, 41:22
care 9:2, 97:3
careful 74:8, 76:9, 76:11, 77:1, 80:8
carefully 80:1
Carfax 45:17
Carpenter 67:12
Carpenters 1:9, 25:5, 25:8, 26:12, 35:3, 35:5, 35:14, 35:16, 35:22, 36:16
cases 8:20,
31:5, 87:3
cash 47:13, 47:16, 47:20, 83:2, 83:4, 83:18
causation 6:18, 10:16, 10:17,
caused 65:18, 65:22
cede 10:23
cell 27:14, 28:17
cents 85:23
CEO 36:8, 66:25, 85:24
cert 6:18, 7:14, 7:18
Certain 26:9, 31:8, 31:9, 31:10, 44:24, 45:1, 66:1, 80:24, 88:10, 88:13, 92:9
certainly 71:13
certainty 77:23
certification 9:22, 9:25, 10:17
certified 7:18, 64:11, 64:13, 87:14
chairman 84:22
CHAKRABORTY 2:32
challenge 79:20
challenged 47:12, 47:15, 65:10
challenges 75:13, 75:17
challenging 86:3
chance 8:2, 18:12
change 18:15, 21:24, 82:25, 83:17, 92:5
changed 81:10
changes 53:15, 88:11, 92:17
channels 79:5
charge 66:16, 91:12
chart 62:3, 72:8, 83:16
charts 38:24
chatroom 27:16
cheap 38:7
cheat 48:25, 74:9
cheated 69:4
cheating 90:16
check 59:9, 76:10
Chevron 53:19
chief 36:11
child 7:2
children 27:7
CHILDRESS 3:3
choice 61:24, 84:3
chose 70:9, 70:21
chosen 73:2
Circuit 8:23, 8:25, 9:3, 10:14, 10:15
circumstances 30:11
Circumstantial 30:18, 30:19, 30:22, 30:24
cited 9:17
civil 5:23
claim 6:18, 7:10, 7:15, 7:17, 7:20, 7:21, 7:24, 10:1, 10:3, 10:17, 76:14, 81:19, 86:5, 89:10, 92:12
claims 10:7, 19:5, 25:25, 26:1
clarify 6:6
CLASS 1:17, 6:18, 7:10, 7:14, 7:15,
7:17, 7:18, 9:22, 9:25, 10:16, 14:13, 25:4, 25:8, 25:9, 25:10, 25:22, 25:23, 25:25, 26:4, 26:7, 26:9, 26:11, 26:13, 26:18, 26:20, 31:23, 33:15, 35:4, 35:5, 35:13, 36:19, 64:15, 65:6, 66:4, 66:5, 67:12
classwide 7:19
clear 9:19, 10:16, 30:15, 71:25, 81:21, 86:11
clear-cut 45:10
cleared 94:17
Cleveland 85:2
close 9:9, 53:4, 64:21, 80:9, 91:21, 93:23
closely 53:1
closest 60:23
Closing 32:25, 33:6, 51:22, 73:11
cloudiness 10:14
coal 38:5
Coast 38:12, 57:2, 59:17, 59:20, 61:14, 62:8, 80:2
cold 23:12
colder 23:12
collapse 66:8
collapsed 47:6
collapses 48:22
collapsing 56:6
colleagues 68:15
column 55:17
Comes 19:16,
105

38:1, 39:2, 60:8, 61:22, 66:9, 71:7
coming 45:2, 56:3, 61:19, 88:4, 93:24
command 85:17
Commerce 3:14
Commission 32:5, 34:11, 40:8, 41:24, 51:6, 71:6
commit 59:10
commitment 93:12
committed 68:3, 89:11, 90:15, 91:2, 93:15
Committee 46:6, 46:7, 46:9, 78:12
common 26:5, 59:9, 81:13, 84:6, 89:14
communicate 27:10, 27:19, 27:22, 28:5
communicated 39:6, 51:6
communications 96:23
commute 27:8
Companies 38:18, 38:19, 52:11, 52:12, 53:7, 53:20, 53:24, 67:10, 71:8, 71:10, 72:22, 75:24, 86:23, 87:2
company 13:25, 14:11, 33:21, 34:3, 34:20, 36:12, 38:22, 39:1, 39:3, 39:4, 39:22, 42:2, 42:3, 43:6, 43:11, 45:6, 46:21, 50:24, 51:21,
64:14, 66:14, 66:15, 66:25, 71:4, 71:12, 71:22, 78:7, 81:14, 82:24, 82:25, 83:21, 84:20, 85:25, 87:4, 87:6, 88:3, 89:6, 89:7, 89:24, 97:5
compare 57:20
comparing 76:20, 76:24
competitors 46:18, 48:10, 51:7, 52:16, 52:17, 52:21, 53:21
completely 7:8
complex 93:3
complicated 41:22, 77:18, 93:8
computer 27:15, 28:18
computer-aided 3:8
conceal 69:10, 73:25
concealment 81:2
concerns 79:5, 89:19
conclude 30:20, 93:14
concluded 6:13, 80:3, 85:11, 89:3, 91:1
conclusion 29:22, 70:18, 86:22, 87:21
conclusions 30:10
conditions 55:13, 63:18, 77:21, 77:23, 78:1, 80:19, 82:25
confronted
46:22
confusing 43:5
consider 29:4, 30:6, 30:7, 30:13
consideration 9:14
considered 80:2
considering 56:16
consistency 15:9
consistent 76:19, 81:12
consists 30:7
consoles 27:21
context 72:17, 86:1
continue 64:2
continued 98:22
contribute 35:17
controller 36:10, 84:22, 91:12
controls 71:23, 87:23
convened 47:4
conveniently 41:11
Convention 6:25
conversation 27:11
conversations 74:13
convinced 93:13
cook 85:17
Coopers 71:20
copy 26:8
core 81:25
corporate 47:10
Corporation 1:17, 25:14, 88:14
corporations 36:5
Correct 4:14, 5:4, 5:11, 6:4, 58:14, 58:15, 59:1, 80:4
corrected 94:14
corrective 94:10
Cortell 2:21, 4:4, 4:5, 4:7, 6:9, 6:10, 6:15, 6:21, 7:5, 8:6, 8:9, 8:12, 8:19, 9:13, 9:16, 9:21, 10:10, 10:18, 10:22, 11:1, 19:7
cost 41:7, 41:8, 41:9, 41:13, 41:15, 49:1, 53:11, 54:3, 54:4, 55:19, 57:4, 57:6, 57:8, 57:10, 57:11, 57:12, 57:20, 58:13, 58:14, 59:3, 59:20, 60:19, 60:21, 61:1, 61:5, 77:25
costly 49:7
costs 38:7, 45:16, 49:2, 49:3, 55:20, 55:21, 57:21, 57:22, 57:23, 57:24, 58:1, 58:2, 58:18, 59:1, 59:4, 59:14, 59:21, 59:22, 60:4, 60:12, 61:25, 62:9, 62:17, 63:8, 75:25, 79:23, 80:2, 80:3, 86:6
coughing 21:14
counsel 5:1, 17:6, 74:17, 79:7
count 62:9
countries 72:23
106

country 33:13
counts 77:19
couple 22:1
course 17:18, 20:15, 43:12, 57:24, 61:18
court. 12:9, 22:22, 98:20
courtesy 10:11
courthouse 22:15, 28:9
courtroom 21:17, 28:15, 29:10, 67:17, 94:17
courtroom. 22:23, 67:20, 94:5
courts 9:3
COVID 72:16
coworkers 27:8
cranking 11:4
created 34:22, 68:22, 71:16
credit 52:5, 52:7, 52:10, 52:11, 52:12, 52:15, 52:20, 54:14, 54:18, 89:11, 89:12, 89:24, 90:2
Creek 1:35
Crescent 2:41
criminal 34:23
critical 9:22, 36:13, 71:22, 88:9, 91:14
criticized 34:4
CRR 3:12
crude 37:20, 37:21, 37:24, 80:23
crunched 68:25
crunching 87:18
crystal 71:13
current 43:10, 55:13
customers 36:7, 38:11
cut 21:5,
53:18, 59:23

< D >
D. 2:45
dad 7:1
Dallas 1:3, 1:29, 1:36, 2:4, 2:18, 2:25, 2:42, 2:48, 3:15, 75:1, 87:18
damning 58:8
Dan 96:21
DANIEL 2:29
DAPHNE 2:33
darn 80:16
data 79:17
dated 60:11, 61:7
David 1:19, 2:15, 25:17, 32:1, 36:10, 68:16
day 5:20, 17:20, 27:9, 79:2, 85:3, 93:6
days 34:19, 40:24, 53:3, 53:4, 54:10, 60:11, 61:7, 63:3, 92:10
deal 34:23, 79:19, 79:21
debated 79:5
debates 74:14
debook 81:17
debooked 78:3, 81:6, 81:16, 82:17
debooking 65:8, 80:20, 82:16, 90:24
debookings 89:18, 89:25
deceive 70:4, 74:1
December 49:22
deception
70:24, 80:12
decide 7:15, 7:16, 9:10, 24:22, 26:14, 29:7, 29:9, 33:5
decided 7:17, 80:13, 90:3
decision 26:19, 29:21, 60:3, 70:25, 87:10
decisions 84:10, 90:23, 90:24, 91:3, 91:6
deck 12:18, 60:15, 60:18, 62:14
decline 65:18
deduct 61:5, 62:25
Dee 22:13, 22:15
Defendant 25:13, 25:15, 25:16, 25:17, 45:21, 65:13, 99:4
Defendants 1:22, 2:10, 25:18, 26:10, 32:1, 32:16, 32:21, 34:8, 36:4, 43:22, 51:18, 60:6, 64:10
defense 23:18, 25:21, 32:14
define 30:25
definitive 88:15
defraud 70:5
defrauded 90:14
Deidre 78:25
delays 5:16
Deliberate 27:24, 33:3, 70:24, 74:1, 80:12
deliberately
70:22
demand 88:11
demonstrate 47:12, 47:15
demonstrative 15:4
denied 19:6
depend 78:1
depending 39:20, 49:25, 53:15
depends 77:21, 83:7
deposition 58:9, 60:10, 90:20
describe 47:11
described 92:12
describing 38:6
desire 93:11
desk 82:18
details 82:23
determination 53:9, 58:12
determine 29:24, 65:18
developed 39:8, 39:9, 39:11, 39:12, 39:14, 41:6, 50:25
development 56:2
device 27:13, 27:15, 28:17
devices 28:22
dictates 71:6
Diego 1:48
difference 39:8
different 26:24, 47:21, 51:1, 70:17, 70:18, 73:1, 73:14, 76:15, 76:20, 76:22, 76:23, 79:23, 80:11, 80:19, 82:6, 82:11, 82:12, 82:20, 82:21, 87:3, 87:6, 87:8,
107

87:17, 91:8, 92:17, 97:6
differently 67:15, 80:10
difficult 9:5, 9:9
dig 36:5
Digest 46:14
diluent 37:14, 37:16, 38:7, 48:24, 49:6, 58:14, 62:25
direct 30:17, 30:22, 30:24
directed 7:11
direction 19:20
disadvantage 56:5
disadvantageous 56:5
disagree 97:12
disclose 34:24, 40:23, 42:9, 51:18, 51:19, 64:19, 75:20
disclosed 36:25, 41:14, 70:16, 76:4, 76:7
disclosure 9:24, 65:21, 66:12
disclosures 51:12, 51:16, 63:21
discuss 27:5, 27:6, 27:23, 28:1, 29:7, 29:11, 59:19, 60:15
discussed 28:21, 28:23, 29:9, 79:6
discussing 29:13, 60:17
Discussion 12:9, 22:22, 98:20
discussions 74:14
96:25
doing 20:3, 29:20, 35:2, 48:3, 55:21, 56:14, 71:22, 80:5, 87:1, 87:19, 88:4, 93:12, 93:14, 97:11
dollar 75:12
dollars 14:9, 34:6, 45:16, 46:25, 48:8, 86:17
done 4:12, 4:13, 4:16, 15:7, 33:16, 66:19, 69:2, 75:15, 80:10, 88:6, 88:7, 93:8
donuts 23:4, 23:6
door 59:9
doubled 66:15
doubles 61:22, 67:1
doubling 56:4, 56:7
doubt 31:6
DOWD 1:46
down 6:13, 9:4, 38:11, 40:11, 41:9, 46:4, 49:11, 51:8, 51:9, 52:18, 52:19, 55:23, 56:10, 56:13, 56:16, 59:23, 65:12, 65:22, 66:23, 70:22, 78:4, 79:1, 80:13, 82:14, 83:3, 85:10, 85:12, 86:4, 86:16, 86:20, 89:4, 89:12
downgrade 52:4, 52:22, 54:19, 89:21, 89:23
dispute 31:10, 31:15, 34:8, 35:8, 53:14, 55:20
disputes 65:16
disregard 69:10
distinction 10:18, 30:21
distort 91:19
distorting 77:1, 80:7
distract 26:22
DISTRICT 1:1, 1:2, 1:27
dividends 52:1, 90:12
DIVISION 1:3, 14:12, 84:20
document 4:20, 5:5, 5:12, 17:4, 17:18, 18:7, 19:16, 34:12, 34:15, 36:18, 36:24, 40:15, 40:23, 41:20, 42:4, 42:8, 43:3, 43:7, 48:2, 50:4, 51:15, 53:11, 53:17, 54:24, 62:12, 64:12, 68:7, 69:11, 71:3, 71:7, 71:14, 71:16, 72:5, 79:13, 88:7
documentary 29:5, 32:13
documenting 85:9
documents 14:13, 16:13, 16:14, 16:19, 17:11, 17:15, 18:3, 18:5, 18:8, 18:13, 18:16, 19:8, 30:8, 53:2, 56:19, 68:22, 69:15, 76:10
downgraded 52:15, 52:19, 53:19
downgrades 52:21, 54:16
downs 68:10, 72:10
draw 29:21, 30:10
driving 75:1, 89:19
dry 7:21, 73:4
due 88:11
During 11:6, 26:21, 27:10, 29:18, 31:23, 32:17, 33:4, 35:4, 65:6, 69:21, 72:16, 94:17
Dutch 46:19, 46:20, 87:4

< E >
E. 2:13
earlier 92:5
early 75:13
earnings 40:23, 42:14, 42:15
easier 25:11
easily 37:8
Easter 26:12
Eastern 25:4
easy 38:1, 44:15
eat 49:6
economic 77:23
economically 40:11, 42:12, 44:4, 50:9, 50:10, 50:19, 55:9, 55:11, 55:12, 55:13, 55:15, 63:17, 77:16
economically-pr oducible 48:16
economics 65:9, 65:15
108

ED 1:26
edge 54:3
Edmonton 57:8, 57:9, 57:10, 57:12, 59:6, 59:14, 59:15, 60:23, 61:11, 61:19, 61:21, 62:10
effect 70:23, 84:9
effective 87:22
effects 20:15
efficiencies 86:6
efficient 65:16, 65:20
effort 5:1
egregious 51:5
eight 45:18, 48:3, 48:7, 64:17, 64:18
either 5:17, 18:13, 24:6, 25:21, 27:22, 51:8, 88:11
electronic 27:13, 28:17
element 10:16, 10:17
elements 69:25
eleven 58:25
elsewhere 61:23
em 24:5, 32:19, 57:5, 64:9
email 53:4, 60:9, 60:11, 60:12, 61:6, 61:8, 63:2, 69:12, 79:12, 97:6
EMILY 2:14
employee 96:3
employees 72:23, 79:25
Employers 35:17
end 24:25, 26:7, 27:24, 43:8, 59:24, 69:24, 92:22

ended 81:1
ending 32:3, 91:21
endorsed 86:21
Energy 36:6, 72:22, 84:20
engaged 71:20
engineering 78:19, 85:23
engineers 68:24, 84:18
English 37:25, 88:9
enjoy 85:25
enormous 77:18
enough 61:17, 96:2
ensuring 71:22
enters 22:23, 67:20
entire 33:5
entirely 30:4
entities 52:11, 52:12
entitled 27:2, 54:25
entity 14:7, 83:19
environment 46:4
equipment 45:13
ERIKA 1:42
especially 92:16
ESPN 46:13
essentially 36:11, 54:7, 64:19
estimate 77:14, 77:15, 78:7, 78:21, 79:3
Estimated 77:7, 77:11, 77:14, 77:22
Estimates 83:18, 83:20, 84:8
estimating 77:17
etched 11:20

Europe 87:5
event 90:4, 92:7
events 33:18
Everybody 6:23, 11:2, 39:6, 44:17, 67:9, 95:7, 97:10
Everyone 35:6, 35:23, 42:1, 48:12, 58:1, 65:22, 72:21, 77:16, 86:25
Everything 12:19, 29:3, 38:3, 44:2, 51:1, 74:4, 74:8
everywhere 41:25
ex-employees 95:22
exact 53:17, 63:2, 87:9, 91:24, 92:12
exactly 47:13, 56:6, 60:12, 61:10, 63:24, 76:2, 79:6, 81:1, 83:25, 89:4, 89:7
example 15:8, 27:12, 61:6, 87:4
Excellent 95:6
exception 88:5
excerpt 13:16
Exchange 31:25, 32:5, 34:11, 40:8, 41:24, 51:6, 54:10, 71:6
exclude 57:13, 60:24, 61:13, 63:9
excluded 26:9, 61:18
Excuse 27:4, 27:20, 97:25
excused 29:3

executive 85:4
executives 36:8, 51:7
Exhibit 12:11, 13:17, 15:6, 16:25, 18:21, 30:12, 30:13
exhibits 5:25, 15:10, 15:17, 17:25, 18:1, 24:4, 30:8, 45:21, 93:7
exist 69:15
existing 63:17, 77:23
exists 30:21
exits 67:17, 94:5
Expansion 56:3, 75:9, 75:11
expect 79:6
expected 51:16, 75:13, 75:15, 83:2, 83:10, 83:11
expects 71:10, 75:8
expense 45:6
expensive 38:13, 45:7, 45:23, 61:1, 61:4
expert 53:12, 65:13, 65:14, 65:19, 94:20, 95:11
experts 65:13, 94:19, 95:1, 95:8, 95:9, 95:10
Explain 5:22, 11:5, 12:25, 23:16, 24:10, 74:4, 76:18, 77:3, 78:21, 86:1, 88:5, 90:1
explained 96:24
explanation 83:7

109

39:3, 42:22, 93:17
found 85:14
Foundry 90:22, 91:5
four 85:24
fours 9:18
frankly 73:23
Fraud 35:13, 59:10, 68:2, 68:8, 68:11, 68:12, 68:20, 70:11, 70:18, 71:15, 81:14, 81:18, 88:19, 89:5, 89:10, 89:11, 90:10, 90:15, 90:19, 91:2, 91:7, 91:17, 92:12, 93:15
fraudulent 88:8, 88:17
French 46:21
friends 27:7
front 10:25, 29:13, 98:14
full 18:7, 86:1
full-year 53:8
fully 74:4
fun 40:6, 44:7, 55:4
Fund 1:10, 25:5, 25:8, 26:12, 35:14, 35:16, 67:12, 90:21, 90:22, 91:5, 91:13
funds 35:25, 91:11
future 38:21, 39:4, 43:11, 43:16, 55:14, 63:23, 64:2, 64:4, 72:19, 81:3, 83:2, 83:4, 83:7, 83:9, 83:18, 88:12

< G >
gains 47:22
game 27:21, 44:7, 44:8, 46:12
games 55:6
gaming 27:21
GARRISON 2:34
gas 7:21, 34:3, 36:6, 39:18, 39:19, 42:17, 43:11, 43:25, 66:2, 66:3, 66:5, 66:6, 66:18, 66:22, 72:4, 72:6, 73:4, 80:23, 80:24, 81:19, 81:24, 83:12, 83:14, 83:17, 92:17
gases 39:18
gatekeeper 7:14
gave 8:14, 74:7, 85:15
GELLER 1:46
general 30:21, 88:12
Generally 30:16, 72:11, 95:4
genius 56:11
gentleman 78:16, 87:20, 91:10
gentlemen 33:10, 33:20, 34:14, 36:12, 46:23, 56:11, 58:17, 59:8, 67:6, 68:3, 69:16, 70:21, 72:1, 93:15
geographic 75:25
geologists 84:19
geoscientists 84:18

gets 18:22, 18:23, 43:3, 57:22, 62:16, 62:20, 62:21
getting 37:9, 44:12, 49:13, 49:14, 49:15, 49:16, 49:17, 49:18, 51:14, 55:18, 62:15, 64:21, 77:25, 85:25
giant 33:22, 34:12, 45:11, 45:14
girls 97:10
give 22:7, 22:24, 23:14, 44:3, 51:17, 86:3, 86:8, 90:13, 92:21
given 9:4, 22:13, 29:19, 30:2, 32:7, 50:10
glad 21:15
Global 78:14
gold 44:19, 44:22
gonna 57:5, 65:12
Gosh 22:11
gotten 10:20, 95:22, 96:4
gown 67:4
graphic 62:12
gratefully 6:10
Great 6:7, 6:14, 7:3, 7:5, 8:21, 9:11, 13:7, 17:21
Greater 1:8, 25:7, 27:2, 51:16
Greenville 2:3
ground 36:6, 37:7, 38:4, 42:13, 43:13, 44:12, 44:16, 45:8, 47:19,

47:25, 57:21, 77:15, 77:16, 78:1, 82:1, 82:5, 82:10, 85:4
groundwork 78:11
Group 1:34, 25:24, 78:15, 78:16, 79:24, 84:21
guarantee 97:4
guess 16:5, 30:1, 85:18
guidance 9:4
guidelines 5:23
Gulf 38:12, 57:2, 59:17, 59:20, 61:14, 62:8, 80:2
guy 14:18, 51:13, 60:6, 96:18
guys 6:8, 60:1, 60:14

< H >
H. 1:39
half 6:22, 7:7, 7:8, 37:18, 37:22, 46:1, 47:24, 49:9, 49:11, 49:24, 50:2, 57:1, 62:8, 63:9
hall 28:6
hand 23:1, 24:14
happen 23:17, 29:17, 64:4, 79:18, 81:3, 81:4, 90:17, 92:4, 97:17
happened 54:8, 59:11, 60:10, 63:11, 64:3, 69:15, 81:7, 81:15, 84:12, 89:1, 92:5

111

explicit 60:24
expressed 74:16
extremely 45:22, 45:23
Exxonmobile 25:13, 68:4, 68:17, 68:23, 70:9, 70:21, 71:25, 78:14, 79:25, 87:22, 87:23, 91:2, 93:16, 96:3, 96:22
eye 69:18
eyes 92:11
eyewitness 30:18

< F >
F&O 76:21
F-10 53:13
F-150 52:8
face 9:19
face-to-face 27:13
Facebook 27:17
fact 30:20, 31:12, 36:22, 39:24, 56:15, 73:16, 81:6, 82:11, 94:16, 94:18
facts 24:24, 24:25, 25:2, 30:10, 30:23, 31:10, 31:11, 31:14, 36:13, 46:15, 69:7, 77:1, 91:20, 92:18
failed 40:23
fair 18:16, 30:9, 57:13
faith 4:25
fake 55:20, 63:8
false 36:17, 40:15, 70:3
falsify 69:8

families 26:10
fan 46:12
fancy 48:22, 55:10
far 37:16, 37:21, 38:3, 71:11
fascinating 55:25
fast 65:1, 65:3
fat 41:20, 43:7
fault 94:15
favor 12:24
Federal 3:13, 71:5
feet 82:1, 82:10
fellow 7:1, 28:9
few 21:23, 29:16, 68:2
field 42:2, 84:17, 84:19, 92:16
fields 14:4, 14:6, 75:5, 81:20, 81:24, 83:11, 83:12
Fiesta 52:8
Fifth 8:23, 8:25, 10:15
file 26:3, 42:3, 71:5
filed 7:12, 8:2, 34:12, 43:3, 43:6, 51:20
filing 53:8
final 53:8
Finally 9:1, 33:3, 42:14, 63:20, 68:9, 78:14, 78:15, 84:22, 91:4, 91:21
finance 91:12
financial 36:9, 41:24, 92:19
financially 56:12

find 25:2, 30:23, 86:6, 86:7
fine 5:14, 5:15
finish 4:6, 94:22, 94:23
finished 73:13, 74:18, 94:24
finishes 21:24
FIRM 2:2, 88:4
firms 71:21
First 16:11, 16:12, 18:6, 23:16, 25:20, 33:10, 35:12, 44:14, 47:4, 47:17, 47:24, 48:3, 48:18, 48:20, 48:21, 49:9, 58:25, 65:9, 65:10, 68:2, 70:2, 73:8, 73:9, 73:10, 73:11, 73:22, 74:3, 92:11, 94:1, 95:20
fiscal 32:2
fit 80:8
fits 38:24
Five 21:12, 34:19, 38:7, 40:24, 47:5, 83:15
fix 79:16
flip 12:17
Floor 3:14
flow 38:8
flowing 49:5
flows 47:13, 47:16, 83:2, 83:4, 83:19
Flowserve 6:12
fluctuations 68:11, 92:15
flying 97:4
focus 72:6, 73:2
FOLKERTH 1:43
folks 4:6,

39:7, 46:8, 52:24, 73:23, 78:10
follow 41:10, 41:12, 47:1, 67:9, 67:11, 69:14, 76:12, 77:21, 81:10, 84:4, 86:10, 93:11
followed 16:7, 67:10, 68:6, 69:3, 69:19, 74:11, 78:23, 80:6, 81:15, 84:14, 86:16, 87:23, 89:8
Following 6:13, 31:14, 68:8, 89:2
foolish 84:10
football 46:12, 75:4, 75:5
Ford 52:8
forecast 84:11
forecasts 84:4, 84:9, 87:7, 87:8
foreign 87:4, 87:5
foremost 16:11
forests 45:11
forever 8:22
forget 57:25
forgot 14:19, 22:14, 41:11
Form 32:2, 97:6
formal 5:8
formally 25:7
format 71:8
formerly 27:18
formula 79:24
Fort 14:10, 14:19, 60:21, 60:22
forth 49:24, 55:10
fortuitously 21:12
forward 7:19,

110

happening 49:20, 81:2, 86:21
happens 5:20, 53:22, 92:14, 92:18
hard 4:16, 7:17, 8:3, 21:16, 21:18, 82:2, 82:3, 83:16, 88:1, 93:10
Harvey 6:21, 6:24
Harwood 2:24
HAYNES 2:23
He'll 78:21, 89:17
headed 78:16
headline 82:23
headquartered 72:21
heard 31:6, 33:5, 69:22, 71:4, 73:7, 75:19, 76:6, 80:15, 84:6, 86:23, 90:8, 90:9, 93:2
hearing 7:14
hearsay 19:3
heavy 41:20
held 16:9
Help 24:1, 54:6, 95:19
helpful 41:2, 49:8
helping 91:3
helps 9:10, 66:18
hid 33:21, 33:25, 34:1, 34:9, 35:2, 36:2, 36:22, 69:4
hide 69:9, 70:22, 73:25, 74:9, 79:17, 80:15, 80:16
hiding 40:4

high 13:4, 45:25, 70:10, 72:14, 78:2
higher 5:23, 31:5, 72:12, 83:4
highlight 34:25, 46:5, 46:13, 46:15
highlighting 35:1
highlights 46:10, 47:17, 62:21
Hillbillies 44:18
hinges 64:5
HINOJOSA 2:15
hire 35:18
historical 43:10
Hit 19:11, 66:11, 66:21
Hold 15:14
holding 9:23
holdings 91:6
home 11:10
honest 74:8
HONORABLE 1:26
Hopefully 24:8
Horne 51:13, 84:25, 85:8
horse 64:5, 64:6
Houdini 56:25
hour 85:23
hours 71:17
houses 17:14
Houston 38:12
huge 35:2, 45:2, 45:3
hundred 5:25, 14:8, 34:6, 45:16, 48:7, 87:18
hundreds 71:17, 86:17, 94:11

idea 74:16
identified 4:21, 79:4
idle 56:9
ignorant 58:17
ignored 30:4, 41:11
immediate 26:10
immediately 62:6, 75:8
impact 53:16
impacted 41:15
impair 83:3
impaired 85:11, 85:12, 88:22
Impairment 66:16, 80:20, 82:13, 82:15, 82:22, 83:5, 87:23, 87:24, 92:10
impairment. 88:14
impairments 42:19, 89:18, 89:25
Imperial 78:10, 78:12
importance 43:18
important 26:18, 33:12, 33:16, 33:21, 39:24, 46:14, 52:2, 53:23, 54:24, 58:22, 69:23, 69:25, 73:14, 74:23, 82:13, 91:22, 95:16, 95:17
improper 69:9
improperly 64:9
include 27:21, 39:16, 40:9, 40:10, 44:6, 46:24, 55:5, 60:25, 61:3, 61:8
included 40:10, 40:14, 42:10,

50:16, 64:9, 79:23
includes 26:4, 27:7, 35:25
including 26:20, 29:1, 36:15
inclusive 26:6
incorporate 83:19
increased 34:22
increases 88:13
independent 28:11, 71:21, 84:23, 87:10, 87:15, 87:16, 88:3
INDEX 99:1
indicating 14:24, 81:25, 82:9
indication 19:19
indicative 55:3
indirect 30:18
individual 7:10, 7:21, 10:3, 26:2, 75:23
Individually 1:6
individuals 70:13
industry 72:17, 77:17, 78:20, 92:17
infer 26:16
inferences 30:9
infers 98:11
inflating 84:9, 84:11
inflation 88:12
influence 29:24
influenced 27:1
information 27:11, 27:19, 28:25, 33:25, 34:14, 35:3, 36:2, 36:17, 36:18, 36:23,

112

42:4, 42:5, 48:13, 50:5, 54:23, 70:17, 71:8, 71:12, 74:15
informed 58:24
inherent 92:15
inherited 8:20
initial 56:2, 75:17, 78:11
injured 35:19, 64:15
inkling 65:9, 65:10
Instagram 27:17
instantaneously 65:12
Instead 63:22
instruct 25:1, 32:22, 55:2
instruction 94:10
instructions 22:7, 22:9, 23:15, 25:3, 33:6
integrated 54:18
integrity 70:12
intended 32:9
intentional 68:11, 74:1, 88:17, 88:19
interest 34:23, 41:15, 52:5, 52:24, 53:15
Intermediate 37:24
internal 71:19, 71:23, 76:18, 76:20, 87:7, 89:2
Internally 43:19, 47:10, 55:7, 58:6, 76:16
internet 27:15, 27:16, 28:22
interpretation 9:16, 9:18

interpretations 33:2
interruptions 29:16
interview 85:15, 86:12
introduced 32:22
invaded 72:12
inventory 37:10, 38:18, 39:23, 40:2, 40:7, 43:12
invest 35:18
invested 45:7, 75:10, 86:7
investigation 5:7, 28:11
investing 42:1
investment 35:18, 66:21, 90:22, 90:24, 91:1, 91:3, 91:5
investments 84:8
investors 35:4, 36:13, 36:15, 41:23, 41:25, 55:15, 63:16, 65:11, 70:22, 81:14, 88:9, 89:6
invitation 6:11
involved 29:1, 58:13, 69:7, 71:17, 73:16, 87:11
Iran 20:14
issue 7:9, 9:5, 9:9, 28:18, 77:5, 77:6, 90:5
issued 92:1
issues 4:9, 26:15, 29:6, 29:15, 82:20
item 10:7, 13:10
itself 39:21,

75:4

< J >
J. 1:19, 2:28, 3:12
Jane 90:20
JASON 23:7
Jeffers 23:5, 23:6
JEFFREY 1:19
job 22:12, 85:23
Joe 1:33, 84:25
JORDAN 2:22
JR 1:6
Judge 1:27, 15:16, 17:14, 21:8, 24:22, 24:23, 33:11, 35:12, 41:18, 55:1, 68:19, 69:23, 73:7, 73:15
judges 8:21, 9:5, 24:25
judgment 17:13, 19:6, 70:5, 71:9
judgments 71:10
jump 42:22
juncture 9:23
juror 13:5, 27:2, 27:3, 27:20
jurors 27:2, 27:23, 28:10, 29:3
Jury 5:9, 7:16, 11:5, 12:25, 22:5, 22:23, 23:2, 27:10, 33:3, 33:11, 67:6, 67:16, 67:17, 67:19, 67:20, 93:21, 94:4, 94:5, 95:17, 98:14
jury. 4:3
justice 31:2

justify 55:7, 58:6

< K >
Keep 29:16, 33:4, 52:22, 63:7, 66:9, 70:1, 70:25, 82:18, 82:19, 84:15, 86:5, 90:2
keeping 54:21, 58:6
keeps 78:4
KENDALL 1:33, 1:34
KEP 56:2, 56:9, 57:3, 61:22
kept 78:6, 81:10, 81:11
key 42:4, 43:25, 83:6
Keystone 61:13
kick 78:12
KID 41:22, 56:1
kidding 41:1
kids 87:1
kind 6:18, 12:25, 21:7, 23:24, 24:13, 64:21, 77:17, 82:4
kinds 37:22, 81:9
King 2:16, 7:3, 15:25, 16:3
Kinkeade 1:26, 68:19, 69:24, 73:7
known 25:7, 27:18, 54:10
knows 48:9, 62:15, 62:17, 72:21, 95:7

< L >
lack 98:10, 98:11

lost 33:25, 36:16, 47:18, 48:6, 49:21, 49:23, 49:25, 66:6, 67:12
lot 10:14, 11:1, 18:12, 24:4, 38:11, 38:12, 39:19, 42:16, 42:19, 48:21, 54:3, 62:1, 65:14, 65:19, 78:10, 82:2, 82:3, 85:21, 91:24, 93:2
lots 40:25, 72:10
Louisiana 38:12
love 22:11
low 46:22, 47:6, 51:24, 53:25, 63:23, 64:8, 66:11, 72:15, 72:16, 81:5, 88:21
low-price 46:3
lowdown 48:3
lower 37:17, 52:24, 63:5, 65:7, 78:3, 83:2
lowest 85:23
lows 66:23
lunch 93:22
LYUBA 2:31

< M >
M. 2:12
Madden 60:7, 61:8
main 52:21, 59:18, 72:6
man 45:15, 60:8, 84:25
managed 85:3
Management 46:6, 46:7, 46:9, 76:18,

78:15
manager 85:2
managers 35:18
manipulate 70:5
manipulated 44:7
manipulation 55:6
mark 5:2
market 35:18, 60:23, 65:16, 65:17, 65:20, 67:4, 68:10, 77:21, 78:1, 89:19, 89:20, 92:16
marketing 71:11
marketplace 34:21
markets 41:24
Mary 90:20
massive 45:22, 46:23, 89:11, 91:7
master 91:12
material 4:21, 34:13, 42:4, 70:2, 70:3
materialize 88:13
materialized 92:13
math 16:13, 48:6, 71:9
mathematician 21:7
matter 58:19, 97:8
matters 74:6
Matts 90:21
Mcmurray 60:21, 60:22
mean 24:19, 50:3, 52:23, 55:14, 58:16, 65:4, 95:17
means 24:11, 27:11, 29:19, 31:2, 31:9, 47:13, 47:15,

52:24, 54:12, 77:24, 90:12, 98:17
meant 70:4
measure 43:25, 45:3, 93:9, 93:13, 93:16
mechanical 3:7
media 27:13, 28:17, 65:6
meet 7:1, 7:2, 93:10
meeting 47:4, 47:14, 55:22, 55:25, 59:18, 60:2, 60:5, 60:8, 60:13, 60:14, 60:15, 61:7, 62:4, 62:7, 62:15
meetings 47:3, 74:13
MELSHEIMER 2:12, 4:25, 16:12, 20:3, 58:20, 67:23, 68:14, 94:9, 94:13, 99:8
member 26:20
members 26:10, 35:5, 36:19, 64:16
memo 69:12
memory 26:23, 26:25
men 68:5, 68:23, 70:8, 70:13, 80:13
mention 34:16
mentioned 73:15, 87:12
merged 54:11, 54:12
merit 6:17
merits 7:9, 10:3, 26:17
message 69:12, 76:14, 79:7, 95:24
messages 94:12,

94:13, 94:15, 95:21, 95:22, 95:25, 96:4, 96:6, 96:22, 96:24, 97:4, 98:10
messaging 27:16
messing 76:25
met 6:24
methodology 70:17, 79:22
metric 39:5
Miami 7:2
Michael 2:7, 12:5
microphone 21:21, 29:13
microphones 21:19
middle 49:17, 50:14, 56:4
mighty 10:16
miles 45:9, 45:10, 59:13, 64:6
million 34:6, 45:18, 47:18, 47:24, 48:6, 48:7, 48:20, 49:21, 49:23, 50:2, 50:21, 53:14, 54:2, 76:5
millions 82:9, 86:17
mind 9:3, 9:9, 33:4, 70:1, 70:6, 71:1
mine 33:22, 33:25, 36:5, 45:6, 45:8, 45:11, 75:4
mined 37:19
mining 37:12, 74:23
mint 52:15
minus 47:23
minute 18:15, 22:1, 24:10, 46:13, 57:18,

113

---

Ladies 33:10, 34:14, 46:23, 56:10, 59:8, 67:6
laid 75:22
language 7:11, 9:19
largely 81:21
larger 25:24
Largest 33:22, 36:5, 36:22, 71:20, 72:22
last 7:12, 8:3, 17:20, 18:15, 22:25, 25:20, 40:17, 49:15, 81:19
late 65:21, 80:24
lately 75:1
later 26:24, 32:19, 40:7, 42:22, 51:21, 60:7, 64:17, 66:19, 71:24, 92:10
LATHAM 2:40
LAW 1:34, 2:2, 24:22, 25:1, 29:1, 29:6, 29:21, 30:21, 32:23, 55:2, 68:19, 69:23, 69:24, 70:19, 88:16
lawsuit 25:22, 25:23, 26:1, 26:3, 55:3
lawyer 22:18, 29:20, 58:20, 68:12, 90:9
Lawyers 5:23, 8:11, 13:7, 23:17, 24:1, 24:2, 29:2, 29:18, 31:10, 32:6, 32:25, 33:1, 74:2, 91:13, 94:11, 95:16

lays 60:11
Lead 25:3, 25:5, 25:6, 25:7, 25:9, 25:10, 26:11, 26:15, 26:20, 31:17, 31:20, 35:13, 80:19
leading 45:1, 59:18
learn 28:15, 68:2, 68:5, 85:21, 85:22
learned 37:1, 47:23
least 15:15, 32:17, 56:24, 60:10
leave 29:10, 41:17
leaves 66:15, 66:25
left 43:14, 44:21
legal 4:9, 25:25, 29:23
less 37:21
level 42:1, 85:23
library 28:12
license 8:14, 8:16, 87:17
lie 70:9, 80:13, 89:9
lied 69:4, 77:8
life 33:13, 33:17, 83:10, 83:11
lifting 57:20, 57:23
likelihood 97:1
limited 30:12, 30:14
limits 18:4
LINDELL 1:40
Line 45:24, 56:3, 99:4
lines 73:1
liquid 39:17
liquids 39:15,

39:16, 39:19, 39:21, 39:23
list 13:4, 53:23, 54:1, 96:3
listen 24:19, 28:20, 29:12, 30:9, 89:14, 93:6
listening 11:9, 26:22, 67:7, 67:13, 95:2, 95:9
literally 78:20
little 6:11, 6:25, 7:2, 8:4, 21:14, 23:5, 24:8, 24:9, 24:18, 38:24, 40:6, 41:1, 41:18, 41:21, 42:21, 43:5, 44:6, 47:10, 47:21, 48:25, 51:19, 53:13, 53:16, 54:1, 55:22, 59:23, 60:22, 61:9, 61:15, 72:3, 72:5, 73:6, 92:6
live 35:21
lives 93:8
LLP 1:46, 2:16, 2:23, 2:34
loan 54:7
logically 30:20
LONG 2:45, 20:3, 21:2, 38:17, 64:19, 67:7, 78:5, 93:24
long-term 88:10, 88:13
Look 8:8, 9:20, 39:18, 39:20, 39:21, 41:2, 47:20, 49:11, 53:10, 62:11, 69:18, 71:15,

72:8, 77:12, 80:2, 80:18, 80:22, 86:6, 90:6, 93:7, 93:17, 96:5, 97:13
lookback 54:5, 54:15
looked 39:15, 50:25
looking 8:11, 28:12, 46:5, 49:8, 53:20, 54:20, 89:2
looks 37:12, 50:12, 63:10, 75:3, 78:10
Lord 21:9
lose 58:20, 87:16
losing 14:8, 17:16, 34:6, 40:13, 40:18, 40:20, 42:6, 42:18, 42:20, 44:5, 45:4, 47:23, 48:8, 48:14, 48:15, 48:19, 49:19, 50:6, 50:20, 55:23, 58:3, 58:4, 58:5, 63:13, 66:10, 75:20
loss 6:18, 10:16, 10:17, 49:23, 50:2
losses 17:11, 17:13, 33:21, 34:9, 34:16, 34:17, 36:15, 36:22, 36:25, 40:4, 41:14, 42:9, 43:2, 43:10, 46:9, 46:10, 46:16, 46:17, 47:11, 47:22, 50:11, 75:22, 76:4, 76:5, 76:7,

114

---

71:16, 90:11
minutes 21:11, 21:12, 32:7, 64:24
mislead 36:13
misleading 39:25, 40:16, 42:8, 63:16, 75:19
misrepresentation 70:3
misrepresentations 64:12
misstated 18:20
misstatement 88:18
mix 37:13, 37:15, 38:5, 38:6
Mobile 1:17, 54:12
moment 91:24
moments 21:23
money 17:16, 35:20, 38:1, 39:10, 40:18, 42:6, 42:18, 42:20, 44:5, 44:19, 45:4, 47:11, 48:8, 48:14, 48:15, 48:23, 50:6, 50:20, 51:23, 51:25, 52:2, 53:16, 54:3, 55:11, 55:14, 56:12, 58:3, 58:4, 58:5, 63:14, 65:11, 66:11, 75:20, 77:13, 86:7, 90:13
monies 84:11
monitoring 53:1, 53:18, 53:21
month 34:7, 35:1, 46:5, 46:8, 46:15, 48:2, 48:8,

49:15, 49:21, 58:4, 60:19, 61:9, 61:10, 62:21, 78:22, 78:23
months 43:8, 47:5, 47:18, 48:4, 48:7, 48:19, 48:20, 48:21, 58:25, 59:18, 62:6, 64:17, 64:18, 71:17, 74:13, 78:22
Moody 54:16
morning 29:8, 68:14
motive 54:22, 89:9, 89:13
Mountain 7:21, 7:24, 17:14, 42:17, 73:4
Mountains 73:4, 81:20, 81:24, 83:12
move 93:5
movements 20:14
moves 21:21
MR. BURKHOLZ 4:15, 4:18, 5:4, 5:14, 5:17, 5:21, 7:7
Ms 4:4, 4:5, 4:7, 6:9, 6:10, 6:15, 6:21, 7:5, 8:6, 8:9, 8:12, 8:19, 9:13, 9:16, 9:21, 10:10, 10:18, 10:22, 11:1, 19:7, 90:21
multibillion 75:12
Myspace 27:17

< N >
N. 2:24
name 14:19,

35:25, 78:16
named 51:13, 84:25, 90:20
names 25:20
Napchat 27:17
napkin 78:9
NATHAN 1:40
natural 34:2, 39:18, 42:17, 66:2, 66:3, 66:5, 66:6, 66:18, 66:22, 80:23, 80:24, 81:19, 83:14
nature 49:4, 81:8, 95:23
near 38:11
nearly 49:3
necessary 55:2
need 4:6, 4:13, 7:1, 9:5, 11:3, 12:4, 21:2, 29:3, 37:1, 45:13, 48:13, 51:25, 54:22, 54:23, 54:25, 71:2, 88:15, 88:16, 92:4, 94:6, 97:9
needed 40:21, 42:16, 85:10, 86:19, 89:3
needs 5:7, 5:9, 11:2, 43:1, 94:10, 94:14
negatively 41:15
New 2:36, 31:24, 66:25
news 15:19, 34:21, 52:3, 53:11, 54:2, 65:6, 92:20
newscast 28:21
newspaper 28:19
Next 16:24, 32:14, 35:10, 39:15, 41:18, 43:15, 44:2, 45:15, 49:21,

61:23, 66:18, 68:1, 70:19, 81:16, 86:5, 86:18, 86:19, 89:1
night 7:12, 8:3
NINA 2:21
No. 1:15, 8:16, 93:21, 96:10, 98:15
nobody 28:8, 60:9
noise 65:18
None 52:16
nor 18:17
normal 68:10, 68:11, 92:14
Norman 78:25
Northern 1:2, 33:23, 45:10
note 26:22
notes 24:17, 24:18, 24:19, 26:21, 26:23, 26:24, 27:1, 27:2
Nothing 11:17, 17:19, 31:4, 43:15, 69:19, 79:18, 81:10, 81:22
notion 77:6
November 62:17
nowhere 34:15
Number 12:5, 38:20, 41:1, 50:23, 63:1, 69:8
numbers 16:15, 40:25, 50:1, 51:12, 57:7, 61:9, 63:21, 68:25, 69:14, 77:4, 79:22, 79:16, 87:19
Numero 38:20
NY 2:36

< O >

116

PAMELA J. WILSON, CSR/RMR/CRR

**App. 50**

o'clock 8:3
O'connor 8:24
oath 22:24, 22:25
object 7:23, 8:15, 8:16, 12:11, 18:3, 86:21
objected 13:18, 15:2, 15:15, 15:20, 15:21, 16:1, 16:8, 17:15, 17:17, 18:2, 19:4
objected-to 15:6
objecting 15:10, 15:13
objection 10:9, 12:15, 15:1, 17:1, 19:2, 19:8, 19:9, 19:12, 19:18, 20:2, 20:17, 29:5, 30:3, 30:5
objectionable 12:20
objections 10:5, 11:22, 16:6, 20:3, 29:18, 29:22, 29:23
obvious 83:6, 90:8
Obviously 38:11, 57:21, 59:15
occurred 33:18, 55:3
occurs 67:2
October 60:2
offended 28:5
offer 32:21
offered 29:5, 32:21
offering 4:20, 5:4, 41:16, 51:23, 53:4, 54:4, 64:18,

66:12, 66:24, 90:11
office 84:22
OFFICER 36:9, 67:19, 94:4
officers 64:14
Official 3:13
often 23:5, 75:2
oil-equivalent 72:24
old 54:10, 74:16, 82:9
Olive 2:17
OLIVER 1:42
omissions 64:12
omitted 36:13, 36:17, 40:17
Once 7:16, 10:1, 41:6, 57:2, 73:12, 82:14
one-day 21:8
ones 6:3, 44:3, 50:25, 59:6, 61:12, 62:10, 83:21, 90:14, 91:2
online 28:19, 57:3, 61:22, 75:11
open 12:9, 22:22, 33:4, 92:11, 98:20
Opening 15:11, 16:8, 17:25, 18:4, 18:14, 18:21, 19:14, 21:1, 21:2, 21:6, 32:7, 32:9, 32:11, 32:12, 73:10, 94:9, 95:3, 95:13, 99:4
operate 45:23, 72:18
operating 78:5, 82:7, 87:3
operation 14:18, 34:3,

37:19, 38:2, 45:22, 56:10, 73:3, 74:23, 75:4, 75:6, 75:12, 78:4, 82:7
operations 51:25, 80:25
operative 7:11
opinion 9:1
opportunity 32:14
opposite 50:6, 77:10, 80:17
optimistic 83:23, 84:2
oranges 76:24
order 7:18, 30:4, 96:13
ordered 94:16
Others 1:7, 88:25, 90:1, 92:25
otherwise 26:5
ought 16:1
outlook 60:16
outset 34:4
Outside 4:3, 76:15
overall 63:15
overpaid 35:6, 36:2, 36:19, 40:19, 42:20
Overrule 10:9, 30:5
overruled 24:7
overstated 42:14
overstatement 50:21, 51:3, 63:13, 63:14, 63:15
overwhelm 49:25
own 26:16, 54:20, 55:7, 71:8, 83:19, 83:21, 84:4, 84:8, 84:11, 87:5, 87:7, 87:9, 87:10,

90:19
owned 13:25, 14:2, 34:3, 87:9
owns 14:8

< P >
P. 1:18, 32:1
Page 41:23, 50:7, 50:12, 50:14, 55:17, 58:6, 60:16, 63:16, 64:9, 76:1, 76:2, 76:5, 76:8, 99:4
pages 60:18, 71:18
paid 48:23, 52:24, 65:6, 65:23, 65:24, 66:13, 66:17
pam_wilson@txnd .uscourts.gov 3:16
PAMELA 3:12
pan 70:5
paper 23:11
paraphrase 74:16
parents 86:25
Part 15:15, 17:13, 19:9, 29:8, 33:12, 33:23, 40:6, 44:7, 45:7, 50:14, 55:4, 62:14, 62:22, 96:23
partial 6:15
particular 28:16, 29:21
parties 28:3, 29:1, 31:14, 35:13
parts 56:1
Party 2:8, 3:4
pass 28:6
passed 79:3,

printing 44:19
prior 43:4, 47:7, 53:8
probably 8:2, 9:7, 21:23, 25:11, 31:6, 44:17, 45:19, 58:8
problem 24:2, 37:8, 38:2, 44:24, 45:12, 47:8, 90:8
problems 45:6, 48:21, 94:8
procedure 24:22, 29:6
Proceedings 3:7, 98:22
process 19:13, 71:19, 77:2, 77:3, 78:21, 81:15, 84:14, 87:11, 89:2
processes 71:23, 74:12
produce 69:6, 94:12, 95:24, 95:25, 96:5, 96:9, 97:2, 97:14
produced 3:8, 33:24, 37:4, 97:1
produces 74:24
producible 40:12, 42:12, 44:4, 50:9, 50:10, 50:19, 55:10, 55:11, 55:12, 55:13, 55:16, 63:17
producing 81:11
product 57:8
production 56:4, 56:7, 75:24, 75:25
professionals 68:25, 79:4
profit 42:13, 43:9, 47:20,

47:24, 86:5
profitability 19:9
profitable 40:12, 44:4, 56:10, 75:9
proven 30:11, 31:13
profits 43:2, 44:1, 44:2, 75:22
programs 28:22
progresses 93:18
Project 65:10, 75:10, 75:11
projections 83:8, 83:13, 83:20, 87:7
promise 28:7, 85:19
promised 23:5
proof 31:15
proper 79:5
properly 29:9
proposal 4:18
proposed 4:20
prospective 13:5
protect 89:11
prove 10:2, 54:22, 54:23, 65:20, 70:2, 70:4, 70:6, 70:8, 73:19, 80:12, 88:17
proved 38:19, 38:25, 39:3, 39:8, 39:9, 39:14, 40:7, 40:12, 41:6, 43:12, 43:15, 43:17, 43:23, 44:3, 44:14, 50:24, 55:5, 55:16, 56:21, 58:12, 59:25, 60:16, 63:12, 64:1, 64:20, 77:6, 77:7, 77:9, 77:11, 77:14, 77:19,

77:22, 78:8, 79:4, 79:8, 81:1, 90:25, 91:16, 92:8
proverb 74:16
proves 30:19
provided 7:22, 36:18
province 33:24
public 34:20, 43:3, 48:5, 71:4, 76:19, 85:15, 86:12, 87:14
publicly 43:8, 48:11
publicly-traded 42:3
publish 5:6, 5:11
pull 38:4, 82:3
pulled 77:16, 81:25
pulling 37:7
pump 72:13
purchased 14:3, 26:5, 31:17, 34:1, 35:4, 35:23
purpose 30:13, 30:14, 76:22, 76:23
Put 11:6, 11:13, 20:8, 20:9, 20:13, 23:18, 32:17, 34:18, 37:11, 43:6, 44:8, 50:7, 50:8, 52:3, 53:11, 54:3, 54:24, 55:16, 63:22, 70:19, 74:15, 78:9, 85:20
putting 37:6, 44:15, 55:8, 63:7, 82:4
PX 15:15, 16:17

< Q >
qualify 59:25, 63:12, 64:1, 64:8, 64:19, 77:9, 80:25, 92:8
quality 37:17, 49:3, 62:25
quantitative 51:11, 63:20
quantities 80:24
quantity 51:10
quarter 39:22
question 29:25, 30:2
questions 24:22, 29:19, 29:23, 74:2, 74:4, 74:5, 87:19, 93:10
quickly 35:9, 65:24, 93:5
quit 10:12
quite 8:6, 38:16, 41:12, 49:7, 60:24, 62:3, 63:5
quotation 15:19
quote 85:14

< R >
R. 1:40
radio 28:20
rail 38:9, 57:4, 59:5, 62:1
Raise 11:21, 23:1, 24:14, 62:20
RAMIREZ 1:6
ramping 75:12
ran 68:24, 79:1, 79:3
Randy 85:2
range 50:22, 80:23

79:8
passes. 79:14, 79:17
patch 75:2
patience 74:20
PATRICE 3:3
PATRICK 2:45
PATTON 2:46
Paul 2:34, 6:21, 6:24
pay 34:23, 41:16, 49:6, 52:1, 52:5, 52:9, 61:14, 90:12
paying 34:5, 48:24
pays 52:1, 90:22
peanut 49:5
PEDRO 1:6
peers 54:15
pen 23:11
Pennsylvania 1:9, 25:7, 35:3, 35:17, 67:12
Pension 1:9, 25:5, 25:8, 26:12, 35:14, 35:25
per 49:13
percent 24:8, 31:4, 39:3, 39:14, 39:22, 40:1, 45:5, 47:7, 50:22, 51:2, 55:23, 59:19, 63:14, 63:15, 66:1
percipient 95:11
perfect 7:13, 9:21
performance 43:10, 91:13
period 14:13, 26:7, 31:23, 35:5, 35:24, 36:1, 39:13,

45:2, 65:6, 66:4, 66:5
periods 78:5
permit 27:6
person 23:21, 36:11, 52:7, 52:9
personnel 28:10
persons 25:23, 26:4, 28:4
pertains 7:9
petroleum 82:3
phase 7:5
phone 28:17
physical 15:1
pick 22:17
picture 15:5, 15:19, 38:25
piece 71:11
Pipeline 38:8, 57:6, 61:13, 61:15, 61:24, 61:25
place 9:24, 28:21, 28:23, 74:12
plain 88:9
PLAINTIFF 6:16, 11:6, 11:22, 23:24, 25:4, 25:6, 25:7, 25:9, 25:10, 25:21, 26:11, 26:15, 26:20, 31:17, 31:20, 32:18, 35:14, 65:13, 73:8, 77:8, 79:19, 85:13, 90:9, 90:21, 90:22, 90:25, 91:11
Plaintiffs 1:12, 1:31, 23:19, 25:11, 32:12, 32:20, 64:15, 68:9, 69:6, 69:11, 70:2, 73:2, 73:13, 73:15, 74:2, 74:18,

75:18, 76:14, 76:20, 84:1, 88:8, 90:18, 91:13
plans 35:25
play 71:22, 72:9
played 44:8
playing 42:1
Please 25:6, 67:24, 70:25
plenty 15:9
Point 5:25, 7:20, 8:7, 18:2, 24:13, 50:16, 62:5, 95:10
policy 84:21, 85:1, 96:23, 97:3, 97:8, 98:2, 98:9
POLYCHRON 1:44
Poor 9:4, 35:2, 53:6, 54:16, 89:23
portion 32:17
portions 5:11
position 6:16
positive 36:24, 47:12, 47:16
possible 29:16, 89:21
possibly 50:10, 93:5
poster 78:9
preadmitted 16:14, 17:4, 19:14, 34:15
precise 15:22
predicated 91:17
preference 94:13
preliminary 22:6, 22:8
premarked 6:1
premise 18:11
prepared 76:21
preparing 51:15, 85:8,

85:9
Preponderance 30:23, 30:25, 31:1
presence 4:3, 27:6, 29:10
present 32:12, 32:14, 32:20, 33:15
presented 10:6, 26:14, 32:11, 76:14
presenting 26:15
pressured 69:8
pretty 17:24, 19:18
preview 74:19
price 20:14, 48:21, 48:23, 57:17, 57:19, 67:1, 68:12, 72:12, 77:24, 87:6
prices 20:15, 20:18, 45:25, 46:22, 47:6, 49:11, 51:24, 53:25, 55:14, 56:6, 63:23, 64:2, 64:8, 66:5, 66:8, 66:14, 72:7, 72:12, 72:14, 72:16, 72:18, 75:24, 78:2, 78:3, 80:23, 81:5, 81:7, 83:14, 83:16, 83:17, 84:2, 88:12, 88:13, 88:20
Pricewaterhouse 71:20, 71:24, 84:24, 87:12, 87:22
pricing 80:5
principal 36:9
principle 15:13, 16:7,

rank 52:13
rate 52:12, 52:13
rates 53:7
rather 10:24, 26:2, 33:1
rating 52:5, 52:7, 52:10, 52:12, 52:16, 52:20, 52:23, 53:5, 53:7, 53:15, 53:19, 53:25, 54:17, 54:21, 89:11, 89:12, 89:19, 89:24, 90:2, 90:5
rating. 54:15
ratings 52:11, 54:17
reach 26:19, 33:4, 69:8
reached 70:17, 87:22
read 8:10, 9:1, 28:19, 32:24, 50:4, 63:24, 86:13, 88:20
Readers 46:14
reading 26:8, 32:24
ready 4:4, 4:7, 4:8, 4:10, 20:10, 67:18
reality 52:13
Realization 48:22, 49:2, 49:11, 58:2, 61:5
realizations 62:24
realize 61:12, 61:15
Really 24:1, 37:6, 37:8, 37:16, 37:22, 37:25, 38:17, 40:8, 41:5, 41:12, 41:21, 42:7, 42:20,

43:16, 44:11, 44:15, 44:19, 45:2, 50:13, 50:20, 52:2, 53:1, 55:24, 58:22, 63:3, 67:8, 72:5, 72:18, 82:2, 85:25, 91:7, 98:13
reason 34:18, 38:15, 45:7, 60:14
reasonable 30:10, 31:5, 77:23, 97:1
reasons 34:19, 40:15, 54:22, 55:1, 56:15
rebooked 81:8
rebuttal 32:20
recall 14:18
received 48:23, 62:12
recently 53:19
Recess 98:21
recess. 67:17
recognize 43:18, 43:24
recollection 27:3
record 8:14, 12:8, 12:9, 22:21, 22:22, 66:11, 66:23, 86:15, 98:19, 98:20
recording 27:14
recoverability 88:10
redaction 4:21, 5:8
redactions 4:12, 6:2
redebooked 82:17
reduce 40:22, 86:6
reducing 21:4
refer 14:14,

25:3, 25:8, 25:10, 25:13, 25:18
referring 98:10
refine 36:6
refineries 38:13
reflexively 86:8
refused 96:11
regard 24:4
regular 39:17
regulators 51:5
relate 29:23, 52:6
relates 9:25
relatives 27:7
reliance 6:17, 7:22, 10:2
relied 19:15, 19:20
rely 26:24, 28:14
remain 63:23
remained 79:8
Remember 6:23, 7:1, 11:8, 32:16, 44:17, 49:17, 57:24, 61:21, 63:19, 66:24, 75:13, 76:6, 80:9, 88:1, 89:12, 92:1, 92:2
remembers 60:9
remove 41:8
renew 10:5
repeat 40:3
replace 37:9, 65:25, 66:21
replacement 44:25, 66:2
replacing 44:11, 44:15
replicated 18:7
replicating 17:18
report 34:10, 34:11, 34:12, 34:19, 34:20,

39:13, 40:15, 41:14, 41:19, 41:21, 41:22, 41:23, 42:9, 43:5, 43:19, 43:20, 43:22, 43:23, 46:6, 46:9, 46:11, 47:14, 51:4, 51:20, 62:20, 62:21, 66:9, 71:4, 75:24, 85:9
reported 3:7, 42:14, 42:15, 44:1, 50:20, 51:2, 79:9, 92:4
Reporter 3:13
reports 17:2, 34:25, 46:15, 58:4, 76:21
represent 26:13, 68:15
representation 15:2, 17:7, 56:18
Representative 2:8, 3:4, 25:4
representatives 25:24
represented 25:9, 26:11, 56:19
reputation 70:12
requested 94:12, 96:16
requesting 29:20
require 31:15, 75:21, 75:22
required 32:4, 34:11, 36:23, 43:23, 80:9, 83:5, 86:18
requirements 71:1
requires 30:23, 43:19, 70:18,

117

118

119

120

PAMELA J.  WILSON,  CSR/RMR/CRR

App. 51

75:24, 76:22, 80:11, 81:9
requiring 26:2
research 28:18, 28:25
reserve 39:9, 39:12, 40:13, 41:7, 43:17, 50:24, 77:17, 77:19, 78:11, 79:4, 80:21, 91:17
reservoir 78:19
resigns 66:14
resolve 29:15, 35:8
resolved 26:1
resource 72:25
resources 82:12
Respectfully 18:10
respond 97:6, 97:19
response 85:13
responsible 23:6
responsive 96:25
rest 37:17, 57:13
restroom 11:3
result 35:5, 36:17, 52:20, 69:9, 77:19
results 53:8
retire 27:24, 35:20
Retirement 35:17, 36:16, 67:12
retrial 7:9
return 36:19
returning 36:15
revealed 86:19
revenue 62:24
revenues 49:13, 58:3, 61:12
reversed 8:23, 8:24, 8:25, 9:7
review 53:7,

78:12, 78:13, 78:15, 84:22, 84:23, 87:13
revisitation 6:17
Rex 1:18, 3:1, 25:15, 32:1, 36:8, 68:15, 85:18
rid 65:17
RIFKIND 2:34
rise 67:19, 88:12, 94:4
risk 88:14, 89:6, 92:9
risks 92:12
RMR 3:12
roads 75:2
ROBBINS 1:46
robe 22:12, 22:13, 22:14, 22:15
Rocky 7:20, 7:24, 17:14, 42:17, 73:3, 73:4, 81:20, 81:24, 83:12
role 71:22
rolling 81:11
room 33:3, 93:21
Rosenthal 1:20, 25:17, 32:2, 36:10, 47:4, 51:14, 51:15, 68:16, 69:13, 69:17, 70:7, 79:10, 79:16
Ross 2:47
roughly 37:22
Royal 46:19
RUDMAN 1:46
Rule 7:14, 9:7, 9:10, 9:11, 9:21, 10:8, 12:2, 15:11, 16:9, 17:24, 18:4, 18:16, 19:19, 24:5, 29:21, 30:21,

40:11, 41:4, 41:9, 55:9, 75:21, 77:20, 83:18, 86:24, 95:4, 95:8
ruled 9:10, 17:12
rules 10:1, 16:7, 25:1, 40:9, 42:24, 47:1, 47:2, 57:14, 58:16, 58:17, 58:18, 67:9, 67:11, 68:6, 68:8, 69:1, 69:4, 69:10, 69:20, 74:11, 75:21, 75:22, 76:21, 76:23, 77:20, 78:24, 80:4, 80:6, 80:7, 81:12, 82:14, 82:16, 83:17, 86:16, 86:17, 87:3, 87:5, 87:24, 89:8, 93:11
rules. 69:14
ruling 8:1
rulings 29:22
run 35:9, 46:8, 90:6
running 22:15, 47:6, 78:4, 78:6
Russia 72:15
rusty 64:5

< S >
S&P 53:10, 53:17, 53:18, 90:1
S. 1:19, 32:2, 57:2, 60:25, 61:1, 61:14, 82:14, 82:16
SAATHOFF 2:13

sabotaging 84:9
SAHAM 1:39, 4:8, 10:4, 10:21, 16:10, 17:23, 33:7, 99:6
sale 62:5
sales 20:15, 60:25
SAM 1:41
sample 81:25, 82:8
San 1:48
sand 38:4, 38:6
Sanders 8:21
Sandra 8:24
sands 33:23, 37:13, 46:19, 59:13, 73:3, 80:25
SARA 1:44
sat 46:7, 70:22, 80:13
satisfies 48:11
save 23:22, 29:11
savings 36:16
saw 52:18, 56:6, 72:14, 72:15, 83:15, 85:6, 88:24
saying 9:3, 9:9, 11:15, 15:3, 19:17, 76:19, 79:13, 84:15, 84:16, 89:13, 95:1, 96:20, 98:12
says 5:7, 49:20, 53:5, 54:14, 63:23, 66:22, 73:16, 79:13, 83:17
scales 31:1, 31:3
scary 8:10
Schleckser 89:16
science 65:15
SCOTT 1:39

53:16
smart 8:11
smartphone 27:14, 28:18
Snafu 50:13
snooty 28:6
sobeit 9:8
soft 24:14
sold 31:20, 37:9, 38:15, 57:2, 62:6
sole 19:8
solely 26:16, 28:14
SOLOWAY 2:28
somebody 91:8
someone 64:3, 70:11, 70:25, 79:13, 84:16
sometime 85:1
Sometimes 27:21, 36:16, 37:23, 37:24, 78:2, 78:3, 86:16
somewhere 38:9, 61:20, 88:18, 91:11, 93:23
soon 4:17, 65:7
sophisticated 58:16
sorry 11:11, 13:12, 18:19, 29:17, 50:13, 94:24, 96:21
sort 19:3, 38:4, 39:5, 52:6, 56:5, 56:11, 72:9, 85:17, 90:7, 94:10
sound 81:14, 81:18, 85:16, 89:5
soup 41:1, 50:1, 61:9
sour 37:21
source 28:16
South 50:16, 76:6

Southern 6:25
space 61:25
SPALDING 2:16
speaking 10:19, 30:16
speaks 11:18, 56:16
special 87:5
specific 30:14, 40:9
specifically 51:8
SPENCER 1:45
spending 93:1
spent 34:2, 39:10
spouse 27:7
SQUIRE 2:46
stage 6:17
stand 16:5, 23:19, 29:5, 58:10, 58:23, 68:22, 69:18, 72:1, 72:2, 85:20
Standard 53:6, 54:16
Standards 78:20, 86:11, 89:23
standing 33:14, 45:15
start 21:14, 74:22, 84:20, 95:5
start-up 75:6, 75:8, 77:3
started 85:22
starting 49:10, 61:21
State 26:12, 35:16, 70:6
statement 21:6, 70:3, 73:10, 86:12, 94:9, 95:3, 95:13, 96:1
Statements 18:5, 21:1, 21:3, 32:7,

32:9, 32:11, 32:12, 48:5, 76:19, 88:19, 99:4
States 1:1, 1:27, 25:4, 38:14, 59:5, 60:5, 62:3, 73:5, 80:1
statistical 65:17
stay 24:15, 64:8, 88:21
stayed 81:5
stays 9:24
stenography 3:7
stick 44:22
sticking 45:8
stipulate 31:9, 31:11, 31:14
stipulated 19:3, 31:12
stipulation 6:1, 31:8
stipulations 31:16
Stock 20:14, 26:5, 31:17, 31:18, 31:19, 31:20, 31:21, 31:24, 35:4, 35:6, 35:7, 35:18, 36:1, 36:3, 36:20, 54:10, 65:5, 65:11, 65:18, 65:22, 67:4, 68:10, 68:11, 91:6, 92:11, 92:15
stood 72:2
Stop 7:17, 16:16, 17:3, 67:7, 86:21, 96:13, 98:8
stopped 78:5
story 6:22, 7:7, 7:9, 76:16
straight 82:20
strategies

37:11, 44:10, 44:11, 44:23
strategy 44:23
straw 37:6, 44:16, 82:4
Strawbridge 78:17, 78:18, 79:24, 92:6, 94:18, 95:11
Street 2:17, 2:24, 3:14
stressed 33:11
stricken 30:4
strip 33:22, 45:11
struck 5:8
structure 71:7
struggle 9:6
stuck 61:25
study 91:23
stuff 37:2, 38:1, 39:25, 48:9, 49:3, 49:16, 61:19
substance 74:25, 81:23
successful 44:20
suck 44:16, 44:22, 47:19
sucked 43:14, 44:12
sucking 43:13, 45:9, 45:12
suffer 54:19
suffered 50:11, 54:16
Suite 1:35, 1:47, 2:3, 2:17, 2:24, 2:41, 2:47
sum 28:25
summarize 36:14, 54:8
summary 12:11, 17:13, 19:6
super 38:3, 45:25, 83:23
supply 88:11
support 90:19

2:39
screen 11:25, 20:8
scribble 78:9
scuttle 34:22
search 28:23
seated 23:3, 67:21
SEC 34:10, 40:8, 43:19, 43:24, 51:5, 51:13, 51:16, 55:15, 56:21, 57:17, 58:11, 59:4, 60:16, 63:3, 63:19, 71:6, 71:9, 75:23, 76:22, 80:4, 81:9
Second 22:3, 48:5, 49:10, 49:24, 50:2, 50:23, 57:7, 59:17, 60:13, 68:5, 73:9, 73:11, 74:21, 77:5
secondly 70:4, 94:16
seconds 10:13, 10:21
secret 86:12
Securities 32:4, 34:10, 35:13, 40:8, 41:23, 51:6, 71:5
SECURITY 8:20, 67:19, 94:4
seeing 72:14, 93:17
seen 24:7, 46:20, 75:1, 80:24
sell 36:6, 37:15, 39:11, 39:19, 59:6, 59:14, 61:16, 61:18, 61:21, 61:23,

91:6
selling 62:1, 63:9, 66:3
sells 38:1, 45:25, 46:1
send 22:3, 29:14
senior 36:8, 64:13, 78:15
sense 7:13, 9:21, 56:13, 59:9, 66:17, 81:13, 84:6, 84:12, 89:14, 89:18, 90:16, 91:9, 91:24, 92:19
sentence 36:21
sentencing 5:19
separately 26:3
seriously 21:16
served 78:19
service 27:10, 27:15, 27:16, 33:11
set 21:19, 21:24, 67:15, 76:21, 76:23, 87:5
set-off 61:15
sets 8:6
seven 80:18
several 29:8, 35:16
shale 82:1, 82:4
shall 83:19
SHAMAILOVA 2:31
share 35:7, 65:12, 67:13
shareholders 25:9, 26:9, 52:2, 71:12, 81:3, 86:7, 90:4, 90:13
shares 31:17, 31:18, 31:19, 31:20, 31:21, 65:7
She'll 79:2,

90:23, 90:25, 91:4
sheet 48:25
SHELDON 1:41
Shell 46:19, 52:18, 53:19, 87:3
ship 60:4, 60:21, 61:11, 61:13
shipments 62:3
shipping 59:5, 62:1
shoot 11:25
short 60:18, 67:17
shorter 59:16
shortly 47:14, 55:24
shouldn't 12:12, 18:11, 18:14, 40:10, 40:12, 42:10, 44:9, 50:18
show 5:10, 7:22, 12:3, 12:12, 12:23, 16:2, 18:1, 18:5, 20:6, 35:1, 35:11, 37:12, 38:24, 68:6, 68:9, 69:11, 76:16, 76:25, 77:10, 80:6, 80:7, 86:2, 86:15, 90:17, 91:15
showed 16:12, 22:14, 81:17
showing 16:8, 46:9, 46:10, 58:5, 61:11, 62:13, 69:12, 77:20
shown 33:2
shows 62:21
shut 56:10, 56:13, 78:4
shutting 56:16
side 23:20,

25:21, 28:2, 32:6, 94:11, 94:12
sign 47:23
signed 32:2, 36:12, 64:11, 64:13
significance 11:19, 32:10
significant 11:17
similar 25:25
Similarly 1:8
simple 16:7, 17:24, 41:10, 41:12, 55:18
simply 16:12, 26:17, 29:19, 30:22, 40:11, 43:1, 59:25, 90:17
sincerely 33:14
single 35:1, 38:22, 41:3, 42:2, 43:16, 69:2, 69:3, 69:6, 69:11, 79:12, 79:14
sir 13:2, 67:25
sit 10:24, 61:20, 93:6
Situated 1:8
situation 49:9, 56:5
six 47:17, 48:18, 48:20, 48:21, 62:17
sixth 9:8
size 45:14
Slide 13:10, 15:5, 15:18, 16:25, 17:17, 20:3, 20:4, 20:5, 20:21, 60:15, 66:18
slides 11:22, 15:12, 15:13, 15:17, 16:12, 66:19
small 50:22,

supposed 34:13
supposedly 90:16
Supreme 10:14, 10:15
suspect 93:2
sustain 29:25, 30:3
sustainability 44:1, 45:3
sustained 24:6, 46:3
swear 22:5, 22:9
sweaters 23:13
sweet 37:20, 37:24
Swiderski 2:7, 91:10, 91:15
Swiger 1:18, 19:16, 25:16, 32:1, 35:15, 36:10, 46:7, 53:5, 53:17, 57:18, 58:9, 58:23, 62:12, 68:15, 69:13, 69:17, 70:7, 73:21, 74:6, 77:1, 79:9, 79:15, 85:6, 88:25
swore 22:18
sworn 22:14, 23:14, 24:21, 90:20
sworn. 23:2
symbol 54:9

< T >
T. 1:43, 2:15
tablet 28:18
tad 61:16
talked 11:8, 21:4, 36:24, 51:13, 51:19, 55:22, 88:23
tall 21:18
tar 37:13,

46:18
tar-like 74:25
team 10:23
teams 74:14, 78:11
technical 56:15
technology 27:12, 82:2
teetering 54:1
telephone 27:14, 28:17
television 28:20, 31:6
temporarily 64:1, 92:8
tempt 17:22
ten 83:15
tens 86:17
term 82:22
test 59:4, 78:23, 79:8, 81:9, 81:17, 87:13
testify 78:18, 79:14
testifying 95:5
testimony 26:22, 27:3, 28:24, 30:8, 30:12, 30:13, 30:17, 32:13, 53:12, 58:8, 58:22, 65:19, 76:11, 90:19, 93:6, 95:2
tests 82:21, 87:19
Texas 1:2, 1:29, 3:15, 34:3, 34:4, 37:20, 37:23, 61:16, 64:4, 72:20, 72:21
text 27:15, 69:12, 94:12, 94:13, 94:15, 95:19, 95:21, 95:22, 95:24, 95:25, 96:4, 96:6, 96:22,

96:24, 97:4, 98:10
Thanks 6:7
the-10-k-is 71:3
themselves 69:16, 84:10, 85:7, 90:18
THEODORE 2:30
theoretically 10:2
theory 79:20, 80:8, 89:9, 89:17, 90:15, 90:19, 91:20
thereof 55:24
they've 32:21
thick 74:25
thinking 29:24, 46:11
third-party 62:5
THOMAS 2:12, 2:39
THOMPSON 2:33
though 26:15, 66:23
thousand 45:16
thousands 35:16, 71:17, 72:24, 73:5, 81:25, 82:10
three 16:19, 18:7, 18:16, 19:8, 33:19, 36:8, 40:20, 52:20, 53:20, 53:24, 54:2, 60:1, 60:6, 60:11, 60:13, 61:7, 62:6, 64:10, 64:13, 68:1, 68:3, 69:16, 71:25, 75:15, 90:23, 93:15
Throughout 25:3, 25:19, 79:7, 82:19, 84:7

ticket 54:9
Tiktok 27:18
Tillerson 1:18, 3:1, 16:5, 25:15, 25:16, 32:1, 34:2, 36:9, 37:11, 44:10, 44:23, 46:7, 47:14, 48:5, 48:9, 51:16, 53:5, 53:18, 55:24, 65:24, 66:14, 66:22, 66:25, 68:15, 69:13, 69:17, 70:6, 79:9, 79:15, 85:5, 85:6, 85:14, 85:19, 85:21, 86:14, 86:20, 90:1, 92:25
timeline 91:23
tipping 31:3
tire 45:15
tires 45:16
Toal 2:29, 96:12, 96:21
today 23:12, 35:8, 58:10, 67:13, 72:2, 72:12, 74:20
Together 25:10, 25:17, 43:7, 59:22, 62:2
Tom 68:14
tons 45:19
took 31:1, 40:4, 67:10, 86:23, 88:5
tools 27:12
top 8:5, 17:15, 24:15, 49:1, 84:16, 88:2
Total 34:7, 46:20, 49:25, 52:18, 53:19, 62:17, 67:13
touching 28:19
tough 86:2,

town 60:22
track 58:20
tracking 91:13
traded 31:24
trading 65:7
train 59:16
transcript 3:8
transcription 3:8
transport 38:10, 38:16
transportation 49:2, 56:23, 57:16, 57:22, 58:13, 58:25, 59:3, 59:4, 59:15, 60:4, 60:8, 61:5, 61:10, 62:9, 62:13, 62:17, 62:25, 79:23, 80:3
transporting 48:24
transquantified 51:11
treasurer 89:17
treat 30:5, 31:12
tremendously 33:12
trending 72:11
trial 4:13, 7:11, 7:23, 9:4, 10:23, 17:20, 21:4, 21:8, 24:25, 25:19, 26:7, 26:11, 26:21, 27:4, 27:5, 28:20, 29:18, 31:15, 32:6, 33:5, 69:21, 69:25, 73:6, 82:19, 82:23, 84:7, 85:1, 93:18
trick 56:20, 56:22
tried 15:21,

45:17
triggers 42:19
trouble 28:7
trucks 38:4, 45:14, 45:18, 81:11
true 16:16, 17:3, 76:17
truly 41:9
truth 6:15, 70:9, 70:21, 89:8
try 18:3, 23:4, 24:15, 24:21, 28:15, 29:15, 49:5, 73:19, 79:19, 79:21, 82:19, 91:19, 92:14, 92:18
trying 15:3, 68:10
Tsocanos 89:22
turn 10:4, 68:10, 73:12
Turtle 1:35
TV 24:7, 24:8
twist 91:19, 92:18
Twitter 27:18
Two 13:15, 22:4, 30:16, 33:21, 33:22, 34:9, 35:2, 35:10, 36:22, 42:5, 43:8, 44:11, 52:4, 54:17, 56:1, 60:18, 64:24, 66:19, 68:1, 69:25, 72:9, 73:2, 73:5, 75:15, 94:8
two-thirds 21:5
TX 1:36, 2:4, 2:18, 2:25, 2:42, 2:48
types 30:16

< U >

Ukraine 20:14, 72:15
ultimately 35:20, 62:19
unadmitted 12:11, 13:16
unbelievable 45:14
uncertainties 77:18
uncontroverted 50:3
underlings 55:7
understand 15:8, 23:24, 26:18, 71:2, 71:3, 72:4, 72:5, 83:9, 97:7, 98:17
understandable 93:4
understanding 32:10
Understood 12:2, 95:14
undertook 71:19
underwriter 54:20
underwriters 54:6
undeveloped 14:4, 81:21, 81:24, 83:11
unduly 27:1
unfair 28:1
unfamiliar 93:2
unintelligible 57:23
unit 66:3
United 1:1, 1:27, 38:14, 59:5, 60:5, 62:3, 73:4, 80:1
Unless 18:22, 27:4, 50:9, 59:10
unlike 82:16
uno 38:20
unpled 10:6,

19:5
unpredictability 92:15
until 23:20, 27:4, 27:19, 27:23, 29:2, 29:15, 33:5
update 62:16, 83:14
updated 79:24
updates 62:15
upgrades 23:8
ups 68:10, 72:10
using 15:9, 16:7, 21:6, 62:18, 79:25, 83:21, 83:24, 84:7

< V >

V. 2:30
valuable 37:21, 38:16
value 67:3, 82:24
various 89:20
vary 72:7
verdict 26:19, 27:20, 33:4
version 37:25, 46:14
veteran 78:19
via 57:5, 61:13, 62:1
view 28:21, 28:23
views 76:18
violates 57:14
viscous 49:4
visit 28:21
visual 59:12
voice 7:3, 24:14
VOLUME 1:25, 4:1, 61:23, 98:22, 99:1
volumes 56:16, 62:5

54:18
XTO 13:23, 13:25, 14:1, 14:7, 14:10, 14:12, 14:14, 14:18, 17:13, 34:4, 40:18, 40:20, 42:17, 44:13, 46:10, 46:16, 48:3, 48:8, 62:15, 65:24, 66:6, 66:10, 67:3, 84:20

< Y >

Y'all 4:8, 4:12, 5:2, 11:6, 11:9, 12:24, 13:6, 13:18, 20:9, 21:2, 21:16, 21:18, 23:3, 23:7, 23:11, 54:25, 67:15, 67:21, 93:21, 94:3, 95:15, 95:17, 96:9, 97:7, 98:13
year 32:3, 34:13, 43:2, 43:4, 43:9, 43:13, 43:15, 43:19, 44:2, 47:5, 47:7, 47:18, 47:24, 48:4, 48:19, 48:20, 49:9, 49:16, 49:17, 49:24, 50:2, 59:24, 62:22, 62:23, 71:13, 75:15, 81:16, 83:15, 86:5, 89:1, 92:2, 92:5
year-to-date 58:25
years 22:12,

37:2, 44:24, 45:1, 66:1, 72:11, 72:23, 80:5, 81:16, 82:9, 83:13, 83:14, 83:15, 85:24, 86:18, 86:19
yesterday 4:19, 4:21, 6:11, 13:5, 19:7, 33:12
York 2:36, 31:24
young 6:23, 44:18
yourselves 27:25
Youtube 27:17

< Z >

zero 86:4

vs 1:15

< W >

W. 1:18, 32:1
Wait 16:16, 23:20, 93:21
walk 77:2
Walker 22:13, 22:16
wall 11:20
wanted 6:6, 39:18, 63:19, 63:21, 90:2, 96:10
wants 28:8, 55:15, 88:20, 97:18
war 20:14, 20:15
warn 64:3
warned 65:8, 81:14
warning 63:22, 64:5, 81:1, 88:23, 88:24
warnings 80:19, 92:7
warns 89:6
waste 4:23
watch 53:23, 54:1
watching 46:12, 46:13
WATKINS 2:40
way. 80:11, 84:17
ways 35:19, 51:1
website 27:16
weeks 35:10, 68:1
weight 27:3
weighted 11:19
WEISS 2:34
WELLS 2:30
West 1:47, 37:23
WHARTON 2:34
whatever 4:9,

9:10, 26:19, 32:21, 45:17, 46:13, 52:8, 62:23, 87:6, 95:1, 97:6, 97:11, 97:12
whatnot 5:7
Whenever 47:22, 54:13, 86:17, 97:18
wherever 38:14
whether 48:14, 58:13, 77:24, 78:7, 85:10
Whoa 17:22, 17:23
Whoever 4:19, 4:20, 5:4, 36:1
whole 4:13, 17:14, 18:2, 18:11, 19:13, 39:1, 39:3, 46:12, 50:7, 50:23, 50:24, 62:22, 62:23, 73:13, 93:8
whom 14:3, 26:12, 27:8, 68:6
wide 45:10, 92:11
widely 20:18, 72:7
WILKINSON 2:14
willy-nilly 41:8, 55:20, 57:11, 63:9
WILSON 3:12
windfall 92:19
wisdom 74:17, 79:7
withdrew 17:1
within 14:8, 63:2
without 19:1, 33:13
witness 18:23, 19:1, 23:18, 23:19, 23:23, 29:4, 29:25,

32:13, 41:3, 45:20, 50:4, 68:7, 68:22, 69:6, 73:16, 73:22, 74:7, 79:14, 94:2, 94:18, 95:12, 96:3
witnesses 28:3, 29:2, 30:8, 32:18, 32:19, 41:6, 68:21, 73:9, 73:12, 73:14, 73:19, 73:20, 74:3, 74:11, 74:19, 76:17, 77:2, 94:16, 95:5, 95:18, 95:22
woman 90:20
women 68:23
WOODBURY 1:19
word 13:6, 16:3, 48:22, 72:1
words 26:16, 29:3, 30:6, 32:23, 71:18, 86:2
work 21:17, 23:9, 23:25, 68:23, 69:2, 69:14, 71:14, 71:19, 74:13, 81:12, 82:2, 82:3, 84:21, 85:7, 87:1, 87:13, 88:1, 88:4, 88:7, 93:10
worked 8:3, 68:6, 70:14, 78:22, 82:6
working 4:16, 4:18, 37:2, 81:10, 84:18, 85:22, 86:5, 92:3
works 78:22, 82:5, 87:2

world 36:5, 41:25, 53:24, 71:21, 72:22, 76:15
worried 52:3, 75:16
worry 97:9
worse 98:10
Worth 14:11, 14:19, 37:18, 37:21, 43:14, 66:12, 83:1, 83:13
worthwhile 61:17
write 51:9, 53:4, 66:22, 82:14, 82:15, 83:3, 83:22, 86:4, 89:4
Write-down 40:22, 42:17, 46:24, 48:16, 52:22, 66:10, 66:17, 67:1, 67:2, 67:3, 80:20
write-downs 46:23, 46:25, 47:1, 48:10, 48:13, 48:15, 52:14, 52:18, 52:21, 53:21, 67:10, 85:16, 86:9, 86:23
writes 78:20
writing 51:8
written 85:10, 85:11, 86:20
wrote 9:1, 52:13, 52:19, 86:16
WTI 37:23, 46:1, 49:4

< X >

XOM 54:9, 54:11, 54:12, 54:13, 54:14

C E R T I F I C A T I O N

I, PAMELA J. WILSON, CSR, certify that the foregoing is a transcript from the record of the proceedings in the foregoing entitled matter.

I further certify that the transcript fees format comply with those prescribed by the Court and the Judicial Conference of the United States.

This the 28th day of April, 2026.

s/Pamela J. Wilson

PAMELA J. WILSON, RMR, CRR
Official Court Reporter
The Northern District of Texas
Dallas Division

PAMELA J.  WILSON,  CSR/RMR/CRR

**App. 53**

# Exhibit 3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

PEDRO RAMIREZ, JR., Individually )
and on Behalf of All Others )
Similarly Situated, and GREATER )
PENNSYLVANIA CARPENTERS PENSION )
FUND, )
)
            Plaintiffs, )
)
    VS. ) No. 3:16-CV-03111-K
)
EXXON MOBILE CORPORATION, ) CLASS ACTION
REX W. TILLERSON, ANDREW P. SWIGER, )
JEFFREY J. WOODBURY, DAVID S. )
ROSENTHAL, )
)
            Defendants. )
_____)

JURY TRIAL PROCEEDINGS -- VOLUME 1-B
BEFORE THE HONORABLE ED KINKEADE
UNITED STATES DISTRICT JUDGE
APRIL 27, 2026
DALLAS, TEXAS

FOR THE PLAINTIFFS:

    JOE KENDALL
    KENDALL LAW GROUP
    3811 Turtle Creek Boulevard, Suite 825 Suite 880
    Dallas, TX  75219
    (214) 744-3000

    SCOTT H. SAHAM
    NATHAN R. LINDELL
    SAM SHELDON
    ERIKA OLIVER
    T. ALEX B. FOLKERTH
    SARA BIERL POLYCHRON
    SPENCER A. BURKHOLZ
    ROBBINS GELLER RUDMAN & DOWD, LLP
    655 West Broadway, Suite 1900
    San Diego, CA  92101
    (619) 231-1058

    BALON B. BRADLEY
    BALON B. BRADLEY LAW FIRM
    11910 Greenville Avenue, Suite 220
    Dallas, TX  75243
    (972) 991-1582

    MICHAEL SWIDERSKI
    (Party Representative)

FOR THE DEFENDANTS:

    THOMAS M. MELSHEIMER
    AUSTIN E. SAATHOFF
    EMILY WILKINSON
    DAVID T. HINOJOSA
    KING & SPALDING, LLP
    2601 Olive Street, Suite 2300
    Dallas, TX  75201
    (214) 764-4446

    NINA CORTELL
    JASON JORDAN
    HAYNES and BOONE, LLP
    2801 N. Harwood Street, Suite 2300
    Dallas, TX  75201
    (214) 651-5000

    AUDRA J. SOLOWAY
    DANIEL TOAL
    THEODORE V. WELLS
    LYUBA SHAMAILOVA
    AMITAV CHAKRABORTY
    DAPHNE THOMPSON
    PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
    1285 Avenue of the Americas
    New York, NY  10019-6064
    (212) 373-3000

    SCOTT C. THOMAS
    LATHAM & WATKINS
    100 Crescent Court, Suite 7084
    Dallas, TX  75201
    (713) 546-5400

    D. PATRICK LONG
    SQUIRE PATTON BOGGS
    2200 Ross Avenue, Suite 4100w
    Dallas, TX  75201
    (214) 758-1500

(Rex Tillerson)

PATRICE CHILDRESS
(Party Representative)

Proceedings reported by mechanical stenography; transcript produced by computer-aided transcription.
_____

DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
Federal Official Court Reporter
1100 Commerce Street, 15th Floor
Dallas, TX  75242
(214) 753-2325

INDEX

| PLAINTIFF'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ANDREW SWIGER | 6 | | | |

EXHIBITS

| PLAINTIFF'S EXHIBIT | INTRODUCED | ADMITTED |
|---|---|---|
| 22 | 113 | 113 |
| 212 | 36 | 36 |
| 213 | 27 | 27 |
| 214 | 34 | 35 |
| 216 | 91 | 91 |
| 217 | 115 | 115 |
| 222 | 104 | 104 |
| 528 | 72 | 73 |
| 563 | 118 | 118 |
| 564 | 96 | 97 |
| 699 | 49 | 49 |
| 708 | 16 | 16 |
| 710 | 53 | 53 |
| 738 | 55 | 55 |

**App. 54**

(PROCEEDINGS BEGAN AT 12:48 PM.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Okay.  Are we ready?

MR. SAHAM:  Yes, Your Honor.

THE COURT:  And you're ready to call your first witness?

MR. SAHAM:  Yes.  The Plaintiffs call Mr. Andrew Swiger to the stand.

THE COURT:  Just a minute.  We'll get you sworn in.  If you'll stand right here as the jury comes in.  Thank you, Mr. Swiger.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury seated in the jury box.)

THE COURT:  Ladies and Gentlemen, y'all be seated.  Thank you.

All right.  Call your first witness.

MR. SAHAM:  The Plaintiffs call Andrew Swiger to the stand, Your Honor.

ANDREW SWIGER,

Was produced, sworn, and examined as follow:

THE COURT:  All right.  If you'll take a seat next to me, sir, and you know how I talked about how uncomfortable that seat is and I'm sorry.

I know there's water down there because I saw the lawyer put it down there.  So I think -- I think we're ready.

MR. SAHAM:  Excellent.

DIRECT EXAMINATION

QUESTIONS BY MR. SAHAM:

Q.   Good afternoon, Mr. Swiger.

A.   Good afternoon.

Q.   When did you start working at Exxon, sir?

A.   In August of 1978.

Q.   And at some point did you join what's called the "Management Committee"?

A.   I did.

Q.   And what's the "Management Committee" at Exxon?

A.   The Management Committee is a group of senior executives that basically runs the country -- the company.

Q.   And how many folks were on that in 2015?

A.   In 2015, six.

Q.   And who -- who were those people?

A.   Sorry?

Q.   You were on the Management Committee?

A.   Yes, sir.

Q.   And Mr. Tillerson was on the Management Committee?

A.   Yes, sir.

Q.   Who else was on the Management Committee?

A.   Mr. Mark Albers, Mr. Jack William, Mr. Mike Dolan and Mr. Darren Woods.

Q.   Okay.  And at some point did you become what's called the

"Principal Financial Officer" of Exxon?

A.   I did.

Q.   And what's the "Principal Financial Officer"?

A.   It's basically the person that has oversight over all the finance departments.

Q.   And is that sometimes referred to as the "PFO"?

A.   It is referred to as the "PFO;" sometimes the "CFO."

Q.   Okay.  So you were -- In 2015 and 2016 you were the CFO/PFO of Exxon?

A.   Yes.  I was the Principal Financial Officer.

Q.   And as a member of the Management Committee and as the PFO, you tracked performance of important Exxon assets.  Is that fair?

A.   I did.

Q.   And one of those assets during this time period was the Kearl Bitumen Tar Sands?

A.   One of them was.

Q.   And what was "Kearl"?  Could you just describe that?  Because I think you have more knowledge than the rest of us.  What was "Kearl" and what was "bitumen" or is "bitumen"?  What is that stuff?

A.   Sure.  Bitumen is a very, very heavy oil.  If you think about, as we said earlier this morning, asphalt, something like that.  It's a very, very heavy oil.  It is contained underground.  In some cases close to the surface, some cases a bit deeper.  In the case of Kearl, it was sort of between 50 and 200 feet below

the surface, existing as a very thick piece of stratum or a deposit, and that's what the deposit was; sand, rock, some vegetative matter, so forth, with bitumen or oil coating the surfaces of the rock there.

So the mining operation would involve removal of the soil on top of that layer of stratum and then excavating the ore, the bitumen sand and rock and so forth, taking it to a processing plant to be turned into a saleable material.  And what that basically means is separating the rocks and the sand and the water away, leaving just the asphalt-like material to then being mixed with diluent, put in a pipeline or on a rail car and sent to the market.

Q.   Thank you, Mr. Swiger.  And is that bitumen sometimes referred to as "Canadian tar sands oil"?

A.   I have heard it referred to as that, yes.

Q.   Okay.  And you mentioned -- and I know I always pronounce it wrong -- "diluent"?

A.   Diluent.

Q.   And -- And what's "diluent"?  Can you describe that a little more?

A.   Diluent is a lighter hydrocarbon.  It's -- It's Naps basically which is sort of between gasoline and fuel oil, if you think about lighter to heavier things.  That diluent is mixed with that tarry-like substance to allow it to flow in pipelines.

Q.   And -- And diluent is not free, correct?

VOLUME 1-B    9

A.    No, it's not.

Q.    And in the 2000 -- We can look at documents to refresh your recollection.

A.    Sure.

Q.    But in the 2015 timeframe, a barrel of diluent cost around six dollars?

A.    I believe that's correct, sir.

Q.    Okay.  And what is "West Texas sweet crude" or "WTI"?

A.    West Texas Intermediate, as it's called, is a blend of West Texas crudes produced in West Texas, been around a while.  It is what we call a "marker crude" because it's widely traded at a couple of points, including one at a place called Cushing, Oklahoma, where a lot of pipelines meet and there's a lot of tanks, and so a market exists there for people to deliver, to sell, and for buyers to take away.  And so there's a market working there, and you get a marker price for what's known as "WTI," West Texas Intermediate.  So you might say West Texas Intermediate is -- today it's about $99 a barrel.  It's been all over the place.  It changes every day, but it's a marker price.

Q.    And is West Texas Intermediate crude worth more or less than a barrel equivalent of Canadian bitumen?

A.    Generally speaking, it will be worth more at a refinery.

Q.    And what is "Brent"?  Is that similar to WTI?

A.    Brent is another light crude marker.  Brent is a blend from the North Sea, between sort of the United Kingdom and Norway, the

VOLUME 1-B    10

North Sea there.  There's a lot of oil production there.  The biggest anchor field is Brent, and so the blend became named "Brent."  It is also traded like West Texas Intermediate quite freely and establishes a marker price.

Q.    And is Brent worth more or less than bitumen?

A.    Brent is worth more than bitumen.

Q.    And is Brent similar to WTI but worth a bit more?

A.    Similar to WTI would be fair.

Q.    And it's fair to say that Kearl Lake up in Northern Alberta, Canada, that's pretty far from where we're standing today?

A.    Very far from where?

Q.    From where we're standing today in Dallas.

A.    Yes, sir.  Yes, sir, it is.

Q.    And it's similarly far from Houston and the Gulf Coast.

A.    Yes, sir.

Q.    And there's a lot of refineries and customers for the Canadian crude and really all crude in the Gulf Coast.  Is that fair?

A.    There's many refineries along the Gulf Coast, yes.

Q.    And it's also true that in 2013 and 2014 there was some hope that something called the "Keystone XL pipeline" would be completed.  Is that true?

A.    Well, the Keystone XL had not even been started yet.  It was suffering a lot of permanent problems.  It never got underway.

Q.    And -- And -- But the original business plan for Kearl hoped

VOLUME 1-B    11

that the Keystone XL pipeline would be completed to allow the bitumen to be transferred to the U.S. more easily and efficiently.  Is that fair?

A.    It was a number of -- It was one of a number of export routes under consideration at the time.  It certainly was not unique.

Q.    And in early 2015 the XL pipeline was vetoed by the Obama Administration.  Is that true?

A.    My recollection of the timeframe is not clear but sometime around there, yes.

Q.    And it's also true that in 2015 the company had, as far as proved reserves, it had 3.6 billion barrels of bitumen on its books as a proved reserve that was disclosed in SEC filings, correct?

A.    That would be 3.6 billion for Kearl, not for all bitumen.

Q.    Right.  But for Kearl, there was 3.6 billion barrels; correct?

A.    Yes, sir.

Q.    And it's also true that approximately -- as of 2015, the company, Exxon, had invested about 24 billion dollars in getting the Kearl bitumen operation up and running and producing bitumen.

A.    My recollection is more in the neighborhood of 20 billion.

Q.    But in the range of 20 billion.

A.    In the range of 20.

Q.    Okay.  I would like to show you what has been pre-admitted

VOLUME 1-B    12

in this case as Plaintiff's Exhibit No. 15.

MR. SAHAM:  And, Your Honor, is it okay to publish Exhibit 15?

THE COURT:  Yes.

MR. SAHAM:  Thank you, Your Honor.

Q    (By Mr. Saham) And I would like to turn your attention, Mr. Swiger, to the second page of Exhibit 15, the second bullet point under "Case for Action."  And we're going to highlight that for you.  Oh, I'm very sorry.

And, Mr. Swiger, you can either look at it on the screen.  But if you would like for me to bring you a hard copy, I can do that as well.

A.    We'll try the screen for a while, sir.

Q.    But, please, if you want a hard copy -- It will move things along if we use the screen but at any time I've got hard copies for you.

A.    I shant hesitate.

Q.    Okay.  I appreciate that.

MR. SAHAM:  Could we highlight Bullet Point No. 2, please?

Q    (By Mr. Saham) Is it accurate that -- And what's an "M-O-E-B" for the jury?

A.    That is a "Million Oil Equivalent Barrel."

Q.    So when it says 3. or approximately 3.6 MOEB, could we be on the same page that that's 3.6 billion barrels?

**App. 56**

A.   We could, yes.

Q.   Okay.  And this document says, "Kearl - 3.6 billion barrels represents approximately 15 percent of ExxonMobil's total proved reserves as reported in the 2015 10-K which had reported 24.8 billion barrels and, accordingly, may be considered material."

Did I read that correctly?

A.   You did.

Q.   And you would agree with me that Kearl was approximately 15 percent of the proved reserves reported in this 10-K, correct?

A.   I would say approximately.  Yes, that's correct.

Q.   And because it was approximately 15 percent, it may be considered material; correct?

A.   That's what it says.

Q.   Okay.  And would you agree that it's a material fact, 15 percent of that bitumen?

A.   There are many metrics that can be used to consider materiality.  Reserves is but just one of them.

Q.   Oh, but I'm talking about the reserves.  Would you -- Okay.  Let's make sure we're on the same page.

Do you believe that the fact that 15 percent of the proved reserves were at Kearl, that that fact was material as someone running the company?

A.   I think it's an important number, yes.

Q.   Okay.  I'd like to put aside Exhibit 15 and I would like to show you what's been pre-admitted as Exhibit 66.

---

MR. SAHAM:  Move to publish, Your Honor.

THE COURT:  That's fine.

Q    (By Mr. Saham) And Exhibit 66 is the 10-K that you signed?

A.   Yes, sir.

Q.   Okay.  And I would like you to turn your attention to Page 7 of this document which -- For the purposes of this litigation, it's Page 7 but you might know this as Page 5.  And it's "Disclosure of Reserves, Summary of Oil and Gas Reserves at Year End 2015."

A.   Yes.

Q.   And that's what this document is or this part of 66?

A.   Yes, it is.

Q.   Okay.  And you would agree with me -- I just want to look at some of the numbers -- the reporting that there's 4.108 billion barrels of Canadian bitumen in this document, approximately 88 percent of that bitumen that was reported in the 4.108 came from Kearl?

A.   That is correct.

Q.   Okay.  And I have -- If you need at any point a calculator, I have one, but I've done the math.  But if I'm off, please check me.

The second number I would like you to take a look at -- Well, before I do that, what's the difference between a "proved reserve" and a "proved developed reserve"?

A.   A "proved reserve" are the quantities that are estimated to

---

be economically recoverable.  A "proved developed reserve" is where the wells or the equipment has been put in place to already begin producing them.

Q.   And with respect to Kearl, the fact that the company had spent 20 billion dollars to be able to ship and sell that bitumen, that made it a "proved developed reserve."

A.   Yes.  Once the Kearl expansion project was up and running, yes.

Q.   Okay.  And Exxon in this 10-K on February 24, 2016, reported 17.9 billion barrels of proved developed reserves, correct?

A.   Proved developed, yes.

Q.   And out of that 17.9 billion barrels of proved developed reserves, 3.6 billion of those came from Kearl; correct?

A.   That is correct.

Q.   And that would be approximately 20 percent of the total proved developed reserves that Exxon reported in this 10-K came from Kearl, correct?

A.   The total proved developed.

Q.   And then as far as the total reserves down at the bottom, the 21 or -- I'm sorry -- 24.7 that's reported in the bottom right, that -- the 3.6 billion barrels of Kearl were approximately 15 percent of that total.

A.   They were precisely 14.5 percent.

Q.   Or if you really want to be precise, 14.57 percent; correct?

A.   I'll take that.

---

Q.   And sometimes accountants at Exxon and elsewhere round numbers, correct?

A.   There are times when rounding is appropriate.  There are times when it is not.

Q.   I would like to show you now what I'm marking as Plaintiff's Exhibit 708.

MR. SAHAM:  And there may be an objection to this document.  I'm not sure if you're still maintaining the objection.

MR. THOMAS:  Your Honor, I assume your ruling from this morning still stands on the types of documents that we talked about before opening trial -- Opening Statement.

THE COURT:  On the redaction portion?

MR. THOMAS:  No, on the financial reporting; financial operating reports.

THE COURT:  Yes.  Yeah.  So do you have an objection now to this?

MR. THOMAS:  Yes.  We would object to this pursuant to our objections this morning.

THE COURT:  Which I ruled on earlier.

MR. THOMAS:  Yes.

THE COURT:  Okay.  Still overruled.  It's admitted.

MR. THOMAS:  Thank you, Your Honor.

THE COURT:  What exhibit number is it?

MR. SAHAM:  This is Exhibit 708, and it's now admitted

and I would move to publish.

THE COURT:  Sure.

Q    (By Mr. Saham) Mr. Swiger, as a member of the Management Committee and as the CFO or PFO, on a monthly basis you receive the "Financial and Operating Highlights Review," correct?

A.    For the upstream here, yes.

Q.    And can you just tell the jury -- That's another point.  Exxon has an "upstream" and a "downstream?"

A.    And a chemicals business line.

Q.    Could you just briefly explain:  What's the difference between "upstream" and "downstream"?

A.    Certainly.

The "upstream" is the exploration for the development of and the production of oil and gas.  Think about the wells and the pumping units and the platforms in the sea.

The "downstream" is the part where the oil is taken and refined into usable products.

There is a third business line, the chemicals business line, which is very important where a lot of those products are then turned into chemical products.

Q.    Okay.  And this report that you received on a monthly basis and the Management Committee received on a monthly basis is titled the "Financial and Operating Highlights Review," correct?

A.    It is.

Q.    And what's the purpose of this report, this highlights

---

report?

A.    To show members of the Management Committee that were in attendance what the highlights were, the financial and operating highlights for that month, March of 2015.

Q.    Okay.  And could you, please, turn to Page 15 of Exhibit 708?

And I want to show you -- Well, you've got two things reported before we zero in.  On the left, you have "Liquids Realizations."

A.    Yes.

Q.    On the right we have "Gas Realizations."

A.    Yes.

Q.    First off, what's a "realization"?

A.    "Realization" is a shorthand for the price you receive at the point that it's been marketed.

Q.    And that you have to subtract from the realization the cost of transport and the cost of -- or to get to the realization, you have to remove transport and diluent costs?

A.    Yes.  From the market point, yes.

Q.    Okay.  And on the left, you have ExxonMobil liquids realizations and it's summarized, and on the right you have gas.  Why are liquids and gas broken up?

A.    Two separate hydrocarbons marketed quite differently.

Q.    Was there any other reason they were broken up or just they were different?

---

A.    They're different.

Q.    And what about the price point?  Is the price point of liquids usually higher per unit than gas?

A.    Not necessarily.  Oftentimes LMG, which is gas, goes for higher than oil around the world.

Q.    What about in the United States?

A.    In the United States, gas is normally lower.

Q.    Okay.

MR. SAHAM:  Can we, please, look at the bottom left-hand corner of this document?

Q.    (By Mr. Saham) And I just -- I really -- Because we'll look at a bunch of these reports the first go-around, I'd like you to sort of give us some detail.

What does "CM" stand for?

A.    The current month.

Q.    Okay.  And what does "PM" stand for or "Versus PM"?

A.    The prior month.

Q.    So if it's negative, you did worse than the prior month or the price was lower?

A.    The price is lower than the prior month.

Q.    Okay.  And what does "YTD" stand for?

A.    "Year to Date."

Q.    And what does "Versus Plan" refer to?

A.    That refers to the current month prices versus what was in the planned assumptions for that month.

---

Q.    And if it's negative, the price is below what was planned for.

A.    Below what was planned a year ago.

Q.    And what about "Versus PYTD"?  What does that stand for?

A.    That is the "Prior Year to Date."

Q.    So if the prices are negative, it means this year, and because this is March of 2015, it means it was lower than it was the year before.

A.    That quarter for the year before, yes.

Q.    Okay.  And then let's look at the left-hand axis.

What's "EM Average"?

A.    "ExxonMobil Average."

Q.    So that's the average of all these liquids that Exxon sells.  The average for this month, current month of March, is 46.73?

A.    That's correct.

Q.    $46.73?

A.    Yes, sir.

Q.    Okay.  And then for Brent, the average Brent price for March, 2015, was 55.92.  Is that fair?

A.    That is correct.

Q.    And then the average WTI price was 47.77?

A.    Yes, sir.

Q.    And then the only specific field broken out here is Kearl, correct?

A.    That is correct.

Q.    And for Kearl, the average monthly price or the average price for the month of March, 2015, was $21.54?

A.    Yes, sir.

Q.    And that's less than half of Brent and less than half of WTI, correct?

A.    Yes, it is.

Q.    And it's less than half the ExxonMobil average price, correct?

A.    Yes.

Q.    Okay.  And then if we look at the star down at the bottom, it says, "Kearl March bitumen production – 92 kbd."  What does that mean?

A.    Ninety-two thousand barrels a day.

Q.    So 92,000 barrels were being produced each day from March of 2015.

A.    Yes.

Q.    And then it says "bitumen sales – 82 kbd"?

A.    That means the actual amount of bitumen that was sold at the market was 82,000 barrels a day.

Q.    Okay.  And then what is "KID earnings"?  What is "KID," first of all?

A.    "KID" is the "Kearl Initial Development."  That was the first phase of the project that started up in 2013.

Q.    And it says "KID earnings:  -51 million."  What does that mean?

A.    The book earnings for KID at that time were 51 million negative.

Q.    And what are "book earnings"?

A.    "Book earnings" are the earnings where you take -- you start with the revenues, subtract all the costs, including the non-cash costs like depreciation, the fiscal RGM royalties, the taxes and so forth and come up with book earnings at the end of the day.  Very different than cash.

Q.    Okay.  And then for "Year to Date," Kearl was selling for 21.60 --

A.    Yes, sir.

Q.    -- for the first three months of 2015?

A.    Yes, sir.

Q.    And that's about half again or less than half the WTI, Brent and ExxonMobil average, correct?

A.    That is correct.

Q.    And "Versus Plan," Kearl was -29.17 from what you planned for?

A.    Yes.

Q.    And it was -34.19 as compared to the prior year?

A.    Yes.

Q.    And then when we look at KID estimated cash, what's "estimated cash"?

A.    That's the estimated cash flow from that project.

Q.    So -- And just to put that in common parlance, that means

that Exxon spent 71 million dollars more in cash than it took in at the Kearl operation?

A.    For all things that are in cash, yes.

        MR. SAHAM:  And can we go to the right side of the chart now, please?  The natural gas portion.

Q    (By Mr. Saham) Now this is the sort of sister chart for gases.  Is that fair?

A.    That is correct, yes.

Q.    And U.S., that would be natural gas being sold in the United States?

A.    Yes.

Q.    And at the current month, the average price was $2.42, correct?

A.    Yes.

Q.    And that's down a dollar 67 or a dollar 67 less than the plan?

A.    Less than the planned assumptions, yes.

Q.    And as far as the prior year, it is down $2.25 from 2014?

A.    That is correct.

Q.    And do you recall approximately when Mr. Tillerson and Exxon bought XTO?

A.    In 2010.

Q.    And do you recall that the prices in 2010 were significantly higher than this?

A.    I recall that they were higher.

Q.    I want to show you what's been pre-admitted as Plaintiff's Exhibit 115, and I would ask you to turn to the 19th page of Exhibit 115.

A.    It does not appear this is something I've seen before.  Can you go back to the e-mail?

Q.    Sure.  I don't believe you received this, but because this document has been called what's "pre-admitted," I can ask you questions about it.

A.    Sure.  I just need to study it more.

Q.    You can take as much time as you want, Mr. Swiger.  Please tell me when you're ready to field some questions.  And if you would like a hard copy, I can give you that as well.

        (Pause)

A.    Okay.

Q.    Can you, please, turn to the 19th page?  And up in this box under "Investments" in the far right, it says, "Total Kearl 23.7."  Does that refresh your recollection that the actual investment for Kearl as of 2015 was 23.7 billion dollars?

A.    Well, I see what the footnote says.  It's the investment anticipated at start-up.  It hadn't started up at this time, but ---

Q.    So your recollection is that at this time the investment was only 20 billion.

A.    I know it was in the twenty billion range.  It could have grown to 23.7 billion, yes.

Q.   Okay.  And then under the -- If we could just put that away and go to the second bullet, the second dash that says "Start-up KEP mid-2015" there.  It says, "Start-up KEP mid-2015, run both KID and KEP till year end.  Then temporarily idle KEP in 2016."

Did I read that correctly?

A.   You read that correctly.

Q.   And do you have an understanding of what it means to "temporarily idle" a facility?

A.   It's a very difficult thing to do, but I have an understanding, yes.

Q.   And if a facility was making money, would you consider temporarily idling it even though that's something that's very difficult to do?

A.   I don't recall any discussions that reached my ears about temporarily idling the facility.

Q.   But you as a business person at Exxon, if you had a field that was making money, would you consider temporarily idling it, given how difficult it was to do?

A.   No, I would not.

Q.   Now also you've been very helpful in covering some of these definitions that I think will be very helpful for us throughout these next couple of weeks.  And -- And I just want to make sure that I have a few of these things correct.

Now to be a proved reserve, something has to be economically producible under existing economic conditions.  Is that fair?

A.   In the SEC definition, yes.

Q.   Okay.  And to be economically producible, that basically means that the revenues exceed the cost of the operation.  Is that fair?

A.   Exceed the cash costs of the operation.

Q.   And then existing -- existing economic conditions include product prices, operating costs, production methods, recovery techniques, and transportation.  Is that fair?

A.   That's fair.

Q.   And there's a very specific definition of how you calculate the prices so there will be comparability across everyone in the industry.  Is that fair?

A.   The entire process is quite proscribed so there's comparability, yes.

Q.   Yes.  So the comparability would be both on the price and the cost so you could compare across the whole sector.

A.   That's correct.

Q.   Okay.  And for product prices, everyone's required to use the first day of the month average price for the whole year.  Is that right?

A.   That's the SEC rule, yes.

Q.   Okay.  And the operating, lifting or production costs, those have to be consistent with FASB.  Is that correct?

A.   That's correct.

Q.   And what is "FASB"?  Can you tell us what that is?

A.   Financial Accounting Standards Board.  They make regulations.

Q.   Okay.  And that basically means you got to use your actual costs for the operations in calculating the SEC proved reserves.

A.   The actual costs based on getting it to wherever the market point is.  That defines the SEC pricing.

Q.   Okay.  I want to show you what we're marking as Plaintiff's Exhibit 213.

MR. THOMAS:  No objection.

MR. SAHAM:  Okay.  I would move to admit 213, Your Honor.

THE COURT:  It's admitted.

MR. SAHAM:  And can I publish it as well?

THE COURT:  Yes.  You don't even need to ask.  If it's admitted, you can always publish it.

MR. SAHAM:  Thank you very much, Your Honor.

Q   (By Mr. Saham) Now you know a gentleman, Mr. Schuessler?

A.   I did, yes.

Q.   And who is he?

A.   He was -- He looked after North America at that time in the production company.

Q.   And this document is dated August 27th, 2015?

A.   That's what it says.

Q.   And it's also talking about diluent?

A.   It is.

Q.   And that's the substance you described before that had to be mixed with the bitumen to get it to flow.

A.   That's correct.

Q.   Okay.  Could we -- Could I, please, turn your attention to Slide 3, Page 3?

And that map, it's a little grainy and hard to read, but it's fair -- I think we established this earlier.  But Fort McMurray, that's the closest civilization or town or fort to where Kearl Lake was?

A.   Yes.

Q.   And then it's several thousand miles away from Houston.

A.   Yes, it is.

Q.   Okay.  Now I would like to turn your attention to Slide No. 11.  And you don't have to testify to this but you could if you are open to it.  It seems like this barrel here is a representation of that barrel up in 213?

A.   It looks familiar, yes.

Q.   Okay.  And this document is communicating certain facts to the reader.  It's entitled "Bitumen Realization Factors," correct?

A.   It is.

Q.   And, again, bitumen is what was produced at Kearl?

A.   Yes.

Q.   And the first column on the left is 2014?

A.   Yes, it is.

Q.   And the column after it is Q1 2015, correct?

A.   Yes, it is.

Q.   And that's the quarter we looked at in that earlier report, correct?

A.   That's correct.

Q.   Okay.  And it lists the price of bitumen in U.S. dollars was 92.91 for 2014.  Is that correct, up at the top?

A.   No, that's not the price of bitumen.  That's WTI.

Q.   Oh, I'm sorry.  You correct me.  I got that wrong.  The price of WTI in -- and, of course, it comes with the barrel -- at the top of the barrel, the average was 92.91 in 2014?

A.   It's a 2014 price.  I can't ascertain from this whether it's the average, but ---

Q.   Okay.  And then the Q1 2015 price was 48, significantly lower?

A.   48.57, yes.

Q.   And does that meet with your recollection that the prices in '15 were lower than the prices in '14?

A.   Yes, sir.

Q.   Okay.  And the next thing listed is "Transportation," correct?

A.   Yes.

Q.   And that would be the cost to get the product to market?

A.   To a variety of markets, yes.

Q.   Okay.  And the transportation cost listed here for 2014 was

$8.33, correct?

A.   That's correct.

Q.   And then the transportation cost for Q1 or the first quarter of 2015 was $7.07, correct?

A.   That's correct, for the mix of sales represented there, yes.

Q.   And I'm also right that -- and correct me if I'm wrong -- Q1 would be January, February and March?

A.   That's correct.

Q.   Okay.  And then the next item is "Quality," correct?  A quality deduction?

A.   Quality market, yes.

Q.   And is this being communicated because the quality of the bitumen up at Kearl or in Canada is a lower quality than WTI so you have to discount for it?

A.   That's correct.

Q.   Okay.  Then the next -- next line is "Diluent."  That's the stuff you were talking about?

A.   Yes, it is.

Q.   To get the bitumen to flow through the pipeline?

A.   Yes.

Q.   And for 2014, every barrel of bitumen required $8.47 of diluent, correct, according to this document?

A.   According to this document, yes.

Q.   And then that improved a little bit in Q1 2015 to $6.56 for each barrel.

A.   That's correct.

Q.   And is -- is that because if oil prices go down, the cost of diluent goes down a bit?

A.   Yes, sir.

Q.   Okay.  So if oil prices are high, diluent is more expensive?

A.   Yes.

Q.   Okay.  And then we have the "Bitumen Realization" at the bottom, and that in 2014 is listed as 59.89.  Is that correct?

A.   That is correct.

Q.   And it had dropped all the way to only $21.33, the realization for bitumen, as of -- for the first three months of 2015, correct?

A.   That is correct.

Q.   Okay.  And then in the "Comments" section in the top right, it says, "Transportation tariffs between plant and market," correct?

A.   Correct.

Q.   And the plant in the case of Kearl bitumen is at the plant Kearl, correct?

A.   That's correct.

Q.   Okay.  And then you got to deduct from the WTI the cost of getting it to the market, wherever it's sold.  That might be different depending on where a particular barrel is sold.

A.   The mix of markets, yes.

Q.   Okay.  And it says here, "Mix of sales at Edmonton and

USGC," correct?

A.   That's what it says yes.

Q.   And what's the "U.S. Gulf Coast"?

A.   The U.S. Gulf Coast is pretty much what it says.  It's Louisiana, Texas, Mississippi.

Q.   I think I asked that badly because I meant to say:  What's "USGC" and I think we jumped ahead.  That's the "U.S. Gulf Coast."

A.   Right.

Q.   Okay.  We can put that one down.
     Now I'm correct that you were informed in November of 2015 that the year-to-date transportation cost for Kearl was $7.  Is that accurate?

A.   I don't recall that specific conversation.

Q.   Okay.  You do recall that I took your deposition in this case?

A.   I do.

Q.   Okay.  And at your deposition you -- you took an oath just like you did here.

A.   I did.

Q.   And you told the truth to the court reporter.

A.   Yes, sir.

Q.   And you wouldn't have said anything intentionally inaccurate, correct?

A.   I would not.

**App. 61**

VOLUME 1-B   33

Q.   I would like to ---

MR. SAHAM:  Your Honor, is it all right to play a short clip or would you rather him be handed the transcript to read it?

MR. THOMAS:  Your Honor, I think this is improper impeachment.  He asked him a question and he said he didn't recall.

MR. SAHAM:  I'm entitled to refresh his recollection, Your Honor.

THE COURT:  He wants to refresh his recollection.

Well, can you -- Why don't you show him the hard copy of it.  Is it long or short?

MR. SAHAM:  Oh, it's a short -- very -- It's three lines of testimony, Your Honor.

THE COURT:  Well, just show it to him.

MR. SAHAM:  I will do that.  May I approach?

THE COURT:  Sure.  You don't have to ask again about approaching.  You approach as you need to.

MR. SAHAM:  Thank you, Your Honor.

Q   (By Mr. Saham) I'm showing you the transcript from your deposition, Mr. Swiger.

A.   Sure.

Q.   And I would ask you to turn to Page 81.  And I'm going to read or I want to see if Lines -- 81, 6 through 9, refresh your recollection.  Tell me when you're there.

A.   It appears we were actually looking at a document at the

VOLUME 1-B   34

time.

Q.   And we can look at that document, too.  But I'm just asking you:  Does looking at this testimony refresh your recollection as to whether you were aware in November of 2017 that the actual transportation cost for Kearl was $7?

A.   That's -- That's what that document would have said and I would agree.

Q.   Okay.  And you testified under oath.  I asked you --

A.   Yes.

Q.   -- "But you were informed in November of 2015 that the year-to-date transportation cost for Kearl was $7," and you answered, "Yes," correct?

A.   Yes.

Q.   Okay.  And that testimony was under oath.

A.   Yes, sir.

Q.   And it was accurate, correct?

A.   It was accurate for the question asked, yes.

Q.   Okay.  And -- And I will show you that document.  I'm showing you what is marked as Exhibit 214.

THE COURT:  Pre-admitted, correct?

MR. SAHAM:  This one is, again, subject to the same objection.

MR. THOMAS:  Based on the Court's ruling, we won't object again, Your Honor.

THE COURT:  Okay, overruled.  Go ahead.

VOLUME 1-B   35

MR. SAHAM:  Okay.  So I would move to publish 214.

Q   (By Mr. Saham) And specifically, on the first page, you're ---

THE COURT:  It's admitted into evidence.

MR. SAHAM:  Thank you, Your Honor.

Q   (By Mr. Saham) This is an e-mail you received on November 12th, 2015; correct?

A.   That is correct.

Q.   And your name appears up at the top as -- as "Swiger" -- or I'm sorry.  It's -- The PowerPoint is labeled "Swiger," correct?

A.   I'm not familiar with the nomenclature.  That's probably right.

Q.   Okay.  And if you turn to Page 4 of this document, this was an "Exxon Production 2015 Corporate Plan, Tom Walters and Hugh Thompson" presentation to you on November 12th, 2015.

Do you know who "Tom Walters" is?

A.   Yes.  He was the President of ExxonMobil Production Company.

Q.   And who was "Hugh Thompson"?

A.   Hugh Thompson was the Executive Vice-President of ExxonMobil Production Company.

Q.   And those are gentlemen that served below you when you were on the Management Committee and PFO?

A.   That is correct.

Q.   Okay.  And I would like to show you Page 22 of this document which is labeled "Kearl Spotlight" up at the top.  And

VOLUME 1-B   36

specifically for transportation for 2015 year to date -- and, again, this is November of 2015 -- it says "Transport -7," correct?

A.   For all the markets, yes.

Q.   Okay.  But that -- Does this refresh your recollection that you were informed in November of 2015 that transportation for Kearl was $7 per barrel?

A.   For all the markets, yes.

Q.   Okay.  We can put this document aside.

Now it's also true that pursuant to FASB, as we talked about earlier, Exxon was required to use actual transportation and diluent costs in the SEC calculation of proved reserves.

A.   For the market used in the SEC proved reserves calculation, yes.  It's very specific.

Q.   It's very specific.  And that's the rule that you have to use the actual cost, correct?

A.   For the market used in the methodology, yes.

Q.   But as you said earlier, Kearl was being sold in multiple markets in 2015, correct?

A.   There were sales in some markets, yes.

Q.   Okay.  I want to show you what I move to admit as Plaintiff's Exhibit 212.

MR. THOMAS:  No objection, Your Honor.

THE COURT:  That's admitted into evidence, Ladies and Gentlemen, 212.

**App. 62**

Q.   (By Mr. Saham) And Exhibit 212, Plaintiff's 212, is an e-mail you received on August 22nd, 2015; correct?

A.   Yes.

Q.   And it was sent to you by Emma Cochrane?

A.   Yes.

Q.   And do you remember who she was?

A.   I do.

Q.   And who was she?

A.   She was the Manager for Upstream Strategic Planning at the time.

Q.   Okay.  And the attachment to this e-mail or, first off, the subject for this e-mail is "Bitumen differentials," correct?

A.   Correct.

Q.   And what's a "differential"?

A.   A "differential" is the difference between prices.

Q.   Okay.  And the attachment is titled "Bitumen Realization," correct?

A.   Yes.

Q.   And, again, this is -- Realization is essentially the revenues received for bitumen, correct?

A.   That is correct.

Q.   Okay.  Could we, please, turn to Page 5 of Exhibit 212?  And this is the "Bitumen Realization Analysis" that was -- the PowerPoint is entitled.  That's a bad question.  I'll withdraw that question.

---

This slide is entitled "Bitumen Realization Analysis," correct?

A.   Correct.

Q.   And the second bullet point of the document says, "Bitumen realization is a netback value at the plant gate that is calculated by deducting costs of transportation to market and diluent," correct?

A.   That is correct.

Q.   And is that an accurate description of how realization was calculated?

A.   Yes.

Q.   And then the second big bullet point describes essentially the deductions that are taken before you get to realization.  From your market price of WTI, those are the deductions you have to take to get to the realization for Kearl; correct?

A.   For each specific market, yes.

Q.   Okay.  And it lists tariffs.  And "tariffs" are another way to say transportation?

A.   Yes.

Q.   And that first bullet point under there for tariffs or transportation says, quote, "The cost of transporting Kearl blend to" -- or I'm sorry -- "The cost of transporting Kearl blend from the plant gate to market includes Woodland, Edmonton rail terminal, Keystone, Gulf Coast access," correct?

A.   That is correct for bitumen going to the Gulf Coast, yes.

---

Q.   So -- So if you're sending bitumen to the Gulf Coast, you have to deduct the transport costs to the Gulf Coast, correct?

A.   That is correct.

Q.   Okay.  And "Market/Quality," again, the Market/Quality is to basically incorporate the fact that this bitumen or tar sand is not quite the same quality as WTI, correct?

A.   That is correct, sir.

Q.   And then finally, you have to deduct the diluent cost, correct?

A.   That is correct.

Q.   And if we turn to the next page or Page 6 of this slide, this is the "Kearl Bitumen Realization History," correct?

A.   Yes.

Q.   And "history" means it's looking backward, correct?

A.   Backwards, yes.

Q.   Okay.  And on this -- Both in the -- Well, if you look at the slide on the left, it says "Kearl Realization at Gate."  That's referring to the plant gate?

A.   That's correct.

Q.   And, again, that's up at Kearl Lake or Fort McMurray for Kearl.

A.   Yes.  That's right, yes.

Q.   Okay.  And then on the right you've got -- in a bar graph representation you've got the "Quality" deduction is green.  The "Transport" deduction is blue and the "Diluent" deduction is red.

---

And those are the components ---

A.   Can you move the slide up a little bit so we can see the legend?

Q.   Yes.

MR. SAHAM:  Can we blow up the right side, please, Michael, so we can all see it better?  Perfect.

Q.   (By Mr. Saham) Okay.  So "Diluent" is red.  Am I right about that?

A.   Yes.

Q.   And "Transportation" is blue.

A.   The "Tariff" is blue, yes.

Q.   Yeah.  And that's -- You told me that was transportation, right?

A.   It's the bulk of transportation, yes.

Q.   Okay.  What else is there in addition to the tariff?

A.   There may be tankage fees.

Q.   So it might be even a little higher than just the tariff.

A.   It could be.

Q.   Okay.  And that actually -- I'm glad you pointed that out, Mr. Swiger, because I remember at your deposition you looked at this blue line or this blue item, and I think you told me it was about six -- it looked like about $6.  And I know it's a graph, so it's hard to see.  Is that fair?

A.   That's fair.

Q.   And then we looked at the November document that the

transportation was 7. Could that be because you had 6 in tariff and then another dollar in tankage fee?

A. No. That's unlikely.

Q. Unlikely. So you think here "tariff" and "transportation" are synonymous?

A. I think so.

Q. And you'd stick that this graph -- And, again, I'm not holding you to it, but it was around six dollars of transportation?

A. That looks to be fair.

Q. And this is August and that other document we looked at was November, so that could explain the discrepancy of the dollar.

A. Right. And this is taking care of all the markets.

Q. Okay. We can set aside Exhibit 212.

Now it's accurate that during 2015 there were significant Kearl shipments to the U.S. Gulf Coast, correct?

A. There was some movement to the Gulf Coast.

Q. Okay. I would like to show you what has been pre-admitted as Plaintiff's Exhibit 339. And this is an October 6th, 2015, document as it says at the top. And for the jury's edification and I know you learned this, Mr. Swiger, at your deposition, there's this metadata when something's electronically generated and that's the date, 10-6-15?

A. Okay.

Q. And then if we turn to Page 6 of Exhibit 339 and look at the

top left, we can blow that up. And this table is labeled "Third-Party Kearl Volumes by Point of Sale," correct?

A. Yes, it is.

Q. And what does "Point of Sale" mean?

A. That is where the sale actually takes place.

Q. Okay. And "USGC" is, again, U.S. Gulf Coast; correct?

A. Yes, it is. Yes.

Q. And in July, August and September, more than half -- Well, let's -- let's take them one at a time.

In July of 2015 the blue line, which is U.S. Gulf Coast, is the biggest line, right, or biggest part of the graph?

A. Yes, it is.

Q. So that means that more than half of the Kearl bitumen, the point of sale was at the U.S. Gulf Coast, correct?

A. In that month, yes.

Q. And for August, similarly, about half of the production went up, but it was still about half was U.S. Gulf Coast?

A. That's correct.

Q. And do you need some water, Mr. Swiger?

A. I'm okay.

Q. Okay. And then for September, it was also about half sold to the U.S. Gulf Coast as well, correct?

A. Yes.

Q. And those -- those volumes went up a little after about April? Is that sort of what this charts shows? That Kearl is

selling more in the second half of 2015 than the first half of 2015?

A. Well, through that point. My recollection is in the fourth quarter it turned around quite a bit but it's not on the graphic. That's just my recollection.

Q. Oh. But my point was that that's -- We were talking about that KEP or the expansion?

A. It started up midway through 2015.

Q. And that increased the volumes for Kearl, correct?

A. It -- It did for a time. We had a number of start-up issues with it. So it was rather up and down to get it running right, and that caused the markets to change quite a bit.

Q. But -- But KEP increased the amount of production.

A. Well, it did bring on more volumes, but there was a time we had to shut the entire facility down, both KID and KEP. So on an average basis, yes, there was an increase.

Q. And is that because there was a fire?

A. There was no fire.

Q. No fire, okay.

A. Mechanical issues.

Q. A mechanical issue, okay.

But for July, August, and September of 2015, about half or more than half of the bitumen was being sold in the United States Gulf Coast, correct?

A. That is correct.

Q. Okay. Okay. We can put 339 aside, and I want to show you what's been pre-admitted as Plaintiff's Exhibit 65. And this is the year-end assessment of potential impairment triggers, correct?

A. I don't see the date on it, but that's -- that's what the subject is, yes.

Q. Okay. But this is a document you've previously seen, correct?

A. It is.

Q. Okay. And if you could turn to Page 75 of what's been pre-admitted as Exhibit 65, there's a chart here entitled "Canada West - June YTD 2015 Profitability," correct?

A. Yes.

Q. And it breaks down the Western Canada operations. Is that fair?

A. It does, yes.

Q. And for Kearl, it says -- Again, the K-O-E-B-D, is that -- that would be Kearl produced 110 million barrels? Do I have that right or ---

A. 110,000.

Q. Per day.

A. Per day.

Q. Okay. Thank you for correcting me.

So 110,000 barrels per day were being produced at Kearl for the first half?

A. Through June of 2015, yes.

Q. First half of 2015.

A. First half, yes.

Q. Okay. And this is a document that you told me you and Mr. Rosenthal shared with Mr. Tillerson, correct?

A. I believe that's correct.

Q. Okay. And -- And -- Okay. You believe that to be correct. Okay. And do you want me to show you your deposition on that one or do you think you showed it to him?

A. It might be worthwhile taking a look at it.

Q. Okay. Could you, please, look at Page 46 and 47 of your deposition, please? And just let me know if that refreshes your recollection that you shared this document with Mr. Tillerson.

A. Yes.

Q. Okay. So you testified earlier and you believe that to be accurate that you shared this document with Mr. Tillerson, correct?

A. Yes.

Q. Okay. And this document is communicating "Canada West – June Year to Date Profitability," correct?

A. That is correct.

Q. And one of the line items is Kearl, correct?

A. Yes.

Q. And you reported to Mr. Tillerson here that Kearl's cash profit was a loss of 162 million dollars, correct?

A. Yes.

Q. And per barrel, the loss was $8.11 per barrel, correct?

A. Yes.

Q. So for every barrel being produced at Kearl for the first six months of 2015, there was a loss, a cash profit loss of $8.11, correct?

A. Yes, but certainly influenced by factors associated with the start-up of KEP, the expansion project.

Q. But you're not disputing there's a loss of 8.11.

A. I am not.

Q. Okay. And then book profit, you described that as a little bit different. That has a loss of 187 million dollars for the first six months, correct?

A. That's correct.

Q. And then per barrel, that loss translates to a loss of $9.37 a barrel, correct?

A. That's correct, yes.

Q. So every barrel being produced had a loss of 9.37; $9.37.

A. A book loss.

Q. Okay. And -- And "book profit," that means that's before you deduct stuff? What's that mean?

A. I'm sorry. Which part?

Q. Well, you said a "book loss." What's that mean?

A. Book earnings include all costs coming from revenue, including non-cash items, like depreciation.

Q. And like sustaining Capex?

A. Sustaining capexes is -- is a cap expense. It doesn't affect book profits until it's recovered as depreciation.

Q. Okay. And what's "Net PP&E"?

A. That's "Net Property, Plant and Equipment."

Q. And what's that mean?

A. That's the asset value.

Q. Okay. So Kearl is on the books here for 18.3 billion?

A. That's correct.

Q. Because some of that -- You said it was about 20 billion, but some of it has already been depreciated?

A. Yes, or portions of it have not been completed yet with the development project, yes.

Q. Okay. Now I want you to turn back a couple of pages to Page No. 70 -- 7-0 -- and this slide is entitled "Profitability History - Upstream Producing Assets." And, again, the "upstream," that's where you dig the stuff out of the ground or suck it out of the ground?

A. Yes, sir.

Q. And XTO - United States is where those Rocky Mountain dry gas assets we've been talking about are housed?

A. They were a very small portion of XTO, yes.

Q. But they were natural gas assets, and XTO had a lot of natural gas -- What do you -- What do you call them? I know you ---

A. Dry gas.

Q. Yeah, dry grass. But you told me they were unconventional or non-conventional?

A. A lot of them were unconventional, yes.

Q. Okay. And that's what XTO was known for is non-conventional gas ---

A. Unconventional.

Q. Okay. And a lot of it was natural gas.

A. Yes. And a small portion was Rocky Mountain dry gas.

Q. A small portion. A small portion that was on the books for something like 3.3 billion dollars, though; correct?

A. That's correct.

Q. So 3.3 billion were on the books for these Rocky Mountain dry gas assets.

A. Yes.

Q. Okay. And for the first half of 2015, 1H'15, XTO - United States lost 630 million dollars, correct?

A. In book earnings, yes.

Q. And this information was communicated to Mr. Tillerson, correct?

A. I'm not sure what -- What is this a part of?

Q. Oh, the same document we've been looking at. And I think you testified you shared this document with Mr. Tillerson.

A. Okay.

Q. Okay. I want to show you what we're marking as Exhibit 699.

Case 3:16-cv-03111-K    Document 376    Filed 05/07/26    Page 73 of 831    PageID 20266

MR. THOMAS: No objection, Your Honor.

THE COURT: It's admitted into evidence.

Q   (By Mr. Saham) Now Exhibit 699, Mr. Swiger, is the Upstream Highlights Report for August of 2015, correct?

A.   Correct.

Q.   And you would have received this sometime in September of 2015?

A.   That is correct.

Q.   Okay.  And if we turn to Page No. 12, the same information is communicated as in the March report but now it's for August of 2015, correct?

A.   Correct.

Q.   Okay.  And if we look at Kearl, the Kearl current month price is still around $21, correct?

A.   Yes, sir.

Q.   It's $21.29, correct?

A.   Yes.

Q.   And that's about half the Brent, WTI and EM Average Price, correct?

A.   That's correct.

Q.   And then if we go to the right part of the slide, the U.S. natural gas -- and blow that up -- the current month U.S. natural gas is about $2.52 or is $2.52, correct?

A.   Yes.  That's what it says, yes.

Q.   Okay.  And then if we turn to Slide No. 17, there's a slide

now entitled to "Special Topics," correct?

A.   Yes.

Q.   And the first Special Topic here are the "Kearl Metrics," correct?

A.   That is correct.

Q.   And it's showing that the realizations for July were 35.32 up in the top left?

A.   Yes, I see that.  Yes.

Q.   And those realizations went down substantially, about 40 percent between July and August, from 35 to 21.  Conveniently, I know the math there because they're football scores.

A.   Okay.

Q.   So there was approximately a 40 percent decline in realizations at Kearl between July and August, correct?

A.   Yes, sir.

Q.   And -- And the reason I'm showing you this is because the last document we looked at showing the losses at Kearl that you shared with Mr. Tillerson, that only covered up to June; right?

A.   That is correct.

Q.   And now we're advancing later into the year, and at least between July and August the price went down $14, correct?

A.   It did.

Q.   Okay.  And similarly on this document, if we go to the right side of the slide down at the bottom, there's another Special Topic labeled "U.S. Segment Earnings," correct?

A.   Yes.

Q.   And the top U.S. Segment Earning, at least the top -- I think you call that a "column" or whatever going across, a line, is "XTO," right?

A.   Yes, it is.

Q.   And that shows for the first quarter of '15 XTO lost 383 million dollars, correct?

A.   Yes.

Q.   And for the second quarter of 2015, XTO lost 247 million dollars, correct?

A.   That is what it says, yes.

Q.   And in the month of July, XTO lost 88 million dollars.

A.   That's correct.

Q.   And for the month of August, it lost 104 million dollars.

A.   That's right.  These are all book earnings, but yes.

Q.   And then year-to-date book earnings, XTO, the first eight months of 2015 lost 822 million dollars, correct?

A.   That is correct.

Q.   Okay.  I want to show you what's been pre-admitted as Exhibit 503.  And the attachment to 503 says "APS Monthly Issues Review," correct?

A.   Yes, it does.

Q.   And those are your initials, "APS".

A.   They are.

Q.   Okay.  And I'd like to turn your attention to Page 3 of the

"APS Monthly Issues Review," the first big bullet point, "Kearl Reserves."  Are you with me?

A.   Yes, I am.

Q.   And this document says under "Kearl Reserves", "Based on recent market prices, there is potential for a substantial debook which may require disclosure during 3Q15 10-K reporting," correct?

A.   That's correct.

Q.   And then it says, "The SEC has indicated, unofficially, that such disclosures are expected," correct?

A.   Yes.

Q.   And this was part of the "APS Monthly Issues Review" that occurred in September of 2015, correct?

A.   That is correct.

Q.   Okay.  And what's a "debook"?

A.   "Debook" means you remove the reserves that are on the books, that are reported as being on the books, from the books so there are no reserves.

Q.   Okay.  And what's a "substantial debook"?

A.   A "substantial debook" would be removing all of the reserves.

Q.   And this is communicating that because of the recent market prices, and the most recent market prices to this document that we just saw was the drop from 35 to 21, there's a potential for a substantial debook which may require disclosure during 3Q15 10-K

VOLUME 1-B    53

reporting, correct?

A. There is a potential. There was a potential, yes.

Q. Okay. And that potential was also indicated by the SEC, unofficially; correct? That they would like a disclosure of that.

A. That's what it says.

Q. Okay. Now I would like to show you the next highlight report for September, 2015, which we will mark as Exhibit 710.

MR. THOMAS: No objection, Your Honor.

THE COURT: What's the number?

MR. BRADLEY: 710, Your Honor.

THE COURT: 710 is admitted into evidence.

Q. (By Mr. Saham) And 710 is the "Financial and Highlight Review Upstream" for September of 2015, correct?

A. Correct.

Q. And if we go to Page 22, that's the "Special Topics," again, correct?

A. Yes, it is.

Q. Top left?

MR. SAHAM: Let's blow that guy up, --

A. Yes.

MR. SAHAM: -- "Kearl Metrics," so we can see it well.

Q. (By Mr. Saham) And we had just seen in the last report that Kearl had gone from 35 to 21, correct?

A. Yes, that's right.

VOLUME 1-B    54

Q. And now it's gone from 21 to 19, correct?

A. That's right.

Q. And for August, the estimated cash loss was 60 million dollars for Kearl, correct?

A. Yes.

Q. And that cash loss increased to 108 million dollars in September, correct?

A. Yes, except for the EMDC or the development company capex in the parenthetical up there. It went to -34 from a positive in August.

Q. And then the earnings for August were negative 12 million?

A. That's correct.

Q. And that grew to negative 65 million in September?

A. Yes, sir.

Q. And if we look at the XTO on the bottom right, XTO lost another 300 million for third quarter '15, correct?

A. That is correct.

Q. And total as through the first nine months of 2015, XTO had lost 932 million dollars, correct?

A. Book earnings, yes.

Q. Okay. And if we can go back to Page 15 of this exhibit for XTO or -- I'm sorry -- for U.S. natural gas on the right, the current month price is down to $2.20, correct?

MR. SAHAM: On the right, Michael.

A. That's correct, yes.

VOLUME 1-B    55

Q. (By Mr. Saham) And year to date, the U.S. natural gas averages out to $2.42, correct?

A. Yes, sir.

Q. And for third quarter '15, the average realization for natural gas is $2.40, correct?

A. That's correct.

Q. And, again, that's quite a bit below the price back in 2010 when XTO was purchased, correct?

A. That's correct.

Q. Okay. I would like to show you what is being marked as Plaintiff's Exhibits 738.

MR. THOMAS: No objection, Your Honor.

THE COURT: 738 is admitted into evidence.

Q. (By Mr. Saham) Now 738, Mr. Swiger, this is the meeting for the September report we just looked at, and that meeting occurred on October 21st, 2015; correct?

A. Yes.

Q. And you were there, correct?

A. Yes, I was.

Q. And you were in Irving which I know that's where the Judge is from and Exxon used to be?

A. That is correct.

Q. Okay. And that's where the meeting occurred?

A. Yes, sir.

Q. Okay. And this meeting, the reason I'm showing it, October

VOLUME 1-B    56

21st, there was another meeting with Mr. Tillerson that occurred five days later about Kearl reserves, correct?

A. I'd have to see the documentation, but yes.

Q. Okay. I'd like to show you what has been pre-admitted as Exhibit 117. And 117 is the slide deck, and it's an e-mail to you, and the slide deck that was used at the October 26th meeting with Mr. Tillerson, correct?

A. That's correct.

Q. And so going back to 738, it's correct that five days before this meeting with Mr. Tillerson, it was reported to you the information in Exhibit 710, specifically on Page 17, that Kearl Realizations were down to $19 a barrel, correct?

A. That's right.

Q. Okay. And in Exhibit 117, if we turn to Page 2, that shows the attendees at that meeting, correct?

A. Yes.

Q. And it also shows that the meeting took place between 1:30 and 2:00 PM in Room 8.

A. That's what it says.

Q. And do you have any memory of Room 8? What that was?

A. It was in Irving.

Q. Okay. And was that like a conference room?

A. It's a meeting room.

Q. Meeting room, okay. And in attendance was yourself, Mr. Swiger, Mr. Rosenthal and some other individuals, correct?

A.  I am Mr. Swiger.

Q.  Oh, I'm sorry.  I'm sorry.

You were in attendance.  Mr. Tillerson was in attendance. Mr. Rosenthal was in attendance, correct?

A.  Yes, that's correct.

Q.  And another person who was in attendance was an individual named "Andy Madden," correct?

A.  That's right.

Q.  And he was the transportation guy, correct?

A.  He was.

Q.  So he knew about transportation costs.

A.  He did.

Q.  Okay.  And he was there.

A.  Yes.

Q.  Okay.  I want to turn your attention to Slide 4, and this is the topic of the deck that was discussed at that meeting, and it's entitled "Kearl Proved Reserves, 2015 SEC Outlook, October 26, 2015;" correct?

A.  That is right.

Q.  Okay.  And then if you turn to the next page, Slide 5, that has the definitions that we talked about earlier that are relevant to the proved reserve calculation?

A.  That is correct.

Q.  "Economic producibility" and "Current existing conditions," et cetera?

A.  That is correct.

Q.  Could you tell us what "sustaining capex" is?

A.  Sustaining capex is -- They're investments that you make on a repetitive basis to sustain the operation.  In the case of Kearl, the best way to think about it is the tires on the big dump trucks.  You have to keep replacing them, keep replacing them.  We call that "sustaining capex."  It's a capital investment that you make but because it's relatively shortly lived, it takes on the nomenclature "sustaining capex" as opposed to building a plant that may last 30 years or so.  It's just a -- It's just a nomenclature thing, yes.

Q.  And those tires were expensive, right?

A.  Yes.

Q.  It's not like putting one on your car.

A.  No, sir.

Q.  Okay.  And ---

THE COURT:  Well, I don't know.  They're pretty expensive on my car.

MR. SAHAM:  They are, Your Honor.  I agree.

THE COURT:  I don't know.

Q  (By Mr. Saham) Okay.  So sustaining capex needs to be included in the calculation of lifting costs, correct?

A.  It was included in the lifting costs, yes.

Q.  Right.  Okay.  I just want to make sure we're ---

A.  A conservative view, yes.

A.  That's true.

Q.  Okay.  And then if you turn to the next page, Slide 6, that articulates on the left-hand side first that Kearl has gone down quite a bit from 2014 -- excuse me very much -- from 64 to 30, correct?

A.  Yes.

Q.  So it's gone down over 50 percent.  It's gone down over 50 percent, correct?

A.  Yes.

Q.  Okay.  And if we look at just out of -- If we go down to the next slide, not slide but next box right below it, this is helpful for the XTO issues we're discussing.  This shows in 2010, when you told me that XTO was bought, natural gas was at $4.38, correct?

A.  That is correct.

Q.  And by October, 2015, we're at 2.70.

A.  Yes.

Q.  So that's about, I guess, a dollar 58 lower?  A dollar 68 lower?

A.  It was, yes.

Q.  Dollar 68.  Sorry.

Okay.  Let's move on to the next -- or move -- Why don't we just move two slides further to "Kearl CP15 Cash Flow Analysis."

Now up at the top it says "15CP Unit Lifting Cost, Cash Opex plus Sustaining Capex minus CAF," correct?

Q.  Okay.  And that's articulated a second time on the right side where it says "Proved reserves equals revenues greater than costs," correct?

A.  I'm sorry.  Where are we?

Q.  Oh, top right.

MR. SAHAM:  Let's blow that up.

A.  Yes.

Q  (By Mr. Saham) So to be a proved reserve.  The revenues have to be greater than the costs, correct?

A.  Yes.

Q.  And the costs are direct cash, operating costs, plus sustaining capex, excluding CAF; correct?

A.  That's correct, yes.

Q.  So you got to include your cash operating costs and your sustaining capex in your lifting costs.

A.  Yes.  We elected to include sustaining capex, yes.

Q.  Okay.  And "lifting costs" are also known under the rules as "production costs," correct?

A.  That's correct, yes.

Q.  Okay.  And if we look at the bottom of this page, the blue chart, if we can blow that guy up, this shows that the cash operating expenses as of the time of this document were $22.70 a barrel?

A.  Yes.

Q.  And then the sustaining capex were $5.80 a barrel, correct?

Case 3:16-cv-03111-K    Document 376    Filed 05/07/26    Page 76 of 831    PageID 20269

A.   That's correct.

Q.   And that would be a total lifting cost of $28.50, --

A.   Yes, sir.

Q.   -- correct?

A.   Yes, sir.

Q.   And then there's a blue line, if we can go up to the chart just above this.

A.   Yes.

Q.   Oh, I'm sorry.  We need to go back.  I got ahead of myself.

A.   Well, it's a pretty important chart.

Q.   Yes.  We're going to go back to that.  But if we could go back to the blue one, I missed something.

So it says down there "Memo: Direct CAF."  What's "Direct CAF"?

A.   That's direct costs above field.

Q.   And "costs above field" would be like an engineer at Kearl working in a trailer.

A.   Right onsite, yes.

Q.   And you got to pay him.

A.   Yes.

Q.   Okay.  And Direct CAF was a dollar and 60 cents.

A.   Yes.

Q.   So if you added that dollar and 60 cents for the engineers working at Kearl, you'd get to $30.10, correct?

A.   That would be correct.

Q.   Okay.  So in the next year when you did this calculation and you wrote off those barrels, you included the Direct CAF, correct?

A.   I don't recall how the CAF worked between the two years but I know there was a change.

Q.   Okay.  And we can look at that later.  But you agree with me if we included the Direct CAF here in this meeting, we get to $30.10, correct?

A.   If the Direct CAF -- If the Direct CAF had not been included in the Cash Opex, you would add it, yes, and get to 30.10.

Q.   Okay.

MR. SAHAM:  Can we pop up to that chart above this now?

Q   (By Mr. Saham) And specifically, I want to look at that SEC price, 2015 SEC price.  That's the first day of the month average price?

A.   Yes.

Q.   But that only deducts a dollar something for transportation to Edmonton, right?

A.   To the market point.

Q.   Just Edmonton.

A.   The market point.

Q.   Well, we looked earlier that for at least half the sales, the point of sale was in the United States, right?

A.   But we're talking about the SEC methodology here.

Q.   And you guys didn't include the shipments to the U.S.

through the SEC methodology.

A.   The SEC methodology was the methodology that we practiced for a number of years on Kearl and Cold Lake which involved using the Edmonton market which is the principal market for clearing heavy crudes and tar sands in Canada.

Q.   But it excluded those 50 percent or greater that we looked at in the chart those sales to the U.S.

A.   Markets outside of Edmonton were not included in the analysis.

Q.   In fact, they were excluded.

A.   They were not included.

Q.   Okay.  Let's go to the last slide here of this deck, and then we'll come back to that one.

In the bottom right it says, for the SEC, you got two ways you can sell Kearl.  You can sell it to Canada or the U.S.  And it specifically says at the bottom "The U.S. sales are excluded from the SEC price."

A.   Yes.

Q.   Okay.  I just wanted to make sure we had that right.

MR. SAHAM:  Can we go back to the last slide?  I guess it was Slide No. 8 we were looking at.

Q   (By Mr. Saham) Okay.  So I was looking at that SEC price of 29.20, and you told me that's only with the Edmonton deductions, correct?

A.   That's correct.

Q.   Okay.  And if we used the CAF of $30 -- If we included the CAF, you agreed with me we're at $30.10, correct, if the CAF was included?

A.   If the CAF had been included, it would have been $30.10 but it was not the methodology, though.

Q.   Okay.  But if you did include it, all I'm getting at is the lifting cost would be above that 29.20, correct?

A.   For 2015 in total, yes.

Q.   And that would have required a debooking, correct, if your lifting costs are above your SEC price?

A.   If it would have been above the SEC price, yes.

Q.   Okay.  And, also, if you would have included those U.S. sales, the ones that got excluded, they had about four or five dollars' extra transportation costs that the Edmonton ones didn't have, correct?

A.   Well -- But I would have to look at the market price down there.  I mean it doesn't sell at the same price as it does in Edmonton.

Q.   Well, let's -- That's -- That's interesting you bring that up because let's go back to another document that you were just looking at that, I think, deals with that specifically.

Bear with me for just one moment.

A.   Sure.

Q.   Whenever you really want to find something, it takes you a while to find it.  Murphy's law or thereabouts.

**App. 69**

Case 3:16-cv-03111-K    Document 376    Filed 05/07/26    Page 77 of 831    PageID 20270

THE COURT:  It took me five years to find a wife.

MR. SAHAM:  It took me longer than that, Your Honor.

Q   (By Mr. Saham) Okay.  I want to go back to my favorite document, the barrel document, Exhibit 213.  And I specifically want to go back to Page 2.

THE COURT:  This is already in evidence, right?

MR. SAHAM:  It is, Your Honor.  It is.

Q   (By Mr. Saham) And I would like to look at the third bullet point, "Diluent prices track Mont Belvieu."  And then under that it says -- Right under that is what I want to highlight, if I could.  I don't know what that is, like a backward alligator or whatever under the bullet point "USGC differential," yeah.

And it says here -- And this is as of August, 2015.  It says, "USGC differential does not consistently cover full transportation costs," correct?

A.  Yes, but this is a diluent study.  Are we talking about transportation of diluent or are we talking about transportation of dil. bit., transportation of diluted bitumen?

Q.  Well, all I'm saying here is this says, "USGC (U.S. Gulf Coast) differential does not consistently cover full transportation costs."  That's what it says, correct?

A.  That's what it says, yes.

Q.  Okay.  I just wanted to make sure.

MR. SAHAM:  Can we go back to Exhibit 117?

And I would like to go to the next slide, please.  The

---

next slide.  There we go, that one.

Q   (By Mr. Saham) Okay.  And I would like to look at transportation, that dollar 27 again.  I think we're in agreement but I just wanted to make sure.  That's the cost to ship Kearl blend from Fort McMurray to Edmonton.

A.  Yes, sir.

Q.  And it costs -- You would agree with me it costs quite a bit more to ship it to the Gulf Coast than Edmonton, right?

A.  I would agree with that.

Q.  Okay.  And just another point of clarification:  Between 2008 and 2013, Kearl was an undeveloped reserve because it wasn't shipping product out, correct?

A.  That is correct, yes.

Q.  And then starting in 2013, it became a proved developed reserve.

A.  A portion of it did, yes.

Q.  And you started having real sales with real numbers associated with them.

A.  We did.

Q.  And real actual costs of transportation and diluent, correct?

A.  Yes, sir.

Q.  And before that, it was a bit speculative because you used -- you had another operation up there called "Cold Lake," right?

---

A.  That's correct.

Q.  And you just used the Cold Lake numbers as a model since there was no real numbers, correct?

A.  It was diluted -- It was bitumen, yes.

Q.  Right.  But as of 2013, you had real numbers; right?

A.  Real numbers for Kearl, yes.

Q.  You had actual costs for Kearl.

A.  We had actual costs for Kearl, yes.

Q.  And FASB requires that when you have actual costs, you use them, correct?

A.  For the method appropriate to the methodology employed, yes.

Q.  Okay.  I want to go to the next slide now.  And, again, U.S. sales and the costs for transportation and diluent for U.S. sales were excluded from the SEC methodology discussed at this meeting, correct?

A.  Yes.  Yes, sir.

Q.  And you were there, correct?

A.  I was.

Q.  And Mr. Tillerson was there.

A.  Yes, he was.

Q.  And Mr. Rosenthal was there, correct?

A.  Yes.

Q.  And that was the decision that the U.S. sales are to be excluded from the SEC calculation.

A.  It was not a decision at that meeting.  It was the

---

methodology that the Global Reserves Group adopted for Kearl starting back in 2013 based on Cold Lake.  And we continued -- The decision of sound judgment was to continue that methodology and see how the market evolved.

Q.  But the decision was made by you, Mr. Tillerson, and Mr. Rosenthal; correct?

A.  No.

Q.  You weren't in charge?

A.  Of what?

Q.  Of making decisions about what goes in the K.

A.  It was -- It was an informational meeting.

Q.  But you signed the K, the 10-K

A.  I did.

Q.  And Mr. Tillerson signed the 10-K.

A.  Yes, sir.

Q.  And Mr. Rosenthal signed the 10-K.

A.  Yes, sir.

Q.  And you three were the three most senior officers of the company, correct?

A.  Yes.

Q.  And it's also true that Mr. Madden was at this meeting.

MR. SAHAM:  We can take that slide down.

Q   (By Mr. Saham) That's true, right?  He was at the meeting?

A.  We'd have to look at the pro forma.

Q.  Okay.  Let's look back at the attendees of the meeting, 117.

---

Mr. Madden, Mr. Andy Madden, was at the meeting, correct?

A.   Yes.

Q.   Okay.  And I want to show you what we're marking as Exhibit 335.

MR. THOMAS:  I'd object to this also on 602, Your Honor.  We never know who they're going to try to use something with.  Mr. Swiger is not on this e-mail.  So I think he's got to lay a foundation for that.

MR. SAHAM:  Well, Your Honor, we went through -- If you want us to come up, we went through a large discussion, and their objections were 401 and 403, nothing other than 401 and 403, and that's why I'm ---

THE COURT:  What's the exhibit number?

MR. SAHAM:  It is 335.

THE COURT:  I need to look at it.  Thank you.

MR. SAHAM:  And, Your Honor, if it would be helpful what page we're going to look at, I could inform you of that.

MR. THOMAS:  Which page did you say?

MR. SAHAM:  The last page.

THE COURT:  Well, the whole thing?

MR. SAHAM:  Well, the whole thing would be admitted, but I'm only going to show him the last page of the whole thing.

THE COURT:  You want the whole thing admitted, but ---

MR. SAHAM:  I would like to publish the last page.  And Mr. Madden will be here later, but this document is quite

important to Mr. Swiger as well.

THE COURT:  Are you familiar with this?  Have you seen this document?

THE WITNESS:  I'm not sure, Judge.

THE COURT:  Take a look at that.

THE WITNESS:  I do not recollect seeing this, no.

THE COURT:  You don't recognize it?

THE WITNESS:  I do not.  I recognize the format.  I don't recognize the document itself.

THE COURT:  Okay.  What about -- Look at the last page.

THE WITNESS:  I see what it's saying.  I don't -- I have not seen this but I understand what it's saying.

THE COURT:  Do you understand enough about it to talk about it or no?

THE WITNESS:  Let me take a closer look.

THE COURT:  Okay, thanks.

(Pause)

THE WITNESS:  Yeah.  I think -- Excuse me.  I think that somebody who has worked on this is going to have to address it.  I'm not familiar enough with it.

THE COURT:  It's not -- It's not really your -- something you ---

THE WITNESS:  No.

THE COURT:  Okay.  I'm not going to admit it at this point.

MR. SAHAM:  That's fine, Your Honor.  I'm going to have to reserve my right to recall Mr. Swiger after Mr. Madden has laid the foundation because this is ---

THE COURT:  I bet he's going to be here.

MR. SAHAM:  Pardon?

THE COURT:  I'm sure he's going to be here.

MR. SAHAM:  Okay.  Thank you, Your Honor.  I appreciate that.

THE COURT:  You're not planning on leaving, are you?

THE WITNESS:  No.

THE COURT:  Okay.

MR. SAHAM:  Okay.

Q    (By Mr. Saham) Well, you can agree with me, Mr. Swiger, that transportation to the U.S. -- and I think you've already agreed to me -- is more expensive than transportation to Edmonton, correct?

A.   That is correct.

Q.   Because it's a lot farther.

A.   Yes.

Q.   Okay.  I want to show you what ---

THE COURT:  Transportation would have been a whole lot cheaper if we had approved the Keystone Pipeline.  "Yes" or "no"?

THE WITNESS:  Yes.

THE COURT:  Yes.  It's easier to put a sludge or I don't know what y'all call that.  What is that -- Whatever

that -- What do you call it when it's going through the pipe?

THE WITNESS:  Pig.

THE COURT:  A what?

THE WITNESS:  A pig.

THE COURT:  A pig.  I like that.

But it's a whole lot faster to put it through a pipeline than it is to somehow get it on a train and train it down wherever you're taking it.  "Yes" or "no"?  "Yes"?

THE WITNESS:  Yes.

THE COURT:  Okay.  All right.

Q    (By Mr. Saham) Oh.  I think we're showing you what's being marked as 528.

MR. SAHAM:  I'm sorry.  528.

MR. THOMAS:  Again, Your Honor, I would object at least for now until he shows Mr. Swiger a copy of this.  It's not -- not clear that he was on this.  He may be.  I just don't know, Your Honor.

THE COURT:  Okay.

MR. SAHAM:  I'll lay a foundation, Your Honor.

THE COURT:  All right.  What number is this?

MR. SAHAM:  This is 528.

Q    (By Mr. Saham) Mr. Swiger, I'm showing you Plaintiff's 528.  Please take a look at that document.

THE COURT:  All of it or something ---

Q    (By Mr. Saham) Well, let's look at the front page for now.

**App. 71**

VOLUME 1-B    73

The date of the metadata here is 11-3-2013 and the file name is "MWA APS MC Draft." Now your initials are "APS," correct?

A. That is correct.

MR. THOMAS: Your Honor, let me shortcut this. I'll withdraw the objection.

THE COURT: All right. Then it's admitted into evidence.

MR. SAHAM: Okay.

Q (By Mr. Saham) So 528 is a November 3, 2013, deck; correct?

A. Yes, sir.

Q. And if you turn to Page 2 of the deck, it's entitled "2013 Corporate Plan Upstream Overview" with -- I think it says "M.W. Albers." That's another member of the Executive Committee?

A. Another member of the Management Committee.

Q. Management Committee. I'm sorry. I'm sorry.

And if we look at Page 10 of this document, please.

MR. SAHAM: And this is very interesting, Judge, that you were just asking about this.

Q. (By Mr. Saham) But the second to last bullet point states, "The Western Canadian heavy crudes are approximately $20 per barrel below last year's plan until 2018. This is a result of insufficient pipeline capacity (quick approval and 2014 start-up of Keystone) to the Gulf Coast. We have mitigated some of this offset with pipeline capacity."

Is that discussing the fact that Keystone isn't up and

VOLUME 1-B    74

running and that increases the prices and decreases the efficiency of getting the Canadian Kearl bitumen to the U.S. Gulf Coast?

A. It means -- It means that at that time a bottleneck was foreseen in that Keystone had not been developed. Other alternatives were being developed, but yes.

Q. Okay.

MR. SAHAM: And then the next bullet point, if we can pull that up.

Q. (By Mr. Saham) The next bullet point states, "Earlier this year we were seeing as much as a $30 differential as folks scramble to move increasing volumes out by rail. The current rail clearing location is to the U.S. Gulf Coast. We expect the discount to moderate slightly to about $25 as folks increase rail capacity and for this discount to continue until 2018. This is a two-and-a-half-year delay versus our projection last year when we expected a quick approval and 2014 start-up of Keystone XL and is far from a certainty even now."

Is this, again, recalling the fact that there was a hope that Keystone XL would be built and that would increase the efficiency of moving the bitumen to the United States?

A. Yes, at that time in 2013.

Q. And does this also recognize, as we saw in 539, that the bitumen had been going to the United States since as early as 2013?

VOLUME 1-B    75

A. Yes.

Q. Okay.

MR. SAHAM: And could we pull up 539 again, Michael? Oh, 538. I'm sorry.

I apologies, Your Honor.

339. Sorry. I'm sorry. 339.

THE COURT: How are you doing on water, Mr. Swiger?

THE WITNESS: I'm okay.

MR. SAHAM: 339, Page 6 of 8. Could you blow up the top left graph as big as we can?

Q. (By Mr. Saham) And the point that I wanted to make here is that bitumen had been going to the U.S. Gulf Coast since 2013, correct?

A. That is correct.

Q. And it only started -- The U.S. -- or I'm sorry. Kearl only started producing in April of 2013, correct?

A. Correct.

Q. So at least as of October and probably since as early as -- Well, I'll withdraw that question.

Since October of 2013, Kearl bitumen had always been shipped and sold in the United States.

A. Some volumes had, yes.

Q. And that volume was increased in 2015.

A. It was increasing in 2015 through the period shown here.

Q. Okay. And this document we're looking at about the Keystone

VOLUME 1-B    76

pipeline, Exhibit 528, discusses bitumen going to the U.S. Gulf Coast via rail in 2013, correct?

A. Yes.

Q. Okay. I want to show you what has been pre-admitted as Exhibit 215.

Now in November of the next year, not 2015, the company aligned the actual transportation costs and the actual diluent costs with the SEC analysis, correct?

A. The methodology evolved and was updated in 2016, yes.

Q. And it was updated to make the SEC analysis consistent with the actual costs and actual prices, correct?

A. The SEC analysis was updated to be and it turned out to be consistent, yes.

Q. Okay. I would like to turn to Page 37 of Exhibit 215. And before I do that, one thing that happened between October, 2015 -- or -- I'm sorry -- that happened before -- Strike that. Withdraw that question.

One thing that happened between February 24th, 2016, and the date of this document in November is the 12-billion-dollar bond offering closed on February 29th, five days after the 10-K, correct?

A. In 2016, yes.

Q. Okay. Now looking at Exhibit 215, the top part of the chart is labeled "Kearl SEC Pricing 2016 Basis," correct?

A. That's correct.

**App. 72**

Q.   And if we look at 2015, the first entry, you've got transportation of a dollar 32 under 2015.

A.   Yes.

Q.   And then when you deduct that dollar 32, you get that price we saw earlier of $28.70, correct?

A.   Correct.

Q.   And then if we look at the actuals down at the bottom, that's "Kearl Actual Average Realizations," the actual numbers running the business; correct?

A.   Yes.  The ones that flow to the bottom line, yes.

Q.   Okay.  And transportation there was $5.88, correct?

A.   That's correct.

Q.   And I think that's $4.56 higher than the transportation cost used in the SEC analysis, correct?

A.   Well, this is not -- this is not an SEC analysis.  It starts with a different WTI month average, for instance.

Q.   Yeah.  But -- But you told me earlier today, and we can go back to it, when you're doing the SEC analysis, you got to use the actual costs just like you do when you're running the business.

A.   You have to use the actual costs appropriate to the methodology adopted which is particular to the market.

Q.   Okay.  Now are you telling us that it's not required to use actual transportation cost in the SEC test?

A.   You are required to use the actual transportation cost to

the market where the price is defined.

Q.   In fact, you testified previously that you already used the actual transportation cost in the SEC analysis, correct?

A.   To the -- To the actual market, yes.

Q.   And you recall that I previously took your deposition in this case.

A.   I do.

Q.   And a court reporter was present?

A.   Yes.

Q.   And you took an oath, correct?

A.   Yes, I did.

Q.   Same oath you took today?

A.   Yes.

MR. SAHAM:  Apologies, Your Honor.

THE COURT:  That's okay.

MR. SAHAM:  This is 720 and 721 I'd like to play.

MR. THOMAS:  Your Honor, again, I think it's improper impeachment.  He just agreed that he said this when he asked him questions.

THE COURT:  I don't know what he's going to do.

MR. THOMAS:  I got my spidey sense to tell me stuff.

THE COURT:  Oh, oh, oh, okay.  Are you like the Great Carnac or whatever it was?

MR. THOMAS:  Yes, but I don't have my -- I don't have my cape and ---

THE COURT:  We'll get you a hat.

MR. THOMAS:  Yeah.  It will cover this up.

MR. SAHAM:  Your Honor, I believe he has not testified to exactly what I said.  I asked him and he's testified earlier today and he testified at his deposition that Exxon was required to use the actual transportation cost in the SEC price, and he's changing that.

THE COURT:  All right.  But he's adding some words.

MR. SAHAM:  He is.  Sorry, my apologies.

THE COURT:  He says "to the market."  That's what he keeps saying, right?

THE WITNESS:  That's correct, to the market.

THE COURT:  Get that all cleared up and we'll kind of move on from here.

Q    (By Mr. Saham) Okay.  That's not what you told me at your deposition, though.  You didn't mention a word about that.

A.   No.  You just asked me about actual costs.  You didn't talk about the market.

Q.   But you were under oath when I asked you the question.

A.   I was.

Q.   And you told me you had to use the actual costs in the SEC analysis --

A.   That's correct.

Q.   -- for transportation, diluent, and other costs.

A.   That's correct.  And, for instance, here, the actual cost to

the market was a dollar 32.

Q.   Well, the actual cost to the U.S. Gulf Coast market, if you went by rail, was $16 a barrel, wasn't it?

A.   But the market being used for the SEC analysis was Edmonton.

Q.   And that's because you excluded the U.S. sales because they were more expensive.

A.   That's correct.  The methodology excluded U.S., not because they were more expensive but because Edmonton was deemed to be the appropriate market point for the SEC analysis.

Q.   But it's also true, sir, that if you didn't exclude those U.S. sales, the SEC price would have exceeded the lifting costs and those proved reserves would not have qualified for this 10-K.

A.   That's what it appears, yes.

Q.   Okay.  And this document shows that because if you use the actuals for 2015, the number you get is $24.27, correct?

A.   That's correct.

Q.   And if we turn to Page 39 of Exhibit 215, the actual lifting cost, the Kearl unit lifting cost is listed as $27.90, correct?

A.   Yes.

Q.   And $24.27 is below that number, correct?

A.   It would be, yes.

Q.   And $28.70, when you only deduct a smaller amount for Edmonton, is above that number; correct?

A.   That is correct.

Q.   And the next year you will align the actuals.  You use the

**App. 73**

actuals, the FASB accounting actuals in the SEC calculation, correct?

A.   The methodology was updated, yes.

Q.   Okay.  And it wasn't updated before the bond offering, correct?

A.   No, it was not.

Q.   It was updated after the bond offering.

A.   I do not recall when the actual update was done, but by the end of the year it was updated.

Q.   Okay.  I want to show you what we're marking or what's been pre-admitted as Exhibit -- Well, I'll skip that one -- what's been pre-admitted as Exhibit 728.  Well, actually I will show you because I think -- we don't get -- it doesn't get to go back if we don't show it.  So why don't we do 745 first.

THE COURT:  Okay.

MR. SAHAM:  And both of these have been pre-admitted, Your Honor.

THE COURT:  Okay.  That means they're in evidence, Ladies and Gentlemen.

Q   (By Mr. Saham) So 745, this is the FASB (Financial Accounting Standards Board) accounting standards codification, correct?

A.   Yes.

Q.   And if we go -- Those are the rules governing actual costs and things you use in accounting?

A.   Yes, sir.

Q.   Okay.  And if we go to Page 31 of this document, there's a definition of "production costs."

A.   Yes.

Q.   And it describes the different things that go into production costs?

A.   I see -- I see that.

Q.   And at the bottom of that first paragraph up at the top, the first paragraph that says "production costs sometimes called lifting costs," correct?

A.   Yes.

Q.   Okay.  So "production costs" and "lifting costs" are synonymous?

A.   Yes.

Q.   Okay.  Now I'd like to show Exhibit 728.

MR. SAHAM:  And this document has also been pre-admitted.

Q   (By Mr. Saham) And, again, "APS," that's your initials?

A.   Yes.

Q.   And this is the Upstream Board Review that took place a couple of weeks after Exhibit 215 because it's dated 11-30-2016.  Is that correct?

A.   Yes.

Q.   And what does the word "must" mean?

A.   Sorry.  What word?

Q.   How do you use the word "must"?  What does that mean?

A.   "Must"?

Q.   Must, M-U-S-T, must.

A.   Must.  Need to.  Must do.

Q.   Okay.  And what about the word "cannot"?  What does that mean to you?

A.   Sorry.  The word?

Q.   Cannot, C-A-N-N-O-T.

A.   Cannot.  Unable to do.

Q.   Okay.  I would like to have you look at Page 23 of Exhibit 728 up at the top, the top bullet point, please.

And this bullet point says, "The SEC" -- And this is a presentation you made to the Board of Directors regarding upstream.  And you said in this presentation, "The SEC prescribes a very specific methodology for the prices used to estimate proved reserves.  We must use the average of the first day of each month in 2016 against actual cash operating costs for the year," correct?  That's what you said?

A.   That's what I said.

Q.   And then you went on to say, "If the average price does not cover the cash costs for the year, then the reserves cannot be considered 'proved' and move to the 'probable' category," correct?

A.   That is correct.

Q.   And that's what you told the Board of Directors.

A.   I did.

Q.   Okay.  I'd like to put 728 aside and show you what I believe has been pre-admitted.  It's Defendant's Exhibit 91 and I believe Plaintiff's Exhibit 741.

THE COURT:  Well, it's their exhibit.  It's going to be admitted unless you object.

MR. THOMAS:  No objection if there was one.

THE COURT:  You can offer any of their exhibits.

MR. SAHAM:  Okay.  Thank you, Your Honor.  I appreciate that.

Q   (By Mr. Saham) And are you a petroleum engineer?

A.   I am.  I am.

Q.   And what's the "Society of Petroleum Engineers"?

A.   It's a professional group.

Q.   And do they put out certain guidelines, such as the Petroleum Resources Management System?

A.   They do.

Q.   Okay.

MR. SAHAM:  And could we turn to Page 33 of Defendant's Exhibit 91, Plaintiff's Exhibit 741?

Q   (By Mr. Saham) And down at the bottom, third from the bottom, there's a definition of "Current Economic Conditions," correct?

A.   No.  It looks like "Coalbed Methane."  Oh, yeah.

Q.   We'll have him blow it up.  You can't -- It's the third from

the bottom. Sorry. "Current Economic Conditions," are you with me, Mr. Swiger?

A. I am now, yes.

Q. Okay. And the second sentence there says, "The SPE Guidelines recommend that a one-year historical average of costs and prices should be used as the default basis of 'constant case' resources, estimates and associated project cash flows," correct?

A. That's what it says.

Q. Do you believe that to be accurate?

A. I'm not sure what it really refers to to tell you the truth.

Q. But it's telling you that you should use a one-year historical average of costs and prices for the SEC guidelines related to "Current Economic Conditions" for proved reserves, correct?

A. That's what it says. I'm not sure what the applicability is, but that's what it says.

Q. Okay. And this is a Petroleum Resource Management, Society of Petroleum Engineers Guidance.

A. Guidelines, yes.

Q. Guidelines, okay.

THE COURT: Okay. We're going to take a break. Don't talk about the case. It's going to be a little longer break. I have to go make a -- talk to a bunch of law students for about ten minutes and then I'll come back. They're here in the building. I'm not running off to Edmonton, Canada or anything.

Don't talk about the case. Thank you, all.

COURT SECURITY OFFICER: All rise for the jury.

(Jury escorted to the Jury Room by the Court Security Officer.)

THE COURT: Hey, let me see y'all for a sec.

(Court recessed from 2:37 PM until 3:22 PM.)

THE COURT: Are you ready?

MR. MELSHEIMER: Mr. Swiger?

THE WITNESS: Yes, sir.

THE COURT: Okay. All right. And you got your next exhibit and all that worked out?

MR. SAHAM: Yes. It's going to be the video, Your Honor.

THE COURT: Okay, great.

COURT SECURITY OFFICER: All rise for the jury.

(Jury seated in the jury box.)

THE COURT: Thank you, all. All right. Go ahead and take your seats.

Go ahead, Mr. Saham.

CONTINUED DIRECT EXAMINATION

QUESTIONS BY MR. SAHAM:

Q. Mr. Swiger, you didn't say "transport to market" at your deposition, correct?

A. I'm sorry?

Q. You didn't add that part you keep adding about "to market"

at your deposition, correct?

A. I wasn't asked about it.

Q. Okay. I would like to play Page 116, Line 24 through 117, Line 7.

(Video clip referred to was played in open court.)

MR. SAHAM: I would also like to play 120/6 through 11.

(Video clip referred to was played in open court.)

Q (By Mr. Saham) That was your testimony?

MR. THOMAS: Your Honor?

THE COURT: Stop. Go ahead.

MR. THOMAS: I'd like to offer the preceding question and answer for optional completeness.

THE COURT: Okay.

MR. THOMAS: Preceding answer to the second clip.

THE COURT: Okay.

MR. THOMAS: This is Page 119, Line 4.

THE COURT: Is it -- Is it on?

MR. THOMAS: I didn't -- I'm going to have to read it, Your Honor, if that's okay.

THE COURT: That's -- That's fine.

MR. THOMAS: Okay.

THE COURT: But you're going to have to read it louder than you're reading it right now.

MR. MELSCHEIMER: I could read it, Judge.

THE COURT: Let him read it, please.

MR. THOMAS: Question: "Well, my question is: Do you agree with me that for transportation costs, as you said, there should be no difference between the SEC pricing transportation cost and the actual realization transportation cost?"

Line 11, Page 119, Answer: "In the SEC analysis, you're going to want to use the actual costs for the project involved whether they're transportation costs, operate -- field operating costs, so forth and so on. Now in an analysis, in trying to figure out how the netbacks work, particularly for" --

THE COURT: How what works?

MR. THOMAS: A netback.

THE COURT: "Netback"?

MR. THOMAS: Yes.

THE COURT: Okay.

MR. THOMAS: I'll start that over, if I may.

" -- how the netbacks work, particularly for a customer, a sale at Edmonton and so forth, they're going to -- they're going to look at different components of transportation based on where they think it's going to and different judgments they might make about market and quality based on their refining circuit. What I don't know is whether in this table on 241, whether this 2015 column is a recasting of the numbers for 2015 on a 2016 basis. In other words, what will the business look like in 2015 had we run it on the basis that we're running it in 2016."

THE COURT: Okay. Thank you.

Go ahead.

MR. SAHAM: I would like to put back on the screen Exhibit 339.

THE COURT: It's already admitted, correct?

MR. SAHAM: Yes, Your Honor.

THE COURT: Anytime they make reference to these exhibits and I'm not really on them, they were already admitted by agreement.

Go ahead.

MR. SAHAM: I need my glasses. Sorry, Your Honor. 6 of 8, Page 6 of 8, please. The top left.

Q   (By Mr. Saham) Again, Mr. Swiger, in July of 2015, over half the bitumen was going to the United States from Kearl, correct?

A.   That is correct.

Q.   And for August of 2015, approximately half the bitumen was going to the United States, correct?

A.   Yes, sir.

Q.   And for September of 2015, over half the bitumen was going to the United States, correct?

A.   That's correct.

Q.   And then you went to a meeting in October with Mr. Tillerson and Mr. Rosenthal where you decided to exclude the U.S. sales from the SEC calculation, correct?

A.   The U.S. sales had been excluded for many years, including

all the first part of this year -- that year, yeah, 2015. That was the methodology.

Q.   And that methodology was changed after the 12-billion-dollar bond offering, correct?

A.   The methodology was changed late in 2016, I believe.

Q.   And the bond offering was five days after the 10-K in February of 2016, correct?

A.   That is correct, yes.

Q.   I want to show you what's been pre-admitted as Plaintiff's Exhibit 547, and I'd like to go to Page 6. This is a "Kearl Proved Reserve 2015 SEC Outlook" on October 16th, 2015, and No. 1 says on the right "Annual Average," correct? "2015 Annual Average"?

A.   I see that.

Q.   And the second bullet point says "strongest alignment with test," correct?

A.   I'm sorry. What?

Q.   You'll see it better in a second, sir.

A.   "Strongest alignment with test," yes. That's what it says. I'm not sure what it means.

Q.   But under "2015 Annual Average," the second bullet point says "strongest alignment with test," correct?

A.   That's what it says.

Q.   And if we go back to Page 3, which is the slide itself, that's entitled "Kearl Proved Reserve 2015 SEC Outlook," and it's

dated October 16th, 2015; correct?

A.   Correct.

Q.   I want to show you what we're marking as Plaintiff's Exhibit 216.

MR. THOMAS: No objection, Your Honor.

THE COURT: That's admitted into evidence.

Q   (By The Court) Now Exhibit 216, this is, if we go to -- that's the e-mail that you received. On the first page, I think your name is on there, correct?

A.   Yes.

Q.   Andrew Swiger. You would have received this e-mail on January 22nd, 2016; correct?

A.   That's correct.

Q.   And it attaches the "December 2015 Financial and Operating Highlights Review," correct?

A.   Yes, sir.

Q.   Okay. And if we go to Page 24 again, we have the "Special Topics," correct?

A.   Yes. Yes.

Q.   And up in the top -- I'm sorry. Up at the top left we have the "Kearl Metrics," correct?

A.   That's correct.

Q.   And we had noticed earlier that the Kearl Bitumen Realizations had been declining in the second half of 2015, correct?

A.   They had, yes.

Q.   And by the time we get to November, they're down to $16 a barrel, correct?

A.   In November, yes.

Q.   And by the time we get to December, the last month of 2015, they're down to 11.

A.   Yes.

Q.   And we noticed earlier when you had briefed Mr. Tillerson in the middle of the year, Kearl was losing $8.11 a barrel, correct?

Kearl was losing -- in the middle of the year was losing -- for the first six months was losing 8.11 per barrel, correct?

A.   Was that operating earnings or cash?

Q.   I believe that was the cash.

A.   It sounds like earnings.

Q.   And the operating was 9.37.

A.   Could be.

Q.   Okay. And the prices went down quite a bit after that, correct?

A.   They did.

Q.   Okay. And they -- they plummeted to as low as $11 the last month of the year.

A.   That's right.

Q.   And for November, estimated cash burn was negative 74 million dollars for Kearl, correct?

A.   That would be including the development company capital

**App. 76**

expenditures, yes.

Q.   Okay.  In December there was an estimated cash loss of 60 million dollars, correct?

A.   Or a positive two without the ongoing investments.

Q.   Okay.  And for earnings for November, you had a negative 53 million, correct?

A.   That's correct.

Q.   And for December earnings, a negative 51 million, correct?

A.   That's correct.  Book earnings, yes.

Q.   Okay.  And then if we look at the bottom right corner of the exhibit, "U.S. Segment Earnings," XTO?

A.   Yes, I see that.

Q.   For 2015, XTO lost 1.349 billion dollars, correct?

A.   That is correct, book earnings.

Q.   And then if we go back to Page 17 of the highlights, the realizations, year to date, that would be the whole year for Kearl, correct?

A.   Yes, it would.

Q.   The whole year for Kearl, $24.28 was the actual realization, correct?

A.   That is correct, yes.

Q.   Okay.  And then if we look at U.S. gas, the current month for December, the price was down as low as a dollar 74, correct?

A.   I can't see that yet.

        MR. SAHAM:  Let's pull that baby up.

A.   I do see it now, yes.

Q   (By Mr. Saham) Okay.  So 1.74, that's, I think -- let me do the math -- about $3 below the price when Mr. Tillerson bought XTO for 31 billion dollars, correct?

A.   The price when XTO was acquired, yes.

Q.   And then it has -- If you go over to the second from the right for the quarter, fourth quarter, 2015, the last three months, so if you average those three months together, the price for U.S. gas was a dollar 80 for those last three months, correct?

A.   That is correct, yes.

Q.   And you received this document in the ordinary scope of your employment, correct?

A.   I did.

Q.   I'd like to show you -- Well, we'll skip that one.

        I'd like to show you what has been pre-admitted as Plaintiff's Exhibit 538 and this is an e-mail you received on December 11th, 2015; correct?

A.   That is correct, yes.

Q.   And the attachment to this e-mail is "2015 SEC pricing PowerPoint," correct?

A.   Yes.

Q.   And the e-mail says, "Andy, headline 2015 AA SEC prices are," and then it lists Brent at 54.17, correct?

A.   Yes.

Q.   And then it lists bitumen at 28.70?

A.   Yes, it does.

Q.   And that number is about four dollars bigger, four dollars larger than the number you saw in the highlights report for December, 2016, for actual realizations at Kearl?

A.   For the month of December you mean?

Q.   No.  For the year to date; for the whole year.

A.   Let's go back and look at it.

Q.   Okay.

        MR. SAHAM:  Let's put 216 back up on Page 24.  No.  I'm sorry.  I had the wrong page.  It's Page 17.

Q   (By Mr. Saham) So if we go to Page 17, the bottom left and we see year to date, for Kearl it's $24.28, correct?

A.   That's correct.

Q.   And that's, like I said, about four -- over four dollars below the price that was being used for the SEC.

A.   Below the SEC price, yes.

Q.   And that SEC test was the test you were using to determine whether you could put those barrels in that big ole 10-K.

A.   The proved reserve test.

Q.   The proved reserve test that was reported in that big ole 10-K on February 24th.

A.   Yes, sir.

        MR. SAHAM:  I'd like to mark for identification Plaintiff's Exhibit 564 which is a 1006, Your Honor.  So we might

have to discuss it.

        THE COURT:  This one is not in yet?

        MR. SAHAM:  It is not.

        THE COURT:  Okay.

        MR. THOMAS:  Just one moment, Your Honor.  This is a little different than what they sent us before.

        THE COURT:  Oh, sure.

        MR. SAHAM:  We tried to take Your Honor's instruction to heart to make the document as complete and non-argumentative as possible.

        THE COURT:  I remember.

        MR. THOMAS:  Your Honor, we object to this used as a 1006.  I don't think the records are voluminous.  I mean as the rules contemplate.  I'm happy to have a discussion about that.  I'm happy to have a further discussion about that, but I don't think these records are voluminous as Rule 1006 contemplates.

        THE COURT:  Okay.  Let me look at that exhibit.  Just a second.

        MR. SAHAM:  May I approach, Your Honor?  I have one if you'd like to see it.

        THE COURT:  Yes, I do.

        MR. SAHAM:  Should I give it to Cole?

        THE COURT:  Give it to Ronnie.

        Thanks, Ronnie.

        Oh, you're objecting on -- Tell me why.

MR. THOMAS: Your Honor, I believe this is not the proper 1006 summary exhibit because the records aren't voluminous as that rule contemplates. I think this would be an appropriate demonstrative but I don't think it's a 1006 because we're just talking about 10 or 12 documents from which these numbers come from.

THE COURT: Overruled. Plaintiff's Exhibit -- Is it 564?

MR. SAHAM: It is, Your Honor.

THE COURT: Admitted into evidence.

MR. SAHAM: Move to publish.

Q (By Mr. Saham) Now, Mr. Swiger, this is a summary of those monthly highlight reports you receive. And if you add up the earnings for each month for 2015, the total is a loss of 440 million dollars for Kearl, correct?

A. It doesn't say "Kearl" anywhere here.

Q. Okay.

A. So I'm not sure what I'm looking at.

Q. Okay. Do you want to go back and look at the reports? I guess we had the other version that has the "Kearl" on it. And we took that off to sort of ---

MR. SAHAM: Well, I would represent, Your Honor, these are the summaries -- and, Mr. Swiger, I'd represent to you -- these are the summaries that were taken from those Kearl "Special Topics" slides we were looking at. They're the numbers, and we

can go back and look at them, if you want. But we just looked at December and November, negative 53 and negative 51. That came directly from that document I'll represent to you.

A. Are you saying this is something you constructed?

Q. This is exactly something we've constructed, and we've just taken the earnings and the cash from those 12 reports, those 12 monthly reports, and we've put them in one document. And we could spend the time to go through them but I would represent to you as an officer of the Court that's exactly what this document is.

A. Okay.

Q. If we went back, we would plug it in.

So we've got the earnings in the first column. And if you add up those earnings, that number there is neglect 440; correct?

A. In the book earnings, yes.

Q. And then for estimated cash, that's the amount that was burned, correct?

A. For the entirety of it, including the development company continuing investments.

Q. So if the company got a billion 2 in revenue from Kearl, it means they spent two billion because ---

A. I'm sorry?

Q. If -- If -- This number is the amount -- the cash costs exceeded revenues that came in, correct?

A. The cash costs and the capital investments.

Q. Okay. And when you add those two together, the -- the amount of cash burned over the revenues is negative 831 million dollars for Kearl?

A. The entirety of cash outlays including the investments, yes.

Q. And then we also can see from this chart it summarizes the realizations, those monthly realizations, that were on Page 17 --

A. Yes.

Q. -- of the reports?

A. Yes.

Q. And for ---

THE COURT: Let him answer. Let him answer. He's about to answer.

MR. SAHAM: My apologies.

A. What was the question?

Q. (By Mr. Saham) Oh, my question is: Current month realizations, that was something that was communicated in those reports on Page 17, correct?

A. Yes.

Q. And if we look at the months, you can look at them by month. The month with the highest realization was the month of June, 2015, correct?

A. That is correct.

Q. And that -- that was the month you only looked at the first six months in that one document with Mr. Tillerson where we saw cash losses of $8 a barrel and book losses of $9 a barrel,

correct?

A. Yes.

Q. And that was for first six months of the year.

And then every single month after that, in the second half of the year, there's a decline in the current month realization. You go from $42 to 35 from June to July, correct?

A. Yes.

Q. And then you go from 35 to 21 from July to August, correct?

A. Correct.

Q. And then it goes from 21 to 19 from August to September, correct?

A. Yes, sir.

Q. And then it pops up a little bit in October to 23.88, correct?

A. Yes.

Q. And then it crashes down to 16 in November and then 11 in December, correct?

A. Yes.

Q. And we saw from those documents we were looking at earlier the year to date actual realizations for Kearl were $24.28, correct?

A. That is correct.

Q. Okay. Now in February of -- Well, strike that question.

Sir, what is a "ratings agency"?

A. As it pertains to bonds perhaps.

**App. 78**

Q. Okay. And what does a ratings agency do?

A. They provide a credit rating on a company that wishes to issue bonds.

Q. Okay. And is a company named "S&P" a credit rating agency?

A. It is one of the credit rating agencies, yes.

Q. And you were aware in early February that S&P would review the 10-K before making a final call on Exxon's bond rating, correct?

A. It's a final call after putting us on CreditWatch in 2015 -- I'm sorry -- Credit Outlook in 2015 and Negative Watch in 2016, yes.

Q. But you were aware that they wanted to see the 10-K before making a final call on your rating?

A. Before making a final call, yes.

Q. Okay. And you knew in February, early February, 2016, that Chevron's rating had been reduced, correct?

A. I did.

Q. Okay. And you also knew that Shell had been downgraded as well, correct?

A. Yes, I did.

Q. And you also knew that Shell had already written down its tar sands assets, correct?

A. I believe so, yes.

Q. And you also knew that Total, another big oil major, had also been downgraded, correct?

A. Yes.

Q. And you knew, also, that they had written down some of their tar sands operation.

A. I did.

Q. Okay. And you shared this information with Mr. Tillerson in early February as well.

A. I believe that's true.

Q. Okay. I would like to show what's been pre-admitted as Exhibit 199.

MR. SAHAM: And could we go to that third paragraph, specifically the second sentence.

Q (By Mr. Saham) And here talking about S&P, you and Mr. Tillerson were informed, "They will review our full year results and 10-K filing prior to making a final determination. S&P cut Chevron's rating today from AA to AA minus. They have also recently downgraded Shell further from AA minus to A+, and Shell remains on CreditWatch along with other European majors, BP, Repsol, ENI, Statoil and Total, correct?

A. It's a difficult time for the industry, yes.

Q. Okay. But you were informed, nonetheless, of this information on February 2nd, 2016; correct?

A. Yes.

Q. And so was Mr. Tillerson. His name is right next to you in the CC, correct?

We'll blow that up so everyone can see it.

A. Yes.

Q. I would like to show you what's been pre-admitted Plaintiff's Exhibit 713. And this document is also dated February 2nd, 2016, and it's an e-mail you sent directly to Mr. Rex Tillerson, correct?

A. It is, yes.

Q. And about halfway through the document the heading is "Downgrades," correct?

A. Yes.

Q. And you said "Chevron Corp" or you copied something that said, "Chevron Corp corporate credit rating lowered to AA minus/stable/A minus 1 plus from double A/negative/A minus 1 plus, correct?

A. Yes.

Q. And you informed Mr. Tillerson of this fact on February 2nd, 2016; correct?

A. Yes.

Q. And this is 22 days before the 10-K was filed with investors.

A. Yes.

Q. I want to show you what's been pre-admitted as Plaintiff's Exhibit 70, and specifically I'd like to turn your attention to Page 3, "Upstream Impairment Comparison."

A. Let's go back to the e-mail again, please.

Q. Sure.

A. So this is September 19th, 2016. Okay, well after the bond offering.

Q. Yes. This document is dated September. We're going to look at a February one in a minute --

A. Okay.

Q. -- but I wanted to give the jury some context. So if we go to Page 3, "Upstream Impairment Comparison," correct?

A. Yes.

Q. That's the title of this?

And in total, competitors of Exxon between 2014 and 2015 had taken 93.7 billion dollars in impairment charges, correct?

A. Yes, sir.

Q. And Exxon had taken zero, correct?

A. At this point, yes. Well, we -- we would be taking impairments year by year, several hundred a year from -- several hundred million a year for various items.

Q. But none were taken in 2014 or 2015, correct?

A. I believe several hundred million were taken in each of those years.

Q. Well, let's look at Exhibit 222.

MR. THOMAS: No objection, Your Honor.

THE COURT: All right. That's admitted into evidence.

Q (By Mr. Saham) And what's the date of Exhibit 222 when we get it up on the screen? Do you see it, Mr. Swiger?

A. I do, yes.

**App. 79**

Q.   What's the date of the top e-mail?

A.   February 14th of 2016.

Q.   And that's ten days before the 10-K was filed?

A.   Yes, sir.

Q.   And who's Ms. Beth Casteel?

A.   I believe she was the Upstream Comptroller at the time.

Q.   And -- And she reported to Mr. Rosenthal as the Head Comptroller?

A.   Yes.

Q.   And she sent you an e-mail on February 14th, 2016, with an attachment entitled "Upstream Competitor Analysis," correct?

A.   Operating costs, yes.

Q.   And she said to you in the e-mail:  "Andy, as follow-up to our conversation on Friday, I had the team take a quick look at the impact from impairments.  Total and BP had more material amounts.  The impact on 2014 CVX" -- and "CVX" is Chevron, correct?

A.   It is.

Q.   "Was under $1/OEB.  Attached is a table with results by competitor.  Happy to do some more digging if you'd like.  Thanks, B."

     Now could you, please, turn to Slide or Page 5 of Exhibit 222?  And we can blow up that top part for you.

     And this is entitled "Upstream Competitor Analysis Oil and Gas Operating Costs, Dollars Per Barrel, 2014."  And for 2014

impairments, since -- That's what's listed here are 2014 impairments in the third column, correct?

A.   Yes, sir.  Yes, sir.

Q.   And this says zero for Exxon, correct?

A.   I stand corrected.

Q.   And then for Chevron, it says 900 million?

A.   Yes.

Q.   And for BP, it says 9.7 billion?

A.   Yes.

Q.   And then "RDS," that's Shell; right?  Royal Dutch Shell?

A.   Yes, it is.

Q.   And it says 2.7 billion, correct?

A.   That's right.

Q.   And then for "TOT," that's Total?

A.   Yes.

Q.   And it says 10.3 billion, correct?

A.   Yes.

Q.   And both Total and Royal Dutch Shell had tar sands operations in Canada that they wrote down during 2015, correct?

A.   They did.

Q.   Okay.  And I want to show you what I'm marking as Plaintiff's Exhibit 595.

     MR. THOMAS:  We'd object to 595 as hearsay, Your Honor.

     MR. SAHAM:  We'll -- We'll withdraw it, Your Honor.  We thought we had a stipulation about newspaper articles and analyst

reports coming in with an instruction, not for the truth of the matter, but it appears we do not have such an agreement.  So we will withdraw this document.

Q.   (By Mr. Saham) I want to show you what's been pre-admitted as Plaintiff's Exhibit 553.  And looking at the metadata, this says, "February 9th, 2016, APS Issue Review."  Again, this is Andy Swiger.  what's your middle name?  I'm sorry.

A.   Porter.

Q.   Andy Porter Swiger, that's you?

A.   Yes.

Q.   Okay.  And who is "Ean Nesselrotte"?

A.   I do not know.

Q.   Okay.  Is that someone who reported to Mr. Schleckser possibly, the Treasurer?

A.   I am not familiar with that name.

Q.   Okay, fair enough.  Fair enough.  Can we go to Page 3?  This was a presentation that was made to you on February 10th, 2016?

A.   Yes.

Q.   "Term Debt Issuance Update," correct?

A.   Yes.

Q.   And on the next page, Page 4, it says "Dialogue With Lead Arrangers," correct?

A.   Yes.

Q.   And what -- what are "lead arrangers"?

A.   Those are the banks that are going to manage the bond

offering.

Q.   Okay.  And if we go to the second bullet point and then there's two of those arrows and then we go to a minus and it says "EM," that -- that column, could we highlight that, particularly where it says "CVX"?  That's Chevron, correct?

A.   Yes.

Q.   And Chevron had already been downgraded as we saw earlier, correct?

A.   Yes.

Q.   And it says "Chevron versus EM."  "EM" is ExxonMobil?

A.   Yes.

Q.   And it says, "CVX, or Chevron, versus EM, or ExxonMobil, from 15 plus basis points to plus 40 to 45 basis points."  This is communicating that subsequent to the downgrade that Chevron experienced, Exxon's comparative spread for the interest rate it would pay compared to Chevron had improved, correct?

A.   Had improved?

Q.   Well, Chevron is now -- You were paying -- In the past Chevron was paying 15 basis points more than Exxon and now it's paying 40 to 45 basis points higher.  So Exxon's relative position to Chevron has improved.  That's what's being communicated here.

A.   Chevron's position relative to ExxonMobil has declined.

Q.   So Chevron's gotten worse relative to ExxonMobil.

A.   They dropped another notch, yes.

Case 3:16-cv-03111-K    Document 376    Filed 05/07/26    Page 88 of 831    PageID 20281

Q. Yeah, because they had been downgraded, correct?

A. They were.

Q. And Exxon had not been downgraded at this time, correct?

A. No, but we were all on a negative watch at this time.

Q. But you had not lost that coveted AAA rating, correct?

A. I had not lost it, no.

Q. Okay. Could you turn to Page 5? And can you explain to the jury -- you're probably better at this than I am -- what's a "spread"?

A. A "spread" is the difference between two opportunity costs. If somebody's borrowing at, say, 10 percent and another person is borrowing at 12 percent, the spread is two percentage points or 200 basis points.

Q. And you would like the spread to be as low or as tight as possible because then you pay less interest.

A. Well, the spread is always relative to something else. So it's a relative question.

Q. Right. So -- So the spread, say, compared to treasury bills, Exxon had a positive spread to that, right?

A. Yes.

Q. Okay. But then when it was compared to its competitors like Chevron, Royal Dutch Shell and Total, those competitors had a positive spread to Exxon, correct?

A. That is correct.

Q. They had to pay more interest, correct?

A. They would.

Q. And they each had taken write-downs and were downgraded, correct?

A. Correct.

Q. And Exxon had not taken any write-downs and had not been downgraded, correct?

A. No. You're sort of mischaracterizing some kind of linkage between downgrading and -- and impairments. I can't agree with that.

Q. Okay. But we have observed in that February 2nd e-mail that each of the other three majors we talked about had suffered downgrades, right?

A. We had observed that, yes.

Q. And we also observed that they had each taken write-downs, correct?

A. Yes, but I see no causal linkage.

Q. I'm not asking for a causal linkage. I'm just asking you: They both had write-downs and downgrades.

A. They did.

Q. All the competitors.

A. They did.

Q. And in contrast, Exxon had no write-downs and no downgrades.

A. That is correct.

Q. Okay. And this document is communicating that as a result of that fact, Exxon has a comparative advantage. It used to have

a -- Exxon (sic) used to have to pay a 15-point premium compared to Exxon and now it's paying a 45-point premium as compared to Exxon on the spread. And I'm looking at the bottom, comparing July '15 to February '15.

A. Blow it up so I can see the heading.

Q. This document is communicating to you that the spread for the competitors compared to Exxon has gotten worse between February, 2015 and July, 2015.

A. Let's go back to the full page.

Q. Sure. Take as much time as you need, sir.

A. Thank you. Yes.

Q. This one's a complex one. I would not deny that.

(Pause)

THE COURT: And those aren't all oil producing companies, correct?

THE WITNESS: That's correct.

THE COURT: I see Microsoft and J & J in there.

THE WITNESS: Yes.

A. What I take from this is that the projected borrowing costs for a ten-year is going to be lower for ExxonMobil than competitor oil companies but higher than the two AAAs, Johnson & Johnson and Microsoft. The market is already anticipating a downgrade for ExxonMobil. You can see that in the spread between Johnson & Johnson and Microsoft with the other two AAAs.

Q (By Mr. Saham) That's not my question, though. My question

is: Between February of 2015 and July of 2015, Chevron's relative borrowing costs to Exxon has gotten worse, correct?

A. Slightly worse, yes.

Q. Okay. And the same for Shell. Shell's relative borrowing cost to Exxon has gotten worse. They used to have a 20-point spread to Exxon?

A. Yes. I see that.

Q. Now it has an 80-point.

A. I see that.

Q. So it's gotten 60 points worse.

A. Yes.

Q. And that's more than half a percentage point in interest, correct?

A. That's correct, yes.

Q. And then for Total, they used to have a 30-point disadvantage to Exxon and now they have a 70-point disadvantage to Exxon, correct?

A. That's correct.

Q. And that's a plus 40; almost half a percentage point in interest.

A. That's correct.

Q. And this was communicated to you on February 9th, 2016; correct?

A. Yes, it is. Yes, it was.

Q. And that is 15 days before the 10-K and 20 days before the

**App. 81**

bond offering, correct?

A.   Yes.

Q.   I want to show you what is being marked as Plaintiff's Exhibit 22.

MR. THOMAS:  No objection, Your Honor.

THE COURT:  Then that's admitted into evidence.

Q.   (By Mr. Saham) Okay.  And Exhibit 22 is the January Financial and Operating Review Report, correct?

If you go to Page -- And you received this on or about February 18, 2016; correct?

And if you go to -- Page 3 is the cover page of the report, if you need to see it.

A.   Okay.  Let's do that.

Q.   Let's go to Page 3, please.  This is the report you had received in -- in February for the January highlights.

A.   Let's go back.  This is the production company.  I would have only seen the Upstream.

Q.   So you're not sure if you saw this one.

A.   I would not in the normal course of business see this, no.

Q.   Okay.  I would like to go -- Since it's admitted, anyway, and it's got the same information, I would like to go to Slide 20.  And Slide 20 has the exact same "Special Topics", "Kearl Metrics", that you saw for the Upstream, correct, as we saw in the other reports?

A.   Same format, yes.

Q.   Okay.  And it's identical to the extent the December information is exactly the same as we saw it.  11.52 was the realization?

A.   Yes.

Q.   Negative 60 cash, million?

A.   Yes.

Q.   And negative 51 earnings, correct?

A.   That's correct.

Q.   So you would have been apprised of this information one way or the other if it was in one of those two reports.

A.   Yes.

Q.   Okay.  And then for January, the prices have gone down even further.  It's gone down to $4 a barrel, correct?

A.   That is correct, yes.

Q.   And we remember when you were telling Mr. Tillerson that Kearl was losing $8.11 a barrel or $9 a barrel for the first half the year, the prices went as high as $42 a barrel, right?

A.   They were, yes.

Q.   And now they're 4?  How much were you losing at 4?

A.   You can see it there on the chart.

Q.   Well, let's see.  So 120 million cash and 82 million, that's just for the month of January?

A.   Just for the month of January but that includes the development company investments, yes.

Q.   And you got this information about six days before the 10-K

was filed?

A.   Yes.

Q.   Okay.  And then if we look on the right side at XTO again, for January, XTO lost 225 million dollars, correct?

A.   Yes.

Q.   And for fourth quarter, it had lost 417 million, correct?

A.   That is correct, yes.  Very difficult time.

Q.   Okay.  I want to show you what we're marking as Plaintiff's Exhibit 217.

MR. THOMAS:  No objection, Your Honor.

THE COURT:  That's admitted into evidence.

Q    (By Mr. Saham) Now this document is dated February 2nd, 2016, and it's the Chairman's Briefing, correct?

A.   Yes.

Q.   And this occurred in Room 5 in the Irving headquarters, correct?

A.   That is correct.

Q.   And it occurred between 2:00 and 5:00 PM, correct?

A.   Yes, sir.

Q.   And if we look down at the bottom of this page, both yourself and Mr. Tillerson were attendees at this meeting, correct?

A.   That is correct.

Q.   And if we go to the second page of this document, it's the heading "Upstream Chairman's Briefing, Exploration Update,"

correct?

A.   Exploration, yes.

Q.   And, again, it reiterates the date of February 22nd, 2016, correct?

A.   It does.

Q.   And that's two days before the 10-K is filed, correct?

A.   That is correct, yes.

Q.   And seven days before the bond offering, correct?

A.   Correct.

Q.   And if we turn to Page 29 of Exhibit 217, this shows that the Kearl bitumen netback that we were just looking at in the other document is $4 a barrel, correct?

A.   That is correct, yes.

Q.   And I think at your deposition I asked you:  Would the company be making money when Kearl was at $4 a barrel, and I think you told me it wouldn't, correct?

A.   It would not.

Q.   It would not be making money, correct?

A.   Correct.

Q.   And this was discussed as part of the Chairman's Briefing two days before the issuance of the 10-K, right?

A.   Yes, that's right.

Q.   Okay.  I want to show you what's been pre-admitted as Exhibit 541.  And if we go to Page 2, this is the "2015 Reserves Workshop," correct?

Case 3:16-cv-03111-K   Document 376   Filed 05/07/26   Page 90 of 831   PageID 20283

A.  Yes.  The date was again?  What was the date?

Q.  Oh, it says on the first page of the document if we go back.  Let me see.  I got to look at it.  10-20-2015.  So six days before that meeting you had with Mr. Tillerson and Mr. Rosenthal in Room 8.

And if we look at Page 2, this is the 2015 Reserves Workshop.  And Strawbridge, is the reserves guy, right?  Bill Strawbridge?

A.  Yes, he is.

Q.  Okay.  And if we turn to Page 9 of this document, it's the -- in big print up there it says "Importance of Reserves," correct?

A.  Yes, it does.

Q.  And you'd agree that reserves are important to an oil and gas company.

A.  They are.

Q.  They're the future.

A.  They are.

Q.  And if you don't have reserves -- Say if you had zero reserves the next year, you'd have nothing to sell, correct?

A.  That's true.

Q.  And the SEC, as recognized by Mr. Strawbridge, the Securities and Exchange Commission requires all companies publicly traded in the United States to annually disclose proved reserves in the 10-K or 20-F if it's a foreign company; correct?

A.  Of course.

Q.  Okay.  And this is, in part, because proved reserves replacement is a key measure of sustainability for a company, correct?

A.  Yes.

Q.  It's important information, correct?

A.  Yes.

Q.  Okay.  I want to mark for identification another 1006 which is Plaintiff's Exhibit 563.

MR. THOMAS:  No objection, Your Honor.

THE COURT:  That's admitted into evidence.

MR. SAHAM:  Can we, please, put it up there?

Q   (By Mr. Saham) So according to Exhibit 563, Kearl is the company's largest single reserve in 2015 with 3 -- 3.6 billion barrels, correct?

A.  Correct.

Q.  And then No. 2 is all of XTO - United States combined is at 2.1 billion barrels, correct?

A.  Yes, that's correct.

Q.  And if we look at No. 25, All Bonga, that's only 52 million barrels, right?

A.  Yes.

Q.  So Kearl is the biggest one.

A.  Yes.

Q.  By some measure, correct?

A.  Correct.

Q.  Okay.  And if we look at the second page of Exhibit 563, this correctly notes that Kearl is 24 percent of the company's total liquid reserves, correct?

A.  Of the liquid reserves, yes.

Q.  Okay.  And it also accurately denotes that Kearl is 88 percent of the proved developed bitumen reserves, correct?

A.  Of the bitumen reserves, yes.

Q.  And then if we go to the next page, that denotes that Kearl is approximately 15 percent of the total proved reverses of the company, correct?

A.  Approximately 15 percent.

Q.  And I think we agreed it's 14.57 percent, correct?

A.  Yes.

Q.  And if you were going to round one way or another, it's closer to 15.

A.  I might round to 14.6.

Q.  You could.  But if you're going to use a whole number for simplicity, you'd go to 15.

A.  Unless the regulations didn't require me to use a whole number.  I mean I might.

Q.  Okay.

MR. SAHAM:  And then can we go to the next page or the prior page?  I think we're okay.  I just had two of the same ones.  But we -- we went through it.  It's 24 percent -- Can we

go to the next page?

A.  We've done this.

Q   (By Mr. Saham) Okay.  We've -- We've repeated the same document.

Okay.  Now as the Principal Financial Officer ---

MR. SAHAM:  We can take this down.

Q   (By Mr. Saham) As the Principal Financial Officer, one of your jobs was to certify the accuracy of the company's financial statements, correct?

A.  That is correct.

Q.  And you were required to do that by the Securities and Exchange Commission, correct?

A.  Absolutely.

Q.  And they also -- The Securities and Exchange Commission required certain things to be in SEC filings, correct?

A.  Many things to be in SEC filings, yes.

Q.  And I want to go back and take a look at Exhibit 66 which is the 10-K, and this has been pre-admitted.

You would agree with me that there's no disclosure specifically in this Exhibit 66 of those losses we've seen from XTO, correct?

A.  Specifically to XTO, no.

Q.  Okay.  And there's no disclosure in here, and I know you would disagree with me, on whether it's required to be in there.  But my question is simpler than that.  There's no disclosure that

**App. 83**

there was an impairment trigger for any XTOS in this document?

A.   That's correct.

Q.   Okay.  And there's no -- Since there's no disclosure of an impairment trigger, there's also no disclosure of a write-down.  And I know you would disagree with me whether there should have been one, but this document doesn't communicate a write-down, correct, for XTO or MGD?

A.   There is write-down on this document.

Q.   Okay.  And there's no disclosure specifically of those losses we saw from Kearl in this document, correct?

A.   There are no field-wide disclosures of anything.

Q.   Right.  But Kearl's the biggest one, right?

A.   It is a big one, yes.

Q.   Biggest one.  We saw it was the biggest one.

A.   Well, it depends on how you measure it.  By reserves, yes.  Certainly not by production which is very important.

Q.   But by reserves, it was the biggest one.

A.   By reserves, it's the biggest one.

Q.   Okay.  And there was no disclosure of those losses, correct?

A.   No.

Q.   And there was no disclosure that U.S. sales were excluded from the SEC proved reserve analysis.  That's not ---

A.   That's not disclosed, no.

Q.   Not disclosed.  And there's no disclosure in here of the impact of that exclusion.  That if you didn't exclude the U.S.

---

sales, you wouldn't have been able to count them as proved reserves.  That's not disclosed.

A.   There's no discussion of that whole issue of doing the methodology for the SEC reserves, no.

Q.   And there's no disclosure that the actual costs of 24.27 or $4 and -- or 24.28 or four dollars and fifty some cents less than what you used for the SEC calculation?

A.   No, that's not disclosed.

Q.   And, again, if we go to Page 7, those Kearl reserves were included in the bitumen column as proved reserves.  3.6 billion of the 4.1 billion reported, correct?

A.   Correct.

Q.   And that's a representation that those Kearl bitumen reserves are economically producible under current conditions, correct?

A.   Yes.

Q.   And similarly, 20 percent of the 17.9 billion barrels of proved developed reserves, 20 percent of those came from Kearl, correct?

A.   That's correct, yes.

Q.   And, again, that's a representation that at least those barrels are economically producible under current economic conditions, correct?

A.   Under the current economic conditions in 2015, yes.

Q.   And then, again, with total proved reserves, we've got the

---

14.57 percent of the total of 24.9.  That also came from Kearl, correct?

A.   I'm sorry?  The question?

Q.   Oh.  The 24.7 which is the total number of proved reserves reported, 3.6 billion of those came from Kearl.

A.   Yes.

Q.   14.57 percent of that number.

A.   Yes.

Q.   Could you, please, turn to Page 11 of Exhibit 66?  Up at the top there's a column for Canada/South America, correct?

A.   Yes.

Q.   And for Canada/South America, average production price is communicated for bitumen in Canada/South America of 25.07, correct?

A.   That's correct?

Q.   And average production costs per barrel were communicated as $19.20, correct?

A.   I think we'll get there.  Yes.

Q.   And there's no disclosure here or anywhere else in this document that the annual production costs for Kearl were $27.90, correct?

A.   This is a disclosure of production prices and production crossed by geographic area and hydrocarbon type.  That's all -- That's what the SEC is looking for here.

Q.   But there's no disclosure that 88 percent of these Canadian

---

bitumen reserves have a production cost of 27.90, $8.70 more than the $19.20 disclosed, correct?

A.   No, there's not, no.

THE COURT:  Mr. Saham, let me see y'all just for a second to the side.

MR. SAHAM:  Certainly, Your Honor.

(The Court met with counsel at sidebar off the record.)

THE COURT:  Ladies and Gentlemen, we're going to break.  Let me tell you why:  There's a big ole honker storm coming and y'all need to get home and put your car in the garage.  Don't -- Don't go out but get home as quickly as you can.  Don't talk about the case.  I'm not trying to scare you.  I'm just telling you:  Before it hits, let's get y'all out of here and get going, and we'll see you in the morning at 9:00.  And somebody will bring donuts.

COURT SECURITY OFFICER:  All rise.

THE COURT:  Thank you, all.  Y'all be careful.

(Court adjourned at 4:15 PM.)

<u>CERTIFICATE OF OFFICIAL REPORTER</u>


    I, Deborah A. Kriegshauser, Federal Official Realtime Court Reporter, in and for the United States District Court for the Northern District of Texas, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically-recorded proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

    Dated this 28th day of April, 2026.


        /s/ Deborah A. Kriegshauser
        _____
        DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
        FEDERAL OFFICIAL COURT REPORTER

# Exhibit 4

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

PEDRO RAMIREZ, JR., Individually )
and on Behalf of All Others )
Similarly Situated, and GREATER )
PENNSYLVANIA CARPENTERS PENSION )
FUND, )
)
Plaintiffs, )
)
)
vs. )  No.  3:16-CV-03111-K
)
EXXON MOBILE CORPORATION, )  CLASS ACTION
REX W. TILLERSON, ANDREW P. SWIGER, )
JEFFREY J. WOODBURY, DAVID S. )
ROSENTHAL, )
)
Defendants. )
_____)

VOLUME 2A
BEFORE THE HONORABLE ED KINKEADE
UNITED STATES DISTRICT JUDGE
APRIL 29, 2026
DALLAS, TEXAS

FOR THE PLAINTIFFS:

JOE KENDALL
KENDALL LAW GROUP
3811 Turtle Creek Boulevard, Suite 825 Suite 880
Dallas, TX  75229
(214) 744-3300

SCOTT H. SAHAM
NATHAN R. LINDELL
SAM SHELDON
ERIKA OLIVER
T. ALEX B. FOLKERTH
SARA BIERL POLYCHRON
SPENCER A. BURKHOLZ
ROBBINS GELLER RUDMAN & DOWD, LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
(619) 231-1058

BALON B. BRADLEY
BALON B. BRADLEY LAW FIRM
11910 Greenville Avenue, Suite 220
Dallas, TX  75243
(972) 991-1582

MICHAEL SWIDERSKI
(Party Representative)

FOR THE DEFENDANTS:

THOMAS M. MELSHEIMER
AUSTIN E. SAATHOFF
EMILY WILKINSON
DAVID T. HINOJOSA
KING & SPALDING, LLP
2601 Olive Street, Suite 2300
Dallas, TX  75201
(214) 764-4446

NINA CORTELL
JASON JORDAN
HAYNES and BOONE, LLP
2801 N. Harwood Street, Suite 2300
Dallas, TX  75201
(214) 651-5000

AUDRA J. SOLOWAY
DANIEL TOAL
THEODORE V. WELLS
LYUBA SHAMAILOVA
AMITAV CHAKRABORTY
DAPHNE THOMPSON
PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

SCOTT C. THOMAS
LATHAM & WATKINS
100 Crescent Court, Suite 7084
Dallas TX  75201
(713) 546-5400

D. PATRICK LONG
SQUIRE PATTON BOGGS
2200 Ross Avenue, Suite 4100w
Dallas TX  75201
(214)758-1500

(Rex Tillerson)

PATRICE CHILDRESS
(Party Representative)

Proceedings reported by mechanical stenography,
transcript produced by computer-aided transcription.

--------------------------------------------------------

PAMELA J. WILSON, RMR, CRR
Federal Official Court Reporter
1100 Commerce Street, 13th Floor
Dallas, Texas 75242
pam_wilson@txnd.uscourts.gov
(214) 662-1557

VOLUME 2A - APRIL 29, 2026

**P R O C E E D I N G S**

THE SECURITY OFFICER:  All rise and come to order.

(Outside the presence of the jury.)

THE COURT:  Okay.  Y'all be seated.

Thank you.

All right.  All right.  Everybody ready?

MR. SAHAM:  Yes, Your Honor.

THE COURT:  Anybody hurt by the storm or anything?  I kind of -- good.  Unless you were in Mineral Wells it wasn't too bad.  So I don't think any of you are staying that far over, are you?

Good.  Okay.  Well, that's great.

MS. CORTELL.  Your Honor, if I could just very quickly say thank you for the holiday observance.

THE COURT:  Well, that was Mr. Wells telling me yesterday and the little lady where I eat breakfast in the morning, if y'all ever want to catch me in the morning it's at Momma's Daughters, and she said I've got these muffins.  And I said okay.  So now I owe y'all at least two --

MS. CORTELL.  They have a birthday tomorrow.

THE COURT:  Whose is tomorrow?

MR. BURKHOLZ:  Mine, Your Honor.

THE COURT:  Well, let me know, do you like banana nut or blueberry?

MR. BURKHOLZ:  I'm a blueberry guy.

THE COURT:  Me too.  I'm glad to know that, that's good.

All right.  You'll have one tomorrow and a little candle.  We won't have enough candles to cover the whole thing.

MR. BURKHOLZ:  That's for sure, Your Honor.

THE COURT:  All right.  Good.

MS. CORTELL.  The only other thing, Your Honor, we did receive the other side's filing on Flowserve.  We have about two or three quick points to make.  If you want me to make those later --

THE COURT:  No, you can make them right now.

MS. CORTELL:  Okay.  I have just a few points.

One, there is no dispute on the general proposition that only claims that were certified for classwide treatment by this court can proceed to trial on a classwide basis.  There's no real dispute on that.

They then pivot and say, well, you already certified this, precisely the same claim.  That is incorrect.

If the court -- I know the court is aware of this.  The impairment claim for Rocky Mountain dry gas was irrevocably tied to the October 28th, 2016 disclosure, which is the one you kept in.

THE COURT:  Yes.

MS. CORTELL.  Here is the third and maybe the most important point, and that is that what we're talking about is reliance, not loss causation.  You got to separate those two.

THE COURT:  Okay.

MS. CORTELL.  What this court determined at class certification was that they only met that reliance burden as to the October 2016 disclosure, not the January 2017 disclosure.  So it's not a question of getting to trial and revisiting loss causation.  It's a reliance problem.  So they're left only with an individual claim as to the impairment claim going -- that they're now articulating.

THE COURT:  It's what?  I'm sorry, I didn't hear the last sentence.

MS. CORTELL.  I probably wasn't very clear.

Let me make one other point.

As to -- as to the claim that was certified, where you found reliance, it's tied to the October 28th '16 date, right?

And the problem that they have now is that their expert ascribes no damages to that date.  Its damage theory instead is now tethered to the disclosure date that the court threw out at certification.  So they really don't have any Rocky Mountain claim at this point.  That's why we've asked for dismissal.

But at a minimum they can't go forward on a classwide

basis on their impairment claim on Rocky Mountain.

THE COURT:  Okay.  Thank you.  You want to respond?

MR. SAHAM:  I would just say not so, Your Honor.  I think Flowserve is on all fours.  Loss causation is the element to be determined here.  Price impact was what Mr. Ferrell had disputed at class certification.  Your Honor ruled on this with at least ten pages of briefing from each side at summary judgment and Your Honor ruled correctly.

THE COURT:  I think -- excuse me.  I think they can.

As much as I hate to rule against you, Ms. Cortell, I'm not agreeing with you on this.  And if you get me reversed at the Fifth Circuit all I ask is don't stop me and say I told you so.

MS. CORTELL.  I would never do that, Your Honor.  You know that.

THE COURT:  You should.  You should.

Okay.  All right.  So that's where we are.

And if I'm not clear enough on any of the rulings that you think I need to be clear so that you've got it clear, I will -- I'm more than happy to make sure that you got it teed up however you need it teed up.

MS. CORTELL.  Thank you.  I guess what I would say in that regard is that we are -- on the bases that we presented to the court we object to any evidence and argument

with regard to the impairment claim on the that basis we presented to the court.

THE COURT:  Right.  And I'm denying that and overruling that.  Okay.

MS. CORTELL.  Thank you, Your Honor.

THE COURT:  I think we're ready.

Mr. Swiger, is he here?

MR. SAHAM:  Yes.

THE COURT:  There you are.  Come back up to this comfortable chair, Mr. Swiger.

Do they have better chairs at Exxon?

THE WITNESS:  There are some better, some not as good.

THE COURT:  Oh, well.  That was a great answer.  I can tell you've been worked over by lawyers.

You stand up until they come in there, okay?

And then we'll have that done.

There we go.

Bring them in.

(Jury enters the courtroom.)

THE SECURITY OFFICER:  United States District Court in and for the Northern District of Texas at Dallas is now in session, the Honorable United States District Judge Ed Kinkeade presiding.

Let us pray.

PAMELA J.  WILSON,  CSR/RMR/CRR

**App. 87**

God bless these United States and this Honorable Court. Please be seated.

THE COURT:  Thank y'all.  Well, I hope nobody's house got hit or you didn't get home.  I've seen you here today, I'm guessing everything worked out.

But thank y'all for being here and we're ready to go on.

We were -- cross-examination of the first witness was going on.

Mr. Swiger is back and Mr. Saham is back, so we'll continue with that.

Go ahead.

DIRECT EXAMINATION (Cont.)

BY MR. SAHAM:

Q.   Mr. Swiger, I'd like to show you what's been preadmitted as Plaintiff's Exhibit 510.  And if you could turn with me to page 182 of 510.  Is that your signature at the bottom there?

A.   Yes, sir.

Q.   And could you read for the jury what you swore to in number 2 and what you signed off on?

A.   "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which statements were made, not misleading with respect to the period covered by this report."

Q.   And you signed -- you signed that certification for the February 24th, 2016 10-K, correct?

A.   I certainly did.

Q.   Okay.  I'd like to show you now what's been preadmitted as Defendant's Exhibit 525.  And -- and I'd ask you, what's the -- what's RBC stand for?

A.   It's Royal Bank of Canada.

Q.   And what's an analyst report?

A.   An analyst report is made by an employee of RBC in this case, well, he -- he writes reports, sells them to investors for a living.

Q.   And before you became controller were you in charge of Exxon's investor relations?

A.   Sir, I was never the controller.

Q.   I'm sorry.  I'm sorry.  Before you -- my bad.

Was -- was Mr. Rosenthal, before he became the controller, was he in charge of investor relations?

A.   He was.

Q.   Okay.  I just wanted to make sure.  Sorry about that.

And what's the date of this analyst report?

A.   February 24, 2016.

Q.   And that's the same day as the 10-K we were just looking at, we were looking at yesterday?

A.   Yes, sir.

Q.   Okay.  And in bullet point 2 the analyst report from Royal Bank of Canada -- and before I show you or concentrate on point 2, Royal Bank of Canada was the analyst or bank geographically that was closest to Kearl, as compared to the ones that were related in the United States, would that be fair?

A.   That would be fair, yes.

Q.   Okay.  And in bullet point 2 the analyst notes on February 24th, 2016, following the issuance of the 10-K, "Most notably, average bitumen production costs declined by 41 percent to $19.20 per barrel, likely demonstrating the efficiency of Kearl."

Did I read that correctly?

A.   You did.

Q.   And that 19.20, we saw -- we observed that on what's referred to as page 9 of the 10-K we looked at yesterday?

A.   We did.

Q.   Okay.  And noted here is the average production cost that was noted in the 10-K of 19.20 and the analyst says, "Likely demonstrating the efficiency of Kearl."

Correct?

A.   Yes, sir.  Good thing.

Q.   Okay.  I would like to show you now what has been preadmitted --

MR. SAHAM:  Am I correct I should say preadmitted? This is the Bank of America document.

MR. THOMAS:  Yes, sir.

MR. SAHAM:

Q.   Okay.  What's been preadmitted and -- and it's marked two ways as Bank of America 665 -- I'm sorry, Plaintiff's Exhibit 665 and Plaintiff's Exhibit 522, but I'd like to show you 522.

MR. SAHAM:  And I believe both have been preadmitted, Your Honor.

THE COURT:  Okay.

BY MR. SAHAM:

Q.   Specifically, if we turn to page 2 of this document --

A.   This is -- okay.

Q.   It's ExxonMobile -- it's a Bank of America document.  It was emailed to ExxonMobile, but it's a Exxon -- a Bank of America document.  And -- and the deck is entitled "ExxonMobile 12 billion Bond Offering, Largest Energy Sector Bond Offering in History, February 29th, 2016."

Did I read that correctly?

A.   You did.

Q.   And this is the 12 billion bond offering we were discussing yesterday?

A.   Yes, sir.

Q.   And it closed on February 29th, 2016, correct?

A.   That's correct.

Q.   And not only was it the largest bond offering Exxon had

**App. 88**

ever done, it was the largest energy sector bond offering in history, correct?

A.   Yes, sir.

Q.   And if we turn to page 4, that's labeled bond offering case study, correct?

A.   Yes, sir.

Q.   And it says again February 29th, 2016.

It notes there's a $12 billion ExxonMobile bond offering, correct?

A.   Yes, sir.

Q.   And then in the second bullet point, the second sentence states, "Exxon also benefited from its AAA credit profile. While most of its peers suffered downgrades by Moody's and S&P.  Exxon's AAA ratings were affirmed making Exxon the only integrated credit to not suffer a downgrade."

Did I read that correctly?

A.   You did read that correctly.

Q.   So Bank of America said Exxon benefited from its AAA creating, correct?

A.   They did.

Q.   And it also noted that Exxon was the only integrated -- well, I want to make sure I read this correctly.  I'm sorry, I lost my place.

They noted that, "While most of its peers suffered downgrades by Moody's and S&P, Exxon's AAA ratings were affirmed, making XOM the only integrated credit to not suffer a downgrade."  Correct?

A.   That's correct.

THE COURT:  What does "integrated credit" mean?

Do you see that "integrated credit"?

What does that mean to somebody like -- I'm not a -- I'm not a numbers guy.

THE WITNESS:  May I?

THE COURT:  Yeah.  I'm asking you.

THE WITNESS:  Sure.  Integrated refers to the nature of the industry.  Oil companies like ExxonMobile are described as integrated because they have upstream, downstream chemicals.  There are many independents that are just upstream.  There are independent refiners.  There are independent chemical companies.  ExxonMobile and its competitor peers are mostly integrated oil companies.

THE COURT:  Well, when you have that term "integrated credit," that wouldn't include the other AAA, which if I remember that other document was Microsoft and Johnson & Johnson.

THE WITNESS:  No, sir, there would not be integrated oil companies, no.

THE COURT:  The only reason I ask is because it doesn't say oil companies, but that's what that means there, integrated?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.  Thanks.

MR. SAHAM:  Thank you, Your Honor.

BY MR. SAHAM:

Q.   I would like to show you now, Mr. Swiger, what has been marked as Plaintiff's Exhibit 595.

MR. TOAL:  This exhibit was offered yesterday.  We objected to it on hearsay grounds.  I renew that objection.

MR. SAHAM:  I thought we reached agreement on --

MR. THOMAS:  I guess it depends on what purpose. I'm not sure exactly what purpose he's going to use it for.

MR. SAHAM:  Well, I think we stipulated to a limiting instruction for all newspaper articles and analyst reports.

THE COURT:  So are you offering it for all purposes or limited purposes?

MR. SAHAM:  Limited purposes, Your Honor.

THE COURT:  Which are?

MR. SAHAM:  Not for the truth of the matter asserted.

THE COURT:  Okay.  All right.  And you want to continue to object?

MR. THOMAS:  There has to be a purpose that's not for the truth of the matter.  Like what's the purpose that's not for the truth of the matter asserted?

THE COURT:  I don't know.

MR. THOMAS:  That's why I'm asking him.

MR. SAHAM:  I think I responded notice to readers.

THE COURT:  It's what?

MR. SAHAM:  Notice to readers of the newspaper article.

MR. THOMAS:  Mr. Swiger would need to know that he has seen this and had notice from this article, not -- it goes to the --

THE COURT:  Well, we'll find out if he does or doesn't?

MR. THOMAS:  Yes, sir.

MR. SAHAM:  That's perfectly fine, but no agreement.

THE COURT:  Y'all don't or do?

MR. SAHAM:  We do not have an agreement, Your Honor.  I misunderstood the other side.  So there's no limiting instruction for newspaper articles.  I was told by one's counsel we had it and now I'm being told by another counsel we don't.

THE COURT:  Okay.  So you're offering it for all purposes?

MR. SAHAM:  Well, I'm not going to offer it at all because it's hearsay unless we have such an agreement.

THE COURT:  Well, that doesn't mean I'm not going

PAMELA  J.   WILSON,  CSR/RMR/CRR

**App. 89**

to admit it.

MR. SAHAM:  I'll offer it for all purposes then, Your Honor.

THE COURT:  No.  I'm not going to let you do that.

MR. SAHAM:  Okay.  Well, I'll offer it for the effect on readers.

THE COURT:  Okay.  I'm going to admit it for that limited purpose only, that it was notice to the readers.  Okay.  And you object that it's hearsay.

MR. THOMAS:  Yes, Your Honor.

THE COURT:  Okay.

MR. SAHAM:  Thank you, Your Honor.

I would like to show Mr. Swiger what's been marked --

THE COURT:  And I overrule your objection.  I'm sorry I didn't put that in the record.

MR. THOMAS:  Understood.

MR. SAHAM:  I'd like to show Mr. Swiger what's been marked now and admitted as Plaintiff's Exhibit 595.

BY MR. SAHAM:

Q.   And the headline of this article is "France's Total Plans to Cut Jobs, Sell Assets After Big Loss."

And the date is February 12th, 2015, correct?

A.   Sure.

Q.   And if we go down to the second paragraph of the article --

A.   Can you tell me what the publication is, where is it from?

MR. SAHAM:  I believe it says at the top the -- it's an article by -- let me put my glasses on.  It shows at the top by Inti Landauro in Paris and Selina Williams in London --

THE COURT:  Wall Street Journal.  There it is.

MR. SAHAM:  The judge is smarter than me, that's why he's the judge.

THE COURT:  I read.

BY MR. SAHAM:

Q.   And If we go down to the second paragraph, Mr. Swiger, the second sentence says, "Total wrote off $6.5 billion of the value of its less profitability shale and oil-sands ventures, as well as its unprofitable European refineries."

Did I read that correctly?

A.   You did.

Q.   You told me yesterday you were aware during 2016 Total had taken multibillion dollar write-offs in the tar sands, right?

A.   Yes, sir.

Q.   And this article a --

A.   I was not aware of the article but I was aware they wrote off tar sands, yes.

Q.   Thank you very much.

I would like to show you now what's being marked as Plaintiff's Exhibit 596.

THE COURT:  Is it another article?

MR. THOMAS:  Same limiting instruction, we would be fine with it being used for that purpose, Your Honor.

THE COURT:  Okay.  Then it's admitted for that limited purpose, not for the truth.

All right.  Go ahead.

BY MR. SAHAM:

Q.   And this article is another Wall Street Journal article.  And the title is "Royal Dutch Shell to Abandon Carmon Creek Oil-Sands Project."

And it's dated October 27, 2015.  Is that correct?

A.   Yes, sir.

Q.   And then in the first paragraph with the line "Calgary Alberta -- Alberta."  It states, "Royal Dutch Shell PLC said Tuesday it would abandon the construction of a major oil-sands project in Western Canada and take a $2 billion write-down, a stark reflection of the challenging economics for unconventional oil projects amid a sharp slump in crude prices."

Did I read that correctly?

A.   You did.  It's also true that whenever anybody abandons a project you must impair it.

Q.   Okay.  But when you abandon it that means you're just leaving it completely, you're not even fussing with it?

A.   Yes.

Q.   And you were aware that Royal Dutch Shell had abandoned their oil-sands project at some point in 2015?

A.   Yes, sir.  Also important to note both companies we've talked about, Total and Royal Dutch Shell, are European, different accounting rules.

Q.   But they were working in the same place, up in Western Canada?

A.   They were indeed.

Q.   And they were trying to get tar sands out --

A.   They were indeed.

Q.   All right.  I'd like to show you what's been preadmitted as Exhibit 125.  And this is a Form 8-K filed by Exxon on October 28th, 2016.  What's a Form 8-K?

A.   It's a disclosure.

Q.   Okay.  And that's when -- when the company -- in between annual and quarterly reports wants to disclose something --

A.   Formally.

Q.   They disclose it in an 8-K?

A.   Yes, sir.

Q.   And that's filed with the SEC and made public?

A.   Yes, sir.

Q.   Okay.  And if we turn to page 9 of this 8-K from October 28th, 2016 and, again, October 28th, 2016, that's

approximately eight months after the bond offering, correct?

A.   Yes.

Q.   And the company disclosed eight months after the bond offering, "Quantities that could be required to be debooked as proved reserves on an SEC basis amount to approximately 3.6 billion barrels of bitumen at Kearl."

The company disclosed a debooking or potential debooking for Kearl on October 28th, 2016, correct?

A.   Yes.

Q.   And that was over a year after Royal Dutch Shell's disclosure, correct?

A.   Royal Dutch Shell's action, yes.

Q.   And over 18 months after Total made a similar disclosure, correct?

A.   Yes.

Q.   And over eight months after the bond offering, correct?

A.   The bond offering, yes, and the 10-K, which had disclosures in it as well.

Q.   But not that disclosure?

A.   Not that specific disclosure.

Q.   Okay.  I want to show you what we're marking as Plaintiff's Exhibit 598.

MR. THOMAS:  Your Honor, it's another article. Same limiting instruction would be fine with us.

THE COURT:  Okay.  It's another article that's admitted for the limited purpose of the same thing, notice.

Is that right, Mr. Saham's?

MR. SAHAM:  Correct, Your Honor.

THE COURT:  All right.  So it's admitted for that purpose.

MR. SAHAM:  Could we please publish it there?

BY MR. SAHAM:

Q.   Okay.  This is another Wall Street Journal article, Mr. Swiger.

By the way, did you read the Wall Street Journal regularly in 2015 and '16?

A.   I did, sir.

Q.   And this article is from December 14th, 2009 and it's titled "King Rex Tillerson's Legacy Rides on XTO Deal."

Correct?

A.   Yes, sir.

Q.   And then it notes that XTO was purchased or was about to be purchased for $31 billion, correct?

A.   That's correct.

Q.   It's described as a mega-size deal, the largest since -- for Exxon at least since the merger with Mobile, correct?

A.   Yes, sir.

Q.   And it goes on to say "The XTO deal could come to define Exxon's Chief Executive Rex Tillerson's legacy," correct?

A.   It says that, yes.

Q.   Okay.  And it does down if we drop down two more paragraphs, starting with four, it says "For Tillerson, the XTO purchase is a bet that natural gas is the fuel of the future, one that is not just used for cooking, but to run utility plants and other high volume energy consumers. Tillerson is also wagering that natural gas will benefit from its status as a 'clean' fuel source that will not be subject to carbon taxes."  Correct?

A.   That is what it says.

Q.   Okay.  And then if we go on to the top of the next page, starting with "but," the article states, "But there's a risk that Tillerson overpaid for XTO, which fetched a 25 percent premium."

Did I read that correctly?

A.   You did, sir.

Q.   And then it goes on to state, "Investors seem to think so.  Exxon is down almost 5 percent today.  Natural gas prices have actually risen recently from their bottom six months ago, though they are still historically low partly because of overcapacity issues.  They are not expected to increase significantly in the near term."

Did I read that correctly?

A.   That is what the author said, yes.

Q.   Okay.  Now I want to show you what has been preadmitted as Exhibit 787.  This is another 8-K from June 25th, 2010.

And on page 2 -- it's essentially -- or the 8-K is essentially disclosing to the world the finalization of the XTO purchase or merger and it says, quote, at the top of the document -- or at top of the page, "On June 25, 2010, XTO Energy, Inc., a Delaware corporation (the company) completed its merger with ExxonMobile Investment Corporation (merger sub) a Delaware Corporation and wholly-owned subsidiary of ExxonMobile Corporation, a New Jersey corporation (ExxonMobile) whereby merger submerged with and into the company (the merger with the company continuing as a surviving corporation and a wholly-owned subsidiary of ExxonMobile)."

Did I read that correctly?

A.   Yes.

Q.   It was a mouthful.

A.   It was.

Q.   And ExxonMobile is a New Jersey corporation?

A.   It is.

Q.   And as of June 25th, 2010, it wholly owned XTO and its assets?

A.   Yes, sir.

Q.   I want to turn your attention back to what has been admitted as Exhibit 117, which was the October meeting with Mr. Tillerson we discussed yesterday.

MR. SAHAM:  And if we could go to page 6.  Bottom,

Henry Hub, could we blow that up, that graph, that Henry Hub graph.

BY MR. SAHAM:

Q.   And as of 2010, the year of that merger with XTO, U.S. natural gas prices were $4.38, correct?

A.   That's correct.

Q.   Just for the jury could you explain to the jury what Henry Hub gas prices are?

A.   Henry Hub is a location in southwestern Louisiana on-shore where a large variety of natural gas pipelines meet at a big junction site there, so it is a good place for buyers and sellers of gas that's moving in the pipelines to do deals.  Those deals are done on the New York Mercantile Exchange, NYMEX, and it becomes a benchmark price for the industry.  Those deals set the price for the industry at a market called Henry Hub.

Q.   And that price for 2010 was approximately $4.10 on average?

A.   On average, yes.

Q.   Okay.  I'd like to show you what I'm marking as Plaintiff's Exhibit 5 --

A.   I'm sorry, sir, may I -- may I see it again?

Q.   Sure.  Sure.

     MR. SAHAM:  Can we put it back up?  Yeah.  To the chart.  And blow it up.

     THE WITNESS:  I'd like to correct my statement.  I noted that it is the SEC price basis, which is different than the average -- the yearly average.

BY MR. SAHAM:

Q.   So that 4.38 is averaging the first day of the month for 12 months --

A.   I believe that was the methodology and at that time.  I don't know when the methodology changed.

Q.   But it's a pretty good -- or it's designed by the SEC to sort of give -- the company has to give an average price using the first day of the month pricing.

A.   All companies do, yes.

Q.   And this is the Henry Hub gas SEC price basis is indicating $4.38 for the year 2010, correct?

A.   Yes, sir.

Q.   Thank you for clarifying.

     I would like to show you now what has been marked as Plaintiff's Exhibit 597.

     MR. THOMAS:  Your Honor, we'd have no objection with the same limiting instruction for a newspaper article.

     THE COURT:  All right.  Then it's admitted with the same instruction.

BY MR. SAHAM:

Q.   And this is a Current Affairs article dated February 16, 2011.  And it's entitled "Exxon is Running Out of Oil."

Correct?

A.   It, is.  But what's the publication?

Q.   I believe it's Current Affairs.

     Does it say right there, Current Affairs?

A.   I'm not sure there is a Current Affairs.

     Oilchange.

Q.   Oilchange.org, I apologize.

     And if we turn to the third page of the article, up at the top where it says "Indeed," and blow that up so everyone can see it.

     MR. SAHAM:  That paragraph that says "Indeed," second paragraph.

BY MR. SAHAM:

Q.   The article states, "Indeed, Exxon's take over of XTO -- XTO Energy accounted for a whopping 80 percent of the reserves it added in 2010."

     Did I read that correctly?

A.   You did read that correctly.

Q.   So 80 percent, according to this article of the reserves added to replace reserves sucked out of the ground in 2010 came from purchasing XTO; is that correct?

A.   According to this article, yes.

Q.   Does that meet your recollection, approximately?

A.   I do not recall.

Q.   Okay.  Now I want to show you what we're marking as Plaintiff's Exhibit 697.

     This is another Wall Street Journal article.

     THE COURT:  Same objection or no objection as long as there's the same limiting instruction?

     MR. THOMAS:  Same limiting instruction would be fine.

     THE COURT:  Strange how I can read your mind?

     MR. THOMAS:  The Great Carnac.

     THE COURT:  That's right.

     They did the mindmeld thing on Star Trek, that guy with the big ears --

     MR. THOMAS:  You're not referring to me are you, judge.

     THE COURT:  I'm working on it.

     Same limiting instruction, not for the truth of the matter asserted but for notice.

     Okay.  Go ahead.

BY MR. SAHAM:

Q.   And this is another Wall Street Journal article.  This one is dated January 10th, 2011, and it's entitled "Exxon's XTO Deal:  Still Terrible."

     Correct?

A.   That's what it says.

Q.   And then I'll just read the whole article since it's pretty short.

"On the day --" this is January 10th, 2011.

"On the day when utilities Duke Energy and Progress Energy announced they're tying the knot, it's worth remembering an energy deal that hasn't gone well so far.

Since Exxon bought natural gas producer XTO Energy in 2009, the company's stock has been one of the worst performers in the energy sector -- energy sector says Barclays Capital.

"The analyst said Exxon shares are up 4 percent over the period, compared to a gain of 23 percent for the energy sector fund XLE and a 15 percent spike in the S&P 500 over the same period.

"In part, Exxon's $36 billion deal for XTO has taken it on the chin from falling natural gas prices, which already were in doldrums at the time the acquisition was struck."

Did I read that correctly?

A.    That is what the author said, yes.

Q.    Now I would like to show you what I'm marking as Plaintiff's Exhibit 221.

MR. THOMAS:  What is it?

MR. SAHAM:  221.

MR. THOMAS:  No objection, Your Honor.

THE COURT:  No limiting instruction on this one?

MR. SAHAM:  No, Your Honor.

THE COURT:  Okay.  This is -- this is admitted for all purposes.

Go ahead.

BY MR. SAHAM:

Q.    And this is an email you received in the ordinary course of your employment on October 14th, 2015, correct?

A.    Yes, sir.

Q.    And it was sent by a gentleman -- I believe it's a gentleman named Taher Hamid; is that correct?

A.    Yes, sir.

Q.    And who is Mr. Hamid?

A.    Mr. Hamid at that time was a senior upstream advisor working for Mr. Albers I think.

Q.    Okay.  And he wrote, "All" -- and you're one of the all -- "Attached are the P&B presentations for the CE review tomorrow."  I guess two starting questions.

What's P&B and what's CE?

A.    P&B is plans and budget.  That's the process we go through for putting together the budgets for the following years.

And CE is contact executive.

Every member of the Management Committee has oversight of specific parts of the company and they are the contact executive for that.  For instance, Mr. Albers had specific oversight of the exploration company, he was the contact executive for that on the Management Committee.

At that time I had a part of the upstream called Gas & Power Marketing as a contact executive sitting on the Management Committee.

Is that adequate, sir?

Q.    Thank you, Mr. Swiger.

And if we turn to page 2 of this document, it's the cover page of the slide deck, and it says, "ExxonMobile. 2015 Plan and Budget - Upstream Overview.  October 15, 2015."  Correct?

A.    Yes, sir.

Q.    So upstream was being discussed in this deck, correct?

A.    Yes, sir.

Q.    And if we turn to page 3 of the deck, the third bullet point says, "Opportunity for new resources in a lower price environment."  Correct?

A.    Yes.

Q.    And it's fair to say October 2015 was a lower price environment for oil and gas --

A.    A lower price environment, yes.

Q.    And then if we go to page 4, the second bullet point under "Key Plan Objectives" it says "Grow net cash flow in a sustained low price environment."  Correct?

A.    That is the guidance, yes.

Q.    Okay.  And as of October 2015 Exxon was in a sustained low-price environment, correct?

A.    Well, it was.  But this guidance would have appeared in all P&B's for many years before and probably still does.  The company is always wanting its divisions, upstream, downstream, and chemicals, to be able to grow cash flow in a low-price environment.  We are price takers.  So when you're running a business with the volatility that you've seen in prices there, what you want your organization to do is focus, focus, focus on always thinking about the business in a low-price environment.  That way you're resilient when the prices go down and you benefit when the prices go up.  So this guidance is typical for every plan cycle, 2015 not being any different.

Q.    Let me ask a question.

If oil is over $100 a barrel you wouldn't call that a sustained low-price environment, correct?

A.    When oil is over $100 a barrel?

Q.    Correct?

A.    I would not, no.

Q.    Okay.  And when, say, Brent is at $50 for a prolonged period, you would refer to that as a sustained low-price environment, right?

A.    I probably would.  But even if oil was at $100 a barrel I would still be guiding the organization to be prepared to operate in sustained low prices.  It is the way you must run a commodity business like ours.

PAMELA J.  WILSON, CSR/RMR/CRR

**App. 93**

Q.   Okay.  Let's turn to page 41, the business environment.
     Business environment, that's referring to the business environment at the time, correct?

A.   Yes.

Q.   Okay.  If we look at the second bullet point that says -- under "Business Environment" here, "Sustained low price environment expected to increase M&A activity as alternatives are exhausted."
     This is referring to the current business environment in October of 2015 as being a sustained low-price environment, correct?

A.   Yes, it is.

Q.   I would like to show you what I'm marking as Plaintiff's Exhibit 219.

     MR. THOMAS:  No objection, Your Honor.

     THE COURT:  That's admitted into evidence.

BY MR. SAHAM:

Q.   And 219, Mr. Swiger, is a set of emails that you received in -- or actually they're all on, I believe, just let me double-check -- they're all -- well, the email starts, if we go down to the bottom -- let's go to the bottom of the second page.
     These are emails that you sent and received on October 28th and 29th, 2016, correct?

A.   Yes.

Q.   And you sent these in the ordinary scope of your employment as a member of the Management Committee and CFO or PFO of the company?

A.   Yes.  Not the bottom one, but the one that has been highlighted I sent, yes.

Q.   But the bottom one on the bottom of page 2 is sent to you, and some other folks, by someone named Matt Smiddy?

A.   Yes.  That's correct.

Q.   And you received this on October 28th, 2015?

A.   Yes.

Q.   And it says -- oh, who's Mr. Smiddy?

A.   I do not know.  I don't recall.

Q.   Okay.  That's fair.  And he said to you -- Mr. Smiddy said to you "November NYMEX was down .059 on the day to expire at $2.03 per MBtu"?

A.   Per million Btu, yes.

Q.   So it's communicating to you that the NYMEX for Henry Hub is down to about $2; correct?

A.   Yes.

Q.   And what's the NYMEX?

A.   The New York Mercantile Exchange.  It is an exchange like the New York Stock Exchange or the Chicago Board.  It deals in commodities like natural gas --

     THE COURT:  Make sure you talk into that microphone.

BY MR. SAHAM:

Q.   And it's a market-based price.  If you wanted to buy an MMBtu on the New York Mercantile Exchanges you'd pay 2 bucks?

A.   Yes.

Q.   And you responded to an email and you forwarded it to someone named Paul.  And you said "Paul, lowest November since?"  Correct?

A.   That's correct.

Q.   And who's the Paul you were sending the email to?

A.   I believe it's Paul Greenwood, if we scroll up a little bit more.

Q.   And who is he?

A.   He was in Gas & Power Marketing.  I don't recall the exact position.  I think he was in a planning function there.

Q.   Okay.  And he responded to you, "Andy," -- up at the top of page 2, "Andy, this November was the lowest that I can see going back to 2000 (November 2001 was $3.20).  I'll check with the team for the pre-2000 data."
     Did I read that correctly?

A.   You did.  It's for the November contract only.  It's the lowest November.

Q.   So he's telling you this pricing for natural gas in the United States is the lowest the company has seen in 15 years, correct?

A.   For delivery specifically in November, yes.

Q.   Okay.  I would like to show you what we looked at yesterday and what's been admitted into evidence as Plaintiff's Exhibit 216.  It's one of the monthly highlight reports.

     MR. SAHAM:  And I'd like to turn to page 17 on the right bottom corner.
     If we could blow up the right column and look at U.S.

BY MR. SAHAM:

Q.   So now we're looking at the next month.  And for the month of December the company's realization for natural gas, the Henry Hub natural gas is $1.74, correct?

A.   Yes, sir.

Q.   And that's the price of U.S. natural gas?

A.   Yes.

Q.   And that's about as low as it's ever been, correct?

A.   It's pretty low.

Q.   Yeah.  And then it notes year-to-date -- and this is not just for December or November, it notes year-to-date the whole year averaged together, the cost of U.S. natural gas was $2.26.  Correct?

A.   That's correct.

Q.   Okay.  And then if we go to fourth quarter, so that would be just the three months of October, November, and December, the price -- the average price for those three

PAMELA J.  WILSON, CSR/RMR/CRR

**App. 94**

months was $1.80, correct?

A.   That is correct.

Q.   And, again, that's pretty low?

A.   Yes.

Q.   And you were informed of this as part of the highlights of the F&O report?

A.   Yes, sir.

Q.   Now I would like to show you what's been marked as Plaintiff's Exhibit 27.

MR. SAHAM:  And this also is Defendant's 33.  It's the Data Guide, but I'm going to use Plaintiff's 27 if you don't have a problem with it.

MR. THOMAS:  I thought you said we had the same --

MR. SAHAM:  No.  No.  No.  You have it 33, we have 27.  It's their -- it's the same document.  Yours is the fatter one, but do you care if we use 27

MR. THOMAS:  You can use 27 if I can use 33.

MR. SAHAM:  Fair enough.

THE COURT:  Do we know what the number is going to be for purposes of the record?

MR. THOMAS:  There will be two separate exhibits.  Ours has the attachments to it.

THE COURT:  Oh, okay.  So we're going to have two separate exhibits which are similar except for the attachments, that's 27 and 33.  Right now we're talking about 27.

You don't have any objection to that; is that correct?

MR. THOMAS:  That's correct.

THE COURT:  Then 27 is admitted into evidence.

MR. SAHAM:  May I approach?

THE COURT:  Yes.

BY MR. SAHAM:

Q.   You can use the screen as well, but for this one I thought it would be good to have the Data Guide.

What's the Data Guide?

A.   It contains the overall assumptions for use in the corporate plan.

Q.   Okay.  And, I'm sorry, and the Data Guide is updated from time to time?

A.   Annually.

Q.   And, again, it's a guide for all Exxon employees?

A.   Yes, sir.

MR. SAHAM:  Could we blow that up?

Thank you, Michael.

BY MR. SAHAM:

Q.   And this is the last update to the Data Guide for 2015 and that update occurred on February 4th, 2016, correct?

A.   I do not know that it's the last Data Guide -- last update.  I see it's revision 4.

Q.   And typically how many revisions would there be to the --

A.   I can't recall that.

Q.   Okay.  But this is already after the end of 2015?

February 1st is one month after the end of 2015?

A.   Yes, for planning purposes of 2016 and beyond.  Yes.

Q.   Okay.  But would you update the 2015 Data Guide in 2016 or would it then become the 2016 Data Guide?

A.   It would -- it would ultimately reach a point where you finished, I just don't know whether revision 4 was the final one.  I can't ascertain that from this document.

Q.   Okay.  Well, let's look at the first page of Exhibit 27.

This is clearly the ExxonMobile 2015 corporate plan Data Guide, correct?

A.   Yes, it is.

Q.   Would you please sir turn to page 10 of the Data Guide, which is extended plan financials in the top right.

What are the extended plan financials

A.   In this case these are the assumptions to be used for the plan years beyond the year of the plan, the out year, which is the year beyond that, all years in the future are the extended financials.

Q.   And on the bottom that's the 2014 financials, correct?  In the same column that we were just looking at.

If we go all the way over to the left, that's the 2014 financial plan --

MR. SAHAM:  Up at the top.

THE WITNESS:  You've lost me.

BY MR. SAHAM:

Q.   He's blowing it up.  You will have it.

So the bottom number when we got to the 5.2 that's for -- that was the extended plan financials in the 2014 guide, correct?

A.   For 2020 plus, yes.

Q.   Yes, but it was what was expected for 2020 plus in 2014?

A.   Assumed.  Not expected.  Assumed.  These are plan assumptions.

Q.   Okay.  Okay.  I just want to make sure I have it right.

A.   Good.

Q.   I'm not trying to quibble.

So the plan assumptions, as they were in 2014, were that the extended plan financials 2020 plus would be $5.20 for natural gas Henry Hub, correct?

A.   That is correct.

Q.   Okay.  And that was reduced by $1.20 during the 2015, at least in the fourth revision, to $4 per MMBtu of Henry Hub natural gas, correct?

A.   That is correct.

Q.   And that's approximately a 22 percent reduction?

A.   I believe that's the math, yes.

Q.   Okay.  And that sizable reduction to the long-term plan,

**App. 95**

that could be considered an impairment trigger, correct?

A.   No.  Change in price is not by itself a trigger, no.

Q.   My question is it could be considered a trigger, correct?

A.   I would not consider it a trigger.

Q.   Okay.  I want to show you what I'm marking as Plaintiff's Exhibit 51.

THE COURT:  Let's take a break.

Don't talk about the case.

This is going to be a short break.  I need to talk to the lawyers about something.

Mr. Swiger, you might want to step down for a second, take a break.

(Jury exits the courtroom.)

(Proceedings resumed at 10:12.)

THE SECURITY OFFICER:  All rise for the jury.

(Jury enters the courtroom.)

THE COURT:  Thank y'all.

Are y'all staying warm enough?

Then I'm going to have to turn it colder.  No.

Mr. Saham, go ahead.

DIRECT EXAMINATION (Cont.)

BY MR. SAHAM:

Q.   Mr. Swiger, I'm showing you what's been preadmitted as Plaintiff's Exhibit 51.  If we could turn to text message 2 please.  This document is entitled XTO asset recovery review with PwC.  11/11/15.  What is PwC?

A.   Pricewaterhouse, our external author, independent external author.

Q.   And XTO is the -- where those Rocky Mountain natural dry gas assets are housed, right?

A.   It was a portion of it.

Q.   And when you say PwC is an independent auditor,  who pays their fees?

A.   ExxonMobile does.

Q.   And their fees in this time frame were about $40 million a year; is that correct?

A.   At that time it would have been closer to 34, 35.

Q.   Million dollars?

A.   Million dollars, yes.  It's a big job.

Q.   And if you look at the next line it says opening talking points for APS/RWT previews.  Correct?

A.   Yes.

Q.   And you're APS?

A.   Yes.

Q.   And RWT is Rex W. Tillerson?

A.   Yes, sir.

Q.   And the second bullet point of this document states, "When 10-Ks are issued for 2015, we will likely be one of the few companies in our industry that will not have taken an impairment write-down.  Chevron noted in their 2Q 10-Q an impairment due to revision to long-term crude price outlook."

Did I read that correctly?

A.   You did, sir.

Q.   And then if we drop down to the seventh bullet point it states, "(be prepared to answer the question:  So has a trigger event occurred?  Answer:  By virtue of the reduction in EM's long-term U.S. natural gas price outlook it would be difficult to argue to SEC that one has not occurred)."

Did I read that correctly?

A.   Yes, sir.

Q.   And this is noting that by virtue of the reduction of Exxon's long-term U.S. natural gas price outlook it would be difficult to argue that a trigger has not occurred, correct?

A.   That was the observation, yes.

Q.   Okay.  Now, going back to Plaintiff's Exhibit 27, the Data Guide --

A.   Yes.

Q.   -- I just want to cover on page 10 just a little more information for the jury.

Natural gas does not have a worldwide pricing, correct?

A.   It does not.

Q.   It's much more expensive in Europe than it is in the United States?

A.   Yes, sir.

Q.   And Henry Hub is the United States pricing for natural gas.

A.   It is the primary basis, yes.  There are other hubs.

Q.   And Henry Hub was an important hub for XTO's natural gas operations, correct?

A.   Yes, sir.

Q.   And just -- I didn't really transition with the jury but I wanted to note that we're now talking about the XTO operations, at least the last couple of sets of questions, and we're going to continue talking about that, as before we were talking about the Kearl operations.

THE COURT:  And you're talking about somewhere in Colorado

BY MR. SAHAM:

Q.   Yes.  And what -- you understand what the Rocky Mountain dry gas operations are, correct?

A.   Yes, sir.

Q.   And there were multiple fields of natural gas that were acquired by Exxon from XTO in that merger, correct?

A.   There was.  They were mostly undeveloped, but yes.

Q.   And those sometimes at Exxon were collectively referred to as the Rocky Mountain dry gas operations, correct?

A.   Assets, yes.

Q.   And there were maybe six or seven fields there, correct?

**App. 96**

A.   I cannot remember the number.  There were a number of them, yes.

Q.   And they produced natural gas, correct?

A.   Dry natural gas, yes.

Q.   And could you just describe for the jury, what's the difference between natural gas and, say, bitumen?

A.   Natural gas is gaseous.  It is what you would use in heating your home or through the stove.  That is basically what natural gas is.

Bitumen is the tar-like substance that has been displayed in the bottles before that have been shown to you.

Q.   And bitumen is a type of oil, correct?

A.   They're all petroleum, yes.

Q.   So bitumen is a liquid, although it's less liquidy than other oils?

A.   Considered a liquid, yes.

Q.   And this Henry Hub stuff, this natural gas, it's a gas, you can't see it when it's in the air?

A.   Gaseous, yes.

Q.   Okay.  And do you know why the price of natural gas is so much more in Europe than it is in the United States?

A.   Europe has to import natural gas from different parts of the world, from the Middle East, from Russia, at least until the Ukraine war, and it costs a lot to get it there.

Q.   Okay.  Where XTO if it produced natural gas in the United States it was easier to ship it to where people needed it in the U.S., so it's cheaper to sell?

A.   Yes.  Although the Rocky Mountains were fairly remote.  The pipeline at the structure there is not so great some places.

Q.   So that made it a little less profitable than some of the other XTO assets?

A.   A little more expensive to develop, yes.

Q.   And if it's more expensive to develop, it's harder to get a return on your investment?

A.   That's true.

Q.   I want to show you what's been preadmitted as Plaintiff's Exhibit 227.

And this is another one of those disclosures on Form 8-K and this one is from January 31st, 2017, correct?

A.   Yes, that's correct.

Q.   And this is the disclosure on January 31st 2017.

If you would turn to page 5, the third bullet point states, "U.S. Upstream earnings include an impairment charge of $2 billion largely -- largely related to dry gas operations in the Rocky Mountains region."

Did I read that correctly?

A.   That is correct, yes.

Q.   So on January 31st, 2017, Exxon disclosed that it had to take an impairment charge of $2 billion after tax for those Rocky Mountain dry gas assets, correct?

A.   Yes, sir.

Q.   And before taxes that charge was over $3 billion, correct?

A.   That would be correct.

Q.   But the company got some sort of tax deduction as a result which reduced it or how does that work?

A.   Any time you suffer a loss you get to credit it against taxes, yes, in any sort of business.

Q.   Okay.  But your -- your loss before taxes was over 3 billion that was written off?

A.   I don't recall exactly, but it was in that neighborhood, yes.

Q.   Okay.  And if we go to page 10 of Exhibit 227, there is a disclosure under "Upstream Asset Impairment," correct?

A.   Yes.

Q.   And it states, the first sentence, "As disclosed in the corporation's third quarter 2016 Form 10-Q filing, continued weakness in the upstream industry environment during 2016 continued weak financial results for several assets in North America, and a reduction in the midpoint of the ranges of the corporation's long-term oil and natural gas prices developed as part of its annual planning and budgeting cycle, the corporation -- or led the corporation to conclude that the facts and circumstances supported performing an impairment assessment of certain long-lived assets, notably North America natural gas assets and certain other assets across the remainder of its upstream operations."

The company disclosed that on January 31st, 2017, correct?

A.   Yes.  There was another reduction in the next year's Data Guide taking the prices even lower for the long term.

Q.   And that second reduction was approximately 50 cents, correct?

A.   That's right, yes.

Q.   And that's about 12 percent, correct?

A.   That is correct.

Q.   And if we go back to Exhibit 27 on page 10, when you told me this wasn't a trigger on page 10, that reduction in the long-term plan was quite a bit larger, it was $1.20, from $5.20 in the long-term outlook or the long-term assumptions to only $4, correct?

A.   Certainly.  But the magnitude of the reduction doesn't really matter to the impairment.  It matters when you get to a price -- you ultimately get to a price that will not support development of the assets.

Q.   But in Exhibit 51, the presentation to you and Mr. Tillerson -- and we can pull up Exhibit 51 -- it was noted that that reduction from 5.20 --

MR. SAHAM:  And let's go to page 2, please, the

seventh bullet point.

BY MR. SAHAM:

Q.   It was noted to you and Mr. Tillerson, "(be prepared to answer the question:  So has a trigger event occurred?  Answer:  By virtue of the reduction in EM's long-term natural gas price outlook, would be difficult to argue to SEC that one has not occurred.)"
     That's referring to the reduction from 5.20 to $4?

A.   It is, yes.

Q.   And the event or reduction that led the corporation to disclose a trigger and ultimately a write-down for those natural gas assets was a reduction of only 50 cents the next year, correct?

A.   That is correct.  When the price dropped down to that range the Rocky Mountain dry gas assets were no longer viable.

Q.   But another thing that happened in between Exhibit 51, the 10-K, and this disclosure in January, was the $12 billion bond offering, correct?

A.   Yes.

Q.   Okay.  I want to show you what I'm marking as Plaintiff's Exhibit 746.

         MR. THOMAS:  I think this was admitted yesterday.

         MR. SAHAM:  I haven't used it yet.  It couldn't have been admitted yesterday.

         MR. THOMAS:  No objection, Your Honor.

         THE COURT:  What's number

         MR. SAHAM:  746, Your Honor.

         THE COURT:  746 is admitted for all purposes.

         MR. SAHAM:  Thank you, Your Honor.

BY MR. SAHAM:

Q.   Now, Exhibit 746 is another one.
     If you look at page 3, this is another one of those meetings and reports you received with the highlights, correct, February 20th, 2017, correct?

A.   That is correct, yes.

Q.   And this is discussing the January highlights, am I correct?
     If we go to the next page.

A.   That would be correct, yes.

Q.   If we go to the next page it's labeled Financial and Operating Highlights Review, January 2017.
     And then if we go to page 11, on the bottom right, we have the January 17 natural gas prices.  So this would be the same month in which the impairment was taken, correct?

A.   Correct.

Q.   And the natural gas price for the month of January was $3.31, correct?

A.   That's right.  Current prison, yes.

Q.   And that -- the market -- the price of natural gas had risen approximately $1.60 from the low it hit at the end of 2015?

A.   I think that's correct math, yes.

Q.   So there was no impairment at year-end 2015, when natural gas was sitting at $1.70 and now there's an impairment disclosed to the market after the bond offering when gas is at $3.30, correct?

A.   Impairments have nothing to do with current prices, they're about long-term prices.

Q.   But you start at the current prices, correct?

A.   They do, but it depends how much gas is actually flowing.  Much of the gas is developed much more in the future and it depends on what the price assumption is in the future.

Q.   Okay.  Let's look at Plaintiff's Exhibit 228.

         MR. THOMAS:  No objection, Your Honor.

         THE COURT:  It's admitted into evidence.

BY MR. SAHAM:

Q.   Please take a look at Plaintiff's Exhibit 228.
     And on page 2 of this document there's a draft labeled "March 28th, 2016.  2016 Plan Gas Business Environment.  A.P. Swiger Review."  Correct?

A.   That is correct.

Q.   And this is referring to a review conducted with you on March 28th, 2016, correct?

A.   Yes, it is.

Q.   And that's approximately one month after the 10-K was filed, correct?

A.   That's correct.

Q.   And approximately one month after the bond offering, correct?

A.   That's correct.

Q.   And if we turn to page 11, if we can look at the top -- what's "Price Basis" referring to?

A.   That is the -- that is the assumption for future prices.

Q.   Okay.  And if we look at that top left chart.

         MR. SAHAM:  If we can blow that up.

BY MR. SAHAM:

Q.   That's Henry Hub "P&B Price Basis," correct?

A.   That is correct.

Q.   So this is the chart that would relate to XTO and natural gas operations in the United States, correct?

A.   Yes.

Q.   And the black line up at the top, that is the line that was used by the company in its impairment testing before the 10-K, correct?

A.   Correct.

Q.   And that black line, because it's higher, would generate more cash flows going forward than either the green line or

**App. 98**

Q.   the blue line, correct?

A.   That is correct, yes.

Q.   And the green line was what was used to determine there was an impairment the next year, correct?

A.   That is correct, yes.

Q.   And the blue line is the Henry Hub futures as of March 21st, 2016, correct?

A.   Specifically on that day and for that day.

Q.   Okay.  But on that day being March 21st, approximately three weeks after the bond offering, correct?

A.   That's correct.

Q.   And approximately three and a half weeks after the 10-K came out?

A.   Yes, sir.

Q.   And both the green line, with the new prices that were used the next year, and the Henry Hub futures prices were communicated to you in March of 2016, correct?

A.   That's correct.

Q.   And this was the information, the green line and the blue line, that was used the next year, in January, eleven months later to determine an impairment, correct?

A.   That's right.

Q.   So you have this information three weeks after the bond offering.

A.   I do.

Q.   And you didn't disclose an impairment to the world?

A.   No.

Q.   And I would like to have you turn back, if you would, sir, to Exhibit 27, the Data Guide.  Specifically page 9 of the Data Guide.

     MR. SAHAM:  And if we can blow that up.

BY MR. SAHAM:

Q.   That's entitled Market Futures - Price Sensitivity for Upstream, correct?

A.   Yes, it is.

Q.   And it says, "The purpose of this section is to establish a consistent basis when developing market futures for evaluating opportunities with near-term price sensitivities, correct?

A.   Near-term price sensitivities, yes.

Q.   And it goes on to say, "Market futures are constantly changing.  The evaluations should be completed using the most recently available market future consistent with an orderly evaluation process.  The market futures should be collected from the prior day close and the preferred source are as follows:  CME Group (NYMEX) WTI and Henry Hub."

     What is NYMEX CME Group Henry Hub?

A.   It is the futures market run on NYMEX.

     CME is Chicago Mercantile Exchange which sits over it

Q.   Can you say that again?  What'd you say?

I didn't hear you.

A.   We've talked about NYMEX numerous times, but I shall explain it again.  NYMEX is the New York market -- New York market, exchange market for things like Henry Hub contracts.  CME, I believe, is the Chicago Mercantile Exchange, which is the parent company of the NYMEX.

Q.   Thank you very much, Mr. Swiger.

     And then the paragraph -- the following paragraph, starting with "Typically" states, "Typically, the market futures have minimal volumes traded beyond 24 months, however the purpose of the market future sensitivity is to test opportunities to the full extent of market futures.  Thus, the market futures should be collected starting from the current year and extended an additional five years (total of six)."

     Did I read that correctly?

A.   You did.

Q.   And if we go back to Exhibit 228, page 11 --

A.   Let's -- let's just -- this is price sensitivities.  These are not price bases.  Whenever you run economics you will do a base case.  Base case, in other words, the price bases we looked at before.

     It's important, particularly for near-term projects, short-lived projects, to run sensitivities, how much higher, how much lower it might be, what does the current market future say, to understand how the asset would respond under different price assumptions.

     So these are sensitivity cases.  They are presented in addition to the base case is for analysis and decision making.

     MR. SAHAM:  Could we go back please to Exhibit 228, page 11, the top chart.

BY MR. SAHAM:

Q.   The blue line, the Henry Hub futures from March 21st, 2016, that's a sensitivity test to the green line, correct?

A.   For a -- for a short-live project, yes.

Q.   And you would agree with me, just by looking at it, the blue line, the sensitivity test from March 21st, 2016, is much closer, although below it, much closer to the green line than it is to the black line, correct?

A.   Yes, I would.

Q.   And the green line is what allowed the company to conclude an impairment the next year and the black line is what weeks before this document was presented to you just by not impairing the Rocky Mountain dry gas assets, correct?

A.   Yes.

Q.   I would like to show you what I'm marking as Plaintiff's Exhibit 230.

     MR. SAHAM:  Okay.  This has been preadmitted, Your Honor, my apologies.

THE COURT:  Okay.

BY MR. SAHAM:

Q.   Exhibit 230 is an email that you received from an individual -- individual named Rob Franklin on May 6th, 2016, correct?

A.   Yes.

Q.   And who's Rob Franklin?

A.   Rob Franklin at that time was the president of the upstream Gas & Power Marketing Company.

Q.   And he's someone who reported to you?

A.   He did.

Q.   As the contact executive for that company?

A.   For that particular company, yes.

Q.   Okay.  And if we look, he's forwarding to you an email from someone named -- named Steve Briggs from the same date, correct?

A.   Yes.

Q.   And he's talking about a review with the chairman on April 20th, correct?

A.   Yes.

Q.   And who's Steve Briggs?

A.   Steve Briggs was a planner in the Gas & Power Marketing Company.

Q.   And under Henry Hub he states, "Added NYMEX futures."  Correct?

A.   Sure.  Informational, yes.

Q.   So he's adding for the presentation with the chairman, Mr. Tillerson, the NYMEX futures, correct?

A.   Yes.

Q.   For Henry Hub?

A.   Yes.

Q.   I'd like to show you now what I'm marking as Plaintiff's Exhibit 161, the company's proxy for year 2016.

MR. THOMAS:  No objection.

MR. SAHAM:  No objection, Your Honor.

THE COURT:  All right.  Then that's admitted into evidence.

BY MR. SAHAM:

Q.   And what's the proxy on 14A, sir?

A.   It contains information about the corporation, directors, senior management people, general business observations.

Q.   And one thing the proxy communicates is the compensation received by certain senior managers like yourself, correct?

A.   Absolutely.  It's important that the shareholders wanted to know what that compensation is.  It is disclosed quite comprehensively.

Q.   Okay.  Let's look at that comprehensive disclosure on page 50, please, for A.P. Swiger, senior vice president, PFO.

The total compensation you received in the year 2013 was over $12 million, correct?

A.   That is correct.

Q.   And the total compensation you received for fiscal year 2014 was over $16 million, correct?

A.   Yes, sir.

Q.   And the total compensation you received for year 2015 was 14,900,000, correct?

A.   That is correct.

Q.   So in those three years you received over $40 million in compensation in those three years, correct?

A.   That's correct.

Q.   And I'd like to turn your attention to page 58 of the proxy shareholder proposals.

MR. SAHAM:  If we could blowup the shareholder proposal portion.

Prior page, I believe.

BY MR. SAHAM:

Q.   What's a shareholder proposal?

A.   It is a proposal that is being brought for us to the shareholders for a vote.

Q.   And who votes on it?

A.   The shareholders.

Q.   And who makes it -- does the company make a representation -- or a recommendation as to whether they're in favor or against the proposal?

A.   Yes, sir.

MR. SAHAM:  Could we turn to the next -- the shareholder proposal on the next page, 59, item 4, "Independent Chairman"?

BY MR. SAHAM:

Q.   One of the shareholders in 2015 proposed splitting the job that Mr. Tillerson held as both CEO and Chairman of the Board of Directors; is that correct.

A.   That is correct.

Q.   And that's because the shareholder who made the proposal believed there was a conflict of interest of the Chairman of the Board being the boss of the CEO, they felt that was a conflict of interest to have the same person hold both jobs, correct?

A.   I believe that's a general way of characterizing it.

Q.   Okay.  And the company, did it oppose or support that proposal?

A.   Oppose the proposal.

Q.   And were you consulted on that proposal?

A.   I was not.

Q.   Do you believe it was a good idea for Mr. Rex Tillerson to be his own boss in 2015?

A.   I do.  Quite common in U.S. companies.

Q.   But there is, at least from this individual's view, a potential conflict of interest of being your own boss,

correct?

A.    For many years -- for many years across all companies, a range of companies in the United States, shareholders have brought this proposal -- this type of proposal forward.  It is almost always defeated.

Q.    And the company in this case opposed that proposal?

A.    Yes, sir.

Q.    And you opposed this proposal?

A.    I did.

Q.    And so did Mr. Tillerson?

A.    I can't speak for Mr. Tillerson.  I'm sure he did.

        MR. SAHAM:  I pass the witness now, Your Honor.

        THE COURT:  Okay.  While you're doing that, when I said certain things were offered for limited purpose, those are newspaper articles, that means that neither said is saying they agree that it's true, they're just saying that was some person's opinion of what was going on at the time.

    Okay?

        MR. THOMAS:  Just a second to set up, Your Honor?

        THE COURT:  Sure.

    Have you still got water down there?

    Have you still got water?

        THE WITNESS:  Yes, sir.

        THE COURT:  Good.

        MR. THOMAS:  Ms. Wilson, is this okay?

        THE COURT:  Do y'all have any short lawyers?

    Makes it easier for the microphone to work.

        MR. MELSHEIMER:  We do, Your Honor.

        THE COURT:  We're going to have to -- I'm going to have to get some of those Janet Jackson microphones for y'all that attach to your head or something, but mercy.

        MR. THOMAS:  That's where the comparisons would stop.

        THE COURT:  It would.  It really would.  Make sure you talk where it's loud enough.  You can hear your voice, you'll know you're loud enough.

    And -- and this wonderful court reporter does not fuss, but -- unless it's really bad.  Okay?

        MR. THOMAS:  Yes, Your Honor.

        THE COURT:  Okay.  All right.  Thank you.

        MR. THOMAS:  May it please the court.

        THE COURT:  Yes.

                    CROSS EXAMINATION

BY MR. THOMAS:

Q.    Mr. Swiger, you've been testifying for four or five hours now and you haven't been asked a few important questions that I want to ask you.  Okay?

A.    Okay.

Q.    Let's just cut to the chase.

    Were you involved in any scheme to defraud or mislead ExxonMobile shareholders?

A.    Certainly not.

Q.    Did you hide anything about Kearl's financial performance from ExxonMobile's shareholders?

A.    Certainly did not.

Q.    Did you misrepresent Kearl's reserves as proved reserves in 2015?

A.    No, I did not.

Q.    And did you lie or mislead shareholders regarding the value or performance of these Rocky Mountain dry gas assets?

A.    I did not.

Q.    Now, did you ever tell anyone at ExxonMobile that worked for you - and I think the plaintiffs called them underlings in the opening statement - did you tell any of those folks to manipulate the company's financial statements, its reserves calculations or its impairment analyses?

A.    I would never do that and never did.

Q.    Okay.  When the 2015 Form 10-K was filed did you personally believe anything was false or misleading in that document?

A.    I did not.

Q.    Now, you were asked about your signature, and you've probably seen it up there a couple of times now.

    When you signed that 10-K it's my understanding you signed it certifying that the information was accurate to the best of your knowledge; is that right?

A.    Yes, sir.

Q.    Do you stand by that signature today?

A.    Absolutely.

Q.    Tell the jury why.

A.    I had been involved in that process for many years.

        THE COURT:  Make sure you talk into the microphone.

        THE WITNESS:  A little challenge here.  Can't move the chair, can't move the mic.

        THE COURT:  No, I'm sorry.

        THE WITNESS:  I'm going to try to do this.

    ExxonMobile is a bottoms-up process organization with a lot of great people.  The 10-K every year is prepared from the bottom-up, meaning it starts out with the data from field people, engineers, financial folks, planners sort of thing, goes through a process with many levels of construction and review all the way up.  I was involved in that process during the time I came up in the corporation, so I knew it pretty well.

    I would participate in a variety of reviews while it was being developed, particularly if different sections were having some changes made to them or the SEC had changed the way a table should be laid out, I would see that.  And then as the drafts became coming -- coming together, we would sit down, David Rosenthal and I, and others, and go through them

PAMELA  J.   WILSON,  CSR/RMR/CRR

**App. 101**

completely. So by the time we were finalized we would -- I would have seen it many, many, many times.

Furthermore, it would be shared with the audit committee, which we talked about a little bit before.

And before being signed sections of it would be reviewed with the Board. The Board had the whole 10-K, but what would happen was we would have a session with the Board where David Rosenthal would take them through the 10-K, highlighting where there were specific questions and asking and answering any questions that were raised. I would then review the document at least two more times before signing it.

Finally, I will tell you, I, because I had the competitive interest and I thought it was in the interest of the company, I would also look at all our competitors' 10-Ks and 20-Fs, which are the financial equivalent of it there. So I was quite satisfied, having been quite thoroughly involved by the time I signed it.

Q.   We're going to get back to Kearl and Rocky Mountain in a moment, but I want the jury to get to know you just a little bit more, Mr. Swiger.

How long did you work at ExxonMobile?

A.   I was there for 43 years.

Q.   When did you start?

A.   Started in August of 1978.

Q.   Did you go to college?

A.   Yes, sir.

Q.   Where'd you go to college?

A.   Went to the Colorado School of Mines, whose mascot by the way is a donkey.

THE COURT:  Is what?

THE WITNESS:  Is a burro.  The mascot of my university, the Colorado School of Mines, is a burro.

THE COURT:  You should have had Henry.

THE WITNESS:  We audition every few years to replace --

THE COURT:  Okay.  Okay.

THE WITNESS:  I was a petroleum engineer from the Colorado School of Mines, which is a relatively small specifically engineering and science-based university, offers degrees in petroleum engineering, mining engineering, geology, geophysics, chemical engineering.

Q.   When did you start at ExxonMobile?

A.   Sir?

Q.   When did you start at ExxonMobile?

A.   I started in August of 1978.

Q.   And when did you stop working for ExxonMobile?

A.   September 1st of 2021.

Q.   Why'd you stop working for ExxonMobile?

A.   I reached the mandatory retirement age.

Q.   What year was that?

A.   65.

Q.   Sorry to out your age there?

A.   That's okay.  I'm fine.

Q.   Now, why did you decide to go to work in the oil and gas industry?

A.   Well my family had been involved around the oil and gas industry for over a century.  My great-grandfather leased out his farm on Ten Mile Creek for oil and gas exploration in 1908, if you can believe that.

My grandfather, his son, drilled wildcat wells in the 1920s.

My father, when he returned from service in the Pacific in World War II went to university and also joined Texaco and then AMOCO oil companies.

And I, while growing up, got the benefit of interacting with lots of people in the oil business.  I thought it was the best business in the world.  I had a knack for, or desire, when I was growing up for taking things apart and putting them together, things like bicycles or toasters or whatever.  I just enjoyed doing that.  So I knew from an early age I probably wanted to be an engineer.  So I couldn't imagine anything better than being a petroleum engineer and that's what I set out to do.

Q.   And just briefly tell the jury what a petroleum engineer does.

A.   A petroleum engineer is involved with -- we talked about the upstream there, it's really the finding of oil and gas, the development of the oil and gas, the producing of the oil and gas, and some of the initial processing, separating the gas from the oil, or the water from the oil, or the water from the gas, those sort of things.  It involves a lot of subsurface work, meaning the reservoirs down below the surface where the oil lays, all the way to the first elements of processing on the surface.

Q.   So you went to work for -- do you work for Exxon -- what was it called when you went to work for the company?

A.   I went to work for Mobil Oil which is a predecessor. Mobile and Exxon merged in 1999 and became ExxonMobile.

Q.   Tell the jury about your first week of work at Mobile.

A.   Well, I drove down from Colorado and got to the district office in a place called Morgan city, Louisiana.  Morgan City sits sort of in the middle of Louisiana at the extreme south, where the Atchafalaya River empties into the Gulf.  It's a big core base, where oil companies have operations for -- or have shore bases for operations out in the Gulf of Mexico.

So I got to the district office one -- one day, filled out my paperwork, did a little bit of introduction there, and then the very next day caught a crew boat to go 50 miles offshore and start an assignment at a field called Eugene Island 126.  And in those days the company's belief was that

**App. 102**

engineers should start in the field doing field work to really learn the business well. So I was out there for a six-month assignment turning valves, setting up tools for jobs to be done, chipping paint, painting compressors, that sort of thing, working seven days on, seven days off. Then seven days on, seven days off, I would go into the office for three or four days, then take my sort of weekend break, then go back offshore again. After about six months or so of that then I went back into the office and started working full-time as an engineer but still going out to the field on a regular basis to supervise the work, going out there, worked with the guys to get it done.

Q. So you went from working on a rig your second day of work to the principal or chief financial officer of ExxonMobile?

A. That is correct, yes.

Q. Not a normal path at the company?

A. Yeah, normal path in the company. The company has for decades been run by engineers. It's -- it's a path for an engineer, yes.

Q. And just briefly give the jury two or three different types of positions you held between turning those valves on the rig and being the principal financial officer.

A. Sure. I mean, one that is pertinent is early in my career I was a reservoir engineer and a reservoir engineer

supervisor. That means I worked with other engineers on determining how much oil and gas was there and how to -- best to get it out of the ground. You know, when you're in that business, and the oil and gas is thousands of feet below, you have to make some estimates from the data that you have, measurements from the wells, measurements from sound being reflected off the reservoir to determine how much oil and gas there is, what state it's in, and what the best way to produce it is, how to most efficiently and effectively recover the most of it, the reserves that we're going to recover from the ground.

I also managed a couple of big continental businesses. I managed our production operations in Africa for a number of years, in Europe for a number of years. I ran our big refining and chemical complex in Singapore for a number of years. I ran the Gas & Power Marketing Company, went on to the Management Committee

Q. Did you -- you've talked about living in Africa and other places and -- and Europe, did you move to Dallas at some point in time?

A. I moved to Dallas in 2009, when I was asked to join the Management Committee.

Q. And you still live here today?

A. Yes, sir.

Q. We talked about the Management Committee, we've talked

about it a lot. Can you tell the jury what the Management Committee's role at the company is?

A. Well, in very simple terms, the Management Committee is charged by the Board with overseeing and managing all the operations of the company.

Q. And does the Management Committee report to anyone?

A. Well, the Management Committee includes Rex Tillerson -- included at the time Rex Tillerson, who was the CEO, yes.

Q. And does he -- who did he report to?

A. He reported to the Board.

Q. Now, in your 43 years of working at ExxonMobile and working in the energy business, have you seen a lot of volatility in the market?

A. Absolutely.

Q. And if I may, were you here for opening statements?

A. I'm sorry?

Q. Were you here for the opening statements?

A. Yes, I was.

Q. Did you see the slide deck that my colleague put up on the screen?

A. I did. I did, yes.

MR. THOMAS: Can we show slide 9 from the plaintiff's opening slide deck?

I don't think that was it.

No. Sorry. Defendant's slide deck.

We'll come back to what we just saw, but -- but let's talk about this.

Your Honor, may I approach the screen just to point?

THE COURT: You can. We've got pointers, if you need one. Do you want one?

MR. THOMAS: I got one right here (indicating), real quick.

THE COURT: Well, yeah, but that one may have been in your nose. We don't want you to use that one. No offense.

Ronnie -- I don't know where Ronnie ran off to.

Okay. All right. Use that -- and use that finger if you need to.

MR. THOMAS: For pointing.

THE COURT: Okay.

BY MR. THOMAS:

Q. There we go.

So when did you join ExxonMobile, sir?

A. 1978.

Q. So that's right about here (indicating)?

A. Yes, sir.

Q. And when did you leave?

A. 2020 -- the end of 2021.

Q. Right after the COVID, right?

A. Yes.

Q.   So this is some of the volatility you've seen (indicating)?

A.   Yeah.  I lived all of that, yes.

Q.   Okay.  And did that volatility shape the decision making at ExxonMobile when you were there?

A.   Absolutely.

Q.   How so?

A.   Well, two important things.  One is the fluctuation in prices.  I talked about that before.  We can't control the price.  We have to take the price that's in the market there.  As you can see, a lot of factors will influence the price.  Supply and demand fundamentals and all these other things that are specific to an event, like the 2008 financial crisis.

The other important thing about the business is it's long term.  The investments that we make are very large, as you've heard, in most projects, and the projects last for decades.  We talked about Kearl.  Kearl is going to produce for 40-plus years.  These are decades-long projects.  So you can't be distracted by the volatility.  You have to focus on the fundamentals.  We accept volatility.  We work our best to manage the volatility.

As I talked about earlier with the plaintiffs, one of the things we do is always ask the organizations to run their businesses like it was a sustained low-price environment, because you're going to get those from time to time and you want to be resilient when they come and then do even better when the prices return.

Q.   Thank you.

So I want to make sure we're -- we're -- reset the stage here, because I think there was a little confusion this morning about what we're talking about.

We're here about two groups of assets that the company had in 2015 and '16, correct?

A.   That's correct.

Q.   And one is -- one is Kearl, which is this bitumen that we've seen, in a field up in Canada, correct?

A.   Yes.

Q.   And -- And how is this -- just briefly, how is this acquired out of the Kearl?

Is it drilled, mined?

A.   Oh, I'm sorry.  It's mined, yes.

THE COURT:  What do you mean by "mined"?

Tell the jury what that means.

That means use diggers.

THE WITNESS:  Digging it out of the earth, sir.

THE COURT:  Okay.  Like you do gravel?

THE WITNESS:  Yes, sir.

BY MR. THOMAS:

Q.   And then --

THE COURT:  Let me stop you there.

We're not talking about going down in a hole in a mine like that where they look for gold and copper or -- I guess they did too.  We're not talking about that.

You're talking about surface mining?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.

BY MR. THOMAS:

Q.   So you're digging layers off of the topsoil and then putting it through that process that you talked about earlier, correct?

A.   That's correct, yes.

Q.   Okay.  Now, separate and apart from that are these Rocky Mountain dry gas assets that is drilled down into thousands of feet into this -- this shale and it pulls out the natural gas, correct?

A.   That's correct, yes.

Q.   Okay.  And we've talked about some -- some concepts that I don't think have really been explained in detail.

For Kearl we've talked about financial performance, but you've also talked about debooking.  And explain to the jury when we say debooking, what do we mean?

A.   Debooking has -- has the meaning of being removed in this case from the proved reserves based on the SEC test that you've heard a lot about.

At that time those reserves move to a different category of reserve called probable.  They can be rebooked when the SEC test shows they are economically recoverable again.

Q.   Is that temporary or permanent if it's debooked?

A.   Temporary.

Q.   Okay.  And when an asset is debooked from a proved reserve do you shut down the plant or the field or the well?

A.   No, we do not.

Q.   Do you stop producing what's being produced there?

A.   No, sir.

Q.   Do you send all the employees home for a year?

A.   No, sir.

Q.   When Kearl was debooked in 2016 did it continue to operate?

A.   It did.  Nothing changed.

Q.   Did it continue to sell bitumen?

A.   Yes, sir.

Q.   Was Kearl later rebooked?

A.   Yes, it was.

Q.   When?

A.   2018.

Q.   Has it -- after that time was it debooked again?

A.   Yes, it was.  It was debooked in the year of the pandemic when prices were very low again.

Q.   Was it rebooked after that?

PAMELA J.  WILSON,  CSR/RMR/CRR

**App. 104**

A.   Yes, sir, it was rebooked.

Q.   And, importantly, when something is debooked from that proved reserve list, does the value of that asset -- I think we talked about paying 20 billion, or something around that, for Kearl.  Does that come off the company's books and records?

A.   It does not.

Q.   So that's -- that's proved reserves in debooking, that's one thing -- and that's what we're talking about when we talk about Kearl, right?

A.   That's right.

Q.   Now, you also just got a lot of questions this morning about something called impairment, and I don't think --

A.   Right.

Q.   -- is that the same as booking or debooking or rebooking?

A.   Not at all.

Q.   Is it governed by different rules?

A.   Yes, sir.

Q.   And tell the jury what an impairment is.

A.   Impairment means that you conclude through a series of analysis and testing that the value of that asset that you have on the books is too much.  You have to write it down to what you think -- what the market says the proper value is.  So when you, when you impair an asset you take a financial --

A.   I do.

Q.   When Kearl was debooked did it cut jobs?

A.   It did not.

Q.   When Kearl was debooked did it sell the assets there?

A.   No, sir.

Q.   Was it still selling that bitumen?

A.   Yes, sir.

Q.   You talked earlier, I want to shift topics a little bit, about a bottom-up process.  I think you used that in one of your answers.

     When you were on the Management Committee how did you get information about Kearl and all these other assets that you had to deal with when you're talking about a company the size of ExxonMobile.

A.   There were many processes, all bottoms-up.  There's many people involved that would ultimately produce reports that went to the Management Committee.  You've seen a number of those introduced in exhibits there, the F&O reviews, the P&B reviews, the special topics, those sort of things, all were the results of a bottom-up process done by a lot of people to develop information to be related upwards.

Q.   Now, I want to talk about the scale of these operations.

     You saw a lot of slides about Kearl, a lot of information about the Rocky Mountain dry gas assets.  Let's -- let's put those this contexts, especially Kearl.

you remove a financial piece from the balance sheet.

Q.   Is that permanent?

A.   Yes, it is.

Q.   So it can't be unimpaired?

A.   Well for U.S. companies it cannot.  Under U.S. GAAP we cannot.  European companies can re -- reinstate the asset.

Q.   And unlike what you said about debooking, if you impair an asset does the value of that asset on the books and records of the company decrease or go away?

A.   The value decreases or potentially goes away.

Q.   Okay.  So we're talking about two separate assets or fields, right?

A.   Right.

Q.   And when we're talking about those we're talking about two separate financial reporting principles, correct?

A.   Yes.

Q.   I want to just touch on something you were asked about.

     You were asked about Total and -- and one of the Shell companies, I believe, and that -- you were shown some articles about that.  Do you recall that?

A.   Yes, I do.

Q.   And one of the articles about Total says, "France -- France's Total Plans to Cut Jobs - Sell Assets."

     And plaintiff's counsel asked you about their assets in the oil stands up in Canada.  Do you recall that?

     During 2015 what was Exxon's daily production levels at the company?

A.   Daily production levels during 2015 are about 2.35 million barrels a day of liquids and about 10 billion cubic feet a day of natural gas.  When you convert the natural gas to a liquids equivalent, dividing it by six and so forth, you get an oil-equivalent production for the company that year of 4.1 million barrels a day.

Q.   Out of that 4.1 million barrels a day, how much did Kearl produce in 2015?

A.   2015 it was 149,000 barrels a day.

Q.   That's roughly three and a half percent?

A.   That would be correct.

Q.   Okay.  Now, with all that production and all these reports you're getting, did you have to trust the folks that were putting those reports together?

A.   Absolutely.

Q.   What kind of employees -- what kind of backgrounds of folks are we talking about?

A.   The people that would do that would mostly have an engineering or a finance background.  There might be marketing people involved in some of it, but mostly engineering and finance.

Q.   Now, for when we're talking about Kearl -- so we're talking about Kearl now --

A.   All right.

Q.   -- what entity operates Kearl?

A.   Imperial Oil Limited.

Q.   I think we've seen Imperial's name on some slides.  I'm not sure the jury has had a chance to understand what Imperial is.

What is Imperial?

A.   Imperial is a majority-owned subsidiary of ExxonMobile that operates exclusively in Canada.

Q.   So you say "majority-owned," do other folks own the other part of Imperial?

A.   Yes.  The Corpor -- ExxonMobile owns just under 70 percent of it.  The rest is publicly traded.

Q.   And when you say "publicly traded" what do you mean?

A.   Individual shareholders.

Q.   And where's Imperial's headquarters?

A.   Calgary, Canada.

Q.   Separate company than ExxonMobile?

A.   Yes, it is.

Q.   Separate employees?

A.   Yes.

Q.   Separate Board of Directors?

A.   Yes.

Q.   You mentioned the Board of Directors -- I think you mentioned an audit committee a minute ago.

Tell the jury what an audit committee of a Board of Directors is.

A.   The Board -- the work of the Board is done by a series of committees that are made up of members of the Board.  So the audit committee will have five or six -- drawn from six or six members of the Board.  And the purpose of the audit committee is to oversee the internal controls in the company, the work of the internal auditor in the company, and the work of our external auditor Pricewaterhouse Coopers.  The audit committee is in fact the organization that engages Pricewaterhouse Coopers to do its work.

Q.   And you talked a little bit about Pricewaterhouse Coopers with the plaintiffs lawyer, but what's the role of an independent auditor?

A.   The role of an independent auditor is to thoroughly review the corporation's financials and the processes to arrive at those financials.

Q.   And the Pricewaterhouse Coopers, is that one of the largest accounting firms in the world?

A.   Yes, sir.

Q.   One of the Big Four I think is what they call it?

A.   Yes, it is.

Q.   Now, you were asked questions about how much ExxonMobile paid Pricewaterhouse Coopers?

A.   Yes.

Q.   And you respond police department big job.

A.   Yes.

Q.   Tell the jury what you meant by that.

A.   Well, ExxonMobile at that point in time had 75,000 or so employees, operated in scores of countries around the world in a variety of different businesses we've touched on before, upstream, downstream, chemicals, lot of far-flung operations, so lots of data, financial data, operational data moving through lots of processes to ultimately be able to report publicly on the company's operations.

Pricewaterhouse Coopers' charge was to monitor, test -- and test those processes and mon -- and test the results, make sure they were accurate.

Q.   The Pricewaterhouse Coopers' employees come work on-site at ExxonMobile's offices?

A.   There were some, yes.

Q.   Okay.  And did you get the sense that the question about how much ExxonMobile has paid Pricewaterhouse Coopers was an inference that maybe there was some sort of influence the company had over Pricewaterhouse Coopers?

MR. SAHAM:  Objection, leading, Your Honor.

THE COURT:  Sustained.

MR. THOMAS:  Your Honor, does the amount -- sorry.

BY MR. THOMAS:

Q.   Mr. Swiger --

MR. THOMAS:  You can answer if you want, judge.

BY MR. THOMAS:

Q.   Does the amount of money that you are paying to Pricewaterhouse Coopers impact their independent role that you just described?

A.   It does not.

MR. SAHAM:  Same objection, as well as foundation.

THE COURT:  As far as you know.  Only answer as far as you know.

Overruled.

THE WITNESS:  I think it's important to understand that all publicly-traded corporations in the United States must have an independent auditor.  That is the rule, an SEC rule.  And all of those publicly-traded corporations pay those independent auditors for their work.

BY MR. THOMAS:

Q.   They don't do it for free?

A.   They do not.

Q.   To your knowledge did Pricewaterhouse Coopers ever express any concern to ExxonMobile about ExxonMobile's process for reporting proved reserves?

A.   They did not.

Q.   Did Pricewaterhouse Coopers ever express, to your knowledge, any concern to ExxonMobile about ExxonMobile's process for reporting production prices and production costs

PAMELA J.  WILSON,  CSR/RMR/CRR

**App. 106**

for its production throughout the country and the world?

A.    No, sir, they did not.

Q.    And to your -- to your knowledge did Pricewaterhouse Coopers ever express any concern to ExxonMobile about ExxonMobile's analysis of whether those Rocky Mountain dry gas assets should or should not be impaired in 2015?

MR. SAHAM:  Objection, leading.

(Pause.)

THE COURT:  Let me look at the question.  Just a sec.

Overruled.

THE WITNESS:  They did not.

BY MR. THOMAS:

Q.    To your knowledge, did Pricewaterhouse Coopers ever suggest that those Kearl reserves needed to be debooked in 2015?

A.    They did not.

Q.    Did they ever suggest that those Rocky Mountain dry gas assets needed to be impaired in 2015?

A.    They did not.

Q.    Now, you met with them in these audit committee meetings, correct?

A.    Sure.  Yes.

Q.    Did you ever instruct anyone to hide anything from Pricewaterhouse Coopers?

A.    Absolutely not.

MR. SAHAM:  Objection, leading.

THE COURT:  Stop.

Overruled.

THE WITNESS:  Absolutely not.

BY MR. THOMAS:

Q.    Now, sir, I want to shift to Kearl.  Okay?

A.    Okay.

Q.    Just to remind the jury, we talked about Kearl was mining, but when did the Kearl mining process actually start production?

A.    The initial phase of the development commenced production in 2013.

Q.    Okay.  And we talked a little bit or heard a little bit about the expansion project.

A.    Yes.

Q.    Tell the jury what the expansion project was.

A.    The expansion project was essentially a duplicate of the initial development to double the capacity of the mine.  It relied on some basic infrastructure that was installed with the initial development but it essentially added infrastructure to double the production of the mine.

Q.    And did -- when was that expansion completed?

A.    It started up in June of 2015.

Q.    When you say it started up, that's when it started

producing on that expansion side?

A.    Yes, sir.

Q.    And how much - I think we talked about a little bit - did all of this cost the company?

A.    It was in the neighborhood of $20 billion.

Q.    Now --

THE COURT:  Wait.  I have a question.

When you say "expand" that could have several connotations.  What do you mean by that?

THE WITNESS:  I mean it -- it expanded --

THE COURT:  Did it go down or do you go out?

THE WITNESS:  No, sir.

THE COURT:  You just get more land and then you dig over there on land you didn't have before?

THE WITNESS:  Well, the land had already been acquired.

THE COURT:  I didn't mean it like that.  I mean but you hadn't been digging on it before.

THE WITNESS:  That's right.  We opened up new sections of the mine and we installed a lot of new equipment to handle the capacity.

THE COURT:  Is this a marsh, kind of a marshy area or no?

THE WITNESS:  It is low-lying, and there are lakes in the vicinity.  It is in the Boreal section of Canada.

It's forested.

THE COURT:  It is forested?

THE WITNESS:  Forested.  And it's called muskeg, m-u-s-k-e-g.  It is a soft, almost Peaty soil.

THE COURT:  Okay.  Okay.  Okay.

THE WITNESS:  A bit like a peat bog in some places.

THE COURT:  Okay.

THE WITNESS:  But lots of dry land, too.

THE COURT:  Okay.  Back to you.

MR. THOMAS:  Thank you, Your Honor.

BY MR. THOMAS:

Q.    Mr. Swiger, when we talk about those $20 billion there is a term you used yesterday and it was "capital development costs".  Do you remember talking about that?

A.    Yes, sir.

Q.    What is a "capital development cost"?

A.    It is an investment made to develop a deposit, in this case the Kearl oil sands, so it is an investment as opposed to an expense.  It was an expenditure but it is an investment expenditure.

Q.    What kind of things would you be spending money on that would classify as a capital development cost?

A.    Well, in the case of Kearl it would be the big processing equipment, the big crushing equipment, the conveyor belts, the pipeline system to take the slurries

PAMELA J.  WILSON,  CSR/RMR/CRR

**App. 107**

around there, all the big mining equipment, the big power shovels, the big dump trucks, the big graters, the dig dozers, all those things.

Q.   And that's what that $20 billion was spent on?

A.   Yes, sir.

Q.   And was that -- those expenditures, do they keep going into 2015?

A.   They did.

Q.   Now --

THE COURT:  You can't expense those trucks?

THE WITNESS:  They're recovered through depreciation.

MR. THOMAS:  That was my next question.

THE COURT:  I'm sorry.  Go ahead.

BY MR. THOMAS:

Q.   You mentioned depreciation a couple of times?

A.   Yes, sir.

Q.   At a very high-level for those of us who aren't accountants, can you tell us what depreciation is?

A.   Depreciation is how you reflect the initial investment in something in the income statement.

So if I was to construct a business that costs say a thousand dollars, and I thought that business had a 20-year life, when I'm thinking about the profit and loss for what we call book earnings, I would have a $50 charge each year to

get to the book earnings.  It is not a cash cost.  It is a noncash cost.  It is depreciation.  You are depreciating the value of that asset over time.  So by the time you get to the end of that 20 years that asset has zero value.  In our case that equipment would be fully used or worn out by that time.  We would have to either cease operations or build new equipment.

Q.   Now, remind the jury, how long the company expected Kearl to use bitumen.

A.   40 years plus, more than 40 years.

Q.   And you mentioned the phrase start-up yesterday in one of your answers counsel's questions.  Did you consider the Kearl project a start-up in 2014 and '15?

A.   Absolutely.

MR. SAHAM:  Objection, leading.

THE COURT:  Overruled.

Q.   Tell the jury --

THE COURT:  I know it's leading when he does that, but I'm going to let both of you lead a little bit.

Okay.  So you were right, but I'm overruling you.  Okay.

MR. THOMAS:  It happens to me a lot, too.

THE COURT:  It will happen to you.

BY MR. THOMAS:

Q.   So you said you did consider it a start-up.  Tell the jury what you mean by that.

A.   The -- the project, particularly the expansion project, has just been constructed and we're beginning to start the operations, mining the oil sands from the development area, importing it into the crusher, moving it through the process equipment for the first time.  So it's -- it's -- it's like -- I don't know what a good analogy would be, starting up a car for the first time, although it's much more complicated.

If you can just imagine a -- a long chain of steps to take this tar sand and turn it into bitumen and each one of those has to work properly to move it to the next step there.  It is a challenging start-up type operation to move through all of those steps and get the system balanced.

Q.   Were there any issues caused by this start-up phase?

A.   There were.  We had a number of issues in the start-up, yes.

Q.   Tell the jury about just one or two of those, please.

A.   Well, I think it's important also when we talk about the start-up here in that part of this project had new technology developed by ExxonMobile.  We pride ourselves on invention and innovation and weaning bitumen from the tar sands was an industry challenge.  You heard about other operators up there.  Whoever can figure out how to do it better, cheaper, more efficiently, is going to have the best business.

So our technology people worked very hard in the early

part of this century on what is a better way to ultimately get that bitumen -- free it from the sand and make it into a saleable project.  So they developed something called a Paraffinic Froth Treatment process.  I know that doesn't mean anything, but it's a big vessel with chemicals in it and a lot of operations going on there to separate that -- to get that sticky bitumen off of the sand grains and turn it into something that we could actually move.

We also in the project constructed what I think was the largest crusher ever built in the industry, big rock crusher.  If it wasn't the biggest it -- well, if it wasn't the biggest I'd be surprised.

So this crusher is a machine, a gigantic machine, the size of this room or bigger, whereby the dump trucks drop the mine material into the crusher.  The crusher has two huge rollers with studs on them, so think of it like a giant paper shredder that you're feeding paper into, in this case you're feeding the ore into and that crusher pulverizes all the rocks and the sand into small finer sand grains to be fed into the process equipment there.

We had problems with the crusher when we started up.  We had a single crusher for both the initial development and the expansion project.  It was designed to handle a load from both phases of the project.  When we started putting the loads in from the expansion phase we experienced a series of

PAMELA J.  WILSON, CSR/RMR/CRR

**App. 108**

mechanical failures. It was not loading itself properly and we were getting mechanical failures. Some of those took a lot of repair work.

I think, if I recall correctly, we were down for a lot of September of 2015 with that crusher offline. When that crusher goes offline there's no production. Everything stops. So you -- you might recall an exhibit there where in one month we sold just 89,000 barrels a day, that was a month where things weren't running well.

The froth treatment plant that I talked about before, this new proprietary technology, took a lot of work to finetune and balance. It suffered through a lot of upsets. You think about like an upset stomach and it takes a little while to recover that. You have to take medicine or just give it time. Well, this took a lot of finetuning by technologists to get the chemical mixes right, get the process equipment working right before it would run reliably.

So we had a period with these start-up issues - and there were several more, but I won't waste the court's time - that had the operation running up and down unreliably for a lot of the second half of 2015. It also required us to incur a lot of additional expense, bring more people in there, bring more equipment in there, bring more chemicals in there to get the operation running right.

Now, I would point out this is not unusual in big projects, particularly with new technology. It happens. We accept it. But, remember, this project had a 40-plus year life. You get through these start-up issues, you get it running reliably, and then you start learning and making it better and better and better, more inexpensive and more efficient. That's what we do.

Q. Did any of these start-up issues impact your view of the long-term value of Kearl?

A. No. This happens with big projects, particularly with novel technology.

MR. THOMAS: Can we pull up Plaintiff's Exhibit 66, please.

This has already been admitted, Your Honor.

THE COURT: Okay.

BY MR. THOMAS:

Q. And we're looking at here the 2015 10-K that's really the document at issue in this case, right?

A. Yes, sir.

Q. Okay. Right before we broke for the -- for the afternoon yesterday, you were shown a table that's on page 11 of the pdf but page 9 of -- if -- if you saw the page number below it.

Tell the jury what this table is.

A. This is an SEC-mandated table showing production prices and production costs broken out by geographical area as

mandated by the SEC and by type of production.

Q. And when you say geographic area, we see here Canada and South America, correct?

A. Yes. Those are two of the geographic areas, yes.

Q. And then we see by product bitumen per barrel and average production cost per barrel of bitumen, correct?

A. Yes.

Q. I think this was cleared up earlier but I'm not sure.

Is there any bitumen in South America?

A. No, sir.

Q. Now, you said this was mandated by the SEC.

Do you have an understanding of the rules the SEC had in place for tables like this back then --

A. Yes, I do. Yes.

MR. THOMAS: Your Honor, at this time we would like to introduce Defense Exhibit 3.

THE COURT: Any objection?

MR. SAHAM: I haven't seen it.

(Pause.)

MR. SAHAM: No objection, Your Honor.

THE COURT: Well, then it's admitted into evidence.

MR. THOMAS: Mr. Gooden, will you put up Defense Exhibit 3, please. Can you zoom in on the bottom, ends with 1204, bottom left.

BY MR. THOMAS:

Q. What are we looking at here?

A. We're looking at SEC regulations.

Q. All right. We're getting at exciting stuff now.

THE COURT: Wow, you must not get out much.

MR. THOMAS: It was my feeble attempt at a joke, judge.

THE COURT: It was good.

MR. THOMAS: Then you one-upped me.

THE COURT: I won't do that. Yeah, I will.

BY MR. THOMAS:

Q. Does this rule apply to the table we were just looking at?

A. Yes, sir, it did.

Q. And it says, "For each of the last three fiscal years disclose production, by final product sold, of oil, gas, and other products."

And "other products" would include bitumen?

A. Yes, sir.

Q. Then it says, "Disclosure shall be made by geographical area and for each country and field that contains 15 percent or more of the registrant's total proved reserves expressed on an oil-equivalent basis."

Did I read all that correctly?

A. You did, sir.

Q. What does that mean generally?

A.   That means that the SEC wants to see anything that adds up to more than 15 percent of the company's total proved reserves disclosed separately.

Q.   Okay.  Was -- you said you kept familiar with the SEC rule-making process?

A.   Yes, sir.

Q.   Was there a time where the SEC proposed -- to your knowledge that the SEC proposed a lower threshold than 15 percent?

A.   There was a -- a study period, I cannot recollect how many years before this it might have been, but it was sometime earlier in the decade, I think, where the SEC proposed individual field disclosure and potential limits on that and so forth, studied the issue for a long time, took comments from industry and other interested parties, including other branches of the government, foreign governments, those sort of things, and ultimately decided that individual field disclosure would not be required for anything less than 15 percent of the total proved reserves, as it says here.

Q.   Did -- from all the materials you looked at, do you have an understanding whatever the SEC's stated reason was for not -- not lowering this percentage?

A.   Yes.  My -- again, my recollection is -- is because they felt it would induce -- it could introduce the potential

that -- the potential for competitive damage, in other words, disclosing things that could be used by competitors against the company.

Q.   And would that competitive damage potentially ultimately hurt the shareholders?

A.   Yes, sir.

Q.   Let's go back to -- well, before we do that --

         MR. THOMAS:  Ronnie, could I have the ELMO, please?  Mr. Jacobson, I'm sorry.

         COURTROOM DEPUTY:  Push 3.

         MR. THOMAS:  You should label it.  On top.  Okay.  It's labeled.

BY MR. THOMAS:

Q.   You were shown this pie chart yesterday.  Do you recall seeing this pie chart?

A.   I do.

Q.   And you were asked some questions about this and you said it was approximately 15 percent and you said precisely it was 14.5 something percent.  Do you remember that?

A.   That's correct, yes.

Q.   Okay.  And you also said there are times when rounding is appropriate and times when rounding is not appropriate.

A.   That's right.

Q.   When it comes to the SEC rules and complying with those rules is that a time that rounding is appropriate?

A.   It is not.  The SEC is quite specific on what it wants.

Q.   And that rule we just looked at said "shall" disclose by geographic region, right?

A.   Yes, sir.

Q.   You were asked what "must" means.  What does "shall" mean?

A.   Shall means you may.  You may.

Q.   Now, I have done some math --  just to back up did you say "shall" means may?

A.   No.  It means you must.

Q.   Okay.  I just wanted to make sure.  Sorry.  So your understanding of what the word "shall" means is the same as must?

A.   When the SEC says you "shall," it is a must.

         MR. THOMAS:  Okay.  Now, at this time I would like to introduce Defendant's Exhibit 1316.

         MR. SAHAM:  No objection.

         THE COURT:  It's admitted into evidence.

BY MR. THOMAS:

Q.   Let's do some math.  I can give you a calculator, but I hate to tell both of you, you were wrong yesterday.  It was the 3.6 billion barrels divided by the 24.7 total proved reserves is 14.54 percent.  Does that sound about right to you?

A.   That sounds about right.

Q.   And is that -- is that more than 15 percent?

A.   No, sir.

Q.   Is it 15 percent?

A.   It is not.

Q.   So under the SEC rules were you required to disclose Kearl on a field-level basis?

A.   No, sir.

Q.   Do you believe that the 2015 10-K complied with those SEC rules we just looked at?

A.   Absolutely.

         MR. THOMAS:  Let's go back to the 10-K, please, that page we were looking at.  Can you zoom into the sentence before the table, please, Mr. Gooden?

BY MR. THOMAS:

Q.   And before this table it says, "The table below summarizes average production prices and average production costs by geographic area and by product type for the last three years."  Is that right?

A.   That is right.

Q.   And is that what we saw in that rule?

A.   Yes, sir.

Q.   So when we're looking at bitumen here, that's an average

PAMELA J.  WILSON, CSR/RMR/CRR

**App. 110**

of what?

A.    All the bitumen production we had.

Q.    So it's not just Kearl?

A.    No.  Kearl and Cold Lake.

Q.    Okay.  We've heard a little bit about Cold Lake.
Tell the jury what Cold Lake is.

A.    Cold Lake is a -- another bitumen project.  It is in a part of Canada a little further south and east of Kearl where the ore body is much deeper, several thousand feet below the ground, but it's still producible by drilling wells and injecting high-temperature steam into those wells to melt the bitumen, probably the best way to say it, to allow it to flow to the surface and it can then be recovered as saleable bitumen.  So it's a different operation but it produces the same saleable product.

Q.    And how long had Cold Lake been in operation in 2015?

A.    Oh, many years.  Cold Lake was a heritage, Exxon IOL operation.  I'm a heritage Mobile guy.  I think it must have started up in the '70s or -- and '80s or '90s.  I -- I do not recall.

Q.    Okay.  But at the end of the day both those fields -- both those fields are selling some form of bitumen; is that right?

A.    Yes.

Q.    Now, we can zoom out if we need to.

101

But is there anything in table -- this table on page 11 of the pdf, which is page 9 of the 10-K, that says anything about profit or loss?

A.    No, sir.  It's not a profitability table.

Q.    And does the word "profit" or "loss" show up on this table anywhere?

A.    No, it does not.

Q.    Now, you know you've been accused of hiding the losses at Kearl, using their language.  Do you see that -- do you remember that?

A.    Yes, sir.

Q.    Did you hide any losses, gains, or any financial performance about Kearl?

A.    No.  It's all in the financials.

Q.    And we saw -- we're about to look at a few of these documents that show negative book earnings of 50- or 60- or $70 million.  Did those go into the 10-K?

A.    Yes, sir.

Q.    Would those have gone into this table?

A.    The earnings would have not, but the underlying data is there, yes.

Q.    Okay.  But this table is not a profit or loss table.

A.    It is Not.

Q.    Now, I want to look at some of those documents.
MR. THOMAS:  Can we see Plaintiff's Exhibit 65 on

102

page 75, please.
Zoom in a little for us please, Mr. Gooden.
Thank you.

BY MR. THOMAS:

Q.    Now, you were shown this years.
Do you remember seeing that?

A.    Yes.

Q.    And you were asked about those losses at Kearl.
A negative number is a loss, no dispute about that?

A.    Right.

Q.    And a parentheses is a negative number, right?

A.    Yes, sir.

Q.    Okay.  Now, that cash number, does that include the cash spent on some of those capital development costs?

A.    It does.

Q.    Okay.

A.    It does.

Q.    Are those production costs, those development costs, are those production costs?

A.    They are not.

Q.    Are they unit lifting costs as that term is used in the SEC proved-reserve test?

A.    They are not.

Q.    And we see the book number of 187 million.  Does that include the depreciation you were talking about?

103

A.    Yes, sir.

Q.    Is depreciation included in production cost?
MR. SAHAM:  Objection, leading.
THE COURT:  Sustained.

BY MR. THOMAS:

Q.    Do you know whether depreciation is or is not included in production cost?

A.    Depreciation -- depreciation is not included in production cost on this.

Q.    And you were shown the table at the -- at the top.  And we saw a slide like this in the plaintiff's opening, but I want to ask you about the bullet and the dash below in the middle that's highlighted there.
It says, "Kearl as an individual field produces net undiscounted cash flows in excess of carrying value.
"Net undiscounted low flows of 71-G."
What's the G mean?

A.    Billion, sir.

Q.    $71 billon or $53 billion greater than the carrying value of $18 billion?

A.    Yes, sir.

Q.    What does that mean?

A.    That is the result of doing the asset recoverability test to test for impairment where you run out the cash flows using the price bases, all the costs, and determine what the

104

PAMELA J.  WILSON,  CSR/RMR/CRR

App. 111

undiscounted cash flows are, compare them with the value on the books and make a determination.

Q. Does this tell us anything about the company's views of the value of Kearl in June of 2015?

A. Yeah, a very valuable project.

Q. And why do you see that?

A. $71 billion of undiscounted cash flow, $53 billion greater than what it's on the books for.

Q. Does this mean at this time ExxonMobile believed it was going to make $53 billion more than it spent?

A. We believed ExxonMobile would make a lot of money off Kearl, yes.

Q. I want to look at the left column there.
KOEBD, I think you said that meant thousands of barrels a day. Is that right?

A. Yes, sir.

Q. And we see Cold Lake is 140,000 barrels a day. Do you see that?

A. Yes, sir.

Q. And Kearl is 110,000 barrels a day?

A. Yes, sir.

Q. And this was in the middle of 2015?

A. Yes, sir.

Q. Do you have a recollection at the end of 2015 the break-out of the volume of bitumen produced by Kearl and Cold Lake on a percentage basis?

A. I do.
Cold Lake was an average of 139,000 barrels a day.
Kearl was an average of 149 thousand barrels a day

Q. So just a little bit off of 50/50; is that right?

A. That would be right.

Q. Okay. When we looked at table 9 that was an average of those two -- those two numbers, correct?

A. Yes, sir.

Q. And when we look at the average and the production costs and the production prices on that table 9 and the 10-K, does the size of the reserves have anything to do with those numbers?

A. No, sir.

MR. THOMAS: Can you go to Plaintiff's Exhibit 211, please.
Go to page 18, please, Mr. Gooden.
Can you just zoom in on the -- the whole chart. Just get rid of the white area around it if you could, please.
And then zoom in on the Kearl metrics, please.
Thank you.

BY MR. THOMAS:

Q. You saw a bunch of these special topics charts, correct?

A. Yes, sir.

Q. Why were you getting special topics charts about Kearl

in the middle of 2015?

A. Well, because Kearl was a very big project in the midst of start-up.

Q. Okay. And you were asked about the earnings and the estimated cash numbers on this chart, correct?

A. Yes, sir.

Q. Okay. And you were -- you -- you tried to answer, and I think you did, I'm not sure you got a chance to explain, about that EMDC CapEx at the end. Do you see that?

A. I do.

Q. Okay. And -- and what does that mean?

A. What that means is if you look at the July line there where it says a negative 63 million of cash for the month of July, that included those ongoing investments while the project was starting up that were going to be capitalized and depreciated later on. If you stripped out those from the expenditure at that time, the Kearl cash flow was actually $37 million positive in July.

Q. And those EMDC capital expenses that you're talking about --

A. Yes, sir.

Q. -- are those production costs?

A. They are not.

Q. As we saw on the table 9 -- page on table 9 in the SEC form?

A. They are not.

Q. And we talked, and we're going to talk a little bit more, about unit lifting costs for that SEC reserves test?

A. Yes.

Q. Are those capital expenses unit lifting costs for purposes of that test?

A. They are not.

Q. Let's go to Plaintiff's Exhibit 216, please.
Actually, stay here real quick. Okay. Let me back out.
MR. THOMAS: Can you -- oh, it's not on this one. Never mind.
Go ahead and go to Plaintiff's Exhibit 216, please.
Thank you.
Go back to that. Sorry. You knew where I was going, Mr. Gooden. I appreciate it.
Can you go back -- yeah. Thank you.

BY MR. THOMAS:

Q. Now, this is the on the slide -- the exhibit we were just looking at and you were asked a lot of questions about these XTO numbers. Do you remember that?

A. Yes.

Q. And when we're talking about the Rocky Mountain dry gas assets, are we talking about XTO in total?

A. No, not at all.

Q. Can you give us some scale of what these Rocky Mountain

dry gas assets, what percentage they make up of XTO?

A.   Well, in terms -- at that time in terms of value it was probably in the order of 6 or 7 percent of the value, the book value of XTO.  In terms of actual production volumes much smaller.  I don't recall or recollect exactly what was being produced in the Rocky Mountain dry gas assets but it was not a lot at that time.

Q.   And then in 2016, at the end of 2016, when there was an impairment of those Rocky Mountain dry gas assets, what about the rest of the other 94 or 95 percent of XTO?

A.   They all -- they all passed the asset recoverability test --

Q.   Okay.  So --

A.   No impairment.

Q.   So when we're talking about that we're not talking about XTO in total, correct?

A.   Oh, no.

Q.   Just a small part of it?

A.   Small part, yeah.

MR. THOMAS:  Now could we go to Plaintiff's Exhibit 216, please, Mr. Gooden.

And go to page 24, please.

BY MR. THOMAS:

Q.   Similar chart, I don't want to dwell on it, we've already looked at it, but can you tell us what that sentence

means and the parenthetical clause at the end of that sentence at the top.

A.   The sentence says the December earnings were $51 million negative, the operating cash was 60 million negatives but if you strip out those ongoing development company capital investments it was actually $2 million in December.

Q.   So if you take out those development expenses it's cash positive to 2 million?

A.   Yes, sir.

Q.   And those development expenses, they're not production costs, correct?

A.   They're not.

Q.   They're not unit lifting costs for the SEC reserve test?

A.   Oh, sorry.  They are capital investments that will ultimately be depreciated.

Q.   Would these calculations that get to these numbers be used for the SEC reserve test?

MR. SAHAM:  Objection, leading.

THE WITNESS:  They would not.

THE COURT:  Sustained.

Ask him without leading.  Okay?

MR. THOMAS:  Okay.  Yes.  Yes, Your Honor.

BY MR. THOMAS:

Q.   You -- you have an understanding of the types of costs and I think you saw an exhibit, that are used in that SEC

proved-reserve test to determine whether the reservations are proved or not?

A.   Yes, I do.

Q.   Okay.  And do you know which types of costs are included?

A.   I do.

Q.   Are production costs, cash production costs included?

A.   Yes, sir.

Q.   Okay.  And we saw sustaining capital expenses are included?

A.   They were.

Q.   What about these development CapEx costs?

A.   Not included.

Q.   Now, I asked you about this earlier, these negative numbers, were they disclosed in the SEC Form 10-K, did these numbers, even though they're not part of the proved-reserve test, make it into that 10-K.

A.   They made it in in the financials in the 10-K, yes.

Q.   Okay.  Can we go back to Plaintiff's Exhibit 66, which is the 2015 Form 10-K and go to page 99 of the 10-K, which is actually page 101 of what you're going to pull up, Mr. Gooden.

BY MR. THOMAS:

Q.   And, again, if you're looking at the hard copy exhibit of the 10-K this is on page 99, correct, Mr. Swiger?

A.   Yes.

Q.   And tell the jury what we're looking at here.

A.   These are the -- these are the consolidated -- these are the results of operations for producing activities by geographic area and breaking out costs, exploration costs, production costs, taxes, those sort of things, to get to a result, an annual result.

Q.   Do these include those depreciation expenses you were talking about earlier?

A.   They do.  You can see the line item there.

Q.   And exploration expenses, are those production costs?

A.   They are not.

Q.   Are those costs that go into the proved-reserve analysis?

A.   They do not.

Q.   And we see the last sentence of the paragraph says, "Oil sands mining operations are included in the results of operations in accordance with Securities and Exchange Commission and Financial Accounting Standards Board rules."

A.   Yes, sir.

Q.   Does the SEC have a different set of rules than the Financial Accounting Standards Board?

A.   They do not.

Q.   And so what does this show the reader about the operations in Canada in 2015?

A. That there was a -- a loss of 896 million.

Q. And what does it show the reader about the operations in the United States in 2015?

A. A loss of 1.755 billion.

Q. And where are those Rocky Mountain dry gas assets located?

A. In the United States.

Q. And is this where those numbers that we just looked at on all those charts, the negative numbers, is this one of the places they would have gone into the 10-K?

A. Absolutely, yes.

MR. THOMAS: Can we go down, I think it's, Mr. Gooden, to 2014, which is on the next page.

BY MR. THOMAS:

Q. And do I have this right, sir -- I'm just trying to get through this, but in the 10-Ks sometimes we see the prior years, the prior two years, so the reader can compare how -- how the company is performing, correct?

A. It's what the SEC requires, yes.

Q. Okay. This is for 2014, those same categories, same expense items.

How much did ExxonMobile make or lose in Canada in 2014

A. $1.767 billion.

Q. And what about in the United States?

A. $2.938 billion.

113

Q. And so what does this tell anyone who's looking at it if you're comparing how 2015 Canadian operations compared to 2014 Canadian operations?

A. That they moved from a profit to a loss.

Q. And how big is that swing?

A. A large swing.

Q. A couple of billion dollars?

A. Two and a half billion.

Q. Now --

MR. THOMAS: We can take this down, Mr. Gooden.

BY MR. THOMAS:

Q. I want to talk about the reserves process that we've spent so much time on.

Who at the company performed the calculation to determine if Kearl's reserves qualified as proved or not?

A. That would be done by the Global Reserves Group.

Q. Would you tell the jury what the Global Reserves Group is.

A. Global Reserves Group is a worldwide group that is charged specifically with the estimation of reserves for the company and performing all the appropriate tests mandated by the SEC on whether the reserves qualify as proved.

Q. Are there members of the Global Reserves Group who are employed by ExxonMobile and then also its subsidiaries?

A. Yes, sir.

114

Q. And you mentioned Imperial Oil. Did -- did they have reserves folks at Imperial Oil?

A. They did, yes, and they would work for the Global Reserves Group.

Q. Again, I asked you this earlier, you were here for opening statement, correct?

A. Yes, I was.

MR. THOMAS: And, Mr. Gooden, can you pull up Defendant's slide 19, please. 19.

Go down one more. Yeah. Just go ahead and run through it.

BY MR. THOMAS:

Q. Okay. Do you remember seeing this in the opening statement?

A. I do.

Q. Does this comport with your understanding of how the reserves process worked in 2015?

A. Yes, sir.

Q. And you said you were a reservoir engineer at some point in time, correct?

A. I was.

Q. And worked on trying to determine how much there were --

THE COURT: Stop. We're going to break -- we're going to break in just a minute.

115

Do you need to break right now?

Okay. We'll break for lunch right now.

And be back in an hour. Thank you.

Sorry.

THE SECURITY OFFICER: All rise for the jury.

(Jury exits the courtroom.)

THE COURT: You can step down, Mr. Swiger.

Okay. Off the record. Thanks, Pam.

(Recess taken at 11:45.)

(Proceedings continued in Volume 2B.)

116

PAMELA J. WILSON, CSR/RMR/CRR

**App. 114**

INDEX - VOLUME 2A

| WITNESS NAME | Page | Line |
|---|---|---|
| ANDY SWIGER | | |
| DIRECT EXAMINATION (CONT.) BY MR. SAHAM | 9 | 12 |
| DIRECT EXAMINATION (CONT.) BY MR. SAHAM | 41 | 22 |
| CROSS EXAMINATION BY MR. THOMAS | 62 | 18 |

PLAINTIFF EXHIBITS

| Exhibit | Description | Identified | Admitted | Denied |
|---|---|---|---|---|
| 27 | Data Guide | 38 | 38 | |
| 161 | Proxy | 58 | 58 | |
| 219 | Email | 33 | 33 | |
| 221 | Email | 30 | 30 | |
| 228 | Unidentified | 51 | 51 | |
| 595 | Article | 17 | 17 | |
| 596 | Article | 19 | 19 | |
| 597 | Article | 26 | 26 | |
| 598 | Article | 21 | 21 | |
| 697 | Article | 28 | 28 | |
| 746 | Email | 50 | 50 | |

DEFENSE EXHIBITS

| Exhibit | Description | Identified | Admitted | Denied |
|---|---|---|---|---|
| 3 | SEC rules | 95 | 95 | |
| 1316 | Unidentified | 99 | 99 | |

117

52:2, 52:22, 53:12, 63:18, 63:24, 64:13, 65:6, 65:8, 94:16, 100:9, 100:12, 102:2, 102:17, 106:11, 111:15, 111:17, 111:18, 111:20, 111:25, 113:10
**10-ks** 42:24, 65:14, 113:16
**10-Q** 43:1, 47:18
**100** 2:41
**10019-6064** 2:36
**101** 111:21
**10:1212.)** 41:15
**11** 50:18, 52:8, 55:18, 56:7, 94:20, 102:1
**11/11/15** 42:2
**110** 105:20
**1100** 3:14
**117** 24:23
**11910** 2:3
**11:4545.)** 116:9
**12** 12:16, 12:20, 26:6, 48:11, 117:7
**1204** 95:24
**125** 20:14
**126** 68:25
**1285** 2:35
**1316** 99:17, 117:44
**139** 106:3
**13th** 3:14
**14** 59:7
**14.5** 98:19
**14.54** 99:24
**140** 105:17
**149** 80:11, 106:4
**14A** 58:14
**15** 29:11, 35:24, 96:20, 97:2, 97:8, 97:19, 98:18, 100:2, 100:4

**16** 74:9
**161** 58:8, 117:19
**17** 36:6, 117:27
**18** 21:13, 106:17, 117:11
**182** 9:16
**187** 103:24
**19** 115:9, 117:29
**19.20** 11:14, 11:18
**1900** 1:47
**1908** 67:9
**1920s** 67:11
**1978** 72:19
**1999** 68:13

〈 2 〉
**2** 9:19, 10:25, 11:2, 11:7, 12:11, 24:1, 31:6, 34:6, 35:3, 35:17, 41:25, 48:25, 51:20, 110:8
**2.35** 80:3
**20** 77:4, 90:4
**20-fs** 65:15
**20-year** 89:23
**2008** 73:13
**2009** 29:6, 70:21
**2010** 25:4, 25:17, 26:14, 27:20
**2010."** 27:16
**2013** 58:25, 86:13
**2014** 39:22, 39:24, 40:6, 40:9, 40:15, 59:4, 90:13, 113:13, 113:20, 113:22, 114:3
**2015** 20:4, 22:11, 31:8, 32:11, 38:21, 39:3, 39:4,

39:6, 39:12, 40:19, 42:24, 51:2, 51:4, 59:6, 60:6, 60:22, 63:7, 63:18, 74:9, 80:1, 80:3, 80:10, 80:11, 85:6, 85:16, 85:19, 89:7, 93:21, 94:16, 100:9, 101:16, 105:22, 105:24, 107:1, 111:20, 112:25, 113:3, 114:2, 115:17
**2016** 18:18, 33:24, 39:5, 39:6, 39:7, 47:18, 47:19, 58:8, 76:13, 109:8
**2018** 76:21
**2020** 40:8, 40:9, 40:16, 72:23
**2021** 72:23
**21** 117:33
**211** 106:15
**212** 2:37
**214** 1:37, 2:19, 2:26, 3:17
**216** 36:4, 108:8, 108:12, 109:21
**219** 33:14, 33:18, 117:21
**22** 40:23, 117:9
**220** 2:3
**2200** 2:47
**221** 29:19, 29:21, 117:23
**227** 46:13, 47:14
**228** 51:15, 51:19, 55:18, 56:6, 117:25
**23** 29:10
**230** 56:23, 57:3
**2300** 2:17, 2:24

**231-1058** 1:49
**24** 55:10, 109:22
**24.7** 99:23
**25** 23:12
**26** 117:31
**2601** 2:17
**27** 37:9, 37:11, 37:15, 37:16, 37:17, 37:25, 38:1, 38:4, 39:11, 43:16, 48:13, 54:4, 117:17
**28** 117:35
**2801** 2:24
**29th** 33:24
**2A** 1:25, 4:1, 117:1
**2Q** 43:1

〈 3 〉
**3** 31:13, 47:10, 50:8, 95:16, 95:23, 98:10, 117:42
**3.6** 21:6, 99:23
**30** 117:23
**33** 37:10, 37:14, 37:17, 37:25, 117:21
**34** 42:13
**35** 42:13
**373-3000** 2:37
**38** 117:17
**3811** 1:35
**3:** 1:15

〈 4 〉
**4** 13:4, 29:9, 31:20, 38:24, 39:9, 60:3
**4.1** 80:8, 80:9
**4.38** 26:5
**40** 90:10
**40-plus** 73:19, 94:2
**41** 11:10, 33:1,

119

〈 Dates 〉
"**March 28th, 2016. 2016** 51:21
"**November** 34:14
**$2.26.** 36:21
**$3.20).** 35:18
**2000 (November 2001** 35:18
**April 20th,** 57:19
**APRIL 27, 2026** 1:28
**APRIL 29, 2026** 4:1
**August of 1978** 65:24, 66:20
**December** 36:11, 36:19, 110:3
**December 14th, 2009** 22:13
**December,** 36:25
**February 12th, 2015,** 17:22
**February 16, 2011.** 26:24
**February 1st** 39:4
**February 20th, 2017,** 50:10
**February 24, 2016** 10:21
**February 24th, 2016** 10:2
**February 24th, 2016,** 11:8
**February 29th, 2016,** 12:23
**February 29th, 2016.** 13:7
**February 29th, 2016."** 12:17
**February 4th, 2016,** 38:22
**January** 50:12, 50:22
**January 10th,**

**2011,** 28:20
**January 10th, 2011.** 29:1
**January 17** 50:19
**January 2017** 6:7
**January 2017.** 50:17
**January 31st** 2017. 46:17
**January 31st, 2017,** 46:15, 46:24, 48:4
**January,** 49:18
**January, eleven month** 53:20
**July** 107:12, 107:18
**July,** 107:14
**June 25, 2010,** 24:4
**June 25th, 2010,** 24:19
**June 25th, 2010.** 23:25
**June of 2015** 105:4
**June of 2015** 86:24
**March 21st,** 53:9
**March 21st, 2016,** 53:6, 56:9, 56:13
**March 28th, 2016,** 51:25
**March of 2016,** 53:17
**May** 14:8, 38:5, 62:16
**May 6th, 2016,** 57:4
**November** 35:6, 35:17, 35:21
**November,** 36:1, 36:19
**October** 24:23
**October 14th,** 2015, 30:5

**October 15, 2015."** 31:8
**October 2015** 31:17, 31:24
**October 2016** 6:7
**October 27, 2015.** 19:13
**October 28th** 33:23
**October 28th '16** 6:17
**October 28th,** 2015 34:9
**October 28th,** 2016 5:23, 20:24
**October 28th,** 2016, 20:25, 21:8
**October 28th,** 2016. 20:15
**October of 2015** 33:10
**September 1st** of 2021 66:22
**September of** 2015 93:5
**three month of** October, November, 36:24
**$1.20** 40:19, 48:15
**$1.60** 51:1, 80:11, 83:4, 93:8, 105:17, 105:20, 106:3
**$1.70** 51:5
**$1.74** 36:12
**$1.767** 113:23
**$1.80** 37:1
**$100** 32:14, 32:16, 32:22
**$12** 13:8, 49:18, 59:1
**$16** 39:15, 43:19, 47:14, 48:13, 48:14, 80:4
**$18** 104:20
**$19.20** 11:10
**$2** 19:18, 34:18, 46:20, 46:25, 110:6
**$2.03** 34:15

**$2.938** 113:25
**$20** 87:5, 88:12, 89:4
**$3** 47:3
**$3.30** 51:7
**$3.31** 50:23
**$31** 22:18
**$36** 29:13
**$37** 107:18
**$4** 40:20, 48:17, 49:8
**$4.10** 25:17
**$4.38** 25:5, 26:14
**$40** 42:11, 59:9
**$5.20** 40:16, 48:16
**$50** 32:19, 89:25
**$51** 110:3
**$53** 104:19, 105:7, 105:10
**$6.5** 18:13
**$70** 102:17
**$71** 104:19, 105:7
**'15** 90:13
**'16** 22:11
**(214)758-1500** 2:49

〈 0 〉
**000** 59:7, 80:11, 83:4, 93:8, 105:17, 105:20, 106:3
**059** 34:14

〈 1 〉
**1.755** 113:4
**10** 39:15, 43:19, 47:14, 48:13, 48:14, 80:4
**10-K** 10:2, 10:22, 11:8, 11:15, 11:18, 21:17, 49:18,

**117:9
4100w** 2:47
**43** 65:22, 71:11

〈 5 〉
**5** 23:17, 25:21, 46:18
**5.2** 40:5
**5.20** 48:24, 49:8
**50** 48:8, 49:12, 58:24, 68:23, 117:37
**50-** 102:16
**50/50** 106:5
**500** 29:11
**51** 41:7, 41:25, 48:22, 48:23, 49:17, 117:25
**510** 9:15, 9:16
**522** 12:5, 12:6
**525** 10:5
**546-5400** 2:43
**58** 59:12, 117:19
**59** 60:3
**595** 15:6, 17:18, 117:27
**596** 19:2, 117:29
**597** 26:18, 117:31
**598** 21:22, 117:33

〈 6 〉
**6** 24:25, 109:3
**6-CV-03111-K** 1:15
**60** 110:4
**60-** 102:16
**619** 1:49
**62** 117:11
**63** 107:13
**65** 67:1, 102:25
**651-5000** 2:26
**655** 1:47
**66** 94:11,

**111:19
662-1557** 3:17
**665** 12:4, 12:5
**697** 28:1, 117:35

〈 7 〉
**7** 109:3
**70** 81:12
**7084** 2:41
**70s** 101:19
**71-G.** 104:16
**713** 2:43
**744-3300** 1:37
**746** 49:22, 50:3, 50:4, 50:7, 117:37
**75** 83:4, 103:1
**75201** 2:18, 2:25, 2:42, 2:48
**75229** 1:36
**75242** 3:15
**75243** 2:4
**764-4446** 2:19
**787** 23:25

〈 8 〉
**8-K** 20:14, 20:15, 20:20, 20:24, 23:25, 24:1, 46:14
**80** 27:15, 27:19
**80s** 101:19
**825** 1:35
**880** 1:35
**89** 93:8
**896** 113:1

〈 9 〉
**9** 11:15, 20:24, 54:4, 71:22, 94:21, 102:2, 106:7, 106:11, 107:24, 117:7
**900** 59:7
**90s** 101:19

**92101** 1:48
**94** 109:10
**95** 109:10, 117:42
**972** 2:5
**99** 111:20, 111:25, 117:44
**991-1582** 2:5

〈 A 〉
**A.** 1:45
**AAA** 13:12, 13:14, 13:18, 13:25, 14:18
**Abandon** 19:11, 19:17, 19:25
**abandoned** 20:3
**abandons** 19:23
**able** 32:4, 83:9
**Absolutely** 58:20, 64:4, 71:14, 73:6, 80:17, 86:1, 86:5, 90:14, 100:11, 103:17
**accept** 73:21, 94:2
**accordance** 112:18
**According** 27:19, 27:22
**accountants** 89:19
**accounted** 27:15
**Accounting** 20:7, 82:19, 112:19, 112:22
**accurate** 63:25, 83:13
**accused** 102:8
**acquired** 44:19, 74:15, 87:16
**acquisition** 29:15
**across** 48:2, 61:2
**ACTION** 1:17, 21:12
**activities**

**112:4
activity** 33:7
**actual** 109:4
**Actually** 23:18, 33:19, 51:11, 86:10, 92:8, 107:17, 108:9, 110:6, 111:21
**Added** 27:16, 27:20, 57:24, 86:21
**adding** 58:2
**addition** 56:4
**additional** 55:14, 93:22
**adds** 97:1
**adequate** 31:4
**admit** 17:1, 17:7
**Admitted** 17:18, 19:6, 22:1, 22:4, 24:23, 26:21, 29:25, 33:16, 36:3, 38:4, 49:23, 49:25, 50:4, 51:17, 58:11, 94:13, 95:21, 99:19, 117:15, 117:40
**advisor** 30:11
**Affairs** 26:24, 27:3, 27:4, 27:5
**affirmed** 13:14, 14:1
**Africa** 70:13, 70:18
**afternoon** 94:20
**age** 66:24, 67:2, 67:21
**ago** 23:19, 81:25
**agree** 56:12, 61:16
**agreeing** 7:12
**agreement** 15:9, 16:14, 16:16, 16:24
**ahead** 9:11,

118

120

**App. 115**

19:8, 28:17, 30:2, 41:21, 89:14, 108:12, 115:10
air 45:18
Albers 30:12, 30:23
Alberta 19:16
Alberta. 19:16
ALEX 1:43
allow 101:12
allowed 56:17
almost 23:17, 61:5, 88:4
already 5:19, 29:14, 39:3, 87:15, 94:13, 109:25
alternatives 33:8
Although 45:14, 46:3, 56:14, 91:7
America 11:25, 12:4, 12:13, 12:15, 13:18, 47:21, 48:2, 95:3, 95:9
Americas 2:35
amid 19:20
AMITAV 2:32
AMOCO 67:14
amount 21:5, 83:23, 84:3
analogy 91:6
analyses 63:16
analysis 56:4, 77:22, 85:5, 112:14
analyst 10:8, 10:9, 10:20, 10:25, 11:2, 11:7, 11:18, 15:13, 29:9
ANDREW 1:18
ANDY 35:16, 35:17, 117:5
announced 29:3
annual 20:18, 47:23, 112:7

Annually 38:15
Answer 8:14, 43:6, 43:7, 49:4, 49:5, 84:1, 84:8, 107:7
answering 65:9
answers 79:10, 90:12
Anybody 4:9, 19:23
apart 67:18, 75:13
apologies 56:25
apologize 27:7
appeared 32:1
apply 96:11
appreciate 108:15
approach 38:5, 72:3
appropriate 98:22, 98:25, 114:21
approximately 21:1, 21:5, 25:17, 27:23, 40:23, 48:8, 51:1, 52:2, 52:5, 53:9, 53:12, 98:18
APS 42:19
APS/RWT 42:17
area 87:22, 91:3, 94:25, 95:2, 96:20, 100:19, 106:19, 112:5
areas 95:4
argue 43:9, 43:14, 49:6
argument 7:25
around 67:6, 77:4, 83:5, 89:1, 106:19
arrive 82:17
Article 16:6, 16:8, 17:20, 17:25, 18:4, 18:22, 18:23,

19:3, 19:10, 21:23, 21:25, 22:8, 22:13, 23:11, 26:20, 26:24, 27:8, 27:14, 27:19, 27:22, 28:2, 28:19, 28:24, 117:27, 117:29, 117:31, 117:33, 117:35
articles 15:13, 16:18, 61:15, 78:20, 78:22
articulating 6:11
ascertain 39:10
ascribes 6:20
asserted 15:20, 15:25, 28:16
assessment 48:1
Asset 42:1, 47:15, 56:1, 76:6, 77:3, 77:22, 77:25, 78:6, 78:8, 90:3, 90:4, 104:23, 109:11
Assets 17:21, 24:20, 42:6, 44:23, 46:7, 47:1, 47:20, 48:1, 48:2, 48:21, 49:12, 49:15, 56:20, 63:10, 74:8, 75:14, 78:11, 78:24, 79:4, 79:12, 79:24, 85:6, 85:19, 108:23, 109:1, 109:6, 109:9, 113:5
Assets. 78:23
assignment 68:24, 69:3
Assumed 40:10
assumption 51:13, 52:10
assumptions

38:11, 39:18, 40:11, 40:15, 48:16, 56:2
Atchafalaya 68:18
attach 62:6
Attached 30:14
attachments 37:22, 37:25
attempt 96:5
attention 24:22, 59:12
audit 65:3, 81:25, 82:1, 82:5, 82:6, 82:9, 85:21
audition 66:9
auditor 42:8, 82:8, 82:9, 82:14, 82:15, 84:13
auditors 84:15
AUDRA 2:28
AUSTIN 2:13
author 23:23, 29:17, 42:3, 42:4
available 54:18
Avenue 2:3, 2:35, 2:47
average 11:9, 11:17, 25:18, 25:19, 26:3, 26:10, 36:25, 95:6, 100:18, 100:25, 106:3, 106:4, 106:7, 106:10
averaged 36:20
averaging 26:5
aware 5:21, 18:18, 18:23, 20:3
away 78:9, 78:10

⟨ B ⟩
B. 1:43, 2:1, 2:2

121

33:21, 34:4, 34:6, 36:7, 39:22, 40:5, 50:18, 95:23, 95:24
bottom-up 64:14, 79:9, 79:20
bottoms-up 64:12, 79:15
bought 29:5
Boulevard 1:35
BRADLEY 2:1, 2:2
branches 97:16
break 41:8, 41:10, 41:13, 69:7, 115:24, 115:25, 116:1, 116:2
break-out 105:25
breakfast 4:17
breaking 112:5
Brent 32:19
briefing 7:7
briefly 67:24, 69:21, 74:14
Briggs 57:15, 57:21, 57:22
Bring 8:9, 93:22, 93:23
Broadway 1:47
broke 94:19
broken 94:25
brought 59:19, 61:4
Btu 34:16
bucks 35:3
Budget 30:17, 31:8
budgeting 47:23
budgets 30:15
build 90:6
built 92:10
bullet 10:25, 11:7, 13:11, 31:13, 31:20, 33:5, 42:23, 43:5, 46:18,

49:1, 104:12
bunch 106:23
burden 6:6
BURKHOLZ 1:45
burro 66:6, 66:7
Business 32:6, 32:8, 32:25, 33:1, 33:2, 33:6, 33:9, 47:9, 51:21, 58:16, 67:16, 67:17, 69:2, 70:4, 71:12, 73:15, 89:22, 89:23, 91:24
businesses 70:12, 73:25, 83:6
buy 35:2
buyers 25:12

⟨ C ⟩
C. 2:39
CA 1:48
calculation 114:14
calculations 63:16, 110:16
calculator 99:21
Calgary 19:15, 81:17
call 32:14, 82:21, 89:25
called 25:16, 31:1, 63:13, 68:11, 68:16, 68:24, 76:2, 77:13, 88:3, 92:3
Canada 10:7, 11:1, 11:2, 19:18, 20:9, 74:12, 78:25, 81:9, 81:17, 87:25, 95:2, 101:8, 112:25, 113:22

Canadian 114:2, 114:3
candle 5:5
candles 5:5
capacity 86:19, 87:21
Capex 107:9, 111:12
Capital 29:8, 88:13, 88:16, 88:22, 103:14, 107:19, 108:5, 110:5, 110:14, 111:9
capitalized 107:15
car 91:7
carbon 23:8
care 37:16
career 69:25
Carmon 19:11
Carnac 28:8
CARPENTERS 1:9
carrying 104:15, 104:19
case 10:10, 13:5, 39:18, 41:9, 55:21, 56:4, 61:6, 75:24, 88:18, 88:23, 90:4, 92:17, 94:17
cases 56:3
cash 31:21, 32:4, 52:25, 90:1, 103:13, 104:15, 104:24, 105:1, 105:7, 107:5, 107:13, 107:17, 110:4, 110:7, 111:7
catch 4:18
categories 113:20
category 76:1
caught 68:23
causation 6:3, 6:9, 7:4
caused 91:14
CE 30:14,

30:16, 30:20
cease 90:6
cents 48:8, 49:12
century 67:7, 92:1
CEO 60:7, 60:12, 71:8
certain 48:1, 48:2, 58:19, 61:14
Certainly 10:3, 48:18, 63:2, 63:5
certification 6:6, 6:22, 7:6, 10:1
certified 5:16, 5:19, 6:16
certifying 63:25
CFO 34:2
chain 91:9
chair 8:10, 64:9
Chairman 57:18, 58:2, 60:4, 60:7, 60:11
chairs 8:11
CHAKRABORTY 2:32
challenge 64:8, 91:22
challenging 19:19, 91:12
chance 81:5, 107:8
Change 41:2
changed 26:8, 64:22, 76:15
changes 64:22
changing 54:17
characterizing 60:15
charge 10:12, 10:17, 46:19, 46:25, 47:3, 83:11, 89:25
charged 71:4, 114:20

123

Back 8:9, 9:9, 24:22, 25:24, 35:18, 43:16, 48:13, 54:3, 55:18, 56:6, 65:18, 69:8, 69:9, 72:1, 88:9, 95:13, 98:7, 99:9, 100:12, 108:9, 108:14, 108:16, 111:19, 116:3
background 80:21
backgrounds 80:18
bad 4:11, 10:15, 62:13
balance 78:1, 93:12
balanced 91:13
BALON 2:1, 2:2
banana 4:24
Bank 10:7, 11:1, 11:2, 11:25, 12:4, 12:13, 12:14, 13:18
Barclays 29:8
barrel 11:10, 32:14, 32:16, 32:22, 95:5, 95:6
barrels 21:6, 80:4, 80:8, 80:9, 80:11, 93:8, 99:23, 105:14, 105:17, 105:20, 106:3, 106:4
Base 55:21, 56:4, 68:19
Based 9:20, 75:24
bases 7:24, 55:20, 55:22, 68:20, 104:25
basic 86:20
basically 45:8
Basis 5:17,

7:1, 8:1, 21:5, 26:2, 26:13, 44:3, 52:9, 52:15, 54:12, 69:11, 100:7, 106:1
basis. 96:22
became 10:12, 10:16, 64:24, 68:13
become 39:7
becomes 25:14
beginning 91:2
Behalf 1:7
belief 68:25
believe 12:7, 18:3, 26:7, 27:3, 30:7, 33:19, 35:10, 40:24, 55:5, 59:16, 60:15, 60:21, 63:19, 67:9, 78:19, 100:9
believed 60:11, 105:9, 105:11
below 56:14, 68:7, 70:4, 94:22, 100:17, 101:9, 104:12
belts 88:25
benchmark 25:14
benefit 23:6, 32:10, 67:15
benefited 13:12, 13:18
best 64:1, 67:17, 70:2, 70:8, 73:21, 91:24, 101:12
bet 23:3
better 8:11, 8:12, 67:22, 74:2, 91:23, 92:1, 94:5
beyond 39:5, 39:19, 39:20, 55:10
bicycles 67:19
BIERL 1:44

Big 17:21, 25:11, 28:11, 42:15, 68:19, 70:12, 70:14, 82:21, 83:1, 88:23, 88:24, 89:1, 89:2, 92:5, 92:10, 93:25, 94:9, 107:2, 114:5
bigger 92:14
biggest 92:11
Billion 12:16, 12:20, 13:8, 18:13, 19:18, 21:6, 22:18, 29:13, 46:20, 46:25, 47:3, 47:11, 49:18, 77:4, 80:4, 87:5, 88:12, 89:4, 99:23, 104:18, 104:19, 104:20, 105:7, 105:10, 113:4, 113:23, 113:25, 114:7, 114:8
billon 104:19
birthday 4:21
bit 35:11, 48:15, 65:4, 65:20, 68:22, 79:8, 82:12, 86:14, 87:3, 88:6, 90:19, 101:5, 106:5, 108:2
Bitumen 11:9, 21:6, 45:6, 45:10, 45:12, 45:14, 74:11, 76:16, 79:6, 90:9, 91:10, 91:21, 92:2, 92:7, 95:5, 95:6, 95:9, 96:11, 100:25, 101:2, 101:7, 101:12, 101:14, 101:22, 105:25

black 52:20, 52:24, 56:15, 56:18
bless 9:1
blow 25:1, 25:25, 27:9, 36:8, 38:18, 52:13, 54:6
blowing 40:4
blowup 59:14
blue 53:1, 53:6, 53:20, 56:9, 56:13
blueberry 4:25, 5:1
Board 34:22, 60:8, 60:12, 65:6, 65:7, 71:4, 71:10, 81:22, 81:24, 82:1, 82:3, 82:4, 82:6, 112:19, 112:22
boat 68:23
body 101:9
bog 88:6
BOGGS 2:46
Bond 12:16, 12:17, 12:20, 12:25, 13:1, 13:4, 13:8, 21:1, 21:3, 21:16, 21:17, 49:19, 51:6, 52:5, 53:10, 53:23
book 89:25, 90:1, 102:16, 103:24, 109:4
booking 77:15
books 77:5, 77:23, 78:8, 105:2, 105:8
BOONE 2:23
Boreal 87:25
boss 60:12, 60:22, 60:25
bottles 45:11
Bottom 9:16, 23:18, 24:25,

122

chart 25:25, 52:12, 52:17, 56:7, 98:14, 98:15, 106:18, 107:5, 109:24
charts 106:23, 106:25, 113:9
chase 62:24
cheaper 46:2, 91:23
check 35:18
chemical 14:15, 66:16, 70:15, 93:16
chemicals 14:13, 32:4, 83:7, 92:5, 93:23
Chevron 43:1
Chicago 34:22, 54:24, 55:5
Chief 22:24, 69:14
CHILDRESS 3:3
chin 29:14
chipping 69:4
Circuit 7:13
circumstances 9:23, 47:25
City 68:16
claim 5:20, 5:22, 6:10, 6:11, 6:16, 6:23, 7:1, 8:1
claims 5:16
clarifying 26:16
CLASS 1:17, 6:5, 7:6
classify 88:22
classwide 5:16, 5:17, 6:25
clause 110:1
clean 23:7
clear 6:14, 7:19, 7:20
cleared 95:8
clearly 39:12
close 54:20
closed 12:23

closer 42:13, 56:14
closest 11:3
CME 54:21, 54:22, 54:24, 55:5
Cold 101:4, 101:5, 101:6, 101:7, 101:16, 101:17, 105:17, 105:25, 106:3
colder 41:20
colleague 71:19
collected 54:19, 55:13
collectively 44:21
college 65:25, 66:2
Colorado 44:13, 66:3, 66:7, 66:13, 68:15
column 36:8, 39:23, 105:13
comes 98:24
comfortable 8:10
coming 64:24
commenced 86:12
comments 97:15
Commerce 3:14
Commission 112:19
Committee 30:21, 30:25, 31:3, 34:2, 65:4, 70:17, 70:22, 70:25, 71:2, 71:3, 71:6, 71:7, 79:11, 79:17, 81:25, 82:1, 82:5, 82:7, 82:10, 85:21
committees 82:4
commodities 34:23
commodity 32:25
common 60:23
communicated

53:17
communicates 58:18
communicating 34:17
companies 14:11, 14:15, 14:16, 14:22, 14:24, 20:5, 26:12, 42:25, 60:23, 61:2, 61:3, 67:14, 68:19, 78:5, 78:6, 78:19
company 11:3, 29:10, 114:2
comparing 114:2
comparisons 62:7
compensation 58:18, 58:21, 58:25, 59:3, 59:6, 59:10
competitive 65:13, 98:1, 98:4
competitor 14:16
competitors 65:14, 98:2
completed 24:5, 54:17, 86:23
completely 20:1, 65:1
complex 70:15
complicated 91:8
complied 100:9
complying 98:24
comport 115:16
comprehensive 58:23
comprehensively 58:22
compressors 69:4
computer-aided 3:8

concentrate 11:1
concepts 75:18
concern 84:20, 84:24, 85:4
conclude 47:24, 56:18, 77:21
conducted 51:24
conflict 60:11, 60:13, 60:25
confusion 74:6
connotations 87:9
consider 41:5, 90:12, 90:24
Considered 41:1, 41:3, 45:16
consistent 54:12, 54:18
consolidated 112:3
constantly 54:16
construct 89:22
constructed 91:2, 92:9
construction 19:17, 64:16
consulted 60:19
consumers 23:5
CONT. 9:12, 41:22, 117:7, 117:9
contact 30:20, 30:22, 30:24, 31:2, 57:12
contain 9:20
contains 38:11, 58:15, 96:20
contexts 79:25
continental 70:12
continue 9:10, 15:22, 44:10, 76:13, 76:16
continued 47:18, 47:20
continuing 24:10

124

contract 35:21
contracts 55:4
control 73:9
controller 10:12, 10:14, 10:17
controls 82:7
convert 80:5
conveyor 88:25
cooking 23:4
Coopers 82:9, 82:11, 82:13, 82:18, 82:24, 83:11, 83:14, 83:18, 83:20, 84:4, 84:19, 84:23, 85:4, 85:14, 85:25
copper 75:3
copy 111:24
core 68:19
corner 36:7
Corpor 81:12
corporate 38:12, 39:12
Corporation 1:17, 24:5, 24:6, 24:7, 24:8, 24:11, 24:17, 47:18, 47:22, 47:24, 49:10, 58:15, 64:18, 82:16
corporations 84:12, 84:14
correctly 7:8, 11:12, 12:18, 13:16, 13:17, 13:22, 18:16, 19:22, 23:14, 23:22, 24:13, 27:17, 27:18, 29:16, 35:20, 43:3, 43:10, 46:22, 55:16, 93:4, 96:23
CORTELL 2:21, 4:14, 4:21, 5:9, 5:14, 6:1, 6:5, 6:14,

7:11, 7:15, 7:23, 8:5
cost 11:17, 36:20, 87:4, 88:16, 88:22, 90:1, 90:2, 95:6, 104:2, 104:7, 104:9
costs 11:9, 45:24, 84:25, 88:14, 89:22, 94:25, 100:19, 103:14, 103:18, 103:19, 103:21, 104:25, 106:10, 107:22, 108:3, 108:5, 110:11, 110:13, 110:24, 111:4, 111:7, 111:12, 112:5, 112:6, 112:11, 112:13
counsel 16:19, 16:20, 78:24, 90:12
countries 83:5
country 85:1, 96:20
couple 44:9, 63:23, 70:12, 89:16, 114:7
course 30:4
COURTROOM 98:10
courtroom. 8:20, 41:14, 41:17, 116:6
cover 5:5, 31:7, 43:19
covered 9:24
COVID 72:24
creating 13:19
credit 13:12, 13:15, 14:1, 14:4, 14:5, 14:18, 47:8
Creek 1:35, 19:11, 67:8
Crescent 2:41
crew 68:23
crisis 73:14

CROSS 62:18, 117:11
cross-examinati on 9:7
CRR 3:12
crude 19:20, 43:2
crusher 91:4, 92:10, 92:13, 92:15, 92:18, 92:21, 92:22, 93:5, 93:6
crushing 88:24
cubic 80:4
Current 26:24, 27:3, 27:4, 27:5, 33:9, 50:24, 51:8, 51:10, 55:14, 55:25
Cut 17:21, 62:24, 78:23, 79:2
cycle 32:11, 47:23

< D >
D. 2:45
Daily 80:1, 80:3
Dallas 1:3, 1:29, 1:36, 2:4, 2:18, 2:25, 2:42, 2:48, 3:15, 8:22, 70:19, 70:21
damage 6:20, 98:1, 98:4
damages 6:20
DANIEL 2:29
DAPHNE 2:33
dash 104:12
Data 37:11, 38:9, 38:10, 38:13, 38:21, 38:23, 39:6, 39:7, 39:12, 39:15, 43:17,

48:7, 54:4, 54:5, 64:14, 70:5, 83:8, 102:20, 117:17
data. 35:19
date 6:17, 6:20, 6:21, 10:20, 17:22, 57:15
dated 19:13, 26:24, 28:20
Daughters 4:19
David 1:19, 2:15, 64:25, 65:7
day 10:22, 26:5, 26:11, 29:1, 29:2, 34:14, 53:8, 53:9, 54:20, 68:21, 68:23, 69:13, 80:4, 80:5, 80:8, 80:9, 80:11, 93:8, 101:21, 105:15, 105:17, 105:20, 106:3, 106:4
days 68:25, 69:5, 69:6, 69:7
Deal 22:20, 22:23, 28:21, 29:4, 29:13, 79:13
Deal. 22:14
deals 25:13, 25:15, 34:23
debooked 21:4, 76:4, 76:6, 76:13, 76:22, 76:23, 77:2, 79:2, 79:4, 85:15
Debooking 21:7, 75:21, 75:22, 75:23, 77:8, 77:15, 78:7
decade 97:12
decades 69:19,

downgrades 13:13, 13:25
downstream 14:13, 32:4, 83:7
dozers 89:3
draft 51:20
drafts 64:24
drawn 82:5
drilled 67:10, 74:16, 75:14
drilling 101:10
drop 23:1, 43:5, 92:14
dropped 49:14
drove 68:15
Dry 5:22, 42:5, 44:16, 44:22, 45:4, 46:20, 47:1, 49:15, 56:20, 63:10, 75:14, 79:24, 85:5, 85:18, 88:8, 108:22, 109:1, 109:6, 109:9, 113:5
due 43:2
Duke 29:2
dump 89:2, 92:14
duplicate 86:18
During 18:18, 40:19, 47:19, 64:17, 80:1, 80:3
Dutch 19:11, 19:16, 20:3, 20:6, 21:10, 21:12
dwell 109:24

< E >
E. 2:13
earlier 73:23, 75:11, 79:8, 95:8, 97:12, 111:14, 112:9, 115:5
early 67:21,

69:24, 91:25
earnings 46:19, 89:25, 90:1, 102:16, 102:20, 107:4, 110:3
ears 28:11
earth 74:21
easier 46:1, 62:2
East 45:23, 101:8
eat 4:17
economically 76:3
economics 19:19, 55:20
Ed 1:26, 8:23
effect 17:6
effectively 70:9
efficiency 11:11, 11:19
efficient 94:6
efficiently 70:9, 91:24
eight 21:1, 21:3, 21:16
either 52:25, 90:6
element 7:5
elements 68:8
ELMO 98:8
EM 43:8, 49:5
Email 30:4, 33:20, 35:5, 35:9, 57:3, 57:14, 117:21, 117:23, 117:37
emailed 12:14
emails 33:18, 33:23
EMDC 107:9, 107:19
EMILY 2:14
employed 114:24
employee 10:9
employees 38:16, 76:11, 80:18, 81:20, 83:5, 83:14

employment 30:5, 34:2
empties 68:18
end 39:3, 39:4, 51:1, 72:23, 90:4, 101:21, 105:24, 107:9, 109:8, 110:1
ends 95:23
Energy 12:16, 13:1, 23:5, 24:5, 27:15, 29:2, 29:3, 29:4, 29:5, 29:7, 29:10, 71:12
engages 82:10
engineer 66:12, 67:21, 67:22, 67:24, 68:1, 69:10, 69:20, 69:25, 115:19
engineering 66:14, 66:15, 66:16, 80:21, 80:23
engineers 64:15, 69:1, 69:19, 70:1
enjoyed 67:20
enough 5:5, 7:19, 37:18, 41:19, 62:10, 62:11
enters 8:20, 41:17
entitled 12:15, 26:25, 28:20, 42:1, 54:8
entity 81:2
Environment 31:18, 31:19, 31:25, 32:5, 32:9, 32:15, 32:21, 33:1, 33:2, 33:3, 33:6, 33:7, 33:9, 33:10, 47:19, 51:21, 73:25

environment. 31:15, 31:22
equipment 87:20, 88:24, 89:1, 90:5, 90:7, 91:5, 92:20, 93:17, 93:23
equivalent 65:15, 80:6
ERIKA 1:42
especially 79:25
essentially 24:1, 24:2, 86:18, 86:21
establish 54:12
estimated 107:5
estimates 70:5
estimation 114:20
Eugene 68:24
Europe 43:23, 45:21, 45:22, 70:14, 70:19
European 18:15, 20:6, 78:6
evaluating 54:13
evaluation 54:19
evaluations 54:17
event 43:7, 49:4, 49:10, 73:13
Everybody 4:7
everyone 27:9
Everything 9:5, 93:6
evidence 7:25, 33:16, 36:3, 38:4, 51:17, 58:12, 95:21, 99:19
exact 35:14
exactly 15:11, 47:12, 109:5
EXAMINATION 9:12, 41:22,

73:18
decades-long 73:19
December 110:6
decide 67:4
decided 97:17
decision 56:4, 73:4
deck 12:15, 31:7, 31:11, 31:13, 71:19, 71:23, 71:25
declined 11:9
decrease 78:9
decreases 78:10
deduction 47:6
deeper 101:9
defeated 61:5
Defendant 10:5, 37:10, 71:25, 99:17, 115:9
DEFENDANTS 1:22, 2:10
DEFENSE 95:16, 95:22, 117:39
define 22:23
defraud 62:25
degrees 66:15
Delaware 24:5, 24:7
delivery 36:1
demand 73:12
demonstrating 11:10, 11:19
Denied 117:15, 117:40
denying 8:3
department 83:1
depends 15:10, 51:11, 51:13
deposit 88:17
depreciated 107:16, 110:15
depreciating 90:2
Depreciation 89:12, 89:16, 89:19, 89:20, 90:2, 103:25, 104:2, 104:6,

104:8, 112:8
DEPUTY 98:10
describe 45:5
described 14:12, 22:20, 84:5
Description 117:15, 117:40
designed 26:9, 92:23
desire 67:18
detail 75:19
determination 105:2
determine 53:3, 53:21, 70:7, 104:25, 111:1, 114:15, 115:22
determined 6:5, 7:5
determining 70:2
develop 46:8, 46:9, 79:21, 88:17
developed 47:22, 51:12, 64:21, 91:20, 92:3
developing 54:12
development 48:21, 68:3, 86:12, 86:19, 86:21, 88:13, 88:16, 88:22, 91:3, 92:22, 103:14, 103:18, 110:5, 110:7, 110:10, 111:12
Diego 1:48
difference 45:6
different 20:7, 26:2, 32:12, 45:22, 56:2, 64:21, 69:21, 76:1, 77:18, 83:6, 101:14, 112:21
difficult 43:9,

43:14, 49:6
dig 87:13, 89:2
diggers 74:20
Digging 74:21, 75:9, 87:18
DIRECT 9:12, 41:22, 117:7, 117:9
Directors 58:16, 60:8, 81:22, 81:24, 82:2
disclose 20:18, 20:20, 49:11, 54:1, 96:15, 99:3, 100:6
disclosed 21:3, 21:7, 46:24, 47:17, 48:4, 51:6, 58:21, 97:3, 111:15
disclosing 24:2, 98:2
Disclosure 5:23, 6:7, 6:8, 6:21, 20:16, 21:11, 21:14, 21:19, 21:20, 46:17, 47:15, 49:18, 58:23, 96:19, 97:13, 97:18
disclosures 21:18, 46:14
discussed 24:24, 31:11
discussing 12:21, 50:12
dismissal 6:24
displayed 45:11
dispute 5:15, 5:18, 103:9
disputed 7:6
distracted 73:20
District 1:1, 1:2, 1:27, 8:21, 8:22, 8:23, 68:15, 68:21

divided 99:23
dividing 80:6
DIVISION 1:3
divisions 32:3
document 11:25, 12:11, 12:13, 12:15, 14:19, 24:4, 31:6, 37:15, 39:10, 42:1, 42:23, 51:20, 56:19, 63:20, 65:11, 94:17
documents 102:16, 102:24
doing 61:13, 67:20, 69:1, 104:23
doldrums 29:15
dollar 18:19
dollars 42:14, 42:15, 89:23, 114:7
done 8:17, 13:1, 25:13, 69:4, 69:12, 79:20, 82:3, 99:9, 114:16
donkey 66:4
double 86:19, 86:22
double-check 33:20
DOWD 1:46
down 17:24, 18:12, 23:1, 23:17, 32:10, 33:21, 34:14, 34:18, 41:12, 43:5, 49:14, 61:21, 64:25, 68:7, 68:15, 75:2, 75:14, 76:7, 77:23, 87:11, 93:4, 93:20, 113:12, 114:10, 115:10, 116:7
downgrade. 13:15, 14:12,

62:18, 117:7, 117:9, 117:11
except 37:24
excess 104:15
Exchange 25:14, 34:21, 34:22, 54:24, 55:4, 55:5, 112:18
Exchanges 35:3
exciting 96:3
exclusively 81:9
excuse 7:9
Executive 22:24, 30:20, 30:23, 30:25, 31:2, 57:12
exhausted. 33:8
EXHIBITS 37:21, 37:24, 79:18, 117:14, 117:39
exits 41:14, 116:6
expand 87:8
expanded 87:10
expansion 86:15, 86:17, 86:18, 86:23, 87:1, 91:1, 92:23, 92:25
expected 23:20, 33:7, 40:9, 40:10, 90:8
expenditure 88:19, 88:20, 107:17
expenditures 89:6
expense 88:19, 89:10, 93:22, 113:21
expenses 107:19, 108:5, 110:7, 110:10, 111:9, 112:8, 112:11
expensive 43:23, 46:8, 46:9
experienced

92:25
expert 6:19
expire 34:15
explain 25:7, 55:3, 75:21, 107:8
explained 75:19
exploration 30:24, 67:8, 112:5, 112:11
express 84:20, 84:23, 85:4
expressed 96:21
extended 39:16, 39:17, 39:21, 40:6, 40:16, 55:14
extent 55:12
external 42:3, 42:4, 82:9
extreme 68:17
Exxon 1:17, 8:11, 10:13, 12:14, 12:25, 13:12, 13:14, 13:18, 13:21, 13:25, 20:14, 22:21, 22:24, 23:17, 26:25, 27:14, 28:20, 29:5, 29:9, 29:13, 31:24, 38:16, 43:13, 44:19, 44:21, 46:24, 68:10, 68:13, 80:1, 101:17
Exxonmobile). 24:12

< F >
F&O 37:6, 79:18
fact 9:21, 9:22, 82:10
factors 73:11
facts 47:25
failures 93:1, 93:2
Fair 11:5,

92:25
11:6, 31:17, 34:13, 37:18
fairly 46:3
falling 29:14
false 63:19
familiar 97:4
family 67:6
far 4:12, 29:4, 84:8
far-flung 83:7
farm 67:8
father 67:12
fatter 37:16
favor 59:25
fed 92:19
Federal 3:13
feeble 96:5
feeding 92:17, 92:18
fees 42:9, 42:11
feet 70:4, 75:15, 80:5, 101:9
felt 60:12, 97:25
Ferrell 7:6
fetched 23:12
few 5:14, 42:25, 62:21, 66:9, 102:15
field 64:14, 68:24, 69:1, 69:10, 74:12, 76:7, 96:20, 97:13, 97:18, 104:14
field-level 100:7
fields 44:18, 44:24, 78:12, 101:21, 101:22
Fifth 7:13
figure 91:23
filed 20:14, 20:22, 52:3, 63:18
filing 5:10, 47:18
filled 68:21

final 39:9, 96:15
finalization 24:2
finalized 65:1
Finally 65:12
finance 80:21, 80:23
Financial 39:25, 47:20, 50:16, 63:3, 63:15, 64:15, 65:15, 69:14, 69:23, 73:13, 75:20, 77:25, 78:1, 78:15, 83:8, 102:12, 112:19, 112:22
financials 39:16, 39:17, 39:21, 39:22, 40:6, 40:16, 82:16, 82:17, 102:14, 111:18
find 16:10
finding 68:2
fine 16:13, 19:5, 21:24, 28:6, 67:3
finer 92:19
finetune 93:12
finetuning 93:15
finger 72:12
finished 39:9
FIRM 2:2
firms 82:19
first 9:7, 19:15, 26:5, 26:11, 39:11, 47:17, 68:8, 68:14, 91:5, 91:7
fiscal 59:3, 96:14
five 55:14, 62:20, 82:5
Floor 3:14
flow 31:21, 32:4, 101:12,

105:7, 107:17
flowing 51:12
flows 52:25, 104:15, 104:16, 104:24, 105:1
Flowserve 5:10, 7:4
fluctuation 73:8
focus 32:7, 32:8, 73:20
FOLKERTH 1:43
folks 34:7, 63:14, 64:15, 80:15, 80:19, 81:10, 115:2
following 11:8, 30:18, 55:8
follows 54:21
foreign 97:16
Forested 88:1, 88:2, 88:3
Form 20:14, 20:15, 46:14, 47:18, 63:18, 101:22, 107:25, 111:15, 111:20
Formally 20:19
forth 80:6, 97:14
forward 6:25, 52:25, 61:4
forwarded 35:5
forwarding 57:14
found 6:17
foundation 84:7
Four 23:2, 62:20, 69:7, 82:21
fours 7:4
fourth 36:23, 40:20
frame 42:11
France 17:20, 78:22, 78:23
Franklin 57:4, 57:7, 57:8
free 84:17, 92:2

Froth 92:4, 93:10
fuel 23:3, 23:7
full 55:12
full-time 69:10
fully 90:5
function 35:14
FUND 1:10, 29:11
fundamentals 73:12, 73:21
fuss 62:12
fussing 20:1
future 23:4, 39:20, 51:13, 51:14, 52:10, 54:18, 55:11, 56:1
Futures 53:6, 53:16, 54:8, 54:12, 54:16, 54:19, 54:23, 55:10, 55:12, 55:13, 56:9, 58:3
futures. 57:24

< G >
GAAP 78:5
gain 29:10
gains 102:12
GARRISON 2:34
Gaseous 45:7, 45:19
GELLER 1:46
general 5:15, 58:16, 60:15
generally 96:25
generate 52:24
gentleman 30:7, 30:8
geographic 95:2, 95:4, 99:4, 100:19, 112:5
geographical 94:25, 96:19
geographically 11:3

geology 66:16
geophysics 66:16
getting 6:8, 80:15, 93:2, 96:3, 106:25
giant 92:16
gigantic 92:13
give 26:10, 69:21, 93:15, 99:21, 108:25
glad 5:2
glasses 18:4
Global 114:16, 114:17, 114:19, 114:23, 115:3
God 9:1
gold 75:3
Gooden 95:22, 100:15, 103:2, 106:17, 108:15, 109:21, 111:22, 113:13, 114:10, 115:8
governed 77:18
government 97:16
governments 97:17
grains 92:7, 92:19
grandfather 67:10
graph 25:1, 25:2
graters 89:2
gravel 74:22
Great 4:13, 8:14, 28:8, 46:4, 64:13
great-grandfath er 67:7
GREATER 1:8, 104:19, 105:8
green 52:25, 53:3, 53:15, 53:19, 56:10, 56:14, 56:17
Greenville 2:3
Greenwood 35:10

ground 27:20, 70:3, 70:11, 101:10
grounds 15:8
Group 1:34, 54:21, 54:22, 114:16, 114:17, 114:19, 114:23, 115:4
groups 74:8
Grow 31:21, 32:4
growing 67:15, 67:18
guess 7:23, 15:10, 30:15, 75:3
guessing 9:5
guidance 31:23, 32:1, 32:11
Guide 37:11, 38:9, 38:10, 38:13, 38:16, 38:21, 38:23, 39:6, 39:7, 39:13, 39:15, 40:6, 43:17, 48:7, 54:4, 54:5, 117:17
guiding 32:23
Gulf 68:18, 68:20
guy 5:1, 14:7, 28:10, 101:18
guys 69:12

< H >
H. 1:39
half 53:12, 80:12, 93:21, 114:8
Hamid 30:8, 30:10, 30:11
handle 87:21, 92:23
happen 65:7, 90:22
happened 49:17
happens 90:21,

91:21
installed 86:20, 87:20
instance 30:23
instead 6:20
instruct 85:24
instruction 15:13, 16:18, 19:4, 21:24, 26:20, 26:22, 28:4, 28:5, 28:15, 29:23
Integrated 13:15, 13:21, 14:1, 14:4, 14:5, 14:10, 14:12, 14:16, 14:18, 14:22, 14:25
interacting 67:15
interest 60:11, 60:13, 60:25, 65:13
interested 97:15
internal 82:7, 82:8
Inti 18:5
introduce 95:16, 97:25, 99:17
introduced 79:18
introduction 68:22
invention 91:20
Investment 24:6, 46:10, 88:17, 88:18, 88:19, 89:20
investments 73:16, 107:14, 110:6, 110:14
investor 10:13, 10:17
Investors 10:10, 23:16
involved 62:25, 64:6, 64:17,

65:17, 67:6, 68:1, 79:16, 80:22
involves 68:6
IOL 101:17
irrevocably 5:22
Island 68:25
issuance 11:8
issue 94:17, 97:14
issued 42:24
issues 23:20, 91:14, 91:15, 93:18, 94:3, 94:7
item 60:3, 112:10
items 113:21
itself 41:2, 93:1

< J >
J. 1:19, 2:28, 3:12
Jackson 62:5
Jacobson 98:9
Janet 62:5
JASON 2:22
JEFFREY 1:19, 24:17
job 42:15, 60:7, 83:1
Jobs 17:21, 60:13, 69:4, 78:23, 79:2
JOE 1:33
Johnson 14:20, 72:18
joined 67:13
joke 96:5
JORDAN 2:22
Journal 18:7, 19:10, 22:8, 22:10, 28:2, 28:19
JR 1:6

Judge 1:27, 8:23, 18:8, 18:9, 28:13, 84:1, 96:6
judgment 7:8
junction 25:11
Jury 8:20, 9:18, 25:7, 41:14, 41:16, 41:17, 43:20, 44:7, 45:5, 64:5, 65:19, 67:24, 68:14, 69:21, 71:1, 74:19, 75:21, 77:20, 81:5, 82:1, 83:3, 86:9, 86:17, 90:8, 90:17, 90:25, 91:17, 94:23, 101:6, 112:2, 114:17, 116:5, 116:6
jury. 4:4

< K >
Kearl. 11:11, 11:19, 21:6
keep 89:6
KENDALL 1:33, 1:34
kept 5:24, 97:4
Key 31:21
kind 4:10, 80:18, 87:22, 88:21
King 2:16, 22:14
Kinkeade 1:26, 8:24
knack 67:17
knot 29:3
knowledge 9:20, 64:1, 84:19, 84:24, 85:3, 85:14, 97:8
KOEBD 105:14

< L >
label 98:11
labeled 13:4, 50:16, 51:20, 98:12
lady 4:17
laid 64:23
Lake 101:4, 101:5, 101:6, 101:7, 101:16, 101:17, 105:17, 106:1, 106:3
lakes 87:24
land 87:13, 87:14, 87:15, 88:8
Landauro 18:5
language 102:9
large 25:10, 73:16, 114:6
largely 46:20
larger 48:15
Largest 12:16, 12:25, 13:1, 22:20, 82:19, 92:10
last 6:13, 38:21, 38:23, 44:9, 73:17, 96:14, 100:19, 112:16
later 5:12, 53:21, 76:18, 107:16
LATHAM 2:40
LAW 1:34, 2:2
lawyer 82:13
lawyers 8:15, 41:11, 62:1
layers 75:9
lays 68:8
lead 90:19
leading 83:21, 85:7, 86:2, 90:15, 90:18, 104:3, 110:18, 110:21
learn 69:2
learning 94:4
leased 67:7,

94:1, 94:9
happy 7:21
hard 91:25, 111:24
harder 46:9
Harwood 2:24
hate 7:11, 99:22
HAYNES 2:23
head 62:6
headline 17:20
headquarters 81:16
hear 6:12, 55:1, 62:10
heard 73:17, 75:25, 86:14, 91:22, 101:5
hearsay 15:8, 16:24, 17:9
heating 45:8
held 60:7, 69:22
Henry 25:1, 25:8, 25:9, 25:16, 26:13, 34:17, 36:12, 40:17, 40:20, 44:1, 44:4, 45:17, 52:15, 53:6, 53:16, 54:21, 54:22, 55:4, 56:9, 57:24, 58:5, 66:8
heritage 101:17, 101:18
hide 63:3, 85:24, 102:12
hiding 102:8
high 23:5
high-level 89:18
high-temperatur e 101:11
higher 52:24, 55:24
highlight 36:4
highlighted 34:5, 104:13

highlighting 65:8
Highlights 37:5, 50:9, 50:12, 50:17
HINOJOSA 2:15
historically 23:19
History 12:17, 13:2
hit 9:4, 51:1
hold 60:13
hole 75:2
holiday 4:15
home 9:4, 45:8, 76:11
Honorable 1:26, 8:23, 9:1
hope 9:3
hour 116:3
hours 62:21
house 9:4
housed 42:6
Hub 25:1, 25:8, 25:9, 25:16, 26:13, 34:18, 36:12, 40:17, 40:20, 44:1, 44:4, 45:17, 52:15, 53:6, 53:16, 54:22, 55:4, 56:9, 57:24, 58:5
Hub. 54:21
hubs 44:3
huge 92:15
hurt 4:9, 98:5

< I >
idea 60:21
Identified 117:15, 117:40
II 67:13
imagine 67:22, 91:9
impact 7:5, 84:4, 94:7
impair 19:24, 77:25, 78:7

impaired 85:6, 85:19
impairing 56:20
Impairment 5:22, 6:11, 7:1, 8:1, 41:1, 43:1, 43:2, 46:19, 46:25, 47:15, 47:25, 48:19, 50:20, 51:4, 51:6, 52:21, 53:4, 53:21, 54:1, 56:18, 63:16, 77:13, 77:20, 77:21, 104:24, 109:9, 109:14
Impairments 51:8
Imperial 81:3, 81:4, 81:6, 81:7, 81:8, 81:11, 81:16, 115:1, 115:2
import 45:22
important 6:2, 20:5, 44:4, 55:23, 58:20, 62:21, 73:8, 73:15, 84:11, 91:18
importantly 77:2
importing 91:4
in. 5:24, 8:19
Inc. 24:5
include 14:18, 46:19, 96:17, 103:13, 103:25, 112:8
included 71:8, 104:2, 104:6, 104:8, 107:14, 111:5, 111:7, 111:10, 111:13, 112:17
includes 71:7
including 97:16
income 89:21
incorrect 5:20

increase 23:21, 33:7
incur 93:21
Independent 14:14, 14:15, 42:3, 42:8, 60:4, 82:14, 82:15, 84:4, 84:13, 84:15
independents 14:13
INDEX 117:1
indicating 26:14, 72:6, 72:20, 73:2
Individual 6:10, 57:4, 60:24, 81:15, 97:13, 97:18, 104:14
Individually 1:6
induce 97:25
industry 14:11, 25:15, 42:25, 47:19, 67:5, 67:7, 91:22, 92:10, 97:15
inexpensive 94:5
inference 83:19
influence 73:11, 83:19
information 43:20, 53:19, 53:23, 58:15, 63:25, 79:12, 79:21, 79:24
Informational 58:1
informed 37:5
infrastructure 86:20, 86:22
initial 68:4, 86:12, 86:19, 86:21, 89:20, 92:22
injecting 101:11
innovation

least 4:20, 7:7, 22:21, 40:20, 44:9, 45:23, 60:24, 65:11
leave 72:22
leaving 20:1
led 47:24, 49:10
left 6:10, 39:24, 52:12, 95:24, 105:13
Legacy 22:14, 22:24
less 18:14, 45:14, 46:6, 97:19
levels 64:16, 80:1, 80:3
lie 63:9
life 89:24, 94:3
lifting 103:21, 108:3, 108:5, 110:13
light 9:22
Likely 11:10, 11:19, 42:24
Limited 15:16, 15:17, 17:8, 19:7, 22:1, 61:14, 81:3
limiting 15:13, 16:18, 19:4, 21:24, 26:20, 28:4, 28:5, 28:15, 29:23
limits 97:13
LINDELL 1:40
Line 19:15, 42:16, 52:20, 52:24, 52:25, 53:1, 53:3, 53:6, 53:15, 53:19, 53:20, 56:9, 56:10, 56:13, 56:14, 56:15, 56:17, 56:18, 107:12, 112:10, 117:3

liquid 45:14, 45:16
liquids 80:4, 80:6
liquidy 45:14
list 77:3
little 4:17, 5:4, 35:10, 43:19, 46:6, 46:8, 64:8, 65:4, 65:19, 68:22, 74:6, 79:8, 82:12, 86:14, 87:3, 90:19, 93:13, 101:5, 101:8, 103:2, 106:5, 108:2
live 70:23
lived 73:3
living 10:11, 70:18
LLP 1:46, 2:16, 2:23, 2:34
load 92:23
loading 93:1
loads 92:25
located 113:6
location 25:9
London 18:6
LONG 2:45, 28:3, 48:7, 65:21, 73:16, 90:8, 91:9, 97:14, 101:16
long-lived 48:1
long-term 40:25, 43:2, 43:8, 43:13, 47:22, 48:15, 48:16, 49:5, 51:9, 94:8
longer 49:15
look 33:5, 36:8, 39:11, 42:16, 50:8, 51:15, 51:19, 52:8, 52:12, 57:14, 58:23, 65:14, 75:3,

85:9, 102:15, 102:24, 105:13, 106:10, 107:12
looked 11:15, 36:2, 55:22, 97:21, 99:3, 100:10, 106:7, 109:25, 113:8
looking 10:22, 10:23, 36:10, 39:23, 56:12, 94:16, 96:1, 96:2, 96:11, 100:13, 100:25, 108:19, 111:24, 112:2, 114:1
lose 113:22
Loss 6:3, 6:9, 7:4, 47:8, 47:10, 89:24, 102:3, 102:5, 102:22, 103:9, 113:1, 113:4, 114:4
Loss. 17:21
losses 102:8, 102:12, 103:8
lost 13:23, 40:2
lot 45:24, 64:13, 68:6, 71:1, 71:12, 73:11, 75:25, 77:12, 79:20, 79:23, 83:7, 87:20, 90:21, 92:6, 93:3, 93:4, 93:11, 93:12, 93:15, 93:21, 93:22, 105:11, 108:19, 109:7
lots 67:16, 83:8, 83:9, 88:8
loud 62:10, 62:11
Louisiana 25:9, 68:16, 68:17
low 23:19,

31:22, 32:24, 33:6, 36:16, 36:17, 37:3, 51:1, 76:24, 104:16
low-lying 87:24
low-price 31:25, 32:5, 32:9, 32:15, 32:20, 33:10, 73:25
lower 31:14, 31:17, 31:19, 48:7, 55:25, 97:8
lowering 97:23
lowest 35:6, 35:17, 35:22, 35:24
lunch 116:2
LYUBA 2:31

< M >
M&A 33:7
m-u-s-k-e-g 88:4
M. 2:12
machine 92:13
magnitude 48:18
major 19:17
majority-owned 81:8, 81:10
manage 73:22
managed 70:12, 70:13
Management 30:21, 30:25, 31:3, 34:2, 58:16, 70:17, 70:22, 70:25, 71:1, 71:3, 71:6, 71:7, 79:11, 79:17
managers 58:19
managing 71:4
mandated 95:1, 95:11, 114:21
mandatory 66:24
manipulate

63:15
marked 12:3, 15:6, 17:13, 17:18, 19:1, 26:17, 37:8
Market 25:16, 50:25, 51:6, 54:8, 54:12, 54:16, 54:18, 54:19, 54:23, 55:3, 55:4, 55:9, 55:11, 55:12, 55:13, 55:25, 71:13, 73:10, 77:24
market-based 35:2
Marketing 31:2, 35:13, 57:9, 57:22, 70:16, 80:22
marking 21:21, 25:20, 27:25, 29:18, 33:13, 41:6, 49:21, 56:22, 58:7
marsh 87:22
marshy 87:22
mascot 66:3, 66:6
material 9:21, 9:22, 92:15
materials 97:21
math 40:24, 51:3, 99:9, 99:21
Matt 34:7
matter 15:19, 15:24, 15:25, 28:16, 48:19
matters 48:19
Mbtu 34:15
mean 14:4, 14:6, 16:25, 69:24, 74:18, 75:22, 81:14, 87:9, 87:10, 87:17, 90:25, 92:4, 96:25, 99:7, 104:17,

104:22, 105:9, 107:11
meaning 64:14, 68:7, 75:23
means 14:24, 19:25, 61:15, 70:1, 74:19, 74:20, 77:21, 97:1, 99:6, 99:8, 99:10, 99:11, 99:13, 107:12, 110:1
meant 83:3, 105:14
measurements 70:6
mechanical 3:7, 93:1, 93:2
medicine 93:14
meet 25:10, 27:23
meeting 24:23
meetings 50:9, 85:22
mega-size 22:20
MELSHEIMER 2:12
melt 101:11
member 30:21, 34:2
members 82:4, 82:6, 114:23
mentioned 81:24, 81:25, 89:16, 90:11, 115:1
Mercantile 25:13, 34:21, 35:3, 54:24, 55:5
mercy 62:6
merged 68:13
merger 22:21, 24:3, 24:6, 24:9, 24:10, 25:4, 44:19
message 41:25
met 6:6, 85:21
methodology 26:7, 26:8
metrics 106:20

Mexico 68:20
mic 64:9
Michael 2:7, 38:19
microphone 34:25, 62:2, 64:7
microphones 62:5
Microsoft 14:19
Middle 45:23, 68:17, 104:13, 105:22, 107:1
midpoint 47:21
midst 107:2
Mile 67:8
miles 68:23
Million 34:16, 42:11, 42:14, 42:15, 59:1, 59:4, 59:9, 80:4, 80:8, 80:9, 102:17, 103:24, 107:13, 107:18, 110:3, 110:4, 110:6, 110:8, 113:1
mind 28:7, 108:11
mindmeld 28:10
Mine 4:23, 75:2, 86:19, 86:22, 87:20, 92:15
mined 74:16, 74:17, 74:18
Mineral 4:10
Mines 66:3, 66:7, 66:13
minimal 55:10
minimum 6:25
mining 66:15, 75:5, 86:10, 89:1, 91:3, 112:17
minute 81:25, 115:25
mislead 62:25, 63:9
misleading

9:24, 63:19
misrepresent 63:6
misunderstood 16:17
mixes 93:16
Mmbtu 35:3, 40:20
Mobil 68:12
Mobile 1:17, 22:21, 68:13, 68:14, 101:18
moment 65:19
Momma 4:19
mon 83:12
money 84:3, 88:21, 105:11
monitor 83:11
month 26:5, 26:11, 36:10, 36:11, 39:4, 50:20, 50:22, 52:2, 52:5, 93:8, 107:13
monthly 36:4
months 21:1, 21:3, 21:13, 21:16, 23:19, 26:6, 37:1, 55:10, 69:8
Moody 13:13, 13:25
Morgan 68:16
morning 4:18, 74:7, 77:12
mostly 14:16, 44:20, 80:20, 80:22
Mountain 5:22, 6:23, 7:1, 42:5, 44:15, 44:22, 47:1, 49:15, 56:20, 63:10, 65:18, 75:14, 79:24, 85:5, 85:18, 108:22, 108:25, 109:6, 109:9, 113:5
Mountains 46:3,

69:8
Oil 14:11, 14:16, 14:22, 14:24, 19:20, 31:18, 32:14, 32:16, 32:22, 45:12, 47:22, 67:4, 67:6, 67:8, 67:14, 67:16, 68:2, 68:3, 68:5, 68:8, 68:12, 68:19, 70:2, 70:4, 70:7, 78:25, 81:3, 88:18, 91:3, 96:15, 112:16, 115:1, 115:2
oil-equivalent 80:7, 96:22
Oil-sands 18:14, 19:12, 19:18, 20:4
Oil. 26:25
Oilchange 27:6
Oilchange.org 27:7
oils 45:15
Olive 2:17
OLIVER 1:42
omit 9:21
on-shore 25:10
on-site 83:14
one-upped 96:8
ones 11:4
ongoing 107:14, 110:5
opened 87:19
opening 42:16, 63:14, 71:15, 71:17, 71:23, 104:11, 115:6, 115:13
operate 32:24, 76:14
operated 83:5
operates 81:2, 81:9
Operating 50:17, 110:4

operation 91:12, 93:20, 93:24, 101:14, 101:16, 101:18
operational 83:8
operations 44:5, 44:9, 44:11, 44:16, 44:22, 46:21, 52:18, 68:19, 68:20, 70:13, 71:5, 79:22, 83:7, 83:10, 90:6, 91:3, 92:6, 112:4, 112:17, 112:18, 112:25, 113:2, 114:2, 114:3
operations. 48:3
operators 91:22
opinion 61:17
opportunities 54:13, 55:12
Opportunity 31:14
Oppose 60:16, 60:18
opposed 61:6, 61:8, 88:18
order 4:3, 109:3
orderly 54:18
ordinary 30:4, 34:1
ore 92:18, 101:9
organization 32:7, 32:23, 64:12, 82:10
organizations 73:24
Others 1:7, 64:25
ourselves 91:20
outlook 43:8, 43:13, 48:16, 49:6
outlook. 43:2

Outside 4:4
overall 38:11
overcapacity 23:20
overpaid 23:12
overrule 17:14
Overruled 84:10, 85:11, 86:4, 90:16
overruling 8:4, 90:20
oversee 82:7
overseeing 71:4
oversight 30:21, 30:24
Overview 31:8
owe 4:20
own 60:22, 60:25, 81:10
owned 24:19
owns 81:12

< P >
P&B 30:14, 30:16, 30:17, 32:2, 52:15, 79:18
P. 1:18, 51:21, 58:24
Pacific 67:12
pages 7:7
paid 82:24, 83:18
paint 69:4
painting 69:4
Pam 116:8
pam_wilson@txnd.uscourts.gov 3:16
PAMELA 3:12
pandemic 76:24
paper 92:16, 92:17
paperwork 68:22
Paraffinic 92:4
paragraph 17:24, 18:12, 19:15, 27:11, 27:12, 55:8,

112:16
paragraphs 23:2
parent 55:6
parentheses 103:11
parenthetical 110:1
Paris 18:5
part 29:13, 31:1, 37:5, 47:23, 81:11, 91:19, 92:1, 101:8, 109:18, 109:19, 111:16
participate 64:20
particular 57:13
particularly 55:23, 64:21, 91:1, 94:1, 94:9
parties 97:15
partly 23:19
parts 30:22, 45:22
Party 2:8, 3:4
pass 61:12
passed 109:11
path 69:17, 69:18, 69:19
PATRICE 3:3
PATRICK 2:45
PATTON 2:46
Paul 2:34, 35:6, 35:9, 35:10
Pause. 85:8, 95:19
pay 35:3, 84:14
paying 77:4, 84:3
pays 42:9
pdf 94:21, 102:2
peat 88:6
Peaty 88:4
PEDRO 1:6
peers 13:13, 13:24, 14:16,

46:21
mouthful 24:15
move 64:8, 64:9, 70:19, 76:1, 91:11, 91:12, 92:8
moved 70:21, 114:4
moving 25:12, 83:8, 91:4
MR. BURKHOLZ 4:23, 5:1, 5:7
MR. MELSHEIMER 62:3
MR. TOAL 15:7
Ms 4:14, 4:21, 5:9, 5:14, 6:1, 6:5, 6:14, 7:11, 7:15, 7:23, 8:5, 61:25
muffins 4:19
multibillion 18:19
multiple 44:18
muskeg 88:3


< N >
N. 2:24
NAME 81:4, 117:3
named 30:8, 34:7, 35:6, 57:4, 57:15
NATHAN 1:40
nature 14:11
near 23:21
Near-term 54:13, 54:15, 55:23
necessary 9:22
need 7:20, 7:22, 16:7, 41:10, 72:5, 72:13, 101:25, 116:1
needed 46:1, 85:15, 85:19
negative

102:16, 103:9, 103:11, 107:13, 110:4, 111:14, 113:9
negatives 110:4
neighborhood 47:12, 87:5
neither 61:15
Net 31:21, 104:14, 104:16
New 2:36, 24:8, 24:17, 25:13, 31:14, 34:21, 34:22, 35:3, 53:15, 55:3, 87:19, 87:20, 90:6, 91:19, 93:11, 94:1
newspaper 15:13, 16:5, 16:18, 26:20, 61:15
next 23:10, 36:10, 42:16, 48:6, 49:12, 50:14, 50:16, 53:4, 53:16, 53:20, 56:18, 60:2, 60:3, 68:23, 89:13, 91:11, 113:13
NINA 2:21
No. 1:15, 14:22, 17:4, 37:14, 41:2, 41:20, 54:2, 71:25, 94:9, 99:11, 101:4, 102:14
nobody 9:3
noncash 90:2
normal 69:17, 69:18
North 47:20, 48:1
Northern 1:2, 8:22
nose 72:9
notably 11:9, 48:1

note 20:5, 44:8
noted 11:17, 11:18, 13:21, 13:24, 26:2, 43:1, 48:24, 49:3
notes 11:7, 13:8, 22:17, 36:18, 36:19
Nothing 51:8, 76:15
Notice 16:3, 16:5, 16:8, 17:8, 22:1, 28:16
noting 43:12
novel 94:10
November 35:22
number 9:19, 37:19, 40:5, 45:1, 50:2, 70:13, 70:14, 70:15, 79:17, 91:15, 94:21, 103:9, 103:11, 103:13, 103:24
numbers 14:7, 106:8, 106:13, 107:5, 108:20, 110:16, 111:15, 111:16, 113:8, 113:9
numerous 55:2
nut 4:25
NY 2:36
NYMEX 25:14, 34:14, 34:17, 34:20, 54:21, 54:22, 54:23, 55:2, 55:3, 55:6, 57:24, 58:3


< O >
object 7:25, 15:22, 17:9
objected 15:8
Objection 15:8, 17:14, 26:19,

28:3, 29:22, 33:15, 38:2, 50:1, 51:16, 58:9, 58:10, 83:21, 84:7, 85:7, 86:2, 90:15, 95:17, 95:20, 99:18, 104:3, 110:18
Objectives 31:21
observance 4:15
observation 43:15
observations 58:17
observed 11:14
occurred 38:22, 43:7, 43:14, 49:4
occurred). 43:9
occurred.) 49:7
offense 72:10
offer 16:23, 17:2, 17:5
offered 15:7, 61:14
Offering 12:16, 12:17, 12:20, 12:25, 13:1, 13:4, 13:9, 15:15, 16:21, 21:1, 21:4, 21:16, 21:17, 49:19, 51:6, 52:5, 53:10, 53:24
offers 66:14
office 68:16, 68:21, 69:6, 69:9
OFFICER 4:3, 8:21, 41:16, 69:14, 69:23, 116:5
offices 83:15
Official 3:13
offline 93:5, 93:6
offshore 68:24,

PENNSYLVANIA 1:9
PENSION 1:9
people 46:1, 58:16, 64:13, 64:15, 67:16, 79:16, 79:20, 80:20, 80:22, 91:25, 93:22
Per 11:10, 34:15, 34:16, 40:20, 95:5, 95:6
percent 11:10, 23:12, 23:17, 27:15, 27:19, 29:9, 29:10, 29:11, 40:23, 48:11, 80:12, 81:13, 96:20, 97:2, 97:9, 97:19, 98:18, 98:19, 99:24, 100:2, 100:4, 109:3, 109:10
percentage 97:23, 106:1, 109:1
perfectly 16:13
performance 63:4, 63:10, 75:20, 102:13
performed 114:14
performers 29:7
performing 47:25, 113:18, 114:21
period 9:24, 29:10, 29:12, 32:20, 93:18, 97:10
permanent 76:4, 78:2
person 60:13, 61:17
personally 63:19
pertinent 69:24
petroleum

45:13, 66:12, 66:15, 67:22, 67:24, 68:1
PFO 34:3, 58:24
phase 86:12, 91:14, 92:25
phases 92:24
phrase 90:11
pie 98:14, 98:15
piece 78:1
pipeline 46:4, 88:25
pipelines 25:10, 25:12
pivot 5:19
place 13:23, 20:8, 25:11, 68:16, 95:13
places 46:5, 70:19, 88:6, 113:10
PLAINTIFF 9:15, 12:4, 12:5, 15:6, 17:18, 19:2, 21:22, 25:21, 26:18, 28:1, 29:19, 33:13, 36:4, 37:9, 37:11, 41:7, 41:25, 43:16, 46:13, 49:22, 51:15, 51:19, 56:22, 58:7, 71:23, 78:24, 94:11, 102:25, 104:11, 106:15, 108:8, 108:12, 109:20, 111:19, 117:14
PLAINTIFFS 1:12, 1:31, 63:13, 73:23, 82:13
Plan 31:8, 31:21, 32:11, 38:12, 39:12, 39:16, 39:17, 39:19, 39:25, 40:6, 40:10,

45:15, 40:16, 40:25, 48:15, 51:21
planner 57:22
planners 64:15
planning 35:14, 39:5, 47:23
Plans 17:21, 30:17, 78:23
plant 76:7, 93:10
plants 23:5
PLC 19:16
Please 9:2, 22:6, 39:15, 42:1, 48:25, 51:19, 56:6, 58:24, 62:16, 91:17, 94:12, 95:23, 98:8, 100:12, 100:14, 103:1, 103:2, 106:16, 106:17, 106:19, 106:20, 108:8, 108:12, 109:21, 109:22, 115:9
plus 40:8, 40:9, 40:16, 90:10
point 6:2, 6:15, 6:23, 10:25, 11:2, 11:7, 13:11, 20:4, 31:14, 31:20, 33:5, 39:8, 42:23, 43:5, 46:18, 49:1, 70:20, 72:3, 83:4, 93:25, 115:19
pointers 72:4
pointing 72:14
points 5:11, 5:14, 42:17
police 83:1
POLYCHRON 1:44
portion 42:7, 59:15
position 35:14

positions 69:22
positive 107:18, 110:8
potential 21:7, 60:25, 97:13, 97:25, 98:1
potentially 78:10, 98:4
Power 31:2, 35:13, 57:9, 57:22, 70:16, 89:1
pray 8:25
pre-2000 35:19
preadmitted 9:14, 10:4, 11:23, 11:24, 12:3, 12:8, 20:13, 23:24, 41:24, 46:12, 56:24
precisely 5:20, 98:18
predecessor 68:12
preferred 54:20
premium. 23:13
prepared 32:23, 43:6, 49:3, 64:13
presence 4:4
presentation 48:22, 58:2
presentations 30:14
presented 7:25, 8:2, 56:3, 56:19
president 57:8, 58:24
presiding 8:24
pretty 26:9, 28:25, 36:17, 37:3, 64:18
previews 42:17
Price 7:5, 25:14, 25:15, 25:17, 26:2, 26:10, 26:13, 31:14, 31:17,

31:19, 31:22, 32:5, 33:7, 35:2, 36:14, 36:25, 41:2, 43:2, 43:8, 43:13, 45:20, 48:20, 49:6, 49:14, 50:22, 50:25, 51:13, 52:9, 52:15, 54:8, 54:13, 54:15, 55:19, 55:20, 55:21, 56:2, 73:10, 73:11, 104:25
**prices** 23:18, 25:5, 25:8, 29:14, 32:7, 32:10, 32:24, 47:22, 48:7, 50:19, 51:8, 51:9, 51:10, 52:11, 53:15, 53:16, 73:9, 74:3, 76:24, 84:25, 94:24, 100:18, 106:11
**prices.** 19:21
**Pricewaterhouse** 42:3, 82:9, 82:11, 82:12, 82:18, 82:24, 83:11, 83:14, 83:18, 83:20, 84:4, 84:19, 84:23, 85:3, 85:14, 85:25
**pricing** 26:11, 35:23, 43:21, 44:1
**pride** 91:20
**primary** 44:3
**principal** 69:14, 69:23
**principles** 78:15
**Prior** 54:20, 59:16, 113:16, 113:17
**prison** 50:24

**probable** 76:2
**probably** 6:14, 32:2, 32:22, 63:23, 67:21, 101:12, 109:3
**problem** 6:9, 6:19, 37:12
**problems** 92:21
**proceed** 5:17
**Proceedings** 3:7, 41:15
**process** 30:17, 54:19, 64:6, 64:12, 64:16, 64:17, 75:10, 79:9, 79:20, 84:21, 84:25, 86:10, 91:4, 92:4, 92:20, 93:17, 97:5, 114:12, 115:17
**processes** 79:15, 82:16, 83:9, 83:12
**processing** 68:4, 68:9, 88:24
**produce** 70:9, 73:18, 79:16, 80:10
**produced** 3:8, 45:3, 45:25, 76:9, 105:25, 109:6
**producer** 29:5
**produces** 101:14, 104:14
**producible** 101:10
**producing** 68:3, 76:9, 87:1, 112:4
**product** 95:5, 96:15, 100:19, 101:15
**production** 11:9, 11:17, 70:13, 80:1, 80:3, 80:7, 80:14, 84:25

85:1, 86:11, 86:13, 86:21, 93:6, 94:24, 94:25, 95:1, 95:6, 96:15, 100:18, 101:2, 103:18, 103:19, 104:2, 104:7, 104:9, 106:10, 106:11, 107:22, 109:4, 110:10, 111:7, 112:6, 112:11
**products** 96:17
**products.** 96:16
**profile** 13:12
**profit** 89:24, 102:3, 102:5, 102:22, 114:4
**profitability** 18:14, 102:4
**profitable** 46:6
**Progress** 29:2
**project** 19:18, 19:24, 20:4, 56:11, 86:15, 86:17, 86:18, 90:13, 91:1, 91:19, 92:3, 92:9, 92:23, 92:24, 94:2, 101:7, 105:5, 107:2, 107:15
**Project.** 19:12
**projects** 19:20, 55:23, 55:24, 73:17, 73:19, 94:1, 94:9
**prolonged** 32:19
**proper** 77:24
**properly** 91:11, 93:1
**proposal** 59:15, 59:18, 59:19, 59:25, 60:3, 60:10, 60:17, 60:18, 60:19, 61:4, 61:6, 61:8
**proposals** 59:13

**proposed** 60:6, 97:7, 97:8, 97:13
**proposition** 5:15
**proprietary** 93:11
**proved** 21:5, 63:6, 75:24, 76:6, 77:3, 77:8, 84:21, 96:21, 97:2, 97:19, 99:24, 111:2, 114:15, 114:22
**proved-reserve** 103:22, 111:1, 111:16, 112:13
**Proxy** 58:8, 58:14, 58:18, 59:13, 117:19
**public** 20:22
**publication** 18:1, 27:2
**publicly** 81:13, 81:14, 83:10
**publicly-traded** 84:12, 84:14
**publish** 22:6
**pull** 48:23, 94:11, 111:21, 115:8
**pulls** 75:15
**pulverizes** 92:18
**purchase** 23:3, 24:3
**purchased** 22:17, 22:18
**purchasing** 27:21
**purpose** 15:10, 15:11, 15:23, 15:24, 17:8, 19:5, 19:7, 22:1, 22:5, 54:11, 55:11, 61:14, 82:6
**purposes** 15:15, 15:16, 15:17
137

10:8, 10:9, 10:20, 10:25, 37:6, 71:6, 71:9, 83:9
**report.** 9:25
**reported** 3:7, 57:10, 71:10
**Reporter** 3:13, 62:12
**reporting** 78:15, 84:21, 84:25
**reports** 10:10, 15:14, 20:18, 36:5, 50:9, 79:16, 80:15, 80:16
**representation** 59:24
**Representative** 2:8, 3:4
**required** 21:4, 93:21, 97:18, 100:6
**requires** 113:19
**reservations** 111:1
**reserve** 76:2, 76:7, 77:3, 110:13, 110:17
**Reserves** 21:5, 27:16, 27:19, 27:20, 63:6, 63:15, 70:10, 75:24, 76:1, 77:8, 84:21, 85:15, 96:21, 97:3, 97:19, 99:24, 106:12, 108:3, 114:12, 114:15, 114:16, 114:17, 114:19, 114:20, 114:22, 114:23, 115:2, 115:4, 115:17
**reservoir** 69:25, 70:7, 115:19
**reservoirs** 68:7
**reset** 74:5

**resilient** 32:9, 74:2
**resources** 31:14
**respect** 9:24
**respond** 7:2, 56:1, 83:1
**responded** 16:3, 35:5, 35:16
**rest** 81:13, 109:10
**result** 47:7, 104:23, 112:7
**results** 47:20, 79:20, 83:12, 112:4, 112:17
**resumed** 41:15
**retirement** 66:24
**return** 46:10, 74:3
**returned** 67:12
**reversed** 7:12
**Review** 30:14, 42:1, 50:17, 51:24, 57:18, 64:17, 65:10, 82:16
**Review.** 51:22
**reviewed** 65:5
**reviews** 64:20, 79:18, 79:19
**revision** 38:24, 39:9, 40:20, 43:2
**revisions** 38:25
**revisiting** 6:9
**Rex** 1:18, 3:1, 22:14, 22:24, 42:21, 60:21, 71:7, 71:8
**rid** 106:19
**Rides** 22:14
**RIFKIND** 2:34
**rig** 69:13, 69:23
**rise** 4:3, 41:16, 116:5
**risen** 23:18, 51:1
**risk** 23:11

**River** 68:18
**RMR** 3:12
**Rob** 57:4, 57:7, 57:8
**ROBBINS** 1:46
**rock** 92:10
**rocks** 92:19
**Rocky** 5:22, 6:22, 7:1, 42:5, 44:15, 44:22, 46:3, 46:21, 47:1, 49:15, 56:20, 63:10, 65:18, 75:13, 79:24, 85:5, 85:18, 108:22, 108:25, 109:6, 109:9, 113:5
**role** 71:2, 82:13, 82:15, 84:4
**rollers** 92:16
**Ronnie** 72:11, 98:8
**room** 92:14
**Rosenthal** 1:20, 10:16, 64:25, 65:8
**Ross** 2:47
**roughly** 80:12
**rounding** 98:21, 98:22, 98:25
**Royal** 10:7, 11:1, 11:2, 19:11, 19:16, 20:3, 20:6, 21:10, 21:12
**RUDMAN** 1:46
**rule** 7:11, 84:13, 84:14, 96:11, 99:3, 100:23
**rule-making** 97:5
**ruled** 7:7, 7:8
**rules** 20:7, 77:18, 95:12, 98:24, 98:25, 100:6, 100:10,

112:21, 117:42
**rules.** 112:19
**rulings** 7:19
**run** 23:4, 32:24, 54:23, 55:20, 55:24, 69:19, 73:24, 93:17, 104:24, 115:10
**Running** 26:25, 32:6, 93:9, 93:20, 93:24, 94:4
**Russia** 45:23
**RWT** 42:21

< S >
**S&P** 13:14, 13:25, 29:11
**S.** 1:19, 25:4, 36:8, 36:14, 36:20, 43:8, 43:13, 46:2, 46:19, 60:23, 78:5
**SAATHOFF** 2:13
**SAHAM** 1:39, 9:9, 22:2, 36:6, 37:10, 41:21, 56:6, 117:7, 117:9
**saleable** 92:3, 101:13, 101:15
**SAM** 1:41
**San** 1:48
**sand** 91:10, 92:2, 92:7, 92:19
**sands** 18:19, 18:24, 20:11, 88:18, 91:3, 91:21, 112:17
**SARA** 1:44
**satisfied** 65:16
**saw** 11:14, 72:1, 79:23, 94:21, 100:23, 102:15, 104:11, 106:23, 107:24,
139

16:22, 17:2, 30:1, 37:20, 39:5, 50:4, 108:6
**Push** 98:10
**put** 17:15, 18:4, 25:24, 71:19, 79:25, 95:22
**putting** 30:18, 67:19, 75:10, 80:16, 92:24
**Pwc** 42:2, 42:8

< Q >
**qualified** 114:15
**qualify** 114:22
**Quantities** 21:4
**quarter** 36:23, 47:18
**quarterly** 20:18
**question** 6:8, 32:13, 41:3, 43:6, 49:4, 83:17, 85:9, 87:7, 89:13
**questions** 30:15, 44:9, 62:22, 65:9, 65:10, 77:12, 82:23, 90:12, 98:17, 108:19
**quibble** 40:14
**quick** 5:11, 72:7, 108:9
**quickly** 4:15
**Quite** 48:15, 58:21, 60:23, 65:16, 99:1
**quote** 24:3

< R >
**R.** 1:40
**raised** 65:10
**RAMIREZ** 1:6
**ran** 70:14, 70:16, 72:11

**range** 49:15, 61:3
**ranges** 47:21
**ratings** 13:14, 13:25
**RBC** 10:6, 10:9
**re** 78:6
**reach** 39:8
**reached** 15:9, 66:24
**read** 9:18, 11:12, 12:18, 13:16, 13:17, 13:22, 18:10, 18:16, 19:22, 22:10, 23:14, 23:22, 24:13, 27:17, 27:18, 28:7, 28:24, 29:16, 35:20, 43:3, 43:10, 46:22, 55:16, 96:23
**reader** 112:24, 113:2, 113:17
**readers** 16:3, 16:5, 17:6, 17:8
**ready** 4:7, 8:6, 9:6
**real** 5:18, 72:7, 108:9
**realization** 36:11
**really** 6:22, 44:7, 48:19, 62:9, 62:13, 68:2, 69:2, 75:19, 94:16
**reason** 14:23, 97:22
**rebooked** 76:2, 76:18, 76:25, 77:1
**rebooking** 77:16
**recall** 27:24, 34:12, 35:13, 39:2, 47:12, 78:20, 78:25, 93:4, 93:7,

98:15, 101:20, 109:5
**receive** 5:10
**received** 30:4, 33:19, 33:23, 34:9, 50:9, 57:3, 58:19, 58:25, 59:3, 59:6, 59:9
**recently** 23:18, 54:18
**Recess** 116:9
**recollect** 97:10, 109:5
**recollection** 27:23, 97:24, 105:24
**recommendation** 59:24
**record** 17:15, 37:20, 116:8
**records** 77:6, 78:9
**recover** 70:10, 70:11, 93:14
**recoverability** 104:23, 109:11
**recoverable** 76:3
**recovered** 89:11, 101:13
**recovery** 42:1
**reduced** 40:19, 47:7
**reduction** 40:23, 40:25, 43:7, 43:12, 47:21, 48:6, 48:8, 48:14, 48:18, 48:24, 49:5, 49:8, 49:10, 49:12
**refer** 32:20
**referred** 11:15, 44:21
**referring** 28:12, 33:2, 33:9, 49:8, 51:24, 52:9
**refers** 14:10

**refineries.** 18:15
**refiners** 14:14
**refining** 70:15
**reflect** 89:20
**reflected** 70:7
**reflection** 19:19
**regard** 7:24, 8:1
**regarding** 63:9
**region** 99:4
**region.** 46:21
**registrant** 96:21
**regular** 69:11
**regularly** 22:11
**regulations** 96:2
**reinstate** 78:6
**relate** 52:17
**related** 11:4, 46:20, 79:21
**relations** 10:13, 10:17
**relatively** 66:13
**reliably** 93:17, 94:4
**reliance** 6:3, 6:6, 6:9, 6:17
**relied** 86:20
**remainder** 48:3
**remember** 14:19, 45:1, 88:14, 94:2, 98:19, 102:10, 103:6, 108:20, 115:13
**remembering** 29:4
**remind** 86:9, 90:8
**remote** 46:3
**remove** 78:1
**removed** 75:23
**renew** 15:8
**repair** 93:3
**replace** 27:20, 66:10
**report** 9:20,
138

110:25, 111:9
**saying** 61:16
**says** 11:18, 13:7, 18:3, 18:13, 22:25, 23:2, 23:9, 24:3, 27:9, 27:11, 28:23, 29:7, 31:7, 31:14, 31:21, 33:6, 34:11, 42:16, 54:11, 77:24, 78:22, 96:14, 96:19, 97:20, 99:15, 100:17, 102:2, 104:14, 107:13, 110:3, 112:16
**scale** 79:22, 108:25
**scheme** 62:25
**School** 66:3, 66:7, 66:13
**science-based** 66:14
**scope** 34:1
**scores** 83:5
**SCOTT** 1:39, 2:39
**screen** 38:8, 71:20, 72:3
**scroll** 35:10
**seated** 4:5, 9:2
**SEC** 20:22, 21:5, 26:2, 26:9, 26:13, 43:9, 49:6, 64:22, 75:24, 76:3, 84:13, 85:10, 95:1, 95:11, 95:12, 96:2, 97:1, 97:4, 97:7, 97:8, 97:12, 97:22, 98:24, 99:1, 99:15, 100:6, 100:10, 103:22, 107:24, 108:3, 110:13, 110:17, 110:25,

111:15, 112:21, 113:19, 114:22, 117:42
**Sec-mandated** 94:24
**second** 13:11, 17:24, 18:12, 18:13, 27:12, 31:20, 33:5, 33:22, 41:12, 42:23, 48:8, 61:19, 69:13, 93:21
**section** 54:11, 87:25
**sections** 64:21, 65:5, 87:20
**Sector** 12:16, 13:1, 29:7, 29:11
**Securities** 112:18
**SECURITY** 4:3, 8:21, 41:16, 116:5
**seeing** 98:15, 103:6, 115:13
**seem** 23:16
**seen** 9:4, 16:8, 32:6, 35:24, 63:23, 65:2, 71:12, 73:1, 74:12, 79:17, 81:4, 95:18
**Selina** 18:5
**Sell** 17:21, 46:2, 76:16, 78:23, 79:4
**sellers** 25:12
**selling** 79:6, 101:22
**sells** 10:10
**send** 76:11
**sending** 35:9
**senior** 30:11, 58:16, 58:19, 58:24
**sense** 83:17
**sensitivities** 54:14, 54:15,

55:19, 55:24
**Sensitivity** 54:8, 55:11, 56:3, 56:10, 56:13
**sent** 30:7, 33:23, 34:1, 34:5, 34:6
**sentence** 6:13, 13:11, 18:13, 47:17, 100:14, 109:25, 110:2, 110:3, 112:16
**Separate** 6:3, 37:21, 37:24, 75:13, 78:11, 78:15, 81:18, 81:20, 81:22, 92:6
**separately** 97:3
**separating** 68:4
**series** 77:21, 82:3, 92:25
**service** 67:12
**session** 8:23, 65:7
**set** 25:15, 33:18, 61:19, 61:23, 112:21
**sets** 44:9
**setting** 69:3
**seven** 44:24, 69:5, 69:6
**seventh** 43:5, 49:1
**several** 47:20, 87:8, 93:19, 101:9
**shale** 18:14, 75:15
**Shall** 55:2, 96:19, 99:3, 99:7, 99:8, 99:10, 99:13, 99:15
**SHAMAILOVA** 2:31
**shape** 73:4
**shared** 65:3
**shareholder** 59:13, 59:14,

59:18, 60:3, 60:10
**shareholders** 58:20, 59:20, 59:22, 60:6, 61:3, 63:1, 63:4, 63:9, 81:15, 98:5
**shares** 29:9
**sharp** 19:20
**sheet** 78:1
**SHELDON** 1:41
**Shell** 19:11, 19:16, 20:3, 20:6, 21:10, 21:12, 78:18
**shift** 79:8, 86:7
**ship** 46:1
**shore** 68:20
**short** 28:25, 41:10, 62:1
**short-live** 56:11
**short-lived** 55:24
**shovels** 89:2
**show** 9:14, 10:4, 11:1, 11:22, 12:5, 15:5, 17:13, 17:17, 19:1, 20:13, 21:21, 23:24, 25:20, 26:17, 27:25, 29:18, 33:13, 36:2, 37:8, 41:6, 46:12, 49:21, 56:22, 58:7, 71:22, 102:5, 102:16, 112:24, 113:2
**showing** 41:24, 94:24
**shown** 45:11, 78:19, 94:20, 98:14, 103:5, 104:10
**shows** 18:4, 76:3
140

shredder 92:17
shut 76:7
side 5:10, 7:8, 16:17, 87:1
signature 9:16, 63:22, 64:3
signed 9:19, 10:1, 63:24, 63:25, 65:5, 65:17
significantly 23:21
signing 65:11
Similar 21:13, 37:24, 109:24
Similarly 1:8
simple 71:3
Singapore 70:15
single 92:22
sit 64:24
site 25:11
sits 54:24, 68:17
sitting 31:2, 51:5
Situated 1:8
six 23:18, 44:24, 69:8, 80:6, 82:5, 82:6
six). 55:15
six-month 69:3
sizable 40:25
size 79:14, 92:14, 106:12
slide 31:7, 71:19, 71:22, 71:23, 71:25, 104:11, 108:18, 115:9
slides 79:23, 81:4
slump 19:20
slurries 88:25
Small 66:13, 92:19, 109:18, 109:19
smaller 109:5
smarter 18:8
Smiddy 34:7,
34:11, 34:13
soft 88:4
soil 88:4
sold 93:8, 96:15
SOLOWAY 2:28
somebody 14:6
someone 34:7, 35:6, 57:10, 57:15
sometime 97:12
sometimes 44:21, 113:16
somewhere 44:12
son 67:10
Sorry 6:12, 10:15, 10:19, 12:4, 13:22, 17:15, 25:22, 38:13, 64:10, 67:2, 71:16, 71:25, 74:17, 83:23, 89:14, 98:9, 99:12, 108:14, 110:14, 116:4
sort 26:10, 47:6, 47:9, 64:15, 68:6, 68:17, 69:5, 69:7, 79:19, 83:19, 97:17, 112:6
sound 70:6, 99:25
sounds 100:1
source 23:7, 54:20
South 68:17, 95:3, 95:9, 101:8
southwestern 25:9
SPALDING 2:16
special 79:19, 106:23, 106:25
specific 21:20, 30:22, 30:23, 65:9, 73:13, 99:1
Specifically 12:11, 36:1, 53:8, 54:4, 66:14, 114:20
SPENCER 1:45
spending 88:21
spent 89:4, 103:14, 105:10, 114:13
spike 29:11
splitting 60:6
SQUIRE 2:46
stage 74:5
stand 8:16, 10:6, 64:3
Standards 112:19, 112:22
stands 78:25
Star 28:10
stark 19:19
start 51:10, 65:23, 66:17, 66:19, 68:24, 69:1, 86:10, 91:2, 94:4
start-up 90:11, 90:13, 90:24, 91:12, 91:14, 91:15, 91:19, 93:18, 94:3, 94:7, 107:3
Started 65:24, 66:20, 69:9, 86:24, 86:25, 92:21, 92:24, 101:19
starting 23:2, 23:11, 30:15, 55:9, 55:13, 91:6, 107:15
starts 33:20, 64:14
state 9:21, 23:16, 70:8
stated 97:22
statement 9:21, 26:1, 63:14, 89:21, 115:6, 115:14
statements 9:22, 9:23, 63:15, 71:15, 71:17
States 1:1, 1:27, 8:21, 8:23, 9:1, 11:4, 13:12, 19:16, 23:11, 27:14, 35:24, 42:23, 43:6, 43:24, 44:1, 45:21, 46:1, 46:19, 47:17, 52:18, 55:9, 57:24, 61:3, 84:12, 113:3, 113:7, 113:24
status 23:7
stay 108:9
staying 4:11, 41:19
steam 101:11
stenography 3:7
step 41:12, 91:11, 116:7
steps 91:9, 91:13
Steve 57:15, 57:21, 57:22
sticky 92:7
stipulated 15:12
Stock 29:6, 34:22
stomach 93:13
Stop 7:13, 62:8, 66:21, 66:23, 75:1, 76:9, 86:3, 115:24
stops 93:7
storm 4:9
stove 45:8
Strange 28:7
Street 2:17, 2:24, 3:14, 18:7, 19:10, 22:8, 22:10, 28:2, 28:19
strip 110:5

141

58:3, 60:7, 60:21, 61:10, 61:11, 71:7, 71:8
title 19:11
titled 22:14
TOAL 2:29
toasters 67:19
today 9:5, 23:17, 64:3, 70:23
together 30:18, 36:20, 64:24, 67:19, 80:16
tomorrow 4:21, 4:22, 5:4
tomorrow. 30:15
took 93:2, 93:11, 93:15, 97:14
tools 69:3
top 18:3, 18:5, 23:10, 24:3, 24:4, 27:9, 35:16, 39:16, 40:1, 52:8, 52:12, 52:20, 56:7, 98:11, 104:10, 110:2
topics 79:8, 79:19, 106:23, 106:25
topsoil 75:9
Total 17:20, 18:13, 18:18, 20:6, 21:13, 55:14, 58:25, 59:3, 59:6, 78:18, 78:22, 78:23, 96:21, 97:2, 97:19, 99:23, 108:23, 109:16
touch 78:17
touched 83:6
traded 55:10, 81:13, 81:14
transcript 3:8
transcription 3:8
transition 44:7
Treatment 5:16, 92:4, 93:10
Trek 28:10
trial 5:17, 6:8
tried 107:7
trigger 41:1, 41:2, 41:3, 41:5, 43:7, 43:14, 48:14, 49:4, 49:11
trucks 89:2, 89:10, 92:14
true 19:23, 46:11, 61:16
trust 80:15
truth 15:19, 15:24, 15:25, 19:7, 28:15
try 64:11
trying 20:11, 40:14, 113:15, 115:22
Tuesday 19:17
turn 9:15, 12:11, 13:4, 20:24, 24:22, 27:8, 31:6, 31:13, 33:1, 36:6, 39:15, 41:20, 41:25, 46:18, 52:8, 54:3, 59:12, 60:2, 91:10, 92:7
turning 69:3, 69:22
Turtle 1:35
Two 4:20, 5:11, 6:3, 12:4, 23:1, 30:15, 37:21, 37:23, 65:11, 69:21, 73:8, 74:8, 78:11, 78:15, 91:17, 92:15, 95:4, 106:8, 113:17, 114:8
TX 1:36, 2:4, 2:18, 2:25, 2:42, 2:48
tying 29:3
type 45:12, 61:4, 91:12, 95:1, 100:19
types 69:22, 110:24, 111:4
typical 32:11
Typically 38:25, 55:9

< U >
Ukraine 45:24
ultimately 39:8, 48:20, 49:11, 79:16, 83:9, 92:1, 97:17, 98:4, 110:15
unconventional 19:20
underlings 63:13
underlying 102:20
understand 44:15, 56:1, 81:5, 84:11
understanding 63:24, 95:12, 97:22, 99:13, 110:24, 115:16
Understood 17:16
undeveloped 44:20
undiscounted 104:15, 104:16, 105:1, 105:7
Unidentified 117:25, 117:44
unimpaired 78:4
unit 103:21, 108:3, 108:5, 110:13
United 1:1, 1:27, 8:21, 8:23, 9:1, 11:4, 35:24, 43:24, 44:1, 45:21, 46:1, 52:18, 61:3, 84:12, 113:3, 113:7, 113:24
university 66:7, 66:14, 67:13
Unless 4:10, 16:24, 62:13
unlike 78:7
unprofitable 18:15
unreliably 93:20
until 8:16, 45:23
untrue 9:21
unusual 93:25
update 38:21, 38:22, 38:24, 39:6
updated 38:13
upset 93:13
upsets 93:12
Upstream 14:12, 14:14, 30:11, 31:1, 31:8, 31:11, 32:3, 46:19, 47:15, 47:19, 48:3, 54:9, 57:9, 68:2, 83:7
upwards 79:21
using 26:11, 54:17, 102:9, 104:25
utilities 29:2
utility 23:5

< V >
V. 2:30
valuable 105:5
value 18:14, 63:10, 77:3, 77:22, 77:24, 78:8, 78:10, 90:3, 90:4, 94:8, 104:15,

143

stripped 107:16
struck. 29:15
structure 46:4
studied 97:14
studs 92:16
study 13:5, 97:10
stuff 45:17, 96:3
sub 24:7
subject 23:7
submerged 24:9
subsidiaries 114:24
subsidiary 24:7, 24:11, 81:8
substance 45:10
subsurface 68:7
sucked 27:20
suffer 13:15, 14:1, 47:8
suffered 13:13, 13:24, 93:12
suggest 85:15, 85:18
Suite 1:35, 1:47, 2:3, 2:17, 2:24, 2:41, 2:47
summarizes 100:18
summary 7:8
supervise 69:11
supervisor 70:1
Supply 73:12
support 48:21, 60:16
supported 47:25
surface 68:8, 68:9, 75:5, 101:13
surprised 92:12
surviving 24:11
Sustained 31:22, 31:24, 32:15, 32:20, 32:24, 33:6, 33:10, 73:25, 83:22, 104:4,
110:20
sustaining 111:9
SWIDERSKI 2:7
SWIGER 1:18, 8:7, 8:10, 9:9, 9:14, 15:5, 16:7, 17:13, 17:17, 18:12, 22:9, 31:5, 33:18, 41:12, 41:24, 51:22, 55:7, 58:24, 62:20, 65:20, 83:25, 88:12, 111:25, 116:7, 117:5
swing 114:5, 114:6
swore 9:18
system 88:25, 91:13

< T >
T. 1:43, 2:15
table 64:23, 94:20, 94:23, 94:24, 96:11, 100:14, 100:17, 102:1, 102:4, 102:6, 102:19, 102:22, 104:10, 106:7, 106:11, 107:24
tables 95:13
Taher 30:8
takers 32:5
talked 20:6, 55:2, 65:4, 68:1, 70:18, 70:25, 73:9, 73:18, 73:23, 75:10, 75:18, 75:20, 75:21, 77:4, 79:8, 82:12, 86:9, 86:14, 87:3, 93:10, 108:2
tar 18:19,
18:24, 20:11, 91:10, 91:21
tar-like 45:10
tax 46:25, 47:6
taxes 47:3, 47:9, 47:10, 112:6
taxes. 23:8
team 35:19
technologists 93:16
technology 91:19, 91:25, 93:11, 94:1, 94:10
teed 7:21, 7:22
Temporary 76:4, 76:5
Ten 7:7, 67:8
term 14:17, 48:7, 73:16, 88:13, 103:21
term. 23:21
terms 71:3, 109:2, 109:4
Terrible. 28:21
test 55:11, 56:10, 56:13, 75:24, 76:3, 83:11, 83:12, 103:22, 104:24, 108:3, 108:6, 109:12, 110:13, 110:17, 111:1, 111:17
testifying 62:20
testing 52:21, 77:22
tests 114:21
tethered 6:21
Texaco 67:13
Texas 1:2, 1:29, 3:15, 8:22
text 41:25
Thanks 15:2, 116:8
THEODORE 2:30
theory 6:20
thinking 32:8, 89:24
third 6:1, 27:8, 31:13, 46:18, 47:18
THOMAS 2:12, 2:39, 12:1, 15:10, 15:23, 16:2, 16:7, 16:12, 17:10, 17:16, 19:4, 21:23, 26:19, 28:5, 28:8, 28:12, 29:20, 29:22, 33:15, 37:13, 37:17, 37:21, 38:3, 49:23, 50:1, 51:16, 58:9, 61:19, 83:23, 83:24, 84:1, 84:2, 98:8, 99:16, 100:16, 117:11
THOMPSON 2:33
thoroughly 65:16, 82:15
though 23:19, 111:16
thousand 89:23, 101:9, 106:4
thousands 70:4, 75:14, 105:14
three 5:11, 36:25, 53:10, 53:12, 53:23, 59:9, 59:10, 69:7, 69:21, 80:12, 96:14, 100:20
threshold 97:8
threw 6:21
throughout 85:1
tied 5:23, 6:17
Tillerson 1:18, 3:1, 22:14, 22:24, 23:2, 23:6, 23:12, 24:24, 42:21, 48:23, 49:3,

142

104:20, 105:1, 105:4, 109:2, 109:3, 109:4
valves 69:3, 69:22
variety 25:10, 64:20, 83:6
ventures 18:15
vessel 92:5
viable 49:16
vice 58:24
vicinity 87:25
view 60:24, 94:7
views 105:3
virtue 43:7, 43:12, 49:5
voice 62:10
volatility 32:6, 71:13, 73:1, 73:4, 73:20, 73:21, 73:22
VOLUME 1:25, 4:1, 23:5, 105:25, 117:1
volumes 55:10, 109:4
vote 59:20
votes 59:21
vs 1:15

< W >
W. 1:18, 42:21
wagering 23:6
Wait 87:7
Wall 18:7, 19:10, 22:8, 22:10, 28:2, 28:19
wanted 10:19, 35:2, 44:8, 58:20, 67:21, 99:12
wanting 32:3
wants 20:18, 97:1, 99:2
War 45:24, 67:13
warm 41:19
waste 93:19
water 61:21, 61:22, 68:5
WATKINS 2:40
ways 12:4
weak 47:20
weakness 47:19
weaning 91:21
week 68:14
weekend 69:7
weeks 53:10, 53:12, 53:23, 56:19
WEISS 2:34
Wells 2:30, 4:10, 4:16, 67:10, 70:6, 101:10, 101:11
West 1:47
Western 19:18, 20:8
WHARTON 2:34
What'd 54:25
whatever 67:20, 97:22
Whenever 19:23, 55:20
Where'd 66:2
whereby 24:9, 92:14
whether 39:9, 59:24, 85:5, 104:6, 111:1, 114:22
white 106:19
Whoever 91:23
whole 5:5, 28:24, 36:20, 65:6, 106:18
wholly 24:19
wholly-owned 24:7, 24:11
whopping 27:15
Why'd 66:23
wildcat 67:10
WILKINSON 2:14
will 7:21, 23:6, 23:7, 37:21, 40:4, 42:24, 42:25, 48:20, 55:21, 65:12, 73:11, 82:5, 90:22, 95:22, 96:9, 110:14
Williams 18:5
Wilson 3:12, 61:25
without 110:21
WITNESS 8:12, 9:7, 14:8, 14:10, 14:21, 15:1, 26:1, 40:2, 61:12, 61:23, 64:8, 64:11, 66:6, 66:9, 66:12, 74:21, 74:23, 75:6, 84:11, 85:12, 86:5, 87:10, 87:12, 87:15, 87:19, 87:24, 88:3, 88:6, 88:8, 89:11, 110:19, 117:3
wonderful 62:12
WOODBURY 1:19
word 99:13, 102:5
words 55:21, 98:1
work 47:7, 62:2, 65:21, 67:4, 68:7, 68:10, 68:11, 68:12, 68:14, 69:1, 69:11, 69:14, 73:21, 82:3, 82:8, 82:11, 83:14, 84:15, 91:11, 93:3, 93:11, 115:3
worked 8:15, 9:5, 63:12, 69:12, 70:1, 91:25, 115:17, 115:22
working 20:8, 28:14, 30:12, 66:21, 66:23, 69:5, 69:9, 69:13, 71:11, 71:12, 93:17
World 24:2, 45:23, 54:1, 67:13, 67:17, 82:19, 83:5, 85:1
worldwide 43:21, 114:19
worn 90:5
worst 29:6
worth 29:3
Wow 96:4
write 77:23
write-down 19:19, 43:1, 49:11
write-offs 18:19
writes 10:10
written 47:11
wrote 18:13, 18:24, 30:13
WTI 54:21

< X >
XLE 29:11
XOM 14:1
XTO 22:14, 22:17, 22:23, 23:3, 23:12, 24:3, 24:4, 24:19, 25:4, 27:14, 27:15, 27:21, 28:21, 29:5, 29:13, 42:1, 42:5, 44:4, 44:8, 44:19, 45:25, 46:7, 52:17, 108:20, 108:23, 109:1, 109:4, 109:10, 109:16

144

< Y >
**Y'all** 4:5,
4:18, 4:20,
9:3, 9:6,
16:15, 41:18,
41:19, 62:1,
62:5
**year** 21:10,
25:4, 26:14,
36:20, 39:19,
39:20, 42:12,
48:6, 49:13,
53:4, 53:16,
53:20, 55:14,
56:18, 58:8,
58:25, 59:3,
59:6, 64:13,
66:25, 76:11,
76:23, 80:7,
89:25, 94:2
**year-end** 51:4
**year-to-date**
36:18, 36:19
**yearly** 26:3
**years** 30:19,
32:2, 35:24,
39:19, 39:20,
55:14, 59:9,
59:10, 61:2,
64:6, 65:22,
66:9, 70:14,
70:16, 71:11,
73:19, 90:4,
90:10, 96:14,
97:11, 101:17,
103:5, 113:17
**years.** 100:20
**yesterday** 4:17,
10:23, 11:15,
12:21, 15:7,
18:18, 24:24,
36:3, 49:23,
49:25, 88:13,
90:11, 94:20,
98:14, 99:22
**York** 2:36,
25:13, 34:21,
34:22, 35:3,
55:3
**yourself** 58:19

< Z >
**zero** 90:4
**Zoom** 95:23,
100:14, 101:25,
103:2, 106:18,
106:20

145

C E R T I F I C A T I O N

I, PAMELA J. WILSON, CSR, certify that the foregoing is a transcript from the record of the proceedings in the foregoing entitled matter.

I further certify that the transcript fees format comply with those prescribed by the Court and the Judicial Conference of the United States.

This the 29th day of April, 2026.


                        s/Pamela J. Wilson
                        _____
                        PAMELA J. WILSON, RMR, CRR
                        Official Court Reporter
                        The Northern District of Texas
                            Dallas Division

146

PAMELA J. WILSON, CSR/RMR/CRR

**App. 122**

# Exhibit 5

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

PEDRO RAMIREZ, JR., Individually )
and on Behalf of All Others )
Similarly Situated, and GREATER )
PENNSYLVANIA CARPENTERS PENSION )
FUND, )
)
              Plaintiffs, )
)
    VS. ) No. 3:16-CV-03111-K
)
EXXON MOBILE CORPORATION, ) CLASS ACTION
REX W. TILLERSON, ANDREW P. SWIGER, )
JEFFREY J. WOODBURY, DAVID S. )
ROSENTHAL, )
)
              Defendants. )
_____)

JURY TRIAL PROCEEDINGS -- VOLUME 2-B
BEFORE THE HONORABLE ED KINKEADE
UNITED STATES DISTRICT JUDGE
APRIL 29, 2026
DALLAS, TEXAS

FOR THE PLAINTIFFS:

    JOE KENDALL
    KENDALL LAW GROUP
    3811 Turtle Creek Boulevard, Suite 825 Suite 880
    Dallas, TX  75219
    (214) 744-3000

    SCOTT H. SAHAM
    NATHAN R. LINDELL
    SAM SHELDON
    ERIKA OLIVER
    T. ALEX B. FOLKERTH
    SARA BIERL POLYCHRON
    SPENCER A. BURKHOLZ
    ROBBINS GELLER RUDMAN & DOWD, LLP
    655 West Broadway, Suite 1900
    San Diego, CA  92101
    (619) 231-1058

(Rex Tillerson)

PATRICE CHILDRESS
(Party Representative)

    Proceedings reported by mechanical stenography; transcript
produced by computer-aided transcription.
_____

DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
Federal Official Court Reporter
1100 Commerce Street, 15th Floor
Dallas, TX  75242
(214) 753-2325

BALON B. BRADLEY
BALON B. BRADLEY LAW FIRM
11910 Greenville Avenue, Suite 220
Dallas, TX  75243
(972) 991-1582

MICHAEL SWIDERSKI
(Party Representative)

FOR THE DEFENDANTS:

    THOMAS M. MELSHEIMER
    AUSTIN E. SAATHOFF
    EMILY WILKINSON
    DAVID T. HINOJOSA
    KING & SPALDING, LLP
    2601 Olive Street, Suite 2300
    Dallas, TX  75201
    (214) 764-4446

    NINA CORTELL
    JASON JORDAN
    HAYNES and BOONE, LLP
    2801 N. Harwood Street, Suite 2300
    Dallas, TX  75201
    (214) 651-5000

    AUDRA J. SOLOWAY
    DANIEL TOAL
    THEODORE V. WELLS
    LYUBA SHAMAILOVA
    AMITAV CHAKRABORTY
    DAPHNE THOMPSON
    PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
    1285 Avenue of the Americas
    New York, NY  10019-6064
    (212) 373-3000

    SCOTT C. THOMAS
    LATHAM & WATKINS
    100 Crescent Court, Suite 7084
    Dallas, TX  75201
    (713) 546-5400

    D. PATRICK LONG
    SQUIRE PATTON BOGGS
    2200 Ross Avenue, Suite 4100w
    Dallas, TX  75201
    (214) 758-1500

VOLUME 2-B     4

INDEX

| PLAINTIFF'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ANDREW SWIGER | | | 83 | 92 |
| DAVID ROSENTHAL | 94 | | | |

EXHIBITS

| DEFENSE EXHIBIT | INTRODUCED | ADMITTED |
|---|---|---|
| 33 | 51 | 51 |
| 369 | 114 | 115 |
| 398 | 12 | 12 |

(PROCEEDINGS BEGAN AT 1:26 PM.)

COURT SECURITY OFFICER: All rise.

THE COURT: Okay. All right. We're ready.

COURT SECURITY OFFICER: All rise for the jury.

(Jury seated in the jury box.)

THE COURT: Okay. You all be seated. Thank you very much.

Okay. Here we go.

MR. THOMAS: May I proceed, Your Honor?

THE COURT: You bet.

CONTINUED CROSS EXAMINATION

QUESTIONS BY MR. THOMAS:

Q. Mr. Swiger, before the lunch break, we had just started talking about the process for estimating the proved reserves at Kearl. Do you recall that?

A. I do.

Q. And I think we had just put this up on the screen. I might be going back a little bit because I can't remember where we were. But what does this screen -- this slide on the screen show us?

A. Well, it shows the process or it's a schematic of the process steps for the reserve estimates that initiate in IOL, Imperial Oil, Limited, and move all the way up to ultimately ExxonMobil Senior Management Review and publication in the 10-K.

Q. And we see the -- I think we were talking about the Global Reserves Group when we broke.

A. Yes.

Q. And we see that at the level just below the Senior Management Review. Would you have been part of that Senior Management Review?

A. Yes, sir.

Q. Okay. Now the Global Reserves Group, tell the -- tell the jury what the "Global Reserves Group" is.

A. It's a technical group that's very independent of the operations, and their sole job is to be involved in assessing reserves around the world, all of ExxonMobil's operations. They have upstream operations there. They direct the work for people in the -- in the units and they are the overseer of all of it and the quality control and the final say on what the reserve estimates are.

MR. THOMAS: Mr. Gooden, can we pull up Plaintiff's Exhibit 66 which is the 2015 10-K? And go to Page 5, please. Sorry. Page 7 of the PDF. It's Page 5 if you're looking at the page number on the 10-K. Okay. Go up, yes. And just go up to the top so we can see what section we're in.

Q. (By Mr. Thomas) And, Mr. Swiger, is this the section we've been looking at about the proved reserves table?

A. Yes, sir.

Q. Okay. Now the section goes on to the next page.

MR. THOMAS: So can we now go to the following page, Mr. Gooden?

Q. (By Mr. Thomas) And what we see here is some -- sort of see here is a description following that table.

MR. THOMAS: And will you highlight that last section, Mr. Gooden?

Q. (By Mr. Thomas) And this is in the 10-K that you signed and the shareholders could review. And Section C is "Qualifications of Reserves Technical Oversight Group and Internal Controls over Proved Reserves." And the first sentence says, "ExxonMobil has a dedicated Global Reserves Group that provides technical oversight and is separate from the operating organizations."

Did I read that correctly?

A. Yes, sir.

Q. Is that the same Global Reserves Group that you've been talking about?

A. It is.

Q. And you said earlier and it says here that they're independent. Is it important that the Reserves Group be independent?

A. Absolutely, yes.

Q. Tell the jury why.

A. Well, because they have a very important job of providing oversight for this -- these reserves which are going to be disclosed to the public. We have to make sure it gets right and it's free from any interference from the operational organizations.

MR. THOMAS: And, Mr. Gooden, could you highlight -- Yes, right there; that sentence there, please.

Q. (By Mr. Thomas) It goes on to say, "The manager of the Global Reserves Group has more than 30 years of experience in reservoir engineering and reserves assessment and has a degree in Engineering. He's an active member of the Society of Petroleum Engineers and previously served on the SPE" -- which is the Society of Petroleum Engineers -- "Oil and Gas Reserves Committee."

Do you know who that is?

A. I do.

Q. Who is that?

A. It's Mr. Strawbridge, Bill Strawbridge.

Q. Going back to the flow chart of the decision.

MR. THOMAS: Thank you, Mr. Gooden.

Q. (By Mr. Thomas) There is a Senior Management Review that you were involved in. Did someone make presentations or give you information as part of that review?

A. Yes. Mr. Strawbridge.

Q. Now in 2015 and early 2016, through this process, did Mr. Strawbridge or anyone else at the Global Reserves Group tell you that the Kearl reserves would not qualify as proved reserves under this SEC test we've been talking about?

A. They did not.

MR. SAHAM: Objection, leading. And, Judge, could we get a limiting instruction about the slide or the opening deck that he keeps using as evidence?

THE COURT: What were you going to say?

No. What were you going to say?

MR. THOMAS: Well, I was going to respond.

THE COURT: Yeah. I was going to say I'll let you respond.

MR. THOMAS: I don't think it was leading, Your Honor. I just tried to summarize it.

THE COURT: I'll overrule the objection. And what were you going to say about this?

MR. THOMAS: We're not trying to submit this as evidence. It's a demonstrative. It's already been used in the case. I was just having him discuss it.

THE COURT: Okay. I'll overrule that objection.

All right. Go ahead.

MR. THOMAS: Yes.

Q    (By Mr. Thomas) Now when the Global Reserves Group would make a presentation to you about -- about reserves and whether they were proved or not, how would that interaction between you and those folks go?

A.    Well, they would -- they would follow a defined presentation format, going through it sort of country by country or bit. fields, that sort of thing. The Management Committee would ask

questions, and at the end of the day the presentation would conclude.

Q.    Now yesterday there was a lot of questions that you were asked about transportation costs and costs related to Kearl's production and sales of bitumen. Do you recall that?

A.    I do.

Q.    And when you were asked those questions about using actual costs, you -- you said "actual costs to the market" which was -- which is what you would want to use. Do you recall that?

A.    That's correct, yes.

Q.    And you even saw a video about this when they played your deposition. Do you remember that?

A.    I did, yes.

Q.    Can you tell the jury why you were saying it's important to focus on what the market is when you use those actual costs?

A.    Yes. Because when you're doing the SEC methodology, you have to select a market price to put into the SEC methodology, first-of-the-month price at a particular marketing point. You must then use the actual costs to get it to that marketing point.

Q.    You were also asked questions yesterday -- I think you heard this in Opening. You were asked whether you and Mr. Tillerson and Mr. Rosenthal made a decision as to whether certain costs would be included or excluded from the SEC reserves price test. Do you remember that line of questioning?

A.    I remember that line of questioning, yes.

Q.    Do you recall what your responses were to those questions?

A.    My response was: It was not a decision we made. It was information culminated by the Global Reserves Management Group who made the decision.

Q.    Just to make sure, I think we talked a little fast there.

A.    Sorry.

Q.    Which group made that decision?

A.    The Global Reserves Management Group.

Q.    Okay. And that would be Mr. Strawbridge's group?

A.    Yes.

Q.    And you said it's important to choose a market. What was your understanding of what market was used in 2015 for the Kearl SEC proved reserves test?

A.    My understanding was it was the Edmonton market which had been used for Kearl previously and Cold Lake all the way back to its start.

Q.    And when you say "used for Kearl previously," do you mean used in prior years?

A.    Prior years.

Q.    Let me finish my question. Prior years' SEC proved reserves test?

A.    Yes, sir.

Q.    Okay. And, again, who made the decision of what market to use?

A.    The Global Reserves Management Group.

Q.    Okay. Now you talked about transportation costs and you saw some numbers from Kearl to Edmonton which is, I think you said, a few hundred miles south of Kearl, correct?

A.    That's correct.

Q.    And there was a reference -- and let me just put this back up here -- yesterday to fake costs and then Plaintiffs showed this slide, and there was a reference to fake transportation costs being used. Do you recall that?

A.    I do.

Q.    In this SEC test, as you understood it, from Kearl to Edmonton, did they use those actual transportation costs?

A.    They certainly did.

Q.    Did you ever know of anyone using fake costs of any kind in the SEC reserves analysis?

A.    Not at all.

Q.    I'd like to show you what was -- Oh, actually this has not been admitted yet.

MR. THOMAS: I'd like to offer Defendant's Exhibit 398 which I believe is unobjected to.

MR. SAHAM: No objection.

THE COURT: It's admitted into evidence.

MR. THOMAS: Can you pull that up for me, please, Mr. Gooden?

Q    (By Mr. Thomas) Mr. Swiger, what is -- what is Exhibit -- Defense Exhibit 398?

VOLUME 2-B    13

A.  It is an e-mail to myself from David Rosenthal dated October 23rd, 2015.

Q.  And this is three days before that meeting that you and Mr. Tillerson and Mr. Rosenthal, Mr. Madden and Mr. Strawbridge had about the Kearl reserves, correct?

A.  That is correct.

Q.  Okay.  And Mr. Rosenthal says to you, "Andy, further to my earlier note, you should have received a draft of the review package.  As I understand the methodology, they have decided to use the price at Edmonton and only use sales to third-party customers in Canada, not including any U.S. -- any sales to EM affiliates, nor sales into the U.S."

    Did I read that correctly?

A.  You did.

Q.  Who is the "they" in that sentence?

A.  The "they" is the Global Reserves Group.

Q.  And the next sentence says, "This is apparently what they do for Cold Lake, although I don't know if the dispositions of CL crude are similar to Kearl."

    Who is the "they" in that sentence?

A.  The "they" would be the Global Reserves Group.

Q.  Okay.  And this is three days before your meeting with Mr. Strawbridge, Mr. Tillerson, Mr. Rosenthal, Mr. Madden and others to talk about these reserves, correct?

A.  Yes, sir.

VOLUME 2-B    14

Q.  Was there any decision made in that meeting about what was going to be included or excluded from the SEC proved reserves test?

A.  Not at all.

Q.  What was the purpose of that meeting?

A.  To review the roll-up of the global reserves.

Q.  Did you have -- Did you, sir, have any -- Do you recall having any reason to question the decision or the thought process of the Global Reserves Group in that meeting?

A.  I did not.

Q.  Why not?

A.  The information was well done.  It came through a long process of rolled-up reviews; really good people working on it that I've known for years and trusted to get it right.  There were no issues that needed to be addressed beyond the meeting.

Q.  Now we're going to get back to that presentation in a moment, but I want to talk about another document you were asked about yesterday.

    MR. THOMAS:  Mr. Gooden, can you pull up Plaintiff's Exhibit 339, please?  Go to Page 6.

Q.  (By Mr. Thomas) Do you remember seeing this chart yesterday?

A.  I do.

Q.  Okay.

    MR. THOMAS:  And let's zoom that chart back up.  Thank you.

VOLUME 2-B    15

Q.  (By Mr. Thomas) Now you were asked questions about the blue and red bars for July, August, and September of 2015.  Do you recall that?

A.  Yes, sir.

Q.  And I think you testified that in two or three of those months it looked like those U.S. Gulf Coast sales were the majority of the sales for those months, correct?

A.  That is correct.

Q.  I don't think you were asked about the prior months.  But in all the prior months, going back from May of 2015 to October of 2013, according to this chart, where were the majority of sales made?

A.  They were made in Edmonton.

Q.  And I think you testified that you had a recollection of what happened the rest of 2015.  Do you recall that yesterday?

A.  Yes, I do.

Q.  Do you still have that recollection today?

A.  I do, yes.  And the recollection was that in the Fourth Quarter of 2015, again, it reverted to a majority of the sales at Edmonton.

Q.  And just so I understand your testimony, in 2014 that same methodology of using Edmonton as the market for the SEC reserves test, was that being used then?

A.  Yes, sir.

Q.  What about in 2013?

VOLUME 2-B    16

A.  Same; Edmonton market.

Q.  Okay.  And did it make -- Would it make any sense to you, sir, to change a methodology or an analysis that's being done based off three months of data for a project that has a 40-year life?

A.  No, sir, that wouldn't make sense.

    MR. THOMAS:  Let's go to Plaintiff's Exhibit 117, please, Mr. Gooden, just to show Mr. Swiger what we're looking at, please.

Q.  (By Mr. Thomas) Mr. Swiger, do you recall looking at this -- this e-mail yesterday from Mr. Strawbridge?

A.  I do.

Q.  And this is the day before your meeting with Mr. Tillerson and the others, correct?

A.  That is correct.

Q.  And it attaches a PowerPoint slide that we'll get to in a moment.  Who presented at this meeting?

A.  That would be Mr. Strawbridge.

Q.  Was it unusual to have a meeting in October about reserves processes?

A.  No.  It's part of the normal process of getting ready for the year end.

Q.  And why was there a meeting about Kearl at this time in 2015?

A.  Big project starting up, as I said before, and one where we

were, you know, concerned about whether the SEC reserves test was going to yield something that we might have to disclose.

Q.   It would be a close call?

A.   We had this meeting to determine that.

Q.   Okay.  At this meeting were you told one way or another whether the reserves would pass the proved reserves test?

A.   We were -- We were left with the data that went through the time of this meeting, but there was still part of the year to run.

Q.   Let's talk about this presentation, if we can.

MR. THOMAS:  Can you go to Page 6, please?  And go up to the title of the slide, if you can, Mr. Gooden; a couple of slides above.  Keep going.

Q   (By Mr. Thomas) And so just to make sure we're all set on the same place here, this is this proved reserves meeting that happened on October 26, 2015; correct?

A.   Yes.

Q.   Okay.

MR. THOMAS:  Can you go to the next slide, please?  Can you blow the whole -- yes, that whole part.

Q   (By Mr. Thomas) And I'm not going to read all this or ask you to read all this, but does this slide comport with your understanding of the SEC proved reserves rules at a high level?

A.   It does, yes.

Q.   And this last section, "Costs of the Operation," it says

"Not defined by the SEC but excludes depreciation.  So assessed to represent Direct Cash Operating Costs."

Did I read that correctly?

A.   You read that correctly.

Q.   Is that your understanding of the rule as you attended this meeting back in October of 2025 (sic)?

A.   Yes, sir.

Q.   Okay.  And we see that depreciation, that expense we talked about earlier that spreads things out that's not a real cash expense, that's excluded.

A.   A non-cash expense, yes.

Q.   Right.  So we're looking at cash operating costs for this test, correct?

A.   That is correct.

MR. THOMAS:  And then can you go to the slide you were at originally, Mr. Gooden?  And can you blow up the background section?

Q   (By Mr. Thomas) Do you see the third bullet in this section, Mr. Swiger?

A.   I do.

Q.   It says 2004 Cold Lake Reclassified.  I think that squiggly line means "approximately."  Is that right?

A.   Yes.

Q.   Five hundred million barrels of oil due to low year-end bitumen prices and high fuel gas prices.

Is "reclassified" another way of saying "rebooking" or "debooking"?

A.   Yes.  Debooking really means you're moving it from one classification of proved to another, probable reserves.

Q.   And did Cold Lake stay in operation after 2004?

A.   Yes, it did.

MR. THOMAS:  Can you zoom back out, Mr. Gooden, and then blow up that bottom left chart?  Yes.

Q   (By Mr. Thomas) Now you were shown this -- a couple of versions of this, "Henry hub pricing."  Remind the jury -- We're going to step out of Kearl and we're going to go down south to the Rocky Mountains and talk about natural gas and those Rocky Mountain dry gas assets.

A.   Yes, sir.

Q.   Can you remind the jury what "Henry hub" is?

A.   "Henry hub" is that point in Southwestern Louisiana that serves as a benchmark market price because lots of buyers and sellers meet there.  It sets the overall price for the United States.

Q.   And you were asked questions about 2010, about the time that -- that ExxonMobil bought those XTO assets and XTO when the price was at $4.38 and comparing that to the price in 2015 of $2.70.  Do you recall that?

A.   I do.

Q.   Now what happened in 2012 to the Henry hub price?

A.   It dropped to 2.77.

Q.   Right about the same as it was in 2015, correct?

A.   Yes, sir.

Q.   And then what happened over the next two years?

A.   It rose to 4.35 in 2014.

Q.   And 4.35 is about the same price that it was in 2010 --

A.   That's correct, yes.

Q.   -- when the XTO was purchased.

Does this just show -- Does this just show the volatility of the market?

A.   It does.

MR. THOMAS:  Now can we go to Page 8, please?  And I want to -- I want to focus first on the right side, the top right language, "SEC Positive Cash Flow Test."

Q   (By Mr. Thomas) Now we've been calling this the "SEC proved reserves test," at least I have.  I think you have as well.

A.   Yes.

Q.   Is that what this is talking about?

A.   Yes, it is.

Q.   And so it says, "Proved reserves equal revenues greater than costs."  What does that mean?

A.   It means that if revenues are greater than costs in the test, the outcome is they are proved reserves.

Q.   And what does it say the costs to be used are?

A.   It says, "Direct Cash Operating Costs plus Sustaining Capex,

**App. 127**

VOLUME 2-B   21

excluding CAF."

Q.   Those tens of millions of capital development expenditures, are those included there?

A.   No, not the investments.  The sustaining capex is included.

Q.   And those are the tires and the smaller things that are going to expire over time.

A.   That sort of thing, short-lived capital investments.

Q.   Okay.  But not the big froth building or the crusher, things like that.

A.   No.

Q.   And then depreciation, is that included here?

A.   No, sir.

Q.   Okay.  So we talked about book earnings that include those things, depreciation and exploration costs.

A.   Yes.

Q.   Okay.  And those are not included in here, correct?

A.   They are not.

Q.   So is it -- is it fair to compare book earnings to this cash flow test that we're looking at here?

A.   It is not.  They're two different things.

        MR. THOMAS:  Can you zoom out, Mr. Gooden?

        Can you zoom into the graph at the top, please?  Thank you, sir.

Q   (By Mr. Thomas) Tell the Jury what the dotted black line is.

A.   That was the 2015 SEC price at the time of this.

VOLUME 2-B   22

Q.   And what is the -- what is the price at the time of this?

A.   $29.20.

Q.   $29.20.  And this is when?

A.   This is -- I believe it was December.

Q.   Let me go back and just refresh your memory.

        MR. THOMAS:  Go back to the title page, please, Mr. Gooden.

A.   Yeah, please do.

        MR. THOMAS:  Show him the date, please.

A.   Okay.

Q   (By Mr. Thomas) Does that refresh your memory when this was?

A.   Yes.  It was -- It would have been the SEC price through the 1st of October.

Q.   And when is the SEC price finally determined?

A.   It's determined the 1st of December when the -- when the price is set 1st of December.

Q.   Okay.  So -- So we've got an SEC price of $29.20.  And what are the -- What's the blue line there?

A.   The blue line are the operating costs.

Q.   And there's a number below that that says "2H15."  What is that?

A.   Well, that shows the operating costs in the second half of 2015 thus far.  So for the year, through October essentially, the average costs were $28.50.  But in the second half of 2015, the organization had brought those operating costs down to $23.40.

VOLUME 2-B   23

Q.   Was that significant to you at the time?

A.   It was.

Q.   Why?

A.   And it showed very good progress on driving the operating costs down at the Kearl development.

Q.   And what changed in the second half of 2015 from the first half of 2015 other than these numbers going down?

A.   Well, I think there were a number of things.  First of all, you got the scale of having the second development; the expansion projects start up; a lot more barrels; more efficient to produce, so forth.  But, more importantly, it was the hard work that people did to take costs out of operating the facility, to find better ways to produce it more efficiently.

Q.   And then we see the formula up at the top, "Cash plus Sustaining Capex minus CAF."  And you talked a lot about the "costs above field" yesterday.  I don't want to retread that, but ---

A.   Yes.

Q.   And you talked about what "sustaining capex" is, but I just want to make sure.  So we have the cash operating expense, and you add the cost for those tires and you deduct costs above field, right?

A.   Yes, sir.

Q.   And just a one-sentence answer:  What -- What are "costs above field"?

VOLUME 2-B   24

A.   Those are people not directly associated with the operation --

Q.   Okay.

A.   -- but supporting it.

Q.   It's like overhead?

A.   Overhead, yes.

        MR. THOMAS:  Now can you zoom out, please, sir, Mr. Gooden?  And get the whole left side together.  Thank you.

Q   (By Mr. Thomas) Remember yesterday you were -- you were asked about this Direct Cost Above Field, dollar 60 at the bottom left in 2015?

A.   Yes.

Q.   And you were asked to add that to the $28.50 and come up with a $30.10 result, correct?

A.   Yes.

Q.   And you were asked, "Well, if that $30.10 exceeded the $29.20 SEC price, would Kearl qualify for the reserves?"  Do you recall that question?

A.   I do.

Q.   Is October the proper time to do that analysis?

A.   No.  You have to complete the year.

Q.   Okay.  And what was going on with costs towards the end of the year in 2015?

A.   They were going down as we could see.

        MR. THOMAS:  Can we go to Plaintiff's Exhibit 214,

please, Page 22?

MR. GOODEN:  Number again?

MR. THOMAS:  Oh, I'm sorry.  22.

Q   (By Mr. Thomas) And you were shown the right side of this graph or this slide yesterday.

MR. THOMAS:  I think pull it up a little bit.  It's fine.

A.  Yes, I was.

Q   (By Mr. Thomas) You were asked about the transportation cost of $7.  Do you recall that?

A.  I do.

Q.  Okay.  There's a -- There's a word below that that talks about "netback."  What is -- I think the Judge even asked you, "What did you say," but I'm not sure you got a chance to explain it.  What is "netback"?

A.  "Netback" is the value of the crude after you've deducted the costs associated with the spread, the diluent and the transportation.  That's what you receive after paying those expenses.

Q.  Are "netback" and "realizations" similar?  Related?  The same?

A.  They are.

Q.  Okay.  And what was the netback at Kearl -- We can go back and look at this, but this is November, 2015, year to date.  What was the netback at Kearl?

A.  $29.

Q.  And this is the month after that meeting where you saw the $29.20 SEC price, correct?

A.  That's correct.

Q.  So those numbers are pretty similar, right?

A.  They are.

Q.  New let's go to Exhibit -- Plaintiff's Exhibit 538.

THE COURT:  Stop.  What does this show?

This shows everything y'all were producing and making money on?  Because you've got WTI and you got all that in there.  I have no idea what "spread" means.  I know what "transportation" means.  So what does -- what does this show?

THE WITNESS:  Judge, it's how you adjust from the WTI marker price in Cushing, Oklahoma, to get it to a netback at Kearl.

The spread has to do with the quality difference between the oils, WTI being a light sweet crude, easier to refine; diluent being much harder.  So diluent gets an $11 debit when a refiner buys it versus WTI in simple terms.

THE COURT:  Okay.  And this is how you calculate what the -- what that sticky stuff from Kearl is worth.

THE WITNESS:  At the -- At the plant gate, yes.

THE COURT:  At the what?

THE WITNESS:  At the Kearl mine, the outlet of the Kearl mine facility.

THE COURT:  So this -- 29 is the value right at the site.

THE WITNESS:  Yes, sir.

THE COURT:  Not in -- Not in Oklahoma.

THE WITNESS:  No, sir.  It starts -- It starts with a value in Oklahoma and gets it to a value at the site.

THE COURT:  Oh, okay.  All right.  Thanks.

Q   (By Mr. Thomas) So -- So -- Just so I understand, you're backing in from that price in Oklahoma to what the price would be if you sold it at the plant gate at Kearl in Canada.

A.  That's correct.

Q.  And for the SEC test, are you also trying to determine a price at the plant gate at Kearl?

A.  Yes.

Q.  Okay.

THE COURT:  But you don't sell any of it at the gate at Kearl.

THE WITNESS:  No.  We were selling most of it in Edmonton.  So we have that transportation cost between Edmonton and Kearl.

THE COURT:  So why do you calculate this at all?  What difference does it make?  Is this for some -- for the SEC test?  Is that why you're doing this?

THE WITNESS:  No.  This is just a standard spotlight review of Kearl just looking at the operating performance.

THE COURT:  This is something to help you know how much you're making or not making based on things.

THE WITNESS:  That's correct, yes.

THE COURT:  And based on the way you engineers value this stuff.

THE WITNESS:  It's how we understand the operating performance, yes.

THE COURT:  Okay.

THE WITNESS:  Yeah.  It is not -- not to do with the SEC test.

THE COURT:  No; right.  But it's how you guys run the deal.

THE WITNESS:  Yes, sir.

THE COURT:  As far as you know, does everybody else do it this way?

THE WITNESS:  I would think it's fairly similar, yes.

THE COURT:  Fairly similar of how you oil people value this?

THE WITNESS:  Yes, sir.  That's a -- That's a standard way of valuing it.

THE COURT:  I get it.  Okay.  How did -- How did you ever come up with that -- with that?  And how do you know that it's -- that it's 11 or 13 or 14?

THE WITNESS:  Well, those are established by the market.  We know what refiners will pay generally for this

**App. 129**

product. We know what they'll pay for WTI. So we know what that spread is. We know what it cost to buy diluent, the Naptha that I talked about the other day.

THE COURT: Yeah. Yes, sir, I remember that. So refineries are the ones that kind of set that spread price.

THE WITNESS: Yes. What they'll pay for it starts the spread price, yes.

THE COURT: Okay. I get it. Okay. Thanks. I just needed a little more understanding. And I'm assuming that since there's nobody on the jury that's an oil and gas expert, they're sort of in the same boat I'm in. Okay?

THE WITNESS: Yes, sir.

THE COURT: All right. Go ahead.

MR. THOMAS: I appreciate it, Judge. Thank you.

Q   (By Mr. Thomas) So just to -- I want to button this up and we'll move on. But as the Judge asked you, this $29 netback, that's what you're using to see how the performance of the -- of Kearl is doing, correct?

A.   The business, yes.

Q.   Okay. And that is within 20 cents of what the SEC price calculated by Mr. Strawbridge and his group was the prior month.

A.   At that time, yes.

MR. THOMAS: Can we go to Plaintiff's Exhibit ---

THE COURT: Is the diluent -- How do you say that? "Diluent"?

THE WITNESS: Diluent.

THE COURT: Is that the Naptha?

THE WITNESS: Yes, sir.

THE COURT: Y'all make that, too, right?

THE WITNESS: We do, but we can buy it on the market.

THE COURT: So I'm guessing it's cheaper to buy it on the market than it is to make it.

THE WITNESS: We like to get the cheapest Naptha that we can.

THE COURT: So whichever way it works, that's what you use.

THE WITNESS: Absolutely.

THE COURT: Okay. Go ahead.

MR. THOMAS: All right, Your Honor.

Can we go to Plaintiff's Exhibit 538, please?

Q   (By Mr. Thomas) You were shown this exhibit yesterday.

THE COURT: Oh, one more question.

Naptha is paint thinner?

THE WITNESS: It could be used as paint thinner, yes.

THE COURT: Okay. But -- I mean that's what we regular humans that go to Home Depot that don't have access to all your stuff, that's what we would buy if we were looking for oil-based paint thinner.

THE WITNESS: Yes, sir.

THE COURT: All right. Okay. Not the -- Not the

water-based because you wouldn't use it for that, right?

THE WITNESS: No. You need -- You need a hydrocarbon like Naptha.

THE COURT: Well, okay. Okay. There we go. It's what I might use to clean my hands after I get the paint on my hands. I probably shouldn't but I could.

THE WITNESS: Yeah. You'd want to rinse them off pretty quickly.

THE COURT: Yes, sir. Yes, sir. I understand. That's why I don't do a lot of painting.

Go ahead. I'm finished for now.

MR. THOMAS: Are you sure? Thank you, Judge.

Q   (By Mr. Thomas) You were shown this e-mail yesterday from Mr. Strawbridge to you on December 11th, 2015. So this is about a month and a half after that meeting y'all had, correct?

A.   Yes.

Q.   And you were asked about the Henry hub price. And the first part of the second sentence of this long paragraph, it's not really that long, but ---

MR. THOMAS: Yes, right there, Mr. Gooden. Can you blow that up?

Q.   (By Mr. Thomas) It says, "The attached charts provide detail on the monthly actual prices and the final Kearl pricing. This Kearl pricing of 28.70 was on the low end of the 28.50 and 29.50 outlook range we showed to the Chairman October 26th, but the

November year-to-date unit costs are coming in about a dollar and 50 per barrel lower. So we look to be in good shape to preserve other Kearl SEC reserves."

Did I read all that correctly?

A.   Sir?

Q.   Did I read all that correctly?

A.   You did, yes.

Q.   So Mr. Strawbridge in December of 2015 tells you what about the Kearl SEC reserves?

A.   We look to be in good shape to preserve them.

Q.   And Mr. Strawbridge is the head of the Global Reserves Group?

A.   Yes, sir.

Q.   Okay. And when you say "preserve," that means keep them on the list of proved reserves.

A.   That is correct, yes.

Q.   So they wouldn't ---

THE COURT: It means don't debook them.

THE WITNESS: Don't debook them, yeah.

MR. THOMAS: I was about to ask that, Judge.

THE COURT: I'm trying to help you.

MR. THOMAS: I appreciate it.

THE COURT: I'm going to help Mr. Saham a little bit.

A.   So just to -- This would be after the final SEC price point is set on December 1st, --

Q    (By Mr. Thomas) Right.

A.    -- just for clarity.

Q.    That's a good clarification, sir.  I know there's a lot -- a lot going on here.

But the way you get the price is you set it on an average of the first day of the month for the 12 months of the year, correct?

A.    That's correct, yes.

Q.    So you've got 12 days of data, though they're spread out over the year.  Take that average and that leads you to get to that SEC price, correct?

A.    Yes, sir.

Q.    And so you -- Even though the year's not over, you know that price because December 1st has already happened.

A.    We do.

THE COURT:  I got another question.  I'm sorry.

MR. THOMAS:  You don't need to apologize.

THE COURT:  Why are we using Brent versus -- I mean why were you using that price versus WTI?

THE WITNESS:  That's a very good question.

THE COURT:  Oh, thank you very much.

THE WITNESS:  Well, it's important to understand this.  This was not about Kearl.  This was about the totality of the SEC price review around the world.  Brent is a very important indicator for a lot of our international operations.  So we use

Brent prices to do the SEC analysis for fields in Africa, fields in the North Sea, some fields in Asia.  It is a good international marker.

THE COURT:  I get it.

Q    (By Mr. Thomas) At any point after December 11th, 2015, did anyone from the Reserves Group or anyone else at ExxonMobil tell you that the Kearl reserves were not going to pass that SEC proved reserves test?

A.    No, not at all.

Q.    Did you have any reason to think that they were not going to pass after hearing this from Mr. Strawbridge?

A.    I did not.

Q.    And based on everything you saw, read, and discussed in 2015, did you believe that Kearl should have been classified as proved reserves on that table we looked at in the 2015 10-K?

A.    Yes, sir.

Q.    Now you were asked some questions about 2016.  And at the end of the 2016 ---

MR. THOMAS:  Yes.

(Mr. Melsheimer consulting with Mr. Thomas.)

Q    (By Mr. Thomas) So going back to where I was, ---

THE COURT:  I'm not the only one bothering you?

MR. THOMAS:  What's that?

THE COURT:  I'm not the only one bothering you?

MR. THOMAS:  I'm getting it in stereo.

THE COURT:  You may get some people from the back of the courtroom here in a little bit.

MR. THOMAS:  I'm doing my best here, Judge.

THE COURT:  You're doing fine.

MR. THOMAS:  Okay.  I appreciate it.

Q    (By Mr. Thomas) I think we were moving on to 2016.  At the end of 2016 the Kearl reserves were debooked, correct?

A.    That is correct, yes.

Q.    And you were still the Principal Financial Officer, correct?

A.    I was.

Q.    And that process that we looked at from Imperial up to the Management Committee, that was still in place in 2016; correct?

A.    Yes, it was.

Q.    Did you oppose the debooking of Kearl in 2016?

A.    Not at all.

Q.    Why not?

A.    It was a result of the process.  The SEC test was applied and that was the answer.

Q.    Okay.  Now you were -- you were asked about some changes to the methodology in 2016 and you were shown a slide deck, and I want to go through that with you just briefly.

MR. THOMAS:  It's Plaintiff's Exhibit 215, please, Mr. Gooden.  And can you show the date of the e-mail?

Q    (By Mr. Thomas) And this is November 16th, 2016.  We saw this yesterday.  And it looks like it's about -- You see the

Subject:  "A Thursday, November 17th UEM/FRM Meeting," correct?

A.    Yes, sir.

Q.    And remind the jury what "UEM" means.

A.    Upstream Endorsement Meeting.

Q.    And what does "FRM" mean?

A.    You know what, that slips my mind at the moment.  It was some kind of -- some kind of a decision-making meeting on investment proposals.

Q.    A lot of acronyms at ExxonMobil?

A.    A lot of acronyms.

Q.    Yeah.  Six years from then, you've let some of them go, right?

A.    I think it will come to me.

Q.    Okay.

A.    But I'm not sure when.

Q.    If it does, you let us know.

MR. THOMAS:  Can we go to Page 34, please?

Q    (By Mr. Thomas) This was a presentation that you saw in a meeting you attended in November, 2016; correct?

A.    Yes.

Q.    Okay.  And I don't think we saw this page yesterday, but you see the section that's "2015 SEC Reserves Pricing Basis"?

A.    Yes.

Q.    And it says, "Assumed local Alberta market only for determining differentials; historically most heavy oil volumes

VOLUME 2-B   37

custody transfer locally."

A.   Yes, sir.

Q.   When it says "Alberta market," what specific markets are we talking about?

A.   This is Edmonton.

Q.   And Edmonton's -- Edmonton's a city there in Alberta, Canada; correct?

A.   Yes.  It has a big heavy oil terminus.

Q.   And does this slide -- Does this correspond to your recollection of the process in 2015?

A.   Yes, sir.

Q.   Does it -- Does it correspond to your recollection of the history of where heavy oil volumes custody transferred?

A.   Yes.

MR. THOMAS:  Then I want to go to Page 37, please.

THE COURT:  Stop.  You know what I'm going to ask.

What is the difference between "heavy oil" and -- I don't know -- "light crude" or whatever you call it?  I don't know.  Can we get that -- make that clear?

Q   (By Mr. Thomas) Can I ask you a question, Mr. Swiger?

A.   Yes.

Q.   What's the difference between "heavy oil" and "light sweet crude"?

A.   Yeah.  It's -- I'll try to do this and not be overly complicated.

VOLUME 2-B   38

If you think about oil being made up of carbon and hydrogen -- this may not -- may not work -- carbon and hydrogen, heavy oil has lots of carbon, heavy molecules, and a little bit of hydrogen.  Lighter oils have a more even distribution between carbon and hydrogen.  It's what gives them their qualities and their viscosity, their appearance.  Heavy oils are heavier, more carbon atoms.  Lighter oils are lighter.  They have less carbon atoms, more hydrogen atoms.

That's -- I don't know.  Does that help, Judge?

THE COURT:  And that's heavy over there.

THE WITNESS:  That's heavy, yeah.

THE COURT:  And the light oil would be West Texas -- what comes out of the ground in West Texas.

THE WITNESS:  Light oil would be more like your motor oil.

THE COURT:  Okay.

THE WITNESS:  Motor oil versus an asphalt.

THE COURT:  Okay.  Which is a much more -- I don't know.  Is "viscous" -- Is that the right word?

THE WITNESS:  Yes.  It's heavier and more viscous, yes.

THE COURT:  Yeah, okay.  Okay.  So that's really kind of how you break that down.  And you use all of it.

THE WITNESS:  Yes, sir.

THE COURT:  I guess if the -- if God was making the world again and you could pick it, you'd pick it all to be

VOLUME 2-B   39

somewhere around Midland.  First off, it would be easy to get out.  Nobody would be shooting at you in a foreign country.  And secondly, it would be the easiest to work with.  "Yes" or "no?"

A.   That would be a "yes."

THE COURT:  See?  I'm getting in the oil business.  I'm getting out of here.

MR. THOMAS:  Well, you got to go where they don't shoot at you at least.

THE COURT:  Well, I mean I'm just telling you:  That's the sort of thing the jury is interested in and kind of wants to make sure they -- They need to understand how, you know, how this works.  And y'all are going all over the dadgum world, I assume.  At least that's what I saw on these charts.  "Yes"?

MR. THOMAS:  Yes, Your Honor.

THE COURT:  Good.  Thanks for answering my question there.

And why do they do that?  Why don't they just get it all out of the ground between Andrews and Midland, particularly Andrews where my friend grew up where the -- they got swimming pools back when Irving barely had a school.  I mean there's something going on there.  So why are y'all going all over the world?

THE WITNESS:  There's insufficient volume to meet world demand.

THE COURT:  That's it.  That's the answer right there.

VOLUME 2-B   40

That's it right there.  It's -- Let me compare it to something.

Is this like Baylor University wants to go all over the world to find the best basketball players we can find.  That's what we have to do because we can't find them all in Irving.  They're not all there.  It's probably not a perfect analogy, but y'all are stuck with what the world is.  "Yes" or "no?"

THE WITNESS:  Yes, sir.  Yes, sir.

THE COURT:  Okay.  Okay.  See?  All right.  I'm just interrupting you.

MR. THOMAS:  I appreciate it, Judge.

THE COURT:  No, you don't.

MR. THOMAS:  I do.

THE COURT:  But it's okay.

MR. THOMAS:  I'll take the oath and say, "I appreciate it.  I appreciate it."

THE COURT:  All right.

Q.   (By Mr. Thomas) So just following up with what the Judge said, I will be clear and make sure everybody understands this.

When we say "heavy oil," that includes bitumen from Kearl or Cold Lake?

A.   It does in the broadest sense.  I mean some people will distinguish heavy oil from bitumen in that heavy oil is heavy but it will flow, so it's not as heavy as bitumen.  So for precision: Bitumen, heavy oil, light oil.

Q.   But bitumen is closer to heavy oil than it is to light oil.

A.    And that's why they're often used in the same family grouping.

THE COURT:  Okay.

Q.    Thank you.

THE COURT:  I kind of cut you off there.  My fault.

MR. THOMAS:  And can we go to Page 37, please, Mr. Gooden?

Q    (By Mr. Thomas) And you were asked about this chart yesterday.  Do you recall that?

A.    Yes, I was.

Q.    And you were asked to compare the number at the bottom.  So what we see here is at the top "Kearl SEC Pricing 2016 Basis" and in the middle "Kearl Actual Average Realizations 2016."  Then on the left side we see 2015.

Do you see that?

A.    I do.

Q.    And you were asked to compare the 28.70 total at the top to the 24.27 total at the bottom.  Do you recall that?

A.    I do.

Q.    And you recall saying that you couldn't compare those.  Those aren't the same things, I believe is what you said.

A.    They're not the same basis.

MR. SAHAM:  Objection, leading.

THE COURT:  I'm going to let him ask that.  Overruled.

Q    (By Mr. Thomas) Did you say yesterday that those weren't the

same things?

A.    They're not the same things.

Q.    And tell the jury why they're not the same things.

A.    They're two different bases.  Starting with the calculation of the oil price at the top, $50.28 was the first of the month pricing.  That's those 12 days during the year.  The bottom starts with the average, the 365 days over the year or at this point year to date.

Q.    And so I think we talked about this earlier, but the top chart has 12 days' worth of data.

A.    Yes.

Q.    And the bottom chart has 365 days' worth of data.

A.    For the pricing, yes.

Q.    Would you ever expect those numbers to be the same?

A.    It would be quite a coincidence.

Q.    Well, why do you say that?

A.    Because you're assuming that 356 days aligned with 12 days in terms of pricing somehow.

Q.    Now, Mr. Swiger, before we leave Kearl, as it relates to the financials and the reserves that we've been talking about at Kearl, as you sit here today, do you still believe all the information in that 10-K that you signed in February of 2016 was accurate?

A.    Absolutely.

Q.    So I want to -- I want to shift gears.  We're shifting gears

to the Rocky Mountain dry gas assets.  And you said earlier that that's not only a different asset or group of assets, it's different accounting or financial reporting principles.  Do you recall that?

A.    For impairment, yes.

Q.    So now we're talking about impairment and not debooking, correct?

A.    Yes, completely different subject.

Q.    Go back up to Kearl just quickly.  Was Kearl ever impaired or written off the financial statements?

A.    Never.

Q.    So getting back to these Rocky Mountain assets and impairment, can you remind the jury how an impairment might come to be?

A.    An impairment might come to be -- It's really a three-step process:

First of all, you look and see whether there's a trigger event that says you need to do an impairment analysis.  A trigger event might be a big change in the operation, cessation of production, some other factor that sets a change in market value.  In other words, for some reason the market is no longer valuing similar assets as highly as it was there.

You then move to Step 2 which is to do the asset recovery analysis.  That's where you take the plan for the asset in terms of how it's going to be developed with drilling and wells and

producing equipment.  You cost it out in terms of what you have to spend to do that.  Then you take the production arising from that development and apply the price forecast, the price bases that we talked about, in order to see what the revenues were.  If the revenues exceed the cost, the value of the asset that's on the books right now, it does not need to be impaired.  If the revenues do not exceed the value on the book now, it does need to be impaired and you move to Step 3.

Step 3 is where you attempt to establish what the value of the asset usually is, oftentimes going back and seeing what the market might value it at, but there are other ways to do it.

Now what I will say that's important on this discussion is:  You don't necessarily need that Step 1 trigger to go ahead and do the Asset Recovery Analysis if you think you should do it just to check on how things are.  You want to take a very conservative view and assure yourself that what's on the books is a proper representation of the value of the asset.

Q.    Do you have to do this -- this process, this three-step process every year?

A.    Do not.

Q.    Okay.  And why not?

A.    Well, as I said before, if you do not see a trigger event for a specific asset, you do not have to do it.  You may choose to do it.

Q.    Okay.  And in 2015 did ExxonMobil conduct an impairment

analysis as it related to its assets?

A.   We did.

Q.   And would that include those Rocky Mountain dry gas assets we've been talking about?

A.   Yes, sir.

Q.   Okay.  Now before we get to this, what constitutes a "trigger"?

A.   Well, as I said before, there are -- We could probably look at something that lists them out specifically, but it's things like:

    An apparent significant change in market value;

    A change in use of the asset;

    A change in the productive qualities of the asset.

    Those sort of things would say:  Something's happened here.  I need to look at what its value is now.

Q.   And are you familiar with the rules of what is and is not a "trigger"?

A.   I was, and I tried to recount some of them now.  I can't list them perfectly from memory.

Q.   Do you recall whether a competitor taking an impairment is a trigger?

A.   No, it is not.

Q.   You were asked a lot about other companies taking impairments in 2014 and '15.  Do you recall that?

A.   I do.

Q.   And did that have an influence one way or another on whether ExxonMobil viewed this as a trigger in 2015?

A.   No, not at all.

Q.   Why not?

A.   Well, because other companies will make different judgments about their specific assets.  They have their assets.  We have our assets.  We can take an example from what was talked about before.

    Total decided to abandon its Canadian bitumen operations.  That's clearly a trigger.  They're walking away from it.  They have to write the value of those down to something that the market would recognize.  In other words, somebody would come in and buy those from Total at some lower price.

    So there are things like that that would be a trigger for them.

Q.   And we saw a lot of questions about low gas prices during 2015 or low prices in the market in 2015.  Were those viewed as a trigger?

A.   They were not.

Q.   Why not?

A.   Well, because these assets are long, long lived in nature.  In fact, something like the Rocky Mountain developed gas -- dry gas assets, a lot of the value would occur decades in the future.

    MR. THOMAS:  Can we look at Plaintiff's Exhibit 51, please?  And go to Page 2, I believe.

Q.   (By Mr. Thomas) And I want to look at this sentence that's highlighted up here.

    MR. THOMAS:  If you could zoom up from that point forward, please.  Is that zoomed in?

    MR. GOODEN:  Yes.

    MR. THOMAS:  Okay.  All right.

Q.   (By Mr. Thomas) Sorry, Mr. Swiger.  It might be a little small there.

    You were asked about this bullet that says, "Be prepared to answer the question:  So has a trigger event occurred?"

    Answer:  "By virtue of the reduction in ExxonMobil's long-term U.S. natural gas price outlook, it would be difficult to argue to SEC that one has not occurred."

    Do you remember getting questions about that?

A.   I do.

Q.   Does this mean that ExxonMobil thought there actually was a trigger?

A.   No.  It just means that we were probably going to be faced with a difficult discussion, but we don't shy away from those.

Q.   Okay.  And can we -- And this was -- We see the title is "XTO Asset Recovery Review with PwC."  Remind the jury who "PwC" is.

A.   Our independent auditor, PricewaterhouseCoopers.

Q.   So this was a discussion with the auditors, correct?

A.   Yes, sir.

    MR. THOMAS:  Can you zoom out and then zoom in on the bottom part, please, Mr. Gooden?

Q.   (By Mr. Thomas) That first bullet says, "Because of the importance of topic to PwC and to us, we needed to put together a deck addressing not only the math behind our assertion that assets are not impaired but also supporting our view of long-term energy demand and prices."

    And there was a meeting set up with PwC.  Did you attend that meeting?

A.   I do not recall.

Q.   But your name was on the talking points.

A.   I probably did, yes.

Q.   Now are you aware of an analysis actually being done about -- on that second step that you talked about?

A.   Yes.

Q.   Okay.  Now you said there doesn't have to be a trigger to do an impairment analysis, correct?

A.   A company can choose to proceed with an Asset Recovery Analysis.

Q.   And is that what ExxonMobil did in 2015?

A.   We did.

Q.   Who headed that up?

A.   That would be David Rosenthal.

Q.   And did he have folks who worked for him?

A.   Oh, plenty, yes.

Case 3:16-cv-03111-K    Document 376    Filed 05/07/26    Page 144 of 831    PageID 20337

MR. THOMAS: And I want to look at Plaintiff's Exhibit 65, please.

Q. (By Mr. Thomas) Are you familiar with this exhibit? I think you saw it with the Plaintiff's lawyer.

A. Yes, I'm familiar with it.

Q. And what is it?

A. It's a -- It's a paper written to talk about what potential impairment triggers are.

Q. And is this that -- What's the purpose of doing this exercise?

A. To document our -- our views.

Q. Okay. And if we can go to Page 6 of the document, please. It says here, "Based on its assessment of the geographic integration of operating areas, the corporation's volume and capex planning and budgeting process, and the level at which largely identifiable revenue and costs could be forecasted, management performed a multi-decade projection of future cash flows."

Do you see that?

A. Yes, I do.

Q. And what does -- What's that mean in plain English, Mr. Swiger?

A. That basically means that the asset recovery process was carried out.

Q. Okay. And do you recall what the result of that process

---

was?

A. The result of that process was no impairments were required.

THE COURT: What's this exhibit number?

MR. THOMAS: Plaintiff's 65. It was admitted yesterday.

THE COURT: Okay. Sorry.

MR. THOMAS: If we go down to the bottom of -- Can you zoom out, please, Mr. Gooden?

Q. (By Mr. Thomas) Okay. And this is on that same page of Plaintiff's Exhibit 65. And it says, "Reviews were held with successively senior levels of management culminating in a review with the Corporation's Chairman/CEO in the Fourth Quarter."

That would be Mr. Tillerson, correct?

A. Yes, sir.

Q. And in that successive levels of review, would that have also been with you, Mr. Swiger?

A. Yes, sir.

Q. And it says at the end, "Management concluded no indication of continuing losses is likely. The carrying value of upstream long-lived assets was recoverable and no impairment trigger had occurred."

Is this your recollection of the results of this analysis?

A. Yes, sir.

Q. Now you were asked about some price projections that I want to talk to you about during your examination with the Plaintiff's

---

lawyer. Can we go to ---

MR. THOMAS: Actually I'd like to offer Defense Exhibit 33 which I believe we have an agreement on.

MR. SAHAM: 33? Yeah, no objection.

THE COURT: 33 is admitted into evidence, Defense Exhibit.

MR. THOMAS: Can you put that up, please, Mr. Gooden?

Q. (By Mr. Thomas) And we've got a long e-mail here, but we've seen this exhibit before in a different form.

MR. THOMAS: Can you go to the fourth page, Mr. Gooden?

Q. (By Mr. Thomas) This is that Dataguide. Do you recall that?

A. Yes, sir.

Q. Okay. And I've got a hard copy if you need it.

A. I have one up here.

Q. Okay. And you were asked about some -- some information on Page 12.

MR. THOMAS: If we can go to Page 12, Mr. Gooden. Kind of blow up that top row of -- Thank you.

Q. (By Mr. Thomas) Do you recall being asked about this? I think maybe earlier this morning, Mr. Swiger?

A. I do.

Q. And it says "Henry hub." Remind the jury what "Henry hub" is.

A. Again, that's that -- that's that big marketing point in Southwestern Louisiana.

---

Q. And you were asked about the decrease of the Extended Plan Financials on the far right for 2020 and further out. In 2014 it was $5.20 and in 2015 it went down to $4, correct?

A. That's correct, yes.

Q. And I think you were asked if that was a trigger, and what was your response to that?

A. It was not.

Q. Okay. Can you tell the jury why not?

A. Well, that was a reduction in costs, but it was far above the break-even cost for the assets we were running at that time, so not considered to be a trigger. Recall that's a price backup close to when XTO was purchased, $4 and some cents MCF at that time. So not a trigger. A big reduction but not sufficient in our view to trigger any impact on valuations.

Q. And I -- I think you were asked about comparing this drop in projections to the drop that was in the 2016 projections. Do you recall that?

A. I do, yeah.

Q. And I think the drop that you were asked about was a 50-cent drop as opposed to a 1.20 drop.

A. Right, to $3.50.

Q. And why was -- why was the latter, the 2016, why was that a trigger and this was not a trigger?

A. Well, it wasn't necessarily a trigger. We elected to perform the analysis in 2016 as well, and that's where we found

that somewhere between that $4 and 3.50 on a long term basis, the asset became impaired.  It could not recover its booked cost.

Q.   And I think you said it mattered more where you got to than how much it dropped.  Is that right?

A.   Absolutely, yes.

Q.   Okay.

MR. THOMAS:  Can we go to Page 11, please?

Q   (By Mr. Thomas) I just want to make sure.  There was some discussion about the New York Mercantile Exchange, this "NYMEX."

A.   Yes.

Q.   And I think you were read a sentence there.  "Typically, the market futures have minimal volumes traded beyond 24 months.  However, the purpose of the market future sensitivity is to test opportunities to the full extent of market futures."

Do you see that?

A.   Yes.

Q.   And then you had said it was a sensitivity test, not a -- not a price projection, and I don't think you got a chance to explain that.  Can you tell the jury the difference between the two?

A.   Yeah.  There's always -- For an investment decision, there's always a base economic case going on, that core planning price basis, that $4 or the 5.20 that we looked at just before.  We always like to test investment decisions against a range of prices just to understand how the asset may behave when prices

are lower or higher, particularly in regimes with complicated tax and royalty structures where the price can actually make a big difference in the financial outcome there because of the way it triggers tax increments and so forth.  This is a particular sensitivity related to projects that are short-term in nature.

Now most of the big projects we've been talking about are decades and decades and decades.  But sometimes when you're doing work to restore a well that has had a flaw in it or a defect, it has broken down in a simpler sense and it's a going to be capable of being restored for three to four more years of production, you want to run some price sensitivities on a very short-term nature to see if I understand everything there.  One way to get a short-term price sensitivity is to look at the non-mix prices because they are -- they're really, as it says here, only valid for about 24 months but there is a tail that goes out a little bit longer.  It's just another sensitivity.  It is not the key decision-making bases.

Q.   Okay.  When you say "sensitivity," can you kind of explain that a little bit?

A.   Another -- Another case to look at.

Q.   Okay.  And you also were asked questions about this, and you said there was a difference between short-term and long-term assets and how you apply those.  Do you recall that?

A.   Yes.

Q.   And is that what you just kind of explained to us?

A.   I did, yes.

Q.   So at the end of 2015, did you have any reason to believe that those Rocky Mountain dry gas assets should have been impaired?

A.   I did not.

Q.   Okay.  By the end of 2016 were those assets impaired?

A.   At the end of 2016?

Q.   In 2016.

A.   Yes.

Q.   And why were they impaired in 2016?

A.   Well, because the price bases had dropped from $4 to 3.50 and the assets were no longer viable at a price of $3.50 going into the future.

Q.   And did you -- Were you still Principal Financial Officer at the time?

A.   I was.

Q.   Did you object to -- to the impairment at the end of 2016?

A.   Not at all.

Q.   Okay.  And Mr. Tillerson worked at the company until the end of 2016.  Is that right?

A.   That is correct, yes.

Q.   And do you recall whether there were discussions with him about this impairment before he left?

A.   There were.

Q.   Did he voice any objection to the impairment?

A.   He did not.

Q.   Now you were asked a lot about a bond offering.

A.   I mean before we get there, it's important to understand:  The impairment decision is a process outcome.  It's the outcome of the calculation.  It's not something that you then argue about it.  You just accept it's the outcome.

Q.   Similar to the proved reserves test?

A.   Yes.

Q.   Now you were asked some questions about a bond offering, and I just want to --

A.   Yes.

Q.   -- cut to the chase on this.

Did you intentionally delay any impairment or debooking to consummate that bond offering?

A.   Not at all.

Q.   Was that ever even in your mind?

A.   No.

Q.   Tell the jury why the company issued bonds in the first part of 2016.

A.   Sure.  We put together the plans and budget every year and with that is a financing plan, how are you going to finance, in other words, generate the cash to make the investments, pay the dividends, those sort of things.  The finance plan associated with that year said, "Well, we'll go to the market and borrow in the range of 10, 12 billion dollars in order to be able to

VOLUME 2-B    57

continue the investment program that we had conceived in the plan. And why did we do that?

Well, we had a fair amount of very short-term debt on the books. This is -- This is money that is borrowed every day on a different basis there. It's short term. It just rolls over, rolls over. It's convenient for financing the short-term needs of the corporation.

We wanted to take advantage of what was, as you might recall, a very low interest environment in the middle of the last decade to borrow long term, replace that short-term debt, be able to continue to fund the Investment Program and really do a great thing for the shareholder.

We borrowed money at a weighted cost of about, if I remember, if I recollect correctly, 2.7 percent to invest in projects that were expected to yield a 15 percent rate of return. So a really good deal for the gentleman taking advantage of a low interest rate environment, replacing some short-term debt with some very low interest loan return debt.

Q. There was some discussion about ExxonMobil's AAA credit rating. Do you recall that?

A. I do.

Q. And tell the jury again what that AAA credit rating represented.

A. A AAA credit rating is the very top credit rating a company can get. It's given to only the most creditworthy borrowers.

VOLUME 2-B    58

Q. And was ExxonMobil's credit rating actually downgraded in 2016?

A. Yes, it was.

Q. And it went from AAA to what?

A. Double AA+, the next notch down.

Q. Okay. You mentioned something called a "CreditWatch" earlier --

A. Yes.

Q. -- and your testimony yesterday, I believe.

A. Yes.

Q. What is -- What is a "CreditWatch"?

A. Well, CreditWatch is a disclosure by the rating agencies that they are evaluating a downgrade. There's actually an Outlook as well. There are two different times in which they will say, "We're looking at this company. We have concerns about the debt levels they have on the books or other things. We're looking at implementing a downgrade."

So they're letting the market know. The rating agency is letting the market know that a downgrade is potentially coming.

MR. THOMAS: Can we pull up Plaintiff's Exhibit 553 which was admitted into evidence yesterday, Your Honor?

And can you go down to Page 3, please, Mr. Gooden?

Q. (By Mr. Thomas) And you remember looking at this slide deck --

A. Yes.

VOLUME 2-B    59

Q. -- yesterday?

And just remind the jury what "term debt" is.

A. That means debt that's going to be issued for a specific term: Five years, ten years, twenty years, thirty years.

Q. Is that another word for "bond"?

A. Bond.

MR. THOMAS: And if we can go to Page 5, please. Mr. Gooden, can you zoom in on the top left part? Yes.

Q. (By Mr. Thomas) Mr. Swiger, what do we see here on the left side?

A. We see energy sector pricing ranges based on the credit rating.

Q. And we see ratings there. Is that a rating from highest to lowest?

A. It is.

Q. Okay. And we see AAA and then high AA. What does "high AA" mean?

A. That's -- That's AA+.

Q. Okay.

A. It's the next notch down.

Q. And so if Exxon had a credit rating of AAA and got knocked down one notch, would it still be in that row there at the top?

A. Yes, it would.

Q. Okay. What's the -- What's the information there we see on the right?

VOLUME 2-B    60

A. The information on the right is the interest rate expressed as a spread over what treasury is, ten-year treasuries, the debt the Government issues which is very safe and more than AAA.

So for a AAA borrower there in the industry, whether it's us or anybody else that's a private sector issuing bonds, they would pay the treasury rate plus 140 to 170 basis points. Well, that's -- that's 1.4 to 1.7 percentage interest rates higher.

MR. THOMAS: And can we zoom back up and then show the graph?

THE COURT: And what did the "T" represent?

THE WITNESS: Treasury rate for ten year.

THE COURT: Which then was -- Do you remember where it was?

THE WITNESS: Very low. Below one percent.

THE COURT: What was it?

THE WITNESS: One percent.

THE COURT: Wow.

THE WITNESS: Yeah. Those were the days.

THE COURT: Don't we all yearn for that?

MR. THOMAS: If you can just show the bottom row. Yes. Thank you.

Q. (By Mr. Thomas) You were shown the -- these dots yesterday, and the Judge asked you if you recall about the fact that a couple of these companies weren't oil and gas companies. Do you remember that?

A.   That is correct, yes.

Q.   And that's Johnson & Johnson and Microsoft.  Did they have AAA ratings at the same time?

A.   They did.

Q.   And what do the blue -- You talked a little about this but I don't think you had a chance to explain.  What do the blue and yellow boxes above ExxonMobil, what do those mean?

A.   Well, the blue box is what was the indicated rate, spread in February as opposed to July of 2015 in the orange box.

Q.   So -- So what does that mean?  What happened from July, '15, to February of 2016?

A.   Well, what happened is we were first put on Negative Outlook in the Fourth Quarter of 2015, and then Negative Watch in the First Quarter of 2016.  So the market anticipated -- was anticipating that there would be a one-notch downgrade, and you can see the spread moving out.  We were going to have to pay more than Johnson & Johnson or Microsoft who were similar AAA borrowers.

     MR. THOMAS:  Can we go back to Page 3 of this slide, Mr. Gooden, or of this exhibit?

Q   (By Mr. Thomas) Just to put this in context, February 10th is -- that is before the bonds were issued, correct?

A.   That is correct, yes.

Q.   And it's before the 10-K was issued, correct?

A.   Yes.

Q.   So that the market, as you said, had already adjusted and increased the interest rate that Exxon would have to pay on these ten-year bonds, correct?

A.   Yes, sir.

Q.   And ---

     THE COURT:  Is ten as far as they go out?

     THE WITNESS:  I'm sorry?

     THE COURT:  Is ten as far as you'll ever go out?

     THE WITNESS:  No.  You can look at a 30-year.  The Treasury does issue 30 years.

     THE COURT:  They will?  To companies like Exxon and other companies?

     THE WITNESS:  Well, banks can buy them.  This is the Treasury, U.S. Government debt.

     THE COURT:  Yes.

     THE WITNESS:  You can buy a 30-year bond.  ExxonMobil issued 30-year bonds.

     THE COURT:  Okay.

     THE WITNESS:  It is a common length of bond.

     THE COURT:  But y'all were looking at ten years at this point.

     THE WITNESS:  Well, this -- this offering was a -- was a series of seven tranches between 3 years and 30 years.

     THE COURT:  Okay.  You used that word "tranche." That's not anything.

     THE WITNESS:  I'm sorry, tranche.  A three-year issue, a five-year issue, a ten-year issue, a seven-year issue, a 20-year issue and a 30-year issue.

     THE COURT:  Okay.

     THE WITNESS:  Please correct me on any jargon.

     THE COURT:  No.  It's okay.  I mean I -- That's the first time I heard that word "tranche."  I don't know.  I thought it was a bakery item.  I didn't know what that meant.  I never even heard that ever.  I mean it's a very interesting term.  You know, there's another term that goes along with that.  I was going to see if it applied.  I'll think of it in a minute.  I can't think of it right now.

     When I was on the board of Baylor Healthcare, we -- we were always doing stuff with this.  And so that's my little -- my little -- my little mind had to get around these -- these kind of tranches and what was going on.  And at different times companies, even not-for-profits like Better Healthcare who apparently has more employees than Exxon now, 62,000 -- Exxon doesn't have 62,000, does it?

     THE WITNESS:  Not presently.

     THE COURT:  Oh, there we go.  My goodness.

     Is that you -- you -- you borrow money and then you hope that interest rates will change.  And if it -- if it goes down, you hope to borrow money at the lower rate to pay off the higher rate.  Things like that happen.

     THE WITNESS:  There are -- There are people that will, as you say, Judge, arbitrage the borrowing to get a ---

     THE COURT:  "Arbitrage," there's that other word. That's what I was trying to think.  And "arbitrage" means?

     THE WITNESS:  That means take a position on two things and try to optimize between them.

     THE COURT:  Okay.  All right.  Many thanks.

     THE WITNESS:  What we're fundamentally doing, as I was talking about before, is you're taking advantage for the benefit of the shareholders to borrow at very low rates, lock that in for a period of time, to then invest that money in projects that will yield a much greater return.

     THE COURT:  I guess between 2. -- What was it?

     THE WITNESS:  2.7ish.

     THE COURT:  And 15?

     THE WITNESS:  Yes, sir.  Shareholders win.

     THE COURT:  Maybe I should have gotten out of real estate.  I don't know but, anyway, that's interesting.

     Okay.  Go ahead.

     MR. THOMAS:  Thank you, Your Honor.

Q   (By Mr. Thomas) And just zooming in on the bottom, when we do compare to the oil and gas or energy companies, even if ExxonMobil at this time would have been downgraded one notch, did you say it was AA+?

A.   Downgraded to AA+.

Q.   Downgraded to AA+?

A.   Yes.

Q.   How would that compare to the rest of these oil and gas energy companies?

A.   They were all inferior credit risks to ExxonMobil.  You can see Chevron is a AA minus.  Shell has a single A+.  Total is a AA-; Statoil, AA minus; and BP has just a single A.  So they would all have to pay more than a AA+ borrower.

THE COURT:  The banks don't trust them as much as they trust you.

THE WITNESS:  That is correct.

Q    (By Mr. Thomas) And all of those companies would have to pay a higher interest rate.  That's what that blue dot means at the top, correct?

A.   Yes.  I mean you could infer by looking at this that the AA+ rating would be in the area where that blue square is for ExxonMobil.  You compare it with the AA minuses and the A+s.  So since the market has already marked us to AA+, you could infer that.

THE COURT:  What exhibit number is this?

MR. THOMAS:  Your Honor, this is Plaintiff's Exhibit 553.

THE COURT:  Thanks.

MR. THOMAS:  Yes, Your Honor.

Q    (By Mr. Thomas) Now just one more time:  Did the bond

---

offering or the credit rating play any part in your decision to sign that 10-K on February 24th, 2016?

A.   Completely unrelated.

Q.   Did it play any part in whether the Kearl reserves showed up on that 10-K as proved reserves?

A.   Not at all.

Q.   Did it play any part in those Rocky Mountain dry gas assets being impaired or not being impaired at the end of 2015?

A.   Not at all.  No part.

Q.   Okay.  Now I want to talk about the 10-K.  You talked about you signed it and there was a process that you generally followed.  What was that process in 2000 -- at the end of 2015?  The process for you to end up signing the 10-K.

A.   Sure, yeah.  As I explained before, it's a -- it's a -- like many ExxonMobil's processes, it's bottoms up.  It starts with information from the field, of the financial people close to the field, the operating units, the planners, the tax and treasury people all collecting the data that's been fed into the system through the course of the year, turning it into the SEC mandated charts, looking at the language in the 10-K, keeping lots of pieces from previous years because they continue to be relevant in terms of thinking about risks and management and how operations are conducted, those sort of things, focusing very carefully on any changes, either SEC-mandated changes in terms of what needs to be disclosed or the format of a table, and any

---

disclosures or changes the corporation wishes to make to help shareholders understand the business better.

Q.   Now we've heard about low prices in late 2015 and early 2016.  Did those declining or low prices have any impact on what was said in that 2015 Form 10-K?

A.   They did.

Q.   And did you work with others about updating the language in the 10-K to reflect those low prices?

A.   It was very comprehensively worked, yes.

Q.   And who were the folks you worked with on that?

A.   David -- David Rosenthal's Controllers group, some of the lawyers, particularly our SEC specialist, and a few other people that were involved in the 10-K.

Q.   Okay.  And do you recall attending meetings to go over potential changes to the 10-K?

A.   Yes, a number of meetings.

Q.   Okay.

MR. THOMAS:  Your Honor, at this time I'd like to admit Defendant's Exhibit 32.

MR. SAHAM:  Your Honor, can we approach?

THE COURT:  Do you really need to?

MR. SAHAM:  I believe so.

THE COURT:  All right.

(The Court and counsel held a sidebar conference off the record.)

---

THE COURT:  All right.  We're going to take a break.

COURT SECURITY OFFICER:  All rise for the Jury.

THE COURT:  Don't talk about the case.

(Jury escorted to the Jury Room by the Court Security Officer.)

(Court recessed from 2:51 PM until 3:20 PM.)

THE COURT:  Okay.  Ready.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury seated in the jury box.)

THE COURT:  Thank you, all.  I see y'all are really taking good notes.  I'm going to be grading those notes!  No, I'm not.  I don't look at them at all.

Okay.  Where were we?  Help me.

MR. THOMAS:  We're about to change topics.

THE COURT:  Are we going back to Kearl are we?

MR. THOMAS:  We're going back to Rocky Mountain, Your Honor.

THE COURT:  Should I break into song?

MR. THOMAS:  John Denver?

THE COURT:  *"He was born in the summer"* -- I won't.  I want to.

MR. THOMAS:  And just for the record, we're withdrawing Exhibit 33 or 32.

THE COURT:  Just for the record, where in Colorado is this?  Is it in the ugly part of Colorado which is the eastern

part that's real flat? Looks like Kansas?

Oh, boy, I'm glad I don't have anybody in here from Kansas.

I'm assuming it's the Rocky Mountains. It's up in the mountains.

MR. THOMAS: I think it's Raton Pass, in that area.

THE COURT: Raton. I'm going to teach y'all how to talk.

MR. THOMAS: My Fort Worth accent. I apologize.

THE COURT: I guess I didn't realize where that is. I want to see it on a map sometime. Oh, there it is. Is it just across the New Mexico line there?

THE WITNESS: Yes. It's on both sides, yeah.

THE COURT: Oh. It's on this side, too?

THE WITNESS: Yeah. The four corners there has a lot of oil and gas.

THE COURT: But Raton is not in the four corners.

THE WITNESS: I thought you were talking about San Juan. Raton is in Colorado.

THE COURT: It's just on the Colorado side.

THE WITNESS: Yes.

THE COURT: Okay. Go ahead.

MR. THOMAS: Okay. Thank you, Your Honor.

THE COURT: Thank you for getting that straightened out for me.

MR. THOMAS: I'm here to help, Your Honor.

THE COURT: I know you are.

MR. THOMAS: Can you put up Defense Exhibit 33 again, Mr. Gooden? And go back to Page 12. Go to that top part, please.

Q. (By Mr. Thomas) Now just one or two questions that I forgot to ask about this. These plan prices that we're talking about, are those used just for impairment analysis?

A. No. That's used for all business decisions.

Q. Like give some examples of what business decisions these plan prices would be used for.

A. It would be used for all bit. project investments. They would be used for single-well investments. They would be used for acquisitions if we were looking at buying another oil well or asset. Every business decision will be made on the basis of these plans. There will be, as we said before, some sensitivities to run just to understand how it behaves under different pricing environments. But these are the bases for all decisions made by the company.

Q. And if you had overstated these plan projected prices, how would that impact those business decisions?

A. They would be poor business decisions not in the interest of the shareholders.

Q. Okay. All right. We can move away from this.

Mr. Swiger I want to talk about the 10-K and go through

some things in the 10-K because this is, as you understand it, the document that you've been accused of lying in, correct?

A. Yes.

Q. Okay.

MR. THOMAS: And can you go to Page 2, please?

THE COURT: And it's exhibit number something.

MR. THOMAS: 66. I apologize.

THE COURT: 66?

MR. THOMAS: Plaintiff's 66, Page 4.

And just if I may, Judge, --

THE COURT: Sure. Do you want a pointer?

MR. THOMAS: -- when we call out the page numbers in the bottom -- this might help later -- there's page numbers at the bottom here but then the exhibit number has a different page number in the bottom right-hand corner. So there's a little difference by two page numbers in both of our exhibits. So I just thought it might be helpful to ---

THE COURT: To the jury, that will be helpful.

MR. THOMAS: Yes. So you kind of see that this is Page 4. So sometimes when we talk about the table on Page 9, it's actually on Page 11 because, you know, let's make this more complex if we could.

THE COURT: Yes, sir.

MR. THOMAS: All right. So could we go up to the "Supply and Demand" section, please?

Q. (By Mr. Thomas) And this is the 10-K you signed in February of 2016 relating to 2015, correct?

A. Yes.

Q. And when we look at the figures, the tables, the data, the actual numerical data, what are the cutoff dates for that in this 10-K?

A. The end of the year, December 31st.

Q. And that would be December 31st, 2015, for this year.

A. Yes.

Q. Okay. In this section it says under "Supply and Demand" on Page -- Page 2, "The oil, gas and petrochemical businesses are fundamentally commodity businesses. This means ExxonMobil's operations and earnings may be significantly affected by changes in oil, gas and petrochemical prices and by changes in margins on refined products."

Mr. Swiger, is this language -- was this language in all the 10-Ks that you signed?

A. Yes, sir.

Q. And so remind the jury when you became the Principal Financial Officer.

A. 2013.

Q. So going back to 2013, this would have been in the 10-Ks that you signed?

A. It would.

Q. What about 2016 going forward until you retired?

A. Yes.

Q. Can we now go to Page 7, and this is 7 of the PDF but Page 5 of the 10-K, correct?

A. Yes.

Q. This is where we see the table of proved reserves. And it says, "When crude oil and natural gas prices are in the range seen in early 2016 for an extended period of time, under the Securities and Exchange Commission's definition of "proved reserves, certain quantities of oil and natural gas could temporarily not qualify as proved reserves."

Was that language always in the 10-Ks that you signed?

A. No. This was a specific disclosure for the business environment at the time.

Q. And why was this added at the time?

A. Because of the low prices, the low oil and gas prices seen at the time.

MR. THOMAS: Can you go to the next page, please, Mr. Gooden?

Q (By Mr. Thomas) This is on Page 6 of the 10-K which is Page 8 of the exhibit. It says, "When crude oil and natural gas prices are in the range seen in late 2015 and early 2016 for an extended period of time, under the SEC definition of 'proved reserves,' certain quantities of oil and natural gas, such as oil sands operations in Canada and natural gas operations in North America, could temporarily not qualify as proved reserves.

Was this language in every 10-K that you signed?

A. No. This was added specifically to this 10-K.

Q. And why?

A. To reflect the conditions cited in the language.

Q. And oil sands operations in Canada, is that Kearl?

A. Kearl is one of the two.

Q. Kearl. And what's the other?

A. Cold Lake.

Q. Cold Lake. Can we go to Page ---

THE COURT: Wait, wait, wait.

And that next sentence kind of defines what you mean by temporarily not qualify, right? When you want to use that term that we've been over a bunch, "debook" and "rebook."

THE WITNESS: Rebooking, yes.

THE COURT: That's when you mean -- That temporarily not qualifies is what "debook" means.

THE WITNESS: Yes, sir.

THE COURT: Because it might be rebooked.

THE WITNESS: Yes, sir.

THE COURT: Not impaired.

THE WITNESS: Correct. No, this is -- this is reserves.

THE COURT: Not impaired. We're not talking about impaired, right?

THE WITNESS: Right.

THE COURT: That's another step that you have to go to to impair some -- something, right?

THE WITNESS: It's a different process.

THE COURT: It's what?

THE WITNESS: A different process having to do with the financial value of the asset rather than the reserves.

THE COURT: But it's a different term, totally different term than this "booked" and "rebooked," right?

THE WITNESS: Yes, sir.

THE COURT: And it comes off the books when it's impaired.

THE WITNESS: Yes. The financial value does, yes.

THE COURT: Yes. That's what I mean.

THE WITNESS: Never to return.

THE COURT: Okay. Thanks.

MR. THOMAS: Thank you, Your Honor.

And let's go to Page 11, which is Page 9. And can we blow up the first two years, 2015 and 2014?

Q (By Mr. Thomas) We've seen this, sir, haven't we, where the Canadian bitumen -- There's no bitumen in South America, right?

A. That's correct, yes.

Q. The Canadian bitumen was at $25.07 per barrel, right?

A. Yes, sir.

Q. And then let's show the 2014. And so in 2014 the price of Canadian bitumen was $62.68, correct?

A. Yes, sir.

Q. So a reader comparing 2015 to 2014 could see that drop in Canadian bitumen, right?

A. Yes, sir.

Q. Okay. And on this -- this Page 9 table, when we're talking about production prices and production costs, is this where we have book depreciation or book capital costs?

A. No.

Q. These production costs are what, sir?

A. Cash costs.

MR. THOMAS: Could we go to Page 42, please?

Q. (By Mr. Thomas) On Page 42 of the 10-K it says, "The Upstream industry environment has been challenged throughout 2015 with abundant crude oil supply causing crude oil prices to decrease to levels not seen since 2004 while natural gas prices remain depressed."

Was this in every 10-K you signed?

A. This was specific to this 10-K reflecting the business environment.

Q. And when we talk about crude oil prices, is that relative to Kearl?

A. All crude oil prices, including bitumen prices.

Q. Okay. And when we talk about natural gas prices, would that be relevant to those Rocky Mountain assets we're talking about?

A. Yes, sir.

Case 3:16-cv-03111-K    Document 376    Filed 05/07/26    Page 151 of 831    PageID 20344

Q.   Now let's go to Page 56, please.  There's a section here titled "Critical Accounting Estimates."  Do you see that?

A.   I do.

Q.   What is -- What is this referring to when it talks about "estimates"?

A.   It's referring to the fact that there are a number of things in the business that can't be defined precisely, things like -- when we talk about reserves that are deep underground.  We can never know exactly how much oil and gas is there.  We can make estimates with all the data we have from the drill wells that we've penetrated the reservoir with and seismic images that were shot to show us what the reservoir looks like.  We can never know volumetrically how much is there and exactly how much is recoverable.  We make estimates based on a lot of experience and, as I said, all the data we have.  And that's an estimate for reserves.

Q.   And it says -- it says ---

     MR. THOMAS:  If we can zoom out, sir.  Zoom out completely.

Q.   (By Mr. Thomas) And what's the first category under this "Critical Accounting Estimates"?

A.   Oil and Gas Reserves.

Q.   Okay.  That's the type of reserves we're talking about, correct?

A.   Yes, sir.

Q.   And if we go down to the bottom of this page.

     MR. THOMAS:  Keep going; just that last paragraph.

Q.   (By Mr. Thomas) I'm not going to read it out loud, but that's the same language we saw on the previous page, correct?

A.   Yes, it is.

Q.   Okay.  And was this added to the 2015 10-K?

A.   Yes, sir.

Q.   Why?

A.   Business environment; disclosing to investors what might or could happen.

Q.   And then let's go to the next page, Page 57 of the 10-K, please.

     And is this ---

     MR. THOMAS:  Let's back out, please, Mr. Gooden, and go to the category at the top.

Q.   (By Mr. Thomas) So this is a different section in the "Critical Accounting Estimate" section, correct?

A.   That's correct, yes.

Q.   And this -- this second section says, "Impact of oil and gas reserves price and margins on testing for impairment."

     So as the Judge pointed out, we were just talking about reserves and debooking, and now we're talking about something different; correct?

A.   Impairment, yes.

Q.   Impairment, okay.

     MR. THOMAS:  And if you can, sir, Mr. Gooden, go down to the line that says "In general."  Right there in the middle.

Q.   (By Mr. Thomas) It says, "In general, the corporation does not view temporarily low prices or margins as a trigger event for conducting impairment tests."

     Is that in every 10-K that you sign?

A.   It has been, yes.

Q.   Okay.  And why is that included in the 10-Ks that you sign?

A.   To make clear to investors and shareholders that temporarily low prices do not initiate a trigger.

Q.   Okay.

     MR. THOMAS:  Can we go down to the next highlighted paragraph, Mr. Gooden?

Q.   (By Mr. Thomas) On Page 57 of the 10-K it says, "In light of continued weakness in the upstream industry environment in late 2015, the Corporation undertook an effort to assess its major long-lived assets, most at risk for potential impairment.  The results of this assessment confirm the absence of a trigger event and indicate that the future on discounted cash flows associated with these assets substantially exceed the carrying value of the assets."

     Was this language in every 10-K you signed?

A.   It was not.

Q.   Was it added in 2015?

A.   It was.

Q.   Why?

A.   Because we chose, despite the absence of a trigger, to go ahead and conduct the asset recovery testing to look at all of them.  In doing that, we concluded there was no trigger and we also concluded that no impairments were required.

     MR. THOMAS:  And I just want to go to Page 99, please, Mr. Gooden.  And we've looked at this table before, and if you can just blow it up.

Q.   (By Mr. Thomas) This is the information that we talked about about operations in Canada and the United States earlier, correct?

A.   Yes, sir.

Q.   When we talked about book earnings versus cash flow, which one, if any of those, is this?

A.   This is book earnings.

Q.   Okay.  And we see depreciation, correct?

A.   We do.

Q.   And depreciation is not included in that SEC reserves test that we've been talking about.

A.   No, not at all.

Q.   And what do we see here for the operations in Canada in 2015?

A.   A loss of 896 million dollars.

Q.   Sir, is it possible to have a book loss like this and also pass the SEC proved reserve test?

VOLUME 2-B    81

A.    Most certainly, yes.

Q.    Tell the jury why.

A.    Well, because the book reserve test includes additional things like depreciation which can make a big difference between cash and book.  If your depreciation is $5 a barrel, that's a huge -- that's a huge extra burden for the revenue to carry.

Q.    And is this book earnings test the same as the SEC price reserve or SEC reserve test?

A.    Not at all, no.

Q.    Are they apples and oranges?

A.    They are.

       MR. THOMAS:  And then let's go to Page 103, please, Mr. Gooden.

Q     (By Mr. Thomas) And then, again, I'm not going -- I'm not going to read it, but on Page 103 we see that same language again a third time, correct?

A.    We do.

Q.    And why was it added a third time here at the end?

A.    Well, it was relevant in this section as well which is oil and gas reserves.

Q.    Mr. Swiger, you've been sitting in this courtroom in that seat for about six hours or so, maybe even more than that between yesterday and today.  Sitting here seeing all this, is there anything that you would have done differently in 2015 as it relates to putting your signature on that 10-K?

VOLUME 2-B    82

A.    Not one single thing.

Q.    Why not?

A.    Because I was confident in the people and the processes that underpinned all that along with my reviews.

Q.    And you understand that you've been alleged committing fraud, correct?

A.    I do.

Q.    Okay.  And how do you react to that?

A.    Not well.

Q.    And why not?

A.    Because it's a -- Well, it's fundamentally an insult, and it's not just to me.  It's to all the people that were involved in the processes to get to where we needed to get to in this.  There are people that worked really hard, made sound decisions, high integrity, did the work, complied with all the laws and regulations.  And to have their integrity impugned by this is, quite frankly, very, very dismaying.

       MR. THOMAS:  Thank you, Mr. Swiger.  I pass the witness, Your Honor.

       THE COURT:  Are you ready, Mr. Saham?

       MR. SAHAM:  I am, Your Honor.

       THE COURT:  All right.  I mean Mr. Saham.  I'll get it straight in a minute.

       MR. SAHAM:  That's quite all right, Your Honor.

VOLUME 2-B    83

REDIRECT EXAMINATION

QUESTIONS BY MR. SAHAM:

Q.    I want to turn your attention back to Page 99.

       MR. THOMAS:  Oh, we need to -- we need to switch the systems here, Your Honor.

       THE COURT:  Oh, okay.  Here we go.

       MR. SAHAM:  Mr. Torres gets it on.

       THE COURT:  Okay.

       MR. SAHAM:  And he will let us know when we're ready.

       Can we go to Exhibit 66, Page 101, and blow that up?

Q     (By Mr. Saham) Now we looked at the Canada/South America and there was a loss down there of -- Let's look at the Canada/South America, and there's a loss of 896 million dollars, correct?

A.    In book earnings, yes.

Q.    Book earnings.  Now in Canada, there were 500 fields, correct?

A.    I do not know the exact number.

Q.    Well, let me show you.  I'm marking what's -- We're marking Exhibit 755.  I'm showing you what's been marked as Plaintiff's Exhibit 755 and you can count it up, if you want.  But Kearl is one of 500 fields in Canada, correct?

A.    Where is this from?

Q.    You got to count them up.

A.    I need to know where it's from.  Did you make this up?

VOLUME 2-B    84

Where's it from?

Q.    Well, it's an ExxonMobil document.

       THE COURT:  Wait, wait, wait.  Is this already admitted?

       MR. SAHAM:  No, Your Honor.  We just are using it to refresh his recollection.

       THE COURT:  Okay.

Q.    (By Mr. Saham) And Exhibit 755 is a document that was produced in this case.  It bears EMC-RAM 001670523.

       Do you know who "Irene Chang" is?

A.    I do not.

Q.    She was a member of the treasury at Exxon.  Why don't we just ask it this way:  Was there more than one field in Canada, sir?

A.    Certainly.

Q.    Was there more than a hundred fields in Canada?

A.    Probably.

Q.    Could there have been 500 fields in Canada?

A.    There could have been.

Q.    And that number that we were looking at, I don't know.  It disappeared.  On Page 99 for South America and Canada, that 896 -- 896-million-dollar loss, that's not just from Kearl.  That's from 500 fields being reported there, correct?

A.    It includes Kearl.

Q.    And 499 other fields.

**App. 143**

A.   Yes.

Q.   Okay.  And that's not just Canada.  It's Canada and South America, correct?

A.   Correct.

Q.   And in South America there were 2774 fields, correct?

A.   That seems extreme.  I would not recognize a number like that.

Q.   Okay.  I want to show you ---

A.   Can you tell me where they were?

Q.   I'll show you.  I'm going to show you what I'm marking as Plaintiff's Exhibit 756, another document produced in this case.  And this is a list of all the fields in Canada and South America.  You can count them up by country, and I would represent to you there's 2700 fields in South America and 500 fields in Canada included in this 896-million-dollar loss.

A.   I'll tell you, sir:  I know the operations pretty well and I do not recognize any of these in the Argentine.

Q.   And how many fields do you recall there being in South America?

A.   Perhaps seven or ten.

Q.   So you think there were only ten fields in South America?

A.   We didn't have very big operations in South America.

Q.   But there were operations in several countries in South America in 2015, correct?

A.   It's pretty much just Argentina.

Q.   Okay.  What about Columbia and Ecuador and the other countries listed?

A.   No.

Q.   Didn't own properties there?

A.   We may have owned properties there but they were not upstream-producing fields.

Q.   But they're fields that were owned by the company.

A.   Not necessarily fields.  We may have owned properties there.

Q.   Sort of like some of those undeveloped properties that XTO owned, correct?

A.   Well, they could have been fuels terminals, that sort of thing, pump stations.

Q.   But this 896-million-dollar number that's a combination of all the Canada and South America operations, Kearl was but one of them, correct?

A.   Kearl was one of the fields in Canada and South America, yes.

Q.   Correct.  And there were many.

A.   I don't know that I would characterize it as "many."

Q.   There were hundreds.

A.   I'm not sure I would do that.  Looking at these, I do not recognize many of these names.  As I said, I'm quite familiar with the operations in both Canada and South America.  I do not know what this list is.  For instance, on this one, it shows "ASLP Jackpine Mine."  We have no interest in the Jackpine Mine.

Q.   Now looking at 755, the Canada operations, I believe you testified just a moment ago that you believe there was probably a hundred fields in Canada.

A.   Perhaps, yes.

Q.   Okay.  So there was at least a hundred fields in Canada and several -- some unnamed numbers in South America included in this number.

A.   A small amount in South America, yes.

Q.   But at least a hundred total.

A.   Perhaps.

Q.   And Kearl was one of those.

A.   Kearl was one of them.

Q.   Okay.  And then for United States, the column right next to it, you got a loss reported of 1.75 billion dollars.  How many fields did the company own in the United States?

A.   I do not know.

Q.   Thousands, correct?

A.   Perhaps.

Q.   So we'll go with a thousand.  There were at least a thousand fields the company owned in the United States.

A.   Perhaps.  I have no way of validating that.

Q.   Okay.  Well, I'll show you what we're marking as Plaintiff's Exhibit 757.  And, again, I would represent this is another document produced by ExxonMobil in this case from Ms. Irene Chang's files that reports fields in the United States.  And I

don't think the exact number is relevant.

Would you agree with me there are many fields in the United States that Exxon owned?

A.   I would agree there are many fields.

Q.   Probably at least a thousand.

A.   In the United States?

Q.   In the United States.

A.   I don't know about that.

Q.   More than hundreds?

A.   More than a hundred.

Q.   So that number, that 1.755 million, that includes fields in addition to the XTO fields, correct?

A.   I think you might be confusing leases with fields.

Q.   Well, if they're leases, this number reported here, this is not represented in any way in the 10-K to be only the XTO fields, correct?  This 1.7-billion-dollar loss.

A.   No.  That's not only XTO, no.

Q.   Okay.  So it's not even an attempt ---

A.   But it includes -- it includes XTO.

Q.   It includes it.  So the 1.755 number that I believe Mr. Melsheimer during the Opening Argument said to me always be careful when I said Kearl wasn't disclosed and he pointed at this number, so the 896, that is not a disclosure of only Kearl.  It's Kearl.  Maybe about one percent of the disclosure --

A.   No.

**App. 144**

Case 3:16-cv-03111-K Document 376 Filed 05/07/26 Page 154 of 831 PageID 20347

Q. -- by field.

A. No by field, but field is meaningless in this context.

Q. Because Kearl's the biggest field the company owns.

A. No, because the disposition, the dispersion of fields can be many that are small, single-well fields. The number of fields is a meaningless metric for anything.

Q. And that's why Kearl is the most important asset the company owns because 15 percent --

A. No, it is not.

Q. -- of the reserves are at Kearl, correct?

A. I would not express it that way, no.

Q. But ---

MR. SAHAM: Can we pull up Exhibit 563?

Q. (By Mr. Saham) You would not dispute that Kearl was the largest single reserve owned by Exxon in 2015, correct?

A. This, sir, is just liquid proved reserves. It does not contain the gas fields that we had.

Q. Okay. For liquid, Kearl was the largest single field, correct?

A. Of proved reserves, yes.

Q. Of proved reserves.

MR. SAHAM: And let's go to the next page, please. Let's blow that up as big as we can.

Q. (By Mr. Saham) And I believe there's a little quibbling here whether Kearl was 14.54 percent, I think was the number you

liked. Kearl was 14.5 percent of the entire proved reserves the company owned, correct?

A. That is correct.

Q. And it was the single largest reserve by field, correct?

A. Single largest reserve.

Q. By field.

A. By field.

Q. And then if you look at just proved developed, and those are just taking the ones that the company's already put the money into developing so you can sell it, correct?

A. That is correct.

Q. And Kearl was 20 percent of those, correct?

A. That is correct.

Q. And if we go to the next page and blow that up. And you mentioned just liquids. When you look at just liquids, Kearl's 24 percent of the proved reserves.

A. Of just the liquids, yes.

Q. Of just the liquids. And then when we look at that bitumen that we've been talking about on Page 9, it's 88 percent of those as far as proved reserves, correct?

A. Of just the bitumen, yes.

Q. And then let's look at, please, if you wouldn't mind, Exhibit 541, Page 9. And I think we talked a little bit about Mr. Strawbridge and his reserves group earlier today. And up at the top of this Mr. Strawbridge noted the importance of reserves,

correct?

A. Yes.

MR. SAHAM: And let's highlight the top portion of this document and blow that up.

Q. (By Mr. Saham) And the importance of the reserves is recognized by the SEC which requires a disclosure every year of the proved reserves, correct?

A. That is correct.

Q. And the reason or one of reasons those proved reserves are so important, if we highlight the second bullet point, is because those reserves are a key measure of sustainability for the company, correct?

A. Correct.

Q. They're the future earnings potential of the company, correct?

A. They are.

MR. SAHAM: And if we go to Plaintiff's Exhibit 15, which I believe is where we started the day yesterday, it was the first document I showed you. And if we go to Page 2 of Exhibit 15, the second bullet point and blow that up. The second bullet point, if we could highlight that, please.

Q. (By Mr. Saham) And we read that yesterday, and we'll read it one more time today.

"Kearl's 3.6 billion barrels represents approximately 15 percent of ExxonMobil's total proved reserves as reported in the

2015 10-K, 24.8 billion barrels, and accordingly may be considered material."

That's what it says, correct?

A. That's what the author says.

MR. SAHAM: I have no further questions, Your Honor.

Your Honor, can we approach?

THE COURT: Again?

MR. SAHAM: Well, ---

THE COURT: I've gotten to know y'all pretty well. Come on up.

(The Court and counsel held a sidebar conference off the record.)

THE COURT: All right, Redirect.

MR. THOMAS: Yes.

THE COURT: Is this Redirect or Re-Redirect?

MR. THOMAS: It's just "Re." I've only gone once.

THE COURT: Re, okay. We're only on one "Re," okay.

RECROSS EXAMINATION

QUESTIONS BY MR. THOMAS:

Q. Mr. Swiger, you were asked about thousands of fields and places, hundreds of fields and places and shown that. Of all those thousands, hundreds, whatever the number of fields, in the 2015 10-K are any of those fields broken out in detail when the financial performance is laid out?

A. Not at all.

**App. 145**

Q.   Why not?

A.   No field level disclosure because nothing rose to the level of field level disclosure, meaning it was 15 percent or more of the total reserve base.

MR. THOMAS:  Thank you.

THE COURT:  You got a Re-Recross?

MR. SAHAM:  No, Your Honor.  We're done.

THE COURT:  Okay.  You think we ought to let Mr. Swiger step down or make him sit in that uncomfortable chair maybe the rest of the day?

All right.  Thanks, Mr. Swiger.  I really appreciate it.

THE WITNESS:  Thank you.

THE COURT:  Okay.  You can take that water with you, if you can.  Don't worry about taking those documents.  That's their problem.  They'll figure all that out.  That's their deal.

THE WITNESS:  A couple of those are rather ---

THE COURT:  Oh, that's fine.  Take them, whatever you want to do.  It's your business.

Okay.  Next witness?

MR. BURKHOLZ:  Yes, Your Honor.  Plaintiffs call David Rosenthal.

THE COURT:  How are you today, sir?

THE WITNESS:  I'm doing good.

THE COURT:  Are you ready for an uncomfortable chair?

THE WITNESS:  Yeah.

THE COURT:  Okay.  We'll work on it, just a minute. Make sure -- I mean make sure that you talk right into the microphone.  Let's get you sworn in, though.

DAVID ROSENTHAL,

Was produced, sworn, and examined as follow:

THE COURT:  All right.  Take your seat.  You heard me talk to Mr. Swiger about it.  It's on a pedestal.  So it will tempt you to lean way back and be comfortable.  Don't do that. Okay?

THE WITNESS:  It's not the worst chair I've ever been in.

THE COURT:  Okay.  It is not electrified.  I will tell you that.  It's not that at least, but you got to lean up and talk right into that microphone.  And you've got water, so I think we're okay.

THE WITNESS:  I'm good.

THE COURT:  Okay, good.

MR. BURKHOLZ:  May it please the Court.

THE COURT:  Yes.

DIRECT EXAMINATION

QUESTIONS By MR. BURKHOLZ:

Q.   Good afternoon, Mr. Rosenthal.

A.   Good afternoon.

Q.   You're represented by counsel for Exxon, right?

A.   Yes, I am.

Q.   Okay.  And considering the events in this case took place 10 or 11 years ago, I want to make sure your recollection is good for today.

You met with them before you testified today, right?

A.   Yes, I did.

Q.   A couple of times?

A.   Yes, I did.

Q.   And you had your deposition taken by Mr. Saham a couple of years ago, right?

A.   Yes, I did.  I didn't realize it was that long ago but I do remember.

Q.   And he showed you a lot of documents in that deposition?

A.   Yes, he did.

Q.   And I notice you've been here the entire time of Mr. Swiger's testimony, correct?

A.   Yes, I have.

Q.   And you noticed that we looked at a lot of documents, right?

A.   Yes, I did.

Q.   And I'm going to try to be efficient with your time and the Court's time.  I am going to have to show you some of those documents.

A.   Okay.

Q.   But as we're going through them, if you think there's something in the document that I've misrepresented, please let me

know.  Okay?

A.   Will do.

Q.   And are you okay with following the documents on the screen?

A.   Sure.

Q.   Okay.  If there's a document you need, let me know.  Okay?

A.   Got it.

Q.   Now you worked for Exxon for over 40 years, right?

A.   Yes, I did.  Right at 42 years.

Q.   Retired in 2024?

A.   2021.

Q.   2021, okay.  And for the time period in this case, you were the Controller in 2015 and 2016?

A.   Yes, I was.

Q.   And the job you had before that, you were in charge of Investor Relations, right?

A.   Yes.  I was the Vice-President of Investor Relations and also Secretary for the corporation.

Q.   And as part of that job, you regularly met with investors, large and small?

A.   Yes, I did.

Q.   And you also met with analysts that followed the company?

A.   Yes, I did.

Q.   And you had an "Investor Day" usually like once a year, right?

A.   Yes, we did.

Q.   They would come down to your place and you'd meet with them and talk to them about the business, right?

A.   Yes, we would.

Q.   And those analysts issue reports on the company, right?

A.   Yes, they do.

Q.   And the media follows the company, also; right?

A.   Yes.

Q.   And Exxon's stock, it's one of the biggest stocks in the S&P 500, right, during this time period?

A.   I don't know where it ranked in the S&P.

Q.   Okay.  It was a company that was widely followed by the media, right?

A.   Yes.

Q.   You would agree?

     And widely followed by these analysts, right?

A.   By the analysts concentrating on the oil and gas industry, yes.

Q.   Okay.  And there were dozens of them that followed the company, right?

A.   There were at least a dozen, yeah.

Q.   Okay.  And the information that Exxon put out was followed by these analysts and by the media, right?

A.   I don't know exactly which information you're referring to.

Q.   Well, every quarter Exxon would put out its results and immediately there would be a reaction by the market, by the

analysts, by investors to that information four times a year, right?

A.   Yes.  The analysts who follow our company would generally put out some analysis after we released our results, yes.

Q.   Like that day they would put them out.  That morning even, right?

A.   Well, some would put out a little preview in the morning, yes.

Q.   Right.  And if the results were good, if they were better than what people expected, the stock might go up; right?

A.   I mean it might.  It didn't -- There wasn't always a correlation.

Q.   But the information was important that came out four times a year about your results, right?

A.   Yes, it was.

Q.   Okay.  In addition to that, the company put out the annual report once a year; right?

A.   Yes, we did.

Q.   And this was important information that was in this document every year, right?

A.   Yes, it was.

Q.   Yeah.  And I think we saw a couple of documents that in the lead-up to the 2015 Annual Report, a bunch of your competitors took write-downs and impairments, right?  Billions, right?

A.   Yes, they did.

Q.   And Exxon did not with this 2015 document take a write-down of the Kearl reserves or an impairment with the Rocky Mountain dry gas, right?

A.   We did not debook the Kearl reserves and we did not take a write-down --

Q.   Right.

A.   -- of the dry gas assets.

Q.   And leading up to the 10-K being published on February 24th, 2016, you didn't tell anybody out in the public what the decision was going to be on whether or not you were going to debook those Kearl reserves or take any kind of impairment charge, right?  Because that would have been a violation of Reg. FD.

A.   Could you repeat that question?  I want to make sure I understand before I answer.

Q.   Before this 10-K was published, --

A.   Yes.

Q.   -- you did not tell anybody in the public realm about the results that were going to be published in this 10-K, right?

A.   I do not ever recall doing that, no.

Q.   All right.  So when the information came out in the 10-K that there was no impairment, no debooking, no write-down like your competitors had taken, that was good news for Exxon, right?

A.   I wouldn't -- I wouldn't characterize it as good news.

Q.   Was that bad news?  I mean come on.

A.   I wouldn't characterize it as good or bad news.

Q.   Your competitors are taking major impairment and write-downs and Exxon's not?  That's good news when you come out that you're not doing it, right?

A.   They're -- They're totally unrelated.  Everybody does their own -- their own analysis and makes their own decisions on -- on impairment.  So I -- I don't think it would make any difference.

Q.   And then after the 12-billion-dollar bond offering a couple of days after this document was published, Exxon announced at the end of October, October 28th, with your Third Quarter results, that you were taking -- likely to take a debooking of 3.6 billions barrels at Kearl, right?

A.   Yes, we did in our Third Quarter, yes.

Q.   Right.  And then there was a stock price reaction.  The stock went down that day, right?  You don't dispute that, do you?

A.   Excuse me?

Q.   The stock went down that day, didn't it?

A.   The stock went down when we released our earnings.

Q.   Right.  With the information that you were likely to debook the Kearl reserves.  The stock went down that day, didn't it?

A.   It may have, yeah.  It may have gone down.  As I recall, it did.

Q.   Okay.  And then when the impairment was taken, after Mr. Tillerson left, Mr. Woods was the new CEO; right?

A.   Yes, he was.

Q.   Right.  And then on January 31st, 2017, you signed an 8-K

announcing the earnings for that quarter, for the December quarter; right?

A.   Yes, I did.

Q.   And that was the first time that the market became aware that the Rocky Mountain dry gas assets were being impaired for, after tax, two billion dollars, right?  That day.

A.   Yes.  Yes, we did disclose that that day.

Q.   Right.  And the stock went down that day, didn't it?

A.   I -- I don't recall, but okay.

Q.   Now you were part of a discussion.  Going back, this 10-K came out on February 24th, 2016.  You were part of a discussion all the way back in May of 2015 about potentially debooking the Kearl reserves, weren't you?

A.   I -- I had a discussion as part of our normal reviews that that was a possibility.

Q.   Right.

          MR. BURKHOLZ:  Can we bring up Exhibit 115?

          It's been admitted, Your Honor.

          Can we turn to Page 2?  Page 3, sorry.  And can we highlight Mr. Rosenthal's name?

Q    (By Mr. Burkholz) So this was a meeting that you were at on May 7th, 2015; right?

A.   Yes, that's correct.

Q.   And it shows in the 1:00 to 2:40 time slot presentations by Mr. Prestipino and Mr. Strawbridge and then a second one with

Mr. Prestipino, right?

A.   Yes.

Q.   And you were there for those discussions, right?

A.   I was.

Q.   Okay.  So let's turn to those slides.  If we can go to Page 13.  We're not going to go through this again in detail, but you'll agree with me that these are the reporting conditions for the SEC test, right?

A.   Yes.

Q.   And like Mr. Swiger testified, you're to use your actual costs for your operating costs, right?

A.   Yes.

Q.   Okay.  And then if we turn to the next page, we saw that the prices had declined on bitumen by 55 percent, right?

A.   Yes.

Q.   Kearl was being challenged to demonstrate positive cash flow, right?

A.   That's what it says, yes.

Q.   Right.  And then the reason that you're having this discussion about potentially making a disclosure about the Kearl reserves is that they're in trouble, right, in terms of the SEC test?

A.   No, I would not -- I would not characterize that at all.

Q.   Okay.  So why don't we turn to Page 19.  We looked at this with Mr. Swiger.  If we can go to the middle.  It says, "Recent

Developments:  Potential impact on proved reserves due to SEC pricing sensitivities."  Do you see that?

A.   Yes, I do.

Q.   Okay.  And then under "Issue," if we go a little further down, it says, "Financial reporting/accounting considerations resulting from a potential removal of reserves due to SEC pricing basis and temporarily idling facilities."

     You're having this discussion in this meeting in May about potentially removing the proved reserves before year end, aren't you?

A.   We were having this discussion in May about a number of potential financial issues that had been raised by my organization.

Q.   And one of them is that you might have to make a disclosure about removing these reserves, the 3.6 billion in reserves, right?  That's one of the issues, right?

A.   We may.

Q.   And then if we can turn to -- let's turn to Page 22.  It says "Kearl – Potential External Disclosures."  Let's look at the first bullet.

     "Significant removal of proved reserves due to SEC pricing may require external disclosure."

     Do you see that?

A.   Yes, I do.

Q.   And then halfway down, it says, "Potential 2015 Form 10-K

disclosure with filing post year-end," right?

     And then below that, there's a reference to an interim disclosure, right?

A.   Yes.

Q.   So we're talking about the disclosure in this document, right?  And you're having a discussion ten months before about making a disclosure in this document about -- about the Kearl -- the 3.6-billion-dollar Kearl reserves being taken off the books, right?

A.   We are having a discussion about the possibility of that so that we can prepare ourselves for that outcome.

Q.   Right.  And you're having that discussion because the SEC test that you're looking at, you're in trouble on passing that test, aren't you?  Because why else are you having this discussion?

A.   Well, we -- we had these discussions as a part of what we call our "Financial Issues Review" which is something my organization pulled together on a number of topics that -- that may come up, that may have issues over the course of the year based on what we're seeing at that time.  So this is only May of the year.  And in May we're taking a look at everything and saying:  There may be some things we'll have to talk about.

Q.   Yeah.  Because the prices are now 55 percent lower than the year before, right?  You're in trouble.

A.   I wouldn't say we're in trouble.  I am saying that they were

55 percent below and, therefore, my organization was doing what I asked them to do which is bring forward things that might be important as the year goes on.

Q.    Okay.  Let's take a look at Exhibit 508.  I think your counsel brought that exhibit up.

Well, before we do that, there was discussion today about this October 26th meeting with Mr. Tillerson, you, Mr. Swiger, Mr. Madden, Mr. Strawbridge and other executives, right?

A.    Yes.  I heard that.

Q.    Right.  And that discussion was about "What do we do about these Kearl reserves?  Do we make a disclosure about potentially removing them from the books or not," right?

A.    It was -- As we saw on the -- on the screen, it was a discussion about Kearl.

Q.    Right.  And it was a discussion about the U.S. sales and whether or not to include the transportation costs for the U.S. sales in the SEC pricing analysis or not.

A.    It -- It was not a discussion to make a decision on what you just had said.

Q.    You did have a discussion in that meeting about whether or not to include the transportation costs to the U.S. which were much higher than the costs in Canada in the SEC pricing analysis, right?

A.    That is not the discussion we had.

Q.    Okay.  So why don't we look at Exhibit 508 and why don't we

bring up -- It's titled -- it's from you to Mr. Swiger three days before this meeting, right?

A.    Yes, it was.

Q.    Okay.  So let's go down and there's a reference in the second paragraph, second sentence about the U.S. sales, right, and whether or not to include them in the SEC pricing analysis, right?  Do you see that?

A.    Let me see the whole sentence here.

Q.    Sure.

A.    Yes.  The Global Reserves Group -- As Andy mentioned earlier, the Global Reserves Group had decided to use the price at Edmonton and only sales to third-party customers in Canada, not including any sales to ExxonMobil affiliates.  So the Global Reserves Group had made that determination.

Q.    So they made that determination.  And you and Mr. Tillerson, Mr. Swiger, I mean why did you even have the meeting if they made the decision?  I mean you can overrule their decision, right?

A.    Well, the meeting was held to bring everybody up to speed on all the issues of the topic of Kearl reserves and for the Reserves Group to provide everybody an understanding of what they were doing.

Q.    Okay.  So can we just look at the reference to -- It says, "You will recall that at the time I first discussed this with RWT."  That's Mr. Tillerson, right?

A.    Yes, it is.

Q.    And so you had a meeting before this meeting with Mr. Tillerson, right?  Was it one meeting or more than one meeting about the U.S. sales issue?

A.    Well, I would not have had a meeting with Mr. Tillerson on just the U.S. sales issue.  I may have had a meeting -- Well, I, obviously, had a meeting with him probably talking about -- I don't recall that specifically but probably talking about a number of issues of which one may have been the Kearl reserves, giving him a heads-up that we were going to have this meeting.

Q.    Right.  And that meeting took place in September, didn't it?

A.    I don't recall when that meeting was held but that could be.

Q.    Okay.  You didn't see any documents getting ready for your testimony today referring to a meeting in September?

A.    I -- I don't recall that.

Q.    Okay.

MR. BURKHOLZ:  Can we bring up ---

THE COURT:  What's that -- What's that exhibit number?

MR. BURKHOLZ:  That exhibit number -- I'm sorry, Your Honor -- Exhibit 508.  I believe it's in evidence already.

THE COURT:  It's Plaintiff's 508?

MR. BURKHOLZ:  508.  We're going to come back to this exhibit.

Can you bring up, Michael, 698?

Q.    (By Mr. Burkholz) Okay.  Let's start this e-mail on the one before the top.

Mr. Richard Oussedik, did he work within your group?

A.    Yes, he did.  He was a member of the Controllers organization.

Q.    Okay.  And Mr. Horne, he worked in your group?

A.    Yes.  He was head of county policy in my group.

Q.    Right.  And you relied a lot on him for the preparation of slide decks and things for your meetings with Mr. Tillerson and others?

A.    Some -- Some parts, depending on the subject.  Yes, Joe would have been a participant in that.

Q.    He prepared things for you for your meetings with Mr. Tillerson?

A.    Yes.

Q.    Okay.  So he's being told in the first e-mail, "Stephen has asked me to get a hold of the packs you were preparing on Kearl reserves/DD&A and the potential PNG interest change for inclusion in DSR's backup book for his discussion with RWT next week."

Do you see that?

A.    Yes, I do.

Q.    And the "DSR" is you, right?

A.    Yes, it is.

Q.    And "RWT" is Mr. Tillerson.

A.    Yes.

Q.    And you're having a meeting with him the week after September 14th, right?

**App. 149**

A.   Yes.  That's what this e-mail says.

Q.   Okay.  So let's go up to the top now.  And you see Mr. Horne has responded on the 14th and he's CC'ing Mr. Littleton, right?

A.   Yes, I see that.

Q.   And what was his job?

A.   Stephen Littleton at the time was the Controller of the production company.

Q.   Okay.  And there's a reference to an attachment "Q3 2015 Reserves Disclosure Considerations September 14th JMH.pptx." That's referring to a PowerPoint attachment, right?

A.   Yes.  Yes, it's referring to ---

Q.   That's common for Mr. Horne to provide those kind of materials for you to meet with Mr. Tillerson, right?

A.   Yes.

Q.   And he's responding to Mr. Oussedik and saying, "Here's the latest that we have to give to Mr. Rosenthal for his meeting with Mr. Tillerson," right?

A.   Yes.

Q.   Okay.  So -- And just so we're clear, Mr. Horne, Mr. Littleton and Mr. Oussedik, they're not lawyers from Exxon, right?  They don't work in the Legal Department.

A.   No, they don't.  They work in the Controller's Department.

Q.   Okay.  So let's look at the attachment.  Let's look at the first page of the attachment.  What do you see?

     There's nothing there, is there?

A.   Not on -- Not on the screen.

Q.   Right.  And then for the slides that were attached, let's look at the next page.  There's nothing there either, is there?

A.   No, there's not.

Q.   And then let's look at the next page.  Nothing there either, is there?

A.   No, there's not.

Q.   And then let's look at the next page.  Nothing there either?

A.   No.

Q.   So you've got this PowerPoint presentation.  What was on it?

     MR. MELSCHEIMER:  Your Honor, objection.  May we approach?  It's -- It's been redacted for attorney/client privilege.  And so he's not entitled, as he knows, to ask about whatever was on the slides.  It may or may not ---

     THE COURT:  Yeah.  I'll sustain that objection.

     MR. MELSCHEIMER:  Your Honor, the question's improper, Your Honor, I believe.

     THE COURT:  Yeah.  Don't -- If we need to go into this, we need to have a discussion outside the presence of the jury --

     MR. BURKHOLZ:  I would like to have that.

     THE COURT:  -- maybe tomorrow but not now.  Can we go to something else now or no?

     MR. BURKHOLZ:  No.  I need to have it now, Your Honor, respectfully.  Your Honor, this is an important issue.  It relates to MIL No. 3.  They've been ---

     THE COURT:  That's not what I'm saying.

     MR. BURKHOLZ:  Oh.

     THE COURT:  I'm -- I'm sure it's an important issue. That's not what I'm saying.  I'm trying to save the jury's time --

     MR. BURKHOLZ:  Yeah.

     THE COURT:  -- and be able to use this next time.  Can we jump to something that's not as controversial?

     MR. BURKHOLZ:  Yes.

     THE COURT:  Then we'll come back to this.

     MR. BURKHOLZ:  I will do that, Your Honor.

     THE COURT:  Okay, thanks.

     MR. MELSCHEIMER:  Thank you, Your Honor.

Q    (By Mr. Burkholz) Let's go back to Exhibit 508.  This is the e-mail that you wrote to Mr. Swiger three days before the October 26th meeting, right?

A.   Yes, it is.

Q.   Okay.  And let's go to the discussion -- sorry -- the reference to your discussion with RWT.  You wrote, "You will recall that at the time I first discussed this with RWT," and referring to the U.S. sales and excluding them, right?

A.   No, I'm not referring --

Q.   Okay.

A.   -- specifically to the U.S. sales.

Q.   You're -- You're referring to the entire SEC analysis for

the Kearl reserves?

A.   I was discussing -- I was discussing Kearl reserves.  I do not recall exactly the components of that discussion.

Q.   Right.  And then you wrote, "The analysis was very close on whether or not the reserves could be considered, quote, 'economic.'"

     And that means whether or not they would pass the SEC test, right?

A.   Yes.  Yes, it does.

Q.   Right.  And so you're talking about or you're referring to your meeting with him in September, and at that time the analysis was very close on whether or not the reserves could be kept on the book, right?

A.   Yes.

Q.   Okay.  And you wrote, "And, thus, I believe, one of the reasons for his interest in the netback calculation assumptions being used."

     You see that, right?

A.   Yes.

Q.   So he wanted to see the backup for why things were so close back in September, right?

A.   He -- He was interested in seeing additional information, as that says, on how the netback assumptions were being calculated.

Q.   Right.  And then the exhibit we just looked at with the attachment, that's what you had to work with him, right?

**App. 150**

Because you were going to have the meeting the following week and go over that attachment with him from Mr. Horne, right? That's what we looked at. The one that was redacted.

A. The one that was redacted.

Q. Right. That's your PowerPoint to meet with Mr. Tillerson, right?

A. Yes, it is.

Q. Okay. And then the next sentence -- And let's go back up to the top so we're clear. I know what you testified but we need to get back to this.

The second sentence, "As I understand the methodology, they have decided to use the price of Edmonton and only use sales to third-party customers in Canada, not including any sales to EM affiliates, nor sales into the U.S.," right?

A. Yes, that's what the sentence says.

Q. So the transportation costs to the U.S., they were higher than the transportation costs within Canada at that time, right? You saw all the documents in front of Mr. Swiger, right?

A. Yes.

Q. Okay. So you're not including the transportation costs to the U.S. in the analysis at this time, right?

A. They were not included in the methodology --

Q. That's right.

A. -- that we were using -- that the Global Reserves Group was using to determine the reserves.

Q. Right. So you're not including it. And now, according to your e-mail -- let's go to the sentence at the bottom -- "The spread between revenue and costs is now safely positive." That's what you wrote, right?

A. Yes, I did.

Q. Okay. In your position at Exxon you communicated with the SEC at times, right?

A. Well, we did -- we made our -- I signed documents that were filed with the SEC, yes.

Q. Right. But I'm talking about actual communications with the SEC. You communicated with the SEC about various disclosure issues. If they sent a letter to the company, you were responding on behalf of the company to the SEC.

A. If we received a letter from the SEC seeking information, yes, I would typically be the person that signed the response to those letters.

Q. And in September of that year, before your meeting, the big meeting we just talked about, the SEC reached out to Exxon Corporation, and they told them that they expected Exxon to write down its bitumen that year. Do you remember that?

A. No, I do not remember that.

Q. Okay.

MR. BURKHOLZ: Can we bring up Exhibit 369? This is Defendant's 369.

Can we admit it, Your Honor, since there's no

objection?

THE COURT: Do they have any objections?

MR. BURKHOLZ: Well, it's their document.

MR. MELSCHEIMER: No objection.

THE COURT: Oh, okay. All right. Then it's admitted.

MR. BURKHOLZ: Can we go to the very end of this document, Michael, and just highlight this last e-mail? Just bring it up, the whole thing.

THE COURT: What's this number again? Help me.

MR. BURKHOLZ: This is their Exhibit 369.

THE COURT: Thanks.

MR. BURKHOLZ: You're welcome.

Q. (By Mr. Burkholz) Do you know what position -- You see it's October 8th, 2015; right?

A. Yes, I do.

Q. This is a couple of weeks before the big meeting with Mr. Tillerson on the 26th, right?

A. Yes.

Q. And who is "Barton Cahir"?

A. Bart, as I recall, was a -- Oh, 2015. You know, I don't recall what Bart was doing in 2015.

Q. Okay. What about Rich Kruger?

A. So Rich Kruger in 2015, I believe he was President of the production company.

Q. Of the production company?

A. Yes.

Q. Okay. And Beverley Babcock, do you know what her job was?

A. At that time in -- in 2015, Beverley, I believe in -- I don't recall exactly in October of 2015 which job Beverley had.

MR. BURKHOLZ: And why don't we just highlight, Michael, the first two sentences all the way up to "Rex in the 26th."

Q. (By Mr. Burkholz) Mr. Cahir wrote, "Rich, got a message from down south that EM Corp got a letter from the SEC that indicated they, quote, 'expect bitumen write-downs this year,' end quote, . . . EM will call a meeting with the contact execs on the 16th and then there is a review with Rex on the 26th."

You see that, right?

A. Yes.

Q. And that's referring to the meeting that Mr. Tillerson and everybody on the 26th that we've discussed a little bit, right?

A. Yes.

Q. And this is a letter from the SEC that indicated -- was sent to EM Corp -- expect bitumen write-downs that year. You understood that, right?

A. So this is a -- this is an e-mail from Bart Cahir to Rich Kruger, CC'd Beverley Babcock, and now my memory has -- has been refreshed at that time. I believe at that time Rich Kruger was actually the head of Imperial Oil and Bart worked in his organization and Beverley would have been the CFO of Imperial

Oil.

Q. And you don't know Mr. Cahir to be anything but accurate in the e-mails that -- that he sends to other employees at Exxon, right?

A. I -- I don't know that.

Q. Do you have any reason to doubt the accuracy of this e-mail?

A. Well, I -- I -- I -- He says, "Rich, got a message from down south that EM Corp got a letter from the SEC that indicated they expect bitumen write-downs this year."

Q. Do you have any reason to doubt the accuracy of the e-mail, the words that he put in this e-mail?

A. Well, I don't -- No. I just -- I don't know what the message is and I don't know who from down south sent that message.

THE COURT: What's "EM"?

MR. BURKHOLZ: ExxonMobil.

THE COURT: Okay. I mean that's what I thought but I thought there might be some other entity. Okay. What's "south"?

THE WITNESS: I assume it's south of Canada.

THE COURT: Oh, okay. Okay. That does make more sense now. Thank you. This is somebody in Canada writing this.

THE WITNESS: Yes. This is -- This is somebody in Canada writing to somebody else in Canada, copying a third person in Canada.

Q (By Mr. Burkholz) Right. But you don't have any basis to

dispute the e-mail that he wrote, the facts in those e-mails. You don't have any basis to dispute that he wrote, "EM Corp got a letter from the SEC that indicated that, quote, 'expect bitumen write-downs this year."

A. I -- I don't dispute that he got a message -- I don't know what that message was -- from somebody down south. I don't know who that was or where they were down south. And this person communicated to him, per Bart's understanding of that message from down south, that EM Corp got a letter from the SEC and then the rest of the sentence. So I'm not denying that.

Q. Okay. Why don't we move on to the October 26th meeting. Oh, yeah. What is "down south"?

A. Excuse me?

Q. What is "down south"?

A. I'm assuming, given the people there, their "down south" was south of the Canadian border to somebody somewhere in Exxon.

Q. And referring to Exxon's headquarters, right?

A. I don't know that.

Q. Let's turn to the October 26th meeting. Let's bring up Exhibit 117. You've seen this document before, right?

A. Yes, I have.

Q. Let's go to Page 5. These are the same "Reserves Reporting Conditions" that we looked at from your May meeting, right?

A. Yes.

Q. And like Mr. Swiger testified, under this test, you're

supposed to use the actual costs, right?

A. The actual costs within the formula or the methodology that you're using to do the reserves analysis.

Q. Right. Your actual costs, right?

A. Within the methodology that they're being applied to.

Q. Now let's look at Page 9.

THE COURT: Can you go back to that for a second? I was reading.

MR. BURKHOLZ: Sure.

THE COURT: I don't read that fast. Sorry. Okay.

Q (By Mr. Burkholz) All right. Let's go to Page 6 instead of 9. So the last time we looked at this ---

MR. BURKHOLZ: Page 6, Mike.

Q (By Mr. Burkholz) Okay. So now the prices in the middle have gone from 64 down to 30 in the year before, right?

A. Yes, on a -- on a year-to-date basis --

Q. Correct.

A. -- as of this time.

Q. Right. About 50 percent less than 2014, right?

A. As of -- Well, through nine months, yes.

Q. And then turning to Page 9 now.

MR. BURKHOLZ: That's Page 11. One back, Michael. Page 10. Sorry.

Q (By Mr. Burkholz) In the example in the materials that you discussed for the SEC pricing process, you're using just the cost

to transport it in Canada and you're excluding the transportation costs for the sales to the U.S., right?

A. We are using the transportation costs seen here as part of our methodology that includes all of the numbers you see.

Q. Right. But you're -- You have sales to the U.S. at this time, right?

We looked at the charts earlier with Mr. Swiger.

A. There were some sales.

Q. Yeah. There were, in fact, substantial sales by this time; right?

A. Well, I think what we saw was there were a few months that had substantial sales.

Q. More than 50 percent, I think; right?

A. Yeah. I think in two or three months, yes.

Q. All right. And the final decision at this time, in October of 2016, to exclude the transportation costs to the U.S. in this calculation, that was made by Mr. Tillerson, Mr. Swiger and you, right?

A. That is not correct.

Q. I see. So you just deferred to other people.

A. No. This was a review of where we were as of that time in August, and it was a discussion about how -- how the SEC methodology was used, what -- the data points, and I don't remember all the rest of the charts, but it was a discussion about where we were, recognizing that we were only in October and

the reserves disclosure is made in -- in the 10-K.

Q. That's actually not entirely true, is it?

Because a year later in October with that disclosure with the Third Quarter results a year later than this time, you made a disclosure about the likely debooking of Kearl reserves, the disclosure that's at issue in this case, correct?

A. We did make a disclosure a year later.

Q. Right. It's not always made at the year end, is it?

A. We made -- We made a disclosure about what was likely to happen at year end.

Q. Right. And that was the first time the market was aware that the company was likely to debook 3.6 billion barrels in an interim quarterly report, not in the final report; right?

A. Yes. Yes, we made that disclosure in the Third Quarter of 2016.

Q. A year later.

A. Yes.

Q. Not at this time, though; right?

A. No.

Q. So let's talk about the U.S. sales at this time.

MR. BURKHOLZ: Why don't we bring up Exhibit 339. I don't think there's an objection to this, Your Honor.

Your Honor, can we move into evidence ---

THE COURT: I'm waiting to hear.

MR. THOMAS: It's already in.

MR. BURKHOLZ: Oh, it's in. It's in.

THE COURT: Oh, it's already in. Go ahead then.

MR. BURKHOLZ: All right. We can bring it up, Michael.

Q (By Mr. Burkholz) All right. Let's look at Page 3. This is a "Third Quarter Equity Crude Marketing Results, Fourth Quarter Plans by Ms. M.B. Wheeler." Do you know who that person is?

A. I do not.

Q. Okay. So let's turn to Page 6. And as we discussed earlier with Mr. Swiger, the top upper left-hand corner is entitled "Third-Party Kearl Volumes by Point of Sale," right?

A. Yes, that's correct.

Q. And "USGC" refers to the U.S. Gulf Coast, right?

A. Yes, it does.

Q. Right. And so that's the blue bar. And you see that, right, that blue bar there? You see that, right?

A. I do see that.

Q. And there's some sales to the U.S. starting on October 13, right?

A. Yes. There is -- There are a few sales, yeah.

Q. And then it starts to ramp up. You see February into -- into May, June; right?

A. Yes, there are additional sales.

Q. And that's with the second phase. The KEP expansion came on in May of 2015, right?

A. In May of 2015, yes.

Q. Yes. And the volume's pretty much doubled, right?

A. They did not double immediately.

Q. But they went up significantly, right?

A. They went up. As Mr. Swiger testified, we had startup problems and a lot of issues to work to get it ramped up.

Q. Yeah, but your -- In August, almost half of your sales are to the U.S., right?

A. In the month of August, yeah, that's about 50/50.

Q. Yeah. And -- And you made a decision at the October meeting and you had -- you made a decision not to include the U.S. transportation costs in the analysis at that point. It's a simple "yes" or "no." We've talked about it.

A. No. No, we did not make that decision at that meeting.

Q. You didn't decide at that meeting that they were going to be excluded?

A. The Reserves Group came in and discussed. This was an information discussion meeting, and they reviewed the topic and discussed all the information that was in the package.

Q. And the company at the end of the year continued to ship to the U.S. Gulf Coast, right?

A. Yes, they did.

Q. And at the end of the year the company did not include those transportation costs in the SEC analysis to decide whether to debook or not.

A. The company used the transportation costs -- the Reserves

Group used the transportation costs that were consistent with the methodology for the overall reserves estimation.

Q. Right. When the company decided not to debook the 3.6 billion barrels in this 2015 10-K that came out in late February, five days before the bond offer, the calculation that was done did not include any of the U.S. transportation costs, the higher costs at that time.

A. The calculation that was done was consistent with the methodology that includes all of the items you saw on that one page.

Q. I understand that. I'm simply asking you a factual question. The calculation did not include the U.S. sales that were taking place.

A. Our methodology did not include U.S. sales.

Q. And that was favorable because the transportation costs, as we looked at earlier, were much higher in the U.S. than they were -- shipping it to the U.S. than the Canadian price of a dollar 78, right?

A. For the barrels that were going that route, yes, --

Q. Right.

A. -- it was more expensive.

Q. And in the SEC calculation, because you're not including the difference between the dollar 78 or so that you used and the $6 average which included all these sales to the U.S., that was helping the company pass the SEC test, right?

A.    I -- I disagree with your characterization about helping the company.

Q.    Well, it did help the analysis to make it show a profit as opposed to not economically producible, right?

A.    I -- I don't understand your use of the word "help."

Q.    Okay.  So let's turn to the end of 2015.  Let's bring up -- I think it's 564.  It's in evidence.

You saw this exhibit earlier today, right, with Mr. Swiger?

A.    Yes.  Yes, I recall seeing this earlier.

Q.    Right.  And it shows on the left-hand side month by month for Kearl the profit and loss for each month, right?  That's what "earnings" stands for, right?

A.    Yes.  Those are -- Those are book earnings.

Q.    Right.  And other than the one month in May -- sorry -- two months, May and July, slight profit, each month showed a loss; right?

A.    That is correct.

Q.    Right.  And totaling 440 million, right?

A.    For the full year, yes.

Q.    All right.

MR. BURKHOLZ:  Let's look at -- Michael, can we bring up 338?

There's no objection to this, Your Honor.  I move to admit it into evidence if it's not in already.

THE COURT:  It's not already in?

MR. MELSCHEIMER:  I believe it's in evidence, Your Honor, yes.

THE COURT:  Well, it's in now.  All right.  I admitted that.

MR. BURKHOLZ:  Thank you.

Q    (By Mr. Burkholz) So this is a document that's dated May 5th, 2016.  But if we look at Page 6, ---

MR. BURKHOLZ:  Thank you, Michael.  Page 4 -- Page 7 rather.  Can we blow up the lower left-hand chart?

Q    (By Mr. Burkholz) So we looked at the sales before the October meeting, right?  We were looking at -- I think the last one we looked at was up till about September.  Is that right?

A.    Yes.

Q.    Now we have the sales through the end of the year, right?  And beyond a little bit, correct?

A.    Yes.  Yes, we do.

Q.    And you see the blue bar, right?  That stands for the USGC, right, again?

A.    Yes.

Q.    And that shows that the sales continued in September, October, November, to the end of the year, right?

A.    Yes.

Q.    Okay.  Why don't we look at -- in this document -- I'm sorry.

Okay.  Let's move on to the 2015 10-K review.  That's

something that you did with Mr. Tillerson.  You had a meeting with him to go over this document, right?

A.    I would have to see it, but ---

Q.    Okay.

A.    Yeah.

Q.    Why don't we bring it up.  It's Exhibit 63.

Okay.  Do you see where it says "2015 10-K Potential Enhancements RWT - DSR Review January 27th"?

A.    Yes, I do.

Q.    That's the review you had with Mr. Tillerson about a month before the 10-K went out, right?

A.    Yes, it was right about a month before.

Q.    Mr. Horne, it shows on the metadata page he was the last one to edit the attachment, right?

A.    Yes, that's what it says.

Q.    Okay.  So let's look at the attachment.  And, again, these are the materials that you used with your meeting with Mr. Tillerson about a month before the 10-K came out, right?

A.    Yes, it is.

Q.    Okay.  So -- And Mr. Horne prepared these, right?

A.    Yes.  He would have -- He would have at least prepared the draft.

Q.    Okay.  In the materials it says, "The price environment through 2015/16 has generated substantial financial and general media attention, unprecedented SEC scrutiny of oil and gas

companies."  That was true at the time, right?

A.    Yes, that was a correct statement.

Q.    Right.  And then there's a reference to SEC staff comments at Spring and Fall API meetings.  Do you see that?

A.    Yes, I do.

Q.    And the first subbullet refers to "significant reporting obligations relating to reserves, impairments, and liquidity in a low price environment."  You see that, right?

A.    Yes, I do.

Q.    And these are things that came out of SEC staff comments at two meetings, right?

A.    Yes, at the Spring and Fall API meetings where Joe and Sandy would have attended.

Q.    Right.  And it's being reported back that these are the things the SEC staff has communicated to oil and gas companies, right?

A.    Yes, at this meeting.

Q.    And you're having this discussion with Mr. Tillerson.  And the second subbullet point says, "SEC believes sentiment has changed regarding duration of industry downturn."

Do you see that?

A.    Yes, I do.

Q.    And then the third bullet point refers to MD&A.  That's the Management Discussion and Analysis part of this 10-K, right?

A.    Yes, it is.

Q.   It's like 20 or 30 pages, right?

A.   Yes.

Q.   And the company discusses the business in those pages, right?

A.   Discusses the business, discusses risks to the business.

Q.   Sure.  And the SEC staff comment at these meetings indicates that this MD&A in this document "must place prior year results in the context of business environment and discuss trends, uncertainties and reasonably possible outcomes quantitatively, if possible, as of the filing date," right?

A.   Yes, that's what it says.

Q.   Okay.  Now let's turn to the next page.  And up at the top it says "Implications of price environment and SEC focus for ExxonMobil," right?

A.   Yes.

Q.   And then the next bullet point, "low commodity prices and continued downgrade of industry credit ratings raise expectations that even the largest companies are at risk."

     Do you see that?

A.   Yes, I do.

Q.   And that was true at the time, right?

     Those facts were true at the time.  There were low commodity prices and continued downgrade of industry credit ratings, right?

A.   Yes.

Q.   And the second bullet point refers to "widespread material

impairments among competitors leaves the impression that Exxon is an outlier."

     Do you see that?

A.   Yes, I do.

Q.   And it was a fact, wasn't it, that there were widespread material impairments among the competitors of Exxon, right?

     We saw some of those documents today.

A.   Yes, there were.

Q.   Right.  And there was some discussion about some foreign companies that had took impairments, right?

A.   Yes.

Q.   But there were American companies that took impairments, also; right?

A.   As I recall on that list, there were a few American companies, yes.

Q.   Right.  Like Chevron took a big impairment in 2015, right?

A.   If I recall, it was four billion dollars.

Q.   Yeah.  And Chevron is on the same accounting system as Exxon, right?

A.   They are under the same accounting standards that we are, yes.

Q.   Right.  And the third bullet point notes that "The SEC will be looking for enhancements to disclosures related to price environment."

     Do you see that?

A.   Yes, I do.

Q.   And then under the next bullet point, it says, "No SEC comment letter since 2016; anticipate SEC letter in 2016."

     MR. MELSCHEIMER:  Since 2013.

Q    (By Mr. Burkholz) Since 2013.  Apologies.  But there's an anticipation of an SEC letter in 2016, right?

A.   What I was communicating is:  We had not had a comment letter from the SEC.  And the comment letter is when they have questions or want some additional information on your 10-K, they send you a letter.  And I'm saying that we haven't gotten a letter since 2013.  But given everything else we've talked about, I do anticipate getting a letter in 2016.

Q.   And the next subbullet point states "Status as one of few, if not only, major industry players without major reserves debook (esp. Canadian oil sands) draws attention," right?

A.   Yes.

Q.   And that was true at the time that Exxon was one of the few, if not the only, major oil and gas company without a major reserves debook, especially up in Canada, right?  That's what it says, right?

A.   That's what it says.

Q.   I think we're done with that document.

     Now let's turn to the time period of February.  We had the rating action on February 2nd.  Let's take a look at that.  And this is in advance of the 10-K coming out on February 24th and

the bond offering on the 29th.  Okay?  I'm giving you context.

A.   Yes.

Q.   So let's bring up Exhibit 199 that was shown earlier today.

     MR. BURKHOLZ:  If we can highlight Mr. Rosenthal's name.

Q    (By Mr. Burkholz) This is an e-mail that you received on February 2nd, correct?

A.   Yes.

Q.   And on that day, if we look at the first paragraph, there's a reference to S&P placing ExxonMobil's AAA credit rating on Negative Outlook which implied the potential for a negative credit action over the next year or two, right?

A.   Yes.

Q.   Okay.  Let's look at the next paragraph -- I'm sorry -- the third paragraph.

     MR. BURKHOLZ:  Let's highlight that whole thing.

Q    (By Mr. Burkholz) So you're being told on this day that S&P was placing Exxon's AAA credit rating on CreditWatch with negative implications, right?

A.   Yes.

Q.   And this action implies a significant probability of a downgrade over the following 90 days, right?

A.   Yes.  That's what it says.

Q.   And Exxon had had a AAA rating like going back to the 1920s, right?

**App. 155**

A.    Certainly going back a long time.

Q.    Right.  And had never been downgraded, right?

A.    Not that I'm aware of.

Q.    And the next sentence notes that "S&P" -- they -- "will review our full year results and 10-K filing prior to making a final determination."

You see that, right?

A.    Yes, I do see that.

Q.    And it also noted that S&P cut Chevron's rating from AA to AA minus, right?

A.    I see that.

Q.    And then there's a reference to recently downgrading Shell further from AA minus to A+, right?

A.    Yes.

Q.    And the bond offering, that took place on the 29th, right?  The 12-billion-dollar bond offering?

A.    Yes.

Q.    Exxon had required S&P and Moody's to reaffirm Exxon's AAA rating for that bond offering, right?  They got a reaffirmation.

A.    Yes.

Q.    And S&P, before making a final determination, wanted to see the full year results, the 10-K filing; right?

A.    That's what it says.

Q.    Okay.  So let's look at the 10-K filing, Exhibit 66.  This is a document that you signed, right?

A.    Yes, I did.

Q.    Now we just noticed -- we just looked at Kearl losing over 400 million dollars, right, for the year 2015; right?

A.    In book earnings, yes.

Q.    And nowhere in the 10-K did the company disclose anything about Kearl's hundreds of million of dollars of losses, right?  It's not in there, is it?

A.    We did not disclose Kearl results on an individual field basis because they were not required to be.

Q.    You could have.  There's nothing that stops you from putting it in the document, right?  You could have done it.

A.    I -- I don't -- I don't know.  I assume we could have put things in there if we wanted to.

Q.    Okay.  Now let's turn to Page 7 of the exhibit.

MR. BURKHOLZ:  Let's just highlight that first part with the bitumen.  The 4.1 billion -- 08 billion barrels.

Q    (By Mr. Burkholz) Those are the Kearl barrels.  They're not being debooked, right?

A.    Well, those are.

Q.    I'm sorry.

A.    All -- All bitumen barrels.

Q.    I apologize.  I apologize for interrupting you.

Of the 4.1 billion barrels, 3.6 billion of those barrels are the Kearl barrels that are not being debooked at that time, right?

A.    That is correct.

Q.    Okay.  And there was also -- I know we haven't discussed the RMDG issue, but there was no impairment taken with this 10-K on the RMDG assets, right?

A.    That is correct.

Q.    Okay.  Now Exxon uses the Wall Street banks to help them sell.  And it's 12 billion dollars of bonds, right?  It's a lot.

A.    Yes.  My recollection was there were a number of banks.

Q.    Right.  And there were different bankers that helped underwrite the deal and get the bonds sold to investors, right?

A.    That's my recollection.

Q.    All right.  And there's something called a "due diligence process" for the offer, right?  Where the bankers ask a company, like Exxon, for information.  They confirm information to make sure that the information going out is accurate to the investing public, right?

A.    They ask for a reaffirmation that nothing material has happened to our -- to our financial condition since the 10-K that was published.

Q.    Okay.  So let's look at Exhibit 122.  This is -- Well, let's ---

MR. BURKHOLZ:  Can you take it off, Michael?

THE COURT:  Okay.  While y'all are fitzing around with that, I don't know if there's such a word as "fitzing," but fooling around, whatever you're doing trying to figure that out,

we're going to break for the day.

And see y'all back at 9:00 tomorrow.  Y'all have been very attentive.  Thank you very much, and you've been very patient.  Don't talk about the case.  See you tomorrow.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury escorted to the Jury Room by the Court Security Officer.)

(An issue was subsequently raised by counsel:)

MR. WELLS:  Your Honor, counsel on both sides have been getting along very well since the trial started.

THE COURT:  You're going to announce you've settled?

MR. WELLS:  No.  I'm not settling anything.

THE COURT:  Oh, I'm sorry.  Go ahead.

MR. WELLS:  But during Mr. Burkholz's examination, he put up on the screen Document -- I think it's 698.

MR. THOMAS:  That's correct.

MR. WELLS:  And the only thing that was up on the screen was "REDACTED; PRIVILEGED."  And he put it on the screen in front of the jury, and that was improper.

He then suggested in front of the jury that other information had been withheld as part of that document, and that was wrong.  There's no justification for it.

He then indicated after Mister -- after my co-counsel objected, he suggested he had a right to do that because it related in some way to a Motion *in limine*, the Motion *in limine*

VOLUME 2-B    137

that Your Honor denied him the right to do what he wanted to do. He wanted to preclude the witness. I assume he really was directing his objection to testimony by the last witness when he talked about reliance on the process. And Your Honor said -- They tried to keep all that out, and Your Honor said, "No, that's coming in but denied without prejudice." And if he wanted to re-raise the motion at any time, I don't care. I just -- You know, that's his right but not in front of the jury.

And so what he did was -- I'll tell you, I was so shocked. I still am shocked. To put a document on the screen when the only thing on the document is "REDACTED FOR PRIVILEGE" and then to milk it and talk about this more, that was wrong. And I need a curative instruction, and I'll leave it to you whether you think anything else is needed. But that -- that just crossed the line.

THE COURT: Okay. Let me hear your response.

MR. BURKHOLZ: With all due respect to Mr. Wells, that exhibit was on the agreed-to -- the Exhibit 698 is on the agreed-to exhibit list. There was nothing improper with me presenting it to the jury. It's agreed to. It's in evidence. And it's not just "PRIVILEGED" that was on the document. There was an e-mail. There was a reference to a meeting on -- on the -- on the document.

THE COURT: Okay. I get it. I'll let y'all know in the morning if I'm going to do anything about it or not. Okay?

VOLUME 2-B    138

I'll think about it. I get it, but that was an agreed exhibit.

MR. BURKHOLZ: It was an agreed-to exhibit. It wasn't even on the privilege log, the document.

THE COURT: Okay. But I know what it said on there. I get that and I get why you both have these big feelings. I get both sides' points.

Were you going to say something over here, Mr. Melsheimer?

MR. MELSCHEIMER: I wasn't, Your Honor. I thought about it but I decided not to.

THE COURT: Mr. Wells covered it very well.

MR. MELSCHEIMER: Thoroughly.

THE COURT: Thoroughly. I get your point. I do get your point. Okay? All right. Thank you.

MR. WELLS: Thank you, Your Honor.

THE COURT: All right. I'll let y'all know in the morning. I'll think about it.

All right. Off the record.

(Court adjourned at 5:05 PM.)

VOLUME 2-B    139

CERTIFICATE OF OFFICIAL REPORTER

I, Deborah A. Kriegshauser, Federal Official Realtime Court Reporter, in and for the United States District Court for the Northern District of Texas, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically-recorded proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 29th day of April, 2026.

/s/ Deborah A. Kriegshauser
_____
DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER

App. 157

# Exhibit 6

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

PEDRO RAMIREZ, JR., Individually )
and on Behalf of All Others )
Similarly Situated, and GREATER )
PENNSYLVANIA CARPENTERS PENSION )
FUND, )
)
                 Plaintiffs, )
)
        vs. )  No.  3:16-CV-03111-K
)
EXXON MOBILE CORPORATION, )  CLASS ACTION
REX W. TILLERSON, ANDREW P. SWIGER, )
JEFFREY J. WOODBURY, DAVID S. )
ROSENTHAL, )
)
                 Defendants. )
----------------------------------)

VOLUME 3A
BEFORE THE HONORABLE ED KINKEADE
UNITED STATES DISTRICT JUDGE
APRIL 30, 2026
DALLAS, TEXAS

FOR THE PLAINTIFFS:

JOE KENDALL
KENDALL LAW GROUP
3811 Turtle Creek Boulevard, Suite 825 Suite 880
Dallas, TX  75229
(214) 744-3300

SCOTT H. SAHAM
NATHAN R. LINDELL
SAM SHELDON
ERIKA OLIVER
T. ALEX B. FOLKERTH
SARA BIERL POLYCHRON
SPENCER A. BURKHOLZ
ROBBINS GELLER RUDMAN & DOWD, LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
(619) 231-1058

BALON B. BRADLEY
BALON B. BRADLEY LAW FIRM
11910 Greenville Avenue, Suite 220
Dallas, TX  75243
(972) 991-1582

MICHAEL SWIDERSKI
(Party Representative)

FOR THE DEFENDANTS:

THOMAS M. MELSHEIMER
AUSTIN E. SAATHOFF
EMILY WILKINSON
DAVID T. HINOJOSA
KING & SPALDING, LLP
2601 Olive Street, Suite 2300
Dallas, TX  75201
(214) 764-4446

NINA CORTELL
JASON JORDAN
HAYNES and BOONE, LLP
2801 N. Harwood Street, Suite 2300
Dallas, TX  75201
(214) 651-5000

AUDRA J. SOLOWAY
DANIEL TOAL
THEODORE V. WELLS
LYUBA SHAMAILOVA
AMITAV CHAKRABORTY
DAPHNE THOMPSON
PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

SCOTT C. THOMAS
LATHAM & WATKINS
100 Crescent Court, Suite 7084
Dallas TX  75201
(713) 546-5400

D. PATRICK LONG
SQUIRE PATTON BOGGS
2200 Ross Avenue, Suite 4100w
Dallas TX  75201
(214)758-1500

(Rex Tillerson)

PATRICE CHILDRESS
(Party Representative)

Proceedings reported by mechanical stenography,
transcript produced by computer-aided transcription.

--------------------------------------------------------
PAMELA J. WILSON, RMR, CRR
Federal Official Court Reporter
1100 Commerce Street, 13th Floor
Dallas, Texas 75242
pam_wilson@txnd.uscourts.gov
(214) 662-1557

VOLUME 3A - APRIL 30, 2026

## P R O C E E D I N G S

THE SECURITY OFFICER:  All rise and come to order.

(Outside the presence of the jury.)

THE COURT:  Okay.  All right.  Mr. Wells, you want to go into more what you were going to go into yesterday?

MR. WELLS.  Yes, Your Honor.

THE COURT:  Okay.

MR. WELLS.  We just received the copy of the rough transcript about 30 minutes ago.  If I could just put the transcript and the document in question up on the screen.

THE COURT:  Sure.  Sure.

MR. WELLS.  So what happened yesterday at the end of the day --

THE COURT:  Can I tell you this right now?

You're going to win.  Do you still want to go into all this?

MR. WELLS:  I think it's important.

THE COURT:  Are you sure?  I can't tell you how many lawyers lose after they do this with me.

MR. WELLS:  Let me give you the reason.

THE COURT:  I'll let you give me the reason

MR. WELLS:  And the reason I want you to see it is it shows the prejudice that it caused, because you got to see.

THE COURT: I remember it.

MR. WELLS: Okay. But I want you -- I want you to feel it.

THE COURT: No, it's okay.

MR. WELLS: Exhibit 698, I'll be very quick. He calls up the documents, puts 698 on the screen. He put it up on the screen. It's a four -- four-page document with that email in front.

Every page behind the document is totally redacted, no substantive information.

THE COURT: Other than the email.

MR. WELLS: Other than -- other than -- the email is in front. It's five pages.

THE COURT: Which is all y'all had agreed to, is the email.

MR. WELLS: Well, we agreed -- it's one document. It was received -- it was produced as one document. So what we agreed to -- we didn't object to the portion of the email that's relevant. The rest of it is attached, but it's one document.

There are multiple documents admitted already in the case with redactions. It has not been our practice to ask for redactions of the redactions.

THE COURT: I get it.

MR. WELLS: Okay. It's one document.

So what it is, he put it up on the screen, he walked the witness through the people on the document. Then after he did that -- now, here's the offensive conduct.

This is from this morning's transcript.

"Q. Okay." --

Now, I want to go the -- Casey, to the page where he asked about nobody being a lawyer.

THE COURT: I remember that.

MR. WELLS: Yeah. I just want you to see -- I want you to see what the jurors saw.

"Q. Okay. So just so we're clear, Mr. Horne, Mr. Littleton and Mr. Oussedik, they're not lawyers from Exxon, right? They don't work in the legal department.

"A. No, they don't. They work in the controller's department."

Now, let me just do it so I can read it.

Then what he did.

"Q. Okay. So let's look at the attachment. Let's look at the" -- go to the next page -- "at the first page of the document. What do you see?

"There's nothing there, is there?"

So at this point the jurors are just sitting there looking at nothing but a blank document but for redacted for privilege.

They then say -- that's page 1.

Witness says: "A. Nothing on the screen, nothing's there."

Go to the next page, next question.

"Q. Right."

Is that page 2?

We just got this a minute ago.

THE COURT: Yes, sir.

MR. WELLS: "Q. Right. And then for the slides that were attached, let's look at the next page. There's nothing there either, is there?

"A. No, there's not."

Now, then it goes to page 2, and they're sitting there looking at page 2 that's redacted.

Then he said: "Q. Then let's look at the next page. Nothing there either, is there?

"A. No, there's not."

And by this time it's about two minutes, the jurors standing (sic) there, we're going through three documents.

Then he ends it with: "Q. And then let's look at the next page."

THE COURT: Wait. Wait. Let's finish right there. There Mr. Melsheimer makes an objection.

MR. WELLS: Yes, sir.

THE COURT: And I sustain it.

MR. WELLS: Yes, sir.

THE COURT: Okay.

MR. WELLS: The reason I want you to see it, I want you to see how premeditated this was.

THE COURT: Everything lawyers do in every case I've ever been in is very premeditated. I get it. I get it. And I get that your exercised about it. I understand. And I'm going to instruct the jury. I promise, I'm going to instruct the jury.

MR. WELLS: Okay. I do have a --

THE COURT: A proposed instruction.

MR. WELLS: But let me -- LET me hear their argument and then I'll show you a curative instruction I propose.

THE COURT: They're going to lose the argument Mr. Saham.

MR. SAHAM: That makes me want to argue more, Your Honor.

THE COURT: Makes you want to argue more. Okay.

MR. SAHAM: Your Honor, I think there's a few things that need to be cleared up here. And I understand I may not persuade you, but I think they're extremely persuasive items.

THE COURT: Well, I've already ruled on it. I sustained the objection.

MR. SAHAM: I understand that. And then the

question is what should be the scope of the --

THE COURT: Of my instruction.

MR. SAHAM: Yes. That's what I'd like to address, Your Honor, if I may.

THE COURT: Okay.

MR. SAHAM: First and foremost, this is an already admitted document. It's agreed to, defendant's filing on this -- it's an agreed-to exhibit. And the reason we know it's defendant's filing because it's in landscape and not portrait, and we put ours in portrait

THE COURT: Oh, there you get them there, too, because you know I hate that.

MR. SAHAM: I don't know.

Can somebody fix this so he can see it?

So this document, 698, it's admitted into evidence for all purposes.

Your Honor said "you don't even in need to ask if a document is admitted, you can use it."

So we're using the document. They produced this document. It's not in a privileged log. There's no lawyers on it. Before any curative instruction is considered, Your Honor should read the document to see if it's even appropriately privileged, because that might be the be-all end-all of this whole thing.

No lawyers on this document. And it gets into a motion

in limine that I know Your Honor denied. I know there was a whole pile of motions in limine and I don't blame you in the least for not having considered this one. It was motion in limine 3, one of our most important motions in limine.

Their whole defense in this case, and you've heard it, Your Honor, process, process, process. They had three meetings, one of which they produced the document for, Exhibit 117, one of which is Exhibit 698, a hundred percent redacted, even though there's no lawyers on it. And the January 1 that you -- Mr. Thomas and I discussed. So two of the three critical documents in the case that support this defense of process we don't have. And they want an instruction to favor them.

The next point I'd make, Your Honor, is about a half hour before all this happened they waived the privilege by asking -- this was Mr. Thomas' examination of Mr. Swiger. They're asking questions about lawyers at meetings approving items. That was the whole purpose of our MIL. They have opened the door. They have waived the privilege.

THE COURT: About which meeting?

THE WITNESS: Well, this is about the -- the january meeting.

THE COURT: A different meeting.

MR. SAHAM: Well, there's three. Remember, there's September, October, and January.

THE COURT: Yes, sir. Yes, sir.

MR. SAHAM: So I objected to this one and we went up. But the bell was already rung in front of the jury.

"Q. And who were the folks you worked with on that?

"A. David Rosenthal's controller group, some lawyers, particularly our SEC specialist, and a few other people that were involved in the 10-K."

THE COURT: Okay.

MR. SAHAM: Again, I don't want to belabor the point, particularly if I'm going to lose or win, but this is not premeditated. They agreed to the document. It was in evidence. Your Honor said we could use any document in evidence.

They didn't -- Mr. Melsheimer didn't stand up and object right away. And when he objected the objection was sustained and now we're here. There was nothing done -- there wasn't even an objection before then, and now they're coming in here claiming some sort of impropriety. And I would just assert --

THE COURT: I remember all of that.

MR. SAHAM: I know, Your Honor. If there's going to be some sort of -- we have a curative instruction, too. If there is going to be a curative instruction --

THE COURT: All right. What do you think it ought be.

MR. SAHAM: Well, we'll show you, Your Honor, assuming I haven't lost it already.

THE COURT: That little laugh was like something from The Munster's.

MR. SAHAM: Well, I don't know if I show the whole thing here. I'm not good at the ELMO.

But here's the curative instruction. It should deal with everything. It should deal with the three documents that have been redacted that we don't get to see in their process argument. That judge also -- I know this is in California so I'm reticent to even bring it up, but he's a very respected judge.

THE COURT: I'm sure he is.

MR. SAHAM: When he dealt with the exact same thing he said the privilege is waived. This wasn't in front of the jury. But you go in front of the jury and talk about lawyers approving stuff and then you've got a document not on the privileged log that was admitted into evidence, agreed to admitted into evidence.

Why'd they put it into evidence if --

THE COURT: I'm not going to go into much detail like you're proposing. And they want me to go into more detail, too. I'm not going to do either of those.

I'm simply something to say, ladies and gentlemen, when something has -- is out for privilege you can't consider it

unless later on I tell you you can, at this point I've not told you that.  And that's all I'm going to say.

MR. SAHAM:  That's fair enough, Your Honor.  I'm fine with that.

And I would still ask that the judge -- that Your Honor review this very short document in camera and --

THE COURT:  I'll think about that.

MR. SAHAM:  Appreciate that.

THE COURT:  Is that a summary of the meeting or something?

MR. SAHAM:  It appears to be.  We don't know, because it's redacted.  It's a meeting with Mr. Tillerson in September of 2017 and it's crucial to their process argument, their whole defense, we have this great process, but we're only going to give you a third of it, you don't get to see the other two-thirds.  That I assert is extremely unfair and prejudicial to the plaintiffs in this case.

THE COURT:  Okay.

MR. SAHAM:  Thank you.

THE COURT:  And you have been complaining about that the whole time.

MR. SAHAM:  I have been.

THE COURT:  I know.  I'm just repeating that.  I'm giving you a little leg up there.

MR. SAHAM:  I appreciate it, Your Honor.

Thank you very much.

THE COURT:  Okay.  All right.  Anything else?

We're going to come back?

You want me to look at your instruction?

All right.

MR. WELLS:  I don't need to show it.  I'll give it to Your Honor.  I'll give it to them.

THE COURT:  Stick it on the ELMO.

MR. WELLS:  No.  No.

MR. TOAL:  You've got to press the button.

Chase has got it.

THE COURT:  There you go.

Thank you.

MR. WELLS:  Members of the jury -- or you just want to read it?

THE COURT:  No, I don't want you to read it.  I agree, I'll read it.

I'm not going to do it.  I've already told you what I'm going to say and that's all I'm going to say.

I'm not going into -- I am not going to make more out of this than what I think should be made.  You want me to do more, they want me to do more.  I'm not going to do it. That's just the way it is.

I think you've made a -- made a good point, and so in response to the point you made I am going to give an

instruction, but I'm not going to -- I am not going to raise this to something where the jury goes, wow, this was some terrible thing, or this was nothing but it's something we got to -- no.

The evidence is what the evidence is.  I make instructions that -- I can read that right there, that goes further than I'm willing to go.

MR. WELLS:  I ask you two things.

THE COURT:  Yes, sir.

MR. WELLS:  Could you strike on the record the Q and A on this point and can you strike the document so it doesn't go back to the jury now that he's made a big issue of those four pages of redactions?

THE COURT:  No, I'm not doing that.  Deny that.

MR. WELLS:  Okay.  And I assume he's prohibited from raising privilege -- going after privilege issues further, he can't do that.

THE COURT:  I doubt anybody is going to do that after this.

If they do, I'm here.

MR. WELLS:  You're going to be with us.

THE COURT:  I'm going to tell you right now, and I'm not fussing at you how you made your objections, but you could have made this objection earlier.  And you both know that.  I mean, that's just the way that it is.  As soon as it

was raised I made -- I made the proper ruling, I think, and so it is what it is.

I'm not -- I'm not trying to -- look, y'all are -- this is -- this is Mike Tyson versus -- who was in their best day?

MR. MELSHEIMER:  Leon Spinks.

THE COURT:  Who?  No, it's not Spinks.  I took my brother to that fight and it lasted -- we got Cokes and it was over, I never saw it.

MR. MELSHEIMER:  Jerry Quarry.

THE COURT:  No, not Jerry Quarry either.

MR. SAHAM:  Evander Holyfield.

THE COURT:  Yeah.  Evander Holyfield who was a pretty good boxer.

Y'all are -- that's just what y'all do.  I'm fine with that. Let me tell you something, Mr. Wells, you are a very persuasive guy, even if you weren't a lawyer.  I wish I would have had you around when I was trying to talk my wife into marrying me.  I mean, you just -- it wouldn't have taken five years.  I mean, you're a very persuasive fellow, that's why the NFL and everybody wants to hire you.  I don't blame them a bit.  I would too.  That's why Exxon wants you.

So I think for me to do either of what y'all want me to do, I think it's in nobody's best interest, so I'm not going to do it.  I know how y'all feel about it.  I think you're both wrong about that.  That's okay.  I'm glad to put that in

PAMELA  J.  WILSON,  CSR/RMR/CRR

**App. 161**

the record.  Okay?

MR. WELLS:  Thank you, Your Honor.

THE COURT:  All right.  Thank you.
Good to have you here, and so --

MR. BURKHOLZ:  Your Honor, before we --

THE COURT:  Off the record.

(Discussion off the record in open court.)

THE SECURITY OFFICER:  All rise for the jury.

THE COURT:  Off the record.

(Discussion off the record in open court.)

(Jury enters the courtroom.)

THE COURT:  Good to see y'all made it back.
Everybody is wearing sweaters.  I don't think earmuffs --
you're going to need that, but stay warm.  Okay?
All right.  Y'all be seated and here we go.

DIRECT EXAMINATION (Continued)

BY MR. BURKHOLZ:

Q.  May it please the court.

THE COURT:  You bet.

BY MR. BURKHOLZ:

Q.  Good morning, Mr. Rosenthal?

A.  Good morning.

Q.  I think we left off we were talking about the due diligence that the bankers did for the $12 billion bond offering?

A.  Yes, I do.

MR. BURKHOLZ:  Okay.  And I'm not sure whether this EXHIBIT got into evidence or not.  I'd like to mark 122, Plaintiffs.  There is one objection to it.

THE COURT:  While they're working on that, ladies and gentlemen, there was an objection yesterday to a -- several pages.  It said privileged on it, and privilege deals with lawyers talking to their clients.  And I'm just telling you that's not something you really can consider, so I'm telling you ignore that, forget it.  That's not anything -- unless I tell you later on that -- that it can be, and I -- I'll make that clear.  Okay?
Thank y'all.

MR. MELSHEIMER:  Your Honor, the objection is hearsay, but I don't think this is offered for the truth of the matter contained herein.

THE COURT:  Yes.  And this is just to show that somebody wrote these articles and it's their thoughts, but not for the truth.

MR. BURKHOLZ:  Right.  This is actually just the due diligence outline for the --

THE COURT:  The what?

MR. BURKHOLZ:  The due diligence outline for the bond offering.  It's not one of the articles.

THE COURT:  It's not?  I'm sorry.  I thought y'all

were getting into the articles.

MR. MELSHEIMER:  That's our objection.

MR. BURKHOLZ:  It's fine.  I don't even need to use it.  I'll ask him the questions.

THE COURT:  Okay.

BY MR. BURKHOLZ:

Q.  Before the bond offering went out on February 29th Exxon issued its 10-K, right, the 2015 10-K?

A.  Yes, we did.

Q.  Right.  And it didn't have the impairment or the write-down of the Kearl reserves in the 10-K, correct?

A.  That is correct, it did not.

Q.  Right.  And the bankers had asked before the offering was there anything more that the company was going to provide to the bankers about what was in the 10-K and you said, "you" being Exxon, there's nothing more, correct?

A.  They asked us to certify that nothing material had changed since we published the 10-K and we told them no.

Q.  Right.  And we asked about whether or not there were -- there was anything more about impairments or reserves that -- that you could tell us, and you said just look at our 10-K, right?

A.  That is -- that is correct, yes.

Q.  Okay.  Good.  Thank you.
Let's turn to the -- the Rocky Mountain dry gas issue.

You were here yesterday, there was a lot of testimony from Mr. Swiger about it?

A.  Yes.

Q.  Okay.  I'm going to try to be as efficient as possible for you and everybody here, but I do have to ask you a few questions, because you actually signed off on what I guess they refer to as the white paper analysis for the 2015 financial -- financials, and then the next year when there was an impairment, right?

A.  Yes, I did sign those documents.

Q.  Okay.  So is it fair to say that for the 2015 financials that were included in here the company did not find a trigger for the impairment analysis for the Rocky Mountain assets?

A.  That is correct.

Q.  Okay.  So why don't we -- I'm going to mark --

MR. BURKHOLZ:  I think, Your Honor, this -- I actually showed this to him yesterday.  It's PX 51.  It's in evidence.
Michael, can we bring up page 2?

BY MR. BURKHOLZ:

Q.  We looked at this yesterday.  I just want to focus on the second bullet point and one other one.
Do you see it says -- this is a meeting with Mr. Tillerson and Mr. Swiger in November of 2015 and you would have communicated with Mr. Tillerson and Mr. Swiger

regarding this impairment issue before the company finalized the 10-K, correct?

A.   Yes, that is correct.

Q.   And the second bullet point says, "When 10-Ks are issued for 2015, we will likely be one of the few companies in our industry that will not have taken an impairment write-down."

That was correct, right?

A.   Yes, that was correct.

Q.   And that Chevron had taken a impairment in their ´second quarter of 2015, correct?

A.   Yes.  That is correct.

Q.   And then further down the question that was asked yesterday of Mr. Swiger, the second to last bullet point in that section, "(be prepared to answer the question:  So has a trigger event occurred?  Answer:  By virtue of the reduction in EM's long-term U.S. natural gas price outlook, it would be difficult to argue to the SEC that one has not occurred)."

Correct?

A.   Yes, that is correct.

MR. BURKHOLZ:  Okay.  So let's look at Defendant's Exhibit 33.  I believe it was shown to Mr. Swiger yesterday.  It's in evidence.

If we could turn to page 12.

If we could highlight the top part.

BY MR. BURKHOLZ:

---

Q.   Is it fair to say the analysis for the Kearl reserves, whether or not they're proved reserves, you're looking at that years current revenues and costs, whereas, the impairment analysis you're looking out a number of years to see whether or not the properties are impaired and need to be -- whether or not the properties need to be impaired and written down?

Is that fair?

A.   Yes.  That is correct.  For the`reserves you use the current conditions and for an impairment analysis you're looking out into the future for all the cash flows, yes.

Q.   Thank you.

So yesterday Mr. Swiger testified about this -- planned prices.  These are the prices that the company was using for the 2015 financials, right, for the impairment analysis?

A.   For the extended plan financials, yes, that's correct.

Q.   Right.  And so --

MR. BURKHOLZ:  If we could highlight the 2020-plus numbers.

BY MR. BURKHOLZ:

Q.   So there was a reduction from 5.2 to 4.0.

I believe Mr. Swiger testified that that was not a trigger, and you agree with that, right?

A.   Yes.  That -- that change from 5.2 to 4.0 was not a trigger.

---

Q.   Okay.  So let's --

MR. BURKHOLZ:  Let me mark Exhibit 65.  I don't think there's any objection to this.

This is the white paper.

No objection.  We move it in, Your Honor.

THE COURT:  Yes, sir.  It's admitted into evidence.

BY MR. BURKHOLZ:

Q.   Let's look at the first page.

This is an analysis at the end of 2015, early 2016, of whether or not the Rocky Mountain asset should be written down, correct?

A.   Yes.  This was a document we used to memorialize our process.

Q.   And turning to page 7, that's your signature on February 10th, 2016, a couple of weeks before the 10-K was issued, right?

A.   Yes, it is.

Q.   And you're not a CPA, are you?

A.   I am not a CPA.

Q.   But you were the controller at this time, right?

A.   Yes, I was.

Q.   And you've collected the analysis that was done at the company for this impairment analysis, right?

A.   Yes.  Yes, I did.  And I reviewed it.

---

Q.   And provided it to Mr. Swiger, your boss, right?

A.   That is correct.

Q.   And provided it to Mr. Tillerson, the CEO.

A.   Yes, that is correct.

Q.   And if you look at --

MR. BURKHOLZ:  Michael, could you bring up page 63?

And highlight the Henry Hub, all the way across.

Actually, Michael, can you -- I need to see the -- bring up the 2020 number plus and highlight that.

That's better.  Thank you.

BY MR. BURKHOLZ:

Q.   So the -- there's the 2020-plus, the $4 a share for the -- $4, excuse me, price for the natural gas in the analysis that we looked at in the -- the dropdown from 5.2 to 4, right?

A.   Yes.  That is correct.

Q.   So no impairment from 5.2 to 4, right?

A.   That is correct.

Q.   And then these are the planned prices that we used to find no impairment in the 2015 10-K, right?

A.   That is correct.

Q.   Okay.  So let's look at the following year.

MR. BURKHOLZ:  This is Exhibit 75, that I'd like to mark as 75.

Any objection?

I don't think there is.

MR. MELSHEIMER: Your Honor, I believe all this work is agreed to as an exhibit.

THE COURT: You -- you don't have any objection.

MR. MELSHEIMER: I have no objection.

THE COURT: Then 75 is admitted into evidence.

MR. BURKHOLZ: Thank you, Your Honor.

Before I get to that -- Michael, can you take it down for a second?

I forgot to mark another Exhibit. 128. This is an email that Mr. Rosenthal is on from March 25th, 2014. He's communicating with another executive, Mr Luettgen at ExxonMobile.

MR. MELSHEIMER: Your Honor, may we approach briefly on this?

I promise this is the only one I'm going to want to talk about just a little bit with you at the bench.

THE COURT: Can you tell I'm kind of giving up you the stink eye?

MR. MELSHEIMER: You're skeptical.

THE COURT: All right.

MR. MELSHEIMER: Can we just visit briefly?

THE COURT: All right. But very briefly.

(Discussion at the bench off the record.)

(Back in open court in the hearing of the jury.)

THE COURT: Okay. I told y'all we would have those breaks.

MR. BURKHOLZ: Thank you, Your Honor.

Let's move on to Exhibit 75, which we have moved into evidence.

Michael, can you bring up the first page.

BY MR. BURKHOLZ:

Q. This is the analysis for the 2016 10-K, correct?

A. Let me just take a look for a second.

Q. I think it's your signature on the bottom of the first page.

A. Yes.

Q. January --

A. Yeah.

Q. Okay. And this is the analysis similar to the exhibit we looked at before for the prior year's financials.

This is the analysis of whether or not the Rocky Mountain dry gas assets should be impaired, correct?

A. That is correct.

Q. And the conclusion eventually was they should be impaired and there was a disclosure a week later, on January 31st that they were impaired for an after-tax amount of $2 billion, right?

A. Yes. That is correct.

Q. And let's look at the prices that were used -- the

planned prices that were used for this.

MR. BURKHOLZ: If you can bring up page 70, Michael.

BY MR. BURKHOLZ:

Q. And then here we have the Henry Hub gas price that's used in the plan for the Rocky Mountain assets, correct?

A. Yes. That's correct.

Q. And we looked at before the 2020-plus number that went from 5.2 to 4, right?

A. Yes, I recall that.

Q. And so that number also applies for 2025 every year going out, the $4 --

A. Yes.

Q. -- in the prior year?

A. Yes, it does.

Q. Okay. Because I want to compare the 2025-plus number here.

So now you're going from -- went from 5.2 to 4, right, in the prior year, no trigger, correct?

A. That is correct.

Q. Now, we're going from 4 to 3.5 and as Mr. Swiger said yesterday that was a trigger, correct?

A. Yes, it was.

Q. And the assets were impaired at 3.5, correct?

A. That is correct.

Q. Now, let's look at Exhibit 228, which is -- which is in evidence already.

MR. BURKHOLZ: Michael, can you just bring up the second page.

BY MR. BURKHOLZ:

Q. Do you recall Mr. Swiger testified about this document yesterday?

A. Yes, I do.

Q. Right. And so this is the March 28th, 2016 plan gas environment with Mr. Swiger's review, correct?

A. Yes, that's correct.

MR. BURKHOLZ: And if you can turn to page 11.

BY MR. BURKHOLZ:

Q. Do you recall Mr. Swiger's testimony about this page?

A. Yes, I do.

Q. And if we can look at the --

MR. BURKHOLZ: Actually, I want to look at the lower right-hand corner, Michael. Just bring that out.

BY MR. BURKHOLZ:

Q. So this shows the 2015 Henry Hub number at $4 going out to 2025, right?

A. Yes, that is correct.

Q. And that's -- that's what was used for the 2015 10-K in the case, right?

A. That is correct.

Q.   And then the 2016 plan we just looked at it, the number goes from 4 to 3.50, right?

A.   That's correct.

MR. BURKHOLZ:  And can we bring up Michael --

BY MR. BURKHOLZ:

Q.   Now, this is in March of 2016, right, this document we're looking at?

A.   Yes, it is.

Q.   So the number --

MR. BURKHOLZ:  Michael, can you bring up --

BY MR. BURKHOLZ:

Q.   Do you see the 3.50 number for 2025?

That's the same number that was used for the 2016 impairment charge, right?

A.   Yes, that is correct.

Q.   Okay.  So a month after the 10-K was issued and the bond offering, you have the numbers -- the 2016 numbers that you're going to use for impairment at the end of the year -- you're aware of those numbers in March of 2016?

We just looked at it, right?

A.   Yes.  That is correct.

Q.   And the company issues quarterly reports after each quarter, right?

A.   Yes, we do.

Q.   That's four times a year?

A.   Yes.  The fourth time would include -- would be in the 10-K.

Q.   That's right.  And after this March 28th document the company issued a -- issues its financial results for the quarter that ended March 31st of that year, right?

A.   Yes.  That's correct.

Q.   And they issued that -- those results at the end of April usually?

A.   Yes.  Typically the end of April.

Q.   And there was no disclosure at that time -- even though you had the numbers that you used at the end of the year, the 3.5, where you found an impairment, there was no disclosure at that time of any impairment of the Rocky Mountain dry gas assets, correct?

A.   That is correct.

Q.   Thank you.

Let's move on to the third quarter of 2016.

We had a brief discussion about that in the beginning.  You recall that's -- October 8th, 2016, was the disclosure by the company of the likely debooking of the 3.6 billion barrels at Kearl, right

A.   Yes.

Q.   Ten months after the bond offering there's now a disclosure of the debooking of the Kearl reserves, right?  The likely debooking?

A.   Yes.  That is correct.

MR. BURKHOLZ:  And if we can mark Exhibit 125, this is the 8-K for that quarter.  I don't think there's an objection.

MR. MELSHEIMER:  No objection.

THE COURT:  It's admitted into evidence.

MR. BURKHOLZ:  Thank you.

BY MR. BURKHOLZ:

Q.   Let's turn to page 3.  This is your signature on the October 2015 8-K that attaches the results for that quarter, right?

A.   Yes.  That is my signature.

Q.   This is giving the market the indication, investors, that the company is likely to debook the 3.6 billion in Kearl, right?

A.   Yes.  That was included in the disclosure.

MR. BURKHOLZ:  Your Honor, I'd like to mark as Exhibit 551 a email from Scott Silvestri to Mr. Tillerson, Mr. Swiger, Mr. Rosenthal, and others, attaching third quarter earnings media summary.

THE COURT:  What's the exhibit number?

MR. BURKHOLZ:  551.

MR. MELSHEIMER:  Just give me -- may I have a moment, Your Honor?

THE COURT:  Sure.  Sure.

MR. MELSHEIMER:  Your Honor, the objection is hearsay.  There's just a bunch of loose articles attached.  And I don't know if the court wants to give this instruction.

THE COURT:  Mr. Burkholz.

MR. BURKHOLZ:  Well, they're attached to an email.  I guess it should all come into evidence.  If you want to give a limine instruction like before, that's fine.

Your Honor, I'm only going to show him the last three articles.

THE COURT:  I was just going to ask.  That's what I was about to ask.

MR. BURKHOLZ:  And just certain parts of those articles.

THE COURT:  Okay.  Admitted but not for the truth of the matter asserted.

BY MR. BURKHOLZ:

Q.   Mr. Rosenthal, this is the media summary for the third quarter earnings.

THE COURT:  And I overrule your objection.  Sorry.

BY MR. BURKHOLZ:

Q.   And page 3 -- before I get to that, Mr. Silvestri, what was his job at the time?

A.   I believe Scott worked in our Public and Government Affairs Group.

Q.   And he was responsible each quarter to provide the

senior executives any news articles that came out regarding the earnings results of that quarter?

A.   I don't recall if he did it every quarter, but he did it this quarter for sure.

Q.   And do you see --

MR. BURKHOLZ:  If we can turn to page 3.

BY MR. BURKHOLZ:

Q.   There's about eight articles that are listed.

MR. BURKHOLZ:  And highlight that, Mike.

BY MR. BURKHOLZ:

Q.   Do you see that?

A.   Yes, I do.

Q.   Okay.  I just want to show you just a few of 'em.

MR. BURKHOLZ:  If we could turn to page 15.

Michael, just highlight the first two paragraphs and the heading.

BY MR. BURKHOLZ:

Q.   This is from Reuters News.

They're a reputable news organization, correct?

A.   I know they're a major news organization.

Q.   And the heading is, "Exxon warns low oil prices my dent reserves nearly 20 percent.

"ExxonMobile warned on Friday it may need to slash proved reserves on its books by nearly 20 percent if oil prices stay low for the rest of 2016.

"The news pushed the company's share price down 2.3 percent to $84."

MR. BURKHOLZ:  Can you highlight that, Michael?

Thank you.

BY MR. BURKHOLZ:

Q.   And, "In afternoon trading, on an otherwise upbeat day that saw Exxon and Chevron post quarterly profits that beat Wall Street expectations."

You received this article at that time, correct?

A.   Yes, I did.

Q.   Okay.  Let's look at the article before that.

Page 14.  Again, from Reuters News on October 28th.

The first paragraph --

MR. BURKHOLZ:  And just highlight that.

BY MR. BURKHOLZ:

Q.   $360 billion U.S. crude producer warned on Friday that it may finally join rivals in writing down assets whacked what by low oil prices.  Cost cuts did at least help Exxon, and rival Chevron, beat estimates" --

MR. BURKHOLZ:  And further down, Michael, to the fourth paragraph.  "The update."

Right there.

BY MR. BURKHOLZ:

Q.   "The update sent Exxon's shares lower, even as cost cuts helped quarterly profit beat Wall Street forecasts."

This is another article you received on that day, correct?

A.   Yes.

Q.   And then finally, the third article.

MR. BURKHOLZ:  Michael, page 17.

Just highlight the top part.

BY MR. BURKHOLZ:

Q.   This is from Bloomberg News.  They're also a reputable news organization, right?

A.   They are a large news organization.

Q.   And the heading is "Exxon Facing Historic Reserves Reduction as Slump Persists."

And then just the first paragraph says, "ExxonMobile warned it may be facing the biggest reserves revision in its history."

Do you see that?

A.   Yes, I see that.

Q.   And these articles are responding to the news that came out that day about the likely debooking of the Kearl reserves, 3.6 billion, right?

A.   Yes, it would appear that that's what they're discussing.

Q.   So let's move on to the actual R&DG impairment.

MR. BURKHOLZ:  Can we mark 227?  This is the earnings released JK from January 31st.

I don't think there was an objection.

MR. MELSHEIMER:  No objection.  No.

THE COURT:  What's the number?

MR. BURKHOLZ:  There's no objection.  It's 227.

THE COURT:  227 is admitted into evidence.

BY MR. BURKHOLZ:

Q.   This is the 8-K for Exxon announcing the fourth quarter results on January 31st 2017?

Is it?

A.   Yes.

Q.   All right.  Turning to page 3, that's your signature, correct?

A.   Yes, that is my signature.

Q.   And then just like we looked at for the October 30th 2008 8-K you're attaching the earnings for that quarter, right?

A.   That is correct.

Q.   And then turning to the next page, page 5, this is a description of -- of the earnings for that quarter, right?

A.   Could I see the first page again, please?

Q.   Sure.  It's page 5.

Okay.  This is our press release, yes.

Q.   Announcing the earnings for that quarter, right?

A.   Yes, it is.

Q.   And then the third bullet point --

MR. BURKHOLZ: Michael, if you could highlight that from the top.

BY MR. BURKHOLZ:

Q. "U.S. Upstream earnings include an impairment charge of $2 billion largely related to dry gas -- gas operations in the Rocky Mountains region."

That's announcing to the public that you're actually taking impairment for the Rocky Mountain dry gas assets, right?

A. Yes. It says that that is included in our results.

MR. BURKHOLZ: And then -- Michael, if you could bring up on that page just the last paragraph.

BY MR. BURKHOLZ:

Q. Do you see the quote from Mr. Darren Woods at the bottom.

A. Yes, I see that.

Q. He was -- he was now the -- the new CEO after Mr. Tillerson left, right?

A. Yes. Mr. Woods was now the CEO of the company.

Q. And he signed off on the financial results for this quarter?

A. Yes, he did.

MR. BURKHOLZ: And then finally Exhibit 518 is the 10-K for 2016. I assume there's no objection.

MR. MELSHEIMER: No -- no objection.

THE COURT: Then it's admitted into evidence.

MR. BURKHOLZ: And then, Michael, could we just bring up page 65?

BY MR. BURKHOLZ:

Q. That's a signature of you, Mr. Swiger, and now the new CEO, Mr. Woods?

A. Yes, those are -- those are our signatures.

Q. Certifying now the 2016 financials with the impairment, sir?

A. Yes. That is correct.

MR. BURKHOLZ: And if you could turn, Michael, to page 7.

And just highlight the proved reserves, the top part, bitumen.

BY MR. BURKHOLZ:

Q. That's showing 436 million barrels, right?

A. Yes, it is.

Q. And the 3.6 billion barrels that were in the prior year's 10-K, they have now been debooked and they're off the company's books, right?

A. Yes. They are not included in this chart.

MR. BURKHOLZ: Pass the witness at this time, Your Honor.

THE COURT: Okay.

MR. MELSHEIMER: May it please the court.

THE COURT: Yes.

CROSS EXAMINATION

BY MR. MELSHEIMER:

Q. Mr. Rosenthal, good morning.

A. Good morning.

Q. You understand that the plaintiffs have personally accused you of securities fraud in this case?

A. Yes, I do.

Q. Tell the jury what you understand that accusation to mean, you personally.

A. That accusation means that I have personally been accused of lying to the public and our shareholders, with the intent of misleading them as to the financial condition of ExxonMobile.

Q. Did you do that?

A. Absolutely not.

Q. Did you tell anyone at ExxonMobile in connection with this 2015 10-K to do anything to mislead or lie to investors?

A. No, I did not, never.

Q. Did you hide anything or conceal anything personally or direct anyone else to do so?

A. No, I did not.

Q. During the process of the -- creating the 2015 10-K did you ever tell anyone at ExxonMobile to mislead the data or twist the data to reach a certain result?

A. No. I -- I never did that.

Q. Did you tell anyone at Exxon that during that 2015 time period that those Kearl reserves must be proved, no matter what the data shows?

A. No, I -- I never said that.

Q. Did you tell anyone at Exxon that they needed to make sure that the tables in the 2015 10-K, or anywhere else, showed that that field was making a profit no matter what the facts were?

A. No. I -- I never did that.

Q. While you were working on -- with ExxonMobile teams in preparing the 10-K in dealing with this impairment issue, did you ever tell anyone that the Rocky Mountain dry gas assets would not be impaired, no matter what?

A. No, I never said that.

Q. While you were working at ExxonMobile in connection with this 2015 10-K did you ever tell anyone to break the rules or not follow the rules to make the numbers look better in that 2015 10-K?

A. No, I -- I never told anybody that.

Q. Did you ever instruct anyone to make a false or misleading statement in that 2015 10-K?

A. No, I did not.

Q. Did anyone ever put any pressure on you to do that?

A. No. Nobody put any pressure on me.

**App. 167**

Q. Now, you signed that 2015 10-K as the company's controller and principal accounting officer.

Do I have that right?

A. Yes, you do.

Q. Tell the jury what kind of responsibility you, David Rosenthal, were taking on when you put your signature on that document?

A. When I sign that document I am taking personal accountability and responsibility for the accuracy of everything that's in that document and also all of the processes that went in to preparing that document and the controls that we had in place around those processes to ensure that the data included in the 10-K was correct.

Q. If you had believed that that 120-page document contained anything that was false or misleading, what would you have done?

A. I would not have signed that document.

Q. How confident are you in the statements and processes that went into those statements in the 2015 10-K?

A. I am 100 percent confident.

Q. How do you feel about those statements today?

A. I feel the same today as I did then. I am absolutely confident in the contents of that 10-K.

Q. Did Exxon ever amend or retract that 2015 10-K or correct it in any way?

A. No, we did not.

Q. Now, we've seen this document, it's -- I don't know if we have a version of it here, but it's -- I told the jury it's about 120-pages; is that right?

A. I think it's between 120 and 130.

Q. You didn't do all that work yourself, did you?

A. No. No, I did not do all the work myself.

Q. A lot of people involved throughout the organization?

A. Yes, a lot of people involved throughout the organization.

Q. More people that are sitting here in this courtroom.

A. Oh, yes. More people than are here.

Q. Hundreds of people.

A. Hundreds of people.

Q. So given that all those people were involved -- did you personally know every one of those people?

A. I didn't know every one of 'em, but I knew quite a few of 'em.

Q. Well, given that, how can you be so confident sitting here today of the accuracy and integrity of that document?

A. Well, because I know all of the processes that are in place to ensure that we produce documents that are correct and have no material misstatements.

I think more important than the processes, even though I didn't know every single individual personally, I knew a lot

of 'em and I know the type of people we have at ExxonMobile. And these are extremely capable, extremely knowledgeable people and just have the highest levels of integrity. And I have confidence in everybody in our organization.

Q. All right. So remember the opening statement where I talked about these two (indicating) things?

A. Yes, I do.

Q. Okay. I want you to help me, remind me about these things.

So this is (indicating) what?

A. That is bitumen.

Q. Bitumen.

And when we're talking about this we're talking about what property?

A. We're talking about Kearl.

Q. Okay. And that's bookings and debookings?

A. Yes.

Q. Okay. What is this (indicating)?

A. That's a core sample of shale.

Q. And inside that shale if you work hard enough you can get gas out?

A. If you work real hard you can get some gas out of that.

Q. That's the Rocky Mountain assets?

A. That is correct.

Q. That's something called impairment?

A. Yes.

Q. That's different from debooking, isn't it?

A. Yes, it is. Those are two completely separate concepts.

Q. Do you remember when I told the ladies and gentlemen of the jury that impairment is forever?

A. Yes, I -- I remember that, and you were correct.

Q. What does that mean, "forever"?

A. That means if you have an impairment and you reduce the value of your assets that are carried on your books, no matter what happens in the future, even if costs -- even if prices were to go way up, you do not put those assets back on the books.

Q. Now, what about this though, this bitumen, what if you debook it, can you rebook it again later?

A. Yes, we can. Yes, we can.

When the circumstances change we can, and we have done that over the course of history

Q. What is driving a lot of that booking and debooking?

A. Changes in the -- in the price in the year that -- that we actually do the reserves analysis.

Q. The price of oil.

A. Yes, the price of oil.

Q. It can go up?

PAMELA J. WILSON, CSR/RMR/CRR

**App. 168**

A.   Yes, it can.

Q.   It can go down?

A.   Yes, it can.

Q.   What are we seeing right now?

A.   Well, right now we're seeing one of those ups.

Q.   A lot of those articles that the plaintiffs' lawyer just showed you were talking about historic lows.

A.   Yes.  The exact opposite of what we're seeing.  That was a downturn.

Q.   $50 a barrel?

A.   Yes.

Q.   Now it's over a hundred?

A.   Yes.

Q.   Did you have anything to do with that personally?

A.   No, I don't have anything to do with it personally.

Q.   But you have to live with it?

A.   I do.  We all do.

Q.   Have to live with it whether it's high or low?

A.   That we do.

Q.   You don't shut down the business when the prices go low?

A.   No, we don't.

Q.   Did it help me keep track of these?

A.   It sure did.

Q.   Okay.  Now, Mr. Rosenthal, you've been testifying for a while, lot of numbers, lot of tables, lot of barrels, lot of accounting.  I want to talk a little bit about you personally.

     Where'd you grow up?

A.   Well, I -- I grew up in a lot of places.  I was born in Denver, Colorado, and I lived there for six months before we moved, and that is indicative of the first 18 years of my life.  I grew up in a military family and we moved quite often all around the U.S. and -- and overseas.

Q.   Did you go to college?

A.   I did go to college.

Q.   Where'd you go to college.

A.   I received a undergraduate degree in corporate finance from the University of Georgia and then I stayed on to get my Master's of Business Administration from the University of Georgia.

Q.   So I'm betting that you're a Georgia Bulldog fan?

A.   That would be a very sure bet.

Q.   Okay.  I wouldn't go around saying that out loud, too much.

A.   Well, I just got a little uncomfortable sitting in this room looking around.

Q.   All right, sir.  Are you married --

     THE COURT:  Good.

     (Laughter)

BY MR. MELSHEIMER:

Q.   Are you married, sir?

A.   Yes, I am married.

Q.   Recent marriage?

A.   No.  In fact, this summer my wife and I are going to celebrate our 50th wedding anniversary.

Q.   Congratulations?

A.   Thank you very much.

Q.   Do you have any children?

A.   We do.  We have two children.  I have a daughter who lives in Dallas and a son who lives in Houston with his wife and my grandson.

Q.   So as a recent grandfather myself let me ask you this: Between being a dad and being a grandfather, which do you like better?

     MR. MELSHEIMER:  Judge, you can answer this, too.

     THE WITNESS:  I will tell you I much prefer being a grandfather than a father.

BY MR. MELSHEIMER:

Q.   Kind of send them home after a while?

A.   You can.  We have a four-night maximum.

Q.   All right, sir.  Where do you live?

A.   I currently live outside of Austin in a little area called Lakeway.

Q.   When did you first start working at Exxon?

A.   I joined the company in August of 1979.

Q.   Was that right out of college?

A.   Yeah.  It was as soon after I got my MBA as I could.

Q.   How long did you work there?

A.   I worked for the company for a total of right at 42 years.

Q.   Could not hold a steady job?

     Was that unusual, sir, for people to work that long at one company?

A.   Not at ExxonMobile.  It was not unusual at all for people to hire in right out of school, whether they were engineers or MBAs, kind of like Mr. Swiger testified yesterday, and stay for their whole career.  That is not unusual.

Q.   What'd you start as?

A.   I was an entry-level financial analyst.

Q.   So I don't want you to spend 42 years telling us about it, but give us just a quick summary of how you went from an analyst to where you were when you retired.

A.   Yes.  I'll do that quickly.

     So I started out, as I mentioned, entry-level financial analyst and then for the next few years I did a number of other analytical roles until I had the opportunity for my first supervisory assignment at the Baytown Chemical Plant right here in Baytown, Texas.

     And then after that I had -- I had a number of other

jobs in the controllers and treasurer's function, including managing organizations as well as doing financial -- high-level financial analysis or financial coordination.

And then I had the opportunity to go to Santiago Chile and be the finance director of a copper mining business we had at the time, did that for three years.

And then I came back to the corporation as the financial reporting manager.

And as things proceeded after that I was the controller of our Global oil and Gas Production Company.

Came back into Dallas, was the assistant controller of the corporation.

And then I was the vice president of investor relations and the corporate secretary.

And then I got the position of the controller and principal accounting officer of the corporation.

Q.    When did you take over as controller of the company?

A.    In 2014.

Q.    Tell the jury what it means to be the controller of a company, where that name comes from.

A.    Well, the name generically "controller" comes from, of course as you would expect the word "control".  But what that really means in our -- in our context is fundamentally making sure that all of the processes you have in place, all of the people you have in place, to take what -- what are

fundamentally just at the very bottom, think about our financial statements, what we call debits and credits in accounting.  All right.  So the electric bill comes in and you pay that electric bill.  You debit cash and you credit expense.

And we have hundreds of millions of those transactions a year.  So -- so I think you can understand that if you have hundreds of millions of these transactions being done by literally hundreds or thousands of people, you -- you have to make sure that you have processes and controls, checks, balances, reviews, to make sure that as all that data comes up that -- that there's no significant or what we call material error or misstatement.

Now, humans are humans so of course errors happen here and there, and we expect that, but my job as controller is, is to make sure that across this global international organization doing this work every day that we have what we need in place to ensure that when I sign that document and all those financial statements are attached, that I have the confidence that I mentioned a minute ago that they are correct.  So that's -- that's one piece.

The other piece of being the controller, doesn't have the word "control" in it, is we are responsible for taking all of that base level accounting data and aggregating it, pulling it all together, and without going into a long story,

turning it into the financial statements that you see in our financial documents, and also taking that same financial data that appears in the financial statements that's governed by rules and regulations, and also turning -- excuse me -- turning that into what we call management information.

Okay.  So the people that are running the business, running the operations, they also need to understand that financial information.  So we -- we do it for the official legal regulatory documents like the 10-K and then we also do it for our management from the very bottom of the company all the way up to when I review the results with our Board of Directors

Q.    So let's talk about this 10-K.  We've heard -- thank you for that, sir.

We've heard a lot about the 10-K.  And I -- this doesn't look as thick as it was in the beginning because I've printed it on both sides, but we can agree it's a lengthy document that's filed every year with the SEC, right?

A.    Yes, it is.

Q.    It's been called an annual report, right?

A.    Yes.

Q.    Okay.  So tell the jury, just, again, I'm going to ask you to be a little briefer than you were with that answer, if you could, what is the process that goes into putting this document together from the perspective of the controller's

office?

A.    Okay.  Sure.  So the process for putting that together is simply it is a process that starts - I think you've heard this term many times - from the bottom-up.  Okay.  So all the people that are closest to the organization, to the operations, so those financial statements that I talked about for too long, and -- and -- so it's that process that comes up for all the financials.  And then there are a lot of other disclosures in there.  So we involve a number of other organizations.  And we're piggybacking off of our quarterly statements that we produce that the gentleman asked me about, and so it's that process, all of those people pulling all that together, and then a significant amount of review at all levels of the organization by a lot of people.

And I think -- I think real importantly, included in that document isn't just the signature of the three of us that you've heard about.  It also has the signature of our independent auditor, Pricewaterhouse Coopers, so all of that comes together and forms the 10-K.

Q.    So help us understand the difference -- just in general way the different groups within the company that are involved in collecting information for the 10-K.

So what about the Accounting Policy Group?

A.    Okay.  So I talked about all the people doing the real accounting, we have a group of subject-matter experts called

**App. 170**

the Accounting Policy Group. And in simple terms their job is to understand all of the rules, regulations, requirements of those statements and ensure that the organization understands how to do their work so that we can comply with all the rules and regulations, and they're -- they advise on all of that.

Q. We've heard about something called the Reserves Group. Are they involved in the 10-K process?

A. Yes, they are.

Q. And what is the Global Reserves Group?

A. Well, the first thing I would point out is they're not part of controllers. So they are an example of a group outside of controllers, an independent group, who is tasked with making some of the disclosures that are included in the 10-K. And they're the ones that are in charge of the -- the disclosures related to our reserves. That's -- that's what they do. So they --

Q. That's our bottle.

A. They do that bottle, yes. They do the reserves in the bottle.

Q. And they don't do just the ones in this bottle, they do reserves all over the world?

A. They do reserves all over the world and by oil and gas and natural liquids and bitumen.

Q. Now, are there certain SEC rules and regulations that

govern how this document is put together?

A. Yes, there are.

Q. And do you have a general understanding of those rules?

A. Yes, I do.

Q. Why is it important for you to have a general understanding of the SEC rules that govern what goes in here and what doesn't go in here?

A. Well, if I'm going to sign that document, like I do every year, I would absolutely want to have familiarity with the rules and regulations surrounding what I'm signing.

Q. Now, are some SEC rules about this 10-K very specific?

A. Oh, absolutely. And you've seen examples of a couple of some of the tables that you've seen. And those are -- I call them cookbook recipe. Okay. So you do this, this, and this and you got the columns, you got the rows, you do the math on the numbers and you fill out the table. Very specific.

Q. Is there any judgment to say, well, I don't feel like doing one of those this year so I'm just going to skip it?

A. No. There is no judgment involved in -- in those kind of specifics.

Q. Are some of the SEC rules that govern this 10-K more general and require judgment?

A. Yes, there are. So if you think about the cookbook recipe on this end and you're all the way at the other end, a

great example of -- of disclosures and what's in the 10-K that require judgment would be the reserves review. And you've heard a lot about reserves. The -- the bitumen that you're seeing there.

But if you -- if you think back to the opening statement, and we talked about -- he put up the definition of reserves, and I don't remember everything, but there are words in there about reasonable certainty and estimate and current conditions, and so when you have regulations that are like that it -- of course you would expect that somewhere with all the work that's being done by all those people, that body of work is going to require some judgment to comply with those rules, and that's what we look to the Reserves Group to do, to use their judgment to make sure we're in compliance with those rules.

Q. When you're making an estimate of something based on current economic conditions, is that a specific thing or is that something that requires judgment?

A. Well, it is a specific calculation, but what does into that does require judgment.

Q. Do the SEC rules stay the same or do they sometimes change?

A. Well, the core, financial statements, those rules stay the same, but the disclosures and other information can change from year to year.

Q. Do the SEC expectations change from year to year and industry to industry?

A. Yes, they do.

Q. Tell the jury about what -- what that means?

A. So a lot of what's in the 10-K is applicable to industry, so any industry, not just oil and gas, but -- but in the oil and gas industry we -- sometimes the SEC's expectations about what we should disclose will change depending on what's going on in the business.

You've seen some charts that would show it's very dynamic, lots of things going on, and so sometimes they say, hey, this year we'd like you to do X, Y and Z.

Q. Well, let me -- I want to talk to you about that because you were asked about some questions yesterday about the SEC conveying certain expectations to -- to Exxon.

Do you remember those questions?

A. I do remember.

Q. I want to make this clear though.

Are those SEC communications directly with Exxon or are they to the whole oil and gas industry?

A. So those expectations are generally communicated to the whole industry via workshops or meetings that people, like you mentioned the Accounting Policy Group, they attend these meetings with people that do just what they do in other oil and gas companies, and typically representatives from the SEC

PAMELA J.   WILSON,  CSR/RMR/CRR

**App. 171**

will also participate in those meetings and there they'll have discussions and they'll express some of these guidance that you're talking about.

Q.   So they're not specifically saying Exxon, Total, Chevron, they're giving general guidance about the industry?

A.   Yes, they're giving general guidance about the industry.

Q.   And is it typically rooted in the conditions at the time?

A.   Yes, it is.

Q.   What was happening back in 2015 that was kind of the most important thing going on with respect to the oil and gas industry?

A.   Well, if you -- if you think about your chart with the highs and the lows, we were in one of those low periods and prices had dropped to, if not historic lows, certainly very low, and so the SEC was very interested in what the impacts were because of this low-price environment that we were in.

Q.   So when you're in a low-price environment, based on your 42 years in the company, is it real clear when you're going to get out of it?

A.   No.  It's -- it's never clear when you're going to get out, just like it's not clear in advance when you're going to go down.

Q.   Well, let's just take what's happening right now in the oil and gas business.

If someone had projected anywhere that the price of oil was going to be $125 a barrel way back in January, do you think that would have been laughed at or someone would have said what's your basis for it?

A.   I think both of those would have happened.  Somebody would have -- would have said what is your basis for that.

Q.   Because back in January it was quite a bit lower.

A.   It was quite a bill lower.  We were well supplied.

Q.   But it changes from month-to-month and year to year?

A.   It can change dramatically month-to-month and over the course of the year and then as we've seen year to year.

Q.   Or it can stay the same for a long time?

A.   Yes, it can.

Q.   Not an easy business.

A.   Not an easy business to manage at all.

Q.   But that chart that I showed the ladies and gentlemen of the jury at the beginning about oil prices from 1974 to 2026, though there were lots of ups and downs, was there kind of an overall trend if you were a long-term investor?

A.   If you're a long-term investor and you're investing in this business, yes, there's a long-term trend.  And you can see the way to the left, what is that, less than $10 a barrel, and then you can go out to the end of this chart here and it's like 110 or 120.

And I think what -- what else is relevant about this is these swings have happened before, not so much way back in the early part of the chart but certainly over the last, what, 15, 20 years.

Q.   Now, I bet Judge Kinkeade remembers, I know I do, back -- back in the '70s when my dad would get a fill-up -- you could fill up a pretty good tank of gas for a couple of dollars?

A.   Yes, you could.

Q.   Can't do that now?

A.   No.  It would be tough.

THE COURT:  You could in Waco.  Cheapest gas.  I don't know why.  I paid 19 cents a gallon.

MR. MELSHEIMER:  So for a buck you could get a little bit over 4 gallons of gas.

THE COURT:  I didn't have a buck, but I -- I mean, maybe I would.  Yes.  Yes.

MR. MELSHEIMER:  You could drive to Dallas on a -- on a dollar.

THE COURT:  Yes.

BY MR. MELSHEIMER:

Q.   Okay.  So who is Sandy Melocik?

A.   Sandy Melocik is one of the senior policy advisors in our Policy Group in the headquarters.

Q.   Did she have some particular expertise based on her experience?

A.   Yes, she did.  In fact, one of the reasons we had Sandy in our group in this senior position was that she had spent several years working at the SEC.  So the people that regulate us and give us the rules, that's where she worked for many years before she joined our company.

Q.   Okay.  I want to talk about the process that went into this 2015 10-K.

So you file it in February.  I gather you don't start working on it January 1st?

A.   No.  No.  As good as we are, we don't start on January 1.

Q.   And it's a little confusing because you're doing something for the previous year?

A.   Yes.  You're -- you're reporting on all of the results in total for the previous year.

Q.   So I think this has been clear, but when this 2015 10-K came out in February of 2016 it was as of December 31st, 2015.  Is that correct?

A.   Yes, that is correct.

Q.   Because you have to draw a line somewhere about where this thing ends.

A.   Yes.  Yes, you do.

Q.   For the following year you start over.

A.   Yes, you do.  You start over Jan 1.

Q. And things can be the same the following year or they can be different the following year?

A. Yes, they can.

Q. And because you did something in one year, that doesn't mean you're going to do the exact same thing the following year, right?

A. No. No. That's not the case. You would never do something the same both years.

Q. But you have the processes in place every year?

A. Yes. The processes and the people and the organization are in place every year.

Q. Okay. I'm going to ask you to turn in your binder -- do you -- do we have a binder up there for you, sir?

I meant to do that. If we didn't --

A. I don't know. I've been using the screen.

MR. MELSHEIMER: May I?

THE COURT: Sure.

MR. MELSHEIMER: Your Honor, just tell me when it's appropriate to take the morning break.

THE COURT: How much longer are you going to be, you think?

MR. MELSHEIMER: With Mr. Rosenthal?

We're going to go to lunch I believe, Your Honor.

THE COURT: Okay. Then let's go ahead and take a break.

Don't talk about the case, ladies and gentlemen.

Thank you.

(Jury exits the courtroom.)

THE COURT: Y'all need something before I take break?

MR. BURKHOLZ: We were going to discuss the issue of the document.

THE COURT: You can step down, Mr. Rosenthal.

MR. MELSHEIMER: Can we do that at lunch or after lunch?

THE COURT: Let's do it now.

MR. BURKHOLZ: I know you were struggling up there with this exhibit, what to do --

THE COURT: Talk right into that microphone, please.

MR. BURKHOLZ: I mentioned that maybe we redact the document and then there was a further discussion where I said, well, maybe I don't need it, I can get it out of him on the stand. And I was thinking in my head he's just going to open the door and why don't I just wait. And that's what he did, gathering testimony that he never committed securities fraud from the witness.

So he's opened the door, the whole thing should come in.

THE COURT: I'm trying to remember what it is.

I'm sorry.

MR. BURKHOLZ: It's the email where Mr. Rosenthal is responding to Mr Luettgen about a footnote about impairment.

And the discussion about the footnote --

THE COURT: What's the number?

MR. BURKHOLZ: This is 128. This is back in 2014 and the 401, 403 argument, or objection, made by Mr. Melsheimer, was that there was a reference to the carbon asset issue here.

And the point of this email is that Mr. Rosenthal is responding to the point of Mr Luettgen about, you sure you want me to delete the footnote that addresses the question of impairment. And he's responding, "Yes. Let's leave off the impairment footnote. That word gives the folks on the third floor heartburn." He testified in his deposition the people on the third floor are Mr. Tillerson and Mr. Swiger.

So I think I'm entitled to ask him questions about the fact that they're deleting a footnote regarding the question of impairment. I don't need to get into questions about the carbon proxy asset part of it but just the fact that he's telling Mr Luettgen leave it out, Mr. Tillerson, Mr. Swiger, and the others on the third floor, gives 'em heartburn.

THE COURT: Okay. And your response is?

MR. MELSHEIMER: May I respond, Your Honor?

Your Honor, context. This is 2014. This is when Mr. Rosenthal is in Investor Relations. There's an activist investor called Ceres, which is an anti-climate change group. They are trying to get the corporation to do all kinds of different things. He takes it upon himself to write a letter to these investors in -- a 15-page letter.

THE COURT: He who?

MR. MELSHEIMER: Mr. Rosenthal is drafting this letter with the help of Mr Luettgen to write to these activist shareholders and explain to them the company's position but it's all rooted in climate-change analysis. Okay?

And so what this exchange shows is -- and if you pull it up just a little bit we can see it.

He says -- you know, he basically just says I've adopted what I could from Pete's draft, I'd like to get your thoughts first before I send it out for a full review. And he looks at it and he says, yeah, let's leave off the impairment footnote, that gives folks on the third floor heartburn. This.

Is not about the 10-K. It's not about impairment that we're talking about in this case. It's talking about this -- this ceres activist investor saying, hey, you guys are going to have to write off all your excess because all these claimant-change regulations are going to be in place and you might have to go out of business and you should tell your

investors that. That's what it's about. And he says, look, let's not say that. Because the whole point of this letter was, hey, these regulations are never going to take place. They're not worried about worldwide regulations putting us out of business so I don't want to put that in this letter because that will give the folks on the third floor heartburn since that's not what we're talking about happening.

It's not a suggestion about concealing something from investors. I have it has nothing to do with the 2015 10-K. And the main problem why it's more prejudicial than probative is I'm going to have to get into all that background, which, of course, we're trying to keep out.

They just want this sound bite, which is misleading and unfair, that says take out impairment footnote. There's no suggestion that there was any impairment footnote removed from this 2015 10-K. This isn't talking about the Rocky Mountain dry gas assets.

Heck, I imagine those activists were delighted that the company was getting into natural gas because it's seen as cleaner. That's not what this trial is about, and that's why this should not come into evidence.

THE COURT: But you said never, have you ever. Like all the lawyers do, you wanted Mr. Rosenthal to be --

MR. MELSHEIMER: In connection with the 2015 10-K.

THE COURT: You didn't say that. You just said

ever. We all want our witness, our clients, to be clean forever. I mean, that's the problem with asking those kinds of broad questions, is that why doesn't that open that up?

I mean, how can he now make an argument -- you can't make the argument later on, well, I said "never" when this exists out here.

MR. MELSHEIMER: Well, let's look at the transcript, Your Honor, because I think it was tied to 2015. But even if it wasn't, this has nothing to do with securities fraud. This is all about -- this -- taking the impairment -- this isn't a filing with the Securities and Exchange Commission. This is a voluntary letter that's being written by Mr. Rosenthal to these investors.

I can explain it. I'm not worried about explaining it. I'm just saying it's going to take a lot of background about why he was saying this and in what context.

THE COURT: I get that. I understand that.

All right. What were you going to say?

MR. BURKHOLZ: Your Honor, just it goes to the practice of the company. They hadn't taken an impairment like this, what happened in this case, for decades. So we're entitled to show that Mr. Tillerson, Mr. Swiger -- this goes to their state of mind about whether or not they should do an impairment in the 2015 10-K. And then Mr. Tillerson is gone the following year when they take the impairment.

THE COURT: Well, let's let him finish his and then see where we are with that and see if you still want to -- want to do that with regard to where we are.

It will depend -- I don't know how much longer his testimony is going to be or what all he's going to go into, whatever it is, but we'll address that. As soon as he finishes then I'll let you know what I'll let you do. Okay?

MR. BURKHOLZ: Fair enough.

MR. MELSHEIMER: Well --

THE COURT: Well, nothing.

MR. MELSHEIMER: Yes, sir. Well, nothing, that's exactly what I was about to say.

THE COURT: That's right. It's up to you, you question your witnesses and how you question, it's not me. And so I know you're very careful, and you've been very careful. They were very careful with their witnesses. I get that. But, you know, I'm not telling you what to do.

I know what I would do if I were a 40-year lawyer in a really tough case and had a witness in this I know what I would do, but I'm not -- I'm not y'all. So we'll see.

MR. MELSHEIMER: Thank you.

THE COURT: Is that a little bit of a warning? I'm taking this out of this book over here.

MR. MELSHEIMER: It's wonderful. Both perplexing and encouraging.

THE COURT: Well, we'll see.

Okay. Off the record. Y'all take a break. Come on.

(Recess taken at 10:44.)

(Proceedings resumed at 11:06.)

(Jury enters the courtroom.)

THE COURT: Okay. Okay. Go ahead.

MR. MELSHEIMER: May it please the court.

THE COURT: There you go.

CROSS EXAMINATION (Cont.)

BY MR. MELSHEIMER:

Q.   Welcome back, Mr. Rosenthal.

A.   Thank you.

Q.   Okay. Let's talk about the process of the 2016 10-K creation. And did you have kind of a kick-off meeting in December where the process for that year kind of got underway?

A.   We had a kick-off exercise, including a letter that went out to everybody.

Q.   And was that in December?

A.   Yes, it was.

Q.   Now, just to be clear, the work that goes into other parts of the 10-K that forms the basis for a lot of the information, that's -- does that start in December or is that going on the whole year?

A.   Well, it's going on the whole year.

Q.   Okay.  So what's happening in December with this kick-off?

A.   So -- so in December we're -- we're now at that point where it's time to go get this thing pulled together, and so there's -- there's a -- just a letter and folks about who -- who -- who's responsible for what and what time frame and what is the -- it's more of a schedule, what's the process and who's in charge of things.

Q.   Okay.  And you've got until 60 days after the year-end.

A.   Yes.  That's correct, 60 days.

Q.   So you look at December 31st, you go 60 days, you've got to get it basically by February 28th, if there's a leap year maybe you get an extra day or something.

A.   Yes.  That's correct.

Q.   Okay.  So what are the different groups that you're involving in this process?  We've heard a lot about many different ones, but I want to put them all in one spot, if we can.  Okay?

A.   Sure.

Q.   What -- what's -- just take me through the different groups and I'm going to write 'em down?

A.   Okay.  I'm going to start with the different controller's groups because just to say "controllers" would not really show what we're doing.

So it's the -- it's the accounting groups.

Q.   Okay.

A.   It's the financial reporting.

Q.   I'm not sure if Sister Mary would think this was okay.  Good enough.  But I'm going to give it a shot.

A.   And the accounting policy, those are pretty much the three big buckets of controllers.

Q.   Okay.  What other big groups?

A.   The Reserves Group would be another really big group.

Q.   That called Global Reserves?

A.   Yes.

Q.   Why is it called Global Reserves?

A.   Well, because they have oversight over our hydrocarbon reserves all around the world.

Q.   Any other groups?

A.   Another one that's very important here is outside the organization, so it's our independent auditor, Pricewaterhouse Coopers.

Q.   They used to tabulate the Oscars didn't they, back in the day?

A.   Well, I think they had a bad day and they didn't do it anymore.

THE COURT:  I remember that.  Yeah, kind of announcing the wrong winner doesn't work.

(Laughter)

BY MR. MELSHEIMER:

Q.   Okay.  Okay.  So that's a pretty good summary of the different groups, and you -- you had this kick-off process in December and you kind of -- what'd you tell all these people?

A.   So what we told all of those people was basically what's the schedule, who's responsible, and -- and what all it is that we need to pull together.  So it's a -- it's a fairly comprehensive but short document that just lays out what do we need to do to get between December 11th and February 28th -- or 24th.

Q.   So were there -- are there materials that are used that are carried over from year to year from one 10-K to another?

A.   Yes.  In fact, our -- our starting point every year is to look at the prior year's 10-K.  So we don't start with a blank sheet of paper.  We pull forward the prior year's 10-K and that's kind of a good place to start.

Q.   Were there some things though that were added to this 2015 10-K that had not been in the previous year's 10-K?

A.   Yes.  There were a number of what we called enhancements to the 10-K for 2015.

Q.   What was prompting these enhanced disclosures?

A.   Well, in the -- stepping back, it was the -- the market, everything that was going on in the market.  And then the Securities and Exchange Commission, at these meetings and things we were talking about earlier, giving guidance on here's what we'd like to see in your 10-K this year, given this market and investors' perceptions and -- and interest.

Q.   So how did the fundamental process though of gathering information and putting it together -- was that the same or different from prior years?

A.   Oh, that process was the same.

Q.   Who was -- were -- were -- were you involved in drafting some of these what you've called enhanced disclosures?

A.   I was involved -- I didn't do the initial pen-to-paper, but once an initial draft was made I was involved in -- in reviewing and working on then, yes.

Q.   Was Ms. Meolick, Ms. Sandy Meolick, also involved?

A.   Yes.  Sandy would have been an example of somebody who would have been at the very beginning understanding what the requirements were, understanding the expectations, and then pulling together a first draft.

Q.   She was that colleague of yours that had previously worked for the Securities and Exchange Commission?

A.   Yes, she was.

Q.   Okay.  Let's take a look at Plaintiff's Exhibit 63, which is already in evidence and has already been shown to the ladies and gentlemen of the jury.

I -- I just want to ask you a -- a few questions about this, so we're all on the same page.

So you were asked about the staff comments at the spring and fall meetings.  Right?

A.   Yes.

Q.   And I think you clarified for us that that was throughout the industry, not just an ExxonMobile kind of situation?

A.   Yes.  That's correct.  Industry participants.

Q.   And what do you have here from PwC and why is that important?

A.   So in addition to our folks going to meetings, these API meetings, Pricewaterhouse also had a process internally where they would compile what their view were of recent comments to the oil and gas companies through their Pricewaterhouse Coopers organization.

Q.   Now, who was this going to be eventually discussing the information you -- you -- you have here on this page?

A.   Oh, this was out of a deck I reviewed with Mr. Tillerson.

Q.   Why would you be reviewing this kind of material with Mr. Tillerson?

A.   Well, I thought it was important to give Mr. Tillerson some background, knowing that we were going to be bringing forward these enhancements and changes from the prior year. And I didn't want to just walk in and say here they are, so I -- I took the opportunity to pull this page together, just to give him a good background overview of what's going on. He obviously is very aware of what's going on in the market,

but how is that translating into SEC expectations for our 10-K filing.

Q.   If we could turn to page 2.  You were asked about this.

"Implications of price environment and SEC focus for ExxonMobile."

When we see that language what we're really talking about is -- on the chart I showed the ladies and gentlemen that's that bottom dip --

A.   Yes.  Yes.

Q.   -- in the prices, right?

A.   Yes.  That's correct.

Q.   That's something everyone is dealing with?

A.   Yes.  Yes.

Q.   The company itself?

A.   Us and the rest of the industry, yes.

Q.   Investors?

A.   Yes.

Q.   People buying gas?

A.   Yes.  Absolutely.

Q.   Okay.  So it says, "Widespread, material impairments among competitors leaves impression that ExxonMobile is an outlier."

I want to make -- you read it on the examination from the plaintiff's counsel, but tell the jury what that meant and whether that's some kind of a good thing or bad thing.

A.   So what I -- again, I'm updating Mr. Tillerson on what's going on and what the environment is.  And if you take an outside-looking-in, okay, there was -- as you saw on some charts yesterday, a lot of other companies in the oil and gas industry were taking impairments in their upstream operations and -- and we had not.  And so it's always good to think about what -- what people who aren't right inside the company might be thinking.

So all I was saying here was, hey, if you're on the outside looking in there's an impression that we're going to be an outlier.

Q.   So because other companies were taking impairments, did that mean that Exxon had to as well?

A.   No.  Absolutely not.

Q.   Why not?

A.   Well, we have different portfolios, different assets, different circumstances.  They may even have had different cost bases of what they paid for or spent to do 'em, so that's different.

And then, secondly, everybody has their own price outlook, their own planning basis, the charts you saw before. So everybody does their own thing with their own assets based on their own company plan outlook.

Q.   Let's take the reverse, sir.

Let's say that your testing and analysis showed that you needed to impair an asset but other companies had not, would that be a reason not to do it?

A.   Same answer.  No, that would be -- that would not have any relevance on our decision.

Q.   Okay.  Let's take a look at this next page.

You were -- again, this is a -- this is a document that you're presenting to Mr. Tillerson in -- in the fall of 2015 would you saw, or is it earlier?

A.   No, I think it's -- if I recall it was actually a little later in the process.

Q.   Okay.  So this is "No SEC comment letter since 2013; anticipate letter in 2016."

So I want to -- you were asked to read this, but I'd ask you now to tell the jury what this meant.

A.   A comment letter -- so we file the document, the 10-K that you've seen, and then people at the SEC review it.  Some years it's a smaller review, some years it's a very detailed review.  And if they have any questions or they want more information, well, they send us a letter.  That's what we call a comment letter, their comment.

And I was just telling Mr. Tillerson that we've not had one since 2013, so the SEC has not sent us a letter and asked for any more information or had any questions, but I did anticipate given the market, given their expectations, given everything that was going on, that we would probably get a

letter this coming year

Q.   And other companies as well?

A.   Oh, yeah.  No, it's a -- the unusual part here is that we hadn't had a letter since 2013.

Q.   So you were asked some questions yesterday -- you were shown an email about -- between some people and you weren't even really sure where those people were or what their jobs were.  Do you remember that?

A.   I do remember that.

Q.   And there was some talk -- there was an email that talked down south and the company had received a letter in 2015, and I'm not really sure you got to answer that.
     Was there a letter that the company got from the SEC in 2015?

A.   No.  No, there was not a letter.

Q.   But you were hearing at these conferences and things that the SEC was wanting the energy companies to be plain about what was happening in oil prices?

A.   Yes.  And be responsive to investors about any risks that that might generate.

Q.   So look at that last bullet point here.  It says "Business and financial reporting requirements require careful reconsideration of 10-K disclosures."
     So just to contextualize this, this is what you're telling Mr. Rex Tillerson?

A.   Yes.  That's correct.

Q.   As part of the 2015 10-K process.

A.   Yes.   I'm saying based on all of the background I've given you, just what you read there.

Q.   And you talk about enhancements where the SEC and user interest is -- is -- is high.
     "Demonstrate to the SEC that management has assessed potential for incremental risks or financial exposures related to current price environment."
     Did you discuss those things with Mr. Tillerson?

A.   Yes, we did.

Q.   Was that a responsible thing to do?

A.   Absolutely.

Q.   Was that being proactive?

A.   It was being proactive, yes.

Q.   So returning to that -- to that -- to that bullet point.
     "Business and financial reporting environments require careful reconsideration," how does that tie into what you and I have been talking about here for the last hour or so?

A.   Well, the -- the way this ties in is we're in the process, we're pulling together the 10-K, and -- and as you know from what's being shown here, there's a lot of nonquantitator -- there's a lot of disclosures, a lot of written things, and what I'm saying here is we -- we need to have a careful reconsideration.  In other words, don't --

we're not just going to pull up what we did last year.  We're going to take that and we're going to be responsible to the environment and to the requests that we knew were out there from the Securities and Exchange Commission.

Q.   So you were asked yesterday about whether you could have disclosed something and whether anything stopped you from doing so.  Do you remember that?

A.   Yes, I do.

Q.   Now, I'd like you to tell the ladies and gentlemen of the jury what you meant by that.
     And also, I want you to think in the context of what you have learned from the SEC about whether --
     MR. BURKHOLZ:  Your Honor, these are --
     MR. MELSHEIMER:  I'll rephrase.
     THE COURT:  Okay.
     MR. MELSHEIMER:  Thank you.

BY MR. MELSHEIMER:

Q.   Did you become aware, or not, of the SEC being interested in the issue of excessive or too much disclosure?

A.   Yes.  Yes, I am.

Q.   Now, what does that mean?  And explain it to the jury.

A.   Well, the SEC has -- as you -- has to tell everybody what they're looking for, and in that process every year emperiodically they go back and think about whether or not things should be added.  And I think it was mentioned yesterday in the 2009 time frame they did undertake a study to see if they wanted to expand the data tables that you've seen from what you saw to a field-by-field basis for the upstream, so in addition to what you saw people would have to disclose that information by their fields

Q.   And what was the ultimate conclusion?

A.   Well, the ultimate conclusion was they were not going to request that.  That was -- the decision they made was, no, that would not -- that would not be a good idea.

Q.   Where does business judgment fit into the decision as to what you're going to disclose when the SEC has not laid it out in a cookbook fashion?

A.   Well, the judgment is very important, because you still have to comply with the rules and regulations.  So the judgment comes into how are we in our specific situation going to comply with those rules.  And we have what we call subject-matter expert specialists, and those people are in charge of -- of coming up with that and making sure that we're in compliance.

Q.   Let's look at some of the disclosures that you were discussing with Mr. Tillerson.
     Turning to page -- exhibit page 3.
     So this is a chart that is in evidence.  And it has the page number, the theme, the potential enhancement, and then the considerations.  Can you lay that out for the ladies and

gentlemen of the jury what we're -- what we're talking about here?

A.   Yes.  So, again, I'm reviewing this package with Mr. Tillerson.  And page -- this is on page 2 of the 10-K, "Theme:  Low-price Environment."  So that's what the SEC is talking they would like us to be responsive to.

And then what is the potential enhancement.  So this is under a section called "Risk Factors - Supply and Demand."

And as you can see there, where you see the bold, that means we're adding this, this is a change from last year, "Any material decline in oil or natural gas prices could have a material adverse effect on the company's operations, our financial condition and our reserves."

But it's also important to point out, which we did, "However, lower prices could also reduce the costs necessary to develop and produce oil and natural gas reserves."

Remember, big picture, it's the revenues minus the cost a nd you need to make sure that just because the revenues go down what happens to your cost.  Oftentimes your costs go down.  So you could have both of those at the same time.

Q.   So jumping ahead just a minute to Kearl -- I've got my Kearl bitumen bottle here.

A.   Yes, sir.

Q.   Do you recall whether or not in the course of the Kearl Expansion Project in 2015 whether or not costs of production at Kearl went up or went down?

A.   Oh, they went down.

Q.   And what effect did that have on the operation?

A.   Well, because -- because the prices went down the spread widens and obviously we're ramping up and we've got more barrels.

Q.   And what did reduced costs do to the overall business case though?

A.   Well, it improves it, of course.

Q.   Okay.  So this -- the bold language, was that language that was already in there or was new language that you were proposing?

A.   This was new language that I was reviewing.

Q.   Okay.  Let's look at -- at the middle of exhibit page 4 to another enhancement.

Again, is this the same format here, page, theme, potential enhancement, and considerations?

A.   Yes.

Q.   Is all of this in bold something that was not in the 2014 10-K that you're -- you and your group are proposing to be added to the 2015 10-K?

A.   Yes.

Q.   Based on market conditions, based on what you've learned from the SEC, based on anything else that you learned that year, right?

A.   Yes.

Q.   Okay.  So I'm going to read it slowly and then I'm going to ask you a question about it.

"When crude oil and natural gas prices are in the range seen in late 2015 for an extended period of time, under the SEC definition of proved reserves, certain quantities of oil and natural gas, primarily relating to oil sands operations in Canada and natural gas operations in North America could temporarily not qualify as proved reserves.  Amounts required to be debooked as proved reserves on an SEC basis will likely be rebooked as proved reserves at some point in the future when price levels recover."

What's happening there?

MR. BURKHOLZ:  Your Honor, he's leading the witness.

THE COURT:  You are leading the witness.  Sustained.

MR. MELSHEIMER:  Well, I would --

BY MR. MELSHEIMER:

Q.   So can you explain to the jury what those sentences mean in plain English?

A.   In -- in plain English we're being responsive to the environment.  And what we're -- what we're telling investors are, hey, when the prices that we've seen in 2015 -- remember, you don't -- you don't know when these cycles are going to change, so we don't know what's going to happen in the future, but if the prices that we see now are in the -- if they happen for an extended period of time, under the definition of SEC proved reserves, so that's the -- the thing, the definitions you saw yesterday, they were telling them, look, certain quantities of oil and natural gas, in this case oil sands in Canada and North America could temporarily be debooked.  They could be debooked.  Because there are other factors other than just price.

What we're saying here is prices are low and if they stay low these things could -- could need to be debooked.

Q.   Did this, or did it not, come true in 2016?

A.   It did come true in 2016.  So the prices stayed low and they got debooked.

Q.   I'd like you to look in the considerations section.

And I'm just going to read it to you and then ask you question about it.  All right?

THE COURT:  What's this exhibit number, by the way?

MR. MELSHEIMER:  Your Honor, Your Honor, it is Exhibit 60 -- 63, Your Honor.  Exhibit 63.

BY MR. MELSHEIMER:

Q.   So I'm going to read this and I'm going to ask you a question about it.

"Considerations:  Addresses need to adequately foreshadow material events that could reasonably occur.  In

PAMELA  J.   WILSON,  CSR/RMR/CRR

**App. 178**

the event that EM expects to debook reserves, we would need to consider additional disclosure at that time.  SEC staff will look at any such events -- events with 20/20 hindsight in developing comment letters."

What does that mean in plain English?

A.   In plain English that means if you do something in the future that's significant they're -- they're going to look to see if before that you had ever given anybody any warning that this might happen.  So -- so the 20/20 hindsight.  They're saying even if you don't do something right now, if it's possible, or it may happen, you need to put that out there.  Because the SEC did not want to have something happen and then look in your statements and find that you haven't done what we're doing here, which is telling everybody here's what's going on, here's what might happen.

Q.   What did you mean by "in the event that ExxonMobile expects to debook reserves"?

A.   So -- so in the -- in the event that we did decide to debook reserves, well, we would need to consider additional disclosure at that time.

Q.   Now, you were asked several questions about a disclosure that Exxon made the next year, in October 2016, about debooking barrels at Kearl.

Do you remember those questions?

A.   Yes, I do.

Q.   Why did Exxon make that additional disclosure in 2016?

A.   Actually, it worked out just the way we said here.

So what -- the reason we made that additional disclosure, because we expected to debook the reserves that year.

Q.   Were you able to conclude that as of October of that year?

A.   No.

Q.   October of 2016?

A.   No.  What -- what we were saying is given where we are that we would -- we would be debooking the reserves.

Q.   That was October --

A.   Yeah.

Q.   -- 2016?

Okay.  Okay.  Let's take a look at Plaintiff's 66, which is the actual 10-K.  This is in evidence.

MR. MELSHEIMER:  If we could go to page 42.  Exhibit page 42, which is page 40 of the 10-K.

BY MR. MELSHEIMER:

Q.   Would you describe at a high-level what Exxon is required to include in this section titled management's discussion and analysis of financial conditions and results of operation?

A.   Sure.  In this section this is where you add commentary to your financial results.

So what they're inspecting here in -- in this discussion is to talk about, to some extent, your results and the results of your operations and the business and -- and provide an overview of that, you know, where you're explaining what's going on.

And then there are -- their are other sections in the -- in what we call the MD&A, the Management Discussion and Analysis, and we talk about the business.  That's what this is really about.

Q.   And if we go through here, Mr. Rosenthal, we're not going to go through all of 'em, but will we see in the 10-K the enhanced disclosures we were talking about earlier with document Plaintiff's -- or Plaintiff's Exhibit 63?

A.   Yes, we will.  This is one of the sections we put those comments.

Q.   So if we can go to the overview section, the bottom of that page.

Actually, page 56.  "When crude oil and natural gas prices".

A.   There it is.  Thank you very much.

Q.   Is this the same language that we saw in your discussion with Mr. Tillerson making it into the 10-K?

A.   No.  We actually revised it a little bit.

Q.   How so?

A.   Well, we wanted it to be more broader and more inclusive.  So let me just read this real quick.

"When crude oil and natural gas prices are in the range seen in late 2015 and early 2016 for an extended period of time, under the SEC definition of proved reserves, certain quantities of oil and gas" -" that's all the same.  And what we changed here, instead of saying "primarily oil sands operations in Canada and gas operations in North America," we said "such as" because if we had left in "primarily" we didn't want people to think that's all there was that could happen.  So we said "such as," so they're important.  But "such as" means there could be all kind of other things, we'll have to see how things turn out.  But "such as oil sands operations in Canada," so that was an improvement to the earlier version you saw.

Q.   So let's -- turning to the next page, exhibit page 59, which is actually page 57 of the 10-K, now, we're switching here to this impairment discussion.  Right?

A.   Yes.

Q.   So we're -- we're using my -- my shale example there.

And can you read the highlighted language and explain that in plain English to the ladies and gentlemen of the jury?

A.   Sure.  The document says, "Critical to the long-term recoverability of certain assets is the assumption that either by supply and demand changes, or due to general

PAMELA J.   WILSON,  CSR/RMR/CRR

**App. 179**

inflation, prices will rise in the future. Should increases in long-term prices not materialize, certain of the Corporation's assets will be at risk for impairment."

And in -- in plainer English, if you think back to the chart you saw earlier over the decades the prices going up and down, and they generally trended up over time, what we're saying here is that is an assumption we make. Whatever the reasons are, we do expect prices to trend up.

Q. But if they don't --

A. But if they don't then certain of the company's assets will be at risk of impairment. In other words, we don't get that price increase, some of our assets are going to be at risk and we're telling them they will be at risk for impairment.

Q. Why did ExxonMobile decide to include that particular warning language in its 2015 10-K about impairments?

A. Well, because it's -- it's -- it's important in this impairment section to -- to clearly state what a risk would be going forward. Okay. So it's important so that people understand what the risk is and what might drive that risk.

Q. What feedback, if any, did Pricewaterhouse give ExxonMobile about the 2015 financial statements reserved to terminations or impairment analysis at issue here?

A. Well after concluding their extensive thorough review, they signed off on our financial statements, and that is included in the 10-K.

Q. Is there a mechanism for an auditor like Pricewaterhouse to qualify or condition review of a company's financial statements or public filings if there's something material that they conclude was improper or wrong?

A. Yes. If they conclude there's something material that's improper or wrong, then the word used is "qualified." That just means they don't agree with everything that's in there.

Q. Did they do that here?

A. They did not.

Q. Okay. So I want to talk -- I want to move on now and talk about specifically the R&DG assets, these undeveloped assets in and around Colorado and New Mexico area. Okay. Are you with me?

A. I am.

Q. Okay. So remind the ladies and gentlemen of the jury, what does it mean that something's undeveloped?

Was Kearl developed or undeveloped?

A. Kearl was developed.

Q. What about the Rocky Mountain assets?

A. So -- so in layman's terms you have property, so you have land, and you know there's -- there's hydrocarbons under it. Okay. But you haven't put in the investments and the facilities and everything you need to do to develop that

property and -- and get those -- those hydrocarbons out, the oil and the gas, you haven't done that yet.

Q. Where did Exxon get these assets?

A. They were included in the acquisition of XTO.

Q. Were they all of XTO or just a small part?

A. Oh, they were a very small part of XTO.

Q. So we've heard about this impairment analysis and -- is it a multistep test?

A. Yes, it's a multistep test.

Q. So can you just tell us in a couple of sentences what the test is and how it works?

A. Sure. Step one is to ask yourself has there been something called a trigger.

And what -- what that really means is has something changed that could be significant enough that might cause you to impair the assets. If the answer is yes, then there's a second step where you calculate, using those price forecasts that you saw out to the end of the project, which could be 30, 40 years, how much revenue are you going to make, how much is it going to cost, and the net. You look at that number and you compare it to the amount -- what we call carry-value. It's -- it's how much did -- did you pay for that asset, how much do you have, and it's sitting on your balance sheet. And if that's a hundred and you add up all of those what we call cash flows, that's money coming in the door, if -- if what's on your books is a hundred and what's coming in is 200, you -- you don't -- you stop.

If what's on your books is a hundred and what comes in is 50, you need to impair that asset, it's no longer worth what you have on the -- on the books.

And then step three is you actually do the impairment calculation.

Q. So you remember this from the opening, sir (indicating)?

A. Yes, I do.

Q. Does this accurately describe the -- the test you just testified to the jury about?

A. Yes, it does.

Q. Okay. Did Exxon determine that there was a trigger event that had occurred that required some additional analysis?

A. We did not identify a trigger event to require that.

Q. Then let me ask you this.

Did Exxon, nonetheless, still do the analysis that's reflected in that chart?

A. Yes, we did. We --

Q. Why?

A. -- we wanted to be absolutely sure, without -- without any doubt -- and, remember, this background of everybody's looking and there's all kinds of scrutiny and things are going on in the industry, we said, hey, let's go ahead and do

**App. 180**

all that work and let's see if there's a problem or not.

And we did all that work. There was not a problem in 2015, and so we were done.

Q. Is that sort of what they -- have you ever heard the term belt and suspenders?

A. Yes, I have.

Q. Is that what this was?

A. Yeah, that would be -- that would be one way to look at it, sure.

Q. When you're doing this assessment you mentioned that you have to look into the future.

A. Yes.

Q. Seems like that's hard to do.

A. Given that chart we looked at earlier, it's -- it's very hard to do.

Q. But is that what the rules require?

A. No. The -- the -- the rules require you to use the -- your planning basis -- you heard a lot about the planning basis yesterday. So what the rules say is nobody knows what the future is going to be, but you have a basis that you use to make investment decisions, Mr. Swiger talked about that yesterday, so if you're going to make multibillion dollar, multiyear investments you have to have a basis to do that, you have to have a price forecast, and the rules say, hey, you take that same price forecast that you're using to make

big investment decisions and you use that in your impairment analysis. They don't want you using two different things. So we used the same basis. Those numbers you saw in those little boxes, those are the same numbers we used for impairment.

Q. So is -- are there published groups that look into the future and make projections about gas prices or oil prices?

A. Yes. There are consulting firms and other -- other organizations that also make price projections.

Q. Why don't you just rely on those instead of your own?

A. Well, because we do all the work to come up with our -- with our own prices. And -- and if we were going to -- again, if we're going to make huge long-term investments, we're -- we're going to do the work to satisfy ourselves that the bases we're using to make those investments are sound.

Q. What relevance is it that the asset is expected to have a 30- or 40-year life versus, say, one that might have a 2- to 3-year life in doing these forecasts?

A. Well, it's -- it's -- it's real important to think about all of the long-term supply demand economics, everything that goes into trying to figure out what a price would be.

If you -- if you just took today's prices, they can be volatile. And think back to where we are today, if -- if you're doing a long-term investment you wouldn't use what the price was a few months ago, you wouldn't use what it today.

So that -- that just wouldn't be prudent.

So you want to make this long-term projection and match that up with the investment profile of the project you're going to do.

Q. Mr. Rosenthal, let me ask you though, why wouldn't someone say, hey, oil is $120 a barrel, I'm going to make all my investment decisions based on that lasting for the next five years?

A. If you used that basis to make a long-term decision, and you recall that chart we saw with the volatility, you're going to make a very bad decision.

Q. Well, what about the reverse though?

What if the -- what if the gas prices or oil prices are super, super low?

MR. BURKHOLZ: Your Honor, He's been leading him all morning. He's doing it again.

MR. MELSHEIMER: I'm just trying to provide an example. I'm happy to rephrase it.

THE COURT: Okay. Try not to lead.

MR. MELSHEIMER: Thank you, Your Honor.

BY MR. MELSHEIMER:

Q. What about the opposite situation, when prices are low?

A. If you just look at the low prices today, you -- you're probably going to not make a -- make very many investments, because you just wouldn't have -- because of the money it

takes in a very low-price environment, say I'm going to use that for 40 years, you wouldn't make any investments and then the market would turn up and you'd wish you had.

Q. Let's take a look at Plaintiff's Exhibit 70. You were asked about this. Do you remember the questions that you were asked on this?

A. Yes, I do.

Q. The chart. I'm sorry.

A. Yes. Yes.

Q. What is shown on this chart?

A. So the title is the "Upstream Impairment Comparison." And -- and this is a chart we used regularly when comparing our results, the results that we publish quarterly and annually, to the results of our competitors, just trying to find out who's doing a better job. And when you're doing that you want an apples-to-apples comparison of your earnings or your profits.

So we go in and look at all of our competitors, and we -- and ourselves, and we look for things that aren't normal, things that are outside of the day-to-day or month-to-month operations, and we pull that out. That way when we're comparing our company to others neither one of us have those items in.

And as you can see from the chart, some of these impairment numbers are quite large. So you wouldn't take

your fourth quarter '15 earnings that don't have an impairment and compare them to the earnings of these people because you'd think you were doing a whole lot better on an operating basis.

So it's important to understand what's included in our competitor earnings and, as you can see on this chart, impairments were a big item over this period.

Q. Tell the jury whether or not you were looking at these competitive impairments to determine whether or not Exxon should do impairments?

A. Absolutely not.

MR. BURKHOLZ: He's leading, Your Honor.

THE COURT: Don't lead.

BY MR. MELSHEIMER:

Q. Why were you . . .

The jury has heard a little bit about depreciation expenses. Could you tell the jury what that is?

A. Sure. So depreciation expense is -- is how you record using up an asset. So I -- I'll just give you a real quick example.

If -- if you buy a delivery truck for a hundred dollars and you think that truck is going to last ten years, well, that hundred dollar check that you write it goes out today. Right? But it's going to last for ten years. So when you put together your profitability statement, you got your

current revenues and costs, you're paying the labor, the cost of the van, you don't want to put that hundred dollars that you spent in -- in that month or that year because it would give you a number that -- that wasn't representative of the asset, because the next year you'd have zero and then you'd think you were making a bunch of money.

So we have what's called the matching principle, which says let's -- let's match these revenues and expenses. So if I'm going to have ten years of this hundred dollar asset, I'll take $10 a year. That's called depreciation expense. Now, of course, it's a noncash expense, because the cash already went out the door on day one when you wrote the check for the van. But the way we keep the books is we take that $10 a year for ten years as depreciation expense. We're using up the asset.

Q. What does impairment mean in relation to depreciation?

A. So what impairment says -- and I'll -- again, I'll use this example because it -- it's easy. So you're out a couple of years and something happens, you -- you wreck the van. Okay?

And now you've got six years left, right?

And so you've got $60 left on your books. Now, this van is not worth $60 anymore. It's worth 20. So instead of doing the $10 a year depreciation expense, you accelerate that. You say, hey, we've used this thing up faster. And

you take a write-down, which accelerates the depreciation expense, so that end up have a value on your books for the rest of the asset, that life, that reflects what it's worth. And you -- you take all of that expense. That goes to earnings when you do it. Okay?

So when you write-down that asset you -- you put it right in earnings. Still noncash, but you got to put it in current period earnings

Q. Can you still drive the truck?

A. Yeah. You probably could get it fixed. You could still drive the truck.

Q. Even though it's been written down?

A. Yes.

Q. Do all the competitor oil companies operate under the same set of accounting rules or do some operate under different rules?

A. Some operate under different rules.

Q. What are the ones that operate under different rules?

A. Well, on this chart you can see we've got asterisks next to some international oil companies outside of the U.S., Shell, BP, Total, for example, and they report on something down at the bottom "IFRS". All I'm going to tell you about IFRS is that stands for International Financial Reporting Standards. So they got a different set of books. U.S. companies use U.S. rules.

Q. Are those rules different or the same with respect to write-downs?

A. Oh, they are different.

Q. Okay. Is "write-down" another way of saying "impairment"?

A. Yes, it is.

Q. I'm going to show you Plaintiff's Exhibit 55, which has been preadmitted.

Do you recognize this as a -- well, tell the jury what it is.

A. Okay. This is -- it's called XTO Asset Recoverability Review. So here we are in November of 2015 and we are reviewing with Pricewaterhouse Coopers, our independent auditor, the recoverability review that we did.

And this ties back to what we mentioned earlier. We didn't have an impairment trigger, but we wanted to do all this work anyway. So we said, okay, we're going to do an Asset Recoverability Review, and we did, and this is our review with the independent auditor of the work we did.

Q. Whose handwriting is on that document, sir?

A. That looks like Joe Horne's handwriting.

Q. Do you see the initials there DSR?

A. Yes.

Q. Is that you?

A. That is me.

PAMELA J. WILSON, CSR/RMR/CRR

**App. 182**

Q.   Did you or did you not attend this meeting?

A.   Oh, I -- I did attend this meeting.

Q.   Okay.  What role did Pricewaterhouse play, if any, in reviewing this analysis in this exhibit?

A.   Oh, they reviewed every bit of it in detail.

Q.   Why did you give them this Exhibit 55 to review?

A.   Well, we wanted them to know what we had done and why we had done it, show them the results, give them the information they needed so they can then do a very thorough, detailed review.

So in this package is a lot of detailed numbers and analysis, but they will then go down and look way down underneath in the organization, one of those bottoms-up processes, and check all of our work, all of our assumptions, all of our processes, to verify that what we showed 'em was correct.

Q.   So we've heard about this 70-page white paper that Mr. Horne and his team put together.  Do you remember that?

A.   Yes, I do.

Q.   You were asked some questions about that --

A.   Yes.

Q.   -- by plaintiffs' counsel?

A.   Yes, I was.

Q.   Was that or was that not provided to Pricewaterhouse?

A.   Oh, that was provided to Pricewaterhouse.

101

Q.   Why did you show that to Pricewaterhouse?

A.   It was -- it was a way to memorialize in writing for them what we had done and why, so they would know -- understand what we were doing and why and then look at the results.

Q.   Have you -- do you remember the term from school "show your work"?

A.   Yes, I do.

Q.   Was -- was the 70-page white paper showing your work or something else?

A.   That would be a good way to put it.

It was -- it was this is our work

Q.   Why was it important to show that?

A.   Well, because it -- it's important for PwC to have access to all of our work and what we're thinking of doing so they can do an appropriate review.

MR. MELSHEIMER:  Your Honor, this might be an appropriate time to take lunch, if that's the court pleasure.

THE COURT:  It is.

All right.  Ladies and gentlemen, your lunch is in there.  See you back in a little over an hour.  Thank you.

Thanks, Mr. Rosenthal.

(Jury exits the courtroom.)

MR. MELSHEIMER:  Judge, may we be excused?

THE COURT:  Yes.

102

(Recess taken at 11:57.)

(Proceedings continued in Volume 3B.)

103

INDEX - VOLUME 3B

| WITNESS NAME | Page | Line |
|---|---|---|
| DAVID ROSENTHAL | | |
| DIRECT EXAMINATION BY NARRATIVE ................... | 17 | 15 |
| CROSS EXAMINATION BY MR. MELSHEIMER .............. | 39 | 2 |
| CROSS EXAMINATION (CONT.) BY MR. MELSHEIMER ..... | 68 | 9 |

PLAINTIFF EXHIBITS

| Exhibit | Description | Identified | Admitted | Denied |
|---|---|---|---|---|
| 65 | White paper ............ | 23 | 23 | |
| 75 | 2016 Analysis .......... | 26 | 25 | |
| 125 | 8-K ....................... | 31 | 31 | |
| 128 | Email ................... | 25 | | |
| 227 | 8-K ....................... | 35 | 36 | |
| 518 | 2016 10-K .............. | 38 | 38 | |
| 551 | Email with articles ... | 31 | 32 | |

104

PAMELA  J.   WILSON,  CSR/RMR/CRR

App. 183

< Dates >
4.0.    22:21
April  30:8
APRIL 30, 2026
1:28, 4:1
August of 1979
47:25
December
68:15, 68:23,
69:1, 69:3,
71:3
December 11th
71:8
December 31st,
69:11
December 31st,
2015.    60:18
February 10th,
2016,   23:15
February 28th
71:8
February 28th,
69:12
February 29th
19:7
February of
2016   60:18
Jan 1.    60:25
January   26:13,
35:25, 58:8
January 1
10:10
January 1.
60:11
January 1st
60:10
January 31st
26:21
January 31st
2017  36:8
January,    58:3
March 25th,
2014.    25:11
March 28th
30:3
March 28th,
2016   28:9
March 31st of
30:5
March of 2016

29:19
March of 2016,
29:6
May   17:18,
38:25, 61:16,
63:24, 68:7
November of
2015   20:24,
100:12
October   34:12,
86:12
October 2015
31:10
October 2016,
85:22
October 30th
2008   36:14
October 8th,
2016,   30:19
October of
86:6
October of 2016
86:9
September of
2017   13:13
September,
October,    10:25
$10 58:23,
98:10, 98:14,
98:24
$12 17:24
$120 95:6
$125 58:3
$2 26:22, 37:5
$360 34:16
$4 24:12,
24:13, 27:12,
28:20
$50 45:10
$60 98:22,
98:23
$84. 34:2
(214)758-1500
2:49

< 1 >
1 6:25
10-K. 11:7
10-ks 21:4

100 2:41, 41:20
10019-6064 2:36
10:4444.) 68:3
11 28:12
110 58:25
1100 3:14
117 10:8
11910 2:3
11.0606.) 68:4
11:5757.) 103:1
12 21:23
120 42:5, 58:25
120-page 41:14
120-pages 42:4
122 18:3
125 31:2,
104:23
128 25:10,
63:6, 104:25
1285 2:35
130 42:5
13th 3:14
14 34:12
15 33:14, 59:4,
97:1, 104:8
15-page 64:5
17 35:5, 104:8
18 46:6
19 59:13
1900 1:47
1974 58:18

< 2 >
2 7:5, 7:12,
7:13, 20:19,
74:3, 81:4,
104:10
2- 94:17
2.3 34:1
20 33:22,
33:24, 59:4,
98:23
20/20 85:3,
85:9
200 92:2
2009 80:1
2013 76:11,
76:22, 77:4
2014 49:18,

63:6, 63:25,
82:20
2016 23:10,
26:8, 29:1,
29:13, 29:17,
30:17, 33:25,
37:24, 38:8,
68:13, 84:12,
84:13, 86:1,
86:14, 88:3,
104:21, 104:29
2016." 76:12
2020 24:9
2020-plus
22:18, 24:12,
27:8
2025 27:11,
28:21, 29:12
2025-plus 27:16
2026 58:18
212 2:37
214 1:37, 2:19,
2:26, 3:17
220 2:3
2200 2:47
227 35:24,
36:4, 36:5,
104:27
228 28:1
23 104:19
2300 2:17, 2:24
231-1058 1:49
24th 71:9
25 104:21,
104:25
26 104:21
2601 2:17
2801 2:24
28th 34:12

< 3 >
3 10:4, 31:9,
32:21, 33:6,
36:11, 80:22
3-year 94:18
3.5 27:21,
27:24, 30:12
3.50 29:2,
29:12

afternoon 34:6
aggregating
50:24
ago 4:10, 7:6,
50:20, 94:25
agree 14:17,
22:23, 51:17,
90:8
agreed 5:14,
5:16, 5:18,
9:7, 11:11,
12:18, 25:3
agreed-to 9:8
ahead 61:24,
68:6, 81:21,
92:25
ALEX 1:43
already 5:21,
8:23, 9:6,
11:3, 12:2,
14:18, 28:2,
72:20, 82:11,
98:12
amend 41:24
America 83:8,
84:7, 88:7
Americas 2:35
AMITAV 2:32
among 74:21
amount 26:22,
52:13, 91:21
Amounts 83:9
Analysis 20:7,
20:13, 22:1,
22:4, 22:10,
22:15, 23:10,
23:23, 23:24,
24:14, 26:8,
26:15, 26:17,
44:22, 49:3,
64:10, 75:25,
86:22, 87:8,
89:23, 91:7,
92:15, 92:18,
94:2, 101:4,
101:12, 104:21
analyst 48:15,
48:18, 48:21
analytical
48:22

ANDREW 1:18
anniversary
47:5
Announcing
36:7, 36:23,
37:7, 70:23
annual 51:20
annually 96:14
Answer 21:14,
21:15, 47:15,
51:23, 76:3,
77:12, 91:16
anti-climate
64:2
anticipate
76:12, 76:24
anybody 15:18,
40:20, 85:8
anyway 100:17
API 73:8
appear 35:21
appears 13:11,
51:3
apples-to-apple
s 96:16
applicable 56:5
applies 27:11
Appreciate
13:8, 13:25
approach 25:14
appropriate
61:19, 102:16,
102:18
appropriately
9:23
approving
10:17, 12:17
April 30:9
area 47:22,
90:14
argue 8:16,
8:18, 21:17
argument 8:12,
8:14, 12:10,
13:13, 63:7,
66:4, 66:5
around 16:17,
41:12, 46:8,
46:18, 46:21,
70:13, 90:14

article 34:9,
34:11, 35:1,
35:4
articles 18:18,
18:24, 19:1,
32:2, 32:9,
32:13, 33:1,
33:8, 35:18,
45:6, 104:31
assert 11:19,
13:16
asserted 32:15
assessed 78:7
assessment
93:10
Asset 23:11,
63:9, 63:20,
76:1, 91:23,
92:4, 94:16,
97:19, 98:5,
98:9, 98:15,
99:3, 99:6,
100:11, 100:18
assets 20:13,
26:18, 27:6,
27:24, 30:14,
34:17, 37:8,
40:13, 43:24,
44:11, 44:13,
65:17, 75:16,
75:22, 88:24,
89:3, 89:10,
89:12, 90:13,
90:14, 90:21,
91:3, 91:16
assignment
48:23
assistant 49:11
assume 15:15,
37:24
assuming 12:2
assumption
88:24, 89:7
assumptions
101:14
asterisks 99:19
attached 5:19,
7:9, 32:2,
32:5, 50:19
attaches 31:10

attaching
31:19, 36:15
attachment 6:18
attend 56:23,
101:1, 101:2
auditor 52:18,
70:16, 90:2,
100:14, 100:19
AUDRA 2:28
Austin 2:13,
2:35, 2:47
Avenue 2:3,
2:35, 2:47
aware 29:19,
73:25, 79:18
away 11:15

< B >
B. 1:43, 2:1,
2:2
Back 14:3,
15:12, 17:12,
25:25, 44:13,
49:7, 49:11,
55:5, 57:11,
58:3, 58:8,
59:2, 59:6,
63:6, 68:11,
70:18, 71:21,
79:24, 89:4,
94:23, 100:15,
102:21
background
65:11, 66:15,
73:20, 73:24,
78:3, 92:23
bad 70:20,
74:25, 95:11
balance 91:24
balances 50:11
BALON 2:1, 2:2
bankers 17:24,
19:13, 19:15
barrel 45:10,
58:3, 58:24,
95:6
barrels 30:21,
38:16, 38:18,
45:25, 82:6

3.6 30:20,
31:14, 35:20,
38:18
30 4:10, 91:19
30- 94:17
31 104:23,
104:31
31st 35:25
32 104:31
33 21:21
35 104:27
36 104:27
373-3000 2:37
38 104:29
3811 1:35
39 104:10
3: 1:15
3A 1:25, 4:1
3B 104:1
3B. 103:2

< 4 >
4 24:15, 24:17,
27:9, 27:18,
27:21, 29:2,
59:15, 82:14
4.0 22:24
40 86:18,
91:19, 96:2
40-year 67:18,
94:17
401 63:7
403 63:7
4100w 2:47
42 48:4, 48:16,
57:20, 86:17,
86:18
436 38:16

< 5 >
5 36:18, 36:21
5.2 22:21,
2:25, 2:42,
22:24, 24:14,
24:17, 27:9,
27:18
50 92:4
50th 47:5
51 20:17

518 37:23,
104:29
546-5400 2:43
55 100:7, 101:6
551 31:18,
31:22, 104:31
56 87:18
57 88:16
59 88:15

< 6 >
6-CV-03111-K
1:15
60 69:9, 69:10,
69:11, 84:20
619 1:49
63 24:6, 72:19,
84:20, 87:13
65 23:2, 38:3,
104:19
651-5000 2:26
655 1:47
66 86:15
662-1557 3:17
68 104:12
698 5:5, 5:6,
9:15, 10:8

< 7 >
7 23:15, 38:12
70 27:2, 96:4
70-page 101:17,
102:9
7084 2:41
70s 59:6
713 2:43
744-3300 1:37
75 24:23,
24:24, 25:6,
26:4, 104:21
75201 2:18,
2:42
75229 1:36
75242 3:15
75243 2:4
764-4446 2:19

< 8 >
8-K 31:3,
31:10, 36:7,
36:15, 104:23,
104:27
825 1:35
880 1:35

< 9 >
9 104:12
92101 1:48
972 2:5
991-1582 2:5

< A >
A. 1:45, 6:14,
7:1, 7:11,
7:16, 11:5
able 86:6
Absolutely
39:16, 41:22,
54:10, 54:13,
74:19, 75:14,
78:13, 92:22,
97:11
accelerate
98:24
accelerates
99:1
access 102:15
accountability
41:9
Accounting
41:2, 46:1,
49:16, 50:3,
50:24, 52:23,
52:25, 53:1,
56:23, 59:6,
70:5, 99:15
accuracy 41:9,
42:20
accurately
92:10
accusation
39:9, 39:11
accused 39:7,
39:12

acquisition
91:4
across 24:7,
50:16
ACTION 1:17
activist 64:1,
64:9, 64:22
activists 65:18
actual 35:23,
86:16
Actually 18:20,
20:6, 20:17,
24:8, 28:17,
37:7, 44:22,
76:9, 86:2,
87:18, 87:23,
88:16, 92:6
add 86:24,
91:24
added 71:16,
79:25, 82:21
adding 81:10
addition 73:8,
80:4
additional
85:2, 85:19,
86:1, 86:3,
92:14
address 9:3,
67:6
Addresses
63:12, 84:24
adequately
84:24
Administration
46:14
Admitted 5:21,
9:7, 9:15,
9:18, 12:18,
12:19, 23:6,
25:6, 31:6,
32:14, 36:5,
38:1, 104:16
adopted 64:14
advance 57:23
adverse 81:12
advise 53:5
advisors 59:23
Affairs 32:24
after-tax 26:22

85:23
base 50:24
Based 55:16,
57:19, 59:25,
75:22, 78:3,
82:23, 82:24,
95:7
bases 75:18,
94:15
basically
64:14, 69:12,
71:4
basis 58:5,
58:7, 68:22,
75:21, 80:3,
83:10, 93:18,
93:19, 93:20,
93:23, 94:3,
95:9, 97:4
Baytown 48:23,
48:24
be-all 9:23
beat 34:7,
34:19, 34:25
become 79:18
beginning
30:18, 51:16,
58:18, 72:13
Behalf 1:7
behind 5:9
belabor 11:9
believe 21:21,
22:22, 25:2,
32:23, 61:23
believed 41:14
bell 11:3
belt 93:5
bench 25:17,
25:24
best 16:4,
16:23
bet 17:19,
46:17, 59:5
better 24:10,
40:18, 47:14,
96:15, 97:3
betting 46:16
BIERL 1:44
big 15:12,
70:6, 70:7,

70:8, 81:17,
94:1, 97:7
biggest 35:14
bill 50:3,
50:4, 58:9
billion 17:24,
26:23, 30:20,
31:14, 34:16,
35:20, 37:5,
38:18
binder 61:12,
61:13
bit 16:21,
25:17, 46:1,
58:8, 59:15,
64:13, 67:22,
87:23, 97:16,
101:5
bite 65:13
Bitumen 38:14,
43:11, 43:12,
44:15, 53:24,
55:3, 81:22
blame 10:2,
16:20
blank 6:23,
71:14
Bloomberg 35:8
Board 51:11
body 55:12
BOGGS 2:46
bold 81:9,
82:10, 82:19
bond 17:24,
18:24, 19:7,
29:16, 30:23
book 67:23
booking 44:20
bookings 43:16
books 33:24,
38:20, 44:11,
44:14, 92:1,
92:3, 92:5,
98:13, 98:22,
99:2, 99:24
BOONE 2:23
born 46:4
boss 24:1
bottle 53:18,
53:19, 53:20,

53:21, 81:22
bottom 26:10,
37:15, 50:1,
51:10, 74:8,
87:16, 99:22
bottom-up 52:4
bottoms-up
101:13
Boulevard 1:35
boxer 16:13
boxes 94:4
BP 99:21
BRADLEY 2:1,
2:2
break 40:17,
61:19, 61:25,
62:5, 68:2
breaks 26:2
brief 30:18
briefer 51:23
briefly 25:15,
25:22, 25:23
bring 12:11,
20:19, 24:6,
24:8, 26:6,
27:2, 28:3,
28:18, 29:4,
29:10, 37:12,
38:3
bringing 73:20
broad 66:3
broader 87:25
Broadway 1:47
brother 16:7
buck 59:14,
59:16
buckets 70:6
Bulldog 46:16
bullet 20:22,
21:4, 21:13,
36:25, 77:21,
78:16
bunch 32:2,
98:6
Burkholz 1:45,
32:4
Business 45:20,
46:14, 49:5,
51:6, 56:9,
58:1, 58:15,

58:16, 58:22,
64:25, 65:5,
77:22, 78:17,
80:10, 82:7,
87:3, 87:8
button 14:10
buy 97:21
buying 74:18

< C >
C. 2:39
CA 1:48
calculate 91:17
calculation
55:19, 92:7
California
12:11
call 50:2,
50:12, 51:5,
54:14, 76:20,
80:16, 87:7,
91:21, 91:25
called 44:1,
47:23, 51:20,
52:25, 53:7,
64:2, 70:9,
70:11, 71:18,
72:7, 81:8,
91:13, 98:7,
98:10, 100:11
calls 5:6
camera 13:6
Canada 83:8,
84:7, 88:7,
88:13
capable 43:2
carbon 63:8,
63:20
career 48:12
careful 67:15,
67:16, 77:23,
78:18, 78:25
CARPENTERS 1:9
carried 44:11,
71:11
carry-value
91:22
case 5:22, 8:4,
10:5, 10:11,

App. 184

13:17, 28:24, 39:7, 61:7, 62:1, 64:21, 66:21, 67:19, 82:8, 84:7
Casey 6:6
cash 22:11, 50:4, 91:25, 98:11
cause 91:15
caused 4:24
celebrate 47:5
cents 59:13
CEO 24:3, 37:17, 37:19, 38:6
Ceres 64:2, 64:22
certain 32:12, 39:25, 53:25, 56:15, 83:6, 84:6, 88:4, 88:24, 89:2, 89:10
certainly 57:16, 59:3
certainty 55:8
certify 19:17
Certifying 38:8
CHAKRABORTY 2:32
change 22:24, 44:18, 55:22, 55:25, 56:1, 56:8, 58:11, 64:2, 81:10, 84:1
changed 19:18, 88:6, 91:15
Changes 44:21, 58:10, 73:21, 88:25
charge 29:14, 37:4, 53:15, 69:8, 80:18
chart 38:21, 57:14, 58:17, 58:24, 59:3, 74:7, 80:23, 89:5, 92:19,

93:14, 95:10, 96:8, 96:10, 96:12, 96:24, 97:6, 99:19
charts 56:10, 75:4, 75:21
Chase 14:11
Cheapest 59:12
check 97:23, 98:12, 101:14
checks 50:10
Chemical 48:23
Chevron 21:9, 34:7, 34:19, 57:5
children 47:8, 47:9
CHILDRESS 3:3
Chile 49:4
circumstances 44:18, 75:17
claimant-change 64:24
claiming 11:18
clarified 73:2
CLASS 1:17
clean 66:1
cleaner 65:20
clear 6:11, 18:12, 56:18, 57:20, 57:22, 57:23, 60:17, 68:21
cleared 8:20
clearly 89:18
clients 18:8, 66:1
climate-change 64:10
closest 52:5
Cokes 16:7
colleague 72:16
collected 23:23
collecting 52:22
college 46:9, 46:10, 46:11, 48:1
Colorado 46:5, 90:14

columns 54:16
comes 49:20, 49:21, 50:3, 50:11, 52:7, 52:19, 80:15, 92:3
coming 11:17, 77:1, 80:18, 91:25, 92:2
comment 76:11, 76:15, 76:20, 85:4
commentary 86:24
comments 72:24, 73:10, 87:15
Commerce 3:14
Commission 66:12, 71:23, 72:17, 79:4
committed 62:21
communicated 20:25, 56:21
communicating 25:12
communications 56:19
companies 21:5, 56:25, 73:11, 75:4, 75:12, 76:1, 77:2, 77:17, 99:14, 99:20, 99:25
Company 19:14, 20:12, 21:1, 22:14, 23:24, 29:22, 30:4, 30:20, 31:14, 34:1, 37:19, 38:20, 41:1, 47:25, 48:4, 48:8, 49:10, 49:17, 49:20, 51:10, 52:21, 57:20, 60:6, 64:9, 65:19, 66:20, 74:14, 75:7, 75:23, 77:11, 77:13, 81:12, 89:10,

90:3, 96:22
compare 27:16, 91:21, 97:2
comparing 96:12, 96:22
comparison 96:16
Comparison. 96:11
competitive 97:9
competitor 97:6, 99:14
competitors 74:21, 96:14, 96:18
compile 73:10
complaining 13:20
completely 44:4
compliance 55:14, 80:19
comply 53:4, 55:12, 80:14, 80:16
comprehensive 71:7
computer-aided 3:8
conceal 39:20
concealing 65:8
concepts 44:5
conclude 86:6, 90:5, 90:6
concluding 89:24
conclusion 26:20, 80:6, 80:7
condition 39:13, 81:13, 90:3
conditions 22:10, 55:9, 55:17, 57:8, 82:23, 86:22
conduct 6:3
conferences 77:16
confidence

deleting 63:18
delighted 65:18
delivery 97:21
demand 88:25, 94:20
Demand. 81:8
Demonstrate 78:7
Denied 10:1, 104:16
dent 33:21
Denver 46:5
Deny 15:14
department 6:13
department. 6:15
depend 67:4
depending 56:9
deposition 63:15
depreciation 97:16, 97:18, 98:10, 98:14, 98:16, 98:24, 99:1
describe 86:20, 92:10
Description 36:19, 104:16
detail 12:21, 12:23, 101:5
detailed 76:17, 101:9, 101:11
determine 92:13, 97:9
develop 81:16, 90:25
developed 90:19, 90:20
developing 85:4
Diego 1:48
difference 52:20
different 10:23, 44:3, 52:21, 61:2, 64:4, 69:15, 69:17, 69:20, 69:22, 71:2, 72:4, 75:16,

75:17, 75:19, 94:2, 96:16, 99:17, 99:18, 99:24, 100:1, 100:3
difficult 21:17
diligence 17:24, 18:21, 18:23
dip 74:8
DIRECT 17:16, 39:21, 104:8
directly 56:19
director 49:5
Directors 51:12
disclose 56:8, 80:5, 80:11
disclosed 79:6
disclosure 26:21, 30:10, 30:12, 30:19, 30:24, 31:16, 79:19, 85:2, 85:20, 85:21, 86:1, 86:4
disclosures 52:9, 53:14, 53:16, 55:1, 55:24, 71:20, 72:7, 78:23, 80:20, 87:12
disclosures. 77:23
discuss 62:6, 78:10
discussed 10:10
discussing 35:22, 73:13, 80:21
Discussion 17:7, 17:10, 25:24, 30:18, 62:17, 63:4, 86:22, 87:1, 87:7, 87:21, 88:17
discussions 57:2
DISTRICT 1:1, 1:2, 1:27

DIVISION 1:3
documents 5:6, 5:21, 7:18, 10:11, 12:8, 20:10, 42:22, 51:2, 51:9
doing 15:14, 49:2, 50:17, 52:24, 54:19, 60:13, 69:24, 79:7, 85:14, 93:10, 94:18, 94:24, 95:16, 96:15, 97:3, 98:24, 102:4, 102:15
dollar 59:19, 93:22, 97:23, 98:9
dollars 59:8, 97:21, 98:2
done 11:16, 23:23, 41:16, 44:18, 50:8, 55:11, 85:14, 91:2, 93:3, 101:7, 101:8, 102:3
door 10:19, 62:20, 62:23, 92:1, 98:12
doubt 15:18, 92:23
DOWD 1:46
down 21:12, 22:7, 23:12, 25:8, 34:1, 34:17, 34:20, 45:2, 45:20, 57:24, 62:8, 69:21, 77:11, 81:19, 81:20, 82:1, 82:2, 82:4, 89:6, 99:12, 99:22, 101:12
downs 58:19
downturn 45:9
draft 64:15, 72:9, 72:15

drafting 64:7, 72:6
dramatically 58:11
draw 60:21
drive 59:18, 89:20, 99:9, 99:11
driving 44:20
dropdown 24:14
dropped 57:16
dry 19:25, 26:18, 30:13, 37:5, 37:8, 40:13, 65:17
DSR 100:22
due 17:23, 18:21, 18:23, 88:25
During 39:23, 40:2
dynamic 56:11

⟨ E ⟩
E. 2:13
earlier 15:24, 71:24, 76:8, 87:12, 88:14, 89:5, 93:14, 100:15
early 23:10, 59:3, 88:3
earmuffs 17:13
earnings 31:20, 32:18, 33:2, 35:25, 36:15, 36:19, 36:23, 37:4, 96:16, 97:1, 97:2, 97:6, 99:5, 99:7, 99:8
easy 58:15, 58:16, 98:18
economic 55:17
economics 94:20
ED 1:26
effect 81:12, 82:3
efficient 20:4

43:4, 50:20
confident 41:18, 41:20, 41:23, 42:19
confusing 60:13
Congratulations 47:6
connection 39:17, 40:16, 65:24
consider 12:25, 18:9, 85:2, 85:19
Considerations 80:25, 82:17, 84:15, 84:24
considered 9:21, 10:3
consulting 94:8
CONT. 68:9, 104:12
contained 18:16, 41:15
contents 41:23
context 49:23, 63:25, 66:16, 79:11
contextualize 77:24
Continued 17:16, 103:2
control 49:22, 50:23
controller 6:14, 11:5, 23:21, 41:2, 49:9, 49:11, 49:15, 49:17, 49:19, 49:21, 50:15, 50:22, 51:25, 69:23
controllers 49:1, 53:12, 53:13, 69:23, 70:6
controls 41:12, 50:10
conveying 56:15
cookbook 54:15, 54:24, 80:12

Coopers 52:18, 70:17, 73:12, 100:13
coordination 49:3
copper 49:5
copy 4:9
core 43:19, 55:23
corner 28:18
corporate 46:12, 49:14
Corporation 1:17, 49:7, 49:12, 49:16, 64:3, 89:3
CORTELL 2:21
Cost 34:18, 34:24, 75:18, 81:17, 81:19, 91:20, 98:1
costs 22:3, 44:12, 81:15, 81:19, 81:25, 82:7, 98:1
counsel 74:24, 101:22
couple 23:16, 54:13, 59:7, 91:10, 98:18
course 44:19, 49:22, 50:14, 55:10, 58:12, 65:12, 81:24, 82:9, 98:11
court. 17:7, 17:10
courtroom 42:11
courtroom. 17:11, 62:3, 68:5, 102:23
CPA 23:19, 23:20
creating 39:23
creation 68:14
credit 50:4
credits 50:2
Creek 1:35
Crescent 2:41
Critical 10:11,

88:23
CROSS 39:2, 68:9, 104:10, 104:12
CRR 3:12
crucial 13:13
crude 34:16, 83:4, 87:18, 88:2
curative 8:12, 9:21, 11:22, 11:23, 12:7
current 22:3, 22:10, 55:9, 55:17, 78:9, 98:1, 99:8
currently 47:22
cuts 34:18, 34:24
cycles 83:25

⟨ D ⟩
D. 2:45
dad 47:13, 59:6
Dallas 1:3, 1:29, 1:36, 2:4, 2:18, 2:25, 2:42, 2:48, 3:15, 47:10, 49:11, 59:18
DANIEL 2:29
DAPHNE 2:33
Darren 37:14
data 39:24, 39:25, 40:4, 41:13, 50:11, 50:24, 51:2, 80:2
daughter 47:9
DAVID 1:19, 2:15, 11:5, 41:5, 104:6
day 4:14, 16:4, 34:6, 35:1, 35:19, 50:17, 69:13, 70:19, 70:20, 98:12
day-to-day

96:20
days 69:9, 69:10, 69:11
deal 12:7, 12:8
dealing 40:12, 74:12
deals 18:7
dealt 12:14
debit 50:4
debits 50:2
debook 31:14, 44:16, 85:1, 85:17, 85:19, 86:4
debooked 38:19, 83:10, 84:8, 84:11, 84:14
debooking 30:20, 30:24, 30:25, 35:19, 44:3, 44:20, 85:23, 86:11
debookings 43:16
decades 66:21, 89:5
December 68:19
decide 85:18, 89:15
decision 76:4, 80:8, 80:10, 95:9, 95:11
decisions 93:21, 94:1, 95:7
deck 73:15
decline 81:11
Defendant 9:7, 9:9, 21:20
DEFENDANTS 1:22, 2:10
defense 10:5, 10:12, 13:14
definition 55:6, 83:6, 84:4, 88:4
definitions 84:5
degree 46:12
delete 63:12

eight 33:8
either 7:10, 7:15, 12:23, 16:10, 16:22, 88:25
electric 50:3, 50:4
ELMO 12:6, 14:8
EM 21:16, 33:13, 42:17, 42:18, 43:1, 63:22, 69:21, 75:18, 85:1, 87:11, 101:15
Email 5:8, 5:11, 5:12, 5:15, 5:18, 25:11, 31:18, 32:5, 63:1, 63:10, 77:6, 77:10, 104:25, 104:31
EMILY 2:14
emperiodically 79:24
encouraging 67:25
end 4:13, 23:10, 29:18, 30:7, 30:9, 30:11, 54:25, 58:24, 91:18, 99:2
end-all 9:24
ended 30:5
ends 7:19, 60:22
energy 77:17
engineers 48:11
English 83:21, 83:22, 85:5, 85:6, 88:21, 89:4
enhanced 71:20, 72:7, 87:12
enhancement 80:24, 81:7, 82:15, 82:17
enhancements 71:18, 73:21,

78:5
enough 13:3, 43:20, 67:8, 70:4, 91:15
ensure 41:13, 42:22, 50:18, 53:3
enters 17:11, 68:5
entitled 63:17, 66:22
entry-level 48:15, 48:20
environment 28:10, 57:18, 57:19, 74:4, 75:2, 79:3, 83:23, 96:1
Environment. 78:9, 81:5
environments 78:17
ERIKA 1:42
error 50:13
errors 50:14
estimate 55:8, 55:16
estimates 34:19
Evander 16:11, 16:12
event 21:15, 85:1, 85:16, 85:18, 92:14, 92:16
events 84:25, 85:3
eventually 26:20, 73:13
Everybody 16:20, 17:13, 20:5, 43:4, 68:18, 75:20, 75:22, 79:22, 85:14, 92:23
everyone 74:12
Everything 8:4, 12:8, 41:10, 55:7, 71:22, 76:25, 90:8, 90:25, 94:20

evidence 9:15, 11:12, 11:13, 12:18, 12:19, 12:20, 15:5, 18:3, 20:18, 21:22, 23:7, 25:6, 26:5, 28:2, 31:6, 32:6, 36:5, 38:1, 65:21, 72:20, 80:23, 86:16
exact 12:14, 45:8, 61:5
exactly 67:12
EXAMINATION 10:16, 17:16, 39:2, 68:9, 74:23, 104:8, 104:10, 104:12
example 53:12, 55:1, 72:12, 88:19, 95:18, 97:20, 98:18, 99:21
examples 54:13
excess 64:23
excessive 79:19
Exchange 64:12, 66:11, 71:23, 72:17, 79:4
excuse 24:13, 51:4
excused 102:24
executive 25:12
executives 33:1
exercise 68:17
exercised 8:6
Exhibit 5:5, 9:8, 10:8, 18:3, 21:21, 23:2, 24:23, 25:3, 25:10, 28:1, 31:2, 31:18, 31:21, 37:23, 62:13, 72:19, 80:22, 82:14, 84:18, 84:20, 86:18,

87:13, 88:15, 96:4, 100:7, 101:4, 101:6, 104:16
EXHIBITS 104:14
exists 66:6
exits 62:3, 102:23
expand 80:2
Expansion 81:25
expect 49:22, 50:15, 55:10, 89:8
expectations 56:1, 56:8, 56:15, 56:21, 72:14, 74:1, 76:24
expectations. 34:8
expected 86:4, 94:16
expects 85:1, 85:17
expense 50:5, 97:18, 98:10, 98:11, 98:14, 98:24, 99:2, 99:4
expenses 97:17, 98:8
experience 60:1
expert 80:17
expertise 59:25
experts 52:25
explain 64:9, 66:14, 79:21, 83:20, 88:20
explaining 66:14, 87:5
exposures 78:8
express 57:2
extended 22:16, 83:5, 84:3, 88:3
extensive 89:24
extent 69:13
extra 69:13
extremely 8:21, 13:16, 43:2,

Exxon 1:17, 6:13, 16:21, 19:7, 19:16, 33:21, 34:7, 34:18, 34:24, 35:11, 36:7, 40:2, 40:6, 41:24, 47:24, 56:15, 56:19, 57:4, 75:13, 85:22, 86:1, 86:20, 91:3, 92:13, 92:18, 97:9
Exxonmobile 25:13, 33:23, 35:13, 39:14, 39:17, 39:24, 40:11, 40:16, 43:1, 48:9, 73:3, 74:21, 85:16, 89:15, 89:22
Exxonmobile. 74:5
eye 25:19

< F >
facilities 90:25
Facing 35:11, 35:14
fact 47:4, 60:2, 63:18, 63:20, 71:12
Factors 81:8, 84:9
facts 40:9
Fair 13:3, 20:11, 22:1, 22:8, 67:8
fairly 71:6
fall 72:25, 76:7
false 40:21, 41:15
familiarity 54:10
family 46:7
fan 46:16
fashion 80:12
faster 98:25
father 47:17
favor 10:13
February 60:9
Federal 3:13
feedback 89:21
feel 5:3, 16:24, 41:21, 41:22, 54:18
fellow 16:19
few 8:19, 11:6, 20:5, 21:5, 33:13, 42:17, 48:21, 72:22, 94:25
field 40:8
field-by-field 80:3
fields 80:5
fight 16:7
figure 94:21
file 60:9, 76:15
filed 51:18
filing 9:7, 9:9, 66:11, 74:2
filings 90:4
fill 54:17, 59:7
fill-up 59:6
finalized 21:1
finally 34:17, 35:4, 37:23
finance 46:12, 49:5
Financial 20:8, 30:4, 37:20, 39:13, 48:15, 48:20, 49:2, 49:3, 49:7, 50:2, 50:19, 51:1, 51:2, 51:3, 51:8, 52:6, 55:23, 70:2, 77:22, 78:8, 78:17, 81:13, 86:22, 86:25, 89:22, 89:25, 90:3, 99:23
financials 20:8, 20:11, 22:15, 22:16, 26:16, 38:8, 52:8
find 20:12, 24:20, 85:13, 96:15
fine 13:4, 16:14, 19:3, 32:7
finish 7:21, 67:1
finishes 67:7
FIRM 2:2
firms 94:8
First 6:19, 9:6, 23:9, 26:6, 26:10, 33:15, 34:13, 35:13, 36:20, 46:6, 47:24, 48:23, 53:11, 64:16, 72:15
fit 80:10
five 5:13, 16:18, 95:8
fix 9:14
fixed 99:10
Floor 3:14, 63:15, 63:16, 63:22, 64:18, 65:6
flows 22:11, 91:25
focus 20:21, 74:4
FOLKERTH 1:43
folks 11:4, 63:14, 64:18, 65:6, 69:5, 73:8
follow 40:18
following 24:22, 60:24, 61:1, 61:2, 61:5, 66:25
footnote 63:2, 63:4, 63:12, 63:14, 63:18, 64:18, 65:14, 65:15
forecast 93:24, 93:25
forecasts 91:17, 94:18
forecasts. 34:25
foremost 9:6
foreshadow 84:25
forever 44:7, 44:9, 66:2
forget 18:10
forgot 25:10
format 82:16
forms 52:19, 68:22
forward 71:14, 73:21, 89:19
found 30:12
four 5:7, 15:13, 29:25
four-night 47:20
four-page 5:7
fourth 30:1, 34:21, 36:7, 97:1
frame 69:6, 80:1
fraud 39:7, 62:22, 66:10
Friday 33:23, 34:16
front 5:8, 5:13, 11:3, 12:15, 12:16
full 64:16
function 49:1
FUND 1:10
fundamental 72:2
fundamentally 49:23, 50:1
fussing 15:23
future 22:11,

Hundreds 42:13, 42:14, 50:6, 50:8, 50:9
hydrocarbon 70:12
hydrocarbons 90:23, 91:1

< I >
idea 80:9
Identified 104:16
identify 92:16
IFRS 99:22, 99:23
ignore 18:10
imagine 65:18
impacts 57:17
impair 76:1, 91:16, 92:4
impaired 22:5, 22:6, 26:18, 26:21, 26:22, 27:24, 40:14
impairment. 89:3
impairments 19:20, 74:20, 75:5, 75:12, 89:16, 97:7, 97:9, 97:10
Implications 74:4
important 4:18, 10:4, 42:24, 54:6, 57:12, 70:15, 73:7, 73:19, 80:13, 81:14, 88:10, 89:17, 89:19, 94:19, 97:5, 102:13, 102:14
importantly 52:15
impression 74:21, 75:10
improper 90:5, 90:7
impropriety 11:18
improvement 88:13
improves 82:9
in. 62:23, 96:23
include 30:1, 37:4, 86:21, 89:15
included 20:12, 31:16, 37:10, 38:21, 41:13, 52:15, 53:14, 90:1, 91:4, 97:5
including 49:1, 68:17
inclusive 88:1
increase 89:12
increases 89:1
incremental 78:8
independent 52:18, 53:13, 70:16, 100:13, 100:19
INDEX 104:1
indicating 43:6, 43:10, 43:18, 92:8
indication 31:13
indicative 46:6
individual 42:25
Individually 1:6
Industry 21:6, 56:2, 56:6, 56:7, 56:20, 56:22, 57:5, 57:7, 57:13, 73:3, 73:5, 74:15, 75:5, 92:25
inflation 89:1
information 5:10, 51:5, 51:8, 52:22, 55:24, 68:23, 72:3, 73:14, 76:19, 76:23, 80:5, 101:8
initial 72:8, 72:9
initials 100:22
inside 43:20, 75:7
inspecting 87:1
instead 88:6, 94:10, 98:23
instruct 8:7, 8:8, 40:21
instruction 8:10, 8:12, 9:2, 9:21, 10:13, 11:22, 11:23, 12:7, 14:4, 15:1, 32:3, 32:7
instructions 15:6
integrity 42:20, 43:3
intent 39:13
interest 16:23, 72:1, 78:6
interested 57:17, 79:19
internally 73:9
International 50:16, 99:20, 99:23
investing 58:21
investment 93:21, 94:1, 94:24, 95:3, 95:7
investments 90:24, 93:23, 94:13, 94:15, 95:24, 96:2
Investor 49:13, 58:20, 58:21, 64:1, 64:2, 64:22
Investors 31:13, 39:18, 64:5, 65:1, 65:9, 66:13, 72:1, 74:16, 77:19, 83:23
involve 52:9
involved 11:7, 42:8, 42:9, 42:15, 52:21, 53:8, 54:20, 72:6, 72:8, 72:9, 72:11
involving 69:16
issue 15:12, 19:25, 21:1, 40:12, 62:6, 63:9, 79:19, 89:23
issued 19:8, 21:4, 23:16, 29:16, 30:4, 30:7
issues 15:16, 29:22, 30:4
it. 9:18
item 97:7
items 8:22, 10:18, 96:23
itself 74:14

< J >
J. 1:19, 2:28, 3:12
January 10:22, 10:25
JASON 2:22
JEFFREY 1:19
Jerry 16:9, 16:10
JK 35:25
job 32:22, 48:6, 50:15, 53:1, 96:15
jobs 49:1, 77:7
Joe 1:33, 100:21
join 34:17
joined 47:25, 60:6
JORDAN 2:22
JR 1:6
Judge 1:27,

44:12, 83:11, 84:2, 85:7, 89:1, 93:11, 93:20, 94:7

< G >
gallon 59:13
gallons 59:15
GARRISON 2:34
gather 60:9
gathering 62:21, 72:2
GELLER 1:46
general 52:20, 54:3, 54:6, 54:23, 57:5, 57:6, 88:25
generally 56:21, 89:6
generate 77:20
generically 49:21
gentleman 52:11
gentlemen 12:24, 18:5, 44:6, 58:17, 62:1, 72:21, 74:7, 79:9, 81:1, 88:21, 90:17, 102:20
Georgia 46:13, 46:15, 46:16
gets 9:25
getting 19:1, 65:19
give 4:21, 4:22, 13:15, 14:6, 14:7, 14:25, 31:23, 32:3, 32:7, 48:17, 60:5, 65:6, 70:4, 73:19, 73:24, 89:21, 97:19, 98:4, 101:6, 101:8
Given 42:15, 42:19, 71:25, 76:24, 78:4, 85:8, 86:10, 93:14
gives 63:14, 63:22, 64:18
giving 13:24, 25:18, 31:13, 57:5, 57:6, 71:24
glad 16:25
Global 49:10, 50:16, 53:10, 70:9, 70:11
govern 54:1, 54:7, 54:22
governed 51:3
Government 32:23
grandfather 47:12, 47:13, 47:17
grandson 47:11
great 13:14, 55:1
GREATER 1:8
Greenville 2:3
grew 46:4, 46:7
Group 1:34, 11:5, 32:24, 52:23, 52:25, 53:1, 53:7, 53:10, 53:12, 53:13, 55:13, 56:23, 59:24, 60:3, 64:2, 70:8, 82:20
groups 52:21, 69:15, 69:21, 69:23, 69:25, 70:7, 70:14, 71:2, 94:6
grow 46:3
guess 20:6, 32:6
guidance 57:2, 57:5, 57:6, 71:24
guy 16:16
guys 64:22

< H >
H. 1:39
half 10:14
handwriting 100:20, 100:21
happen 50:14, 84:1, 84:3, 85:9, 85:11, 85:12, 85:15, 88:10
happened 4:13, 10:15, 58:6, 59:2, 66:21
happening 57:11, 57:25, 65:7, 69:1, 77:18, 83:13
happens 44:12, 81:19, 98:19
happy 95:18
hard 43:20, 43:22, 93:13, 93:15
Harwood 2:24
hate 9:12
HAYNES 2:23
head 62:19
heading 33:16, 33:21, 35:11
headquarters 59:24
hear 8:11
heard 10:5, 51:13, 51:15, 52:3, 52:17, 53:7, 55:3, 69:16, 91:7, 93:4, 93:18, 97:16, 101:17
hearing 25:25, 77:16
hearsay 18:15, 32:2
heartburn 63:22, 64:18, 65:6
heartburn. 63:15
Heck 65:18
help 34:18, 43:8, 45:22, 52:20, 64:8
helped 34:25
Henry 24:7, 27:5, 28:20
herein 18:16
hide 39:20
high 45:18, 78:6
high-level 49:3, 86:20
highest 43:3
highlight 21:24, 22:18, 24:7, 24:9, 33:9, 33:15, 34:3, 34:14, 35:6, 37:1, 38:13
highlighted 88:20
highs 57:15
hindsight 85:3, 85:9
HINOJOSA 2:15
hire 16:20, 48:10
Historic 35:11, 45:7, 57:16
history 44:19
history. 35:15
hold 48:6
Holyfield 16:11, 16:12
home 47:19
HONORABLE 1:26
Horne 6:11, 100:21, 101:18
hour 10:15, 78:19, 102:21
Houston 47:10
Hub 24:7, 27:5, 28:20
huge 94:13
humans 50:14
hundred 10:8, 45:12, 91:24, 92:1, 92:3, 97:21, 97:23, 98:2, 98:9,

12:10, 12:12, 13:5, 47:15, 59:5, 100:24
judgment 54:18, 54:20, 54:23, 55:2, 55:12, 55:14, 55:18, 55:20, 80:10, 80:13, 80:15
jumping 81:21
jurors 6:10, 6:22, 7:17
Jury 8:7, 8:8, 11:3, 12:16, 14:14, 15:2, 15:12, 17:8, 17:11, 39:9, 41:5, 42:3, 44:7, 49:19, 51:22, 56:4, 58:18, 62:3, 68:5, 72:21, 74:24, 76:14, 79:10, 79:21, 81:1, 83:20, 88:22, 90:17, 92:11, 97:8, 97:16, 97:17, 100:9, 102:23
jury. 4:4, 25:25

< K >
Kearl 19:11, 22:1, 30:21, 30:24, 31:15, 35:19, 40:3, 43:15, 81:21, 81:22, 81:24, 82:1, 85:23, 90:19, 90:20
keep 45:22, 65:12, 98:13
KENDALL 1:33, 1:34
kick-off 68:14, 68:17, 69:2, 71:2
Kind 25:18, 41:5, 47:19, 48:11, 54:20, 57:11, 58:19, 68:14, 68:15, 70:22, 71:3, 71:15, 73:3, 73:17, 74:25, 88:11
kinds 64:3, 66:2, 92:24
KING 2:16
Kinkeade 1:26, 59:5
knowing 73:20
knowledgeable 43:2
knows 93:19

< L >
labor 98:1
Ladies 12:24, 18:5, 44:6, 58:17, 62:1, 72:21, 74:7, 79:9, 88:21, 90:17, 102:20
laid 80:11
Lakeway 47:23
land 90:23
landscape 9:9
language 74:6, 82:10, 82:11, 82:13, 87:21, 88:20, 89:16
large 35:10, 96:25
largely 37:5
last 21:13, 32:8, 37:12, 59:3, 77:21, 78:19, 79:1, 81:10, 97:22, 97:24
lasted 16:7
lasting 95:7
late 83:5, 88:3
later 13:1, 18:11, 26:21, 44:16, 66:5, 76:10
LATHAM 2:40
laugh 12:3
laughed 58:4
Laughter 46:24, 70:24
LAW 1:34, 2:2
lawyer 6:7, 16:16, 45:6, 67:18
lawyers 4:20, 6:12, 8:4, 9:20, 9:25, 10:9, 10:17, 11:5, 12:16, 18:8, 65:23
lay 80:25
layman 90:22
lays 71:7
lead 95:19, 97:13
leading 83:14, 83:16, 95:15, 97:12
leap 69:12
learned 79:12, 82:23, 82:24
least 10:3, 34:18
leave 63:13, 63:21, 64:17
leaves 74:21
left 17:23, 37:18, 58:23, 88:8, 98:21, 98:22
leg 13:24
legal 6:13, 51:9
lengthy 51:17
Leon 16:5
less 58:23
letter 64:4, 64:5, 64:8, 65:2, 65:5, 65:12, 68:17, 69:5, 76:11, 76:12, 76:15, 76:19, 76:20, 76:22, 77:1, 77:4, 77:11, 77:13, 77:15
letters. 85:4
level 50:24
levels 43:3, 52:14, 83:12
lie 39:18
life 46:7, 94:17, 94:18, 99:3
likely 21:5, 30:20, 30:25, 31:14, 35:19, 83:10
limine 10:1, 10:2, 10:4, 32:7
LINDELL 1:40
Line 60:21, 104:4
liquids 53:24
listed 33:8
literally 50:9
little 12:3, 13:24, 25:17, 46:1, 46:20, 47:22, 51:23, 59:15, 60:13, 64:13, 67:22, 76:9, 87:23, 94:4, 97:16, 102:21
Littleton 6:12
live 45:16, 45:18, 47:21, 47:22
lived 46:5
lives 47:10
LLP 1:46, 2:16, 2:23, 2:34
log 9:20, 12:18
LONG 2:45, 48:3, 48:7, 50:25, 52:7, 58:13
long-term 21:16, 58:20, 58:21, 58:22, 88:23, 89:2,

94:13, 94:20, 94:24, 95:2, 95:9
longer 61:20, 67:4, 92:4
looked 20:21, 24:14, 26:16, 27:8, 29:1, 29:20, 36:14, 93:14
looking 6:23, 7:13, 22:2, 22:4, 22:11, 29:7, 46:21, 75:10, 79:23, 92:24, 97:8
looks 64:16, 100:21
loose 32:2
lose 4:20, 8:14, 11:10
lost 12:2
lot 20:1, 42:8, 42:9, 42:25, 44:20, 45:6, 45:25, 46:4, 51:15, 52:8, 52:14, 55:3, 56:5, 66:15, 68:22, 69:16, 75:4, 78:22, 78:23, 93:18, 97:3, 101:11
lots 56:11, 58:19
loud 46:18
low 33:11, 33:25, 34:18, 45:18, 45:20, 57:15, 57:17, 84:10, 84:11, 84:13, 95:14, 95:22, 95:23
Low-price 57:18, 57:19, 81:5, 96:1
lower 28:18, 34:24, 58:8, 58:9, 81:15
lows 45:7,

57:15, 57:16
Luettgen 25:12, 63:2, 63:11, 63:21, 64:8
lunch 61:23, 62:9, 62:10, 102:18, 102:20
lying 39:12
LYUBA 2:31

< M >
M. 2:12
main 65:10
major 33:20
manage 58:16
Management 51:5, 51:10, 78:7, 86:21, 87:7
manager 49:8
managing 49:2
mark 18:3, 20:15, 23:2, 24:24, 25:10, 31:2, 31:17, 35:24
market 31:13, 71:21, 71:22, 72:1, 73:25, 76:24, 82:23, 96:3
marriage 47:3
married 46:22, 47:1, 47:2
marrying 16:18
Mary 70:3
Master 46:14
match 95:2, 98:8
matching 98:7
material 19:17, 42:23, 50:13, 73:17, 74:20, 81:11, 81:12, 84:25, 90:4, 90:6
materialize 89:2
materials 71:10

math 54:16
matter 18:16, 32:15, 40:3, 40:8, 40:14, 44:12
maximum 47:20
MBA 48:2
Mbas 48:11
MD&A 87:7
mean 15:25, 16:18, 16:19, 39:10, 44:9, 59:16, 61:5, 66:2, 66:4, 75:13, 79:21, 83:20, 85:5, 85:16, 90:18, 98:16
means 39:11, 44:10, 49:19, 49:23, 56:4, 81:10, 85:6, 88:11, 90:8, 91:14
meant 61:14, 74:24, 76:14, 79:10
mechanical 3:7
mechanism 90:2
media 31:20, 32:17
meeting 10:20, 10:22, 10:23, 13:9, 13:12, 20:23, 68:14, 101:1, 101:2
meetings 10:7, 10:17, 56:22, 56:24, 57:1, 71:23, 72:25, 73:8, 73:9
Melocik 59:22, 59:23
MELSHEIMER 2:12, 7:22, 11:14, 59:18, 63:8, 104:10, 104:12
Members 14:14
memorialize

23:13, 102:2
mentioned 48:20, 50:20, 56:23, 62:16, 79:25, 93:10, 100:15
Meolick 72:11
Mexico 90:14
Michael 2:7, 20:19, 24:6, 24:8, 25:8, 26:6, 27:3, 28:3, 28:18, 29:4, 29:10, 33:15, 34:3, 34:20, 35:5, 37:1, 37:11, 38:2, 38:11
microphone 62:14
middle 82:14
Mike 16:4, 33:9
MIL 10:18
military 46:7
million 38:16
millions 50:6, 50:8
mind 66:23
mining 49:5
minus 81:17
minute 7:6, 50:20, 81:21
minutes 4:10, 7:17
mislead 39:18, 39:24
misleading 39:13, 40:22, 41:15, 65:13
misstatement 50:13
misstatements 42:23
MOBILE 1:17
moment 31:24
money 91:25, 95:25, 98:6
month 29:16, 98:3
month-to-month

58:2, 58:18, 73:11, 75:4, 77:18, 81:11, 81:16, 83:4, 83:6, 83:7, 84:6, 84:7, 87:18, 88:2, 88:5, 88:6, 88:12, 91:2, 94:7, 95:6, 95:13, 99:14, 99:20
Okay. 6:5
Olive 2:17
OLIVER 1:42
once 72:9
one 5:16, 5:17, 5:19, 5:25, 10:3, 10:4, 10:7, 10:8, 11:2, 18:4, 18:24, 20:22, 21:5, 21:17, 25:16, 42:16, 42:17, 45:5, 48:8, 50:21, 54:19, 57:15, 59:23, 60:2, 61:4, 69:17, 70:15, 71:11, 76:22, 87:14, 91:12, 93:8, 94:17, 96:22, 98:12, 101:13
ones 53:15, 53:21, 69:17, 99:18
open 17:7, 17:10, 25:25, 62:20, 66:3
opened 10:19, 62:23
opening 43:5, 55:5, 92:8
operate 99:14, 99:15, 99:17, 99:18
operating 97:4
operation 82:3, 86:23

operations 37:5, 51:7, 52:6, 75:5, 81:12, 83:7, 83:8, 87:3, 88:7, 88:13, 96:21
opportunity 48:22, 49:4, 73:23
opposite 45:8, 95:22
order 4:3
organization 33:19, 33:20, 35:9, 35:10, 42:8, 42:10, 43:4, 50:17, 52:5, 52:14, 53:3, 61:10, 70:16, 73:12, 101:13
organizations 49:2, 52:10, 94:9
Oscars 70:18
Others 1:7, 31:19, 63:22, 96:22
otherwise 34:6
ought 11:24
ourselves 94:14, 96:19
Oussedik 6:12
outlier 75:11
outlier. 74:22
outline 18:21, 18:23
outlook 21:16, 75:21, 75:23
Outside 4:4, 47:22, 53:13, 70:15, 75:16, 96:20, 99:20
outside-looking -in 75:3
overall 58:20, 82:7
overrule 32:19
overseas 46:8

oversight 70:12
overview 73:24, 87:4, 87:16
own 75:20, 75:21, 75:22, 75:23, 94:10, 94:12

< P >
P. 1:18
package 81:3, 101:11
page. 7:20
pages 5:13, 15:13, 18:7
paid 59:13, 75:18
pam_wilson@txnd .uscourts.gov 3:16
PAMELA 3:12
paper 20:7, 23:4, 71:14, 101:17, 102:9, 104:19
paragraph 34:13, 34:21, 35:13, 37:12
paragraphs 33:15
part 21:24, 35:6, 38:13, 51:12, 59:3, 63:20, 77:3, 78:2, 91:5, 91:6
participants 73:5
participate 57:1
particular 59:25, 89:15
particularly 11:6, 11:10
parts 32:12, 68:22
Party 2:8, 3:4
Pass 38:22
PATRICE 3:3

PATRICK 2:45
PATTON 2:46
PAUL 2:34
pay 50:4, 91:22
paying 98:1
PEDRO 1:6
pen-to-paper 72:8
PENNSYLVANIA 1:9
PENSION 1:9
People 6:2, 11:6, 42:8, 42:9, 42:11, 42:12, 42:13, 42:14, 42:15, 42:16, 43:1, 43:3, 48:7, 48:10, 49:25, 50:9, 51:6, 52:5, 52:12, 52:14, 52:24, 55:11, 56:22, 56:24, 60:4, 61:10, 63:15, 71:3, 71:4, 74:18, 75:7, 76:16, 77:6, 77:7, 80:4, 80:17, 88:9, 89:19, 97:2
percent 10:8, 33:22, 33:24, 34:2, 41:20
perceptions 72:1
period 40:3, 83:5, 84:3, 88:3, 97:7, 99:8
periods 57:15
perplexing 67:24
Persists. 35:12
personal 41:8
personally 39:6, 39:10, 39:11, 39:20, 42:16, 42:25, 45:14, 45:15,

58:10, 58:11, 96:20
months 30:23, 46:5, 94:25
morning 6:4, 17:21, 17:22, 39:4, 39:5, 61:19, 95:16
motion 9:25, 10:3
motions 10:2, 10:4
Mountain 19:25, 20:13, 23:11, 26:18, 27:6, 30:13, 37:8, 40:13, 43:24, 65:17, 90:21
Mountains 37:6
move 23:5, 26:4, 30:17, 35:23, 90:12
moved 26:4, 46:6, 46:7
MR. SAHAM 8:19, 8:25, 9:3, 9:6, 9:13, 10:24, 11:2, 11:9, 11:21, 12:1, 12:5, 12:14, 13:3, 13:8, 13:11, 13:22, 13:25, 16:11
MR. TOAL 14:10
Ms 72:11
multibillion 93:22
multiple 5:21
multistep 91:8, 91:9
multiyear 93:23
Munster 12:4
myself 42:7, 47:12

< N >
N. 2:24
NAME 49:20, 49:21, 104:4

NARRATIVE 104:8
NATHAN 1:40
natural 21:16, 24:13, 53:24, 65:19, 81:11, 81:16, 83:4, 83:7, 83:8, 84:6, 87:18, 88:2
nd 81:18
nearly 33:22, 33:24
necessary 81:15
need 8:20, 9:17, 14:6, 17:14, 19:3, 22:5, 22:6, 24:8, 33:23, 50:18, 51:7, 62:4, 62:18, 63:19, 71:6, 71:8, 78:24, 81:18, 84:11, 84:24, 85:1, 85:11, 85:19, 90:25, 92:4
needed 40:6, 76:1, 101:9
neither 96:22
net 91:20
New 2:36, 37:17, 38:5, 82:11, 82:13, 90:14
News 33:1, 33:18, 33:19, 33:20, 34:1, 34:12, 35:8, 35:9, 35:10, 35:18
next 6:19, 7:3, 7:9, 7:14, 7:20, 10:14, 20:8, 36:18, 48:21, 76:5, 85:22, 88:15, 95:7, 98:5, 99:19
NFL 16:20
NINA 2:21

No. 1:15, 14:9, 15:4, 36:2, 40:1, 40:10, 40:25, 42:7, 47:4, 54:20, 57:22, 59:11, 60:11, 61:7, 75:14, 77:15, 86:10, 87:23, 93:17
Nobody 6:7, 16:23, 40:25, 93:19
noncash 98:11, 99:7
nonetheless 92:18
nonquantitator 78:23
normal 96:19
North 83:8, 84:7, 88:7
NORTHERN 1:2
not. 7:11, 7:16
Nothing 6:21, 6:23, 7:1, 7:10, 7:15, 11:16, 15:3, 19:16, 19:17, 65:9, 66:9, 67:10, 67:11
number 22:4, 24:9, 27:8, 27:11, 27:16, 28:20, 29:1, 29:9, 29:12, 29:13, 31:21, 36:3, 48:21, 48:25, 52:9, 63:5, 71:18, 80:24, 84:18, 91:21, 98:4
numbers 22:19, 29:17, 29:19, 30:11, 40:18, 45:25, 54:17, 94:3, 94:4, 96:25, 101:11
NY 2:36

< O >
object 5:18, 11:14
objected 11:2, 11:15
objection 7:22, 8:24, 11:15, 11:17, 15:24, 18:4, 18:6, 18:14, 19:2, 23:3, 23:5, 24:25, 25:4, 25:5, 31:4, 31:5, 32:1, 32:19, 36:1, 36:2, 36:4, 37:24, 37:25, 63:7
objections 15:23
obviously 73:25, 82:5
occur 84:25
occurred 21:15, 92:14
occurred). 21:17
offensive 6:3
offered 18:15
offering 17:25, 18:24, 19:7, 19:13, 29:17, 30:23
office 52:1
OFFICER 4:3, 17:8, 41:2, 49:16
Official 3:13, 51:8
often 46:8
Oftentimes 81:19
oil 33:21, 33:24, 34:18, 44:23, 44:24, 49:10, 53:23, 56:6, 56:7, 56:20, 56:24, 57:12, 58:1,

46:2
perspective 51:25
persuade 8:21
persuasive 8:22, 16:16, 16:19
Pete 64:15
picture 81:17
piece 50:21, 50:22
piggybacking 52:10
pile 10:2
place 41:12, 42:22, 49:24, 49:25, 50:18, 61:9, 61:11, 64:24, 65:3, 71:15
places 46:4
plain 77:17, 83:21, 83:22, 85:5, 85:6, 88:21
plainer 89:4
PLAINTIFF 72:19, 74:24, 86:15, 87:13, 96:4, 100:7, 104:14
Plaintiffs 1:12, 1:31, 13:17, 18:4, 39:6, 45:6, 101:22
plan 22:16, 27:6, 28:9, 29:1, 75:23
planned 22:13, 24:19, 27:1
planning 75:21, 93:18
Plant 48:23
play 101:3
please 17:18, 36:20, 38:25, 62:15, 68:7
pleasure 102:18
plus 24:9

point 6:22, 10:14, 11:10, 13:1, 14:24, 14:25, 15:11, 20:22, 21:4, 21:13, 36:25, 53:11, 63:10, 63:11, 65:2, 69:3, 71:12, 77:21, 78:16, 81:14, 83:11
Policy 52:23, 53:1, 56:23, 59:23, 59:24, 70:5
POLYCHRON 1:44
portfolios 75:16
portion 5:18
portrait 9:10
position 49:15, 60:3, 64:10
possible 20:4, 85:11
post 34:7
potential 78:8, 80:24, 81:7, 82:17
practice 5:22, 66:20
preadmitted 100:8
prefer 47:16
prejudice 4:24
prejudicial 13:17, 65:10
premeditated 8:3, 8:5, 11:11
prepared 21:14
preparing 40:12, 41:11
presence 4:4
presenting 76:7
president 49:13
press 14:10, 36:22
pressure 40:24, 40:25
pretty 16:13, 59:7, 70:5,

71:1
previous 60:14, 60:16, 71:17
previously 72:16
price 21:16, 24:13, 27:5, 34:1, 44:21, 44:23, 44:24, 58:2, 74:4, 75:20, 78:9, 83:12, 84:9, 89:12, 91:17, 93:24, 93:25, 94:9, 94:21, 94:25
prices 22:14, 24:19, 26:25, 27:1, 33:21, 33:25, 34:18, 44:13, 45:20, 57:16, 58:18, 74:10, 77:18, 81:11, 81:15, 82:4, 83:4, 83:24, 84:2, 84:10, 84:13, 87:19, 88:2, 89:1, 89:2, 89:5, 89:8, 94:7, 94:12, 94:22, 95:13, 95:22, 95:23
Pricewaterhouse 52:18, 70:17, 73:9, 73:11, 89:21, 90:2, 100:13, 101:3, 101:24, 101:25, 102:1
primarily 83:7, 88:6, 88:8
principal 41:2, 49:16
principle 98:7
printed 51:16
prior 26:16, 27:14, 27:19, 38:18, 71:13, 71:14, 72:4,

73:21
privilege 6:24, 10:15, 10:19, 12:15, 12:25, 15:16, 18:7
privileged 9:20, 9:23, 12:18, 18:7
proactive 78:14, 78:15
probably 76:25, 95:24, 99:10
probative 65:10
problem 65:10, 66:2, 93:1, 93:2
proceeded 49:9
Proceedings 3:7, 68:4, 103:2
process 10:6, 10:12, 12:10, 13:13, 13:14, 23:14, 39:23, 51:24, 52:2, 52:3, 52:7, 52:12, 53:8, 60:7, 68:13, 68:15, 69:7, 69:16, 71:2, 72:2, 72:5, 73:9, 76:10, 78:2, 78:21, 79:23
processes 41:11, 41:12, 41:18, 42:21, 42:24, 49:24, 50:10, 61:9, 61:10, 101:14, 101:15
produce 42:22, 52:11, 81:16
produced 3:8, 5:17, 9:19, 10:7
producer 34:16
Production 49:10, 81:25
profile 95:2,

profit 34:25, 40:8
profitability 97:25
profits 34:7, 96:17
prohibited 15:15
Project 81:25, 91:18, 95:3
projected 58:2
projection 95:2
projections 94:7, 94:9
promise 8:7, 25:16
prompting 71:20
proper 16:1
properties 22:5, 22:6
property 43:14, 90:22, 91:1
propose 8:13
proposed 8:10
proposing 12:22, 82:12, 82:20
proved 22:2, 33:24, 38:13, 40:3, 83:6, 83:9, 83:10, 83:11, 84:4, 88:4
provide 19:14, 32:25, 87:4, 95:17
provided 24:1, 24:3, 101:24, 101:25
proxy 63:20
prudent 95:1
Public 32:23, 37:7, 39:12, 90:4
publish 96:13
published 19:18, 94:6
pull 64:12, 71:6, 71:14, 73:23, 79:1, 96:21
pulled 69:4
pulling 50:25, 52:12, 72:15, 78:21
purpose 10:18
purposes 9:16
pushed 34:1
put 4:10, 5:6, 6:1, 9:10, 12:20, 16:25, 40:24, 40:25, 41:6, 44:13, 54:1, 55:6, 65:5, 69:17, 85:11, 87:14, 90:24, 97:25, 98:2, 99:6, 99:7, 101:18, 102:11
puts 5:6
putting 51:24, 52:2, 65:4, 72:3
Pwc 73:6, 102:14
PX 20:17

< Q >
Q. 6:5, 6:11, 6:18, 7:4, 7:8, 7:14, 7:19, 11:4
qualified. 90:7
qualify 83:9, 90:3
quantities 83:6, 84:6, 88:5
Quarry 16:9, 16:10
quarter 21:10, 29:23, 30:5, 30:17, 31:3, 31:10, 31:20, 32:18, 32:25, 33:2, 33:3, 33:4, 36:7, 36:15, 36:19, 36:23, 37:21, 97:1
quarterly 29:22, 34:7, 34:25, 52:10, 96:13
question 4:11, 7:3, 9:1, 21:12, 21:14, 63:12, 63:18, 67:14, 83:3, 84:17, 84:23
questions 10:17, 19:4, 20:6, 56:14, 56:16, 63:17, 63:19, 66:3, 72:22, 76:18, 76:23, 77:5, 85:21, 85:24, 96:5, 101:20
quick 5:5, 48:17, 88:1, 97:19
quickly 48:19
quite 42:17, 46:7, 58:8, 58:9, 96:25
quote 37:14

< R >
R&DG 35:23, 90:13
R. 1:40
raise 15:1
raised 16:1
raising 15:16
RAMIREZ 1:6
ramping 82:5
range 83:4, 88:2
reach 39:25
read 6:16, 9:22, 14:15, 14:16, 14:17, 15:6, 74:23, 76:13, 78:4, 83:2, 84:16, 84:22, 88:1, 88:20
real 43:22, 52:15, 52:24, 57:20, 88:1, 94:19, 97:19
really 18:9, 49:23, 67:19, 69:24, 70:8, 74:6, 77:7, 77:12, 87:9, 91:14
reason 4:21, 4:22, 4:23, 8:2, 9:8, 76:2, 86:3
reasonable 55:8
reasonably 84:25
reasons 60:2, 89:8
rebook 44:16
rebooked 83:11
recall 27:10, 28:6, 28:14, 30:19, 33:3, 76:9, 81:24, 95:10
received 4:9, 5:17, 34:9, 35:1, 46:12, 77:11
Recent 47:3, 47:12, 73:10
Recess 68:3, 103:1
recipe 54:15, 54:25
recognize 100:9
reconsideration 77:23, 78:18, 78:25
record 15:10, 17:1, 17:6, 17:7, 17:9, 17:10, 68:2, 97:18
record. 25:24
recover. 83:12
Recoverability 88:24, 100:11,

121

37:8, 40:13, 43:24, 65:16, 90:21
role 101:3
roles 48:22
room 46:21
rooted 57:8, 64:10
ROSENTHAL 1:20, 11:5, 17:21, 25:11, 31:19, 32:17, 39:4, 41:6, 45:24, 61:22, 62:8, 63:1, 63:10, 64:1, 64:7, 65:23, 66:13, 68:11, 87:10, 95:5, 102:22, 104:6
Ross 2:47
rough 4:9
rows 54:16
RUDMAN 1:46
ruled 8:23
rules 40:17, 40:18, 51:4, 53:2, 53:5, 53:25, 54:4, 54:7, 54:11, 54:12, 54:22, 55:13, 55:15, 55:21, 55:23, 60:5, 80:14, 80:16, 93:16, 93:17, 93:19, 93:24, 99:15, 99:16, 99:17, 99:18, 99:25, 100:1
ruling 16:1
rung 11:3
running 51:6, 51:7

< S >
S. 1:19, 21:16, 34:16, 37:4, 46:8, 99:20, 99:24, 99:25
SAATHOFF 2:13
SAHAM 1:39, 8:15, 8:16, 13:19
SAM 1:41
sample 43:19
San 1:48
sands 83:7, 84:7, 88:6, 88:13
Sandy 59:22, 59:23, 60:2, 72:11, 72:12
Santiago 49:4
SARA 1:44
satisfy 94:14
saw 6:10, 16:8, 34:7, 75:3, 75:21, 76:8, 80:3, 80:4, 84:5, 87:21, 88:14, 89:5, 91:18, 94:3, 95:10
saying 46:18, 57:4, 64:22, 66:15, 66:16, 75:9, 78:3, 78:24, 84:10, 85:10, 86:10, 88:6, 89:7, 100:4
says 7:1, 20:23, 21:4, 35:13, 37:10, 64:14, 64:17, 65:1, 65:14, 74:20, 77:21, 88:23, 98:8, 98:17
schedule 69:7, 71:5
school 48:10, 102:6
scope 9:1
Scott 1:39, 2:39, 31:18, 32:23
screen 4:11, 5:6, 5:7, 6:1, 7:1, 61:15
scrutiny 92:24
seated 17:15
SEC 11:6, 21:17, 51:18, 53:25, 54:7, 54:12, 54:22, 55:21, 56:1, 56:7, 56:14, 56:19, 56:25, 57:17, 60:4, 74:1, 74:4, 76:16, 76:22, 77:13, 77:17, 78:5, 78:7, 79:12, 79:18, 79:22, 80:11, 81:5, 82:24, 83:6, 83:10, 84:4, 85:2, 85:12, 88:4
second 20:22, 21:4, 21:9, 21:13, 25:9, 26:9, 28:4, 91:17
secondly 75:20
secretary 49:14
section 21:14, 81:8, 84:15, 86:21, 86:24, 87:16, 89:18
sections 87:6, 87:14
Securities 39:7, 62:21, 66:9, 66:11, 71:23, 72:17, 79:4
SECURITY 4:3, 17:8
seeing 45:4, 45:5, 45:8, 55:4
Seems 93:13
seen 42:2, 54:13, 54:14, 56:10, 58:12, 65:19, 76:16, 80:3, 83:5, 83:24, 88:3
send 47:19, 64:16, 76:19
senior 33:1, 59:23, 60:3
sent 34:24, 76:22
sentences 83:20, 90:10
separate 44:4
set 99:15, 99:24
several 18:7, 60:4, 85:21
shale 43:19, 43:20, 88:19
SHAMAILOVA 2:31
share 24:12, 34:1
shareholders 39:12, 64:9
shares 34:24
sheet 71:14, 91:24
SHELDON 1:41
Shell 99:21
short 13:6, 71:7
shot 70:4
show 8:12, 12:1, 12:5, 14:6, 18:17, 32:8, 33:13, 56:10, 66:22, 69:24, 100:7, 101:8, 102:1, 102:6, 102:13
showed 20:17, 40:8, 45:7, 58:17, 74:7, 75:25, 101:15
showing 38:16, 102:9
shown 21:21, 72:20, 77:6, 78:22, 96:10
shows 4:24, 28:20, 40:4,

123

100:14, 100:18
redact 62:16
redacted 5:9, 6:23, 7:13, 10:9, 12:9, 13:12
redactions 5:22, 5:23, 15:13
reduce 44:10, 81:15
reduced 82:7
Reduction 21:15, 22:21, 35:12
refer 20:7
reference 63:8
reflected 92:19
reflects 99:3
regard 67:3
regarding 21:1, 33:1, 63:18
region. 37:6
regularly 96:12
regulate 60:5
regulations 51:4, 53:2, 53:5, 53:25, 54:11, 55:9, 64:24, 65:3, 65:4, 80:14
regulatory 51:9
related 37:5, 53:16, 78:9
relating 83:7
relation 98:16
Relations 49:13, 64:1
release 36:22
released 35:25
relevance 76:4, 94:16
relevant 5:19, 59:1
rely 94:10
Remember 5:1, 6:8, 10:24, 11:20, 43:5, 44:6, 44:8, 55:7, 56:16, 56:17, 62:24, 70:22, 77:8, 77:9, 79:7, 81:17, 83:25, 85:24, 92:8, 92:23, 96:5, 101:18, 102:6
remembers 59:5
remind 43:8, 90:17
removed 65:15
repeating 13:23
rephrase 79:14, 95:18
report 51:20, 99:21
reported 3:7
Reporter 3:13
Reporting 49:8, 60:15, 70:2, 77:22, 78:17, 99:23
reports 29:22
Representative 2:8, 3:4, 98:4
representatives 56:25
reputable 33:19, 35:8
request 80:8
requests 79:3
require 54:23, 55:2, 55:12, 55:20, 77:22, 78:17, 92:16, 93:16, 93:17
required 83:9, 86:21, 92:14
requirements 53:2, 72:14, 77:22
requires 55:18
reserved 89:22
Reserves 19:11, 19:20, 22:1, 22:2, 30:24, 33:22, 33:24, 35:11, 35:14, 35:20, 38:13, 40:3, 44:22, 53:7, 53:10, 53:16, 53:19, 53:22, 53:23, 55:2, 55:3, 55:7, 55:13, 70:8, 70:9, 70:11, 70:13, 83:6, 83:9, 83:10, 83:11, 84:4, 85:1, 85:17, 85:19, 86:4, 86:11, 88:4
reserves. 81:13, 81:16
respect 57:12, 100:1
respected 12:12
respond 63:24
responding 35:18, 63:2, 63:11, 63:13
response 14:25, 63:23
responsibility 41:5, 41:9
responsible 32:25, 50:23, 69:6, 71:5, 78:12, 79:2
responsive 77:19, 81:6, 83:22
rest 5:19, 33:25, 74:15, 99:3
result 39:25
results 30:4, 30:7, 31:10, 33:2, 36:8, 37:10, 37:20, 51:11, 60:15, 86:22, 86:25, 87:2, 87:3, 96:13, 96:14, 101:8, 102:5
resumed 68:4
reticent 12:11
retired 48:18
retract 41:24
returning 78:16
Reuters 33:18, 34:12
revenue 91:19
revenues 22:3, 81:17, 81:18, 98:1, 98:8
reverse 75:24, 95:12
Review 13:6, 28:10, 51:11, 52:13, 55:2, 64:16, 76:16, 76:17, 76:18, 89:24, 90:3, 100:12, 100:14, 100:18, 100:19, 101:6, 101:10, 102:16
reviewed 23:25, 73:15, 101:5
reviewing 72:10, 73:17, 81:3, 82:13, 100:13, 101:4
reviews 50:11
revised 87:23
revision 35:14
Rex 1:18, 3:1, 77:25
RIFKIND 2:34
right-hand 28:18
Right. 7:4
rise 4:3, 17:8, 89:1
Risk 81:8, 89:3, 89:11, 89:13, 89:18, 89:20
risks 77:19, 78:8
rival 34:19
rivals 34:17
RMR 3:12
ROBBINS 1:46
Rocky 19:25, 20:13, 23:11, 26:17, 27:6, 30:13, 37:6,

122

64:12
shut 45:20
sic 7:18
sides 51:17
sign 20:10, 41:8, 50:18, 54:9
signature 23:15, 26:10, 31:9, 31:12, 36:11, 36:13, 38:5, 41:6, 52:16, 52:17
signatures 38:7
signed 20:6, 37:20, 41:1, 41:17, 89:25
significant 50:12, 52:13, 85:7, 91:15
signing 54:11
Silvestri 31:18, 32:21
similar 26:15
Similarly 1:8
simple 53:1
simply 12:24, 52:3
single 42:25
sir 7:7, 7:23, 7:25, 11:1, 15:9, 23:6, 38:9, 46:22, 47:1, 47:21, 48:7, 51:14, 61:13, 67:11, 75:24, 81:23, 92:8, 100:20
Sister 70:3
sitting 6:22, 7:12, 42:11, 42:19, 46:20, 91:23
Situated 1:8
situation 73:4, 80:15, 95:22
six 46:5, 98:21
skeptical 25:20
skip 54:19
slash 33:23
slides 7:8
slowly 83:2
Slump 35:12
small 91:5, 91:6
smaller 76:17
SOLOWAY 2:28
Somebody 9:14, 18:18, 58:6, 72:12
someone 58:2, 58:4, 95:6
sometimes 55:21, 56:7, 56:11
somewhere 55:10, 60:21
son 47:10
soon 15:25, 48:2, 67:6
Sorry 18:25, 32:19, 62:25, 96:8
sort 11:18, 11:22, 93:4
sound 65:13, 94:15
south 77:11
SPALDING 2:16
specialist 11:6
specialists 80:17
specific 54:12, 54:17, 55:17, 55:19, 80:15
specifically 57:4, 90:13
specifics 54:21
SPENCER 1:45
spend 48:16
spent 60:3, 75:18, 98:3
Spinks 16:5, 16:6
spot 69:17
spread 82:4
spring 72:24
SQUIRE 2:46
staff 72:24, 85:2
stand 11:14, 62:19
Standards 99:24
standing 7:18
stands 99:23
start 47:24, 48:14, 60:9, 60:11, 60:24, 60:25, 68:23, 69:22, 71:13, 71:15
started 48:20
starting 71:12
starts 52:3
state 66:23, 89:18
statement 40:22, 43:5, 55:6, 97:25
statements 41:18, 41:19, 41:21, 50:2, 50:19, 51:1, 51:3, 52:6, 52:11, 53:3, 55:23, 85:13, 89:22, 89:25, 90:4
STATES 1:1, 1:27
stay 17:14, 33:25, 48:12, 55:21, 55:23, 58:13, 84:11
stayed 46:13, 84:13
steady 48:6
stenography 3:7
Step 62:8, 91:12, 91:17, 92:6
stepping 71:21
Stick 14:8
stink 25:19
stop 92:2
stopped 79:6
story 50:25
Street 2:17, 2:24, 3:14, 34:8, 34:25
strike 15:10, 15:11
struggling 62:12
study 80:1
stuff 12:17
subject-matter 52:25, 80:17
substantive 5:10
suggestion 65:8, 65:15
Suite 1:35, 1:47, 2:3, 2:17, 2:24, 2:41, 2:47
summary 13:9, 31:20, 32:17, 48:17, 71:1
summer 47:4
super 95:14
supervisory 48:23
supplied 58:9
Supply 81:8, 88:25, 94:20
support 10:11
surrounding 54:11
suspenders 93:5
sustain 7:24
Sustained 8:24, 11:15, 83:17
sweaters 17:13
SWIDERSKI 2:7
Swiger 1:18, 10:16, 20:2, 20:24, 20:25, 21:13, 21:21, 22:13, 22:22, 24:1, 27:21, 28:6, 28:10, 28:14, 31:19, 38:5, 48:11, 63:16, 63:21, 66:22, 93:21
swings 59:2
switching 88:16

124

< T >
T. 1:43, 2:15
table 54:17
tables 40:7, 45:25, 54:14, 80:2
tabulate 70:18
talked 43:6, 52:6, 52:24, 55:6, 77:11, 93:21
tank 59:7
tasked 53:13
team 101:18
teams 40:11
temporarily 83:9, 84:8
Ten 30:23, 97:22, 97:24, 98:9, 98:14
term 52:4, 93:5, 102:6
terminations 89:23
terms 53:1, 90:22
terrible 15:3
test 91:8, 91:9, 91:11, 92:10
testified 22:13, 22:22, 28:6, 48:11, 63:15, 92:11
testifying 45:24
testimony 20:1, 28:14, 62:21, 67:5
testing 75:25
Texas 1:2, 1:29, 3:15, 48:24
Thanks 102:22
the`reserves 22:9
Theme 80:24, 81:5, 82:16
THEODORE 2:30
there. 7:2

they'll 57:1, 57:2
thick 51:16
thinking 62:19, 75:8, 102:15
third 13:15, 30:17, 31:19, 32:17, 35:4, 36:25, 63:14, 63:16, 63:22, 64:18, 65:6
Thomas 2:12, 2:39, 10:10, 10:16
THOMPSON 2:33
thorough 89:24, 101:9
though 10:9, 30:10, 42:24, 44:15, 56:18, 58:19, 71:16, 72:2, 82:8, 95:5, 95:12, 99:12
thoughts 18:18, 64:15
thousands 50:9
three 7:18, 10:6, 10:11, 10:24, 12:8, 32:8, 49:6, 52:16, 70:6, 92:6
throughout 42:8, 42:9, 73:3
tie 78:18
tied 66:8
ties 78:20, 100:15
Tillerson 1:18, 3:1, 13:12, 20:24, 20:25, 24:3, 31:18, 37:18, 63:16, 63:21, 66:22, 66:24, 73:16, 73:18, 73:19, 75:1, 76:7, 76:21, 77:25,

78:10, 80:21, 81:4, 87:22
title 96:11
titled 86:21
TOAL 2:29
today 41:21, 41:22, 42:20, 94:22, 94:23, 94:25, 95:23, 97:23
together 50:25, 51:25, 52:2, 52:13, 52:19, 54:1, 69:4, 71:6, 72:3, 72:15, 73:23, 78:21, 97:25, 101:18
took 16:6, 73:23, 94:22
top 21:24, 35:6, 37:2, 38:13
Total 48:4, 57:4, 60:16, 99:21
totally 5:9
tough 59:11, 67:19
track 45:22
trading 34:6
transactions 50:6, 50:8
transcript 3:8, 4:10, 4:11, 6:4, 66:8
transcription 3:8
translating 74:1
treasurer 49:1
trend 58:20, 58:22, 89:8
trended 89:6
trial 65:20
trigger 20:12, 21:15, 22:23, 22:25, 27:19, 27:22, 91:13, 92:13, 92:16,

100:16
truck 97:21, 97:22, 99:9, 99:11
true 84:12, 84:13
truth 18:15, 18:19, 32:14
Try 20:4, 95:19
trying 16:3, 16:17, 62:24, 64:3, 65:12, 94:21, 95:17, 96:14
turn 19:25, 21:23, 28:12, 31:9, 33:6, 33:14, 38:11, 61:12, 74:3, 88:12, 96:3
Turning 23:15, 36:11, 36:18, 51:1, 51:4, 51:5, 80:22, 88:15
Turtle 1:35
twist 39:25
two 7:17, 10:10, 15:8, 33:15, 43:6, 44:4, 47:9, 94:2
two-thirds 13:16
TX 1:36, 2:4, 2:18, 2:25, 2:42, 2:48
type 43:1
Typically 30:9, 56:25, 57:8
Tyson 16:4

< U >
ultimate 80:6, 80:7
uncomfortable 46:20
undergraduate 46:12

68:21, 70:23, 93:1, 93:2, 94:11, 94:14, 100:17, 100:19, 101:14, 102:7, 102:9, 102:12, 102:15
worked 11:4, 32:23, 48:4, 60:5, 72:17
working 18:5, 40:11, 40:16, 47:24, 60:4, 60:10, 72:10
works 91:11
workshops 56:22
world 53:22, 53:23, 70:13
worldwide 65:4
worried 65:4, 66:14
worth 92:4, 98:23, 99:3
wow 15:2
wreck 98:19
write 64:4, 64:8, 64:23, 69:21, 97:23
write-down 19:11, 99:1, 99:6, 100:4
write-down. 21:6
write-downs 100:2
writing 34:17, 102:2
written 22:7, 23:11, 66:12, 78:24, 99:12
wrote 18:18, 98:12

< X >
XTO 91:4, 91:5, 91:6, 100:11

< Y >
Y'all 5:14, 16:3, 16:14, 16:22, 16:24, 17:12, 17:15, 18:13, 18:25, 26:1, 62:4, 67:20, 68:2
year-end 69:9
years 16:19, 22:3, 22:4, 46:6, 48:5, 48:16, 48:21, 49:6, 57:20, 59:4, 60:4, 60:6, 61:8, 72:4, 76:17, 91:19, 95:8, 96:2, 97:22, 97:24, 98:9, 98:14, 98:19, 98:21
yesterday 4:6, 4:13, 18:6, 20:1, 20:17, 20:21, 21:13, 21:21, 22:13, 27:22, 28:7, 48:12, 56:14, 75:4, 77:5, 79:5, 80:1, 84:5, 93:19, 93:22
York 2:36
yourself 42:6, 91:12

< Z >
Z. 56:12
zero 98:5

underneath 101:13
understand 8:6, 8:20, 8:25, 39:6, 39:9, 50:7, 51:7, 52:20, 53:2, 66:17, 89:20, 97:5, 102:4
understanding 54:3, 54:7, 72:13, 72:14
understands 53:4
undertake 80:1
underway 68:16
undeveloped 90:13, 90:18, 90:19
unfair 13:16, 65:14
UNITED 1:1, 1:27
University 46:13, 46:14
unless 13:1, 18:11
until 48:22, 69:9
unusual 48:7, 48:9, 48:13, 77:3
upbeat 34:6
update 34:24
update. 34:21
updating 75:1
ups 45:5, 58:19
Upstream 37:4, 75:5, 80:4, 96:11
user 78:5
using 9:19, 22:14, 61:15, 88:19, 91:17, 93:25, 94:2, 94:15, 97:19, 98:15

< V >

V. 2:30
value 44:11, 99:2
van 98:2, 98:13, 98:19, 98:22
verify 101:15
version 42:3, 88:14
versus 16:4, 94:17
via 56:22
vice 49:13
view 73:10
virtue 21:15
visit 25:22
volatile 94:23
volatility 95:10
VOLUME 1:25, 4:1, 103:2, 104:1
voluntary 66:12
vs 1:15

< W >
W. 1:18
Waco 59:12
Wait 7:21, 62:20
waived 10:15, 10:19, 12:15
walk 73:22
walked 6:1
Wall 34:8, 34:25
wanted 65:23, 80:2, 87:25, 92:22, 100:16, 101:7
wanting 77:17
wants 16:20, 16:21, 32:3
warm 17:14
warned 33:23, 34:16, 35:14
warning 67:22, 85:8, 89:16
warns 33:21

WATKINS 2:40
wearing 17:13
wedding 47:5
week 26:21
weeks 23:16
WEISS 2:34
Welcome 68:11
WELLS 2:30, 4:5, 4:7, 4:9, 4:13, 4:18, 4:21, 4:23, 5:2, 5:5, 5:12, 5:16, 5:25, 6:9, 7:8, 7:23, 7:25, 8:2, 8:9, 8:11, 14:6, 14:9, 14:14, 14:9, 15:10, 15:8, 15:10, 15:15, 15:21, 16:15, 17:2
West 1:47
whacked 34:17
WHARTON 2:34
What'd 48:14, 71:3
Whatever 67:6, 89:7
Where'd 46:3, 46:11
whereas 22:3
whether 18:2, 19:19, 22:2, 22:5, 22:6, 23:11, 26:17, 45:18, 48:10, 66:23, 74:25, 79:5, 79:6, 79:12, 79:24, 81:24, 81:25, 97:8, 97:9
White 20:7, 23:4, 101:17, 102:9, 104:19
whole 9:24, 10:2, 10:5, 10:18, 12:5, 13:14, 13:21, 48:12, 56:20, 56:22, 62:23, 65:2, 68:24,

68:25, 97:3
Why'd 12:20
widens 82:5
Widespread 74:20
wife 16:17, 47:4, 47:10
WILKINSON 2:14
will 21:5, 21:6, 47:16, 56:8, 57:1, 65:6, 67:4, 83:10, 85:3, 87:11, 87:14, 89:1, 89:3, 89:11, 89:13, 101:12
willing 15:7
WILSON 3:12
win 4:16, 11:10
winner 70:23
wish 16:16, 96:3
within 52:21
without 50:25, 92:22
WITNESS 6:2, 7:1, 10:21, 38:22, 47:16, 62:22, 66:1, 67:19, 83:15, 83:16, 104:4
witnesses 67:14, 67:16
wonderful 67:24
WOODBURY 1:19
Woods 37:14, 37:19, 38:6
word 49:22, 50:23, 63:14, 90:7
words 55:8, 78:25, 89:11
work 6:13, 6:14, 25:3, 42:6, 42:7, 43:20, 43:22, 48:3, 48:7, 50:17, 53:4, 55:11, 55:12,

C E R T I F I C A T I O N

I, PAMELA J. WILSON, CSR, certify that the foregoing is a transcript from the record of the proceedings in the foregoing entitled matter.

I further certify that the transcript fees format comply with those prescribed by the Court and the Judicial Conference of the United States.

This the 30th day of April, 2026.

s/Pamela J. Wilson

PAMELA J. WILSON, RMR, CRR
Official Court Reporter
The Northern District of Texas
Dallas Division

PAMELA J. WILSON, CSR/RMR/CRR

**App. 189**

# Exhibit 7

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

PEDRO RAMIREZ, JR., Individually )
and on Behalf of All Others )
Similarly Situated, and GREATER )
PENNSYLVANIA CARPENTERS PENSION )
FUND, )
)
                    Plaintiffs, )
)
    VS.                         ) No. 3:16-CV-03111-K
)
EXXON MOBIL CORPORATION, )  CLASS ACTION
REX W. TILLERSON, ANDREW P. SWIGER, )
JEFFREY J. WOODBURY, DAVID S. )
ROSENTHAL, )
)
                    Defendants. )
_____)

JURY TRIAL PROCEEDINGS -- VOLUME 3-B
BEFORE THE HONORABLE ED KINKEADE
UNITED STATES DISTRICT JUDGE
APRIL 30, 2026
DALLAS, TEXAS

FOR THE PLAINTIFFS:

    JOE KENDALL
    KENDALL LAW GROUP
    3811 Turtle Creek Boulevard, Suite 825 Suite 880
    Dallas, TX  75219
    (214) 744-3000

    SCOTT H. SAHAM
    NATHAN R. LINDELL
    SAM SHELDON
    ERIKA OLIVER
    T. ALEX B. FOLKERTH
    SARA BIERL POLYCHRON
    SPENCER A. BURKHOLZ
    ROBBINS GELLER RUDMAN & DOWD, LLP
    655 West Broadway, Suite 1900
    San Diego, CA  92101
    (619) 231-1058

    BALON B. BRADLEY
    BALON B. BRADLEY LAW FIRM
    11910 Greenville Avenue, Suite 220
    Dallas, TX 75243
    (972) 991-1582

    MICHAEL SWIDERSKI
    (Party Representative)

FOR THE DEFENDANTS:

    THOMAS M. MELSHEIMER
    AUSTIN E. SAATHOFF
    EMILY WILKINSON
    DAVID T. HINOJOSA
    KING & SPALDING, LLP
    2601 Olive Street, Suite 2300
    Dallas, TX  75201
    (214) 764-4446

    NINA CORTELL
    JASON JORDAN
    HAYNES and BOONE, LLP
    2801 N. Harwood Street, Suite 2300
    Dallas, TX  75201
    (214) 651-5000

    AUDRA J. SOLOWAY
    DANIEL TOAL
    THEODORE V. WELLS
    LYUBA SHAMAILOVA
    AMITAV CHAKRABORTY
    DAPHNE THOMPSON
    PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
    1285 Avenue of the Americas
    New York, NY  10019-6064
    (212) 373-3000

    SCOTT C. THOMAS
    LATHAM & WATKINS
    100 Crescent Court, Suite 7084
    Dallas, TX  75201
    (713) 546-5400

    D. PATRICK LONG
    SQUIRE PATTON BOGGS
    2200 Ross Avenue, Suite 4100w
    Dallas, TX  75201
    (214) 758-1500

(Rex Tillerson)

PATRICE CHILDRESS
(Party Representative)

    Proceedings reported by mechanical stenography; transcript produced by computer-aided transcription.
_____

DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
Federal Official Court Reporter
1100 Commerce Street, 15th Floor
Dallas, TX  75242
(214) 753-2325

INDEX

| PLAINTIFF'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DAVID ROSENTHAL (Cont'd.) | | 5 | 40, 54 | 50 |
| MICHAEL SWIDERSKI | 57 | 67 | 104 | --- |
| ANDREW MADDEN | 107 | | | |

EXHIBITS

| DEFENSE EXHIBIT | INTRODUCED | ADMITTED |
|---|---|---|
| 122 | 43 | 44 |
| 128 | 31 | 31 |
| 331 | 110 | 110 |
| 331-A | 118 | 118 |
| 335 | 137 | 137 |

(PROCEEDINGS BEGAN AT 1:26 PM.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Okay.  Here we go.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury seated in the jury box.)

THE COURT:  You all be seated.  Thanks.

Go ahead.

Thanks, Mr. Rosenthal.

MR. MELSCHEIMER:  May it please the Court.

THE COURT:  Yes, sir.

CONTINUED CROSS EXAMINATION

QUESTIONS BY MR. MELSCHEIMER:

Q.   Just returning, Mr. Rosenthal, from lunch, I'll remind us: What was Pricewaterhouse's conclusion about Exxon's 2015 impairment analysis?

A.   Yes.  After their thorough, detailed review of everything we did, their conclusion was there was no need to impair any of our assets.

Q.   If they had disagreed, what would have happened?

MR. BURKHOLZ:  It calls for speculation, Your Honor.

MR. MELSCHEIMER:  Let me ask it a slightly different way.

A.   Okay.

Q   (By Mr. Melscheimer) Do accounting firms have the capacity to note exceptions to things in the work that a company does?

A.   Yes, they do.

Q.   And what's that called?

A.   Ultimately, they can do what's called "Qualified Annual Report" which simply means we don't agree with everything that's in here.

Q.   Did they do that here?

A.   No, they didn't.

Q.   Okay.  Now go back to Plaintiff's Exhibit 55 just real briefly.  These are Mr. Horne's notes.  Do you remember telling us that?

A.   Yes, I do.

Q.   Okay.  And I highlighted something here under your initials.  Can you read what is highlighted in front of the jury, please, sir?

A.   Yes, I can.  It says, "We may be wrong but this is how we run the business."

Q.   Tell the jury what you meant by that.

A.   What I meant by that was:  The whole concept that we've talked about where we use the same price outlook, the same bases for impairment analysis that we use for our investment plan; right?

All the huge multi-billion-dollar projects, decades in duration.  And what I told them was when we got finished and we showed them what our price forecast outlook was, I said, "We may be wrong," and we've talked about how you don't know how things

are going to go.  So I said, "We may be wrong but this is how we run the business."

And I think the end of that was:  "We use the same prices for putting investments on the books that we use to take investments off the books.  We may be wrong but that's how we do it."

Q.   You talked a bit about the depreciation rules, and you gave that example of the hundred-dollar truck.  Can we agree that maybe it could be a more expensive truck?

A.   Well, it could have been a lot more expensive, but I didn't want to challenge myself with the math.

Q.   Okay.  So depreciation rules, where -- where -- where do those come from?

A.   So the depreciation rules that we follow are part of the accounting standards that we have to keep the books so they are -- they are set in accounting policy.

Q.   Does ExxonMobil make those rules or does somebody else?

A.   Oh, we don't make those rules.  The -- The FASB makes those.  The people that make the rules for how you keep your books, that's who did it.

Q.   Now, Mr. Rosenthal, ---

THE COURT:  Is that GAAP?

THE WITNESS:  Well, they -- What they -- Their product is GAAP, Generally Accepted Accounting Principles.

THE COURT:  Okay.

Q   (By Mr. Melscheimer) There's been -- Were you here for the Opening Statement?

A.   Yes, I was.

Q.   Did you hear the suggestion made by Plaintiff's counsel that Exxon, in effect, rigged this impairment testing to avoid taking an impairment ahead of its 2016 bond offering?

A.   Yes, I did.  I heard that.

Q.   How do you react to that suggestion?

A.   It's -- It's -- It's totally false.

Q.   Why do you say that?

A.   Well, we do -- we do our impairment analysis like we do everything.  We do it when it's appropriate, how it's appropriate.  We follow the rules.  And -- And once we come to our conclusions, we let the chips fall where they may.  We are not influenced by external events or other things going on.

Q.   Aside from you and other Exxon employees, who would be looking at the process that you described on impairment to make certain Exxon was following the rules?

A.   Well, different layers in the Controller's organization look at it as well as, I think, primarily PricewaterhouseCoopers is doing their reviews and their examinations.

Q.   We heard from Mr. Swiger, something called the "Audit Committee."  What's that?

A.   Yes.  So the Audit Committee is the Audit Committee of the Board of Directors, so our independent Board of Directors.  A

**App. 191**

VOLUME 3-B    9

subset of them form the Audit Committee of the Board.

Q.   What -- What role would they have in this impairment analysis?

A.   The role the Audit Committee of the Board has is to oversee all of our financial statements, our controls over those financial statements.  And then we do, in fact, review these with them.

MR. MELSCHEIMER:  Your Honor, may we -- may we approach just briefly on one issue before I move on very quickly?

THE COURT:  No.

MR. MELSCHEIMER:  All right.

Q   (By Mr. Melscheimer) Let's move on to Kearl reserves.

A.   Sure.

Q.   Can we do that?

A.   Yes.

Q.   I want to talk to you about the process of estimating the proved reserves in 2015.  Are you with me?

A.   Yes, I am.

Q.   Okay.  Let's take a look at Defense Exhibit 5 which has been pre-admitted.

So this is an e-mail involving -- from a man named "Prestipino" to someone named "Littleton," copying someone named ---

MR. BURKHOLZ:  Your Honor, I think we've got an objection to this.  It's hearsay.

VOLUME 3-B    10

MR. MELSCHEIMER:  Oh, I thought -- I thought it was in evidence.  It's an agreed exhibit.  I've got it down as an agreed exhibit.  DX 5?

MR. BURKHOLZ:  It's agreed.  I apologize.

THE COURT:  Okay.  Go ahead.

Q   (By Mr. Melscheimer) Who's "Mr. Prestipino"?

A.   So Mr. Prestipino is a gentleman that works -- worked in my Controllers organization.

Q.   What was his role?

A.   He was in the financial reporting end of our business.

Q.   What about Mr. Littleton?

A.   Mr. Littleton was the Controller of our Global Oil and Gas Production Company.

Q.   Okay.  So let's go to the bottom string here.  And it says, "Vince/Janie:  What is the status of our page related to the implications of debooking reserves at Kearl for our review with DSR?  Have you guys caught up with Bill?"

Did I read that correctly?

A.   Yes, you did.

Q.   Who is "DSR"?

A.   Well, that would be me.

Q.   Who is "Bill"?

A.   Well, that would be Bill Strawbridge, the head of the Global Reserves Group.

Q.   Is he the head of this group that we have right here as No.

VOLUME 3-B    11

4 on the whiteboard?

A.   Yes, he is.

Q.   Remind the jury where that group sat in relation to your group in the Controllers organization.

A.   So the Global Reserves Group was completely separate from the Controllers group.  They were their own organization.

Q.   So this e-mail is in April.  When does ExxonMobil report its estimates of proved reserves?  Is it in the middle of the year or later?

A.   No.  It's at the end of the year in the 10-K.

Q.   So can you share with the jury, if you know, why Mr. Prestipino and Mr. Littleton would have been discussing the implications of debooking reserves at Kearl with you in April of 2015?

A.   Yes.  We had a -- a process within the Controllers group we generally started after the First Quarter.  That was called the "Watch List Process."  And -- And what that was, you've heard us talk about "bottoms up."  Well, this is a bottoms-up process where I ask all the people in my organization there out in the field, in the businesses doing what they're doing, to keep their eyes open and be on the lookout for anything that's out there, anything that's happening in the environment, in the market, in the business that might later on potentially become a financial issue.  And then we would gather those up and have a Financial Issues Review.  So we're keeping on top of that.

VOLUME 3-B    12

And so what's happening here is they have identified, looking at Kearl and the low -- the low price environment, and they're getting ready to add this as a Watch List item, meaning we're going to keep an eye on it and -- and look at it over the year.

Q.   Had the decision been made or not made at this point with respect to estimating proved reserves?

A.   Oh, no, it had not been made.  We're in April.

Q.   And is that a decision that's made within your group or someplace else?

A.   Oh, that is not me.  Within the Controller's function.

Q.   So let's take a look at the reply that Mr. Prestipino mentions.  And he says, "Stephen, yes, we have had -- we have had several discussions with Bill."

Do you believe that to be Mr. Strawbridge?

A.   Yes.  That was -- That was Mr. Strawbridge.

Q.   "We will have a draft to you to review early next week."

And then there's -- there's three things mentioned there.  Can you explain to the jury why those three things would have been relevant to a discussion about Kearl reserves?

A.   Well, if you're going to talk about potential things that might happen down the road and you're going to review those with me, you generally would talk about the things that I would be most interested in relating to the financials.  And so three of those are there.  They're going to be prepared to talk about what

**App. 192**

VOLUME 3-B    13

we would do, how we would calculate depreciation and still be within the rules that I mentioned. So they're going to talk about that. You see some of that there.

They're going to talk about whether or not if debooking reserves had any relationship to the need for -- to do an asset recoverability or impairment consideration.

And then finally, we need to be thinking about if we were to some day have to make a disclosure, what might that look like.

So very typical of what would happen if somebody was raising a potential issue for all of us to sit down and talk about.

Q.    So I want to make sure we're keeping things straight here. So this is our Kearl object. And that's debooking, right?

A.    Yes. Yes.

Q.    But this uses the term "impairment" and kind of seems to mix those terms up. Can you explain that for the jury?

A.    I can because sometimes people mix those up and they think if you debook reserves, by definition, the assets that are producing those reserves need to be impaired. But if you recall some of the dialogue we've had about debookings, they tend to be temporary. And when prices come up, you put them back on the books. And we talk about impairment looks at cash flows for the length of the project.

So reserves, that decision is made based on one year's data for that year. And that's when you decide, as we've talked about, whether reserves come in or off the books, where the

VOLUME 3-B    14

impairment analysis isn't using today's prices. It's using the prices out into the future.

But the reason it's on the list is because sometimes people confuse those, and I need to sit down with them and make sure they understand the difference.

Q.    As the Controller of the company at this time, what does reviewing this e-mail now in 2026 tell you about the processes that were in place at the company back in 2015?

A.    Actually I have to tell you this: I'm happy to see this because this tells you things were working just the way I wanted them to work. This is the process that we put in place to make sure that myself, as the Controller, kept informed of potential or rising issues that were out there. Whether they were going to eventually have an impact or not, I needed to be aware of their potential implications.

Q.    Let's take a look at Plaintiff's Exhibit 115. I believe you were asked about this on your -- on your examination, sir.

THE COURT:    What was that last exhibit?

MR. MELSCHEIMER:    The last exhibit, sir, was DX 5. DX 5.

THE COURT:    Thank you.

MR. MELSCHEIMER:    And this, Your Honor, is PX 115 already in evidence.

Q.    (By Mr. Melsheimer) So this is an e-mail attaching -- Well, what does it say it's attaching?

VOLUME 3-B    15

Well, they've just taken off the one thing that would tell you that.

A.    Yes.

Q.    Okay. There you go.

A.    Okay. It's the "Upstream Financial Issues Review" for May. So about a month later from when that other thing we saw or were looking at.

Q.    What is the "Upstream Financial Issues Review"?

A.    Okay. Well, that's where like every quarter or so my direct reports, and I was the Controller over the businesses Andy talked about, Upstream, Downstream and Chemical, and each of them would come in and have what was called a "Financial Issues Review" which would be: Here's everything that's on the Watch List. Here's the things we're keeping an eye on. Here are some potential things that might happen down the road you need to be aware of. And then we just sit down as a group and we talk about all these for several hours every quarter.

Q.    So let's take a look. Who is "Beth Casteel"?

A.    So Beth Casteel was the Vice-President of Upstream Business Services.

Q.    Did she work for you or someone else?

A.    She reported to me.

Q.    Looking at her e-mail to you and others, starting on Exhibit Page 1 and continuing on to Page 2, does she list several items?

A.    Yes. She's following up on several items.

VOLUME 3-B    16

Q.    Do many of them have nothing to do with what we're talking about today?

A.    Yes. Most of them don't have anything to do with what we're talking about today.

Q.    Was Kearl an item on the agenda?

A.    Yes, Kearl was an item.

Q.    Okay. Is that where it says "Kearl reserves"?

A.    Yes, it is.

Q.    What does she say you're doing with respect to Kearl reserves back in May of 2015?

A.    Well, we were monitoring the Kearl SEC price sensitivity. So recall the price for SEC purposes is the first day of the month for 12 months and you average those. And so what she's saying is: Well, we're here in May and we have a few months of data and -- and we're monitoring it." And also, as we do, compare all of our results that Andy talked about yesterday. So that's some of the things we do.

And so she's saying, "Hey, we're going to monitor the prices and our plan assumptions for operations and production and costs for a potential interim reserve debook," and picking up on one of the things we talked about, depreciation, confirm Dallas policy -- Joe Horne's group -- for what was called a "Modified UOP" using reserves determined on a company-priced basis.

You don't have to worry about what all that means. All that says is if you debook the reserves, you need a -- you need a

depreciation methodology and what's that going to be.

Q. So she mentions "potential interim reserves debook." What does that mean?

A. Well, that would be down the road later in the year, you know. If -- If we needed to make a -- a potential interim reserve disclosure, what would that -- what would that look like? How would we think about that?

Q. She uses the word "potential." Did Exxon end up having to make an interim disclosure in 2015?

A. Yeah. That's the disclosure we made at the end of the year.

Q. But an interim disclosure.

A. Oh, no, no. No.

Q. Did you ever see or hear anything during 2015 where it was stated that Kearl would be debooked?

A. No. No, I never heard that.

Q. So let's look at Plaintiff's Exhibit 88 which is an agreed exhibit in evidence. Do you see this, sir?

A. Yes, I do.

Q. Do you remember being asked about this on your original examination?

A. Yes, I do.

Q. Now is this related to this October 26th, 2015, presentation to Mr. Tillerson about the Kearl reserves?

A. Yes, it does.

Q. So I'm showing you some e-mails, Plaintiff's Exhibit 88.

Now do you recognize these e-mails?

A. Yes, I do.

Q. How looking at the middle of the page, is there an e-mail from Ms. Casteel to you a few days before this October 26th meeting?

A. Yes. Yes, there is.

Q. And she says, "Hi, David. Attached is the latest draft of the deck for the Kearl discussion." What was that?

A. So that was the discussion we were going to have with Mr. Tillerson.

Q. What does she say in the rest of the e-mail, if you could read that to the jury? And I want to ask you a question or two about it.

A. Sure. She says, "The backup chart helps to describe the current pricing basis which is modeled after the process used for Cold Lake. Bill's team" -- that would be Bill Strawbridge, Global Reserves -- "is thinking through the implications of the growing percentage of sales into the U.S. for the process going forward. My vote is to keep it simple since there is a liquid market in Edmonton and the SEC price for reserves determination is to exclude any value generated by investments made downstream of the oil and gas operation; for example, transportation, refining, et cetera. Thanks, B."

Q. So let me ask you a couple of questions about that. She mentions the process used for Cold Lake.

A. Yes.

Q. What is that?

A. The process used for Cold Lake, remember, we had two oil sands projects. We had Kearl, which was mining, and Cold Lake, which was what we call *in situ*, underground and the Cold Lake had been on for a long time and we had a process for ---

Q. How long had Cold Lake been operating?

A. Gosh, I don't know the total but it was several years; several years.

Q. Might it have been as early as 1985?

A. It could have been. I know it had been on a long time.

Q. Okay. Please continue.

A. And so we had a process to do the reserves just like we've talked about over the last couple of days. And so when -- when the Kearl project, the oil sands project, started up, they modeled that -- that SEC reserves calculation after the process we were already using and had used for many years for Cold Lake.

Q. Now she says, "Bill's team is thinking through the implication of the growing percentage of sales into the U.S. for the process going forward."

A. Yes.

Q. Did I read that right?

A. Yes, you did.

Q. Who is "Bill"?

A. Well, that would be Bill Strawbridge.

Q. Global Reserves Group?

A. Global Reserves Group. That's his team.

Q. And what did you understand her to mean by "the process going forward in connection with the growing percentage of sales into the U.S."?

A. Well, given that it was late October, I interpreted this to mean for the process going forward the next year. In other words, we're looking this year at what we might want to do next year.

Q. She expresses an opinion about what to do by saying "my vote." Do you see that?

A. Yes, I do.

Q. What do you understand her to be saying, "My vote is to keep it simple"?

A. Well, that's ---

MR. BURKHOLZ: Objection, Your Honor. Calls for speculation.

THE COURT: Sustained.

MR. MELSCHEIMER: Let me just rephrase that, Your Honor. I'm trying to meet the objection.

Q. (By Mr. Melscheimer) What did you under -- What did you understand her to mean when she said, "My vote is to keep it simple"?

MR. BURKHOLZ: Leading, Your Honor.

THE COURT: I'm going to let him -- I'm going to let

him answer that. Overruled.

A. Okay.

Q. (By Mr. Melscheimer) You may answer, sir.

A. All right. Thank you.

I -- I interpreted that to mean that what she was saying is: There is a liquid market in Edmonton and -- so she wants to keep it simple, and she raises a couple of interesting points. One, there is a liquid market in Edmonton. That's what we had been using. And then she mentions some things that we have to be careful of when we're -- if we're thinking about doing something different going forward because -- because there's all these other rules. Okay?

And you've heard discussion the last few days about pipelines and rail cars and refineries. Well, some of those were third-parties and some of those were owned by ExxonMobil. And all Beth is raising here is, "Hey, if we're going to be thinking through this, we need to -- we need to keep in mind that any investments we've made downstream that happen to be in here, we need to make sure we get this right and that we don't end up adding value that's generated here up into the SEC price value" because that wouldn't be the correct thing to do. So she's raising it as something we all got to think about going forward.

Q. Now -- And "going forward" meaning what?

A. In the next year.

Q. So let's take a look at an e-mail that you sent on this

string to Mr. Rosenthal -- I'm sorry -- This is a different exhibit, Plaintiff's Exhibit 508. Same topic.

Do you recognize Exhibit 508 as an e-mail, which is a day later from the Ms. Casteel e-mail, that you sent to Mr. Swiger? What is the topic?

A. So the topic is "The Kearl Reserves Review."

Q. And we've gone through this e-mail, but let me just ask you a few questions about it.

You say, "You should have received a draft of the review package." What did you mean by that?

A. Just a draft of -- of the review package that we planned to use in the Kearl reserves review.

Q. Then you say, "As I understand the methodology, they have decided to use the price at Edmonton and only use sales to third-party customers in Canada, not including any sales to EM affiliates, nor sales into the U.S." Did I read that correctly?

A. Yes, you did.

Q. What did you mean by that?

A. Well, what I meant by that -- First of all, when I said "they," that would be Bill Strawbridge and his Reserves Group. And I'm just telling Andy that the Reserves Group has decided for this year that they're going to use the price at Edmonton and then also only use sales to third-party customers that are in Canada, and they're not going to include any sales to ExxonMobil affiliates. So those would be companies or businesses that we

actually owned ourselves in the -- in the -- in the downstream, nor sales into the U.S. So they're not going to include any of that in the calculation.

Q. Who was responsible for preparing the deck, the slide deck for the Kearl reserves review meeting that you were going to be involved in with Mr. Tillerson and Mr. Swiger?

A. So, again, that would be Mr. Strawbridge, the head of the Global Reserves Group. His team would do all of that work.

Q. Then you say, "This is apparently what they do for Cold Lake, although I don't know if the dispositions of CL crude are similar to Kearl." Do you see that?

A. Yes, I do.

Q. So, again, who is "they"?

A. Well, again, that would be the Global Reserves Group led by Bill Strawbridge.

Q. And Cold Lake is that other bitumen production facility?

A. Yes. That's "CL."

Q. Now a little further down you say -- or the next sentence you say, "There is a chart in the backup that gives an example of how the price is calculated." Do you see that?

A. Yes, I do.

Q. Why was that included?

A. Well, that was a chart that I asked them to put into the backup to just give a visual depiction of -- of how our crude is flowing and how the price is calculated.

Q. So continuing, you say, "You will recall that at the time I first discussed this with RWT" -- Is that Mr. Tillerson?

A. Yes, it is.

Q. "The analysis was very close on whether or not the reserves could be considered economic." So let's stop right there.

What -- What did that part of the sentence mean?

A. So what I'm communicating there is I had had a discussion with Mr. Tillerson. I believe, if I recall right, it was a number of topics but this was one of them. And at that time, with the SEC prices that we had, okay, they already happened through the year, this analysis was close. And -- And so just what I said, they're now -- the analysis is close to being considered economic.

Q. And is the -- is the price that is being considered, is that changing from month to month or is it staying the same?

A. No. It's changing every month.

Q. Why is that? Remind us why that is.

A. Well, it changes every month because you're only using the price on the first day of each month. So unless the price was exactly the same on the first day of one month as it is the next month, that price is going to change. And as you remember, we had been monitoring this since early in the year.

Q. And then you say -- You said, quote, "economic." Why -- Why did you put "economic" in quotes?

A. Oh. Well, "economic" is the test for keeping the reserves

on the books.

Q.    Whether the -- what you can make selling it is greater than the cost of getting it out of the ground.

A.    Yes, per the methodology that we're using.

Q.    Sometimes called the "Cash Flow Test"?

A.    Yes.

Q.    And you say, "and, thus, I believe one of the reasons for his interest in the netback calculation assumptions being used." What did you mean by that?

A.    Oh, that simply means that after our discussion, he had an interest in -- in seeing how all of this was done, what did this look like, how were these calculations being -- being calculated.

Q.    And then you say, "While the spread between revenue and cost is now safely positive, I think the team should be ready to discuss Kearl bitumen disposition options and related value chain and netback."

So what did you mean by "The spread between revenue and cost is now safely positive"?

A.    Yes.  By the time we had gotten to this point in the year, the production had actually ramped up and we were producing a lot more barrels.  And so the costs divided up by those barrels was much less than it was earlier in the year.  So that unit cost of production had gone down.

And when you compare that to what the prices were through -- through now into October, that spread had -- was now wide.  I

don't remember exactly how wide, but it was safely wide.  So there wasn't a huge concern at this point.

And then I said, "Hey, even though it's safely positive, I want to have the meeting, anyway.  I want to have the discussion. And I still think the team should be ready to discuss these disposition options and related value chain and netback."

And the reason I said that was:  Again, we were in this evolving situation with Kearl coming up and things that Beth mentioned.  And so I just thought it was important to get out on the table, if we're looking at what we're going to do in the following year, what does this look like?  Where is this bitumen flowing?  Where is it going?  Is it going to ExxonMobil businesses through ExxonMobil assets?  Is it going third-party?

And then the "value chain" which is really at the end of the day:  How are you going to make the most money selling this product in the market?  That's -- That's the "value chain."

Q.    What does "safely positive" mean in connection with the SEC Cash Flow Test?

A.    Well, it means that -- that we're not going to take a debook.

Q.    Let's take a look at Plaintiff's Exhibit 117.  I believe you were asked about this in your earlier examination.  It's been pre-admitted.

Now this is an exhibit of an e-mail to yourself and others with attachments that reference this October 26th Chairman's

Review.  Do you see that?

A.    Yes, I do.

Q.    Do these materials relate to this meeting in October that we've been talking about?

A.    Yes, they do.

Q.    Looking at the page stamped 2 of 11, we see your name is there?

A.    Yes, I am.  Right in the middle.

Q.    If we flip back, who's sending out this e-mail initially?

A.    That's Bill Strawbridge sending out the -- the memo and attaching the package that he and his team have prepared.

Q.    If you go down to the bottom there of that e-mail, you can see -- Does the Global Reserves Group actually have its own logo?

A.    Yes, they do.

Q.    And can you read that, the three words on the logo there?

A.    Well, the second one is "consistency" and the third one is "commitment" and I have to be honest -- oh, "collaboration," I think, is the first word.  So I think -- I think that's what they're saying:  Collaboration, consistency and compliance.

Q.    How do those three words work based on your understanding of what the Global Reserves Group does?

A.    Personally, I think it's a -- it's a great message to his organization.  And -- And what he's saying here, I think, is, again, is a good message.  We're going to collaborate.  No one person gets to make the decision.  No one person's going to be

doing all the work.  We're going to make -- We're going to remain consistent over time.  And -- And if the last word is "commitment," this is a commitment to -- I assume this is a commitment to basically complying with the rules and doing what they should be doing.

Q.    Okay.  Thank you.

So let's go back to the -- Let's go to the last page of this exhibit, Page 11 of 11.  Do you see a chart titled "Kearl Value Chain - Bitumen Sales Options"?

A.    Yes.

Q.    Was this the chart that you had told in that earlier e-mail with Mr. Swiger that you had requested the reserves team include?

A.    Yes.  This is the "Kearl Value Chain - Sales Options."  So this is the chart that depicted where we were selling the crude and thinking about the value chain itself.  In other words, how are we going to make the most money on this.

Q.    How does what is shown on this slide compare to what you had heard from Mister -- Ms. Casteel and told Mr. Swiger about the pricing methodology that was being used at Kearl for the SEC estimate?

A.    So what this shows is for the current year's SEC estimate, you can see the various places we were -- we were sending and selling this crude.  And then it's -- it's just noting within the model what they were using, which -- which items were in the -- in the formula, in the methodology and what they're using, like

marker price and differential. And then it also showed those sales dispositions that -- that were not included in the SEC price methodology.

Q. Thinking back to this meeting -- And it was 11 years ago almost, right?

A. Yes, it was.

Q. Do you recall any pushback to what Mr. Strawbridge was presenting?

A. No, I don't recall any pushback from anyone on this presentation.

Q. Do you recall anyone giving any direction to Mr. Strawbridge to do something different to calculate the SEC price for proved reserves?

A. No, I do not.

Q. Do you recall any direction to Mr. Strawbridge not to do something different?

A. No, I don't -- I don't recall any direction along those lines.

Q. Now we've heard that -- that Exxon and Imperial updated this SEC pricing methodology in 2016. Have you heard that?

A. Yes, I did hear that.

Q. What is your understanding of why the methodology was updated in 2016?

A. Well, as we got into 2016 and they were really working through all these options that you see here -- And, again,

they're trying to maximize what we call the "value chain." How -- From top to bottom, how do we make the most money?

And as we -- as we got into 2016 and we're making some of these sales and we had more clarity on pipeline opportunities, rail car opportunities, customer opportunities, and you worked through some of the things on inner-company sales and that sort of thing, they had gathered a lot more data and a lot more information. And when they looked at all this -- this new data set, new information, and -- and they're not doing this in a vacuum, they're talking the business, understanding how we're running the business, they decided that a change to the methodology would be appropriate.

Q. Why wasn't that updated methodology change made in 2015?

A. Well, because in 2015 the judgment was: We didn't have sufficient data for a business that was in the start-up, ramp-up stage, and we were testing all types of things, and they just -- they just didn't think that -- that what we knew at the time warranted making a change.

MR. MELSCHEIMER: Your Honor, might we -- might I approach to address an issue the Court raised before we took the last break and invited further conversation?

THE COURT: I was planning on letting you come up when you come to the end of whatever you're doing.

MR. MELSCHEIMER: This is an appropriate time to do that, Your Honor, if it pleases the Court. I'm not -- I got a

few more minutes to go but this would be the appropriate time.

THE COURT: I'm still giving you the side eye.

MR. MELSCHEIMER: You are.

THE COURT: But I'll let y'all come up.

MR. MELSCHEIMER: Thank you. Thank you, Your Honor.

(At this point the Court and counsel held a discussion at sidebar off the record.}

MR. MELSCHEIMER: Okay. Thank you. Thank you, Your Honor. I really appreciate that.

Q. (By Mr. Melscheimer) So, Mr. Rosenthal, I want to go back to this concept of impairment. Are you with me?

A. Yes, I am.

Q. Okay. Now I want to take you back to 2014, and I'd like to show you an e-mail, Plaintiff's Exhibit 128.

MR. MELSCHEIMER: And I assume there's no objection to this.

MR. SHELDON: Certainly no objection to this, Your Honor.

THE COURT: All right. Then it's admitted.

Q. (By Mr. Melscheimer) I want to go through this with you to -- Okay. So ---

THE COURT: Are you going to use your finger to point or do you need a pointer?

MR. MELSCHEIMER: It's a lot cleaner.

THE COURT: I wouldn't bet on that, but let me -- let

me get you a pointer. Let me get you a pointer.

MR. MELSCHEIMER: I'd like that pointer, Your Honor.

THE COURT: Ronnie's got -- Where Ronnie's? He slipped out on me. Oh, you've got a pointer? Great.

MR. MELSCHEIMER: I do. I could use a few pointers.

THE COURT: Ronnie, do we got a pointer, too?

MR. MELSCHEIMER: Is it analogue?

THE COURT: It's a green one. Baylor green.

MR. MELSCHEIMER: Oh, nice. Really nice. Oh, no. It's red.

THE COURT: Oh, wow!

MR. MELSCHEIMER: It's Alabama red.

THE COURT: What happened to that green one we had? I don't know. Okay.

MR. MELSCHEIMER: Okay. Oh, mine's Baylor green.

THE COURT: Well, the Lord is intervening in your life.

Q. (By Mr. Melscheimer) Okay. So let's take a look at this, sir. Can you hear me okay?

A. Yes, I can.

MR. MELSCHEIMER: Madam Court Reporter, can you hear me?

COURT REPORTER: Yes.

MR. MELSCHEIMER: Okay. Thank you.

Q. (By Mr. Melscheimer) So what is the subject of this e-mail?

A. So the subject of the e-mail, as this title says, it's

called "The Ceres Draft."

Q. Now what is the year we're talking about?

A. Oh, this would be 2014; early 2014.

Q. Okay. So does this e-mail that we're talking about have anything to do with impairments of the Rocky Mountain dry gas assets that are involved in this case?

A. No.

Q. Is it -- Does it have anything to do with the 2015 10-K that we spent the last few days talking about?

MR. BURKHOLZ: Leading, Your Honor.

THE COURT: Sustained.

Q (By Mr. Melscheimer) Tell the jury whether or not this has anything to do with the 2015 10-K.

A. No, this -- this has nothing to do with our 2015 10-K.

Q. Were you even the Controller in 2015?

A. No. I was the Vice-President of Investor Relations and the Secretary of the corporation.

Q. Okay. So 2014, something called "Ceres Draft."

Now just -- I want you to explain to the jury just at a high level what is "Ceres"? What is "C-E-R-E-S"?

A. So Ceres is what we call an advocacy organization. So think of a group of people who are focused on a particular subject and dialogue with, in this case, investors and companies about this subject that they're very interested in. That's an advocacy group. Ceres is an advocacy group.

Q. Now what was their -- Just generally, what was their main issue that they were focused on?

A. So their main issue, in general, had to do with climate change.

Q. And so what were you doing with respect to Ceres in March of 2014?

A. So Ceres had asked us, which a lot of advocacy organizations do, to interact and dialogue with them on what they viewed as being possible potential government regulations and policies well into the future. So this is a hypothetical policy or set of rules that wasn't in place now. And so they had come and talked to us about what they thought this potential was and had asked us to respond to what they were saying, and they asked us some questions. And so that's -- At a very high level, that's what this draft is. We're being responsive to our discussions.

Q. Why were you involved in this response?

A. Well, as head of Investor Relations, I dealt with investors. And sometimes these -- these groups were activist investors. They were investors.

As Secretary of the Corporation, I was responsible for dealing with shareholder proposals that would -- that were being offered up for our proxy. That was one of my roles as Secretary of the corporation, and -- and Ceres had talked to us about a shareholder proposal that dealt with some of these issues.

Q. And there's discussion here about carbon risks, asset

discussion, and managing risks and things of that nature. Is this a -- What is -- What is this dialogue taking place between you and Mr. Luettgen?

A. So let me just read this real quick.

(Pause)

A. So that I am concise, what was your question again?

Q. The question is: What is this discussion you were having with Mr. Luettgen? And who was Mr. Luettgen?

A. Okay. So Mr. Luettgen worked for me, and he was -- he was our Manager of Shareholder Relations, amongst his other responsibilities. So he was kind of the point man on the ground dealing with advocacy groups and activist shareholders.

Q. And what was the work product you were creating?

A. So we were creating what turned out to be a 30-page report to address the issues that they had raised, answer their questions, and really continue the dialogue about the subjects that you see here: Carbon risk, how you manage those, how they relate to climate change. And so it's -- it's a pretty big bundle of topics that we'd been asked to deal with. And so here, we're having some discussion about: How are we going to do this? What's in? What's out? And what order?

Q. Okay. So let's take a look, if we can go down in the e-mail. Do you -- Does he send you a draft in the bottom e-mail? And then what do you say to him in 2014?

A. Okay. So I said -- And this comes after -- We were going

through the drafts and I had previously to this e-mail dialogue asked him to take a footnote that dealt with "impairment" out of the section of the report that was dealing with all those other topics.

Q. And you say, "That word gives the folks on the third floor heartburn."

A. Yes. At the time -- Because he had -- In the other note he had said -- He said, "I just want to confirm you want me to do this." And I said, "Yes. Let's leave off the 'impairment' footnote. That word gives the folks on the third floor heartburn."

Q. What did you mean by that?

A. Well, what I was trying to -- to relay to Rob was: Yes, I asked you to do this. Yes, I still do.

That -- That word "impairment" is -- You know, this is a very important word. This is a very important concept. It has lots of connotations that deal with financials and other things, and it doesn't have anything to do with this work we're doing on this report.

Q. Were you doing any kind of an impairment analysis like we've been talking about in 2015 in this report?

A. No. No, we weren't. This was -- This report -- Just real quickly, this report dealt with the world's demand for energy, electricity, gas, all that, and how it -- way out into the 2040 '50 timeframe, and how the world was going to meet that demand.

VOLUME 3-B    37

Where were the supplies going to come from?

Q.    What's the timeframe?

A.    2040, 2050 is when ---

Q.    2040?

A.    Yeah, when the impact of these policies would -- would -- would happen.  And so they were -- Again, they were talking about these policies and what they thought might happen and what risk that might be to oil and gas companies which -- I mean without going through a whole discussion, it basically would have put us out of business.

Q.    Does that word there have anything to do with the 2015 discussions about the Rocky Mountain impairments or the accounting analysis or anything like that?

A.    No, not at all.

Q.    And you weren't even the Controller in 2014.

A.    No.  I was -- I was the person in charge of dialoguing with these folks and -- and being responsive to their requests.

Q.    Just a couple more questions before we finish, sir.

    You were asked about a lot of different articles, and you were shown some articles back in 2015 talking about the performance of Exxon and other energy companies.

    Is there a common thread in those articles about what every one of them is highlighting?

A.    Well, yeah.  They're talking about what -- what our competitors are doing for one thing.  And then the other thing

VOLUME 3-B    38

they're highlighting is that they think the -- when we published our Third Quarter results, that the stock dropped.

Q.    And is there -- What is being said, if anything, in those articles about prices, foreign prices?

A.    Well, they talked about being in a very low price environment.  And that low price environment was having these impacts.

Q.    For everybody.

A.    For everybody, yes.  They talked about everybody.

Q.    Was that any kind of a secret?

A.    No.  They weren't -- They weren't scooping anybody with those articles.

Q.    All right.  Mr. Rosenthal, you've been in this courtroom since Monday; right?

A.    Yes, I have.

Q.    You have been on the stand about an hour yesterday and up until about 2:30 today.

A.    That is correct.

Q.    Is there anything you would have done differently as it relates to putting your signature on this 2015 10-K Annual Report?

A.    No.  There is nothing I would do differently.

Q.    Why not?

A.    Because what was true in 2015 is true today.  I -- I stand by my signatures and I stand by that work product and the

VOLUME 3-B    39

processes and people that put that thing together.

Q.    Have they shown you any document or e-mail or something that you did or wrote or saw that's caused you to second-guess anything you did in signing that certification in that 2015 10-K?

A.    I have not seen anything over the course of the trial so far that would have caused me to do anything different than what I did which was sign that document.

Q.    Now my trial partner asked Mr. Swiger this question, and I'm going to ask you and I'm going to -- I'm going to end with this question to you, sir.

A.    Okay.

Q.    You've been accused of securities fraud in connection with this 2015 10-K.  Sitting here, being here on the stand, what's your reaction to that?

A.    Well, I'll tell you:  The -- My reaction goes back to when you first asked me did I know what "securities fraud" was.  And I'll tell you it was hard to get those words out of my mouth, that I had personally lied, that I had -- had an intent to mislead people.  That's difficult for me to even say.  And -- And I will tell you:  There is nothing anybody could say to me or say about me that would be any more wrong than that statement, personally lying and an intent to mislead.  Okay?

    The -- The other thing that came to my mind as I've been going through this, you know, we talk a lot about "bottom up." You've heard that a lot about "bottom up".  And so I wasn't just

VOLUME 3-B    40

thinking about me.  I was thinking about my organization, that large group of thousands and thousands of people that do the work to put that document together.  And -- And, you know, I can -- I can assure you from the bottom -- and I think I was referred to this the other day as one of the bosses -- from the bottom to the boss, I stand by my signature on those documents.  Always have and always will.

        MR. MELSCHEIMER:  May I have a moment, Your Honor?

        THE COURT:  Sure.

        MR. MELSCHEIMER:  Thank you, Mr. Rosenthal.

        No further questions, Your Honor.

        THE COURT:  Mr. Burkholz?

        MR. BURKHOLZ:  May it please the Court.  I have about 10 or 15 minutes of questions.

        THE COURT:  Sure.

        MR. BURKHOLZ:  Thank you.

        THE COURT:  Sure.  Yes, sir.

                REDIRECT EXAMINATION

QUESTIONS BY MR. BURKHOLZ:

Q.    Good afternoon, Mr. Rosenthal.

A.    Good afternoon.

Q.    Can you tell us what your compensation was in 2015?

A.    I think total, all in, my compensation was 3 and a half, 3.6 million dollars, something like that.

Q.    And what portion of that was salary and what portion of that

was bonus and stock?

A.   As I recall, salary and bonus was -- the cash part was like 1.2 million dollars and the balance of 24, 25 would have been in restricted shares.

Q.   And what about 2016?  What was your total compensation in 2016?

A.   In 2016 it was -- I think it went to about, if I recall correctly, four-and-a-half million dollars in total, 1.1 in salary and benefits or -- I'm sorry -- salary and bonus, and -- and the other 3 points a million in stock.

Q.   When you -- You testified that the change of including the U.S. transportation costs in the SEC reserve analysis, you didn't do it in 2015 but that you made the change later in 2016 before the disclosure where you debooked those 3.6 billion barrels.  Do you remember that testimony?

A.   Yes, I do.

Q.   And you said, "Well, we didn't include it in the 2015 analysis because we didn't have, quote, 'sufficient data,'" right?  That's what you said?

A.   Yes.

MR. BURKHOLZ:  So, Ms. Torres, can you bring up what's been put into evidence DX 213?  And can you -- can you bring up Page 11 and can we highlight the top part?

Q   (By Mr. Burkholz) This shows the transportation costs, right, for all of 2014?  $8.33?

A.   I'm not familiar with this presentation itself, but that is transportation, however they're calculating it.

Q.   Right.  I mean we've been looking at the barrel, the transportation costs; right?

A.   Yes.

Q.   And that in the First Quarter it's $7.07, right?

A.   Yes.

Q.   And there's a reference in the "Comments" there's a mix of sales at Edmonton and going to the U.S. Gulf Coast, right?

A.   On the far right, yes.

Q.   Okay.  Now let's look at ---

MR. BURKHOLZ:  Mr. Torres, can you bring up Exhibit 338 which is in evidence, Page 7?  And can you blow up the bottom left-hand part?

Thank you.  Thank you.

Q   (By Mr. Burkholz) I think you and I looked at this earlier. This shows the third-party Kearl volumes by point of sale, and I think we discussed the blue part which is shipments going to the U.S. Gulf Coast, right?

A.   Yes, they were.

Q.   And here we are going all the way to the end of 2015, and we have significant sales to the U.S., right?

A.   Yes, we do.

Q.   Close to 50 percent in some months, correct?

A.   In some months, yes.

Q.   Right.  So we have the data at this time, right?

A.   We have the sales data.

Q.   Right.  We have the actual transportation costs which you told me earlier today you used the actual costs in the SEC calculation, right?

A.   Within the methodology that the Global Reserves Group was using, yes.

Q.   Right.  And the methodology was not to include these U.S. sales, right?

A.   The methodology that the Global Reserves Group was using did not include these sales.

Q.   Right.  And that's a decision that you and Mr. Tillerson and Mr. Swiger ultimately are responsible for when you put this 10-K out to the public, right?  You're the ones responsible.

A.   We are responsible for the information in that 10-K, yes.

Q.   And when you eventually made the change to include the U.S. transportation costs, that was eight months after the 12-million-dollar bond offering, right?

A.   Yes.  Chronologically, it was eight months later.

Q.   Yeah.  Before we get to the impairment issue, which I'll finish my examination of you on, I want to go back to the bond offering.  And we marked Exhibit 122.

MR. BURKHOLZ:  Do you still have an objection to that exhibit?  122.  It's the due diligence document for the bond offering.

MR. MELSCHEIMER:  Oh, sure.  I'm sorry.  Yes, go ahead.

MR. BURKHOLZ:  Okay, no objection.

THE COURT:  All right.  Then that's admitted into evidence.

Q   (By Mr. Burkholz) Okay.  Let's just go back to this quickly.

MR. BURKHOLZ:  Mr. Torres, can you bring up 122?  And can you highlight the subject?

Q   (By Mr. Burkholz) You're on this e-mail, right?  Do you see it on the bottom, the CC?

A.   I -- I am sure I'm in here.

Q.   Okay.

A.   Yes, I see that now.

Q.   And there was a due diligence call between the company and the bankers just days before the offering, right?

A.   Okay.  Yes.

Q.   And can we turn to Page 8 -- Page 7 of the exhibit?

These are a list of questions that the underwriters, the bankers for the offering, are asking the company; right?

"Before we put this bond offering out, can you answer these questions?"

A.   I'm sorry.  I'm just familiarizing myself with the document.

(Pause)

A.   Okay.  I'm familiar with it.  Would you, please, repeat the question?

Q.   This is the due diligence being done by the bankers before

the offering, and they're asking the company, "Can you confirm information -- Before we send this bond offering out to investors, can you confirm and answer these questions?"

This is a typical process.

A.   Yes.

Q.   And if we look at Question 15, which is on the next page, --

MR. BURKHOLZ:  Let's highlight that.

Q.   -- they're asking you basically, "In addition to the information provided in your public filings, please discuss any material write-downs or impairments that are currently being deliberated or are probable because of announced or apparent political, regulatory or economic changes."

Do you see that?

A.   Yes, I do.

Q.   And the company responds -- the company referred to in this SEC filing said, "We don't have anything else to -- to tell you," right?

A.   That is correct.

Q.   Okay.  And you didn't tell the bankers that you had an SEC Kearl reserves analysis that did not include the U.S. transportation costs.  You didn't tell them that, right?

A.   No.  I would not have told them that.

Q.   And you didn't tell them that -- Well, strike that.

You didn't tell them anything about the fact that PricewaterhouseCoopers in a meeting indicated that in the

impairment analysis, that there could be a trigger?

A.   No.  I wouldn't have said that --

Q.   Okay.

A.   -- because ---

Q.   Let's -- Let's look back at Exhibit 55 which your counsel showed you.

THE COURT:  What was that last document?

MR. BURKHOLZ:  It was 122.

THE COURT:  Thank you.

Q    (By Mr. Burkholz) If we turn to Page 2, this is the page that Mr. Melsheimer was showing you.  That's you in the left-hand corner, right?

A.   Yes, it is.

Q.   Okay.  And this is a meeting with PricewaterhouseCoopers to discuss potential impairment of the Rocky Mountain assets and other assets, correct?

A.   Yes.  Yes, that's correct.

Q.   And PwC was your auditor at that time?

A.   Yes, PricewaterhouseCoopers.

Q.   And who's "Mr. O'Riordan"?

A.   So Mr. O'Riordan, if I recall correctly, was the Audit Manager for our upstream oil and gas business.

Q.   Let's see what he wrote on here.  He's "Michael," right, on the lower left-hand corner?

MR. BURKHOLZ:  Can we highlight that, Mr. Torres?

A.   Yes.  I believe that's Michael O'Riordan, yes.

Q.   (By Mr. Burkholz) Now your counsel pointed to the part above it, "We may be wrong," and you provided us some testimony on that.  Mr. O'Riordan wrote --

MR. BURKHOLZ:  Can we highlight the $5 and the $4?

Yes.  Thank you.

Q.   (By Mr. Burkholz) He wrote ---

MR. BURKHOLZ:  The whole thing, please.

Q.   (By Mr. Burkholz) "$5 to $4 LT," do you agree with me that refers to "long term"?

A.   Yes.

Q.   "Could be considered -- Could be argued as a trigger," right?

A.   Yes.

Q.   And that's Mr. O'Riordan, the partner on the case, telling you that it could be a trigger, right?

A.   He's telling me it could be.

Q.   And you didn't consider it a trigger at the end of the year when you looked at the prices, right?

A.   That's correct because ---

Q.   That was his -- his point at the time that it could be, right?

A.   It could be.

Q.   Now let's bring up Exhibit 128.  Well, before we do that, Mr. Melsheimer pointed you to the MD&A part of this 2015 10-K.

Do you remember that?

A.   I do.  I do remember that.

Q.   It's about 25 pages in here.  You can describe anything you want about the company's business, right?

A.   Within some parameters, yes.

Q.   And there's no disclosure at all in this 10-K about the hundreds of millions of dollars of losses at Kearl at the end of 2015, right?

A.   Yeah.  That is correct.

Q.   And do you know what "SAB 99" is?

A.   SAP 99?

Q.   SAB 99.  It's a regulation.  Your counsel pointed to a different regulation, and I'm asking you if you understand that there's other regulations that apply to this 10-K.

A.   I do.  I don't recall specifically what SAB 99 was.

Q.   It's a materiality regulation.  You don't know anything about it?

A.   I -- I do know what the materiality regulation is.

Q.   Oh, you do.

A.   Yeah.

Q.   And it says, "Anything more than five percent is considered material in certain situations."

Are you aware of that?

A.   Anything more than five percent, I don't recall that specifically.

Q.   And if there's a document in this case that refers to the fact that Kearl reserves, which were almost 15 percent, were material, you would expect it to be included under that regulation; right?

A.   I don't know because I don't know what that regulation says.

Q.   Okay.  Okay.

MR. BURKHOLZ:  Let's bring up 128.  Let's just highlight the "heartburn" part, that right there.

Q   (By Mr. Burkholz) Now you gave an explanation to this e-mail.  Let's talk about the issue of impairment.  The folks on the third floor that you said "impairment footnote gives heartburn" includes the two gentlemen sitting over there, Mr. Tillerson and Mr. Swiger; right?

A.   Well, I would like to say what I said is "The word gives the folks on the third floor heartburn."

Q.   Right.  And that is the two gentlemen in this case that are co-defendants, right?

A.   Yes.  They were -- They were part of the group on the third floor, yes.

Q.   Right.  And you have an MBA, right?

A.   I do have an MBA.

Q.   And you've testified for hours about the impairment process here, right?

A.   Yes.  Yes, I have.

Q.   An impairment is an impairment, isn't it, whether it's in a

---

letter to an investor or if it's in your financial statements?  There's no difference between what's being discussed here and the impairment that was not taken in the 10-K, is there?

A.   The -- The context is -- is completely different.

Q.   I see.  So the impairment that you didn't take in the 10-K because it gave Mr. Tillerson heartburn, the following year you took the impairment charge, and he was no longer the CEO at the time.  Isn't that correct, sir?  He had left on January 31st before then.

A.   That is not correct.

Q.   He was not the CEO on January 31st, 2017, when you took the -- when Exxon announced the impairment charge, was he?

A.   He was not the CEO that signed that 10-K.  That is correct.

Q.   Okay.

MR. BURKHOLZ:  Nothing further, Your Honor.

MR. MELSCHEIMER:  May I, Your Honor, just follow up on a few things?

RECROSS EXAMINATION

QUESTIONS BY MR. MELSHEIMER:

Q.   Was Mr. Tillerson the CEO when that impairment issue was raised at Exxon in 2016?

A.   Yes, he was.

Q.   So, Mister -- Mr. Rosenthal, so after all that questioning, the first thing he asked you was how much money you made.

A.   Yes.

---

Q.   Are you embarrassed about that?

A.   No.

Q.   Is that salary that you received made public?

A.   The incentive compensation was public, yes.

Q.   And what is the -- Where did most of that compensation come from?  Salary or stock?

A.   Stock.  Most of my compensation was in restricted shares of stock.

Q.   So you -- You've got an interest in the stock of ExxonMobil.

A.   Yes.

Q.   Just making sure.  Okay.  Making sure the company performs well.

A.   Yes.

Q.   Not hurting yourself.

A.   Yes.

Q.   Being honest.

A.   Yes.

Q.   High integrity.

A.   Yes.

Q.   Okay.  So I want to ask you about this "he directed you" to Plaintiff's Exhibit 55 and this notion that "he referred you" -- Pull that up.  I just want to do what -- focus on what he did.

Plaintiff's Exhibit 55, just to -- just to look at this, what is -- what does "restricted stock" mean?  You said "restricted stock."  What does that mean?

---

A.   "Restricted stock" means you're -- you're given the shares of stock but you can't have them for a long time.  So they're there.  But in my case, I was only entitled to the shares five years -- half in five years after they were awarded and the other half ten years or retirement, whichever came later.  So the shares were there but they weren't mine to put my hands on.

Q.   Five years?

A.   Half in five years.

Q.   Okay.  So I want to go to this.

MR. MELSCHEIMER:  And I've lost my Baylor green pointer somehow, Your Honor, between sitting down and whatever.

Q   (By Mr. Melscheimer) But there was a mention here of your statement of "we may be wrong" and then he highlighted this -- this notion of "trigger," correct?

A.   Yes.

Q.   I'm trying to find that, but ---

A.   It's the -- It's the second arrow under his name.

Q.   Sorry.  "Could be considered a trigger."  Do you see that?

A.   Yes, I do.

Q.   Was it?

A.   No.  What -- What -- What Michael O'Riordan was saying there is no different than I would have said.  It could be a trigger.

Q.   And what did Pricewaterhouse ultimately conclude about Exxon's analysis that there wasn't a trigger?

A.   They agreed there was not a trigger.  This was a statement

that said it could be. As you recall, we did all the work. Pricewaterhouse reviewed it. They said, "Yeah, it could have been but it wasn't."

Q. And then on this bond offering, you were asked some questions about the bond offering, about when it happened. So tell me if this is right: The bond offering was about a month after Valentines's Day.

THE COURT: Don't lead the witness.

MR. BURKHOLZ: Your Honor, it's leading.

THE COURT: Don't lead the witness.

Q. (By Mr. Melscheimer) Was -- The bond offering, when did it occur?

A. The bond offering occurred -- I can't remember the exact date now.

Q. Was it in March?

A. Yeah, it was in March.

Q. Was it before or after St. Patrick's Day?

A. I -- I don't recall when it was.

Q. Any relationship to St. Patrick's Day?

A. No. Whenever it was, there's no relationship.

MR. BURKHOLZ: Your Honor, is Mr. Melsheimer going to testify now?

THE COURT: What? I couldn't hear you.

MR. BURKHOLZ: Objection. Is he going to testify now? Come on.

THE COURT: You mean leading?

MR. BURKHOLZ: Yes.

THE COURT: Stained.

Q. (By Mr. Melscheimer) Did the bond offering have any relationship one way or another to any of the decisions we've been talking about either with respect to the Kearl proved reserves or the Rocky Mountain dry gas assets?

A. No. Although the chronology that's been laid out is correct, there is no relation between those events.

MR. MELSCHEIMER: Thank you.

Thank you, Your Honor.

MR. BURKHOLZ: One more question, Your Honor.

THE COURT: Yes, sir.

REDIRECT EXAMINATION

QUESTIONS BY MR. BURKHOLZ:

Q. The restricted stock that you received, the class members, including our client, paid for the restricted stock, the Exxon. You didn't pay for that, those shares that you got in addition to your bonus and your salary, correct?

A. They were part of my -- my compensation. They were part of my compensation for the job that I was doing with the corporation.

Q. And what was the total of your salary and bonus?

MR. MELSCHEIMER: Objection; asked and answered.

THE COURT: I'll let him answer one more time.

Overruled.

Q. (By Mr. Burkholz) Just 2015.

A. So if I recall what I said and it's right, it was in the order of three-and-a-half million dollars in total.

MR. BURKHOLZ: Nothing further, Your Honor.

MR. MELSCHEIMER: Thank you.

Your Honor, I have nothing further.

THE COURT: You may step down, Mr. Rosenthal. Thank you.

Mr. Burkholz, are you still up or we got a new lawyer?

MR. BURKHOLZ: I'm still up.

THE COURT: Okay.

MR. BURKHOLZ: Plaintiff calls Michael Swiderski.

MS. SOLOWAY: Your Honor, I apologize. I'm going to be covering this witness. Can we take a very short biology break, please?

THE COURT: Whoa! That is a very persuasive request. The answer is: Yes.

MS. SOLOWAY: Thank you.

THE COURT: Ladies and Gentlemen, y'all take a break. Don't talk about the case.

(The jury was escorted to the Jury Room by the Court Security Officer.)

(Court recessed from 2:47 PM until 3:00 PM.)

THE COURT: Okay. Bring the jury in.

COURT SECURITY OFFICER: All rise for the jury.

(Jury seated in the jury box.)

THE COURT: Y'all be seated.

Let me tell you something: Tomorrow it's going to be rainy and cold. I don't know. This is Texas; whatever. We don't -- This is an old, old building. This is how old it is: When I was at Baylor, I worked on air conditioners and I worked on those various type of air conditioners over there, and one of the guys come up to work on it. But, anyway, it's very inefficient and we switch over but we don't switch over until it gets really -- Oh, my microphone wasn't on. Sorry, Debbie.

What I'm saying is: It will be even colder tomorrow because I can't -- They won't turn the heat on and off. I mean it's the Federal Government. What do y'all expect? It's just not going to get -- not going to get done. So I think you might want to wear a toboggan tomorrow -- I don't know -- because it's going to be cold. I will try to get some heat on, if I can, a little bit but I just wanted y'all to know that.

Okay. You ready, Mr. Burkholz?

MR. BURKHOLZ: Yes, Your Honor. Plaintiff calls Michael Swiderski.

THE COURT: Hi, Mr. Swiderski. How are you, sir?

THE WITNESS: Good, Your Honor.

THE COURT: That's good. I bought some of those shoes like that online last night. I'm going to see how they work, --

VOLUME 3-B    57

THE WITNESS:  They're very comfortable.

THE COURT:  -- you know.

All right.  Get him sworn in.

MICHAEL SWIDERSKI,

Was produced, sworn, and examined as follow:

THE COURT:  All right.  And you know about sitting right here and that it's uncomfortable but you're going to lean up and talk into that microphone.

THE WITNESS:  Yes.

THE COURT:  Great.  Here we go.

DIRECT EXAMINATION

QUESTIONS BY MR. BURKHOLZ:

Q.   Mr. Swiderski, you were designated by the Lead Plaintiff, Greater Pennsylvania Carpenters Fund, now known as Eastern Atlantic Carpenters Pension Fund, to testify at this trial?

A.   Correct.

Q.   And the Greater Pennsylvania Carpenters Fund recently merged into the Eastern Atlantic Carpenters Fund at the end of last year?

A.   Yes.

Q.   During the time period of this case, 2015, 2016, the Lead Plaintiff, Greater Pennsylvania Carpenters Fund -- Pension Fund was a retirement fund for carpenters?

A.   Yes.

Q.   And still is, right?

VOLUME 3-B    58

A.   Correct.

Q.   And have you ever testified in court before?

A.   Never.

Q.   Are you a little nervous?

A.   A little bit.

Q.   And you had your pretrial deposition taken, also; right?

A.   Yes.

Q.   And was that the first time that happened?

A.   Yes.

Q.   And about how many hours did that go?

A.   It was like about six hours.

Q.   Okay.  And they showed you a lot of documents and asked you a lot of questions?

A.   Yes.

Q.   And Mr. Melsheimer showed a -- in Opening some things, some mistakes that you made in deposition answering questions.

Did you see that?

A.   Yes, I did.

Q.   And did you make some other mistakes during your testimony?

A.   Yeah, because it was something new and I stumbled a bit, but ---

Q.   Did you try your best?

A.   Oh yeah.  I always try my best.

Q.   And you've been here since the Opening Statement and watching the testimony?

VOLUME 3-B    59

A.   Yes.

Q.   Do you have a better idea of what "proved reserves" are?

A.   Yes, I do.

Q.   Okay.  Do you have any legal training?

A.   Zero.

Q.   And you've been the point person for the Fund.  I'm just going to refer to the Lead Plaintiff as "the Fund."

You've been the point person for the Fund on this litigation since the beginning ten years ago, right?

A.   Correct.

Q.   And the trustees that run the Fund, they know you've been doing that, right?

A.   Yes.

Q.   And who have you worked for over the last period of time?

A.   Carpenters Combined Funds.

Q.   And are they the administrator of the Fund?

A.   Yes.

Q.   And how long have you worked for them?

A.   26 years.

Q.   And just briefly, what do they do for the Fund?

A.   We collect all the contributions from various employers and allocate it to the retirees, pay out their benefits, maintain their work history and any other pension-related contributions.

Q.   And during the time period of this case, you and another gentleman, was it Mr. Klein?

VOLUME 3-B    60

A.   Yes, James Klein.

Q.   He was your boss?

A.   Yes.

Q.   And you both attended board meetings?

A.   Yes.

Q.   And how often did the trustees have board meetings?

A.   Quarterly.

Q.   Okay.  Can you describe for the jury who the beneficiaries are of the Fund?  Who the carpenters are?

A.   The carpenters are construction workers.  They build homes like residential homes, via wood and metal framing.  They are also commercial carpenters that build buildings, hospitals, bridges.  There's different classifications, like heavy highway.  They build the forms for the bridges and highways.  There's pile drivers who build -- drive pilings into the ground to shore up walls and the base for large buildings.  Millwrights, they work on the big turbines that power power plants and wind turbines.  Floor coverers, they lay the carpeting and laminate on flooring.  Mill cabinet people that build the chairs and install the chairs and tables that you see today; hang doors.  There's a lot of things that a carpenter will do.

Q.   And the Fund participants, about how many of them were there during 2016, 2015?

A.   There were approximately 2900 -- no -- 5800 retirees at that point in time.

**App. 204**

Q.   And the Fund provides a monthly retirement benefit?

A.   Yes.

Q.   And the -- And the employers contribute to the Fund.  They put their money into the Fund as part of the compensation and part of the Collective Bargaining Agreement with the union?

A.   Yes.

Q.   Okay.  And can you describe who the -- the types of companies are that contribute to the Fund?

A.   There are construction companies.  It could be a guy working out of the back of his truck all the way up to companies that hire thousands of employees, carpenters.

Q.   And they're the ones that contribute the money into the Fund that's then invested?

A.   Yes.

Q.   Okay.  And can you describe to the jury the -- the Board of Trustees that oversees the Fund?

A.   Yes.  The Board of Trustees is made up of 12 members, six on the labor side, which are union representatives, and six that are management.  These are owners of companies or directors of employer associations.  These are groups of employers that create an association that then negotiate with the union for the wage package.

Q.   So there's 12 members?

A.   Yes.

Q.   And how many are union and how many are management?

A.   There's six union, six management.

Q.   And they meet quarterly?

A.   Yes.

Q.   And are any of them paid?

A.   No.

Q.   And can you describe the type of person from the management side that helps oversee the Fund?  What kind of jobs do they have?

A.   They're owners of companies that employ the carpenters.

Q.   And the union members on the board?

A.   They're mainly leadership roles in the various unions that make up the carpenters area.

Q.   And all 12 members have a fiduciary duty --

A.   Yes.

Q.   -- to the -- to the participants?

A.   Yes.

Q.   To make sure that the funds are invested appropriately?

A.   Correct.

Q.   Does the Fund have any employees?

A.   No, no employees.

Q.   Does it rely on professionals for advice?

A.   Yes.

Q.   Including the combined funds?

A.   Combined funds.

Q.   And what about -- Does it have actuaries that advise the

Fund?

A.   Yes, we have actuaries that -- We have legal counsel.

Q.   The actuaries, what do they do?  Do they show up at the quarterly meetings?

A.   Yes.  Yes.  Their primary role is to forecast the liabilities, the how much money we're going to pay out to these retirees in a future period, and the assets that will help fund these liabilities.

Q.   And does -- Do the trustees rely on lawyers to help them figure out issues at board meetings?

A.   Yes.  We have attorney -- Fund counsel attorneys and also attorneys, such as yourself, that monitor securities litigation.

Q.   Okay.  And there's also an Investment Consultant?

A.   Yes.  They -- Their primary role is to make sure that the next level, Investment Managers, invest in a structure of investments.  We invest in stocks, bonds, private equity, real estate funds.  And we got to make sure that we -- There's -- There's a document called "Investment Policy Statement."  It outlines what amounts of stocks, bonds, different categories of assets that we're allowed to invest in, and they make sure we're within those ranges.

Q.   And there's also Investment Managers that actually invest the money in the different categories of types of investments?

A.   Yes.  Those -- Those Investment Managers are recommended by the Investment Advisor.

Q.   So the Investment Advisor recommends to the Board, "These are the managers that should invest the Fund's money."

A.   Correct.

Q.   Do the six management, six union trustees, are they investment experts?

A.   No.

Q.   And does -- Is each of the entities that provide the service that you've described, the lawyers, the managers, the consultants, the actuaries, the combined funds, are they all fiduciaries to the Fund?

A.   Yes, they are.

Q.   What does that mean in your -- in your view?

A.   They have a responsibility to do what's best for the membership and the retirees.

Q.   How many Investment Managers did the Fund have in 2016?

A.   Approximately 20.

Q.   And how many of those invested in common stocks like Exxon?

A.   About seven, I believe.

Q.   And they all had agreements with the Fund on how to --

A.   Yes.

Q.   -- parameters on investments?

A.   There's always contracts with all the Investment Managers.

Q.   And each of those Investment Managers, they -- pursuant to contract, they had full discretions as to how to invest the assets in the common stock?

VOLUME 3-B   65

A.   Yes.

Q.   So all decision-making regarding any purchases on behalf of the Fund were delegated to the Investment Manager.

A.   Correct.

Q.   Did the Fund Trustees or anybody affiliated with the Fund have any input into any of the purchases or sales of any of the common stock by any of the Managers during this year?

A.   No.

Q.   Who was the Investment Manager that purchased Exxon stock during the class period in 2016?

A.   Foundry Partners.

Q.   Did Foundry Partners ever discuss any individual stocks with anybody at the Fund?

A.   No.

Q.   Are you aware that the Defendants took the deposition of the Investment Manager, Ms. Matts, from Foundry during this case?

A.   Yes.

Q.   Do you know how many stocks were in the account that Foundry managed during 2016?

A.   Approximately 50.

Q.   And Exxon was one of them.

A.   Yes.

Q.   The -- The parties stipulated, and I think that Your Honor read this to the jury, to the transactions that the Fund made in this case; its Investment Manager made on its behalf.  The

VOLUME 3-B   66

Statement of Stipulated Facts:  The Lead Plaintiff purchased 11,150 shares of ExxonMobil common stock on May 12th, 2016; 2700 shares of ExxonMobil common stock on June 17th, 2017; and 57 -- 5,775 shares of ExxonMobil common stock on July 28th, 2016.  The Lead Plaintiff sold 1350 -- 1,350 shares of ExxonMobil common stock on June 27th, 2016; and 3,725 shares of ExxonMobil stock on September 20, 2016.

Were all of those transactions done by Foundry?

A.   Yes.

Q.   And the Fund had no knowledge of any of the reasons for those purchases or sales.

A.   No.

Q.   And did the Fund -- The 14,550 shares that were netted out of those transactions that the manager purchased, did the Fund still hold those on October 28th of 2016?

A.   Yes.

Q.   And the 14,550 shares that the Fund purchased, the net shares, did the Fund still own those shares on January 31st, 2017, when Exxon disclosed the two-billion-dollar impairment?

A.   Yes.

Q.   Did anyone at the Fund have any involvement at all reviewing any information that came out about Exxon in 2016 that related to Foundry's purchase or sale of Exxon stock?

A.   No.

MR. BURKHOLZ:  I'll pass the witness, Your Honor.

VOLUME 3-B   67

THE COURT:  Okay.  Ms. Soloway?

MS. SOLOWAY:  Thank you, Your Honor.

CROSS EXAMINATION

QUESTIONS BY MS. SOLOWAY:

Q.   Good afternoon, Mr. Swiderski.

A.   Good afternoon.

Q.   So my name is Audra Soloway.  I'm counsel for ExxonMobil and Mr. Tillerson and Mr. Swiger and Mr. Rosenthal in this case.  Okay?

A.   Yes.

Q.   I'd like to start with some things that I think we're going to be able to agree on.

THE COURT:  Ms. Soloway?

MS. SOLOWAY:  Yes.

THE COURT:  You have a very soft, very pleasant voice but it needs to be amplified.

MS. SOLOWAY:  You might be the first person ever to tell me I need to amplify but I'm going to do it, Your Honor.  All right.  Is this better?

THE COURT:  That's much better.

MS. SOLOWAY:  Okay, terrific.

Q   (By Ms. Soloway) Mr. Swiderski, you have both a Bachelor's Degree in Accounting and a Master's Degree in Finance, correct?

A.   Correct.

Q.   Okay.  And you mentioned earlier you were the Controller of

VOLUME 3-B   68

the Carpenters Combined Funds during the 2015 to 2017 time period --

A.   Correct, yes.

Q.   -- at issue in this case?  Just give me -- give me a chance to get my question in and then please go ahead and answer.

So I'm just going to refer to the Plaintiff in this case as "the Fund," if that's okay with you.

A.   Yes.

Q.   Okay, great.  And I think you said this already.  Your job includes overseeing the Fund's investments, correct?

A.   I -- I do the accounting for the Fund.

Q.   So you reconcile the investments?

A.   Correct.

Q.   You keep track of them --

A.   Yes.

Q.   -- to make it really -- to make it really simple.

A.   Yes.

Q.   Okay.  So the market value of the Fund's holdings in the 2015-2016 time period, approximately how much was that?

A.   It was around 850 million.

Q.   Okay.  Hundreds of millions of dollars.

A.   Yes.

Q.   You think 850 million, approximately?

A.   Yes, somewhere around that.

Q.   Okay, great.  So there's been a lot of testimony over the

**App. 206**

past few days about that Form 10-K for 2015 that was filed in February of 2016, correct?

A.   Correct.

Q.   And you've been sitting right over there listening to that testimony since Monday?

A.   Yes.

Q.   Okay.  So I want to start with some questions about what the Fund itself does before it makes an investment; in particular, focusing on ExxonMobil which is, of course, relevant to this case.  Are you with me?

A.   Yes.

Q.   Okay.  So the Fund itself does not read the Form 10-K for Exxon before an investment is made on the Fund's behalf, correct?

A.   Correct.

Q.   And we've, again, been talking about this 10-K and we've been talking, for example, about that table with the average production prices and costs.  You've been here.  You've heard that?

A.   Yes.

Q.   So the Fund does not read and rely on that table, correct?

A.   Correct.

Q.   Okay.  And same thing.  We've been talking about those SEC proved reserves.  Are you with me?

A.   Yes.

Q.   And they're reported in that 10-K?

A.   Yes.

Q.   Okay.  The Fund itself does not -- did not read and rely on that table, correct?

A.   Correct.

Q.   Okay.  And then we'll do the Rocky Mountain dry gas assets.  We've been talking about the disclosures in the Form 10-K.  Again, the Fund itself does not read and rely on the alleged misstatements in this case about the Rocky Mountain dry gas assets, correct?

A.   Correct.

Q.   Okay.  So I want to, if we could, turn to a couple of slides.  You were here during Openings, correct?

A.   Correct.

Q.   Okay.  I want to turn to a couple of slides that we used during the Opening.

     MS. SOLOWAY:  If we could pull up the Exxon Opening Slide 40, please.

Q    (By Ms. Soloway) Okay.  You were here when this was on the screen, sir?

A.   Yes.

Q.   You recall seeing this?

A.   Yes.

Q.   And this slide shows that the Fund made its first investment in ExxonMobil on May 12th, 2016; correct?

A.   Yeah.

Q.   Right over here.  There you go, the green.  "Yeah"?

A.   Yeah.

Q.   Okay.  And that was just 77 days after the warnings that Mr. Melsheimer walked us through that were in that Form 10-K, correct?

A.   Correct.

Q.   Okay.

     MS. SOLOWAY:  And if we could move to Opening Slide 22.

Q    (By Ms. Soloway) Okay.  You were here when this slide was presented during the Openings, correct?

A.   Correct.

Q.   And this was the slide that walked through those seven additional warnings that ExxonMobil gave investors in that Form 10-K for 2015?

A.   Yes.

Q.   Okay.  You remember that?

A.   Yes.

Q.   Okay.  And the Fund itself did not review these warnings in connection with its purchase in ExxonMobil shares, correct?

A.   No.  We delegate that responsibility to the Investment Manager.

Q.   And we're going to get to Foundry in a minute.  But the Fund itself does not do that, correct?

A.   Correct.

Q.   Okay.  And just to take one example, we'll do Warning 7

here.  "When oil and" -- Excuse me.  "When crude oil and natural gas prices are in the range seen in late 2015 and early 2016 for an extended period of time, under the SEC definition of 'proved references,' certain quantities of oil and natural gas, such as oil sands operations in Canada, could temporarily not qualify as proved reserves."

     Do you see that?

A.   Yes.

Q.   Before investing, the Fund itself did not read that disclosure, correct?

A.   Correct.

Q.   You did not read that disclosure.

A.   No.

Q.   Okay.  So you mentioned Foundry a minute ago, right?

A.   Yes.

Q.   Okay.  So I want to turn to Foundry and just unpack a little bit what the role of these outside Investment Advisors are that help the Fund.  Can we do that for a minute?

A.   Of course.

Q.   Okay.  So is it fair to say that these are sophisticated advisors that make judgments about how to invest the Fund's money?

A.   Yes.

Q.   So that's that 850 million dollars.  They make -- They help you figure out what to do with that, correct?

A.  Correct.

Q.  And they pick stocks, correct?

A.  Yes.

Q.  They might make investments in things other than stocks, correct?

A.  Correct.

Q.  And they decide what information is important in making that investment decision, correct?

A.  Correct.

Q.  So they decide, you know -- If they think they need to read the 10-K, they read the 10-K; correct?

A.  I would assume so.

Q.  That's their decision, correct?

A.  Yes.

Q.  Okay.  And fair to say that -- I think you said the Fund employs 20 different of these outside Investment Advisors?

A.  Yes.

Q.  Okay.  And you're giving them the authority to make investment decisions within certain boundaries that you've set, correct?

A.  Correct.

Q.  Okay.  And you said Foundry was the advisor that made the investment in this case in ExxonMobil, correct?

A.  Correct.

Q.  And that was the investment in 2016 that we've been talking

about at this trial.

A.  Yes.

Q.  Okay.  So, again, with respect to ExxonMobil, it was Foundry that was doing whatever research they felt needed to be done on ExxonMobil, right?

A.  Correct.

Q.  Okay.  They were deciding what information was important.

A.  Correct.

Q.  They were deciding what information was not important?

A.  Correct.

Q.  Okay.  And they made the decision to purchase ExxonMobil on the Fund's behalf.

A.  Yes.

Q.  Okay.  I want to -- I want to turn to a consultant named "Graystone."  You know who Graystone is.  "Yes"?

A.  Yes.

Q.  Okay.  So that, as I understand it, it's a part of Morgan Stanley.  Am I getting that right?

A.  Yes.

Q.  And Morgan Stanley, obviously, is a big, sophisticated bank, correct?

A.  Correct.

Q.  Okay.  And Graystone, as I understand it, receives reporting from Investment Managers like Foundry, correct?

A.  Correct.  They are our advisor.

Q.  Okay.  So they sort of make sure that all of those Investment Advisors that you have are doing their jobs, correct?

A.  Yeah, correct.

Q.  Okay.  And they're looking out for your interests, correct?

A.  Correct.

Q.  Okay.  So, again, you've been sitting here this past week.  The Fund in this case is claiming that an alleged fraud by ExxonMobil was revealed to shareholders in October of 2016, correct?

A.  Correct.

Q.  And then, again, the claim is that alleged fraud was revealed in January of 2017, correct?

A.  Correct.

Q.  Okay.  So I just want to pause on that.  October, 2016, is when, under the Fund's theory that they're bringing, you know, bringing to this courtroom, when the fraud became public, correct?

A.  Yes.  The -- Yes.

Q.  That -- That's your understanding of the theory, correct?

A.  Yes.

Q.  Okay.  So I want to direct your attention to that time period; right?

So the Fund says in October of 2016 the truth was revealed about Kearl, correct?

That's the theory that the Fund has in this case?

A.  Yes.

Q.  Okay.

MR. BURKHOLZ:  Your Honor, this is getting into legal conclusions.

MS. SOLOWAY:  I'm about -- I'll turn right around, Your Honor.

THE COURT:  Okay.  Okay.  Overruled.

Q   (By Ms. Soloway) Okay.  So I just want to direct your attention to that moment in time, October of 2016.  Foundry, your Investment Manager for the ExxonMobil investment, did not alert you and tell you that it had concerns about potential fraud, correct?

A.  We -- We never dealt with individual stocks.

Q.  I'm not -- Again, I understand.  You delegate.  But I'm just asking a question about that moment in time, right?

October, 2016, did Foundry pick up the phone to call you and alert you that ExxonMobil had possibly engaged in shareholder fraud?

A.  No, because in normal course of business that would not occur.

Q.  They did not pick up the phone and call you, correct?

MR. BURKHOLZ:  Asked and answered, Your Honor.

Q   (By Ms. Soloway) It's a "yes" -- Sir, it's a "yes" or "no" question.

A.  Yeah.

VOLUME 3-B    77

Q.   They did not pick up the phone.

A.   No.

Q.   Okay.  And Graystone, we talked about Graystone.  They're the consultant that sit up here, right?  Correct?

A.   Correct.

Q.   Graystone also did not pick up the phone and call the Fund and say, "We're concerned about possible fraud by ExxonMobil," correct?

A.   Correct.

Q.   Okay.  So you actually learned that there was a lawsuit against ExxonMobil from your counsel in this case, Robbins Geller; correct?

A.   Correct.

Q.   Okay.  They reached out to you in approximately December of 2016.  Do I have that right?

     MR. BURKHOLZ:  Your Honor, we're getting into attorney/client privilege.

     MS. SOLOWAY:  Your Honor, I have not asked any question about communications with counsel.  Just a time period.

     MR. BURKHOLZ:  She just asked a question about communication, when it took place.

     THE COURT:  Okay.  You're getting -- You're getting really close.

     MS. SOLOWAY:  Let me rephrase the question, Your Honor.

     THE COURT:  Okay.

VOLUME 3-B    78

     MS. SOLOWAY:  Okay.

Q   (By Ms. Soloway) You first spoke with your counsel -- Just the date, sir.  You first spoke with your counsel about this case in or about December of 2016, correct?  "Yes" or "no"?

A.   I don't recall the exact date.

Q.   Do you recall that it was, roughly, late 2016?

A.   Yes.

Q.   Okay.  And you got a phone call -- Again, don't tell me the substance, but you got a phone call from your lawyer at the Robbins Geller firm, correct?

A.   Yes.

Q.   And those are the same lawyers that are here representing you in court today.

A.   Correct.

Q.   Okay.  And they called you directly, correct?

A.   I don't recall if they called me directly or the former administrator, James Klein.

Q.   Okay.  But ---

A.   Yeah, the Fund office.  They ---

Q.   They got in touch with the Fund.

A.   Yes.

Q.   Okay.  And you mentioned during your Direct that you used the Robbins Geller law firm for monitoring, correct?

A.   Correct.

Q.   And, in fact, you have a written signed Monitoring Agreement

VOLUME 3-B    79

with the Robbins Geller firm, correct?

A.   Correct.

Q.   And that agreement was signed in 2013?

A.   I don't recall exactly when we signed it, but it sounds reasonable.

Q.   And before the events in this case, correct?

A.   Yes.

Q.   Okay.  And under that agreement, Robbins Geller monitors the stocks that are in your portfolio; correct?

A.   Correct.

Q.   Okay.  And you have agreed in that written agreement with Robbins Geller to make sure that your money managers, right, all those people that manage your money and keep your assets, that they provide account statements to Robbins Geller so that they can see all of the securities in your account over the prior five-year period, correct?

A.   Correct.

Q.   And also in that agreement, you agreed to update Robbins Geller in real time by sending them monthly account statements, correct?

A.   Correct.

Q.   And that is so Robbins Geller can monitor all the changes and developments in your account, correct?

A.   Correct.

Q.   Okay.  At the time of your deposition -- Do you recall that

VOLUME 3-B    80

you were deposed in this matter?

A.   Yes.

Q.   I'm sure it was the best day of your life, right?

A.   Yeah.

Q.   That was in 2019, correct?

A.   Yes.

Q.   Okay.  So at the time of your deposition, the Fund had been involved in seven securities cases like this one, correct?

     MR. BURKHOLZ:  Your Honor, we had a Motion *in Limine* on that and we had the goose-and-gander discussion.

     THE COURT:  Well, I don't know how -- I'm going to sustain the objection at this time.

     The jury is instructed to disregard that last question.

     All right.  Go ahead.

     MS. SOLOWAY:  I'm sorry, Your Honor.  I didn't -- I just didn't quite catch the ruling.

     THE COURT:  You -- You can't go into that.

     MS. SOLOWAY:  How many lawsuits?

     THE COURT:  Correct.

     MR. BURKHOLZ:  Your Honor, ---

     MS. SOLOWAY:  I just want to make -- Truly, just checking.

Q   (By Ms. Soloway) Your deposition, let's see.  Give me one second.  Okay.

     MR. BURKHOLZ:  Your Honor, may I approach?

**App. 209**

THE COURT:  No, I don't think you need to.

MR. BURKHOLZ:  Okay.

Q    (By Ms. Soloway) So I'm going to go back to the prior question, getting back to ExxonMobil.  It was Robbins Geller that brought this case to you guys under the Monitoring Agreement, correct?

A.   Correct.

Q.   Okay.  And I want to turn back to Foundry.  As your Investment Advisor, it's Foundry's responsibility to alert you when the companies that you invest in are believed to be committing fraud, correct?

MR. BURKHOLZ:  Objection.  Calls for speculation.

THE COURT:  Well, only if he knows.  I don't know if he knows or not.

MS. SOLOWAY:  Well, Your Honor, we discussed this at his deposition.  So I believe he does know.

THE COURT:  Well, I don't -- I wasn't there.

Q    (By Ms. Soloway) Well, why don't we start with this:  Sir, do you know if it's Foundry's responsibility to alert you when the companies you invest in are believed to be committing fraud?

A.   No.

Q.   You don't know the answer to that?

A.   Oh.  They are not typically notifying us of any kind of fraud -- fraudulent.

Q.   So let me rephrase the question.  I'm not asking if they're

typically alerting you.  I'm asking you whether it's their responsibility to alert you.

A.   No.

Q.   So, sir, you recall that you gave a deposition in this case in 2019?

A.   Yes.

Q.   Okay.  And at the time you did your best to answer all those questions accurately, correct?

A.   Yes.

Q.   Okay.  And you said you were telling the truth at the deposition, correct?

A.   Yes.

Q.   And you were, correct?

A.   Yes.

Q.   Okay.  And you were given an opportunity to correct the record after the deposition, correct?

A.   Yes.

Q.   Okay.

MS. SOLOWAY:  Your Honor, permission to publish Page 195 of the transcript.

THE COURT:  Show it to him.

MS. SOLOWAY:  Sure.  Let me just get a copy.  Can I walk a copy up to him?

THE COURT:  That's exactly how I want you to do it.

MS. SOLOWAY:  I will do that, Your Honor.

(Pause)

MS. SOLOWAY:  Your Honor, permission to approach.

THE COURT:  Yes.

Q    (By Ms. Soloway) Mr. Swiderski, you can turn to Page 195.

MS. SOLOWAY:  Your Honor, I don't -- I wouldn't want to run afoul of any rules here.  May I put it on the screen or should I read it?  Just read it aloud?

THE COURT:  Not yet.

MR. SAHAM:  Your Honor, we haven't received a copy of this either.

THE COURT:  You don't have a copy?

MR. SAHAM:  Well, we do now.

MS. SOLOWAY:  Okay, great.

THE COURT:  Oh, okay.

MR. BURKHOLZ:  What page?

THE COURT:  195.

MR. BURKHOLZ:  Thank you.

Q    (By Ms. Soloway) Mr. Swiderski, this is testimony that you gave at your deposition?

A.   Yes.

Q.   Okay.  And I'll direct your attention to Line 15.

MS. SOLOWAY:  May I read it aloud, Your Honor?

THE COURT:  Let him read it first.

Have you read it?

THE WITNESS:  Yes, sir.

THE COURT:  Okay.

MS. SOLOWAY:  May I read it, Your Honor, aloud?

THE COURT:  I think there's another question you ought to ask first, but I'll let you do it your way.

MS. SOLOWAY:  Okay.  Thank you, Your Honor.

Q    (By Ms. Soloway) Question:  "So whose responsibility is it to alert Greater Penn when companies it invests in are believed to be committing fraud?"

There is an objection.

The witness answers:  "That's Foundry's responsibility to make those decisions."

MR. BURKHOLZ:  Can we have the objection, Your Honor, read?

THE COURT:  I'm sorry.

MR. BURKHOLZ:  Can we have the objection read?

THE COURT:  I can't hear you.

MR. BURKHOLZ:  Can we have the objection read?

THE COURT:  Yes.  You can read it yourself right now.  You're going to have to say it into the microphone, though.

MR. BURKHOLZ:  "Objection to form, asked and answered, lacks foundation."

THE COURT:  All right.  Overruled.

MS. SOLOWAY:  Okay.

Q    (By Ms. Soloway) Sir, do you need that over again or you have it in front of you, correct?

**App. 210**

VOLUME 3-B    85

A.   Yes, I do.

Q.   So it is Foundry's responsibility to make decisions when companies that it invests in are believed to be committing fraud, correct?

A.   It would be the Investment Manager.  I don't really recall why I answered it that way.

Q.   Okay.  Let's try this, sir:  Did Foundry ever communicate to you that it believed ExxonMobil had committed fraud?

A.   No.

Q.   There never came a time when Foundry called you and said, "We've been defrauded by ExxonMobil"?

A.   No.  We would never communicate with the Investment Manager directly.

Q.   But they didn't call you and say, "We made this investment for the Fund in ExxonMobil and we think there's been a fraud"?

A.   No.

Q.   Okay.  Before you filed this lawsuit, the Fund did not take any steps to determine whether it had been defrauded other than communicating with its lawyers, correct?

A.   Correct.

Q.   Okay.  You didn't ask Foundry if it believed ExxonMobil had committed fraud.

A.   Correct.  We never communicated with them.

Q.   And when you ask Foundry for information, they have an obligation to provide it to you, correct?

VOLUME 3-B    86

A.   Yes.

Q.   In fact, you can fire Foundry for failing to provide you information that they reasonably -- that you reasonably request, correct?

A.   It would really be up to Graystone, the Investment Advisor, to fire Foundry.

Q.   But you have an Investment Policy Agreement, correct, with Foundry?

A.   Yes.

Q.   And if they failed to provide you with information under that agreement, you can actually fire them; correct?

A.   I would have to delegate that to the attorneys to make that decision.

Q.   Okay.  But that power rests with the Fund, correct?

A.   Yes.

Q.   Okay.  And so you can go to Foundry at any time and you can ask Foundry for information, correct?

A.   Me personally?  No.

Q.   Can someone on the Fund's behalf go ask Foundry for information?

A.   Yes.  It's typically Graystone.

Q.   Okay.  And so prior to getting involved in this lawsuit, the Fund did not ask Foundry if it had considered the quantity of proved reserves at ExxonMobil as part of its investment decision, correct?

VOLUME 3-B    87

A.   Correct.

Q.   Okay.  And prior to filing this lawsuit, the Fund did not ask Foundry if the quantity of proved reserves would have mattered to its investment decision, correct?

A.   I'm kind of like out of the scope of what the Fund would need, but ---

Q.   But it didn't happen, correct?

A.   It didn't happen.

Q.   Okay.  And prior to filing this lawsuit, the Fund did not ask Foundry if it considered potential asset impairments as part of its investment decision, correct?

A.   Again, we rely on the experts, but the Fund itself did not.

Q.   So, again, you filed -- the Fund filed a lawsuit accusing ExxonMobil of fraud, correct?

A.   Correct.

Q.   And before doing that, it did not call Foundry, the Investment Manager who had made the ExxonMobil investment, and ask them whether they cared about potential asset impairments as part of their investment decision, correct?

A.   The Fund itself, we would, again, rely on the experts, our legal counsel and the Investment Advisor to guide the Fund accordingly.

Q.   So -- But that phone call just didn't happen, correct?

A.   Correct.

Q.   So I want to turn back to the -- I think you told me earlier

VOLUME 3-B    88

that it was on or around late 2016 when you first heard from Robbins Geller about possibly getting involved in this lawsuit.  Is that right?

A.   Yes.

Q.   Okay.

     MS. SOLOWAY:  So, Your Honor, I'm going to -- if you don't mind, I'm going to put a demonstrative up on the screen.

     THE COURT:  Okay.

     MR. BURKHOLZ:  Your Honor, we didn't get the demonstrative.

     MS. SOLOWAY:  Oh, I'm sorry.

     THE COURT:  Well, look at it and see.  Is it going to matter?  I mean look at it.

     (Pause)

     MS. SOLOWAY:  Are you guys okay with that?

     MR. BURKHOLZ:  Yep.  All set.

     MS. SOLOWAY:  Terrific.

     Your Honor, we'll put the --

     THE COURT:  All right.

     MS. SOLOWAY:  -- demonstrative on the screen.

     THE COURT:  Okay.

     MS. SOLOWAY:  Thank you very much.

     And, Your Honor, I'd like to submit into evidence Defendant's Exhibits 919 and 1042 which are not objected to and were pre-admitted.

**App. 211**

THE COURT: Have you seen those exhibits?

MR. BURKHOLZ: I'd like a copy.

(Pause)

MS. SOLOWAY: Are you good?

MR. BURKHOLZ: We're set.

MS. SOLOWAY: Okay.

Q    (By Ms. Soloway) So, Mr. Swiderski, just to make it easier, the exhibits we just admitted are those Annual Account Statements that have all the holdings of all the securities that the Fund owns. So to make it easier so you wouldn't have to flip through that, we created a chart. And that's what's up on the screen. Are you with me?

A.    Yes.

Q.    Okay. And I think you testified to some of this already. We'll just quickly run through it.

The Fund purchased ExxonMobil stock in May, June and July of 2016, correct? That's what this shows?

A.    Correct.

Q.    Okay. But it also sold ExxonMobil stock in June and September of 2016, correct?

A.    That's what it shows.

Q.    Okay. And the Fund was doing some purchasing and some selling during this period of time from February 24th, 2016, to October 28th, 2016; correct?

A.    Correct.

Q.    And that's the period of time we've been talking about as the "class period" in this case?

A.    Correct.

Q.    Okay. And during that period of time, the Fund was also receiving dividends from ExxonMobil, correct?

A.    I believe so, yes.

Q.    And just to -- for the benefit of the jury, can you remind us what a "dividend" is?

A.    Depending on the quantity of shares of stock that somebody owns, there's a factor of cash that's received per share.

Q.    So these are cash payments that ExxonMobil pays all of its shareholders, correct?

A.    Correct.

Q.    And as a shareholder in ExxonMobil, the Fund obtained these -- was entitled to receive these payments.

A.    Correct.

Q.    Okay. If we could -- This is in Defendant's Exhibit 919 on Page 25.

MS. SOLOWAY: Would you mind putting that up, Casey?

Q    (By Ms. Soloway) Okay. So you're familiar with this document? This is the Fund's account statement?

A.    Yes.

Q.    And just looking at the left-hand column here, do you see at the top it says "Activity"?

A.    Yes.

Q.    Okay. Underneath that it says "Dividend"?

A.    Yes.

Q.    And then the description is "ExxonMobil Corp." So that tells you what company, right?

A.    Correct.

Q.    Okay. And then the "Payable Date" are the dates of the dividends, correct?

A.    Correct.

Q.    And then if you go to the "Cash" column on the right side, do you see that?

A.    Yes.

Q.    Those are the amounts of cash that the Fund receives based on its ownership of those shares, correct?

A.    Correct.

Q.    Okay. So these are the dividends paid in September of 2016, correct?

A.    Yes.

Q.    And also in December of 2016, correct?

A.    Correct.

Q.    And there is, you know, over 23,000 dollars in dividends there, correct?

A.    Correct.

Q.    Okay. And I'm going to -- We'll quickly do the next year, Defendants' Exhibit 1024 that we were just looking at, Page 24.

MR. BURKHOLZ: Your Honor, now we're getting outside

the class period of the case. It's completely inappropriate.

THE COURT: Now why are you going outside the period?

MS. SOLOWAY: So, Your Honor, the Fund continued to hold shares after filing its lawsuit, and I'm going to go through that with the witness.

THE COURT: Based on? After it was over, you just want to say that ---

MS. SOLOWAY: I'm happy to explain but I -- Maybe we should approach.

THE COURT: Okay. I'm not going to let you go into that. Just confine yourself to the -- to the period of time that they owned the stock. Okay?

MS. SOLOWAY: So, Your Honor, they -- they did own the stock in 2017. That's ---

THE COURT: For the period that they owned the stock during the time that -- that has been designated in here as these periods of time.

MS. SOLOWAY: Okay. Your Honor, I may ask you to approach on that later, but we'll keep going. Okay?

THE COURT: Okay.

MS. SOLOWAY: Okay. Thank you, Your Honor.

THE COURT: I probably didn't make that very clear. I'm sorry.

Q    (By Ms. Soloway) I want to just go back to the demonstrative chart that we had up.

MS. SOLOWAY: So, Your Honor, actually I think we probably should address this now, if you don't mind.

THE COURT: Okay. Okay. You want to go ahead and say whatever you were going to say?

MS. SOLOWAY: Should I come up, Your Honor?

THE COURT: Do I need to -- Can't we just say it right now?

MS. SOLOWAY: I -- I have a sense that I may get ---

THE COURT: Do you care if she says it right now in front of the jury or no?

MR. BURKHOLZ: Well, anything after January 31st, 2017, has no relationship to the claims in this case. So I don't want her asking any questions beyond that.

MS. SOLOWAY: Respectfully, Your Honor, it's highly pertinent to rebutting the presumption of reliance in this case, and I would -- I would like to be heard on it.

THE COURT: Okay. Ladies and Gentlemen, we're going to take a break. Don't talk about the case.

(Jury escorted to the Jury Room by the Court Security Officer.)

THE COURT: You know, there's no need to come to the side when -- when they're not here. Okay.

MS. SOLOWAY: Your Honor, I'm sorry. I just did not want to speak in front of the jury and run afoul of any ---

THE COURT: You're -- You're doing just fine.

MS. SOLOWAY: Okay, good.

THE COURT: Unlike some of these other lawyers that just kind of, you know, they get on their motorcycle and get it running and they go down the road. Here we go. I won't say who that is.

MS. SOLOWAY: So ---

THE COURT: Go ahead.

MS. SOLOWAY: Thank you, Your Honor.

So you'll recall that the presumption of reliance is rebuttable at trial, correct, as to the Lead Plaintiff?

THE COURT: Yes.

MS. SOLOWAY: And so one way that you rebut the presumption of reliance is by showing that the Fund would have purchased even if they had known about the alleged misrepresentation.

THE COURT: Okay.

MS. SOLOWAY: And in this case, the Fund found out about the alleged fraud, talked to their lawyers about the alleged fraud, asked to come into a lawsuit about the alleged fraud, and did not sell their shares that entire time. They held them until July of 2017.

That is powerful evidence, Your Honor, that they would have purchased ExxonMobil even if they had known about the alleged misrepresentation because they did not sell their stock after they learned about the alleged fraud. That -- That is our

basis. And I'm not going to go beyond July of 2017, but they held their shares until July, 2017, which is two days ---

THE COURT: Well, let's not go to the "go beyond" until I've said. Let me see.

MS. SOLOWAY: Well, I -- I won't ask him whether they own ExxonMobil today. I will not go there. They may. I don't know, but I will not ask that question.

THE COURT: Okay. What's -- And what's your response?

MR. BURKHOLZ: Well, the response is it's completely irrelevant to rebutting the presumption -- completely irrelevant to rebutting the presumption. The purchase, the last one that took place on September 20th, leading up to that is fair game. The stock drop, the first one happened on October 31st. We -- The first Complaint, I believe, was filed in December. And then in January the Lead Plaintiff moved to be appointed. And then on the 31st there was the second disclosure in the case. That's the end of the time period that's relevant, January 31st, 2017. Whatever happens after the bad news comes out and the stock goes down.

THE COURT: What happened on January 31st?

MR. BURKHOLZ: That's the last day -- the second corrected disclosure. The truth is out from the news. Now both false -- alleged false statements and omissions are out in the marketplace. The stock has gone down. Anything after that date is an entirely new investment decision based on the truth being

out there. So whatever happened after January 31st, 2017, is completely irrelevant to rebutting the presumption.

MS. SOLOWAY: Your Honor, there was a motion *in limine* on this time period which Your Honor denied, as I -- as I know you remember.

Sorry, Your Honor.

THE COURT: That's okay.

(Ms. Soloway consulting with co-counsel.)

MS. SOLOWAY: We will let this go, Your Honor.

MR. BURKHOLZ: Very well.

THE COURT: What? Wait a minute. Wait a minute. I'm not going to let you let it go. This is how -- This is how I make my living. Y'all got to argue up here either way. No.

Are you sure?

It's not my call. Okay. You're going to let it go.

MS. SOLOWAY: No.

THE COURT: Oh, we're back?

MS. SOLOWAY: It's like a -- It's like a discussion with my husband. I won.

THE COURT: Whoa, whoa, whoa. Whoa, whoa, whoa. I may still rule against you.

MS. SOLOWAY: I know, Your Honor.

THE COURT: Okay. All right. Is there anything else you want to argue?

MS. SOLOWAY: I think, Your Honor, the key thing here

VOLUME 3-B    97

is:  There's a -- There's a credible issue here of whether the Fund would have made this investment decision but for the alleged fraud.  And the fact that they didn't sell in that time period is powerful evidence on that point.  That's the key point.

MR. BURKHOLZ:  Your Honor, they took the deposition of the Investment Manager, and that's Foundry.  They're the ones that made the decision to buy or sell the stock.  Mr. Swiderski and the Fund had nothing to do with it.

So we have the deposition that they're going to play, and all of that can come through with that deposition.  It's irrelevant to the question to Mr. Swiderski.

THE COURT:  Okay.

MR. BURKHOLZ:  Your Honor, it was *EDS*, the Fifth Circuit case right on point.

MS. SOLOWAY:  On -- On which point?

MR. BURKHOLZ:  The point that we've been discussing.

THE COURT:  On whether these go beyond this date and them holding it is -- rebuts the presumption.

MS. SOLOWAY:  I -- I actually believe there's law going both ways on this, Your Honor, but I came up ---

THE COURT:  Well, today it's going to go against your way.

MS. SOLOWAY:  Okay.  I think there are going to be some people over here who are happy about that, so there you go.

THE COURT:  Is that right?

VOLUME 3-B    98

MS. SOLOWAY:  Mr. Melsheimer is one of them.

THE COURT:  That Mr. Melsheimer, he's always getting involved, isn't he?

Y'all got a bunch of good lawyers on both sides and it's very fascinating.  I really -- You're a good lawyer.  I will tell you that.  I don't mind putting that on the record.

MS. SOLOWAY:  That's very nice, Your Honor.

THE COURT:  I just happen to disagree with you on this.  And I think there is some law out there both ways but I think here in the Fifth Circuit, I think it's -- it's against you.  Okay?

MS. SOLOWAY:  Understood, Your Honor.

THE COURT:  Are you ready to go on?

MS. SOLOWAY:  I am, but I will ---

THE COURT:  I know.  I get that.  I'm going to let you bring the jury back.  Do you have any more of these controversial?  Let's do it while we got them out.

MS. SOLOWAY:  Maybe I'll ask my colleagues before I answer that question, Your Honor.

THE COURT:  Yeah.  Why don't you check.  Why don't you check and see if there's anything else.

(Pause)

MS. SOLOWAY:  All right.  We are in agreement, Your Honor.  We can proceed.

THE COURT:  Okay.  It's going to really hack me off if

VOLUME 3-B    99

-- if y'all lose this case and I get reversed on this kind of issue.  I've never been reversed as many times as I'm reversed on these SEC cases.  I can't seem to -- I can't seem to make either the Supreme Court or, you know -- Anyway, it's just frustrating.

But I'm going to -- I just think the law is against you on this, and I'm going to go with -- with the Plaintiffs.

Okay.  All right.  So you think you got all the rest of it ready to go, Ms. Soloway?

MS. SOLOWAY:  I do, Your Honor.

THE COURT:  Do you normally practice in New York?

MS. SOLOWAY:  I -- I practice everywhere but I live in New York.

THE COURT:  I mean you talk as fast as my kids.

MS. SOLOWAY:  I'll try to slow it down.  I feel bad.

THE COURT:  It's good.  No, you do great.  You're at 78 RPMs and I'm at 33.  It's okay.  It's part of -- I guess because I'm in the south.  I don't know, but, you know, you're fine.

MS. SOLOWAY:  I will -- I will try to slow it down.

THE COURT:  You're doing a great job.

All right.  Let's bring them in.

COURT SECURITY OFFICER:  All rise for the jury.

THE COURT:  Do we have a whole lot more with him?

MS. SOLOWAY:  No.

(Jury seated in the jury box.)

THE COURT:  Well, it's good to have you all back.

VOLUME 3-B    100

Please be seated.

All right, Ms. Soloway.

MS. SOLOWAY:  Thank you, Your Honor.

CONTINUED CROSS EXAMINATION
QUESTIONS BY MS. SOLOWAY:

Q.  All right, Mr. Swiderski.  We're almost there.  Okay?

A.  Okay.

Q.  Okay.  So we've been talking a lot about barrels in this courtroom, correct?

A.  Correct.

Q.  And I see that the barrel went missing, but there was a big barrel here.  Do you remember that?

A.  Yes.

Q.  Okay.  And you've heard all the testimony about proved reserves --

A.  Yes.

Q.  -- since you've been sitting in this courtroom for the past four days, correct?

A.  Correct.

Q.  And we've talked about the fact that you were deposed in 2019?

A.  Yes.

Q.  And that means you sat in a room with a bunch of lawyers and they asked you questions, correct?

A.  Correct.

VOLUME 3-B    101

Q.    And that questioning happened about two years after the Lead Plaintiff or the Fund first joined this case, correct?

A.    Correct.

Q.    And at that time at your deposition, you did not know what a "proved reserve" was, correct?

A.    Correct.

Q.    And you had never heard of "proved reserves," correct?

A.    Correct.

Q.    Your Complaint, as we've talked about, also makes claims about impairments, correct?

A.    Correct.

Q.    And at your 2019 deposition you did not know the difference between "debookings" and "impairments," correct?

A.    From what I recall, I don't believe so.

Q.    Okay.  Before proceeding in a case, the plaintiff in a case files something called a "Complaint," correct?

A.    Correct.

Q.    And that contains all of their claims?

A.    Yes.

Q.    Okay.  And the Fund's Complaint was filed by your lawyers at Robbins Geller, correct?

A.    Correct.

Q.    You did not review a copy of that Complaint before it was filed by your lawyers, correct?

A.    I did review it.

VOLUME 3-B    102

Q.    You -- You reviewed the Complaint before it was filed or you've reviewed it since?

A.    From what I remember, I reviewed all the documents that the attorney would have given me.

Q.    Okay.  You have that deposition binder still there?

A.    Yes.

Q.    Okay.  I'd like you to turn to Page 214, please.  Why don't we try this, sir:  Take a look at Page 214, Line 8.

A.    Yes.

Q.    "Sir, did you review a copy of the Complaint in this case before it was filed by your lawyers?"

A.    I said, "Yes."  Line 11?

Q.    Line -- Take a look at Lines 8 through 25.

    (Pause)

Q.    Have you had a chance to review the testimony?

A.    Yes.

Q.    You did not see a copy of the Complaint in this case before it was filed in July of 2017, correct?

A.    According to my testimony, no.

Q.    And, in fact, no one at the Fund saw a copy of the Complaint before it was filed in this case, correct?

A.    Correct.

Q.    You've heard all the testimony over the past couple of days about that sticky substance called "bitumen" --

A.    Yes.

VOLUME 3-B    103

Q.    -- in these jars over here?

    At the time of your deposition you didn't know what "bitumen" was before your lawyers explained it to you, correct?

A.    Correct.

    MS. SOLOWAY:  Just a moment, Your Honor.

    THE COURT:  Sure.

    (Pause)

Q    (By Ms. Soloway) We're in the home stretch here.  A few more questions.

    The Fund's holdings of ExxonMobil stock in 2016 and 2017 were worth about 1.2 million, correct?

A.    I don't recall the exact valuation.

Q.    Does that sound about right?

A.    Yes.

Q.    Okay.  And the total holdings of the Fund at that time, you said, were 850 million; correct?

A.    Correct.

Q.    So the Fund's holdings of ExxonMobil stock were about .14 percent of the Fund's overall holdings, correct?

A.    Correct.

Q.    Okay.

    MS. SOLOWAY:  Thank you, Your Honor.

    MR. BURKHOLZ:  Short Redirect, Your Honor.

    THE COURT:  Okay.

VOLUME 3-B    104

REDIRECT EXAMINATION

QUESTIONS BY MR. BURKHOLZ:

Q.    We talked about the Fund's lawyers, the Fund counsel.

A.    Yes.

Q.    What's the name of the firm in 2016 that was the Fund's counsel?

A.    Tucker Arensberg.

Q.    And they've been involved in this case from the beginning?

A.    Yes.

Q.    And she -- Ms. Soloway just asked you about the consolidated Complaint.  It's about 180 pages.  And you testified you didn't read it before it was filed, right?

A.    No.

Q.    But did your Fund counsel review it?

A.    Yes.

Q.    And did you rely on your Fund counsel and the lawyers at Robbins Geller throughout this ten years of the litigation?

A.    Yes.

Q.    Ms. Soloway asked you about -- questions about the case, issues regarding the public information that was out there.  And is it your testimony that the Investment Manager had full discretion to buy the stock of ExxonMobil and whatever they reviewed or relied upon?

A.    Yes.

Q.    And you never had any -- You or anybody at the Fund never

VOLUME 3-B   105

had any discussions with Foundry about why they bought or sold the stock?

A.   Yeah.   We -- We would not discuss that with the manager.

Q.   And whose job is it to advise the Fund of a potential stock fraud case?   The Investment Manager or your lawyers?

A.   Our lawyers.

MR. BURKHOLZ:   Nothing further, Your Honor.

THE COURT:   Ms. Soloway?

MS. SOLOWAY:   Nothing.   Thank you so much, Your Honor.

THE COURT:   Are you sure?   You're the very first lawyer that hasn't jumped back up for a second shot.

MS. SOLOWAY:   I think we're good.   Thank you.

THE COURT:   Okay.   All right.

You can step down, sir.

THE WITNESS:   Okay.   Thank you, sir.

MR. SHELDON:   Finally.

THE COURT:   You're up?

MR. SHELDON:   Yep.   Your Honor, Plaintiffs call Andrew Madden.

THE COURT:   Okay.

MR. SHELDON:   And once again, Your Honor, it's Sam Sheldon.

THE COURT:   Yes, sir.   Is it "Maddox"?

MR. SHELDON:   Madden, M-A-D-D-E-N.

THE COURT:   M-A-D-E-what?

VOLUME 3-B   106

MR. SHELDON:   Sorry.   M as in "Mary", A as in "apple", D as in "Delta", D as in "Delta", E as in "echo", N as in "Nancy."

THE COURT:   You sound like a pilot or something.   Okay.   And it's "Madden"?

MR. SHELDON:   Madden.

THE COURT:   Like in the famous NFL coach?

MR. SHELDON:   Yes, like John Madden, yes.

THE COURT:   Any relation?

MR. SHELDON:   I don't believe so.   I never asked.

THE COURT:   Well, we better ask, find out.

(The witness, Andrew Madden, entered the courtroom.)

THE COURT:   Hi, Mr. Madden.   How are you?

THE WITNESS:   I am very well.   Thank you.

THE COURT:   Can we get you sworn in?

THE WITNESS:   Okay.

THE COURT:   Right now.   Wait, wait, wait.   Raise your right hand.

ANDREW MADDEN,

Was produced, sworn, and examined as follow:

THE COURT:   Mr. Madden, you got some water down there?

THE WITNESS:   I do, indeed, yes.   Thank you.

THE COURT:   Okay.   Have a seat.   You heard me talk about this seat?

THE WITNESS:   I did early on, yes.

VOLUME 3-B   107

THE COURT:   What in the world.   What is your language?

THE WITNESS:   My language is English.

THE COURT:   You know, the reason I'm teasing you, did you see what the King said yesterday?

THE WITNESS:   I did see some of it, yes, sir.

THE COURT:   That we don't -- That we have everything in common except our language?

THE WITNESS:   Yeah.

THE COURT:   Listen, we're glad to have you here today, and we'll hear more about why you have that lovely accent.   Okay?

THE WITNESS:   Yes.

THE COURT:   Thank you.

Go ahead.

MR. SHELDON:   May it please the Court.

THE COURT:   Sure.

DIRECT EXAMINATION

QUESTIONS BY MR. SHELDON:

Q.   Good afternoon, sir.

A.   Good afternoon.

Q.   Would you state and spell your name for the record?

A.   Yes.   My name is Andrew William Madden.   So A-N-D-R-E-W.   Middle name William, W-I-L-L-I-A-M.   And Madden, M-A-D-D-E-N.

Q.   And, Mr. Madden, are you currently employed by ExxonMobil?

A.   No, I'm not.

Q.   Are you retired?

VOLUME 3-B   108

A.   I am, yes.

Q.   In what year did you retire from ExxonMobil?

A.   I retired in 2024.

Q.   And from 2012 to 2016 did you serve as the Vice-President of ExxonMobil Supply and Transportation?

A.   Yes, I did, indeed.

Q.   And can you tell the jury what is "supply and transportation"?

A.   So supply and transportation is the piece of the organization in ExxonMobil which looks after optimizing our refineries, deciding what they're going to run, and looks after trading, buying and selling bulk products that ExxonMobil makes and crude oil, and transporting products and crude oil around the world.

Q.   And, sir, are you familiar with the Kearl mine?

A.   I am familiar with it, yes.

Q.   And the Kearl mine was located in Alberta, Canada?

A.   It was and is, yes.

Q.   And the Kearl mine was operated by a company called "IOL"?

A.   Yes, it was.

Q.   And "IOL" stands for "Imperial Oil, Limited."

A.   Yes.

Q.   And ExxonMobil was the majority owner of IOL.   Is that correct?

A.   Yes, that is correct.

Q.   And bitumen was mined at Kearl?

A.   It was, yes.

Q.   And can you describe for the jury:  What is "bitumen"?

A.   So bitumen is a heavy, thick oil which is a hydrocarbon which -- It's like a crude oil but a very heavy one.

Q.   And then was the bitumen diluted into dilbit?

A.   It was.  It was, indeed, yes.

Q.   And it costs money to dilute it into dilbit?

A.   It costs money, yes, to buy the diluent which dilutes it and turn it into -- and dilute it with the -- into dilbit, yes.

Q.   And can you tell the jury:  Why is it diluted into dilbit?

A.   It's diluted into dilbit because to transport it and -- predominantly by pipelines, it needs to be less thick than it is when it's bitumen.  So it's really to allow it to be transported.

Q.   And then once it was diluted into dilbit, the Supply and Transportation group was responsible for selling the dilbit.  Is that correct?

A.   Yes, that is correct.

Q.   And it was either sold to ExxonMobil's customers or it was transferred to ExxonMobil refineries.  Is that correct?

A.   Yes.  That would be correct, yes.

Q.   And for the period of 2015, the Supply and Transportation group would have all the records for the sales transactions for the Kearl bitumen.

A.   Yes, they would.

Q.   And included in those sales transactions, we can see where the geographic location was where the Kearl bitumen was sold.

A.   Where the transaction took place?  Yes, we could.

Q.   And to be even more specific, within those sales transactions, we could see for 2015 where in the United States or how much of the Kearl dilbit was sold in the United States.  Is that correct?

A.   Yes, we could see where it was actually sold, all of it.  Yes, we could.

Q.   I'd like to show you Exhibit 331.

     MR. THOMAS:  No objection.

     THE COURT:  What number was that?

     MR. SHELDON:  Your Honor, it's 331.

     THE COURT:  331 is admitted into evidence.

Q   (By Mr. Sheldon) And, sir, we see a PowerPoint.

     THE COURT:  Stop.

     I want to hear about where you're from and why you have that funny accent.

     THE WITNESS:  Okay.  So I'm -- I'm originally from Scotland.  I was born in -- I was born in Scotland.

     THE COURT:  What town?

     THE WITNESS:  Dumfries in Scotland, in Southwest Scotland.

     THE COURT:  I've been to Dumfries.

     THE WITNESS:  Have you?

     THE COURT:  My family's from Scotland.  Don't I sound Scottish?

     THE WITNESS:  No, you don't sound like it.

     THE COURT:  I know.  I know.  But I go to -- I go to St. Andrews nearly every year --

     THE WITNESS:  Okay.  Very nice.

     THE COURT:  -- and teach.

     THE WITNESS:  Yes.  Very nice.

     THE COURT:  I'm a member of the St. Andrews Golf Club.  I've never played golf over there, not once.

     THE WITNESS:  Okay.

     THE COURT:  I eat hamburgers and watch the most famous golfers in the world play, but anyway.

     Well, that's good.  So when did you leave Scotland?

     THE WITNESS:  So I left Scotland when I was 11, but I then lived around England growing up.

     THE COURT:  Okay.  So when did you come over here?

     THE WITNESS:  I came over here to live first in 2004.

     THE COURT:  Married to a Scottish woman?

     THE WITNESS:  Actually she's English, but ---

     THE COURT:  The English as we say if we're Scottish.

     THE WITNESS:  Yeah, that, indeed.

     THE COURT:  Are you a Highlander or a Lowlander?

     THE WITNESS:  Well, Dumfries is a Lowlander, I'm afraid.

     THE COURT:  Oh, you took my land.  Oh, my gosh!

     It's funny.  I had a guy.  It wasn't your name.  We were -- We were with William Wallace.  And a man came up to me at church in St. Andrews.  He goes, "Are you a 'Kinkeade'?"  And I said, "Yes, sir, I am."  "We took your land."  I said, "Well, let's step outside and talk about that."  I couldn't believe it.

     But I mean, you know, the Highlanders, the further north you go in Scotland, they hate the English as they like to say.  Isn't that true?

     THE WITNESS:  That -- That is, indeed, true.  Yes.

     THE COURT:  Oh, my goodness.  Well, we're glad to have you over here.

     THE WITNESS:  Thank you.

     THE COURT:  Okay.  All right.  Now that I've gotten all of that out of my system, go ahead.

     MR. SHELDON:  Thank you, Your Honor.

Q   (By Mr. Sheldon) And, Mr. Madden, for the record, do you see on the screen -- At any point if you actually need to see the document, let me know.

A.   Okay.

Q.   But we'll put it up on the screen and then you'll just let me know if you want me to walk you over the documents so you can look at them.

     So for the record, do you see Plaintiff's Exhibit 331?

A.   Yes, I do, indeed.

VOLUME 3-B    113

MR. SHELDON: And can we go to the next page?

Q  (By Mr. Sheldon) And this is a PowerPoint titled "Employee Forum Buenos Aires." Do you see that?

A.    Yes, I do.

Q.    And your name is on the PowerPoint?

A.    It is.

Q.    And it was a presentation in March of 2015. Is that correct?

A.    Yes, it was.

Q.    And your staff helped you put together this PowerPoint?

A.    Yes, they did.

Q.    And you actually presented the PowerPoint.

A.    I would guess that myself and Dwight Tozer together presented it, yes.

Q.    And the presentation was about the refining and supply aspect of ExxonMobil. Is that correct?

A.    I need to look at the whole presentation maybe, if I could, just to grant you I can answer that correctly. My recollection is it was about the -- broader than just refining and supply. It was about the whole of the industry and as well as ExxonMobil's operations.

MR. SHELDON: If we can go to Page 37.

Q    (By Mr. Sheldon) And on the screen, do you see where it says "Sales Performance - Kearl Blend"?

A.    Yes. Yes, I do. In the title, yes.

VOLUME 3-B    114

Q.    And then underneath that it says "Kearl Placement." Do you see that?

A.    I do, indeed.

Q.    And then underneath "Kearl Placement," it was "through December, 2014."

A.    I do see that, yes.

Q.    And so we're talking about Kearl Placement on this chart through December, 2014. Is that correct?

A.    We are talking about placement of Kearl through that date, yes.

Q.    And then do you see where it says "External 60 percent"?

A.    I do see that, yes.

Q.    And then do you see where it says "Internal 40 percent"?

A.    I do.

Q.    So I want to discuss with you what "External 60 percent" means and what "Internal 40 percent" reflects.

A.    Okay.

Q.    So let's start with the "External 60 percent." So by the end of 2014, 60 percent of Kearl dilbit had been sold to third-parties. Is that correct?

A.    That is correct, yes.

Q.    And what is a "third-party," sir?

A.    So a "third-party" means any organization that is not part of ExxonMobil. So -- Yeah.

Q.    And then the large circle to the left of "External" shows

VOLUME 3-B    115

where the third-parties are geographically located. Is that correct?

A.    No, it doesn't.

Q.    Well, okay. We see "External 60 percent" and then we see places to the left of that, correct?

A.    The places to the left are where the crude was ultimately run, where it was placed.

Q.    Right.

A.    But the entity when it was sold may not have been at that location. They might have sold it somewhere else and then taken it to that location.

Q.    Okay. But ultimately the 60 percent reflects where it ended up.

A.    Yes, because it all gets run in a refinery, and that's where it went to be run, in the refinery.

Q.    And 38 percent of the third-parties were located in USGC. Is that correct?

A.    Again maybe, just to be precise, 38 percent of the third-parties that we sold to? No, that wouldn't be the case.

Q.    But 38 percent ended up in the USGC. Is that correct?

A.    That is, indeed, correct.

Q.    And "USGC" stands for "United States Gulf Coast."

A.    It does, indeed.

Q.    And that's located in the United States.

A.    Yes, it is, indeed.

VOLUME 3-B    116

Q.    And 49 percent were located in Mid-Con, is that correct?

A.    That is correct.

Q.    And "Mid-Con" is "Mid-Continent."

A.    It is, indeed, yes.

Q.    And that includes the Midwest of the United States and includes Southern Canada. Is that correct?

A.    Yeah. Predominantly the U.S. area, yes.

Q.    Okay. And seven percent were located in Edmonton, Canada.

A.    Of where we run it? Yes, it was, indeed, or where it got run, yes, it was, indeed.

Q.    Okay. And only six percent were located outside of North America. Is that correct?

A.    It is, yes.

Q.    So by the end of 2014, only a small percentage of the dilbit ended up in Alberta, Canada. Is that correct?

A.    In terms of, again, where it was being run, yes, that is, indeed, correct.

Q.    And there's a cost of getting the Kearl dilbit from Alberta, Canada, to the United States. Is that correct?

A.    There is.

Q.    Okay. Now let's discuss the "Internal 40 percent." Do you see that?

A.    I do, indeed.

Q.    And once the Kearl dilbit is processed in ExxonMobil or IOL's own refineries, the resulting product, synthetic oil, is

**App. 218**

then sold to either a third-party or processed into other refined petroleum products by Exxon. Is that correct?

A.   That's not quite correct, no.

Q.   Can you explain it?

A.   Okay, certainly. So when the oil, the crude oil called "dilbit," to turn it into useful products which are products that we know, like gasoline and diesel and jet fuel, it needs to be processed in a refinery. So the oil gets taken to a refinery and that can be, as you have on the page, one of our refineries or someone else's. And at those refineries it gets turned into products like gasoline, diesel and jet fuel which then gets sold. The synthetic oil is not what we sell from the refineries.

Q.   And so 18 percent -- we're talking about the internal -- of the Kearl dilbit was processed in an ExxonMobil or IOL refinery located in Sarnia, Canada?

A.   Yes, that's correct.

Q.   And then we see .3 percent of the Kearl dilbit was processed in an ExxonMobil or IOL refinery located in Nantucket or Nanticoke, Canada.

A.   Yes.

Q.   And all the remaining cities that we see up there, Baytown, Joliet, Beaumont, Billings, Chalmette and Baton Rouge, are located in the United States.

A.   Yes, that's correct.

Q.   So by the end of 2014, 81.7 percent of the Kearl dilbit was

processed in ExxonMobil refineries located in the United States. Is that correct?

A.   Of the -- Of the internal -- Of the oil which we processed internally, yes, it was, indeed.

Q.   And for the internal, there's also a cost to get the Kearl dilbit from Canada to the United States, correct?

A.   There is.

MR. SHELDON: Your Honor, 331 is already in evidence. We'd like to mark and move for admission just this one page and call it 331-A.

Any objection? We'd just like to mark this slide and admit it separately as 331-A.

MR. THOMAS: But 331 would still be in evidence.

MR. SHELDON: Yes.

MR. THOMAS: No objection.

MR. SHELDON: Okay. So 331-A, Your Honor, we move. They have no objection to have it as a separate exhibit as 331-A.

THE COURT: Well, it's already admitted because it's part of 331. So we'll double admit it. How's that?

MR. SHELDON: Thank you, Your Honor.

THE COURT: It's admitted and double admitted. Okay.

MR. SHELDON: Just makes it easier when there's 40 pages.

THE COURT: Okay. It makes it easier for you, harder for the court reporter.

MR. SHELDON: Thank you, Your Honor.

THE COURT: It's okay.

MR. SHELDON: Can we pull up 336? There's no objection.

THE COURT: What happened to 331-A? We're not going to look at?

MR. SHELDON: Oh, no. That was 331-A.

THE COURT: Oh. Oh, okay. Okay, okay.

Q.   (By Mr. Sheldon) Sir, I'm showing you on your screen what is already admitted into evidence as 336. We'll blow it up.

A.   Thank you.

Q.   And, sir, it was -- If you see at the top, it's an e-mail dated October 15th, 2015, from William Strawbridge to you. Do you see that?

A.   Yes, I do see that.

Q.   And the subject is "PROP: Kearl SEC Reserves October 26 Chairman's Briefing." Do you see that?

A.   I do.

Q.   And the e-mail starts, "Andy, I don't think we've met, but I'm the Global Reserves Manager and wanted to advise you of an upcoming review of Kearl reserves with the Chairman."

Do you see that?

A.   Yes, I see that.

Q.   And in October of 2015 Mr. Tillerson was the Chairman and CEO of ExxonMobil?

A.   He was.

Q.   And then it says, "As you are probably aware, the low price environment for 2015 is challenging our ability to demonstrate positive cash flow for Kearl which is a requirement for proved reserves. The Chairman has asked for a review of the YEO for Kearl reserves, and we are going to hold that review during the October 26th Chairman's Briefing." Do you see that?

A.   I do, indeed.

Q.   Okay. And Mr. Strawbridge is telling you in his e-mail that there's a low price environment for 2015 that's challenging their ability to demonstrate positive cash flow for Kearl, correct?

A.   Yes, that's what -- that's what it says, yes.

Q.   And he's telling you that that's a requirement for proved reserves. Is that correct?

A.   Yes. That's in the sentence you highlighted, yes.

Q.   And then if you see the next sentence, it says, "David Rosenthal and Beth Casteel advised that it would be good to have downstream participation in the meeting, and your name was mentioned as a good candidate."

Do you see that?

A.   Okay. Yes, I see that sentence.

Q.   And do you know who "David Rosenthal" is?

A.   I do, indeed, yes.

Q.   Okay. And who was he?

A.   So he was running the Controllers in the Finance

VOLUME 3-B    121

organization of ExxonMobil.

Q.    And who was "Beth Casteel"?

A.    I know Beth Casteel also worked in the Finance organization. I'm not sure of exactly what her role was.

Q.    And what does "downstream" mean?

A.    So "downstream" is whenever you look at an oil company like ExxonMobil. Upstream is getting oil -- discovering and getting oil out of the ground and gas, and downstream is refining and turning it into finished products and marketing those products. And we also include in there crude trading, purchasing crude and selling crude. That's the downstream.

Q.    And if we go to the next paragraph, the second sentence says, "I have a chart on Kearl bitumen pricing that shows the 2015 monthly realized prices and bitumen differentials as provided by your organization."

    Do you see that?

A.    Yes, I do see that.

Q.    And so from this e-mail, it was Mr. Rosenthal that had -- that had advised Mr. Strawbridge to invite you to this meeting. Would you agree with that?

A.    Yes, I would agree that's what this e-mail says, yes.

Q.    Okay. And Mr. Rosenthal -- I'm sorry -- Mr. Strawbridge was telling you that he's relying on realized prices provided by your organization. Is that correct?

A.    Yes, that's correct.

VOLUME 3-B    122

Q.    And, once again, for 2015, it was your group that had the records for all the sales transactions related to Kearl in 2015?

A.    Yes, it was.

Q.    Now before you received this e-mail on October 15th, 2015, from Mr. Strawbridge, you had recently met with Mr. Tillerson on September 29th, 2015, to discuss Kearl realizations.

    Do you remember that?

A.    With Mr. Tillerson?

Q.    Yes, sir.

A.    You'll have to refresh me. I don't remember that.

Q.    Okay. I'm going to get to a few e-mails and we'll show you the e-mail.

A.    Okay.

        MR. SHELDON: Now can we pull up 688? There's no objection to 688. So if we can go to that.

Q    (By Mr. Sheldon) So 688 is a series of e-mails. I want to go to Page 4 of 4.

        MR. SHELDON: Let's blow that up.

Q.    (By Mr. Sheldon) What we see on the screen is an e-mail from Darren Woods on September 22nd, 2015, to you and Mr. Wascom, and the subject is "LIFO and Kearl."

    Do you see that?

A.    I do see that.

Q.    And in September of 2015 Mr. Woods was your boss. Is that correct?

VOLUME 3-B    123

A.    No, I don't think that was correct.

Q.    Who was your boss in September of 2015?

A.    I think by then it was Jerry Wascom.

Q.    Okay. And what relation did you have to Mr. Woods?

A.    So he had been my boss, and I think at this point he then moved to a new role in Dallas, I think.

Q.    Okay. And Mr. Woods ultimately became the Chairman and the CEO of the ExxonMobil.

A.    He did.

Q.    And he's still the Chairman today.

A.    Yes, he is.

Q.    And he's the person that replaced Mr. Tillerson?

A.    He did, yes.

Q.    And so if we see in the e-mail, it says, "Spoke with Rosenthal this AM regarding a recent outlook discussion he had with Rex. Two issues that will eventually come back to you are Kearl realizations and LIFO earnings. I understand from David that Andy's teams are looking at both. Before locking in on any assumptions and subsequent numbers, let's discuss."

    Do you see that?

A.    Yes, I do see that.

Q.    And "Rosenthal" is referring to David Rosenthal, the Controller of ExxonMobil. Is that correct?

A.    I would assume so, yes.

Q.    And it's the same Mr. Rosenthal that had -- that had advised

VOLUME 3-B    124

Mr. Strawbridge to invite you to the October 26, 2015, meeting. Is that correct?

A.    It is the same person.

Q.    And "Rex" is referring to "Rex Tillerson," the current Chairman and CEO of ExxonMobil. Is that correct?

A.    Yes, that is, indeed.

Q.    And you're familiar with the term "Kearl realization."

A.    I am familiar with it, yes.

Q.    And "Kearl realization" means how much money ExxonMobil receives in dollars per barrel for Kearl after deducting the costs of diluent and transporting the dilbit to the customer.

    Would you agree with that definition?

A.    Sorry. I -- Could you just repeat the definition just to make sure I'm ---

Q.    Sure. In essence, it's how much money you're making per barrel after you subtract for costs.

A.    Yes, that's broadly correct. Yes, that is correct.

Q.    And "Andy" in the e-mail is referring to you, correct?

A.    Yes, I'm sure he is.

Q.    And according to this e-mail, as of September 22nd, 2015, your teams were looking at Kearl realizations.

A.    We were. We were always trying to get as much money as we could from Kearl because we were selling it.

Q.    And Mr. Woods is telling you in this e-mail not to lock in on any assumptions and numbers regarding Kearl before you discuss

**App. 220**

with him.  Is that correct?

A.    Well, that's not quite correct.  Before locking in on any assumptions, you know, and the subsequent numbers, let's discuss, yes.

Q.    Okay.

A.    I take that as it's the assumptions we're making that he's particularly interested in.

Q.    Now for Page -- Let's go to Page 3 of 4 and the last line.  And do you see where it says, "On Kearl, we are working with Bart Cahir in Canada on the pricing assumptions and sensitivities"?  Do you see that?

A.    Could I just -- Is it okay if I just read the e-mail so I understand the context of what we have or ---

Q.    You can do that, sir, but I'm just simply asking:  Did I read that correctly?

A.    Okay.  Thank you.  I just want to check that I understand what it is.

Q.    I don't plan to ask any more questions on this e-mail other than that.

A.    Okay.

      (Pause)

A.    Yes, I do see the last sentence.

Q.    And now if we can go to Page 2 of 4.

      MR. SHELDON:  And if you could blow up the middle of the page.  And so if you can -- The e-mail where it starts with

"Jeff," if you can just blow that up.

Q.    (By Mr. Sheldon) So I'm now referring to an e-mail, sir, that's from you, Andrew Madden, to Jeffrey Gross on September 28th with the subject "RE: LIFO and Kearl."  Do you see that?

A.    Yes, sir, I do.

Q.    And the e-mail says, "Jeff, I actually fly to Dallas this evening and am meeting with the Chairman first thing tomorrow.  Could we chat today, please?"

      Do you see that?

A.    Yes, I see that.

Q.    And "tomorrow" would be September 29th, 2015.  Is that correct?

A.    It is, indeed, yes.

Q.    And the "Chairman" would be Rex Tillerson, correct?

A.    Yes, it would.

Q.    So does that refresh your recollection that you met Mr. Tillerson on September 29th, 2015?

A.    It certainly says I did.  I mean I met with Mr. Tillerson once a month by routine, and I would imagine this was one of those meetings.

Q.    And the subject line was "LIFO and Kearl."  Do you see that?

A.    The subject line of the e-mail?

Q.    Yes, of this e-mail.

A.    I do see that, yes.

Q.    And do you remember who was at that September 29th, 2015,

meeting that you had with Mr. Tillerson?

A.    Well, I don't remember in detail.  But given it was the regular monthly meetings where we went, it would have been, you know, Mr. Tillerson, Mr. Swiger, Mr. Woods, and I might have been there with Jerry Wascom, my boss, and whoever was running the marketing company at that time, too, but I don't remember who it was.

Q.    Thank you.

      MR. SHELDON:  If we could go to Exhibit 339.

Q.    (By Mr. Sheldon) Sir, I'm showing you what's already been admitted into evidence, which is Exhibit 339, and there's a custodian, Andrew Yates.  Are you familiar with Mr. Yates?

A.    I am familiar with Mr. Yates, yes.

Q.    He was an IOL employee in 2015?

A.    He was, yes.

Q.    And the date of this is October 6th, 2015.  Is that correct?

A.    Yes, that's the date.

Q.    And that was 20 days before the October 26th, 2015, meeting with the Chairman regarding Kearl, correct?

A.    The meeting that Mr. Strawbridge invited me to.

Q.    Correct.

A.    Yes, it was.

Q.    At the request of Mr. Rosenthal.

A.    Yes, it was.

      MR. SHELDON:  And if we go to Page 6 of 8, and if we

could blow up the chart.  And go a little lower so we can see the title.

Q.    (By Mr. Sheldon) So the chart that I'm showing you is Exhibit 339.  It's "Kearl Disposition."  Do you see that?

A.    The title of the page is "Kearl Disposition."

Q.    Yes.  I'm just saying:  Do you see the title?

A.    I do see the title, yes.

Q.    And do you remember, sir, you had your deposition taken in this case?

A.    I do, indeed, yes.

Q.    And do you remember discussing this chart?

A.    Yes, I do.

Q.    Okay.  And what the chart is showing is "Third-Party Kearl Volumes by Point of Sale."  Is that correct?

A.    Yes, that's what the chart's showing.

Q.    And it starts in October of 2013 and it goes to September of 2015.  Is that correct?

A.    Yes, that's correct.

Q.    And what this chart is showing are the "Third-Party Kearl Volumes by Point of Sale."  Is that correct?

A.    That is correct.  That's the title of the chart, yes.

Q.    And we see red on the chart.  Is that correct?

A.    Yes, that is correct.

Q.    And the red reflects the third-party point of sales for Edmonton/Hardisty?

A.   Yes.  It reflects the ones that we're selling in Edmonton and Hardisty.

Q.   And the blue reflects "USGC," correct?

A.   Yes, it does.

Q.   And that stands for "United States Gulf Coast."  Is that correct.

A.   Yes, that's also correct.

Q.   And then on the left-hand side, if we could blow it up, you see "KBD."  Is that correct?  Left-hand side.

A.   Yes, I see that.  That's also correct.

Q.   And "KBD" stands for "thousands of barrels per day"?

A.   It does, indeed, yes.

Q.   And then in the middle of the chart or on the left-hand side we can see the different barrel amounts reflected in thousands of barrels.  Is that correct?

A.   Yes, that's right.

Q.   And then we see blue reflected, meaning sales to the United States Gulf Coast from October, 2013, through September of 2015.  Is that correct?

A.   The blue bars, yes.  That's -- They're the sales to the U.S. Gulf Coast, yes.

Q.   And so if we start with September, the blue on the chart looks slightly bigger than the red on the chart.  Is that correct?

A.   So it's starting in which September?

Q.   September of 2015.

A.   It does look slightly bigger, yes.

Q.   And that reflects that there's -- for September of 2015, there's slightly more sales to the United States Gulf Coast than there is to Edmonton/Hardisty.  Is that correct?

A.   That is correct.

Q.   And that was one month before the October meeting with Mr. Tillerson, correct?

A.   Yes.

Q.   And then if we look at August, 2015, it roughly looks like it's an equal amount of sales that month from the United States Gulf Coast into Edmonton/Hardisty.  Is that correct?

A.   Yes, that's correct.

Q.   And August was two months before the meeting with Mr. Tillerson.  Is that correct?

A.   Yes, that's correct.

Q.   And then if we look at July, 2015, it's roughly equal.  It's roughly -- or we see more sales from the United -- to the United States Gulf Coast than we do to Edmonton/Hardisty.

Is that correct?

A.   Yes, that's correct.

Q.   And then if we -- And July was, if I can do my math, it was roughly three months before the meeting with Mr. Tillerson.  Is that correct?

A.   Yes, that's also correct.

Q.   And then if we look at June, it looks like it's slightly less, the sales from the United States Gulf Coast, than it was from Edmonton/Hardisty.  Is that correct?

A.   Yes.

Q.   And so you would agree with me there was substantial sales to the United States Gulf Coast from June, 2015, to September, 2015.  Is that correct?

A.   Yes.  We have, yes, substantial sales to the Gulf Coast in that period.  We did.

Q.   So there were substantial sales going to the United States, the Gulf Coast, for each month, for the four months leading up to the meeting with Mr. Tillerson on October 26th, 2015.  Is that correct?

A.   That is correct.

Q.   And you would agree with me, sir, that we don't see October or November and December of 2015 on this chart, but there was also sales going to the United States Gulf Coast in those months, too.  Is that correct?

A.   I can't see it from this chart, as you say, but I would imagine.  Yeah, I can't see it from the chart.

Q.   Okay.  But from personal memory, sir -- and I'll show you another document -- would you agree with me that in October and November and December of 2015 there were also sales in those months going to the United States Gulf Coast?

A.   From my memory, there was.  I don't know how much it would

have been, but yes.

Q.   Okay.  And then if we can zoom out, what does the "25 third-party refiners have processed Kearl" reflect?

A.   That means that there are 25, you know, refineries not owned by ExxonMobil who have taken the Kearl crude and run it -- and bought it and run it in their refineries.

Q.   And are those the third-parties?

A.   They're third-parties.

Q.   And those 25, there it looks like almost all of them are, if not all of them, are located in the United States?

A.   That the refineries in the United States?

Q.   Yes.

A.   Yes.  And let me just check.  Yes, I think that's correct.

        MR. SHELDON:  If we can go to 337.

Q.   (By Mr. Sheldon) Sir, 337 has already been admitted into evidence.  I'm showing you an e-mail dated October 22nd, 2015.  It's from Mr. Strawbridge to several people, including you.

Do you see that?

A.   Yes, I do see that.  Thanks for the highlight.

Q.   And the -- And the attachment says "Kearl 2015 SEC Reserves October 26 Chairman's Review."  Do you see that?

A.   I do see that, a draft, yes.

Q.   And it says, "All:  Attached is current draft of Monday's Kearl review package."  Do you see that?

A.   I do see that.

Q.   And then if we go down to the third paragraph starting with "Andy."  And it says, "Andy, your folks, those that provide us the Kearl pricing data, have reviewed the pricing charts but welcome any comments you may have."

Do you see that?

A.   Yes, I see that.

Q.   And that's -- "You" is referring to Andy, correct?

A.   To me?

Q.   Yes.

A.   Yes, it is.

Q.   And your group, Supply and Transportation, has provided Mr. Strawbridge the Kearl pricing data.  Is that correct?

A.   Indeed.  That's correct.

Q.   And according to this e-mail, your group has also reviewed the pricing charts.

A.   Yes.  That's what it says, yes.

Q.   And Mr. Strawbridge is asking you or he's saying, "I welcome any comments you may have."

A.   Correct.

MR. SHELDON:  And now I'm on Page -- If you can go to Page 9 of 9.

Q.   (By Mr. Sheldon) And this slide is entitled "Kearl SEC Bitumen Pricing Process."  Do you see that?

A.   I do see that, yes.

Q.   And then underneath, it says "Kearl Bitumen SEC Pricing

Process."  Do you see that?

A.   Yes, I do see that.

Q.   And this was an example that was intended to show Mr. Tillerson at the October 26th meeting how the SEC price for Kearl bitumen was being calculated.  Is that correct?

A.   Yes, it is correct, yes.

Q.   And then if we look under "Market Quality" and if we go under the first bullet point, it says, "excludes U.S. sales."

Do you see that?

A.   Yes, I do see that.

Q.   So according to this pricing, the example being given to Mr. Tillerson, U.S. sales are being excluded.

A.   For the SEC pricing process, yes, that's what it says.

MR. SHELDON:  And if we could pull up Exhibit 338.  So this is 338, and let's go to Page 7.  And if you could blow up the chart.

Q.   (By Mr. Sheldon) And the last chart that we looked at, Mr. Madden, ended in September of 2015.  Is that correct?

A.   Yes, it did.  Thank you.

Q.   And now on this chart we can see October 15th, November 15th and December 15th.  Is that correct?

A.   Yes, that's correct.

Q.   And in October 15th we see blue reflecting Kearl bitumen being sold to third-parties in the United States Gulf Coast.  Is that correct?

A.   We do, indeed, yes.

Q.   And we see the same for November.  Is that correct?

A.   It is correct, yes.

Q.   And we see the same for December.  Is that correct?

A.   Yes, it's correct.

MR. SHELDON:  So if we could go back to 337, Page 9 of 9.

Q    (By Mr. Sheldon) Now under "Transportation," we see a dollar 27 per barrel.  Do you see that?

A.   I do see that, yes.

Q.   And you would agree with me the cost to transport Kearl bitumen to the United States costs more than a dollar 27 per barrel.  Is that correct?

A.   I would, indeed, yes.

MR. SHELDON:  If we could go to 587.  587, there's no objection.  And if we could go to the top part of the page and blow it up.

Q.   (By Mr. Sheldon) So this is an e-mail, sir, from you on October 23rd, 2015, to Jerry Wascom and you're copying Darren Woods.  The subject is:  "Forward:  PROP:  Kearl 2015 SEC Reserves, October 26, Chairman's Review - Draft Package."

Do you see that?

A.   I do see that.

Q.   And you say in the e-mail, "Jerry, there's a discussion on jewel reserves which we have been helping work with Rex on Monday

(package attached).  Andy Steiger asked me to be present, if possible, to discuss, as needed, the mechanics and dynamics of West Canadian pricing.  As a result, I'm going to fly up with Tom Walters Monday morning."

Do you see that?

A.   I do see that.

Q.   And did you mean to say "jewel reserves" or was this a typo for "Kearl reserves"?

A.   I think you're right with the second.  It was a typo for "Kearl reserves."  It was probably on my -- on my iPhone.

Q.   Because if you Google "jewel reserves," it says "the most," you know, "important," something along those lines.  So ---

A.   This was -- I'm certain this would have been "Kearl reserves" with a typo with me doing it on my phone because I was just telling Jerry that I was going to go up with a different flight with Tom in the morning.

Q.   And in this e-mail, again, "Rex" is referring to Rex Tillerson, correct?

A.   That's correct.

Q.   And according to this e-mail, you've been working with Mr. Tillerson on the Kearl reserves.  Is that correct?

A.   I'm not sure that's -- I don't -- No, I don't think that's what it says.  I think, you know, maybe my punctuation wasn't the best.  What it actually says, there's a discussion on Kearl reserves which we'd been helping work and the discussion is with

Rex Tillerson on Monday.

Q.   Okay.

A.   Not that we've been working in advance with Rex Tillerson because I certainly hadn't been.

Q.   Okay.  And then it says that -- that you've been asked to go to the meeting to discuss, as needed, the mechanics and dynamics of Kearl bitumen pricing.  Is that correct?

A.   Yes, that's correct.

Q.   And you were going to fly up with Tom Walters?

A.   Yes, that's correct.

Q.   And Mr. Walters at that time was the President of ExxonMobil Production?

A.   I believe so.  Yes, he was.

Q.   And you and Mr. Walters flew together on -- on ExxonMobil's plane to that meeting.  Is that correct?

A.   Yes, that is correct.

        MR. SHELDON:  And if we could go to Exhibit 335.  Don't put it up.  There's an objection.

        MR. THOMAS:  No objection, Your Honor.

        THE COURT:  335 is admitted into evidence.

        MR. SHELDON:  If we could go to the top part of the e-mail.

Q.   (By Mr. Sheldon) So this is from Tom Martenak on October 23rd, 2015, to you and several other people, and the subject is "Canadian Bitumen Realization and Diluent Cost."

    Do you see that?

A.   Yes, I do see that.

Q.   And, again, this is three days before the October 26th meeting.  Is that correct?

A.   Excuse me.  Yes, it is.

Q.   And, again, you're -- you're familiar with the term "Kearl realization."

A.   I am familiar with the term, yes.

Q.   And Mr. Martenak, he was someone that reported to you?

A.   He was, yes.

Q.   And he was the Manager of International Equity Crude Sales.  Is that correct?

A.   Yes, that's correct.

Q.   And according to this e-mail, he was providing you with the projected summary for Kearl's netbacks for October and November, 2015.  Is that correct?

A.   Just let me --

Q.   Sure.

A.   -- read it for a second.

    (Pause)

A.   Yes, that's correct.  The one he proposed for Rich Kruger, yes.

        MR. SHELDON:  If we could blow up the first paragraph.

Q.   (By Mr. Sheldon) And what he's saying is "Below (and attached larger) is a summary of current and next month's

projected bitumen netbacks for Cold Lake and Kearl as prepared by Mike Wheeler the middle of each month for Rich Kruger.  These are not actual accounting numbers but mid-month look-ahead expected numbers based on average to-date published prices.  Also, it's important to know these realizations reflect the full cost of transportation, not the variable cost we use to assess incremental sales."

    Do you see that?

A.   I do see that, yes.

Q.   And then underneath, there's 1, 2 and 3, and I want to focus on No. 3.

        MR. SHELDON:  If we can highlight that.

Q.   (By Mr. Sheldon) And it says, "Transportation by pipe or rail, and tank storage fees (both dilbit and diluent) on a full cost basis."

    Do you see that?

A.   I do see that.

        THE COURT:  What's this exhibit number?

        MR. SHELDON:  This is 335, Your Honor.

Q.   (By Mr. Sheldon) And so in this e-mail Mr. Martenak again was providing you with a summary of projected bitumen netbacks for Kearl for the months of October and November, 2015.  Is that correct?

A.   For the months October and November, yes.  That's what -- Next month's, yes.

Q.   Okay.

A.   Which would be -- Which would be November, yes.

Q.   And "netbacks" and "realizations" are basically the same thing.  Would you agree?

A.   I would agree with you on that, yes.

Q.   And, again, I'm not -- I went to law school because I don't understand accounting or science.  But can you tell the jury in simple terms what's "realization" or "netback"?

A.   So "realization" is how much money we make by actually selling the crude or how much you've actually made once you've -- once you've sold it and taken off any costs.

Q.   And then according to this e-mail, Mr. Martenak was also providing you with the full cost of Kearl's transportation for the months of October and November, 2015.  Is that correct?

A.   He was providing the costs on a full cost basis, yes.

        MR. SHELDON:  And if we go three lines down below the chart.  Keeping going down.  Keep going down.  Okay.  And I want to start with "The difference."  So highlight "The difference" and then highlight it all the way down to -- to "being lower."

Q.   (By Mr. Sheldon) So according to this e-mail, Mr. Martenak is telling you, "The difference between WCS and Edmonton and the Kearl and Cold Lake bitumen realizations is transportation to Edmonton, the diluent correction, and the most negatively arb on -- on full transportation cost to GC markets.  The difference between Cold Lake and Kearl bitumen is that a higher percentage

**App. 224**

of Kearl goes to the US -- USG, so it carries more of a full transportation cost. It makes sense to send Kearl to the USG because the TAN discount is lower but it does result in Kearl bitumen realizations being lower."

Do you see that?

A. Yes, I do see what you were reading.

Q. And "USGC" is "United States Gulf Coast."

A. It is. That's my understanding, certainly.

Q. And, again, Mr. Martenak is telling you this on October 23rd, 2015, three days before the October 26th, 2015, meeting with Mr. Tillerson. Is that correct?

A. Yes, that is correct.

Q. And then if we look at that chart, we really can't see the chart because it's blurry and hard to read. Is that correct?

A. It's a little blurry but, yeah, I can see some of it.

Q. But if we go to Page 20 of 20 and if we blow up this chart, this chart is the same on Page 20 of 20 as the one on Page 1 of 20 but we can see it better. Is that correct?

A. Yes, that is correct.

Q. And at the top of the chart we see "Bitumen Realization Estimate 19 October 2015," correct?

A. Yes, it is. That's correct.

Q. And so what this chart is intended to reflect was an estimate on October 19th, 2015, as to how much money ExxonMobil is making in dollars a barrel for bitumen. Is that correct?

A. It's intended to reflect -- That's not quite correct, no.

Q. Well, you tell me where I went wrong.

A. Okay. It's intended to reflect, via selling it in a number of different ways, how much ExxonMobil would have made in realization if it had -- in the market as it was, how much we would have made if we sold it in those ways.

Q. And so these, you're providing -- someone's providing estimates, right?

A. They're estimates, but they're also -- they're not saying how much we were moving by any of those three ways.

Q. But these were estimates as of October 19th, 2015, of how much money could be made selling Kearl bitumen.

A. It is how much could be made, yes.

Q. And the first column that we look at reflects "Enbridge."

MR. SHELDON: And if we could blow up the right side, the "Kearl Bitumen Realizations," so we can see the right side. Mr. Torres, this whole right side, blow that up.

Q. (By Mr. Sheldon) So if we look at just -- He's going to blow it up.

A. Okay.

Q. Okay. There we go. So for the record, I'm on October 19th, "MTD Enbridge." Do you see where I'm at?

A. I do see where you're at, yes.

Q. And we start with $47.07 is the market price at WTI Cushing. Do you see that?

A. Yes, I do see that.

Q. And Enbridge, we're talking about the first point of sale going to Edmonton. Is that correct?

A. I think -- Yes, it is. It's that first point of sale in Canada.

Q. So if we're just talking about Canada, we would subtract for transportation a dollar 7. Do you see that?

A. I do see that, yes.

Q. And that's the cost of transportation to get it to Edmonton. Is that correct?

A. It is, yes.

Q. And now if we move to the second column, it says "October MTD Keystone," correct?

A. Yes, that's correct.

Q. And those would be for sales going to the United States. Is that correct?

A. They would, indeed, yes.

Q. And if we look at the transportation cost for October 19th, 2015, for the sales going to the United States, it's $12.12 per barrel. Do you see that?

A. I do see that. It's the full transportation cost, yes.

Q. And if we did rail to the United States -- that's the next column over -- it would be even more money than $12.12 per barrel. Is that correct?

A. That is correct, yes.

Q. And this is on October 19th. It's six days before the October 25th or -- sorry -- October 25th, 2000 -- or October 26th -- I'm getting my math all messed up -- it's seven days, a week before the meeting. Is that correct?

A. I think it -- Yes, it is correct.

MR. SHELDON: Now if we could go to Exhibit 117. I'm sorry. Let me go -- Sorry. I think I'm on 590. Go to 590 first. Okay. Go to the bottom of the page. Okay. You need to go further down.

Q. (By Mr. Sheldon) So this reflects October 23rd, if you see the last line on this e-mail. It's an e-mail. All we see is "William Strawbridge." Do you see that?

A. Yes, I see Bill's name, yes.

Q. Okay. And if we go down further, he's sending you an e-mail on October 23rd, 2015. And the e-mail says, "Andy, final version of package with new backup chart that David Rosenthal asked us to include. Let me know if you have any edits to the package."

Do you see that?

A. Yes. I see that sentence, yes.

Q. And so according to this e-mail, Mr. Rosenthal had asked Mr. Strawbridge to include a new backup chart.

A. Yes. That's what it says, yes.

Q. And, again, Mr. Rosenthal was the one that asked Mr. Strawbridge to have you come to the meeting.

A. He was, yes.

Q.   And then if we go up, and you reply to the e-mail.

MR. SHELDON:  Keep going down to the middle.

Q    (By Mr. Sheldon) And you send him a reply on October 24th to Mr. Strawbridge.

MR. SHELDON:  And just highlight the first line and then stop at "SEC pricing."

Q.   (By Mr. Sheldon) And you say to Mr. Strawbridge, "Thanks, Bill.  Looks fine.  I wasn't quite sure what the purpose of the lasted in backup was.  It describes how sales are excluded from SEC pricing."

Do you see that?

A.   Yes, I do see that.

Q.   And, sir, at your deposition you testified you don't really understand how the SEC pricing works.  Is that correct?

A.   That is correct.

Q.   Okay.

MR. SHELDON:  And if we go to the top of the e-mail.

Q    (By Mr. Sheldon) Then the day before the meeting, Mr. Strawbridge responds to you.  Is that correct?  He's sending you an e-mail.

A.   Yes, that's correct.

MR. SHELDON:  And let's highlight the whole e-mail.

Q.   (By Mr. Sheldon) And he says, "Thanks, Andy.  The last backup chart was requested by David Rosenthal based on his earlier discussions with the Chairman.  Evidently, a lot of his

discussions have centered around U.S. pricing for Kearl, and he wanted to make sure we could describe the various sales options for Kearl.  Hopefully, we won't have to use."

Do you see that?

A.   Yes, I do see that.

Q.   So Mr. Strawbridge is telling you that Mr. Rosenthal is having discussions with Mr. Tillerson, correct?

A.   It does suggest that, yes.

Q.   And he's telling you he's had a lot of discussions with -- that Mr. Tillerson and Mr. Rosenthal have had a lot of discussions.  Is that correct?

"Evidently, a lot of discussions."

A.   Yes, it does suggest that.

Q.   "And a lot of the discussions between Mr. Rosenthal and Mr. Tillerson are centered around the U.S. pricing for Kearl."

Do you see that?

A.   Yes, I do.

MR. SHELDON:  If we could go to Exhibit 117.  And for the record, I'm on Page 1 of 1.

Q.   (By Mr. Sheldon) So this is an e-mail on October 25th, 2015.  It's from Mr. Strawbridge to you and several people.

Do you see that?

A.   Yes, I do see that.

Q.   And he's saying, "Attached is the -- basically the review package for Monday's meeting with the Chairman."

Do you see that?

A.   Yes.  I see that highlighted, yes.

MR. SHELDON:  And if we could go to Page 11 of 11.

Q    (By Mr. Sheldon) And do you see where it says "Kearl Value Chain - Bitumen Sales Options"?

A.   Yes, I do see that.

Q.   And in the prior e-mail, you were asking -- you and Mr. Strawbridge were having a discussion about why a certain slide was included in the presentation.

Do you remember that?

A.   I do remember that.

Q.   And in Exhibit 117, Page 11 of 11, is this the slide that was being referenced?

A.   I believe it is, yes.

Q.   Okay.  And, again, in the bottom right we see on this slide that U.S. sales are excluded from the SEC price.  Do you see that?

A.   Yes, I do see that.

MR. SHELDON:  And if we could go to Exhibit 590.

Q    (By Mr. Sheldon) Now I'm on an e-mail.

MR. SHELDON:  Let's go to the bottom of the page.  Okay.  Oh, sorry.  I went to the wrong one.  601.  Go to the bottom e-mail.

There is no objection to this e-mail.

THE COURT:  Okay, good since we're going to have to do

it tomorrow.

MR. SHELDON:  Oh.  Can we just do this one last one or not?  You're the boss.

THE COURT:  Okay.  Then I'll let you do it.

MR. SHELDON:  Okay.

THE COURT:  Sucking up always works.

Q    (By Mr. Sheldon) So, sir, this e-mail is dated from you to Mr. Martenak on October 26th, 2015.  Do you see that?

A.   I do.  Yes, I see that.

Q.   And you say, "Tom, the review went really well.  Chairman was very happy with the basis of the reserve calculation.  Just concluded at the end by saying, 'Keep it running and get costs down further.'"

Do you see that?

A.   Yes, I do see that.

Q.   And so you were sending this e-mail to Mr. Martenak immediately after the October 26th, 2015, meeting with Chairman Tillerson.

A.   That's correct.

Q.   And you told Mr. Martenak that Chairman Tillerson was very happy with the reserve calculation.

Do you see that?

A.   Yes, I do.

Q.   And then Mr. Tillerson said at the end of the meeting, "Keep it running"?

A.   I do see that, yes.

Q.   And he was referring to keep Kearl running, correct?

A.   That's correct.

Q.   And he said, "Get the costs down further."

A.   That's also correct.

Q.   And he was referring to the Kearl costs.

A.   To the overall costs of the operation, yes.

        MR. SHELDON:  Okay.  Thank you.

        THE COURT:  Okay.  See y'all back in the morning at 9:00.  Don't talk about the case.  Thank you, all, very much.

        THE WITNESS:  Thank you.

        COURT SECURITY OFFICER:  All rise for the jury.

        (Jury escorted to the Jury Room by the Court Security Officer and excused for the evening.)

        (Court adjourned at 5:00 PM.)

CERTIFICATE OF OFFICIAL REPORTER

        I, Deborah A. Kriegshauser, Federal Official Realtime Court Reporter, in and for the United States District Court for the Northern District of Texas, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically-recorded proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

        Dated this 30th day of April, 2026.


                    /s/ Deborah A. Kriegshauser
                    _____
                    DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
                    FEDERAL OFFICIAL COURT REPORTER

**App. 227**

# Exhibit 8

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

PEDRO RAMIREZ, JR., Individually )
and on Behalf of All Others )
Similarly Situated, and GREATER )
PENNSYLVANIA CARPENTERS PENSION )
FUND, )
)
           Plaintiffs, )
)
VS. ) No. 3:16-CV-03111-K
)
EXXON MOBIL CORPORATION, ) CLASS ACTION
REX W. TILLERSON, ANDREW P. SWIGER, )
JEFFREY J. WOODBURY, DAVID S. )
ROSENTHAL, )
)
           Defendants. )
_____ )

JURY TRIAL PROCEEDINGS -- VOLUME 4-B
BEFORE THE HONORABLE ED KINKEADE
UNITED STATES DISTRICT JUDGE
MAY 1, 2026
DALLAS, TEXAS

FOR THE PLAINTIFFS:

    JOE KENDALL
    KENDALL LAW GROUP
    3811 Turtle Creek Boulevard, Suite 825
    Dallas, TX  75219
    (214) 744-3000

    SCOTT H. SAHAM
    NATHAN R. LINDELL
    SAM SHELDON
    ERIKA OLIVER
    T. ALEX B. FOLKERTH
    SARA BIERL POLYCHRON
    SPENCER A. BURKHOLZ
    ROBBINS GELLER RUDMAN & DOWD, LLP
    655 West Broadway, Suite 1900
    San Diego, CA  92101
    (619) 231-1058

    BALON B. BRADLEY
    BALON B. BRADLEY LAW FIRM
    11910 Greenville Avenue, Suite 220
    Dallas, TX  75243
    (972) 991-1582

    MICHAEL SWIDERSKI
    (Party Representative)

FOR THE DEFENDANTS:

    THOMAS M. MELSHEIMER
    AUSTIN E. SAATHOFF
    EMILY WILKINSON
    DAVID T. HINOJOSA
    KING & SPALDING, LLP
    2601 Olive Street, Suite 2300
    Dallas, TX  75201
    (214) 764-4446

    NINA CORTELL
    JASON JORDAN
    HAYNES and BOONE, LLP
    2801 N. Harwood Street, Suite 2300
    Dallas, TX  75201
    (214) 651-5000

    AUDRA J. SOLOWAY
    DANIEL TOAL
    THEODORE V. WELLS
    LYUBA SHAMAILOVA
    AMITAV CHAKRABORTY
    DAPHNE THOMPSON
    PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
    1285 Avenue of the Americas
    New York, NY  10019-6064
    (212) 373-3000

    SCOTT C. THOMAS
    LATHAM & WATKINS
    100 Crescent Court, Suite 7084
    Dallas, TX  75201
    (713) 546-5400

    D. PATRICK LONG
    SQUIRE PATTON BOGGS
    2200 Ross Avenue, Suite 4100w
    Dallas, TX  75201
    (214) 758-1500

    (Rex Tillerson)

    PATRICE CHILDRESS
    (Party Representative)

    Proceedings reported by mechanical stenography; transcript produced by computer-aided transcription.
_____

DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
Federal Official Court Reporter
1100 Commerce Street, 15th Floor
Dallas, TX  75242
(214) 753-2325

VOLUME 4-B        4

INDEX

| PLAINTIFF'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| REX TILLERSON | 16 | | | |

EXHIBITS

| PLAINTIFF'S EXHIBIT | INTRODUCED | ADMITTED |
|---|---|---|
| 254 | 56 | 57 |
| 558 | 34 | 34 |
| 560 | 122 | 122 |
| 561 | 44 | 45 |
| 572 | 70 | 71 |
| 600 | 59 | 59 |
| 732 | 137 | 138 |

**App. 228**

VOLUME 4-B    5

(PROCEEDINGS BEGAN AT 12:45 PM.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  All right.  Is there anything you'd like to talk to me about?

MR. SAHAM:  Your Honor, Mr. Toal is going to go first, but if I may approach and give you both what Plaintiff proposed as a stipulation and what Plaintiff proposed to ask, and then he'll argue whatever he wants to argue.

THE COURT:  Okay.  Y'all didn't work anything out?

MR. SAHAM:  No.  We proposed on the top that stipulation and they rejected it, and those are the questions we plan to ask as a result of them rejecting it.

THE COURT:  Okay.  All right.  Go ahead.

MR. TOAL:  So, Your Honor, just referring to the three questions, we -- we made clear to Plaintiffs that we didn't have an issue with them asking Questions 1 and 3.  Question 2 we do think is improper and objectionable under 403.  That's asking about the preservation of e-mail accounts.  And they want to use it with Mr. Tillerson, and they want to ask it as the first question or the first series of questions in their examination.

Mr. Tillerson had nothing to do with preservation of e-mail accounts.  By the time this issue had arisen, he was not working at ExxonMobil.  He was serving as Secretary of State.  And the fact that they want to use this as their first series of questions shows that this is intended for no purpose other than

VOLUME 4-B    6

hurting his credibility and creating prejudice.  And we think it is objectionable under Rule 403.

And we would cite for Your Honor's consideration the Fifth Circuit's decision in *Caparotta* which is 168 F3d 754, 1999 decision, which dealt with evidence that had been inadvertently not retained.  And the Court said it would have been more -- The Court actually reversed for an abuse of discretion and said, "It would have been more appropriate for the District Court to have informed the jury that the documents had been inadvertently destroyed and that the District Court found no bad faith on the part of Entergy.  Federal Rule of Evidence 403 provides that, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of *inter alia*, unfair prejudice or confusion of the issues."

Caparotta argues that "The evidence was relevant because the jury might wonder why certain evidence was never introduced and also to show that Entergy had poor adherence to its own document retention policies."

The District Court found the evidence relevant with respect to the credibility and reliability of Entergy.  "Assuming that some probative value did exist as to the issues in this case, such value is miniscule.  Contrastingly, the danger of unfair prejudice and confusion of the issues was substantial."

And we would submit that as to Question 2, that's exactly what Plaintiffs are attempting to do here, to create

VOLUME 4-B    7

unfair prejudice when the issue of retention of these documents has no relevance and certainly no relevance to Mr. Tillerson and his testimony.

THE COURT:  Mr. Saham.

MR. SAHAM:  Thank you very much, Your Honor, and I would restate -- I'd go back to where we started this day.  And if you want me to quote Mr. Melsheimer.  In the Opening Argument in this case ---

THE COURT:  Wait, wait, wait.  I've already heard that.

MR. SAHAM:  Yeah.  I thought you wanted us to make a record.

THE COURT:  There went "yeah" again.  That's $500 we're up to now with all those "yeahs."  Okay?  It's five.

MR. BURKHOLZ:  I'm covering it, Your Honor.

THE COURT:  I'm glad you're covering it.

And he made a very broad statement.

Agreed?  You want to read it to me again?

MR. SAHAM:  Only if the Court wants me to read it to him.

THE COURT:  Well, if you think it needs to be in the record again, read it.

MR. SAHAM:  I believe it should be in the record.

The Opening Argument which opened the door to this whole issue ---

THE COURT:  Well, it's not argument.  It's an Opening

VOLUME 4-B    8

Statement.

MR. SAHAM:  Opening Statement.

THE COURT:  It's actually not supposed to be argument but many lawyers do, but go ahead.

MR. SAHAM:  The Opening Statement at -- at Page 69, Lines 11 through 15, Mr. Melsheimer stated:

Quote, "Plaintiffs will not show you a single document, not an e-mail, not a text message, not a memo, showing that Mr. Tillerson or Mr. Swiger or Mr. Rosenthal said anything like 'Make these numbers work; don't follow the rules; those documents don't exist because that never happened.'"

We have also cited to Your Honor the letter written from Mr. Wells to Judge Ostrager in New York, March 16th, 2017, where Mr. Wells stated again:

Quote, "ExxonMobil determined, however, that despite the Company's intent to preserve the relevant e-mails in both of Mr. Tillerson's account, due to the manner in which e-mail accounts had been configured years earlier and how they interact with the system, these technological processes did not automatically extend to the secondary e-mail account."

Then at his deposition Mr. Tillerson stated under oath:

Quote, "I operated off Wayne Tracker and ExxonMobil.com."

Then he was asked, "So you're using the Wayne Tracker primarily.  That was -- That was the primary account."

**App. 229**

Mr. Tillerson's answer: "It became my primary for company business."

That is the record. Mr. Melsheimer's Opening opened the door. We want to ask three simple questions because the -- the door has been opened. And the jury was told, not -- not in unsimple terms, that the existence or nonexistence of these e-mails, whether it's because they were never written -- and nobody knows whether that's true or not because Mr. Tillerson's primary account was not preserved.

THE COURT: Anything else, Mr. Toal?

MR. TOAL: Yes, Your Honor.

I want to be absolutely clear: We don't think there is any reason to believe that any e-mails were lost, although it is the case that the effort to put a hold on the Wayne Tracker account was not initially successful. The account was used to send messages to other people at ExxonMobil who were on a litigation hold.

It's also the case that many of these e-mail messages were sent both to Mr. Tillerson's "Rex Tillerson" e-mail account and to the "Wayne Tracker" account. So those -- those e-mails would be in the mix. And to the extent there is anything responsive, they would have been produced.

And so we would object to Question 2 on both 401 and 403 grounds. And if they're allowed to ask that question, we would reserve our right to respond to demonstrate the

circumstances.

THE COURT: What was the line in that case you read about what the ---

MR. TOAL: Oh, and I just note that among others, people like Mr. Swiger who testified here, Mr. Rosenthal, were part of the litigation hold. So any communications to and from Mr. Swiger, Mr. Rosenthal would have been preserved.

So the last line that I read was "Assuming that some probative value did exist as to the issues in this" ---

THE COURT: No, that's not what I want.

MR. TOAL: Okay.

THE COURT: About what the judge should or shouldn't have said.

MR. TOAL: They said it would have been more appropriate for the District Court to have informed the jury that the documents had been inadvertently destroyed and that the District Court had no -- found no bad faith on the part of Entergy.

I would submit here there is no evidence that any e-mail was lost for the reasons that we have discussed.

THE COURT: All right. Do you have any objection to me reading that?

MR. SAHAM: No, Your Honor. Instead of the second question, then I would just ask Question 1 and Question 3 and Your Honor would instruct or ---

THE COURT: Yeah. And I'll read something that says those are not preserved and the Court concludes it was inadvertent.

It's not perfect. I don't have any perfect language.

MR. SAHAM: Could we confer for one moment, Your Honor?

THE COURT: You absolutely may if you won't use the word "yeah."

(Pause)

MR. SAHAM: Your Honor, I would -- I would make two points. I haven't had a chance to read the case because Mr. Toal just started reading it. But I could bet that counsel in that case didn't open the door in their Opening Statement or I'm sure our fine friend here would have said.

THE COURT: I agree with that. That's not the point. The point is: I know the good judge in that court, another -- not "another" but a fine federal judge went into all that and figured all that out and spent time and found that what happened with regard to Exxon was something that either wasn't probative or it was inadvertent. But, whatever, that was not used in that case there in New York.

Was that a jury trial or a judge trial?

MR. TOAL: It was a bench trial, Your Honor.

THE COURT: Yeah. Of course, that's a little different, but the judge did make that finding that it was -- didn't have any relevance I think maybe is what he said.

MR. SAHAM: Well, Your Honor, can I make one suggestion?

THE COURT: Wait, wait, wait. You can; just a sec. What did the judge say there?

MR. TOAL: He didn't make a -- I think we satisfied him that there were no e-mails that were likely to be lost given the circumstances here and the way that e-mail account had been used.

And we would object to an instruction like this. I think in this *Caparotta* case, it was established that there were e-mails that were missing, were destroyed.

THE COURT: Well, it's either going to be this or I'm going to let him ask the question. That's your choice or you can object to both.

MR. TOAL: I think we would object to both. There -- There's just no evidence and there's no reason to believe that any e-mails from this account went missing.

THE COURT: I don't agree with that. It's not that they didn't go missing. They were destroyed but it was inadvertent. That's what happened.

MR. TOAL: Your Honor, I would submit they were ---

THE COURT: And you're saying, "But they got it by going to everybody else's e-mail and looking at that, anything that might have been relevant."

MR. TOAL: They were preserved in accounts of everybody else.

VOLUME 4-B    13

THE COURT: Well, that's a "maybe." We don't know who all he sent e-mails to. That's -- I mean I'm just guessing. Anyway, that's what I'm going to do. I'm going to do that, and I'm glad that both of y'all object. That makes me feel good.

MR. TOAL: Well, and just to be clear, we have no objections to Questions 1 and 2 or 1 and 3.

THE COURT: No. You already made that statement.

MR. TOAL: Okay.

THE COURT: It's the part I'm adding that you don't like.

MR. TOAL: That's correct.

THE COURT: Okay. And you don't like it either?

MR. SAHAM: I would make one -- I would like it with one caveat: I would delete the word "inadvertent" because we don't know whether it was inadvertent or -- It shouldn't be on purpose, but why do we put in the word "inadvertent" when no one knows?

MR. TOAL: Your Honor, as to those two options, we'd actually prefer that they ask the question to which we object, but we think it's more prejudicial for the Court to issue that instruction.

THE COURT: Really? You'd rather him ask the question?

MR. TOAL: We -- We object to the question. We think it is unfairly prejudicial, but our concern is that a statement from the Court that presupposes documents were lost, ---

VOLUME 4-B    14

THE COURT: Well, he's darn sure not going to use the word "inadvertent" and I was.

So you're going to live with that?

MR. TOAL: Well, we -- we object to it but we think it's the lesser of two evils.

THE COURT: Okay. All right. Then you're going to get to go ahead and ask it the way you want.

MR. SAHAM: Thank you, Your Honor.

THE COURT: All right. Here we go.

MR. SAHAM: The Plaintiffs call -- Oh, do we want to bring in the jury first or should we call the witness?

THE COURT: Well, I'd rather you'd go on with a bench trial.

MR. SAHAM: Well, we offered twice to Mr. Melsheimer to stipulate to Your Honor as to a bench trial and he has not gotten back to us.

THE COURT: Sorry, Mr. Melsheimer. They're picking on you a little bit today, but I think you're -- you've got wide shoulders.

MR. MELSCHEIMER: I'm not -- I've seen worse.

THE COURT: Okay. All right. Let's bring them in.

COURT SECURITY OFFICER: All rise for the jury.

(Jury seated in the jury box.)

THE COURT: Good to see y'all back. Y'all be seated. I hope none of you got the chili or you're going to be napping

VOLUME 4-B    15

this afternoon.

All right. Here we go.

MR. SAHAM: The Plaintiffs call Rex Tillerson, Your Honor.

THE COURT: Okay. Good afternoon, Mr. Tillerson.

THE WITNESS: Good afternoon, Your Honor.

THE COURT: Let's get you sworn in. Okay?

THE WITNESS: Certainly.

REX W. TILLERSON,

Was produced, sworn, and examined as follow:

THE COURT: And you've heard about the infamous chair over here that you're going to have to sit in.

THE WITNESS: I've been observing.

THE COURT: I'm sorry. I'm thinking about taking that chair out and putting just a regular chair in. I've had this same courtroom for 25 years. I should have done it before now.

THE WITNESS: Yeah, it doesn't move.

THE COURT: No, it doesn't move.

THE WITNESS: Okay.

THE COURT: So make sure you talk into the -- into the microphone.

THE WITNESS: Yes, sir.

THE COURT: Okay?

THE WITNESS: I will.

THE COURT: All right. Thank you.

VOLUME 4-B    16

All right. Are you ready, Mr. Saham?

MR. SAHAM: I am, Your Honor.

DIRECT EXAMINATION

QUESTIONS BY MR. SAHAM:

Q. Good afternoon, Mr. Tillerson.

A. Good afternoon.

Q. When you worked at Exxon, you had two Exxon e-mail accounts, correct?

A. That is correct.

Q. E-mails from your primary account were not preserved, correct?

A. Well, I'm not sure which account you're speaking of. Can you tell me which account you're asking about?

Q. I would be glad to. The Wayne Tracker account, those were not preserved, correct?

A. Well, I learned a few years after I left the corporation that, for technical reasons that I don't understand, it was not preserved.

Q. And you're also aware or became aware at some point in time that text messages were not produced to the Plaintiff in this case, correct?

A. That's my understanding.

Q. Thank you very much.

When did you become Chairman of the Board and CEO of Exxon?

A. January 1st, 2006.

**App. 231**

VOLUME 4-B    17

Q.  And what does that mean to be the CEO and Chairman of Exxon?

A.  Well, the CEO has responsibility for the managing of the corporation and its business activities.  The Chairman has responsibility for chairing the Board of Directors of whom at that time all were independent directors and the board activities and responsibilities.

Q.  And is it fair to say as the CEO -- That's the "Chief Executive Officer," correct?

A.  That's correct.

Q.  And that's the boss of the company.  Is that fair?

A.  If you'd like to use that term, I'll accept it.

Q.  And as the boss or the CEO, you set the tone for your executives and employees.  Is that fair?

A.  That's correct.

Q.  And what you say matters to those -- those folks who work for you, correct?

A.  I would expect so.

Q.  And would you -- would you -- would you agree that reserves are an important metric used to measure the future profitability of an oil and gas company?

A.  They're one of the important metrics.

Q.  And how do reserves impact future profits?

A.  Well, your reserves or your resource base, because that's where you start is with your resource base, contains the future opportunities to generate cash flow and earnings by developing

VOLUME 4-B    18

those reserves and producing them.

Q.  Okay.  And if Exxon didn't replace the reserves it was using in a year and come up or develop future reserves, it would negatively impact the company's stock price, correct?

A.  Well, it would depend on the, you know, the magnitude of those changes because you are constantly adding reserves through ongoing activities.  If you were to see-saw it together, I'm never going to explore for another barrel, I'm never going to acquire another lease, I'm never going to, then eventually it's a depletion business and you would -- you would run out of oil to produce.

Q.  And if you didn't have any oil to sell, you couldn't make profits.

A.  Well, you might only be in the downstream of the petrochemicals business then.

Q.  But it would eliminate the upstream business.

A.  Potentially.

Q.  And that's a big part of the company.

A.  Yes.

Q.  And when you became CEO, the tar sands oil at Kearl was one of the main reserves that was used or developed to replace other reserves that were being used up by the company.  Is that fair?

A.  Well, it was a very large technically-known resource.  That was one of the advantages.  There wasn't a lot of risk as to whether it existed from a standpoint, and it was going to last a

VOLUME 4-B    19

very long time, 40-plus years.  So it had those two characteristics that made it important.  It was not the only important reserve.

Q.  But as far as replacement of reserves that were being used up in those years early in your chairmanship, that was one of the important resources that was used to replace other reserves that were being used up.

A.  Well, as I said, it's a large reserve.  And so I'm not -- I'm not necessarily agreeing with your characterization of replacement because once you have it, you have it and you continue to add other sources of reserves as well.  So, yes, it's important.  And, again, the value of it was the fact that it was going to be very long term.

Q.  Okay.  My -- My point is a little different.

Each year you're using up some of the resource base, correct?

A.  Yes.  It's a depletion business.

Q.  And if you didn't replace those reserves being depleted, you'd have fewer proved reserves.

A.  Yes, that's true from one year to the next.

Q.  Okay.  I'm going to show you what we're marking as Plaintiff's 556.

MR. MELSCHEIMER:  Your Honor, this is an excerpt from a book we've -- we've objected to, and there's a ---

THE COURT:  Make sure you talk into that microphone.

VOLUME 4-B    20

MR. MELSCHEIMER:  Yes, Your Honor.

This is some excerpts from a book, and they're going to ask, I guess, about one statement in there.  I guess I would say if we don't -- He can ask him about the statement, but I don't know that the book needs to be in evidence.

MR. SAHAM:  We're not seeking to put the book in evidence.  Just the e-mail and the summary of the book pursuant to Your Honor's motion in limina ruling.  Your Honor ruled that we could ask about and publish one bullet point from this exhibit.

They had moved in limine and you ruled ---

THE COURT:  Where is it?  Where is that bullet point?

MR. SAHAM:  Oh, it is Bullet Point 2 on Page 2, the first sentence.  Just that one sentence.

MR. MELSCHEIMER:  And -- And, Your Honor, what I would say as to this ---

THE COURT:  Wait, wait, wait.  I want to make sure I know what I'm talking about.  Bullet Point 2 under Chapter 1?

MR. SAHAM:  No, overall theme.  So it's the -- If you take away the e-mail, then it's Page 1.  So it would be the second page of the document, the first ---

THE COURT:  Oh, up at the top of the page?

MR. SAHAM:  Go back one page, Your Honor.  So there's the e-mail, then Page 1, the first bullet point.

THE COURT:  Oh, okay.

**App. 232**

VOLUME 4-B    21

MR. SAHAM: Yes. Sorry.

THE COURT: It's on Page 1 --

MR. SAHAM: Yes.

THE COURT: -- and Bullet Point 2?

MR. SAHAM: The first sentence.

THE COURT: Okay. And your objection is?

MR. MELSCHEIMER: The objection is it's hearsay. This is an excerpt from a book or a summary of a book that was sent around. If he wants to ask him about whether or not that statement, whether he agrees or disagrees with that statement, we have no problem with it, but it shouldn't come into evidence the whole -- the whole summary. It's not -- It's hearsay and it's not relevant.

THE COURT: Well, we're just talking about that one point and it's -- it's -- I'm going to give it. It's not for the truth of the matter asserted but that somebody -- a fellow named Steve Coll, the writer, that's his opinion, and they may -- he may refer to it in that. So with that instruction, I admit that one bullet point. Okay?

MR. SAHAM: Thank you, Your Honor.

Mr. Torres, can we pull up Exhibit 556?

Q    (By Mr. Saham) Mr. Tillerson, do you remember who Alan Jeffers was at Exxon?

A.    Yes, I do.

Q.    And who was he?

VOLUME 4-B    22

A.    Well, as it indicate on this e-mail, he was the Media Relations Manager.

Q.    And he sent you an e-mail on April 9th, 2012, with an attachment summarizing a book by an individual named Steve Coll. Is that correct?

A.    That's what this e-mail says.

Q.    And if we turn to Page 2 of the document, it's -- it's entitled "Summary of Private Empire ExxonMobil, an American Power," by Steve Coll.

A.    Excuse me. I think you asked me if he sent it to me?

Q.    Oh, no, no. I just -- I asked you who ---

A.    Because he didn't send it. It doesn't appear to be addressed to me, anyway.

Q.    Okay.

MR. MELSCHEIMER: Excuse me. Excuse me.

So, Your Honor, he's showing more than just the bullet point, and that's all the Court's admitted. So we would just request that just the bullet point ---

THE COURT: Yeah. Just take everything out. You can barely see what was in the background.

But you don't want the background.

MR. SAHAM: No, Your Honor. I just want Bullet Point 2.

THE COURT: Okay. Then pull Bullet Point 2 out of that showing the background.

VOLUME 4-B    23

Q    (By Mr. Saham) So Mr. Jeffers, who's the -- worked in Media Relations, summarized a book by an individual named Steve Coll, correct?

A.    That's what the e-mail says.

Q.    Did you -- Have you ever heard of this Steve Coll fellow?

A.    Just -- I know he's a writer. That's all.

Q.    Did you ever read this book?

A.    I never read the whole thing.

Q.    Read the summary of it?

A.    I think I kind of flipped through it a little bit. It's on my book shelf at home.

Q.    Okay. Well, that's good to know. And if we just zero in on Page 2, just Bullet Point 2 -- nothing else, Mr. Torres -- this says, "The challenge to replace reserves is a critical measure of success on Wall Street."

Would you agree with that statement?

A.    It is an important measure of success. I don't know that I agree with Mr. Coll's characterization of "critical."

Q.    But you'd agree it's important.

A.    Yes.

Q.    Material.

A.    However you'd like to use that word. It's important.

Q.    I'd like to mark what's -- or I'd like to show you what's been marked as Plaintiff's Exhibit 593.

And I believe this would come in with a limiting

VOLUME 4-B    24

instruction, Your Honor.

THE COURT: And what are you trying to offer here?

MR. SAHAM: It's just a -- We had a stipulation regarding newspaper articles, that they wouldn't be offered for the truth of the matter but they could be admitted into evidence.

THE COURT: Are you trying to offer all of it or some of it?

MR. SAHAM: Mainly on Page 3 of the document, the top ---

THE COURT: Well, I don't care about mainly.

MR. SAHAM: Only Page 3, "Proven Reserves and Oil Sands," which is Page 3. That's -- I mean we'd offer the entire article.

THE COURT: Wait a minute. Wait a minute.

MR. SAHAM: But that's what we're going to be discussing, Your Honor.

THE COURT: You want that whole page.

MR. SAHAM: Yes. I believe -- That would be fine. I believe what we've been doing so far is just admitting the article and then going through the portion that's relevant.

THE COURT: Well, the last one, you just had that one little part.

MR. SAHAM: Yeah, but that was because they had moved *in limine* and you denied their motion.

THE COURT: Okay. Okay.

**App. 233**

MR. SAHAM:  Yeah.

THE COURT:  I don't have that big of a memory of everything we've done and not done.  So this one, you'd like to offer this page, not for the truth of the matter asserted but that whoever wrote this article -- I don't -- oh, Mr. Levine.  This is his opinion, right?

MR. SAHAM:  Correct, Your Honor.

THE COURT:  All right.  And your objection is?

MR. MELSCHEIMER:  Our objection is --

THE COURT:  Hearsay.

MR. MELSCHEIMER:  -- it's hearsay.  And as long as the Court's instructing the members of the jury this is not offered because it's true, then it's fine.

THE COURT:  No, it's not offered for the truth.  It is admitted but not for the truth but that this was an article written at the time by Mister -- I'm probably mispronouncing his name; it's spelled L-E-V-I-N-E -- Steve Levine or Levine, however you pronounce it, and that he wrote this.  Okay?

Here we go.

MR. SAHAM:  Thank you, Your Honor.

Q   (By Mr. Saham) Mr. Tillerson, again, you became Chairman and CEO back in 2006, correct?

A.   That is correct.

Q.   And you made major investments at Kearl, correct?

A.   Well, I don't -- At some point, not necessarily in 2006.  I

don't remember the precise timing but, yes, we did.

Q.   But ultimately by 2015, the company had spent about 23.7 billion on Kearl?

A.   That sounds right.

Q.   And you also bought a company in 2010 called "XTO" for over 30 billion dollars?

A.   That sounds right.

Q.   And that was Mister -- I know he doesn't like it when I touch it, but that's the Shell oil business, Shell gas business?

A.   Yes.

MR. MELSCHEIMER:  Your Honor, just so the record is clear, I don't -- that's a weird sentence to put in the record.  He's -- He's ---

MR. SAHAM:  I'll withdraw it, Your Honor.

MR. MELSCHEIMER:  He can -- Your Honor, he's free to touch the million-old -- year-old shale core sample.  He's free to touch that to his heart's content.

THE COURT:  He's free to do that whether you like it or not.

MR. MELSCHEIMER:  Thank you, Your Honor.

THE COURT:  Okay.

Q   (By Mr. Saham) And according to Mr. Levine, if we turn ---

MR. SAHAM:  Mr. Torres, if we can pull up Exhibit 593, Page 3 up at the top, "Proved Reserves and Oil Sands," starting with after the comma in the first line there.

Q.   (By Mr. Saham) "The oil sands are a core Exxon investment."  Would you agree with that statement, sir?

A.   Where are you reading exactly?  I'm sorry.

Q.   I am reading -- We're going to highlight it for you.  He's just a little behind us.  Up at the top, the first sentence where it says --

A.   Oh, I see.

Q.   -- after the comma "The oil sands are a core Exxon investment."  There we go.  And my first question is:  Do you agree with that statement?

A.   Well, again, I think it may be assigning more significance to the oil sands than they deserve.  It was a -- It was an important investment.  It was significant.  We had other investments of similar size.  So to say this was "core" means that everything centered around it.  That's the way I would read it, that everything centered around it, and that was not the case.

Q.   Okay.  But you would agree with me it was a -- Kearl was an important investment.

A.   Yes.  I've already agreed with that.

Q.   Okay.  And then the next sentence states, "The company" -- referring to Exxon -- "is heavily relying on the oil sands for maintaining its base of proven oil reserves."

Would you agree that's a correct statement?

A.   Not necessarily.

Q.   Well, in certain years would you agree with me that Kearl was over 70 percent of the replacement reserves?

A.   Yeah, in that year.

Q.   So in certain years you would agree that's a fair statement, that the company was heavily relying on oil sands for maintaining its base of proven oil reserves.

A.   Yes.  That's why you got to keep looking.

Q.   And in the year 2008 the company added 1.1 billion barrels of oil from Kearl, and that was approximately 73 percent of the barrels added to proven reserves that year.

A.   I believe that's the correct math.

Q.   And Mr. Levine goes on in the next paragraph, starting with "In addition," he says, "In addition, the oil sands have long been crucial to maintaining the company's smooth record for reserve replacement."

What is "reserve replacement"?

A.   Well, it's -- I'm assuming that that's -- this is the way Mr. Levine is referring to it.  Every year an important measure to report to shareholders is:  In that year you produced a certain amount of your reserves.  How much were you able to add back?  Because you either made new discoveries or you proved investments in a project.  So now -- You've seen these definitions of "proved reserves" and what needs to be proved.

So let's say, you know, we produced a billion barrels.  I'm just making numbers up, and we added back a billion.  Then we

would have a hundred percent replacement.

Q. And the next sentence Mr. Levine writes, quote, "For the last nine years, for instance, Exxon has announced an unbroken trajectory of replacing more than a hundred percent of the oil and natural gas that it pumps out of the ground. Yet, according to its 10-K filings with the Securities and Exchange Commission, it has reached that mark in just four of the past nine years, and the other five years in 2001, 2002, 2004, 2007 and 2008, its volume of proven oil reserves actually dropped, according to the reports. The difference, the reason Exxon was able to announce publicly that it had fully replaced its reverses was its holding of oil sands which in each year pushed the company over the hundred percent mark. SEC rules do not permit the oil sands to be combined on the 10-K with a company's other oil and natural gas reserves but companies can do so in public announcements such as press releases and statements to investors, according to an SEC spokesman."

Is it accurate that in the early 2000s you couldn't count your tar sands along with your oil reserves?

A. I don't -- I just don't remember what the rules were at that time.

Q. But they changed at some point, correct?

A. I -- I don't remember that either.

Q. Well, at some point you could count Kearl and its tar sands as proved reserves.

A. Yeah. I know what the rules were in the period that we've been talking about, but I didn't go back and look at rules prior to that, and I can't recall them. I'm not ---

Q. Okay. But in -- But in 2015 you could count those reserves.

A. Yes, you could.

Q. And you're just not sure if previously you could.

A. I just don't recall what the rules might have been at that period of time.

Q. Okay. I want to show you what's previously been marked as Plaintiff's Exhibit ---

A. I'm sure we followed whatever they were.

Q. I want to show you what's previously been marked as Plaintiff's Exhibit 541, and I'm going to go to Page 9.

Well, before we do that, I just want to show you what it is on the second page.

MR. SAHAM: So could we go to Page 2, Michael?

Q. (By Mr. Saham) This is a 2015 Reserves Workshop. I think we've had it on the screen with some previous -- previous witnesses, and I want to go to Page No. 9, "Importance of Reserves."

A. Could you give me the entire document, please?

Q. Oh, I most certainly can, sir.

A. Thank you.

Q. And as we're going along, if you want a paper document at any time, just tell me.

A. I'll let you know.

MR. SAHAM: May I approach, Your Honor?

THE COURT: Sure.

A. Yeah, pretty lengthy, yeah. Much bigger than I was expecting. Okay.

Q. (By Mr. Saham) And you can take as much time as you want to -- to look through there.

A. And you're going to Page 9. Is that what you said?

Q. I'm going to Page 9, and I'm using the pages on the bottom right where it says "9 of" however many there are. 9 out of 141.

A. This is a 141-page document?

Q. It is, Your Honor -- or Mr. Tillerson.

A. Wow.

MR. SAHAM: And Your Honor.

A. Okay. I'll get there. Give me a second.

MR. SAHAM: Mr. Torres, if you could highlight the -- the title and the first two bullets point on Page 9.

A. Okay. I've got it on Page 9.

Q. (By Mr. Saham) And I don't -- I don't think this is going to be controversial because I think you've already testified that reserves or proved reserves are important to an oil and gas company, correct?

A. Yes, that's correct.

Q. And it's also accurate that the Securities and Exchange Commission requires all companies that are publicly traded in the

United States to annually disclose proved reserves, correct?

A. That is correct.

Q. And that's the Page 5 in the 10-K we've been talking about the last few days.

A. It's in the 10-K.

Q. And would you also agree with me the second bullet point which states, "Proved reserves replacement is key measure of sustainability for a company," would you agree that's an accurate statement?

A. Yes, it is.

Q. Mr. Tillerson, I just want to make sure I have this correct that a proved reserve is essentially a resource that's economically producible at existing costs, correct?

A. Correct.

Q. I want to show you what I'm marking as Plaintiff's Exhibit 695.

MR. SAHAM: This, again, would be offered with a limiting instruction. It's the *Globe -- Globe and Mail* article.

MR. MELSCHEIMER: Same objection, Your Honor, hearsay, but with the Court's instruction that it's not offered because it's true.

MR. SAHAM: And this -- if we could put this on the screen, Mr. Torres.

This is a *Globe and Mail* article.

THE COURT: All right. I'm admitting it but not for

VOLUME 4-B    33

the truth of the matter asserted.

Q. (By Mr. Saham) And the title of the article was "Imperial Oil finally producing bitumen at the Kearl mine." The article is dated April 27th, 2013.

Does that meet with your recollection of when Kearl started producing bitumen?

A. Yes.

Q. And once it started producing some of the reserves that were -- Undeveloped reserves could become proved developed reserves, correct?

A. That is correct.

Q. And "proved developed" meant those were reserves that you had actually spent enough company resources to be able to get them out of the ground and sell them, correct?

A. That is correct.

Q. And it's also accurate that once a project was built and started up, you only used what your actual costs incurred are. Otherwise, you're putting false things into your books of accounting, correct?

A. Correct.

Q. So once a project starts up, you can only include what you're actually incurring. You don't include something speculative in your accounting reports. It would be false, correct?

A. I believe that's correct.

VOLUME 4-B    34

Q. I want to show you what I'm marking as Plaintiff's Exhibit 558.

THE COURT: This has already been offered, hasn't it?

MR. SAHAM: It hasn't been offered yet.

And I believe you did object. So I'm waiting for you, sir.

MR. MELSCHEIMER: Yeah. No objection, Your Honor.

THE COURT: All right. Then it's admitted into evidence.

MR. SAHAM: Could you, please, put it up on the screen, Mr. Torres, starting with Page 4?

Q. (By Mr. Saham) And this is the "2013 Proved Reserves Changes Chairman's Review," January 27th, 2014. And you would have been Chairman of the Board then, correct?

A. Yes. And would you provide me that document as well?

Q. I will, indeed, sir.

A. I don't believe I've seen it. At least I haven't seen it since 2014.

Q. Fair enough.

A. Thank you.

Q. You're welcome. And just let me know when you're ready to proceed. And if -- And if it's helpful to you, Mr. Tillerson, I'm going to be asking you -- and, again, I'm using the pages in the bottom right -- I'm going to be asking you about Pages 4, 5 and 13, and 4 is the one on the screen that is just the title of

VOLUME 4-B    35

the deck.

(Pause)

A. Okay.

MR. SAHAM: If you could go, Mr. Torres, to -- to the next page, Page 5, please.

Q. (By Mr. Saham) And this is entitled "2013 Proved Reserve Change Summary." What's a "Proved Reserve Change Summary"?

A. Well, as we were discussing, the reserves were a replacement mechanism. This is a summary of the changes to the proved reserves, it looks like, for -- I guess for 2013 it looks like. So that would be, you know, again, what was produced or there may have been reserve bookings that would come off the books and then what changes -- what are the changes of things that might be coming back on the books. So as I flipped through the document, I think this was a review of those changes, what was coming off, what was going in.

Q. And this was something that was shared with the CEO and Chairman of the company, yourself.

A. Well, I don't know that it -- Let me look. I don't know that it was in this particular format or not. I just don't remember. But -- But, you know, eventually those changes or certainly the proved reserve, yeah, proved reserve changes would have been reviewed with the Chairman.

Q. Okay. And if we just go back one page, this is entitled "The Chairman's Review."

VOLUME 4-B    36

A. Yeah.

Q. And you were, indeed, the Chairman, correct?

A. Okay, yeah.

Q. And then going ---

A. So I obviously saw it.

Q. And then going back to Page 5, the second bullet point stresses "Reserves replacement 103 percent, 20th consecutive year of greater than a hundred percent replacement." That's what it says, correct?

A. That's what it says.

Q. And is that something you were proud of as Chairman, that you were replacing at least a hundred percent of your reserves every year?

A. Well, that was always something you would hope to do with the success of your various programs, exploration programs, acquisitions, investment decisions. That's what your objective was, always to replace a hundred percent. But, again, this is a -- this is a one-year look. So, you know, you're going to have years where you're probably going to fall short. You're going to have years where you're going to replace, you know, 150 percent. So I think the important thing was as you look at it over long enough periods of time, how are you doing, you know. If you look at it over 10, 15, 20 years and you're depleting, that probably says a little something different than if you look over 10, 15 or 20 years and some years you're replacing more than a hundred and

**App. 236**

some years you're replacing less, but you look at it over a long period of time if you're still even.

Q.   And -- And -- And that over a long period of time is, quote, "a critical measure of success on Wall Street," correct?

A.   Well, they certainly pay attention to that metric, as we said earlier.

Q.   And I'd like to now go to Page 13 of Exhibit 558, and this is entitled -- the slide entitled "Proved Reserves Plan Outlook."

MR. SAHAM:  And under "Outlook" at the top -- top right, if we can highlight that.

Q.   (By Mr. Saham) It says "Outlook:  Current portfolio challenged to maintain greater than a hundred percent replacement.  Near-term dependent on Kearl and XTO."

Do you see that?

A.   I do.

Q.   And it's -- Is it fair to say in this time period, 2014 and 2015, without Kearl and XTO, the company would not have reached a hundred percent reserves replacement?

A.   Well, given -- given the numbers that they're showing here, yes, that would be true.

Q.   And if we highlight the table, 2014 and 2015 and the key up at the top, "Proved Reserve Adds," the middle sort of gray bar that just got highlighted, that's referring to Kearl, correct?

A.   Yes, it is.

Q.   So that above the black, that is at least half the reserves

in both 2014 and 2015, correct, at Kearl?

A.   That certainly appears to be the case.

Q.   And then about 30 or 40 percent of the reserve replacement in 2014 and 2015 is coming from XTO, correct?

A.   It looks to be about right.

Q.   So without Kearl and without XTO, there would have been significantly less reserve replacement, correct?

A.   Yes.

Q.   I'd like to show you what's been marked ---

A.   For those years.

Q.   For those years.  Fair enough.

I'd like to show you what's been previously marked as Exhibit 563.

MR. SAHAM:  If we can blow up the top two up at the top there.

Q   (By Mr. Saham) For liquids -- this is "Exxon's Top 25 Largest Liquid Proved Reserves in 2015" -- Kearl was, indeed, the largest single proved reserve with the company, correct?

A.   Yes.

Q.   Approximately 15 percent of the entire reserves of the company?

A.   Yes, it was.

Q.   And then XTO was the second biggest liquid reserve.

A.   All of XTO.  You're talking about an aggregation of a lot of different properties, but you are correct.  XTO's, you know,

if -- if they were reporting independently, but this is a summation of everything they held.

Q.   Right.  So one difference with Kearl, all those 3.6 billion barrels were in one field, correct?

A.   Well, one -- Yeah, one mining area as you've heard described, yes.

Q.   And how large was that mining area again continuously?

A.   Well, someone testified as to how many square miles it was, and I don't remember, but it was -- it was large.  We'll stipulate to that.

Q.   Okay, excellent.

MR. SAHAM:  Could we go to the next page, please?

Q   (By Mr. Saham) And this pie graph on the left summarizes what we just articulated, I believe, that Kearl was approximately 15 percent of total proved reserves of the company in 2015, correct?

A.   Yes.  I appreciate your addition of the word "approximately."

Q.   Because it was -- I think we did the math.  It was 14.54 percent, correct?

A.   Yes.

Q.   Okay.  And then if we look at the pie graph on the right of just the developed, proved developed, which are the ones you've already sunk the money into and can actually sell, Kearl's 20 percent of the reserves, correct?

A.   That's correct.

Q.   So 20 percent, one in five of the barrels of proved developed reserves, the ones that are actually ready to be sold and can be -- produced and sold are at Kearl, correct?

A.   That's correct.

Q.   Okay.  And then if we go to the next page, on the left, if we're just talking about the liquids, we knock out all the natural gas -- and, again, since I'm now allowed to touch it, I'm going to touch it a lot -- the Shell gas, if we knock this out, ---

A.   It's pretty exciting, isn't it?

Q.   It is.  It really is.  Does this come from a museum possibly?

A.   It came out of a well.

Q.   Wow.  I don't think I've ever touched something that's a million years old or whatever, so it's sort of cool.

MR. SAHAM:  Can we let the jury ---

THE COURT:  You shook my hand.

MR. SAHAM:  That's true, too.  Your Honor, can we let the jury touch it?  I mean I don't -- I don't know if they'd object, but I think it would be ---

THE COURT:  Do you care if they pass that around the jury?

MR. MELSCHEIMER:  Your Honor, I have no objection.

THE COURT:  Okay.

**App. 237**

VOLUME 4-B    41

MR. SAHAM: And maybe the bitumen, too? Is that okay?

THE COURT: Don't pour it out of that bottle, but ---

THE WITNESS: Be careful. It's got some duct tape on it.

MR. SAHAM: Yeah, yeah. Just be careful, but I don't know. It's a little "Show and Tell," I guess. If I could approach the jury?

THE COURT: Yes.

MR. SAHAM: I'll just take it back when they're all done. I'll start one on one side and one on the other. I got a kick out of touching it, so I don't know.

MR. MELSCHEIMER: Again, let's make sure we're talking about the shale.

THE COURT: Okay.

MR. MELSCHEIMER: Thank you.

THE WITNESS: I know most people think these are just good door stops.

MR. SAHAM: I can collect that back.

UNIDENTFIED JUROR: Thank you.

THE COURT: What do you call the -- the area over in the Fort Worth area where they're -- they get oil and -- I guess it's ---

THE WITNESS: The Barnett? Is that what you're thinking of, Your Honor?

THE COURT: The Barnett? That's shale?

VOLUME 4-B    42

THE WITNESS: Yes. This comes -- Although this came out of the Rocky Mountains.

THE COURT: Yes, but it would be similar.

THE WITNESS: But it's -- it's similar. It's not as deep here.

THE COURT: Okay.

Q   (By Mr. Saham) And then, finally, the chart on the right, that just represents -- and I want you to confirm that, Mr. Tillerson, accurately -- that Kearl was 88 percent of the company's bitumen in 2015.

A.   That's correct.

Q.   Okay. And I want to show you what I'm marking as Plaintiff's Exhibit 233. I'm just keep bringing them to you so you have both.

A.   Okay. Thank you.

MR. SAHAM: I believe you objected.

MR. MELSCHEIMER: Just give me a second.

THE COURT: Is this another article?

MR. SAHAM: No, no, no. This was a Board of Directors minutes.

THE COURT: All right. And is this something they're going to object to?

MR. SAHAM: They have previously, so.

THE COURT: Well, what's the number?

MR. SAHAM: Oh, I'm sorry. It's 233, Plaintiff's 233,

VOLUME 4-B    43

Your Honor.

THE COURT: Go ahead.

MR. MELSCHEIMER: Your Honor, no objection.

THE COURT: 233 is admitted into evidence.

Q   (By Mr. Saham) Now these are the minutes of the Board of Directors from April 29th, 2015; correct?

A.   Yes, it is.

Q.   And what's -- What are -- What are minutes to the Board of Directors meetings?

A.   Well, the Board meets generally once a month, although there are a couple of months it does not meet. And so the Secretary takes -- takes down some copious notes to generally capture what topics were discussed at the board meeting, who presented what. So it's kind of an abbreviated description of what took place in the board meeting that day.

Q.   And as Chairman of the Board, you typically preside. And I believe three --

A.   That's correct.

Q.   -- three down, it says, "Rex Tillerson, Chairman, presided," correct?

A.   That is correct.

Q.   And you were also -- had two hats on at these meetings because you were the Chief Executive Officer presenting about the business and you were also running the Board, correct?

A.   That's correct.

VOLUME 4-B    44

Q.   Okay. And if we turn to the second page of the document, up at the top, No. 5, --

A.   Yes.

Q.   -- it indicates that you discussed with the Board of Directors that day, quote, "response to low price environment," correct?

A.   Yes. I think there were, it looks like, maybe six items that I covered with them.

Q.   And -- And one of them was the recognition that as of April 29th, 2015, the company was in a low price environment, correct?

A.   Yeah. We may have been in one longer than that but, yeah, we were in one at the time of the board meeting.

Q.   Okay. I want to show you what we're marking as Plaintiff's Exhibit 561.

THE COURT: I -- I have a question about one of those words. I've never seen that word before. I want to ask about it. "Seismicity," what does that mean?

THE WITNESS: Let's see, Your Honor. Where?

THE COURT: It's at the end of that first paragraph. You were talking about water injection. Seismicity.

THE WITNESS: Okay, yeah.

THE COURT: So does that mean when you water inject, it may cause ---

THE WITNESS: Yeah. There had been -- You may remember, Your Honor, there had been some earthquake activity in

**App. 238**

Oklahoma.

THE COURT: Oh, okay. As a result of what may or may not have been water injection.

THE WITNESS: Yeah. There was some investigation going on as to whether water injection from oil and gas producing activities might have triggered those seismic events.

THE COURT: Okay.

THE WITNESS: So I was -- It had been in the news pretty, you know, pretty recently. So I think I touched on it with the Board just to let them know, "Here's what we know about it."

THE COURT: Okay.

THE WITNESS: Yeah.

THE COURT: I remember that happening.

Okay. Go ahead.

MR. SAHAM: I -- I believe they have withdrawn their objection to 561, if we can bring that up on the board or on the screen.

THE COURT: Has it already been admitted?

MR. SAHAM: No, it has not, Your Honor.

THE COURT: Then it's admitted.

MR. SAHAM: Thank you very much, Your Honor.

Q   (By Mr. Saham) And this is a summary from the company's earlier 10-Ks of bitumen prices. And it shows that ---

A.   Excuse me. Just so I'm clear as to what I'm looking at, you

say a summary of earlier -- These are the prices taken out of the 2011 10-K, the -- I just want to make sure I understand what I'm looking at.

Q.   Yes, Your Honor, or yes, Mr. Tillerson. I'm sorry. I get you two mixed up.

A.   That's okay.

Q.   But ---

THE COURT: He doesn't wear a robe.

MR. SAHAM: He does not.

A.   We both have white hair --

THE COURT: Oh, wow!

A.   -- but his is much healthier than mine.

Q   (By Mr. Saham) Mr. Tillerson, for -- for -- Yes, you're absolutely correct. These numbers are taken --

A.   Okay.

Q.   -- directly from the company's 10-K.

A.   Thank you. Thank you.

Q.   And hopefully they meet with your recollection. If not, ---

A.   Well, I wouldn't -- I wouldn't remember. I just wanted to make sure I knew what I was looking at.

Q.   But this document essentially summarizes the prices for bitumen in 2011 through 2014 were in the, I guess, 58 to 64 dollar range, correct?

A.   Yes, that's correct.

Q.   And then prices dropped precipitously in 2015, correct?

A.   Yes, they did.

Q.   And this was the time you were talking to the Board about being in a low price environment, correct?

A.   That is correct.

Q.   And around this time --

MR. SAHAM: If we could pull up what's previously been admitted as Exhibit 65 and go to Page 75.

Q.   -- you were briefed on ---

A.   I'm sorry. Can you -- Can you just for a second go back? I know we've seen this, but I just want to make sure I know which document we're looking at again.

Q.   Certainly. I'm going to bring you the whole thing.

A.   Well, I was trying to save you some steps. That's all right.

Q.   Well, it's good for me.

A.   Okay.

Q.   And -- And I just want to look at -- You know, you can look at as much as you want, but I want to look at Page 75.

A.   Okay.

Q.   And this is "Canada West - June Year to Date 2015 Profitability."

MR. SAHAM: And if we just show the Kearl portion of the graph.

Q   (By Mr. Saham) And this is showing that for the first six months of the year, Kearl lost cash profit of approximately 162

million dollars. Is that correct?

A.   That's what it says.

Q.   And then cash profit, when you look at that 162 million dollars by barrel, Kearl lost $8.11 for every single barrel produced, correct, on average?

A.   That is correct.

Q.   And then we have -- to the right of that we have book profit, and Kearl lost 187 million dollars of book profit for the first six months, correct?

A.   Correct.

Q.   And when we look at that per barrel, Kearl lost $9.37 per barrel produced for the first six months, correct?

A.   That's correct.

Q.   And I'd like to go back a couple pages in Exhibit 65 to Page 70, if we could.

It was also reported to you in the same document that for the first half of 2015, the XTO - United States business lost 630 million dollars, correct?

A.   That's what it says.

Q.   And that would have been reported to you in this document, correct?

A.   Yes.

Q.   And I want to show you now what's been previously marked ---

A.   I really liked a lot of those other numbers better, but that's all right.

Q.   The positive ones, right, sir?

A.   You bet.  I mean this is -- I mean I think it's a great slide because it illustrates the value of those vast holdings that ExxonMobil had, the diversity of the holdings that -- You know, we could still go after projects like Kearl who's going to have some problems early on.  And because we've -- we've done so well in these other -- These are projects that were done previous to Kearl.

Q.   Well, when we're looking at this business, this giant business you were running, the two with losses were Canada West caused by the Kearl operation, correct?

A.   Which was a pretty new project, yes.

Q.   And that -- It was a new project but it was 15 percent of the future.  It was 15 percent of the proved reserves, right?

A.   Yeah.  We were still working on it.

Q.   Yeah.  But it was losing money, right?

A.   Yes.

Q.   And you knew it was losing money.

A.   Yes, I did.

Q.   Okay.  And then XTO - United States similarly -- And that was the other business that was losing money during this period, right?

A.   Yes, it was.

Q.   And you were informed of that fact.

A.   Yes, I was.

Q.   Now I'd like to pull up Exhibit 564, and this sort of just takes on after.  You were informed that first document showed what was going on the first six months of the year, correct?

A.   Yes.

Q.   And then this document, which comes from the "Management Committee Financial Highlights Report," summarizes the whole year, including the second six months of the year, correct?

A.   That's what it says.

Q.   And we saw that earnings were -- for the first half of the year were in the negative 180-million-dollar range, correct?

A.   That's right.

Q.   And then when we get to earnings for the whole year, the Kearl business had lost 440 million, correct?

A.   Correct.

Q.   So there were significant losses following those first six months, correct?

A.   That is correct.

Q.   And if we look at just cash loss in millions, how much more cash was burned over what was taken in, the loss there was 831 million dollars from Kearl, correct?

A.   That is correct.

Q.   And that was, in part, because of the downward trend in prices the second half of the year, correct?

A.   Are you speaking of the cash or the earnings or both?

Q.   Both.

A.   Yeah, it was due to the downturn in the environment.  And then on the cash side, we were still investing.

Q.   So if we look from June to July, the price went down $7 a barrel from 42 to 35, correct, in the current month realizations?

A.   That is correct.

Q.   And then it dropped another 14.  And I pointed this out before.  At least for these first three numbers, they're all football numbers, so they're easy to keep track of.  But it dropped another two touchdowns, down to 21 as of August, correct?

A.   Right.

Q.   And then it dropped -- I guess that may be a two-point conversion or safety -- down to 19?

A.   Okay.

Q.   And then it popped up another $4 in October, correct?

A.   That is correct.

Q.   And then it really went down -- another touchdown -- to 16 in November, correct?

A.   Yes.

Q.   And then it ended the year at 11.52 per barrel.

A.   Correct.

Q.   And those were numbers that when you're -- when you're -- only can sell or realize $11.52, it doesn't cover the lifting costs at Kearl, does it?

A.   Well, I can't tell from this because I don't have lifting costs on here.

Q.   Okay.  But -- But you wouldn't expect to be making money at $11 a barrel at Kearl, correct?

A.   Probably not.

Q.   Okay, fair enough.
     And then down in the bottom right that's the average of the whole year's realizations was $24.28, correct?

A.   That is what it says.

Q.   Okay.  Now I want to show you what has been previously marked and admitted as Plaintiff's Exhibit 222.  Oh, I'll bring it to you as well, sir.

A.   Thank you.

Q.   You're welcome.
     Now it's true that the Management Committee and yourself, you keep track of your competitors' businesses and what was going on there as well.  Is that fair?

A.   Yes.

Q.   And one thing you kept track of in the February, 2016, timeframe was the impairments that were recorded by competitors, correct?

A.   Well, I don't remember precisely the timing, but we would have been paying attention to what others were doing, yes.

     MR. SAHAM:  And can we go to Page 5, Mr. Torres, up at the top graph where we're looking at the -- yes, just the top.  There we go, perfect.

Q.   And "CVX," that's Chevron?  Tell me when you're there.  It's

on the screen, too.  It may be easier to see.

A.  Yeah.  I just was making sure I knew what was before and after.  Okay.

Q.  So "CVX" is Chevron, correct?

A.  That is correct.

Q.  And this is indicating -- And Chevron had the same kind of accounting as Exxon, U.S. GAAP; correct?

A.  Correct.

Q.  So it had to abide by the same rules as Exxon, correct?

A.  Correct.

Q.  And it recorded, according to this document, in 2014 a 900-million-dollar impairment, correct?  Or impairments of 900 million dollars?

A.  That's what it says.

Q.  And then RDS's role, that's Shell?

A.  That's correct.

Q.  And Total is the French company, T-O-T?

A.  Correct.

Q.  And those are both European companies, so they followed European GAAP, correct?

A.  Yeah.  It's actually IFRS.  It's not called "GAAP" over there.  It's IFRS, but that's okay.

Q.  It's just the European accounting principles.

A.  European version.

Q.  Yeah.  So it's a little bit different.

And then they recorded -- Royal Dutch Shell recorded 2.7 billion dollars of impairments in 2014, correct?

A.  That's what it says.

Q.  And Total recorded 10.3 billion dollars of impairments, correct?

A.  That's correct.

Q.  And both Total and Royal Dutch Shell had operations in the tar sands like Exxon did, correct?

A.  That's my recollection, yes.

Q.  And they both took large impairments of those businesses during 2014 or 2015.

A.  Yes.

Q.  I think it was 2015.

A.  Yes, they did.

Q.  Okay.  I'd like to show you and put up on the screen what's been previously admitted as Exhibit 595.  And this is an article entitled "France's Total Plans to Cut Jobs, Sell Assets After Big Loss."

And then if you go down to the second paragraph, it says Total -- or I'm sorry.  It's the one that -- yeah, starting with where it says "Total" in the second sentence.

"Total wrote off 6.5 billion of the value of its less profitable shale and oil sands ventures as well as its unprofitable European refineries."

So this article is reporting about that tar sands write-down

that Total took in 2015, correct?

A.  Well, yeah.  It lists shale and oil sands and some refineries.

Q.  But at least part of this 6.5-billion-dollar write-down was from tar sands.

A.  That's correct.

Q.  And I'd like to pull up Plaintiff's Exhibit 596.

And this is an article entitled "Royal Dutch Shell to Abandon Carmon Creek Oil Sands Project.  Energy giant will take a 2-billion-dollar write-down; cites uncertain business environment."

This article is reporting that Shell not only wrote down its tar sands operations but it actually abandoned the operation, correct?

A.  Well, once they made the decision to abandon, then they had to write them down.  So I don't -- You flipped it around, but yeah.

Q.  What does it mean to "abandon" an operation?

A.  Well, assuming this article is accurate, it means basically that you're going to see-saw your activity and you're going to not just walk away because you'll have some obligations generally as to how you're supposed to leave that piece of property, what condition.

So if they're truly abandoning it now and forevermore, you know, then that means they've got to finish all that remediation

work and then they can walk away.  Or if they're simply abandoning their project, they just stop all spending, shut it down, and they still own the rights but they're just not doing anything with them.

Q.  Okay.  But if you're shutting it down, you're not producing from it anymore, correct?

A.  Well, I'm not sure they were producing from this one yet or not.  I don't remember.

Q.  Okay.  But if -- if -- You were a CEO for a long time and worked in oil and gas for 40 years, correct?

A.  Correct.

Q.  Typically, you wouldn't abandon a profitable project, correct?

A.  No.  That's true.

Q.  All right.  I want to show you what we're marking as Plaintiff's Exhibit 254.

MR. SAHAM:  And I think you objected to it.

A.  Thank you.

Q.  You're welcome.

MR. MELSCHEIMER:  Is this the transcript of the interview?

MR. SAHAM:  It is.

MR. MELSCHEIMER:  We have -- We have no objection.

THE COURT:  What's the number?  I'm sorry.

MR. SAHAM:  254, Your Honor.

THE COURT: 254 is admitted into evidence.

MR. SAHAM: And if we could turn to the third page of the document, Mr. Torres.

Q. (By Mr. Saham) This is an interview you gave with Barbara Shook and Tom Wallin on August 27th, 2015, and it's a transcript of that interview, sir.

A. Okay.

Q. Do you -- Do you recall meeting with Ms. Barbara Shook and Tom Wallin back in 2015?

A. Yes, I do.

Q. And who are they?

A. Well, I don't remember Tom as well but I remember Barbara. She was a long-time writer, covered the oil and gas industry, the upstream primarily, and she wrote for some of the trade journals, *Petroleum Weekly* and others. And the reason I remember this interview is because Barbara called and she said, "Mr. Tillerson, I'm getting ready to retire. Would you, please, grant me an interview?" And so that's how the interview came about.

Q. Okay.

MR. SAHAM: Could we, please, turn to Page 17 of the interview transcript?

Q. (By Mr. Saham) And I'm -- I'm really focused on Lines 1 through 11, Mr. Tillerson, and I'm going to read them and we can blow them up as well.

And before I ask you the -- Before I read that, I think you

agreed with me that as the CEO of the company, you set the tone for executives and employees below you, correct?

A. That is correct.

Q. And you also, I think, agreed with me that what you said mattered to those employees, correct?

A. Correct.

MR. SAHAM: And now I'd like to go and blow up Page 15 and highlight, starting with "Once" in Line 1.

"Once you" -- And this is part of your response to -- that you gave during that interview.

"Once you put the investment dollars in there, if the price goes down, those investment dollars are stuck. You know, you get to live with that. We don't do write-downs. I mean if you look at our history, we do not write investments down, and we follow the accounting standards. But a lot of other people are very quick to want to write investments down because then it kind of improves things going forward. Well, it's part of our disciplined approach to investing is everybody around here understands if you make that investment, you're going to get to live with that for the rest of your career."

Those are words you said during that interview, correct?

A. Those are some of the words I said, yes.

Q. And this -- this Exhibit 254 replicates all the words you said that day, correct?

A. Right. So we don't need to take the time here, but it is useful to read both sides of this section you've read out of because it does provide some context. But that's -- We can proceed from this.

Q. Excellent. And I'm sure your -- your excellent lawyers are going to ask you as many questions as they want about this document, and this document is admitted into evidence.

But you'd agree with me I read those words correctly.

A. Yes, you did.

Q. I want to show you what I'm marking as Plaintiff's Exhibit 600.

A. Thank you.

Q. You're welcome.

MR. MELSCHEIMER: No objection, Your Honor.

THE COURT: That's admitted into evidence.

Q. (By Mr. Saham) And -- And this is a transcript -- From time to time the company would make statements and have conference calls with investment analysts. Is that fair?

A. Usually when we released quarterly earnings, there would be an analyst call -- there would be a call-in so the analyst could ask questions.

Q. And this one's from January 31st, 2017. That's after you left the company, correct?

A. Yes, it is.

Q. And who is "Jeff Woodbury"?

A. Mr. Woodbury was Vice-President of Investor Relations at the time.

Q. Okay. And on Page 18 of this document ---

MR. SAHAM: If we could go to the top, Mr. Torres, to the question.

Q. (By Mr. Saham) But do you remember a guy named "Jason Gammel" who was a Jefferies, LLC, analyst?

A. I'm sorry. Say that again. You're on Page 18?

Q. Yeah. If you go to Page 18, up at the top, there's a gentleman named "Jason Gammel" from Jefferies, LLC, analyst, who's asking a question of Mr. Woodbury.

A. Okay.

Q. Do you remember that man, Mr. Gammel?

A. I vaguely remember Mr. Gammel, yes.

Q. Okay. And he's one of the analysts, the investment analysts, that covered the company?

A. That is correct.

Q. And towards the bottom of -- the last question he really asked of Mr. Woodbury in that paragraph, he says, "Can you talk about whether would -- you would still view those proved reserves as potentially needing to be written down or whether the price recovery into the end of the year was sufficient to allow those to remain on the books."

Do you see that question?

A. Yeah. I'm not -- Okay. I just -- Yeah. So I wanted to

make sure he's referring to the oil sands that's in the -- up in the -- Is that right, right here?

Q.   It is.  It would appear so.  Yes, sir.

A.   Okay, got it.

Q.   And -- And Mr. Woodbury says, "Yes, it's a good question. Again, I want to make sure that everybody is very clear that there is separation between proved reserves reporting under this, you see rules, and then the whole issue of asset impairments. And really what you're asking, Jason, is clearly the question about proved reserves."

Did I read that correctly?

A.   Yes, you did.

Q.   And this was a fairly typical sort of exchange that would occur at these conference calls?

A.   Yes.

Q.   Thank you very much.

I want to turn your attention to what's previously been marked as Plaintiff's Exhibit 117.  And -- And this is that October 26th, 2015, meeting we've been discussing at such length.

A.   Yes.

Q.   And if we go to Page 2 of the document, this lists the attendees.  And -- And the presenter was Bill Strawbridge?

A.   Correct.

Q.   And he was an employee of Exxon, correct?

A.   That's correct.

Q.   Do you -- Do you know approximately how much money he made per year?

A.   I do not.

Q.   A few hundred thousand probably?

A.   Oh, I'm sure.

Q.   Okay.  But quite a bit less than yourself.

A.   Probably.

Q.   And quite a bit less than Mr. Rosenthal and Mr. Swiger.

MR. MELSCHEIMER:  Objection; relevance.

THE COURT:  I'll let him answer this one more time. Overruled.

A.   Sorry?

Q    (By Mr. Saham) Oh, I'll just repeat the question I just asked.  Mr. Strawbridge made quite a bit less money than Mr. Swiger and Mr. Rosenthal, correct?

A.   Most likely.

Q.   And I'd like to turn your attention to the very last page of the deck which is Page 11.  And to the right -- And I think we're all on the same page.

At that meeting it was communicated that U.S. sales were being excluded from the SEC price, correct?

A.   That is correct.

Q.   There's no doubt after that meeting, that was what was going to happen, correct?

A.   That was the methodology that Mr. Strawbridge and -- and the

Global Reserves Group were using at that time.

Q.   And it was the methodology that was presented to you and Mr. Swiger and Mr. Rosenthal at this meeting.

A.   Yes.

Q.   And you three were on the -- signed on the 10-K, correct?

A.   That's correct.

Q.   And you and Mr. Swiger were on the Management Committee, correct?

A.   That's correct.

Q.   And it was ultimately your decision whether or not those sales would be excluded.

A.   It was not our decision.  What we did was take a review from Mr. Strawbridge and went over the process by which the Global Reserves Group had put together that year's analysis, and this was not complete yet because I think we're in -- what, is this the October?

Q.   Yes.  It's October 26.

A.   Yeah.  So they've not completed their work, but this was a meeting where they were going over the process, I think.  They were primarily going over the process at this point.

Q.   But at a minimum, you had to sign off on whether those sales were going to be excluded.

A.   No, I did not.

Q.   Okay.  You were aware from the documents that if those sales were included, the U.S. sales -- we looked at the different

percentages -- and we're going to get into them a little bit more as we go along here today -- but if those U.S. sales were included, those proved reserves at Kearl would have had to be debooked, correct?

A.   That would have been a completely different methodology than the Global Reserves Group was utilizing.

Q.   My only question, and I just want to make sure we're on the same page and the jury understands:  If you included the transportation costs and included those U.S. sales, rightly or wrongly, that would have resulted in a debooking of 15 percent of the company's reserves.

A.   So you're saying if we included those sales, rightly or wrongly -- denotes we could have included them wrongly -- and it would have resulted -- I haven't got the final calculations to get to the end of the year, but I'll allow you your assertion that if we included them wrongly, because we shouldn't have done that, then we would have been following our own procedures or processes, but you probably would have gotten a different result.

Q.   Okay.  So I think we're getting close because I know we're on opposite sides of the coin here.  My questions are a pretty simple one.

You learned -- Before you signed that 10-K, you were aware that if the company would have included those sales to the U.S., that those -- 15 percent of the reserves, those 3.6 billion barrels, would not have qualified, correct?

VOLUME 4-B    65

A.   I don't have the final calculations or the final review.  So I don't want to imply that I knew more than I knew at this point, but I can only go to what I can recall, and I just can't recall what level of detail we actually got to here.

But -- But, again, the point being:  It's somewhat irrelevant because we used a methodology, and I thought you heard others describe that and you heard Mr. Madden just before me go through an explanation for why the sales were excluded.

Q.   Okay.  Let's go to Page 10 here.  And the transportation cost that was included was approximately a dollar 27, a dollar 50, whatever it is to Edmonton; in the dollar range, correct?

A.   A dollar 27, correct.

Q.   And a certain percentage of the sales went to the United States, correct?  To the United States Gulf Coast.

A.   That's right.

Q.   And those sales had a significantly higher transportation cost, correct?

A.   Some of them did.  I -- I don't know that I've ever seen a breakdown of every one of the sales, but yes.

Q.   Okay.  We -- We saw before when we -- And we could pull up -- Why don't we pull up 564 again.

When you're keeping track for the business, right, you -- you keep track of all the sales, the U.S. sales, the Canadian sales, the Chinese sales, the Mexican sales.  No matter where they go, you want to know because you're running a business.  Is

VOLUME 4-B    66

that fair?

A.   Well, the people who are responsible for that certainly need to know.  I don't know that I need to know all of that detail, quite frankly.  I mean there's no way I could keep up with all of that.

Q.   Well, the Management Committee kept track of it.  You were on the Management Committee, correct?

A.   This was a presentation at a meeting.

Q.   Okay.  And for Fiscal Year 2015, the Management Committee was informed, and I believe it was in June and we'll get to the documents shortly, that the realizations for Kearl, all the sales, not just the Canadian sales, were $24.28, correct?

A.   Well, that's what's on this chart.

Q.   Okay.  And then we'll look in a minute, but I think this is not in dispute.  The lifting cost or production cost for Kearl was $27.90.  I'll represent that to you, sir, and we'll get to that shortly.  Will you take my representation for now or do you want to go there?

A.   No.  That's fine.

MR. MELSCHEIMER:  Objection, Your Honor.  Well, go ahead.

Q.   (By Mr. Saham) So you agree $27.90 is above $24.28, correct?

A.   Yes.

Q.   So if -- And, again, I'm just asking you:  If you would have used all the sales, not just the Canadian sales, it's very likely

VOLUME 4-B    67

that those would not qualify as proved reserves because the SEC price with all the sales in there, not just the Canadian sales, would be below $27.90.

A.   We had no basis with the methodology that was being used to -- to include those sales.  And, again, I would refer back to some of Mr. Madden's testimony, but he did a very thorough job of explaining why.

Q.   But they're real sales.  They happened, right?

A.   They're real sales.

Q.   They cost the company money to transport.  They had to pay a pipeline to use the pipeline, correct?

A.   Depending on where they were going and on which pipeline and whether, you know -- Yes, there was -- there was transportation costs.  I'll certainly agree to that.

Q.   And some of the costs were to railroad companies, like Warren Buffett's company with the -- You know, you had to pay for the tanker cars to transport some of the oil, correct?

A.   That's correct.

Q.   Those are real expenditures by the company.

A.   Yes.

Q.   Actual costs.

A.   Yes.

Q.   Okay.  I want to show you what has been already admitted as Plaintiff's Exhibit 528.

A.   Thank you.

VOLUME 4-B    68

Q.   You're welcome.  And if we could go to Page 2, this is an upstream ---

THE COURT:  Is this already in evidence?

MR. SAHAM:  It is, Your Honor.

THE COURT:  Okay, great.

Q   (By Mr. Saham) And Page 2 is just a -- We can blow it up here.  This is an upstream overview with Mr. Albers who is also on the Management Committee, correct?

A.   That's correct.

Q.   And if we go to -- And if you're not ready yet, just tell me, but I want to go to Page 10 and we'll pull that up there, the bottom bullet point.  And let me know when you're ready for me to ask a question, and we can highlight that as well.

MR. SAHAM:  And, Michael, could you highlight the "Western Canadian heavy crudes," too, just one bullet point above?  Or maybe just both of those, yes.

A.   Okay.  Okay.

Q.   So we're -- yeah, we're on Page 10, those bottom two bullet points of Albers' presentation.

A.   Okay.

Q.   And it's talking about Western Canadian heavy crudes, correct?

A.   Yes.

Q.   And that's -- That includes Kearl, right?

A.   Yes.

**App. 244**

VOLUME 4-B    69

Q.   And it says, "Heavy crudes are approximately $20 per barrel below last year's plan until 2018.  This is a result of insufficient pipeline capacity (quick approval and 2014 start-up of Keystone) to the Gulf Coast.  We have mitigated some of this offset with pipeline capacity."

This is referring -- This document from 2013 is referring to Kearl shipments to the United States, correct?

A.   I would assume so.

Q.   And then it goes on to say in the last bullet point, "Earlier this year we were seeing as much as a $30 differential as folks scramble to move increasing volumes out by rail.  The current rail clearing location is to the U.S. Gulf Coast.  We expect the discount to moderate slightly to about $25 as folks increase rail capacity and for this discount to continue until 2018.  This is a two-and-a-half-year delay versus our projection last year when we expected a quick approval and 2014 start-up of Keystone XL and is far from a certainty even now."

Did I read that correctly?

A.   You did.

Q.   And do you recall that you had some frustration back in this time period that the Obama Administration didn't approve the Keystone XL pipeline?

A.   Well, I recall the Obama Administration did not approve the Keystone XL pipeline.  Maybe I was frustrated.  I don't remember that part.

VOLUME 4-B    70

Q.   Well, it would have been better for the company and it was part of the business plan to be able to ship this Kearl oil through a more efficient, less expensive pipeline; correct?

A.   It would have been better for all the companies operating up there.  It would have been for the U.S. energy consumer, yes.

Q.   But certainly better for Exxon.

A.   Well, it would have been better for all of us, yes.

Q.   And I'd like to play for you some statements you made in another interview at the Economic Club of Washington on March 12th, 2015.

MR. SAHAM:  Don't play it yet.

MS. SOLOWAY:  Is there a number for this?

MR. SAHAM:  572.

THE COURT:  Is this already in?

MR. SAHAM:  It is not.  And I think they're waiting to look at the -- I believe they've -- So, Your Honor, it's a video.  So they've had the video for quite some time.

THE COURT:  I just need to know if they object.

MR. SAHAM:  If there's -- They're thinking about it.

THE COURT:  Okay.

MR. SAHAM:  And this is a statement made by Mr. Tillerson, so it certainly would be an admission.

MR. MELSCHEIMER:  So -- So, Your Honor, we'd object to this.  It's a -- It's an incomplete -- It appears to be just a Q and A, a portion of a Q and A regarding -- I think regarding

VOLUME 4-B    71

the Keystone pipeline.  I just object to it.  It's not complete, and I don't know -- I object to the relevance as well.

MR. SAHAM:  Well, I think the relevance will be clear.  We're going to play about 30 seconds of it and they can play as much as they want, Your Honor.

MR. MELSCHEIMER:  Well, Your Honor, that doesn't make it -- If the Court wants to hear something more from me, I'll say something.

THE COURT:  Well, I didn't want to cut you off.  What's the number?

MR. MELSCHEIMER:  561 -- 572.

MR. SAHAM:  572.

MR. MELSCHEIMER:  572.

THE COURT:  I'm going to admit 572.  But you may play any more of it that you want, the Defense can, and I'll allow you to do that for sure.

MR. MELSCHEIMER:  Thank you, Your Honor.

MR. SAHAM:  Could we, please, play Exhibit 572 which is from an interview excerpt with Mr. Tillerson at the Washington Economic Club on March 12th, 2015?

(The video referred to was played in open court.)

Q    (By Mr. Saham) That appeared to be you, Mr. Tillerson?

A.   That is -- That is I.

Q.   Okay.  And you were aware ---

THE COURT:  Whoa!  Somebody taught you grammar.  Most

VOLUME 4-B    72

people would say, "That is me."

THE WITNESS:  My grandmother.

THE COURT:  Is your mother an English teacher?

THE WITNESS:  No.  She was a disciplinarian.

THE COURT:  Oh.  Oh, okay.

Q    (By Mr. Saham) Were you aware, Mr. Tillerson, that as of March of 2015, so about -- This is five months before that -- no, seven months before that October meeting, correct?

A.   Correct.

Q.   You were aware that a significant amount of the -- Well, strike that question.

You were aware that some of the Kearl oil sands was moving by rail and less efficient pipelines, correct?

A.   Yes.

Q.   And it was not efficient and expensive for the company, correct?

A.   It was -- I think I was speaking relatively.  It was more expensive than had the XL been built.

Q.   But it was moving, and you knew it was moving through those means.

A.   Yes.

Q.   And you described them as more expensive and less efficient, correct?

A.   That's correct.

Q.   Now I want to show what's been admitted as Plaintiff's

Exhibit 335, and this is the document we were discussing with Mr. Madden earlier today. And if we can just go to Page 20. And I'll give you the whole document so you have it.

MR. SAHAM: And line it up the same way we lined it up this morning.

A. Thank you.

Q (By Mr. Saham) You're welcome.

And this document is dated October 23rd, and it's three days before your meeting that we've been talking about in Exhibit 117. And as we saw in Exhibit 117, Mr. Madden was at that meeting, correct?

A. That's correct.

Q. And Mr. Madden received this e-mail, Exhibit 335; correct?

A. The e-mail indicates that, correct.

Q. And when we're looking at it, Enbridge, that would be if you sold it at Edmonton, correct? "October 19 MTD Enbridge."

A. That's correct.

Q. And the transportation for that was the lowest of the different options, correct, at a dollar 70?

A. As expected, yes.

Q. And the bitumen realization, I think as expected, is the largest, 25.14; correct?

A. That's correct.

Q. So the highest, best, most profitable realization during this time period for Kearl bitumen sales was Edmonton, correct?

A. That's correct.

Q. And those were the ones y'all used in your SEC proved reserves calculation, correct?

A. Yes, we did.

Q. Okay. Now the ones that weren't used, the ones that were excluded from that calculation, are October MTD Keystone. That was one of the ones that was excluded, correct?

A. Correct.

Q. And those transportation costs were approximately ten times greater than transporting it to Edmonton at 12.12, correct? $12.12.

A. $12.12.

Q. And the realization would be approximately -- I got -- I guess we got a touchdown again -- approximately $7 less than the Edmonton realizations, correct, at 17.44?

A. Yes.

Q. And then the worst option was rail because that costs $16.50 to transport, correct, to the Gulf Coast?

A. Correct.

Q. And those were also excluded, correct, from the SEC calculation, correct?

A. That's correct.

Q. And those -- those ones -- those sales only resulted in $11.71, correct?

A. That is right.

Q. Which means less than half the realization amount for the ones that were included in the SEC proved reserves calculation, correct?

A. Correct.

Q. Now I want to show you what's previously been marked as Exhibit 213. And do you remember a gentleman named "Mr. Schuessler"?

A. Vaguely, yes.

Q. What was his job?

A. I'm not sure I can recall exactly what Tom was doing at the time.

MR. SAHAM: And if we could, please, go to Page No. 11.

Q (By Mr. Saham) And I think my barrel is still back there. Let's get the barrel out.

MR. SAHAM: Your Honor, could I bring the barrel back out?

THE COURT: Carefully.

MR. SAHAM: Carefully.

Q (By Mr. Saham) Have you had a chance to look at Page 11, Mr. Tillerson?

A. Not yet.

Q. Okay. Let me know when you're ready.

(Pause)

A. So we're back in the "Supplemental Information" section?

Q. We are on Page 11 of what's been previously admitted as

Plaintiff's Exhibit 213.

A. Okay.

Q. And the barrel pictured on Page 11 is very similar to this three-dimensional barrel we have here. Is that fair?

A. Well done.

Q. Okay. Well, I appreciate that.

And it demonstrates how you calculate bitumen realization at the plant gate, and you start with that WTI at Cushing. Could you -- I think some others have described it but let's hear from you. What's "WTI at Cushing"?

A. Well, WTI is West Texas Intermediate which is a particular grade of crude oil. It's largely produced out of West Texas, so it's relatively light.

Cushing is a major pipeline and stored -- tank storage hub in Cushing, Oklahoma. Some of you know where Cushing is. If you go up there, you'll find massive tanks, these big tanks, and a lot of pipeline connections. So it's a trading hub, buying and selling, where producers can transport their crude to Cushing. It can be sold from the -- They can store it in tanks raw, if they need to, and then it can be bought by someone, and it will be taken from there by pipeline to a refinery somewhere. But there's an extensive network of pipelines and tankage in Cushing.

Q. And if we're trying to figure out what Kearl is worth or what the realization at Kearl's plant gate is, the first thing we have to subtract from the WTI price at Cushing is the

transportation, correct?

A.    That is correct.

Q.    And here for year 2014, this document is from August. Let me make sure I get the right date because I want to be precise here.

This document is from August 27th, 2015, and it denotes that Exxon's price historically for transportation from Kearl to Cushing or to get the WTI price or the total transportation deduction for 2014 was on average $8.33, correct?

A.    Yes. Of course, as you know, none of the bitumen was going to Cushing.

Q.    Right. But you're trying to deduct. So I guess it's not -- I guess I got that wrong. Thank you for correcting me.

The 8.33 is not the cost to transport it to Cushing. That's just the actual cost for all the barrels that were sold, no matter where they were sold, to get them where they were sold, to the point of sale.

A.    Are you asking or --

Q.    Oh, I'm asking.

A.    -- or just stating?

Q.    I'm asking.

A.    Yeah. I'm not -- I'm not certain. Just to be truthful with you, I'm not certain what the 8.33 includes, but ---

Q.    Seems like it would.

A.    But it represents -- yeah, clearly represents

transportation.

Q.    Okay. And then if we look at First Quarter, we get a little more certainty. It's 7.07. And the reason I think we have some certainty is that Mr. Swiger previously testified that he was informed twice, in August of 2015 and in November of 2015, that the transportation cost, the actual transportation cost for Kearl in aggregate was $7 a barrel, and that's what's listed for the Q1 2015 number, $7.07; correct?

A.    Correct.

Q.    So you got to deduct. If you want to figure out what -- what this bitumen is worth at the plant gate, you got to deduct the transportation, correct?

A.    That is correct.

Q.    And the next thing you got to deduct is the quality, correct?

A.    Correct.

Q.    And that signifies -- It's a pretty big number here because Kearl, that's bitumen -- Let's look at it again. We've got not only Mr. Melsheimer's shale, we've got the bitumen.

A.    You must not like your exhibits.

Q.    I like mine better actually. But I'm so weak, they're hard to lift. They're quite heavy.

A.    Well, you made them.

Q.    So, again, we could use ours.

A.    There you go.

Q.    This is the bitumen.

A.    You were talking about the steps. This will help you with your cardio.

Q.    Yeah, it will. I need the upper body strength, Mr. Tillerson, as you can tell.

THE COURT:    No. You need to fill that with cookies.

MR. SAHAM:    That, too.

Q    (By Mr. Saham) But in any event, this denotes -- and I don't think this is in dispute -- that bitumen, this stuff, it's not as good as that WTI or Brent. It's got a lower quality, so you can't sell it for as much.

A.    That is correct.

Q.    Okay. So you got to deduct that. Then you got to deduct -- I know Mr. Swiger calls it "diluent". Do you call it "diluent" or "diluent"?

A.    Diluent.

Q.    Does everybody call it "diluent" that knows what they're doing?

A.    Yes.

Q.    Okay. So that stuff's called "diluent." I didn't know that until I started this case.

A.    That's why some people call it "bitumen."

Q.    Yeah. Bitumen, though.

A.    Thank you.

Q.    It's bitumen, yeah. It's not bitumen. It's bitumen. I

don't see a C-H or whatever, but that's the way they say it.

So you got to -- you got to deduct the cost of diluent, and that stuff's expensive. In 2014 the average cost for a barrel of diluent or what you needed to put in a barrel to get it to flow through the pipeline or on the rail cars was $8.47, correct?

A.    Correct.

Q.    And then that went down in 2015 to 6.56 for that First Quarter because the prices were going down for all oil, all petro carbons. So the bitumen was less expensive, right?

A.    The diluent you mean?

Q.    Diluent; diluent. Dammit. Yes, the diluent was less expensive. But in any event, you got to deduct those to get to your actual cost.

A.    Correct.

Q.    And this, like the document we saw earlier, shows that the realization for bitumen in 2014 from Kearl was -- was roughly $60, and for that First Quarter of 2014 it had crashed down to $21, correct?

A.    That's what this depiction indicates.

Q.    Right. And that's consistent with what we've seen in these other documents, that the price was going down quite a bit in 2015.

A.    That's correct.

Q.    Okay. And you -- Running this business, you would have known that stuff back then. I know it's --

VOLUME 4-B    81

A. Yes.

Q. -- a while ago.

A. Yeah.

Q. All right. Now I'd like to look again at Plaintiff's Exhibit 339 which has been previously admitted.

MR. SAHAM: And if we could go to the chart on the top left on Page 6, "Kearl Disposition."

Q (By Mr. Saham) And do you want this whole thing, Mr. Tillerson, the whole document or is the chart good enough?

A. No. This is -- This is fine. This one has been up, I think, a few times.

Q. Okay, excellent. And this is, again, showing where the Kearl point of sale was. And it starts -- The start is October of 2013, and we learned and you testified earlier that there was no -- there was no Kearl sold -- no Kearl bitumen sold until April of 2013, correct?

A. That's my recollection, and I think the chart indicated that as well.

Q. Yeah. So -- So between 2008 and 2013, Kearl was a proved undeveloped reserve; correct?

A. Yes. I'm not sure what portion of it was proved undeveloped, but, yes, it would have been proved undeveloped.

Q. Because it wasn't being sold yet. There were no actual numbers to know how much it would cost to ship it or anything like that, correct?

VOLUME 4-B    82

A. That's -- Well, that is correct, yes.

Q. And, instead, so between 2008 and 2013, it was legitimate just to use the Cold Lake numbers because that was like the closest you had. So you used the Cold Lake model to come up to determine, "Oh, can we sell this? Is it economically producible? We'll use our Cold Lake model because it's the closest thing we've got."

If I got it wrong, correct me. But is that what you were doing?

A. I think that's accurate.

Q. Okay. So between 2008 and 2013, it's an undeveloped reserve. You don't have any actual costs to use, right?

A. Correct.

Q. And you told me before: Once you got actual costs, once it's up and running, you got to use those actual costs; right?

A. That is correct.

Q. Okay. So starting in April of 2013, you've got actual costs for Kearl, correct?

A. Yes.

Q. And we know you've got actual costs and we know where the oil's going from this document, at least the third-party sales. You excluded all the intercompany sales, right, from the SEC proved reserves calculation?

A. Are you talking about this chart or ---

Q. No, no. Before we get to the chart, there's like --

VOLUME 4-B    83

Remember we saw that pie graph and it splits in two?

A. Right.

Q. You got the future company and the third-party? You ignored the intercompany sales for the -- for the SEC proved reserves.

A. Correct.

Q. And that was like 40 percent of the sales. We just didn't use those.

A. Okay.

Q. We just used these. And these, we see every single month starting -- we don't go all the way back to April, so we got a few months missing. But at least as of October, 2013, through the month before the meeting, there were always sales to the U.S. Gulf Coast; correct?

A. That is correct.

Q. Okay. And we also know from the previous document we looked at, at least in 2014, even though there were fewer sales to the U.S. Gulf Coast, the overall transportation cost per barrel was actually more, even though it was a fewer -- it was -- it was a lesser percentage of the sales. We saw that. It was $8 a barrel transportation cost on that barrel we just looked at, right, for 2014?

A. Well, okay.

Q. We can pull that back up.

A. Yeah; no. I just wanted you to clarify what you were referring to.

VOLUME 4-B    84

Q. I'm just thinking 2014 and ---

A. Yeah.

MR. SAHAM: And, Your Honor, if I may, I'm just -- I'm just looking. There's sales, and everyone has been talking about how they bumped up when KEP came online in '15. But fascinatingly, per barrel, even though there were fewer sales to the U.S. -- I don't know; maybe the economy is a scale -- you had to pay more for each barrel to put it into the pipeline because there were fewer of them or more to the rail companies because there were fewer of them, but we saw that you're actually paying $8 a barrel for transportation for 2014, correct?

A. That's what the previous, I think, slide you had up showed.

Q. Yeah. And those were actual costs. That came out of the company's coffers.

A. That's my understanding.

Q. I want to show you what's previously been marked as Plaintiff's Exhibit 216. And we can show this to you as well, please. Can you, please, take a look at 216?

A. Okay.

Q. And, again, this is the "Management Committee Highlight Report," and this is the one for December, and the meeting took place in January.

THE COURT: It's already admitted.

MR. SAHAM: It is in evidence. Yes, Your Honor.

Q (By Mr. Saham) And if we go to Page 3, it shows the

VOLUME 4-B    85

highlight. And would you -- What's an F -- "F & O Upstream Report", "Financial and Operating Highlights Report"? Do you know what that is, just generally?

A. Well, it's -- it's a report out of the -- I don't know if this is for the month. I haven't had a chance to look this over. I don't know if it's just for the month of December or whether it's a review of the year to date. I'd have to look through here, but I'm not -- You said it's a Management Committee review. I was just looking to see.

Q. Yeah. I think if we look at the very last page, you didn't necessarily attend the meeting, but it was a Management Committee ---

A. It may have been an Upstream Management Committee meeting.

Q. Okay. And if we look at the first page, it indicates that Mr. Swiger attended. We got it on the screen, the last page, of who was there. But this is an "Upstream Earnings Review" --

A. Okay, yeah.

Q. -- for the Management Committee. And I believe Mr. Swiger testified he was ---

A. Okay. So this is the Quarterly Earnings Review.

Q. Yeah. He was the -- He was the Contact Executive he said for this group, Upstream.

But in any event, this is "Highlights Review," and what I want to look at are just two pages starting at Page 24.

And if we look at the top, "Special Topics, Kearl Metrics,"

VOLUME 4-B    86

that top left, this shows -- and this is where we got that summary exhibit that just had all the different numbers on it, but the 16.33 realization for November and 11.52, that's the same number that was on that summary as we just took all of these and put them on one page.

But I'm looking at -- November and December, the prices were really bad for Kearl, correct? 16 and 11 realizations?

A. That's my recollection, yes.

Q. And they resulted in burning -- in November, the company burned -- it spent 74 million dollars at Kearl more than it took in, correct, according to this report?

A. Yeah, if you exclude the project capex.

Q. And then ---

A. It's plus two.

Q. And then for earnings, which is what goes in the, I guess -- Is earnings the bottom line or the top line? I always get that ---

A. Bottom line.

Q. Bottom line. So if we got to the bottom line, earnings for November at Kearl were negative 53 million dollars, correct?

A. Correct.

Q. And then for December, at 11.52, the company burned 60 million in cash and had negative 51 million in earnings, correct?

A. Correct.

Q. And then if we go to the bottom right of this page, this

VOLUME 4-B    87

Management Committee report and we look at XTO, it reports for the year that XTO lost a billion 3, correct?

A. Correct.

Q. And then if we go to Page 17 of this report, this -- the bottom left -- Well, on the left, we talked about this with Mr. Swiger. This is realizations. Left is liquids and right is gas, correct?

A. That's correct.

Q. And for Kearl, it's the only field that's called out on this Highlight Report. You've got "EM average" which is the entire company and then you got "Brent" and "WTI," and the only single field that's called out on this Management Highlight Report is Kearl, correct?

A. Yes.

Q. And Kearl, here, we've got current month, as we saw, is 11.52 realization, correct?

A. Yes.

Q. And then year to date, that's the whole year, it's 24.28.

A. Correct.

Q. So the reader of this report would know that the Kearl realization for the entire year was $24.28, correct?

A. It would appear so.

Q. Okay. Now let's look at XTO on the right or -- I'm sorry -- not XTO but U.S. Henry hub natural gas, and this shows that the current month, the "CM," U.S. natural gas prices hit, I think

VOLUME 4-B    88

what might be a record low, of a dollar and 74 cents, correct?

A. Correct.

Q. What's the lowest natural gas prices have ever been in the U.S. to your recollection?

A. I'd have to look -- look back.

Q. Do you recall it being ---

A. This would be pretty close. It may have been below this for a day or so. I don't remember.

Q. But this is pretty near the bottom, correct?

A. Pretty near the bottom, yes.

Q. Okay. And then for Q4, what would be the last three months in aggregate for U.S. natural gas prices for the whole quarter was only a dollar 80, correct?

A. Yes.

Q. So for three-months average, it's a dollar 80.

A. Correct.

Q. Again, pretty low.

A. Correct.

Q. I want to show you what's previously been marked as Plaintiff's Exhibit 63, and it's in evidence.

A. Thank you.

Q. Now before we get into the document, when you -- when you file a 10-K, there's a lot of rules that the SEC has; right?

A. They do.

Q. And you got to follow all of them, not just some of them;

correct?

A.   That is correct.

Q.   So I know it was pointed out earlier there's this one rule, 1204, about a certain page, right?  Not -- This is purely a hypothetical question.  But if someone followed that rule but didn't follow the rest of the rules, that wouldn't be okay; correct?

A.   I don't -- I don't recall exactly what the 1204 rule was, so.  But ---

Q.   Okay.  I'll withdraw that question.

A.   But if you're -- if you're just saying you can follow some of the rules and not follow others, I would agree with that.

Q.   Okay, perfect.  That's all I was trying to establish.  Thank you, Mr. Tillerson.

So another rule that -- and I don't know if you're familiar with this one or not -- is SEC Item 303 that talks about disclosing material trends and uncertainties.  Are you familiar with that rule?

A.   Well, you just described it.  So yes, I am now.

Q.   Okay.  But were you before or is that ---

A.   I'm sure I was.

Q.   Okay.

A.   It's just been a while since I looked at SEC rules.

Q.   Okay.  But that's one of the rules that executives had to follow with respect to the 10-K, and it related to the

"Management Discussion and Analysis" section, correct?

MR. MELSCHEIMER:  Objection, Your Honor; relevance based on the Court's previous dismissal of the 303 claim.  So that's our objection.

THE COURT:  Overruled.

Q    (By Mr. Saham) And -- Oh.

MR. SAHAM:  Could we read back the question?  I think I forgot what the question was.

THE COURT:  Okay.

COURT REPORTER:  But that's one of the rules that executives had to follow with respect to the 10-K, and it related to the "Management Discussion and Analysis" section, correct?

A.   That is correct.

Q    (By Mr. Saham) And the "Management Discussion and Analysis" section, that's sometimes referred to as viewing the company in the eyes of management, correct?

A.   I don't know that I've heard it described that way, but -- but I'll accept that.

Q.   Okay.  And Rule 303, I think as we just discussed, requires you to disclose trends and uncertainties in that MD&A section, correct, if they're material?

A.   Correct.

Q.   And you had a discussion on January 27th.  And if we look at Page 2 of this document, it's called the 10 -- you've got a 10-K Disclosure Review on January 27th, 2016.  So this is about a

month before the 10-K was filed.  Is that fair?

A.   Yes.

Q.   And you had this discussion with Mr. Rosenthal, and he communicated to you that there was unprecedented SEC scrutiny of oil and gas companies, correct?

A.   Correct.

Q.   And he further articulated to you that there were certain comments made by the SEC staff at the Spring and Fall API Meetings, correct?

A.   That is correct.

Q.   And what's "API" again?

A.   The American Petroleum Institute.

Q.   And they have a couple meetings each year?

A.   Yes, two or three.

Q.   And the SEC is in attendance at some of those or representatives of the SEC?

A.   Sometimes, yes.

Q.   Okay.  And it appears that at the Spring and Fall 2015 Meetings, there were folks from the SEC there; correct?

A.   It appears, yes.

Q.   And Mr. Rosenthal communicates to you in this Disclosure Review, quote, "Significant reporting obligations related to reserves, impairments and liquidity in a low price environment.  SEC believes sentiment has changed regarding duration of industry downturn.  MD&A must place prior year results in context of

business environment and discuss trends, uncertainties, and reasonably possible outcomes quantitatively, if possible."

Did I read that correctly?

A.   You did.

Q.   And what does "quantitatively" mean?

A.   Numerically.

Q.   So Mr. Rosenthal, the Controller of the company, is telling you based on what was learned at this meeting, that the SEC wants quantitative disclosures, correct?  Numerical disclosures?

A.   Yes.  Yeah.

Q.   Okay.  And then if we go to the next page, Page 3?

THE COURT:  Stop.  Before we go to Page 3, let's take a break.

MR. SAHAM:  Certainly, Your Honor.

THE COURT:  Don't talk about the case, Ladies and Gentlemen.

COURT SECURITY OFFICER:  All rise.

(Jury escorted to the Jury Room by the Court Security Officer.)

THE COURT:  Do you all need to talk to me?

MR. MELSCHEIMER:  Excuse me?

THE COURT:  Do you all need anything from me?

MR. MELSCHEIMER:  Not at the moment.

THE COURT:  Okay.

MR. MELSCHEIMER:  I don't want to say forever.

THE COURT: Well, let me see y'all a second.

MR. MELSCHEIMER: Oh, you miss us.

THE COURT: I didn't -- I'm not ever going to say that.

MR. SAHAM: You want to see us. I'm coming, Your Honor. I always want to see Your Honor.

(The Court and counsel held a sidebar discussion off the record.)

(Court recessed from 3:01 PM until 3:27 PM.)

THE COURT: Okay. Let's go.

COURT SECURITY OFFICER: All rise for the jury.

(Jury seated in the jury box.)

THE COURT: Thank you, all. I appreciate it. All right. Be seated.

Go ahead.

CONTINUED DIRECT EXAMINATION

QUESTIONS BY MR. SAHAM:

Q. Mr. Tillerson, you used to be on the API Board. Is that true?

A. Yes.

Q. And when were you on the API Board?

A. Well, I -- yeah, I joined it when I became Chairman and CEO of ExxonMobil and remained on that Board until I retired.

Q. So would you go to the meetings?

A. I'd go to the board meetings.

Q. But would you go to the spring and fall meeting?

A. Typically. You know, the API had committees as well and those committees might meet at other times when the Board wasn't meeting. I did not attend the committee meetings.

Q. Well, so -- We were looking at Exhibit 63, and we can put it back on -- on the big board, the 10-K disclosure which is talking about the SEC comments at Spring and Fall API Meeting, and this would be the 2015 meetings. Would you -- Would you have physically been there?

A. I seem to recall the SEC having a representative at one of the board meetings, but I think this may be referring to some other meetings that I was not in attendance at.

Q. Okay. Thank you very much.

And then what's your middle name?

A. Wayne.

Q. And we were looking at Page 3, I believe, when we left off of Exhibit ---

THE COURT: Did that just kind of come out of the blue?

MR. SAHAM: It did, Your Honor. You know how they give you the notes of things you're supposed to ask? That was one of them.

THE COURT: And you just kind of pulled that out?

MR. SAHAM: Yep. Yep.

THE COURT: Okay.

MR. SAHAM: I do what I'm told, Your Honor.

THE COURT: All right.

MR. SAHAM: You tell me what to do and I do it.

THE COURT: Well, no. We're not going to get into his blood type, though, either.

MR. SAHAM: No blood types.

THE COURT: All right. Let's go.

THE WITNESS: I thought he was going to ask me who I was named for.

Q. (By Mr. Saham) Who were you named for?

A. John Wayne.

Q. Really! Wow. Now that's -- that's an interesting one. Everybody likes John Wayne, so.

THE COURT: "*Well, now, pilgrim, I don't know.*"

Q. (By Mr. Saham) All right.

THE WITNESS: I knew I shouldn't have started that.

THE COURT: You shouldn't have.

Q. (By Mr. Saham) All right. So we're on Page 3 of Exhibit 63, back to less interesting but more pressing matters.

The first bullet point there on Page 3 of Exhibit 63 states, "Low commodity prices and continued downgrade of industry credit ratings raise expectations that even the largest companies are at risk."

That's another item that Mr. Rosenthal discussed with you on January 27th in a 10-K disclosure review?

A. Yes.

Q. And what does it mean -- Well, I'll withdraw that question

and actually drop down to the fourth bullet point.

And if we could -- We got that one blown up nice and big.

That one says, "No SEC comment letter since 2013; anticipate SEC letter in 2016. Status as one of few, if not only, major industry players without major reserves debook (especially Canadian oil sands) draws attention."

Mr. Rosenthal has explained to you here that the fact that Exxon's the only large player without a debooking of tar sands is drawing scrutiny from the SEC, correct?

A. Well, I'm not -- I'm not sure he's saying it's drawing scrutiny. He's just making a statement -- I think he's just making a statement of fact.

Q. Okay. But -- But that was a --

A. It says "draws attention." So, yeah, they would have noticed.

Q. Okay. So draws attention to the fact that Exxon, unlike Shell and unlike Total, it had not taken a debooking or write-down of the tar sands, correct?

A. That's correct.

Q. And that drew the attention of the SEC. And Mr. Rosenthal, your Controller, is pointing that out to you before the 10-K filing.

A. He is.

Q. And he also pointed out on the page before that the SEC wanted to do quantitative disclosures, correct?

A.    Let's see.  We were looking at the ---

Q.    Page 2, which is the prior page, of Exhibit 63.  And I think just to read it, in that first -- first section, it first referred to the API meetings and then it said, when talking about the MD&A, it said, "Discuss trends, uncertainties, and reasonably possible outcomes quantitatively," correct?

A.    If possible.

Q.    If possible, yes.  And you said "quantitatively" meant with numbers, correct?

A.    If possible.

Q.    And is it fair to say that one of the things you and Mr. Rosenthal discussed was with respect to the tar sands, if Exxon wasn't going to debook those barrels, the SEC wanted more information quantitatively, numerically, if possible; correct?

A.    I don't remember us having that specific discussion.

Q.    You just don't remember one way or another?

A.    I do not.

Q.    Okay.  And if we go back to Page 3, immediately under what we were just looking at, the next bullet point, it says, "Focus areas" -- I'll wait till he blows that up.

      "Focus areas likely to involve risks related to low prices, foreshadowing of reasonably possible future implications of low prices on reserves, impairments, liquidity, and Management's assessment process and inclusions related to impairment triggers."

      Did I read that correctly?

A.    Yes, you did.

Q.    And one of the rules that governs impairment -- this is yet another rule -- is ASE 360.  Is that one you remember?

A.    I do not remember the specifics of that, no.

Q.    Okay.  But you remember there was a ---

A.    There's a rule.

Q.    Okay.  An accounting rule at GAAP about impairments?

A.    Yes, there's a rule.

Q.    Okay.  And that's one of the things that you were discussing at this meeting.

A.    I don't remember if we were discussing that or not.  You're talking about the rule or ---

Q.    Well, impairment triggers are being discussed here.

A.    I don't remember how much we got into impairment triggers when we were -- I mean this has been a while, so I just don't remember.

Q.    But that's one of the bullet points --

A.    Yes.

Q.    -- is referencing impairment triggers.

A.    Yep.

Q.    And this was the review you were having with Mr. Rosenthal approximately one month before the 10-K was filed, correct?

A.    That is correct.

Q.    I want to show you what's been previously marked as Exhibit

217 which is the "Upstream Chairman's Review" on February 22nd, 2016.

A.    Thank you.

      THE COURT:  This is already in evidence?

      MR. SAHAM:  It is, Your Honor.

Q    (By Mr. Saham) And you were the Chairman and CEO on February 22nd, 2016; correct?

A.    Yes.  Yes, I was.

Q.    And as -- If we -- If we sort of scroll down a bit, this shows you were in attendance at this meeting along with several other individuals from the Management Committee.

A.    Yes.

Q.    And this would have been two days before the 10-K was filed?

A.    It looks like it.

Q.    Okay.  And if we turn to Page -- Well, if we turn to the second page, this explains what you're being ---

      MR. SAHAM:  All right.  Thank you, Michael.

Q    (By Mr. Saham) It's the "Upstream Chairman's Briefing Exploration Update, February 22nd, 2016," by M.G. Cousins, correct?

A.    Well, the first -- Yeah.  If you go back to that prior page, there's -- there's several groups are going to be discussing things on the agenda.  So the first group up was the exploration update.

Q.    Okay.  And then -- Let me make sure I'm in the -- still in

exploration by the time we get to the one I would like to discuss.  Yeah, I believe we still are.

      Do you recall who "M.G. Cousins" was?

A.    Mike Cousins.

Q.    And what was his job?

A.    I believe he was Executive Vice-President of the Exploration Company at the time.

Q.    And what did the Exploration Company do?

A.    Well, they were charged with -- So this is an organization made up of geologists and geoscientists principally, geophysicists.  So they are charged with locating prospective areas for new undiscovered resources, all in natural gas.  So they put together the exploration programs, try to identify prospects, you know, acquire the acreage, the leases and what not.  And if they thought they had a drillable prospect, they bring it in to the corporation to review, review it, and see if we liked it or not.

Q.    Okay.  And would you turn -- I think -- I think I've sorted this out.  So -- Unfortunately, I'm going to confuse Michael.

      MR. SAHAM:  But, Michael, if you could go to EMCRAM, last three Bates numbers are 617.  Same document.  I just want to make sure I have the right heading of the slide.  Well, actually it's not that one.  I'm sorry.  Okay.  Here we go.  Actually go to 627; last three Bates numbers are 627.  Yeah.

Q    (By Mr. Saham) And this would be "Chairman's Briefing

Upstream" and, as noted in that agenda, that was one of the sets of people that were going to brief you about the upstream part of the business?

A.    The -- The Production Company?  Is that what you're asking?

Q.    Yes.  But it says "ExxonMobil Production Company."  And then under the picture of the world or the globe it says "Chairman's Briefing Upstream," correct?

A.    Yes.  The ExxonMobil Production Company is -- is one of the companies within the Upstream.

Q.    And -- And that was the part of the business that     Mr. Swiger was the contact executive for?

A.    I believe he was at this time.  Those assignments moved around from time to time, but I believe he was.

Q.    Okay.  And then in that deck, if we go to Page 29 of Exhibit 217, that's the slide I want to discuss with you.  And this is the "Estimated Operating Cash Generation" for all the upstream business, correct?

A.    That's what it says.

Q.    And most -- most of the businesses are positive, correct?  Making money.

A.    Most of them are, yes.

Q.    And then the biggest loser at the bottom is Canada, correct, at negative 79 million?

A.    That's correct.

Q.    And then on the right, there's a couple of bullet points,

and one of them calls out Kearl bitumen netback, approximately $4 a barrel, correct?

A.    That's what it says.

Q.    And the netback, as people have discussed earlier, is another fancy way of saying "realization," correct?

A.    It generally is pretty close.

Q.    Okay.  So -- So this is noting that for the month of January, the Kearl bitumen is only realizing $4 a barrel, correct?

A.    Well, that's generally.  I don't know if it's precise, but ---

Q.    Okay.  But it's generally realizing $4 a barrel.  And we looked --

MR. SAHAM:  If we could pull back -- Leave this up for me to make it half the screen, Michael, and pull up 564 on the other side, if that's possible.

It probably is.  He's really good.

And then pull up 564 on the other side, if we could.

Q    (By Mr. Saham) Okay.  And we noticed before -- and it was in Exhibit 65 -- we saw the document when it was being briefed only about the first half of the year, and we saw the company was losing about -- or Kearl was losing about 180 million dollars.  Do you remember that?

A.    Yes.

Q.    And that was when prices were between 13 and 42 dollars a

barrel if we look at January through June current month realizations on the right.

A.    Correct.

Q.    And now -- So if you're losing ---

MR. SAHAM:  The one over to the left, Michael, "Current Month Realizations."

Q    (By Mr. Saham) So for the first six months of 2015, we got as high as $42 a barrel but when you average those six months together, the company was still losing 187 million for Kearl, correct?

A.    That's correct.

Q.    And now for the month of January, the realization is only $4 a barrel, correct?  Approximately.

A.    Approximately.

Q.    And that's like a tenth of what the realization was in June, correct?

A.    It appears to be.

Q.    These are really low prices now for January, correct?

A.    Yes.

Q.    And you're being told about these really low prices two days before you sign that 10-K, correct?

A.    Yes.

Q.    And you're being told about these really low prices seven days before the bond offering, the 12-billion-dollar bond offering.

A.    Yes.

Q.    Now I want to show you what has previously been marked as Plaintiff's Exhibit 66 which is the 10-K.  Two days later it was signed, correct?

A.    Correct.

Q.    And in this 10-K there was no disclosure of Kearl's losses, correct?

A.    No, there was not.

Q.    And there was no disclosure of those XTO losses of 1.3 billion dollars, correct?

A.    Correct.

Q.    And there was no disclosure of an impairment trigger, correct?

A.    Correct.

Q.    And there was no disclosure or write-down of those 3.6 billion barrels at Kearl, correct?

A.    Correct.

Q.    And there was no disclosure that U.S. sales were excluded from the SEC proved reserves analysis, correct?

A.    Correct.

Q.    And there was no disclosure of the impact that exclusion would have had on the analysis, correct?

A.    Correct.

Q.    And if we look and we turn to Page No. 7 of the 10-K, Exhibit 66, and look at the bitumen barrels that were included as

proved reserves, the 4.1 billion barrels, 3.6 billion of those barrels were from Kearl, correct?

A.   I think that's been -- Yeah, I think it's been shown on other exhibits.

Q.   Yeah.  Eighty-eight percent of those barrels came from Kearl.  Is that correct?

A.   Correct.

Q.   And then if we look at the 17.90, the proved developed reserves, 17.9 billion barrels on the far right.

MR. SAHAM:  Got to go down a little, Michael.

Q   (By Mr. Saham) 17,970, those are the total proved developed reserves, correct?

A.   Correct.

Q.   And 3.6 billion of those or 20 percent came from Kearl, correct?

A.   Correct.

Q.   And then if we go down to the bottom right, total proved reserves, 24,759, 3.6 billion or 14.54 percent of those 24 billion barrels came from Kearl, correct?

A.   Correct.

Q.   And then if we go to Page 11, please, production prices and production costs, and we look at the 19.20 which is the average production costs for Canada/South America, that's listed for bitumen of 19.20, correct?  The 19.20 which is average production costs.  That's what's listed on ---

A.   Oh, okay.  I was looking across from what he had highlighted.

Q.   Yeah.

MR. SAHAM:  You can unhighlight the "bitumen per barrel" that you highlighted.  No, not that one.  Yeah, just that baby, yes, please.  Thank you.

A.   Yes.

Q   (By Mr. Saham) So it's disclosed on Page 11 that the average production cost per barrel of bitumen was $19.20, correct?

A.   During 2015, correct.

Q.   And there's no disclosure there that the production costs for Kearl were actually $27.90, correct?

A.   No, there's not.

Q.   And there's no disclosure that that number is actually $8.70 -- that this number for Kearl was $8.70 higher than the 19.20 reported, correct?

A.   Correct.

Q.   And then if we go to Page 101 of the document and blow up Canada/South America and the total results of operations, the 896 and Canada/South America, a loss of 896 million dollars was reported for all operations in Canada and South America, correct?

A.   Correct.

Q.   And in Canada, the company had approximately 500 fields, leases or properties that went into that 860 million dollars, correct?

A.   I have no idea.

Q.   Okay.  Would -- I just want to reach common ground.  Would you say there was at least a hundred properties in Canada?

A.   I don't know.

Q.   You don't know the number of properties in Canada.

A.   No.

Q.   Okay.  I would like to show you what's previously been marked as -- I got to find it -- Exhibit 755.  And I ask you to look at that and see if it refreshes your recollection as to the number of properties, leases and/or fields in Canada in 2015.

A.   I'm not -- What am I looking at?

MR. MELSCHEIMER:  Excuse me.  I'm sorry, Your Honor. This -- This was not admitted with Mr. Swiger and so it shouldn't be shown.  If he wants to offer it, ---

THE COURT:  Oh, it hasn't been admitted yet?

MR. SAHAM:  No, no, no.  I didn't want it to be shown.

MR. MELSCHEIMER:  But it was displayed as if it had been admitted.

THE COURT:  It was what?

MR. MELSCHEIMER:  It was displayed just now.  That's -- That's our objection.

THE COURT:  Well, were you going to try to admit it or no?  You just want him to look at it?

MR. SAHAM:  Well, first, I want him to look at it.

THE COURT:  Okay.

MR. SAHAM:  I might try to admit it, but I really just wanted to refresh his recollection because I wanted to reach some kind of ground that there was a large number of properties in Canada.

A.   What am I looking at?

Q   (By Mr. Saham) I believe this is a document that -- Do you remember someone named "Irene Chang" who was in the Treasury group?

A.   No.

Q.   Okay.  This is a document that was produced by ExxonMobil in this case that lists properties in Canada.  It's a "Field Summary" it's titled and it lists, I would represent to you, 500 different properties in Canada --

MR. MELSCHEIMER:  Your Honor, I'm going to object.

Q.   -- or fields in Canada.

MR. MELSCHEIMER:  For refreshing recollection, he's just got to show it to him and he either does or he doesn't. What he's representing about it may or may not be accurate.

THE COURT:  Overruled.  Go ahead.

Q   (By Mr. Saham) And I would ask you, Mr. Tillerson:  Does this refresh your recollection that there were hundreds of properties in Canada that Exxon owned or operated?

A.   No, it does not.

Q.   Okay.  And you just don't remember, as we sit here, how many properties there were in Canada.

**App. 254**

VOLUME 4-B    109

A.   Not on -- No, I do not.  I don't remember.

Q.   Okay.

A.   I mean you've told me what this is.  You said this is individual leases.

Q.   Okay.

A.   If it's individual leases, it could be hundreds or thousands --

Q.   Okay.

A.   -- of individual leases, but I don't know -- I don't know what this is precisely.  You've told -- It sounds like you've given me a mix of things, a mix of fields, a mix of leases.  So I really don't know what it is.

Q.   Well, I ---

A.   And so back to your question, in answer to your question, I do not know the number of because I don't know what your definition now of "properties" is.  So I don't know how to answer your question.

Q.   Okay.

A.   I mean that's -- that's the only way I know how to deal with it.

Q.   Well, let's try and ---

A.   I guess I'm supposed to give you this back.

Q.   You can put it down.

A.   Okay.

Q.   Just put it down?

VOLUME 4-B    110

A.   Okay.

Q.   My question would be:  How do you define "properties, leases and fields"?  You know, how do you -- Well, I just want to reach common ground.

Exxon had multiple -- and maybe this is a fair way to characterize it -- multiple properties from which it made revenue in the country of Canada back in 2015, correct?

A.   Yes.

Q.   Do you have any estimation of the number of properties that Exxon made money from in Canada?

A.   Can you provide me a definition of what you would include as a "property"?

Q.   Well, I'm not an oil and gas man.  So how did you define "properties" -- let's do all of them -- "properties," then we'll do "leases," and then we'll do "fields."

How did you define "properties" as the CEO of Exxon back in 2015?

A.   Typically fields.

Q.   Okay.

A.   So a -- Where we had an operation, you know.  So it would be an accumulation of leases that became -- that then would be a field.  That's how we typically would think about it.

Q.   Okay.  So an accumulation of leases would make a field.

A.   Typically.

Q.   Okay.  So did Exxon have over 100 leases in Canada in 2015

VOLUME 4-B    111

that it generated revenue from?

A.   Most likely.

Q.   Okay, fair enough.  So your testimony is that Exxon most likely ---

MR. SAHAM:  And can we put the 10-K back on the screen?  Page 101, and the 896 and Canada/South America.

Q   (By Mr. Saham) So most likely there were at least 100 fields in Canada that contributed to that 896-million-dollar number.

A.   Could be.

Q.   Okay.  Then let's talk about leases in South America.  I would represent to you that there were thousands of leases in South America that contributed to that number.  Is that fair or do you believe there were thousands?

A.   I have no idea.

Q.   Okay.  Why don't we just try to reach common ground on that.  Were there at least 100 leases in South America that contributed to that 896?

A.   I do not know.

Q.   Okay.  There were -- Exxon made money from South America in 2015, correct?

A.   I don't know if we made money in South America upstream in 2015 or not.  I just don't remember.

Q.   You just don't remember.  And if there's a field summary with 2774 fields or leases on it, that's just something you wouldn't be familiar with.

VOLUME 4-B    112

A.   Wouldn't mean -- Wouldn't be -- Wouldn't mean a thing to me.

Q.   Okay.  So what we can agree upon is that there may have been -- This -- This heading is Canada/South America, correct?

A.   Yes, it is.

Q.   So this is communicating to the reader the results of a loss of 896 million from all the properties Exxon operated in Canada and South America, correct?

A.   Yes.

Q.   And Kearl's only one of those properties, correct?

A.   Yes.

Q.   Some by just what I've ---

THE COURT:  Stop.

Why do you group Canada with South America?

THE WITNESS:  I believe it was an SEC format.

THE COURT:  Is that right?

I mean I don't -- I mean there's several countries between Canada and South America.

THE WITNESS:  Well, the U.S. --

THE COURT:  Yes.

THE WITNESS:  -- is listed separately.  So I think it's -- If you look at the first two columns, basically it's Western Hemisphere.

THE COURT:  Okay.  Okay.  I get it.  All right.  It seems like it would just be easier to -- Never mind.  The SEC is going to figure out what they're going to do, and you just have

**App. 255**

Case 3:16-cv-03111-K    Document 376    Filed 05/07/26    Page 268 of 831    PageID 20461

to fit.

Is it like a template?

THE WITNESS: Yes. Yes. Basically, they prescribe the geographic splits and then they prescribe the thresholds by which you would provide greater detail.

THE COURT: Well, you understand how, sitting here, it kind of seems odd to link Canada with South America.

THE WITNESS: Yes. It's been that way for as long as I can remember.

THE COURT: Okay. All right.

Q. (By Mr. Saham) So just to summarize for the jury, there's to your recollection at least a hundred leases in Canada that contributed revenue, and there could be additional leases in South America that are contributing to that 896-million-dollar loss. Is that fair?

A. Well, I would only -- I think what I said is: I don't know how many fields there are or were in Canada. You asked me if it could be a hundred or more than a hundred, and I said likely but I don't know. So I don't -- I don't want that to get lost in all this little ring around the rosie we're doing. I don't know.

Q. Okay, you don't know. But you said it's likely there's a hundred fields in Canada.

A. Could be.

Q. Okay. But one thing we're certain of: It's not just Kearl that makes up this number. It says "Canada/South America,"

correct?

A. There are -- There are other fields in here. We can certainly say that.

Q. That's all I wanted to clear up. Thank you, Mr. Tillerson.

A. Okay.

Q. And then I wanted to go to -- back to Page Number -- we're still on the 10-K here, and I wanted to go back to Page 37, the bottom line earnings after income taxes that were reported of 16.15 billion dollars.

MR. SAHAM: This 16.15 billion, if you could highlight that, Mr. Torres.

Q. (By Mr. Saham) That's the total earnings reported by the company for Fiscal Year 2015, correct?

A. That is correct.

Q. And it's fair to say there's no impairment charge for the Rocky Mountain dry gas XTO operations included in that number.

A. No, there's not.

Q. And there was -- Such an impairment charge was taken the following year, correct, after you left?

A. The following year --

Q. Okay.

A. -- which was for the year 2016.

Q. Yes. And -- And it was reported to the world on January 31st, 2017; correct?

A. Correct.

Q. And that impairment charge, after taxes, was two billion dollars, correct?

A. That's what I recall, yes.

Q. Okay. And -- And my only point is: That charge was not taken here.

A. No, it was not taken in 2015.

Q. Okay. And then I would like to go to Page No. 117. And that's your signature?

A. It represents that I signed it, yes.

Q. Okay. And -- And you were signing the document in two places, there and below, both as the Principal Executive Officer and as the Chairman of the Board, correct?

A. That is correct.

Q. So you signed it twice in both capacities, correct?

A. That is correct.

Q. Okay. I'd also like to show you what's been pre-admitted as Exhibit 215 at Page 39. And if we could split the left chart along with Page Number -- and I'm going to give Mr. Torres the page -- Page No. 11 of the 10-K, Exhibit 66.

A. I'm not sure what I'm looking at on the left. Have you got the whole document?

Q. Yeah. We're going to blow that up. Just be -- be patient with us, Mr. Tillerson. We'll blow it up so you can see.

A. Do you have the document, though?

Q. Yes.

MR. SAHAM: Do we?

MR. FOLKERTH: Not today.

MR. SAHAM: Does anyone have 215?

Your Honor, could we borrow your copy for Mr. Tillerson?

THE COURT: You certainly may.

MR. SAHAM: Thank you, Your Honor.

THE COURT: Which one is it?

MR. SAHAM: 215. I think we gave it out to Mr. Swiger yesterday and didn't replenish our stocks.

THE COURT: Here you go.

THE WITNESS: Thank you, sir.

THE COURT: You bet.

MR. SAHAM: And then I would like to highlight the -- on the right, Mr. Torres, the 19.20 of lifting cost or average production cost. And then I'd like to -- if we could blow up on the left the leftmost chart, "Kearl Unit Lifting Cost."

Q. (By Mr. Saham) And you were here yesterday when Mr. Swiger testified that lifting costs and production costs are the same thing under the ASE; "production cost" also known as "lifting cost," correct?

A. I think I recall that, yes.

Q. And the -- According to the document on the left, Exhibit 215, which is from a November meeting with Mr. Swiger where he ultimately presented to the Board 27.90 or 27.9 ---

A.   What -- I'm sorry.  Can you tell me what page in this?

Q.   Oh, my apologies, sir.  It's Page 39.

A.   Okay.

Q.   The bottom -- bottom right.

A.   There's a lot of the other information in here.

Q.   Yes.

MR. SAHAM:  And if we could highlight "2015" under the 27.90, that will be all the information.

A.   Okay.  I'm sorry.  Go ahead.

Q   (By Mr. Saham) Okay.  So my question is, and I think you've already answered it once:  But on the right we have the 10-K disclosure for Canada/South America bitumen.  The average production or lifting cost is listed as $19.20, correct?

A.   That is what it says, yes.

Q.   And on the left -- And this was -- I'm just going back to this because -- before I represent it to you and I wanted to show you that I wasn't just making it up, that the lifting cost for Kearl for 2015 was $27.90, correct?

A.   That's what it says, yes.

Q.   And that's not disclosed in the 10-K, correct?

A.   No, it is not.

Q.   Okay.  Thank you very much.

MR. SAHAM:  We can take those down.

Q   (By Mr. Saham) Okay.  I want to show you what has been previously admitted into evidence as Plaintiff's Exhibit 510.

And you remember the term "SOCS" or "Sarbanes Oxley Certifications"?  Do you remember that, Mr. Tillerson?

A.   I do.

Q.   And what were the "Sarbanes Oxley Certifications"?

A.   Well, I remember the -- I remember the term.  I couldn't cite to you precisely.  So you may have to read it back to me.

Q.   Okay.

MR. SAHAM:  Could we, please, go to Page 182?

And this is just the big, fat -- Ladies and Gentlemen of the Jury, just -- just so you're not confused, I think in evidence there's two different versions of the 10-K.  One of them is fatter because it has more certifications on it than the other.  So it's Exhibit 66 and Exhibit 510.  And we're looking at right now Exhibit 510 which is the fat version that includes these certifications.

And if we look at -- I think I sent you to the wrong page, Michael.  Could you, please, go to 181?

Q   (By Mr. Saham) And that's -- that's your -- First off, let's just look at the signature down at the bottom.  That's your signature again, Mr. Tillerson, or your electronic signature being placed on this?

A.   Yeah.  It's the representation of my signature.

Q.   And -- And -- And you gave permission to give that signature, correct?

A.   Yes, I did.

Q.   And this was dated February 24th, 2016?

A.   That is correct.

MR. SAHAM:  And if we can just highlight the beginning from "I, Rex W. Tillerson, certify" through No. 2, please.  No. 1 and 2, starting with "I, Rex Tillerson."

Q   (By Mr. Saham) Okay.  So you certified by signing this document that you reviewed the Annual Report on Form 10-K, correct?

A.   I did.

Q.   And then you further certified that "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

That's what you certified to, correct?

A.   That is correct.

Q.   Okay.  I want to show you what's previously been marked as Plaintiff's Exhibit 199, and it is in evidence.

And this is an e-mail you received from a gentleman named "Robert Schleckser" on February 2nd, 2016.  Who's "Robert Schleckser"?

A.   He was the Corporate Treasurer.

Q.   And what did the Corporate Treasurer do at Exxon?

A.   Well, the Treasury Department was responsible for ensuring

the corporation had the financial capacity to undertake its activities.  So it would -- it would manage the cash.  It would manage any debt and would ensure, as they were following the corporate plan, that we had the financial structures in place to allow us to carry out the plan.  And then, obviously, they would get involved if there were big transactions maybe through an acquisition.  Or sometimes through a contract with the Government, they might get involved in those.

Q.   Okay.

MR. SAHAM:  And can we highlight the second two sentences of the third paragraph starting with "They"?  So starting with the word "They."

Q   (By Mr. Saham) And you would have received this document in the ordinary scope of your employment?

A.   It would appear so.

MR. SAHAM:  And if we could highlight that sentence above that as well, Mr. Torres.  Thank you very much.

Q   (By Mr. Saham) Mr. Schleckser informed you and Mr. Swiger on February 2nd, 2016, they -- and that was referring to S&P, the credit rating agency; correct?

A.   Yes.

Q.   And what was S&P, the credit rating -- Or what's a "credit ratings agency"?

A.   Well, the credit rating agencies assess the financial strength of entities with respect to their ability to borrow

**App. 257**

money, repay money. You know, they're kind of the surety of that; are they high risk? Are they low risk? So there's two rating agencies, S&P and the other is Moody's, that does -- they do similar things.

Q. And Mr. Schleckser is informing you and Mr. Swiger, they -- being S&P -- "will review our full year results and 10-K filing prior to making a final determination," correct? That's the first -- or that's what he says there?

A. That's what that sentence says.

Q. And when he was talking about the 10-K, he's talking about Exhibit 66, the document you signed?

A. Yes.

Q. And he goes on to say, "They have also recently downgraded Shell further from AA minus to A+ and Shell remains on CreditWatch along with other European majors, BP, Repsol, ENI, Statoil and Total," correct?

A. Correct.

Q. And, again, both Shell and Total had taken write-downs in the tar sands," correct?

A. Correct.

Q. And both had also been downgraded by the ratings agencies, correct?

A. That's what this says.

Q. Okay. And you received this document 22 days before the 10-K was filed.

A. Well, I didn't look at the date but I'll -- I'll take your word for it.

Q. Well, it's February 2nd and the 10-K is ---

A. Yeah. I just -- I'm just not seeing the date on what's in front of me here.

Q. He can go up a bit.

MR. SAHAM: Mr. Torres, let's go up so he can see the date.

Q. (By Mr. Saham) It's February 2nd, 2016. That's 22 days before the 10-K was filed, correct?

A. Correct.

Q. And then it would be 27 days before the bond offering, correct?

A. Correct.

Q. I want to show you what I'm marking as Plaintiff's Exhibit 560.

MR. SAHAM: Don't put it up yet because they may want to object. I'm not sure.

Is it pre-admitted? Oh, it's agreed to. So you can put it up, Mr. Torres. I'm sorry. This is agreed to.

So if Your Honor would admit it, that would be wonderful.

THE COURT: I will. But what's the number? 560?

MR. SAHAM: It is 5-6-0.

THE COURT: 560 is admitted into evidence. I think it

was already in evidence.

MR. SAHAM: Well, there's -- The identical document for Mr. Swiger was in evidence. It's not identical but it's very similar, so.

THE COURT: Okay. Well, it's in evidence now.

MR. SAHAM: Thank you, Your Honor.

Q. (By Mr. Saham) And, Mr. Tillerson, "RWT," Rex Wayne Tillerson, those are your initials?

A. That's correct.

Q. And this is an Issue Review that was being conducted with you on February 11th, 2016?

A. Well, that's what it says.

Q. And Ean Nesselrotte and Namisa Taylor, those were people who worked for Mr. Schleckser, right?

A. I don't recall.

Q. Don't recall, okay. Let's go to Page 3 of the document. It's dated February 11th, 2016, "Term-Debt Issuance Update."

Now the term-debt issuance, that was with the bond offering that was closed on February 29th, 2016; correct?

A. I assume that's what this document's related to.

Q. Okay. And if we go to the next page, Page 4, this is entitled "Dialogue with Lead Arrangers," correct?

A. That is correct.

Q. And what's a "Lead Arranger"?

A. Well, arrangers are the banks who are going to help with the

placement of the bonds to people who would like to purchase and take those bonds up.

Q. Okay. And if we go down, there's two bullet points. The second bullet point, the third arrow, and then there's a minus EM vs. JNJ, if we could highlight that.

MR. SAHAM: Yeah, that's good enough. And then highlight the CVX vs. EM all the way to the end.

Q. (By Mr. Saham) Okay. "CVX," that's Chevron, correct?

A. That is correct.

Q. And "EM," that's Exxon, correct?

A. Correct?

Q. And this states, "Chevron versus Exxon from plus 15 basis points to plus 40 to 45 basis points." This is indicating that there's been a movement, a negative movement for Chevron as compared to Exxon. It used to only have to pay 15 basis points more than ExxonMobil when it borrowed and now it has to pay 40 to 45 basis points more, correct?

A. That's what it says.

Q. So this is a company that's taken write-downs and been downgraded and now has to pay more in interest than Exxon.

A. Well, I don't want to represent that I know what the rating agency was taking into consideration when they made this change.

Q. Right. But two things we know have happened: Chevron had 900 million dollars in write-downs and Chevron was downgraded. Whether it's cause and effect or not, both those things are true.

Case 3:16-cv-03111-K    Document 376    Filed 05/07/26    Page 271 of 831    PageID 20464

A.   Don't know.  Don't know the cause and effect.  You're right.

Q.   Right.  I'm not asserting ---

A.   Yeah.  But those things are true.  I just can't make them a relation onto this necessarily.

Q.   Okay.  So Chevron had a 900-million-dollar write-down, correct?

A.   Correct.

Q.   And Chevron was downgraded by S&P and Moody's, correct?

A.   That is correct.

Q.   Now if we go to the next page of the document, Page 5, "Impact of Volatility on Spreads," now could you explain to us ---

THE COURT:  Why don't you tell the jury about basis -- basis points and ---

MR. SAHAM:  Sure.

THE COURT:  Because that last had a lot of little letters --

MR. SAHAM:  That's true.

THE COURT:  -- that means certain things in credit.  Okay?

Q    (By Mr. Saham) Could you explain to the jury, Mr. Tillerson, what a "basis point" is?

A.   Well, a "basis point" is -- is another way of saying "percent" or the interest rate.  So if you have -- A 100 basis points would equal one percent.  So that if you've got 50 basis

points, it's a half of a percent.  Twenty-five basis points would be .25.  So that's -- It's just a -- It's a nomenclature that's used in financing and particularly in debt.

Q.   And what's a "spread"?

A.   Well, the "spread" would represent the difference between two -- two points of reference.  So in other words, one -- one company might be here and the other company would be there.  The difference would be known as the "spread."

Q.   Thank you, Mr. Tillerson.

MR. SAHAM:  So if we look at the top left, "Current Energy Sector Pricing Ranges," could we highlight that and then the first entry there, AAA -- AAA/High AA?  If you could highlight just the first -- that all the way over to the end.

Q    (By Mr. Saham) Okay.  So this is indicating that the highest level, AAA to High AA -- So AAA, presumably, would be as high as -- or sorry -- would be -- Okay.  Let me -- Let me -- Let me start over.

This -- This is showing the spread versus treasury.  Is that correct?

A.   That's what the "T" represents, what the treasuries would be yielding, and then the "plus 140" would be plus 140 basis points.  So if treasuries were yielding three percent, a AAA to High AA would be yielding 4.4 percent.  So you just add the treasury to -- to the spread.

Q.   So -- So if there's a range there, presumably AAA is better

than High AA because it only goes two A's?

A.   Well, it is, but I think it's worth noting that in this display, the two are -- You would not be able to distinguish between the two, and -- and I think it's because there were only three AAA companies at the time.

And so if they're trying to represent the appetite in the bond market for high-quality debt, the next available high-quality, that's going to be AA plus, and there's not a lot of -- there aren't very many companies with AA plus either.  So they lump them together because that's really your highest -- highest quality issuance that you can pursue.

Q.   But if AAA is plus 140, High AA could be?

A.   Could be a 170.

Q.   Right.  So there would be a --

A.   Yeah.

Q.   -- 30-point -- that would a 30-point spread, 30 basis points.

A.   Thirty basis points.

Q.   Three-tenths of a percent.

A.   Three-tenths of a percent.

Q.   And if you're borrowing -- If you're thinking about 30 basis points and you're borrowing 12 million dollars, that could be hundreds of millions of dollars, can't it?

A.   Or it could be that the bonds are taken up at Treasury plus 140.

Q.   Right.  But the difference between 140 and 170, those 30 basis points, could be -- we could be talking about hundreds of millions of dollars, correct?

A.   Well, we could be talking about a lot of what if's or what could have been.

Q.   Well, I'm not asking you a "what if."  I'm asking you:  Getting plus 140 versus plus 170 on 12 billion in bonds, that could be hundreds of millions of dollars, correct?

A.   Yeah, we can do math.  That's correct.

Q.   And then if we look down at the bottom chart, that complex one we looked at with Mr. Swiger, I just want to -- I think we covered this with Mr. Swiger but I want to make sure I get it right with you.  The dark blue is February of 2016, correct?

A.   Yes.

Q.   And then the yellow is July of 2015.

A.   That is correct.

Q.   And if we look at just Exxon by itself now, --

A.   Right.

Q.   -- Exxon has gotten -- its -- its spread versus Treasury has gotten worse by 60 basis points in that period from July to February, correct?

A.   That is correct.

Q.   It used to be only 85 over Treasury and now it's 145 over Treasury, correct?

A.   That is correct.

Q.   And if we compare it to Chevron, Chevron went from 100 over Treasury to 190, correct?

A.   That is correct.

Q.   So Exxon's advantage over Chevron back in July of 2015 was only 15 basis points, correct?

A.   Yes.

Q.   And now its advantage has gotten, at least comparatively, its spread advantage is now 45 basis points, correct?

A.   Well, we're also sort of mixing apples and oranges here again because Chevron's credit rating was never as high as Exxon's.  So there was always going to be a spread difference there.  And so it's not -- it should not be surprising that that difference exists.

Q.   Oh, yeah.  But the difference changed.  Back in July of 2015, that difference was only 15 basis points, correct?

A.   That is correct.

Q.   But between July and February, it grew; that difference grew; correct?

A.   I guess it grew from 145 to 190.  Is that what we're -- Is that what you're focusing on?

MR. SAHAM:  Can we put it back the way it was?

Q   (By Mr. Saham) Exxon's advantage used to be 15 points.  Exxon was at 85 and Chevron was at 100, correct?

A.   That's right.

Q.   And that was a 15-point basis point advantage in favor of

---

those two little dots.  And you're on?

Q.   I'm on Page 5.

A.   Page 5, okay.  Thank you.

Q.   And on Page 5 there's a lot of information in there, so I want you to look at it because there is a lot of information.

(Pause)

A.   Yeah.  There's no -- There's no reference that I can see from the Treasurers as to what the cause of -- what the cause might be for the change, relative, but they do -- they are acknowledging that part of this is in a reaction to the low price environment, but they're also saying both ExxonMobil and Chevron maintain significant capacity to borrow.  It's kind of the conclusion, so.

Q.   Right.  But all -- all I'm saying here is that the relative spread between Exxon and Chevron, Exxon's position vis-a-vis Chevron has improved over this period.  Although both have gotten worse, Chevron has gotten more -- they got more of a battle than Exxon.

A.   Okay.

Q.   And, again, I think we just talked about this.  Two things that happened in that interim period were a write-down by Chevron and a downgrade of Chevron, correct?

A.   Yes.

Q.   And during that period, Exxon did not take a write-down; correct?

---

Exxon as of July, 2015; correct?

A.   That is right.

Q.   And now we're in February of 2016 and that advantage, at least relative between -- although both companies' spread has gotten larger as compared to Treasury, Exxon's has not gone off as much as Chevron's, correct?

A.   That is correct.

Q.   So now Exxon's advantage is 45 basis points over Exxon or over Chevron, correct?

A.   That's what it says.

Q.   Okay.  And the one thing that's happened that changed in that interim period or the two things that have happened is Chevron took a 900-million-dollar write-down and it was downgraded, correct?

A.   Those things have happened.

Q.   And that has affected the relative spreads between the two companies.

A.   It may have had some impact.  I'd have no way of knowing of how much.

Q.   Well, this is being communicated to you by the Treasurer -- the Treasurer part of Exxon 17 days or 18 days before the bond offering, correct?

A.   Yes.  I don't -- Do I have this?

Q.   Oh, sure.

A.   Because I -- They're -- They're communicating more than just

---

A.   We did not.

Q.   And you didn't suffer a downgrade, correct?

A.   Well, we were on CreditWatch and I think, as we know, that ultimately -- S&P, anyway, ultimately did.  And I think because we were on CreditWatch is why you saw the move for Exxon from 85 to 145.

Q.   Right.  But you still got the AAA.

A.   At the time of the bond issuance, yes.

Q.   Okay.  And then now let's look at and compare Exxon to Shell.  Exxon used to have a 20-basis-point advantage as of July, 2015, over Shell; correct?

A.   That's correct.

Q.   And that advantage grew significantly by the time you got to February because Shell was up to 225 and Exxon only went up to 145, correct?

A.   Correct.

Q.   That's -- That's an 80-point advantage.  It went from having a 20-point advantage to an 80-point advantage, correct?

A.   It's a spread.  I don't know.  You're wanting to call it an "advantage," but yes, that's correct.

Q.   And a lower spread -- a lower spread to Treasury is better.

A.   That is correct.

Q.   You pay less interest if you've got that lower spread, correct?

A.   Correct.

**App. 260**

Q. Okay. And then two things that happened with respect to Shell is Shell took a 2-billion-dollar write-down in the tar sands, correct? That's one of the things that happened?

A. I think that's -- Yeah. I think we looked at that, yeah.

Q. And Shell was also downgraded, correct?

A. Yes.

Q. Okay. And similarly, if we look at Exxon's -- Exxon vis-a-vis Total, Exxon used to have a 20-basis-point advantage, spread comparison to Total in July of 2015 and that spread advantage increased to -- let me do the math -- 70 basis points, correct?

A. Correct.

Q. And what happened with Total in that interim period, in that period between July, 2015, and February, 2016, is Total also took a write-down in the tar sands, correct?

A. And an abandonment of their project.

Q. Abandoned Carmon Creek.

A. Correct.

Q. And Total was downgraded by the credit rating agencies, correct?

A. Yes, they were.

Q. Okay. And this information was communicated to you on February 11, 2016; correct?

A. Correct.

Q. And that was 13 days before you signed the 10-K, correct?

---

A. Correct.

Q. And 18 days before Exxon's 12-billion-dollar bond offer.

A. Correct.

Q. Okay. I want to show you what's previously been marked and admitted into evidence as Plaintiff's Exhibit 522.

Now this document is dated February 29th, 2016, and it's from Bank of America, John Shepard. Do you remember John Shepard?

A. I don't know that I ever met the man.

Q. Okay. But Bank of America/Merrill Lynch was one of the lead underwriters for the 12-billion-dollar bond offering?

A. I believe so.

Q. And if we turn to Page 2 of this document, it's entitled, the slide, "ExxonMobil, 12-Billion-Dollar Bond Offering, Largest Energy Sector Bond Offering in History," correct?

A. That's what it says.

Q. It was the largest bond offering not only that Exxon had ever done but the largest energy sector bond offering in the history of the United States, correct?

A. Well, that's what I've been told, yes.

Q. Okay. And this document is dated February 29th, 2016, and it's recounting what occurred the date -- the day this bond offering went public, correct?

A. Well, I haven't -- I don't know that I've seen this. So I haven't really looked at it.

---

Q. Yeah. And I think the substance that we're going to look at is on Page 4, but feel free to look at the whole document. We can pull up Page 4 on the screen.

THE COURT: Is this admitted into evidence?

MR. SAHAM: It is, Your Honor.

THE COURT: And it's Exhibit Number?

MR. SAHAM: 522. This is actually an interesting one that has two exhibit numbers, both 522 and 665.

THE COURT: And they're both Plaintiff numbers?

MR. SAHAM: They're both Plaintiff's numbers.

THE COURT: All right. They're both ---

MR. SAHAM: I believe they've both been admitted because I think Defendants like the 665.

THE COURT: Which one are we going to refer to it as?

MR. SAHAM: This one is 522.

THE COURT: How about let's refer to it as that from now on?

MR. SAHAM: It's fine with me, Your Honor.

THE COURT: All right. Then that's what we're going to call it, 522.

Q (By Mr. Saham) So Exhibit 522 on Page 4 is stating, if we can highlight it, "Bond Offering Case Study." It's describing the bond offering, at least the highlights. And it says, "ExxonMobil AAA rating, 12-billion-dollar, 8-tranche Bond Offering," correct?

---

A. Correct.

Q. And it's on Bank of America/Merrill Lynch stationery or letterhead, correct?

A. It looks like it.

Q. And then it's dated February 29th, 2016; correct?

A. Correct.

Q. And that's the date the bond offering was issued to the public?

A. Yes.

Q. And it's five days after you signed the 10-K?

A. Yes.

Q. And it's recounting that this bond offering of multiple tranches totaled 12 billion dollars, correct?

A. Yes.

Q. And then if we could blow up -- On the right it says, "largest" -- again, it says, "largest energy bond offering in history." It reiterates that in the gray, correct?

A. Correct.

MR. SAHAM: And then if we could highlight the second bullet point, starting with the second sentence. "Exxon also benefited," if we can highlight that down to the bottom of it.

Q (By Mr. Saham) Bank of America's informing you that Exxon also benefited from its AAA credit profile. That's one of the things that Bank of America's summarizing to Exxon, correct?

A. That's what it says.

**App. 261**

VOLUME 4-B   137

Q.   That you benefited from that AAA rating, correct?

A.   That was their assessment.

Q.   And they were the lead underwriter of the bond offering?

A.   I believe so.

Q.   They were the ones responsible for selling it.

A.   Correct.

Q.   So if they said you benefited from it, they would be the people who would know, correct?

A.   Most likely.

Q.   Okay.  And in addition to saying that Exxon also benefited from its AAA credit profile, the Bank of America folks go on to say, "While most of its peers suffered downgrades by Moody and S&P, Exxon's AAA ratings were affirmed, making Exxon the only integrated credit to not suffer a downgrade," correct?

A.   That's what it says.

Q.   And you have no reason to believe that's inaccurate, correct?

A.   No, I do not.

Q.   I want to show you what I'm marking as Plaintiff's Exhibit 732.  And before -- I'll show you the document in a second while they're looking at it, but I have a couple of questions before I present it to you.

     It's true that Exxon paid S&P and Moody's to rate the bonds, correct?  You had to pay for it.

A.   I believe that's right, yes.

VOLUME 4-B   138

Q.   And for this 12-billion-dollar bond offering, it was approximately ten million dollars that was paid to the ratings agencies, correct?

A.   I don't know the amount.

Q.   Okay.  I want to use this document.  I don't know if they object to it.

     MR. MELSCHEIMER:  No objection.

     MR. SAHAM:  No objection.  Could we admit this into evidence, Your Honor?

     THE COURT:  Yes.

     MR. SAHAM:  And could we put it on the screen, specifically Page 19?  We should probably show Page 3 first, though.

     THE COURT:  Well, we can but we're going to do it Monday.  We're going to break down for the week.

     MR. SAHAM:  Okay.  Thank you, Your Honor.

     THE COURT:  All right.  Y'all worked really hard.  I'm going to give you -- I'm going to be like your boss, give you 30 minutes off.  Okay?

     We'll see you all Monday at 9:00.  Please stay well. Don't get sick or anything.  Don't talk about the case.  See you back Monday at 9:00.

     COURT SECURITY OFFICER:  All rise for the jury.

     (Jury escorted to the Jury Room by the Court Security Officer and excused for the day.)

VOLUME 4-B   139

     THE COURT:  Thanks, Mr. Tillerson.

     Okay.  Do we need the court reporter for anything?

     MS. CORTELL:  Your Honor, I was just going to ---

     THE COURT:  All right.  Let me -- "Yes"?

     MS. CORTELL:  Just ministerial on one of our demonstratives.  I would like to ---

     THE COURT:  Ms. Cortell, you're kind of like Colombo.

     MS. CORTELL:  Sorry.

     THE COURT:  Just -- Just -- Just one more thing.

     MS. CORTELL:  Yeah.  We're all tired, Your Honor.  Just a pretty little picture.

     THE COURT:  Okay.  Well, let's get these in.

     All right.  These are your demonstratives?

     MS. CORTELL:  This is the demonstrative from yesterday. It's the board makeup by Mr. Melsheimer.  We would like it admitted, the demonstrative exhibit, as Defendant's Exhibit 1318.

     THE COURT:  These are the ones that got erased.

     MS. CORTELL:  This is the one that got erased, yeah.

     THE COURT:  Okay.  Do you have any objection to that being admitted as a demonstrative only?

     MR. SAHAM:  No, Your Honor.

     THE COURT:  Then it's admitted as a demonstrative.  And it's a picture of the erased exhibit which we now have preserved forever.

     MR. SAHAM:  Is that like the one that got away,

VOLUME 4-B   140

Your Honor?

     THE COURT:  No.  We captured it.  Okay.

     MR. MELSCHEIMER:  Thank you, Your Honor.

     THE COURT:  It will be admitted as a demonstrative exhibit.  Ronnie will mark it.

     Is that it, Ms. Cortell?

     MS. CORTELL:  Yes, Your Honor.

     THE COURT:  All right.  Then that's in.

     Off the record.

     (Court adjourned at 4:30 PM.)

**App. 262**

CERTIFICATE OF OFFICIAL REPORTER


          I, Deborah A. Kriegshauser, Federal Official Realtime
Court Reporter, in and for the United States District Court for
the Northern District of Texas, do hereby certify that pursuant
to Section 753, Title 28, United States Code, that the foregoing
is a true and correct transcript of the stenographically-recorded
proceedings held in the above-entitled matter and that the
transcript page format is in conformance with the regulations of
the Judicial Conference of the United States.

          Dated this 2nd day of May, 2026.


                    /s/ Deborah A. Kriegshauser
                    _____
                    DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
                    FEDERAL OFFICIAL COURT REPORTER

**App. 263**

# Exhibit 9

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

PEDRO RAMIREZ, JR., Individually      )
and on Behalf of All Others           )
Similarly Situated, and GREATER       )
PENNSYLVANIA CARPENTERS PENSION        )
FUND,                                 )
                                      )
              Plaintiffs,             )
                                      )
      vs.                             )   No.  3:16-CV-03111-K
                                      )
EXXON MOBILE CORPORATION,             )   CLASS ACTION
REX W. TILLERSON, ANDREW P. SWIGER,   )
JEFFREY J. WOODBURY, DAVID S.         )
ROSENTHAL,                            )
                                      )
              Defendants.             )
------------------------------------)

VOLUME 5A
BEFORE THE HONORABLE ED KINKEADE
UNITED STATES DISTRICT JUDGE
MAY 4, 2026
DALLAS, TEXAS

FOR THE PLAINTIFFS:

JOE KENDALL
KENDALL LAW GROUP
3811 Turtle Creek Boulevard, Suite 825 Suite 880
Dallas, TX  75229
(214) 744-3300

SCOTT H. SAHAM
NATHAN R. LINDELL
SAM SHELDON
ERIKA OLIVER
T. ALEX B. FOLKERTH
SARA BIERL POLYCHRON
SPENCER A. BURKHOLZ
ROBBINS GELLER RUDMAN & DOWD, LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
(619) 231-1058

BALON B. BRADLEY
BALON B. BRADLEY LAW FIRM
11910 Greenville Avenue, Suite 220
Dallas, TX  75243
(972) 991-1582

MICHAEL SWIDERSKI
(Party Representative)

FOR THE DEFENDANTS:

THOMAS M. MELSHEIMER
AUSTIN E. SAATHOFF
EMILY WILKINSON
DAVID T. HINOJOSA
KING & SPALDING, LLP
2601 Olive Street, Suite 2300
Dallas, TX  75201
(214) 764-4446

NINA CORTELL
JASON JORDAN
HAYNES and BOONE, LLP
2801 N. Harwood Street, Suite 2300
Dallas, TX  75201
(214) 651-5000

AUDRA J. SOLOWAY
DANIEL TOAL
THEODORE V. WELLS
LYUBA SHAMAILOVA
AMITAV CHAKRABORTY
DAPHNE THOMPSON
PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

SCOTT C. THOMAS
LATHAM & WATKINS
100 Crescent Court, Suite 7084
Dallas TX  75201
(713) 546-5400

D. PATRICK LONG
SQUIRE PATTON BOGGS
2200 Ross Avenue, Suite 4100w
Dallas TX  75201
(214)758-1500

(Rex Tillerson)

PATRICE CHILDRESS
(Party Representative)

Proceedings reported by mechanical stenography,
transcript produced by computer-aided transcription.

---------------------------------------------------------
PAMELA J. WILSON, RMR, CRR
Federal Official Court Reporter
1100 Commerce Street, 13th Floor
Dallas, Texas 75242
pam_wilson@txnd.uscourts.gov
(214) 662-1557

VOLUME 5A - MAY 4, 2026

P R O C E E D I N G S

(Outside the presence of the jury.)

THE SECURITY OFFICER:  All rise and come to order.

The United States District Court in and for the Northern District of Texas at Dallas is now in session, your Honorable United States District Judge Ed Kinkeade presiding.

Let us pray.

God bless these United States and this Honorable Court.

Please be seated.

THE COURT:  Y'all filed a couple of motions over the weekend?

MR. SAHAM:  Yes.  One,  Your Honor -- before -- before we get to that I just wanted to raise with the court Ms. Oliver, who was sitting here who was going to actually play a speaking role --

THE COURT:  Where is she?

MR. SAHAM:  Her father had a stroke.

THE COURT:  Where is she?

MR. SAHAM:  Back in San Diego.

THE COURT:  Oh, I thought you said she was here.

MR. SAHAM:  She had been sitting in that chair the whole trial.

THE COURT:  I do remember.

MR. SAHAM:  She was going to play a speaking role.

Her father had a stroke and he was taking care of her kids, so it's unclear whether she will be returning. I leave it to the court whether the jury needs to be informed or what should occur.

THE COURT: I don't think the jury will notice who we call or don't call. They would have noticed her sitting here. They think everybody out there is a lawyer. They don't know about witnesses. They may now that we start getting into the experts. So maybe. But I don't think it's . . .

If you need me to, let me know. I'll do something.

MR. SAHAM: I don't know whether defense counsel have an opinion.

THE COURT: They haven't said a word, so I'm guessing they don't have an opinion.

MR. SAHAM: She's unlikely to return. If the court feels it necessary to mention her absence, if not, we don't have a strong opinion.

THE COURT: Let's wait until we get there and see where we are.

What are you going to say, hey, we were going to have one more witness but her family has had a stroke.

MR. SAHAM: She wasn't a witness. She was a lawyer who was going to examine witnesses and now one of us will be examining those witnesses.

She's not going to be sitting there anymore.

THE COURT: The jury doesn't care.

MR. SAHAM: Okay.

THE COURT: I mean, they would notice that you were gone.

MR. SAHAM: Maybe.

THE COURT: They would notice. And if we brought in somebody that spoke Texas, they would really notice. They would have thought something bad -- that I had done something to you, maybe.

(Laughter)

That's the only thing we need to worry about.

No, it will be fine.

Okay. And then your motion.

MR. SAHAM: Yeah. Substantively --

THE COURT: You're up to $600, okay, on yeahs.

MR. BURKHOLZ: So noted, Your Honor.

THE COURT: You're going to cover him, correct?

MR. BURKHOLZ: I got him.

THE COURT: Good. All right.

MR. SAHAM: My apologies, Your Honor.

The time sensitive portion of our motion is with respect to Exhibit 698. There has been manifest unfairness in front of the jury, both in opening argument saying there's not a single document and so forth, Mr. Swiger's testimony that

lawyers approve things.

There's only three meetings basically at issue in this case, a September meeting with Mr. Tillerson, an October meeting, and January.

Exhibit 698 is a PowerPoint presentation, wasn't on a privileged log, was preadmitted in this case, is in evidence, and it's fully redacted for privilege.

So I would like to either utilize that document with Mr. Tillerson, if they want to have the court review the unredacted version, I would use that with Mr. Tillerson, that might entail a slight delay so I could read the document, but I believe the only -- there's -- there's two ways to correct this manifest unfairness. The most time-sensitive way is through Mr. Tillerson and then later in closing argument to be able to rebut what was said in opening argument about the lack of evidence and possibly a curative instruction.

Most interestingly, we wrote a four-and-a-half page brief citing five on-point Fifth Circuit cases. I don't think I've ever had a brief like that before. We have one talking about manifest unfairness, sword and shield, this is prototypical sword and shield.

We have two opening the door cases, both Fifth Circuit cases: one where the door was opened in opening argument; one from eliciting testimony. We have both.

And then we have the case that Mr. Toal read to the court -- into the record, the Capparotta case that says the way you cure this type of situation is a curative instruction.

We have four cases, three types of relief. We would like to be able to examine Mr. Tillerson and use it in closing and a curative instruction.

The second two relief, the closing and the curative instruction, we don't need to address that now. I guess the only thing we need to address immediately is can -- and I didn't want to just show the document to him, even though it's in evidence, can I use either the redacted document with Mr. Tillerson or will I receive an unredacted document to use with Mr. Tillerson.

THE COURT: And?

MR. WELLS: Your Honor, --

THE COURT: Make sure you talk into that microphone.

MR. WELLS: Okay. With respect to Exhibit 698, that was the exhibit where Mr. Burkholz put up on the screen four blank pages marked privilege, let the jurors see those pages. We objected. The court sustained the objection and gave a curative instruction. And now they're asking to do it again, in essence. I mean, that's what in New York we call chutzpah.

I mean, the notion that they would show the jurors the

unredacted -- the redacted pages, suggests that there was something we hid from them.  Had the court sustained the objection and then turned around 48 hours later and want to redo it, you know, it -- it's -- it's -- there's a degree of audacity.

Look, if they wanted to bring motion during discovery, period, contesting our assertion of privilege, they could have done it.  They cannot turn this trial into a forum to deal with discovery motions that were never raised.

THE COURT:  Let me stop you right there.

What about that?

MR. SAHAM:  This would have never came up but for Mr. Melsheimer's statement, and I'm just going to quote it, it's in the record at opening, "Plaintiffs will not show you a single document, not an email, not a text, not a memo showing that Mr. Tillerson --"

THE COURT:  Okay.  So your answer is they opened it up?

MR. SAHAM:  Correct, Your Honor.

THE COURT:  Okay.  I get it.

Go ahead.

MR. WELLS:  Your Honor, this notion that Mr. Melsheimer opened some door by saying they won't be shown a single document to the effect that somebody said -- fixed the numbers or cheated, it -- you know, it -- it -- it is not real.

If Mr. Melsheimer had stood up and said they won't show you any evidence that these defendants engaged in fraud, they would make the same dog-gone argument under -- under that -- you know, notion, he couldn't say anything.  Because what they're really saying is evidence is missing.  And if Mr. Melsheimer just said we're going to show you that there is no evidence, they could make the same argument.

I mean, the bottom line is they can't do what they're doing.  There's a pattern here where they have engaged in what I call self-help.  They didn't bring -- bring this issue to the court's attention outside of the presence of the jury.  They took things into their own hands --

MR. SAHAM:  Motion in limine --

MR. WELLS:  -- and they put that material up on the screen instead of raising the issue with the court.  And they have done it with the text messages, they have done it with the -- the issue of Wayne Tracker -- I mean -- the Wayne Tracker thing is really amazing, because on Friday when it was raised, I said at sidebar, wasn't on the record, I asked him could you wait until Monday so I could check the files on this issue.  They said, no, we want to ask these questions right at the beginning.  And they wanted to do it because they wanted to try and hurt Mr. Tillerson, suggest he had done something wrong because documents were missing.

Now, we went back over the weekend and we checked the file.  And what the file shows is there are no missing emails from the Wayne Tracker account from August 18, 2015, forward.  They exist.  Because we found a backup tape, two weeks after this whole issue was raised --

THE COURT:  Let me make sure, just for purposes of the record:  What you're saying is those emails still exist from the recipients' accounts?

MR. WELLS:  No.  I'm saying they exist from the Wayne Tracker account, when -- so the Wayne Tracker issue was first raised by me.  I wrote a letter in mid-March saying that we recognized that the hold on that account hadn't worked because of an IT problem.

THE COURT:  Right.

MR. WELLS:  We then had -- immediately we had the IT people look to see if there were any backups or how could we remediate the harm.  Within two weeks they found a backup tape.  The tape showed all of the Wayne Tracker emails from August 15th, 2015 forward, the relevant period in this case.  They exist.  It became --

THE COURT:  Okay.

MR. WELLS:  Yes.  And they said in their opening that the so-called conspiratorial meeting was in October of 2015.  So they have all of the emails.

The Wayne Tracker issue was a big deal in my head because they were saying things happened bad in 2014.  And so what happened -- there was no dispute about the fact we found a backup tape.

THE COURT:  Let me stop you.

Y'all have the Wayne Tracker emails from 2015 on?

MR. SAHAM:  We have no Wayne Tracker emails.

I don't know if they have been produced.  There's no relevant Wayne Tracker emails that we've received --

THE COURT:  Wait a minute.  I'm hearing two totally different things.  They said they went back and found them in some kind of backup and you're saying but we didn't get 'em?

MR. SAHAM:  This is the first I've heard of that, the first inkling I've ever had that they found the tape.

THE COURT:  It is of me, too.  I haven't heard that before.

MR. SAHAM:  We don't have them in our case to suggest that the beginning of 2015 isn't relevant.  The losses that Mr. Tillerson was told about for January to June was approximately $8 a barrel, $187 million.  There were meetings every month.  So he's saying maybe they found some and -- and/or maybe if he sent an email to Mr. Swiger it would have been captured.  What if he sent an email to Mr. Trump about it or anyone else?

THE COURT:  No.  What he's saying is they found the Wayne Tracker emails themselves, not the recipient, the Wayne

Tracker emails from 2015 forward.

MR. SAHAM: From August 2015 forward I believe he said. So we're missing the first eight months of 2015 at a minimum.

And I'd like Mr. Wells to tell us, if he knows, were those produced to the plaintiff from that backup tape. I never received them. I never saw 'em.

MR. WELLS: Your Honor, I'll let Mr. Toal.

MR. TOAL: If there were any emails that are responsive account that were in that account, just like they accounts, were produced to the plaintiffs.

There are documents in this case from the Wayne Tracker account. That have been produced to the plaintiffs.

MR. SAHAM: From other people's files. But, Your Honor --

THE COURT: Wait. Stop.

Did y'all produce the Wayne Tracker emails to the plaintiffs, yes or no?

MR. TOAL: Yes, to the extent they were relevant to their requests we produced them.

THE COURT: Okay. You didn't ever get any Wayne Tracker emails, yes or no?

MR. SAHAM: I -- we did receive some and I believe they came from other people's files, like a document Mr. Swiger received on the Wayne Tracker --

THE COURT: That's not what they're telling me.

MR. SAHAM: This is the first they have told us that. In ten years of litigation this is absolutely the first time they have ever mentioned that.

And this motion here today, Your Honor, is about Exhibit 698, not Wayne Tracker.

MR. WELLS: Your Honor, just so it's clear, there's --

THE COURT: Well, okay. Stop.

I want you to give them -- whatever. Give 'em all the Wayne Tracker that are responsive to anything they have asked, give it to them now, if you haven't already given it to them.

MR. WELLS: I believe we have. And the key word is "responsive."

THE COURT: I get that. I understand.

MR. WELLS: But I want to be clear, there is a certification in the public record by a woman named Ms. Connie Finestein who says - all this is filed in the NYAG case - who says she found it, they exist for August 18, 2015 forward. It's in my brief. I quote from it. It's a public record.

That's why I said on Friday --

THE COURT: All right. Let me stop you.

Both sides, I'm assuming, didn't provide every email,

every, every, every, only the ones that are responsive to requests. Both ways. Yes or no?

MR. SAHAM: Your Honor, first off, there's nothing before August. They produced discovery for all of 2015 --

THE COURT: Okay. Would you mind answering my question?

MR. SAHAM: Your question is was every email that was --

THE COURT: You didn't produce every, every email, you produced the ones in response to what they asked.

MR. SAHAM: Yes.

THE COURT: And they say they have done that same thing. Okay?

MR. SAHAM: I hear.

THE COURT: Back to a certain date.

MR. SAHAM: Yes. That's what they just said for the first time.

THE COURT: I understand that. And you can ask, look, but you don't have anything prior to this. You can ask him that.

MR. SAHAM: I don't want to go back to Wayne Tracker. We filed the motion about Exhibit 698, a document that's in evidence, and they're bringing up Wayne Tracker now. This is about 698 and whether I can show that to Mr. Tillerson on the stand. We've already resolved the Wayne Tracker issue, despite their wanting to revisit it.

THE COURT: What are you going to do?

What are you going to do with regard to this Wayne Tracker business?

You can't ask him, hey, you didn't produce any of those, because they did.

MR. SAHAM: Well, first of all, that's -- that's not what Mr. Wells said. He said they produced -- they have -- they have saved some of them.

THE COURT: No. All of 'em that are responsive to your request back to --

MR. SAHAM: August 19th, yes.

THE COURT: Back to August 19th, 2015, forward have all been produced.

MR. SAHAM: Right. But nothing before then. Nothing before then.

THE COURT: I said you can go into that prior to.

MR. SAHAM: Correct.

THE COURT: And say you don't have that.

MR. SAHAM: Understood.

THE COURT: Okay. But all this talk is about -- you said I don't want to talk about that.

MR. SAHAM: I want to talk about Exhibit 698, which is a critical meeting. The document has been fully redacted. They didn't put it into a privileged log. It's agreed to,

PAMELA J. WILSON, CSR/RMR/CRR

**App. 267**

admitted into evidence.

THE COURT: But it's been redacted?

MR. SAHAM: It is fully redacted, Your Honor. If I could bring it up for the court to see it.

THE COURT: No. I've seen it. I've got it. I remember.

MR. SAHAM: That is manifestly unfair. This was not on the privilege log.

MR. WELLS: It was flipped from the AG production and we didn't do a privilege log on that flip. If they had a problem with that since they had the document since 2023 they could have raised it during discovery. That's how it works.

THE COURT: Yeah. What about that?

MR. SAHAM: Your Honor, they have opened the door by arguing there's no evidence and arguing that the process was sound when there are only three meetings and ones completely redacted.

THE COURT: Do you have the other two meetings?

MR. SAHAM: Well, we have the October meeting. They withdrew, because it was redacted as well, another January document that was fully redacted because they knew we were going to raise the same issue about it when Mr. Thomas and I came up there last week.

I'm not sure we have all the January.

I know we don't have this critical document. It doesn't appear to be privileged. It wasn't on a privilege log. It's agreed to be produced in this case. It's in evidence, Your Honor. It can be used for all purposes.

THE COURT: It's been in evidence but with the word "redacted" on it from the beginning.

MR. SAHAM: Right. Either one of two things, either I get to use it in its redacted form or in its unredacted form. It would be manifestly unfair given what they argued, given what Mr. Swiger said about lawyers approving this, the door is open. They have waived the privilege, at a minimum, to this document. And if the court doesn't want to order an unredacted version, I should be able to use the redacted version with Mr. Tillerson and in the closing argument as well.

THE COURT: Go ahead.

MR. WELLS: He can't use a page redacted for privilege for an improper purpose, to put before the jury that we did something wrong in asserting the privilege.

The fact that it's in evidence is because it's a 5-page document. The first page has material that's not redacted. We didn't -- the rest of it is redacted. It's one document. Okay?

THE COURT: I get it. Okay. I get both your arguments.

All right. But your argument is this only came up because of the opening statement.

MR. SAHAM: The opening statement --

THE COURT: Stop. I've heard all y'all I need to hear.

MR. SAHAM: Okay.

THE COURT: Y'all have had back and forth, back and forth, back and forth. It's not tennis. It ends at some point.

And so here's what we're going to do. Since the argument has been opened, I need to look at it. So give that to me, whatever is redacted, and I'll decide one way or the other if the opening got to that -- is it -- is it something that's long?

MR. WELLS: No. It's only four pages, Your Honor.

THE COURT: Okay. I'll look at that and I'll decide.

Thank you.

MR. LONG: Thank you, Your Honor.

THE COURT: What I'm assuming is it's the notes of the meeting.

MR. SAHAM: It's a PowerPoint presentation.

THE COURT: It's a PowerPoint.

MR. SAHAM: It's a PowerPoint that was made to Mr. Tillerson I believe on September 1st.

THE COURT: From?

MR. SAHAM: Mr. Rosenthal and/or Mr. Horne, with no lawyers anywhere.

THE COURT: Is this about Canada or --

MR. SAHAM: It's about Kearl reserves. I'll just read from it: reserves disclosure litigation. That's the attachment. The subject line: Kearl.

THE COURT: All right. Well, let me look at it.

MR. MELSHEIMER: You want it right now?

THE COURT: I want it.

MR. WELLS: Your Honor, I'm going to give you the document.

THE COURT: Give it to Ronnie and he'll give it to me.

All right.

MR. WELLS: With reference to Mr. Parsons, he is our SEC disclosure lawyer. You need that to understand why we --

THE COURT: I get it.

I'm trying to remember, what -- in that part that's redacted -- I need to compare it to the redacted one.

What number is that? 698?

MS. CORTELL: Yes, Your Honor.

THE COURT: Great. Thank you.

I've got it.

And then all of this, right?

PAMELA J. WILSON, CSR/RMR/CRR

**App. 268**

Y'all took out all of this?

MR. WELLS: That's correct.

Your Honor, it relates to the issue of whether we should make a disclosure in our 2015 third quarter 10-Q and what language we should use.

THE COURT: Yes, sir.

MR. WELLS: It has nothing to do with Edmonton or transportation costs or any of the issues in this case, not a one.

MR. SAHAM: Your Honor, the disclosure --

MR. WELLS: The language --

THE COURT: Stop. Y'all quit talking over each other.

All right. Now. Go ahead.

MR. SAHAM: The disclosure that Mr. Wells just referred to as having nothing to do with this case is the false -- the very false statement at issue. They needed to disclose that Kearl was losing money or that Kearl was not a proved reserve or was likely not to be a proved reserve. That's what at issue in this case. Their defense is Edmonton this or Edmonton that, but that's not what's at issue in this case.

THE COURT: Their defense is what?

MR. SAHAM: Well, they say they should only include sales to Edmonton, that's why I think he raised Edmonton.

It's whether they needed to disclose the profitability, lack thereof, or the fact that this did not qualify as a proved reserve. That's is what is at issue in this case.

And if it was a privileged document, of course, the lawyer's name was redacted. They waived the privilege through opening argument and through Mr. Swiger's testimony that lawyers approved this.

They have -- Mr. Swiger told the jury that lawyers approved it. That's a classic sword and shield waiver, Your Honor, Fifth Circuit black letter law.

MR. WELLS: Your Honor, that's a misrepresentation. Mr. Swiger did not say anything at any time about any lawyer approving anything.

MR. SAHAM: I will quote. "Some of the lawyers, particularly our SEC specialists."

That's from April 29th, Volume 2B, 67, lines 7 through 13.

MR. WELLS: And the question was: Who did you work with on the 10-K. And he gave a list of people. That was a misrepresentation what he just said, because that's not in those page cites or the transcript anywhere.

THE COURT: There was something else you were going to talk about, too. I can actually think about two things at once. I forgot what it was.

MR. SAHAM: Oh, the first thing was Ms. Oliver's

departure.

THE COURT: Didn't you file two things?

MR. SAHAM: We filed one motion, multiple forms of relief, being able to address this with Mr. Tillerson and closing argument and then a potential curative instruction, but that can be dealt with in the charge conferences.

THE COURT: Okay. I'm going to take a little break and think about it for a minute and talk to my scary smart lawyers like y'all's scary smart lawyers before I rule on this, because I'm assuming you want to talk to Mr. Tillerson about it.

MR. SAHAM: Correct, Your Honor.

THE COURT: If y'all want to make one last quick shot I'm glad to hear it.

MR. SAHAM: My point, Your Honor, I think we made it in this short brief, four on-point Fifth Circuit cases. You can't use the privilege as a sword and a shield. And when you do so by saying there's no documents and eliciting testimony from one of the defendants that lawyers were involved in approving the language, that's prototypical sword and shield, privilege was waived.

There was no lawyer, other than maybe one who's redacted, we've never seen. It wasn't on a privileged log. It was admitted into evidence.

If the court weren't convinced by the sword and shield argument there's no doubt the door was opened in opening argument and questions of Mr. Swiger.

The four cases cited in our brief, I won't repeat them.

THE COURT: You've repeated them several times.

When I repeat like this, here's what my wife does (indicating), "You've already told me that at least twice." So should I do that to y'all?

MR. SAHAM: I've been there with my wife, Your Honor, so -- she has her own signal.

THE COURT: Mr. Wells. Mr. Wells.

MR. WELLS: Your Honor, all of these issues could have been raised during the discovery process.

THE COURT: Okay. I get that argument.

MR. WELLS: There's no use of a sword for somebody to say I worked with a number of people including the lawyers. There was nothing in there about lawyers approved it, nothing in there, in this case, about us trying to take advantage of the legal defense. It didn't happen. It hasn't happened. That document, not on our -- not on our list.

They could -- all these arguments could have been made. There's no sword -- Mr. Swiger -- if -- if there was a document and the lawyer's name was on it and somebody said who was at the meeting, to say the lawyer was at the meeting, that's not waiver. It just doesn't happen. This whole thing was made up. And he just made up what Mr. Swiger said. They

**App. 269**

just keep making things up. We're not arguing about things that actually happened. They're engaged in misrepresentation.

THE COURT: All right. Thank y'all.

I'll let you know in a minute. Okay?

Let the jury know it will be a little longer. Blame it on me, okay. Not on the lawyers.

MR. MELSHEIMER: Your Honor --

THE COURT: No. No argument.

MR. MELSHEIMER: Okay. See, I've self-censored.

THE COURT: Barely.

Sometimes my wife will do that.

(Recess taken at 9:30.)

THE SECURITY OFFICER: All rise.

(Outside the presence of the jury.)

THE COURT: Okay. Here's what I'm going to do. I don't think what Mr. Melsheimer or what Mr. Swiger said waived privilege. I'm just not ready to go that far. And so I'm only going to let you use the document with the portions that are unredacted. You can't show the word "redacted".

But I will include this document they gave me today in the record sealed so if I'm wrong about this and you lose, maybe you only win partially or whatever, if it goes up on appeal they will have it and can rule against me.

MR. SAHAM: If I understand this correctly I can ask Mr. Tillerson about the first page, put the first page on the screen, but not the remaining four pages?

THE COURT: Correct. And you can go back and ask him about the -- you wanted to get -- you can say, look, but we don't have anything from Wayne Tracker prior to duh-duh-duh.

MR. SAHAM: We already asked the Wayne Tracker questions. We don't need to go back over there.

THE COURT: All right. You're not going to go back over something more than once?

MR. SAHAM: Only with Your Honor.

(Laughter)

MR. BURKHOLZ: Your Honor, I don't want Mr. Saham to get in trouble, but you mentioned the word "redacted" can't be shown.

THE COURT: Can't be shown.

MR. BURKHOLZ: It is on the first page.

MR. SAHAM: Well, that's for the other side.

THE COURT: Can't you cover it up with a white sheet of paper?

Mr. Torres is in the restroom.

THE COURT: We can't go on without Mr. Torres.

MR. MELSHEIMER: Your Honor, should Mr. Tillerson take the stand?

THE COURT: Please.

Good morning, Mr. Tillerson. Have you got some water down there?

THE WITNESS: Well-taken care of.

THE COURT: Do you have any documents you want Mr. Tillerson to have?

Well, I'll ask them in a minute when they're not . . .

(Pause.)

Ms. Soloway, Mr. Burkholz, if you will come up here real quick. Mr. Toal. It won't take me but a second.

(Discussion at the bench off the record.)

(Back in open court outside the presence of the jury.)

MR. MELSHEIMER: Your Honor, can we just address one issue in the aim of efficiency?

THE COURT: Yes.

MR. MELSHEIMER: So there's -- so, Your Honor, as the court is aware, there have been newspaper articles that the court has admitted for a limited purpose, and you've told them, you know, not for the truth of the matter asserted, and that's -- that's fine, as to some of them, but we're now getting into some areas where I think that instruction really doesn't do the trick, given what's in the article.

So for -- so, for example, there's -- there's an article from the Houston Chronicle, Plaintiff's Exhibit 762, that talks about Exxon is under investigation by federal and state agencies. That shouldn't be allowed to go in front of the jury at all. And the point of this is we were on notice --

MR. SAHAM: I'm not using that document, Mr. Melsheimer.

MR. MELSHEIMER: Well, you've got it.

MR. SAHAM: I'm not using it.

THE COURT: Okay. Well, stop. Okay. Let's don't argue about something I don't have to --

MR. MELSHEIMER: Okay. So that one, so there's no 762.

And then 761, Your Honor, this is one where -- this is this statement --

MR. SAHAM: Also not using.

MR. MELSHEIMER: Okay. So I didn't just make these up, they were circulated on a list.

THE COURT: You just wanted to talk because you hadn't got to talk this morning. And that's okay. You're a lawyer.

(Laughter)

MR. MELSHEIMER: Okay. No 762.

Okay. 763, 764, 765, and 766, are you using those with Mr. Tillerson?

MR. SAHAM: No.

MR. MELSHEIMER: Okay. Great.

THE COURT: Do you want to say anything else?

MR. LONG: On advice of counsel, no.

THE COURT: With my wife, we have this debate on

**App. 270**

whether she has more words to say than she does.  She does.  And she admits it.  And she wants me to sit down and listen.  I'm not going to compare you to my wife, but I've never met a lawyer that doesn't feel like they needed to say one more thing.  I shouldn't fuss at you about that, because you gave us time back on your opening statement, so I guess I need to cut you a little slack.

Okay?

I'm still reading your book.

MR. MELSHEIMER:  Thank you, Your Honor.

THE COURT:  I didn't see me mentioned in there at all.

MR. MELSHEIMER:  Third edition.

THE COURT:  Third edition.  Okay.

Mr. Saham, are you ready?

MR. SAHAM:  I am, Your Honor.

THE COURT:  All right.  Do we have timing?

Do you have any idea how much longer we'll be with Mr. Tillerson?

MR. SAHAM:  One to two hours would be my guess.

THE COURT:  Okay.  All right.  I'm not trying to limit you, I'm just trying -- and we have another witness ready?

MR. SAHAM:  We do.  Two more.

THE COURT:  Okay.  All right.

---

MR. MELSHEIMER:  Your Honor, just by way of preview, we have a lengthy examination of Mr. Tillerson, depending on how much longer he does.  I don't know if we'll reach another witness today, but it's great that we have one.

THE COURT:  Okay.  That's good.

Good planning.  Appreciate it.

All right.  Y'all -- anybody else need to say anything?

This is your time.

Good.  Good to see y'all back.  I hope you had a good weekend.

All right.  Here we go.

THE SECURITY OFFICER:  All rise for the jury.

(Jury enters the courtroom.)

THE COURT:  Well, I don't have it as cold as I want it, but we're doing okay.  It's 68 in here.  All right.  And there's no wind.  Thank you.

So y'all be seated.  Thank you for being here.  Hope you had a great weekend.  We're going to continue with the cross-examination of Mr. Tillerson, and that's -- that's where we are.  Y'all all got your notes and your pens and everything and water or whatever you need?

Okay.  Here we go.  Mr. Saham.

DIRECT EXAMINATION (Cont.)

BY MR. SAHAM:

Q.   Good morning, Mr. Tillerson.

---

A.   Good morning.

Q.   What does the word "transparency" mean?

A.   Full disclosure.  Everything -- everything to be seen can be seen.

Q.   Okay.  I want to show you what's been admitted into evidence as Plaintiff's Exhibit 91.

And this is a document dated --

MR. SAHAM:  Up at the top if we could blow that up.

BY MR. SAHAM:

Q.   Is dated December 17th, 2015.  And it's discussing a Kearl 2016 SEC pricing process review that was going to occur on January 13th, 2016.  Correct?

A.   That is what it says.

Q.   And January 13th, 2016, was approximately five weeks before the 10-K that we've been talking about was filed, correct?

A.   Correct.

Q.   And approximately six weeks before the bond offering we've been discussing, correct?

A.   Correct.

Q.   And if I call your attention to the middle, where it says -- this appears to be notes from that meeting, it says from this meeting (January 13, 2016).  Are you with me?

And underneath that it says "It was agreed that for transparency and consistency we should include all sales from

---

options 1 through 3 which would give us a better part of the over market as it stands today and is expected to be in the future."

Did I read that correctly?

A.   That is what it says.

MR. SAHAM:  I would like to go to the second page of that document where those three options are listed in the middle of the second page of the document, where there's options 1, 2, 3.

If we could blow that up.

BY MR. SAHAM:

Q.   Option number 1 next to it says 45 percent and it says "Continue to price Kearl at the first market point (Edmonton and Hardisty average)."

Did I read that correctly?

A.   You did.

Q.   And the percentage there is 45 percent, correct?

A.   Yes.  I'm not sure what the 45 percent means, but you have read it correctly.

Q.   Okay.  I think it will come clear when we read the other options.

Option 2 this would go up to 72 percent since "(Option 1 plus U.S. pipeline markets) weight average Canada and U.S. pipeline sale point markets."

So option 1 is talking about sales in Edmonton and it's

PAMELA J.  WILSON, CSR/RMR/CRR

**App. 271**

45 percent of the sales.

Option 2 includes both option 1, the Edmonton sales, plus U.S. pipeline markets, and that gets you from 45 percent of the sales to 72 percent of the sales covered, correct?

A. That's what it says.

Q. And then if we use all three options we get up to 88 percent, a much more fulsome number, option 1 plus option 2, this would also include the rail -- let me just read this.

I'll withdraw that part of the question because it was a poorly phrased question.

But option three reads "(88 percent) (Option 2 plus rail admitted) weight average Canada, U.S. pipeline sale point markets, rail comment."

So it appears that option 3 would include the Canada sales at Edmonton, the U.S. pipeline sales, and the rail sales, correct?

A. That's what it says.

Q. And if we go back to the first page, what we just read from under -- from this meeting January 13th, 2016 --

MR. SAHAM: If we could blow that up.

BY MR. SAHAM:

Q. And that first sentence again it says, "It was agreed that for transparency and consistency we should include all the sales from options 1 through 3," correct?

A. That's what it says.

Q. So to include more sales you would include all sales, more than double the sales, 88 percent of the sales as opposed to 45 percent, correct?

A. That is correct.

Q. And this meeting was held over a month before the 10-K was filed?

A. I think -- can we go back to the -- the earlier email --

Q. Yeah. Let's go to the top.

A. Make sure I'm not getting my dates confused.

Q. January 13, 2016 is the meeting.

A. And the subject is the Kearl 2016 SEC pricing process and review. And the K you're referring to was for 2015. Have I got that right?

Q. Correct?

THE COURT: You said January 13th, is that right?

MR. SAHAM: Yes, Your Honor.

THE COURT: Okay. I want to make sure.

BY MR. SAHAM:

Q. So I just want to make sure, this meeting, where it says -- a little lower where we're talking about the transparency it says from this meeting and then it says January 13th, 2016. Correct?

MR. SAHAM: Let's blow that up again, Michael.

THE WITNESS: Yes.

BY MR. SAHAM:

Q. So we're talking about a meeting that occurred almost a month, six weeks before the 10-K was filed, correct?

A. That's correct.

Q. I want to show you what's previously been marked as Exhibit 15, and --

MR. SAHAM: And has been admitted into evidence, Your Honor.

THE COURT: Okay.

MR. SAHAM: And I'd like to go to page 2 of the document, the second bullet point in the middle under "case for action."

The second bullet point, if we could blow that up, please, Michael.

BY MR. SAHAM:

Q. I think we agreed to this earlier but I want to make sure, Kearl was 3.6 million barrels?

A. That's correct.

Q. And it represented approximately 15 percent of ExxonMobile's total proved reserves?

A. Slightly less than 15 percent.

Q. 13.45 percent, correct?

A. Yes.

Q. And accordingly may be considered material, that amount, correct?

A. That's what this says.

Q. Okay. Do you dispute that 15 perecent of the proved reserves are 14. -- I'll strike that question.

14.57 percent of the company's proved reserves was a material amount of the company's proved reserves, right?

A. It did not rise to the threshold of the SEC cutoff.

Q. You're -- you're familiar with SAB 99, correct?

A. Vaguely.

Q. And that governors what goes in SEC filings, generally, certain SEC filings?

A. Generally.

Q. And that's governed by a 5 percent threshold, correct?

A. Well, 5 percent of what?

Q. Of an item that is being considered for disclosure in the SEC filing.

A. I don't know if that's a financial percentage or -- so I -- I -- I'd just have to say I don't know.

MR. SAHAM: Okay. And I would like to pull up Plaintiff's Exhibit 563 -- we looked at this early, but to go through it one more time.

BY MR. SAHAM:

Q. Kearl was the largest single proved reserve, correct, at 3.6 billion barrels?

A. That is correct.

Q. And if we go to the next page, the first -- the first

PAMELA J. WILSON, CSR/RMR/CRR

**App. 272**

bullet point -- well let's just -- we've already talked about the first one.

Let's look at the second one. Because we've agreed to disagree whether 14.54 or 15 percent is the number, depending on whether you round, but Kearl was 20 percent and we looked at the numbers yesterday -- or on Friday was 20 percent of the proved developed reserves?

A. That's correct.

Q. And the proved developed reserves are the ones the company has subject the money to produce and sell?

A. That's correct.

Q. And if we go to the next page, Kearl was 76 -- I'm sorry, 24 percent of the liquid excluding natural gas that was gaseous form, correct, it was 24 percent of the proved liquid reserves?

A. Correct.

Q. And it was 88 percent of the bitumen, correct?

A. Correct.

Q. And at least according to the email we looked at, Exhibit 15, it said accordingly may be considered material, correct?

A. That's what that email said.

Q. Okay. I want to show you what we were looking at before we broke on Friday. We were looking at Exhibit 732, which had been admitted into evidence by the court.

And we were looking at the third page of the document when we broke, which is a January 11th, 2016 deck, "2016 Term-debt Issuance." And I think I asked you if this related to the bond offering and I believe you said yes.

Is that your recollection that this term-debt issuance would be the $12 billion bond offering?

A. Yes.

Q. Okay. And if we go to page 19 it details one-time costs of the issuance.

MR. SAHAM: If we could blow that up.

BY MR. SAHAM:

Q. And one of the costs for this issuance was payment to credit ratings agencies, correct? And that was about $10 million, correct?

A. That's what it says.

Q. And those credit rating agencies that received the $10 million were S&P and Moody's who both rated the bonds, correct?

A. That's correct.

Q. And Exxon paid them to rate those bonds?

A. Yes, we paid them for their services.

Q. I want to show you what has been agreed to be admitted, it's Exhibit 716, Plaintiff's 716. It's also Defendant's Exhibit 890.

And we'll just go immediately to the second page of the document. These are board minutes. And specifically you would agree with me that these are board minutes from the October 26, 2016 meeting of the Board of Directors, correct?

A. Correct.

Q. And you attended that meeting as the CEO and Chairman of the Board of Directors?

A. That is correct.

MR. SAHAM: And if we turn to page 3 of the document, the second paragraph.

If we could blow That up.

The second paragraph.

BY MR. SAHAM:

Q. Now, there's been a lot of reference to the inspector auditor in this case. You've heard reference to that in this case?

A. Yes.

Q. And Exxon and the Board of Directors here was approving the payment of fees to PwC for 2016?

A. That is correct.

Q. And that was for their services in auditing financials and other work?

A. Yes.

Q. And here you and the Board of Directors preapproved fees for PwC in the amount of $13.4 million, correct?

A. That is correct.

Q. I want to show you what I'm marking as -- or has been marked as Plaintiff's Exhibit 160, which is the proxy that Exxon filed with the SEC on April 14th of 2015.

MR. MELSHEIMER: No objection.

MR. SAHAM: Move for admission, Your Honor.

THE COURT: What's the document number?

MR. SAHAM: 160. 160 is admitted into evidence.

BY MR. SAHAM:

Q. Okay. This is the proxy which is another SEC filing the company makes, correct?

A. That's correct.

Q. And if we turn to page 51 that details your compensation for the years --

THE COURT: Mr. Saham, why don't you tell the jury what a proxy is, make that clear, what proxy means.

BY MR. SAHAM:

Q. Mr. Tillerson, what's a proxy?

A. Well, it's -- it's a document that's produced as part of the annual meeting where shareholders will get the opportunity to vote on certain items. And it contains a lot of information about the corporation.

You're going to see there's compensation information, compensation about the Board. And that is put before the shareholders for their information because there's going to be an annual meeting held later where the shareholders will

**App. 273**

be asked to vote.

Q. And the company takes positions on some of the shareholder proposals?

A. The Board expresses their view on those shareholder proposals, whether they think they're a good idea, they think they're not a good idea.

Q. And as Chairman you get to participate in that recommendation?

A. It's -- it's a Board recommendation, so I participate in those discussions, yes.

Q. Okay. Looking at 51 --

MR. SAHAM: If we could blow up the first line.

BY MR. SAHAM:

Q. Mr. Tillerson, the blue line all the way to the end.

And in -- this -- this document shows your compensation between 2012 and 2014, correct?

A. That is correct.

Q. And in 2012 your compensation was approximately $40.2 million, correct?

A. Well, including stock awards, deferred bonuses, and some other deferred compensation, that is correct.

Q. Okay. And your -- stock awards means you were given Exxon stock, correct?

A. Well, the Exxon stock awards were given in the form of what's called restricted shares, so I'm not actually -- I

don't actually take ownership of the shares. They go into -- think of it a little bit like a trust account. Half of the -- I will be given half of the shares in five years. I'll be given the other half of the shares in ten years or at retirement, whichever is later. So I don't receive those shares for quite a long time.

I do receive the dividend payment from those shares, but I don't own the shares, I don't vote the shares, they're sitting separately.

Q. And you -- you don't have to pay for those shares.

They're awarded to you as --

A. They were -- they were part of my compensation. They were the largest part of my compensation.

Q. And in total, with the shares and cash and other items, your total compensation for 2012 was $40.2 million, correct?

A. Including all those changes you see, which included changes in the -- my pension that I was earning over my entire career, so there were changes to the pension, so, yes, that is the total amount. It's all -- this is so the shareholders know exactly everything I'm receiving.

Q. Okay. And then the next year, 2013, you received $28.1 million in total compensation, correct?

A. That is correct.

Q. And then in 2014 you received 33 million in total compensation, correct?

A. That's correct.

Q. And the retirement age for the CEO at Exxon is -- back in this period was 65, correct?

A. That's correct.

Q. So you were going to -- you were scheduled to retirement in March of 2017 when you reached the age of 65 as that was the company's mandatory retirement age for your position, correct?

A. It would have been March 31st, yes.

Q. And in total for those three years we looked at, 2012 to 2014, you received compensation in excess of $100 million, correct?

A. That's correct.

Q. One more set of questions about the proxy.

MR. SAHAM: If we could go to, please, page 66 of Exhibit 160. These are the shareholder proposals. And if we could blowup the independent chairman proposal.

BY MR. SAHAM:

Q. One -- one of the Exxon shareholders proposed separating -- at this time you were the CEO and the Chairman of the Board, correct?

A. That is correct.

Q. And one of the shareholders believed that was a conflict of interest, correct, because you were basically your own boss as Chairman of the Board and CEO?

A. I think -- yeah, I think that -- that's kind of how they expressed it. I'll accept that.

Q. Okay. And you and the Board voted against that proposal, correct?

A. We recommended a vote against the proposal. The Board doesn't vote on the proposals, the shareholders vote.

Q. But you recommended that the company's position as expressed through the Board of Directors, of which you were the Chairman, is that that separation of those two positions should not occur, correct?

A. That is correct. It was recommended that the shareholders not support the proposal.

Q. Okay. I want to transition now. And I think Mr. Melsheimer is always very good at this so I'm going to adapt his skill in that regard.

Let's transition to the natural gas, the shale, the Rocky Mountain XTO part of the case.

And I'm not going to break it. I'm going to put it down very softly.

MR. SAHAM: I would like to pull up what has been admitted into evidence as Plaintiff's Exhibit 598.

And if we could look at the first -- well, the -- the heading of this article is "King Rex Tillerson's Legacy Rides on XTO Deal."

BY MR. SAHAM:

Q.   That's the -- the -- I guess the -- what do you call it, the headline of this article?

A.   You read it accurately.

Q.   Okay.  And it notes that under your chairmanship as CEO, under your leadership, Exxon purchased or was about to purchase or consummate the purchase of XTO Energy for $31 billion, correct?

A.   That's correct.

Q.   And that deal was closed in June of 2010, correct?

A.   That's my recollection, yes.

Q.   And as part of that deal Exxon acquired a significant number of undeveloped proved reserves that were natural gas; is that fair?

A.   Yes.

Q.   And some of that undeveloped natural gas reserves was located in the Rocky Mountain region of the United States?

A.   That is correct.

Q.   I would like to show you --

     MR. SAHAM:  If you could go down towards the bottom of the first page.  Where it says "for Tillerson".

     If we could blow that one up, that paragraph.

BY MR. SAHAM:

Q.   This states -- I just want to make sure I read this correctly, "For Tillerson, the XTO purchase is a bet that natural gas is the fuel of the future, one that is not just

used for cooking, but to run utility plants and other high volume energy consumers."

     Did I read that correctly?

A.   You did.

Q.   Okay.  And if we could go to -- you agree with me that the purchase for XTO, although the deal was made public in 2009, it didn't finalize until 2010, June of 2010; is that correct?

A.   That was my recollection, yes.

     MR. SAHAM:  Okay.  If we could go to Exhibit 117, page number 6, the chart -- the Henry Hub chart on the bottom left corner.

     And if we could blow that up, please.

BY MR. SAHAM:

Q.   This shows in 2010 when the deal was consummated with XTO natural gas prices were at $4.38, correct?

A.   That's -- that's correct.

Q.   And by the time we got to 2015, at least October of 2015, the price was in the 2.70 range?  $2.70.

A.   Yes.  It's a really nice chart, because it shows that up and down and up and back down again nature of the commodity business of natural gas.  It goes up, goes down, it goes up, goes down.

Q.   And it was up when you bought XTO?

A.   Yes.

Q.   And it was down by the time you got to 2016?

A.   In 2016, correct.

Q.   And it actually went even further down.

     MR. SAHAM:  If we look at Exhibit 216, please.

     THE COURT:  And what do those numbers mean, 2.70, that's --

     MR. SAHAM:  $2.70 per unit.

     THE COURT:  Per what?

BY MR. SAHAM:

Q.   What is the measurement of natural gas?

A.   It's measured in Btus so it's the heating value of the gas.

Q.   So like we say a barrel of oil we say an MMBtu of natural gas?

A.   That's correct.

Q.   That's like a unit of sale or unit of measure?

A.   Yes.

Q.   If we look at Exhibit 216 on the right under U.S. natural gas for the fourth quarter of 2015 -- those are the months of October, November and December, correct?

A.   That's correct.

Q.   And the price of natural gas in the United States for those three months was $1.80 per MMBtu, correct?

A.   That's correct.

Q.   That's about as low as it has gone I think we discussed?

A.   Yes.

Q.   And it actually went a little lower in December, for the current month it was as low as $1.74 for MMBtu?

A.   Yes.

Q.   So this was an example of an extremely low natural gas price, correct?

A.   For those months, that's correct.

     MR. SAHAM:  Okay.  Now I'd like to go to what's been -- I believe this has been admitted into evidence already as Exhibit -- if I'm wrong about that you correct me, please, Mr. Melsheimer.  I'm not sure we've seen this one before.  But it's Exhibit 696.  It's another newspaper article.

     MR. MELSHEIMER:  Your Honor, we don't have an objection with the same instruction about these newspaper articles that the court has previously given.

     THE COURT:  That they're not admitted for the truth but just that this was this author's thoughts?

     MR. MELSHEIMER:  Yes, sir.

     THE COURT:  Okay.  All right.  Then it's admitted for that purpose.

BY MR. SAHAM:

Q.   Okay.  This is a Wall Street Journal article dated December 16, 2009.  It's titled "Gassing Up EXXON'S Tank."

     The last sentence says, "So the 25 percent premium being

offered to XTO Energy's shareholders weighed on Exxon's stock price on Monday."

Did I read that correctly?

A.   Yes, you did.

Q.   When this deal went public Exxon's stock price went down, is that what's being articulated by the Wall Street Journal?

A.   That's what the author is reporting, I believe.

Q.   And he's also reporting that Exxon paid a 25 percent premium for Exxon -- for XTO?

A.   That's correct.

Q.   Okay.  And if we go down to the paragraph directly under the picture it states, "What's more, Exxon is scaling up in a business that looks dreadful right now:  U.S. natural gas. The all-paper offer, valued at $41 billion including assumed net debt, equates to $2.89 per thousand cubic feet equivalent of proven reserves."

Did I read that correctly?

A.   You did.

Q.   Why is the author if you recall describing the purchase as 41 billion instead of 31 billion?

A.   Well, we were -- to make the acquisition of the merger you're buying the value of the company the stock market places on it and they had debt, so when you buy them you're taking on their debit obligations as well, so the two added together actually, $41 billion.

Q.   Okay.  I want to show you what I'm marking as -- or what's been marked as Plaintiff's Exhibit 597.

MR. SAHAM:  I believe this is another newspaper article.

MR. MELSHEIMER:  Your Honor, same -- same statement about -- not offered because it's true.

THE COURT:  All right.  Exhibit 597 is admitted not for the truth of the matter asserted but for whatever this author thought.

BY MR. SAHAM:

Q.   And this is a newspaper article from February 16th, 2011, correct?

A.   Well, I -- I see the date.  I'm not sure what -- I'm not sure what "Current Affairs" is but I see the date.

Q.   Okay.  And the heading of this Current Affairs article is "Exxon is Running Out of Oil," correct?

A.   That is what it says.

Q.   And if we go to page 3, the second paragraph.

"Indeed Exxon's takeover" -- and that states, "Indeed Exxon's takeover of XTO Energy accounted for a whopping 80 percent of the reserves it added in 2010."

Did I read that correctly?

A.   You did.

Q.   And we looked at earlier some of those chairman

review -- review documents that showed that XTO and Kearl were essential to replacing reserves in the 2010 to 2015 period, correct?

A.   In the respective years where they were reported.

Q.   And would you agree with me that for 2010 XTO represented approximately 80 percent of the reserves that were replaced that year?

A.   I don't recall, but I wouldn't dispute it.  I'm sure the author did their homework.

Q.   Okay.  I want to show you what's being marked a Wall Street Journal article, another article, Exhibit 697.  This one is already admitted.

This one is titled "Exxon's XTO deal:  Still Terrible." Dated January 10, 2011, correct?

A.   Yes.

Q.   And the second-to-last paragraph, if we can go there, "In part" -- reads, "In part, Exxon's $36 billion deal for XTO has taken it on the chin from falling natural gas prices, which already were in the doldrums at the time the acquisition was struck."

Did I read that correctly?

A.   You did.  And the date of this again was?

Q.   January 10th, 2011, a Wall Street Journal --

A.   So only six months after the deal was done?

Q.   Well, the deal --

A.   Yeah.  Absolutely.  Yeah.  Six months.

Q.   I want to show you what I'm marking as -- or what's been marked --

THE COURT:  Mr. Saham, I want to correct something, I think, because I -- I kind of recognize that print. Current Affairs is part of Wall Street Journal.

MR. SAHAM:  Thank you, Your Honor.

THE COURT:  It's part of it.

Okay.

BY MR. SAHAM:

Q.   I want to show you what's been marked as Plaintiff's Exhibit 234.

MR. MELSHEIMER:  Your Honor, subject to studying this for anything that's irrelevant, it's an interview with Mr. Tillerson, and I don't want to delay anything, but we'll certainly -- we object to any irrelevant portions that we'll take a look at and raise that with the court, but I don't want to slow down the examination.

THE COURT:  What's --

MR. MELSHEIMER:  It's 234.  Plaintiff's Exhibit 234.

THE COURT:  Is that an objection or no?

MR. MELSHEIMER:  It's a request that we admit it and then we be allowed to look and see if there's anything in there that's not relevant to the issues in this case.  It's a

lengthy interview and I haven't studied it from top to bottom.

THE COURT:  Overruled.  234 is admitted into evidence.

MR. SAHAM:  Can we put that on the screen, Mr. Torres?

BY MR. SAHAM:

Q.   Now, you gave a speech to the Council on Foreign Relations June 27, 2012, correct?

A.   That's what this says, yes.

Q.   Okay.  Do you recall giving speeches to the Council on Foreign Relations?

A.   I think I recall this one, yes.

Q.   Okay.  So you recall giving a speech?

A.   There was a speech and then a -- like a fireside chat. I don't -- I don't remember all the details, but --

Q.   And -- and in the introduction in the second paragraph, second sentence, it says about -- in introducing you, Mr. Tillerson, it says, "He's been in the position for six years" -- referring to CEO, and then it says, "He was responsible for the big move into natural gas, the $30 billion acquisition of XTO Energy in 2009."

That's what -- those are true statements, correct?

A.   Well, that was Mr. Murray's introduction, yes.  You read it correctly.

Q.   Okay.  And then if we turn to page 11 of the document, right in the middle -- and this is in response to a question by Mr. Murray, you state -- and this is talking about natural gas, "It will be supplied at whatever its cost to supply will be.  And what I can tell you is the cost to supply is not $2.50.  We are all losing our shirts today.  You know, we're making no money.  It's all in the red."

You made that statement back in June of 2012, correct?

A.   Could I see the question that was asked?

Q.   Certainly.  I can provide you with --

A.   Just so we've got the context for the answer.  I just didn't see it.

Q.   I can provide you the whole document, Mr. Tillerson.

A.   I don't know if I need to read the entire thing.  I just -- you know, there's a low of a conversation going on here.

Q.   And we can go up as far as you like.

Just let Mr. Torres know and he can --

A.   Like Mr. Murray was making some observations about how the whole American economy was benefiting from the cheap natural gas and asked me if I agreed with that.

I said yes.

You know, we have -- we do have a historic opportunity to rejuvenate and restore American competitiveness because now we have long-term secure stable supplies of natural gas,

which we historically had not had.

And then he says relatively.

And then I made this observation about the current environment, that we are all -- meaning everyone in the industry at that low-price environment was struggling.

Q.   So at 2 -- $2.50 Exxon is losing its shirt on natural gas?

A.   We were talking about the industry broadly.  Mr. Murray wasn't asking me specifically about ExxonMobile.

This was a conversation about -- you know, the Council of Foreign Relations wants to understand the broad picture, so we were talking about the business environment, and so the cost of supply that was referenced there was kind of an application to everybody in the business at that time.  It was a broader -- I was not speaking directly about ExxonMobile.

Q.   But in this time period Exxon wasn't making money in the U.S. when natural gas prices were 2.50 on those assets?

A.   Well, I think we've looked at some other documents in evidence that makes that clear.  I don't recall.  Again, that was not part of this conversation.

Q.   But you said we are all losing our shirts at 2.50?

A.   Yeah, the industry broadly was not doing well.

Q.   And Exxon was a big part of that industry?

A.   Well, we were a participant in the industry, yes.

Q.   Okay.  I want to show you what we're marking as Plaintiff's Exhibit 758, which is another newspaper article.

MR. MELSHEIMER:  Same objection.

THE COURT:  758 is admitted into evidence for a limited purpose.

BY MR. SAHAM:

Q.   And this is a Reuters article dated March 8th, 2008. And the title is "Exxon CEO struggles to reverse Tillerson's legacy of failed bets."  Did I read that correctly?

A.   Yes, you did.

MR. MELSHEIMER:  I'm sorry, Your Honor.  I apologize.  I was looking at a different one.  I have an objection to this on timing.  It's May 2018 so just I would object to the relevance of this from a timing standpoint.  I apologize for not --

THE COURT:  No problem.  This is still a timely objection.  I overrule.  Okay?

BY MR. SAHAM:

Q.   This article is entitled "Exxon CEO struggles to reverse Tillerson's legacy of failed bets."  Correctly -- correct -- did I -- I'm sorry, I'm going to withdraw that.

The article is entitled "Exxon CEO struggles to reverse Tillerson's legacy of failed bets."  Correct?

A.   Well, you read -- you read what's up there correctly.

Q.   And the CEO in March of 2018 was your successor Darren

PAMELA J.  WILSON, CSR/RMR/CRR

**App. 277**

Woods; is that correct?

A.   That is correct.

Q.   And if we go to page 3 of 4 of the article, down towards the bottom.

MR. SAHAM:  Where it says "Others, however," if we could blow up those two paragraphs.

BY MR. SAHAM:

Q.   The Reuters author states, "Other's, however, want more information on Exxon's operations.  Of the world's five largest publicly-traded oil producers, Exxon ranks last for providing detailed data to investors, while BP PLC is the best, according to an analysis of quarterly earnings, regulatory filings by investment Researcher Redburn Limited.

"BP and Shell, for example, offer more than twice as much data as Exxon on each segment of its operations Redburn found.  ExxonMobile's greatest challenge for 2018 might not be its evaluations or growth but opening up to investors said Redburn oil and gas analyst Rob West.

Did I read that correctly?

A.   You did.

Q.   Okay.  I want to show you what's previously been admitted into evidence as Plaintiff's Exhibit 221.

And this is a Management Committee presentation dated October 14th, 2015.

And I'd like to turn your attention to page 2.

And that's a slide deck entitled "2015 Plan & Budget - Upstream Overview.  October 15, 2015," correct?

A.   Correct.

Q.   And if we go to the next page -- the first page of the deck slide -- page 3 of the document, it states "Opportunities for new resources in lower price environment," right?

A.   That's what it says.

Q.   And if we go to the next page of the document it's entitled "Key Plan Objectives"?

A.   Correct.

Q.   And the second plan objective is "Grow net cash flow in a sustained low price environment."

Correct?

A.   Correct.

Q.   Would you agree with me that in October of 2015 the oil and gas industry was in a sustained low-price environment?

A.   Well, we were in a low-price environment in October 2015, I think, making a judgment of whether it was sustained or not, I don't know if we were making that judgment at that time.

This says though that -- because this is plan looking forward.  So this is some guidance that says looking forward, as you've heard others testify, we need to build this business to grow net cash flow in a low-price environment.

We need to be prepared for that.

Q.   Okay.  And if we go to slide -- or page 41 of the document entitled "Business Environment."

The second bullet point says, "Sustained low price environment expected to increase M&A activity as alternatives are exhausted."

Did I read that correctly?

A.   You did.

Q.   So this also under "Business Environment," is referring to the same "sustained low price environment," correct?

A.   Correct.

Q.   Okay.  I want to show you what's been previously marked as Exhibit 219.  And I want to go to page 2.

Do you remember an individual named Matt Smiddy?

A.   I do not.

Q.   Okay.  And he's informing Mr. Swiger in the bottom email here that the November NYMEX was down approximately 6 cents on the day to expire at $2.03 per MBtu, correct?

A.   Correct.

Q.   And if you go up Mr. Swiger forwards the email and says "Paul" -- he forwards it to a gentleman name Paul and says, "lowest November since?"  Correct?

A.   That's what it says.

Q.   And then the response to Mr. Swiger above that says, "This November was the lowest that I can see going back to 2000 (November 2001 was $3.20).  I'll check with the team for pre2000 data."

Did I read that correctly?

A.   You did.

Q.   Does this meet with your recollection that the natural gas prices in November 2015 were the lowest they had been in 15 years?

A.   Well, I have no specific recollection of it, but I know they were bottoming out about that time frame.

Q.   Okay.  And in the same time frame you and the Management Committee lowered what was considered the Exxon long-term outlook for natural gas prices, correct?

A.   That's my recollection.

Q.   And you lowered it by over 20 percent, correct?

A.   I think we looked at some earlier evidence that indicated that.

Q.   Okay.  I want to go to the -- bring up Plaintiff's Exhibit 27, which is the DATAGUIDE.

And what's the DATAGUIDE, Mr. Tillerson, at Exxon?

A.   It's a document that we provide to the -- all the business lines upstream, downstream, chemicals.  It gives them certain assumptions that they're to use in putting together their strategic plans and their budgets for the -- for the future.

Q.   Okay.  If we could go to page 10 of the DATAGUIDE,

extended plan financials, 2020-plus.  Up in the top right.

A.   Correct.

Q.   This indicates that the extended plan financials were lowered from $5.20 in 2014 to $4 in 2015, correct?

A.   That's correct.

Q.   And that's a reduction of over 20 percent, correct?

A.   Yes.

Q.   Okay.  I want to show you what's been admitted into evidence as Plaintiff's Exhibit 51.  And this is a --

MR. SAHAM:  If we could go to the next page of the document

BY MR. SAHAM:

Q.   This is the XTO Asset Recovery Review with PwC 11/11/15 opening talking points for APS and RWT previews.

You would be RWT, correct?

A.   That's correct.

Q.   Okay.  This is a document Mr. Horne or Mr. Rosenthal prepared for you to use with PwC in a meeting with them relating to the 2015 year-end?

A.   I believe it was, yes.

Q.   Okay.  If we look at the second bullet point it states -- under "Why We're Here" the second bullet point says "When 10-Ks are issued for 2015 we will likely be one of the few companies in our industry that will not have taken an impairment write-down - Chevron noted in their 2Q 10-Q an

impairment due to revision of long-term crude price outlook."

Did I read that correctly?

A.   You did.

Q.   And we had just looked at in the DATAGUIDE Exxon had revised its long-term natural gas price outlook around the same time frame, correct?

A.   That's correct.

Q.   And then if we drop down to the bullet point that's two above, how the meeting will unfold, it says "(be prepared to answer the question:  So has a trigger event occurred?  Answer:  By virtue of the reduction in EM's long-term U.S. natural gas price outlook, would be difficult to argue to SEC that one has not occurred).

Did I read that correctly?

A.   You did.

Q.   That's referring from the long-term reduction from $5.20 to $4?

A.   I believe it is.

Q.   And you did meet with PwC at year-end, correct?

A.   I meet with the lead auditor, yes.

Q.   And who was the lead auditor?

A.   I cannot recall his name.

Q.   Was it a gentleman named Mr. O'Riordan?

A.   Sounds correct, but --

Q.   Okay.  And when you met with PwC at year-end with

respect to Kearl and XTO you only emphasized results through June of 2015, correct?

A.   Well, I was -- if I met with them in November, December, we would have talked about everything up to that point.

Q.   Well, I want to show you what's been previously marked as Exhibit 65.

And if you could turn to page 65 of Exhibit 65.

65 of 65.  There we go.  This is labeled "Addendum C, 2015 Upstream Recoverability Review North America x-XTO.  See attached.  Reviewed with PwC December, 2015."

Did I read that correctly?

A.   Yes.

Q.   And if we turn to page number 70 -- five pages into this appendix -- we have a profitability history - upstream producing assets.  And it has the -- the top line says "1H15," correct?  Does that mean first half of 2015?

A.   Yes.

Q.   And then if we go down to XTO United States it shows $630 million loss, correct?

A.   That's correct.

Q.   And for the year, I think we saw on Exhibit 2016, the loss of XTO was $1.3 billion, correct?

A.   I believe that's correct.

Q.   And here you're only sharing with PwC -- even though it's December, you only have the losses through the first

half of the year, correct?

A.   Well, that's what this document says.  I don't believe I was in this meeting, so I'm not sure what all was shared with PwC in that meeting.

Q.   Okay.  Well, you did receive -- if we go to Exhibit 75 -- you had -- you had received that chart, correct?

I believe you testified to that earlier, that that information was communicated to you, correct?

A.   I think I had seen that chart before --

Q.   Yes.

A.   -- I'm just not sure in what format or context.

MR. SAHAM:  If we go to page 75 of Exhibit 65.  And blow that up, please.

BY MR. SAHAM:

Q.   This is entitled, "Canada West - June year-to-date 2010 profitability."

Correct?

A.   That's correct.

Q.   And we saw that Kearl lost $162 million the first half of the year, cash profit, correct?

A.   Correct.

Q.   $8.11 negative?

A.   Correct.

Q.   And for book profit was negative 9.37 per barrel, correct?

PAMELA J.  WILSON,  CSR/RMR/CRR

**App. 279**

A. Correct.

Q. Over $187 million loss, correct?

A. Correct.

Q. And those losses we observed in Exhibit 564, we could go back to it again, those losses increased in the second half of the year, correct?

A. Correct.

Q. Do you have any understanding why this December review with PwC only included the first half of the year?

A. I do not.

Q. I want to show you what's previously been marked as Plaintiff's Exhibit 228.

MR. SAHAM: It's been admitted into evidence, Your Honor.

THE COURT: Okay.

BY MR. SAHAM:

Q. And page 2 reveals what this is. It's a March 28th, 2016 -- 2016 plan gas business environment with your CFO, Mr. Swiger.

And if we turn to page 11 of the document.

The black line.

MR. SAHAM: If we can just blow up the top left.

BY MR. SAHAM:

Q. The black line is the plan that was in effect for 2015, the 2015 financial case with the maximum of $4 -- the maximum

price, correct?

A. That's correct.

Q. And it was used for the company's impairment analysis at year-end 2015, correct?

A. As well as investment decisions, correct.

Q. Did you -- well -- and the green line is the 2 -- 2016 financial base case, correct?

A. That's correct.

Q. And this was in existence obviously before March 28th, as it's being presented to Mr. Swiger on March 28th, 2016, correct?

A. It would have been.

Q. And it is -- the -- the base case for 2016 is quite a bit lower than the financial case for 2015, correct?

A. Correct.

Q. And if you did a 30-year cash flow analysis it would generate less or lower cash flows than the black line, correct?

A. It would.

Q. And below that is the strip pricing, correct?

A. Yes. Let me -- let me add a little bit to that last answer I gave you. On the revenue side of the calculation this would generate less, but I don't know what the cost curve would look like that would go with this lower price environment. So both of them are going to move when you get

into a lower price environment.

So I don't know -- it -- it's incomplete to say -- for me to say yes to your question, other than generally yes. But I don't know by how much, because costs would be lower, too.

Q. Okay. But price is one of the crucial assumptions in a cash flow analysis, correct?

A. Well, you can't calculate it without it.

Q. So it would be crucial, correct?

A. Yes.

Q. And the green line would generate less cash than the black line, correct?

A. It would generate less revenue.

Q. And, in fact, when the green line was used in 2016 an impairment was found, correct?

A. Say that again.

Q. In 2016 year-end an impairment analysis was done using the green line and an impairment was found, correct?

A. Once -- once -- once that calculation was made toward the end of the year, that's correct.

Q. But this green line was in existence as of March 2016, correct?

A. That's correct.

Q. Less than a month after the IPO, correct?

A. Correct.

Q. Three weeks after the bond offering, correct?

A. Correct.

Q. And the blue line at the bottom is labeled the Henry Hub futures as of March 21st, 2016, correct?

A. That's correct.

Q. And, again, this is futures -- futures contracts as of March 21st, 2016, correct?

A. Correct.

Q. And that's about --

MR. MELSHEIMER: Your Honor, you said -- I think he misspoke, he said after the IPO and I think he meant after the 10-K. I just wanted the record to be clear.

THE COURT: Was it after the 10-K or after the --

THE WITNESS: What IPO were you referring to?

MR. SAHAM: If I said IPO it was a mistake.

THE WITNESS: Okay.

BY MR. SAHAM:

Q. It was -- the green line -- let's go back to the blue line.

The blue line -- on March 21st, 2016, this is about three weeks after the $12 billion bond offering was closed, correct

A. That's correct.

Q. And about four weeks -- less than four weeks after the 10-K for 2015 was filed, correct?

A.    Correct.

Q.    And it's the Henry Hub futures as of March 21st, 2016, correct?

A.    Correct.

MR. SAHAM:  And if we could go to the bottom right of the document.  The financial cases.  And blow that up.

BY MR. SAHAM:

Q.    Now, this is articulating what's in the graph but numerically, correct?

A.    That's correct.

Q.    And it shows -- there's a couple of differences between the 2015 case and the 2016 case.  One of 'em we discussed is the maximum or long-term price, which was reduced from $4 to 3.50, correct?

A.    That's correct.

Q.    And the other difference is how quickly you get to that long-term price, correct?

A.    Are you looking at the '16 Henry Hub line again.

Q.    Yeah.  So in '16 you wouldn't reach the maximum price of $3.50 until 2025, correct?

A.    Okay.  Yes.

Q.    And in '15 you were going to reach the maximum price of $4 five years more likely by 2020, correct?

A.    Yes.  Different price outlook.

Q.    But it would also generate more cash flows by reaching the maximum price more quickly, correct?

A.    It would generate more revenue.

Q.    Okay.  More revenue.  Okay.  That's fair enough.

I would like to show you what we're marking as -- well, skip that document.

I want to show you what I'm marking as Plaintiff's Exhibit 527.

MR. MELSHEIMER:  Your Honor, we -- we object to 527.  And we may need to take this up, if the court wants to hear about it.

THE COURT:  Just a second.

MR. SAHAM:  And our response, Your Honor, is this is a clear business record.  It went to the treasurer of the company.  We -- we offered to call Mr. Schleckser first so not to have to re-call Mr. Tillerson.  He's a witness that will be called in this case.

There is also a stipulation about authenticity and the business record foundation to the extent plaintiffs are relying on documents produced by Exxon.  And this is clearly a business record.

MR. MELSHEIMER:  Your Honor, this is dated March 2017, which is after Mr. Tillerson is gone from the -- from the company.  And so we -- we object that it's not something he would have seen.

THE COURT:  Let me stop you.

Y'all take break.

Don't talk about the case.

(Jury exits the courtroom.)

(Outside the presence of the jury.)

THE COURT:  Okay.  The jury is now out.  Okay.

MR. MELSHEIMER:  This is a document that --

THE COURT:  He's already gone.

MR. MELSHEIMER:  He's already gone.  What it is, it's some kind of a --

THE COURT:  Looks like a report from somebody called the administrative group.  I don't know what that is.

MR. MELSHEIMER:  Yeah.  It's a group that -- what they did, Your Honor, as I understand it, is they gathered a bunch of people together and sort of got reviews -- asked them questions about how things could -- what their feedback is about different things.

THE COURT:  Looks like it's only about upstream.

MR. MELSHEIMER:  But, Your Honor, again, it's something -- the main point of this is -- let me tell you what's going on here.

They know he's not the person to ask about this.  This is a document when he was Secretary of State of the United States.  Okay.  So they -- they were going to call a -- a witness to talk about it, Mr. Schleckser,

THE COURT:  Are you not going to call Mr. Schleckser?

MR. MELSHEIMER:  You've now decided not to call him?

MR. SAHAM:  Untrue.  We offered to call Mr. Schleckser so we wouldn't have to re-call Mr. Tillerson and Mr. Thomas rejected our proposal, even though he's on their witness list and we reserved the right to call every witness on their witness list.

Judge, this is a business record.

THE COURT:  I'm not arguing with you about it.  I'm just asking you want to get this in through him and fully go into it through him?

MR. SAHAM:  Well, Your Honor, it's about him.  They get 32 employees in a room and talk about how they can improve the upstream business.

MR. MELSHEIMER:  Your Honor --

THE COURT:  When I leave the bench somebody is going to be doing that about me, probably the Fifth Circuit and all you lawyers.  My jokes won't be funny anymore.  I get all that.  He's gone.

MR. SAHAM:  Well, Your Honor, they have gone into with each witness, and I assume they're going to do this with Mr. Tillerson, married for 47 years, Eagle Scout and --

THE COURT:  Stop that.  I'm sure all that is true, and that he had cutting horses.  Okay.  I get that.  But, I

mean, I don't really understand.  He -- he wasn't privy to this.  I mean, what are you going to say, well, after you left they did a bunch of different stuff?

MR. SAHAM:  No.  No.  No.  It's employees looking back at how the company could improve under the new CEO versus how the business was run under the old CEO and you'll see some of the comments are highly prejudicial.

THE COURT:  Okay.  It's not really him.  Why don't you call somebody who is after that?

MR. SAHAM:  Yes, Your Honor, we will.  We'll call Mr. Schleckser.

THE COURT:  Then call Mr. Schleckser.

MR. SAHAM:  But we want to ask Mr. Schleckser about some of the remarks because they're very pertinent of what went on in this case.

MR. MELSHEIMER:  Your Honor, so a couple of things just to be clear.  So this fellow Schleckser is not on their witness list.

THE COURT:  He's on yours.

MR. SAHAM:  And we reserved --

MR. MELSHEIMER:  They did not reserve the right in their --

THE COURT:  Well, if he's on yours they can call him.  I'm not going to get into that.

MR. MELSHEIMER:  Okay.  I guess what I would say,

Your Honor, is, again --

THE COURT:  All right.  You don't have to say anything.  I know what you're going to say because I'm the Great Carnac and I kind of know what you're going to say.  I'm kidding.

But really I think your objection is he's not the guy --

MR. MELSHEIMER:  Correct.

THE COURT:  -- Schleckser is the guy.

MR. MELSHEIMER:  Correct.

THE COURT:  It's not that hard to know what you were going to say.

I'm going to let you cross-examine him, but only about that part about they said this about you, you know, and give him a chance to respond about it.

MR. SAHAM:  That's all I'm going to do, Your Honor.

THE COURT:  Are you sure you want to do that?

MR. SAHAM:  If it's okay with Your Honor, I do.

THE COURT:  Oh, it's okay with me.

MR. SAHAM:  Then we'll put --

THE COURT:  Then you'll put Schleckser in.

MR. SAHAM:  And put it in him through him.

THE COURT:  All right.  I'm going to let this come in.  He's not really the right person to really offer this under that.

I'm assume he's on the list.  Not -- we don't know if

he's going to object or not, right?

MR. SAHAM:  They objected --

THE COURT:  You did object.

MR. MELSHEIMER:  Your Honor -- Your Honor, there is a very strong 403 objection to the contents of this exhibit.  So it is then he's not the right person to talk about it.  So that's true.

It's also true that there's a lot of material in here that is far more unfairly prejudicial than probative -- probative to the issues in this case.

THE COURT:  Well, it's a -- it's a fairly lengthy document.  I'm not going to go through and pick all that out.

MR. MELSHEIMER:  There's nothing in here, Your Honor, to do with Kearl or the R&DG assets.  This is a group of people they gather to kind of do like a Yelp review.

THE COURT:  Like what?

MR. MELSHEIMER:  A review of, hey, what can we do, what -- you know, what's your opinion of this, what's your opinion of that.  It's not relevant to any of the issues in this case.  And we have a serious 403 objection.

But without regard to that, you understand my other objection --

THE COURT:  I do.  I'm still going to let him be the one to let it in because it will save time.  Because it's going to come in through Schleckser.

MR. MELSHEIMER:  Your Honor, might I --

THE COURT:  Now, there may be parts of it you want to keep out that I don't know about.  I don't know.

MR. MELSHEIMER:  So, Your Honor, might we address that and show the court some specific things that should be kept out in an effort to try to convince you --

THE COURT:  Yes.  But I've thumbed through it and it's just -- it's just a whole bunch of secondguessing.  That's what it is.  And happens all the time in business.  Happens all the time everywhere.  Happens among y'all.  I mean, that's just what it is.

Okay.

MR. MELSHEIMER:  Correct, Your Honor, but that doesn't mean that every piece of it should come in as not being -- as not being probative enough to overcome its prejudice.

THE COURT:  I don't agree with that.  I think that it's probative and I don't think it's that prejudicial.

I mean, mercy, he -- Mr. Tillerson made decisions based upon his expertise at the time and what he thought and what he saw in a very volatile world of oil and gas.  Everybody, including the jury, is going to know that's a volatile world, I mean, it just is.  A lot of businesses are.

And the fact that people secondguess him, that's okay.  I mean, he -- he knew that.  I mean, when he took the job he

knew that somebody was going to secondguess him as soon as he left.  Mercy, they left Irving.  If he was -- if he was still the CEO we'd be in Irving.  I'm betting.  I don't know that.  There's a lot of decisions they made differently to go back to Houston because Houston is where 90 percent of all the oil and gas stuff is.  I get it.  I just think he can answer it and he'll be fine.

MR. MELSHEIMER:  Your Honor, thank you, and I -- I understand that, but I guess my -- my question remains:  what is probative to the issues this jury has to decide about reviews done in March of 2017 --

THE COURT:  Well, it's probative to show maybe he was wrong.

MR. MELSHEIMER:  But whether he's wrong or right, we know that's not an issue in the case, since it has to be -- his intent has to have been deliberate.

THE COURT:  No, it has to do with the decisions he made on Kearl and the decisions he made on Rocky Mountain and XTO, and that's okay.  I think that's okay.

MR. MELSHEIMER:  But there's nothing in here about any of those discussions, Your Honor.  I'm not trying to argue with the court but there is literally nothing in here about those issues.

THE COURT:  Well, what is there about Kearl and -- and Rocky Mountain?

MR. SAHAM:  Your Honor, it's about the decision-making process and how those decisions were made, key decisions at the company in the prior years.

THE COURT:  It mentions Kearl and it mentions --

MR. SAHAM:  No.  No, it doesn't mention any particular item by name.  It's how decisions were made, how information was presented up --

THE COURT:  So I'm reading your mind and Carnac comes back, and that he was on autocrat and he did it all on his own without enough other advice.  Yes or no?

MR. SAHAM:  Something along those lines, Your Honor.

THE COURT:  Oh.  Okay.  Shocked, I got it right.  I think that's an appropriate kind of cross to go into that.

MR. MELSHEIMER:  One more point on a separate issue, Your Honor?  This is not my discussion, but I am -- I would -- the court -- I need to gently correct the court --

THE COURT:  That won't be the first time.  You don't need to do it gently.  I'd rather you do it much -- firmly.

MR. MELSHEIMER:  Your Honor, you said that Current Affairs was from the Wall Street Journal --

THE COURT:  It is.

MR. MELSHEIMER:  -- and, in fact, that exhibit that was shown was not from the Wall Street Journal.

THE COURT:  It was.

MR. MELSHEIMER:  It's from an environmental activist group website.

THE COURT:  No it wasn't.  I can look at the print and tell the difference.  You show that to me and I'll correct it.

Current Affairs is part of the Wall Street Journal.  It may have been those people aggravating about it and the Wall Street Journal reporting about those, but I'll guarantee you -- I can't guarantee it.  I'm not going to go that far.  I'm not going to make that -- but I'm pretty sure that it's a Wall Street Journal -- you know, it's like the newspapers have a thing on home, another one on sports, another one.  Current Affairs is a section of Wall Street Journal.  It just -- it just is.  I read the Wall Street Journal, not all the time, but enough to know.  And the print is identical.

MR. MELSHEIMER:  Your Honor, can we just maybe take -- I think I can prove to you that the court may belaboring under a misimpression as to this exhibit.  I don't want to take up the court's time.

THE COURT:  Okay.  You can tell me that later.  And if I'm wrong, I'll tell you.

MR. SAHAM:  Your Honor, could we use the restroom?

THE COURT:  No.

(Laughter)

Yes.

(Recess taken at 11:00.)

(Proceedings resumed at 11:19.)

(Outside the presence of the jury.)

MR. MELSHEIMER:  Your Honor, may I just put on the record the objections to 527?

THE COURT:  Sure.  More objections you mean?

MR. MELSHEIMER:  I want to make sure I said them out loud on the record, which is 403, unfairly prejudicial and more than probative.

Also it's hearsay, hearsay within hearsay.  Even if it were a "business record" of Exxon there's a bunch of anonymous quotes and things in there that are on their face hearsay within hearsay.  We don't know who those people are that made those remarks, so there's no way to cross-examine anyone about what they thought.  It's littered with that.

And, frankly, that's the main reason they want it in, for those comments, so unfairly prejudicial, outweighs probative value, hearsay, and multiple -- hearsay within hearsay, and overall relevance given the timing.

THE COURT:  Okay.  Overruled.  I'm going to admit that.  Let me say, it's a business record.  I mean, you don't

PAMELA J.  WILSON, CSR/RMR/CRR

**App. 283**

object that we don't have the actual person down here from Exxon and that -- you're not making that objection, are you?

MR. MELSHEIMER:  I'm not making that objection at all, Your Honor.  I think that the problem is, as the court is well aware, just because it's a business record that doesn't obviate the need to look at what's in there.  And there's a lot of hearsay in that business record that is not cured by the business record proof, that's all I'm saying.

And I would also add, as my good friend Mr. Wells points out --

THE COURT:  I like the way y'all refer to each other as "my good friend," you sound like the Senator, "My good friend on the other side" I'm going to say all these ugly things about, except he's on your side.

MR. MELSHEIMER:  I'm glad to have him, judge.  My good friend, not just my friend.  That's what I would say to the other side, my friend.  My good friend.

Your Honor, also this isn't something that Exxon regularly prepares.  It's a consultant that's brought in to do the survey.  So I think there's questions about its status as an 803 business record.

THE COURT:  You don't think it's a business record?

MR. MELSHEIMER:  I'm not sure that it is, Your Honor, because of the nature of the way it was prepared.  It is not in our ordinary course to -- to do things like this.

But the main objection I have is that it's hearsay and that it's overly prejudicial and outweighs the probative value.

THE COURT:  Overruled.  Overruled.  Let me say it one more time.  Overruled.

MR. MELSHEIMER:  Your Honor, are you overruling it?

THE COURT:  Yes.  Even with the support of your good friend.  Okay?

MR. MELSHEIMER:  He's stout.

THE COURT:  Now, I don't know that I ruled this morning and gave you a good record on what you had filed on your motion -- on the motions you filed over the weekend about the curative instruction and that sort of thing.  I meant to say I denied it.  Okay?

MR. SAHAM:  Okay.

THE COURT:  So you've got a record on that.

MR. SAHAM:  I assume that's without prejudice to bringing it up in the charge conferences, correct?

THE COURT:  Oh, sure.

MR. SAHAM:  Because there are instructions.

THE COURT:  Yes.  Of course.  You can bring whatever you want.

And I'll correct about it wasn't the Wall Street Journal, that it was Mad Magazine, or whatever the article was, written by -- what was that guy's name used to be in Mad

Magazine?  I loved him.  Alfred E. Neuman.  Might have written it.  No, he didn't write that article.  But whoever wrote it.

But I will correct it that I was wrong.  Okay?

MR. MELSHEIMER:  Your Honor, I wouldn't go that far

MR. KENDALL:  What, me worry?

THE COURT:  Off the record.

(Discussion off the record in open court.)

(Back in open court.)

THE COURT:  All right.  Bring 'em in.

(Jury enters the courtroom at 11:24.)

THE SECURITY OFFICER:  All rise for the jury.

THE COURT:  All right.  Thank y'all.

Y'all be seated.

Ladies and gentlemen, I need to correct something.  I was very sure of that article being a Wall Street Journal.  I can barely get these words out of my mouth:  I was wrong.  It was out of some other article.

And you see those smiling faces over there, rubbing it -- no, they didn't rub it in.  Anyway, I was wrong.  I forgot what article it was -- what was it?

It was a -- Do we even know?

MR. SAHAM:  Current Affairs.

THE COURT:  Anyway, it wasn't the Wall Street Journal, it was somebody else.

Okay.  Here we go.

DIRECT EXAMINATION (Cont.)

BY MR. SAHAM:

Q.  Mr. Tillerson, you left the company at the end of 2015, beginning of 2016?

A.  I left December 31st, 2016.

Q.  And you were succeeded as CEO by Mr. Woods; is that fair to say?

A.  That's correct.

Q.  And both when you were at the company and immediately thereafter Mr. Robert Schleckser was the treasurer of the company; is that correct?

A.  I believe so.

Q.  And Emma Cochrane was the Vice President of Upstream Strategic Planning, correct?

A.  Could be.

Q.  Do you remember Ms. Cochrane?

A.  I do.  I just don't remember the exact position she was operating in when I retired.

Q.  But she worked in the upstream?

A.  That's correct.

MR. SAHAM:  Okay.  And if we could pull up what's been marked and admitted into evidence as Plaintiff's Exhibit 527.

If we could go to page 3.

This document - going to page 3 - is an Upstream Portfolio Metrics & Insight Workshop (sic).

If we go to page 4 of the document --

THE WITNESS: Do you have that document available for me?

MR. SAHAM: Oh, yes, sir.

There you go.

THE WITNESS: Thank you.

BY MR. SAHAM:

Q. If we go page 4 of the document -- and, again, take as much time as you want to review the document.

But the objectives --

A. You're going to have to give me a few minutes.

Q. Okay.

A. I've not seen this.

It's new to me.

Q. Please look through it.

A. I apologize. It might take a while. It's a pretty thick document.

(Pause.)

THE COURT: It's my fault, folks. I should have given this to Mr. Tillerson earlier, so he has every -- should have every right to look at it.

BY MR. SAHAM:

Q. Mr. Tillerson --

MR. SAHAM: If we could get page 3.

BY MR. SAHAM:

Q. I think this describes what this document is. It's the "Upstream Portfolio Metrics & Insights Workout, Edited for Upstream Endorsement Meeting, March 3, 2017."

The next page, "Review Objectives.

"Share process and insights from the Design Thinking Portfolio Workout.

"Facilitate a framing discussion on ideas and next steps.

And "solicit input and direction."

There were I believe 32 employees that were invited to this meeting and they provided certain comments to the upstream management.

If we go to page 51 it describes the people who were in the room. It says, "You're in this room because you have a breadth of experience. You've come from across the corporation. You're highly respected in the areas that you've worked, and you think differently."

"Emma Cochrane, Vice President Upstream Strategic Planning."

And then there is commentary from various individuals who worked for you at Exxon.

And I ask you to turn to page 59, "Top 5 Learning by Vote."

And these are some of the top five comments that these folks voted on.

At the far left, starting there, there's a comment, "Afraid to fail."

"Too much concern about failure, as opposed to doing the right thing."

That's what it says, correct?

A. You read it accurately.

Q. And then if we go up to the top of the middle of the document it says, "Anticipate what boss wants." Correct?

A. That's what it says.

Q. And then it says, "Based on a pointer deck, not open discussion." Correct?

A. That's what it says.

Q. And then it says, "Decision by committee no frank real discussion." 27 votes. Correct?

A. That's what it says.

Q. And then when we looked at too much concern about failure as opposed to doing the right thing, that had 16 votes, correct?

A. That's what it says.

Q. Okay. If we go to the far right where there's 12 votes for "Arrogant/underestimate competitors/governments, et cetera" -- Correct?

A. That's what it says.

Q. If we go to page 63 under the heading "Risk aversion, Fear of failure," up at the top right under "Afraid to fail" there's a quote, "Managers in this company do not get rewarded for rocking the boat." Correct?

A. That's what's it says.

Q. If we go down to the bottom of that column it says "We really shy away from doing anything on paper that shows in hindsight that we made a bad decision."

That's what it says, correct?

A. That's what it says.

Q. Okay. And if we go to page 65, couple of pages on, about optionality, maintaining flexibility, in the middle of the page it says "Due to fear of missing out and pride, assets are often held until it is too late to divest or repurpose." Did I read that correctly?

A. That's what you read.

Q. And then on the right it says, "We never kill things. We have keep working it." Is that what it says?

A. That's what it says.

Q. Okay. And if we go to page 69, the heading of that is "Executive bias. Getting to a yes". Correct?

A. Yes.

Q. And if we look at "Selected Notes & Quotes" on the right, the third one says, "Catering to the preference of contact executives leads to a Tailoring of sorts." That's

what it says, correct?

A.   That's what it says.

Q.   And then if we drop down two more bullet points it says "Upward reviews biased towards what is expected upwards."

Did I read that correctly?

A.   You read it correctly.

Q.   And then the last comment at the bottom says, "Too hierarchical - miss input - delivery what 'the boss' wants - all input not in Dallas!"  That's what it says, correct?

A.   That's what it says.

Q.   And during 2015 and 2016 you were the boss at Exxon, correct?

A.   Yes, I was.

Q.   And back in August of 2015 you made a public statement, "We don't do write-downs."  Is that correct?

A.   That's correct.

MR. SAHAM:  I will pass the witness, Your Honor.

THE COURT:  Okay.

MR. MELSHEIMER:  May it please the court.

THE COURT:  Yes.

CROSS EXAMINATION

BY MR. MELSHEIMER:

Q.   Mr. Tillerson, we'll come back to this, but just in your quick review of Exhibit -- Plaintiff's Exhibit 527, that have anything to do with the 2015 10-K?

A.   No.

Q.   Or anything to do with the process for creating that document?

A.   No.

Q.   Does this appear to be a document about investments the company was making and whether or not they were aggressive enough or too conservative?

MR. SAHAM:  Objection, leading.

THE COURT:  Overruled.

BY MR. MELSHEIMER:

Q.   It's overruled.

A.   Yes, it does.  And it also seems to be something that pertains to the upstream only.

Q.   All right.  We'll come back to this.

Mr. Tillerson, you've been testifying for several hours over a couple of days, I want to ask you something directly.

Did you take part in any kind of plan to cheat Exxon's investors?

A.   Absolutely not.

Q.   The plaintiffs are claiming that you lied to investors and didn't look out for them, what do you say to that?

A.   That is untrue.

Q.   Did you ever communicate to anyone at Exxon to manipulate the company's financial statements, its reserves calculations, or its impairment analysis?

A.   No, I did not.

Q.   Did you ever tell or say to any ExxonMobile employee that Kearl must qualify as proved reserves at the end of 2015 no matter what the numbers show?

A.   No, I did not.

Q.   Did you ever communicate to anyone that the Rocky Mountain dry gas assets will not be written down or impaired no matter what the data shows?

A.   I did not.

Q.   When the 10 -- 2015 Form 10-K was filed, did you personally believe any statement in there was false or misleading?

A.   No.

Q.   Can you give us an estimate of how many people you think worked on that 2015 10-K?

A.   It would have been in excess of a hundred, possibly hundreds.

Q.   Did -- did you ever push any of those people to reach a certain result?

A.   No.

Q.   Did you personally perform any of the calculations behind the numbers in the 10-K?

A.   No, I did not.

Q.   If you didn't do those calculations yourself, how were you comfortable signing it?

A.   Well, as you've heard, I had a 41-and-a-half-year career with the company, so I had come up from the bottom.  And at various assignments along the way you get some -- I'm one of those people that kind of tangentially touches the documents.  So I understood the processes that were in place, I understood the people, and I had great confidence in the process, as long as we follow the process I had great confidence in the competencies and expertise in the people, many of the key ones along the way whom I knew, and it's with that confidence, and confidence in their honesty and integrity, that I could easily sign-off on that 10-K.

Q.   Do you still stand by those people today?

A.   I certainly do.

Q.   Do you believe they got it right?

A.   I do.

Q.   All right.  Mr. Tillerson, I want to back up a little bit.  We haven't had a chance to hear much about you.  Where'd you grow up?

A.   I was born in Wichita Falls, Texas.

And we moved to Vernon when I was -- Vernon, Texas, a little bitty town up the river when I was 6.

THen when I was 10 we moved to Stillwater, Oklahoma.

THE COURT:  I got to interrupt you.

Other than you, who's the most famous - most famous, I don't know how to say this - live being that ever came out of

Vernon, Texas, or nearby?

THE WITNESS:  I don't know that I'm one of -- one of them, so . . .

THE COURT:  Other than you.  And it was on the Waggoner Ranch.

THE WITNESS:  Well, there was a horse -- you want live being or human?

THE COURT:  I said live being.

THE WITNESS:  There was a horse named Poco Bueno.

THE COURT:  Okay.  That's it.  That's it.  I had to do that, ladies and gentlemen.  My dad was obsessed with Poco Bueno.  And he is buried standing up near Vernon, Texas at the gate of the Waggoner Ranch.  As a little boy, I got to pet that horse a million times.  Not a million.  A bunch.  My dad always wanted to have a colt out of that horse.  We never got one, 'cause we'd save the money up and he'd say, Ed, don't raise your hand at this sale, we'll wind up spending $10,000 and I don't have it.  And we just never had quite enough money to get it.

But what I remember most is that was is that was the most famous Quarter Horse ever in the history of Quarter Horses and he won the -- the Furturity in New Mexico I think faster than any horse ever.  But, anyway, so I -- I remember that.

And that ranch, really big, if you ever drive out there.

I think it's recently, in the last few years, the family all got crossways, shock and -- over money and property, and it sold.

THE WITNESS:  It sold about -- about four or five years ago.  It was about a half a million acre ranch.  And a fellow named Kroenke bought it, who is now the largest landowner in the United States, private landowner in the United States.

THE COURT:  There you go.  It was not a federal judge that bought it.

Go ahead.

BY MR. MELSHEIMER:

Q.    What did your dad do for a living?

A.    My dad got home from the war in the Pacific, he married my mom, and He sold bread from a bread truck to grocery stores and restaurants around town.  He did that for about ten years.  And then he was recruited and became a professional -- paid professional with the Boy Scouts of America.  And that's when we began to move around.  And he spent 28 years with them.

Q.    Did you work when you were growing up as a boy?

A.    I did.

Q.    What kind of jobs did you have when you were growing up?

A.    Well, I -- when I was 10-years-old I started mowing lawns for $2 a lawn with our push lawnmower.  When I was 12 I went into the Oklahoma State University there in Stillwater to apply for a job because I heard they had jobs.  And the gentleman told me, well, how old are you.  I said I'm 12.  He said, well, I can't hire you, here's some paperwork, when you turn 13 come back and see me.  I went home, my parents got out the paperwork, and when I turned 13 we mailed it into the State of Oklahoma.  They had child labor laws, so you had to get a permit to go to work on a regular basis and they restricted your hours to 15 hours a week.

So I went back to see this gentleman.  I said, here's my paperwork.  And he hired me to be a busboy and a dishwasher at the student union for 75 cents an hour.  When I turned 16 I learned that janitors make a dollar an hour.  So I went back to sigh the same gentleman.  I said, I understand janitors make a dollar an hour.  He said, that's right.  And I said, well, I'd like to be a janitor.  So he hired me to be a janitor at one of the engineering buildings.  And that was actually the first time I ever came in contact with engineers, is when I was sweeping floors and running one of those big buffers, judge, that you were talking about.

THE COURT:  Well, we're going to have a competition.

THE WITNESS:  We're going to have a three-way race now, because I spent a lot of time on the other end of a buffer when I had that job.

BY MR. MELSHEIMER:

Q.    Do you still have that certificate that allowed you to work from the State of Oklahoma at 13 years old?

A.    I do.  It has my 13-year-old signature at the bottom of it, embossed seal of State of Oklahoma.  It's hanging in my office at home.  It has always hung in my office at home to remind me.

Q.    Why?

A.    Just to remind me.

Q.    Were there other activities outside of school that were important to you growing up?

A.    Well, the two most important activities for me growing up were my church and the Boy Scouts.

Q.    What was your highest rank that you achieved in Scouts?

A.    I was an Eagle Scout.

Q.    Did you go to college?

A.    I did.  I went to the University of Texas at Austin.  I had a scholarship to go there, so I was blessed.

Q.    What did you study?

A.    Civil engineering.

Q.    Were you in the band?

A.    I was in the band.

Q.    What did you play?

A.    I was a percussion or drumline section leader.

Q.    When did you graduate?

A.    1975.

Q.    When you graduated from college where'd you go to work?

A.    Went to work for Exxon Company USA in Katy, Texas.

Q.    What position did you take in Exxon when you went to work for 'em?

A.    The lowest entry-level job for an engineer, associate production engineer.

Q.    Can you explain to the jury what a production engineer does and what you did in Katy, Texas?

A.    Well, Katy had operated one of the largest gas fields in the United States, the Katy gas field.  And it had a large gas processing plant as well.  Then we had a small oil operation along the edge of the gas rim.

    And my job -- they had me do a lot of things, but it was a great entry into the -- the industry.  So I worked on some wells.  I sat on some drill wells.  I designed some producing facilities, tanks and pumps and things like that.  And I spent a little time in the plant learning how process engineering functioned inside the gas plant.

    After I left Katy, I went to Tyler in East Texas, was my second assignment.  And I was in what we call subsurface engineering.  And my job principally was restoring wells to production, but also my principal job was to work with the research company in Houston.  We were developing the tight gas fields in the -- Carthage, Texas, called Cotton Valley,

and a tight limestone field called the Haynesville line.  Those required what's called hydraulic fracturing in order for the wells to be productive.

    And this is 1977.  Fracturing had been around a little while but it had not advanced.  So we were working to advance the technology, testing a lot of different fracking fluids, a lot of different ways to prop the fractures open.  And I would follow rigs around with the Haliburton, Baker Hughes or Western companies, sleep in the backseat of my car and -- from about 3:00 o'clock on, until they were ready to pump the job.  I used to tell people I would keep several rolls of nickles, dimes, and quarters in my car.  I knew where every pay phone in the three-county area was, because as soon as the job was over I had to go back and find a pay phone so I could call down to Houston and give them the results.

Q.    Did you eventually end up moving into management at Exxon?

A.    I did.  When I was 28 I became the engineering manager of the Kingsfield District of South Texas.  And Kingsfield district had responsibility for all the oil and gas production and gas processing on all the big ranches, the King Ranch, the East Ranch, the Armstrong Ranch, the Wildomar Ranch, the Kelsey Ranch.  So we had all -- basically all of South Texas we were operating.

Q.    As you moved up in the company, sir, what -- summarize for the ladies and gentlemen of the jury some of the titles and roles that you had.

A.    Well, eventually I moved out of the domestic business, was transferred up to New Jersey and became manager of International Natural Gas sales.  So I had responsibility for gas sales in all of Europe, Southeast Asia -- and that's when I began to travel globally a lot.

    I next was assigned as President of Exxon Yemen and Exxon SOS -- Exploration and Production Khorat, which was our Thai affiliate.  So I had an office in Bangkok.  I had an office in Sanaa, Yemen, and I lived in Central Yemen in a hotel in Sanaa when we were negotiating a very complicated liquified natural gas development project with the Yemeni government.

    From there, when we finished that contract, I was assigned to Russia and was President of Exxon Neftegas Limited, our Russian affiliate, and Vice President of Exxon Ventures, CIS, commonwealth of independent states.  Those were all the former Soviet states.  Primarily we were involved in Azerbaijan, Kazakhstan, and Turkmenistan.

Q.    Can you say those real fast three times?

A.    Probably tie my tongue up.

Q.    Don't try.

    At some point did you come back to the United States?

A.    When the ExxonMobile merger occurred at the end of 1999 I came back from Russia to the U.S. to be Executive Vice President of a new company that had been created out of the merger called ExxonMobile Development Company.  ExxonMobile Development Company was responsible for executing all the major projects in the upstream, so all the offshore production platforms, all the offshore drilling, offshore West Africa, liquefied natural gas plants in the Middle East, Kearl project in Canada.  So all of the major big expenditure projects, we were responsible for building those, executing them, starting them up, and then we would turn them over to the production company.

Q.    When did you become CEO of ExxonMobile?

A.    In January 1st, 2006.

Q.    Quite a journey from a 13-year-old busboy I gather?

A.    It's been a great ride.

Q.    Tell the jury what were your responsibilities as CEO of ExxonMobile?

A.    My responsibility was to deliver superior shareholder value to the shareholders and to do that by leading an organization in basically what was largely risk management.  So it's manage the risk of the operation.  There's a lot of risk in what we do.  You got to protect the people, you got to protect the assets.  So you have to have processes and people in place to do that.  My job was to make sure we had those.

**App. 288**

You've got to manage the risk, the technical risk. There's a lot of technical risks. These are very complicated and complex activities we're undertaking. So the technical risk as to be managed.

You have to manage the financial risk, making sure that you are always financially strong to pursue opportunities on behalf of the shareholders.

And, lastly, you've got to manage geopolitical risks because ExxonMobile Corporation was a global corporation, lot of different countries, a lot of countries that are difficult to operate in, so managing that geopolitical risk as well, always with the -- with the mission of delivering shareholder value by managing all those different risks, and in a position to pursue great opportunities when they present themselves.

Q.   Why were you so focused on pursuing shareholder value?

A.   Well, that was our reason for being. Every -- everything we did belonged to the shareholders. None of that money -- none of that money is ExxonMobile's. That was always the shareholders' money. So if we're making investments, we're investing the shareholders money. And when we had excess capacity to do so, my thought was always I need to give it back to the shareholder. I can either give it back to them in dividends or give it back to them by buying shares back, and that reduces the number of shares, so

everybody else's shares go up in value. So there's a lot of ways to do that. But to do that you have to have an extremely long -- long-term outlook.

This business -- nothing happens in a year or two in this business. It happens over 5, 10, 20, 30, 40 years. That's the only way you can think about it.

Q.   As the CEO of such a large company, how did you stay informed day-to-day with what was going on?

A.   Well, I had a Management Committee as you've heard. Management Committee has been talked about often. And we officed all on the same floor. My door was always open to the Management Committee or any of the functional vice presidents, like the treasurer, the controller, the general counsel. Anyone who needed to see me could come up and see me.

On days that we were in the office together I would always have lunch with the Management Committee, got an opportunity for us just catch up with each other on what's going on in their various areas of responsibility.

You've seen in documents in this trial called the Chairman's Briefing, so every month I had set aside two days, it was always the Monday and Tuesday before the Board would meet on Wednesday so that I was up-to-date on issues. And each of the business-line presidents would come in. Upstream would come in on Monday. Downstream and chemicals would come

in on Tuesday. And they would give me a quick, brief overview of what was called the F&O, the Financial and Operating parameters, tell me how they were doing on safety, environment incidents, any risk management, here's how the financials are looking at this point, just real quick.

And then they would put on the agenda whatever topics they wanted to brief us on. And that was a way to stay in touch with how things were progressing. And sometimes they were seeking guidance on whether to proceed or they might bring an issue to me and say, hey, we are really having a lot of trouble with the President of Venezuela. That's when I get involved. So then, you know, that would be my cue that I needed to start getting down to Venezuela to talk to the president about what is the problem.

So it was a very active discussion and very open discussion and a lot of give and take in those meetings

Q.   Pretty complicated business?

A.   It's a very complicated business. I loved every minute of it.

Q.   How did you approach complex decisions?

A.   With a lot of collaboration with others. There are always -- there are always people that know a whole lot more about the subject matter than I did.

I profess that I was not the smartest man in the room and I knew that and I respected other's capabilities and

their expertise on issues enormously. So I really had to look to others and their knowledge and their expertise to inform any decisions that were being made.

Q.   Plaintiffs' lawyer has used a term "boss" to refer to you. Did you refer to yourself as the boss?

A.   No, I did not.

Q.   Were you the boss?

A.   I was the most senior executive in the corporation -- corporation, so the buck stopped -- the old famous saying the buck stopped here.

Q.   Why don't you like that word "boss"?

A.   I guess it's just not a term I ever saw myself as. There were only a few people that called me that and they were the security guys.

Q.   When did you leave Exxon?

A.   December 31st of 2016.

Q.   Why did you leave Exxon?

What did you go do?

A.   I had been nominated to become the 69th U.S. Secretary of State.

Q.   Did you become the Secretary of State of the United States after that?

A.   I did. I was confirmed on February the 1st, 2017.

Q.   So how many years did you work at ExxonMobile in total?

A.   41 and a half.

Q.   How old are you?

A.   74.

Q.   What did you do now?

A.   Well, my wife and I manage our charitable foundation, which we set up a number of years ago.

     We have a ranch, cattle operation.  We still are very involved in horses, hay.  So I run the cattle and the hay and my wife runs the horse operation.

     And then we try to get as much time with our very busy grandkids as we can.  It's hard to work ourselves into their schedule.

Q.   How many are there?

A.   There are six with another one on the way.

Q.   Congratulations.

A.   Thank you.

Q.   So, Mr. Tillerson, I'd like to talk to you a little about the process of putting the 2015 10-K together.  They have heard quite a bit about it.  You've been sitting here listening.

     From your perspective what did that process look like?

A.   Well, it's a process that really -- and you've heard from others, it really goes on throughout the year.  It's -- it culminates at the end of the year once all the information for that calendar year is available because you cannot finalize it until you have that.

     But -- but throughout the year -- and you've seen documents referring to 10-Qs, you file a quarterly report as the year goes along as well, so obviously you're building on those quarterly reports as you're putting the final 10-K together.  A lot of different groups and organizations have input to the K -- if you look through the entire K there is all kinds of information.

     We focused, obviously, in these discussions on a narrow part of the K, the upstream, and a very narrow part of the upstream, Kearl and Rocky Mountain dry gas, but there's a lot of other information in there, obviously, about the downstream and the chemicals business.

     So lots of input from lots of different people, working it throughout the year.  As the year nears the end then they're starting to consolidate all that into the form the SEC requires that it be put into because they -- they really dictate the format and the information that's required to be in there.  Once the end of the year has come, then you take most of January to kind of wrap that all up.  Now you have all your numbers, now you need to finalize it all.

Q.   Did you participate in any meetings yourself about specific changes to the 2015 10-K?

A.   I did.

Q.   At any point during any of those meetings did anyone raise any concern that ExxonMobile was hiding information from investors or not telling the truth?

A.   No, no one did.

Q.   Did anyone suggest to you in those meetings that the disclosures that ExxonMobile was providing to its shareholders -- shareholders were inadequate in any way?

A.   No, they did not.

Q.   Let's take a look at Plaintiff's Exhibit 63, which we've seen.

     Do you recognize this, sir?

A.   Yes.  It's been up on the screen before.

Q.   Let's -- this is a potential enhancements review of -- dated January 27th, 2016.

     Let's turn to page 27.

     So what was the -- this was Mr. Rosenthal, I believe, testified that he presented this to you and talked to you about these issues.  What was the -- the purpose of that conversation as you remember it?

A.   Well, the -- the SEC from time to time would provide guidance on particular aspects of your upcoming filing that they -- they were -- had expectations of things they were going to be looking for in your filing, and there had been -- some of these sessions had been -- been occurring throughout the year.  And so he was sharing with me some of the -- what those SEC comments were.

Q.   And it says MD&A, that's the -- that's the portion of the 10-K that talks about management's sense of potential risks and other issues?

A.   Yes, it's the management discussion and analysis section.

Q.   It says, "Must place prior year results in context of business environment and discuss trends, uncertainties, and reasonably possible outcomes, quantitatively if possible, as of the filing date."

     So what was the business environment in 2015?

A.   Well, the industry was in a low-price environment.  And any time we go through these wild swings up and down the SEC is going to be particularly interested in how our company is reacting to that business environment, what are they doing differently and in their filings have they taken into full account that business environment in complying with all the rules and standards for filing your information in your K.

Q.   Now, there was some questions about this phrase "quantitatively if possible" and you were asked questions that suggested that Exxon should have quantified the risk of low prices to the reserves up in Canada.

     Do you remember those questions?

A.   I do.

Q.   Why was it not the case that it was -- strike that question.

     Could you have quantified with a number the risk of the

issue of proved reserves in Canada in 2015?

A.   Well, I don't believe we could have.  And that was the conclusion of the organization that's responsible for taking a look at that.  And you've heard some testimony from Mr. Madden about the difficulties of the last half of 2015 with the Kearl start-up, that a -- a lot of variability which was making it difficult to get really good market data on where they were placing the bitumen, you talk about placing it and then point of sale could be somewhere else, but it was just really difficult to get a -- a confident number.

And I think that's -- that's the key, as I recall it, was there just wasn't a confidence that we understood how this market was going to behave as those additional volumes came on.  More information was really needed, including getting -- getting the project and operation stable.

Q.   Did Exxon though disclose a risk to the Canadian oil sands operations in Canada if the low-price environment continued?

A.   Yes, we did.

Q.   Okay.  And we'll talk about that in a -- in a moment.

Let's turn next to page 3.

What we have highlighted here is "Address key business environment factors and trends proactively - should reduce risk SEC will require amendment of 10-K, higher likelihood changes, if any, can be addressed in future filings."

What was that all about?

A.   Well, I think it was a recognition, again, that we knew the SEC was going to be really looking closely at the filings so let's -- let's get -- let's be proactive about it.  You know, let's don't defensive about it, let's go proactive.  If we needed to do extra work to document why we came to the conclusions we did, let's do the work.

I think our folks, everyone, recognized you're going to have SEC looking over this shoulder and you're gonna have PriceWaterhouse Coopers then - the auditors - looking over this shoulder at everything you're doing, so let's be very deliberate about what we're doing.

Q.   Let's turn to the -- the last bullet point on this slide.

"Foreshadow reasonably possible impacts, where material, to address SEC's 20/20 hindsight."  What is that getting at?

A.   Well, obviously, once you file your 10-K that year is over.  Okay.  So now every -- everything is in your rear view mirror.  Well, the SEC gets that document in February/March.  And -- and their folks that are responsible for compliance are going to start going through that document.  And that's probably going to be March, June, July they're going through it.

Well, they now have the benefit of looking backwards and -- and asking questions about what you've done.  So --

and that's just -- and that's fine.  I mean, that's just part of that whole process.  And I think folks were recognizing we have to acknowledge they're going to be looking at it with 20/20 hindsight.  When -- when we're preparing it we have to only look at the year itself.  So I think it was an acknowledgement that that's going to happen so we need to, again, be very deliberate about any special warnings we wanted to issue, anything we wanted to highlight, let's be very deliberate about that so when they look back they will see that.

Q.   Mr. -- Mr. Tillerson, would it be possible to cover every potential future event and risk in a 10-K?

A.   No, it -- it would be impossible.  Again, I was talking about the risk management elements of running this business.  And I know the 10-K has been held up to you.  It's currently (indicating) like that.  If we tried to address every potential risk I'm sure we would at least double the size of that document.

Q.   Why wouldn't it be better for it to be even more involved?

A.   Well, I think -- and the SEC looked at this whole question of how much information really is useful and helpful to shareholders, and they -- even they were sensitive to not creating information overload, if I can use that description, where there's just so much information in that document it becomes unwieldy and really no longer helpful to shareholders or potential investors.  So, you know they -- I think they were sensitive to not creating something that then later just became unuseful because of the fact it contained too much information.

Q.   Is there business judgment involved?

A.   Absolutely.

Q.   And did you bring your -- your 40 years of experience making business judgments to your job as CEO?

A.   I did, and I knew others did as well.

Q.   And so "reasonably possible impacts," tell us how that relates to business judgment.

A.   Well, again, you're -- you're dealing with the current environment, and as you've seen, we did have our own views, where -- where do we think things are going to go over the next year or two, how is this going to play out.  So you -- you try to use your past experience of how this environment of the petroleum and petrochemical business, this volatility, is just a natural part of it.  You try to ignore the highs and you try to ignore the lows and you kind of try to say, okay, let's kind of look through here and see on-average how are we going to do, how are things going to look.

I used to tell the organization don't get euphoric at the highs and don't -- don't get despondent at the lows, because you're never going to stay there, it's going to go

back and forth. So it's -- it's that years of living in that environment and then understanding what's the real impact of that on your assets, on your operations performance, over long periods of time. Because, again, you have to judge things over long periods of time. What happens in one year, not very instructive.

Q. Have you heard the phrase that a company like ExxonMobile is a price taker, not a price maker?

A. Yes.

Q. What does that phrase mean?

A. Well, with the commodities, we'll focus on the upstream since that's what this is about, the commodities of oil and natural gas. The prices are really set by the marketplace. And in the case of oil it is a global market. Oil is fungible. You can put it on a ship, you can take it anywhere in the world and sell it to somebody. So the -- the market out there determines that. And we just have to take whatever price the market is going to give us.

There are players who try to influence that market, like OPEC that you're aware of, well, they try to influence it by altering the supply-to-man balance. But the market ultimately runs on what's the supply, what's the demand. If you get too much supply the price gets low. If the demand goes high, the price goes up. We are takers of whatever price that -- that is.

Natural gas is very similar. It's a very liquid market. And in the U.S. for a long time all the gas got sold in the U.S. because we were -- we were short of gas, you know we were very tight on gas. Well, with all of the new technologies of the last 20, 25 years now, we have become net exporters of gas. So now there's a certain element of global pricing to gas as well, because a producer can sell a domestic market or they could sell it to someone who is shipping L&G around the world, to Europe or China or Japan, or wherever. So, again, the market, supply and demand is going to set that price. We take whatever that is.

Q. Is that why it's so important to focus on costs, since you can't really control the price?

A. Yeah, I mean, again, you look at what are the things within my control, what are the things that are not within my control. The price is the one thing that we never have in our control. But costs are always something you can go to work on. Not just costs. You can go to work on contract terms. You can go to work on government taxes. You can go and lobby for tax relief. You can go and lobby for change to your contract in another country. They operate under different kind of tax regimes than we have in this country.

So we were always looking for how do we lower the cost, we can lower -- like I said, the operation itself, but not just with the operation itself. There are other ways we can

try to attack that cost structure that will allow that asset to perform better in a low-price environment. That's what you go to work on.

Q. Mr. Tillerson, let's take a look at page 4 of Plaintiff's Exhibit 63.

Is this a list of proposed enhancements that your team suggested be made to the 2015 10-K in light of the current conditions?

A. Yes, it is.

Q. Did you reject any of those enhancements?

A. I -- we didn't -- I didn't reject any of them.

Let me look at them real quickly here.

There may have been one change made to one of them. I was just kind of looking for it.

Q. All right. We're going to -- we're going to take you to that, sir --

A. Okay.

Q. -- but let me ask you generally, did you think it was a good idea to have these enhancements?

A. Yes, I did. Again reflective of the SEC scrutiny we were expecting, this is part of that recognizing the hindsight 20/20 issue.

Q. So let's take a look at the middle of the page, one of these enhancements here, and if I understand it, if it's in bold there's been testimony that that was the new language.

Do you remember that?

A. I do.

Q. And I won't read the whole thing but it starts out, "When crude oil and natural gas prices are in the range seen in late 2015 for an extended period of time, under the SEC definition of proved reserves, certain quantities of oil and natural gas, primarily relating the oil sands operations in Canada," there's some words and then "can temporarily -- temporarily not qualify as proved reserves."

Did I read that correctly?

A. Yes, you did.

Q. I want to focus on a couple of things about that. One is it talks about the prices in late 2015.

What was it about the prices in late 2015 that were different from the prices earlier in the year?

A. Well, I think that we -- as we've seen in other exhibits in evidence that's been presented, the prices were -- the prices were deteriorating throughout the year and they were hitting those bottoms in the fourth quarter. So we were really looking at that trend. And I think the observation here is that if that trend continues then these things could happen.

Q. Is it sometimes hard when you're in the middle of it to know if you're in a trend or a blip or something that is not going to last for a long time or will last for a long time?

A.   Yes.  That -- that's where some of this judgment comes in.  You know, having been around in the business for a long time, I had lived through a lot of ups and downs, and so you have some view of how long these things last, really driven by fundamentals.

And so you are looking at what are the -- what are the economic conditions in the U.S., if you're looking at natural gas, you know, are we in a downturn in the economy.  Same with oil, people are not driving as much.  So there are a lot of forces that can change that supply-and-demand balance.  So when we're in -- in these trends like this you're looking around saying, okay, well, what's causing this, is it a supply issue or is it a demand issue, how long is that likely to persist.

Demand can turn around pretty quickly.  Supply not so much.  It takes a while to add new supply.  If you're in a situation where you got -- you're short of supply, it takes a while to add supply.  So it's just you're making those judgments all the time.

Q.   So this language here, "Primarily related to oil sands operations in Canada," do you see that?

A.   I do.

Q.   The oil sands operations in Canada that we're talking about in this trial is Kearl?

A.   Yes.

Q.   And was this language ultimately included or was it slightly modified?

A.   It was slightly modified.

Q.   Why?

A.   Well, that sentence there, where it says "Primarily relating to oil sands operations in Canada and natural gas operations in North America" I felt was too limiting.  Someone could read that and think, well, those are the only places that might be affected by the low-price environment.  So I requested the "primarily" be replaced by words "such as", still identifying the oil sands and U.S. natural gas but I didn't want to mislead the reader to think those could be the only things, so I wanted to make it broader, more inclusive.

Q.   Did that warning appear in multiple places throughout the 2015 10-K in substance?

A.   That's my recollection.

MR. MELSHEIMER:  Your Honor, I'm about to move to a different topic.  Would this be an appropriate time to break for lunch?

THE COURT:  I'm getting hungry, too.

Yeah.  All right.  Y'all's lunch is in there.

Don't talk about the case.

THE SECURITY OFFICER:  All rise.

(Jury exits the courtroom.)

THE COURT:  Off the record.

(Discussion off the record in open court.)

(Recess taken at 12:10.)

(Proceedings continued in Volume 5B.)

INDEX - VOLUME 5A

WITNESS NAME                                          Page   Line

REX TILLERSON

   DIRECT EXAMINATION (CONT.) BY MR. SAHAM .......... 30     23

   DIRECT EXAMINATION (CONT.) BY MR. SAHAM .......... 84     2

   CROSS EXAMINATION BY MR. MELSHEIMER .............. 89     21

PLAINTIFF EXHIBITS

| Exhibit | Description | Identified | Admitted | Denied |
| --- | --- | --- | --- | --- |
| 160 | Proxy .................... | 40 | 40 | |
| 234 | Tillerson Interview ... | 52 | 53 | |
| 597 | Article ................. | 50 | 50 | |
| 696 | Article ................. | 48 | 48 | |
| 758 | Article ................. | 56 | 56 | |

PAMELA  J.   WILSON,  CSR/RMR/CRR

**App. 293**

< Dates >
$2.50.    54:8
$2.70.    46:19
$3.20).    60:1
(January 13,
2016).    31:23
11/11/15    61:13
2000 (November
2001  60:1
2010, June of
2010  46:7
April 14th of
2015.    40:3
April 29th,
22:16
August 15th,
2015  11:19
August 18, 2015
14:20
August 18,
2015,  11:3
August 19th,
16:12
August 19th,
2015,  16:13
August 2015
13:2
August of 2015
89:14
December  65:8
December 16,
2009.    48:24
December 17th,
2015.    31:10
December 31st
of 2016  104:16
December 31st,
2016  84:6
December,
47:20, 48:2,
63:25
December,
2015."  63:10
February
104:23
February 16th,
2011,  50:12
January  12:18,
17:21, 106:19
January 10,

2011, 51:14
January 10th,
2011,  51:23
January 11th,
2016  38:2
January 13,
2016  34:11
January 13th,
34:16
January 13th,
2016  33:19
January 13th,
2016,  31:14
January 13th,
2016.    31:12,
34:23
January 1st,
2006  100:13
January 27th,
2016.    107:12
June  12:18,
64:15
June 27, 2012,
53:9
June of 2010
45:9
June of 2012,
54:8
June of 2015,
63:2
March 2016,
67:21
March 2017,
70:21
March 21st,
2016,  68:4,
68:7, 68:20,
69:2
March 28th,
66:9
March 28th,
2016  65:17
March 28th,
2016,  66:10
March 3, 2017."
86:5
March 31st,
43:9
March 8th,
2008.    56:7

March of 2017
43:6, 77:11
March of 2018
56:25
March, June,
July  110:22
May  89:19
May 2018  56:13
MAY 4, 2026
1:28, 4:1
November
59:17, 59:22,
59:25
November 2015
60:6
November,
December,  63:3
October  7:3,
17:19
October 14th,
2015.    57:24
October 15,
2015  58:2
October 2015,
58:18
October 26,
2016  39:3
October of 2015
58:16
October of
2015,  46:18
October of
2015.    11:23
October,
November  47:20
September  7:3,
19:24
$1.3  63:22
$1.74  48:3
$1.80  47:23
$10  38:13,
38:16, 93:18
$100  43:11
$12  38:6, 68:21
$13.4  39:24
$162  64:19
$187  12:19,
65:2
$2  94:25
$2.03  59:18

$2.50  55:6
$2.70  47:7
$2.89  49:16
$28.1  42:21
$3.50  69:20
$30  53:21
$31  45:6
$36  51:17
$4  61:4, 62:17,
65:25, 69:13,
69:23
$4.38  46:16
$40.2  41:18,
42:15
$41  49:15, 50:1
$5.20  61:4,
62:16
$600  6:16
$630  63:19
$8  12:19
$8.11  64:22
(214)758-1500
2:49

< 0 >
00  98:10
000  93:18

< 1 >
1  32:1, 32:9,
32:12, 32:22,
32:25, 33:2,
33:7, 33:24
10  60:25,
91:10, 92:22,
102:5
10-K  22:19,
31:15, 34:5,
35:3, 68:12,
68:13, 68:25,
89:25, 91:10,
91:15, 91:22,
92:11, 105:17,
106:4, 106:22,
108:1, 109:24,
110:17, 111:12,
111:15, 115:7,
118:16

120:24
598  44:21
5A  1:25, 4:1,
120:1
5B.  119:4

< 6 >
6  46:11, 59:17,
92:21
6-CV-03111-K
1:15
619  1:49
63  88:1, 107:7,
115:5
65  43:3, 43:6,
63:6, 63:7,
63:8, 64:12,
88:11
651-5000  2:26
655  1:47
66  43:15
662-1557  3:17
67  22:16
68  30:15
69  88:20
696  48:12,
120:26
697  51:11
698  6:23, 7:5,
8:18, 14:6,
15:22, 15:24,
16:23, 20:21
69th  104:19

< 7 >
7  22:16
70  63:13
7084  2:41
713  2:43
716  38:23
72  32:22, 33:4
732  37:24
74  105:2
744-3300  1:37
75  64:6, 64:12,
95:12
75201  2:18,
2:25, 2:42,

2:48
75229  1:36
75242  3:15
75243  2:4
758  56:2, 56:4,
120:28
76  37:12
761  28:9
762  27:22,
28:8, 28:18
763  28:19
764  28:19
764-4446  2:19
765  28:19
766  28:19

< 8 >
80  50:21, 51:6
803  81:21
825  1:35
84  120:10
88  33:6, 33:11,
34:2, 37:17
880  1:35
89  120:12
890  38:24

< 9 >
9.37  64:24
90  77:5
91  31:6
92101  1:48
972  2:5
99  36:7
991-1582  2:5
9:3030.)  25:12

< A >
A.  1:45
able  7:15, 8:5,
18:12, 23:4
above  59:24,
62:9
absence  5:17
Absolutely
14:3, 52:1,
90:19, 112:7

accept  44:2
according
37:19, 57:12
accordingly
35:24, 37:20
account  11:3,
11:10, 11:12,
13:10, 13:13,
42:2, 108:15
accounted  50:21
accounts  11:8,
13:11
accurately
45:3, 87:8
achieved  96:14
acknowledge
111:3
acknowledgement
111:6
acquired  45:11
acquisition
49:22, 51:20,
53:22
acre  94:5
across  86:17
ACTION  1:17
action.  35:12
active  103:15
activist  79:5
activities
96:10, 96:12,
101:3
activity  59:5
actual  81:1
actually  4:15,
22:23, 25:2,
41:25, 42:1,
47:3, 48:2,
50:1, 95:18
adapt  44:15
add  66:21,
81:9, 117:16,
117:18
added  49:25,
50:22
Addendum  63:8
additional
109:13
Address  8:8,
8:9, 23:4,

27:11, 76:4,
109:22, 110:16,
111:16
addressed
109:25
administrative
71:11
admission  40:5
admit  52:23,
80:24
admits  29:2
Admitted  17:1,
23:24, 27:16,
31:5, 33:12,
35:7, 37:25,
38:22, 40:7,
44:21, 48:9,
48:17, 48:20,
50:8, 51:12,
53:3, 56:4,
57:22, 61:8,
65:13, 84:23,
120:18
advance  98:5
advanced  98:5
advantage  24:18
advice  28:24,
78:10
Affairs  50:15,
50:16, 52:6,
78:24, 79:9,
79:16, 83:23
affected  118:9
affiliate
99:10, 99:17
Afraid  87:4,
88:2
Africa  100:7
AG  17:9
age  43:2, 43:6,
43:7
agencies  27:24,
38:13, 38:16
agenda  103:6
aggravating
79:10
aggressive  90:6
ago  94:5, 105:5
agree  39:2,
46:5, 51:5,

10-ks  61:23
10-Q  21:4,
61:25
10-qs  106:2
10-years-old
94:24
100  2:41
10019-6064  2:36
11  54:1, 65:20,
80:5, 83:11
1100  3:14
117  46:10
11910  2:3
11:0000.)  80:4
12  87:22,
94:25, 95:3
1285  2:35
12:1010.)  119:3
13  22:17, 95:5,
95:6, 96:3
13-year-old
96:4, 100:14
13.45  35:22
13th  3:14
14  36:3
14.54  37:4
14.57  36:4
15  35:6, 35:19,
35:21, 36:2,
37:4, 37:20,
60:7, 69:22,
95:9
16  69:18,
69:19, 87:19,
95:12
160  40:2, 40:7,
43:16, 120:20
19  38:8
19.  80:5
1900  1:47
1975  97:1
1977  98:4
1999  99:25
1H15  63:16
1st  19:24,
104:23

< 2 >
2  32:9, 32:22,

33:2, 33:7,
33:11, 35:10,
55:6, 57:25,
59:13, 65:17,
66:6, 120:10
2.50  55:18,
55:22
2.70  46:19,
47:5
20  37:5, 37:6,
60:14, 61:6,
102:5, 114:5
20/20  110:16,
111:4, 115:22
2009  46:7
2009."  53:22
2010  46:15,
51:2, 51:5,
64:15
2010."  50:22
2012  41:16,
41:18, 42:15,
43:10
2013  42:21
2014  12:1,
41:16, 42:24,
43:11, 61:4
2015  12:5,
12:17, 13:1,
13:3, 15:4,
21:4, 34:13,
46:18, 47:19,
51:2, 58:1,
61:4, 61:19,
61:23, 63:9,
63:16, 65:24,
65:25, 66:4,
66:14, 68:25,
69:12, 84:4,
89:11, 89:25,
91:3, 91:10,
91:15, 105:17,
106:22, 108:9,
109:1, 109:5,
115:7, 116:5,
116:13, 116:14,
118:16
2016  31:11,
34:12, 38:2,
39:18, 47:1,

47:2, 63:21,
65:18, 66:6,
66:13, 67:14,
67:17, 69:12,
84:5, 89:11
2017  104:23
2018  57:16
2020  69:23
2020-plus  61:1
2023  17:11
2025  69:20
21  120:12
212  2:37
214  1:37, 2:19,
2:26, 3:17
216  47:4, 47:18
219  59:13
220  2:3
2200  2:47
221  57:22
228  65:12
23  120:8
2300  2:17, 2:24
231-1058  1:49
234  52:12,
52:20, 52:21,
53:3, 120:22
24  37:13, 37:14
24.  83:11
25  48:25, 49:9,
114:5
2601  2:17
27  60:18,
87:16, 107:13
28  94:20, 98:18
2801  2:24
2B  22:16
2Q  61:25

< 3 >
3  32:1, 32:9,
33:14, 33:24,
39:8, 50:19,
57:3, 58:5,
84:25, 85:1,
86:1, 98:10,
109:21
3.50  69:14
3.6  35:17,

36:23
30  102:5, 120:8
30-year  66:16
31  49:21
32  72:14, 86:12
33  42:24
373-3000  2:37
3811  1:35
3:  1:15

< 4 >
4  57:3, 85:3,
85:10, 115:4
40  102:5,
112:8, 120:20
403  75:5,
75:20, 80:11
41  49:21, 59:2,
104:25
41-and-a-half-y
ear  92:1
4100w  2:47
45  32:12,
32:17, 32:18,
33:1, 33:3,
34:3
47  72:23
48  9:3, 120:26

< 5 >
5  36:12, 36:13,
86:24, 102:5
5-page  18:19
50  120:24
51  40:12,
41:11, 61:9,
86:15
52  120:22
527  70:7, 70:9,
80:8, 84:24,
89:24
53  120:22
546-5400  2:43
56  120:28
563  36:19
564  65:4
59  86:24
597  50:3, 50:8,

58:16, 76:17
agreed  16:25,
18:2, 31:24,
33:22, 35:16,
37:3, 38:22,
54:21
ahead  9:21,
18:15, 21:14,
94:11
aim  27:12
ALEX  1:43
Alfred  83:1
all-paper  49:15
allow  115:1
allowed  27:24,
52:24, 96:2
almost  35:2
already  14:12,
15:25, 24:6,
26:6, 37:1,
48:10, 51:12,
51:19, 71:7,
71:8
altering  113:21
alternatives
59:5
although  46:6
amazing  10:19
amendment
109:24
America  63:9,
94:19, 118:7
American  54:20,
54:24
Americas  2:35
AMITAV  2:32
among  76:10
amount  35:24,
36:5, 39:24,
42:19
analysis  57:12,
66:3, 66:16,
67:7, 67:17,
90:25, 108:3
analyst  57:18
and/or  12:21,
20:1
ANDREW  1:18
annual  40:19,
40:25

anonymous  80:15
Answer  9:17,
54:11, 62:10,
62:11, 66:22,
77:6
answering  15:5
Anticipate
87:10
anybody  30:7
Anyway  83:20,
83:24, 93:23
apologies  6:21
apologize
56:12, 56:15,
85:18
appeal  25:23
appear  18:1,
90:5, 118:15
appears  31:22,
33:14
appendix  63:14
application
55:14
apply  95:2
Appreciate  30:6
approach  103:20
appropriate
78:14, 118:19
approve  7:1
approved  22:7,
22:9, 24:16
approving
18:10, 22:13,
23:20, 39:17
approximately
12:19, 31:14,
31:18, 35:19,
41:18, 51:6,
59:17
APS  61:14
area  98:13
areas  27:19,
86:18, 102:19
argue  28:6,
62:12, 77:22
argued  18:9
arguing  77:15,
25:1, 72:10
argument  6:24,
7:14, 7:15,

7:23, 10:4,
10:8, 18:14,
18:25, 19:10,
22:6, 23:5,
24:1, 24:2,
24:13, 25:8
arguments
18:24, 24:20
Armstrong  98:22
around  9:3,
62:5, 94:16,
94:19, 98:4,
98:8, 114:9,
117:2, 117:12,
117:15
Arrogant/undere
stimate  87:23
Article  27:20,
27:21, 44:23,
45:2, 48:13,
48:23, 50:5,
50:12, 50:16,
51:11, 56:2,
56:7, 56:19,
56:22, 57:3,
82:24, 83:2,
83:16, 83:18,
83:21, 120:24,
120:26, 120:28
articles  27:15,
48:16
articulated
49:6
articulating
69:8
Asia  99:6
aside  102:21
aspects  107:19
asserted  27:17,
50:9
asserting  18:18
assertion  9:7
Asset  61:13,
115:1
assets  55:18,
63:15, 75:14,
88:14, 91:7,
100:23, 113:3
assigned  99:8,
99:16

assignment
97:21
assignments
92:3
associate  97:6
assume  72:22,
74:25, 82:17
assumed  49:15
assuming  14:25,
19:19, 23:10
assumptions
60:22, 67:6
attached  63:10
attachment  20:6
attack  115:1
attended  39:5
attention
10:12, 31:21,
57:25
audacity  9:5
auditing  39:20
auditor  39:14,
62:20, 62:21
auditors  110:10
AUDRA  2:28
August  15:4
Austin  2:13,
96:17
authenticity
70:17
author  48:18,
49:8, 49:20,
50:10, 51:9,
57:8
autocrat  78:9
available  85:4,
105:24
Avenue  2:3,
2:35, 2:47
average  32:23,
33:12
average).  32:14
aversion  88:1
awarded  42:11
awards  41:20,
41:22, 41:24
aware  27:15,
81:5, 113:20
away  88:7
Azerbaijan

PAMELA  J.   WILSON,  CSR/RMR/CRR

**App. 294**

99:20

< B >
B. 1:43, 2:1, 2:2
backseat 98:9
backup 11:4, 11:17, 12:3, 12:11, 13:6
backups 11:16
backwards 110:24
bad 6:9, 12:1, 88:8
Baker 98:8
balance 113:21, 117:10
BALON 2:1, 2:2
band 96:21, 96:22
Bangkok 99:10
Barely 25:10, 83:17
barrel 12:19, 47:13, 64:24
barrels 35:17, 36:23
base 66:7, 66:13
Based 76:19, 87:12
basically 7:2, 43:24, 98:23, 100:20
basis 95:8
became 11:20, 94:17, 98:18, 99:4, 112:4
become 100:12, 104:19, 104:21, 114:5
becomes 112:1
began 94:19, 99:7
beginning 10:23, 12:17, 18:5, 84:5
Behalf 1:7, 101:7

behave 109:13
behind 91:22
belaboring 79:21
believe 7:12, 13:2, 13:23, 14:14, 19:24, 38:4, 48:9, 49:8, 50:4, 61:20, 62:18, 63:23, 64:2, 64:7, 84:13, 86:12, 91:11, 92:14, 107:14, 109:2
believed 43:23
belonged 101:18
below 66:20
bench 27:9, 72:17
benefit 110:24
benefiting 54:20
best 57:12
bet 45:24
bets. 56:9, 56:20, 56:23
better 32:1, 111:19, 115:2
betting 77:3
bias 88:21
biased 89:4
BIERL 1:44
big 11:25, 53:21, 55:24, 93:25, 95:20, 98:21, 100:8
billion 36:23, 38:6, 45:7, 49:15, 49:21, 50:1, 51:17, 53:22, 63:22, 68:21
bit 42:2, 66:14, 66:21, 92:17, 105:18
bitty 92:21
bitumen 37:17, 109:8
black 22:10,

65:21, 65:24, 66:17, 67:12
Blame 25:5
blank 8:20
bless 4:9
blessed 96:18
blip 116:24
blow 31:8, 32:10, 33:20, 34:24, 35:13, 38:10, 39:10, 41:12, 45:21, 46:13, 57:6, 64:13, 65:22, 69:6
blowup 43:17
blue 41:14, 68:3, 68:18, 68:20
Board 39:1, 39:2, 39:3, 39:6, 39:17, 39:23, 40:23, 41:4, 41:9, 43:21, 43:25, 44:3, 44:5, 44:8, 102:22
boat. 88:4
BOGGS 2:46
bold 115:25
bond 31:18, 38:4, 38:6, 68:1, 68:21
bonds 38:17, 38:20
bonuses 41:20
book 29:9, 64:24
BOONE 2:23
born 92:19
boss 43:25, 87:10, 89:8, 89:11, 104:4, 104:5, 104:7, 104:11
bottom 10:9, 45:19, 46:11, 53:2, 57:4, 59:16, 68:3, 69:5, 88:6,

89:7, 92:2, 96:4
bottoming 60:9
bottoms 116:19
bought 46:24, 94:6, 94:10
Boulevard 1:35
Boy 93:13, 94:18, 94:21, 96:13
BP 57:11, 57:14
BRADLEY 2:1, 2:2
bread 94:15
breadth 86:17
break 23:7, 44:18, 71:1, 118:19
brief 7:18, 7:19, 14:21, 23:16, 24:3, 103:1, 103:7
Briefing 102:21
Bring 9:6, 10:11, 17:4, 60:17, 82:21, 83:10, 103:10, 112:8
bringing 15:23, 82:18
broad 55:11
broader 55:15, 118:13
broadly 55:8, 55:23
Broadway 1:47
broke 37:24, 38:2
brought 6:7, 81:19
Btus 47:11
buck 104:9, 104:10
Budget 58:1
budgets 60:23
Bueno 93:9, 93:12
buffer 95:25
buffers 95:20
build 58:24, [125]

84:17, 86:20
cold 30:14
collaboration 103:21
college 96:16, 97:2
colt 93:15
column 88:6
comes 78:9, 117:1
comfortable 91:25
comment 87:3, 89:7
comment. 33:13
commentary 86:22
comments 73:7, 80:20, 86:13, 87:1, 107:24
Commerce 3:14
Committee 57:23, 60:11, 87:15, 102:9, 102:10, 102:12, 102:17
commodities 113:11, 113:12
commodity 46:21
commonwealth 99:18
communicate 90:23, 91:6
communicated 64:8
companies 61:24, 98:9
Company 36:4, 36:5, 37:10, 40:10, 41:2, 43:7, 44:7, 49:23, 66:3, 70:14, 70:23, 73:5, 78:3, 84:4, 84:10, 84:12, 88:3, 90:6, 90:24, 92:2, 97:3, 97:24, 98:25, 100:2, 100:3,

100:4, 100:11, 102:7, 108:12, 113:7
compare 20:20, 29:3
compensation 40:12, 40:22, 40:23, 41:15, 41:18, 41:21, 42:12, 42:13, 42:15, 42:22, 42:25, 43:11
competencies 92:8
competition 95:22
competitiveness 54:24
competitors/governments 87:23
completely 17:17
complex 101:3, 103:20
compliance 110:20
complicated 99:12, 101:2, 103:17, 103:18
complying 108:15
computer-aided 3:8
concern 87:5, 87:18, 106:25
conclusion 109:3
conclusions 110:7
conditions 115:8, 117:7
conferences 23:6, 82:18
confidence 92:6, 92:8, 92:10, 109:12
confident 109:10
confirmed 104:23

conflict 43:23
confused 34:10
Congratulations 105:14
Connie 14:19
conservative 90:7
considered 35:24, 36:14, 37:20, 60:11
consistency 31:25, 33:23
consolidate 106:15
conspiratorial 11:23
consultant 81:19
consumers. 46:2
consummate 45:6
consummated 46:15
CONT. 30:23, 84:2, 120:8, 120:10
contact 88:25, 95:18
contained 112:4
contains 40:20
contents 75:5
contesting 9:7
context 54:11, 64:11, 108:5
Continue 30:18, 32:13
continued 109:18, 119:4
continues 116:21
contract 99:15, 114:18, 114:21
contracts 68:6
control 114:13, 114:15, 114:16, 114:17
controller 102:13
conversation 54:15, 55:10, 55:21, 107:17

convince 76:6
convinced 23:25
cooking 46:1
Coopers 110:10
corner 46:12
Corporation 1:17, 40:21, 86:18, 101:9, 104:8, 104:9
Correctly 25:24, 32:4, 32:15, 32:19, 45:24, 46:3, 49:3, 49:18, 50:23, 51:21, 53:25, 56:9, 56:20, 56:24, 57:19, 59:7, 60:3, 62:2, 62:14, 63:11, 88:15, 89:5, 89:6, 116:10
CORTELL 2:21, 20:22
cost 54:4, 54:5, 55:13, 66:23, 114:23, 115:1
costs 21:8, 38:8, 38:12, 67:4, 114:12, 114:17, 114:18
Cotton 97:25
Council 53:8, 53:11, 55:10
counsel 5:12, 28:24, 102:14
countries 101:10
country 114:21, 114:22
couple 4:11, 69:11, 73:16, 88:11, 90:16, 116:12
course 22:4, 81:25, 82:21
court. 83:8, 83:9, 119:2
courtroom 83:11 [127]

building 100:9, 106:3
buildings 95:17
bullet 35:11, 35:13, 37:1, 59:4, 61:21, 61:22, 62:8, 89:3, 110:13
bunch 71:14, 73:3, 76:8, 80:14, 93:14
buried 93:12
Burkholz 1:45, 8:19, 27:7
busboy 95:11, 100:14
business-line 102:24
businesses 76:23
busy 105:9
buy 49:24
buying 49:23, 101:25

< C >
C. 2:39
CA 1:48
calculate 67:8
calculation 66:22, 67:19
calculations 90:25, 91:21, 91:24
calendar 105:24
call 5:6, 8:23, 10:11, 31:21, 45:1, 70:14, 71:23, 71:25, 72:2, 72:4, 72:7, 73:9, 73:10, 73:12, 73:23, 97:21, 98:15
called 41:25, 70:16, 71:11, 97:25, 98:1, 98:2, 100:3, 102:20, 103:2,

104:13
Canada 20:3, 32:23, 33:12, 33:14, 64:15, 100:8, 108:20, 109:1, 109:17, 116:8, 117:21, 117:23, 118:6
Canadian 109:16
capabilities 103:25
capacity 101:22
Capparotta 8:1
captured 12:22
car 98:9, 98:12, 27:2
career 42:18, 92:1
Carnac 74:4, 78:8
CARPENTERS 1:9
Carthage 97:25
case 7:3, 7:6, 7:25, 8:1, 11:19, 12:16, 13:12, 14:20, 18:2, 21:8, 21:16, 21:20, 21:22, 22:3, 24:17, 35:11, 39:14, 39:15, 44:17, 52:25, 65:25, 66:7, 66:13, 66:14, 69:12, 70:16, 71:2, 73:15, 75:10, 75:20, 77:15, 108:23, 113:14, 118:23
cases 7:18, 7:22, 7:23, 8:4, 23:16, 24:3, 69:6
cash 42:14, 58:12, 58:25, 64:20, 66:16, 66:17, 67:7, 67:11, 69:25
catch 102:18

Catering 88:24
cattle 105:6, 105:7
cause 93:16
causing 117:12
Central 99:11
cents 59:17, 95:12
CEO 39:5, 43:2, 43:20, 43:25, 45:4, 53:20, 56:8, 56:19, 56:22, 56:25, 73:5, 73:6, 77:3, 84:7, 100:12, 100:16, 102:7, 112:9
certain 15:15, 36:10, 40:20, 60:22, 86:13, 91:19, 114:6, 116:6
Certainly 52:16, 54:10, 92:13
certificate 96:2
certification 14:18
cetera 87:24
CFO 65:18
chair 4:22
Chairman 39:5, 41:7, 43:17, 43:20, 43:25, 44:9, 50:25, 102:21
chairmanship 45:4
CHAKRABORTY 2:32
challenge 57:16
chance 74:14, 92:17
change 114:20, 115:13, 117:10
changes 42:16, 42:17, 42:18, 106:22, 109:25
charge 23:6,

82:18
charitable 105:4
chart 46:11, 46:20, 64:6, 64:9
chat 53:15
cheap 54:20
cheat 90:17
cheated 9:25
check 10:21, 60:1
checked 11:1
chemicals 60:21, 102:25, 106:12
Chevron 61:25
child 95:7
CHILDRESS 3:3
chin 51:18
China 114:9
Chronicle 27:22
church 96:13
chutzpah 8:24
Circuit 7:18, 7:22, 22:10, 23:16, 72:18
circulated 28:13
CIS 99:18
cited 24:3
cites 22:21
citing 7:18
Civil 96:20
claiming 90:20
CLASS 1:17
classic 22:9
clear 14:7, 14:17, 32:20, 40:15, 55:20, 68:12, 70:13, 73:17
clearly 70:19
closed 45:9, 68:21
closely 110:3
closing 7:14, 8:6, 8:7, 18:14, 23:5
Cochrane 114:14, [126]

courtroom. 30:13, 71:3, 118:25
cover 6:18, 26:18, 111:11
covered 33:4
created 100:2
creating 90:2, 111:24, 112:3
credit 38:13, 38:16
Creek 1:35
Crescent 2:41
critical 16:24, 17:25
CROSS 78:14, 89:21, 120:12
cross-examination 30:19
cross-examine 74:12, 80:17
crossways 94:2
CRR 3:12
crucial 67:6, 67:9
crude 62:1, 116:4
cubic 49:16
cue 103:12
culminates 105:23
curative 7:16, 8:2, 8:6, 8:7, 8:22, 23:5, 82:13
cure 8:2
cured 81:8
Current 48:3, 50:15, 50:16, 52:6, 55:3, 78:23, 79:9, 79:16, 83:23, 112:13, 115:7
currently 111:15
curve 66:24
cut 29:7
cutoff 36:6
cutting 72:25

courtroom.
< D >
D. 2:45
dad 93:11, 93:15, 94:13, 94:14
Dallas 1:3, 1:29, 1:36, 2:4, 2:18, 2:25, 2:42, 2:48, 3:15, 4:6, 89:9
DANIEL 2:29
DAPHNE 2:33
Darren 56:25
data 57:11, 57:15, 91:8, 109:7
data. 60:2
DATAGUIDE 60:18, 60:19, 60:25, 62:4
date 15:15, 50:14, 50:15, 51:22
date. 108:8
Dated 31:7, 31:10, 48:23, 51:14, 56:7, 57:23, 70:21, 107:12
dates 34:10
DAVID 1:19, 2:15
day 59:18
day-to-day 102:8
days 90:16, 102:16, 102:21
deal 9:9, 11:25, 45:9, 45:11, 46:6, 46:15, 49:5, 51:13, 51:17, 51:24, 51:25
Deal. 44:24
dealing 112:13
dealt 23:6
debate 28:25
debit 49:25

debt 49:16, 49:24
decide 19:11, 19:16, 77:10
decided 72:2
Decision 87:15
decision-making 78:2
decision. 88:8
decisions 66:5, 76:19, 77:4, 77:17, 77:18, 78:2, 78:3, 78:6, 103:20, 104:3
deck 38:2, 58:1, 58:5, 87:12
Defendant 38:23
DEFENDANTS 1:22, 2:10, 10:3, 23:19
defense 5:12, 21:20, 21:23, 24:18
defensive 110:5
deferred 41:20, 41:21
definition 116:6
degree 9:4
delay 7:11, 52:15
deliberate 77:16, 110:12, 111:7, 111:9
deliver 100:18
delivering 101:12
delivery 89:8
Demand 113:22, 113:23, 114:10, 117:13, 117:15
Denied 82:14, 120:18
departure 23:1, 37:4
depending 30:3, 37:4
describes 86:3, 86:15

describing 49:20
Description 111:24, 120:18
Design 86:7
designed 97:16
despite 16:1
despondent 112:24
detailed 57:11
details 38:8, 40:12, 53:16
deteriorating 116:18
determines 113:17
developed 37:7, 37:9
developing 97:24
Development 99:13, 100:3, 100:4
dictate 106:17
Diego 1:48, 4:20
difference 69:16, 79:7
differences 69:11
Different 12:10, 56:12, 69:24, 71:16, 73:3, 98:6, 98:7, 101:10, 101:13, 106:5, 106:13, 114:22, 116:15, 118:19
differently 77:4, 108:14
differently. 86:19
difficult 62:12, 101:10, 109:7, 109:10
difficulties 109:5
dimes 98:12
DIRECT 30:23, 84:2, 120:8 [128]

120:10
direction. 86:11
directly 49:12, 55:15, 90:16
Directors 39:3, 39:6, 39:17, 39:23, 44:8
disagree 37:4
disclose 21:18, 22:1, 109:16
disclosure 20:5, 20:16, 21:4, 21:10, 21:15, 31:3, 36:14
disclosures 107:4
discovery 9:6, 9:9, 15:4, 17:12, 24:12
discuss 108:6
discussed 47:25, 69:12
discussing 31:10, 31:19
Discussion 27:9, 78:18, 83:8, 86:9, 103:15, 103:16, 108:3, 119:2
discussion. 87:13, 87:16
discussions 41:10, 77:21, 106:8
dishwasher 95:11
dispute 12:2, 36:2, 51:8
District 1:1, 1:2, 1:27, 4:5, 4:6, 4:7, 98:19, 98:20
divest 88:14
dividend 42:7
dividends 101:24
DIVISION 1:3
documents

10:25, 13:12, 23:18, 27:3, 51:1, 55:19, 70:19, 92:4, 102:20, 106:2
dog-gone 10:4
doing 10:10, 30:15, 55:23, 72:18, 87:5, 87:19, 88:7, 103:3, 108:13, 110:11, 110:12
doldrums 51:19
dollar 95:13, 95:15
domestic 99:3, 114:8
done 6:9, 9:8, 10:17, 10:25, 15:12, 51:24, 67:17, 77:11, 110:25
door 7:22, 7:23, 9:23, 17:14, 18:10, 24:1, 102:11
double 34:2, 111:17
doubt 24:1
DOWD 1:46
down 27:1, 29:2, 44:18, 45:19, 46:21, 46:22, 46:23, 47:1, 47:3, 49:6, 49:12, 52:18, 57:3, 59:17, 62:8, 63:18, 81:1, 88:6, 89:3, 91:7, 98:15, 103:13, 108:11
downs 117:3
Downstream 60:21, 102:25, 106:12
downturn 117:8
dreadful 49:14
drill 97:16
drilling 100:6

drive 93:25
driven 117:4
driving 117:9
drop 62:8, 89:3
drumline 96:24
dry 91:7, 106:10
Due 62:1, 88:13
duh-duh-duh 26:5
during 9:6, 17:12, 24:12, 89:11, 106:24

< E >
E. 2:13, 83:1
Eagle 72:23, 96:15
earlier 34:7, 35:16, 50:25, 60:15, 64:7, 85:22, 116:15
early 36:19
earning 42:17
earnings 57:12
easily 92:11
East 97:20, 98:22, 100:7
economic 117:7
economy 54:20, 117:8
Ed 1:26, 4:7, 93:16
edge 97:13
Edited 86:4
edition 29:13, 29:14
Edmonton 21:7, 21:20, 21:21, 21:25, 32:13, 32:25, 33:2, 33:15
effect 9:24, 65:24
efficiency 27:12
effort 76:6
eight 13:3
Either 7:8,

8:11, 18:6, 18:7, 101:23
element 114:6
elements 111:14
eliciting 7:24, 23:18
EM 12:11, 13:7, 14:10, 16:10, 62:11, 69:12, 83:10, 97:5
email 9:15, 12:21, 12:22, 14:25, 15:7, 15:9, 34:8, 37:19, 37:22, 59:16, 59:20
emails 11:2, 11:7, 11:18, 11:24, 12:5, 12:6, 12:8, 12:25, 13:1, 13:9, 13:17, 13:22
embossed 96:5
EMILY 2:14
Emma 84:14, 86:20
emphasized 63:1
employee 91:2
employees 72:14, 73:4, 86:12
end 41:14, 67:20, 84:4, 91:3, 95:24, 98:16, 99:25, 105:23, 106:14, 106:18
Endorsement 86:5
ends 19:7
Energy 45:6, 46:2, 49:1, 50:21, 53:22
engaged 10:3, 10:10, 25:2
engineer 97:6, 97:7, 97:8
engineering 95:17, 96:20, 129

fault 85:21
Fear 88:2, 88:13
February/march 110:19
Federal 3:13, 27:23, 94:9
feedback 71:15
feel 29:4
feels 5:17
fees 39:18, 39:23
feet 49:16
fellow 73:17, 94:6
felt 118:7
few 61:24, 85:13, 94:1, 104:13
field 97:11, 98:1
fields 97:10, 97:25
Fifth 7:18, 7:22, 22:10, 23:16, 72:18
file 11:2, 23:2, 106:2, 110:17
filed 4:11, 14:19, 15:22, 23:3, 31:15, 34:6, 35:3, 40:3, 68:25, 82:11, 82:12, 91:10
files 10:21, 13:14, 13:24
filing 36:15, 40:9, 107:19, 107:21, 108:8, 108:16
filings 36:9, 36:10, 57:13, 108:14, 110:3
filings. 109:25
final 106:4
finalize 46:7, 105:25, 106:20
Financial

36:16, 65:25, 66:7, 66:14, 69:6, 90:24, 101:5, 103:2
financially 101:6
financials 39:20, 61:1, 61:3, 103:5
find 98:14
fine 6:13, 27:18, 77:7, 111:1
Finestein 14:19
finished 99:15
fireside 53:15
FIRM 2:2
firmly 78:22
first 11:11, 12:12, 12:13, 13:3, 14:2, 14:4, 15:3, 15:17, 16:7, 18:20, 22:25, 25:25, 26:16, 32:13, 33:18, 33:22, 36:25, 37:2, 41:12, 44:22, 45:20, 58:4, 63:16, 63:25, 64:19, 65:9, 70:14, 78:20, 95:18
five 7:18, 31:14, 42:3, 57:9, 63:13, 69:23, 87:1, 94:4
fixed 9:24
flexibility 88:12
flip 17:10
flipped 17:9
Floor 3:14, 102:11
floors 95:19
flow 58:12, 58:25, 66:16, 67:7
flows 66:17,

69:25
fluids 98:6
focus 113:11, 114:12, 116:12
focused 101:16, 106:8
FOLKERTH 1:43
folks 85:21, 87:2, 110:8, 110:20, 111:2
follow 92:7, 98:8
forces 117:10
Foreign 53:8, 53:12, 55:11
Foreshadow 110:15
forgot 22:24, 83:21
Form 18:7, 18:8, 37:14, 41:24, 91:10, 106:15
format 64:11, 106:17
former 99:19
forms 23:3
forth 6:25, 19:6, 19:7, 113:1
forum 9:8
forward 11:3, 11:19, 13:1, 13:2, 14:21, 16:13, 58:23
forwards 59:20, 59:21
found 11:4, 11:17, 12:2, 12:10, 12:13, 12:20, 12:24, 14:20, 57:16, 67:15, 67:18
foundation 70:18, 105:4
four 8:4, 8:20, 19:14, 23:16, 24:3, 26:1, 68:24, 94:4
four-and-a-half

7:17
fourth 47:19, 116:19
fracking 98:6
fractures 98:7
Fracturing 98:2, 98:4
frame 60:9, 60:10, 62:6
framing 86:9
frank 87:15
frankly 80:19
fraud 10:3
Friday 10:19, 14:23, 37:6, 37:24
friend 81:9, 81:12, 81:13, 81:16, 81:17, 82:8
front 6:23, 27:24
fuel 45:25
Full 31:3, 108:14
fully 7:7, 16:24, 17:3, 17:21, 72:11
fulsome 33:7
functional 102:12
functioned 97:19
FUND 1:10
fundamentals 117:5
fungible 113:15
funny 72:19
Furturity 93:22
fuss 29:5
future 45:25, 60:24, 109:25, 111:12
future. 32:3
futures 68:4, 68:6, 69:2

< G >
GARRISON 2:34, 131

97:19, 97:22, 98:18
engineers 95:19
enhancements 107:11, 115:6, 115:10, 115:19, 115:24
enormously 104:1
enough 70:3, 76:15, 78:10, 79:18, 90:7, 93:19
entail 7:11
enters 30:13, 83:11
entire 42:18, 54:14, 106:6
entitled 56:19, 56:22, 58:1, 58:10, 59:3, 64:15
entry 97:15
entry-level 97:6
Environment 55:4, 55:5, 55:12, 58:6, 58:17, 58:18, 58:25, 59:5, 59:9, 59:10, 65:18, 66:25, 67:1, 103:4, 108:6, 108:9, 108:10, 108:13, 108:15, 109:17, 109:23, 112:14, 112:17, 113:2, 115:2, 118:9
Environment. 58:13, 59:3
environmental 79:4
equates 49:16
equivalent 49:16
ERIKA 1:42
essence 8:23
essential 51:2
estimate 91:14

et 87:23
euphoric 112:23
Europe 99:6, 114:9
evaluations 57:17
event 62:10, 111:12
eventually 98:16, 99:3
Everybody 5:7, 55:14, 76:21, 102:1
everyone 55:4, 110:8
Everything 30:21, 31:3, 42:20, 63:4, 101:18, 110:11, 110:18
everywhere 76:10
evidence 7:6, 7:16, 8:11, 10:3, 10:6, 10:8, 15:23, 17:1, 17:15, 18:2, 18:4, 18:19, 23:24, 31:6, 35:7, 37:25, 40:7, 44:21, 48:9, 53:4, 55:20, 56:4, 57:22, 60:15, 61:9, 65:13, 84:23, 116:17
exact 84:18
exactly 42:20
EXAMINATION 30:2, 30:23, 52:18, 84:2, 89:21, 120:8, 120:10, 120:12
examine 5:24, 8:5
examining 5:25
example 27:21, 48:5, 57:14
except 81:14

excess 43:11, 91:16, 101:22
excluding 37:13
executing 100:4, 100:9
Executive 88:21, 100:1, 104:8
executives 88:25
exhausted. 59:6
EXHIBITS 116:16, 120:15
exist 11:4, 11:7, 11:9, 11:20, 14:20
existence 66:9, 67:21
exits 71:3, 118:25
expectations 107:20
expected 32:2, 59:5, 89:4
expecting 115:21
expenditure 100:8
experience 86:17, 112:8, 112:17
expertise 76:20, 92:8, 104:1, 104:2
experts 5:9
expire 59:18
explain 97:8
Exploration 99:9
exporters 114:6
expressed 44:2, 44:8
expresses 41:4
extended 61:1, 61:3, 116:5
extent 13:19, 70:18
extra 110:6
extremely 48:5, 102:3

EXXON'S 48:24
Exxonmobile 35:20, 55:9, 55:16, 57:16, 91:2, 99:25, 100:3, 100:12, 100:17, 101:9, 101:19, 104:24, 106:25, 107:4, 113:8

< F >
F&O 103:2
face 80:15
faces 83:19
Facilitate 86:9
facilities 97:17
fact 12:2, 18:19, 22:2, 67:14, 76:24, 79:1, 112:4
factors 109:23
fail 88:2
fail. 87:4
failed 56:9, 56:20, 56:23
failure 87:5, 87:19, 88:2
fair 45:13, 70:3, 84:7
fairly 75:11
falling 51:18
Falls 92:19
false 21:17, 91:11
familiar 36:7
family 5:22, 94:1
famous 92:24, 93:21, 104:9
far 25:17, 54:17, 75:9, 79:12, 83:5, 87:3, 87:22
fast 99:21
faster 93:23
father 4:18, 5:1, 130

gaseous 37:14
Gassing 48:24
gate 93:13
gather 75:15, 100:14
gathered 71:13
gave 8:22, 22:19, 25:20, 29:5, 53:8, 66:22, 82:11
GELLER 1:46
general 102:13
Generally 36:9, 36:11, 67:3, 115:18
generate 66:17, 66:23, 67:11, 67:13, 69:25, 70:2
gentleman 59:21, 62:23, 95:3, 95:10, 95:14
gentlemen 83:15, 93:11, 99:1
gently 78:19, 78:21
geopolitical 101:8, 101:11
gets 33:3, 110:19, 113:23
Getting 5:9, 27:19, 34:10, 88:21, 103:13, 109:15, 110:16, 118:21
Give 14:10, 14:12, 19:10, 20:10, 20:12, 32:1, 74:13, 85:13, 91:14, 98:15, 101:23, 101:24, 103:1, 103:16, 113:18
given 14:12, 18:8, 18:9, 27:20, 41:22, 41:24, 42:3, 42:4, 48:16,

80:22, 85:22
gives 60:21
giving 53:11, 53:14
glad 23:14, 81:15
global 101:9, 113:14, 114:6
globally 99:7
God 4:9
gonna 110:9
governed 36:12
government 99:14, 114:19
governors 36:9
graduate 96:25
graduated 97:2
grandkids 105:10
graph 69:8
Great 20:23, 28:22, 30:4, 30:18, 74:4, 92:6, 92:7, 97:15, 100:15, 101:14
GREATER 1:8
greatest 57:16
green 66:6, 67:11, 67:14, 67:18, 67:21, 68:18
Greenville 2:3
grocery 94:15
GROUP 1:34, 71:11, 71:12, 75:14, 79:5
groups 106:5
Grow 58:12, 58:25, 92:18
growing 94:21, 94:23, 96:11, 96:12
growth 57:17
guarantee 79:11, 79:12
guess 8:8, 29:6, 29:20, 45:1, 73:25, 77:9, 104:12

guessing 5:15
guidance 58:23, 103:9, 107:19
guy 74:6, 74:8, 82:25
guys 104:14

< H >
H. 1:39
Half 42:2, 42:3, 42:4, 63:16, 64:1, 64:19, 65:5, 65:9, 94:5, 104:25, 109:5
Haliburton 98:8
hand 93:17
hands 10:13
hanging 96:5
happen 24:18, 24:24, 111:6, 116:22
happened 12:1, 12:2, 24:19, 25:2
Happens 76:9, 76:10, 102:4, 102:5, 113:5
hard 74:10, 105:10, 116:23
Hardisty 32:14
harm 11:17
Harwood 2:24
hay 105:7
HAYNES 2:23
Haynesville 98:1
he'll 20:12, 77:7
head 11:25
heading 44:23, 50:16, 88:1, 88:20
headline 45:2
hear 15:14, 19:4, 23:14, 70:10, 92:17
heard 12:12, 12:14, 19:3,

39:14, 58:24, 92:1, 95:2, 102:9, 105:18, 105:21, 109:4, 113:7
hearing 12:9
hearsay 80:13, 80:16, 80:21, 80:22, 81:7, 82:1
heating 47:11
held 34:5, 40:25, 88:14, 111:15
helpful 111:22, 112:1
Henry 46:11, 68:3, 69:2, 69:18
hid 9:2
hiding 106:25
hierarchical 89:8
high 46:1, 113:24
higher 109:24
highest 96:14
highlight 111:8
highlighted 109:22
highly 73:7, 86:18
highs 112:19, 112:24
hindsight 88:8, 111:4, 115:22
hindsight. 110:16
HINOJOSA 2:15
hire 95:4
hired 95:11, 95:16
historic 54:23
historically 55:1
history 63:14, 93:21
hitting 116:19
hold 11:12
home 79:15, 132

**App. 296**

94:14, 95:5, 96:6
homework 51:9
honesty 92:10
Honorable 1:26, 4:6, 4:9
Hope 30:9, 30:17
Horne 20:1, 61:17
Horse 93:6, 93:9, 93:14, 93:15, 93:21, 93:23, 105:8
Horses 72:25, 93:22, 105:7
hotel 99:12
hour 95:12, 95:13, 95:15
hours 9:3, 29:20, 90:15, 95:9
Houston 27:22, 77:5, 97:24, 98:15
Hub 46:11, 68:3, 69:2, 69:18
Hughes 98:8
human 93:7
hundred 91:16
hundreds 91:17
hung 96:6
hungry 118:21
hurt 10:24
hydraulic 98:2

< I >
idea 29:18, 41:5, 41:6, 115:19
ideas 86:9
identical 79:18
Identified 120:18
identifying 118:11
ignore 112:19, 112:20

immediately 8:9, 11:15, 38:25, 84:10
impact 113:2
impacts 110:15, 112:11
impaired 91:7
impairment 61:25, 62:1, 66:3, 67:15, 67:17, 67:18, 90:25
important 96:11, 96:12, 114:12
impossible 111:13
improper 18:17
improve 72:15, 73:5
in. 74:20, 74:23, 83:10, 83:20, 102:24, 117:2
inadequate 107:5
incidents 103:4
include 21:24, 25:20, 31:25, 33:8, 33:14, 33:23, 34:1
included 42:16, 65:9, 118:1
includes 33:2
Including 24:15, 41:20, 42:16, 49:15, 76:22, 109:14
inclusive 118:14
incomplete 67:2
increase 59:5
increased 65:5
independent 43:17, 99:18
INDEX 120:1
indicated 60:16
indicates 61:3
indicating 24:6, 111:16

individual 59:14
Individually 1:6
individuals 86:22
industry 55:5, 55:8, 55:23, 55:24, 55:25, 58:17, 61:24, 97:15, 108:10
influence 113:19, 113:20
inform 104:3
information 40:21, 40:22, 40:24, 57:9, 64:8, 78:7, 105:23, 106:7, 106:11, 106:17, 106:25, 108:16, 109:14, 111:22, 111:24, 111:25, 112:5
informed 5:3, 102:8
informing 59:16
inkling 12:13
input 86:11, 89:8, 89:9, 106:6, 106:13
inside 97:19
Insight 85:2
Insights 86:4, 86:7
inspector 39:13
instead 10:16, 49:21
instruction 7:16, 8:3, 8:6, 8:8, 8:22, 23:5, 27:19, 48:15, 82:13
instructions 82:20
instructive 113:6
integrity 92:11
intent 77:16
interest 43:24

interested 108:12
interestingly 7:17
International 99:5
interrupt 92:23
Interview 52:14, 53:1, 120:22
introducing 53:18
introduction 53:17, 53:24
investigation 27:23
investing 101:21
investment 57:13, 66:5
investments 90:5, 101:21
investors 57:11, 57:17, 90:18, 90:20, 107:1, 112:2
invited 86:12
involved 23:20, 99:20, 103:12, 105:7, 111:20, 112:6
IPO 67:24, 68:11, 68:14, 68:15
irrelevant 52:14, 52:16
Irving 77:2, 77:3
issuance 38:5, 38:9, 38:12
Issuance. 38:3
issue 7:2, 10:11, 10:16, 10:18, 10:22, 11:5, 11:10, 11:25, 16:1, 17:22, 21:3, 21:17, 21:20, 21:21, 22:3, 27:12, 77:15,

133

least 24:6, 37:19, 46:18, 111:17
leave 5:2, 72:17, 104:15, 104:17
left 46:12, 65:22, 72:8, 77:2, 84:4, 84:6, 87:3, 97:20
Legacy 44:23, 56:9, 56:20, 56:23
legal 24:18
lengthy 30:2, 53:1, 75:11
Less 35:21, 66:17, 66:23, 67:11, 67:13, 67:24, 68:24
letter 11:11, 22:10
lied 90:20
light 115:7
likelihood 109:24
likely 11:19, 61:23, 69:23, 117:13
limestone 98:1
limine 10:14
limit 29:22
Limited 27:16, 56:5, 57:13, 99:17
limiting 118:7
LINDELL 1:40
Line 10:9, 20:6, 41:12, 41:14, 63:15, 65:21, 65:24, 66:6, 66:17, 67:11, 67:12, 67:14, 67:18, 67:21, 68:3, 68:18, 68:19, 68:20, 69:18, 98:1, 120:4
lines 22:16,

60:21, 78:11
liquefied 100:7
liquid 37:13, 37:15, 114:1
liquified 99:13
list 22:19, 24:19, 28:13, 72:7, 72:8, 73:18, 74:25, 115:6
listed 32:7
listen 29:2
listening 105:19
literally 77:22
litigation 14:3, 20:5
littered 80:18
little 23:7, 25:5, 29:7, 34:21, 42:2, 48:2, 66:21, 92:16, 92:21, 93:13, 97:18, 98:4, 105:16
live 92:25, 93:7, 93:8
lived 99:11, 117:3
living 94:13, 113:1
LLP 1:46, 2:16, 2:23, 2:34
lobby 114:20
located 45:16
log 7:6, 16:25, 17:8, 17:10, 18:1, 23:23
LONG 2:45, 19:13, 19:18, 28:24, 42:6, 92:7, 102:3, 113:4, 113:5, 114:2, 116:25, 117:2, 117:4, 117:13
long-term 54:25, 60:11, 62:1, 62:5, 62:11, 62:16,

69:13, 69:17, 102:3
longer 25:5, 29:18, 30:3, 112:1
Look 9:6, 11:16, 15:19, 19:10, 19:15, 20:7, 26:3, 37:3, 44:22, 47:4, 47:18, 52:17, 52:24, 61:21, 66:24, 79:6, 81:6, 85:17, 85:23, 88:23, 90:21, 104:2, 105:20, 106:6, 107:7, 109:4, 111:5, 111:9, 112:21, 112:22, 114:14, 115:4, 115:12, 115:23
looked 36:19, 37:5, 37:19, 43:10, 50:25, 55:19, 60:15, 62:4, 87:18, 111:21
Looking 37:23, 37:24, 38:1, 41:11, 56:12, 58:22, 58:23, 69:18, 73:4, 103:5, 107:21, 110:3, 110:9, 110:10, 110:24, 111:3, 114:23, 115:14, 116:20, 116:7, 117:7, 117:11
Looks 49:14, 71:10, 71:17
lose 25:21
losing 21:18, 54:6, 55:6, 55:22
loss 63:19, 63:22, 65:2
losses 12:18,

63:25, 65:4, 65:5
lost 64:19
lot 39:13, 40:20, 75:8, 76:23, 77:4, 81:7, 95:24, 97:14, 98:6, 98:7, 99:7, 100:21, 101:2, 101:9, 101:10, 102:1, 103:10, 103:16, 103:21, 103:22, 106:5, 106:10, 109:6, 117:3, 117:9
lots 106:13
loud 80:11
loved 83:1, 103:18
low 47:25, 48:3, 48:5, 54:15, 58:13, 59:4, 59:10, 108:20, 113:23
low-price 55:5, 58:17, 58:18, 58:25, 108:10, 109:17, 115:2, 118:9
lower 34:21, 48:2, 58:6, 66:14, 66:17, 66:24, 67:1, 67:4, 114:23, 114:24
lowered 60:11, 60:14, 61:4
lowest 59:22, 59:25, 60:6, 97:6
lows 112:20, 112:24
lunch 102:17, 118:20, 118:22
LYUBA 2:31

< M >
M&A 59:5

135

78:17, 103:10, 109:1, 111:8, 115:22, 117:13
issued 61:23
issues 21:8, 24:11, 52:25, 75:10, 75:19, 77:10, 77:23, 102:23, 104:1, 107:16, 108:2
it. 88:18
item 36:14, 78:6
items 40:20, 42:14
itself 111:5, 114:24, 114:25

< J >
J. 1:19, 2:28, 3:12
janitor 95:16, 95:17
janitors 95:13, 95:15
January 7:4, 17:24
Japan 114:9
JASON 2:22
JEFFREY 1:19
Jersey 99:4
job 76:25, 95:2, 95:25, 97:6, 97:14, 97:22, 97:23, 98:11, 98:14, 100:24, 112:9
jobs 94:23, 95:2
JOE 1:33
jokes 72:19
JORDAN 2:22
Journal 48:23, 49:7, 51:11, 51:23, 52:6, 78:24, 79:2, 79:9, 79:11, 79:14, 79:16, 79:17, 82:24,

83:16, 83:25
journey 100:14
JR 1:6
Judge 1:27, 4:7, 72:9, 81:15, 94:10, 95:20, 113:4
judgment 58:19, 58:20, 112:6, 112:12, 117:1
judgments 112:9, 117:19
jurors 8:20, 8:25
Jury 5:3, 5:5, 6:2, 6:24, 10:12, 18:17, 22:8, 25:5, 27:25, 30:12, 30:13, 40:14, 71:3, 71:5, 76:22, 77:10, 83:11, 83:12, 97:8, 99:1, 100:16, 118:25
jury. 4:3, 25:14, 27:10, 71:4, 80:6

< K >
Katy 97:3, 97:9, 97:10, 97:11, 97:20
Kazakhstan 99:20
Kearl 20:4, 20:6, 21:18, 31:11, 32:13, 34:12, 35:17, 36:22, 37:5, 37:12, 51:1, 63:1, 64:19, 75:14, 77:18, 77:24, 78:4, 91:3, 100:8, 106:10, 109:6, 117:24
keep 25:1, 76:3, 88:18,

98:11
Kelsey 98:23
KENDALL 1:33, 1:34, 83:6
kept 76:6
Key 14:14, 58:10, 78:3, 92:9, 109:11, 109:22
Khorat 99:9
kidding 74:5
kids 5:1
kill 88:17
kind 12:11, 44:1, 52:5, 55:13, 71:9, 74:4, 75:15, 78:14, 90:17, 92:4, 94:23, 106:19, 112:20, 112:21, 114:22, 115:14
kinds 106:7
King 2:16, 44:23, 98:22
Kingsfield 98:19
Kinkeade 1:26, 4:7
knowledge 104:2
knows 13:5
Kroenke 94:6

< L >
L&G 114:9
labeled 63:8, 68:3
labor 95:7
lack 7:16, 22:1
Ladies 83:15, 93:11, 99:1
landowner 94:7
language 21:5, 21:11, 23:20, 115:25, 117:20, 118:1
large 97:11, 102:7
largely 100:20

largest 36:22, 42:13, 57:10, 94:6, 97:10
last 17:23, 23:13, 48:25, 57:10, 66:21, 89:7, 94:1, 109:5, 110:13, 114:5, 116:25, 117:4
lastly 101:8
late 88:14, 116:5, 116:13, 116:14
later 7:14, 9:3, 40:25, 42:5, 79:23, 112:3
LATHAM 2:40
Laughter 6:11, 26:11, 28:17, 80:2
LAW 1:34, 2:2, 22:10
lawn 94:25
lawnmower 94:25
lawns 94:25
laws 95:7
lawyer 5:7, 5:23, 20:16, 22:5, 22:12, 23:22, 24:22, 24:23, 28:16, 29:4, 104:4
lawyers 7:1, 18:9, 20:2, 22:7, 22:8, 22:14, 23:9, 23:19, 24:16, 25:6, 72:19
lead 62:20, 62:21
leader 96:24
leadership 45:5
leading 90:8, 100:19
leads 88:25
learned 95:13
Learning 86:24, 97:18

134

M. 2:12
Mad 82:24, 82:25
Madden 109:5
Magazine 82:24, 83:1
mailed 95:6
main 71:19, 80:19, 82:1
maintaining 88:12
major 100:5, 100:8
maker 113:8
man 103:24
manage 100:21, 101:1, 101:5, 101:8, 105:4
managed 101:4
Management 57:23, 60:10, 86:14, 98:16, 100:20, 102:9, 102:10, 102:12, 102:17, 103:4, 108:1, 108:3, 111:14
manager 98:18, 99:4
Managers 88:3
managing 101:11, 101:13
mandatory 43:7
manifest 6:23, 7:13, 7:20
manifestly 17:7, 18:8
manipulate 90:24
marked 8:20, 35:5, 40:2, 50:3, 51:10, 52:3, 52:11, 59:12, 63:5, 65:11, 84:23
market 32:2, 32:13, 49:23, 109:7, 109:13, 113:14, 113:16, 113:18, 113:19,

113:21, 114:1, 114:8, 114:10
marketplace 113:13
markets 32:23, 33:3, 33:13
markets. 32:24
marking 40:1, 50:2, 52:2, 56:1, 70:4, 70:6
married 72:23, 94:14
material 10:15, 18:20, 35:24, 36:5, 37:20, 75:8, 110:15
Matt 59:14
matter 27:17, 50:9, 91:4, 91:8, 103:23
maximum 65:25, 69:13, 69:19, 69:22, 70:1
Mbtu 59:18
MD&A 107:25
mean 6:4, 8:23, 8:25, 10:9, 10:18, 31:2, 47:5, 63:16, 73:1, 73:2, 76:11, 76:14, 76:19, 76:23, 76:25, 80:9, 80:25, 111:1, 113:10, 114:14
meaning 55:4
means 32:18, 40:15, 41:22
meant 68:11, 82:14
measure 47:16
measured 47:11
measurement 47:10
mechanical 3:7
meet 60:5, 62:19, 62:20, 102:23
Meeting 7:3,

7:4, 11:23, 16:24, 17:19, 19:20, 24:23, 31:22, 31:23, 33:19, 34:5, 34:11, 34:20, 34:22, 35:2, 39:3, 39:5, 40:19, 40:25, 61:18, 62:9, 64:3, 64:4, 86:5, 86:13
meetings 7:2, 12:20, 17:16, 17:18, 103:16, 106:21, 106:24, 107:3
MELSHEIMER 2:12, 9:13, 9:23, 10:2, 10:7, 25:16, 28:2, 44:14, 48:11, 120:12
memo 9:15
mention 5:17, 78:5
mentioned 14:4, 26:13, 29:11
mentions 78:4
Mercy 76:19, 77:2
merger 49:22, 99:25, 100:3
messages 10:17
met 29:3, 62:25, 63:3
Metrics 85:2, 86:4
Mexico 93:22
Michael 2:7, 34:24, 35:14
microphone 8:17
mid-march 11:11
Middle 31:21, 32:8, 35:11, 54:2, 87:9, 88:12, 100:7, 115:23, 116:23
million 12:19, 35:17, 38:14,

38:17, 39:24, 41:19, 42:15, 42:22, 42:24, 43:11, 63:19, 64:19, 65:2, 93:14, 94:5
mind 15:5, 78:8
minimum 13:4, 18:11
minute 12:9, 23:8, 25:4, 27:5, 103:18
minutes 39:1, 39:2, 85:13
mirror 110:19
misimpression 79:21
mislead 118:12
misleading 91:12
misrepresentation 22:11, 22:20, 25:2
missing 10:6, 10:25, 11:2, 13:3, 88:13
mission 101:12
misspoke 68:11
mistake 68:15
Mmbtu 47:13, 47:23, 48:3
MOBILE 1:17
modified 118:2, 118:3
mom 94:15
moment 109:20
Monday 10:21, 102:22, 102:25
Monday. 49:2
money 21:18, 31:10, 54:7, 55:17, 93:16, 93:19, 94:2, 101:19, 101:20, 101:21
month 12:20, 34:5, 35:3, 48:3, 67:24, 102:21
months 13:3,

136

47:20, 47:23, 48:7, 51:24, 52:1
Moody 38:17
morning 26:25, 28:15, 30:25, 31:1, 82:11
Motion 6:14, 6:22, 9:6, 10:14, 14:5, 15:22, 23:3, 82:12
motions 4:11, 9:9, 82:12
Mountain 44:17, 45:16, 77:18, 77:25, 91:7, 106:10
mouth 83:17
Move 40:5, 53:21, 66:25, 94:19, 118:18
moved 92:20, 92:22, 98:25, 99:3
moving 98:16
mowing 94:24
MR. BURKHOLZ 6:17, 6:19, 26:12, 26:16
MR. TOAL 13:9, 13:19
Ms 4:15, 14:19, 20:22, 22:25, 27:7, 84:17
multiple 23:3, 80:21, 118:15
Murray 53:24, 54:3, 54:19, 55:8
myself 104:12

< N >
N. 2:24
NAME 22:5, 24:22, 59:21, 62:22, 78:6, 82:25, 120:4
named 14:18, 59:14, 62:23, 93:9, 94:6
narrow 106:8, 106:9
NATHAN 1:40
Natural 37:13, 44:16, 45:12, 45:15, 45:25, 46:16, 46:22, 47:10, 47:14, 47:19, 47:22, 48:5, 49:14, 51:18, 53:21, 54:3, 54:21, 54:25, 55:6, 55:18, 60:5, 60:12, 62:5, 62:12, 99:5, 99:13, 100:7, 112:19, 113:13, 114:1, 116:4, 116:7, 117:7, 118:6, 118:11, 81:24
near 93:12
nearby 93:1
nears 106:14
necessary 5:17
need 5:11, 6:12, 8:8, 8:9, 19:3, 19:10, 20:16, 20:20, 26:7, 29:6, 30:7, 30:21, 54:14, 58:24, 59:1, 70:9, 78:19, 78:21, 81:6, 83:15, 101:23, 106:20, 111:6
needed 21:17, 22:1, 29:4, 102:14, 103:13, 109:14, 110:6
needs 5:3
Neftegas 99:16
negative 64:22, 64:24
negotiating 99:12
net 49:16, 58:12, 58:25, 114:5
Neuman 83:1
New 2:36, 8:23, 58:6, 73:5, 85:16, 93:22, 99:4, 100:2, 114:4, 115:25, 117:16
newspaper 27:15, 48:12, 48:15, 50:4, 50:12, 56:2
newspapers 79:14
next 32:12, 36:25, 37:12, 42:21, 58:4, 58:9, 61:10, 86:6, 86:9, 99:8, 109:21, 112:16
nice 46:20
nickles 98:12
NINA 2:21
No. 1:15, 11:9, 12:24, 16:10, 17:5, 19:14, 25:8, 28:21, 28:24, 73:4, 78:5, 80:1, 90:1, 91:13
nominated 104:19
None 101:18, 101:19
North 63:9, 118:7
Northern 1:2, 4:5
noted 6:17, 61:25
Notes 19:19, 30:20, 31:22, 45:4, 88:23
Nothing 15:3, 16:15, 16:16, 21:7, 21:16, 24:16, 24:17, 75:13, 77:20, 77:22, 102:4
notice 5:5, 6:4, 6:7, 6:8, 27:25
noticed 5:6
notion 8:25, 9:22, 10:5
number 20:21, 24:15, 32:12, 33:7, 37:4, 40:6, 45:12, 46:11, 63:13, 101:25, 105:5, 108:25, 109:10
numbers 9:25, 37:6, 47:5, 91:4, 91:22, 106:20
numerically 69:9
NY 2:36
NYAG 14:19
NYMEX 59:17

< O >
o'clock 98:10
O'riordan 62:23
object 52:16, 56:14, 70:8, 70:23, 75:1, 75:3, 81:1
objected 8:21, 75:2
Objection 8:21, 9:3, 40:4, 48:15, 52:22, 56:3, 56:13, 56:17, 74:6, 75:5, 75:20, 75:22, 81:2, 81:3, 82:1, 90:8
objections 80:8, 80:9
objective 58:12
Objectives 58:10, 85:12,
86:6
obligations 49:25
observation 55:3, 116:20
observations 54:19
observed 65:4
obsessed 93:11
obviate 81:6
obviously 66:9, 106:3, 106:8, 106:11, 110:17
occur 5:4, 31:11, 44:10
occurred 35:2, 62:10, 62:13, 99:25
occurring 107:22
offer 49:15, 57:14, 74:23
offered 49:1, 50:7, 70:14, 72:4
offering 31:18, 38:4, 38:6, 68:1, 68:21
office 96:6, 99:10, 99:11, 102:16
officed 102:11
OFFICER 4:4, 25:13, 30:12, 83:12, 118:24
Official 3:13
offshore 100:5, 100:6
often 88:14, 102:10
Oil 47:13, 50:17, 57:10, 57:18, 58:16, 76:21, 77:5, 97:12, 98:20, 109:16, 113:12, 113:14, 116:4, 116:6, 116:7, 117:9, 117:20, 117:23, 118:6, 118:11
Oklahoma 92:22, 95:1, 95:7, 96:3, 96:5
old 73:6, 95:3, 96:3, 104:9, 105:1
Olive 2:17
Oliver 1:42, 4:15, 22:25
on-average 112:21
on-point 7:18, 23:16
Once 22:24, 26:9, 67:19, 105:23, 106:18, 110:17
one-time 38:8
ones 15:1, 15:10, 17:16, 37:9, 92:9
OPEC 113:20
open 18:10, 27:10, 83:8, 83:9, 87:12, 98:7, 102:11, 103:15, 119:2
opened 7:23, 9:17, 9:23, 17:14, 19:10, 24:1
opening 6:24, 7:15, 7:22, 7:23, 9:14, 11:22, 19:1, 19:2, 19:12, 22:6, 24:1, 29:6, 57:17, 61:14
operate 101:11, 114:21
operated 97:10
Operating 84:19, 98:24, 103:3
operation 97:13, 100:21, 105:6, 105:8, 109:15, 114:24, 114:25
operations 57:9, 57:15, 109:17, 113:3, 116:7, 117:21, 117:23, 118:6, 118:7
opinion 5:13, 5:15, 5:18, 75:18, 75:19
Opportunities 58:6, 101:6, 101:14
opportunity 40:20, 54:23, 102:18
opposed 34:3, 87:5, 87:19
Option 32:12, 32:22, 32:25, 33:2, 33:7, 33:11, 33:14
optionality 88:12
options 32:1, 32:7, 32:9, 32:21, 33:6, 33:24
order 4:4, 18:12, 98:2
ordinary 81:25
organization 100:20, 109:3, 112:23
organizations 106:5
Others 1:7, 57:5, 58:24, 103:21, 104:2, 105:22, 112:10
ourselves 105:10
outcomes 108:7
outlook 60:12, 62:5, 62:12, 69:24, 102:3
outlook. 62:1
Outside 4:3, 10:12, 25:14, 27:10, 71:4, 80:6, 96:10
outweighs 80:20, 82:2
overall 80:22
overcome 76:15
overload 111:24
overly 82:2
overrule 56:17
Overruled 53:3, 80:23, 82:4, 82:5, 90:9, 90:11
overruling 82:6
Overview 58:2, 103:2
own 10:13, 24:9, 42:8, 43:24, 78:10, 112:14
ownership 42:1

< P >
P. 1:18
Pacific 94:14
pages 8:20, 8:21, 9:1, 19:14, 26:1, 63:13, 88:11
paid 38:20, 38:21, 49:9, 94:18
pam_wilson@txnd.uscourts.gov 3:16
PAMELA 3:12
paper 26:19, 88:7
paperwork 95:4, 95:6, 95:11
paragraph 39:9, 39:11, 45:21, 49:12, 50:19, 51:16, 53:17
paragraphs 57:6
parameters 103:3
parents 95:5
Parsons 20:15
part 20:19, 24:16, 24:17, 75:13, 77:20, 77:22, 102:4
32:1, 33:9, 40:18, 42:12, 42:13, 44:17, 45:11, 51:17, 52:6, 52:8, 55:21, 55:24, 74:13, 79:9, 90:17, 106:9, 111:1, 112:19, 115:21
partially 25:22
participant 55:25
participate 41:7, 41:9, 106:21
particular 78:6, 107:19
particularly 22:15, 108:12
parts 76:2
Party 2:8, 3:4
pass 89:17
past 112:17
PATRICE 3:3
PATRICK 2:45
pattern 10:10
PATTON 2:46
Paul 2:34, 59:21
Pause. 27:6, 85:20
pay 42:10, 98:13, 98:14
payment 38:12, 39:18, 42:7
PEDRO 1:6
PENNSYLVANIA 1:9
pens 30:20
PENSION 1:9, 42:17, 42:18
people 11:16, 13:14, 13:24, 22:19, 24:15, 71:14, 75:15, 76:24, 79:10, 80:16, 86:15, 91:14, 91:18, 92:4, 92:6, 92:8, 92:12, 98:11, 100:22, 100:24, 103:22, 104:13, 106:13, 117:9
Per 47:7, 47:8, 47:23, 49:16, 59:18, 64:24
percent 32:12, 32:17, 32:18, 32:22, 33:1, 33:3, 33:4, 33:7, 33:11, 34:2, 34:3, 35:19, 35:21, 35:22, 36:4, 36:12, 36:13, 37:4, 37:5, 37:6, 37:13, 37:14, 37:17, 48:25, 49:9, 50:22, 51:6, 60:14, 61:6, 77:5
percentage 32:17, 36:16
percussion 96:24
perecent 36:2
perform 91:21, 115:2
performance 113:3
period 9:7, 11:19, 43:3, 51:3, 55:17, 116:5
periods 113:4, 113:5
permit 95:8
persist 117:14
person 71:21, 74:23, 75:6, 81:1
personally 91:11, 91:21
perspective 105:20
pertains 90:13
pertinent 73:14
possibly 7:16, 91:16
potential 23:5, 107:11, 108:1, 111:12, 111:17, 112:2
Powerpoint 7:5, 19:21, 19:22, 19:23
pray 4:8
pre2000 60:2
preadmitted 7:6
preapproved 39:23
preference 88:24
prejudice 76:16, 82:17
prejudicial 73:7, 75:9, 76:18, 80:11, 80:20, 82:2
premium 48:25, 49:10
prepared 59:1, 61:18, 62:9, 81:24
prepares 81:19
preparing 111:4
presence 4:3, 10:12, 25:14, 27:10, 71:4, 80:6
present 101:14
presentation 7:5, 19:21, 57:23
presented 66:10, 78:7, 107:15, 116:17
President 84:14, 86:20, 99:8, 99:16, 99:17, 100:2, 103:11, 103:14
presidents 102:13, 102:24
presiding 4:7
Pretty 79:13, 85:18, 103:17, 117:15
preview 30:2
previews 61:14
previously 35:5, 48:16, 57:21, 59:12, 63:5, 65:11
price 32:13, 46:19, 47:22, 48:6, 49:2, 49:5, 58:6, 58:13, 59:4, 59:10, 62:1, 62:5, 62:12, 66:1, 66:24, 67:1, 67:6, 69:13, 69:17, 69:19, 69:22, 69:24, 70:1, 113:8, 113:18, 113:23, 113:24, 113:25, 114:11, 114:13, 114:16
prices 46:16, 51:18, 55:18, 60:6, 60:12, 108:20, 113:13, 116:4, 116:13, 116:14, 116:15, 116:17, 116:18
Pricewaterhouse 110:10
pricing 31:11, 34:12, 66:20, 114:7
pride 88:13
Primarily 99:19, 116:7, 117:20, 118:5, 118:10
principal 97:23
principally 97:22
print 52:5, 79:6, 79:18
prior 15:19, 16:17, 26:4, 78:3, 108:5
private 94:7
privilege 7:7, 8:20, 9:7, 17:8, 17:10, 18:1, 18:11, 18:17, 18:18, 22:5, 23:17, 23:21, 25:17
privileged 7:6, 16:25, 18:1, 22:4, 23:23
privy 73:1
proactive 110:4, 110:5
proactively 109:23
Probably 72:18, 99:22, 110:22
probative 75:9, 75:10, 76:15, 76:18, 77:10, 77:12, 80:12, 80:21, 82:2
problem 11:13, 17:11, 56:16, 81:4, 103:14
proceed 103:9
Proceedings 3:7, 80:5, 119:4
process 17:15, 24:12, 31:11, 34:12, 78:2, 86:7, 90:2, 92:7, 97:18, 105:17, 105:20, 105:21, 111:2
processes 92:5, 100:23
processing 97:12, 98:21
produce 13:17, 15:9, 16:5, 37:10
produced 3:8, 12:7, 13:6, 13:11, 13:13, 13:20, 15:4, 15:10, 16:8, 16:14, 18:2, 40:18, 70:19
producer 114:7
producers 57:10
producing 63:15, 97:16
Production 17:9, 97:7, 97:8, 97:23, 98:21, 99:9, 100:6, 100:11
productive 98:3
profess 103:24
professional 94:18
profit 64:20, 64:24
profitability 22:1, 63:14
profitability. 64:16
progressing 103:8
project 99:13, 100:8, 109:15
projects 100:5, 100:9
proof 81:8
prop 98:7
property 94:2
proposal 43:17, 44:4, 44:5, 44:12, 72:6
proposals 41:3, 41:5, 43:16, 44:6
proposed 43:19, 115:6
protect 100:22, 100:23
prototypical 7:21, 23:20
prove 79:20
proved 21:19, 22:2, 35:20, 36:2, 36:4, 36:5, 36:22, 37:7, 37:9, 37:14, 45:12, 91:3, 109:1, 116:6, 116:9
proven 49:17
provide 14:25,

54:10, 54:13, 60:20, 107:18
provided 86:13
providing 57:11, 107:4
Proxy 40:2, 40:9, 40:15, 40:17, 43:14, 120:20
public 14:18, 14:21, 46:6, 49:5, 89:14
publicly-traded 57:10
pull 36:18, 44:20, 84:22
pump 98:10
pumps 97:17
purchase 45:6, 45:24, 46:6, 49:20
purchased 45:5
purpose 18:17, 27:16, 48:21, 56:5, 107:16
purposes 11:6, 18:3
pursue 101:6, 101:14
pursuing 101:16
push 91:18, 94:25
put 8:19, 10:15, 16:25, 18:17, 25:25, 40:23, 44:18, 53:5, 74:19, 74:20, 74:21, 80:7, 103:6, 106:16, 113:15
putting 60:22, 105:17, 106:4
Pwc 39:18, 39:24, 61:13, 61:18, 62:19, 62:25, 63:10, 63:24, 64:4, 65:9

< Q >
qualify 22:2, 91:3, 116:9
quantified 108:19, 108:25
quantitatively 108:7, 108:18
quantities 116:6
Quarter 21:4, 47:19, 93:21, 116:19
quarterly 57:12, 106:2, 106:4
quarters 98:12
question 15:6, 15:7, 22:18, 33:9, 33:10, 36:3, 54:2, 54:9, 62:10, 67:3, 77:9, 108:24, 111:22
questions 10:22, 24:2, 26:7, 43:14, 71:15, 81:20, 108:17, 108:18, 108:21, 110:25
quick 23:13, 27:8, 89:24, 103:1, 103:5
quickly 69:16, 70:1, 115:12, 117:15
quit 21:12
Quite 42:6, 66:13, 93:18, 100:14, 105:18
quote 9:13, 14:21, 22:14, 88:3
Quotes 80:15, 88:23

< R >
R&DG 75:14
R. 1:40
race 95:23

rail 33:8, 33:11, 33:13, 33:15
raise 4:14, 17:22, 52:17, 93:17, 106:25
raised 9:9, 10:20, 11:5, 11:11, 17:12, 21:25, 24:12
raising 10:16
RAMIREZ 1:6
Ranch 93:5, 93:13, 93:25, 94:5, 98:22, 98:23, 105:6
ranches 98:21
range 46:19, 116:4
rank 96:14
ranks 57:10
rate 38:20
rated 38:17
rather 78:21
rating 38:16
ratings 38:13
re-call 70:15, 72:5
reach 30:4, 69:19, 69:22, 91:18
reached 43:6
reaching 69:25
reacting 108:13
read 7:11, 7:25, 20:5, 32:4, 32:15, 32:19, 32:20, 33:8, 33:18, 45:3, 45:23, 46:3, 49:3, 49:18, 50:23, 51:21, 53:24, 54:14, 56:9, 56:24, 57:19, 59:7, 60:3, 62:2, 62:14, 63:11, 79:17, 87:8, 88:15, 88:16, 89:5,

89:6, 116:3, 116:10, 118:8
reader 118:12
reading 29:9, 78:8
reads 33:11, 51:17
ready 25:17, 29:15, 29:23, 98:10
real 10:1, 27:7, 87:15, 99:21, 103:5, 113:2, 115:12
really 6:8, 10:6, 10:19, 27:19, 46:20, 73:1, 73:8, 74:6, 74:23, 88:7, 93:25, 103:10, 104:1, 105:21, 105:22, 106:16, 109:7, 109:10, 109:14, 110:3, 111:22, 112:1, 113:13, 114:13, 116:20, 117:4
rear 110:18
reason 80:19, 101:17
reasonably 108:7, 110:15, 112:11
rebut 7:15
recall 49:20, 51:8, 53:11, 53:13, 53:14, 55:20, 62:22, 109:11
receive 8:12, 13:23, 42:5, 42:7, 64:5
received 12:8, 13:7, 13:25, 38:16, 42:21, 42:24, 43:11, 64:6
receiving 42:20
recently 94:1
141

restoring 97:22
restricted 41:25, 95:9
restroom 26:20, 79:25
result 91:19
results 63:1, 98:15, 108:5
resumed 80:5
retired 84:19
retirement 42:5, 43:2, 43:5, 43:7
return 5:16
returning 5:2
Reuters 56:7, 57:8
reveals 65:17
revenue 66:22, 67:13, 70:2, 70:3
reverse 56:9, 56:19, 56:22
Review 7:9, 31:11, 34:13, 51:1, 61:13, 63:9, 65:8, 75:15, 75:17, 85:11, 86:6, 89:24, 107:11
Reviewed 63:10
reviews 71:14, 77:11, 89:4
revised 62:5
revision 62:1
revisit 16:1
rewarded 88:4
REX 1:18, 3:1, 44:23, 120:6
ride 100:15
Rides 44:23
RIFKIND 2:34
rigs 98:8
rim 97:13
rise 4:4, 25:13, 30:12, 36:6, 83:12, 118:24
Risk 88:1, 100:20, 100:21,

100:22, 101:1, 101:4, 101:5, 101:11, 103:4, 108:19, 108:25, 109:16, 109:24, 111:12, 111:14, 111:17
risks 101:2, 101:8, 101:13, 108:2
river 92:21
RMR 3:12
Rob 57:18
ROBBINS 1:46
Robert 84:11
rocking 88:4
Rocky 44:17, 45:16, 77:18, 77:25, 91:6, 106:10
role 4:16, 4:25
roles 99:2
rolls 98:11
Ronnie 20:12
room 72:14, 86:16, 103:24
Rosenthal 1:20, 20:1, 61:17, 107:14
Ross 2:47
round 37:5
rub 83:20
rubbing 83:19
RUDMAN 1:46
rule 23:9, 25:23
ruled 82:10
rules 108:16
run 46:1, 73:6, 105:7
Running 50:17, 95:19, 111:14
runs 105:8, 113:22
Russia 99:16, 100:1
Russian 99:17
RWT 61:14, 61:15

< S >
S&P 38:17
S. 1:19, 32:23, 33:3, 33:12, 33:15, 47:18, 49:14, 55:18, 62:11, 100:1, 104:19, 114:2, 114:3, 117:7, 118:11
SAATHOFF 2:13
SAB 36:7
safety 103:3
SAHAM 1:39, 16:15, 26:12, 26:17, 29:15, 30:22, 40:14, 41:13, 52:4, 53:7, 86:1, 86:2, 120:8, 120:10
sale 32:24, 33:12, 47:16, 93:17, 109:9
sales 21:25, 31:25, 32:25, 33:1, 33:2, 33:4, 33:15, 33:16, 33:24, 34:1, 34:2, 99:5, 99:6
SAM 1:41
San 1:48, 4:20
Sanaa 99:11, 99:12
sands 109:17, 116:7, 117:20, 117:23, 118:6, 118:11
SARA 1:44
sat 97:16
save 75:24, 93:16
saved 16:9
saw 13:7, 63:21, 64:19, 76:21, 104:12
saying 6:24, 9:23, 10:6,

11:7, 11:9, 11:11, 12:1, 12:11, 12:20, 12:24, 23:18, 81:8, 104:9, 117:12
scaling 49:13
scary 23:8, 23:9
schedule 105:11
scheduled 43:5
Schleckser 70:14, 71:24, 72:1, 72:5, 73:11, 73:12, 73:13, 73:17, 74:8, 74:20, 75:25, 84:11
scholarship 96:18
school 96:10
SCOTT 1:39, 2:39
Scout 72:23, 96:15
Scouts 94:18, 96:13, 96:14
screen 8:19, 10:16, 26:1, 53:5, 107:10
scrutiny 115:20
seal 96:5
sealed 25:21
seated 4:10, 30:17, 83:14
SEC 20:16, 22:15, 31:11, 34:12, 36:6, 36:9, 36:10, 36:15, 40:3, 40:9, 62:12, 106:16, 107:18, 107:24, 108:11, 109:24, 110:3, 110:9, 110:16, 110:19, 111:21, 115:20, 116:5
second 8:7, 27:8, 32:6, 32:8, 35:11,
143

Recess 25:12, 80:4, 119:3
recipient 12:25
recipients 11:8
recognition 110:2
recognize 52:5, 107:9
recognized 11:12, 110:8
recognizing 111:2, 115:21
recollection 38:5, 45:10, 46:9, 60:5, 60:8, 60:13, 118:17
recommendation 41:8, 41:9
recommended 44:5, 44:7, 44:11
record 8:1, 9:14, 10:20, 11:7, 14:18, 14:22, 25:21, 68:12, 70:13, 70:18, 70:20, 72:9, 80:8, 80:11, 80:14, 80:25, 81:5, 81:7, 81:8, 81:21, 81:22, 82:11, 82:16, 83:7, 83:8, 119:1, 119:2
record. 27:9
Recoverability 63:9
Recovery 61:13
recruited 94:17
red. 54:7
redacted 7:7, 8:11, 9:1, 16:24, 17:2, 17:3, 17:17, 17:20, 17:21, 18:5, 18:7, 18:13, 18:16, 18:20, 18:21,

19:11, 20:20, 22:5, 23:23, 25:19, 26:13
Redburn 57:13, 57:15, 57:18
redo 9:4
reduce 109:23
reduced 69:13
reduces 101:25
reduction 61:6, 62:11, 62:16
refer 81:11, 104:4, 104:5
reference 20:15, 39:13, 39:14
referenced 55:13
referred 21:16
referring 34:13, 53:20, 59:9, 62:16, 68:14, 106:2
reflective 115:20
regard 16:3, 44:15, 75:21
regimes 114:22
region 45:16
regular 95:8
regularly 81:19
regulatory 57:13
reject 115:10, 115:11
rejected 72:6
rejuvenate 54:24
related 38:3, 117:20
relates 21:3, 112:12
relating 61:19, 116:7, 118:6
Relations 53:9, 53:12, 55:11
relatively 55:2
relevance 56:14, 80:22
relevant 11:19,

12:8, 12:17, 13:19, 52:25, 75:19
relief 8:4, 8:7, 23:4, 114:20
relying 70:19
remaining 26:1
remains 77:9
remarks 73:14, 80:17
remediate 11:17
remember 4:24, 17:6, 20:19, 53:16, 59:14, 84:17, 84:18, 93:20, 93:23, 107:17, 108:21, 116:1
remind 96:7, 96:9
repeat 24:3, 24:5
repeated 24:4
replaced 51:7, 118:10
replacing 51:2
report 71:10, 106:2
reported 3:7, 51:4
Reporter 3:13
reporting 49:8, 49:9, 79:11
reports 106:4
Representative 2:8, 3:4
represented 35:19, 51:6
repurpose. 88:15
request 16:11, 52:23
requested 118:10
requests 13:20, 15:2
require 109:24
required 98:2, 106:17

requires 106:16
research 97:24
Researcher 57:13
reserve 21:19, 22:3, 36:22, 73:21
reserved 72:7, 73:20
reserves 20:4, 20:5, 35:20, 36:3, 36:4, 36:5, 37:7, 37:9, 37:15, 45:12, 45:15, 50:22, 51:2, 51:6, 90:24, 91:3, 108:20, 109:1, 116:6
reserves. 49:17, 116:9
resolved 15:25
resources 58:6
respect 6:22, 8:18, 63:1
respected 86:18, 103:25
respective 51:4
respond 74:14
response 15:10, 54:2, 59:24, 70:12
responsibilities 100:16
responsibility 98:20, 99:5, 100:18, 102:19
responsible 53:21, 100:4, 100:9, 109:3, 110:20
responsive 13:10, 14:11, 15:1, 16:10
responsive. 14:15
rest 18:21
restaurants 94:16
restore 54:24
142

35:13, 37:3, 38:25, 39:9, 39:11, 50:19, 53:17, 53:18, 58:12, 59:4, 61:21, 61:22, 65:5, 70:11, 97:21
second-to-last 51:16
secondguess 76:24, 77:1
secondguessing 76:8
Secretary 71:22, 104:19, 104:21
section 79:16, 96:24, 108:4
secure 54:25
SECURITY 4:4, 25:13, 30:12, 83:12, 104:14, 118:24
seeking 103:9
seems 90:12
seen 17:5, 23:23, 31:3, 31:4, 48:11, 64:9, 70:24, 85:15, 102:20, 106:1, 107:8, 112:14, 116:4, 116:16
segment 57:15
Selected 88:23
self-censored 25:9
self-help 10:11
sell 37:10, 113:16, 114:7, 114:8
Senator 81:12
senior 104:8
sense 104:1
sensitive 6:22, 111:23, 112:3
sent 12:21, 12:22
sentence 33:22,

48:25, 53:18, 118:5
separate 78:16
separately 42:9
separating 43:20
separation 44:9
serious 75:20
services 38:21, 39:20
session 4:6
sessions 107:22
set 43:14, 102:21, 105:5, 113:13, 114:11
several 24:4, 90:15, 98:11
shale 44:16
SHAMAILOVA 2:31
Share 86:7
shared 64:3
shareholder 41:3, 41:4, 43:16, 100:18, 101:12, 101:16, 101:23
shareholders 40:19, 40:24, 40:25, 42:20, 43:19, 43:23, 44:6, 44:12, 49:1, 100:19, 101:7, 101:18, 101:20, 101:21, 107:5, 111:23, 112:1
shares 41:25, 42:1, 42:3, 42:4, 42:6, 42:7, 42:8, 42:10, 42:14, 101:25, 102:1
sharing 63:24, 107:23
sheet 26:19
SHELDON 1:41
Shell 57:14
shield 7:20, 7:21, 22:9, 23:17, 23:21,

23:25
ship 113:15
shipping 114:9
shirt 55:6
shirts 54:6, 55:22
shock 94:2
Shocked 78:13
short 23:16, 114:3, 117:17
shot 23:14
shoulder 110:9, 110:11
shouldn't 27:24, 29:5
show 8:10, 8:25, 9:14, 10:2, 10:7, 15:24, 25:19, 31:5, 35:5, 37:23, 38:22, 40:1, 45:18, 50:2, 51:10, 52:2, 52:11, 56:1, 57:21, 59:12, 61:8, 63:5, 65:11, 70:4, 70:6, 76:5, 77:12, 79:7, 91:4
showed 11:18, 51:1
showing 9:16
shown 9:23, 26:14, 26:15, 79:2
shows 11:2, 41:15, 46:15, 46:20, 63:18, 69:11, 88:7, 91:8
shy 88:7
sic 85:2
side 26:17, 66:22, 81:13, 81:14, 81:17
sidebar 10:20
sides 14:25
sigh 95:14
sign-off 92:11

signal 24:9
signature 96:4
significant 45:11
signing 91:25
similar 114:1
Similarly 1:8
single 6:25, 9:15, 9:24, 36:22
sir 21:6, 43:19, 85:6, 98:25, 107:9, 115:16
sit 29:2
sitting 4:15, 4:22, 5:6, 6:1, 42:9, 105:18
Situated 1:8
situation 8:2, 117:17
Six 31:18, 35:3, 51:24, 52:1, 53:19, 105:13
size 111:17
skill 44:15
skip 70:5
slack 29:7
sleep 98:9
slide 58:1, 58:5, 59:2, 110:14
slight 7:11
Slightly 35:21, 118:2, 118:3
slow 52:18
small 97:12
smart 23:8, 23:9
smartest 103:24
Smiddy 59:14
smiling 83:19
so-called 11:23
softly 44:19
sold 94:3, 94:4, 94:15, 114:2
solicit 86:11
Soloway 2:28,
144

27:7
somebody 6:8, 9:24, 24:14, 24:22, 71:10, 72:17, 73:9, 77:1, 83:25, 113:16
Someone 114:8, 118:8
Sometimes 25:11, 103:8, 116:23
somewhere 109:9
soon 77:1, 98:13
sorry 37:13, 56:11, 56:21
sort 71:14, 82:13
sorts. 88:25
SOS 99:9
sound 17:16, 81:12
Sounds 62:24
South 98:19, 98:24
Southeast 99:6
Soviet 99:19
SPALDING 2:16
speaking 4:16, 4:25, 55:15
special 111:7
specialists. 22:15
specific 60:8, 76:5, 106:22
specifically 39:1, 55:9
speech 53:8, 53:14, 53:15
speeches 53:11
SPENCER 1:45
spending 93:17
spent 94:20, 95:24, 97:18
spoke 6:8
sports 79:15
SQUIRE 2:46
stable 54:25, 109:15

stand 15:25, 26:23, 92:12
standards 108:16
standing 93:12
standpoint 56:14
stands 32:2
start 5:8, 103:13, 110:21
start-up 109:6
started 94:24
starting 87:3, 100:10, 106:15
starts 116:3
State 27:23, 54:3, 71:22, 95:1, 95:7, 96:3, 96:5, 104:20, 104:21
statement 9:13, 19:1, 19:2, 21:17, 28:10, 29:6, 50:6, 54:8, 89:14, 91:11
statements 53:23, 90:24
States 1:1, 1:27, 4:5, 4:7, 4:9, 45:16, 45:23, 47:22, 49:13, 50:20, 57:8, 58:5, 61:22, 63:18, 71:23, 94:7, 94:8, 97:11, 99:18, 99:19, 99:24, 104:22
status 81:20
stay 102:7, 103:7, 112:25
stenography 3:7
steps 86:10
Stillwater 92:22, 95:1
stipulation 70:17
stock 41:20, 41:22, 41:23,

41:24, 49:1, 49:5, 49:23
stood 10:2
Stop 9:10, 12:4, 13:16, 14:9, 14:24, 19:3, 21:12, 28:5, 70:25, 72:24
stopped 104:9, 104:10
stores 94:16
stout 82:9
Strategic 60:23, 84:15, 86:20
Street 2:17, 2:24, 3:14, 48:23, 49:6, 51:11, 51:23, 52:6, 78:24, 79:2, 79:9, 79:11, 79:14, 79:16, 79:17, 82:23, 83:16, 83:24
strike 36:3, 108:23
strip 66:20
stroke 4:18, 5:1, 5:22
strong 5:18, 75:5, 101:6
struck. 51:20
structure 115:1
struggles 56:8, 56:19, 56:22
struggling 55:5
student 95:12
studied 53:1
study 96:19
studying 52:13
stuff 73:3, 77:6
subject 20:6, 34:12, 37:10, 52:13, 103:23
substance 118:16
Substantively

6:15
subsurface 97:21
succeeded 84:7
successor 56:25
suggest 10:24, 12:17, 107:3
suggested 108:19, 115:7
suggests 9:1
Suite 1:35, 1:47, 2:3, 2:17, 2:24, 2:41, 2:47
summarize 98:25
superior 100:18
supplied 54:4
supplies 54:25
Supply 54:4, 54:5, 55:13, 113:22, 113:23, 114:10, 117:13, 117:15, 117:16, 117:17, 117:18
supply-and-demand 117:10
supply-to-man 113:21
support 44:12, 82:7
survey 81:20
Sustained 8:21, 9:2, 58:13, 58:17, 58:19, 59:4, 59:10
sweeping 95:19
SWIDERSKI 2:7
Swiger 1:18, 6:25, 12:21, 13:25, 18:9, 22:6, 22:8, 22:12, 24:2, 24:21, 24:25, 25:16, 59:16, 59:20, 59:24, 65:19, 66:10
swings 108:11
sword 7:20, 7:21, 22:9, 23:17, 23:20,

trust 42:2
truth 27:17, 48:17, 50:9, 107:1
try 10:24, 76:6, 99:23, 105:9, 112:17, 112:19, 112:20, 113:19, 113:20, 115:1
trying 20:19, 24:17, 29:21, 29:22, 77:21
Tuesday 102:22, 103:1
Turkmenistan 99:20
turn 9:8, 39:8, 40:12, 54:1, 57:25, 63:7, 63:13, 65:20, 86:24, 95:5, 100:10, 107:13, 109:21, 110:13, 117:15
turned 9:3, 95:6, 95:12
Turtle 1:35
twice 57:14
twice. 24:6
Two 7:12, 7:22, 8:7, 11:4, 11:17, 12:9, 17:18, 18:6, 22:23, 23:2, 29:20, 29:24, 44:9, 49:25, 57:6, 62:8, 89:3, 96:12, 102:4, 102:21, 112:16
TX 1:36, 2:4, 2:18, 2:25, 2:42, 2:48
Tyler 97:20
type 8:2
types 8:4

< U >

ugly 81:14
ultimately 113:22, 118:1
uncertainties 108:6
unclear 5:2
underneath 31:24
understand 14:16, 15:18, 20:16, 25:24, 55:11, 71:13, 73:1, 75:21, 77:9, 95:14, 115:24
understanding 65:8, 113:2
Understood 16:20, 92:5, 92:6, 109:12
undertaking 101:3
undeveloped 45:12, 45:15
unfair 17:7, 18:8
unfairly 75:9, 80:11, 80:20
unfairness 6:23, 7:13, 7:20
unfold 62:9
union 95:12
unit 47:7, 47:16
United 1:1, 1:27, 4:5, 4:7, 4:9, 45:16, 47:22, 63:18, 71:22, 94:7, 94:8, 97:11, 99:24, 104:21
University 95:1, 96:17
unlikely 5:16
unredacted 7:10, 8:12, 9:1, 18:8, 18:12, 25:19
until 5:19,

ugly 81:14 (column 5)

10:21, 46:7, 69:20, 88:14, 98:10, 105:25
Untrue 72:4, 90:22
unuseful 112:4
unwieldy 112:1
up-to-date 102:23
upcoming 107:19
ups 117:3
Upstream 58:2, 60:21, 63:9, 63:14, 71:17, 72:15, 84:14, 84:20, 85:1, 86:4, 86:5, 86:14, 86:20, 90:13, 100:5, 102:24, 106:9, 106:10, 113:11
Upward 89:4
upwards. 89:4
USA 97:3
useful 111:22
using 28:1, 28:4, 28:11, 28:19, 67:17
utility 46:1
utilize 7:8

< V >

V. 2:30
Vaguely 36:8
Valley 97:25
value 47:11, 49:23, 80:21, 82:3, 100:19, 101:13, 101:16, 102:1
valued 49:15
variability 109:6
various 86:22, 92:3, 102:19
Venezuela 103:11, 103:13
Ventures 99:18
Vernon 92:20,

93:1, 93:12
version 7:10, 18:12, 18:13
versus 73:6
Vice 84:14, 86:20, 99:17, 100:1, 102:12
view 41:4, 110:18, 117:4
views 112:14
virtue 62:11
volatile 76:21, 76:22
volatility 112:18
VOLUME 1:25, 4:1, 22:16, 46:2, 119:4, 120:1
volumes 109:13
vote 40:20, 41:1, 42:8, 44:5, 44:6
Vote. 86:25
voted 44:3, 87:2
votes 87:16, 87:20, 87:22
vs 1:15

< W >

W. 1:18
Waggoner 93:5, 93:13
Wait 5:19, 10:21, 12:9, 13:16
waived 18:10, 22:5, 23:21, 25:17
waiver 22:9, 24:24
Wall 48:23, 49:6, 51:10, 51:23, 52:6, 78:24, 79:2, 79:9, 79:10, 79:14, 79:16, 79:17, 82:23,

---

23:25, 24:14, 24:21

< T >

T. 1:43, 2:15
Tailoring 88:25
takeover 50:20, 50:21
taker 113:8
takers 113:24
talked 37:1, 63:4, 102:10, 107:15
talks 27:23, 108:1, 116:13
tangentially 92:4
Tank. 48:24
tanks 97:17
tape 11:4, 11:18, 12:3, 12:13, 13:6
tax 114:20, 114:22
taxes 114:19
team 60:1, 115:6
technical 101:1, 101:2, 101:3
technologies 114:5
technology 98:6
temporarily 116:8, 116:9
ten 14:3, 42:4, 94:17
tennis 19:7
term 104:4, 104:12
Term-debt 38:3, 38:5
terms 114:19
Terrible. 51:13
testified 64:7, 107:15
testify 58:24
testifying 90:15

testimony 6:25, 7:24, 22:6, 23:19, 109:4, 115:25
testing 98:6
Texas 1:2, 1:29, 3:15, 4:6, 6:8, 92:19, 92:20, 93:1, 93:12, 96:17, 97:3, 97:9, 97:20, 97:25, 98:19, 98:24
text 9:15, 10:17
Thai 99:10
themselves 12:25, 101:15
THEODORE 2:30
thereafter 84:11
thereof 22:2
thick 85:19
thing. 87:6
Thinking 86:7
Third 21:4, 29:13, 29:14, 38:1, 88:24
Thomas 2:12, 2:39, 17:23, 72:6
THOMPSON 2:33
though 8:10, 58:22, 63:24, 72:6, 109:16
thoughts 48:18
thousand 49:16
Three 7:2, 8:4, 17:16, 32:7, 33:6, 33:11, 43:10, 47:23, 68:1, 68:21, 99:21
three-county 98:13
three-way 95:23
threshold 36:6, 36:12
throughout

105:22, 106:1, 106:14, 107:22, 116:18, 118:15
thumbed 76:7
tie 99:22
tight 97:24, 98:1, 114:4
time-sensitive 7:13
timely 56:16
timing 29:17, 56:13, 56:14, 80:22
title 56:8
titled 48:24, 51:13
titles 99:1
Toal 2:29, 7:25, 13:8, 27:8
today 14:5, 25:20, 30:4, 32:2, 54:6, 92:12
together 50:1, 60:23, 71:14, 102:16, 105:17, 106:5
tongue 99:22
took 10:13, 21:1, 76:25
Top 31:8, 34:9, 53:1, 61:1, 63:15, 65:22, 86:24, 87:1, 87:9, 88:2
topic 118:19
topics 103:6
Torres 26:20, 26:21, 53:6, 54:18
total 35:20, 42:14, 42:15, 42:19, 42:22, 42:24, 43:10, 104:24
totally 12:9
touch 103:8
touches 92:4
toward 67:19

towards 45:19, 57:3, 89:4
town 92:21, 94:16
Tracker 10:18, 10:19, 11:3, 11:10, 11:18, 11:25, 12:5, 12:6, 12:8, 12:25, 13:1, 13:12, 13:17, 13:22, 13:25, 14:6, 14:11, 15:22, 15:23, 16:1, 16:4, 26:4, 26:6
transcript 3:8, 22:21
transcription 3:8
transferred 99:4
transition 44:13, 44:16
transparency 31:2, 31:25, 33:23, 34:22
transportation 21:8
travel 99:7
treasurer 70:13, 84:11, 102:13
trend 116:20, 116:21, 116:24
trends 108:6, 109:23, 117:11
trial 4:23, 9:8, 102:20, 117:24
trick 27:20
tried 111:16
trigger 62:10
trouble 26:13, 103:11
truck 94:15
true 50:7, 53:23, 72:24, 75:7, 75:8
Trump 12:23,

83:16, 83:24
wanted 4:14, 9:6, 10:23, 10:24, 26:3, 28:14, 68:12, 93:15, 103:7, 111:8, 118:13
wanting 16:1
wants 29:2, 55:11, 70:9, 89:8
wants. 87:10
war 94:14
warning 118:15
warnings 111:7
water 26:25, 30:21
WATKINS 2:40
Wayne 10:18, 11:3, 11:10, 11:18, 11:25, 12:5, 12:6, 12:8, 12:25, 13:12, 13:17, 13:21, 13:25, 14:6, 14:11, 15:21, 15:23, 15:25, 16:3, 26:4, 26:6
ways 7:12, 15:2, 98:7, 102:2, 114:25
website 79:5
Wednesday 102:23
week 17:23, 95:9
weekend 4:12, 11:1, 30:10, 30:18, 82:12
weeks 11:4, 11:17, 31:14, 31:18, 35:3, 68:1, 68:21, 68:24
weighed 49:1
weight 32:23, 33:12
WEISS 2:34
Well-taken 27:2

Wells 2:30, 8:15, 8:18, 9:22, 10:15, 11:9, 11:15, 11:22, 13:5, 13:8, 14:7, 14:14, 14:17, 16:8, 17:9, 18:16, 19:14, 20:10, 20:15, 21:2, 21:7, 21:11, 21:15, 22:11, 22:18, 24:10, 24:11, 24:14, 81:9, 97:16, 97:22, 98:3
West 1:47, 57:18, 64:15, 100:7
Western 98:9
WHARTON 2:34
whatever 14:10, 19:11, 25:22, 30:21, 50:9, 54:4, 82:22, 82:24, 103:6, 113:17, 113:24, 114:11
Where'd 92:18, 97:2
wherever 114:10
whether 5:2, 5:3, 5:12, 15:24, 21:3, 22:1, 29:1, 37:4, 37:5, 41:5, 58:19, 77:14, 90:6, 103:9
whichever 42:5
white 26:18
whoever 83:2
whole 4:23, 11:5, 24:24, 54:13, 54:20, 76:8, 103:22, 111:2, 111:21, 116:3
whom 92:9

whopping 50:21
Wichita 92:19
wife 24:5, 24:8, 25:11, 28:25, 29:3, 105:4, 105:8
wild 108:11
Wildomar 98:22
WILKINSON 2:14
will 5:2, 5:5, 5:24, 6:13, 8:12, 9:14, 22:14, 25:5, 25:11, 25:20, 25:23, 27:7, 32:20, 40:19, 40:25, 42:3, 54:4, 61:23, 61:24, 62:9, 70:16, 73:10, 75:24, 83:4, 89:17, 91:7, 109:24, 111:9, 115:1, 116:25
WILSON 3:12
win 25:22
wind 30:16, 93:17
withdraw 33:9, 56:21
withdrew 17:20
Within 11:17, 80:13, 80:16, 80:21, 114:15
without 26:21, 67:8, 75:21, 78:10, 82:17
WITNESS 5:22, 5:23, 27:2, 29:22, 30:4, 34:25, 68:14, 68:16, 70:15, 71:24, 72:7, 72:8, 72:22, 73:18, 85:4, 85:8, 89:17, 93:2, 93:6, 93:9, 94:4, 95:23, 120:4
witnesses 5:8,

5:24, 5:25
woman 14:18
won 93:22
WOODBURY 1:19
Woods 57:1, 84:7
word 5:14, 14:14, 18:4, 25:19, 26:13, 31:2, 104:11
words 29:1, 83:17, 116:8, 118:10
work 22:18, 39:21, 94:21, 95:8, 96:3, 97:2, 97:3, 97:5, 97:23, 104:24, 105:10, 110:6, 110:7, 114:18, 114:19, 115:3
worked 11:13, 24:15, 84:20, 86:19, 86:23, 91:15, 97:15
working 88:18, 98:5, 106:13
Workout 86:4, 86:8
works 17:12
Workshop 85:2
world 57:9, 76:21, 76:22, 113:16, 114:9
worry 6:12, 83:6
wrap 106:19
write 83:2
write-down 61:25
write-downs. 89:15
written 82:25, 83:2, 91:7
wrote 7:17, 11:11, 83:3

< X >

**x-xto** 63:9
**XTO** 44:17,
44:24, 45:6,
45:24, 46:6,
46:16, 46:24,
49:1, 49:10,
50:21, 51:1,
51:5, 51:13,
51:18, 53:22,
61:13, 63:1,
63:18, 63:22,
77:19

< Y >
**Y'all** 4:11,
12:5, 13:17,
19:3, 19:6,
21:1, 21:12,
23:9, 23:13,
24:7, 25:3,
30:7, 30:9,
30:17, 30:20,
71:1, 76:10,
81:11, 83:13,
83:14, 118:22
**yeahs** 6:16
**year** 42:21,
51:7, 63:21,
64:1, 64:20,
65:6, 65:9,
67:20, 102:4,
105:22, 105:23,
105:24, 106:1,
106:3, 106:14,
106:18, 107:23,
108:5, 110:17,
111:5, 112:16,
113:5, 116:15,
116:18
**year-end** 61:19,
62:19, 62:25,
66:4, 67:17
**year-to-date**
64:15
**years** 14:3,
40:13, 42:3,
42:4, 43:10,
51:4, 53:20,
60:7, 69:23,

72:23, 78:3,
94:1, 94:5,
94:17, 94:20,
96:3, 102:5,
104:24, 105:5,
112:8, 113:1,
114:5
**Yelp** 75:15
**Yemen** 99:8,
99:11
**Yemeni** 99:13
**yesterday** 37:6
**York** 2:36, 8:23
**yourself** 91:24,
104:5, 106:21

149

C E R T I F I C A T I O N

I, PAMELA J. WILSON, CSR, certify that the foregoing is a transcript from the record of the proceedings in the foregoing entitled matter.

I further certify that the transcript fees format comply with those prescribed by the Court and the Judicial Conference of the United States.

This the 4th day of May, 2026.

s/Pamela J. Wilson

PAMELA J. WILSON, RMR, CRR
Official Court Reporter
The Northern District of Texas
Dallas Division

150

**App. 301**

# Exhibit 10

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

PEDRO RAMIREZ, JR., Individually )
and on Behalf of All Others )
Similarly Situated, and GREATER )
PENNSYLVANIA CARPENTERS PENSION )
FUND, )
                                 )
            Plaintiffs, )
                                 )
     VS.                         ) No. 3:16-CV-03111-K
                                 )
EXXON MOBIL CORPORATION, ) CLASS ACTION
REX W. TILLERSON, ANDREW P. SWIGER, )
JEFFREY J. WOODBURY, DAVID S. )
ROSENTHAL, )
                                 )
            Defendants. )
_____)


JURY TRIAL PROCEEDINGS -- VOLUME 5-B
BEFORE THE HONORABLE ED KINKEADE
UNITED STATES DISTRICT JUDGE
MAY 4, 2026
DALLAS, TEXAS

FOR THE PLAINTIFFS:

    JOE KENDALL
    KENDALL LAW GROUP
    3811 Turtle Creek Boulevard, Suite 825
    Dallas, TX  75219
    (214) 744-3000

    SCOTT H. SAHAM
    NATHAN R. LINDELL
    SAM SHELDON
    ERIKA OLIVER
    T. ALEX B. FOLKERTH
    SARA BIERL POLYCHRON
    SPENCER A. BURKHOLZ
    ROBBINS GELLER RUDMAN & DOWD, LLP
    655 West Broadway, Suite 1900
    San Diego, CA  92101
    (619) 231-1058

    BALON B. BRADLEY
    BALON B. BRADLEY LAW FIRM
    11910 Greenville Avenue, Suite 220
    Dallas, TX  75243
    (972) 991-1582

    MICHAEL SWIDERSKI
    (Party Representative)

FOR THE DEFENDANTS:

    THOMAS M. MELSHEIMER
    AUSTIN E. SAATHOFF
    EMILY WILKINSON
    DAVID T. HINOJOSA
    KING & SPALDING, LLP
    2601 Olive Street, Suite 2300
    Dallas, TX  75201
    (214) 764-4446

    NINA CORTELL
    JASON JORDAN
    HAYNES and BOONE, LLP
    2801 N. Harwood Street, Suite 2300
    Dallas, TX  75201
    (214) 651-5000

    AUDRA J. SOLOWAY
    DANIEL TOAL
    THEODORE V. WELLS
    LYUBA SHAMAILOVA
    AMITAV CHAKRABORTY
    DAPHNE THOMPSON
    PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
    1285 Avenue of the Americas
    New York, NY  10019-6064
    (212) 373-3000

    SCOTT C. THOMAS
    LATHAM & WATKINS
    100 Crescent Court, Suite 7084
    Dallas, TX  75201
    (713) 546-5400

    D. PATRICK LONG
    SQUIRE PATTON BOGGS
    2200 Ross Avenue, Suite 4100w
    Dallas, TX  75201
    (214) 758-1500

(Rex Tillerson)

PATRICE CHILDRESS
(Party Representative)

    Proceedings reported by mechanical stenography; transcript
produced by computer-aided transcription.
_____

DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
Federal Official Court Reporter
1100 Commerce Street, 15th Floor
Dallas, TX  75242
(214) 753-2325

INDEX

| PLAINTIFF'S WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| REX TILLERSON | 5 (Cont'd) | 120, 126, 129 | 108, 125, 127 | |

EXHIBITS

| PLAINTIFF'S EXHIBIT | INTRODUCED | ADMITTED |
|---|---|---|
| 36 | 46 | 47 |
| 769 | 121 | 121 |

| DEFENSE EXHIBIT | INTRODUCED | ADMITTED |
|---|---|---|
| 97 | 8 | 9 |

(PROCEEDINGS BEGAN AT 12:45 PM.)

THE COURT: Okay. Are you ready?

MR. MELSHEIMER: I am.

THE COURT: All right. Let's bring them in.

COURT SECURITY OFFICER: All rise for the jury.

(Jury seated in the jury box.)

THE COURT: I hope the sandwiches were good today. Y'all be seated. Thank you.

We're going to go on. You're still on Direct.

MR. MELSHEIMER: May it please the Court.

THE COURT: Yes, sir.

CONTINUED DIRECT EXAMINATION

QUESTIONS BY MR. MELSCHEIMER:

Q. Mr. Tillerson, I want to turn to the Kearl Page 9 table. You were asked a lot of questions about Page 9 of the 2015 10-K. Let's take a look at Page 9 of Plaintiff's Exhibit 66. Do you see this table?

A. I do.

Q. Remind us what this table shows.

A. Well, it's labeled at the top there "Production Prices and Production Costs."

Q. If we could scan out, does it provide three years of data?

A. Yes, it -- it does.

Q. Why does the SEC requires three years of data, if you know?

A. Well, the SEC wants to provide context for the current year,

and one of the ways to do that is by showing some history, as we've talked many times about how much things can go up and down. It's useful to be able to see how these numbers might change as -- as prices and the environment changes.

Q. Well, looking at the 2014 and then looking at 2015 years of bitumen on that table, what would an investor see?

A. Well, they would see that the price per bitumen per barrel from 2014 was $62.68, and in 2015 that price had declined to $25.07. They would also see, though, that in tandem with that, the average production cost per barrel was $32.66 in '14 in a higher price environment but the product cost also dropped to $19.20 a barrel in the lower-price environment.

Q. Are there items that affect a company's profitability that are not captured in the "Production Costs" table in Figure -- on Page 9?

A. Yes. There are other -- other things that would be used in calculating profitability. This is not a profitability table.

Q. And who requires this table to be in this format?

A. The SEC prescribes this precise format, including the history.

Q. Are capital development costs included in average production costs or prices?

A. No, they're not.

Q. Remind us what "capital development costs" are.

A. Well, those are the initial dollars you're putting in to

build facilities, drill wells, and create the infrastructure necessary for the production to go on in years to come.

Q. What is a "capital development cost" at Kearl?

A. What's a "capital development cost" at Kearl?

Q. What's an example of one?

A. Well, like the big crushers that you heard Mr. Swiger, I think, describe the size of this room; the big, the large trucks, those initial investment in those trucks, the slurry process, these huge vats that were used. So all of these big, large pieces of equipment which are part of the permanent infrastructure that will be operated in years to come.

Q. Why aren't those costs included in this chart?

A. Well, because they are accounted for in a profitability table through the depreciation mechanism, and -- and that's -- that's according to good accounting standards and practices. That's how you recognize those costs going forward.

Again, this -- this table is very specific. It's just prices and production costs. Nothing more, nothing less.

Q. Now is Kearl specifically called out in this table on Page 9?

A. No, it's not.

Q. Is any asset broken out? Crude oil? NGL? Natural gas? Synthetic oil?

A. Not by field or geography. Well, it is by geography. I'm sorry. Not by field.

Q. If you look at 2014 for Canada and South America, those numbers are quite a bit better. Was Kearl broken out individually when the prices were higher?

A. No.

Q. And not broken out individually when the prices were lower.

A. No.

Q. Did the SEC consider requiring companies to disclose this type of information by individual field when it adopted these rules?

A. They did. They had undertaken -- As I recall, it was one or two-year study they did. And when they were revisiting -- And I think the study was actually to modernize oil and gas reporting in the 10-K. And they went on soliciting tours and they got a lot of input from industry participants, from investors, from analysts and what not, and initially went into that with the view that they were going to require disclosure down to the ten percent level and, after gathering a lot of input, issued their final rule which, I think, became effective January, 2010, if I'm remembering correctly.

Q. Mister -- Mister -- Mr. Tillerson, let's -- let's look at DX 27.

A. Okay.

MR. MELSHEIMER: Your Honor, we'd offer DX 27 which is an SEC rule from 17 CFR Parts 210 and following. 97. If I didn't say 97, Your Honor, Defense Exhibit 97.

**App. 303**

MR. SAHAM: No objection, Your Honor.

THE COURT: Defense Exhibit 97 is admitted into evidence.

Q. (By Mr. Melsheimer) Can you tell the jury what Exhibit 97 is, Mr. Tillerson?

A. This is a Securities and Exchange Commission rule for certain parts. And, again, it's labeled "Modernization of Oil and Gas Reporting."

Q. So let's take a look at Page 53. We have heard the term "geographic area" mentioned in different places in the 10-K, on Page 9 and other places. What was the SEC's proposed definition of "geographic area"?

A. Well, as is highlighted here, they were proposing to require disclosure by continent, country -- any continent or country containing 15 percent or more of the company's reverses and sedimentary basin or field containing 10 percent or more of the company's reverses.

Q. So if we go on, is there some comments listed there that made SEC not adopt this rule?

MR. MELSHEIMER: And if you could highlight that, Mr. Gooden.

A. There are. And, again, they were -- you know, it took, as I recall, a couple of years to do this exercise. And several commenters were concerned -- I'm just reading from it -- that the proposed definition would add too much detail to the disclosures.

Q. Let me stop you there. Is that the point you made before lunch about not -- that more detail is not necessarily better?

A. That is the point I was making as well, yeah.

Q. Okay. Then it goes on to say, "They were concerned that this amount of detail would make the disclosures too complex and incoherent."

Do you agree with that?

A. I do agree with that.

Q. They were particularly concerned with the extension of this standard to disclosures other than reserves, such as production wells and acreage. And then finally, it says, "Commenters also believed that the disclosures, in particular by field, would cause competitive harm in future property sales transactions, unitization agreements, and other asset transfers."

What is that saying?

A. Well, this -- In this business there's a lot of those types of activities, property sale transaction, unitization agreements, what not, and the more detail you're required to publish publicly, you're basically giving your counterpart or your competitor a roadmap to how you calculate the value of that asset. So you're really at a disadvantage then in a negotiation because they got all this information that we consider to be private for competitive reasons. And -- And in order to preserve, you know, the value that our shareholders have in this asset, even if we're thinking about selling it, we want to get

the best price.

Q. Let's turn to Page 56. Can you read for the jury the first sentence there we've highlighted, first couple of sentence starts out "We are not"?

A. "We are not adopting the requirement that we proposed to disclose reserves by sedimentary basin or field. We share commenters' concerns that there is potential for competitive harm from such disclosure in future property sales transactions, unitization agreements, and other asset transfers."

Q. So let's turn to Page 56. What was the final rule described here?

A. "With respect to reserves estimates, the final rules require disclosure of reserves in countries containing more than 15 percent of the company's proved reserves. As with production disclosure, this 15 percent threshold would be based on the company's total global oil and gas proved reserves rather than on individual products as proposed."

Q. Is it almost 15 percent?

A. No. It's more than 15 percent.

Q. And that's the language of the rule?

A. That is the rule.

Q. Now it says, "This 15 percent threshold would be based on the company's total global oil and gas proved reserves rather than on individual products as proposed."

Now you've been here in court. The Plaintiffs have

mentioned total liquid reserves and other calculations. Is this 15 percent threshold based on any of those charts that they showed you?

A. No, it's not.

Q. What is it based on?

A. Just what it says here. It's strictly based on your total oil and gas proved reserves, not -- not just proved oil reverses, not just proved developed oil reserves, but total oil and gas reserves. That's the SEC rule.

Q. Let's turn to Page 80. And focusing on the highlighted language there, did the SEC also reject field level disclosures with respect to the information on Page 9?

A. Yes, they did.

Q. So it says, "This disclosure must be made by geographical area and for each country and field containing 15 percent more of the registrant's proved reserves expressed on an oil equivalent basis."

Okay. So let's look on Page 99 of the 2015 10-K. Are you familiar with this table as well?

A. I am.

Q. What does it show?

A. Well, this is now showing a profit, profitability table, by those same geographic areas.

Q. Now how does this table break out the results of operation? By field, geographic area, or something else?

**App. 304**

VOLUME 5-B    13

A.   No.  It follows the same conventions that we were just discussing.  So it's the same geographic areas that are reported in the previous formats.

Q.   Now we've highlighted the last sentence there in the "Introductory" paragraph.  What does that say?

A.   "Oil sands mining operations are included in the results of operations in accordance with the Securities and Exchange Commission and Financial Accounting Standards Board rules."

Q.   So that would be Kearl?

A.   That's correct.

Q.   And any other oil sands mining operations.

A.   Correct.

Q.   Does this show more than one year just like the other table did?

A.   I believe it does.

          MR. MELSHEIMER:  If we can go to Page 100, Mr. Gooden.

A.   It shows that same three-year history.

Q    (By Mr. Melsheimer) Why does it do that?

A.   Well, again, to give the reader, investor, shareholders some context, some prospective.  Now we're looking at total profitability.  So if you want to see what the effects of the changing business environment are on the, quote, "bottom line," it's right here for you to see.

Q.   So is this more or less comprehensive than the table on Page 9?

VOLUME 5-B    14

A.   Well, it's more comprehensive.

Q.   How so?

A.   Well, this includes depreciation of those big capital expenditures I was talking about.  It includes taxes in this table.  So it has all the elements of making a profit or loss calculation are here.

Q.   So is Page 9 broader or narrower than Page 99?

A.   Well, Page 9 is narrower.

Q.   Now let's look at the South -- Canada/South America column.  What does it show for 2015?

A.   In terms of results of -- "Total Results of Operations"?

Q.   "Total Results of Operations."

A.   It shows a loss of 896 million dollars.

Q.   All right.  Now let's take a look at the year before, 2014.  What does it show?

A.   It shows a profit of $1,767,000,000.

Q.   Is the breakout the same every year, whether it's positive or negative?

A.   Yes, it is.

Q.   Someone reading this, what would they see from 2014 to 2015 --

A.   Well, again, ---

Q.   -- with respect to Kearl -- with -- with respect to the -- with respect to the Canada/South America operations?

A.   Well, they would see the impact of this deteriorating price

VOLUME 5-B    15

environment.  And -- And, you know, actually it is helpful.  If you're looking at this table and you're looking at Table 9 together, it does help.

Q.   How -- How big a swing is that from making almost 1.8 billion to losing almost 900 million?

A.   It's a big swing.

Q.   Almost three billion?

A.   Yes, it is.

Q.   Okay.  So was that -- Did you guys just do a great job in 2014 and then a terrible job in 2015?

A.   Well, again, in -- You know, as we've talked, we were in the middle of the start-up of an expansion project as well.  But the business environment in 2015, particularly the second half of 2015 as we've talked, was really beginning to -- to deteriorate.  And so that's just a reflection of that environment.  And, again, as we looked earlier on Table 9, yes, the -- the folks that were working on this were working really hard to capture as much unit cost reduction as they could, but the prices were falling out from under them pretty fast as well.

Q.   I want to talk about these Kearl profitability reports.

          MR. MELSHEIMER:  Can you pull up Plaintiff's Exhibit 216?

Q    (By Mr. Melsheimer) This is the December, 2015, Financial and Operating Highlights Review for the Upstream Group.  Do you remember being asked some questions about this, sir?

VOLUME 5-B    16

A.   I do.

Q.   Remind us what this is again, these -- these -- these reports.

A.   Well, this is the Upstream again coming in and reviewing both the financial, how they're -- how they did in the month of December, but also operating.  So like volumes, capex, some of the other elements that they're just reporting on in -- in December of that year.

Q.   So looking -- looking at Page 2, what is the division this is for?  Is it Upstream?

A.   Yes, it's for the Upstream.

Q.   Can you remind the jury what "upstream" is versus "downstream"?

A.   Well, upstream includes the exploration, development, production of gas and oil marketing elements of the business.  So that's the part of the corporation that explores for, finds, contracts, you know, for oil and natural gas reserves, resources, develops them, produces them, and then they're marketed and sold.

Q.   What about "downstream" and "chemical"?

A.   Downstream is the refining, supply and transportation, fuels -- retail fuels marketing, the gas stations you see, and then lubes, like if you're putting Mobil 1 in your car.  I hope y'all are.  Then, you know, it's the lubes company.  So they are out purchasing crude.  Sometimes they're purchasing it from the upstream but they can purchase if from third-parties to refine

**App. 305**

VOLUME 5-B    17

that crude and turn it into those products.

Q.   What about "chemical"?

A.   Petro Chemicals is -- is another division, if you kind of think about these sequentially.  They're taking feedstocks oftentimes from our refineries, buying the feedstocks in order to then convert those into useable chemicals -- polyolefins, polyethylene -- things that are then sold to manufacturers who turn them into things like your garbage bags that are at home in the kitchen.  A lot of medical supply devices are produced from those products.  So a wide array of uses of the products the Chemical Company produces.

Q.   When we've been talking about Kearl and RMDG in this lawsuit, what division are we talking about?

A.   The Upstream.

Q.   Let's turn to Page 24.  Can you see Kearl is listed on the "Special Topics" back in December of 2015?

A.   I do.

Q.   Do you remember why?

A.   Well, again, it was a -- it was in a start-up mode from the middle of '15 on, the expansion project was.  So we were monitoring it pretty carefully and again, as you've heard, because there were a lot of issues going on.  And the organization was keeping us apprised of how -- what kind of progress they were making on that, kind of where they were, you know, where they were trying to get things stabilized.  So it was

VOLUME 5-B    18

getting pretty good attention every month.

Q.   Can you remind us the lifespan of Kearl back in 2015?

A.   Forty-plus years.

Q.   Can you remind the jury the scale of the investment that Exxon had put into Kearl by this time?

A.   Well, if you go back to the Kearl initial development, which you heard started up in 2013, a lot of really big pieces were put in in that initial phase.  And then as it was expanded, the mine was expanded and capacity was expanded.  So by then, we were north of 20 billion dollars.

Q.   So let's look at Page 24.  You were asked a lot of questions about the numbers in this chart.  What were the earnings for December of 2015 for Kearl?

A.   The earnings were negative 51 million.

Q.   Do earnings include capital development and depreciation expenses associated with the Kearl expansion project?

A.   They would include depreciation.

Q.   Are these non-cash items?

A.   The depreciation?

Q.   Yes, sir.

A.   Yes, sir.

Q.   And are depreciation expenses or capital costs considered in the SEC Cash Flow Test that is used to estimate proved reserves?

A.   No.

Q.   Now what about the 60-million-dollar negative number in the

VOLUME 5-B    19

"Estimated Cash Column"?  Does that include capital development costs and depreciation?

A.   Yes, it does.

Q.   How do you know that?

A.   Well, there's a note up above.  The way the organizations were reporting the estimated cash in these presentations, they were putting every -- all the expenditures in.  So there is a notation up above regarding the negative 60 million in cash for the December month; that if you take those capex numbers out, those EMDC costs, those development cost capital to -- that was ongoing to finish out the Kearl expansion project, then Kearl actually earned a plus two million dollars of cash.

Q.   So two million positive for -- for December.

A.   Correct.

Q.   You know, now we've heard a lot about ---

If we go to -- If we go to Page 21.

I thought this was 23.

MR. GOODEN:  It is 23.

MR. MELSHEIMER:  Okay.  Just one moment, Your Honor.

(Pause)

MR. MELSHEIMER:  Okay.  Let's look at -- I'm sorry.  Let's look at Plaintiff's Exhibit 564.

Q    (By Mr. Melsheimer) So, Mister -- Mr. Tillerson, remember this chart the clients -- the lawyer showed you?

A.   Yes.  Yes, I do.

VOLUME 5-B    20

Q.   And actually what is this column here I'm pointing out, "Current Month Realization"?  What's that?

A.   Well, that would be the value of the bitumen per barrel that was being received.

Q.   So the lowest month of -- The lowest month of the year for that, if I'm looking at this right, is December, $11.52.

A.   That is correct.

Q.   Now if we go back to the previous chart, if the lowest month of realization is $11.52, you still had two million dollars positive?

A.   Yes.  It still generated two million dollars of positive cash flow when you take those -- those capital expenditure numbers out, the one-time expenditures.

Q.   And these capital development costs that you were putting into Kearl are not considered cash costs?

A.   That's correct.

Q.   And they're not included in the SEC test for proved reserves?

A.   That's correct.

Q.   So you were also asked some questions -- If we could move to this "U.S. Segment Earnings."

Do you recall those questions?

A.   I do.

Q.   And you were asked some questions about XTO and that, of course, is our -- our shale/gas issue.  What percentage of XTO --

percentage of the XTO did the RMDG assets represent?

A.   My recollection is it was less than ten percent.  I don't recall the precise number.

Q.   Okay.  So we're going to -- we're going to talk about that some more in a minute.  But this is entitled "U.S. Segment Earnings"?

A.   That's correct.

Q.   So when you're performing a recoverability analysis to determine whether an asset should be written down or not, does the company use present earnings in that analysis?

A.   No.

Q.   What is a recoverability analysis primarily evaluating?

A.   Well, the recoverability analysis is looking at the capital you spent, what have you invested into the asset.  And then you're making a -- you're developing a projection over the life of the asset, how much money is going to be earned over the life of that asset.

Q.   So you're looking in the future?

A.   Yes.  It's all -- It's all forward looking.  It has nothing to do with past or even current today.  It's all about future.

Q.   So you were shown a lot of articles about XTO losses and low gas prices in the years after Exxon bought XTO in 2020 and before 2015.  Do you recall that?

A.   I do.

Q.   Does that recoverability analysis look at those articles --

A.   No.

Q.   -- to determine whether an asset needs to be impaired?

A.   No.

Q.   Are you looking backwards or forwards?

A.   Forwards.

Q.   When estimating cash flows for a recoverability analysis, future cash flows, does a company like Exxon rely on long-term market conditions or short-term market conditions?

          MR. SAHAM:  Objection; leading, Your Honor.

          THE COURT:  It is leading.  I'll sustain.

          MR. MELSHEIMER:  Let me -- Let me ask it a different way.

Q    (By Mr. Melsheimer) Which -- Which are you relying on?  Short-term or long-term projections?

A.   Long-term projections.

Q.   I want to turn to Page 4.  What does this page show, sir?

A.   Well, again, this is a summary from the upstream of some of that F & O information that I referenced earlier.  It's got financial information.  It's got volume information, some opex and capex information.

Q.   And what does it show for the year-to-date earnings For the Upstream Group?

A.   7,101,000,000.

Q.   Which assets are included in that number?

A.   Well, all -- That would be all of the upstream assets which

would include Kearl and would include XTO.

Q.   So Kearl's earnings included?

A.   Correct.

Q.   XTO's earnings included?

A.   That's correct.

Q.   Okay.  So let's go back to 564, this chart that Plaintiff showed you.  So they showed you this chart showing "Kearl Loss: 440 million dollars" in 2015, right?

A.   That is correct.

Q.   So were Kearl's earnings of minus 440 million dollars included in the year-to-date earnings listed on Page 4 of that F & O report that we were looking at?

A.   Yes.  They were in -- They were reported in that 7,101,000,000 number.

Q.   Now were those earnings also -- Were the earnings for the Upstream Division also included in the 2015 10-K?

A.   Yes, they were.

Q.   Well, let's take a look at the 10-K on Page 42.

          So what does this page show?

A.   This is the page from the 10-K describing the functional earnings of the upstream, the downstream, the chemicals business.

Q.   Okay.  So let's just do some quick math.  What are the earnings for the upstream?

A.   A negative 1,079,000,000.

Q.   Okay.  Okay.  So let's -- What are the non -- What are the

non-U.S. earnings for the Upstream Division?

A.   A positive 8,180,000,000.

Q.   Okay.  If you subtract those, what do you get or if you add them together, what do you get?

A.   Well, I think you're going to get the 7,100,000,000.

Q.   7,101,000,000?

A.   101, if you do the math correctly.

Q.   7,101,000,000.

A.   Correct.

Q.   As a total.  And, again, let's go to Page 4 of 216, Plaintiff's Exhibit 216.  These F & O reports, what does the F & O report show in December of '15 the Upstream Division earned for the year?

A.   7,101,000,000.

Q.   So this number, this 7.1 billion, is the same number that's contained in the 2015 10-K, is it or is it not?

A.   It is.

Q.   Now on Friday you were asked whether there was disclosure of Kearl's losses in the 10-K.  Do you remember that question?

A.   I do.

Q.   And you said there wasn't.  But is that correct?

A.   No.  I guess I was interpreting the question to mean were Kearl's losses identified directly in the 10-K and, no, they're not but their losses are contained in the 10-K because they're part of the 7,101,000,000 and they're part of the negative or the

VOLUME 5-B    25

non-U.S. number that's in the 10-K.

Q.   Do you ever recall Exxon, in your experience, breaking out on an asset-by-asset level this kind of information in the 10-K?

A.   No.

Q.   Whether it was good news or not so good news.

A.   Correct.

Q.   Was there any change in the approach that you took as CEO and that the company took under your watch whether the results were good one year or not so good one year?

A.   No.  You just -- You follow the accounting rules.  And whatever the result of those procedures are, that's what you reflect in your 10-K.

Q.   So did anyone at ExxonMobil -- Let me ask:  Did you hide this information from anyone?

A.   No.

Q.   From any investor?

A.   No.  It's all right there for everyone to see.

Q.   You just have to do a little math.

A.   That would -- That might help.

Q.   So let's turn back to Page 42 of the 10-K, Plaintiff's 66.  And let's go back to the 2014 earnings.

So what were the earnings in the Upstream Division in 2014?

A.   A positive $5,197,000,000.

Q.   And then what were the earnings for the non-U.S. Upstream Division?

VOLUME 5-B    26

A.   A positive 22,351,000,000.

Q.   So what does that total?  About 27 billion?

A.   Almost -- Yeah, 27-and-a-half billion.

Q.   So if you looked at this page as an investor, you would see what as between 2014 and 2015?

A.   Well, again, you'd see the impact of the low-price environment in 2015, particularly in the United States but, obviously, you'd see it in the non-U.S. as well because of the significant drop in earnings in the non-U.S.

Q.   So from 2014 to 2015, the earnings went from 27 billion to 7 billion?

A.   That is correct.

Q.   Is that as plain as day in the 2015 10-K?

A.   It seems pretty plain.

MR. SAHAM:  Objection; leading.

THE COURT:  Overruled.

Q   (By Mr. Melsheimer) I'm sorry, sir.

A.   Yes.  It seems -- It seems very plain to me.  Again, as part of the -- The SEC's trying to keep this thing simple so people can follow it.

MR. MELSHEIMER:  Now, Mr. Gooden, can you go to Page 46?

Q   (By Mr. Melsheimer) And -- And, in fact, can you read the line I have highlighted under 2015?

A.   "Upstream earnings were 7,101,000,000, down $20,447,000,000

VOLUME 5-B    27

from 2014.  Lower realizations decreased earnings by 18.8 billion dollars."

Q.   Now we're just talking about the Upstream Division here.  You mentioned the two other divisions, Downstream and Chemical?

A.   Yes.

Q.   Now how did they do ---

A.   Excuse me, counsel.  I think they're having trouble seeing the screen.

(Mr. Tillerson referring to the jury.)

Q   (By Mr. Melsheimer) How did the Up -- How did the Downstream and Chemical business do?

A.   Well, I'd have to look at the chart and see.  It's reported in the 10-K as well.

Q.   Well, let's take a look at Page 42 of the 10-K.  You mean you don't have all these numbers memorized, sir?

A.   Not from 11 or 12 years ago, no.

Q.   Okay.  Well, let's take a look at Page 42 of the 10-K.  What are the earnings from the Downstream and the Chemical?

A.   Well, the U.S. Downstream earned 1,901,000,000 positive, and the non-U.S. Downstream earned 4.65 billion in 2015.  Chemicals similarly had positive earnings of the U.S.:  2,386,000,000; non-U.S.:  2,032,000,000.

Q.   So if we add those to the -- to the Upstream earnings in 2015, what do we get?

A.   Well, if you add those, and then you'll see there's a line

VOLUME 5-B    28

there for "Corporate" and "Financing," then the bottom line of ExxonMobil's earnings for 2015 were 16,150,000,000.

Q.   I want to ask you one more question about Plaintiff's Exhibit 216.

MR. MELSHEIMER:  Can we go back to Page 4?

Q   (By Mr. Melsheimer) And what does it say there about total production volumes in oil equivalent barrels for 2015, year to date?

A.   2015 year to date was 4,097,000 barrels on equivalent per day.

Q.   And that is -- that is -- So four -- Say that number again.  I'll make sure I get that number right.

A.   4,097,000 barrels equivalent per day.

Q.   Okay.  A little over four million barrels a day --

A.   Correct.

Q.   -- total.  Then let's look at Page 116 of the 10-K.  And do we see that number reported there?  Just like we saw in the internal financials, do we see it reported there in the 10-K on Page 116?

A.   We do.

Q.   Now if we go to Page 15 of the 10-K, can you tell the jury what Kearl's Net Average Production Per Day was in 2015?

A.   During 2015, Average Net Production at Kearl was 149,000 barrels per day.

Q.   Okay.  So you have 149,000 out of Kearl per day --

**App. 308**

A.    Correct.

Q.    -- out of a total of a little over four billion.

A.    Four million.

Q.    Four million, I'm sorry.  Four million.

A.    Correct.

Q.    Can you do some quick math on that or did you get a chance to do some quick math before you came in today about what that was?

A.    I think it came out to like three-and-a-half percent or four percent, something like that.

Q.    3.63 percent, does that sound right?

A.    That sounds right.

Q.    Okay.  Okay.  Let's go to Plaintiff's Exhibit 217 which was the "February 22nd, 2016, Upstream Chairman's Briefing."  Do you see that?

A.    Yes.

Q.    Now let's go to Page 29 which we have there on the -- on the screen.  Now it showed that in January of 2016, the netback at Kearl was about four dollars a barrel.  Do you see that?

A.    Yes.

Q.    Did you expect that prices would remain at four dollars a barrel for the rest of the year?

A.    No.

Q.    Why not?

A.    Well, at that low level of prices, that would suggest the

environment for the entire industry was really very, very low.  And anytime it gets that -- that low, it doesn't stay there very long because you start seeing supply starting to be reduced.  People shut down their drilling activities like out in the Permian and other places.  So in a few months you're going to start seeing that supply response to that low-price environment.

Q.    So what time period is the 2015 10-K for?

A.    For 2015.

Q.    When does it end?

A.    December 31st of 2015.

Q.    This is January, 2016?

A.    That's correct.

Q.    So when the 2015 10-K was filed in February of 2016, how many months of data did the company have for 2016?

A.    I guess one complete month.

Q.    And is -- As you understand it, is the 2016 10-K supposed to deal with 2016 data and the 2015 10-K is supposed to deal with 2015 data?

A.    That's correct.  It's a calendar year full stop.

Q.    Did Exxon disclose in the 2015 10-K that oil prices were the lowest seen since 2004?

A.    That's my recollection.

MR. MELSHEIMER:  Can we pull up Page 44 of Plaintiff's Exhibit 66 which is the 2015 10-K?

Q.    (By Mr. Melsheimer) "The upstream industry environment has

been challenged throughout 2015 with abundant crude oil supply causing crude oil prices to decrease to levels not seen since 2004 while natural gas prices remained depressed."

Did I read that correctly?

A.    Yes, you did.

Q.    Was that accurate?

A.    Yes.

Q.    Now in your experience, and I think you've told us this, are these kinds of prices volatile?

A.    Yes, they are.

Q.    Were they volatile in the full year of 2015?

A.    They were.

Q.    So if ExxonMobil had disclosed in the 2015 10-K the results of January, 2016, would that have given an accurate picture of Kearl as of 2015?

A.    No.

Q.    Would any event that happened in 2016 be relevant to Kearl's proved reserves as of 2015?

A.    No, it would not.

Q.    Why not?

A.    Well, again, the SEC rules are very clear in terms of how you calculate that.  It's the first day of each month's price averaged over the 12 months.  That's -- That's all you get to use are those prices and then your lifting costs for that same period of time, and that's it.  It's to cover that 12-month period.  You

know, they don't want to bring other data in from either end of the year.  That begins to contaminate the analysis.  So that's it.

Q.    So let's take a look at another page from the 10-K, Page 7.

THE COURT:  Would you get him to explain "lifting costs"?

Q    (By Mr. Melsheimer) Mister -- Mr. Tillerson, can you, please, explain "lifting costs" for the Ladies and Gentlemen of the Jury?

A.    Well, in the context of Kearl, it's really all those costs to mine -- mine the material with the big shovels and the trucks and take it over to the process, the crusher and run it through the diluent process, add the dilbit -- the diluent to it so that you now have a marketable product.

Q.    Is it lifting as in lifting it out of the ground?

A.    That's where the term comes from.  In a conventional oil development, you're drilling wells, and so you're lifting the crude oil from down below the ground to the surface.  That's where the term "lifting cost" comes from.

MR. MELSHEIMER:  Can we turn to Page 7 of the 2015 10-K?

Q    (By Mr. Melsheimer) And read that for the jury.  I'm going to ask you a question about it.

A.    The highlighted area?

Q.    Yes, sir.

A.    "Otherwise, no major discovery or other favorable or adverse event has occurred since December 31st, 2015, that would cause a significant change in the estimated proved reserves as of that date."

Q.    As of that date being what?

A.    December 31st, two thousand and -- Well, let's see.  I have to look at the whole thing.  I guess as of the time of the filing.

Q.    Since December 31st, 2015?

A.    Right.

Q.    Is that what it says?

A.    Right.

Q.    Okay.  I want to go on and talk about the Kearl proved reserves.

      What group in ExxonMobil is responsible for evaluating whether Kearl's assets qualified as proved reserves in 2015?

A.    Well, the Global Reserves Organization would do that in the case of Kearl in collaboration, coordination with the Imperial Oil Corporation's Reserves Group as well.

Q.    Why were there two groups involved?

A.    Well, Imperial Oil is a -- is a separate corporation.  It has their own Board of Directors, traded on the Toronto Stock Exchange.  Even though ExxonMobil owns the majority share, nonetheless, they need to have the independence to do their analysis, and then the two Reserves Groups would work together.

Q.    What does the Global Reserves Group do as a general matter?

A.    Well, it's a group comprised of long-time experts; in particular, a lot of reservoir engineering expertise.  So they're doing a couple of things:

      One, they're -- they're looking at the technical qualification for the reserves themselves.  There are technical definitions using the Society of Petroleum Engineering Standards, and they are first confirming the technical -- that the reserves technically and physically exist as well as the technical work to make some estimation of what's recoverable because you won't get a hundred percent of what's down there.  You'll get some portion.

      Then they're taking that information and they're now running -- taking it over to the regulatory filing requirements which is the calculations you heard a lot about.  And they will run those calculations, and -- and then that determines -- make that determination on whether they qualify ultimately to be booked as proved reserves using the SEC procedures.

Q.    Does the Global Reserves Group play any role in operating or running the assets?

A.    No, they don't.  They're completely independent of the operation.

Q.    Why is that important?

A.    Well, we don't want the pressure of booking or debooking reserves to be part of the process of evaluation.  They don't -- They don't have any responsibility for any of that.  They just

have responsibility for doing the calculations.

Q.    How were you involved in the SEC reserves process, if you were?

A.    Well, I would get -- From time to time I'd get updates from the Global Reserves Group as the year would go along.  They might be looking at some things and they wanted to highlight.  If there were some potential for things to come up, they -- they try to highlight those for us.  Towards the end of the year, then as more and more of this data is available, you know, you get -- start getting nine months of price data, ten months of price data.  You got ten months of listing cost data.  They're beginning to now zero in on whether there's going to be some changes or not, and that's when they would begin to share those upline with us.  The calculations aren't final till the full year's in, obviously, but by then you've got a fair amount of data.  So you got some idea even though nothing's been finalized.

Q.    During 2015 did Mr. Strawbridge ever tell you that Kearl would not qualify as proved reserves at year end?

A.    No, he didn't.

Q.    Did anyone in the Global Reserves Group tell you that?

A.    No, they did not.

Q.    Tell the jury what Mr. Strawbridge and others from Global Reserves Group told you about the Kearl proved reserves during 2015.

      MR. SAHAM:  Objection; calls for hearsay, Your Honor.

      THE COURT:  Sustained.

Q    (By Mr. Melsheimer) Did you ever have any reason to question the professional judgment of Mr. Strawbridge or anyone in his group?

A.    No.  No.  They were long-time experts; had been doing this for a while.

Q.    Did you have any reason to believe that the Global Reserves Group or any individual in that group was not following the SEC rules?

A.    No, not at all.

Q.    Did you trust them?

A.    Absolutely.

Q.    Let's take a look at Plaintiff's Exhibit 117 which is admitted, and you've been asked a number of questions about this.  This is the "Kearl 2015 SEC Reserves, October of '26, Chairman's Review."

      And just for the interest of time, you've told us these Chairman's Reviews were monthly items that you made yourself available for whatever issues wanted to be brought to your attention.

A.    That's correct.

Q.    It wasn't just about Kearl.

A.    No.  There was a full day's agenda.  This is one of the items on the agenda, I'm sure.

Q.    Was it unusual that you were having a Chairman's Review

about Kearl or proved reserves in October of 2015?

A.   No.  No, as I indicated.  So by now, this late in October, they have October 1st pricing.  So they've got ten months' worth of information now.  So things are starting to come together, and this was a good time for them to begin to talk to us about it.

Q.   Do you recall why the Kearl proved reserves was a particular topic of discussion in October of 2015?

A.   Well, again, large project, expansion starting up.  So it was a really important investment as well.  And then the fact that we had a business environment that was starting -- we were starting to see the duration of a business environment.  So it would be normal that they would be looking at this.

Q.   Who made the presentation at the meeting?

A.   I believe Bill Strawbridge did.

Q.   And just -- Can you -- Can you tell us generally what he told you?

A.   Well, just generally, I think the conclusion was that they didn't see any debooking of Kearl coming up based on the information they had at that point.  My recollection is they -- they talked about they had stuck with the methodology they had been using for years for the sale of bitumen up in Edmonton because -- and you heard some testimony from Mr. Madden about that was a well-known market established.  We had high confidence in those numbers.  So they had stayed with methodology that had been used by Imperial and by the Global Reserves Group.

Q.   Let's -- Let's turn to Page 8 of this document.  Can you tell the jury what is shown on Page 8?

A.   Well, it's a depiction of 2014 and '15 -- And the "YEO" is "year-end outlook."  So, again, they've got ten months but we're not to the end of the year.  So they're -- they're kind of making an estimate of what they think it's going to be at the end of the year of the cash opex and sustaining capex and then the SEC clearing price.  So they're just showing that there's -- there's head room, there's margin between those two which would indicate Kearl is going to pass the SEC requirement for remaining on the books.

Q.   So let's -- let's take a look at the right-hand column here, "SEC Positive Cash Flow Test.  Proved reserves equals revenues greater than costs."

      Is that your understanding?

A.   That's correct.

Q.   Okay.  "And costs are Direct Cash Operating Costs plus Sustaining CAPEX, including CAF."  Do you know what "CAF" is?

A.   Costs Above field.

Q.   What is that?

A.   That's the allocated cost of things like me, the corporate structure, some of the upstream overhead costs of various functions that support the business, like controllers and what not.  Their costs get allocated out to everybody.  Everyone gets a piece of that.  And under the SEC process and procedures, you

take those costs out because those costs are not going away if -- just because a property changes or does, you know, come off the books.

Q.   So let's take a look at what's shown here and what I've highlighted, "2015 Annual Average, Outlook price approximately one dollar per barrel greater than costs."  Did I read that right?

A.   Yes, you did.

Q.   What would that mean for proved reserves?

A.   It means that Kearl would qualify as a proved reserve.

Q.   Is that what Mr. Strawbridge told you?

A.   Yes.

Q.   And then here, "2015 Second Half, Outlook price approximately six dollars a barrel greater than cost."  So what's -- what's happening here?

      You've got the annual average of one dollar but then the second half it's six dollars.  What's -- What's happening there?

A.   Well, there's two things going on as we've talked:

      The expansion project just starting up, so you're getting more volume, and you're getting more volume under those -- some of those same costs.  So the unit cost is going down because I'm dividing by more barrels.

      But also what was going on is the organization was really concentrating on getting the overall costs down on a day-to-day basis.  So both of those were all in the positive direction for

lowering the unit lifting cost.

Q.   Are you confident or not that Mr. Strawbridge communicated all this to you at this October's Chairman's Review?

A.   I am confident.

Q.   Okay.  Let's take a look at Page 6.  You were asked some questions about this for the 2015 outlook.  "Properties challenged to demonstrate positive cash flow," and one of them is Kearl.

A.   Correct.

Q.   Was that a surprise to you?

A.   No.

Q.   Why not?

A.   Well, I think even the analysis we just looked at showed it was close, you know.  There wasn't a -- It wasn't like it was, you know, a big margin.  It was close.  So it didn't -- It was not surprising.

Q.   Does it matter if it's -- in terms of proved reserves whether it's a dollar or 50 cents or two dollars?

A.   No.  As long as it's positive.

Q.   You said something a minute ago, and I want to make sure I understand it.  You talked about the costs going down as the volume went up.  Do you remember that?

A.   Yes, that's correct.

Q.   So let's do some -- some math on that, if we can.  And we're just going to use some easy -- easy numbers.

Let's say you got a thousand barrels coming out, and that's costing you a hundred dollars to do that.

So what's that cost per barrel?

A. It's going to be ten cents a barrel.

Q. Okay. Now if -- What happens if you increase the production to 2000 barrels but you're able to keep your cost at a hundred?

A. It's going to be a nickel.

Q. So is that what you meant by reducing your unit cost?

A. Yes. Yeah. There's two effects going on: The increased volume as well as the lowering of the overall absolute costs. So both things are going on at the same time.

Q. And I'm gathering, from looking at all these, that the increased volume was something that was happening on the second half of the year and not the first half of the year.

A. Right. It was -- Again, you've seen these charts of the volatility in the second half of '15. If you draw -- kind of draw a line through that, it was gradually increasing but it was very unstable. So the idea was to get that up to its capacity and then be able to hold that with some level of stability so you weren't up and down every other day. And that's where the increased volumes actually come from is when you can keep the thing running.

Q. Just one more question about that just in case anyone's wondering.

So how is it that you're able to keep the costs constant

even though you're producing more of something?

A. Well, a lot of those costs are fixed, and even some of the variable costs, though, have a scalability component to them. So you're -- you're getting a scalability factor even out of some of the variability, variable costs, because a lot of your -- Let's say your employee costs. A number of employees are out there. Yes, you have additional employees for the expansion but you already had a lot of these base employees that were already out there operating the plant. So that's just a simple example of that cost is going to benefit from higher volume as well.

So it's -- it's a combination of a whole host of different costs. And again, the organization, they're also trying to work on getting -- getting the actual costs down on commodities they might be buying, contracts they're negotiating for repairs. They may be negotiating even for a contract on those big tires. They're just constantly trying to find ways to lower their costs.

Q. Is -- In a low-price environment, low oil price, low bitumen price environment like you had in 2015, does that affect your operational costs as well?

A. Well, it certainly affects the cost of the diluent that you're purchasing to blend with the bitumen so that it can be sold because the diluent cost would be less in a low-price environment as well.

Q. Was there ever a Management Committee meeting you were involved with where you or Mr. Swiger or Mr. Rosenthal told the

Reserves Group what to include or exclude in the SEC Cash Flow Test for estimating proved reserves?

A. No. We had no input on that.

Q. Did anyone at this October, 2015, Chairman's Review meeting instruct the Reserves Team to change their analysis?

A. No.

Q. At this October meeting, did you direct Mr. Strawbridge or anyone in his group to reach a certain conclusion?

A. No, certainly not.

Q. Was Mr. Strawbridge the kind of guy that would have stood for that?

A. No.

Q. So transportation costs -- And we're going to meet him later, I think.

Transportation costs, you were asked some questions about the transportation costs used in this SEC price. Do you remember that?

A. I do.

Q. And you saw some costs related to transportation to the Gulf Coast in 2015. Do you remember that?

A. I do.

Q. To your knowledge, were those costs included in the 2015 proved reserves estimate?

A. No, they were not.

Q. Why not?

A. Well, again, it was not -- that was not the methodology the Global Reserves Group was using that year, again during this start-up period of Kearl where things were unstable. They had low confidence in those market numbers for that second half of the year. And I think that the expectation was that as we got more information, once we got this thing lined out, you know, then they might have confidence to change that methodology but they didn't change it for '15, so there was no change made.

Q. Was this approach consistent or inconsistent with the treatment of other Canadian bitumen assets?

A. It was consistent. It was the same methodology that had been used for Cold Lake for many years.

Q. One thing I've heard you say before that was kind of interesting on Cold Lake: So Kearl is a mine for bitumen. Cold Lake is different. It's something called a "huff and puff."

A. That's -- That's kind of how I describe it.

Q. What is that?

A. Well, it's -- you drill wells. The bitumen at Cold Lake is buried deeper, so you cannot surface mine it. So you drill wells just like you're drilling for oil, but this tar is not going to flow into that well. So what is done is you pump a lot of steam down the wellbore out into the formation. Basically you heat -- heat as much of the formation up as you can. So you'll -- you'll pump steam for several weeks and get all that heated up or as hot as you can get it. Then you turn that well around and start

producing it. Now the tar is hot and it will actually flow. So you can flow tar out of the well and then until it stops. As things cool down, it's going to stop flowing, and you do the same thing again. So it's called a "huff and puff" because you're pumping the steam down there.

Q. With respect to the transportation costs at Kearl, did you personally decide whether Edmonton would be used for a basis for sales or not?

A. No.

Q. Who came up with that methodology?

A. Well, that would be the -- The Global Reserves Group would have done that in consultation with the Supply and Trading Group. And, again, you heard from Mr. Madden, I think, last week. So that's who would have come up with those numbers.

Q. Did -- In this October meeting, did you have any understanding of what would happen if U.S. sales were included in transportation costs or did you not know?

A. No. That case wasn't run, so I would have no way of knowing.

Q. What else didn't you have at the October meeting to be able to make a decision?

In other words, was any decision made at that October meeting that said, "Let's do this, let's do that," or was it something you were still waiting on?

A. No. We would wait. Again, as I -- as I mentioned, you want

---

to wait to get the end of the year. It would have been inappropriate to be making a decision when you still had some of the year left. So you wait. Again, the process -- this was just all part of the process of things going into the 10-K. People towards the end would start reviewing things, but they'd have to wait to finalize it till the year's over.

Q. So I think you told us a minute ago you had a pretty good idea of where it was headed because you had those ten months.

A. That's correct.

Q. But you weren't totally certain.

A. Well, you just -- you wait. There's no need to make a call at that point, so you don't make a call.

Q. So I want to jump to January of 2016. Was there a meeting with you in January of 2016 in which the 2015 proved reserves estimate was discussed?

A. I'm sure there was.

Q. Let's take a look at DX 36.

MR. MELSHEIMER: And actually, Your Honor, we're going to offer DX -- DX 36 which is the Chairman's Review with slides and speakers' notes dated January 25th, 2016. DX 36.

THE COURT: Do you all have duplicate numbers? Do they have a Plaintiff's 36?

MR. MELSHEIMER: I don't know if there is a Plaintiff's 36 that's in evidence, Your Honor, but I can check.

THE COURT: Just let me know later.

---

MR. SAHAM: No objection.

THE COURT: It's admitted into evidence.

Q. (By Mr. Melsheimer) So let's -- Mr. Gooden, can you turn to Page 3 of Defense Exhibit 36? What is this, sir?

A. It's labeled the "2015 Proved Reserve Changes, Chairman's Review" held in late January. It would have been during the Chairman's Briefing. Again, one of those monthly meetings that we had.

Q. What was -- What was the purpose of this presentation?

A. Now, I believe, they finalized all the numbers, the errors in the books, and so now it's to review those results and, in particular, talk about any changes.

Q. So let's look at Page 4 which is Slide 1 of the deck. Can you read that last bullet point to the jury, Mr. Tillerson?

A. "Process -- Process-wise, we have not made any changes in last year. Process is well established, and we continue to demonstrate strong controls through the satisfactory internal and PricewaterhouseCoopers audits. Additionally, there were no reserves-related issues raised by the SEC on our 10-K filing."

Q. What did you understand that to mean?

A. Well, that the process we had used worked well. They concluded everything. We made the filings. It had been audited by PwC, and we had not at this point had any issues raised by the regulator.

Q. Were these -- Were these things you were saying,

---

Mr. Tillerson, or were these things being said to you?

A. Well, no. I think these are from the presenter.

Q. So let's -- let's turn to the Kearl analysis, starting on Page 37.

What were the results of the SEC test as of Year End 2015 under the full year and second half cost figures?

A. Looking under the heading "2015 SEC Net Cash Flow Test," the annual average had a price that was two dollars a barrel above the cost which meant that it met the test for proved reserves.

Q. So let me stop you there for a second. We looked at one in October. Do you remember what it was in October?

A. I think the year to date was like a dollar in October.

Q. So it's gotten a little better since then.

A. Yes.

Q. Okay. And then what -- what would it be if you looked at just the second half cost?

A. Well, second half, it had improved to seven dollars a barrel above cost. And, again, we know the price was declining, so this has to be all related to lowering the unit lifting cost.

Q. We were seeing bitumen down --

A. Correct.

Q. -- quite a bit by end of the year.

A. That's right.

Q. Do you remember, Mr. Tillerson, what number we saw in October when Mr. Strawbridge presented these -- these figures to

you?

A.   I believe it was six dollars.

Q.   Again, some improvement.

A.   Correct.

Q.   So if we turn next to the next slide, Page 40, what's that first bullet point?

A.   "So Kearl clearly meets the Net Cash Flow Test required by the SEC."

Q.   Again, is this what the presenter told you?

A.   I believe it is.

Q.   Any doubt in your mind about whether Kearl, thus, passed the estimated proved reserves test?

A.   None whatsoever.

Q.   Now what's that second bullet point?

A.   "Obviously, 2016 will be a challenge.  Kearl netback price was $13.29 on January the 1st, 2016."

So recall we had a very low price in December of '15, and so now we have the first month of the new year available, and it was $13.29, a slight improvement but not a lot.  So I think they're just acknowledging that at that pricing level, this could be a challenging year for Kearl.

Q.   Do you recall from way back in the beginning of your testimony with -- on Direct this morning, Mr. Tillerson, whether or not ExxonMobil included a disclosure about the possibility of this being a continuing challenge in 2016?

A.   Yes, we did.

Q.   What was said?

A.   Well, it's in the 2015 10-K.  We added that cautionary language about if the current prices that we were experiencing in late 2015 were to continue into 2016, then certain oil and gas reserves, such as the oil sands in Canada.  So that -- that was that language that was in there to acknowledge that that was a possibility.

Q.   Let's move to 2016, Mr. Tillerson.  Did Exxon work to update how it did the SEC proved reserves estimate for Kearl in 2016?

A.   Yes, they did.

Q.   And whose idea was it to do this update?

A.   Well, I think it was probably -- I think it originated with Imperial Oil's Reserves Group because they are the Canadian reporting, but I'm sure it was in collaboration with Mr. Strawbridge's Global Reserves Group as well.  So, again, it would have -- it would have emerged out of the two reserve reporting organizations.

Q.   Did anyone come to you in 2015 proposing a new methodology to be used in 2015?

A.   No, no one.

Q.   Did you oppose updating the methodology in 2016?

A.   No, not at all.

Q.   Did you tell the Reserves Group to delay updating the methodology --

A.   No.

Q.   -- at any point?

A.   No.

MR. MELSHEIMER:  Now can you pull up Plaintiff's -- Mr. Gooden, can you pull up Plaintiff's Exhibit 91?

Q   (By Mr. Melsheimer) Now do you recall, Mr. Tillerson, being asked questions about this e-mail?

A.   Yes.

Q.   Now are you on this e-mail?

A.   No, I don't believe I am.

Q.   I don't see it.  You're not one of the attendees at this -- at this meeting, right?

A.   No.

Q.   You were asked some questions about 2015, and I think you pointed out to the jury that this was about 2016 pricing.

A.   That's correct.

Q.   And if you look at the text of the document, --

MR. MELSHEIMER:  Would you scroll up a little bit?

Q.   -- what does it say with respect to 2015 from the part that's highlighted?

MR. SAHAM:  Objection; leading.

THE COURT:  Don't lead the witness.

Q   (By Mr. Melsheimer) What does it say after the bolded -- after the last discussion on December 16th, 2015?

A.   You're wanting the third paragraph that's different or ---

Q.   That starts "Bill Strawbridge."

A.   Okay.  "Bill Strawbridge advised that no changes should be done to this process until we have completed the review process and have endorsed it with the agreed changes to be made going forward.  We confirm that the Kearl pricing method would not be changed for the 2015 -- for 2015 with the new markets that have come on.  Might need to review the calculation of the diluent value used since we have started to bring more diluent up from the U.S."

Q.   Okay.  Thank you, Mr. Tillerson.

I want to talk about -- about the debooking of the Kearl reserves estimate.  Did there come a time when Kearl's reserves were debooked?

A.   They were.

Q.   Were they debooked in 2016?

A.   They were.

Q.   Did you oppose or protest the debooking of the Kearl reserves, estimated reserves in 2016?

A.   No, I didn't.

Q.   Did the debooking of Kearl's estimated reserves in 2016 have anything to do -- top, side or bottom -- with the 2016 bond offering?

A.   No.

Q.   Did the debooking of Kearl's proved reserves estimate affect the company's plans to continue operating the Kearl project?

A.   No, not at all.

Q.   Did the debooking of Kearl's proved reserves estimate change your outlook on the future potential for Kearl?

A.   No, it did not.

Q.   Why not?

A.   Again, it's a 40-year project.  We know the price environment we were in in 2015, '16 represented essentially what was the bottom of the market.  It wasn't going to go much lower than that.  So the day would come when those prices would recover and it didn't take much for Kearl to be profitable again because of the volumes to become a significant contributor to both earnings and net cash generation.  I haven't followed it closely since I left but I suspect that's the case.

Q.   So Mr. Tillerson, I want to shift to the RMDG assets.  All right?

A.   Okay.

Q.   So I want to talk about the XTO acquisition.  What was your role when the XTO acquisition took place?

A.   Well, I was Chairman and CEO at the time.

Q.   What year did it happen?

A.   Well, I believe it closed in mid-2010, but the whole process began about a year prior to that.

Q.   So there were a lot of articles that were shown that seemed to be kind of critical or questioning the XTO acquisition.  Did you see those articles?

A.   I did.

Q.   Did you -- Did you live through those articles when you were CEO?

A.   I didn't read very many of them.

Q.   Can you tell the Ladies and Gentlemen of the Jury what led to ExxonMobil's decision to acquire the XTO company?

A.   Well, I'm going to go back a little bit in time because I think it's important to give you a little perspective.

So before I became Chairman and CEO, in fact, back pre-2000, Exxon Corporation had really kind of left in the lower 48 of the U.S. and everything was concentrated overseas.  So when I came to Dallas to join the Management Committee, the shale -- the shale revolution, if I can call it that, particularly in the Barnett, here in the metroplex area, was really just beginning to heat up.  And I was watching that and -- and got agreement from the then Chairman to run a little program to try to understand it because we just didn't have any experts in this area anymore.  So we picked up a few leases here nearby Dallas area, drilled the wells, did the horizontal, did the fracking so we kind of understood what all was involved.  Wells came in productive.  Did the little test, and then we ended up selling that small piece because that wasn't important.  It was really so we could figure this out.

And what I came to the conclusion of was that we were -- first, we were late to the party.  So if we were going to get in this space which was emerging, that this was going to be a really important resource to the United States.  We had to -- We were just going to have to go out and acquire somebody.  We didn't have an organization that could do this.  It would take a long time to build an organization from scratch, and we were already behind in terms of leasing.  So we were -- Our eyes and ears were kind of open to someone who might want to be acquired.

XTO approached us in 2009, the founder and then Chairman and CEO, and said, "Look, I don't have a successor to take over my job and so we'd really like to have discussions about the possibility of us merging into ExxonMobil."  They thought a lot of us, and our values and our standards were very well aligned.  So that set off a conversation which ultimately led to the transaction where XTO merged with ExxonMobil.

And I give that you background because there were really two elements to the -- to the acquisition:

First, obviously, yes, getting their acreage position.  They had a lot of acreage in the Barnett.  They had a lot of acreage elsewhere, a lot of it undeveloped.  So we were -- That gave us something meaningful to work on.  We were looking for something meaningful size-wise, but equally important to me and from a strategic standpoint was getting their organization.  They had about 1100 people, had a very active landman organization.  We had essentially none at this point.

Q.   Now when you say the landman, ---

A.   People that go out and acquire the leases, that sign up, you know, sign up the properties and get the rights for you to go out and develop.  They had engineers that had been drilling these horizontal wells and doing the fracking a long time.  They had done a lot of improvements to the process.

So basically, an important element of this acquisition was:  How do we get into this space quickly?  Got to have an organization to do it.  I don't care what anybody says.  You can have the best resources.  You can have all the money in the world.  If you don't have the best people, you got nothing.  So we had to go out and get some people, and that was what was motivating me in that acquisition.  And I think as time has gone by, while on a short-term basis some things didn't work out, okay, fine.  Today, because of that entry now ten, whatever, how many years ago, ExxonMobil is the largest shale oil producer in the Permian Basis today.  It was all built on the start with that organization, and now we had the wherewithal to go out and expand and pick up more.  And we made another big acquisition right before I retired to give XTO more acreage to work on.

This was a very long-term decision.  That's why all of these pundits trying to assess it in six months or a year meant absolutely nothing.  Just meant absolutely nothing.

Q.   Mr. Tillerson, let me ask you:  Was this a long-term or short-term investment?

A.   No.  This was a long-term -- long-term view of how do we --

how do we position ExxonMobil Corporation, who was not in this space, how do we get position to participate in a meaningful way? Because we're a big outfit. Doing it small doesn't do anything for our shareholders. We've got to do it at scale. That's -- That's how we deliver the best value to the shareholders.

Q. Did you have some experience as a young man that you told us about earlier today about this -- this -- all this sort of fracking and other related issues?

A. Yes, my second assignment with the company in 1977.

Q. So did that play some role in you thinking back to what you've done as a young man and what you could do now as the Chairman of the company?

A. I had a lot of confidence in technology and a lot of confidence that the technology would continue to evolve and would get better and better, and we needed to be a part of that.

Q. So there were a lot of questions from the Plaintiff's counsel suggesting that because the gas prices went down, that this was a bad deal.

When you made this acquisition or when the company made it, was it solely about the current price of natural gas?

MR. SAHAM: Objection; leading.

THE COURT: Overruled. I'll let him answer that.

A. No. It was made with a long-term view of natural gas prices and also the long-term view of the role natural gas was going to play in the energy supply, not just here in the U.S. but

globally.

Q. Did low gas prices in the years after the acquisition make the acquisition a failure?

A. No.

Q. Did the fact that gas prices went down mean you should have written everything off?

A. No. That's a -- That's an asset-by-asset evaluation you do. And that's why, yes, subsequently there were some assets that were written down. Once you go through those impairment calculations, that's -- that's what you do. You follow the accounting rules and then whatever it is it is.

Q. So let me turn your attention to what the Plaintiffs have called the "RMDG assets," the Rocky Mountain dry gas assets. What is the connection between those assets and XTO?

A. Well, those assets came with the acquisition. They were really -- They were really out of three different geographic areas in Southern Colorado, Northern New Mexico, a little bit into Utah.

Q. What are they?

A. They are dry gas, tight gas, not -- not too dissimilar to the kind of formations we were fracking in the 1970s in East Texas. So they're -- They require hydraulic fracturing, stimulation in order for the gas to be liberated so that you can produce it.

Q. Are they short-lived or long-lived assets?

A. These -- These are going to be long-lived assets. So there's a lot of gas reserve down there but it's -- it's going to take a while to get it out.

Q. When gas prices dropped in 2015, was that unusual or unique in the history of the industry?

A. No. Again, it's just part of the ups and downs of supply -- the dynamics of supply and demand. Whenever they get out of balance, prices are going to go up or they're going to go down, depending on which of those is out of balance.

Q. Remind the jury how you managed through those ups and downs.

A. Well, again, you try to ignore things and don't get real despondent if you're in a low-price environment but really concentrate on the things you can control. And that's back to all the emphasis on getting your costs down, working on the things. You can find new technology to apply. If we need to invest more dollars to get unit cost down because the scale will help us, bring that forward.

Q. Can you turn to Plaintiffs' Exhibit 51 which the Plaintiffs' lawyer asked you about? Do you recall getting questions about this document?

A. Yes.

Q. What is it?

A. Well, this is in anticipation of a discussion with the PricewaterhouseCoopers independent auditors regarding the pricing environment.

Q. Let me direct your attention to Page 2, the middle of the page that says, "Be prepared to answer the question: So has a trigger event occurred? Answer: By virtue of the reduction in EM's long-term U.S. natural gas price outlook, it would be difficult to argue to SEC that one has not occurred."

What did you understand that to mean?

A. Well, that we could expect that we were going to be asked about it, and so we needed to be prepared to explain our conclusions on why we believed a trigger had not occurred. So do the work necessary to document that so you can explain it to the independent auditors. Also as to the SEC. So here we're -- I mean we're highlighting we know this is going to be closely looked at in this environment.

Q. You recall I asked Mr. Rosenthal if he had ever heard the phrase "show your work" --

A. Yes.

Q. -- from school?

A. Yes.

Q. Was this a "show your work-type" situation?

A. Yes. That's kind of the message was: Look, we need to do the analysis and you need to be able to document it and explain it.

Q. Did anyone at ExxonMobil express to you that they believed an impairment trigger had occurred for the RMDG assets in 2015?

A. No.

Case 3:16-cv-03111-K    Document 376    Filed 05/07/26    Page 331 of 831    PageID 20524

Q.   You said this was a meeting in preparation for a meeting with Pricewaterhouse.  Why were you going to meet with Pricewaterhouse?

A.   Well, I always had a closeout meeting with Pricewaterhouse or we would meet.  Anytime if the Lead Auditor wanted to meet, then I would certainly meet with the Lead Auditor.  But we always met towards the end of the year so that the Lead Auditor could express to me did they have any concerns about the audit process.  I was -- I could also then ask them:  Are you satisfied you got to look at everything you wanted to look at?  Because with your auditors, your books have to be open to everything.  And is there anyone who refused to give you information?  Is there anyone who refused to meet with you?

     Those are the kind of questions I was asking the PwC people, and then they would tell me if they had areas where they felt they had concerns or issues that we needed to talk more about, you know, or they needed more information or -- because what we wanted was to make sure they could finish all of their work, write their letter at the end of the year that's so important to our filings with the SEC and with the shareholders.

Q.   So let's take a look at the next slide, "How the Meeting Will Unfold."  And, again, this is the meeting with Pricewaterhouse?

A.   That's correct.

Q.   So we've highlighted there, "Since EM's views on impairment

are supported in large part by resilient asset base and resourceful workforce, important to spend time with PwC documenting evolution and continuous improvement of XTO's operations since the merger."

     Do you see that?

A.   Yes, I do.

Q.   What did you understand that to mean?

A.   Well, that's back to what I was saying earlier, that we knew this was going to get looked at closely.  So it's -- To use counselor's phraseology, "show your work."  So let's -- let's get our documents in order.  XTO had undertaken a lot of improvement initiatives.  Let's get those documented.  We needed to show PricewaterhouseCoopers why we're confident that we're passing these tests appropriately.

Q.   What does "the resourceful workforce and resilient asset base" mean?

A.   Well, the -- Again, we had acquired this organization, and one of the characteristics of the XTO organization in this space, in the shale space was they had been very creative, very innovative in testing and trying new things and getting their costs down.  The asset base was pretty broad based.  It wasn't all concentrated in one particular field or basin or another.  So you had a diversity of assets to manage.  Some of them were better quality.  Some of them were lower cost to develop than others.  So you had that to work with.

Q.   What is this notion of continuous improvement?

A.   Well, it -- in this business and as we've talked many times, since you can't control the price, you work on the things you can control, and that's your costs.  You are never done.  You're never done because somebody somewhere is probably coming up with something that's better than what you're doing.  You better figure it out, too.  So it's always, always, always finding the next thing that's going to get our cost structure down.  That's -- That's how you respond in these low-price environments.  And, you know, one of the great challenges when you get in a high-price environment, it's easy for people to take kind of their foot off of that pedal.  So we always have to remind them in a high-price environment, "Stay with it because that high-price environment isn't going to last.  We'll be back down here at the bottom again one day.  So don't ever stop continually improving this thing.  High price, low price, it doesn't matter.

Q.   Does that statement about continuous improvement, does that relate in any way to your statement in that interview in the *Petroleum Intelligence Weekly* where you said, "We don't do write-downs but we follow the accounting standards"?

A.   That was really -- If you read the entire interview, that was the point I was making in answer to a question Ms. Shook asked me is:  Yes, of course, we follow the accounting standards and we're going to do those and that's fine, but I don't want my operating organization reading anything into that result.  Write

it down.  If it's impaired, non-impaired, it doesn't matter because we're still going to operate this asset.  And we've -- we've invested the shareholder's money.  Whether it's on the books, off the books, whatever, nothing's changed about what your responsibility is.  And your responsibility is to make that asset perform; high prices, low prices, all prices.

     If you read the full interview, you'll get that was the tone.  I was speaking to the Operating Organization there.  The Accounting Organization knows to follow the rules.

Q.   Is that what you meant by ---

     THE COURT:  Mr. Melsheimer?

     MR. MELSHEIMER:  Yes, sir.  Is this a good time for a break?

     THE COURT:  Is it a good time for you to finish?

     MR. MELSHEIMER:  It is a good time for a break, Your Honor.

     THE COURT:  Was that a "no"?

     MR. MELSHEIMER:  I'm not quite finished, if that is the Court's question.  I've got a little bit more to cover with Mr. Tillerson since we have to put him on in his entirety.

     THE COURT:  Okay.  No, I want you to.  I just -- Why don't we take a break and you can pray about that a little bit.

     MR. MELSHEIMER:  I will do so.

     THE COURT:  Y'all don't talk about the case.  Thank you, all.

VOLUME 5-B   65

COURT SECURITY OFFICER:  All rise for the jury.

(Jury escorted to the Jury Room by the Court Security Officer.)

THE COURT:  Thanks, Mr. Tillerson.

(Court recessed from 3:03 PM until 3:33 PM.)

THE COURT:  Okay.  Bring them in.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury seated in the jury box.)

THE COURT:  All right.  Y'all be seated.  Here we go.

MR. MELSHEIMER:  May it please the Court.

THE COURT:  Yes, sir.

CONTINUED DIRECT EXAMINATION

QUESTIONS BY MR. MELSHEIMER:

Q.   Mr. Tillerson, we were talking about continuous improvement, and I'd like to go back to what I said I would cover, Plaintiffs' Exhibit 527.  Do you remember that -- the document you were asked about about that workshop with about 30 ExxonMobil employees after you left the company?

A.   Yes.

Q.   Are you with me?

A.   Yes.

Q.   And you've had a chance to look at that?

A.   I've had a chance just to kind of flip through it.  I haven't -- have not spent any time on it.

Q.   And I think I was clear but just to be -- Was it anything to

VOLUME 5-B   66

do with putting together the 10-K?

A.   No.

Q.   Was it anything to do about following the accounting rules?

A.   No.

Q.   Was it anything to do about estimating proved reserves?

A.   No.

Q.   Was it anything to do about impairment of assets?

A.   No.

Q.   Okay.  Now did Exxon in its efforts for continuous improvement while you were there, did Exxon sometimes seek employee feedback?

A.   Yeah.  From time to time, yes.

Q.   And this 527 appears to be an example of that after -- after you left the company in terms of its compilation?

A.   Yes.  It looks like an upstream kind of sponsored workshop to do that.

Q.   And remind us:  How many people were at the company when you left?

There's about 30 in this -- in this program.  How many people were at Exxon when you leaf?

A.   Over 70,000.

Q.   And if you look at ---

MR. MELSHEIMER:  Can we just look at Page 100?

Q   (By Mr. Melsheimer) Do you know who "Al Harper" was?

A.   Yes.

VOLUME 5-B   67

Q.   Was he Treasurer of the Upstream Group?

A.   Yes.

Q.   So this is one of the slides where he says, "There's no way in the world that a couple of people could have sat around and achieved what this group achieved in a day.  So it's a very big, sincere and genuine thank you."

What does that -- What does that mean to you?

A.   Well, not -- You know, not knowing in great detail what all was done at the workshop, but I gathered that Mr. Harper, along with a couple of other people were kind of the sponsors or coordinators of this event.  And so I think they felt like they had gathered some really useful information, some input from this group, and he was -- he was thanking them.

Q.   Okay.  Is this an example of continuous improvement as far as you can tell?

A.   Sure.  Got to listen to people to see what others might think of things.

Q.   But when it comes to something like the accounting rules and how to follow the accounting rules, do you listen to Pricewaterhouse?

A.   We listen to Pricewaterhouse, the auditors, and we listen to the Controllers Organization that knows what those rules are.

Q.   The experts in those rules?

A.   That's right.

Q.   And when it comes to estimating proved reserves, do you

VOLUME 5-B   68

listen to the Global Reserves Group and those experts?

A.   Yes, we do.

Q.   All right.  You were asked some questions about the tone of the company, and what -- Tell us:  What was the tone at ExxonMobil?

A.   Well, I think at least the tone that had been part of our culture for a long time, and I certainly wanted to maintain that, was two things, and that's the safety of our people and the assets and that -- the integrity of the organization and its reputation of honesty.  Those are not priorities.  They're values.  You know, priorities can change but values can't change.  We have to protect the people, the most valuable asset the corporation has.  We need to protect the assets that the shareholders have entrusted us to invest in.  And then we need to at all times conduct ourselves with the highest level of integrity and honesty.  Our entire reputation is built on those two things.

Q.   Mr. Tillerson, do you think the tone that you set for the company discouraged employees from recognizing losses or reporting bad news?

A.   I certainly don't think so.

Q.   And how do you -- how did you reinforce the tone that you described to the jury?  How did you go about reinforcing it?

A.   We'd have a lot of employee meetings, and I would travel around the world.  We generally do employee town halls.  Some of

you may have heard of them referred to that way and have open Q and A time, but that was a really good opportunity for me to reinforce to people this notion that protecting people, protecting each other, their health, their safety, their well-being, it was not a priority. It was a value. That's how we value one another. And that's how important the corporation's reputation for integrity and honesty was around the world. It's the reason countries would entrust us with their, quote, "crown jewels," their natural resources. That was the most valuable thing those countries had. They had to trust us to do that properly, to do it well, and to do it fairly and honestly. You know, one misstep and that whole reputation is built by the actions of all the people in the corporation, not one person. It's built by everybody's actions every day, and that's why just one or two missteps can really destroy that. And we just -- There's no way we want anyone doing that because once you make that mistake, it's very hard to restore that reputation.

Q. So let me show you Plaintiffs' Exhibit 254. This was an interview that you gave to the *Petroleum Intelligence Weekly* in late August of 2015. You remember that, right?

A. I believe so.

Q. And let's go to Page 17. And I don't want to belabor this because I believe you answered it, but you talk about "Once you put the investment dollars in there, if the price goes down, those investment dollars are stuck. You know, we get to live

with that. We don't do write-downs. I mean if you look at our history, we don't write investments down, and we follow the accounting standards. But a lot of other people are very quick to want to write investments down because then it kind of improves things going forward."

I think you explained the context of this, but with those senses in mind, could you tell the Jury what you were saying?

A. Well, one of the important measures of -- of oil and gas companies, particularly in the upstream, is the return on capital employed. Your capital employed is what's on your books. So the return is the income you're generating from those assets. So when you remove something from -- from the asset base through an impairment or write it down, you've just lowered the denominator and your return automatically got better. What the message to the organization was: That is not how you earn a higher return. We're going to follow the accounting rules. If we have to write something down, write it down, but that's not for you and the Operating Organization to be worrying about. Just like I said earlier, your job is to make the asset perform. Things might go south on us after we've made that investment. Those are still the shareholders' dollars. They're still their investment dollars. Go make it work. That was the message to the Operating Organization, and that's what the men and women of ExxonMobil did and they still do today. That's why they have always been able to outperform competitors. They're dedicated to the shareholder.

They're dedicated to the shareholder's investments.

Q. Who benefits from that approach even today?

A. The shareholders.

Q. The shareholders?

A. The shareholders.

Q. Was this a message directed at Pricewaterhouse or the people in the Controllers Organization?

A. No.

Q. Did you ever direct any employee, accountant, controller or anyone to avoid or delay an impairment to achieve a particular result?

A. Never.

Q. Did ExxonMobil take impairments or write-downs while you were CEO of the company?

A. Yes, we did. We took write-downs, I think, every year. At some level there was a write-down.

Q. Now we seen some examples where it just shows zero in some of those charts. Is that because the write-down might be too small to be noted?

A. It could have been small and didn't meet the threshold for -- for disclosure.

Q. But it still could be tens of millions of dollars.

A. We took write-downs of hundreds of millions of dollars.

Q. Okay. Let's take a look at PX 65, and this is already admitted.

And this is this white paper that I think we're going to hear about from Mr. Horne. This was to show your work on the impairment analysis. Do you remember that?

A. Yes.

Q. And it just notes in there a couple of examples, recent examples, including the Torrance refinery in 2015 and Argentina upstream assets in 2010, both of which triggered assessments and write-downs. Is that an example of a write-down?

A. Yes.

Q. So did Exxon write down the Torrance refinery in 2015?

A. Yes, we did.

Q. And the Argentina assets in 2010?

A. Yes, we did.

Q. Do you recall how much the write-down was for Torrance in 2015?

A. I don't recall the precise number but it was in the hundreds of millions of dollars.

MR. MELSHEIMER: Can you turn to Page 3, Mr. Gooden?

Q (By Mr. Melsheimer) Is this highlighted sentence here another example of an impairment or write-down?

A. Yes, it is.

Q. What was the Chalmette refinery joint venture?

A. Chalmette refinery was a refinery on the coast of Louisiana -- Chalmette, Louisiana -- that was 50 percent owned by a PerdaVesa, a Venezuelan national oil company, 50 percent owned

by ExxonMobil. It had been configured specifically to run Venezuelan heavy crude. So we had big concessions in Venezuela producing heavy crude from Venezuela. All that crude we brought into that refinery because it was built for that crude to get, you know, to get the most value out of those barrels.

When we left Venezuela due to the expropriation, then that whole arrangement dissolved and at some point an impairment was taken on the Chalmette refinery.

Q. Do you recall how much that was?

A. A few hundred million dollars. I -- I don't remember the exact number.

Q. Now, Mr. Tillerson, you've been in court since the trial started. Do you recall Mr. Rosenthal's testimony about impairment causing heartburn? Do you remember that?

A. I remember that.

Q. Or the word "impairment" causing heartburn?

A. Right.

Q. How did you take Mr. Rosenthal's use of that word "heartburn"?

A. Well, I'm having to interpret, but I think he was just saying none of us like to take write-downs. We don't like to take impairments, obviously. You'd rather have that on the books, rather keep working it. As you heard, though, impairing or writing it down doesn't in all cases mean it's gone, and that was the important point. But I think it was just a reflection

that, of course, we don't like to have to write things down.

Q. And was that -- was that -- The context of that e-mail, was that in a totally separate issue with proved reserves or RMDG assets?

A. Yes.

Q. Did it involve anything to do with this trial?

A. Correct.

Q. It did or it didn't?

A. It did not. I'm sorry.

Q. Do you recall Plaintiff showing you two news articles about your competitors writing down assets in the Canadian oil sands?

A. I do.

Q. Okay. Now in this case the alleged write-down that should have been taken in 2015 was not the Canadian oil sands but was the natural gas assets, right?

A. That is correct.

Q. Okay. So do you know whether a competitor taking an impairment on their oil sands assets would have any impact on whether ExxonMobil should do the same?

A. No. It would be completely irrelevant.

Q. Why?

A. Well, they may have a completely different cost basis that they put into their asset. The quality of what they're developing might -- may not necessarily be the same. So there's just -- There's no way one could translate to the other.

MR. MELSHEIMER: Mr. Gooden, can you -- can you --

Q. (By Mr. Melsheimer) And do each -- does each company in this business have different price assumptions and outlooks that they use?

A. Yes. You are to use your best estimate of prices going forward and the same basis on which you're making your investments. So other companies are going to have their own outlooks. We don't share that. That's proprietary information. They don't share theirs. We don't share ours. So there's -- You're going to have different calculations in that -- in that regard. And then I think, as you heard, the European companies also operate under slightly different accounting rules than we operate in the U.S.

Q. So let's take a look at PX 595. Do you know that fellow there in the picture?

A. That's my old friend Patrice Pouyanné.

Q. Okay. And was Total an American company?

A. No. They were a French company.

Q. And so they operated under the same or different accounting rules?

A. Different.

Q. Take a look at Page 1. Do you recall him asking you -- Plaintiffs' counsel asking you about Total wrote off 6.5 billion of the value of its less profitable shale and oil sands ventures this morning?

A. Yes.

Q. Are we talking about -- So this article was written in February of 2015, if you -- Can you see that?

A. Yes, I do see that.

Q. So are we talking about impairments in 2015 or in 2014?

A. Well, they're saying at the end of December. So I presume they're speaking about December of 2014.

Q. Is there any claim here related to an impairment Exxon should have taken in 2014?

A. No.

Q. So take a look at Page 2. It says, "The company reported a loss," and then it says, "Other oil companies have also reported lower earnings, but rivals, ExxonMobil and some others, managed to turn a profit." Do you see that?

A. Yes, I do.

Q. Was that correct?

A. Yes, it's correct.

Q. Let's put up 596 on the screen. Do you recall the Plaintiff showing you this article on Friday as well?

A. I do.

Q. This is an abandonment of an oil sands project?

A. Yes.

Q. Does Shell operate under the U.S. accounting rules or different rules?

A. Different rules.

Q.   Take a look at the first paragraph.  "Royal Dutch Shell" -- Boy, say that fast.

"Royal Dutch Shell said Tuesday it would abandon the construction of a major oil sands project in Western Canada and take a two-billion-dollar write-down."

Why was -- What does this article say -- Whether it's true or not, what does this article say about why Shell was taking a write-down?

A.   Well, they were walking away from the project all together. So in other words, they're announcing that they're not -- not going to go forward.  Given that it was a two-billion-dollar write-down, I don't recall precisely but it must have been pretty early in their process of evaluating and they decided not to proceed.  So walking away, you take everything off the books then at that point.

Q.   Did Exxon abandon Kearl or the RMDG assets in 2015?

A.   No, we did not.

Q.   So let's go back to Plaintiffs' Exhibit 65 and go to Page 75.  Do you recall the Plaintiffs asking you questions about this page on Friday?

A.   I do.

Q.   And can you read the last bullet point on the bottom -- or the first bullet point on the bottom of that page that we have highlighted?

A.   "Kearl, as an individual field, produces net undiscounted

cash flows in excess of carrying value.  The net undiscounted cash flow of 71 billion dollars are 53 billion dollars greater than the carrying value of 18 billion dollars."

Q.   So if -- So this is saying that the future cash flows for -- for Kearl are 71 billion or 53 billion greater than what you have on the books at 18 billion?

A.   That's correct.

Q.   But, again, with Kearl for this case, we're not talking about impairments.  We're talking about estimated reserves, right?

A.   That's -- That's correct.

Q.   Okay.  Now let's go to Page 70 while we're on this document. Do you recall them asking you on Friday whether this showed that XTO had lost 630 million dollars in the first half of 2015?

A.   Yes, I do.

Q.   And I think you said, "I like these other numbers better." Do you remember that?

A.   Yes.  There's several numbers on there I like better.

Q.   And why does this slide illustrate the diversity and strength of ExxonMobil?

A.   Well, it's -- it's diverse geographically.  You see countries from all over the world almost, you know; not on every continent but pretty close and -- and their performance.  And that is one of the benefits of ExxonMobil's global reach is because all parts of the world aren't always performing the

same way.  They're different physical structures, different tax structures, different agreements under which we're developing the resources, but that diversity gets you through some of these ups and downs.  One part of the business may not be doing so well. Other parts of the business are going to do really well, and in future years they may go the other way.  Well, that's -- that's the value of that diversified set of holdings all over the world.

Q.   Well, take -- take a look at this.  You made -- In 2015 you made 426 million in Kazakhstan, two billion in Qatar?

A.   Correct.

Q.   Almost 300 million in Norway.

A.   Right.

Q.   A lot of fuel and a lot of oil in Norway North Sea, I guess, or where is that?

A.   Yes, it's North Sea.

Q.   Okay.  So were any of these assets reported individually on the 10-K?

A.   No, none of them.

Q.   And what's the total amount of earnings for 2015 for the upstream assets?

A.   For 2015, --

Q.   First half.

A.   -- first half is 5,469,000,000.

Q.   Even in a really challenging environment.

A.   Yes.  It was -- As you know, it was better in the first half

of '15 than it was in the second half.

Q.   Now they also asked you about the numbers for XTO - United States.  Do you see that?

A.   I do.

Q.   And that's that 630 million, but were the earnings for the United States actually positive?

A.   Well, the rest of the United States earned 372.  The XTO portion was a negative 630.  So first half of the year, they were negative for the United States.

Q.   Well, I guess what I'm getting at is -- Maybe -- Maybe I'm looking at this wrong.  But does this include or not include the loss of 630 million?

MR. SAHAM:  Objection; leading, Your Honor.

THE COURT:  I'm going to let him answer that. Overruled.

A.   So ask the question again.

Q   (By Mr. Melsheimer) Well, I guess what I'm getting at, it says United States 372 million, then XTO - United States.  Is that United States net of that 630 or is it separate or do you know?

A.   I don't know.

Q.   Okay.  So I want to talk about XTO in the United States. You've been shown a lot of articles about how XTO was performing, but what were XTO's earnings in 2014?

A.   $1,400,000,000.

Q.   What were they in 2013?

A.   $711,000,000.

Q.   And it looks like in 2012 they were negative.

A.   They were negative 228 million.

Q.   So it went from -- In the course of three years it went from a $228,000,000 loss to 1.4 billion dollars?

A.   Correct.

THE COURT:  Mexico is not on there.

THE WITNESS:  We didn't -- We didn't have any upstream holdings in Mexico.

THE COURT:  Okay.

MR. MELSHEIMER:  Mr. Gooden, you can take that down.

Q    (By Mr. Melsheimer) I want to move to 2016.  Did Exxon take a write-down of the RMDG assets in 2016?

A.   Yes.

Q.   Now there's been a suggestion that that decision was made after you left the company and without your knowledge.  Is that true?

A.   No.

Q.   Explain that to the jury.

A.   Well, again, as we were approaching the end of the year of 2016, as you've heard, and people are beginning to prepare for the reporting period of the year 2016, the new pricing basis for investing is not in place because we were developing the company plan on which all the investments would be made.  So now you have

the new pricing basis.  You can now run an impairment case with the new price basis.  And you've seen some charts where our price basis, long-term, changed, particularly for gas.  Remember it went from, I think, 5.20 to $4.00.  Then it went from $4.00 to 3.50.  So in those earlier ranges there was no impairment.  There was sufficient revenue to cover the costs.  When it went on down to 3.50, then the people ran the numbers again, and at that point it was evident that the properties needed to be impaired and so the impairment was taken.

Q.   So, Mr. Tillerson, is the -- is it the -- There's been a lot of questions about the percentage of the -- of the decline in the price projections, and it was -- at one point it was 25 percent.  Then it was bigger.  Does the percentage of the change in price projections, is that what's important or is it the -- what their price projection ultimately is?

MR. SAHAM:  Objection.  Calls for expert testimony.

THE COURT:  What?

MR. SAHAM:  Well, Your Honor, he's calling for expert testimony about accounting rules and Mr. Tillerson has not been designated as an expert in accounting, nor has he provided any ---

THE COURT:  I'm going let him answer.  Overruled.

A.   Well, the change is not what math matters.  What matters is what is your price forecast for the future.  And that's why I mentioned when it went from the 5.20 to $4.00, there was still

sufficient carrying capacity for the -- for the cost of the asset.  When it went to 3.50, then you had less revenue.  So that was the change.  It was the absolute change, not the amount of the change.  It was the absolute change.

Q.   Was that an example of you -- of your people following the accounting standards when it came to impairments?

A.   Yes.

Q.   Did you object or try to prevent those assets from being impaired before you left the company?

A.   No, not in any way.

Q.   So, Mr. Tillerson, the Plaintiffs asked you a bunch of questions about your compensation while at ExxonMobil.  Do you remember that?

A.   Yes.

Q.   Do you know why they asked you those questions?

A.   I don't know.  I guess they were interested.

Q.   A significant portion of your compensation every year was in stock awards, was it not?

A.   Yes.

Q.   Why was a significant portion of your compensation in stock awards?

A.   Well, the Board's compensation philosophy and the Board -- the independent Board of Directors set all of the executives' compensation levels.  We had no input on it, but their view was they wanted the senior management of the corporation's interest

to be fully in line with the shareholders.  Ninety-plus percent of my net worth was in ExxonMobil stock.  So I -- They didn't want there to be any gap between why I would do something in the interest of the shareholder that wasn't in my own interest as a shareholder as well.  So that was the basic philosophy behind it.

Q.   Were these compensation numbers made public?

A.   Yes.  They were published in the -- in the proxy every year.

Q.   So the shareholders, if they wanted to, could object or suggest anyone was overcompensated?

A.   They could do that.  There was also a great deal of detail provided from the Board Compensation Committee about some of this philosophy I was talking about and also how they structured the compensation to achieve that.  So there was a lot of information about executive compensation in that proxy.

Q.   During the time that these folks over here claim you defrauded investors, did you sell any of your ExxonMobil stock?

A.   No.

Q.   Do you still currently own a lot of your ExxonMobil stock?

A.   Well, I don't own nearly as much as I used to because when I went to serve in the government, a condition of my serving was I had to sell everything.  The Government Ethics Agreement did not allow me to own any shares of any stock.  I had to put every -- All of my wealth had to go into treasury bills or one mutual fund that they approved, and that was just a condition of my government -- the Office of Government Ethics required that.  So

after I returned from government service, I began to buy some ExxonMobil stock. So, yes, I own stock today but not -- not to the level I once did.

Q. Why do you still hold it?

A. Well, I believe in the company's capabilities to outperform the competitors the best I can tell. And I'm not there anymore. I don't want to represent I know things that I don't, but I fully believe those values are still in place. They were there throughout my career. I don't think those are going to change, and the current management, I think, is dedicated to all the same principles and the same values. And I would always recommend ExxonMobil stock to anyone.

Q. Did you stick with your ExxonMobil stock throughout the ups and downs of the 40 years you worked there?

A. Oh, yes. Yeah, I had.

Q. Why?

A. I still had the first shares I bought in 1975. First year I went to work I bought my first shares of stock. I had them until I had to sell them. It made me cry.

Q. Mr. Tillerson, let's transition to another issue. You're -- You were here in the Opening when the Plaintiff suggested that the bond offering somehow was a motive for you to manipulate the company's estimated reserves and impairment disclosures. Do you recall the gist of that?

A. I do.

Q. Did you instruct anyone to delay or change anything about the financial reporting in the 2015 10-K for purposes of solidifying, improving or affecting that bond offering in any way?

A. No. That's ridiculous.

Q. Can you remind the jury in plain terms what a bond offering is?

A. That's the vehicle you use as a corporation to go out and borrow money, and you pay interest on that money you've borrowed. The bonds are issued through several arrangers. Individuals and institutions can buy those, and so that's how a corporation borrows money.

Q. It's kind of like an IOU that you write or anyone that buys it?

A. Yes. It has terms for the payment of the interest and terms for the payback of the principal as well.

Q. Now at the time in 2016 it's been suggested or said that it was the largest bond offering in the history of the oil and gas industry. Did you hear that?

A. Yes, I did.

Q. In 2015 did Exxon, just the previous year, did Exxon have another large bond offering?

A. We did.

Q. For how much? Do you remember?

A. Eight billion is my recollection.

Q. Was the timing of that bond offering also in March?

A. I believe it was.

Q. Anything suspicious about that at all?

A. No.

Q. So you had a bond offering a year earlier from the bond offering that was done here. Is that -- Is that right?

A. That's right.

Q. When Exxon did that bond offering in 2016, was there anything different about the process?

A. Not materially different, no.

Q. What was your involvement in the 2016 bond offering?

A. Very little. The Treasury Department handled that, the details of all of that other than they did bring the final term sheet to me. We also discussed it with the Board at the time, so -- how the bonds were structured. I think either Mr. Rosenthal or Mr. Swiger may have gone through some of that in their testimony.

Q. Who was in charge of the bond offering, if there was one person in charge? Who was it?

A. Mr. Schleckser, the Corporate Treasurer.

Q. Okay. Did his group, Mr. Schleckser's group, did it have any involvement at all in the reserves estimates, the impairment decisions or the 10-K disclosures?

A. Well, not in the reserve estimates, not in the impairments. Their only involvement in the K would have been to provide

information related to financing issues.

Q. Did the people responsible for the reserves estimate and the impairment analysis, Mr. Strawbridge, Mr. Horne who we'll hear from, the Global Reserves Group, the Accounting Policy Group, did any of them have any involvement in the bond offering to your knowledge?

A. No, none.

Q. I think you've explained this, but why did Exxon do a bond offering in the Spring of 2016?

A. Well, net cash generation had dropped, and we ---

Q. What does that mean?

A. The amount of cash available after paying all the bills, so to speak. So the conditions for borrowing were very favorable at that time in 2016. Interest rates were very low. The assessment from treasurers in talking to the marketplace was these bonds would be very attractive and people would be very interested in purchasing those. So we knew we could get good terms.

It was also allowing us to restructure the financing structure of the corporation. We had some hard debt lending that we could retire by borrowing and replacing it with some very low interest rates that were structured in several different -- what we call "tranches," layers, so to speak. It gives us then some flexibility on how we want to pay those back. That would allow us to maintain our investment programs that we had in front of us, opportunities that we had to invest.

And then the low-price environment, we also wanted to be positioned for new opportunities that might come along, companies that needed to get rid of assets that might fit us well, and you wanted to be able to move on those quickly. So having all that flexibility was really why we were doing that. And all of that, again, trying to stay positioned for the long term for the benefit of the shareholders.

Q. Mr. Tillerson, just again some real quick math. Do you remember what the borrowing cost was for the bonds? What did you have to pay to get the money?

A. Well, it was a blended interest rate because there were, I think, seven tranches but it was -- it was less than three percent.

Q. Okay. So -- So you were borrowing money at less than three percent.

A. Correct.

Q. And what were you going to do -- What did you hope to do with that money that you borrowed?

A. Well, we would be investing that money in either ongoing opportunities or new opportunities that would generate a double-digit return. So we would be -- We would expect to be generating a 10 to 15 percent return on those investments.

Q. Borrow at less than three, make ten percent or more.

A. Correct.

Q. Pretty good deal?

---

opportunities. That's the reason you borrow, not to pay the dividend.

Q. Let's turn to Defense Exhibit 570. This has been admitted into evidence. And is this a -- It's entitled "Investor Day, March 2nd, 2016." What is it?

A. Well, every year ExxonMobil Corporation would travel to the New York Stock Exchange in March and have an investor analyst meeting and go through a number of presentations. This would be after the 10-K was available. And then there would be an extensive Q and A from the analysts, so an opportunity for them to ask us questions.

Q. Could people ask questions at these meetings?

A. Oh, yes.

Q. Would shareholders attend?

A. Typically not this meeting because the annual meeting then would be held later in May, and that's the meeting for shareholders to come and have an opportunity to do the same thing. They'd get a -- They would receive a presentation from the corporation. There would be an opportunity to stand up and ask questions from the audience.

Q. But would -- would the transcript of this have been made public to anyone that wanted to review it?

A. Yes.

Q. So let's take a look at Page 22. You were asked a question about the dividend. And just using the highlighted language,

---

A. Well, I think it serves the shareholder well. Again, these are -- these are, again, investments that are going to be around for 20, 30, 40 years. That's -- That's how you build this thing.

Q. So the people that were loaning money, the market that was loaning money here in 2016, was that market aware of the challenges facing the energy industry in terms of low prices and things of that nature?

A. Yes, they certainly were.

Q. And based on your experience as a CEO, would that have been reflected in the interest rates they were charging?

A. It would have been reflected in how they viewed the risks of the bonds because what sets that interest rate is really how risky is this borrowing to me, the lender. And so they would have had that -- would take that information into account.

Q. So there was this suggestion that ExxonMobil needed to borrow money to cover the payment of its dividend. Is that true or false?

A. I believe that's false.

Q. How so?

A. Well, I think we had sufficient cash on hand to pay the dividend, and the paying the dividend was important. It was a real priority for us, for the entire corporation, because so many shareholders relied on that -- that cash payment. So we were going to pay that dividend. So when we borrowed, we weren't borrowing to pay the dividend. We're always borrowing for

---

what did you say about the dividend?

A. So what we've always endeavored to do is be reliable with the dividend and we've been pretty predictable. Thirty-three years now, we've been very predictable. So your question of priority is: Yes, the dividend is a high priority because it's part of why we are important to long-term shareholders.

Q. What did you mean by that?

A. Well, as I said, it's -- I used to always tell people we're for -- we're for long-term investors here. If you buy ExxonMobil stock, it's going to pay this dividend. You hold it a long time, it's going to appreciate in value. I tell them, "You put it under your pillow and you sleep well at night." You don't even have to think about it.

Short-term traders, you know, people who are buying for the short term, they got to pay a lot of attention to know when to get in and out and in and out. That's not us.

And that dividend record was kind of emblematic of that, that we paid the dividend reliably every year. In fact, we raised the dividend every year, and people kind of have an expectation of that. There's no promise anywhere that that's going to continue but the track record was pretty good.

Q. So let's go on to the next page here.

Did you -- Did you talk to the investors -- the analysts and the investors about the company's approach to borrowing?

A. Yes, we did.

**App. 324**

Q.   Then you say, "Then look at our investment programs and if we need to borrow to invest, we'll do that because if I'm borrowing money at rates that we got yesterday, if I can't generate a return in multiples of that, I've really somehow messed this thing up.  So we are -- The way I view the borrowing is that we are really borrowing because we got opportunities to put that money to work and it's low cost, and let's go put it to work."

Is that what you just told the Ladies and Gentlemen of the Jury about the --

A.   Yes.

Q.   -- less than three percent versus ten percent or more?

A.   That's correct.

Q.   And at the same event you went on to say about the kind of shareholders.  You say, "You've heard me say many times we're not for the short-term shareholder necessarily.  That's not what we build the business around.  It's not how we run the business.  We run the business for people that are going to own these shares for a very long time, and we hope they're in their trusts that they leave their children and their grandchildren.  And whenever we run into challenges, I get -- have to think about how I am going to pay the dividend.  I think about those people, and we're going to pay that dividend.  That's why we're important to people."

What did you mean by that?

MR. SAHAM:  Your Honor, I would object as to a leading question.  Mr. Melsheimer seems to be testifying for Mr. Tillerson.

MR. MELSHEIMER:  I'm just reading what he said and asked him what he meant.  I can ask him to read it if counsel would prefer.

THE COURT:  No.  Since we've already read it and so we don't have to read it again for the second or third time, I'm going to overrule the objection.

Q.   (By Mr. Melsheimer) Mr. Tillerson?

A.   Well, I think as I was explaining, you know, just a moment ago, that -- and I would meet shareholders at the annual meeting, actual shareholders, people who we're talking about here.  We had a -- We always had an exhibition out in the lobby of the Meyerson -- the big Meyerson Symphony Hall is where we held the annual meetings so we had plenty of room for everybody to attend.  And I'd have an opportunity to mingle for about an hour before the meeting would start and talk to them, what was important, and most of it was them coming up and just wanted to give me a hug, you know, "thank you"; "thank you, thank you, thank you."

But then in the meeting, again, we had an opportunity for questions and people could ask questions.  And at the end of the meeting those same shareholders would come up, not the same ones I met out there.  Others in the meeting would come up and want to shake your hand and just say, "Keep the dividend up, you know.  I

really count on it," or they'd want to tell me a story about how I sent -- "I sent my granddaughter to college on those shares I bought 25 years ago."  That's who we exist for.  Those are the people that we are important to.  And we think about them every day we're running this business.

MR. MELSHEIMER:  Can you go to the bottom of Page 7 and the top of Page 8?

Q    (By Mr. Melsheimer) Can you read for the Ladies and Gentlemen of the Jury the first couple of sentences highlighted there?

A.   "The quality of ExxonMobil's portfolio is also evident relative to significant recent asset impairments by our competitor group.  Not shown are North American pure play E&P companies which, if you look at the last couple of years, took impairments of over 120 billion dollars and, if you look at the last eight years, took impairments of over 200 billion dollars.

Now while these impairments will improve competitor return on capital performance, capital-employed performance in the future years, they represent a significant destruction of shareholder assets.  Our investment discipline delivers industry-leading returns and a portfolio that is durable across a wide range of commodity prices.  Effective project execution provides the lowest installed capital cost which, along with optimized operations, creates a long-term value that simply outpaces our competitors."

Q.   What did you mean by that?

A.   Well, again, people want to know how you do that.  Well, this is how you do it.  You have very disciplined investment standards.  No other competitor had an organization like the ExxonMobil Development Company.  We were able to develop large capital projects from the huge LNG facilities in the Middle East, the huge LNG receiving terminals in Europe.  We could always develop those at a lower unit cost than any of our competitors.  It's just a -- It's a competency that we developed through a systems, a project management systems that was developed that allows us to do that.

The same was true in the other parts of our businesses.  We were -- We were a very systems-driven business.  Every business line focused, focused, focused on that.  And as a result, our cost structure was typically lower than most of our competitors.

Q.   Take a look at Page 8, just that last highlighted line on the page, sir.  Can you read that and explain what that means?

A.   "On average, 48 cents of every dollar generated by the business over the last five years was distributed to our shareholders while continuing to invest in an advantaged portfolio of projects."

Q.   What does that mean?

A.   Well, in other words, we generate a dollar of cash.  Half of it went back to the shareholder either as a dividend or as a share buy-back.  I've never gone back and added up how much we

gave back to shareholders during my tenure but it was a lot.

Q.   There was some discussion with the Plaintiffs' counsel about ExxonMobil's credit rating.  Do you recall that?

A.   I do.

Q.   What was ExxonMobil's credit rating at the time of the offering?

A.   AAA with S&P, AAA with Moody's.

Q.   Do you recall what the U.S. Government's credit rating was at the time?

A.   I believe it was AA.

Q.   You were asked about Exxon paying the rating agencies to provide a rating.  Do you recall that?

A.   I do.

Q.   Do all public companies need to pay for a service for the credit agency to rate them whenever they do a bond offering?

A.   Yes, they are.

Q.   Is there any connection between the rating and the fee?  Can you pay a little bit more to get a better rating?

A.   No.  That would -- That would destroy the rating agency's credibility.

Q.   Is it independent?

A.   It is.

Q.   Now there's been some talk about the AAA credit rating.  So what -- what happened at ExxonMobil?  It had been AAA for a long time and then what did it go to later in 2016?

A.   It was re-rated to AA plus.

Q.   On both rating agencies or just one?

A.   I'm sorry.  S&P re-rated to AA plus.  Moody's kept the AAA rating.

Q.   Moody's kept AAA.  S&P went to AA plus.

A.   Plus.

Q.   Okay.  Was ExxonMobil the highest-rated energy company, even under the AA plus?

A.   Yes.

Q.   What was more important to you as the CEO of Exxon?  Doing what you needed to do to preserve that credit rating or conducting the business in a way you thought would benefit the shareholders?

A.   Well, we had to stick with our strategic planning and our financial planning bases.  We weren't going to adjust just to the credit ratings once.

        MR. MELSHEIMER:  So, Mr. Gooden, can you pull up PX 205?

Q    (By Mr. Melsheimer) Is this -- Is this an e-mail from Bob Schleckser to you, Mr. Swiger and Mr. Woods about the Moody's rating?

A.   It appears to be, yes.

Q.   Now you see here we've got this -- this "Wayne.Tracker" e-mail address.  Do you see that?

A.   I do.

Q.   And you were asked some questions about that on Friday.  You were asked whether or not you had two different work e-mail addresses.  Do you remember that?

A.   I do.

Q.   Why did you have two work e-mail addresses?

A.   Well, the one e-mail address I had for a long time during my career at Exxon was my "Rex.W.Tillerson@ExxonMobil.com."  That e-mail address was fairly widely known, including in the public.  And when I became Chairman and CEO, I don't remember exactly what year it began to happen, but my e-mail began to get bombarded from outside e-mails.

Q.   How many are we talking about?  Just a -- Just a few a day?

A.   No.  This would be hundreds to thousands, such that when I needed to try to go in and look at my e-mails, it would take me a long time to find the ones that I needed to look at.  And actually my Executive Assistant was trying to help.  She was trying to clean it up as fast as she could but they were coming in faster than she could clean it up.  So --

Q.   Were these e-mails attaboys or something else?

A.   Most of it were from activists.  There was a lot of climate activists bombarding the e-mail system.  So ---

Q.   And others -- others as well?

A.   Probably others, too.  So I -- I asked for a solution.  I said, "What can we do about this?"  And they tried some filters but people just came in through different, you know -- you

couldn't really block them all.  So at that point they said, "Well, let's -- let's set up another e-mail for you that's not going be known publicly.  It will be known for the people inside the company to use but not publicly."  And that's when "Wayne." -- the securities guys came up with "Wayne.Tracker," my middle name "Tracker."

Q.   And what was "Tracker"?  Was that a Boy Scout thing?

A.   It might have been or it might have been them tracking me. I don't know.

Q.   Okay.  So did you use that e-mail for business purposes?

A.   Yes.

Q.   Now you were asked some questions about what happened to your e-mails after you left Exxon to become Secretary of State. What did you learn about the "Wayne.Tracker" e-mail account after you left the company?

A.   Well, when it came up in the questioning Friday, I, too, was curious as to what did happen.  So I did a little asking around over the weekend and discovered that the "Wayne.Tracker" e-mails were all preserved from -- I don't remember the exact date -- the middle of August of 2015 all the way through the time I retired. So they were -- they were there.  They had been found on a backup disk.

Q.   Were you personally responsible for retaining, archiving or backing up your own e-mails?

A.   No.

Q.   You were also asked about text messages.  Did you use text messages to communicate about Exxon's business in 2015?

A.   No.  I never used text messages.

Q.   Now I want to be clear about this.  Did you get the impression from Friday's questioning that the Plaintiffs were suggesting that you sent an e-mail or a text directing something improper with respect to Kearl or RMDG?

A.   Well, I'm not sure what they were implying.

Q.   Well, let me ask you.  Did you ever text anyone or e-mail anyone to manipulate Exxon's financial statements, reserves estimates or impairment analysis?

A.   No, I did not.

Q.   I want to turn back to the contents of the e-mail.  It says, "Rex/Andy/Darren, please note expected Moody's action today in Namisa's note below.  At this point we are fairly certain we will remain AAA or Aaa --

A.   Yeah.  That's Moody's AAA.

Q.   -- with either negative outlook (Moody's) or watch (S&P) going into Monday's debt offering."

    So what did Mr. Schleckser say about Moody's?

A.   That we would likely remain AAA but he was noting with either negative outlook or we'd be on -- With Moody's, they used the term "negative outlook."  S&P would use what was called "on their watch list."

Q.   Without getting into a lot of detail because we can -- we

can hear about it otherwise, but could ExxonMobil have kept its AAA credit rating with S&P if it had wanted to in your -- in your experience?

A.   Well, S&P provided to Mr. Schleckser and his team some conditions under which they would not -- that they would retain the AAA rating.

Q.   What was that?

A.   They wanted us -- They wanted ExxonMobil to deliver the balance sheet or pay back some of the debt that we had already borrowed so that we had less -- so that we're carrying less debt.  That was the condition.

Q.   Did you think that was a good idea?

A.   No.  No, we didn't, and not just myself but we -- we talked about it among the management team and agreed, no, we -- we needed to maintain our investment programs.  We want to maintain our positioning for all the reasons I described earlier.  So we -- we basically said, "Fine; whatever S&P wants to do."

        MR. MELSHEIMER:  Mr. Gooden, can you pull up PX 210?

Q    (By Mr. Melsheimer) Are you familiar with this e-mail?

A.   Yes, I believe I've seen it before.

Q.   Senior meeting with S&P on March 23rd?

A.   Correct.

Q.   What is it?

A.   Well, it's a -- it's a summary of the Treasurer's meeting with S&P where they had these discussions about the potential for

the re-rating.

Q.   When was this sent?

A.   March 24th, 2016.

Q.   So it was before or after the bond offering?

A.   It would have been just before.

Q.   You think the bond offering was in early March or in mid-March or do you remember?

A.   I don't remember.

Q.   Okay.

A.   I guess it was after the bond.

Q.   Also after St. Patrick's Day.

A.   Well, their meeting occurred on my birthday.  So I don't know.

Q.   Why did -- Why did -- Do you know why Mr. Swiger and Mr. Schleckser met with S&P Senior Management Team in late March, 2016?

A.   Well, it says the meeting was at S&P's request.  They wanted to resolve their CreditWatch status.  They had a 90 -- Once they put us on notice, I guess they had a 90-day cure period, if I can use that word, and so they were looking to resolve that.  I get that from the first line of the e-mail.

Q.   Is that something S&P sets up on their own?

A.   Yes.  This -- This came at their request as I understand it.

Q.   Were you surprised that ExxonMobil was placed on a CreditWatch?

A.   No, I was not.

Q.   Why not?

A.   Well, again, given the business environment and we had borrowed the eight billion dollars the previous year which -- which triggered some of this because of the deteriorating business environment, using the criteria that S&P and Moody's uses to rate various companies, we were around the threshold of those ratings.

Q.   Was the negative CreditWatch designation made public?

A.   I believe it was, yes.

Q.   And was it -- was it made public before the bond offering?

A.   I believe it was.

Q.   Okay.  I'd like you to turn to another highlightedness under "They continue to project our cash flow-to-debt ratio to below their AAA threshold for that metric over the next few years."

    What did you understand that to mean?

A.   Well, as I mentioned, they -- they have certain thresholds in their mind that warrant a re-rating.  And so they were running those numbers out using -- you know, using their models, not using any information we had.  They were running those using their models and that we were right at that threshold for a re-rating.

Q.   "As such, they were keenly interested in our perspective of the priority of the AAA rating relative to other objectives (dividend growth, capital spending) once market conditions

improve or, in their words, our 'financial philosophy.'"

What did you understand that to mean?

A.    Well, again, that's -- that's where we shared with them the priority we placed on dividends, priority we placed on maintaining our investment programs and that we felt that was in the interest of our shareholders, and whatever decision they wanted to make using their metrics was their decision to make.

Q.    And if we can go to the next portion of this e-mail.  What does that -- Can you -- Can you read what's highlighted for the jury?  And then I want to ask you a question about it.

A.    "We reiterated that the AAA rating is important to our business model, both in terms of government and partner relationships, as well as the ability to maintain long-term strategic focus despite near-term market volatility.  We cast this perspective in the context of maintaining this rating over numerous commodity cycles over the last 80 years."

Q.    So is that what you were saying about the importance of the credit rating to the company?

A.    Yes.  It -- It -- You know, it did carry a certain stature with it when we would have conversations with host governments or partners, potential partners.  And our view was:  Look, we've been through these price swings a lot of times over the last 80 years we've had this rating.  We were -- Quite frankly, we were a little mystified that they were even looking at it, but ---

Q.    And did the folks at Moody's agree with you and not change

the rating?

A.    Moody's left the AAA rating in place.

Q.    So let's -- let's go to what I think we've heard sometimes referred to as "the rest of the story."

So read that to the Ladies and Gentlemen of the Jury and then I want to ask you a question about it.

A.    "However, while we noted that the likely near-term impact of market improvement would be to reduce debt (i.e., reduced CP balance and -- commercial paper balances and financing near-term maturities), we would always need to weigh deliberate de-levering of the company against other priorities/opportunities in the context of driving shareholder value.  In other words, they were seeking a commitment to de-lever that we did not give.  From a 'financial philosophy' standpoint, we made it clear that this had not changed versus our history."

Q.    So de-leveraging is reducing debt?

A.    Yes.

Q.    Why would the company not want to reduce debt back in 2016?

A.    Well, if we had the capacity, we probably would have.  But in 2016, again, in the business environment, that's why we were out borrowing.  So we weren't going to borrow and then take the money and pay down other debt unless we were trading it for significantly lower cost debt, like the commercial paper that was mentioned.

Q.    Would the downgrade from AAA to AA plus, if it occurred

before the bond offering, in your judgment, would it have impacted Exxon's ability to issue the bonds?

A.    No, it would not have.

Q.    Were you concerned that the movement from AAA to AA plus would have impacted the interest rate that Exxon would need to pay on the bonds?

A.    No.  That was never a concern.

Q.    Now you understand that the Plaintiffs in this case are arguing that the motive behind all this wrongdoing they lay at your feet is that you were doing all this to keep that credit rating.

A.    That's ridiculous.

Q.    Okay.  Why is -- Tell the jury why it's ridiculous.

A.    Well, I think we've been through this explanation of what our priorities were with respect to the financial and capital structure of the corporation.  Go back to those values I was talking about earlier, you know, protecting our people and assets, maintaining the corporation's integrity and reputation of honesty.  There's no way anyone was going to compromise that just for a bond offering.  Just -- It was going to have no impact.

MR. MELSHEIMER:  May I have one moment, Your Honor?

THE COURT:  Yes.

(Pause)

Q    (By Mr. Melsheimer) Mr. Tillerson, I asked the Ladies and Gentlemen of the Jury in the Opening to take the measure of the

witnesses, the measure of the people that they're going to hear from, including yourself.  So ---

MR. SAHAM:  Your Honor, is this a question?

THE COURT:  I'm about to find out.

Q    (By Mr. Melsheimer) Can you look the jury in the eye and tell them:  Did you do anything improper, fraudulent or misleading in connection with any of your work with the 2015 10-K?

A.    I did nothing improper, nor did anyone else in ExxonMobil Corporation.  We followed all the rules.  We followed all the standards.  There's nothing unusual about anything we did.  And I would say furthermore:  My whole DNA just wouldn't let me do anything other than that.  My entire career at ExxonMobil, my entire career in public service was built on my own personal integrity and my reputation.  There's no way I'm going to compromise that for something as insignificant as what we've been talking about.  And I know that same thing is true for every woman and man in the ExxonMobil Corporation.

MR. MELSHEIMER:  Thank you, Mr. Tillerson.

Your Honor, no further questions at this time.

THE COURT:  Mr. Saham?

RECROSS EXAMINATION

QUESTIONS BY MR. SAHAM:

Q.    Mr. Tillerson, I just want to make sure I understand your testimony.  I believe you testified that your "Wayne.Tracker"

e-mail from before August of 2015 was not preserved? Is that correct?

A. I don't know what the situation was prior to August. What I was able to ascertain is that it was documented that it was preserved from mid-August, '15, to the time of my retirement. Prior to that, I just don't know.

Q. You don't know whether it was preserved or not.

A. I don't know.

Q. But you had two e-mails and you're not sure if the "Wayne.Tracker" one was preserved before August of 2015.

A. I don't know.

Q. Okay. Now I'd like to show you what's been previously marked as Plaintiff's Exhibit 213.

MR. SAHAM: Could we, please, go to Page 11, Mr. Torres? And if we could look at transportation costs.

Q (By Mr. Saham) Remember we looked at this earlier, Mr. Tillerson? And for 2014 Kearl's transportation costs were $8.33, correct?

A. That's what the chart says.

Q. And for the First Quarter of 2015, Kearl's actual transportation costs were over seven dollars a barrel, correct?

A. That's what the chart says.

MR. SAHAM: Could we move this over to the left and then pull up Page -- or Exhibit 117 on the right, Slide 10?

Q (By Mr. Saham) And this was the meeting that you had in

October of 2016, correct?

A. October, '16, or October, '15?

Q. I'm sorry. October 26th, 2015.

A. Okay. Yes.

Q. Is that -- You remember we've been talking about that?

A. Yes.

Q. And the transportation costs you used for the Kearl proved reserve calculation was $1.27, correct?

A. Yes. We used the actual transportation costs to ship Kearl blend from Fort McMurray to the Edmonton market. That was the methodology that the Reserves Group was using.

Q. And I'm just going to do the calculation because I'm not good at math. But if you take $7.07, the actual transportation cost for the entire -- entirety of the Kearl sales and you subtract $1.27, you get a $6.43 difference between what you used in the calculation and the actual cost, correct?

A. Well, I think this says Q1 2015, correct? Where do we move?

Q. Well, if we're looking at Q1, the transportation cost was $7.07, correct?

A. For Q1.

Q. And for the month of October when you excluded all the sales to the U.S. Gulf Coast and you only used the Edmonton sales, you got the transportation cost down to $1.27, correct?

A. Under the methodology that the Reserves Group was using. And, again, there was a lot of discussion with Mr. Madden about

why. Yes, it was $1.27 for sales at Edmonton.

Q. But once -- You had sales to the U.S. Gulf Coast -- we looked at it yesterday and we can pull it up again -- since October of 2013, correct?

A. That's correct.

Q. And that's when the Kearl operation was up and running and had actual sales, correct?

A. That's correct.

Q. And for 2014, as an example, the actual costs for transportation were over eight dollars a barrel for that entire year, correct?

A. That's what the chart says.

Q. And for the First Quarter of 2017, the actual transportation costs were over seven dollars a barrel, correct?

A. That's what the chart says.

Q. But at the meeting in October of 2015, October 26th, 2015, the meeting with Mr. Strawbridge, the decision was made to use only a little bit over a dollar in transportation costs, correct?

A. Well, the decision was not made in that meeting.

Q. It was made in January, correct?

A. The decision was made by the Reserves Group, including their work with the Imperial Oil Reserves Group, around the methodology that would be utilized that year. And we've talked a lot about all the reasons why and Mr. Madden talked a lot about all the reasons why the point of sale chosen was the Edmonton market

because it was a well-established, high-confident market.

There were sales to the U.S. Gulf Coast, and those were excluded as has been shown on many slides. Those were excluded from the methodology because there was not a well-established market on which people were confident is how it was explained to me. They were not confident in using those prices because of the instability in the late 2015.

Q. But there were actual costs incurred, and you testified on Friday that once an operation is up and running, you have to use the actual cost or it's false, correct?

A. And they did use actual cost, $1.27.

Q. But they ignored the actual cost to markets beyond Edmonton, correct?

A. Full disclosure, they -- they disclosed they excluded the sales to the U.S. Gulf Coast for the reasons that I've described they shared with me and the other experts who shared.

Q. And if those costs weren't excluded, it would have significantly raised the transportation costs for Kearl, correct, in the calculation?

A. I can't say how much it would have changed the methodology. Just, you know, if you change one thing, I'm not sure what else changes.

Q. Okay. But the actual costs for Kearl were somewhere between seven and eight dollars a barrel transportation. Is that fair, if your looking at First Quarter?

A.   No.  No, I don't know that these are per barrel.  I don't know because the volumes were changing for the rest of the year.  A lot of things were changing.  I -- I can't tell you conclusively how the outcome would have been.  Those -- Those numbers were never run.

Q.   Okay.  Mr. Tillerson, if you could turn to Page 11 of Exhibit 117, the last page of the October meeting.  It says specifically at the bottom right-hand corner that U.S. -- U.S. sales were excluded from the SEC price, right?

A.   Yes, full disclosure.

Q.   And that you knew they were being excluded, correct?

A.   Yes.

Q.   And you had to approve this methodology or it wouldn't have gone through, correct?

A.   I did not -- I did not approve the methodology.  I left that to the experts as we've -- as we've described, both the experts at Imperial Oil, the experts at ExxonMobil Global Reserves Group and the experts they consulted with.  I didn't -- I didn't intervene in any of the methodology.  It was explained to me.  I had no basis on which to make changes or suggest changes to them, so I accepted that.

Q.   And in order to be a proved reserve, it had to be economically producible, correct, under existing costs?

A.   That's correct.

          MR. SAHAM:  Could we, please, pull up Exhibit 564?

Q    (By Mr. Saham) And we saw that on a cash basis Kearl lost 831 million dollars for 2015, correct?

A.   Yes.  But we're kind of back to an apples and orange situation, I think, because of costs that are included in here that would be excluded in the reserves calculation.

Q.   Okay.  Mr. Tillerson, you have to be -- you have to be economically producible to be a proved reserve, correct?

A.   That is correct.  And there's an SEC methodology that you use to make those calculations.  It's, you know -- We don't -- We don't change that.

Q.   Is it your testimony to this jury today that an asset that's losing 831 million dollars was economically producible in your view?

A.   Well, I would take you to a previous slide we looked at earlier on the minus 60 million.  You'll recall that when you take the development capex out which is excluded from a reserves calculation, it was actually plus two million dollars.

Q.   Well, that's not quite right that you exclude the capex.  If you could turn back to the Exhibit 117, specifically Slide 8, and this is something you went through with your counsel.  If we could go to Slide 8, up at the top left it says, "15CP Unit Lifting Cost."  You got to include the sustaining capex in the calculation.

A.   Sustaining capex, not the project development capex.

Q.   And let's ---

A.   Big -- Big distinction.  I know you're trying to confuse everybody but there is a distinction.

Q.   Well, Mr. Tillerson, you would agree with me if you looked on -- if we can go to the bottom portion of the blue box, the sustaining capex portion of capex was $5.80 a barrel, correct?

A.   That's correct.

Q.   And that needed to be included in the calculation, correct?

A.   And I'm confident that it was.

Q.   But when we -- when we add that 5.80 to the $22.70, we get $28.50, correct?

A.   For the -- I'm sorry.  What are you asking?

Q.   The total cost.

A.   Yeah.

Q.   When you use your cash opex and sustaining capex, you get $28.50?

A.   Yes.  That's what -- That's what they have on the chart.

Q.   Yeah.  And if we could go back to where we were before with just the top portion of the chart so we can see that.  And it says as of October, the SEC price was 29.20 and you had 28.50 in costs when you include sustaining capex and cash opex, correct?

A.   That's correct.

Q.   And the SEC price of 29.20, that only deducted $1.27 of transportation cost, correct?

A.   It deducted the actual transportation cost.

Q.   To Edmonton, correct?

A.   That's correct.

Q.   And approximately in 2015 about 50 percent of the sales went to the United States Gulf Coast, correct?

A.   That's correct.

Q.   And those were completely excluded, correct?

A.   As has been disclosed on a number of documents.  It's not in dispute.

Q.   Well -- But you also agreed with me on Friday if you would have included those costs, the $16 by rail to the U.S. Gulf Coast, the $11.00 by pipeline, that $1.27 would have gone up significantly, wouldn't it?

A.   If -- If I said that with certainty, I misspoke because I don't know.  Those numbers were never run.  They were never presented to me, so I really don't know.

Q.   Well, you knew -- you knew the actual costs.  And let's go back to 564.  You knew the actual costs.  You knew that Kearl was losing 440 million dollars in earnings and 831 million dollars in costs, in cash.

A.   And earnings has nothing to do with the reserve calculation.

Q.   Well, is -- is it your testimony, when you look at these numbers, a negative 440 million dollars in earnings and a negative 831 million dollars in cash, losing money every single month under cash and losing money 10 out of the 12 months, that that's an asset in your view, as the CEO of the company, that was economically producible under current conditions?

A.    Again, the "Estimated Cash" columns includes costs that are to be excluded in the SEC calculation.  I know you keep wanting to put them back in but they're excluded.

Q.    The sustaining capex actually is included; $5.88, correct?

A.    But when you take the development -- the Project Development Capex out, the minus 60 becomes plus two.

Q.    All right, Mr. Tillerson.  Let's move on to -- I'm going to show you what's being marked as Exhibit 769.  And I believe you testified that XTO in the long run was a great investment, correct?  That was your belief?

A.    From a strategic standpoint, it played out like we hoped it would.

Q.    Okay.  And at the Year End 2016 ---

MR. SAHAM:  Could we put up, please, Exhibit 769?

Q    (By Mr. Saham) At Year End 2016, you took a 3.3-billion-dollar write-down, correct?

A.    That's correct.

Q.    And then your successor in -- And that was of the XTO assets, correct?

A.    I don't recall if that was all it was or whether there were other things in there.  I just don't remember.

Q.    Well, you wrote down four Rocky Mountain dry gas assets that had a total pre-tax charge of 3.3 billion dollars, correct?

A.    Okay.

Q.    And then two years later, your successor, Mr. Woods, wrote

down an additional 20 billion dollars of your XTO purchase, correct?

A.    Well, that's -- that's what the article says.  That was -- I don't know.

Q.    Okay.

MR. SAHAM:  Could we go down to the bottom of the page, Mr. Torres, where it says, "The write-down lays bare?"

Q.    (By Mr. Saham) Well, let's -- let's first look at Darren -- It says, "Darren Woods, CEO of Exxon" or I'm sorry.  "The ExxonMobil on Monday said it would write down the value of natural gas properties by 17 to 20 billion dollars, its biggest-ever impairment/project spending next year to its lowest level in 15 years."

And then if you go down to the next paragraph or two paragraphs later, it says, "The oil major is reeling" or I'm sorry.  It says, starting with "The write-down", "The write-down lays bare the size of the miscalculation that the company made in 2010 when it paid 30 billion for U.S. shale producer XTO Energy as the natural gas prices went into a decade-long decline.  The write-down also includes properties in Argentina and Western Canada."

So in total, when you add up the three billion dollars you wrote down and the 20 billion dollars that your successor, Mr. Woods, wrote down, over 76 percent of your purchase price of the XTO investment was written down, correct?

A.    Well, that's the math.

MR. SAHAM:  And if I may, could we put up Page 3 of Exhibit 70?

Q    (By Mr. Saham) And this indicates that during 2014 and 2015 when Exxon took zero dollars in impairments, its competitors took over 93.7 billion of impairments, correct?

A.    That's correct.

Q.    And everyone was in the same sustained low-price environment we discussed earlier today, correct?

A.    Correct.

Q.    But you took zero in impairments and the competitors took almost a hundred billion in impairments, correct?

A.    That's what the chart says.

MR. SAHAM:  And if we could pull up Exhibit 527, Page 69.

Q    (By Mr. Saham) And before we do that, I think you testified earlier that you were the boss and you set the tone at the top of the company.  Is that fair?

A.    That's fair.

MR. SAHAM:  And if we could pull up Page 69 of 527.

Q    (By Mr. Saham) And this is comments -- the bottom right-hand corner -- from that meeting in March shortly after you left.  The bottom right observation was that under your leadership, the company was "too hierarchical, missed input, deliver what the boss wants, all input not in Dallas."  That's what the comment

says, correct?

A.    You can read.

Q.    I can.  And you were the boss of the company, correct?

MR. MELSHEIMER:  Objection; asked and answered.

THE COURT:  Overruled.

A.    Yes.

Q    (By Mr. Saham) And you had expressed publicly that you didn't think the company did -- should do write-downs, correct?

A.    That one line statement was in the interview, yes.

Q.    Okay.  And Mr. Rosenthal had expressed in an e-mail that your counsel referenced a bit earlier that the word "impairment" gave people on the third floor heartburn, correct?

A.    Correct.

Q.    And you sat on the third floor, correct?

A.    Correct.

MR. SAHAM:  I have no further questions, Your Honor.

MR. MELSHEIMER:  Briefly, Your Honor?

THE COURT:  Yes, sir.

REDIRECT EXAMINATION

QUESTIONS BY MELSHEIMER:

Q.    Mr. Tillerson, ---

MR. MELSHEIMER:  Can we pull up 769 which you were asked about on your Re-Recross?

THE COURT:  Is this your exhibit or their exhibit?

MR. MELSHEIMER:  It's Plaintiff's Exhibit 769.

THE COURT: Okay, sorry.

Q. (By Mr. Melsheimer) If you remember, counsel for the Plaintiff said, "Skip over one paragraph." Do you remember that question?

A. Vaguely, yeah.

Q. So let's -- let's go to the one he skipped over. This was the question about the write-down that was taken in 2020. So it's Plaintiff's Exhibit 769.

MR. SAHAM: And, Your Honor, I would move 769 into evidence so that there's no -- no question about what was said in the article with the same limiting instruction.

MR. MELSHEIMER: Well, Your Honor, again, this is a -- this is a -- He asked him about it. This is a 2020 article, so we object in terms of relevance and timing. But I want to ask -- He asked him about it. I want to ask him about the write-down that he referenced in 2020.

THE COURT: Overruled. This will be admitted for the limited purpose of whoever wrote this article but not for the truth of the matter asserted.

Q. (By Mr. Melsheimer) So you see what it said right here? I don't know. Help me out. Was something kind of funny happening in 2020?

A. The pandemic.

Q. COVID?

A. Yes.

Q. What was COVID's effect on energy usage in the world?

A. Well, demand dropped dramatically because everyone was staying home. People weren't working. A lot of the manufacturing shut down. So there was a huge correction in prices in response to that.

Q. Is that one of those unpredictable events that you have to deal with when you're running an energy company?

A. That one was -- That one was an unusual one.

Q. Do you think that might have had something to do with a write-down of assets that year by your successor, Mr. Woods?

A. Well, I wasn't there.

MR. SAHAM: Objection; calls for speculation.

THE COURT: Stop.

MR. SAHAM: Objection. Calls for speculation and is hearsay, Your Honor.

THE COURT: Sustained.

Q. (By Mr. Melsheimer) Can events like the COVID pandemic have an effect on a company's outlook for the present and the future?

A. Certainly.

Q. Now Mr. Woods, was he a member of your Management Committee while you were CEO?

A. Yes, he was.

Q. Was he one of those people that you relied on?

A. Yes.

Q. Took his advice?

A. Yes.

Q. He had the ability to share his point of view?

A. Certainly.

Q. Okay. Now finally, you were asked some questions about the Cash Flow Test, and I just want to make something clear. So first of all, you were shown costs for 2015 at about seven dollars, and it was -- it said "Q1 costs." Do you remember that?

A. I do.

Q. Remind the jury what was happening to the costs at Kearl in 2015.

A. Well, it was -- As the year progressed, the unit costs were coming down, again due to the volumes increasing, and you saw that in some other charts, I believe, in evidence. So the last half of the year was more relevant to that than the first half was.

Q. So were the Q1 costs higher or lower than the rest of the year?

A. Higher.

Q. And let me ask you this: You were shown some documents, the chart about Kearl losing money in 2015.

A. Correct.

Q. Do you remember those questions?

A. Yes.

Q. Is it your understanding that you could have a book loss and an asset like Kearl and still pass the SEC specific Cash Flow

Test for estimated proved reserves?

A. Yes, you can.

Q. Is that what you were trying to say about him being confusing?

A. Yes.

Q. Is there anything confusing about the SEC Estimated Proved Reserves Test?

A. No.

Q. If you know how to use it.

A. Correct.

Q. And who was the person that best knew how to use it at ExxonMobil when you were the CEO?

A. Well, Bill Strawbridge and the Global Reserves Group.

MR. MELSHEIMER: One moment Your Honor.

(Pause)

MR. MELSHEIMER: Thank you, Mr. Tillerson. I have no further questions, Your Honor.

I appreciate your patience.

THE COURT: Anything else?

MR. SAHAM: Yes, Your Honor.

I'd like to pull up Exhibit 335, Page 20.

MR. MELSHEIMER: Your Honor, I'm going to object as being beyond the scope. I didn't ask him about 335.

MR. SAHAM: Well, Your Honor, he talked about how I only showed him First Quarter. So now I want to show him the

**App. 332**

October numbers as well.

THE COURT:  All right.  Overruled.

RECROSS EXAMINATION

QUESTIONS BY MR. SAHAM:

Q.   And, Mr. Tillerson, again, we looked at this document on Friday.  It shows Enbridge.  That's -- Those are the sales you used $1.70 for transportation and you could get a realization of 25.  You said that was the methodology that was employed by Mr. Strawbridge's group, correct?

A.   That's my understanding.

Q.   And for October, it's showing if you use that methodology, you can realize $25.14 due to the fact that you only have to deduct $1.70 for transportation, correct?

A.   Correct.

Q.   And then if we look at the excluded shipments to the United States, the ones via the Keystone pipeline, those incurred in October of 2015 when you had the meeting a transportation cost of $12.12, correct?

A.   Correct.

Q.   And that would reduce your realization some eight dollars below the Canadian realization to only $17.44, correct?

A.   Correct.

Q.   And if you -- if you had to ship it by rail in October, the transportation cost was $16.50, correct?

A.   Correct.

Q.   And that would result in only an $11.71 realization or revenue, correct?

A.   Correct.

Q.   And that's less than half of what you'd get if you use only the Edmonton sales, correct?

A.   Correct.

MR. SAHAM:  No further questions, Your Honor.

MR. MELSHEIMER:  Your Honor, just with respect to this exhibit, I have one question on this exhibit.

THE COURT:  Go ahead.

MR. MELSHEIMER:  Thank you, Your Honor.

If you can pull up the first page of Exhibit 335.

REDIRECT EXAMINATION

QUESTIONS BY MR. MELSHEIMER:

Q.   Do you see what I've highlighted, sir?

A.   Yes.

Q.   What does it say?

A.   "These are not actual accounting numbers."

MR. MELSHEIMER:  No further questions.

THE COURT:  Mr. Saham, anything else?

MR. SAHAM:  I'd like you to pull up Exhibit 215, Mr. Torres, at Page 37.

MR. MELSHEIMER:  Your Honor, I had one question about one exhibit.  I didn't ask anything else.  I object as beyond the scope.

THE COURT:  We're going to flush this all out right now.

Okay.  Go ahead.

MR. SAHAM:  Please pull up Page 37 of Exhibit 215.

RECROSS EXAMINATION

QUESTIONS BY MR. SAHAM:

Q.   And this is the look-back of what happened in 2015, and we've got up at the top the Kearl SEC pricing, correct?

And that's the analysis you said needed to be used, the SEC analysis, correct?

MR. MELSHEIMER:  Your Honor, just an objection.  This is a 2016.

THE COURT:  It is.

MR. MELSHEIMER:  Okay.

Q   (By Mr. Saham) Is that accurate?  It says "Kearl SEC pricing," correct?

A.   2016 Basis.

Q.   Yeah.  And then if we look at the first column of that, it says 2015, correct?

A.   That would have been the prior year.

Q.   And it deducts $1.32 for transportation, correct?

A.   That is correct.

Q.   And that's -- The shipment is only to Edmonton, correct?

A.   That's correct.

Q.   And you get a realization of $28.70 under the SEC analysis,

correct?

A.   Correct.

Q.   And below that, we have what's called the "Kearl Actual Average Realization 2016," correct?

A.   That's what it says.

Q.   And then it looks back at 2015, correct, in the first column?

A.   Correct.

Q.   And if you use the actual transportation cost for 2015, it's $5.88, correct?

A.   That's what it says.

Q.   And you would get a realization using the 5.88 of only $24.27, correct?

A.   That's what it says.

Q.   And that's below the 27.90 lifting cost that was used in the SEC analysis, correct?

A.   That's the comparison.

MR. SAHAM:  No further questions, Your Honor.

THE COURT:  Do you want to come back?

MR. MELSHEIMER:  Well, Your Honor, I do because it's also a little misleading, but let me -- If you can put that back up.

MR. SAHAM:  Your Honor!

THE COURT:  Wait, wait, wait.  You can't comment.

MR. SAHAM:  I mean if he wants to make his Closing

Argument ---

THE COURT:  Wait.  Stop!  Don't attack each other ever again.  It will cost you, if you do.  Don't.

MR. MELSHEIMER:  Could you pull that back up?

REDIRECT EXAMINATION

QUESTIONS BY MR. MELSHEIMER:

Q.   Mr. Tillerson, just one question about this.  Do you know if the actual realization number is done the same way as the SEC pricing basis in terms of estimated proved reserves?  In other words, does one use the 1st of the month price averaged for 12 months and is this the same or different?

MR. SAHAM:  Objection; leading.

THE COURT:  I'll let him answer that.  Overruled.

A.   I'm not sure I can tell just looking at this.

Q    (By Mr. Melsheimer) But is there a difference between -- Is there or is there not a difference between the SEC Estimated Reserves Basis that uses the 1st of the month pricing and what you might use in the business itself for all days of the months?

A.   Yes, there could be a difference.

MR. MELSHEIMER:  Nothing further, Your Honor.  Thank you.

MR. SAHAM:  Nothing further, Your Honor.

THE COURT:  Going to wait till you -- I want a double assurance that there's nothing else.  It's like double secret probation.

Nothing else from the Defense?

MR. MELSHEIMER:  Nothing else, Your Honor.

THE COURT:  Mr. Saham?

MR. SAHAM:  No, Your Honor, nothing from us.

THE COURT:  Okay.  Ladies and Gentlemen, we'll break for the day.  Y'all worked so hard.

I guess I have one question:  If you want different kinds of donuts, you're going to have to let me know.  Okay?

All right.  See y'all.  Don't talk about the case. Thank you.

THE COURT:  Thanks, Mr. Tillerson.

(Court adjourned at 5:00 PM.)

CERTIFICATE OF OFFICIAL REPORTER

I, Deborah A. Kriegshauser, Federal Official Realtime Court Reporter, in and for the United States District Court for the Northern District of Texas, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically-recorded proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 4th day of May, 2026.

/s/ Deborah A. Kriegshauser
_____
DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER

**App. 334**

# Exhibit 11

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

PEDRO RAMIREZ, JR.,                    )
Individually and on Behalf of    )
All Others Similarly Situated,   )
                                       )
        Plaintiff,               )
                                       )
        v.                             ) Civil Action No.
                                       ) 3:16-CV-03111-K
EXXON MOBIL CORPORATION, REX W. )
TILLERSON, ANDREW P. SWIGER,       )
JEFFREY J. WOODBURY, and           )
DAVID S. ROSENTHAL,                )
                                       )
        Defendants.              )
_____ )

VIDEO-RECORDED DEPOSITION OF D. PAUL REGAN

Wednesday, January 29, 2025
San Francisco, California

Stenographically Reported By:
Hanna Kim, CLR, CSR No. 13083

App. 335

Page 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

PEDRO RAMIREZ, JR., )
Individually and on Behalf of )
All Others Similarly Situated, )
)
Plaintiff, )
)
v. ) Civil Action No.
) 3:16-CV-03111-K
EXXON MOBIL CORPORATION, REX W. )
TILLERSON, ANDREW P. SWIGER, )
JEFFREY J. WOODBURY, and )
DAVID S. ROSENTHAL, )
)
Defendants. )
_____ )

Video-recorded deposition of D. PAUL REGAN, taken on behalf of the Defendants, at the law offices of Paul Weiss Rifkind Wharton & Garrison, LLP, located at 535 Mission Street, 25th Floor, San Francisco, California 94105, on Wednesday, January 29, 2025, before Hanna Kim, CLR, Certified Shorthand Reporter, No. 13083.

Page 3

APPEARANCES OF COUNSEL:

For Plaintiffs:

ROBBINS GELLER RUDMAN & DOWD LLP
BY: SCOTT H. SAHAM, ESQ.
BY: SAM SHELDON, ESQ.
BY: SPENCER BURKHOLZ, ESQ.
BY: SARA B. POLYCHRON, ESQ. (Via Zoom)
BY: JUSTIN GARY OETTING, ESQ. (Via Zoom)
655 West Broadway, Suite 1900
San Diego, California 92101
619.231.1058
ssaham@rgrdlaw.com
ssheldon@rgrdlaw.com
sburkholz@rgrdlaw.com
spolychron@rgrdlaw.com
joetting@rgrdlaw.com

Page 4

APPEARANCES OF COUNSEL: (CONTINUED)

For Defendants:

PAUL, WEISS, RIFKIND, WHARTON & GARRISON
LLP
BY: DANIEL TOAL, ESQ.
BY: LYUBA SHAMAILOVA, ESQ.
BY: ELIZABETH HUH, ESQ. (Via Zoom)
1285 Avenue of the Americas
New York, New York 10019-6064
212.373.3869
dtoal@paulweiss.com
lshamailova@paulweiss.com
ehuh@paulweiss.com

Also Present:

HEATHER JENNETTE, Forensic Accountant,
Robbins Geller Rudman & Dowd
DANIEL BOLIA, Exxon Mobil
STEPHANIE HANSEN (Via Zoom)
P. LONG (Via Zoom)
VINNY BEZERRA, Video Operator

Page 5

INDEX OF EXAMINATION

WITNESS: D. PAUL REGAN
EXAMINATION                          PAGE
BY MR. TOAL:                         13

2 (Pages 2 - 5)

Page 6

INDEX OF EXHIBITS

REGAN DEPOSITION EXHIBITS                    PAGE

Exhibit 1    "EXPERT REPORT OF D. PAUL       13
             REGAN, CPA/CFF OCTOBER 11,
             2024"; 215 pages

Exhibit 2    "EXPERT REPLY REPORT            14
             OF D. PAUL REGAN, CPA/CFF
             January 10, 2025"; 150 pages

Exhibit 3    "Order," in the matter of Mark  39
             Smilovits, et al., vs. First
             Solar, Inc., et al., in the
             U.S. District Court, District
             of Arizona; 25 pages

Exhibit 4    Copy of Solar Power, Inc.       44
             10(K) for the fiscal year
             ended December 31st, 2010; 66
             pages

Exhibit 5    Amended 10(K) for Solar Power   45
             for the fiscal year ended
             December 31st, 2010; 56 pages

Exhibit 6    Excerpt from the Petroleum      60
             Accounting textbook, including
             page 268 of textbook; 6 pages

Page 7

INDEX OF EXHIBITS  (CONTINUED)

REGAN DEPOSITION EXHIBITS                    PAGE

Exhibit 7    FASB Topic 932 "Accounting      63
             Standards Update" dated
             January 2010; 83 pages

Exhibit 8    Document entitled "SEC 17 CFR   66
             Parts 210, 211, 229, and 249,"
             entitled "MODERNIZATION OF OIL
             AND GAS REPORTING"; 161 pages

Exhibit 9    Exxon Mobil Corporation's       88
             10(K) for 2015; 120 pages

Exhibit 10   Excel spreadsheet; "Kearl       102
             Bitumen Crude Oil Pricing for
             Security and Exchange Reserves
             Calculation"; 8 pages

Exhibit 11   E-mail set, with top e-mail     107
             from Bill Strawbridge to Beth
             Casteel dated October 21,
             2015; Bates nos. EMC_RAMIREZ
             000030844 through EMC_RAMIREZ
             000030846

Page 8

INDEX OF EXHIBITS  (CONTINUED)

REGAN DEPOSITION EXHIBITS                    PAGE

Exhibit 12   Document entitled "SEC Price,"  117
             "How SEC Price is Documented
             and Distributed"; Bates nos.
             EMC_RAMIREZ 000000161 through
             EMC_RAMIREZ 000000169

Exhibit 13   "SEC YE~ Reserves Final         123
             Review," "Kearl"; Bates nos.
             EMC_RAM_NYAG 003426312 through
             EMC_RAM_NYAG 003426325

Exhibit 14   E-mail set, with top e-mail     127
             from Vince Prestipino to Mark
             Taylor, dated October 26,
             2015; Bates nos. EMC_RAMIREZ
             000056334 through EMC_RAMIREZ
             000056336, and attachments; 11
             pages

Exhibit 15   Document entitled "2015 Proved  137
             Reserves Changes," Chairman's
             Review," "January 25, 2016";
             Bates nos. EMC_RAMIREZ
             000012279 through EMC_RAMIREZ
             000012329

Page 9

INDEX OF EXHIBITS  (CONTINUED)

REGAN DEPOSITION EXHIBITS                    PAGE

Exhibit 16   Document entitled "UPSTREAM     145
             FINANCIAL ISSUES REVIEW
             AGENDA" dated May 7, 2015;
             Bates nos. EMC_RAM 001593539
             through EMC_RAM 001593606

Exhibit 17   Slide deck entitled "Kearl      146
             Proved Reserves 2015 SEC
             Outlook" dated October 16,
             2015; Bates nos. EMC_RAMIREZ
             000030838 through EMC_RAMIREZ
             000030843

Exhibit 18   Document entitled "Kearl        146
             Proved Reserves 2015 SEC
             Outlook" dated October 26,
             2015; 8 pages

Exhibit 19   E-mail set, with top e-mail     150
             from Kurt Otte to Cindy Allen
             dated October 15, 2015; Bates
             nos. EMC_RAM_SEC 000035525
             through EMC_RAM_SEC 000035532

3 (Pages 6 - 9)

Page 10

INDEX OF EXHIBITS  (CONTINUED)

REGAN DEPOSITION EXHIBITS                    PAGE

Exhibit 20    "America's F&O - Delivering        196
                 the Plan," "December 2015";
                 Bates nos. EMC_RAM_SEC
                 000009968 through EMC_RAM_SEC
                 000010025

Exhibit 21    "Commission Guidance Regarding    210
                 Management's Discussion and
                 Analysis of Financial
                 Condition and Results of
                 Operations" from Federal
                 Register 17 CFR Parts 211,
                 231, and 241; 10 pages

Exhibit 22    Document entitled "Assessment     237
                 of Potential Impairment
                 Triggers"; EMC_RAM 000000001
                 through EMC_RAM 000000079

Exhibit 23    "35 Subsequent Measurement"; 8    247
                 pages

                          --o0o--

Page 11

          San Francisco, California
          Wednesday, January 29, 2025
          9:10 a.m., Pacific Standard Time
                    --o0o--
          THE VIDEOGRAPHER:  Good morning.  We are going on the record at 9:10 a.m., on January 29th of 2025.

          Please note that the microphones are sensitive and may pick up whispering and private conversations.    09:10:18

          Please mute your phones at this time.

          Audio and video recording will continue to take place unless all parties agree to go off the record.

          This is the Media Unit 1 of the    09:10:26 video-recorded deposition of D. Paul Regan, taken by counsel for Defendant, in the matter of Pedro Ramirez, Jr., versus Exxon Mobil Corporation, et al., filed in the United States District Court, Northern District of Texas; Case Number:    09:10:47 3:16-cv-03111-K.

          The location of the deposition is 535 Mission Street, 25th Floor, San Francisco, California.

          My name is Vinny Bezerra, representing    09:11:08

Page 12

Veritext Legal Solutions, and I am the videographer.

          I am not authorized to administer an oath. I am not related to any party in this action, nor am I financially interested in the outcome.

          If there are any objections to proceeding,    09:11:31 please state them at the time of your appearance.

          Counsel and all present have been noted for the record.

          Will the court reporter please introduce yourself and administer the oath to the witness.    09:11:39

          THE COURT REPORTER:  Good morning.  This is Hanna Kim, Certified Shorthand Reporter, License Number 13083.

          I'm going to administer the oath to the witness.

///
///
///
///
///
///
///
///
///
///

Page 13

          D. PAUL REGAN,
     having been duly administered an oath,
     was examined and testified as follows:

               EXAMINATION
BY MR. TOAL:
     Q.  Good morning, Mr. Regan.
     A.  Good morning, Mr. Toal.
     Q.  Mr. Regan, are you aware of any reason you wouldn't be able to testify truthfully today?    09:12:13
     A.  No.
     Q.  Let me mark for you as Regan Exhibit 1 a copy of the opening expert report that you submitted in this case on October 10th, 2024.
          (Regan Deposition Exhibit 1 was marked for    09:12:44
          identification.)
BY MR. TOAL:
     Q.  Mr. Regan, do you recognize this as the report that you submitted in this case?
     A.  Yes.                    09:12:54
     Q.  And is that your signature on page 136?
     A.  Yes.
     Q.  Okay.
          MR. TOAL:  I'm going to mark as Regan Exhibit 2 a copy of the reply report that you    09:13:15

4 (Pages 10 - 13)

Page 14

submitted in this case on January 10th, 2025.

(Regan Deposition Exhibit 2 was marked for identification.)

BY MR. TOAL:

Q. Mr. Regan, do you recognize that as your    09:13:35 reply report in this case?

A. Yes.

Q. Okay. And is your signature -- does it appear on page 99?

A. Yes.                    09:13:49

Q. Have you reviewed either of these reports since you submitted them?

A. Yes.

Q. Approximately how many times?

A. I would recall reading Exhibit 1 from    09:14:01 start to finish at least twice. Exhibit 2, at least once. And certain sections many times.

Q. And how recently did you review your opening report?

A. Well, the second read of the opening    09:14:32 report was last week.

Q. And how recently have you reviewed your reply report?

A. Also last week.

Q. Is everything in your opening report and    09:14:50

Page 15

your reply report accurate to the best of your knowledge?

A. In the re-reading and then referencing into the documents, there were a few items which I wanted to correct --                    09:15:16

Q. And --

A. -- or change.

Q. -- what -- what items would you like to correct?

MR. SAHAM: Dan -- Dan, there -- we have    09:15:23 an errata, if you want me to go get it, in the other room or do that at a break.

BY MR. TOAL:

Q. Well, can you tell me, based on your recollection, which -- which points you want to    09:15:33 correct?

A. Yes, I have it in front of me.

Q. Okay. Why don't you go ahead and tell me.

A. This is with respect to the Exhibit 1. On -- in Paragraph 28, Footnote 17 and 18, it    09:15:48 presently reads page 10. And, as updated, it should read page 6.

Paragraph 29, Footnote 20, reads -- that uses the words "all Kearl." [As read] It should be, "Yes, largely Kearl." [As read]    09:16:16

Page 16

Paragraph 43, Footnote --

Q. Mr. Regan, let me stop you briefly. Are these all on -- on the -- are -- are these all typographical errors that you're correcting?                    09:16:30

A. I think they all could be characterized that way, yes.

Q. Are there any substantive points in your report that you wanted to correct?

A. I don't believe they are substantive.    09:16:40

Q. Okay.

A. They don't change my opinions.

Q. Okay. So do you stand by the opinions in both -- both reports?

A. I do.                    09:16:52

Q. Are you offering any opinions in this matter beyond those that are set forth in your reports?

A. I don't think so at this time. However, I know that discovery is continuing. Additional    09:17:10 depositions will be taken.

And it could be that the -- the deposition testimony or the exhibits might cause me to supplement what I have written in Exhibit 1 or 2.

Q. But as you sit here today, you don't have    09:17:30

Page 17

any plan to offer any opinions beyond those that are set forth in your reports; correct?

A. That's correct.

Q. Ha- -- have you been asked to do any additional work in this case?                    09:17:44

A. No.

Q. Mr. Regan, what do you consider to be your area of expertise?

A. Generally accepted accounting principles, which I'll call GAAP; generally accepted auditing    09:18:03 standards, which I'll call GAAS. Those are the areas that I consider my expertise.

Q. Do you consider yourself an expert in the area of oil and gas accounting?

A. I don't -- I've never claimed to be an    09:18:26 expert in a particular niche; however, I've worked on a number of GAAS -- GAAP/GAAS issues that involved oil and gas.

And I believe I understand and am -- have expertise in GAAP and GAAS as it relates to oil and    09:18:44 gas companies.

Q. And when you say you never claimed to be an expert in a particular niche, do you consider oil and gas accounting to be a niche?

A. Yes, it's a segment of the -- the GAAP and    09:19:00

5 (Pages 14 - 17)

Page 18

GAAS world.

Q. What prior experience do you have regarding oil and gas accounting?

A. I've testified in a number of instances where oil and gas accounting was at issue. I've testified in a number of -- of those circumstances.

I've also owned a working interest in a number of -- or in an oil and gas operation, which aqua- -- acquainted me with the industry.

Q. How many cases have you testified in where oil and gas account- -- oil -- oil and gas accounting was at issue?

A. (Indicating.)

As I sit here now, I can recall four that I can recall the name of the cases.

I expect that there are more, but I don't have a present recollection of the names.

Q. Okay. If any additional ones come to mind, you can -- you can let me know later in the deposition.

A. Fine.

Q. What are the four that you recall?

A. Enron, Anadarko, Alta Mesa, Elk Grove. And I believe there were one or two more. One involved an oil and gas company where the field in

Page 19

question was in Southern California and another that was in deep water, Gulf of Mexico.

Q. And what was the subject of your testimony in Enron?

A. It focused on a number of -- of SPEs, special purpose entities, the accounting for those entities.

There was also certain contracts that involved the transfer of -- of oil from one party to another -- or multiple parties.

Those were the principal areas.

Q. Did your testimony in any of these matters that you've just described involve determining proved reserves for oil and gas assets?

A. My recollection is the Anadarko case involved proved reserves. And Alta Mesa may have as well.

Q. And what was the issue as to proved reserves in Anadarko?

A. Whether they were overstated and improperly accounted for.

Q. And did you offer an opinion related to proved reserves?

A. Not the proved reserves themselves in terms of measuring their quantities, but whether or

Page 20

not the process form -- for determining proved reserves was flawed.

Q. And what opinion did you offer?

A. That the proved reserves were substantially overstated.

Q. And what was the nature of the opinion you offered in Alta Mesa?

A. That the forecasted revenues and expenses relating to proved reserves were materially overstated and were not properly accounted for and presented in the financial statements.

Q. Did you offer an opinion in Alta Mesa about whether assets qualified as proved reserves?

A. Well, I didn't make a determination of the quantities of proved reserves, but I offered an opinion with respect to the fact that they were overstated and impaired and should have been written off.

Q. So as to the oil and gas cases that you described, did any of them involve disclosures related to impairments of oil and gas assets?

It sounds like you're saying that was one of the opinions you offered in Alta Mesa; is that correct?

A. That's -- that's my recollection, yes.

Page 21

Q. Did any of the others re- -- relate to disclosures concerning impairment of oil and gas assets?

A. My recollection, the Elk -- in the Elk case -- E-L-K -- my opinions were similar, that the balance sheet was overstated in terms of measuring proved reserves.

Q. Did -- did you offer an opinion in the Elk Grove case about whether assets were impaired?

A. Well, I think that was the consequence of the -- as a result of the overstatement, there was an impairment.

Q. In Elk Grove, did you go through the elements of the -- the tests under ASC 360?

A. That would be a -- a -- a part of my analysis.

Q. Have you ever worked for an oil and gas company?

A. No. I'm -- my career has been in -- as -- in public accounting.

Q. Have you ever provided auditing services to an oil and gas company?

A. In connection with one of the items that I -- one of the engagements that I can't remember the name of, I reviewed the audit and had comments

6 (Pages 18 - 21)

Page 22

with respect to the audit.

But that was not done as an audit in accordance with GAAS, but as someone that was reviewing the audit working papers.

Q.  So -- so you never conducted an audit of an oil and gas company; correct?

A.  Not as an auditor in accordance with GAAS, but my recollection is that I have made determinations of whether audits were in accordance with GAAS.

Q.  Involving oil and gas companies?

A.  Yes.

Q.  And how many times have you done that?

A.  I have a specific recollection of at least two.  And I suspect there are others.

Q.  And what were the companies at issue in those -- those matters?

A.  One was Enron, and the other was a -- a company that I mentioned a moment ago that I don't -- I don't recall the name of it.

Q.  What -- what did that company do?

A.  It was mostly deepwater drilling in the Gulf of Mexico.

Q.  For either of those two matters where you reviewed audits involving oil and gas companies,

Page 23

were you reviewing estimates of proved reserves?

A.  The -- the distinction that I need to make is I made -- I made determinations about whether proved reserves were properly recorded on the -- by the company in its accounting records.

I -- I accepted the determination of the quantities of reserves by -- actually, it was a third-party company hired by the company to make those determinations of the quantities of proved reserves.

The then issue was from an accounting perspective were they properly accounted for and presented in the financial statements.

Q.  Okay.  But in those engagements it sounds like you accepted the quantities of proved reserves as a given; is that correct?

A.  My recollection is that there was some ambiguities in the third-party expert report as to proved reserves, and there were some modifications and changes.

But that was not within my -- my expertise is not to determine the quantities of oil and gas that qualify as proved reserves.  My work focused on were they properly accounted for.

Q.  And properly accounted for in what

Page 24

respect?

A.  Whether the quantities determined by those third-party experts were properly accounted for on the balance sheet or whether they were overstated on the balance sheet.

In other words, proved reserves gives you a -- a quantity, and then you need to measure the -- the value of that -- those quantities based upon a forecast of cash receipts, disbursements, exploration costs, and determining whether or not they're fairly presented on the balance sheet, and, in some instances, whether the income statement has been properly presented.

Q.  So your role was in evaluating the value that was ascribed to proved reserves in those cases; is that correct?

A.  Yes.

Q.  And you -- you were not involved in determining the quantities of proved reserves in those cases; correct?

A.  Correct.

Q.  And just so we're clear, you have never been involved in a case where your responsibility was determining the quantities of proved reserves; correct?

Page 25

MR. SAHAM:  Object- -- objection to form. Vague as to "quantity."

THE WITNESS:  I've not determined the barrels or the barrel equivalence of what was characterized as proved reserves by the entities. That's an expertise in which I have relied on other parties.

BY MR. TOAL:

Q.  Other than the matters that you just described, have you ever consulted for an oil and gas company?

A.  Well, while I owned a working interest, I had meetings, discussions.  It was a general partnership.  I was one of five partners.

We had wells in -- it started out principally in Fort Worth and eventually had wells in Texas -- excuse me, other parts of Texas, Oklahoma, and Louisiana.

Q.  And what was the name of the entity in which you had the working interest?

A.  Meeker.

Q.  And you no longer have that interest; is that correct?

A.  Well, we sold -- we sold substantially all of the interest in 2000- -- I think it was 2015 to

7 (Pages 22 - 25)

**App. 341**

Page 26

Anadarko.

I have a small -- I have a -- my interest remains, but our assets are sub- -- are very small 'cause there was distributions after the sale.

Q. In connection with the working interest  09:34:24 you had in an oil and gas entity, did you do any work for that entity in determining proved reserves?

A. No. Again, I've never -- I've never been involved in -- in the geologic determinations of the quantities of -- of proved reserves.  09:34:50

Q. Have you ever been involved in the financial aspects of determining quantities of proved reserves other than your work on this case?

A. Well, that's a broad question.

I know we would -- we had discussions of  09:35:12 whether -- in reviewing the facts and circumstances, whether there would be -- we would drill a -- another well.

And based upon the expectations of the geological analysis, we would make that  09:35:34 determination. But I'm -- I'm not a geologist. I'm -- that's not my area of expertise. There would be discussions, but I would not be involved in those determinations.

Q. Have -- have you ever been involved in  09:35:54

Page 27

determining whether assets qualify as proved reserves under the SEC's cash flow test, other than your work on this case?

A. Yes.

Q. And in what circumstances?  09:36:11

A. In -- in a number of these cases, there needs to be a determination of what are the -- what are the reasonable expectations of revenues that are going to occur, when are those revenues going to occur, so the -- the -- the pace of those revenues,  09:36:42 what are the operating costs, what are the ex- -- additional exploration costs that are necessary.

And that -- that's a complicated process, the revenue expectations, which move into a projection or a forecast, as is the exploration  09:37:07 costs and the operating expenses, and eventually the measurement of the value of the proved reserves.

Q. Are revenue expectations relevant to the SEC test for proved reserves?

A. I guess in a -- in a theoretical sense you  09:37:29 could -- you -- you -- the proved reserves are a geologic determination.

The value of those reserves on the balance sheet of the enterprise is integrally entwined with the quantities.  09:38:03

Page 28

Then you need to make a determination of taking those quantities, moving that into a forecast, and assessing, for example, whether or not those reserves are impaired.

Or in an initial transaction where you're  09:38:15 recording the -- the value in an exchange between companies, what you're going to debit on the balance sheet.

Q. So I -- my question is a little bit more specific.  09:38:33

With respect to -- you understand there is a [verbatim] SEC test for determining whether certain assets qualify as proved reserves; correct?

A. Yes.

Q. And that involves whether the assets are  09:38:43 economically producible; correct?

A. Yes.

Q. Okay. In any of your work, have you ever been involved in determining whether certain assets were economically producible so that they could be  09:38:59 recognized as pro- -- as proved reserves?

A. Yes, that's the process I was describing in my prior answer.

Q. Okay. And for which company did you do that?  09:39:09

Page 29

A. Well, the one that comes to mind was Alta Bates -- Alta Mesa. Excuse me.

Q. And other than Alta Mesa, have you been involved in that work for any other client or case?

A. I think in the Elk case and the other  09:39:23 whose name I'm not remembering at the moment. It was a --

Q. Any others besides those?

A. It was a critical element of that case in valuing the balance sheet presentation of the value  09:39:44 of the proved reserves.

Q. Well, I'm not talking about the value of the proved reserves. I'm just talking about whether the assets qualify as proved reserves.

Do you understand that?  09:39:58

A. When -- when I hear your question, it strikes me that you're asking me did the third party that calculated the barrels, the barrel equivalence, that particular geologic calculation, that's not something that I'm involved in.  09:40:24

Q. I understand that.

There's a geological calculation.

There's also a test of economic producibility; correct?

A. Yes. And that -- that's what I am  09:49:29

8 (Pages 26 - 29)

App. 342

Page 30

involved in -- have been involved in.

Q. In those three matters that you described; is that right?

A. That's my recollection, yes.

Q. Okay. Do you recall any others where you played that role?

A. Well, I've played that role in many other cases where, you know, what is being valued is a different -- is another long-term asset, but it's not characterized as proved reserves.

THE COURT REPORTER: I'm sorry. Counsel, may we go off the record real quick?

MR. TOAL: Yes.

THE VIDEOGRAPHER: This is end of Media Number 1. We are off the record at 9:41 a.m.

(Short recess taken.)

THE VIDEOGRAPHER: This is the beginning of Media Number 2. We are back on record at 9:49 a.m.

BY MR. TOAL:

Q. Mr. Regan, have you ever worked for a third-party consulting firm that provides oil and gas proved reserves estimation services?

A. No. My only employer has been Peat Marwick Mitchell, which is now KPMG, and Hemming

Page 31

Morse.

Q. And are -- are you familiar with the third-party firms that provide proved reserves estimation services?

A. Yes.

Q. And what are those firms? Can you identify them?

A. Oh, I'd have to look them up, but I -- I've seen a number of -- of reports by geologic companies that have made those calculations.

Q. And do you know the names of any of those firms?

A. If you would name a few, I can tell you whether or not I'm -- I'm familiar with their work. It's not something that I focus on.

Q. Ha- -- have you ever served on the Society of Petroleum Engineers Oil and Gas Reserves Committee?

A. No.

Q. Are you familiar with that committee?

A. Just by name.

Q. Do you know what it does?

A. I'm -- I'm not going to speculate as to what it does or -- and what -- what its scope is in its entirety.

Page 32

Q. So you don't know what it does; correct?

A. Again, I have an expectation of what they do, but it's not something that I want to testify about.

Q. Have you ever worked at the U.S. Securities and Exchange Commission?

A. I've worked with the SEC on many cases.

Q. Have you ever been employed at the SEC?

A. I've not been an employee, but I've testified on behalf of the SEC, and they have retained me in connection with a number of cases.

Q. Have you testified -- in any of the matters where you testified on behalf of the SEC, did any of those matters relate to proved reserves of oil and gas assets?

A. I don't recall that as I sit here today.

Q. And did any of those cases relate to impairment of oil and gas assets?

A. I don't have a specific recollection of that.

Q. Do you have a general recollection of that?

A. I don't have a -- a recollection of the SEC asking me to do that.

Q. Prior to this case, have you ever done any

Page 33

work related to oil and gas companies involving estimating oil and gas proved reserves pursuant to SEC Regulations S-X and S-K?

A. Well, I think your question now -- you know, when I look at my report on page 14, I look at the word "proved reserves" and I say it "generally refers to the quantity of reserves that appear within reasonable certainty to be recoverable in the future from known oil and gas locations." [As read]

And the cite for that is an SEC -- it originated with the SEC. It's ASC 932-10-S99.

But in terms of an SEC -- there is an SEC calculation that relates to proved reserves, and that's where you -- oh, you -- you make a determination of what the revenue per barrel is on the first day of the month, and you calculate an average, and then you look at the costs that are associated with that revenue.

It's the -- the latter piece that I have been involved in in ways that I've described to you this morning.

But if --

Q. So --

A. -- if we're looking at -- at page 14 of Exhibit 1, Paragraph 30, that determination of

9 (Pages 30 - 33)

Page 34

proved reserves is, I think, a geologic determination.

What I've been involved in are calculations of the price -- the relevant price in the prior 12 months on the first day of the month in comparison to the costs associated with those revenues. 09:54:06

Q. So just --

A. That's an -- that's -- that's also an SEC -- an SEC calculation and an instruction. 09:54:18

Q. So in terms of that SEC calculation that you just described, in which other engagements have you been involved in that determination?

A. So a determination under ASC 932-10- --

THE COURT REPORTER: "ASC"? 09:54:39

THE WITNESS: -- ASC 932-10-99 -- S99, excuse me, I recall that being a calculation and an item of our work on Alta Mesa and at least one or two of the other oil and gas companies that I mentioned earlier today. 09:55:21

BY MR. TOAL:

Q. And can you identify the others?

A. No. Those are the ones that I -- I don't have a specific recollection of their name.

Q. Okay. So you think Alta Mesa and one or 09:55:32

Page 35

two of the others that you can't remember the names of right now; correct?

A. Correct.

Q. Have you ever prepared the management's discussion and analysis sections of a company's 10(K) form? 09:55:46

A. I've participated in the review and, in some instances, helped in the preparation of public companies that I have been on the boards of.

And also as mayor of the town of Hillsborough and a member of the finance committee and a member of its counsel, we issue public debt. And it has an MD&A where I would participate in the preparation of portions of the MD&A. 09:56:18

Q. Are -- are tho- -- those the only situations in which you've been involved in the drafting of an MD&A section? 09:56:39

A. There have been -- there were occasions where, in the performance of an audit in accordance with generally accepted auditing standards, be it by the AICPA or the PCAOB, I review- -- 09:57:05

THE COURT REPORTER: I'm sorry, I can't hear. "AICPA or"?

THE WITNESS: -- PCAOB, I would review the MD&A and other information within the document that 09:57:23

Page 36

the financial statements were included.

And, in some instances, suggest that something in addition be addressed or suggest editing to words that appeared in the MD&A.

BY MR. TOAL: 09:57:48

Q. Okay. So let's -- first you -- you mentioned serving on public boards.

Which public boards have you served on?

A. International Display Works, Inc., and Solar Power, Inc. 09:58:28

And the town is the town of Hillsborough, H-I-L-L-S-B-O-R-O-U-G-H.

Q. In terms of public companies, it was just the two that you mentioned; is that correct?

A. Yes. 09:58:39

Q. Okay. Now, it sounds from your prior answers like you've never been principally responsible for drafting an MD&A section in 10(K); is that correct?

MR. SAHAM: Objection to form. 09:58:49

THE WITNESS: I would say with respect to certain portions I would edit or make suggestions, but I was not the one that signed the re- -- the report.

BY MR. TOAL: 09:59:21

Page 37

Q. And you were reviewing MD&A sections that other people had prepared; correct?

A. I think in every instance the MD&A was -- was drafted by others, and what I provided was edits and commentary, as I previously described. 09:59:46

Q. Okay. And you did that in connection with your service on these boards of directors and in connection with certain audits that you conducted; correct?

A. As well as the town of Hillsborough. 09:59:57

Q. Does the town of Hillsborough issue a 10(K)?

A. It issues financial statements as a -- an entity with the SEC and documents similar to the content of a 10(K). 10:00:18

Q. And so have you ever been involved in the preparation of an MD&A section for an oil and gas company?

A. No, I don't recall doing that.

Q. Have you ever served on a disclosure committee for a public company? 10:00:39

A. I don't believe that any of the -- the public companies or the town of Hillsborough would -- they didn't characterize it as a disclosure committee. So, no. 10:01:06

10 (Pages 34 - 37)

Page 38

Q.  Have you ever offered an opinion on an MD&A section that a court excluded?

A.  I don't recall that.

Q.  Do you recall offering an opinion on MD&A in the case called First Solar?          10:01:29

A.  What --

Q.  So --

(Simultaneous speaking.)

THE COURT REPORTER:  I'm sorry -- I'm sorry, I can't hear both of you.

THE WITNESS:  I recall preparing a report. I think I had a deposition in the first Solar case.

BY MR. TOAL:

Q.  And do you recall the Judge excluded your opinion on MD&A?          10:01:53

A.  That's not what my recollection is.  My recollection is that the parties agreed that I was -- my testimony would not address MD&A.

And the Judge said, "Well, if you've basically agreed that he isn't, then I will include    10:02:13 in my order an instruction that he not testify about MD&A."

Q.  And that was in response to a Daubert challenge that the other side brought; correct?

MR. SAHAM:  Objection.  Calls for          10:02:30

Page 39

speculation and legal conclusion.

THE WITNESS:  Yeah, I -- I don't -- I don't recall the circumstances under which that occurred.

BY MR. TOAL:          10:02:39

Q.  Okay.

MR. TOAL:  Let me mark as Regan Exhibit 3 an order from the U.S. District Court for the District of Arizona.

(Regan Deposition Exhibit 3 was marked for    10:02:48 identification.)

BY MR. TOAL:

Q.  And you can look through any part of this you want.  I'm going to direct your attention to page 16 of this document.          10:03:08

Is -- is this a document you recall seeing before?

A.  I don't know that I've seen this document. I recall discussing it with counsel, and my recollection is that counsel indicated that they had    10:03:30 agreed that I would not be testifying about MD&A.

And it was -- it was not as a result of -- it was a result of their agreement with counsel, but not as a result of Exhibit 3.

Q.  Do you see on page 15 there's a heading    10:03:58

Page 40

"Defendants' Motion to Exclude Regan's Testimony"?

[As read]

A.  Let me see the date of this.

I see that, yes.

Q.  Okay.  And the -- the date's on the last    10:04:24 page.  It's December 17th, 2019?

A.  Yes.  My recollection is that was shortly before trial.

Q.  Okay.  And then if you go to page 16, there's a subheading for "SEC Disclosure Rules and    10:04:39 MD&A."

Do you see that?

A.  I do.

Q.  And then at the bottom of that section, it says, "The Court will grant Defendants' motion in    10:04:53 this regard and preclude Regan from testifying at trial about SEC disclosure rules and MD&A."

Do you see that?

A.  Yeah.  Let -- let me read the paragraph under Paragraph A.          10:05:09

So defendants -- what -- what -- under Paragraph A, in the first paragraph, at Line 7 it says "Defendants argue that" Regan -- "Regan's opinions about alleged violations of MD&A disclosure" are not rele- -- "are irrelevant          10:05:29

Page 41

to Plaintiffs 10(b) and 10b-5" [as read] --

THE COURT REPORTER:  I'm sorry, I can't hear you, sir.

THE WITNESS:  -- "10(b) and 10b-5 claims, and that his opinions are unreliable because they    10:05:40 simply mirror his conclusions about GAAP with no additional analysis." [As read]

BY MR. TOAL:

Q.  And the first sentence in that paragraph is "Defendants argue that Regan is not qualified to    10:05:50 opine on SEC disclosure rules in general and MD&A in particular"; correct?

A.  Yes.

Q.  Okay.  And the Court granted that motion; correct?          10:06:02

A.  I need to read in the next paragraph, and I'll need to read the Judge's decision.

(Witness reviews.)

Yeah, and the paragraph beginning at Line 12 is consistent with my recollection that          10:06:26 "Plaintiffs devote several pages to defending Regan's accounting qualifications - which Defendants do not challenge - and then states: 'plaintiffs do not intend to elicit testimony regarding the requirements of MD&A or whether the defendants          10:06:51

11 (Pages 38 - 41)

Page 42

complied with those requirements from Regan at trial." [As read]

Now, you say the Judge -- the Judge made a determination, and where is that?

Q. On page 16, at the bottom of Section A, you see there's language indicating that the Judge granted the motion to exclude your testimony.

A. Yes, that's a part of that paragraph where plaintiffs indicate that they "do not intend to elicit testimony regarding the requirements of MD&A or whether defendants complied with those requirements from Regan at trial." [As read]

And the -- the Judge granted the motion, and it -- my understanding is that that's consistent with the explanation that I gave at the beginning, which is there was a motion. Because plaintiffs were not going to attempt to elicit testimony regarding the requirements of MD&A, that they did not challenge this determination because it's -- it was a challenge without -- without meaning at that point.

Q. Well, the defendants' motion argued that you're not qualified to offer opinions on MD&A in particular; correct?

A. That was in the defendants' argument, yes.

Page 43

Q. And that's the motion the Judge granted; correct?

A. The Court granted the motion to "preclude Regan from testifying at trial about SEC disclosure rules and MD&A." [As read] But I don't equate that to a determination that I wasn't qualified to discuss MD&A.

Q. Now, you -- you mentioned you served on the board of directors for Solar Power; correct?

A. Correct.

Q. And how many years did you serve on that board?

A. (Witness reviews.)

From 2006 to 2010, some date in 2010.

Q. And you served on the audit committee for Solar Power; correct?

A. Yes. Yes.

Q. And you were chairman of the audit committee for some period of time?

A. Yes.

Q. And what period were you the chairman of the audit committee?

A. 2006 to 2010.

Q. Okay. I'm going to mark for you as Regan Exhibit 4 a copy of the Solar Power 10(K) for the

Page 44

fiscal year ended December 31st, 2010.

(Regan Deposition Exhibit 4 was marked for identification.)

BY MR. TOAL:

Q. So first, Mr. Regan, do you recognize this as Solar Power's 10(K) for the year ended December 31st, 2010?

A. I do.

Q. And if you turn to the 35th page, you see you signed this 10(K); correct?

A. It shows that I signed this 10(K), and it shows the date of March 14, 2011.

But I resigned, as I recall, no later than December 31, 2010.

Q. Okay. When did you resign?

A. When -- when the board voted to -- to enter into the transaction with the buyer of Solar Power, I was working against that company in -- as an expert.

And my recollection is that I objected to the transaction, and I could -- I felt I couldn't continue to be on the board, and I resigned before the end of the year.

Q. Well, this shows your signature as of March 14, 2011.

Page 45

Are -- are you saying you didn't authorize the use of your signature on this 10(K)?

MR. SAHAM: Object- -- objection to form.

THE WITNESS: I know there was discussions with respect to this 10(K), and I don't specifically have a recollection of how those di- -- discussions were resolved, but I certainly had resigned prior to the issuance of this 10(K).

BY MR. TOAL:

Q. When do you believe you resigned from the board of Solar Power?

A. That was sometime near the end of 2010.

Q. Okay. I'm going to show you an amended 10(K) for Solar Power for the fiscal year ended December 31st, 2010, which we'll mark as Regan Exhibit 5.

(Regan Deposition Exhibit 5 was marked for identification.)

BY MR. TOAL:

Q. Do you recognize this as the amended 10(K) for Solar Power for the year 2010?

A. I -- I know there was an amendment. I don't know that I've reviewed this document.

Q. Okay. If you turn to page 21 --

A. I see it.

12 (Pages 42 - 45)

Page 46

Q. -- do you see -- do you see there are signatures there with the date of April 16th, 2012?

A. Yes.

MR. SAHAM: When you say "21," are you talking about the bottom numbers? What numbers are you referring to?

MR. TOAL: Yeah, there's a number immediately after the signature.

MR. SAHAM: Oh, okay. So not the bottom right corner?

THE WITNESS: It's 25 of 56.

MR. SAHAM: Okay. I'm there now.

BY MR. TOAL:

Q. Now, you said you knew that Solar Power had issued an amended 10(K) for the year 2010.

How did you know that?

A. I don't recall now. I could speculate, but I'm -- I don't have a specific recollection of how I know it.

Q. If you turn to page 3 -- yeah, so this is 3 of 56 using the numbers on the bottom right -- you see it's entitled "Explanatory Note"?

A. Yes.

Q. And then the second paragraph says, "Based on its review, management determined that the

Page 47

Company improperly recognized revenue at the date of the initial sale on a solar development project initiated in 2009 under the percentage of completion method for construction work for the new owner. The transaction should have been accounted for in accordance with accounting standards for sales of real estate and due to continuing involvement with the project after the transaction, no sale should have been recognized. Instead, the transaction should have been accounted for using the financing method."

Do you see that?

A. I do.

Q. Okay. And that amendment relates to the period that you served as a chair of the audit committee for Solar Power; correct?

A. Yes.

Q. And so this was an acknowledgment by the company that there was improper revenue recognition during this period; correct?

MR. SAHAM: Objection to form.

THE WITNESS: That's the company's statement. I -- I have a recollection of working on that transaction, working with the auditors, working with the company, analyzing the transaction.

Page 48

And at the time the financial statements were issued, we believe that it's been accounted for properly.

Now, the company was sold, and the new owners made a diff- -- different determination and --

BY MR. TOAL:

Q. And when you made the determination that the transaction had been accounted for properly, did you do that in good faith?

A. Oh, yeah.

Q. Were you trying to mislead anybody?

A. No.

Q. But the new owners reached a different accounting determination? That's your understanding?

A. New management and the new owners reached a different determination. These are the folks that I -- I mentioned earlier. I was at that time working on a case against them for accounting improprieties.

Q. Have you ever been a plaintiff or a defendant in a lawsuit?

A. I don't recall that.

Q. Mr. Regan, what percentage of your work is

Page 49

devoted to working as an expert witness?

A. Well, I've never made that determination. What I do know is that since 1996 all of my client-related work relates to what we call forensic accounting issues.

And in some of those cases my role as a consultant becomes one where I am named as an expert.

And I've not made a determination of, you know, what -- what percentage of my revenue or my time relates to my working as an expert versus my working as a consultant.

Q. Well, when you work as a consultant, are you working as a consultant in a litigation capacity?

A. Not always. Sometimes in the -- in the cases we work prior to a Complaint being filed, we work for audit committees.

I work for audit committees where there's a concern that something may not have been accounted for or -- or disclosed and it needs to be investigated as to whether or not a -- a restatement should be reissued or whether persons within the company have acted improperly.

So that's pre-litigation work -- and work,

13 (Pages 46 - 49)

Page 50

where one, maybe perhaps not even in contemplation of litigation, may be concerned about litigation, but not -- not in connection with then litigation.

Q. So what's your best estimate of what percentage of your income is derived from your work as an expert witness either as a consulting or a testifying expert?

MR. SAHAM: Objection. Vague as to time.

THE WITNESS: Well, I'm really -- I've never made that determination. We're talking about from -- well, 30 years.

BY MR. TOAL:

Q. Well, let's say in the last four years.

A. I'd say that all of my work has been, in the last four years, relating to matters that are either in litigation or likely to be in litigation. And my work on those engagements are as a consultant. And in some of those cases I've become a -- a named expert in those cases.

I -- I would think that the time after being a designated expert is less than 50 percent. I don't know how much less than 50 percent it is.

Q. So a designated expert is when you're identified as an expert on behalf of one of the parties, and then there's some additional percentage

Page 51

relating to instances where you're a consulting expert.

Is that correct?

A. Yes.

Q. In your career, approximately how many times have you've been engaged to offer an expert opinion?

A. Well, the engaging typically is as a consultant. And at some point it's expected that I would offer an expert opinion.

Q. All right.

Let's -- let's make it easy.

How many times have you offered expert opinions in a litigation or an arbitration?

A. Well, I've -- I -- I mentioned in my Ex- -- in my Exhibit 1 that I've been deposed more than 235 times. So it's something more than 235 times 'cause I'm only deposed once I've been designated as an expert.

And in some of the -- some of the cases that I've testified in at trial, I wasn't deposed. It depends on the venue.

So it's probably in excess of 250 times.

Q. And what percentage of your work is on behalf of plaintiffs in those cases?

Page 52

A. Whenever I've attempted to identify that, it's usually about 60 percent plaintiff/40 percent defendant.

Q. And of the cases you've described where you were engaged to offer an expert opinion, how many of those were securities cases?

A. Hmm. I don't know how many are securities cases, but they would be a significant number.

Q. And --

A. They're not -- they're not all securities cases, but many of them are.

Q. Have you ever offered an opinion on behalf of a defendant in a securities fraud case?

A. I -- I haven't looked in -- and attempted to make that determination. I have a recollection of doing so. But I've not -- I've not attempted to make that determination.

Q. And what -- what matter is it that you think you offered an opinion on behalf of a defendant in a securities fraud case?

A. One that comes to mind, it was the MiniScribe case in Texas, where I was hired by Hambrecht & Quist and Morgan Stanley.

Q. Any others you can think of?

A. And also, I have a recollection where

Page 53

there's a complaint and a cross complaint, and the line becomes murky as to representing the plaintiff or the defendant. So I -- I -- as I sit here, I can't make that determination.

I have another recollection, the City of San Jose versus Pricewaterhouse, where I was retained by Pricewaterhouse. I think that was a securities case. I'm not sure. But I -- I'd have to go through all -- a list of all of my cases in order to make that determination.

Q. Those are the ones you can recall as you sit here today?

A. Yes.

Q. Have you previously been retained by Robbins Geller?

A. Yes.

Q. How many times?

A. I would guess in the ten-plus cases.

Q. Are you aware Plaintiffs previously retained an accountant named Charlotte Wright in this case?

A. What was the first name?

Q. Charlotte.

A. No, I'm not aware of that.

Q. Have you read the Complaint that was filed

14 (Pages 50 - 53)

Page 54

in this suit?

A. Yeah, I did read the Complaint.

Q. Did you see there was a declaration attached to the Complaint submitted by Charlotte Wright?                    10:27:47

A. I don't know if I looked at the attachment. The Complaint is something that I looked at, as I recall in 2000- -- the fall of 2023. I don't have that recollection.

Q. Have you had any communications with    10:28:09 Charlotte Wright in connection with your work on this case?

A. No.

Q. Do you know who Charlotte Wright is?

A. I do not.                    10:28:17

Q. Do you know if Charlotte Wright is an expert on oil and gas accounting?

A. I don't know anything about her.

Q. You -- you know what a Daubert motion is; correct?                    10:28:31

A. Yes.

Q. Have your -- other than the case we looked at previously, have your expert opinions ever been the subject of Daubert motions?

A. I'd say most of my opinions are -- there's   10:28:40

Page 55

Daubert challenges.

Q. And have any of those Daubert challenges, other than the one we looked at, been successful?

A. The one that I recall is No- -- Novalis, and my recollection is, the judge determined that I   10:29:09 would not testify about legal matters or the intent of defendants.

Q. And what court was that in?

A. It was in Southern California. I don't remember the name of the court.            10:29:32

Q. Any other times you can recall that your opinions have been excluded on Daubert or a similar state procedure?

A. No state procedures. I have a recollection -- this goes back a long time ago,   10:29:51 where the judge made a ruling that I would not testify about the back office operations of a brokerage -- or hedge fund. A hedge fund. But I haven't -- I had no intention of testifying about the back office operations of a hedge fund 'cause I   10:30:13 don't know nothing about it.

Q. Are you aware of instances in which judges have disagreed with or criticized opinions that you offered?

A. I don't have any in mind.            10:30:25

Page 56

Q. So you're not aware of any?

MR. SAHAM: Objection to form. Calls for speculation.

THE WITNESS: I don't have a recollection of that happening.                    10:30:43

BY MR. TOAL:

Q. Did you do anything to prepare for today's deposition?

A. I reread Exhibits 1 and 2. And I looked at the underlying documents that are referenced in    10:30:57 Exhibits 1 and 2.

Q. Did you do anything else?

A. I had discussions with Matt Lombardi and Nick Georgouses, and I had discussions with counsel.

Q. When did you have discussions with       10:31:19 counsel?

A. In connection with my deposition, I met with counsel last Friday by Zoom for about two and a half hours. And I met with counsel yesterday from 9:00 to about 2:30.                    10:31:45

Q. Who are Matt Lombardi and Nick Georgouses?

A. Matt's a partner in Hemming Morse, and Nick is a manager.

Q. Okay. Other than -- other than what you've described, did you do anything else to      10:32:03

Page 57

prepare for this deposition?

A. No.

Q. You're being compensated for your time on this case at a rate of $920 an hour; correct?

A. Yes.                    10:32:17

Q. Do you receive any other compensation in connection with your work or the work of your firm on this case?

A. Yeah, the firm bills $920 an hour for my work. I work -- I'm a partner in the firm. My      10:32:33 compensation with the firm is -- is not contingent upon what -- I have a -- a compensation arrangement with the firm, and it's not related to this case.

Q. And how many people at your firm have been working with you on this matter?            10:33:02

A. I think we have, as of last Saturday, about -- about 1,700 hours, and Mr. Lombardi has about 500. I have about 450. Nick has about 400. And there's a variety of associates who have done -- done work. But the principal folks are myself,      10:33:49 Mr. Lombardi and Georgouses.

Q. And how's your -- how are your reports drafted?

A. I -- I characterize them as a -- as a bit differently.                    10:34:16

15 (Pages 54 - 57)

Page 58

Exhibit 1, we understood the assignment, and then outlined what the report would look like, and then flushed out the report in its various sections.

I worked with Mr. Lombardi. He -- he 10:34:55 focused on the Kearl issues. Mr. Georgouses focused on XTO, but Mr. Lombardi also helped with that. And we worked closely together to flush out the outline and prepare the report.

With respect to Exhibit 2, I reviewed 10:35:26 Mr. Abington's report. I prepared a number of points that I wanted to reply to, identified those items.

And then Mr. Lombardi and I flushed out those that related to Kearl, and Mr. Georgouses and 10:36:00 I did the same with respect to XTO. And we all worked together to finalize it. It was -- we had a fairly short fuse over the holidays.

There were also some, kind of, general comments in the reply report, for example, the 10:36:33 discussions of Mr. Abington's reliance on PwC, Mr. Abington's reliance, to some extent, on judgment. I -- I did much of that portion of the reply report.

Q. Did -- did somebody prepare drafts of 10:37:02

Page 59

those reports for your review?

A. Well, it was both in Word, and there was the building of the Word file over the course of time. So it would change every time somebody opened the file and change the wording of the -- of the 10:37:28 report as it was being finalized or prepared.

Q. Who was the person who was typing in the words?

A. I typed words. Mr. Lombardi typed words. Mr. Georgouses typed words. In some instances, it 10:37:54 was over a Zoom, and we all corrob- -- corroborated on particular paragraphs in real time.

Q. How much has your firm been compensated in connection with this engagement?

A. I think our billings to date is about 10:38:24 $860,000.

Q. So let me ask you to take a look at Exhibit 1, which is your opening report. If you can turn to page 15.

So you see -- see in Paragraph 36, you're 10:38:51 discussing -- discussing oil and gas reserves. And you say, "They are considered a 'critical component' of an energy company's financial reporting disclosure requirements, demonstrated in part, by each of the following." 10:39:19

Page 60

And then Sub A says, "Proved reserves are used to determine the fair value of oil and gas properties."

Do you see that?

A. I do. 10:39:28

Q. And as support for that statement, you cite to the 8th edition of the Petroleum Accounting textbook; correct?

A. I do.

MR. TOAL: So I'm going to mark an excerpt 10:39:53 from the Petroleum Accounting textbook, which we'll mark as Regan Exhibit 6.

(Regan Deposition Exhibit 6 was marked for identification.)

BY MR. TOAL: 10:40:27

Q. So the particular page you reference is page 268; correct?

A. Correct.

Q. All right.

So if you take a look at Regan Exhibit 6, 10:40:34 page 268, you see the second paragraph says, "Proved reserves are a critical component of an E&P company's financial reporting disclosure requirements as demonstrated by the following." And then the last bullet point says, "Reserves are also 10:40:56

Page 61

used to determine the fair value of oil and gas properties in business combinations, as explained further in Chapter 32."

Correct?

A. Yes. 10:41:10

Q. So the Petroleum Accounting textbook actually says reserves are relevant to determining fair value of the oil and gas properties only in the context of business combinations; right?

MR. SAHAM: Objection to form. 10:41:25

THE WITNESS: No. I -- I looked at the entirety of the paragraph and certainly the lead into that bullet as, "Proved reserves are a critical component of an E&P company's financial reporting disclosure requirements as demonstrated by the 10:41:39 following."

And certainly under the first bullet, "Under successful efforts method accounting and exploratory well costs remain capitalized only if they result in finding proved reserves." [As read] 10:41:55

So that's a significant influence on the balance sheet.

I've also highlighted the third bullet, "Proved properties' net of capitalized costs are limited to certain computations of value based on 10:42:11

16 (Pages 58 - 61)

Page 62

reserves, including proved reserves, as discussed in Chapters 17 and 18." [As read]

And the fourth bullet, "Public companies must disclose certain supplemental unaudited information" --                    10:42:30

THE COURT REPORTER: I'm sorry, supplemental what?

THE WITNESS: "Unaudited information about proved reserved volumes." [As read]

So, for example, page 5 of the 2015 10(K)    10:42:38 where Exxon shows the quantities of proved reserves, that's an important part of the reporting requirements relating to proved reserves.

BY MR. TOAL:

Q. Is it your opinion, Mr. Regan, that    10:43:00 proved -- SEC proved reserves are used to determine the fair value of oil and gas properties?

A. An SEC determination of quantities of oil and gas that are characterized as proved reserves, they have an influence on -- on determination of    10:43:24 a -- of a company's value. I mean, it's not the only criteria or consideration, but they are important.

Q. Okay. I'm going to mark for you the FASB Topic 932 "Accounting Standards Update" dated    10:43:52

Page 63

January 2010, which we'll mark as Regan Exhibit 7.

(Regan Deposition Exhibit 7 was marked for identification.)

BY MR. TOAL:

Q. Do you recognize this document, Mr. Regan?    10:44:28

A. Yes.

Q. And do you recognize it as FASB's January 2010 "Amendment to Topic 932 of the FASB Accounting Standards Codification"? [As read]

A. Yes.                    10:44:46

Q. And does that make this authoritative accounting guidance?

A. It does.

Q. If you would turn to page 43 of this document.                    10:44:56

So do you see this page has the title "Background Information and Basis for Conclusions"?

A. Yes. So pages -- pages 5 through -- the pages that precede page 43 -- page 43 is a background. It's not authoritative guidance. It's    10:46:01 not part of the authoritative guidance portion of 932. It's designed to give the readers of 932 background as to the bases for information and conclusions in the authoritative portion of 932.

Q. Did you read this document in connection    10:46:27

Page 64

with your work on this engagement?

A. I've read this document in connection with this engagement and others.

Q. And did you read the entirety of the document?                    10:46:39

A. I have read the entirety of the document, yes.

Q. Okay. In connection with your work on this engagement, did you read the section entitled "Background Information and Basis for Conclusions"?    10:46:48

MR. SAHAM: Objection to form.

THE WITNESS: I don't recall whether I did that in connection with this engagement.

BY MR. TOAL:

Q. Okay. Do you see under BC1, it says, "The    10:46:57 following summarizes the Board's considerations in reaching the conclusions in this Update"?

A. Yes.

Q. Okay. And if you go over to page 45, so do you see under BC10, there's a reproduction of the    10:47:17 final rule?

A. Yes.

Q. Okay. And then it says in the indented part, "The objective of reserves estimation is to provide the public with comparable information about    10:47:34

Page 65

volumes, not fair value, of a company's reserves available to enable investors to compare the business pro" -- "prospects of different companies." [As read]

Do you see that language?                    10:47:49

A. I do.

Q. And then further down in that indented paragraph, about six lines from the bottom, it says, "these measures do not attempt to portray a reflection of their fair value."                    10:48:02

Do you see that?

A. Yes.

Q. And do you agree with those statements?

A. I think it's an accurate statement.

Q. Now, what does it mean when a company    10:48:13 de-books proved reserves?

A. It removes them from the presentation of proved reserves. So, for example, on page 5 of the 2015 10(K), when you move from 2015 to 2016, it de-booked, reserve will disappear from that    10:48:50 schedule.

Q. Is it still possible to produce oil or natural gas from reserves that have been de-booked as SEC proved reserves?

A. Yes.                    10:49:07

17 (Pages 62 - 65)

Page 66

Q.  And could you still generate cash flow from those assets even if they're de-booked from SEC proved reserves?

A.  Yes.

Q.  Does de-booking SEC proved reserves impact    10:49:17 a company's cash flow, if you're still producing from those assets?

A.  It -- it is not a -- there's not a direct relationship between a de-booking of proved reserves and cash flow from those reserves.    10:49:48

Q.  And does de-booking SEC proved reserves affect a company's profits earned from those assets?

A.  Not directly.

Q.  What are the SEC regulations that govern reporting of oil and gas proved reserves?    10:50:17

A.  The compilation of the SEC component of proved reserves are discussed in 932.  I think it's 932S, it ends in S99.

Q.  Let me show you a document entitled "SEC 17 CFR Parts 210, 211, 229, and 249," entitled    10:51:16 "MODERNIZATION OF OIL AND GAS REPORTING," which we'll mark as Regan Exhibit 8.

(Regan Deposition Exhibit 8 was marked for identification.)

BY MR. TOAL:    10:51:45

Page 67

Q.  So, Mr. Regan, do you recognize this as the SEC's release on modernization of oil and gas reporting issued in 2008?

A.  Yes.

Q.  And did you review this document in    10:51:53 connection with your work on this assignment?

A.  Yes.

Q.  And let me direct your attention to page 131 of this document.

A.  I'm there.    10:52:42

Q.  Okay.  Do you agree, Mr. Regan, that this section contains the text to the rules that govern estimation of SEC oil and gas proved reserves?

A.  Yes.

Q.  And so, for purposes of estimating proved    10:52:59 reserves for its Kearl asset, Exxon Mobil is required to estimate an SEC defined price for those reserves; correct?

A.  Correct.

Q.  And where in this set of rules is that    10:53:18 price defined?

MR. SAHAM:  Objection to form.

THE WITNESS:  Well, as I said earlier, the price is defined as the average of the amount realized on the first day of the month of each month    10:53:39

Page 68

in the calendar year in which the product is sold.

BY MR. TOAL:

Q.  And can you point me to where in this document the SEC price is defined?

MR. SAHAM:  Objection to form.  You want    10:54:00 him to read through the entire Exhibit 8, which is --

THE WITNESS:  2 --

MR. SAHAM:  -- 161 pages?

THE WITNESS:  It's on page 3 --    10:54:09

(Simultaneous speaking.)

THE COURT REPORTER:  I'm sorry, one second.  It's on page -- there's talking over.

THE WITNESS:  On page 3, in the "TABLE OF CONTENTS," it's identified as Section II-B, starting    10:54:20 with 1 through 4.

BY MR. TOAL:

Q.  Let me -- let me see if I can help you. If you turn to page 141.

A.  I've got it.    10:54:44

Q.  All right.

So at the top of page 140, do you see there's 22 in parentheses, and it says "Proved oil and gas reserves"?

A.  Yes.    10:55:16

Page 69

Q.  Okay.  So it says, "Proved oil and gas reserves are those quantities of oil and gas, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible - from a given date forward,    10:55:29 from known reservoirs, and under existing economic conditions, operating methods, and government regulations."

Do you see that language?

A.  Yes.    10:55:41

Q.  And then if you go to page 141, there's a Sub v, Roman -- Romanette v.  Do you see that?

A.  Yes.

Q.  And it says, "Existing economic conditions include prices and costs at which economic    10:55:58 producibility from a reservoir is to be determined. The price shall be the average price during the 12-month period prior to the ending date of the period covered by the report, determined as an unweighted arithmetic average of the    10:56:13 first-day-of-the-month price for each month within such period, unless prices are defined by contractual arrangements, excluding escalations based on future conditions."

Is -- is that the -- the language in the    10:56:28

18 (Pages 66 - 69)

Page 70

SEC regulations that prescribe how the SEC price is to be determined?

A. Yes.

Q. And that's sometimes referred to as the SEC price; correct?    10:56:43

A. Yes.

Q. And if you go to page 135, at the top of that page, there's a definition of "economically producible"; correct?

A. Yes.    10:57:05

Q. And it says, "The term economically producible, as it relates to a resource, means a resource which generates revenue that exceeds, or is reasonably expected to exceed, the costs of the operation. The value of the products that generate    10:57:18 revenue shall be determined at the terminal point of oil and gas producing activities as defined in paragraph (a)(16) of this section."

Correct?

A. Yes.    10:57:33

Q. So how does the concept of economically producible factor into whether an asset qualifies as an SEC proved reserve?

A. Well, as it -- you just read, it relates to a resource which generates revenue that exceeds    10:58:07

Page 71

or is reasonably expected to exceed the costs of the operation.

Q. So it doesn't have to be the case that it's currently economically producible if it's reasonably expected to be economically producible;    10:58:23 correct?

MR. SAHAM: Objection to form.

THE WITNESS: Well, when making the calculation of economic producibility, Exxon and other oil and gas companies and -- and also there's    10:59:05 further discussion of economic producibility and constraints as to how you change actual costs, if you can change actual costs, because of some expectation in the future. But how this is operationalized and how it was operationalized at    10:59:30 Exxon is to look at the costs which generate those revenues.

So in the instance of 2015, you've got revenues and prices that are as of the first of the month of each month within 2015. And it needs to    10:59:55 identify those costs of operations that relate to that revenue stream.

BY MR. TOAL:

Q. Where does the rule say that?

MR. SAHAM: And, Dan, we've been going    11:00:19

Page 72

about an hour, so whenever it's a good breaking point.

THE WITNESS: (Witness reviews.)

If you look at page 32 of my report, Paragraph 75, I -- in Paragraph B at the top, I'm    11:00:59 largely restating what we've been discussing.

C is a further discussion of the 12-month period prior to the ending date of the period covered by the report.

And in Paragraph 75, and also on the    11:01:48 following page [verbatim], 76, I presented En- -- Enron's -- or Exxon's, excuse me, operationalization of the calculation of proved reserves, which I think is a discussion of the calculation.

You'll notice there it's -- underneath    11:02:19 economically producible, it addresses existing economic conditions. And it indicates that "operating costs, production methods, recovery techniques, transportation and marketing arrangements, ownership and/or entitlement items and    11:02:36 regulatory requirements that are extant on the" -- "on the effective date of the estimate. An anticipated change in conditions must have reasonable certainty of occurrence." [As read]

I think the discussion of the -- of the    11:02:54

Page 73

SEC pricing rules, there's a further discussion on my Paragraph 76, a similar chart.

I further discuss it in Paragraph 77.

And I'm looking at GAAP ASC 932-360-25-15, which also addresses this issue.    11:03:39

BY MR. TOAL:

Q. So --

A. Also, the testimony of Mr. Rosenthal, as seen in Paragraph 78, where he stated you use your current costs -- your current actual cost.    11:03:53

I think that my understanding is that there's some vagueness as to cost of operation. And that's reflected on page 32 at the bottom of the chart, which it's -- indicates is "not defined by the SEC, but excludes depreciation, so assessed to    11:04:21 represent Direct Cash Operating Costs." [As read]

And when I see Exxon operationalizing the SEC definition, they look to -- and Mr. Rosenthal, the principal accounting officer of the company, he emphasizes that you look to the actual costs    11:04:52 associated with the realization of those selling prices that are included in the calculation.

Q. Well, what it says in the presentation that you excerpted in Paragraph 75 is that you look at existing economic conditions that are extant on    11:05:10

19 (Pages 70 - 73)

Page 74

the effective date of the estimate; right?

A. Yes. And it's op- -- that language is operationalized by Exxon as actual costs associated with the revenue calculation.

MR. SAHAM: Dan, is it good time for a break? We've been going for like an hour and 20.

MR. TOAL: Yes, almost.

BY MR. TOAL:

Q. Sir, are you offering an opinion based on the SEC regulations or how Exxon Mobil operationalized them?

A. My calculation is guided by 932 -- ASC 932, the SEC regulations, and the testimony and operationalization of that -- of -- of those documents as corrected by Exxon in 2016.

Q. Now, we looked at the language that talks about economically producible shall be determined at the terminal point of oil and gas producing activities; correct?

A. Correct.

Q. And do you agree that's an accurate statement?

A. I agree that it's -- that it's an accurate quote from -- from the document.

Q. And for an asset like Kearl, what was the

Page 75

terminal point --

MR. SAHAM: Objection to form.

BY MR. TOAL:

Q. -- of oil and gas producing activities?

A. Well, what Exxon determined is for bitumen, the operationalizing of this language was the point at which it realized the -- the revenue -- the sales and the revenue per unit.

So if it -- if it shipped product that was realized in the Gulf Coast or somewhere else in the United States, it determined what that revenue was and what the costs were to transport, to use diluent, and to consider quality factors, actual costs associated with that realized revenue.

Q. Okay.

MR. TOAL: Why don't we go off the record.

THE VIDEOGRAPHER: This is the end of Media Number 2. We are off the record at 11:08 a.m.

(Short recess taken.)

THE VIDEOGRAPHER: This is the beginning of Media Number 3. We are back on record at 11:26 a.m.

BY MR. TOAL:

Q. Mr. Regan, let me ask you to take a look at page 136 of Regan Exhibit 8. And there's a

Page 76

paragraph with the title "Instruction 1 to paragraph (a)(16)(i)."

Do you see that?

A. I do.

Q. And there it says, "The oil and gas production function shall be regarded as ending at a 'terminal point,' which is the outlet valve on the lease or field storage tank. If unusual physical or operational circumstances exist, it may be appropriate to regard the terminal point for the production function as:

"a. The first point at which oil, gas, or gas liquids, natural or synthetic, are delivered to a main pipeline, a common carrier, a refinery, or a marine terminal." [As read]

Do you see that language?

A. I do.

Q. So for an asset like Kearl, where would the outlet valve be for purposes of determining SEC proved reserves?

A. Well, I think you need to look at the transactions involving the realization which generates the selling price. And --

THE COURT REPORTER: Generates the what price?

Page 77

THE WITNESS: The selling price.

And in that instance you look at both a and b.

And in b you -- it indicates that you look to the natural resources delivered to a purchaser.

And if that purchaser -- when -- when you -- when you realize the sale to that purchaser, as Mr. Swiger indicated in his testimony that I cite on page 23, you look at the actual transportation costs.

It's further discussed on page 24.

So what -- what Exxon did in its determination of realization of price, it would be a mixture of a and b.

And in b, you need to consider the actual costs for -- of the diluent, of the quality adjustments, and the transportation that is involved.

And that's what Exxon did when they operationalized this paragraph.

BY MR. TOAL:

Q. So, Mr. Regan, b refers to "the case of natural resources that are intended to be upgraded into synthetic oil or gas" [as read]; correct?

A. Yes.

20 (Pages 74 - 77)

Page 78

Q. And do you know what synthetic oil is?

A. I'm not familiar with the -- the definition of synthetic oil.

Q. Okay. So you don't know if Kearl involved upgrading to synthetic oil; correct?    11:29:40

A. That's not something I looked into, but it -- in the determination of the selling price realization, what Exxon did was to look to the actual costs of delivering the product in order to realize that selling price.    11:30:07

And I assume that's an operationalization of subparagraph b on page 136.

Q. Do you know for any bitumen produced from Kearl what the first point was at which the bitumen was delivered to a main pipeline or common carrier?    11:30:24

A. That's not something I determined. I utilized what Exxon determined based on its business records.

Q. Well, do --

A. I think it --    11:30:46

Q. -- were Exxon Mobil's business records calculated on an SEC proved reserve basis?

A. Well, if you look at the testimony of the CFO, Mr. Swiger, his answer in the -- Paragraph 45 is "you have to understand, the transportation cost    11:31:05

Page 79

doesn't vary based on SEC or the actual basis. You use actual transportation costs." [As read]

Q. Actual transportation costs to the first point at which bitumen was delivered to a main pipeline or common carrier under the SEC rules; right?    11:31:23

MR. SAHAM: Objection to form.

THE WITNESS: No. I -- I think Exxon delivered Kearl product to railcars, pipelines, a -- a variety of -- of methods of delivering product in order to realize the selling price that was used in its SEC calculation.    11:31:44

BY MR. TOAL:

Q. Do you know for Kearl bitumen delivered in 2015 where the initial sale took place?    11:32:00

A. I think it --

MR. SAHAM: Objection to form.

THE WITNESS: -- it depends on the transaction. There are -- there were many transactions. Some were delivered -- or realized by delivering product to Edmonton, and some were realized by delivering to a number of other points in the United States.    11:32:13

BY MR. TOAL:

Q. Do you -- do you know if the product was    11:32:34

Page 80

sold before it was delivered into the United States?

A. I -- I -- I expect that some was, yeah, some product.

Q. Do you know as a matter of fact?

A. Well, I didn't go up and watch it happen,    11:32:48 and I haven't seen freight records or delivery records.

Q. So --

A. I'm -- I'm -- I'm looking at the documents which were cited in my report, which bear upon the    11:32:59 realization of the aver- -- of the average price within the SEC calculation.

Q. For purposes of your analysis, did you try to determine for sales that took place in 2015 where the initial sale was made?    11:33:24

A. My recollection is that there were a number of documents that are cited in my report which discuss the point at which purchasers of product which drove the purchase price occurred in 2015, as well as 2016.    11:33:55

And it varied. Some doc- -- some documents estimated it -- it ten- -- tended to be in percentages -- so what percentage of the sales were to purchasers in the United States, what percentage was -- that were delivered to Edmonton.    11:34:16

Page 81

Q. Do you know if those numbers were calculated based on where an initial sale took place as opposed to an ultimate sale to another party?

MR. SAHAM: Objection to form and foundation.    11:34:29

THE WITNESS: I looked at the characterization of the sales within the documents itself.

BY MR. TOAL:

Q. And beyond whatever's reflected in the    11:34:38 documents, you have no basis for knowing where the initial sale of product from Kearl took place in 2015; correct?

MR. SAHAM: Objection to form and foundation.    11:34:50

THE WITNESS: I rely on the documents and the testimony that I've cited.

BY MR. TOAL:

Q. And so your information about where an initial sale took place from Kearl of its bitumen in    11:35:01 2015 is based entirely on documents that you've referenced in your reports or testimony you've referenced in your reports; correct?

A. Yes. I have no -- I have no other resources to -- to rely on.    11:35:21

21 (Pages 78 - 81)

Page 82

THE COURT REPORTER: Your pen is making noise.

Thank you.

THE WITNESS: Oh, really? Hmm. Hmm.

BY MR. TOAL:    11:35:33

Q. And for purpose of your analysis on SEC proved reserves, you didn't make any determination of where the first point was at which oil, gas, or gas liquids, natural or synthetic, were delivered to a main pipeline, a common carrier, a refinery, or a    11:35:53 marine terminal; correct?

MR. SAHAM: Objection to form and foundation and misstates prior testimony.

THE WITNESS: I looked to Exxon documents which operationalized the SEC rules.    11:36:09

BY MR. TOAL:

Q. So did you make a determination somewhere of the first point at which oil, gas, or gas liquids were delivered to a main pipeline, common carrier, refinery, or marine terminal?    11:36:30

MR. SAHAM: Same objection.

THE WITNESS: That's not a determination that I made. I've made -- you know, my comments and my reports are based upon Exxon's operationalization on SEC pricing of how they realized that selling --    11:36:50

Page 83

the selling prices that they use in their documents.

BY MR. TOAL:

Q. So do the SEC regulations provide any further explanation or guidance about how companies are supposed to calculate the SEC price for its    11:37:11 assets when assessing proved reserves beyond what we've reviewed?

A. There -- there may have been others. I may have mentioned them in my report. I don't have that -- those in mind as we speak.    11:37:41

Q. So as you sit here today, you can't identify any other regulation or SEC guidance regarding how companies are supposed to calculate SEC price for proved reserve purposes; correct?

A. Well, you might remind me because I've --    11:37:59 I've seen a lot of documents that discuss SEC pricing over the last several years, and I -- I don't have them characterized in my head as to what specific guidance exists.

Q. So if you think of any others, you can let    11:38:29 me know.

But as you sit here today, you -- you can't think of any others beyond the ones we've just reviewed; correct?

A. Well, it -- you know, it -- it could well    11:38:40

Page 84

be that there are some -- there's been some iss- -- SEC guidance that was issued on this subject. It could be that it's referred to in my report. But I don't have it in mind as we speak.

Q. Do the SEC regulations allow companies,    11:39:00 when calculating proved reserves, to use realized sale prices beyond the terminal point of oil and gas producing activities?

A. Well, I think on Paragraph [verbatim] 136, the sentence preceding a and b states, "If unusual    11:39:48 physical or operational circumstances exist, it may be appropriate to regard the terminal point for the production function as:"

Q. So that's just how you defined the terminal point in that situation --    11:40:10

A. Right --

Q. -- correct?

A. -- which I think is relevant to your question.

And then, in particular, b touches on    11:40:17 circumstances which may be beyond the terminal point.

Q. For natural resources intended to be upgraded into synthetic oil or gas; right?

A. Right.    11:40:31

Page 85

Q. And you don't know if bitumen qualifies as natural resources intended to be upgraded into synthetic oil or gas; right?

A. That's -- that's a determination that I -- I don't make.    11:40:57

Q. So if you turn back to page 135 and the definition of "Economically producible," it talks about the "resource which generates revenue that exceeds, or is reasonably expected to exceed, the costs of operation [as read]; right?    11:41:26

A. Yes.

Q. So in calculating SEC proved reserves, you not only have to calculate an SEC price, you have to estimate the costs of operation; correct?

A. Yes.    11:41:42

Q. And do the SEC regulations define the costs of operations?

A. Well, as we -- as we talked about earlier, the testimony in the case indicates that actual costs are those which are -- are to be used in the    11:42:15 determination of the SEC price, particularly with respect to quality adjustments, transportation, and diluent.

Q. So let me -- let me stop you.

I want to focus you on the SEC    11:42:32

22 (Pages 82 - 85)

Page 86

regulations, so that's the context for my question.

Do the SEC regulations define the costs of operation?

A. If you look at Paragraph 75, which is the -- an Enron -- or an -- an Exxon summary of the "SEC Proved Reserves Reporting Conditions," under "Costs of "Operations" [as read], it says it's "Not defined by the SEC, but excludes depreciation, so assessed to represent Direct Cash Operating Costs."

Q. So do you agree --

A. And --

(Interruption in the room.)

THE COURT REPORTER: I'm sorry, I hear whispering in the microphones.

BY MR. TOAL:

Q. So do you agree, Mr. Regan, that operating costs are not defined by the SEC?

A. The statement that is made in -- at the end of the highlighted portion of Ex- -- of Paragraph 75, I agree with that where it says "Not defined by the SEC," and then there's a -- some qualification.

Q. And -- so it goes on to say --

A. And -- and then --

Q. -- "but excludes depreciation." [As read]

Page 87

Do you agree that the costs of operations for purposes of calculating SEC proved reserves should exclude depreciation?

A. I agree with the first portion of the sentence where it says "Not defined by the SEC."

Q. Do you agree --

A. Where it says "but excludes depreciation," as I said in my report, I have not analyzed other -- the other components of the costs of operation.

I've looked at revenue and the costs -- the actual costs incurred to realize that revenue as identified by Exxon.

Q. So would you include in an SEC proved reserve test capital expenditures?

A. No, those are not defined as operating costs.

And if you look at page -- Paragraph 1- -- Paragraph 76 under "Operating Costs," it says, "The average production cost, not including ad valorem and severance taxes, per unit of production should be computed using production costs disclosed pursuant to FASB," which is the -- in -- in ASC 932, there's a discussion of production costs and, to some extent, an identification of what those are.

Q. Are -- are you aware of any SEC rule that

Page 88

says that when determining operating costs for purposes of SEC proved reserves, you should make that determination pursuant to FASB?

A. No.

Q. And you're aware that that particular definition was changed in subsequent versions of this presentation; correct?

A. When you say "this presentation," you're talking about --

Q. The --

A. -- the presentations in -- cited in my Paragraph 75 and 76?

Q. That's correct.

So you're referencing language in the excerpt that you have from an Exxon Mobil presentation in Paragraph 76; right?

A. Yes.

Q. And the version that's excerpted in your Paragraph 75 is -- is the most recent and final version of that presentation; right?

A. Yes.

MR. TOAL: I'm going to mark as Regan Exhibit 9 a copy of Exxon Mobil's 10(K) for 2015.

(Regan Deposition Exhibit 9 was marked for identification.)

Page 89

BY MR. TOAL:

Q. Do you recognize this as Exxon Mobil's 10(K) for the year 2015?

A. Yes.

Q. And you reviewed this document in connection with your work on this case; correct?

A. Yes.

Q. If you could turn to page 6 of the 10(K), there's a heading "Qualifications of Reserves Technical Oversight Group and Internal Controls over Proved Reserves."

Okay. So in this paragraph it says, "Exxon Mobil has a dedicated Global Reserves group that provides technical oversight and is separate from the operating organization."

Do you see that language?

A. Yes.

Q. Do you have any reason to dispute the accuracy of that sentence?

A. No.

Q. It goes on to say, "Primary responsibilities of this group," the global reserves group, "include oversight of the reserves estimation process for compliance with SEC rules and regulations, review of annual changes in reserves

23 (Pages 86 - 89)

**App. 357**

Page 90

estimates, and the reporting of Exxon Mobil's proved reserves." [As read]

Do you see that?

A. I do.

Q. Do you have any basis for disputing the accuracy of that sentence?

A. No.

Q. It then goes on to say, "In addition, the group provides training to personnel involved in the reserves estimation and reporting process within Exxon Mobil and its affiliates."

Do you see that language?

A. Yes.

Q. Do you have any basis for disputing the accuracy of that sentence?

A. No.

Q. And do you have an understanding that Imperial Oil is an Ex- -- was an Exxon Mobil affiliate as of 2015?

A. Yes.

Q. And what's your understanding of the relationship between Exxon Mobil and Imperial Oil?

A. It's described in a footnote to my report. Exxon has an ownership interest in Imperial Oil and a -- a variety of relationships.

Page 91

Q. And is it your understanding that Imperial Oil is a publicly traded company?

A. Yes.

Q. And do you understand that Imperial Oil had reporting obligations to its regulators?

A. Yes.

Q. As between -- well, what's your understanding of what company owned the Kearl asset?

A. I think Imperial Oil had some bitumen operations, but the a- -- the asset that we're talking about is the asset reported with -- within Exxon's 10(K); for example, on page 5, the bitumen asset that is seen on page 5 and presented in terms of millions of barrels and on page 9 where it's discussing the bitumen.

Q. So my question's a little bit different. I'm asking who owned the Kearl asset itself.

A. Well, the Kearl asset that is being addressed at -- in this dispute is owned by Exxon.

Q. Your understanding is it's not owned by Imperial?

MR. SAHAM: Objection to form. Calls for a legal conclusion.

THE WITNESS: It's the Kearl asset that is presented on page 5, page 9, and as well as within

Page 92

footnotes to the financial statements.

Now, to the extent that some of that is owned by another entity, it might be a subsidiary of Exxon, or it might be in part owned by Imperial. I -- that's not a distinction that I'm making. I'm looking to what was reported in the 10(K).

BY MR. TOAL:

Q. So fair to say you don't know what corporate entity owns the Kearl asset?

A. No. I --

MR. SAHAM: Objection to the form.

THE WITNESS: -- I have an expectation that it's probably owned by one of the many subsidiaries of -- of Exxon, but it's not something that mattered to my report.

BY MR. TOAL:

Q. And what -- what entity operated the Kearl asset?

A. I've not made that determination.

Q. So you don't know if it was Imperial or some Exxon Mobil subsidiary?

A. That's not a determination that I made.

Q. So you don't know one way or the other?

A. That wasn't relevant to my work.

Page 93

Q. And ju- -- I understand you're saying it wasn't relevant, but you don't know who operated the Kearl asset; correct?

A. It's not something that I determined.

Yeah, from a -- that's a -- also a legal opinion. I mean, given the extent of Exxon's ownership of Imperial, given the extent of its ownership of its various subsidiaries, you know, it's a legal question of who owned Kearl.

Q. So my question right now is, who operated Kearl? Do you know that?

MR. SAHAM: Objection to form.

THE WITNESS: It's not something that I determined.

BY MR. TOAL:

Q. And do you know which company was responsible for estimating proved reserves at Kearl?

MR. SAHAM: Objection to form. Calls for a legal conclusion. Form. Foundation.

THE WITNESS: Well, again, I think that's probably a legal question, but I -- I would expect that it's Exxon.

BY MR. TOAL:

Q. But you don't know; correct?

A. Well, from a -- from a lay perspective,

24 (Pages 90 - 93)

App. 358

Page 94

I'm not a lawyer. You know, there -- the Kearl operations are incorporated within Exxon's 10(K). So Exxon is operating Kearl, Exxon or one of its enterprises, which it either owns a hundred percent of or a -- a majority of ownership in.          11:55:38

Q. So the -- the 10(K) includes consolidated results; correct?

A. Right. Yeah. It's under the -- under the GAAP rules of who -- who should be consolidated and then as discussed in Note 1 of the financial          11:56:00 statements.

Q. And -- but my question is, do you know which entity was responsible for estimating proved reserves at Kearl?

MR. SAHAM: Objection. Asked and          11:56:11 answered.

THE WITNESS: I -- that's not a determination that I made. It may be several entities.

BY MR. TOAL:          11:56:27

Q. Okay. So the -- this paragraph in the 10(K) at page 6 continues saying, "The Manager of the Global Reserves group has more than 30 years of experience in reservoir engineering and reserves assessment and has a degree in Engineering. He is          11:56:41

Page 95

an active member of the Society of Petroleum Engineers and previously served on the SPE Oil and Gas Reserves Committee. The group is staffed with individuals that have an average of more than 20 years of technical experience in the petroleum          11:56:55 industry, including expertise in the classification and categorization of reserves under the SEC guidelines. This group includes individuals who hold advanced degrees in either Engineering or Geology. Several members of the group hold          11:57:10 professional registrations in their field of expertise, and a member currently sits on the SPE Oil and Gas Reserves Committee." [As read]

Do you have any basis for disputing the accuracy of anything in that paragraph that we just          11:57:28 read?

A. No.

Q. Did you -- have you offered any opinions in this case about the qualifications of Exxon Mobil's reserves technical oversight group?          11:57:38

A. No. There's no discussion of that in my report.

Q. Have you offered any opinions in this case about Exxon Mobil's internal controls over proved reserves?          11:57:48

Page 96

A. No, I'm -- that's not addressed.

Q. I'll ask you to take a look at your Exhibit 1, which is your opening report. And if you could go to page 39.

A. I'm there.          11:58:35

Q. Okay. So in the middle of Paragraph 93, you say, "The Kearl expansion project was completed and started up in 2015, adding additional capacity of 110 thousand barrels of bitumen per day. Exxon also significantly increased Kearl bitumen sales to          11:58:52 markets in the United States during 2015." [As written]

Do you see that?

A. Yes.

Q. And what's your basis for saying that          11:59:00 "Exxon significantly increased Kearl bitumen sales to markets in the United States during 2015"?

A. (Witness reviews.)

The first document that's referred to is a document showing U.S. crude sales volume. It          12:00:03 identifies the delivery of Kearl product in 2015 by -- by entity, by Exxon entity.

And then in the -- in the second document that's referenced...

(Witness reviews.)          12:01:44

Page 97

If -- if -- if you look, I -- I've referenced to 97 -- Paragraph 97, where there's a document indicating that at least 15 percent of all bitumen sales were made through the U.S. market during 2015.          12:02:40

Then, as indicated by Exxon's global reserves manager, William Strawbridge, acknowledged that bitumen sales to the United States had grown to 28 percent of such sales.

Q. So -- so let me just focus you on the year          12:03:02 2015. When in 2015 do you believe that Exxon significantly increased Kearl bitumen sales to markets in the United States?

A. If you look at the top of page 43, it indicates that they started selling Kearl in August          12:03:31 of 2014.

Paragraph 98, "Other evidence suggests that: approximately" --

THE COURT REPORTER: I'm sorry, other evidence?          12:03:54

THE WITNESS: "Other evidence suggests that: (i) approximately 30 percent" -- "34 percent of all Kearl Bitumen produced was sold into U.S. markets during 2015." [As read] [As written]

BY MR. TOAL:          12:04:09

25 (Pages 94 - 97)

Page 98

Q.  So, Mr. Regan, I don't think you're answering my question.  So let me try to focus you on the question I'm asking.

You have a statement here saying, "Exxon significantly increased Kearl bitumen to markets in the U.S. during 2015."

When in 2015 do you think that significant increase happened?

A.  Well, again, if you look at Paragraph 98, you know, there's a reference to 34 percent and a statement in -- after two little i, "after the middle of 2015, greater than 50 percent of Kearl volumes were being sent to" -- "to the United States."  [As read]

Q.  So what -- precisely when in 2015 do you think this significant increase happened?

MR. SAHAM:  Objection.  Asked and answered.

THE WITNESS:  If you look at Paragraph -- Footnote 133, on par- -- page 43, the Prestipino testimony indicates that post KEP startup, mid 2015, there was a change in the underlying market recipients for Kearl bitumen greater than 50 percent delivered to the U.S."  [As read]

BY MR. TOAL:

Page 99

Q.  So -- so when was it post KEP startup that you believe there's a significant increase in sales to the U.S.?

A.  It -- it appears from the variety of documents that I've just discussed that there was an increasing level of sales to the bitumen product to the United States during 2015.  I also have a reference to Edmonton market becoming saturated; and therefore, the -- Exxon had to look to purchasers in the United States during 2015.

Q.  So -- so when did the Kearl expansion project go online?

A.  I think it was -- if you look at Footnote 133, it's -- second line near the end of that line, it says, "Post KEP startup, mid 2015."  [As read]  I think it was somewhere in the middle of 2015.  That -- that's the -- the expansion.

Q.  Do you know what the production capacity of the Kearl expansion project was?

A.  It's in my report.  I think that brought capacity up to something in the area of 220 -- it -- it doubled capacity.

Q.  Do you know how long it took the Kearl expansion project to achieve its production capacity?

Page 100

A.  I've got tables in my report, which track -- or documents that it refers to, that track its production during 2015.

Q.  So as you sit here today, do you know how long it took it for it to achieve its production capacity?

MR. SAHAM:  Objection to form.  Asked and answered.

THE WITNESS:  What was relevant to me is that, as you can see in Footnote 133, there's a -- a -- many references to "greater than 50 percent of Kearl product were shipped and delivered to purchasers in the United States."  I -- I wasn't focusing on how much of its production relative to its capacity did it achieve in any one -- any of the months.

BY MR. TOAL:

Q.  Just to --

A.  I'm looking at, well, was it a significant percentage of product sold to purchasers in the United States?  And certainly during 2015, the purchasers of Kearl product in 2015 was growing and became substantial.

Q.  And just to focus on my question, do you know how long it took the Kearl expansion project to

Page 101

achieve its production capacity?

A.  No.  That's not something I relied on.

Q.  Do you know for any sales into the U.S. from Kearl in 2015, how many of those were intercompany sales?

A.  No.  That's not a determination that I've seen made.

Q.  Let me ask you to take a look at page 39 of your report, and let's have a look at Paragraph 94.

So you say here, "Exxon repeatedly acknowledged in its internal communications that Kearl's SEC pricing during 2015 was based off price reductions for quality, diluent, and transportation costs limited to the Edmonton/Alberta market.  The following final $28.70 SEC price per barrel of Kearl bitumen references only the local Alberta market (red boxes/average price and related text added)."  [As read]

Do you see that language?

A.  I do.

Q.  And one of the documents that you cite as support in Footnote 125 is EMC_RAMIREZ 000005478; right?

A.  Yes.

26 (Pages 98 - 101)

Page 102

MR. TOAL: Let me mark as Regan Exhibit 9 -- 10? 10, that document.

(Regan Deposition Exhibit 10 was marked for identification.)

BY MR. TOAL:                    12:10:50

Q. So, Mr. Regan, do you recognize this document?

MR. SAHAM: Exhibit 10 doesn't have any Bates number on it. I mean, are you saying that that's '5478?                    12:10:58

MR. TOAL: Yeah, this was produced as a native. So this is --

MR. SAHAM: But is it '5478, is what I'm asking. Because he's citing '5478 in his report, and this doesn't -- I mean...                    12:11:09

MR. TOAL: This is '5478.

MR. SAHAM: Okay. This a native version of '5478.

Right.

And this is not the complete document.                    12:11:24

MR. TOAL: This has excerpts from '5478. It's an Excel spreadsheet.

THE WITNESS: Okay.

BY MR. TOAL:

Q. All right.                    12:11:42

Page 103

So do you recognize this as the document that you referenced in support of Paragraph 94?

MR. SAHAM: Objection to form. Foundation.

THE WITNESS: It appears to be, yes.                    12:12:13

BY MR. TOAL:

Q. Okay. And do you see it starts in 2009, and this has the Kearl blend price for each month in 2009?

A. Yes.                    12:12:24

Q. And then if you flip through, it's got similar charts for 2010 and the following years?

A. The last page is 2015.

Q. Okay. And so, this document reflects that the pricing methodology that was used to determine    12:12:47 the SEC price for Kearl in 2015 was the same methodology that had been used every year going back to 2009; right?

A. Well, I -- I know that some of the rows change as you go by year. But in each instance, it    12:13:23 starts with the NYMEX U.S. dollars per barrel, and it has quality, differentials, exchange. The diluent costs seem to be different. It changes as you move over the course of the time.

But they certainly use WTI NYMEX U.S.                    12:14:08

Page 104

dollars per barrel, and then it adjusts for quality differential in diluent and transportation.

Q. Mr. Regan, do you have an understanding that Exxon Mobil used the same pricing methodology for Kearl every year from 2009 through 2015?        12:14:37

MR. SAHAM: Objection. Form. Foundation.

THE WITNESS: Well, certainly, it -- it appears that in a -- in a quick analysis of these pages, that the format and methodology, which is to take NYMEX, consider quality differential, diluent    12:15:11 cost, and transportation, that was -- that's -- that's what's happening on these schedules.

BY MR. TOAL:

Q. And do you have an understanding that Imperial developed a pricing model for Kearl?        12:15:27

MR. SAHAM: Objection to form.

BY MR. TOAL:

Q. For purposes of calculating the SEC price?

A. Yes.

Q. Okay. Do you know when that pricing model    12:15:38 was developed?

A. I don't think so.

Q. And you're not -- you don't have any basis to believe that Exxon Mobil changed its pricing model between 2014 and 2015; do you?                    12:15:58

Page 105

A. Well, at some point, my recollection is, Imperial changed its pricing model and the cost of transportation, diluent, and quality began to incorporate the realization of product sales to the United States.                    12:16:28

Q. And that change was for the year 2016; correct?

A. The change was made in 2016. I think there was a discussion and an analysis of the need to change in 2015.                    12:16:40

Q. Do you have any basis to believe that the pricing model used to calculate SEC prices for Kearl changed between 2014 and 2015?

A. I don't think I did.

Q. And do you have any basis for believing    12:16:58 that the pricing model used for SEC price at Kearl changed any time between 2009 and 2015?

A. I don't think it changed as reported in the 10(K), for example.

Q. Do you have any basis for believing that    12:17:20 any aspect of the pricing model for calculating bitumen prices at Kearl changed between 2009 and 2015?

A. Well, certainly in 2015, people who were involved in determining the pricing model, either at    12:17:38

27 (Pages 102 - 105)

Page 106

Imperial or Exxon, were considering the need for a change. And that consideration, as I recall, began sometime in 2015.

Q. Did the model that was used to calculate the SEC price change in 2015?    12:17:58

A. No. And that's been made clear in my report.

Q. That model, do you have any basis for believing that pricing model changed between 2009 and 2015?    12:18:17

A. No. And it's because my expectation is that the -- the realization of -- of the price was consistently shipments to Edmonton, and it wasn't until 2015 that there began to be substantial product where the realization was through purchasers    12:18:46 in the United States.

Q. But in answer to my question, you don't have any basis for believing that pricing model for Kearl changed at any point during that period of 2009 to 2015; correct?    12:19:01

A. Not to determine the numbers that are included in the 10(K).

Q. And do you have an understanding that the pricing model at Kearl was the pricing model that had been used at Cold Lake to determine bitumen    12:19:16

Page 107

prices for SEC proved reserve purposes?

A. As I sit here, I don't have a recollection that I -- I have the pricing model at Kearl -- at Cold Lake. I may have documents that show that pricing model. Because that's -- oftentimes the    12:19:43 document has the pricing model at Kearl on one page and on Cold Lake another page.

Q. So do you know whether the -- do you know how the pricing model at Kearl was developed?

A. I need to have my recollection refreshed    12:20:37 to see the calculation at Cold Lake. Cold Lake has not been a focus of my report.

Q. Okay. Let me show you a document that we'll mark as Regan Exhibit 11.

(Regan Deposition Exhibit 11 was marked    12:20:56 for identification.)

BY MR. TOAL:

Q. So this is an e-mail, the most recent e-mail is from Bill Strawbridge to Beth Casteel dated October 21, 2015.    12:21:10

Mr. Regan, my question is whether you recognize this as a document that you reviewed in connection with your reply report?

A. I believe I've cited this document in my report.    12:22:03

Page 108

Q. Okay. And you see on the second page, there's an e-mail from Beth Casteel to Bill Strawbridge dated October 21st, 2015, at 7:44 a.m.?

A. Yes, at the bottom of the second page.

Q. Right.    12:22:27

And the first bullet point there in Ms. Casteel's e-mail says, "SEC rules call for valuing reserves at the plant gate, i.e. any profit or loss downstream of the gate excluded from the positive cash flow test."    12:22:41

You see that language?

A. I do.

Q. And do you agree with that understanding of what the SEC rules call for when valuing reserves?    12:22:51

A. Well, that language is taken from a portion of the SEC rules.

Q. So do you agree that's an accurate understanding of what the SEC rules call for when valuing reserves?    12:23:06

A. Well, I think it's incomplete.

Q. And what -- what part do you think is --

A. Well, it --

(Simultaneous speaking.)

THE COURT REPORTER: I'm sorry, one    12:23:18

Page 109

second.

THE WITNESS: -- it doesn't quite --

THE COURT REPORTER: One second. I didn't get the full question.

BY MR. TOAL:    12:23:19

Q. So what part do you think is incomplete? What's missing?

A. The discussion in Paragraph B, on page -- I think it was 136.

Q. Related to synthetic oil?    12:23:33

A. Yes.

Q. Do you agree that under the SEC rules, you're required to exclude any profit or loss downstream of the gate under the positive cash flow test?    12:23:46

MR. SAHAM: Ob- -- objection to form.

THE WITNESS: I'm not sure what she's referring to here. In the -- in the operationalization of the price of product sold by Kearl in the United States, what Exxon is using is    12:24:29 the amount it realized from the purchaser, which is consistent with their calculation.

And if there's any realization subsequent to the purchaser, that would be excluded from the calculation.    12:24:49

28 (Pages 106 - 109)

Page 110

BY MR. TOAL:

Q.  And so, if Imperial sold bitumen to Exxon Mobil Oil Corporation at Edmonton for a certain price, and Exxon Mobil Oil Corporation subsequently sold that at a 20 percent premium, do the SEC rules require you to use the price obtained at Edmonton or the eventual sale from Exxon Mobil Oil Corporation?

MR. SAHAM:  Objection.  Form.  Foundation.  Incomplete hypothetical.

THE WITNESS:  What I've used in my calculation is the methodology and the calculations which Exxon made of the amount of money that it realized on the sale of bitumen, whether it be in Canada or in the United States.

And in Exxon's calculation of the amount of the SEC price, was what it realized from the purchaser of those products.

BY MR. TOAL:

Q.  So my question is about what the SEC rules require.

A.  Well, I -- I'm accepting that Exxon has interpreted the underlying transaction and identified the actual am- -- amount realized, less the actual cost of transportation, diluent, and quality factors, which resulted from the sale of its

Page 111

product, whether it be in Canada or in the United States.

Q.  So I -- I'm not asking about your view of what Exxon's interpretation is.  I'm asking about what the SEC rules require in that situation.

Are you able to answer that question?

MR. SAHAM:  Objection.  Form.  Foundation.

THE WITNESS:  I'm --

MR. SAHAM:  Misstates prior testimony.  Argumentative.

THE WITNESS:  What I have done in my report and in my analysis is to look at determinations that Exxon made of the real- -- the realization that it received and the determinations that it made of its realization net of cost of diluent, trans- -- actual cost of diluent, transportation and quality differentials.

I haven't dug into how Exxon interpreted the various complexities of the SEC pricing.  I'm looking at how they operationalized the SEC pricing once they considered that there were sales in the United States and that those sales constituted a meaningful amount.

BY MR. TOAL:

Q.  I'll move to strike as nonresponsive.

Page 112

My question, Mr. Regan, is not about Exxon Mobil's interpretation.  It's about your understanding of the SEC rules in that situation.

Do the SEC rules require that you use the price obtained from the sale in Edmonton or the subsequent sale by Exxon Mobil Oil Corporation at a 20 percent premium?

MR. SAHAM:  Objection.  Form.  Foundation.

THE WITNESS:  That's not a determination that I made in the preparation of my reports.  My reports clearly state that I'm correcting for the shortfalls in the 2015 calculation, and the correction is to adopt the operationalization of this -- this complex calculation, taking the documents and the calculations that Exxon used to correct for the shortfall in its 2015 calculations.

BY MR. TOAL:

Q.  Do you agree that the SEC regulations don't permit companies to take into account profit or loss downstream of prices obtained at the gate of the facility?

A.  That's a -- a refinement that I've not made.  I -- my calculations in my reports are based upon Exxon's correction of its shortfall in the calculations that it made, which were incorporated

Page 113

in the 2015 10(K).

Q.  So you were asked to --

A.  And -- and I -- I assumed that Exxon's corrections was an appropriate -- appropriate operationalization of the SEC pricing rules.

Q.  So you haven't been asked to express an opinion on what the SEC rules themselves require with regard to SEC pricing; correct?

A.  Well, there's some elements that I've included in my report that -- for example, you take the amount realized on the first day of each month, and you take an unweighted average to get an average price that you identify actual costs associated with that revenue.

But in terms of the complexities associated with determining the amount realized, that's something I've relied on Exxon to have provided me in their own documents and calculations.

Q.  And you weren't asked to express an opinion on what price you use in the situation we described; correct?

A.  Correct.

MR. SAHAM:  Dan, if you're moving on to something else, is it a good time for a break; do you think?

29 (Pages 110 - 113)

Page 114

MR. TOAL: In just a moment.

BY MR. TOAL:

Q. All right.

If you look at the third page of this e-mail -- do you understand, by the way, the bullet points in this e-mail we've been reading from to be Ms. Casteel's comments, and then Mr. Strawbridge above that says, "Beth, comments below"?

So do you understand this to be Mr. Strawbridge responding to points that Ms. Casteel raised to the bullet points?

MR. SAHAM: Objection. Form. Foundation. Calls for speculation.

THE WITNESS: How I operationalize this e-mail, where he says, "Beth, comments below," when I go below, Ms. Casteel makes bullet points. And I'm assuming Mr. Strawbridge, his comment starts with the word, "True - SEC pre-" -- pre -- "prescriptive on this." Is that my -- interpreting it the same way as you are?

BY MR. TOAL:

Q. That's the way I interpreted it, too.

A. Right.

Q. So that'd be Mr. Strawbridge responding that Ms. Casteel's summary is "True - the SEC

Page 115

prescriptive on this 'The value of the product that generates revenue shall be determined at the terminal point of oil and gas producing activities. The oil and gas production function shall be regarded as ending at a 'terminal point,' which is the out-" -- "'outlet valve on the lease or field storage tank.'" [As read]

You agree with that as a [verbatim] accurate summary of the SEC regulations; right?

A. Well, I think Mr. Strawbridge is quoting from a portion of the SEC regulations.

Q. And -- and you -- you agree with the substance of what he communicated there; right?

A. Well, I agree that he's quoting a document. You know, but -- you know, it -- what Exxon later determined, as you move in time, is that the -- the realized pricing of product shipped into the United States to purchasers in the United States in -- needed to include refinements, which it later made, and that the calc- -- the calculations that were made in 2015 were -- were -- had shortfalls.

And the shortfalls relate, in part, to -- to pricing the product only to products shipped to Edmonton -- assuming that all products were sold to Edmonton, when, in fact, much of it was shipped to

Page 116

purchasers in the United States. And that was a shortfall. And I don't think -- Mr. Strawbridge is not -- he's not focusing on that. And no matter -- he -- he was -- he was resistant to accepting that until later in 2016.

Q. So you actually don't know in 2015 what the first point of sale was for any of the bitumen that was shipped; do you?

MR. SAHAM: Objection. Form.

THE WITNESS: I have to rely on -- on -- on that based upon the Exxon documents that I've already reviewed. And I don't know that it -- it gives me that degree of specificity.

BY MR. TOAL:

Q. Now, do you see in the third to last paragraph in this e-mail on the third page, it says, "It is important to remember that this WTI-bitumen differential process was developed several decades back for Cold Lake (and similar for Syncrude), and has been used for Kearl pricing since 2008."

Do you see that?

A. I do see that.

Q. Do you have any basis to dispute the accuracy of that statement?

A. No. I think that's consistent with what

Page 117

I've seen.

Q. And does this refresh your recollection that the pricing model that was used at Kearl was adapted from the pricing model that had been used historically at Cold Lake?

MR. SAHAM: I'm sorry.

THE WITNESS: Yeah, I've read this before. So, yes.

MR. TOAL: All right.

We can go off the record.

THE VIDEOGRAPHER: This is the end of Media Number 3. We are off the record at 12:37 p.m.

(Lunch recess taken.)

THE VIDEOGRAPHER: This is the beginning of Media Number 4. We are back on record at 1:26 p.m.

BY MR. TOAL:

Q. Mr. Regan, I'm going to show you a document that is entitled "SEC Price," "How SEC Price is Documented and Distributed," as Bates Number EMC Ramirez '161 [as read]. And we'll mark this as Regan Exhibit 12.

(Regan Deposition Exhibit 12 was marked for identification.)

BY MR. TOAL:

30 (Pages 114 - 117)

Page 118

Q. Do you recognize this document, Mr. Regan?

A. Yeah, I expect that I've seen this, yes.

Q. Okay. And this is a document that Mr. Abington references in his report.

Did you review all of the materials that he relied upon?    13:27:45

A. Yes.

Q. And this is a document that describes the process for estimating SEC price for purposes of estimating proved reserves; right?    13:27:55

A. Yes.

Q. So if you turn to the page that ends in the Bates Number '162, there's a heading that says "Process."

Do you see that?    13:28:10

A. Yes.

Q. And it says here that "GRG coordinates the monthly price exercise with input from Refining & Supply, Crude Oil Supply & Marketing and Gas & Power Marketing. Every month the first-of-the-month prices are recorded and distributed to the Upstream SEC Price contacts. R&S provides the crude prices, GPM provides the natural gas and NGL prices, and COSM provides the bitumen prices. GRG posts the year-end SEC price. Affiliate teams apply a premium    13:28:23    13:28:45

Page 119

(or netback) to the marker price to determine a first-of-the-month field price; affiliate controllers then enter the field price into Dataflex." [As read]

Do you see that?    13:28:58

A. I do.

Q. So this document describes and lays out the process that's followed at Exxon Mobil for determining and documenting the SEC price; correct?

A. Yes.    13:29:12

Q. And there's a reference to "Affiliate teams applying a premium (or a netback) to the marker price." [As read]

Do you have an understanding that the affiliate team with respect to Kearl was Imperial?    13:29:25

A. That -- I believe that's the case, yes.

Q. Okay. So as to Kearl, Imperial would be the -- the affiliate that applied the premium or netback to the marker price to determine first-of-the-month field prices; correct?    13:29:48

A. Yes.

Q. And then Exxon Mobil's "Global reserves group would complete a quality check against the hydrocarbon price file and the Dataflex record used for the Year End SEC Reserves Evaluation" [as read];    13:30:11

Page 120

right?

A. That -- that's what it says, yes.

Q. Do you have any reason to dispute the accuracy of that?

A. No.    13:30:20

Q. And so the -- the model used for pricing at Kearl to determine the netbacks based off the marker price, that was developed by Imperial; correct?

A. I don't know that the document says it was developed by Imperial because it had been in place for quite a period of time, but I -- that's not what the document says.    13:30:52

Q. Well, it says that the affiliate does the -- the netback or premium and applies that to the marker price; right?    13:31:08

A. That's the process that's described in this document.

Q. Okay. So that -- that at least would have been done by Imperial; correct?    13:31:21

A. If they followed the process, yes.

Q. Okay. And you don't have any belief -- any reason to believe that with respect to Kearl, they didn't follow the process outlined here, do you?    13:31:34

Page 121

A. No.

Q. To your knowledge, did Imperial present Exxon Mobil's global reserves group with any alternative pricing models during calendar year 2015?    13:31:54

A. My recollection is that during 2015 there was a discussion of an al- -- alternative to consider the impact of sales into the United States and as that impacted the transportation costs and quality differentials and diluent because of the -- those costs were at -- those actual costs were different than what was in -- had previously been considered in the pricing.    13:32:18

But I don't -- I don't know who you'd characterize those people as and who were they representing in those conversations.    13:32:36

Q. So is it your understanding that a new and different pricing model was developed in 2016?

A. Well, there was a discussion of revi- -- revisions to the pricing model in 2015, starting certainly by the fall of 2015.    13:32:56

And then the pricing model was changed in 2016 to cure the shortfalls and the calculation that had previously been in place.

Q. Do you know how long it took to develop    13:33:21

31 (Pages 118 - 121)

Page 122

the alternative pricing model?

A. Well, the -- my recollection is that there were -- there were calculations of an alternative pricing model in 2015. I don't know how long it took for people to do that. 13:33:41

Q. Did you see that the alternative pricing model was not developed until March or April of 2016?

A. I think it depends on how you define "developed." 13:33:57

I mean, if you've got calculations and presentations in 2015, does that constitute developed?

Q. Did -- did you see any indication that there was a [verbatim] operational alternative 13:34:11 pricing model for Kearl in 2015?

A. What do you mean by "operational"?

Q. A -- a model that could have been used.

A. Well, there were presentations in 2015. So something was in place in 2015 that enabled those 13:34:31 determinations.

Q. Do you know what the pricing model was that was in use at Kearl?

A. When?

Q. Do you know in 2015 what the pricing model 13:34:48

Page 123

was?

A. There was a -- as we saw on what's Exhibit 10 to this deposition, if you characterize that as a representation of the pricing model, it was in place it appears to be from at least January 13:35:13 of 2009, and it was continued through 2015. This model was in existence.

Q. Do you know if there was any other alternative pricing model that was in existence in 2015? 13:35:34

A. My recollection is that there were calculations of -- let's see -- pricing, which considered realization to Exxon of shipments within the United States in 2015 and the impact of that that would have on actual transportation costs, 13:36:03 quality differentials, and diluent.

Now, whether you characterize that as a model or not, I think it depends on your definition of a model.

Q. Right. So let me show you a document 13:36:21 we'll mark as Regan Exhibit 13. It bears Bates Number EMC RAM NYAG '33426312 [as read].

(Regan Deposition Exhibit 13 was marked for identification.)

BY MR. TOAL: 13:36:52

Page 124

Q. So this is entitled "SEC Year-End Reserves Final Review," "Kearl," December 10th, 2015." [As read]

Is this a document you're familiar with?

A. I've seen a lot of documents that look 13:37:04 like this.

Q. And do you see there's an Imperial logo on the top right of this document?

A. Yes.

Q. And in this presentation, Imperial is 13:37:18 presenting Exxon Mobil's global reserves group with the results of their proved reserve determination for Kearl as of December 10th, 2015; correct?

A. Yes, that's the date of the document --

Q. Okay. 13:37:37

A. -- on page 1.

Q. Now, if you'd turn to, using the numbers in the bottom left, page 13.

A. I have it.

Q. Okay. So this page ends in the Bates 13:38:02 Number '324.

And do you see in this chart Imperial is estimating that the preliminary 2015 SEC final price for Kearl was $28.60?

A. Yes. I see the description, "2015 SEC 13:38:26

Page 125

Final $28.60" [as read], and it's pointing to the dashed line.

Q. Okay. And also presented on this chart is that Kearl's average unit lifting cost for 2015 was estimated to be $26.90 per barrel; correct? 13:38:53

A. What part of the chart is that --

MR. SAHAM: Yeah, where do you see that?

THE WITNESS: -- is that seen?

BY MR. TOAL:

Q. So do you see there's a -- there's a 13:39:12 number immediately below that dashed line that says "26.90" [as read]?

MR. SAHAM: See, I think on our copy maybe you can't see it.

THE WITNESS: It's not on my copy. 13:39:24

MR. SAHAM: Yeah, mine either.

MS. SHAMAILOVA: They're just in black and white. I can get the colored version.

MR. TOAL: Okay.

BY MR. TOAL: 13:39:35

Q. We'll come back to that. I'll -- I'll represent to you that there's a -- it's a -- it appears in color, and it says "26.90" [as read] immediately under the line.

MR. SAHAM: The -- the -- the solid line? 13:39:48

32 (Pages 122 - 125)

Page 126

MR. TOAL: Under the dashed line.

MR. SAHAM: Under the dashed line. Okay. That's part the we can't see.

BY MR. TOAL:

Q. All right.                                13:39:55

And do you see there's a -- there's a dot that says "$21.80" [as read]?

A. Yes.

Q. Okay. And you -- do you see that dot corresponds to what's identified as the "2015 2H ex    13:40:12 CAF"?

A. Yes.

Q. Okay. And so is your understanding those are the average unit lifting costs for Kearl for the second half of 2015?                         13:40:28

A. That's my understanding excluding costs above field.

Q. Okay.

THE COURT REPORTER: Costs of what? I'm sorry.                                      13:40:39

THE WITNESS: Costs above field.

BY MR. TOAL:

Q. Okay. And so both of those cost numbers, $26.90 and $21.80, would be less than the projected SEC price of $28.60; correct?             13:40:49

Page 127

A. Yes.

Q. So this was the information that Imperial was presenting to Exxon Mobil's global reserves group; right?

MR. SAHAM: Objection to form and            13:41:09 foundation. Calls for speculation.

THE WITNESS: It appears to be, yes.

BY MR. TOAL:

Q. All right.

And let me show you a document I'm going    13:41:28 to mark as Regan Exhibit 14. The cover is an e-mail from Vince Prestipino to Mark Taylor. It is dated October 26, 2015.

(Regan Deposition Exhibit 14 was marked for identification.)                       13:42:11

BY MR. TOAL:

Q. And there's an attachment to the document.

Do you -- do you recognize this document, Mr. Regan?

A. Well, it's similar to a lot of documents    13:42:16 that I recall reading.

Q. If you look at, in your opening report, Footnote 126, is this the document you're -- you're citing in Footnote 126?

A. Yes.                                      13:42:35

Page 128

Q. Okay.

A. Does this -- yes.

Okay.

Q. All right.

So if you flip the page, the second e-mail    13:42:47 is from Bill Strawbridge to Andrew Swiger and others sent on October 25th, 2015.

Do you see that?

A. Yes.

Q. And then we have a page with the last      13:43:01 three Bates numbers ending in '336 that shows the attendees at a Kearl reserves update.

Do you see that?

A. I do.

Q. So the attendees here included Rex        13:43:18 Tillerson, as indicated on this page; right?

A. Yes.

Q. And Mr. Swiger; correct?

A. Yes.

Q. And Mr. Swiger was the company's principal  13:43:27 financial officer at the time?

A. Correct.

Q. And Mr. Tillerson was the CEO and chairman of the company at the time?

A. Yes.                                      13:43:38

Page 129

Q. And David Rosenthal's identified as an attendee; correct?

A. Yes.

Q. And he was the company's principal accounting officer and controller at this time;    13:43:44 right?

A. Yes.

Q. So if you turn to the next page, this presents a slide deck; correct?

A. Yes.                                      13:44:02

Q. And if you go to page 5 of the slide deck, it's got a title of "Kearl CP15 Cash Flow Analysis."

Do you see that page?

A. I do.

Q. And do you have an understanding that the    13:44:23 SEC proved reserve test is a cash flow analysis?

A. Well, when you operationalize economically, you know, feasible, it's looking at the -- the cash flow from the items that are in the reserve --                                   13:44:52

Q. So do you --

A. -- yeah.

Q. -- do you agree the SEC proved reserve test is a cash flow test?

A. Yeah, when you look at it in -- as a        13:45:00

Veritext Legal Solutions

212-267-6868                  www.veritext.com                  516-608-2400

**App. 367**

Page 130

whole, yes.

Q. Okay. So this -- the graph on this slide states that Kearl's SEC price was expected to be around $29.20 per barrel; correct?

A. Yes.                    13:45:19

Q. And there's only an -- only an expected price here because this slide deck is dated October 26th, 2015, so you still wouldn't have SEC first-of-month numbers for November or December; right?                    13:45:35

A. Correct.

Q. Okay. And then the unit lifting cost on this slide for 2015 on average is estimated to be about $28.50 per barrel?

A. Correct.                    13:45:55

Q. And the unit lifting cost --

A. That's defining unit lifting cost as "Cash Opex plus Sustaining Capex minus costs above field." [As read] So it doesn't appear to include any costs above field.                    13:46:10

Q. Right.

So there's a [verbatim] indication at the top of the slide that this is "Cash Opex plus Sustaining Capex minus costs above field" [as read]; right?                    13:46:22

Page 131

A. Yes.

Q. Okay. So presented that way, the 2015 annual average unit lifting cost is estimated to be around $28.50; right?

MR. SAHAM: Objection to form.                    13:46:39

THE WITNESS: That's the way I perceive the label on the blue -- solid blue line.

BY MR. TOAL:

Q. Okay. And then -- and it --

A. For -- for year-end 2015.                    13:47:00

Q. So they're -- they're not at the year end, but this is an estimate --

A. Yes.

Q. -- based on where they are now; right?

A. Correct. That's the data point.                    13:47:13

Q. Okay. And do you see on the right of the slide it says "2015 Annual Average" and the third bullet point says "Outlook minus price approximately $1 per barrel greater than costs"? [As read]

A. I do see that.                    13:47:31

Q. Okay.

A. And I think that's the comparison of the $29.20 to the $28.05 [verbatim].

Q. Correct.

And then in this presentation, the unit                    13:47:50

Page 132

lifting costs for the second half of 2015 was projected to be around $23.40; right?

A. That's what the document shows.

Q. Okay. And on the right, under "2015 2H" [as read], the third bullet point says "Outlook                    13:48:18 price approximately $6 per barrel greater than costs"; right?

A. Yes.

Q. And it also presents projected costs for 2018 of approximately $25.50 per barrel; right?                    13:48:38

A. Yes.

Q. Okay. And it indicates under 2014 that is the forecast, right, on the chart?

A. Where do I see that?

Q. So if you go down to the -- the graph --                    13:49:09

A. Yes.

Q. -- it starts with "2014" --

A. Yeah, okay, underneath the X axis.

Q. Right.

A. And the years.                    13:49:22

Q. Okay.

A. And, actually, 2015 is also a forecast, I guess.

Q. All right.

So Mr. Tillerson, Mr. Swiger,                    13:49:30

Page 133

Mr. Rosenthal were all being advised at this point that the expectation was that the SEC price for proved reserves at Kearl in 2015 was expected to be higher than the projected unit lifting costs; right?

MR. SAHAM: Objection. Form. Foundation.  13:49:56 And misstates the document.

THE WITNESS: That this document, given the methodology to make these determinations, reflects that infor- -- that which you describe.

And you've got to -- you've got to assume    13:50:21 that the SE- -- that the price -- I don't know the assumption for the price of November and December, but we know it fell dramatically in January of 2016 and it continued to fall.

There's an ex- -- an exclusion of all CAF.  13:50:42

Yeah, based on -- based upon the facts and circumstances that are shown in this chart, that's what the data is reflecting.

BY MR. TOAL:

Q. Okay. So let me ask you to take a look at  13:51:02 Slide 8 of this presentation, which is entitled "Kearl Value Chain - Bitumen Sales Options."

So you see at the -- the top of this diagram there's a rectangle for Kearl; right?    13:51:25

34 (Pages 130 - 133)

Page 134

A. Yes.

Q. And then it's divided into Canada and U.S. --

A. Yes.

Q. -- correct?                    13:51:34

And under Canada, it says "Edmonton," "Contract market point."

Do you see that?

A. Yes.

Q. What does that mean?          13:51:45

A. My expectation is that that's where the realization of shipments to Edmonton, that's the market price at Edmonton.

Q. Okay. And then under U.S. there's another box, another rectangle, that says "Edmonton"; right?   13:52:09

A. Yes.

Q. And it says underneath "Edmonton," "Inter-company sale (EMOC)."

Do you see that?

A. Yes.                          13:52:23

Q. And "EMOC" stands for Exxon Mobil Oil Company; right?

A. Yes.

Q. And then underneath that rectangle it says, "US Sales," "EMOC to EM D/S on third-party     13:52:40

Page 135

sales." [As read]

Do you see that?

A. Yes.

Q. Do you know what "D/S" stands for?

A. I wouldn't speculate. I don't know that     13:52:51 I've seen a definition. But it may be direct sales or direct shipments.

Q. Do you think it could stand for "downstream"?

A. Sure.                         13:53:14

Q. Do you know if the U.S. Gulf Coast was the initial point of sale for any delivery of Kearl product in 2015?

A. I've seen documents that talk about sales to U.S. GC, which I assume was the U.S. Gulf Coast,     13:53:45 but I think they're in 2015.

Q. Do you know if that was the initial point of sale?

A. I've assumed that that's the point at which the sale price was realized.     13:54:08

Q. Do you know if -- if that's the place at which the sale price was realized?

A. No, I haven't drilled into Exxon's accounting records to see whether or not that's the case.                            13:54:26

Page 136

Q. What -- what product did Kearl sell?

A. Bitumen.

Q. Did it sell bitumen in its raw form?

A. I know it -- or I've seen -- the documents that I've seen indicate that it shipped product in     13:54:49 railcars, and it shipped product -- a lot of its product in pipeline.

Q. Can you ship bitumen in railcars or pipelines?

A. In order for it to flow within the     13:55:06 pipeline, you have to inject diluent into it so as to reduce its viscosity so that it will flow.

Q. And was that something referred to as a "Kearl blend"?

A. Yes. And it impacts the quality, and it     13:55:21 has an impact on realization.

Q. For any sales of the Kearl blend that were made to other Exxon Mobil affiliates, do you know if any of those transactions were priced at arm's length?                         13:55:44

A. That's not something that I know. I used the amount realized based upon Exxon's determin- -- determination of the realization per barrel equivalent.

Q. Let me show you a document we'll mark as     13:56:09

Page 137

Regan Exhibit --

THE COURT REPORTER: 15.

MS. SHAMAILOVA: 15.

BY MR. TOAL:

Q. -- 15.                        13:56:26

So this is entitled "2015 Proved Reserves Changes," Chairman's Review," "January 25, 2016." [As read]

(Regan Deposition Exhibit 15 was marked for identification.)                    13:57:11

BY MR. TOAL:

Q. Do you recognize this document, Mr. Regan?

A. Yeah, I -- I expect that I've seen this document.

Do you know if it's referred to in my     13:57:49 report?

Q. I believe it's referred to on page 6 of Exhibit A to your opening report.

So under the heading of "Documents and Other Information Considered in Forming Opinions."     13:58:05 [As read]

A. Yeah. Okay.

Q. Okay. Do you recognize the document?

A. As I sit here now, I -- I don't have a specific recollection of this document.     13:58:25

35 (Pages 134 - 137)

Page 138

Q. Okay. Well, do you -- do you recognize this as a -- a presentation made to the chairman of Exxon Mobil in January of 2016 about proved reserves?

A. Yes.                    13:58:41

Q. So flip, if you could, to the Bates numbers that end in '312.

And so the graph on the bottom left shows in 2015 SEC price of $28.70; correct?

A. Yes.                    13:59:26

Q. And this slide also shows an average unit lifting cost for 2015 of $26.50 per barrel; correct?

A. Yes. I assume that's -- you're referring to the number that is in the lower chart below the dotted line?                    13:59:46

Q. Yeah, the line that goes below the dashed line, it says -- for "2015 Actual" [as read], it says $26.50; right?

A. Yes.

Q. And then it also shows a unit lifting cost    13:59:57 of $21.30 per barrel for the second half of 2015; correct?

A. Yes.

Q. And then it has projected 2018 costs for Kearl of $25.60 per barrel; right?                    14:00:11

Page 139

A. Yes.

Q. And each of those cost metrics was lower than the final SEC price of $28.70 a barrel; correct?

A. Correct.                    14:00:26

Q. And so that's the information that was being presented to Mr. Tillerson as part of the chairman's review; right?

MR. SAHAM: Objection. Form. Foundation. Calls for speculation.                    14:00:36

THE WITNESS: That's some of the information that was presented to Mr. Tillerson.

BY MR. TOAL:

Q. That -- that's the information being presented on that slide; correct?                    14:00:44

A. On this slide, yes.

Q. Now, take a look at page 43 of your opening report. In Paragraph 99 you say, "Exxon's 2015 failure to properly consider actual costs associated with U.S. market sales resulted in a    14:01:16 significant overstatement of the Company's internally asserted 2015 SEC bitumen price by approximately $4.04 per barrel. This overstatement related entirely to Exxon's failure to consider added diluent and transportation costs incurred and    14:01:37

Page 140

corresponding 'spread' or 'quality' adjustments in connection with its 2015 U.S. market sales. While these costs appear to have been partially offset by quality spread benefits, the net impact was significant."                    14:01:53

Do you see that language?

A. Yes.

Q. And "quality spread," as used here, refers to the differential applied to the WTI marker price to discount for product quality; right?                    14:02:05

A. Yes.

Q. Now, when you use the term "market sales," is that the same as third-party sales?

A. (Witness reviews.)

My recollection is that that's the amount    14:03:35 realized on the sales that are included in Exxon documents relating to this issue.

Q. So when you use the term "market sales," it wouldn't matter if that was a sale to an Exxon Mobil affiliate; correct?                    14:04:01

A. It's the sale to -- price to the purchaser at its destination as used by Exxon in the documents that I refer to.

Q. And without regard to whether it's a sale to another corporate affiliate; correct?                    14:04:37

Page 141

A. Depends on what the author of the document in- -- included or excluded in that determination.

Q. And for purposes of your reference to "market sales," it wouldn't matter if the transaction happened at a market price; correct?                    14:05:01

A. It's the price that was realized by Exxon.

I'll give an example. It's in document EMC_RAMIREZ 00022930, and it addresses Canadian bitumen realization. And it discusses bitumen realization as equal to the industry marker less    14:05:46 differentials for quality, diluent and transportation.

The interesting marker in that instance is -- is WTI. So it's not -- that particular example is not discussing any market sale. But an    14:06:03 assumption that it is -- sales are based on WTI adjusted for quality, diluent and transportation to Hard- -- Hardesty and then also to the Gulf Coast.

So it's a -- it's an expectation of what    14:06:25 Exxon should be credited for realization at WTI, less quality, less diluent, less transportation to Hard- -- Hardesty and then to the Gulf Coast.

Q. And for purposes of the SEC proved reserve analysis, is what's relevant what Exxon Mobil    14:06:52

36 (Pages 138 - 141)

Page 142

realized or what Imperial realized when selling its Kearl product?

A. Well, what's relevant in -- in the documents that -- that I look at are dependent upon on what the author of those documents, how they made the calculation and what they're presenting. So in this instance, it -- the one that I'm looking at is an Imperial document. And it's looking at how you determine the realization of Canadian bitumen.

And -- and in this per- -- example, it's determining the realization, market price, market realization as WTI, less quality, less diluent, less transportation, to Hardesty, and then further costs of diluent and transportation to the Gulf Coast.

Q. Well, the document you're looking at has two diagrams, one for 2015 and one for 2016; right?

A. Correct.

Q. And the document for 2015 indicates that those transactions are clearing at Hardesty; right?

A. Well, the realization was calculated, expect -- assuming that it cleared at Hardesty, and then Exxon could ignore additional costs of diluent and transportation to move the product to the Gulf Coast.

Q. Well, the -- the diagram for 2016

Page 143

indicates that some transactions are clearing at Hardesty and others are clearing at the Gulf Coast; right?

A. If it's delivered and the realization is at Edmonton, you would stop at that point for those transactions. But if they were -- the realization was to occur at the Gulf Coast, you would continue on.

Q. And you --

A. It was telling the reader that we didn't -- we didn't do that in 2015.

Q. Well, in 2015, it indicates the transactions are clearing at Hardesty; right?

MR. SAHAM: Objection. Form. Foundation. Calls for speculation.

THE WITNESS: I think the calculation of realization assumed that.

BY MR. TOAL:

Q. What does it mean for a transaction to clear at Hardesty?

A. That you have a purchaser at Hardesty, and you realize a price based upon the delivery of product at that point.

Q. Let me ask you to take a look at page 33 of your opening report.

Page 144

A. By the way, that document indicates that in 2015, 30 percent of Kearl product was shipped to the U.S. in pipelines, and 25 percent to the U.S. via rail. So --

Q. That's 2016; correct?

A. No. It says, "Kearl volumes have expanded into the U.S. market post KEP" -- which is Kearl expansion -- "startup in 2015. Volume split approximately 45 percent Alberta, 30 percent U.S. pipelines and 25 percent U.S. rail." [As read]

Q. What's the date of that document?

A. Well, it -- it's talking about Kearl volumes have expanded into the U.S. post startup. The date that this presentation was prepared is November 2016.

Q. So let me ask you to take a look at Paragraph 77 of your opening report, which is on page 33.

A. Yes.

Q. Here in Paragraph 77, you state, "Exxon recognize that when determining proved reserves, operating costs should be computed using production disclosed pursuant to the FASB (i.e. GAAP)."

Correct?

A. YES. ASC 932-360-25 -15.

Page 145

Q. Okay. And you're excerpting an -- you're excerpting an Exxon Mobil presentation in Paragraph 76 of your report; right?

A. Yes.

MR. TOAL: We're going to mark as Regan Exhibit 16, a document entitled "UPSTREAM FINANCIAL ISSUES REVIEW AGENDA" dated May 7, 2015, which has the Bates number EMC_RAM '1593539.

(Regan Deposition Exhibit 16 was marked for identification.)

BY MR. TOAL:

Q. Is this a document you recognize?

A. Yes.

Q. If you turn to the pages that end in the Bates Number '546, do you see there's a slide deck entitled "2015 Reserves and Resources Outlook"?

A. Yes.

Q. And then if you flip to the page that ends in '549.

A. Yes.

Q. This is the slide that you excerpt in your report at page 76; right?

A. Correct.

MR. TOAL: All right. So let me show you a document that we'll mark as Regan Exhibit 17.

37 (Pages 142 - 145)

Page 146

This is a slide deck entitled "Kearl Proved Reserves 2015 SEC Outlook" dated October 16, 2015. Bears a Bates number of EMC_RAMIREZ '30838.

(Regan Deposition Exhibit 17 was marked for identification.)                14:14:24

BY MR. TOAL:

Q. Is this a document you recognize?

A. It looks like the documents that I've seen, yeah.

Q. Okay. If you flip to the last page, you    14:14:31 see there's another version of this presentation and slide on "SEC Proved Reserves Reporting Conditions"?

A. Yes.

Q. All right.

And this one at the bottom under    14:14:50 "Operating Costs" also has a reference to FASB; correct?

A. Yes.

Q. And I'm going to show you a document we'll mark as Regan Exhibit 18. It's entitled "Kearl    14:15:07 Proved Reserves 2015 SEC Outlook" dated October 26, 2015.

(Regan Deposition Exhibit 18 was marked for identification.)

BY MR. TOAL:                14:15:43

Page 147

Q. And do you recognize this document?

MR. SAHAM: Did he identify Bates numbers?

THE WITNESS: I think it's a native.

MR. SAHAM: Is this a native? Do you want to give him the Bates number?                14:16:00

MS. SHAMAILOVA: This was produced as a native.

MR. TOAL: It's the --

MR. SAHAM: Right, but it still has a Bates number; right?                14:16:05

MS. SHAMAILOVA: Correct. And the Bates number is --

THE COURT REPORTER: You're not mic'ed. Can you speak up, please.

MS. SHAMAILOVA: Sure.                14:16:08 EMC_RAMIREZ 000007141.

THE WITNESS: I think this is the document from which I took the -- the insert in Paragraph 75 of my report.

BY MR. TOAL:                14:16:32

Q. Okay. And so, this document under "Costs of the Operation" says, "Not defined by the SEC, but excludes depreciation, so assessed to represent Direct Cash Operating Costs."

Correct?                14:16:44

Page 148

A. Yes.

Q. And do you agree that that is how the SEC rules are interpreted with regard to SEC cost for purposes of proved reserve account?

MR. SAHAM: Objection. Form. Foundation.    14:16:59

THE WITNESS: Well, you can see that there's a difference between Exhibit 17 and Exhibit 18 because Exhibit 18 ends that sentence "pursuant to FASB."

And in the FASB, I discuss it on page 33    14:17:30 and page -- it continues on to page 34. And the FASB definition is broader. So they're -- they're two different ways that one can view operating costs.

But as I also said in my initial report, I    14:17:51 did not address the differences in operating costs. I focused on the net realization that was included in the price. There were some issues with respect to cost. Direct CAF cost was another item. It seems to be fairly agreed upon by most direct CAF    14:18:21 costs should be included.

Although, many of these calculations appear to have excluded all CAF costs. But I've not focused on that in great depth.

BY MR. TOAL:                14:18:40

Page 149

Q. Okay. So the -- of the presentations we looked at, the latest in time is the one that's before you, dated October 26th, 2015; correct?

A. I think so, yes.

Q. Okay. So in your report, you actually    14:18:52 took those presentations out of chronological order; right?

MR. SAHAM: Objection to form. Foundation.

THE WITNESS: The excerpt in Paragraph 75    14:19:02 refers to -- these don't have Bates numbers on it.

But hang on, let me see.

BY MR. TOAL:

Q. So if it helps you out, the -- the exhibit you're looking at, Exhibit 18, has a Bates number    14:19:57 of '7141.

A. That one's presented first.

Q. Right.

So it's out of chronological order; right? You present the -- the latest presentation first in    14:20:10 your report?

MR. SAHAM: Objection to form.

THE WITNESS: Yes, it -- the lead to that paragraph is "Consistent with this understanding, Exxon's internal SEC Proves" -- "Proved Reserve    14:20:24

38 (Pages 146 - 149)

Page 150

summary including the" -- "included the following overview relating to the reporting of proved reserves." [As read]

So that one was October 26th, 2015. And it says, "Similar interactions" -- on Paragraph 76 -- "of this presentation were included in other Upstream Financial Review meetings. For example, the following was included in the Company's May 7, 2015 meeting." [As read]

MR. TOAL: So I'm going to mark as Regan Exhibit Number 19, a series of e-mails. The top one is from Kurt Otte to Cindy Allen dated October 15, 2015. It has a Bates stamp of EMC_RAM_SEC '35525.

(Regan Deposition Exhibit 19 was marked for identification.)

BY MR. TOAL:

Q. So do you see in the top -- or the second e-mail in this sequence from Thomas Clark to Vince Prestipino, the second sentence says, "Beth Casteel raised a question during Bill Strawbridge's presentation on Kearl reserves and the SEC requirements."

Do you see that?

A. Yes.

Q. And then in the second paragraph, it

Page 151

continues, "I discussed with Kurt yesterday and he confirmed that the SEC requirements that Bill is working with are not the same as the FASB requirements that we looked at as part of the impairment analysis for PWC." [As written]

Do you see that language?

A. Yes.

Q. And do you understand the reference to "Bill" is a reference to Bill Strawbridge, who was the head of the Global Reserves Group at this time?

A. Yes.

Q. And the "SEC requirements that Bill was working with" was a reference to the SEC proved reserves; right?

A. That's what the document states, yes.

Q. So after the presentation that we were looking at on October 15th, 2015, Exxon personnel discussed and de- -- deliberately revised the description of operating costs to remove the reference to FASB; right?

MR. SAHAM: Objection to form. Foundation. Calls for speculation.

THE WITNESS: It appears that that's the reason why we're -- the insert at 76, where it talks about FASB, that that was dropped in Paragraph 75.

Page 152

And there it says, Direct Cash Operating Costs," which I think in another document or other documents, they operationalized that as costs that would go away had Kearl ceased operations.

BY MR. TOAL:

Q. And is that the way you interpret -- is that consistent with your interpretation of the SEC rules on operating costs, that if the costs would not go away, if the asset was shut down, that those are not appropriately included in the SEC cash flow test?

MR. SAHAM: Objection to form. Foundation.

THE WITNESS: That's consistent with my expectation that to the extent that you've got variable costs that are within CAF, they should be included in the calculation. Then in the final calculations, within Exxon, it's uncertain as to whether or not those variable costs are included or excluded. So I don't know how it was finally resolved.

BY MR. TOAL:

Q. When Exxon Mobil was talking about direct costs above field for Kearl, what expenses was it referring to?

Page 153

A. The documents were identified in part. They included safety procedures, training, payroll. I don't think there was much more specificity than that.

Q. And did you analyze whether those costs would go away if Kearl was shut down?

A. Well, as I said, I don't -- I don't present a calculation which takes issue with the Kearl -- the resolution of the Kearl. However, there were, I think, hundreds of millions of dollars in CAF, and there are broad category of costs. And it's unlikely that none of those are variable.

So to subtract all CAF, you know, it's not in my report, and I'm not commenting on it, but my opinion would be that to subtract all CAF would be to eliminate and not consider costs that are variable and are only in place because there's operations at Kearl.

Q. But you didn't analyze whether any costs classified as direct costs above field for Kearl would go away if Kearl stopped operation; correct?

A. That's correct. And -- and I don't -- didn't need to because when I adopt Exxon's methodology, and it's uncertain as to whether or not any CAF are included in that methodology, I have

39 (Pages 150 - 153)

Page 154

co- -- lifting costs that exceed the realized sales per unit. So I don't -- I didn't have to get into that le- -- level of dispute.

Q. So let me ask you to take another look at Regan Exhibit 15.                14:27:49

A. Got it.

Q. Okay. So we were looking at the -- on a page that ended in '312.

A. Yes.

Q. Okay. So in your opening report, are you    14:28:25 opining that the proper SEC price for proved reserve purposes should have been $24.66? This is not --

A. Is this --

Q. -- in the document. I'm asking you about your report.                14:28:52

A. Ah.

Q. You have a reference in your report at page 46.

A. It's also on page 1. It's in the summary of opinions.                14:29:13

Q. So are you offering an opinion that --

A. Did you say it was 46?

Q. Page 46.

Are you offering an opinion in this case that properly calculated, the SEC price for Kearl    14:29:25

Page 155

for 2015 for SEC proved reserve purposes was $24.66?

A. Yes.

Q. Okay. And in Regan Exhibit 15, which you just had out --

A. Yeah.                14:29:49

Q. -- that's underneath your binder --

A. Yeah.

Q. -- you didn't see anyone reporting to Exxon Mobil senior management that the SEC price for Kearl for 2015 was $24.66; did you?                14:30:01

MR. SAHAM: Form. Foundation. Calls for speculation.

THE WITNESS: I don't recall that part- -- that particular number.

BY MR. TOAL:                14:30:26

Q. In fact, you haven't seen any presentation internal to Exxon Mobil that presents any final SEC price for 2015 that was anything other than $28.70; right?

A. Well, I think if you look at Paragraph 102    14:30:46 of my original report, there is another calculation that shows it to be $27 and 72 percent [verbatim] -- $72.72. No, I think I said that wrong. $27.72.

Q. Well, have you -- what was the date of that calculation?                14:31:24

Page 156

A. Well, as Paragraph 102 says, "Utilizing the corrective calculation methodology applied during 2016." So it's a 2016 calculation.

Q. And late in 2016?

A. Well, I cite three different documents. I    14:31:44 don't have in mind when that was, but it's the calculation using the facts and circumstances that were in place in 2015.

Q. So the -- in any event, the 20- -- the January 25th, 2016, Chairman's review                14:32:20 presentation --

(Interruption in the room.)

THE COURT REPORTER: I'm sorry, Counsel. There's whispering so I didn't get your question.

BY MR. TOAL:                14:32:30

Q. So in any event, the January 2015, 2016 -- 2015 proved reserve changes Chairman's review presents a final SEC number of -- final SEC price of $28.70; correct?

A. This document presents that number. But    14:32:48 the folks, including the Chairman, knew that this calculation did not consider the realization of product shipped in the United States and that that product resulted in a significantly higher -- or higher nets against the price resulting in a net    14:33:19

Page 157

realization that was substantially less because of the factors of diluent, quality, and most particularly, transportation of that product in the United States.

So the persons reading this document,        14:33:40 including the Chairman, would know that this is -- has not considered and incorporated changes that would result from recognizing that the selling of bitumen product from Kearl had a lower realization than had it been sold to Edmonton.                14:34:03

Q. And what's your basis for saying that senior management at Exxon Mobil knew that sales into the U.S. would have a different realization?

A. The documents that I cite indicate that by October 2015, Mr. Tillerson, for example, knew that    14:34:32 realization and product -- a product shipped in the United States was substantially less than product shipped to Edmonton.

Q. What document says that?

A. (Witness reviews.)                14:35:07

If you look at page 40 of my original report, Paragraph 95, "internal 2015 presentation to Exxon's management contemporaneously acknowledged the Company's SEC Kearl bitumen pricing excluded pricing from the U.S. market." [As read]                14:37:12

40 (Pages 154 - 157)

Page 158

And there's a di- -- discussion of a meeting on October 26th, with Mr. Tillerson and other executives about sales into the United States being excluded from the calculation of proved Kearl bitumen reserves.    14:37:32

And if you look at Paragraph 96, my recollection is in Paragraph 96 -- and if you look at the chart at the top of page 42, the determination of the bitumen SEC price included only the cost of transportation to Edmonton at $1.27.    14:38:17

And my recollection is that it was communicated also in the fall of 2015. The transportation to the U.S. market was significantly higher.

There's also references to Mr. Tillerson    14:38:44 indicating that shipping product to the United States in 2000 -- in the fall of 2015 was at a significant loss.

Q. And you -- you're aware of evidence in this case that differentials in the U.S. were better    14:39:10 than differentials that were in Edmonton; right?

A. Yeah, some of the elements of the -- the three netbacks, which is quality, transportation, and dissolution, quality -- you know, sometimes they went up. Sometimes they produced a -- a lower net.    14:39:36

Page 159

Sometimes they produced a higher net. Depends on when shipment was made and which of the three nets you look at.

Q. And this chart that you pointed to on page 41 of your report, is the one that shows U.S. sales    14:39:50 at Edmonton being intercompany sales; right?

MR. SAHAM: Objection. Form. Foundation.

THE WITNESS: It says it excludes intercompany sales, and it excludes U.S. sales.

BY MR. TOAL:    14:40:35

Q. All right.

And so, if you take a look back at Regan Exhibit 15, which I think should still be under your binder there.

A. Are we still at Bates '312?    14:40:55

Q. Yes.

All right. So that's where the unit lifting cost for the second half of 2015 is identified as $21.30; correct?

A. Excluding all CAF.    14:41:10

Q. And now, we talked before about this formula at the top of the chart, "Cash Opex plus Sustaining Capex minus CAF"; remember? [As read]

A. Yes.

Q. Now, you're aware that Imperial's    14:41:32

Page 160

longstanding practice had been to exclude all costs above field for purposes of estimating Kearl's proved reserves; right?

MR. SAHAM: Objection. Form. Foundation.

THE WITNESS: Is -- is this in reference    14:41:47 to the model that we talked about earlier.

BY MR. TOAL:

Q. It's reflected in the model that we discussed earlier, and it -- it's reflected in documents that you've reviewed in this case.    14:42:04

Do you have a recollection that Kearl had historically excluded all costs above field from its SEC cost determinations?

A. I just want to see the exhibit.

I've got it.    14:42:37

Q. Okay. So if you look at Regan Exhibit 19.

A. Okay. I got it.

Q. Okay. So if you flip to the second page of these series of e-mails, there's an e-mail from deidrenorman@esso.ca. [As read]    14:43:06

Do you see that, October 15th, 2015?

A. From Ken Gordon to Deidre Norman, I do.

Q. And I -- below that, there's one from Deidre Norman where it says, "Deidre Norman wrote." [As read]    14:43:32

Page 161

Do you see that?

A. Yes.

Q. Okay. So it says, "I've chatted with Bill again this morning; he has been asked about the direct versus allocated CAF question from Beth    14:43:42 Casteel this morning as well; here's what we discussed."

The second dash says, "Historically, we have always removed all CAF for reserves 'cash flow positivity' analysis."    14:43:56

Do you see that?

A. Yes.

Q. Okay. Is that something that you reviewed in the course of your work on this assignment?

A. I would expect I read this.    14:44:01

Q. She also goes on to say in the next dash, "SEC does not have specific language that can clarify this question."

Do you see that?

A. Yes.    14:44:18

Q. Do you agree with that, that there's no specific language in the SEC regulations about treatment of direct costs above field?

A. Yes. That's consistent with the -- the chart that I have in Paragraph 75, page 32, cost of    14:44:31

41 (Pages 158 - 161)

Page 162

operations not defined by the SEC.

Q. So Exxon Mobil didn't change -- well, first of all, Deidre Norman, do you know whether she's -- who she was employed by in 2015?

A. Her e-mail address says "esso.ca."    14:44:58

Q. And do you know if she was an Imperial employee? Do you see your signature line? Do you see it says "Operations Technical, Imperial"?

A. Yes.

Q. Okay. So to the best of your knowledge,    14:45:16 Imperial wasn't changing its methodology for determining SEC costs between 2014 and 2015; was it?

A. I'm sorry. I was reading the document, and I wasn't listening.

Q. To the best of your knowledge, you're not    14:45:44 aware that Imperial changed the methodology it used for determining costs for purposes of SEC proved reserves at Kearl; are you?

MR. SAHAM: Objection. Form. Foundation.

THE WITNESS: I -- I'm not aware that --    14:45:59 that they made a change with respect to CAF in 2015. I have seen discussions, like this discussion from Deidre, where, you know, if you look to the 1 -- fourth bullet down from the bottom of the page.

BY MR. TOAL:    14:46:29

Page 163

Q. Is this where it says, "If you think about 'direct'" -- "about the 'direct CAF,' these are engineers supporting the asset currently; there is an argument that says these engineers would be reallocated if we were to shut in Kearl, and as    14:46:39 such, it would not make sense to burden the reserve cash flow analysis with these costs"?

A. Right.

And the -- the -- the other side of that argument is that it appears as if there's safety    14:46:51 folks and that there's hundreds of millions of dollars in CAF costs, it's unlikely that none of them are variable.

So if you beyond -- discuss it beyond engineers and is it reasonable to assume that every    14:47:16 engineer would be reallocated to some other location, I don't know.

And it's an aggressive argument that none of the CAF should -- should remain. And that some of the CAF is, in fact, direct CAF and that that    14:47:38 should be considered in the calculation.

But I haven't -- I haven't made that argument. I've accepted the way that Exxon made the calculation and why -- and how it corrected the calculation. But it's still likely that it hasn't    14:47:53

Page 164

considered var- -- direct CAF costs.

Q. So you don't have any basis to dispute that Imperial had always removed costs above field for reserves cash flow positivity analysis as of October of 2015; correct?    14:48:12

MR. SAHAM: Objection. Form. Foundation. Calls for speculation.

THE WITNESS: I -- I -- I haven't argued that point in my reports.

BY MR. TOAL:    14:48:25

Q. So you don't have any basis to dispute it; correct?

MR. SAHAM: Same objections.

THE WITNESS: Other than what I've already testified to today, that it's a -- it's very    14:48:33 aggressive to exclude all CAF. Some of the CAF is likely to be direct and is likely to be a variable cost which should be considered. But I haven't meant -- made that argument in my report.

BY MR. TOAL:    14:48:48

Q. So my question's a little bit different.

With respect to exclusion of costs above field, are you aware of any time prior to October of 2015 when Exxon Mobil included costs above field in its SEC proved reserve determinations?    14:49:05

Page 165

MR. SAHAM: Same objections. Form. Foundation.

THE WITNESS: I've not -- I've not seen -- I've not seen a calculation which identifies the variable component of CAF at Kearl.    14:49:24

But I also -- she -- Deidre finishes by saying, "Given we now have local and corporate" forks [verbatim] -- "folks from controllers concerned about this, it would be ideal to get everyone together to talk about this and gain    14:49:41 consensus; Bill would be more than happy" --

THE COURT REPORTER: I'm sorry, after "consensus" I didn't hear you.

THE WITNESS: -- semicolon, "Bill would be happy to join in this conversation, but given his    14:49:56 contact execs review tomorrow, he would prefer if we could discuss this today." [As read]

And she asks for a -- a -- a meeting in 30 minutes. "I can set something up if you know." [As read]    14:50:09

I think they were talking about -- and in the next e-mail on page 527, Ken Gordon to Mark Taylor, it says, It -- it "seems like Bill is now questioning the inclusion of 'direct' CAF. It would be good to get clarity on this..." [As read]    14:50:32

42 (Pages 162 - 165)

Page 166

This is a discussion they were having in 2015.

BY MR. TOAL:

Q.   And he goes on to say "there is an argument that our 'direct' CAF (example engineers) would be allocated elsewhere if Kearl should not be around," correct, "much like accountants/HR"? [As read]

A.   Sure.  Accountants doing the payroll --

MR. SAHAM:  Objection to form.

THE COURT REPORTER:  I'm sorry, one second.

MR. SAHAM:  Objection to form.

THE WITNESS:  There -- as -- as I say, there's millions of dollars in CAF.  Some of them are likely to go away if Kearl went away.

BY MR. TOAL:

Q.   Now, what's your understanding of the category of costs that are referenced as "sustaining capex"?

MR. SAHAM:  Dan, if we're moving on to a different topic -- we've been going well over an hour -- can we take a break?

MR. TOAL:  Yeah, right after this line.

THE WITNESS:  Sustaining capex is capital

Page 167

expenditures needed to sustain your existing production.  It's not capex relating to an expansion, for example.

BY MR. TOAL:

Q.   So what would it be as applied to Kearl?

MR. SAHAM:  Objection to form.

THE WITNESS:  That you're having to replace significant pieces of equipment.  You know, something that costs a million dollars, you're likely to, you know, capitalize that.  It's a capex.  You need it to sustain production.

You're not expanding production, but you -- in order to keep it -- producing at existing levels, you have to replace X item of capital equipment.

BY MR. TOAL:

Q.   And do you know how frequently sustaining capex needs to be replaced at Kearl?

A.   Well, there are probably hundreds of thousands of capital items.  It's likely that they're sustaining capex every year.

Q.   Do you know?

A.   Again, I haven't challenged that element of the -- of -- of the issue.  It's not an issue in my report.

Page 168

My recollection is that in the forecasts of revenues and expenses, there's line items for sustaining capex.  It depends on the field.  We can look at those.  And they are -- they are identified.  But I don't carry them around in my head.

Q.   And as a general matter, when calculating SEC proved reserves, are capital expenditures supposed to be included in operating costs?

A.   In -- in a -- in an ASC 932 calculation, as I say in Paragraph 77, it would include operating costs of support equipment and facilities, costs for equipment and facilities, "depreciation."

With respect to SEC calculations, we're basically talking about direct cash operating costs, and those are not capital expenses.

Q.   So as a general matter, you would not include capital expenditures in an SEC proved reserve analysis; correct?

A.   I wouldn't expect to see it, no.

Q.   And if Exxon Mobil had excluded sustaining capex from its SEC proved reserve analysis, that would have reduced its unit lifting costs; correct?

A.   Unit lifting costs would be higher if sustaining capex were in -- were in the calculation.

Q.   And it would be lower if it wasn't in the

Page 169

calculation; right?

A.   Correct.

Q.   And do you know on a per barrel basis how much the sustaining capex was for 2015 at Kearl?

A.   No.  It's not something that's in my report and not something that's at issue between my report and the Exxon calculations.

The -- my report and the Exxon calculations go to Exxon's calculations themselves, where, in calculating the realization, they subtract from the WTI the quality spread, the transportation costs, and the -- the diluent cost.

That's the issues that reside in this case.  We're -- we're not -- my report doesn't address capex with respect to the Kearl proved reserves.

Q.   So you -- you're not offering an opinion in this case that sustaining capex should be included in the costs of operation for proved reserve purposes; correct?

A.   I've accepted Exxon's calculations of lifting costs.

Q.   And so is that another way of saying you're not expressing an opinion on whether sustaining capex should be included under the SEC

43 (Pages 166 - 169)

Page 170

regulations?

A. No, my report doesn't address that. It basically accepts what Exxon itself calculated as lifting costs.

And to the extent that there's any capital items included in that calculation, my report doesn't address it.

MR. TOAL: We can go off the record.

THE VIDEOGRAPHER: This is the end of Media Number 4. We are off the record at 2:57 p.m.

(Short recess taken.)

THE VIDEOGRAPHER: This is the beginning of Media Number 5. We are back on record at 3:17 p.m.

BY MR. TOAL:

Q. Mr. Regan, let me ask you to take a look at page 37 of your reply report, which is Regan Exhibit 2.

A. I've got it.

Q. Okay. In Paragraph 63, you're discussing use of the second half of 2015 unit lifting costs; correct?

A. Yes.

Q. And you say that "the consideration of six months of costs would be inconsistent with Exxon's

Page 171

own pricing methodology that considers diluent, transportation costs, and quality spread costs over a full twelve-month period" [as read]; right?

A. Yes.

Q. Now, the SEC regulations don't require that when estimating the costs of operation, you use the full year annual average cost of operations; correct?

A. There is not that degree of specificity in that SEC guidance.

Q. And so the SEC regulation doesn't prohibit consideration of second half of the year's costs of operation for SEC proved reserve purposes, does it?

A. It doesn't get to that lev- -- level of specificity in their guidance.

Q. And it would be perfectly appropriate for Exxon Mobil to use operating costs for SEC proved reserve analyses as of the time that the analysis is conducted; correct?

A. Well, as -- as of the time the analyses [verbatim] was conducted, there -- there's clearly a great deal of specificity with respect to the sell- -- the selling price, but there's not much guidance with respect to costs.

But Mr. Swiger indicated that you need --

Page 172

you would need to use actual costs that are incurred. And that's consistent with his testimony that I think has been included in -- in this report starting at page 23.

You use -- he repeatedly indicates you need to use actual costs.

Q. But he -- he never said you couldn't use actual costs for the second half of 2015, did he?

A. His testimony talks about actual costs. And if you're using second half times two, that's not actual costs.

Q. Well, it's calculated as a unit lifting cost; right?

A. That is not an actual cost.

Q. It would be an actual cost for the second half of 2015?

A. It's an actual cost of the second half, and it's a -- an assumption as to what costs would be appropriate for the first half.

Now, you have to remember the costs for the first half include revenue per unit that are -- they tend to be much higher. So here you then have a calculation of the average price using high unit revenue and comparing that to a low oper- -- low lifting costs.

Page 173

Q. But you're aware at Kearl there is a major expansion project in the beginning of -- or in the middle of 2015; right?

A. Yes. It was completed in the -- in mid-2015.

Q. And so you're aware that costs in the second half of 2015 reflected the effects of the expansion project on the asset; right?

A. Well, costs relating to the expansion substantially -- a substantial portion of those costs would be capitalized as part of -- of the expansion. And then you would be depreciating those costs, and depreciation was excluded.

Q. In terms of the unit lifting costs, you're aware that the unit lifting costs for the second half of 2015 reflected the effects of the expansion project; right?

A. Well, after the expansion project enabled Exxon to produce more units, the costs for that month would include its costs incurred in those months.

Now, the expansion project, most of those -- much -- much of those costs would be capitalized and depreciated. It -- it wouldn't go into lifting costs.

44 (Pages 170 - 173)

Page 174

Q. But in terms of the unit lifting costs, once the expansion project had been completed and production had increased, you're spreading fixed costs over a much larger volume of production; right?                    15:22:55

A. If you included depreciation, yeah.

Q. Well, even if you don't include depreciation, you're still spreading the fixed costs over a larger volume of production; right?

A. Fixed costs aren't included in the lifting   15:23:11 costs.

What type of fixed costs are you talking about?

Q. You're aware that the unit lifting costs dropped substantially between the first and the        15:23:23 second half of 2015; right?

MR. SAHAM: Objection. Form. Foundation. Calls for speculation.

THE WITNESS: Yeah, and I think those have been characterized as the -- the folks who are good   15:23:33 people working there, and they're trying to gain some economies of scale and increase some efficiencies in operating the new facility, but it doesn't relate to their fixed costs.

BY MR. TOAL:                    15:23:52

Page 175

Q. Well, it did relate to their unit lifting costs; right? The unit lifting costs in the second half of 2015 were reported at $21.30 per barrel; correct?

A. It's shown in -- in the charts which have   15:24:05 the second half of 2015. I don't remember the number.

Q. Let me ask you to take another look at Regan Exhibit 8. This is the SEC's "MODERNIZATION OF OIL AND GAS REPORTING."                    15:24:38

A. Got it.

What page?

Q. If you go to page 140.

A. I've got it.

Q. All right.                    15:25:10

So it says here under the definition of "Proved oil and gas reserves" that "Proved oil and gas reserves are those quantities of oil and gas, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to   15:25:24 be economically producible - from a given date forward, from known reserves, under existing economic conditions." [As read]

So as of the time that -- that the proved reserve determination was made for Kearl for 2015,   15:25:40

Page 176

it's looking at economically producible from that date forward; right?

MR. SAHAM: Objection to form.

THE WITNESS: From that date forward, and the calculation looks to a realized price based on   15:25:55 the first day of each month without a weighted calculation. And you look at actual costs associated with that realized price.

But you -- you -- you don't -- you don't reestimate what your future costs are going to be   15:26:16 un- -- unless it's under extraordinary circumstances and -- I -- I don't have the language in front of me that I can quote, but they caution against using future costs at any significantly different amount.

BY MR. TOAL:                    15:26:40

Q. So you're supposed to use your existing economic conditions; correct?

A. Yes.

Q. And you can also use costs if you have reasonable certainty that you can achieve those   15:26:50 costs going forward; right?

A. Well, that -- yeah, within the language that unless evidence indicates that renewal is reasonably certain.

Q. That has to do with the time at which   15:27:10

Page 177

contracts expire; right?

A. That -- I think there's similar language with respect to the operations of the enterprise.

Q. Do you know what Kearl's unit lifting costs are currently?                    15:27:33

A. No, I've not looked at their unit lifting costs in 2025.

Q. Did you look at them for any year other than 2015 and 2016?

A. No. I think all of the documents that   15:27:45 I've seen have calculations that are 2015 or 2016. Maybe some earlier.

Q. And if Exxon Mobil had reasonable certainty that the costs it achieved in the second half of 2015 were representative of the costs they   15:28:13 could achieve with reasonable certainty going forward, there would be nothing inappropriate about using those costs in its SEC proved reserve analysis; correct?

A. They could make an argument that -- that   15:28:30 they had expectations that fit within the language of reasonable certainty.

However, that would be inconsistent with Mr. Swiger's testimony in this case where he -- he clearly says you need to look at actual costs.   15:28:53

45 (Pages 174 - 177)

Page 178

Q. And he didn't say actual costs over what time period, did he?

A. No, but if you look at -- I don't see a calculation which projects lifting costs into the future at a different amount than was in -- was in the documents that were used to recalculate the SEC price for 2015 or '16.

Q. Well, the SEC test requires you to use existing economic conditions; right?

A. Right.

Q. And not make projections into the future?

A. That's -- that's certainly correct with respect to the amount realized, and it is cautionary language with respect to using lower costs in the future.

Q. Let me ask you to take another look at Regan Exhibit 15. So this is the January 25th, 2016, chairman's review.

A. I have it.

Q. Okay. So if you'd go to the page -- pages that end in '314 and '315.

A. I got it.

Q. Okay. So the left, the same charts we looked at before, correct, on the page that ends in '312?

Page 179

A. Yes.

Q. And on the right there are what appear to be speaker notes; correct?

A. They may well be.

Q. That's the page that ends in '315? Is that where you're looking?

A. Yes.

Q. Okay. So do you see the first bullet point there says, "The chart on the bottom left shows 2015 CP unit lifting cost, defined as cash opex plus sustaining capex less CAF (our interpretation of SEC operating cost)"? [As read]

A. Yes.

Q. And so that was -- do you have an understanding that Mr. Strawbridge delivered this presentation during the chairman's review?

A. This is before Mr. DuCharme took over, so I -- I -- I would assume that it was presented by Mr. Strawbridge.

Q. Okay. And so Mr. Strawbridge is presenting to the chairman his interpretation of the SEC operating cost as excluding costs above field; correct?

A. Yes.

Q. And Mr. Strawbridge was the person who

Page 180

served on the oil and gas reserves committee for the Society of Petroleum Engineers; correct?

A. Yes. And I think he's the fellow that the 10(K) refers to on page 6.

Q. And the next bullet point says, "So, Kearl clearly meets the net cash flow test required by SEC"; right?

A. Yes. I assume he's comparing the SEC price of $28.70 to the -- to the cost of $26.50.

Q. All right.

So that's the conclusion that Mr. Strawbridge was presenting to Exxon Mobil's senior management; right?

A. At this time, in this deck.

And the next bullet says, "Obviously, 2016 will be a challenge. Kearl netback price was $13.29 on January 1st, 2016."

Q. And --

A. And I think the SEC rules is that you need to consider informa- -- facts and circumstances up to the date of the filing of the 10(K).

Q. Is it your understanding that SEC proved reserves are determined on an annual basis?

A. Well, for purposes of the 10(K), that's done on an annual basis.

Page 181

Q. Okay.

A. The -- the company can make its determination however frequently it wishes.

Q. And do you remember Exxon Mobil made a disclosure in its 2015 10(K) that if prices stayed at the levels they've been seeing in late 2015 and early 2016 it might have to de-book certain of its proved reserves, including its Canadian oil stance?

MR. SAHAM: Objection to form.

THE WITNESS: I think the language is that if the price remained at the low levels of -- in early 2016 that it may have to de-book. We can look at the language of the 10(K). I don't -- I just don't have a recollection --

BY MR. TOAL:

Q. I think it's Exhibit --

A. -- that it talked about --

Q. -- it's Exhibit 9.

A. Oh, I see it on page 6. Are you referring to page 6, the third full paragraph, "When crude oil and natural gas prices" --

Q. Yeah. So when --

A. Right.

Q. So it says, "When crude oil" --

MR. TOAL: Are you with me?

46 (Pages 178 - 181)

Page 182

BY MR. TOAL:

Q. So it says, "When crude oil and natural gas prices are in the range seen in late 2015 and early 2016 for an extended period of time, under the SEC definition of proved reserves, certain quantities of oil and natural gas, such as oil sands operations in Canada and natural gas operations in North America could temporarily not qualify as proved reserves"?

A. Yes.

Q. Okay. So --

A. I think that's mentioned also in -- elsewhere in the 10(K).

Q. So Exxon Mobil was alerting the market to the fact that the prices seen in late 2015 and early 2016 could require a de-booking of its oil sands assets; right?

A. That's what this statement is saying. Of course my report is saying that, when calculated, correcting for the shortfalls that were identified in 2016, they already needed to be de-booked.

So there's a significant difference between the context of my report and this statement.

Q. Are -- are you offering any opinion in this case about the adequacy of the disclosure

Page 183

regarding the potential need to de-book in 2016 the -- the Kearl proved reserves?

A. Well, they were de-booked in 2016.

Q. So are -- are you offering an opinion about the adequacy of the disclosure made in this 2015 10(K) about the potential need to de-book at the end of 2016?

A. Well, I think the -- the natural consequence of my -- both of my reports are -- are saying that had the calculation that was made in 2015 been cured of its shortfalls, the de-booking would have occurred in 2015.

And then of course that makes moot this -- this statement. Because what this is -- what my report is basically saying is that this statement is misleading because it should have been de-booked at -- at year end.

Q. So -- so assume you're -- you're wrong about whether the Kearl proved reserves should have been de-booked in 2015, are you offering an opinion about the adequacy of the disclosure that Exxon Mobil actually made in the 2015 10(K) about the potential that Kearl proved reserves would have to be de-booked at the end of 2016?

A. Well, I addressed that on -- in my

Page 184

original report on the first page, page 1, at the bottom of page 1 and continuing on to page 2, "In the absence of a de-booking of the Kearl proved reserves," and I explain the additional disclosure which was needed in -- as it turns out, in -- in both the -- the MD&A and in the footnotes to the financial statements.

Just like in 2016, it was mentioned in both the MD&A and in the footnotes to the financial statements.

And then on page 2, I get into some of the specificity which was called for if you didn't de-book, such as the reoccurring [verbatim] losses "'reasonably likely' to have a material negative effect on the Company's Upstream" [as read] --

THE COURT REPORTER: Sorry, you're reading too fast. If you can go slowly if you're reading into the record, please.

THE WITNESS: "Kearl's reoccurring losses did and were 'reasonably likely' to have a material negative effect on the Company's Upstream earnings and profitability;" [As read]

Then there's Item 2 and 3. And then an explanation of why those were necessary and further discussion in Section Roman IV.B. of this report.

Page 185

I also noticed that Mr. Abington says in his report at Paragraph 157, that ASC, which is a part of the PCAOB, requires transparent reporting of potential risks that could impact a company's financial position. And these kinds of disclosures that are described in 1, 2, and 3 would help the reader to understand what those risks are.

BY MR. TOAL:

Q. So only with respect to the issue of the likelihood or the potential for having to de-book the Kearl proved reserves at the end of 2016, are you offering any opinion that the language we just read in the 2015 10(K) was an inadequate disclosure?

MR. SAHAM: Objection. Asked and answered.

THE WITNESS: It seems very complex because when you say "only," certainly my first opinion is that it should have been de-booked at 12/31/15, which means you wouldn't say what-- you wouldn't state what was said about it might need to be de-booked in 2016.

Then in the second opinion addresses, well, if you didn't de-book, what additional disclosure needed to be made.

And those additional disclosures that are

47 (Pages 182 - 185)

Page 186

described on page 2 are significantly more than the language that we've just read with respect to the potential de-booking that's included in the 10(K).

BY MR. TOAL:

Q. So at the time Exxon Mobil's 2015 10(K) 15:42:26 came out, that was February of 2016; correct?

A. I think it's February 24, 2016.

Q. So with respect to SEC pricing data for 2016, it only had two -- two first of month data points; correct? 15:42:47

A. Correct.

Q. And so, ten first of month pricing data points still to come; right?

A. Ten more to come. And at the time that the de-booking was determined, the prices were 15:43:01 actually higher than what -- what was in place in January and February of 2016.

Q. So Exxon couldn't have known, as of February 2016, whether it would need to de-book its Kearl proved reserves at the end of 2016 or not; 15:43:18 right?

MR. SAHAM: Objection. Form. Foundation. Misstates prior testimony.

THE WITNESS: Well, if Exxon's calculations of -- let me see if I can't focus on -- 15:43:33

Page 187

on a chart, which would be helpful here.

Here we go.

BY MR. TOAL:

Q. I'll -- I'll withdraw the question just in the interest of time. 15:44:30

Now, in estimating Kearl's SEC proved reserves in 2015, do you agree that Imperial Oil with oversight from Exxon Mobil's Global Reserves Group performed an exercise to try and determine an SEC price for the first day of the month of every 15:44:49 month in 2015?

A. Yes.

Q. And Imperial Oil then calculated an unweighted average of those 12 SEC prices to arrive at a final end-of-year SEC price for Kearl in 2015; 15:45:04 correct?

A. Yes.

Q. And Imperial oil also estimated a unit lifting cost for the Kearl operation that was to be used for purposes of Kearl's SEC proved reserves for 15:45:19 2015; right?

A. Yes.

Q. And those -- that SEC price was then compared to those unit lifting costs in an analysis that was presented to senior management; right? 15:45:36

Page 188

A. Yes. We've seen those in exhibits we've discussed today.

Q. And based on that analysis, Exxon Mobil and Imperial Oil concluded in 2015 that Kearl passed the SEC's cash flow test; right? 15:45:54

MR. SAHAM: Objection to form.

THE WITNESS: Based upon certain documents that you've shown me. But as I indicated, there are documents and discussions in addition to those that you've shown me that indicate that it didn't pass, 15:46:14 if the U.S. sales and the resulting diluent, transportation costs and quality spread were properly considered.

BY MR. TOAL:

Q. And Mr. Strawbridge told Exxon Mobil's 15:46:37 senior management that Kearl clearly passed the cash flow test for the SEC proved reserves; right?

MR. SAHAM: Objection. Form. Foundation. Calls for speculation.

THE WITNESS: The speaking notes that are 15:46:50 a part of Exhibit 15 contain that language.

BY MR. TOAL:

Q. And you're aware that in 2016, Imperial Oil with oversight from Exxon Mobil's Global Reserves Group performed a separate exercise to 15:47:18

Page 189

determine whether Kearl passed the SEC cash flow test in 2016; right?

A. Yes.

Q. And as part of that process, Imperial went through the same process of calculating an SEC price 15:47:38 for the first month of every month in 2016; right?

A. Yes.

Q. And it then calculated an unweighted arithmetic average of those SEC prices; right?

A. Yes. 15:47:55

Q. And it calculated a unit lifting cost for Kearl in 2016; correct?

A. Yes.

Q. And it then compared the SEC final price to the unit lifting cost for Kearl; correct? 15:48:09

A. Yes.

Q. And based on that analysis in 2016, Exxon Mobil determined that Kearl did not qualify as a proved reserve; correct?

A. It did. Yes. 15:48:26

Q. And Exxon Mobil disclosed that in its 2016 10(K); right?

A. Yes. It's disclosed in the MD&A, as well as the notes to the financial statements.

Q. Now, to your knowledge, has Exxon Mobil 15:48:41

48 (Pages 186 - 189)

Page 190

ever publicly stated that its 2015 SEC proved reserves estimates for Kearl were incorrect?

A. Exxon is an entity to the SEC or --

Q. Are you aware of any public statement by Exxon Mobil saying that its 2015 proved reserve analysis for Kearl was incorrect?

A. I'm not fa- -- I'm not aware of that.

Q. Are you aware of the SEC telling Exxon Mobil that it thought Exxon Mobil's proved reserve determinations for Kearl for 2015 were incorrect?

A. I'm not aware of a document that says that.

Q. And to your knowledge, the SEC has never required Exxon Mobil to issue a restatement in connection with its disclosures related to Kearl's 2015 SEC proved reserves; correct?

A. Correct.

Q. Are you aware of any public report or statement claiming that Exxon Mobil's de-booking of Kearl after 2016 demonstrated that those reserves should have been de-booked at year end 2015?

A. No.

Q. And you'd agree that the fact that certain reserves are de-booked in 2016, doesn't suggest that they should have been de-booked in 2015; right?

Page 191

A. Well, the fact that they de-booked --

THE COURT REPORTER: Your microphone, sir.

THE WITNESS: They de-booked the reserves in 2016 based upon realized prices that were higher than wh- -- what were in place in -- at the time of filing the 2015 report, that's an indication of -- as if prices got better in the latter part of 2016, why weren't they de-booked when the prices were worse in the first two months of 2016.

BY MR. TOAL:

Q. The -- the mere fact that proved reserves for an asset are de-booked in 2016, that doesn't mean those same assets should have been de-booked the prior year; correct?

MR. SAHAM: Objection. Asked and answered.

THE WITNESS: That fact alone does not argue for that result. However, there is the pricing contradiction that I just described.

BY MR. TOAL:

Q. Now, the 2015 proved reserves analysis used price and cost information from 2015; correct?

A. Yes.

Q. And the 2016 proved reserve analysis used price and cost information from 2016; correct?

Page 192

A. Yes.

Q. And assets that are de-booked in one year can be rebooked in subsequent years; correct?

A. They can.

Q. And are you aware that Kearl was rebooked after 2016?

A. I -- I think I've heard that, but I -- that's not something I relied on in my report. So I didn't drill into a document to determine that. That's just -- that's not relevant to my report.

Q. So with the disclosure we looked at in Exxon Mobil's 2015 10(K), that essentially told the market that based on prices in late 2015 and early 2016, Exxon Mobil's cost of production for its Canadian oil sands assets was lower -- I'm sorry, was higher than those prices in late 2015 and early 2016; right?

MR. SAHAM: Objection to form.

THE WITNESS: You're talking about the language on page 6 of --

BY MR. TOAL:

Q. That's right.

A. Okay.

MR. SAHAM: Did -- did you say the 2016 10(K) or the 2015 10(K)?

Page 193

MR. TOAL: The 2015 10(K).

MR. SAHAM: Same objection.

THE WITNESS: Well, it says, "When crude oil and natural gas prices are in the range seen in late 2015 and early 2016, for an extended period of time, it could temporarily not qualify as proved reserves." [As read] So there's a couple of hedges built into that statement.

And it's not saying that if prices seen in 2015 and if you took effect to the January 1st and February 1st, 2016, prices, it would have been de-booked. It doesn't -- it doesn't say that because there's a hedge, take for an ex- -- for an extended period of time. And it says could temporarily not qualify.

BY MR. TOAL:

Q. So there -- there's no equivalent warning in Exxon Mobil's 2014 10(K); is there?

MR. SAHAM: Form. Foundation.

THE WITNESS: No. Because this warning is the result of the reduced pricing in 2015 and '16. The pricing in 2014 was -- was -- was higher, as seen in page 91 of my original report.

BY MR. TOAL:

Q. And was it understood by the market that

49 (Pages 190 - 193)

Page 194

oil sands assets at the time were among the highest cost of production for oil assets?

MR. SAHAM: Objection. Form. Foundation. Calls for speculation.

THE WITNESS: That's consistent with my expectation reading the analyst comments.

BY MR. TOAL:

Q. Let me ask you to turn to page 60 of your opening report.

A. Page 60?

Q. Yeah.

A. Okay.

Q. So in Paragraph 124, you state that Kearl experienced "cumulative recurring losses since January 1, 2015," that you say "resulted in net operating losses during each consecutive quarter in the 2015 fiscal year." [As read]

Correct?

A. Yes.

Q. And how are you defining "net operating losses" here?

A. I believe that's the caption on the financial statement itself.

Q. And what does -- what does it include?

And just so the record's clear, are you

Page 195

referring to a document referenced in Footnote 174 in your report?

A. Yes.

Q. And what's the Bates number of the document you're referencing?

A. There -- there's two Bates numbers.

Q. What's the bottom one?

A. The bottom one?

EMC_RAM_SEC, five zeros, 9566. [As read]

And I'm looking at March 2015. And it shows for Kearl, net revenue of 166 million, cash Opex, 338 million. Noncash Opex of 92 million. A negative federal income tax of 70 million. For a year-to-date operating loss of $147,000 -- $147 million.

Q. So that is including noncash Opex; correct?

A. It's got noncash Opex of $92 million. And then it's offset by negative federal income taxes of $70 million.

Q. And then where you're reading from had a net revenue of 166 million and cash Opex of 138 million; correct?

A. Cash Opex was 338 million.

Q. 338 million.

Page 196

A. So if you just had net revenue of 166 less catch Opex of 338 million, you can subtract from 338 million 166 million, and you'd have a very large loss at that level.

Q. So "net operating losses" here is defined to include noncash Opex; correct?

A. Yeah. So for the first quarter, it's a negative 147 million. That is after noncash Opex of 92 and a negative federal income tax, which is 70, so the net of those is $22 million.

Q. So just to be clear, the term you're using, "net operating losses," includes noncash operating expenses; correct?

A. I'm using -- the -- the line is described on the report as year-to-date operating segment earnings. Operating segment earnings.

Q. Let me ask you to take a look at a document that's previously been marked as Exhibit 67. It's titled "America's F&O - Delivering the Plan. December 2015."

(Regan Deposition Exhibit 20 was marked for identification.)

BY MR. TOAL:

Q. Is this a document you're familiar with?

A. Yes.

Page 197

Q. Okay. Let me direct your attention to the page that has the Bates Number EMC_RAM_SEC '9 -- '9988.

A. Got it.

Q. Okay. And so, this -- this is a table of profitability for Kearl West IOL.

Do you see that?

A. Yes.

MR. SAHAM: Can -- Canada West/IOL, you mean?

THE WITNESS: Canada West/IOL.

BY MR. TOAL:

Q. I'm sorry, Canada West/IOL.

And there's a column for Kearl.

Do you see that?

A. I do.

Q. And the bottom -- bottom of the table shows 2015 year-to-date numbers; correct?

A. Yes.

Q. And is this similar to the chart that you were just looking at?

A. Yes.

Q. Okay. So -- and this is a chart that you cite for the proposition that in 2015, Kearl was losing $7.34 per barrel; right?

50 (Pages 194 - 197)

Page 198

A. Yes. It's calculated on this sheet and -- and the row says, "Operating Unit Earnings," and it's defined in a parentheses "(dollars/OEB)." [As read]

Q. Okay. Do you know what "OEB" stands for?    16:04:13

A. Equivalent -- oil equivalent barrels.

Q. All right.

And do you see toward the top of this table, there's a line that says "Realizations - U.S. dollar per barrel"? [As read]    16:04:32

A. Yes.

Q. And that number is 24.27; right?

A. Yes.

Q. And then if you go further down, there is a row for "Cash Opex, dollar/OEB." [As read]    16:04:51

Do you see that?

A. Yes.

Q. And that number is $24.16; right?

A. Yes.

Q. All right.    16:05:08

So does that mean that Kearl in 2015 was cash flow positive?

A. On -- on this schedule, re- -- comparing those two lines, it would indicate that the realization was $0.11 more than the cash Opex.    16:05:54

Page 199

Q. And --

A. So to the extent that -- if -- if you just make that comparison, yes.

Q. And then the operating unit earnings of negative $7.34 includes things like noncash Opex;    16:06:15 right?

A. It includes noncash Opex. It includes a tax -- federal income tax benefit of $151 million.

Q. And what would noncash Opex consist of?

A. Any allocations which did not accost,    16:06:39 which did not involve expenditure of cash. It might --

Q. It would include depreciation?

A. -- might -- usually, that's one of the bigger items.    16:07:13

Q. Now, if you could turn to page 51 of your opening report.

A. Yes.

Q. So you write in Paragraph 112, "Exxon failed to properly disclose certain known trends and    16:07:53 uncertainties related to its Kearl Upstream operations, including Kearl's recurring lack of profitability."

Do you see that language?

A. I do.    16:08:05

Page 200

Q. And then in Paragraph 113, you say, "These trends and uncertainties required disclosure under Item 303."

Do you see that?

A. Yes.    16:08:16

Q. And then if you go to page 81 of your opening report.

A. I have it.

Q. So in Paragraph 162, you say, "Exxon's disclosure of known trends and uncertainties    16:08:44 regarding the recurring and expanding lack of profitability of its Upstream Canadian Kearl bitumen operations and its potential negative impact to disclosed proved reserves was necessary to comply with the SEC's MD&A financial related reporting    16:08:59 rules which required the Company to disclose: (i) 'known trends or uncertainties that have had or that the registrant re" -- "reasonably expects will have a favorable or unfavorable impact on net sales or revenues or income from operations,' and (ii)    16:09:20 information necessary to understand results of operations, including disclosure of 'material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results    16:09:39

Page 201

or future financial condition.'" [As read]

Do you see that language?

A. Yes.

Q. So with respect to Kearl, what reported financial information would not necessarily be    16:09:49 indicative of future operating results?

A. Well, if you go back to page 2, what the reader is seeing in the 10(K) is on page 9, that there is a gross margin of, I think it's $5.87 on bitumen in Canada. And what I describe on page 2    16:10:37 are the -- is the information that was consistently reported to management and consistently in -- in management's understanding that there were reoccurring losses, that there were operating losses, consistently contrasted with Cold Lake.    16:11:09

And if you look at the -- page 9, the bitumen, you would -- you would not know that the -- the operations of Kearl, which is 80 percent of the bitumen operations in terms of the quantities of the reserves, you would have an expectation that -- that    16:11:36 there was a -- a significant margin. And the company was consistently seeing that that margin resided, not within Kearl, but within Cold Lake. But the reader didn't -- wasn't informed of that.

Q. So, let's take a look at --    16:11:59

51 (Pages 198 - 201)

Page 202

A. And then --

Q. I just want to make sure we're talking about the same thing.

So if you look at Exhibit 9, that's the 2015 10(K). You have that in front of you? 16:12:07

A. Yeah, I can get it 'cause it's here somewhere. I'm sorry. It makes noise for you?

Yeah, I've got it. Hang on.

Q. All right.

So I think you were referring to a table 16:12:29 at page 9; correct?

A. Yes.

Q. All right.

So this is entitled "Production Prices and Production Costs"; correct? 16:12:41

A. Yes.

Q. And -- and so, it reflects a bitumen price per barrel for Canada/South America of $25.07; correct?

A. Yes. 16:12:57

Q. And right under "Production Prices and Production Costs," it says, "The table below summarizes average production prices and average production costs by geographic area and by product type for the last three years"; right? Do you see 16:13:11

Page 203

that language?

A. At the top of the page underneath Item B?

Q. Yeah. It says, "The table below summarizes average production prices" --

A. Right. 16:13:25

Q. -- "and average production costs by geographic area."

A. Right.

Q. Okay. And then it says average production costs per barrel for bitumen $19.20; correct? 16:13:34

A. Yes.

Q. Okay. How are -- are the numbers in this chart presented on a cash flow basis?

A. It's a calculation of average production prices. I suspect that's not done on a cash basis 16:13:57 but on an accrual basis based upon the realization of what was billed for product shipped, which may not be equal to its cash flow.

Q. And for costs or costs presented on a cash flow basis? 16:14:17

A. I would expect it's the cash, the costs of production, as identified by Exxon, probably on an accrual basis. And I don't know what costs were included or not included.

Q. Are -- are there SEC rules prescribing how 16:14:34

Page 204

these numbers should be presented?

A. I don't think they get into whether it's an accrual basis or a cash basis.

Q. So it sounds like from your testimony, you don't know the basis on which these numbers were 16:14:53 presented; correct?

MR. SAHAM: Objection. Form. Foundation.

THE WITNESS: Well, the critical point is that what -- what I'm addressing in my report is that this is a combination of Cold Lake and Kearl. 16:15:04 And it gives the reader the impression that there's about $6 of margin. And the reader is not informed of an important indicator that the vast majority of bitumen is in Kearl, and that particular product within Kearl is actually experiencing a loss. 16:15:34

And so, there needs to be a -- in terms of MD&A and -- and footnotes to the financial statements, footnotes to this schedule, which provides an important piece of information that is focused on by management and has been a focus of 16:15:56 management and viewed in the eyes of management significantly during 2015. The reader does -- is -- is, I think, misled in thinking that there's a margin with respect to Kearl. And that's not the case. 16:16:20

Page 205

BY MR. TOAL:

Q. So we just reviewed the F&O chart where you -- you agreed that the numbers for Kearl indicated Kearl was cash flow positive; correct?

MR. SAHAM: Objection. Form. Foundation. 16:16:31 Assumes facts not in evidence.

BY MR. TOAL:

Q. I think you're looking for America's F&O report.

A. I have it. Year-to-date operating 16:16:57 earnings, negative 304 million. Segment earnings are negative 580 million. The Capex, $24.16, which is $0.11 less than the realized price. Certainly not $5.

Q. Well, the -- the chart on page 9 says it's 16:17:36 presenting average production prices; correct?

A. Yeah, in this chart in -- in Exhibit -- is it 20? In Exhibit 20, is average --

Q. I'm sorry, I'm asking about the chart on -- in the 10(K) on page 9. 16:18:06

A. Right.

Q. That refers to production prices and production costs.

A. Right.

Q. That says it's -- it's summarizing average 16:18:13

52 (Pages 202 - 205)

Page 206

production prices and average production cost by geographic area and product type; right?

A. Correct.

Q. So this chart is saying on average, bitumen assets in Canada and South America have 16:18:25 approximately a $5 plus margin; right?

A. That's what it's saying. And the profitability analysis in the F&O report is indicating that cash in versus cash out leaves an $0.11 margin for Kearl -- 16:18:58

Q. Well --

A. -- which is the overwhelming amount of product and revenue. And it's not experiencing a $5 margin.

Q. Are you aware of any SEC regulation that 16:19:14 requires oil and gas companies to break out the profitability of assets by field?

A. Well, there -- there are certain SEC regulations that require an analysis and a presentation based upon revenue, when revenue is 16:19:42 tracked by field.

However, in -- in this discussion, what I'm focusing on more in the -- is -- is that management has reports and is -- in the eyes of management, they've been seeing that Kearl is not 16:20:06

Page 207

experiencing a margin of $5. And the -- the -- the experience that Kearl is massively different than the experience at Cold Lake.

Cold Lake had segment earnings of $336 -- $336 million. Kearl had a negative $580 million. 16:20:34 They're dramatically different, and to mush them together to conceal that Kearl is a troubled asset, I -- I -- it's why I say what I said on page 2 of my report.

Q. Have you looked at Exxon's prior 10(K)s in 16:20:56 the -- the chart on production prices and production costs?

A. Well, the prior -- there's a 2014 here. But 2014, Kearl is not as dominant as it was in 2015. 16:21:22

Q. Is -- is this the same way that Exxon Mobil presented production prices and production costs in 2014, 2013, 2012?

A. It's the same way, but facts and circumstances have changed dramatically in 2015. 16:21:37

Q. Okay. We can -- we can come back to that, but I want to get back to your report.

So the -- we read some language at Paragraphs 112, 113, and 162 of your opening report which concerns the requirements of Item 303; right? 16:21:54

Page 208

MR. SAHAM: What -- what page did you say? I'm sorry.

MR. TOAL: Paragraphs 112, 113, and 162.

THE WITNESS: Yes.

BY MR. TOAL: 16:22:13

Q. Okay. Do you base your opinion that Exxon Mobil should have disclosed Kearl's supposed operating losses on any other regulation other than Item 303?

A. Well, I -- I think that when Exxon 16:22:23 disclosed in 2016, it disclosed the de-booking and the experience of Kearl in both the footnotes to the financial statements and in the MD&A.

And I expect the footnotes to the financial statements come -- portion arise in part 16:23:09 from 932 -- ASC 932 and ASC 275 where they're talk- -- address risks and uncertainties that are important for the reader to understand. Risks and uncertainties associated with the Kearl operations.

Q. Do you offer any opinion in this case on 16:23:41 what ASC 275 required in terms of disclosure?

A. 275 requires disclosure of significant risks and uncertainties particularly with respect to accounting estimates or in addition to accounting estimates that could have a -- a material impact on 16:24:10

Page 209

the financial position of the company.

Q. Have you offered any opinion in your expert reports regarding ASC 275?

A. No, it's -- it's consistent with -- with the MD&A disclosures that are described in my 16:24:30 report. And I noted that Mr. Abington identified ASC 275. I think he has a good point, so I've added that.

Q. And where do you reference ASC 275?

A. It -- it's not in my report. 16:24:53

Q. Is it in your --

A. But I've --

Q. -- reply report?

A. -- I've -- I've read his reply report.

My -- my reply report is discussing where 16:25:01 I think he has misled or is incorrect.

It happens that he makes a statement with respect to ASC 275 that I agree with.

Q. Do you -- do you reference ASC 275 in either your opening or your reply reports? 16:25:22

A. I don't think so.

Q. All right.

I'm going to show you a document we'll mark as Regan Exhibit --

MS. SHAMAILOVA: 20. 16:25:59

53 (Pages 206 - 209)

Page 210

MR. TOAL: 20.

THE COURT REPORTER: 21.

MS. SHAMAILOVA: 21.

MR. TOAL: 21.

This is the -- from the Federal Register     16:26:08 17 CFR Parts 211, 231, and 241. And it's entitled "Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operation." [As read]

(Regan Deposition Exhibit 21 was marked     16:26:27 for identification.)

THE WITNESS: Thank you.

BY MR. TOAL:

Q. Is this a document you're familiar with?

A. Yes.     16:26:49

Q. Did you review this document when preparing your reply report?

A. I don't know. I would have to look at the footnotes and the text to see if it's referred to in the reply report.     16:27:19

Q. All right.

Do you see under "SUMMARY" in the left column on the first page it says, "The Commission is publishing interpretive guidance regarding the disclosure commonly known as Management's Discussion     16:27:31

Page 211

and Analysis of Financial Condition and Results of Operations, or MD&A"? [As read]

A. Yes.

Q. All right.

If you turn to page 75063, if you go down     16:27:48 to the middle column under the heading B, "Sources and Uses of Cash," do you see in the second half of that first paragraph it says, "MD&A should focus on the primary drivers of and other material factors necessary to an understanding of the company's cash     16:28:24 flows and the indicative value of historical cash flows"?

Do you see that language?

A. I do.

Q. Okay. And the -- the MD&A is supposed to     16:28:40 reflect management's view of the company; correct?

A. Yes. It's looking at the company through the eyes of management, and it's providing textual -- a textual discussion of what resides within the financial statements.     16:29:00

Q. And is it your view that Exxon Mobil considered Kearl to be a primary driver for cash flows in its upstream segment as of 2015?

A. I would think it was material to Exxon's operations. We talk about materiality in my -- I     16:29:21

Page 212

think it's in -- I know it's in my original report. I don't know if it's in my reply report because Mr. Abington didn't discuss materiality.

Q. Can you answer my question?

The question is whether you're expressing     16:29:38 an opinion that Exxon Mobil management in 2015 considered Kearl to be a primary driver for cash flows in its upstream segment?

A. Based on the characteristics of Kearl and     16:30:00 its performance and the analysis that was done by management on a reoccurring basis through the F&O reports, I think that what I've seen is consistent with their view that it is a primary driver.

Q. What percentage of upstream cash flows did Kearl account for in 2015?     16:30:20

A. I haven't made that calculation. This is under the caption "Sources and Uses of Cash." But I haven't made that calculation. I'd need to make that calculation.

Q. When we looked at Exxon Mobil's 10(K) for     16:30:42 2015 in the chart on page 9, what regulation governs the presentation of those numbers?

MR. SAHAM: Objection. Asked and answered.

THE WITNESS: Well, from a -- an     16:31:29

Page 213

accounting perspective, the presentation of other financial information that accompanies the finan- -- audited financial statement should be reviewed for fairness and reasonableness by auditors and accountants.     16:32:10

This is not a part of the MD&A, but when there is a presentation of the kind of information that is seen on page 9, it should not mislead readers, and it should be consistent with the financial information that's include- --     16:32:35 incorporated in the financial statements.

BY MR. TOAL:

Q. Are you familiar with Regulation S-K?

A. S-K, yes.

Q. And what does Regulation S-K cover?     16:32:46

A. It covers the financial reporting by a public entity.

Q. And are -- are you familiar with the fact that Regulation S-K provides that disclosure shall be made by geographical area and for each country     16:33:05 and field that contains 15 percent or more of the registrant's total proved reserves expressed on an oil equivalent barrel's basis unless prohibited by the country in which the reserves are located?

A. I'm -- I'm familiar with that language,     16:33:23

54 (Pages 210 - 213)

Page 214

and I think I quote it in my report.

The reserve -- reserves at Kearl round up to 15 percent. How do they get -- there's a -- an -- an argument that Kearl should be presented.

But when -- when you combine two disparate    16:33:41 operations into one number, where one represents a $500 million loss and the other rep- -- rep- -- is a three hun- -- more than a $300 million profit, it results in a mis- -- in a -- in a presentation which is misleading to the reader.    16:34:06

Q. Kearl accounted for less than 15 percent of Exxon Mobil's proved reserves as of 2015; correct?

A. Oh, let's see.

I don't have my calculator with me, but --    16:34:25

Q. Well, take a look at --

A. Page 5?

Q. -- take a look at page 36 of your opening report.

Do you see in Footnote 114 you calculated    16:34:49 that Kearl accounted for 14.54 percent?

A. Right, which rounds to 15.

Q. Is there anything in the rule about rounding?

A. Pardon me?    16:35:02

Page 215

Q. Is there anything in the rule about rounding?

A. Well, 14.5, if you were to measure it in -- in a percentage without decimals, it's 15 percent.    16:35:12

Q. Well, the rule talks about a field that contains 15 percent or more.

A. Yeah.

Q. So you read that to say that you should round up from 14.5?    16:35:22

A. Well, when you calculate a number and it's 14.5 and you present it as a percentage without a decimal, it becomes 15.

Q. So is that your understanding of the rule, that you round up?    16:35:34

A. That's a legal question. I'm -- I'm not an attorney and I don't have --

Q. It's an accounting question.

A. I think from an accounting per- -- perspective, you look at it more from the importance    16:35:42 in the eyes of management, the distinction in performance of -- of Kearl's operations, and it's performing significantly different than Cold Lake.

And when you lump them together, you are concealing significant information about a material    16:36:08

Page 216

resource --

Q. Have you --

A. -- and operation. I mean, they're -- management was consistently asked about Kearl. Management consistently focused on Kearl. People    16:36:22 wanted to know how -- what -- what -- is Kearl profitable. The answers were always evasive and vague.

Q. Did Ex- -- did Exxon Mobil ever say that Kearl was profitable at that time?    16:36:38

A. I think it used words which resulted in the -- in the question of not knowing whether there were profits or if there were losses. And if there were losses, were they significant.

Q. Do you -- are you aware of any statement    16:37:03 by Exxon Mobil in 2015 saying that Kearl was profitable?

A. I've seen statements which somebody could interpret that statement as indicating that there were profits within Kearl.    16:37:23

Q. Are you aware that the SEC considered requiring disclosure at the field level and decided against it?

A. In this instance?

Q. In -- in terms of promulgating its rule    16:37:41

Page 217

on -- in Regulation S-K.

MR. SAHAM: Objection. Form. Foundation.

THE WITNESS: I -- I don't have a reco- -- recollection of that discussion. I -- I've seen other SEC discussions where they do address if, at    16:37:59 the field level, there's a separate accounting and separate performance, it would sometimes be necessary to include that within the provisions that they're discussing.

I'm -- I'm aware of the 15 percent item    16:38:26 that you mentioned. This is -- this is equal to 15 percent.

BY MR. TOAL:

Q. 14.5 percent is equal to 15 percent in your view?    16:38:44

A. If you were to -- if you were to have a 14.54 percent and you were to show it as a [verbatim] integer, it would be 15.

Q. Did -- as part of your work on this matter, did you analyze the disclosures of other    16:38:59 major oil and gas companies to see if any of them disclose profitability at the field level?

A. No, but you did see that I identified the overwhelming amount of de-bookings that were occurring. And I -- you have to be careful be- --    16:39:25

55 (Pages 214 - 217)

Page 218

or -- because, you know, for example, Chevron, Anadarko, and Enron Oil and Gas, they had massive write-offs in 2015.

Others that were based on reporting out of FASB on an IFRS basis had impairments and write-offs in 2015.

Now they're -- they're -- IFRS rules are different, so I don't -- I didn't mention those in the report.

But the overwhelming amount of disclosure with respect to de-bookings or impairments, which is a step further than de-booking, they were occurring in 2015, not 2016.

Q. When you're talking about Chevron --

A. And -- and Chevron -- or, excuse me, Exxon continu- -- continually was concerned about the SEC waiting for requirements of de-booking in speeches and articles, and there were discussions at the Exxon management level about we -- we've got to -- we have to be mindful of the SEC's expectations.

Q. When you're talking about Chevron and Anadarko and Enron Oil and Gas, you're talking about impairments, not de-booking of proved reserves; right?

A. Right. But impairments is a step further

Page 219

than de-booking.

Q. So the analysis under U.S. GAAP for impairments is governed by ASC 360; right?

A. Yes. And in an oil and gas enterprise, it's 932-360, which marries ASC 360.

Q. And ASC 360 sets out a three-part test for evaluating impairments; correct?

A. Yes.

Q. And in the first step you need to assess whether there's reason to believe that the carrying value of an asset may not be recoverable; correct?

A. Yes.

Q. And that's referred to as an impairment trigger?

A. Yes.

Q. And then in the second step, if you have an impairment trigger, then you have to see if the undiscounted cash flows from that asset exceed the carrying value for the asset; correct?

A. Correct.

MR. SAHAM: Hey, Dan, if we're moving into impairment, is this a good time for a break?

MR. TOAL: Before I get to Step 3? Are you kidding me?

MR. SAHAM: We'll do Step 3. We'll let

Page 220

you -- I don't want to -- I don't want to steal your thunder, so...

BY MR. TOAL:

Q. Okay. And then if the undiscounted cash flows are less than the carrying value, then you have to assess the fair market value of the asset and write the carrying value down to the fair market value of the asset; correct?

A. Correct.

MR. TOAL: Okay. We can go off the record.

THE VIDEOGRAPHER: This is the end of Media Number 5. We are off the record at 4:43 p.m.

(Short recess taken.)

THE VIDEOGRAPHER: This is the beginning of Media Number 6. We are back on record at 4:52 p.m.

BY MR. TOAL:

Q. Mr. Regan, in your report you identify a number of other oil and gas companies that took impairments in 2015; correct?

A. Yes.

Q. And the majority of those followed different accounting rules, either IFRS or full cost accounting; correct?

Page 221

A. What page are you on?

Q. Well, I'm trying to move this along.

But if -- I think you testified earlier that the only other successful efforts -- accounting companies that took impairments in 2014 or 2015 were Chevron, Anadarko, and Enron Oil and Gas; correct?

A. Correct. Yeah. The -- the other were -- used IFRS, which has a -- a lower bar to trigger impairment.

Q. As -- as does full cost accounting; correct?

A. Yes.

Q. Now, even for companies that used the same method of accounting, like successful efforts, the fact that one company takes an impairment of certain of its assets doesn't mean that other companies necessarily need to impair their assets; correct?

A. Correct.

Q. And with respect to impairment, there were four Rocky Mountain dry gas assets that Exxon Mobil ended up impairing in 2016; correct?

A. Yes.

Q. And in your analysis, your analysis essentially is that those assets should have been impaired at the end of 2015; correct?

56 (Pages 218 - 221)

Page 222

A. Yes.

Q. And one of the assets that Exxon Mobil impaired in 2016, you actually agree should not have been impaired in 2015 either; correct?

A. Correct.                    16:54:45

Q. And that's Green River?

A. Yes.

Q. Now, you're aware that Exxon Mobil prepared a detailed white paper reflecting its analysis of whether there's an impairment trigger or 16:55:02 any impairment of its Rocky Mountain dry gas assets in 2015; correct?

A. Yes.

Q. And you've reviewed that white paper?

A. Yes.                    16:55:16

Q. Do you have any reason to believe that white paper was not prepared in good faith?

MR. SAHAM: Objection to form. Calls for speculation.

THE WITNESS: I don't give opinions on 16:55:26 that as- -- that aspect. I think that goes to intent. I can't -- I'm not going to testify about somebody's intent, whether it's good or bad or...

BY MR. TOAL:

Q. So you're not offering any opinions in 16:55:41

Page 223

this case regarding intent; correct?

A. I'm not.

Q. Are you offering any opinions in this case on the adequacy of Exxon Mobil's controls and procedures related to impairments?        16:56:02

A. Well, I think the controls and procedures, you know, I became aware to some extent. They're talked about in the 10(K). They're talked about in some of the documents that are referred to.

But my principal concern with respect to 16:56:23 the analysis by Exxon was in the use of the company's price plan in -- in its analysis and that the price plan for its 2015 analysis, you know, was substantially set at such a high level, it was not reasonable. And that it should have been -- instead 16:56:54 of use the company's data guide, it should have used NYMEX and should have then inflated NYMEX in the years -- six years out at -- at a reasonable inflation rate.

And if they would have used a more -- if 16:57:18 they wouldn't have used an unreasonable price, then it would have triggered impairments that are seen in the chart that I prepared at -- at page 130.

Q. Okay. So before we get there, I just need to know if you're offering any opinions in this case 16:57:39

Page 224

on the adequacy of Exxon Mobil's controls and procedures related to impairments?

MR. SAHAM: Objection. Asked and answered.

THE WITNESS: Yeah again, I -- I don't 16:57:52 criticize the controls and procedures other than the fact that they started in their cash flow analysis with a pri- -- with prices that -- that were excessive. They were unreasonable in relation to the prices that they should have used.        16:58:08

BY MR. TOAL:

Q. Do you have any expertise in forecasting prices for natural gas?

A. I've reviewed, analyzed prices for na- -- natural gas in -- certainly in the Alta Bates 16:58:24 [verbatim], and I may have in the Anadarko case and in the other case. For some reason I can't remember the name of it.

Q. That's not my question.

Do you have expertise in forecasting 16:58:41 prices for natural gas?

A. Well, I've certainly done in -- done a lot of forecasts. I've testified about forecasts. I've testified about accounting rules relating to forecasts. I've testified about the differences 16:59:08

Page 225

between a forecast and a projection or a pro forma.

Now, whether or not -- whether or not it's specific to natural gas, you know, there -- there have been specifics with respect to natural gas. Alta Bates [verbatim] was one for sure. I'd have to 16:59:29 look at my Anadarko report to see if that was a part of the case. And there was the other case that I mentioned.

Q. Mr. Regan, you're an accountant; correct?

A. I'm a CPA and certified in financial 16:59:45 forensics.

Q. And at the beginning of the day you told me your expertise was in accounting; correct?

A. That's correct.

Q. Have you ever been qualified as an expert 16:59:54 in forecasting natural gas prices?

A. Well, I would -- I would need to look at -- let's see -- all of those cases that I've mentioned which contain forecasts of natural gas, they all settled prior to trial.        17:00:20

Q. Were you ever accepted by a Court as an expert on forecasting natural gas prices?

A. I don't think that those -- the cases in which I participated in preparing or critiquing forecasts of natural gas prices, I think all of them 17:00:35

57 (Pages 222 - 225)

Page 226

had settled prior to my testimony at trial.

Q. So you've never -- you've never been accepted by a Court as an expert in forecasting natural gas prices; correct?

A. I think that's the conclusion from my prior answer. 17:00:48

Q. So can you say "yes"?

A. I -- I've -- I've never testified at trial in matters that involved forecasting natural gas prices. 17:01:05

Q. Have you ever held yourself out as an expert in forecasting natural gas prices?

A. I don't hold myself out as other than an expert in GAAP and GAAS.

Q. And there's nothing in -- and when you talk about "GAAS," you're talking about generally accepted auditing standards, not natural gas; correct? 17:01:20

A. That -- that's what the acronym GAAS stands for, generally accepted auditing standards. 17:01:36

Q. And if I look at your CV, will I find anything in there suggesting that you're an expert in forecasting natural gas prices?

A. No. I think the only -- and -- and I'd -- I'd need to look and see if it's in my CV. I 17:02:01

Page 227

prepared a [verbatim] accounting guide for the accountants' preparation of forecasts, projections, and pro formas. And I don't -- I don't know if it's still in -- but it -- it's not specific as to natural -- natural gas. I know that. 17:02:25

Q. Okay. When coming up with the prices that you use in your undiscounted cash flow analysis, did you conduct an assessment of long-term demand and supply trends in the market for natural gas?

A. I used the NYMEX futures and then escalated in -- af- -- after the sixth year at two and a half percent. And I also did a -- a -- a -- a -- a number of comparisons between NYMEX and other indices. 17:02:49

I also noted that the -- Exxon's guidance indicated that NYMEX is the index that should be used; it's preferred. It was -- and I also compared the company's plan to other indexes [verbatim] by year, and the company's plan by year is not reasonable. It's -- and you can look at page -- page 56 of my rebuttal report starting at 56. 17:03:21

If you look at -- if you look at page 55, natural gas prices versus spot prices. If you look at -- 17:04:04

Q. So, Mr. Regan, my question was, in coming 17:04:36

Page 228

up with the prices that you use in your undiscounted cash flow analysis, did you do an analysis of long-term demand and supply trends for natural gas; yes or no?

A. Well, I think, for example, look at 65 of the reply report. 17:04:51

Q. Can you answer my question?

A. I think 65 is -- provides that analysis.

If you look at the Exxon 2015 price plan, it's an outlier in comparison to NYMEX futures, which is actual prices that -- that are being transacted in the marketplace, which is a reflection of an expectation of supply and demand. That's a key ingredient in -- in what drives market futures. 17:05:07

And if you look at the light blue line, that's the market futures as of December 31, 2015. It's -- it's very close to the 2016 Exxon price plan. Nowhere near what the 2015 Exxon price plan was. 17:05:32

Q. So other than looking at NYMEX futures prices, did you do anything else that you consider to be an analysis of long-term demand and supply trends for natural gas? 17:05:59

A. Well, I think also the chart on page 66, that is a reflection of long-term supply and demand 17:06:20

Page 229

as reflected in futures prices.

Q. Okay. Anything beyond that?

A. I think if you look at page 69, Exxon has something that it calls a build plan. And I noticed that Exxon's prices in its build plan, which presumably is a reflection of -- of supply and demand, is very similar to NYMEX -- NYMEX futures. That's N-Y-M-E-X. 17:06:49

Q. Mr. Regan, are you aware of any third-party forecaster that uses the methodology that you used to try and forecast natural gas prices decades into the future? 17:07:10

MR. SAHAM: Objection. Form. Foundation. And misstates prior testimony.

THE WITNESS: I think the Exxon data guide provides guidance that is consistent with what I've done. 17:07:23

BY MR. TOAL:

Q. Well, you said Exxon said that NYMEX is the index that should be used and that was preferred. 17:07:43

Where did Exxon Mobil say that?

A. I think it's in my -- my reply report.

Q. Did Exxon Mobil say that NYMEX should be used for projecting long-term prices for natural 17:07:56

58 (Pages 226 - 229)

Page 230

gas?

A. No. It indicates that you use NYMEX prices for a period of time. I think it's a -- you look out five years, and then you -- for periods after that, you inflate based upon a reasonable rate of inflation, which I used two and a half percent.    17:08:15

Q. And when Exxon Mobil said that, it said that it could be used as a sensitivity analysis; correct?

A. That's -- yes, that's a sensitivity analysis to assess the reasonableness of an item that is used in the calculation.    17:08:34

Q. Are you familiar with Exxon Mobil's outlook for energy?

A. No, I don't -- I don't have a specific recollection of that document.    17:08:46

Q. Are you aware that Exxon Mobil annually conducts a detailed assessment of demand and supply for oil and natural gas?

A. I believe I've heard that.    17:09:00

Q. And are you aware that Exxon Mobil has an entire corporate strategic planning group that is responsible for conducting that analysis every year?

A. I'm not aware of the specifics, but, you know, if you look at page 57 of my reply report in    17:09:15

Page 231

Paragraph F, the -- the plan -- or -- or the -- the prices within Exxon's analysis assumes a ten and a half percent compound annual growth rate.

And look at the compound annual growth rates from 2010, '11, '12, '13, '14, and '15, it's a    17:09:39
negative 12.8, negative 9.9, negative 16.9, negative 15.9, negative 2.1, negative 9.7. If somebody wants us -- to convince me that it's reasonable to use a compound annual growth rate of 10.5, you need to get a new group to do your projections.    17:10:02

Q. Mr. Regan, Exxon Mobil analyzed the factors under ASC 360 that are relevant to assessing whether there's an impairment trigger; correct?

A. It did.

Q. And one of the things you focus on was that there were low current prices for natural gas in 2015; correct?    17:10:26

A. No, not current prices. I mean, if you look at -- at my report on page -- in my original report, page 93, in Paragraph 185, I'm looking at what is a persistent, long-term trend going back to 2005. There is a persistent, long-term trend that is continuing through -- from 2005 to 12/31/15, and it actually continued into 2016.    17:10:46

Q. So one of the factors under ASC 360 is    17:11:18

Page 232

whether there's a current period operating or cash flow loss combined with the history of operating or cash flow losses or projection of future losses; correct?

A. Yes.    17:11:33

Q. Okay. So for these three Rocky Mountain dry gas assets that you reference in your report, did you assess whether there was a history of operating losses on those properties?

A. If you look at page 96, Paragraph 191 and Paragraph 190, you have year-to-date XTO U.S. losses of more than $1.3 billion.    17:11:52

Q. And was there a history of losses for XTO?

A. Well, that -- that's a history of losses.

Q. Well, that's a current year loss; correct?    17:12:40

A. Yes, but it's a whopper, $1.3 billion.

Q. So is it your opinion that if you have a big loss in a year, that, in and of itself, is an indication of an impairment trigger?

A. No. I would look at it in conjunction with Paragraph 185, where what's driving those losses in -- or a significant influence on those losses is the price of natural gas. And that price of natural gas is a persistent low price and declining. Prospects of -- of significant    17:12:58    17:13:23

Page 233

improvement are unlikely.

Q. Mr. Regan, as of 2015, for any of these Rocky Mountain dry gas assets, was there either a history of operating losses or a projection of future losses?    17:13:45

A. Well, I don't think you can ignore the sea of red that is seen on Paragraph 192 of my original report, a $1.3 billion loss.

Q. Can you answer my question --

A. In an -- in an environment of a persistent decline in the price of the commodity. I think that is a history of operating losses.    17:14:22

Q. So your history of operating losses refers to losses in 2015?

A. That's what I focused on in the report, together with the persistent declining natural gas prices that had been going on for ten years.    17:14:42

Q. Did you identify a history of losses for any year prior to 2015?

A. I don't recall doing that. I also -- you know, we talked earlier about, you've got sub- -- depos- -- depositions subsequent to my reports. And I've got a -- the concur -- I saw the concurring partner at PwC indicating that with the significant decline in prices, he expressed it in a very    17:15:01    17:15:31

59 (Pages 230 - 233)

Page 234

colorful way, that it was certainly an -- an impairment trigger.

The -- the history and the declining natural gas prices that were in place and the -- and the change in -- even the change in Enron's [verbatim] price plan was a no-brainer, that it -- there was an impairment trigger.

Q. Enron's price plan?

A. Exxon's price pl- -- price plan.

Thank you.

Q. Now --

A. It's -- I think his name is -- I can't remember the name of that person, but you probably are aware of that testimony.

Q. So Exxon Mobil developed price projections for natural gas that it included in its data guide; correct?

A. Yes.

Q. And it indicated that those prices should be used for purposes of evaluating multibillion dollar investments; right?

A. It did.

Q. And do you have any -- any information suggesting that Exxon Mobil did not actually use those prices in its data guide to evaluate

Page 235

investment opportunities?

MR. SAHAM: Objection to form.

THE WITNESS: Well, it -- it does have significantly different prices in its build plan, which, you know, I -- I would like to know more about what the build plan is and how it was used within Exxon. And hopefully, there will be additional discovery about that because you can see that the build plan and the NY- -- NYMEX futures are very -- very consistent with each other.

BY MR. TOAL:

Q. Mr. Regan, do you have any evidence suggesting that Exxon Mobil did not actually use the prices in its data guide, the opportunity cost, to evaluate potential investments?

MR. SAHAM: Objection to form. Foundation.

THE WITNESS: I haven't --

(Simultaneous speaking.)

THE COURT REPORTER: Wait, one second.

MR. SAHAM: Yeah, let me just finish objecting, Paul. Sorry.

THE WITNESS: I'm sorry.

MR. SAHAM: Objection. Form. Foundation. Calls for speculation.

Page 236

THE WITNESS: I haven't looked and made a determination of to what extent it incorporated its price plan in its investment decisions. If its price plan as a -- as it existed in 2015 was its ex- -- expectation, it should have been buying up a heck of a lot of oil and gas properties. And I don't think it did that.

BY MR. TOAL:

Q. So can you identify any instance, as you sit here today, where Exxon Mobil did not use the opportunity prices in its data guide in evaluating investment opportunities in 2015?

MR. SAHAM: Objection. Form. Foundation.

THE WITNESS: I --

MR. SAHAM: Calls for speculation.

THE WITNESS: I --

MR. SAHAM: Assumes facts not in evidence.

THE WITNESS: I don't have an analysis, one way or the other.

BY MR. TOAL:

Q. Mr. Regan, I'm going to show you a document entitled "Assessment of Potential Impairment Triggers." And it has the Bates Number EMC_RAM '1. And we'll mark this as Regan 22.

(Regan Deposition Exhibit 22 was marked

Page 237

for identification.)

BY MR. TOAL:

Q. Do you recognize this as the Exxon Mobil impairment white paper prepared for 2015?

A. Yes.

Q. And at the top of this page, it says, "Exxon Mobil employs a variety of business and financial processes to monitor for potential impairment triggers as required under ASC 360."

Do you see that language?

A. Yes.

Q. Do you have any reason to dispute the accuracy of that statement?

MR. SAHAM: Objection. Form. Foundation. Calls for speculation.

THE WITNESS: No.

BY MR. TOAL:

Q. And if you turn to page 5, it's got the Bates number of EMC_RAM '5. You see there's a section entitled "Current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset." [As written]

Do you see that?

60 (Pages 234 - 237)

Page 238

A. I do.

Q. And you agree that Exxon Mobil conducted an analysis of that factor; correct?

MR. SAHAM: Objection to form. Foundation. Calls for speculation.    17:21:28

THE WITNESS: I believe so, yes.

BY MR. TOAL:

Q. And if you turn to the next page, page 6, you see in the middle paragraph, in the middle of that paragraph, it says, "Management's cash flow    17:21:44 projections were based on the Company's" -- "Company Plan's middle case of the Opportunity Case prices, and future operating expense and capital spending plans applied to the resource base as determined by the Corporation's technical staff.    17:22:00

The Company Plan Opportunity Case prices are the outcome of a rigorous, annual process to assess the worldwide, long-term supply and demand balance for energy sources. The Corporation uses these price outlooks in assessing long-term    17:22:17 investment opportunities and they are consistent, or even conservative, when compared to the long-term price forecasts published by several reputable industry" -- "industry groups such as WoodMac, EIA, IEA, IHS-CERA, and PIRA." [As read]    17:22:33

Page 239

Do you see that language?

A. Yes.

Q. Do you have any reason to dispute the accuracy of anything in that language?

A. No.    17:22:44

Q. And you agree that Exxon Mobil compared its long-term price projections to those of third-party forecasters; correct?

A. Yes.

Q. And it determined when it did that, that    17:22:56 its projections were consistent or conservative with the -- or conservative relative to those of the third-party forecasters; right?

MR. SAHAM: That misstates -- objection. Assumes facts not in evidence.    17:23:20

THE WITNESS: Yeah, do you have a chart that -- that reflects that because I don't see that.

BY MR. TOAL:

Q. Well, take a look --

MR. TOAL: Oh, yeah.    17:23:43

BY MR. TOAL:

Q. So take a look at EMC_RAM '27 in this document.

Do you see here that Exxon Mobil's comparing its projections of long-term natural gas    17:24:05

Page 240

prices to those of Woods MacKenzie [verbatim], EIA, IHS-CERA and PIRA?

A. Yes. I see that, yeah.

Q. And do you see that Exxon Mobil's long-term projection is lower than the projections    17:24:29 from those forecasters?

A. Let -- let me -- so which line is Exxon Mobil's line?

Q. Do you see the -- there's an arrow on the right, and it says "$4 per MBTU, 2015 dollars,    17:25:05 Mid-point of Opportunity Evaluation Cases"? [As read]

A. I do, yeah.

Q. Okay. And do you see all the other lines are at the same level or higher than Exxon Mobil's    17:25:27 long-term projection?

A. You know, we -- we tried to recreate that chart on 810 of my original report. And we were seeing lower lines.

Q. Well, the --    17:26:05

A. No, I didn't --

Q. -- chart you have on page 110 --

THE COURT REPORTER: Can you start that question over.

BY MR. TOAL:    17:26:17

Page 241

Q. Mr. Regan, the chart you have on page 110 also shows that Exxon Mobil's long-term projected price of $4 is equal to or lower than those of IHS-CERA, Woods MacKenzie [verbatim], PIRA and EIA; right?    17:26:35

A. Right. Right.

Q. So Exxon Mobil did compare its long-term projections to those of the third-party forecasters; correct?

A. Some third-party forecasters, yes.    17:26:46

Q. And it determined that its projections were consistent with or lower than those of other third-party forecasters; correct?

MR. SAHAM: Come on.

THE WITNESS: Well, my recollection is    17:27:01 that in the cash flow analysis and forecast, the Exxon $4 -- $4 pricing was accelerated to an earlier date than -- than these are forecasting.

Also, there is a document -- we talk about this on page 109 of my original report in Paragraph    17:27:40 C. And we -- I state that "the third-party pricing included in Exxon's documentation was similarly outdated, and in certain instances, including pricing measures for EIA and PIRA that were internally recognized as not having 'much weight'    17:28:04

61 (Pages 238 - 241)

Page 242

for natural" -- "natural gas pricing." [As read]

And in Paragraph D on page 110, I say, "Third-party pricing included in PwC's audit documentation appears to include similarly dated third-party price information." [As read]     17:28:24

So I -- I'm concerned that some of these indexes are recognized within Exxon as to not carry much weight, and the lines are drawn based on outdated information when we analyzed this in particular.     17:28:53

BY MR. TOAL:

Q.  Now, have you -- have you run an undiscounted cash flow analysis using projections, full projections, from Woods MacKenzie [verbatim] or IHS-CERA?     17:29:14

A.  No.  Our undiscounted cash flow analysis was based on the NY- -- NYMEX.  And then, as an indicated in this document, using two and a half percent as you move into year six and beyond.

Q.  And you cut -- well, you -- you do use a     17:29:34 Woods MacKenzie [verbatim] projection for five years, but then you cut it off after five years implying rate of inflation; right?

MR. SAHAM:  Objection.  Form.

THE WITNESS:  Yes, I think that's     17:29:47

Page 243

reflected in the chart.

BY MR. TOAL:

Q.  And -- and you did that because if you use the Woods MacKenzie [verbatim] projections themselves, that would have shown that the     17:29:59 undiscounted cash flows exceeded the carrying value of the Rocky Mountain dry gas assets; right?

MR. SAHAM:  Objection.  Form.  Foundation. Misstates testimony.

THE WITNESS:  Well, there's a -- there's a     17:30:22 comparison at 235 -- Paragraph 235, page 124.  And you can see that the -- we compared the prices in the data guide to the NYMEX -- NYMEX, Henry Hub, Wood MacKenzie and IHS.  And you can see that the data guide is substantially higher, materially     17:30:48 higher than -- than all three of these.  That's also seen in the chart in -- in page 126, Paragraph 238.

And in the conclusion, which is at page 130, at Paragraph 247, you can see the -- in the original report, the impairment indicators.  And     17:31:21 they are impairment -- on -- Wood -- Wood MacKenzie they are impaired.  We use five-year forecast plus two and a half percent inflator, which was consistent with our methodology.

BY MR. TOAL:     17:31:40

Page 244

Q.  Right.

But you didn't use the Woods MacKenzie [verbatim] projections out into the future; correct?

A.  Not -- not beyond five years.

Q.  And if you had used the actual Woods     17:31:47 MacKenzie [verbatim] projections, that would have shown that these assets were not impaired; correct?

MR. SAHAM:  Objection.

BY MR. TOAL:

Q.  On undiscounted cash flow test --     17:31:56

A.  I don't know that.

(Simultaneous speaking.)

MR. SAHAM:  Objection.  Form.  Foundation. Calls for speculation.

THE WITNESS:  I don't know that.     17:32:04

BY MR. TOAL:

Q.  So you've never ran an analysis using the Woods Mackenzie [verbatim] projections?

A.  No.  Our analysis would consistently -- after you get to -- through the fifth year where     17:32:11 you're using two and a half percent inflation factor.

Q.  And can you point to any third-party forecaster that uses that methodology of projecting five years and then just using a rate of inflation?     17:32:24

Page 245

A.  I think that's what the Exhibit 22 is saying, what should be done.

Q.  Where does it say that?

A.  There's a discussion of the use of a two and a half percent inflator after a certain number     17:32:47 of years.

Here it is, on page Bates EMC_RAM '6.  And it indicates, "Management's long-term inflation assumption of two and a half percent is generally aligned with third parties such as Moody's, IHS,     17:33:19 Oxford Economics, which are between two and two and a half percent."  [As read]

And I believe another guidance in the data guide they talk about -- once you get out beyond five years, it's so speculative, it's -- you know,     17:33:39 your calculations should be using an inflator, and I think they suggest two and a half percent -- two and a half percent.

Q.  Is this reference to long-term inflation assumptions, is that an assumption applied to costs     17:33:54 or to projected natural gas prices?

MR. SAHAM:  Objection to form.

THE WITNESS:  It says in that same paragraph -- near the top it says, "Based on its assessment of the geographic integration of     17:34:22

62 (Pages 242 - 245)

Page 246

operating areas, the Corporation's volume and capex planning and budgeting process, and the level at which largely identifiable revenue and costs could be forecasted, management performed a multi-decade projection of future cash flows (see attached  17:34:41 Appendices A and B)."  [As read]

Then -- then it continues on and --

BY MR. TOAL:

Q.  It continues on to say that "Management's cash flow projections were based on the Company  17:34:53 Plan's middle case of the Opportunity Case prices"; right?

A.  Yes.

MR. SAHAM:  Objection to form.

BY MR. TOAL:  17:35:02

Q.  So if -- if it's the fact that Exxon Mobil, in fact, used its opportunity case prices in evaluating investments, ASC 360 requires the company to use assumptions for its impairment analysis that are reasonable in relation to those price  17:35:18 projections; correct?

A.  I -- I don't think it says "requires." And also, it -- it certainly indicates that the plan must be based on reasonable prices.  And much of my original report and reply report was demonstrating  17:35:38

Page 247

that the prices that were used were not reasonable.

Q.  Doesn't ASC 360 say that the company shall use assumptions that are reasonable in relation to those it uses for its own corporate purposes?

A.  Well, let's -- let's look at it, and let's  17:36:00 read the whole of the -- of ASC 360.

Q.  All right.

So let me show you ASC 360, which we'll mark as Regan Exhibit 23.

(Regan Deposition Exhibit 23 was marked  17:36:14 for identification.)

BY MR. TOAL:

Q.  This is a document you've reviewed in connection with your work?

A.  Yes.  17:36:54

Q.  Let me direct your attention to 360-10-35-30, which appears on page 5 of 8.

All right.  Do you see this says, "Estimates of future cash flows used to test the recoverability of a long-lived asset (asset group)  17:37:24 shall incorporate the entity's own assumptions about its use of the asset (asset group) and shall consider all available evidence.  The assumptions used in developing those estimates shall be reasonable in relation to the assumptions used in  17:37:42

Page 248

developing other information used by the entity for comparable periods, such as internal budgets and projections, accruals related to incentive compensation plans, or information communicated to others."  17:37:58

Do you see that language?

A.  Yeah.  And what I think is important is that in the first sentence, it says, "shall incorporate the entity's own assumptions about its use of the asset and shall consider all available  17:38:15 evidence."  And then there are a number of paragraphs in my reply report and in my original report which considered all available evidence -- or certainly other evidence, and it showed that -- if we look at the next sentence, "the assumptions used  17:38:36 in developing those estimates shall be reasonable in relation to the assumptions used."  [As read]

The argument in my original report and in my reply report is that when you consider all available evidence, the pricing assumptions used  17:38:54 were not reasonable.

Q.  Mr. Regan, who has greater expertise in forecasting natural gas prices, you or Exxon Mobil?

A.  Well, Exxon Mobil is -- you know, the -- it doesn't do forecasting.  It's a corporation.  You  17:39:17

Page 249

have to look to who did the pricing, how was the pricing used.  My understanding is that the pricing, for example, in the fall of 2015, it -- there was recommendations, and it was adjusted by -- by members of the management group.  A lot of the  17:39:41 people that you -- that are discussed in here and discussed in the 10(K), they may have participated, but they didn't make the final adjustments and decision.  It was done by the management group.

I don't know what they considered when  17:39:58 deciding to use the very high amounts that were used and that I've been criticizing in my original report and subsequent report.

Q.  And your methodology relies on NYMEX strip prices; correct?  17:40:17

A.  Yes.

Q.  And --

A.  And an inflator.

Q.  And what's the liquidity of NYMEX strip prices beyond two years?  17:40:24

A.  You know, once you get beyond two years, there's issues with respect to liquidity that the trades after two years are -- are not significant. But they still -- Exxon provides guidance as to the reliability and the -- the use of NYMEX prices in  17:40:54

63 (Pages 246 - 249)

Page 250

putting together forecasts, as indicated in my original report and my reply report.

Q. Does Exxon Mobil say NYMEX strip prices should be used to put together forecasts for long-lived assets?

A. Well, what -- I'd have to do a -- a word search for Exxon's comments and assessment of NYMEX. But my recollection in the 2015 data guide, it -- it complements and speaks highly of NYMEX. And you can use it for a period of time, and then you have to use an inflator, because after -- after approximately five years, they don't -- they recommend an inflator rather than NYMEX.

Q. Do you know what percentage of the production at the three Rocky Mountain dry gas assets you analyzed in your report was to be produced beyond 2020?

A. I haven't made that calculation. But it's -- it's something that resides within the spreadsheet, and it could be done.

Q. Would it surprise you to learn that for a -- Uintah's asset, about 94 percent of the production was to take place after 2020?

A. No. 'Cause the periods in those forecasts are long, and -- and much of -- much of the -- in --

Page 251

in the calculations that -- that were made by Exxon, they accelerated the pace of the increase in the price of gas so that the production -- and then -- then they increased it by significantly more than inflation so that revenue would be very much benefited by those assumptions.

Q. Have you analyzed the extent to which natural gas prices track the rate of overall inflation?

A. Well, you could see that in my analysis, out of the compound annual growth rate assumed in the Exxon calculations versus the compound annual growth rate from the various years, I don't think it was keeping up with inflation. It was -- it was significantly below inflation.

Q. And there are years where natural --

A. It was a -- it was a negative.

Q. And there are years where natural gas prices increased significantly more than the overall rate of inflation; correct?

A. Maybe one year.

Q. Only one year in the history of natural gas prices has that happened?

A. No. I'm looking at -- at the -- the chart that goes back approximately ten years.

Page 252

Q. Is it your -- is it your opinion --

A. There was -- if you look at page 91, Paragraph 182, that's a persistent decline, a significant decline. That is not keeping up with inflation --

Q. Do --

A. -- from -- from 2014 to 2016. And if you look at -- at 1- -- at 185, well, you -- you might have beat inflation in 2007.

Q. Do past prices for natural gas predict future prices for natural gas?

A. Well, I think in most instances when you read the documents that relate to somebody trying to predict, they typically say past prices are not an -- not an -- not an indicator of what future prices will be. But they're an important indicator.

Q. That's your -- that's your opinion as an accountant?

A. An opinion as to somebody that has prepared a lot of forecasts of various commodities and products and services.

Q. Is it your opinion that Exxon Mobil, notwithstanding its use of opportunity case prices to evaluate investments, could have decided to use projections based on NYMEX strip prices plus an

Page 253

inflation escalator to conduct its impairment analysis?

A. That it could have decided to do that?

Q. Yeah. Would that have been permissible under the rules in your view?

A. Yes.

Q. And would it also be permissible under the rules, in your view, for Exxon Mobil to use the actual projections it used to evaluate investment opportunities?

A. Let me -- with -- to evaluate investment opportunities?

Q. Yes.

A. I think it -- it's something that they would -- they could have considered if they chose to.

Q. And that would have been permissible under the rules; correct?

A. Yes.

MR. TOAL: All right.

Why don't we go off the record.

THE VIDEOGRAPHER: This is the end of Media Number 6. We are off the record at 5:47 p.m.

(Off the record.)

THE VIDEOGRAPHER: This is beginning of

64 (Pages 250 - 253)

Page 254

Media Number 7. We are back on record at 5:51 p.m.

BY MR. TOAL:

Q. Mr. Regan, you understand that PwC audited Exxon Mobil's impairment analysis for 2015; correct?

A. Yes. It was included in their audit procedures.    17:51:22

Q. And PwC produced an extensive memo documenting its review and its analysis; correct?

A. Yes.

Q. And you're aware that PWC concluded in that in the analysis that we agree with the determination that there are no assets for which a material impairment should be recorded and that a trigger event has not occurred; correct?    17:51:35

A. Yes, that was the conclusion. However, it did accept the prices that were used in the company plan and in the -- and -- and you can -- that was -- that's the key difference between, you know, the work that I've done and the analysis that I've done and what Exxon did and what PwC was reviewing. It accepted the company's pricing plan.    17:51:54    17:52:14

Q. And --

A. And you'll see consistent criticism within the PCAOB inspection reports, criticizing Pricewaterhouse of accepting that kind of an    17:52:31

Page 255

assumption in other impairment analysis of oil and gas companies, which may include Exxon, but it doesn't identify the companies.

Q. And PwC confirmed that Exxon Mobil was using prices for its projected natural gas prices that were reasonable in relation to those that were used to evaluate investment opportunities; right?    17:52:48

MR. SAHAM: Objection. Form. Foundation.

THE WITNESS: It -- it didn't assess the reasonableness. It accepted them.    17:53:03

BY MR. TOAL:

Q. And it determined they were using the same projected natural gas prices that it used to evaluate investment opportunities; right?

A. That's my recollection. It made that determination, but it did not assess that in comparison to other available information and do an analysis of the reasonableness of the pricing used in the projections.    17:53:14

Q. Now, you say in your report that auditing standards established by the PCAOB recognized that an audit- -- auditor's unqualified opinion does not provide absolute assurance that financial statements are free of material misstatement; correct?    17:53:29

A. Correct.    17:53:46

Page 256

Q. But the auditing standards do establish that an auditor's unqualified opinion provides reasonable assurance that financial statements are free of material misstatements; right?

A. Yes. The financial statements taken as a whole, not as to piecemeal components of those financial statements. The opinion is on the financial statements as a whole.    17:54:00

Q. And to the best of your knowledge, Pricewaterhouse has never withdrawn its unqualified opinion with respect to Exxon Mobil's 2015 financials; correct?    17:54:16

A. Correct.

MR. TOAL: I have nothing further.

THE WITNESS: All righty.    17:54:29

THE COURT REPORTER: Off the record?

MR. TOAL: Off the record.

THE VIDEOGRAPHER: We are off the record at 5:54 p.m. This concludes today's testimony given by D. Paul Regan. The total number of media used was seven and will be retained by Veritext Legal Solutions.    17:54:40

(Off the video record.)

THE COURT REPORTER: Counsel? Scott, would you like a rough?    17:55:23

Page 257

MR. SAHAM: Yes. Just whatever you send them.

THE COURT REPORTER: On the final, too?

MR. SAHAM: Yes.

(Proceedings concluded, 5:55 p.m., on January 29, 2025.)

65 (Pages 254 - 257)

**App. 399**

Page 258

## CERTIFICATE OF REPORTER

I, Hanna Kim, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, not in anywise interested in the outcome thereof.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

In witness whereof, I have hereunto subscribed

Dated: 1

Hanna Kim
CLR, CSR No. 13083

---

Page 259

Scott H. Saham, Esq.
scotts@rgrdlaw.com

January 31, 2025

RE:   Ramirez, Jr., Pedro v. Exxon Mobil Corporation, Et Al
1/29/2025, D. Paul Regan (#7102054)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney.

Copies should be sent to all counsel, and to Veritext at cs-ny@veritext.com

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions

---

Page 260

Ramirez, Jr., Pedro v. Exxon Mobil Corporation, Et Al
D. Paul Regan (#7102054)

### E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____  _____

D. Paul Regan                Date

---

Page 261

Ramirez, Jr., Pedro v. Exxon Mobil Corporation, Et Al
D. Paul Regan (#7102054)

### ACKNOWLEDGEMENT OF DEPONENT

I, D. Paul Regan, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____  _____

D. Paul Regan                Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20___.

_____

NOTARY PUBLIC

---

66 (Pages 258 - 261)

**App. 400**

**[& - 131]**                                                        Page 1

**&**

**&**   2:16 3:4 4:4
4:19 52:23
118:18,19,19

**0**

**0.11**   198:25
205:13 206:10
**000000001**
10:18
**000000079**
10:19
**000000161**   8:7
**000000169**   8:8
**000005478**
101:23
**000007141**
147:16
**000009968**   10:7
**000010025**   10:8
**000012279**   8:24
**000012329**   8:25
**000030838**   9:13
**000030843**   9:14
**000030844**   7:21
**000030846**   7:22
**000035525**   9:22
**000035532**   9:23
**000056334**   8:17
**000056336**   8:18
**00022930**   141:8
**001593539**   9:7
**001593606**   9:8

**003426312**   8:11
**003426325**   8:12
**03111**   1:7 2:7
11:21

**1**

**1**   6:4 11:15
13:12,15 14:15
15:19 16:24
30:15 33:25
51:16 56:9,11
58:1 59:18
68:16 76:1
87:17 94:10
96:3 124:16
131:19 154:19
162:23 184:1,2
185:6 194:15
236:24 252:8
**1,700**   57:17
**1.27.**   158:10
**1.3**   232:12,16
233:8
**1/29/2025**
259:5
**1/31/25**   258:22
**10**   6:9,16,19
7:12,13 10:15
15:21 35:6
36:18 37:12,15
41:1,4 43:25
44:6,10,11
45:2,5,8,14,20
46:15 62:10

65:19 88:23
89:3,8 91:12
92:7 94:2,6,22
102:2,2,3,8
105:19 106:22
113:1 123:3
180:4,21,24
181:5,13
182:13 183:6
183:22 185:13
186:3,5 189:22
192:12,25,25
193:1,18 201:8
202:5 205:20
207:10 212:20
223:8 249:7
**10.5**   231:9
**10019-6064**
4:10
**102**   7:13
155:20 156:1
**107**   7:17
**109**   241:20
**10b**   41:1,4
**10th**   13:14 14:1
124:2,13
**11**   6:5 7:17
8:18 107:14,15
231:5
**110**   96:9
240:22 241:1
242:2
**112**   199:19
207:24 208:3

**113**   200:1
207:24 208:3
**114**   214:20
**117**   8:4
**11:08**   75:18
**11:26**   75:22
**12**   8:4 34:5
41:20 69:18
72:7 117:22,23
187:14 231:5
**12.8**   231:6
**12/31/15**
185:19 231:23
**120**   7:12
**123**   8:9
**124**   194:13
243:11
**125**   101:23
**126**   127:23,24
243:17
**127**   8:13
**1285**   4:9
**12:37**   117:12
**13**   5:5 6:4 8:9
123:21,23
124:18 231:5
**13.29**   180:16
**130**   223:23
243:19
**13083**   1:24
2:20 12:13
258:25
**131**   67:9

**[133 - 2015]**

**133** 98:20 99:14 100:10
**135** 70:7 85:6
**136** 13:21 75:25 78:12 84:9 109:9
**137** 8:20
**138** 195:22
**14** 6:7 8:13 33:5,24 44:12 44:25 127:11 127:14 231:5
**14.5** 215:3,10 215:12 217:14
**14.54** 214:21 217:17
**140** 68:22 175:13
**141** 68:19 69:11
**145** 9:4
**146** 9:9,15
**147** 195:15 196:8
**147,000** 195:14
**15** 8:20 9:21 39:25 59:19 97:3 137:2,3,5 137:9 144:25 150:12 154:5 155:3 159:13 178:17 188:21 213:21 214:3 214:11,22

215:5,7,13 217:10,12,14 217:18 231:5
**15.9** 231:7
**150** 6:9 9:19
**151** 199:8
**157** 185:2
**1593539** 145:8
**15th** 151:17 160:21
**16** 9:4,11 39:15 40:9 42:5 70:18 76:2 145:6,9 146:2 178:7 193:21
**16.9** 231:6
**161** 7:10 68:9 117:21
**162** 118:13 200:9 207:24 208:3
**166** 195:11,22 196:1,3
**16th** 46:2
**17** 7:7 9:9 10:14 15:20 62:2 66:20 145:25 146:4 148:7 210:6
**174** 195:1
**17th** 40:6
**18** 9:15 15:20 62:2 146:20,23 148:8,8 149:15

**182** 252:3
**185** 231:20 232:21 252:8
**19** 9:19 150:11 150:14 160:16
**19.20** 203:10
**190** 232:11
**1900** 3:10
**191** 232:10
**192** 233:7
**196** 10:4
**1996** 49:3
**1:26** 117:16
**1st** 180:17 193:10,11

**2**

**2** 6:7 13:25 14:2,16 16:24 30:18 56:9,11 58:10 68:8 75:18 170:18 184:2,11,23 185:6 186:1 201:7,10 207:8
**2.1** 231:7
**20** 10:4 15:23 74:6 95:5 110:5 112:7 156:9 196:21 205:18,18 209:25 210:1 261:15

**2000** 25:25 54:8 158:17
**2005** 231:22,23
**2006** 43:14,23
**2007** 252:9
**2008** 67:3 116:20
**2009** 47:3 103:7,9,18 104:5 105:17 105:22 106:9 106:20 123:6
**2010** 6:17,21 7:6 43:14,14 43:23 44:1,7 44:14 45:12,15 45:21 46:15 63:1,8 103:12 231:5
**2011** 44:12,25
**2012** 46:2 207:18
**2013** 207:18
**2014** 97:16 104:25 105:13 132:12,17 162:12 193:18 193:22 207:13 207:14,18 221:5 252:7
**2015** 7:12,20 8:16,20 9:6,10 9:12,16,18,21 10:5 25:25

**[2015 - 210]**                                          Page 3

| | | | |
|---|---|---|---|
| 62:10 65:19,19 | 140:2 142:16 | 194:15,17 | 183:1,3,7,24 |
| 71:18,20 79:15 | 142:18 143:11 | 195:10 196:20 | 184:8 185:11 |
| 80:14,20 81:13 | 143:12 144:2,8 | 197:18,24 | 185:21 186:6,7 |
| 81:21 88:23 | 145:7,16 146:2 | 198:21 202:5 | 186:9,17,19,20 |
| 89:3 90:19 | 146:2,21,22 | 204:22 207:15 | 188:23 189:2,6 |
| 96:8,11,17,21 | 149:3 150:4,9 | 207:20 211:23 | 189:12,17,21 |
| 97:5,11,11,24 | 150:13 151:17 | 212:6,15,21 | 190:20,24 |
| 98:6,7,12,15,21 | 155:1,10,18 | 214:12 216:16 | 191:4,7,9,12,24 |
| 99:7,10,15,16 | 156:8,16,17 | 218:3,6,13 | 191:25 192:6 |
| 100:3,21,22 | 157:15,22 | 220:21 221:5 | 192:14,17,24 |
| 101:4,13 | 158:12,17 | 221:25 222:4 | 193:5,11 |
| 103:13,16 | 159:18 160:21 | 222:12 223:13 | 208:11 218:13 |
| 104:5,25 | 162:4,12,21 | 228:9,16,18 | 221:21 222:3 |
| 105:10,13,17 | 164:5,24 166:2 | 231:17 233:2 | 228:17 231:24 |
| 105:23,24 | 169:4 170:21 | 233:14,19 | 252:7 |
| 106:3,5,10,14 | 172:8,16 173:3 | 236:4,12 237:4 | **2018**   132:10 |
| 106:20 107:20 | 173:5,7,16 | 240:10 249:3 |   138:24 |
| 108:3 112:12 | 174:16 175:3,6 | 250:8 254:4 | **2019**   40:6 |
| 112:16 113:1 | 175:25 177:9 | 256:11 | **2020**   250:17,23 |
| 115:21 116:6 | 177:11,15 | **2016**   8:22 | **2023**   54:8 |
| 121:5,6,20,21 | 178:7 179:10 |   65:19 74:15 | **2024**   6:6 13:14 |
| 122:4,12,16,19 | 181:5,6 182:3 |   80:20 105:6,8 | **2025**   1:15 2:19 |
| 122:20,25 | 182:15 183:6 |   116:5 121:18 |   6:9 11:2,7 14:1 |
| 123:6,10,14 | 183:11,12,20 |   121:23 122:8 |   177:7 257:6 |
| 124:2,13,23,25 | 183:22 185:13 |   133:13 137:7 |   259:3 |
| 125:4 126:10 | 186:5 187:7,11 |   138:3 142:16 | **21**   7:19 10:9 |
| 126:15 127:13 | 187:15,21 |   142:25 144:5 |   45:24 46:4 |
| 128:7 130:8,13 | 188:4 190:1,5 |   144:15 156:3,3 |   107:20 210:2,3 |
| 131:2,10,17 | 190:10,16,21 |   156:4,10,16 |   210:4,10 |
| 132:1,4,22 | 190:25 191:6 |   177:9,11 | **21.30**   138:21 |
| 133:3 135:13 | 191:21,22 |   178:18 180:15 |   159:19 175:3 |
| 135:16 137:6 | 192:12,13,16 |   180:17 181:7 | **21.80**   126:7,24 |
| 138:9,12,17,21 | 192:25 193:1,5 |   181:12 182:4 | **210**   7:8 10:9 |
| 139:19,22 | 193:10,21 |   182:16,21 |   66:20 |

**[211 - 3:16]**

**211**  7:8 10:14
66:20 210:6
**212.373.3869**
4:11
**215**  6:6
**21st**  108:3
**22**  10:16 68:23
196:10 236:24
236:25 245:1
**220**  99:21
**229**  7:8 66:20
**23**  10:20 77:9
172:4 247:9,10
**23.40**  132:2
**231**  10:15
210:6
**235**  51:17,17
243:11,11
**237**  10:16
**238**  243:17
**24**  77:11 186:7
**24.16**  198:18
205:12
**24.27**  198:12
**24.66**  154:12
155:1,10
**241**  10:15
210:6
**247**  10:20
243:19
**249**  7:8 66:20
**25**  6:14 8:22
46:11 137:7
144:3,10

**25.07**  202:18
**25.50**  132:10
**25.60**  138:25
**250**  51:23
**25th**  2:17 11:23
128:7 156:10
178:17
**26**  8:15 9:17
127:13 146:21
**26.50**  138:12,18
**26.50.**  180:9
**26.90**  125:5,12
125:23 126:24
**268**  6:24 60:17
60:21
**26th**  130:8
149:3 150:4
158:2
**27**  155:22
239:22
**27.72.**  155:23
**275**  208:16,21
208:22 209:3,7
209:9,18,19
**28**  15:20 97:9
**28.05**  131:23
**28.50**  130:14
131:4
**28.60**  124:24
125:1 126:25
**28.70**  101:16
138:9 139:3
155:18 156:19
180:9

**29**  1:15 2:19
11:2 15:23
257:6
**29.20**  130:4
131:23
**29th**  11:6
**2:30**  56:20
**2:57**  170:10
**2h**  126:10
132:4

### 3

**3**  6:10 39:7,10
39:24 46:20,21
68:10,14 75:21
117:12 184:23
185:6 219:23
219:25
**30**  33:25 50:11
94:23 97:22
144:2,9 165:19
259:16
**300**  214:8
**303**  200:3
207:25 208:9
**304**  205:11
**30838**  146:3
**31**  44:14
228:16 259:3
**312**  138:7
154:8 159:15
178:25
**314**  178:21

**315**  178:21
179:5
**31st**  6:17,21
44:1,7 45:15
**32**  61:3 72:4
73:13 161:25
**324**  124:21
**33**  143:24
144:18 148:10
**33426312**
123:22
**336**  128:11
207:4,5
**338**  195:12,24
195:25 196:2,2
**34**  97:22 98:10
148:11
**35**  10:20
**35525**  150:13
**35th**  44:9
**36**  59:20
214:18
**360**  21:14
219:3,5,6
231:12,25
237:9 246:18
247:2,6,8
**360-10-35-30**
247:17
**37**  170:17
**39**  6:10 96:4
101:8
**3:16**  1:7 2:7
11:21

**3:17**   170:14

**4**

**4**   6:15 43:25
44:2 68:16
117:15 170:10
240:10 241:3
241:17,17
**4.04**   139:23
**40**   52:2 157:21
**400**   57:18
**41**   159:5
**42**   158:8
**43**   16:1 63:14
63:19,19 97:14
98:20 139:17
**44**   6:15
**45**   6:19 64:19
78:24 144:9
**450**   57:18
**46**   154:18,22,23
**4:43**   220:13
**4:52**   220:17

**5**

**5**   6:19 41:1,4
45:16,17 62:10
63:18 65:18
91:12,13,25
129:11 170:13
205:14 206:6
206:13 207:1
214:17 220:13
237:18,19
247:17

**5.87**   201:9
**50**   50:21,22
98:12,23
100:11
**500**   57:18
214:7
**51**   199:16
**527**   165:22
**535**   2:17 11:22
**546**   145:15
**5478**   102:10,13
102:14,16,18
102:21
**549**   145:19
**55**   227:22
**56**   6:21 46:11
46:21 227:21
227:21
**57**   230:25
**580**   205:12
207:5
**5:47**   253:23
**5:51**   254:1
**5:54**   256:19
**5:55**   257:5

**6**

**6**   6:22,24 15:22
60:12,13,20
89:8 94:22
132:6 137:17
180:4 181:19
181:20 192:20
204:12 220:16

238:8 245:7
253:23
**60**   6:22 52:2
194:8,10
**619.231.1058**
3:12
**63**   7:4 170:20
**65**   228:5,8
**6538**   258:24
**655**   3:10
**66**   6:17 7:7
228:24
**67**   196:19
**69**   229:3

**7**

**7**   7:4 9:6 40:22
63:1,2 145:7
150:8 254:1
**7.34**   197:25
199:5
**70**   195:13,20
196:9
**7102054**   259:5
260:2 261:2
**7141**   149:16
**72**   155:22
**72.72.**   155:23
**75**   72:5,10
73:24 86:4,20
88:12,19
147:18 149:10
151:25 161:25

**75063**   211:5
**76**   72:11 73:2
87:18 88:12,16
145:3,22 150:6
151:24
**77**   73:3 144:17
144:20 168:10
**78**   73:9
**7:44**   108:3

**8**

**8**   7:7,16 9:18
10:20 66:22,23
68:6 75:25
133:21 175:9
247:17
**80**   201:18
**81**   200:6
**810**   240:18
**83**   7:6
**860,000**   59:16
**88**   7:11
**8th**   60:7

**9**

**9**   7:11 88:23,24
91:14,25 102:2
181:18 197:2
201:8,16 202:4
202:11 205:15
205:20 212:21
213:8
**9.7.**   231:7
**9.9**   231:6

**[91 - acknowledgement]**                              Page 6

**91**  193:23
  252:2
**92**  195:12,18
  196:9
**920**  57:4,9
**92101**  3:11
**93**  96:6 231:20
**932**  7:4 62:25
  63:8,22,22,24
  66:17 74:12,13
  87:22 168:9
  208:16,16
**932-10**  33:11
  34:14
**932-10-99**
  34:16
**932-360**  219:5
**932-360-25**
  144:25
**932-360-25-15**
  73:4
**932s**  66:18
**94**  101:10
  103:2 250:22
**94105**  2:18
**95**  157:22
**9566**  195:9
**96**  158:6,7
  232:10
**97**  97:2,2
**98**  97:17 98:9
**99**  14:9 139:18
**9988**  197:3

**9:00**  56:20
**9:10**  11:3,6
**9:41**  30:15
**9:49**  30:19

**a**

**a.m.**  11:3,6
  30:15,19 75:18
  75:22 108:3
**abington**  118:4
  185:1 209:6
  212:3
**abington's**
  58:11,21,22
**able**  13:10
  111:6
**above**  114:8
  126:17,21
  130:18,20,24
  152:24 153:20
  160:2,12
  161:23 164:3
  164:22,24
  179:22 259:6
  261:7
**absence**  184:3
**absolute**
  255:23
**accelerated**
  241:17 251:2
**accept**  254:16
**accepted**  17:9
  17:10 23:6,15
  35:20 163:23

  169:21 225:21
  226:3,17,20
  254:21 255:10
**accepting**
  110:21 116:4
  254:25
**accepts**  170:3
**accompanies**
  213:2
**accordance**
  22:3,7,9 35:19
  47:6
**accost**  199:10
**account**  18:11
  112:19 148:4
  212:15
**accountant**
  4:18 53:20
  225:9 252:18
**accountants**
  166:7,9 213:5
  227:2
**accounted**
  19:21 20:10
  23:12,24,25
  24:3 47:5,10
  48:2,9 49:20
  214:11,21
**accounting**
  6:23 7:4 17:9
  17:14,24 18:3
  18:5,12 19:6
  21:20 23:5,11
  41:22 47:6

  48:15,20 49:5
  54:17 60:7,11
  61:6,18 62:25
  63:9,12 73:19
  129:5 135:24
  208:24,24
  213:1 215:18
  215:19 217:6
  220:24,25
  221:4,10,14
  224:24 225:13
  227:1
**accrual**  203:16
  203:23 204:3
**accruals**  248:3
**accuracy**  89:19
  90:6,15 95:15
  116:24 120:4
  237:13 239:4
  259:9
**accurate**  15:1
  65:14 74:21,23
  108:18 115:9
**achieve**  99:24
  100:5,15 101:1
  176:20 177:16
**achieved**
  177:14
**acknowledged**
  97:7 101:12
  157:23
**acknowledge...**
  261:3

**App. 406**

**[acknowledgment - alta]**                                      Page 7

| | | | |
|---|---|---|---|
| **acknowledg...** 47:18 259:12 | **ad** 87:19 | **adjustments** 77:17 85:22 | 115:12,14 129:23 148:2 |
| **acquainted** 18:9 | **adapted** 117:4 | 140:1 249:8 | 161:21 187:7 |
| **acronym** 226:19 | **added** 101:18 139:25 209:7 | **adjusts** 104:1 | 190:23 209:18 |
| **acted** 49:24 | **adding** 96:8 | **administer** 12:2,10,14 | 222:3 238:2 |
| **action** 1:7 2:7 12:3 | **addition** 36:3 90:8 188:9 | **administered** 13:2 | 239:6 254:11 |
| **active** 95:1 | 208:24 | **adopt** 112:13 153:23 | **agreed** 38:17 38:20 39:21 |
| **activities** 70:17 74:19 75:4 | **additional** 16:20 17:5 | **advanced** 95:9 | 148:20 205:3 |
| 84:8 115:3 | 18:18 27:12 | **advised** 133:1 | **agreement** 39:23 |
| **actual** 71:12,13 73:10,20 74:3 | 41:7 50:25 | **af** 227:11 | **ah** 154:16 |
| 75:13 77:9,15 | 96:8 142:22 | **affect** 66:12 | **ahead** 15:18 |
| 78:9 79:1,2,3 | 184:4 185:23 | **affiliate** 90:19 | **aicpa** 35:21,23 |
| 85:19 87:11 | 185:25 235:8 | 118:25 119:2 | **al** 6:11,12 |
| 110:23,24 | **additions** 261:6 | 119:11,15,18 | 11:19 121:7 |
| 111:16 113:13 | **address** 38:18 | 120:14 140:20 | 259:4 260:1 |
| 121:11 123:15 | 148:16 162:5 | 140:25 | 261:1 |
| 138:17 139:19 | 169:15 170:2,7 | **affiliates** 90:11 | **alberta** 101:15 |
| 172:1,6,8,9,11 | 208:17 217:5 | 136:18 | 101:17 144:9 |
| 172:14,15,17 | **addressed** 36:3 | **agenda** 9:6 | **alerting** 182:14 |
| 176:7 177:25 | 91:19 96:1 | 145:7 | **aligned** 245:10 |
| 178:1 228:11 | 183:25 | **aggressive** | **alleged** 40:24 |
| 244:5 253:9 | **addresses** | 163:18 164:16 | **allen** 9:20 |
| **actually** 23:7 | 72:16 73:5 | **ago** 22:19 | 150:12 |
| 61:7 116:6 | 141:8 185:22 | 55:15 | **allocated** 161:5 |
| 132:22 149:5 | **addressing** | **agree** 11:13 | 166:6 |
| 183:22 186:16 | 204:9 | 65:13 67:11 | **allocations** |
| 204:15 222:3 | **adequacy** | 74:21,23 86:10 | 199:10 |
| 231:24 234:24 | 182:25 183:5 | 86:16,20 87:1 | **allotted** 259:19 |
| 235:13 | 183:21 223:4 | 87:4,6 108:13 | **allow** 84:5 |
| | 224:1 | 108:18 109:12 | **alta** 18:23 |
| | **adjusted** | 112:18 115:8 | 19:16 20:7,12 |
| | 141:17 249:4 | | 20:23 29:1,2,3 |

34:18,25
224:15 225:5

**alternative**
121:4,7 122:1
122:3,6,15
123:9

**ambiguities**
23:18

**amended** 6:19
45:13,20 46:15

**amendment**
45:22 47:14
63:8

**america** 182:8
202:18 206:5

**america's** 10:4
196:19 205:8

**americas** 4:9

**amount** 67:24
109:21 110:12
110:15,23
111:23 113:11
113:16 136:22
140:15 176:14
178:5,13
206:12 217:24
218:10

**amounts**
249:11

**anadarko**
18:23 19:15,19
26:1 218:2,22
221:6 224:16
225:6

**analyses**
171:18,20

**analysis** 10:11
21:16 26:20
35:5 41:7 69:3
80:13 82:6
104:8 105:9
111:12 129:12
129:16 141:25
151:5 161:10
163:7 164:4
168:18,21
171:18 175:19
177:19 187:24
188:3 189:17
190:6 191:21
191:24 206:8
206:19 210:8
211:1 212:10
219:2 221:23
221:23 222:10
223:11,12,13
224:7 227:7
228:2,2,8,22
230:8,11,23
231:2 236:18
238:3 241:16
242:13,16
244:17,19
246:19 251:10
253:2 254:4,8
254:11,19
255:1,18

**analyst** 194:6

**analyze** 153:5
153:19 217:20

**analyzed** 87:8
224:14 231:11
242:9 250:16
251:7

**analyzing**
47:25

**andrew** 1:8 2:8
128:6

**annual** 89:25
131:3,17 171:7
180:23,25
231:3,4,9
238:17 251:11
251:12

**annually**
230:17

**answer** 28:23
78:24 106:17
111:6 212:4
226:6 228:7
233:9

**answered**
94:16 98:18
100:8 185:15
191:16 212:24
224:4

**answering** 98:2

**answers** 36:17
216:7

**anticipated**
72:23

**anybody** 48:12

**anywise** 258:15

**appear** 14:9
33:7 130:19
140:3 148:23
179:2

**appearance**
12:6

**appearances**
3:1 4:1

**appeared** 36:4

**appears** 99:4
103:5 104:8
123:5 125:23
127:7 151:23
163:10 242:4
247:17

**appended**
261:7

**appendices**
246:6

**applicable**
259:8

**applied** 119:18
140:9 156:2
167:5 238:14
245:20

**applies** 120:15

**apply** 118:25

**applying**
119:12

**appropriate**
76:10 84:12
113:4,4 171:16

**[appropriate - assume]**                                                     Page 9

| | | | |
|---|---|---|---|
| 172:19 | **arithmetic** | 111:3,4 154:14 | 250:22 |
| **appropriately** | 69:20 189:9 | 205:19 | **assets**  19:14 |
| 152:10 | **arizona**  6:14 | **asks**  165:18 | 20:13,21 21:3 |
| **approximately** | 39:9 | **aspect**  105:21 | 21:9 26:3 27:1 |
| 14:14 51:5 | **arm's**  136:19 | 222:21 | 28:13,15,19 |
| 97:18,22 | **arrangement** | **aspects**  26:12 | 29:14 32:15,18 |
| 131:18 132:6 | 57:12 | **asserted**  139:22 | 66:2,7,12 83:6 |
| 132:10 139:23 | **arrangements** | **assess**  219:9 | 182:17 191:13 |
| 144:9 206:6 | 69:23 72:20 | 220:6 230:11 | 192:2,15 194:1 |
| 250:12 251:25 | **arrive**  187:14 | 232:8 238:18 | 194:2 206:5,17 |
| **april**  46:2 | **arrow**  240:9 | 255:9,16 | 221:16,17,20 |
| 122:7 | **articles**  218:18 | **assessed**  73:15 | 221:24 222:2 |
| **aqua**  18:9 | **asc**  21:14 33:11 | 86:9 147:23 | 222:11 232:7 |
| **arbitration** | 34:14,15,16 | **assessing**  28:3 | 233:3 243:7 |
| 51:14 | 73:4 74:12 | 83:6 231:12 | 244:7 250:5,16 |
| **area**  17:8,14 | 87:22 144:25 | 238:20 | 254:12 |
| 26:22 99:21 | 168:9 185:2 | **assessment** | **assignment** |
| 202:24 203:7 | 208:16,16,21 | 10:16 94:25 | 58:1 67:6 |
| 206:2 213:20 | 209:3,7,9,18,19 | 227:8 230:18 | 161:14 |
| **areas**  17:12 | 219:3,5,6 | 236:22 245:25 | **associated** |
| 19:11 246:1 | 231:12,25 | 250:7 | 33:18 34:6 |
| **argue**  40:23 | 237:9 246:18 | **asset**  30:9 | 73:21 74:3 |
| 41:10 191:18 | 247:2,6,8 | 67:16 70:22 | 75:14 113:13 |
| **argued**  42:22 | **ascribed**  24:15 | 74:25 76:18 | 113:16 139:20 |
| 164:8 | **asked**  17:4 | 91:8,10,11,13 | 176:8 208:19 |
| **argument** | 94:15 98:17 | 91:17,18,24 | 237:23 |
| 42:25 163:4,10 | 100:7 113:2,6 | 92:10,19 93:3 | **associates** |
| 163:18,23 | 113:19 161:4 | 152:9 163:3 | 57:19 |
| 164:19 166:5 | 185:14 191:15 | 173:8 191:12 | **assume**  78:11 |
| 177:20 214:4 | 212:23 216:4 | 207:7 219:11 | 133:10 135:15 |
| 248:18 | 224:3 | 219:18,19 | 138:13 163:15 |
| **argumentative** | **asking**  29:17 | 220:6,8 237:24 | 179:18 180:8 |
| 111:10 | 32:24 91:17 | 247:20,20,22 | 183:18 |
| | 98:3 102:14 | 247:22 248:10 | |

**[assumed - barrel]**

**assumed** 113:3 135:19 143:17 251:11

**assumes** 205:6 231:2 236:17 239:15

**assuming** 114:17 115:24 142:21

**assumption** 133:12 141:16 172:18 245:9 245:20 255:1

**assumptions** 245:20 246:19 247:3,21,23,25 248:9,15,17,20 251:6

**assurance** 255:23 256:3

**attached** 54:4 246:5 259:11

**attachment** 54:7 127:17

**attachments** 8:18

**attempt** 42:17 65:9

**attempted** 52:1 52:14,16

**attendee** 129:2

**attendees** 128:12,15

**attention** 39:14 67:8 197:1 247:16

**attorney** 215:17 259:13

**audio** 11:12

**audit** 21:25 22:1,2,4,5 35:19 43:15,18 43:22 47:15 49:18,19 242:3 254:5 255:22

**audited** 213:3 254:3

**auditing** 17:10 21:21 35:20 226:17,20 255:20 256:1

**auditor** 22:7

**auditor's** 255:22 256:2

**auditors** 47:24 213:4

**audits** 22:9,25 37:8

**august** 97:15

**author** 141:1 142:5

**authoritative** 63:11,20,21,24

**authorize** 45:1

**authorized** 12:2

**available** 65:2 247:23 248:10 248:13,20 255:17 259:6

**avenue** 4:9

**aver** 80:11

**average** 33:17 67:24 69:17,20 80:11 87:19 95:4 101:18 113:12,12 125:4 126:14 130:13 131:3 131:17 138:11 171:7 172:23 187:14 189:9 202:23,23 203:4,6,9,14 205:16,18,25 206:1,4

**aware** 13:9 53:19,24 55:22 56:1 87:25 88:5 158:19 159:25 162:16 162:20 164:23 173:1,6,15 174:14 188:23 190:4,7,8,11,18 192:5 206:15 216:15,21 217:10 222:8 223:7 229:9 230:17,21,24

234:14 254:10

**axis** 132:18

**b**

**b** 3:8 36:12 41:1,4 68:15 72:5 77:3,4,14 77:15,22 78:12 84:10,20 109:8 203:2 211:6 246:6

**back** 30:18 55:15,17,20 75:21 85:6 103:17 116:19 117:15 125:21 159:12 170:13 201:7 207:21 207:22 220:16 231:21 251:25 254:1

**background** 63:17,20,23 64:10

**bad** 222:23

**balance** 21:6 24:4,5,11 27:23 28:7 29:10 61:22 238:19

**bar** 221:8

**barrel** 25:4 29:18 33:15 101:16 103:21

**App. 410**

**[barrel - billion]**                                                   Page 11

104:1 125:5
130:4,14
131:19 132:6
132:10 136:23
138:12,21,25
139:3,23 169:3
175:3 197:25
198:10 202:18
203:10
**barrel's** 213:23
**barrels** 25:4
29:18 91:14
96:9 198:6
**base** 208:6
238:14
**based** 15:14
24:8 26:19
46:24 61:25
69:24 74:9
78:17 79:1
81:2,21 82:24
101:13 112:23
116:11 120:7
131:14 133:16
133:16 136:22
141:16 143:22
176:5 188:3,7
189:17 191:4
192:13 203:16
206:20 212:9
218:4 230:5
238:11 242:8
242:17 245:24
246:10,24

252:25
**bases** 63:23
**basically** 38:20
168:14 170:3
183:15
**basis** 63:17
64:10 78:22
79:1 81:11
90:5,14 95:14
96:15 104:23
105:11,15,20
106:8,18
116:23 157:11
164:2,11 169:3
180:23,25
203:13,15,16
203:20,23
204:3,3,5
212:11 213:23
218:5
**bates** 7:20 8:6
8:10,16,23 9:7
9:12,21 10:6
29:2 102:9
117:20 118:13
123:21 124:20
128:11 138:6
145:8,15 146:3
147:2,5,10,11
149:11,15
150:13 159:15
195:4,6 197:2
224:15 225:5
236:23 237:19

245:7
**bc1** 64:15
**bc10** 64:20
**bear** 80:10
**bears** 123:21
146:2
**beat** 252:9
**becoming** 99:8
**began** 105:3
106:2,14
**beginning**
30:17 41:19
42:15 75:20
117:14 170:12
173:2 220:15
225:12 253:25
**behalf** 1:4 2:4
2:15 32:10,13
50:24 51:25
52:12,19
**belief** 120:22
**believe** 16:10
17:19 18:24
37:22 45:10
48:2 97:11
99:2 104:24
105:11 107:24
119:16 120:23
137:17 194:22
219:10 222:16
230:20 238:6
245:13
**believing**
105:15,20

106:9,18
**benefit** 199:8
**benefited** 251:6
**benefits** 140:4
**best** 15:1 50:4
162:10,15
256:9
**beth** 7:18
107:19 108:2
114:8,15
150:19 161:5
**better** 158:20
191:7
**beyond** 16:17
17:1 81:10
83:6,23 84:7
84:21 163:14
163:14 229:2
242:19 244:4
245:14 249:20
249:21 250:17
**bezerra** 4:23
11:25
**big** 232:18
**bigger** 199:15
**bill** 7:18 107:19
108:2 128:6
150:20 151:2,9
151:9,12 161:3
165:11,14,23
**billed** 203:17
**billings** 59:15
**billion** 232:12
232:16 233:8

**App. 411**

| | | | |
|---|---|---|---|
| **bills** 57:9 | **boards** 35:9 | **box** 134:15 | **business** 61:2,9 |
| **binder** 155:6 | 36:7,8 37:7 | **boxes** 101:18 | 65:3 78:17,21 |
| 159:14 | **bolia** 4:20 | **brainer** 234:6 | 237:7 |
| **bit** 28:9 57:24 | **book** 181:7,12 | **break** 15:12 | **buyer** 44:17 |
| 91:16 164:21 | 183:1,6 184:13 | 74:6 113:24 | **buying** 236:5 |
| **bitumen** 7:14 | 185:10,23 | 166:23 206:16 | **c** |
| 75:6 78:13,14 | 186:19 | 219:22 | **c** 72:7 241:21 |
| 79:4,14 81:20 | **booked** 65:20 | **breaking** 72:1 | **caf** 126:11 |
| 85:1 91:9,12 | 65:23 66:2 | **briefly** 16:2 | 133:15 148:19 |
| 91:15 96:9,10 | 182:21 183:3 | **broad** 26:14 | 148:20,23 |
| 96:16 97:4,8 | 183:16,20,24 | 153:11 | 152:16 153:11 |
| 97:12,23 98:5 | 185:18,21 | **broader** 148:12 | 153:13,15,25 |
| 98:23 99:6 | 190:21,24,25 | **broadway** 3:10 | 159:20,23 |
| 101:17 105:22 | 191:1,3,8,12,13 | **brokerage** | 161:5,9 162:21 |
| 106:25 110:2 | 192:2 193:12 | 55:18 | 163:2,12,19,20 |
| 110:13 116:7 | **booking** 66:5,9 | **brought** 38:24 | 163:20 164:1 |
| 116:17 118:24 | 66:11 182:16 | 99:20 | 164:16,16 |
| 133:22 136:2,3 | 183:11 184:3 | **budgeting** | 165:5,24 166:5 |
| 136:8 139:22 | 186:3,15 | 246:2 | 166:15 179:11 |
| 141:9,9 142:9 | 190:19 208:11 | **budgets** 248:2 | **calc** 115:20 |
| 157:9,24 158:5 | 218:12,17,23 | **build** 229:4,5 | **calculate** 33:16 |
| 158:9 200:12 | 219:1 | 235:4,6,9 | 83:5,13 85:13 |
| 201:10,17,19 | **bookings** | **building** 59:3 | 105:12 106:4 |
| 202:17 203:10 | 217:24 218:11 | **built** 193:8 | 215:11 |
| 204:14 206:5 | **books** 65:16 | **bullet** 60:25 | **calculated** |
| **black** 125:17 | **bottom** 40:14 | 61:13,17,23 | 29:18 78:22 |
| **blend** 103:8 | 42:5 46:5,9,21 | 62:3 108:6 | 81:2 142:20 |
| 136:14,17 | 65:8 73:13 | 114:5,11,16 | 154:25 170:3 |
| **blue** 131:7,7 | 108:4 124:18 | 131:18 132:5 | 172:12 182:19 |
| 228:15 | 138:8 146:15 | 162:24 179:8 | 187:13 189:8 |
| **board** 43:9,12 | 162:24 179:9 | 180:5,15 | 189:11 198:1 |
| 44:16,22 45:11 | 184:2 195:7,8 | **burden** 163:6 | 214:20 |
| **board's** 64:16 | 197:17,17 | **burkholz** 3:7 | |

**App. 412**

**[calculating - cases]**                                          Page 13

| | | | |
|---|---|---|---|
| **calculating** | 123:12 148:22 | 202:18 206:5 | **carry**  168:5 |
| 84:6 85:12 | 152:18 168:13 | **canadian**  141:8 | 242:7 |
| 87:2 104:18 | 169:7,9,9,21 | 142:9 181:8 | **carrying** |
| 105:21 168:6 | 177:11 186:25 | 192:15 200:12 | 219:10,19 |
| 169:10 189:5 | 245:16 251:1 | **capacity**  49:15 | 220:5,7 243:6 |
| **calculation** | 251:12 | 96:8 99:18,21 | **case**  11:20 |
| 7:16 29:19,22 | **calculator** | 99:22,25 100:6 | 13:14,19 14:1 |
| 33:13 34:10,11 | 214:15 | 100:15 101:1 | 14:6 17:5 |
| 34:17 71:9 | **calendar**  68:1 | **capex**  130:18 | 19:15 21:5,9 |
| 72:13,14 73:22 | 121:4 | 130:24 159:23 | 24:23 26:13 |
| 74:4,12 79:12 | **california**  1:16 | 166:20,25 | 27:3 29:4,5,9 |
| 80:12 107:11 | 2:18 3:11 11:1 | 167:2,10,18,21 | 32:25 38:5,12 |
| 109:22,25 | 11:24 19:1 | 168:3,21,24 | 48:20 52:13,20 |
| 110:11,15 | 55:9 | 169:4,15,18,25 | 52:22 53:8,21 |
| 112:12,14 | **call**  17:10,11 | 179:11 205:12 | 54:12,22 57:4 |
| 121:23 142:6 | 49:4 108:7,14 | 246:1 | 57:8,13 71:3 |
| 143:16 152:17 | 108:19 | **capital**  87:14 | 77:22 85:19 |
| 153:8 155:21 | **called**  38:5 | 166:25 167:14 | 89:6 95:19,23 |
| 155:25 156:2,3 | 184:12 | 167:20 168:7 | 119:16 135:25 |
| 156:7,22 158:4 | **calls**  38:25 56:2 | 168:15,17 | 154:24 158:20 |
| 163:21,24,25 | 91:22 93:18 | 170:5 238:13 | 160:10 169:14 |
| 165:4 168:9,24 | 114:13 127:6 | **capitalize** | 169:18 177:24 |
| 169:1 170:6 | 139:10 143:15 | 167:10 | 182:25 204:25 |
| 172:23 176:5,7 | 151:22 155:11 | **capitalized** | 208:20 223:1,3 |
| 178:4 183:10 | 164:7 174:18 | 61:19,24 | 223:25 224:16 |
| 203:14 212:16 | 188:19 194:4 | 173:11,24 | 224:17 225:7,7 |
| 212:18,19 | 222:18 229:4 | **caption**  194:22 | 238:12,12,16 |
| 230:12 250:18 | 235:25 236:15 | 212:17 | 246:11,11,17 |
| **calculations** | 237:15 238:5 | **career**  21:19 | 252:23 258:19 |
| 31:10 34:4 | 244:14 | 51:5 | **cases**  18:10,15 |
| 110:11 112:15 | **canada**  110:14 | **careful**  217:25 | 20:19 24:15,20 |
| 112:16,23,25 | 111:1 134:2,6 | **carrier**  76:14 | 27:6 30:8 32:7 |
| 113:18 115:20 | 182:7 197:9,11 | 78:15 79:5 | 32:11,17 49:6 |
| 122:3,11 | 197:13 201:10 | 82:10,19 | 49:17 50:18,19 |

[cases - characteristics]                                    Page 14

51:20,25 52:4
52:6,8,11 53:9
53:18 225:18
225:23 240:11
**cash** 24:9 27:2
66:1,6,10
73:16 86:9
108:10 109:14
129:12,16,19
129:24 130:17
130:23 147:24
152:1,10
159:22 161:9
163:7 164:4
168:14 179:10
180:6 188:5,16
189:1 195:11
195:22,24
198:15,22,25
199:11 203:13
203:15,18,19
203:21 204:3
205:4 206:9,9
211:7,10,11,22
212:7,14,17
219:18 220:4
224:7 227:7
228:2 232:1,3
237:20,22
238:10 241:16
242:13,16
243:6 244:10
246:5,10
247:19

**casteel** 7:19
107:19 108:2
114:11,16
150:19 161:6
**casteel's** 108:7
114:7,25
**catch** 196:2
**categorization**
95:7
**category**
153:11 166:19
**cause** 16:23
26:4 51:18
55:20 200:24
202:6 250:24
**caution** 176:13
**cautionary**
178:13
**ceased** 152:4
**ceo** 128:23
**cera** 238:25
240:2 241:4
242:15
**certain** 14:17
19:8 28:13,19
36:22 37:8
61:25 62:4
110:3 176:24
181:7 182:5
188:7 190:23
199:20 206:18
221:15 241:23
245:5

**certainly** 45:7
61:12,17
100:21 103:25
104:7 105:24
121:21 178:12
185:17 205:13
224:15,22
234:1 246:23
248:14
**certainty** 33:8
69:4 72:24
175:20 176:20
177:14,16,22
**certificate**
258:1
**certified** 2:19
12:12 225:10
258:2
**certify** 258:3,13
**cff** 6:5,8
**cfo** 78:24
**cfr** 7:7 10:14
66:20 210:6
**chain** 133:22
**chair** 47:15
**chairman**
43:18,21
128:23 138:2
156:21 157:6
179:21
**chairman's**
8:21 137:7
139:8 156:10
156:17 178:18

179:16
**challenge** 38:24
41:23 42:19,20
180:16
**challenged**
167:23
**challenges** 55:1
55:2
**change** 15:7
16:12 59:4,5
71:12,13 72:23
98:22 103:20
105:6,8,10
106:2,5 162:2
162:21 234:5,5
260:4,7,10,13
260:16,19
**changed** 88:6
104:24 105:2
105:13,17,18
105:22 106:9
106:19 121:22
162:16 207:20
**changes** 8:21
23:20 89:25
103:23 137:7
156:17 157:7
259:10 261:6
**changing**
162:11
**chapter** 61:3
**chapters** 62:2
**characteristics**
212:9

**characterizati...**
81:7
**characterize**
37:24 57:24
121:15 123:3
123:17
**characterized**
16:6 25:5
30:10 62:19
83:18 174:20
**charlotte** 53:20
53:23 54:4,11
54:14,16
**chart** 73:2,14
124:22 125:3,6
132:13 133:17
138:14 158:8
159:4,22
161:25 179:9
187:1 197:20
197:23 203:13
205:2,15,17,19
206:4 207:11
212:21 223:23
228:24 239:16
240:18,22
241:1 243:1,17
251:24
**charts** 103:12
175:5 178:23
**chatted** 161:3
**check** 119:23
**chevron** 218:1
218:14,15,21

221:6
**chose** 253:15
**chronological**
149:6,19
**cindy** 9:20
150:12
**circumstances**
18:6 26:16
27:5 39:3 76:9
84:11,21
133:17 156:7
176:11 180:20
207:20
**cite** 33:10 60:7
77:8 101:22
156:5 157:14
197:24
**cited** 80:10,17
81:17 88:11
107:24
**citing** 102:14
127:24
**city** 53:5
**civil** 1:7 2:7
**claimed** 17:15
17:22
**claiming**
190:19
**claims** 41:4
**clarify** 161:18
**clarity** 165:25
**clark** 150:18
**classification**
95:6

**classified**
153:20
**clear** 24:22
106:6 143:20
194:25 196:11
**cleared** 142:21
**clearing** 142:19
143:1,2,13
**clearly** 112:11
171:21 177:25
180:6 188:16
**client** 29:4 49:4
**close** 228:17
**closely** 58:8
**clr** 1:24 2:19
258:25
**coast** 75:10
135:11,15
141:19,23
142:14,24
143:2,7
**codification**
63:9
**cold** 106:25
107:4,7,11,11
116:19 117:5
201:15,23
204:10 207:3,4
215:23
**color** 125:23
**colored** 125:18
**colorful** 234:1
**column** 197:14
210:23 211:6

**combination**
204:10
**combinations**
61:2,9
**combine** 214:5
**combined**
232:2 237:21
**come** 18:18
125:21 186:13
186:14 207:21
208:15 241:14
**comes** 29:1
52:21
**coming** 227:6
227:25
**comment**
114:17
**commentary**
37:5
**commenting**
153:14
**comments**
21:25 58:20
82:23 114:7,8
114:15 194:6
250:7
**commission**
10:9 32:6
210:7,23
**committee**
31:18,20 35:11
37:21,25 43:15
43:19,22 47:16
95:3,13 180:1

**[committees - concerns]**

committees
  49:18,19
commodities
  252:20
commodity
  233:11
common  76:14
  78:15 79:5
  82:10,19
commonly
  210:25
communicated
  115:13 158:12
  248:4
communicati...
  54:10 101:12
companies
  17:21 22:11,16
  22:25 28:7
  31:10 33:1
  34:19 35:9
  36:13 37:23
  62:3 65:3
  71:10 83:4,13
  84:5 112:19
  206:16 217:21
  220:20 221:5
  221:13,16
  255:2,3
company  18:25
  21:18,22 22:6
  22:19,21 23:5
  23:8,8 25:11
  28:24 37:18,21

44:18 47:1,19
  47:25 48:4
  49:24 65:15
  73:19 91:2,8
  93:16 128:24
  134:18,22
  181:2 200:16
  201:22 209:1
  211:16,17
  221:15 238:11
  238:16 246:10
  246:18 247:2
  254:16
company's
  35:5 47:22
  59:23 60:23
  61:14 62:21
  65:1 66:6,12
  128:20 129:4
  139:21 150:8
  157:24 184:15
  184:21 185:4
  211:10 223:12
  223:16 227:18
  227:19 238:11
  254:21
comparable
  64:25 248:2
compare  65:2
  241:7
compared
  187:24 189:14
  227:17 238:22
  239:6 243:12

comparing
  172:24 180:8
  198:23 239:25
comparison
  34:6 131:22
  199:3 228:10
  243:11 255:17
comparisons
  227:13
compensated
  57:3 59:13
compensation
  57:6,11,12
  248:4
compilation
  66:16
complaint
  49:17 53:1,1
  53:25 54:2,4,7
complements
  250:9
complete
  102:20 119:23
  261:8
completed  96:7
  173:4 174:2
  259:16
completion
  47:3 258:19
complex
  112:14 185:16
complexities
  111:19 113:15

compliance
  89:24
complicated
  27:13
complied  42:1
  42:11
comply  200:14
component
  59:22 60:22
  61:14 66:16
  165:5
components
  87:9 256:6
compound
  231:3,4,9
  251:11,12
computations
  61:25
computed
  87:21 144:22
conceal  207:7
concealing
  215:25
concept  70:21
concern  49:20
  223:10
concerned  50:2
  165:9 218:16
  242:6
concerning
  21:2
concerns
  207:25

**App. 416**

**[concluded - continu]**                                    Page 17

**concluded**
  188:4 254:10
  257:5
**concludes**
  256:19
**conclusion**  39:1
  91:23 93:19
  180:11 226:5
  243:18 254:15
**conclusions**
  41:6 63:17,24
  64:10,17
**concur**  233:23
**concurring**
  233:23
**condition**  10:12
  201:1 210:8
  211:1
**conditions**  69:7
  69:14,24 72:17
  72:23 73:25
  86:6 146:12
  175:23 176:17
  178:9
**conduct**  227:8
  253:1
**conducted**  22:5
  37:8 171:19,21
  238:2
**conducting**
  230:23
**conducts**
  230:18

**confirmed**
  151:2 255:4
**conjunction**
  232:20
**connection**
  21:23 26:5
  32:11 37:6,8
  50:3 54:11
  56:17 57:7
  59:14 63:25
  64:2,8,13 67:6
  89:6 107:23
  140:2 190:15
  247:14
**consecutive**
  194:16
**consensus**
  165:11,13
**consequence**
  21:10 183:9
**conservative**
  238:22 239:11
  239:12
**consider**  17:7
  17:12,13,23
  75:13 77:15
  104:10 121:8
  139:19,24
  153:16 156:22
  180:20 228:21
  247:23 248:10
  248:19
**consideration**
  62:22 106:2

  170:24 171:12
**considerations**
  64:16
**considered**
  59:22 111:21
  121:13 123:13
  137:20 157:7
  163:21 164:1
  164:18 188:13
  211:22 212:7
  216:21 248:13
  249:10 253:15
**considering**
  106:1
**considers**  171:1
**consist**  199:9
**consistent**
  41:20 42:14
  109:22 116:25
  149:24 152:7
  152:14 161:24
  172:2 194:5
  209:4 212:12
  213:9 229:16
  235:10 238:21
  239:11 241:12
  243:24 254:23
**consistently**
  106:13 201:11
  201:12,15,22
  216:4,5 244:19
**consolidated**
  94:6,9

**constitute**
  122:12
**constituted**
  111:22
**constraints**
  71:12
**construction**
  47:4
**consultant**  49:7
  49:12,13,14
  50:18 51:9
**consulted**
  25:10
**consulting**
  30:22 50:6
  51:1
**contact**  165:16
**contacts**  118:22
**contain**  188:21
  225:19
**contains**  67:12
  213:21 215:7
**contemplation**
  50:1
**contemporan...**
  157:23
**content**  37:15
**contents**  68:15
**context**  61:9
  86:1 182:23
**contingent**
  57:11
**continu**  218:16

**App. 417**

**[continually - correct]**

**continually**
218:16
**continue** 11:12
44:22 143:7
**continued** 4:1
7:1 8:1 9:1
10:1 123:6
133:14 231:24
**continues**
94:22 148:11
151:1 246:7,9
**continuing**
16:20 47:7
184:2 231:23
237:23
**contract** 134:7
**contracts** 19:8
177:1
**contractual**
69:23
**contradiction**
191:19
**contrasted**
201:15
**controller**
129:5
**controllers**
119:3 165:8
**controls** 89:10
95:24 223:4,6
224:1,6
**conversation**
165:15

**conversations**
11:10 121:16
**convince** 231:8
**coordinates**
118:17
**copies** 259:14
**copy** 6:15
13:13,25 43:25
88:23 125:13
125:15
**corner** 46:10
**corporate**
92:10 140:25
165:7 230:22
247:4
**corporation**
1:8 2:8 11:18
110:3,4,7
112:6 238:19
248:25 259:4
260:1 261:1
**corporation's**
7:11 238:15
246:1
**correct** 15:5,9
15:16 16:9
17:2,3 20:24
22:6 23:16
24:16,20,21,25
25:23 28:13,16
29:24 32:1
35:2,3 36:14
36:19 37:2,9
38:24 41:12,15

42:24 43:2,9
43:10,16 44:10
47:16,20 51:3
54:20 57:4
60:8,17,18
61:4 67:18,19
70:5,9,19 71:6
74:19,20 77:24
78:5 81:13,23
82:11 83:14,24
84:17 85:14
88:7,13 89:6
93:3,24 94:7
105:7 106:20
112:16 113:8
113:21,22
119:9,20 120:9
120:20 124:13
125:5 126:25
128:18,22
129:2,9 130:4
130:11,15
131:15,24
134:5 138:9,12
138:22 139:4,5
139:15 140:20
140:25 141:5
142:17 144:5
144:24 145:23
146:17 147:11
147:25 149:3
153:21,22
156:19 159:19
164:5,12 166:7

168:18,22
169:2,20
170:22 171:8
171:19 175:4
176:17 177:19
178:12,24
179:3,23 180:2
186:6,10,11
187:16 189:12
189:15,19
190:16,17
191:14,22,25
192:3 194:18
195:17,23
196:6,13
197:18 202:11
202:15,19
203:10 204:6
205:4,16 206:3
211:16 214:13
219:7,11,19,20
220:8,9,21,25
221:6,7,11,17
221:18,21,25
222:4,5,12
223:1 225:9,13
225:14 226:4
226:18 230:9
231:13,17
232:4,15
234:17 238:3
239:8 241:9,13
244:3,7 246:21
249:15 251:20

**App. 418**

**[correct - court]**                                      Page 19

| | | | |
|---|---|---|---|
| 253:18 254:4,8 | 164:18 169:12 | 139:25 140:3 | 178:14 179:22 |
| 254:14 255:24 | 171:7 172:13 | 142:13,22 | 187:24 188:12 |
| 255:25 256:12 | 172:14,15,17 | 144:22 146:16 | 202:15,22,24 |
| 256:13 261:8 | 179:10,12,22 | 147:21,24 | 203:6,10,19,19 |
| **corrected** 74:15 | 180:9 187:19 | 148:14,16,21 | 203:21,23 |
| 163:24 | 189:11,15 | 148:23 151:19 | 205:23 207:12 |
| **correcting** 16:5 | 191:22,25 | 152:1,3,8,8,16 | 207:18 245:20 |
| 112:11 182:20 | 192:14 194:2 | 152:19,24 | 246:3 |
| **correction** | 206:1 220:24 | 153:5,11,16,19 | **counsel** 3:1 4:1 |
| 112:13,24 | 221:10 235:14 | 153:20 154:1 | 11:17 12:7 |
| **corrections** | **costs** 24:10 | 160:1,12 | 30:11 35:12 |
| 113:4 261:6 | 27:11,12,16 | 161:23 162:12 | 39:19,20,23 |
| **corrective** | 33:17 34:6 | 162:17 163:7 | 56:14,16,18,19 |
| 156:2 | 61:19,24 69:15 | 163:12 164:1,3 | 156:13 256:24 |
| **corresponding** | 70:14 71:1,12 | 164:22,24 | 258:14 259:14 |
| 140:1 | 71:13,16,21 | 166:19 167:9 | **country** 213:20 |
| **corresponds** | 72:18 73:10,16 | 168:8,11,11,14 | 213:24 |
| 126:10 | 73:20 74:3 | 168:22,23 | **couple** 193:7 |
| **corrob** 59:11 | 75:12,14 77:10 | 169:12,19,22 | **course** 59:3 |
| **corroborated** | 77:16 78:9 | 170:4,21,25 | 103:24 161:14 |
| 59:11 | 79:2,3 85:10 | 171:2,2,6,12,17 | 182:19 183:13 |
| **cosm** 118:24 | 85:14,17,20 | 171:24 172:1,6 | **court** 1:1 2:1 |
| **cost** 73:10,12 | 86:2,7,9,17 | 172:8,9,11,18 | 6:13 11:19 |
| 78:25 87:19 | 87:1,9,10,11,16 | 172:20,25 | 12:9,11 30:11 |
| 104:11 105:2 | 87:18,21,23 | 173:6,9,11,13 | 34:15 35:22 |
| 110:24 111:15 | 88:1 101:15 | 173:14,15,19 | 38:2,9 39:8 |
| 111:16 125:4 | 103:23 113:13 | 173:20,23,25 | 40:15 41:2,14 |
| 126:23 130:12 | 121:9,11,11 | 174:1,4,8,10,11 | 43:3 55:8,10 |
| 130:16,17 | 123:15 126:14 | 174:12,14,24 | 62:6 68:12 |
| 131:3 138:12 | 126:16,19,21 | 175:2,2 176:7 | 76:24 82:1 |
| 138:20 139:2 | 130:18,19,24 | 176:10,14,19 | 86:13 97:19 |
| 148:3,19,19 | 131:19 132:1,7 | 176:21 177:5,7 | 108:25 109:3 |
| 158:10 159:18 | 132:9 133:4 | 177:14,15,18 | 126:19 137:2 |
| 160:13 161:25 | 138:24 139:19 | 177:25 178:1,4 | 147:13 156:13 |

**[court - decades]**

165:12 166:11
184:16 191:2
210:2 225:21
226:3 235:20
240:23 256:16
256:24 257:3
**cover** 127:11
213:15
**covered** 69:19
72:9
**covers** 213:16
**cp** 179:10
**cp15** 129:12
**cpa** 6:5,8
225:10
**credited** 141:21
**criteria** 62:22
**critical** 29:9
59:22 60:22
61:13 204:8
**criticism**
254:23
**criticize** 224:6
**criticized** 55:23
**criticizing**
249:12 254:24
**critiquing**
225:24
**cross** 53:1
**crude** 7:14
96:20 118:19
118:22 181:20
181:24 182:2
193:3

**cs** 259:15
**csr** 1:24 258:25
**cumulative**
194:14
**cure** 121:23
**cured** 183:11
**current** 73:10
73:10 231:16
231:18 232:1
232:15 237:20
**currently** 71:4
95:12 163:3
177:5
**cut** 242:20,22
**cv** 1:7 2:7 11:21
226:21,25

**d**

**d** 1:13 2:14 5:3
6:4,8 11:16
13:1 134:25
135:4 242:2
256:20 259:5
260:2,24 261:2
261:4,12
**dallas** 1:3 2:3
**dan** 15:10,10
71:25 74:5
113:23 166:21
219:21
**daniel** 4:6,20
**dash** 161:8,16
**dashed** 125:2
125:11 126:1,2

138:16
**data** 69:3
131:15 133:18
175:20 186:8,9
186:12 223:16
229:15 234:16
234:25 235:14
236:11 243:13
243:15 245:13
250:8
**dataflex** 119:4
119:24
**date** 40:3 43:14
44:12 46:2
47:1 59:15
69:5,18 72:8
72:22 74:1
124:14 144:11
144:14 155:24
175:21 176:2,4
180:21 195:14
196:15 197:18
205:10 232:11
241:18 260:24
261:12
**date's** 40:5
**dated** 7:5,19
8:15 9:6,11,17
9:21 62:25
107:20 108:3
127:12 130:7
145:7 146:2,21
149:3 150:12
242:4 258:22

**daubert** 38:23
54:19,24 55:1
55:2,12
**david** 1:9 2:9
129:1
**day** 33:16 34:5
67:25 69:21
96:9 113:11
176:6 187:10
225:12 261:15
**days** 259:16
**de** 65:16,20,23
66:2,5,9,11
151:18 181:7
181:12 182:16
182:21 183:1,3
183:6,11,16,20
183:24 184:3
184:13 185:10
185:18,21,23
186:3,15,19
190:19,21,24
190:25 191:1,3
191:8,12,13
192:2 193:12
208:11 217:24
218:11,12,17
218:23 219:1
**deal** 171:22
**debit** 28:7
**debt** 35:12
**decade** 246:4
**decades** 116:18
229:12

**App. 420**

**[december - depreciated]**

**december** 6:17
6:21 10:5 40:6
44:1,7,14
45:15 124:2,13
130:9 133:12
196:20 228:16
**decided** 216:22
252:24 253:3
**deciding**
249:11
**decimal** 215:13
**decimals** 215:4
**decision** 41:17
249:9
**decisions** 236:3
**deck** 9:9 129:9
129:11 130:7
145:15 146:1
180:14
**declaration**
54:3
**declare** 261:4
**decline** 233:11
233:25 252:3,4
**declining**
232:25 233:16
234:3
**dedicated**
89:13
**deemed** 261:6
**deep** 19:2
**deepwater**
22:22

**defendant**
11:17 48:23
52:3,13,20
53:3
**defendants**
1:10 2:10,15
4:3 40:1,15,21
40:23 41:10,22
41:25 42:11,22
42:25 55:7
**defending**
41:21
**define** 85:16
86:2 122:9
**defined** 67:17
67:21,24 68:4
69:22 70:17
73:14 84:14
86:8,17,21
87:5,15 147:22
162:1 179:10
196:5 198:3
**defining** 130:17
194:20
**definition** 70:8
73:18 78:3
85:7 88:6
123:18 135:6
148:12 175:16
182:5
**degree** 94:25
116:13 171:9
**degrees** 95:9

**deidre** 160:22
160:24,24
162:3,23 165:6
**deidrenorman**
160:20
**deliberately**
151:18
**delivered** 76:13
77:5 78:15
79:4,9,14,20
80:1,25 82:9
82:19 98:24
100:12 143:4
179:15
**delivering** 10:4
78:9 79:10,21
79:22 196:19
**delivery** 80:6
96:21 135:12
143:22
**demand** 227:8
228:3,13,22,25
229:7 230:18
238:18
**demonstrated**
59:24 60:24
61:15 190:20
**demonstrates**
237:23
**demonstrating**
246:25
**dependent**
142:4

**depends** 51:22
79:18 122:9
123:18 141:1
159:1 168:3
**deponent**
259:13 261:3
**depos** 233:22
**deposed** 51:16
51:18,21
**deposing**
259:13
**deposition** 1:13
2:14 6:3 7:3
8:3 9:3 10:3
11:16,22 13:15
14:2 16:22
18:20 38:12
39:10 44:2
45:17 56:8,17
57:1 60:13
63:2 66:23
88:24 102:3
107:15 117:23
123:3,23
127:14 137:9
145:9 146:4,23
150:14 196:21
210:10 236:25
247:10 258:18
**depositions**
16:21 233:22
**depreciated**
173:24

**App. 421**

**[depreciating - differentials]**                                    Page 22

**depreciating**
  173:12
**depreciation**
  73:15 86:8,25
  87:3,7 147:23
  168:12 173:13
  174:6,8 199:13
**depth**   148:24
**derived**   50:5
**describe**   133:9
  201:10
**described**
  19:13 20:20
  25:10 30:2
  33:20 34:12
  37:5 52:4
  56:25 90:23
  113:21 120:17
  185:6 186:1
  191:19 196:14
  209:5
**describes**   118:8
  119:7
**describing**
  28:22
**description**
  124:25 151:19
**designated**
  50:21,23 51:19
**designed**   63:22
**destination**
  140:22
**detailed**   222:9
  230:18

**determin**
  136:22
**determination**
  20:14 23:6
  26:21 27:7,22
  28:1 33:15,25
  34:2,13,14
  42:4,19 43:6
  48:5,8,15,18
  49:2,9 50:10
  52:15,17 53:4
  53:10 62:18,20
  77:13 78:7
  82:7,17,22
  85:4,21 88:3
  92:20,23 94:18
  101:6 112:9
  124:12 136:23
  141:2 158:9
  175:25 181:3
  236:2 254:12
  255:16
**determinations**
  22:9 23:3,9
  26:9,24 111:13
  111:14 122:21
  133:8 160:13
  164:25 190:10
**determine**
  23:22 60:2
  61:1 62:16
  80:14 103:15
  106:21,25
  119:1,19 120:7

  142:9 187:9
  189:1 192:9
**determined**
  24:2 25:3
  46:25 55:5
  69:16,19 70:2
  70:16 74:17
  75:5,11 78:16
  78:17 93:4,14
  115:2,16
  180:23 186:15
  189:18 238:14
  239:10 241:11
  255:12
**determining**
  19:13 20:1
  24:10,19,24
  26:7,12 27:1
  28:12,19 61:7
  76:19 88:1
  105:25 113:16
  119:9 142:11
  144:21 162:12
  162:17
**develop**   121:25
**developed**
  104:15,21
  107:9 116:18
  120:8,11
  121:18 122:7
  122:10,13
  234:15
**developing**
  247:24 248:1

  248:16
**development**
  47:2
**devote**   41:21
**devoted**   49:1
**di**   45:6 158:1
**diagram**
  133:25 142:25
**diagrams**
  142:16
**diego**   3:11
**diff**   48:5
**difference**
  148:7 182:22
  254:18
**differences**
  148:16 224:25
**different**   30:9
  48:5,14,18
  65:3 91:16
  103:23 121:12
  121:18 148:13
  156:5 157:13
  164:21 166:22
  176:14 178:5
  207:2,6 215:23
  218:8 220:24
  235:4
**differential**
  104:2,10
  116:18 140:9
**differentials**
  103:22 111:17
  121:10 123:16

**App. 422**

**[differentials - document]**                                    Page 23

141:11 158:20
158:21
**differently**
57:25
**diluent**  75:13
77:16 85:23
101:14 103:23
104:2,10 105:3
110:24 111:16
111:16 121:10
123:16 136:11
139:25 141:11
141:17,22
142:12,14,22
157:2 169:12
171:1 188:11
**direct**  39:14
66:8 67:8
73:16 86:9
135:6,7 147:24
148:19,20
152:1,23
153:20 161:5
161:23 163:2,2
163:20 164:1
164:17 165:24
166:5 168:14
197:1 247:16
**direction**
258:11
**directly**  66:13
**directors**  37:7
43:9

**disagreed**
55:23
**disappear**
65:20
**disbursements**
24:9
**disclose**  62:4
199:20 200:16
217:22
**disclosed**  49:21
87:21 144:23
189:21,23
200:14 208:7
208:11,11
**disclosure**
37:20,24 40:10
40:17,25 41:11
43:4 59:24
60:23 61:15
181:5 182:25
183:5,21 184:4
185:13,24
192:11 200:2
200:10,22
208:21,22
210:25 213:19
216:22 218:10
**disclosures**
20:20 21:2
185:5,25
190:15 209:5
217:20
**discount**
140:10

**discovery**
16:20 235:8
**discuss**  43:7
73:3 80:18
83:16 148:10
163:14 165:17
212:3
**discussed**  62:1
66:17 77:11
94:10 99:5
151:1,18 160:9
161:7 188:2
249:6,7
**discusses**  141:9
**discussing**
39:19 59:21,21
72:6 91:15
141:15 170:20
209:15 217:9
**discussion**
10:10 35:5
71:11 72:7,14
72:25 73:1
87:23 95:21
105:9 109:8
121:7,19 158:1
162:22 166:1
184:25 206:22
210:8,25
211:19 217:4
245:4
**discussions**
25:13 26:15,23
45:4,6 56:13

56:14,15 58:21
162:22 188:9
217:5 218:18
**disparate**  214:5
**display**  36:9
**dispute**  89:18
91:19 116:23
120:3 154:3
164:2,11
237:12 239:3
**disputing**  90:5
90:14 95:14
**dissolution**
158:24
**distinction**  23:2
92:5 215:21
**distributed**  8:6
117:20 118:21
**distributions**
26:4
**district**  1:1,2
2:1,2 6:13,13
11:19,20 39:8
39:9
**divided**  134:2
**division**  1:3 2:3
**doc**  80:21
**document**  7:7
8:4,20 9:4,15
10:16 35:25
39:15,16,18
45:23 63:5,15
63:25 64:2,5,6
66:19 67:5,9

**[document - earnings]**

68:4 74:24 89:5 96:19,20 96:23 97:3 102:2,7,20 103:1,14 107:6 107:13,22,24 115:15 117:19 118:1,3,8 119:7 120:10 120:13,18 123:20 124:4,8 124:14 127:10 127:17,18,23 132:3 133:6,7 136:25 137:12 137:14,23,25 141:1,7 142:8 142:15,18 144:1,11 145:6 145:12,25 146:7,19 147:1 147:17,21 151:15 152:2 154:14 156:20 157:5,19 162:13 190:11 192:9 195:1,5 196:18,24 209:23 210:14 210:16 230:16 236:22 239:23 241:19 242:18 247:13

**documentation** 241:22 242:4
**documented** 8:5 117:20
**documenting** 119:9 254:8
**documents** 15:4 37:14 56:10 74:15 80:9,17,22 81:7,11,16,21 82:14 83:1,16 99:5 100:2 101:22 107:4 112:15 113:18 116:11 124:5 127:20 135:14 136:4 137:19 140:17,22 142:4,5 146:8 152:3 153:1 156:5 157:14 160:10 177:10 178:6 188:7,9 223:9 252:13
**doing** 37:19 52:16 166:9 233:20
**dollar** 198:10 198:15 234:21
**dollars** 103:21 104:1 153:10 163:12 166:15 167:9 198:3

240:10
**dominant** 207:14
**dot** 126:6,9
**dotted** 138:15
**doubled** 99:22
**dowd** 3:4 4:19
**downstream** 108:9 109:14 112:20 135:9
**drafted** 37:4 57:23
**drafting** 35:17 36:18
**drafts** 58:25
**dramatically** 133:13 207:6 207:20
**drawn** 242:8
**drill** 26:17 192:9
**drilled** 135:23
**drilling** 22:22
**driver** 211:22 212:7,13
**drivers** 211:9
**drives** 228:14
**driving** 232:21
**dropped** 151:25 174:15
**drove** 80:19
**dry** 221:20 222:11 232:7 233:3 243:7

250:15
**dtoal** 4:12
**ducharme** 179:17
**due** 47:7
**dug** 111:18
**duly** 13:2 258:5

**e**

**e** 7:17,17 8:13 8:13 9:19,19 21:5 107:18,19 108:2,7 114:5 114:6,15 116:16 127:11 128:5 150:11 150:18 160:19 160:19 162:5 165:22 229:8 260:3,3,3
**e&p** 60:22 61:14
**earlier** 34:20 48:19 67:23 85:18 160:6,9 177:12 221:3 233:21 241:17
**early** 181:7,12 182:4,15 192:13,16 193:5
**earned** 66:12
**earnings** 184:21 196:16

196:16 198:2
199:4 205:11
205:11 207:4
**easy** 51:12
**economic** 29:23
69:6,14,15
71:9,11 72:17
73:25 175:23
176:17 178:9
**economically**
28:16,20 69:5
70:8,11,21
71:4,5 72:16
74:17 85:7
129:18 175:21
176:1
**economics**
245:11
**economies**
174:22
**edit** 36:22
**editing** 36:4
**edition** 60:7
**edits** 37:4
**edmonton**
79:21 80:25
99:8 101:15
106:13 110:3,6
112:5 115:24
115:25 134:6
134:12,13,15
134:17 143:5
157:10,18
158:10,21

159:6
**effect** 184:15
184:21 193:10
**effective** 72:22
74:1
**effects** 173:7,16
**efficiencies**
174:23
**efforts** 61:18
221:4,14
**ehuh** 4:14
**eia** 238:24
240:1 241:4,24
**either** 14:11
22:24 50:6,16
94:4 95:9
105:25 125:16
209:20 220:24
222:4 233:3
**element** 29:9
167:23
**elements** 21:14
113:9 158:22
**elicit** 41:24
42:10,17
**eliminate**
153:16
**elizabeth** 4:8
**elk** 18:23 21:4
21:4,8,13 29:5
**em** 134:25
**emc** 7:20,21 8:7
8:8,11,12,16,17
8:23,24 9:7,8

9:12,13,22,23
10:6,7,18,19
101:23 117:21
123:22 141:8
145:8 146:3
147:16 150:13
195:9 197:2
236:24 237:19
239:22 245:7
**emoc** 134:18,21
134:25
**emphasizes**
73:20
**employed** 32:8
162:4
**employee** 32:9
162:7
**employer** 30:24
**employs** 237:7
**en** 72:11
**enable** 65:2
**enabled** 122:20
173:18
**ended** 6:17,20
44:1,6 45:14
154:8 221:21
**ends** 66:18
118:12 124:20
145:18 148:8
178:24 179:5
**energy** 59:23
230:14 238:19
**engaged** 51:6
52:5

**engagement**
59:14 64:1,3,9
64:13
**engagements**
21:24 23:14
34:12 50:17
**engaging** 51:8
**engineer**
163:16
**engineering**
69:3 94:24,25
95:9 175:19
**engineers**
31:17 95:2
163:3,4,15
166:5 180:2
**enron** 18:23
19:4 22:18
86:5 218:2,22
221:6
**enron's** 72:12
234:5,8
**enter** 44:17
119:3
**enterprise**
27:24 177:3
219:4
**enterprises**
94:4
**entire** 68:6
230:22
**entirely** 81:21
139:24

**[entirety - excerpt]**

entirety 31:25 61:12 64:4,6

entities 19:6,7 25:5 94:19

entitled 7:7,9 8:4,20 9:4,9,15 10:16 46:22 64:9 66:19,20 117:19 124:1 133:22 137:6 145:6,16 146:1 146:20 202:14 210:6 236:22 237:20

entitlement 72:20

entity 25:19 26:6,7 37:14 92:3,10,18 94:13 96:22,22 190:3 213:17 248:1

entity's 247:21 248:9

entwined 27:24

environment 233:10

equal 141:10 203:18 217:11 217:14 241:3

equate 43:5

equipment 167:8,15 168:11,12

equivalence 25:4 29:18

equivalent 136:24 193:17 198:6,6 213:23

errata 15:11 259:11,13,16

errors 16:4

escalated 227:11

escalations 69:23

escalator 253:1

esq 3:5,6,7,8,9 4:6,7,8 259:1

essentially 192:12 221:24

esso.ca. 160:20 162:5

establish 256:1

established 255:21

estate 47:7

estimate 50:4 67:17 72:22 74:1 85:14 131:12

estimated 69:4 80:22 125:5 130:13 131:3 175:20 187:18

estimates 23:1 90:1 190:2 208:24,25

247:19,24 248:16

estimating 33:2 67:15 93:17 94:13 118:9,10 124:23 160:2 171:6 187:6

estimation 30:23 31:4 64:24 67:13 89:23 90:10

et 6:11,12 11:19 259:4 260:1 261:1

evaluate 234:25 235:15 252:24 253:9 253:11 255:7 255:14

evaluating 24:14 219:7 234:20 236:11 246:18

evaluation 119:25 240:11

evasive 216:7

event 156:9,16 254:14

events 200:22

eventual 110:7

eventually 25:16 27:16

evidence 97:17 97:20,21

158:19 176:23 205:6 235:12 236:17 239:15 247:23 248:11 248:13,14,20

ex 27:11 51:16 86:19 90:18 126:10 133:15 193:13 216:9 236:5

examination 5:1,4 13:5

examined 13:3 258:4

example 28:3 58:20 62:10 65:18 91:12 105:19 113:10 141:7,15 142:10 150:7 157:15 166:5 167:3 218:1 228:5 249:3

exceed 70:14 71:1 85:9 154:1 219:18

exceeded 243:6

exceeds 70:13 70:25 85:9

excel 7:13 102:22

excerpt 6:22 60:10 88:15 145:21 149:10

**[excerpted - expenses]**                                    Page 27

**excerpted**
  73:24 88:18
**excerpting**
  145:1,2
**excerpts**
  102:21
**excess** 51:23
**excessive** 224:9
**exchange** 7:15
  28:6 32:6
  103:22
**exclude** 40:1
  42:7 87:3
  109:13 160:1
  164:16
**excluded** 38:2
  38:14 55:12
  108:9 109:24
  141:2 148:23
  152:20 157:24
  158:4 160:12
  168:20 173:13
**excludes** 73:15
  86:8,25 87:7
  147:23 159:8,9
**excluding**
  69:23 126:16
  159:20 179:22
**exclusion**
  133:15 164:22
**excuse** 25:17
  29:2 34:17
  72:12 218:15

**execs** 165:16
**executives**
  158:3
**exercise** 118:18
  187:9 188:25
**exhibit** 6:4,7,10
  6:15,19,22 7:4
  7:7,11,13,17
  8:4,9,13,20 9:4
  9:9,15,19 10:4
  10:9,16,20
  13:12,15,25
  14:2,15,16
  15:19 16:24
  33:25 39:7,10
  39:24 43:25
  44:2 45:16,17
  51:16 58:1,10
  59:18 60:12,13
  60:20 63:1,2
  66:22,23 68:6
  75:25 88:23,24
  96:3 102:2,3,8
  107:14,15
  117:22,23
  123:3,21,23
  127:11,14
  137:1,9,18
  145:6,9,25
  146:4,20,23
  148:7,8,8
  149:14,15
  150:11,14
  154:5 155:3

  159:13 160:14
  160:16 170:18
  175:9 178:17
  181:16,18
  188:21 196:19
  196:21 202:4
  205:17,18
  209:24 210:10
  236:25 245:1
  247:9,10
**exhibits** 6:1,3
  7:1,3 8:1,3 9:1
  9:3 10:1,3
  16:23 56:9,11
  188:1
**exist** 76:9 84:11
**existed** 236:4
**existence** 123:7
  123:9
**existing** 69:6
  69:14 72:16
  73:25 167:1,13
  175:22 176:16
  178:9
**exists** 83:19
**expanded**
  144:6,13
**expanding**
  167:12 200:11
**expansion** 96:7
  99:11,17,19,24
  100:25 144:8
  167:3 173:2,8
  173:9,12,16,18

  173:22 174:2
**expect** 18:16
  80:2 93:21
  118:2 137:13
  142:21 161:15
  168:19 203:21
  208:14
**expectation**
  32:2 71:14
  92:13 106:11
  133:2 134:11
  141:20 152:15
  194:6 201:20
  228:13 236:5
**expectations**
  26:19 27:8,14
  27:18 177:21
  218:20
**expected** 51:9
  70:14 71:1,5
  85:9 130:3,6
  133:3
**expects** 200:18
**expenditure**
  199:11
**expenditures**
  87:14 167:1
  168:7,17
**expense** 238:13
**expenses** 20:8
  27:16 152:24
  168:2,15
  196:13

**experience** 18:2 94:24 95:5 207:2,3 208:12

**experienced** 194:14

**experiencing** 204:15 206:13 207:1

**expert** 6:4,7 13:13 17:13,16 17:23 23:18 44:19 49:1,8 49:11 50:6,7 50:19,21,23,24 51:2,6,10,13,19 52:5 54:17,23 209:3 225:15 225:22 226:3 226:12,14,22

**expertise** 17:8 17:12,20 23:21 25:6 26:22 95:6,12 224:12 224:20 225:13 248:22

**experts** 24:3

**expire** 177:1

**explain** 184:4

**explained** 61:2

**explanation** 42:15 83:4 184:24

**explanatory** 46:22

**exploration** 24:10 27:12,15

**exploratory** 61:19

**express** 113:6 113:19

**expressed** 213:22 233:25

**expressing** 169:24 212:5

**extant** 72:21 73:25

**extended** 182:4 193:5,14

**extensive** 254:7

**extent** 58:22 87:24 92:2 93:6,7 152:15 170:5 199:2 223:7 236:2 251:7

**extraordinary** 176:11

**exxon** 1:8 2:8 4:20 7:11 11:18 62:11 67:16 71:9,16 73:17 74:3,10 74:15 75:5 77:12,19 78:8 78:17,21 79:8 82:14 86:5 87:12 88:15,23 89:2,13 90:1

90:11,18,22,24 91:19 92:4,15 92:22 93:22 94:3,3 95:19 95:24 96:9,16 96:22 97:11 98:4 99:9 101:11 104:4 104:24 106:1 109:20 110:2,4 110:7,12,21 111:13,18 112:1,6,15 113:17 115:16 116:11 119:8 119:22 121:3 123:13 124:11 127:3 134:21 136:18 138:3 140:16,19,22 141:6,21,25 142:22 144:20 145:2 151:17 152:18,23 155:9,17 157:12 162:2 163:23 164:24 168:20 169:7,8 170:3 171:17 173:19 177:13 180:12 181:4 182:14 183:21 186:5,18 187:8 188:3,15,24

189:17,21,25 190:3,5,8,9,14 190:19 192:12 192:14 193:18 199:19 203:22 207:16 208:6 208:10 211:21 212:6,20 214:12 216:9 216:16 218:15 218:19 221:20 222:2,8 223:4 223:11 224:1 228:9,17,18 229:3,15,19,22 229:24 230:7 230:13,17,21 231:11 234:15 234:24 235:7 235:13 236:10 237:3,7 238:2 239:6,24 240:4 240:7,15 241:2 241:7,17 242:7 246:16 248:23 248:24 249:24 250:3 251:1,12 252:22 253:8 254:4,20 255:2 255:4 256:11 259:4 260:1 261:1

**exxon's** 72:12 82:24 91:12

**[exxon's - financial]**

93:6 94:2 97:6 110:15 111:4 112:24 113:3 135:23 136:22 139:18,24 149:25 153:23 157:23 169:9 169:21 170:25 186:24 200:9 207:10 211:24 227:15 229:5 231:2 234:9 241:22 250:7
**eyes** 204:21 206:24 211:18 215:21

**f**

**f** 231:1
**f&o** 10:4 196:19 205:2,8 206:8 212:11
**fa** 190:7
**facilities** 168:11,12
**facility** 112:21 174:23
**fact** 20:16 80:4 115:25 155:16 163:20 182:15 190:23 191:1 191:11,17 213:18 221:15 224:7 246:16

246:17
**factor** 70:22 238:3 244:22
**factors** 75:13 110:25 157:2 211:9 231:12 231:25
**facts** 26:16 133:16 156:7 180:20 205:6 207:19 236:17 239:15
**failed** 199:20
**fails** 259:18
**failure** 139:19 139:24
**fair** 60:2 61:1,8 62:17 65:1,10 92:9 220:6,7
**fairly** 24:11 58:18 148:20
**fairness** 213:4
**faith** 48:10 222:17
**fall** 54:8 121:21 133:14 158:12 158:17 249:3
**familiar** 31:2 31:14,20 78:2 124:4 196:24 210:14 213:13 213:18,25 230:13

**fasb** 7:4 62:24 63:8 87:22 88:3 144:23 146:16 148:9 148:10,12 151:3,20,25 218:5
**fasb's** 63:7
**fast** 184:17
**favorable** 200:19
**feasible** 129:18
**february** 186:6 186:7,17,19 193:11
**federal** 10:13 195:13,19 196:9 199:8 210:5 258:18
**fell** 133:13
**fellow** 180:3
**felt** 44:21
**field** 18:25 76:8 95:11 115:6 119:2,3,20 126:17,21 130:18,20,24 152:24 153:20 160:2,12 161:23 164:3 164:23,24 168:3 179:22 206:17,21 213:21 215:6

216:22 217:6 217:22
**fifth** 244:20
**file** 59:3,5 119:24
**filed** 11:19 49:17 53:25
**filing** 180:21 191:6
**final** 8:9 64:21 88:19 101:16 124:2,23 125:1 139:3 152:17 155:17 156:18 156:18 187:15 189:14 249:8 257:3
**finalize** 58:17
**finalized** 59:6
**finally** 152:20
**finan** 213:2
**finance** 35:11
**financial** 9:5 10:11 20:11 23:13 26:12 36:1 37:13 48:1 59:23 60:23 61:14 92:1 94:10 128:21 145:6 150:7 184:7,9 185:5 189:24 194:23 200:15 200:24 201:1,5

**App. 429**

**[financial - forecaster]**

204:17 208:13 208:15 209:1 210:8 211:1,20 213:2,3,10,11 213:16 225:10 237:8 255:23 256:3,5,7,8

**financially**  12:4

**financials**  256:12

**financing**  47:10

**find**  226:21

**finding**  61:20

**fine**  18:21

**finish**  14:16  235:21

**finishes**  165:6

**firm**  30:22 57:7  57:9,10,11,13  57:14 59:13

**firms**  31:3,6,12

**first**  6:11 33:16  34:5 36:6 38:5  38:12 40:22  41:9 44:5  53:22 61:17  67:25 69:21  71:19 76:12  78:14 79:3  82:8,18 87:4  96:19 108:6  113:11 116:7  118:20 119:2  119:20 130:9

149:17,20 162:3 172:19 172:21 174:15 176:6 179:8 184:1 185:17 186:9,12 187:10 189:6 191:9 196:7 210:23 211:8 219:9 248:8

**fiscal**  6:16,20  44:1 45:14  194:17

**fit**  177:21

**five**  25:14  195:9 230:4  242:21,22  243:22 244:4  244:25 245:15  250:12

**fixed**  174:3,8  174:10,12,24

**flawed**  20:2

**flip**  103:11  128:5 138:6  145:18 146:10  160:18

**floor**  2:17  11:23

**flow**  27:2 66:1  66:6,10 108:10  109:14 129:12  129:16,19,24  136:10,12

152:10 161:9 163:7 164:4 180:6 188:5,17 189:1 198:22 203:13,18,20 205:4 224:7 227:7 228:2 232:2,3 237:21 237:22 238:10 241:16 242:13 242:16 244:10 246:10

**flows**  211:11,12  211:23 212:8  212:14 219:18  220:5 243:6  246:5 247:19

**flush**  58:8

**flushed**  58:3,14

**focus**  31:15  85:25 97:10  98:2 100:24  107:12 186:25  204:20 211:8  231:15

**focused**  19:5  23:23 58:6,6  148:17,24  204:20 216:5  233:15

**focusing**  100:14 116:3  206:23

**folks**  48:18  57:20 156:21  163:11 165:8  174:20

**follow**  120:24

**followed**  119:8  120:21 220:23

**following**  59:25  60:24 61:16  64:16 72:11  101:16 103:12  150:1,8

**follows**  13:3

**footnote**  15:20  15:23 16:1  90:23 98:20  99:13 100:10  101:23 127:23  127:24 195:1  214:20

**footnotes**  92:1  184:6,9 204:17  204:18 208:12  208:14 210:19

**forecast**  24:9  27:15 28:3  132:13,22  225:1 229:11  237:22 241:16  243:22

**forecasted**  20:8  246:4

**forecaster**  229:10 244:24

**App. 430**

**[forecasters - future]**

| | | | |
|---|---|---|---|
| **forecasters** 239:8,13 240:6 241:8,10,13 | 109:16 110:8 111:7 112:8 114:12 116:9 127:5 131:5 | **forward** 69:5 175:22 176:2,4 176:21 177:17 | **freight** 80:6 **frequently** 167:17 181:3 |
| **forecasting** 224:12,20 225:16,22 226:3,9,12,23 241:18 248:23 248:25 | 133:5 136:3 139:9 143:14 148:5 149:8,22 151:21 152:12 155:11 159:7 | **foundation** 81:5,15 82:13 93:19 103:4 104:6 110:8 111:7 112:8 | **friday** 56:18 **front** 15:17 176:12 202:5 **full** 109:4 171:3 171:7 181:20 |
| **forecasts** 168:1 224:23,23,25 225:19,25 227:2 238:23 250:1,4,24 252:20 | 160:4 162:19 164:6 165:1 166:10,13 167:6 174:17 176:3 181:9 186:22 188:6 | 114:12 127:6 133:5 139:9 143:14 148:5 149:9 151:22 152:13 155:11 159:7 160:4 | 220:24 221:10 242:14 **function** 76:6 76:11 84:13 115:4 **fund** 55:18,18 |
| **foregoing** 258:5,17 261:5 | 188:18 192:18 193:19 194:3 204:7 205:5 | 162:19 164:6 165:2 174:17 186:22 188:18 | 55:20 **further** 61:3 65:7 71:11 |
| **forensic** 4:18 49:5 | 217:2 222:18 229:13 235:2 235:16,24 | 193:19 194:3 204:7 205:5 217:2 229:13 | 72:7 73:1,3 77:11 83:4 142:13 184:24 |
| **forensics** 225:11 | 236:13 237:14 238:4 242:24 243:8 244:13 | 235:17,24 236:13 237:14 238:5 243:8 | 198:14 218:12 218:25 256:14 258:13,17 |
| **forks** 165:8 **form** 20:1 25:1 35:6 36:20 45:3 47:21 56:2 61:10 | 245:22 246:14 255:8 **forma** 225:1 **formas** 227:3 | 244:13 255:8 **four** 18:14,22 50:13,15 221:20 | **fuse** 58:18 **future** 33:9 69:24 71:14 176:10,14 |
| 64:11 67:22 68:5 71:7 75:2 79:7,17 81:4 81:14 82:12 91:22 92:12 93:12,18,19 100:7 103:3 104:6,16 | **format** 104:9 **forming** 137:20 **formula** 159:22 **fort** 25:16 **forth** 16:17 17:2 258:9 | **fourth** 62:3 162:24 **francisco** 1:16 2:18 11:1,23 **fraud** 52:13,20 **free** 255:24 256:4 | 178:5,11,15 200:25 201:1,6 229:12 232:3 233:5 238:13 244:3 246:5 247:19 252:11 252:15 |

**App. 431**

**[futures - go]** Page 32

**futures** 227:10
228:10,14,16
228:20 229:1,7
235:9

**g**

**g** 36:12
**gaap** 17:10,17
17:20,25 41:6
73:4 94:9
144:23 219:2
226:14
**gaas** 17:11,17
17:17,20 18:1
22:3,7,10
226:14,16,19
**gain** 165:10
174:21
**garrison** 2:16
4:4
**gary** 3:9
**gas** 7:10 17:14
17:18,21,24
18:3,5,8,11,12
18:25 19:14
20:19,21 21:2
21:17,22 22:6
22:11,25 23:22
25:11 26:6
30:23 31:17
32:15,18 33:1
33:2,9 34:19
37:17 54:17
59:21 60:2

61:1,8 62:17
62:19 65:23
66:15,21 67:2
67:13 68:24
69:1,2 70:17
71:10 74:18
75:4 76:5,12
76:13 77:24
82:8,9,18,18
84:7,24 85:3
95:3,13 115:3
115:4 118:19
118:23 175:10
175:17,18,18
180:1 181:21
182:3,6,7
193:4 206:16
217:21 218:2
218:22 219:4
220:20 221:6
221:20 222:11
224:13,15,21
225:3,4,16,19
225:22,25
226:4,9,12,17
226:23 227:5,9
227:23 228:3
228:23 229:11
230:1,19
231:16 232:7
232:23,24
233:3,16 234:4
234:16 236:6
239:25 242:1

243:7 245:21
248:23 250:15
251:3,8,18,23
252:10,11
255:2,5,13
**gate** 108:8,9
109:14 112:20
**gc** 135:15
**geller** 3:4 4:19
53:15
**general** 25:13
32:21 41:11
58:19 168:6,16
**generally** 17:9
17:10 33:6
35:20 226:16
226:20 245:9
**generate** 66:1
70:15 71:16
**generates**
70:13,25 76:23
76:24 85:8
115:2
**geographic**
202:24 203:7
206:2 245:25
**geographical**
213:20
**geologic** 26:9
27:22 29:19
31:9 34:1
**geological**
26:20 29:22

**geologist** 26:21
**geology** 95:10
**georgouses**
56:14,21 57:21
58:6,15 59:10
**geoscience** 69:3
175:19
**give** 63:22
141:7 147:5
222:20
**given** 23:16
69:5 93:6,7
133:7 165:7,15
175:21 256:19
261:9
**gives** 24:6
116:13 204:11
**global** 89:13,22
94:23 97:6
119:22 121:3
124:11 127:3
151:10 187:8
188:24
**go** 11:13 15:11
15:18 21:13
30:12 40:9
53:9 64:19
69:11 70:7
75:16 80:5
96:4 99:12
103:20 114:16
117:10 129:11
132:15 152:4,9
153:6,21

Veritext Legal Solutions
212-267-6868    www.veritext.com    516-608-2400

**App. 432**

**[go - happening]** Page 33

166:16 169:9 170:8 173:24 175:13 178:20 184:17 187:2 198:14 200:6 201:7 211:5 220:10 253:21

**goes** 55:15 86:23 89:21 90:8 138:16 161:16 166:4 222:21 251:25

**going** 11:6 12:14 13:24 27:9,9 28:7 31:23 39:14 42:17 43:24 45:13 60:10 62:24 71:25 74:6 88:22 103:17 117:18 127:10 145:5 146:19 150:10 166:22 176:10 176:21 177:16 209:23 222:22 231:21 233:17 236:21

**good** 11:5 12:11 13:7,8 48:10 72:1 74:5 113:24 165:25 174:20 209:7 219:22

222:17,23

**gordon** 160:22 165:22

**govern** 66:14 67:12

**governed** 219:3

**government** 69:7

**governs** 212:21

**gpm** 118:23

**grant** 40:15

**granted** 41:14 42:7,13 43:1,3

**graph** 130:2 132:15 138:8

**great** 148:24 171:22

**greater** 98:12 98:23 100:11 131:19 132:6 248:22

**green** 222:6

**grg** 118:17,24

**gross** 201:9

**group** 89:10,13 89:22,23 90:9 94:23 95:3,8 95:10,20 119:23 121:3 124:11 127:4 151:10 187:9 188:25 230:22 231:10 247:20 247:22 249:5,9

**groups** 238:24

**grove** 18:23 21:9,13

**growing** 100:22

**grown** 97:8

**growth** 231:3,4 231:9 251:11 251:13

**guess** 27:20 53:18 132:23

**guidance** 10:9 63:12,20,21 83:4,12,19 84:2 171:10,15 171:24 210:7 210:24 227:15 229:16 245:13 249:24

**guide** 223:16 227:1 229:15 234:16,25 235:14 236:11 243:13,15 245:14 250:8

**guided** 74:12

**guidelines** 95:8

**gulf** 19:2 22:23 75:10 135:11 135:15 141:18 141:23 142:14 142:23 143:2,7

**h**

**h** 3:5 36:12,12 259:1 260:3

**ha** 17:4 31:16

**half** 56:19 126:15 132:1 138:21 159:18 170:21 171:12 172:8,10,16,17 172:19,21 173:7,16 174:16 175:3,6 177:15 211:7 227:12 230:6 231:3 242:18 243:23 244:21 245:5,9,12,17 245:18

**hambrecht** 52:23

**hang** 149:12 202:8

**hanna** 1:24 2:19 12:12 258:2,24

**hansen** 4:21

**happen** 80:5

**happened** 98:8 98:16 141:5 251:23

**happening** 56:5 104:12

**App. 433**

**[happens - ihs]**                                              Page 34

| | | | |
|---|---|---|---|
| **happens** 209:17 | **henry** 243:13 | **hmm** 52:7 82:4 82:4 | 45:18 60:14 63:3 66:24 |
| **happy** 165:11 165:15 | **hereto** 261:7 | **hold** 95:9,10 226:13 | 87:24 88:25 102:4 107:16 |
| **hard** 141:18,23 | **hereunto** 258:21 | **holidays** 58:18 | 117:24 123:24 |
| **hardesty** 141:18,23 142:13,19,21 143:2,13,20,21 | **hey** 219:21 | **hopefully** 235:7 | 127:15 137:10 145:10 146:5 |
| **head** 83:18 151:10 168:5 | **high** 172:23 223:14 249:11 | **hour** 57:4,9 72:1 74:6 166:23 | 146:24 150:15 196:22 210:11 |
| **heading** 39:25 89:9 118:13 137:19 211:6 | **higher** 133:4 156:24,25 158:14 159:1 168:23 172:22 186:16 191:4 192:16 193:22 240:15 243:15 243:16 | **hours** 56:19 57:17 | 237:1 247:11 |
| **hear** 29:16 35:23 38:10 41:3 86:13 165:13 | | **how's** 57:22 | **identified** 50:24 58:12 68:15 87:12 110:23 126:10 129:1 153:1 159:19 168:4 182:20 203:22 209:6 217:23 |
| | | **hr** 166:7 | |
| | | **hub** 243:13 | |
| | | **huh** 4:8 | |
| | **highest** 194:1 | **hun** 214:8 | |
| **heard** 192:7 230:20 | **highlighted** 61:23 86:19 | **hundred** 94:4 | |
| **heather** 4:18 | **highly** 250:9 | **hundreds** 153:10 163:11 167:19 | **identifies** 96:21 165:4 |
| **heck** 236:6 | **hillsborough** 35:11 36:11 37:10,11,23 | **hydrocarbon** 119:24 | **identify** 31:7 34:22 52:1 71:21 83:12 113:13 147:2 220:19 233:18 236:9 255:3 |
| **hedge** 55:18,18 55:20 193:13 | **hired** 23:8 52:22 | **hypothetical** 110:9 | |
| **hedges** 193:7 | **historical** 211:11 | **i** | |
| **held** 226:11 | **historically** 117:5 160:12 161:8 | **i.e.** 108:8 144:23 | |
| **help** 68:18 185:6 | | | **iea** 238:25 |
| **helped** 35:8 58:7 | | **ideal** 165:9 | **ifrs** 218:5,7 220:24 221:8 |
| **helpful** 187:1 | **history** 232:2,8 232:13,14 233:4,12,13,18 234:3 237:21 251:22 | **identifiable** 246:3 | **ignore** 142:22 233:6 |
| **helps** 149:14 | | **identification** 13:16 14:3 39:11 44:3 | **ihs** 238:25 240:2 241:4 242:15 243:14 |
| **hemming** 30:25 56:22 | | | |

**App. 434**

245:10
**ii** 68:15 200:20
**immediately**
46:8 125:11,24
**impact** 66:5
121:8 123:14
136:16 140:4
185:4 200:13
200:19 208:25
**impacted** 121:9
**impacts** 136:15
**impair** 221:17
**impaired** 20:17
21:9 28:4
221:25 222:3,4
243:22 244:7
**impairing**
221:21
**impairment**
10:17 21:2,12
32:18 151:5
219:13,17,22
221:9,15,19
222:10,11
231:13 232:19
234:2,7 236:23
237:4,9 243:20
243:21 246:19
253:1 254:4,13
255:1
**impairments**
20:21 218:5,11
218:23,25
219:3,7 220:21

221:5 223:5,22
224:2
**imperial** 90:18
90:22,24 91:1
91:4,9,21 92:4
92:21 93:7
104:15 105:2
106:1 110:2
119:15,17
120:8,11,20
121:2 124:7,10
124:22 127:2
142:1,8 162:6
162:8,11,16
164:3 187:7,13
187:18 188:4
188:23 189:4
**imperial's**
159:25
**implying**
242:23
**importance**
215:20
**important**
62:12,23
116:17 204:13
204:19 208:18
248:7 252:16
**impression**
204:11
**improper** 47:19
**improperly**
19:21 47:1
49:24

**improprieties**
48:21
**improvement**
233:1
**inadequate**
185:13
**inappropriate**
177:17
**incentive** 248:3
**include** 38:20
69:15 87:13
89:23 115:19
130:19 168:10
168:17 172:21
173:20 174:7
194:24 196:6
199:13 213:10
217:8 242:4
255:2
**included** 36:1
73:22 106:22
113:10 128:15
140:16 141:2
148:17,21
150:1,6,8
152:10,17,19
153:2,25 158:9
164:24 168:8
169:19,25
170:6 172:3
174:6,10 186:3
203:24,24
234:16 241:22
242:3 254:5

**includes** 94:6
95:8 196:12
199:5,7,7
**including** 6:23
62:1 87:19
95:6 150:1
156:21 157:6
181:8 195:16
199:22 200:22
241:23
**inclusion**
165:24
**income** 24:12
50:5 195:13,19
196:9 199:8
200:20
**incomplete**
108:21 109:6
110:9
**inconsistent**
170:25 177:23
**incorporate**
105:4 247:21
248:9
**incorporated**
94:2 112:25
157:7 213:11
236:2
**incorrect** 190:2
190:6,10
209:16
**increase** 98:8
98:16 99:2
174:22 251:2

**[increased - interactions]**

**increased**
96:10,16 97:12
98:5 174:3
251:4,19
**increasing** 99:6
**incurred** 87:11
139:25 172:2
173:20
**indented** 64:23
65:7
**index** 5:1 6:1
7:1 8:1 9:1
10:1 227:16
229:20
**indexes** 227:18
242:7
**indicate** 42:9
136:5 157:14
188:10 198:24
**indicated** 39:20
77:8 97:6
128:16 171:25
188:8 205:4
227:16 234:19
242:18 250:1
**indicates** 72:17
73:14 77:4
85:19 97:15
98:21 132:12
142:18 143:1
143:12 144:1
172:5 176:23
230:2 245:8
246:23

**indicating**
18:13 42:6
97:3 158:16
206:9 216:19
233:24
**indication**
122:14 130:22
191:6 232:19
**indicative**
200:25 201:6
211:11
**indicator**
204:13 252:15
252:16
**indicators**
243:20
**indices** 227:14
**individually**
1:4 2:4
**individuals**
95:4,8
**industry** 18:9
95:6 141:10
238:24,24
**inflate** 230:5
**inflated** 223:17
**inflation**
223:19 230:6
242:23 244:21
244:25 245:8
245:19 251:5,9
251:14,15,20
252:5,9 253:1

**inflator** 243:23
245:5,16
249:18 250:11
250:13
**influence** 61:21
62:20 232:22
**infor** 133:9
**informa** 180:20
**information**
35:25 62:5,8
63:17,23 64:10
64:25 81:19
127:2 137:20
139:6,12,14
191:22,25
200:21,24
201:5,11
204:19 213:2,7
213:10 215:25
234:23 242:5,9
248:1,4 255:17
**informed**
201:24 204:12
**ingredient**
228:14
**initial** 28:5
47:2 79:15
80:15 81:2,12
81:20 135:12
135:17 148:15
**initiated** 47:3
**inject** 136:11
**input** 118:18

**insert** 147:18
151:24
**inspection**
254:24
**instance** 37:3
71:18 77:2
103:20 141:13
142:7 216:24
236:9
**instances** 18:4
24:12 35:8
36:2 51:1
55:22 59:10
241:23 252:12
**instruction**
34:10 38:21
76:1
**integer** 217:18
**integrally**
27:24
**integration**
245:25
**intend** 41:24
42:9
**intended** 77:23
84:23 85:2
**intent** 55:6
222:22,23
223:1
**intention** 55:19
**inter** 134:18
**interactions**
150:5

**intercompany** 101:5 159:6,9
**interest** 18:7 25:12,20,22,25 26:2,5 90:24 187:5
**interested** 12:4 258:15
**interesting** 141:13
**internal** 89:10 95:24 101:12 149:25 155:17 157:22 248:2
**internally** 139:22 241:25
**international** 36:9
**interpret** 152:6 216:19
**interpretation** 111:4 112:2 152:7 179:12 179:21
**interpreted** 110:22 111:18 114:22 148:3
**interpreting** 114:19
**interpretive** 210:24
**interruption** 86:12 156:12

**introduce** 12:9
**investigated** 49:22
**investment** 235:1 236:3,12 238:21 253:9 253:11 255:7 255:14
**investments** 234:21 235:15 246:18 252:24
**investors** 65:2
**involve** 19:13 20:20 199:11
**involved** 17:18 18:25 19:9,16 24:18,23 26:9 26:11,23,25 28:19 29:4,20 30:1,1 33:20 34:3,13 35:16 37:16 77:18 78:4 90:9 105:25 226:9
**involvement** 47:7
**involves** 28:15
**involving** 22:11 22:25 33:1 76:22
**iol** 197:6,9,11 197:13
**irrelevant** 40:25

**iss** 84:1
**issuance** 45:8
**issue** 18:5,12 19:18 22:16 23:11 35:12 37:11 73:5 140:17 153:8 167:24,24 169:6 185:9 190:14
**issued** 46:15 48:2 67:3 84:2
**issues** 9:5 17:17 37:13 49:5 58:6 145:7 148:18 169:13 249:22
**item** 34:18 148:19 167:14 184:23 200:3 203:2 207:25 208:9 217:10 230:11
**items** 15:4,8 21:23 58:13 72:20 129:19 167:20 168:2 170:6 199:15
**iv.b.** 184:25

**j**

**j** 1:9 2:9
**january** 1:15 2:19 6:9 7:6

8:22 11:2,6 14:1 63:1,8 123:5 133:13 137:7 138:3 156:10,16 178:17 180:17 186:17 193:10 194:15 257:6 259:3
**jeffrey** 1:9 2:9
**jennette** 4:18
**joetting** 3:17
**join** 165:15
**jose** 53:6
**jr** 1:4 2:4 11:18 259:4 260:1 261:1
**ju** 93:1
**judge** 38:14,19 42:3,3,6,13 43:1 55:5,16
**judge's** 41:17
**judges** 55:22
**judgment** 58:23
**justin** 3:9

**k**

**k** 1:7 2:7 6:16 6:19 7:12 11:21 21:5 33:3 35:6 36:18 37:12,15 43:25 44:6,10

**App. 437**

**[k - know]**                                                                Page 38

| | | | |
|---|---|---|---|
| 44:11 45:2,5,8 | 99:11,19,23 | 183:19,23 | **ken** 160:22 |
| 45:14,20 46:15 | 100:12,22,25 | 184:3 185:11 | 165:22 |
| 62:10 65:19 | 101:4,16 103:8 | 186:20 187:15 | **kep** 98:21 99:1 |
| 88:23 89:3,8 | 103:16 104:5 | 187:19 188:4 | 99:15 144:7 |
| 91:12 92:7 | 104:15 105:12 | 188:16 189:1 | **key** 228:14 |
| 94:2,6,22 | 105:16,22 | 189:12,15,18 | 254:18 |
| 105:19 106:22 | 106:19,24 | 190:2,6,10,20 | **kidding** 219:24 |
| 113:1 180:4,21 | 107:3,6,9 | 192:5 194:13 | **kim** 1:24 2:19 |
| 180:24 181:5 | 109:20 116:20 | 195:11 197:6 | 12:12 258:2,24 |
| 181:13 182:13 | 117:3 119:15 | 197:14,24 | **kind** 58:19 |
| 183:6,22 | 119:17 120:7 | 198:21 199:21 | 213:7 254:25 |
| 185:13 186:3,5 | 120:23 122:16 | 200:12 201:4 | **kinds** 185:5 |
| 189:22 192:12 | 122:23 124:2 | 201:18,23 | **knew** 46:14 |
| 192:25,25 | 124:13,24 | 204:10,14,15 | 156:21 157:12 |
| 193:1,18 201:8 | 126:14 128:12 | 204:24 205:3,4 | 157:15 |
| 202:5 205:20 | 129:12 133:3 | 206:10,25 | **know** 16:20 |
| 207:10 212:20 | 133:22,25 | 207:2,5,7,14 | 18:19 26:15 |
| 213:13,14,15 | 135:12 136:1 | 208:12,19 | 30:8 31:11,22 |
| 213:19 217:1 | 136:14,17 | 211:22 212:7,9 | 32:1 33:5 |
| 223:8 249:7 | 138:25 142:2 | 212:15 214:2,4 | 39:18 45:4,22 |
| **kearl** 7:13 8:10 | 144:2,6,7,12 | 214:11,21 | 45:23 46:16,19 |
| 9:9,15 15:24 | 146:1,20 | 216:4,5,6,10,16 | 49:3,10 50:22 |
| 15:25 58:6,15 | 150:21 152:4 | 216:20 | 52:7 54:6,14 |
| 67:16 74:25 | 152:24 153:6,9 | **kearl's** 101:13 | 54:16,18,19 |
| 76:18 78:4,14 | 153:9,18,20,21 | 125:4 130:3 | 55:21 78:1,4 |
| 79:9,14 81:12 | 154:25 155:10 | 160:2 177:4 | 78:13 79:14,25 |
| 81:20 91:8,17 | 157:9,24 158:4 | 184:19 187:6 | 80:4 81:1 |
| 91:18,24 92:10 | 160:11 162:18 | 187:20 190:15 | 82:23 83:21,25 |
| 92:18 93:3,9 | 163:5 165:5 | 199:22 208:7 | 85:1 92:9,21 |
| 93:11,17 94:1 | 166:6,16 167:5 | 215:22 | 92:24 93:2,8 |
| 94:3,14 96:7 | 167:18 169:4 | **keep** 167:13 | 93:11,16,24 |
| 96:10,16,21 | 169:15 173:1 | **keeping** 251:14 | 94:1,12 98:10 |
| 97:12,15,23 | 175:25 180:5 | 252:4 | 99:18,23 100:4 |
| 98:5,12,23 | 180:16 183:2 | | 100:25 101:3 |

**App. 438**

103:19 104:20
107:8,8 115:15
115:15 116:6
116:12 120:10
121:14,25
122:4,22,25
123:8 129:18
133:11,13
135:4,5,11,17
135:21 136:4
136:18,21
137:15 152:20
153:13 157:6
158:24 162:3,6
162:23 163:17
165:19 167:8
167:10,17,22
169:3 177:4
198:5 201:17
203:23 204:5
210:18 212:1,2
216:6 218:1
223:7,13,25
225:3 227:3,5
230:25 233:21
235:5,5 240:17
244:11,15
245:15 248:24
249:10,21
250:14 254:18
**knowing** 81:11
216:12
**knowledge**
15:2 121:2

162:10,15
189:25 190:13
256:9
**known** 33:9
69:6 175:22
186:18 199:20
200:10,17,23
210:25
**kpmg** 30:25
**kurt** 9:20
150:12 151:1

**l**

**l** 21:5 36:12,12
**label** 131:7
**lack** 199:22
200:11
**lake** 106:25
107:4,7,11,11
116:19 117:5
201:15,23
204:10 207:3,4
215:23
**language** 42:6
65:5 69:9,25
74:2,16 75:6
76:16 88:14
89:16 90:12
101:20 108:11
108:16 140:6
151:6 161:17
161:22 176:12
176:22 177:2
177:21 178:14

181:10,13
185:12 186:2
188:21 192:20
199:24 201:2
203:1 207:23
211:13 213:25
237:10 239:1,4
248:6
**large** 196:3
**largely** 15:25
72:6 246:3
**larger** 174:4,9
**late** 156:4
181:6 182:3,15
192:13,16
193:5
**latest** 149:2,20
**law** 2:15
**lawsuit** 48:23
**lawyer** 94:1
**lay** 93:25
**lays** 119:7
**le** 154:3
**lead** 61:12
149:23
**learn** 250:21
**lease** 76:8
115:6
**leaves** 206:9
**left** 124:18
138:8 178:23
179:9 210:22
**legal** 12:1 39:1
55:6 91:23

93:5,9,19,21
215:16 256:21
259:23
**length** 136:20
**lev** 171:14
**level** 99:6 154:3
171:14 196:4
216:22 217:6
217:22 218:19
223:14 240:15
246:2
**levels** 167:14
181:6,11
**license** 12:12
**lifting** 125:4
126:14 130:12
130:16,17
131:3 132:1
133:4 138:12
138:20 154:1
159:18 168:22
168:23 169:22
170:4,21
172:12,25
173:14,15,25
174:1,10,14
175:1,2 177:4
177:6 178:4
179:10 187:19
187:24 189:11
189:15
**light** 228:15
**likelihood**
185:10

**[likely - loss]** Page 40

**likely** 50:16 163:25 164:17 164:17 166:16 167:10,20 184:14,20

**limited** 61:25 101:15

**line** 40:22 41:19 53:2 99:14,14 125:2 125:11,24,25 126:1,2 131:7 138:15,16,17 162:7 166:24 168:2 196:14 198:9 228:15 240:7,8 260:4 260:7,10,13,16 260:19

**lines** 65:8 198:24 240:14 240:19 242:8

**liquidity** 249:19,22

**liquids** 76:13 82:9,18

**list** 53:9

**listening** 162:14

**litigation** 49:14 49:25 50:2,2,3 50:16,16 51:14

**little** 28:9 91:16 98:11 164:21

**lived** 237:24 247:20 250:5

**llp** 2:17 3:4 4:5

**local** 101:17 165:7

**located** 2:17 213:24

**location** 11:22 163:17

**locations** 33:9

**logo** 124:7

**lombardi** 56:13 56:21 57:17,21 58:5,7,14 59:9

**long** 4:22 30:9 55:15 99:23 100:5,25 121:25 122:4 227:8 228:3,22 228:25 229:25 231:21,22 237:24 238:18 238:20,22 239:7,25 240:5 240:16 241:2,7 245:8,19 247:20 250:5 250:25

**longer** 25:22

**longstanding** 160:1

**look** 31:8 33:5 33:5,17 39:13 58:2 59:17

60:20 71:16 72:4 73:18,20 73:24 75:24 76:21 77:2,4,9 78:8,23 86:4 87:17 96:2 97:1,14 98:9 98:19 99:9,13 101:8,9 111:12 114:4 124:5 127:22 129:25 133:20 139:17 142:4 143:24 144:16 154:4 155:20 157:21 158:6,7 159:3 159:12 160:16 162:23 168:4 170:16 175:8 176:7 177:8,25 178:3,16 181:12 196:17 201:16,25 202:4 210:18 214:16,18 215:20 225:6 225:17 226:21 226:25 227:20 227:22,22,23 228:5,9,15 229:3 230:4,25 231:4,19 232:10,20 239:19,22

247:5 248:15 249:1 252:2,8

**looked** 52:14 54:6,8,22 55:3 56:9 61:11 74:16 78:6 81:6 82:14 87:10 149:2 151:4 177:6 178:24 192:11 207:10 212:20 236:1

**looking** 33:24 73:4 80:9 92:6 100:19 111:20 129:18 142:7,8 142:15 149:15 151:17 154:7 176:1 179:6 195:10 197:21 205:8 211:17 228:20 231:20 251:24

**looks** 146:8 176:5

**losing** 197:25

**loss** 108:9 109:13 112:20 158:18 195:14 196:4 204:15 214:7 232:2,15 232:18 233:8 237:21

**losses** 184:13 184:19 194:14 194:16,21 196:5,12 201:14,15 208:8 216:13 216:14 232:3,3 232:9,11,13,14 232:22,23 233:4,5,12,13 233:14,18 237:22,23
**lot** 83:16 124:5 127:20 136:6 224:22 236:6 249:5 252:20
**louisiana** 25:18
**low** 172:24,24 181:11 231:16 232:24
**lower** 138:14 139:2 157:9 158:25 168:25 178:14 192:15 221:8 240:5,19 241:3,12
**lshamailova** 4:13
**lump** 215:24
**lunch** 117:13
**lyuba** 4:7

**m**

**m** 229:8
**mackenzie** 240:1 241:4 242:14,21 243:4,14,21 244:2,6,18
**made** 22:8 23:3 23:3 31:10 42:3 48:5,8 49:2,9 50:10 55:16 80:15 82:23,23 86:18 92:20,23 94:18 97:4 101:7 105:8 106:6 110:12 111:13 111:15 112:10 112:23,25 115:20,21 136:18 138:2 142:5 159:2 162:21 163:22 163:23 164:19 175:25 181:4 183:5,10,22 185:24 212:16 212:18 213:20 236:1 250:18 251:1 255:15 261:5
**mail** 7:17,17 8:13,13 9:19

9:19 107:18,19 108:2,7 114:5 114:6,15 116:16 127:11 128:5 150:18 160:19 162:5 165:22
**mails** 150:11 160:19
**main** 76:14 78:15 79:4 82:10,19
**major** 173:1 217:21
**majority** 94:5 204:13 220:23
**make** 20:14 23:2,8 26:20 28:1 33:14 36:22 51:12 52:15,17 53:4 53:10 63:11 82:7,17 85:5 88:2 133:8 163:6 177:20 178:11 181:2 199:3 202:2 212:18 249:8
**makes** 114:16 183:13 202:7 209:17
**making** 71:8 82:1 92:6

**management** 46:25 48:17 155:9 157:12 157:23 180:13 187:25 188:16 200:23 201:12 204:20,21,21 206:24,25 211:18 212:6 212:11 215:21 216:4,5 218:19 246:4 249:5,9
**management's** 10:10 35:4 201:13 210:7 210:25 211:16 238:10 245:8 246:9
**manager** 56:23 94:22 97:7
**march** 44:12,25 122:7 195:10
**margin** 201:9 201:21,22 204:12,24 206:6,10,14 207:1
**marine** 76:15 82:11,20
**mark** 6:10 8:14 13:12,24 39:7 43:24 45:15 60:10,12 62:24 63:1 66:22

**[mark - mentioned]**                                                       Page 42

88:22 102:1
107:14 117:21
123:21 127:11
127:12 136:25
145:5,25
146:20 150:10
165:22 209:24
236:24 247:9
**marked**  13:15
14:2 39:10
44:2 45:17
60:13 63:2
66:23 88:24
102:3 107:15
117:23 123:23
127:14 137:9
145:9 146:4,23
150:14 196:18
196:21 210:10
236:25 247:10
**marker**  119:1
119:13,19
120:8,16 140:9
141:10,13
**market**  97:4
98:22 99:8
101:15,17
134:7,13
139:20 140:2
140:12,18
141:4,5,15
142:11,11
144:7 157:25
158:13 182:14

192:13 193:25
220:6,7 227:9
228:14,16
**marketing**
72:19 118:19
118:20
**marketplace**
228:12
**markets**  96:11
96:17 97:13,24
98:5
**marries**  219:5
**marwick**  30:25
**massive**  218:2
**massively**
207:2
**material**
184:14,20
200:22 208:25
211:9,24
215:25 254:13
255:24 256:4
**materiality**
211:25 212:3
**materially**  20:9
243:15
**materials**  118:5
**matt**  56:13,21
**matt's**  56:22
**matter**  6:10
11:17 16:17
52:18 57:15
80:4 116:3
140:19 141:4

168:6,16
217:20
**mattered**  92:16
**matters**  19:12
22:17,24 25:9
30:2 32:13,14
50:15 55:6
226:9
**mayor**  35:10
**mbtu**  240:10
**md&a**  35:13,14
35:17,25 36:4
36:18 37:1,3
37:17 38:2,4
38:15,18,22
39:21 40:11,17
40:24 41:11,25
42:10,18,23
43:5,7 184:6,9
189:23 200:15
204:17 208:13
209:5 211:2,8
211:15 213:6
**mean**  62:21
65:15 93:6
102:9,15
122:11,17
134:10 143:19
191:13 197:10
198:21 216:3
221:16 231:18
**meaning**  42:20
**meaningful**
111:23

**means**  70:12
185:19
**meant**  164:19
**measure**  24:7
215:3
**measurement**
10:20 27:17
**measures**  65:9
241:24
**measuring**
19:25 21:6
**media**  11:15
30:14,18 75:18
75:21 117:12
117:15 170:10
170:13 220:13
220:16 253:23
254:1 256:20
**meeker**  25:21
**meeting**  150:9
158:2 165:18
**meetings**  25:13
150:7
**meets**  180:6
**member**  35:11
35:12 95:1,12
**members**  95:10
249:5
**memo**  254:7
**mention**  218:8
**mentioned**
22:19 34:20
36:7,14 43:8
48:19 51:15

**[mentioned - mobil's]** Page 43

83:9 182:12 184:8 217:11 225:8,19

**mere** 191:11

**mesa** 18:23 19:16 20:7,12 20:23 29:2,3 34:18,25

**met** 56:17,19

**method** 47:4,11 61:18 221:14

**methodology** 103:15,17 104:4,9 110:11 133:8 153:24 153:25 156:2 162:11,16 171:1 229:10 243:24 244:24 249:14

**methods** 69:7 72:18 79:10

**metrics** 139:2

**mexico** 19:2 22:23

**mic'ed** 147:13

**microphone** 191:2

**microphones** 11:8 86:14

**mid** 98:21 99:15 173:5 240:11

**middle** 96:6 98:12 99:16 173:3 211:6 238:9,9,12 246:11

**million** 167:9 195:11,12,12 195:13,15,18 195:20,22,23 195:24,25 196:2,3,3,8,10 199:8 205:11 205:12 207:5,5 214:7,8

**millions** 91:14 153:10 163:11 166:15

**mind** 18:19 29:1 52:21 55:25 83:10 84:4 156:6

**mindful** 218:20

**mine** 125:16

**miniscribe** 52:22

**minus** 130:18 130:24 131:18 159:23

**minutes** 165:19

**mirror** 41:6

**mis** 214:9

**mislead** 48:12 213:8

**misleading** 183:16 214:10

**misled** 204:23 209:16

**missing** 109:7

**mission** 2:17 11:23

**misstatement** 255:24

**misstatements** 256:4

**misstates** 82:13 111:9 133:6 186:23 229:14 239:14 243:9

**mitchell** 30:25

**mixture** 77:14

**mobil** 1:8 2:8 4:20 7:11 11:18 67:16 74:10 88:15 89:13 90:11,18 90:22 92:22 104:4,24 110:3 110:4,7 112:6 119:8 134:21 136:18 138:3 140:20 141:25 145:2 152:23 155:9,17 157:12 162:2 164:24 168:20 171:17 177:13 181:4 182:14

183:22 188:3 189:18,21,25 190:5,9,14 207:17 208:7 211:21 212:6 216:9,16 221:20 222:2,8 229:22,24 230:7,17,21 231:11 234:15 234:24 235:13 236:10 237:3,7 238:2 239:6 241:7 246:17 248:23,24 250:3 252:22 253:8 255:4 259:4 260:1 261:1

**mobil's** 78:21 88:23 89:2 90:1 95:20,24 112:2 119:22 121:3 124:11 127:3 180:12 186:5 187:8 188:15,24 190:9,19 192:12,14 193:18 212:20 214:12 223:4 224:1 230:13 239:24 240:4,8 240:15 241:2

**App. 443**

**[mobil's - need]**

254:4 256:11
**model** 104:15
104:20,25
105:2,12,16,21
105:25 106:4,8
106:9,18,24,24
107:3,5,6,9
117:3,4 120:6
121:18,20,22
122:1,4,7,16,18
122:22,25
123:4,7,9,18,19
160:6,8
**models** 121:4
**modernization**
7:9 66:21 67:2
175:9
**modifications**
23:19
**moment** 22:19
29:6 114:1
**money** 110:12
**monitor** 237:8
**month** 33:16
34:5 67:25,25
69:18,21,21
71:20,20 72:7
103:8 113:11
118:20,20
119:2,20 130:9
171:3 173:20
176:6 186:9,12
187:10,11
189:6,6

**monthly**
118:18
**months** 34:5
100:16 170:25
173:21 191:9
**moody's**
245:10
**moot** 183:13
**morgan** 52:23
**morning** 11:5
12:11 13:7,8
33:21 161:4,6
**morse** 31:1
56:22
**motion** 40:1,15
41:14 42:7,13
42:16,22 43:1
43:3 54:19
**motions** 54:24
**mountain**
221:20 222:11
232:6 233:3
243:7 250:15
**move** 27:14
65:19 103:24
111:25 115:16
142:23 221:2
242:19
**moving** 28:2
113:23 166:21
219:21
**multi** 246:4
**multibillion**
234:20

**multiple** 19:10
**murky** 53:2
**mush** 207:6
**mute** 11:11

**n**

**n** 229:8
**name** 11:25
18:15 21:25
22:20 25:19
29:6 31:13,21
34:24 53:22
55:10 224:18
234:12,13
258:21
**named** 49:7
50:19 53:20
**names** 18:17
31:11 35:1
**native** 102:12
102:17 147:3,4
147:7
**natural** 65:23
76:13 77:5,23
82:9 84:23
85:2 118:23
181:21 182:2,6
182:7 183:8
193:4 224:13
224:15,21
225:3,4,16,19
225:22,25
226:4,9,12,17
226:23 227:5,5

227:9,23 228:3
228:23 229:11
229:25 230:19
231:16 232:23
232:24 233:16
234:4,16
239:25 242:1,1
245:21 248:23
251:8,16,18,22
252:10,11
255:5,13
**nature** 20:6
**near** 45:12
99:14 228:18
245:24
**necessarily**
200:25 201:5
221:17
**necessary**
27:12 184:24
200:14,21
211:10 217:8
261:6
**need** 23:2 24:7
28:1 41:16,17
76:21 77:15
105:9 106:1
107:10 153:23
167:11 171:25
172:1,6 177:25
180:19 183:1,6
185:20 186:19
212:18 219:9
221:17 223:24

**App. 444**

**[need - nymex]**                                                                    Page 45

225:17 226:25
231:9
**needed**  115:19
167:1 182:21
184:5 185:24
**needs**  27:7
49:21 71:20
167:18 204:16
**negative**
184:14,21
195:13,19
196:8,9 199:5
200:13 205:11
205:12 207:5
231:6,6,6,6,7,7
251:17
**neither**  258:13
**net**  61:24
111:15 140:4
148:17 156:25
158:25 159:1
180:6 194:15
194:20 195:11
195:22 196:1,5
196:10,12
200:19
**netback**  119:1
119:12,19
120:15 180:16
**netbacks**  120:7
158:23
**nets**  156:25
159:2

**never**  17:15,22
22:5 24:22
26:8,8 36:17
49:2 50:10
172:7 190:13
226:2,2,8
244:17 256:10
**new**  4:10,10
47:4 48:4,14
48:17,17
121:17 174:23
231:10
**ngl**  118:23
**niche**  17:16,23
17:24
**nick**  56:14,21
56:23 57:18
**noise**  82:2
202:7
**noncash**  195:12
195:16,18
196:6,8,12
199:5,7,9
**nonresponsive**
111:25
**norman**  160:22
160:24,24
162:3
**north**  182:8
**northern**  1:2
2:2 11:20
**nos**  7:20 8:6,10
8:16,23 9:7,12
9:22 10:6

**notary**  261:13
261:19
**note**  11:8 46:22
94:10 259:10
**noted**  12:7
209:6 227:15
261:7
**notes**  179:3
188:20 189:24
**notice**  72:15
**noticed**  185:1
229:4
**notwithstandi...**
252:23
**novalis**  55:4
**november**
130:9 133:12
144:15
**number**  11:20
12:13 17:17
18:4,6,8 19:5
27:6 30:15,18
31:9 32:11
46:7 52:8
58:11 75:18,21
79:22 80:17
102:9 117:12
117:15,21
118:13 123:22
124:21 125:11
138:14 145:8
145:15 146:3
147:5,10,12
149:15 150:11

155:14 156:18
156:20 170:10
170:13 175:7
195:4 197:2
198:12,18
214:6 215:11
220:13,16,20
227:13 236:23
237:19 245:5
248:11 253:23
254:1 256:20
**numbers**  46:5,5
46:21 81:1
106:21 124:17
126:23 128:11
130:9 138:7
147:2 149:11
195:6 197:18
203:12 204:1,5
205:3 212:22
**ny**  235:9
242:17 259:15
**nyag**  8:11,12
123:22
**nymex**  103:21
103:25 104:10
223:17,17
227:10,13,16
228:10,20
229:7,7,19,24
230:2 235:9
242:17 243:13
243:13 249:14
249:19,25

**[nymex - oil]** Page 46

250:3,7,9,13 252:25

**o**

**o** 36:12,12
**o0o** 10:22 11:4
**oath** 12:2,10,14 13:2
**ob** 109:16
**object** 25:1 45:3
**objected** 44:20
**objecting** 235:22
**objection** 25:1 36:20 38:25 45:3 47:21 50:8 56:2 61:10 64:11 67:22 68:5 71:7 75:2 79:7 79:17 81:4,14 82:12,21 91:22 92:12 93:12,18 94:15 98:17 100:7 103:3 104:6,16 109:16 110:8 111:7 112:8 114:12 116:9 127:5 131:5 133:5 139:9 143:14 148:5 149:8,22

151:21 152:12 159:7 160:4 162:19 164:6 166:10,13 167:6 174:17 176:3 181:9 185:14 186:22 188:6,18 191:15 192:18 193:2 194:3 204:7 205:5 212:23 217:2 222:18 224:3 229:13 235:2 235:16,24 236:13 237:14 238:4 239:14 242:24 243:8 244:8,13 245:22 246:14 255:8
**objections** 12:5 164:13 165:1
**objective** 64:24
**obligations** 91:5
**obtained** 110:6 112:5,20
**obviously** 180:15
**occasions** 35:18
**occur** 27:9,10 143:7

**occurred** 39:4 80:19 183:12 254:14
**occurrence** 72:24
**occurring** 217:25 218:12
**october** 6:5 7:19 8:15 9:11 9:17,21 13:14 107:20 108:3 127:13 128:7 130:8 146:2,21 149:3 150:4,12 151:17 157:15 158:2 160:21 164:5,23
**oeb** 198:3,5,15
**oetting** 3:9
**offer** 17:1 19:22 20:3,12 21:8 42:23 51:6,10 52:5 208:20
**offered** 20:7,15 20:23 38:1 51:13 52:12,19 55:24 95:18,23 209:2
**offering** 16:16 38:4 74:9 154:21,24 169:17 182:24 183:4,20

185:12 222:25 223:3,25
**office** 55:17,20
**officer** 73:19 128:21 129:5
**offices** 2:16
**offs** 218:3,5
**offset** 140:3 195:19
**oftentimes** 107:5
**oh** 31:8 33:14 46:9 48:11 82:4 181:19 214:14 239:20
**oil** 7:9,14 17:14 17:18,20,23 18:3,5,8,11,11 18:11,25 19:9 19:14 20:19,21 21:2,17,22 22:6,11,25 23:22 25:10 26:6 30:22 31:17 32:15,18 33:1,2,9 34:19 37:17 54:17 59:21 60:2 61:1,8 62:17 62:18 65:22 66:15,21 67:2 67:13 68:23 69:1,2 70:17 71:10 74:18

**[oil - operationalization]**

75:4 76:5,12
77:24 78:1,3,5
82:8,18 84:7
84:24 85:3
90:18,22,24
91:2,4,9 95:2
95:13 109:10
110:3,4,7
112:6 115:3,4
118:19 134:21
175:10,17,17
175:18 180:1
181:8,20,24
182:2,6,6,16
187:7,13,18
188:4,24
192:15 193:4
194:1,2 198:6
206:16 213:23
217:21 218:2
218:22 219:4
220:20 221:6
230:19 236:6
255:1
**okay** 13:23
14:8 15:18
16:11,13 18:18
23:14 28:18,24
30:5 34:25
36:6,16 37:6
39:6 40:5,9
41:14 43:24
44:15 45:13,24
46:9,12 47:14

56:24 62:24
64:8,15,19,23
67:11 69:1
75:15 78:4
89:12 94:21
96:6 102:17,23
103:7,14
104:20 107:13
108:1 118:3
119:17 120:19
120:22 124:15
124:20 125:3
125:19 126:2,9
126:13,18,23
128:1,3 130:2
130:12 131:2,9
131:16,21
132:4,12,18,21
133:20 134:14
137:22,23
138:1 145:1
146:10 147:21
149:1,5 154:7
154:10 155:3
160:16,17,18
161:3,13
162:10 170:20
178:20,23
179:8,20 181:1
182:11 192:23
194:12 197:1,5
197:23 198:5
203:9,12
207:21 208:6

211:15 220:4
220:10 223:24
227:6 229:2
232:6 240:14
**oklahoma**
25:18
**once** 14:17
51:18 111:21
174:2 245:14
249:21
**one's** 149:17
**ones** 18:18
34:23 53:11
83:23
**online** 99:12
**op** 74:2
**opened** 59:4
**opening** 13:13
14:19,20,25
59:18 96:3
127:22 137:18
139:18 143:25
144:17 154:10
194:9 199:17
200:7 207:24
209:20 214:18
**oper** 172:24
**operated** 92:18
93:2,10
**operating**
27:11,16 69:7
72:18 73:16
86:9,16 87:15
87:18 88:1

89:15 94:3
144:22 146:16
147:24 148:13
148:16 151:19
152:1,8 168:8
168:10,14
171:17 174:23
179:12,22
194:16,20
195:14 196:5
196:12,13,15
196:16 198:2
199:4 200:25
201:6,14
205:10 208:8
232:1,2,9
233:4,12,13
237:20,21
238:13 246:1
**operation** 18:8
70:15 71:2
73:12 85:10,14
86:3 87:9
147:22 153:21
169:19 171:6
171:13 187:19
210:9 216:3
**operational**
76:9 84:11
122:15,17
**operationaliz...**
72:12 74:14
78:11 82:24
109:19 112:13

**App. 447**

113:5
**operationalize**
  114:14 129:17
**operationalized**
  71:15,15 74:3
  74:11 77:20
  82:15 111:20
  152:3
**operationaliz...**
  73:17 75:6
**operations**
  10:13 55:17,20
  71:21 85:17
  86:7 87:1
  91:10 94:2
  152:4 153:18
  162:1,8 171:7
  177:3 182:7,7
  199:22 200:13
  200:20,22
  201:18,19
  208:19 211:2
  211:25 214:6
  215:22
**operator**  4:23
**opex**  130:18,23
  159:22 179:11
  195:12,12,16
  195:18,22,24
  196:2,6,8
  198:15,25
  199:5,7,9
**opine**  41:11

**opining**  154:11
**opinion**  19:22
  20:3,6,12,16
  21:8 38:1,4,15
  51:7,10 52:5
  52:12,19 62:15
  74:9 93:6
  113:7,20
  153:15 154:21
  154:24 169:17
  169:24 182:24
  183:4,20
  185:12,18,22
  208:6,20 209:2
  212:6 232:17
  252:1,17,19,22
  255:22 256:2,7
  256:11
**opinions**  16:12
  16:13,16 17:1
  20:23 21:5
  40:24 41:5
  42:23 51:14
  54:23,25 55:12
  55:23 95:18,23
  137:20 154:20
  222:20,25
  223:3,25
**opportunities**
  235:1 236:12
  238:21 253:10
  253:12 255:7
  255:14

**opportunity**
  235:14 236:11
  238:12,16
  240:11 246:11
  246:17 252:23
**opposed**  81:3
**options**  133:23
**order**  6:10
  38:21 39:8
  53:10 78:9
  79:11 136:10
  149:6,19
  167:13
**organization**
  89:15
**original**  155:21
  157:21 184:1
  193:23 212:1
  231:19 233:7
  240:18 241:20
  243:20 246:25
  248:12,18
  249:12 250:2
  258:18
**originated**
  33:11
**otte**  9:20
  150:12
**outcome**  12:4
  238:17 258:16
**outdated**
  241:23 242:9
**outlet**  76:7,19
  115:6

**outlier**  228:10
**outline**  58:8
**outlined**  58:2
  120:24
**outlook**  9:11,17
  131:18 132:5
  145:16 146:2
  146:21 230:14
**outlooks**
  238:20
**overall**  251:8
  251:19
**oversight**  89:10
  89:14,23 95:20
  187:8 188:24
**overstated**
  19:20 20:5,10
  20:17 21:6
  24:4
**overstatement**
  21:11 139:21
  139:23
**overview**  150:2
**overwhelming**
  206:12 217:24
  218:10
**own**  113:18
  171:1 247:4,21
  248:9
**owned**  18:7
  25:12 91:8,17
  91:19,20 92:3
  92:4,14 93:9

**App. 448**

**[owner - paragraph]**                                        Page 49

**owner** 47:4
**owners** 48:5,14
  48:17
**ownership**
  72:20 90:24
  93:7,8 94:5
**owns** 92:10
  94:4
**oxford** 245:11

**p**

**p** 1:8 2:8 4:22
**p.m.** 117:12,16
  170:10,14
  220:13,17
  253:23 254:1
  256:19 257:5
**pace** 27:10
  251:2
**pacific** 11:3
**page** 5:4 6:3,24
  7:3 8:3 9:3
  10:3 13:21
  14:9 15:21,22
  33:5,24 39:15
  39:25 40:6,9
  42:5 44:9
  45:24 46:20
  59:19 60:16,17
  60:21 62:10
  63:14,16,19,19
  64:19 65:18
  67:8 68:10,13
  68:14,19,22

69:11 70:7,8
72:4,11 73:13
75:25 77:9,11
78:12 85:6
87:17 89:8
91:12,13,14,25
91:25 94:22
96:4 97:14
98:20 101:8
103:13 107:6,7
108:1,4 109:8
114:4 116:16
118:12 124:16
124:18,20
128:5,10,16
129:8,11,13
137:17 139:17
143:24 144:18
145:18,22
146:10 148:10
148:11,11
154:8,18,19,23
157:21 158:8
159:4 160:18
161:25 162:24
165:22 170:17
172:4 175:12
175:13 178:20
178:24 179:5
180:4 181:19
181:20 184:1,1
184:2,2,11
186:1 192:20
193:23 194:8

194:10 197:2
199:16 200:6
201:7,8,10,16
202:11 203:2
205:15,20
207:8 208:1
210:23 211:5
212:21 213:8
214:17,18
221:1 223:23
227:20,21,22
228:24 229:3
230:25 231:19
231:20 232:10
237:6,18 238:8
238:8 240:22
241:1,20 242:2
243:11,17,18
245:7 247:17
252:2 260:4,7
260:10,13,16
260:19
**pages** 6:6,9,14
  6:18,21,24 7:6
  7:10,12,16
  8:19 9:18
  10:15,21 41:21
  63:18,18,19
  68:9 104:9
  145:14 178:20
**paper** 222:9,14
  222:17 237:4
**papers** 22:4

**par** 98:20
**paragraph**
  15:20,23 16:1
  33:25 40:19,20
  40:22,22 41:9
  41:16,19 42:8
  46:24 59:20
  60:21 61:12
  65:8 70:18
  72:5,5,10 73:2
  73:3,9,24 76:1
  76:1 77:20
  78:24 84:9
  86:4,20 87:17
  87:18 88:12,16
  88:19 89:12
  94:21 95:15
  96:6 97:2,17
  98:9,19 101:9
  103:2 109:8
  116:16 139:18
  144:17,20
  145:2 147:18
  149:10,24
  150:5,25
  151:25 155:20
  156:1 157:22
  158:6,7 161:25
  168:10 170:20
  181:20 185:2
  194:13 199:19
  200:1,9 211:8
  231:1,20
  232:10,11,21

**[paragraph - period]** Page 50

233:7 238:9,10
241:20 242:2
243:11,17,19
245:24 252:3
**paragraphs**
59:12 207:24
208:3 248:12
**pardon** 214:25
**parentheses**
68:23 198:3
**part** 21:15
39:13 42:8
59:24 62:12
63:21 64:24
92:4 108:22
109:6 115:22
125:6 126:3
139:7 151:4
153:1 155:13
173:11 185:3
188:21 189:4
191:7 208:15
213:6 217:19
219:6 225:6
**partially** 140:3
**participate**
35:13
**participated**
35:7 225:24
249:7
**particular**
17:16,23 29:19
41:12 42:24
59:12 60:16

84:20 88:5
141:14 155:14
204:14 242:10
**particularly**
85:21 157:3
208:23
**parties** 11:13
19:10 25:7
38:17 50:25
245:10
**partner** 56:22
57:10 233:24
**partners** 25:14
**partnership**
25:14
**parts** 7:8 10:14
25:17 66:20
210:6
**party** 12:3 19:9
23:8,18 24:3
29:17 30:22
31:3 81:3
134:25 140:13
229:10 239:8
239:13 241:8
241:10,13,21
242:3,5 244:23
258:14
**pass** 188:10
**passed** 188:4
188:16 189:1
**past** 252:10,14
**paul** 1:13 2:14
2:16 4:4 5:3

6:4,8 11:16
13:1 235:22
256:20 259:5
260:2,24 261:2
261:4,12
**paulweiss.com**
4:12,13,14
**payroll** 153:2
166:9
**pcaob** 35:21,24
185:3 254:24
255:21
**peat** 30:24
**pedro** 1:4 2:4
11:17 259:4
260:1 261:1
**pen** 82:1
**people** 37:2
57:14 105:24
121:15 122:5
174:21 216:5
249:6
**perceive** 131:6
**percent** 50:21
50:22 52:2,2
94:4 97:3,9,22
97:22 98:10,12
98:23 100:11
110:5 112:7
144:2,3,9,9,10
155:22 201:18
213:21 214:3
214:11,21
215:5,7 217:10

217:12,14,14
217:17 227:12
230:6 231:3
242:19 243:23
244:21 245:5,9
245:12,17,18
250:22
**percentage**
47:3 48:25
49:10 50:5,25
51:24 80:23,24
100:20 212:14
215:4,12
250:14
**percentages**
80:23
**perfectly**
171:16
**performance**
35:19 212:10
215:22 217:7
**performed**
187:9 188:25
246:4
**performing**
215:23
**period** 43:19,21
47:15,20 69:18
69:19,22 72:8
72:8 106:19
120:12 171:3
178:2 182:4
193:5,14 230:3
232:1 237:20

**[period - potential]**

250:10
**periods** 230:4
248:2 250:24
**permissible**
253:4,7,17
**permit** 112:19
**persistent**
231:21,22
232:24 233:10
233:16 252:3
**person** 59:7
179:25 234:13
**personnel** 90:9
151:17
**persons** 49:23
157:5
**perspective**
23:12 93:25
213:1 215:20
**pertains** 258:17
**petroleum** 6:22
31:17 60:7,11
61:6 95:1,5
180:2
**phones** 11:11
**physical** 76:8
84:11
**pick** 11:9
**piece** 33:19
204:19
**piecemeal**
256:6
**pieces** 167:8

**pipeline** 76:14
78:15 79:5
82:10,19 136:7
136:11
**pipelines** 79:9
136:9 144:3,10
**pira** 238:25
240:2 241:4,24
**pl** 234:9
**place** 11:13
79:15 80:14
81:2,12,20
120:11 121:24
122:20 123:5
135:21 153:17
156:8 186:16
191:5 234:4
250:23 258:9
**plaintiff** 1:6 2:6
48:22 52:2
53:2
**plaintiffs** 3:3
41:1,21,23
42:9,16 51:25
53:19
**plan** 10:5 17:1
196:20 223:12
223:13 227:18
227:19 228:9
228:18,18
229:4,5 231:1
234:6,8,9
235:4,6,9
236:3,4 238:16

246:23 254:17
254:21
**plan's** 238:12
246:11
**planning**
230:22 246:2
**plans** 238:14
248:4
**plant** 108:8
**played** 30:6,7
**please** 11:8,11
12:6,9 147:14
184:18
**plus** 53:18
130:18,23
159:22 179:11
206:6 243:22
252:25
**point** 42:21
51:9 60:25
68:3 70:16
72:2 74:18
75:1,7 76:7,10
76:12 78:14
79:4 80:18
82:8,18 84:7
84:12,15,22
105:1 106:19
108:6 115:3,5
116:7 131:15
131:18 132:5
133:1 134:7
135:12,17,19
143:5,23 164:9

179:9 180:5
204:8 209:7
240:11 244:23
**pointed** 159:4
**pointing** 125:1
**points** 15:15
16:8 58:12
79:22 114:6,10
114:11,16
186:10,13
**polychron** 3:8
**portion** 58:23
63:21,24 86:19
87:4 108:17
115:11 173:10
208:15
**portions** 35:14
36:22
**portray** 65:9
**position** 185:5
209:1
**positive** 108:10
109:14 198:22
205:4
**positivity**
161:10 164:4
**possible** 65:22
**post** 98:21 99:1
99:15 144:7,13
**posts** 118:24
**potential** 10:17
183:1,6,23
185:4,10 186:3
200:13 235:15

**[potential - price]**                                    Page 52

| | | | |
|---|---|---|---|
| 236:22 237:8 | **prepared** 35:4 | 122:19 149:1,6 | 76:25 77:1,13 |
| **power** 6:15,19 | 37:2 58:11 | **presented** | 78:7,10 79:11 |
| 36:10 43:9,16 | 59:6 144:14 | 20:11 23:13 | 80:11,19 83:5 |
| 43:25 44:18 | 222:9,17 | 24:11,13 72:11 | 83:14 85:13,21 |
| 45:11,14,21 | 223:23 227:1 | 91:13,25 125:3 | 101:13,16,18 |
| 46:14 47:16 | 237:4 252:20 | 131:2 139:7,12 | 103:8,16 |
| 118:19 | **preparing** | 139:15 149:17 | 104:18 105:16 |
| **power's** 44:6 | 38:11 210:17 | 179:18 187:25 | 106:5,12 |
| **practice** 160:1 | 225:24 | 203:13,19 | 109:19 110:4,6 |
| **pre** 49:25 | **prescribe** 70:1 | 204:1,6 207:17 | 110:16 112:5 |
| 114:18,18 | **prescribing** | 214:4 | 113:13,20 |
| **precede** 63:19 | 203:25 | **presenting** | 117:19,20 |
| **preceding** | **prescriptive** | 124:11 127:3 | 118:9,18,22,25 |
| 84:10 | 114:19 115:1 | 142:6 179:21 | 119:1,2,3,9,13 |
| **precisely** 98:15 | **present** 4:17 | 180:12 205:16 | 119:19,24 |
| **preclude** 40:16 | 12:7 18:17 | **presently** 15:21 | 120:8,16 |
| 43:3 | 121:2 149:20 | **presents** 129:9 | 124:23 126:25 |
| **predict** 252:10 | 153:8 215:12 | 132:9 155:17 | 130:3,7 131:18 |
| 252:14 | **presentation** | 156:18,20 | 132:6 133:2,11 |
| **prefer** 165:16 | 29:10 65:17 | **prestipino** 8:14 | 133:12 134:13 |
| **preferred** | 73:23 88:7,8 | 98:20 127:12 | 135:20,22 |
| 227:17 229:21 | 88:16,20 | 150:19 | 138:9 139:3,22 |
| **preliminary** | 124:10 131:25 | **presumably** | 140:9,21 141:5 |
| 124:23 | 133:21 138:2 | 229:6 | 141:6 142:11 |
| **premium** 110:5 | 144:14 145:2 | **previously** 37:5 | 143:22 148:18 |
| 112:7 118:25 | 146:11 149:20 | 53:14,19 54:23 | 154:11,25 |
| 119:12,18 | 150:6,21 | 95:2 121:12,24 | 155:9,18 |
| 120:15 | 151:16 155:16 | 196:18 | 156:18,25 |
| **preparation** | 156:11 157:22 | **pri** 224:8 | 158:9 171:23 |
| 35:8,14 37:17 | 179:16 206:20 | **price** 8:4,5 34:4 | 172:23 176:5,8 |
| 112:10 227:2 | 212:22 213:1,7 | 34:4 67:17,21 | 178:7 180:9,16 |
| **prepare** 56:7 | 214:9 | 67:24 68:4 | 181:11 187:10 |
| 57:1 58:9,25 | **presentations** | 69:17,17,21 | 187:15,23 |
| | 88:11 122:12 | 70:1,5 76:23 | 189:5,14 |

**App. 452**

**[price - produced]**                                              Page 53

191:22,25
202:17 205:13
223:12,13,21
228:9,17,18
232:23,23,24
233:11 234:6,8
234:9,9,15
236:3,4 238:20
238:23 239:7
241:3 242:5
246:20 251:3
**priced**   136:19
**prices**   69:15,22
  71:19 73:22
  83:1 84:7
  105:12,22
  107:1 112:20
  118:21,22,23
  118:24 119:20
  181:5,21 182:3
  182:15 186:15
  187:14 189:9
  191:4,7,8
  192:13,16
  193:4,9,11
  202:14,21,23
  203:4,15
  205:16,22
  206:1 207:11
  207:17 224:8
  224:10,13,14
  224:21 225:16
  225:22,25
  226:4,10,12,23

227:6,23,23
228:1,11,21
229:1,5,11,25
230:3 231:2,16
231:18 233:17
233:25 234:4
234:19,25
235:4,14
236:11 238:12
238:16 240:1
243:12 245:21
246:11,17,24
247:1 248:23
249:15,20,25
250:3 251:8,19
251:23 252:10
252:11,14,16
252:23,25
254:16 255:5,5
255:13
**pricewaterho...**
  53:6,7 254:25
  256:10
**pricing**   7:14
  73:1 82:25
  83:17 101:13
  103:15 104:4
  104:15,20,24
  105:2,12,16,21
  105:25 106:9
  106:18,24,24
  107:3,5,6,9
  111:19,20
  113:5,8 115:17

115:23 116:20
117:3,4 120:6
121:4,13,18,20
121:22 122:1,4
122:6,16,22,25
123:4,9,12
157:24,25
171:1 186:8,12
191:19 193:21
193:22 241:17
241:21,24
242:1,3 248:20
249:1,2,2
254:21 255:18
**primary**   89:21
  211:9,22 212:7
  212:13
**principal**   19:11
  57:20 73:19
  128:20 129:4
  223:10
**principally**
  25:16 36:17
**principles**   17:9
**prior**   18:2
  28:23 32:25
  34:5 36:16
  45:7 49:17
  69:18 72:8
  82:13 111:9
  164:23 186:23
  191:14 207:10
  207:13 225:20
  226:1,6 229:14

233:19 258:4
**private**   11:9
**pro**   28:21 65:3
  225:1 227:3
**probably**   51:23
  92:14 93:21
  167:19 203:22
  234:13
**procedure**
  55:13
**procedures**
  55:14 153:2
  223:5,6 224:2
  224:6 254:6
**proceeding**
  12:5
**proceedings**
  257:5 258:5,8
  258:15,19
**process**   20:1
  27:13 28:22
  89:24 90:10
  116:18 118:9
  118:14 119:8
  120:17,21,24
  189:4,5 238:17
  246:2
**processes**   237:8
**produce**   65:22
  173:19
**produced**
  78:13 97:23
  102:11 147:6
  158:25 159:1

**[produced - proved]**                                      Page 54

250:17 254:7
**producibility**
29:24 69:16
71:9,11
**producible**
28:16,20 69:5
70:9,12,22
71:4,5 72:16
74:17 85:7
175:21 176:1
**producing** 66:6
70:17 74:18
75:4 84:8
115:3 167:13
**product** 68:1
75:9 78:9 79:9
79:10,21,25
80:3,19 81:12
96:21 99:6
100:12,20,22
105:4 106:15
109:19 111:1
115:1,17,23
135:13 136:1,5
136:6,7 140:10
142:2,23
143:23 144:2
156:23,24
157:3,9,16,16
157:17 158:16
202:24 203:17
204:14 206:2
206:13

**production**
72:18 76:6,11
84:13 87:19,20
87:21,23 99:18
99:24 100:3,5
100:14 101:1
115:4 144:22
167:2,11,12
174:3,4,9
192:14 194:2
202:14,15,21
202:22,23,24
203:4,6,9,14,22
205:16,22,23
206:1,1 207:11
207:11,17,17
250:15,23
251:3
**products** 70:15
110:17 115:23
115:24 252:21
**professional**
95:11
**profit** 108:8
109:13 112:19
214:8
**profitability**
184:22 197:6
199:23 200:12
206:8,17
217:22
**profitable**
216:7,10,17

**profits** 66:12
216:13,20
**prohibit** 171:11
**prohibited**
213:23
**project** 47:2,8
96:7 99:12,19
99:24 100:25
173:2,8,17,18
173:22 174:2
**projected**
126:24 132:2,9
133:4 138:24
241:2 245:21
255:5,13
**projecting**
229:25 244:24
**projection**
27:15 225:1
232:3 233:4
237:22 240:5
240:16 242:21
246:5
**projections**
178:11 227:2
231:10 234:15
238:11 239:7
239:11,25
240:5 241:8,11
242:13,14
243:4 244:3,6
244:18 246:10
246:21 248:3
252:25 253:9

255:19
**projects** 178:4
**promulgating**
216:25
**proper** 154:11
**properly** 20:10
23:4,12,24,25
24:3,13 48:3,9
139:19 154:25
188:13 199:20
**properties** 60:3
61:2,8,24
62:17 232:9
236:6
**proposition**
197:24
**prospects** 65:3
232:25
**proved** 8:20
9:10,16 19:14
19:16,18,23,24
20:1,4,9,13,15
21:7 23:1,4,9
23:15,19,23
24:6,15,19,24
25:5 26:7,10
26:13 27:1,17
27:19,21 28:13
28:21 29:11,13
29:14 30:10,23
31:3 32:14
33:2,6,13 34:1
60:1,21 61:13
61:20,24 62:1

**App. 454**

**[proved - quantities]**                                                    Page 55

| | | | |
|---|---|---|---|
| 62:9,11,13,16 62:16,19 65:16 65:18,24 66:3 66:5,9,11,15,17 67:13,15 68:23 69:1 70:23 72:13 76:20 78:22 82:7 83:6,14 84:6 85:12 86:6 87:2,13 88:2 89:11 90:1 93:17 94:13 95:24 107:1 118:10 124:12 129:16,23 133:3 137:6 138:3 141:24 144:21 146:1 146:12,21 148:4 149:25 150:2 151:13 154:11 155:1 156:17 158:4 160:3 162:17 164:25 168:7 168:17,21 169:15,19 171:13,17 175:17,17,24 177:18 180:22 181:8 182:5,9 183:2,19,23 184:3 185:11 | 186:20 187:6 187:20 188:17 189:19 190:1,5 190:9,16 191:11,21,24 193:6 200:14 213:22 214:12 218:23 **proves**  149:25 **provide**  31:3 64:25 83:3 255:23 **provided**  21:21 37:4 113:18 **provides**  30:22 89:14 90:9 118:22,23,24 204:19 213:19 228:8 229:16 249:24 256:2 **providing** 211:18 **provisions** 217:8 **public**  21:20 35:8,12 36:7,8 36:13 37:21,23 62:3 64:25 190:4,18 213:17 261:19 **publicly**  91:2 190:1 **published** 238:23 | **publishing** 210:24 **purchase**  80:19 **purchaser**  77:5 77:6,7 109:21 109:24 110:17 140:21 143:21 **purchasers** 80:18,24 99:9 100:13,20,22 106:15 115:18 116:1 **purpose**  19:6 82:6 **purposes**  67:15 76:19 80:13 83:14 87:2 88:2 104:18 107:1 118:9 141:3,24 148:4 154:12 155:1 160:2 162:17 169:20 171:13 180:24 187:20 234:20 247:4 **pursuant**  33:2 87:22 88:3 144:23 148:9 **put**  250:4 **putting**  250:1 **pwc**  58:21 151:5 233:24 254:3,7,10,20 255:4 | **pwc's**  242:3 |
| | | | **q** |
| | | | **qualification** 86:22 **qualifications** 41:22 89:9 95:19 **qualified**  20:13 41:10 42:23 43:6 225:15 **qualifies**  70:22 85:1 **qualify**  23:23 27:1 28:13 29:14 182:8 189:18 193:6 193:15 **quality**  75:13 77:16 85:22 101:14 103:22 104:1,10 105:3 110:25 111:17 119:23 121:10 123:16 136:15 140:1,4,8,10 141:11,17,22 142:12 157:2 158:23,24 169:11 171:2 188:12 **quantities** 19:25 20:15 23:7,9,15,22 |

**[quantities - reading]**                                                Page 56

24:2,8,19,24
26:10,12 27:25
28:2 62:11,18
69:2 175:18
182:6 201:19
**quantity**  24:7
25:2 33:7
**quarter**  194:16
196:7
**question**  19:1
26:14 28:9
29:16 33:4
84:19 86:1
93:9,10,21
94:12 98:2,3
100:24 106:17
107:21 109:4
110:19 111:6
112:1 150:20
156:14 161:5
161:18 187:4
212:4,5 215:16
215:18 216:12
224:19 227:25
228:7 233:9
240:24
**question's**
91:16 164:21
**questioning**
165:24
**quick**  30:12
104:8
**quist**  52:23

**quite**  109:2
120:12
**quote**  74:24
176:13 214:1
**quoting**  115:10
115:14

**r**

**r**  36:12 260:3,3
**r&s**  118:22
**rail**  144:4,10
**railcars**  79:9
136:6,8
**raised**  114:11
150:20
**ram**  8:11,12
9:7,8,22,23
10:6,7,18,19
123:22 145:8
150:13 195:9
197:2 236:24
237:19 239:22
245:7
**ramirez**  1:4 2:4
7:20,21 8:7,8
8:16,17,23,24
9:12,13 11:18
101:23 117:21
141:8 146:3
147:16 259:4
260:1 261:1
**ran**  244:17
**range**  182:3
193:4

**rate**  57:4
223:19 230:5
231:3,9 242:23
244:25 251:8
251:11,13,20
**rates**  231:5
**rather**  250:13
**raw**  136:3
**reached**  48:14
48:17
**reaching**  64:17
**read**  14:20
15:22,24,25
33:9 40:2,19
41:1,7,16,17
42:2,12 43:5
53:25 54:2
61:20 62:2,9
63:9,25 64:2,4
64:6,9 65:4
68:6 70:24
72:24 73:16
76:15 77:24
79:2 85:10
86:7,25 90:2
95:13,16 97:24
98:14,24 99:15
101:19 115:7
117:7,21 119:4
119:13,25
123:22 124:3
125:1,12,23
126:7 130:19
130:24 131:19

132:5 135:1
137:8,21
138:17 144:10
150:3,9 157:25
159:23 160:20
160:25 161:15
165:17,20,25
166:8 171:3
175:23 179:12
184:15,22
185:13 186:2
193:7 194:17
195:9 198:4,10
198:15 201:1
207:23 209:14
210:9 211:2
215:9 238:25
240:12 242:1,5
245:12 246:6
247:6 248:17
252:13 259:9
261:5
**reader**  143:10
185:7 201:8,24
204:11,12,22
208:18 214:10
**readers**  63:22
213:9
**reading**  14:15
15:3 114:6
127:21 157:5
162:13 184:16
184:17 194:6
195:21

**[reads - recollection]** Page 57

**reads** 15:21,23
**real** 30:12 47:7
  59:12 111:13
**realization**
  73:21 76:22
  77:13 78:8
  80:11 105:4
  106:12,15
  109:23 111:14
  111:15 123:13
  134:12 136:16
  136:23 141:9
  141:10,21
  142:9,11,12,20
  143:4,6,17
  148:17 156:22
  157:1,9,13,16
  169:10 198:25
  203:16
**realizations**
  198:9
**realize** 77:7
  78:10 79:11
  87:11 143:22
**realized** 67:25
  75:7,10,14
  79:20,22 82:25
  84:6 109:21
  110:13,16,23
  113:11,16
  115:17 135:20
  135:22 136:22
  140:16 141:6
  142:1,1 154:1

  176:5,8 178:13
  191:4 205:13
**reallocated**
  163:5,16
**really** 50:9 82:4
**reason** 13:9
  89:18 120:3,23
  151:24 219:10
  222:16 224:17
  237:12 239:3
  259:11 260:6,9
  260:12,15,18
  260:21
**reasonable**
  27:8 33:8 69:4
  72:24 163:15
  175:20 176:20
  177:13,16,22
  223:15,18
  227:20 230:5
  231:8 246:20
  246:24 247:1,3
  247:25 248:16
  248:21 255:6
  256:3
**reasonableness**
  213:4 230:11
  255:10,18
**reasonably**
  70:14 71:1,5
  85:9 176:24
  184:14,20
  200:18

**rebooked** 192:3
  192:5
**rebuttal** 227:21
**recalculate**
  178:6
**recall** 14:15
  18:14,15,22
  22:20 30:5
  32:16 34:17
  37:19 38:3,4
  38:11,14 39:3
  39:16,19 44:13
  46:17 48:24
  53:11 54:8
  55:4,11 64:12
  106:2 127:21
  155:13 233:20
**receipt** 259:17
**receipts** 24:9
**receive** 57:6
**received**
  111:14
**recent** 88:19
  107:18
**recently** 14:18
  14:22
**recess** 30:16
  75:19 117:13
  170:11 220:14
**recipients**
  98:23
**reco** 217:3
**recognition**
  47:19

**recognize**
  13:18 14:5
  44:5 45:20
  63:5,7 67:1
  89:2 102:6
  103:1 107:22
  118:1 127:18
  137:12,23
  138:1 144:21
  145:12 146:7
  147:1 237:3
**recognized**
  28:21 47:1,9
  241:25 242:7
  255:21
**recognizing**
  157:8
**recollection**
  15:15 18:17
  19:15 20:25
  21:4 22:8,14
  23:17 30:4
  32:19,21,23
  34:24 38:16,17
  39:20 40:7
  41:20 44:20
  45:6 46:18
  47:23 52:15,25
  53:5 54:9 55:5
  55:15 56:4
  80:16 105:1
  107:2,10 117:2
  121:6 122:2
  123:11 137:25

**App. 457**

140:15 158:7
158:11 160:11
168:1 181:14
217:4 230:16
241:15 250:8
255:15
**recommend**
250:13
**recommendat...**
249:4
**record** 11:6,14
12:8 30:12,15
30:18 75:16,18
75:21 117:10
117:12,15
119:24 170:8
170:10,13
184:18 220:11
220:13,16
253:21,23,24
254:1 256:16
256:17,18,23
**record's** 194:25
**recorded** 1:13
2:14 11:16
23:4 118:21
254:13
**recording**
11:12 28:6
**records** 23:5
78:18,21 80:6
80:7 135:24
**recoverability**
247:20

**recoverable**
33:8 219:11
**recovery** 72:18
**recreate** 240:17
**rectangle**
133:25 134:15
134:24
**recurring**
194:14 199:22
200:11
**red** 101:18
233:7
**reduce** 136:12
**reduced** 168:22
193:21
**reductions**
101:14
**reestimate**
176:10
**refer** 140:23
**reference** 60:16
98:10 99:8
119:11 141:3
146:16 151:8,9
151:13,20
154:17 160:5
209:9,19 232:7
245:19
**referenced**
56:10 81:22,23
96:24 97:2
103:2 166:19
195:1 259:6

**references**
100:11 101:17
118:4 158:15
**referencing**
15:3 88:14
195:5
**referred** 70:4
84:3 96:19
136:13 137:15
137:17 210:19
219:13 223:9
**referring** 46:6
109:18 138:13
152:25 181:19
195:1 202:10
**refers** 33:7
77:22 100:2
140:8 149:11
180:4 205:22
233:13
**refinement**
112:22
**refinements**
115:19
**refinery** 76:14
82:10,20
**refining** 118:18
**reflect** 211:16
**reflected** 73:13
81:10 160:8,9
173:7,16 229:1
243:1
**reflecting**
133:18 222:9

**reflection**
65:10 228:12
228:25 229:6
**reflects** 103:14
133:9 202:17
239:17
**refresh** 117:2
**refreshed**
107:10
**regan** 1:13 2:15
5:3 6:3,5,8 7:3
8:3 9:3 10:3
11:16 13:1,7,9
13:12,15,18,24
14:2,5 16:2
17:7 30:21
39:7,10 40:16
40:23 41:10
42:1,12 43:4
43:24 44:2,5
45:15,17 48:25
60:12,13,20
62:15 63:1,2,5
66:22,23 67:1
67:11 75:24,25
77:22 86:16
88:22,24 98:1
102:1,3,6
104:3 107:14
107:15,21
112:1 117:18
117:22,23
118:1 123:21
123:23 127:11

**[regan - rep]** Page 59

127:14,19
137:1,9,12
145:5,9,25
146:4,20,23
150:10,14
154:5 155:3
159:12 160:16
170:16,17
175:9 178:17
196:21 209:24
210:10 220:19
225:9 227:25
229:9 231:11
233:2 235:12
236:21,24,25
241:1 247:9,10
248:22 254:3
256:20 259:5
260:2,24 261:2
261:4,12
**regan's** 40:1,23
41:22
**regard** 40:16
76:10 84:12
113:8 140:24
148:3
**regarded** 76:6
115:5
**regarding** 10:9
18:3 41:24
42:10,18 83:13
183:1 200:11
209:3 210:7,24
223:1

**register** 10:14
210:5
**registrant**
200:18
**registrant's**
213:22
**registrations**
95:11
**regulation**
83:12 171:11
206:15 208:8
212:21 213:13
213:15,19
217:1
**regulations**
33:3 66:14
69:8 70:1
74:10,13 83:3
84:5 85:16
86:1,2 89:25
112:18 115:9
115:11 161:22
170:1 171:5
206:19
**regulators** 91:5
**regulatory**
72:21
**reissued** 49:23
**relate** 21:1
32:14,17 71:21
115:22 174:24
175:1 252:13
**related** 12:3
19:22 20:21

33:1 49:4
57:13 58:15
101:18 109:10
139:24 190:15
199:21 200:15
223:5 224:2
248:3 258:14
**relates** 17:20
33:13 47:14
49:4,11 70:12
70:24
**relating** 20:9
50:15 51:1
62:13 140:17
150:2 167:2
173:9 224:24
**relation** 224:9
246:20 247:3
247:25 248:17
255:6
**relationship**
66:9 90:22
**relationships**
90:25
**relative** 100:14
239:12
**rele** 40:25
**release** 67:2
**relevant** 27:18
34:4 61:7
84:18 92:25
93:2 100:9
141:25 142:3
192:10 231:12

**reliability**
249:25
**reliance** 58:21
58:22
**relied** 25:6
101:2 113:17
118:6 192:8
**relies** 249:14
**rely** 81:16,25
116:10
**remain** 61:19
163:19
**remained**
181:11
**remains** 26:3
**remember**
21:24 35:1
55:10 116:17
159:23 172:20
175:6 181:4
224:17 234:13
**remembering**
29:6
**remind** 83:15
**remove** 151:19
**removed** 161:9
164:3
**removes** 65:17
**renewal** 176:23
**reoccurring**
184:13,19
201:14 212:11
**rep** 214:7,7

**repeatedly**
  101:11 172:5
**replace** 167:8
  167:14
**replaced**
  167:18
**reply** 6:7 13:25
  14:6,23 15:1
  58:12,20,24
  107:23 170:17
  209:13,14,15
  209:20 210:17
  210:20 212:2
  228:6 229:23
  230:25 246:25
  248:12,19
  250:2
**report** 6:4,7
  13:13,19,25
  14:6,19,21,23
  14:25 15:1
  16:9 23:18
  33:5 36:24
  38:11 58:2,3,9
  58:11,20,24
  59:6,18 69:19
  72:4,9 80:10
  80:17 83:9
  84:3 87:8
  90:23 92:16
  95:22 96:3
  99:20 100:1
  101:9 102:14
  106:7 107:12

107:23,25
111:12 113:10
118:4 127:22
137:16,18
139:18 143:25
144:17 145:3
145:22 147:19
148:15 149:5
149:21 153:14
154:10,15,17
155:21 157:22
159:5 164:19
167:25 169:6,7
169:8,14 170:2
170:6,17 172:3
182:19,23
183:15 184:1
184:25 185:2
190:18 191:6
192:8,10
193:23 194:9
195:2 196:15
199:17 200:7
204:9 205:9
206:8 207:9,22
207:24 209:6
209:10,13,14
209:15 210:17
210:20 212:1,2
214:1,19 218:9
220:19 225:6
227:21 228:6
229:23 230:25
231:19,20

232:7 233:8,15
240:18 241:20
243:20 246:25
246:25 248:12
248:13,18,19
249:12,13
250:2,2,16
255:20
**reported** 1:23
  91:11 92:6
  105:18 175:3
  200:24 201:4
  201:12
**reporter** 2:20
  12:9,11,12
  30:11 34:15
  35:22 38:9
  41:2 62:6
  68:12 76:24
  82:1 86:13
  97:19 108:25
  109:3 126:19
  137:2 147:13
  156:13 165:12
  166:11 184:16
  191:2 210:2
  235:20 240:23
  256:16,24
  257:3 258:1,3
**reporting** 7:10
  59:23 60:23
  61:14 62:12
  66:15,21 67:3
  86:6 90:1,10

91:5 146:12
150:2 155:8
175:10 185:3
200:15 213:16
218:4
**reports** 14:11
  16:14,18 17:2
  31:9 57:22
  59:1 81:22,23
  82:24 112:10
  112:11,23
  164:9 183:9
  206:24 209:3
  209:20 212:12
  233:22 254:24
**represent**
  73:16 86:9
  125:22 147:23
**representation**
  123:4
**representative**
  177:15
**representing**
  11:25 53:2
  121:16
**represents**
  214:6
**reproduction**
  64:20
**reputable**
  238:23
**requested**
  258:20

**[require - respect]** Page 61

**require** 110:6 110:20 111:5 112:4 113:7 171:5 182:16 206:19

**required** 67:17 109:13 180:6 190:14 200:2 200:16 208:21 237:9 261:13

**requirements** 41:25 42:1,10 42:12,18 59:24 60:24 61:15 62:13 72:21 150:22 151:2,4 151:12 207:25 218:17

**requires** 178:8 185:3 206:16 208:22 246:18 246:22

**requiring** 216:22

**reread** 56:9

**reserve** 65:20 70:23 78:22 83:14 87:14 107:1 124:12 129:16,20,23 141:24 148:4 149:25 154:11 155:1 156:17 163:6 164:25

168:18,21 169:20 171:13 171:18 175:25 177:18 189:19 190:5,9 191:24 214:2

**reserved** 62:9

**reserves** 7:15 8:9,21 9:10,16 19:14,16,19,23 19:24 20:2,4,9 20:13,15 21:7 23:1,4,7,10,15 23:19,23 24:6 24:15,19,24 25:5 26:7,10 26:13 27:2,17 27:19,21,23 28:4,13,21 29:11,13,14 30:10,23 31:3 31:17 32:14 33:2,6,7,13 34:1 59:21 60:1,22,25 61:7,13,20 62:1,1,11,13,16 62:19 64:24 65:1,16,18,23 65:24 66:3,5,9 66:10,11,15,17 67:13,16,18 68:24 69:2 72:13 76:20

82:7 83:6 84:6 85:12 86:6 87:2 88:2 89:9 89:11,13,22,23 89:25 90:2,10 93:17 94:14,23 94:24 95:3,7 95:13,20,25 97:7 108:8,15 108:20 118:10 119:22,25 121:3 124:1,11 127:3 128:12 133:3 137:6 138:4 144:21 145:16 146:1 146:12,21 150:3,21 151:10,14 158:5 160:3 161:9 162:18 164:4 168:7 169:16 175:17 175:18,22 180:1,23 181:8 182:5,9 183:2 183:19,23 184:4 185:11 186:20 187:7,8 187:20 188:17 188:25 190:2 190:16,20,24 191:3,11,21 193:7 200:14

201:20 213:22 213:24 214:2 214:12 218:23

**reservoir** 69:16 94:24

**reservoirs** 69:6

**reside** 169:13

**resided** 201:23

**resides** 211:19 250:19

**resign** 44:15

**resigned** 44:13 44:22 45:7,10

**resistant** 116:4

**resolution** 153:9

**resolved** 45:7 152:21

**resource** 70:12 70:13,25 85:8 216:1 238:14

**resources** 77:5 77:23 81:25 84:23 85:2 145:16

**respect** 15:19 20:16 22:1 24:1 28:11 36:21 45:5 58:10,16 85:22 119:15 120:23 148:18 162:21 164:22 168:13 169:15 171:22

**App. 461**

**[respect - right]** Page 62

171:24 177:3 178:13,14 185:9 186:2,8 201:4 204:24 208:23 209:18 218:11 221:19 223:10 225:4 249:22 256:11

**responding** 114:10,24

**response** 38:23

**responsibilities** 89:22

**responsibility** 24:23

**responsible** 36:18 93:17 94:13 230:23

**restatement** 49:22 190:14

**restating** 72:6

**result** 21:11 39:22,23,24 61:20 157:8 191:18 193:21

**resulted** 110:25 139:20 156:24 194:15 216:11

**resulting** 156:25 188:11

**results** 10:12 94:7 124:12 200:21,25 201:6 210:9

211:1 214:9

**retained** 32:11 53:7,14,20 256:21

**return** 259:13 259:16

**revenue** 27:14 27:18 33:15,18 47:1,19 49:10 70:13,16,25 71:22 74:4 75:7,8,11,14 85:8 87:10,11 113:14 115:2 172:21,24 195:11,22 196:1 206:13 206:20,20 246:3 251:5

**revenues** 20:8 27:8,9,10 34:7 71:17,19 168:2 200:20

**revi** 121:19

**review** 8:10,22 9:5 14:18 35:7 35:21,24 46:25 59:1 67:5 89:25 118:5 124:2 137:7 139:8 145:7 150:7 156:10 156:17 165:16 178:18 179:16

210:16 254:8 258:19 259:7

**reviewed** 14:11 14:22 21:25 22:25 45:23 58:10 83:7,24 89:5 107:22 116:12 160:10 161:13 205:2 213:3 222:14 224:14 247:13

**reviewing** 22:4 23:1 26:16 37:1 254:20

**reviews** 41:18 43:13 72:3 96:18,25 140:14 157:20

**revised** 151:18

**revisions** 121:20

**rex** 1:8 2:8 128:15

**rgrdlaw.com** 3:13,14,15,16 3:17 259:2

**rifkind** 2:16 4:4

**right** 30:3 35:2 46:10,21 51:11 60:19 61:9 68:21 74:1 79:6 84:16,24 84:25 85:3,10 88:16,20 93:10

94:8 101:24 102:19,25 103:18 108:5 114:3,23 115:9 115:13 117:9 118:10 120:1 120:16 123:20 124:8 126:5 127:4,9 128:4 128:16 129:6 130:10,21,25 131:4,14,16 132:2,4,7,10,13 132:19,24 133:4,25 134:15,22 138:18,25 139:8 140:10 142:16,19 143:3,13 145:3 145:22,24 146:14 147:9 147:10 149:7 149:18,19 151:14,20 155:19 158:21 159:6,11,17 160:3 163:8 166:24 169:1 171:3 172:13 173:3,8,17 174:5,9,16 175:2,15 176:2 176:21 177:1

**[right - saham]**                                                          Page 63

178:9,10 179:2
180:7,10,13
181:23 182:17
186:13,21
187:21,25
188:5,17 189:2
189:6,9,22
190:25 192:17
192:22 197:25
198:7,12,18,20
199:6 202:9,13
202:21,25
203:5,8 205:21
205:24 206:2,6
207:25 209:22
210:21 211:4
214:22 218:24
218:25 219:3
234:21 239:13
240:10 241:5,6
241:6 242:23
243:7 244:1
246:12 247:7
247:18 253:20
255:7,14 256:4
**righty** 256:15
**rigorous**
  238:17
**risks** 185:4,7
  208:17,18,23
**river** 222:6
**robbins** 3:4
  4:19 53:15

**rocky** 221:20
  222:11 232:6
  233:3 243:7
  250:15
**role** 24:14 30:6
  30:7 49:6
**roman** 69:12
  184:25
**romanette**
  69:12
**room** 15:12
  86:12 156:12
**rosenthal** 1:9
  2:9 73:8,18
  133:1
**rosenthal's**
  129:1
**rough** 256:25
**round** 214:2
  215:10,15
**rounding**
  214:24 215:2
**rounds** 214:22
**row** 198:2,15
**rows** 103:19
**rudman** 3:4
  4:19
**rule** 64:21
  71:24 87:25
  214:23 215:1,6
  215:14 216:25
**rules** 40:10,17
  41:11 43:5
  67:12,20 73:1

79:5 82:15
89:24 94:9
108:7,14,17,19
109:12 110:5
110:19 111:5
112:3,4 113:5
113:7 148:3
152:8 180:19
200:16 203:25
218:7 220:24
224:24 253:5,8
253:18
**ruling** 55:16
**run** 242:12

**s**

**s** 1:9 2:9 33:3,3
  36:12 134:25
  135:4 207:10
  213:13,14,15
  213:19 217:1
  260:3
**s99** 33:11 34:16
  66:18
**safety** 153:2
  163:10
**saham** 3:5
  15:10 25:1
  36:20 38:25
  45:3 46:4,9,12
  47:21 50:8
  56:2 61:10
  64:11 67:22
  68:5,9 71:7,25

74:5 75:2 79:7
79:17 81:4,14
82:12,21 91:22
92:12 93:12,18
94:15 98:17
100:7 102:8,13
102:17 103:3
104:6,16
109:16 110:8
111:7,9 112:8
113:23 114:12
116:9 117:6
125:7,13,16,25
126:2 127:5
131:5 133:5
139:9 143:14
147:2,4,9
148:5 149:8,22
151:21 152:12
155:11 159:7
160:4 162:19
164:6,13 165:1
166:10,13,21
167:6 174:17
176:3 181:9
185:14 186:22
188:6,18
191:15 192:18
192:24 193:2
193:19 194:3
197:9 204:7
205:5 208:1
212:23 217:2
219:21,25

222:18 224:3
229:13 235:2
235:16,21,24
236:13,15,17
237:14 238:4
239:14 241:14
242:24 243:8
244:8,13
245:22 246:14
255:8 257:1,4
259:1
**sale** 26:4 47:2,8
77:7 79:15
80:15 81:2,3
81:12,20 84:7
110:7,13,25
112:5,6 116:7
134:18 135:12
135:18,20,22
140:19,21,24
141:15
**sales** 47:6 75:8
80:14,23 81:7
96:10,16,20
97:4,8,9,12
99:2,6 101:3,5
105:4 111:21
111:22 121:8
133:22 134:25
135:1,6,14
136:17 139:20
140:2,12,13,16
140:18 141:4
141:16 154:1

157:12 158:3
159:5,6,9,9
188:11 200:19
**sam** 3:6
**san** 1:16 2:18
3:11 11:1,23
53:6
**sands** 182:6,16
192:15 194:1
**sara** 3:8
**saturated** 99:8
**saturday** 57:16
**saw** 123:2
233:23
**saying** 20:22
45:1 93:1
94:22 96:15
98:4 102:9
157:11 165:7
169:23 182:18
182:19 183:10
183:15 190:5
193:9 206:4,7
216:16 245:2
**says** 40:15,23
46:24 60:1,21
60:25 61:7
64:15,23 65:8
68:23 69:1,14
70:11 73:23
76:5 86:7,20
87:5,7,18 88:1
89:12 99:15
108:7 114:8,15

116:16 118:13
118:17 120:2
120:10,13,14
125:11,23
126:7 131:17
131:18 132:5
134:6,15,17,25
138:17,18
144:6 147:22
150:5,19 152:1
156:1 157:19
159:8 160:24
161:3,8 162:5
162:8 163:1,4
165:23 175:16
177:25 179:9
180:5,15
181:24 182:2
185:1 190:11
193:3,14 198:2
198:9 202:22
203:3,9 205:15
205:25 210:23
211:8 237:6
238:10 240:10
245:23,24
246:22 247:18
248:8
**sburkholz** 3:15
**scale** 174:22
**schedule** 65:21
198:23 204:18
**schedules**
104:12

**scope** 31:24
**scott** 3:5
256:24 259:1
**scotts** 259:2
**se** 133:11
**sea** 233:6
**search** 250:7
**sec** 7:7 8:4,5,9
9:10,16,22,23
10:6,7 27:19
28:12 32:7,8
32:10,13,24
33:3,10,11,12
33:12 34:10,10
34:11 37:14
40:10,17 41:11
43:4 62:16,18
65:24 66:2,5
66:11,14,16,19
67:13,17 68:4
70:1,1,5,23
73:1,15,18
74:10,13 76:19
78:22 79:1,5
79:12 80:12
82:6,15,25
83:3,5,12,14,16
84:2,5 85:12
85:13,16,21,25
86:2,6,8,17,21
87:2,5,13,25
88:2 89:24
95:7 101:13,16
103:16 104:18

**App. 464**

**[sec - see]**

| | | | |
|---|---|---|---|
| 105:12,16 | 169:25 171:5 | 211:7 219:16 | 124:22,25 |
| 106:5 107:1 | 171:10,11,13 | 235:20 | 125:7,10,13,14 |
| 108:7,14,17,19 | 171:17 177:18 | **section** 35:17 | 126:3,6,9 |
| 109:12 110:5 | 178:6,8 179:12 | 36:18 37:17 | 128:8,13 |
| 110:16,19 | 179:22 180:7,8 | 38:2 40:14 | 129:13 131:16 |
| 111:5,19,20 | 180:19,22 | 42:5 64:9 | 131:20 132:14 |
| 112:3,4,18 | 182:5 186:8 | 67:12 68:15 | 133:24 134:8 |
| 113:5,7,8 | 187:6,10,14,15 | 70:18 184:25 | 134:19 135:2 |
| 114:18,25 | 187:20,23 | 237:20 | 135:24 140:6 |
| 115:9,11 | 188:17 189:1,5 | **sections** 14:17 | 145:15 146:11 |
| 117:19,19 | 189:9,14 190:1 | 35:5 37:1 58:4 | 148:6 149:12 |
| 118:9,22,25 | 190:3,8,13,16 | **securities** 32:6 | 150:17,23 |
| 119:9,25 124:1 | 195:9 197:2 | 52:6,7,10,13,20 | 151:6 155:8 |
| 124:23,25 | 203:25 206:15 | 53:8 | 160:14,21 |
| 126:25 129:16 | 206:18 216:21 | **security** 7:15 | 161:1,11,19 |
| 129:23 130:3,8 | 217:5 218:16 | **see** 39:25 40:3 | 162:7,8 168:19 |
| 133:2 138:9 | **sec's** 27:2 67:2 | 40:4,12,18 | 178:3 179:8 |
| 139:3,22 | 175:9 188:5 | 42:6 44:9 | 181:19 186:25 |
| 141:24 146:2 | 200:15 218:20 | 45:25 46:1,1 | 197:7,15 198:8 |
| 146:12,21 | **second** 14:20 | 46:22 47:12 | 198:16 199:24 |
| 147:22 148:2,3 | 46:24 60:21 | 54:3 59:20,20 | 200:4 201:2 |
| 149:25 150:13 | 68:13 96:23 | 60:4,21 63:16 | 202:25 210:19 |
| 150:21 151:2 | 99:14 108:1,4 | 64:15,20 65:5 | 210:22 211:7 |
| 151:12,13 | 109:1,3 126:15 | 65:11 68:18,22 | 211:13 214:14 |
| 152:7,10 | 128:5 132:1 | 69:9,12 73:17 | 214:20 217:21 |
| 154:11,25 | 138:21 150:17 | 76:3,16 89:16 | 217:23 219:17 |
| 155:1,9,17 | 150:19,25 | 90:3,12 96:13 | 225:6,18 |
| 156:18,18 | 159:18 160:18 | 100:10 101:20 | 226:25 235:8 |
| 157:24 158:9 | 161:8 166:12 | 103:7 107:11 | 237:10,19,25 |
| 160:13 161:17 | 170:21 171:12 | 108:1,11 | 238:9 239:1,17 |
| 161:22 162:1 | 172:8,10,15,17 | 116:15,21,22 | 239:24 240:3,4 |
| 162:12,17 | 173:7,15 | 118:15 119:5 | 240:9,14 |
| 164:25 168:7 | 174:16 175:2,6 | 122:6,14 | 243:12,14,19 |
| 168:13,17,21 | 177:14 185:22 | 123:12 124:7 | 246:5 247:18 |

**[see - shows]** Page 66

248:6 251:10
254:23
**seeing** 39:16
181:6 201:8,22
206:25 240:19
**seem** 103:23
**seems** 148:20
165:23 185:16
**seen** 31:9 39:18
73:9 80:6
83:16 91:13
101:7 117:1
118:2 124:5
125:8 135:6,14
136:4,5 137:13
146:9 155:16
162:22 165:3,4
177:11 182:3
182:15 188:1
193:4,9,23
212:12 213:8
216:18 217:4
223:22 233:7
243:17
**segment** 17:25
196:15,16
205:11 207:4
211:23 212:8
**sell** 136:1,3
171:23
**selling** 73:21
76:23 77:1
78:7,10 79:11
82:25 83:1

97:15 142:1
157:8 171:23
**semicolon**
165:14
**send** 257:1
**senior** 155:9
157:12 180:13
187:25 188:16
**sense** 27:20
163:6
**sensitive** 11:9
**sensitivity**
230:8,10
**sent** 98:13
128:7 259:14
**sentence** 41:9
84:10 87:5
89:19 90:6,15
148:8 150:19
248:8,15
**separate** 89:14
188:25 217:6,7
**sequence**
150:18
**series** 150:11
160:19
**serve** 43:11
**served** 31:16
36:8 37:20
43:8,15 47:15
95:2 180:1
**service** 37:7
**services** 21:21
30:23 31:4

252:21
**serving** 36:7
**set** 7:17 8:13
9:19 16:17
17:2 67:20
165:19 223:14
258:9
**sets** 219:6
**settled** 225:20
226:1
**seven** 256:21
**several** 41:21
83:17 94:18
95:10 116:18
238:23
**severance**
87:20
**shamailova** 4:7
125:17 137:3
147:6,11,15
209:25 210:3
**sheet** 21:6 24:4
24:5,11 27:24
28:8 29:10
61:22 198:1
259:11
**sheldon** 3:6
**ship** 136:8
**shipment** 159:2
**shipments**
106:13 123:13
134:12 135:7
**shipped** 75:9
100:12 115:17

115:23,25
116:8 136:5,6
144:2 156:23
157:16,18
203:17
**shipping**
158:16
**short** 30:16
58:18 75:19
170:11 220:14
**shortfall**
112:16,24
116:2
**shortfalls**
112:12 115:21
115:22 121:23
182:20 183:11
**shorthand** 2:20
12:12 258:2,10
**shortly** 40:7
**show** 45:13
66:19 107:4,13
117:18 123:20
127:10 136:25
145:24 146:19
209:23 217:17
236:21 247:8
**showed** 248:14
**showing** 96:20
**shown** 133:17
175:5 188:8,10
243:5 244:7
**shows** 44:11,12
44:24 62:11

**App. 466**

**[shows - specific]**                                    Page 67

128:11 132:3
138:8,11,20
155:22 159:5
179:10 195:11
197:18 241:2
**shut** 152:9
153:6 163:5
**side** 38:24
163:9
**sign** 259:12
**signature** 13:21
14:8 44:24
45:2 46:8
162:7 258:24
**signatures** 46:2
**signed** 36:23
44:10,11
259:19
**significant** 52:8
61:21 98:7,16
99:2 100:19
139:21 140:5
158:18 167:8
182:22 201:21
208:22 215:25
216:14 232:22
232:25 233:24
249:23 252:4
**significantly**
96:10,16 97:12
98:5 156:24
158:13 176:14
186:1 204:22
215:23 235:4

251:4,15,19
**similar** 21:5
37:14 55:12
73:2 103:12
116:19 127:20
150:5 177:2
197:20 229:7
**similarly** 1:5
2:5 241:22
242:4
**simply** 41:6
**simultaneous**
38:8 68:11
108:24 235:19
244:12
**sir** 41:3 74:9
191:2
**sit** 16:25 18:14
32:16 53:3,12
83:11,22 100:4
107:2 137:24
236:10
**sits** 95:12
**situated** 1:5 2:5
**situation** 84:15
111:5 112:3
113:20
**situations**
35:16
**six** 65:8 170:24
223:18 242:19
**sixth** 227:11
**slide** 9:9 129:9
129:11 130:2,7

130:13,23
131:17 133:21
138:11 139:15
139:16 145:15
145:21 146:1
146:12
**slowly** 184:17
**small** 26:2,3
**smilovits** 6:11
**society** 31:16
95:1 180:2
**solar** 6:12,15
6:19 36:10
38:5,12 43:9
43:16,25 44:6
44:17 45:11,14
45:21 46:14
47:2,16
**sold** 25:24,24
48:4 68:1 80:1
97:23 100:20
109:19 110:2,5
115:24 157:10
**solid** 125:25
131:7
**solutions** 12:1
256:22 259:23
**somebody**
58:25 59:4
216:18 231:7
252:13,19
**somebody's**
222:23

**sorry** 30:11
35:22 38:9,10
41:2 62:6
68:12 86:13
97:19 108:25
117:6 126:20
156:13 162:13
165:12 166:11
184:16 192:15
197:13 202:7
205:19 208:2
235:22,23
**sounds** 20:22
23:14 36:16
204:4
**sources** 211:6
212:17 238:19
**south** 202:18
206:5
**southern** 19:1
55:9
**spe** 95:2,12
**speak** 83:10
84:4 147:14
**speaker** 179:3
**speaking** 38:8
68:11 108:24
188:20 235:19
244:12
**speaks** 250:9
**special** 19:6
**specific** 22:14
28:10 32:19
34:24 46:18

**[specific - strategic]**

83:19 137:25 161:17,22 225:3 227:4 230:15

**specifically** 45:5

**specificity** 116:13 153:3 171:9,15,22 184:12

**specifics** 225:4 230:24

**speculate** 31:23 46:17 135:5

**speculation** 39:1 56:3 114:13 127:6 139:10 143:15 151:22 155:12 164:7 174:18 188:19 194:4 222:19 235:25 236:15 237:15 238:5 244:14

**speculative** 245:15

**speeches** 218:17

**spencer** 3:7

**spending** 238:13

**spes** 19:5

**split** 144:8

**spolychron** 3:16

**spot** 227:23

**spread** 140:1,4 140:8 169:11 171:2 188:12

**spreading** 174:3,8

**spreadsheet** 7:13 102:22 250:20

**ssaham** 3:13

**ssheldon** 3:14

**staff** 238:15

**staffed** 95:3

**stamp** 150:13

**stance** 181:8

**stand** 16:13 135:8

**standard** 11:3

**standards** 7:5 17:11 35:20 47:6 62:25 63:9 226:17,20 255:21 256:1

**stands** 134:21 135:4 198:5 226:20

**stanley** 52:23

**start** 14:16 240:23

**started** 25:15 96:8 97:15 224:7

**starting** 68:15 121:20 172:4 227:21

**starts** 103:7,21 114:17 132:17

**startup** 98:21 99:1,15 144:8 144:13

**state** 12:6 55:13,14 112:11 144:20 185:20 194:13 241:21

**stated** 73:9 190:1

**statement** 24:12 47:23 60:6 65:14 74:22 86:18 98:4,11 116:24 182:18,23 183:14,15 190:4,19 193:8 194:23 209:17 213:3 216:15 216:19 237:13

**statements** 20:11 23:13 36:1 37:13 48:1 65:13 92:1 94:11 184:7,10 189:24 204:18 208:13,15

211:20 213:11 216:18 255:23 256:3,5,7,8

**states** 1:1 2:1 11:19 41:23 75:11 79:23 80:1,24 84:10 96:11,17 97:8 97:13 98:14 99:7,10 100:13 100:21 105:5 106:16 109:20 110:14 111:2 111:22 115:18 115:18 116:1 121:8 123:14 130:3 151:15 156:23 157:4 157:17 158:3 158:17

**stayed** 181:5

**steal** 220:1

**stenographic...** 1:23

**step** 218:12,25 219:9,16,23,25

**stephanie** 4:21

**stop** 16:2 85:24 143:5

**stopped** 153:21

**storage** 76:8 115:7

**strategic** 230:22

**[strawbridge - table]** Page 69

**strawbridge** 7:18 97:7 107:19 108:3 114:7,10,17,24 115:10 116:2 128:6 151:9 179:15,19,20 179:25 180:12 188:15

**strawbridge's** 150:20

**stream** 71:22

**street** 2:17 11:23

**strike** 111:25

**strikes** 29:17

**strip** 249:14,19 250:3 252:25

**sub** 26:3 60:1 69:12 233:21

**subheading** 40:10

**subject** 19:3 54:24 84:2

**submitted** 13:13,19 14:1 14:12 54:4

**subparagraph** 78:12

**subscribed** 258:21 261:14

**subsequent** 10:20 88:6 109:23 112:6

192:3 233:22 249:13

**subsequently** 110:4

**subsidiaries** 92:15 93:8

**subsidiary** 92:3 92:22

**substance** 115:13

**substantial** 100:23 106:14 173:10

**substantially** 20:5 25:24 157:1,17 173:10 174:15 223:14 243:15

**substantive** 16:8,10

**subtract** 153:13,15 169:10 196:2

**successful** 55:3 61:18 221:4,14

**suggest** 36:2,3 190:24 245:17

**suggesting** 226:22 234:24 235:13

**suggestions** 36:22

**suggests** 97:17 97:21

**suit** 54:1

**suite** 3:10

**summarizes** 64:16 202:23 203:4

**summarizing** 205:25

**summary** 86:5 114:25 115:9 150:1 154:19 210:22

**supervision** 258:12

**supplement** 16:24

**supplemental** 62:4,7

**supply** 118:19 118:19 227:9 228:3,13,22,25 229:6 230:18 238:18

**support** 60:6 101:23 103:2 168:11

**supporting** 163:3

**supposed** 83:5 83:13 168:8 176:16 208:7 211:15

**sure** 53:8 109:17 135:10 147:15 166:9

202:2 225:5

**surprise** 250:21

**suspect** 22:15 203:15

**sustain** 167:1 167:11

**sustaining** 130:18,24 159:23 166:19 166:25 167:17 167:21 168:3 168:20,24 169:4,18,25 179:11

**swiger** 1:8 2:8 77:8 78:24 128:6,18,20 132:25 171:25

**swiger's** 177:24

**sworn** 258:5 261:14

**syncrude** 116:19

**synthetic** 76:13 77:24 78:1,3,5 82:9 84:24 85:3 109:10

**t**

**t** 260:3,3

**table** 68:14 197:5,17 198:9 202:10,22 203:3

**App. 469**

**[tables - texas]**                                                              Page 70

| | | | |
|---|---|---|---|
| **tables** 100:1 | 50:10 68:13 | 231:2 233:17 | 189:2 219:6 |
| **take** 11:13 | 88:9 91:11 | 251:25 | 244:10 247:19 |
| 59:17 60:20 | 144:12 152:23 | **tend** 172:22 | **testified** 13:3 |
| 75:24 96:2 | 165:21 168:14 | **tended** 80:22 | 18:4,6,10 |
| 101:8 104:10 | 174:12 192:19 | **term** 30:9 | 32:10,12,13 |
| 112:19 113:10 | 202:2 218:14 | 70:11 140:12 | 51:21 164:15 |
| 113:12 133:20 | 218:21,22 | 140:18 196:11 | 221:3 224:23 |
| 139:17 143:24 | 226:16 | 227:8 228:3,22 | 224:24,25 |
| 144:16 154:4 | **talks** 74:16 | 228:25 229:25 | 226:8 |
| 159:12 166:23 | 85:7 151:24 | 231:21,22 | **testify** 13:10 |
| 170:16 175:8 | 172:9 215:6 | 238:18,20,22 | 32:3 38:21 |
| 178:16 193:13 | **tank** 76:8 115:7 | 239:7,25 240:5 | 55:6,17 222:22 |
| 196:17 201:25 | **tax** 195:13 | 240:16 241:2,7 | 258:6 |
| 214:16,18 | 196:9 199:8,8 | 245:8,19 | **testifying** 39:21 |
| 239:19,22 | **taxes** 87:20 | **terminal** 70:16 | 40:16 43:4 |
| 250:23 | 195:19 | 74:18 75:1 | 50:7 55:19 |
| **taken** 2:15 | **taylor** 8:15 | 76:7,10,15 | **testimony** |
| 11:16 16:21 | 127:12 165:23 | 82:11,20 84:7 | 16:23 19:3,12 |
| 30:16 75:19 | **team** 119:15 | 84:12,15,21 | 38:18 40:1 |
| 108:16 117:13 | **teams** 118:25 | 115:3,5 | 41:24 42:7,10 |
| 170:11 220:14 | 119:12 | **terms** 19:25 | 42:17 73:8 |
| 256:5 258:8,10 | **technical** 89:10 | 21:6 33:12 | 74:13 77:8 |
| **takes** 153:8 | 89:14 95:5,20 | 34:11 36:13 | 78:23 81:17,22 |
| 221:15 | 162:8 238:15 | 91:13 113:15 | 82:13 85:19 |
| **talk** 135:14 | **techniques** | 173:14 174:1 | 98:21 111:9 |
| 165:10 208:17 | 72:19 | 201:19 204:16 | 172:2,9 177:24 |
| 211:25 226:16 | **tell** 15:14,18 | 208:21 216:25 | 186:23 204:4 |
| 241:19 245:14 | 31:13 | **test** 27:2,19 | 226:1 229:14 |
| **talked** 85:18 | **telling** 143:10 | 28:12 29:23 | 234:14 243:9 |
| 159:21 160:6 | 190:8 | 87:14 108:10 | 256:19 259:9 |
| 181:17 223:8,8 | **temporarily** | 109:15 129:16 | 259:17 261:8 |
| 233:21 | 182:8 193:6,15 | 129:24,24 | **tests** 21:14 |
| **talking** 29:12 | **ten** 53:18 80:22 | 152:11 178:8 | **texas** 1:2 2:2 |
| 29:13 46:5 | 186:12,14 | 180:6 188:5,17 | 11:20 25:17,17 |

**App. 470**

**[texas - toal]** Page 71

| | | | |
|---|---|---|---|
| 52:22 | 108:21,22 | 245:17 246:22 | 158:2,15 |
| **text** 67:12 | 109:6,9 113:25 | 248:7 251:13 | **time** 11:3,11 |
| 101:18 210:19 | 115:10 116:2 | 252:12 253:14 | 12:6 16:19 |
| **textbook** 6:23 | 116:25 122:9 | **thinking** | 43:19 48:1,19 |
| 6:24 60:8,11 | 123:18 125:13 | 204:23 | 49:11 50:8,20 |
| 61:6 | 131:22 135:8 | **third** 23:8,18 | 55:15 57:3 |
| **textual** 211:19 | 135:16 143:16 | 24:3 29:17 | 59:4,4,12 74:5 |
| 211:19 | 147:3,17 149:4 | 30:22 31:3 | 103:24 105:17 |
| **thank** 82:3 | 152:2 153:3,10 | 61:23 114:4 | 113:24 115:16 |
| 210:12 234:10 | 155:20,23 | 116:15,16 | 120:12 128:21 |
| **that'd** 114:24 | 159:13 163:1 | 131:17 132:5 | 128:24 129:5 |
| **theoretical** | 165:21 172:3 | 134:25 140:13 | 149:2 151:10 |
| 27:20 | 174:19 177:2 | 181:20 229:10 | 164:23 171:18 |
| **thereof** 258:16 | 177:10 180:3 | 239:8,13 241:8 | 171:20 175:24 |
| **thing** 202:3 | 180:19 181:10 | 241:10,13,21 | 176:25 178:2 |
| **things** 199:5 | 181:16 182:12 | 242:3,5 244:23 | 180:14 182:4 |
| 231:15 | 183:8 186:7 | 245:10 | 186:5,14 187:5 |
| **think** 16:6,19 | 192:7 201:9 | **tho** 35:15 | 191:5 193:6,14 |
| 21:10 25:25 | 202:10 204:2 | **thomas** 150:18 | 194:1 216:10 |
| 29:5 33:4 34:1 | 204:23 205:8 | **thought** 190:9 | 219:22 230:3 |
| 34:25 37:3 | 208:10 209:7 | **thousand** 96:9 | 250:10 258:9 |
| 38:12 50:20 | 209:16,21 | **thousands** | 259:18 |
| 52:19,24 53:7 | 211:24 212:1 | 167:20 | **timeframe** |
| 57:16 59:15 | 212:12 214:1 | **three** 30:2 | 259:8 |
| 65:14 66:17 | 215:19 216:11 | 128:11 156:5 | **times** 14:14,17 |
| 72:13,25 73:11 | 221:3 222:21 | 158:23 159:2 | 22:13 51:6,13 |
| 76:21 78:20 | 223:6 225:23 | 202:25 214:8 | 51:17,18,23 |
| 79:8,16 83:20 | 225:25 226:5 | 219:6 232:6 | 53:17 55:11 |
| 83:23 84:9,18 | 226:24 228:5,8 | 243:16 250:15 | 172:10 |
| 91:9 93:20 | 228:24 229:3 | **thunder** 220:2 | **title** 63:16 76:1 |
| 98:1,7,16 | 229:15,23 | **tillerson** 1:8 2:8 | 129:12 |
| 99:13,16,20 | 230:3 233:6,11 | 128:16,23 | **titled** 196:19 |
| 104:22 105:8 | 234:12 236:7 | 132:25 139:7 | **toal** 4:6 5:5 |
| 105:14,18 | 242:25 245:1 | 139:12 157:15 | 13:6,8,17,24 |

14:4 15:13
25:8 30:13,20
34:21 36:5,25
38:13 39:5,7
39:12 41:8
44:4 45:9,19
46:7,13 48:7
50:12 56:6
60:10,15 62:14
63:4 64:14
66:25 68:2,17
71:23 73:6
74:7,8 75:3,16
75:23 77:21
79:13,24 81:9
81:18 82:5,16
83:2 86:15
88:22 89:1
92:8,17 93:15
93:23 94:20
97:25 98:25
100:17 102:1,5
102:11,16,21
102:24 103:6
104:13,17
107:17 109:5
110:1,18
111:24 112:17
114:1,2,21
116:14 117:9
117:17,25
123:25 125:9
125:19,20
126:1,4,22

127:8,16 131:8
133:19 137:4
137:11 139:13
143:18 145:5
145:11,24
146:6,25 147:8
147:20 148:25
149:13 150:10
150:16 152:5
152:22 155:15
156:15 159:10
160:7 162:25
164:10,20
166:3,17,24
167:4,16 170:8
170:15 174:25
176:15 181:15
181:25 182:1
185:8 186:4
187:3 188:14
188:22 191:10
191:20 192:21
193:1,16,24
194:7 196:23
197:12 205:1,7
208:3,5 210:1
210:4,13
213:12 217:13
219:23 220:3
220:10,18
222:24 224:11
229:18 235:11
236:8,20 237:2
237:17 238:7

239:18,20,21
240:25 242:11
243:2,25 244:9
244:16 246:8
246:15 247:12
253:20 254:2
255:11 256:14
256:17
**today** 13:10
16:25 32:16
34:20 53:12
83:11,22 100:4
164:15 165:17
188:2 236:10
**today's** 56:7
256:19
**together** 58:8
58:17 165:10
207:7 215:24
233:16 250:1,4
**told** 188:15
192:12 225:12
**tomorrow**
165:16
**took** 79:15
80:14 81:2,12
81:20 99:23
100:5,25
121:25 122:5
147:18 149:6
179:17 193:10
220:20 221:5
**top** 7:17 8:13
9:19 68:22

70:7 72:5
97:14 124:8
130:23 133:24
150:11,17
158:8 159:22
198:8 203:2
237:6 245:24
**topic** 7:4 62:25
63:8 166:22
**total** 213:22
256:20
**touches** 84:20
**toward** 198:8
**town** 35:10
36:11,11 37:10
37:11,23
**track** 100:2,2
251:8
**tracked** 206:21
**traded** 91:2
**trades** 249:23
**training** 90:9
153:2
**trans** 111:16
**transacted**
228:12
**transaction**
28:5 44:17,21
47:5,8,9,24,25
48:9 79:19
110:22 141:5
143:19
**transactions**
76:22 79:20

**App. 472**

**[transactions - under]**

136:19 142:19 143:1,6,13

**transcribed** 258:11

**transcript** 258:18,20 259:6,19 261:5 261:8

**transfer** 19:9

**transparent** 185:3

**transport** 75:12

**transportation** 72:19 77:9,17 78:25 79:2,3 85:22 101:14 104:2,11 105:3 110:24 111:17 121:9 123:15 139:25 141:12 141:17,22 142:13,14,23 157:3 158:10 158:13,23 169:11 171:2 188:12

**treatment** 161:23

**trend** 231:21 231:22

**trends** 199:20 200:2,10,17 227:9 228:3,23

**trial** 40:8,17 42:2,12 43:4 51:21 225:20 226:1,8

**tried** 240:17

**trigger** 219:14 219:17 221:8 222:10 231:13 232:19 234:2,7 254:14

**triggered** 223:22

**triggers** 10:18 236:23 237:9

**troubled** 207:7

**true** 114:18,25 261:8

**truth** 258:6,6,7

**truthfully** 13:10

**try** 80:13 98:2 187:9 229:11

**trying** 48:12 174:21 221:2 252:13

**turn** 44:9 45:24 46:20 59:19 63:14 68:19 85:6 89:8 118:12 124:17 129:8 145:14 194:8 199:16 211:5 237:18 238:8

**turns** 184:5

**twelve** 171:3

**twice** 14:16

**two** 18:24 22:15,24 34:19 35:1 36:14 56:18 98:11 142:16 148:13 172:10 186:9,9 191:9 195:6 198:24 214:5 227:11 230:6 242:18 243:23 244:21 245:4,9 245:11,11,17 245:17 249:20 249:21,23

**type** 174:12 202:25 206:2

**typed** 59:9,9,10

**typewriting** 258:11

**typically** 51:8 252:14

**typing** 59:7

**typographical** 16:4

**u**

**u** 36:12

**u.s.** 6:13 32:5 39:8 96:20 97:4,23 98:6 98:24 99:3

101:3 103:21 103:25 134:3 134:14 135:11 135:15,15 139:20 140:2 144:3,3,7,9,10 144:13 157:13 157:25 158:13 158:20 159:5,9 188:11 198:9 219:2 232:11

**uintah's** 250:22

**ultimate** 81:3

**un** 176:11

**unaudited** 62:4 62:8

**uncertain** 152:18 153:24

**uncertainties** 199:21 200:2 200:10,17,23 208:17,19,23

**under** 21:14 27:2 34:14 39:3 40:20,21 47:3 61:17,18 64:15,20 69:6 79:5 86:6 87:18 94:8,8 95:7 109:12,14 125:24 126:1,2 132:4,12 134:6 134:14 137:19 146:15 147:21

**[under - used]** Page 74

159:13 169:25
175:16,22
176:11 182:4
200:2 202:21
210:22 211:6
212:17 219:2
231:12,25
237:9 253:5,7
253:17 258:11
**underlying**
56:10 98:22
110:22
**underneath**
72:15 132:18
134:17,24
155:6 203:2
**understand**
17:19 28:11
29:15,21 78:25
91:4 93:1
114:5,9 151:8
185:7 200:21
208:18 254:3
**understanding**
42:14 48:16
73:11 90:17,21
91:1,8,20
104:3,14
106:23 108:13
108:19 112:3
119:14 121:17
126:13,16
129:15 149:24
166:18 179:15

180:22 201:13
211:10 215:14
249:2
**understood**
58:1 193:25
**undiscounted**
219:18 220:4
227:7 228:1
242:13,16
243:6 244:10
**unfavorable**
200:19
**unit**  11:15 75:8
87:20 125:4
126:14 130:12
130:16,17
131:3,25 133:4
138:11,20
154:2 159:17
168:22,23
170:21 172:12
172:21,23
173:14,15
174:1,14 175:1
175:2 177:4,6
179:10 187:18
187:24 189:11
189:15 198:2
199:4
**united**  1:1 2:1
11:19 75:11
79:23 80:1,24
96:11,17 97:8
97:13 98:13

99:7,10 100:13
100:21 105:5
106:16 109:20
110:14 111:1
111:22 115:18
115:18 116:1
121:8 123:14
156:23 157:4
157:17 158:3
158:16
**units**  173:19
**unqualified**
255:22 256:2
256:10
**unreasonable**
223:21 224:9
**unreliable**  41:5
**unusual**  76:8
84:10
**unweighted**
69:20 113:12
187:14 189:8
**update**  7:5
62:25 64:17
128:12
**updated**  15:21
**upgraded**
77:23 84:24
85:2
**upgrading**  78:5
**upstream**  9:4
118:21 145:6
150:7 184:15
184:21 199:21

200:12 211:23
212:8,14
**use**  45:2 73:9
75:12 79:2
83:1 84:6
103:25 110:6
112:4 113:20
122:23 140:12
140:18 170:21
171:6,17 172:1
172:5,6,7
176:16,19
178:8 223:11
223:16 227:7
228:1 230:2
231:8 234:24
235:13 236:10
237:24 242:20
243:3,22 244:2
245:4 246:19
247:3,22
248:10 249:11
249:25 250:10
250:11 252:23
252:24 253:8
**used**  60:2 61:1
62:16 79:11
85:20 103:15
103:17 104:4
105:12,16
106:4,25
110:10 112:15
116:20 117:3,4
119:24 120:6

**[used - volumes]**

122:18 136:21
140:8,22
162:16 178:6
187:20 191:22
191:24 216:11
221:8,13
223:16,20,21
224:10 227:10
227:17 229:11
229:20,25
230:6,8,12
234:20 235:6
244:5 246:17
247:1,19,24,25
248:1,15,17,20
249:2,11 250:4
253:9 254:16
255:7,13,18
256:20 259:19
**uses** 15:24
211:7 212:17
229:10 238:19
244:24 247:4
**using** 46:21
47:10 87:21
109:20 124:17
144:22 156:7
172:10,23
176:13 177:18
178:14 196:12
196:14 242:13
242:18 244:17
244:21,25
245:16 255:5

255:12
**usually** 52:2
199:14
**utilized** 78:17
**utilizing** 156:1

**v**

**v** 1:7 2:7 69:12
69:12 259:4
260:1 261:1
**vague** 25:2
50:8 216:8
**vagueness**
73:12
**valorem** 87:19
**value** 24:8,14
27:17,23 28:6
29:10,12 60:2
61:1,8,25
62:17,21 65:1
65:10 70:15
115:1 133:22
211:11 219:11
219:19 220:5,6
220:7,8 243:6
**valued** 30:8
**valuing** 29:10
108:8,14,20
**valve** 76:7,19
115:6
**var** 164:1
**variable** 152:16
152:19 153:12
153:17 163:13

164:17 165:5
**varied** 80:21
**variety** 57:19
79:10 90:25
99:4 237:7
**various** 58:3
93:8 111:19
251:13 252:20
**vary** 79:1
**vast** 204:13
**venue** 51:22
**verbatim** 28:12
72:11 84:9
115:8 122:15
130:22 131:23
155:22 165:8
171:21 184:13
217:18 224:16
225:5 227:1,18
234:6 240:1
241:4 242:14
242:21 243:4
244:3,6,18
**verify** 259:9
**veritext** 12:1
256:21 259:14
259:23
**veritext.com**
259:15
**version** 88:18
88:20 102:17
125:18 146:11
**versions** 88:6

**versus** 11:18
49:11 53:6
161:5 206:9
227:23 251:12
**video** 1:13 2:14
4:23 11:12,16
256:23
**videographer**
11:5 12:1
30:14,17 75:17
75:20 117:11
117:14 170:9
170:12 220:12
220:15 253:22
253:25 256:18
**view** 111:3
148:13 211:16
211:21 212:13
217:15 253:5,8
**viewed** 204:21
**vince** 8:14
127:12 150:18
**vinny** 4:23
11:25
**violations**
40:24
**viscosity**
136:12
**volume** 96:20
144:8 174:4,9
246:1
**volumes** 62:9
65:1 98:13
144:6,13

**[voted - woods]** Page 76

| | | | |
|---|---|---|---|
| **voted** 44:16 | 188:1,1 218:19 | **witness** 5:3 | 159:8 160:5 |
| **vs** 6:11 | **wednesday** | 12:10,15 25:3 | 162:20 164:8 |
| **w** | 1:15 2:18 11:2 | 34:16 35:24 | 164:14 165:3 |
| **w** 1:8 2:8 | **week** 14:21,24 | 36:21 38:11 | 165:14 166:14 |
| **wait** 235:20 | **weight** 241:25 | 39:2 41:4,18 | 166:25 167:7 |
| **waiting** 218:17 | 242:8 | 43:13 45:4 | 174:19 176:4 |
| **want** 15:11,15 | **weighted** 176:6 | 46:11 47:22 | 181:10 184:19 |
| 32:3 39:14 | **weiss** 2:16 4:4 | 49:1 50:6,9 | 185:16 186:24 |
| 68:5 85:25 | **wells** 25:15,16 | 56:4 61:11 | 188:7,20 191:3 |
| 147:4 160:14 | **went** 158:25 | 62:8 64:12 | 191:17 192:19 |
| 202:2 207:22 | 166:16 189:4 | 67:23 68:8,10 | 193:3,20 194:5 |
| 220:1,1 | **west** 3:10 197:6 | 68:14 71:8 | 197:11 204:8 |
| **wanted** 15:5 | 197:9,11,13 | 72:3,3 77:1 | 208:4 210:12 |
| 16:9 58:12 | **wh** 191:5 | 79:8,18 81:6 | 212:25 217:3 |
| 216:6 | **wharton** 2:16 | 81:16 82:4,14 | 222:20 224:5 |
| **wants** 231:7 | 4:4 | 82:22 91:24 | 229:15 235:3 |
| **warning** | **whatever's** | 92:13 93:13,20 | 235:18,23 |
| 193:17,20 | 81:10 | 94:17 96:18,25 | 236:1,14,16,18 |
| **watch** 80:5 | **whereof** 258:21 | 97:21 98:19 | 237:16 238:6 |
| **water** 19:2 | **whispering** | 100:9 102:23 | 239:16 241:15 |
| **way** 16:7 92:24 | 11:9 86:14 | 103:5 104:7 | 242:25 243:10 |
| 114:5,20,22 | 156:14 | 109:2,17 | 244:15 245:23 |
| 131:2,6 144:1 | **white** 125:18 | 110:10 111:8 | 255:9 256:15 |
| 152:6 163:23 | 222:9,14,17 | 111:11 112:9 | 258:4,21 259:8 |
| 169:23 207:16 | 237:4 | 114:14 116:10 | 259:10,12,18 |
| 207:19 234:1 | **whopper** | 117:7 125:8,15 | **wood** 243:14 |
| 236:19 | 232:16 | 126:21 127:7 | 243:21,21 |
| **ways** 33:20 | **william** 97:7 | 131:6 133:7 | **woodbury** 1:9 |
| 148:13 | **wishes** 181:3 | 139:11 140:14 | 2:9 |
| **we've** 71:25 | **withdraw** | 143:16 147:3 | **woodmac** |
| 72:6 74:6 83:7 | 187:4 | 147:17 148:6 | 238:24 |
| 83:23 114:6 | **withdrawn** | 149:10,23 | **woods** 240:1 |
| 166:22 186:2 | 256:10 | 151:23 152:14 | 241:4 242:14 |
| | | 155:13 157:20 | 242:21 243:4 |

**[woods - zoom]**                                                    Page 77

244:2,5,18
**word** 33:6 59:2
  59:3 114:18
  250:6
**wording** 59:5
**words** 15:24
  24:6 36:4 59:8
  59:9,9,10
  216:11
**work** 17:5
  23:23 26:7,13
  27:3 28:18
  29:4 31:14
  33:1 34:18
  47:4 48:25
  49:4,13,17,18
  49:19,25,25
  50:5,14,17
  51:24 54:11
  57:7,7,10,10,20
  64:1,8 67:6
  89:6 92:25
  161:14 217:19
  247:14 254:19
**worked** 17:16
  21:17 30:21
  32:5,7 58:5,8
  58:17
**working** 18:7
  22:4 25:12,20
  26:5 44:18
  47:23,24,24
  48:20 49:1,11
  49:12,14 57:15

151:3,13
  174:21
**works** 36:9
**world** 18:1
**worldwide**
  238:18
**worse** 191:9
**worth** 25:16
**wright** 53:20
  54:5,11,14,16
**write** 199:19
  218:3,5 220:7
**written** 16:24
  20:17 96:12
  97:24 151:5
  237:24
**wrong** 155:23
  183:18
**wrote** 160:24
**wti** 103:25
  116:17 140:9
  141:14,16,21
  142:12 169:11

| **x** |
| --- |

**x** 33:3 132:18
  167:14 229:8
  258:20
**xto** 58:7,16
  232:11,13

| **y** |
| --- |

**y** 229:8
**ye** 8:9

**yeah** 39:2
  40:19 41:19
  46:7,20 48:11
  54:2 57:9 80:2
  93:5 94:8
  102:11 117:7
  118:2 125:7,16
  129:22,25
  132:18 133:16
  137:13,22
  138:16 146:9
  155:5,7 158:22
  166:24 174:6
  174:19 176:22
  181:22 194:11
  196:7 202:6,8
  203:3 205:17
  215:8 221:7
  224:5 235:21
  239:16,20
  240:3,13 248:7
  253:4
**year** 6:16,20
  44:1,6,23
  45:14,21 46:15
  68:1 89:3
  97:10 103:17
  103:20 104:5
  105:6 118:25
  119:25 121:4
  124:1 131:10
  131:11 167:21
  171:7 177:8
  183:17 187:15

190:21 191:14
  192:2 194:17
  195:14 196:15
  197:18 205:10
  227:11,19,19
  230:23 232:11
  232:15,18
  233:19 242:19
  243:22 244:20
  251:21,22
**year's** 171:12
**years** 43:11
  50:11,13,15
  83:17 94:23
  95:5 103:12
  132:20 192:3
  202:25 223:18
  223:18 230:4
  233:17 242:22
  242:22 244:4
  244:25 245:6
  245:15 249:20
  249:21,23
  250:12 251:13
  251:16,18,25
**yesterday**
  56:19 151:1
**york** 4:10,10

| **z** |
| --- |

**zeros** 195:9
**zoom** 3:8,9 4:8
  4:21,22 56:18
  59:11

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

**App. 478**

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

**App. 479**

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

**App. 480**

# Exhibit 12

Page 1

VOLUME: I
PAGES: 1 to 324
EXHIBITS:  1 to 7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

Civil Action No. 3:16-CV-03111-K

PEDRO RAMIREZ, JR.,                )
INDIVIDUALLY AND ON BEHALF         )
OF ALL OTHERS SIMILARLY            )
SITUATED,                          )
               Plaintiffs,         )
                                   )
vs.                                )
                                   )
EXXON MOBIL CORPORATION,           )
ET AL,                             )
               Defendants.         )

VIDEOTAPED DEPOSITION OF STEVEN P. FEINSTEIN, Ph.D., called as a witness on behalf of the Defendants, pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Jeanette N. Maracas, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of WilmerHale, LLP, 60 State Street, Boston, Massachusetts, on Wednesday, January 22, 2025, commencing at 9:17 a.m.

**App. 481**

Page 2

APPEARANCES:

ROBBINS GELLER RUDMAN & DOWD, LLP
By: Scott H. Saham, Esq.
By: Spencer Burkholz, Esq.
By: T. Alex B. Folkerth, Esq.
655 West Broadway
San Diego, CA 92101
For the Plaintiffs.
Ssaham@rgrdlaw.com
Sburkholz@rgrdlaw.com
Afolkerth@rgrdlaw.com

PAUL WEISS RIFKIND WHARTON & GARRISON
By: Audra J. Soloway, Esq.
By: Emily Miller, Esq.
1285 Avenue of the Americas
New York, NY 10019
For the Defendants.
Asoloway@paulweiss.com
Emiller@paulweiss.com

Bob Giannini, Videographer.

ALSO PRESENT VIA ZOOM:

Patrice Childress
David Ceasar

Page 3

I N D E X

Testimony of:        Direct  Cross
Steven P. Feinstein, Ph.D.
(by Ms. Soloway)        5

E X H I B I T S

No.        Description        Page

Exhibit 1   10/11/24 Report on
            Loss Causation and Damages
            of Steven P. Feinstein,
            Ph.D.            10

Exhibit 2   1/10/25 Reply Report
            of Steven P. Feinstein,
            Ph.D.            35

Exhibit 3   ExxonMobil 2015
            Form 10-K.        57

Exhibit 4   12/10/24 Expert
            Report of Allen
            Ferrell, Ph.D.    174

Exhibit 5   12/21/18 Expert
            Report of Frank C.
            Torchio.          217

Exhibit 6   Annual Coupon
            document.          264

Exhibit 7   12/10/24 Expert
            Report of Anthony
            Saunders, Ph.D.    276

Page 4

PROCEEDINGS

VIDEOGRAPHER: Good morning. We are on the record. This is the videographer speaking, Bob Giannini. I'm with the court reporter, Jeanette Maracas with Veritext Legal Solutions. Today is January 22nd, 2025, the time is 9:17 a.m. We are here at WilmerHale located in Boston, Massachusetts, to take the video deposition of Steven Feinstein in the matter of Pedro Ramirez, Jr. versus ExxonMobil Corporation, et al.

Will counsel introduce themselves for the record.

MR. SAHAM: Scott Saham for the plaintiffs.

MR. FOLKERTH: Alex Folkerth for the plaintiffs.

MR. BURKHOLZ: Spencer Burkholz for the plaintiffs.

MS. SOLOWAY: Good morning. Audra Soloway from Paul Weiss for the defendants.

MS. MILLER: Emily Miller for the defendants.

VIDEOGRAPHER: Patrice Childress and David Caesar are online. Will the court

Page 5

reporter please swear in the witness.

STEVEN P. FEINSTEIN, Ph.D.

A witness called for examination by counsel for the Defendants, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. SOLOWAY:

Q. Good morning Dr. Feinstein. How are you?

A. Good, thank you.

Q. Is there anything that would prevent you from giving truthful testimony today?

A. No.

Q. Let's just start with some background information. What do you consider your primary area of professional expertise?

A. Finance, finance, financial economics, econometrics, statistics and then numerous sub-areas within those fields.

Q. Are you a lawyer?

A. No.

Q. Do you have any formal legal training?

A. No.

Q. Are you offering legal opinions in this matter?

2 (Pages 2 - 5)

Page 6

A. No, although I understand my opinions have bearing on legal questions.

Q. Do you have any expertise in oil and gas?

A. Some that I've acquired over the years analyzing oil and gas companies, being involved in cases that involved oil and gas companies, but I'm not considering myself an oil and gas industry expert.

Q. And in the cases where you've analyzed oil and gas companies, was that as a financial economist?

A. Yes.

Q. On the issue of accounting issues for oil and gas companies, do you have expertise there?

A. Some. More than most people, but I'm not an accountant.

Q. Are you offering an expert opinion in this case on any accounting issues?

A. Not as an accountant, not accounting principles, but I can offer opinions that are reliable about how a financial analyst would interpret accounting numbers.

Q. So let me just make sure I understand that. Are you offering opinions here today about

Page 7

how accountants should handle asset impairments for an oil and gas company?

A. I'm having trouble with the way you worded the question. There are certain principles of accounting that financial analysts are well aware of and rely on such as the accounting is supposed to represent accurately the condition of the company, so that's an overlap area between financial analysis and accounting and I can offer that opinion.

Q. Are you offering the opinion in this case about whether Exxon's public disclosures complied with accounting principles?

A. No.

Q. And with respect to proved reserves, are you familiar with the concept of proved reserves?

A. Yes.

Q. Are you offering the opinion in this case about whether Exxon's public disclosures complied with accounting rules for proved reserves?

A. No.

Q. Have you personally been a party in

Page 8

litigation?

A. Yes.

Q. In what sense?

A. Minor items, a contractor dispute, that sort of thing.

Q. Anything other than a contractor dispute?

MR. SAHAM: Objection, relevance.

A. Minor, when I was renting an apartment, there was some issue with the security deposit that I filed a small claims for. That's all I recall that proceeded to litigation of any kind.

Q. So a contractor dispute and a small claims matter about a deposit. Am I getting that right?

A. Yeah, to answer your question about litigation.

Q. Where you've been a party to litigation?

A. Correct.

Q. How many times have you been engaged to provide an expert opinion?

A. Many.

Q. I think in your report you say that you've conducted analyses and presented opinions related to financial markets, valuation and

Page 9

damages in more than 200 cases, is that right?

A. That's right.

Q. And more than 25 times in the last four years?

A. I don't think I wrote that in the report, but I would say that's accurate.

Q. Let me just mark your report so that if you need it, you have it.

MS. SOLOWAY: I think we agreed we'd start at one to avoid confusion. So the exhibits to the Feinstein report, if it's okay with you, we'll just mark it all as one exhibit. Is that okay?

MR. SAHAM: Sure.

MS. SOLOWAY: Okay. Just give us a minute. We need to collate it.

(Pause)

MS. SOLOWAY: I'm going to --

A. I have a question about a previous question you asked, when you said about litigation.

Q. Yes.

A. Would that include that I got divorced 15 years ago?

Q. Would you like to add that to your answer?

3 (Pages 6 - 9)

Page 10

A. Yes.

Q. Okay. Anything else, sir?

A. No.

Q. I don't want to hear about your divorce.

A. Okay. Here's Exhibit 1.

(Exhibit 1 marked for identification.)

MS. SOLOWAY: Just for the record, I've handed the witness Exhibit 1, which is --

Q. And, Dr. Feinstein, just take a moment to confirm that's your first report in this case and the exhibits to your first report, correct?

A. It came in three pieces. Can we combine them or leave them as three pieces?

Q. You can hold them as a pile like that. If you want, we can find you a clip.

A. Okay. This is --

Q. There's no pending question. I just wanted you to have it in front of you to answer questions.

In your report you actually give a list of your past four years of experience as an expert, correct?

Page 11

A. This is a list on Exhibit 3 beginning on Page 100 of testimonies I've provided. These aren't all the engagements, but these are the testimony I provided.

Q. When you say testimony you provided in the last four years, is this all cases where you've actually given a deposition?

A. Yes, in the last four years.

Q. Or testified at a trial or arbitration?

A. Yes.

Q. Are there additional matters in which you've provided an expert report but not testified?

A. Probably.

Q. Have you ever testified at a jury trial?

A. Yes.

Q. What case was that?

A. I would need an older list than this, but certainly Puma Securities. I'll probably remember the name of it later. It was a Chinese case in New York. And Apollo Group involving the University of Phoenix. Those come to mind. I'd have to think about it to see if there's any others I'm leaving off.

Q. And those were jury trials?

A. Yes.

Page 12

Q. Were those securities class actions?

A. Yes.

Q. So, again, without looking at the document, meaning I'm not asking a question about the document, what percentage of your expert work has been in securities fraud cases?

A. Most. Order of magnitude, 90 percent.

Q. In performing your analysis as an expert in securities fraud cases, in how many instances have you represented plaintiffs?

A. I've never represented plaintiffs.

Q. Let me rephrase the question, then. In how many instances in your securities fraud case experience have you provided an opinion on behalf of plaintiffs?

A. I think someone else may define it that way, but my opinions are for the benefit of the court and triers of fact.

Q. Who hired you in the cases in which you provided an expert opinion in your securities litigation cases?

A. That's usually plaintiff-side attorneys.

Q. Can you identify any case in the securities fraud context where you were retained by a defendant?

Page 13

A. Not within the last four or five years or even ten years.

Q. What about over the course of your entire career?

A. I have.

Q. What cases?

A. The one that I recall is very early, PressTek, it was a company called PressTek in New Hampshire. I was engaged by defense attorneys. A gas company, it was three gas companies. Oneok was one of them and there was, each of the parties was both a plaintiff and a defendant.

Q. That was a securities case?

A. I believe it was.

Q. Okay.

A. Or at least it -- no, that's right, mergers and acquisitions. It involved securities. There's more.

Q. Let me actually limit the answer. This case is a case under the Exchange Act Section 10(b), correct?

A. That's right.

Q. Can you identify any cases in the context of Exchange Act Section 10(b) cases where

4 (Pages 10 - 13)

Page 14

you've represented defendants?

A. I never represented anybody.

Q. Dr. Feinstein, when I say represented defense, I mean, I'm talking about the party that retained you to provide an expert opinion. In what securities fraud Exchange Act 10(b) case have you been retained as a defendant -- by the defendant?

A. Well, PressTek is one that qualifies in the definitions in your question.

Q. Any others?

A. Not that I can recall.

Q. When was PressTek? Do you remember when that engagement was?

A. A long time ago.

Q. How many years?

A. Not quite 30, but close to 30. Early in my career.

Q. So since PressTek, in the past 30 years you have not been retained by defendants in any securities Exchange Act cases to provide expert advice, correct?

A. That's right.

Q. How frequently over the past four years have you been retained by the Robbins Geller

Page 15

firm to provide an expert opinion?

A. I'd have to go through and count from this list. I don't know the number.

Q. If I told you that I counted and it was 13, would that sound about right?

A. In the past four years?

Q. We counted on that list, yes.

A. I have no reason to believe it's wrong.

Q. And that's just testimony given, correct?

A. That's right.

Q. Have you been retained by the Robbins Geller law firm in more cases that aren't on that list?

A. I'm not sure. I'd have to look. Well, I think so if you would include cases that I have been engaged in that are ongoing and I have not yet testified in. I would think the answer is probably yes, but I can't tell you for sure one way or the other.

Q. Are you able to quantify how many such cases?

A. No. I mean, if I had all my documents, maybe you can ask that question, I could, but as I sit here now, no.

Q. Have you ever been subject to something called a Daubert motion?

Page 16

A. Yes.

Q. Do you know what a Daubert motion is?

A. Yes.

Q. Has someone challenging your opinion through a Daubert motion ever been successful?

A. Once.

Q. Which case was that?

A. The Freddie (phonetic) case.

Q. Is that the Ohio Public Employees Retirement System versus the Federal Home Loan Mortgage case in the Northern District Ohio?

A. Yes.

Q. Any others?

A. Well, successful Dauberts, no.

Q. Okay. Are there any other cases apart from the case we just talked about in which your opinions have been excluded by the court?

A. No, not excluded, not that I can recall.

Q. Okay. Any other opinions where a court has reviewed your opinions and has criticized them?

A. Of course. You know, I've had 200 cases, it's happened from time to time.

Q. Can you identify those cases for me?

A. Well, I mean, it depends. I guess there's

Page 17

some subjectivity into how you define criticism. Vale is a case involving a Brazilian mining company. The judge accepted my opinion that Vale Securities traded in an efficient market. The judge certified the class based on my opinion, but one aspect of my analysis the judge said, because of the conflicting arguments, that he was not going to give weight to one aspect of the support for the opinion that I gave that he ultimately relied on. So do you call that criticism? I'm not sure.

Q. I would characterize that as criticism. What else, what other cases?

A. Again, there's the Kirkland case. Kirkland is a gold mining company and the question at issue was -- I think it was your case, right?

Q. Yes, sir.

A. I don't think we should re-litigate that case today, but the question was, there was a disclosure that may have informed the market about one of the misrepresentations. I did not give an opinion as to whether or not that -- the allegation of

5 (Pages 14 - 17)

Page 18

misrepresentation that the judge said was cured by that disclosure is not one that I ever opined had caused damages. Nonetheless, the judge said that applying the Goldman standard, also your case, that applying the Goldman standard in order for that case to go forward, there would have had to have been a significant drop on that day. I disagreed.

I wrote in my report that a non-significant stock price reaction doesn't prove that there was no reaction, but the judge opined that it had to be significant in order for one to conclude that the disclosure had effect, and if one were then to conclude that the disclosure had no effect, that there was no price impact.

Q. Any other cases where the court has criticized your opinion?

A. Oh, yeah, early in my career, some 30-odd, 25 years ago, a valuation case, it was not a 10(b)-5 securities case, called Liberty Digital.

Q. Any others?

A. I know the defense lawyers like to think so or say so or represent that, but I've

Page 19

disagreed with them every time. There are cases where the judge or the court has said that my opinion is not supportive of plaintiff's allegations, but that's not -- that's a criticism of the scope of my report, not the analysis that went into it or produced the conclusions.

Q. What cases would you put in that category?

A. I think China Agritech is the one I'm talking about. I can't remember the name of it, but there was a case where my opinion was that the literature, the financial literature supported a particular proposition, and my engagement, the scope of my engagement was to opine about what the financial literature said. The judge said that how plaintiff's attorneys were using my opinion didn't support their case because I didn't do analysis about the specific case, but I was never asked to do analysis about the specific case. I was asked to report on what the literature said about a particular financial principle.

Q. Are you describing China Agritech right now?

A. No, that was not China Agritech.

Page 20

Q. What are you describing?

A. I can't remember. It will probably come back to me later.

Q. You're not sure what case you were just talking about?

A. Right. Those are the facts of the case. I just don't remember the name. Later today it will probably pop back into my memory.

Q. Let me know if it does. What about the Las Vegas Sands case?

A. No. I don't think there was a criticism of me. I mean, I'm very clear in my reports what I'm relying, what assumptions I'm relying on. I always write, as I did in this case, that I'm assuming plaintiffs' allegations and relying on an assumption that plaintiffs will prove their allegations. And in that case I think the judge said that plaintiffs didn't prove their allegations and that's why -- so from that, based on what I wrote in my opinion, the conclusion wasn't accepted because what I said it was assuming wasn't proved.

Q. You were a loss causation expert in that case, correct?

Page 21

A. I don't remember the details, but I think so.

Q. And in that case the judge found that as to certain alleged misstatements, the plaintiffs had not established loss causation, correct?

A. Right, but it wasn't because of the financial analysis. It was because of the facts that the financial analysis was based on and assuming as written in the report. So esssentially the judge relied on my opinion that that conclusion would derive from plaintiffs proving their factual allegations.

Q. Isn't it true that the court in that case held that your report didn't identify any corrective disclosure related to the revelation of certain alleged misstatements in that case?

A. No. I think you're taking things out of context. I think that I -- it could be that my opinion was helpful to defendants in that case. I wrote about what I believed were the corrective disclosures based on an assumption that plaintiffs could prove their factual allegations. There were some alleged

6 (Pages 18 - 21)

Page 22

corrective disclosures that I did not accept, and as a result, the judge observed that my analysis didn't prove that the damages stemmed from disclosures. So I would say the judge relied on my opinion, not rejected it.

Q. Are there any other cases in which, other than the ones we've already just talked about this morning, where the court, you were a loss causation expert and the court did not accept your opinions on loss causation?

A. Why don't you remind me. You've probably done the research more than I have. As I sit here now, I don't think so, but I'm not going to say it's an exclusive list. It's over 200 cases over 30 years. Of course there's going to be a handful of cases where a judges disagree or find that my opinion, while reliable, is not helpful to prove plaintiff's case. That's happened.

Q. But sitting here today, you don't recall any others, correct?

A. Do you? I mean, I know it's my deposition and you're asking me the questions, but sitting here now, I've talked about the

Page 23

ones that -- you remember your losses. I remember Liberty Digital, I remember the ones you've talked about. I can't remember any others.

Q. When were you first contacted by the Robbins Geller firm for this matter?

A. The matter has evolved over time, but I did look through my records and at least the case code we assigned to this case, I first worked on it a little bit back in the year 2017.

Q. Okay. And then what role were you playing in 2017?

A. I just don't recall. I looked at the records and I don't remember what I did eight years ago.

Q. And then the report that you submitted as part of -- let's just be clear. There was class certification proceedings already in this case, correct?

A. Yes.

Q. And you were not plaintiffs' expert for class certification?

A. Correct.

Q. And you submitted now two reports at the

Page 24

merit stage, correct?

A. That's right.

Q. When did the plaintiffs ask you to provide an opinion for the merit stage?

A. Last year, either beginning or middle of the summer.

Q. So beginning or middle of the summer of 2024?

A. That's my recollection.

Q. And did you offer any opinions in this case on class certification?

A. No.

Q. Do you know -- let me just take a step back. You work for a company called Crowninshield Financial Research, correct?

A. I work for them, they work for me. I own the company.

Q. Understood. What percentage of your compensation comes from Crowninshield?

A. You mean my total family income?

Q. Of all the compensation you generate, what percentage of it comes from Crowninshield?

A. It varies from year to year. If we take an average over several years, between 80 and 90.

Page 25

Q. And where does the rest of the compensation come, your role as a professor?

A. A few things, professor, royalties, rent, investments.

Q. So 80 to 90 comes from Crowninshield and the rest comes from those things?

A. Yes.

Q. Do you know what percent of Crowninshield's work comes from expert work in securities class action fraud cases?

A. I have a rough idea. I don't know the exact number.

Q. Roughly?

A. 75 to 80 percent is my estimate, give or take. I'm sorry. Can you back up and ask that question again, or remind me what the question was?

Q. I was asking you what percent of the work that Crowninshield does is for securities class action?

A. Securities. I just want to make sure that you said securities and not just litigation in general. My answer stands.

Q. Okay. Do you know what percentage of Crowninshield's revenues have been generated

7 (Pages 22 - 25)

Page 26

from engagements with Robbins Geller?

A. Roughly about a third. Well, again, it varies from year to year, something we're aware of and we're -- yeah, it's by choice. Around a third is what it is now.

Q. Can you give me a time frame for that one-third? Is that over the past several years?

A. Yeah, it probably was a little higher earlier in that period and more towards a third now.

Q. So when was it higher, what year?

A. What did you say? Five years, six years, seven years? Probably three, four, five years ago it was higher.

Q. But around now you think it's about one-third?

A. That's right.

Q. You're compensated by the hour for your work in this case, is that right?

A. Not entirely.

Q. Can you tell me how you're compensated?

A. The firm submits invoices. The firm receives compensation based on my hours, but also on the hours of people assisting me.

Q. Other than hourly fees charged by you or

Page 27

the people who are working with you, do you receive compensation from the engagement in any other way?

A. Well, if by "compensation" you mean reimbursement, we receive a reimbursement for data fees. But no, there's no other compensation and there's absolutely no contingency issues.

Q. So the outcome of this case has no bearing on what you're paid for your work in this case?

A. Correct.

Q. Do you have a sense of how many hours you've spent working on this case so far?

A. Yes.

Q. How many?

A. Well, are we going back to 2017?

Q. Yes.

A. Around 200 if we go back to 2017.

Q. And if I were just to ask about your work on these two recent reports, how many hours would that be?

A. Including preparation for deposition? Well, actually, preparation for deposition and preparation of the reply report have not been

Page 28

invoiced yet. That's in the process now, so they weren't in the records that I had to look at.

Q. So that's not included in the 200?

A. Let me think this through. Yeah, I would say it's not. I would say it's not. So I would say it's about 130 to 150 before the reply report, before the deposition preparation.

Q. And then how many since?

A. I mean, it's in the system. It hasn't been printed out yet, so I'm guesstimating. For the deposition I'm thinking 25 hours and for the reply report which was just recently filed 50, 50 or more.

Q. Just to make sure I got this right, 130 to 150 hours before your reply report, 25 in prep for the depo and 50 working on the reply, roughly?

A. That's my estimate. It's just a rough estimate, as I sit here now based on my impressions and recollections, not based on review of the records.

Q. And before you began work on the merits reports in this case, were you billing time

Page 29

to this matter?

A. Yes, but not much.

Q. What was the scope of your work in that?

       MR. SAHAM: Objection, work product.

Q. Just the subject matter without any details. I don't want what advice you provided, but were you serving as a causation and damages expert?

A. You asked that similar question moments ago and I said I didn't recall eight years ago what I did for this case. I know the case went on hiatus. I just don't recall what I did back then eight years ago or a number of intermittent periods where the case kind of came back to life. I just don't recall what I did.

       Frankly, if I would get a call about an old case, even to consider it, working on it, I would probably review what was done before, review the documents that I had in my possession. So I'd say that's probably what I did until the preparation for this report that we have here.

Q. Did you review Mr. Torchio's report before it was submitted?

8 (Pages 26 - 29)

Page 30

A. No.

Q. In your report there's a list of materials considered. It's called the Documents and Other Information Considered. Are you familiar with that? I believe it's in Exhibit 1.

A. I'm noticing some pages missing unless I have -- yeah, a page is missing from this document.

Q. What do you think is missing?

A. Well, like I said, this was handed to me in pieces. The first piece goes from the cover, the table of contents, Page 1 through Page 65. The next sheet which is loose and not bound to the others is Page 66. The next piece that I have after that is Page 71, so there's a gap between 66 and 71 which covers part of the document you're now asking me about.

Q. Okay. We'll get you a different copy. It is correct that there's an exhibit in your report that's called Documents and Other Information Considered?

A. Yes.

Q. And in addition to the documents that are

Page 31

cited in the footnotes to your report, if you add those two things together, does that include all the materials you considered in forming the opinions expressed in your report?

A. Yes.

Q. Are you aware of anything that was left out of either the footnotes or the list of documents and other information considered?

A. No. Aware that I relied on is what you're asking?

Q. Yes.

A. I am not aware if or that I relied on any documents not referenced in Exhibit 1 or covered by the statement at the end of Exhibit 1 that says any other documents cited in the report.

Q. Did you consider disclosures made by Imperial Oil Limited in preparing your report?

A. Only to the extent that they were cited in other documents that are cited in the report, news articles, analyst reports and so forth.

Q. But the actual filings made by Imperial Oil Limited, you have not read those in preparing your report, correct?

Page 32

MR. SAHAM: Audra, if he is going to be talking about what he considered, I think he needs the complete, so we should probably pause there because there are important portions of this Exhibit 1 missing from his exhibit.

MS. SOLOWAY: We will get it on a break and supplement it. We can come back to this.

Q. Sitting here right now, sir, you don't recall reviewing the public filings of Imperial Oil?

A. I really want to use the full exhibit to refresh my recollection.

Q. Okay. We'll come back to it.

You reference in your report other reports that defendants' expert, Allen Ferrell, has submitted in other cases, is that right?

A. In this report?

Q. In your reply report.

A. Yes.

Q. And did you check before citing those reports by Mr. Ferrell, Dr. Ferrell whether you're permitted to cite them in this case?

Page 33

A. There's a general process. I didn't do that personally. I would expect my staff to do that.

Q. You would expect your staff to confirm that if you cited a report, that it was publicly available?

A. Those are the rules and that's our process.

Q. And are you aware, sitting here right now, whether any of reports you cited are actually not publicly available?

A. No.

Q. Do you know whether the report in City of Westland Police and Fire Retirement System versus MetLife is publicly available?

A. I don't know.

Q. Do you know whether the report in the Anadarko Petroleum Corporation case is available publicly?

A. I don't know.

Q. Are you able to provide copies of those reports?

A. Right now here? No, not here now.

Q. In this litigation are you permitted to provide copies of those reports?

A. I don't know. I'd have to ask counsel.

9 (Pages 30 - 33)

Page 34

Q. How did you select documents to review in order to prepare your opinions in this case?

A. It's research and analysis. There's a process to research and analysis, understanding the question, considering how one might answer the questions, acquiring the data and documents that would be relevant to answering the question. That's what I did.

Q. With respect to -- there are certain documents cited in your report that were produced by Exxon in the case that are not publicly available, correct?

MR. SAHAM: Again, I'm going to object. Those are the ones referenced in the missing pages of the exhibit. You might even have an extra copy.

MS. SOLOWAY: They're also in the footnotes.

Q. I'm asking generally, you're aware that you cited documents that were produced by ExxonMobil in this case, correct?

A. I have an exhibit in my report called Documents and Other Information Considered

Page 35

and that's going to be the best way for me to answer the question accurately, is to refer to that, so I'd really like to see the rest of that exhibit.

Q. Why don't we mark the reply report.

MR. SAHAM: We might even have one that doesn't have writing on it.

MS. SOLOWAY: This is fine. We'll sort it out on a break.

MR. SAHAM: Okay.

(Exhibit 2 marked for identification.)

Q. I'm going to hand you a document we've marked as Exhibit 2. Is that your reply report in this case?

A. Yes.

Q. I just want to make sure -- hang on. You're about to mix up the exhibits. No, no, no, don't put that down. That is the exhibit to your reply report, correct?

A. This is the exhibit to the first report.

Q. I just handed that to you.

A. No, this is what you handed me.

Q. No. I handed you two documents. Pick that piece of paper up, please. Good. Now put

Page 36

it with the other one. Thank you. And now close the other document so you don't confuse them.

MR. SAHAM: This one?

MS. SOLOWAY: Yes, please. Thank you.

A. Got it.

Q. Okay. Are these the two reports that you submitted in this case, sir?

A. Yes.

Q. And if you look at the reply report and there's a list of documents considered there as well, it's Exhibit 1. Do you see that? It's attached. Turn the next page. Do you see that?

A. It's not attached.

Q. Excuse me. It's the attachment to your report, correct? This is Exhibit 1?

A. Yes, it is.

Q. Okay. Do you see at the bottom it says Produced Documents?

A. Yes.

Q. These are documents with Bates numbers, correct?

A. Yes.

Page 37

Q. Do you understand these to be documents that had been produced by parties in the litigation?

A. That's my understanding.

Q. How did you select documents for review that are documents that are produced by the parties in the litigation and not public documents?

A. Well, in the course of the research and analysis, I consider what information I would want to have to either form an opinion or confirm an opinion, and typically I would ask counsel, plaintiffs' counsel, if they know of any documents that bear on the question that I might have. I might explain to them the question and they might say there's some documents that bear on that. In the course of reading those documents, I might either be satisfied that it's complete or understand that it's incomplete. I might return and ask for a more complete production of documents on a topic. Sometimes -- and so that is one way documents arrive to me.

Also, I do believe access to a data

10 (Pages 34 - 37)

Page 38

bank is provided so that my staff can serve that same purpose. I would ask them we should get documents that refer to this or that and they would search the data bank for documents that are appropriate or related to what I'm asking about.

Q. Does your staff have access to all the documents produced in the case?

A. Yes -- no, no. They have access to all the same documents I have, if that's what you mean. I do believe they have access to the documents produced in this case.

Q. And the ones that you've considered are ones you list in your reports, correct?

A. Right.

Q. Sitting here today, is there anything about either your first report or your second report that you believe, sitting here now, is incorrect?

A. Yes. There's a revision I want to make.

Q. What's that?

A. It would be on Page 54 of the reply report.

Q. Okay.

A. In Paragraph 146, I'd want to strike the last sentence of 146.

Page 39

Q. Why are we striking the last sentence of 146?

A. Well, the criticism from Dr. Saunders was that I should have been answering a different question, which I explained was an inappropriate criticism. I answered correctly the question I was asked. He challenged the question, not the answer. So I explain that in the report.

When doing the analysis, I had come to the opinion that it wouldn't matter if I was asked a different question, but in preparing for the deposition and considering what I wrote and the conclusions I arrived at, it became obvious that if a different question was asked, it would require a different answer. So I wrote here it turns out, however, the result would be the same as what I presented, and it actually would not be.

Q. What would it be?

A. Well, I think there's support in the literature for the principle that a bond that has a split rating, meaning in this case it would be, let's say, AAA from one

Page 40

credit rating agency and AA+ from a different rating agency, that when determining what the additional spread or yield is required on a split rating bond, you would average the spreads from those two indices instead of taking the spread from the lower rating index.

So the result is still that there would be hundreds of millions of dollars of extra interest expense that Exxon could have expected to have paid if they had gotten a downgrade to a split rating from their AAA rating, but it's not the same number, the $800 million-plus that I found was the correct answer to the question that I was asked which is what if they were downgraded to AA+.

Q. I just want to make sure I understand this. When you calculated the $832 million number, the question that you were answering was assume Exxon was downgraded to AA+ by both of the credit rating agencies that covered it or only by one of the credit rating agencies that covered it?

A. By both, essentially by both. The question

Page 41

was a little more parsimonious than that. It was assume it was downgraded to AA+, not assume it was downgraded to a split rating that the data providers would assign to a AA+ index, but assume it was downgraded to a AA+.

Q. And so are you withdrawing your opinion that 832 million is the difference in future value of the interest that would be generated on the bonds?

A. No, absolutely not. In fact, that's what I was trying to explain when I explained what the issue here is. The answer to the question I was asked is still the 800 million-plus. If I was asked a different question which is assume that Exxon was downgraded to a split rating, the correct answer is 400 million-plus.

Q. So are you now offering an opinion that subject to that revision of the question, the amount of interest Exxon would have paid over the course of the bonds is 400 million-plus?

A. You're not -- no, that's not it. It's what I said it was, not what you said it was.

11 (Pages 38 - 41)

Page 42

Q. Have you put together a supplemental report to explain where that 400-plus-million-dollar number comes from?

A. No, but Dr. Saunders -- I mean, it's implicit in the revision I've just given you just now. You would take the average -- if the question was revised, then the answer is revised. That's what my opinion is. I'm adding to my opinion that if I was asked a different question, I would give a different answer.

Q. And I'm asking have you put that anywhere on a piece of paper and produced it in this litigation?

A. Not yet.

Q. Are you going to?

A. It depends on what you and counsel decide.

Q. Okay. We'll come back to that. Other than the sentence you just told me that you would strike, is there anything else in either your first report or your second report in this case that you would like to correct?

A. There's always a typo here or there, but nothing substantial.

Q. Okay. Your opinions have not changed?

Page 43

A. Correct. Well, except for that one.

Q. Any other opinions have changed?

A. No.

Q. And are you proposing in this case to offer any opinions other than the ones in your report?

A. If asked, including if asked today, I'll answer to the best of my ability.

Q. Do you propose to come to trial and offer opinions that are not included in either of the reports that you submitted?

A. Not yet. As I sit here now, these reports contain my opinions. Depends on what you ask today, yeah, or what other work might be requested by you or plaintiffs' counsel between now and trial.

Q. Sitting here right now, you have no present plan to offer opinions that are not included in your reports, correct?

A. That's right.

Q. What did you do to prepare for your deposition?

A. I read all the documents, as many as I could, reviewed them, read them, read the reports, my reports, checked computations, consulted

Page 44

with my staff and met with plaintiffs' counsel for a meeting yesterday.

Q. How long did you meet with plaintiffs' counsel yesterday?

A. Approximately five hours.

Q. Are you okay? Do you want to keep going? Do you want a break?

A. I'm fine. Thanks for asking. Let's go a little while longer.

Q. Great.

A. 10 or 15 minutes.

Q. Okay. I want to turn to an understanding of your understanding of the allegations in this case. So you're here as a loss causation and damages expert, correct?

A. I'm here as a finance expert offering opinions about loss causation and damages, the opinions that derive from my analysis of loss causation and damages in this case.

Q. Okay. Do you have an understanding, sitting here today, that the judge in the case has issued a ruling on class certification?

A. I do.

Q. What's your understanding regarding the class that was certified in this case?

Page 45

A. That it extends from February 24, 2016 to October 28, 2016.

Q. I think it's Note 1 of your report if you're looking for it.

A. And that surviving allegations involve issues of Exxon's profitability, reserves and impairments.

Q. We'll come back to that in a minute. Do you understand that the judge ruled in this case that there was no statistically significant reaction to the January 31st, 2017 announcement?

A. I don't know if you would call it a ruling. The judge expressed in a very well-written order that he was persuaded by that or he came, that he observed that the experts that had previously been engaged, Mr. Torchio and Ferrell, thought so. I don't think it was a ruling. There was a ruling based on that understanding, but I don't think it was a ruling about the facts.

Q. What was the ruling it was based on that understanding?

A. That the class period should be terminated on October 28th, 2016.

12 (Pages 42 - 45)

Page 46

Q. So the class does not include the dates between October 28th and January 31st, correct?

A. Depends on -- the class never includes dates. The class includes people, parties.

Q. So the class doesn't include investors who acquired securities between October 28th and January 31st, correct?

A. That's my understanding.

Q. And what is your understanding of why the judge excluded that time period from his class certification order?

A. The judge explained it. He thought that there was no statistically significant reaction to the January 31st, 2017 disclosure about impairments and he based that understanding on his reading of Mr. Torchio's report and Allen Ferrell's report. Those reports were wrong about that issue, and we'll probably talk about that today.

Q. So just to go back, is it your understanding that the judge reached the conclusion that both, that there was no statistically significant stock price movement on January 31st and that the stock price movement should

Page 47

be measured on a close-to-open basis instead of a close-to-close basis?

MR. SAHAM: Objection, calls for a legal conclusion.

A. Yeah, could we look at the document? I recall for sure the statistical significance prong of the basis for the opinion, but I'm pretty sure that he considered Mr. Torchio's analysis that went beyond the opening on January 31st, but ruled the way he did on the class period nonetheless because of non-significance. That's what I recall, but it's in the document. You can show it to me and I'll show you where it is.

Q. So notwithstanding that the judge excluded the January 31st, 2017 disclosure, you have included it in your expert report, correct?

A. Absolutely. It was appropriate to do so based on my expert analysis.

Q. And are you proposing to testify to a jury in the class action about the January 31st, 2017 date?

A. I'll answer any questions that are asked today and then about it, and my answers

Page 48

will be consistent with what I wrote in my report.

Q. And your damages analysis includes damages that result from the purported corrective disclosure on January 31st, correct?

A. Yes.

Q. Were you instructed by lead plaintiff's counsel to include the January 31st, 2017 alleged corrective disclosure in your report?

A. No.

Q. Were you asked by lead plaintiff's counsel to assess the January 31st, 2017 alleged corrective disclosure?

A. I don't think so. I'm not sure. The reason why I'm hesitating in the answer is it was my decision. I don't recall whether my -- I don't recall whether they also suggested it, but it was my decision to do so.

Q. I understand it's your decision. I'm asking whether you were asked by lead plaintiff's counsel to assess the January 31st, 2017 alleged corrective disclosure?

A. I don't -- I don't recall. It was my decision to evaluate damages and that was a necessary part of that analysis. It

Page 49

wouldn't have made a difference if they did or didn't. I just don't recall if they did or didn't, and the reason I don't recall is because it would have been irrelevant.

Q. You had already reviewed Mr. Torchio's analysis at the time that you completed your expert report in this case, correct?

A. Yes.

Q. And you'd already reviewed the class action decision by the judge when you worked on your report in this case, correct?

A. Yes.

Q. You assume in your opinions that the plaintiff will be able to prove the factual allegations, correct?

A. Yes.

Q. And you're not here offering an opinion on whether statements are false or whether defendants had a fraudulent state of mind or the other elements of plaintiffs' claim, you're not here to give an opinion on the merits of those, correct?

A. That's right.

Q. Okay. I want to just understand what your understanding is of what the plaintiffs'

13 (Pages 46 - 49)

**App. 493**

Page 50

theory is. And before you said that you understood it was profitability, reserves and impairments, but I want to break those out and ask you what is your understanding for each of those. So why don't we go one by one. On reserves, what is your understanding of what the plaintiffs' theory is in this case?

A. Plaintiffs' allege that the company should have de-booked the Kearl assets as of or by the start of the class period and that it was misleading not to.

Q. So I want to just drill down on that. What is your understanding of what exactly -- let me just rephrase.

The beginning of the class period is February 28th, correct, 2015 -- 2016?

MR. SAHAM: 24th, I believe, not 28th.

MS. SOLOWAY: Sorry.

MR. SAHAM: You can start over.

Q. Let me start over. Actually, just give me one second. It may help to have your report in front of you. Let me rephrase that question.

Page 51

The first day of the class period is February 28, 2016, correct?

A. February 24th, 2016.

Q. Sorry.

A. As of when the 10-K was filed which was on February 24th, 2016.

Q. Apologies. Thank you for correcting me.

And that 10-K you just referenced, that's the 10-K for the full year 2015?

A. Yes, fiscal year, but it coincides with calendar year.

Q. Okay. And the allegation in this case is that the first alleged misstatement or omission in the case becomes public in that 10-K, correct?

A. That's right.

Q. And with respect to the reserves theory that you were just talking about, what is your understanding of what the alleged false or misleading statement or omission is?

A. That the Kearl assets, properties, should have been de-booked and disclosed as de-booked in that document.

Q. So turn to your first report, please.

MS. SOLOWAY: How do you guys

Page 52

propose we do this? Do you want to swap out a totally new copy or do I just --

MR. BURKHOLZ: Go off the record.

MS. SOLOWAY: Let's go off the record.

VIDEOGRAPHER: The time is 10:15. We're off the record.

(Break taken)

VIDEOGRAPHER: The time is 10:36. We're back on the record.

BY MS. SOLOWAY:

Q. So while we were off the record, Dr. Feinstein, we swapped out your Exhibit 1 for Exhibit 1 that has all the pages. Can you just confirm that you've just had an opportunity to look at it and it now has all the pages?

A. Yes.

Q. And Exhibit 2 is now clipped together so that all the pages are together, correct?

A. Yes.

Q. Okay. And there was one question we were going to come back to which is, I had asked you whether you reviewed the disclosures of Imperial Oil and you said you didn't believe

Page 53

so, but you wanted to look at your report. Can you now answer that question?

MR. SAHAM: Objection to form.

Q. Let me just ask it in an open-ended way. Did you review the disclosures of Imperial Oil in forming the opinions in your report?

A. I read what other experts had said about it, but not the primary source.

Q. So before the break we were talking about what your understanding is of the fraud theory that the plaintiffs have alleged. Do you recall that?

A. Yes.

Q. And you were describing your understanding of the plaintiffs' theory about the proved reserves at Kearl. Do you recall that?

A. Yes.

Q. I believe what you said, and you'll correct me if I've got this wrong, is that it's your understanding that the plaintiffs have pled that as of the end of 2015, Kearl no longer legitimately qualified as proved reserves. Do I have that right?

MR. SAHAM: Objection to form, calls for a legal conclusion.

14 (Pages 50 - 53)

Page 54

A. I understand that that is one of their allegations.

Q. Take a look at Paragraph 30 of your report, your first report.

A. Okay.

Q. Is this consistent with your understanding of what the plaintiffs' theory is about Kearl?

A. Yes. You need all the parts of the paragraph about Kearl.

Q. So Paragraph 30 is consistent with your understanding of what plaintiffs' theory is about Kearl, correct?

A. One moment. (Witness examines document)

MR. SAHAM: Objection to form.

A. I think you'd also have to include Paragraph 29.

Q. Okay.

A. And 31.

Q. Okay.

A. Okay.

Q. There's nothing in Paragraphs 29, 30 or 31 that you, sitting here right now, think is inaccurate?

A. Correct, about plaintiffs' allegations.

Page 55

Q. Great. So that first sentence of Paragraph 30 which says, "lead plaintiff contends that by year end 2015, operations at Kearl, which represented approximately 14 percent of Exxon's proved reserves portfolio, no longer legitimately qualified as a 'proved' reserve." Do you see that?

A. I do.

Q. What is your understanding of what alleged misstatements are implicated by that allegation? I'm just trying to get at what is your understanding of what was misstated in the 2015 10-K by virtue of what's explained in this sentence?

A. I think it's on Page 5 of the 2015 10-K. There's a table of proved reserves and Kearl is not de-booked.

Q. Okay. And, actually, I think this goes to Paragraph 40 of your report?

A. That's only about the reserve portion. There's also a profitability portion which are interrelated.

Q. Let's come back to that, okay? I just want to focus on, in Paragraph 40 of your report you say, "as of year end 2015, Exxon reported

Page 56

that it had 24.8 billion oil-equivalent barrels of proved reserves." Do you see that?

A. I do.

Q. That's a reference to the table on Page 5 that you were just talking about?

A. Yes.

Q. Is it your understanding that the plaintiffs' theory is that that 24.8 billion figure that you're referring there should not have included the Kearl reserves?

A. My understanding is that plaintiffs are alleging that that number is overstated and should have reflected a de-booking of Kearl.

Q. As of the end of 2015?

A. Right, as reported in the 10-K or what could have been reported in management discussion and analysis.

Q. Okay. And what is it that -- again, going back to that table on Page 5 that you referred to, what should the table have said if not 24.8 billion barrel equivalent?

A. Can I see the table, please?

Q. Just give me a second.

Page 57

(Exhibit 3 marked for identification.)

Q. So I'm handing you what's been marked Exhibit 3. It is only excerpts of the Form 10-K, Dr. Feinstein, because the Form 10-K is very heavy, but you asked to see the table on Page 5 and it's there.

A. Right. I needed the 175-page document and this information is on Page 5.

Q. So you asked for Page 5. You now have Page 5, correct?

A. Got it.

Q. Okay. What is your understanding of what this table should have reflected if it had been accurate but for the defendants' alleged fraud?

A. I really need to hear the wording of your question again.

Q. Sure.

A. Could the court reporter read it back or you read it back?

MS. SOLOWAY: My realtime is not working at the moment, so please.

(Question read)

A. I'm not offering an accounting opinion.

15 (Pages 54 - 57)

Page 58

We discussed earlier I'm not an accountant. I think I can help you. I think what you're asking is what is my understanding of what plaintiffs are alleging.

Q. Mm-hmm.

A. I think you're asking what is my understanding of what the plaintiffs are alleging, which is different from what is my opinion about what the table should look like. I understand that plaintiffs are alleging that there should be some indication here that Kearl should have been de-booked as of this date, and exactly how that indication is manifested in the 10-K is really a question for the accounting experts. But as a financial expert, I would understand, I understand that there's a number of ways that information could have been provided, and it's not provided, according to plaintiffs, anywhere in the 10-K that Kearl should have been de-booked.

Q. Okay. And with respect to this table in particular, is it your understanding of the plaintiffs' pleaded theory that this number of total proved reserves, that 24,759 at the

Page 59

bottom which you also reference in Paragraph 40 of your report, should have been reduced by the amount of Kearl?

MR. SAHAM: Objection to form.

A. Well, you said pleaded theory, so I'm not opining about what their pleaded theory is. I do recognize and understand what their allegations are. The legal process of how you go from allegations to pleadings is something they teach in law school and I didn't go to law school, but I understand their allegations are that there should be a recognition here, an indication that Kearl should have been de-booked.

Q. In what way?

A. I'm not an accountant, so I can tell you I've seen it as a financial expert, I've seen discussions like that in the notes that are attached to a 10-K, or the section called management's discussion and analysis. The numbers would likely be different, but I do understand as a consumer of accounting information that there's no indication here that Kearl was de-booked and the allegation is there should have been an indication here

Page 60

that Kearl should have been entirely de-booked.

Q. If Kearl had been entirely de-booked, in what amount would that de-booking have represented?

A. Entirely, entirely. There's 3.6 billion barrels equivalence or 3.5 billion barrels equivalence, somewhere in that area because it changed as they're taking oil out. That's another way that proved reserves fall. The numbers I see in this case are that it's 3.6 or 3.5 billion barrel equivalence.

Q. Is that 3.5 to 3.6 the number of barrels that were de-booked later by Exxon for the full year 2016? Is that where you're getting that number from?

A. Right. They did, ultimately the number they presented, there could be some rounding, they rounded off to the first decimal. They said 3.5 billion, so what they ultimately -- well, on October 28th they said that it would be 3.6 billion and then later the number showed up as 3.5, but what's the key part is that it's 100 percent of Kearl, whatever

Page 61

Kearl was, and analysts from the company knew what Kearl was, it was entirely the amount.

Q. Again, just to be clear, the allegation, as you understand it, is that entire amount should have been de-booked as of the year end 2015?

A. My understanding is that the allegation is that it should have been represented in this 10-K as of this date that was made and available to analysts and investors that Kearl should have been de-booked.

Q. And then with respect to Kearl, is there anything else that it's your understanding was misrepresented by defendants in the Form 10-K?

A. Yes.

Q. 2015?

A. Yes.

Q. Please tell me what.

A. On Page 9, Page 9, this would be an affirmative misrepresentation that plaintiffs are alleging and there's also a number of omissions related to it, but the issue is that plaintiffs are alleging that the truth was that the company was losing money on

16 (Pages 58 - 61)

Page 62

every barrel produced at Kearl, and that is not represented on Page 9 and the numbers that would indicate a profitability of bitumen per barrel is, therefore, misleading.

Q. Which numbers in particular on Page 9 are you referencing?

A. They're small, but I'll tell you where they are. If you look at Page 9, you have words in the left-hand column. You've got numbers in a column where the heading is United States, and then you've got numbers in the third column which says Canada/South America. As you start from the top of that column and work your way down, you end up with a number that is alongside an indicator or legend, bitumen per barrel. And it says -- scroll down some more. Average cost per barrel bitumen says $19.2 per barrel. And moving down the column further, there's something that says average production prices, bitumen per barrel, and the number there is 25.07. So the spread between 25.07 and 19.20 would give the misimpression to the market that the bitumen operations were profitable and plaintiffs are alleging they

Page 63

were not.

Q. Are plaintiffs alleging that all of the bitumen operations were not profitable?

A. No, but Kearl is 75 percent of Canada, of what would be covered here in Canada, South America bitumen production. So with profit numbers that high, financial analysts, investors, equity analysts would be given the misimpression that Kearl was profitable, whereas the truth, according to plaintiffs, is that it was not.

One moment. I have this written in my report and I just want to refer back to the wording that I used, if I can find it. Paragraph 62 addresses what I was just describing. I'll read from it. It says, "the company presented detailed data on average production prices and average production costs for each geographic region" -- I'm sorry, "for each geographic area," and I cite to this document. "For fiscal year 2015, the reported average production price per barrel of bitumen was 25.07." What I mean by that is it was reported to be 25.07. The reported average production

Page 64

cost per barrel of bitumen was 19.20 and that's the reported number, indicating an average profit per barrel of bitumen production of approximately $5.87 equal to the difference between the $25.07 average production price and the $19.20 average production cost per barrel. Plaintiffs are alleging that was misleading and concealed the true conditions at Kearl.

Q. Is it your understanding that plaintiffs' theory that the $19.20 or the $25.07 are themselves incorrect?

A. Well, my understanding is they believe these numbers were misleading. The spread between them, I believe, they say is false and misleading.

Q. So let me focus like a laser on one of these numbers. The average production cost per barrel of bitumen that you drew my attention to before was 19.20. Do you see that in the table?

A. I see it in the table and also in my Paragraph 62.

Q. Is it your understanding of plaintiffs' theory that that number 19.20 is incorrectly

Page 65

calculated?

A. I'm going to stand by my answer that I gave you. What they're alleging is that the spread between cost and price is false and misleading. Which of these numbers is more false, I don't recall at the moment. It doesn't really matter. What matters is the spread.

Q. That's what I'm trying to get at. Is it your understanding of plaintiffs' theory that either of these numbers are actually inaccurately calculated?

A. The answer I gave is the complete answer. It's the spread between the two numbers that they are alleging is false and misleading. Which number is more false, I don't know if that's something they're alleging, but I do know that it doesn't matter based on their allegations. Their allegation is that the spread between the two numbers is false and misleading.

Q. Sitting here today, can you tell me what the average production cost per barrel for bitumen should have been under plaintiffs' theory if not 19.20?

17 (Pages 62 - 65)

Page 66

A. Some number that would have indicated a different spread. The answer is yes, to the extent that, as it's relevant for financial analytic purposes and for calculating loss causation and damages, some number that would then produce a spread that wasn't positive showing a profit. It should have been a number that somehow indicated that Kearl was not profitable.

Q. But sitting here today, you can't tell me what 19.20 should have been, correct?

A. That's correct, and I explained that what matters is the spread, not the number.

Q. And sitting here today, you can't tell me what 25.07 should have been, correct?

A. I can give the same answer I gave before. I can tell you that it should have been some number that, together with the number they gave for cost, would indicate to the market or inform the market that Kearl wasn't profitable.

Q. I think you've just walked me through the two Kearl theories, right? One is the proved reserves on Page 5 we looked at together,

Page 67

correct? And the other is this table on Page 9 that we just looked at together. Is there anything else about Kearl, to your understanding, that plaintiffs alleged was misrepresented in this case?

A. There's a lot of color you can add to those two misrepresentations. It's relevant that -- if you're asking are there more misrepresentations or affirmative misrepresentations, no. Are there more omissions? Probably. Kearl represented a large portion of the company's reserves and the allegation is that these numbers concealed that this field, this operation, these assets that the company had previously presented as their future were not profitable.

Q. So I'm not asking this in an abstract way. I'm asking this in a concrete way. We've looked at two tables together and you've explained to me your understanding of plaintiffs' theory for why they're false or misleading. Is there anything else that, to your understanding, plaintiffs allege about Kearl was false or misleading in the

Page 68

2015 10-K?

A. I think we hit the highlights.

Q. Okay. You mentioned omissions a moment ago. Do you have an understanding that plaintiffs' theory is that there was some information that was required to be provided but wasn't provided?

MR. SAHAM: Objection to form.

A. I did see that. There's somewhere it's alleged that -- I also know it as a financial analyst that there are ways that the company could have informed the marketplace about the lack of profitability and need for de-booking at Kearl, so the fact that the company didn't do that would suggest that there were omissions.

Every single day during the class period before the market knew that Kearl had to be de-booked the market was kept in the dark about lack of profitability at Kearl.

Q. Does part of your damages analysis in this case include that type of omission that you just referenced?

A. Well, I recognize that the misrepresentations

Page 69

were not corrected until the de-booking, and I explained that I take the calculated artificial inflation caused by the misrepresentations back to the start of the class period. Clearly that's premised on that misrepresentation, that things that could have been said to correct the misrepresentations were omitted and not said throughout the entire class period until the October 2016 corrective disclosure.

Q. Do you have particular dates in mind on which you believe those omissions happened?

A. There's a legal definition of "omission" and then there's a lay person or a financial, an analyst definition of "omission." My analysis tells me that the market was kept in the dark about the lack of profitability at Kearl for several months. So on every single one of those days the company omitted, this is not in a legal sense of the word, but at least in the vernacular or financial analytics sense of the word, the company omitted informing the market about the true profitability and lack thereof and the need for de-booking at Kearl.

18 (Pages 66 - 69)

Page 70

Q. You understand that to be part of plaintiffs' fraud theory in this case?

A. That the market was not informed until the October 28th disclosure, yes.

Q. The omissions that you just referenced, do you understand that to be part of plaintiffs' theory?

MR. SAHAM: Objection to form.

A. I did explain that omission as a legal definition so I'm not answering with respect to a legal definition of omission, but financial analysts did point out when they did learn the truth that facts had been omitted and misrepresented and they were misinformed.

Q. Financial analysts pointed that out?

A. At the end of the class period, that's right.

Q. They said "we were misinformed"?

A. Yes.

Q. In those words, "we were misinformed"?

A. Not in those words, but that's what they wrote.

Q. Which financial analysts are you referring to?

A. It's in my report. Let me find it. It's

Page 71

here.

Q. I'll wait for you to find it. I'd very much like to see which analyst said that.

(Pause)

A. I'm pretty sure it was Raymond James. Here it is.

(Pause)

A. I know it's here.

Q. Why don't we do this. You can spend time looking on your next break, and if you're able to find it, you'll let me know. Let's move on.

I want to go back to your understanding of the plaintiffs' theory. You just walked me through your understanding of the plaintiffs' theory on Kearl, correct?

A. Wait a minute. Actually, just give me one more minute. I remember more about it. He pointed out that -- I think it was more of a comment about the impairments. He said that we were told that the company doesn't take impairments and now they're taking an impairment.

Q. We're not talking about impairments now, are we? So you're not aware of any analyst

Page 72

who said that about Kearl, correct?

MR. SAHAM: Objection to form.

A. I'd have to think about it.

Q. You can think about it and we'll move on. Going back to Kearl, sir.

A. Yes.

Q. You just walked me through your understanding of the plaintiffs' theory about Kearl, correct?

A. My understanding of plaintiffs' allegations with respect to Kearl, that's right.

Q. And when were the alleged corrective disclosures that you focus on in your report with respect to Kearl?

A. October 28th, October 28th, 2016 when the company announced that they were going to de-book Kearl in its entirety.

Q. Do you have an understanding about whether, when the company made that announcement, they said that they were going to de-book Kearl, they were saying that they were going to de-book it for 2016 or for 2015?

A. Well, they were pretty clear that it would show up in the 2016 accounting, but the market learned from that that Kearl -- the

Page 73

company was clear that based on conditions as they were at the time of that announcement which was in 2016, costs were above price. They said that in order for them not to de-book, they would have to see a rebound in prices, so that informed the market that at current prices and current market conditions, Kearl was not profitable.

Q. Did the company ever communicate that it should have de-booked Kearl for full year 2015?

MR. SAHAM: Objection to form.

A. Well, I mean, they're fighting this case, right? They hired you to fight the case. I mean, no, they haven't admitted to that. I think that's one of the contentious issues in this case that the company is saying no and plaintiffs are saying yes, that they should have de-booked Kearl for 2015.

Q. So I'm not talking about what is being discussed in this case. I'm asking about public disclosures. When, if ever, did Exxon communicate that as of year end 2015, Kearl should not have been included within its proved reserves?

19 (Pages 70 - 73)

Page 74

A. They didn't. That's why there's a lawsuit.

Q. Sir, I want to make sure you're understanding the question. Are you with me?

A. Yeah.

Q. Okay. We looked at this Form 10-K together, correct?

A. Right.

Q. We looked at table, the table on Page 5 together, correct?

A. Right.

Q. We looked at the total number of proved reserves in the bottom right-hand corner of that table, correct?

A. We looked at Page 5 and Page 9, yes.

Q. My question for you is, Exxon disclosed in the 10-K that the total proved reserves as of the end of 2015 was this 24,759 billion number, correct, Page 5?

A. Where were you reading the 25 number from?

Q. Bottom right-hand corner, 24,759. Do you see that?

A. Yes, but it's the bitumen column that is more at issue here.

Q. I'm focusing on the first theory you articulated which had to do with total

Page 75

proved reserves. Are you with me? You said Kearl should have been booked in its entirety earlier. Do you remember that?

A. Of course, but maybe we're not on the same page. The page is 5, Page 5, and the column is the bitumen column.

Q. What number are you looking at, sir?

A. 4,108 for Canada and South America bitumen. To the best of my knowledge, there's no bitumen in South America, so that's Canada. The bottom of that number is 4,560 and plaintiffs are alleging these numbers are false and misleading and should have been different.

Q. Okay. My question for you is when, if ever, has Exxon disclosed that those numbers as of the end of 2015 should not have included the Kearl assets?

A. That's the problem. They didn't ever fess up to that. Plaintiffs are saying that they should have. Maybe they'll do it today, but they didn't yet and they didn't then and plaintiffs are alleging they should have.

Q. Okay. And the corrective disclosure in October, are you with me?

Page 76

A. Yes.

Q. The corrective disclosure, you said that that was the first time that the public found out that Exxon may de-book the 3.6 billion barrels from Kearl, correct?

MR. SAHAM: Objection to form, vague.

A. If I'm understanding your question correctly, I would say yes.

Q. Okay. And that disclosure concerned proved reserves for full year 2016, correct?

A. That disclosure informed the market of what the company was likely to do for its accounting for the 2016 10-K, and plaintiffs are alleging they should have done that a year earlier.

Q. Did Exxon ever make a disclosure akin to the one that they made for 2016 about the 3.6 for 2015?

A. You don't think I answered that question already?

Q. I just want to make sure we're understanding each other. They did not, correct?

A. Exxon has not yet and did not ever admit to what plaintiffs are alleging that Kearl

Page 77

should have been de-booked in its entirety as of, for the year 2015.

Q. And, in fact --

A. And that's why it was unknown to the marketplace until the announcement in October 2016 that Kearl was not profitable.

Q. Now we're combining two theories, right? Now we're on the second theory?

A. No, no. The profitability of Kearl is, either of these misrepresentations, if they had been corrected, could have informed the marketplace about the truth of Kearl, but because neither of them had been corrected until October of 2016, the market was misinformed by these alleged misrepresentations and omissions.

Q. Okay.

A. There's two identified sets of misrepresentations, but what was concealed by them is the same thing, the lack of profitability at Kearl.

Q. Okay. So I want to take a step back here. Companies, public companies in the United States file annual reports on Form 10-K, correct?

20 (Pages 74 - 77)

Page 78

A. That's right.

Q. And Exxon filed a 10-K for the full year 2015 in February of 2016, correct?

A. Yes.

Q. And that's the document that we've been looking at excerpts of in this exhibit that we've been looking at, correct, Exhibit 3?

A. That's right.

Q. Okay. And the information that we've been looking at, including the numbers cited in Paragraph 40 of your expert report, the 24.8 billion oil-equivalent barrels which appears on Page 5, that information is a total proved reserves number as of the end of 2015, correct?

A. Yes.

Q. Okay. You understand that Exxon also had to file a Form 10-K for 2016, correct?

A. That's right.

Q. And that's for information for the following year, correct?

A. Well, I don't know if I would characterize it exactly that way. It incorporates information, purportedly it's supposed to incorporate information and updates to the

Page 79

prior information based on the most recent year. Analysts may read it somewhat differently.

Q. Do you understand that Exxon reports total proved reserves on an annual basis?

A. Yes.

Q. And it reported in the Form 10-K for 2015 as of the end of 2015 total proved reserves, correct?

A. That's what the case is about. They purported to, and plaintiffs are alleging that that reporting was false and misleading and violated various accounting rules.

Q. Okay. When Exxon filed its Form 10-K for the full year 2016, it also included, among other information, total proved reserves as of end of 2016, correct?

A. Purportedly. I mean, they filed a report. It had numbers in it and that's what they purported to be representing.

Q. In the October corrective disclosure that you mentioned earlier, do you remember mentioning that earlier?

A. Oh, yeah.

Q. And that disclosed, I think you said, the

Page 80

3.6 barrels at Kearl, correct?

MR. SAHAM: Objection to form.

A. Billion.

Q. What did I say? Let me add a word. You referenced earlier the October corrective disclosure?

A. Yes.

Q. And that disclosed 3.6 billion barrels that may need to be de-booked from Kearl, correct?

MR. SAHAM: Objection to form.

A. It's a little stronger than that. They gave an indication that it was likely to happen.

Q. Is it your understanding, sitting here today, that that de-booking would be for the 2016 Form 10-K reporting of proved reserves?

A. Yeah, I mean, if you're asking where does the number go, what table does it go into, they were telling the market that they would put it into the 2016 10-K that would be filed around February of 2017, but it informed the marketplace about what was going on at Kearl even then as the company was

Page 81

speaking.

Q. Did it inform the market that the number of proved reserves reported as of the end of 2015 was incorrect?

A. Well, I don't know exactly for -- I don't know if it informed everybody, but plaintiffs are alleging that there should have been a disclosure that would have informed everybody. So I don't -- as of the time of the date of the disclosure, the market learned the truth. Did they learn that they were duped? I don't know. That's not my opinion.

I saw some analysts that indicated that they did feel mislead that we were talking about earlier, but my opinion is not that they learned they were duped. They learned the truth. It's the truth that plaintiffs are alleging should have been disclosed earlier.

Q. Okay. Let's go back to my actual question. I'm only talking about proved reserves. I'm not talking about impairments yet, okay? Did the market -- can you cite as an analyst in the marketplace who upon

21 (Pages 78 - 81)

App. 501

Page 82

receiving the alleged corrective disclosure in October of 2016, understood that to mean that the 2015 proved reserves had been incorrectly reported?

MR. SAHAM: Objection to form.

A. I see the distinction you're trying to make. You're asking did the disclosure tell people the truth that was concealed or did the disclosure tell people that they were misled by the disclosure.

For purposes of calculating damages and assessing loss causation, I don't need to make that distinction, so I probably should back off of offering any new opinion here now. It doesn't make a difference to my calculations whether the market learned the truth that was concealed or learned that they had been deceived by the misrepresentations and omissions.

Q. I'm not asking about deception. I'm just asking information purposes. The 10-K for 2015, to your knowledge, has any number in that 10-K ever been restated?

A. No, to my knowledge, it has not been restated.

Page 83

Q. So I'm asking you can you identify, sitting here today, any public disclosure by Exxon, and I'm not asking that communicated that Exxon deceived people, but merely that communicated that the 2015 proved reserves number was wrong?

MR. SAHAM: Objection, asked and answered.

A. I mean, this is the evidence that plaintiffs are I understand going to use to support their case that the de-booking should have happened earlier. It's the entire body of evidence that plaintiffs are intending to use to prove that point.

Q. But I'm not asking that question. I'm asking a different question, which is whether, sitting here right now at this moment, you can point to a public disclosure by Exxon that the 2015 proved reserves number should not have been 24.8 billion oil-equivalent barrels, but instead should have been something else?

MR. SAHAM: Objection.

A. You've asked that question before and I answered by saying that's why there's a

Page 84

dispute here, that's why there's a lawsuit. Plaintiffs are saying that there's evidence that they should have de-booked and the company hasn't yet agreed.

Q. Okay. I'm going to take that answer to mean that you cannot identify such a public disclosure.

MR. SAHAM: Objection to form. Is that a question?

MS. SOLOWAY: It's not. It's me just making my record and feeling better. Thanks, Scott.

Q. We're going to move on to impairments.

A. Okay.

Q. Let me just ask, is there anything else about the plaintiffs' theory about Kearl that we haven't talked about that you understand was misstated that we haven't discussed yet?

A. Everything in my report about it, so yes. I analyzed it intensively. I give quotes from the company, I give quotes from analysts, how analysts received it. I wrote about the questions that analysts asked at the conference call in the morning after

Page 85

trading started on October 28th. I have all of that in my report.

Q. Thank you for the speech.

A. It was the answer to your question.

Q. Are there any alleged falsities about Kearl that you understand to be part of plaintiffs' theory that we have not yet discussed this morning?

A. Probably.

Q. What are they?

A. I don't know. If you ask the questions about them, I'll answer them. I understand there's a lot of nuance and plaintiffs are marshalling a lot of evidence to prove their case.

Q. I'm not asking about their evidence. I'm asking what your understanding is of what the plaintiffs allege was misstated. You told me about the proved reserves at Kearl and you told me about the profitability of bitumen. Is there anything else about Kearl we haven't discussed this morning that you understand to be part of plaintiffs' fraud case?

A. I would agree that the way you described it

22 (Pages 82 - 85)

Page 86

are the category names. What goes in that category we haven't discussed.

Q. Okay. Is there anything else you'd like to add to the category names?

A. Yes. Everything in my report.

Q. Let's move on to impairments. You mentioned earlier that you also analyzed plaintiffs' theory that ExxonMobil should have taken impairments. Is that of the Rocky Mountain Dry Gas assets?

A. Yeah, plaintiffs are alleging that the impairments that ultimately were taken with respect to three of the four RMDG assets were taken late, that they should have been taken by the start of the class period.

Q. Is it your understanding that plaintiffs' theory is that the Form 2015 10-K that we were just looking at together is false or misleading because it does not communicate the impairment of those Rocky Mountain Dry Gas assets?

A. Yes.

Q. And what aspect of the Form 10-K do you understand is false or misleading by virtue of that?

Page 87

A. That they didn't take the -- that they didn't recognize an impairment on those assets. Plaintiffs are alleging that those assets should have been recognized as impaired.

Q. Are there specific words in the 10-K that, to your understanding, the plaintiffs are alleging are false and misleading based on this Rocky Mountain Dry Gas asset impairment issue?

A. Well, that it's missing, that the impairment is not taken. And yes, book value, book value is reduced when impairments are taken, and the book values were not reduced to recognize the impairment that plaintiffs are alleging should have been recognized.

Q. And how much, to your understanding, do plaintiffs allege the book value should have been reduced by as of the end of 2015?

A. Well, it's a number commensurate with what the impairment ultimately was, which was, I think, about 85 percent of $2 billion.

Q. When, to your understanding, did the public first learn about this alleged fraud?

A. When the impairment was taken.

Page 88

Q. When was that?

A. That was January 31st, 2017.

Q. Is there any other time when the public learned that Exxon made false or misleading statements or omissions about impairments in connection with the Rocky Mountain Dry Gas assets?

MR. SAHAM: Objection to form.

A. They may have learned more after that date about specifics, but on that day there was an impairment announced pre-trading and there was discussion about the impairment once trading started, and that's when what plaintiffs are alleging the bulk of what they're alleging was concealed was disclosed. There may have been other nuance later, but there hadn't been any up to that point, and I analyzed that day to see how the market reacted to those announced impairments.

Q. Is it your understanding that the alleged false or misleading statements about the Rocky Mountain Dry Gas impairments were corrected by any information that was released on October 28, 2016?

A. If you look carefully at the company's

Page 89

language when they talk about impairments, no, the market did not learn what they ultimately learned. They learned -- they were told that the company always checks for impairment at the end of the year and they were told that gas prices had gone down, but they did not learn about the impairments until the impairments were taken.

Q. To your understanding, is the October 28, 2016 disclosure by Exxon a corrective disclosure of the alleged false and misleading statements about the Rocky Mountain Dry Gas impairment issue?

A. No, it is not.

Q. And so for the purpose of your analysis, you treat the January 31st, 2017 disclosure as the alleged corrective disclosure for the alleged fraud relating to the Rocky Mountain Dry Gas impairment issue?

A. Yes.

Q. I just want to spend a minute on that. So, again, going back to the conversation we had earlier, Exxon has to report annually on Form 10-K, remember?

A. That's right.

23 (Pages 86 - 89)

**App. 503**

Page 90

Q. Okay. Did Exxon ever disclose that the impairment analysis it had conducted for full year 2015 was incorrect in any way?

MR. SAHAM: Objection to form.

A. They haven't admitted to the allegations, as far as I know.

Q. Is there any public disclosure -- even putting aside whether they've made admissions, is there any public disclosure that you're aware of that has revealed that the 2015 impairment analysis was improperly reported?

A. One moment.

(Pause)

MS. SOLOWAY: I'll just put on the record the witness is taking a pause to read from the document.

A. Okay. So can I hear your question again? I think the answer is on Page 40, but let me review it.

Q. Page 40 of what?

A. Let me hear the question again, please.

MS. SOLOWAY: Madam Court Reporter, could you please do that?

(Question read)

Page 91

A. Well, I mean, Barclays analysts reported with these words.

Q. What page? Tell me where you're reading, please.

A. Page 40, Paragraph 95, the second block quote.

Q. Of your report?

A. Yes.

Q. Just let me get there. I'm not asking you to read your report out loud. I'm capable of reading it myself. Just give me a minute.

MR. SAHAM: Do you still want him to answer that question?

MS. SOLOWAY: Hang on. I just want to get there.

Q. I'm at Paragraph 95 of your report. And could you just direct me to where you're looking on the page?

A. The bolded words in the middle, there's bolded at the top, the bottom and the middle. It's the middle bolded words.

Q. Okay. And where in those bolded words does it indicate that the impairment of the natural gas assets in the Rockies was effective as of year end 2015?

Page 92

A. Well, it says here that investors were surprised especially because of the company's unchanged stance on impairments previously.

Q. Where are you looking?

A. Where I told you.

Q. Can you read the words out loud.

A. "Impairments and reserves. Investors were likely at least somewhat surprised by the $2 billion asset impairment especially considering ExxonMobil's prior unchanged stance on impairments as of the third quarter 2016 earnings update following the launch of the SEC's probe."

Q. So this refers back to a third quarter update, does it not?

A. Right.

Q. When was that?

A. That was in October.

Q. This says third quarter 2016.

A. Right. October 2016 would have been the third quarter earnings update.

Q. I'm sorry. I wasn't following what you were saying. I'm asking whether there's any public disclosure that you're aware of that recognizes that as of the year

Page 93

end 2015, Exxon's impairment analysis was inaccurate or otherwise improperly reported?

A. You used the word "any." The fact that this analyst is pointing out that people are surprised because impairments weren't taken sooner and there was indications that there was no, the company represented there was no need to take impairments sooner, that's an indication that investors understood that impairments should have been taken sooner.

Q. Can you point to anyone who recognized that impairments should have been taken as early as the year end 2015 in particular?

A. No. Plaintiffs are alleging that and plaintiffs have their expert accountant concurring.

Q. Other than plaintiffs, can you identify anyone who you're aware of who publicly stated that the impairment of the Rocky Mountain Dry Gas assets for 2016 somehow means that the 2015 impairment analysis was incorrect?

MR. SAHAM: Objection to form.

A. If we just cabin or confine my answer to

24 (Pages 90 - 93)

Page 94

address exactly the words of the question you asked, I think implicit in analyst commentary, there's surprise which is an indication that there was some suspicion that impairment should have been taken sooner, but I didn't see anything that direct, the way you phrased it.

Q. Nothing specifically linking back to 2015?

A. Oh, no, it all links back to the past, but I don't want to say there's nothing linking back to 2015. That's not correct at all. It all links back to the past. There's surprise that -- people were not expecting impairment especially of a major asset like Rocky Mountain Dry Gas. That also implies that they feel they may have, they should have been informed sooner.

Q. Okay. I'm just, again, going back to core principles here. Can you identify any analyst or other public disclosure who concluded that the impairment of the Rocky Mountain Dry Gas assets in 2016 means that the 2015 impairment analysis was inaccurate in some way?

MR. SAHAM: Objection to form.

Page 95

A. I think I answered that question. I hear what you're trying to establish with your question, but I think it's misleading.

When investors and analysts say they were surprised by a disclosure, that is an indication that they feel that they were previously misinformed or uninformed, and so that's an indication that there should have been better disclosure sooner.

Q. But sometimes when the market is surprised, there's no indication that it should have been disclosed sonner, correct? Let me rephrase the question.

It's not always true that just because the market is surprised, that that means that something should have been disclosed earlier, correct?

A. I would agree that that's true except in this particular case, this quote on Page 40 of my report says that the reason for the surprise is what the company had told people sooner.

Q. Okay. I want to ask you a question about -- and you can turn to Paragraph 162 of your report.

Page 96

A. Paragraph 162?

Q. Mm-hmm.

A. I'm there.

Q. Okay. In your Paragraph 162 you reference the number $2.63, correct?

MR. SAHAM: Objection.

Q. I misread that. Withdraw that question. Apologies.

In that paragraph, at the end you reference the number $2.39. Do you see that?

A. I do.

Q. What does $2.39 represent?

A. That's the amount of the decline in the stock price that was caused by the disclosure of the Kearl, the Kearl de-booking and everything it implied.

Q. Is there any portion of that $2.39 that you attribute to issues relating to the Rocky Mountain Dry Gas impairment issue?

A. No.

Q. So that number, $2.39, is entirely Kearl, in your view?

A. Yes.

Q. And if I draw your attention to Paragraph 166 of your report.

Page 97

A. Yes.

Q. You reference $1.05 in that paragraph?

A. I do.

Q. What does $1.05 represent?

A. That's the decline caused -- decline in the ExxonMobil stock price caused by the disclosure of the impairment of just those Rocky Mountain Dry Gas assets that plaintiffs are alleging should have been impaired earlier.

Q. Okay. Is there any part of the $1.05 that you ascribe to anything Kearl-related?

A. No.

Can we take a break?

Q. Of course, absolutely.

VIDEOGRAPHER: The time is 11:35. We're off the record.

(Break taken)

VIDEOGRAPHER: The time is 11:56. We're back on the record.

BY MS. SOLOWAY:

Q. So I wanted to just go back to the table on Page 9, Exhibit 3 of the 10-K. Let me know when you're there.

A. Okay.

25 (Pages 94 - 97)

Page 98

Q. When we spoke earlier, I think you used the word "categories" to describe the two theories about Kearl. You said there's one category that relates to this profitability issue and then we also talked about the proved reserves issue. Do you remember that?

MR. SAHAM: Objection to form.

A. I don't think I said it exactly that way. Both misrepresentations misinformed the market about the same thing.

Q. Which is?

A. That Kearl wasn't profitable.

Q. With respect to this table, you mentioned the spread between the 19.20 and the 25.07. Do you remember that?

A. Yes.

Q. Do you know what regulations govern the presentation of these numbers?

A. No.

Q. Do you know whether CAPEX is included in the calculation of these numbers?

A. I think they're not, but I'm not an accountant. I'm not sure.

Q. What about depreciation?

Page 99

A. Same thing.

Q. Not sure?

A. No, I'm pretty sure it's not. They're not in there. It's -- well, price is an index price minus certain costs and those costs do not include depreciation in CAPEX, so those numbers would not be in here.

Q. So is this a cash flow analysis, then?

A. This is a mandated analysis on per-barrel profitability, basically, cost of producing versus the price the company would receive with some adjustments and some structure how those numbers are calculated.

Q. Mandated by whom?

A. I think it's the SEC.

Q. Have you personally looked into how these numbers were calculated?

A. No.

Q. Are you offering an opinion as part of your expert report that they were calculated inaccurately?

A. You asked me exactly that question before. I'm not offering an accounting opinion, but I am expressing that I do know how the numbers and presentation like this would

Page 100

be received and interpreted by financial analysts, equity analysts, valuation experts, and I understand that there is an accounting expert who has concluded the numbers were wrong.

Q. So if you assume -- I just want to make sure. So you're assuming that the plaintiffs are able to prove through other evidence including their accounting expert that these numbers are wrong? You assume that for purposes of causation and damages?

MR. SAHAM: Objection to form.

A. That they were misleading. I believe their allegation is they were false and misleading, but yeah, I think that's their allegation. These numbers are, constitute a false and misleading affirmative statement.

Q. And how much, if any, of your damages calculation for Kearl do you attribute to these particular numbers in the table at Page 9 being false or misleading?

A. Well, the truth about Kearl could have been disclosed in a number of different ways, so the fact -- because any disclosure would have informed the market about the

Page 101

truth, a variety of disclosures could have informed the market about the truth so it's $2.39 per share.

Q. Is there any subset of the $2.39 per share that you attribute to the alleged misleading nature of the spread between the 19.20 and the 25.07?

MR. SAHAM: Objection to form.

A. I'm accepting as an assumption that it's proved that these numbers are, in fact, false and misleading, or false, rather, and I'm accepting that the truth about Kearl was different from what's represented by these numbers. I didn't go and visit Kearl myself so I'm accepting that the condition was different than what was represented by these numbers, and my conclusion is that because of these numbers, the market was not expecting the de-booking and that if the de-booking had occurred earlier as plaintiffs are alleging it should have occurred, the stock price would have fallen $2.39 then when the market learned the truth about Kearl not being profitable.

Q. If the court were to hold that the

26 (Pages 98 - 101)

Page 102

information presented in Table 9 is accurate and wasn't required to be presented in any different way, would that change your damages calculation for Kearl, the 2.39?

MR. SAHAM: Objection to form, calls for a legal conclusion.

A. Well, not really because, as I just explained, the damages occur because the market was misled about the lack of profitability of Kearl. If the court decides that this document didn't have to be any different, the proved reserves document according to plaintiffs could have also disclosed that same truth. That's on Page 5.

Q. So just to be clear, you don't have a breakdown of that $2.39 as between the alleged misstatements on Page 9 and, for example, the alleged misstatements on Page 5 of the Form 10-K?

A. The way I would express it is both alleged misstatements and all the omissions fortified the concealment of the true condition of Kearl, and had either of them been more perspicuous or transparent or informative or had there been another document that could

Page 103

have informed the marketplace of that important fact, the inflation would have come out of the stock price on the day of that disclosure rather than when it did.

Q. So I just want to make sure we're totally clear on this. I want you to imagine a situation where at summary judgment the court looks at the table on Page 9 of the 2015 Form 10-K and says, this information was presented in accordance with all SEC rules and GAAP and is not false or misleading. So that argument drops out of the case. Are you with me?

A. I understand.

Q. Okay. What is the damages number that you would propose to present to the jury in that situation for Kearl-related liability?

A. So if the court says that this document did not have to be the document to expose the truth, there's another document that should have and could have, the damages would be the same.

Q. Are you aware of any public disclosure either by Exxon or any other public commentary from anyone else that discloses

Page 104

that with respect to the 2015 10-K that contained this $19.20 and this $25.07, that these numbers were incorrectly calculated?

A. I didn't do research into that area. I mean, as I said in my report, I relied on the assumption that plaintiffs would prove their factual allegations which is that the truth was other than what these numbers portray.

Q. Dr. Feinstein, you are a causation expert in this case, correct?

A. I assess loss causation, I assess that the alleged misrepresentations and omissions caused investor losses, and part of that analysis said that I would assume the factual allegations, not the liability, but the factual allegations, plaintiffs' factual allegations.

Q. Isn't it also the job of a causation expert to review public disclosures to determine when or if the truth has been revealed?

A. I did that. I did not see the truth revealed about Kearl being unprofitable elsewhere to the extent that was disclosed by a de-booking of the entire property.

Page 105

Q. So you didn't find any corrective disclosure with respect to the chart on Page 9 of the reported average production cost per barrel for bitumen; you didn't find anything public that corrected that, correct?

MR. SAHAM: Objection to form, misstates prior testimony.

A. Yeah, it's the spread between the cost and the price that is what's misleading. And I never said that either the cost by itself was wrong or that the price by itself was wrong. I did say that the spread between the two of them is what's alleged to be false and misleading, and then my financial expertise comes into play, that would cause a financial analyst to not know that Kearl was not profitable, a major important property of the company.

Q. When did the public learn that the spread between the 19.20 and the 25.07 was misleading, as you just described it?

A. They learned that the -- the conditions that they were led to believe were the case by these numbers and others, they revised their understanding of those conditions

27 (Pages 102 - 105)

**App. 507**

Page 106

once there was the de-booking.

Q. And that was in the October 2016 alleged corrective disclosure?

A. Yes.

Q. And you agree with me that that disclosure was for information current as of 2016, correct?

MR. SAHAM: Objection to form, asked and answered.

A. It informed the market that at least as of that date, Kearl was not profitable. Plaintiffs are alleging that same disclosure could have been made for earlier dates.

Q. But did that disclosure, the one in October of 2016, disclose to the market that Kearl had not been profitable in 2015 as of the end of the year?

MR. SAHAM: Objection, asked and answered.

A. I think there's an inference. One can infer that operations are supposed to be getting more efficient, not less efficient. Oil prices did rebound somewhat, so I think one can infer from the facts that disclosure probably could have been made earlier, but

Page 107

I didn't see any -- as I sit here, I don't recall commentary that specifically said that they should have been told sooner.

Q. So sitting here today, you can't point to any analyst or any other market commentary that made the inference that the information provided in October of 2016 was also true as of the end of 2015?

MR. SAHAM: Objection to form.

A. That's what plaintiffs are saying they're going to prove. That's the assumption I relied upon for calculating damages. I didn't see analysts explicitly saying that, but I did see analysts saying oil prices have recovered somewhat, the company said they'll be getting more efficient at Kearl, not less efficient.

Q. Again, I'm asking a very particular question which is whether you can identify any analyst or other market commentary that drew the inference you just referenced that the profitability of Kearl that you say was revealed in October of 2016 was also true as at the end of 2015?

MR. SAHAM: Objection to form.

Page 108

A. What changed was the market's understanding of the conditions at Kearl. Before the disclosure, they didn't know it was not profitable. After the disclosure, they do know it was not profitable. That's what changed. I didn't see any analyst saying that we think -- I didn't see analysts that said that Kearl changed or Kearl didn't change; I didn't see that. I said that what changed was their understanding of conditions at Kearl. That's what changed.

Q. Just take a look at Paragraph 64 of your report. Let me know when you're there.

A. Okay.

Q. Are you offering the opinion in this case based on the documents you cite in Paragraph 64 that Kearl was not profitable?

A. That's not an independent opinion of mine. I'm assuming that actual allegation, but I cite to support that, would support that factual allegation.

Q. But you're not actually offering an expert opinion that you -- for example, you haven't gone and analyzed all the relevant documents to whether Kearl was profitable and draw a

Page 109

conclusion?

A. Well, I mean, if the numbers, if that spread was supposed to be negative and it was reported as positive but if the correct spread would have reported as negative, I know as a financial analyst to interpret that as lack of profitability, and that's how analysts would, other analysts should and would interpret it the same way. It's not like any financial analyst is necessarily going to -- some do, that's true. We rely on the numbers that are produced from the company, me and financial analysts in general.

Q. I'm asking a very narrow question which is whether you yourself are offering the opinion based on the documents you looked at that Kearl was not profitable?

A. I don't think it's a fair way to ask the question. I didn't calculate -- I'm not an accountant, I didn't do the accounting numbers. I am offering the opinion that if I and any other financial analyst seeing negative numbers there would conclude that Kearl was not profitable would independently

28 (Pages 106 - 109)

App. 508

Page 110

conclude from negative numbers in that table and from the de-booking that with prices and costs the way they were, Kearl was not profitable.

Q. Let's try it one more time. There's lots of information available within Exxon about the profitability of Kearl, correct?

A. Yeah, but these numbers are really the best. These are the numbers that you'd go to. Okay. I mean, it's a big company with not everything broken out. Here we have Canadian bitumen broken out.

Q. Within Exxon, are you aware of how many different ways Exxon measures profitability?

A. Really the question is how many different ways are you defining profitability. I'm sure there's different ways of defining profitability and measuring profitability.

Q. Are you sitting here today offering an opinion about how ExxonMobil should have been measuring profitability?

A. No, but I am offering an opinion how an analyst reading what Exxon reported would interpret that information.

Q. Okay. You have a series of paragraphs in

Page 111

your expert report where you talk about the filings of other oil and gas companies. You mentioned Chevron, Royal Dutch, Shell, Total, BP. Do you recall that?

A. Yes. Where are you reading from, what paragraph?

Q. It starts around Paragraph 48-ish of your report.

A. Okay.

Q. Are you with me?

A. Yes.

Q. What is the relevance of these other companies' impairment disclosures to your opinions in this case, if any?

A. It sets the stage and also informs the reader of the report about how important the alleged misrepresentations and omissions were. Analysts knew that oil prices were low and they knew that other companies had taken impairments because of low oil prices, and they asked specifically Exxon -- well, they observed other oil companies taking impairments because of the low oil prices and they wondered why isn't Exxon taking impairments. And they were satisfied

Page 112

by the representations that were being made, but plaintiffs' allegation is that they should not have been.

Q. Okay. An impairment analysis isn't solely about whether prices have declined, correct? It's not the sole input to an impairment analysis?

A. Of course not.

Q. There's other inputs you would need to know as to whether or not a company should take an impairment?

A. Yes.

Q. What are those?

A. Well, impairment is a forward-looking analysis, so calculation of cash flows, expected future cash flows is a calculation that needs to be made, expected future cash flows need to be summed. The sum of the expected future cash flows is then compared to the carrying value or the book value of the asset which itself is a function of a number of variables, the purchase cost or development cost minus depreciation, amortization and any previous impairments.
    So the sum of the future expected

Page 113

cash flows is compared to the book value and if the book value is higher than the sum of the expected future cash flows, the asset has failed the test. I'm sorry. I'm giving you the -- yeah, that's right. So once it fails the test -- do you want me to keep going?

Q. No, that was actually very helpful. Let me ask the next question. You just walked through at least some of the things you would need to evaluate in order to determine whether a company should take an impairment. Have you evaluated those factors for Chevron Corporation in connection with its impairment analysis for 2015?

A. I did not do the accounting work. I'm relying on other people's accounting, including the company's.

Q. You mean Chevron?

A. Oh, just for Chevron? Yes, the answer for that would be yes as well. I'm relying on other people's accounting, including the company's. That would Chevron's, yes.

Q. So for Chevron, for example, with respect to the impairment that you mention Chevron

29 (Pages 110 - 113)

Page 114

taking, you haven't analyzed all those things you just listed, which were future cash flows, carrying value, depreciation, amortization, previous impairments, you have not done that analysis?

A. I looked at the impairments. I didn't check the accounting of Chevron. I accepted Chevron's accounting and its reported result.

Q. Are you opining that the Chevron breakdown somehow signals that the Exxon impairment analysis for 2015 was done incorrectly?

A. No, that's not my opinion.

Q. So --

A. My opinion is not -- I didn't draw that conclusion from that premise.

Q. So you haven't sat down and compared, for example, Chevron's assets with Exxon's assets to see whether they're comparable?

A. Well, that was part of my case, actually, part of my engagement because of Dr. Ferrell's work, Dr. Ferrell says that Chevron is a comparable company. In fact, he says its similar size as the only comparable company to ExxonMobil. So I do understand -- I looked at the basis for

Page 115

his saying that so I do understand that there's similarities between the companies.

Q. Do you know which assets Chevron wrote down in 2015?

A. No.

Q. Do you know which assets Anadarko wrote down in 2015?

A. Beyond what I wrote in Paragraph 55, no.

Q. What about Total?

A. Same answer. Beyond what's in my report and what you can read from the sources, no.

Q. Same thing for Shell?

A. Yes.

Q. So fair to say you have not endeavored to compare the conditions of the writedowns for those companies with the Rocky Mountain Dry Gas asset impairment analysis?

A. It's not entirely true what you said. I explain in Paragraph 48 that I looked at the press coverage for these impairments. I see that the impairments were attributed to a sector-wide decline, I mean for these other companies a sector-wide decline in oil and natural gas prices, and Exxon is an oil and gas company. I'm not done yet.

Page 116

It says here in Paragraph 48 that the Wall Street Journal cited declining commodity prices as being the reasons for these impairments and reported that U.S. oil and gas producers have written down the value of their drilling fields by more in 2015 than any full year in history. It goes on to say that the Wall Street Journal reported that exploration and production companies have taken nearly $60 billion in impairment charges exceeding the previous high of 49 billion in 2008.

The reason for reporting this is that the market expected that unless there was some very good reason not to, oil and gas companies should be writing down their assets because of the prices, not any change in efficiencies.

Q. Didn't we just agree, Dr. Feinstein, that there are a lot of inputs into the impairment analysis and that declining prices aren't the only one?

A. Yeah, but the bottom line is the most important thing if you're comparing one company to another. If all the other oil

Page 117

and gas companies are writing down assets because of declining prices, one would wonder why Exxon is not doing that. They asked, analysts did wonder, they asked and they had an answer.

Q. Again, just to understand what relevance, if any, these other companies have to Exxon in order to know whether Exxon employed a different impairment analysis than these other companies, you would actually have to sit down and look at the inputs that Exxon used and compare them to the inputs that these other companies used. That is not an analysis that you have done, correct?

A. I didn't second-guess or reverse-engineer or debug Exxon's accounting. I observed what other analysts observed, which is that virtually all the other major oil companies took impairments and Exxon didn't, and that raised eyebrows, raised concerns which were addressed to the company which helps establish that the substance of the alleged misrepresentations and omissions is important information to investors.

Q. Let's turn to -- I want to ask you about

30 (Pages 114 - 117)

Page 118

one of the theories that you take issue with Dr. Ferrell about. In your reply report there's a section where you talk about Dr. Ferrell's analysis of the alleged misstatement dates and his conclusion that the stock price does not increase in a statistically significant way on the dates of the alleged misstatements. Do you remember that?

A. Yes.

Q. So do you disagree with Dr. Ferrell that there is no statistically significant stock price increase on the dates when the alleged misstatements were made?

A. I've got to think about it. I very strongly disagree with his econometrics. He made some serious econometric mistakes.

Q. I understand that you disagree with where he landed, his conclusions. I'm just asking a question about the regression and the numbers here, meaning he looked at the dates of the alleged misstatements and he found no statistically significant stock price increase on the dates of the alleged misstatements. I just want to know whether

Page 119

you agree with that finding narrowly?

A. As I sit here now, I don't have a reason to dispute that. I explained that it's irrelevant and I didn't want to rely on his finding, but the combination of his finding being unsupported because it was produced by bad econometrics and my determination that it was irrelevant, I don't think I explicitly set out to test it, but I'm pretty sure the numbers are in my report.

Q. Can you show me?

A. Yeah, Exhibit 4 has Exxon's logarithmic returns.

Q. Let's look at the day of the 10-K. Show me what page that's on, the 2015.

A. These aren't the residual returns from the regression. Like I said, it wasn't something that I sought to independently verify or prove right or wrong, and apparently -- yeah, oftentimes I'll put the residual reasons from every day in the report. In this case I didn't do that, so I don't have the results here. It wasn't something I sought to test. I determined that whatever I would find wasn't really relevant.

Page 120

Q. Okay. So are you telling me that you didn't even look to see whether on the dates the alleged misstatements were made, the stock price experienced a statistically significant price movement?

A. Yeah, I explain why. It's concealing information, concealing conditions. I explain that in the report. Concealing conditions is generally not going to cause a statistically significant change in the stock price. Disclosure of conditions that are different from what the market understood them to be is what one would look at to determine if the statements are important or not to investors and had an impact on the price.

Q. Okay. Let me just make sure I've got this right because I'm trying to understand what you did or didn't do. I would like to understand whether, when we are in front of the jury in this case, are you going to walk in and say "I have now looked at Dr. Ferrell's analysis and I disagree. There was a statistically significant stock price increase on one of the dates when

Page 121

defendants allegedly issued a misrepresentation." So I'm really being narrow here. Do you disagree with Dr. Ferrell's finding that on the dates of the alleged misstatements, there was no statistically significant stock price increase?

A. I have no reason to dispute it at this moment.

Q. I want to understand, there can be fraud cases and you've probably even had some where the alleged misstatement is made by the company and the stock price goes up in a statistically significant manner. That can happen, correct?

A. Yeah, if the misrepresentation changes the mix of information, changes the market's understanding of the condition of the company in a positive way.

Q. Okay. And just to understand, if the information that a company is releasing is both new and value-relevant, you would expect the stock price to go up, correct?

A. No.

Q. Why wouldn't it go up in a situation where

31 (Pages 118 - 121)

Page 122

new value-relevant information is coming out?

A. It can be new, valuation-relevant and confirmatory of the previous understanding of the condition of the company.

Q. How can something be both new and confirmatory at the same time?

A. Ask philosophers. Confirmation is new information. Confirmation of a prior belief is new information. Confirmation of my prior understanding is new information. And also the other reason, there's a number of reasons we can touch on or talk about. It could cause the stock price to rise by an amount that's not statistically significant. If the valuation relevance is such that the amount that it causes the price to rise is below two times the typical volatility, doesn't mean that the new information did not -- that result would not mean for sure that the new information had no impact on the price. What it would tell you is that the impact that it had on the price, if it did have an impact, was by an amount less than two standard deviations of typical movements.

Page 123

Q. Is it your position, then, that even absent statistical significance, there can be increases in stock prices that you would feel comfortable saying this isn't the result of random stock price movement, this non-statistically significant stock price increase is because of the alleged misstatement?

MR. SAHAM: Objection to form, incomplete hypothetical.

Q. Do you understand my question?

A. You said is there any condition or any hypothetical. Yes, of course, there is.

Q. What would such a situation be?

A. I'm going to have to hear your question back again. You were kind of forming it as you were saying it. Let me make sure I fully understand it.

Q. Under what situation would you say I don't need to see statistically significant stock price movement for you to view the stock price increase as meaningful as opposed to random stock price fluctuation on any given day?

A. If there's a good theoretical or principled

Page 124

reason for drawing that conclusion -- I'll just give a silly one. A company, let's say a retail company, a restaurant, let's say, has a particular value of X and let's say it's a publicly-traded restaurant so the value fluctuates from day to day, and they discover behind a wall of the restaurant that there is a million dollars of gold that they didn't know was there before and they announce to the public we found this million dollars of gold. The value of the restaurant is going to go up a million dollars. You can observe it going up a million dollars. The million dollars might not be two standard deviations away from the typical stock price fluctuation. You'd know, even though it wasn't proved by a statistical analysis, that that -- the statistical analysis would not be what you rely on to prove that the gold made the value go up, but the fundamental principle is that finding a million dollars in gold is worth a million dollars in this case would make the price go up, so there are other ways you can draw the conclusion besides statistical analysis. Statistical

Page 125

analysis is one of the tools. It's not the only tool.

Q. Okay. In Paragraph 111 to 114 of your report you talk about oil and gas reserves as being important. I don't want to put words in your mouth. You can look at those paragraphs in your report. And you come to the conclusion that information about de-booking of reserves and impairments are material to investors. Do you see that?

A. Yes.

Q. Are you offering an opinion on the materiality?

A. Well, materiality has a legal definition, but it also has an economics definition, and in the economics -- so I'm not offering a legal opinion. I want to be really clear about that. If I use the word "material," I'm pretty careful because I understand what courts have said about this. I'm pretty careful to use the words "economic materiality" if I'm referring to the economic definition, and I can tell you what that economic definition is. I'm not offering a legal opinion.

32 (Pages 122 - 125)

Page 126

When I say something is economically material, what I mean by that is that according to the principles of finance, according to the textbooks on valuation, according to the vast body of published research on what investors, on what determines prices, the information qualifies as being important to investors for the determination of price and making investment decisions.

I understand that that is very similar to the legal definition, but I'm not usurping any legal trier-of-fact or adjudicator. I'm offering my opinion about what the economic literature says.

Q. I want to understand whether you've applied a methodology to ascertain the economic materiality of information ExxonMobil provided about proved reserves.

A. It's here. Have a look at Page 41. The first section is called analytical methodology for establishing economic materiality, and then I go on and I execute that methodology.

Q. What paragraphs is your methodology for

Page 127

assessing economic materiality contained in?

A. 97 through 99, and then it's executed -- actually, 97 through 99 and also 100 through 104.

Q. Is it anywhere else in your report?

A. Yes.

Q. Where?

A. Where I execute it beginning on Page 43, it says -- so Page 41 says here's what the analytical methodology and beginning on 43 I say here is me, I am now executing the methodology, and I do that on Paragraphs 105 through a lot of the report, through 142.

Q. So on Page 43, that section you just pointed me to, it says "executing the loss causation analysis for Exxon stock." Do you see that? Do you see where I'm referring you, the heading?

A. I see that.

Q. I'm trying to understand whether there's a methodology that you applied to assess economic materiality, meaning if you want to understand whether proved reserves information is economically material to investors, is there a methodology that you

Page 128

deployed to ascertain that?

A. Absolutely, and it's laid out here. Should I read it to you?

Q. No, no. Does it overlap with your loss causation methodology?

A. Yes, because in Paragraph 97 I write one step in assessing if alleged misrepresentations and omissions caused investor losses is to examine financial principles, company statements and commentary by market participants in order to ascertain if the subject matter of the alleged misrepresentations and omissions constitutes economically material information. So I say that part of my loss causation methodology is executing the methodology for establishing economic materiality.

And even beyond that in Paragraph 101, I add to the methodology. I say in addition to establishing economic materiality based on what I previously wrote about, analysis of loss causation also typically comprises empirical analysis to determine whether the revelation of the previously concealed truth observably caused a security

Page 129

price decline.

So if it wasn't clear here, I'll say it clearly now. The methodology for establishing economic materiality involves all these things in Paragraph 97 and also the event study which serves the dual purpose of establishing economic materiality and establishing or assessing loss causation.

Q. I want to try to understand if there's a methodology that I can apply to understand the magnitude of any change to proved reserves that you applied in your report.

Let me explain what I mean by that. When we spoke earlier, you said that the alleged corrective disclosure disclosed that Exxon may de-book 3.6 billion barrel equivalence in connection with Kearl. Am I getting that right?

MR. SAHAM: Objection to form.

A. You said that Exxon made that disclosure.

Q. Yes. I just want to make sure you're with me.

A. They did make that disclosure.

Q. And you've come to the conclusion that that information is economically material,

33 (Pages 126 - 129)

Page 130

correct?

A. Yes.

Q. Okay. So if Exxon had disclosed that it was going to de-book 500 million barrels, would that have been economically material?

A. That wasn't the assignment. I tested what the economic materiality did occur with the event study. My empirical analysis tested, was one test of economic materiality of what was disclosed. It didn't test the economic materiality of something else that could have been disclosed except for if the same thing had been disclosed, other financial analysis tells us if the same thing had been disclosed earlier, it would have had a comparable effect on the stock price.

Q. I'm just trying to figure out whether you have a methodology that you can point to that tells me at what threshold the de-booking of proved reserves becomes economically material. Go ahead.

A. Yeah, I hear you. I mean, I didn't do an analysis to draw a bright line and say above this is economically material and

Page 131

below this is not economically material. My analysis tells me that what did occur and what was concealed was economically material.

Q. When we spoke earlier, you said that you understood that ultimately Exxon disclosed a two billion impairment in connection with the Rocky Mountain Dry Gas assets, correct?

A. Yes.

Q. Have you done any work to understand whether if that impairment had been one billion instead of two billion, it would have been economically material to investors?

A. Well, some of the financial analysis I conducted told me that it's not just the magnitude, but the importance of those assets to the company that made them economically material, these disclosures and the alleged concealment, so it's not just the magnitude. I don't have a bright-line number for the magnitude, although I know that what did occur is beyond that bright line, whatever it is. But I also have analysis that says that because of the importance of these assets

Page 132

to Exxon and the declared importance of these assets to Exxon's future, their de-booking and their impairment is more important to investors than other de-booking might have been.

Q. I want to make sure I got that. So you don't have an analysis that you've done on magnitude, for example, that's the one, the two billion should have been one billion instead. You don't have a methodology that you applied that says, well, this is the threshold above which as a magnitude issue this impairment would be economically material to investors, correct?

MR. SAHAM: Objection to form.

Q. You haven't developed that here?

MR. SAHAM: Objection to form.

A. I think that's fair to say, except insofar as the numbers that did occur had observable effects and, therefore, we know they're beyond wherever that threshold might be.

Q. Okay. And then you also just referenced the fact that some assets could be viewed by the market as being more important than other assets, right?

Page 133

A. True.

Q. And here what analysis, if any, did you perform that we can look at together that would demonstrate how important the Rocky Mountain Dry Gas assets are compared to any other assets in Exxon's portfolio?

A. I would look at the history of them and why they were purchased for $41 billion and what the purchase price was and why they were purchased, what the reasons were given at the time, so those are the elements I'm thinking about.

Q. I'm trying to understand if you've approached this with some kind of a quantitative methodology. Do you have a sliding scale, for example, of importance of assets? Like do you rank the Rocky Mountain Dry Gas assets on a scale of one to ten, with ten being the most important? How do you quantify that approach --

MR. SAHAM: Objection to form.

Q. -- if at all?

A. I quantify the econometrics of the disclosures. Not all financial analysis is quantitative that way. The company itself

34 (Pages 130 - 133)

App. 514

Page 134

said that these assets were important to its future. That's why I have a section on what the company said.

Q. Again, just going back to my question, I'm trying to understand if there's a methodology that you've employed that is capable of being replicated. For example, if there was some other asset and you wanted to look at how that asset compared to the Rocky Mountain Dry Gas asset in terms of importance, is there a methodology that you developed that I can use to compare one asset against another?

MR. SAHAM: Objection to form.

A. Absolutely. All of my methodology is replicable. Essentially, I mean, I lay out the steps. You would look to see what the economic principles say about the statements being made, what did the company say, what kind of importance did the company put on these assets, what did the analysts say, how often do these assets get addressed in analyst reports.

Let's say when the company, when Kearl was de-booked, what did analysts say

Page 135

when companies, when Rocky Mountain assets were impaired. That's a financial analysis that anybody can do, and I've done it for them. It's in my report. You can't say these -- no one can say that Kearl was not important to the future of the company and the valuation of the company based on fundamental principles, based on company statements, based on analyst statements, based on news media reports, based on the econometrics.

Q. I just want to make sure I've got this right. By "econometrics" you mean looking at the alleged corrective disclosure and seeing whether the market reacted to the alleged disclosure of truthful information?

A. Yes.

Q. Okay. So you just gave me a number of inputs, right? What did the company say, what did analysts say, what did the news media say, what are the econometrics. And I'm just asking you, other than reading all of those things and understanding them, is there some model or other applicable framework that you can point me to that

Page 136

you applied to say "ah-hah, I have found economic materiality"?

A. That's a multi-prong test, as a lot of finance and accounting tests are. If there's concordance, consistency between what accounting principles say, what the company said, what analysts said, what the news media said and what the econometrics say, it's fair to conclude that we have economic materiality proved.

Q. But, again, what I'm hearing you say is that you read a bunch of stuff, what did the company say, what did analysts say, what did the news media say, and then you looked at the back-end stock price reaction and you concluded from all of that that there was economic materiality. But what I'm not hearing is you explain how you weighed those things, what model you applied, whether there's any quantitative analysis going on here. Is there anything I'm missing or is this just you read a bunch of stuff and you drew an opinion?

MR. SAHAM: Objection to form.

A. Apparently there's a lot you're missing.

Page 137

I explained what the quantitative analysis is and then you dismissed it. I explained that there is quantitative analysis that anybody can do. Some people do it right, some people don't, but anybody can do it.

Anybody can read the analyst, the conference calls and see what questions analysts were asking the company. In this case, after the October 2016 -- during the October 2016 conference call, there were questions about Kearl, and afterwards analysts said the important part of the disclosure was Kearl. That tells you that Kearl was economically material.

Q. Okay. Let's --

A. That's not just reading a bunch of stuff. That's paying attention to what analysts are expressing is what they're concerned about and that is a component of the analysis from an economics perspective of economic materiality.

Q. So let's talk about that. Let's just focus on analysts as an example. Have you read every analyst report about ExxonMobil during this time period?

35 (Pages 134 - 137)

Page 138

A. Pretty much.

Q. Did you take the analyst reports and sort them into piles, one pile for analysts who said, according to you, this Kearl information is important and analysts who sorted it into a different pile and said this information is not important? Did you do that?

A. Well, maybe not exactly the way you would have done it, but essentially, yes. I read them and derived a conclusion about what analysts were concerned about. They were concerned about Kearl.

Q. So how many analysts were concerned about Kearl?

A. More than weren't.

Q. Give me the numbers.

A. I don't know. Like I said, I didn't -- I mean, my conclusion is sound. If you think it needs -- I don't think it needs to be quantified that way. Maybe you do, but I don't. I'm satisfied with a conclusion based on the reading of the analyst reports that analysts were concerned about Kearl, and they said so. It's in my report as

Page 139

well. I'll go through and find it for you if you want later.

Analysts said that was the important part of the -- that was the important part of the disclosure, and when it came time for them to ask questions to the company, they asked about Kearl.

Q. But you haven't sat down and tried to figure out how many analysts were concerned about Kearl, how many weren't? That's not an analysis that you did?

A. I don't think that's the right way to do the analysis. I didn't do it the wrong way. I can tell you if I had done it that way, you'd have an expert that says, "oh, what does 15 versus 4 tell you?" No. You read the analyst reports, you can see what people are concerned about.

Q. Okay.

MS. SOLOWAY: I'm going to start a new topic and it's 12:49. Do you guys want to take lunch?

MR. SAHAM: Sure.

MS. SOLOWAY: I do not want your colleague to be hangry.

Page 140

MR. SAHAM: Much appreciated.

MS. SOLOWAY: Let's take a break.

VIDEOGRAPHER: The time is 12:50. We're off the record.

(Lunch break)

Page 141

AFTERNOON SESSION

VIDEOGRAPHER: The time is 1:35. We're back on the record.

BY MS. SOLOWAY:

Q. Welcome back, Dr. Feinstein. So I want to turn to the topic of the analysis that you conducted of the October 28, 2016 alleged corrective disclosure.

So in your report you identify certain new non-fraud-related information that was disclosed at the same time that you believe the alleged corrective disclosure of the fraud was disclosed, correct?

A. Yes.

Q. And what is that -- can I refer to that as confounding information?

A. Sure.

Q. What was that confounding information that you identified?

A. Well, Exxon is a big company and when they have an earnings announcement, they report a lot of information and some information will be important and some information won't be important and some will be positive and some will be negative, so it's important to

36 (Pages 138 - 141)

Page 142

analyze any individual piece within the context of the whole. But information that I saw that was identified by myself and analysts included a -- also that the company might have noted included disruptions in Nigeria. There were some political militant disruptions in Nigeria that had an effect on production of oil in Nigeria. And I think I have a list of these items around Pages 57, 58, other items I thought were worth addressing.

Q. Are you on Page 57 of your first report?

A. Yes.

Q. What paragraph are you looking at?

A. 155, 153. I write, "there were several pieces of company-specific news released in connection with the company's Q3 2016 earnings announcement." Some of those are non-fraud and reasonably valuation-relevant so I analyzed them to see if they could have contributed to the negative price reaction that was experienced on October 28, 2016.

So the number that most analysts look at first when there's an earnings

Page 143

announcement is earnings per share and that was 5 cents above what analysts on average were forecasting, so that's called a beat, that would be positive news. A beat would not be expected to contribute to a stock price decline.

However, the next thing that analysts often do is calculate what's called an adjusted earnings number that would back out certain deal profit that might occur in the same time, and analysts noted that if you back out the profit that was earned on the sale of certain assets, Canadian assets, that you'd end up with earnings of, or adjusted earnings of 54 cents per share, which was 4 cents below the 58 cents. So I had to look to see if that 4-cent miss could have contributed to the stock price decline which was about, $2.43 was the stock price decline that the econometrics indicated was caused by the mix of news, company news. So I wanted to see this 2.43, could this be explained by the 4-cent miss in adjusted earnings. I can explain later how I did that.

Page 144

Other things that were considered, Paragraph 159, the company noted that there was -- it's characterized as low production levels and low realized sales prices that negatively impacted its upstream segment just for that quarter, notably Nigerian operations.

Let's see what else. Commodity prices were low, oil and gas prices were low. So I did an assessment to determine whether Nigeria, the adjusted earnings missed and commodity prices could be what made the stock price fall $2.39 or $2.43 or any part of that $2.43.

Q. I'm sorry. I just want to make sure I'm following the things that you identified. You identified a 4-cent miss, correct?

A. In adjusted EPS.

Q. In adjusted EPS, and then you also mentioned something about commodity prices?

A. Yeah, oil and gas prices remained low.

Q. Okay. And was there new information disclosed about commodity prices that day?

A. No, that's what I determined, nothing that the market would have learned from that

Page 145

announcement, so that rules that out as being what could have caused the stock price to climb.

Q. What's your understanding of what happened in the Nigeria operations?

A. Well, just like other companies had experienced, I think there were terrorists, there were raids and terrorists and activity that interrupted. I guess the word they used was "disruptions," disruptions in Nigerian oil production owned by Exxon.

Q. And if I'm getting this right, you reduced the $2.43 findings for that day of statistically significant stock price movement by 4 cents. Am I getting that right?

A. Not quite.

Q. Explain it.

A. I attributed 4 cents of the decline to these other factors.

Q. All of the other factors?

A. All of them, all of them on net.

Q. What are you including when you say "all of them"?

A. Pretty much everything. Anything that

37 (Pages 142 - 145)

Page 146

someone could point to, I can explain why on net it couldn't have had more than a 4-cent impact on the stock price except for the de-booking announcement.

Q. Okay.

A. So the de-booking announcement was the big news that caused the stock price to fall significantly.

Q. Tell me, does your $2.39 calculation take into account the disruptions in Nigeria?

A. Yes.

Q. In what way?

A. Well, I observed -- well, okay. The company announced what daily production levels were for the company as a whole for the past quarter and they were within guidance, but at the lower end of guidance. But then I observed that the company did not change its guidance for a total year of production. So the upshot of that miss or any other negative news was the 4-cent miss, and I pointed out that that 4-cent miss was non-recurring. At least with respect to Nigeria, it was essentially expected because production did come in within guidance and

Page 147

then the company then reaffirmed its full-year production guidance number.

So if Nigeria did have an impact on earnings and production, it wouldn't be a lasting impact or cause the company and analysts to revise their production forecast downward for the future.

Q. Is it your position that the news about Nigeria was not new?

A. Yeah, essentially, it wasn't. What was going on there wasn't news. I explain that in my report. It wasn't new. People had known about it. It was warned about. It was discussed by analysts. It was discussed by other companies.

Essentially the new part of it is that, essentially the update. For the most part, it was consistent with analyst expectations when the company attributed being at the low end of their production guidance in part to it.

Q. I just want to try to focus for a second on the company's release of information about Nigeria on October 28th.

What, if anything, about the

Page 148

company's announcement about Nigeria was new that day?

A. That the company felt that it was, of all the things they could have talked about going around the world where Exxon is involved all around the world, that was something they wanted to talk about in their earnings announcement as being notable as they released their performance numbers.

Q. What else?

A. That's basically it. Production was at the low end of the quarter guidance, it didn't fall below quarter guidance, but it was at the low end of quarter guidance, but it did not have a lasting effect on company guidance for production or on the market's consensus forecast for the company's earnings for the rest of the year. So I concluded that it may have had an effect, but the effect was non-recurring.

Q. So if Nigeria had an effect, you believe that you already took that into account in the 0.04-cent deduction, or I should say the 4-cent reduction that you made?

A. Yeah, and the miss was 4 cents and when

Page 149

you're analyzing -- this is financial evaluation principles. If you're analyzing whether a 4-cent miss has a big impact on the stock price or a small impact on the stock price, according to the tenets of financial valuation, you would assess whether it's a recurring effect or a non-recurring effect, does it have a lasting effect on the company going forward into the distant future or is it a one-time thing.

And because guidance wasn't changed, production guidance wasn't changed and because earnings forecasts went up, I determined that any effect that Nigeria had was either anticipated or non-recurring. Either way it would have a small de minimis impact on the stock price. All these factors combine to at most contribute a 4-cent decline in the stock price.

Q. Is it your opinion that the disruptions in Nigeria were viewed by analysts as not having any continuing impact?

A. Well, certainly the company thought so. They reaffirmed guidance. Yeah, I think that's the conclusion, that no continuing

38 (Pages 146 - 149)

App. 518

Page 150

impact that wasn't already baked into the stock price, no new continuing impact that wasn't already previously anticipated.

Q. Other than the fact that the company didn't change production guidance, is there any other evidence you have to support the proposition that there were no continued impacts expected from Nigeria?

A. Yes.

Q. What?

A. Well, that it had been widely reported in the news. I mentioned a lot of these just a moment ago. What was going on in Nigeria was not unknown. Other companies had reported also what was going on in Nigeria. People knew what Exxon's exposure to Nigeria was. Earnings forecasts rose and not fell. I'm not saying Nigeria is not important. I'm saying that any lasting impact had already previously been known and baked into the price. There was no revision to any lasting forecast. There was no revision to any lasting effect.

Q. So you have not in your 4-cent reduction, you don't have an allocation within that

Page 151

4 cents for Nigeria versus other production issues?

A. That's right, because production guidance was reaffirmed and earnings forecasts went up.

Q. So, again, I want to make sure I'm following this. You're not allocating any of that 4-cent decrease to Nigeria at all, then?

A. Sure, I am.

Q. How much?

A. In the mix with all other information that may have been negative, all factors that were negative combined had at most a 4-cent impact.

Q. Can you break out for me how much impact you ascribe to Nigeria?

A. No. I didn't, it wasn't necessary to. The metrics are not disaggregated that -- the metrics that go into the valuation are not disaggregated, but the valuation metric is what it is and produces a conclusion of 4 cents.

Q. Okay. Turn to Paragraph 77 of your report, please.

A. Yeah.

Page 152

Q. Do you see the paragraph that you block quote in that Paragraph 77?

A. Yes.

Q. That's the language that constitutes the alleged October 28th corrective disclosure, correct?

A. Yes.

Q. And you're ascribing $2.39 of the decline on that day to the disclosure about Kearl that's in this paragraph, correct?

A. Yes.

Q. Do you see that after the disclosure about Kearl, it mentions one billion oil-equivalent barrels in other North America operations that could be required to be de-booked as proved reserves?

A. Yes.

Q. Is it your understanding that that one billion oil-equivalent barrels at other North America operations relate to the fraud in this case?

A. It does not.

Q. Have you taken into account that disclosure in your assessment of the stock price reaction on October 28th?

Page 153

A. Yes.

Q. In what way?

A. I looked carefully at what the company said about it, I looked at what analysts said about it, and based on the questions that were asked by analysts and the answers given by the company and the commentary that analysts put forth explaining that other, the entire mix of information, I determined that that's not responsible for any of the $2.43 drop that occurred that day caused by company news.

Q. What commentary?

A. On Page 33, for example, sort of -- I'll tell you how many lines down. One, two, three, four, five, six, seven, eight, nine, ten, 11, "Kearl was the focus on conference call questions." So that was the focus. That's what surprised people. There it is. The other billion the company explained was end-of-field-life adjustments, the same magnitude that they had taken the previous year. It didn't capture the concern, attention or imagination of analysts nearly as much as Kearl, or at all compared to

39 (Pages 150 - 153)

Page 154

Kearl.

Kearl being a de-booking of one of the company's most important assets, if not the most important asset, was the focus of analysts' attention, not that other billion which was the same number in the previous year and explained by the company to be end-of-field-life adjustments.

Q. Other than the citation in Paragraph 86, did you identify any other commentary that supports the proposition that the additional one billion of de-booked proved reserves didn't have any market impact?

A. Yeah, there was maybe, I think, two-dozen analyst reports in the -- consistent within these analyst reports is the commentary that what was surprising and new and valuation-relevant was Kearl.

Q. You mentioned earlier that the -- you came to the conclusion in subtracting the 4 cents that that was appropriate because the production disappointment was not recurring. That's what you said earlier, correct?

A. Well, I didn't call it a disappointment. It came in at the low end of guidance. It

Page 155

came in within the guidance still even with Nigeria, but at the low end of the guidance, and guidance was reaffirmed. So even if it was disappointing, reaffirming the annual guidance means that the disappointment will be made up in the following quarter and that announcement was made a third of the way into the following quarter.

And that's not the only reason. There's also the earnings effect. Analysts revised earnings for the full year going forward to be higher than what they had forecasted before the announcement, so that's why it may have had a one-time effect, but it wouldn't be a recurring factor so it wouldn't have a recurring -- it wouldn't have the valuation effect of a recurring factor.

Q. For what year, in your view, did analysts forecast upwards?

A. 2016 and 2017, so the immediate, the rest of the year they were in and the next year.

Q. Let's focus on 2016. You're talking about the analysis that you conducted of the -- I

Page 156

want to make sure I'm pronouncing this correctly. I/B/E/S data?

A. That's what people refer to it.

Q. I B E S?

A. Yes.

Q. And the I/B/E/S data is the basis for your analysis that the 2016 earnings per share estimates by analysts went up, correct?

A. Yes.

Q. Have you had a chance to review the analysis that Dr. Ferrell did of that I/B/E/S data?

A. Oh, yes.

Q. Are you aware that Dr. Ferrell found that there were 25 analysts who provided inputs to I/B/E/S on October 25th, 2016?

A. I'm aware.

Q. And that Dr. Ferrell found that 15 analysts provided inputs to I/B/E/S on November 8th, 2016?

A. That might not even be the correct way to characterize what I/B/E/S did, but I'm aware that he said that, but he's kind of wrong.

Q. Okay. Well, tell me, are you aware of how many analysts had provided inputs to I/B/E/S on October 25, 2016 if it wasn't 25? Is it

Page 157

a different number?

A. The 25 I'm not objecting to, but I/B/E/S screens analyst submissions for currency, whether they're current or whether they're stale, so it's altogether possible that analysts who didn't update forecasts after the October 28th earnings announcement were screened out by I/B/E/S. It wouldn't be that they didn't provide them. It would be that I/B/E/S determined them to be stale and not updated.

Q. So let's just unpack that a little bit. The first date that you looked at, if I'm getting this right, is October 25, 2015.

A. What page are we on now in the reply report?

Q. I think this is in your opening report, actually.

A. Okay.

Q. If there's some other page you want to look at, can you just tell me?

A. I know it's in the reply report because that's where I compared my numbers to his numbers.

Q. Sure, let's go to that page. What page are you on?

40 (Pages 154 - 157)

Page 158

A. I was going to ask you. It's going to be somewhere between 11 and 26. There we go. Page 14.

Q. Okay. So in Paragraph 41 you talk about Dr. Ferrell's analysis and his note that the number of contributing analysts from October 25, 2016 to November 8, 2016 goes from 25 to 15, correct?

A. What paragraph are you in?

Q. 41 of your reply report.

A. Yes, I see that, and I recall that as well.

Q. Okay. So let's just start with the basic facts here. The I/B/E/S database that you relied on for the 2016 data, did it, in fact, have 25 analyst inputs as of October 25, 2016?

A. Yes, as reported by I/B/E/S.

Q. And did it, in fact, have 15 analyst inputs as of November 8th, 2016?

A. I/B/E/S constructed their consensus forecast number for that date from the contributions, the survey contributions of 15 analysts.

Q. So there are a different number of analysts contributing on October 25th and November 8th, correct?

Page 159

A. That's right.

Q. And can you tell me sitting --

A. Actually, that's not correct. We don't know how many submitted. We know how many I/B/E/S accepted.

Q. So the I/B/E/S data reflects 25 inputs that I/B/E/S accepted for October 25th, correct?

A. Right, to produce their number which is the gold standard for consensus forecasts in the industry.

Q. And then on November 8th, 15, correct?

A. Right.

Q. You're not disagreeing with Dr. Ferrell that there is, in fact, a different number of analyst inputs for those two dates, correct?

A. That's right.

Q. For the 25 analysts who provided inputs on October 25th, who are they?

A. I don't have it listed here. I don't know who they are.

Q. Do you have any insight into who those analysts are?

A. Sure. I mean, we know that there were dozens of analysts following Exxon, actually,

Page 160

approximately two dozen, so that's consistent with the number 25, but I trusted I/B/E/S knows who they are and I don't need to know who they are. I/B/E/S is the gold standard in the industry for consensus forecasts.

Q. Do you have the ability when you -- I've never sat in front of I/B/E/S and opened it up. When you open I/B/E/S up to get this information, can you click something that tells you who are the analysts that provided inputs for October 25th, 2016?

A. I don't recall.

Q. You don't recall whether you can get that information?

A. That's right.

Q. Did you try?

A. No, I didn't, no.

Q. Did anyone who works for you try?

A. I don't know, but it's not necessary because I/B/E/S is the gold standard for consensus forecasts in the industry. I trust that they know how to do their job. In fact, it's not just that I trust that. Almost all professional financial analysts and academics trust I/B/E/S to know how to do that job.

Page 161

Q. And for November 8th when there are 15 inputs reflected, do you know who those analysts are?

A. Personally, as I sit here now, no.

Q. Did you ever know?

A. No, I did not know, but it wasn't necessary to know because I know they were screened by I/B/E/S according to I/B/E/S's rigorous standards.

Q. Can you tell me whether the 15 analysts whose inputs are reflected on November 8th are within the 25 whose inputs are reflected on October 25th?

A. As I sit here now, I can't, although it's -- I/B/E/S is the gold standard and they determined that this was a reflective, reliable, precise, reflective sample of analysts on both dates.

Q. Did you send a document request to I/B/E/S to get this information?

A. No.

Q. Did you call them to ask them if they would voluntarily provide you this information?

A. No.

Q. To your knowledge, did anyone working for

41 (Pages 158 - 161)

App. 521

Page 162

you call I/B/E/S to get that information?

A. As I explained, I made a determination that it was appropriate to rely on I/B/E/S because that is the most reputable source for consensus forecast data. I find it amusing that in order to attack me, Professor Ferrell has to attack I/B/E/S, but I don't think he's justified in doing that and I didn't feel it would be justified for me to do it either. They know how to do their job. They're trusted. They're relied upon. I relied on the numbers without feeling it necessary to second-guess their numbers.

Q. Sitting here today, you can't explain to me why the number of analysts with inputs in I/B/E/S on October 25th and November 8th are different, correct?

A. Wrong.

Q. You can explain it?

A. Yes.

Q. How?

A. Well, there is documentation that I/B/E/S puts out about how they screen and why the number might fluctuate. After a -- I'll leave it at that to answer your question.

Page 163

I read the documentation and was satisfied that it answered that question.

Q. There are various explanations, though, right? There's not just one explanation?

A. Well, there's one most reasonable explanation.

Q. Which is?

A. After an earnings announcement, if analysts don't update, I/B/E/S has a screening process for screening out stale forecasts. That's a concern when one constructs a consensus forecast number that some of the numbers might be stale which would make the number unreliable, which is one reason why Dr. Ferrell's number is unreliable. And I/B/E/S is well aware of that and they endeavor to make sure that their numbers that are included are not stale. So after an important announcement like October 28th, if fewer -- if I/B/E/S -- it's more likely after an important announcement that more reports will be screened out.

Q. Okay. So one possible reason why the number would have changed is because I/B/E/S determined that information was no longer

Page 164

current, correct?

A. That the analyst had not updated their number in light of an important announcement.

Q. What other reasons exist?

A. Well, maybe it's a survey number, so you can imagine that an analyst might choose not to participate in the survey. In that case, they might be self-selecting or self-censoring, if you will. They didn't feel comfortable updating their number yet and so they didn't feel comfortable providing a survey answer, so it's either I/B/E/S screened it out or the analyst screened it out.

Q. And the analyst who didn't update their numbers, it doesn't mean they weren't going to update their number, it just means that they hadn't done it as of the 8th of November?

        MR. SAHAM: Objection to form.

A. That is correct, and it's consistent with what we observe happening. We observe that the number of I/B/E/S constituents subsequently increased, but in a manner that still undercuts Dr. Ferrell's argument.

Page 165

Q. What other reasons might there be for why there's 25 analyst inputs on the first date and only 15 on the second date?

A. I don't think it's a reason that applies to Exxon, but for some companies you might have analysts simply dropping coverage as a reason and you also have analysts that are ticking up coverage. I don't think that's what was driving this fact for the I/B/E/S survey. You'd actually want to see this to know that this was a precise number.

Q. Is I/B/E/S relying on analysts participating in order to get its information?

A. Yes.

Q. Does I/B/E/S call analysts at every major bank to get updated information from them regularly?

A. Again, like I said, they're the gold standard for consensus forecast. I don't second-guess their methodology. I know the rest of the industry and academics trust them to do their job right. I felt it was appropriate for me to trust them similarly.

Q. I want to understand what you know about

42 (Pages 162 - 165)

Veritext Legal Solutions

212-267-6868              www.veritext.com              516-608-2400

**App. 522**

Page 166

how I/B/E/S deploys that methodology.  Do they affirmatively call the analysts at all the major investment banks that cover Exxon to get updated numbers?

A.  I don't know the process that goes into how they conduct their business to produce what's considered the gold standard for consensus forecasts, but I do know that's the general consensus about their reliability, credibility, precision and I trusted that, I trusted their numbers and it's appropriate to.

Q.  Do you know whether they rely on analysts calling in as opposed to them reaching out and calling the analysts?

A.  I can speculate, but I won't, no.

Q.  Do you know exactly what they do to make sure that when they get an estimate from an analyst, that they're comparing apples and apples and that the analyst's model is using the same assumptions as a different analyst's model?

A.  I know how to do my job and they know how to do their job, and I know that academics who have studied the I/B/E/S numbers have

Page 167

come to the conclusion that they're the best ones, and I reported that in my report as well.  Again, I don't know why one would be compelled to challenge the gold standard for consensus forecasts unless it was some results-driven bias that they had, and I didn't have any results-driven bias.  I'm quite sure that if the numbers supported -- I would surmise that if the numbers supported Dr. Ferrell's argument to the I/B/E/S numbers, he wouldn't be attacking I/B/E/S.

Q.  So, again, I want to go back to what you know.  You can tell me 17 times that I/B/E/S is the gold standard, but I'm trying to understand what you actually know about what I/B/E/S does.

So what, if anything, does I/B/E/S do specifically to ensure that when it receives inputs from analysts, that those inputs can be compared to other inputs getting from other analysts to ensure consistency across the estimates?

MR. SAHAM:  Objection to form, calls for speculation.

A.  Well, their documentation says they have a

Page 168

rigorous process and a rigorous screening process and people who have studied their process and the results have determined that both are reliable.

Q.  Who are the people who have studied it?

A.  Okay.  On Page 17 I have a sampling and I could have filled up many pages with citations to research that uses I/B/E/S. Steven Larocque, et al., on Page 17 I have three excerpts that I think make the point. The first one says, "academic researchers often rely on I/B/E/S for consensus forecast and street earnings, for example, an I/B/E/S research bibliography of research about analysts and earnings cites 575 published papers, many of which use I/B/E/S data." Okay.

Q.  That doesn't answer my question about what exactly you know --

A.  I'm not done.  Let me finish my answer.

Q.  I don't need you to read your report to me. Thank you.

A.  It wasn't a complete answer.

Q.  I have read your report and --

MR. SAHAM:  Are you withdrawing your

Page 169

question?

MS. SOLOWAY:  I'm not withdrawing anything.

MR. SAHAM:  Then let him finish his answer.

Q.  I have read your report, Dr. Feinstein.  I don't need you to read it into the record for me.  I want to know whether you know, not what other researchers might know, but what you know personally about what I/B/E/S does to ensure consistency across its inputs?

MR. SAHAM:  Okay.  You're either withdrawing the other question or he gets to finish answering and then you can ask the next question because you cut him off.

MS. SOLOWAY:  I do not need him to stonewall by reading his report into the record.

MR. SAHAM:  Then withdraw the question.

MS. SOLOWAY:  It's unnecessary.

Q.  The question before you is, what do you know, not other researchers, but what do you personally know about what techniques I/B/E/S uses to ensure consistency across

43 (Pages 166 - 169)

Page 170

inputs? You personally, not other people, what do you know? What can you tell me?

MR. SAHAM: I object to form as there's now two questions pending so it's compound by definition.

Q. Please answer that question.

A. I need to tell you that most of what I know about finance is derived from other people's research. There's a -- I have a doctorate in financial economics. There's a lot of stuff I know about finance, and I would say the vast majority, virtually all of it comes to me from the research of other people. I can't claim credit for -- except for a few things.

Similarly with the reliability of I/B/E/S, I learned that from these people who have studied it, and Paragraph 47 says "the average value-relevance of the FactSet earnings surprise is significantly lower than that of I/B/E/S, even after controlling for differences in FDP-firm-quarter characteristics." Larocque did a study and found I/B/E/S to be the most reliable consensus forecast numbers.

Page 171

Q. Other than what you just told me, is there anything else you can add to your answer about what you personally are aware from your work here and providing an expert opinion in this case where you're relying on I/B/E/S, what I/B/E/S does to ensure the consistency of inputs it receives from analysts?

MR. SAHAM: Objection to form, asked and answered.

Q. I'm not asking you to repeat what you've already told me. I just want you to close this out. Is there anything else you can tell me about what you know?

MR. SAHAM: Objection to form.

A. I cite a bibliography of articles that study I/B/E/S's process and I read those articles and they were a compelling basis for accepting I/B/E/S's numbers. I do the work that I do and I allow I/B/E/S to do the work they do and I rely on people who have studied whether I/B/E/S is reliable and I accept their conclusions. I'm not here to tell you I'm an expert in how I would set up my own company to collect and

Page 172

publish I/B/E/S or, rather, consensus forecast numbers. To the best of my knowledge, neither is Dr. Ferrell, but both of us are -- both of us use data that other people produce. I used the data that they produced.

Q. Did you call I/B/E/S to ask them about their techniques for vetting analyst inputs?

MR. SAHAM: Objection, asked and answered.

A. You don't think my answer is going to change from the last time you asked that, do you?

Q. Is it still no?

A. Correct.

Q. Did anyone on your team do that?

A. I don't know. I do know that we did look at the documentation that I/B/E/S provides. There's a cite to that in the report, I believe. I/B/E/S does provide documentation about their methodology. It's not like I know nothing about their methodology. I know it's reliable and carefully considered by them.

Q. Are you familiar with FactSet?

Page 173

A. Yes.

Q. Is it a widely-used database?

A. Not as widely-used as I/B/E/S for consensus forecast.

Q. And what's that based on?

A. Published research. You don't want me to read from my report, but it's in my report. Most people use I/B/E/S. Some people use FactSet.

Q. This is in Paragraph 46, the first block quote, that's what you read to me?

A. Yes, and it's consistent with other numerous valuations.

Q. Have you ever cited FactSet when you provided an expert opinion?

A. I don't think so for consensus forecasts. FactSet is very good at digesting SEC filings and presenting them in a consistent form. I use that and, in fact, I've lobbied for Babson College to get FactSet. I have access to FactSet, pay for it, too. But it's for financial data, is what we use it for, not for forecasts. I/B/E/S is the gold standard for forecasts.

Q. So turn to -- actually, I'm going to mark

44 (Pages 170 - 173)

Page 174

another exhibit.

MR. SAHAM: Ferrell's report?

MS. SOLOWAY: Do you guys have your own copy of that, too?

(Exhibit 4 marked for identification.)

Q. Exhibit 4, I'm handing you Dr. Ferrell's report. You've had an opportunity to review this, correct?

A. Yes.

Q. So let's start by turning to Page 21 of his report.

A. Okay. I'm there.

Q. 21 contains a chart that's Exhibit B, correct?

A. Yeah. I want to point out that he seems to be afraid to call it I/B/E/S data. He calls it LSEG data.

Q. We can agree that the I/B/E/S data is retrieved from that platform, correct?

A. Yeah, it makes one wonder why he was afraid to call it what it really is.

Q. I'm sure it's a fear. I'm sure you're right about that.

So let's focus on the -- and I'll

Page 175

use I/B/E/S just to make you more comfortable, okay?

A. Thank you.

Q. Let's focus on the I/B/E/S data on this chart. Did you have an opportunity to review this chart when you received this report?

A. Yes.

Q. Is there anything in this chart that is inaccurate?

A. Let me look at it to refresh my memory. I don't recall that I determined that. I don't know if I set out to, but I don't recall that I did.

Q. Well, this is the same concern I articulated before to you. I want to know whether you're going to show up at the trial in this case and tell me this report is wrong -- excuse me, that this chart is wrong.

Do you have any basis, sitting here today, to say that anything in this chart, Exhibit B, is wrong?

A. Well, I'm not opining whether it's wrong or right. What I noticed is that he rejected using I/B/E/S and he felt it was necessary to further his argument and I thought it was

Page 176

inappropriate to reject I/B/E/S.

Q. This chart is I/B/E/S. Didn't we just agree we can call LSEG I/B/E/S?

A. (Witness examines document)

Q. Dr. Feinstein, are you confused by what's in this chart?

A. Well, you said you want to make sure that my testimony here is consistent with what I might offer at trial, so I want to make sure that my testimony here is consistent with what I wrote in my report, and that's going to take about a minute or two to check.

Q. Okay.

A. (Witness examines document) Okay. I'm ready.

Q. Is there anything in this chart that you, looking at it now and having had the chance to look at your own report, believe is inaccurate?

A. No.

Q. We're talking about Exhibit B on Page 21 of Dr. Ferrell's report, correct?

A. That's right.

Q. Okay. And if you look in the column all the way to the left, do you see where it says

Page 177

"full year 2016 EPS"?

A. Yes.

Q. Okay. So this provides both the average and median change between October 25th and November 8th for analyst estimates -- excuse me, inputs which is what you were looking at in your report, correct?

A. That's right.

Q. And he comes up with the same 5 cents and 8 cents that you do, correct?

A. Yes.

Q. And then you didn't look at 2017, 2018, 2019 and 2020, correct?

A. I report on 2017 in my report on Page 53 -- Page 19, Paragraphs 53 through 58.

Q. Which report are you looking at right now?

A. The reply report.

Q. I'm talking about your opening report.

A. Oh, that's correct.

Q. You did not look at 2017, 2018, 2019, 2020 in your opening report?

A. Right, I did not, for good reason.

Q. Did you know when you submitted your opening report that, had you looked at 2018, 2019 and 2020, the I/B/E/S data would have reflected

45 (Pages 174 - 177)

Page 178

a negative change in analyst inputs between October 25, 2016 and November 8, 2016?

A. At some point I became aware of that, but it's explainable. This is consistent with what the market learned about Kearl.

Q. When did you become aware?

A. I don't recall exactly when.

Q. Was it before or after you put in your opening report?

A. I don't recall, but it is consistent with what the market would have learned about Kearl, that the property the company was depending on to be its future was not profitable.

Q. So your testimony right now is that the -- let's just take this in pieces.

You agree with Dr. Ferrell that, in fact, analysts who covered Exxon and who submitted inputs to I/B/E/S lowered their forecasted EPS for 2018, 2019 and 2020, correct?

A. Right, but not for 2016 and not for 2017 on average.

Q. We'll come back to 2017. But for those three years, you agree with Dr. Ferrell that, in

Page 179

fact, there is a negative change to their forecast, correct?

A. That's right. So it's a mix of factors that would be short-term and long-term.

Q. And your position now is that those negative changes can be attributed to Kearl?

A. Well, it's that -- they may be, that's right. If we want to see what the effect is of things like Nigeria or production that was reported in the third quarter of 2016, we should look at the short-term forecast. If we want to look at the effect of long-term assets like Kearl, we would look at longer-term forecasts.

So what I determined early on was that the longer-term forecasts that I/B/E/S provides were not relevant for determining whether the various or sundry items that Dr. Ferrell points out as being potentially confounding information for assessing whether they were recurring or non-recurring, one would look at the shorter-term forecast, not the longer-term forecast.

Q. So I want to be really clear about what your position is here because I never heard this

Page 180

before and I don't believe it's in your reply report. I just want to make sure we're on the same page.

You agree that if you use I/B/E/S data, we see that in 2018, 2019 and 2020 analysts have lowered their forecast for earnings per share, correct?

A. For 2018, 2019 and 2020, yes.

Q. Okay. And where in any of your reports do you explain on what basis you believe those earnings-per-share changes were taken?

MR. SAHAM: Object to form.

Q. Where is that? Where in your reports do you explain the reasons why you believe these reductions in earnings per share were made by analysts?

A. I'm not following your question.

Q. What you just told me a few minutes ago is that you now attribute --

A. No, you're mischaracterizing if that's what you're thinking.

Q. I heard you say Kearl, it could be Kearl, right? I'm asking you where in your report? Show me.

A. Well, the point is because it could be Kearl,

Page 181

the longer-term forecast, we can't use the longer-term forecast to disaggregate which effects announced for the quarter in October of 2016 were short-term or long-term because Kearl is going to affect the long-term forecast, less likely to affect the short-term forecast. Things like temporary disruptions in production are more likely to affect the short-term forecast and less likely to affect the long-term forecast.

So if we're trying to disaggregate what's long-term and short-term, what's recurring and non-recurring, then you would look at the short-term forecast, which is what I did. And they're not even that short-term. It's the rest of the year and the next year.

Q. Okay. Dr. Feinstein, let's focus for a minute here. The October 28th alleged corrective disclosure in this case, once you took into account the one-time asset issues, reflected a decline in production, correct?

MR. SAHAM: Objection to form.

46 (Pages 178 - 181)

Page 182

Q. Excuse me. Let me rephrase that. A miss,
I think you called it a miss in production,
is that right?

A. No, that's not what I said.

Q. What words did you use?

A. Earnings, a miss in adjusted earnings.

Q. A miss in adjusted earnings. And one reason
for that miss in adjusting earnings you
believe is lower than expected production,
correct?

A. That's what the company and the analysts
attribute it to, right. Nigeria and prices
as well.

Q. So what I would like to understand is how,
if at all, you analyzed for the years in the
future how much of the change in analyst
expectations is a result of the alleged
fraud-related disclosure of Kearl and the
production issue we just talked about?

A. The question that I was asking is, is the
disruption which some people describe it as
a temporary disruption in Nigeria, is that a
recurring long-term permanent effect or a
short-term effect? The fact that it is
completely made up in the rest of the year

Page 183

2016 is good-enough analysis. It's
sufficient to answer that question. But
if production in Nigeria was disrupted so
that production was low or lower than
anticipated for the third quarter of 2016,
the fact that -- or that any factors were
impacting earnings in the third quarter
of 2016, the fact that the forecasts for
all of 2016 tells you that whatever was
impacting the number in Q3 2016 was not going
to impact the number on net negatively in
the fourth quarter of 2016. That's all
you have to do. That's the right analysis.
If you go beyond the next quarter, you're
going to be confounding that analysis with
longer-term effects which include Kearl.

Q. Okay. So it could be Kearl and it could be
something else, right? Longer-term effect,
it could include Kearl and it could include
other issues, correct?

A. All that was reported was quarter effects
on production and Kearl. I didn't offer
the opinion that it was definitely Kearl,
but it's -- because Kearl can explain all
of this, it doesn't help us answer the

Page 184

question how recurring, how long-term, how
permanent, how persistent are the effects
of what was cited to be the reasons for the
4-cent miss in Q3 of 2016.

Q. So your position is Kearl can explain this?

A. My position is that it's not for sure.
It can, but because it can, it makes looking
at the out-years not the right methodology
for determining whether or not the excuses
given for the, or the reasons attributed
for Q3 2016's 4-cent adjusted earnings miss
were recurring or not.

Q. So you're saying Kearl can account for the
reduction in earnings per share estimates,
but you have not concluded that it does,
correct?

A. That's right.

Q. And it is also possible that the changed
outlook on Exxon's production which was also
part of the October 28th disclosure may
account for the changed estimates in 2018,
2019, 2020 reflected in this chart, correct?

A. No.

Q. You're telling me, sitting here today, that
you have performed an analysis and you can

Page 185

rule out that production is -- you can
rule out that production takes into account
these lowered analyst earnings per share
expectations?

A. Production outside of any reason -- the
only negative in the Q3 2016 earnings
announcement that could explain these changes
and revisions for the out-years is Kearl
because all the other ones would have been
made up in, are made up in for the rest of
the year 2016.

Q. So you're telling me that the market would
have understood that there's no possibility
that this issue in Nigeria would continue
to persist past 2016 and the market couldn't
have been taking that into account after
2016?

A. You're mixing up a few things. They might
have thought so, but they wouldn't have
revised their estimates. It's hard to
explain, but it's correct. Something like
Nigeria, the hypothesis you're proposing
is that the market would have thought, okay,
Nigeria explains low production, modestly
low production, low end of the guided range

47 (Pages 182 - 185)

**App. 527**

Page 186

for Q3 2016. It and everything else is going to bounce back in Q4 2016, bounce back in 2017, and then raise its head again in 2018, '19 and '20. That's preposterous. There's no way that these factors that were alluded to as negative factors by the company and by Dr. Ferrell would have evaporated for the rest of 2016 and for 2017 and then could explain a long-term persistent effect in 2018, 2019 and 2020. That hypothesis is preposterous and must be rejected. The proper analysis is to look at 2016 to determine whether or not those other factors, the confounding factors are recurring or non-recurring.

Q. Where in your reply report do you provide that analysis?

A. Well, look, I provide the analysis. I don't provide the defense from preposterous questions. I provide the analysis. I explain it right here in my report. Would you like me to show you and read from it?

Q. I definitely don't want you to read from it. You can identify on the record the paragraph that you think explains the analysis that

Page 187

you just described.

A. Paragraphs from my original report, LCD report which is Exhibit 1, Paragraphs 156, 157, 158, 159, 160, 161, 162 and the footnotes on Page 59. And in the reply report Paragraphs 39 -- well, 38, 39, 40, 41 and then through 44 -- well, not even 44. It continues because it's the defense through 52. Actually, it goes beyond that, 52, then 53, 59, 60, 61, 62 through 66 through 70, through 70, so quite a bit of the report is addressing that.

Q. Okay. Let's turn to Exhibit C of Dr. Ferrell's report, Page 23.

A. Exhibit C, Charlie?

Q. Yes. Actually, let me just ask one more question. You pointed out earlier, going back to Exhibit B, that the 2017 average and median, one is positive and one is negative. Do you see that?

A. I do.

Q. So the median is negative 6 cents and the positive is 4 cents. Do you see that?

A. Yes.

Q. Do you have a basis for which you can reject

Page 188

the negative median?

A. At most it's mixed, but it doesn't indicate that the market has revised its estimate. The consensus estimate is an average estimate. Average is really the more appropriate number here.

Q. Doesn't the median mean that more analysts than not who provided inputs on this day did a downward negative revision for 2017?

A. Yes, but taking into account weighting by the numbers the average is positive. I've seen consensus more often average than median.

Q. I just want to be very clear. More analysts than not gave a downward revision for 2017 which is why we have a negative median, correct?

A. That's right. Analysts also point out that 2016, which is the more important comparison, was positive on both bases.

Q. Let's turn to Exhibit C now. You had an opportunity to review Dr. Ferrell's Exhibit C, correct?

A. Yes.

Q. Do you have any basis to dispute any of

Page 189

the information contained in it?

A. No.

Q. Sitting here today, do you disagree with any of the numbers reported in this chart?

A. That they are what FactSet reported or that they're reliable measures of the consensus estimate?

Q. That they are what FactSet reported.

A. I have no reason to dispute that.

Q. And your reason for rejecting FactSet is that you believe I/B/E/S is the superior database?

A. It's one of the reasons. It's not the only reason.

Q. Turn to Page 24 of Dr. Ferrell's report.

A. What page?

Q. 24.

A. 24, you said?

Q. Yes. So Dr. Ferrell looked at analyst estimates for full year 2016, correct?

A. Yes.

Q. Do you have any basis to dispute the information contained in this chart, Exhibit D?

A. I didn't seek to verify the numbers.

48 (Pages 186 - 189)

Page 190

Q. Sitting here today, are you able to point to anything in here that you believe is inaccurate?

A. I can't vouch for accurate or inaccurate. I think it's inappropriate, but not necessarily inaccurate. For Dr. Ferrell to say he has a better consensus forecast methodology and number than I/B/E/S is ridiculous.

Q. Well, we don't know what's in I/B/E/S's number, right? We don't know which analyst contributed to that number, correct?

A. I'm not sure whether it's not known.

Q. It's not known to you, correct?

A. Right.

Q. But this chart we can actually see that there are 18 analysts for which Dr. Ferrell looked for 2016 to see whether they changed their estimates for full year 2016, correct?

A. That's not clear. He says he's looking at October 28th to October 31st. I really can't vouch for his numbers. When I was -- when I received his report and set out to critique it, I was struck by how audacious it was to try to attack me by attacking

Page 191

I/B/E/S. I didn't feel it was necessary to verify the numbers in his alternative methodology. I do have some descriptive statistics that prove his numbers are unreliable.

Q. What are your descriptive statistics?

A. I just want to finish the answer. But I didn't seek to verify whether these numbers are, in fact, in the reports he said they're in, and it's not even clear these are before numbers or from before October 28th or after October 28th.

Q. Let's unpack this. Again, I don't want to show up at trial and find out for the first time that you have some issue with the information presented in this report. You've had an opportunity to study this, correct?

A. Yeah, I had a month to study this and write my report.

Q. And you have a team, correct?

A. Yeah. I'll show up to trial and explain that I/B/E/S is the gold standard for forecasts and that Dr. Ferrell is not and that yet he thought it was prudent or appropriate to reject I/B/E/S in favor of

Page 192

his alternative measure. I'll say all that. If you ask me did I verify the numbers in his inferior forecast, I'd have to say no, I didn't because the entire exercise, the entire endeavor is silly.

Q. Are you familiar with the concept of primary sources and secondary sources?

A. Of course. Can we take a break?

Q. I just want to finish --

A. There's nothing pending. There's no question pending.

Q. I just asked you a question.

A. And I answered it. I said of course I'm familiar with the concept.

Q. I'm going to trust that you're not going to discuss the substance of the last question on the break.

A. Sure.

VIDEOGRAPHER: The time is 2:41. We're off the record.

(Break taken)

VIDEOGRAPHER: The time is 2:56. We're back on the record.

BY MS. SOLOWAY:

Page 193

Q. Before we broke, I asked you if you knew what the difference was between a primary source and a secondary source. I think you said you do?

A. Yeah.

Q. What's a primary source?

A. I didn't come prepared to give a definition, but I don't know. Source data, source data -- I don't have a definition I can offer you now.

Q. You have a Ph.D. in economics, is that right?

A. That's right.

Q. And you can't tell me what a primary source and a secondary source are?

A. I didn't come prepared to define these terms. I'm sure I can do a better job later. Here on the spot at three o'clock in the deposition, I don't feel comfortable trying to craft a good definition for you.

Q. Okay. Is a secondary source a term that that's sometimes used to describe a source that has pulled together information from other underlying pieces of information?

A. I think that's -- I don't know if that would be the best definition, but it's a

49 (Pages 190 - 193)

Page 194

characterization that's reasonable.

Q. Okay. And I/B/E/S does that, correct?

A. They do that, but that's why the definition kind of falls apart. I think some people consider I/B/E/S to be a primary source. It's not an interpretation of earnings. It's the consensus forecast number.

Q. It's a collation of different analysts' information, correct?

A. It's what I/B/E/S determines to be the best measure of the market's consensus forecast and they have a methodology for producing that.

Q. I/B/E/S reaches that by taking inputs from the analysts themselves, correct?

A. We talked earlier. They have an extensive process. They've been in business for decades. They've honed their process. There's research about them. I don't think we can characterize today in any fewer number of pages than I've written what I/B/E/S does and how they arrive at these forecasts.

Q. But their forecasts are based on inputs from analysts, correct?

A. Their forecast considers input from analysts.

Page 195

Remember, they have a process for screening as well.

Q. And there are also analyst reports that analysts themselves publish, correct?

A. That's true.

Q. So from many analysts you can actually find the support for their estimates in their own research reports, correct?

A. Some. Not all. Many is probably a reasonable characterization.

Q. So many analysts provide the modeling they do for their EPS estimates in their analyst reports, correct?

A. Yeah, and I would say some don't. I would say many also don't.

Q. But some do?

A. That's right.

Q. Okay. And so for some analysts, the ones that provide that, you can actually go look at their reports, correct?

A. Well, that's why assistance from I/B/E/S is helpful. You may be able to, but you'd have to be careful about whether or not the analyst is publishing a report that's updated based on the most current

Page 196

disclosures.

Q. So you can go look at the analyst report and you can see that for yourself, correct?

A. Sometimes. Sometimes not.

Q. So let's look at the chart, Exhibit D on Page 24 of Dr. Ferrell's report. Do you understand that what Dr. Ferrell has done here is he's actually gone to the analyst reports themselves?

A. That's what he represented he did.

Q. And that's the primary source, right?

A. Well, again, just as I/B/E/S pulls together information from different analysts, analysts pull together information from a number of sources themselves. So you can call that either secondary or primary by your definition.

Q. So let's just use the first line as an example. BofA Merrill Lynch, do you see that?

A. I do.

Q. It says prior full year 2016 estimate $2.50, current $2.44. Do you see that?

A. I see that, but I'm looking to see where he describes what that means because this

Page 197

heading is October 28th. I see that. I don't know whether it's October 28th before or after the announcement.

Q. Okay. You can leave that question open and you can just assume that it's pre-announcement. How's that?

A. I don't know if we can. He says analyst reports listed on Appendix B that are dated between October 28, 2016 and October 31st, 2016. So October 28, 2016 could be after the announcement in the morning of October 28th.

Q. Let's just leave that to the side, then. Do you have any basis to dispute that for Bank of America Merrill Lynch the October 28th full year 2016 estimate was 2.50?

A. Yeah.

Q. What is it?

A. As of when?

Q. As of October 28th.

A. I don't know. It's not clear here. It's not clear when that estimate was formed, whether it was updated with October 28th disclosures. I just don't know from this table.

50 (Pages 194 - 197)

Page 198

Q. Sorry. Going back to that document, are you with me, Exhibit D?

A. Yes, I'm there.

Q. Okay. The estimates that Bank of America Merrill Lynch put out, current is listed as being October 31st, 2016. Do you see that? That's at the bottom where it says "source."

A. I don't see that.

Q. Under the table.

A. I see that.

Q. Analyst report listed on Appendix B that are dated between October 28, 2016 and October 31st, 2016. Do you see that?

A. I see the words. I'm having trouble understanding what they mean.

Q. Okay. Dr. Feinstein, have you gone and actually looked at these analyst reports?

A. Absolutely.

Q. Are you telling me, sitting here today, that you didn't go to check whether Bank of America Merrill Lynch's estimates changed between October 28th and October 31st?

A. I relied on I/B/E/S to assess the consensus, the market's consensus forecast and changes.

Page 199

I didn't seek to second-guess I/B/E/S or produce by my own concoction a number that could have been better than I/B/E/S.

Q. Okay. So you did not actually go look at the analyst reports themselves for this information?

MR. SAHAM: Objection, misstates prior testimony.

A. False.

Q. Either you did or you didn't. You either looked at the analyst reports themselves to see whether they provided changes in estimates for 2016 or you didn't. Which one did you do?

A. I looked at the analyst reports and I saw the contents of the analyst reports. If they included a forecast, I observed it, I read it, I considered it.

Q. Okay. Where?

A. What do you mean, where?

Q. In your report, did you do a table like this?

A. I'll show you.

Q. Which report are you looking at?

A. First we'll look at the October 11, 2024

Page 200

report, Exhibit 1. Starting on Page 68, continuing on Pages 69 and 70 and 71 and 72, 73, 74, 75, 76.

Q. Let me withdraw the question and ask a more particular question.

A. I'm finishing. I mean, here I explain that I looked at these reports and considered their contents.

Q. I'm asking you whether you performed an analysis of analyst estimates from their reports before October 28th and after October 28th?

A. I answered that question two questions ago. I said that I relied on I/B/E/S for their presentation of the market consensus forecast and I didn't seek to produce an estimate or measure a consensus forecast that's better than I/B/E/S because I don't think I'm qualified to do that, nor is Dr. Ferrell.

Q. Okay. The output of this chart is that both the average and the median are negative, correct?

MR. SAHAM: Objection to form. What chart?

Q. I'm on Page 24, Exhibit D, the output of

Page 201

this chart is that both the average and the median are negative, correct?

A. What do you mean by "output"?

Q. There are 18 analysts included in this chart, correct?

A. No, actually. There's less than 18 that are included in the computations.

Q. There's some for which there's an NA, correct?

A. Yes.

Q. So there's no numbers included there, right, for those NAs?

A. That's right.

Q. For the ones where there is a numerical value given for their full year 2016 estimate, the average is a negative change, correct?

A. Change from when to when?

Q. From prior to current as listed in the chart.

A. I don't know what "prior" means and I don't know what "current" means. He doesn't explain it.

Q. Okay. At the bottom it says under Source, "analyst reports listed in Appendix B that are dated between October 28, 2016 and

51 (Pages 198 - 201)

Page 202

October 31st, 2016." Do you see that?

A. Right. So does that define the prior or does that define the current?

Q. Those reports are listed in Appendix B, so you've had access to them for a month, correct?

A. I had access to this report. It's not clear what he means by source or analyst reports listed on Appendix B that are dated between October 28, 2016 and October 31st, 2016.

Q. Okay. Dr. Feinstein, I understand that you don't know what time of day the reports were issued at, but this chart purports to set out reports that were issued on October 18th, correct?

A. No.

Q. Dr. Feinstein, the title of the chart is Summary of Equity Analyst's Change in 2016 EPS Estimates, October 28, 2016 to October 31st, 2016. Are you telling me you don't understand this chart?

A. Yes.

Q. Okay. You don't understand this chart?

A. I don't think it's explained well and

Page 203

presented well. I mean, when were these prior numbers published?

Q. October 28, 2016.

A. I'm not sure that's what this chart says. That's not what the documentation here says.

Q. Okay.

A. And so even if it were October 28, 2016, it opens the question, is it before the announcement? Is it after the announcement? Was it updated to take into account the announcement? None of that's clear here.

Q. Is that clear from the I/B/E/S data?

A. Yes.

Q. Tell me how.

A. That's what the documentation for I/B/E/S does. I/B/E/S says that they screen to make sure that after a major announcement, they only include in the consensus forecast numbers that they have determined take into account the major announcement.

Q. Okay. Other than what I/B/E/S says, though, you don't actually know what they did he to support that, correct?

A. I think it's prudent to rely on what they say so given that they're the gold standard

Page 204

for providing consensus forecast numbers to the finance industry.

Q. I appreciate that you don't understand what this chart is and you don't know what it reflects even though you've had a month to look at it, assuming the accuracy of the information reflected in this chart, this chart reflects that both the average and the median full year 2016 estimate declined based on these analysts' estimates, correct?

MR. SAHAM: Objection, form, foundation and argumentative.

A. Because these numbers differ from the I/B/E/S numbers, I don't trust these numbers. I don't think they're reliable.

MS. SOLOWAY: Okay. Let the record reflect that the witness is not interested in answering the question.

MR. SAHAM: Is that a question?

MS. SOLOWAY: No. That's just me feeling better.

MR. SAHAM: Okay.

Q. Take a look at Paragraph 39 of Dr. Ferrell's report. Have you had an opportunity to review Paragraph 39?

Page 205

A. Yes.

Q. You've had this report for a month as well?

A. Yes.

Q. Is there anything in Paragraph 39 that you take issue with?

A. Yes.

Q. What is that?

A. Well, aside from the fact that it relies on unreliable inputs, it produced preposterous results.

Q. So let's limit this to the analysis that was done. I appreciate that you prefer the I/B/E/S numbers and would prefer to use those, but putting aside the fact that you disagree with the source material, do you have any issue with the way Dr. Ferrell conducted the math that's done in Paragraph 39?

A. Yes, and I explain that in my report.

Q. What's your issue?

A. Look at Paragraph 48 -- 58 of my report. If we were to accept this analysis, he concludes that the valuation impact of recurring impacts on earnings is between $1.14 per share and $5.93 per share, and

52 (Pages 202 - 205)

Page 206

the number is ridiculous.

As I say on the next page, how can you call that precise when the top end of his range is 5.2 times larger than the lower end of his range? It's 2.4 times greater than the total residual price decline that actually did occur on October 28th which his analysis is purportedly trying to explain only a portion of. And get this, it would be 1.9 times, almost two times more negative than the largest observed one-day stock price decline that ever occurred in Exxon stock during the class period. There's something wrong with his analysis.

Q. There's a range given, correct?

A. Yes.

Q. Have you provided a range in your report?

A. I have a more precise estimate. I've determined that the effects were non-recurring and had a, had an impact on the stock price equal to their maximum non-recurring impact on earnings which was 4 cents per share.

Q. If you use the I/B/E/S data for 2018, '19 and '20, you could construct your own range,

Page 207

couldn't you?

A. I wouldn't use it for -- I didn't use it that way. Range for what? A range for what I would purport to be how much of the stock price decline -- let me just leave it at that. I don't know what you mean. A range of what?

Q. What Dr. Ferrell is doing here, as I understand it, is he's estimating a range to explain how the stock is likely to move based on the potential that there is future recurring negative impacts which are demonstrated by the earnings-per-share estimate, right? You didn't do a similar analysis to that, correct?

A. I was trying to assess what was the valuation impact of this group of other confounding factors, and I set forth what my methodology is and I executed the methodology and arrived at 4 cents. If that's what he's trying to do here, and it's not entirely clear it is, we know his result is unreliable because the stock price decline that day caused by company information was $2.43 per share and he's saying that it could be $6 a share

Page 208

based on his analysis. That proves there's something wrong with his analysis.

Q. I'm not asking about his analysis. I'm asking whether you performed any similar analysis?

A. Yes. I explained that. I got 4 cents a share.

Q. Okay. Let's turn to January 31st, the topic of January 31st. So you were aware when you put your report in in this case that the plaintiffs had retained an expert, Mr. Torchio, who concluded that on January 31st Exxon stock did not have a statistically significant movement as measured from close to open, correct?

A. I forget what his conclusion was. I determined that his econometrics was lacking, was wrong.

Q. Let's talk about that. In what way do you believe Mr. Torchio's analysis was faulty?

A. The peer group was just wrong. The peer group was wrong. That's what I recall as being the major flaw.

Q. In what way?

A. Well, it's not a peer group that we can

Page 209

trust represents the company's, Exxon's industry sector.

Q. Can you expand on that? What's wrong with -- and Mr. Torchio has testified in dozens of these cases, correct?

A. Yeah, and I disagree with what he did.

Q. Let's just make sure we understand whether you think what he did was wrong or you just have a different view.

A. It was wrong. It was wrong.

Q. It was wrong?

A. It was wrong.

Q. Okay. And do you know whether he does analyses like that in all of his cases?

A. I really only know about this case.

Q. What was wrong about his selection?

A. It doesn't comport with what the company said was the best indicator, the best measure of industry sector effects. I think he also used two-day windows, which the judge criticized and I would agree would not be appropriate for the facts and circumstances of the two dates, the dates he examined.

Q. Is there anything else that was wrong with what he did?

53 (Pages 206 - 209)

Page 210

A. No. Well, the results. When you correct those mistakes, you get different results.

Q. So you changed the industry index to use different companies, as I understand it, when you performed your regression analysis, correct?

A. No, I didn't change the industry index at all. I used exactly the industry index that the company said was appropriate to measure industry sector effects.

Q. So when you say the company says it, what are you referring to?

A. Exxon, Exxon has documents, filings that say we believe the best indicator of our industry sector is evaluating index comprising four peer companies.

Q. BP, Chevron, Shell and Total?

A. Yes.

Q. Do you always use the company's own disclosures of its peers as the basis for your comparative index when you run a regression?

A. If I can, if it's available.

Q. Have you ever not?

A. Well, in other words, you're saying it

Page 211

was available and I chose not to use it?

Q. Yes.

A. I don't recall that I have, at least not during the last ten years, probably longer. I can't think of it. The company has some discretion under SEC Regulation S-K to use an index for S-K purposes, disclosure purposes that is not their industry sector, and then sometimes usually the foreign companies, they won't even comply with Regulation S-K. But if the company says this is our peer group, that's my methodology. That's my favorite chosen methodology that I use in every case that I can, the company's peer group.

Q. Is there academic literature that says that that methodology that you use is the only correct way to do a regression?

A. In securities litigation?

Q. Mm-hmm.

A. There's not that much academic literature that specifically, is addressed specifically for securities litigation, but there's literature that speaks about how not to overfit the model. I cite it in my report

Page 212

that you shouldn't try to overfit the model, you shouldn't necessarily choose a peer group based on fit or R-squared, that you should pick your index a priori before running your test. You don't pick an index, look at the results and then say I don't like the results, I'm going to pick a different index. There's literature that says that and my methodology complies with all of those prescriptions from the literature.

Q. I want to be really narrow here. You're taking the position in this case that Mr. Torchio's selection was wrong and yours was correct, right?

A. Yes.

Q. I want to know if you can point me to any academic literature that you could cite, sitting here today, that I could look at to understand why his was wrong and yours was right?

A. I have it. It's in my report. My understanding is that Mr. Torchio selected his index in a similar manner to Dr. Ferrell on the basis of the results that were

Page 213

produced by the regression, how they fit. and Campbell, Lo and MacKinlay, an authority in the field, my Paragraph 96 quotes from their 1997 book that warns against overfitting and says, "the most effective means of reducing the impact of overfitting and data-snooping is to impose some discipline on the specification search by a priori theoretical considerations." And my methodology is entirely a priori theoretical considerations. It uses the index the company identified as correctly representative, not one that was based on ex-post results produced.

So I have Campbell, Lo and MacKinlay. There's an article by MacKinlay himself that says essentially the same thing. There's more that I don't have in my report, there's a lot of literature that warns against data results-driven choices. Mine is not results-driven. It's picked in advance using an objective methodology. I don't have it cited. There's literature on how to reduce as much as possible subjectivity that has to be imposed on

54 (Pages 210 - 213)

Page 214

an econometric design using an objective methodology and consistently using it such as using the company's choice would satisfy that criterion for correctness.

Q. So I want to make sure I got this right. You believe that Mr. Torchio, in constructing his index, self-selected companies in order to achieve a certain result?

A. That's my recollection, that he said he chose it on the basis of fit, that he thought there were a number of -- as did Ferrell, that there were a number of off-the-shelf canned indices and that which ones he used he picked on the basis of fit.

Q. What does that mean? What is your understanding of how he changed an index based on fit?

A. Changed, you said?

Q. I think you just said --

A. Chose.

Q. He chose an index, and then are you suggesting that he modified the index in some way?

A. I think he did. I mean, most people do. If you're going to use an off-the-shelf

Page 215

index, they would remove the subject company. I don't recall specifically his report. Do you have it here? Can I look at it? Why don't we look at his report.

Q. Hang on a second. I'd like to know what your understanding is of what he did because you told me pretty strenuously that it was wrong.

A. Oh, yes.

Q. And I'd like to understand why.

MR. SAHAM: Objection to form, and if you want to ask about what Torchio did, show him his report.

MS. SOLOWAY: Is it "Torchio" with a "cha"?

MR. SAHAM: I'm not even sure if it's "Torchio." I think it's "Torchio," but I think it's fair if you ask him questions about what Torchio did, that you show him the report.

MS. SOLOWAY: Okay. Objection noted.

Q. You said it's your understanding -- I just want to make sure I'm getting this right -- that he selected an index. Do you mean

Page 216

like an industry index to use for comparative purposes?

MR. SAHAM: Objection to form.

A. Yes.

Q. And what index did he select?

A. I don't recall, but it was one that was produced by one of the data providers.

Q. And do you know the name of that index?

A. Can I see his report? It's in the report.

Q. Hang on a second. I just want to understand what your understanding is of what he did.

MR. SAHAM: Again, I object to foundation. It's unfair. It's not a memory test. If you're asking him about what Torchio did and you've got Torchio's report sitting there, show it to him.

Q. What did he do after he selected an existing index?

A. I read his report. I understood what he -- I understood as I read his report that what he chose to do is wrong. If you want me to be more specific, I really have to refresh my memory by looking at his report.

Q. We'll give you his report.

MS. SOLOWAY: Let me mark this.

Page 217

We're up to Exhibit 5.

(Exhibit 5 marked for identification.)

A. (Witness examines document)

Q. Dr. Feinstein, are you able to point me to the place in the report where this error was committed?

MR. SAHAM: Objection to form. Take your time reviewing the report.

A. (Witness examines document)

In Paragraph 47 he refers us to Appendix B, so I'm turning to Appendix B. Appendix B is on Page B1, which I guess the number is on the top of the page, Page 115. Note he also cites to Campbell, Lo and MacKinlay on Page 117 which is B3.

Q. Okay. Well, this filibustering is impressive.

MR. SAHAM: Let him review the document.

Q. I think the question on the table is can you please show me where in Mr. Torchio's report he made the error that you're telling me about?

MR. SAHAM: Ms. Soloway, you

55 (Pages 214 - 217)

Page 218

asked him to identify it. He's going to take the time to review the report so he can answer your question, so stop interrupting him or withdraw the question. He's entitled the time to review the report to answer your question and you interrupting him is going to make it take longer.

A. Paragraph 22 is the answer to your question, Paragraph 22 on Page B8. It's exactly consistent with what I testified to earlier.

Q. Paragraph 22 on Page B8, I'm there.

A. Also --

Q. Before we move off of that, tell me what is improper about what is described in Paragraph 22.

MR. SAHAM: Objection to form.

A. In his words, he said "I," meaning him, "tested multiple S&P 500 industry indexes related to oil and gas including Bloomberg identifier," in parentheses, "total return indexes used if available; S&P 500" -- do you want me to read them all?

Q. No. I just wanted you to --

A. He tested multiple indices and removed Exxon, which was appropriate, but then selected

Page 219

the ones used for his analysis based on fit. That's in Paragraph 23. Based on fit means he picked his model based on what the model produced, not based on a priori considerations.

Q. If you look at the paragraph underneath that, he talks about "to determine which market and industry proxies to use, I examined the R-squared and adjusted R-squared statistics." Do you see that?

A. Yes.

Q. What is an R-squared a measure of?

A. It's a measure of fit, meaning for each model, how closely does it -- how much, how much of the company's stock return variation does the model explain. So by picking the highest R-squared model, you're attributing as much as possible across all the choices of indices, as much as possible of the company's movements to market and sector whereas many of those movements really should be attributed to company-specific information.

Q. So are you in Footnote 14 where he says "the specification with this industry index

Page 220

had the highest R-squared and adjusted R-squared"?

A. Where are you reading?

Q. Footnote 14.

A. Of which report?

Q. Of what you were just reading to me, Paragraph 23 of Torchio's report.

A. His Footnote 14 was on the next page, right?

Q. Page B9.

A. That's right.

Q. So I just want to make sure I understand what your criticism is. I think what he's saying here is that in Footnote 14, the specification with this industry index had the highest R-squared and adjusted R-squared?

A. Right. And I want to point out that you would not know that until after you've run the regression. You wouldn't know that before you ran the regression.

Q. Unless I'm misunderstanding, I think he's saying he ran a whole bunch of different information and then he's saying the specification with this industry index had the highest R-squared and adjusted R-squared. Am I getting that right, what

Page 221

he did?

A. You read it right, but you interpreted it wrong if you said my interpretation was not accurate.

Q. What's your interpretation of what he did?

A. He ran many regressions and then looked at the results of those many regressions, and based on the results of those many regressions, decided which market and sector index to use.

Q. When you say "results," what do you mean? Like what do you think he was looking at when you say "results"?

A. The output, the output of the regression.

Q. You mean whether or not statistical significance was achieved on any given day?

MR. SAHAM: Objection to form.

A. Well, it's related, but it's fit. It's which model -- highest R-squared -- R-squared is a ratio that shows how much of the variation in the dependent variable can be explained by the model that you chose. The higher the R-squared tells that you -- if it's the highest R-squared, it means you're attributing most of all possible models,

56 (Pages 218 - 221)

Page 222

it's the model that attributes most of the movement in the company stock price to non-company information.

Q. What does a lower R-squared mean?

A. That would mean that less of the movement is being attributed to market and sector information and, therefore, more would be attributed, possibly appropriately if your specification is correct, to company information. So choosing on the basis of R-squared is choosing on the basis of the result of the regression rather than considerations like the market thinks this is the best representation of its industry.

Q. So I just want to be clear. You believe it's improper to look at the output of this R-squared before you select an index?

A. Yes.

Q. And I just want to make sure I'm also clear --

A. In this application, if that's what you're trying -- if we're trying to figure out how much of a day or a period stock price movements were caused by company information versus market and sector information.

Page 223

Q. I just want to be really clear. If the only thing Mr. Torchio looked at when he ran this analysis was the R-squared or the adjusted R-squared, but didn't go further to look at whether on the alleged corrective disclosure date there was a statistically significant decline or not, would that still be improper, in your view?

A. Yes.

Q. I just want to make sure. Do we agree that a lower R-squared means that it's more likely to find statistical significance?

A. Of what?

Q. Of the information that you're testing for on any given day.

A. The company-specific information?

Q. Yes.

A. I would say it's more likely than not that you'd be attributing -- if you're choosing your model specification on the basis of R-squared, then you're likely picking an independent variable, a right-hand-side variable that has a high correlation and may be the wrong causation direction, and that would more likely with a higher R-squared

Page 224

find non-significance on various days.

Q. So just --

A. It's not always, but more likely.

Q. So higher R-squared, less likely to find statistical significance?

A. Not always. I said, I would say probably in more applications than fewer applications that's the result you would find. Let me be more clear about this. You're going to find exceptions. I mean, that's the whole thing with data. The data exists and we come afterwards, after the data has been produced and try to analyze it. So you would -- you're more likely to make the mistake of simultaneity if you pick your independent variables on the basis of fit. You're more likely to find variables that seem to fit the data because in this case Exxon is causing the sector index to move rather than the sector is causing -- rather than picking up the sector effect that causes Exxon to move. That's one mistake you're more likely to make if you pick your specification and variables on the basis of fit. It's not the only mistake, but

Page 225

that's one of the mistakes that you're more likely to make. You might not make it, but you're more likely to make that mistake.

Q. Okay. So --

A. I just want to point out that I read an excerpt from the literature that said don't do this, don't over-pick the model, pick your model specification based on the basis concepts, not on the basis of fit.

Q. Okay. I hear you. So I want you to turn to, go back to Dr. Ferrell's report and turn to Page 30. Actually, I'm going to have you go to 29, Paragraph 47.

A. I'm sorry. What page now?

Q. Page 29, bottom, very bottom of the page which is in Paragraph 47.

A. Got it.

Q. Dr. Ferrell writes, "specifically," this is the very last line on the page, "specifically, for January 31, 2017, Dr. Feinstein's close-to-close adjusted R-squared of 53.6 percent is lower than my and Mr. Torchio's close-to-close regression models adjusted R-squared of 56.3 percent and 55.3 percent." Do you see that?

57 (Pages 222 - 225)

Page 226

A. I do.

Q. Is the data in that sentence correct?

A. I don't know. What's wrong in that sentence is that that's the basis for picking the model specification. I didn't check to see -- I didn't do -- I don't recall -- I probably looked at it at some point, but I don't recall if I verified his R-squared number.

Q. Sitting here today, you have no basis to dispute that the adjusted R-squared on the close-to-close basis of your model is lower than Mr. Torchio's, correct?

A. It's not confirmed or -- I'm not going to confirm or deny.

Q. Is there any place you can look this up?

A. Well, I mean, I could. It's not appropriate -- it's not that I would, though. This is not the basis for how you pick a model in a regression for an event study.

Q. So I'm going to move off of the topic of how you pick a model. I'm just focused on the R-squared right now. Do you have any basis to dispute that your close-to-close adjusted R-squared was 53.6 percent which

Page 227

is lower than Mr. Torchio's and Dr. Ferrell's?

A. No, I don't have a basis for disputing it, as I sit here now.

Q. Dr. Ferrell goes on to say, "this means that Dr. Feinstein's conclusion relies on a regression model that does a worse job of predicting ExxonMobil's price movements than my regression model and Mr. Torchio's model." Do you see that?

A. Yes. And boy, is that wrong.

Q. Tell me on what basis that's wrong.

A. We're not trying to predict anything. We're trying to explain. All of the data has already happened, for one. And the second thing is his model, because it was picked in order to have a higher R-squared, doesn't reliably explain Exxon's stock price movements.

I'll just give you an example. I can take Exxon's stock price movements themselves, I can take those returns, I can add a little bit of noise to it, just random noise, a little tiny bit, and use that as my right-hand-side variable and I'll get

Page 228

an R-squared close to one. It doesn't mean that that's a good model. It would be a terrible model. That's essentially what he's done.

Q. Okay. So I just want to make sure we're on the same page here. Before we looked at this paragraph, I think you agreed with me that a lower R-squared means that a model is more likely to identify a statistically significant result, correct?

A. No. In some circumstances it's more.

Q. I think you said there could be exceptions, but generally yes?

MR. SAHAM: Objection to form.

A. Well, let's see. Yeah, I would think that it's more likely to get the correct answer if it was picked a priori on the basis of concepts rather than effect.

Q. That's not my question. My question is -- and I'm pretty sure you told me this before and it's in the transcript -- that a lower R-squared as a general matter means that it is more likely to find statistical significance in your result, correct?

A. If the reason -- let me think about it

Page 229

a second.

Q. Do you want to withdraw your earlier testimony, Dr. Feinstein?

A. No, no, I don't. I think the problem here is in the word, use of the word "likely" which you and I both used. You're more likely to find -- yeah, I'd say that the facts are what they are. The question is which model is best at detecting the true facts, and the one with the lower R-squared because it attributes less of the movement to the market in the sector is going to attribute more of the movements, the stock price movement to company information which might be the correct answer, which is the correct answer if the model was picked a priori based on concepts rather than fit.

So the model, yes, the model will, but it will be appropriately so. It would be more likely to detect. That's it. The model -- if the model is specified correctly, it will be more likely to detect correct statistically significant movements.

Q. Okay. You did not do a close-to-open study for January 31st, correct?

58 (Pages 226 - 229)

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

**App. 538**

Page 230

A. Yes.

Q. You only performed a close-to-close study?

A. Which was appropriate given the facts of this case and, frankly, consistent with the judge's order as well.

Q. Let's put the judge's order to the side. I think we can let the judge interpret his own order. Can we agree to that?

A. I'll answer your questions.

Q. Okay. Dr. Ferrell in his report shows that if he took your methodology and extended it to apply it to a close to open, that there would be no statistical significance for January 31st, isn't that right?

A. I don't recall, again, because you're asking me to verify results of a test that is poorly constructed. Why would you do close-to-open when important news came out during the next trading day related to the disclosure we're trying to test?

Q. Dr. Feinstein, I understand that you disagree with the judge's ruling that close-to-open is appropriate here, I get it. Let's put that to the side for a moment.

I'm asking you whether -- and if

Page 231

you'd like, you can look at Page 31 of Dr. Ferrell's report. I'm asking you whether it is correct that if we run your regression using your inputs and assumptions on a close-to-open basis, it is not, it does not get a statistically significant stock price movement on January 31st for close-to-open?

MR. SAHAM: Objection to form.

A. What are you asking me?

Q. Look at Page 31 of Dr. Ferrell's report.

A. I think you did mischaracterize the judge's order.

Q. And I'm happy that we can let the judge decide what the judge ordered on another day. This is a narrow question. Do you see Exhibit E of Dr. Ferrell's report?

A. I do.

Q. It's called Feinstein Regression Model Close-to-Open Event Study on January 31st, 2017. Do you see that?

A. Yes.

Q. Do you understand that Dr. Ferrell is using your methodology and your regression and he's performing a close-to-open event study on January 31st?

Page 232

A. I'll take your word for it. I didn't verify this result because it was -- what negative word should I pick? It's not well-motivated, irrelevant.

Q. It's irrelevant?

A. Absolutely.

Q. Okay. So sitting here today, do you have any basis to dispute that if we run your regression model on a close-to-open on January 31st, 2017, the result is not statistically significant?

A. I did not test my model on a close-to-open basis because the news came out, important news related to the disclosure came out during trading on January 31st, 2017.

Q. What time did the news come out?

A. Well, the press release was before the open, but the conference call started at 9:30 and extended for about an hour and there was important information, questions and answers about the impairment.

Q. Okay. And the press release came out before the market opened, correct?

A. The conference call was after the market opened.

Page 233

Q. Going back to Dr. Ferrell's report, you've had this for a month, correct?

A. I critiqued his report, and the critique of this test is that he runs it on the wrong period.

Q. And if you assume for the moment that we want to understand whether there's a statistically significant price movement from close to open, do you have any basis to dispute his finding?

A. I can't verify his finding or dispute it.

Q. I'm going to have to tell you, I have the same problem when we show up at trial in this case, are you going to take the stand and say this was done incorrectly? Is the math wrong or isn't it wrong?

MR. SAHAM: Objection to form.

A. I'll say I didn't verify his result, that it's just the wrong test to run. Close to open when the news came out after the open, doesn't make sense.

Q. Do you have anything, sitting here today, that you can point to in this analysis that you can say "I am aware that this was calculated incorrectly"?

59 (Pages 230 - 233)

Page 234

A. Yes.

Q. What?

A. Here he says the adjusted R-squared is 67.9 percent and moments ago you were criticizing my model for having a 53 percent R-squared. Which is it? 53 or 67?

Q. I think you may be confusing close-to-open and close-to-close, but putting that aside.

A. No, no, that's the basis for understanding that there's a problem with the specification.

Q. Do you have any other reason to dispute that on a close-to-open basis using your regression, the outcome is not statistically significant?

A. As I sit here now, no. I can't confirm. I didn't confirm it.

MR. BURKHOLZ: We've been going for about an hour.

MS. SOLOWAY: Sure.

VIDEOGRAPHER: The time is 3:50. We're off the record.

(Break taken)

VIDEOGRAPHER: The time is 4:04. We're back on the record.

Page 235

BY MS. SOLOWAY:

Q. Dr. Feinstein, I'd like to turn to the analysis that you did to address potential confounding information for the January 31st, 2017 date that you examined.

My understanding is that you made a deduction from your damages calculation for the Green River impairment. Do I have that right?

A. Yes.

Q. Apart from the Green River impairment, did you make any adjustments to take into account confounding information on January 31st?

A. Yes.

Q. What was that? Tell me what paragraph of your report you're in.

A. 163 through 166. So the regression indicated that $1.23 of the company-specific information on January 31st, 2017, including information disclosed during trading that day caused the stock price to fall $1.23 per share and identified no public negative confounding information, but I was informed by counsel, plaintiffs' counsel that an internal document produced in connection

Page 236

with this litigation found that seven different assets, the impairment, the two billion, $2.03 billion in impairment was spread across seven different assets. One of those was Green River and there was an amount given for Green River and I was told that Green River, that counsel doesn't intend to prove or at this point cannot prove or something of that sort, cannot attribute fraud to the Green River disclosure, impairment disclosure, but also two other assets.

So there were seven properties that accounted for the $2.03 billion of impairment, two were not at RMDG, and one of RMDG's assets is not alleged to have been impaired as of the start of the class period. So it's not just Green River. It's Green River and two other assets.

Q. The 85.9 percent that you say is allegation-related at the bottom of the page on 61, how did you identify the 85.9 percent? Where did that particular number come from?

A. Footnote 156, that document.

Page 237

Q. Just to understand the math here, did you do this on a pro-rata basis, meaning you figured out what the total size of the impairment was, and then you said, well, I'm going to dollar for dollar do a reduction that only takes into account the same share as the amount of the impairment?

MR. SAHAM: Objection to form.

A. Essentially, right. 85.9 percent of the impairment is attributable to the three allegation-related RMDG assets and, therefore, I attributed 85.9 percent of the stock price, of the residual stock price decline to the alleged fraud involving those three properties.

Q. So you made a quantitative judgment?

A. Yes.

Q. You did not make a qualitative adjustment?

A. Right.

Q. For example, you didn't take into account how important the Rocky Mountain Dry Gas assets were vis-à-vis any other assets that had been impaired that day?

A. I did the calculation the way I explained.

Q. So no, correct?

60 (Pages 234 - 237)

Page 238

A. No, that's not entirely correct. Deciding the pro-rata basis is the correct basis is qualitative and quantitative.

Q. Other than the analysis we just discussed having to do with the non-fraud-related impairments, did you identify any other confounding information?

A. No.

Q. You did not make any adjustment for the earnings reported for the fourth quarter of 2016, correct?

A. I think it was a B, so it was positive news.

Q. Again, just to be clear, you did not make any adjustments for the earnings report for the fourth quarter of 2016, correct?

A. I looked at the elements of the earnings report and I didn't find anything that would reasonably, according to financial valuation principles, contribute to a stock price decline.

Q. And what methodology did you use to determine that?

A. I looked at all of the elements of the disclosure and compared them against financial valuation principles.

Page 239

Q. So I just want to make sure I understand how you deployed a methodology, if any, here. In your report you cite some analyst reports, correct?

A. Yes.

Q. And Dr. Ferrell cites other analyst reports, correct?

A. No. I cite all the analyst reports. I don't think he cites any that I didn't cite.

Q. Let me actually draw your attention. In your reply report, I think you accused him of cherry-picking analyst reports, so why don't we go to that. It's in Paragraph 124. And, again, without reading it aloud, I just want to direct your attention at the top of Page 47, you state that Dr. Ferrell is relying on an unrepresentative selection of only five analyst reports. Do you see that?

A. No. I was turning the page. Page 47, you said?

Q. Top of the page, you say his analysis is based on an unrepresentative selection of five analyst reports. Do you see that?

A. Not yet. That sentence begins on the

Page 240

previous page. Okay. Now I see it.

Q. Okay. So what I'd like to understand is what methodology, if any, did you use to analyze the analyst reports here? So there are some analyst reports that Dr. Ferrell cites and there are other analyst reports that you cite. On balance, how did you come to the conclusion that there was no need to take into account the company's earnings results that were released that same day?

MR. SAHAM: Objection to form, compound.

A. That's in my Paragraph 122 on Page 45. I go through the different analyst reports that he ignored, Evercore, ISI, report results in line by XOM. How can he say that that was a miss? Jefferies, Material Beat, how can he say that that was a miss? Jefferies says adjusted EPS was 89 cents per share versus our estimate of 68 cents per share, consensus of 70 cents per share. The consensus numbers take all the analysts into account properly screened and say that this was a beat. For him to say it was a miss is just wrong.

Page 241

Q. Okay. I think that's misconstruing what he said, but let's just take a step back. There are some analyst reports that you cite who view this as a beat and there are some other analysts who don't, and I think what you're saying is that they're in the minority. Am I getting that right?

MR. SAHAM: Objection form, compound.

A. Yes.

Q. My question for you is, did you have any methodology that you could deploy here to try to figure out whether on balance there is some amount of information here that relates to the earnings that the market would have incorporated into the stock price that day and needs to be disaggregated from the stock price decline you calculated for January 31st?

MR. SAHAM: Objection to form.

A. Yes.

Q. What was that methodology?

A. I compared the reported result to the consensus forecast and it was a material

61 (Pages 238 - 241)

App. 541

Page 242

beat and most of the analysts said so.

Q. And what was your data source for the consensus forecast?

A. In this case, the analysts themselves referred back to I/B/E/S and the numbers that were consistent with I/B/E/S. So, for example, on Page 45, numerette 1, Evercore says that the company's 71 cents per share adjusted EPS was in line with consensus estimates at 70. So they're saying it's 70. I'm pretty sure I/B/E/S said it was 70 going into this announcement. So it's Evercore says that the consensus was 70 and 71 cents and they wrote in line, but 71 is more than 70 so it's a beat.

I'm not done. Jefferies said again the consensus is 70. I don't know why you're laughing. You asked me how do I know that the consensus was 70. Jefferies said it was 70. Raymond James said it was 70. RBC said it was 70. UBS said it was 70. Just look through this list of analyst reports and my excerpts, they all say it's 70 cents going in, and the company's announced earnings was greater than 70.

Page 243

Why is that funny?

Q. So, again, I find it funny when you read your report to me even though I have read it myself.

A. Why didn't you know that the analysts that I give ten different examples of analysts that say the consensus was 70 and Ferrell was just wrong.

Q. I appreciate that you think Dr. Ferrell is wrong. Let's move on.

In the October 28th disclosure discussion, you recall we talked about that for a while?

A. Yes.

Q. You looked at I/B/E/S data to see what the forecasts were before the information came out and how they changed after. Do you recall that? We talked about that for a while earlier.

MR. SAHAM: Objection to form.

A. Yes.

Q. Did you perform that same analysis here?

A. There was no confounding information announced aside from parts of the impairment that would, that according to evaluation

Page 244

principles was negative, so there was no need to.

The thing to do was to see -- okay. In the October announcement arguably, not for sure, but arguably there was a 4-cent miss. It was actually a beat, but adjusted EPS made it a miss. So the question was was that a recurring miss or a non-recurring miss, and I/B/E/S indicated that it was a non-recurring miss. Here it's not even a miss, it's a beat, so there was no need to do that same analysis to determine whether it's recurring or non-recurring.

Q. So the answer you is you did not do that analysis because you did not view it as necessary?

A. It wasn't necessary or appropriate given that the confounding information, if anything, was positive in this case, in this date, in this date.

Q. I want to turn to the concept that you talk about in your report, maybe you don't describe it this way. Do you know what I mean when I say "constant dollar inflation ribbon"?

Page 245

A. Yes.

Q. What is a constant dollar inflation ribbon?

A. Inflation is calculated on a dollar basis rather than a percent basis and a determination is made that the inflation that came out at the end of the class period is commensurate with the amount of inflation that would have been there all along.

Q. And so in this case, I want to put the January 31st disclosure to the side for a moment and focus on the October corrective disclosure.

A. Okay.

Q. Is it correct that you have calculated that there was the same amount of inflation in the stock from the first day of the class period through the October corrective disclosure date?

A. Can I hear the last part of your question?

Q. Let me rephrase it. Is it correct that you have calculated that there's the same amount of inflation in the stock on each day of the class period from the first day of the class period up until the October alleged corrective disclosure?

62 (Pages 242 - 245)

Page 246

A. Well, it's actually the first night of the class period after the 10-K is filed and it's a conclusion that the best estimate of the inflation is the number, is the amount of inflation that dissipated at the end. It's a fairly short class period, it's eight months, and the best estimate of how the market would have reacted to the news on the first day or any day is what we observed the market doing and how they reacted on that disclosure date. So it's a conclusion. It's not an assumption. It's a conclusion.

Q. That got a little confusing for me there because I don't think we were talking about the same thing. Let me try to make this really clear for you.

An investor who purchased stock in Exxon on February 3rd has the same damages as an investor who purchased on October 27th, correct, per share?

MR. SAHAM: Objection to form. Did you mean to say February 3rd?

MS. SOLOWAY: I did say February 3rd.

MR. SAHAM: But did you mean to?

Page 247

Because February 3rd is not in the class period.

MS. SOLOWAY: You're right. Thank you. Let me pick a different date.

Q. I want to make sure I'm following the way you constructed the inflation ribbon. So under your damages calculation, an investor who purchased stock on a per-share basis has the same damages per share if they purchased the day after the class starts, which is February 24th, 2016, as on October 27th, which is the day before the alleged corrective disclosure, correct?

A. No.

Q. How are their damages different?

A. Depends when they sold the stock or if they did sell the stock.

Q. Okay. Let me rephrase the question.

You've calculated in this case an amount of alleged artificial inflation in the stock price, correct?

A. Well, no, it was never alleged, as far as I know, what the inflation was.

Q. You've calculated an amount of inflation that you believe was in the stock price as a

Page 248

result of the alleged fraud, correct?

A. That's right.

Q. And that amount is the same on the second day of the class period as it is the day before the corrective disclosure, correct?

A. Well, I mean, this kind of analysis is the estimation of what the stock price would have been in a but-for world, so I estimated that the amount of inflation was the same on each day of the class period from the start of the class period until the first corrective disclosure. That was the best estimate of the amount of inflation in the stock price.

Q. And on October 28th, Exxon disclosed that Kearl -- let me rephrase the question.

You agree that the alleged corrective disclosure here on October 28th is that Exxon needed to de-book the Kearl proved reserves in the amount of approximately 3.6 billion barrel-equivalence, correct?

MR. SAHAM: Objection to form.

Q. We talked about that earlier?

A. Yes. That was a corrective disclosure.

Page 249

Q. And I think you said earlier that you recall that ultimately Exxon de-booked 3.5 billion. That was the final number?

A. Yes, that's right, but the announcement said 3.6 was likely.

Q. Okay. So Exxon was giving in the corrective disclosure an assessment that it was likely that 3.6 would need to be de-booked for Kearl, correct?

A. Yes.

Q. Does your --

A. They also gave the contingency. They said it was contingent on oil prices and the market could observe oil prices.

Q. Okay. Does your analysis assume that the, there was the same probability of de-booking on October 27th as there was the day after the class period started?

A. I assumed the factual allegations of the case which is that they should have de-booked on the first day of the class period or sooner.

Q. So your view is that if you take as true the factual allegations, there's the same probability of de-booking at the beginning

63 (Pages 246 - 249)

Page 250

of the class period as at the end?

A. Not probability. That they should have de-booked. It's not a probability of de-booking. It's not a random event out of the company's control. The allegation is that they were supposed to de-book and they didn't.

Q. And that's because your understanding is the company should have de-booked the Kearl reserves in its 2015 financial financial results?

A. It's not my understanding.

Q. What's your understanding?

A. That the plaintiffs are alleging that it was fraudulent not to de-book.

Q. And not to do it in the 2015 financial results?

A. Correct. It was a fraudulent misrepresentation presenting financials without the de-booking.

Q. Okay. I want to turn to the debt offering that Exxon conducted in March of 2016. Do you recall that that happened?

A. Yes.

Q. And you've given some expert opinion on

Page 251

that subject, correct?

A. Yes.

Q. Do you have expertise in how credit rating agencies decide their ratings?

A. Yes.

Q. What expertise is that?

A. I have a Ph.D. in financial economics with a concentration in finance. I've studied bonds, I've studied fixed income. I've taught fixed income, I've taught credit ratings, how companies arrive at credit ratings.

In fact, it was interesting when I was coming here this morning, the organization, the trade organization of financial analysts is called the Charter Financial Analysts Institute and the Boston chapter used to be called the Boston Security Analysts Society. Now they call themselves the CFA Institute Boston. But I worked in this very building writing the fixed income curriculum for the fixed income specialization designation offered at the time by the Charter Financial Institute. So I was recognized then and I believe

Page 252

I'm still recognized as having expertise in fixed income analysis including how bonds are rated.

Q. Have you ever worked for a credit rating agency?

A. No.

Q. You've never worked for S&P?

A. That's correct.

Q. Moody's?

A. Correct.

Q. Any of the other ones?

A. No, I didn't work for Fitch or Moody's or S&P. I did work for the Boston Security Analysts Society and the Charter Financial Analysts Institute writing their curriculum and writing their test questions about bond rating and fixed income analysis.

Q. But do they give ratings?

A. No. They're the trade organization that specializes in teaching, among other things, financial analysts about credit risk and bond analysis.

Q. Do you have personal knowledge of how -- why don't we start with S&P. Do you have personal knowledge of how S&P takes into

Page 253

account, if at all, proved reserves in its credit rating for oil and gas companies?

A. What do you mean, personal knowledge? I read the documentation, I read published research about that and some of it is cited in my report.

Q. Other than what's cited in your report, do you have personal knowledge about how S&P takes into account, if at all, proved reserves in doing its ratings?

A. I know that they care about them. They say so.

Q. Anything else?

A. What do you mean by "personal knowledge"? I have knowledge about it.

Q. That's your personal knowledge.

A. Yeah, okay. I understand that they make an assessment of what is -- they do credit risk analysis. I've taught courses in this. It's an extensive subject and I know how to do credit risk analysis. I know what they do, among other things.

Q. Okay. So I'm not focused on credit risk analysis. I'm focused on proved reserves in particular.

64 (Pages 250 - 253)

Page 254

A. For an oil and gas company, reserves are a component of credit risk analysis.

Q. So, again, I just want to try to focus on what you actually know about how S&P, if at all, takes into account proved reserves in performing its assessment to provide a rating for an oil and gas company.

Apart from what you've already shared with me, is there anything else that you can identify?

MR. SAHAM: Objection to form.

A. I don't know. If you had a more specific question, I'd be able to answer that more specifically.

Q. Do you have any other basis to say "I have knowledge about this subject" other than what you've already given me?

MR. SAHAM: Objection to form.

A. Well, I have a premier academic degree in finance and premier practitioner degree in finance and I taught fixed income analysis and I helped write the curriculum for the CFA Institute's fixed income designation and everything that goes with that. I believe I mastered the literature on

Page 255

the subject. I'm aware of the literature. I keep current on research. I discuss papers at conferences and everything that goes with that.

Q. Okay. So if you could turn to Page 52 of your reply report.

A. Okay.

Q. In Paragraph 141 you cite a chart. Do you see that?

A. I do.

Q. Where is that chart from?

A. Footnote 124 gives the source.

Q. Do you have an understanding of what that chart reflects?

A. Yes.

Q. Okay. How, if at all, is this chart relevant to your analysis?

A. This is Standard & Poor's saying that one of their key credit factors for oil and gas exploration and production companies is reserve size, and this case is about reserves, among other things.

Q. Do you understand that reserves are different than proved reserves?

A. I know what proved reserves are. I know

Page 256

what unproved reserves are. I know what developed reserves are. I know what undeveloped reserves are. I understand the matrix. So they say they care about reserves. It's a broader-umbrella word.

Q. Do you have any basis to say whether for S&P the amount of proved reserves for Kearl that's at issue in this case, the 3.6 billion barrel-equivalence would have mattered to S&P's credit rating?

A. No, I'm not offering that opinion.

Q. Okay. So you say in this paragraph that S&P noted that information about the company's reserves is the most important credit factor, correct?

A. Let me back up. I am offering the opinion that reserves matter to a company like S&P, but you said the exact size, that particular quantity, 3.6 versus 3.5. I'm not offering that opinion. I'm not offering an opinion that -- I am offering the opinion that, according to this document and others, reserve size in general matters. I offer that opinion.

Q. So I just want to make sure I'm clear on

Page 257

what opinions you're offering. You're offering the opinion that reserve size in general matters?

A. Yes.

Q. But you're not offering the opinion that the 3.6 billion barrel-equivalence at Kearl would have made a difference to S&P's rating of Exxon?

A. I can tell you that it would have been of interest to them and they would have considered it. I can't tell you what their determination would have been based on knowing it. I'm not offering an opinion about what they would have determined based on knowning it. I do know what stock investors, how they reacted to that knowledge, but I'm not opining as to how S&P, how that would have changed any of their determinations.

Q. You said that you are opining that they would have considered it and it would have been of interest to them, the 3.6 billion?

A. Yeah.

Q. What's that based on?

A. This document, this document on Page 52

65 (Pages 254 - 257)

Page 258

which is Bates stamped.

Q. This document doesn't have a numeric threshold, correct?

A. That's why I gave that first answer. Then I realized that maybe you're not asking about the numeric threshholds. If you're asking about the numeric thresholds, I'm not offering that opinion. If you're asking about the topic in general, I am offering that opinion.

Q. Have you reviewed any testimony that's been given in this case from S&P?

A. No.

Q. Are you aware that an S&P representative was deposed in this case?

A. I think, yes.

Q. But you've not reviewed his testimony?

A. Correct.

Q. What about Moody's? Are you offering the opinion that the 3.6 billion barrel-equivalence at issue here at Kearl would have impacted Moody's credit rating of Exxon?

A. It's really the same answer. I think it's information that would have been of

Page 259

interest to them and they would have considered it. I'm not offering an opinion about how they would have reacted to it.

Q. Are you offering the opinion that they would have reacted to it at all?

A. I think they would have considered it and would be interested in it and they would analyze and assess it. I don't know what decision they would have made with that information.

Q. Okay. And what is the basis for your position that it would have been of interest to Moody's?

A. At least this document here. Moody's and S&P are fairly similar in terms of what they do, and it certainly makes sense that scale, scope are factors that affect credit ratings.

Q. So you actually cite Moody's in Paragraph 140, right?

A. Yes.

Q. Are you aware of whether Moody's has a numeric threshold for its consideration of proved reserves?

A. No, I don't know what their numeric threshold might be or if they have one.

Page 260

Q. You don't know whether the 3.6 billion barrel-equivalence would have caused Moody's to change their rating of Exxon, correct?

A. That's correct. That's not an opinion I'm planning to offer or have proffered.

Q. Would you agree that the S&P representative who covered Exxon during the relevant time period would have more knowledge about what S&P considered important than you do?

MR. SAHAM: Objection to form, calls for speculation, assumes facts not in evidence.

A. I really can't speak to that. I don't know who the person was or what they said or under what conditions they said them.

Q. Do you know the name Ben Tsocanos?

A. It's in my report.

Q. Do you have any idea what Mr. Tsocanos testified on any of those subjects at his deposition in this case?

A. No.

Q. I want to make sure we're on the same page about what the 832 million of additional interest expense that you calculated in your report means. So can we agree that this

Page 261

represents additional interest expense over the life of the note?

A. Yes, maturity and accrued to the last day, accrued to the maturity day.

Q. So to that point, some of these notes are callable, right?

A. None of them have been called, to the best of my knowledge.

Q. What does it mean for a bond to be callable?

A. They can buy it back at a price specified in the bond documents, and that's it. And then after they buy it back after they pay the investors who are holding those bonds the price that's specified, they have no further obligation to those investors to make payments on those bonds.

Q. Let's just use the 30-year bonds as an example. Were those callable?

A. I think they were. I've seen a table that lays out all the details. It might be in Dr. Saunders' report. I'm pretty sure they were.

Q. Okay. Let me just -- I won't try to pin you down on that if you're not finding it quickly.

66 (Pages 258 - 261)

Page 262

If the 30-year bonds were callable and they were called before their 30-year maturity, how, if all, would that impact the calculation of the 832 million additional interest expense that you calculated?

A. My understanding is they weren't called. They have not been called.

Q. This year right now is 2025, right?

A. Yes.

Q. And the 30-year bond that was issued in 2016 is still outstanding if it hasn't been called, correct?

A. That's right.

Q. At some point in the next some number of years, it could be called, correct?

A. It could be.

Q. My question for you is, if that were to happen, how, if at all, would that impact the 832 million of additional interest expense that you calculated?

A. It would be less.

Q. How would you have to reduce it?

A. Well, there would be fewer coupons paid and so there would be fewer coupons to which that spread. The spread dictated by the

Page 263

credit risk would also have to be paid, but the calculation was on the assumption that they were not called, and so for a number of the bonds have been called.

Q. And then just to go back to the 832 million and how it was calculated, when you ascertained the spread you just referred to, I want to just understand what you were doing. Were you trying to figure out what the additional interest expense would be if Exxon was downgraded by S&P only or if Exxon was downgraded by S&P and Moody's?

A. The calculation that's in my report is an estimate of the higher interest expense if it was downgraded by both.

Q. And have you done a calculation for additional interest expense, in your view, if only S&P had downgraded Exxon at the time of the March offering?

A. Yes, now I have.

Q. And is that the page that your counsel handed to me on a break?

A. Yes.

MS. SOLOWAY: Let's mark this just so it's in the record.

Page 264

(Exhibit 6 marked for identification.)

Q. I'm handing you what's been marked Exhibit 6. Does this document which you provided to us modify your opinion that you're offering in this case?

A. With respect to that one sentence that I asked to be stricken earlier today, but not with respect to answering the question that I was originally asked.

Q. Let me just make sure I understand this. The question you believe you were originally asked was what would the additional interest expense be, in your view, if Exxon had been downgraded by both Moody's and S&P before the March 2016 offering?

A. That's right.

Q. Is it your understanding that the plaintiffs in this case allege that Exxon was at risk of being downgraded by Moody's before the bond offering?

MR. SAHAM: Objection to form, calls for speculation.

A. I don't -- you're asking are they alleging that?

Page 265

Q. I'm asking what is your understanding of the allegation here. Are the plaintiffs alleging that Exxon was at risk of being downgraded by Moody's before the March 2016 bond rating?

A. I don't recall.

Q. Do you know the answer?

A. We talked about what their allegations are and I didn't include them as one of them. So the allegations, as I understood them, were how I answered the question earlier. I would have to look at the complaint or their other documents.

Q. So sitting here today, you don't recall whether the plaintiffs allege that Exxon was at risk of Moody's downgrading them before the March 2016 bond offering?

A. I think every company is always at risk of a downgrade.

Q. I'm asking what the plaintiffs allege, though. Do the plaintiffs make that allegations?

A. I don't know.

Q. This is new calculation that you provided?

A. Yes.

67 (Pages 262 - 265)

Page 266

Q. So this calculation is a situation where there's a split rating, correct?

A. This is a calculation of what the extra interest expense would be on a future-value basis out to maturity for each of the bonds if it was a split rating downgrade.

Q. Okay. Does that calculation take into account in any way any implications of S&P putting Exxon on a negative credit watch?

A. Yes.

Q. How does it do that?

A. Well, I saw defense experts say that they looked at the marketing reaction to credit watch and saw no reaction whatsoever from the market which tells me that the market was not expecting a downgrade as a result of being put on credit watch.

Q. You're talking about Dr. Saunders' report?

A. Right.

Q. And Dr. Saunders did an event study and examined whether the announcement of a negative credit watch by S&P had a statistically significant negative impact on Exxon's bonds, correct?

A. Yeah, he said that it didn't, and so --

Page 267

he offered some explanation, but the best explanation was the market was not expecting a company that had a AAA rating since the Depression to be downgraded.

Q. Okay.

A. That's the best explanation for why there was no reaction then, and then there was a downgrade later.

Q. Are you aware that Dr. Saunders also performed an event study and looked at the date of the downgrade?

A. Yeah, but that's not going to tell you what one would expect the higher interest to be at the time of issue. That would tell you on an intertemporal time series basis the results of everything that happened between the issuance and that day.

Q. Let's back up here, Dr. Feinstein. Dr. Saunders did an event study and he looked at both the day of the negative credit watch and also the day of the actual downgrade, correct?

A. Yes.

Q. And on neither of those dates did he find a negative statistically significant

Page 268

movement, correct?

A. Right. The result of his econometric or his regression analysis was not that the movement in the yield was so pronounced as to stand out as being statistically significant.

Q. And you're citing that as support for the proposition that the market didn't care about the negative credit watch, correct?

A. I didn't say they don't care. I said they weren't expecting it.

Q. But the actual downgrade itself also didn't have a negative statistically significant reaction, correct?

A. That doesn't prove that the market didn't care. What it proves is that if there was -- there may have been a reaction. We talked about this earlier today. There may have been a reaction, but you're talking about six and a half basis points or 13 basis points, enough to represent a lot of money, but not enough to stand out against the background noise and volatility of the entire market over a several-month period.

Q. So speaking totally analytically -- let's

Page 269

just take a step back.

You don't disagree with the findings of Dr. Saunders' event study on either of those dates, do you?

A. Correct. His event study did not detect a significant reaction. It doesn't mean there was no reaction at all.

Q. Do you have any concerns about the way he ran his event study? Did you find any mistakes in his regression? Do you have a problem with any of his assumptions? Do you have any issues with his event study?

A. I wasn't able to replicate it. I might still try, but I have no reason to say he did it wrong. What I observed is that the better explanation for the credit watch result is that given the fact that Exxon has had a AAA rating for decades, is that the market was not expecting a downgrade. And the explanation for why you don't see a significant reaction according to his regression is that that's not a tool that would necessarily find a six-and-a-half or 13-basis-point change in yield, would not detect it. It could have happened, but it

68 (Pages 266 - 269)

**App. 548**

Page 270

wouldn't be detected as being statistically significant.

But I do want to say that, nonetheless, at issue, if one were to do what I did, which is to estimate how much more interest would -- let's say Exxon was doing the analysis, how much interest do we have to pay if we lose our AAA rating and have a split rating. The smart thing to do would be to look at benchmarks of how much more do AA+ bonds on average pay than AAA bonds, which is exactly what I did and reported in my report.

So my number is what one would have expected to be their higher interest expense. It's not a report that says you're going to find using a time series econometric model that spread to be statistically, to be a statistically significant movement when it happens.

Q. Just to be clear, you don't disagree that there was no statistically significant movement when S&P downgraded Exxon's bonds from a AAA to a AA+, correct?

A. Correct, but you wouldn't expect that

Page 271

particular tool to detect the change. In terms of basis points, it's small. In terms of money, it's huge, hundreds of millions of dollars. But standing out against the impact of various factors affecting the entire bond market, not just Exxon, you wouldn't expect a regression analysis like that to detect it as being statistically significant.

It's similar to the gold example I gave before. Just because it doesn't stand out according to a particular tool as being statistically significant doesn't mean it's immaterial or economically unimportant. The spread as indicated by the indices comes to 400 or $800 million.

Q. Okay. Let's go back to the spread that you calculated. You said that you calculated it by looking at the difference between AAA and AA+. That's what you said a minute ago, correct?

A. That's right.

Q. That's actually not what you did, though, correct? You looked at the difference between AA and AAA and then you extrapolated

Page 272

from that, correct?

MR. SAHAM: Objection to form.

A. I actually interpolated.

Q. Interpolated instead of extrapolated?

A. Yes.

Q. Okay. So using the word "interpolated," you looked at information for AA companies and then you looked at information for AAA companies and then you extrapolated what you believe a AA+ company would -- I'm sorry, interpolated what you believe a AA+ company would receive in terms of --

A. Right, right. AA+ is a notch above AA so the spread would not be as great as the spread between AAA and AA, but you can linearly interpolate between the two to see how much spread there is between AA+ and AAA.

Q. Can you cite any academic literature apart from the articles you cited in your report that are about subprime securities that supports the proposition that there's a linear interpretation between AA and AAA bond yields?

MR. SAHAM: Objection to form.

Page 273

A. Yes. I gave that one example, it was handy. There are many, many others. Linearly interpolating bond yields between those steps is a generally-accepted, widely-used practice.

MS. SOLOWAY: Let's take a five, ten-minute break.

VIDEOGRAPHER: The time is 4:54. We're off the record.

(Break taken)

VIDEOGRAPHER: The time is 5:08. We're back on the record.

BY MS. SOLOWAY:

Q. When we went off the record, we were talking about the linear interpolation that you did in order to identify, if I'm getting this correctly, the 13-basis-point spread that you identified. Am I getting that right?

A. Yes.

Q. So I asked you whether you could identify any studies or academic literature that supports the proposition that as between AAA bonds and AA bonds, you can linearly interpolate AA+ bond yields, and I think you were about to tell me that you could.

69 (Pages 270 - 273)

Page 274

A. Yeah, it's all over the fixed income analysis literature and textbooks. Linear interpolation is generally accepted and widely used. Everyone understands that data indices, yield spreads and so on are usually provided for each whole rating, and to get the pluses or minuses, you need to linearly interpolate.

Q. I'm asking whether you can cite any academic literature that applies the concept of linear interpolation in specifically this context?

A. I did. You didn't like it. I presented it in the first report and it was about bond analysis, but I guess Dr. Saunders criticized it for being about a particular type of bond, not realizing that the concept applies to all the bonds.

Q. Can you point to anything other than what you've already identified in your report that says that as between AA and AAA securities, that you can use this concept of linear interpolation?

A. Yeah. Look, if it's a general concept that you would linearly interpolate between two adjacent ratings, then it applies to all

Page 275

adjacent ratings, AAA and AA, AA and A and so on. That's widely-used, generally-accepted practice.

I mean, I did cite in my report -- you said besides what's in my report, so I'm not sure what you're asking for. I don't have the literature memorized, but I recently published an article with two well-known professors. It was reviewed and we talk about linear interpolation. That's in Paragraph 174 of my reply report. I have the quotes on Page 67 that talk about how it's common to average linear between two ratings. It's just widely-used, generally-accepted procedures.

Q. Do you know whether -- let me just pause on this for a moment. Do you know how many AAA-rated securities S&P had in the 2016 time period?

A. I know it was a few. It was single digits. I don't remember precisely. You mean securities or companies?

Q. Companies.

A. It was a few, maybe two or three.

Q. Do you know how many AA+ there were at

Page 276

that time?

A. More than that.

Q. How many?

A. I don't recall. It might be in the Saunders report. He had a table.

MS. SOLOWAY: We can mark that.

(Exhibit 7 marked for identification.)

Q. Here's Exhibit 7, which is a copy of the Saunders report. Feel free to look at the table if you want to refresh your recollection.

MR. SAHAM: While he's looking at that, do we know how much time we have left?

MS. SOLOWAY: Less than an hour.

Q. It's on Page 22 of his report if you need help finding it.

A. Okay.

Q. So Dr. Saunders' report shows two AAA-rated companies and this is S&P ratings of investment grade U.S. listed companies as of April 27, 2016, correct?

A. Yes.

Q. Any basis to dispute that two AAA?

A. No.

Page 277

Q. And then he lists three for AA+. Do you see that?

A. Yes.

Q. Any basis to dispute that?

A. No.

Q. And then for AA he lists six. Do you see that?

A. Yes.

Q. Any basis to dispute that?

A. No.

Q. Fair to say that this is a very small number of companies that fall in the AA, AA+ and AAA categories?

A. The basis for -- first of all, these are companies, these aren't issues. And, actually, I think there are -- might be misrepresenting the state of the market because sometimes you'll have an issue that's got a higher rating than a company if it's -- for a variety of reasons that can happen. No, I don't have any reason to dispute that this is accurate. Where is the source for this? Figure 5?

Q. 79, Footnote 79.

A. I still don't see that. I see 78 on Page 21.

70 (Pages 274 - 277)

Page 278

Oh, there it is.

Q. Dr. Feinstein, focusing back on the document, are you aware of any academic literature or studies that have examined investment grade U.S. listed companies akin to the ones represented in this chart and have determined that as between AA and AAA, that you can linearly interpolate in order to determine what the bond yields would be for AA+?

A. I'm aware that that's generally, that's widely and generally-accepted practice. Because the indices won't have the pluses and minuses, it's generally-accepted, widely-used practice to interpolate to estimate what your additional interest would be exactly as I did in my analysis.

Q. So you could test the proposition that linear interpolation is an appropriate in this specific context, correct?

A. I suppose.

Q. How would you do that?

A. I don't know. I'd have to think about that.

Q. Did you do it here?

A. Well, I applied widely-used and

Page 279

generally-accepted practice supported by sources that I cited in my report. It could be some research I'll do in the future. It's not something I did for this case.

Q. So, again, just sitting here today, you don't claim to have gone out and tested what AA-rated companies in 2016 got on yields for their bonds, correct?

A. No, I do know that number. That's what the index is. The ICE index tells me on average AA-rated bonds what yield they got.

Q. For this time period, for 2016?

A. Yes, absolutely. That's the date I looked at.

Q. So, again, you used the index, but you didn't go to the primary source data and look at the companies themselves, fair?

A. Come on, it's Federal Reserve economic data. I used data from the Federal Reserve Bank system.

Q. But the Federal Reserve Bank system doesn't have the information about the AA+, correct?

A. Right, because it's typical that data providers will give you A, AA, AAA, and if

Page 280

you want to know the in-between ratings, you would interpolate.

Q. So the interpolation is necessary to get to the AA+ because the database doesn't give you that information. That's what you're saying?

A. The database does give you that information. The way you get it out of the database is by interpolating between AAA and AA.

Q. Okay. Do you know whether S&P would agree that linear interpolation as between AA and AAA would be possible to get you to AA+?

MR. SAHAM: Objection to form, calls for speculation, assumes facts not in evidence.

A. What do you mean by "to get you to AA+"? To get you to AA+ yield?

Q. Yes.

A. To estimate the AA+ yield?

Q. Yes.

A. You're saying that S&P has a unified unanimous opinion, everyone who works at S&P? I don't think that's the case. I think they would accept that generally-accepted widely-used practice is to interpolate

Page 281

between their ratings when one wishes to assess what kind of credit risk there is for a rating that's not AA or AAA but in between.

Q. Did you undertake to find out whether S&P, the institution, has a view on that?

A. I don't know what you mean by "has a view on that." I've cited articles that have a view on that.

Q. I'm just focused on --

A. It's the appropriate methodology.

Q. I'm just focused on S&P right now. You applied this linear interpolation and you used that to ascertain what you believe the yield would be on AA+ bonds, correct?

A. Estimate, yeah.

Q. And I'm just asking whether you did any work to try to figure out whether S&P would endorse that methodology?

A. No, I didn't ask S&P for their endorsement, or anyone at S&P.

Q. If you look at Paragraphs 147 to 149 of your reply report.

A. Okay.

Q. This is the section of your report where

71 (Pages 278 - 281)

Page 282

you talk about that composite rating. Do you remember this? You offered some testimony about the composite rating and how you would calculate a one for a AAA and a two for a AA+? Do you remember that?

A. Yes.

Q. Are you still relying on this aspect of your analysis, notwithstanding that you've struck the last sentence of Paragraph 146 from your report?

A. Well, what this says is that Intercontinental Exchange, the providers of the ICE data indices, they explain this is how they assign bonds to their indices. So what they're explaining here is that a split-rated bond that has AAA from one agency and AA+ from a different agency, they would assign that bond and that bond's yield to the -- okay.

If one has a AAA and the other has a AA, they would assign that bond's yield to the AA index, so that tells you that the AA index has split-rated yields in there that even, where those yields are from bonds that have actually a split rating, that would be higher than AA and so even

Page 283

their AA yields might be biased low. It's still relevant.

Q. Okay. The proposition, as I understand it, is that they assign a one for a AAA and a two for a AA+ and then they average those if there are only two ratings to get a 1.5. Am I getting that right?

A. And they would treat that as if it was a AA+ bond.

Q. And the reason is because 1.5, when rounded, rounds up to 2.0?

A. Right. So when there's a split rating, they assign that bond to the lower rating of the two rating agencies' ratings, which means that every one of their indices is going to have bonds with split ratings, split ratings where they're split a little bit higher than the index itself.

So, if anything, that tells you that these indices are going to be, the yields are going to be somewhat biased low because you're going to have slightly higher-rated bonds in each of them.

Q. So I just want to make sure we're clear on this. 1.5 is exactly in the middle of one

Page 284

and two, correct?

A. That's right.

Q. And are you aware of any support for the proposition that you should be using this rounding that they use in their composite rating system for purposes of calculating damages in this case?

A. I didn't calculate damages.

Q. Sorry. Let me rephrase that.

Can you point to any support for the proposition that the rounding that they use in their composite rating system is appropriate to use for purposes of calculating the additional interest expense in this case?

A. Well, I did explain that they assign split-rated bonds to the lower rating and that's going to impact the yield for their indices. But I also explained after considering all the evidence and the articles and the literature that I would linearly interpolate between the two ratings of a split rating and essentially have the spread, and that's how I came up with an interest estimate that's about half of the previous

Page 285

one I presented if the question is what is the extra interest expense if the bond was downgraded to a split rating rather than what would the extra interest expense be if the bond was downgraded to AA+.

Q. So I just want to make sure I understand what's still in the case and what isn't still in the case.

Are you planning on giving testimony in this case that you can use the composite rating calculation that you perform in 149 in support of your additional interest expense?

A. If 149, if you're interpreting that as only being about split ratings, then I'm not using this to support the methodology for calculating the extra interest on a split-rated bond.

Q. So you would only use this if you were asked the question, please calculate the additional interest expense on a non-split-rated bond, meaning AA+ by both rating agencies?

A. No, I don't think I would need what's in 148 and 149 for that purpose either, but what's in 148 and 149 tells you that, if

72 (Pages 282 - 285)

Page 286

anything, the indices for lower-rated bonds and AAA, the spreads between lower-rated bonds and higher-rated bonds is going to be slightly smaller than what that spread would be if they did the weightings some other way.

Q. But that's not information that you need to actually offer in your additional interest calculation, correct?

A. It adds color to the calculation. The number would be the same, you're right, but the color would be that there are reasons to assume this is a conservative estimate, or reasons to conclude that this is a conservative estimate.

Q. In Paragraphs 150 to 151 of your rebuttal report, you disagree with Dr. Saunders?

A. Absolutely.

Q. I just want to ask you about one sentence in here. In Paragraph 150, you say "the default probabilities can both be rounded to zero, but they are not zero." Do you see that?

A. Absolutely, yes.

Q. Is your assertion that the historical

Page 287

one-year default rates on AA+ bonds is not zero?

A. Yes, it's not zero.

Q. What is it?

A. It's not zero. It's not zero. It's some positive number. Zero would be a risk-free bond. If AA+ or even AAA bonds had zero default risk, they would have the same yield as government bonds, and they don't. Saunders' own tables show that there's quite a spread between corporate AAA bonds and government bonds and there's a big spread between corporate AA+ and government bonds. That can only explain -- it can only be explained by them having a non-zero default risk.

I looked at his tables, actually, since filing these reports. Moody's does put out default probability tables, and if you go out to the four-year point, if you look at AA-rated bonds versus AAA-rated bonds, they both have positive default risk over four years after issuance, and the AA-rated bonds have five times more default risk than AAA-rated bonds if you got to

Page 288

the four-year point.

Q. Is that data you're going to produce in this case?

A. I'd be happy to.

Q. I'll put on the record that I'm asking for it if you're planning on relying on it.

So going back to Dr. Saunders' expert report, I just want to be clear, I want to make sure you're not talking about a different data set than he is. Why don't we just look at his report. I handed it to you. I marked it as Exhibit 7. Is that right?

MR. SAHAM: Yes.

Q. Sorry, I lost my place. Just give me a second.

(Pause)

Q. So take a look at Paragraph 28.

A. Of Dr. Saunders' report?

Q. Mm-hmm.

A. 28?

Q. Mm-hmm.

A. Okay.

Q. So there are figures supplied to support Dr. Saunders' opinion here on the one-year

Page 289

default rates for U.S. corporate bonds rated AAA and also for AA+. Do you see that?

A. You want me to turn to Figure 1 and Figure 2 on Page 12?

Q. I do.

A. Can we get a blow-up of that? He takes the scale from zero to 100 percent where all the action is taking place between zero and 20 basis points, and the scale is ridiculous. The thickness of the line and the thickness of the ink in the line is where the action is on these graphs. It's totally uninformative to present the data this way.

Q. I just want to understand your position. Your position is that it's not actually zero?

A. Yes.

Q. And what is it?

A. It's not zero.

Q. But what is it?

A. Well, the Moody's data that I recently looked at on -- oh, oh, one-year default, one-year default rates for AAA-rated bonds, that they would default within the first

73 (Pages 286 - 289)

**App. 553**

Page 290

year, I think the Moody's data does have, for AAA it has zero, for AA it's definitely not a zero, absolutely not zero. If I remember correctly, it was -- I'm doing this from memory. It's probably dangerous to do that at this late hour, but it was not zero, and I guess I'll send you that document.

Q. We hope you guys will produce that.

A. For the one-year default rate, I know the Moody's document -- I use this in my teaching. That's why I remember this. It was zero for one year. It was not zero for two years or three years -- actually, I can't testify to that. It was not zero up to four years, but the AA-rated bond was definitely not zero.

Q. And then if you look at the next paragraph, there's a Figure 3 which is described at the top of Page 13, and what Dr. Saunders says is that this figure which is the average cumulative default rate for U.S. AAA and AA+-rated corporate bonds shows that the cumulative default rate for both AAA and AA+ bonds has been consistently lower than

Page 291

one percent over a ten-year period.

A. Okay. So maybe I don't even have to send you that document. This is what I was -- this is consistent with the documents and data that I'm familiar with. Notice that they're not zero. You got AAA and AA+ and both lines are not zero. They have positive default probability.

Q. My understanding is that this is the cumulative default rate over a longer time period and that the prior charts were one year. So if you have something different that calls into question Figure 1 and Figure 2, I would still hope you guys would produce it.

A. I can say that the AAA in the document that I'll send you, the AAA default rate for one year is listed as zero, but the AA is not.

Q. Then you'll send that to us. Do you have any basis to question the information provided in Figure 3 or is this also consistent with your recollection?

A. No, but it just tells you that these are risky bonds. That's why they carry a higher yield than government bonds.

Page 292

Q. Is it your testimony, sitting here today, Dr. Feinstein, that a AA+-rated bond is a risky bond? Is that like a for-real opinion that you're offering in this case?

MR. SAHAM: Objection to form.

A. It's a term of art. We talked about risk-free bonds. Risk-free bonds are used in all of finance. We talk about the risk-free interest rate. Almost every model in finance has as an anchor what we call the risk-free interest rate. Anything that's not risk-free is risky.

So maybe the word in finance, the term of art in finance is different from how you're interpreting it, but risky means not risk-free. These bonds are not risk-free. The assumption is that U.S. Treasury bonds are risk-free. Corporate bonds are not risk-free, and that's why corporate bonds always pay a higher yield than do government bonds. And that's also why, if you were expecting or were concerned or had a fear of a downgrade, you might reference bond yield tables to see how much more interest you would have to pay if you had a lower-rated

Page 293

bond that you were issuing. This red line in the parlance of finance, the red line and the blue line would refer to risky bonds, meaning they're not risk-free.

Q. Can you identify any AA+ bond issued by a corporate issuer that has defaulted in the last ten years?

A. Lehman Brothers defaulted on AA-rated bonds, and this table -- what's the source for this table?

Q. Sorry. Did you say AA or did you say AA+?

A. I said AA. I'd have to look. It might have been AA+, but it's certainly AA.

Q. I'm sorry. If I didn't, I meant to ask you if you can identify within the past ten years any AA+-rated corporate bonds that have defaulted?

A. Well, as I sit here now, I mean, I don't have them all memorized, but when -- if a company deteriorates, it might fall from AA+ to then AA and then default. If you're asking do they default right away when they are AA+ or do they get downgraded and then default, history is replete with examples of AA-rated bonds that defaulted. And I

74 (Pages 290 - 293)

**App. 554**

Page 294

gave Lehman as an example, but that was 2008, so that's what I happen to be very familiar with. This tells you, it says so right here. This tells you that AA+ bonds do default. That what this Table 3 tells you on Page 13.

Q. I'm just asking you whether you can identify any AA+-rated bonds in the ten past years that while rated at that level, have defaulted?

A. That's an odd question. I mean, often what happens is they'll be AA-rated or AA+ and then they'll be downgraded and then default, but the rating agencies, they were called to testify in Congress after 2008 because there were high-rated bonds that defaulted.

Q. Again, I'm just drawing your attention to the past ten years and you haven't identified one company. Should I take that to mean that you cannot identify one?

MR. SAHAM: Objection to form, foundation, calls for speculation.

A. I think it's on Page 13 of Dr. Saunders' report, although we can't really tell what his source is, can we? He's got a table

Page 295

that says AA+ bonds have defaulted.

Q. I'm asking you whether, sitting here today, you're offering an expert opinion in this case -- in fact, you have now testified that AA+ bonds are risky, and I'm asking you whether you can identify a AA+-rated corporate bond that has defaulted in the past ten years? You have not identified one. Should I take that to mean that you cannot do that at this time?

MR. SAHAM: Objection, form, foundation, calls for speculation, asked and answered and argumentative.

Q. You can answer the question. Can you identify one?

A. As I sit here now, no, but I stand by what I've already testified to. And the term "risky" is a term of art, as I explained. Maybe it has a different meaning to you, but in the parlance of finance, it's not risk-free, and Dr. Saunders himself with his table, Figure 3 on Page 13 acknowledges that AA+ bonds and even AAA bonds are, in fact, risky.

Q. I just want to make sure if I run this by

Page 296

other economists, I'm going to hear the same thing from them that there's only two categories, there's risk-free and then there's risky. That's the whole world can be separated into those two categories? Is that your testimony?

MR. SAHAM: Objection, form, misstates prior testimony and compound.

A. Depends who you ask, but generally-accepted principles are that the term "risk-free" refers to a very specific kind of bond. And, of course, there are a variety of categories. In fact, that's what the rating agencies do, that's what these credit ratings are. There's many categories, but if it's not risk-free, in the parlance of finance, the generally-accepted parlance of fixed income analysis, not risk-free would mean risky.

Q. Okay.

A. It doesn't mean that it's going to default tomorrow necessarily. In fact, that's what the credit agencies are trying to determine, but it does mean that it's not risk-free and, therefore, investors are going to demand a higher yield than if it were risk-free.

Page 297

Q. So Paragraph 63 of Dr. Ferrell's report, can you turn to that, please.

A. Paragraph 63?

Q. Mm-hmm.

A. All right.

Q. Tell me when you're there.

A. I'm there.

Q. Do you see that he calculated 77.5 million?

A. I see that.

Q. What does that represent?

A. I think he said that it's the present value of the expected higher interest if there were a downgrade, is what he said.

Q. And that's based off of your 832 million calculation?

A. That's my understanding.

Q. Do you have any basis to dispute that 77.5 million is the present-day value of your 832 million of future additional interest expense?

A. I don't have a reason to dispute that. I think, actually, it's calculated correctly, but it is the present value. It's a valuation of that higher interest expense. It's not the higher interest expense. So,

75 (Pages 294 - 297)

Page 298

in other words, it's not how much the company would -- they're not going to write a check for 77.5, whereas the future-value calculation would represent a number that they could write a check for in order to cover their higher interest expense.

Q. Paragraph 62 of Dr. Ferrell's report, could you turn to that?

A. Yes.

Q. All right. Do you see the reference to 660 million?

A. Not yet. I don't see it. What line is it in? 62, ignoring the above -- I don't see it.

Q. Hang on a second.

A. Oh, it's on the next page.

Q. So you see the reference to 660 million at the top of Page 37?

A. I do.

Q. What is that?

A. Well, how does he describe it? He's saying that if you just limit the analysis to the 2046 maturity bond which is the longest one with the most coupons, the number would be 660 million of the 800-plus million.

Page 299

Q. Do you have any basis to disagree with that calculation?

A. No.

Q. Let me draw your attention to Paragraph 61 of Dr. Ferrell's report. He talks in this paragraph about a bond event study that he performed on four of the five bonds issued by Exxon in March of 2016. Do you see that?

A. Paragraph 61?

Q. Yes.

A. An empirical test I ran or he ran?

Q. In Paragraph 61 of Dr. Ferrell's report, he talks about a bond event study that he performed on four of the five bonds issued by Exxon in March of 2016, correct?

A. Yes.

Q. Do you have any basis to disagree with any of the findings that he includes in Paragraph 61?

A. The analytical approach is wrong, but in determining the result from that, I don't dispute.

Q. So you don't dispute that the bond event study finds that the residual returns on October 28th and January 31st were not

Page 300

statistically significant, correct?

A. The way I would characterize it is this kind of event study failed to detect a significant return even if there was one. Essentially by its design was designed to fail to detect such a return.

Q. Dr. Feinstein, you understand the concept of statistical significance very well, correct?

A. Yes.

Q. You're not suggesting that Dr. Ferrell's analysis somehow missed a statistically significant return on those days, are you?

A. What I'm saying is that the test did not detect a return of magnitude that would stand out as statistically significant. It doesn't mean that there was no effect.

Q. We talked a little bit earlier about the fact that Exxon had been put on a negative credit watch prior to the March 2016 bond offering, right?

A. Yes.

Q. And what is your understanding of what it means when -- and that was by S&P, correct?

A. Yes.

Page 301

Q. What is your understanding of what it means if S&P places a company on a negative credit watch?

A. They have reason to increase their surveillance, as they call it, increase their surveillance to watch to see if downgrade is necessary, and they're calling it a negative credit watch. The information that draws them to impose extra surveillance is negative information.

Q. So once a company is on a negative credit watch, what is your understanding of the likelihood that its credit rating would be downgraded?

A. Well, it's funny that both of your experts say that you should not rely on aggregated data or indices to draw conclusions about individual bonds, that the unique idiosyncrasies of each bond are more important than what sort of group the bond belongs to. But then when they opine about credit watch, that's exactly what they do. They say let's look at the average of all bonds that have ever been put on credit watch and you'll observe that they have a

76 (Pages 298 - 301)

**App. 556**

Page 302

higher likelihood of being downgraded. So there's an inconsistency in their analysis.

I think it's reasonable that if it's on credit watch, it would, in general, if you're aggregating across all bonds, bonds that are put on credit watch have a higher likelihood of a downgrade than bonds that are not put on credit watch. But in this case, looking at the news articles, how the news reported on it, there was no indication that the market was expecting a downgrade for Exxon bonds.

Q. So most of that answer, I think, was not responsive to my question, so let me make sure I understand your answer.

When S&P places a company on a negative credit watch, what is the probability that its credit rating is going to be downgraded? Are you able to tell me?

A. No, I can't tell you exactly what that probability is.

Q. Do you know whether it's greater than 50 percent?

A. I don't think it is. I know that Dr. Saunders thought so. Are we talking about

Page 303

Exxon's bond or across some aggregated index or collection of bonds, a population of bonds? He said that -- I would say that it's higher, the probability is higher than across -- aggregating across all bonds that are on credit watch, the probability is higher than bonds that are not on credit watch, but how high it is, I don't know.

Q. If it were the case that it is a greater than 50 percent chance that a company on a negative credit watch is going to be downgraded, I'm asking if it were, if that turned out to be true, how, if at all, would you take that into account in your calculation of the additional interest expense?

A. I'd have to run the analysis. I didn't do that analysis.

Q. How would you do the analysis?

A. I don't know. I'd have to think about it. It's not something I would do on the fly. I'll admit it would be -- it would reduce the estimate of expected future interest expense, but I don't know precisely how much, and I don't think that analysis would

Page 304

apply to Exxon given Exxon's history of never having been downgraded since the Great Depression, Moody's reluctance to downgrade it. The fact that it ended up with a split rating was evidence to me that the market was not expecting a downgrade and, if anything, a good reason to believe there wouldn't be one.

Q. So I just want to make sure I'm really clear on your answer. Your analysis, the one that you provided today, I think it's Exhibit 6, the single-page analysis.

A. Yes.

Q. I want to be really focused on my question. That assumes a scenario where S&P has downgraded but Moody's has not, correct?

A. Maybe I need to clarify. What it tells you is if you thought or if Exxon thought or Exxon's finance division thought that they were going to get downgraded to a split rating, that kind of analysis is the analysis that they would reasonably do in order to estimate their future interest expense.

Q. Okay.

A. And that number is, in my opinion, a

Page 305

reasonable approximation of that extra interest expense on a future-value basis.

Q. You're not testifying here today that anyone at Exxon actually did that calculation, correct?

A. No, but I applied generally-accepted widely-used methodology for that task at hand. If that's what they were interested in, if that's what they were fearing, if they hired me to consult with them, I would tell them that's the analysis to do.

And I would imagine if it was one of my students that was working for Exxon or a student who was a Charter Financial -- or an analyst who was a Charter Financial analyst, that would be the type of analysis they would do to estimate their future interest expense. They would figure they're going to get six and a half percent higher yield and they can project out how much extra interest expense that would be.

Q. Dr. Feinstein, I'm not asking you to speculate about what Exxon would have done, could have done, should have done. Sitting here today, you are not testifying that you

77 (Pages 302 - 305)

Page 306

are aware of any document in which Exxon performed a calculation of its additional interest expense if it was downgraded by S&P from AAA to AA+, correct?

A. That's correct.

Q. You have no idea whether such a document exists, correct?

A. I would phrase it as I don't know if that document exists.

MR. SAHAM: I guess I would, given this line of questioning of Dr. Feinstein, I would ask you to look at your privilege log to see if any such documents exist on the privilege log that have been withheld.

MS. SOLOWAY: Okay. Thank you. Duly noted.

Q. Let's move on. Let's go back to my actual question. So this document, do you have Exhibit 6 back in front of you, the single page?

A. No. Wait. I thought -- I don't have it. I think I handed it back to you.

Q. It may be on the bottom.

A. Okay.

Q. You have Exhibit 6 now. Pardon me for

Page 307

reaching over you.

A. No problem.

Q. This calculation, are you with me?

A. Yes.

Q. Okay. This is a situation that you're, a scenario that you're calculating where there's a split rating, correct? That's the difference between --

A. That's not how I would describe it. This is an estimate of the extra interest expense that would have to be paid if, in fact, there was a downgrade to a split rating.

Q. So this analysis does not take into account that the market was aware before the bond offering that S&P had placed Exxon on a negative credit watch, correct?

A. That's a hypothetical.

Q. It's hypothetical or it actually happened?

A. Wait. Say that again, your question.

Q. You're aware that S&P had already placed Exxon on a negative credit watch at the time of the offering, correct?

A. Yes.

Q. So the market was already aware that Exxon was on a negative credit watch, correct?

Page 308

A. Right.

Q. So it was AAA-rated, but on negative credit watch, correct?

A. Right. Okay.

Q. Okay. Is there anywhere in your analysis of the additional interest expense that you take into account that negative credit watch?

A. What I've seen, there's no indication that even with the negative credit watch the market was expecting a downgrade. I would have to consider that. This doesn't, this is not the analysis built on an assumption that that negative credit watch would have informed the market that there might be a credit watch. If you were to take that into account, you might have to consider that the negative credit watch would cause the market to anticipate -- we'd have to think about what the market would be anticipating especially that it was Exxon and it had never been downgraded.

Q. I'm going to go back to my question before. I asked you to assume that a negative credit watch implies a greater than 50 percent probability of a downgrade. Do you remember

Page 309

that?

A. That's the hypothetical. That's what I thought you were asking before. That's purely hypothetical.

Q. If that is true, how, if at all, would you alter Exhibit 6?

A. It would end up being a lower number. Some of that extra -- some of the yield on top of which I'm placing this spread would have already been built into the bonds.

Q. Do you know what that number is?

A. No.

Q. How would you tell me -- how would you calculate that number?

A. I'd have to think about it. I don't know. I wouldn't do it after a full day of deposition on the fly.

Q. I'm just going to put on the record that if that's something that you're planning to come to trial and testify about, that we would like advance knowledge of that and we'd like to understand what calculations you would perform, okay?

A. Okay.

Q. Okay. Have you looked at the S&P deposition

78 (Pages 306 - 309)

App. 558

Page 310

to ascertain whether S&P offered any information about the probability of a downgrade when a company is on a negative credit watch?

MR. SAHAM: Objection, asked and answered.

A. No.

Q. Turn to Paragraph 70 of your report, please.

A. Okay. This is an exhibit, right?

MR. SAHAM: No, Paragraph 70. I think you said Paragraph 70, right?

MS. SOLOWAY: I did.

A. I thought it was page. Okay.

Q. There's a sentence in the middle of the paragraph that starts with, "without the cash flows from the March 2016 note offering, Exxon would not have been able to increase its dividend and it likely would have had to delay or reduce its previously declared dividend payments." Do you see that?

A. Yes.

Q. Is that an opinion you're offering in this case?

A. They would not have been able to pay the dividend out of operating cash flow so they

Page 311

would have to dig into cash balances or pay the dividend out of proceeds from borrowing.

Q. I just first want to understand, is it an opinion that you're planning on offering in this case that Exxon wouldn't have been able to pay the dividend in 2016 without doing the bond offering?

A. The opinion is the way I just described it. It's that they would not have been able to pay it out of operating income. The operating income would not be sufficient to pay the dividend that they declared.

Q. What's that based on?

A. The numbers here that their operating income was less than the amount of the dividend -- operating cash flow, I'm sorry, operating cash flow was less than the dividend.

Q. I want to make sure I understand that. When you say operating cash flow, you mean if you looked at Exxon's balance sheet, how much cash is listed on the balance sheet at that moment in time?

A. No.

Q. What do you mean?

Page 312

A. What it means is the cash flow that is produced by operations, so it's revenue, cost, depreciation, taxes, the cash flow that's produced from operations would not have been enough. According to these numbers that were in their own filings, the cash flow from operations would not have been enough to pay that dividend. They would have had to either use their cash balances or pay it out of -- well, there's a few other things they could do that are rare. They would either have to borrow money to pay the dividend, use cash balances or divest of some asset, but the operations were not enough to fund that dividend.

Q. As of that moment in time?

A. As of the moment in time, according to the data that was in the 10-K.

Q. So I just want to make sure I understand that. You have not conducted an analysis of what adjustments Exxon could have made to its capital expenditures to make additional cash available to pay the dividend?

A. That's kind of what I was saying. These are

Page 313

rare things that a company might do if it was desperate to pay a dividend. They could have sold assets. That's what I was referring to in my last answer.

Generally companies pay dividends out of operating income. A dividend, the way it's taught in finance is a company earns money, some of it is retained earnings, some of it is paid out as a dividend. So based on that principle, if that's the way the company was operating, it would not have been able to pay its dividend without borrowing money. But as you're pointing out and as I pointed out, there are some desperate acts they could have taken to pay the dividend.

So it's not completely correct to say there's no way they could have paid that dividend without borrowing money, but those other acts are desperate acts. They could have sold assets in order to pay the dividend. They could have cut back on research and development. They could have cut back on investing activities or capital investing activities. So really what I mean

79 (Pages 310 - 313)

Page 314

here is that they couldn't pay the dividend out of operating cash flows. They would have had to do something else or borrow.

Q. Okay. So I just want to make sure I understand what you've analyzed here. You have not undertaken an independent analysis of the viability of the company generating additional cash to pay the dividend by engaging in asset sales, correct?

A. I'm sure they could have. I have -- no, I think that's false. I've looked at the balance sheet, yeah. If they want to divest and shrink the company, they can pay a dividend, but it's not what they usually do, it's not what most companies do.

Q. But sitting here today, are you able to tell me whether there any assets that would have been attractive for Exxon to sell that year that they might have been thinking about selling that they could have used to pay the dividend? Have you studied that?

    MR. SAHAM: Objection to form.

A. I looked at the balance sheet. There are things the company could have sold. There's R&D they could have cut back on. There's

Page 315

investing activity they could have cut back on, but those are essentially desperate acts if they're done in order to pay a dividend.

Q. Did you interview company management to find out whether those were actually desperate acts? What deposition are you relying on, if any, for the proposition that it would be a desperate act to sell an asset in order to use cash to pay a dividend?

    MR. SAHAM: Objection to form.

A. These are general principles of financial economics.

Q. So in your --

A. Dividends are generally paid out of income, operating income, and it's really frowned upon if a company is going to divest assets for the purpose of paying a dividend, rarely happens.

Q. I want to focus on what you've actually studied and not general principles of economics as Dr. Feinstein sees them. I really just want to understand what you looked at, so I'm going to ask you a

Page 316

series of questions about whether you have actually investigated these things, okay?

    Did you consider whether the company could have, for example, discontinued share repurchases in order to have additional cash on the balance sheet?

A. I looked at the 10-K. I saw what the company had. This paragraph is about that this company could not pay that dividend at that level without doing something like that. That was clear in the 10-K, that they either had to borrow money or do something like that, cut back on cash outflows, sell assets or such.

Q. Okay.

A. And yes, the analysis one would do to answer these questions is an analysis I did do. You can always do more analysis, you can dig into it deeper. You can always call investor relations and interview company executives, but the analysis I did is I looked at the 10-K, I looked at the balance sheet.

Q. Is there anywhere in your report where I can find that analysis?

A. No. It's right here. I mean, the analysis

Page 317

is right here. There's two numbers that are important here, $12.1 billion of dividends, $6.52 billion of operating cash flow after investing activity and that came out of the 10-K, and that's what you need in order to draw this conclusion.

Q. And apart from the information you just pointed me to in Paragraph 70, is there any other place you've conducted an analysis of whether there are other steps Exxon could have taken to make cash available to pay the dividend?

A. Other than the appropriate analysis, no.

Q. What paragraph is the appropriate analysis in?

A. 70. I looked at the 10-K, I saw the magnitude of the dividend, I saw the magnitude of the operating cash flow and I compared them, and I saw that there were assets on the books, there was investing activity, there was capital expenditure. So that analysis, those observations are enough to draw this conclusion. Companies that are going bankrupt will oftentimes liquidate assets to pay cash to its

80 (Pages 314 - 317)

**App. 560**

Page 318

investors.

Q. Is it your position that Exxon was going bankrupt?

A. No. That's why I would call it a desperate act. To dig into the balance sheet and sell assets in order to pay a dividend, that's something that companies going bankrupt would do. It's not something you would expect Exxon to do. What they did do, apparently, is borrow money to pay the dividend.

Q. Okay. What is a dividend?

A. I answered that just a few questions ago. A dividend is a cash payment to equity investors, usually a percentage of earned income.

Q. Is a dividend one way that a company shares value from its operations with its shareholders?

A. Well, they pay out earned income on a pro-rata basis to investors prorated by how much equity each investor owns.

Q. So yes, it's one way that shareholders can get value from their investment in Exxon stock, correct?

A. Yes, or a realized value.

Page 319

Q. And another one is share buybacks, correct?

A. Yes.

Q. How do share buybacks give value to Exxon shareholders?

A. Well, people who owned the equity receive cash from the company similarly on a prorated basis commensurate with how much of the equity they previously owned.

Q. And are you -- have you looked into whether Exxon engaged in share buybacks?

A. No.

MS. SOLOWAY: I'm going to take just five minutes to make sure I have no more questions and come back.

MR. SAHAM: Okay.

VIDEOGRAPHER: The time is 6:05. We're off the record.

(Break taken)

VIDEOGRAPHER: The time is 6:10. We're back on the record.

MS. SOLOWAY: Dr. Feinstein, we have no further questions at this time. Thank you for your time. All set?

MR. SAHAM: Yeah, we're done.

VIDEOGRAPHER: The time is 6:10.

Page 320

We're off the record.

(Whereupon the deposition was concluded at 6:10 p.m.)

Page 321

COMMONWEALTH OF MASSACHUSETTS)
SUFFOLK, SS. )

I, Jeanette Maracas, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 22nd day of January, 2025, at 9:17 a.m., the person hereinbefore named, who was by me duly sworn to testify to the truth and nothing but the truth of his knowledge touching and concerning the matters in controversy in this cause; that he was thereupon examined upon his oath, and his examination reduced to typewriting under my direction; and that the deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any attorney or counsel employed by the parties hereto or financially interested in the action.

In witness whereof, I have hereunto set my hand this 29th day of January, 2025.

Notary Public
My commission expires 7/29/27

81 (Pages 318 - 321)

Page 322

Scott H. Saham, Esq.

Ssaham@rgrdlaw.com

January 29, 2025

RE:   Ramirez, Jr., Pedro v. Exxon Mobil Corporation, Et Al

1/22/2025, Steven P. Feinstein , Ph.D. (#7102057)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at cs-ny@veritext.com

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

Page 323

Ramirez, Jr., Pedro v. Exxon Mobil Corporation, Et Al

Steven P. Feinstein , Ph.D. (#7102057)

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____  _____

Steven P. Feinstein , Ph.D.                Date

Page 324

Ramirez, Jr., Pedro v. Exxon Mobil Corporation, Et Al

Steven P. Feinstein , Ph.D. (#7102057)

ACKNOWLEDGEMENT OF DEPONENT

I, Steven P. Feinstein , Ph.D., do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____  _____

Steven P. Feinstein , Ph.D.                Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____ DAY OF _____, 20___.

_____

NOTARY PUBLIC

82 (Pages 322 - 324)

App. 562

**[& - 2]**                                                                Page 1

**&**

**&**  2:3,9 255:18

**0**

**0.04**  148:23
**03111**  1:6

**1**

**1**  1:1,2 3:9 10:5
  10:6,9 30:6,13
  31:14,16 32:5
  36:13,18 45:3
  52:13,14 187:3
  200:1 242:7
  289:4 291:13
**1.05**  97:2,4,11
**1.14**  205:25
**1.23**  235:18,21
**1.5**  283:10,25
**1.5.**  283:6
**1.9**  206:10
**1/10/25**  3:11
**1/22/2025**
  322:5
**10**  3:10,14
  13:22,25 14:7
  18:21 44:11
  51:5,8,9,15
  55:13,15 56:16
  57:5,6 58:14
  58:21 59:19
  61:9,15 68:1
  74:5,16 76:14
  77:24 78:2,18

79:7,14 80:17
80:22 82:21,23
86:17,23 87:6
89:24 97:23
102:19 103:9
104:1 119:14
246:2 312:18
316:7,11,22
317:5,16
**10/11/24**  3:9
**100**  11:2 60:25
  127:3 289:8
**10019**  2:11
**101**  128:19
**104**  127:4
**105**  127:12
**10:15**  52:6
**10:36**  52:9
**11**  153:17
  158:2 199:25
**111**  125:3
**114**  125:3
**115**  217:14
**117**  217:16
**11:35**  97:16
**11:56**  97:19
**12**  289:5
**12.1**  317:2
**12/10/24**  3:15
  3:20
**12/21/18**  3:17
**122**  240:13
**124**  239:13
  255:12

**1285**  2:10
**12:49**  139:21
**12:50**  140:3
**13**  15:5 268:20
  269:24 273:17
  290:20 294:6
  294:23 295:22
**130**  28:7,16
**14**  55:4 158:3
  219:24 220:4,8
  220:13
**140**  259:19
**141**  255:8
**142**  127:13
**146**  38:24,25
  39:2 282:9
**147**  281:22
**148**  285:24,25
**149**  281:22
  285:11,14,24
  285:25
**15**  9:23 44:11
  139:16 156:17
  158:8,18,22
  159:11 161:1
  161:10 165:3
**150**  28:7,17
  286:16,20
**151**  286:16
**153**  142:15
**155**  142:15
**156**  187:3
  236:25

**157**  187:4
**158**  187:4
**159**  144:2
  187:4
**160**  187:4
**161**  187:4
**162**  95:24 96:1
  96:4 187:4
**163**  235:17
**166**  96:24
  235:17
**17**  167:13
  168:6,9
**174**  3:16
  275:11
**175**  57:8
**18**  190:17
  201:4,6
**18th**  202:16
**19**  177:15
  186:4 206:24
**19.2**  62:18
**19.20**  62:23
  64:1,6,11,25
  65:25 66:12
  98:15 101:6
  104:2 105:20
**19.20.**  64:20
**1997**  213:4
**1:35**  141:2

**2**

**2**  3:11 35:11,14
  52:19 87:22

**App. 563**

92:9 289:4 291:14

**2.0** 283:11

**2.03** 236:3,14

**2.39** 96:12,17 96:21 101:3,4 101:23 102:4 102:16 144:13 146:9 152:8

**2.39.** 96:10

**2.4** 206:5

**2.43** 143:19,22 144:13 145:13 153:11 207:24

**2.43.** 144:14

**2.44.** 196:23

**2.50** 196:22 197:16

**2.63** 96:5

**20** 186:4 206:25 289:10 324:15

**200** 9:1 16:22 22:16 27:19 28:4

**2008** 116:12 294:2,15

**2015** 3:13 50:17 51:9 53:21 55:3,13 55:15,25 56:15 61:6,17 63:22 68:1 72:22 73:11,19,23

74:17 75:17 76:19 77:2 78:3,15 79:7,8 81:4 82:3,22 83:5,19 86:17 87:19 90:3,11 91:25 93:1,14 93:22 94:8,11 94:23 103:9 104:1 106:16 107:8,24 113:15 114:11 115:4,7 116:7 119:15 157:14 250:10,16

**2016** 45:1,2,25 50:17 51:2,3,6 60:16 69:10 72:15,22,24 73:3 76:11,14 76:18 77:6,14 78:3,18 79:15 79:17 80:17,22 82:2 88:24 89:10 92:12,19 92:20 93:21 94:22 106:2,6 106:15 107:7 107:23 137:9 137:10 141:7 142:17,23 155:22,24 156:7,15,19,25 158:7,7,14,16

158:19 160:11 177:1 178:2,2 178:22 179:10 181:4 183:1,5 183:8,9,10,12 184:4 185:6,11 185:15,17 186:1,2,8,13 188:19 189:20 190:18,19 196:22 197:9 197:10,10,16 198:6,13,14 199:13 201:15 201:25 202:1 202:10,11,19 202:20,21 203:3,7 204:9 238:11,15 247:11 250:22 262:11 264:16 265:4,17 275:18 276:22 279:8,13 299:8 299:15 300:20 310:16 311:7

**2016's** 184:11

**2017** 23:11,13 27:17,19 45:12 46:15 47:17,23 48:8,12,21 80:23 88:2 89:16 155:22 177:12,14,20

178:22,24 186:3,9 187:18 188:9,15 225:20 231:20 232:10,15 235:5,19

**2018** 177:12,20 177:24 178:20 180:5,8 184:21 186:4,10 206:24

**2019** 177:12,20 177:24 178:20 180:5,8 184:22 186:10

**2020** 177:13,20 177:25 178:20 180:5,8 184:22 186:10

**2024** 24:8 199:25

**2025** 1:24 4:7 262:8 321:6,16 322:3

**2046** 298:23

**21** 174:11,14 176:21 277:25

**21498** 321:19

**217** 3:18

**22** 1:24 218:8,9 218:11,15 276:16

**22nd** 4:6 321:6

**App. 564**

**[23 - 4]**                                                                    Page 3

| | | | |
|---|---|---|---|
| **23**  187:14 219:2 220:7 | **276**  3:21 | **3** | 208:8,9,13 229:25 230:14 231:7,19,25 232:10,15 235:4,13,19 241:20 245:10 299:25 |
| **24**  45:1 189:15 189:17,18 196:6 200:25 | **27th**  246:19 247:12 249:17 | **3**  3:13 11:1 57:1,4 78:7 97:23 290:19 291:21 294:5 295:22 | |
| **24,759**  58:25 74:17,20 | **28**  45:2 51:2 88:24 89:9 141:7 142:22 197:9,10 198:13 201:25 202:10,20 203:3,7 288:18 288:21 | **3.5**  60:7,12,14 60:21,24 249:2 | **324**  1:1 |
| **24.8**  56:1,9,22 78:12 83:20 | | **3.5.**  256:19 | **33**  153:14 |
| **24th**  50:18 51:3 51:6 247:11 | | **3.6**  60:6,12,14 60:23 76:4,19 80:1,8 129:16 248:21 249:5,8 256:9,19 257:6 257:22 258:20 260:1 | **35**  3:12 |
| **25**  9:4 18:20 28:13,17 74:19 156:14,25,25 157:2,14 158:7 158:8,15,15 159:6,18 160:2 161:12 165:2 178:2 | **28th**  45:25 46:2 46:7 50:17,19 60:22 70:4 72:15,15 85:1 147:24 152:5 152:25 157:7 163:19 181:20 184:20 190:21 191:11,12 197:1,2,12,16 197:20,23 198:23 200:11 200:12 206:7 243:11 248:15 248:18 299:25 | | **37**  298:18 |
| | | | **38**  187:6 |
| | | | **39**  187:6,6 204:23,25 205:4,18 |
| | | **30**  14:17,17,19 18:19 22:16 54:3,11,22 55:2 225:12 261:17 262:1,2 262:10 322:16 | **3:16**  1:6 |
| **25.07**  62:22 64:5,11 66:16 101:7 104:2 105:20 | | | **3:50**  234:21 |
| | | | **3rd**  246:18,22 246:24 247:1 |
| **25.07.**  62:22 63:23,25 98:15 | | | **4** |
| **25th**  156:15 158:24 159:7 159:19 160:11 161:13 162:16 177:4 | **29**  54:17,22 225:13,15 322:3 | **31**  54:19,22 225:20 231:1 231:10 | **4**  3:15 119:12 139:16 143:16 143:17,23 144:17 145:15 145:19 146:3 146:21,22 148:24,25 149:3,18 150:24 151:1,8 151:13,22 154:20 174:5,7 184:4,11 187:23 206:23 |
| | **29th**  321:16 | **31st**  45:11 46:2 46:8,15,25 47:10,17,22 48:5,8,12,21 88:2 89:16 190:21 197:9 198:6,14,23 202:1,10,21 | |
| **26**  158:2 | **2:41**  192:20 | | |
| **264**  3:19 | **2:56**  192:23 | | |
| **27**  276:22 | | | |

**[4 - 79]**                                                                 Page 4

| | | **6** | **7** |
|---|---|---|---|
| 207:20 208:6 244:5 | 74:18 75:5,5 78:13 102:14 102:19 143:2 177:9 217:1,2 277:23 | **6**  3:19 187:22 207:25 264:1,3 304:12 306:19 306:25 309:6 | **7**  1:2 3:20 276:7,9 288:12 |
| **4,108**  75:8 | **5.2**  206:4 | **6.52**  317:3 | **7/29/27**  321:20 |
| **4,560**  75:11 | **5.87**  64:4 | **60**  1:23 116:10 187:10 | **70**  187:11,11 200:2 240:21 242:10,11,12 242:13,15,17 242:19,20,21 242:21,22,24 242:25 243:7 310:8,10,11 317:8,16 |
| **40**  55:19,24 59:2 78:11 90:19,21 91:5 95:19 187:6 | **5.93**  205:25 | **61**  187:10 236:22 299:4,9 299:12,19 | |
| **400**  41:18,22 42:2 271:16 | **50**  28:15,15,18 302:22 303:10 308:24 | **62**  63:15 64:23 187:10 298:7 298:13 | **71**  30:16,17 200:2 242:8,14 242:15 |
| **41**  126:20 127:9 133:8 158:4,10 187:7 | **500**  130:4 218:18,21 | **63**  297:1,3 | **7102057**  322:5 323:2 324:2 |
| **43**  127:8,10,14 | **52**  187:9,10 255:5 257:25 | **64**  108:12,17 | **72**  200:2 |
| **44**  187:7,8 | **53**  177:14,15 187:10 234:5,6 | **65**  30:14 | **73**  200:3 |
| **45**  240:13 242:7 | **53.6**  225:22 226:25 | **655**  2:5 | **74**  200:3 |
| **46**  173:10 | **54**  38:22 143:15 | **66**  30:15,17 187:10 | **75**  25:14 63:4 200:3 |
| **47**  170:18 217:11 225:13 225:16 239:16 239:20 | **55**  115:8 | **660**  298:11,17 298:25 | **76**  200:3 |
| | **55.3**  225:25 | | **77**  151:23 152:2 |
| **48**  111:7 115:19 116:1 205:21 | **56.3**  225:24 | **67**  234:6 275:12 | |
| | **57**  3:14 142:10 142:12 | **67.9**  234:3 | **77.5**  297:8,18 298:3 |
| **49**  116:12 | **575**  168:15 | **68**  200:1 240:20 | |
| **4:04**  234:24 | **58**  142:10 143:16 177:15 205:21 | **69**  200:2 | **78**  277:25 |
| **4:54**  273:8 | | **6:05**  319:16 | **79**  277:24,24 |
| **5** | **59**  187:5,10 | **6:10**  319:19,25 320:3 | |
| **5**  3:4,17 18:21 55:15 56:5,20 57:7,9,10,11 66:25 74:8,14 | **5:08**  273:11 | | |

**App. 566**

**[8 - accepted]**                                                              Page 5

| 8 | 95 91:5,16 | 293:12,13,13 | 310:17,24 |
|---|---|---|---|

**8** 158:7 177:10
178:2
**80** 24:24 25:5
25:14
**800** 40:14
41:14 271:16
298:25
**832** 40:19 41:8
260:23 262:4
262:19 263:5
297:14,19
**85** 87:22
**85.9** 236:20,22
237:9,12
**86** 154:9
**89** 240:19
**8th** 156:18
158:19,25
159:11 161:1
161:11 162:16
164:18 177:5

**9**

**9** 61:20,20 62:2
62:5,8 67:2
74:14 97:23
100:21 102:1
102:17 103:8
105:2
**90** 12:7 24:25
25:5
**92101** 2:5

**95** 91:5,16
**96** 213:3
**97** 127:2,3
128:6 129:5
**99** 127:2,3
**9:30** 232:19

**a**

**a.m.** 1:25 4:7
321:7
**aa** 40:1,17,21
41:2,5,6
270:11,24
271:20,25
272:7,10,11,13
272:13,15,17
272:23 273:23
273:24 274:20
275:1,1,25
277:1,6,12,12
278:7,10 279:8
279:12,23,25
280:4,9,11,12
280:16,17,19
281:3,15 282:5
282:16,20,21
282:22,25
283:1,5,9
285:5,22 287:1
287:7,13,21,24
289:2 290:2,16
290:23,25
291:6,18 292:2
293:5,8,11,11

293:12,13,13
293:16,21,21
293:23,25
294:4,8,12,12
295:1,5,6,23
306:4
**aaa** 39:25
40:13 267:3
269:18 270:8
270:12,24
271:19,25
272:8,15,18,23
273:23 274:20
275:1,18
276:19,24
277:13 278:7
279:25 280:9
280:12 281:3
282:4,16,19
283:4 286:2
287:7,11,21,25
289:2,24 290:2
290:22,24
291:6,16,17
295:23 306:4
308:2
**ability** 43:8
160:6
**able** 15:20
33:20 49:14
71:11 100:8
190:1 195:22
217:5 254:13
269:13 302:19

310:17,24
311:7,10
313:12 314:16
**above** 73:3
130:25 132:12
143:2 272:13
298:13 322:6
324:7
**absent** 123:1
**absolutely** 27:7
41:11 47:19
97:15 128:2
134:15 198:19
232:6 279:14
286:18,24
290:3
**abstract** 67:18
**academic**
168:11 211:16
211:21 212:18
254:19 272:19
273:21 274:9
278:3
**academics**
160:24 165:22
166:24
**accept** 22:2,11
171:23 205:22
280:24
**accepted** 17:3
20:22 114:7
159:5,7 273:4
274:3 275:2,14
278:12,14

279:1 280:24 296:9,17 305:6

**accepting** 101:9,12,15 171:19

**access** 37:25 38:7,9,11 173:20 202:5,7

**accordance** 103:10

**account** 146:10 148:22 152:23 181:22 184:13 184:21 185:2 185:16 188:10 203:10,20 235:12 237:6 237:20 240:9 240:23 253:1,9 254:5 266:8 303:14 307:13 308:7,16

**accountant** 6:17,20 58:1 59:16 93:16 98:24 109:21

**accountants** 7:1

**accounted** 236:14

**accounting** 6:13,19,20,23 7:5,7,10,14,22 57:25 58:15

59:22 72:24 76:14 79:13 99:23 100:3,9 109:21 113:16 113:17,22 114:7,8 117:16 136:4,6

**accrued** 261:3 261:4

**accuracy** 204:6 322:9

**accurate** 9:7 57:15 102:1 190:4 221:4 277:22

**accurately** 7:8 35:2

**accused** 239:11

**achieve** 214:8

**achieved** 221:16

**acknowledge...** 324:3

**acknowledges** 295:22

**acknowledg...** 322:12

**acquired** 6:4 46:7

**acquiring** 34:7

**acquisitions** 13:18

**act** 13:21,25 14:7,21 315:9

318:5

**action** 1:6 25:10,20 47:22 49:9 289:9,13 321:14

**actions** 12:1

**activities** 313:24,25

**activity** 145:8 315:1 317:4,21

**acts** 313:15,20 313:20 315:3,7

**actual** 31:23 81:21 108:19 267:21 268:12 306:17

**actually** 10:23 11:7 13:20 27:24 33:9 39:19 50:22 55:18 65:11 71:17 108:22 113:8 114:19 117:10 127:3 157:17 159:3 159:25 165:10 167:15 173:25 187:9,16 190:16 195:6 195:19 196:8 198:18 199:4 201:6 203:22 206:7 225:12 239:10 244:6

246:1 254:4 259:18 271:23 272:3 277:16 282:24 286:8 287:17 289:17 290:14 297:22 305:4 307:18 315:6,21 316:2

**add** 9:25 31:2 67:6 80:4 86:4 128:19 171:2 227:23

**adding** 42:9

**addition** 30:25 128:20

**additional** 11:11 40:3 154:11 260:23 261:1 262:4,19 263:10,17 264:13 278:16 284:14 285:12 285:20 286:8 297:19 303:15 306:2 308:6 312:23 314:8 316:5

**additions** 324:6

**address** 94:1 235:3

**addressed** 117:21 134:22 211:22

**[addresses - alleged]** Page 7

| | | | |
|---|---|---|---|
| **addresses** 63:15 | **advice** 14:22 29:6 | **agree** 85:25 95:18 106:5 | 49:15 54:2,25 59:8,9,12 |
| **addressing** 142:11 187:12 | **affect** 181:5,6,9 181:10 259:17 | 116:19 119:1 174:19 176:2 | 65:19 72:10 90:5 104:7,16 |
| **adds** 286:10 | **affecting** 271:6 | 178:17,25 | 104:17,18 |
| **adjacent** 274:25 275:1 | **affirmative** 61:21 67:9 | 180:4 209:21 223:10 230:8 | 249:19,24 265:8,10,22 |
| **adjudicator** 126:14 | 100:17 | 248:17 260:6 260:25 280:10 | **allege** 50:9 67:24 85:18 |
| **adjusted** 143:9 143:15,24 | **affirmatively** 166:2 | **agreed** 9:10 84:4 228:7 | 87:18 264:19 265:15,20 |
| 144:11,18,19 | **afolkerth** 2:7 | **agritech** 19:9 | **alleged** 21:4,17 |
| 182:6,7 184:11 | **afraid** 174:17 174:21 | 19:24,25 | 21:25 48:9,12 |
| 219:9 220:1,15 | **afternoon** 141:1 | **ah** 136:1 | 48:22 51:13,19 53:11 55:9 |
| 220:24 223:4 225:21,24 | **agencies** 40:22 | **ahead** 130:22 | 57:16 67:4 |
| 226:11,25 | 40:24 251:4 | **akin** 76:17 278:5 | 68:10 72:12 77:15 82:1 |
| 234:3 240:19 242:9 244:6 | 283:14 285:22 294:14 296:13 | **al** 1:12 4:11 168:9 322:4 | 85:5 87:24 88:20 89:11,17 |
| **adjusting** 182:8 | 296:22 | 323:1 324:1 | 89:18 101:5 |
| **adjustment** 237:18 238:9 | **agency** 40:1,2 252:5 282:16 | **alex** 2:4 4:16 | 102:17,18,20 104:13 105:13 |
| **adjustments** 99:12 153:21 | 282:17 | **allegation** 17:25 51:12 | 106:2 111:17 117:22 118:4,8 |
| 154:8 235:12 | **aggregated** 301:16 303:1 | 55:11 59:24 61:3,7 65:19 | 118:13,22,24 120:3 121:5,12 |
| 238:14 312:21 | **aggregating** 302:5 303:5 | 67:13 100:14 100:15 108:19 | 123:7 128:7,12 129:15 131:19 |
| **admissions** 90:9 | **ago** 9:24 14:15 18:20 23:16 | 108:21 112:2 236:21 237:11 | 135:14,16 141:7,12 152:5 |
| **admit** 76:24 303:22 | 26:14 29:9,10 29:13 68:4 | 250:5 265:2 | 181:20 182:17 223:5 236:16 |
| **admitted** 73:15 90:5 | 150:13 180:18 200:13 234:4 | **allegations** 19:4 20:16,17 | 237:14 245:25 |
| **advance** 213:22 309:21 | 271:20 318:12 | 20:19 21:13,25 44:13 45:5 | |

**[alleged - analyst]**                                                    Page 8

| | | | |
|---|---|---|---|
| 247:12,20,22 | 152:14,20 | 99:8,9 104:15 | 254:2,21 |
| 248:1,17 | 197:15 198:4 | 112:4,7,15 | 255:17 268:3 |
| **allegedly** 121:1 | 198:22 | 113:15 114:5 | 270:7 271:8 |
| **alleging** 56:13 | **americas** 2:10 | 114:11 115:17 | 274:2,14 |
| 58:4,8,11 | **amortization** | 116:21 117:9 | 278:17 282:8 |
| 61:22,24 62:25 | 112:24 114:4 | 117:14 118:4 | 296:18 298:22 |
| 63:2 64:8 65:3 | **amount** 41:21 | 120:23 124:17 | 300:12 302:2 |
| 65:15,17 75:12 | 59:3 60:4 61:2 | 124:18,25 | 303:17,18,19 |
| 75:23 76:15,25 | 61:4 96:13 | 125:1 127:16 | 303:25 304:10 |
| 79:11 81:7,19 | 122:14,16,24 | 128:22,23 | 304:12,21,21 |
| 86:11 87:3,8 | 236:6 237:7 | 130:8,14,24 | 305:11,16 |
| 87:16 88:14,15 | 241:15 245:7 | 131:2,14,24 | 307:13 308:5 |
| 93:15 97:9 | 245:15,22 | 132:7 133:2,24 | 308:12 312:20 |
| 101:21 106:12 | 246:5 247:20 | 135:2 136:20 | 314:6 316:16 |
| 250:14 264:24 | 247:24 248:3,9 | 137:1,3,19 | 316:17,18,21 |
| 265:3 | 248:13,20 | 139:11,13 | 316:24,25 |
| **allen** 3:15 | 256:7 311:16 | 141:6 155:25 | 317:9,13,14,22 |
| 32:17 46:18 | **amusing** 162:6 | 156:7,10 158:5 | **analyst** 6:22 |
| **allocating** | **anadarko** | 183:1,13,15 | 31:22 68:11 |
| 151:7 | 33:17 115:6 | 184:25 186:12 | 69:15 71:3,25 |
| **allocation** | **analyses** 8:24 | 186:17,18,20 | 81:25 93:4 |
| 150:25 | 209:14 | 186:25 200:10 | 94:2,20 105:16 |
| **allotted** 322:19 | **analysis** 7:10 | 205:11,22 | 107:5,20 108:6 |
| **allow** 171:20 | 12:8 17:7 19:6 | 206:8,14 | 109:6,10,23 |
| **alluded** 186:6 | 19:19,20 21:8 | 207:15 208:1,2 | 110:23 134:23 |
| **alongside** 62:15 | 21:9 22:3 34:4 | 208:3,5,20 | 135:9 137:6,24 |
| **aloud** 239:14 | 34:5 37:10 | 210:5 219:1 | 138:2,23 |
| **alter** 309:6 | 39:10 44:18 | 223:3 233:23 | 139:17 147:18 |
| **alternative** | 47:9,20 48:3 | 235:3 238:4 | 154:15,16 |
| 191:2 192:1 | 48:25 49:6 | 239:22 243:22 | 157:3 158:15 |
| **altogether** | 56:18 59:20 | 244:12,15 | 158:18 159:15 |
| 157:5 | 68:22 69:16 | 248:6 249:15 | 164:2,6,13,15 |
| **america** 62:12 | 89:15 90:2,11 | 252:2,17,22 | 165:2 166:19 |
| 63:6 75:8,10 | 93:1,22 94:23 | 253:19,21,24 | 172:8 177:5 |

178:1 182:16 185:3 189:19 190:11 195:3 195:12,24 196:2,8 197:7 198:12,18 199:5,11,15,16 200:10 201:24 202:8 239:3,6 239:8,12,18,24 240:4,5,6,14 241:3 242:22 305:15,16

**analyst's** 166:20,22 202:19

**analysts** 7:5 61:1,10 63:8,8 70:12,16,23 79:2 81:14 84:23,23,24 91:1 95:4 100:2,2 107:13 107:14 108:7 109:8,8,13 111:18 117:4 117:17 134:21 134:25 135:20 136:7,13 137:8 137:12,17,23 138:3,5,12,14 138:24 139:3,9 142:4,24 143:2 143:8,11 147:6

147:14 149:21 153:4,6,8,24 154:5 155:11 155:20 156:8 156:14,17,24 157:6 158:6,22 158:23 159:18 159:23,25 160:10,24 161:3,10,18 162:15 163:8 165:6,7,13,16 166:2,13,15 167:19,21 168:15 171:8 178:18 180:6 180:16 182:11 188:7,14,18 190:17 194:8 194:15,24,25 195:4,6,11,18 196:13,13 201:4 204:10 240:22 241:5 242:1,4 243:5 243:6 251:16 251:17,19 252:14,15,21

**analytic** 66:4

**analytical** 126:21 127:10 299:20

**analytically** 268:25

**analytics** 69:22

**analyze** 142:1 224:13 240:4 259:8

**analyzed** 6:9 84:21 86:7 88:18 108:24 114:1 142:20 182:15 314:5

**analyzing** 6:5 149:1,2

**anchor** 292:10

**announce** 124:10

**announced** 72:16 88:11,19 146:14 181:3 242:25 243:24

**announcement** 45:12 72:19 73:2 77:5 141:21 142:18 143:1 145:1 146:4,6 148:1 148:8 155:7,14 157:7 163:8,19 163:21 164:3 185:7 197:3,6 197:11 203:9,9 203:11,17,20 242:12 244:4 249:4 266:21

**annual** 3:19 77:24 79:5

155:5

**annually** 89:23

**answer** 8:16 9:25 10:21 13:20 15:18 25:23 34:7 35:2 39:8,17 40:15 41:13,18 42:7,11 43:8 47:24 48:15 53:2 65:2,13 65:13 66:2,17 84:5 85:4,12 90:19 91:13 93:25 113:20 115:10 117:5 162:25 164:12 168:18,20,23 169:5 170:6 171:2 172:11 183:2,25 191:7 218:3,5,8 228:16 229:15 229:16 230:9 244:14 254:13 258:4,24 265:7 295:14 302:13 302:15 304:10 313:4 316:16

**answered** 39:6 76:20 83:8,25 95:1 106:9,19 163:2 171:10 172:10 192:14

200:13 265:11 295:13 310:6 318:12

**answering** 34:9 39:4 40:20 70:10 169:14 204:18 264:9

**answers** 47:25 153:6 232:21

**anthony** 3:21

**anticipate** 308:18

**anticipated** 149:15 150:3 183:5

**anticipating** 308:19

**anybody** 14:2 135:3 137:4,5 137:6

**apart** 16:15 194:4 235:11 254:8 272:19 317:7

**apartment** 8:8

**apollo** 11:20

**apologies** 51:7 96:8

**apparently** 119:19 136:25 318:9

**appearances** 2:1

**appears** 78:13

**appended** 324:7

**appendix** 197:8 198:12 201:24 202:4,9 217:12 217:12,13

**apples** 166:19 166:20

**applicable** 1:18 135:24 322:8

**application** 222:21

**applications** 224:7,7

**applied** 126:16 127:21 129:12 132:11 136:1 136:19 278:25 281:13 305:6

**applies** 165:4 274:10,16,25

**apply** 129:10 230:12 304:1

**applying** 18:4,5

**appreciate** 204:3 205:12 243:9

**appreciated** 140:1

**approach** 133:20 299:20

**approached** 133:13

**appropriate** 38:5 47:19 154:21 162:3 165:23 166:12 188:6 191:25 209:22 210:9 218:25 226:17 230:3,23 244:17 278:19 281:11 284:13 317:13,14

**appropriately** 222:8 229:19

**approximately** 44:5 55:4 64:4 160:1 248:21

**approximation** 305:1

**april** 276:22

**arbitration** 11:9

**area** 5:16 7:9 60:8 63:20 104:4

**areas** 5:19

**arguably** 244:4 244:5

**argument** 103:12 164:25 167:10 175:25

**argumentative** 204:12 295:13

**arguments** 17:8

**arrive** 37:24 194:22 251:11

**arrived** 39:14 207:19

**art** 292:6,14 295:18

**article** 213:16 275:8

**articles** 31:22 171:16,18 272:20 281:8 284:20 302:9

**articulated** 74:25 175:14

**artificial** 69:3 247:20

**ascertain** 126:17 128:1 128:11 281:14 310:1

**ascertained** 263:7

**ascribe** 97:12 151:16

**ascribing** 152:8

**aside** 90:8 205:8,14 234:8 243:24

**asked** 9:21 19:20,21 29:9 39:7,12,16 40:16 41:14,15 42:9 43:7,7 47:24 48:11,20

**[asked - attorney]**                                                    Page 11

| | | | |
|---|---|---|---|
| 52:23 57:6,10 | 265:1,20 274:9 | 86:21 87:3,4 | 286:13 308:23 |
| 83:7,24 84:24 | 275:6 281:17 | 88:7 91:24 | **assumed** |
| 94:2 99:22 | 288:5 293:22 | 93:21 94:22 | 249:19 |
| 106:8,18 | 294:7 295:2,5 | 97:8 114:17,17 | **assumes** 260:11 |
| 111:21 117:3,4 | 303:12 305:22 | 115:3,6 116:17 | 280:14 304:15 |
| 139:7 153:6 | 309:3 | 117:1 131:8,17 | **assuming** 20:15 |
| 171:10 172:9 | **asoloway** 2:12 | 131:25 132:2 | 20:23 21:10 |
| 172:12 192:13 | **aspect** 17:6,9 | 132:23,25 | 100:7 108:19 |
| 193:1 218:1 | 86:23 282:7 | 133:5,6,16,17 | 204:6 |
| 242:18 264:8 | **assertion** | 134:1,21,22 | **assumption** |
| 264:10,13 | 286:25 | 135:1 143:13 | 20:16 21:24 |
| 273:20 285:19 | **assess** 48:12,21 | 143:13 154:3 | 101:9 104:6 |
| 295:12 308:23 | 104:12,12 | 179:13 236:2,4 | 107:11 246:12 |
| 310:5 | 127:21 149:6 | 236:12,16,19 | 263:2 292:17 |
| **asking** 12:4 | 198:24 207:16 | 237:11,22,22 | 308:12 |
| 22:24 25:18 | 259:8 281:2 | 313:3,21 | **assumptions** |
| 30:18 31:11 | **assessing** 82:12 | 314:17 315:18 | 20:13 166:21 |
| 34:21 38:6 | 127:1 128:7 | 316:13 317:20 | 231:4 269:11 |
| 42:12 44:8 | 129:8 179:20 | 317:25 318:6 | **attached** 36:14 |
| 48:19 58:3,6 | **assessment** | **assign** 41:4 | 36:16 59:19 |
| 67:8,18,19 | 144:10 152:24 | 282:13,17,20 | 322:11 |
| 73:21 80:19 | 249:7 253:18 | 283:4,13 | **attachment** |
| 82:7,20,21 | 254:6 | 284:16 | 36:17 |
| 83:1,3,15,16 | **asset** 7:1 87:9 | **assigned** 23:9 | **attack** 162:6,7 |
| 85:16,17 91:9 | 92:9 94:15 | **assignment** | 190:25 |
| 92:23 107:18 | 112:21 113:4 | 130:6 | **attacking** |
| 109:15 118:19 | 115:17 134:8,9 | **assistance** | 167:11 190:25 |
| 135:22 137:8 | 134:10,12 | 195:21 | **attention** 64:20 |
| 171:11 180:23 | 154:4 181:22 | **assisting** 26:24 | 96:24 137:17 |
| 182:20 200:9 | 312:14 314:9 | **assume** 40:21 | 153:24 154:5 |
| 208:3,4 216:14 | 315:10 | 41:2,3,5,16 | 239:10,15 |
| 230:16,25 | **assets** 50:10 | 49:13 100:6,10 | 294:17 299:4 |
| 231:2,9 258:5 | 51:21 67:15 | 104:15 197:5 | **attorney** |
| 258:7,8 264:24 | 75:18 86:10,13 | 233:6 249:15 | 321:13,13 |

**App. 573**

**[attorney - back]**

322:13
**attorneys** 12:22 13:10 19:17
**attractive** 314:18
**attributable** 237:10
**attribute** 96:18 100:19 101:5 180:19 182:12 229:13 236:9
**attributed** 115:21 145:19 147:19 179:6 184:10 219:22 222:6,8 237:12
**attributes** 222:1 229:11
**attributing** 219:18 221:25 223:19
**audacious** 190:24
**audra** 2:9 4:20 32:1
**authority** 213:2
**available** 33:6 33:10,14,18 34:14 61:10 110:6 210:23 211:1 218:21 312:23 317:11 322:6

**avenue** 2:10
**average** 24:24 40:4 42:6 62:17,20 63:18 63:18,22,25 64:3,5,6,18 65:23 105:3 143:3 170:19 177:3 178:23 187:18 188:4,5 188:11,12 200:21 201:1 201:16 204:8 270:11 275:13 279:12 283:5 290:21 301:23
**avoid** 9:11
**aware** 7:6 26:4 31:7,10,13 33:8 34:21 71:25 90:10 92:24 93:19 103:23 110:13 156:13,16,21 156:23 163:16 171:3 178:3,6 208:9 233:24 255:1 258:14 259:21 267:9 278:3,11 284:3 306:1 307:14 307:20,24

**b**

**b** 2:4 3:6 13:22 13:25 14:7 18:21 156:2,4 156:6,11,15,18 156:21,24 157:2,8,10 158:13,17,20 159:5,6,7 160:2,4,7,8,20 160:25 161:8,8 161:15,19 162:1,3,7,16,22 163:9,15,20,24 164:12,23 165:10,13,16 166:1,25 167:10,11,13 167:16,17 168:8,12,13,16 169:10,25 170:17,21,24 171:6,6,17,19 171:20,22 172:1,7,18,20 173:3,8,23 174:14,17,19 175:1,4,21,24 176:1,2,3,21 177:25 178:19 179:16 180:4 187:18 189:11 190:8,10 191:1

191:22,25 194:2,5,10,14 194:21 195:21 196:12 197:8 198:12,24 199:1,3 200:14 200:18 201:24 202:4,9 203:12 203:15,16,21 204:14 205:13 206:24 217:12 217:12,13 238:12 242:5,6 242:11 243:15 244:9
**b1** 217:13
**b3** 217:16
**b8** 218:9,11
**b9** 220:9
**babson** 173:20
**back** 20:3,8 23:10 24:13 25:15 27:17,19 29:13,15 32:8 32:15 42:18 45:8 46:21 52:10,23 55:23 56:20 57:20,21 63:13 69:4 71:13 72:5 77:22 81:21 82:14 89:22 92:14 94:8,9 94:11,12,18

**[back - believe]**                                                        Page 13

97:20,22
123:16 134:4
136:15 141:3,5
143:9,12
167:12 178:24
186:2,2 187:18
192:24 198:1
225:11 233:1
234:25 241:2
242:5 256:16
261:10,12
263:5 267:18
269:1 271:17
273:12 278:2
288:7 306:17
306:19,22
308:22 313:22
313:24 314:25
315:2 316:13
319:14,20
**background**
5:14 268:23
**bad** 119:7
**baked** 150:1,20
**balance** 240:7
241:14 311:21
311:22 314:12
314:23 316:6
316:22 318:5
**balances** 311:1
312:9,13
**bank** 38:1,4
165:17 197:15
198:4,21

279:20,22
**bankrupt**
317:24 318:3,7
**banks** 166:3
**barclays** 91:1
**barrel** 56:22
60:12 62:1,4
62:16,18,18,21
63:23 64:1,3,7
64:19 65:23
99:9 105:3
129:16 248:21
256:9 257:6
258:21 260:2
**barrels** 56:2
60:7,7,14 76:5
78:12 80:1,8
83:21 130:4
152:14,19
**based** 17:6
20:20 21:9,23
26:23 28:21,22
45:19,22 46:16
47:20 65:18
73:1 79:1 87:8
108:16 109:17
128:21 135:7,8
135:9,10,10
138:23 153:5
173:5 194:23
195:25 204:10
207:11 208:1
212:3 213:13
214:17 219:1,2

219:3,4 221:8
225:8 229:17
239:23 257:12
257:15,24
297:14 311:14
313:10
**bases** 188:20
**basic** 158:12
**basically** 99:10
148:11
**basis** 47:1,2,7
79:5 114:25
156:6 171:18
175:19 180:10
187:25 188:25
189:22 197:14
210:20 212:25
214:10,14
222:10,11
223:20 224:16
224:24 225:8,9
226:4,10,12,19
226:24 227:3
227:12 228:17
231:5 232:8,13
233:9 234:9,13
237:2 238:2,2
245:3,4 247:8
254:15 256:6
259:11 266:5
267:15 268:20
268:20 269:24
271:2 273:17
276:24 277:4,9

277:14 289:10
291:20 297:17
299:1,17 305:2
318:20 319:7
**bates** 36:23
258:1
**bear** 37:14,17
**bearing** 6:2
27:9
**beat** 143:4,5
240:18,24
241:4 242:1,15
244:6,11
**began** 28:24
**beginning** 11:1
24:5,7 50:16
127:8,10
249:25
**begins** 239:25
**behalf** 1:8,17
12:15
**belief** 122:8
**believe** 13:15
15:8 30:5
37:25 38:11,18
50:18 52:25
53:18 64:13,15
69:12 100:13
105:23 141:12
148:21 172:20
176:18 180:1
180:10,14
182:9 189:11
190:2 208:20

210:14 214:6
222:15 247:25
251:25 254:25
264:12 272:10
272:11 281:14
304:7
**believed**  21:22
**belongs**  301:21
**ben**  260:16
**benchmarks**
  270:10
**benefit**  12:17
**best**  35:1 43:8
  75:9 110:8
  167:1 172:2
  193:25 194:10
  209:18,18
  210:14 222:14
  229:9 246:3,7
  248:12 261:7
  267:1,6
**better**  84:11
  95:9 190:7
  193:16 199:3
  200:17 204:21
  269:16
**beyond**  47:9
  115:8,10
  128:18 131:23
  132:21 183:14
  187:9
**bias**  167:6,7
**biased**  283:1,21

**bibliography**
  168:14 171:16
**big**  110:10
  141:20 146:7
  149:3 287:12
**billing**  28:25
**billion**  56:1,9
  56:22 60:6,7
  60:12,21,23
  74:17 76:4
  78:12 80:3,8
  83:20 87:22
  92:9 116:10,12
  129:16 131:7
  131:11,12
  132:9,9 133:8
  152:13,19
  153:20 154:6
  154:12 236:3,3
  236:14 248:21
  249:2 256:9
  257:6,22
  258:20 260:1
  317:2,3
**bit**  23:10
  157:12 187:11
  227:23,24
  283:18 300:18
**bitumen**  62:4
  62:16,18,21,24
  63:3,6,23 64:1
  64:3,19 65:24
  74:22 75:6,8
  75:10 85:21

105:4 110:12
**block**  91:5
  152:1 173:10
**bloomberg**
  218:19
**blow**  289:7
**blue**  293:3
**bob**  2:14 4:4
**body**  83:12
  126:5
**bofa**  196:19
**bolded**  91:19
  91:20,21,22
**bond**  39:23
  40:4 252:16,22
  261:9,11
  262:10 264:21
  265:5,17 271:6
  272:24 273:3
  273:24 274:13
  274:15 278:9
  282:15,18
  283:9,13 285:2
  285:5,18,21
  287:7 290:16
  292:2,3,23
  293:1,5 295:7
  296:11 298:23
  299:6,13,23
  300:20 301:19
  301:20 303:1
  307:14 311:8
**bond's**  282:18
  282:20

**bonds**  41:10,22
  251:9 252:2
  261:13,16,17
  262:1 263:4
  266:5,24
  270:11,12,23
  273:23,23
  274:17 279:9
  279:12 281:15
  282:14,24
  283:16,23
  284:17 286:2,3
  286:3 287:1,7
  287:9,11,12,13
  287:21,22,24
  287:25 289:1
  289:24 290:23
  290:25 291:24
  291:25 292:7,7
  292:16,17,18
  292:19,21
  293:3,8,16,25
  294:4,8,16
  295:1,5,23,23
  299:7,14
  301:18,24
  302:5,6,7,12
  303:2,3,5,7
  309:10
**book**  72:17,20
  72:22 73:5
  76:4 87:12,12
  87:14,18
  112:20 113:1,2

129:16 130:4 213:4 248:19 250:6,15

**booked** 50:10 51:22,23 55:17 58:12,21 59:14 59:24 60:2,3 60:15 61:5,11 68:19 73:10,19 75:2 77:1 80:9 84:3 134:25 152:15 154:12 249:2,8,20 250:3,9

**booking** 56:14 60:4 68:14 69:1,25 80:16 83:11 96:15 101:19,20 104:24 106:1 110:2 125:9 130:21 132:3,4 146:4,6 154:2 249:16,25 250:4,20

**books** 317:20

**borrow** 312:12 314:3 316:12 318:10

**borrowing** 311:3 313:13 313:19

**boston** 1:23 4:8 251:17,18,20

252:13

**bottom** 36:20 59:1 74:12,20 75:11 91:20 116:23 198:7 201:23 225:15 225:15 236:21 306:23

**bounce** 186:2,2

**bound** 30:15

**boy** 227:11

**bp** 111:4 210:17

**brazilian** 17:3

**break** 32:8 35:9 44:7 50:3 52:8 53:9 71:10 97:14,18 140:2 140:5 151:15 192:9,18,22 234:23 263:22 273:7,10 319:18

**breakdown** 102:16 114:9

**bright** 130:24 131:21,23

**broader** 256:5

**broadway** 2:5

**broke** 193:1

**broken** 110:11 110:12

**brothers** 293:8

**building** 251:21

**built** 308:12 309:10

**bulk** 88:14

**bunch** 136:12 136:22 137:16 220:21

**burkholz** 2:4 4:18,18 52:3 234:18

**business** 166:6 194:17

**buy** 261:10,12

**buybacks** 319:1,3,10

**c**

**c** 3:17 4:1 187:13,15 188:21,23

**ca** 2:5

**cabin** 93:25

**caesar** 4:25

**calculate** 109:20 143:8 282:4 284:8 285:20 309:14

**calculated** 40:19 65:1,12 69:2 99:13,17 99:20 104:3 233:25 241:19 245:3,14,21

247:19,24 260:24 262:5 262:20 263:6 271:18,18 297:8,22

**calculating** 66:5 82:11 107:12 284:6 284:14 285:17 307:6

**calculation** 98:22 100:19 102:4 112:15 112:16 146:9 235:7 237:24 247:7 262:4 263:2,13,16 265:24 266:1,3 266:7 285:11 286:9,10 297:15 298:4 299:2 303:15 305:4 306:2 307:3

**calculations** 82:16 309:22

**calendar** 51:11

**call** 17:11 29:17 45:13 84:25 137:10 153:18 154:24 161:22 162:1 165:16 166:2 172:7 174:17

**[call - causation]** Page 16

174:22 176:3
196:15 206:3
232:18,24
251:19 292:10
301:5 316:19
318:4
**callable** 261:6,9
261:18 262:1
**called** 1:16 5:3
13:8 15:25
18:21 24:14
30:3,22 34:24
59:19 126:21
143:3,8 182:2
231:18 251:16
251:18 261:7
262:2,6,7,12,15
263:3,4 294:14
**calling** 166:14
166:15 301:7
**calls** 47:3 53:24
102:6 137:7
167:24 174:18
260:11 264:22
280:14 291:13
294:22 295:12
**campbell** 213:2
213:15 217:15
**canada** 62:12
63:4,5 75:8,10
**canadian**
110:11 143:13
**canned** 214:13

**capable** 91:10
134:6
**capex** 98:21
99:6
**capital** 312:22
313:24 317:21
**capture** 153:23
**care** 253:11
256:4 268:8,10
268:16
**career** 13:4
14:18 18:19
**careful** 125:19
125:21 195:23
**carefully** 88:25
153:3 172:23
**carry** 291:24
**carrying**
112:20 114:3
**case** 6:19 7:12
7:20 10:13
11:16,20 12:14
12:23 13:14,20
13:21 14:7
16:7,8,11,16
17:2,15,17,21
18:5,6,20,21
19:11,18,19,21
20:4,6,10,15,18
20:25 21:3,14
21:18,22 22:20
23:9,9,20
24:11 26:19
27:9,11,14

28:25 29:11,11
29:14,18 32:25
33:17 34:3,13
34:23 35:15
36:9 38:8,12
39:25 42:22
43:4 44:14,19
44:21,25 45:10
49:7,11 50:8
51:12,14 60:11
67:5 68:23
70:2 73:13,14
73:17,21 79:10
83:11 85:15,24
95:19 103:13
104:11 105:23
108:15 111:14
114:19 119:22
120:21 124:23
137:9 152:21
164:8 171:5
175:16 181:21
208:10 209:15
211:14 212:13
224:18 230:4
233:14 242:4
244:19 245:9
247:19 249:20
255:21 256:8
258:12,15
260:20 264:6
264:19 279:5
280:23 284:7
284:15 285:7,8

285:10 288:3
292:4 295:4
302:9 303:9
310:23 311:6
**cases** 6:6,9 9:1
11:6 12:6,9,19
12:21 13:6,24
13:25 14:21
15:12,15,20
16:15,22,24
17:14 18:17
19:2,8 22:7,16
22:17 25:10
32:18 121:11
209:5,14
**cash** 99:8
112:15,16,17
112:19 113:1,3
114:3 310:16
310:25 311:1
311:17,18,20
311:22 312:1,3
312:6,9,13,23
314:2,8 315:10
316:5,13 317:3
317:11,18,25
318:13 319:6
**categories** 98:2
277:13 296:3,5
296:12,15
**category** 19:8
86:1,2,4 98:4
**causation** 3:9
20:24 21:6

**App. 578**

**[causation - checks]**                                                                    Page 17

22:10,11 29:7
44:15,17,19
66:5 82:12
100:11 104:10
104:12,19
127:15 128:5
128:15,22
129:8 223:24
**cause**  105:15
120:9 122:13
147:5 308:17
321:9
**caused**  18:3
69:3 96:14
97:5,6 104:14
128:8,25
143:21 145:2
146:7 153:11
207:23 222:24
235:21 260:2
**causes**  122:16
224:22
**causing**  224:19
224:20
**ceasar**  2:17
**censoring**
164:9
**cent**  143:17,23
144:17 146:3
146:21,22
148:23,24
149:3,18
150:24 151:8
151:13 184:4

184:11 244:5
**cents**  143:2,15
143:16,16
145:15,19
148:25 151:1
151:22 154:21
177:9,10
187:22,23
206:23 207:20
208:6 240:19
240:20,21
242:8,14,24
**certain**  7:4 21:4
21:17 34:11
99:5 141:10
143:10,13
214:8
**certainly**  11:18
149:23 259:16
293:13
**certification**
23:19,23 24:11
44:22 46:12
**certified**  17:5
44:25
**certify**  321:6,12
**cfa**  251:20
254:23
**cha**  215:15
**challenge**  167:4
**challenged**
39:8
**challenging**
16:4

**chance**  156:10
176:17 303:10
**change**  102:3
108:9 116:17
120:10 129:11
146:18 150:5
172:12 177:4
178:1 179:1
182:16 201:16
201:18 202:19
210:7 260:3
269:24 271:1
323:4,7,10,13
323:16,19
**changed**  42:25
43:2 60:9
108:1,6,8,10,11
149:11,12
163:24 184:18
184:21 190:18
198:22 210:3
214:16,18
243:17 257:18
**changes**  121:16
121:17 179:6
180:11 185:7
198:25 199:12
322:10 324:6
**chapter**  251:18
**characteristics**
170:23
**characterizati...**
194:1 195:10

**characterize**
17:13 78:22
156:21 194:20
300:2
**characterized**
144:3
**charged**  26:25
**charges**  116:11
**charlie**  187:15
**chart**  105:2
174:14 175:5,6
175:8,18,20
176:2,6,16
184:22 189:4
189:23 190:16
196:5 200:20
200:24 201:1,5
201:19 202:14
202:18,22,24
203:4 204:4,7
204:8 255:8,11
255:14,16
278:6
**charter**  251:16
251:24 252:14
305:14,15
**charts**  291:11
**check**  32:23
114:6 176:12
198:21 226:5
298:3,5
**checked**  43:25
**checks**  89:4

**App. 579**

**[cherry - come]**                                            Page 18

| | | | |
|---|---|---|---|
| **cherry** 239:12 | 172:19 211:25 | 206:13 236:17 | 226:12,24,24 |
| **chevron** 111:3 | 212:18 239:3,8 | 245:6,16,23,24 | 228:1 229:24 |
| 113:13,19,20 | 239:9 240:7 | 246:2,6 247:1 | 230:2,2,12,18 |
| 113:24,25 | 241:4 255:8 | 247:10 248:4 | 230:22 231:5,7 |
| 114:7,9,22 | 259:18 272:19 | 248:10,11 | 231:19,24 |
| 115:3 210:17 | 274:9 275:4 | 249:18,21 | 232:9,12 233:9 |
| **chevron's** | **cited** 31:1,17 | 250:1 | 233:19 234:7,8 |
| 113:23 114:8 | 31:20,21 33:5 | **clear** 20:12 | 234:8,13 |
| 114:17 | 33:9 34:12,22 | 23:18 61:3 | **closely** 219:14 |
| **childress** 2:16 | 78:10 116:2 | 72:23 73:1 | **code** 23:9 |
| 4:24 | 173:14 184:3 | 102:15 103:6 | **coincides** 51:10 |
| **china** 19:9,24 | 213:23 253:5,7 | 125:17 129:2 | **collate** 9:17 |
| 19:25 | 272:20 279:2 | 179:24 188:14 | **collation** 194:8 |
| **chinese** 11:20 | 281:8 | 190:20 191:10 | **colleague** |
| **choice** 26:4 | **cites** 168:15 | 197:21,22 | 139:25 |
| 214:3 | 217:15 239:6,9 | 202:8 203:11 | **collect** 171:25 |
| **choices** 213:20 | 240:6 | 203:12 207:21 | **collection** |
| 219:19 | **citing** 32:23 | 222:15,20 | 303:2 |
| **choose** 164:6 | 268:7 | 223:1 224:9 | **college** 173:20 |
| 212:2 | **city** 33:12 | 238:13 246:16 | **color** 67:6 |
| **choosing** | **civil** 1:6,19 | 256:25 270:21 | 286:10,12 |
| 222:10,11 | **claim** 49:20 | 283:24 288:8 | **column** 62:9,10 |
| 223:19 | 170:14 279:7 | 304:10 316:11 | 62:12,13,19 |
| **chose** 211:1 | **claims** 8:10,13 | **clearly** 69:5 | 74:22 75:5,6 |
| 214:10,20,21 | **clarify** 304:17 | 129:3 | 176:24 |
| 216:21 221:22 | **class** 12:1 17:6 | **click** 160:9 | **combination** |
| **chosen** 211:13 | 23:19,23 24:11 | **climb** 145:3 | 119:5 |
| **circumstances** | 25:10,20 44:22 | **clip** 10:18 | **combine** 10:15 |
| 209:22 228:11 | 44:25 45:24 | **clipped** 52:19 | 149:18 |
| **citation** 154:9 | 46:1,4,5,6,12 | **close** 14:17 | **combined** |
| **citations** 168:8 | 47:11,22 49:9 | 36:2 47:1,2,2 | 151:13 |
| **cite** 32:25 63:21 | 50:11,16 51:1 | 171:12 208:14 | **combining** 77:7 |
| 81:24 108:16 | 68:17 69:5,9 | 225:21,21,23 | **come** 11:22 |
| 108:20 171:16 | 70:17 86:15 | 225:23 226:12 | 20:2 25:2 32:8 |

**App. 580**

| | | | |
|---|---|---|---|
| 32:15 39:11 | **commission** | 317:23 318:7 | 154:7 171:25 |
| 42:18 43:9 | 321:20 | **company** 7:2,8 | 178:12 182:11 |
| 45:8 52:23 | **committed** | 13:8,10 17:3 | 186:7 207:24 |
| 55:23 103:2 | 217:7 | 17:16 24:14,17 | 209:17 210:9 |
| 125:7 129:24 | **commodity** | 50:9 61:1,25 | 210:11 211:5 |
| 146:25 167:1 | 116:3 144:8,12 | 63:17 67:15 | 211:11 213:12 |
| 178:24 193:7 | 144:20,23 | 68:11,15 69:19 | 215:1 219:23 |
| 193:15 224:12 | **common** | 69:22 71:21 | 222:2,3,9,24 |
| 232:16 236:24 | 275:13 | 72:16,19 73:1 | 223:16 229:14 |
| 240:7 279:19 | **commonwealth** | 73:9,17 76:13 | 235:18 250:9 |
| 309:20 319:14 | 1:21 321:1,5 | 80:25 84:4,22 | 254:1,7 256:17 |
| **comes** 24:19,22 | **communicate** | 89:4 93:7 | 265:18 267:3 |
| 25:5,6,9 42:3 | 73:9,23 86:19 | 95:21 99:11 | 272:10,11 |
| 105:15 170:13 | **communicated** | 105:18 107:15 | 277:19 293:20 |
| 177:9 271:16 | 83:3,5 | 109:13 110:10 | 294:19 298:2 |
| **comfortable** | **companies** 6:5 | 112:10 113:12 | 301:2,11 |
| 123:4 164:10 | 6:7,10,14 | 114:22,24 | 302:16 303:10 |
| 164:11 175:2 | 13:11 77:23,23 | 115:25 116:25 | 310:3 313:1,7 |
| 193:18 | 111:2,13,19,22 | 117:21 121:13 | 313:11 314:7 |
| **coming** 122:1 | 115:2,16,23 | 121:19,21 | 314:13,24 |
| 251:14 | 116:10,16 | 122:4 124:2,3 | 315:5,18 316:3 |
| **commencing** | 117:1,7,10,13 | 128:10 131:17 | 316:8,9,20 |
| 1:24 | 117:18 135:1 | 133:25 134:3 | 318:16 319:6 |
| **commensurate** | 145:6 147:15 | 134:19,20,24 | **company's** |
| 87:20 245:7 | 150:14 165:5 | 135:6,7,8,19 | 67:12 88:25 |
| 319:7 | 210:4,16 | 136:7,13 137:8 | 92:2 113:18,23 |
| **comment** 71:20 | 211:10 214:7 | 139:6 141:20 | 142:17 147:23 |
| **commentary** | 251:11 253:2 | 142:4,16 | 148:1,17 154:3 |
| 94:3 103:25 | 255:20 272:7,9 | 143:22 144:2 | 209:1 210:19 |
| 107:2,5,20 | 275:22,23 | 146:13,15,18 | 211:15 214:3 |
| 128:10 153:7 | 276:20,21 | 147:1,5,19 | 219:15,20 |
| 153:13 154:10 | 277:12,15 | 148:3,16 149:9 | 240:9 242:8,24 |
| 154:16 | 278:5 279:8,18 | 149:23 150:4 | 250:5 256:14 |
| | 313:5 314:15 | 153:3,7,12,20 | |

**[comparable - conducted]** Page 20

comparable 114:18,22,24 130:16

comparative 210:21 216:1

compare 115:15 117:12 134:12

compared 112:19 113:1 114:16 133:5 134:9 153:25 157:22 167:20 238:24 241:24 317:19

comparing 116:24 166:19

comparison 188:19

compelled 167:4

compelling 171:18

compensated 26:18,21

compensation 24:19,21 25:1 26:23 27:2,4,7

complaint 265:12

complete 32:3 37:20,22 65:13 168:23 324:8

completed 49:6 322:16

completely 182:25 313:17

complied 7:14 7:22

complies 212:9

comply 211:10

component 137:19 254:2

comport 209:17

composite 282:1,3 284:5 284:12 285:10

compound 170:5 240:12 241:10 296:8

comprises 128:23

comprising 210:16

computations 43:25 201:7

concealed 64:9 67:14 77:19 82:8,17 88:15 128:25 131:3

concealing 120:6,7,8

concealment 102:22 131:19

concentration 251:8

concept 7:17 192:6,15 244:21 274:10 274:16,21,23 300:7

concepts 225:9 228:18 229:17

concern 153:23 163:11 175:14

concerned 76:10 137:18 138:12,13,14 138:24 139:9 139:18 292:22

concerning 321:8

concerns 117:20 269:8

conclude 18:13 18:15 109:24 110:1 136:9 286:14

concluded 94:21 100:4 136:16 148:19 184:15 208:12 320:3

concludes 205:23

conclusion 20:21 21:12 46:22 47:4 53:25 101:17 102:6 109:1

114:15 118:5 124:1,24 125:8 129:24 138:11 138:19,22 149:25 151:21 154:20 167:1 208:16 227:6 240:8 246:3,11 246:12 317:6 317:23

conclusions 19:7 39:14 118:19 171:23 301:17

concoction 199:2

concordance 136:5

concrete 67:19

concurring 93:17

condition 7:8 101:15 102:22 121:18 122:4 123:12

conditions 64:9 73:1,8 105:22 105:25 108:2 108:10 115:15 120:7,9,11 260:15

conduct 166:6

conducted 8:24 90:2 131:15

**[conducted - context]**

141:7 155:25
205:17 250:22
312:20 317:9
**conference**
84:25 137:7,10
153:17 232:18
232:24
**conferences**
255:3
**confine** 93:25
**confirm** 10:12
33:4 37:12
52:15 226:15
234:16,17
**confirmation**
122:7,8,9
**confirmatory**
122:3,6
**confirmed**
226:14
**conflicting** 17:8
**confounding**
141:16,18
179:20 183:15
186:14 207:17
235:4,13,23
238:7 243:23
244:18
**confuse** 36:3
**confused** 176:5
**confusing**
234:7 246:13
**confusion** 9:11

**congress**
294:15
**connection**
88:6 113:14
129:17 131:7
142:17 235:25
**consensus**
148:17 158:20
159:9 160:5,20
162:5 163:11
165:20 166:8,9
167:5 168:12
170:25 172:1
173:3,16 188:4
188:12 189:6
190:7 194:7,11
198:24,25
200:15,17
203:18 204:1
240:21,22
241:25 242:3,9
242:13,17,19
243:7
**conservative**
286:13,15
**consider** 5:15
29:18 31:18
37:10 194:5
308:11,16
316:3
**consideration**
259:22
**considerations**
213:9,11 219:5

222:13
**considered**
30:3,4,23 31:3
31:9 32:2
34:25 36:12
38:13 47:8
144:1 166:7
172:23 199:18
200:7 257:11
257:21 259:2,6
260:9
**considering** 6:7
34:6 39:13
92:10 284:20
**considers**
194:25
**consistency**
136:5 167:22
169:11,25
171:7
**consistent** 48:1
54:6,11 147:18
154:15 160:1
164:21 173:12
173:18 176:8
176:10 178:4
178:10 218:10
230:4 242:6
291:4,22
**consistently**
214:2 290:25
**constant**
244:24 245:2

**constituents**
164:23
**constitute**
100:16
**constitutes**
128:13 152:4
**construct**
206:25
**constructed**
158:20 230:17
247:6
**constructing**
214:6
**constructs**
163:11
**consult** 305:10
**consulted**
43:25
**consumer**
59:22
**contacted** 23:5
**contain** 43:13
**contained**
104:2 127:1
189:1,23
**contains**
174:14
**contends** 55:2
**contentious**
73:16
**contents** 30:13
199:16 200:8
**context** 12:24
13:24 21:20

**App. 583**

**[context - correct]** Page 22

| | | | |
|---|---|---|---|
| 142:2 274:11 278:20 | **copies** 33:20,24 322:14 | 54:13,25 57:11 66:12,13,16 | 190:12,14,19 191:17,20 |
| **contingency** 27:8 249:12 | **copy** 30:20 34:18 52:2 | 67:1 69:7 71:16 72:1,9 | 194:2,9,15,24 195:4,8,13,20 |
| **contingent** 249:13 | 174:4 276:9 **core** 94:18 | 74:6,9,13,18 76:5,11,23 | 196:3 200:22 201:2,5,9,17 |
| **continue** 185:14 | **corner** 74:12 74:20 | 77:25 78:3,7 78:15,18,21 | 202:6,16 203:23 204:10 |
| **continued** 150:7 | **corporate** 287:11,13 | 79:9,17 80:1 80:10 94:11 | 206:15 207:15 208:15 209:5 |
| **continues** 187:8 | 289:1 290:23 292:18,19 | 95:12,17 96:5 104:11 105:5 | 210:1,6 211:18 212:15 222:9 |
| **continuing** 149:22,25 150:2 200:2 | 293:6,16 295:7 **corporation** 1:11 4:11 | 106:7 109:4 110:7 112:5 117:14 121:15 | 226:2,13 228:10,16,24 229:15,16,22 |
| **contractor** 8:4 8:6,13 | 33:17 113:14 322:4 323:1 | 121:23 130:1 131:8 132:14 | 229:25 231:3 232:23 233:2 |
| **contribute** 143:5 149:18 238:19 | 324:1 **correct** 8:19 10:14,25 13:22 | 141:13 144:17 152:6,10 154:23 156:8 | 237:25 238:1,2 238:11,15 239:4,7 245:14 |
| **contributed** 142:21 143:18 190:12 | 14:22 15:9 20:25 21:6 22:22 23:20,24 | 156:20 158:8 158:25 159:3,7 159:11,16 | 245:20 246:20 247:13,21 248:1,5,22 |
| **contributing** 158:6,24 | 24:1,15 27:12 30:21 31:25 | 162:17 164:1 164:21 172:15 | 249:9 250:18 251:1 252:8,10 |
| **contributions** 158:21,22 | 34:14,23 35:20 36:18,24 38:14 | 174:9,15,20 176:22 177:7 | 256:15 258:3 258:18 260:3,4 |
| **control** 250:5 **controlling** 170:21 | 40:15 41:17 42:22 43:1,19 | 177:10,13,19 178:21 179:2 | 262:12,15 266:2,24 |
| **controversy** 321:9 | 44:15 46:3,8 47:18 48:5 | 180:7 181:24 182:10 183:20 | 267:22 268:1,9 268:14 269:5 |
| **conversation** 89:22 | 49:7,11,15,22 50:17 51:2,15 52:20 53:18 | 184:16,22 185:21 188:17 188:23 189:20 | 270:24,25 271:21,24 272:1 276:22 |

**[correct - cumulative]**                                      Page 23

278:20 279:9
279:23 281:15
284:1 286:9
299:15 300:1,9
300:24 304:16
305:5 306:4,5
306:7 307:7,16
307:22,25
308:3 313:17
314:9 318:24
319:1 324:8
**corrected** 69:1
77:11,13 88:23
105:5
**correcting** 51:7
**corrections**
324:6
**corrective**
21:16,23 22:1
48:4,9,13,22
69:10 72:12
75:24 76:2
79:21 80:6
82:1 89:10,17
105:1 106:3
129:15 135:14
141:8,12 152:5
181:21 223:5
245:11,17,25
247:13 248:5
248:12,18,25
249:6
**correctly** 39:7
76:8 156:2

213:12 229:21
273:17 290:4
297:22
**correctness**
214:4
**correlation**
223:23
**cost** 62:17 64:1
64:7,19 65:4
65:23 66:20
99:10 105:3,8
105:10 112:22
112:23 312:3
**costs** 63:19
73:3 99:5,5
110:3
**counsel** 4:12
5:4 33:25
37:13,13 42:17
43:15 44:2,4
48:8,11,21
235:24,24
236:7 263:21
321:13,13
322:14
**count** 15:2
**counted** 15:4,7
**coupon** 3:19
**coupons** 262:23
262:24 298:24
**course** 13:3
16:22 22:16
37:9,18 41:22
75:4 97:15

112:8 123:13
192:8,14
296:12
**courses** 253:19
**court** 1:3 4:4
4:25 12:18
16:17,19 18:17
19:2 21:14
22:9,10 57:20
90:23 101:25
102:10 103:8
103:18
**courts** 125:20
**cover** 30:13
166:3 298:6
**coverage**
115:20 165:6,8
**covered** 31:15
40:22,24 63:5
178:18 260:7
**covers** 30:18
**craft** 193:19
**credibility**
166:10
**credit** 40:1,22
40:23 170:14
251:3,10,11
252:4,21 253:2
253:18,21,23
254:2 255:19
256:10,15
258:22 259:17
263:1 266:9,13
266:17,22

267:20 268:9
269:16 281:2
296:14,22
300:20 301:3,8
301:11,13,22
301:24 302:4,6
302:8,17,18
303:6,7,11
307:16,21,25
308:2,7,9,13,15
308:17,23
310:4
**criterion** 214:4
**criticism** 17:2
17:12,13 19:5
20:11 39:3,6
220:12
**criticized** 16:20
18:18 209:21
274:14
**criticizing**
234:4
**critique** 190:24
233:3
**critiqued** 233:3
**cross** 3:2
**crowninshield**
24:15,19,22
25:5,19
**crowninshiel...**
25:8,25
**cs** 322:15
**cumulative**
290:22,24

**App. 585**

**[cumulative - de]** Page 24

291:10
**cured** 18:2
**currency** 157:3
**current** 73:7,7
106:6 157:4
164:1 195:25
196:23 198:5
201:19,21
202:3 255:2
**curriculum**
251:22 252:15
254:22
**cut** 169:15
313:22,24
314:25 315:1
316:13
**cv** 1:6

**d**

**d** 3:1 4:1
189:24 196:5
198:2 200:25
**daily** 146:14
**dallas** 1:4
**damages** 3:9
9:1 18:3 22:4
29:7 44:15,17
44:19 48:3,3
48:24 66:5
68:22 82:11
100:11,18
102:4,8 103:15
103:21 107:12
235:7 246:18

247:7,9,15
284:7,8
**dangerous**
290:5
**dark** 68:20
69:17
**data** 27:6 34:8
37:25 38:4
41:4 63:17
156:2,6,11
158:14 159:6
162:5 168:16
172:4,6 173:22
174:17,18,19
175:4 177:25
180:5 193:8,9
203:12 206:24
213:7,20 216:7
224:11,11,12
224:18 226:2
227:14 242:2
243:15 274:5
279:17,19,20
279:24 282:12
288:2,10
289:14,22
290:1 291:5
301:17 312:18
**database**
158:13 173:2
189:12 280:4,7
280:8
**date** 47:23
58:13 61:9

81:10 88:9
106:11 157:13
158:21 165:3,3
223:6 235:5
244:20,20
245:18 246:11
247:4 267:11
279:14 323:24
324:12
**dated** 197:8
198:13 201:25
202:9
**dates** 46:1,4
69:11 106:13
118:5,7,13,21
118:24 120:2
120:25 121:4
159:15 161:18
209:23,23
267:24 269:4
**daubert** 15:25
16:2,5
**dauberts** 16:14
**david** 2:17 4:25
**day** 18:8 51:1
68:17 88:10,18
103:3 119:14
119:21 123:24
124:6,6 144:23
145:13 148:2
152:9 153:11
188:8 202:13
206:11 207:23
209:20 221:16

222:23 223:15
230:19 231:15
235:21 237:23
240:10 241:18
245:16,23,23
246:9,9 247:10
247:12 248:4,4
248:10 249:17
249:21 261:3,4
267:17,20,21
297:18 309:16
321:6,16
324:15
**days** 69:19
224:1 300:13
322:16
**de** 50:10 51:22
51:23 55:17
56:14 58:12,21
59:14,24 60:2
60:3,4,15 61:5
61:11 68:14,19
69:1,25 72:17
72:20,22 73:5
73:10,19 76:4
77:1 80:9,16
83:11 84:3
96:15 101:19
101:20 104:24
106:1 110:2
125:9 129:16
130:4,21 132:3
132:4 134:25
146:4,6 149:16

152:15 154:2
154:12 248:19
249:2,8,16,20
249:25 250:3,4
250:6,9,15,20
**deal** 143:10
**debt** 250:21
**debug** 117:16
**decades** 194:18
269:18
**deceived** 82:18
83:4
**deception**
82:20
**decide** 42:17
231:14 251:4
**decided** 221:9
**decides** 102:10
**deciding** 238:1
**decimal** 60:20
**decision** 48:16
48:18,19,24
49:10 259:9
**decisions**
126:10
**declare** 324:4
**declared** 132:1
310:19 311:13
**decline** 96:13
97:5,5 115:22
115:23 129:1
143:6,19,20
145:19 149:19
152:8 181:23

206:6,12 207:5
207:23 223:7
237:14 238:20
241:19
**declined** 112:5
204:9
**declining** 116:2
116:21 117:2
**decrease** 151:8
**deduction**
148:23 235:7
**deemed** 324:6
**deeper** 316:19
**default** 286:21
287:1,8,15,19
287:22,24
289:1,23,24,25
290:10,22,24
291:8,10,17
293:21,22,24
294:5,13
296:20
**defaulted** 293:6
293:8,17,25
294:10,16
295:1,7
**defendant**
12:25 13:13
14:8,8
**defendants**
1:12,17 2:11
4:21,23 5:4
14:1,20 21:21
32:17 49:19

57:15 61:14
121:1
**defense** 13:9
14:4 18:24
186:19 187:8
266:12
**define** 12:16
17:1 193:15
202:2,3
**defining** 110:16
110:17
**definitely**
183:23 186:23
290:2,17
**definition**
69:13,15 70:10
70:11 125:14
125:15,23,24
126:12 170:5
193:7,9,19,25
194:3 196:17
**definitions**
14:10
**degree** 254:19
254:20
**delay** 310:19
**demand** 296:24
**demonstrate**
133:4
**demonstrated**
207:13
**deny** 226:15
**dependent**
221:21

**depending**
178:13
**depends** 16:25
42:17 43:13
46:4 247:16
296:9
**deploy** 241:13
**deployed** 128:1
239:2
**deploys** 166:1
**depo** 28:18
**deponent**
322:13 324:3
**deposed** 258:15
**deposing**
322:13
**deposit** 8:10,14
**deposition** 1:15
4:9 11:7 22:23
27:23,24 28:8
28:13 39:13
43:22 193:18
260:20 309:17
309:25 315:7
320:2 321:10
**depreciation**
98:25 99:6
112:23 114:3
312:3
**depression**
267:4 304:3
**derive** 21:12
44:18

**[derived - disappointing]** Page 26

**derived** 138:11 170:8

**describe** 98:2 182:21 193:21 244:23 298:21 307:9

**described** 85:25 105:21 187:1 218:14 290:19 311:9

**describes** 196:25

**describing** 19:24 20:1 53:14 63:16

**description** 3:7

**descriptive** 191:3,6

**design** 214:1 300:5

**designation** 251:23 254:23

**designed** 300:5

**desperate** 313:2,15,20 315:2,7,9 318:4

**detailed** 63:17

**details** 21:1 29:5 261:20

**detect** 229:20 229:22 269:5 269:25 271:1,8 300:3,6,15

**detected** 270:1

**detecting** 229:9

**deteriorates** 293:20

**determination** 119:7 126:9 162:2 245:5 257:12

**determinations** 257:19

**determine** 104:20 113:11 120:14 128:23 144:10 186:13 219:7 238:21 244:12 278:9 296:22

**determined** 119:24 144:24 149:14 153:9 157:10 161:16 163:25 168:3 175:11 179:15 203:19 206:19 208:17 257:14 278:7

**determines** 126:7 194:10

**determining** 40:2 179:17 184:9 299:21

**developed** 132:16 134:11 256:2

**development** 112:23 313:23

**deviations** 122:24 124:15

**dictated** 262:25

**diego** 2:5

**differ** 204:13

**difference** 41:8 49:1 64:5 82:15 193:2 257:7 271:19 271:24 307:8

**differences** 170:22

**different** 30:20 39:5,12,15,17 40:1 41:15 42:10,10 58:8 59:21 66:2 75:14 83:16 100:23 101:13 101:16 102:3 102:12 110:14 110:15,17 117:9 120:12 138:6 157:1 158:23 159:14 162:17 166:21 194:8 196:13 209:9 210:2,4 212:8 220:21 236:2,4 240:14 243:6 247:4,15 255:23 282:17

288:10 291:12 292:14 295:19

**differently** 79:3

**dig** 311:1 316:18 318:5

**digesting** 173:17

**digital** 18:22 23:2

**digits** 275:20

**direct** 3:2 5:7 91:17 94:7 239:15

**direction** 223:24 321:10

**disaggregate** 181:2,12

**disaggregated** 151:18,20 241:18

**disagree** 22:18 118:11,16,18 120:23 121:3 189:3 205:15 209:6 230:21 269:2 270:21 286:17 299:1 299:17

**disagreed** 18:8 19:1

**disagreeing** 159:13

**disappointing** 155:4

**[disappointment - divorced]**

**disappointment**
154:22,24
155:6
**discipline**
213:8
**disclose** 90:1
106:15
**disclosed** 51:22
74:15 75:16
79:25 80:8
81:20 88:15
95:12,17
100:23 102:14
104:24 129:15
130:3,10,12,13
130:15 131:6
141:11,13
144:23 235:20
248:15
**discloses**
103:25
**disclosure**
17:22 18:2,14
18:15 21:16
46:15 47:17
48:5,9,13,22
69:10 70:4
75:24 76:2,10
76:12,17 79:21
80:6 81:8,10
82:1,7,9,10
83:2,18 84:7
89:10,11,16,17
90:7,9 92:24

94:20 95:5,9
96:14 97:7
100:24 103:4
103:23 105:1
106:3,5,12,14
106:24 108:3,4
120:11 129:15
129:20,23
135:14,16
137:13 139:5
141:8,12 152:5
152:9,12,23
181:21 182:18
184:20 211:7
223:6 230:20
232:14 236:10
236:11 238:24
243:11 245:10
245:12,17,25
246:11 247:13
248:5,12,18,25
249:7
**disclosures**
7:13,21 21:23
22:1,4 31:18
52:24 53:5
72:13 73:22
101:1 104:20
111:13 131:18
133:24 196:1
197:24 210:20
**discontinued**
316:4

**discover** 124:7
**discretion**
211:6
**discuss** 192:17
255:2
**discussed** 58:1
73:21 84:19
85:7,22 86:2
147:14,14
238:4
**discussion**
56:17 59:20
88:12 243:12
**discussions**
59:18
**dismissed**
137:2
**dispute** 8:4,6
8:13 84:1
119:3 121:8
188:25 189:9
189:22 197:14
226:11,24
232:8 233:10
233:11 234:12
276:24 277:4,9
277:22 297:17
297:21 299:22
299:23
**disputing** 227:3
**disrupted**
183:3
**disruption**
182:21,22

**disruptions**
142:5,7 145:10
145:10 146:10
149:20 181:8
**dissipated**
246:5
**distant** 149:9
**distinction** 82:6
82:13
**district** 1:3,4
16:11
**divest** 312:14
314:13 315:18
**dividend**
310:18,20,25
311:2,7,13,16
311:18 312:8
312:13,15,24
313:2,6,9,12,16
313:19,22
314:1,8,14,21
315:4,11,19
316:9 317:12
317:17 318:6
318:10,11,13
318:16
**dividends**
313:5 315:16
317:3
**division** 1:4
304:19
**divorce** 10:4
**divorced** 9:23

**[doctorate - draw]**                                                Page 28

**doctorate**
  170:10
**document**  3:19
  12:3,5 30:9,18
  35:13 36:2
  47:5,13 51:23
  54:14 57:8
  63:21 78:5
  90:17 102:11
  102:12,25
  103:18,19,20
  161:19 176:4
  176:14 198:1
  217:4,10,20
  235:25 236:25
  256:22 257:25
  257:25 258:2
  259:14 264:4
  278:2 290:8,11
  291:3,16 306:1
  306:6,9,18
**documentation**
  162:22 163:1
  167:25 172:18
  172:20 203:5
  203:15 253:4
**documents**
  15:21 29:20
  30:3,22,25
  31:9,14,16,21
  34:1,8,12,22,25
  35:24 36:12,21
  36:23 37:1,5,6
  37:8,14,17,19

37:22,24 38:3
38:5,8,10,12
43:23 108:16
108:24 109:17
210:13 261:11
265:13 291:4
306:13
**doing**  39:10
  117:3 162:8
  207:8 246:10
  253:10 263:9
  270:7 290:4
  311:8 316:10
**dollar**  42:2
  237:5,5 244:24
  245:2,3
**dollars**  40:9
  124:8,11,12,13
  124:14,21,22
  271:4
**dowd**  2:3
**downgrade**
  40:12 265:19
  266:6,16 267:8
  267:11,21
  268:12 269:19
  292:23 297:13
  301:7 302:7,12
  304:4,6 307:12
  308:10,25
  310:3
**downgraded**
  40:16,21 41:2
  41:3,5,17

263:11,12,15
263:18 264:15
264:20 265:4
267:4 270:23
285:3,5 293:23
294:13 301:14
302:1,19
303:12 304:2
304:16,20
306:3 308:21
**downgrading**
  265:16
**downward**
  147:7 188:9,15
**dozen**  154:14
  160:1
**dozens**  159:25
  209:4
**dr**  5:9 10:11
  14:3 32:24
  39:3 42:4
  52:12 57:5
  104:10 114:20
  114:21 116:19
  118:2,4,11
  120:23 121:3
  141:5 156:11
  156:13,17
  158:5 159:13
  163:14 164:25
  167:10 169:6
  172:3 174:7
  176:5,22
  178:17,25

179:19 181:19
186:7 187:13
188:22 189:15
189:19 190:6
190:17 191:23
196:6,7 198:17
200:19 202:12
202:18 204:23
205:16 207:8
212:24 217:5
225:11,18,20
227:1,5,6
229:3 230:10
230:21 231:1
231:10,16,22
233:1 235:2
239:6,16 240:5
243:9 261:21
266:18,20
267:9,18,18
269:3 274:14
276:19 278:2
286:17 288:7
288:19,25
290:20 292:2
294:23 295:21
297:1 298:7
299:5,12 300:7
300:11 302:24
305:22 306:11
315:23 319:21
**draw**  96:24
  108:25 114:14
  124:24 130:24

**App. 590**

**[draw - economic]**

| | | | |
|---|---|---|---|
| 239:10 299:4 301:17 317:6 317:23 | 157:2,8,10 158:13,17,20 159:5,6,7 | 204:14 205:13 206:24 231:16 242:5,6,11 | 151:4 155:11 155:12 156:7 157:7 163:8 |
| **drawing** 124:1 294:17 | 160:2,4,7,8,20 160:25 161:8,8 | 243:15 244:9 323:3,3,3 | 168:13,15 170:20 180:7 |
| **draws** 301:9 | 161:15,19 | **earlier** 26:9 | 180:11,15 |
| **drew** 64:19 107:20 136:23 | 162:1,3,7,16,22 163:9,15,20,24 | 58:1 75:3 76:16 79:22,23 | 182:6,6,7,8 183:7 184:11 |
| **drill** 50:13 | 164:12,23 | 80:5 81:16,20 | 184:14 185:3,6 |
| **drilling** 116:6 | 165:10,13,16 | 83:12 86:7 | 194:6 205:24 |
| **driven** 167:6,7 213:20,21 | 166:1,25 167:10,11,13 | 89:23 95:17 97:10 98:1 | 206:22 207:13 238:10,14,16 |
| **driving** 165:9 | 167:16,17 | 101:20 106:13 | 240:9 241:16 |
| **drop** 18:8 153:11 | 168:8,12,13,16 169:10,25 | 106:25 129:14 130:15 131:5 | 242:25 313:8 **earns** 313:8 |
| **dropping** 165:6 | 170:17,21,24 | 154:19,23 | **econometric** |
| **drops** 103:12 | 171:6,6,17,19 | 187:17 194:16 | 118:17 214:1 |
| **dry** 86:10,20 87:9 88:6,22 | 171:20,22 172:1,7,18,20 | 218:10 229:2 243:19 248:24 | 268:2 270:17 **econometrics** |
| 89:13,19 93:21 | 173:3,8,23 | 249:1 264:8 | 5:18 118:16 |
| 94:15,22 96:19 | 174:17,19 | 265:11 268:18 | 119:7 133:23 |
| 97:8 115:17 | 175:1,4,24 | 300:18 | 135:11,13,21 |
| 131:8 133:5,17 | 176:1,2,3 | **early** 13:7 | 136:8 143:20 |
| 134:10 237:21 | 177:25 178:19 | 14:17 18:19 | 208:17 |
| **dual** 129:6 | 179:16 180:4 | 93:13 179:15 | **economic** |
| **duly** 5:5 306:16 321:7 | 189:11 190:8 190:10 191:1 | **earned** 143:12 318:14,19 | 125:21,22,24 126:15,17,22 |
| **duped** 81:12,17 | 191:22,25 | **earnings** 92:12 | 127:1,22 |
| **dutch** 111:3 | 194:2,5,10,14 | 92:21 141:21 | 128:17,20 |
| **e** | 194:21 195:21 | 142:18,25 | 129:4,7 130:7 |
| **e** 3:1,6 4:1,1 156:2,4,6,11,15 156:18,21,24 | 196:12 198:24 199:1,3 200:14 200:18 203:12 203:15,16,21 | 143:1,9,14,15 143:24 144:11 147:4 148:8,18 149:13 150:17 | 130:9,11 134:18 136:2 136:10,17 137:20 279:19 |

**App. 591**

**economically**
126:1 127:24
128:14 129:25
130:5,22,25
131:1,3,13,18
132:13 137:14
271:14
**economics** 5:17
125:15,16
137:20 170:10
193:11 251:7
315:14,23
**economist** 6:11
**economists**
296:1
**effect** 18:14,16
130:16 142:7
148:15,19,20
148:21 149:7,8
149:8,14
150:23 155:11
155:15,18
179:8,12
182:23,24
183:18 186:10
224:21 228:18
300:17
**effective** 91:25
213:5
**effects** 132:20
181:3 183:16
183:21 184:2
206:19 209:19
210:10

**efficiencies**
116:18
**efficient** 17:5
106:22,22
107:16,17
**eight** 23:15
29:10,13
153:16 246:7
**either** 24:5 31:8
37:11,19 38:17
42:20 43:10
65:11 77:10
102:23 103:24
105:10 149:15
149:16 162:10
164:12 169:12
196:16 199:10
199:10 269:3
285:24 312:9
312:12 316:11
**elements** 49:20
133:11 238:16
238:23
**emiller** 2:12
**emily** 2:10 4:22
**empirical**
128:23 130:8
299:11
**employed**
117:8 134:6
321:13,13
**employees** 16:9
**endeavor**
163:16 192:5

**endeavored**
115:14
**ended** 53:4
304:4
**endorse** 281:19
**endorsement**
281:20
**engaged** 8:20
13:9 15:16
45:17 319:10
**engagement**
14:14 19:14,14
27:2 114:20
**engagements**
11:3 26:1
**engaging** 314:9
**engineer**
117:15
**ensure** 167:18
167:21 169:11
169:25 171:6
**entire** 13:3 61:4
69:9 83:12
104:25 153:9
192:4,5 268:23
271:6
**entirely** 26:20
60:1,3,6,6 61:2
96:21 115:18
207:21 213:10
238:1
**entirety** 72:17
75:3 77:1

**entitled** 218:4
**eps** 144:18,19
177:1 178:20
195:12 202:20
240:19 242:9
244:7
**equal** 64:4
206:21
**equity** 63:8
100:2 202:19
318:13,21
319:5,8
**equivalence**
60:7,8,13
129:17 248:21
256:9 257:6
258:21 260:2
**equivalent** 56:1
56:22 78:12
83:21 152:13
152:19
**errata** 322:11
322:13,16
**error** 217:6,23
**especially** 92:2
92:9 94:14
308:20
**esq** 2:3,4,4,9,10
322:1
**essentially**
40:25 134:16
138:10 146:24
147:10,16,17
213:17 228:3

237:9 284:23 300:5 315:2

**esssentially** 21:11

**establish** 95:2 117:22

**established** 21:5

**establishing** 126:22 128:16 128:20 129:4,7 129:8

**estimate** 25:14 28:20,21 166:18 188:3,4 188:5 189:7 196:22 197:16 197:22 200:16 201:16 204:9 206:18 207:14 240:20 246:3,7 248:13 263:14 270:5 278:16 280:19 281:16 284:25 286:13 286:15 303:23 304:23 305:17 307:10

**estimated** 248:8

**estimates** 156:8 167:22 177:5 184:14,21 185:20 189:20

190:19 195:7 195:12 198:4 198:22 199:13 200:10 202:20 204:10 242:10

**estimating** 207:9

**estimation** 248:7

**et** 1:12 4:11 168:9 322:4 323:1 324:1

**evaluate** 48:24 113:11

**evaluated** 113:13

**evaluating** 210:15

**evaluation** 149:2 243:25

**evaporated** 186:8

**event** 129:6 130:8 226:20 231:19,24 250:4 266:20 267:10,19 269:3,5,9,12 299:6,13,23 300:3

**evercore** 240:15 242:7 242:13

**everybody** 81:6 81:9

**evidence** 83:9 83:13 84:2 85:14,16 100:8 150:6 260:12 280:15 284:20 304:5

**evolved** 23:7

**ex** 213:14

**exact** 25:11 256:18

**exactly** 50:14 58:13 78:23 81:5 94:1 98:9 99:22 138:9 166:17 168:19 178:7 210:8 218:9 270:12 278:17 283:25 301:22 302:20

**examination** 5:3,7 321:10

**examine** 128:9

**examined** 5:5 209:23 219:8 235:5 266:21 278:4 321:9

**examines** 54:14 176:4,14 217:4 217:10

**example** 102:18 108:23 113:24 114:17

132:8 133:16 134:7 137:23 153:14 168:13 196:19 227:20 237:20 242:7 261:18 271:10 273:1 294:1 316:4

**examples** 243:6 293:24

**exceeding** 116:11

**except** 43:1 95:18 130:12 132:18 146:3 170:15

**exceptions** 224:10 228:12

**excerpt** 225:6

**excerpts** 57:4 78:6 168:10 242:23

**exchange** 13:21 13:25 14:6,21 282:12

**excluded** 16:17 16:18 46:11 47:16

**exclusive** 22:15

**excuse** 36:17 175:17 177:5 182:1

**excuses** 184:9

**[execute - explained]**                                      Page 32

**execute**  126:23 127:8
**executed**  127:2 207:19
**executing** 127:11,15 128:16
**executives** 316:20
**exercise**  192:4
**exhibit**  3:9,11 3:13,15,17,19 3:20 9:14 10:5 10:6,9 11:1 30:6,21 31:14 31:16 32:5,6 32:13 34:17,24 35:4,11,14,20 35:21 36:13,18 52:13,14,19 57:1,4 78:6,7 97:23 119:12 174:1,5,7,14 175:21 176:21 187:3,13,15,18 188:21,22 189:24 196:5 198:2 200:1,25 217:1,2 231:16 264:1,3 276:7 276:9 288:12 304:12 306:19 306:25 309:6 310:9

**exhibits**  1:2 9:12 10:13 35:18
**exist**  164:4 306:13
**existing**  216:17
**exists**  224:11 306:7,9
**expand**  209:3
**expect**  33:2,4 121:23 267:13 270:25 271:7 318:8
**expectations** 147:19 182:17 185:4
**expected**  40:11 112:16,17,19 112:25 113:3 116:14 143:5 146:24 150:8 182:9 270:15 297:12 303:23
**expecting** 94:14 101:19 266:16 267:2 268:11 269:19 292:22 302:11 304:6 308:10
**expenditure** 317:21
**expenditures** 312:22

**expense**  40:10 260:24 261:1 262:5,20 263:10,14,17 264:14 266:4 270:16 284:14 285:2,4,13,21 297:20,24,25 298:6 303:16 303:24 304:23 305:2,18,21 306:3 307:10 308:6
**experience** 10:24 12:14
**experienced** 120:4 142:22 145:7
**expert**  3:15,17 3:20 6:8,18 8:21 10:25 11:12 12:5,8 12:20 14:5,22 15:1 20:24 22:10 23:22 25:9 29:8 32:17 44:15,16 47:18,20 49:7 58:16 59:17 78:11 93:16 99:20 100:4,9 104:10,19 108:22 111:1 139:15 171:4

171:24 173:15 208:11 250:25 288:8 295:3
**expertise**  5:16 6:3,14 105:15 251:3,6 252:1
**experts**  45:16 53:7 58:15 100:2 266:12 301:15
**expires**  321:20
**explain**  37:16 39:9 41:12 42:2 70:9 115:19 120:6,8 129:13 136:18 143:24 145:18 146:1 147:11 162:14,19 180:10,14 183:24 184:5 185:7,21 186:9 186:21 191:21 200:6 201:22 205:19 206:9 207:10 219:16 227:14,18 282:13 284:16 287:14
**explainable** 178:4
**explained**  39:5 41:12 46:13 55:14 66:13

**[explained - factors]** Page 33

67:21 69:2
102:8 119:3
137:1,2 143:23
153:20 154:7
162:2 202:25
208:6 221:21
237:24 284:19
287:15 295:18
**explaining**
153:8 282:15
**explains** 185:24
186:25
**explanation**
163:4,6 267:1
267:2,6 269:16
269:20
**explanations**
163:3
**explicitly**
107:13 119:8
**exploration**
116:9 255:20
**expose** 103:19
**exposure**
150:16
**express** 102:20
**expressed** 31:4
45:14
**expressing**
99:24 137:18
**extended**
230:11 232:19
**extends** 45:1

**extensive**
194:16 253:20
**extent** 31:20
66:3 104:24
**extra** 34:18
40:10 266:3
285:2,4,17
301:9 305:1,20
307:10 309:8
**extrapolated**
271:25 272:4,9
**exxon** 1:11
34:13 40:10,21
41:16,21 55:25
60:15 73:23
74:15 75:16
76:4,17,24
78:2,17 79:4
79:14 83:2,4
83:19 88:4
89:10,23 90:1
103:24 110:6
110:13,14,23
111:21,24
114:10 115:24
117:3,7,8,11,19
127:16 129:16
129:20 130:3
131:6 132:1
141:20 145:11
148:5 159:25
165:5 166:3
178:18 206:13
208:13 210:13

210:13 218:24
224:19,22
246:18 248:15
248:19 249:2,6
250:22 257:8
258:23 260:3,7
263:11,12,18
264:14,19
265:3,15 266:9
269:17 270:6
271:7 299:8,15
300:19 302:12
304:1,18 305:4
305:13,23
306:1 307:15
307:21,24
308:20 310:17
311:6 312:21
314:18 317:10
318:2,9,23
319:3,10 322:4
323:1 324:1
**exxon's** 7:13,21
45:6 55:5 93:1
114:17 117:16
119:12 132:2
133:6 150:16
184:19 209:1
227:18,21
266:24 270:23
303:1 304:1,19
311:21
**exxonmobil**
3:13 4:11

34:23 86:8
97:6 110:20
114:24 126:18
137:24
**exxonmobil's**
92:10 227:8
**eyebrows**
117:20

**f**

**fact** 12:18
41:11 68:14
77:3 93:3
100:24 101:10
103:2 114:22
126:13 132:23
150:4 158:14
158:18 159:14
160:22 165:9
173:19 178:18
179:1 182:24
183:6,8 191:9
205:8,14
251:13 269:17
295:4,24
296:13,21
300:19 304:4
307:11
**factor** 155:16
155:19 256:15
**factors** 113:13
145:20,21
149:17 151:12
179:3 183:6

**App. 595**

**[factors - fess]** Page 34

186:5,6,14,14 207:18 255:19 259:17 271:5
**facts** 20:6 21:8 45:21 70:13 106:24 158:13 209:22 229:8 229:10 230:3 260:11 280:14
**factset** 170:19 172:25 173:9 173:14,17,20 173:21 189:5,8 189:10
**factual** 21:13 21:25 49:14 104:7,15,17,17 108:21 249:19 249:24
**fail** 300:6
**failed** 113:4 300:3
**fails** 113:6 322:18
**fair** 109:19 115:14 132:18 136:9 215:18 277:11 279:18
**fairly** 246:6 259:15
**fall** 60:11 144:13 146:8 148:13 235:21 277:12 293:20

**fallen** 101:22
**falls** 194:4
**false** 49:18 51:19 64:15 65:4,6,15,16,20 67:22,25 75:13 79:12 86:18,24 87:8 88:4,21 89:11 100:14 100:16,21 101:11,11 103:11 105:13 199:9 314:11
**falsities** 85:5
**familiar** 7:17 30:5 172:25 192:6,15 291:5 294:3
**family** 24:20
**far** 27:14 90:6 247:22
**faulty** 208:20
**favor** 191:25
**favorite** 211:13
**fdp** 170:22
**fear** 174:23 292:22
**fearing** 305:9
**february** 45:1 50:17 51:2,3,6 78:3 80:23 246:18,22,23 247:1,11

**federal** 1:18 16:10 279:19 279:20,22
**feel** 81:15 94:16 95:6 123:3 162:9 164:10 164:11 191:1 193:18 276:10
**feeling** 84:11 162:12 204:21
**fees** 26:25 27:6
**feinstein** 1:16 3:3,10,12 4:10 5:2,9 9:12 10:11 14:3 52:13 57:5 104:10 116:19 141:5 169:6 176:5 181:19 198:17 202:12 202:18 217:5 229:3 230:21 231:18 235:2 267:18 278:2 292:2 300:7 305:22 306:11 315:23 319:21 322:5 323:2,24 324:2,4,12
**feinstein's** 225:21 227:6
**fell** 150:17
**felt** 148:3 165:23 175:24

**ferrell** 3:16 32:18,24,24 45:18 114:21 118:2,11 156:11,13,17 159:13 162:7 172:3 178:17 178:25 179:19 186:7 189:19 190:6,17 191:23 196:7 200:19 205:16 207:8 212:24 214:11 225:18 227:5 230:10 231:22 239:6 239:16 240:5 243:7,9
**ferrell's** 46:18 114:21 118:4 120:23 121:4 158:5 163:15 164:25 167:10 174:2,7 176:22 187:14 188:22 189:15 196:6 204:23 225:11 227:2 231:2,10 231:16 233:1 297:1 298:7 299:5,12 300:11
**fess** 75:19

**[fewer - five]**

| | | | |
|---|---|---|---|
| **fewer** 163:20 194:20 224:7 262:23,24 | **final** 249:3 | **financials** 250:19 | **first** 5:5 10:12 10:13 23:5,9 |
| **field** 67:14 153:21 154:8 213:3 | **finance** 5:17,17 44:16 126:3 136:4 170:8,11 204:2 251:8 254:20,21 292:8,10,13,14 293:2 295:20 296:16 304:19 313:7 | **find** 10:18 22:18 63:14 70:25 71:2,11 105:1,4 119:25 139:1 162:5 191:14 195:7 223:12 224:1,4 224:8,10,17 228:23 229:7 238:17 243:2 267:24 269:9 269:23 270:17 281:5 315:6 316:24 | 30:12 35:21 38:17 42:21 51:1,13,24 54:4 55:1 60:20 74:24 76:3 87:24 126:21 142:12 142:25 157:13 165:2 168:11 173:10 191:14 196:18 199:25 245:16,23 246:1,9 248:11 249:21 258:4 274:13 277:14 289:25 311:4 |
| **fields** 5:19 116:6 | | | |
| **fight** 73:14 | | | |
| **fighting** 73:13 | | | |
| **figure** 56:9 130:18 139:8 222:22 241:14 263:9 277:23 281:18 289:4,4 290:19,21 291:13,13,21 295:22 305:18 | **financial** 5:17 6:10,22 7:5,9 8:25 19:12,15 19:23 21:7,9 24:15 58:16 59:17 63:7 66:4 68:10 69:14,21 70:12 70:16,23 100:1 105:14,16 109:6,10,13,23 128:9 130:14 131:14 133:24 135:2 149:1,6 160:24 170:10 173:22 238:18 238:25 250:10 250:10,16 251:7,16,17,24 252:14,21 305:14,15 315:13 | **finding** 119:1,5 119:5 121:4 124:21 233:10 233:11 261:24 276:17 | **fiscal** 51:10 63:21 |
| **figured** 237:3 | | **findings** 145:13 269:2 299:18 | **fit** 212:3 213:1 214:10,14,17 219:2,3,13 221:18 224:16 224:18,25 225:9 229:17 |
| **figures** 288:24 | | **finds** 299:24 | |
| **file** 77:24 78:18 | | **fine** 35:8 44:8 | |
| **filed** 8:10 28:15 51:5 78:2 79:14,18 80:23 246:2 | | **finish** 168:20 169:4,14 191:7 192:10 | **fitch** 252:12 |
| **filibustering** 217:17 | | **finishing** 200:6 | **five** 13:1 26:12 26:13 44:5 153:16 239:18 239:24 273:6 287:24 299:7 299:14 319:13 |
| **filing** 287:18 | | **fire** 33:13 | |
| **filings** 31:23 32:11 111:2 173:17 210:13 312:6 | | **firm** 15:1,12 23:6 26:22,22 170:22 | |
| **filled** 168:7 | **financially** 321:14 | | |

**[fixed - forward]**                                                    Page 36

| | | | |
|---|---|---|---|
| **fixed** 251:9,10 | 304:14 | **forecasted** | 103:9 105:6 |
| 251:21,22 | **focusing** 74:24 | 155:14 178:20 | 106:8 107:9,25 |
| 252:2,17 | 278:2 | **forecasting** | 123:9 129:19 |
| 254:21,23 | **folkerth** 2:4 | 143:3 | 132:15,17 |
| 274:1 296:17 | 4:16,16 | **forecasts** | 133:21 134:14 |
| **flaw** 208:23 | **following** 78:20 | 149:13 150:17 | 136:24 164:20 |
| **flow** 99:8 | 92:12,22 | 151:4 157:6 | 167:23 170:3 |
| 310:25 311:17 | 144:16 151:6 | 159:9 160:5,21 | 171:9,15 |
| 311:18,20 | 155:7,9 159:25 | 163:10 166:8 | 173:18 180:12 |
| 312:1,3,7 | 180:17 247:5 | 167:5 173:16 | 181:25 200:23 |
| 317:4,18 | **follows** 5:6 | 173:23,24 | 204:11 215:11 |
| **flows** 112:15,16 | **footnote** 219:24 | 179:14,16 | 216:3 217:8 |
| 112:18,19 | 220:4,8,13 | 183:8 191:23 | 218:16 221:17 |
| 113:1,3 114:3 | 236:25 255:12 | 194:22,23 | 228:14 231:8 |
| 310:16 314:2 | 277:24 | 243:16 | 233:17 237:8 |
| **fluctuate** | **footnotes** 31:1 | **foregoing** | 240:11 241:9 |
| 162:24 | 31:8 34:20 | 324:5 | 241:21 243:20 |
| **fluctuates** | 187:5 | **foreign** 211:9 | 246:21 248:23 |
| 124:6 | **forecast** 147:6 | **forget** 208:16 | 254:11,18 |
| **fluctuation** | 148:17 150:22 | **form** 3:14 | 260:10 264:22 |
| 123:23 124:16 | 155:21 158:20 | 37:11 53:3,24 | 272:2,25 |
| **fly** 303:21 | 162:5 163:12 | 54:15 57:5,6 | 280:13 292:5 |
| 309:17 | 165:20 168:12 | 59:4 61:15 | 294:21 295:11 |
| **focus** 55:24 | 170:25 172:2 | 68:8 70:8 72:2 | 296:7 314:22 |
| 64:17 72:13 | 173:4 179:2,11 | 73:12 74:5 | 315:12 |
| 137:22 147:22 | 179:22,23 | 76:6 77:24 | **formal** 5:22 |
| 153:17,18 | 180:6 181:1,2 | 78:18 79:7,14 | **formed** 197:22 |
| 154:4 155:24 | 181:6,7,9,11,15 | 80:2,11,17 | **forming** 31:4 |
| 174:25 175:4 | 190:7 192:3 | 82:5 84:8 | 53:6 123:16 |
| 181:19 245:11 | 194:7,11,25 | 86:17,23 88:8 | **forth** 31:22 |
| 254:3 315:21 | 198:25 199:17 | 89:24 90:4 | 153:8 207:18 |
| **focused** 226:22 | 200:15,17 | 93:24 94:25 | **fortified** 102:21 |
| 253:23,24 | 203:18 204:1 | 98:8 100:12 | **forward** 18:7 |
| 281:10,12 | 241:25 242:3 | 101:8 102:5,19 | 112:14 149:9 |

**App. 598**

155:13
**found**   21:3
40:14 76:3
118:22 124:10
136:1 156:13
156:17 170:24
236:1
**foundation**
204:12 216:13
294:22 295:12
**four**   9:4 10:24
11:6,8 13:1
14:24 15:6
26:13 86:13
153:16 210:16
287:20,23
288:1 290:16
299:7,14
**fourth**   183:12
238:10,15
**frame**   26:6
**framework**
135:25
**frank**   3:17
**frankly**   29:17
230:4
**fraud**   12:6,9,13
12:24 14:6
25:10 53:10
57:16 70:2
85:24 87:24
89:18 121:10
141:10,13
142:19 152:21

182:18 236:10
237:14 238:5
248:1
**fraudulent**
49:19 250:15
250:18
**freddie**   16:8
**free**   276:10
287:6 292:7,7
292:9,11,12,16
292:16,18,19
293:4 295:21
296:3,10,16,18
296:23,25
**frequently**
14:24
**front**   10:21
50:24 120:20
160:7 306:19
**frowned**
315:17
**full**   32:13 51:9
60:16 73:10
76:11 78:2
79:15 90:3
116:7 147:2
155:12 177:1
189:20 190:19
196:22 197:16
201:15 204:9
309:16
**fully**   123:18
**function**
112:21

**fund**   312:15
**fundamental**
124:20 135:8
**funny**   243:1,2
301:15
**further**   62:19
175:25 223:4
261:15 319:22
321:12
**future**   41:8
67:16 112:16
112:17,19,25
113:3 114:2
132:2 134:2
135:6 147:7
149:10 178:13
182:16 207:11
266:4 279:4
297:19 298:3
303:23 304:23
305:2,17

**g**

**g**   4:1
**gaap**   103:11
**gap**   30:17
**garrison**   2:9
**gas**   6:3,5,7,8,10
6:14 7:2 13:10
13:11 86:10,21
87:9 88:7,22
89:6,13,19
91:24 93:21
94:15,22 96:19

97:8 111:2
115:17,24,25
116:5,16 117:1
125:4 131:8
133:5,17
134:10 144:9
144:21 218:19
237:21 253:2
254:1,7 255:20
**geller**   2:3 14:25
15:11 23:6
26:1
**general**   25:23
33:1 109:14
166:9 228:22
256:23 257:3
258:9 274:23
302:4 315:13
315:22
**generally**   34:21
120:9 228:13
273:4 274:3
275:2,14
278:11,12,14
279:1 280:24
296:9,17 305:6
313:5 315:16
**generate**   24:21
**generated**
25:25 41:9
**generating**
314:7
**geographic**
63:19,20

**[getting - great]**

**getting**  8:14 60:16 106:22 107:16 129:18 145:12,15 157:14 167:21 215:24 220:25 241:7 273:16 273:18 283:7

**giannini**  2:14 4:4

**give**  9:16 10:23 17:9,24 25:14 26:6 42:10 49:21 50:22 56:24 62:23 66:17 71:17 84:21,22 91:11 124:2 138:17 193:7 216:24 227:20 243:6 252:18 279:25 280:4,7 288:15 319:3

**given**  11:7 15:9 42:5 63:9 123:23 133:10 153:6 184:10 201:15 203:25 206:15 221:16 223:15 230:3 236:6 244:17 250:25 254:17 258:12 269:17 304:1 306:10

321:11 324:9

**gives**  255:12

**giving**  5:12 113:5 249:6 285:9

**go**  15:2 18:7 27:19 44:8 46:21 50:5 52:3,4 59:9,11 71:13 80:20,20 81:21 97:22 101:14 110:9 121:23,25 124:12,20,23 126:23 130:22 139:1 151:19 157:24 158:3 167:12 183:14 195:19 196:2 198:21 199:4 223:4 225:11 225:13 239:13 240:14 263:5 271:17 279:17 287:20 306:17 308:22

**goes**  30:12 55:18 86:1 116:8 121:13 158:7 166:5 187:9 227:5 254:24 255:4

**going**  9:19 17:9 22:15,17 27:17

32:1 34:15 35:1,13 42:16 44:6 52:23 56:19 65:2 72:5,16,20,21 80:24 83:10 84:5,13 89:22 94:18 107:11 109:11 113:7 120:9,21 123:15 124:12 124:13 130:4 134:4 136:21 139:20 147:11 148:5 149:9 150:13,15 155:12 158:1,1 164:16 172:11 173:25 175:16 176:12 181:5 183:10,15 186:2 187:17 192:16,16 198:1 212:7 214:25 218:1,6 224:9 225:12 226:14,21 229:12 233:1 233:12,14 234:18 237:5 242:12,24 267:12 270:17 283:16,20,21 283:22 284:18

286:4 288:2,7 296:1,20,24 298:2 302:18 303:11 304:20 305:19 308:22 309:18 315:18 315:25 317:24 318:2,7 319:12

**gold**  17:16 124:8,11,19,22 159:9 160:4,20 161:15 165:19 166:7 167:4,14 173:23 191:22 203:25 271:10

**goldman**  18:4,6

**good**  4:2,20 5:9 5:10 35:25 116:15 123:25 173:17 177:22 183:1 193:19 228:2 304:7

**gotten**  40:11

**govern**  98:18

**government** 287:9,12,13 291:25 292:20

**grade**  276:21 278:5

**graphs**  289:13

**great**  44:10 55:1 272:14 304:3

**App. 600**

**[greater - history]**

**greater** 206:6
242:25 302:22
303:9 308:24
**green** 235:8,11
236:5,6,7,10,18
236:19
**group** 11:20
207:17 208:21
208:22,25
211:12,15
212:3 301:20
**guess** 16:25
117:15 145:9
162:13 165:20
199:1 217:13
274:14 290:7
306:10
**guesstimating**
28:12
**guidance**
146:16,17,19
146:25 147:2
147:21 148:12
148:13,14,16
149:11,12,24
150:5 151:3
154:25 155:1,3
155:3,5
**guided** 185:25
**guys** 51:25
139:21 174:3
290:9 291:14

**h**

**h** 2:3 3:6 322:1
323:3
**hah** 136:1
**half** 268:20
269:23 284:25
305:19
**hampshire**
13:9
**hand** 35:13
62:9 74:12,20
223:22 227:25
305:8 321:16
**handed** 10:9
30:11 35:22,23
35:24 263:21
288:11 306:22
**handful** 22:17
**handing** 57:3
174:7 264:3
**handle** 7:1
**handy** 273:1
**hang** 35:17
91:14 215:5
216:10 298:15
**hangry** 139:25
**happen** 80:14
121:15 262:18
277:21 294:2
**happened**
16:23 22:20
69:12 83:12
145:4 227:15

250:23 267:16
269:25 307:18
**happening**
164:22
**happens**
270:20 294:12
315:20
**happy** 231:13
288:4
**hard** 185:20
**head** 186:3
**heading** 62:10
127:18 197:1
**hear** 10:4 57:17
90:18,22 95:1
123:15 130:23
225:10 245:19
296:1
**heard** 179:25
180:22
**hearing** 136:11
136:18
**heavy** 57:6
**held** 21:15
**help** 50:23 58:2
183:25 276:17
**helped** 254:22
**helpful** 21:21
22:19 113:8
195:22
**helps** 117:21
**hereinbefore**
321:7

**hereto** 321:14
324:7
**hereunto**
321:16
**hesitating**
48:15
**hiatus** 29:12
**high** 63:7
116:12 223:23
294:16 303:8
**higher** 26:9,11
26:14 113:2
155:13 221:22
223:25 224:4
227:17 263:14
267:13 270:15
277:19 282:25
283:18,23
286:3 291:24
292:20 296:25
297:12,24,25
298:6 302:1,7
303:4,4,7
305:19
**highest** 219:17
220:1,15,24
221:19,24
**highlights** 68:2
**hired** 12:19
73:14 305:10
**historical**
286:25
**history** 116:7
133:7 293:24

304:1

**hit** 68:2

**hmm** 58:5 96:2
211:20 288:20
288:22 297:4

**hold** 10:17
101:25

**holding** 261:13

**home** 16:10

**honed** 194:18

**hope** 290:9
291:14

**hour** 26:18
232:19 234:19
276:15 290:6

**hourly** 26:25

**hours** 26:23,24
27:13,21 28:13
28:17 44:5

**how's** 197:6

**huge** 271:3

**hundreds** 40:9
271:3

**hypothesis**
185:22 186:11

**hypothetical**
123:10,13
307:17,18
309:2,4

**i**

**ice** 279:11
282:12

**idea** 25:11
260:18 306:6

**identification**
10:7 35:12
57:2 174:6
217:3 264:2
276:8

**identified**
77:18 141:19
142:3 144:16
144:17 213:12
235:22 273:18
274:19 294:18
295:8

**identifier**
218:20

**identify** 12:23
13:24 16:24
21:15 83:1
84:6 93:18
94:19 107:19
141:9 154:10
186:24 218:1
228:9 236:22
238:6 254:10
273:16,20
293:5,15 294:7
294:20 295:6
295:15

**idiosyncrasies**
301:19

**ignored** 240:15

**ignoring**
298:13

**imagination**
153:24

**imagine** 103:6
164:6 305:12

**immaterial**
271:14

**immediate**
155:22

**impact** 18:16
120:15 122:21
122:22,23
146:3 147:3,5
149:3,4,17,22
150:1,2,19
151:14,15
154:13 183:11
205:23 206:20
206:22 207:17
213:6 262:3,18
266:23 271:5
284:18

**impacted** 144:5
258:22

**impacting**
183:7,10

**impacts** 150:8
205:24 207:12

**impaired** 87:5
97:9 135:2
236:17 237:23

**impairment**
71:23 86:20
87:2,9,11,15,21
87:25 88:11,12

89:5,13,19
90:2,11 91:23
92:9 93:1,20
93:22 94:5,14
94:21,23 96:19
97:7 111:13
112:4,6,11,14
113:12,14,25
114:10 115:17
116:11,20
117:9 131:7,11
132:3,13
232:21 235:8
235:11 236:2,3
236:11,15
237:4,7,10
243:24

**impairments**
7:2 45:7 46:16
50:3 71:20,22
71:24 81:23
84:13 86:6,9
86:12 87:13
88:5,19,22
89:1,7,8 92:3,7
92:11 93:5,8
93:10,13
111:20,23,25
112:24 114:4,6
115:20,21
116:4 117:19
125:9 238:6

**imperial** 31:18
31:23 32:12

**[imperial - indicate]** Page 41

52:25 53:5
**implicated** 55:10
**implications** 266:8
**implicit** 42:4 94:2
**implied** 96:16
**implies** 94:16 308:24
**importance** 131:16,25 132:1 133:16 134:10,20
**important** 32:5 103:2 105:17 111:16 116:24 117:23 120:14 125:5 126:8 132:4,24 133:4 133:19 134:1 135:6 137:12 138:5,7 139:3 139:4 141:23 141:24,25 150:18 154:3,4 163:19,21 164:3 188:19 230:18 232:13 232:20 237:21 256:14 260:9 301:20 317:2
**impose** 213:7 301:9

**imposed** 213:25
**impressions** 28:22
**impressive** 217:18
**improper** 218:14 222:16 223:8
**improperly** 90:11 93:2
**inaccurate** 54:24 93:2 94:23 175:9 176:19 190:3,4 190:6
**inaccurately** 65:12 99:21
**inappropriate** 39:6 176:1 190:5
**include** 9:23 15:15 31:3 46:1,6 48:8 54:16 68:23 99:6 183:16,19 183:19 203:18 265:9
**included** 28:4 43:10,18 47:18 56:11 73:24 75:17 79:15 98:21 142:4,5 163:18 199:17

201:4,7,11
**includes** 46:4,5 48:3 299:18
**including** 27:23 43:7 78:10 100:9 113:18 113:22 145:23 218:19 235:19 252:2
**income** 24:20 251:9,10,22,22 252:2,17 254:21,23 274:1 296:17 311:11,12,15 313:6 315:16 315:17 318:15 318:19
**incomplete** 37:21 123:10
**inconsistency** 302:2
**incorporate** 78:25
**incorporated** 241:17
**incorporates** 78:23
**incorrect** 38:19 64:12 81:4 90:3 93:23
**incorrectly** 64:25 82:4 104:3 114:11

233:15,25
**increase** 118:6 118:13,24 120:25 121:7 123:7,22 301:4 301:5 310:17
**increased** 164:24
**increases** 123:3
**independent** 108:18 223:22 224:16 314:6
**independently** 109:25 119:18
**index** 40:7 41:5 99:4 210:3,7,8 210:15,21 211:7 212:4,5 212:8,24 213:12 214:7 214:16,21,22 215:1,25 216:1 216:5,8,18 219:25 220:14 220:23 221:10 222:17 224:19 279:11,11,16 282:21,22 283:18 303:2
**indexes** 218:18 218:21
**indicate** 62:3 66:20 91:23 188:2

**App. 603**

**[indicated - institute]** <span style="float:right">Page 42</span>

| | | | |
|---|---|---|---|
| **indicated** 66:1 66:9 81:14 143:21 235:17 244:9 271:15 | 219:25 220:14 220:23 222:14 | 141:16,18,22 141:22,23 | 77:11 80:24 81:6,8 94:17 |
| | **infer** 106:21,24 | 142:2 144:22 | 100:25 101:2 |
| **indicating** 64:2 | **inference** 106:20 107:6 107:21 | 147:23 151:11 153:9 160:9,14 161:20,23 | 103:1 106:10 235:23 308:14 |
| **indication** 58:11,14 59:13 59:23,25 80:13 93:9 94:4 95:6 95:8,11 302:11 308:8 | **inferior** 192:3 | 162:1 163:25 165:14,17 | **informing** 69:23 |
| | **inflation** 69:3 103:2 244:24 245:2,3,5,7,15 245:22 246:4,5 247:6,20,23,24 248:9,13 | 179:20 189:1 189:23 191:16 193:22,23 194:9 196:13 196:14 199:6 204:7 207:24 219:23 220:22 | **informs** 111:15 |
| | | | **ink** 289:12 |
| | | | **input** 112:6 194:25 |
| **indications** 93:6 | **inform** 66:21 81:2 | 222:3,7,10,24 222:25 223:14 223:16 229:14 | **inputs** 112:9 116:20 117:11 117:12 135:19 |
| **indicator** 62:15 209:18 210:14 | **information** 5:15 30:4,23 31:9 34:25 37:10 57:9 58:18 59:23 68:6 78:9,13 78:20,24,25 79:1,16 82:21 88:23 102:1 103:9 106:6 107:6 110:6,24 117:24 120:7 121:17,21 122:1,8,9,10,19 122:20 125:8 126:7,18 127:24 128:14 129:25 135:16 138:5,7 141:10 | 232:20 235:4 235:13,19,20 235:23 238:7 241:15 243:16 243:23 244:18 256:13 258:25 259:10 272:7,8 279:23 280:5,7 286:7 291:20 301:8,10 310:2 317:7 | 156:14,18,24 158:15,18 159:6,15,18 160:11 161:2 161:11,12 162:15 165:2 167:19,20,20 169:11 170:1 171:7 172:8 177:6 178:1,19 188:8 194:14 194:23 205:9 231:4 |
| **indices** 40:5 214:13 218:24 219:19 271:16 274:5 278:13 282:13,14 283:15,20 284:19 286:1 301:17 | | | |
| | | | **insight** 159:22 |
| **individual** 142:1 301:18 | | | **insofar** 132:18 |
| **individually** 1:8 | | **informative** 102:24 | **instances** 12:10 12:13 |
| **industry** 6:8 159:10 160:5 160:21 165:22 204:2 209:2,19 210:3,7,8,10,15 211:8 216:1 218:18 219:8 | | **informed** 17:22 68:12 70:3 73:6 76:12 | **institute** 251:17 251:20,24 252:15 |

**[institute's - issuer]** Page 43

**institute's**
254:23
**institution**
281:6
**instructed** 48:7
**intend** 236:7
**intending**
83:13
**intensively**
84:21
**intercontinen...**
282:11
**interest** 40:10
41:9,21 257:10
257:22 259:1
259:12 260:24
261:1 262:5,19
263:10,14,17
264:13 266:4
267:13 270:6,7
270:15 278:16
284:14,24
285:2,4,12,17
285:21 286:8
292:9,11,24
297:12,20,24
297:25 298:6
303:15,23
304:23 305:2
305:18,21
306:3 307:10
308:6
**interested**
204:17 259:7

305:8 321:14
**interesting**
251:13
**intermittent**
29:14
**internal** 235:25
**interpolate**
272:16 273:24
274:8,24 278:8
278:15 280:2
280:25 284:22
**interpolated**
272:3,4,6,11
**interpolating**
273:3 280:9
**interpolation**
273:15 274:3
274:11,22
275:10 278:19
280:3,11
281:13
**interpret** 6:23
109:6,9 110:24
230:7
**interpretation**
194:6 221:3,5
272:23
**interpreted**
100:1 221:2
**interpreting**
285:14 292:15
**interrelated**
55:22

**interrupted**
145:9
**interrupting**
218:3,6
**intertemporal**
267:15
**interview** 315:5
316:20
**introduce** 4:12
**investigated**
316:2
**investing**
313:24,25
315:1 317:4,20
**investment**
126:9 166:3
276:21 278:4
318:23
**investments**
25:4
**investor** 104:14
128:9 246:17
246:19 247:7
316:19 318:21
**investors** 46:6
61:10 63:8
92:1,7 93:9
95:4 117:24
120:15 125:10
126:6,8 127:25
131:13 132:4
132:14 257:16
261:13,15
296:24 318:1

318:14,20
**invoiced** 28:1
**invoices** 26:22
**involve** 45:5
**involved** 6:6,6
13:18 148:6
**involves** 129:4
**involving** 11:21
17:2 237:14
**irrelevant** 49:4
119:4,8 232:4
232:5
**ish** 111:7
**isi** 240:15
**issuance**
267:17 287:23
**issue** 6:13 8:9
17:17 41:13
46:19 61:23
74:23 87:10
89:13,19 96:19
98:5,6 118:1
132:13 182:19
185:14 191:15
205:5,16,20
256:8 258:21
267:14 270:4
277:18
**issued** 44:22
121:1 202:14
202:15 262:10
293:5 299:7,14
**issuer** 293:6

**App. 605**

**[issues - keep]** Page 44

**issues** 6:13,19 27:8 45:6 73:16 96:18 151:2 181:23 183:20 269:12 277:15
**issuing** 293:1
**items** 8:4 142:9 142:10 179:18

**j**

**j** 2:9
**james** 71:5 242:20
**january** 1:24 4:6 45:11 46:2 46:8,15,24 47:10,17,22 48:5,8,12,21 88:2 89:16 208:8,9,12 225:20 229:25 230:14 231:7 231:19,25 232:10,15 235:4,13,19 241:20 245:10 299:25 321:6 321:16 322:3
**jeanette** 1:19 4:5 321:4
**jefferies** 240:17 240:19 242:16 242:19

**job** 104:19 160:22,25 162:11 165:23 166:23,24 193:16 227:7
**journal** 116:2,8
**jr** 1:7 4:10 322:4 323:1 324:1
**judge** 17:3,5,7 18:1,4,12 19:2 19:16 20:18 21:3,11 22:2,5 44:21 45:9,14 46:11,13,22 47:16 49:10 209:20 230:7 231:13,14
**judge's** 230:5,6 230:22 231:11
**judges** 22:18
**judgment** 103:7 237:16
**jury** 11:14,24 47:21 103:16 120:21
**justified** 162:8 162:9

**k**

**k** 1:6 3:14 51:5 51:8,9,15 55:13,15 56:16 57:5,6 58:14

58:21 59:19 61:9,15 68:1 74:5,16 76:14 77:24 78:2,18 79:7,14 80:17 80:22 82:21,23 86:17,23 87:6 89:24 97:23 102:19 103:9 104:1 119:14 211:6,7,11 246:2 312:18 316:7,11,22 317:5,16
**kearl** 50:10 51:21 53:16,21 54:8,10,13 55:3,16 56:11 56:14 58:12,21 59:3,13,24 60:1,3,25 61:1 61:2,11,12 62:1 63:4,9 64:9 66:9,21 66:24 67:3,11 67:25 68:14,18 68:21 69:18,25 71:16 72:1,5,8 72:11,14,17,21 72:25 73:8,10 73:19,24 75:2 75:18 76:5,25 77:6,9,12,21 80:1,9,25

84:16 85:5,19 85:22 96:15,15 96:21 97:12 98:3,13 100:19 100:22 101:12 101:14,24 102:4,10,23 103:17 104:23 105:16 106:11 106:15 107:16 107:22 108:2,8 108:8,11,17,25 109:18,25 110:3,7 129:17 134:25 135:5 137:11,13,14 138:4,13,15,24 139:7,10 152:9 152:13 153:17 153:25 154:1,2 154:18 178:5 178:12 179:6 179:13 180:22 180:22,25 181:5 182:18 183:16,17,19 183:22,23,24 184:5,13 185:8 248:16,19 249:9 250:9 256:8 257:6 258:21
**keep** 44:6 113:7 255:2

**[kept - lead]**

**kept**  68:19
69:16
**key**  60:24
255:19
**kind**  8:12 29:14
123:16 133:14
134:20 156:22
194:4 248:6
281:2 296:11
300:3 304:21
312:25
**kirkland**  17:15
17:15
**knew**  61:1
68:18 111:18
111:19 150:16
193:1
**know**  15:3 16:2
16:22 18:24
20:9 22:23
24:13 25:8,11
25:24 29:11
33:12,15,16,19
33:25 37:14
45:13 65:16,18
68:10 71:8,11
78:22 81:5,6
81:12 85:11
90:6 97:24
98:18,21 99:24
105:16 108:3,5
108:13 109:6
112:9 115:3,6
117:8 118:25

124:9,16
131:22 132:20
138:18 157:21
159:4,4,20,24
160:3,19,22,25
161:2,5,6,7,7
162:10 165:11
165:21,25
166:5,8,13,17
166:23,23,24
167:3,13,15
168:19 169:8,8
169:9,10,23,24
170:2,8,11
171:14 172:17
172:17,22,23
175:12,15
177:23 190:10
190:11 193:8
193:24 197:2,7
197:21,24
201:20,21
202:13 203:22
204:4 207:6,22
209:13,15
212:17 215:5
216:8 220:17
220:18 226:3
242:17,19
243:5 244:23
247:23 253:11
253:20,21
254:4,12
255:25,25

256:1,2 257:15
259:8,24 260:1
260:14,16
265:7,23
275:16,17,20
275:25 276:14
278:23 279:10
280:1,10 281:7
290:10 302:22
302:24 303:8
303:20,24
306:8 309:11
309:15
**knowing**
257:13
**knowledge**
75:9 82:22,24
161:25 172:3
252:23,25
253:3,8,14,15
253:16 254:16
257:17 260:8
261:8 309:21
321:8
**known**  147:13
150:20 190:13
190:14 275:8
**knowning**
257:15
**knows**  160:3

**l**

**lack**  68:13,20
69:17,24 77:20

102:9 109:7
**lacking**  208:17
**laid**  128:2
**landed**  118:19
**language**  89:1
152:4
**large**  67:12
**larger**  206:4
**largest**  206:11
**larocque**  168:9
170:23
**las**  20:9
**laser**  64:17
**lasting**  147:5
148:15 149:8
150:19,22,23
**late**  86:14
290:6
**laughing**
242:18
**launch**  92:13
**law**  15:12
59:10,11
**lawsuit**  74:1
84:1
**lawyer**  5:20
**lawyers**  18:24
**lay**  69:14
134:16
**lays**  261:20
**lcd**  187:2
**lead**  48:7,11,20
55:2

| | | | |
|---|---|---|---|
| **learn** 70:13 81:11 87:24 89:2,7 105:19 | **liability** 103:17 104:16 | 323:16,19 | 211:16,21,24 212:8,11,18 213:19,23 |
| **learned** 72:25 81:11,17,18 82:16,17 88:4 88:9 89:3,3 101:23 105:22 144:25 170:17 178:5,11 | **liberty** 18:21 23:2 | **linear** 272:23 273:15 274:2 274:10,22 275:10,13 278:19 280:11 281:13 | 225:6 254:25 255:1 272:19 273:21 274:2 274:10 275:7 278:3 284:21 |
| | **life** 29:15 153:21 154:8 261:2 | | |
| | **light** 164:3 | **linearly** 272:16 273:2,23 274:8 274:24 278:8 284:21 | **litigate** 17:20 |
| | **likelihood** 301:13 302:1,7 | | **litigation** 8:1 8:12,17,18 9:21 12:21 25:22 33:23 37:3,7 42:14 211:19,23 236:1 |
| **leave** 10:16 162:25 197:4 197:13 207:5 | **likely** 59:21 76:13 80:13 92:8 163:20 181:6,9,10 207:10 223:11 223:18,21,25 224:3,4,14,17 224:23 225:2,3 228:9,16,23 229:5,7,20,22 249:5,7 310:18 | **lines** 153:15 291:7 | |
| **leaving** 11:23 | | **linking** 94:8,11 | |
| **led** 105:23 | | **links** 94:9,12 | |
| **left** 31:7 62:9 176:25 276:14 | | **liquidate** 317:25 | **little** 23:10 26:9 41:1 44:9 80:12 157:12 227:23,24 246:13 283:17 300:18 |
| **legal** 4:6 5:22 5:24 6:2 47:4 53:25 59:8 69:13,20 70:9 70:11 102:6 125:14,17,25 126:12,13 322:23 | | **list** 10:24 11:1 11:17 15:3,7 15:13 22:15 30:2 31:8 36:12 38:14 142:9 242:22 | |
| | **limit** 13:20 205:11 298:22 | | **llp** 1:23 2:3 |
| | **limited** 31:19 31:24 | **listed** 114:2 159:20 197:8 198:5,12 201:19,24 202:4,9 276:21 278:5 291:18 311:22 | **lo** 213:2,15 217:15 |
| **legend** 62:16 | **line** 116:23 130:24 131:21 131:23 196:18 225:19 240:16 242:9,14 289:11,12 293:1,2,3 298:12 306:11 323:4,7,10,13 | | **loan** 16:10 |
| **legitimately** 53:22 55:6 | | | **lobbied** 173:19 |
| | | | **located** 4:8 |
| **lehman** 293:8 294:1 | | | **log** 306:13,14 |
| | | **lists** 277:1,6 | **logarithmic** 119:12 |
| **level** 294:9 316:10 | | **literature** 19:12,12,15,22 39:23 126:15 | **long** 14:15 44:3 179:4,12 181:4 181:6,10,13 |
| **levels** 144:4 146:14 | | | |

182:23 184:1
186:9
**longer**  44:9
53:22 55:6
163:25 179:14
179:16,23
181:1,2 183:16
183:18 211:4
218:7 291:10
**longest**  298:23
**look**  15:14 23:8
28:3 36:11
47:5 52:16
53:1 54:3 58:9
62:8 88:25
108:12 117:11
119:14 120:2
120:13 125:6
126:20 133:3,7
134:8,17
142:25 143:17
157:19 172:17
175:10 176:18
176:24 177:12
177:20 179:11
179:12,13,22
181:15 186:13
186:18 195:19
196:2,5 199:4
199:25 204:6
204:23 205:21
212:6,19 215:3
215:4 219:6
222:16 223:5

226:16 231:1
231:10 242:22
265:12 270:10
274:23 276:10
279:17 281:22
287:21 288:11
288:18 290:18
293:12 301:23
306:12
**looked**  23:14
66:25 67:2,20
74:5,8,11,14
99:16 109:17
114:6,25
115:19 118:21
120:22 136:15
153:3,4 157:13
177:24 189:19
190:18 198:18
199:11,15
200:7 221:6
223:2 226:7
228:6 238:16
238:23 243:15
266:13 267:10
267:19 271:24
272:7,8 279:14
287:17 289:23
309:25 311:21
314:11,23
315:25 316:7
316:21,22
317:16 319:9

**looking**  12:3
45:4 71:10
75:7 78:6,7,10
86:18 91:18
92:4 112:14
135:13 142:14
176:17 177:6
177:16 184:7
190:20 196:24
199:24 216:23
221:12 271:19
276:13 302:9
**looks**  103:8
**loose**  30:14
**lose**  270:8
**losing**  61:25
**loss**  3:9 20:24
21:5 22:10,11
44:14,17,19
66:5 82:12
104:12 127:15
128:4,15,22
129:8
**losses**  23:1
104:14 128:9
**lost**  288:15
**lot**  67:6 85:13
85:14 116:20
127:13 136:3
136:25 141:22
150:12 170:11
213:19 268:21
**lots**  110:5

**loud**  91:10 92:6
**low**  111:19,20
111:23 144:3,4
144:9,10,21
147:20 148:12
148:14 154:25
155:2 183:4
185:24,25,25
283:1,22
**lower**  40:6
146:17 170:20
182:9 183:4
206:5 222:4
223:11 225:22
226:12 227:1
228:8,21
229:10 283:13
284:17 286:1,3
290:25 292:25
309:7
**lowered**  178:19
180:6 185:3
**lseg**  174:18
176:3
**lunch**  139:22
140:5
**lynch**  196:19
197:15 198:5
**lynch's**  198:22

| m |
| --- |

**mackinlay**
213:2,16,16
217:16

**App. 609**

**[madam - market's]**

| | | | |
|---|---|---|---|
| **madam** 90:23 | **make** 6:24 | **makes** 174:21 | 72:25 73:6,7 |
| **made** 31:18,23 | 25:21 28:16 | 184:7 259:16 | 76:12 77:14 |
| 49:1 61:9 | 35:17 38:20 | **making** 84:11 | 80:21 81:2,10 |
| 72:19 76:18 | 40:18 74:2 | 126:9 | 81:24 82:16 |
| 88:4 90:8 | 76:17,22 82:7 | **management** | 88:18 89:2 |
| 106:13,25 | 82:13,15 100:6 | 56:17 315:5 | 95:10,15 98:11 |
| 107:6 112:1,17 | 103:5 120:17 | **management's** | 100:25 101:2 |
| 118:14,16 | 123:17 124:23 | 59:20 | 101:18,23 |
| 120:3 121:12 | 129:21,23 | **mandated** 99:9 | 102:9 106:10 |
| 124:20 129:20 | 132:6 135:12 | 99:14 | 106:15 107:5 |
| 131:17 134:19 | 144:15 151:6 | **manifested** | 107:20 116:14 |
| 144:12 148:24 | 156:1 163:13 | 58:14 | 120:12 128:11 |
| 155:6,8 162:2 | 163:17 166:17 | **manner** 121:14 | 132:24 135:15 |
| 180:16 182:25 | 168:10 175:1 | 164:24 212:24 | 144:25 154:13 |
| 185:10,10 | 176:7,9 180:2 | **maracas** 1:19 | 178:5,11 |
| 217:23 235:6 | 203:17 209:7 | 4:5 321:4 | 185:12,15,23 |
| 237:16 244:7 | 214:5 215:24 | **march** 250:22 | 188:3 200:15 |
| 245:5 257:7 | 218:7 220:11 | 263:19 264:16 | 219:7,21 221:9 |
| 259:9 312:21 | 222:19 223:10 | 265:4,17 299:8 | 222:6,13,25 |
| 324:5 | 224:14,23 | 299:15 300:20 | 229:12 232:23 |
| **magnitude** | 225:2,2,3 | 310:16 | 232:24 241:16 |
| 12:7 129:11 | 228:5 233:21 | **mark** 9:8,13 | 246:8,10 |
| 131:16,20,21 | 235:12 237:18 | 35:5 173:25 | 249:14 266:15 |
| 132:8,12 | 238:9,13 239:1 | 216:25 263:24 | 266:15 267:2 |
| 153:22 300:15 | 246:15 247:5 | 276:6 | 268:8,15,24 |
| 317:17,18 | 253:17 256:25 | **marked** 10:6 | 269:19 271:6 |
| **major** 94:14 | 260:22 261:16 | 35:11,14 57:1 | 277:17 302:11 |
| 105:17 117:18 | 264:11 265:21 | 57:3 174:5 | 304:6 307:14 |
| 165:16 166:3 | 283:24 285:6 | 217:2 264:1,3 | 307:24 308:10 |
| 203:17,20 | 288:9 295:25 | 276:7 288:12 | 308:14,18,19 |
| 208:23 | 302:14 304:9 | **market** 17:5,23 | **market's** 108:1 |
| **majority** | 311:19 312:19 | 62:24 66:21,21 | 121:17 148:17 |
| 170:12 | 312:22 314:4 | 68:18,19 69:16 | 194:11 198:25 |
| | 317:11 319:13 | 69:23 70:3 | |

**[marketing - memory]**

| | | | |
|---|---|---|---|
| **marketing** 266:13 | **math** 205:17 233:16 237:1 | 134:16 135:13 138:19 159:24 | 196:25 201:20 201:21 202:8 |
| **marketplace** 68:12 77:5,12 80:24 81:25 103:1 | **matrix** 256:4 **matter** 4:10 5:25 8:14 23:6 23:7 29:1,5 | 164:16 188:7 198:16 199:20 200:6 201:3 203:1 207:6 | 213:6 219:3 221:24 223:11 227:5 228:8,22 260:25 283:15 |
| **markets** 8:25 | 39:11 65:7,18 | 214:15,24 | 292:15 300:24 |
| **marshalling** 85:14 | 128:12 228:22 256:17 | 215:25 221:11 221:15 222:4,5 | 301:1 312:1 **meant** 293:14 |
| **massachusetts** 1:22,23 4:8 321:1,5 | **mattered** 256:10 **matters** 11:11 | 224:10 226:17 228:1 244:24 246:22,25 | **measure** 192:1 194:11 200:17 209:18 210:9 |
| **mastered** 254:25 | 65:7 66:14 256:23 257:3 | 248:6 253:3,14 261:9 269:6 | 219:12,13 **measured** 47:1 |
| **material** 125:10,18 | 321:8 **maturity** 261:3 | 271:14 275:4 275:21 280:16 | 208:14 **measures** |
| 126:2 127:24 128:14 129:25 | 261:4 262:3 266:5 298:23 | 281:7 293:18 294:11,19 | 110:14 189:6 **measuring** |
| 130:5,22,25 131:1,4,13,18 | **maximum** 206:21 | 295:9 296:18 296:20,23 | 110:18,21 **media** 135:10 |
| 132:14 137:14 205:15 240:17 | **mean** 14:4 15:21 16:25 | 300:17 311:20 311:25 313:25 | 135:21 136:8 136:14 |
| 241:25 | 20:12 22:23 | 316:25 | **median** 177:4 |
| **materiality** 125:13,14,22 | 24:20 27:4 28:11 38:11 | **meaning** 12:4 39:24 118:21 | 187:19,22 188:1,7,13,16 |
| 126:18,23 127:1,22 | 42:4 63:24 73:13,15 79:18 | 127:22 218:17 219:13 237:2 | 200:21 201:2 204:9 |
| 128:17,20 129:4,7 130:7 | 80:19 82:3 83:9 84:6 91:1 | 285:22 293:4 295:19 | **meet** 44:3 **meeting** 44:2 |
| 130:9,11 136:2 136:10,17 | 104:5 109:2 110:10 113:19 | **meaningful** 123:22 | **memorized** 275:7 293:19 |
| 137:21 | 115:22 122:18 | **means** 93:22 | **memory** 20:8 |
| **materials** 30:2 31:3 | 122:20 126:2 129:13 130:23 | 94:22 95:16 155:5 164:17 | 175:10 216:13 216:23 290:5 |

**[mention - missing]**

mention  113:25

mentioned  68:3
  79:22 86:6
  98:14 111:3
  144:19 150:12
  154:19

mentioning
  79:23

mentions
  152:13

merely  83:4

mergers  13:17

merit  24:1,4

merits  28:24
  49:22

merrill  196:19
  197:15 198:5
  198:22

met  44:1

methodology
  126:17,22,24
  126:25 127:10
  127:12,21,25
  128:5,15,16,19
  129:3,10
  130:19 132:10
  133:15 134:5
  134:11,15
  165:21 166:1
  172:21,22
  184:8 190:8
  191:3 194:12
  207:18,19
  211:13,14,17

212:9 213:10
  213:22 214:2
  230:11 231:23
  238:21 239:2
  240:3 241:13
  241:23 281:11
  281:19 285:16
  305:7

metlife  33:14

metric  151:20

metrics  151:18
  151:19

middle  24:5,7
  91:19,20,21
  283:25 310:14

militant  142:6

miller  2:10
  4:22,22

million  40:14
  40:19 41:8,15
  41:18,23 42:2
  124:8,10,12,13
  124:14,21,22
  130:4 260:23
  262:4,19 263:5
  271:16 297:8
  297:14,18,19
  298:11,17,25
  298:25

millions  40:9
  271:4

mind  11:22
  49:19 69:11

mine  108:18
  213:20

minimis  149:16

mining  17:3,16

minor  8:4,8

minority  241:7

minus  99:5
  112:23

minuses  274:7
  278:14

minute  9:17
  45:8 71:17,18
  89:21 91:11
  176:12 181:20
  271:20 273:7

minutes  44:11
  180:18 319:13

mischaracteri...
  231:11

mischaracteri...
  180:20

misconstruing
  241:1

misimpression
  62:23 63:9

misinformed
  70:15,18,20
  77:15 95:7
  98:10

mislead  81:15

misleading
  50:12 51:20
  62:4 64:8,14
  64:16 65:5,15

65:21 67:23,25
  75:13 79:12
  86:19,24 87:8
  88:4,21 89:12
  95:3 100:13,14
  100:17,21
  101:5,11
  103:12 105:9
  105:14,21

misled  82:10
  102:9

misread  96:7

misrepresent...
  18:1 61:21
  69:6 121:2,16
  250:19

misrepresent...
  17:23 67:7,9
  67:10 68:25
  69:4,8 77:10
  77:16,19 82:19
  98:10 104:13
  111:17 117:23
  128:8,13

misrepresented
  61:14 67:5
  70:14

misrepresenti...
  277:17

missed  144:11
  300:12

missing  30:7,8
  30:10 32:5
  34:17 87:11

**[missing - multiple]**                                                    Page 51

136:21,25
**misstated**
  55:12 84:18
  85:18
**misstatement**
  51:13 118:5
  121:12 123:8
**misstatements**
  21:4,17 55:10
  102:17,18,21
  118:8,14,22,25
  120:3 121:5
**misstates**  105:7
  199:7 296:8
**mistake**  224:15
  224:22,25
  225:3
**mistakes**
  118:17 210:2
  225:1 269:10
**misunderstan...**
  220:20
**mix**  35:18
  121:17 143:21
  151:11 153:9
  179:3
**mixed**  188:2
**mixing**  185:18
**mm**  58:5 96:2
  211:20 288:20
  288:22 297:4
**mobil**  1:11
  322:4 323:1
  324:1

**model**  135:24
  136:19 166:20
  166:22 211:25
  212:1 219:3,4
  219:14,16,17
  221:19,22
  222:1 223:20
  225:7,8 226:5
  226:12,19,22
  227:7,9,9,16
  228:2,3,8
  229:9,16,18,18
  229:21,21
  231:18 232:9
  232:12 234:5
  270:18 292:9
**modeling**
  195:11
**models**  221:25
  225:23
**modestly**
  185:24
**modified**
  214:22
**modify**  264:5
**moment**  10:11
  54:14 57:23
  63:12 65:6
  68:3 83:18
  90:13 121:9
  150:13 230:24
  233:6 245:11
  275:17 311:23
  312:16,17

**moments**  29:9
  234:4
**money**  61:25
  268:21 271:3
  312:12 313:8
  313:13,19
  316:12 318:10
**month**  191:18
  202:5 204:5
  205:2 233:2
  268:24
**months**  69:18
  246:7
**moody's**  252:9
  252:12 258:19
  258:22 259:13
  259:14,18,21
  260:2 263:12
  264:15,20
  265:4,16
  287:18 289:22
  290:1,11 304:3
  304:16
**morning**  4:2,20
  5:9 22:9 84:25
  85:8,22 197:11
  251:14
**mortgage**
  16:10
**motion**  15:25
  16:2,5
**motivated**
  232:3

**mountain**  86:9
  86:20 87:9
  88:6,22 89:13
  89:19 93:21
  94:15,22 96:19
  97:8 115:16
  131:8 133:5,17
  134:9 135:1
  237:21
**mouth**  125:6
**move**  71:12
  72:4 84:13
  86:6 207:10
  218:13 224:19
  224:22 226:21
  243:10 306:17
**movement**
  46:24,25 120:5
  123:5,21
  145:15 208:14
  222:2,5 229:11
  229:14 231:7
  233:8 268:1,4
  270:19,23
**movements**
  122:25 219:20
  219:22 222:24
  227:8,19,21
  229:13,23
**moving**  62:19
**multi**  136:3
**multiple**
  218:18,24

**App. 613**

**[n - north]** Page 52

| n | | | |
|---|---|---|---|
| **n** 1:19 3:1 4:1 | 112:9,18 | 308:23 310:3 | 246:8 302:9,10 |
| **name** 11:19 | 113:11 123:20 | **negatively** | **nigeria** 142:6,7 |
| 19:10 20:7 | 160:3 168:21 | 144:5 183:11 | 142:8 144:11 |
| 216:8 260:16 | 169:7,16 170:7 | **neither** 77:13 | 145:5 146:10 |
| **named** 321:7 | 240:8 244:2,11 | 172:3 267:24 | 146:24 147:3,9 |
| **names** 86:1,4 | 249:8 274:7 | 321:12 | 147:24 148:1 |
| **narrow** 109:15 | 276:16 285:23 | **net** 145:22 | 148:21 149:14 |
| 121:3 212:12 | 286:7 304:17 | 146:2 183:11 | 149:21 150:8 |
| 231:15 | 317:6 | **never** 12:11 | 150:13,15,16 |
| **narrowly** 119:1 | **needed** 57:8 | 14:2 19:20 | 150:18 151:1,8 |
| **nas** 201:12 | 248:19 | 46:4 105:10 | 151:16 155:2 |
| **natural** 91:24 | **needs** 32:3 | 160:7 179:25 | 179:9 182:12 |
| 115:24 | 112:17 138:20 | 247:22 252:7 | 182:22 183:3 |
| **nature** 101:6 | 138:20 241:18 | 304:2 308:20 | 185:14,22,24 |
| **nearly** 116:10 | **negative** 109:3 | **new** 2:11 11:20 | **nigerian** 144:6 |
| 153:24 | 109:5,24 110:1 | 13:9 52:2 | 145:11 |
| **necessarily** | 141:25 142:21 | 82:14 121:22 | **night** 246:1 |
| 109:10 190:6 | 146:21 151:12 | 122:1,2,5,7,9 | **nine** 153:16 |
| 212:2 269:23 | 151:13 178:1 | 122:10,18,20 | **noise** 227:23,24 |
| 296:21 | 179:1,5 185:6 | 139:21 141:10 | 268:23 |
| **necessary** | 186:6 187:19 | 144:22 147:9 | **non** 18:10 |
| 48:25 151:17 | 187:22 188:1,9 | 147:12,16 | 47:12 123:6 |
| 160:19 161:6 | 188:16 200:21 | 148:2 150:2 | 141:10 142:19 |
| 162:13 175:24 | 201:2,16 | 154:17 265:24 | 146:23 148:20 |
| 191:1 244:16 | 206:11 207:12 | **news** 31:22 | 149:7,15 |
| 244:17 280:3 | 232:2 235:22 | 135:10,20 | 179:21 181:14 |
| 301:7 324:6 | 244:1 266:9,22 | 136:8,14 | 186:15 206:20 |
| **need** 9:9,17 | 266:23 267:20 | 142:16 143:4 | 206:22 222:3 |
| 11:17 54:9 | 267:25 268:9 | 143:21,22 | 224:1 238:5 |
| 57:17 68:13 | 268:13 300:19 | 146:7,21 147:8 | 244:8,10,13 |
| 69:24 80:9 | 301:2,8,10,11 | 147:11 150:12 | 285:21 287:15 |
| 82:12 93:8 | 302:17 303:11 | 153:12 230:18 | **north** 152:14 |
| | 307:16,21,25 | 232:13,14,16 | 152:20 |
| | 308:2,7,9,13,17 | 233:20 238:12 | |

**[northern - objection]** Page 53

**northern** 1:4 16:11
**notable** 148:8
**notably** 144:6
**notary** 1:20 321:5,20 324:13,19
**notch** 272:13
**note** 45:3 158:5 217:15 261:2 310:16 322:10
**noted** 142:5 143:11 144:2 215:22 256:13 306:16 324:7
**notes** 59:18 261:5
**notice** 291:5
**noticed** 175:23
**noticing** 30:7
**notwithstandi...** 47:16 282:8
**november** 156:18 158:7 158:19,24 159:11 161:1 161:11 162:16 164:19 177:5 178:2
**nuance** 85:13 88:16
**number** 15:3 25:12 29:13 40:13,19 42:3

56:13 58:18,24 60:14,17,18,23 61:22 62:15,21 64:2,25 65:16 66:1,6,8,14,19 66:19 74:11,18 74:19 75:7,11 78:14 80:20 81:2 82:22 83:6,20 87:20 96:5,10,21 100:23 103:15 112:22 122:11 131:21 135:18 142:24 143:9 147:2 154:6 157:1 158:6,21 158:23 159:8 159:14 160:2 162:15,24 163:12,13,15 163:23 164:3,5 164:10,17,23 165:12 183:10 183:11 188:6 190:8,11,12 194:7,20 196:14 199:2 206:1 214:11 214:12 217:14 226:9 236:23 246:4 249:3 262:14 263:4 270:14 277:11

279:10 286:11 287:6 298:4,24 304:25 309:7 309:11,14
**numbers** 6:23 36:23 59:21 60:11 62:2,5,9 62:11 63:7 64:14,18 65:5 65:11,14,20 67:13 75:12,16 78:10 79:19 98:19,22 99:7 99:13,17,25 100:4,10,16,20 101:10,14,17 101:18 104:3,8 105:24 109:2 109:12,22,24 110:1,8,9 118:21 119:10 132:19 138:17 148:9 157:22 157:23 162:12 162:13 163:12 163:17 164:16 166:4,11,25 167:8,9,11 170:25 171:19 172:2 188:11 189:4,25 190:22 191:2,4 191:8,11 192:2 201:11 203:2

203:19 204:1 204:13,14,14 205:13 240:22 242:5 311:15 312:5 317:1
**numerette** 242:7
**numeric** 258:2 258:6,7 259:22 259:24
**numerical** 201:14
**numerous** 5:18 173:12
**ny** 2:11 322:15

**o**

**o** 4:1
**o'clock** 193:17
**oath** 321:9
**object** 34:16 170:3 180:12 216:12
**objecting** 157:2
**objection** 8:7 29:4 47:3 53:3 53:24 54:15 59:4 68:8 70:8 72:2 73:12 76:6 80:2,11 82:5 83:7,23 84:8 88:8 90:4 93:24 94:25 96:6 98:8

**[objection - oil]**                                                         Page 54

| | | | |
|---|---|---|---|
| 100:12 101:8 | **observations** | 158:15,24 | **offering**  5:24 |
| 102:5 105:6 | 317:22 | 159:7,19 | 6:18,25 7:12 |
| 106:8,18 107:9 | **observe**  124:13 | 160:11 161:13 | 7:20 41:19 |
| 107:25 123:9 | 164:22,22 | 162:16 163:19 | 44:16 49:17 |
| 129:19 132:15 | 249:14 301:25 | 177:4 178:2 | 57:25 82:14 |
| 132:17 133:21 | **observed**  22:2 | 181:4,20 | 99:19,23 |
| 134:14 136:24 | 45:16 111:22 | 184:20 190:21 | 108:15,22 |
| 164:20 167:23 | 117:16,17 | 190:21 191:11 | 109:16,22 |
| 171:9,15 172:9 | 146:13,18 | 191:12 197:1,2 | 110:19,22 |
| 181:25 199:7 | 199:17 206:11 | 197:9,9,10,11 | 125:12,16,24 |
| 200:23 204:11 | 246:9 269:15 | 197:15,20,23 | 126:14 250:21 |
| 215:11,21 | **obvious**  39:15 | 198:6,13,14,23 | 256:11,16,19 |
| 216:3 217:8 | **occur**  102:8 | 198:23 199:25 | 256:20,21 |
| 218:16 221:17 | 130:7 131:2,22 | 200:11,12 | 257:1,2,5,13 |
| 228:14 231:8 | 132:19 143:10 | 201:25 202:1 | 258:8,9,19 |
| 233:17 237:8 | 206:7 | 202:10,10,15 | 259:2,4 263:19 |
| 240:11 241:9 | **occurred** | 202:20,20 | 264:5,16,21 |
| 241:21 243:20 | 101:20,22 | 203:3,7 206:7 | 265:17 292:4 |
| 246:21 248:23 | 153:11 206:12 | 243:11 244:4 | 295:3 300:21 |
| 254:11,18 | **october**  45:2,25 | 245:11,17,25 | 307:15,22 |
| 260:10 264:22 | 46:2,7 60:22 | 246:19 247:11 | 310:16,22 |
| 272:2,25 | 69:10 70:4 | 248:15,18 | 311:5,8 |
| 280:13 292:5 | 72:15,15 75:25 | 249:17 299:25 | **offices**  1:22 |
| 294:21 295:11 | 77:6,14 79:21 | **odd**  18:19 | **oftentimes** |
| 296:7 310:5 | 80:5 82:2 85:1 | 294:11 | 119:20 317:24 |
| 314:22 315:12 | 88:24 89:9 | **offer**  6:21 7:10 | **oh**  18:19 79:24 |
| **objective** | 92:18,20 106:2 | 24:10 43:4,9 | 94:9 113:20 |
| 213:22 214:1 | 106:14 107:7 | 43:18 176:9 | 139:15 156:12 |
| **obligation** | 107:23 137:9 | 183:22 193:9 | 177:19 215:9 |
| 261:15 | 137:10 141:7 | 256:23 260:5 | 278:1 289:23 |
| **observable** | 142:22 147:24 | 286:8 | 289:23 298:16 |
| 132:19 | 152:5,25 | **offered**  251:23 | **ohio**  16:9,11 |
| **observably** | 156:15,25 | 267:1 282:2 | **oil**  6:3,5,6,8,9 |
| 128:25 | 157:7,14 158:7 | 310:1 | 6:13 7:2 31:19 |

**App. 616**

**[oil - operating]**

31:23 32:12
52:25 53:6
56:1 60:9
78:12 83:21
106:23 107:14
111:2,18,20,22
111:23 115:24
115:25 116:5
116:15,25
117:18 125:4
142:8 144:9,21
145:11 152:13
152:19 218:19
249:13,14
253:2 254:1,7
255:19
**okay** 9:13,14
9:16 10:2,5,19
13:16 16:15,19
23:12 25:24
30:20 32:15
35:10 36:8,20
38:23 42:18,25
44:6,12,20
49:24 51:12
52:22 54:5,18
54:20,21 55:18
55:23 56:19
57:13 58:22
68:3 74:5
75:15,24 76:10
77:17,22 78:9
78:17 79:14
81:21,24 84:5

84:14 86:3
90:1,18 91:22
94:18 95:23
96:4 97:11,25
103:15 108:14
110:10,25
111:9 112:4
120:1,17
121:20 125:3
130:3 132:22
135:18 137:15
139:19 144:22
146:5,13
151:23 156:23
157:18 158:4
158:12 163:23
168:6,17
169:12 174:13
175:2 176:13
176:14,24
177:3 180:9
181:19 183:17
185:23 187:13
193:20 194:2
195:18 197:4
198:4,17 199:4
199:19 200:20
201:23 202:12
202:24 203:6
203:21 204:16
204:22 208:8
209:13 215:21
217:17 225:4
225:10 228:5

229:24 230:10
232:7,22 240:1
240:2 241:1
244:3 245:13
247:18 249:6
249:15 250:21
253:17,23
255:5,7,16
256:12 259:11
261:23 266:7
267:5 271:17
272:6 276:18
280:10 281:24
282:18 283:3
288:23 291:2
296:19 304:24
306:15,24
307:5 308:4,5
309:23,24,25
310:9,13 314:4
316:2,15
318:11 319:15
**old** 29:18
**older** 11:17
**omission** 51:14
51:20 68:23
69:13,15 70:9
70:11
**omissions**
61:23 67:11
68:3,16 69:12
70:5 77:16
82:19 88:5
102:21 104:13

111:17 117:23
128:8,13
**omitted** 69:8,19
69:23 70:14
**once** 16:6 88:13
106:1 113:6
181:21 301:11
**oneok** 13:11
**ones** 22:8 23:1
23:3 34:16
38:13,14 43:5
167:2 185:9
195:18 201:14
214:13 219:1
252:11 278:6
**ongoing** 15:16
**online** 4:25
**open** 47:1 53:4
160:8 197:4
208:15 229:24
230:12,18,22
231:5,7,19,24
232:9,12,18
233:9,20,20
234:7,13
**opened** 160:7
232:23,25
**opening** 47:10
157:16 177:18
177:21,23
178:9
**opens** 203:8
**operating**
310:25 311:11

**App. 617**

**[operating - page]**                                          Page 56

311:12,15,17
311:17,20
313:6,11 314:2
315:17 317:3
317:18
**operation**
67:14
**operations**  55:3
62:24 63:3
106:21 144:7
145:5 152:14
152:20 312:2,4
312:7,14
318:17
**opine**  19:15
301:21
**opined**  18:3,12
**opining**  59:6
114:9 175:22
257:17,20
**opinion**  6:18
7:11,12,20
8:21 12:14,20
14:6 15:1 16:4
17:4,6,10,24
18:18 19:3,11
19:17 20:21
21:11,21 22:5
22:18 24:4
37:11,12 39:11
41:7,19 42:8,9
47:7 49:17,21
57:25 58:9
81:13,16 82:14

99:19,23
108:15,18,23
109:16,22
110:20,22
114:12,14
125:12,17,25
126:14 136:23
149:20 171:5
173:15 183:23
250:25 256:11
256:16,20,20
256:21,24
257:2,5,13
258:8,10,20
259:2,4 260:4
264:5 280:22
288:25 292:4
295:3 304:25
310:22 311:5,9
**opinions**  5:24
6:1,21,25 8:24
12:17 16:17,19
16:20 22:11
24:10 31:4
34:2 42:25
43:2,5,10,13,18
44:17,18 49:13
53:6 111:14
257:1
**opportunity**
52:16 174:8
175:5 188:22
191:17 204:24

**opposed**  123:22
166:14
**order**  12:7 18:6
18:13 34:2
45:15 46:12
73:4 113:11
117:8 128:11
162:6 165:14
214:7 227:17
230:5,6,8
231:12 273:16
278:8 298:5
304:22 313:21
315:3,10 316:5
317:6 318:6
**ordered**  231:14
**organization**
251:15,15
252:19
**original**  187:2
**originally**
264:10,12
**outcome**  27:9
234:14
**outflows**
316:13
**outlook**  184:19
**output**  200:20
200:25 201:3
221:14,14
222:16
**outside**  185:5
**outstanding**
262:11

**overfit**  211:25
212:1
**overfitting**
213:5,6
**overlap**  7:9
128:4
**overstated**
56:13
**own**  24:16
171:25 174:4
176:18 195:8
199:2 206:25
210:19 230:8
287:10 312:6
**owned**  145:11
319:5,8
**owns**  318:21

**p**

**p**  1:15 3:3,10
3:12 4:1 5:2
322:5 323:2,24
324:2,4,12
**p.m.**  320:3
**page**  3:7 11:2
30:8,13,14,15
30:16 36:14
38:22 55:15
56:5,20 57:7,8
57:9,10,10
61:20,20 62:2
62:5,8 66:25
67:2 74:8,14
74:14,18 75:5

**App. 618**

75:5,5 78:13
90:19,21 91:3
91:5,18 95:19
97:23 100:21
102:14,17,19
103:8 105:2
119:15 126:20
127:8,9,14
142:12 153:14
157:15,19,24
157:24 158:3
168:6,9 174:11
176:21 177:14
177:15 180:3
187:5,14
189:15,16
196:6 200:1,25
206:2 217:13
217:14,14,16
218:9,11 220:8
220:9 225:12
225:14,15,15
225:19 228:6
231:1,10
236:22 239:16
239:20,20,22
240:1,13 242:7
255:5 257:25
260:22 263:21
275:12 276:16
277:25 289:5
290:20 294:6
294:23 295:22
298:16,18

304:12 306:20
310:13 323:4,7
323:10,13,16
323:19
**pages** 1:1 30:7
34:17 52:14,17
52:20 142:10
168:7 194:21
200:2
**paid** 27:10
40:11 41:22
262:23 263:1
307:11 313:9
313:18 315:16
**paper** 35:25
42:13
**papers** 168:16
255:3
**paragraph**
38:24 54:3,9
54:11,16 55:1
55:19,24 59:1
63:15 64:23
78:11 91:5,16
95:24 96:1,4,9
96:24 97:2
108:12,16
111:6,7 115:8
115:19 116:1
125:3 128:6,18
129:5 142:14
144:2 151:23
152:1,2,10
154:9 158:4,9

170:18 173:10
186:24 204:23
204:25 205:4
205:17,21
213:3 217:11
218:8,9,11,14
219:2,6 220:7
225:13,16
228:7 235:15
239:13 240:13
255:8 256:12
259:18 275:11
282:9 286:20
288:18 290:18
297:1,3 298:7
299:4,6,9,12,18
310:8,10,11,15
316:8 317:8,14
**paragraphs**
54:22 110:25
125:7 126:25
127:12 177:15
187:2,3,6
281:22 286:16
**pardon** 306:25
**parentheses**
218:20
**parlance** 293:2
295:20 296:16
296:17
**parsimonious**
41:1
**part** 23:18
30:18 48:25

60:24 68:22
70:1,6 85:6,23
97:11 99:19
104:14 114:19
114:20 128:15
137:12 139:4,4
144:13 147:16
147:18,21
184:20 245:19
**participants**
128:11
**participate**
164:7
**participating**
165:13
**particular**
19:13,22 58:23
62:5 69:11
93:14 95:19
100:20 107:18
124:4 200:5
236:23 253:25
256:18 271:1
271:12 274:15
**parties** 13:12
37:2,7 46:5
321:14
**parts** 54:9
243:24
**party** 7:25 8:18
14:4
**past** 10:24
14:19,24 15:6
26:7 94:9,12

**[past - philosophers]**                                                    Page 58

146:15 185:15
293:15 294:8
294:18 295:8
**patrice** 2:16
4:24
**paul** 2:9 4:21
**paulweiss.com**
2:12,12
**pause** 9:18 32:4
71:4,7 90:14
90:16 275:16
288:17
**pay** 173:21
261:12 270:8
270:11 292:20
292:25 310:24
311:2,7,11,13
312:8,10,13,23
313:2,5,12,15
313:21 314:1,8
314:13,21
315:3,10 316:9
317:11,25
318:6,10,19
**paying** 137:17
315:19
**payment**
318:13
**payments**
261:16 310:20
**pedro** 1:7 4:10
322:4 323:1
324:1

**peer** 208:21,21
208:25 210:16
211:12,15
212:2
**peers** 210:20
**pending** 10:20
170:4 192:11
192:12
**people** 6:16
26:24 27:1
46:5 82:8,9
83:4 93:4
94:13 95:21
137:4,5 139:17
147:12 150:16
153:19 156:3
168:2,5 170:1
170:14,17
171:21 172:5
173:8,8 182:21
194:4 214:24
319:5
**people's** 113:17
113:22 170:9
**percent** 12:7
25:8,14,18
55:4 60:25
63:4 87:22
225:22,24,25
226:25 234:4,5
236:20,23
237:9,12 245:4
289:8 291:1
302:23 303:10

305:19 308:24
**percentage**
12:5 24:18,22
25:24 318:14
**perform** 133:3
243:22 285:11
309:23
**performance**
148:9
**performed**
184:25 200:9
208:4 210:5
230:2 267:10
299:7,14 306:2
**performing**
12:8 231:24
254:6
**period** 26:10
45:24 46:11
47:11 50:11,16
51:1 68:18
69:5,9 70:17
86:15 137:25
206:13 222:23
233:5 236:18
245:6,16,23,24
246:2,6 247:2
248:4,10,11
249:18,21
250:1 260:8
268:24 275:19
279:13 291:1
291:11

**periods** 29:14
**permanent**
182:23 184:2
**permitted**
32:25 33:23
**persist** 185:15
**persistent**
184:2 186:10
**person** 69:14
260:14 321:7
**personal**
252:23,25
253:3,8,14,16
**personally** 7:25
33:2 99:16
161:4 169:10
169:24 170:1
171:3
**perspective**
137:20
**perspicuous**
102:24
**persuaded**
45:15
**petroleum**
33:17
**ph.d.** 1:16 3:3
3:10,12,16,21
5:2 193:11
251:7 322:5
323:2,24 324:2
324:4,12
**philosophers**
122:7

**App. 620**

**[phoenix - population]** Page 59

**phoenix** 11:21
**phonetic** 16:8
**phrase** 306:8
**phrased** 94:7
**pick** 35:24
  212:4,5,7
  224:15,23
  225:7,7 226:19
  226:22 232:3
  247:4
**picked** 213:21
  214:14 219:3
  227:16 228:17
  229:16
**picking** 219:17
  223:21 224:21
  226:4 239:12
**piece** 30:12,16
  35:25 42:13
  142:1
**pieces** 10:15,16
  30:12 142:16
  178:16 193:23
**pile** 10:17
  138:3,6
**piles** 138:3
**pin** 261:23
**place** 217:6
  226:16 288:15
  289:9 317:9
**placed** 307:15
  307:20
**places** 301:2
  302:16

**placing** 309:9
**plaintiff** 12:22
  13:13 49:14
  55:2
**plaintiff's** 19:4
  19:16 22:20
  48:7,11,20
**plaintiffs** 1:9
  2:6 4:15,17,19
  12:10,11,15
  20:15,17,19
  21:5,13,24
  23:22 24:3
  37:13 43:15
  44:1,3 49:20
  49:25 50:7,9
  53:11,15,20
  54:7,12,25
  56:8,12 58:4,7
  58:10,20,24
  61:21,24 62:25
  63:2,11 64:7
  64:10,24 65:10
  65:24 67:4,22
  67:24 68:5
  70:1,6 71:14
  71:16 72:8,10
  73:18 75:12,20
  75:23 76:14,25
  79:11 81:6,19
  83:9,13 84:2
  84:16 85:6,13
  85:18,23 86:7
  86:11,16 87:3

  87:7,15,18
  88:14 93:15,16
  93:18 97:8
  100:7 101:21
  102:13 104:6
  104:17 106:12
  107:10 112:2
  208:11 235:24
  250:14 264:18
  265:2,15,20,21
**plan** 43:18
**planning** 260:5
  285:9 288:6
  309:19 311:5
**platform**
  174:20
**play** 105:15
**playing** 23:12
**pleaded** 58:24
  59:5,6
**pleadings** 59:9
**please** 5:1
  35:25 36:5
  51:24 56:23
  57:23 61:19
  90:22,24 91:4
  151:24 170:6
  217:22 285:20
  297:2 310:8
**pled** 53:21
**plus** 40:14
  41:15,18,23
  42:2 298:25

**pluses** 274:7
  278:13
**point** 70:12
  83:14,18 88:17
  93:12 107:4
  130:19 135:25
  146:1 168:10
  174:16 178:3
  180:25 188:18
  190:1 212:17
  217:5 220:16
  225:5 226:7
  233:23 236:8
  261:5 262:14
  269:24 273:17
  274:18 284:10
  287:20 288:1
**pointed** 70:16
  71:19 127:14
  146:22 187:17
  313:14 317:8
**pointing** 93:4
  313:13
**points** 179:19
  268:20,21
  271:2 289:10
**police** 33:13
**political** 142:6
**poor's** 255:18
**poorly** 230:17
**pop** 20:8
**population**
  303:2

**App. 621**

**[portfolio - price]**

**portfolio** 55:5 133:6
**portion** 55:20 55:21 67:12 96:17 206:9
**portions** 32:5
**portray** 104:9
**position** 123:1 147:8 179:5,25 184:5,6 212:13 259:12 289:16 289:17 318:2
**positive** 66:7 109:4 121:19 141:24 143:4 187:19,23 188:11,20 238:12 244:19 287:6,22 291:7
**possession** 29:21
**possibility** 185:13
**possible** 157:5 163:23 184:18 213:24 219:18 219:20 221:25 280:12
**possibly** 222:8
**post** 213:14
**potential** 207:11 235:3
**potentially** 179:19

**practice** 273:5 275:3 278:12 278:15 279:1 280:25
**practitioner** 254:20
**pre** 88:11 197:6
**precise** 161:17 165:11 206:3 206:18
**precisely** 275:21 303:24
**precision** 166:10
**predict** 227:13
**predicting** 227:8
**prefer** 205:12 205:13
**premier** 254:19 254:20
**premise** 114:15
**premised** 69:5
**prep** 28:18
**preparation** 27:23,24,25 28:9 29:22
**prepare** 34:2 43:21
**prepared** 193:7 193:15
**preparing** 31:19,24 39:13

**preposterous** 186:4,11,19 205:9
**prescriptions** 212:10
**present** 2:15 43:17 103:16 289:14 297:11 297:18,23
**presentation** 98:19 99:25 200:15
**presented** 8:24 39:19 60:19 63:17 67:16 102:1,2 103:10 191:16 203:1 274:12 285:1
**presenting** 173:18 250:19
**press** 115:20 232:17,22
**presstek** 13:8,8 14:9,13,19
**pretty** 47:8 71:5 72:23 99:3 119:9 125:19,21 138:1 145:25 215:7 228:20 242:11 261:21
**prevent** 5:11
**previous** 9:20 112:24 114:4

116:11 122:3 153:22 154:7 240:1 284:25
**previously** 45:17 67:15 92:3 95:7 128:21,24 150:3,20 310:19 319:8
**price** 18:10,16 46:24,25 63:23 64:6 65:4 73:3 96:14 97:6 99:4,5,11 101:22 103:3 105:9,11 118:6 118:13,23 120:4,5,11,16 120:25 121:6 121:13,23 122:13,17,21 122:23 123:5,6 123:21,22,23 124:15,23 126:9 129:1 130:17 133:9 136:15 142:21 143:6,18,20 144:13 145:3 145:14 146:3,7 149:4,5,17,19 150:2,21 152:24 206:6 206:12,21

**[price - production]** Page 61

207:5,23 222:2
222:23 227:8
227:18,21
229:14 231:6
233:8 235:21
237:13,13
238:19 241:17
241:19 247:21
247:25 248:7
248:14 261:10
261:14
**prices** 62:21
63:18 73:6,7
89:6 106:23
107:14 110:2
111:18,21,24
112:5 115:24
116:3,17,21
117:2 123:3
126:7 144:4,9
144:9,12,20,21
144:23 182:12
249:13,14
**primary** 5:16
53:8 192:6
193:2,6,13
194:5 196:11
196:16 279:17
**principle** 19:23
39:23 124:21
313:10
**principled**
123:25

**principles** 6:21
7:4,14 94:19
126:3 128:10
134:18 135:8
136:6 149:2
238:19,25
244:1 296:10
315:13,22
**printed** 28:12
**prior** 79:1
92:10 105:7
122:8,10
196:22 199:8
201:19,20
202:2 203:2
291:11 296:8
300:20
**priori** 212:4
213:9,10 219:4
228:17 229:17
**privilege**
306:12,14
**pro** 237:2
238:2 318:20
**probabilities**
286:21
**probability**
249:16,25
250:2,3 287:19
291:8 302:18
302:21 303:4,6
308:25 310:2
**probably** 11:13
11:18 15:18

20:2,8 22:12
26:9,13 29:19
29:22 32:4
46:20 67:11
82:13 85:9
106:25 121:11
195:9 211:4
224:6 226:7
290:5
**probe** 92:13
**problem** 75:19
229:4 233:13
234:10 269:11
307:2
**procedure** 1:19
**procedures**
275:15
**proceeded** 8:11
**proceedings**
23:19
**proceeds** 311:2
**process** 28:1
33:1,7 34:5
59:8 163:9
166:5 168:1,2
168:3 171:17
194:17,18
195:1
**produce** 66:6
159:8 166:6
172:5 199:2
200:16 288:2
290:9 291:14

**produced** 19:7
34:13,22 36:21
37:2,6 38:8,12
42:13 62:1
109:12 119:6
172:6 205:9
213:1,14 216:7
219:4 224:13
235:25 312:2,4
**producers**
116:5
**produces**
151:21
**producing**
99:10 194:12
**product** 29:4
**production**
37:22 62:20
63:6,18,19,22
63:25 64:4,6,7
64:18 65:23
105:3 116:9
142:8 144:3
145:11 146:14
146:19,25
147:2,4,6,20
148:11,16
149:12 150:5
151:1,3 154:22
179:9 181:8,23
182:2,9,19
183:3,4,22
184:19 185:1,2
185:5,24,25

255:20
**professional**
1:20 5:16
160:24 321:5
**professor** 25:2
25:3 162:6
**professors**
275:9
**proffered**
260:5
**profit** 63:7 64:3
66:8 143:10,12
**profitability**
45:6 50:2
55:21 62:3
68:13,20 69:17
69:24 77:9,21
85:20 98:5
99:10 102:10
107:22 109:7
110:7,14,16,18
110:18,21
**profitable**
62:25 63:3,10
66:10,22 67:17
73:8 77:6
98:13 101:24
105:17 106:11
106:16 108:4,5
108:17,25
109:18,25
110:4 178:14
**project** 305:20

**prong** 47:7
136:3
**pronounced**
268:4
**pronouncing**
156:1
**proper** 186:12
**properly**
240:23
**properties**
51:21 236:13
237:15
**property**
104:25 105:18
178:12
**propose** 43:9
52:1 103:16
**proposing** 43:4
47:21 185:22
**proposition**
19:13 150:7
154:11 268:8
272:22 273:22
278:18 283:3
284:4,11 315:8
**prorated**
318:20 319:6
**prove** 18:11
20:17,19 21:24
22:3,19 49:14
83:14 85:14
100:8 104:6
107:11 119:19
124:19 191:4

236:8,8 268:15
**proved** 7:16,17
7:22 20:23
53:15,22 55:5
55:6,16 56:2
58:25 60:10
66:24 73:25
74:11,16 75:1
76:10 78:14
79:5,8,16
80:17 81:3,22
82:3 83:5,19
85:19 98:6
101:10 102:12
124:17 126:19
127:23 129:11
130:21 136:10
152:16 154:12
248:20 253:1,9
253:24 254:5
255:24,25
256:7 259:23
**proves** 208:1
268:16
**provide** 8:21
14:5,22 15:1
24:3 33:20,24
157:9 161:23
172:20 186:16
186:18,19,20
195:11,19
254:6
**provided** 11:2
11:4,5,12

12:14,20 29:6
38:1 58:19,19
68:6,7 107:7
126:19 156:14
156:18,24
159:18 160:10
173:14 188:8
199:12 206:17
264:4 265:24
274:6 291:21
304:11
**providers** 41:4
216:7 279:25
282:12
**provides**
172:18 177:3
179:17
**providing**
164:11 171:4
204:1
**proving** 21:13
**provisions** 1:18
**proxies** 219:8
**prudent** 191:24
203:24
**public** 1:21
7:13,21 16:9
32:11 37:7
51:14 73:22
76:3 77:23
83:2,18 84:6
87:23 88:3
90:7,9 92:24
94:20 103:23

103:24 104:20
105:4,19
124:10 235:22
321:5,20
324:19
**publicly** 33:6
33:10,14,18
34:14 93:19
124:5
**publish** 172:1
195:4
**published**
126:5 168:15
173:6 203:2
253:4 275:8
**publishing**
195:24
**pull** 196:14
**pulled** 193:22
**pulls** 196:12
**puma** 11:18
**purchase**
112:22 133:9
**purchased**
133:8,10
246:17,19
247:8,10
**purely** 309:4
**purport** 207:4
**purported** 48:4
79:11,20
**purportedly**
78:24 79:18
206:8

**purports**
202:14
**purpose** 38:2
89:15 129:6
285:24 315:19
**purposes** 66:4
82:11,21
100:11 211:7,8
216:2 284:6,13
**pursuant** 1:17
**put** 19:8 35:19
35:25 42:1,12
80:22 90:15
119:20 125:5
134:20 153:8
178:8 198:5
208:10 230:6
230:23 245:9
266:17 287:19
288:5 300:19
301:24 302:6,8
309:18
**puts** 162:23
**putting** 90:8
205:14 234:8
266:9

**q**

**q3** 142:17
183:10 184:4
184:11 185:6
186:1
**q4** 186:2

**qualified** 53:22
55:6 200:19
**qualifies** 14:9
126:7
**qualitative**
237:18 238:3
**quantified**
138:21
**quantify** 15:20
133:19,23
**quantitative**
133:14,25
136:20 137:1,3
237:16 238:3
**quantity**
256:19
**quarter** 92:12
92:14,19,21
144:6 146:16
148:12,13,14
155:7,9 170:22
179:10 181:3
183:5,7,12,14
183:21 238:10
238:15
**question** 7:4
8:16 9:20,20
10:20 12:4,12
14:10 15:22
17:16,21 25:16
25:17 29:9
34:6,9 35:2
37:15,16 39:5
39:7,8,12,16

40:15,20,25
41:14,16,20
42:7,10 50:25
52:22 53:2
57:18,24 58:15
74:3,15 75:15
76:8,20 81:21
83:15,16,24
84:9 85:4
90:18,22,25
91:13 94:1
95:1,3,13,23
96:7 99:22
107:18 109:15
109:20 110:15
113:9 118:20
123:11,15
134:4 162:25
163:2 168:18
169:1,13,15,20
169:22 170:6
180:17 182:20
183:2 184:1
187:17 192:11
192:13,17
197:4 200:4,5
200:13 203:8
204:18,19
217:21 218:3,4
218:6,8 228:19
228:19 229:8
231:15 241:12
244:7 245:19
247:18 248:16

**App. 625**

254:13 262:17 264:9,12 265:11 285:1 285:20 291:13 291:20 294:11 295:14 302:14 304:14 306:18 307:19 308:22

**questioning** 306:11

**questions** 6:2 10:22 22:24 34:7 47:24 84:24 85:11 137:7,11 139:6 153:5,18 170:4 186:20 200:13 215:18 230:9 232:20 252:16 316:1,17 318:12 319:14 319:22

**quickly** 261:25

**quite** 14:17 145:17 167:8 187:11 287:10

**quote** 91:6 95:19 152:2 173:11

**quotes** 84:21 84:22 213:3 275:12

**r**

**r** 4:1 212:3 219:9,9,12,17 220:1,2,15,15 220:24,25 221:19,19,23 221:24 222:4 222:11,17 223:3,4,11,21 223:25 224:4 225:21,24 226:8,11,23,25 227:17 228:1,8 228:22 229:10 234:3,5 323:3 323:3

**r&d** 314:25

**raids** 145:8

**raise** 186:3

**raised** 117:20 117:20

**ramirez** 1:7 4:10 322:4 323:1 324:1

**ran** 220:19,21 221:6 223:3 269:9 299:11 299:11

**random** 123:5 123:23 227:23 250:4

**range** 185:25 206:4,5,15,17

206:25 207:3,3 207:7,9

**rank** 133:17

**rare** 312:11 313:1

**rarely** 315:19

**rata** 237:2 238:2 318:20

**rate** 290:10,22 290:24 291:10 291:17 292:9 292:11

**rated** 252:3 275:18 276:19 279:8,12 282:15,22 283:23 284:17 285:18,21 286:1,3,3 287:21,21,24 287:25 289:2 289:24 290:16 290:23 292:2 292:25 293:8 293:16,25 294:8,9,12,16 295:6 308:2

**rates** 287:1 289:1,24

**rather** 101:11 103:4 172:1 222:12 224:20 224:20 228:18 229:17 245:4

285:3

**rating** 39:24 40:1,2,4,6,12 40:13,22,23 41:4,17 251:3 252:4,17 253:2 254:7 256:10 257:8 258:22 260:3 265:5 266:2,6 267:3 269:18 270:8,9 274:6 277:19 281:3 282:1,3 282:24 283:12 283:13,14 284:6,12,17,23 285:3,11,22 294:14 296:13 301:13 302:18 304:5,21 307:7 307:12

**ratings** 251:4 251:11,12 252:18 253:10 259:17 274:25 275:1,13 276:20 280:1 281:1 283:6,14 283:16,17 284:22 285:15 296:14

**ratio** 221:20

**raymond** 71:5 242:20

**App. 626**

**[rbc - receiving]**                                                        Page 65

**rbc** 242:21
**reached** 46:22
**reaches** 194:14
**reaching**
  166:14 307:1
**reacted** 88:19
  135:15 246:8
  246:10 257:16
  259:3,5
**reaction** 18:10
  18:11 45:11
  46:15 136:15
  142:22 152:25
  266:13,14
  267:7 268:14
  268:17,19
  269:6,7,21
**read** 31:24
  43:23,24,24
  53:7 57:20,21
  57:24 63:16
  79:2 90:17,25
  91:10 92:6
  115:11 128:3
  136:12,22
  137:6,23
  138:10 139:16
  163:1 168:21
  168:24 169:6,7
  171:17 173:7
  173:11 186:22
  186:23 199:17
  216:19,20
  218:22 221:2

225:5 243:2,3
253:4,4 322:9
324:5
**reader** 111:16
**reading** 37:18
  46:17 74:19
  91:3,11 110:23
  111:5 135:22
  137:16 138:23
  169:17 220:3,6
  239:14
**ready** 176:15
**reaffirmed**
  147:1 149:24
  151:4 155:3
**reaffirming**
  155:4
**real** 292:3
**realized** 144:4
  258:5 318:25
**realizing**
  274:16
**really** 32:13
  35:3 57:17
  58:15 65:7
  102:7 110:8,15
  119:25 121:2
  125:17 174:22
  179:24 188:5
  190:21 209:15
  212:12 216:22
  219:22 223:1
  246:16 258:24
  260:13 294:24

304:9,14
313:25 315:17
315:24
**realtime** 57:22
**reason** 15:8
  48:14 49:3
  95:20 116:13
  116:15 119:2
  121:8 122:11
  124:1 155:10
  163:14,23
  165:4,7 177:22
  182:7 185:5
  189:9,10,14
  228:25 234:12
  269:14 277:21
  283:10 297:21
  301:4 304:7
  322:11 323:6,9
  323:12,15,18
  323:21
**reasonable**
  163:5 194:1
  195:10 302:3
  305:1
**reasonably**
  142:19 238:18
  304:22
**reasons** 116:3
  119:21 122:12
  133:10 164:4
  165:1 180:14
  184:3,10
  189:13 277:20

286:12,14
**rebound** 73:5
  106:23
**rebuttal** 286:16
**recall** 8:11 13:7
  14:12 16:18
  22:21 23:14
  29:10,12,15
  32:11 47:6,13
  48:16,17,23
  49:2,3 53:12
  53:16 65:6
  107:2 111:4
  158:11 160:12
  160:13 175:11
  175:13 178:7
  178:10 208:22
  211:3 215:2
  216:6 226:6,8
  230:15 243:12
  243:18 249:1
  250:23 265:6
  265:14 276:4
**receipt** 322:17
**receive** 27:2,5
  99:11 272:12
  319:5
**received** 84:23
  100:1 175:6
  190:23
**receives** 26:22
  167:19 171:7
**receiving** 82:1

**App. 627**

Page 66

**recent** 27:21
  79:1
**recently** 28:14
  275:7 289:22
**recognition**
  59:13
**recognize** 59:7
  68:25 87:2,15
**recognized**
  87:4,16 93:12
  251:25 252:1
**recognizes**
  92:25
**recollection**
  24:9 32:14
  214:9 276:12
  291:22
**recollections**
  28:22
**record** 4:3,13
  10:8 52:3,5,7
  52:10,12 84:11
  90:16 97:17,20
  140:4 141:3
  169:7,18
  186:24 192:21
  192:24 204:16
  234:22,25
  263:25 273:9
  273:12,14
  288:5 309:18
  319:17,20
  320:1 321:11

**records** 23:8,14
  28:2,23
**recovered**
  107:15
**recurring**
  146:23 148:20
  149:7,7,15
  154:22 155:16
  155:17,18
  179:21,21
  181:14,14
  182:23 184:1
  184:12 186:15
  186:15 205:24
  206:20,22
  207:12 244:8,8
  244:10,13,13
**red** 293:1,2
**reduce** 213:24
  262:22 303:22
  310:19
**reduced** 59:2
  87:13,14,19
  145:12 321:10
**reducing** 213:6
**reduction**
  148:24 150:24
  184:14 237:5
**reductions**
  180:15
**refer** 35:3 38:3
  63:13 141:15
  156:3 293:3

**reference** 32:16
  56:5 59:1 96:4
  96:10 97:2
  292:23 298:10
  298:17
**referenced**
  31:14 34:16
  51:8 68:24
  70:5 80:5
  107:21 132:22
  322:6
**referencing**
  62:6
**referred** 56:21
  242:5 263:7
**referring** 56:10
  70:23 125:22
  127:17 210:12
  313:4
**refers** 92:14
  217:11 296:11
**reflect** 204:17
**reflected** 56:14
  57:14 161:2,11
  161:12 177:25
  181:23 184:22
  204:7
**reflective**
  161:16,17
**reflects** 159:6
  204:5,8 255:14
**refresh** 32:14
  175:10 216:22
  276:11

**regarding**
  44:24
**region** 63:19
**registered** 1:20
  321:4
**regression**
  118:20 119:17
  210:5,22
  211:18 213:1
  220:18,19
  221:14 222:12
  225:23 226:20
  227:7,9 231:3
  231:18,23
  232:9 234:14
  235:17 268:3
  269:10,22
  271:7
**regressions**
  221:6,7,9
**regularly**
  165:18
**regulation**
  211:6,11
**regulations**
  98:18
**reimbursement**
  27:5,5
**reject** 176:1
  187:25 191:25
**rejected** 22:6
  175:23 186:12
**rejecting**
  189:10

**App. 628**

**[relate - report]**                                                    Page 67

relate 152:20
related 8:25
  21:16 38:5
  61:23 97:12
  103:17 141:10
  182:18 218:19
  221:18 230:19
  232:14 236:21
  237:11 238:5
  321:13
relates 98:4
  241:16
relating 89:18
  96:18
relations
  316:20
release 147:23
  232:17,22
released 88:24
  142:16 148:9
  240:10
releasing
  121:21
relevance 8:7
  111:12 117:6
  122:15 170:19
relevant 34:8
  66:3 67:7
  108:24 119:25
  121:22 122:1,2
  142:19 154:18
  179:17 255:16
  260:7 283:2

reliability
  166:10 170:16
reliable 6:22
  22:19 161:17
  168:4 170:24
  171:22 172:23
  189:6 204:15
reliably 227:18
relied 17:11
  21:11 22:5
  31:10,13 104:5
  107:12 158:14
  162:11,12
  198:24 200:14
relies 205:8
  227:6
reluctance
  304:3
rely 7:6 109:11
  119:4 124:19
  162:3 166:13
  168:12 171:21
  203:24 301:16
relying 20:13
  20:14,16
  113:17,21
  165:13 171:5
  239:17 282:7
  288:6 315:8
remained
  144:21
remember
  11:19 14:13
  19:10 20:2,7

  21:1 23:1,2,2,3
  23:15 71:18
  75:3 79:22
  89:24 98:7,16
  118:9 195:1
  275:21 282:2,5
  290:4,12
  308:25
remind 22:12
  25:16
remove 215:1
removed
  218:24
rent 25:3
renting 8:8
repeat 171:11
rephrase 12:12
  50:15,24 95:13
  182:1 245:20
  247:18 248:16
  284:9
replete 293:24
replicable
  134:16
replicate
  269:13
replicated
  134:7
reply 3:11
  27:25 28:8,14
  28:17,19 32:21
  35:5,14,20
  36:11 38:22
  118:2 157:15

  157:21 158:10
  177:17 180:2
  186:16 187:5
  239:11 255:6
  275:11 281:23
report 3:9,11
  3:15,17,21
  8:23 9:6,8,12
  10:12,13,23
  11:12 18:9
  19:6,21 21:10
  21:15 23:17
  27:25 28:8,14
  28:17 29:23,24
  30:2,22 31:1,5
  31:17,19,21,25
  32:16,20,21
  33:5,12,16
  34:12,24 35:5
  35:15,20,21
  36:11,18 38:17
  38:18,22 39:9
  42:1,21,21
  43:6 45:3
  46:18,18 47:18
  48:2,9 49:7,11
  50:23 51:24
  53:1,6 54:3,4
  55:19,24 59:2
  63:13 70:25
  72:13 78:11
  79:18 84:20
  85:2 86:5
  89:23 91:7,10

**[report - reputable]**

91:16 95:20,25
96:25 99:20
104:5 108:13
111:1,8,16
115:10 118:2
119:10,21
120:8 125:4,7
127:5,13
129:12 135:4
137:24 138:25
141:9,21
142:12 147:12
151:23 157:15
157:16,21
158:10 167:2
168:21,24
169:6,17
172:19 173:7,7
174:2,8,12
175:6,17
176:11,18,22
177:7,14,14,16
177:17,18,21
177:24 178:9
180:2,23
186:16,21
187:2,3,6,12,14
189:15 190:23
191:16,19
195:24 196:2,6
198:12 199:21
199:24 200:1
202:7 204:24
205:2,19,21

206:17 208:10
211:25 212:22
213:18 215:2,4
215:13,20
216:9,9,15,19
216:20,23,24
217:6,9,23
218:2,5 220:5
220:7 225:11
230:10 231:2
231:10,16
233:1,3 235:16
238:14,17
239:3,11
240:15 243:3
244:22 253:6,7
255:6 260:17
260:25 261:21
263:13 266:18
270:13,16
272:20 274:13
274:19 275:4,5
275:11 276:5
276:10,16,19
279:2 281:23
281:25 282:10
286:17 288:8
288:11,19
294:24 297:1
298:7 299:5,12
310:8 316:23
**reported** 55:25
56:16,17 63:22
63:24,25 64:2

79:7 81:3 82:4
90:12 91:1
93:2 105:3
109:4,5 110:23
114:8 116:4,9
150:11,15
158:17 167:2
179:10 183:21
189:4,5,8
238:10 241:24
270:13 302:10
**reporter** 1:20
4:5 5:1 57:20
90:23 321:5
**reporting**
79:12 80:17
116:13
**reports** 20:12
23:25 27:21
28:25 31:22
32:17,24 33:9
33:21,24 36:8
38:14 43:11,12
43:19,24,25
46:19 77:24
79:4 134:23
135:10 138:2
138:23 139:17
154:15,16
163:22 180:9
180:13 191:9
195:3,8,13,20
196:9 197:8
198:18 199:5

199:11,15,16
200:7,11
201:24 202:4,9
202:13,15
239:4,6,8,12,18
239:24 240:4,5
240:6,14 241:3
242:23 287:18
**represent** 7:7
18:25 96:12
97:4 268:21
297:10 298:4
**representation**
222:14
**representations**
112:1
**representative**
213:13 258:14
260:6
**represented**
12:10,11 14:1
14:2,3 55:4
60:5 61:8 62:2
67:11 93:7
101:13,16
196:10 278:6
**representing**
79:20
**represents**
209:1 261:1
**repurchases**
316:5
**reputable**
162:4

**App. 630**

**request**  161:19
**requested**
  43:15
**require**  39:16
**required**  40:3
  68:6 102:2
  152:15 324:13
**research**  22:13
  24:15 34:4,5
  37:9 104:4
  126:6 168:8,14
  168:14 170:9
  170:13 173:6
  194:19 195:8
  253:5 255:2
  279:3 313:23
**researchers**
  168:11 169:9
  169:23
**reserve**  55:7,20
  255:21 256:23
  257:2 279:19
  279:20,22
**reserves**  7:16
  7:18,23 45:6
  50:2,6 51:17
  53:16,23 55:5
  55:16 56:2,11
  58:25 60:10
  66:25 67:12
  73:25 74:12,16
  75:1 76:11
  78:14 79:5,8
  79:16 80:18

81:3,22 82:3
83:5,19 85:19
92:7 98:6
102:12 125:4,9
126:19 127:23
129:12 130:21
152:16 154:12
248:20 250:10
253:1,10,24
254:1,5 255:22
255:23,24,25
256:1,2,3,5,7
256:14,17
259:23
**residual**  119:16
  119:20 206:6
  237:13 299:24
**respect**  7:16
  34:11 51:17
  58:22 61:12
  70:10 72:11,14
  86:13 98:14
  104:1 105:2
  113:24 146:23
  264:7,9
**responsible**
  153:10
**responsive**
  302:14
**rest**  25:1,6 35:4
  148:18 155:22
  165:21 181:17
  182:25 185:10
  186:8

**restated**  82:23
  82:25
**restaurant**
  124:3,5,7,11
**result**  22:2
  39:18 40:8
  48:4 114:8
  122:19 123:4
  182:17 207:22
  214:8 222:12
  224:8 228:10
  228:24 232:2
  232:10 233:18
  241:24 248:1
  266:16 268:2
  269:17 299:21
**results**  119:23
  167:6,7 168:3
  205:10 210:1,2
  212:6,7,25
  213:14,20,21
  221:7,8,11,13
  230:16 240:10
  240:16 250:11
  250:17 267:16
**retail**  124:3
**retained**  12:24
  14:5,7,20,25
  15:11 208:11
  313:8
**retirement**  16:9
  33:13
**retrieved**
  174:20

**return**  37:21
  218:20 219:15
  300:4,6,13,15
  322:13,16
**returns**  119:13
  119:16 227:22
  299:24
**revealed**  90:10
  104:21,22
  107:23
**revelation**
  21:17 128:24
**revenue**  312:2
**revenues**  25:25
**reverse**  117:15
**review**  28:23
  29:19,20,24
  34:1 37:5 53:5
  90:20 104:20
  156:10 174:8
  175:5 188:22
  204:25 217:19
  218:2,5 322:7
**reviewed**  16:20
  43:24 49:5,9
  52:24 258:11
  258:17 275:9
**reviewing**
  32:11 217:9
**revise**  147:6
**revised**  42:7,8
  105:24 155:12
  185:20 188:3

**[revision - rules]**

**revision** 38:20 41:20 42:5 150:21,22 188:9,15

**revisions** 185:8

**rgrdlaw.com** 2:6,7,7 322:2

**ribbon** 244:25 245:2 247:6

**ridiculous** 190:9 206:1 289:11

**rifkind** 2:9

**right** 8:15 9:2,3 13:17,23 14:23 15:5,10 17:18 19:24 20:6 21:7 24:2 26:17,19 28:16 32:10,19 33:8 33:22 38:15 43:17,20 49:23 51:16 53:23 54:23 56:16 57:8 60:18 66:24 70:17 72:11 73:14 74:7,10,12,20 77:7 78:1,8,19 83:17 89:25 92:16,20 113:5 119:19 120:18 129:18 132:25 135:13,19

137:4 139:12 145:12,16 151:3 157:14 159:1,8,12,17 160:15 163:4 165:23 174:23 175:23 176:23 177:8,16,22 178:15,22 179:3,7 180:23 182:3,12 183:13,18 184:8,17 186:21 188:18 190:11,15 193:11,12 195:17 196:11 201:12,13 202:2 207:14 212:15,21 214:5 215:24 220:8,10,16,25 221:2 223:22 226:23 227:25 230:14 235:9 237:9,19 241:8 247:3 248:2 249:4 259:19 261:6 262:8,8 262:13 264:17 266:19 268:2 271:22 272:13 272:13 273:18 279:24 281:12

283:7,12 284:2 286:11 288:13 293:22 294:4 297:5 298:10 300:21 308:1,4 310:9,11 316:25 317:1

**rigorous** 161:8 168:1,1

**rise** 122:13,17

**risk** 252:21 253:19,21,23 254:2 263:1 264:19 265:3 265:16,18 281:2 287:6,8 287:16,22,25 292:7,7,9,11,12 292:16,16,18 292:19 293:4 295:21 296:3 296:10,16,18 296:23,25

**risky** 291:24 292:3,12,15 293:3 295:5,18 295:24 296:4 296:18

**river** 235:8,11 236:5,6,7,10,18 236:19

**rmdg** 86:13 236:15 237:11

**rmdg's** 236:16

**robbins** 2:3 14:25 15:11 23:5 26:1

**rockies** 91:24

**rocky** 86:9,20 87:9 88:6,22 89:12,18 93:20 94:15,21 96:18 97:8 115:16 131:8 133:4,17 134:9 135:1 237:21

**role** 23:12 25:2

**rose** 150:17

**rough** 25:11 28:20

**roughly** 25:13 26:2 28:19

**rounded** 60:20 283:10 286:21

**rounding** 60:19 284:5,11

**rounds** 283:11

**royal** 111:3

**royalties** 25:3

**rudman** 2:3

**rule** 185:1,2

**ruled** 45:9 47:10

**rules** 1:18 7:22 33:7 79:13 103:11 145:1

**App. 632**

**[ruling - satisfied]**                                                Page 71

**ruling**  44:22
  45:13,19,19,21
  45:22 230:22
**run**  210:21
  220:17 231:3
  232:8 233:19
  295:25 303:17
**running**  212:5
**runs**  233:4

**s**

**s**  3:6 4:1 156:2
  156:4,6,11,15
  156:18,21,24
  157:2,8,10
  158:13,17,20
  159:5,6,7
  160:2,4,7,8,20
  160:25 161:8
  161:15,19
  162:1,3,7,16,22
  163:9,15,20,24
  164:12,23
  165:10,13,16
  166:1,25
  167:10,11,13
  167:16,17
  168:8,12,13,16
  169:10,25
  170:17,21,24
  171:6,6,20,22
  172:1,7,18,20
  173:3,8,23
  174:17,19

  175:1,4,24
  176:1,2,3
  177:25 178:19
  179:16 180:4
  189:11 190:8
  191:1,22,25
  194:2,5,10,14
  194:21 195:21
  196:12 198:24
  199:1,3 200:14
  200:18 203:12
  203:15,16,21
  204:14 205:13
  206:24 211:6,7
  211:11 242:5,6
  242:11 243:15
  244:9 323:3
**s&p**  218:18,21
  252:7,13,24,25
  253:9 254:4
  256:7,13,17
  257:18 258:12
  258:14 259:15
  260:6,9 263:11
  263:12,18
  264:15 266:8
  266:22 270:23
  275:18 276:20
  280:10,21,22
  281:5,12,18,20
  281:21 300:24
  301:2 302:16
  304:15 306:4
  307:15,20

  309:25 310:1
**s&p's**  256:10
  257:7
**s's**  161:8
  171:17,19
  190:10
**saham**  2:3 4:14
  4:14 8:7 9:15
  29:4 32:1
  34:15 35:6,10
  36:4 47:3
  50:18,21 53:3
  53:24 54:15
  59:4 68:8 70:8
  72:2 73:12
  76:6 80:2,11
  82:5 83:7,23
  84:8 88:8 90:4
  91:12 93:24
  94:25 96:6
  98:8 100:12
  101:8 102:5
  105:6 106:8,18
  107:9,25 123:9
  129:19 132:15
  132:17 133:21
  134:14 136:24
  139:23 140:1
  164:20 167:23
  168:25 169:4
  169:12,19
  170:3 171:9,15
  172:9 174:2
  180:12 181:25

  199:7 200:23
  204:11,19,22
  215:11,16
  216:3,12 217:8
  217:19,25
  218:16 221:17
  228:14 231:8
  233:17 237:8
  240:11 241:9
  241:21 243:20
  246:21,25
  248:23 254:11
  254:18 260:10
  264:22 272:2
  272:25 276:13
  280:13 288:14
  292:5 294:21
  295:11 296:7
  306:10 310:5
  310:10 314:22
  315:12 319:15
  319:24 322:1
**sale**  143:13
**sales**  144:4
  314:9
**sample**  161:17
**sampling**  168:6
**san**  2:5
**sands**  20:10
**sat**  114:16
  139:8 160:7
**satisfied**  37:19
  111:25 138:22
  163:1

**satisfy** 214:3
**saunders** 3:21
  39:3 42:4
  261:21 266:18
  266:20 267:9
  267:19 269:3
  274:14 276:4
  276:10,19
  286:17 287:10
  288:7,19,25
  290:20 294:23
  295:21 302:25
**saw** 81:14
  142:3 199:15
  266:12,14
  316:7 317:16
  317:17,19
**saying** 72:21
  73:17,18 75:20
  83:25 84:2
  92:23 107:10
  107:13,14
  108:6 115:1
  123:4,17
  150:18,19
  184:13 207:25
  210:25 220:13
  220:21,22
  241:6 242:10
  255:18 280:6
  280:21 298:21
  300:14 312:25
**says** 31:16
  36:20 55:2

62:12,16,18,20
63:16 92:1,19
95:20 103:9,18
114:21,23
116:1 126:15
127:9,9,15
131:24 132:11
139:15 167:25
168:11 170:18
176:25 190:20
196:22 197:7
198:7 201:23
203:4,5,16,21
210:11 211:11
211:16 212:9
213:5,17
219:24 234:3
240:19 242:8
242:13 270:16
274:20 282:11
290:21 294:3
295:1
**sburkholz** 2:7
**scale** 133:15,18
  259:16 289:8
  289:10
**scenario**
  304:15 307:6
**school** 59:10,11
**scope** 19:5,14
  29:3 259:17
**scott** 2:3 4:14
  84:12 322:1

**screen** 162:23
  203:16
**screened** 157:8
  161:7 163:22
  164:13,13
  240:23
**screening**
  163:9,10 168:1
  195:1
**screens** 157:3
**scroll** 62:17
**search** 38:4
  213:8
**sec** 99:15
  103:10 173:17
  211:6
**sec's** 92:13
**second** 38:17
  42:21 50:23
  56:24 77:8
  91:5 117:15
  147:22 162:13
  165:3,20 199:1
  215:5 216:10
  227:15 229:1
  248:3 288:16
  298:15
**secondary**
  192:7 193:3,14
  193:20 196:16
**section** 13:21
  13:25 59:19
  118:3 126:21
  127:14 134:2

281:25
**sector** 115:22
  115:23 209:2
  209:19 210:10
  210:15 211:8
  219:21 221:9
  222:6,25
  224:19,20,21
  229:12
**securities** 11:18
  12:1,6,9,13,20
  12:23 13:14,18
  14:6,21 17:4
  18:21 25:9,19
  25:21,22 46:7
  211:19,23
  272:21 274:21
  275:18,22
**security** 8:9
  128:25 251:18
  252:13
**see** 11:23 35:4
  36:13,15,20
  55:7 56:2,23
  57:7 60:11
  64:21,22 68:9
  71:3 73:5
  74:21 82:6
  88:18 94:6
  96:10 104:22
  107:1,13,14
  108:6,7,9
  114:18 115:21
  120:2 123:20

125:10 127:16 127:17,19 134:17 137:7 139:17 142:20 143:17,22 144:8 152:1,12 158:11 165:11 176:25 179:8 180:5 187:20 187:23 190:16 190:18 196:3 196:19,23,24 196:24 197:1 198:6,9,11,14 198:15 199:12 202:1 216:9 219:10 225:25 226:6 227:10 228:15 231:15 231:20 239:18 239:24 240:1 243:15 244:3 255:9 269:20 272:17 277:2,6 277:25,25 286:22 289:2 292:24 297:8,9 298:10,12,13 298:17 299:8 301:6 306:13 310:20

**seeing** 109:23 135:15

**seek** 189:25 191:8 199:1 200:16

**seem** 224:18

**seems** 174:16

**seen** 59:17,17 188:12 261:19 308:8

**sees** 315:23

**segment** 144:5

**select** 34:1 37:5 216:5 222:17

**selected** 212:23 214:7 215:25 216:17 218:25

**selecting** 164:8

**selection** 209:16 212:14 239:17,23

**self** 164:8,9 214:7

**sell** 247:17 314:18 315:9 316:13 318:5

**selling** 314:20

**send** 161:19 290:7 291:2,17 291:19

**sense** 8:3 27:13 69:20,22 233:21 259:16

**sent** 322:14

**sentence** 38:25 39:1 42:19

55:1,14 226:2 226:3 239:25 264:7 282:9 286:19 310:14

**separated** 296:5

**series** 110:25 267:15 270:17 316:1

**serious** 118:17

**serve** 38:2

**serves** 129:6

**serving** 29:7

**session** 141:1

**set** 119:9 171:25 175:12 190:23 202:15 207:18 288:10 319:23 321:16

**sets** 77:18 111:15

**seven** 26:13 153:16 236:1,4 236:13

**several** 24:24 26:7 69:18 142:15 268:24

**share** 101:3,4 143:1,15 156:7 180:7,11,15 184:14 185:3 205:25,25 206:23 207:13 207:24,25

208:7 235:22 237:6 240:20 240:21,21 242:8 246:20 247:8,9 316:4 319:1,3,10

**shared** 254:9

**shareholders** 318:18,22 319:4

**shares** 318:17

**sheet** 30:14 311:21,22 314:12,23 316:6,22 318:5 322:11

**shelf** 214:12,25

**shell** 111:3 115:12 210:17

**short** 179:4,11 181:4,7,9,13,15 181:17 182:24 246:6

**shorter** 179:22

**show** 47:14,14 72:24 119:11 119:14 175:16 180:24 186:22 191:14,21 199:23 215:13 215:19 216:16 217:22 233:13 287:10

**[showed - soloway]**                                    Page 74

showed  60:24
showing  66:7
shows  221:20
  230:10 276:19
  290:23
shrink  314:13
side  12:22
  197:13 223:22
  227:25 230:6
  230:24 245:10
sign  322:12
signals  114:10
signature
  321:19
signed  322:19
significance
  47:6,12 123:2
  221:16 223:12
  224:1,5 228:24
  230:13 300:8
significant  18:8
  18:10,12 45:11
  46:14,24 118:7
  118:12,23
  120:4,10,24
  121:6,14
  122:15 123:6
  123:20 145:14
  208:14 223:7
  228:10 229:23
  231:6 232:11
  233:8 234:15
  266:23 267:25
  268:6,13 269:6

269:21 270:2
270:19,22
271:9,13 300:1
300:4,13,16
significantly
  146:8 170:20
silly  124:2
  192:5
similar  29:9
  114:23 126:12
  207:14 208:4
  212:24 259:15
  271:10
similarities
  115:2
similarly  1:8
  165:24 170:16
  319:6
simply  165:6
simultaneity
  224:15
single  68:17
  69:19 275:20
  304:12 306:19
sir  10:2 17:19
  32:10 36:9
  72:5 74:2 75:7
sit  15:23 22:14
  28:21 43:12
  107:1 117:11
  119:2 161:4,14
  227:4 234:16
  293:18 295:16

sitting  22:21,25
  32:10 33:8
  38:16,18 43:17
  44:20 54:23
  65:22 66:11,15
  80:15 83:1,17
  107:4 110:19
  159:2 162:14
  175:19 184:24
  189:3 190:1
  198:20 212:19
  216:16 226:10
  232:7 233:22
  265:14 279:6
  292:1 295:2
  305:24 314:16
situated  1:9
situation  103:7
  103:17 121:25
  123:14,19
  266:1 307:5
six  26:12
  153:16 268:20
  269:23 277:6
  305:19
size  114:23
  237:3 255:21
  256:18,23
  257:2
sliding  133:15
slightly  283:22
  286:4
small  8:10,13
  62:7 149:4,16

271:2 277:11
smaller  286:4
smart  270:9
snooping  213:7
society  251:19
  252:14
sold  247:16
  313:3,21
  314:24
sole  112:6
solely  112:4
soloway  2:9 3:4
  4:20,21 5:8
  9:10,16,19
  10:8 32:7
  34:19 35:8
  36:5 50:20
  51:25 52:4,11
  57:22 84:10
  90:15,23 91:14
  97:21 139:20
  139:24 140:2
  141:4 169:2,16
  169:21 174:3
  192:25 204:16
  204:20 215:14
  215:21 216:25
  217:25 234:20
  235:1 246:23
  247:3 263:24
  273:6,13 276:6
  276:15 306:15
  310:12 319:12
  319:21

**[solutions - stale]** Page 75

solutions  4:6
 322:23
somewhat  79:2
 92:8 106:23
 107:15 283:21
sonner  95:12
sooner  93:6,8
 93:11 94:6,17
 95:9,22 107:3
 249:22
sorry  25:15
 50:20 51:4
 63:20 92:22
 113:4 144:15
 198:1 225:14
 272:10 284:9
 288:15 293:11
 293:14 311:17
sort  8:5 35:9
 138:2 153:14
 236:9 301:20
sorted  138:6
sought  119:18
 119:24
sound  15:5
 138:19
source  53:8
 162:4 193:3,3
 193:6,8,8,13,14
 193:20,21
 194:5 196:11
 198:8 201:23
 202:8 205:15
 242:2 255:12

277:23 279:17
 293:9 294:25
sources  115:11
 192:7,7 196:15
 279:2
south  62:12
 63:6 75:8,10
speak  260:13
speaking  4:4
 81:1 268:25
speaks  211:24
specialization
 251:23
specializes
 252:20
specific  19:19
 19:21 87:6
 142:16 216:22
 219:23 223:16
 235:18 254:12
 278:20 296:11
specifically
 94:8 107:2
 111:21 167:18
 211:22,22
 215:2 225:18
 225:20 254:14
 274:11
specification
 213:8 219:25
 220:14,23
 222:9 223:20
 224:24 225:8
 226:5 234:11

specifics  88:10
specified
 229:21 261:10
 261:14
speculate
 166:16 305:23
speculation
 167:24 260:11
 264:23 280:14
 294:22 295:12
speech  85:3
spencer  2:4
 4:18
spend  71:9
 89:21
spent  27:14
split  39:24 40:4
 40:12 41:3,17
 266:2,6 270:9
 282:15,22,24
 283:12,16,17
 283:17 284:17
 284:23 285:3
 285:15,18,21
 304:5,20 307:7
 307:12
spoke  98:1
 129:14 131:5
spot  193:17
spread  40:3,6
 62:22 64:14
 65:4,8,14,20
 66:2,7,14
 98:15 101:6

105:8,12,19
 109:3,5 236:4
 262:25,25
 263:7 270:18
 271:15,17
 272:14,15,17
 273:17 284:23
 286:5 287:11
 287:12 309:9
spreads  40:5
 274:5 286:2
squared  212:3
 219:9,9,12,17
 220:1,2,15,15
 220:24,25
 221:19,19,23
 221:24 222:4
 222:11,17
 223:3,4,11,21
 223:25 224:4
 225:21,24
 226:8,11,23,25
 227:17 228:1,8
 228:22 229:10
 234:3,5
ss  321:2
ssaham  2:6
 322:2
staff  33:2,4
 38:1,7 44:1
stage  24:1,4
 111:15
stale  157:5,10
 163:10,13,18

**[stamped - studied]**                                      Page 76

**stamped** 258:1
**stance** 92:3,11
**stand** 65:2
   233:14 268:5
   268:22 271:12
   295:16 300:16
**standard** 18:5
   18:6 122:24
   124:14 159:9
   160:4,20
   161:15 165:19
   166:7 167:4,14
   173:23 191:22
   203:25 255:18
**standards**
   161:9
**standing** 271:4
**stands** 25:23
**start** 5:14 9:11
   50:11,21,22
   62:13 69:4
   86:15 139:20
   158:12 174:11
   236:17 248:11
   252:24
**started** 85:1
   88:13 232:18
   249:18
**starting** 200:1
**starts** 111:7
   247:10 310:15
**state** 1:23
   49:19 239:16
   277:17

**stated** 93:20
**statement**
   31:15 51:20
   100:17
**statements**
   49:18 88:5,21
   89:12 120:14
   128:10 134:18
   135:9,9
**states** 1:3 62:11
   77:24
**statistical** 47:6
   123:2 124:17
   124:18,25,25
   221:15 223:12
   224:5 228:23
   230:13 300:8
**statistically**
   45:10 46:14,23
   118:7,12,23
   120:4,10,24
   121:6,14
   122:14 123:6
   123:20 145:14
   208:13 223:6
   228:9 229:23
   231:6 232:11
   233:8 234:14
   266:23 267:25
   268:5,13 270:1
   270:18,19,22
   271:9,13 300:1
   300:12,16

**statistics** 5:18
   191:4,6 219:9
**stemmed** 22:4
**step** 24:13
   77:22 128:7
   241:2 269:1
**steps** 134:17
   273:4 317:10
**steven** 1:15 3:3
   3:10,12 4:9 5:2
   168:9 322:5
   323:2,24 324:2
   324:4,12
**stock** 18:10
   46:24,25 96:14
   97:6 101:22
   103:3 118:6,12
   118:23 120:3
   120:11,24
   121:6,13,23
   122:13 123:3,5
   123:6,20,21,23
   124:15 127:16
   130:16 136:15
   143:6,18,20
   144:13 145:2
   145:14 146:3,7
   149:4,5,17,19
   150:2 152:24
   206:12,13,21
   207:5,10,23
   208:13 219:15
   222:2,23
   227:18,21

229:13 231:6
235:21 237:13
237:13 238:19
241:17,19
245:16,22
246:17 247:8
247:16,17,21
247:25 248:7
248:14 257:15
318:24
**stonewall**
   169:17
**stop** 218:3
**street** 1:23
   116:2,8 168:13
**strenuously**
   215:7
**stricken** 264:8
**strike** 38:24
   42:20
**striking** 39:1
**stronger** 80:12
**strongly** 118:15
**struck** 190:24
   282:9
**structure** 99:12
**student** 305:14
**students**
   305:13
**studied** 166:25
   168:2,5 170:18
   171:22 251:8,9
   314:21 315:22

**[studies - surprise]**

| | | | |
|---|---|---|---|
| **studies** 273:21 278:4 | **subscribed** 324:14 | **supplemental** 42:1 | 119:9 120:17 122:20 123:17 |
| **study** 129:6 130:8 170:23 171:17 191:17 191:18 226:20 229:24 230:2 231:19,24 266:20 267:10 267:19 269:3,5 269:9,12 299:6 299:13,24 300:3 | **subsequently** 164:24 | **supplied** 288:24 | 129:21 132:6 135:12 139:23 |
| | **subset** 101:4 | **support** 17:10 19:18 39:22 83:10 108:20 108:20 150:6 195:7 203:23 268:7 284:3,10 285:12,16 288:24 | 141:17 144:15 151:6,9 156:1 157:24 159:24 163:17 166:18 167:8 174:23 174:23 176:7 176:10 180:2 184:6 190:13 192:19 193:16 |
| | **substance** 117:22 192:17 | | |
| | **substantial** 42:24 | | |
| | **subtracting** 154:20 | | |
| | **successful** 16:5 16:14 | **supported** 19:13 167:8,9 279:1 | 203:4,17 209:7 214:5 215:16 |
| **stuff** 136:12,22 137:16 170:11 | **sufficient** 183:2 311:12 | **supportive** 19:3 | 215:24 220:11 222:19 223:10 |
| **sub** 5:19 | **suffolk** 321:2 | **supports** 154:11 272:22 273:22 | 228:5,20 234:20 239:1 |
| **subject** 15:24 29:5 41:20 128:12 215:1 251:1 253:20 254:16 255:1 | **suggest** 68:15 | | 242:11 244:5 247:5 256:25 |
| | **suggested** 48:17 | | |
| | **suggesting** 214:22 300:11 | **suppose** 278:21 | 260:22 261:21 264:11 275:6 |
| **subjectivity** 17:1 213:25 | **sum** 112:18,25 113:3 | **supposed** 7:7 78:24 106:21 109:3 250:6 | 283:24 285:6 288:9 295:25 |
| **subjects** 260:19 | **summary** 103:7 202:19 | **sure** 6:24 9:15 15:14,19 17:12 20:4 25:21 28:16 35:17 40:18 47:6,8 48:14 57:19 71:5 74:2 76:22 98:24 99:2,3 100:6 103:5 110:17 | 302:15 304:9 311:19 312:19 314:4,10 319:13 |
| **submissions** 157:3 | **summed** 112:18 | | |
| **submits** 26:22 | **summer** 24:6,7 | | |
| **submitted** 23:17,25 29:25 32:18 36:9 43:11 159:4 177:23 178:19 | **sundry** 179:18 | | **surmise** 167:9 |
| | **superior** 189:11 | | **surprise** 94:3 94:13 95:21 170:20 |
| | **supplement** 32:8 | | |
| **subprime** 272:21 | | | |

**[surprised - tell]**                                    Page 78

**surprised** 92:2 92:8 93:5 95:5 95:10,15 153:19

**surprising** 154:17

**surveillance** 301:5,6,9

**survey** 158:22 164:5,7,12 165:10

**surviving** 45:5

**suspicion** 94:4

**swap** 52:1

**swapped** 52:13

**swear** 5:1

**sworn** 5:5 321:7 324:14

**system** 16:10 28:11 33:13 279:21,22 284:6,12

**t**

**t** 2:4 3:6 323:3 323:3

**table** 30:13 55:16 56:5,20 56:21,23 57:7 57:14 58:9,22 64:21,22 67:1 74:8,8,13 80:20 97:22 98:14 100:20 102:1 103:8 110:1 197:25 198:10 199:21 217:21 261:19 276:5,11 293:9 293:10 294:5 294:25 295:22

**tables** 67:20 287:10,17,19 292:24

**take** 4:9 10:11 24:13,23 25:15 42:6 54:3 69:2 71:22 77:22 84:5 87:1 93:8 97:14 108:12 112:10 113:12 118:1 138:2 139:22 140:2 146:9 176:12 178:16 192:9 203:10,19 204:23 205:5 217:9 218:2,7 227:21,22 232:1 233:14 235:12 237:20 240:9,22 241:2 249:23 266:7 269:1 273:6 288:18 294:19 295:9 303:14 307:13 308:7 308:15 319:12

**taken** 52:8 86:8 86:12,14,15 87:12,13,25 89:8 93:6,11 93:13 94:5 97:18 111:20 116:10 152:23 153:22 180:11 192:22 234:23 273:10 313:15 317:11 319:18

**takes** 185:2 237:6 252:25 253:9 254:5 289:7

**talk** 46:20 89:1 111:1 118:3 122:12 125:4 137:22 148:7 158:4 208:19 244:22 275:9 275:12 282:1 292:8

**talked** 16:16 22:8,25 23:3 84:17 98:5 148:4 182:19 194:16 243:12 243:18 248:24 265:8 268:17 292:6 300:18

**talking** 14:4 19:9 20:5 32:2 51:18 53:9

56:6 71:24 73:20 81:16,22 81:23 155:24 176:21 177:18 246:14 266:18 268:19 273:14 288:9 302:25

**talks** 219:7 299:5,13

**task** 305:7

**taught** 251:10 251:10 253:19 254:21 313:7

**taxes** 312:3

**teach** 59:10

**teaching** 252:20 290:12

**team** 172:16 191:20

**techniques** 169:24 172:8

**tell** 15:19 26:21 59:16 61:19 62:7 65:22 66:11,15,18 82:8,9 91:3 122:22 125:23 139:14,16 146:9 153:15 156:23 157:20 159:2 161:10 167:13 170:2,7 171:14,24 175:17 193:13

203:14 218:13
227:12 233:12
235:15 257:9
257:11 267:12
267:14 273:25
294:24 297:6
302:19,20
305:11 309:13
314:17
**telling**  80:21
120:1 184:24
185:12 198:20
202:21 217:23
**tells**  69:16
130:14,20
131:2 137:13
160:10 183:9
221:23 266:15
279:11 282:21
283:19 285:25
291:23 294:3,4
294:5 304:17
**temporary**
181:8 182:22
**ten**  13:2 133:18
133:18 153:17
211:4 243:6
273:7 291:1
293:7,15 294:8
294:18 295:8
**tenets**  149:5
**term**  179:4,4,11
179:12,14,16
179:22,23

181:1,2,4,4,6,7
181:9,10,13,13
181:15,17
182:23,24
183:16,18
184:1 186:9
193:20 292:6
292:14 295:17
295:18 296:10
**terminated**
45:24
**terms**  134:10
193:16 259:15
271:2,3 272:12
**terrible**  228:3
**terrorists**  145:7
145:8
**test**  113:4,6
119:9,24 130:9
130:10 136:3
212:5 216:14
230:16,20
232:12 233:4
233:19 252:16
278:18 299:11
300:14
**tested**  130:6,9
218:18,24
279:7
**testified**  5:5
11:9,12,14
15:17 209:4
218:10 260:19
295:4,17

**testify**  47:21
290:15 294:15
309:20 321:7
**testifying**  305:3
305:25
**testimonies**
11:2
**testimony**  3:2
5:12 11:4,5
15:9 105:7
176:8,10
178:15 199:8
229:3 258:11
258:17 282:3
285:9 292:1
296:6,8 321:11
322:9,17 324:8
**testing**  223:14
**tests**  136:4
**texas**  1:4
**textbooks**
126:4 274:2
**thank**  5:10 36:1
36:5 51:7 85:3
168:22 175:3
247:3 306:15
319:22
**thanks**  44:8
84:12
**theoretical**
123:25 213:9
213:11
**theories**  66:24
77:7 98:3

118:1
**theory**  50:1,7
51:17 53:11,15
54:7,12 56:9
58:24 59:5,6
64:11,25 65:10
65:25 67:22
68:5 70:2,7
71:14,16 72:8
74:24 77:8
84:16 85:7
86:8,17
**thereof**  69:24
**thickness**
289:11,12
**thing**  8:5 77:20
98:11 99:1
115:12 116:24
130:13,15
143:7 149:10
213:17 223:2
224:11 227:16
244:3 246:15
270:9 296:2
**things**  21:19
25:3,6 31:2
69:6 113:10
114:2 129:5
135:23 136:19
144:1,16 148:4
170:15 179:9
181:7 185:18
252:20 253:22
255:22 312:11

**App. 641**

313:1 314:24 316:2

**think** 8:23 9:6 9:10 11:22 12:16 15:15,17 17:17,20 18:24 19:9 20:11,18 21:1,19,20 22:14 26:15 28:5 30:10 32:3 39:22 45:3,18,20 48:14 54:16,23 55:15,18 58:2 58:2,6 66:23 68:2 71:19 72:3,4 73:16 76:20 79:25 87:22 90:19 94:2 95:1,3 98:1,9,23 99:15 100:15 106:20,23 108:7 109:19 118:15 119:8 132:18 138:19 138:20 139:12 142:9 145:7 149:24 154:14 157:16 162:8 165:4,8 168:10 172:11 173:16 182:2 186:25 190:5 193:3,24

194:4,19 200:18 202:25 203:24 204:15 209:8,19 211:5 214:19,24 215:17,18 217:21 220:12 220:20 221:12 228:7,12,15,25 229:4 230:7 231:11 234:7 238:12 239:9 239:11 241:1,6 243:9 246:14 249:1 258:16 258:24 259:6 261:19 265:18 273:24 277:16 278:23 280:23 280:23 285:23 290:1 294:23 297:11,22 302:3,13,24 303:20,25 304:11 306:22 308:18 309:15 310:11 314:11

**thinking** 28:13 133:12 180:21 314:19

**thinks** 222:13

**third** 26:2,5,7 26:10,16 62:12 92:11,14,19,21

155:8 179:10 183:5,7

**thought** 45:18 46:13 142:10 149:23 175:25 185:19,23 191:24 214:10 302:25 304:18 304:18,19 306:21 309:3 310:13

**three** 10:15,16 13:10 26:13 86:13 153:16 168:10 178:24 193:17 237:10 237:15 275:24 277:1 290:14

**threshholds** 258:6

**threshold** 130:20 132:12 132:21 258:3 259:22,24

**thresholds** 258:7

**ticking** 165:8

**time** 4:7 14:15 16:23,23 19:1 23:7 26:6 28:25 46:11 49:6 52:6,9 71:9 73:2 76:3 81:9 88:3

97:16,19 110:5 122:6 133:11 137:25 139:5 140:3 141:2,11 143:11 149:10 155:15 172:12 181:22 191:15 192:20,23 202:13 217:9 218:2,5 232:16 234:21,24 251:24 260:7 263:19 267:14 267:15 270:17 273:8,11 275:19 276:1 276:14 279:13 291:10 295:10 307:22 311:23 312:16,17 319:16,19,22 319:23,25 322:18

**timeframe** 322:8

**times** 8:20 9:4 122:17 167:13 206:4,5,10,10 287:24

**tiny** 227:24

**title** 202:18

**today** 4:6 5:12 6:25 17:21 20:7 22:21

**App. 642**

**[today - truthful]**

38:16 43:7,14
44:21 46:20
47:25 65:22
66:11,15 75:21
80:16 83:2
107:4 110:19
162:14 175:20
184:24 189:3
190:1 194:20
198:20 212:19
226:10 232:7
233:22 264:8
265:14 268:18
279:6 292:1
295:2 304:11
305:3,25
314:16
**together** 31:2
42:1 52:19,20
66:19,25 67:2
67:20 74:5,9
86:18 133:3
193:22 196:12
196:14
**told** 15:4 42:19
71:21 85:19,20
89:4,6 92:5
95:21 107:3
131:15 171:1
171:12 180:18
215:7 228:20
236:6
**tomorrow**
296:21

**took** 117:19
148:22 181:22
230:11
**tool** 125:2
269:22 271:1
271:12
**tools** 125:1
**top** 62:13 91:20
206:3 217:14
239:16,22
290:20 298:18
309:8
**topic** 37:23
139:21 141:6
208:9 226:21
258:9
**torchio** 3:18
45:17 208:12
209:4 212:23
214:6 215:12
215:14,17,17
215:19 216:15
223:2
**torchio's** 29:24
46:17 47:9
49:5 208:20
212:14 216:15
217:22 220:7
225:23 226:13
227:1,9
**total** 24:20
58:25 74:11,16
74:25 78:14
79:4,8,16

111:4 115:9
146:19 206:6
210:17 218:20
237:3
**totally** 52:2
103:5 268:25
289:14
**touch** 122:12
**touching** 321:8
**towards** 26:10
**trade** 251:15
252:19
**traded** 17:4
124:5
**trading** 85:1
88:11,13
230:19 232:15
235:20
**training** 5:22
**transcript**
228:21 322:6
322:19 324:5,8
**transparent**
102:24
**treasury**
292:17
**treat** 89:16
283:8
**trial** 11:9,14
43:9,16 175:16
176:9 191:14
191:21 233:13
309:20

**trials** 11:24
**tried** 139:8
**trier** 126:13
**triers** 12:18
**trouble** 7:3
198:15
**true** 21:14 64:9
69:23 95:14,18
102:22 107:7
107:23 109:11
115:18 133:1
195:5 229:9
249:23 303:13
309:5 321:10
324:8
**trust** 160:21,23
160:25 165:22
165:24 192:16
204:14 209:1
**trusted** 160:2
162:11 166:11
166:11
**truth** 61:24
63:10 70:13
77:12 81:11,18
81:18 82:8,17
100:22 101:1,2
101:12,24
102:14 103:20
104:8,21,22
128:25 321:7,8
**truthful** 5:12
135:16

**App. 643**

**try** 110:5 129:9 147:22 160:16 160:18 190:25 212:1 224:13 241:14 246:15 254:3 261:23 269:14 281:18

**trying** 41:12 55:11 65:9 82:6 95:2 120:18 127:20 130:18 133:13 134:5 167:14 181:12 193:18 206:8 207:16 207:20 222:22 222:22 227:13 227:14 230:20 263:9 296:22

**tsocanos** 260:16,18

**turn** 36:14 44:12 51:24 95:24 117:25 141:6 151:23 173:25 187:13 188:21 189:15 208:8 225:10 225:11 235:2 244:21 250:21 255:5 289:4 297:2 298:8 310:8

**turned** 303:13

**turning** 174:11 217:12 239:20

**turns** 39:17

**two** 23:25 27:21 31:2 35:24 36:8 40:5 65:14,20 66:24 67:7,20 77:7,18 98:2 105:13 122:17 122:24 124:14 131:7,12 132:9 153:15 154:14 159:15 160:1 170:4 176:12 200:13 206:10 209:20,23 236:2,11,15,19 272:16 274:24 275:8,13,24 276:19,24 282:5 283:5,6 283:14 284:1 284:22 290:14 296:2,5 317:1

**type** 68:23 274:15 305:16

**typewriting** 321:10

**typical** 122:17 122:25 124:15 279:24

**typically** 37:12 128:22

**typo** 42:23

| u |
|---|

**u.s.** 116:4 276:21 278:5 289:1 290:22 292:17

**ubs** 242:21

**ultimately** 17:11 60:18,21 86:12 87:21 89:3 131:6 249:2

**umbrella** 256:5

**unanimous** 280:22

**unchanged** 92:3,10

**under** 13:21 65:24 123:19 198:10 201:23 211:6 247:7 260:15 321:10

**undercuts** 164:25

**underlying** 193:23

**underneath** 219:6

**understand** 6:1 6:24 37:1,20 40:18 45:9

48:19 49:24 54:1 58:10,17 58:17 59:7,11 59:22 61:4 70:1,6 78:17 79:4 83:10 84:18 85:6,12 85:23 86:24 100:3 103:14 114:25 115:1 117:6 118:18 120:18,20 121:10,20 123:11,18 125:19 126:11 126:16 127:20 127:23 129:9 129:10 131:10 133:13 134:5 165:25 167:15 182:14 196:7 202:12,22,24 204:3 207:9 209:7 210:4 212:20 215:10 216:10 220:11 230:21 231:22 233:7 237:1 239:1 240:2 253:17 255:23 256:3 263:8 264:11 283:3 285:6 289:16 300:7 302:15

309:22 311:4
311:19 312:19
314:5 315:24

**understanding**
34:6 37:4
44:12,13,20,24
45:20,23 46:9
46:10,17,21
49:25 50:4,7
50:14 51:19
53:10,14,20
54:6,12 55:9
55:12 56:8,12
57:13 58:3,7
58:23 61:7,13
64:10,13,24
65:10 67:4,21
67:24 68:4
71:14,15 72:7
72:10,18 74:2
76:8,22 80:15
85:17 86:16
87:7,17,23
88:20 89:9
105:25 108:1
108:10 121:18
122:3,10
135:23 145:4
152:18 198:16
212:23 214:16
215:6,23
216:11 234:9
235:6 250:8,12
250:13 255:13

262:6 264:18
265:1 291:9
297:16 300:23
301:1,12

**understands**
274:4

**understood**
24:18 50:2
82:2 93:10
120:12 131:6
185:13 216:19
216:20 265:10

**undertake**
281:5

**undertaken**
314:6

**undeveloped**
256:3

**unfair** 216:13

**unified** 280:21

**unimportant**
271:15

**uninformative**
289:14

**uninformed**
95:7

**unique** 301:18

**united** 1:3
62:10 77:23

**university**
11:21

**unknown** 77:4
150:14

**unnecessary**
169:21

**unpack** 157:12
191:13

**unprofitable**
104:23

**unproved**
256:1

**unreliable**
163:14,15
191:5 205:9
207:22

**unrepresentat...**
239:17,23

**unsupported**
119:6

**update** 92:12
92:15,21
147:17 157:6
163:9 164:15
164:17

**updated** 157:11
164:2 165:17
166:4 195:25
197:23 203:10

**updates** 78:25

**updating**
164:10

**upshot** 146:20

**upstream**
144:5

**upwards**
155:21

**use** 32:13 83:10
83:14 125:18
125:21 134:12
168:16 172:4
173:8,8,19,22
175:1 180:4
181:1 182:5
196:18 205:13
206:24 207:2,2
210:3,19 211:1
211:6,14,17
214:25 216:1
219:8 221:10
227:24 229:5
238:21 240:3
261:17 274:21
284:5,12,13
285:10,19
290:11 312:9
312:13 315:10

**used** 63:14 93:3
98:1 117:12,13
145:10 172:5
173:2,3 193:21
209:20 210:8
214:13 218:21
219:1 229:6
251:18 273:4
274:4 275:2,14
278:15,25
279:16,20
280:25 281:14
292:7 305:7
314:20 322:19

**[uses - want]** Page 84

uses 168:8 169:25 213:11
using 19:17 166:21 175:24 213:22 214:1,2 214:3 231:4,22 234:13 270:17 272:6 284:4 285:16
usually 12:22 211:9 274:6 314:14 318:14
usurping 126:13

**v**

v 322:4 323:1 324:1
vague 76:7
vale 17:2,4
valuation 8:25 18:20 100:2 122:2,15 126:4 135:7 142:19 149:6 151:19 151:20 154:18 155:18 205:23 207:16 238:18 238:25 297:24
valuations 173:13
value 41:8 87:12,13,18 112:20,20

113:1,2 114:3 116:6 121:22 122:1 124:4,6 124:11,20 170:19 201:15 266:4 297:11 297:18,23 298:3 305:2 318:17,23,25 319:3
values 87:14
variable 221:21 223:22,23 227:25
variables 112:22 224:16 224:17,24
variation 219:16 221:20
varies 24:23 26:3
variety 101:1 277:20 296:12
various 79:13 163:3 179:18 224:1 271:5
vast 126:5 170:12
vegas 20:10
verified 226:8
verify 119:18 189:25 191:2,8 192:2 230:16 232:1 233:11

233:18 322:9
veritext 4:5 322:14,23
veritext.com 322:15
vernacular 69:21
versus 4:11 16:10 33:14 99:11 139:16 151:1 222:25 240:20 256:19 287:21
vetting 172:8
viability 314:7
video 4:9
videographer 2:14 4:2,3,24 52:6,9 97:16 97:19 140:3 141:2 192:20 192:23 234:21 234:24 273:8 273:11 319:16 319:19,25
videotaped 1:15
view 96:22 123:21 155:20 209:9 223:8 241:4 244:15 249:23 263:17 264:14 281:6,7 281:9

viewed 132:23 149:21
violated 79:13
virtually 117:18 170:12
virtue 55:13 86:24
vis 237:22,22
visit 101:14
volatility 122:18 268:23
volume 1:1
voluntarily 161:23
vouch 190:4,22
vs 1:10

**w**

wait 71:2,17 306:21 307:19
walk 120:22
walked 66:23 71:15 72:7 113:9
wall 116:2,8 124:7
want 10:4,18 25:21 29:6 32:13 35:17 37:11 38:20,24 40:18 44:6,7 44:12 49:24 50:3,13 52:1 55:23 63:13

**[want - withdraw]**                                                                   Page 85

| | | | |
|---|---|---|---|
| 71:13 74:2 | 239:1,15 | 35:1 37:23 | **wednesday** |
| 76:22 77:22 | 244:21 245:9 | 47:10 53:4 | 1:24 |
| 89:21 91:12,14 | 247:5 250:21 | 59:15 60:10 | **weighed** 136:19 |
| 94:10 95:23 | 254:3 256:25 | 62:14 67:18,19 | **weight** 17:9 |
| 100:6 103:5,6 | 260:22 263:8 | 78:23 85:25 | **weighting** |
| 113:6 117:25 | 270:3 276:11 | 90:3 94:7,24 | 188:10 |
| 118:25 119:4 | 280:1 283:24 | 98:9 102:3,20 | **weightings** |
| 121:10 125:5 | 285:6 286:19 | 109:9,19 110:3 | 286:6 |
| 125:17 126:16 | 288:8,9 289:4 | 118:7 121:19 | **weiss** 2:9 4:21 |
| 127:22 129:9 | 289:16 295:25 | 133:25 138:9 | **welcome** 141:5 |
| 129:21 132:6 | 304:9,14 311:4 | 138:21 139:12 | **went** 19:6 |
| 135:12 139:2 | 311:19 312:19 | 139:13,14 | 29:12 47:9 |
| 139:21,24 | 314:4,12 | 146:12 149:16 | 149:13 151:4 |
| 141:5 144:15 | 315:21,24 | 153:2 155:8 | 156:8 273:14 |
| 147:22 151:6 | **wanted** 10:20 | 156:20 176:25 | **west** 2:5 |
| 156:1 157:19 | 53:1 97:22 | 186:5 205:16 | **westland** 33:13 |
| 165:10,25 | 134:8 143:22 | 207:3 208:19 | **wharton** 2:9 |
| 167:12 169:8 | 148:7 218:23 | 208:24 211:18 | **whatsoever** |
| 171:12 173:6 | **warned** 147:13 | 214:23 237:24 | 266:14 |
| 174:16 175:15 | **warns** 213:4,19 | 244:23 247:5 | **whereof** 321:16 |
| 176:7,9 179:8 | **watch** 266:9,14 | 266:8 269:8 | **wide** 115:22,23 |
| 179:12,24 | 266:17,22 | 280:8 286:6 | **widely** 150:11 |
| 180:2 186:23 | 267:20 268:9 | 289:15 300:2 | 173:2,3 273:4 |
| 188:14 191:7 | 269:16 300:20 | 311:9 313:7,10 | 274:4 275:2,14 |
| 191:13 192:10 | 301:3,6,8,12,22 | 313:18 318:16 | 278:12,15,25 |
| 212:12,17 | 301:25 302:4,6 | 318:22 | 280:25 305:7 |
| 214:5 215:12 | 302:8,17 303:6 | **ways** 58:18 | **wilmerhale** |
| 215:24 216:10 | 303:8,11 | 68:11 100:24 | 1:22 4:8 |
| 216:21 218:22 | 307:16,21,25 | 110:14,16,17 | **windows** |
| 220:11,16 | 308:3,7,9,13,15 | 124:24 | 209:20 |
| 222:15,19 | 308:17,24 | **we've** 22:8 | **wishes** 281:1 |
| 223:1,10 225:5 | 310:4 | 35:13 67:19 | **withdraw** 96:7 |
| 225:10 228:5 | **way** 7:3 12:17 | 78:5,7,9 | 169:19 200:4 |
| 229:2 233:7 | 15:19 27:3 | 234:18 | 218:4 229:2 |

**[withdrawing - year]** Page 86

| | | | |
|---|---|---|---|
| **withdrawing** 41:7 168:25 169:2,13 | **work** 12:6 24:14,16,16 25:9,9,18 26:19 27:10,20 28:24 29:3,4 43:14 62:14 113:16 114:21 131:10 171:4 171:20,21 252:12,13 281:18 | 251:21 252:15 252:16 | **x** |
| **withheld** 306:14 | | **written** 21:10 45:14 63:12 116:5 194:21 | **x** 3:1,6 124:4 **xom** 240:16 |
| **witness** 1:16 5:1,3 10:9 54:14 90:16 176:4,14 204:17 217:4 217:10 321:11 321:16 322:8 322:10,12,18 | | **wrong** 15:8 46:19 53:19 83:6 100:5,10 105:11,12 119:19 139:13 156:22 162:18 175:17,18,21 175:22 206:14 208:2,18,21,22 209:3,8,10,10 209:11,12,16 209:24 212:14 212:20 215:8 216:21 221:3 223:24 226:3 227:11,12 233:4,16,16,19 240:25 243:8 243:10 269:15 299:20 | **y** |
| **wonder** 117:2,4 174:21 | **worked** 23:10 49:10 251:20 252:4,7 | | **yeah** 8:16 18:19 26:4,9 28:5 30:8 43:14 47:5 74:4 79:24 80:19 86:11 100:15 105:8 110:8 113:5 116:23 119:12 119:20 120:6 121:16 130:23 144:21 147:10 148:25 149:24 151:25 154:14 174:16,21 191:18,21 193:5 195:14 197:17 209:6 228:15 229:7 253:17 257:23 266:25 267:12 274:1,23 281:16 314:12 319:24 |
| **wondered** 111:24 | **working** 27:1 27:14 28:18 29:19 57:23 161:25 305:13 | | |
| **word** 69:20,22 80:4 93:3 98:2 125:18 145:9 229:5,5 232:1 232:3 256:5 272:6 292:13 | **works** 160:18 280:22 | | |
| **worded** 7:3 | **world** 148:5,6 248:8 296:4 | | |
| **wording** 57:17 63:14 | **worse** 227:7 | | |
| **words** 62:8 70:20,21 87:6 91:2,19,21,22 92:6 94:1 125:6,21 182:5 198:15 210:25 218:17 298:1 | **worth** 124:22 142:11 | **wrote** 9:6 18:9 20:21 21:22 39:14,17 48:1 70:22 84:23 115:3,6,8 128:21 176:11 242:14 | **year** 23:10 24:5 24:23,23 26:3 26:3,11 51:9 51:10,11 55:3 55:25 60:16 |
| | **write** 20:14 128:6 142:15 191:18 254:22 298:2,5 | | |
| | **writedowns** 115:15 | | |
| | **writes** 225:18 | | |
| | **writing** 35:7 116:16 117:1 | | |

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

**App. 648**

**[year - à]**                                                                  Page 87

| | | |
|---|---|---|
| 61:5 63:22 | 178:25 182:15 | **zoom**   2:15 |
| 73:10,23 76:11 | 184:8 185:8 | **à** |
| 76:16 77:2 | 211:4 262:15 | **à**   237:22 |
| 78:2,21 79:2 | 287:23 290:14 | |
| 79:15 89:5 | 290:14,16 | |
| 90:3 91:25 | 293:7,16 294:8 | |
| 92:25 93:14 | 294:18 295:8 | |
| 106:17 116:7 | **yesterday**   44:2 | |
| 146:19 147:2 | 44:4 | |
| 148:18 153:23 | **yield**   40:3 | |
| 154:7 155:12 | 268:4 269:24 | |
| 155:20,23,23 | 274:5 279:12 | |
| 177:1 181:17 | 280:17,19 | |
| 181:18 182:25 | 281:15 282:18 | |
| 185:11 189:20 | 282:20 284:18 | |
| 190:19 196:22 | 287:9 291:25 | |
| 197:16 201:15 | 292:20,23 | |
| 204:9 261:17 | 296:25 305:20 | |
| 262:1,2,8,10 | 309:8 | |
| 287:1,20 288:1 | **yields**   272:24 | |
| 288:25 289:23 | 273:3,24 278:9 | |
| 289:24 290:1 | 279:8 282:22 | |
| 290:10,13 | 282:23 283:1 | |
| 291:1,12,18 | 283:21 | |
| 314:19 | **york**   2:11 11:20 | |
| **years**   6:4 9:5 | **z** | |
| 9:24 10:24 | **zero**   286:22,22 | |
| 11:6,8 13:1,2 | 287:2,3,5,5,6,7 | |
| 14:16,19,24 | 287:15 289:8,9 | |
| 15:6 18:20 | 289:17,20 | |
| 22:16 23:15 | 290:2,3,3,7,13 | |
| 24:24 26:8,12 | 290:13,15,17 | |
| 26:12,13,14 | 291:6,7,18 | |
| 29:10,13 | | |

Texas Rules of Civil Procedure

Part II, Section 9, Evidence and Discovery

Rule 203

203.1 Signature and Changes.

(a) Deposition transcript to be provided to witness. The deposition officer must provide the original deposition transcript to the witness for examination and signature. If the witness is represented by an attorney at the deposition, the deposition officer must provide the transcript to the attorney instead of the witness.

(b) Changes by witness; signature. The witness may change responses as reflected in the deposition transcript by indicating the desired changes, in writing, on a separate sheet of paper, together with a statement of the reasons for making the changes. No erasures or obliterations of any kind may be made to the original deposition transcript. The witness must then sign the transcript under oath and return it to the deposition officer. If the witness does not return the transcript to the deposition officer within 20 days of the date the transcript was provided to the witness or the

**App. 650**

witness's attorney, the witness may be deemed to have waived the right to make the changes.

(c) Exceptions. The requirements of presentation and signature under this subdivision do not apply:

(1) if the witness and all parties waive the signature requirement;

(2) to depositions on written questions; or

(3) to non-stenographic recordings of oral depositions.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

**App. 651**

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored

**App. 652**

in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

**App. 653**

# Exhibit 13



**UBS** Global Research    **31 January 2017**

**Ramirez v. Exxon Mobil Corporation**

## DX-0062

No. 3:16-cv-3111-K (N. D. Tex.)

# ExxonMobil Corp.

## 2017 Capex Above Expectations; 4Q16 EPS Beats on R&M Asset Sale Gain & Favorable Tax Items

### Key takeaways from 4Q16 results and the conference call:

1) 4Q16 results included a Canadian downstream asset sale gain of ~$522MM which positively impacted EPS by $0.13/share; 2) 2017 capex increase (+14% YoY) is driven by higher activity levels rather than cost inflation; 3) noted recent Permian acquisition can support a multi-decade production plateau of ~350 MBoed (vs. ~18 MBoed currently); 4) inferred that it is likely to de-book some proved reserves based on lower 2016 oil prices but less than the 4.6 BBoe noted with 3Q16 results due to some offsets; & 5) we made only minor changes to our 2017-18 EPS estimates.

### 2017 capex up ~14% YoY, above expectations

XOM expects 2017 capex to be "about $22bn," above consensus of ~$18.2bn and UBSe of $20.3bn and a ~14% increase from 2016 spending of $19.3bn. However, we'd note the guidance is right in line with XOM's $22 billion outlined at its Analyst Day last March. XOM repurchased just 12MM shares of its common stock in 2016 to offset dilution which it will continue to do but does not currently plan on making purchases to reduce shares outstanding. At this level of spending and assuming current futures strip prices, we forecast XOM will generate a FCF deficit (after dividends) this year of ~$2bn (compared to last year's ~$8.3bn FCF deficit). We expect XOM to update its long term capex outlook and production guidance at its March Analyst Day.

### 4Q EPS beats on R&M asset sale gain & favorable tax items; CFPS in line

4Q clean EPS (which excludes a $2bn writedown related to Rockies dry gas assets) rose 34% YoY to $0.89, above consensus & UBSe of $0.70 & $0.71, respectively. Upstream earnings rose ~62% YoY to ~$1.39bn, vs. consensus of ~$1.43bn. R&M earnings fell 8% YoY to ~$1.24bn, well above UBSe $985MM & consensus $898MM aided by the asset sale gain. Chemical segment earnings of ~$872MM fell ~9% YoY & was ~20% below expectations. Corporate & financing *earnings* of $209MM were much better than consensus & UBSe of an *expense* of ~$456MM & ~$364MM, respectively, on favorable non-US tax items positively impacting EPS vs consensus by $0.16/share. 4Q cash flow from ops of $7.4bn was near both UBSe ~$7.2bn & consensus of ~$7.8bn.

### Valuation: material premium to peers and its historical average multiples

Our $77 PT is based on a normalized relative PE of 0.95x (in line with its 5-year avg).

## Equities

Americas
Oil Companies, Major

| | |
|---|---|
| **12-month rating** | **Sell** |
| **12m price target** | **US$77.00** |
| **Price** | **US$84.86** |

**RIC:** XOM.N  **BBG:** XOM US

**Trading data and key metrics**

| | |
|---|---|
| **52-wk range** | US$95.12-74.59 |
| **Market cap.** | US$352bn |
| **Shares o/s** | 4,147m (COM) |
| **Free float** | 100% |
| **Avg. daily volume ('000)** | 3,799 |
| **Avg. daily value (m)** | US$331.5 |
| **Common s/h equity (12/16E)** | US$174bn |
| **P/BV (12/16E)** | 2.0x |

**EPS (UBS, diluted) (US$)**

| | 12/16E | | | |
|---|---|---|---|---|
| | From | To | % ch | Cons. |
| Q1 | 0.43 | 0.43 | 0 | 0.43 |
| Q2 | 0.41 | 0.41 | 0 | 0.41 |
| Q3 | 0.63 | 0.63 | 0 | 0.63 |
| Q4E | 0.71 | 0.89 | 24 | 0.70 |
| 12/16E | 2.19 | 2.36 | 8 | 2.19 |
| 12/17E | 3.54 | 3.58 | 1 | 4.20 |
| 12/18E | 3.94 | 3.91 | -1 | 4.98 |

William A. Featherston
Analyst
william.featherston@ubs.com
+1-212-713 9701

Michael Ziffer, CFA
Associate Analyst
michael.ziffer@ubs.com
+1-212-713 2257

Christopher Zhang, CFA
Associate Analyst
christopher.zhang@ubs.com
+1-212-713 9957

| Highlights (US$m) | 12/13 | 12/14 | 12/15 | 12/16E | 12/17E | 12/18E | 12/19E | 12/20E |
|---|---|---|---|---|---|---|---|---|
| Net earnings (UBS) | 32,580 | 29,820 | 16,150 | 9,867 | 15,173 | 16,575 | 18,120 | 17,195 |
| EPS (UBS, diluted) (US$) | 7.37 | 6.96 | 3.85 | 2.36 | 3.58 | 3.91 | 4.32 | 4.13 |
| CEPS (UBS, diluted) (US$) | 11.23 | 11.69 | 7.97 | 6.35 | 7.68 | 8.15 | 8.67 | 8.65 |
| DACF (UBS) | 49,635 | 50,216 | 33,667 | 24,838 | 32,991 | 34,808 | 36,682 | 36,288 |
| Net DPS (US$) | 2.46 | 2.70 | 2.88 | 2.98 | 3.24 | 3.56 | 3.64 | 3.64 |

| Profitability/valuation | 12/13 | 12/14 | 12/15 | 12/16E | 12/17E | 12/18E | 12/19E | 12/20E |
|---|---|---|---|---|---|---|---|---|
| Production (000 boe/d) | 4,175 | 3,968 | 4,098 | 4,053 | 4,159 | 4,148 | 4,051 | 3,996 |
| ROACE (UBS) % | 16.5 | 14.3 | 7.6 | 4.7 | 7.0 | 7.6 | 8.4 | 8.0 |
| EV/DACF (UBS) x | 8.3 | 8.7 | 11.2 | 15.6 | 11.8 | 11.2 | 10.7 | 10.8 |
| Price/CEPS (UBS, diluted) x | 8.1 | 8.3 | 10.4 | 13.4 | 11.1 | 10.4 | 9.8 | 9.8 |
| P/E (UBS, diluted) x | 12.3 | 14.0 | 21.5 | 35.9 | 23.7 | 21.7 | 19.7 | 20.5 |
| Net dividend yield % | 2.7 | 2.8 | 3.5 | 3.5 | 3.8 | 4.2 | 4.3 | 4.3 |

Source: Company accounts, Thomson Reuters, UBS estimates. Metrics marked as (UBS) have had analyst adjustments applied. Valuations: based on an average share price that year, (E): based on a share price of US$84.86 on 30 Jan 2017 19:39 EST

**www.ubs.com/investmentresearch**

This report has been prepared by UBS Securities LLC.  **ANALYST CERTIFICATION AND REQUIRED DISCLOSURES BEGIN ON PAGE 27.**  UBS does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision.

*112*

ExxonMobil Corp. | Sell (Price target US$77.00)

**UBS** Research **THESIS MAP** a guide to our thinking and what's where in this report

PIVOTAL QUESTIONS

**Q: What is XOM's capex and production growth outlook?**

XOM expects 2017 capex to be "about $22bn", up ~14% YoY from comparable 2016 spending of ~$19.3bn leaving with a ~$2.0bn 2017E FCF deficit (after dividends) assuming the current futures strip, narrower than last year's ~$8.3bn FCF deficit. But we believe investors were expecting a lower budget than the year old guidance of ~$22 billion in 2017 given 2016 spending came in $4 billion below the original $23 billion guidance. XOM is targeting to hold volumes flat through 2020 at ~4.0-4.2 MMBoed, and we expect it to largely maintain this guidance at its upcoming Analyst Day.

**Q: Will XOM use the downturn to pursue M&A of U.S. shale assets/E&Ps?**

XOM has noted two issues have prevented it from pursuing a corporate-level acquisition of a U.S. E&P: 1) expectations between buyers & corporate sellers is too wide and 2) belief that significant value destruction in E&Ps caused by higher debt levels, ongoing FCF deficits, and the recent wave of dilutive equity financings (>$30bn last year on top of the $13bn in 2015). Thus, while it remains open to corporate-level transactions, it's more focused on asset-level and private deals of varying sizes (as evidenced by its recent $6 billion acquisition of privately-held Permian assets from the Bass family).

**Q: How should XOM perform in a period of rising oil prices?**

We analyzed XOM's performance vs the S&P 500 and S&P energy index during periods of rising oil prices. In six periods of rising oil prices, XOM materially underperformed E&Ps on five of those occassions. And it underperformed the S&P 500 in three of those occassions, with the standout period of underperformance occurring from December 2008 to April 2010; we'd note that was the last time XOM's relative PE (to the S&P 500) was above 1x.

UBS VIEW

While XOM has reduced its capex burden and is improving its capital efficiency, we estimate it is still left with an upstream production growth profile well below global integrated peers and comparable ROCE. Moreover, its current dividend yield of ~3.6% is below CVX's ~3.9% and European majors' ~6.3%. And while XOM's balance sheet is arguably the most defensive in the sector, we believe investors are paying a premium for that security with its shares discounting a recovery to ~$75/Bbl WTI…well above ~$70/Bbl for CVX and ~$60/Bbl for the Euro majors.

EVIDENCE

1) ROCE falling from 14.3% in 2014 to 7.6% in 2015 to 7.0% in 2017E (near the 2017E peers average of 6.4%); 2) needs ~$60/Bbl Brent next year to cover capex & divi (vs. ~$55/Bbl for CVX); & 3) trades at >3.5 turn premium to historical avg EV/DACF (vs. peers' ~1.0x premium).

WHAT'S PRICED IN?

We estimate XOM is discounting a recovery to $75/Bbl WTI. XOM trades at a >5 turn premium to its Integrated peers on 2017-18E EV/DACF, well above its historical average 2.6x turn premium despite its lower growth & ROCE outlook vs. the group.

UPSIDE / DOWNSIDE SPECTRUM





COMPANY DESCRIPTION

ExxonMobil, created through the 1999 merger of Exxon and Mobil Corp., is the largest listed energy stock by market capitalization. The company is involved in all phases of the...

more →

**William A. Featherston,** Analyst, william.featherston@ubs.com, +1-212-713 9701

ExxonMobil Corp.   31 January 2017 | ⚜UBS  2

*113*

**App. 655**

ExxonMobil Corp.    UBS Research

COMMENTARY    return ↑

## Key Takeaways from 4Q Results

▪ **XOM expects 2017 capex to be "about $22 billion" (including affiliate spending), up ~14% YoY from comparable 2016 spending of ~$19.3 billion and above consensus of ~$18.2 billion and prior UBSe of ~$20.3 billion.** While the preliminary guidance is right in line with the ~$22 billion outlined at its Analyst Day last March, we believe investors were expecting a lower budget given that 2016 spending came in roughly $4 billion below the initial budget of $23.2 billion leading many to assume a downward bias to year old guidance of ~$22 billion in 2017 and ~$20-$24 billion for 2018-20.  And while XOM will provide details on its 2017 budget at its Analyst Day on March 1st, management noted the YoY increase is more a function of higher activity levels rather than cost inflation. We assume XOM's Chemical and Downstream spending stay roughly flat YoY with all of the YoY increase coming from the Upstream segment (but again we'll get a clearer picture at its upcoming Analyst Day).  *At this level of spending and assuming current futures strip prices, we forecast XOM will have ~$2.0 billion free cash flow deficit (after dividends) this year (vs. ~$8.3 billion last year) and requires a Brent price of ~$60/Bbl to reach free cash flow neutrality (above the ~$55/Bbl at CVX).*

▪ **We expect XOM will largely maintain its year-old 2017 production guidance of ~4.0-4.2 MMBoed at its upcoming Analyst Day (as disclosed at last year's meeting).**  XOM's production outlook excludes the impact of future asset sales and implies volumes will basically be roughly flat YoY relative to 2015 and 2016 levels. XOM noted it does not expect a change in its underlying decline rate of 3% per annum despite the much larger than expected capex cut last year (due to base optimization work).  However, we expect XOM to deliver some growth this year as five major capital project start-ups from 2016 (which add 250 MBoed of working interest production capacity) continue ramping up and another five projects (e.g. Hebron, Sakhalin-1 Odoptu Stage 2, Upper Zakum 750, Kaombo Split Hub, and Barzan) are expected to commence over the next two years (adding another ~340 MBoed of working interest production capacity). *We forecast 2017 growth of ~2.5% YoY, enabling volumes of ~4.159 MMBoed…in the upper half of company guidance and near consensus of ~4.144 MMBoed.*

▪ **Full year 2016 production came in at 4.053 MMBoed (-1.1% YoY), in the lower half of XOM's full year guidance range of ~4.0-4.2 MMBoed.** XOM's net liquids volumes rose ~0.8% YoY while net natural gas production fell ~4% YoY, leaving its liquids percentage mix for the year at ~58% (vs. ~57% in 2015 and ~53% in 2014). And while XOM's 2016 production guidance did not include expectations for liquids and natural gas volumes, management has noted it expects a gradual shift towards a higher liquids percentage mix. Importantly, 2015 marked the first year since 2010 that XOM exceeded its initial production guidance while 2016 was essentially in line (see

ExxonMobil Corp.    31 January 2017    ❈UBS 3

Figure 1)…reflecting improved execution on volume targets and an increasingly **predictable** asset base. *However, we believe the current commodity cycle has shifted investor focus away from production growth/project execution to ROCE, free cash flow, shareholder returns and relative value creation – areas where we believe XOM will perform near peers . . . compared to its historically superior ROCE and free cash flow generation when compared to the peers.*

**Figure 1: XOM's Production Growth vs. Guidance (2009-16)**

|  | Analyst Day Guidance | Actual YoY Production | Variance vs. Guidance |
|---|---|---|---|
| 2009 | 2% | 0.2% | -1.8% |
| 2010 | 3-4%* | 7.0% | 3.5% |
| 2011 | 4-5% | 1.3% | -3.2% |
| 2012 | -3% | -5.9% | -2.9% |
| 2013 | -1% | -1.5% | -0.5% |
| 2014 | -4% | -4.9% | -0.9% |
| 2015 | 2% | 3.3% | 1.3% |
| 2016 [1] | (2%)-2% | -1.1% | -1.1% |

Source: UBS estimates, Company data; *"Organic" production growth excluding the impact of the XTO Energy acquisition

- **Looking to 2018-20, XOM preliminarily expects upstream production to stay flat at ~4.0-4.2 MMBoed per annum but has highlighted a number of development opportunities in 2018+ which it can ramp up or down based on the commodity price environment and we expect an update at its upcoming Analyst Day.** Similar to its 2017 production outlook, XOM's preliminary 2018-20 volume guidance excludes the impact of future asset sales and is based on a Brent price range of ~$40-$80/Bbl (vs. the futures strip range of ~$55-56/Bbl). The company has highlighted several development opportunities post-2018 which could ultimately add potential net production of 1.4-2.4 MMBoed through 2030, including: 1) **unconventional U.S. resource** (mostly Bakken and Permian with net resource potential of ~6 BBoe and peak production of ~0.6-1.0 MMBoed); 2) **conventional/deepwater** (offshore West Africa, Tengiz, Guyana, and Romania with ~3 BBoe and ~0.3-0.5 MMBoed); 3) **LNG** (Golden Pass, PNG future, West Coast Canada, Alaska, Sakhalin, and Scarborough with ~3 BBoe and ~0.2-0.3 MMBoed); and 4) **heavy oil** (Canada SAGD, Firebag, and Syncrude Expansions with ~7 BBoe and ~0.3-0.6 MMBoed). *However, other than U.S unconventionals, XOM's resource opportunities (particularly deepwater, LNG and heavy oil) require higher oil prices than embedded in the current futures curve which may prompt XOM to ultimately pursue more meaningful US unconventional acquisitions (presumably asset deals in the current environment or additional private corporate deals) to bolster that part of its resource base. We forecast modest declines of ~1% per annum from 2018-20, leaving 2020 production at ~4.0 MMBoed…near the low-end of guidance and implying volumes will be down ~2% vs. 2015 levels.*

---

**ExxonMobil Corp.**   31 January 2017

⚛UBS  4

*115*

**App. 657**

- **Management inferred that it is likely to de-book some proved reserves based on lower 2016 oil prices but less than the 4.6 BBoe noted with 3Q16 results due to some offsets.** For reference, on its 3Q16 conference call, the company stated that if average YTD crude prices persisted for the remainder of the year, it will likely be required to de-book proved reserves from Kearl (~3.6 BBoe) and other North American assets (~1 BBoe in aggregate), or ~19% of its companywide proved reserve base of ~24.8 BBoe at year-end 2015. On today's conference call, management noted it does expect to reflect the aforementioned price impact on 2016 proved reserves but inferred that it will be less than 4.6 BBoe due to some partial offsets to those numbers. And despite a likely de-booking of some proved reserves, we'd note there is no impact to XOM's cash flow/production or to how the company manages its business or key assets.

- **We note several near-term catalysts to monitor: 1) XOM will disclose 2016 proved reserves in mid-February.** The company replaced 67% of production in 2015 (the first year since 2007 XOM did not replace >100% of its production) and has posted average replacement ratios of 91% and 99% over the last 3-year and 5-year periods, respectively; **2) Disclosure of longer-term capex guidance along with its 10-K filing later this month or at its March 1st Analyst day**; we forecast XOM will guide to modest increases in 2018-19 spending of ~$22.6 billion and ~$23.8 billion, compared to guidance for 2017 of ~$22 billion and in line with the implied medium term spending range of $20-$24 billion outlined at last year's meeting; and **3) XOM will host its 2017 Analyst Day on March 1st,** where it will disclose 2017 and long-term production guidance; we forecast 2017 production growth of +2.6%, falling to ~1% per annum *declines* in 2018-19 (albeit still within its current guidance of 4.0-4.2 MMBoed).

- **Earlier this month, XOM agreed to acquire several private companies owned by the Bass family which primarily operate in the northern Delaware Basin (Eddy County) for $5.6 billion in XOM shares plus additional contingent cash payments of up to $1 billion.** Adjusted for production valued at $45,000/Boed, we estimate XOM is paying ~$21,000 per acre, above recent northern Delaware transactions. In the northern Delaware, we have seen three sizable transactions in the last year: Matador's purchase of 4,600 acres in Eddy County for $4,600/acre, CXO's purchase of Enduring Resources in Lea County for $16,400/acre, and EOG's purchase of Yates Petroleum which valued the northern Delaware at $6,000/acre. XOM is acquiring 250,000 net acres, >18 MBoed (70% liquids) of production, and 3.4 BBoe of resource potential. This adds to XOM's current Permian position of ~140 MBoed and 1.5 million acres (~500,000 prospective for shale). While the deal more than doubles XOM's Permian resource potential to ~6 BBoe and increases its unconventional acreage in the basin to 750,000, it represents just ~4% of XOM's overall resource base of ~94 BBoe. Nonetheless, it is consistent with recent management commentary that it is more likely to pursue asset-level or private deals given the lofty valuations of publicly-traded US E&Ps, and highlights its need to add resource towards the low end of the cost curve (one third of its companywide resource base is low margin heavy oil/oil sands) and shorter duration investment projects given an oil price environment likely to be

---

**ExxonMobil Corp.**   31 January 2017

more volatile going forward. Management noted it expects the acquisition to support a multi-decade production plateau of ~350 MBoed.

- **In July, XOM announced it will acquire InterOil (IOC) Corporation for >$2.5 billion.** The deal is comprised of a fixed price of $45/share (paid in XOM shares) and a contingent resource payment (CRP) of $0.90/Mcfe of Elk-Antelope 2C resource above 6.2 Tcfe (subject to a cap of 11 Tcfe, which was revised up in December from 10 Tcfe prior). IOC's principal undeveloped asset is a 36.5% stake in the Elk and Antelope gas/condensate fields in Papua New Guinea which were expected to supply the country's 2nd proposed LNG project (Papua LNG operated by Total where Oil Search (22.8%) and InterOil (36.5%) both have interests). We note that XOM has indicated a desire to develop a third LNG train at the separate XOM-operated two-train 6.9 MTA Papua New Guinea LNG, but also indicated the need for additional low-cost gas resource to support the project. And while ultimate development will be decided amongst its partners and the government parties, XOM noted there is "strong case" that the production will go into its existing facility at Papua New Guinea LNG (e.g. rather than a separate LNG development project). Wood Mackenzie ranks Papua New Guinea LNG among the lowest cost LNG projects globally. In addition to its low place on the cost curve, increasing gas resource would be consistent with XOM's more bullish view on global gas demand growth where it expects long-term growth of 1.5% per annum (vs 0.7% per annum for oil). Given this transaction would be equity financed, XOM still has the financial capacity to also pursue other acquisition opportunities. The proposed deal calls for XOM to issues ~0.54 shares for every IOC share (based on XOM's current share price), or ~27 million shares to acquire IOC. This is equal to just ~0.65% dilution to XOM's share count. A shareholder vote is scheduled for mid-February, and followed by a final ruling in the Canadian courts before the transaction can close.

## Valuation: Shares Appear Richly Valued vs Peers and Its Historical Average

- **We've maintained our price target of $77,** which is based on a "normalized" relative PE of 0.95x our 2017E EPS (in line with its 5-year average).

- **XOM's relative P/E of 1.12x (vs. the S&P 500) is well above its 5- and 10-year historical averages of ~0.95x and ~0.87x, respectively.** For reference, XOM's relative P/E reached a previous high of 1.17x before beginning to retreat in mid-February 2009 coinciding with the fear during the financial crisis beginning to subside, bottoming at a relative P/E of 0.60x in March 2010 and then rebounding. While it has retracted from a recent modern-day high of ~1.68x, its current relative P/E multiple of 1.12x remains well above historical averages likely given the market's view that these are trough earnings on the back of unsustainably low oil prices.

- **Using its 5-year average of a 0.95x relative PE, we estimate the market is pricing a recovery in oil prices to ~$75/Bbl in XOM shares.**

---

ExxonMobil Corp.    31 January 2017                                    ⚜ UBS  6

**Figure 2: Historical Relative P/E for forward year earnings vs S&P 500**



Source:  FactSet

- **XOM's valuation also appears full relative to peers and its historical average multiple.** XOM trades at a ~5x premium to its Integrated peers on 2017-18E EV/DACF, well above its historical average 2.6x turn premium despite the narrowing in its and ROCE premium vs peers.  It also offers a lower dividend yield than its peers, currently at ~3.6% vs. the peer average of ~5.7%.

**Figure 3: XOM's Valuation vs. Integrated Peers**

| Company | EV/DACF | | | | P/E | | | Dividend |
| | Hist. Avg | 2017E | 2018E | 2019E | 2017E | 2018E | 2019E | Yield |
|---|---|---|---|---|---|---|---|---|
| BP | 5.1x | 6.0x | 5.3x | 4.8x | 13.8x | 10.9x | 9.9x | 6.7% |
| Chevron | 6.4x | 9.6x | 8.7x | 7.3x | 26.9x | 23.5x | 19.6x | 3.9% |
| RD/Shell | 5.6x | 6.4x | 5.6x | 5.1x | 6.1x | 5.3x | 4.6x | 6.9% |
| Total | 5.2x | 6.2x | 5.7x | 5.1x | 12.0x | 10.8x | 9.7x | 5.4% |
| **Integrateds Average** | **5.6x** | **7.1x** | **6.3x** | **5.6x** | **14.7x** | **12.6x** | **10.9x** | **5.7%** |
| | | | | | | | | |
| **ExxonMobil** | **8.2x** | **11.9x** | **11.3x** | **9.8x** | **23.5x** | **21.5x** | **19.5x** | **3.6%** |

Source:  UBS estimates and Company documents

Based on UBS official NYMEX natural gas and WTI and ICE Brent crude oil commodity price forecasts of: 2016- $2.46/MMBtu, $43.35/Bbl & $45.56/Bbl; 2017- $3.25/MMBtu, $58/Bbl & $60/Bbl; 2018- $3.00/MMBtu, $63/Bbl & $65/Bbl; 2019 & LT- $3.25/MMBtu, $68/Bbl & $70/Bbl.

**Figure 4: XOM's Upstream Production Growth Outlook vs. Peers**

|  | 2015 | 2016E | 2017E | 2018E | 2019E | 2020E | 2016-20E CAGR |
|---|---|---|---|---|---|---|---|
| Chevron | 2.0% | -1.1% | 6.8% | 5.2% | 1.6% | -0.6% | 3.2% |
| BP | 4.0% | -0.6% | 9.7% | 2.1% | 0.4% | 2.3% | 3.6% |
| RD/Shell | -3.4% | 21.3% | 4.3% | -0.6% | -1.4% | 3.0% | 1.3% |
| Total | 9.4% | 4.4% | 4.5% | 8.0% | 5.9% | 5.3% | 5.9% |
| **Peer Average** | **3.0%** | **6.0%** | **6.3%** | **3.7%** | **1.6%** | **2.5%** | **3.5%** |
| **ExxonMobil** | **3.3%** | **-1.1%** | **2.6%** | **-0.3%** | **-2.3%** | **-1.4%** | **-0.4%** |

Source: UBS estimates and Company documents

**Figure 5: XOM's Companywide ROCE vs. Peers**

|  | 2015 | 2016E | 2017E | 2018E | 2019E |
|---|---|---|---|---|---|
| Chevron | 3.2% | 0.9% | 4.2% | 4.8% | 5.6% |
| BP | 4.6% | 3.1% | 6.9% | 9.2% | 9.9% |
| RD/Shell | 1.5% | 3.7% | 7.0% | 8.6% | 10.1% |
| Total | NA | 7.8% | 7.4% | 8.6% | 9.3% |
| **Peer Average** | **3.1%** | **3.9%** | **6.4%** | **7.8%** | **8.7%** |
| **ExxonMobil** | **7.6%** | **4.7%** | **7.0%** | **7.6%** | **8.4%** |

Source: UBS estimates and Company documents

## Disciplined, Consistent Capital Allocation throughout the Cycle

- **XOM recently reiterated its capital allocation priorities; its two highest priorities are:** 1) sustaining a stable and growing dividend, and 2) funding investment in its resource base, followed by 3) returning cash to shareholders through share repurchases as the flexible part of its capital allocation.

  - Management's capital allocation priority is **sustaining and growing the dividend,** which it has now grown for 33 consecutive years. In April, XOM announced an increase to its quarterly dividend from $0.73/share to $0.75/share in 2Q16 (+2.7% YoY, its lowest YoY increase since 2003). Over the last decade (2005-15), XOM has increased its dividend at a ~10% CAGR. However, XOM's dividend yield of 3.6% is below CVX's 3.9%, and the European Majors ~5.4-6.9% yields. On the back of lower oil prices, XOM's dividend growth rate slowed to 6.7% in 2015 and 3.5% in 2016, but we forecast growth will rise to 8.7% in 2017 and 9.9% in 2018. For perspective, when oil prices collapsed in 2008-09, XOM reduced the rate of its dividend growth from ~11% to ~5% in both 2009 and 2010 before increasing the rate of growth when oil rallied higher.

  - The company's other primary capital allocation priority is **selective investment in its resource base,** with a focus on driving above-average

ROCE relative to Integrated peers. As of year-end 2015, XOM's companywide resource base stood at ~91 BBoe (~24.8 BBoe of proved reserves), implying a resource base:proved ratio of ~3.7x, just below peers' ~4.0x. Nonetheless, we estimate XOM will generate an average companywide ROCE of ~7.0% in 2017, above Chevron (UBSe-4.2%) but materially below XOM's ~7.6% in 2015, ~14% in 2014, and its 2010-13 average of ~21%.

- **Consistent with its capital allocation priorities, XOM suspended its share repurchase in 1Q16 to reduce shares outstanding in the current challenging environment.** Meanwhile, it repurchased 12 million shares during 2016 for a total of $977 million as it continued to buy back shares to offset dilution related to shares issued under its employee benefit plans. For reference, XOM cut its share repurchase (for reducing shares outstanding) to $500 million per quarter in 2H15 from $1 Billion per quarter in 1H15, ~$3 billion per quarter from mid-2013 through 2014, and >$5 billion per quarter in 2011-12, reflecting deteriorating levels of free cash flow generation.

## Operations Update

- **XOM estimates five major upstream project start-ups in 2017-18 will ultimately add a total of ~340 MBoed of net production capacity, following the five that came on stream in 2016 which should eventually add 250 MBoed of net production capacity.** Of the projects coming online in 2017-18, adding to liquids volumes are primarily Upper Zakum expansion, Kaombo Split Hub, Hebron, and Odoptu Stage 2. Gas volume contributors will primarily be Gorgon Train 3 and Barzan. *We outline below the key projects driving ExxonMobil's growth in 2016-18:*

**2016 Start-Ups to Add 250 MBbld of Net Production Capacity**

- XOM has a 25% interest in the CVX-operated 15 MTA **Gorgon LNG project offshore Australia,** which commenced in March but quickly experienced mechanical issues. Operations have since restarted (currently producing at ~110 MBoed gross) and Train 2 recently started up, achieving first LNG in late October. Construction on Train 3 is progressing as planned and expected to come on stream in early 2Q17, implying the facility is producing near capacity by year-end 2017. In December 2013, CVX raised the Gorgon project budget by another $2 billion to US$54 billion (~45% above the initial budget of US$37 billion) and pushed back first gas sales from mid-2015 to YE15 due to weather delays and labor productivity issues. XOM holds a 25% working interest in the project, which is initially developed with three 5.2 MMTPA trains supported by 22 Tcf of resource from the Gorgon and Jansz-Io gas fields on environmentally sensitive Barrow Island offshore NW Australia. Peak production from Trains 1-3 should reach 450 MBoed (2.6 Bcfd of natural gas and 20 MBbld of condensate).

---

**ExxonMobil Corp.**   31 January 2017                                          ⚜UBS  9

- In May 2013, XOM announced plans to move forward with the initial development phase of the **Julia** oil project, comprised of five leases in the Walker Ridge area with an estimated ~6 BBoe of resource in place. The first development phase includes a six well development (first spud was expected in mid-2014) designed to produce 34 MBoed, tied back to Chevron's Jack/St. Malo production facility. The project has an estimated cost of $4 billion and reached first production in April 2016, ahead of schedule and under budget.

- At the **Heidelberg** prospect (9% w.i.) in the **Gulf of Mexico,** first production commenced in January from three wells, which was ahead of original expectations for a 2Q16 start-up. Operator APC disclosed a fourth well was successfully drilled in 2Q16 and a fifth well was spud in July and expected to come on line in early. APC estimates Heidelberg holds 200-400 MMBoe of gross resource potential (~27 MMBoe net to XOM at the midpoint).

- The **Point Thomson** Initial Production System (62% w.i.) on the Alaska North Slope also commenced production in April 2016. The project will initially produce ~5 MBbld of natural gas condensate and ~100 MMcfd of *recycled* natural gas (gets re-injected for future recovery) before ramping to full capacity of ~10 MBbld and ~200 MMcfd, with the condensate to be transported by a 22-mile pipeline connecting into the Trans-Alaska Pipeline System. Located 60 miles east of Prudhoe Bay, the Point Thomson reservoir holds an estimated 8 Tcf of natural gas and 200 MMBbl of condensate, representing ~25% of known gas resources on the North Slope.

- The **Kashagan** project (16.8% w.i.) in Kazakhstan successfully re-started in October (consistent with expectations) and should gradually ramp-up to target capacity over the next 12 months. Phase 1 of the project, which consists of one large hub and 4 satellites at Kashagan East, is expected to have a gross capacity of 370 MBbld for liquids and 450 MMcfd for gas for a total net production of 76 MBoed, and Phases 2 and 3 are expected to come online towards the end of the decade and provide an additional 1,260 MBbld gross (214 MBbld net) liquids production capacity. The project will use sour gas injection in order to help maximize oil recovery. Production facilities began start-up in September 2013 and production ramped up to ~80 MBoed; however, operations were shut-in after a gas leak was detected. The operating company determined that both oil and gas pipelines needed to be replaced and construction of the new pipeline began in 2015.

**2017-18 Start-Ups to Add 340 MBbld of Net Production Capacity**

- XOM continues to expect start-up of the **Hebron oil field** (operator; 36% working interest) offshore Eastern Canada by the end of 2017, which should ultimately reach peak production of 150 MBbld. Following topside installation, the gravity-based platform (including 1.2 MMBbls of crude oil storage capacity) will be towed to its final location 230 miles offshore. The project was sanctioned in early 2013 with an estimated capital cost of $14 billion, and should recover >700 MMBbls of oil.

---

**ExxonMobil Corp.**   31 January 2017

- XOM is expanding the existing Odoptu 2 development (30% w.i.) off the coast of Russia called the **Odoptu Stage 2** project. The expansion develops an incremental 290 MMBbls of oil, more than doubling the total recovery from Odoptu to ~500 MMBbl, and adds ~55 MBbld of gross production.  Start-up at the northern well site expansion is expected in 2017, followed by the southern site in 2022.

- At **Upper Zakum** (28% w.i.) in the **UAE**, the field redevelopment project to increase production capacity from 660 MBbld to 750 MBoed is progressing, with two of the four artificial islands having commenced in November 2014 while drilling will continue over the next three years to the targeted production plateau. XOM is currently evaluating further expanding the project capacity to 1 MMBoed. In 2013, the project was granted a 15-year extension through 2041 with more favorable fiscal terms.

- In Block 32 (15% w.i.) offshore **Angola**, the first FPSO vessel development is the **Kaombo Split Hub** project in the southeastern section of the block, with a ~600 MMBbl estimated oil recovery. FID for the project was reached in 2014, and execution stage activities are progressing with start-up expected in 2017.

- Previously projected to start up in 2016, the **Barzan** project (7% w.i.) is developed to supply up to 90 MBbld of liquids and 1.4 Mcfd of natural gas primarily to Qatar once on stream in 2017. Barzan is one of several large projects XOM participates in that are supplied by Qatar's giant North Field.

---

**ExxonMobil Corp.**   31 January 2017

⚛ UBS  11

*122*

**App. 664**

**Figure 6: XOM's Major Development Projects 2016-19+**

| | Project | Country | Region | W.I. | Oil (MBbld) | Gas (MMcfd) | Gross MBoed | Net MBoed |
|---|---|---|---|---|---|---|---|---|
| **2016** | Gorgon Jansz | Australia | OECD | 25% | 20 | 2765 | 481 | 120 |
| | Kashagan Phase 1 | Kazakhstan | Caspian | 17% | 370 | 450 | 445 | 76 |
| | Heidelberg | U.S. | OECD | 9% | 80 | 80 | 93 | 8 |
| | Julia Phase 1 | U.S. | OECD | 50% | 30 | 0 | 30 | 15 |
| | Point Thomson | U.S. | OECD | 62% | 10 | 200 | 43 | 27 |
| **2017-18** | AB32 Kaombo Split Hub | Angola | Africa | 15% | 250 | 0 | 250 | 38 |
| | Hebron | Canada | OECD | 36% | 150 | 0 | 150 | 54 |
| | Sakhalin-1 Odoptu Stage 2 | Russia | Russia | 30% | 55 | 0 | 55 | 17 |
| | Upper Zakum 750 | U.A.E. | Middle East | 28% | 750 | 0 | 750 | 210 |
| | Barzan | Qatar | Middle East | 7% | 90 | 1400 | 323 | 23 |
| **2019+** | Gorgon Area Expansion | Australia | OECD | 25% | 10 | 915 | 163 | 41 |
| | Scarborough | Australia | OECD | 50% | 0 | 1030 | 172 | 86 |
| | Firebag | Canada | OECD | 70% | 380 | 0 | 380 | 266 |
| | Steam-Assisted Gravity Drainage (SAGD) | Canada | OECD | 63%-100% | 350+ | 0 | 350+ | 285+ |
| | Syncrude Aurora South Phases 1 & 2 | Canada | OECD | 25% | 210 | 0 | 210 | 53 |
| | Syncrude Mildred Lake  Extension | Canada | OECD | 25% | 210 | 0 | 210 | 53 |
| | West Coast Canada (WCC) LNG | Canada | OECD | 100% | 0 | 1600 | 267 | 267 |
| | Cepu Gas | Indonesia | S.E. Asia | 41% | 5 | 180 | 35 | 14 |
| | Natuna | Indonesia | S.E. Asia | TBD | 0 | 1100 | 183 | TBD |
| | West Qurna (Phase 1) | Iraq | Middle East | 33% | 1600 | 0 | 1600 | 528 |
| | Kashagan Future Phases | Kazakhstan | Caspian | 17% | 1260 | 0 | 1260 | 214 |
| | Tengiz Expansion | Kazakhstan | Caspian | 25% | 655 | 0 | 655 | 164 |
| | Bonga North | Nigeria | Africa | 20% | 200 | 0 | 200 | 40 |
| | Bonga Southwest | Nigeria | Africa | 16% | 200 | 0 | 200 | 32 |
| | Bosi | Nigeria | Africa | 56% | 140 | 315 | 193 | 108 |
| | Owowo West | Nigeria | Africa | 27% | 180 | 130 | 202 | 54 |
| | Satellite Field Development Phase 2 | Nigeria | Africa | 40% | 80 | 0 | 80 | 32 |
| | Uge | Nigeria | Africa | 20% | 110 | 20 | 113 | 23 |
| | Usan Future Phases | Nigeria | Africa | 30% | 50 | 0 | 50 | 15 |
| | PNG Future | Papua New Guinea | Other | 33% | 10 | 570 | 105 | 35 |
| | Domino | Romania | Europe | 50% | 0 | 630 | 105 | 53 |
| | Sakhalin-1 Future Phases | Russia | Russia | 30% | 0 | 800 | 133 | 40 |
| | Tanzania Block 2 | Tanzania | Africa | 35% | 0 | 1000 | 167 | 58 |
| | Alaska LNG | U.S. | OECD | 36% | 60 | 3500 | 643 | 232 |
| | Golden Pass Products LNG Export | U.S. | OECD | 30% | 0 | 2500 | 417 | 125 |
| | Julia Phase 2 | U.S. | OECD | 50% | 30 | 0 | 30 | 15 |
| | Ca Voi Xanh | Vietnam | Asia | 64% | 3 | 375 | 66 | 42 |

Source:  Company reports and WoodMackenzie

# Increased Emphasis on Global Unconventional Resource Plays

**XOM highlighted its growing position in unconventional resource.** XOM estimates it has >40 BBoe of companywide unconventional resources, which accounts for nearly half of its total resource base of ~94 BBoe. Almost half of its companywide unconventional resource base is heavy oil/oil sands and the rest natural gas and oil. XOM has doubled its unconventional resource since 2005. This is particularly important as it expects global oil and gas supply growth over the next three decades to be led by unconventionals. At its 2016 Analyst Day XOM noted that it had reduced its total rig count by over 60% from its 2015 peak but can adjust activity up or down depending on market conditions.

- **XOM holds an estimated ~7.5 million unconventional acres in North America and has a 18+ BBoe resource base in the US** (including the acquisition of several private companies in the Permian owned by the Bass family). The company's near term focus is on the Permian and Bakken liquids plays, where it produced a combined ~240 MBoed in 3Q16). Net production in these plays increased by 25% in 2015. *We highlight several of XOM's key unconventional resource assets below:*

---

**ExxonMobil Corp.**   31 January 2017

UBS  12

*123*

- In the **Bakken**, production averaged >100 MBoed during 1H16. We note that operated production has more than doubled from 1Q13 it shifted to pad development and focuses on optimizing well completions. XOM continues to see efficiency gains in the play; at its 2016 Analyst Day management noted that Bakken development costs per Boe have fallen by over 50% since 2012 to under $11/Boe. At last update, XOM held an estimated 0.9 BBoe of resource in the play.

- XOM is increasing activities in the **Permian Basin** where it is currently running 10 rigs with plans to ramp further in the near future. Production is currently >140 MBoed, compared to 120 MBoed at the end of July 2015 and its >100 MBoed exit rate at year end 2014, and previously noted that unconventional production in the basin nearly doubled in 2015 compared to 2014. The company noted in its 2016 Analyst Presentation that from 1H14 to 2H15, in the **Wolfcamp** formation specifically, well recoveries improved by ~80% on longer lateral lengths and improved completion design while drilling costs per foot and fracture stimulation costs per foot fell by over 60% and 70%, respectively. Due to these improvements, development cost per Boe came down by 60% to under $10/Boe over the same period. The company holds >1.5 million net acres in the play, and since 2014 has completed 5 transactions in the Midland Wolfcamp and Spraberry areas which boosted its total position to 135,000 acres. XOM's subsidiary, XTO, made two non-monetary exchanges with LINN Energy in 2014 which increased XTO's acreage position by ~42,000 net acres in its core area of the northern Midland Basin prospective for horizontal Wolfcamp and Spraberry development and ~1,800 net acres in the New Mexico Delaware Basin, increasing the company's acreage in the Permian to over 1.5 million net acres, much of which is believed to be prospective for unconventional plays. Notably, the transactions increased XTO's acreage in the Midland Basin Wolfcamp core to ~120,000 net acres and total position in the basin to ~320,000 net acres.

- **XOM estimates the Permian assets it is acquiring from the Bass family support a peak production of 350 MBoed.** Earlier this month, XOM agreed to acquire several private companies owned by the Bass family which primarily operate in the northern Delaware Basin (Eddy County) for $5.6 billion in XOM shares plus additional contingent cash payments of up to $1 billion. Adjusted for production valued at $45,000/Boed, we estimate XOM is paying ~$21,000 per acre, above recent northern Delaware transactions. In the northern Delaware, we have seen three sizable transactions in the last year: Matador's purchase of 4,600 acres in Eddy County for $4,600/acre, CXO's purchase of Enduring Resources in Lea County for $16,400/acre, and EOG's purchase of Yates Petroleum which valued the northern Delaware at $6,000/acre. XOM is acquiring 250,000 net acres, >18 MBoed (70% liquids) of production, and 3.4 BBoe of resource potential. This adds to XOM's current Permian position of ~140 MBoed and 1.5 million acres (~500,000 prospective for shale). While the deal more than doubles XOM's Permian resource potential to ~6 BBoe and increases its unconventional acreage in the play to 750,000, it represents just ~4% of XOM's overall resource base of ~94 BBoe.

---

**ExxonMobil Corp.**   31 January 2017                                    ❄ UBS  13

*124*

- XOM previously highlighted development on its liquids-rich position in **Woodford Shale in the Ardmore Basin,** where production was ~40 MBoed at the end of July 2015. The company closed on a small acquisition in 2013, which increased its total acreage position to >280,000 acres in the play. XOM plans to develop over 1.5 BBoe of resources (up from 600 MMBoed estimated in 2012) in the Woodford Ardmore at an F&D cost of <$10/Boe.

- XOM also has ~55,000 net acres prospective for the **Utica Shale**, most of which was acquired from the privately-held Phillips Resources and TWP in June 2011. The company previously sold 30,000 net acres of its Utica acreage in Harrison, Jefferson, and Belmont Counties and will use the proceeds to fund near-term development costs on its remaining core acreage (55,000 net acres). XOM previously highlighted its initial Utica well (operated by XTO) was producing at a peak 30-day rate of ~15 MMcfd of dry gas.

- XOM continues to delineate liquids rich plays across its acreage acquired from Celtic Exploration which closed in 1Q13 (C$3.1 billion), adding 545,000 acres in the **Montney** and 104,000 acres in the **Duvernay**, 128 MMBoe of 2P resource (76% gas), and 72 MMcfd of natural gas and 4 MBbld of liquids production. In **Canada**, XOM is also encouraged by early results in the liquids-rich **Cardium play** (where it holds 235,000 net acres), and is also involved in the **Viking oil play**.

**Figure 7: North American Unconventional Acreage Position**

| Play | Category | Acreage (000's) |
|---|---|---|
| Summit Creek | Shale gas | 445 |
| Horn River | Shale gas | 340 |
| Fayetteville | Shale gas | 505 |
| Haynesville/Bossier | Shale gas | 240 |
| Barnett | Shale gas | 230 |
| Marcellus/Utica | Shale gas | 625 |
| Woodford | Shale gas/shale oil | 280 |
| Eagle Ford | Shale gas/shale oil | 90 |
| Smackover | Shale oil | 215 |
| Montney/Duvernay | Shale oil | 660 |
| Utica | Shale oil | 55 |
| Bakken | Tight oil | 585 |
| Cardium | Tight oil | 235 |
| Permian | Tight oil | 750 |
| Freestone | Tight gas | 320 |
| Piceance | Tight gas | 320 |
| Uinta | Tight gas/CBM | 260 |
| San Juan/Raton | Tight gas/CBM | 445 |
| San Joaquin Valley | Heavy oil/oil sands | 150 |
| Athabasca | Heavy oil/oil sands | 720 |
| **Total** | | **7,470** |

Source: Company documents and UBS estimates

---

**ExxonMobil Corp.**   31 January 2017                                      ⚛ UBS  14

*125*

- **XOM is also making efforts in developing unconventional oil plays outside of North America.**

  - In **Argentina**, XOM has increased its acreage in the Neuquen Basin by more than 6 fold since July 2010 to ~850,000 net acres. The company had drilled >8 wells with its joint venture partners at last update, and it was evaluating test results from its 2012-2013 drilling program. XOM previously announced the completion of two operated wells targeting the Vaca Muerta formation: the Bajo del Choique X-2 well tested at an average rate of 770 Bbld, the highest unconventional rate achieved to date in Argentina. Meanwhile, XOM disclosed its La Invernada X-3 well (its second horizontal well) flow tested at over 600 Bbld of oil. The company subsequently announced it was beginning a production pilot program in these blocks.

  - The company recently highlighted its unconventional liquids opportunity in **Colombia**, where it drilled and was testing its first well at last update and noted it sees potential from **La Luna** liquids. XOM had previously been reported as one of several companies bidding for acreage in Colombia, specifically in the Middle Magdalena basin.

  - In June 2012, XOM agreed with Rosneft to conduct a study of unconventional oil opportunities in **Western Siberia** and create an Arctic Research Center to support the partners' joint venture offshore developments on the Arctic Shelf. In December 2012, the companies signed an agreement to jointly develop a tight oil pilot project targeting the 2.7 million acres in the Bazhenov and Achimov formations in western Siberia, which entails drilling new horizontal and vertical wells, deepening and redevelopment activities on existing or idle wells, and an advanced core survey program including geomechanical analysis. XOM is particularly excited about the prospectivity of the Bazhenov, as western Siberia accounts for 60% of Russian oil and the Bazhenov is the source rock for western Siberia. XOM (49% working interest in the project) and Rosneft (51%) planned to complete the pilot and jointly select blocks for commercial development by 2015. XOM will provide up to $300 million for the pilot in addition to geological and well engineering resources and horizontal drilling services. But XOM's participation in Russian Arctic or unconventional activities have been suspended given sanctions.

## Details on Exploration Program

**XOM has a track record of adding resources at the lowest F&D costs amongst its peers and has a well-balanced portfolio of global resource opportunities which should support its longer term production growth.** We provide an update on a portion of XOM's exploration program below:

- Offshore **Guyana**, XOM announced in May 2015 a "significant oil discovery" at the **Liza-1** prospect on the **Stabroek block** (45% w.i.) which marked the country's first deepwater well. XOM notes Liza was the largest exploration

---

**ExxonMobil Corp.**   31 January 2017

DX-0062 - 15 of 31                     **App. 668**

discovery in the world in 2015. The well encountered >295 feet of high-quality oil-bearing sandstone pay. And in late June, XOM announced the **Liza-2** well encountered >190 feet of oil-bearing sandstone reservoirs and confirms a "world-class discovery" with a recoverable resource of 800 MMBoe to 1.4 BBoe. In October the **Liza-3** appraisal well encountered 200 feet of net oil pay in the same high quality reservoir encountered by the Liza-1 and Liza-2 wells, prompting the partners to increase the recoverable resources estimate to the upper end of the previously announced 0.8-1.4 BBoe range. Earlier this month, XOM announced the Liza-3 appraisal well (completed in November) identified an additional reservoir of ~100-150 MMBoe incremental resource potential directly below the Liza field, prompting us to increase our resource estimate for Liza from 1.3 BBoe to 1.425 BBoe. XOM expects to sanction the first phase of the Liza development later this year . . . an FPSO with 100 MBbld of capacity that is expected to come on stream in 2020. It also announced the **Payara-1** well (45% w.i. and located 10 miles NW of Liza discovery) on the Stabroek block encountered >95 feet of oil-bearing pay. Appraisal drilling is planned for later this year to determine the full resource potential of Payara. The partners will next drill the **Snoek** prospect (6 miles south of Liza). XOM previously also entered into an agreement to acquire ~50% interest in the **Kaieteur block** which is adjacent to the **Canje** (where XOM has a 35% w.i.) and Stabroek blocks, which will bring its total acreage position in Guyana to 11.4 million acres across the 3 blocks.

- In late December, XOM announced a new natural gas discovery at the Oil Search-operated **Muruk-1** well (XOM 42.5% w.i.) in the **Papua New Guinea North Highlands**, 13 miles northwest of the Hides Gas Field, which sources the PNG LNG project. The Muruk-1 well was drilled to 10,630 feet and encountered similar high-quality sandstone reservoirs as the Hides field, in line with pre-drill expectations. Evaluation is ongoing to determine the size of the discovery.

- In October 2016, XOM announced a "significant" oil discovery at **Owowo** prospect (27% operated w.i.) offshore **Nigeria** with potential resource of 0.5-1 BBbls. The **Owowo-3** well encountered 460 feet of oil-prone sandstone reservoir, extending the resource discovery of its prior exploration well (**Owowo-2**).

- In the northern **Black Sea**, XOM has established a ~3.5 million net acre position across Ukraine, Romania and Russia. **Offshore Romania**, XOM and its partner, OMV, have completed exploration activities after drilling seven wells since 2014 and are advancing with detailed development planning and economic viability studies. We note that its partner, OMV, previously indicated it was pleased with its initial well in the Neptune block, **Domino 1**, which made the gas discovery in 2012 with a preliminary resource estimate of 1.5-3.0 Tcf. The discovery well, which encountered ~230 feet of net gas pay, was the first deepwater exploration well drilled offshore Romania. OMV had indicated that it was too early to determine commerciality of the discovery, which requires additional testing. The partners completed drilling at **Domino 2** and were evaluating the results at last update. Additional exploratory drilling occurred in 2015 at the **Pelican South** prospect located to the north of the

---

**ExxonMobil Corp.**   31 January 2017

Domino discovery. XOM's Romania unit head had previously disclosed that the potential investment in the region could be in the $3-$10 billion range if the testing proves to be successful.

▪ **As sanctions against the Russian oil and gas sector specifically target deepwater, unconventional, and Arctic activities, XOM's Russian joint venture in the Kara Sea, Black Sea, West Siberia, and Arctic Shelf are within the scope of the sanctions.** However, sanctions do not apply to its Sakhalin and Far East LNG projects. Below we summarize XOM's previously planned explorations in Russia with updates given the sanctions.

   ▪ XOM previously provided an update on its Strategic Cooperation Agreement signed with **Rosneft** in August 2011 for 2 joint venture projects in the Kara and Black Seas. Rosneft holds a 66.7% equity interest in the Russian projects and XOM owns 33.3%. The companies planned to spend $3.2 billion to jointly explore in Russia, the US and other regions of the world. In the **Kara Sea,** the partnership completed 2D and 3D seismic in September on East Prinovozemelskiy Blocks 1, 2 and 3, which covers 31 million acres (equal in size to all of the leased acreage in the Gulf of Mexico). The partnership previously announced the discovery of hydrocarbons at the **University** prospect. With results under evaluation, XOM believes it is premature to provide further comments and disclosed well had been safely plugged and abandoned. The University prospect marks the first well in the Kara Sea and, while geological data interpretation may take up to two months, Rosneft preliminary estimates resources of ~2.8 BBoe (12 Bcf of gas and 730 billion Bbls of oil).

   ▪ In the **Black Sea**, the partners previously planned to explore a 2.8 million acre position on the Tuapse License Block where seismic acquisition was complete and exploration drilling had previously been planned in late 2014/early 2015. Combined unrisked resource potential could be as large as 85 BBoe. The agreement allowed Rosneft to gain interest in several of XOM's assets in North America including a 30% interest in 20 blocks in Gulf of Mexico and some of XOM's unconventional assets including the Calera Ranch project in the Delaware Basin and 56,000 net acres in the Cardium play in the Hamilton area.

   ▪ XOM and Rosneft previously finalized the agreement (announced in February 2014) to expand the scope of the partnership to include seven new **Arctic blocks** spanning 150 million acres across the **Chukchi, Laptev and Kara Seas**. In addition to extensive 2D and 3D seismic programs, at the time the companies had planned to drill 14 exploration and appraisal wells in the license block over the next 10 years. The two companies had also begun evaluating the joint development of a potential 5 MMTA LNG facility in the **Russian Far East**, where the partners previously awarded contracts for the first phase of FEED development for the project to CB&I and Foster Wheeler. The partners would evaluate designs from each contractor prior to awarding contracts for phase 2, and planned to finalize project design for the plant and associated facilities by the end of 2014 at last update.

---

**ExxonMobil Corp.**   31 January 2017

- Offshore **Tanzania**, XOM (35% working interest) and Statoil (operator, 65% working interest) made an additional gas discovery on the Block 2 license in October 2014. The **Giligiliani-1** exploration well discovered 1.2 Tcf of natural gas in place, bringing the total volumes in place to ~21 Tcf in Block 2. The well follows the **Piri-1** well which was completed in 2Q14 and discovered gas in a high quality reservoir confirming an additional 2 to 3 Tcf of gas in place. The partners have now completed 7 successful wells on the block with total resource in place estimated at ~21 Tcf. The partners will next drill the **Kungamanga** prospect and, at last update, completed an evaluation of potential sites for a common onshore LNG plant and made a location recommendation to the government.

- XOM previously added 2.3 million gross acres offshore **Cote d'Ivoire** and 160,000 gross acres offshore Equatorial Guinea. This adds to an already strong west African acreage position, where XOM had acquired an 80% interest in **Liberia's** Block 13 covering >625,000 acres offshore Liberia in water depths of 250-10,000 feet in 2013.

- In December 2012, XOM disclosed that it reached an agreement with Impact Oil & Gas to acquire a 75% interest and assume operatorship of the **Tugela South** exploration right, which spans ~2.8 million acres offshore **South Africa** in water depths of up to 6,500 feet. The agreement also includes the right to acquire 75% participating interests in future exploration rights on three additional offshore areas currently held by Impact. Separately, XOM also finalized a technical cooperation permit with the South African government to study the exploration potential of the ~12.4 million acre Deepwater Durban Basin; the permit is exclusive to XOM and valid for 1 year, after which the company may apply for an exploration right if it wishes to further explore the area.

## Fourth Quarter Results Review

**4Q16 adjusted EPS rose 34% YoY to $0.89, above UBSe of $0.71 and consensus' $0.70 driven by better than expected corporate income (driven by unusual tax items) and downstream results (driven by a $522 million gain on asset sale, or $0.13/share).** GAAP EPS of $0.41 includes a writedown of ~$2 billion related to Rockies dry gas assets. Higher than forecasted Downstream earnings (+$0.08/share vs. consensus) was driven entirely by a gain on Canadian retail sites ($522 million or $0.13/share) and much better than expected income from the Corporate segment (+$0.16/share vs consensus expectations) were partly offset by weaker than expected Upstream earnings (-$0.01/share vs consensus) and Chemicals (-$0.04/share vs consensus). 4Q cash flow from operations of $7.4 billion was above UBSe of $7.2 billion but below consensus of $7.9 billion.

**Upstream Earnings Surge Sequentially and YoY but Modestly Below Expectations**

- **Clean upstream earnings of $1.385 billion more than doubled from $620 million in 3Q and rose 62% YoY, 14% above UBSe but 3% below consensus.** Excluding a writedown of ~$2 billion related to Rockies dry gas

---

**ExxonMobil Corp.**   31 January 2017                                              ❄UBS  18

*129*

assets, XOM's clean US Upstream *loss* of ($301) million narrowed by 37% QoQ and 44% YoY. International Upstream *profit* of $1.7 billion rose 54% QoQ and 21% YoY. On a YoY basis, 4Q16 clean upstream earnings were positively impacted by higher liquids and US gas realizations, partly offset by lower international gas realizations as well as lower volume and mix effects.

- **Upstream production fell 3% YoY but rose 8% QoQ to 4,121 MBoed, 3% below UBSe but in line with consensus.**

  - **US Upstream volumes** fell 2% YoY but were roughly flat QoQ 996 MBoed, 1% above our forecast. Liquids volumes were flat YoY at 496 MBbld, while domestic gas volumes continued to decline, sliding 4% YoY to 3.0 Bcfd.

  - **International upstream volumes** (76% of companywide 4Q16 production) fell 3% YoY to ~3.1 MBoed on base field declines and lower entitlements, partly offset by its project start-ups. International liquids production fell 5% YoY and natural gas volumes declined 1% YoY.

  - **Worldwide oil and gas realizations** rose 12% YoY to $31.10/Boe, 2% above our estimates.

### Downstream Earnings Beat on Asset Sale Gain

- **R&M earnings fell 8% YoY to $1.24 billion, up 1% QoQ and well above UBSe $985 million and consensus of $898 million aided by a $522 million asset sale gain.** Relative to the year-ago quarter, the R&M earnings decline reflected weaker refining margins, which more than offset favourable volume/mix effects and the asset sale gains.

- **Companywide refining throughput fell 1% YoY but was little changed sequentially.** Petroleum product sales were down 3% YoY and 1% QoQ to ~5.5 MMBbld.

### Chemical Earnings Down YoY and QoQ and Below Expectations

- **Chemical earnings fell 9% YoY and 26% sequentially to $872 billion, 22% and 17% below our forecasts and consensus, respectively.** The YoY decline was driven by lower margins as well as unfavourable volumes/mix, inventory, and foreign exchange effects.

### Corporate and Financing

- **Corporate and financing *earnings* of $209 million were much better than consensus and UBSe of an *expense* of $456 million and $364 million, respectively, on favorable non-US tax items positively impacting EPS vs consensus by $0.16/share.** Notably, XOM provided 2017 quarterly Corporate expense guidance of $400-$600 million, better than prior guidance of $500-$700 million but highlighting that the 4Q16 *income* should be viewed as unusual.

- **While XOM paid another ~$3.1 billion in dividends, share repurchases to offset dilution remained de minimus in 4Q.** Looking ahead, share repurchases will be maintained to offset dilution, but XOM is not generating

---

enough free cash flow to re-initiate a large enough buyback program to reduce shares outstanding.

- **Net debt fell ~$2 billion QoQ but rose ~$4 billion YoY to $39.1 billion.**

The figure below provides the primary factors impacting XOM's 4Q16 EPS results, as well as outlining the differences between results and our estimates.

**Figure 8: XOM's Fourth Quarter Operating and Financial Comparison**

| | Third Quarter Results | | | % Change | | Results vs. Estimates | | | | Consensus | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 4Q16 | 3Q16 | 4Q15 | Q-o-Q | Y-o-Y | 4Q16A | 4Q16E | % Variance | Per Share | 4Q16 | % Variance | Per Share |
| **Earnings ($ in millions)** | | | | | | | | | | | | |
| Upstream: | | | | | | | | | | | | |
| US | ($301.0) | ($477.0) | ($538.0) | -37% | -44% | ($301.0) | ($285.5) | 5% | ($0.00) | ($229.0) | 31% | ($0.02) |
| International | $1,686.0 | $1,097.0 | $1,395.0 | 54% | 21% | $1,686.0 | $1,505.6 | 12% | $0.04 | $1,655.0 | 2% | $0.01 |
| **Total Upstream** | **$1,385.0** | **$620.0** | **$857.0** | **123%** | **62%** | **$1,385.0** | **$1,220.1** | **14%** | **$0.04** | **$1,426.0** | **-3%** | **($0.01)** |
| | | | | | | | | | | | | |
| Downstream | | | | | | | | | | | | |
| US | $270.0 | $225.0 | $435.0 | 20% | -38% | $270.0 | $214.4 | 26% | $0.01 | $233.0 | 16% | $0.01 |
| International | $971.0 | $1,004.0 | $916.0 | -3% | 6% | $971.0 | $770.7 | 26% | $0.05 | $665.0 | 46% | $0.07 |
| **Total Downstream** | **$1,241.0** | **$1,229.0** | **$1,351.0** | **1%** | **-8%** | **$1,241.0** | **$985.2** | **26%** | **$0.06** | **$898.0** | **38%** | **$0.08** |
| | | | | | | | | | | | | |
| Chemicals | | | | | | | | | | | | |
| US | $352.0 | $434.0 | $520.0 | -19% | -32% | $352.0 | $380.8 | -8% | ($0.01) | | | |
| International | $520.0 | $737.0 | $443.0 | -29% | 17% | $520.0 | $739.2 | -30% | ($0.05) | | | |
| **Total Chemicals** | **$872.0** | **$1,171.0** | **$963.0** | **-26%** | **-9%** | **$872.0** | **$1,120.1** | **-22%** | **($0.06)** | **$1,056.0** | **-17%** | **($0.04)** |
| | | | | | | | | | | | | |
| All Other | $209.0 | ($370.0) | ($391.0) | -156% | -153% | $209.0 | ($364.0) | -157% | $0.14 | ($456.0) | -146% | $0.16 |
| | | | | | | | | | | | | |
| **Total Segment Income** | **$3,707.0** | **$2,650.0** | **$2,780.0** | **40%** | **33%** | **$3,707.0** | **$2,961.4** | **25%** | | | | |
| | | | | | | | | | | | | |
| **Clean Net Income** | **$3,707.0** | **$2,650.0** | **$2,780.0** | **40%** | **33%** | **$3,707.0** | **$2,961.4** | **25%** | **$0.18** | **$2,924.0** | **27%** | **$0.19** |
| | | | | | | | | | | | | |
| Diluted Shares Outstanding (mm) | 4,176.0 | 4,178.0 | 4,183.0 | 0% | 0% | 4,176.0 | 4,158.2 | 0% | | | | |
| | | | | | | | | | | | | |
| **Clean Diluted EPS** | **$0.89** | **$0.63** | **$0.66** | **40%** | **34%** | **$0.89** | **$0.71** | **25%** | **$0.18** | **$0.70** | **27%** | |
| | | | | | | | | | | | | |
| **Upstream Production** | | | | | | | | | | | | |
| US: | | | | | | | | | | | | |
| Liquids (MBbld) | 496 | 484 | 494 | 2% | 0% | 496 | 487 | 2% | | | | |
| Natural Gas (MMcfd) | 2,997 | 3,058 | 3,123 | -2% | -4% | 2,997 | 3,010 | 0% | | | | |
| **Total (MBoed)** | **996** | **994** | **1,015** | **0%** | **-2%** | **996** | **988** | **1%** | | | | |
| | | | | | | | | | | | | |
| International: | | | | | | | | | | | | |
| Liquids (MBbld) | 1,888 | 1,727 | 1,987 | 9% | -5% | 1,888 | 1,999 | -6% | | | | |
| Natural Gas (MMcfd) | 7,427 | 6,543 | 7,480 | 14% | -1% | 7,427 | 7,513 | -1% | | | | |
| **Total (MBoed)** | **3,126** | **2,818** | **3,234** | **11%** | **-3%** | **3,126** | **3,251** | **-4%** | | | | |
| | | | | | | | | | | | | |
| **Total (MBoed)** | **4,121** | **3,811** | **4,248** | **8%** | **-3.0%** | **4,121** | **4,239** | **-3%** | | **4,142** | **0%** | |
| | | | | | | | | | | | | |
| **Upstream Realizations** | | | | | | | | | | | | |
| US : Crude ($/bbl) | 43.38 | 38.76 | 34.36 | 12% | 26% | 43.38 | 41.79 | 4% | | | | |
| Natural Gas ($/mcf) | 2.69 | 2.65 | 1.80 | 2% | 49% | 2.69 | 2.81 | -4% | | | | |
| | | | | | | | | | | | | |
| International: Crude ($/bbl) | 44.82 | 40.96 | 36.99 | 9% | 21% | 44.82 | 44.42 | 1% | | | | |
| Natural Gas ($/mcf) | 4.97 | 4.47 | 5.80 | 11% | -14% | 4.97 | 4.59 | 8% | | | | |
| | | | | | | | | | | | | |
| Revenue per boe ($/boe) | | | | | | | | | | | | |
| US | 26.16 | 23.95 | 19.39 | 9% | 35% | 26.16 | 25.78 | 1% | | | | |
| International | 32.53 | 29.69 | 30.29 | 10% | 7% | 32.53 | 31.72 | 3% | | | | |
| Worldwide | 31.10 | 28.29 | 27.86 | 10% | 12% | 31.10 | 30.43 | 2% | | | | |
| | | | | | | | | | | | | |
| **Upstream Tax Rate** | 52% | 55% | 58% | -6% | -10% | 52% | 53% | -1% | | | | |
| | | | | | | | | | | | | |
| **Downstream Data** | | | | | | | | | | | | |
| US Refinery Runs (mbpd) | 1,604 | 1,604 | 1,649 | 0% | -3% | 1,604 | 1,484 | 8% | | | | |
| International Refinery Runs (mbpd) | 2,767 | 2,761 | 2,746 | 0% | 1% | 2,767 | 2,746 | 1% | | | | |
| **Total Throughput (mbpd)** | **4,371** | **4,365** | **4,395** | **0%** | **-1%** | **4,371** | **4,230** | **3%** | | | | |
| | | | | | | | | | | | | |
| **Total Product Sales (mbpd)** | **5,506** | **5,585** | **5,679** | **-1%** | **-3%** | **5,506** | **5,458** | **1%** | | | | |

Source: UBS estimates, Factset, and company documents

**ExxonMobil Corp.**  31 January 2017    ❄UBS  20

*131*

**Figure 9: ExxonMobil Earnings Summary (2014-2021E)**

| ($MM except per share data) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Upstream** | **2014** | **2015** | **2016E** | **2017E** | **2018E** | **2019E** | **2020E** | **2021E** | **CAGR (2016-2021E)** |
| Production: | | | | | | | | | |
| - Oil (MBbld) | 2,110.8 | 2,346 | 2,365 | 2,471 | 2,482 | 2,428 | 2,391 | 2,464 | 1% |
| - Gas (MMcfd) | 11,145.1 | 10,515 | 10,127 | 10,128 | 9,999 | 9,742 | 9,628 | 9,441 | -1% |
| **Total Production (MBoed)** | **3,968** | **4,098** | **4,053** | **4,159** | **4,148** | **4,051** | **3,996** | **4,038** | **-0.1%** |
| | -4.9% | 3.3% | -1.1% | 2.6% | -0.3% | -2.3% | -1.4% | 1.1% | |
| Production Breakdown n: | | | | | | | | | |
| % Non-OECH | 43% | 44% | 43% | 44% | 44% | 44% | 44% | 45% | |
| % Oil | 53% | 57% | 58% | 59% | 60% | 60% | 60% | 61% | |
| Y/Y Grow th | -4.9% | 3.3% | -1.1% | 2.6% | -0.3% | -2.3% | -1.4% | N/A | |
| Oil Prices: ($/Bbl) | | | | | | | | | |
| UBS Forecast (WTI) | $92.89 | $48.81 | $43.35 | $58.00 | $63.00 | $68.00 | $68.00 | $68.00 | |
| XOM Global Liquids Realization | $91.12 | $45.75 | $38.33 | $51.54 | $55.86 | $60.18 | $60.17 | $60.18 | |
| Natural Gas Prices: ($/Mcf) | | | | | | | | | |
| UBS Forecast (Henry Hub) | $4.45 | $2.67 | $2.46 | $3.25 | $3.00 | $3.25 | $3.25 | $3.25 | |
| XOM Global NatGas Realization | $7.74 | $5.25 | $3.84 | $4.89 | $5.62 | $6.09 | $6.14 | $6.18 | |
| Upstream Net Income: | | | | | | | | | |
| - U.S. | $5,197 | ($1,079) | ($4,151) | ($487) | ($429) | ($151) | ($369) | ($592) | -32% |
| - Non-U.S. | $22,351 | $8,180 | $4,347 | $8,797 | $10,521 | $11,372 | $10,707 | $10,429 | 19% |
| Total Upstream Net Income | $27,548 | $7,101 | $196 | $8,311 | $10,092 | $11,221 | $10,337 | $9,837 | |
| Check | Ok | Ok | Ok | Ok | Ok | Ok | Ok | Ok | |
| Merger Effects and Special Items | ($2,600) | $0 | $2,027 | $0 | $0 | $0 | $0 | $0 | |
| **Upstream Net Income** | **$24,948** | **$7,101** | **$2,223** | **$8,311** | **$10,092** | **$11,221** | **$10,337** | **$9,837** | **35%** |
| Check | Ok | Ok | Ok | Ok | Ok | Ok | Ok | Ok | |
| **% of Total Net Income** | **84%** | **44%** | **23%** | **55%** | **61%** | **62%** | **60%** | **59%** | |
| **Upstream ROCE** | **15.1%** | **4.2%** | **1.3%** | **4.8%** | **5.8%** | **6.4%** | **5.9%** | **5.6%** | |
| **Downstream** | **2014** | **2015** | **2016E** | **2017E** | **2018E** | **2019E** | **2020E** | **0001E** | |
| Throughput: | | | | | | | | | |
| - U.S. | 1,809 | 1,709 | 1,591 | 1,591 | 1,591 | 1,591 | 1,591 | 1,591 | 0% |
| - Non-U.S. & Other | 2,667 | 2,722 | 2,677 | 2,678 | 2,678 | 2,678 | 2,677 | 2,678 | 0% |
| **Total Throughput (MBoed)** | **4,476** | **4,432** | **4,269** | **4,269** | **4,269** | **4,269** | **4,269** | **4,269** | **0%** |
| Check | Ok | Ok | Ok | Ok | Ok | Ok | Ok | Ok | |
| Refining Capacity | 5,291 | 5,291 | 5,035 | 5,035 | 5,035 | 5,035 | 5,035 | 5,035 | |
| Capacity Utilization | 84.6% | 83.8% | 84.8% | 84.8% | 84.8% | 84.8% | 84.8% | 84.8% | |
| Check | Ok | Ok | Ok | Ok | Ok | Ok | Ok | Ok | |
| Benchmark Margins: | | | | | | | | | |
| Gulf Coast 3-2-1 crack spread | $10.77 | $13.26 | $10.76 | $10.50 | $10.25 | $10.25 | $10.25 | $10.25 | |
| West Coast 3-2-1 crack spread | $15.57 | $26.60 | $17.73 | $15.75 | $15.50 | $15.00 | $14.75 | $14.75 | |
| Rotterdam cracking | $2.70 | $6.47 | $4.47 | $4.12 | $3.37 | $2.89 | $3.28 | $2.92 | |
| Singapore cracking | $5.79 | $7.72 | $6.15 | $5.50 | $5.00 | $5.50 | $5.00 | $5.00 | |
| Weighted Average Refining Margins: | | | | | | | | | |
| - U.S. | $11.15 | $14.31 | $11.04 | $10.50 | $10.25 | $10.25 | $10.25 | $10.25 | |
| - Non-U.S. | $5.20 | $8.21 | $6.21 | $5.80 | $5.22 | $5.10 | $5.17 | $4.98 | |
| Total Weighted Average | $7.60 | $10.56 | $8.01 | $7.55 | $7.10 | $7.02 | $7.06 | $6.94 | |
| Consolidated Marketing Margins: | | | | | | | | | |
| U.S. | $3.18 | $3.93 | $3.86 | $3.93 | $3.93 | $3.93 | $3.93 | $3.93 | |
| International | $5.00 | $5.08 | $5.06 | $5.08 | $5.08 | $5.08 | $5.08 | $5.08 | |
| Downstream Net Income: | | | | | | | | | |
| - U.S. | $1,618 | $1,901 | $1,094 | $1,142 | $1,069 | $1,475 | $1,490 | $1,504 | 7% |
| - Non-U.S. | $1,427 | $4,656 | $3,107 | $2,803 | $2,645 | $2,645 | $2,779 | $2,765 | -2% |
| Downstream Net Income | $3,045 | $6,557 | $4,201 | $3,945 | $3,713 | $4,120 | $4,268 | $4,269 | |
| Check | Ok | Ok | Ok | Ok | Ok | Ok | Ok | Ok | |
| Merger Effects and Special Items | ($100) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| **Total Downstream Net Income** | **$2,945** | **$6,557** | **$4,201** | **$3,945** | **$3,713** | **$4,120** | **$4,268** | **$4,269** | **0%** |
| Check | Ok | Ok | Ok | Ok | Ok | Ok | Ok | Ok | |
| **% of Total Net Income** | **10%** | **41%** | **43%** | **26%** | **22%** | **23%** | **25%** | **26%** | |
| **Downstream ROCE** | **12.3%** | **28.2%** | **17.8%** | **16.6%** | **15.5%** | **17.3%** | **17.8%** | **17.8%** | |
| **Other & Companywide Totals** | **2014** | **2015** | **2016E** | **2017E** | **2018E** | **2019E** | **2020E** | **0001E** | |
| Chemicals Net Income: | | | | | | | | | |
| - U.S. | $2,804 | $2,386 | $1,876 | $1,535 | $1,534 | $1,534 | $1,533 | $1,532 | -4% |
| - Non-U.S. | $1,511 | $2,032 | $2,739 | $2,979 | $2,978 | $2,977 | $2,976 | $2,975 | 2% |
| Total Chemicals Net Income | $4,315 | $4,418 | $4,615 | $4,514 | $4,512 | $4,511 | $4,509 | $4,507 | |
| Check | Ok | Ok | Ok | Ok | Ok | Ok | Ok | Ok | |
| Merger Effects and Special Items | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| **Total Chemicals Net Income** | **$4,315** | **$4,418** | **$4,615** | **$4,514** | **$4,512** | **$4,511** | **$4,509** | **$4,507** | **0%** |
| Check | Ok | Ok | Ok | Ok | Ok | Ok | Ok | Ok | |
| % of Total Net Income | 14% | 27% | 47% | 30% | 27% | 25% | 26% | 27% | |
| Corp. Finance & All Other | ($2,388) | ($1,926) | ($1,172) | ($1,596) | ($1,743) | ($1,731) | ($1,919) | ($1,905) | |
| % of Total Net Income | -8% | -12% | -12% | -11% | -11% | -10% | -11% | -11% | |
| Total Companywide Net Income | $29,820 | $16,150 | $9,867 | $15,173 | $16,575 | $18,120 | $17,195 | $16,708 | 11% |
| **Clean EPS** | **$6.96** | **$3.85** | **$2.36** | **$3.58** | **$3.91** | **$4.32** | **$4.13** | **$4.04** | **11%** |
| Companywide ROCE | 14.3% | 7.6% | 4.7% | 7.0% | 7.6% | 8.3% | 7.9% | 7.7% | 10% |
| Discretionary Cash Flow (DCF) | $50,048 | $33,457 | $26,540 | $32,547 | $34,541 | $36,415 | $36,021 | $36,424 | 7% |
| **CFPS** | **$11.69** | **$7.97** | **$6.35** | **$7.68** | **$8.15** | **$8.67** | **$8.65** | **$8.82** | **7%** |
| **Debt-Adjusted Cash Flow (DACF)** | **$50,216** | **$33,667** | **$26,840** | **$32,971** | **$34,808** | **$36,682** | **$36,288** | **$36,691** | **6%** |

Source: UBS estimates and company documents

**ExxonMobil Corp.** 31 January 2017 ⚜UBS 21

**Figure 10: ExxonMobil Upstream Production and Price Realizations (2014-2021E)**

| Upstream forecasts | 2014 | 2015 | 1QA | 2QA | 3QA | 4QA | 2016 | 1QE | 2QE | 3QE | 4QE | 2017E | 2018E | 2019E | 2020E | 2021E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Liquids Daily Production (MBbld)** | | | | | | | | | | | | | | | | |
| United States | 454 | 476 | 500 | 495 | 484 | 496 | 494 | 488 | 501 | 501 | 501 | 498 | 505 | 508 | 507 | 507 |
| Canada | 301 | 403 | 476 | 359 | 437 | 453 | 431 | 496 | 488 | 496 | 497 | 495 | 517 | 529 | 536 | 543 |
| Europe | 184 | 205 | 218 | 201 | 189 | 208 | 204 | 215 | 199 | 187 | 206 | 202 | 192 | 183 | 185 | 177 |
| Africa | 489 | 529 | 565 | 494 | 388 | 449 | 474 | 546 | 478 | 471 | 449 | 486 | 461 | 428 | 396 | 482 |
| Asia-Pacific/Middle East | 438 | 466 | 509 | 515 | 445 | 510 | 495 | 520 | 525 | 459 | 520 | 506 | 495 | 469 | 459 | 455 |
| Russia/Caspian | 245 | 268 | 270 | 266 | 268 | 268 | 268 | 287 | 284 | 285 | 285 | 285 | 312 | 311 | 308 | 300 |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Daily Oil Production (MBbld)** | 2,111 | 2,346 | 2,538 | 2,330 | 2,211 | 2,384 | 2,365 | 2,553 | 2,476 | 2,399 | 2,458 | 2,471 | 2,482 | 2,428 | 2,391 | 2,464 |
| **Natural Gas Daily Production (MMcfd)** | | | | | | | | | | | | | | | | |
| United States | 3,404 | 3,147 | 3,160 | 3,097 | 3,058 | 2,997 | 3,078 | 2,923 | 2,916 | 2,878 | 2,840 | 2,889 | 2,693 | 2,548 | 2,412 | 2,286 |
| Canada | 311 | 260 | 258 | 257 | 220 | 222 | 239 | 232 | 236 | 202 | 204 | 219 | 204 | 190 | 178 | 167 |
| Europe | 2,816 | 2,286 | 2,775 | 1,749 | 1,650 | 2,518 | 2,173 | 2,546 | 1,623 | 1,534 | 2,315 | 2,002 | 1,855 | 1,745 | 1,692 | 1,627 |
| Asia-Pacific/Middle East | 4,317 | 4,541 | 4,266 | 4,388 | 4,396 | 4,416 | 4,367 | 4,787 | 4,863 | 4,724 | 4,553 | 4,731 | 4,933 | 4,943 | 5,036 | 5,068 |
| Russia/Caspian | 293 | 274 | 263 | 264 | 264 | 264 | 264 | 271 | 271 | 271 | 271 | 271 | 300 | 304 | 301 | 284 |
| Other | 4 | 5 | 2 | 7 | 13 | 7 | 7 | 16 | 16 | 16 | 16 | 16 | 14 | 12 | 10 | 9 |
| **Total Daily Gas Production (MMcfd)** | 11,145 | 10,515 | 10,724 | 9,762 | 9,601 | 10,424 | 10,127 | 10,775 | 9,926 | 9,625 | 10,199 | 10,128 | 9,999 | 9,742 | 9,628 | 9,441 |
| **Companywide Daily Production Volumes:** | | | | | | | | | | | | | | | | |
| Crude Oil (MBbld) | 2,111 | 2,346 | 2,538 | 2,330 | 2,211 | 2,384 | 2,365 | 2,553 | 2,476 | 2,399 | 2,458 | 2,471 | 2,482 | 2,428 | 2,391 | 2,464 |
| Natural Gas (MMcfd) | 11,145 | 10,515 | 10,724 | 9,762 | 9,601 | 10,424 | 10,127 | 10,775 | 9,926 | 9,625 | 10,199 | 10,128 | 9,999 | 9,742 | 9,628 | 9,441 |
| **Total Daily Production (MBoed)** | 3,968 | 4,098 | 4,325 | 3,957 | 3,811 | 4,121 | 4,053 | 4,349 | 4,130 | 4,004 | 4,158 | 4,159 | 4,148 | 4,051 | 3,996 | 4,038 |
| **Total Daily Production (MMcfd)** | 23,810 | 24,588 | 25,952 | 23,742 | 22,867 | 24,728 | 24,319 | 26,094 | 24,779 | 24,022 | 24,948 | 24,955 | 24,890 | 24,308 | 23,974 | 24,227 |
| **OECD Production Volumes (MBoed)** | 2,027 | 2,032 | 2,226 | 1,906 | 1,931 | 2,113 | 2,044 | 2,150 | 1,984 | 1,953 | 2,097 | 2,046 | 2,006 | 1,967 | 1,942 | 1,907 |
| **Non-OECD Production Volumes (MBoed)** | 1,695 | 1,798 | 1,829 | 1,784 | 1,610 | 1,739 | 1,740 | 1,909 | 1,860 | 1,763 | 1,773 | 1,826 | 1,828 | 1,772 | 1,744 | 1,829 |
| US (MBoed) | 1,021.0 | 1,000.1 | 1,026.7 | 1,011.2 | 993.7 | 995.5 | 1,006.7 | 975.6 | 987.1 | 980.7 | 974.3 | 979.4 | 954.0 | 932.8 | 909.1 | 887.8 |
| YoY % Growth | 0% | -2% | 2% | 2% | 1% | -2% | 1% | -5% | -2% | -1% | -2% | -3% | -3% | -2% | -3% | -2% |
| QoQ % Growth | NA | NA | 1% | -2% | -2% | 0% | NA | -2% | 1% | -1% | -1% | NA | NA | NA | NA | NA |
| International (MBoed) | 2,947 | 3,098 | 3,299 | 2,946 | 2,818 | 3,126 | 3,047 | 3,373 | 3,143 | 3,023 | 3,184 | 3,180 | 3,194 | 3,119 | 3,087 | 3,150 |
| YoY % Growth | -7% | 5% | 2% | -1% | -4% | -3% | -2% | 2% | 7% | 7% | 2% | 4% | 0% | -2% | -1% | 2% |
| QoQ % Growth | NA | NA | 2% | -11% | -4% | 11% | NA | 8% | -7% | -4% | 5% | NA | NA | NA | NA | NA |
| % Oil | 53% | 57% | 59% | 59% | 58% | 58% | 58% | 59% | 60% | 60% | 59% | 59% | 60% | 60% | 60% | 61% |
| % North American Natural Gas | 16% | 14% | 13% | 14% | 14% | 13% | 14% | 12% | 13% | 13% | 12% | 12% | 12% | 11% | 11% | 10% |
| % North America | 35% | 35% | 36% | 36% | 39% | 36% | 36% | 35% | 37% | 38% | 36% | 36% | 36% | 37% | 37% | 36% |
| % International | 59% | 58% | 58% | 58% | 54% | 57% | 57% | 59% | 56% | 55% | 57% | 57% | 56% | 55% | 55% | 56% |
| Days | 366 | 365 | 91 | 91 | 92 | 92 | 366 | 90 | 91 | 92 | 92 | 365 | 365 | 365 | 366 | 366 |
| **Total Production Volumes:** | | | | | | | | | | | | | | | | |
| Total Crude Oil (MMBbl) | 772.6 | 856.1 | 231.0 | 212.0 | 203.4 | 219.3 | 865.7 | 229.8 | 225.3 | 220.7 | 226.1 | 902.0 | 905.9 | 886.1 | 875.1 | 902.0 |
| Total Natural Gas (Bcf) | 4,079.1 | 3,837.9 | 975.9 | 888.3 | 883.3 | 959.0 | 3,706.6 | 969.7 | 903.3 | 885.3 | 938.3 | 3,696.9 | 3,649.7 | 3,555.9 | 3,524.0 | 3,455.3 |
| **Total Production (MMBoe)** | 1,452.4 | 1,495.8 | 393.6 | 360.1 | 350.6 | 379.2 | 1,483.5 | 391.4 | 375.8 | 368.3 | 382.5 | 1,518.1 | 1,514.1 | 1,478.8 | 1,462.4 | 1,477.9 |
| **Total Production (Bcf)** | 8,714.5 | 8,974.5 | 2,361.7 | 2,160.5 | 2,103.8 | 2,275.0 | 8,900.9 | 2,348.5 | 2,254.9 | 2,210.0 | 2,295.2 | 9,108.6 | 9,084.8 | 8,872.6 | 8,774.5 | 8,867.2 |
| YoY % Growth | -5% | 3% | 2% | -1% | -3% | -3% | -1% | 1% | 4% | 5% | 1% | 3% | 0% | -2% | -1% | 1% |
| QoQ % Growth | NA | NA | 2% | -9% | -4% | 8% | NA | 6% | -5% | -3% | 4% | NA | NA | NA | NA | NA |
| **Oil prices:** | | | | | | | | | | | | (311.0) | | | | |
| UBS Forecast (WTI) | $92.89 | $48.81 | $33.64 | $45.59 | $44.92 | $49.16 | $43.35 | $54.00 | $55.50 | $60.50 | $62.00 | $58.00 | $63.00 | $68.00 | $68.00 | $68.00 |
| UBS Forecast (Brent) | $99.38 | $53.57 | $35.32 | $47.41 | $47.46 | $51.95 | $45.56 | $56.00 | $57.50 | $62.50 | $64.00 | $60.00 | $65.00 | $70.00 | $70.00 | $70.00 |
| ANS-WC | | | | | | | | | | | | | | | | |
| **XOM Oil Realizations:** | | | | | | | | | | | | | | | | |
| US liquids | $85.82 | $43.00 | $27.11 | $37.97 | $38.76 | $43.38 | $36.80 | $46.98 | $48.29 | $52.64 | $53.94 | $50.51 | $54.86 | $59.21 | $59.21 | $59.21 |
| % US liquids / WTI | 92% | 88% | 81% | 83% | 86% | 88% | 85% | 87% | 87% | 87% | 87% | 87% | 87% | 87% | 87% | 87% |
| Non-US liquids | $92.57 | $46.45 | $28.67 | $41.46 | $40.96 | $44.82 | $38.73 | $48.38 | $49.68 | $54.00 | $55.30 | $51.80 | $56.11 | $60.43 | $60.43 | $60.43 |
| % Non-US liquids / Brent | 93% | 87% | 81% | 87% | 86% | 86% | 85% | 86% | 86% | 86% | 86% | 86% | 86% | 86% | 86% | 86% |
| Worldwide liquids | $91.12 | $45.75 | $28.36 | $40.72 | $40.48 | $44.52 | $38.33 | $48.12 | $49.40 | $53.71 | $55.02 | $51.54 | $55.86 | $60.18 | $60.17 | $60.18 |
| % Worldwide liquids / Brent | 92% | 85% | | | | | 84% | | | | | 86% | 86% | 86% | 86% | 86% |
| **Gas prices:** | | | | | | | | | | | | | | | | |
| UBS Forecast (Henry Hub) | $4.45 | $2.67 | $2.09 | $1.95 | $2.81 | $2.98 | $2.46 | $3.50 | $3.25 | $3.00 | $3.25 | $3.25 | $3.00 | $3.25 | $3.25 | $3.25 |
| **XOM Gas Realizations:** | | | | | | | | | | | | | | | | |
| US gas | $4.22 | $2.26 | $1.60 | $1.74 | $2.65 | $2.69 | $2.17 | $3.09 | $2.87 | $2.65 | $2.87 | $2.87 | $2.65 | $2.87 | $2.87 | $2.87 |
| % US gas / HH bid week | 95% | 85% | 77% | 89% | 94% | 90% | 88% | 88% | 88% | 88% | 88% | 88% | 88% | 88% | 88% | 88% |
| European gas | $8.83 | $6.82 | $5.05 | $4.35 | $4.48 | $4.97 | $4.71 | $5.36 | $5.75 | $6.25 | $6.40 | $5.94 | $6.50 | $7.44 | $7.58 | $7.58 |
| % European gas / lagged Brent | 53% | 76% | 86% | 55% | 57% | 57% | 62% | 60% | 60% | 60% | 60% | 59% | 60% | 64% | 65% | 65% |
| Non-US gas | $9.29 | $6.53 | $4.80 | $4.06 | $4.47 | $4.97 | $4.58 | $5.32 | $5.46 | $5.94 | $6.08 | $5.70 | $6.72 | $7.23 | $7.23 | $7.23 |
| % Non-US gas / Brent | 56% | 73% | 82% | 51% | 57% | 57% | 60% | 57% | 57% | 57% | 57% | 57% | 62% | 62% | 62% | 62% |
| Worldwide gas | $7.74 | $5.25 | $3.86 | $3.32 | $3.89 | $4.31 | $3.84 | $4.71 | $4.70 | $4.95 | $5.19 | $4.89 | $5.62 | $6.09 | $6.14 | $6.18 |
| % Worldwide gas / Brent | 47% | 59% | | | | | 51% | | | | | 49% | 52% | 52% | 53% | 53% |

Source: UBS estimates and company documents

**Figure 11: ExxonMobil Cash Flow Statement  (2014-2021E)**

| Full Cash Flow Statement ($ MM except per share) | 2014 | 2015 | 1QA | 2QA | 3QA | 4QE | 2016E | 1QE | 2QE | 3QE | 4QE | 2017E | 2018E | 2019E | 2020E | 2021E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Income | $33,615 | 16,551 | $1,781 | $1,681 | $2,889 | $1,680 | 8,031 | $3,126 | $3,654 | $4,179 | $4,214 | $15,173 | $16,575 | $18,120 | $17,195 | $16,708 |
| DD&A | 17,297 | 18,048 | 4,765 | 4,821 | 4,605 | 6,063 | 20,254 | 4,818 | 4,688 | 4,622 | 4,745 | 18,874 | 19,466 | 19,795 | 20,325 | 21,216 |
| Exploration | 0 | 0 | | | | | 0 | | | | | 0 | 0 | 0 | 0 | 0 |
| Deferred Taxes | 0 | 0 | | | | | 0 | | | | | 0 | 0 | 0 | 0 | 0 |
| Accretion | 0 | 0 | | | | | 0 | | | | | 0 | 0 | 0 | 0 | 0 |
| Impairments | 0 | 0 | | | | 2,100 | 2,100 | | | | | 0 | 0 | 0 | 0 | 0 |
| Other | -864 | -1,142 | -1,335 | -657 | -1,478 | -375 | -3,845 | -375 | -375 | -375 | -375 | -1,500 | -1,500 | -1,500 | -1,500 | -1,500 |
| Discretionary Cash Flow | $50,048 | $33,457 | $5,211 | $5,845 | $6,016 | $9,468 | $26,540 | $7,569 | $7,967 | $8,426 | $8,584 | $32,547 | $34,541 | $36,415 | $36,021 | $36,424 |
| Working Capital Changes | -$4,932 | -$3,113 | -$399 | -$1,326 | -$661 | -$1,725 | -$4,111 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Cash Provided by Operations | $45,116 | $30,344 | $4,812 | $4,519 | $5,355 | $7,743 | $22,429 | $7,569 | $7,967 | $8,426 | $8,584 | $32,547 | $34,541 | $36,415 | $36,021 | $36,424 |
| | | | | | | | | | | | | | | | | |
| Capital Expenditures | -$32,952 | -$26,490 | -$4,601 | -$4,271 | -$3,404 | -$4,153 | -$16,429 | -$4,778 | -$4,778 | -$4,778 | -$4,778 | -$19,114 | -$19,467 | -$20,457 | -$21,528 | -$22,684 |
| Investment in Unconsolidated Subsidiary | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Acquisitions | $0 | $0 | $0 | $0 | $0 | $0 | $0 | -$8,017 | $0 | $0 | $0 | -$8,017 | $0 | $0 | $0 | $0 |
| Net Proceeds From Asset Sales | $4,035 | $2,389 | $177 | $1,029 | $976 | $2,100 | $4,282 | $600 | $600 | $747 | $500 | $2,447 | $2,400 | $2,400 | $2,400 | $4,000 |
| Other | $1,942 | $277 | $75 | $95 | -$807 | $0 | -$637 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Cash Provided (Used In) Investing | -$26,975 | -$23,824 | -$4,349 | -$3,147 | -$3,235 | -$2,053 | -$12,784 | -$12,195 | -$4,178 | -$4,031 | -$4,278 | -$24,683 | -$17,067 | -$18,057 | -$19,128 | -$18,684 |
| | | | | | | | | | | | | | | | | |
| Increase in Long-term Debt | $5,731 | $8,028 | $11,963 | $1 | $0 | $0 | $11,964 | $393 | $250 | $20 | $0 | $662 | $2,007 | $1,663 | $2,331 | $2,648 |
| Repayments of Long-term Debt | -$69 | -$26 | -$7,622 | $1,399 | $1,875 | -$4,000 | -$8,348 | $0 | $0 | $0 | -$60 | -$60 | $0 | $0 | $0 | $0 |
| Net move in Long-term Debt | $5,662 | $8,002 | 4,341 | 1,400 | 1,875 | (4,000) | $3,616 | 393 | 250 | 20 | (60) | $602 | $2,007 | $1,663 | $2,331 | $2,648 |
| Dividends Paid | -$11,568 | -$12,090 | -$3,054 | -$3,133 | -$3,133 | -$3,132 | -$12,452 | -$3,132 | -$3,539 | -$3,537 | -$3,536 | -$13,744 | -$15,088 | -$15,285 | -$15,154 | -$15,035 |
| Issuance of Equity, net of costs | $30 | $5 | $5 | $2 | -$1 | $0 | $6 | $7,870 | $0 | $0 | $0 | $7,870 | $0 | $0 | $0 | $0 |
| Share Repurchases | -$13,183 | -$4,039 | (726) | (1) | 0 | (150) | -$877 | (150) | (150) | (150) | (150) | -$600 | -$4,000 | -$4,000 | -$4,000 | -$4,000 |
| Other | $890 | $691 | $112 | -$128 | -$126 | $200 | $58 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Cash Provided (Used In) Financing | -$18,169 | -$7,431 | -$1,860 | -$1,860 | -$1,385 | -$7,082 | -$9,649 | $4,980 | -$3,439 | -$3,667 | -$3,746 | -$5,872 | -$17,081 | -$17,621 | -$16,823 | -$16,388 |
| | | | | | | | | | | | | | | | | |
| Change in Cash | -$28 | -$911 | $1,141 | -$488 | $735 | -$1,392 | -$4 | $354 | $350 | $727 | $560 | $1,992 | $393 | $737 | $69 | $1,352 |
| Cash at Beginning of Period | $4,644 | $4,616 | $3,705 | $4,846 | $4,358 | $5,093 | $3,705 | $3,701 | $4,055 | $4,405 | $5,132 | $3,701 | $5,692 | $6,085 | $6,821 | $6,891 |
| Cash at End of Period | $4,616 | $3,705 | $4,846 | $4,358 | $5,093 | $3,701 | $3,701 | $4,055 | $4,405 | $5,132 | $5,692 | $5,692 | $6,085 | $6,821 | $6,891 | $8,243 |
| Supplemental disclosures | | | | | | | | | | | | | | | | |
| Income taxes paid | ($18,085) | ($7,269) | ($749) | ($1,395) | ($905) | $1,407 | ($1,642) | $144 | $168 | $192 | $194 | $699 | ($9,734) | ($10,642) | ($10,099) | ($9,812) |
| Cash interest paid | ($380) | ($586) | ($223) | ($111) | ($375) | ($106) | ($815) | ($106) | ($106) | ($106) | ($106) | ($424) | ($424) | ($424) | ($424) | ($424) |
| | | | | | | | | | | | | | | | | |
| Cash Flow Metrics: | | | | | | | | | | | | | | | | |
| Discretionary cash flow | $50,048 | $33,457 | $5,211 | $5,845 | $6,016 | $9,468 | $26,540 | $7,569 | $7,967 | $8,426 | $8,584 | $32,547 | $34,541 | $36,415 | $36,021 | $36,424 |
| Operating Cash Flow | $45,116 | $30,344 | $4,812 | $4,519 | $5,355 | $7,743 | $22,429 | $7,569 | $7,967 | $8,426 | $8,584 | $32,547 | $34,541 | $36,415 | $36,021 | $36,424 |
| Total Capex | ($32,952) | ($26,490) | ($4,601) | ($4,271) | ($3,404) | ($4,153) | ($16,429) | ($4,778) | ($4,778) | ($4,778) | ($4,778) | ($19,114) | ($19,467) | ($20,457) | ($21,528) | ($22,684) |
| Free Cash Flow (FCF) | $12,164 | $3,854 | $211 | $248 | $1,951 | $3,590 | $6,000 | $2,791 | $3,189 | $3,648 | $3,806 | $13,433 | $15,073 | $15,958 | $14,493 | $13,740 |
| FCF per Share | $2.84 | $0.92 | $0.05 | $0.06 | $0.47 | $0.86 | $1.44 | $0.67 | $0.75 | $0.86 | $0.89 | $3.17 | $3.56 | $3.80 | $3.48 | $3.33 |
| | | | | | | | | | | | | | | | | |
| Dividends Paid | (11,568) | (12,090) | (3,054) | (3,133) | (3,133) | (3,132) | (12,452) | (3,132) | (3,539) | (3,537) | (3,536) | (13,744) | (15,088) | (15,285) | (15,154) | (15,035) |
| Excess FCF (FCF less Dividends) | 596 | (8,236) | (2,843) | (2,885) | (1,182) | 458 | (6,452) | (341) | (350) | 110 | 270 | (311) | (15) | 673 | (661) | (1,295) |
| | | | | | | | | | | | | | | | | |
| Debt-Adjusted Cash Flow (DACF) | $50,216 | $33,667 | $5,273 | $5,891 | $6,103 | $9,574 | $26,840 | $7,675 | $8,073 | $8,532 | $8,690 | $32,971 | $34,808 | $36,682 | $36,288 | $36,691 |
| DACF per share | $11.73 | $8.02 | $1.26 | $1.41 | $1.46 | $2.29 | $6.42 | $1.84 | $1.89 | $2.00 | $2.04 | $7.78 | $8.21 | $8.74 | $8.72 | $8.88 |
| CFPS | $11.69 | $7.97 | $1.25 | $1.40 | $1.44 | $2.27 | $6.35 | $1.81 | $1.87 | $1.98 | $2.01 | $7.68 | $8.15 | $8.67 | $8.65 | $8.82 |

Source:  UBS estimates and company documents

**Figure 12: ExxonMobil Balance Sheet  (2014-2021E)**

| Balance Sheet ($ MM) | 2014 | 2015 | 1QA | 2QA | 3QA | 4QE | 2016E | 1QE | 2QE | 3QE | 4QE | 2017E | 2018E | 2019E | 2020E | 2021E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $4,616 | $3,705 | $4,846 | $4,358 | $5,093 | $3,701 | $3,701 | $4,055 | $4,405 | $5,132 | $5,692 | $5,692 | $6,085 | $6,821 | $6,891 | $8,243 |
| Other Current Assets | $48,294 | $38,918 | $39,405 | $41,470 | $37,852 | $37,852 | $37,852 | $37,852 | $37,852 | $37,852 | $37,852 | $37,852 | $37,852 | $37,852 | $37,852 | $37,852 |
| Property Plant and Equipment | $252,668 | $251,605 | $255,257 | $254,062 | $251,923 | $247,913 | $247,913 | $255,290 | $254,780 | $254,189 | $253,723 | $253,723 | $251,325 | $249,587 | $248,389 | $245,857 |
| Investment in Unconsolidated Subsidiary | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Goodwill | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Other Assets | $43,915 | $42,530 | 43,281 | 42,583 | 44,518 | 44,893 | $44,893 | 45,268 | 45,643 | 46,018 | 46,393 | $46,393 | $47,893 | $49,393 | $50,893 | $52,393 |
| Total Assets | $349,493 | $336,758 | $342,789 | $342,473 | $339,386 | $334,359 | $334,359 | $342,465 | $342,681 | $343,192 | $343,660 | $343,660 | $343,154 | $343,653 | $344,025 | $344,345 |
| | | | | | | | | | | | | | | | | |
| Loans & Notes Payable | $17,468 | $18,762 | $13,540 | $14,972 | $17,239 | $17,239 | $17,239 | $17,239 | $17,239 | $17,239 | $17,239 | $17,239 | $17,239 | $17,239 | $17,239 | $17,239 |
| Other Current Liabilities | $47,165 | $35,214 | 35,186 | 36,532 | 32,782 | 32,982 | $32,982 | 32,982 | 32,982 | 32,982 | 32,982 | $32,982 | $32,982 | $32,982 | $32,982 | $32,982 |
| Long-term Debt | $11,653 | $19,925 | $29,568 | $29,499 | $28,916 | $24,916 | $24,916 | $25,309 | $25,559 | $25,578 | $25,518 | $25,518 | $27,526 | $29,189 | $31,520 | $34,168 |
| Other Liabilities | $52,913 | $49,229 | $49,704 | $48,583 | $48,582 | $50,852 | $50,852 | $50,852 | $50,852 | $50,852 | $50,852 | $50,852 | $50,852 | $50,852 | $50,852 | $50,852 |
| Deferred Taxes | $39,230 | $36,818 | $36,293 | $36,012 | $34,857 | $34,857 | $34,857 | $34,857 | $34,857 | $34,857 | $34,857 | $34,857 | $34,857 | $34,857 | $34,857 | $34,857 |
| Additional Paid in Capital | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Stockholder Equity | $181,064 | $176,810 | $178,498 | $176,875 | $177,010 | $175,408 | $175,408 | $175,252 | $175,218 | $175,709 | $176,237 | $176,237 | $173,724 | $172,559 | $170,600 | $168,273 |
| Total Liabilities & Stockholders' Equity | $349,493 | $336,758 | $342,789 | $342,473 | $339,386 | $336,254 | $336,254 | $336,491 | $336,706 | $337,217 | $337,686 | $337,686 | $337,180 | $337,678 | $338,050 | $338,371 |
| | | | | | | | | | | | | | | | | |
| Minority Share of Total Debt | $2,434 | $2,287 | $2,287 | $2,287 | $2,287 | $2,287 | $2,287 | $2,287 | $2,287 | $2,287 | $2,287 | $2,287 | $2,287 | $2,287 | $2,287 | $2,287 |
| XOM Share of Equity-Company Debt | $4,766 | $4,447 | $4,447 | $4,447 | $4,447 | $4,447 | $4,447 | $4,447 | $4,447 | $4,447 | $4,447 | $4,447 | $4,447 | $4,447 | $4,447 | $4,447 |
| | | | | | | | | | | | | | | | | |
| Total Debt | $29,121 | $38,687 | $43,108 | $44,471 | $46,155 | $42,155 | $42,155 | $42,548 | $42,798 | $42,817 | $42,757 | $42,757 | $44,765 | $46,428 | $48,759 | $51,407 |
| Net Debt / (Net Cash) | $24,505 | $34,982 | $38,262 | $40,113 | $41,062 | $38,454 | $38,454 | $38,493 | $38,392 | $37,685 | $37,065 | $37,065 | $38,680 | $39,607 | $41,868 | $43,163 |
| Total Debt/Capitalization | 14% | 18% | 19% | 20% | 21% | 19% | 19% | 19% | 19% | 20% | 20% | 20% | 20% | 21% | 22% | 23% |
| Net Debt/Capitalization | 12% | 16% | 17% | 18% | 18% | 18% | 18% | 17% | 17% | 17% | 17% | 17% | 18% | 18% | 19% | 20% |
| Debt/EBITDA | 0.4x | 0.9x | | | | | 1.3x | | | | | | 1.3x | 1.0x | 0.9x | 1.0x | 1.1x |
| EBITDA/Interest | 248.6x | 138.1x | | | | | 87.3x | | | | | | 79.7x | 109.0x | 115.5x | 113.3x | 113.6x |

Source:  UBS estimates and company documents

**ExxonMobil Corp.**   31 January 2017    ☘UBS  23

*134*

ExxonMobil Corp.                                                          **UBS** Research

## UPSIDE / DOWNSIDE SPECTRUM                                      return ↑



**Upside (US$93):** Our upside case assumes XOM posts better than expected 2017-18 production growth and improves per-Boe metrics, enabling the company to begin narrowing its free cash flow deficit. In this more optimistic scenario coupled with its European peers' continued struggles to narrow the funding gap, we could see XOM's normalized relative PE multiple expand to 1.15x 2018E EPS (vs. 5-year average of ~0.95x), implying upside to $93/share.

**Base Case (US$77):** Our $77 price target assumes a normalized relative PE of 0.95x which is in line with its 5-year average multiple. Under our revised normalized price deck, we forecast 2018 EPS of ~$4.50 which we multiply by 17x (0.95x S&P P/E of ~18x) for a price target of $77/share. The primary driver behind our reduced price target is our lower normalized oil price deck which reduced our 2018 normalized EPS by ~$0.55.

**Downside (US$69):** Our downside case assumes XOM misses production guidance (also putting its 2016-20 production CAGR target of flat production at risk) and widens its free cash flow deficit. In this scenario, we could see XOM's normalized relative PE multiple shrink to 0.85x 2018E EPS (vs. 5-year average of ~0.95x), implying downside to ~$69/share..

---

ExxonMobil Corp.    31 January 2017                                    ❈ UBS  24

*135*

ExxonMobil Corp.    UBS Research

## COMPANY DESCRIPTION    return ↑

ExxonMobil, created through the 1999 merger of Exxon and Mobil Corp., is the largest listed energy stock by market capitalization. The company is involved in all phases of the petroleum integration chain, from the exploration and production of crude oil and natural gas to the manufacturing and sales of refined products/chemicals/petrochemicals and other derivative products, in addition to its ownership of interests in electrical power generation facilities.

### Industry outlook

Integrated Oils sector faces several notable challenges, including anemic production growth (or production declines) and limited access to the most prospective international regions. Since 2001, the Big-5's production has declined 9% (excluding acquisitions) because of the dearth of suitable upstream re-investment opportunities. In addition, upstream per-unit costs have risen at ~10% per annum over 2008-13. We forecast WTI price to average $58/Bbl in 2017 and a normalized price of $68/Bbl beginning in 2019, and note the Majors are currently discounting a ~$73/Bbl WTI oil price, well above the 2017-21 futures strip.

**Production by commodity (2017E)**



Gas 41%

Oil 59%

**Production Growth: XOM vs. Integrated Oil Peers**

|  | 2015 | 2016E | 2017E | 2018E | 2019E | 2020E | 2016-20E CAGR |
|---|---|---|---|---|---|---|---|
| Chevron | 2.0% | -1.1% | 6.8% | 5.2% | 1.6% | -0.6% | 3.2% |
| BP | 4.0% | -0.6% | 9.7% | 2.1% | 0.4% | 2.3% | 3.6% |
| RD/Shell | -3.4% | 21.3% | 4.3% | -0.6% | -1.4% | 3.0% | 1.3% |
| Total | 9.4% | 4.4% | 4.5% | 8.0% | 5.9% | 5.3% | 5.9% |
| **Peer Average** | **3.0%** | **5.9%** | **6.7%** | **3.5%** | **1.6%** | **2.5%** | **3.6%** |
| **ExxonMobil** | **3.3%** | **-1.1%** | **2.6%** | **-0.3%** | **-2.3%** | **-1.4%** | **-0.4%** |

Source: Company documents and UBS estimates

App. 679

**Forecast returns**

| | |
|---|---:|
| Forecast price appreciation | -9.3% |
| Forecast dividend yield | 3.8% |
| Forecast stock return | -5.5% |
| Market return assumption | 6.2% |
| Forecast excess return | -11.7% |

**Valuation Method and Risk Statement**

ExxonMobil is subject to risks associated with volatile movements in crude oil prices, natural gas prices and refining margins. ExxonMobil may have exposure to political, economic and meteorological events as well as geological risk associated with resource exploration. In addition, ExxonMobil provides limited financial disclosures (particularly for refining) making the forecasting of future earnings results challenging. Moreover, ExxonMobil's outlook is dependent upon its ability to identify large-scale capital projects that meet its stringent hurdle rates. The most material risk is ExxonMobil's ability to re-invest its considerable cash flow at rates of return commensurate with what it has enjoyed historically while still offsetting depletion. Our $77 price target assumes a normalized relative PE of 0.95x.

DX-0062 - 26 of 31      **App. 679**

## Required Disclosures

This report has been prepared by UBS Securities LLC, an affiliate of UBS AG. UBS AG, its subsidiaries, branches and affiliates are referred to herein as UBS.

For information on the ways in which UBS manages conflicts and maintains independence of its research product; historical performance information; and certain additional disclosures concerning UBS research recommendations, please visit www.ubs.com/disclosures. The figures contained in performance charts refer to the past; past performance is not a reliable indicator of future results. Additional information will be made available upon request. UBS Securities Co. Limited is licensed to conduct securities investment consultancy businesses by the China Securities Regulatory Commission. UBS acts or may act as principal in the debt securities (or in related derivatives) that may be the subject of this report. This recommendation was finalized on: 31 January 2017 09:05 PM GMT.

**Analyst Certification:** Each research analyst primarily responsible for the content of this research report, in whole or in part, certifies that with respect to each security or issuer that the analyst covered in this report: (1) all of the views expressed accurately reflect his or her personal views about those securities or issuers and were prepared in an independent manner, including with respect to UBS, and (2) no part of his or her compensation was, is, or will be, directly or indirectly, related to the specific recommendations or views expressed by that research analyst in the research report.

**UBS Investment Research: Global Equity Rating Definitions**

| 12-Month Rating | Definition | Coverage[1] | IB Services[2] |
|---|---|---|---|
| **Buy** | FSR is > 6% above the MRA. | 45% | 29% |
| **Neutral** | FSR is between -6% and 6% of the MRA. | 39% | 27% |
| **Sell** | FSR is > 6% below the MRA. | 15% | 16% |
| **Short-Term Rating** | Definition | Coverage[3] | IB Services[4] |
| **Buy** | Stock price expected to rise within three months from the time the rating was assigned because of a specific catalyst or event. | <1% | <1% |
| **Sell** | Stock price expected to fall within three months from the time the rating was assigned because of a specific catalyst or event. | <1% | <1% |

Source: UBS. Rating allocations are as of 31 December 2016.
1:Percentage of companies under coverage globally within the 12-month rating category.
2:Percentage of companies within the 12-month rating category for which investment banking (IB) services were provided within the past 12 months.
3:Percentage of companies under coverage globally within the Short-Term rating category.
4:Percentage of companies within the Short-Term rating category for which investment banking (IB) services were provided within the past 12 months.

**KEY DEFINITIONS:  Forecast Stock Return (FSR)**  is defined as expected percentage price appreciation plus gross dividend yield over the next 12 months.   **Market Return Assumption (MRA)**  is defined as the one-year local market interest rate plus 5% (a proxy for, and not a forecast of, the equity risk premium).   **Under Review (UR)**  Stocks may be flagged as UR by the analyst, indicating that the stock's price target and/or rating are subject to possible change in the near term, usually in response to an event that may affect the investment case or valuation.   **Short-Term Ratings**  reflect the expected near-term (up to three months) performance of the stock and do not reflect any change in the fundamental view or investment case.   **Equity Price Targets**  have an investment horizon of 12 months.

**EXCEPTIONS AND SPECIAL CASES:  UK and European Investment Fund ratings and definitions are: Buy:**  Positive on factors such as structure, management, performance record, discount;   **Neutral:**  Neutral on factors such as structure, management, performance record, discount;    **Sell:**  Negative on factors such as structure, management, performance record, discount.   **Core Banding Exceptions (CBE):**  Exceptions to the standard +/-6% bands may be granted by the Investment Review Committee (IRC). Factors considered by the IRC include the stock's volatility and the credit spread of the respective company's debt. As a result, stocks deemed to be very high or low risk may be subject to higher or lower bands as they relate to the rating. When such exceptions apply, they will be identified in the Company Disclosures table in the relevant research piece.

---

**ExxonMobil Corp.**   31 January 2017                                                                                                    ❊ UBS  27

Research analysts contributing to this report who are employed by any non-US affiliate of UBS Securities LLC are not registered/qualified as research analysts with FINRA. Such analysts may not be associated persons of UBS Securities LLC and therefore are not subject to the FINRA restrictions on communications with a subject company, public appearances, and trading securities held by a research analyst account. The name of each affiliate and analyst employed by that affiliate contributing to this report, if any, follows.

**UBS Securities LLC:** William A. Featherston; Michael Ziffer, CFA; Christopher Zhang, CFA.

### Company Disclosures

| Company Name | Reuters | 12-month rating | Short-term rating | Price | Price date |
|---|---|---|---|---|---|
| **ExxonMobil Corp.**[3, 6, 7, 16] | XOM.N | Sell | N/A | US$84.86 | 30 Jan 2017 |

Source: UBS. All prices as of local market close.
Ratings in this table are the most current published ratings prior to this report. They may be more recent than the stock pricing date

3.      UBS AG, Australia Branch is acting as joint financial advisor to InterOil Corporation on an arrangement agreement with ExxonMobil and will receive a fee for acting in this capacity.
6.      This company/entity is, or within the past 12 months has been, a client of UBS Securities LLC, and non-investment banking securities-related services are being, or have been, provided.
7.      Within the past 12 months, UBS Securities LLC and/or its affiliates have received compensation for products and services other than investment banking services from this company/entity.
16.     UBS Securities LLC makes a market in the securities and/or ADRs of this company.

Unless otherwise indicated, please refer to the Valuation and Risk sections within the body of this report. For a complete set of disclosure statements associated with the companies discussed in this report, including information on valuation and risk, please contact UBS Securities LLC, 1285 Avenue of Americas, New York, NY 10019, USA, Attention: Investment Research.

**ExxonMobil Corp. (US$)**



| Date | Stock Price (US$) | Price Target (US$) | Rating |
|------|------------------:|-------------------:|-------:|
| 2013-10-30 | 88.81 | 91.0 | Neutral |
| 2014-04-02 | 97.95 | 95.0 | Neutral |
| 2014-07-02 | 101.57 | 101.0 | Neutral |
| 2014-10-06 | 94.52 | 96.0 | Neutral |
| 2014-12-03 | 94.95 | 95.0 | Neutral |
| 2015-01-26 | 91.76 | 92.0 | Neutral |
| 2015-04-02 | 84.3 | 90.0 | Neutral |
| 2015-07-22 | 81.79 | 87.0 | Neutral |
| 2015-07-31 | 79.21 | 84.0 | Neutral |
| 2015-09-07 | 72.46 | 77.0 | Neutral |
| 2015-10-30 | 82.74 | 81.0 | Neutral |
| 2016-01-12 | 75.2 | 77.0 | Neutral |
| 2016-04-29 | 88.4 | 85.0 | Neutral |
| 2016-07-06 | 94.09 | 90.0 | Neutral |
| 2016-07-18 | 94.82 | - | No Rating |
| 2016-07-22 | 94.01 | 90.0 | Neutral |
| 2016-07-31 | 88.95 | 86.0 | Neutral |
| 2017-01-18 | 86.28 | 77.0 | Sell |

Source: UBS; as of 30 Jan 2017

**ExxonMobil Corp.**   31 January 2017                                            UBS  29

**App. 682**

## Global Disclaimer

This document has been prepared by UBS Securities LLC, an affiliate of UBS AG. UBS AG, its subsidiaries, branches and affiliates are referred to herein as UBS.

Global Research is provided to our clients through UBS Neo and, in certain instances, UBS.com (each a "System"). It may also be made available through third party vendors and distributed by UBS and/or third parties via e-mail or alternative electronic means. The level and types of services provided by Global Research to a client may vary depending upon various factors such as a client's individual preferences as to the frequency and manner of receiving communications, a client's risk profile and investment focus and perspective (e.g., market wide, sector specific, long-term, short-term, etc.), the size and scope of the overall client relationship with UBS and legal and regulatory constraints.

All Global Research is available on UBS Neo. Please contact your UBS sales representative if you wish to discuss your access to UBS Neo.

When you receive Global Research through a System, your access and/or use of such Global Research is subject to this Global Research Disclaimer and to the terms of use governing the applicable System.

When you receive Global Research via a third party vendor, e-mail or other electronic means, your use shall be subject to this Global Research Disclaimer and to UBS's Terms of Use/Disclaimer (http://www.ubs.com/global/en/legalinfo2/disclaimer.html). By accessing and/or using Global Research in this manner, you are indicating that you have read and agree to be bound by our Terms of Use/Disclaimer. In addition, you consent to UBS processing your personal data and using cookies in accordance with our Privacy Statement (http://www.ubs.com/global/en/legalinfo2/privacy.html) and cookie notice (http://www.ubs.com/global/en/homepage/cookies/cookie-management.html).

**If you receive Global Research, whether through a System or by any other means, you agree that you shall not copy, revise, amend, create a derivative work, transfer to any third party, or in any way commercially exploit any UBS research provided via Global Research or otherwise, and that you shall not extract data from any research or estimates provided to you via Global Research or otherwise, without the prior written consent of UBS.**

This document is for distribution only as may be permitted by law. It is not directed to, or intended for distribution to or use by, any person or entity who is a citizen or resident of or located in any locality, state, country or other jurisdiction where such distribution, publication, availability or use would be contrary to law or regulation or would subject UBS to any registration or licensing requirement within such jurisdiction. It is published solely for information purposes; it is not an advertisement nor is it a solicitation or an offer to buy or sell any financial instruments or to participate in any particular trading strategy. No representation or warranty, either expressed or implied, is provided in relation to the accuracy, completeness or reliability of the information contained in this document ("the Information"), except with respect to Information concerning UBS. The Information is not intended to be a complete statement or summary of the securities, markets or developments referred to in the document. UBS does not undertake to update or keep current the Information. Any opinions expressed in this document may change without notice and may differ or be contrary to opinions expressed by other business areas or groups of UBS. Any statements contained in this report attributed to a third party represent UBS's interpretation of the data, information and/or opinions provided by that third party either publicly or through a subscription service, and such use and interpretation have not been reviewed by the third party.

Nothing in this document constitutes a representation that any investment strategy or recommendation is suitable or appropriate to an investor's individual circumstances or otherwise constitutes a personal recommendation. Investments involve risks, and investors should exercise prudence and their own judgement in making their investment decisions. The financial instruments described in the document may not be eligible for sale in all jurisdictions or to certain categories of investors. Options, derivative products and futures are not suitable for all investors, and trading in these instruments is considered risky. Mortgage and asset-backed securities may involve a high degree of risk and may be highly volatile in response to fluctuations in interest rates or other market conditions. Foreign currency rates of exchange may adversely affect the value, price or income of any security or related instrument referred to in the document. For investment advice, trade execution or other enquiries, clients should contact their local sales representative.

The value of any investment or income may go down as well as up, and investors may not get back the full (or any) amount invested. Past performance is not necessarily a guide to future performance. Neither UBS nor any of its directors, employees or agents accepts any liability for any loss (including investment loss) or damage arising out of the use of all or any of the Information.

Any prices stated in this document are for information purposes only and do not represent valuations for individual securities or other financial instruments. There is no representation that any transaction can or could have been effected at those prices, and any prices do not necessarily reflect UBS's internal books and records or theoretical model-based valuations and may be based on certain assumptions. Different assumptions by UBS or any other source may yield substantially different results.

This document and the Information are produced by UBS as part of its research function and are provided to you solely for general background information. UBS has no regard to the specific investment objectives, financial situation or particular needs of any specific recipient. In no circumstances may this document or any of the Information be used for any of the following purposes:

(i) valuation or accounting purposes;

(ii) to determine the amounts due or payable, the price or the value of any financial instrument or financial contract; or

(iii) to measure the performance of any financial instrument.

By receiving this document and the Information you will be deemed to represent and warrant to UBS that you will not use this document or any of the Information for any of the above purposes or otherwise rely upon this document or any of the Information.

UBS has policies and procedures, which include, without limitation, independence policies and permanent information barriers, that are intended, and upon which UBS relies, to manage potential conflicts of interest and control the flow of information within divisions of UBS and among its subsidiaries, branches and affiliates. For further information on the ways in which UBS manages conflicts and maintains independence of its research products, historical performance information and certain additional disclosures concerning UBS research recommendations, please visit www.ubs.com/disclosures.

Research will initiate, update and cease coverage solely at the discretion of UBS Investment Bank Research Management, which will also have sole discretion on the timing and frequency of any published research product. The analysis contained in this document is based on numerous assumptions. All material information in relation to published research reports, such as valuation methodology, risk statements, underlying assumptions (including sensitivity analysis of those assumptions), ratings history etc. as required by the Market Abuse Regulation, can be found on NEO. Different assumptions could result in materially different results.

The analyst(s) responsible for the preparation of this document may interact with trading desk personnel, sales personnel and other parties for the purpose of gathering, applying and interpreting market information. UBS relies on information barriers to control the flow of information contained in one or more areas within UBS into other areas, units, groups or affiliates of UBS. The compensation of the analyst who prepared this document is determined exclusively by research management and senior management (not including investment banking). Analyst compensation is not based on investment banking revenues; however, compensation may relate to the revenues of UBS Investment Bank as a whole, of which investment banking, sales and trading are a part, and UBS's subsidiaries, branches and affiliates as a whole.

For financial instruments admitted to trading on an EU regulated market: UBS AG, its affiliates or subsidiaries (excluding UBS Securities LLC) acts as a market maker or liquidity provider (in accordance with the interpretation of these terms in the UK) in the financial instruments of the issuer save that where the activity of liquidity provider is carried out in accordance with the definition given to it by the laws and regulations of any other EU jurisdictions, such information is separately disclosed in this document. For financial instruments admitted to trading on a non-EU regulated market: UBS may act as a market maker save that where this activity is carried out in the US in accordance with the definition given to it by the relevant laws and regulations, such activity will be specifically disclosed in this document. UBS may have issued a warrant the value of which is based on one or more of the financial instruments referred to in the document. UBS and its affiliates and employees may have long or short positions, trade as principal and buy and sell in instruments or derivatives identified herein; such transactions or positions may be inconsistent with the opinions expressed in this document.

**United Kingdom and the rest of Europe:** Except as otherwise specified herein, this material is distributed by UBS Limited to persons who are eligible counterparties or professional clients. UBS Limited is authorised by the Prudential Regulation Authority and regulated by the Financial Conduct Authority and the Prudential Regulation Authority. **France:** Prepared by UBS Limited and distributed by UBS Limited and UBS Securities France S.A. UBS Securities France S.A. is regulated by the ACPR (Autorité de Contrôle Prudentiel et de Résolution) and the Autorité des Marchés Financiers (AMF). Where an analyst of UBS Securities France S.A. has contributed to this document, the document is also deemed to have been prepared by UBS Securities France S.A. **Germany:** Prepared by UBS Limited and distributed by UBS Limited and UBS Europe SE. UBS Europe SE is regulated by the Bundesanstalt fur Finanzdienstleistungsaufsicht (BaFin). **Spain:** Prepared by UBS Limited and distributed by UBS Limited and UBS Securities España SV, SA. UBS Securities España SV, SA is regulated by the Comisión Nacional del Mercado de Valores (CNMV). **Turkey:** Distributed

---

**ExxonMobil Corp.**   31 January 2017

✤UBS  30

**App. 683**

by UBS Limited. No information in this document is provided for the purpose of offering, marketing and sale by any means of any capital market instruments and services in the Republic of Turkey. Therefore, this document may not be considered as an offer made or to be made to residents of the Republic of Turkey. UBS AG is not licensed by the Turkish Capital Market Board under the provisions of the Capital Market Law (Law No. 6362). Accordingly, neither this document nor any other offering material related to the instruments/services may be utilized in connection with providing any capital market services to persons within the Republic of Turkey without the prior approval of the Capital Market Board. However, according to article 15 (d) (ii) of the Decree No. 32, there is no restriction on the purchase or sale of the securities abroad by residents of the Republic of Turkey. **Poland:** Distributed by UBS Limited (spolka z ograniczona odpowiedzialnoscia) Oddzial w Polsce regulated by the Polish Financial Supervision Authority. Where an analyst of UBS Limited (spolka z ograniczona odpowiedzialnoscia) Oddzial w Polsce has contributed to this document, the document is also deemed to have been prepared by UBS Limited (spolka z ograniczona odpowiedzialnoscia) Oddzial w Polsce. **Russia:** Prepared and distributed by UBS Bank (OOO). **Switzerland:** Distributed by UBS AG to persons who are institutional investors only. UBS AG is regulated by the Swiss Financial Market Supervisory Authority (FINMA). **Italy:** Prepared by UBS Limited and distributed by UBS Limited and UBS Limited, Italy Branch. Where an analyst of UBS Limited, Italy Branch has contributed to this document, the document is also deemed to have been prepared by UBS Limited, Italy Branch. **South Africa:** Distributed by UBS South Africa (Pty) Limited (Registration No. 1995/011140/07), an authorised user of the JSE and an authorised Financial Services Provider (FSP 7328). **Israel:** This material is distributed by UBS Limited. UBS Limited is authorised by the Prudential Regulation Authority and regulated by the Financial Conduct Authority and the Prudential Regulation Authority. UBS Securities Israel Ltd is a licensed Investment Marketer that is supervised by the Israel Securities Authority (ISA). UBS Limited and its affiliates incorporated outside Israel are not licensed under the Israeli Advisory Law. UBS Limited is not covered by insurance as required from a licensee under the Israeli Advisory Law. UBS may engage among others in issuance of Financial Assets or in distribution of Financial Assets of other issuers for fees or other benefits. UBS Limited and its affiliates may prefer various Financial Assets to which they have or may have Affiliation (as such term is defined under the Israeli Advisory Law). Nothing in this Material should be considered as investment advice under the Israeli Advisory Law. This Material is being issued only to and/or is directed only at persons who are Eligible Clients within the meaning of the Israeli Advisory Law, and this material must not be relied on or acted upon by any other persons. **Saudi Arabia:** This document has been issued by UBS AG (and/or any of its subsidiaries, branches or affiliates), a public company limited by shares, incorporated in Switzerland with its registered offices at Aeschenvorstadt 1, CH-4051 Basel and Bahnhofstrasse 45, CH-8001 Zurich. This publication has been approved by UBS Saudi Arabia (a subsidiary of UBS AG), a Saudi closed joint stock company incorporated in the Kingdom of Saudi Arabia under commercial register number 1010257812 having its registered office at Tatweer Towers, P.O. Box 75724, Riyadh 11588, Kingdom of Saudi Arabia. UBS Saudi Arabia is authorized and regulated by the Capital Market Authority to conduct securities business under license number 08113-37. **Dubai:** The information distributed by UBS AG Dubai Branch is intended for Professional Clients only and is not for further distribution within the United Arab Emirates. **United States:** Distributed to US persons by either UBS Securities LLC or by UBS Financial Services Inc., subsidiaries of UBS AG; or by a group, subsidiary or affiliate of UBS AG that is not registered as a US broker-dealer (a **'non-US affiliate'**) to major US institutional investors only. UBS Securities LLC or UBS Financial Services Inc. accepts responsibility for the content of a document prepared by another non-US affiliate when distributed to US persons by UBS Securities LLC or UBS Financial Services Inc. All transactions by a US person in the securities mentioned in this document must be effected through UBS Securities LLC or UBS Financial Services Inc., and not through a non-US affiliate. UBS Securities LLC is not acting as a municipal advisor to any municipal entity or obligated person within the meaning of Section 15B of the Securities Exchange Act (the "Municipal Advisor Rule"), and the opinions or views contained herein are not intended to be, and do not constitute, advice within the meaning of the Municipal Advisor Rule. **Canada:** Distributed by UBS Securities Canada Inc., a registered investment dealer in Canada and a Member-Canadian Investor Protection Fund, or by another affiliate of UBS AG that is registered to conduct business in Canada or is otherwise exempt from registration. **Mexico:** This report has been distributed and prepared by UBS Casa de Bolsa, S.A. de C.V., UBS Grupo Financiero, an entity that is part of UBS Grupo Financiero, S.A. de C.V. and is an affiliate of UBS AG. This document is intended for distribution to institutional or sophisticated investors only. Research reports only reflect the views of the analysts responsible for the reports. Analysts do not receive any compensation from persons or entities different from UBS Casa de Bolsa, S.A. de C.V., UBS Grupo Financiero, or different from entities belonging to the same financial group or business group of such. For Spanish translations of applicable disclosures, please see www.ubs.com/disclosures. **Brazil:** Except as otherwise specified herein, this material is prepared by UBS Brasil CCTVM S.A. to persons who are eligible investors residing in Brazil, which are considered to be: (i) financial institutions, (ii) insurance firms and investment capital companies, (iii) supplementary pension entities, (iv) entities that hold financial investments higher than R$300,000.00 and that confirm the status of qualified investors in written, (v) investment funds, (vi) securities portfolio managers and securities consultants duly authorized by Comissão de Valores Mobiliários (CVM), regarding their own investments, and (vii) social security systems created by the Federal Government, States, and Municipalities. **Hong Kong:** Distributed by UBS Securities Asia Limited and/or UBS AG, Hong Kong Branch. **Singapore:** Distributed by UBS Securities Pte. Ltd. [MCI (P) 007/09/2016 and Co. Reg. No.: 198500648C] or UBS AG, Singapore Branch. Please contact UBS Securities Pte. Ltd., an exempt financial adviser under the Singapore Financial Advisers Act (Cap. 110); or UBS AG, Singapore Branch, an exempt financial adviser under the Singapore Financial Advisers Act (Cap. 110) and a wholesale bank licensed under the Singapore Banking Act (Cap. 19) regulated by the Monetary Authority of Singapore, in respect of any matters arising from, or in connection with, the analysis or document. The recipients of this document represent and warrant that they are accredited and institutional investors as defined in the Securities and Futures Act (Cap. 289). **Japan:** Distributed by UBS Securities Japan Co., Ltd. to professional investors (except as otherwise permitted). Where this document has been prepared by UBS Securities Japan Co., Ltd., UBS Securities Japan Co., Ltd. is the author, publisher and distributor of the document. Distributed by UBS AG, Tokyo Branch to Professional Investors (except as otherwise permitted) in relation to foreign exchange and other banking businesses when relevant. **Australia:** Clients of UBS AG: Distributed by UBS AG (Holder of Australian Financial Services License No. 231087). Clients of UBS Securities Australia Ltd: Distributed by UBS Securities Australia Ltd (Holder of Australian Financial Services License No. 231098). This Document contains general information and/or general advice only and does not constitute personal financial product advice. As such, the Information in this document has been prepared without taking into account any investor's objectives, financial situation or needs, and investors should, before acting on the Information, consider the appropriateness of the Information, having regard to their objectives, financial situation and needs. If the Information contained in this document relates to the acquisition, or potential acquisition of a particular financial product by a 'Retail' client as defined by section 761G of the Corporations Act 2001 where a Product Disclosure Statement would be required, the retail client should obtain and consider the Product Disclosure Statement relating to the product before making any decision about whether to acquire the product. The UBS Securities Australia Limited Financial Services Guide is available at: www.ubs.com/ecs-research-fsg. **New Zealand:** Distributed by UBS New Zealand Ltd. UBS New Zealand Ltd is not a registered bank in New Zealand. The information and recommendations in this publication are provided for general information purposes only. To the extent that any such information or recommendations constitute financial advice, they do not take into account any person's particular financial situation or goals. We recommend that recipients seek advice specific to their circumstances from their financial advisor. **Korea:** Distributed in Korea by UBS Securities Pte. Ltd., Seoul Branch. This document may have been edited or contributed to from time to time by affiliates of UBS Securities Pte. Ltd., Seoul Branch. **Malaysia:** This material is authorized to be distributed in Malaysia by UBS Securities Malaysia Sdn. Bhd (Capital Markets Services License No.: CMSL/A0063/2007). This material is intended for professional/institutional clients only and not for distribution to any retail clients. **India:** Distributed by UBS Securities India Private Ltd. (Corporate Identity Number U67120MH1996PTC097299) 2/F, 2 North Avenue, Maker Maxity, Bandra Kurla Complex, Bandra (East), Mumbai (India) 400051. Phone: +912261556000. It provides brokerage services bearing SEBI Registration Numbers: NSE (Capital Market Segment): INB230951431, NSE (F&O Segment) INF230951431, NSE (Currency Derivatives Segment) INE230951431, BSE (Capital Market Segment) INB010951437; merchant banking services bearing SEBI Registration Number: INM000010809 and Research Analyst services bearing SEBI Registration Number: INH000001204. UBS AG, its affiliates or subsidiaries may have debt holdings or positions in the subject Indian company/companies. Within the past 12 months, UBS AG, its affiliates or subsidiaries may have received compensation for non-investment banking securities-related services and/or non-securities services from the subject Indian company/companies. The subject company/companies may have been a client/clients of UBS AG, its affiliates or subsidiaries during the 12 months preceding the date of distribution of the research report with respect to investment banking and/or non-investment banking securities-related services and/or non-securities services. With regard to information on associates, please refer to the Annual Report at: http://www.ubs.com/global/en/about_ubs/investor_relations/annualreporting.html

The disclosures contained in research documents produced by UBS Limited shall be governed by and construed in accordance with English law.

UBS specifically prohibits the redistribution of this document in whole or in part without the written permission of UBS and UBS accepts no liability whatsoever for the actions of third parties in this respect. Images may depict objects or elements that are protected by third party copyright, trademarks and other intellectual property rights. © UBS 2017. The key symbol and UBS are among the registered and unregistered trademarks of UBS. All rights reserved.



# Exhibit 14

# Morgan Stanley | RESEARCH

UPDATE

*January 31, 2017 02:43 PM GMT*

Exxon Mobil Corporation

# In-line Results, Permian Outlook in Focus

| Stock Rating | Industry View | Price Target |
|---|---|---|
| Underweight | In-Line | $95.00 |

XOM reported in-line results, net of tax effect; cash flow largely in line; and better than expected write-down (~$2Bn). Call focus on recent +$5Bn Permian acquisition (largest since XTO), planned ramp and implicit confirmation on superior asset return profile.

**Net results largely in line.** XOM reports a clean beat, but operational segment results are modestly below consensus. XOM reported headline 4Q16 EPS of $0.41. Adjusting for $2.027Bn ($.049/sh) of impairment of dry gas assets in the Rockies and 206MM ($0.05/sh) and gain on sale on Canadian downstream assets raises EPS to $0.83 vs. $0.71 MS and $0.70 Consensus. We focus on the business segment earnings line (Upstream+Downstream+Chemical) to gauge XOM's performance in the quarter which would adjust for the majority of foreign tax reversal likely included in "Corporate and Financing" line (tax was a $1.4Bn credit to net income and the C&F line was +$209MM vs -$375-456M expecte by MS-Street). **Adjusted segment income was $3.2bn ($0.78/sh) vs. $3.3Bn ($0.80/sh) MS and $3.4 ($0.81/sh) Consensus. Cash flow from operations was similarly incrementally weaker at $1.77/sh vs. MS 1.80/sh (Street at $1.73/sh).** Total production of 4,121Mboed was slightly ahead of MS and consensus with PNG LNG volumes the biggest upside surprise vs. our estimates as Oil Search reported volumes were producing 20% above nameplate capacity and the realized LGN price rose 10% QoQ.

**Impairment better than expected.** The impairment of $2.027Bn, associated with dry gas assets in the Rockies, was likely smaller than expected. At the time of 3Q16 results, XOM indicated that were crude prices to stay in line with then YTD SEC price deck (~$42/bl, based on the price on the first of each month) reserves associated with Kearl (3.6Bn bl) and other NAm assets (1Bn boe) would be at risk of impairment.

**Call at 9:30am ET. Focus on the call should be on Permian acreage acquisition:** - **Strategic rationale** behind the transaction given XOM's more cautious approach to M&A during the downcycle and success at organically adding resource (Guyana). Look for insights on: **(1)** whether the transaction driven by management view that Permian offers superior return to other parts of the portfolio (asset classes) even including $27k/acre acquisition cost; **(2)** whether the shorter-cycle Permian asset was added to provide spending flexibility into what's likely to be shorter commodity price cycle; **(3)** whether Permian provides

MORGAN STANLEY & CO. LLC

**Evan Calio**
EQUITY ANALYST
Evan.Calio@morganstanley.com    +1 212 761-6472

**Ilya Balabanovsky**
RESEARCH ASSOCIATE
Ilya.Balabanovsky@morganstanley.com    +1 212 761-8530

**Stephen Colalillo**
RESEARCH ASSOCIATE
Stephen.Colalillo@morganstanley.com    +1 212 296-5250

**Aaron Zhang**
RESEARCH ASSOCIATE
Aaron.Zhang@morganstanley.com    +1 212 296-5293

Exxon Mobil Corporation ( XOM.N, XOM.US )
Integrated Oil / **United States of America**

| | |
|---|---|
| Stock Rating | Underweight |
| Industry View | In-Line |
| Price target | $95.00 |
| Shr price, close (Jan 30, 2017) | $84.86 |
| Mkt cap, curr (mm) | $351,888 |
| 52-Week Range | $95.52-73.55 |

Morgan Stanley does and seeks to do business with companies covered in Morgan Stanley Research. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of Morgan Stanley Research. Investors should consider Morgan Stanley Research as only a single factor in making their investment decision.

For analyst certification and other important disclosures, refer to the Disclosure Section, located at the end of this report.

**App. 685**

Ramirez v. Exxon Mobil Corporation
**DX-0063**
No. 3:16-cv-3111-K (N. D. Tex.)

1

**Morgan Stanley** | **RESEARCH**

production and future cash flow growth to the end of the decade prior to
Guyana, and other major projects, coming on line 2020+.

- **Activity and production outlook** for acquired assets and the legacy Permian
position. We estimate that the BOPCO acquisition adds 1% of growth (186Mboed
by 2020 on 18 rigs) to what would otherwise have been a ~flat XOM production
trajectory to end of the decade (4.0-4.2MMboed guided for 2020 at last Analyst
Day vs. ~4.1MMboed for 2016). This growth should be somewhat back end
loaded, given time needed to optimize spacing and completions and gradually
ramp rig count to preserve efficiencies. However, the asset growth could be
accelerated.

2

**App. 686**

**Morgan Stanley** | **RESEARCH**                                                    UPDATE

# 4Q16 Variance

**Exhibit 1:** 4Q16 Earnings Variance

| XOM Earnings | 4Q16A | 4Q16E | % to MS | 3Q16 | 4Q15 | QoQ | Δ QoQ | YoY |
|---|---|---|---|---|---|---|---|---|
| United States | (301) | (270) | 12% | (477) | (538) | -37% | 176 | -44% |
| Non-U.S. | 1,686 | 1,661 | 1% | 1,097 | 1,395 | 54% | 589 | 21% |
| Total Upstream | 1,385 | 1,392 | 0% | 620 | 857 | 123% | 765 | 62% |
| United States | 270 | 299 | -10% | 225 | 435 | 20% | 45 | -38% |
| Non-U.S. | 711 | 854 | -17% | 1,004 | 916 | -29% | (293) | -22% |
| Total Downstream | 981 | 1,152 | -15% | 1,229 | 1,351 | -20% | (248) | -27% |
| United States | 352 | 316 | 11% | 434 | 520 | -19% | (82) | -32% |
| Non-U.S. | 520 | 487 | 7% | 737 | 443 | -29% | (217) | 17% |
| Total Chemical | 872 | 802 | 9% | 1,171 | 963 | -26% | (299) | -9% |
| Total segment income | 3,238 | 3,346 | -3% | 3,020 | 3,171 | 7% | 218 | 2% |
| Corporate and financing | 209 | (375) | -156% | (370) | (391) | -156% | 579 | -153% |
| Adjusted net income attributable to ExxonMobil | 3,447 | 2,971 | 16% | 2,650 | 2,780 | 30% | 797 | 24% |
| Common shares outstanding, diluted (MM) | 4,176 | 4,178 | 0% | 4,178 | 4,183 | 0% | (2) | 0% |
| Adjusted earnings per diluted common share | 0.83 | 0.71 | 16% | 0.63 | 0.66 | 30% | 0 | 24% |
| Cash flow from ops per diluted share | 1.77 | 1.80 | -1% | 1.28 | 1.05 | 38% | 0 | 69% |

Source: Morgan Stanley Research estimates, company reports

**Exhibit 2:** Earnings vs. Consensus

| XOM Earnings vs. Consensus $MM | 4Q16A | Cons. | Δ % | Per share variance 4Q16A | Cons. | Delta |
|---|---|---|---|---|---|---|
| United States | (301) | (229) | 31% | (0.07) | (0.05) | (0.02) |
| Non-U.S. | 1,686 | 1,655 | 2% | 0.40 | 0.40 | 0.01 |
| Total Upstream | 1,385 | 1,426 | -3% | 0.33 | 0.34 | (0.01) |
| United States | 270 | 233 | 16% | 0.06 | 0.06 | 0.01 |
| Non-U.S. | 711 | 665 | 7% | 0.17 | 0.16 | 0.01 |
| Total Downstream | 981 | 898 | 9% | 0.23 | 0.21 | 0.02 |
| Total Chemical | 872 | 1,056 | -17% | 0.21 | 0.25 | (0.04) |
| Total segment income | 3,238 | 3,380 | -4% | 0.78 | 0.81 | (0.03) |
| Corporate and financing | 209 | (456) | -146% | 0.05 | (0.11) | 0.16 |
| Adjusted net income attributable to ExxonMobil | 3,447 | 2,924 | 18% | 0.83 | 0.70 | 0.13 |

Source: Morgan Stanley Research estimates, company reports

**Exhibit 3:** Upstream Operating Result

| XOM Upstream | 4Q16A | 4Q16E | % to MS | 3Q16 | 4Q15 | QoQ | Δ QoQ | YoY |
|---|---|---|---|---|---|---|---|---|
| United States | 496 | 496 | 0% | 484 | 494 | 2% | 12 | 0% |
| Canada / South America | 453 | 465 | -3% | 437 | 452 | 4% | 16 | 0% |
| Europe | 208 | 213 | -2% | 189 | 222 | 10% | 19 | -6% |
| Africa | 449 | 397 | 13% | 388 | 543 | 16% | 61 | -17% |
| Asia | 726 | 722 | 1% | 651 | 722 | 12% | 75 | 1% |
| Australia / Oceania | 52 | 50 | 3% | 62 | 48 | -16% | (10) | 8% |
| Non-U.S. | 1,888 | 1,847 | 2% | 1,727 | 1,987 | 9% | 161 | -5% |
| Total liquids production (Mbld) | 2,384 | 2,342 | 2% | 2,211 | 2,481 | 8% | 173 | -4% |
| United States | 2,997 | 3,087 | -3% | 3,058 | 3,123 | -2% | (61) | -4% |
| Canada / South America | 222 | 230 | -4% | 220 | 241 | 1% | 2 | -8% |
| Europe | 2,518 | 2,600 | -3% | 1,650 | 2,504 | 53% | 868 | 1% |
| Africa | 7 | 13 | -46% | 13 | 4 | -46% | (6) | 75% |
| Asia | 3,698 | 3,843 | -4% | 3,662 | 4,103 | 1% | 36 | -10% |
| Australia / Oceania | 982 | 794 | 24% | 998 | 628 | -2% | (16) | 56% |
| Non-U.S. | 7,427 | 7,482 | -1% | 6,543 | 7,480 | 14% | 884 | -1% |
| Total natural gas production available for sale(Mcfd) | 10,424 | 10,568 | -1% | 9,601 | 10,603 | 9% | 823 | -2% |
| United States | 996 | 1,009 | -1% | 994 | 1,015 | 0% | 2 | -2% |
| Non-U.S. | 3,126 | 3,094 | 1% | 2,818 | 3,234 | 11% | 308 | -3% |
| Total BOE production (Mboed) | 4,121 | 4,103 | 0% | 3,811 | 4,248 | 8% | 310 | -3% |
| **United States realizations:** | | | | | | | | |
| Crude ($/b) | 43.38 | 43.16 | 1% | 38.76 | 34.36 | 12% | 4.62 | 26% |
| Natural gas ($/Mcf) | 2.69 | 2.78 | -3% | 2.65 | 1.80 | 2% | 0.04 | 49% |
| **Non-U.S. realizations:** | | | | | | | | |
| Crude ($/bbl) | 44.82 | 45.06 | -1% | 40.96 | 36.99 | 9% | 3.86 | 21% |
| Natural gas ($/Mcf) | 4.97 | 5.40 | -8% | 4.47 | 5.80 | 11% | 0.50 | -14% |

Source: Morgan Stanley Research estimates, company reports

3

**Morgan Stanley** | **RESEARCH**

UPDATE

**Exhibit 4:** Downstream Operating Results

| XOM Downstream | 4Q16A | 4Q16E | % to MS | 3Q16 | 4Q15 | QoQ | Δ QoQ | YoY |
|---|---|---|---|---|---|---|---|---|
| United States | 1,604 | 1,620 | -1% | 1,604 | 1,649 | 0% | - | -3% |
| Canada | 401 | 400 | 0% | 406 | 390 | -1% | (5) | 3% |
| Europe | 1,460 | 1,490 | -2% | 1,476 | 1,483 | -1% | (16) | -2% |
| Asia Pacific | 706 | 678 | 4% | 677 | 679 | 4% | 29 | 4% |
| Other Non-U.S. | 200 | 190 | 5% | 202 | 194 | -1% | (2) | 3% |
| Non-U.S. | 2,767 | 2,757 | 0% | 2,761 | 2,746 | 0% | 6 | 1% |
| Total refinery throughput (Mbld) | 4,371 | 4,377 | 0% | 4,365 | 4,395 | 0% | 6 | -1% |
| | | | | | | | | |
| United States | 2,227 | 2,348 | -5% | 2,327 | 2,416 | -4% | (100) | -8% |
| Non-U.S. | 2,780 | 2,829 | -2% | 2,747 | 2,791 | 1% | 33 | 0% |
| Total petroleum product sales (Mbld) | 5,007 | 5,176 | -3% | 5,074 | 5,207 | -1% | (67) | -4% |
| | | | | | | | | |
| United States | 1.83 | 2.00 | -9% | 1.52 | 2.87 | 20% | 0.30 | -36% |
| Non-U.S. | 2.79 | 3.37 | -17% | 3.95 | 3.63 | -29% | (1.16) | -23% |
| Implied net income/throughput ($/bbl) | 2.44 | 2.88 | -15% | 3.06 | 3.34 | -20% | (0.62) | -27% |

Source: Morgan Stanley Research estimates, company reports

DX-0063 - 4 of 10

**App. 688**

4

**Morgan Stanley** | **RESEARCH**

# Valuation Methodology and Risks

**XOM:** Our $95 price target is based on 11.7x 2017E P/CF vs 8.3x for the closest peer CVX given stronger balance sheet, greater downstream exposure and integration, and higher more secure yield. Risks to our price target include commodity price risk, lower production volumes and capital cost inflation.

5

**App. 689**

**Morgan Stanley** | **RESEARCH**

UPDATE

# Disclosure Section

The information and opinions in Morgan Stanley Research were prepared by Morgan Stanley & Co. LLC, and/or Morgan Stanley C.T.V.M. S.A., and/or Morgan Stanley Mexico, Casa de Bolsa, S.A. de C.V., and/or Morgan Stanley Canada Limited. As used in this disclosure section, "Morgan Stanley" includes Morgan Stanley & Co. LLC, Morgan Stanley C.T.V.M. S.A., Morgan Stanley Mexico, Casa de Bolsa, S.A. de C.V., Morgan Stanley Canada Limited and their affiliates as necessary.

For important disclosures, stock price charts and equity rating histories regarding companies that are the subject of this report, please see the Morgan Stanley Research Disclosure Website at www.morganstanley.com/researchdisclosures, or contact your investment representative or Morgan Stanley Research at 1585 Broadway, (Attention: Research Management), New York, NY, 10036 USA.

For valuation methodology and risks associated with any recommendation, rating or price target referenced in this research report, please contact the Client Support Team as follows: US/Canada +1 800 303-2495; Hong Kong +852 2848-5999; Latin America +1 718 754-5444 (U.S.); London +44 (0)20-7425-8169; Singapore +65 6834-6860; Sydney +61 (0)2-9770-1505; Tokyo +81 (0)3-6836-9000. Alternatively you may contact your investment representative or Morgan Stanley Research at 1585 Broadway, (Attention: Research Management), New York, NY 10036 USA.

## Analyst Certification

The following analysts hereby certify that their views about the companies and their securities discussed in this report are accurately expressed and that they have not received and will not receive direct or indirect compensation in exchange for expressing specific recommendations or views in this report: Evan Calio. Unless otherwise stated, the individuals listed on the cover page of this report are research analysts.

## Global Research Conflict Management Policy

Morgan Stanley Research has been published in accordance with our conflict management policy, which is available at www.morganstanley.com/institutional/research/conflictpolicies.

## Important US Regulatory Disclosures on Subject Companies

As of December 30, 2016, Morgan Stanley beneficially owned 1% or more of a class of common equity securities of the following companies covered in Morgan Stanley Research: Chevron Corporation.

Within the last 12 months, Morgan Stanley managed or co-managed a public offering (or 144A offering) of securities of Chevron Corporation, **Exxon Mobil Corporation**.

Within the last 12 months, Morgan Stanley has received compensation for investment banking services from Chevron Corporation, **Exxon Mobil Corporation**. In the next 3 months, Morgan Stanley expects to receive or intends to seek compensation for investment banking services from Chevron Corporation, **Exxon Mobil Corporation**.

Within the last 12 months, Morgan Stanley has received compensation for products and services other than investment banking services from Chevron Corporation, **Exxon Mobil Corporation**.

Within the last 12 months, Morgan Stanley has provided or is providing investment banking services to, or has an investment banking client relationship with, the following company: Chevron Corporation, **Exxon Mobil Corporation**.

Within the last 12 months, Morgan Stanley has either provided or is providing non-investment banking, securities-related services to and/or in the past has entered into an agreement to provide services or has a client relationship with the following company: Chevron Corporation, **Exxon Mobil Corporation**.

Morgan Stanley & Co. LLC makes a market in the securities of Chevron Corporation, **Exxon Mobil Corporation**.

The equity research analysts or strategists principally responsible for the preparation of Morgan Stanley Research have received compensation based upon various factors, including quality of research, investor client feedback, stock picking, competitive factors, firm revenues and overall investment banking revenues. Equity Research analysts' or strategists' compensation is not linked to investment banking or capital markets transactions performed by Morgan Stanley or the profitability or revenues of particular trading desks.

Morgan Stanley and its affiliates do business that relates to companies/instruments covered in Morgan Stanley Research, including market making, providing liquidity, fund management, commercial banking, extension of credit, investment services and investment banking. Morgan Stanley sells to and buys from customers the securities/instruments of companies covered in Morgan Stanley Research on a principal basis. Morgan Stanley may have a position in the debt of the Company or instruments discussed in this report. Morgan Stanley trades or may trade as principal in the debt securities (or in related derivatives) that are the subject of the debt research report.

Certain disclosures listed above are also for compliance with applicable regulations in non-US jurisdictions.

## STOCK RATINGS

Morgan Stanley uses a relative rating system using terms such as Overweight, Equal-weight, Not-Rated or Underweight (see definitions below). Morgan Stanley does not assign ratings of Buy, Hold or Sell to the stocks we cover. Overweight, Equal-weight, Not-Rated and Underweight are not the equivalent of buy, hold and sell. Investors should carefully read the definitions of all ratings used in Morgan Stanley Research. In addition, since Morgan Stanley Research contains more complete information concerning the analyst's views, investors should carefully read Morgan Stanley Research, in its entirety, and not infer the contents from the rating alone. In any case, ratings (or research) should not be used or relied upon as investment advice. An investor's decision to buy or sell a stock should depend on individual circumstances (such as the investor's existing holdings) and other considerations.

## Global Stock Ratings Distribution

(as of December 31, 2016)

The Stock Ratings described below apply to Morgan Stanley's Fundamental Equity Research and do not apply to Debt Research produced by the Firm. For disclosure purposes only (in accordance with NASD and NYSE requirements), we include the category headings of Buy, Hold, and Sell alongside our ratings of Overweight, Equal-weight, Not-Rated and Underweight. Morgan Stanley does not assign ratings of Buy, Hold or Sell to the stocks we cover. Overweight, Equal-weight, Not-Rated and Underweight are not the equivalent of buy, hold, and sell but represent recommended relative weightings (see definitions below). To satisfy regulatory requirements, we correspond Overweight, our most positive stock rating, with a buy recommendation; we correspond Equal-weight and Not-Rated to hold and Underweight to sell recommendations, respectively.

6

**App. 690**

# Morgan Stanley | RESEARCH

| STOCK RATING CATEGORY | COVERAGE UNIVERSE | | INVESTMENT BANKING CLIENTS (IBC) | | | OTHER MATERIAL INVESTMENT SERVICES CLIENTS (MISC) | |
|---|---|---|---|---|---|---|---|
| | COUNT | % OF TOTAL | COUNT | % OF TOTAL IBC | % OF RATING CATEGORY | COUNT | % OF TOTAL OTHER MISC |
| Overweight/Buy | 1142 | 34% | 271 | 41% | 24% | 572 | 36% |
| Equal-weight/Hold | 1442 | 43% | 299 | 45% | 21% | 702 | 45% |
| Not-Rated/Hold | 69 | 2% | 8 | 1% | 12% | 9 | 1% |
| Underweight/Sell | 668 | 20% | 85 | 13% | 13% | 286 | 18% |
| TOTAL | 3,321 | | 663 | | | 1569 | |

Data include common stock and ADRs currently assigned ratings. Investment Banking Clients are companies from whom Morgan Stanley received investment banking compensation in the last 12 months.

## Analyst Stock Ratings

Overweight (O). The stock's total return is expected to exceed the average total return of the analyst's industry (or industry team's) coverage universe, on a risk-adjusted basis, over the next 12-18 months.

Equal-weight (E). The stock's total return is expected to be in line with the average total return of the analyst's industry (or industry team's) coverage universe, on a risk-adjusted basis, over the next 12-18 months.

Not-Rated (NR). Currently the analyst does not have adequate conviction about the stock's total return relative to the average total return of the analyst's industry (or industry team's) coverage universe, on a risk-adjusted basis, over the next 12-18 months.

Underweight (U). The stock's total return is expected to be below the average total return of the analyst's industry (or industry team's) coverage universe, on a risk-adjusted basis, over the next 12-18 months.

Unless otherwise specified, the time frame for price targets included in Morgan Stanley Research is 12 to 18 months.

## Analyst Industry Views

Attractive (A): The analyst expects the performance of his or her industry coverage universe over the next 12-18 months to be attractive vs. the relevant broad market benchmark, as indicated below.

In-Line (I): The analyst expects the performance of his or her industry coverage universe over the next 12-18 months to be in line with the relevant broad market benchmark, as indicated below.

Cautious (C): The analyst views the performance of his or her industry coverage universe over the next 12-18 months with caution vs. the relevant broad market benchmark, as indicated below.

Benchmarks for each region are as follows: North America - S&P 500; Latin America - relevant MSCI country index or MSCI Latin America Index; Europe - MSCI Europe; Japan - TOPIX; Asia - relevant MSCI country index or MSCI sub-regional index or MSCI AC Asia Pacific ex Japan Index.

## Stock Price, Price Target and Rating History (See Rating Definitions)

7

**App. 691**

**Morgan Stanley** | RESEARCH                                    UPDATE



Exxon Mobil Corporation (XOM.N) - As of 1/30/17 in USD
Industry : Integrated Oil

Stock Rating History: 1/1/14 : U/I

Price Target History: 10/7/13 : 77; 1/12/14 : 90; 12/16/14 : 85; 9/4/15 : 80; 10/12/15 : 78; 1/12/16 : 75; 6/13/16 : 95

Source: Morgan Stanley Research     Date Format : MM/DD/YY     Price Target ⟶     No Price Target Assigned (NA)
Stock Price (Not Covered by Current Analyst) ⋯⋯   Stock Price (Covered by Current Analyst) ▰▰▰
Stock and Industry Ratings (abbreviations below) appear as ♦ Stock Rating/Industry View
Stock Ratings: Overweight (O)  Equal-weight (E)  Underweight (U)  Not-Rated (NR)   No Rating Available (NA)
Industry View: Attractive (A)   In-line (I)   Cautious (C)    No Rating (NR)

Effective January 13, 2014, the stocks covered by Morgan Stanley Asia Pacific will be rated relative to the analyst's industry (or industry team's) coverage.

Effective January 13, 2014, the industry view benchmarks for Morgan Stanley Asia Pacific are as follows: relevant MSCI country index or MSCI sub-regional index or MSCI AC Asia Pacific ex Japan Index.

## Important Disclosures for Morgan Stanley Smith Barney LLC Customers

Important disclosures regarding the relationship between the companies that are the subject of Morgan Stanley Research and Morgan Stanley Smith Barney LLC or Morgan Stanley or any of their affiliates, are available on the Morgan Stanley Wealth Management disclosure website at www.morganstanley.com/online/researchdisclosures. For Morgan Stanley specific disclosures, you may refer to www.morganstanley.com/researchdisclosures.

Each Morgan Stanley Equity Research report is reviewed and approved on behalf of Morgan Stanley Smith Barney LLC. This review and approval is conducted by the same person who reviews the Equity Research report on behalf of Morgan Stanley. This could create a conflict of interest.

## Other Important Disclosures

Morgan Stanley & Co. International PLC and its affiliates have a significant financial interest in the debt securities of Chevron Corporation, **Exxon Mobil Corporation**.

Morgan Stanley Research policy is to update research reports as and when the Research Analyst and Research Management deem appropriate, based on developments with the issuer, the sector, or the market that may have a material impact on the research views or opinions stated therein. In addition, certain Research publications are intended to be updated on a regular periodic basis (weekly/monthly/quarterly/annual) and will ordinarily be updated with that frequency, unless the Research Analyst and Research Management determine that a different publication schedule is appropriate based on current conditions. Morgan Stanley is not acting as a municipal advisor and the opinions or views contained herein are not intended to be, and do not constitute, advice within the meaning of Section 975 of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

Morgan Stanley produces an equity research product called a "Tactical Idea." Views contained in a "Tactical Idea" on a particular stock may be contrary to the recommendations or views expressed in research on the same stock. This may be the result of differing time horizons, methodologies, market events, or other factors. For all research available on a particular stock, please contact your sales representative or go to Matrix at http://www.morganstanley.com/matrix.

Morgan Stanley Research is provided to our clients through our proprietary research portal on Matrix and also distributed electronically by Morgan Stanley to clients. Certain, but not all, Morgan Stanley Research products are also made available to clients through third-party vendors or redistributed to clients through alternate electronic means as a convenience. For access to all available Morgan Stanley Research, please contact your sales representative or go to Matrix at http://www.morganstanley.com/matrix.

Any access and/or use of Morgan Stanley Research is subject to Morgan Stanley's Terms of Use (http://www.morganstanley.com/terms.html). By accessing and/or using Morgan Stanley Research, you are indicating that you have read and agree to be bound by our Terms of Use (http://www.morganstanley.com/terms.html). In addition you consent to Morgan Stanley processing your personal data and using cookies in accordance with our Privacy Policy and our Global Cookies Policy (http://www.morganstanley.com/privacy_pledge.html), including for the purposes of setting your preferences and to collect readership data so that we can deliver better and more personalized service and products to you. To find out more information about how Morgan Stanley processes personal data, how we use cookies and how to reject cookies see our Privacy Policy and our Global Cookies Policy (http://www.morganstanley.com/privacy_pledge.html).

If you do not agree to our Terms of Use and/or if you do not wish to provide your consent to Morgan Stanley processing your personal data or using cookies please do not access our research.

Morgan Stanley Research does not provide individually tailored investment advice. Morgan Stanley Research has been prepared without regard to the circumstances and objectives of those who receive it. Morgan Stanley recommends that investors independently evaluate particular investments and strategies, and encourages investors to seek the advice of a financial adviser. The appropriateness of an investment or strategy will depend on an investor's

8

**Morgan Stanley** | **RESEARCH**

circumstances and objectives. The securities, instruments, or strategies discussed in Morgan Stanley Research may not be suitable for all investors, and certain investors may not be eligible to purchase or participate in some or all of them. Morgan Stanley Research is not an offer to buy or sell or the solicitation of an offer to buy or sell any security/instrument or to participate in any particular trading strategy. The value of and income from your investments may vary because of changes in interest rates, foreign exchange rates, default rates, prepayment rates, securities/instruments prices, market indexes, operational or financial conditions of companies or other factors. There may be time limitations on the exercise of options or other rights in securities/instruments transactions. Past performance is not necessarily a guide to future performance. Estimates of future performance are based on assumptions that may not be realized. If provided, and unless otherwise stated, the closing price on the cover page is that of the primary exchange for the subject company's securities/instruments.

The fixed income research analysts, strategists or economists principally responsible for the preparation of Morgan Stanley Research have received compensation based upon various factors, including quality, accuracy and value of research, firm profitability or revenues (which include fixed income trading and capital markets profitability or revenues), client feedback and competitive factors. Fixed Income Research analysts', strategists' or economists' compensation is not linked to investment banking or capital markets transactions performed by Morgan Stanley or the profitability or revenues of particular trading desks.

The "Important US Regulatory Disclosures on Subject Companies" section in Morgan Stanley Research lists all companies mentioned where Morgan Stanley owns 1% or more of a class of common equity securities of the companies. For all other companies mentioned in Morgan Stanley Research, Morgan Stanley may have an investment of less than 1% in securities/instruments or derivatives of securities/instruments of companies and may trade them in ways different from those discussed in Morgan Stanley Research. Employees of Morgan Stanley not involved in the preparation of Morgan Stanley Research may have investments in securities/instruments or derivatives of securities/instruments of companies mentioned and may trade them in ways different from those discussed in Morgan Stanley Research. Derivatives may be issued by Morgan Stanley or associated persons.

With the exception of information regarding Morgan Stanley, Morgan Stanley Research is based on public information. Morgan Stanley makes every effort to use reliable, comprehensive information, but we make no representation that it is accurate or complete. We have no obligation to tell you when opinions or information in Morgan Stanley Research change apart from when we intend to discontinue equity research coverage of a subject company. Facts and views presented in Morgan Stanley Research have not been reviewed by, and may not reflect information known to, professionals in other Morgan Stanley business areas, including investment banking personnel.

Morgan Stanley Research personnel may participate in company events such as site visits and are generally prohibited from accepting payment by the company of associated expenses unless pre-approved by authorized members of Research management.

Morgan Stanley may make investment decisions that are inconsistent with the recommendations or views in this report.

To our readers in Taiwan: Information on securities/instruments that trade in Taiwan is distributed by Morgan Stanley Taiwan Limited ("MSTL"). Such information is for your reference only. The reader should independently evaluate the investment risks and is solely responsible for their investment decisions. Morgan Stanley Research may not be distributed to the public media or quoted or used by the public media without the express written consent of Morgan Stanley. Information on securities/instruments that do not trade in Taiwan is for informational purposes only and is not to be construed as a recommendation or a solicitation to trade in such securities/instruments. MSTL may not execute transactions for clients in these securities/instruments. To our readers in Hong Kong: Information is distributed in Hong Kong by and on behalf of, and is attributable to, Morgan Stanley Asia Limited as part of its regulated activities in Hong Kong. If you have any queries concerning Morgan Stanley Research, please contact our Hong Kong sales representatives.

Morgan Stanley is not incorporated under PRC law and the research in relation to this report is conducted outside the PRC. Morgan Stanley Research does not constitute an offer to sell or the solicitation of an offer to buy any securities in the PRC. PRC investors shall have the relevant qualifications to invest in such securities and shall be responsible for obtaining all relevant approvals, licenses, verifications and/or registrations from the relevant governmental authorities themselves. Neither this report nor any part of it is intended as, or shall constitute, provision of any consultancy or advisory service of securities investment as defined under PRC law. Such information is provided for your reference only.

Morgan Stanley Research is disseminated in Brazil by Morgan Stanley C.T.V.M. S.A.; in Mexico by Morgan Stanley México, Casa de Bolsa, S.A. de C.V which is regulated by Comision Nacional Bancaria y de Valores. Paseo de los Tamarindos 90, Torre 1, Col. Bosques de las Lomas Floor 29, 05120 Mexico City; in Japan by Morgan Stanley MUFG Securities Co., Ltd. and, for Commodities related research reports only, Morgan Stanley Capital Group Japan Co., Ltd; in Hong Kong by Morgan Stanley Asia Limited (which accepts responsibility for its contents) and by Morgan Stanley Asia International Limited, Hong Kong Branch; in Singapore by Morgan Stanley Asia (Singapore) Pte. (Registration number 199206298Z) and/or Morgan Stanley Asia (Singapore) Securities Pte Ltd (Registration number 200008434H), regulated by the Monetary Authority of Singapore (which accepts legal responsibility for its contents and should be contacted with respect to any matters arising from, or in connection with, Morgan Stanley Research) and by Morgan Stanley Asia International Limited, Singapore Branch (Registration number T11FC0207F); in Australia to "wholesale clients" within the meaning of the Australian Corporations Act by Morgan Stanley Australia Limited A.B.N. 67 003 734 576, holder of Australian financial services license No. 233742, which accepts responsibility for its contents; in Australia to "wholesale clients" and "retail clients" within the meaning of the Australian Corporations Act by Morgan Stanley Wealth Management Australia Pty Ltd (A.B.N. 19 009 145 555, holder of Australian financial services license No. 240813, which accepts responsibility for its contents; in Korea by Morgan Stanley & Co International plc, Seoul Branch; in India by Morgan Stanley India Company Private Limited; in Indonesia by PT Morgan Stanley Asia Indonesia; in Canada by Morgan Stanley Canada Limited, which has approved of and takes responsibility for its contents in Canada; in Germany by Morgan Stanley Bank AG, Frankfurt am Main and Morgan Stanley Private Wealth Management Limited, Niederlassung Deutschland, regulated by Bundesanstalt fuer Finanzdienstleistungsaufsicht (BaFin); in Spain by Morgan Stanley, S.V., S.A., a Morgan Stanley group company, which is supervised by the Spanish Securities Markets Commission (CNMV) and states that Morgan Stanley Research has been written and distributed in accordance with the rules of conduct applicable to financial research as established under Spanish regulations; in the US by Morgan Stanley & Co. LLC, which accepts responsibility for its contents. Morgan Stanley & Co. International plc, authorized by the Prudential Regulatory Authority and regulated by the Financial Conduct Authority and the Prudential Regulatory Authority, disseminates in the UK research that it has prepared, and approves solely for the purposes of section 21 of the Financial Services and Markets Act 2000, research which has been prepared by any of its affiliates. RMB Morgan Stanley Proprietary Limited is a member of the JSE Limited and regulated by the Financial Services Board in South Africa. RMB Morgan Stanley Proprietary Limited is a joint venture owned equally by Morgan Stanley International Holdings Inc. and RMB Investment Advisory (Proprietary) Limited, which is wholly owned by FirstRand Limited. The information in Morgan Stanley Research is being disseminated by Morgan Stanley Saudi Arabia, regulated by the Capital Market Authority in the Kingdom of Saudi Arabia , and is directed at Sophisticated investors only.

The information in Morgan Stanley Research is being communicated by Morgan Stanley & Co. International plc (DIFC Branch), regulated by the Dubai Financial Services Authority (the DFSA), and is directed at Professional Clients only, as defined by the DFSA. The financial products or financial services to which this research relates will only be made available to a customer who we are satisfied meets the regulatory criteria to be a Professional Client.

The information in Morgan Stanley Research is being communicated by Morgan Stanley & Co. International plc (QFC Branch), regulated by the Qatar Financial Centre Regulatory Authority (the QFCRA), and is directed at business customers and market counterparties only and is not intended for Retail Customers as defined by the QFCRA.

As required by the Capital Markets Board of Turkey, investment information, comments and recommendations stated here, are not within the scope of investment advisory activity. Investment advisory service is provided exclusively to persons based on their risk and income preferences by the authorized firms. Comments and recommendations stated here are general in nature. These opinions may not fit to your financial status, risk and return preferences. For this reason, to make an investment decision by relying solely to this information stated here may not bring about outcomes that fit your expectations.

The trademarks and service marks contained in Morgan Stanley Research are the property of their respective owners. Third-party data providers make no warranties or representations relating to the accuracy, completeness, or timeliness of the data they provide and shall not have liability for any damages relating

9

**Morgan Stanley** | **RESEARCH**

to such data. The Global Industry Classification Standard (GICS) was developed by and is the exclusive property of MSCI and S&P.
Morgan Stanley Research, or any portion thereof may not be reprinted, sold or redistributed without the written consent of Morgan Stanley.

**INDUSTRY COVERAGE: Integrated Oil**

| COMPANY (TICKER) | RATING (AS OF) | PRICE* (01/30/2017) |
|---|---|---|
| **Evan Calio** | | |
| Chevron Corporation (CVX.N) | O (11/01/2016) | $111.82 |
| Exxon Mobil Corporation (XOM.N) | U (04/10/2013) | $84.86 |

Stock Ratings are subject to change. Please see latest research for each company.
* Historical prices are not split adjusted.

© 2017 Morgan Stanley

10

**App. 694**

# Exhibit 15

Case 3:16-cv-03111-K    Document 376    Filed 05/07/26    Page 714 of 831    PageID 20907

Assets → 360 Property, Plant, and Equipment → 10 Overall ↓

# 35 Subsequent Measurement

ⓘ **General Note**:The Subsequent Measurement Section provides guidance on an entity's subsequent measurement and subsequent recognition of an item. Situations that may result in subsequent changes to carrying amount include impairment, credit losses, fair value adjustments, depreciation and amortization, and so forth.

**Ramirez v. Exxon Mobil Corporation**

**DX-0070**

No. 3:16-cv-3111-K (N. D. Tex.)

## General

**360-10-35-1**    This Subsection addresses depreciation of property, plant, and equipment and the post acquisition accounting for an interest in the residual value of a leased asset.

### > Depreciation

**360-10-35-2**    This guidance addresses the concept of depreciation accounting and the various factors to consider in selecting the related periods and methods to be used in such accounting.

**360-10-35-3**    Depreciation expense in financial statements for an asset shall be determined based on the asset's useful life.

**360-10-35-4**    The cost of a productive facility is one of the costs of the services it renders during its useful economic life. Generally accepted accounting principles (GAAP) require that this cost be spread over the expected useful life of the facility in such a way as to allocate it as equitably as possible to the periods during which services are obtained from the use of the facility. This procedure is known as depreciation accounting, a system of accounting which aims to distribute the cost or other basic value of tangible capital assets, less salvage (if any), over the estimated useful life of the unit (which may be a group of assets) in a systematic and rational manner. It is a process of allocation, not of valuation.

**360-10-35-5**    See paragraph 360-10-35-20 for a discussion of depreciation of a new cost basis after recognition of an impairment loss.

**360-10-35-6**    See paragraph 360-10-35-43 for a discussion of cessation of depreciation on long-lived assets classified as held for sale.

#### · > Declining Balance Method

**360-10-35-7**    The declining-balance method is an example of one of the methods that meet the requirements of being systematic and rational. If the expected productivity of the asset or ability of the asset to generate revenue is relatively greater during the earlier years of its life, or maintenance charges tend to increase during later years, the declining-balance method may provide the most satisfactory allocation of cost. That conclusion also applies to other methods, including the sum-of-the-years'-digits method, that produce substantially similar results.

#### · > Loss or Damage Experience as a Factor in Estimating Depreciable Lives

**360-10-35-8**    In practice, experience regarding loss or damage to depreciable assets is in some cases one of the factors considered in estimating the depreciable lives of a group of depreciable assets, along with such other factors as wear and tear, obsolescence, and maintenance and replacement policies.

#### · > Unacceptable Depreciation Methods

**360-10-35-9**    If the number of years specified by the Accelerated Cost Recovery System of the Internal Revenue Service (IRS) for recovery deductions for an asset does not fall within a reasonable range of the asset's

**DX-0070 - 1 of 7**              **App. 695**

Case 3:16-cv-03111-K    Document 376    Filed 05/07/26    Page 715 of 831    PageID 20908

useful life, the recovery deductions shall not be used as depreciation expense for financial reporting.

360-10-35-10    Annuity methods of depreciation are not acceptable for entities in general.

· > Accounting Changes

360-10-35-11    See paragraphs 250-10-45-17 through 45-20 for guidance on the accounting and presentation of changes in methods of depreciation.

360-10-35-12    Paragraph not used.

## > Adjusting the Residual Value in Leased Assets by a Third Party

360-10-35-13    The following paragraph provides guidance on how an entity acquiring an interest in the residual value of a leased asset shall account for that asset during the lease term.

360-10-35-14    An entity acquiring an interest in the residual value of any leased asset, irrespective of the classification of the related lease by the lessor, shall not recognize increases to the asset's estimated value over the remaining term of the related lease, and the asset shall be reported at no more than its acquisition cost until sale or disposition. If it is subsequently determined that the fair value of the residual value of a leased asset has declined below the carrying amount of the acquired interest and that decline is other than temporary, the asset shall be written down to fair value, and the amount of the write-down shall be recognized as a loss. That fair value becomes the asset's new carrying amount, and the asset shall not be increased for any subsequent increase in its fair value before its sale or disposition.

# Impairment or Disposal of Long-Lived Assets

360-10-35-15    There are unique requirements of accounting for the impairment or disposal of long-lived assets to be held and used or to be disposed of. Although this guidance deals with matters which may lead to the ultimate disposition of assets, it is included in this Subsection because it describes the measurement and classification of assets to be held and used and assets held for disposal before actual disposition and derecognition. See the Impairment or Disposal of Long-Lived Assets Subsection of Section 360-10-40 for a discussion of assets or asset groups for which disposition has taken place in an exchange or distribution to owners.

## > Long-Lived Assets Classified as Held and Used

360-10-35-16    This guidance addresses how long-lived assets or asset groups that are intended to be held and used in an entity's business shall be reviewed for impairment.

· > Measurement of an Impairment Loss

360-10-35-17    An impairment loss shall be recognized only if the carrying amount of a long-lived asset (asset group) is not recoverable and exceeds its fair value. The carrying amount of a long-lived asset (asset group) is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset (asset group). That assessment shall be based on the carrying amount of the asset (asset group) at the date it is tested for recoverability, whether in use (see paragraph 360-10-35-33) or under development (see paragraph 360-10-35-34). An impairment loss shall be measured as the amount by which the carrying amount of a long-lived asset (asset group) exceeds its fair value.

· · > Assets Subject to Asset Retirement Obligations

360-10-35-18    In applying the provisions of this Subtopic, the carrying amount of the asset being tested for impairment shall include amounts of capitalized asset retirement costs. Estimated future cash flows related to the liability for an asset retirement obligation that has been recognized in the financial statements shall be excluded from both of the following:

a The undiscounted cash flows used to test the asset for recoverability

DX-0070 - 2 of 7
App. 696

Case 3:16-cv-03111-K    Document 376    Filed 05/07/26    Page 716 of 831    PageID 20909

bThe discounted cash flows used to measure the asset's fair value.

360-10-35-19    If the fair value of the asset is based on a quoted market price and that price considers the costs that will be incurred in retiring that asset, the quoted market price shall be increased by the fair value of the asset retirement obligation for purposes of measuring impairment.

· > Adjusted Carrying Amount Becomes New Cost Basis

360-10-35-20    If an impairment loss is recognized, the adjusted carrying amount of a long-lived asset shall be its new cost basis. For a depreciable long-lived asset, the new cost basis shall be depreciated (amortized) over the remaining useful life of that asset. Restoration of a previously recognized impairment loss is prohibited.

· > When to Test a Long-Lived Asset for Recoverability

360-10-35-21    A long-lived asset (asset group) shall be tested for recoverability whenever events or changes in circumstances indicate that its carrying amount may not be recoverable. The following are examples of such events or changes in circumstances:

aA significant decrease in the market price of a long-lived asset (asset group)

bA significant adverse change in the extent or manner in which a long-lived asset (asset group) is being used or in its physical condition

cA significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset (asset group), including an adverse action or assessment by a regulator

dAn accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of a long-lived asset (asset group)

eA current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset (asset group)

fA current expectation that, more likely than not, a long-lived asset (asset group) will be sold or otherwise disposed of significantly before the end of its previously estimated useful life. The term *more likely than not* refers to a level of likelihood that is more than 50 percent.

360-10-35-22    When a long-lived asset (asset group) is tested for recoverability, it also may be necessary to review depreciation estimates and method as required by Topic 250 or the amortization period as required by Topic 350. Paragraphs 250-10-45-17 through 45-20 and 250-10-50-4 address the accounting for changes in estimates, including changes in the method of depreciation, amortization, and depletion. Paragraphs 350-30-35-1 through 35-5 address the determination of the useful life of an intangible asset. Any revision to the remaining useful life of a long-lived asset resulting from that review also shall be considered in developing estimates of future cash flows used to test the asset (asset group) for recoverability (see paragraphs 360-10-35-31 through 35-32). However, any change in the accounting method for the asset resulting from that review shall be made only after applying this Subtopic.

· > Grouping Long-Lived Assets Classified as Held and Used

360-10-35-23    For purposes of recognition and measurement of an impairment loss, a long-lived asset or assets shall be grouped with other assets and liabilities at the lowest level for which identifiable cash flows are largely independent of the cash flows of other assets and liabilities. However, an impairment loss, if any, that results from applying this Subtopic shall reduce only the carrying amount of a long-lived asset or assets of the group in accordance with paragraph 360-10-35-28.

360-10-35-24    In limited circumstances, a long-lived asset (for example, a corporate headquarters facility) may not have identifiable cash flows that are largely independent of the cash flows of other assets and liabilities and of other asset groups. In those circumstances, the asset group for that long-lived asset shall include all assets and liabilities of the entity.

360-10-35-25    In limited circumstances, an asset group will include all assets and liabilities of the entity. For example, the cost of operating assets such as corporate headquarters or centralized research facilities may be funded

DX-0070 - 3 of 7

**App. 697**

Case 3:16-cv-03111-K    Document 376    Filed 05/07/26    Page 717 of 831    PageID 20910

by revenue-producing activities at lower levels of the entity. Accordingly, in limited circumstances, the lowest level of identifiable cash flows that are largely independent of other asset groups may be the entity level. See Example 4 (paragraph 360-10-55-35).

·· > Effect of Goodwill when Grouping

360-10-35-26    Goodwill shall be included in an asset group to be tested for impairment under this Subtopic only if the asset group is or includes a reporting unit. Goodwill shall not be included in a lower-level asset group that includes only part of a reporting unit. Estimates of future cash flows used to test that lower-level asset group for recoverability shall not be adjusted for the effect of excluding goodwill from the group. The term *reporting unit* is defined in Topic 350 as the same level as or one level below an operating segment. That Topic requires that goodwill be tested for impairment at the reporting unit level.

360-10-35-27    Other than goodwill, the carrying amounts of any assets (such as accounts receivable and inventory) and liabilities (such as accounts payable, long-term debt, and asset retirement obligations) not covered by this Subtopic that are included in an asset group shall be adjusted in accordance with other applicable generally accepted accounting principles (GAAP) before testing the asset group for recoverability. Paragraph 350-20-35-31 requires that goodwill be tested for impairment only after the carrying amounts of the other assets of the reporting unit, including the long-lived assets covered by this Subtopic, have been tested for impairment under other applicable accounting guidance.

· > Allocating Impairment Losses to an Asset Group

360-10-35-28    An impairment loss for an asset group shall reduce only the carrying amounts of a long-lived asset or assets of the group. The loss shall be allocated to the long-lived assets of the group on a pro rata basis using the relative carrying amounts of those assets, except that the loss allocated to an individual long-lived asset of the group shall not reduce the carrying amount of that asset below its fair value whenever that fair value is determinable without undue cost and effort. See Example 1 (paragraph 360-10-55-20) for an illustration of this guidance.

· > Estimates of Future Cash Flows Used to Test a Long-Lived Asset for Recoverability

360-10-35-29    Estimates of future cash flows used to test the recoverability of a long-lived asset (asset group) shall include only the future cash flows (cash inflows less associated cash outflows) that are directly associated with and that are expected to arise as a direct result of the use and eventual disposition of the asset (asset group). Those estimates shall exclude interest charges that will be recognized as an expense when incurred.

360-10-35-30    Estimates of future cash flows used to test the recoverability of a long-lived asset (asset group) shall incorporate the entity's own assumptions about its use of the asset (asset group) and shall consider all available evidence. The assumptions used in developing those estimates shall be reasonable in relation to the assumptions used in developing other information used by the entity for comparable periods, such as internal budgets and projections, accruals related to incentive compensation plans, or information communicated to others. However, if alternative courses of action to recover the carrying amount of a long-lived asset (asset group) are under consideration or if a range is estimated for the amount of possible future cash flows associated with the likely course of action, the likelihood of those possible outcomes shall be considered. A probability-weighted approach may be useful in considering the likelihood of those possible outcomes. See Example 2 (paragraph 360-10-55-23) for an illustration of this guidance.

360-10-35-31    Estimates of future cash flows used to test the recoverability of a long-lived asset (asset group) shall be made for the remaining useful life of the asset (asset group) to the entity. The remaining useful life of an asset group shall be based on the remaining useful life of the primary asset of the group. For purposes of this Subtopic, the primary asset is the principal long-lived tangible asset being depreciated or intangible asset being amortized that is the most significant component asset from which the asset group derives its cash-flow-generating capacity. The primary asset of an asset group therefore cannot be land or an intangible asset not being amortized.

360-10-35-32    Factors that an entity generally shall consider in determining whether a long-lived asset is the primary asset of an asset group include the following:

DX-0070 - 4 of 7
App. 698

Case 3:16-cv-03111-K    Document 376    Filed 05/07/26    Page 718 of 831    PageID 20911

a Whether other assets of the group would have been acquired by the entity without the asset

b The level of investment that would be required to replace the asset

c The remaining useful life of the asset relative to other assets of the group. If the primary asset is not the asset of the group with the longest remaining useful life, estimates of future cash flows for the group shall assume the sale of the group at the end of the remaining useful life of the primary asset.

360-10-35-33
Estimates of future cash flows used to test the recoverability of a long-lived asset (asset group) that is in use, including a long-lived asset (asset group) for which development is substantially complete, shall be based on the existing service potential of the asset (asset group) at the date it is tested. The service potential of a long-lived asset (asset group) encompasses its remaining useful life, cash-flow-generating capacity, and for tangible assets, physical output capacity. Those estimates shall include cash flows associated with future expenditures necessary to maintain the existing service potential of a long-lived asset (asset group), including those that replace the service potential of component parts of a long-lived asset (for example, the roof of a building) and component assets other than the primary asset of an asset group. Those estimates shall exclude cash flows associated with future capital expenditures that would increase the service potential of a long-lived asset (asset group).

360-10-35-34
Estimates of future cash flows used to test the recoverability of a long-lived asset (asset group) that is under development shall be based on the expected service potential of the asset (group) when development is substantially complete. Those estimates shall include cash flows associated with all future expenditures necessary to develop a long-lived asset (asset group), including interest payments that will be capitalized as part of the cost of the asset (asset group). Subtopic 835-20 requires the capitalization period to end when the asset is substantially complete and ready for its intended use.

360-10-35-35
If a long-lived asset that is under development is part of an asset group that is in use, estimates of future cash flows used to test the recoverability of that group shall include the cash flows associated with future expenditures necessary to maintain the existing service potential of the group (see paragraph 360-10-35-33) as well as the cash flows associated with all future expenditures necessary to substantially complete the asset that is under development (see the preceding paragraph). See Example 3 (paragraph 360-10-55-33). See also paragraphs 360-10-55-7 through 55-18 for considerations of site restoration and environmental exit costs.

· > Fair Value

360-10-35-36
For long-lived assets (asset groups) that have uncertainties both in timing and amount, an expected present value technique will often be the appropriate technique with which to estimate fair value.

# > Long-Lived Assets Classified as Held for Sale

360-10-35-37
This guidance addresses the accounting for expected disposal losses for long-lived assets and asset groups that are classified as held for sale but have not yet been sold. See paragraphs 360-10-45-9 through 45-11 for the initial criteria to be met for classification as held for sale.

· > Measurement of Expected Disposal Loss or Gain

360-10-35-38
Costs to sell are the incremental direct costs to transact a sale, that is, the costs that result directly from and are essential to a sale transaction and that would not have been incurred by the entity had the decision to sell not been made. Those costs include broker commissions, legal and title transfer fees, and closing costs that must be incurred before legal title can be transferred. Those costs exclude expected future losses associated with the operations of a long-lived asset (disposal group) while it is classified as held for sale. Expected future operating losses that marketplace participants would not similarly consider in their estimates of the fair value less cost to sell of a long-lived asset (disposal group) classified as held for sale shall not be indirectly recognized as part of an expected loss on the sale by reducing the carrying amount of the asset (disposal group) to an amount less than its current fair value less cost to sell. If the sale is expected to occur beyond one year as permitted in limited situations by paragraph 360-10-45-11, the cost to sell shall be discounted.

DX-0070 - 5 of 7

**App. 699**

Case 3:16-cv-03111-K    Document 376    Filed 05/07/26    Page 719 of 831    PageID 20912

360-10-35-39  The carrying amounts of any assets that are not covered by this Subtopic, including goodwill, that are included in a disposal group classified as held for sale shall be adjusted in accordance with other applicable GAAP prior to measuring the fair value less cost to sell of the disposal group. Paragraphs 350-20-40-1 through 40-7 provide guidance for allocating goodwill to a lower-level asset group to be disposed of that is part of a reporting unit and that constitutes a business. Goodwill is not included in a lower-level asset group to be disposed of that is part of a reporting unit if it does not constitute a business.

360-10-35-40  A loss shall be recognized for any initial or subsequent write-down to fair value less cost to sell. A gain shall be recognized for any subsequent increase in fair value less cost to sell, but not in excess of the cumulative loss previously recognized (for a write-down to fair value less cost to sell). The loss or gain shall adjust only the carrying amount of a long-lived asset, whether classified as held for sale individually or as part of a disposal group.

360-10-35-41  See paragraphs 310-20-35-12D and 310-20-40-12 for guidance related to determination of cost basis for foreclosed assets under Subtopic 310-20 and the measurement of cumulative losses previously recognized under paragraph 360-10-35-40.

360-10-35-42  See paragraphs 830-30-45-13 through 45-15 for guidance regarding the application of Topic 830 to an investment being evaluated for impairment that will be disposed of.

· > Accounting While Held for Sale

360-10-35-43  A long-lived asset (disposal group) classified as held for sale shall be measured at the lower of its carrying amount or fair value less cost to sell. If the asset (disposal group) is newly acquired, the carrying amount of the asset (disposal group) shall be established based on its fair value less cost to sell at the acquisition date. A long-lived asset shall not be depreciated (amortized) while it is classified as held for sale. Interest and other expenses attributable to the liabilities of a disposal group classified as held for sale shall continue to be accrued.

· > Changes to a Plan of Sale

360-10-35-44  If circumstances arise that previously were considered unlikely and, as a result, an entity decides not to sell a long-lived asset (disposal group) previously classified as held for sale, the asset (disposal group) shall be reclassified as held and used. A long-lived asset that is reclassified shall be measured individually at the lower of the following:

a Its carrying amount before the asset (disposal group) was classified as held for sale, adjusted for any depreciation (amortization) expense that would have been recognized had the asset (disposal group) been continuously classified as held and used

b Its fair value at the date of the subsequent decision not to sell.

360-10-35-45  If an entity removes an individual asset or liability from a disposal group previously classified as held for sale, the remaining assets and liabilities of the disposal group to be sold shall continue to be measured as a group only if the criteria in paragraph 360-10-45-9 are met. Otherwise, the remaining long-lived assets of the group shall be measured individually at the lower of their carrying amounts or fair values less cost to sell at that date.

## > Long-Lived Assets to Be Disposed of Other than by Sale

360-10-35-46  This guidance addresses the accounting for impairment of long-lived assets and asset groups that are intended to be disposed of by abandonment.

· > Long-Lived Assets to Be Abandoned

360-10-35-47  For purposes of this Subtopic, a long-lived asset to be abandoned is disposed of when it ceases to be used. If an entity commits to a plan to abandon a long-lived asset before the end of its previously estimated useful life, depreciation estimates shall be revised in accordance with paragraphs 250-10-45-17 through 45-20 and 250-10-50-4 to reflect the use of the asset over its shortened useful life (see paragraph 360-10-35-22).

DX-0070 - 6 of 7

App. 700

Case 3:16-cv-03111-K    Document 376    Filed 05/07/26    Page 720 of 831    PageID 20913

360-10-35-48    Because the continued use of a long-lived asset demonstrates the presence of service potential, only in unusual situations would the fair value of a long-lived asset to be abandoned be zero while it is being used. When a long-lived asset ceases to be used, the carrying amount of the asset should equal its salvage value, if any. The salvage value of the asset shall not be reduced to an amount less than zero.

· > Long-Lived Asset Temporarily Idled

360-10-35-49    A long-lived asset that has been temporarily idled shall not be accounted for as if abandoned.

DX-0070 - 7 of 7                                    App. 701

# Exhibit 16

**Table of Contents**

**Index to Financial Statements**

2009

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

## FORM 10-K

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended December 31, 2009
or
☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from          to
Commission File Number 1-2256

# EXXON MOBIL CORPORATION
(Exact name of registrant as specified in its charter)

| NEW JERSEY | 13-5409005 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

5959 LAS COLINAS BOULEVARD, IRVING, TEXAS 75039-2298
(Address of principal executive offices) (Zip Code)
(972) 444-1000
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, without par value (4,721,273,113 shares outstanding at January 31, 2010) | New York Stock Exchange |
| **Registered securities guaranteed by Registrant:** | |
| SeaRiver Maritime Financial Holdings, Inc. | |
| **Twenty-Five Year Debt Securities due October 1, 2011** | New York Stock Exchange |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ✓  No ___

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.  Yes ___  No ✓

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ✓  No ___

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  Yes ✓  No ___

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ✓

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ✓      Accelerated filer ___
Non-accelerated filer ___      Smaller reporting company ___

Indicate by check mark whether the registrant is a shell company (as defined by Rule 12b-2 of the Act). Yes ___  No ✓

The aggregate market value of the voting stock held by non-affiliates of the registrant on June 30, 2009, the last business day of the registrant's most recently completed second fiscal quarter, based on the closing price on that date of $69.91 on the New York Stock Exchange composite tape, was in excess of $335 billion.

**Documents Incorporated by Reference:**
None

Ramirez v. Exxon Mobil Corporation

**DX-0120**

No. 3:16-cv-3111-K (N. D. Tex.)

Table of Contents

Index to Financial Statements

**B. Production Prices and Production Costs**

The table below summarizes average production prices and average production costs by geographic area and by product type for the last three years.

| | United States | Canada/ S. America | Europe | Africa | Asia Pacific/ Middle East | Russia/ Caspian | Total |
|---|---|---|---|---|---|---|---|
| **During 2009** | | | | | | | |
| **Consolidated Subsidiaries** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil and NGL, per barrel | $ 53.43 | $ 54.07 | $ 56.88 | $ 60.10 | $ 59.58 | $ 58.42 | $ 57.86 |
| Natural gas, per thousand cubic feet | 3.10 | 3.19 | 5.61 | 1.70 | 3.08 | 2.11 | 4.00 |
| Bitumen, per barrel | — | 45.22 | | | | | 45.22 |
| Synthetic oil, per barrel | — | 61.26 | — | — | — | — | 61.26 |
| Average production costs, per barrel - total | 11.80 | 17.75 | 10.19 | 8.07 | 6.89 | 7.84 | 10.25 |
| Average production costs, per barrel - bitumen | — | 14.77 | — | — | — | — | 14.77 |
| **Equity Companies** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil and NGL, per barrel | 56.54 | — | 58.20 | — | 60.10 | 49.09 | 56.22 |
| Natural gas, per thousand cubic feet | 5.75 | — | 8.20 | — | 3.94 | 1.41 | 5.81 |
| Average production costs, per barrel - total | 18.07 | — | 2.48 | — | 0.49 | 3.23 | 2.72 |
| **Total** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil and NGL, per barrel | 54.02 | 54.07 | 56.89 | 60.10 | 59.79 | 52.46 | 57.56 |
| Natural gas, per thousand cubic feet | 3.10 | 3.19 | 6.74 | 1.70 | 3.52 | 1.58 | 4.69 |
| Bitumen, per barrel | — | 45.22 | — | — | — | — | 45.22 |
| Synthetic oil, per barrel | — | 61.26 | — | — | — | — | 61.26 |
| Average production costs, per barrel - total | 12.57 | 17.75 | 8.06 | 8.07 | 3.88 | 4.83 | 8.36 |
| Average production costs, per barrel - bitumen | — | 14.77 | — | — | — | — | 14.77 |
| **During 2008** | | | | | | | |
| **Consolidated Subsidiaries** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil and NGL, per barrel | $ 87.41 | $ 89.46 | $ 89.65 | $ 92.69 | $ 92.28 | $ 94.20 | $ 90.96 |
| Natural gas, per thousand cubic feet | 7.22 | 7.82 | 10.12 | 3.33 | 4.55 | 2.08 | 7.54 |
| Bitumen, per barrel | — | 65.45 | — | — | — | — | 65.45 |
| Synthetic oil, per barrel | — | 100.35 | — | — | — | — | 100.35 |
| Average production costs, per barrel - total | 11.80 | 18.03 | 8.97 | 6.66 | 5.19 | 9.64 | 9.38 |
| Average production costs, per barrel - bitumen | — | 19.55 | — | — | — | — | 19.55 |
| **Equity Companies** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil and NGL, per barrel | 89.94 | — | 85.08 | — | 94.21 | 84.14 | 90.80 |
| Natural gas, per thousand cubic feet | 13.97 | — | 11.09 | — | 8.86 | 1.38 | 9.89 |
| Average production costs, per barrel - total | 18.55 | — | 4.06 | — | 0.75 | 4.83 | 3.86 |
| **Total** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil and NGL, per barrel | 87.95 | 89.46 | 89.59 | 92.69 | 93.01 | 89.06 | 90.93 |
| Natural gas, per thousand cubic feet | 7.23 | 7.82 | 10.54 | 3.33 | 6.43 | 1.61 | 8.35 |
| Bitumen, per barrel | — | 65.45 | — | — | — | — | 65.45 |
| Synthetic oil, per barrel | — | 100.35 | — | — | — | — | 100.35 |
| Average production costs, per barrel - total | 12.72 | 18.03 | 7.67 | 6.66 | 3.38 | 6.96 | 8.14 |
| Average production costs, per barrel - bitumen | — | 19.55 | — | — | — | — | 19.55 |

11

# Exhibit 17

**Table of Contents**

**Index to Financial Statements**

## 2010

## UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

## FORM 10-K

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2010

or

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from to
Commission File Number 1-2256

# EXXON MOBIL CORPORATION
(Exact name of registrant as specified in its charter)

| NEW JERSEY | 13-5409005 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

5959 LAS COLINAS BOULEVARD, IRVING, TEXAS 75039-2298
(Address of principal executive offices) (Zip Code)

(972) 444-1000
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| **Common Stock, without par value (4,958,598,361 shares outstanding at January 31, 2011)** | **New York Stock Exchange** |
| **Registered securities guaranteed by Registrant:** | |
| **SeaRiver Maritime Financial Holdings, Inc.** | |
| **Twenty-Five Year Debt Securities due October 1, 2011** | **New York Stock Exchange** |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ✔ No _

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes _ No ✔

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ✔ No _

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ✔ No _

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ✔

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ✔ Accelerated filer _
Non-accelerated filer _ Smaller reporting company _

Indicate by check mark whether the registrant is a shell company (as defined by Rule 12b-2 of the Act). Yes _ No ✔

The aggregate market value of the voting stock held by non-affiliates of the registrant on June 30, 2010, the last business day of the registrant's most recently completed second fiscal quarter, based on the closing price on that date of $57.07 on the New York Stock Exchange composite tape, was in excess of $290 billion.

**Documents Incorporated by Reference:**
**Proxy Statement for the 2011 Annual Meeting of Shareholders (Part III)**

Ramirez v. Exxon Mobil Corporation

**DX-0137**

No. 3:16-cv-3111-K (N. D. Tex.)

Table of Contents

Index to Financial Statements

**B. Production Prices and Production Costs**

The table below summarizes average production prices and average production costs by geographic area and by product type for the last three years.

| During 2010 | United States | Canada/ S. America | Europe | Africa | Asia | Australia/ Oceania | Total |
|---|---|---|---|---|---|---|---|
| **Consolidated Subsidiaries** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil and NGL, per barrel | $ 70.22 | $ 69.92 | $ 73.37 | $ 78.08 | $ 72.96 | $ 68.91 | $ 74.04 |
| Natural gas, per thousand cubic feet | 3.92 | 3.41 | 6.44 | 2.15 | 3.19 | 3.31 | 4.31 |
| Bitumen, per barrel | — | 56.61 | — | — | — | — | 56.61 |
| Synthetic oil, per barrel | — | 78.42 | — | — | — | — | 78.42 |
| Average production costs, per oil-equivalent barrel - total | 9.92 | 20.07 | 11.62 | 9.63 | 5.65 | 11.20 | 10.54 |
| Average production costs, per barrel - bitumen | — | 17.81 | — | — | — | — | 17.81 |
| Average production costs, per barrel - synthetic oil | — | 42.79 | — | — | — | — | 42.79 |
| **Equity Companies** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil and NGL, per barrel | 74.70 | — | 74.14 | — | 72.67 | — | 72.98 |
| Natural gas, per thousand cubic feet | 8.30 | — | 6.91 | — | 5.42 | — | 6.02 |
| Average production costs, per oil-equivalent barrel - total | 19.11 | — | 2.41 | — | 0.98 | — | 2.31 |
| **Total** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil and NGL, per barrel | 70.98 | 69.92 | 73.38 | 78.08 | 72.80 | 68.91 | 73.81 |
| Natural gas, per thousand cubic feet | 3.92 | 3.41 | 6.68 | 2.15 | 4.56 | 3.31 | 5.00 |
| Bitumen, per barrel | — | 56.61 | — | — | — | — | 56.61 |
| Synthetic oil, per barrel | — | 78.42 | — | — | — | — | 78.42 |
| Average production costs, per oil-equivalent barrel - total | 10.67 | 20.07 | 8.46 | 9.63 | 2.91 | 11.20 | 8.14 |
| Average production costs, per barrel - bitumen | — | 17.81 | — | — | — | — | 17.81 |
| Average production costs, per barrel - synthetic oil | — | 42.79 | — | — | — | — | 42.79 |
| **During 2009** | | | | | | | |
| **Consolidated Subsidiaries** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil and NGL, per barrel | $ 53.43 | $ 54.07 | $ 56.88 | $ 60.10 | $ 60.38 | $ 54.84 | $ 57.86 |
| Natural gas, per thousand cubic feet | 3.10 | 3.19 | 5.61 | 1.70 | 3.07 | 2.97 | 4.00 |
| Bitumen, per barrel | — | 45.22 | — | — | — | — | 45.22 |
| Synthetic oil, per barrel | — | 61.26 | — | — | — | — | 61.26 |
| Average production costs, per oil-equivalent barrel - total | 11.80 | 17.75 | 10.19 | 8.07 | 6.55 | 8.98 | 10.25 |
| Average production costs, per barrel - bitumen | — | 14.77 | — | — | — | — | 14.77 |
| Average production costs, per barrel - synthetic oil | — | 37.47 | — | — | — | — | 37.47 |
| **Equity Companies** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil and NGL, per barrel | 56.54 | — | 58.20 | — | 56.12 | — | 56.22 |
| Natural gas, per thousand cubic feet | 5.75 | — | 8.20 | — | 3.79 | — | 5.81 |
| Average production costs, per oil-equivalent barrel - total | 18.07 | — | 2.48 | — | 1.07 | — | 2.72 |
| **Total** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil and NGL, per barrel | 54.02 | 54.07 | 56.89 | 60.10 | 58.18 | 54.84 | 57.56 |
| Natural gas, per thousand cubic feet | 3.10 | 3.19 | 6.74 | 1.70 | 3.48 | 2.97 | 4.69 |
| Bitumen, per barrel | — | 45.22 | — | — | — | — | 45.22 |
| Synthetic oil, per barrel | — | 61.26 | — | — | — | — | 61.26 |
| Average production costs, per oil-equivalent barrel - total | 12.57 | 17.75 | 8.06 | 8.07 | 3.53 | 8.98 | 8.36 |
| Average production costs, per barrel - bitumen | — | 14.77 | — | — | — | — | 14.77 |
| Average production costs, per barrel - synthetic oil | — | 37.47 | — | — | — | — | 37.47 |

11

**App. 705**

# Exhibit 18

Case 3:16-cv-03111-K   Document 376   Filed 05/07/26   Page 728 of 831   PageID 20921

**Table of Contents**

**Index to Financial Statements**

**2011**

## UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-K

þ   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2011

**or**

¨   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from            to

Commission File Number 1-2256

# EXXON MOBIL CORPORATION

(Exact name of registrant as specified in its charter)

| NEW JERSEY | 13-5409005 |
|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification Number)** |

**5959 LAS COLINAS BOULEVARD, IRVING, TEXAS 75039-2298**

(Address of principal executive offices) (Zip Code)

**(972) 444-1000**

(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| **Common Stock, without par value (4,713,220,567 shares outstanding at January 31, 2012)** | **New York Stock Exchange** |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes þ   No ¨

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ¨   No þ

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes þ   No ¨

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes þ   No ¨

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ¨

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer  þ            Accelerated filer  ¨

Non-accelerated filer  ¨            Smaller reporting company  ¨

Indicate by check mark whether the registrant is a shell company (as defined by Rule 12b-2 of the Act).   Yes ¨   No þ

The aggregate market value of the voting stock held by non-affiliates of the registrant on June 30, 2011, the last business day of the registrant's most recently completed second fiscal quarter, based on the closing price on that date of $81.38 on the New York Stock Exchange composite tape, was in excess of $395 billion.

**Documents Incorporated by Reference:**
**Proxy Statement for the 2012 Annual Meeting of Shareholders (Part III)**

Ramirez v. Exxon Mobil Corporation

**DX-0158**

No. 3:16-cv-3111-K (N. D. Tex.)

**Table of Contents**

**Index to Financial Statements**

**B. Production Prices and Production Costs**

The table below summarizes average production prices and average production costs by geographic area and by product type for the last three years.

| | United States | Canada/ S. America | Europe | Africa | Asia | Australia/ Oceania | Total |
|---|---|---|---|---|---|---|---|
| **During 2011** | | | | | | | |
| **Consolidated Subsidiaries** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil and NGL, per barrel | $ 90.65 | $ 97.10 | $102.20 | $109.69 | $ 98.79 | $ 96.28 | $100.79 |
| Natural gas, per thousand cubic feet | 3.45 | 3.29 | 9.32 | 2.83 | 3.37 | 3.98 | 4.65 |
| Bitumen, per barrel | – | 64.65 | – | – | – | – | 64.65 |
| Synthetic oil, per barrel | – | 102.80 | – | – | – | – | 102.80 |
| Average production costs, per oil-equivalent barrel - total | 11.14 | 23.58 | 13.58 | 14.04 | 6.58 | 12.85 | 12.33 |
| Average production costs, per barrel - bitumen | – | 19.80 | – | – | – | – | 19.80 |
| Average production costs, per barrel - synthetic oil | – | 47.68 | – | – | – | – | 47.68 |
| **Equity Companies** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil and NGL, per barrel | 104.44 | – | 103.23 | – | 100.14 | – | 100.74 |
| Natural gas, per thousand cubic feet | 5.08 | – | 8.61 | – | 7.78 | – | 8.08 |
| Average production costs, per oil-equivalent barrel - total | 19.96 | – | 2.92 | – | 1.09 | – | 2.45 |
| **Total** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil and NGL, per barrel | 92.80 | 97.10 | 102.22 | 109.69 | 99.50 | 96.28 | 100.78 |
| Natural gas, per thousand cubic feet | 3.45 | 3.29 | 8.96 | 2.83 | 6.14 | 3.98 | 5.93 |
| Bitumen, per barrel | – | 64.65 | – | – | – | – | 64.65 |
| Synthetic oil, per barrel | – | 102.80 | – | – | – | – | 102.80 |
| Average production costs, per oil-equivalent barrel - total | 11.68 | 23.58 | 9.85 | 14.04 | 3.41 | 12.85 | 9.45 |
| Average production costs, per barrel - bitumen | – | 19.80 | – | – | – | – | 19.80 |
| Average production costs, per barrel - synthetic oil | – | 47.68 | – | – | – | – | 47.68 |
| **During 2010** | | | | | | | |
| **Consolidated Subsidiaries** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil and NGL, per barrel | $ 70.22 | $ 69.92 | $ 73.37 | $ 78.08 | $ 72.96 | $ 68.91 | $ 74.04 |
| Natural gas, per thousand cubic feet | 3.92 | 3.41 | 6.44 | 2.15 | 3.19 | 3.31 | 4.31 |
| Bitumen, per barrel | – | 56.61 | – | – | – | – | 56.61 |
| Synthetic oil, per barrel | – | 78.42 | – | – | – | – | 78.42 |
| Average production costs, per oil-equivalent barrel - total | 9.92 | 20.07 | 11.62 | 9.63 | 5.65 | 11.20 | 10.54 |
| Average production costs, per barrel - bitumen | – | 17.81 | – | – | – | – | 17.81 |
| Average production costs, per barrel - synthetic oil | – | 42.79 | – | – | – | – | 42.79 |
| **Equity Companies** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil and NGL, per barrel | 74.70 | – | 74.14 | – | 72.67 | – | 72.98 |
| Natural gas, per thousand cubic feet | 8.30 | – | 6.91 | – | 5.42 | – | 6.02 |
| Average production costs, per oil-equivalent barrel - total | 19.11 | – | 2.41 | – | 0.98 | – | 2.31 |
| **Total** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil and NGL, per barrel | 70.98 | 69.92 | 73.38 | 78.08 | 72.80 | 68.91 | 73.81 |
| Natural gas, per thousand cubic feet | 3.92 | 3.41 | 6.68 | 2.15 | 4.56 | 3.31 | 5.00 |
| Bitumen, per barrel | – | 56.61 | – | – | – | – | 56.61 |
| Synthetic oil, per barrel | – | 78.42 | – | – | – | – | 78.42 |
| Average production costs, per oil-equivalent barrel - total | 10.67 | 20.07 | 8.46 | 9.63 | 2.91 | 11.20 | 8.14 |
| Average production costs, per barrel - bitumen | – | 17.81 | – | – | – | – | 17.81 |
| Average production costs, per barrel - synthetic oil | – | 42.79 | – | – | – | – | 42.79 |

9

# Exhibit 19

**2012**

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

**FORM 10-K**

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2012

**or**

**TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from to

Commission File Number 1-2256

# EXXON MOBIL CORPORATION

(Exact name of registrant as specified in its charter)

| **NEW JERSEY** | **13-5409005** |
|---|---|
| **(State or other jurisdiction of** | **(I.R.S. Employer** |
| **incorporation or organization)** | **Identification Number)** |

**5959 LAS COLINAS BOULEVARD, IRVING, TEXAS 75039-2298**

(Address of principal executive offices) (Zip Code)

**(972) 444-1000**

(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| **Common Stock, without par value (4,480,449,635 shares outstanding at January 31, 2013)** | **New York Stock Exchange** |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑ No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes    No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☑ No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☑ Accelerated filer

Non-accelerated filer    Smaller reporting company

Indicate by check mark whether the registrant is a shell company (as defined by Rule 12b-2 of the Act). Yes    No ☑

The aggregate market value of the voting stock held by non-affiliates of the registrant on June 30, 2012, the last business day of the registrant's most recently completed second fiscal quarter, based on the closing price on that date of $85.57 on the New York Stock Exchange composite tape, was in excess of $394 billion.

**Documents Incorporated by Reference: Proxy Statement for the 2013 Annual Meeting of Shareholders (Part III)**

**Ramirez v. Exxon Mobil Corporation**

**DX-0183**

No. 3:16-cv-3111-K (N. D. Tex.)

## B. Production Prices and Production Costs

The table below summarizes average production prices and average production costs by geographic area and by product type for the last three years.

| | United States | Canada/ S. America | Europe | Africa | Asia | Australia/ Oceania | Total |
|---|---|---|---|---|---|---|---|
| **During 2012** | | | *(dollars per unit)* | | | | |
| **Consolidated Subsidiaries** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil and NGL, per barrel | 84.51 | 91.45 | 104.14 | 110.11 | 102.19 | 93.39 | 100.29 |
| Natural gas, per thousand cubic feet | 2.15 | 1.98 | 8.92 | 2.77 | 3.91 | 4.39 | 3.90 |
| Bitumen, per barrel | - | 58.91 | - | - | - | - | 58.91 |
| Synthetic oil, per barrel | - | 92.77 | - | - | - | - | 92.77 |
| Average production costs, per oil-equivalent barrel - total | 11.14 | 26.94 | 15.06 | 13.35 | 7.27 | 12.11 | 13.02 |
| Average production costs, per barrel - bitumen | - | 23.71 | - | - | - | - | 23.71 |
| Average production costs, per barrel - synthetic oil | - | 47.45 | - | - | - | - | 47.45 |
| **Equity Companies** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil and NGL, per barrel | 103.94 | - | 104.59 | - | 101.60 | - | 101.94 |
| Natural gas, per thousand cubic feet | 3.22 | - | 9.66 | - | 9.38 | - | 9.48 |
| Average production costs, per oil-equivalent barrel - total | 20.15 | - | 3.36 | - | 1.43 | - | 2.80 |
| **Total** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil and NGL, per barrel | 87.43 | 91.45 | 104.15 | 110.11 | 101.88 | 93.39 | 100.68 |
| Natural gas, per thousand cubic feet | 2.15 | 1.98 | 9.33 | 2.77 | 7.64 | 4.39 | 6.11 |
| Bitumen, per barrel | - | 58.91 | - | - | - | - | 58.91 |
| Synthetic oil, per barrel | - | 92.77 | - | - | - | - | 92.77 |
| Average production costs, per oil-equivalent barrel - total | 11.68 | 26.94 | 10.34 | 13.35 | 3.74 | 12.11 | 9.91 |
| Average production costs, per barrel - bitumen | - | 23.71 | - | - | - | - | 23.71 |
| Average production costs, per barrel - synthetic oil | - | 47.45 | - | - | - | - | 47.45 |
| **During 2011** | | | | | | | |
| **Consolidated Subsidiaries** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil and NGL, per barrel | 90.65 | 97.10 | 102.20 | 109.69 | 98.79 | 96.28 | 100.79 |
| Natural gas, per thousand cubic feet | 3.45 | 3.29 | 9.32 | 2.83 | 3.37 | 3.98 | 4.65 |
| Bitumen, per barrel | - | 64.65 | - | - | - | - | 64.65 |
| Synthetic oil, per barrel | - | 102.80 | - | - | - | - | 102.80 |
| Average production costs, per oil-equivalent barrel - total | 11.14 | 23.58 | 13.58 | 14.04 | 6.58 | 12.85 | 12.33 |
| Average production costs, per barrel - bitumen | - | 19.80 | - | - | - | - | 19.80 |
| Average production costs, per barrel - synthetic oil | - | 47.68 | - | - | - | - | 47.68 |
| **Equity Companies** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil and NGL, per barrel | 104.44 | - | 103.23 | - | 100.14 | - | 100.74 |
| Natural gas, per thousand cubic feet | 5.08 | - | 8.61 | - | 7.78 | - | 8.08 |
| Average production costs, per oil-equivalent barrel - total | 19.96 | - | 2.92 | - | 1.09 | - | 2.45 |
| **Total** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil and NGL, per barrel | 92.80 | 97.10 | 102.22 | 109.69 | 99.50 | 96.28 | 100.78 |
| Natural gas, per thousand cubic feet | 3.45 | 3.29 | 8.96 | 2.83 | 6.14 | 3.98 | 5.93 |
| Bitumen, per barrel | - | 64.65 | - | - | - | - | 64.65 |
| Synthetic oil, per barrel | - | 102.80 | - | - | - | - | 102.80 |
| Average production costs, per oil-equivalent barrel - total | 11.68 | 23.58 | 9.85 | 14.04 | 3.41 | 12.85 | 9.45 |
| Average production costs, per barrel - bitumen | - | 19.80 | - | - | - | - | 19.80 |
| Average production costs, per barrel - synthetic oil | - | 47.68 | - | - | - | - | 47.68 |

9

# Exhibit 20

10-K 1 xom10k2013.htm FORM 10-K

**2013**

## UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

### FORM 10-K

☒   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2013

or

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from          to

Commission File Number 1-2256

# EXXON MOBIL CORPORATION
(Exact name of registrant as specified in its charter)

| **NEW JERSEY** | **13-5409005** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

**5959 LAS COLINAS BOULEVARD, IRVING, TEXAS 75039-2298**
(Address of principal executive offices) (Zip Code)

**(972) 444-1000**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| **Common Stock, without par value (4,321,238,544 shares outstanding at January 31, 2014)** | **New York Stock  Exchange** |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes  ☒   No  ☐·

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes  ☐   No  ☒·

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes  ☒   No  ☐·

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes  ☒   No  ☐·

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☐·

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer  ☒          Accelerated filer  ☐·

Non-accelerated filer  ☐          Smaller reporting company  ☐·

Indicate by check mark whether the registrant is a shell company (as defined by Rule 12b-2 of the Act).   Yes  ☐   No  ☒·

The aggregate market value of the voting stock held by non-affiliates of the registrant on June 28, 2013, the last business day of the registrant's most recently completed second fiscal quarter, based on the closing price on that date of $90.35 on the New York Stock Exchange composite tape, was in excess of $397 billion.

**Documents Incorporated by Reference:  Proxy Statement for the 2014 Annual Meeting of Shareholders (Part III)**

Ramirez v. Exxon Mobil Corporation

**DX-0208**

No. 3:16-cv-3111-K (N. D. Tex.)

## B. Production Prices and Production Costs

The table below summarizes average production prices and average production costs by geographic area and by product type for the last three years.

| | United States | Canada/ S. America | Europe | Africa | Asia | Australia/ Oceania | Total |
|---|---|---|---|---|---|---|---|
| **During 2013** | | | | *(dollars per unit)* | | | |
| **Consolidated Subsidiaries** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil, per barrel | 93.56 | 98.91 | 106.75 | 108.73 | 106.18 | 107.92 | 104.13 |
| NGL, per barrel | 44.30 | 44.96 | 65.36 | 75.24 | 40.83 | 59.55 | 51.12 |
| Natural gas, per thousand cubic feet | 2.99 | 2.80 | 10.07 | 2.79 | 4.10 | 4.20 | 4.60 |
| Bitumen, per barrel | - | 59.63 | - | - | - | - | 59.63 |
| Synthetic oil, per barrel | - | 93.96 | - | - | - | - | 93.96 |
| Average production costs, per oil-equivalent barrel - total | 12.02 | 32.02 | 19.57 | 13.95 | 8.95 | 16.81 | 15.42 |
| Average production costs, per barrel - bitumen | - | 34.30 | - | - | - | - | 34.30 |
| Average production costs, per barrel - synthetic oil | - | 50.94 | - | - | - | - | 50.94 |
| **Equity Companies** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil, per barrel | 102.24 | - | 99.26 | - | 103.96 | - | 103.66 |
| NGL, per barrel | 42.02 | - | - | - | 70.90 | - | 69.96 |
| Natural gas, per thousand cubic feet | 4.37 | - | 9.28 | - | 10.19 | - | 9.82 |
| Average production costs, per oil-equivalent barrel - total | 22.77 | - | 3.79 | - | 1.87 | - | 3.36 |
| **Total** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil, per barrel | 95.11 | 98.91 | 106.49 | 108.73 | 104.98 | 107.92 | 104.01 |
| NGL, per barrel | 44.24 | 44.96 | 65.36 | 75.24 | 61.64 | 59.55 | 56.26 |
| Natural gas, per thousand cubic feet | 3.00 | 2.80 | 9.59 | 2.79 | 8.53 | 4.20 | 6.86 |
| Bitumen, per barrel | - | 59.63 | - | - | - | - | 59.63 |
| Synthetic oil, per barrel | - | 93.96 | - | - | - | - | 93.96 |
| Average production costs, per oil-equivalent barrel - total | 12.72 | 32.02 | 12.42 | 13.95 | 4.41 | 16.81 | 11.48 |
| Average production costs, per barrel - bitumen | - | 34.30 | - | - | - | - | 34.30 |
| Average production costs, per barrel - synthetic oil | - | 50.94 | - | - | - | - | 50.94 |
| **During 2012** | | | | | | | |
| **Consolidated Subsidiaries** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil, per barrel | 94.71 | 98.67 | 110.91 | 111.19 | 109.95 | 112.12 | 107.05 |
| NGL, per barrel | 50.32 | 57.84 | 68.08 | 76.63 | 43.65 | 56.85 | 54.71 |
| Natural gas, per thousand cubic feet | 2.15 | 1.98 | 8.92 | 2.77 | 3.91 | 4.39 | 3.90 |
| Bitumen, per barrel | - | 58.91 | - | - | - | - | 58.91 |
| Synthetic oil, per barrel | - | 92.77 | - | - | - | - | 92.77 |
| Average production costs, per oil-equivalent barrel - total | 11.14 | 26.94 | 15.06 | 13.35 | 7.27 | 12.11 | 13.02 |
| Average production costs, per barrel - bitumen | - | 23.71 | - | - | - | - | 23.71 |
| Average production costs, per barrel - synthetic oil | - | 47.45 | - | - | - | - | 47.45 |
| **Equity Companies** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil, per barrel | 105.02 | - | 104.59 | - | 106.59 | - | 106.33 |
| NGL, per barrel | 58.38 | - | - | - | 75.24 | - | 74.87 |
| Natural gas, per thousand cubic feet | 3.22 | - | 9.66 | - | 9.38 | - | 9.48 |
| Average production costs, per oil-equivalent barrel - total | 20.15 | - | 3.36 | - | 1.43 | - | 2.80 |
| **Total** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil, per barrel | 96.60 | 98.67 | 110.74 | 111.19 | 108.22 | 112.12 | 106.88 |
| NGL, per barrel | 50.46 | 57.84 | 68.08 | 76.63 | 62.61 | 56.85 | 59.74 |
| Natural gas, per thousand cubic feet | 2.15 | 1.98 | 9.33 | 2.77 | 7.64 | 4.39 | 6.11 |
| Bitumen, per barrel | - | 58.91 | - | - | - | - | 58.91 |
| Synthetic oil, per barrel | - | 92.77 | - | - | - | - | 92.77 |
| Average production costs, per oil-equivalent barrel - total | 11.68 | 26.94 | 10.34 | 13.35 | 3.74 | 12.11 | 9.91 |
| Average production costs, per barrel - bitumen | - | 23.71 | - | - | - | - | 23.71 |
| Average production costs, per barrel - synthetic oil | - | 47.45 | - | - | - | - | 47.45 |

9

**App. 711**

# Exhibit 21

**2014**

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

**FORM 10-K**

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2014

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from to

Commission File Number 1-2256

# EXXON MOBIL CORPORATION

(Exact name of registrant as specified in its charter)

| **NEW JERSEY** | **13-5409005** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

**5959 LAS COLINAS BOULEVARD, IRVING, TEXAS 75039-2298**

(Address of principal executive offices) (Zip Code)

**(972) 444-1000**

(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| **Common Stock, without par value (4,194,690,266 shares outstanding at January 31, 2015)** | **New York Stock Exchange** |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☑ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☑ Accelerated filer ☐

Non-accelerated filer ☐ Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined by Rule 12b-2 of the Act). Yes ☐ No ☑

The aggregate market value of the voting stock held by non-affiliates of the registrant on June 30, 2014, the last business day of the registrant's most recently completed second fiscal quarter, based on the closing price on that date of $100.68 on the New York Stock Exchange composite tape, was in excess of $429 billion.

**Documents Incorporated by Reference: Proxy Statement for the 2015 Annual Meeting of Shareholders (Part III)**

Ramirez v. Exxon Mobil Corporation

**DX-0256**

No. 3:16-cv-3111-K (N. D. Tex.)

## B. Production Prices and Production Costs

The table below summarizes average production prices and average production costs by geographic area and by product type for the last three years.

| | United States | Canada/ S. America | Europe | Africa | Asia | Australia/ Oceania | Total |
|---|---|---|---|---|---|---|---|
| **During 2014** | | | *(dollars per unit)* | | | | |
| **Consolidated Subsidiaries** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil, per barrel | 84.00 | 86.46 | 96.43 | 97.46 | 95.27 | 95.56 | 93.21 |
| NGL, per barrel | 39.70 | 51.86 | 53.68 | 65.21 | 40.81 | 56.77 | 47.07 |
| Natural gas, per thousand cubic feet | 3.61 | 3.96 | 8.18 | 2.61 | 3.71 | 5.87 | 4.68 |
| Bitumen, per barrel | - | 62.68 | - | - | - | - | 62.68 |
| Synthetic oil, per barrel | - | 89.76 | - | - | - | - | 89.76 |
| Average production costs, per oil-equivalent barrel - total | 13.35 | 33.03 | 22.29 | 12.58 | 8.64 | 11.05 | 15.94 |
| Average production costs, per barrel - bitumen | - | 32.66 | - | - | - | - | 32.66 |
| Average production costs, per barrel - synthetic oil | - | 55.32 | - | - | - | - | 55.32 |
| **Equity Companies** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil, per barrel | 91.24 | - | 88.68 | - | 93.42 | - | 92.89 |
| NGL, per barrel | 38.77 | - | - | - | 65.31 | - | 64.41 |
| Natural gas, per thousand cubic feet | 4.54 | - | 8.28 | - | 10.00 | - | 9.38 |
| Average production costs, per oil-equivalent barrel - total | 24.34 | - | 6.10 | - | 1.85 | - | 4.22 |
| **Total** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil, per barrel | 85.23 | 86.46 | 96.17 | 97.46 | 94.44 | 95.56 | 93.15 |
| NGL, per barrel | 39.68 | 51.86 | 53.68 | 65.21 | 58.52 | 56.77 | 51.84 |
| Natural gas, per thousand cubic feet | 3.62 | 3.96 | 8.23 | 2.61 | 8.36 | 5.87 | 6.64 |
| Bitumen, per barrel | - | 62.68 | - | - | - | - | 62.68 |
| Synthetic oil, per barrel | - | 89.76 | - | - | - | - | 89.76 |
| Average production costs, per oil-equivalent barrel - total | 14.10 | 33.03 | 15.59 | 12.58 | 4.44 | 11.05 | 12.55 |
| Average production costs, per barrel - bitumen | - | 32.66 | - | - | - | - | 32.66 |
| Average production costs, per barrel - synthetic oil | - | 55.32 | - | - | - | - | 55.32 |
| **During 2013** | | | | | | | |
| **Consolidated Subsidiaries** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil, per barrel | 93.56 | 98.91 | 106.75 | 108.73 | 106.18 | 107.92 | 104.13 |
| NGL, per barrel | 44.30 | 44.96 | 65.36 | 75.24 | 40.83 | 59.55 | 51.12 |
| Natural gas, per thousand cubic feet | 2.99 | 2.80 | 10.07 | 2.79 | 4.10 | 4.20 | 4.60 |
| Bitumen, per barrel | - | 59.63 | - | - | - | - | 59.63 |
| Synthetic oil, per barrel | - | 93.96 | - | - | - | - | 93.96 |
| Average production costs, per oil-equivalent barrel - total | 12.02 | 32.02 | 19.57 | 13.95 | 8.95 | 16.81 | 15.42 |
| Average production costs, per barrel - bitumen | - | 34.30 | - | - | - | - | 34.30 |
| Average production costs, per barrel - synthetic oil | - | 50.94 | - | - | - | - | 50.94 |
| **Equity Companies** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil, per barrel | 102.24 | - | 99.26 | - | 103.96 | - | 103.66 |
| NGL, per barrel | 42.02 | - | - | - | 70.90 | - | 69.96 |
| Natural gas, per thousand cubic feet | 4.37 | - | 9.28 | - | 10.19 | - | 9.82 |
| Average production costs, per oil-equivalent barrel - total | 22.77 | - | 3.79 | - | 1.87 | - | 3.36 |
| **Total** | | | | | | | |
| Average production prices | | | | | | | |
| Crude oil, per barrel | 95.11 | 98.91 | 106.49 | 108.73 | 104.98 | 107.92 | 104.01 |
| NGL, per barrel | 44.24 | 44.96 | 65.36 | 75.24 | 61.64 | 59.55 | 56.26 |
| Natural gas, per thousand cubic feet | 3.00 | 2.80 | 9.59 | 2.79 | 8.53 | 4.20 | 6.86 |
| Bitumen, per barrel | - | 59.63 | - | - | - | - | 59.63 |
| Synthetic oil, per barrel | - | 93.96 | - | - | - | - | 93.96 |
| Average production costs, per oil-equivalent barrel - total | 12.72 | 32.02 | 12.42 | 13.95 | 4.41 | 16.81 | 11.48 |
| Average production costs, per barrel - bitumen | - | 34.30 | - | - | - | - | 34.30 |
| Average production costs, per barrel - synthetic oil | - | 50.94 | - | - | - | - | 50.94 |

9

# Exhibit 22

**To:** "Richard Auter (US - Assurance)" <richard.g.auter@pwc.com>
**Subject:** Upstream Impairment Memos
**From:** matthew.b.ary@us.pwc.com
**Sent:** Wed, 7 Sep 2016 08:58:06 -0400

See attached for upstream global and US impairment memos.

Thanks,

**M. Brice Ary**

PwC
Office: +1 713 356 4298 | Mobile: +1 281 300 9330 | Fax: +1 813 741 6513
Email: matthew.b.ary@us.pwc.com
PricewaterhouseCoopers LLP
1000 Louisiana Suite 5800 Houston, TX 77002

http://www.pwc.com/us



Ramirez v. Exxon Mobil
Corporation

**DX-0808**

No. 3:16-cv-3111-K (N. D. Tex.)

CONFIDENTIAL TREATMENT REQUESTED

PRAM0000509

**App. 714**



App. 715

DOCUMENT
PLACEHOLDER

DOCUMENT PRODUCED IN NATIVE

CONFIDENTIAL TREATMENT REQUESTED

PRAM0000510

App. 715



# Memo

| | |
|---|---|
| To: | ExxonMobil Upstream Year End 2015 Audit Files |
| From: | ExxonMobil Upstream Engagement Team |
| Date: | February 2, 2015 |
| Subject: | U.S. Production - Long-lived Asset Impairment Assessment |

## Issue

The impairment triggering review within this paper is focused on ASC 360, Condition 5 (A current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset (asset group)). We would note that the other ASC 360 conditions applicable to the U.S. Production assets are assessed within the Upstream Long-lived Asset Impairment assessment memo.

The focus of this memo is on the U.S. Production Exxon Mobil Operated ("EMOP) assets which are consolidated within the Exxon Mobil Corporations Upstream Functional business. The engagement team would note that there are other assets held within U.S. Production referred to as Exxon Mobil Operated by Others ("OBO") assets. As noted within the Upstream Long-lived Asset Triggering Event Assessment memo, these assets have a history of generating positive earnings and are generating positive earnings and cash flows in the current year[1]. Considering the history and current year profitability of these assets, Management has concluded there to be no impairment triggering event associated with these assets; the engagement team does not take exception with this conclusion. The remainder of this memo will focus on U.S. Production EMOP assets.

Summarized below are the applicable materiality levels:

| | |
|---|---|
| Affiliate Performance Materiality | - $100 million pre-tax |
| Affiliate De Minimis Threshold | - $50 million pre-tax |
| Functional Performance Materiality | - $1.425 billion pre-tax |
| Functional De Minimis Threshold | - $190 million pre-tax |

---

[1] The engagement team have summarized the more significantly of these U.S. Production OBO assets, along with their NBV, below:

| Asset Grouping (all amounts in $000,000's) | Net Book Value | Earnings (9Mo) | Cash flow (9Mo) |
|---|---|---|---|
| Lucius | 1,093 | 43 | 362 |
| Ursa | 369 | 13 | 67 |
| Thunderhorse | 1,210 | 14 | 158 |

The engagement team would note there is a collection of other minor assets recorded within the U.S. Production OBO asset.

1

**App. 716**



This memo should be read in conjunction with the Upstream Long-lived Asset Impairment Assessment memo as well as other planning and gather evidence documentation located within the Upstream audit file to provide context to various discussions summarized herein.

**Managements Triggering Event Assessment**

Management's impairment triggering event assessment is multi-layered. That is, an assessment for potential triggering events is first done at the Affiliate level, which is then followed by a final assessment and conclusion at the Functional level.

_Affiliate Assessment_

The engagement team would note that Affiliate Management will typically hold multiple reviews which includes a monthly analysis covering all U.S. assets, including U.S. Production.  As part of this monthly analysis, Affiliate Management will hold monthly Financial and Operations (F&O) debrief meetings which are used to assess the operating and financial performance of its assets/ investments – these reviews are performed at the asset level with further analysis performed if deemed necessary.  We would note that during the F&O meetings, Affiliate Management focuses on production, revenue, capital projects, operating expenses, cash flows and qualitative factors that affect operations.  We would also note that the engagement teams meets quarterly with Affiliate Management to update our understanding of asset level operational and financial performance, refer to PEFR-A 1 Earnings analysis documentation.

In addition to these processes, Affiliate Management performs PEFR A 5 "Controller's monitors the existence of potential impairment trigger conditions for long-lived assets, in accordance with ASC 360" in which Affiliate Management reviews all asset groups, including U.S. Production, for the triggering event conditions outlined within ASC 360.

Based on the assessment performed, U.S. Affiliate Management identified a potential impairment trigger may exist due to negative earnings generated by certain assets during the period. Based on this assessment, Affiliate Management raised this potential trigger event to Functional Management for further review.

_Functional and Affiliate Assessment_

In order for Management to gain an understanding of the factors that have resulted in certain U.S. Production assets generating negative earnings (YTD), Management has performed, as part of their F&O process, a detailed analysis on each asset group within U.S. Production – refer to a summary below.

| $000,000's[2] | SYU | Gulf of Mexico | Hadrian South | La Barge | Mobile Bay | ILA/South Texas |
|---|---|---|---|---|---|---|
| NBV | $1,972 | $158[3] | $488 | $1,387 | $1,280 | $217 |
| Revenue | $122 | $130 | $40 | $301 | $107 | $3 |
| Production Liquids (kbd) | 12 | 9 | 1 | 1 | 5 | 1 |

[2] The information included within the table was obtained by Management from the September 2015 Americas F&O review package and agreed to the respected RUs in the Dataflex system. The engagement team reperformed the tie out of this data without exception.

[3] The Gulf of Mexico (GOM) asset is operated by ExxonMobil in the offshore Gulf region.  ExxonMobil has operated in the Gulf of Mexico for over 60 years where it has produced both oil and gas hydrocarbons.  Production of the Gulf of Mexico asset group is ~80% liquids and ~20% gas as of 9/30/2015.  The engagement team would note the Gulf of Mexico assets are individually immaterial. As a result a further assessment over this asset was not deemed necessary.

2

**App. 717**



| | | | | | | |
|---|---|---|---|---|---|---|
| Gas (KOEBD) | 2 | 2 | 14 | 20 | 15 | 0 |
| YTD Earnings | $(150) | $(60) | $(6) | $154 | $(37) | $(29) |
| Cash Flow | $7 | $95 | $27 | $205 | $31 | $17 |

Within the table above we have listed those Asset Groups which have a larger relative carrying value, however, we would note that there are other Asset Group's Management reviews within the U.S Upstream Affiliate (for example, other Asset Groups reviewed include Thunderhorse, Lucius and Ursa). The engagement team would note for each of these Asset Groups that positive earnings and cash flows from operations have been generated.

The following sections of this memo provide a summary of the assessment performed by Functional and Affiliate Management (hereafter collectively referred to as "Management") over the more significant Asset Groups listed which are generating negative earnings, as well as PwC's considerations of this assessment.

### Santa Ynez Unit ('SYU')

SYU is an offshore oil and gas asset that is located off the coast of California. A summary of SYU's historical results is shown below:

| Year of Operation[4] | SYU –YTD Earnings | Cash Flow Generated |
|---|---|---|
| 2012 | $293 | $368 |
| 2013 | $347 | $473 |
| 2014 | $209 | $365 |

Management would note that, as per results above, the SYU asset has been historically profitable. To assess current year results, Management developed a pro forma view of SYU's earnings for 9/30/2015, absent any identifiable non-recurring/infrequent earnings events to depict what the earnings would have been after normalizing for these non-recurring/infrequent events. The engagement team would note PwC Audit Guide 12263 provides guidance on the presentation of pro forma financial information; specifically, that adjustments should be based on management's assumptions and should be to items that will not continue to affect the income statement 12 months from current date. Refer to the Proforma View section, below, for the understanding and financial impact that the identifiable non-recurring/infrequent earnings events had on the current operations of SYU.

*Proforma View*

Management prepared the following proforma view of the SYU operations for the current period. As a result of the analysis below, Management has concluded that an impairment triggering event for the SYU asset does not exist in the current year as the asset has been profitable at current realizations.

| | Net Cash Generated |
|---|---|
| Actual Year to Date [5] | $(150) |
| Normalizing Events | |

---

[4]The information included within the table was obtained by Management from the December 2012, 2013, and 2014 Americas F&O review package and agreed to the respected RUs in the Dataflex system. The engagement team reperformed the tie out of this data without exception.

[5]The information included within the table was obtained by Management from the September 2015 Americas F&O review package and agreed to the respected RUs in the Dataflex system. The engagement team reperformed the ty out of this data without exception.

3



| | | |
|---|---|---|
| - *Production Effect* | $201 | A |
| *Normalized Year to Date* | $51 | |

**A** Management would note that the SYU off-take pipeline was shut-in during the period. This shut-in was the result of the Plains All American pipeline rupture near Santa Barbara that occurred in May 2015. The engagement team reviewed news articles and the Watchlist to corroborate the existence of this shut-in. Management calculated the shut-in of production to be ~25 (kbd) and ~35 (mcfd) with price realizations of $33.74/bbl and $3.20/kcf. The engagement team deemed this fact pattern to be reasonable by performing a lookback analysis over production for the past 3 years for SYU and noted that on average SYU had a production total of 25 (kbd) and 35 (mcfd). The current price realizations agreed to realizations incurred in the U.S during the months of the shut-in. Through discussions with management we would note that Plains All American is currently working to remediate the pipeline and expects this to be fully operational in future periods.

Considering this, the engagement team does not take exception to Managements conclusion that an ASC 360 condition 5 (defined within the Upstream functional long-lived asset impairment assessment memo) impairment triggering event does not exist for the SYU Asset.

**Hadrian South**

Hadrian South is an ExxonMobil operated asset that is located in the Gulf of Mexico, off the coast of Louisiana. Hadrian South facilities tie into an Anadarko-operated Lucius project. Hadrian South's first volume of production was in March 2015, its production mix is ~95% gas and ~5% liquids.

Below, Management has summarized a month by month analysis of the financial and operational data of Hadrian South from first production through September, 2015.

| Hadrian South[6] | Mar | Apr | May | Jun | Jul | Aug | Sep |
|---|---|---|---|---|---|---|---|
| *Margin (Revenue less direct expenses)* | $0 | $8 | $14 | $13 | $7 | $5 | $9 |
| *Cash Opex* | 0 | 1 | 1 | 3 | 5 | 2 | 4 |
| *Non-Cash Opex* | 0 | 3 | 6 | 5 | 1 | 2 | 3 |
| *Int Exp/Income Taxes* | 0 | 3 | 4 | 3 | 1 | 1 | 1 |
| *Operating Earnings* | $0 | $2 | $2 | $1 | $0 | $0 | $1 |

The engagement team corroborated the start of production by way of review of 3rd party articles and production statistics, as well as the engagement team's review of Dataflex financial information. Based on these procedures the engagement team agrees with the timeframe presented / analyzed by Management.

Based on review of the monthly analysis prepared by Management, we would note that Hadrian South has generated positive earnings each month post start-up (i.e., minor YTD loss in table on pg. 2 pertains to non-recurring pre-start up costs). Giving consideration to this, Management has concluded that a further analysis on this asset was not necessary and that no triggering event exists.

---

[6]The information included within the table was obtained by Management from the September 2015 Americas F&O review package and agreed to the respected RUs in the Dataflex system. The engagement team reperformed the tie out of this data without exception. We would note that the information in this table will not reconcile to the Hadrian South data provided earlier within this memo as the data within this table is only for the period March – September (post first production).

4



The engagement team does not take exception to Management's conclusion that an ASC 360, condition 5 impairment triggering event does not exist for the Hadrian South Asset.

**Mobile Bay**

Mobile Bay is an ExxonMobil operated asset that is located in the Gulf of Mexico off the coast of Alabama. Mobile Bay is predominantly a gas field that produces around 20 KOEB per year, of which, 75% is gas and 25% is liquid (NGL) production.

A summary of Mobile Bay's historical results is shown below:

| Year of Operation[7] | Mobile Bay – YTD Earnings | Cash Flow Generated |
|---|---|---|
| 2012 | $12 | $103 |
| 2013 | $6 | $112 |
| 2014 | $16 | $77 |

The applicable ASC 360 condition states an impairment triggering event exists if there exists: "A current-period operating or cash flow loss combined with a history of operating or cash flow losses **or** a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset (asset group)". Management has noted that Mobile Bay is currently operating at a year-to-date earnings loss of $(37)M for 2015. Management would note however that there are no historical losses associated with this asset group and that the asset group is generating positive cash flows in the current year. Despite this, Management has determined that due to the current operating loss, it would be prudent to look at a projection of future cash flows consistent with the aforementioned condition – that is, this projection is used by Management to inform their conclusion as to whether an impairment trigger exists for this asset under this condition.

<u>Cash Flow Projection</u>

A summary of Managements analysis is below. As a result of this analysis, and the headroom identified, Management concluded there to be no impairment triggering event in the current year.

| | Cash Flow (2015-2040)[1] | NBV[2] | Headroom (rel) |
|---|---|---|---|
| Mobile Bay | $1,335 | $1,280 | $55 |

1 – The engagement team performed procedures over Management's forecast including auditing the accuracy and completeness of the model, data, and key assumptions as outlined below.

2 – Agreed to Dataflex Conform 100 – PP&E as of 6/30/2015, the effective date of Management's assessment.

As outlined in Audit Advisor 13/11, Management's process to develop an accounting estimate involves three components that must be considered: (1) data – factual information about past and current conditions, (2) assumptions – predictions of future outcomes, and (3) models – applications or spreadsheets that translate data and assumptions, applying relevant accounting principles, to produce an estimate. The engagement team applied this guidance to assist in the review of the projected cash flows for the Mobile Bay asset as outlined below.

---

[7]The information included within the table above was obtained by Management from the December 2012, 2013, and 2014 Americas F&O review package and agreed to the respected RUs in the Dataflex system. The engagement team reperformed the tie out of this data without exception.

5



*Data*

The Data used by Management in preparing the cash flow model for Mobile Bay is derived from both the Phoenix reserves system (discussed later within this memo) and the Dataflex system (i.e., prior year actual results), while all operating and capital expenditure data is developed in the planning and budgeting process (PEFR A 1). The inflation rate for revenue and operating expense used in the cash flow model are from the "Corporate Plan Dataguide" which is developed in conjunction with the Corporate and Functional Controllers (as part of PEFR A 1) and provides guidance on what rates to be used.

In assessing Management's projected cash flows, the engagement team considered the completeness and accuracy of the underlying data utilized in the calculation. Specifically, the engagement team agreed all current amounts to the Upstream F&Os and Dataflex[8] system. Additionally, the engagement team obtained supporting corroborating evidence for the underlying data that impacted assumptions utilized.

*Assumptions*

Key assumptions used within Management's cash flow projection are summarized below:

- Liquids and Gas Production

  Management used production volumes in the cash flow model, including all proved and a risk-weighted portion of probable reserves for Mobile Bay. Management determined the production profile to be included within the model based on actual historical production for Mobile Bay in addition to their experience with future production decline curves as fields near end of life.

  As to the risk-weighting, Management applied a 22% risk weighting (or 12 MOEB of the total probable 52 MOEB) for gas and a 92% risk weighting (or 12 MOEB of the total probable 13 MOEB) for liquids, which equals a total risk weighted probable reserve recovery of 36%.

  We would note that Management's risk weighting of probable reserves was on a more conservative basis than standard industry practice, which is typically between 40% - 60% for probable reserves[9]. If Management used a risk weighting of 50%, Mobile Bay would have an increased headroom of $178M (at 60%, headroom would be $250M). Furthermore, we would note that Management did not include any possible reserves within their model – again, this highlights the conservative nature of Management's estimation.

  As Management was more conservative with regards to risk weighting of probable reserves and the exclusion of possible reserves, the engagement team does not take exception to the amount of probable reserves used in the cash flow model. The engagement team would also note that ExxonMobil holds a AAA credit rating and as such has the wherewithal to continue development of Mobile Bay.

  With regards to the production volumes, the engagement team would note that production for both liquids and gas for Mobile Bay is a significant input in the cash flow model that Management prepared. In order to gain comfort around the production volumes that are being used in the cash flow model, the

---

[8] Controls that cover this process are PEFR A 1, 4, 5, 16 and PEFR F 3, 7, and 13 – the engagement team performed walkthrough and testing over these controls as part of the Exxon Mobil Corporation audit for 2015.

9 Per the Petroleum Accounting Principles, Procedures, & Issues accounting textbook, the industry standard of risk weighting probable reserves is a range between 40% and 60%, refer to Appendix D for additional guidance.

6

**App. 721**



engagement team performed a reasonableness check on the production volumes used each year in the cash flow model. This check was first performed by way of a lookback analysis over production for Mobile Bay over the last 5 years. We would note that based on cumulative audit knowledge, as well as industry experience, that production volumes follow a natural decline year over year. It is based on this understanding that when performing a lookback over prior year's production volumes that we would expect production to decrease except for years of capital spend which may sustain or increase in production. Refer to analysis compiled below.

| Production[10] | 2015 (9 mo.) Annualized | 2014 | 2013 | 2012 | 2011 | 2010 |
|---|---|---|---|---|---|---|
| Liquids (KBD) | 7 | 6 | 8 | 8 | 10 | 11 |
| Gas (MCFD) | 123 | 107 | 121 | 136 | 136 | 173 |

Based on review of the lookback analysis, summarized above, the engagement team would note that production has trended downward each year for both gas and liquids. This natural decline in production over the past 5 years is consistent with our understanding and industry experience - it is based on this understanding that when reviewing the production volumes used in the cash flow model we would note that there is a consistent downward trend in production year over year, refer to graphical summaries below.



---

[10] The information included within the table above was obtained by Management from the December 2010, 2011, 2012, 2013, 2014, and September 2015 Americas F&O review package and agreed to the respected RUs in the Dataflex system. The engagement team reperformed the tie out of this data without exception.

7

**App. 722**





*Information in the charts above were derived from the Mobile Bay cash flow model that is linked in this memo.*

The engagement team would note that the primary risk associated with Management's undiscounted analysis is the total production and not necessarily the production forecast in any given year. As a result, and in addition to the procedures summarized above, the engagement team performed a review over total production used in the cash flow model for both liquids and gas.

The engagement team obtained the total proved and probable reserves data[11] for Mobile Bay at June 30, 2015 from the Global Reserves Group (GRG), specifically the Phoenix system used by the GRG. We have gained comfort over the reserves data provided by the Global Reserves Group / Phoenix system through walkthrough and SOX testing procedures performed over the reserves process as well as Phoenix system testing performed by PwC Risk Assurance (refer to the planning section of the Aura Database for PwC Risk Assurance scoping). We compared the amount of reserves provided by the GRG to the amount of production volumes that were used in the cash flow model to ensure that production equals the forecast amount – no differences were identified. As a result, the engagement team determined the production data used within the model to be reasonable.

- Cash Operating Expense

Per discussion with Neil Higgins, US BAR Manager, cash operating expense will generally remain consistent for Mobile Bay. Management noted that an average operating expense per barrel from 2015 to 2040, end of field life, would be an average of $13.40 per oil equivalent barrel. In order to assess the reasonableness over the cash operating expense, the engagement team reviewed the F&O related to Mobile Bay for the past five years and noted that, on average, the cash operating expense per barrel was $14.76. We would note that in 2014, Mobile Bay had a significant increase in cash operating expense per barrel due to increased cash cost above field (corroborated to F&O packages and through various

---

[11] Proved and probable reserves are used as these reserves are determined to be more likely than not to be developed and produced. We would note that per the "Petroleum Accounting – Principles, Procedures & Issues" textbook that most successful efforts companies in the industry consider both proved and probable reserves in the cash flow determination.

8



discussions with Management) incurred that year due to drive replacement and subsurface value replacement. We would also note that when 2014 is normalized for onetime expenses, the 5 year average cash operating expense per barrel is $13.48 – this is consistent with the amount used by Management of $13.40. Considering this, the engagement team does not take exception to Management's use of $13.40 cash operating expense per barrel within the model. We would also note that inflation has been applied to this assumption – refer to inflation discussion below.

- Capital Expense

Per discussion with Management, and consistent with our review of the Mobile Bay cash flow model, there are two capital expenditures that are planned to be incurred. These planned capital expenditures are drilling/field injections which will increase the recovery of both liquids and gas reserves. Based on our understanding and knowledge of the oil & gas industry, the enhanced recovery (tertiary) injection is a normal operational activity used by companies to increase the rate of recovery. The engagement team would note that based on review of the "Petroleum Accounting – Principles, Procedures, & Issues" that the additional drilling and field injections are properly classified as a capital expenditures and that the additional expenditure to increase recovery is standard across the exploration and production business.

The engagement team also obtained the budgeted spend for the additional capital investment and noted that it had been approved by Management for the 2016 and 2018 years. We would also note the total amount of capital expenditures forecast is below Affiliate materiality, further, we would note that the reserves impact was to increase reserve production in certain years, with the offset being a reduced production profile at end of field life (a net change to total reserves of 0) – because of the immateriality of the cash flow effects as a result of capital expenditures, the engagement team deemed this to be an immaterial assumption. Based on discussions with Management, review of approved capital budget spend, and our understanding of industry knowledge we deem the assumptions utilized by Management in regard to capital expenditure in the cash flow model to be reasonable.

- Pricing – Gas and Liquids

Per discussion with Management, and review of the cash flow model, the engagement team would note that Management used the Corporate plan price which is distributed through the "Corporate Plan Dataguide" for both liquids and gas. For consideration and conclusion around the plan price used by Management, refer to the "Upstream Long-lived Asset Impairment Assessment".

- Inflation

Management applied an inflation rate of 2.5% for both revenue and operating expense in the cash flow model for Mobile Bay. Management consistently applied the inflation rate throughout the cash flow model.

Per discussion with Management, and review of the Mobile Bay cash flow model, the engagement team noted that Management applied an estimated inflation factor to projected revenue and operating expense at 2.5% per year. Management applied the inflation factor in accordance with the ExxonMobil 2015 "Corporate Plan Dataguide", which is a planned CPI growth rate of 2.5%. The engagement team corroborated the projected inflation rate by performing a lookback analysis over the past 10 year's CPI and noted that the average growth rate was 2.3%. As a sensitivity, when applying a CPI rate of 2.3% for both revenue and operating expense, the engagement team noted that the Mobile Bay cash flow model

9

App. 724



had $23M headroom. The engagement team deemed the utilization of the inflation rate of 2.5% to be reasonable based on the lookback and sensitivity procedures performed, as summarized above.

- Model

  The engagement team verified that the projected cash flow prepared by Management aligned with Management's policies and is in accordance with GAAP accounting principles (ASC 360-10). Additionally, the engagement team tested the model including validating the accuracy of the calculations.

  As can been seen from the data above, the projected cash inflows are greater than the net book value for Mobile Bay. As a result, Management concluded that an impairment triggering event did not exist for the Mobile Bay asset. Based on our review performed above, the engagement team does not take exception to Management's assessment and conclusions.

*Conclusion – Mobile Bay*

Based on procedures performed by Management, and the corroborating procedures performed by PwC as detailed above, we do not take exception to Management's assertion that there was no impairment triggering event for the Mobile Bay asset. We recognize that recoverability of an asset's carrying value is an area of judgement involving inherent uncertainty in forecasting future events. We further note the relative size of Mobile Bay's NBV of $1.2B to Upstream performance materiality of $1.5B - this comparison is relevant as the likelihood of the asset (to be held and used) to be completely impaired is remote. Using Management's undiscounted cash flow analysis and applying a 6% discount factor, which was judgmentally determined to be a reasonable assumption given the U.S. risk free rate of investment and ExxonMobil's AAA credit rating assessed by Moody, the resulting exposure to impairment would be $547 million which is less than Upstream performance materiality. Given the previously noted uncertainty involved in forecasting future cash flows, the conservatism applied by Management with regards to key assumptions (reserves and inflation), we consider this calculated exposure a reasonable basis to conclude that the risk of a material misstatement resulting from incorrect estimates or judgements is remote.

## ILA/South Texas

The engagement team would note that the ILA/South Texas assets are heritage Exxon Mobil properties. A summary of ILA/South Texas historical results is shown below:

| *Year of Operation*[12] | *ILA – YTD Earnings* | *Cash Flow Generated* |
|---|---|---|
| 2012 | $55 | $324 |
| 2013 | $75 | $223 |
| 2014 | $(114) | $85 |

In recent periods, Exxon Mobil has divested some of the acreage within this asset which was nearing end of field-life (i.e. less than 10 years of production left). A summary of the most recent divestments is shown below – all of which have resulted in a gain on sale.

---

[12]The information included within the table above was obtained by Management from the December 2012, 2013, and 2014 Americas F&O review package and agreed to the respected RUs in the Dataflex system. The engagement team reperformed the tie out of this data without exception.

10



| ILA/ South Texas Asset[13] | Earnings Impact (millions) |
|---|---|
| South Louisiana Gas Plants (2014) | $1 |
| Santa Fe Ranch (2015) | $16 |
| King Ranch Gas Plant & South Texas Pipelines (2015) | $193 |

Management would note that, consistent with the results above, the ILA asset has been historically profitable. Furthermore, Management would also note that the NBV of the ILA asset is immaterial to the Upstream function and has inconsequential earnings when considering the USP asset as a whole. Giving consideration to these factors, Management has concluded that a further analysis on this asset was not necessary.

In addition to Management's fact pattern summarized above, the engagement team would note that this asset is generating positive cash flows in the current year. We would also note that the NBV of this asset is insignificant in the context of the Upstream functional long lived assets (less than 0.1%). In addition, the risk associated with impairment of this asset group is considered to be low as if a triggering event were identified it is unlikely 100% of the carrying value of this asset group (to be held and used) would be impaired. Considering the above, the engagement team has concluded that based on applicable Upstream materiality that no further assessment on this asset group is considered necessary.

## Overall Conclusion – U.S. Production

Based on the procedures performed as detailed in this memo, we conclude that Management's process is both aligned with US GAAP accounting principles and the Corporation's Accounting Policy; therefore, Management's impairment assessment process is considered to be operating effectively. Additionally, we agree with the Corporation's determination that, as of 3Q 2015, there are no USP assets for which a ASC 360 condition 5 impairment triggering event exists.

## Update - December 31, 2015

Management have considered the risk of impairment through the end of the year by reviewing the financial results of the US Production assets and assessing these results against conclusions reached in the analysis outlined within this memorandum above. Refer to the table below and the discussions that follow.

| Country[14] (in $000,000) | GAAP Earnings (9M) | Cash Flow (9M) | GAAP Earnings* (YTD) | Cash Flow (YTD) |
|---|---|---|---|---|
| SYU | (150) | 7 | (200) | (115) |
| Gulf of Mexico | (60) | 95 | (78) | 100 |
| Hadrian South | (6) | 27 | (29) | 40 |
| La Barge | 154 | 205 | 191 | 253 |
| Mobile Bay | (37) | 31 | (57) | 32 |

---

[13] The information included within the table above was obtained from the 2014 & 2105 Upstream Watchlist.

[14] The information in the table above was obtained from the respected country/region F&O package as of 12/31/2015 and agreed to Dataflex without exception. As noted above, the focus of this memo is on the U.S. Production Exxon Mobil Operated ("EMOP") assets which are consolidated within the Exxon Mobil Corporations Upstream Functional business. The engagement team would note that there are other assets recorded within U.S. Production referred to as Exxon Mobil Operated by Others ("OBO") assets however the conclusions that an impairment triggering event does not exist for these assets is covered by the Upstream overall long-lived asset impairment assessment memo.

11

**App. 726**



| | | | | |
|---|---|---|---|---|
| *ILA/South Texas* | (29) | 17 | (41) | 40 |

The engagement team would note that based on review of the GAAP earnings above, the following USP asset groups were generating negative earnings as of December 31, 2015: SYU, Gulf of Mexico, Hadrian South, Mobile Bay, and ILA/South Texas; each of these was similarly identified for further review on an interim basis, at September 30, 2015.   Below we have summarized an update on each of these asset groups.

SYU Assessment

Management reviewed the earnings for SYU and noted that due to the pipeline shut-in (discussed above), that production remains suspended and currently no revenue is being generated for this asset.  Management determined that based on the fact that there has been no significant change in the status of SYU from interim conclusions, that no triggering event is identified.  The engagement team does not take exception to the conclusions reached.

Hadrian South Assessment

Management performed an assessment over Hadrian South at interim and noted that due to the asset being in the early stage of production, that it had incurred one-time earnings events in regards to the start of production. Management has concluded that their assessment at interim is still accurate when considering the 12 month 2015 data.  The engagement team reviewed the operational performance for Hadrian South for the fourth quarter and noted that it was generating a small earnings loss but still generating positive cash from operations for the year. The engagement team does not take exception to the conclusions reached.

Mobile Bay Assessment

Management performed a future projection of cash flows for Mobile Bay at interim and concluded that an impairment triggering event did not exist - refer to the memo above for details on this assessment. Management also reviewed each significant assumption utilized and noted that no changes to these assumptions was warranted after considering the full 12 months of data. The engagement team does not take exception to the conclusions reached.

ILA/South Texas

Management would note that there has been no significant change to their conclusions reached on this asset group as compared to the conclusions reached on an interim basis – that is, no impairment triggering event is identified for this asset group. The engagement team does not take exception to this conclusion.

Year-end update review of Reserves

The engagement team performed a review of Management's analysis over reserve changes as of year-end. Management noted that there were two US Production assets that incurred a downward revision to reserves: SYU and Alaska (Prudhoe Bay).  All other changes in reserves for US Production, upward or downward were immaterial as they were less than +/- 10MOEB (refer to Upstream long-lived asset impairment memo for assessment of this precision level). Management performed an analysis over each of these reserve revisions to determine if the change was deemed to be significant.

12

**App. 727**



- For SYU, Management noted that the decline in proved reserves amounted to approximately 6.6% of total proved reserves. This decline in reserves was due to a reduced 5-year drilling plan. Management would note that because of this revision to the drilling plan, the 5-year outlook did not include a plan to drill these reserves and therefore the associated reserves were recategorized from Proved Undeveloped ("PUD") to Unproved. Management would note that there is still an intention to produce these reserves beyond the 5-year outlook.
- For Alaska, Management would note that the revision was only applicable to one of the Asset Groupings within this asset – Prudhoe Bay. The decline in proved reserves for Prudhoe Bay represented only 1.8% of total proved reserves. The decline in resource was as a result of Management not using the reserves in operations but reinjecting as a potential LNG resource.

Management would note that on an overall basis (after considering proved and unproved reserves), the total reserves remained unchanged for each of SYU and Alaska (Prudhoe Bay). Considering that the amount which was recategorized was insignificant and that there was no net change to the total reserve for each asset, Management concluded that there was no impairment triggering event present for either asset. Considering the above fact pattern the engagement team does not take exception to Management's conclusion that the reserve revisions for SYU and Alaska are deemed to be insignificant. As a result, we do not take exception that an impairment triggering event is not present for these assets.

Conclusion

Giving consideration to the fact pattern that existed as of, and subsequent to, December 31, 2015, Management has not identified an impairment triggering event to be present for the US Production long-lived assets. The engagement team understood the various conclusion reached, as documented above, and does not take exception to the conclusion that an impairment triggering event does not exist.

13

**App. 728**



## Appendix A – Audit Advisor 13/10 – Auditing cash flow forecasts/projections and other assumptions used in fair value estimates

The engagement team reviewed Management's cash flow analysis for the Mobil Bay asset in accordance with Audit Advisor 13/10 due to the fact that Management performed a cash flow recoverability analysis over the Mobile Bay asset to determine if a possible triggering event was present.

The engagement team notes that Management's long-lived asset impairment process includes the use of a cash flow forecast and other assumptions to estimate fair value, when an impairment trigger is noted. The following depicts the 12-step approach to use when performing audit procedures to test Management's process as issued by PwC in 2013 with Audit Advisor 13/10. The engagement team has used this as a completeness check when assessing procedures performed for long-lived asset impairment triggering events, as it is considered to be a significant estimate from an Upstream perspective.

### 1. Understand and assess process of controls:

The engagement team walked through Management's impairment trigger assessment process as outlined within this memo. Additionally, the engagement team performed detailed walkthroughs and operating effectiveness testing as outlined within the planning section of the Aura Database. Note: PEFR – F13 (a review control) and PEFR – A5 specifically related to the impairment process and is documented within the following EGA:

Identify risks and understand controls in the business process – PEFR-F 13 & PEFR-A 5 (Impairment) - Upstream

### 2. Perform retrospective review:

In performing our retrospective review, the engagement team reviewed Management's analysis for the following factors:

1. Any changes to assumptions or historical data compared to the prior period review.
2. Review of any impairment charges in the current year compared to last year's conclusion.
3. Any other changes to Management's impairment review or process.

The engagement team would note that a trigger assessment is required every year. We would note that a cash flow was not prepared by Management in prior year, for impairment triggering even assessment purposes, as there was no indication of an impairment trigger present.

### 3. Set roles and responsibilities:

In order to obtain a detailed understanding of Management's annual process and the review conducted at the Functional level, Michael O'Riordan, Engagement Leader, Robert Wright, Engagement Senior Manager, Blake Bell, Engagement Manager, Jeff Asby, Engagement Senior Associate met with Senior Management including Vincent Prestipino, Accounting Policy Manager, Joe Bob Allaire, BAR Manager, Tom Clark, Americas Financial Reporting and Capex Manager and David Norwood, Production Controller.

Based on Management's process and analysis performed, the engagement team determined the use of specialists was not required. All of Management's inputs, data and models utilized within the impairment

14

**App. 729**



assessment have been validated and assessed by the audit engagement team. Refer to memo above as well as the workpaper linked below.

**4. Test operating effectiveness of key controls:**

All key controls relating to asset impairment have been tested by the engagement team and are operating effectively. Refer to the EGA referenced in Step 1 for our understanding and assessment of the impairment process and controls and the following link for our testing of the operational effectiveness of key controls in the impairment process: PEFR-F 13 – Affiliate Controllers monitor the existence of impairment trigger conditions for long-lived assets, in accordance with ASC 360 & PEFR-A 5 – Controller's monitor the existence of potential impairment trigger conditions for long-lived assets, in accordance with ASC 360.

**5. Test completeness and accuracy of the underlying data:**

The completeness and accuracy of the underlying data has been validated throughout our assessment. Specifically the engagement team has agreed all current data to Dataflex conforms scoped in for key report testing and has verified the mathematically accuracy of Management's analysis. The engagement team also performs SOX control procedures over the underlying data used by Management, refer to the planning section of the Aura Database for control procedures.

**6. Inquire about changes in assumptions:**

The engagement team would note that a cash flow model was not prepared last year based on the results of the Corporation's impairment assessment. The model does reflect changes to the Corporation's view of plan price, drilling plans and other business decisions. The engagement team notes the key assumption utilized by Management to identify an impairment triggers are in line with ASC 360.

**7. Obtain corroborating evidence:**

While validating Management's assessment, the engagement team consistently validated Management's significant assumptions with corroborating evidence.

Specifically, the engagement team corroborated with the following evidence:

*Industry data (including current and future pricing, production, etc.);
*Historical data;
*Client key reports with financial data (tested by the engagement team); and
*Discussion with affiliate teams to inquire if any items were noted that could be indicative of an impairment trigger.

**8. Consider contrary evidence:**

As part of Management's assessment on Plan Price, we would note that there exists contrary evidence with regards to the NYMEX 5-year strip price (refer to Upstream long-lived assets impairment assessment memo), in that it is not correlated to other indices considered by Management. As noted above, Management considers the NYMEX benchmark to have limited informative value and that other indices consider long-term supply/demand economics to form a view of the future commodity pricing environment. The engagement team would note the other sources utilized by Management are considered reputable and used widely within the industry.

15



The engagement team exercised professional skepticism while reviewing Management's process and is not aware of any other external data or other information used in the business that would indicate a potential impairment trigger.

**9. Consider sensitivity analysis:**

The engagement team utilized sensitivity analyses in order to assist in our conclusion that no asset group was impaired: Projected future commodity prices for both Brent and Henry Hub based on current levels of production.

It should be noted that where sensitivity analyses were utilized, the engagement team understood and agreed with Management's underlying assumptions, however, given the subjectivity of the assumptions, the engagement team deemed it appropriate to evidence different assumptions (projected commodity prices) to display that there was no change in the conclusion reached by Management when using more conservative measures.

**10. Test model:**

The engagement team noted that at 6/30/2015 Management prepared a cash flow model for the Mobile Bay asset that an impairment triggering event was not present and therefore a cash flow model was not required. The engagement team would note that no exceptions were taken, refer to the memo above for determination.

**11. Consider specialist's results:**

Based on the analysis performed, specialists were not required and therefore this step is not applicable.

**12. Document conclusion:**

The engagement team reached an independent conclusion based on the detailed review performed and concurred with Management's assessment that no assets were impaired.

16

**App. 731**



### Appendix B– Audit Advisor 14/03 – Reminder to engagement teams – Auditing estimates of future cash flows

The engagement team notes that PwC issued Audit Advisor 14/03 'Reminder to engagement teams – Auditing estimates of future cash flows' in 2014. PwC Audit Advisor 14/03 includes a discussion of recent inspection comments and key reminders based on the existing guidance in Audit Advisor 13/10 (see Appendix A above) and was prepared to help engagement teams avoid potential audit execution issues that have been identified in recent inspections. PwC Audit Advisor 14/03 includes 'key reminder' points for engagement teams to consider, based on the recent inspections results for auditing estimates of future cash flows. Specifically, PwC Audit Advisor 14/03 noted that deficiencies were commonly identified in the following four steps of the 12-step approach (see Appendix A above), with the 'key reminder' points specific to engagement team audit procedures as they relate to these four steps:

- Step 1: Understanding of the process.
- Step 4: Identifying and testing relevant internal controls.
- Step 7: Substantive testing of significant assumptions.
- Step 8: Consideration of and response to contrary evidence.

The following depicts PwC Houston response for our current year audit procedures as they relate to these steps:

*Step 1 reminders: Gain an understanding from the client of the processes and controls in place around developing the cash flow forecasts/projects and fair value estimates, including the likely sources of potential misstatement the controls are intended to address.*

PwC Audit 5161.02 includes a number of example questions that can be used in gaining an appropriate understanding of management's process and controls related to the development of cash flow forecasts, including specific questions relevant to auditing business combination valuations and impairment analyses. The related questions, and the engagement team's response, most relevant to current year inspection comments are:

- Who prepared the cash flow forecast, and does the preparer have the appropriate skill set and knowledge of the subject matter?

  Engagement Team Response: The engagement team notes that the cash flow forecast is prepared by Vincent Prestipino, Accounting Policy Manager, Joe Bob Allaire, BAR Manager, Tom Clark, Americas Financial Reporting and Capex Manager and David Norwood, Production Controller. We have assessed all individuals to have the appropriate skill set and knowledge on the subject matter. Refer to the "Determine audit approach" EGA in the planning section of the Aura Database for procedures performed to validate this assessment

- What was the source of the underlying data used to prepare the information, and how did the preparer get comfortable with the reliability of the information used (e.g., completeness and accuracy of company-produced information)?

  Engagement Team Response: The engagement team notes all data that would be used by Management in the cash flow analysis is based on historical results and/or the current year annual plan from the

17

**App. 732**



P&B. We would note that Management did not perform a cash flow in prior year as no trigging events were present.

- Are the cash flow forecasts appropriately based on market participant assumptions where required by the accounting framework?

Engagement Team Response: The engagement team notes, in accordance with ASC 360, Management prepared a cash flow model on an undiscounted basis for Mobile Bay. As such, market participant assumptions are not required when preparing an undiscounted cash flow model. Refer to memo above for considerations around assumptions used on the undiscounted cash flow model.

- What are the assumptions that are significant to the cash flow forecasts? Who was involved in the process of selecting or developing these assumptions?

Engagement Team Response: The engagement team notes that the following assumptions are considered to be significant to the cash flow forecast:

1. Production;
2. Cash Operating Expense;
3. Capital Expense;
4. Pricing – Gas and Liquids & Percentage of ExxonMobil realization vs market price
5. Inflation Revenue & Operating Expense.

The engagement team notes that these assumptions are consistent with prior asset performance and history as well as comparable to independent evidence. Based on our understanding of the business and corroboration of assumptions we consider these assumptions to be an appropriate reflection of cash flow. Further, we consider these assumptions to be complete, as there have been no conditions or events identified that would indicate that there ought to be a change to Management's cash flow forecast. In the current year, those involved in making these assumptions were: Vincent Prestipino, Accounting Policy Manager, Joe Bob Allaire, BAR Manager, Tom Clark, Americas Financial Reporting and Capex Manager and David Norwood, Production Controller

- Who reviews the cash flow forecast, and does the reviewer have the appropriate skill set and knowledge to review it? What are the controls within the review process (i.e., what specific activities are performed during the review), including activities to evaluate the reasonableness of the assumptions used? Did any changes stem from the review?

Engagement Team Response: The engagement team notes that the cash flow forecast prepared within 404 control PEFR-F 13 is reviewed by Vincent Prestipino, Accounting Policy Manager, Joe Bob Allaire, BAR Manager, Tom Clark, Americas Financial Reporting and Capex Manager, David Norwood, Production Controller, and by Corporate Controllers. We note that all individuals have the appropriate skill set and knowledge to review the cash flow forecast, as documented at the "Determine Audit Approach" EGA in the planning section of the Aura Database. Further, we note there are appropriate controls, including activities to evaluate the reasonableness of assumptions used, in the long-lived asset impairment review process, as documented at the following link: Identify risks and understand controls in the business process PEFR-F 13 & PEFR-A 5 (Impairment) - Upstream. Lastly, we note there were no changes to the forecasted cash flow analysis based on the review performed.

18

**App. 733**



*Step 4 reminders: Evaluate the design and test the operating effectiveness of the controls over management's development of the accounting estimate.*

Integral to gaining an appropriate understanding of management's process over the development of cash flow forecasts is the identification of relevant control activities that management has implemented to address LSPMs. For integrated audits and financial statement-only audits where we plan to place reliance on controls, we must also obtain sufficient evidence regarding operating effectiveness of controls. Current year inspection comments related to controls over cash flow forecasts include the following issues:

- Not sufficiently evaluating the nature or related precision of review control activities performed related to the cash flow forecast.

  Engagement Team Response: As documented throughout this memo and at the referenced EGAs below, the engagement team notes that there are appropriate review control activities and Management reviews all cash flow assumptions in the cash flow forecast, regardless of materiality: Identify risks and understand controls in the business process PEFR-F 13 & PEFR-A 5 (Impairment) – Upstream & PEFR-F 13 – Affiliate Controllers monitor the existence of impairment trigger conditions for long-lived assets, in accordance with ASC 360.

- Not evidencing whether a review control was designed to address each significant assumption.

  Engagement Team Response: The engagement team notes that there is a review control designed to address each significant assumption. Refer to the following links: Identify risks and understand controls in the business process PEFR-F 13 & PEFR-A 5 (Impairment) – Upstream & PEFR-F 13 – Affiliate Controllers monitor the existence of impairment trigger conditions for long-lived assets, in accordance with ASC 360.

- Not identifying and testing controls over the development of all significant assumptions.

  Engagement Team Response: The engagement team has identified and tested controls over the development of all significant assumptions. Refer to the following links: Identify risks and understand controls in the business process PEFR-F 13 & PEFR-A 5 (Impairment) – Upstream & PEFR-F 13 – Affiliate Controllers monitor the existence of impairment trigger conditions for long-lived assets, in accordance with ASC 360.

- Inappropriately characterizing substantive testing as reperformance of a control activity without linking the testing and evidence obtained to the specific control activities performed by the individual executing the control.

  Engagement Team Response: The engagement team has tested the reperformance of all control activities within the following links: Identify risks and understand controls in the business process PEFR-F 13 & PEFR-A 5 (Impairment) – Upstream & PEFR-F 13 – Affiliate Controllers monitor the existence of impairment trigger conditions for long-lived assets, in accordance with ASC 360.

*Step 7 reminders: Obtain corroborating evidence to support significant assumptions and changes in the cash flow forecasts/projections or fair value estimates.*

19



Inspection comments most frequently involve issues related to insufficient substantive audit evidence to support our conclusions regarding the reasonableness of significant assumptions underlying cash flow forecasts. As previously discussed, cash flow forecasts are frequently an important input into the development of certain estimates, and, accordingly, we obtain corroborating evidence to evaluate the reasonableness of underlying significant assumptions.

Current year inspection comments related to substantive testing of significant assumptions underlying cash flow forecasts reflect examples of over-reliance on the following forms of evidence:

- Inquiry
- Agreeing cash flow forecasts to those approved by the Board
- Sensitivity analyses
- Meeting / call agendas and lists of meeting participants
- Engagement team attendance at meetings / calls without adequate details of the evidence obtained
- Reviewer sign-offs

Engagement Team Response: As documented throughout this memo, and noted below, we have appropriately corroborated significant assumptions used by Management in the cash flow forecast. The reliance we have obtained from the procedures to corroborate the assumptions are beyond those listed above.

Specifically, the engagement team corroborated with the following evidence:

* Industry data (including current and future pricing, production, etc.);
*Historical data;
*Client key reports with financial data (tested by the engagement team); and
*Discussion with affiliate teams to inquire if any items were noted that could be indicative of an impairment trigger.

*Step 8 reminders: Consider the nature of any evidence contrary to the assumptions used by management.*

Current year inspection comments include the following examples where engagement teams' consideration of contrary evidence in evaluating the reasonableness of significant cash flow forecast assumptions was not sufficiently documented:

- Assumptions that was different from actual results for recent periods.

  Engagement Team Response: As documented throughout this memo, there were no changes to significant assumptions from prior years.

- Stable selling price assumptions despite an actual decline in recent selling prices.

  Engagement Team Response: The engagement team has assessed Management's view of current and future commodity prices.

- Use of industry growth rates to corroborate assumptions even though the company's historical growth rates were inconsistent with historical industry data.

20

**App. 735**



Engagement Team Response: As documented in the memo, the engagement team has considered third party publications and external sources to corroborate Management's assumptions as they relate to trends in the commodity pricing environment.

- Assuming incremental cost savings despite a history of not achieving targeted cost savings.

  Engagement Team Response: Management did not include any cost savings in the cash flow model for Mobile Bay.

21

**App. 736**



### Appendix C– Audit Advisor 15/05 – Auditing Estimates of future cash flows

The engagement team notes that PwC issued Audit Advisor 15/05 'Important reminders and documentation example' in 2015. PwC Audit Advisor 15/05 includes a discussion of recent inspection comments and key reminders based on the existing guidance in Audit Advisor 13/10 (see Appendix A above) and Audit Advisor 14/03 (see Appendix B above) was prepared to help engagement teams avoid potential audit execution issues that have been identified in recent inspections. PwC Audit Advisor 15/05 includes 'key reminder' points for engagement teams to consider, based on the recent inspections results for auditing estimates of future cash flows. Specifically, PwC Audit Advisor 15/05 noted that deficiencies were commonly identified in the following steps, with the 'key reminder' points specific to engagement team audit procedures.

### Key points to consider when executing procedures over cash flow forecasts

The following are some of the key points to consider when executing procedures over cash flow forecasts.

- ***Consider use of sensitivity analysis to help identify significant assumptions***— All assumptions are not created equal, and we need to perform substantive testing (and controls testing for integrated audits) for all assumptions that are *significant*. One way to help identify the importance of an assumption is to perform a sensitivity analysis. The more sensitive the valuation estimate is to changes in assumptions, the more persuasive the evidence needed to audit that assumption. Remember, a sensitivity analysis is a good risk assessment procedure, but it is *not* a substantive test.

  The engagement team performed a sensitivity analysis over the conclusion and noted that the maximum error was immaterial for Mobile Bay. LINK WORKPAPER. Other sensitivity analysis included assessing other earnings events for certain assets recorded within U.S. Production.

- ***Identify detailed LSPM***— Consider having an LSPM for each significant assumption to reduce the risk that we don't obtain an understanding of, and perform controls and substantive testing related to, each significant assumption.

  The engagement team decided to have one LSPM for the various assumptions, "Assumptions used to estimate the carrying value of assets are not reasonable." The engagement team takes no exception to the use of one LSPM as we deem the risk of not obtaining an understanding of, and performing controls and substantive testing related to each assumption to be low. Refer to the "Assumptions" section above for assessment of the key assumptions utilized by Management.

- ***Assess the design of controls early in the audit***— Events that require the preparation of cash flow forecasts, such as business combinations or impairment triggers, may be infrequent or non-recurring in nature. Therefore, it is important to have early discussions with management to obtain the necessary understanding of their process and related controls in a timely manner. Obtaining our understanding prior to execution of the client's process and related controls will allow us to consider the most effective and efficient testing methods in the circumstances. Conversely, obtaining our understanding after management's process and controls have been executed will, in many cases, limit our ability to effectively and efficiently obtain audit evidence about the design and operating effectiveness of controls through observation procedures.

  Management reviews for potential triggering events on a quarterly basis as part of the earnings review and Watchlist PEFR controls. The engagement team would note that we attend these quarterly meetings, at both the Functional and Affiliate level, to discuss these results with Management, assessing the design of the controls on a quarterly bases.

22

**App. 737**



- ***Document specifics when using observation to test controls***— As a reminder, if our planned testing approach includes observation of meetings, our documentation should include specifics regarding what we observed during the meeting. Examples include (a) specific actions requested and questions raised by the control operator, (b) the completeness of discussions, including whether specific matters addressed supported the designed precision level of the control, (c) follow-up items or changes resulting from the discussion which provide evidence of the precision and effectiveness of the review, (d) whether the control operator demonstrated the requisite knowledge and experience, and (e) other matters considered important in testing the control. In addition to the accompanying documentation example, engagement teams can reference the relevant 2015 Accounting and Auditing Workshop materials in the Accounting, Auditing and SEC Developments database.

  The testing of the PEFR A 5 and F 13 is not observation as directed by PwC Dallas.  These controls are tested by way of reperformance and inspection, refer to the Aura Database.

- ***Avoid pitfalls when using reperformance to test controls***— Review controls over complex estimates, including review controls related to estimates of future cash flows, may not lend themselves to reperformance testing in all cases. In cases where reperformance is deemed appropriate, we must obtain persuasive evidence AND perform exactly what the control operator does when executing the control.

  As documented in this memo and in *Identify risks and understand controls in the business process - PEFR-F 13 & PEFR-A 5 (Impairment) - Upstream and PEFR-F 13 - Affiliate Controllers monitor the existence of impairment trigger conditions for long-lived assets, in accordance with ASC 360, the engagement team ensured that we reperformed exactly what the control operator does when executing the control.

- ***Test controls over the accuracy and completeness of company produced information used in key controls***— For all key controls selected for testing, evaluate and identify those that use company-produced information in the execution of the control, and ensure we have identified and developed plans to test the control(s) management has in place over the reliability (completeness and accuracy) of such information. As a reminder, in non-integrated audits, as an alternative to testing controls over the reliability of key reports, we can perform substantive testing of the completeness and accuracy of such information / data.

  The engagement team evaluated and identified company-produced information in the executing of the control and developed a plan to test the controls Management has in place over the reliability of such information. Refer to the 'Summary of IT Dependencies' tab within *Identify risks and understand controls in the business process - PEFR-F 13 & PEFR-A 5 (Impairment) – Upstream.

- ***Thoroughly address estimates that differ from historical results and other contrary evidence***— When cash flow forecasts differ significantly from actual results achieved in recent years or there are circumstances that indicate historical information is not representative of future conditions, this represents *contrary evidence*. To address this and other types of *contrary evidence* we should evaluate and document how management's controls (where we are relying on controls) considered this evidence and how we considered this evidence in drawing our controls and substantive testing conclusions.

  Refer to appendix B above for documentation around historical results and other contrary evidence.

23

**App. 738**



## Appendix D– Risk of Various Classes of Reserves

The table below provides an industry standard risk weighting of reserves used in determining the discounted cash flow for an asset.

| Property Type | Risking |
|---|---|
| Proved | |
| Proved Developed Producing | 100% |
| Proved Developed Nonproducing | 100% |
| Proved Undeveloped | 80% - 100% |
| | |
| Probable | |
| Probable Reserves | 40% - 60% |
| | |
| Possible | |
| Possible Reserves | 10% - 25% |

The table above is derived from the Petroleum Accounting – Principles, Procedures, & Issues textbook.  The use of risk weighting reserves as noted above is consistent with the accounting guidance in ASC 360.

24



DOCUMENT PRODUCED IN NATIVE

CONFIDENTIAL TREATMENT REQUESTED

PRAM0000511

App. 740



# Memo

| | |
|---|---|
| To: | ExxonMobil Upstream Year End 2015 Audit Files |
| From: | ExxonMobil Upstream Engagement Team |
| Date: | February 2016 |
| Subject: | Upstream Long-lived Asset Impairment Assessment |

*Note, this assessment was developed using data and considerations as of an interim date, September 30, 2015. An update of this interim assessment is included at the end of this memorandum giving consideration to the full year financial information for the year ended December 31, 2015.*

## Background

*Business Overview*

Exxon Mobil Corporation (hereafter referred to as "Exxon", "ExxonMobil" or the "Corporation") is a public company registered on the New York Stock Exchange ("NYSE"). The Corporation's principal business is energy, involving exploration for, and production of, crude oil and natural gas, manufacture of petroleum products and transportation and sale of crude oil, natural gas and petroleum products. The Corporation is the largest publicly traded E&P Company globally and operates in multiple countries and markets internationally.

The Corporation reported pre-tax income of $52 billion, $58 billion, and $79 billion for 2014, 2013, and 2012, respectively. Pre-tax income for the nine months ending September 30, 2015 amounted to $19 billion. For the Upstream Functional business (pre-intercompany adjustments), pre-tax income of $51 billion, $61 billion and $67 billion was generated for 2014, 2013 and 2012, respectively. For the nine months ending September 30, 2015, pre-tax income amounted to $18B.

ExxonMobil had a market capitalization of $319 billion at January 19, 2016, and has maintained a credit rating of AAA for over 90 years. The Corporation consistently manages its business with a long-term outlook due to the long term nature of its investments, including those discussed in this memo; to that end, average return on capital employed for Exxon Mobil's Upstream function for the 15-year period ended December 31, 2014 was 31.56%.

The applicable materiality to the Upstream functional audit are as follows:
- Functional performance materiality: $1.425B
- Functional de minimis threshold: $190M
- Affiliate performance materiality: $100M
- Affiliate de minimis threshold: $50M

## Purpose of Memo

Management has assessed its long-lived assets and equity method investments held within the Corporation's Upstream Functional business (hereafter referred to as the "Upstream business" or "Upstream") for potential triggering events under applicable ASC standards, giving consideration to current facts and circumstances

1

**App. 741**



including recent declines in commodity prices. As a result of this assessment, Management has concluded that no impairment triggering events occurred in 2015. In arriving at these conclusions, Management considered historical results, current year results, and in certain instances, forecasts of future results.

We would note that this memo should be read in conjunction with other planning and gather evidence documentation within the Upstream and Corporate audit files to provide context to various discussions summarized herein.

### PwC Risk Assessment

The engagement team notes the determination of an impairment triggering event requires a significant amount of judgment. As to risk, consistent with prior years, the PwC Corporate engagement team determined that impairment was neither a significant nor elevated audit risk for the 2015 global audit. This assessment was based on the engagement team's understanding of the nature of the Corporation's assets and operations, its demonstrated profitability over the business cycle – which includes an industry leading ROCE (Return on Capital Employed), the absence of material impairments in the past, the absence of material losses on sale, and the Corporation's view that the decision making and operational management of their business should not be made based on short-term price volatility (further discussed above).

Based on our cumulative audit knowledge, our understanding of the Corporation and our review procedures to date, we believe that the impairment assessment represent a normal risk and that our audit procedures have been appropriately designed to address that risk.

### Upstream Assets

ExxonMobil's Upstream investments range in type from conventional liquid plays to non-conventional shale fracking to large gas production / LNG projects[1]. These investments are characterized by similar attributes as they are capital intensive, long-term in nature and where the cumulative return on the investment is dependent on a number of factors including efficiency of the capital investment, reservoir performance, fiscal terms, operating costs and prices. Further, investments are typically organized by 1) exploratory assets, 2) unproved properties and 3) proved properties. Such investments can be held in consolidated subsidiaries, as an undivided interest in a joint venture subject to proportionate consolidation, or in affiliates accounted for under the equity method.

The table below outlines the total Upstream business' long-lived assets and equity investment assets as of 9/30/2015.

| Asset | Balance as of 9/30/2015 ($M)[2] |
|---|---|
| PP&E | $174,383 |

---

[1] In addition to crude, the Corporation also produces natural gas, natural gas liquids and condensate. In certain regions (primarily North America), natural gas prices are set by reference to an index price (e.g. Henry Hub, Houston Ship Channel) which is independent of the crude price. In other regions, however, natural gas prices are determined (pursuant to contract) using a crude oil index and are therefore subject to change as crude prices change. Further, movements in condensate market prices are closely related to crude prices changes.

[2] Amounts depicted have been agreed to Dataflex Conform 100, Balance Sheet as of 9/30/2015. Note this information is derived from Dataflex a covered system tested by PwC Risk Assurance. Based on our review, these are the main long-lived assets within the Upstream function.

2

**App. 742**



| | |
|---|---|
| Unproved Property | $26,770 |
| Equity investments | $24,314 |
| Intangible assets | $466 |
| Goodwill | $166 |
| **Total** | **$226,099** |

*PP&E*

Per ASC 360-10-35, a long-lived asset group should be tested for impairment whenever there is a change or event which indicates that the carrying amount is not recoverable. Examples of impairment indicators that are relevant to the Upstream industry are summarized within the table below:

| ASC 360 Condition | Example Impairment Indicator |
|---|---|
| Condition 5* | Current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset (asset group). |
| Condition 1 | Significant decrease in the market price of a long-lived asset (asset group). |
| Condition 1 – Upstream Industry Specific | Lower expected future oil and gas price, such as the prices used by Management in evaluating whether to develop or acquire properties. |
| Condition 1 – Upstream Industry Specific | Significant downward revisions to an asset's (asset group's) reserve estimates |
| Condition 2 | Significant adverse change in the extent or manner in which a long lived asset (asset group) is being used or in its physical condition |
| Condition 3 | Accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of a long-lived asset (asset group) |
| Condition 4 | Significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset (asset group), including an adverse action or assessment by a regulator |
| Condition 6 | Current expectation that, more likely than not, a long-lived asset (asset group) will be sold or otherwise disposed of significantly before the end of its previously estimated useful life. |

*The engagement team considers this condition to be most relevant to the oil and gas upstream business.

In later sections of this memo, we consider the requirements of ASC 360[3] and Management's related processes to identify whether any impairment triggers exist in relation to long-lived asset balances for the year ended December 31, 2015. We also consider the existence of impairment triggers in the context of equity method investments.

---

[3] The engagement team also considered the guidance outlined within the *PwC Global Guide to Accounting for Business Combinations and Non-controlling Interests (2013) – Chapter 10: Accounting for Tangible and Intangible Assets Post acquisition (the "BCG").*

3



*Unproved Properties*

As indicated within the table above, the Unproved Properties balance is $26,770M for ExxonMobil globally. XTO holds a significant portion of the Unproved Properties balance, $24,366M[4], while IOL (recorded within the IOL entity) holds a balance of $259M[5] in unproved properties.   The remaining balance of $2,145M is recorded across 67 RUs - no individual RU holds a balance above functional SUM. The engagement team notes this balance is comprised of unoperated acreage and other land, leases, and easements for the Upstream business segment.   Per ASC 932-360-35, Unproved Properties shall be assessed periodically to determine whether they have been impaired.

As to an impairment assessment over the Unproved Properties balance of $2.1B, due to Management's long term view of this portfolio; and their ability to exploit this portfolio over an extended period given the strength of the Corporation's balance sheet, Management does not view the current price environment to alter its view on the carrying value of unproved properties

Management would note there are several processes in place to review this Unproved Properties balance for indicators of potential triggering events, this includes the Watchlist control (PEFR F4 – described in detail later within this memo) as well as suspended wells controls. As to suspended wells, we would note that substantive testing procedures are performed by Affiliate and Functional teams, furthermore, SOX 404 testing is also performed at the Functional level – it is through these procedures that we would note Management is making sufficient progress towards exploitation of these unproved properties[6]. As to the broader controls listed, each of these controls feed into Management's comfort over triggering events associated with Unproved Properties. We would also note from an audit perspective that Unproved Properties, where significant, are covered by directed procedures assigned to Affiliate teams.

Further to the above, per inquiry with Management, there has been no change in methodology and risk assessment with regards to the assessment and accounting for unproved properties.  Management believes that their methodology for assessing and accounting for unproved properties is appropriate in terms of industry practice and the requirements of the standard.  With regard to XTO, which represents approximately 91% of unproved properties balance, we would note that Management has amortized the unproved property balance on a consistent basis in accordance with ASC 932 and industry practice. Additionally, Management performs a periodic assessment to assess whether an impairment exists on XTO and all other unproved properties. We would note that, collectively, the XTO and IOL balances represent $24,625M and are subject to audit procedures by PwC audit teams in North Texas and Calgary respectively. In addition, the PwC Houston Functional Team has reviewed the "Unproved Property" Memo prepared by the PwC North Texas team and included in the XTO File and do not take exception to the procedures performed or conclusions reached. The remaining balance not covered by XTO and IOL audit opinions is $2.1B. As it relates to this remaining balance, the engagement team considered the relative size and broad disbursement of this balance, the financial strength of the Company and discussions with Management where there is no indication that the Company plans to let any leases expire or indication that they cannot be renewed. Considering this fact pattern, we do not take exception to Management's conclusion that an impairment does not exist for Unproved Properties.

---

[4] For consideration of Management's methodology and risk assessment approach as it relates to Unproved Properties for XTO, refer to the year-end 2015 memo on XTO Unproved Properties located within the XTO Aura file.

[5] The engagement team would note that this amount is covered by the full-scope opinion issued by PwC Calgary over IOL.

[6] The engagement team would note that approximately 65% of the non-XTO/Kearl unproved property balance has at least one suspended well associated with it. The remaining balance (35%) is considered immaterial.

4



Note, the engagement team also considered Unproved Properties in the context of the current price environment (see footnote 15 below) and whether this environment gave rise to an impairment trigger – see discussion in sections below.

_Equity investments_

The Corporation has investments in several entities that are accounted for using the equity method of accounting. For the Corporation's equity affiliates, Management has performed an assessment of whether there is an indication that there is a loss in the value of any of its investments that is considered to be 'other-than-temporary', as required by ASC 323-10-35-31. PwC Houston notes that although the accounting guidance for impairment of equity investments (ASC323) is different than that of wholly owned long-lived assets (ASC360), both standards require the preparer to consider whether conditions and circumstances existing at period end indicate that an asset (or equity investment) may be impaired. To that end, Management reviews historical earnings as well as the current fact pattern associated with each equity investment during their impairment review process. This includes identifying investments for:

- A loss in value that is other than temporary decline;
- Absence of an ability to recover the carrying amount of the investment; or
- Inability of the investee to sustain an earnings capacity that would justify the carrying amount of the investment.

PwC Houston would note that Management considers that the following procedures which are performed on an ongoing basis over equity investees allows for the identification of possible triggering events:

- Review of financial and operational information - Management monthly receives and reviews production volumes and prices, operating expense, and capital expense information as well as the current month's trial balance. They also review current and prior year's cash flows to ensure that the investment is still recoverable.
- Quarterly meetings with the operational Management team - ExxonMobil Management quarterly has formal meetings with the equity investee operational team to review current performance as well as future expansion or production activities.
- SOX review control procedures - Management has the following PEFR key SOX controls in place to review and ensure proper accounting rules are being followed: PEFR A 37, 38, 39, 5 and PEFR F 7.
- F&O reviews performed monthly - Management includes equity investees in their monthly F&O reviews to ensure that both functional and affiliate Management is informed of the current status of operations year to date and versus plan
- Audits of investees - ExxonMobil reserves the right to conduct periodical audits of the investee - such audits are carried out on a frequent basis.
- Reserves processes – ExxonMobil SOX control process around reserves includes within its scope equity method investments.

Based on our testing performed, we would note that the procedures are appropriately designed and operating effectively to identify the potential for impairment, as listed above.

We also considered other factors, where relevant, such as:

- Reduction in the share price of an investment that has fallen below the Corporation's cost base of the investment;

5

**App. 745**



- Reduction or cessation in an investee's dividend payments;
- Downgrading of an investee's debt rating;
- Asset impairment recorded by an investee within their stand-alone accounts;
- Any adverse reports issued by an auditor or analyst.

As all of ExxonMobil Upstream's significant equity affiliates are privately held companies with securities that are not publically traded, and no debt ratings are available, we would note that the trigger related to these considerations are not always applicable. ExxonMobil does receive distributions from the equity affiliates either monthly or quarterly based on the associated agreement in place. We reviewed all distributions for the current year through review of the Dataflex information and noted that distributions were paid out, on a consistent basis, each period; furthermore, through discussions with Management/Affiliate teams we would note that none of these distributions are overdue.

Management's review noted that for every equity method investment there has been significant cumulative profitability over the life of the investment – the engagement team corroborated this representation without exception. The table below was prepared by Management to provide a summary of the significant equity investments for the Upstream function. The table includes historical operating results for the past 3 years, and year to date September 30, 2015, as well as the current NBV for each of the equity investments. As noted within PwC ARM 1163.47: "A series of operating losses of an investee or other factors may indicate that a decrease in value of the investment has occurred which is other than temporary and which should be recognized even though the decrease in value is in excess of what would otherwise be recognized by application of the equity method".

| RU Holding Equity Investment ($M)[7] | Investee[8] | NBV as of 9/30/2015* | YTD After-Tax Earnings | | | |
|---|---|---|---|---|---|---|
| | | | 2012 | 2013 | 2014 | 2015 YTD |
| 3787 Mobil California E&P Asset Co. | Aera Energy | 2,904 | 1,219 | 980 | 730 | 216 |
| 0518 ExxonMobil Holding Comp Holland L | NAM[9] | 396 | 1,549 | 1,415 | 1,049 | 489 |
| 3549 ExxonMobil Qatargas Inc. 2168 ExxonMobil Qatargas (II) Limited | Qatar Gas Qatar Gas (2) | 156 1,860 | 339 2,063 | 333 2,354 | 242 2,123 | 124 908 |
| 3548 ExxonMobil RASGAS Inc. 2457 ExxonMobil Ras Laffan (III) Limited | Ras Laffan Ras Laffan II Ras Laffan (3) | 388 1,346 1,169 | 4,344 2,474 | 5,213 2,550 | 3,978 2,637 | 1,080 1,185 |

[7] The information in the table above is derived from the Dataflex system which is a covered system tested by PwC Risk Assurance.

[8] Agreed to Exxon Mobil Corporation 2014 10-K.

[9] Management is monitoring legal developments in Groningen pertaining to home value losses – refer to the Exxon Mobil Upstream legal documentation for further background on this matter. Management has concluded that there are no indications to date that would suggest this investment is impaired. Based on our discussions with Management, including in-house legal counsel, we do not take exception to this conclusion.

6

**App. 746**



| 3588 ExxonMobil Kazakhstan Ventures, I | Tengiz | 3,825 | 1,874 | 2,095 | 1,944 | 699 |
|---|---|---|---|---|---|---|
| 7100 Papua New Guinea | Papua New Guinea Liquefied Natural Gas Global Company LDC | 4,514 | | | ** | |
| 2343 ExxonMobil Italiana Gas S.R.L. | Terminale GNL Adriatico S.R.L. (Adriatic) | 1,760 | 37 | 33 | 30 | 16 |

*The engagement team would note that the table above includes a total NBV of approximately $18B. The total financial statement line item for equity method investments, as noted above, is $24B. The remaining balance is made up of advances to the above listed equity method investments of approximately $3.3B[10], individually insignificant investments of approximately $2B and individually insignificant advances to these investments of $0.7B. Refer to the engagements teams audit planning (scoping) documentation around the comfort obtained over this remaining balance.

** The engagement would note that this balance represents a receivable from the Papua New Guinea Liquefied Natural Gas Global Company LDC ("Gloco") equity method investment. This receivable is structured in a way that allows for recoverability through underlying sales of cargo out of PNG. We would note that in 2014, the first year of production in PNG, that PNG had positive earnings of $558M; furthermore, YTD 2015 earnings are $460M. Considering these earnings, we would note that the receivable held by ExxonMobil is considered to be recoverable. PwC Australia is also directed per PwC Dallas to perform directed procedures over Gloco, which includes this receivable balance.

Management has also noted that there were no impairments recorded by an investee within the investees stand-alone accounts. Furthermore, Management noted that there were no adverse reports issued by an auditor or analyst associated with any investee.

*PwC Conclusion*

The engagement team would note that all significant equity investees, noted above, have historically generated net income, cash flows and distributions and are currently generating positive net income, distributions and cash flows as of 9/30/2015; no other factors are noted which would indicate an other than temporary loss in the investment. The equity investees noted above are also subject to audit procedures and SOX controls testing during year-end 2015 by local PwC affiliate teams[11]. Based on our analysis as of 9/30/2015, as well as communications with local PwC affiliate teams, we concur with Management that there are no impairment triggers for the Upstream function equity method investments.

Note, the engagement team also considered equity method investments in the context of the current price environment and whether this environment gave rise to an "other than temporary" impairment trigger – see discussion in sections below.

*Other equity investments*

---

[10] Of this balance, approximately $1.7B pertains to Ras Laffan, $1B pertains to Qatar Gas and $0.6B pertains to Tengiz.

[11] Refer to directed procedures issued by PwC Dallas for a listing of audit procedures to be performed over in-scope equity method investments.

7



Refer to the ExxonMobil Upstream scoping documentation, included within the Upstream Aura file, for documentation of the comfort obtained over the remaining equity method investment balance not included within the table above. We would note that no individual investment had incurred operating losses over the prior three years or in 2015. As such, we deem it appropriate to conclude no impairment trigger presently exists and waive further review.

*Intangible assets*

Based on discussion with Management and review of the Dataflex Conform 100, the engagement team notes the majority of the intangible assets are comprised of software, patents and trademarks which are all subject to amortization. The intangible balance as of 9/30/2015 was $466M which is below our Functional performance materiality. We would note that $361M of this amount relates to the carrying value reported in XTO affiliates, for which PwC Dallas performs a full scope financial statement audit and issues an opinion to PwC Houston as part of the year-end reporting program[12]. Additionally, the engagement team scanned the detail listing of the intangible asset balance by reporting unit (37 RUs) and noted that no individual affiliate (RU) had a net carrying value above $50M as of 9/30/2015. Based on the facts and circumstances identified above, and given the immateriality of the intangible asset balance, the engagement team determined it was not necessary for the PwC Houston team to perform an impairment analysis over the intangible assets.

*Goodwill*

As indicated above, the goodwill balance as of 9/30/2015 is $166M. Given the immateriality of this balance no further procedures were considered necessary.

Based on the assessment performed above, the remainder of this memo will focus on our analysis specific to long lived assets wholly owned by ExxonMobil.

In the following sections of this memo we review and evaluate Management's process for identifying and determining if an impairment trigger occurred.

**Property, Plant and Equipment - Impairment Trigger Assessment**

In the following sections, we consider Managements assessment as to whether an impairment trigger occurred in 2015. We approach our considerations using, as Management did, the guidance in ASC 360 which outlines a number of conditions which, if arising, may result in an impairment trigger. Before discussing each of these conditions, we first address the price environment that persisted through 2015, given its pervasive effect on the industry, and the results of operations of the Corporation. This discussion, and related assessment of the effect of the price environment, informs the subsequent analysis of each of the conditions as outlined below.

Since September 30, 2014, the price for benchmark crudes (Brent and WTI) has declined by approximately 70% to February 11, 2016. This decline raises the question as to whether lower prices, are an indicator of possible impairment of investments held in ExxonMobil's Upstream portfolio. In considering this matter, reference is made to the applicable guidance in both ASC 360-10-35 for long-lived assets and ASC 323-10 for Equity method investments ("Other than temporary impairments"). Both standards require the preparer to consider whether conditions and circumstances existing at period end indicate that an asset (or equity

---

[12] The engagement team would note that this balance is below the materiality levels assigned to the XTO audit.

8

**App. 748**



investment) may be impaired[13].

As of September 30, 2015, ExxonMobil ("The Corporation") had $226 billion of Upstream investments ($202 billion of consolidated PP&E and $24 billion of equity method investments) and daily production of approximately 4.2 million BOE.  Such investments range in type from conventional liquid plays to non-conventional shale fracking to large gas production / LNG projects[14].   These investments are characterized by similar attributes as they are capital intensive, long-term in nature (with certain projects having time horizons beyond 30 years) and where the cumulative return on the investment is dependent on a number of factors including efficiency of the capital investment, reservoir performance, fiscal terms, operating costs and prices. Further, Investments are typically organized by 1) exploratory assets, 2) unproved properties and 3) proved properties[15]. Such investments can be held in consolidated subsidiaries, as an undivided interest in a joint venture subject to proportionate consolidation, or in affiliates accounted for under the equity method.

With regard to prices, management plans, invests and operates their assets based on a long term view of demand and supply fundamentals. This view is captured in management's plan price[16] which governs both management's investment selection as well as monitoring of performance over time.  It is management's long held believe that the plan price should take precedent over short-term volatility in prices.  As such and although prices may have declined significantly in recent month, management consider that the use of (reference to) of plan prices for decision making remains both appropriate and prudent.

Accordingly, as of December 31, 2015 and subsequent to year end, management does not believe that present price conditions are an indicator of possible impairment requiring further assessment under ASC 360 / ASC 323.  In making this assertion, management would note the sustained profitability of their investments over the longer term despite historical short-term volatility in prices. Management would also note that the plan price currently applied is materially consistent with the plan price they have been using over the past 5 years  - through the previous use of this plan price, they have not identified conditions that would constitute an impairment trigger.

The following table outlines the average annual income of the upstream business segment over the most recent 5, 10 and 15 year periods. Although shorter in length compared to the average life of the typical upstream investments, the periods presented provide an understanding of the sustained profitability of Upstream through the top and bottom of the business cycle (as represented by the commodity prices ranges presented).

|  | 5 Yr. Avg | 10 Yr. Avg | 15 Yr. Avg |
|---|---|---|---|

[13] Note, management takes the view that the considerations involved in assessing for impairment triggers is substantially the same whether applying ASC 360-10-35 or ASC 323-10.

[13] In addition to crude, the Corporation also produces natural gas, natural gas liquids and condensate. In certain regions (primarily North America), natural gas prices are set by reference to an index price (e.g. Henry Hub, Houston Ship Channel) which is independent of the crude price.  In other regions, however,   natural gas prices are determined (pursuant to contract) using a crude oil index and are therefore subject to change as crude prices change. Further, movements in condensate market prices are closely related to crude prices changes.

[15] We would note that US GAAP has specific guidance as to assessing the ongoing capitalization of exploration costs (primarily wells) and costs of unproved properties.  This guidance is discussed in Appendix I. Although the guidance is separate from ASC 360 (and ASC 323) we believe that this discussion is relevant as commodity price assessment (on future project profitability) could ultimately factor into an assessment of the ongoing capitalization of such costs.

[16] Plan price refers to Management's view of WTI, Brent and Henry Hub prices (collectively and hereafter referred to as "Plan Price").

9

**App. 749**



| Average Income (in millions) | 26,476 | 26,153 | 20,975 |
|---|---|---|---|
| Return on Capital Employed | 22.40% | 33.12% | 31.56% |

| | 5 Yr. Range | | |
|---|---|---|---|
| | Low | High | Average |
| West Texas Intermediate | $34.55 | $113.39 | $85.25 |
| Brent | 32.26 | 128.14 | 96.33 |
| Henry Hub ( per million BTU) | 1.63 | 8.15 | 4.17 |

| | 10 Yr. Range | | |
|---|---|---|---|
| | Low | High | Average |
| West Texas Intermediate | $30.28 | $145.31 | $80.85 |
| Brent | 33.73 | 143.95 | 85.74 |
| Henry Hub (per million BTU) | 163 | 13.31 | 4.51 |

| | 15 Yr. Range | | |
|---|---|---|---|
| | Low | High | Average |
| West Texas Intermediate | $17.50 | $145.31 | $65.96 |
| Brent | 16.51 | 143.95 | 68.32 |
| Henry Hub (per million BTU) | 1.63 | 18.48 | 4.56 |

That the Upstream's investments have historically generated income across the business cycle would, in management's view, support their assessment that short-term supply / demand fluctuations should be considered as a point in a significantly longer horizon where prudence and experience requires more weight be given to the longer term and a plan price which reflects that longer-term. An example of a short-term fluctuation which required prudent consideration of longer term fundamentals was the significant decrease in crude prices in the fourth quarter of 2008 (from $133 to $40 per barrel). Although impacting short-term profitability, the Corporation's long term view of the economics of its various investments was not significantly affected. Indeed, prices quickly recovered reflecting the more persistent supply / demand fundamentals which management plan and operate their business on. Consistent with management's current view, management did not consider 2008 price volatility to constitute a trigger for impairment purposes.

The table above also outlines historic Return on Capital Employed (ROCE). Management view ROCE as a key measure of the efficiency of the capital base and an indicator of how resilient ExxonMobil investments are to price volatility when viewed over the longer term. This resilience is established and maintained when investments opportunities (and existing investments) are assessed using plan price during the planning process to ensure the recoverability and profitability of investments across multiple scenarios. We note that this resilience is further demonstrated by virtue of the fact that the Corporation has not historically incurred losses on upstream asset divestments.

In management's view, the long-term nature of the business in which it operates and the related need to plan and perform across the entire business cycle is fundamental to understanding their business and to assessing the profitability / recoverability of its investments. As indicated, critical to the development of sustainable asset

10

**App. 750**



plans and the subsequent assessment of performance is the use of a Plan Price. The discussion below considers management's rationale for the use of the plan price in decision making and stewarding of their business and, by axiom, assessing for impairment triggers. The discussion also considers the processes by which management establishes and applies the plan price for purposes of investment selection and subsequent monitoring.   The discussion concludes with the Engagement Team's assessment and conclusion as to management's assertion.

*Plan Price – Management Philosophy[17]*

ExxonMobil has been using plan prices in the evaluation and monitoring of planned as well as existing projects for a significant number of years.  The application of plan price is viewed as a key tool by which Management can evaluate whether their investments are providing sufficient economic return over time. It is Management's philosophy that in a capital intensive industry where investments can extend over multiple decades it is prudent if not fundamental to effective business Management and decision making to use a price which reflects long term fundamentals rather than applying short-term, more volatile prices leading to potentially  imprudent short-term decision making. This philosophy applies equally to their business planning (including acquisition and divestment) as well as to their assessment as to whether a price change has given rise to a potential trigger for accounting purposes. Management's view is summarized in the 2014 MD&A on Form 10-K as follows:

*"In general, the Corporation does not view temporarily low prices or margins as a trigger event for conducting the impairment tests. The markets for crude oil and natural gas have a history of significant price volatility. Although prices will occasionally drop significantly, industry prices over the long term will continue to be driven by market supply and demand. On the supply side, industry production from mature fields is declining, but this is being offset by production from new discoveries and field developments. OPEC production policies also have an impact on world oil supplies. The demand side is largely a function of global economic growth. The relative growth/decline in supply versus demand will determine industry prices over the long term, and these cannot be accurately predicted.*

*Accordingly, any impairment tests that the Corporation performs make use of the Corporation's price assumptions developed in the annual planning and budgeting process for the crude oil and natural gas markets, petroleum products and chemicals. These are the same price assumptions that are used for capital investment decisions."*

Management considers that their philosophy is rooted in the experience the Corporation has acquired over multiple decades as to how energy markets and attendant supply and demand fundamentals work. For example, the Chart below provided by ExxonMobil Production Company depicts change in Global crude supply from 2008 through 2013.  As can be seen, crude supply increases in North America and Russia were offset by supply declines in the Middle East and North Africa.  A key take away from Management's point of view is how price may be impacted if Middle East and North African supply rebounded.  Indeed, this possibility is reflected in a plan price significantly lower than previous average crude prices over this timeframe.

---

[17] Note, the discussion throughout this below although primarily focused on crude prices is also applicable to natural gas prices derived from either separate indices (e.g. Henry Hub) or with reference to oil prices (LNG, European based contracts etc.). Management take the view that the same fundamentals and business rationale which require management to use a plan price for crude oil also require management to use a plan price for natural gas / LNG.

11

**App. 751**





This understanding of the fundamental drivers of energy markets can also be found in Management's "2015 Energy Outlook" which looks out 25 years to 2040 and considers energy demand and supply in key areas including Transportation, Electricity and Industry. The "Outlook" forecasts that crude oil and natural gas demand will increase by 24% and 65%, respectively, to 2040 driven by increased population growth, increased economic activity and improving quality of life standards. As noted at various points within this memo, many of the assets / projects in the Upstream Portfolio extend out multiple decades.

A comparison of ExxonMobil's past three "Outlooks" (2010, 2012 and 2015) indicates that Management's long-term view has not changed significantly year to year. That is, albeit the short term can fluctuate significantly, Management has had a consistent view of the long term. This consistent view of the long term, where short-term movements tend to smooth out over more persistent dynamics around supply and demand, underpins the approach Management takes to establishing the plan price. We would note that within the 2015 Outlook – "A View to 2040", Management has presented a summary of the consistency of this view (pg. 63) – with limited variability being identified.

Furthermore, management does not view the short term volatility in the price environment as a trigger due to overall historical trends of the hydrocarbon market. Included within Appendix G are graphical representations of both WTI and Henry Hub prices for the last 25 years. The volatility in pricing can be clearly seen when comparing year over year – this pattern supports ExxonMobil's view as to plan price as it taking precedent versus the short term.

*Governance and Application*

The Corporate Planning Group has responsibility for developing plan prices. Each year, this Group assesses whether a change is required to current plan prices or whether their existing view of fundamental drivers of supply and demand continues to persist.

12

App. 752



Once plan prices are established[18], it is approved by Executive Management and in October of each year, corporate controllers release the Corporate Plan Data Guide, which includes, along with other assumptions, the plan price to be used to prepare the plan(s) for each asset and business segment. The plan price for 2015, 2016, and 2017 is $60 for Brent (in real dollars) and then increases to $80 for the subsequent years. The guide states that 2.5% inflation factor should be applied to determine the nominal price. To adjust for WTI, the Guide provides an annual adjustment of approximately $6.1 through 2024 (real dollars)[19]. The guide also provides guidance for natural gas (Henry Hub) which ranges between $2.9 and $4 to 2025 (real dollars).

Note, the Corporate Plan Data Guide provides instruction that opportunities evaluation (investment, divestment, acquisition and venture) should recognize the potential for significant variation in prices over the life of an opportunity. As such, economic evaluation should be assessed over a range from $40 - $120 / bbl, in $20 increments. Similar instruction is provided for assessing gas opportunities – Henry Hub opportunities are to be assessed over five price points: $2.5, $3, $4, $5 and $6.

The plan process is a bottom up process where plans are prepared at the lowest possible level and are rolled into broader plans. Plan instructions and assumptions are distributed via email to the various regional Financial and Reporting Managers (i.e. Americas, Africa, Asia Pacific, Europe/Caspian and Middle East/Russia). The Financial Reporting Managers work with the Planning group assigned to each region as well as asset superintendents, who are responsible for stewarding specific assets to develop plans at the asset level which roll up into the affiliate company plan, regional production plan, functional company plan, upstream segment plan, and ultimately the Exxon Mobil Corporate plan. The application and understanding of the Planning and Budgeting process is documented within the following EGA:

Identify risks and understand controls in the business process – PEFR F1 (Planning & Budgeting)

For US production for example, the asset plans are compiled and summarized in a report presented by each Asset Superintendent to the U.S. Operations Manager, in the May/June timeframe. The Americas regional plan, which rolls all Americas Assets into one plan, is reviewed and approved by the Americas Regional Vice President in September. Each plan rolls up into a higher level plan and a Corporate Plan is ultimately approved by the Executive Management Committee at Corporate.

During the generation of the asset level plan as well as review of the final allocated plan, Asset Superintendents are responsible for identifying whether assets may not be able to meet previously expected performance measures (e.g. volumes, earnings) developed during the prior year plan process. Note, the fact that an asset does not meet performance targets is not considered a triggering event for an impairment analyses; performance targets are higher than a breakeven point and are focused on generating the highest value/return to the investors. As the plans include comparison with the previous year's plan, Management is able to identify any negative trends. If a trend is identified where an asset is not meeting performance targets, a root cause analysis is conducted whereby Management determines the driver for the miss in an attempt to address any

---

[18] Included within Appendix B is a summary of the engagement teams understanding of Managements process to set plan price as part of PEFR F1. Refer to the engagement team's documentation of this control within the Upstream functional Aura file.

[19] PwC obtained the 2015 Corporate Plan Data Guide from the ExxonMobil Intranet and noted that the Data Guide contained instructions and guidance for crude, gas, and product price bases for corporate plan financial cases, opportunity evaluation, and market futures as well as guidance around plan sensitivities. The Data Guide also provides guidance around tax planning considerations, exchange rate basis, inflation adjustment factors, and interest rate bases. PwC also noted that the Data Guide provides key dates of submissions and reviews performed over the Corporate Plan by the Functional Presidents as well as a final review presentation by the Management Committee to the Corporation to formalize the Plan submission and endorsement.

13

**App. 753**



unforeseen issues or reduce future planned capex or opex to provide the highest return.  As noted above, it is ExxonMobil's goal to identify any underperforming asset as early as possible in order to either adjust future spend or dispose of such asset prior to that asset operating at a loss.

In addition to the analysis performed at asset plan inception, on an ongoing monthly basis, Management monitor performance of their assets by comparing actual results to Plan. This comparison encompasses volumes, cash and non-cash opex, capital spend and realizations. This monitoring is performed through the multiple Financial and Operating reviews conducted through the upstream organization.

The above review process is viewed as a key control and is documented within the following EGA:

Identify risks and understand controls in the business process – PEFR F2 & 3 (Earnings Estimate & Submissions)

Pursuant to the establishment of asset plans and the ongoing monitoring of actual performance to stewarded plan, Management believes that it has the appropriate processes and tools in place to assess the performance of their investments over the long-term.  The engagement team would note that this is applicable for all Upstream functional assets as all Asset Groups have an asset plan.

*Management's 2015 Plan Price*

A summary of the 2015 plan prices communication is depicted within the tables below:

| Liquids plan price - $ bbl | 2016 | 2017 | 2018 | 2019 | 2020+ |
|---|---|---|---|---|---|
| 2015 plan price | 60 | 60 | 65 | 70 | 80 |

| Gas plan price - $ mbtu | 2016 | 2017 | 2018 | 2019 | 2020+ |
|---|---|---|---|---|---|
| 2015 plan price | 2.9 | 3 | 3.2 | 3.6 | 4 |

Management's long-term outlook on the pricing environment, for both crude[20] and gas[21] is consistent with that of other third party price projections noted below.  The pricing in the charts below comes from various generally accepted outlooks including the EIA (Energy Information Administration), IHS-CERA (Cambridge Energy Research Associates), PIRA (Petroleum Industry Research Associates), FGE (FACTS Global Energy), and Woods Mackenzie.  The pricing below projects out to year 2030 which is shorter than the average life of a typical E&P asset.  We would note that ExxonMobil does not currently have any material[22] NBV assets that are within 10+ years of end of field life.

---

[20] The information in the chart is a compilation of projected Crude prices from the following 3rd party sources IHS-CERA, EIA, PIRA, and FGE.

[21] The information in the chart is a compilation of projected Gas prices from the following 3rd party sources IHS-CERA, EIA, PIRA, and FGE.

[22] Material is defined as functional performance materiality of $1.5B.

14

**App. 754**



We would also note that ExxonMobil's view of the future demand growth for crude oil and natural gas is consistent with that of the International Energy Agency's (IEA) and BP's forecasts over the same period - refer to Appendix D.

Overall, the charts below provide Management comfort that their price forecasts are conservative in comparison. Further, the overall trend in forecast prices confirms to Management that for planning and monitoring purposes the use of plan prices rather than current spot prices or short-term forward prices (e.g., NYMEX 5-year strip prices – further explained below) is more appropriate for managing their business[23].

As to NYMEX, the Corporation's projects/investments are typically long term in nature. While the forward curve (NYMEX) is a data point they consider in their analysis, they believe other factors are more relevant given their long term strategy and investment decisions. Further, Management noted that at any point in time, the forward price is very much dictated by the current spot price. That is, it does not necessarily reflect expectations as to changes in demand and supply over the period of the curve. Management also noted that market futures have minimal volumes traded beyond the 24 months which significantly limits their informational relevance.

---

[23] The engagement team would note that within both charts (liquids and gas) we have depicted ExxonMobil's plan price from both a real and nominal perspective. The nominal ExxonMobil plan price is included to summarize what is included within the ExxonMobil forecasts, where applicable. We would note that an inflation factor has not been included for the third party prices shown (that is, they are presented on a real basis), therefore, the real ExxonMobil plan price is included to be comparable to the third party projected prices.

15

**App. 755**



App. 756







**Third Party Henry Hub Price Outlook**

Legend:
- EIA
- IHS-CERA
- PIRA
- Wood Mackenzie
- NYMEX (5 year strip)
- ExxonMobil Plan Price (real)
- ExxonMobil Plan Price (nominal)

## Management Assessment of Change in Plan Prices

As it relates to plan prices established in October 2015, Management would note:

- In comparison to the 2014 plan price guidance[24], the 2015 plan price – for both liquids and gas - has been changed for certain periods. Management has noted, however, that the plan price for each period

---

[24] A summary of the 2014 and 2015 plan price communications are depicted within the tables below:

| Liquids plan price - $ bbl | 2016 | 2017 | 2018 | 2019 | 2020+ |
|---|---|---|---|---|---|
| 2014 plan price | 80 | 80 | 80 | 80 | 80 |
| 2015 plan price* | 60 | 65 | 70 | 80 | 80 |

| Gas plan price - $ mbtu | 2016 | 2017 | 2018 | 2019 | 2020+ |
|---|---|---|---|---|---|
| 2014 plan price | 4.5 | 4.6 | 4.8 | 5 | 5.1 |

17

**App. 757**



forward is greater than current year realizations. Management would note at current year realizations, the Upstream organization has generated positive cash flows from operations for all asset groups and positive net income for all asset groups with the exception of certain asset groups in North America– see further discussion on North America below.

- Specific to liquids price, the long term plan price (2019+) has not changed at $80; furthermore, the plan price for all periods forward is higher than current realizations. Management supports their view that no impairment triggering event has resulted from the change in plan price as through fiscal 2015 the Upstream function has generated positive cash flows and earnings at current realizations (crude and condensate realizations = $45.71/bbl for 2015). Further, management would note that the downward revision in liquid (Brent / WTI) plan price is over a short term (compared to their investment cycle) and has no significant effect on longer term decision making.

- Specific to the Henry Hub gas price, management would note there has been a change to their longer term view on U.S. Henry Hub gas prices primarily resulting from current and expected abundance in natural gas production. However, Management would also note that the revised price plan is still sufficient to allow for recovery of capitalized costs / generate positive earnings (further outlined within the discussion below on XTO and certain U.S. Production assets).

In summary, Management does not view the 2015 revision to the plan price as a triggering event based on the fact that the Corporation is producing positive cash flows, and, for the significant majority of Asset Groups, positive earnings[25] at prices lower than the revised plan price.

### PwC Assessment of Plan Price

As stated above, ExxonMobil's plan price is established by Corporate and Functional Management and the manner in which it is communicated, applied, and stewarded are managed centrally, leveraging standardized processes and controls. Similarly, the assessment as to whether price movements may constitute an impairment trigger is performed by Corporate and Functional Management. Accordingly, and consistent with the centralized approach, Management will assess whether a trigger may have occurred due to current price conditions, centrally. We consider this approach to be appropriate as:

- Key decisions about plan price and its application are made centrally – Management take the view that local affiliates would not have the necessary resources and expertise to assess price conditions separately;
- ExxonMobil uses a consistent plan price (as adjusted) globally;
- The Upstream's monitoring processes are standardized across the affiliates with established and frequent reporting to Functional Management of matters with potential earnings effect (including impairment). That is, Functional Management is timely alerted if assets are not performing to plan or target;

| 2015 plan price** | 2.9 | 3 | 3.2 | 3.6 | 4 |
|---|---|---|---|---|---|

*Management noted that the plan price change as it relates to crude was only for the 3-years of 2016 – 2018. This change would have an inconsequential effect on the upstream function given the long-term nature of its investments.

**As it relates to gas, Management noted that the corporations plan price is consistent with the CME forward price forecasts.

[25] The engagement team would note that there have been GAAP losses incurred in North America. These losses have been further assessed by Management and considered by the engagement team later within this memo.

18

**App. 758**



- All other conditions that may constitute an impairment trigger are monitored at the local level given that they are operational (for the most part) in nature and are less related to macroeconomic drivers of supply and demand.

As to current price conditions, even though currently below plan price, the engagement team does not take exception to Management's view that price conditions are not an indicator of possible impairment requiring further assessment under ASC 360 / 323. That is, the engagement team does not take exception to Management's view that the plan price and its reflection of long term fundamentals take precedence over short-term volatility in prices.

In evaluating Management's assertion on price as a possible trigger, we would note:

- Through the Corporation's disciplined investment process (enabled by use of the plan price), Upstream Investments have proven to be resilient to adverse price movements in the past.
- Forecasting future prices based on recent and short-term price movements is not in Management's view a prudent basis for decision making. Rather and as evidenced above, the use of plan price has proved to be effective over the long term.
- Management's plan price process is robust; it is based on an analysis of fundamental drivers of supply / demand over the long term which has been consistent year over year.
- Management's reference to the plan price in assessing asset performance and recoverability is reasonable given price volatility at any given point in time.
- Management's application of the plan price and subsequent monitoring of asset performance is subject to robust controls and review - a number of which are key controls for purposes of financial statement controls effectiveness.
- Management's outlook as to supply / demand is consistent with their peer group as well as Governmental and Non-Governmental agencies such as the International Energy Agency.
- As noted elsewhere in the memo, there have been a number of instances of precipitous declines in commodity prices over the past 15 years. Management, during these events, has continued to focus on plan price believing that it is a better measure to use in the long-term. The rebound in commodity prices after such declines would seem to support Management's caution in reacting to the short-term – this is evident in that over the past few years as commodity prices exceeded $120/bbl., Management maintained a plan price at $80/bbl.
- Management's revision to Plan Price are not considered significant as, outside of certain North American Assets, the entire Upstream portfolio (crude and condensate, gas and LNG) was generated positive cash and positive earnings. Regarding North America, Management conducted a separate assessment (discussed below) and concluded no impairment triggering event was present.
- Finally, we would note that the Corporation's relative financial strength further enhances the Corporation's ability to compensate for lower commodity prices and sustain its Upstream portfolio (i.e. not shut in or abandon). This may not be the case with smaller or less financially sound industry participants. Management views the Corporation's financial strength, as evidenced by AAA credit rating and the market capitalization $319 billion, to be a competitive advantage of strategic importance. The Corporation's sound financial position gives it the opportunity to access capital markets in the full range of market conditions, and enables the Corporation to take on large, long-term capital commitments.

Specific to current year developments, we would further note:

- In regards to the annual plan price, we would note that in comparison to the facts and circumstances that existed at December 31, 2014, there have been no changes to Management's plan price

19



methodology, no changes in monitoring of impairment triggering events and no shut-in of production, due to current price environment. In addition to this, the engagement team has considered Management's fact pattern (as described in the section above), after giving consideration to these various factors, the engagement team does not take exception with Management's conclusion that the revision to plan price is not an impairment triggering event.

- There has been ongoing significant capital expenditures across all regions (~$17B for the 9 months ended September 30, 2015) providing evidence that Management investment decisions are based on long-term horizons and long-term assessment of supply/demand fundaments.
- Positive cash flows have been recognized across all Upstream assets groups globally.
- To date there has not been a significant cut to planned capital expenditures globally for 2016 ($~23B).
- For the 9 months ended September 30, 2015 there has been no significant downward revisions of reserves across the ExxonMobil portfolio of assets.
- No additional information has come to the Engagement Team's attention which would indicate that a potential impairment triggering event may exist.

*PwC Conclusion – Plan Prices*

Based on the above analysis we do not take exception to management's conclusion that there is no triggering event associated with the recent and current commodity price environment or the 2015 revisions to plan prices.

## Property, Plant and Equipment - Asset Groupings

Per ASC 360-10-35, the assessment of asset impairment is to occur at the lowest level that "identifiable cash flows are largely independent of the cash flows of other assets and liabilities. Net cash flows from one asset group may not be used to offset the net cash flows from an impaired asset group when those asset groups are not otherwise interrelated."

The Corporation reviews its Upstream operations in a number of ways in making their determination of the appropriate asset groupings, recognizing that the appropriate asset group can vary for the different locations depending on the nature of the operations, stage of the operations (production or exploration), the level of integration between the different businesses within a location and the level of shared infrastructure as well as common cost above field.

*Management's Process*

The engagement team would note that the Corporation's Upstream Management holds multiple reviews and analysis monthly across its entire portfolio of assets. As part of this, Management holds monthly Financial and Operations (F&O) debrief meetings which are used to assess the operating and financial performance of its upstream assets/ investments – these reviews are performed by the in-Country Affiliate teams with further analysis performed by the Functional organization. This F&O review process facilitates Management's ongoing assessment of the appropriateness of Asset Groupings. We would note that during the F&O meetings, Management focuses on production, revenue, capital projects, operating expenses, cash flows and qualitative factors that affect operations. We would note that the engagement teams meet quarterly with Functional Management to update our understanding of asset operations and performances country by country.

As Management makes this ongoing assessment of the following factors are considered pertinent:

20



- Detailed Affiliate and Functional Reviews (F&O) - Management would note that F&O reviews are performed over all Upstream Asset Groups. It is during these reviews that Management takes a more granular look at individual Asset Groups and reviews their financial and operating performance which includes financial and non-financial data. Due to the level of granularity/precision of these reviews, Management is able to focus on and assess Asset Groupings. Mr. Clark provided us with the Americas September F&O package and noted that it contained their asset groups for this region, for example we noted that EMOP assets - SYU, LaBarge, Mobile Bay, Gulf of Mexico, Hadrian South and In-land Louisiana were identifiable as were OBO assets (Thunder Horse, Lucius, Ursa, and other in lower 48) in the package.

- Whilst performing the F&O reviews, the nature of the investments, the extent of operations, and the monitoring structures in place all frame the review of asset groups and related impairment exposures. Of significance here would be:

  o PSC Agreements - For countries/regions that are operating under production sharing agreements (referred to as PSA's or PSC's)[26] which includes, amongst other countries, Nigeria, Angola, Malaysia, Offshore Kazakhstan and Indonesia, Management deems the risk of impairment triggering event being present to be a low risk as the PSA is cost recovery by nature.
  o Affiliate Presence - In all significant Upstream locations, the Corporation has controller and operational presence on location - this provides detailed knowledge and understanding of the related asset portfolio which enables robust affiliate and functional reviews.
  o Equity Method Investments - Investments representing one asset group such as Aera (US), Nam (Netherlands), Tengiz (Kazakhstan) and Rasgas and Qatargas (Qatar) – management has robust processes in place to monitor the investments - see separate discussion above as to management's ongoing monitoring.
  o Lack of Operational Complexity– for many countries/regions that ExxonMobil are doing business in, their investment is represented by one producing asset (Equatorial Guinea, Chad, Australia, Papua New Guinea, Russia, Azerbaijan, etc.).
  o Operated by Others (OBO) - Holding interests in OBO operations is normal practice across the industry. ExxonMobil has such interests primarily in the US and the North Sea. To assist in the monitoring of these investments, management leverages a number of SOX 404 key controls - PwC test these OBO SOX controls as part of our audit procedures.

---

[26] A Production Sharing Agreement is a type of contract entered into between a host government and an E&P company. In production sharing agreements the E&P Company bears the resource and financial risk of the exploration, development and production of the field. Production from successful wells is allocated to allow the E&P Company to recover operational and capital expenditures incurred in bringing the field to production. The amount of periodic production allocated to the E&P company can vary as the market price for the hydrocarbon changes - that is, the higher the hydrocarbon market price, the less barrels are required to recover the agreed recoverable cost - this "entitlement" (to barrels calculation) is a frequent factor in the Corporation's analysis of period to period changes in production volumes. By the nature of these typical agreement terms and absent geophysical / geological risks as well as geo-political / legal risks, the investment is expected to be recoverable regardless of short or long-term view of price. The engagement team would note that there have been no downward reserve revisions for any PSC-relevant country in the current year. Based on the facts above, the engagement team notes that those assets operating under a PSA do not currently have an impairment trigger present.

The engagement team discussed the above fact pattern with various PwC teams auditing ExxonMobil affiliates whom operate under a PSA arrangement including: Nigeria, Angola, Malaysia and Indonesia; in each instance the engagement team confirmed the fact pattern as stated above is consistent with the executed contracts in place in their respective jurisdictions.

Included within the 10-k, in the "Gross and net developed acreage" section, is a summary of countries where a PSC Agreement is in place.

21

**App. 761**



- Watchlist and Legal Reviews - In addition to the F&O reviews discussed above, and later within this memo, consideration is made over potential / possible events occurring which could give rise to Asset Grouping considerations or reconsiderations would impact a triggering event assessment through other controls – including the Watchlist and Legal Review PEFR controls. These controls will highlight events impacting a country as a whole as well as at a disaggregated asset level.

- Stage of Operations - Management has noted that there are 3 different stages of operations for Upstream assets: exploration, development, and production. Assets that are in the exploration and development stage are assets that are currently incurring capital and operational expenses to reach production, but are yet to produce any volumes of oil and/or gas therefore no revenue is associated with these assets. The engagement team reviews these assets by way of the ExxonMobil Development Company and ExxonMobil Exploration Company F&O packages. For assets in the production stage, Management will review based on the Production company F&O packages, these assets in production are identified by having production volumes of oil and/or with associated revenues. We identify the stage of each asset through review of the applicable F&O package, communication and confirmation with local PwC teams.

- Level of Integration – Management will also give consideration to the level of integration of the underlying assets within a Country. At times, assets will have shared gathering systems, pipelines, offshore platforms and/or processing facilities and therefore disaggregation of assets below a certain level does not achieve the objective of independent cash flows.

Other controls that Management leverage in their ongoing assessment as to whether Asset Groups are appropriate include: Earnings Analysis and Balance Sheet reviews (F7, 3, A1 and A16), Legal and regulatory update (F8), Planning and Budgeting (PEFR F1) and the Reserve assessments/process.

*PwC Assessment of Asset Grouping*

The engagement team evaluated Management's monitoring of asset groupings through reperformance of the monthly F&O meetings (PEFR F3 and A1) as well as the ongoing testing of the design and operating effectiveness of other controls referred to in the section above. During these monthly reviews, Management will examine the revenue, operating expenses, non-cash operating expenses, production volumes (gas & liquids), and significant onetime events that affected operations - this review occurs at the asset level noted above.

In addition to the F&O meetings, the engagement team also reviews, on a quarterly basis, financial information, balance sheet and income statement at a RU level. During this review, the engagement team identifies significant increases and decreases in balances over comparative periods and will inquire of Management as to any changes. This will keep the engagement team informed of any potential new investments or activities within an asset group which would need to be considered from a disaggregation perspective. Similarly, our controls testing around and substantive review of management's hydrocarbon reserve estimates help inform our assessment of asset groupings.

The engagement team would also note that other controls that operate at the functional level, including the Watchlist (PEFR F4), Earnings Analysis (F7), Legal Review (F8) and other business process controls (e.g. the Reserves process) also allow the engagement team to be informed of the Upstream functions operations.

For in-scope locations, the following additional procedures are performed. These procedures serve to inform the engagement team of actual or potential changes in operations for each asset group.

22



- *Communications with local PwC affiliate teams.* Local PwC affiliate teams have direct interactions and discussion with Management over operations locally. We have continuous communication with local affiliate teams throughout the year over walkthrough and controls testing, local operations and the performance of those operations. As well in October, PwC affiliate teams issue early warning memos to inform us of significant and unusual transactions.
- *Directed substantive procedures performed over impairment triggers for scoped locations.* PwC Affiliate teams are directed to perform substantive procedures over ASC 360 long-lived asset group impairment assessments as it relates to their locations, included within the scope of this testing is assessments around the asset groupings applied by Management. PwC Houston will review Inter-Office reporting - Refer to year end update in following sections of this memo.
- *SOX 404 procedures performed for scoped.* PwC Affiliate teams are directed to perform a walkthrough and operating effectiveness test over PEFR A5 (impairment triggering event assessment) for each in-scope RU. PwC Houston will review Inter-Office reporting - Refer to year end update in following sections of this memo.

We would note that based on the analysis within the appendices, reviews performed by Management noted above, walkthrough and operating effectiveness testing of the impairment triggering event controls (F12 and A5) and review of ASC 360, that the level and detail of ongoing analysis performed by Management is appropriate to identify impairment triggers.

## *Property, Plant and Equipment - Impairment Conditions*

Above we have summarized various conditions applicable to the Upstream industry to assess for impairment triggering events. With our considerations as to the current price environment in the context of the plan price methodology used by the Corporation discussed above, the rest of this memo steps through the key considerations made with respect to these conditions.

As background, the Corporation's assessment of impairment triggers is part of their SOX 404 key control process. The Corporation reviews long-lived assets to be held and used for impairment whenever events indicate that the carrying amount of an asset or asset group may not be recoverable. This check is performed in conjunction with key controls in the Legal process, Reserves process, monthly Upstream earnings reviews at both the Functional and Affiliate level (PEFR-F 3 & PEFR-A 1), Upstream quarterly meeting with Law (PEFR-F 8) and the monthly review of the Watchlist[27] at both the Functional and Affiliate level (PEFR-F4 and PEFR-A12)[28].

In order to obtain a detailed understanding of Management's annual process and the review conducted at the Functional level, Michael O'Riordan, Engagement Leader, Robert Wright, Senior Manager and Jeff Asby, Senior Associate, held various discussions with Senior Management including Vincent Prestipino, Accounting Policy Manager, Joe Bob Allaire, BAR Manager, Tom Clark, Americas Financial Reporting and Capex Manager and David Norwood, Production Controller, and documented our understanding of the review conducted via PEFR-F13.

---

[27] The Watchlist is designed to monitor material financial issues and inform Management of potential financial impacts well in advance of occurrence. Management also will review items in the Legal, Reserves, and PEFR process which cover the potential conditions outlined within ASC 360.

[28] As documented in our walkthrough procedures pertaining to these controls (within the EGAs noted above), we would note that these controls operate at a level of precision much lower than the Upstream Functional performance materiality and Affiliate performance materiality thresholds of $1.5B and $100M, respectively. Also, based on our operational effectiveness testing of these controls, we have concluded that the underlying information used by Management in the execution of the control activities is complete and accurate.

23



Refer to the following sections for considerations around each of the ASC 360 conditions summarized above. As it relates to all conditions (except price – see directed procedures) we would note that PwC affiliate teams are instructed to perform directed procedures over the SOX controls in place as well as substantive audit work around the impairment triggers for each in-scope affiliate – no triggering event conditions have been identified to date.

### *A current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset (asset group)*

Using the F&O process, Management will assess an Asset Group's performance to identify those Asset Groups which are currently operating at a loss for further assessment.

Associated with this condition, the first part of Management's assessment is to understand whether an Asset Grouping with a current operating loss also has a history of operating losses[29]. If this fact pattern exists, Management will perform an additional review to assess whether current and/or historical operating losses relate to non-recurring events or infrequent events which financial performance should be normalized for. Management consider that losses resulting from non-recurring or infrequent events may not be indicative of the underlying or long-term performance of the Asset Group, but can have the effect of distorting analysis and decision making, if not normalized for. Examples of non-recurring or infrequent events that result in losses (but are not indicative of the underlying) include start-up delays, severe weather, unexpected pipeline outages, or civic unrest.

If no such non-recurring / infrequent events occurred, and absent other qualitative factors (or consideration of cash flows), Management may direct the respective Affiliate to perform a "Step 1" impairment test. The engagement team would note that no Assets Grouping had such condition identified (i.e. normalized current and historical losses – earnings or cash flow) through 2015.

If an Asset Group has current operating losses but neither historical losses nor non-recurring or infrequent events that when normalized account for these losses, Functional Management will direct the affiliate to perform a review of future cash flow projections to determine whether, in combination with current losses, an impairment triggering event exists.

As part of this process, certain USP, XTO and Canadian Asset Groups were identified as having current operating losses (although no historical losses). For these asset groups, Functional Management directed Affiliate Management to:

- Perform a review of the current losses to identify whether any non-recurring or infrequent events were distorting performance and whether such events should be normalized for;

- Perform an analysis of future cash flow projections in circumstances where subsequent to the "normalization" assessment, current losses still persisted; and

---

[29] Note, although the condition only gives consideration to "operating and cash flow losses" (not earnings), Management's approach to assess each Asset Grouping based on current and historical earnings could be viewed as conservative in comparison to this condition.

24

**App. 764**



- Conclude with support from Functional Management whether projections of future losses may indicate an impairment trigger exists (when considered in combination with currents losses).

Management view the structure and sequence of their review approach to be in accordance with the ASC Condition above, which would seem to require that current losses be combined with either historical losses or projected losses to conclude an impairment triggering event exists. The engagement team has reviewed Management's process for identifying an impairment triggering event and view this sequence to be in accordance with the standard.

### Assessment of Price Environment

As noted earlier, Management has concluded that the current pricing environment, and revisions to their plan price, do not give rise to an impairment triggering event. In addition to that assessment, and consistent with the requirements of this condition, Management has also reviewed earnings and cash flow per the above referenced F&O data by country – see summarized table below.

| Country[30]*** (all amounts shown in $M unless otherwise stated) | NBV | Production (KOEBD) | GAAP Earnings (YTD) | GAAP Earnings 2012-2014 | Cash flow generated (YTD) | Cash flow generated – pre CAPEX (YTD) |
|---|---|---|---|---|---|---|
| Nigeria | 11,978 | 293 | 532 | 6,669 | 655 | 1,597 |
| Angola | 8,478 | 171 | 410 | 4,985 | 1,098 | 1,933 |
| Equatorial Guinea | 1,237 | 34 | 76 | 1,628 | 171 | 283 |
| Chad | 1,247 | 26 | 36 | 956 | 93 | 180 |
| Canada East | 4,758 | 41 | 117 | 1,747 | 244 | 306 |
| U.S. (EMOP) | 5,493 | 82 | (127) | 2,561 | 201 | 270 |
| U.S. (OBO) | 2,956 | 66 | 99 | 4,935 | 192 | 496 |
| Canada West/IOL**** | 40,041 | 373 | (45) | 3,949 | 404 | 861 |
| Alaska & Transportation | 3,355 | 90 | 231 | 3,661 | 140 | 382 |
| Australia*** | 14,814 | 97 | 115 | 1,437 | 191 | 378 |
| Malaysia | 2,681 | 93 | 293 | 2,355 | 454 | 565 |
| Indonesia | 59 | 37 | 84 | 741 | 85 | 85 |
| PNG | 5,279 | 70 | 460 | 568 | 711 | 755 |
| Norway | 4,753 | 227 | 438 | 4,196 | 755 | 1,204 |
| UK | 3,300 | 77 | 272 | 362 | 545 | 781 |
| Russia | 4,494 | 55 | 222 | 2,240 | 407 | 515 |
| XTO***** | 43,453 | 715 | (1,041) | 2,746 | (2,028) | 1,640 |

---

[30] The information in the table was obtained from the respective September 2015 F&O packages and the Dataflex system. Refer to the previous sections of the memo for discussions around the F&O process and the Dataflex system. Management has gained comfort over the information used in the F&O review packages as it is derived from the Dataflex system, which Management has IT controls around. All historic operational and financial data is obtained from prior period F&O analyzes and Dataflex.

25



*\*\*Other countries/regions were either determined to be immaterial in terms of NBV; or were equity investees and were assessed earlier in this memo.*

*\*\*\*\*The engagement team notes that Canada West/IOL has generated net negative year to date earnings through September 2015. These assets are covered by a full-scope opinion issued by PwC Calgary over the IOL entity, however, additional understanding is documented within Appendix C "Canada West/IOL Analysis & Canada East".* We would note that no impairment triggering event has been identified by Management for this asset group.

*\*\*\*\*\*The engagement team notes that XTO is currently generating net negative year to date earnings through September 2015. We would note an impairment assessment is performed within the XTO audit unit and is covered by a full-scope audit opinion to PwC Houston.* We would note that no impairment triggering event has been identified by Management for this asset group.

The engagement team would note that included within the table above are all assets which are currently in production as of December 31, 2015. We would note that there are other capitalized assets which are in the development stage. These development-stage assets are considered within the ASC 360, Condition 3 assessment: "Accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of a long-lived asset (asset group)". Certain of the most notable development-stage assets are Gorgon, in Australia and Kashagan in Kazakhstan. Refer to discussion later on within this memo on these assets.

As noted above, Management has performed a review as part of its monthly F&O reviews and has noted there is no asset that is operating at a loss combined with a history of operating losses or projected losses.

Pursuant to the above analysis as summarized in the table, Management identified certain assets in the USP, XTO and Canadian Affiliates that have generated YTD to negative earnings (current losses). For these assets, Management performed an in-depth review of these current losses to understand whether any non-recurring/infrequent earnings events were driving these losses. This analysis concluded that for certain Asset Groups in Canada and USP assets, non-recurring/infrequent earnings events accounting for the losses incurred were present and, when normalizing results for these events, the underlying operations were generating positive earnings. As a result of this, and giving consideration to the plan price discussion above (i.e. current prices are not viewed as an impairment trigger per se, Management concluded that no impairment triggering event exists for these assets.

For the remaining assets where no non-recurring / infrequent earnings event were identified (XTO assets and Mobile Bay), Management performed a review of projected future cash flows, as prescribed within this ASC 360 condition, to determine if a triggering event is present[31]. In summary of this additional analysis, Management did not identify an impairment trigger as it relates to the ASC 360 criteria above. Note, because of historical losses incurred during start-up and losses in 2015 due to facilities expansion, Management have conservatively prepared a forecast of Kearl; this forecast was reviewed by PwC Calgary and is summarized within Appendix B.

---

[31] The engagement team would note that this is in accordance with the guidance in ASC 360 as summarized below:

"A current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of long-lived asset (asset group)"

26

**App. 766**



*PwC Assessment*

The engagement team first obtained the prior 3 year earnings for each asset group. We would note that there were no asset groups which had a history of an operating loss.  Furthermore, we would note that positive cash flows were generated for every asset grouping. We consider 3 years to be an appropriate basis to provide adequate historical data for the impairment trigger assessment, however, we would note that the same conclusions would be reached if the analysis were performed on a 5 or 10 year basis.

| [32]Country (all amounts shown in $M) | GAAP Earnings 2012-2014 | Cash flow generated (YTD) | GAAP Earnings* (YTD) |
|---|---|---|---|
| Nigeria | 6,669 | 655 | 532 |
| Angola | 4,985 | 1,098 | 410 |
| Equatorial Guinea | 1,628 | 171 | 76 |
| Chad | 956 | 93 | 36 |
| Canada East | 1,747 | 244 | 117 |
| U.S. (EMOP) | 2,561 | 201 | (127) |
| U.S. (OBO) | 4,935 | 192 | 99 |
| Canada West/IOL | 3,949 | 404 | (45) |
| Alaska & Transportation | 3,661 | 140 | 231 |
| Australia | 1,437 | 191 | 115 |
| Malaysia | 2,355 | 454 | 293 |
| Indonesia | 741 | 85 | 84 |
| PNG | 568 | 711 | 460 |
| Norway | 4,196 | 755 | 438 |
| UK | 362 | 545 | 272 |
| Russia | 2,240 | 407 | 222 |
| XTO | 2,746 | (2,028)[33] | (1,041) |

*Current year to 9/30/2015 data was used in performing the review of earnings.  The engagement team has performed a SAS100 review over the 3Q data as part of our quarterly procedures for 2015.

**Other countries/regions were either determined to be immaterial in terms of revenue or were equity investees and were concluded on in first part of this memo.

As noted above, there were three regions (XTO, U.S. EMOP and Canada[34]) that had Asset Groups with current year to date negative operating earnings (but not cash flow losses) – aside from those listed, no other Asset Groups were identified by Management as having negative earnings in the current year.

[32] The information included within the table above was obtained from the respective country/regional F&O package as of 9/30/2015. We would note that this is summarized data taken from Management's disaggregated F&O process; for example, the Nigerian amounts are made up of Ebok, AK, Bonga, Usan, Erha and JV Asset Groupings, and Angola amounts are made up of Block 15 and 17 Asset Groupings.

[33] The engagement team would note that XTO had capital expenditures of approximately $5.5B in the current year. Therefore, XTO generated positive cash from operations when adjusting for this item.

[34] The engagement team would note that, in Canada, Canada West is operating with current year negative operating earnings. Further, Canada East includes individual Asset Groups which are operating at current year negative operating earnings. Therefore, the analysis on Canada, included within the Appendices, includes both Canada West and Canada East.



The engagement team obtained the asset level analysis and noted that the following assets were currently operating at a loss: In-land Louisiana/ South Texas, Santa Ynez Unit, Gulf of Mexico, Mobile Bay, Hadrian South, Syncrude, Kearl and XTO.   Based on the fact that these assets were operating at a current loss, Management performed a 3 year lookback of year-to-date earnings, refer to analysis below.

| *Fields*[35] | *Asset Group* (all amounts shown in $M) | *2012-2014* | *9/30/2015* |
|---|---|---|---|
| *Earnings* | | | |
| *ILA/South Texas* | U.S. EMOP | 16 | (29) |
| *SYU* | U.S. EMOP | 849 | (150) |
| *Gulf of Mexico* | U.S. EMOP | 81 | (60) |
| *Mobile Bay* | U.S. EMOP | 2 | (37) |
| *Hadrian South* | U.S. EMOP | *** | (6) |
| *Syncrude* | Canada West/IOL | 1,313 | (19) |
| *Kearl*** | Canada West/IOL | (760) | (210) |
| *Minimum Reporting* | Canada West/IOL | 295 | (63) |
| *XTO**** | XTO | 2,746 | (1,041) |

*\*\*For consideration over the Kearl asset, refer to Appendix C of the memo.  We would note that impairment considerations relating to this Asset Group are subject to audit procedures by PwC Calgary. Refer to assessment of Year end Inter-Office Reporting at Year End Update Section of this Memo.*

*\*\*\*Per Discussion with Management and review of the F&Os we would note that Hadrian South started production in 2015.  Refer to "USP impairment assessment" Memo for additional considerations.*

*\*\*\*\*For considerations over the XTO assets, we would note that impairment considerations relating to XTO assets are subjects to audit procedures by the PwC North Texas.  Refer to assessment of Year end Inter-Office Reporting at Year End Update Section of this Memo.*

We would note that based on the analysis performed by Management, all assets in the table above, except Kearl (see above), have generated positive earnings over the past 3 years.  As noted above, Management performed an additional analysis on those assets that have generated negative earnings over the past 9-months by first normalizing earnings for any non-recurring/infrequent earnings event which would account for these losses.

Absent a non-recurring/infrequent earnings event, Management prepared forecasts to determine if the respective assets will be generate positive cash flows in the future. Refer to separate memos on US Production) for analyses over forecasted results and review of one time earnings events that have impacted operations. Canada related assets are discussed within the Appendices and *are subject to audit procedures by PwC Calgary.* XTO related discussions are included in the XTO file.

---

[35] The summarized information in the table above was obtained from the Americas F&O package for 2014, 2013, and 2012. The engagement team would note that included within the table above are those Asset Groups which have a larger relative carrying value, however, we would note that there are other Asset Group's Management reviews within the U.S Upstream Affiliate (for example, other Asset Groups reviewed include Thunderhorse, Lucius and Ursa). The engagement team would note for each of these Asset Groups that historical and current year positive earnings and cash flows from operations have been generated.

28

**App. 768**



We would note that the further analysis performed by Managements over the USP, XTO and Canada assets resulted in Management concluding no impairment triggering events have occurred.

*PwC Conclusion*

Based on the review of the lookback analysis table provided above by Management, forecasted results, quarterly F&O reviews with Management, SAS 100 reviews, control procedures (PEFR F&O) and communications with affiliate PwC teams globally; we do not take exception with Management that there is no impairment trigger for assets operating with a current loss combined with a history of operating losses or a projection of future losses as defined above per ASC 360. Management is deemed to have a robust process in place by which cash flows are monitored and reviewed for current, historical, and where necessary the possibility of future operating losses.

In arriving at our conclusion, the engagement team notes that the PwC National Office has stated that whether the lower oil prices are indicative of a triggering event for impairment "will likely depend on the attributes of a company's portfolio of assets and will require Management to apply judgment. For example, a company with properties that have been organically developed and that have a long production profile may conclude that the recent decline in prices does not cause the company to change its pricing forecast. Alternatively, a company with proved developed properties that have been purchased in the last two years and that have a short production profile may conclude that the recent decline in prices has caused the company to change its pricing forecast.[36]" In the engagement team's view, the facts and circumstances[37] of ExxonMobil as outlined throughout this memo, would support Management's judgment that current price conditions are not a trigger as it pertains to their Upstream Portfolio.

### A significant decrease in the market price of a long-lived asset (asset group)

The engagement team would note that based on discussions with Management, and knowledge of the industry, that there are several factors which E&P companies use to assess the current value of assets: commodity prices and oil and gas reserves / future production are of most significance. Considering these factors, discussed further throughout this memo, Management has concluded there to be no evidence of a trigger arising from this area. Note in any assessment of market price, Management would use plan rather than current price to arrive at such assessment.

Further, Management has considered recent M&A activity – refer to Condition 6 for further discussion. After giving consideration to this recent activity, in addition to planned activity (no divestments are currently planned which would result in a loss on sale), Management has concluded there is no triggering event associated with this condition. Considering this fact pattern, the engagement team does not take exception to this conclusion.

### Upstream Industry Specific Condition - Lower expected future oil and gas price, such as the prices used by Management in evaluating whether to develop or acquire properties

---

[36] Refer to the "Energy Assurance Quarterly Update Call" on 01/08/15 and pursuant to PwC's "Client and Audit considerations associated with Lower Hydrocarbon Prices" issued on 01/26/15.

[37] Refer to the engagement team's documentation within "PwC's Assessment of Plan Price", above, for further analysis of the financial strength of the corporation and its investment plans in 2016.

29

**App. 769**



Refer to section above titled "Plan Price" for Management's considerations regarding the current commodity price environment. There were no impairment triggering events identified by Management as part of their assessment of this Condition. The engagement team has documented our considerations within the same section of this memo and does not take exception to Management's conclusion that an impairment triggering event does not exist.

### Upstream Industry Specific Condition - Significant downward revisions to an asset's (asset groups) reserve estimates

Consistent with the reserve estimation process, changes to reserve estimates occur and are approved on a periodic basis. Reserves are often changed due to common occurrences, such as production (decrease to reserves), extensions or favorable results from test wells (increase to reserves), dry holes or negative results from test wells (both a decrease to reserves). Reserve changes are subject to a rigorous controls process as documented in the engagement team's understanding of the Hydrocarbon Reserves SOX 404 process. Changes to reserves are initiated by engineers, coordinated by the Global Reservoir Group and approved in accordance with the Delegation of Authority Guidelines based on the size of the change.

As noted earlier within this memo, at September 30, 2015 there has been no reserve revisions identified by Management. We would note that a significant part of the reserve process happens annually, in January, and therefore we will consider updates to this within the December 31, 2015 update section of this memo. For now, there has been no impairment triggering event identified by Management under this condition.

### A significant adverse change in the extent or manner in which a long-lived asset (asset group) is being used or in its physical condition and Accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction

The Corporation has a robust process in place by which they plan, develop, and monitor long lived assets to ensure they are performing based on expectations (PEFR F-1 & PEFR F-3). This process takes a bottom up approach by which Management starts with an asset and creates a formal plan to develop and or bring the asset to production. The asset's development plan is built during the annual Planning and Budgeting[38] (P&B) process which starts in early April and continues through final approval in December. The P&B process that is performed in the current year, 2015, is for the next fiscal year plan operations to be performed in 2016.

During the P&B process Management performs a profit-loss analysis in which they identify the development and production plan to maximize the asset's value and revenue. When determining the development plan Management weights such options as operating structure of the field (EMOP, OBO, PSA or JV), type of extraction activities, and type of shipping/transportation to be used to bring the crude to market. When developing the suggested plan for the asset, affiliate Management use the Corporate Data Guide to perform different operational/pricing scenarios or stress test for each asset. During the stressing of the asset, operations are looked at across a range of commodity prices per the Corporate Data Guide, Brent from $40 - $120 a barrel and Henry Hub from $2.5 to $6 mbtu. The Corporate Data Guide is stewarded by Functional Management and provides guidelines (pricing and operational cost) to be used when evaluating assets across

---

[38] PEFR F#1 is the P&B process, the engagement team performed walkthrough and operating effectiveness testing as part of the year end procedures. As it relates to the P&B, the engagement team would note that the output of this control is subject to review as part of the F&O process and subject to review as part of our audit procedures around cash flow models referred to within this memo: Kearl (PwC Canada), XTO (PwC Fort Worth) and Mobile Bay (PwC Houston).

30

**App. 770**



the ExxonMobil portfolio.  The Corporate Data Guide is updated annually throughout the P&B process to ensure that affiliates are using the most accurate data when developing the asset plan.

Once the development plan is completed and agreed at the operational level it is then rolled into the Functional plan and then sent to the Functional Presidents and Management Committee that are located at ExxonMobil Corporate office in Dallas for final endorsement.  Once the finalized endorsement of the plan is provided it is then uploaded into Dataflex[39] and used to compare actual production, revenue, capital expenditures and operating cost to the plan.  Management regularly reviews the results of operations for the asset to the plan through the monthly F&O[40] (PEFR F-3) process that is performed at each asset group.

Management holds monthly F&O meetings at the following functional company level: ExxonMobil Exploration Company, ExxonMobil Development Company, ExxonMobil Production Company, ExxonMobil Gas & Power Marketing, ExxonMobil Africa, ExxonMobil Americas, ExxonMobil Asia Pacific, ExxonMobil Europe Caspian, ExxonMobil Middle East Russia and ExxonMobil Upstream Research Company.  During these monthly meetings Management reviews the current operations (revenue, capex, opex, and production) as well as compares the current operations to those developed during the P&B process for each Asset Group.  The monthly reviews allow for Management to analyze and determine if a change to the operations of the asset is deemed necessary to maximize profitability.

During the ExxonMobil Development Company monthly F&O meeting, Management is debriefed on the current status of all development capital expenditures and expenses for each project in its development stage. During the review, Management compares year to date capex and opex against the planned capex and opex to assess if there is any overruns for each region and asset.  If there are overruns noted, then explanations for the increased spend is presented in the F&O meeting to allow Management to understand the cause of the increased spend.  The capital expenditures budget is set each year during the P&B process as documented above for each region and each project that is being developed.

We would note that where costs are expected to exceed the originally planned amount, there is a process in place whereby Management will request a supplemental endorsement by senior Management (depending on DOAG levels). For example, in 2015 Management requested and obtained a supplemental approval for Gorgon – Janz[41]. The amount, although not significant, represented approximately 6% of the original planned amount

---

[39] Dataflex is a covered system tested by PwC RA, which is used to compile financial statement data.

[40] F&O information is developed based on information compiled from the Dataflex system and the engagement team performs walkthrough and operating effectiveness testing over the F&O process performed by the engagement team.

[41] ExxonMobil has a 25% interest in Gorgon. The engagement team would note that Gorgon's Net Book Value at December 31, 2015 was $10.9B, with a reserves case of 5.9 TCF and 43 MOEB EMNI – total reserves for the field are 24 TCF. This project was 93% complete as of 2015 and is expected to have first production in 2016. As it relates to Gorgon, we would note that the field is expected to achieve annual production of 15 million tonnes of LNG (with 3 LNG trains). Furthermore, we would note that ExxonMobil has long-term executed Sale and Purchase Agreements to sell 1.5 million tons per annum of LNG to India's Petronet LNG Limited over a 20-year term and with PetroChina to supply approximately 2.25 million tons per annum (also 20 years).

The engagement team would note that a supplemental request for funding for the Gorgon asset was made, amounting to approximately $600M or approximately 6% of the total capitalized cost of the asset. Because of this supplemental request, Management prepared a ROCE analysis. As part of this ROCE analysis, we would note that Management is expecting an Absolute Value Profit (AVP) of $28B using $60/bbl Brent ($12.9B at $40/bbl Brent and $40B at $80/bbl Brent).

As a result of this fact pattern – abundant resources, first production in first half of 2016, long-term contracts in place and a license period extending beyond 40 years - Management does not consider there to be a triggering event for the Gorgon Asset Grouping. From an Upstream functional audit

31



(and met threshold for DOAG approval by the ExxonMobil Management Committee). Similarly, in 2014, a supplement was requested for Kashagan[42]. In both cases, PwC obtained and reviewed the supplemental request and related support[43], including evidence of the Management Committee approval.

Based on the extensive planning procedures used during the P&B process and the continued monitoring of the asset performance through monthly F&Os, Management has not identified any triggering event associated with this condition.

*PwC Assessment and Conclusion*

On a quarterly basis the engagement team attended the F&O meetings with Management for each of the functional companies. During the quarterly F&O meetings PwC gains an understanding of current operations, financial profiles, and production analysis for each asset that is stewarded by the respected function. It is through these meetings that the engagement team obtains comfort that Management has a robust process in place to monitor potential assets meeting a triggering event under these conditions.

Also, as stated earlier, the engagement team also places reliance on PwC Affiliate teams to cover every in-scope location and assess this condition – there has been no impairment triggering event identified as a result of the Affiliate teams procedures.

Given the above, we do not take exception to Management's conclusion that there is no impairment triggering event associated with these conditions.

---

perspective Gordon is considered in-scope and covered by PwC Australia's reporting – refer to the engagement team's assessment of reporting within the December 31, 2015 update section of this memorandum. Considering the fact pattern, the engagement team does not take exception to this conclusion but would note that we will continue to monitor this asset as the field moves into production.

[42] ExxonMobil has a 17% interest in the Kashagan field. The engagement team would note that Kashagan's Net Book Value at December 31, 2015 was $9.5B, with a reserves case of 478 MOEB EMNI – total reserves for the field are 2900 MOEB. This asset is expected to have first production in late 2016 / early 2017 – with expected capacity of over 370KBD. As it relates to Kashagan, we would also note that the Kashagan field is governed by a PSC with the Kazakhstan government which will be in place until beyond 2040.

The engagement team would note that a supplemental request for funding for the Kashagan asset was made, amounting to approximately $900M or approximately 12% of the total capitalized cost of the asset. This supplemental request was made to improve the integrity and performance of the offshore pipeline. Because of this supplemental request, Management prepared a ROCE analysis. As part of this ROCE analysis, we would note that Management is expecting an Absolute Value Profit (AVP) of $15B using $80/bbl Brent ($7B at $60/bbl Brent and $22B at $100/bbl Brent).

As a result of this fact pattern, Management does not consider there to be a triggering event for the Kashagan Asset Group. The engagement team does not take exception to this conclusion but would note that we will continue to monitor this asset as the field moves into production.

[43] The engagement team would note that there were no impairment triggering events identified by Management associated with any of these assets. However, to assess whether contrary evidence exists, the engagement team obtained and reviewed the ROCE analysis prepared for each asset. We would also note that the key driver of the ROCE analysis prepared by Management is the Corporation's overall assessment of Plan Price – as noted above, the engagement team does not take exception to Management's use of Plan Price in monitoring and decision making. Considering this fact pattern, along with the background of each asset noted above, the engagement team concluded it was not necessary to perform further procedures on these models – also, the engagement team does not take exception to Management's conclusion that an impairment triggering event does not exist for these assets.

32



*A significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset (asset group), including an adverse action or assessment by a regulator*

The impairment trigger related to a change in legal factors or in the business climate is continually monitored by ExxonMobil both during the quarters and annually. Note, the change in business climate (resulting from recent price movements) has been discussed separately and in detail above. Note, changes in business climate resulting from tax law changes and changes in contracts with host governments, among others, will be captured in the Corporation's Watchlist process, which is viewed as an ICFR key control.

The Corporation maintains a robust legal department both at the local affiliate level, functional level, and corporate levels. The Corporation is notified of all legal cases at the local affiliate/country level. Once potential legal issues are known by local affiliate contacts, they are communicated up to the legal and tax departments at the functional level and corporate level by way of the legal compendium and Watchlist. The legal departments at the Functional and Corporate level also provide an oversight and consultation role for local legal and tax affiliate contacts as needed.

Specific to the legal process, we would note the legal compendium is used to track case specific information such as affiliate/business unit, parties, key issues, description of dispute and background, current status, amount claimed, and law issue lead for the case. The legal compendium is a live document that is constantly being updated by the respected law issue lead in order to keep Management informed of current case status. Management has comfort over the legal compendium through the legal controls in place over the legal review process and period end financial reporting controls.

Furthermore, on a Quarterly basis legal holds discussions with Management to inform them of case updates and new cases that have been filed against the Corporation. During these quarterly meetings Management is also informed of any new legal ruling that have an industry or regional effect. During these quarterly meetings Management identifies any possible triggering events related to changes in legal factors or business climates. As of present Management has not identified any triggering events as it relates to a change in legal factors or a change in the business environment in which they operate. Management will continue to monitor for any triggers through quarterly discussions with law and review of the legal compendium.

Aside from the legal process described above, also important to this condition are considerations associated with tax or other regulatory changes. From a tax and regulatory perspective, Management has the Watchlist process in place (described above) at both a Functional and Affiliate perspective. This process provides updates for every region that the Upstream Function operates from a tax, regulatory and business climate perspective. During the year there have been no items flagged of significance through this process that caused Management to conclude an impairment triggering event was present.

*PwC Assessment*

To confirm Management's conclusion that an impairment triggering event is not present, we perform procedures as follows on an ongoing basis.

- The engagement team quarterly attends the legal debrief with Management in which each case included in the legal compendium is discussed in detail and the future actions that are possible for each case on a go forward basis.

33

**App. 773**



- The engagement team performs an independent quarterly review of the legal compendium in which we review each case for accounting implications and assess for any trigging events. We obtained comfort over the legal compendium based on the SOX controls testing and walkthrough procedures performed over the legal process and period end financial reporting process as part of the global integrated Exxon Mobil Corporation audit.
- The engagement team also reviews each months Functional Watchlist; PwC affiliate teams review the monthly Affiliate Watchlist.

*PwC Conclusion*

In conclusion, based on our review of the legal compendium, discussions with Exxon Mobil's tax department and review of the monthly Watchlist, we would note that there are no cases, tax or regulatory developments currently pending which may significantly affect ExxonMobil's Upstream Functional operations. Based on the understanding and procedures performed, we do not take exception to Management's assessment that an impairment trigger is not present. Management is deemed to have a robust process in place by which legal factors, tax and regulatory changes and the business climate are constantly monitored and evaluated to ensure that a triggering event is not present.

### *Current expectation that, more likely than not, a long-lived asset (asset group) will be sold or otherwise disposed of significantly before the end of its previously estimated useful life.*

Management continually monitors each asset groups performance through monthly F&O meetings and the P&B process to determine if an asset is of greater value to the Corporation if they continue to operate and develop the asset/field or dispose of the asset. It is during these reviews that Management will evaluate and perform a robust review of not only assets they are currently operating for future profitability, but also for assets the Corporation is currently developing as well. Management has noted that they have the wherewithal to continue to develop all assets as planned as they currently hold a credit rating of AAA and have a market capitalization of $317B.

Management is continually monitoring the Corporation's asset portfolio in order to better position ExxonMobil in the industry. All divestment of assets are both reviewed and managed at the affiliate level and functional level through the use of the Watchlist as well as PEFR controls that are at the affiliate and functional level (PEFR-11). Management has noted that during the current year that there have been no significant asset sales or planned asset sales that relate to the Upstream business function.

Management has determined that the following impairment trigger "...a long-lived asset (asset group) will be sold or otherwise disposed of significantly before the end of its previously estimated useful life" is currently not present. Management reviews the Watchlist and F&Os monthly to note of any assets that are being sold and what the P/L impact will be. The Corporation has noted that at 9/30/2015 there has been no triggering event based on these monthly reviews performed. Management continues to perform monthly reviews of the Watchlist and F&Os to seek ways to maximize their investment in the Corporation's assets.

*PwC Assessment*

The engagement team reviews the Watchlist monthly to become aware of any potential or executed divestments of long-lived assets at the time of their occurrence. We would note there have been five divestments of acreage within the Upstream function. None of the results of the divestments are viewed as a potential trigger for further impairment assessment. Three of the divestments (King Ranch – Texas, Sean –

34



UK, Parkland and Claresholm - Canada Conventional) resulted in gains for the Corporation. A divestment related to Cook Inlet (Alaska) had a negative earnings impact of $-95M in 3Q upon finalization of the divestment[44]. The final divestment was relating to the Aceh in Indonesia which resulted in a negative earnings impact of $-90M in 3Q[45].

*PwC Conclusion*

In conclusion, the engagement team noted that no impairment trigger related to "...a long-lived asset (asset group) will be sold or otherwise disposed of significantly before the end of its previously estimated useful life." was present. We would also note that Management has a robust system of controls in place around the divestment of long-lived fixed assets, the engagement team has performed SOX procedures around these controls (FA #12, PEFR A-12, 13 and PEFR F-4, 7, 11) and have noted no deficiencies. Moreover, we would note that the losses incurred on sales in 2015 were, as explained in the footnote below, related to specific matters and are not indicative of a pervasive issue across the Corporation's Upstream portfolio which may indicate an impairment trigger exists.

## Overall Conclusion

Based on the procedures performed as detailed in this memo and Appendices, discussion with Management, and review of financial information, we conclude that Management's process is both aligned with US GAAP accounting principles and the Corporation's Accounting Policy; therefore, Management's impairment process is considered to be operating effectively.

Additionally, we do not take exception with the Corporation's assertion that there are no assets for which a material impairment should be recorded. We will continue to monitor and evaluate the current business environment and operations that are being conducted by ExxonMobil for future triggering events in accordance with ASC 360 and 323.

---

[44] The engagement team notes that Cook Inlet was unique in that it was a heritage XTO property acquired in 1998 by XTO (significantly before the ExxonMobil acquisition of XTO in 2010). ExxonMobil management did not consider this property to be a fit with their upstream strategy nor their overall asset portfolio. Management also identified integrity issues with the current property/operation and to avoid further exposure, divested the property. Management notes that the divestment of the Cook Inlet is not considered a potential triggering event as it is viewed as unique (see above) and does not provide an indicative view of the recoverability of the overall ExxonMobil asset portfolio in the region or Globally. Note, other ExxonMobil Alaska properties generated positive income and cash flow through September 30.

[45] Management would note as it pertains to the Aceh divestment that the Aceh field was operated under a Production Sharing Contract partnered with the Government of Indonesia. This agreement allowed for ExxonMobil to cost recover expenses incurred related to production of hydrocarbons. In 2015, the Government of Indonesia disputed certain costs. When ExxonMobil divested the Aceh field to a third party, these disputed costs were written off – this is the loss recorded on this divestment. Excluding these costs, the divestments would have resulted in a nominal gain for the Corporation.

35

**App. 775**



## December 31, 2015 Update

We would note that as of, and subsequent to, December 31, 2015 commodity prices have continued to be volatile, with Brent prices, for example, ranging between $27 and $36 per barrel in the first few weeks of 2016. Management would note that this volatility further supports their position that short-term (current) prices are inherently volatile and are not a prudent basis for decision making - as.

The memorandum above has included considerations of financial and operating data through September 30, 2015. We have updated Management's review of the financial and operating results associated with Upstream assets through December 31, 2015, and also considered any other events occurring subsequent to year-end which may be relevant – this analysis is below.

As it relates to Affiliate team reporting - the engagement team would also note that at the time of this update, we have performed a review of all Affiliate team reporting, including those interoffice reports covering XTO and Canada. We would note that no exceptions were raised in the inter-office reporting (including MOE's) related to Management's process, controls, or conclusions as to the approach to the applicable of ASC 360 (property, plant and equipment), ASC 323 (equity method investments) or ASC 932 (unproved properties).

## Long-lived Assets

*A current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset (asset group)*

Management performed an updated review over the year to date operating earnings – see summarized table below.  Management would note that based on this analysis, there were no additional countries that had generated negative current year earnings other than those identified at September 30.  For those assets which had generated negative current year earnings which were previously identified (i.e., within USP, Canada and XTO), Management has performed an updated assessment to understand whether any further analysis was needed. Similar to the memo above, for USP refer to the separate memo prepared. With regard to XTO and IOL, the respective engagement teams have updated their procedures through year-end to support their inter-office opinions. Consistent with our analysis through September 30, 2015, we provide below an update of our understanding of Canada West operations.

| [46]Country | GAAP Earnings (9 Mo) | GAAP Earnings (12 Mo) |
|---|---|---|
| Nigeria | $532 | $631 |
| Angola | 410 | 486 |
| Equatorial Guinea | 76 | 62 |
| Chad | 36 | 39 |
| Canada East | 117 | 124 |
| U.S. (EMOP) | (127) | (213) |
| U.S. (OBO) | 99 | 59 |

[46] The information included in the table above is summarized data obtained from the respected country/region F&O package as of 12/31/2015 and agreed to Dataflex. *This information allows Management and the engagement team to focus on the full-year results for each asset.*

36

**App. 776**



| | | |
|---|---|---|
| Canada West/IOL | (45) | (148) |
| Alaska & Transportation | 231 | 262 |
| Australia | 115 | 96 |
| Malaysia | 293 | 258 |
| Indonesia | 84 | 115 |
| PNG | 460 | 567 |
| Norway | 438 | 645 |
| UK | 272 | 303 |
| Russia | 222 | 273 |
| XTO | (1,041) | (1,521) |

Canada West/IOL Considerations

The earnings analysis below was prepared by Management and agreed by the engagement team to the Americas F&O and Dataflex system as of December 31, 2015.

| | [47]Cold Lake | Syncrude** | Kearl* |
|---|---|---|---|
| Revenue | $1,451 | $1,046 | $1,286 |
| NBV | 5,797 | 5,490 | 26,290 |
| YTD Earnings (12M) | $260 | $(18) | $(304) |

*Kearl is noted as generating negative year-to-date earnings for the full year of 2015. Refer to the following section "Kearl Assessment" for an update assessment over Kearl.

**Syncrude is noted as operating at a negative year-to-date earnings for the full year of 2015. Refer to the following section "Syncrude Assessment" for an update assessment over Syncrude.

*Kearl Assessment*

The engagement team reviewed the Kearl monthly profitability analysis prepared by Management, which was included in the December F&O package. We would note that for the final 3 months of 2015, Kearl operated at a loss of approximately $94M.

Management would note that operations for the Kearl asset had not substantially changed in the fourth quarter; the loss recorded over the 4th quarter was primarily due to a reduction in the realizations in December. Based on the fact that operational performance did not change, Management determined that the assessment performed at interim, which included a cash flow forecast (to assess whether a triggering event exists) concluding there to be $53B in headroom, was still appropriate to support their position that Kearl's results do not represent an impairment triggering event.

The engagement team reviewed the updated fact pattern on Kearl and held discussions with the PwC Calgary team. Supporting Management's position is that Kearl was able to generate positive cash from operations over the cumulative period and positive earnings since the asset was put into production.

---

[47] The information in the table above is obtained from the December 2015 Americas F&O review package and agreed to the respected RUs in the Dataflex system.

37

**App. 777**



*Syncrude Assessment*

The engagement team reviewed the Syncrude monthly profitability analysis prepared by Management, which was included in the December F&O package. We would note that for the final 3 months of 2015, Syncrude operated at near break-even levels (loss of $2M) and generated positive cash from operations for each month.

Similar to Kearl, Management would note that operations for the Syncrude asset had not substantially changed in the fourth quarter, the negative earnings incurred in December were primarily due to a reduction in the price realizations.  Based on the fact that operational performance did not change, Management determined that the assessment performed at interim, was still appropriate to support their position that Syncrude's results do not represent an impairment triggering event.

Canada East

Management would note there have been no changes to the fact pattern associated with the Canada East asset as compared with their interim assessment. The engagement team reviewed the December F&O analysis and does not take exception with this conclusion. Refer to PwC Calgary opinion over IOL.

Management has concluded that as a result of the updated analysis performed, there is no impairment triggering event identified at December 31, 2015 under this condition for any Asset Group recorded within the Upstream functional business. Supported by opinions from PwC Calgary (IOL) and PwC Fort Worth (XTO), and the independent corroboration performed, as documented throughout this memorandum, the engagement team does not take exception with this conclusion.

## *A significant decrease in the market price of a long-lived asset (asset group)*

Refer to discussion above regarding the volatility in market prices subsequent to December 31, 2015.

Management has also considered recent M&A activity – refer to condition 6 for further discussions.  In regards to this triggering event condition, we have not identified any matter that would indicate that the Corporation's preliminary conclusions need to be reconsidered as of 12/31/2015.

## *Upstream Industry Specific Condition - Lower expected future oil and gas price, such as the prices used by Management in evaluating whether to develop or acquire properties*

We would not that Management's consideration around "Plan Price" has not changed from that at September 30.  Refer to the section above titled "Plan Price" for Management's considerations regarding the current commodity price environment. There were no impairment triggering events identified by Management as part of their assessment of this condition. Refer to the memo above for the engagement's consideration around "Plan Price".

## *Upstream Industry Specific Condition - Significant downward revisions to an asset's (asset groups) reserve estimates.*

The engagement team would note that reserves data is supplemental data included within the Corporation's 10-k. The engagement team would note this information is unaudited information, however, because of its relevance on future production and, therefore, cash flows, the engagement team would note the reserves process has relevance to assessing for potential impairment triggering events within the oil and gas industry.

38

**App. 778**



As it relates to the reserves process, Management has a robust controls process around the monitoring, booking, and revision of reserves which are stewarded by the Global Reserves Group. We would note that the reserves process is subject to SOX 404 testing and walkthrough procedures for the current year and no exceptions were noted as a result of the engagement team's testing of this process.

The engagement team reviewed the 2015 proved reserve change package for the year, which is presented to the Corporations Chairman, Rex Tillerson. In reviewing this package we would note that the Company's proved reserves, using the Corporation Plan Price (an alternative, the SEC basis, is described below), were 25.0 GOEB at December 31, 2015, a decrease of 0.3 GOEB from the Company's reserves at December 31, 2014 of 25.3 GOEB.

Key changes driving the decline of 0.3 GOEB is summarized below. The engagement team would note that a significant factor across the reserve write-downs is a change in the 5-year drilling plan which resulted in a reclassification of proved undeveloped reserves to unproved reserves – see summary below.



The net reserve additions column is made up of 1.56 GOEB's of reserve additions, less 494 MOEB's of reserve write-downs / sales (see details of each of these below). The remaining amount of this net reserve addition is derived from individually inconsequential adjustments.[48] The reserve additions and write-downs/disposals was further assessed by Management from an impairment triggering event perspective – this assessment is below:

Reserve additions (1.56 GOEB):

---

[48] Management's threshold for reserve analysis generally is any reserve change less than +/- 10 MOEB. The engagement team has considered the precision level of this threshold and would note that in comparison to the Corporations total reserves, 25.0 GOEB, that this threshold represents approximately 0.04% of the total resource base. Furthermore, considering the risk of aggregation, the total net changes for Asset Groupings being below this threshold is 235 MOEB, or less than 1% of total reserves of the Corporation. Considering this, the engagement team considers Management's process to be sufficiently precise to assess any potential impairment triggering events associated with reserve revisions.

39



- Upper Zakum (United Arab Emirates) – 698 MOEB: The Corporation's basis for increase related to commercial certainty as to achieving 750 KBD production through life of license (2041) and increased technical certainty via reservoir modelling and wellbore integrity studies.
- XTO (USA) – 620 MOEB: 399 MOEB of this reserve addition is primarily as a result of a further allocation of planned capital expenditures to liquids; more specifically, at current plan price, certain liquids fields are more profitable as compared to gas fields and as a result, increased crude production is expected (note, the impact of the decrease in gas capital expenditure is discussed in reserve write-down section below). The remainder of the reserve addition in XTO is a result of asset acquisitions which accounted for an additional 221 MOEB – the largest of these acquisitions was the Endeavor acquisition in the Permian Basin (215 MOEB).
- Kearl (Canada) – 166 MOEB and Balder (Norway) – 20 MOEB: The current year's reserve addition of 0.2 GOEB for these assets is primarily a result of performance through FY 15 (improved recovery rate).
- Other reserve additions include 59 MOEB from PSC's: Usan (Nigeria), Dalia (Angola), West Qurna (Iraq), Sakhalin Odoptu (Russia).[49]

Reserve write-downs[50] and sales (494 MOEB):

- Tabu (Malaysia) - (12) MOEB: Management would note that Malaysia is generating positive earnings in all Asset Groupings for the year. Management performed an analysis over the reserve revision and noted that the downward revision of 12 MOEB is only 2.2% of proved reserves[51] for Malaysia and as such deemed to be insignificant. As a result, Management has concluded that an impairment triggering event for Malaysia has not been identified. The engagement team does not take exception to the conclusion reached.
- XTO (USA) - (220) MOEB: 110 MOEB of this recategorization to unproved relates to Marcellus / Utica Gas plays where management have constrained planned capex over the next 5 years thus impacting extent of drilling program. The remaining 110 MOEB relates to economic and technical revisions across a number of gas plays due to the lower Henry Hub Company plan price which have the effect of shortening the economic life of certain gas plays.
- Nigeria JV (Nigeria) - (95) MOEB: Management would note that Nigeria is generating positive earnings in all Asset Groupings for the year. Management performed an analysis over the reserve revision and note that the downward revision of 95 MOEB is only 4.7% of proved reserves for Nigeria JV and as such deemed to be insignificant. As a result, Management has concluded that an impairment triggering event for Nigeria has not been identified. The engagement team does not take exception to the conclusion reached.
- SYU and Prudhoe Bay (US Production) – (74) MOEB: Refer to further discussion on these revisions within the US Production memo.
- Syncrude (Canada) - (13) MOEB & Cold Lake – (21) MOEB: These decreases are due to higher royalty rates that are incurred due to an increase in the effective tax rate in the Province of Alberta, Canada. Management noted that the downward revisions for Syncrude and Cold Lake was insignificant as 13

---

[49] The engagement team would note that each of these fields are operated under PSCs under which entitlements have increased due to the lower commodity pricing environment – see discussion in memo above for further background on the nature of PSCs.

[50] The engagement team would note there was a revision to the reserves of the AERA equity method investment, refer to section addressing equity method investments below for the considerations associated with this revision. Furthermore, for USP applicable reserve revisions (SYU and Prudhoe Bay) refer to the USP memo for the engagement team's documentation of the conclusions reached.

[51] The engagement team have recalculated this amount based on the reserves reported within the Phoenix reserves system. This is applicable for all MOEB as a % of proved reserve calculations within this memo and the US Production memo.

40



MOEB is 2.2% of proved reserves for Syncrude and 21 MOEB is 2.2% of proved reserves for Cold Lake. As a result, Management has concluded that an impairment triggering event for these Asset Groupings within Canada has not been identified. The engagement team does not take exception to the conclusion reached.

- Aera (USA) – (20) MOEB: See equity method investment section below.
- Reserve sales amount to (39) MOEB. The most significant sale was the Aceh, Indonesia asset which amounts to (17) MOEB.

When considering the above revisions in comparison to the Company's total proved gas reserves, and to the reserves associated with the various assets impacted (e.g., Malaysia, Nigeria, etc.), Management have concluded these revisions to be insignificant. Furthermore and as noted elsewhere, Management, when assessing whether reserve changes may indicate an impairment trigger, consider the entire resource base (as appropriately risked) and not just the proved reserves (whether Company plan or SEC). Management would note that these revisions do not indicate any issues with the geophysics / performance of the plays but are simply price and current environment related and are therefore appropriately still considered to be a part of the resource base. Management would also note that their strong financial position, as represented by the "AAA" credit rating, indicates that management have the ability to exploit the full resource base over time. Considering this fact pattern, Management concluded that an impairment triggering event was not identified. The engagement team does not take exception to this conclusion.

The above discussion pertains to changes in reserves resulting from the use of Plan Price. The engagement team would note that the Corporation externally reports proved reserves on the basis of the average of the first-day-of-the-month price for each month during the 12-month period ended December 31, 2015 (hereafter referred to as the "SEC Price") in compliance with Regulation S-X 4(10).

On an SEC Price basis, Management reported total reserves of 25.3 GOEB within the 10-k for the period ended December 31, 2014. At December 31, 2015, Management plans to report proved reserves of 24.8 GOEB. The 0.2 GOEB difference when comparing reserves on a Plan Price (25.0 MOEB) basis to the SEC Price basis relates to different price assumptions used between the two methods of calculating reserves.

The decline in total reserves on an SEC Price basis is driven by declines in WTI, Brent and Henry Hub average prices for the year. Brent in 2015 decreased to $54/bbl from $101/bbl in 2014. Henry Hub in 2015 decreased to $2.59 / MTBU from $4.35 / MTBU in 2014. As a result of these decreases, total proved reserves of 264 MOEB were moved from proved to unproved.

41

**App. 781**





Because the SEC Price basis shows a further reduction in reserves, as compared with the Plan Price basis, this information could be considered contrary evidence (in the context of impairment trigger assessment) – Management therefore performed a further analysis to understand each SEC Price reserve revision. The assets representing the significant majority of the SEC price change are summarized below:

- Kearl (addition of 187 MOEB) – As a result of applying a lower SEC price, earnings forecasts decrease, which results in lower royalty payments to the Alberta government. This results in a 187 MOEB increase to the reserves for Kearl on an SEC Reserves basis.
- Prudhoe Bay (decrease of 220 MOEB) and XTO (decrease of 481 MOEB) – Applying the SEC price, a total of 701 MOEB of reserves  The decline in resource was as a result of Management not using the reserves in operations but reinjecting as a potential LNG resource. As a result, these reserves are reclassified to unproved on an SEC reserves basis.  Similar to the Plan Price basis, noted above, Management would note that both of these reserve write-downs have resulted in a re-categorization from proved undeveloped reserves to unproved reserves, again providing Management with comfort that the nature of these revisions is isolated to the pricing assumption applied.

Management would not that, similar to the use of a NYMEX price, the use of SEC pricing provides no informative value on future prices. Historical pricing has little correlation/predictive value on future supply/demand trends. As a result, Management view Plan Price, and the reserves associated with Plan Price, to be more representative and applicable to the long-term nature of the Corporation's investments. Given this, and considering the nature of the reserve revisions resulting from the application of SEC Price, Management does not consider the SEC Price case to be an impairment triggering event. The engagement team reviewed this fact pattern, noting that affiliate teams did not take exception to this treatment in their reporting and, as such, do not take exception to this conclusion.

*A significant adverse change in the extent or manner in which a long-lived asset (asset group) is being used or in its physical condition and Accumulation of costs significantly in excess of*

42

**App. 782**



*the amount originally expected for the acquisition or construction & Accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction*

We would note that there has been no change in Management's conclusion reached at interim with regards to these conditions.

The engagement team attended the December F&O meetings with Management for all assets. During these quarterly F&O meetings, PwC gained an updated understanding of current operations, financial profiles, and production analysis for each asset. We would note through these meetings, and review of the functional watchlist and F&Os, that we do not take exception to Management's conclusion that there is no impairment triggering event associated with these conditions.

*Significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset (asset group), including an adverse action or assessment by a regulator*

The Corporation's robust legal, business and regulatory and review process has not changed from what is stated above at interim. Management continues to monitor both the current legal and business environment through review of the legal compendium as well as monthly watchlist reviews. During the 4Q review of the legal compendium held with Management, Managements concluded that there were no new cases of significance or developments in existing cases of significance identified which would give rise to a potential impairment triggering event – we do not take exception to this conclusion.

Management also gave consideration to tax or other regulatory changes. As noted above, Management reviews the Watchlist at both the Functional and Affiliate level to identify updates to any region in which Upstream operates from a tax, regulatory, and business climate perspective. As of December 31, Management has not flagged any items of significance through this process that caused Management to conclude an impairment triggering event was present. In conclusion, based on our review of the legal compendium, discussions with Exxon Mobil's tax department and review of the monthly Watchlist, we would note that there are no tax or regulatory developments currently pending which may significantly affect ExxonMobil's Upstream Functional operations. Based on the understanding and procedures performed, we do not take exception to Management's assessment that an impairment trigger is not present.

*Current expectation that, more likely than not, a long-lived asset (asset group) will be sold or otherwise disposed of significantly before the end of its previously estimated useful life.*

Per discussion with Management we would note that there has been no change to the review process over this triggering event criteria as noted above. Through Management's continual monitoring of the asset groups performance by way of the F&O review, they have not identified any instances in which an asset has been sold significantly before the end of its previously estimated useful life. The engagement team reviewed the Watchlist monthly to become aware of any potential or executed divestments of long-lived assets at the time of their occurrence. We would note there has been one divestment in the 4th quarter pertaining to the Norway Sleipner field which resulted in a $77M gain. Overall, Management concluded there continues to be no impairment triggering event associated within this condition – the engagement team does not take exception to this conclusion.

**Equity Investment Assessments**

43

**App. 783**



Management performed a review over the equity investee earnings as of December 31, 2015 to update their assessment as to if an impairment triggering event is present. Refer to the table below for Management's updated analysis.

| RU Holding Equity Investment ($M)[52] | Investee[53] | YTD After-Tax Earnings | |
|---|---|---|---|
| | | 2015 9M | 2015 YTD |
| 3787 Mobil California E&P Asset Co. | Aera Energy | 216 | 146 |
| 0518 ExxonMobil Holding Comp Holland L | NAM[54] | 489 | 567 |
| 3549 ExxonMobil Qatargas Inc.<br>2168 ExxonMobil Qatargas (II) Limited | Qatar Gas<br>Qatar Gas (2) | 124<br>908 | 158<br>1,077 |
| 3548 ExxonMobil RASGAS Inc.<br>2457 ExxonMobil Ras Laffan (III) Limited | Ras Laffan<br>Ras Laffan II<br>Ras Laffan (3) | 1,080<br><br>1,185 | 1,400<br><br>1,306 |
| 3588 ExxonMobil Kazakhstan Ventures, I | Tengiz | 699 | 755 |
| 7100 Papua New Guinea | Papua New Guinea Liquefied Natural Gas Global Company LDC | ** | |
| 2343 ExxonMobil Italiana Gas S.R.L. | Adriatic | 16 | 22 |

** See further information on this investment within the memo above.

Management has determined that based on review of current year-to-date positive earnings for each significant investment that their conclusion at interim was still appropriate - that no impairment triggering event is present. The engagement team would note that based on review of current period earnings that we do not take exception to Management's conclusions as it relates to equity method investments.

Reserve considerations

Management did identify a downward proved reserve revision of 20 MOEB for the Aera equity investee as of December 31, 2015, representing 5.6% of proved reserves for the investment. The 20 MOEB reserve revisions

---

[52] The information in the table above is derived from the Dataflex system which is a covered system tested by PwC Risk Assurance.

[53] Agreed to Exxon Mobil Corporation 2014 10-K.

[54] Management is monitoring legal developments in Groningen pertaining to home value losses – refer to the Exxon Mobil Upstream legal documentation for further background on this matter. Management has concluded that there are no indications to date that would suggest this investment is impaired. Based on our discussions with Management, including in-house legal counsel, we do not take exception to this conclusion.

44



resulted in a reclassification from proved to unproved due to the timing of the drilling outlook over the next 5-years. Additionally, we would note that, when considering total proved and unproved reserves, there was only a net 1 MOEB decline in reserves for Aera. Management viewed this revision as not being significant. Furthermore, Management would note that Aera is generating positive earnings and cash flows at current realizations. Considering this, Management has concluded that an impairment triggering event for the Aera equity investee has not been identified. The engagement team considered this fact pattern and does not take exception to the conclusion reached.

There were no other reserve changes identified that were applicable to equity method investments.

## Corporate Assessment

The engagement team would note that, in addition to the assessments and conclusions performed at the Affiliate and Functional level, as summarized throughout this memo, additional communications have followed between Exxon Mobil Corporate, the Exxon Mobil Audit Committee and PwC Dallas, as Corporate auditors. We would note Corporate Management have concluded there to be no impairment triggering events identified within the Upstream function. The Corporate assessment makes reference to several monitoring controls Management has in place, including the monitoring controls made reference to throughout this memo: Watchlist, F&O and Planning and Budgeting control (P&B)[55].

## Updated Assessment Conclusion - December 31, 2015

Giving consideration to the conditions that existed as of, and subsequent to, December 31, 2015, Management has not identified an impairment triggering event to be present for long-lived assets or equity method investments. The engagement team understood the various conclusion reached, as documented above, and does not take exception to the conclusion that an impairment triggering event does not exist.

---

[55] As it relates to the P&B, the engagement team would note that the output of this control is subject to review as part of the F&O process and subject to review as part of our audit procedures around cash flow models referred to within this memo: Kearl (PwC Canada), XTO (PwC Fort Worth) and Mobile Bay (PwC Houston).

45

**App. 785**



## Appendix A – ExxonMobil Fixed Asset Impairment Policy

*Introduction*

This policy section of the ExxonMobil Accounting Manual summarizes the reporting standards for the impairment of long-lived assets under ASC 360 and its application to ExxonMobil.

*Scope*

Long-lived assets included in the scope of ASC 360 are property plant and equipment (except unproved oil and gas properties, which are covered by ASC 932), capitalized leases of lessees, and intangible assets subject to amortization. The accounting for impairment of goodwill and indefinite lived intangibles is covered by ASC 350 (see Accounting Manual Topic "Goodwill" - GW).

Long-lived assets to be held and used by ExxonMobil and its affiliates must be reviewed for impairment whenever events indicate that the carrying amount of an asset or asset group may not be recoverable. In performing the review for recoverability (only when material events indicate a need), estimated future cash flows expected to result from the use of the asset group and its eventual disposition should be compared to the asset group's net book value. If the sum of undiscounted expected future cash flows is less than the net book value, impairment is indicated. The loss should be calculated by comparing the "fair value" of the asset grouping against the net book value to determine any impairment loss to be recognized. If "fair value" is not readily available, discounted expected future cash flows may be substituted when determining the impairment loss to currently recognize.

Fixed assets that are to be disposed of by sale, exchange or distribution should be reported at the lower of net book value or fair value less cost to sell. Business Group Controllers should be consulted on accounting related to the sale of material assets or a business segment. Fixed assets that are abandoned are disposed of when the asset ceases to be used. If a plan of abandonment is committed to before the end of the asset's useful life, depreciation estimates should be revised prospectively to reflect the shortened life.

*Summary of Provisions*

At issue is when a fixed asset group impaired is and how to measure impairment. A three step process is required:

1) Test for impairment only when events or changes in circumstances indicate that the carrying amount of a fixed asset group may not be recoverable. Following are examples of events that may indicate an impairment assessment should be made:

- Significant decrease in market values of an asset group

- Significant change in the utilization of an asset group

- Adverse legal factors

- Significant construction cost overruns

46

**App. 786**



- History of cash flow losses with similar forecasts for the future

2) A recoverability test for impairment should be made using the best internal estimates of future prices, costs and disposition values to determine the estimated future cash flows expected to result from use of the asset group and its eventual disposition.

If undiscounted cash flows are less than the net book value of an asset group, impairment is indicated.

3) An impairment loss shall be measured as the amount by which the carrying amount of the long-lived asset (asset group) exceeds its fair value. Refer to the fair value section of the Accounting Manual for guidance on measuring fair value.

An impairment loss for an asset group shall reduce only the carrying amounts of a long-lived asset or assets of the group. It shall be allocated on a pro rata basis using the relative carrying amounts of those assets, except that the loss allocated to an individual long-lived asset of the group shall not reduce the carrying amount of that asset below its fair value. An impairment that has been recognized is never reversed in a subsequent reporting period.

*Policy – Test for Impairment*

A recoverability test for impairment should be made when events indicate that significant changes may have occurred that could materially affect total future cash flows of an asset grouping. This does not imply that an annual year-end test is required.

*Policy –Asset Groupings*

Assets should be grouped at the lowest level for which there is identifiable cash flows that are largely independent of the cash flows of other groups of assets. That grouping should then be utilized to determine cash flow projections and any potential impairment loss recognition. For determining when to recognize and how to measure an impairment loss, assets should be grouped when they are used together; that is, when they are part of the same group of assets and are used together to generate group cash flow. ExxonMobil views the issue as requiring assets to be broadly grouped into units that have readily identifiable cash flows.

All asset groupings should be reviewed with Business Group and Corporate Controllers before being implemented or modified.

*Policy – Oil and Gas Issues*

ASC 360 applies to all resources classified as proved reserves and their related cost should be included in the impairment methodology previously outlined.  The impairment of unproved reserves continue to be covered by ASC 932.

Unproved Reserves

Impairment tests for costs associated with unproved reserves (i.e., acquisition costs of unproved acreage, costs of drilling exploratory wells, and costs of drilling exploratory-type stratigraphic wells) which have never been classified as proved are specified in ASC 932.

47

**App. 787**



Proved Reserves

ASC 360 accounting for fixed asset impairment covers all resources and related capitalized costs associated with proved reserves.  Asset grouping is a significant issue in this area and should be carefully reviewed by Business Group and Corporate Controller's.

Reserves no longer classified as proved

Proved developed reserves may remain in that category as long as production from that particular reservoir continues (since presumably, "commercial" predictability is supported by actual production).  If production is suspended, developed reserves that no longer qualify as proved must be removed from the proved category ("de-booked").

48

App. 788



### Appendix B – "Canada West/IOL Analysis" & "Canada East"

*We would note that the assets in Canada are covered by PwC Calgary's interoffice opinion. However, to demonstrate our understanding of Managements analysis, we have included the below documentation within the PwC Houston Audit file.*

### Canada West/IOL Analysis

As noted above, a step in Management's analysis is to review the current year-to-date earnings for each country/region. Based on the analysis above at 9/30/2015 we would note that the Canada West/IOL asset group is currently operating at negative year-to-date earnings for 2015. In order to gain an understanding of the factors that are leading to the Canada West/IOL asset operating at negative earnings, Management drilled down on the assets to perform an analysis on each Asset Grouping. Refer to the table below for a breakdown analysis of the significant Asset Groups that are negatively generating cash.

|  | [56]Cold Lake | Syncrude** | Kearl* |
|---|---|---|---|
| *Revenue* | $1,204 | $802 | $954 |
| *NBV* | 5,797 | 5,490 | 26,290 |
| *YTD Earnings* | $246 | $(19) | $(210) |

*\*Kearl asset is noted as operating at a negative year-to-date earnings from 1/1/2015 to 9/30/2015. Refer to the following section "Analysis of Kearl" for assessment over determination of a triggering event.*

*\*\*Syncrude asset is noted as operating at a negative year-to-date earnings from 1/1/2015 to 9/30/2015. Refer to the following section "Analysis of Syncrude" for assessment over determination of a triggering event.*

The engagement team would note that the above table summarizes the significant Asset Groups in Canada West / IOL. There are several other smaller fields recorded within Canada, some of these fields have incurred negative earnings for the current year. However, for those Asset Groups which are not in the development/exploration stages, each of these Asset Groups has generated positive cash flows and has a history of positive earnings. Also, each of these Asset Groups is individually insignificant for further assessment to be performed. It should also be noted that one of these smaller fields (NBV of $56M – discussed in Condition 6 of memo) was divested in January 2016, resulting in a gain of $44M. As a result of these facts, the remainder of this memos analysis on Canada will be focused on the significant assets operating at current period negative earnings: Kearl and Syncrude.

### Analysis of Kearl

The Kearl project is a jointly owned operation between Imperial Oil Limited (operator) and ExxonMobil. Kearl is the largest oil sands project currently in North America and contains an estimated 4.6 billion barrels of recoverable bitumen. For decades, ExxonMobil and Imperial Oil have advanced oil sands innovation, and the Kearl project represents a state-of-the-art approach to modern oil sands production. Due to the unique nature of the production and mining activities that are being used to process the oil sands ExxonMobil has made

---

[56] The information in the table above is obtained from the September 2015 Americas F&O review package (pg. 19) and agreed to the respected RUs in the Dataflex system.

49

**App. 789**



significant capital investments in operations in the Kearl project.  The current NBV for the Kearl project is approximately $26.3 billion, making it the largest capital investment in Canada to date.

The development of the Kearl oil sands began in the early 2010's with planned initial production beginning in 2012 at 160 barrels of bitumen per day[57]. Production first reached market in 2013 in which ExxonMobil recognized production of a net 21 KBD.  As the asset was still in a developmental/early production stage in 2013 optimal production techniques and efficiencies had not been fully captured. Subsequently in 2014 production for the Kearl project increased to a net 66 KBD, during 2014 Kearl was operating two of the planned 3 trains to process the bitumen.  The increased production volumes of 2014 lead to a 50% decrease in operating expense per barrel when comparing to 2013.

In the first half of 2015, ExxonMobil undertook operations to bring the 3rd processing train online.  In June 2015 the Corporation announced that the 3rd train was fully operational and that increased production has doubled from 66 KBD to as much as 169KBD, all stated in ExxonMobil share percentage.

During the September quarterly F&O meeting with Management, Kearl production had significantly increased, refer to table below.  The increased production volumes lead to another ~45% decrease in operating expense per barrel, currently the operating expense per barrel in 3Q averages $31.  We would note that over the past two and half years of operations, the Corporation has decreased operating expense per barrel by ~70% and increased production by ~80%.

Below Management has prepared a profitability analysis by month for the Kearl project that shows average operations for 2014 and a monthly breakdown of 2015 operations.

| Kearl Profitability[58] | 2014 | | | | 2015 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 14' Avg | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sept* |
| Production (KBD) | 66 | 63 | 87 | 73 | 72 | 113 | 120 | 154 | 169 | 100 |
| Realization $/bbl | $60 | $21 | $23 | $22 | $30 | $34 | $42 | $35 | $21 | $19 |
| Unit Opex | 69 | 57 | 44 | 52 | 47 | 28 | 37 | 24 | 24 | 45 |
| Unit Cash Opex | 52 | 44 | 35 | 40 | 35 | 19 | 27 | 17 | 16 | 31 |
| Unit Non Cash | 17 | 12 | 9 | 11 | 12 | 8 | 10 | 7 | 8 | 14 |
| Unit Earnings | (16) | (26) | (18) | (23) | (15) | 2 | (31)[59] | 5 | (2) | (22) |

*The decrease in production for the month of September for Kearl was due to the shutdown of the K1 crusher and conveyor belt replacement.  Per discussions with Management, this shutdown is what lead to the decreased production and negative earnings for Kearl and is noted as a onetime event.  As this event is not indicative of an ongoing operational impact, we deem the operating loss incurred by Kearl in September to be a one-time effect.  Management would also note that production at Kearl is

---

[57] 160KBD is the gross production for the project which is jointly owned by Imperial Oil Limited and ExxonMobil Canada.

[58] The Kearl Profitability was prepared by Management, and was included in the September Americas F&O package (pg. 49) presented to PwC during the 3Q 2015.

[59] The engagement team would note that the month of June does not agree to the F&O because there is an $80M one-time event which occurred in June. This was the one-time earnings impact of a change in tax rate in the province of Alberta. Including this $80M, the total earnings per the table, for the 9-months period ended September 30, 2015, will reconcile to the $210M loss YTD for Kearl.

50



*expected to reach 220 (KBD) at full production, expected in 2016 – this will further improve the economic situation for this asset.*

Based on the analysis prepared by Management above over the monthly operations for Kearl, we would note that once all trains began production for a full month, that Kearl began generating positive cash from operations. Based on discussions with Management, the Corporation is currently in the process of conducting debottlenecking operations which will increase production to the projects regulatory capacity of 220KBD (ExxonMobil share). Refer to the following sections for additional analysis and determinations made over the Kearl asset.

In addition to the above, Management, developed a future cash flow projection for Kearl. Management represented that the results of this projection, applying the 2015 plan price, is $71B which is $45B larger than the carrying value We would note that management's assessment is subject to audit procedures by PwC Calgary. Refer to assessment of Year end Inter-Office Reporting at Year End Update Section of this Memo.

*PwC Conclusion*

Based on the quarterly meetings with Management, review of monthly F&Os and the analyses performed above over Kearl, the engagement team would note that there was no indication of an impairment triggering event occurring in the current year. The engagement team will continue to monitor ExxonMobil's assets for impairment triggers throughout the 2015 Exxon Mobil Corporation integrated audit.

<u>Analysis of Syncrude</u>

Syncrude is an oil sand production operation located in Alberta Canada in which IOL holds a 25% ownership interest. Syncrude has an operational capacity of 350 kbd as well as 5.1 billion barrels of proven and probable reserves, gross. The asset could produce at maximum capacity (350 kbd) for the next ~40 years at which time it would recover all 5.1 billion barrels of proven and probable reserves. Based on the long remaining life of the asset, Management uses a long term outlook when reviewing triggering events for Syncrude.

Per discussions with Management, Syncrude experienced a planned turnaround during April and May of 2015. In the analysis prepared below by Management, we can see that in the month of April and May production decreased. Per the analysis below, Syncrude returned to profitability for the months of June, July, and August, following this planned turnaround. Management also noted that in September the Syncrude mine was shutdown, which can be seen in the September production volumes which lead to negative earnings for the month. The Syncrude mine was shut down due to operational reasons to assess whether any maintenance activities were required from a safety perspective. The Syncrude mine is currently under repair and should be back to operations as early as Q4 2015. The engagement team notes that this is deemed to be a non-recurring event and as such we concur with Management that the losses incurred in September are one-time earnings events.

| *Syncrude Profitability*[60] | *2014* | | | | | | *2015* | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 14' Avg | Jan | Feb | Mar | Apr* | May* | Jun | Jul | Aug | Sept** |
| *Production* (KBD) | 60 | 48 | 50 | 48 | 23 | 19 | 53 | 56 | 52 | 12 |
| *Realization $/bbl* | 90 | 44 | 47 | 44 | 55 | 62 | 63 | 53 | 42 | 40 |

---

[60] Information in the tables above was prepared by Management as part of the quarterly F&O meetings with PwC, the information above is obtained from the Americas September 2015 F&O (pg. 49).

51



| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Unit Opex $'000 | 62 | 44 | 45 | 41 | 136 | 118 | 38 | 36 | 36 | 173 |
| Unit Earnings $'000 | 20 | (1) | 1 | 3 | (52) | (33) | 17 | 13 | 7 | (83) |
| Cash from Ops $'000 | 795 | 15 | 22 | 26 | (46) | (26) | 63 | 63 | 44 | (37) |

*April and May were planned turnaround months for Syncrude, as such, there was a decreased rate of production and increased opex.

**In September the mine became shut in, as such, there was a decrease in the rate of production and increased opex.

Based on review of the monthly production and earnings analysis prepared above by Management, we would note that Syncrude produced positive unit earnings and cash from operations when performing at normal operational capacity. We would note that for the three months that Syncrude was in turnaround or shut in that these instances are viewed as a one off event and should be normalized. Based on the normalizing of operations management would note that Syncrude is operating at a positive unit earnings as well as cash from operations.

We would note that in accordance with ASC 360, Syncrude does not have a current period loss combined with a history of operating losses, based on review of Management F&Os. We further note that management's assessment is subject to audit procedures by PwC Calgary. Refer to assessment of Year end Inter-Office Reporting at Year End Update Section of this Memo.

### Canada East

As noted above, the first step of Management's analysis was to review the current year-to-date earnings for each country/region. Based on the analysis above at 9/30/2015, we would note that the Canada East asset group is currently operating at negative year-to-date earnings for 2015. In order to gain an understanding of the factors that are leading to the Canada East asset group operating at a negative earnings, Management drilled down on the assets and performed an analysis on each field in the asset group. Refer to the table below for a breakdown analysis, by field, and further evaluation of the fields that are generating negative cash.

| | Hibernia/HSE[61] | Sable* | Terra Nova | Hebron** |
|---|---|---|---|---|
| Revenue | $385 | $36 | $84 | $0 |
| NBV | 1,176 | 397 | 241 | 2,944 |
| YTD Earnings | $185 | $(89) | $23 | $(4) |

*Sable asset is noted as generating negative earnings for the nine-months ended September 30, 2015. Because the NBV is immaterial ($397M), no further analysis was considered necessary on this asset at a functional level. We would note that management's assessment is subject to audit procedures by PwC Calgary. Refer to assessment of Year end Inter-Office Reporting at Year End Update Section of this Memo.

**Hebron asset is noted as generating negative cash for the months ended September 30, 2015. Refer to the following section "Analysis of Hebron" for assessment over determination of a triggering event.

[61] The information in the table above is obtained from the September 2015 Americas F&O review package (pg. 19) and agreed to the respected RUs in the Dataflex system.

52



### Analysis of Hebron

Hebron is an oil field project located offshore Newfoundland and Labrador in the Jeanne d'Arc Basin, it is estimated to recover more than 700 million barrels of oil. The project is estimated to cost around $14 billion once complete, it will be a gravity-based structure used to drill offshore. Oil production is expected to occur around the end of 2017 with daily production around 150 kbd. Hebron will be operated by ExxonMobil affiliate, ExxonMobil Canada Properties, which holds 36% equity in the project. The co-ventures consist of Chevron Canada Limited (26.7%), Suncor Energy Inc. (22.7%), Statoil Canada (9.7%) and Nalcor Energy Oil and Gas (4.9%).

Per discussion with Management, Hebron is currently in the development stage with an estimated completion date in late 2017. We would note that based on review of the monthly F&Os for ExxonMobil Development Company and Americas, that there is still significant capital investments being incurred on the Hebron project which coincides with the understanding that the project is still in development phase of operation. The engagement team also reviewed 3rd party information which also projected first oil to reach production in 2017.

### PwC Conclusion

In conclusion, based on review of the monthly F&Os, quarterly discussions with Management and verification of project status per 3rd party sources, we agree with Management that the Hebron project is still in the development stage of operations. As this project is still in the development stage, Management considers there to be no impairment trigger present. We would note that management's assessment is subject to audit procedures by PwC Calgary. Refer to assessment of Year end Inter-Office Reporting at Year End Update Section of this Memo.

.

53

**App. 793**



## Appendix D – ExxonMobil "Outlook" Comparison

The purpose of the table below is to compare the "Industry Outlook" as provided by ExxonMobil, BP (industry competitor), and International Energy Agency (independent third party).   BP was included as they are one of the major competitors to ExxonMobil with a similar portfolio of assets in their portfolio.

| ExxonMobil | | | | | |
|---|---|---|---|---|---|
| | | Oil Demand | | Natural Gas Demand | |
| Years: | | Total % Increase | Annual % Change | Total % Increase | Annual % Change |
| 2010-2025 | A | 19% | 1.2% | 37% | 2.10% |
| 2025-2040 | | 7% | 0.05% | 19% | 1.20% |
| 2010-2040 | | 28% | 0.08% | 63% | 1.60% |

| International Energy Agency | | | | | |
|---|---|---|---|---|---|
| | | Oil Demand | | Natural Gas Demand | |
| Years: | | Total % Increase | Annual % Change | Total % Increase | Annual % Change |
| 2014-2040 | B | 22% | 0.90% | 50% | 1.9% |

| BP | | | | | |
|---|---|---|---|---|---|
| | | Oil Demand | | Natural Gas Demand | |
| Years: | | Total % Increase | Annual % Change | Total % Increase | Annual % Change |
| 2014-2035 | C | 21% | 0.60% | 55% | 1.90% |

| | |
|---|---|
| A | Per review of the "Outlook for Energy" via the ExxonMobil Intranet, projections of long-term oil demand remain reasonably consistent over the period (between 20%-24% increases).  Natural gas projections remain consistently between 60%-65% over the time span. |
| B | Per review of the "IEA World Energy Outlook", IEA's 2014-2040 projections of increased demand for oil (22%) and natural gas (50%) are reasonably consistent with ExxonMobil's long-term demand projections for oil (24%) and natural gas (65%) for the period 2014-2040. |
| C | Per review of the "BP Energy Outlook", BP's 2014-2035 projections of increased demand for oil (21%) and natural gas (55%) are reasonably consistent with ExxonMobil's long-term demand projections for oil (20%-24% increases) and natural gas (60%-65% increases) for the period 2014-2040. |



**APPENDIX E – Notes on discussion with Corporate Planning**

On November 11, 2015, PwC met with representatives of ExxonMobil Corporate Planning (Bill Coulton), and Corporate Controllers (David Rosenthal, Steve Littleton, Joe Horne) to obtain an understanding of the Corporate Plan Price process. This discussion should be viewed as a walkthrough of the key elements of the current year's process and inquiry. This discussion and inquiry is substantiated through PwC's review of the Corporate Plan Data Guide, design and operating effectiveness testing of various PEFR controls described here and through observation of Management's ongoing monitoring of their business to plan throughout the year, particularly noted as part of their F&O process.

**Establishment and Governance**

- *What are key determinants in how plan price is developed? What benchmarking is performed, if any?*

The plan price used by the Corporation is determined and established by the Corporate Planning Group annually. During this process, the planning group considers a number of factors impacting current and future pricing. The establishment of plan pricing includes considerations of the long term fundamentals of supply and demand, evaluation of market situations in which operations are conducted, as well as benchmarking from 3rd party sources, such as International Energy Agency (IEA), Wood Mackenzie, and CERA. Management noted that their views on supply and demand fundamentals are reflected in the ExxonMobil 2015 Outlook which is published on their Website.

- *How relevant, if at all, is the "point in time" five year forward price curve when plan price is set?*

As noted earlier, the Corporation's projects/investments are typically long term in nature. While the forward curve is a data point they consider in their analysis, they believe other factors are more relevant given their long term strategy and investment decisions. Further, Management noted that at any point in time the forward price is very much dictated by the current spot price. That is, it does not necessarily reflect expectations as to changes in demand and supply over the period of the curve. Management also noted that market futures have minimal volumes traded beyond the 24 months which significantly limits their informational relevance.

- *Is the process the same for all commodities and across all indices (WTI, BRENT, Henry Hub, NBP etc.)?*

The process for establishing the plan price across different commodities and across different indices is substantially the same.

- *Are prior plan assumptions compared to subsequent actuals to assess the efficacy of the plan price assessment process?*

Management considers a number of factors including past and current price considerations to the extent that such data may inform expectations as to long-term fundamentals around energy demand and supply.

- *To what future period does the plan price extend to? After a certain point is the price held constant except for annual inflation adjustment?*

Plan price are provided on a 2015 constant dollar basis (real price) for 2020+. The Corporate Plan Data Guide includes instructions that users are to inflate prices by a factor of 2.5%, where applicable.

55

**App. 795**



- *What have been the considerations as to whether the recent declines in crude prices require a revision to plan price?*

As stated above, the Corporation has a long term view of prices. Management has adjusted near term liquids (Brent) prices to reflect anticipated supply/demand effects in the near term. Within 5 years, however, their plan price for Brent reverts to prior year assumptions. Further, Management has adjusted downwards gas (Henry Hub) prices long-term by approximately 20% or $1 (see further analysis in the main portion of this memo) to reflect their view of overcapacity and oversupply in North America (see PwC assessment of plan price adjustments in memo). Management note, however, that their longer term decisions have not changed, thereby indicating that there has not been a fundamental shift which would raise questions as to the long-term profitability of upstream activities.

- *What is the review / approval process around the establishment of plan price?*

The review process around the plan price is performed at multiple levels, first with Functional Management and Corporate Strategic Planning then with Contact Executives and final approval is performed by the Management Committee.

In line with developing the current year plan price Management also develops a 10 year plan pricing parameters to be used by affiliates depending on the price marker and market conditions.

### Communication and Application*

- *How is the plan price communicated through the Corporation (timing and distribution mode of Corporate Plan Data Guide?*

The Corporate Plan Data Guide is communicated through email to the appropriate Functional contacts as well as posted on SharePoint which can be accessed by all contacts. The timing of distribution of the Data Guide is between April/May, during the start of the Planning and Budgeting process.

- *What guidance is provided as to the application of plan price to various assets and investments? For example, is the communicated plan price used to develop affiliate plans for proved, unproved and in-development properties / interests (whether EMOP or OBO)?*

The plan process is a bottom up process whereby plans are prepared at the Asset Group level and are rolled into broader plans of the Affiliate, Function and, ultimately, into Corporate. The process begins with a communication (email) to regional Presidents and Vice Presidents in April of each year which contains instructions for preparing the plan as well as a copy of the Corporate Plan Data Guide which includes corporate-wide assumptions to be used when preparing the plan (e.g. prices, inflation). Vice Presidents distribute the Plan email and attachments to the various regional Financial and Reporting Managers in their Group (i.e. Americas, Africa, Asia Pacific, Europe/Caspian and Middle East/Russia). The Financial Reporting Managers work with the Planning group assigned to each region as well as asset superintendents, who are responsible for stewarding specific assets (e.g. Mobile Bay, SYU), to develop plans at the asset level which roll up into the affiliate company plan, regional production plan, functional company plan, Upstream segment plan, and ultimately the Exxon Mobil Corporate plan.

56



- *What process/ controls are in place to ensure that plan price is consistently applied across the organization through the planning cycle?*

The Corporation has multiple layers of review that occur to ensure that the plan price is being applied consistently and appropriately. Plan price is reviewed by the Planning group, Treasury groups, as well as Functional Management review, and will be reviewed in the reappraisal process for selected assets. Additionally, the Corporation monitors actuals versus plan during their monthly F&O analysis. Any deviations from plan are explained and discussed during various review meetings.

- *Is the established plan price also used in other activities including acquisitions, divestitures, deferred tax asset recoverability assessments, impairment analysis?*

The plan price is utilized for these assessments. The Data Guide provides guidance on what prices to utilize for the various activities.

*Note, as part of substantiating our inquiries here, PwC has obtained and reviewed the ExxonMobil 2015 Corporate Plan Data Guide which outlines guidance as to plan process, plan timelines, plan prices and other plan inputs including inflation, forex and tax assumptions.

**Plan Outcomes and Monitoring**

- *For assets that are identified as not meeting appropriate performance criteria through the plan process, what is Management's response? What is the process by which the planned response is developed and approved?*

If assets are not meeting appropriate performance criteria then they undergo a re-appraisal process in which Management performs a more detail review of the assets and evaluates the assets at a range of pricing.

As noted above, the Corporate Plan Data Guide provides instruction that opportunities evaluation (investment, divestment, acquisition and venture) should recognize the potential for significant variation in prices over the life of an opportunity. As such, economic evaluation should be assessed over a range from $40 - $120 / bbl, in $20 increments. Similar instruction is provided for assessing gas opportunities – Henry Hub opportunities are to be assessed over five price points: $2.5, $3, $4, $5 and $6.

- *Is there a process of re-assessment/ re-evaluation for assets that, based on plan price, meet performance criteria, but are generating cash flow losses based on realized actual prices?*

Management performs monthly monitoring of assets through the F&O process which provides a detail review of current operations versus planned. Management would monitor assets through this process and identify any assets that need a more thorough review.

**PEFR Functional #5** – *"Reviews are held with Operating Company Presidents"*
- Reviews are held with Operating Company Presidents to discuss:
    - ○  -Financial and operating results as reported in Dataflex
    - ○  -Analytical review of results

**PEFR Affiliate #1** – *"Earnings analysis is prepared"*

57



- Earnings analysis is prepared which compares -
  - Reported earnings and volumes vs. prior month, plan and prior year
  - Reported opex vs. prior month, plan and prior year (Upstream only)
  - Key business metrics - reported vs. plan and prior year (e.g., volumes, cash opex, non-cash opex, capex)

58

**App. 798**



**Appendix F - Client and Audit Considerations associated with Lower Hydrocarbon Prices**

The following guidance was released by the PwC US energy industry for engagement teams to consider during this year's review

**General client and accounting considerations**
*Upstream companies*

- **Oil and Gas Reserves and Acreage:**
    - Since the economic limit that is used to determine oil and gas reserves is based on a trailing 12-month average price, oil and gas reserves reported as of September 30 and December 31, 2015 will be based on a trailing 12-month average price that is substantially lower than the prices used as of December 31, 2014. This will likely result in downward revisions in reserves.
    <span style="color:red">Refer to the "Reserves" section for considerations and conclusion drawn around revisions in reserves.</span>
    - Consider the impact of announced capital expenditure reductions on future drilling and reserve recognition (particularly proved undeveloped reserves); refer to *Petroleum Accounting: Principles, Procedures and Issues (7th Edition), Chapter 16*, for further guidance on reserve considerations.
    <span style="color:red">Refer to the analysis on the ASC condition titled "Accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction" section for considerations and conclusion reached around capital expenditures outlooks.</span>

- **Impairments:** Successful efforts accounting
    - Consider whether the lower oil prices are indicative of a triggering event for impairment. This will likely depend on the attributes of a company's portfolio of assets and will require management to apply judgment. For example, a company with properties that have been organically developed and have a long production profile may conclude that the price decline does not cause the company to change its pricing forecast. Alternatively, a company with proved developed properties that have been purchased within the last two years and have a short production profile may conclude that the recent price decline has caused the company to change its pricing forecast.
    <span style="color:red">Refer to the analysis on the ASC condition titled "A significant decrease in the market price of a long-lived asset (asset group)" section consideration and conclusion reached around the impact of the current pricing environment.</span>
    - Step 1 of the impairment analysis would be based on a company's internal forecasts, so teams should ensure that the forecasts are consistent with assumptions in other areas of the business, such as forecasts used for evaluating dispositions, acquisitions and debt covenants.
    <span style="color:red">For considerations and conclusion reached around Step 1 refer to the "USP Impairment Assessment" memo.</span>
    - Generally, derivatives should not be considered in the impairment analysis
    <span style="color:red">Not applicable as ExxonMobil does not hold any material derivatives.</span>
    - Expected future cash flows – As hydrocarbon prices continue to remain at their current levels or decline, companies should consider the impact on the company's price decks to determine if future hydrocarbon prices used in cash flow projections should be amended.
    <span style="color:red">For considerations and conclusion reached around expected future cash flows refer to the "USP Impairment Assessment" memo.</span>

59



- Consider the impact on cash outflows of the decrease in operating and capital costs being experienced by producers in the current environment, as service companies react to the current price environment.

  For considerations and conclusion reached around cash outflows tied to operating and capital cost refer to the "USP Impairment Assessment" memo as well as the XTO analysis performed to support the XTO interoffice opinion.

- **Liquidity:**
  - Reserve-based revolving credit facilities– Since most of these facilities have bi-annual redetermination dates (i.e., in April and November), consider the implications of reductions in quantities or value of the reserve base, particularly those that are fully drawn or rely on such credit, as they could serve to accelerate the repayment of debt. If the borrowing base is reduced, entities that are fully drawn may have a call on their debt to bring the balance in line with revised limits. To the extent that borrowings under a credit facility are reduced, the impact of such a reduction should be considered in the evaluation of PUDs described above. Refer to ASC 470-10-45 and PwC Audit 5685 to 5686 for further guidance on the treatment and classification of subjective acceleration clauses.

    Refer to the "Reserves" section for considerations around reserves. We would also note that ExxonMobil holds a AAA credit rating in addition to a low debt to equity ratio.

The remainder of the guidance was deemed to be not applicable to this memo and has been separately assessed in the Upstream / Corporate files or is not relevant to ExxonMobil.

60

**App. 800**



## Appendix G – Historical Hydrocarbon Prices

Below are graphical representations of both WTI[62] and Henry Hub[63] prices for the last 25 years.

**Cushing, OK WTI Spot Price FOB**

**Henry Hub Natural Gas Spot Price**

_____

[62] Obtained from the U.S. Energy Information Administration website and shows the WTI spot price from 1986-2015.

[63] Obtained from the U.S. Energy Information Administration website and shows the Henry Hub spot price from 1998-2015.

61

**App. 801**

Excel spreadsheet included on thumb drive provided to the Court.
*See* ECF No. 180 ¶ 11(c)



DOCUMENT PRODUCED IN NATIVE

CONFIDENTIAL TREATMENT REQUESTED

PRAM0000512

**App. 803**

Excel spreadsheet included on thumb drive
provided to the Court.
*See* ECF No. 180 ¶ 11(c)



DOCUMENT PRODUCED IN NATIVE

PRAM0000513

App. 805