# Exhibit 27

Message
_____

| | |
|---|---|
| From: | Rosenthal, David S [/O=EXXONMOBIL/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DAVID.S.ROSENTHAL] |
| Sent: | 10/23/2015 4:16:40 PM |
| To: | Casteel, Beth E [beth.e.casteel@exxonmobil.com] |
| Subject: | RE: PROP:Kearl 2015 SEC Reserves - Oct 26 Chairman's Review Draft Package |

Beth – lets discuss this as soon as you have a chance and before we respond to Andy's note.

David Rosenthal
Vice President and Controller
Exxon Mobil Corporation
Phone: 972-444-1202
Fax: 972-444-1221

_____

**From:** Casteel, Beth E
**Sent:** Thursday, October 22, 2015 7:35 PM
**To:** Rosenthal, David S
**Subject:** FW: PROP:Kearl 2015 SEC Reserves - Oct 26 Chairman's Review Draft Package

Hi David, Attached is the latest draft of the deck for the Kearl discussion. The back-up chart helps to describe the current pricing basis which is modeled after the process used for Cold Lake. Bill's team is thinking through the implications of the growing % of sales into the U.S. for the process going forward. My vote is to keep it simple since there is a liquid market in Edmonton and the SEC price for reserves determination is to exclude any value generated by investments made downstream of the oil & gas operation (e.g. transportation, refining, etc). Thanks, b

**From:** Strawbridge, William N
**Sent:** Thursday, October 22, 2015 4:41 PM
**To:** Hamid, Taher N; Genetti, Dominic; Casteel, Beth E; Madden, Andrew W
**Subject:** PROP:Kearl 2015 SEC Reserves - Oct 26 Chairman's Review Draft Package

All – attached is current draft of Monday's Kearl review package.

Beth – I included a back-up chart that provides more details on Kearl Bitumen SEC pricing process.

Andy – Your folks (those that provide us the Kearl pricing data) have reviewed the pricing charts but welcome any comments you might have

I plan to finalize and send to CEs tomorrow. I'll be bringing hard copies to Monday's review.

Bill Strawbridge
Global Reserves Manager
22777 Springwood Village Parkway
Spring, TX 77389
N1.4A.528
832-624-6966
281-415-6445 (cell)
William.n.strawbridge@exxonmobil.com
MySite

Civil Action No.
3:16-cv-03111-K
**TRIAL EXHIBIT**
**PX 088**

CONFIDENTIAL

EMC_RAMIREZ 000030973



# Exhibit 28

Message

| | |
|---|---|
| **From:** | Strawbridge, William N [/O=EXXONMOBIL/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=WILLIAM.N.STRAWBRIDGE] |
| **Sent:** | 10/25/2015 4:58:29 PM |
| **To:** | Swiger, Andrew P [andrew.p.swiger@exxonmobil.com]; Albers, Mark W Mgmtcom [mark.w.albers@exxonmobil.com]; Williams, Jack P [jack.p.williams@exxonmobil.com]; Madden, Andrew W [andy.w.madden@exxonmobil.com]; Rosenthal, David S [david.s.rosenthal@exxonmobil.com]; Soraci, Ben A [ben.a.soraci@exxonmobil.com]; Walters, Thomas R [thomas.r.walters@exxonmobil.com]; Thompson, Hugh W [hugh.w.thompson@exxonmobil.com] |
| **CC:** | Casteel, Beth E [beth.e.casteel@exxonmobil.com]; Hamid, Taher N [taher.n.hamid@exxonmobil.com]; Genetti, Dominic [dominic.genetti@exxonmobil.com]; Ismail, Nadia K [nadia.k.ismail@exxonmobil.com]; King, Rose M [rose.m.king@exxonmobil.com] |
| **Subject:** | PROP:10/26 Kearl Reserves Update Proforma and Review Package |
| **Attachments:** | Kearl 2015 SEC Reserves Oct 26 Chairman's Review - Final.pptx; 1026 Kearl Reserves Update Proforma APS.doc |

Attached is the Proforma and Review Package for Monday's Kearl SEC Reserves review with the Chairman.

I will be bringing hard copies of the material to the meeting.

Bill Strawbridge
Global Reserves Manager
22777 Springwood Village Parkway
Spring, TX 77389
N1.4A.528
832-624-6966
281-415-6445 (cell)
William.n.strawbridge@exxonmobil.com
MySite





Civil Action No.
3:16-cv-03111-K
**TRIAL EXHIBIT**
**PX 117**

CONFIDENTIAL                                                                          EMC_RAMIREZ 000056281

**CONFIRMATION:** 10/21/15; 10/23/15

## Monday, October 26, 2015

### 1:30 – 2:00 p.m.

### Room 8

---

| REVIEW | ATTENDEES |
|---|---|
| **Kearl Reserves Update** | Rex Tillerson |
| | Andy Swiger |
| | Mark Albers |
| | Jack Williams |
| | Andy Madden |
| | David Rosenthal |
| | Ben Soraci |
| | Bill Strawbridge (Presenter) |
| | Hugh Thompson |
| | Tom Walters |

---

Meeting materials to be distributed at the meeting.

**CONTACT:** Kathi Burner, 972-444-1963, Assistant to Andy Swiger

CONFIDENTIAL

EMC_RAMIREZ 000056282

Document Produced in Native Format

CONFIDENTIAL

EMC_RAMIREZ 000056283



# Kearl Proved Reserves

## 2015 SEC Outlook

October 26, 2015
Energy lives here



PROPRIETARY

# SEC Proved Reserves Reporting Conditions



## SEC Proved Reserves

"Those quantities of oil and gas, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be *economically producible* - from a given date forward, from known reservoirs, and *under existing economic conditions*, operating methods, and government regulations."

## Economically Producible

"A resource which generates revenue that exceeds, or is reasonably expected to exceed, the *costs of the operation*. The value of the products that generate revenue shall be determined at the terminal point of oil and gas producing activities."

## Existing Economic Conditions

"*Product prices*, operating costs, production methods, recovery techniques, transportation and marketing arrangements, ownership and/or entitlement terms and regulatory requirements that are extant on the effective date of the estimate. An anticipated change in conditions must have reasonable certainty of occurrence…"

## Product Prices

"The average price during the 12-month period prior to the ending date of the period covered by the report, determined as an unweighted arithmetic average of the first-day-of-the-month price for each month within such period, unless prices are defined by contractual arrangements, *excluding escalation* based upon future conditions."

## Costs of the Operation

Not defined by the SEC, but excludes depreciation, so assessed to represent *Direct Cash Operating Costs*

**ExxonMobil**



2

# SEC Reserves and Pricing Impact









Note: YTD (Jan – Oct)

**ExxonMobil**

## Background

- SEC reserve adjustments taken to Company Reserves at YE

- SEC pricing adjustments usually related to economic end-of-field life or entitlement changes

- 2004 Cold Lake reclassified ~500 MBO due to low YE bitumen prices ($8/bbl) and high fuel gas price ($7.5/kcf)

## 2015 Outlook

- Overall balanced impact across Upstream

- Positive impact
    + 250 MOEB lower Canadian royalty
    + 75 MOEB PSC entitlement increase

- Negative impact:
    − 210 MOEB XTO EOFL reductions
    − 90 MOEB tax/royalty EOFL reduction

- Properties challenged to demonstrate positive cash flow
    + AB32 Kaombo (36 MOEB) – Total planning to reclassify
    + Kearl – 3.3 GBO

PROPRIETARY

3

# Kearl 2015 SEC Pricing





**Pricing Basis**

- SEC pricing process for Kearl modeled after Cold Lake

- WTI marker price

- Quality/Market differential from 3P Edmonton trades for Kearl Blend

- Diluent cost to convert Kearl Blend to Bitumen

- Transportation costs from Edmonton to Fort McMurray

**2015**

- YTD $30.4/bbl, range $17 - $46

- Oct 1 $23.3/bbl

- AAO $29.2 – WTI futures, Oct differentials held flat

**ExxonMobil**

PROPRIETARY

4

# Kearl CP15 Cash Flow Analysis





### 15CP Unit Lifting Cost
### Cash Opex + Sustaining Capex - CAF

| Unit Lifting Costs ($US/bbl 2015$) | | | | |
|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 |
| Total Costs | 28.5 | 22.3 | 24.6 | 25.5 |
| Sustain Capex | 5.8 | 3.6 | 3.2 | 4.5 |
| Cash Opex | 22.7 | 18.7 | 21.4 | 21.0 |
| O&M | 14.1 | 12.1 | 14.5 | 13.6 |
| Energy/L&I/Taxes | 8.6 | 6.5 | 6.8 | 7.4 |
| Memo: Direct CAF | 1.6 | 1.3 | 1.2 | 1.2 |



**ExxonMobil**

PROPRIETARY

5

## SEC Positive Cash Flow Test

- Proved Reserves = Revenues > Costs
- Costs are direct cash operating costs + sustaining CAPEX, excluding CAF

### 1. 2015 Annual Average

- Annual price and unit costs
- Historical approach
- Outlook - price ~$1/bbl > costs

### 2. 2015 2H – K1/K2 Operating

- Annual price and 2H15 unit costs
- Initial data of long-term ops.
- Outlook - price ~$6/bbl > costs

### 3. 2018 Future Stable K1/K2 Ops

- 2015 price and 2018 unit costs
- Representative of long-term ops.
- Outlook – price ~$4/bbl > costs





Backup





**App. 1125**

# Kearl SEC Bitumen Pricing Process



### Kearl Bitumen SEC Pricing Process
### Oct 2015 Example (US $/BBL)

| WTI Marker | Differentials | | | Bitumen |
|---|---|---|---|---|
| | Market/Quality | Diluent | Transportation | |
| 44.74 | -15.42 | -4.76 | -1.27 | 23.29 |

- Oct 1 Nymex Actual Price

- Third Party Contracts at Edmonton Market
  - Excludes Inter-Company Sales
  - Excludes US Sales

- Volume Weighted Sept Trades for Oct Delivery

- Contracts Define Kearl Blend - WTI Differential

- Consistent with Cold Lake SEC Pricing Process

- Costs to Create Kearl Blend From Bitumen

- Cost to Ship Kearl Blend from Fort McMurry to Edmonton Market

- SEC Oct 1 Price

**ExxonMobil**

PROPRIETARY

7



# Exhibit 29

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

## FORM 8-K

### CURRENT REPORT
Pursuant to Section 13 OR 15(d) of The Securities Exchange Act of 1934

Date of Report (Date of earliest event reported):  October 28, 2016

# Exxon Mobil Corporation
(Exact name of registrant as specified in its charter)

| **New Jersey** | **1-2256** | **13-5409005** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**5959 LAS COLINAS BOULEVARD, IRVING, TEXAS 75039-2298**
(Address of principal executive offices)                    (Zip Code)

Registrant's telephone number, including area code:  **(972) 444-1000**

_____
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Civil Action No.
3:16-cv-03111-K
**TRIAL EXHIBIT**
**PX 125**

EMC_RAM 001649431

Item 2.02      Results of Operations and Financial Condition
Item 7.01      Regulation FD Disclosure


The following information is furnished pursuant to both Item 2.02 and Item 7.01.

The Registrant hereby furnishes the information set forth in its News Release, dated October 28, 2016, announcing third quarter 2016 results, a copy of which is included as Exhibit 99.1, and furnishes the information in the related 3Q16 Investor Relations Data Summary, a copy of which is included as Exhibit 99.2. Material available by hyperlink from the News Release is not deemed to be furnished herewith or included in this filing.

EMC_RAM 001649432

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

EXXON MOBIL CORPORATION

Date:  October 28, 2016

By:  _____ /s/ DAVID S. ROSENTHAL _____

David S. Rosenthal
Vice President and Controller
(Principal Accounting Officer)

EMC_RAM 001649433

INDEX TO EXHIBITS

Exhibit No.          Description

99.1                 Exxon Mobil Corporation News Release, dated October 28, 2016, announcing
                     third quarter 2016 results.

99.2                 3Q16 Investor Relations Data Summary.

EMC_RAM 001649434

# *News Release*



**Exxon Mobil Corporation**
5959 Las Colinas Boulevard
Irving, TX 75039
972 444 1107 Telephone
972 444 1138 Facsimile

FOR IMMEDIATE RELEASE
FRIDAY, OCTOBER 28, 2016

### ExxonMobil Earns $2.7 Billion in Third Quarter of 2016

- Cash generation supported by integrated portfolio
- Continued focus on business fundamentals and strategic investments
- Chemical and Downstream results reflect diverse product portfolio, integrated manufacturing sites

| | Third Quarter | | | Nine Months | | |
|---|---|---|---|---|---|---|
| | **2016** | 2015 | % | **2016** | 2015 | % |
| **Earnings Summary** *(Dollars in millions, except per share data)* | | | | | | |
| Earnings | **2,650** | 4,240 | -38 | **6,160** | 13,370 | -54 |
| Earnings Per Common Share Assuming Dilution | **0.63** | 1.01 | -38 | **1.47** | 3.18 | -54 |
| Capital and Exploration Expenditures | **4,190** | 7,670 | -45 | **14,475** | 23,635 | -39 |

IRVING, Texas – October 28, 2016 – Exxon Mobil Corporation today announced estimated third quarter 2016 earnings of $2.7 billion, or $0.63 per diluted share, compared with $4.2 billion a year earlier. Results reflect lower refining margins and commodity prices.

"ExxonMobil's integrated business continues to deliver solid results," said Rex W. Tillerson, chairman and chief executive officer. "While the operating environment remains challenging, the company continues to focus on capturing efficiencies, advancing strategic investments, and creating long-term shareholder value."

During the quarter, Upstream earnings were $620 million. Volumes for the quarter declined 3 percent to 3.8 million oil-equivalent barrels per day compared with a year ago, due to unplanned downtime, primarily in Nigeria, and field decline partially offset by increased production from recent project start-ups.

Third quarter Chemical earnings of $1.2 billion, comparable with prior year results, reflect higher maintenance costs, partially offset by increased specialty product sales. Downstream earnings declined to $1.2 billion primarily due to weaker refining margins.

During the quarter, capital and exploration expenses were reduced by 45 percent to $4.2 billion.

The corporation distributed $3.1 billion in dividends to shareholders in the third quarter.

EMC_RAM 001649435

**Third Quarter 2016 Highlights**

- Earnings of $2.7 billion decreased $1.6 billion, or 38 percent, from the third quarter of 2015.

- Earnings per share assuming dilution were $0.63.

- Cash flow from operations and asset sales was $6.3 billion, including proceeds associated with asset sales of $1 billion.

- Capital and exploration expenditures were $4.2 billion, down 45 percent from the third quarter of 2015.

- Oil-equivalent production was 3.8 million oil-equivalent barrels per day, with liquids down 5.1 percent and natural gas up 0.8 percent.

- The corporation distributed $3.1 billion in dividends to shareholders.

- Dividends per share of $0.75 increased 2.7 percent compared with the third quarter of 2015.

- ExxonMobil and InterOil Corporation announced an agreed transaction worth more than $2.5 billion, under which ExxonMobil will acquire all of the outstanding shares of InterOil. The acquisition will give ExxonMobil access to InterOil's resource base, which includes interests in six licenses in Papua New Guinea covering about four million acres. The transaction is pending the outcome of a shareholder appeal of the court decision approving the transaction.

- ExxonMobil Kazakhstan Ventures Inc., a 25 percent shareholder in Tengizchevroil LLP, has approved the final investment decision for the Future Growth and Wellhead Pressure Management Project as part of the next expansion phase of the Tengiz oil field.

- In Guyana, the Liza-3 appraisal well was successfully completed in October, confirming a world-class resource discovery in excess of 1 billion oil-equivalent barrels. Also in October, the Owowo-3 exploration well, located offshore Nigeria, confirmed a discovery of 500 million to 1 billion barrels of oil.

- ExxonMobil announced plans to increase production of ultra-low sulfur fuels at the Beaumont, Texas, refinery by approximately 40,000 barrels per day. The new unit will use proprietary technology to remove sulfur while minimizing octane loss, and will ensure gasoline meets the latest environmental standards.

- The company announced plans to expand its specialty elastomers plant in Newport, Wales. The project is expected to be completed in late 2017 and will result in a 25 percent increase in global capacity to manufacture Santoprene thermoplastic vulcanizate, high-performance elastomers used for automotive, industrial and consumer applications.

- ExxonMobil and Saudi Basic Industries Corporation (SABIC) are considering the potential development of a jointly owned petrochemical complex on the U.S. Gulf Coast. The project would include a steam cracker and derivative units, and would be located in Texas or Louisiana near natural gas feedstock. A final investment decision will be made upon completion of necessary studies.

- During the quarter, the company announced new developments in its relationships with the Georgia Institute of Technology, Princeton University and the University of Texas at Austin to pursue technologies to help meet growing energy demand while reducing environmental impacts and the risk of climate change.

EMC_RAM 001649436

**Third Quarter 2016 vs. Third Quarter 2015**

Upstream earnings were $620 million in the third quarter of 2016, down $738 million from the third quarter of 2015. Lower liquids and gas realizations decreased earnings by $880 million, while volume and mix effects increased earnings by $80 million. All other items, including lower expenses partly offset by unfavorable foreign exchange effects, increased earnings by $60 million.

On an oil-equivalent basis, production was down compared with the third quarter of 2015. Liquids production totaled 2.2 million barrels per day, down 120,000 barrels per day. Higher downtime, mainly in Nigeria, and field decline were partly offset by project start-ups. Natural gas production was 9.6 billion cubic feet per day, up 77 million cubic feet per day from 2015 as project start-ups more than offset field decline and divestment impacts.

U.S. Upstream earnings declined $35 million from the third quarter of 2015 to a loss of $477 million in the third quarter of 2016. Non-U.S. Upstream earnings were $1.1 billion, down $703 million from the prior year.

Downstream earnings were $1.2 billion, down $804 million from the third quarter of 2015. Weaker margins, mainly in refining, decreased earnings by $1.6 billion while favorable volume and mix effects increased earnings by $170 million. All other items increased earnings by $580 million, including lower maintenance expenses and gains from divestments in Canada. Petroleum product sales of 5.6 million barrels per day were 203,000 barrels per day lower than the prior year mainly due to divestment of the Torrance, California, and Chalmette, Louisiana, refineries.

Earnings from the U.S. Downstream were $225 million, down $262 million from the third quarter of 2015. Non-U.S. Downstream earnings of $1 billion were $542 million lower than prior year.

Chemical earnings of $1.2 billion were $56 million lower than the third quarter of 2015. Margins decreased earnings by $10 million. Volume and mix effects increased earnings by $20 million. All other items decreased earnings by $70 million due primarily to higher maintenance expenses. Third quarter prime product sales of 6.1 million metric tons were 51,000 metric tons higher than the prior year's third quarter.

U.S. Chemical earnings of $434 million were $92 million lower than the third quarter of 2015. Non-U.S. Chemical earnings of $737 million were $36 million higher than prior year.

Corporate and financing expenses were $370 million for the third quarter of 2016, compared to $378 million in the third quarter of 2015.

**First Nine Months 2016 Highlights**

• Earnings of $6.2 billion decreased 54 percent from $13.4 billion in 2015.

• Earnings per share assuming dilution were $1.47.

• Cash flow from operations and asset sales was $16.9 billion, including proceeds associated with asset sales of $2.2 billion.

• Capital and exploration expenditures were $14.5 billion, down 39 percent from 2015.

- 7 -

EMC_RAM 001649437

- Oil-equivalent production was essentially unchanged at 4 million oil-equivalent barrels per day, with liquids up 2.6 percent and natural gas down 4.4 percent.

- The corporation distributed $9.3 billion in dividends to shareholders.

**First Nine Months 2016 vs. First Nine Months 2015**

Upstream earnings were $838 million, down $5.4 billion from the first nine months of 2015. Lower realizations decreased earnings by $5.8 billion. Favorable volume and mix effects increased earnings by $130 million. All other items increased earnings by $260 million, primarily due to lower expenses partly offset by the absence of asset management gains.

On an oil-equivalent basis, production of 4 million barrels per day was essentially flat compared to the same period in 2015. Liquids production of 2.4 million barrels per day increased 59,000 barrels per day, with project start-ups partly offset by field decline, the Canadian wildfires, and downtime mainly in Nigeria. Natural gas production of 10 billion cubic feet per day decreased 458 million cubic feet per day from 2015 as regulatory restrictions in the Netherlands, field decline and divestment impacts were partly offset by project start-ups.

U.S. Upstream earnings declined $1.3 billion from 2015 to a loss of $1.8 billion in 2016. Earnings outside the U.S. were $2.7 billion, down $4.1 billion from the prior year.

Downstream earnings of $3 billion decreased $2.2 billion from 2015. Weaker refining margins decreased earnings by $3.3 billion, while volume and mix effects increased earnings by $330 million. All other items increased earnings by $680 million, mainly reflecting lower maintenance expense and gains from divestments. Petroleum product sales of 5.5 million barrels per day were 306,000 barrels per day lower than 2015 mainly due to divestment of the Torrance and Chalmette refineries.

U.S. Downstream earnings were $824 million, a decrease of $642 million from 2015. Non-U.S. Downstream earnings were $2.1 billion, down $1.6 billion from the prior year.

Chemical earnings of $3.7 billion increased $288 million from 2015. Stronger margins increased earnings by $440 million. Favorable volume and mix effects increased earnings by $130 million. All other items decreased earnings by $280 million, including the absence of asset management gains in the U.S. partly offset by lower expenses. Prime product sales of 18.6 million metric tons were up 387,000 metric tons from 2015.

U.S. Chemical earnings were $1.5 billion, down $342 million from the first nine months of 2015 reflecting the absence of asset management gains. Non-U.S. Chemical earnings of $2.2 billion were $630 million higher than prior year.

Corporate and financing expenses were $1.4 billion in 2016, compared to $1.5 billion in 2015.

During the first nine months of 2016, Exxon Mobil Corporation purchased 9 million shares of its common stock for the treasury at a gross cost of $727 million. These shares were acquired to offset dilution in conjunction with the company's benefit plans and programs. The corporation will continue to acquire shares to offset dilution in conjunction with its benefit plans and programs, but does not currently plan on making purchases to reduce shares outstanding.

EMC_RAM 001649438

**Forward-looking Statements**

As disclosed in ExxonMobil's 2015 Form 10-K, low crude oil and natural gas prices can impact the corporation's reserves as reported under Securities and Exchange Commission (SEC) rules. Average year-to-date crude prices have been significantly affected by the very low prices experienced during the first quarter of 2016, but have recovered considerably since that time.  If the average prices seen during the first nine months of 2016 persist for the remainder of the year, under the SEC definition of proved reserves, certain quantities of oil, such as those associated with the Kearl oil sands operations in Canada, will not qualify as proved reserves at year-end 2016. In addition, if these average prices persist, the projected end-of-field-life for estimating reserves will accelerate for certain liquids and natural gas operations in North America, resulting in a reduction of proved reserves at year-end 2016. Quantities that could be required to be de-booked as proved reserves on an SEC basis amount to approximately 3.6 billion barrels of bitumen at Kearl, and about 1 billion oil-equivalent barrels in other North America operations. Among the factors that would result in these reserves being re-booked as proved reserves at some point in the future are a recovery in average price levels, a further decline in costs, and / or operating efficiencies. Under the terms of certain contractual arrangements or government royalty regimes, lower prices can also increase proved reserves attributable to ExxonMobil. We do not expect the de-booking of reported proved reserves under SEC definitions to affect the operation of the underlying projects or to alter our outlook for future production volumes.

In light of continued weakness in the upstream industry environment during 2016, and as part of its annual planning and budgeting process which is currently in progress, the corporation will perform an assessment of its major long-lived assets, similar to the exercise undertaken in late 2015, including North America natural gas assets and certain other assets across the remainder of its operations. The assessment will reflect crude and natural gas price outlooks consistent with those that management uses to evaluate investment opportunities and generally consistent with the long-term price forecasts published by third-party industry and government experts. Development of future undiscounted cash flow estimates requires significant management judgment, particularly in cases where an asset's life is expected to extend decades into the future. An asset group would be impaired if its estimated undiscounted cash flows were less than the asset's carrying value, and impairment would be measured by the amount by which the carrying value exceeds fair value. The corporation will complete its asset recoverability assessment and analyze the conclusions of that assessment in connection with the preparation and review of the corporation's year-end financial statements for inclusion in its 2016 Form 10-K. Until these activities are complete, it is not practicable to reasonably estimate the existence or range of potential future impairments related to the corporation's long-lived assets.

EMC_RAM 001649439

**ExxonMobil will discuss financial and operating results and other matters during a webcast at 8:30 a.m. Central Time on October 28, 2016. To listen to the event or access an archived replay, please visit www.exxonmobil.com.**

Cautionary Statement

Statements relating to future plans, projections, events or conditions are forward-looking statements. Actual financial and operating results, including project plans, costs, timing, and capacities; capital and exploration expenditures; asset carrying values; reported reserves; resource recoveries; and share purchase levels, could differ materially due to factors including: changes in oil or gas prices or other market or economic conditions affecting the oil and gas industry, including the scope and duration of economic recessions; the outcome of exploration and development efforts; changes in law or government regulation, including tax and environmental requirements; the impact of fiscal and commercial terms; changes in technical or operating conditions; and other factors discussed under the heading "Factors Affecting Future Results" in the "Investors" section of our website and in Item 1A of ExxonMobil's 2015 Form 10-K. Closing of pending acquisitions is also subject to satisfaction of the conditions precedent provided in the applicable agreement. We assume no duty to update these statements as of any future date.

Frequently Used Terms

This press release includes cash flow from operations and asset sales, which is a non-GAAP financial measure. Because of the regular nature of our asset management and divestment program, we believe it is useful for investors to consider proceeds associated with the sales of subsidiaries, property, plant and equipment, and sales and returns of investments together with cash provided by operating activities when evaluating cash available for investment in the business and financing activities. A reconciliation to net cash provided by operating activities is shown in Attachment II. References to quantities of oil or natural gas may include amounts that we believe will ultimately be produced, but that are not yet classified as "proved reserves" under SEC definitions. Further information on ExxonMobil's frequently used financial and operating measures and other terms including "prime product sales" is contained under the heading "Frequently Used Terms" available through the "Investors" section of our website at exxonmobil.com.

Reference to Earnings

References to corporate earnings mean net income attributable to ExxonMobil (U.S. GAAP) from the consolidated income statement. Unless otherwise indicated, references to earnings, Upstream, Downstream, Chemical and Corporate and Financing segment earnings, and earnings per share are ExxonMobil's share after excluding amounts attributable to noncontrolling interests.

The term "project" as used in this release can refer to a variety of different activities and does not necessarily have the same meaning as in any government payment transparency reports. Santoprene is a registered trademark of Exxon Mobil Corporation.

Exxon Mobil Corporation has numerous affiliates, many with names that include ExxonMobil, Exxon, Mobil, Esso, and XTO. For convenience and simplicity, those terms and terms such as Corporation, company, our, we, and its are sometimes used as abbreviated references to specific affiliates or affiliate groups. Similarly, ExxonMobil has business relationships with thousands of customers, suppliers, governments, and others. For convenience and simplicity, words such as venture, joint venture, partnership, co-venturer, and partner are used to indicate business and other relationships involving common activities and interests, and those words may not indicate precise legal relationships.

EMC_RAM 001649440

*Estimated Key Financial and Operating Data*

## Exxon Mobil Corporation
### Third Quarter 2016
(millions of dollars, unless noted)

| | Third Quarter | | Nine Months | |
|---|---|---|---|---|
| | 2016 | 2015 | 2016 | 2015 |
| **Earnings / Earnings Per Share** | | | | |
| Total revenues and other income | **58,677** | 67,344 | **165,078** | 209,075 |
| Total costs and other deductions | **55,451** | 61,595 | **157,726** | 189,737 |
| Income before income taxes | **3,226** | 5,749 | **7,352** | 19,338 |
| Income taxes | **337** | 1,365 | **1,001** | 5,617 |
| Net income including noncontrolling interests | **2,889** | 4,384 | **6,351** | 13,721 |
| Net income attributable to noncontrolling interests | **239** | 144 | **191** | 351 |
| Net income attributable to ExxonMobil (U.S. GAAP) | **2,650** | 4,240 | **6,160** | 13,370 |
| Earnings per common share (dollars) | **0.63** | 1.01 | **1.47** | 3.18 |
| Earnings per common share | | | | |
| - assuming dilution (dollars) | **0.63** | 1.01 | **1.47** | 3.18 |
| **Other Financial Data** | | | | |
| Dividends on common stock | | | | |
| Total | **3,133** | 3,060 | **9,320** | 9,036 |
| Per common share (dollars) | **0.75** | 0.73 | **2.23** | 2.15 |
| Millions of common shares outstanding | | | | |
| At September 30 | | | **4,147** | 4,163 |
| Average - assuming dilution | **4,178** | 4,190 | **4,178** | 4,201 |
| ExxonMobil share of equity at September 30 | | | **170,597** | 170,723 |
| ExxonMobil share of capital employed at September 30 | | | **218,993** | 207,303 |
| Income taxes | **337** | 1,365 | **1,001** | 5,617 |
| Sales-based taxes | **5,437** | 5,813 | **15,687** | 17,308 |
| All other taxes | **7,054** | 7,585 | **21,076** | 22,454 |
| Total taxes | **12,828** | 14,763 | **37,764** | 45,379 |
| ExxonMobil share of income taxes of | | | | |
| equity companies | **391** | 686 | **1,256** | 2,402 |

- 11 -

EMC_RAM 001649441

**Exxon Mobil Corporation**
**Third Quarter 2016**
(millions of dollars)

| | Third Quarter | | Nine Months | |
|---|---|---|---|---|
| | 2016 | 2015 | 2016 | 2015 |
| **Earnings (U.S. GAAP)** | | | | |
| Upstream | | | | |
| United States | (477) | (442) | (1,823) | (541) |
| Non-U.S. | 1,097 | 1,800 | 2,661 | 6,785 |
| Downstream | | | | |
| United States | 225 | 487 | 824 | 1,466 |
| Non-U.S. | 1,004 | 1,546 | 2,136 | 3,740 |
| Chemical | | | | |
| United States | 434 | 526 | 1,524 | 1,866 |
| Non-U.S. | 737 | 701 | 2,219 | 1,589 |
| Corporate and financing | (370) | (378) | (1,381) | (1,535) |
| Net income attributable to ExxonMobil | 2,650 | 4,240 | 6,160 | 13,370 |

**Cash flow from operations and asset sales** (billions of dollars)

| | Third Quarter | | Nine Months | |
|---|---|---|---|---|
| | 2016 | 2015 | 2016 | 2015 |
| Net cash provided by operating activities (U.S. GAAP) | 5.3 | 9.2 | 14.7 | 26.0 |
| Proceeds associated with asset sales | 1.0 | 0.5 | 2.2 | 1.6 |
| Cash flow from operations and asset sales | 6.3 | 9.7 | 16.9 | 27.6 |

- 12 -

EMC_RAM 001649442

**Exxon Mobil Corporation**
**Third Quarter 2016**

|  | Third Quarter | | Nine Months | |
| --- | --- | --- | --- | --- |
|  | 2016 | 2015 | 2016 | 2015 |
| Net production of crude oil, natural gas liquids, bitumen and synthetic oil, thousand barrels per day (kbd) | | | | |
| United States | 484 | 468 | 493 | 470 |
| Canada / South America | 437 | 425 | 424 | 386 |
| Europe | 189 | 197 | 203 | 198 |
| Africa | 388 | 531 | 482 | 524 |
| Asia | 651 | 651 | 700 | 671 |
| Australia / Oceania | 62 | 59 | 57 | 51 |
| Worldwide | 2,211 | 2,331 | 2,359 | 2,300 |
| Natural gas production available for sale, million cubic feet per day (mcfd) | | | | |
| United States | 3,058 | 3,094 | 3,105 | 3,155 |
| Canada / South America | 220 | 229 | 244 | 267 |
| Europe | 1,650 | 1,495 | 2,057 | 2,213 |
| Africa | 13 | 7 | 7 | 6 |
| Asia | 3,662 | 3,910 | 3,758 | 4,151 |
| Australia / Oceania | 998 | 789 | 856 | 693 |
| Worldwide | 9,601 | 9,524 | 10,027 | 10,485 |
| Oil-equivalent production (koebd)[1] | 3,811 | 3,918 | 4,030 | 4,047 |

[1] Gas converted to oil-equivalent at 6 million cubic feet = 1 thousand barrels.

- 13 -

EMC_RAM 001649443

### Exxon Mobil Corporation
### Third Quarter 2016

|  | Third Quarter | | Nine Months | |
| --- | --- | --- | --- | --- |
|  | 2016 | 2015 | 2016 | 2015 |
| Refinery throughput (kbd) |  |  |  |  |
| United States | 1,604 | 1,681 | 1,587 | 1,730 |
| Canada | 406 | 391 | 350 | 385 |
| Europe | 1,476 | 1,504 | 1,403 | 1,501 |
| Asia Pacific | 677 | 687 | 708 | 636 |
| Other | 202 | 194 | 187 | 192 |
| Worldwide | 4,365 | 4,457 | 4,235 | 4,444 |
| Petroleum product sales (kbd) |  |  |  |  |
| United States | 2,327 | 2,509 | 2,258 | 2,556 |
| Canada | 511 | 501 | 489 | 493 |
| Europe | 1,553 | 1,549 | 1,514 | 1,547 |
| Asia Pacific | 721 | 781 | 749 | 741 |
| Other | 473 | 448 | 463 | 442 |
| Worldwide | 5,585 | 5,788 | 5,473 | 5,779 |
| Gasolines, naphthas | 2,298 | 2,382 | 2,258 | 2,374 |
| Heating oils, kerosene, diesel | 1,810 | 1,908 | 1,754 | 1,925 |
| Aviation fuels | 421 | 433 | 403 | 416 |
| Heavy fuels | 358 | 372 | 370 | 380 |
| Specialty products | 698 | 693 | 688 | 684 |
| Worldwide | 5,585 | 5,788 | 5,473 | 5,779 |
| Chemical prime product sales, thousand metric tons (kt) |  |  |  |  |
| United States | 2,320 | 2,377 | 7,167 | 7,099 |
| Non-U.S. | 3,813 | 3,705 | 11,449 | 11,130 |
| Worldwide | 6,133 | 6,082 | 18,616 | 18,229 |

- 14 -

EMC_RAM 001649444

Attachment V

**Exxon Mobil Corporation**
**Third Quarter 2016**
(millions of dollars)

| | Third Quarter | | Nine Months | |
|---|---|---|---|---|
| | 2016 | 2015 | 2016 | 2015 |
| **Capital and Exploration Expenditures** | | | | |
| Upstream | | | | |
| United States | 712 | 1,992 | 2,701 | 6,207 |
| Non-U.S. | 2,360 | 4,382 | 8,269 | 13,330 |
| Total | 3,072 | 6,374 | 10,970 | 19,537 |
| Downstream | | | | |
| United States | 192 | 242 | 608 | 803 |
| Non-U.S. | 397 | 344 | 1,151 | 1,031 |
| Total | 589 | 586 | 1,759 | 1,834 |
| Chemical | | | | |
| United States | 359 | 452 | 1,148 | 1,452 |
| Non-U.S. | 144 | 217 | 529 | 699 |
| Total | 503 | 669 | 1,677 | 2,151 |
| Other | 26 | 41 | 69 | 113 |
| Worldwide | 4,190 | 7,670 | 14,475 | 23,635 |
| Exploration expenses charged to income included above | | | | |
| Consolidated affiliates | | | | |
| United States | 35 | 45 | 178 | 122 |
| Non-U.S. | 291 | 278 | 946 | 881 |
| Equity companies - ExxonMobil share | | | | |
| United States | - | - | - | 3 |
| Non-U.S. | 6 | 2 | 1 | 33 |
| Worldwide | 332 | 325 | 1,125 | 1,039 |

- 15 -

EMC_RAM 001649445

Attachment VI

## Exxon Mobil Corporation
### Earnings

| | $ Millions | $ Per Common Share[1] |
|---|---|---|
| **2012** | | |
| First Quarter | 9,450 | 2.00 |
| Second Quarter | 15,910 | 3.41 |
| Third Quarter | 9,570 | 2.09 |
| Fourth Quarter | 9,950 | 2.20 |
| Year | 44,880 | 9.70 |
| **2013** | | |
| First Quarter | 9,500 | 2.12 |
| Second Quarter | 6,860 | 1.55 |
| Third Quarter | 7,870 | 1.79 |
| Fourth Quarter | 8,350 | 1.91 |
| Year | 32,580 | 7.37 |
| **2014** | | |
| First Quarter | 9,100 | 2.10 |
| Second Quarter | 8,780 | 2.05 |
| Third Quarter | 8,070 | 1.89 |
| Fourth Quarter | 6,570 | 1.56 |
| Year | 32,520 | 7.60 |
| **2015** | | |
| First Quarter | 4,940 | 1.17 |
| Second Quarter | 4,190 | 1.00 |
| Third Quarter | 4,240 | 1.01 |
| Fourth Quarter | 2,780 | 0.67 |
| Year | 16,150 | 3.85 |
| **2016** | | |
| First Quarter | 1,810 | 0.43 |
| Second Quarter | 1,700 | 0.41 |
| Third Quarter | 2,650 | 0.63 |

[1] Computed using the average number of shares outstanding during each period.

- 16 -

EMC_RAM 001649446

**EXXON MOBIL CORPORATION**

<u>3Q16 INVESTOR RELATIONS DATA SUMMARY (PAGE 1 of 4)</u>

| Earnings, $M | 3Q16 | 2Q16 | 1Q16 | 4Q15 | 3Q15 |
|---|---|---|---|---|---|
| **Upstream** | | | | | |
| United States | (477) | (514) | (832) | (538) | (442) |
| Non-U.S. | 1,097 | 808 | 756 | 1,395 | 1,800 |
| Total | 620 | 294 | (76) | 857 | 1,358 |
| **Downstream** | | | | | |
| United States | 225 | 412 | 187 | 435 | 487 |
| Non-U.S. | 1,004 | 413 | 719 | 916 | 1,546 |
| Total | 1,229 | 825 | 906 | 1,351 | 2,033 |
| **Chemical** | | | | | |
| United States | 434 | 509 | 581 | 520 | 526 |
| Non-U.S. | 737 | 708 | 774 | 443 | 701 |
| Total | 1,171 | 1,217 | 1,355 | 963 | 1,227 |
| | | | | | |
| Corporate and financing | (370) | (636) | (375) | (391) | (378) |
| Net income attributable to ExxonMobil (U.S. GAAP) | 2,650 | 1,700 | 1,810 | 2,780 | 4,240 |
| Earnings per common share (U.S. GAAP) | 0.63 | 0.41 | 0.43 | 0.67 | 1.01 |
| Earnings per common share - assuming dilution (U.S. GAAP) | 0.63 | 0.41 | 0.43 | 0.67 | 1.01 |
| | | | | | |
| **Capital and Exploration Expenditures, $M** | | | | | |
| **Upstream** | | | | | |
| United States | 712 | 914 | 1,075 | 1,615 | 1,992 |
| Non-U.S. | 2,360 | 3,005 | 2,904 | 4,255 | 4,382 |
| Total | 3,072 | 3,919 | 3,979 | 5,870 | 6,374 |
| **Downstream** | | | | | |
| United States | 192 | 227 | 189 | 236 | 242 |
| Non-U.S. | 397 | 415 | 339 | 543 | 344 |
| Total | 589 | 642 | 528 | 779 | 586 |
| **Chemical** | | | | | |
| United States | 359 | 355 | 434 | 493 | 452 |
| Non-U.S. | 144 | 208 | 177 | 199 | 217 |
| Total | 503 | 563 | 611 | 692 | 669 |
| Other | 26 | 34 | 9 | 75 | 41 |
| | | | | | |
| **Total Capital and Exploration Expenditures** | 4,190 | 5,158 | 5,127 | 7,416 | 7,670 |

| Exploration Expense Charged to Income, $M | | 3Q16 | 2Q16 | 1Q16 | 4Q15 | 3Q15 |
|---|---|---|---|---|---|---|
| Consolidated | - United States | 35 | 35 | 108 | 60 | 45 |
| | - Non-U.S. | 291 | 409 | 246 | 459 | 278 |
| Non-consolidated - ExxonMobil share | - United States | - | - | - | 9 | - |
| | - Non-U.S. | 6 | 5 | (10) | 3 | 2 |
| **Exploration Expenses Charged to Income Included Above** | | 332 | 449 | 344 | 531 | 325 |

| | 3Q16 | 2Q16 | 1Q16 | 4Q15 | 3Q15 |
|---|---|---|---|---|---|
| **Effective Income Tax Rate, %** | 20% | 40% | 19% | 13% | 32% |
| | | | | | |
| **Common Shares Outstanding, millions** | | | | | |
| At quarter end | 4,147 | 4,147 | 4,147 | 4,156 | 4,163 |
| Average - assuming dilution | 4,178 | 4,178 | 4,178 | 4,183 | 4,190 |
| | | | | | |
| **Total Cash and Cash Equivalents, $B** | 5.1 | 4.4 | 4.8 | 3.7 | 4.3 |
| | | | | | |
| **Total Debt, $B** | 46.2 | 44.5 | 43.1 | 38.7 | 34.3 |
| | | | | | |
| **Cash Flow from Operations and Asset Sales, $B** | | | | | |
| Net cash provided by operating activities | 5.3 | 4.6 | 4.8 | 4.3 | 9.2 |
| Proceeds associated with asset sales | 1.0 | 1.0 | 0.2 | 0.8 | 0.5 |
| Cash flow from operations and asset sales | 6.3 | 5.6 | 5.0 | 5.1 | 9.7 |

- 17 -

EMC_RAM 001649447

EXXON MOBIL CORPORATION

### 3Q16 INVESTOR RELATIONS DATA SUMMARY (PAGE 2 of 4)

| | 3Q16 | 2Q16 | 1Q16 | 4Q15 | 3Q15 |
|---|---|---|---|---|---|
| **Net production of crude oil, natural gas liquids, bitumen and synthetic oil, kbd** | | | | | |
| United States | 484 | 495 | 500 | 494 | 468 |
| Canada / South America | 437 | 359 | 476 | 452 | 425 |
| Europe | 189 | 201 | 218 | 222 | 197 |
| Africa | 388 | 494 | 565 | 543 | 531 |
| Asia | 651 | 724 | 726 | 722 | 651 |
| Australia / Oceania | 62 | 57 | 53 | 48 | 59 |
| Total liquids production | 2,211 | 2,330 | 2,538 | 2,481 | 2,331 |
| | | | | | |
| **Natural gas production available for sale, mcfd** | | | | | |
| United States | 3,058 | 3,097 | 3,160 | 3,123 | 3,094 |
| Canada / South America | 220 | 257 | 258 | 241 | 229 |
| Europe | 1,650 | 1,749 | 2,775 | 2,504 | 1,495 |
| Africa | 13 | 7 | 2 | 4 | 7 |
| Asia | 3,662 | 3,819 | 3,794 | 4,103 | 3,910 |
| Australia / Oceania | 998 | 833 | 735 | 628 | 789 |
| Total natural gas production available for sale | 9,601 | 9,762 | 10,724 | 10,603 | 9,524 |
| | | | | | |
| **Total worldwide liquids and gas production, koebd** | 3,811 | 3,957 | 4,325 | 4,248 | 3,918 |
| | | | | | |
| **Refinery throughput, kbd** | | | | | |
| United States | 1,604 | 1,555 | 1,602 | 1,649 | 1,681 |
| Canada | 406 | 246 | 398 | 390 | 391 |
| Europe | 1,476 | 1,462 | 1,269 | 1,483 | 1,504 |
| Asia Pacific | 677 | 718 | 729 | 679 | 687 |
| Other Non-U.S. | 202 | 171 | 187 | 194 | 194 |
| Total refinery throughput | 4,365 | 4,152 | 4,185 | 4,395 | 4,457 |
| | | | | | |
| **Petroleum product sales, kbd** | | | | | |
| United States | 2,327 | 2,228 | 2,218 | 2,416 | 2,509 |
| Canada | 511 | 479 | 476 | 472 | 501 |
| Europe | 1,553 | 1,561 | 1,429 | 1,530 | 1,549 |
| Asia Pacific | 721 | 760 | 766 | 758 | 781 |
| Other Non-U.S. | 473 | 472 | 445 | 503 | 448 |
| Total petroleum product sales | 5,585 | 5,500 | 5,334 | 5,679 | 5,788 |
| | | | | | |
| Gasolines, naphthas | 2,298 | 2,266 | 2,211 | 2,330 | 2,382 |
| Heating oils, kerosene, diesel | 1,810 | 1,752 | 1,699 | 1,921 | 1,908 |
| Aviation fuels | 421 | 386 | 402 | 403 | 433 |
| Heavy fuels | 358 | 367 | 386 | 368 | 372 |
| Specialty products | 698 | 729 | 636 | 657 | 693 |
| Total petroleum product sales | 5,585 | 5,500 | 5,334 | 5,679 | 5,788 |
| | | | | | |
| **Chemical prime product sales, kt** | | | | | |
| United States | 2,320 | 2,447 | 2,400 | 2,565 | 2,377 |
| Non-U.S. | 3,813 | 3,863 | 3,773 | 3,919 | 3,705 |
| Total chemical prime product sales | 6,133 | 6,310 | 6,173 | 6,484 | 6,082 |

- 18 -

EMC_RAM 001649448

EXXON MOBIL CORPORATION

## 3Q16 INVESTOR RELATIONS DATA SUMMARY (PAGE 3 of 4)

| Earnings Factor Analysis, $M | 3Q16 vs. 3Q15 | 3Q16 vs. 2Q16 |
|---|---|---|
| **Upstream** | | |
| Prior Period | 1,358 | 294 |
| Realization | -880 | 240 |
| Volume / Mix | 80 | -40 |
| Other | 60 | 120 |
| Current Period | 620 | 620 |
| **Downstream** | | |
| Prior Period | 2,033 | 825 |
| Margin | -1,550 | -330 |
| Volume / Mix | 170 | 240 |
| Other | 580 | 490 |
| Current Period | 1,229 | 1,229 |
| **Chemical** | | |
| Prior Period | 1,227 | 1,217 |
| Margin | -10 | 40 |
| Volume / Mix | 20 | -40 |
| Other | -70 | -50 |
| Current Period | 1,171 | 1,171 |

| Upstream Volume Factor Analysis, koebd | | |
|---|---|---|
| Prior Period | 3,918 | 3,957 |
| Entitlements - Net Interest | 12 | -1 |
| Entitlements - Price / Spend / Other | -41 | -67 |
| Quotas | - | - |
| Divestments | -32 | - |
| Growth / Other | -46 | -78 |
| Current Period | 3,811 | 3,811 |

| Sources and Uses of Funds, $B | 3Q16 |
|---|---|
| Beginning Cash | 4.4 |
| Earnings | 2.7 |
| Depreciation | 4.6 |
| Working Capital / Other | -2.0 |
| Proceeds Associated with Asset Sales | 1.0 |
| PP&E Adds / Investments and Advances [1] | -4.2 |
| Shareholder Distributions | -3.1 |
| Debt / Other Financing | 1.7 |
| Ending Cash | 5.1 |

[1] PP&E Adds / Investments and Advances includes PP&E adds of ($3.4B) and net advances of ($0.8B).

- 19 -

EMC_RAM 001649449

EXXON MOBIL CORPORATION

### 3Q16 INVESTOR RELATIONS DATA SUMMARY (PAGE 4 of 4)

| Average Realization Data | 3Q16 | 2Q16 | 1Q16 | 4Q15 | 3Q15 |
|---|---|---|---|---|---|
| **United States** | | | | | |
| ExxonMobil | | | | | |
| Crude ($/b) | 38.76 | 37.97 | 27.11 | 34.36 | 41.95 |
| Natural Gas ($/kcf) | 2.65 | 1.74 | 1.60 | 1.80 | 2.40 |
| | | | | | |
| Benchmarks | | | | | |
| WTI ($/b) | 44.88 | 45.48 | 33.27 | 42.10 | 46.37 |
| ANS-WC ($/b) | 44.65 | 45.71 | 33.76 | 43.67 | 51.44 |
| Henry Hub ($/mbtu) | 2.81 | 1.95 | 2.09 | 2.27 | 2.77 |
| | | | | | |
| **Non-U.S.** | | | | | |
| ExxonMobil | | | | | |
| Crude ($/b) | 40.96 | 41.46 | 28.67 | 36.99 | 44.91 |
| Natural Gas ($/kcf) | 4.47 | 4.06 | 4.80 | 5.80 | 6.29 |
| European NG ($/kcf) | 4.48 | 4.35 | 5.05 | 6.11 | 6.67 |
| | | | | | |
| Benchmarks | | | | | |
| Brent ($/b) | 45.85 | 45.57 | 33.89 | 43.69 | 50.26 |

The above numbers reflect ExxonMobil's current estimate of volumes and realizations given data available as of the end of the third quarter of 2016. Volumes and realizations may be adjusted when full statements on joint venture operations are received from outside operators. ExxonMobil management assumes no duty to update these estimates.

EMC_RAM 001649450

# Exhibit 30

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 8-K

### CURRENT REPORT
Pursuant to Section 13 OR 15(d) of The Securities Exchange Act of 1934

Date of Report (Date of earliest event reported):  January 31, 2017

# Exxon Mobil Corporation
(Exact name of registrant as specified in its charter)

| New Jersey | 1-2256 | 13-5409005 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**5959 LAS COLINAS BOULEVARD, IRVING, TEXAS 75039-2298**
(Address of principal executive offices) (Zip Code)

Registrant's telephone number, including area code: **(972) 444-1000**

(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Civil Action No.
3:16-cv-03111-K
**TRIAL EXHIBIT**
**PX 227**


EXHIBIT
Exhibit 28

Item 2.02          Results of Operations and Financial Condition
Item 7.01          Regulation FD Disclosure


The following information is furnished pursuant to both Item 2.02 and Item 7.01.

The Registrant hereby furnishes the information set forth in its News Release, dated January 31, 2017, announcing fourth quarter 2016 results, a copy of which is included as Exhibit 99.1, and furnishes the information in the related 4Q16 Investor Relations Data Summary, a copy of which is included as Exhibit 99.2. Material available by hyperlink from the News Release is not deemed to be furnished herewith or included in this filing.

- 2 -

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

EXXON MOBIL CORPORATION

Date: January 31, 2017                    By:           /s/ DAVID S. ROSENTHAL
                                                         David S. Rosenthal
                                                      Vice President and Controller
                                                      (Principal Accounting Officer)

- 3 -

INDEX TO EXHIBITS

**App. 1150**

| Exhibit No. | Description |
|---|---|
| 99.1 | Exxon Mobil Corporation News Release, dated January 31, 2017, announcing fourth quarter 2016 results. |
| 99.2 | 4Q16 Investor Relations Data Summary. |

- 4 -

*News Release*



EXHIBIT 99.1

**Exxon Mobil Corporation**
5959 Las Colinas Boulevard
Irving, TX 75039
972 444 1107 Telephone
972 444 1138 Facsimile

FOR IMMEDIATE RELEASE
TUESDAY, JANUARY 31, 2017

**ExxonMobil Earns $7.8 Billion in 2016; $1.7 Billion During Fourth Quarter**

- Cash flow from operating activities of $7.4 billion and asset sales of $2.1 billion more than covered fourth quarter dividends and additions to property, plant and equipment
- Investing strategically across all business segments
- U.S. Upstream earnings include an impairment charge of $2 billion largely related to dry gas operations in the Rocky Mountains region

| | **Fourth Quarter** | | | **Twelve Months** | | |
|---|---|---|---|---|---|---|
| | **2016** | 2015 | % | **2016** | 2015 | % |
| **Earnings Summary** | | | | | | |
| *(Dollars in millions, except per share data)* | | | | | | |
| Earnings | **1,680** | 2,780 | -40 | **7,840** | 16,150 | -51 |
| Earnings Per Common Share | | | | | | |
| Assuming Dilution | **0.41** | 0.67 | -39 | **1.88** | 3.85 | -51 |
| Capital and Exploration | | | | | | |
| Expenditures | **4,829** | 7,416 | -35 | **19,304** | 31,051 | -38 |

IRVING, Texas – January 31, 2017 – Exxon Mobil Corporation today announced estimated 2016 earnings of $7.8 billion, or $1.88 per diluted share. An asset recoverability review was completed in the fourth quarter and resulted in a U.S. Upstream asset impairment charge of about $2 billion mainly related to dry gas operations with undeveloped acreage in the Rocky Mountains region of the U.S. Excluding the impairment charge, full year earnings were $9.9 billion compared with $16.2 billion a year earlier, reflecting lower commodity prices and refining margins.

Fourth quarter earnings were $1.7 billion, including the impairment charge recorded during the period. Excluding the impairment charge, earnings of $3.7 billion were up from the $2.8 billion reported in the fourth quarter of 2015, due to higher liquids realizations partly offset by weaker refining margins.

"ExxonMobil demonstrated solid operating performance in 2016. Financial results for the year were negatively impacted by the prolonged downturn in commodity prices and the impairment charge," said Darren W. Woods, chairman and chief executive officer. "The company's continued focus on fundamentals and our ability to leverage an attractive global portfolio through our integrated business ensures we are well positioned to generate long-term shareholder value."

ExxonMobil completed five major Upstream projects during the year in Australia, Kazakhstan and the U.S., adding 250,000 oil-equivalent barrels per day of working interest production capacity. The company made three important new discoveries in Guyana, Nigeria and Papua New Guinea, and is growing its exploration portfolio, capturing 16 exploration blocks in 2016 with three additional awards to be finalized in 2017.

In the Downstream segment, ExxonMobil completed a 20,000-barrel-per-day crude expansion project at the Beaumont, Texas, refinery that increased the site's flexibility to process domestic light crude oils. ExxonMobil is also advancing projects to increase production of higher-value fuels and lubricants, including investments at refineries in Belgium and the Netherlands.

The Chemical business continued to capitalize on its liquids and gas cracking capabilities, capturing increased specialty and commodity product demand. The company is selectively investing to extend its advantage with projects that expand production capacity for ethylene and related products around the world.

During 2016, the corporation distributed $12.5 billion in dividends to shareholders.


**Fourth Quarter 2016 Highlights**

- Earnings of $1.7 billion decreased $1.1 billion, or 40 percent, from the fourth quarter of 2015. Excluding an impairment charge of $2 billion, earnings of $3.7 billion increased $927 million from the fourth quarter of 2015.

- Earnings per share assuming dilution were $0.41.

- Cash flow from operations and asset sales of $9.5 billion, including proceeds associated with asset sales of $2.1 billion, more than covered dividends and additions to property, plant and equipment.

- Capital and exploration expenditures were $4.8 billion, down 35 percent from the fourth quarter of 2015.

- Oil-equivalent production was 4.1 million oil-equivalent barrels per day, with liquids down 3.9 percent and natural gas down 1.7 percent from the prior year.

- The corporation distributed $3.1 billion in dividends to shareholders.

- Dividends per share of $0.75 increased 2.7 percent compared to the fourth quarter of 2015.

- In January 2017, ExxonMobil announced an acquisition that will more than double its Permian Basin resource potential to six billion oil-equivalent barrels. The upfront acquisition cost of $5.6 billion, to be paid in ExxonMobil shares, will add resource potential of 3.4 billion oil-equivalent barrels across 250,000 net acres in New Mexico's Delaware Basin. Additional cash payments over time totaling up to $1 billion are contingent on resource development.

- In January 2017, ExxonMobil announced positive results from its Payara-1 well offshore Guyana. The well encountered more than 95 feet of high-quality, oil-bearing sandstone reservoirs, and is the second discovery on the Stabroek Block. In addition to the Payara discovery, appraisal drilling at Liza-3 has identified an additional high-quality, deeper reservoir directly below the Liza field. This deeper reservoir is estimated to contain resources between 100 million and 150 million oil-equivalent barrels.

- ExxonMobil continues to enhance its global exploration portfolio. ExxonMobil and Total S.A. have jointly submitted the high bid for Block 2 located in the Perdido area offshore Mexico. Additionally, ExxonMobil and its partner Qatar Petroleum were selected to negotiate the terms of an exploration and production sharing contract for Block 10 offshore Cyprus.

- In October, the Kashagan oil field in Kazakhstan achieved a stable re-start of production and the second LNG Train at Gorgon in Australia started up. Production continued to ramp up at these assets through the fourth quarter.

- The Port Allen Aviation Lubricants Plant achieved full production during the quarter. The new 90,000-square-foot facility expands on the integrated chemical and lubricants complex in Baton Rouge, Louisiana, and helps meet rising demand for high-performance synthetic aviation lubricants. The state-of-the-art complex blends, packages and distributes the entire line of Mobil Jet engine lubricants.

- ExxonMobil announced plans to add a new production unit at its Beaumont, Texas, polyethylene plant that will increase capacity by 65 percent, or approximately 650,000 metric tons per year, to meet growing global chemical demand. Construction of the new unit has begun at the plant and start-up is expected in 2019.

**Fourth Quarter 2016 vs. Fourth Quarter 2015**

Upstream earnings were a loss of $642 million in the fourth quarter of 2016, including an impairment charge of $2 billion mainly related to dry gas operations with undeveloped acreage in the Rocky Mountains region of the U.S. Excluding the impairment charge, earnings were $1.4 billion, up $528 million from the fourth quarter of 2015. Higher liquids realizations partially offset by lower gas realizations increased earnings by a net $510 million. Lower volume and mix effects decreased earnings by $50 million. All other items, including lower expenses partly offset by the absence of favorable non-U.S. tax items from the prior year, increased earnings by $70 million.

On an oil-equivalent basis, production was down 127,000 barrels per day, or 3 percent, compared with the fourth quarter of 2015. Liquids production totaled 2.4 million barrels per day, down 97,000 barrels per day as field decline and lower entitlements were partly offset by increased project volumes, notably in Nigeria and Indonesia. Natural gas production was 10.4 billion cubic feet per day, down 179 million cubic feet per day from 2015 as higher project volumes were more than offset by field decline and lower entitlements.

U.S. Upstream earnings were a loss of $2.3 billion in the fourth quarter of 2016, including an impairment charge of $2 billion. Excluding the impairment charge, earnings were a loss of $301 million, an improvement of $237 million from the fourth quarter of 2015. Non-U.S. Upstream earnings were $1.7 billion, up $291 million from the prior year period.

Downstream earnings were $1.2 billion, down $110 million from the fourth quarter of 2015. Weaker refining and marketing margins decreased earnings by $570 million, while favorable volume and mix effects increased earnings by $200 million. All other items increased earnings by $260 million as gains from divestments in Canada were partly offset by higher maintenance expense and unfavorable foreign exchange impacts. Petroleum product sales of 5.5 million barrels per day were down 173,000 barrels per day from the prior year mainly reflecting the divestment of refineries in California and Louisiana.

Earnings from the U.S. Downstream were $270 million, down $165 million from the fourth quarter of 2015. Non-U.S. Downstream earnings of $971 million were $55 million higher than prior year.

3

Chemical earnings of $872 million were $91 million lower than the fourth quarter of 2015. Margins decreased earnings by $10 million. Volume and mix effects decreased earnings by $30 million. All other items decreased earnings by a net $50 million due to unfavorable inventory effects. Fourth quarter prime product sales of 6.3 million metric tons were 175,000 metric tons lower than the prior year.

U.S. Chemical earnings of $352 million were $168 million lower than the fourth quarter of 2015. Non-U.S. Chemical earnings of $520 million were $77 million higher than prior year.

Corporate and financing earnings of $209 million were $600 million higher than the fourth quarter of 2015 mainly reflecting favorable non-U.S. tax items.

**Full Year 2016 Highlights**

- Earnings of $7.8 billion decreased 51 percent from $16.2 billion in 2015. Excluding an impairment charge of $2 billion, earnings were $9.9 billion, a decrease of $6.3 billion from the prior year.

- Earnings per share assuming dilution were $1.88.

- Cash flow from operations and asset sales was $26.4 billion, including proceeds associated with asset sales of $4.3 billion.

- Capital and exploration expenditures were $19.3 billion, down 38 percent from 2015.

- Oil-equivalent production was down slightly at 4.1 million oil-equivalent barrels per day, with liquids up 0.9 percent and natural gas down 3.7 percent.

- The corporation distributed $12.5 billion in dividends to shareholders.

**Full Year 2016 vs. Full Year 2015**

Upstream earnings were $196 million, including an impairment charge of $2 billion. Excluding the impairment charge, earnings were $2.2 billion, down $4.9 billion from 2015. Lower realizations decreased earnings by $5.3 billion. Favorable volume and mix effects increased earnings by $130 million. All other items increased earnings by $310 million, primarily due to lower expenses partly offset by the absence of favorable tax items from the prior year.

On an oil-equivalent basis, production of 4.1 million barrels per day was down slightly compared to 2015. Liquids production of 2.4 million barrels per day increased 20,000 barrels per day with increased project volumes, mainly in Canada, Indonesia and Nigeria, partly offset by field decline, the impact from Canadian wildfires, and downtime notably in Nigeria. Natural gas production of 10.1 billion cubic feet per day decreased 388 million cubic feet per day from 2015 as field decline, regulatory restrictions in the Netherlands and divestments were partly offset by higher project volumes and work programs.

U.S. Upstream earnings were a loss of $4.2 billion in 2016, including an impairment charge of $2 billion. Excluding the impairment charge, earnings were a loss of $2.1 billion compared to a loss of $1.1 billion in 2015. Earnings outside the U.S. were $4.3 billion, down $3.8 billion from the prior year.

4

Downstream earnings of $4.2 billion decreased $2.4 billion from 2015. Weaker refining and marketing margins decreased earnings by $3.8 billion, while volume and mix effects increased earnings by $560 million. All other items increased earnings by $920 million, mainly reflecting gains from divestments, notably in Canada. Petroleum product sales of 5.5 million barrels per day were 272,000 barrels per day lower than 2015 mainly reflecting the divestment of refineries in California and Louisiana.

U.S. Downstream earnings were $1.1 billion, a decrease of $807 million from 2015. Non-U.S. Downstream earnings were $3.1 billion, down $1.5 billion from the prior year.

Chemical earnings of $4.6 billion increased $197 million from 2015. Stronger margins increased earnings by $440 million. Favorable volume and mix effects increased earnings by $100 million. All other items decreased earnings by $340 million, primarily due to the absence of asset management gains in the U.S. Prime product sales of 24.9 million metric tons were up 212,000 metric tons from 2015.

U.S. Chemical earnings were $1.9 billion, down $510 million from 2015 reflecting the absence of asset management gains. Non-U.S. Chemical earnings of $2.7 billion were $707 million higher than prior year.

Corporate and financing expenses of $1.2 billion in 2016 were $754 million lower than 2015 mainly reflecting favorable non-U.S. tax items.

During 2016, Exxon Mobil Corporation purchased 12 million shares of its common stock for the treasury at a gross cost of $977 million. These shares were acquired to offset dilution in conjunction with the company's benefit plans and programs. The corporation will continue to acquire shares to offset dilution in conjunction with its benefit plans and programs, but does not currently plan on making purchases to reduce shares outstanding.

5

**Upstream Asset Impairment Charge**

As disclosed in the corporation's third quarter 2016 Form 10-Q filing, continued weakness in the upstream industry environment during 2016, continued weak financial results for several assets in North America, and a reduction in the mid-point of the ranges of the corporation's long-term oil and natural gas prices developed as part of its annual planning and budgeting cycle, led the corporation to conclude that the facts and circumstances supported performing an impairment assessment of certain long-lived assets, notably North America natural gas assets and certain other assets across the remainder of its Upstream operations. The assessment reflected long-term crude and natural gas prices which are consistent with the mid-point of the ranges that management uses to evaluate investment opportunities and which are in the range of long-term price forecasts published by third-party industry experts and government agencies. This assessment indicated that the vast majority of asset groups have future undiscounted cash flow estimates exceeding carrying values. However, the carrying values for certain asset groups in the United States exceeded the estimated cash flows. As a result, the corporation's fourth quarter 2016 results include an after-tax charge of $2 billion to reduce the carrying value of those assets to fair value. The asset groups subject to this impairment charge are primarily dry gas operations in the Rocky Mountains region of the United States with large undeveloped acreage positions.

| | 2016 | |
|---|---|---|
| | **Fourth Quarter** | **Twelve Months** |
| **Earnings** (millions of dollars) | | |
| Net income attributable to ExxonMobil | 1,680 | 7,840 |
| Impairment charge* | (2,027) | (2,027) |
| Net income attributable to ExxonMobil excluding impairment charge | 3,707 | 9,867 |
| **Upstream Earnings** (millions of dollars) | | |
| Net income attributable to ExxonMobil | (642) | 196 |
| Impairment charge* | (2,027) | (2,027) |
| Net income attributable to ExxonMobil excluding impairment charge | 1,385 | 2,223 |
| **U.S. Upstream Earnings** (millions of dollars) | | |
| Net income attributable to ExxonMobil | (2,328) | (4,151) |
| Impairment charge* | (2,027) | (2,027) |
| Net income attributable to ExxonMobil excluding impairment charge | (301) | (2,124) |

*Impairment charge resulting from the fourth quarter 2016 asset recoverability assessment.

*ExxonMobil will discuss financial and operating results and other matters during a webcast at 8:30 a.m. Central Time on January 31, 2017. To listen to the event or access an archived replay, please visit www.exxonmobil.com.*

6

*Cautionary Statement*

*Statements relating to future plans, projections, events or conditions are forward-looking statements. Future results, including project plans, costs, timing, and capacities; capital and exploration expenditures; asset carrying values; resource recoveries; and share purchase levels, could differ materially due to factors including: changes in oil, gas or petrochemical prices or other market or economic conditions affecting the oil, gas or petrochemical industries, including the scope and duration of economic recessions; the outcome of exploration and development efforts; changes in law or government regulation, including tax and environmental requirements; the impact of fiscal and commercial terms and outcome of commercial negotiations; changes in technical or operating conditions; actions of competitors; and other factors discussed under the heading "Factors Affecting Future Results" in the "Investors" section of our website and in Item 1A of ExxonMobil's 2015 Form 10-K. Closing of pending acquisitions is also subject to satisfaction of the conditions precedent provided in the applicable agreement. We assume no duty to update these statements as of any future date.*

*Frequently Used Terms and Non-GAAP Measures*

*This press release includes cash flow from operations and asset sales. Because of the regular nature of our asset management and divestment program, we believe it is useful for investors to consider proceeds associated with the sales of subsidiaries, property, plant and equipment, and sales and returns of investments together with cash provided by operating activities when evaluating cash available for investment in the business and financing activities. A reconciliation to net cash provided by operating activities is shown in Attachment II. This press release also includes earnings excluding an impairment charge related to the fourth quarter 2016 Upstream asset recoverability assessment. We believe this figure is useful for investors to consider in comparing the performance of our underlying business across periods when one of the periods, such as fourth quarter 2016, includes a significant impairment charge. A reconciliation of earnings excluding this impairment charge to GAAP earnings is shown on page six. References to quantities of oil or natural gas may include amounts that we believe will ultimately be produced, but that are not yet classified as "proved reserves" under SEC definitions. Further information on ExxonMobil's frequently used financial and operating measures and other terms including "prime product sales" is contained under the heading "Frequently Used Terms" available through the "Investors" section of our website at exxonmobil.com.*

*Reference to Earnings*

*References to corporate earnings mean net income attributable to ExxonMobil (U.S. GAAP) from the consolidated income statement. Unless otherwise indicated, references to earnings, Upstream, Downstream, Chemical and Corporate and Financing segment earnings, and earnings per share are ExxonMobil's share after excluding amounts attributable to noncontrolling interests.*

*The term "project" as used in this release can refer to a variety of different activities and does not necessarily have the same meaning as in any government payment transparency reports. Mobil Jet is a registered trademark of Exxon Mobil Corporation.*

*Exxon Mobil Corporation has numerous affiliates, many with names that include ExxonMobil, Exxon, Mobil, Esso, and XTO. For convenience and simplicity, those terms and terms such as Corporation, company, our, we, and its are sometimes used as abbreviated references to specific affiliates or affiliate groups. Similarly, ExxonMobil has business relationships with thousands of customers, suppliers, governments, and others. For convenience and simplicity, words such as venture, joint venture, partnership, co-venturer, and partner are used to indicate business and other relationships involving common activities and interests, and those words may not indicate precise legal relationships.*

7

*Estimated Key Financial and Operating Data*

Attachment I

**Exxon Mobil Corporation**
**Fourth Quarter 2016**
(millions of dollars, unless noted)

| | Fourth Quarter | | Twelve Months | |
|---|---|---|---|---|
| | 2016 | 2015 | 2016 | 2015 |
| **Earnings / Earnings Per Share** | | | | |
| Total revenues and other income | 61,016 | 59,807 | 226,094 | 268,882 |
| Total costs and other deductions | 60,399 | 57,179 | 218,125 | 246,916 |
| Income before income taxes | 617 | 2,628 | 7,969 | 21,966 |
| Income taxes | (1,407) | (202) | (406) | 5,415 |
| Net income including noncontrolling interests | 2,024 | 2,830 | 8,375 | 16,551 |
| Net income attributable to noncontrolling interests | 344 | 50 | 535 | 401 |
| Net income attributable to ExxonMobil (U.S. GAAP) | 1,680 | 2,780 | 7,840 | 16,150 |
| | | | | |
| Earnings per common share (dollars) | 0.41 | 0.67 | 1.88 | 3.85 |
| | | | | |
| Earnings per common share | | | | |
| - assuming dilution (dollars) | 0.41 | 0.67 | 1.88 | 3.85 |
| | | | | |
| **Other Financial Data** | | | | |
| | | | | |
| Dividends on common stock | | | | |
| Total | 3,133 | 3,054 | 12,453 | 12,090 |
| Per common share (dollars) | 0.75 | 0.73 | 2.98 | 2.88 |
| | | | | |
| Millions of common shares outstanding | | | | |
| At December 31 | | | 4,148 | 4,156 |
| Average - assuming dilution | 4,176 | 4,183 | 4,177 | 4,196 |
| | | | | |
| ExxonMobil share of equity at December 31 | | | 167,325 | 170,811 |
| ExxonMobil share of capital employed at December 31 | | | 212,794 | 211,658 |
| | | | | |
| Income taxes | (1,407) | (202) | (406) | 5,415 |
| Sales-based taxes | 5,403 | 5,370 | 21,090 | 22,678 |
| All other taxes | 7,189 | 7,336 | 28,265 | 29,790 |
| Total taxes | 11,185 | 12,504 | 48,949 | 57,883 |
| | | | | |
| ExxonMobil share of income taxes of | | | | |
| equity companies | 436 | 609 | 1,692 | 3,011 |

8

**Attachment II**

**Exxon Mobil Corporation**
**Fourth Quarter 2016**
(millions of dollars)

|  | Fourth Quarter | | Twelve Months | |
|---|---|---|---|---|
|  | **2016** | 2015 | **2016** | 2015 |
| **Earnings (U.S. GAAP)** | | | | |
| Upstream | | | | |
| United States | **(2,328)** | (538) | **(4,151)** | (1,079) |
| Non-U.S. | **1,686** | 1,395 | **4,347** | 8,180 |
| Downstream | | | | |
| United States | **270** | 435 | **1,094** | 1,901 |
| Non-U.S. | **971** | 916 | **3,107** | 4,656 |
| Chemical | | | | |
| United States | **352** | 520 | **1,876** | 2,386 |
| Non-U.S. | **520** | 443 | **2,739** | 2,032 |
| Corporate and financing | **209** | (391) | **(1,172)** | (1,926) |
| Net income attributable to ExxonMobil | **1,680** | 2,780 | **7,840** | 16,150 |

**Cash flow from operations and asset sales** (billions of dollars)

| | Fourth Quarter | | Twelve Months | |
|---|---|---|---|---|
| Net cash provided by operating activities | | | | |
| (U.S. GAAP) | **7.4** | 4.3 | **22.1** | 30.3 |
| Proceeds associated with asset sales | **2.1** | 0.8 | **4.3** | 2.4 |
| Cash flow from operations and asset sales | **9.5** | 5.1 | **26.4** | 32.7 |

9

Attachment III

**Exxon Mobil Corporation**
**Fourth Quarter 2016**

|  | Fourth Quarter | | Twelve Months | |
|---|---|---|---|---|
|  | 2016 | 2015 | 2016 | 2015 |
| Net production of crude oil, natural gas liquids, bitumen and synthetic oil, thousand barrels per day (kbd) |  |  |  |  |
| United States | 496 | 494 | 494 | 476 |
| Canada / South America | 453 | 452 | 430 | 402 |
| Europe | 208 | 222 | 204 | 204 |
| Africa | 449 | 543 | 474 | 529 |
| Asia | 726 | 722 | 707 | 684 |
| Australia / Oceania | 52 | 48 | 56 | 50 |
| Worldwide | 2,384 | 2,481 | 2,365 | 2,345 |
| Natural gas production available for sale, million cubic feet per day (mcfd) |  |  |  |  |
| United States | 2,997 | 3,123 | 3,078 | 3,147 |
| Canada / South America | 222 | 241 | 239 | 261 |
| Europe | 2,518 | 2,504 | 2,173 | 2,286 |
| Africa | 7 | 4 | 7 | 5 |
| Asia | 3,698 | 4,103 | 3,743 | 4,139 |
| Australia / Oceania | 982 | 628 | 887 | 677 |
| Worldwide | 10,424 | 10,603 | 10,127 | 10,515 |
| Oil-equivalent production (koebd)[1] | 4,121 | 4,248 | 4,053 | 4,097 |

[1] Gas converted to oil-equivalent at 6 million cubic feet = 1 thousand barrels.

10

Attachment IV

**Exxon Mobil Corporation**
**Fourth Quarter 2016**

| | Fourth Quarter | | Twelve Months | |
|---|---|---|---|---|
| | **2016** | 2015 | **2016** | 2015 |
| Refinery throughput (kbd) | | | | |
| United States | **1,604** | 1,649 | **1,591** | 1,709 |
| Canada | **401** | 390 | **363** | 386 |
| Europe | **1,460** | 1,483 | **1,417** | 1,496 |
| Asia Pacific | **706** | 679 | **708** | 647 |
| Other | **200** | 194 | **190** | 194 |
| Worldwide | **4,371** | 4,395 | **4,269** | 4,432 |
| | | | | |
| Petroleum product sales (kbd) | | | | |
| United States | **2,227** | 2,416 | **2,250** | 2,521 |
| Canada | **499** | 472 | **491** | 488 |
| Europe | **1,535** | 1,530 | **1,519** | 1,542 |
| Asia Pacific | **719** | 758 | **741** | 746 |
| Other | **526** | 503 | **481** | 457 |
| Worldwide | **5,506** | 5,679 | **5,482** | 5,754 |
| | | | | |
| Gasolines, naphthas | **2,304** | 2,330 | **2,270** | 2,363 |
| Heating oils, kerosene, diesel | **1,826** | 1,921 | **1,772** | 1,924 |
| Aviation fuels | **387** | 403 | **399** | 413 |
| Heavy fuels | **368** | 368 | **370** | 377 |
| Specialty products | **621** | 657 | **671** | 677 |
| Worldwide | **5,506** | 5,679 | **5,482** | 5,754 |
| | | | | |
| Chemical prime product sales, thousand metric tons (kt) | | | | |
| United States | **2,409** | 2,565 | **9,576** | 9,664 |
| Non-U.S. | **3,900** | 3,919 | **15,349** | 15,049 |
| Worldwide | **6,309** | 6,484 | **24,925** | 24,713 |

11

Attachment V

**Exxon Mobil Corporation**
**Fourth Quarter 2016**
(millions of dollars)

|  | Fourth Quarter | | Twelve Months | |
|---|---|---|---|---|
|  | **2016** | 2015 | **2016** | 2015 |
| **Capital and Exploration Expenditures** | | | | |
| Upstream | | | | |
| United States | 817 | 1,615 | 3,518 | 7,822 |
| Non-U.S. | 2,755 | 4,255 | 11,024 | 17,585 |
| Total | 3,572 | 5,870 | 14,542 | 25,407 |
| Downstream | | | | |
| United States | 231 | 236 | 839 | 1,039 |
| Non-U.S. | 472 | 543 | 1,623 | 1,574 |
| Total | 703 | 779 | 2,462 | 2,613 |
| Chemical | | | | |
| United States | 405 | 493 | 1,553 | 1,945 |
| Non-U.S. | 125 | 199 | 654 | 898 |
| Total | 530 | 692 | 2,207 | 2,843 |
| Other | 24 | 75 | 93 | 188 |
| Worldwide | 4,829 | 7,416 | 19,304 | 31,051 |
| Exploration expenses charged to income included above | | | | |
| Consolidated affiliates | | | | |
| United States | 42 | 60 | 220 | 182 |
| Non-U.S. | 296 | 459 | 1,242 | 1,340 |
| Equity companies - ExxonMobil share | | | | |
| United States | - | 9 | - | 12 |
| Non-U.S. | 51 | 3 | 52 | 36 |
| Worldwide | 389 | 531 | 1,514 | 1,570 |

12

**Exxon Mobil Corporation**
**Earnings**

|  | $ Millions | $ Per Common Share[1] |
|---|---|---|
| **2012** | | |
| First Quarter | 9,450 | 2.00 |
| Second Quarter | 15,910 | 3.41 |
| Third Quarter | 9,570 | 2.09 |
| Fourth Quarter | 9,950 | 2.20 |
| Year | 44,880 | 9.70 |
| **2013** | | |
| First Quarter | 9,500 | 2.12 |
| Second Quarter | 6,860 | 1.55 |
| Third Quarter | 7,870 | 1.79 |
| Fourth Quarter | 8,350 | 1.91 |
| Year | 32,580 | 7.37 |
| **2014** | | |
| First Quarter | 9,100 | 2.10 |
| Second Quarter | 8,780 | 2.05 |
| Third Quarter | 8,070 | 1.89 |
| Fourth Quarter | 6,570 | 1.56 |
| Year | 32,520 | 7.60 |
| **2015** | | |
| First Quarter | 4,940 | 1.17 |
| Second Quarter | 4,190 | 1.00 |
| Third Quarter | 4,240 | 1.01 |
| Fourth Quarter | 2,780 | 0.67 |
| Year | 16,150 | 3.85 |
| **2016** | | |
| First Quarter | 1,810 | 0.43 |
| Second Quarter | 1,700 | 0.41 |
| Third Quarter | 2,650 | 0.63 |
| Fourth Quarter | 1,680 | 0.41 |
| Year | 7,840 | 1.88 |

[1] Computed using the average number of shares outstanding during each period.

13

**EXXON MOBIL CORPORATION**                                                                                    **EXHIBIT 99.2**

4Q16 INVESTOR RELATIONS DATA SUMMARY (PAGE 1 of 4)

| Earnings, $M | 4Q16 | 3Q16 | 2Q16 | 1Q16 | 4Q15 |
|---|---|---|---|---|---|
| **Upstream** | | | | | |
| United States | (2,328) | (477) | (514) | (832) | (538) |
| Non-U.S. | 1,686 | 1,097 | 808 | 756 | 1,395 |
| Total | (642) | 620 | 294 | (76) | 857 |
| **Downstream** | | | | | |
| United States | 270 | 225 | 412 | 187 | 435 |
| Non-U.S. | 971 | 1,004 | 413 | 719 | 916 |
| Total | 1,241 | 1,229 | 825 | 906 | 1,351 |
| **Chemical** | | | | | |
| United States | 352 | 434 | 509 | 581 | 520 |
| Non-U.S. | 520 | 737 | 708 | 774 | 443 |
| Total | 872 | 1,171 | 1,217 | 1,355 | 963 |
| | | | | | |
| **Corporate and financing** | 209 | (370) | (636) | (375) | (391) |
| Net income attributable to ExxonMobil (U.S. GAAP) | 1,680 | 2,650 | 1,700 | 1,810 | 2,780 |
| | | | | | |
| Earnings per common share (U.S. GAAP) | 0.41 | 0.63 | 0.41 | 0.43 | 0.67 |
| Earnings per common share | | | | | |
| - assuming dilution (U.S. GAAP) | 0.41 | 0.63 | 0.41 | 0.43 | 0.67 |
| | | | | | |
| **Capital and Exploration Expenditures, $M** | | | | | |
| **Upstream** | | | | | |
| United States | 817 | 712 | 914 | 1,075 | 1,615 |
| Non-U.S. | 2,755 | 2,360 | 3,005 | 2,904 | 4,255 |
| Total | 3,572 | 3,072 | 3,919 | 3,979 | 5,870 |
| **Downstream** | | | | | |
| United States | 231 | 192 | 227 | 189 | 236 |
| Non-U.S. | 472 | 397 | 415 | 339 | 543 |
| Total | 703 | 589 | 642 | 528 | 779 |
| **Chemical** | | | | | |
| United States | 405 | 359 | 355 | 434 | 493 |
| Non-U.S. | 125 | 144 | 208 | 177 | 199 |
| Total | 530 | 503 | 563 | 611 | 692 |
| **Other** | 24 | 26 | 34 | 9 | 75 |
| | | | | | |
| **Total Capital and Exploration Expenditures** | 4,829 | 4,190 | 5,158 | 5,127 | 7,416 |

| Exploration Expense Charged to Income, $M | | 4Q16 | 3Q16 | 2Q16 | 1Q16 | 4Q15 |
|---|---|---|---|---|---|---|
| Consolidated | - United States | 42 | 35 | 35 | 108 | 60 |
| | - Non-U.S. | 296 | 291 | 409 | 246 | 459 |
| Non-consolidated - ExxonMobil share | - United States | - | - | - | - | 9 |
| | - Non-U.S. | 51 | 6 | 5 | (10) | 3 |
| **Exploration Expenses Charged to Income Included Above** | | 389 | 332 | 449 | 344 | 531 |

| | 4Q16 | 3Q16 | 2Q16 | 1Q16 | 4Q15 |
|---|---|---|---|---|---|
| **Effective Income Tax Rate, %** | -92% | 20% | 40% | 19% | 13% |
| | | | | | |
| **Common Shares Outstanding, millions** | | | | | |
| At quarter end | 4,148 | 4,147 | 4,147 | 4,147 | 4,156 |
| Average - assuming dilution | 4,176 | 4,178 | 4,178 | 4,178 | 4,183 |
| | | | | | |
| **Total Cash and Cash Equivalents, $B** | 3.7 | 5.1 | 4.4 | 4.8 | 3.7 |
| | | | | | |
| **Total Debt, $B** | 42.8 | 46.2 | 44.5 | 43.1 | 38.7 |
| | | | | | |
| **Cash Flow from Operations and Asset Sales, $B** | | | | | |
| Net cash provided by operating activities | 7.4 | 5.3 | 4.6 | 4.8 | 4.3 |
| Proceeds associated with asset sales | 2.1 | 1.0 | 1.0 | 0.2 | 0.8 |
| Cash flow from operations and asset sales | 9.5 | 6.3 | 5.6 | 5.0 | 5.1 |

**EXXON MOBIL CORPORATION**

**4Q16 INVESTOR RELATIONS DATA SUMMARY (PAGE 2 of 4)**

| | 4Q16 | 3Q16 | 2Q16 | 1Q16 | 4Q15 |
|---|---|---|---|---|---|
| **Net production of crude oil, natural gas liquids, bitumen and synthetic oil, kbd** | | | | | |
| United States | 496 | 484 | 495 | 500 | 494 |
| Canada / South America | 453 | 437 | 359 | 476 | 452 |
| Europe | 208 | 189 | 201 | 218 | 222 |
| Africa | 449 | 388 | 494 | 565 | 543 |
| Asia | 726 | 651 | 724 | 726 | 722 |
| Australia / Oceania | 52 | 62 | 57 | 53 | 48 |
| Total liquids production | 2,384 | 2,211 | 2,330 | 2,538 | 2,481 |
| | | | | | |
| **Natural gas production available for sale, mcfd** | | | | | |
| United States | 2,997 | 3,058 | 3,097 | 3,160 | 3,123 |
| Canada / South America | 222 | 220 | 257 | 258 | 241 |
| Europe | 2,518 | 1,650 | 1,749 | 2,775 | 2,504 |
| Africa | 7 | 13 | 7 | 2 | 4 |
| Asia | 3,698 | 3,662 | 3,819 | 3,794 | 4,103 |
| Australia / Oceania | 982 | 998 | 833 | 735 | 628 |
| Total natural gas production available for sale | 10,424 | 9,601 | 9,762 | 10,724 | 10,603 |
| | | | | | |
| **Total worldwide liquids and gas production, koebd** | 4,121 | 3,811 | 3,957 | 4,325 | 4,248 |
| | | | | | |
| **Refinery throughput, kbd** | | | | | |
| United States | 1,604 | 1,604 | 1,555 | 1,602 | 1,649 |
| Canada | 401 | 406 | 246 | 398 | 390 |
| Europe | 1,460 | 1,476 | 1,462 | 1,269 | 1,483 |
| Asia Pacific | 706 | 677 | 718 | 729 | 679 |
| Other Non-U.S. | 200 | 202 | 171 | 187 | 194 |
| Total refinery throughput | 4,371 | 4,365 | 4,152 | 4,185 | 4,395 |
| | | | | | |
| **Petroleum product sales, kbd** | | | | | |
| United States | 2,227 | 2,327 | 2,228 | 2,218 | 2,416 |
| Canada | 499 | 511 | 479 | 476 | 472 |
| Europe | 1,535 | 1,553 | 1,561 | 1,429 | 1,530 |
| Asia Pacific | 719 | 721 | 760 | 766 | 758 |
| Other Non-U.S. | 526 | 473 | 472 | 445 | 503 |
| Total petroleum product sales | 5,506 | 5,585 | 5,500 | 5,334 | 5,679 |
| | | | | | |
| Gasolines, naphthas | 2,304 | 2,298 | 2,266 | 2,211 | 2,330 |
| Heating oils, kerosene, diesel | 1,826 | 1,810 | 1,752 | 1,699 | 1,921 |
| Aviation fuels | 387 | 421 | 386 | 402 | 403 |
| Heavy fuels | 368 | 358 | 367 | 386 | 368 |
| Specialty products | 621 | 698 | 729 | 636 | 657 |
| Total petroleum product sales | 5,506 | 5,585 | 5,500 | 5,334 | 5,679 |
| | | | | | |
| **Chemical prime product sales, kt** | | | | | |
| United States | 2,409 | 2,320 | 2,447 | 2,400 | 2,565 |
| Non-U.S. | 3,900 | 3,813 | 3,863 | 3,773 | 3,919 |
| Total chemical prime product sales | 6,309 | 6,133 | 6,310 | 6,173 | 6,484 |

**EXXON MOBIL CORPORATION**

**4Q16 INVESTOR RELATIONS DATA SUMMARY (PAGE 3 of 4)**

| Earnings Factor Analysis, $M | 4Q16 vs. 4Q15 | 4Q16 vs. 3Q16 | 2016 vs. 2015 |
|---|---|---|---|
| **Upstream** | | | |
| Prior Period | 857 | 620 | 7,101 |
| Realization | 510 | 450 | -5,320 |
| Volume / Mix | -50 | 230 | 130 |
| Other | -1,960 | -1,940 | -1,720 |
| Current Period | -642 | -642 | 196 |
| **Downstream** | | | |
| Prior Period | 1,351 | 1,229 | 6,557 |
| Margin | -570 | 160 | -3,840 |
| Volume / Mix | 200 | 100 | 560 |
| Other | 260 | -250 | 920 |
| Current Period | 1,241 | 1,241 | 4,201 |
| **Chemical** | | | |
| Prior Period | 963 | 1,171 | 4,418 |
| Margin | -10 | -200 | 440 |
| Volume / Mix | -30 | 50 | 100 |
| Other | -50 | -150 | -340 |
| Current Period | 872 | 872 | 4,615 |
| | | | |
| **Upstream Volume Factor Analysis, koebd** | | | |
| Prior Period | 4,248 | 3,811 | 4,097 |
| Entitlements - Net Interest | 11 | -1 | 9 |
| Entitlements - Price / Spend / Other | -94 | 70 | -23 |
| Quotas | - | - | - |
| Divestments | -22 | -1 | -34 |
| Growth / Other | -22 | 242 | 4 |
| Current Period | 4,121 | 4,121 | 4,053 |

| Sources and Uses of Funds, $B | 4Q16 |
|---|---|
| Beginning Cash | 5.1 |
| Earnings | 1.7 |
| Depreciation | 8.1 |
| Working Capital / Other | -2.4 |
| Proceeds Associated with Asset Sales | 2.1 |
| PP&E Adds / Investments and Advances [1] | -3.8 |
| Shareholder Distributions | -3.1 |
| Debt / Other Financing | -4.0 |
| Ending Cash | 3.7 |

[1] PP&E Adds / Investments and Advances includes PP&E adds of ($3.9B) and net advances of $0.1B.

**EXXON MOBIL CORPORATION**

**4Q16 INVESTOR RELATIONS DATA SUMMARY (PAGE 4 of 4)**

| Average Realization Data | 4Q16 | 3Q16 | 2Q16 | 1Q16 | 4Q15 |
|---|---|---|---|---|---|
| **United States** | | | | | |
| ExxonMobil | | | | | |
| Crude ($/b) | 43.38 | 38.76 | 37.97 | 27.11 | 34.36 |
| Natural Gas ($/kcf) | 2.69 | 2.65 | 1.74 | 1.60 | 1.80 |
| | | | | | |
| Benchmarks | | | | | |
| WTI ($/b) | 49.18 | 44.88 | 45.48 | 33.27 | 42.10 |
| ANS-WC ($/b) | 50.01 | 44.65 | 45.71 | 33.76 | 43.67 |
| Henry Hub ($/mbtu) | 2.98 | 2.81 | 1.95 | 2.09 | 2.27 |
| **Non-U.S.** | | | | | |
| ExxonMobil | | | | | |
| Crude ($/b) | 44.82 | 40.96 | 41.46 | 28.67 | 36.99 |
| Natural Gas ($/kcf) | 4.97 | 4.47 | 4.06 | 4.80 | 5.80 |
| European NG ($/kcf) | 4.97 | 4.48 | 4.35 | 5.05 | 6.11 |
| | | | | | |
| Benchmarks | | | | | |
| Brent ($/b) | 49.46 | 45.85 | 45.57 | 33.89 | 43.69 |

The above numbers reflect ExxonMobil's current estimate of volumes and realizations given data available as of the end of the fourth quarter of 2016. Volumes and realizations may be adjusted when full statements on joint venture operations are received from outside operators. ExxonMobil management assumes no duty to update these estimates.

# Exhibit 31

Message

| | |
|---|---|
| **From:** | Strawbridge, William N [/O=EXXONMOBIL/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=WILLIAM.N.STRAWBRIDGE] |
| **Sent:** | 12/11/2015 9:24:36 PM |
| **To:** | Swiger, Andrew P [andrew.p.swiger@exxonmobil.com] |
| **CC:** | Genetti, Dominic [dominic.genetti@exxonmobil.com]; Hamid, Taher N [taher.n.hamid@exxonmobil.com] |
| **Subject:** | PROP:RE: US Gas - SEC Pricing |
| **Attachments:** | 2015 SEC Pricing.pptx |

Andy, headline 2015 AA SEC prices are:

Brent - $54.17/bbl

Bitumen - $28.70/bbl

Henry Hub - $2.59/MBTU

The attached charts provide detail on the monthly actual prices and the final Kearl pricing. This Kearl pricing of $28.70 was on the low end of the $28.50 - $29.5o outlook range we showed to the Chairman Oct 26, but the Nov YTD unit costs are coming in about $1.50 /bbl lower, so we look to be in good shape to preserve our Kearl SEC reserves.

We continue to work with XTO on their SEC pricing/reserves and we should have a good Upstream assessment next week. The ~500 MBOE SEC sensitivity you shared with the Board a few weeks back could be lower pending our final XTO assessments. We will share this with you at our Jan 14 UEM, but glad to provide earlier guidance if desired.

Bill Strawbridge
Global Reserves Manager
22777 Springwood Village Parkway
Spring, TX 77389
N1.4A.528
832-624-6966
281-415-6445 (cell)
William.n.strawbridge@exxonmobil.com
MySite



---

**From:** Swiger, Andrew P
**Sent:** Friday, December 11, 2015 2:44 PM
**To:** Strawbridge, William N
**Subject:** RE: US Gas - SEC Pricing

Bill, Do we now have all the key "SEC" oil and gas prices for 2015 and can you provide the list?

Andy

**From:** Strawbridge, William N
**Sent:** Wednesday, November 04, 2015 10:10 AM

Civil Action No.
3:16-cv-03111-K
**TRIAL EXHIBIT**
**PX 538**

CONFIDENTIAL

EMC_RAMIREZ 000032893

**To:** Swiger, Andrew P
**Subject:** RE: US Gas - SEC Pricing

Andy, HH Nov 1 actual was $1.96 and YTD is now $2.63/MBTU

Bill Strawbridge
Global Reserves Manager
22777 Springwood Village Parkway
Spring, TX 77389
N1.4A.528
832-624-6966
281-415-6445 (cell)
William.n.strawbridge@exxonmobil.com
MySite



**From:** Swiger, Andrew P
**Sent:** Wednesday, November 04, 2015 8:40 AM
**To:** Strawbridge, William N
**Subject:** RE: US Gas - SEC Pricing

Bill,  Do we have the Nov HH price now and YTD avg?

Andy

**From:** Strawbridge, William N
**Sent:** Friday, October 30, 2015 2:48 PM
**To:** Swiger, Andrew P
**Subject:** RE: US Gas - SEC Pricing

Andy, I have confirmed (with XTO) that for purposes of SEC US natural gas reserves analysis, we utilize the 1st day of month Henry Hub posted pricing and then adjust as necessary with the appropriate differential. The basis for determining the differential utilizes an average differential for some historic period (general prior month), but can vary by region.

Bill Strawbridge
Global Reserves Manager
22777 Springwood Village Parkway
Spring, TX 77389
N1.4A.528
832-624-6966
281-415-6445 (cell)
William.n.strawbridge@exxonmobil.com
MySite

CONFIDENTIAL

EMC_RAMIREZ 000032894



**From:** Swiger, Andrew P
**Sent:** Friday, October 30, 2015 1:53 PM
**To:** Strawbridge, William N
**Subject:** US Gas - SEC Pricing

Bill,  Just wanted to confirm that for SEC reserves pricing for US natural gas we actual HH pricing on first day of the month as opposed to the contract month price for that month which is set 3 days ahead of the 1st day of the month.  Correct?

Regards,  Andy

CONFIDENTIAL

EMC_RAMIREZ 000032895

App. 1171

Document Produced in Native Format

CONFIDENTIAL

EMC_RAMIREZ 000032896





# SEC 2015 Pricing



Dec 1
Brent = $43.25
WTI = $41.85
Kearl Bitumen = $17.80

2015 Avg
Brent = $54.17
WTI = $50.28
Kearl Bitumen = $28.70



**ExxonMobil**

PROPRIETARY

2

# Exhibit 32

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

PEDRO RAMIREZ, JR., Individually )
and on Behalf of All Others )
Similarly Situated, and GREATER )
PENNSYLVANIA CARPENTERS PENSION )
FUND, )
)
Plaintiffs, )
)
vs. )  No.  3:16-CV-03111-K
)
EXXON MOBILE CORPORATION, )  CLASS ACTION
REX W. TILLERSON, ANDREW P. SWIGER, )
JEFFREY J. WOODBURY, DAVID S. )
ROSENTHAL, )
)
Defendants. )
-----------------------------------)

VOLUME 7A
BEFORE THE HONORABLE ED KINKEADE
UNITED STATES DISTRICT JUDGE
MAY 6, 2026
DALLAS, TEXAS

FOR THE PLAINTIFFS:

JOE KENDALL
KENDALL LAW GROUP
3811 Turtle Creek Boulevard, Suite 825 Suite 880
Dallas, TX  75229
(214) 744-3300

SCOTT H. SAHAM
NATHAN R. LINDELL
SAM SHELDON
ERIKA OLIVER
T. ALEX B. FOLKERTH
SARA BIERL POLYCHRON
SPENCER A. BURKHOLZ
ROBBINS GELLER RUDMAN & DOWD, LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
(619) 231-1058

BALON B. BRADLEY
BALON B. BRADLEY LAW FIRM
11910 Greenville Avenue, Suite 220
Dallas, TX  75243
(972) 991-1582

MICHAEL SWIDERSKI
(Party Representative)

FOR THE DEFENDANTS:

THOMAS M. MELSHEIMER
AUSTIN E. SAATHOFF
EMILY WILKINSON
DAVID T. HINOJOSA
KING & SPALDING, LLP
2601 Olive Street, Suite 2300
Dallas, TX  75201
(214) 764-4446

NINA CORTELL
JASON JORDAN
HAYNES and BOONE, LLP
2801 N. Harwood Street, Suite 2300
Dallas, TX  75201
(214) 651-5000

AUDRA J. SOLOWAY
DANIEL TOAL
THEODORE V. WELLS
LYUBA SHAMAILOVA
AMITAV CHAKRABORTY
DAPHNE THOMPSON
PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

SCOTT C. THOMAS
LATHAM & WATKINS
100 Crescent Court, Suite 7084
Dallas TX  75201
(713) 546-5400

D. PATRICK LONG
SQUIRE PATTON BOGGS
2200 Ross Avenue, Suite 4100w
Dallas TX  75201
(214)758-1500

(Rex Tillerson)

PATRICE CHILDRESS
(Party Representative)

Proceedings reported by mechanical stenography,
transcript produced by computer-aided transcription.

---------------------------------------------------------

PAMELA J. WILSON, RMR, CRR
Federal Official Court Reporter
1100 Commerce Street, 13th Floor
Dallas, Texas 75242
pam_wilson@txnd.uscourts.gov
(214) 662-1557

VOLUME 7A - MAY 6, 2026

**P R O C E E D I N G S**

THE SECURITY OFFICER:  All rise and come to order. United States District Court in and for the Northern District of Texas at Dallas is now in session, the Honorable United States District Judge Ed Kinkeade presiding.

Let us pray.

God bless these United States and this Honorable Court.

Please be seated.

(Outside the presence of the jury.)

MR. TOAL:  One issue to take up with Your Honor.

THE COURT:  What is it?

MR. TOAL:  Yesterday we got Mr. Regan's demonstrative slides.  I think these slides confirm exactly what we were concerned about yesterday when we raised this issue, which is that what Mr. Regan intends to do here exactly what he's been precluded from other cases, which is just narrating a bunch of documents, offering opinions that are not legal, that don't have any accounting methodology and invading the role of the jury.

If I could hand up the slides, Your Honor.

THE COURT:  Have we not been given them yet?

Okay.  Yes.  I need a set.  Do you have a set for me, Mr. Saham?

MR. TOAL:  Yes, sir.

THE COURT: Do you have a set for me?

MR. SAHAM: I assume it's what he has. We'll give you another one if you want it, Your Honor.

THE COURT: I just want one.

MR. TOAL: Your Honor, these slides are not truly a reflection of accounting opinions or expert opinions. They're more in the vein of a summation. And to see that, I think you really don't need to look any further than slides 46 and 49 at the end of this deck.

THE COURT: Okay.

MR. TOAL: Where there's a whole discussion of tone at the top. This is based on these stray employee comments at that employee forum. And this is exactly the sort of opinion that Mr. Regan has been precluded from offering in other cases, including the Under Armour securities litigation in the District of Maryland in 2024.

THE COURT: Go ahead.

MR. TOAL: And other slides, likes 36 and 37, are offering opinions on motives and state -- states of mind of the defendants, suggesting that things were done to avoid scrutiny of questionable accounting or to avoid impairments.

Slides 34 and 35 attempt to draw factual conclusions for the jury about supposed concessions that the defendants made.

Slide 44 opines that the word "impairment" gave Mr. Tillerson heartburn. That's obviously not an accounting opinion.

And there's several cases within the Fifth Circuit that have underscored how improper this sort of expert testimony is. The Salas case by the Fifth Circuit in 1992 said the trial judge ought to insist that a proffered expert bring more to the jury than lawyers can offer in argument. And that's exactly what Mr. Regan is attempting here. So we object to his testimony and we submit that it should not be allowed.

THE COURT: Okay. Mr. Saham.

MR. SAHAM: Thank you, Your Honor.

First of all, the accounting rules, which Mr. Regan is going to testify about, are all in his slide deck. Each of those accounting rules, we'll take 303 as an example, item 303, SAB 99, they all talk about the facts and circumstances. They're embedded in generally accepted accounting principles, they're embedded in generally-accepted auditing standards. The facts and circumstances are crucial to his opinions. Each one of those documents that are referenced in the slide deck relate specifically to a GAAP or SEC rule that was violated and those are the bases for those opinions.

They have had his report for, I don't know, over a year, I can't remember how long, it was January of 2024 or 2025. They filed a Daubert motion about it raising exactly the same issue and Your Honor has denied it.

With respect to "tone at the top" that's a -- also -- I don't have the number right there, but that's a GAAP principle that if the tone at the top is flawed the accounting rules can be influenced.

The facts and circumstances are crucial here. Each of the items he's testifying about relate to accounting principles, not legal. Mr. Toal I believe misspoke and said he's opining about legal principles. Not so, Your Honor.

And his opinions have been offered and accepted by I believe over a hundred federal courts. And, you know, a couple of outliers cited by Mr. Toal in strange circumstances I don't think under -- underlie the fact that he's been accepted by over a hundred courts, about 15 times testifying on behalf of the SEC.

THE COURT: All right. Let me -- you want to say something else, Mr. Toal?

I don't want to cut you off.

MR. TOAL: Well, the fact that you look at certain facts and circumstances in an accounting context is not a vehicle to try and convert your accounting expert into an all-purpose commentator on documents and testimony that the jury is fully able to evaluate for itself. It's exactly the sort of practice for which Mr. Regan has been criticized in the past and it's exactly what he's improperly attempting to do here.

MR. SAHAM: Could I make one other point, Your Honor?

THE COURT: Yes.

MR. SAHAM: My last point is I made multiple objections -- and I wish I never have to make any objection, but I think the one that objection that to me has stuck the most in -- in this -- that's occurred in this case, they had a set of slides they used in their opening and they have asked each of the three defendants questions using those slides. You know, talking about utilizing argument and opening statement to question witnesses, that's -- far more of that has occurred on the other side than -- than on our side, Your Honor. And I would just submit that.

THE COURT: Okay. Mr. Toal, something else? Anything?

MR. TOAL: No, Your Honor.

THE COURT: All right. I've already ruled on Daubert. I'm going to let him testify.

All right. Are we ready to finish with --

MR. SAHAM: Your Honor, one more point that I believe your clerk has raised with me, just to reurge so you can deny it on the record.

THE COURT: Okay.

MR. SAHAM: And I don't think any of this was on the record yesterday when we discussed it, but we renewed our

**App. 1175**

sword and shield opening the door testimony based on the testimony of Mr. Horne at 1359 in yesterday's transcript where he testified there's no disclosure because debooking chances at Kearl were low.  We again reurge that that opened the door and was the use of the sword and shield and unfairly prejudices the plaintiff and that our motion with respect to 698 should be granted.

THE COURT:  Denied.

MR. SAHAM:  Thank you, Your Honor.

THE COURT:  Okay.  All right.

How much longer do you think you'll be with him?

MR. TOAL:  I think five minutes.

THE COURT:  Okay.  All right.

Off the record.

(Discussion off the record in open court.)

THE SECURITY OFFICER:  All rise for the jury.

(Jury enters the courtroom.)

THE COURT:  Okay.  Good to see y'all back this morning.  I'm sorry, the doughnut place had sold out of all of the chocolates.  I apologize.

Y'all be seated.  Tomorrow I'll get a better selection.

All right.  Go ahead.

MR. TOAL:  Thank you, Your Honor.

REDIRECT EXAMINATION (Cont.)

BY MR. TOAL:

Q.   Good morning, Mr. Horne?

A.   Good morning.

Q.   When we broke yesterday I had only a few more questions, so I'll be brief.

Do you recall yesterday that plaintiff showed you a few lines of testimony from your deposition?

A.   Yes, I do.

Q.   And that testimony dealt with strip pricing to value certain XTO assets; is that correct?

A.   Yes.  That's right.

Q.   And the transcript referred to that happening in the year 2014, correct?

A.   Yes.  That's what the testimony indicated.

Q.   And your testimony yesterday was you didn't recall any valuation of XTO in 2014 but you thought maybe that was referring to a valuation exercise at the time of the XTO merger; is that right?

A.   Yes.  That's correct.

Q.   When was the XTO merger?

A.   XTO merger was in 2010.

Q.   Did you have a chance to review that part of your deposition testimony yesterday?

A.   Yes, I did.

Q.   And did -- did reviewing the rest of the testimony around those few lines that plaintiff's counsel showed you make clear the context of the discussion you were having?

A.   Yes, sir, it did.

Q.   And -- AND what did it show?

A.   Well, immediately before that part of the -- the deposition, we were talking about the merger itself in 2010 and how we went about valuing it.

Q.   And did plaintiff's counsel show you that testimony when he was questioning you?

A.   No.

Q.   And did that context clarify when you use strip pricing to estimate value at XTO?

A.   Yes.

Q.   And when did you do that?

A.   Yes.  That was in 2010 at the merger.

Q.   So why did you use strip pricing in 2010?

A.   The accounting rules, when you have a merger or a purchase, require you to put the assets on your books at fair value and that was deemed the appropriate approach at the time of the merger.

Q.   Does that suggest you should have used strip pricing as part of your 2015 Asset Recoverability Review?

A.   No.  Not -- not at all.  The accounting rules for asset recoverability work are totally different, totally different section of the accounting standards.

And as I've mentioned before, when you do an asset recoverability assessment we use a different set of prices.

Q.   Do you recall you were asked some questions yesterday about Kearl proved reserves?

A.   Yes, I do.

Q.   And do you recall testifying that you weren't that familiar with the SEC proved reserve rules?

A.   Yes.  That's correct.

Q.   And were the SEC proved reserve rules part of your responsibility in the Accounting Policy Group?

A.   No, not at all.

Q.   Were you involved in assessing proved reserves at Kearl?

A.   No.

Q.   Were you involved in assessing proved reserves anywhere?

A.   No.

Q.   Now, in connection with proved reserves, was your role limited to drafting potential disclosures?

A.   Yes.

Q.   And did you do that with input from the experts at ExxonMobile about proved reserves?

A.   Yes, I relied on them heavily.

Q.   Who were those people?

A.   They were personnel in the Global Reserves Group.

Q.   And did -- had you ever worked in the Global Reserves Group?

A.   No.

App. 1176

Q.   Now, on the other hand, you were in charge of ExxonMobile's Asset Recoverability Reviews in 2015 and 2016, correct?

A.   Yes, sir.

Q.   And you wrote the impairment papers on those recoverability reviews in both 2015 and 2016, correct?

A.   Yes, the white papers.

Q.   How much work went into putting those white papers together?

A.   Significant amount of work, multiple weeks with multiple people involved.

Q.   How long were those white papers?

A.   I think the one in 2015 was about 80 pages long and I think the one in 2016 probably tipped the scales with 200 pages.

Q.   And was conducting these Asset Recoverability Reviews part of your area of responsibility?

A.   Yes.

Q.   Was the work that you did on those Asset Recoverability Reviews reviewed by others?

A.   Yes, sir.

Q.   Who reviewed those reviews?

A.   Our public auditor, PwC, went through it with a fine-toothed comb.  We had people internal to my group, as talked about yesterday, performed coalesced reviews.

Q.   And were those Asset Recoverability Reviews accurate?

A.   Yes.

Q.   What did they conclude in 2015?

A.   They concluded the assets were not impaired.

Q.   And do you stand by that analysis today?

A.   Yes, sir.

     MR. TOAL:  Nothing further -- further, Your Honor.

     THE COURT:  Thanks.

     I've got a question.

     I don't understand this, you -- is it Hugoton Royal Trust?

     THE WITNESS:  Yes, sir.  Hugoton Royal Trust.

     THE COURT:  Who are they and what difference -- what's that?

     What's going on there?

     THE WITNESS:  It's an oddball type of entity that -- that became in vogue let's say in the '90s.

     THE COURT:  What do you mean "in vogue"?

     THE WITNESS:  Certain companies were stripping off part of their operations and putting them into a royalty trust.  Okay?

     And then that royalty trust was literally a public company that traded on the New York Stock Exchange.

     But the company itself, in this case XTO, did not own any shares of Hugoton Royal Trust.

     THE COURT:  Okay.

     THE WITNESS:  Like I said, it's kind of a strange construct.

     THE COURT:  Okay.  Is that -- is that entity still around?

     THE WITNESS:  Gosh, I don't -- I don't know.

     It was around certainly in 2015/16.  I just don't know.

     THE COURT:  Thank you.

     Go ahead.

               RECROSS EXAMINATION

BY MR. SHELDON:

Q.   Good morning, sir?

A.   Good morning.

Q.   Did you just say you used strip pricing to assess fair value; is that correct?

A.   Yes.

Q.   Now, just so we're clear, Mr. Horne, you testified earlier that you met with primarily Mr. Toal for about a hundred hours; is that correct?

A.   I think, yeah.  Somewhere around there.

Q.   And you would agree that the average workday is 8 hours?

A.   In many industries that may be the norm.

Q.   All right.  And so you met with him for the equivalent of 12 and a half days; is that correct?

A.   Yes.

Q.   And when you met with him you reviewed documents?

A.   Yes.

Q.   And when you met with him you practiced for your direct examination, didn't you?

A.   Yes, sir.

Q.   And then after you two practiced together, you came here yesterday and your direct examination was approximately three hours, correct?

A.   I think that's about right.

Q.   And then my examination was for about an hour; is that correct?

A.   Sounds right.

Q.   And you and I never practiced together before we did the cross-examination?

A.   That's correct.

Q.   And then after the cross-examination Mr. Toal asked you about another hour's worth of questions?

A.   Yeah.  That's less clear.  I can't remember how long that lasted.

Q.   And there was breaks after the questioning, correct?

A.   Yes, sir.

Q.   And you and Mr. Toal would talk during the breaks?

A.   Yes.

Q.   And then we broke yesterday after court.

     Do you remember that?

A.   Yes, sir.

Q.   And then you spoke to him again?

A.   Yes.

Q.   And then you spoke to him this morning?

A.   Yes.

Q.   And then you testified this morning, correct?

A.   Yes.

MR. SHELDON:  Pass the witness.

THE COURT:  All right.  Mr. Toal.

REDIRECT EXAMINATION

BY MR. TOAL:

Q.   Mr. Horne, have you testified truthfully and accurately throughout your testimony here?

A.   Yes.

MR. TOAL:  Okay.  Nothing further.

MR. SHELDON:  Nothing further, Your Honor.

THE COURT:  All right.  We're ready to call our next witness.

We'll go back into the plaintiff's case, correct?

MR. SAHAM:  Yes, Your Honor.

THE COURT:  Call your next witness.

MR. SAHAM:  The plaintiffs call Paul Regan to the stand.

THE COURT:  You may step down.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  We just have one on the witness stand at a time.

THE WITNESS:  Thank you.

THE COURT:  Thank you, Mr. Horne.

MR. SAHAM:  Your Honor, may I move our barrel back into position?

THE COURT:  You may.

MR. SAHAM:  Thank you, Your Honor.

THE COURT:  Where does that barrel stay at night?

MR. SAHAM:  I think it stays over here.  It's all lonely.

THE COURT:  Let me get you sworn in, sir.

(Witness sworn.)

THE COURT:  All right.  If you'll have a seat right there next to me, I'd sure appreciate it.

THE WITNESS:  Okay.

THE COURT:  We've worked on the microphone that maybe you can lean a little bit back and maybe we can still hear you.  But you might want to bend that microphone.  It can be bent.

Yeah.  There we go.

THE WITNESS:  The chair doesn't move.

THE COURT:  There you go.  No.  It will be fine.

Make sure you can -- you can hear yourself.  Then you know you're loud enough.  Okay?

THE WITNESS:  All righty.

THE COURT:  All right.  Here we go.

DIRECT EXAMINATION

BY MR. SAHAM:

Q.   Good morning, Mr. Regan.

A.   Good morning.

Q.   How are you doing today?

A.   I'm doing fine.  Gave me a chance Sunday to visit -- my oldest grandson is a freshman at TCU and we went to dinner.

THE COURT:  Oh, I'm sorry for that.  That's terrible.

(Laughter)

BY MR. SAHAM:

Q.   How many --

THE WITNESS:  He loves it though, Your Honor.

THE COURT:  No.  TCU is a great school.  It's not Baylor but it's okay.

(Laughter.)

BY MR. SAHAM:

Q.   How many grand -- grandchildren do you have?

A.   I have six.

Q.   Okay.  And are you also the grandparent of something else?

A.   I'm introduced in conferences and speeches as the grandfather of forensic accounting.

Q.   And why is that?

A.   Basically I started it as a result of a -- of a securities lawsuit.

Q.   Okay.  And how long ago was --

A.   Way, way back in time.

Q.   How long ago, approximately?

A.   How long ago was it?

Q.   How long ago was that?

A.   '70 -- started in '73 and ended in '75.

Q.   Okay.  And did you create some slides to be created to help you with your testimony today.

A.   I did.

Q.   And the first slide, this sets out your qualifications, correct?

A.   Yes.

Q.   And could you just describe, what's your background?

A.   Well, I have an undergraduate and masters in accounting.

I have been in public accounting since 1968 and I've been licensed as a certified public accountant since 1970

Q.   And did you -- when you started your career did you work for one of those Big Four accounting firms?

A.   At the time it was the Big Eight and it was the firm which was now KPMG.

Q.   Okay.  And what was it called back when you worked there?

A.    Peat Marwick Mitchell & Co.  And there was a merger with Klynveld Goerdeler.  And they dropped the name Klynveld and went with the initials K -- K from Klynveld, PM from Peat Marwick, and Goerdeler -- from Goerdeler, they were a big European firm.

Q.    And about how many times have you been qualified as an expert to testify in state or federal court?

A.    More than 125 times.

Q.    And have you ever been retained by the Securities and Exchange Commission to testify about their rules?

A.    Yes, I have.

Q.    How many times did the Securities and Exchange Commission hire you to testify about Securities and Exchange Commission rules?

A.    Approximately 15 times.

Q.    Okay.  And did you -- have you ever been retained by any other government entities to testify about accounting and auditing?

A.    Yes.  I've been retained by the FDIC, which is the Federal Deposit Insurance Corporation, Department of Justice, and many attorney -- attorneys general around the United States.  Attorneys general are of states.

Q.    And have you been retained by corporations in the past?

A.    I have.

Q.    About how many times?

A.    Over a hundred.

Q.    And what are some of the corporations that have hired you to testify about accounting and auditing and SEC rules?

A.    An example would be Apple, General Electric, Raytheon, Boeing, Levi Strauss, and the National Football League.

Q.    And have you ever been -- held any political positions?

A.    I was elected to my town's school board three times, and then elected to City Council three times, and served one term as its mayor.

Q.    And about how many hours have you spent examining the facts and circumstances of this case?

A.    Approximately 700.

Q.    And -- you -- I assume you get paid for your work?

A.    I do.

Q.    And how much do you get paid per hour?

A.    $950 an hour.

        MR. SAHAM:  Okay.  Your Honor, the plaintiffs would offer Mr. Regan as an expert in accounting, forensic accounting, and auditing.

        MR. TOAL:  No objection.

        THE COURT:  All right.  He's admitted as an expert in those areas.

        MR. SAHAM:  Thank you, Your Honor.

BY MR. SAHAM:

Q.    Now, you're offering certain opinions in this case.  Is that fair?

A.    Yes.

Q.    And what's the first opinion that you're offering?

A.    That Exxon concealed recurring losses at its largest single reserve, which was located at Kearl, which is in Canada, and that is -- relates to accounting rules item 303 and Staff Accounting Bulletin 99.

Q.    Just so we're clear, there's a lot of SEC rules and accounting rules, right?

A.    Yes.

Q.    And just because you comply with one that doesn't get you off the hook, does it?

A.    Right.

Q.    So you have to comply with all of them, all the applicable ones?

A.    All the applicable ones which are material.

Q.    And it's your opinion that failing to disclose these recurring losses violated at least two of those rules?

A.    Yes.

Q.    Item 303 and SAB 99?

A.    That's correct.

Q.    Okay.  And you're offering a second opinion as well?

A.    That it failed to timely write down or debook 3.6 billion barrels of reserves located at Kearl.  And that's -- the ASC is Accounting Standards Codification 932.

Q.    Okay.  And what are the ASC or -- the Accounting Standards Codification, what is that for the jury?

A.    Those are promulgated by the Financial Accounting Standards Board and they constitute GAAP.  It's a codification that was done in 2009 that took all of the various segments of GAAP, Generally Accepted Accounting Principles, and codified them into one collection of -- of accounting rules.

Q.    And can you just describe for the jury what GAAP -- that's G-A-A-P, all caps, right?

A.    Yes.

Q.    And you -- you accountants talk about that a lot, right?

A.    We talk about it a lot.

Q.    And what is it, just in layman's terms?

A.    It's Generally Accepted Accounting Principles.  And since 2009 those are codified in ASC by the FASB.

Q.    And again what's the FASB?

A.    Financial Accounting Standards Board.

Q.    And what do they do?

    What's the FASB?

    What's their role?

    What's their job?

A.    The FASB establishes GAAP for public companies.

Q.    Okay.  And you're offering a third opinion in this case;

is that fair?

A.   Yes.

Q.   And what's that third opinion?

A.   Failed to timely write down Exxon's Rocky Mountain dry gas assets, which were impaired and required an after tax charge of 1.7 billion against earnings.  That's based on ASC 360.

Q.   And that's the rule dealing with impairments?

A.   Correct.

Q.   And we're going to look at this next slide.

There has been a lot of talk in this case about what an SEC annual report or 10-K is.  Can you explain that to the jury basically from an accounting parlance?

What is an annual report on Form 10-K?

A.   It's kind of like a report card.  And it's an annual report, so it's -- it's as of in this instance 12/31/15.  And it reports financial statements, balance sheet, which lists assets and its liability.  It includes an income statement and it includes other statements and a great deal of like teacher's notes that help people understand those financial statements.  And then it also includes management's MD&A, which is supposed to be management's narrative explanation to the reader of those financial -- that financial information.  Because financial information often needs an explanation from management's eyes.

Q.   And are there certain rules that govern what needs to go in the 10-K to ensure transparency?

A.   Yes.

Q.   And what's transparency in an accounting standard -- standard?

A.   In simple terms, it's enabling the reader of the 10-K to see the company through the eyes of management.  And it -- it not only includes the financial statements but we often talk about MD&A, which is Management's Discussion and Analysis, which is that narrative explanation provided by management to the reader.

Q.   And for oil and gas companies, are there some -- some additional standards that they have to comply with in the 10-K?

A.   Yes.  If you're an oil and gas company you have to provide some information, which is not required of let's say Levi Strauss or General Electric.

And this is the last -- can I have the Baylor pointer, the green pointer?  I guess you call it Baylor green is what I've been told here.

MR. SAHAM:  Unfortunately, judge, I'm very sorry, we only have the red one.

THE COURT:  Well, I'm going to take my tie off and you can attach it.

(Laughter)

THE WITNESS:  So we're -- oh, boy.

BY MR. SAHAM:

Q.   Doesn't reach?

A.   Doesn't show up or doesn't reach.

Q.   Do you want -- do you want me to point to something and I can --

A.   Well, it's the last bullet.

Q.   Okay.

A.   And with respect to oil and gas companies they need to provide information to the investors --

THE COURT:  Let me take that and check that.  We'll get it checked, make sure it's working right.

Thank you.  Appreciate it.

MR. SAHAM:  He may just not have the range from there, Your Honor.

Okay.  We have a Baylor green, maybe it will work better.

THE COURT:  Here's a red.  It's working.  Just hard to see.

BY MR. SAHAM:

Q.   It's that green button at the top.

There you go.

THE COURT:  I think the green is easier to see.

THE WITNESS:  I'm glad we've got this.

This is helpful.

So "It's intended to provide investors with a more meaningful and comprehensive understanding of oil and gas reserves which should help investors evaluate the relative value of the oil and gas companies.

BY MR. SAHAM:

Q.   And we talked a little bit about item 303.

Can you tell the jury what that is and what that requires?

A.   It -- it -- it fleshes out in more detail the objectives and the rules that relate to the 10-K.

Q.   And in this particular case did you review some internal documents where the company repeated the language of 303 and emphasized it at internal meetings?

A.   Yes.

Q.   And is this one of those documents?

A.   It is, yes.  This is an Exxon document.

I added the date, January 27, 2016, from the metadata -- metadata in the file.

This was in connection with a -- providing talking points that Mr. Rosenthal provided to Mr. Tillerson.

And the comment that is applicable to your question is "The MD&A must discuss trends, uncertainties, and reasonably possible outcomes, quantitatively," and this is important -- "as of the filing date."

So as of the filing date a lot of the 10-K is as of

PAMELA  J.   WILSON,  CSR/RMR/CRR

**App. 1180**

December 31, 2015. You need to consider facts and circumstances that occur up to the filing date, which in this instance was February 24th, 2015.

BY MR. SAHAM:

Q. Could we break that down a little bit? What's a trend from an accounting or auditing perspective?

A. A trend is a series of movements as opposed to a point in time.

Q. Okay. And were there trends at issue in this case that we're going to discuss?

A. Yes.

Q. Okay. And what's an uncertainty?

A. An uncertainty is a fact and circumstance where you're unsure about whether something is or is not the case.

Q. And -- and are uncertainties required to be spoken of in the Management Discussion and Analysis discussion --

A. To the extent they're material, yes.

Q. Okay. And "material" means important, and we'll get to that eventually?

A. Yes. Important to the reader. Yes.

Q. And there's a whole rule about materiality as well?

A. Yes. It's called Staff Accounting Bulletin 99.

Q. And when you say "Staff Accounting Bulletin," which staff?

A. Securities and Exchange Commission.

Q. And that's one of the rules you applied in this case?

A. Yes.

Q. And "quantitatively," what does that mean?

A. That basically means you're gathering information in numbers.

Q. And was there an additional part to this document that was notable?

A. Yes. This talking point is that it was stating that Exxon is one of the few, if not the only major industry players, without major reserves debooked, especially Canadian oil sands, that it's going to draw attention from the SEC.

Q. So when you read these two bullet points together, is the SEC essentially telling Exxon that if they don't write down these oil sands they want quantitative or numerical disclosures?

MR. TOAL: Objection to leading.

THE COURT: Sustained.

BY MR. SAHAM:

Q. Is there a linkage between these two bullet points, Mr. Regan?

A. Yes. The fact that it's a discussion of SEC disclosure and it's in that period of time between the end of the reporting period and the filing date, this is clearly a discussion relating to this important trend, uncertainty, and disclosure requirements with respect to the -- the Canadian gas -- the Canadian oilfields, the Canadian oil sands.

And it's reminding Mr. Tillerson that there's a spotlight that's going to be on our reporting here with respect to a quantitative analysis and whether or not we debook this reserve on this field.

Q. And these trends, uncertainties, with respect to Kearl, were they disclosed in the 2015 10-K?

A. No.

Q. And were there certain trends and uncertainties that you viewed internally with respect to Kearl that management was aware of?

A. Yes.

Q. And does this chart summarize those?

A. Yes. I put this chart together basically to help me kind of analytically look at what was happening with respect to the Kearl field as it was reported to management on a monthly basis.

Q. And does this relate to the eyes of management?

A. Yes. I mentioned the SEC rules. They want the 10-K to report information that is important to the eyes of management, what has management seen, what have they considered that was important to the company.

And so what I -- I put together here was from their monthly F&L highlight report, which went to executive management, because I wanted to see, well, what were the earnings of Kearl by month and for the year 2015.

And you can see that in that first column that in every month there was a -- reported a loss, except for August for $25 million and May of $7 million. So these are in millions and they're in millions of dollars.

Also, there was the --

Q. Could I -- could I stop you there, Mr. Regan, just so the jury understands?

What are earnings?

A. Oh, earnings is you take revenues minus expenses equals earnings.

Q. And is that also referred to as the bottom line?

A. Often, yes.

Q. And what does it mean, the "bottom line"?

A. It's at the bottom of an income statement, which is probably why it's called the bottom line.

Q. And the bottom line here was that for fiscal year 2015 Kearl's earnings were negative $440 million?

A. Yes.

Q. And what's the next column?

A. In the monthly F&L report they present a determination of the estimated cash consumed by month. That would be after considering the revenues collected and after expenditures incurred. This is the negative sum.

And in -- in every instance it's a negative. Accountants tend to put negative numbers in red or also they have a dash in front of them.

So these are all negative. And it totals $831 million

Q. So Kearl burned $831 million in cash, a negative amount, in 2015?

A. Yes. That's what was reported.

Q. And reported to whom?

A. Executive management.

Q. And what's the third column, CM realizations, dollars per barrel, what's that?

A. CM is current month.

And realization is -- basically is -- is described on this barrel here where you have the -- the -- the delivery of -- of oil, and this is on a barrel basis, and you subtract various costs, actual costs that are incurred to get to the amount that you realize from your customers that you deliver the barrel to.

And that is -- in this instance we start out with $13.50 per barrel and at the end of the year it was $11.52. And in January it was a little over $4 per barrel.

Q. And is there a trend there?

A. Well, there was a peak reached in June of $42.01.

And as you move through the rest of the year the trend is that it's declining

Q. And the $4 in January, is -- is that relevant to something we -- we looked at earlier that is in the 303?

And I'm just going to click back.

Is there something relevant in that guidance?

A. Yeah. We need to consider information that is as of the filing date.

The $4 was reported in -- during -- at the end of January it was reported to executive management that the realization had declined to $4.

Q. And this 10-K that's at issue in this case, the annual report, when was that filed publicly?

A. February 24, 2016.

Q. Okay. And was any of this information on this graph disclosed in that 10-K?

A. No.

Q. And what about did you look at page 99 of the 10-K?

A. I did.

Q. And was this information disclosed there?

A. No.

Q. What was disclosed there?

A. I think it was a -- a consolidation of fields throughout Canada and South America, which are hundreds.

Q. So it was a consolidation of two full continents?

A. I don't know whether Canada is a continent.

Q. That's a good point. I stand corrected.

It was a consolidation of one country and one continent?

A. Yes.

Q. And are proved reserves important to an oil and gas company?

A. They are a -- a key measure of an oil company.

Q. And why are they a key measure?

A. Because they represent a collection of oil and gas presented in barrels which are going to provide future profitability in the coming years. In order to be a proved reserve it has to be -- the oil has to be a profitable barrel.

The more years you're going to be able to prove to investors that you're going to be able to sustain the company because you've got this massive amount of proved reserves. So that's why it's referred to as a key measure of sustainability for a company --

Q. And this is --

A. -- oil and gas company.

Q. And this is an Exxon document?

A. Yes. It's from their Global Reserves Workshop.

This one is as of October 10, 2015.

Q. Now, did Exxon understand the rules of how you are supposed to -- or -- or strike that.

Did you look at certain documents that set out the standards for calculating a proved reserve?

A. Oh, yes. Correct.

Q. And is this one of those Exxon documents that sets out the standard?

A. Yes. This is part of a May 7, 2015 Global Reserves Workshop. And one of the presentations to the attendees was what is proved reserves, SEC proved reserves.

Q. And what's the concept of economically producible?

What's that?

A. Well, first of all, the SEC proved reserves is -- the estimates have to be reasonably certain to be economically producible. And Mr. Horne testified that -- you know, that that threshold is about 90 percent. And economically producible is that the resource generates revenue that exceeds costs of operation.

All of these are to be developed using existing economic conditions.

The product prices, which is the determination for realization, is a formula which uses the first day of the month of each month in the reporting period, and it's after you incur the kind of costs that were described in that barrel.

And then operating costs are determined based upon the rules of the FASB.

Q. So you got to comply with the accounting rules, correct? Correct?

PAMELA J. WILSON, CSR/RMR/CRR

App. 1182

A. Yes.

Q. And did Exxon follow these rules in the Kearl calculation in this case?

A. No.

Q. And were they aware of those rules?

A. Oh, yeah. We -- we just saw that. Yes.

Q. And was there testimony making clear that they were aware of those rules?

A. Yes.

Q. And what is that testimony?

And could you read it to the jury?

And whose testimony is this?

A. This is Mr. Tillerson's trial testimony in both instances.

And the question was: "Q. And it's also accurate that once a project was built and started up, you only used what your actual costs incurred are. Otherwise you're putting false things into your books of accounting, correct?"

And the answer was: "A. Correct."

The next question is: "Q. So once a project starts up, you can only include what you're actually incurring. You don't include something speculative in your accounting reports. It would be false, correct?

"A. I believe that's correct."

Q. And were there manuals at Exxon that made this clear with respect to proved reserves?

A. Yes. This is a manual discussing that calculation.

The effective date has been blown up. It's November 1st, 2015. And it was prepared to help senior management in the preparation of the 10-K.

And included in that is a paragraph that says "Lifting and development costs for any project with proved reserves that are not under development at year-end should be consistent with actual current year average prices and costs."

Q. Now, did Exxon follow this rule in its calculation of proved reserves at Kearl?

A. No. Did not use its actual prices -- or actual costs, excuse me.

Q. And does this slide help communicate how they got around those rules?

A. Yes.

Q. And what's being communicated in this slide?

A. In the left-hand portion this is how Exxon calculated its realization for purposes of determining whether the bitumen at Canada and Kearl qualified as proved reserves.

And on the right-hand side is collecting the actual costs, which is a calculation that I did based upon Exxon's records.

Q. So Exxon's actual transportation costs for moving Kearl to market, including all the markets, was $5.88, correct?

A. Yes.

Q. And they only used $1.32 in their SEC analysis?

A. Correct.

Q. And did that inclusion change whether or not you could include those barrels as proved reserves?

A. Yes. It was the major differential between whether it qualified as proved reserves or did not, because the -- the calculation by Exxon was that the realization was $28.70, whereas, the actual, using actual transportation, it's $24.27. And the lifting cost, which is the cost that are incurred to lift the oil out of the ground were $27.90.

So in the Exxon calculation lifting costs were 27.90. The amount they received when they sell the oil was shown to be -- or the SEC pricing of the amount received when they sell the oil was 27.90. So it was determined to be economically profitability, producible. Whereas, in this calculation it is not economically producible.

And that's -- you know, when I -- I saw the calculations that we saw earlier, where there were these significant losses, I -- I first asked myself, well, if you've got that degree of loss how could it be economically producible. Now, that's -- that's not a quantification of economically producible. So then I drilled into these records and found that they determined that there was economic producibility by not including all of the costs.

Q. And are you allowed to do that under the FASB or the GAAP?

A. No.

Q. Why not?

A. Because you have to use actual costs.

If you -- if you stray from that, you know, the -- the SEC for oil and gas companies made it clear in 2009 that it wants these calculations to be done consistently in the industry in order to enhance comparability, so that if -- if I as a potential investor am considering investing in one oil and gas company I want to see that they -- they measure these things in the same manner, they don't just pick and choose their own methodology.

Q. And did Exxon pick and choose?

A. Yes.

Q. And was that -- did that -- did that -- what's the word I'm looking for?

Did that meet with GAAP requirements or A -- FASB requirements?

A. No.

Q. Okay. And did Exxon ultimately correct this problem?

A. Yes.

Q. When did they correct it?

A. In 2016.

PAMELA J. WILSON, CSR/RMR/CRR

App. 1183

Q.   And how do you know they corrected it?

A.   I have discovered a variety of documents that show how the calculation was done in 2016, both documents that quantify this change and also discussions within Exxon personnel that basically are saying, hey, we've been -- we did it wrong and we -- we need to correct it.

Q.   And that --

A.   And this is -- this -- go ahead.

Q.   Oh, I just wanted to clarify.

That was well after the 10-K was filed, correct?

A.   Yes.

What you put -- can I talk about what's on the screen?

Q.   Yeah.  Please.  Please.  Use the slide.

A.   You've got two -- two charts here.

The top one is Kearl SEC pricing and it has for the year 2015, in the first column, and these January through year-to-date are various months in 2016.

And in the second chart -- portion of the chart, is the Kearl actual realizations in 2016 per barrel.  But it starts out with for the year 2015.

Q.   And --

A.   And you can see that in that chart transportation for 2015 is $5.88.  And you can see that in 2016, as they move along the transportation line, their SEC pricing is using actual transportation.

And the realization calculated here, $24.27, that's the amount they collected from customers.  And you compare that to lifting costs of 27.90 and it's not economically producible

Q.   So in 2016 they used the actuals, correct?

A.   Yes.

Q.   And it resulted in a debooking?

A.   Yes.

Q.   And in 2015 they didn't use the actuals, correct?

A.   Correct.

Q.   And they kept those barrels?

A.   Yes.

Q.   But they had, as we -- we observed in the management reports, they had the evidence, they had the actual numbers in 2015 every month, correct?

A.   Yes.

Q.   And ultimately they aligned the actuals with the SEC pricing, correct?

A.   They did, yes.

Q.   And is there any basis not to align the actual costs with the SEC calculation?

A.   No.

As we -- as we saw in the Exxon manual that we showed a few moments ago, you need to use the actual costs and prices for the full year.

Q.   And --

A.   And that was prepared for the 2015 10-K.

Q.   And did the CFO of the company understand that?

A.   Yes.

Q.   How do you know?

A.   This comes from the deposition of Mr. Swiger, the principle financial officer.

He was asked the question:  "Q.  And I just want to make sure I have this correct -- right.  In the SEC analysis, you're going to want to use the actual cost involved, whether it's transportation, diluent, or any other cost, correct?".

And the answer:  "A. That is correct."

Q.   And did he also receive reports that made that clear?

A.   Yes.  He says -- the question was:  "Q. Okay.  But you were informed in November 2015 that the year-to-date transportation cost for Kearl was $7, correct?"

The answer is:  "A.  Yes."

Q.   And is there any basis not to use the actual transportation costs to market in -- in doing the SEC analysis?

A.   No.

Q.   And you talked a little bit a moment ago about something called Kearl unit lifting cost?

A.   Yes.

Q.   What is that?

A.   Lifting costs are the costs to bring the oil to the surface.  And it is the -- all of the costs, the labor, the materials, the repairs and maintenance, the sustaining CapEx.

This is a $23 billion collection of expensive machines.  It's operating 24 hours a day, seven days a week, 365 days a year.  Sometimes it's very cold in Edmon -- or in this area.  You've got to maintain it.  Things break, you've got to fix it.  Those are lifting costs.

Q.   And are those also called production costs under the rules?

A.   Yes.  Production costs, lifting costs, operating costs, they're all the same.

Q.   And just to make it clear.

There's two parts to lifting cost, cash OpEx and sustaining CapEx?

A.   Yes.  You can see on this chart where it's discussing Kearl unit lifting cost by year, the second row, cash OpEx, so that's cash operating expense, and sustaining CapEx, which are the costs to keep the beast alive, basically.  You've got this massive operation and you're going to have to do a lot of capital expenses just to keep production going.

Q.   And what's the difference between a cash operating expense and a sustaining capital expense?

A.   Cash OpEx would be cost of materials, labor.

And sustaining CapEx is I've got to spend money on

the -- to repair the equipment, to modify the equipment to make it more efficient or make it work.

Q.   And both of those items have to be included in lifting costs, correct?

A.   Yes.  This is an Exxon document and it's describing how you determine lifting costs by year.  And it collects both cash OpEx and sustaining CapEx.

Q.   And as of the end of October the company's lifting cost was calculated to be $28.50, correct?

A.   Yes.  That's the -- the costs that I've seen on Plaintiff's Exhibit 117.

Q.   And then by the end of the year that lifting cost was brought down by 60 cents to $27.90, correct?

A.   Yes.

Q.   So the year-end Kearl lifting cost was $27.90?

A.   Yes.

Q.   And in order to be a proved reserve your realizations had to be above that number?

A.   Yes.

Q.   And with actual numbers was the realization above that number?

A.   No.

Q.   And did Kearl qualify as a proved reserve as a result?

A.   No.

Q.   Now, does this next slide explain how you calculate

lifting costs?

A.   Yes.  This is from a document in November 2016.  It's a presentation by Mr. Swiger to the -- the Board of Directors of Exxon.

And he states, "We must use the actual" -- excuse me -- "We must use the average of the first day of each month in 2016 against actual cash operating costs for the year.  If the average price does not cover the cash costs for the year then the reserves cannot be considered proved and move to the probable category."

Q.   And why did you highlight "for the year"?

A.   Because it's a calculation that is for the 12 months.

The -- the price is based upon the -- the SEC rule that says you use the amount realized on the first day of the month for each month in the filing period.  So that's January through December.

Q.   And does that relate in any way to the comparability between companies?

A.   Yes.  That's the point I mentioned earlier, that every company should be doing it that way in order for there to be comparability.

Q.   And is this another Exxon document you reviewed?

A.   Yes, it is.

Q.   And what is it communicating?

A.   This is an October 16, 2015 presentation.

There's a variety of components in this chart.  But on the right side there's a discussion of the SEC positive cash flow test.

And they were looking at three different scenarios.

Scenario one, which is average -- annual average price and costs, which is the strongest alignments with the test.  That was the scenario one.

Q.   And is that the language that is comparable with the guidelines we looked at earlier?

A.   Yes.

Q.   And is that what needs to be used in the test?

A.   Yes.

Q.   And what else is being communicated in this slide?

A.   Well -- oops, can we go back?

Q.   Sorry.  I overclicked.

A.   Again, we're looking at cash OpEx and sustaining CapEx.

Now, the blue line -- again, this is I think October 16th, 2015.  The blue line is defined as lifting cost.  And it's at 12 -- year-end $31.8 -- 80 cents.  And that's a year-end estimate, because this is October.

And the SEC price, they are expecting that it will be between $28.50 and 29.50.

Lifting cost is 31.80.

So it would not be economically producible.

There was -- another line was -- this 2015 calendar

period excluding CAF.  And if they exclude CAF that line looks to be about the same as the SEC price.

Q.   And what -- what's direct CAF or direct cost above field?

A.   Well, direct CAF is -- CAF is costs above field.  And direct CAF is those costs within CAF that directly relate to the ability to produce the oil.

There's another component and it's called indirect CAF, and that doesn't have a direct relationship to production.

In -- in Exxon documents what I've seen is that there is an expectation that when calculating lifting costs they should include direct CAF, which is about $1.60.  But here you've got an exclusion of all CAF.  And you can see that lowers the line quite a bit.

Q.   And as an example of direct CAF an engineer up at Kearl working on the project?

A.   Yes.

Q.   And that needs to be included by the rules?

A.   Direct CAF, yes.

Q.   And is another thing you reviewed in your assignment in this case the petroleum engineer's Resource Management System Guide?

A.   Yes.

Q.   And what is that, essentially?

A.   What does that say?

Q.   Well, what's the -- what are petroleum -- what's the Petroleum Resources Management System Guide?

A.   This is a guide that is put together by various industry groups, Society of Petroleum Engineers, for example, and -- and others.  And they put together -- put together a resource management guide to help companies in their reporting.

Q.   And do they issue guidance about current economic conditions?

A.   Yes.

Q.   And what do they say in guiding petroleum engineers in looking at current economic conditions?

A.   Well, if we go back to that GAAP schedule, it has to be economically producible, proved reserves, using current economic conditions.

And current economic conditions, the Society of Petroleum Engineer guidelines recommend a one-year historical average of "cost and prices should be used as the default basis of 'constant case' resources estimates and associated project cash flows."

Q.   And, again, does this relate to that concept of comparability?

A.   Yes.

Q.   How so?

A.   Because it's -- it's adopting the SEC objective that was established in 2009 of having comparability of reporting,

comparability of gathering numbers and reporting them to investors.

MR. SAHAM:  Your Honor, this is a -- an agreed to exhibit that hasn't been admitted yet, but I'll move to admit it.

THE COURT:  Is it 817

MR. SAHAM:  517, Your Honor.

THE COURT:  Okay.  It's admitted into evidence.

BY MR. SAHAM:

Q.   Mr. Regan, did employees at Exxon point out the same things hinges that you're pointing out here today?

A.   Yes.  I've seen a number of emails and comments with respect to this calculation.  This is one example.  Sheila Webber, she was the upstream business analyst and reporting manager, and she is discussing in her email the subject of transportation costs for Cold Lake and Kearl.

And she states in her email, "This was always a concern that the old pricing method," -- which was using the $1.32, which was the cost of shipping the product to Edmonton -- "showed an Edmonton price but our actual transportation costs include getting it to the final destination."

Which many of the sales were to U.S. Gulf Coast and other destinations that were quite far from Edmonton.

Q.   Now, turning to the 10-K itself, which was Exhibit 66, were there certain defects in that document from an

accounting perspective?

A.   Yes.

Q.   And was one of those defects found on page 5 of the document?

A.   Yes.

Q.   And could you describe what that problem was?

A.   Well, in the proved reserves developed category the 10-K reports -- bitumen in Canada and South America reports millions of barrel equivalents, which 4,108 is 4,108,000,000 barrels of proved reserves.

My issue with that is that the Kearl reserves, which are 3,601,000,000 did not qualify as proved reserves.

Q.   Why didn't they qualify?

A.   Because they were not economically producible under existing economic conditions.

Q.   So that 4.1 billion number was overstated?

A.   Yes.

Q.   By how much?

A.   By about 710 percent.

Q.   And what about the 24.7 billion number for total proved reserves, what was the problem there?

A.   Well, that's the same 3,600,000,000 is included in that number and it was overstated by 17 percent.

Q.   And these numbers, including the Kearl here, that violates Generally Accepted Accounting Principles?

A.   Yes.

Q.   And who signed this document, the 10-K?

A.   It was certified to be accurate and that it did not omit material facts -- facts necessary to make these statements not misleading, signed by Mr. Swiger, Mr. Tillerson, Mr. Rosenthal.

Q.   And did the 10-K live up to that certification?

A.   No.

Q.   Now I want to turn to accounting material -- accounting materiality, and that's governed by SEC Staff Accounting Bulletin 99, correct?

A.   Correct.

Q.   And can you just explain to the jury what Staff Accounting Bulletin -- Securities and Exchange Commission Staff Accounting Bulletin 99 requires of publicly traded companies.

A.   Yes.  It was issued by the SEC as -- in the industry we call it SAB 99, Staff Accounting Bulletin 99.  It came out in 1999.  And it was incorporated in these -- FASB'S SA -- ASC 250-10-S99.

It basically is a long discussion of what is material from an accountant's perspective when putting -- reviewing, analyzing, auditing a financial report.  And they have a rule of thumb that a quantitative percentage threshold is 5 percent.  They basically say that something under 5 percent

PAMELA J.   WILSON,  CSR/RMR/CRR

App. 1186

could be material and -- if it's a particularly sensitive subject and something over 5 percent could not be material, depending upon the nature of -- of the item.

So the discussion is -- I can't remember how many pages, but it's a many-paged discussion of materiality and the types of things which might be material to an accountant.

Q.   And do you have any question in your mind at all that the 3.6 billion barrels at Kearl were material?

A.   No.

Q.   And did you prepare some pie graphs to help illustrate how material those barrels were to the company?

A.   I did, yes.

Q.   And what's being communicated starting with the far left?

A.   In the far left I took the Kearl proved reserves, divided it by the total proved reserves, and I got 14.54 percent, which I rounded up to the nearest number of 15.  So it represented 15 percent of Exxon's total proved reserves.

I also looked at proved developed reserves, did the same calculation.  And I -- Kearl is 20 percent of proved developed reserves, which is I think particularly important, because a proved developed reserve is where Exxon has spent billions of dollars taking that field and making it productive and provide -- providing product that it can sell.  And that requires -- in this instance, Kearl, the total

invested origi -- was 23. -- a little over $23 billion.

I also looked at two other components.  This one is proved liquid reserves, which is oil versus natural gas, and it was 24 percent of Exxon's liquid reserves.

And then I looked at, well, is it -- how does it compare to the bitumen reserves, and it's 88 percent of the bitumen reserves.

Q.   And was there another page of the 10-K that was also problematic?

A.   Yes.

Q.   And before we get to that, do you have any question in your mind that Kearl was material to Exxon?

A.   No.

Q.   And what was the problem with what happened on page 9?

A.   The -- page 9 there's disclosure of production prices and production costs.

There's the average production prices.

And there's a line for bitumen per barrel, Canada and South America.  South America did not have any bitumen.

And it shows the average production prices of $25.07.

Then it shows average production cost per barrel of $19.20.

This is a presentation of $5.87 per barrel.

Because it's proved reserves, which are economically producible, that -- when you multiply that 3,600,000,000 of

Kearl -- I -- I've added this also, Kearl's production costs, we've seen, is $27.90 --

Q.   Before we get to the multiplication, Mr. Regan, I just want to make it -- make it clear.

88 percent of this number was coming from Kearl; is that correct?

A.   Yes.

Q.   And what were Kearl's production or lifting costs?

A.   $27.90.

Q.   So quite a bit higher than the $19.20 list -- listed on this page?

A.   Yes.

Q.   And could that be misleading?

A.   Oh, yes.

Q.   Why?

A.   I think the -- the inference is that --

Q.   Sorry.

A.   -- the Kearl product -- you know, you want to -- you want to present information in a 10-K that is transparent and not misleading to a reader, an investor.  And the presumption there is that Kearl is representative in these numbers.  I mean, it's 88 percent of this -- of this column.

That shows $5.87 positive per barrel.  It implies that the Kearl 3,601,000,000 barrels will provide $21 billion of profit to the company in the future.  And we knew it -- my

determination is that it was not economically producible. It's very much in conflict with the -- the lower realization and the higher costs that we know that are associated with Kearl.

Q.   And if you were going to have these numbers in there the way they were, was some discussion in the Management Discussion and Analysis required?

A.   Oh, yes, so that management should be discussing the -- the narrative discussion of -- so that this information would not mislead the investor.

Q.   And did that happen here?

A.   No.

Q.   There was no such discussion in the MD&A section?

A.   No.

Q.   Now --

THE COURT:   What is the MD&A section?

BY MR. SAHAM:

Q.   Could you describe again what the MD&A section is for the jury, please?

A.   The MD&A is management's narrative of the financial statements.  And it's to include a discussion of -- of risks, trends, uncertainties, unusual events.

THE COURT:   Being the 10-K?

THE WITNESS:   In the 10-K.  Yes, it's a section of the --

THE COURT: So it's the -- it's the -- we've got all these numbers in here but we're also going to give you some narrative to -- to give more detail?

THE WITNESS: Correct, Your Honor.

THE COURT: Okay.

BY MR. SAHAM:

Q. Again, is that supposed to detail the business from the eyes of management?

A. Yes.

Q. And did that occur here in this 10-K?

A. No.

Q. And did Exxon employees in their own words recognize the materiality of Kearl?

A. Yes. I think this is Mr. Horne.

Q. And what's -- I believe it's Mr. Prestipino.

A. Oh, Mr. Prestipino, excuse me.

Q. Thank you. What did he say about Kearl?

A. He said that "Kearl (3.6 billion) represents approximately 15 percent of ExxonMobile's total proved reserves (as reported in the 10-K) and accordingly may be considered material."

Q. Now, you offered -- you're offering another opinion in this case. And let's go back.

Where's -- where's our shale?

You're offering an opinion about the Rocky Mountain dry

gas that gets pumped out of the shale as well?

A. Yes.

Q. And what's the opinion that you're offering by the Rocky Mountain dry gas?

A. That Exxon failed to write down three of its Rocky Mountain dry gas assets which were impaired and required a $1.7 billion after tax charge against earnings at 12/31/15.

Q. And -- and we're going to get to this in detail, but what's an impairment?

A. Impairment is an accounting term indicating that the amount recorded on the companies books and records will not be realized in the ordinary course of its sales. It won't -- it won't realize that value, so to that extent it needs to be written down.

Q. And is there a rule that governors impairment testing?

A. Yes. It's ASC 360.

Q. Okay. And when did Exxon purchase the XTO business which housed those Rocky Mountain dry gas assets?

A. 2010.

Q. And what was the price of natural gas in that period?

A. It was approximately in the 4 to $5 range, I think in the higher end of the -- of that range.

Q. And when we got to 2015, the period in question in this case, where were the prices then?

A. It had dropped to $2.28, by the end of the year.

Q. And, again, if you could describe for the jury in a little bit more granular fashion, what is an impairment under ASC 360?

A. That the asset is worth less than what is recorded on the books. And GAAP calls for specific procedures when the issue of impairment is addressed.

Q. And -- and does it get divided into three tests?

A. Yes.

Q. And sometimes the first step, confusing, they call it step zero?

A. I -- I --I know in this case -- accountants tend to call that one Step Zero and then Step 1 and Step 2, but I know in -- in this trial it's been merged into Step 1, 2, and 3, so I will -- I will call it Step 1, 2, and 3.

Q. Okay. So that first step is to determine whether there's a trigger, correct?

A. Yes.

Q. And what's a trigger?

Can you describe that to the jury?

A. A trigger is, you know, from a broad perspective is events that have occurred where a light bulb comes on or "Houston, we have a problem," from Apollo 13, you know, based on those facts and circumstances we may not be able -- be able to recover our book value on these assets.

Q. And did you --

A. It's a light bulb test or accountants often talk about it, "Houston, we have a problem."

Q. Okay. And did you observe certain triggers in this case?

A. Yes.

Q. And what were they?

A. Well, the ASC talks about several triggers, but one of have them is decreases in prices, that's a trigger.

Q. And did that occur here?

A. Yes.

Q. And was there other triggers that were apparent?

A. Yes.

Q. What was the second trigger that was apparent?

A. That there had been losses that actually have occurred or are expected to continue.

Q. And was there a third trigger here as well?

A. Yes. A decrease in price outlook as determined by management.

Q. And once there's a trigger, what does an accountant have to do next?

A. They apply a two-step process.

The first step is to prepare expected undiscounted cash flows. And if that test indicates that the undiscounted cash flows will not generate enough to cover the recorded amount on the books and records you go to the next step, which is to

**App. 1188**

measure the impairment loss.

Q. And is -- does ASC 360 require something overarching?

A. Yes.

Q. And what's that?

A. You must use reasonable assumptions, including price and cost, that are in existence at the time of the filing date.

Q. And did Exxon comply with that vital rule?

A. Absolutely not.

Q. Okay. Let's start with the triggers.

What was the first trigger you observed?

A. Decrease in prices.

Q. And does this chart illustrate those decrease in prices?

A. Yes. What I did is I put together a two-year chart, ending with the filing date, starting with the two preceding years.

And we've got a little blip here which relates to a very, very -- the polar vortex which consumed a lot of natural gas and resulted in supply chain issues. And we had an unusual peak here. But after there there's a persistent decline in prices over the two-year period, falling to a low of $1.85 on the filing date.

Q. And do you have any question in your mind that that was a trigger?

A. No.

Q. And did you observe --

THE COURT: Wait. Wait. Wait. What's the polar vortex?

THE WITNESS: As I recall the press was describing it as an unusual collection of -- of climacteric events which sent cold air from --

THE COURT: Oh, oh, it got really cold.

THE WITNESS: It got really cold. Really, really cold.

THE COURT: Oh, Okay. I understand.

THE WITNESS: Really cold for a long time.

THE COURT: When you said "polar vortex" that kind of sounds like something William Shatner might have said back in the day, but I didn't really understand it.

Thank you.

THE WITNESS: And a major use of natural gas is for power plants that supply heat. People use it to warm their houses, cook their food, dry their clothes. And during that polar vortex there was also some supply issues and a real spike there. It's kind of like --

THE COURT: Is it like what we had in snowmageddon --

THE WITNESS: Yes. Yes.

THE COURT: -- back three or four years ago?

THE WITNESS: Yes.

THE COURT: Okay.

BY MR. SAHAM:

Q. Do you have any question whether or not this decline in prices was an impairment trigger?

A. No.

Q. And were there other impairment triggers as well?

A. Yes.

Q. And what's being illustrated here?

A. That second trigger was losses being experienced within the entity that holds the assets.

And in this instance XTO operates the fields that we've analyzed and in 2015 XTO lost $1,384,000,000. You can see that profitability -- it's -- it's a very large number in comparison to other geographic areas.

Q. And it's negative.

A. Yes. It's negative. Yes.

Q. And do accountants -- you talked about the red, do they also sometimes use brackets for negatives?

A. We do, yes.

Q. Okay. So when you've got brackets around a number that means it's a negative number or a loss?

A. They're typically bad.

Q. Okay. And you detected a third trigger; is that fair?

A. Yes. ASC 360, condition 1b upstream industry specific.

The example that's given -- and this is a paper written by Pricewaterhouse, "Lower expected future oil and gas such as prices used by management in evaluating whether to develop or acquire properties."

Q. And did this drop in the future expected prices occur during 2015 at Exxon?

A. Yes.

Q. And what is being described in your yellow highlights between 2014 and 2015?

A. Well, as we look at the gas plan within Exxon, 2014, you look at 2024, which is in a long-term period, it dropped from $5.10 to $4, which is a 22 percent drop.

And you can see that they started that drop in -- in prior -- prior years. Every year has a signature drop from 2014 to 2015.

Q. Now, under the accounting rules is a 22 percent drop in lower expected future oil and gas prices used by management an accounting trigger?

A. Yes.

Q. And is that expressly called out in the accounting rules ASC 360 conditions?

A. Yes.

Q. And did Exxon interestingly recognize the existence of the trigger when they went from 4 to 3.5 the next year?

A. It did not characterize that as a trigger.

Q. The 5.1 to 4 they didn't characterize as a trigger?

A. They did not.

PAMELA J. WILSON, CSR/RMR/CRR

**App. 1189**

Q.   Okay.  The next year, in 2016, did they find a trigger?
A.   They did.  And this is a drop from $4 to $3.50 in 2024, which is a 13 percent drop.
Q.   Is it possible that that smaller drop could be a trigger and the bigger drop not be a trigger?
A.   I don't think that that's a reasonable interpretation of ASC 360.
Q.   Why not?
A.   It's a lower expected future oil and gas prices used by management, that's what the rule says.
Q.   And did Exxon itself recognize that this was a trigger internally?
A.   No.  This -- this is a -- notes from Mr. Swiger's -- notes prepared for Mr. Swiger and Mr. Tillerson in connection with a meeting with PwC and a couple of -- and this was on November 11, 2015.  And the APS and RWT is Mr. Swiger and Mr. Tillerson.
    And it indicates -- certainly with respect to the trigger, "(be prepared to answer the question:  So has a trigger occurred?  Answer:  By virtue of reduction in ExxonMobile's long-term gas price outlook, it would be difficult to argue to SEC that one has not occurred)."
    That's the outlook we were just looking at
Q.   And you would agree with that supposition that it's difficult to argue a trigger has not occurred when your

prices went down 22 percent?
A.   Yes.
Q.   Now, might have there have been a reason why they didn't want to find a trigger?
    MR. TOAL:  Objection, speculation.
    THE COURT:  Sustained.
BY MR. SAHAM:
Q.   What's being communicated in this document, Mr. Regan, and why was it important to your consideration?
A.   Well, this is -- I think in the last sentence, "Once a trigger occurs, the impairment testing process with it, still more opportunities for auditors and regulators to challenge and second-guess our judgment on any number of fronts."
    And basically if you're doing an impairment trigger or you recognize an impairment trigger it sets off red flares, Roman candles, inside the audit world or inside the SEC.
    You know, usually I see audit firms -- and I -- I review workpapers from all the Big Four multiple times.  They get very concerned about whether there's an impairment trigger and they want to look at the -- at the calculations in detail, provide a lot of scrutiny.  So does the SEC.
    It's -- companies like to avoid that kind of -- of special consideration.
    Plus it's expensive.  I mean, if PwC says this is -- needs special consideration, it means the New York office is

going to have to get involved and then we're going to have all kinds of -- of second-guessing and -- analysis that we'll need to do
Q.   How many years did you spend as a Big Eight auditor?
A.   Oh, I -- well, I was -- six years.
    But I've reviewed audit workpapers for the last -- much of the last 50 years of the big -- Big Six, then Big Four.
Q.   And in your 50-years-plus of experience, when an impairment trigger is recognized that initiates greater scrutiny from auditors and regulators?
A.   Absolutely not.
Q.   And what's being communicated in this next -- or -- or strike that.
    And is one of the things that that scrutiny is going to focus on the reasonableness of the assumptions for prices and costs used?
A.   That should be key.
Q.   So there's going to be more probing and prodding on that issue if you have a trigger?
A.   There should be, yes.
Q.   And what's the significance of this document from an auditor's perspective?
    THE COURT:  Don't tell us yet.
    We're going to take a break.
    All right.  Don't talk about the case, ladies and

gentlemen.
                    (Recess taken.)
            (Proceedings resumed at 11:03.)
        THE SECURITY OFFICER:  All rise for the jury.
                (Jury enters the courtroom.)
        THE COURT:  Thank y'all.
    All be seated.
    Okay.  Go ahead, Mr. Saham.
            DIRECT EXAMINATION (Cont.)
BY MR. SAHAM:
Q.   Mr. Regan, just for one minute I want to switch back to the tar sands and slide 13 which is up there.
A.   Yes.
Q.   I just wanted to make clear, that's an Exxon document?
A.   Right.
Q.   You didn't make that document, right?
A.   No, I did not.
Q.   But you did your own analysis using the actual costs, right?
A.   Yes.
Q.   And you re-created the analysis with the appropriate transportation costs, correct?
A.   Yes.
Q.   And the first-day-of-the-month price, correct?
A.   Yes.

Q.    And did those barrels qualify as proved reserves?

A.    No.

Q.    Okay.  I wanted to jump back.  We were again in the shale, going back to the natural gas, Rocky Mountain dry gas, and you were talking about as an auditor what would be the consequence of shutting down the auditor?

A.    Well, as an auditor you want -- you want to believe that the client is allowing you a full -- auditors talk about full-scope access, I can see everything, I can communicate everything, client represents to me that they have allowed full access to all the books and records.

You don't want to be in a circumstance where the client is trying to shut me down or hide information from me.

Q.    And did you review certain -- PwC was Exxon's auditor, correct?

A.    Correct.

Q.    And that was one of the Big Four?

A.    It is you have the Big Four.

Q.    And did you review the PwC Petroleum Academy Advanced Upstream Accounting Guide?

A.    I did.

Q.    And what was that?

What is the Petroleum Accounting Guide that PwC issued?

A.    This was a -- a course that was written by PwC and it was used to train its accountants and also it invited clients to this academy and some of the attendees were Exxon employees.

Q.    And what does it say about the use of strip pricing?

A.    Well, it -- it talks about the purpose.  And in the instance of impairment analysis it has two categories: Price used to determine economic producibility.  And it discusses use of strip pricing.  And prices used for determining cash flows and revenue, management estimate - generally strip pricing.  So if you're going to project cash flows and revenue what the academy is -- is stating is you should be using strip pricing.

And then there's some notes to this slide.  And the notes indicate that pricing should be generally -- utilize the strip prices.  Those prices are generally flatlined after year five.  But they say you flatlined them but then also they mention you'd use a reasonable inflation -- inflation right after that in years following flatlining.

Q.    Okay.  Now, I want to ask you about both those concepts separately.

Can you describe for the jury exactly what strip pricing is?

A.    Strip pricing is reflective of market transactions that have occurred where the buyer and the seller are dealing with selling particular products, in this case oil, in some future period.  And that information is gathered and recorded and you can obtain that information from -- it's called NYMEX, which is New York exchange.

And -- and the NYMEX gathers that information and reports it.  Those actual transactions were buyers and sellers are trading - in this instance - oil in future periods.

THE COURT:  All right.  Let's make that -- let's get that kind of clear.

So it's what we call futures, right?

They're buying and selling a contract and locking in prices in the future; is that the way it works?

Or explain that.

THE WITNESS:  Yeah.  No, that's -- that's -- that's a good summary.

THE COURT:  You're not just -- it's not today's price, it's a price that's going -- it's today's price of a contract in the future?

THE WITNESS:  In the future.

THE COURT:  Okay.

BY MR. SAHAM:

Q.    And what is flatlining?

THE COURT:  It's like if I went to Walmart - and they won't do this - and said, hey, I want to buy a TV, and I wanted it at two or three months' from now's price, and they would sell it to me, that or they wouldn't.  I wanted to buy a hundred TVs at that price.  Would that be kind of a way you could do it, if they would do it?

They wouldn't do it though, right?

There's no futures markets in TVs.

THE WITNESS:  Not that I know of.

THE COURT:  Okay.

BY MR. SAHAM:

Q.    And just to clarify.

This strip pricing, it's a market, so it adjusts the price based upon buyers and sellers come to an equal -- equilibrium; is that fair?

A.    Yes.

Q.    That's a good characterization of it?

A.    Yes.

Q.    And what does it mean to flatline those prices?

A.    After year five you flatline it.  You don't increase it or decrease it.

Q.    And why is that?

A.    Strip prices generally --

THE COURT:  Yeah, it's not that predictable that far out.

THE WITNESS:  Yeah.  It's not that predictable, so they -- they want to -- they want to flatline it after that, so . . .

BY MR. SAHAM.

**App. 1191**

Q.   Okay.  And did Exxon in its -- did you review Exxon's Dataguide?

A.   Oh, yeah.

Q.   And what was that?

A.   That -- it is a corporate guide -- in 2015 it was put together starting I think in May of 2015 and eventually, by September, they had finalized their price plan.

Q.   And did it discuss in the Dataguide the use of market futures for price sensitivity for upstream analysis?

A.   Yes.

Q.   And what was communicated in that Dataguide about strip pricing and the NYMEX and so forth.

A.   It says "The market futures should be collected from the prior day close and the preferred sources are as follows:".

"CME Group (NYMEX)-WTI and Henry Hub."

So this is for oil and this is for natural gas.

And then it goes on to say that the -- the market futures should be collected starting from the current year and extending an additional five years, for a total of six.  For opportunity evaluations that require prices beyond six years, the last available market futures in year six should be escalated with the corporate escalation factor," which in Exxon's case was two and a half percent.

Q.   And did Exxon follow this guidance in its impairment analysis in 2015?

A.   No.

Q.   And does this next document that you reviewed illustrate that point?

A.   Yes.

Q.   And what's being communicated?

And this -- again, this is a document, Exhibit 228, correct?

A.   I'm sorry, I didn't hear that.

Q.   Oh, this is Exhibit 228, the document you reviewed?

A.   Yes.

Q.   And this was a presentation to Mr. Swiger in March of 2016, correct?

A.   Yes.

Q.   Approximately a month after the 10-K was filed, correct?

A.   Yes.

Q.   And does this document illustrate how Exxon failed to follow page 9 of its Dataguide in its 2015 impairment analysis?

A.   Yes.

Q.   And what's the black line here?

Let's just go through these lines on the left.

What's the black line represent?

A.   Well, the black line was the Henry Hub planning and budget price bases, which was adopted in February -- October of 2015.

And what -- what I've also included on the right side is the data that is used to plot the lines, the black line.

And so, for example, the Henry Hub, the $4 at 2020, is right where I'm pointing, 2020 at $4.  And then it's flatlined.

Now --

Q.   And it -- oh, I'm sorry.

What's the green line communicate?

So if -- the black line is the 2015 impairment plan numbers used by Exxon?

A.   Yes.

Q.   And that resulted in zero impairment, right?

A.   Right.

Q.   And what's the green line?

A.   The green line is defined as a 2016 financial base case.  And you can see that it's significantly lower than the black line.

Q.   And that green line is what was used in 2016 for the impairment analysis, correct?

A.   Yes.

Q.   And did that result in impairment?

A.   Yes.

Q.   And which -- which of the two lines -- again, the black line is above the green line, correct?

A.   Oh, by -- by a great deal, yes.

Q.   And what's the significance of being above -- the black line being above the green line?

A.   Well, we can -- there's a date here -- we -- we know that this -- this was an analysis just few weeks after the filing of the 10-K.

And if we go -- go back to that chart, you can see the green line is much -- I think much more reasonable than the black line.  And let me explain why.  And this is key.  And I know it's a lot of detail.

But you might remember that at the filing date -- or at 12/31/15, the price of Henry Hub was $2.28 and at the filing date it was $1.85.  So the black line starts out with a price of $2.98.  So that's -- that's an enormous leap from -- you might recall that chart that showed the persistent decline of prices, to suddenly have that leap, I think it's like 30 percent, so we're getting a -- a starting point of the black line which is not -- I don't think reasonable.  It's not appropriate.

Then you've got a few years of growth at 3 percent.

And then it starts -- you see where it goes from 2018, 2019 and '20, it's just a rocketship.  Well, that's a 12 percent increase in 2019 and an 11 percent increase in 2020.  They haven't experienced that kind of increase -- well, I've not seen it.

So we've got a -- a black line that starts off with

**App. 1192**

stale data. This data was -- the early period of the black line was done in May/June of 2015. Then the $4 price came in October, or September/October. So the -- the starting -- the starting point, where we get out of the gate, has been elevated. This is supposed to be a calculation that is reflective of facts and circumstances on the filing date. So the starting point is too high.

The climb to 2020 is too steep.

And then in the impairment analysis that line is accelerated by 2 and a half percent in each year thereafter.

Q. And --

A. And so when you -- when you start too high, you accelerate too fast, you build in positive cash flow at unrealistic levels.

Q. And what's the obligation to update and how does that relate to this?

A. Oh, obligation to update. When you determine that the facts and circumstances have changed, and in this instance -- at some point early in 2020 there should have been a determination because circumstances were so --

Q. You said 2020 --

A. I'm sorry. 20 -- 2016 there should have been a determination that, whoa, wait a minute, this black line is -- is really in the reasonable to be used and -- and we're going to change it to the -- the more reasonable line.

Q. And this document --

A. And that -- that leads to impairment.

You need to disclose that to investors on or around the date that you made that determination

Q. And this document is from March 28th, correct?

A. Yes.

Q. And what's the significance of the dashed --

A. March 28th, 2016.

Q. Yeah. And what's the significance of the dashed blue line and what's the date of that number?

A. That's the Henry Hub futures pricing, that was dated March 21, 2016. This is on the chart. That's not something I added. That was on the chart itself. So that's 2000 -- March 21, 2016. And this -- this is the Henry Hub futures pricing. That's the dotted blue line.

Q. It's even below the green line that resulted in impairment, correct?

A. Yes.

Q. So the blue line and the green line would both result in impairment?

A. Yes.

Q. But they used the black line?

A. Right.

Q. And they didn't update at any point -- this is March 28th, they didn't provide an update to investors, correct?

A. Not on March 28th. It wasn't until quite a bit later.

Q. And you talked about the speed to get there. How is the Mr. Horne document and these bookends, how does that relate to the speed of getting to the long-term price?

A. Well, ASC 360 says you've got to be -- use reasonable assumptions, and the assumptions need to consider facts and circumstances that were in place on the filing date.

So as we saw on the black line, that was stale data. This is a very important calculation. These spreadsheets are complex but they're easily changed, because you just change the -- the input dates on the revenue and the rest of it is calculated in seconds.

Now, Mr. Horne, on August 21, 2015, he was talking about a bookend calculation for the price outlook. And with respect to the Henry Hub $4 he said that he's produced three cases showing us returning to the $4 scenario in the years 2025, 2030 and 2035, respectively. And he attached from his -- his spreadsheets to this email.

Q. And if you look at the black line, when do they get to the $4 in their test that avoids impairment?

A. We can see the -- the data. The black line is using $4.

Q. And that's before Mr. Horne's bookends, correct?

A. It's -- it's before the most aggressive point in the bookend.

Q. Five years before, correct?

A. Yes.

Q. Ten years before the middle of the bookends?

A. Yes.

Q. Fifteen years before the most -- the least aggressive, most conservative, of the bookends?

A. Yes.

Q. And --

A. And that has a huge impact on the revenues that flow into the impairment analysis.

Q. And how does this document relate to the reasonableness of the assumptions used by Exxon in their impairment testing?

A. It's a reflection of the reasonableness of the facts and circumstances that were used and should have been used at the filing date or 12/31/15.

Q. And were the assumptions used by Exxon reasonable or unreasonable?

A. As we can see, the black line ignores -- it starts too high, not at 225 or 185, and it accelerates at a rocketship pace, which was -- 2020 that -- by having the $4 amount being at 2020 it required the unreasonable rates of increase.

Q. And did you redo the impairment assessment using reasonable assumptions?

A. Yes.

Q. And that's the Step 1 test or Step 2 test?

PAMELA J. WILSON, CSR/RMR/CRR

App. 1193

A.   Step 1, or Step 2, either one, to do the undiscounted cash flow.

Q.   And you used reasonable -- you replaced the Exxon assumptions with reasonable assumptions; is that fair?

A.   Yes.

Q.   And could you describe --

THE COURT:   What was that last exhibit number with those colored --

MR. SAHAM:   228.

THE COURT:   228?

MR. SAHAM:   Yeah.   This one is 228.   It's a March 28th presentation to Mr. Swiger.   And it's in evidence.

THE COURT:   Thanks.

MR. SAHAM:   And it has both the charts -- both those two charts are contained within it, without the highlights.

THE COURT:   Was that done by Mr. Horne?

MR. SAHAM:   No.   It was a presentation to Mr. Swiger.   I think it says who made the presentation. I can't think.

THE COURT:   Oh, we don't know who did it.

MR. SAHAM:   I think we do.   As we're sitting here right now we don't have that -- some of our folks --

THE COURT:   Okay.   All right.   Maybe we'll get that later.

MR. SAHAM:   But it's on the documentation who made the presentation.

THE COURT:   Yeah, that's 11 -- 12 --

MR. SAHAM:   Let's see if it says, Your Honor.

It doesn't say who made the presentation.   It just says it was to Mr. Swiger.

BY MR. SAHAM:

Q.   And moving forward to where we were.

What were the reasonable assumptions that you used in your fair value assessment that Exxon did not use?

A.   Well, we figured the starting point was too high, as I explained, so we brought it back to the 12/31/15 price.

Then we also felt that the speed to the long-term price was too fast and we used the -- the strip pricing to guide us as to how to move that price after the starting point.

So the long-term price was accelerated too early.   So we thought the green line was more reasonable but the blue strip was reasonable.   Green line produces impairment.   Blue line produces impairment.

We also looked to see what third parties -- there was a third-party comparison that was done by Exxon, but it was done earlier in time, when the prices were stale.   When you use updated prices from third parties, which is IHS and Wood Mackenzie, you also get impairment.

Q.   And so when you redid the analysis with more reasonable assumptions the cash flows were below the book value for the three assets, Unitah, Raton, and San Juan?

A.   Yes.   We -- we -- we didn't change anything in the Excel spreadsheets.   No changes.   Except the starting point and the escalation, how quickly you get to a price at 2020.   And then we escalated at two and a half percent, same rate that Exxon did.

So no changes to the very complex and -- spreadsheets, except starting point and how you get from the starting point to 2020.

Q.   Okay.   And then that resulted in an impairment, correct?

A.   Yes.

Q.   And then how do you -- you value the impairment as it's supposed to be done in ASC 360 Step 2?

A.   Yes.

Q.   Or Step 3?

A.   Yes.

Q.   And could you describe what you did there?

A.   We -- using the same spreadsheets we compare the -- the calculated fair value for the -- these three assets, Unitah, Raton, and San Juan.   We looked at the book value of those assets, compared it to the calculated fair value, identified a total impairment of 3. -- 3,350,000,000 which after tax -- there would be a tax benefit of approximately -- bringing the number down to $1.7 billion.

Q.   So the -- when you used reasonable assumptions the Rocky Mountain dry gas assets were impaired after taxes by $1.7 billion?

A.   Yes.

Q.   And what's the significance of these other emails you've cited?

A.   This is another kind of a reflection of tone at the top, within Exxon.   Tone at the top is something that accountants and auditors use to describe the control environment within the company.   And this is an example, it's an email from Mr. Rosenthal to I believe the controller.

Let's -- and he says, "Let's leave off the impairment footnote.   That word gives the folks on the third floor heartburn."

It's reflective of what I said before the break. Impairment sets off kind of bad tones, it sets off investigations by auditors, the SEC, and it hurts the bottom line if you book an impairment

Q.   And you used a couple of words that I think you need to describe for the jury.

"Control environment," what's that?

A.   Accountants, they want a -- a control environment within a company that wants their financial statements to be reflective of -- that they're accurate, that they have been developed with transparency, that they have developed with

input from appropriate people that are competent, with the desire to get it right.

Q.   And what's "tone at the top" refer to?

A.   Tone at the top is -- it's a concept that was developed by the AICPA, American Institute of Certified Public Accountants, and the SEC, where it's basically been found to be an indicator of quality of financial reporting.

If the tone at the top, executive management, is -- is driven to make sure the numbers are right, make sure that they're accurately reported, make sure that they're complete, that's a great environment.  You really want that environment, because as an auditor or as an accountant it's been shown over the last hundred years that if you have a good tone at the -- if you have a bad tone at the top it often leads to materially miss -- misstated financial statements.

Q.   Have you ever heard the term garbage in, garbage out?

A.   Yeah.

Q.   What's that mean?

A.   That if you provide the wrong inputs you will get the wrong answer.

Q.   And what about this email?

Why is this email relevant -- I'm sorry, this is not an email.

Why is this speech by Mr. Tillerson relevant to what

happened in 2015?

A.   Well, in -- this is 2012.  He's addressing the -- the price of natural gas and he basically is saying "At $2.5 we're all losing our shirts today.  You know, we're not making money.  It's all in the red."

Q.   What were the prices in 2015, above or below 2.50?

A.   At the end of the year it was 2.28 and in January it fell to $1.85.

Q.   Now, is losing your shirt an impairment trigger?

A.   That's kind of a colloq --

Q.   Colloquial --

A.   -- colloquialism.  I think it -- sorry about that.

Yeah, it's another way of saying -- saying the red light is going on that things aren't likely to be good.

Q.   Now, did you review the Upstream Portfolio Metrics and Insight Workout, which I believe is Exhibit 527?

You reviewed this document, correct?

A.   I did.

Q.   And how does that relate to tone at the top?

What's going on here?

A.   It discusses how information was viewed by people within the company as it related to communicating information to management.

Q.   And what were some of the notable comments and votes by these folks in March of 2017?

A.   These were I think 36 participants that were selected by -- because of their positions and they wanted a broad perspective of folks within the company.  Most of them were over -- had worked for over 20 years.

A couple of comments that they summarized as the top five learnings, they say "Anticipate what the boss wants."

"Afraid to fail."

"Too much concern about failure, as opposed to doing the right thing."

Q.   How do those relate to tone at the top?

A.   It's reflective of lower-level folks and their attitude towards what they need to provide to the boss.

Q.   And who was the boss during 2015 at Exxon?

A.   The Management Committee, Mr. Tillerson, Mr. Swiger, Mr. Rosenthal.

Q.   Now, what's being communicated in this next slide?

And how does this relate to tone at the top?

MR. TOAL:  Your Honor, we object to lack of foundation.

THE COURT:  Overruled.

But we've been over this.  You might make an objection that we're being repetitive.

MR. TOAL:  I would --

THE COURT:  Yes, it is.

MR. TOAL:  I would add that objection.

THE COURT:  I'm going to give you a couple more.  You can't go into all of these, but some of them.  Okay?

BY MR. SAHAM:

Q.   Is there something on this slide that's particularly important to tone at the top that caught your attention?

A.   Yes.  Two items.  "Managers in this company do not get rewarded or rocking the boat."  Again, bringing bad news, suggesting that there's a trigger, suggesting that there's an impairment.

Q.   And what about the bottom note?

A.   "We really shy away from doing anything on paper...that shows in hindsight that we made a bad decision."

Q.   How's that relate to tone at the top?

A.   That Kearl reserves are not proved reserves and needed to be debooked or we purchased assets of XTO which were found to be of no value.

Q.   And what about this last set of comments?

How do these relate to tone at the top?

A.   "Catering to the preferences of contract executives leads to a tailoring of sorts."

"Upwards review based towards what is expected upwards." (sic)

And "Deliver what the boss wants."

Q.   Now, just to summarize your opinions here, you've got three opinions, right?

A. Yes.

Q. And what's the first one.

A. Exxon concealed recurring losses at its largest single reserve, which is the Kearl field in Canada.

Q. And which accounting rules in particular were violated here?

A. Item 303, SAB 99.

Q. And do you have any doubt about this opinion?

A. No.

Q. And what's your second opinion you're offering in this case?

A. Failed to timely write down or debook the 3.6 billion barrels of proved reserves located at Kearl.

Q. And what's the accounting rule that was violated here?

A. ASC 932.

Q. And do you have any doubt about this opinion that you're offering?

A. No.

Q. And then finally, what's your last opinion?

A. Failed to timely write down Exxon's Rocky Mountain dry gas assets which were impaired and required a nearly $1.7 billion charge against earnings.

Q. And which rule was violated here?

A. ASC 360.

Q. And just because that a company complies with one rule,

89

is that enough?

A. No. You look for a fair presentation. You look at all of the applicable rules. And if you violated significant rules that resulted in a material misstatement, that's what you're looking for.

MR. SAHAM: I would pass the witness, Your Honor.

THE COURT: Do you want to do it now or do you want to break for lunch?

MR. TOAL: We'll go ahead and break for lunch.

THE COURT: Okay, Mr. Toal. I'm not trying to force you to do that. It's up to you.

MR. TOAL: That's fine, Your Honor.

THE COURT: All right. You can be judge for a minute.

(Laughter)

MR. TOAL: Felt fantastic.

THE COURT: I'm going to take it right back now. Okay. All right. I think y'all's lunch is in there, so we'll see y'all back an hour, hour and a half.

Thank you.

THE SECURITY OFFICER: All rise for the jury.

(Recess taken at 11:43.)

(Proceedings continued in Volume 7B.)

90

INDEX - VOLUME 7A

WITNESS NAME                                                    Page   Line

JOSEPH HORNE

  REDIRECT EXAMINATION (Cont.) BY MR. TOAL ........  9     24

  RECROSS EXAMINATION BY MR. SHELDON ...............  15    10

  REDIRECT EXAMINATION BY MR. TOAL .................  17    10

PAUL REGAN

  DIRECT EXAMINATION BY MR. SAHAM ..................  19     3

  DIRECT EXAMINATION (CONT.) BY MR. SAHAM .........  68     9

PLAINTIFF EXHIBITS

Exhibit     Description              Identified  Admitted  Denied

517         Unidentified ..........              50

91

< Dates >
$1.60.    48:12
$1.85.    76:12, 86:8
$11.52.    33:20
$19.20.    54:22
$2.98.    76:13
$24.27.    39:11
$25.07.    54:20
$27.90.    39:12
$5.88.    41:23
12/31/15  58:7, 82:12
12/31/15,    76:11
27.90.    39:13, 39:16
29.50.    47:22
31.80.    47:23
August    32:4
August 21, 2015,    79:13
December 31, 2015.    29:1
February    74:24
February 24, 2016.    34:12
February 24th, 2015.    29:3
January    33:21, 34:8, 41:16, 46:15, 86:7
January 27, 2016,    28:17
January of 2024    6:23
January,    34:1
June of $42.01.    33:23
March    79:1
March 21, 2016.    78:12, 78:14
March 28th    81:11
March 28th, 78:5, 78:24
March 28th, 2016.    78:8
March of 2016,

74:11
March of 2017    86:25
MAY 6, 2026    1:28, 4:1
May 7, 2015    36:4
May of $7 million.    32:5
May of 2015    73:6
November 11, 2015.    65:16
November 1st, 2015.    38:3
November 2015    43:15
November 2016.    46:2
October    45:8
October 10, 2015.    35:21
October 16, 2015    46:25
October 16th, 2015.    47:17
October of 2015.    74:24
October,    77:3
September,    73:7
$1    63:11
$1.32 39:3, 50:18
$1.7 58:7, 83:25, 84:2, 89:21
$1.85 61:21
$13.50 33:19
$19.20 55:10
$2.28 58:25, 76:11
$2.5 86:3
$21 55:24
$23 44:4, 54:1
$24.27 42:1
$25 32:5
$27.90 45:13, 45:15, 55:2, 55:9

$28.50 45:9, 47:22
$28.70 39:9
$3.50 65:2
$31.8 47:19
$4 33:21, 34:1, 34:7, 34:9, 64:10, 65:2, 75:3, 75:4, 77:2, 79:15, 79:16, 79:20, 79:22, 80:20
$440 32:19
$5 58:21
$5.10 64:10
$5.87 54:23, 55:23
$5.88 39:1
$7 43:16
$831 33:4, 33:5
$950 22:16
(214)758-1500 2:49

< 0 >
000 51:9, 51:12, 51:22, 54:25, 55:24, 63:11, 83:23

< 1 >
1 59:12, 59:13, 59:14, 80:25, 81:1
1.7 25:6
10 91:10, 91:12
10-K 25:12, 25:14, 26:2, 26:6, 26:14, 28:10, 28:25, 31:8, 31:20, 34:10, 34:14, 34:16, 38:5, 41:10, 43:2, 50:24, 51:7, 52:2, 52:7, 54:8, 55:19, 56:23, 56:24,

57:10, 57:20, 74:14, 76:5
100 2:41
10019-6064 2:36
108 51:9
11 76:22, 82:3
11910 2:3
1100 3:14
117 45:11
11910 2:3
11:0303.) 68:3
11:4343.) 90:22
12 15:24, 46:12, 47:19, 76:21, 82:3
12/31/15 25:16, 80:15
125 21:8
1285 2:35
13 59:22, 65:3, 68:12
1359 9:2
13th 3:14
14.54 53:16
15 7:13, 21:15, 53:17, 53:18, 57:19, 91:10
17 51:23, 91:12
185 80:19
19 91:16
1900 1:47
1968 20:18
1970 20:19
1992 6:4
1999 52:19
1b 63:23

< 2 >
2 59:12, 59:13, 59:14, 77:10, 80:25, 81:1, 83:14
2.28 86:7
2.50 86:6
20 53:20, 76:21, 77:22, 87:4
200 13:14
2000 78:13
2009 24:5,

92

**App. 1196**

24:17, 40:8, 49:25
**2010** 10:20, 11:5, 11:14, 11:15, 58:19
**2012** 86:2
**2014** 10:12, 10:15, 64:7, 64:8, 64:13
**2015** 11:21, 13:2, 13:6, 13:13, 14:3, 31:8, 32:2, 32:18, 33:6, 41:16, 41:20, 41:23, 42:9, 42:15, 43:2, 47:25, 58:23, 63:11, 64:4, 64:7, 64:13, 73:5, 73:25, 74:17, 75:9, 77:2, 86:1, 86:6, 87:13
**2015/16** 15:7
**2016** 13:2, 13:6, 13:14, 40:25, 41:3, 41:17, 41:19, 41:23, 42:5, 46:7, 65:1, 75:15, 75:18, 77:22
**2018** 76:20
**2019** 76:21, 76:22
**2020** 75:3, 75:4, 76:22, 77:8, 77:19, 77:21, 80:20, 80:21, 83:5, 83:10
**2024** 5:16, 64:9, 65:2
**2025** 6:23, 79:17
**2030** 79:17
**2035** 79:17
**212** 2:37
**214** 1:37, 2:19,

2:26, 3:17
**22** 64:10, 64:14, 66:1
**220** 2:3
**2200** 2:47
**225** 80:19
**228** 74:6, 74:9, 81:9, 81:10, 81:11
**23** 54:1
**2300** 2:17, 2:24
**231-1058** 1:49
**24** 44:5, 54:4, 91:8
**24.7** 51:20
**250-10-S99** 52:20
**2601** 2:17
**27.90** 42:3
**2801** 2:24
**28th** 79:1

< 3 >
**3** 51:12, 51:22, 54:25, 55:24, 59:13, 59:14, 76:19, 83:16, 83:23, 91:16
**3.5** 64:22
**3.6** 23:23, 53:8, 57:18, 89:12
**30** 76:15
**303** 6:14, 6:15, 23:6, 23:20, 28:6, 28:12, 34:2, 89:7
**34** 5:22
**35** 5:22
**350** 83:23
**36** 5:18, 87:1
**360** 25:7, 58:16, 59:3, 61:2, 63:23, 64:19, 65:7, 79:5, 83:14, 89:24
**365** 44:5
**37** 5:18

**373-3000** 2:37
**3811** 1:35
**384** 63:11
**3:** 1:15

< 4 >
**4** 51:9, 58:21, 64:22, 64:24
**4.1** 51:16
**4100w** 2:47
**44** 5:24
**46** 5:9
**49** 5:9

< 5 >
**5** 51:3, 52:24, 52:25, 53:2
**5.1** 64:24
**50** 67:7, 91:26
**50-years-plus** 67:8
**517** 50:7, 91:26
**527** 86:16
**546-5400** 2:43

< 6 >
**6-CV-03111-K** 1:15
**60** 45:13
**600** 51:22, 54:25
**601** 51:12, 55:24
**619** 1:49
**651-5000** 2:26
**655** 1:47
**66** 50:24
**662-1557** 3:17
**68** 91:18
**698** 9:7

< 7 >
**70** 20:9
**700** 22:12
**7084** 2:41
**710** 51:19

**713** 2:43
**73** 20:9
**744-3300** 1:37
**75** 20:9
**75201** 2:18, 2:25, 2:42, 2:48
**75229** 1:36
**75242** 3:15
**75243** 2:4
**764-4446** 2:19
**7A** 1:25, 4:1, 91:1

< 8 >
**8** 15:21
**80** 13:13, 47:19
**817** 50:6
**825** 1:35
**88** 54:6, 55:5, 55:22
**880** 1:35

< 9 >
**9** 54:14, 54:15, 74:17, 91:8, 91:18
**90** 36:12
**92101** 1:48
**932** 23:25, 89:15
**972** 2:5
**99** 6:15, 23:7, 23:20, 29:23, 34:16, 52:11, 52:15, 52:18, 89:7
**991-1582** 2:5

< A >
**A.** 1:45, 37:19, 37:24, 43:12, 43:17, 86:7
**ability** 48:7
**able** 7:22, 35:12, 35:13, 59:23, 59:24

**associated** 49:18, 56:3
**assume** 5:2, 22:13
**assumptions** 61:5, 67:15, 79:6, 80:12, 80:16, 80:23, 81:4, 82:9, 83:1, 84:1
**attach** 26:24
**attached** 79:17
**attempt** 5:22
**attempting** 6:7, 7:24
**attendees** 36:5, 70:1
**attention** 30:12, 88:5
**attitude** 87:11
**attorney** 21:21
**Attorneys** 21:21, 21:22
**audit** 66:16, 66:17, 67:6
**auditing** 6:17, 21:18, 22:3, 22:19, 29:6, 52:23
**auditor** 13:23, 67:4, 67:22, 69:5, 69:6, 69:7, 69:14, 85:12
**auditors** 66:12, 67:10, 69:8, 84:9, 84:17
**AUDRA** 2:28
**AUSTIN** 2:13
**available** 73:21
**Avenue** 2:3, 2:35, 2:47
**average** 15:21, 38:9, 46:6, 46:8, 47:5, 49:17, 54:17, 54:20, 54:21
**avoid** 5:20, 5:21, 66:22
**avoids** 79:20

**aware** 31:12, 37:5, 37:8
**away** 88:11

< B >
**B.** 1:43, 2:1, 2:2
**back** 9:18, 17:19, 18:5, 18:18, 20:5, 20:24, 34:3, 47:14, 49:12, 57:23, 62:12, 62:23, 68:11, 69:3, 69:4, 76:6, 82:12, 90:17, 90:19
**background** 20:16
**bad** 63:21, 84:16, 85:14, 88:7, 88:12
**balance** 25:17
**BALON** 2:1, 2:2
**barrel** 18:5, 18:9, 33:11, 33:14, 33:15, 33:18, 33:20, 33:21, 35:11, 36:21, 41:19, 51:9, 54:18, 54:21, 54:23, 55:23
**barrels** 23:24, 35:8, 39:6, 42:11, 51:10, 53:8, 53:11, 55:24, 69:1, 89:13
**base** 75:15
**based** 5:12, 9:1, 25:6, 36:22, 38:23, 46:13, 59:22, 72:10, 88:21
**bases** 6:21, 74:24
**Basically** 20:2, 25:13, 30:5,

31:15, 33:13, 41:5, 44:19, 52:21, 52:25, 66:14, 85:6, 86:3
**basis** 31:18, 33:15, 42:20, 43:18, 49:18
**Baylor** 19:17, 26:18, 26:19, 27:16
**beast** 44:19
**became** 14:17
**Behalf** 1:7, 7:14
**believe** 7:7, 7:10, 8:21, 37:24, 57:15, 69:7, 84:11, 86:16
**below** 78:16, 83:1, 86:6
**bend** 18:19
**benefit** 83:24
**bent** 18:20
**better** 9:21, 27:17
**beyond** 73:20
**BIERL** 1:44
**Big** 20:21, 20:22, 21:4, 66:18, 67:4, 67:7, 69:17, 69:18
**bigger** 65:5
**billion** 23:24, 25:6, 44:4, 51:16, 51:20, 53:8, 54:1, 55:24, 57:18, 58:7, 83:25, 84:3, 89:12, 89:22
**billions** 53:23
**bit** 18:18, 28:6, 29:5, 43:22, 48:14, 55:10, 59:2, 79:1
**bitumen** 38:21,

51:8, 54:6, 54:18, 54:19
**black** 74:20, 74:22, 74:23, 75:2, 75:9, 75:16, 75:23, 76:1, 76:8, 76:12, 76:16, 76:25, 77:1, 77:23, 78:22, 79:8, 79:19, 79:21, 80:18
**bless** 4:8
**blip** 61:16
**blown** 38:3
**Blue** 47:17, 47:18, 78:9, 78:15, 78:19, 82:17, 82:18
**Board** 22:7, 24:4, 24:19, 46:3
**boat.** 88:7
**Boeing** 22:5
**BOGGS** 2:46
**book** 59:24, 83:1, 83:21, 84:18
**bookend** 79:14, 79:25
**bookends** 79:3, 79:23, 80:3, 80:6
**books** 11:17, 37:18, 58:11, 59:5, 60:25, 69:11
**BOONE** 2:23
**boss** 87:6, 87:12, 87:13, 88:23
**bottom** 32:13, 32:15, 32:16, 32:17, 32:18, 84:17, 88:10
**Boulevard** 1:35
**boy** 27:1
**brackets** 63:17, 63:19
**BRADLEY** 2:1

---

**above** 45:18, 45:20, 48:3, 48:5, 75:24, 76:1, 76:2, 86:6
**Absolutely** 61:8, 67:11
**Academy** 69:19, 70:1, 70:10
**accelerate** 77:13
**accelerated** 77:10, 82:16
**accelerates** 80:19
**Accepted** 6:16, 7:9, 7:13, 24:6, 24:16, 51:25
**access** 69:9, 69:11
**accordingly** 57:20
**accountant** 20:19, 52:22, 53:6, 60:19, 85:12
**Accountants** 24:12, 33:2, 59:11, 60:1, 63:16, 69:25, 84:8, 84:22, 85:6
**accurate** 14:1, 37:15, 52:3, 84:24
**accurately** 17:12, 85:10
**acquire** 64:2
**ACTION** 1:17
**actual** 33:16, 37:17, 38:9, 38:13, 38:22, 38:25, 39:10, 40:6, 41:19, 41:25, 42:14, 42:20, 42:24, 43:10, 43:18, 45:20, 46:5, 46:7, 50:20,

68:18, 71:4
**actually** 37:21, 60:14
**actuals** 42:5, 42:9, 42:17
**add** 87:25
**added** 28:17, 55:1, 78:13
**additional** 26:13, 30:7, 73:19
**addressed** 59:6
**addressing** 86:2
**adjusts** 72:9
**admit** 50:4
**Admitted** 22:21, 50:4, 50:8, 91:24
**adopted** 74:24
**adopting** 49:24
**Advanced** 69:19
**Afraid** 87:7
**aggressive** 79:24, 80:5
**ago** 20:4, 20:6, 20:7, 20:8, 42:24, 43:22, 62:23
**agree** 15:21, 65:24
**agreed** 50:3
**ahead** 5:17, 9:22, 15:9, 41:8, 68:8, 90:9
**AICPA** 85:5
**air** 62:5
**ALEX** 1:43
**align** 42:20
**aligned** 42:17
**alignments** 47:6
**alive** 44:19
**all-purpose** 7:21
**allowed** 6:9, 40:2, 69:10
**allowing** 69:8
**already** 8:17
**America** 34:22, 51:8, 54:19

**American** 85:5
**Americas** 2:35
**AMITAV** 2:32
**amount** 13:10, 33:5, 33:17, 35:14, 39:14, 39:15, 42:2, 46:14, 58:11, 60:24, 80:20
**Analysis** 14:5, 26:9, 29:17, 31:5, 39:3, 43:9, 43:20, 56:7, 67:2, 68:18, 68:21, 70:5, 73:9, 73:25, 74:18, 75:19, 76:4, 77:9, 80:10, 82:25
**analyst** 50:14
**analytically** 31:16
**analyzed** 63:11
**analyzing** 52:23
**ANDREW** 1:18
**annual** 25:12, 25:14, 25:15, 34:10, 47:5
**Answer** 37:19, 43:12, 43:17, 65:19, 65:20, 85:21
**Anticipate** 87:6
**Apollo** 59:22
**apologize** 9:20
**apparent** 60:11, 60:13
**Apple** 22:4
**applicable** 23:15, 23:16, 28:21, 90:3
**applied** 30:2
**apply** 60:21
**Appreciate** 18:15, 27:13
**approach** 11:18
**appropriate** 11:18, 68:21, 76:18, 85:1

**Approximately** 16:7, 20:6, 21:15, 22:12, 57:19, 58:21, 74:14, 83:24
**APS** 65:16
**area** 13:17, 44:6
**areas** 22:22, 63:13
**argue** 65:22, 65:25
**argument** 6:6, 8:10
**Armour** 5:15
**around** 10:25, 15:5, 15:7, 15:20, 21:21, 38:15, 63:19, 78:3
**ASC** 23:25, 24:1, 24:17, 25:6, 52:20, 58:16, 59:3, 60:7, 61:2, 63:23, 64:19, 65:7, 79:5, 83:14, 89:15, 89:24
**assess** 15:14
**assessing** 12:11, 12:13
**assessment** 12:1, 80:22, 82:10
**Asset** 11:21, 11:22, 11:25, 13:2, 13:16, 13:19, 14:1, 59:4
**assets** 10:9, 11:17, 14:4, 25:5, 25:18, 58:6, 58:18, 59:24, 63:9, 83:2, 83:20, 83:22, 84:2, 88:15, 89:21
**assignment** 48:20

2:2
**break** 29:5, 44:7, 67:24, 84:15, 90:8, 90:9
**breaks** 16:20, 16:22
**brief** 10:4
**bring** 6:5, 44:1, 88:7
**bringing** 83:24, 88:7
**broad** 59:20, 87:2
**Broadway** 1:47
**broke** 10:3, 16:24
**brought** 45:13, 82:12
**budget** 74:24
**build** 77:13
**built** 37:16
**bulb** 59:21, 60:1
**bullet** 27:7, 30:13, 30:20
**Bulletin** 23:7, 29:23, 29:24, 52:11, 52:14, 52:15, 52:18
**bunch** 4:18
**BURKHOLZ** 1:45
**burned** 33:5
**business** 50:14, 57:7, 58:17
**button** 27:21
**buy** 71:23, 71:25
**buyer** 70:23
**buyers** 71:4, 72:10
**buying** 71:10

< C >
**C.** 2:39
**CA** 1:48
**CAF** 48:1, 48:3, 48:5, 48:6, 48:8, 48:12, 48:13, 48:15,

48:19
**calculate** 45:25
**calculated** 38:19, 42:1, 45:9, 79:12, 83:20, 83:22
**calculating** 35:25, 48:11
**calculation** 37:3, 38:2, 38:11, 38:23, 39:9, 39:13, 39:18, 41:3, 42:21, 46:12, 50:13, 53:20, 77:5, 79:9, 79:14
**calculations** 39:19, 40:9, 66:20
**calendar** 47:25
**Call** 17:17, 17:21, 17:22, 26:19, 52:18, 59:9, 59:11, 59:14, 71:9
**called** 20:24, 29:23, 32:17, 43:23, 44:9, 48:8, 64:18, 71:1
**calls** 59:5
**Canada** 23:6, 34:22, 34:24, 38:21, 51:8, 54:18, 89:4
**Canadian** 30:11, 31:1, 31:2
**candles** 66:16
**Capex** 44:3, 44:15, 44:18, 44:25, 45:7, 47:16
**capital** 44:21, 44:23
**caps** 24:10
**card** 25:15
**career** 20:20
**CARPENTERS** 1:9
**case** 6:4, 8:7,

14:24, 17:19, 22:11, 22:25, 24:25, 25:11, 28:11, 29:10, 29:15, 30:2, 34:10, 37:3, 48:21, 49:18, 57:23, 58:24, 59:11, 60:4, 67:25, 70:24, 73:23, 75:15, 89:11
**cases** 4:17, 5:15, 6:2, 79:16
**Cash** 32:23, 33:5, 44:14, 44:17, 44:18, 44:22, 44:24, 45:7, 46:7, 47:2, 47:16, 49:19, 60:22, 60:23, 70:7, 70:9, 77:13, 81:2, 83:1
**categories** 70:5
**category** 51:7
**category.** 46:10
**Catering** 88:19
**caught** 88:5
**cents** 45:13, 47:19
**Certain** 7:18, 10:9, 14:19, 22:25, 26:1, 31:10, 35:24, 36:10, 50:25, 60:3, 69:14
**certainly** 15:7, 65:18
**certification** 52:7
**Certified** 20:19, 52:3, 85:5
**CFO** 43:3
**chain** 61:18
**chair** 18:22
**CHAKRABORTY**

2:32
**challenge** 66:12
**chance** 10:21, 19:8
**chances** 9:4
**change** 39:5, 41:4, 77:25, 79:10, 83:3
**changed** 77:18, 79:10
**changes** 83:4, 83:8
**characterization** 72:13
**characterize** 64:23, 64:24
**charge** 13:1, 25:6, 58:7, 89:22
**chart** 31:14, 31:15, 41:18, 41:22, 44:16, 47:1, 61:12, 61:13, 76:6, 76:14, 78:12, 78:13
**charts** 41:14, 81:14, 81:15
**check** 27:11
**checked** 27:12
**CHILDRESS** 3:3
**chocolates** 9:20
**choose** 40:13, 40:15
**Circuit** 6:2, 6:4
**circumstance** 29:14, 69:12
**circumstances** 6:15, 6:18, 7:5, 7:11, 7:19, 22:11, 29:2, 59:23, 77:6, 77:18, 77:20, 79:7, 80:14
**cited** 7:11, 84:6
**City** 22:8
**clarify** 11:10,

41:9, 72:8
CLASS 1:17
clear 11:1, 15:17, 16:18, 23:8, 37:7, 37:25, 40:8, 43:13, 44:13, 55:4, 68:14, 71:8
clearly 30:24
clerk 8:21
click 34:3
client 69:8, 69:10, 69:12
clients 69:25
climacteric 62:4
climb 77:8
close 73:14
clothes 62:17
CM 33:10, 33:12
CME 73:15
Co. 21:1
coalesced 13:25
Coast 50:22
Codification 23:25, 24:2, 24:5
codified 24:7, 24:17
Cold 44:6, 50:16, 62:5, 62:6, 62:7, 62:8, 62:10
collected 32:24, 42:2, 73:13, 73:18
collecting 38:22
collection 24:7, 35:7, 44:4, 62:4
collects 45:6
colloq 86:10
Colloquial 86:11
colloquialism 86:12
colored 81:8
column 32:3,

32:21, 33:10, 41:16, 55:22
comb 13:24
comes 43:6, 59:21
coming 35:9, 55:5
comment 28:21
commentator 7:21
comments 5:12, 50:12, 86:24, 87:5, 88:17
Commerce 3:14
Commission 21:10, 21:13, 21:14, 30:1, 52:14
Committee 87:14
communicate 38:15, 69:9, 75:8
communicated 38:18, 47:13, 53:13, 66:8, 67:12, 73:11, 74:5, 87:16
communicating 46:24, 86:22
companies 14:19, 24:24, 26:12, 27:9, 28:4, 40:8, 46:18, 49:6, 52:16, 58:11, 66:22
company 14:23, 14:24, 26:7, 26:15, 28:12, 31:23, 35:4, 35:5, 35:13, 35:16, 35:18, 40:12, 43:3, 45:8, 46:20, 53:11, 55:25, 84:10, 84:23, 86:22, 87:3, 88:6, 89:25
comparability 40:10, 46:17,

46:21, 49:21, 49:25, 50:1
comparable 47:8
compare 42:2, 54:5, 83:19
compared 83:22
comparison 63:13, 82:21
competent 85:1
complete 85:10
complex 79:10, 83:8
complies 89:25
comply 23:11, 23:14, 26:13, 36:24, 61:7
component 48:8
components 47:1, 54:2
comprehensive 28:2
computer-aided 3:8
concealed 23:4, 89:3
concept 36:7, 49:20, 85:4
concepts 70:18
concern 50:17, 87:8
concerned 4:15, 66:19
concessions 5:23
conclude 14:3
concluded 14:4
conclusions 5:22
condition 63:23
conditions 36:16, 49:8, 49:11, 49:14, 49:15, 51:15, 64:19
conducting 13:16
conferences 19:24
confirm 4:14
conflict 56:2

confusing 59:9
connection 12:15, 28:19, 65:14
consequence 69:6
conservative 80:6
consider 29:1, 34:5, 79:6
consideration 66:9, 66:23, 66:25
considered 31:23, 46:9, 57:21
considering 32:24, 40:11
consistent 38:9
consistently 40:9
consolidation 34:21, 34:23, 35:1
constant 49:18
constitute 24:4
construct 15:3
consumed 32:23, 61:17
CONT. 9:24, 68:9, 91:8, 91:18
contained 81:15
context 7:19, 11:1, 11:10
continent 34:24, 35:1
continents 34:23
continue 60:15
contract 71:10, 71:17, 88:19
Control 84:9, 84:21, 84:22
controller 84:11
convert 7:20
cook 62:17
corporate 73:5, 73:22

48:3, 48:5, 48:6, 48:9, 48:12, 48:15, 48:19, 68:9, 91:16, 91:18
directly 48:6
Directors 46:3
disclose 23:17, 78:3
disclosed 31:8, 34:14, 34:18, 34:20
disclosure 9:3, 30:22, 31:1, 54:15
disclosures 12:16, 30:16
discovered 41:2
discuss 28:22, 29:11, 73:8
discussed 8:25
discusses 70:6, 86:21
discussing 38:2, 44:16, 50:15, 56:8
Discussion 5:11, 9:15, 11:1, 26:9, 29:17, 30:22, 30:25, 47:2, 52:21, 53:4, 53:5, 56:6, 56:7, 56:9, 56:13, 56:21
discussions 41:4
District 1:1, 1:2, 1:27, 4:4, 4:5, 4:6, 5:16
DIVISION 1:3
document 28:16, 30:7, 35:19, 45:5, 46:2, 46:22, 50:25, 51:4, 52:2, 66:8, 67:21, 68:14, 68:16,

74:2, 74:6, 74:9, 74:16, 78:1, 78:5, 79:3, 80:11, 86:17
documentation 82:1
documents 4:18, 6:19, 7:21, 16:1, 28:12, 28:15, 35:24, 36:2, 41:2, 41:3, 48:10, 54:15
doing 19:7, 19:8, 43:19, 46:20, 66:14, 87:8, 88:11
dollars 32:6, 33:10, 53:23
done 5:20, 24:5, 40:9, 41:3, 77:2, 81:17, 82:21, 82:22, 83:14
door 9:1, 9:5
dotted 78:15
doubt 89:8, 89:16
doughnut 9:19
DOWD 1:46
down 17:24, 23:23, 25:4, 29:5, 30:15, 45:13, 58:5, 58:14, 66:1, 69:6, 69:13, 83:25, 89:12, 89:20
drafting 12:16
draw 5:22, 30:12
drilled 39:24
driven 85:9
drop 64:3, 64:10, 64:11, 64:12, 64:14, 65:2, 65:3, 65:4, 65:5
dropped 21:2, 58:25, 64:9

dry 25:4, 57:25, 58:4, 58:6, 58:18, 62:17, 69:4, 84:2, 89:20
during 16:22, 34:7, 62:17, 64:4, 87:13

〈 E 〉
E. 2:13
earlier 15:18, 34:2, 39:20, 46:19, 47:9, 82:22
early 77:1, 77:19, 82:16
earnings 25:6, 32:2, 32:10, 32:11, 32:12, 32:19, 58:7, 89:22
easier 27:23
easily 79:10
economic 36:15, 39:25, 49:7, 49:11, 49:14, 49:15, 51:15, 70:6
economically 36:7, 36:10, 36:12, 39:17, 39:18, 39:22, 39:23, 42:3, 47:24, 49:13, 51:14, 54:24, 56:1
Ed 1:26, 4:6
Edmon 44:6
Edmonton 50:19, 50:20, 50:23
effective 38:3
efficient 45:2
Eight 20:22, 67:4
either 81:1
elected 22:7, 22:8
Electric 22:4,

26:17
elevated 77:5
email 50:15, 50:17, 79:18, 84:10, 85:22, 85:23, 85:24
emails 50:12, 84:5
embedded 6:16, 6:17
EMILY 2:14
emphasized 28:13
employee 5:12, 5:13
employees 50:10, 57:12, 70:2
enabling 26:6
end 5:9, 30:23, 33:20, 34:7, 45:8, 45:12, 58:22, 58:25, 86:7
ended 20:9
ending 61:14
Engineer 48:15, 48:21, 49:16
Engineers 49:4, 49:10
enhance 40:10
enormous 76:13
enough 18:25, 60:24, 90:1
ensure 26:2
enters 9:17, 68:5
entities 21:17
entity 14:16, 15:4, 63:9
environment 84:9, 84:21, 84:22, 85:11, 85:12
equal 72:10
equals 32:11
equilibrium 72:11
equipment 45:1
equivalent

Corporation 1:17, 21:20
corporations 21:23, 22:2
Correct. 37:19, 37:24, 43:12
corrected 34:25, 41:1
CORTELL 2:21
cost 39:11, 43:10, 43:11, 43:16, 43:23, 44:14, 44:17, 44:24, 45:8, 45:12, 45:15, 47:18, 47:23, 48:3, 49:17, 50:19, 54:21, 61:6
costs. 38:10
Council 22:8
counsel 10:25, 11:7
country 35:1
couple 7:11, 65:15, 84:19, 87:5, 88:1
course 58:12, 69:24
court. 9:15
courtroom. 9:17, 68:5
courts 7:10, 7:13
cover 46:8, 60:24
create 20:10
created 20:10
Creek 1:35
Crescent 2:41
criticized 7:23
cross-examination 16:14, 16:16
CRR 3:12
crucial 6:18, 7:5
current 33:12, 38:9, 49:7, 49:11, 49:13, 49:15, 73:18

customers 33:17, 42:2
cut 7:17

〈 D 〉
D. 2:45
Dallas 1:3, 1:29, 1:36, 2:4, 2:18, 2:25, 2:42, 2:48, 3:15, 4:5
DANIEL 2:29
DAPHNE 2:33
dash 33:3
dashed 78:7, 78:9
data 75:2, 77:1, 79:8, 79:21
Dataguide 73:2, 73:8, 73:11, 74:17
date 28:17, 28:25, 29:2, 30:24, 34:6, 38:3, 61:6, 61:14, 61:21, 76:3, 76:10, 76:12, 77:6, 78:4, 78:10, 79:7, 80:15
dated 78:11
dates 79:11
Daubert 6:24, 8:18
DAVID 1:19, 2:15
day 36:18, 44:5, 44:6, 46:14, 62:13, 73:14
days 15:24, 44:5
deal 25:19, 75:25
dealing 25:8, 70:23
dealt 10:8

debook 23:23, 31:6, 89:12
debooked 30:11, 88:15
debooking 9:3, 42:7
December 46:16
decision. 88:12
deck 5:9, 6:13, 6:20
decline 61:20, 63:2, 76:14
declined 34:9
declining 33:25
Decrease 60:17, 61:11, 61:12, 72:17
decreases 60:8
deemed 11:18
default 49:17
defects 50:25, 51:3
DEFENDANTS 1:22, 2:10, 5:20, 5:23, 8:9
defined 47:18, 75:15
degree 39:22
Deliver 33:17, 88:23
delivery 33:14
demonstrative 4:14
Denied 6:25, 9:8, 91:24
deny 8:22
Department 21:20
depending 53:3
Deposit 21:20
deposition 10:6, 10:22, 11:5, 43:6
describe 20:16, 24:9, 51:6, 56:18, 59:1, 59:19, 70:20, 81:6, 83:18, 84:9, 84:20
described

33:13, 36:20, 64:6
describing 45:5, 62:5
Description 91:24
desire 85:2
destination. 50:21
destinations 50:23
detail 28:9, 57:3, 57:7, 58:8, 66:21, 76:9
detected 63:22
determination 32:22, 36:17, 56:1, 77:20, 77:23, 78:4
determine 45:6, 59:15, 70:6, 77:17
determined 36:22, 39:16, 39:25, 60:17
determining 38:20, 70:7
develop 64:1
developed 36:15, 51:7, 53:19, 53:21, 53:22, 84:25, 85:4
development 38:7, 38:8
Diego 1:48
difference 14:13, 44:22
different 11:23, 12:1, 47:4
differential 39:7
difficult 65:22, 65:25
diluent 43:11
dinner 19:9
DIRECT 16:3, 16:7, 19:3,

15:23
equivalents 51:9
ERIKA 1:42
escalated 73:22, 83:6
escalation 73:22, 83:5
especially 30:11
essentially 30:14, 48:24
established 49:25
establishes 24:24
estimate 11:11, 47:20, 70:8
estimated 32:23
estimates 36:10, 49:18
European 21:5
evaluate 7:22, 28:3
evaluating 64:1
evaluations 73:20
events 56:22, 59:21, 62:4
eventually 29:20, 73:6
everything 69:9, 69:10
evidence 42:14, 50:8, 81:12
exactly 4:14, 4:17, 5:13, 6:7, 6:24, 7:22, 7:24, 70:20
EXAMINATION 9:24, 15:10, 16:4, 16:7, 16:10, 17:10, 19:3, 68:9, 91:8, 91:10, 91:12, 91:16, 91:18
examining 22:10
example 6:14,

22:4, 48:15, 49:4, 50:13, 63:24, 75:3, 84:10
exceeds 36:14
Excel 83:3
Except 32:4, 83:4, 83:9
Exchange 14:23, 21:10, 21:12, 21:13, 30:1, 52:14, 71:2
exclude 48:1
excluding 48:1
exclusion 48:13
excuse 38:14
46:5, 57:16
Executive 31:25, 33:9, 34:8, 85:8
executives 88:19
exercise 10:16
Exhibit 45:11, 50:4, 50:24, 74:6, 74:9, 81:7, 86:16, 91:24
EXHIBITS 91:21
existence 61:6, 64:21
existing 36:15, 51:15
expectation 48:11
expected 60:15, 60:22, 63:25, 64:3, 64:15, 65:9, 88:21
expecting 47:21
expenditures 32:24
expense 44:18, 44:23
expenses 32:11, 44:21
expensive 44:4, 66:24
experience 67:8
experienced

63:8, 76:23
expert 5:6, 6:3, 6:5, 7:20, 21:7, 22:18, 22:21
experts 12:18
explain 25:12, 45:25, 52:13, 71:12, 76:8
explained 82:12
explanation 25:22, 25:24, 26:10
expressly 64:18
extending 73:19
extent 29:18, 58:13
Exxonmobile 12:19, 13:2, 57:19, 65:21
eyes 25:25, 26:7, 31:19, 31:21, 57:8

〈 F 〉
F&L 31:25, 32:22
fact 7:12, 7:18, 29:14, 30:22
factor 73:22
facts 6:15, 6:18, 7:5, 7:19, 22:11, 29:1, 52:4, 59:23, 77:6, 77:18, 79:6, 80:13
factual 5:22
fail. 87:7
Failed 23:23, 25:4, 58:5, 74:16, 89:12, 89:20
failing 23:17
failure 87:8
fair 11:17, 15:14, 23:1, 25:1, 63:22,

72:11, 81:4, 82:10, 83:20, 83:22, 90:2
falling 61:20
false 37:18, 37:23
familiar 12:6
fantastic 90:16
far 8:11, 50:23, 53:13, 53:15, 72:21
FASB 24:17, 24:18, 24:21, 24:24, 36:23, 40:2, 40:19
FASB'S 52:19
fashion 59:2
fast 77:13, 82:14
FDIC 21:19
Federal 3:13, 7:10, 21:7, 21:20
fell 86:8
Felt 82:13, 90:16
few 10:3, 10:5, 10:25, 30:10, 42:24, 76:4, 76:19
field 31:6, 31:17, 48:4, 48:5, 53:23, 89:4
fields 34:21, 63:10
Fifteen 80:5
Fifth 6:2, 6:4
figured 82:11
file 28:18
filed 6:24, 34:11, 41:10, 74:14
filing 28:24, 28:25, 29:2, 30:24, 34:6, 46:15, 61:6, 61:14, 61:21, 76:5, 76:10, 76:11, 77:6,

**App. 1198**

79:7, 80:15
final 50:21
finalized 73:7
finally 89:19
Financial 24:3, 24:19, 25:17, 25:20, 25:23, 25:24, 26:8, 43:7, 52:23, 56:20, 75:15, 84:23, 85:7, 85:15
find 65:1, 66:4
fine 18:23, 19:8, 90:12
fine-toothed 13:24
finish 8:19
FIRM 2:2, 20:22, 21:5
firms 20:21, 66:17
First 6:12, 20:13, 23:3, 32:3, 36:9, 36:18, 39:21, 41:16, 46:6, 46:14, 59:9, 59:15, 60:22, 61:10, 89:2
first-day-of-th e-month 68:24
fiscal 32:18
Five 9:12, 70:15, 72:16, 73:19, 80:1, 87:6
fix 44:7
flares 66:15
flatline 72:15, 72:16, 72:23
flatlined 70:14, 70:15, 75:5
flatlining 70:17, 71:21
flawed 7:3
fleshes 28:9
Floor 3:14, 84:13

flow 47:3, 77:13, 80:9, 81:2
flows 60:23, 60:24, 70:8, 70:9, 83:1
flows. 49:19
focus 67:15
FOLKERTH 1:43
folks 81:23, 84:13, 86:25, 87:3, 87:11
follow 37:2, 38:11, 73:24, 74:17
following 70:17
follows 73:14
food 62:17
Football 22:5
footnote 84:13
force 90:11
forensic 19:25, 22:18
Form 25:14
formula 36:18
forth 73:12
forum 5:13
forward 82:8
found 39:24, 51:3, 85:6, 88:15
foundation 87:19
Four 20:21, 62:23, 66:18, 67:7, 69:17, 69:18
freshman 19:9
front 33:3
fronts. 66:13
full 34:23, 42:25, 69:8, 69:11
full-scope 69:9
fully 7:22
FUND 1:10
future 35:8, 55:25, 63:25, 64:3, 64:15, 65:9, 70:24,

71:5, 71:11, 71:17, 71:18
futures 71:9, 72:4, 73:9, 73:13, 73:18, 73:21, 78:11, 78:14

< G >
G-A-A-P 24:10
GAAP 6:20, 7:2, 24:4, 24:6, 24:9, 24:24, 40:3, 40:19, 49:12, 59:5
garbage 85:17
GARRISON 2:34
gas 25:5, 26:12, 26:15, 27:9, 28:2, 28:4, 31:2, 35:3, 35:7, 35:18, 40:8, 40:12, 54:3, 58:1, 58:4, 58:6, 58:18, 58:20, 61:18, 62:15, 63:25, 64:8, 64:15, 65:9, 65:21, 69:4, 73:16, 84:2, 86:3, 89:21
gate 77:4
gathered 70:25
gathering 30:5, 50:1
gathers 71:3
Gave 5:24, 19:8
GELLER 1:46
General 21:21, 21:22, 22:4, 26:17
Generally 6:16, 24:6, 24:16, 51:25, 70:8, 70:13, 70:14, 72:19
generally-accep

ted 6:17
generate 60:24
generates 36:13
gentlemen 68:1
geographic 63:13
gets 58:1
getting 50:21, 76:16, 79:4
give 5:2, 57:2, 57:3, 88:1
given 4:22, 63:24
gives 84:13
glad 27:24
Global 12:22, 12:23, 35:20, 36:4
God 4:8
Goerdeler 21:2, 21:4
Gosh 15:6
govern 26:1
governed 52:10
government 21:17
governors 58:15
grand 19:20
grandchildren 19:20
grandfather 19:25
grandparent 19:22
grandson 19:9
granted 9:7
granular 59:2
graph 34:13
graphs 53:10
great 19:16, 25:19, 75:25, 85:11
GREATER 1:8, 67:9
Green 26:19, 27:16, 27:21, 27:23, 75:8, 75:14, 75:15, 75:18, 75:24, 76:2, 76:7

25:23, 25:24, 26:16, 27:10, 30:5, 31:21, 34:5, 34:13, 34:18, 55:19, 56:9, 69:13, 70:25, 71:1, 71:3, 86:21, 86:22
informed 43:15
initials 21:3
initiates 67:9
input 12:18, 79:11, 85:1
inputs 85:20
inside 66:16
Insight 86:16
insist 6:5
instance 25:16, 29:3, 33:1, 33:19, 53:25, 63:10, 70:5, 71:5, 77:18
instances 37:14
Institute 85:5
Insurance 21:20
intended 28:1
intends 4:16
interestingly 64:21
internal 13:24, 28:11, 28:13
internally 31:11, 65:12
interpretation 65:6
introduced 19:24
invading 4:20
invested 54:1
investigations 84:17
investing 40:11
investor 40:11, 55:20, 56:10
investors 27:10, 28:1, 28:3, 35:13, 50:2, 78:3, 78:25

invited 69:25
involved 12:11, 12:13, 13:11, 43:10, 67:1
issue 4:11, 4:16, 6:25, 29:10, 34:10, 49:7, 51:11, 59:6, 67:19
issued 52:17, 69:23
issues 61:18, 62:18
Item 6:14, 23:6, 23:20, 28:6, 53:3, 89:7
items 7:6, 45:3, 88:6
itself 7:22, 11:5, 14:24, 50:24, 65:11, 78:13

< J >
J. 1:19, 2:28, 3:12
JASON 2:22
JEFFREY 1:19
job 24:23
JOE 1:33
JORDAN 2:22
JOSEPH 91:6
JR 1:6
Juan 83:2, 83:21
Judge 1:27, 4:6, 6:5, 26:21, 90:13
judgment 66:13
jump 69:3
Jury 4:20, 5:23, 6:6, 7:22, 9:16, 9:17, 24:2, 24:9, 25:13, 28:7, 32:9, 37:11, 52:13, 56:19, 59:1,

59:19, 68:4, 68:5, 70:20, 84:20, 90:21
jury. 4:10
Justice 21:20

< K >
keep 44:19, 44:21
KENDALL 1:33, 1:34
kept 42:11
key 35:5, 35:6, 35:15, 67:17, 76:8
kind 15:2, 25:15, 31:16, 36:20, 62:11, 62:19, 66:22, 71:8, 72:1, 76:23, 84:7, 84:16, 86:10
kinds 67:2
KING 2:16
Kinkeade 1:26, 4:6
Klynveld 21:2, 21:3
KPMG 20:23

< L >
labor 44:2, 44:24
lack 87:18
ladies 67:25
Lake 50:16
language 28:12, 47:8
large 63:12
largest 23:4, 89:3
last 8:4, 26:18, 27:7, 66:10, 67:6, 67:7, 73:21, 81:7, 85:13, 88:17, 89:19
lasted 16:19

later 79:1, 81:25
LATHAM 2:40
Laughter 19:12, 26:25, 90:15
Laughter. 19:18
LAW 1:34, 2:2
lawsuit 20:3
lawyers 6:6
layman 24:15
leading 30:17
leads 78:2, 85:15, 88:20
League 22:5
lean 18:18
leap 76:13, 76:15
learnings 87:6
least 23:18, 80:5
leave 84:12
left 53:14, 53:15, 74:21
left-hand 38:19
legal 4:19, 7:7, 7:8
less 16:18, 59:4
levels 77:14
Levi 22:5, 26:17
liability 25:18
licensed 20:19
lift 39:12
Lifting 38:6, 39:11, 39:13, 42:3, 43:23, 44:1, 44:8, 44:11, 44:14, 44:17, 45:3, 45:6, 45:8, 45:12, 45:15, 46:1, 47:18, 47:23, 48:11, 55:8
light 59:21, 60:1, 86:13
likely 86:14
likes 5:18
limited 12:16

78:16, 78:19, 82:17, 82:18
Greenville 2:3
ground 39:12
Group 1:34, 12:9, 12:22, 12:24, 13:24, 73:15
groups 49:4
growth 76:19
guess 26:19
guidance 34:4, 49:7, 73:24
Guide 48:22, 49:2, 49:3, 49:6, 69:20, 69:23, 73:5, 82:14
guidelines 47:9, 49:16
guiding 49:10
Gulf 50:22

< H >
H. 1:39
half 15:24, 73:23, 77:10, 83:6, 90:19
hand 4:21, 13:1
happen 56:11
happened 54:14, 86:1
happening 10:11, 31:16
hard 27:18
Harwood 2:24
HAYNES 2:23
hear 18:19, 18:24, 74:8
heard 85:17
heartburn 5:25
heartburn. 84:14
heat 62:16
heavily 12:20
held 22:6
help 20:11, 25:20, 28:3, 31:15, 38:4,

38:15, 49:6, 53:10
helpful 27:25
Henry 73:15, 74:23, 75:3, 76:11, 78:11, 78:14, 79:15
hide 69:13
high 77:7, 77:12, 80:19, 82:11
higher 55:10, 56:3, 58:22
highlight 31:25, 46:11
highlights 64:6, 81:16
hindsight 88:12
hinges 50:11
HINOJOSA 2:15
hire 21:13
hired 22:2
historical 49:16
holds 63:9
Honor 4:11, 4:21, 5:3, 5:5, 6:11, 6:25, 7:8, 8:2, 8:13, 8:16, 8:20, 9:9, 9:23, 14:7, 17:16, 17:20, 17:25, 18:5, 18:8, 19:15, 22:17, 22:23, 27:15, 50:3, 50:7, 57:4, 82:4, 87:18, 90:6, 90:12
Honorable 1:26, 4:5, 4:8
hook 23:12
HORNE 9:2, 10:1, 15:17, 17:12, 18:4, 36:11, 57:14, 79:3, 79:13, 79:23, 81:17, 91:6

hour 16:10, 16:17, 22:15, 22:16, 90:19
hours 15:19, 15:21, 16:8, 22:10, 44:5
housed 58:18
houses 62:17
Houston 59:22, 60:2
Hub 74:23, 75:3, 76:11, 78:11, 78:14, 79:15
Hub. 73:15
huge 80:9
Hugoton 14:10, 14:12, 14:25
hundred 7:10, 7:13, 15:19, 22:1, 72:1, 85:13
hundreds 34:22
hurts 84:17

< I >
Identified 83:22, 91:24
ignores 80:18
IHS 82:23
illustrate 53:10, 61:12, 74:2, 74:16
illustrated 63:7
immediately 11:4
impact 80:9
impaired 14:4, 25:5, 58:6, 84:2, 89:21
impairments 5:21, 25:8
implies 55:23
Important 28:23, 29:19, 29:21, 30:25, 31:21, 31:23, 35:3, 53:21,

66:9, 79:9, 88:5
improper 6:3
improperly 7:24
include 37:21, 37:22, 39:6, 48:12, 50:21, 56:21
included 38:6, 45:3, 48:18, 51:22, 75:1
includes 25:18, 25:19, 25:21, 26:8
including 5:15, 39:1, 40:1, 51:24, 61:5
inclusion 39:5
income 25:18, 32:16
incorporated 52:19
increase 72:16, 76:22, 76:23, 80:21
incur 36:20
incurred 32:25, 33:16, 37:17, 39:12
incurring 37:21
INDEX 91:1
indicate 70:13
indicated 10:13
indicates 60:23, 65:18
indicating 58:10
indicator 85:7
indirect 48:8
Individually 1:6
industries 15:22
industry 30:10, 40:10, 49:3, 52:17, 63:23
inference 55:16
inflation 70:16
influenced 7:4
information

LINDELL 1:40
lines 10:6, 10:25, 74:21, 75:2, 75:23
linkage 30:20
liquid 54:3, 54:4
list 55:10
listed 55:10
lists 25:17
literally 14:22
litigation 5:15
little 18:18, 28:6, 29:5, 33:21, 43:22, 54:1, 59:2, 61:16
live 52:7
LLP 1:46, 2:16, 2:23, 2:34
located 23:5, 23:24, 89:13
locking 71:10
lonely 18:11
LONG 2:45, 6:23, 13:12, 13:13, 16:18, 20:4, 20:6, 20:7, 20:8, 52:21, 62:10
long-term 64:9, 65:21, 79:4, 82:13, 82:16
longer 9:11
look 5:8, 7:18, 25:10, 31:16, 34:16, 35:24, 64:8, 64:9, 66:20, 79:19, 90:2
looked 34:2, 47:9, 53:19, 54:2, 54:5, 82:20, 83:21
looking 40:18, 47:4, 47:16, 49:11, 65:23, 90:5
looks 48:2
losing 86:4,

86:9
loss 32:4, 39:22, 61:1, 63:20
losses 23:4, 23:18, 39:21, 60:14, 63:8, 89:3
lost 63:11
lot 23:8, 24:12, 24:14, 25:11, 28:25, 44:20, 61:17, 66:21, 76:9
loud 18:25
loves 19:15
low 9:4, 61:20
Lower 56:2, 63:25, 64:15, 65:9, 75:16
lower-level 87:11
lowers 48:14
lunch 90:8, 90:9, 90:18
LYUBA 2:31

< M >
M. 2:12
machines 44:4
Mackenzie 82:24
maintain 44:7
maintenance 44:3
major 30:10, 30:11, 39:7, 62:15
Management 25:21, 25:22, 25:25, 26:7, 26:9, 26:10, 29:17, 31:11, 31:17, 31:19, 31:22, 32:1, 33:9, 34:8, 38:4, 42:13, 48:21, 49:2, 49:6, 56:6, 56:8, 56:20,

57:8, 60:18, 64:1, 64:15, 65:10, 70:8, 85:8, 86:23, 87:14
manager 50:15
Managers 88:6
manner 40:13
manual 38:2, 42:23
manuals 37:25
many-paged 53:5
market 39:1, 43:19, 70:22, 72:9, 73:8, 73:13, 73:17, 73:21
markets 39:1, 72:4
Marwick 21:1, 21:4
Maryland 5:16
massive 35:14, 44:20
masters 20:17
material 23:16, 29:18, 29:19, 52:4, 52:9, 52:21, 53:1, 53:2, 53:6, 53:8, 53:11, 54:12, 90:4
material. 57:21
materiality 29:22, 52:10, 53:5, 57:13
materially 85:15
materials 44:3, 44:24
May/june 77:2
mayor 22:9
MD&A 25:21, 26:9, 28:22, 56:13, 56:16, 56:18, 56:20
mean 14:18, 30:4, 32:15, 55:22, 66:24, 72:15, 85:19

meaningful 28:2
means 29:19, 30:5, 63:20, 66:25
measure 35:5, 35:6, 35:15, 40:12, 61:1
mechanical 3:7
meet 40:19
meeting 65:15
meetings 28:13
MELSHEIMER 2:12
mention 70:16
mentioned 11:25, 31:20, 46:19
merged 59:13
merger 10:17, 10:19, 10:20, 11:5, 11:14, 11:16, 11:19, 21:1
met 15:18, 15:23, 16:1, 16:3
metadata 28:17, 28:18
method 50:18
methodology 4:19, 40:14
Metrics 86:15
MICHAEL 2:7
microphone 18:17, 18:19
middle 80:3
million 32:5, 32:19, 33:4, 33:5
millions 32:5, 32:6, 51:9
mind 5:19, 53:7, 54:12, 61:22
minus 32:11
minute 68:11, 77:23, 90:14
minutes 9:12
mislead 56:10
misleading 52:5, 55:13

55:20
misspoke 7:7
misstated 85:15
misstatement 90:4
Mitchell 21:1
MOBILE 1:17
modify 45:1
moment 43:22
moments 42:24
money 44:25, 86:5
month 32:2, 32:4, 32:23, 33:12, 36:19, 42:15, 46:6, 46:15, 74:14
monthly 31:18, 31:25, 32:22
months 41:17, 46:12, 71:24
morning 9:19, 10:1, 10:2, 15:12, 15:13, 17:4, 17:6, 19:5, 19:6
motion 6:24, 9:6
motives 5:19
Mountain 25:4, 57:25, 58:4, 58:6, 58:18, 69:4, 84:2, 89:20
move 18:5, 18:22, 33:24, 41:23, 46:9, 50:4, 82:15
movements 29:8
moving 38:25, 82:8
MR. SHELDON 15:11, 17:8, 17:16
MR. TOAL 4:11, 4:25, 5:5, 5:11, 5:18, 7:18, 8:16, 9:12, 9:23, 9:25, 14:7,

17:11, 17:15, 22:20, 30:17, 66:5, 87:18, 87:23, 87:25, 90:9, 90:12, 90:16
multiple 8:4, 13:10, 66:18
multiplication 55:3
multiply 54:25
myself 39:21

‹ N ›
N. 2:24
NAME 21:2, 91:4
narrating 4:18
narrative 25:22, 26:10, 56:9, 56:20, 57:3
NATHAN 1:40
National 22:5
natural 54:3, 58:20, 61:18, 62:15, 69:4, 73:16, 86:3
nature 53:3
nearest 53:17
nearly 89:21
necessary 52:4
need 4:23, 5:8, 27:9, 29:1, 34:5, 41:6, 42:24, 67:3, 78:3, 79:6, 84:19, 87:12
needed 88:14
needs 25:24, 26:1, 47:11, 48:18, 58:13, 66:25
negative 32:19, 32:25, 33:1, 33:2, 33:4, 33:5, 63:14, 63:15, 63:20
negatives 63:17
New 2:36,

14:23, 66:25, 71:2
news 88:7
next 17:18, 17:21, 18:15, 25:10, 32:21, 37:20, 45:25, 60:20, 60:25, 64:22, 65:1, 67:12, 74:2, 87:16
night 18:9
NINA 2:21
No. 1:15, 11:9, 11:22, 12:12, 12:14, 18:23, 19:16, 31:19, 34:15, 37:4, 38:13, 40:21, 42:22, 43:21, 45:22, 45:24, 53:9, 54:13, 56:14, 57:11, 61:24, 63:4, 65:13, 69:2, 74:1, 81:18, 89:9, 90:2
norm 15:22
Northern 1:2, 4:4
notable 30:8, 86:24
note 88:10
notes 25:20, 65:13, 65:14, 70:12, 70:13
Nothing 14:7, 17:15, 17:16
number 7:2, 45:18, 45:21, 50:12, 51:16, 51:20, 51:23, 53:17, 55:5, 63:12, 63:19, 63:20, 66:13, 78:10, 81:7, 83:25
numbers 30:6, 33:2, 42:14, 45:20, 50:1,

51:24, 55:21, 56:5, 57:2, 75:10, 85:9
numerical 30:15
NY 2:36
NYMEX 71:1, 71:3, 73:12
NYMEX)-WTI 73:15

‹ O ›
object 6:8, 87:18
Objection 8:5, 8:6, 22:20, 30:17, 66:5, 87:21, 87:25
objections 8:5
objective 49:24
objectives 28:9
obligation 77:15, 77:17
observe 60:3, 61:25
observed 42:13, 61:10
obtain 71:1
obviously 5:25
occur 29:2, 57:10, 60:9, 64:3
occurred 8:7, 8:12, 59:21, 60:14, 65:20, 65:25, 70:23
occurred).
65:22
occurs 66:11
October 47:20
oddball 14:16
offer 6:6, 22:18
offered 7:9, 57:22
offering 4:18, 5:14, 5:19, 22:25, 23:3, 23:22, 24:25, 57:22, 57:25,

performed 13:25
period 30:23, 30:24, 36:19, 46:15, 48:1, 58:20, 58:23, 61:20, 64:9, 70:25, 77:1
periods 71:6
persistent 61:19, 76:14
personnel 12:22, 41:5
perspective 29:7, 51:1, 52:22, 59:20, 67:22, 87:3
Petroleum 48:21, 49:1, 49:2, 49:4, 49:10, 49:16, 69:19, 69:23
pick 40:13, 40:15
pie 53:10
place 9:19, 79:7
PLAINTIFF 9:6, 10:5, 10:25, 11:7, 17:19, 45:11, 91:21
PLAINTIFFS 1:12, 1:31, 17:22, 22:17
plan 64:8, 73:7, 75:9
planning 74:23
plants 62:16
players 30:11
Please 4:9, 41:13, 56:19
plot 75:2
Plus 66:24
PM 21:3
point 8:1, 8:4, 8:20, 27:5, 29:8, 30:9, 34:25, 46:19, 50:10, 74:3, 76:16, 77:4, 77:7, 77:19,

78:24, 79:24, 82:11, 82:15, 83:4, 83:9
pointer 26:18, 26:19
pointing 50:11, 75:4
points 28:20, 30:13, 30:20
polar 61:17, 62:1, 62:11, 62:18
Policy 12:9
political 22:6
POLYCHRON 1:44
Portfolio 86:15
portion 38:19, 41:18
position 18:6
positions 22:6, 87:2
positive 47:2, 55:23, 77:13
possible 28:23, 65:4
potential 12:16, 40:11
power 62:16
practice 7:23
practiced 16:3, 16:6, 16:13
pray 4:7
preceding 61:14
precluded 4:17, 5:14
predictable 72:20, 72:22
preferences 88:19
preferred 73:14
prejudices 9:6
preparation 38:5
prepare 53:10, 60:22
prepared 38:4, 43:2, 65:14, 65:19
presence 4:10
present 32:22,

55:19
presentation 46:3, 46:25, 54:23, 74:11, 81:12, 81:18, 81:19, 82:2, 82:5, 90:2
presentations 36:5
presented 35:8
presiding 4:6
press 62:3
Prestipino 57:15, 57:16
presumption 55:20
Price 46:8, 46:13, 47:5, 47:21, 48:2, 50:20, 58:20, 60:17, 61:5, 65:21, 68:24, 70:5, 71:16, 71:24, 72:1, 72:10, 73:7, 73:9, 74:24, 76:11, 76:12, 77:2, 79:4, 79:14, 82:12, 82:13, 82:15, 82:16, 83:5, 86:3
prices 12:1, 36:17, 38:9, 38:13, 42:24, 49:17, 54:15, 54:17, 54:20, 58:24, 60:8, 61:11, 61:12, 64:1, 64:3, 64:15, 65:9, 66:1, 67:15, 70:7, 70:14, 71:11, 72:15, 72:19, 73:20, 76:15, 82:22, 82:23, 86:6
Pricewaterhouse 63:25

pricing 10:8, 11:10, 11:15, 11:20, 15:14, 39:15, 41:15, 41:24, 42:18, 50:18, 70:3, 70:7, 70:9, 70:11, 70:13, 70:20, 70:22, 72:9, 73:12, 78:11, 78:15, 82:14
primarily 15:18
principle 7:3, 43:7
Principles 6:16, 7:7, 7:8, 24:7, 24:16, 51:25
prior 64:12, 73:14
probable 46:10
probably 13:14, 32:17
probing 67:18
problem 40:22, 51:6, 51:21, 54:14, 59:22
problem. 60:2
problematic 54:9
procedures 59:5
Proceedings 3:7, 68:13
process 60:21, 66:11
prodding 67:18
produce 48:7
produced 3:8, 79:15
produces 82:18, 82:19
producibility 39:25, 70:6
producible 36:7, 36:11, 36:13, 39:17, 39:18, 39:22, 39:24, 42:4, 47:24, 49:13,

58:3, 89:10, 89:17
office 66:25
OFFICER 4:3, 9:16, 43:7, 68:4, 90:21
Official 3:13
Often 25:24, 26:8, 32:14, 60:1, 85:15
oil 26:12, 26:15, 27:9, 28:2, 28:4, 30:12, 30:15, 31:2, 33:15, 35:3, 35:5, 35:7, 35:10, 35:18, 39:12, 39:14, 39:16, 40:8, 40:11, 44:1, 48:7, 54:3, 63:25, 64:15, 65:9, 70:24, 71:5, 73:16
oilfields 31:2
old 50:18
oldest 19:9
Olive 2:17
OLIVER 1:42
omit 52:3
Once 37:16, 37:20, 60:19, 66:10
One 4:11, 5:3, 5:4, 6:19, 8:1, 8:6, 8:20, 13:13, 13:14, 18:1, 20:21, 22:8, 23:11, 24:7, 26:22, 28:15, 30:2, 30:10, 35:1, 35:21, 36:2, 36:5, 40:11, 41:15, 47:5, 47:7, 50:13, 51:3, 54:2, 59:12, 60:7, 65:22, 67:14,

68:11, 69:17, 81:1, 81:11, 89:2, 89:25
one-year 49:16
ones 23:15, 23:16
oops 47:14
open 9:15
opened 9:4
opening 8:8, 8:11, 9:1
operates 63:10
operating 36:22, 44:5, 44:11, 44:18, 44:22, 46:7
operation 36:14, 44:20
operations 14:20
Opex 44:14, 44:17, 44:24, 45:7, 47:16
opines 5:24
opining 7:8
opinion 5:14, 6:1, 23:3, 23:17, 23:22, 24:25, 25:3, 57:22, 57:25, 58:3, 89:8, 89:10, 89:16, 89:19
opinions 4:18, 5:6, 5:19, 6:18, 6:21, 7:9, 22:25, 88:24, 88:25
opportunities 66:12
opportunity 73:20
opposed 29:8, 87:8
order 4:3, 35:9, 40:10, 45:17, 46:20
ordinary 58:12
origi 54:1
Others 1:7,

13:20, 49:5
Otherwise 37:17
ought 6:5
outcomes 28:23
outliers 7:11
outlook 60:17, 65:21, 65:23, 79:14
Outside 4:10
overarching 61:2
overclicked 47:15
Overruled 87:20
overstated 51:16, 51:23
own 14:24, 40:14, 57:12, 68:18

‹ P ›
P. 1:18
pace 80:20
Page 34:16, 51:3, 54:8, 54:14, 54:15, 55:11, 74:17, 91:4
pages 13:13, 13:15, 53:4
paid 22:13, 22:15
pam_wilson@txnd
.uscourts.gov
3:16
PAMELA 3:12
paper 63:24
paper...that 88:11
papers 13:5, 13:7, 13:8, 13:12
paragraph 38:6
parlance 25:13
part 10:21, 11:4, 11:21, 12:8, 13:17, 14:20, 30:7, 36:4

participants 87:1
particular 28:11, 70:24, 89:5
particularly 53:1, 53:21, 88:4
parties 82:20, 82:23
parts 44:14
Party 2:8, 3:4
Pass 17:8, 90:6
past 7:24, 21:23
PATRICE 3:3
PATRICK 2:45
PATTON 2:46
PAUL 2:34, 17:22, 91:14
peak 33:23, 61:19
Peat 21:1, 21:3
PEDRO 1:6
PENNSYLVANIA 1:9
PENSION 1:9
People 12:21, 13:11, 13:24, 25:20, 62:16, 85:1, 86:21
per 22:15, 33:11, 33:20, 33:21, 41:19, 54:18, 54:21, 54:23, 55:23
percent 36:12, 51:19, 51:23, 52:25, 53:2, 53:17, 53:18, 53:20, 54:4, 54:6, 55:5, 55:22, 57:19, 64:10, 64:14, 65:3, 66:1, 73:23, 76:16, 76:19, 76:22, 77:10, 83:6
percentage 52:24

51:14, 54:25, 56:1
product 36:17, 50:19, 53:24, 55:18
Production 44:9, 44:11, 44:21, 48:9, 54:15, 54:16, 54:17, 54:20, 54:21, 55:1, 55:8
productive 53:24
products 70:24
proffered 6:5
profit 55:25
profitability 35:9, 39:17, 63:12
profitable 35:10
project 37:16, 37:20, 38:7, 48:16, 49:19, 70:9
promulgated 24:3
properties. 64:2
prove 35:12
proved 12:3, 12:6, 12:8, 12:11, 12:13, 12:15, 12:19, 35:3, 35:9, 35:14, 35:25, 36:6, 36:9, 38:1, 38:7, 38:12, 38:21, 39:6, 39:8, 45:17, 45:23, 46:9, 49:13, 51:7, 51:10, 51:12, 51:20, 53:15, 53:16, 53:18, 53:19, 53:20, 53:22, 54:3, 54:24, 57:19, 69:1,

88:14, 89:13
provide 26:16, 27:10, 28:1, 35:8, 53:24, 55:24, 66:21, 78:25, 85:20, 87:12
provided 26:10, 28:20
providing 28:19, 53:24
Public 13:23, 14:22, 20:18, 20:19, 24:24, 85:5
publicly 34:11, 52:15
pumped 58:1
purchase 11:17, 58:17
purchased 88:15
purpose 70:4
purposes 38:20
put 11:17, 31:15, 31:24, 33:2, 41:12, 49:3, 49:5, 61:13, 73:5
putting 13:8, 14:20, 37:17, 52:22
Pwc 13:23, 65:15, 66:24, 69:14, 69:19, 69:23, 69:24

‹ Q ›
Q. 37:15, 37:20, 43:8, 43:14
qualifications 20:13
qualified 21:6, 38:21, 39:8
qualify 45:23, 51:12, 51:13, 69:1
quality 85:7
quantification

39:23
quantify 41:4
quantitative 30:15, 31:5, 52:24
quantitatively 28:23, 30:4
question 8:11, 14:9, 28:21, 37:15, 37:20, 43:8, 43:14, 53:7, 54:11, 58:23, 61:22, 63:2, 65:19
questionable 5:21
questioning 11:8, 16:20
questions 8:9, 10:3, 12:2, 16:17
quickly 83:5
quite 48:14, 50:23, 55:10, 79:1

‹ R ›
R. 1:40
raised 4:15, 8:21
raising 6:24
RAMIREZ 1:6
range 27:14, 58:21, 58:22
rate 83:6
rates 80:21
Raton 83:2, 83:21
Raytheon 22:4
re-created 68:21
reach 27:3, 27:4
reached 33:23
read 30:13, 37:11
reader 25:23, 26:6, 26:11, 29:21, 55:20

ready 8:19, 17:17
real 62:18
realization 33:13, 34:9, 36:18, 38:20, 39:9, 42:1, 45:20, 56:2
realizations 33:10, 41:19, 45:17
realize 33:17, 58:13
realized 46:14, 58:12
Really 5:8, 62:6, 62:7, 62:10, 62:13, 77:24, 85:11, 88:11
reason 66:3
reasonable 61:5, 65:6, 70:16, 76:7, 76:17, 77:24, 77:25, 79:5, 80:16, 80:23, 81:3, 81:4, 82:9, 82:17, 82:18, 82:25, 84:1
reasonableness 67:15, 80:11, 80:13
reasonably 28:22, 36:10
recall 10:5, 10:14, 12:2, 12:5, 62:3, 76:14
receive 43:13
received 39:14, 39:15
Recess 68:2, 90:22
recognize 57:12, 64:21, 65:11, 66:15
recognized 67:9
recommend 49:16

record 8:22, 8:25, 9:14, 9:15
recorded 58:11, 59:4, 60:24, 70:25
records 38:24, 39:24, 58:11, 60:25, 69:11
recover 59:24
Recoverability 11:21, 11:23, 12:1, 13:2, 13:6, 13:16, 13:19, 14:1
RECROSS 15:10, 91:10
recurring 23:4, 23:18, 89:3
red 26:22, 27:18, 33:2, 63:16, 66:15, 86:13
red. 86:5
redid 82:25
REDIRECT 9:24, 17:10, 91:8, 91:12
redo 80:22
reduction 65:20
refer 85:3
referenced 6:19
referred 10:11, 32:13, 35:15
referring 10:16
reflection 5:6, 80:13, 84:7
reflective 70:22, 77:6, 84:15, 84:24, 87:11
REGAN 4:13, 4:16, 5:14, 6:7, 6:12, 7:23, 17:22, 19:5, 22:18, 30:21, 32:8, 50:10, 55:3, 66:8, 68:11, 91:14

regulators 66:12, 67:10
relate 6:20, 7:6, 28:10, 31:19, 46:17, 48:6, 49:20, 77:16, 79:3, 80:11, 86:19, 87:10, 87:17, 88:13, 88:18
related 86:22
relates 23:6, 61:16
relating 30:25
relationship 48:9
relative 28:3
relevant 34:1, 34:4, 85:23, 85:25
relied 12:20
remember 6:23, 16:18, 16:25, 53:4, 76:10
reminding 31:3
renewed 8:25
repair 45:1
repairs 44:3
repeated 28:12
repetitive 87:22
replaced 81:3
report 6:22, 25:12, 25:14, 25:15, 25:16, 31:21, 31:25, 32:22, 34:11, 52:23
reported 3:7, 31:17, 32:4, 33:7, 33:8, 34:7, 34:8, 57:20, 85:10
Reporter 3:13
reporting 30:24, 31:4, 36:19, 49:6, 49:25, 50:1, 50:14, 85:7
reports 25:17,

37:23, 42:14, 43:13, 51:8, 71:4
represent 35:7, 74:22
Representative 2:8, 3:4, 55:21
represented 53:18
represents 57:18, 69:10
require 11:17, 61:2, 73:20
required 25:5, 26:16, 29:16, 56:7, 58:6, 80:21, 89:21
requirements 31:1, 40:19, 40:20
requires 28:8, 52:15, 53:25
reserve 12:6, 12:8, 23:5, 31:6, 35:10, 35:25, 45:17, 45:23, 53:22, 89:4
Resource 36:13, 48:21, 49:5
Resources 49:2, 49:18
respect 7:1, 9:6, 27:9, 31:1, 31:5, 31:7, 31:11, 31:16, 38:1, 50:13, 65:18, 79:15
respectively 79:17
responsibility 12:9, 13:17
rest 10:24, 33:24, 79:11
result 20:2, 45:23, 75:21, 78:19
resulted 42:7, 61:18, 75:12,

78:16, 83:11, 90:4
resumed 68:3
retained 21:9, 21:16, 21:19, 21:23
returning 79:16
reurge 8:21, 9:4
revenue 36:13, 70:8, 70:10, 79:11
revenues 32:11, 32:24, 80:9
Review 10:21, 11:21, 28:11, 66:17, 69:14, 69:19, 73:1, 86:15, 88:21
reviewed 13:20, 13:22, 16:1, 46:22, 48:20, 67:6, 74:2, 74:9, 86:17
reviewing 10:24, 52:22
Reviews 13:2, 13:6, 13:16, 13:20, 13:22, 13:25, 14:1
rewarded 88:7
Rex 1:18, 3:1
RIFKIND 2:34
right-hand 38:22
righty 19:1
rise 4:3, 9:16, 68:4, 90:21
risks 56:21
RMR 3:12
ROBBINS 1:46
rocketship 76:21, 80:19
rocking 88:7
Rocky 25:4, 57:25, 58:3, 58:5, 58:18, 69:4, 84:1, 89:20
role 4:20, 109

78:7, 78:9, 84:5
Significant 13:10, 39:20, 90:3
significantly 75:16
Similarly 1:8
simple 26:6
single 23:5, 89:3
sir 4:25, 11:2, 13:4, 13:21, 14:6, 14:12, 15:12, 16:5, 16:21, 17:1, 18:12
sitting 81:22
Situated 1:8
Six 19:21, 67:5, 67:7, 73:19, 73:20, 73:21
Slide 5:24, 6:13, 6:19, 20:13, 25:10, 38:15, 38:18, 41:13, 45:25, 47:13, 68:12, 70:12, 87:16, 88:4
Slides 4:14, 4:21, 5:5, 5:8, 5:18, 5:22, 8:8, 8:10, 20:10
smaller 65:4
snowmageddon 62:21
Society 49:4, 49:15
sold 9:19
SOLOWAY 2:28
Sometimes 44:6, 59:9, 63:17
Somewhere 15:20
Sorry 9:19, 19:10, 26:21, 47:15, 55:17, 74:8, 75:7,

77:22, 85:23, 86:12
sort 5:13, 6:3, 7:23
sorts. 88:20
Sounds 16:12, 62:12
sources 73:14
South 34:22, 51:8, 54:19
SPALDING 2:16
special 66:23, 66:25
specific 59:5, 63:23
specifically 6:20
speculation 66:5
speculative 37:22
speech 85:25
speeches 19:24
speed 79:2, 79:4, 82:13
SPENCER 1:45
spend 44:25, 67:4
spent 22:10, 53:22
spike 62:19
spoke 17:2, 17:4
spoken 29:16
spotlight 31:4
spreadsheets 79:9, 79:18, 83:4, 83:8, 83:19
SQUIRE 2:46
Staff 23:7, 29:23, 29:24, 29:25, 52:10, 52:13, 52:15, 52:18
stale 77:1, 79:8, 82:22
stand 14:5, 17:23, 18:1, 34:25

standard 26:4, 26:5, 36:3
Standards 6:17, 11:24, 23:25, 24:2, 24:4, 24:19, 26:13, 35:25
start 33:19, 61:9, 77:12
started 20:2, 20:9, 20:20, 37:16, 64:11
starting 53:13, 61:14, 73:6, 73:18, 76:16, 77:3, 77:4, 77:7, 82:11, 82:15, 83:4, 83:9
starts 37:20, 41:19, 76:12, 76:20, 76:25, 80:18
state 5:19, 21:7
statement 8:11, 25:18, 32:16
statements 25:17, 25:19, 25:21, 26:8, 52:4, 56:21, 84:23, 85:16
States 1:1, 1:27, 4:1, 4:6, 4:8, 5:19, 21:22, 46:5, 50:17
stating 30:9, 70:10
stay 18:9
stays 18:10
steep 77:8
stenography 3:7
Step 17:24, 59:9, 59:10, 59:12, 59:13, 59:14, 59:15, 60:22, 60:25, 80:25, 81:1, 83:14, 83:16

Stock 14:23
stop 32:8
strange 7:11, 15:2
Strauss 22:5, 26:17
stray 5:12, 40:7
Street 2:17, 2:24, 3:14
strike 35:23, 67:13
Strip 10:8, 11:10, 11:15, 11:20, 15:14, 70:3, 70:7, 70:8, 70:11, 70:14, 70:20, 70:22, 72:9, 72:19, 73:11, 82:14, 82:17
stripping 14:19
strongest 47:6
stuck 8:6
subject 50:15, 53:2
submit 6:8, 8:13
subtract 33:15
suddenly 76:15
suggest 11:20
suggesting 5:20, 88:8
Suite 1:35, 1:47, 2:3, 2:17, 2:24, 2:41, 2:47
sum 32:25
summarize 31:14, 88:24
summarized 87:5
summary 71:14
summation 5:7
Sunday 19:8
supply 61:18, 62:16, 62:18
supposed 5:23, 25:22, 35:23, 57:7, 77:5, 83:14 111

12:15, 24:22
Roman 66:16
Rosenthal 1:20, 28:20, 52:6, 84:11, 87:15
Ross 2:47
rounded 53:17
row 44:17
Royal 14:10, 14:12, 14:25
royalty 14:20, 14:22
RUDMAN 1:46
rule 6:20, 25:8, 29:22, 38:11, 46:13, 52:23, 58:15, 61:7, 65:10, 89:14, 89:23, 89:25
ruled 8:17
rules 6:12, 6:14, 7:4, 11:16, 11:22, 12:6, 12:8, 21:10, 21:14, 22:3, 23:6, 23:8, 23:9, 23:18, 24:8, 26:1, 28:10, 30:2, 31:20, 35:22, 36:23, 36:24, 37:2, 37:5, 37:8, 38:16, 44:10, 48:18, 64:14, 64:18, 89:5, 90:3, 90:4
RWT 65:16

< S >
S. 1:19, 50:22
SA 52:19
SAATHOFF 2:13
SAB 6:15, 23:20, 52:18, 89:7
SAHAM 1:39, 4:24, 6:10,

68:8, 91:16, 91:18
Salas 6:4
sales 50:22, 58:12
SAM 1:41
San 1:48, 83:2, 83:21
sands 30:12, 30:15, 31:2, 68:12
SARA 1:44
saw 37:6, 39:19, 39:20, 42:23, 79:8
saying 41:5, 86:3, 86:13
says 38:6, 43:14, 46:14, 65:10, 66:24, 73:13, 79:5, 81:19, 82:4, 82:5, 84:12
scales 13:14
Scenario 47:5, 47:7, 79:16
scenarios 47:4
schedule 49:12
school 19:16, 22:7
SCOTT 1:39, 2:39
screen 41:12
scrutiny 5:21, 66:21, 67:10, 67:14
seat 18:14
seated 4:9, 9:21, 68:7
SEC 6:20, 7:14, 12:6, 12:8, 22:3, 23:8, 25:12, 30:12, 30:14, 30:22, 31:20, 36:6, 36:9, 39:3, 39:15, 40:8, 41:15, 41:24, 42:17, 42:21, 43:9, 43:19,

46:13, 47:2, 47:21, 48:2, 49:24, 52:10, 52:17, 65:22, 66:16, 66:21, 84:17, 85:6
second 23:22, 41:18, 44:17, 60:13, 63:8, 89:10
second-guess 66:13
second-guessing 67:2
seconds 79:12
section 11:24, 56:13, 56:16, 56:18, 56:24
Securities 5:15, 20:3, 21:9, 21:12, 21:13, 30:1, 52:14
SECURITY 4:3, 9:16, 68:4, 90:21
seen 31:22, 45:10, 48:10, 50:12, 55:2, 76:24
segments 24:6
selected 87:1
selection 9:21
sell 39:14, 39:16, 53:24, 71:25
seller 70:23
sellers 71:5, 72:10
selling 70:24, 71:10
senior 38:4
sensitive 53:1
sensitivity 73:9
sent 62:5
sentence 66:10
separately 70:19
September/octob

er 77:3
series 29:8
served 22:8
session 4:5
set 4:23, 5:1, 8:8, 12:1, 35:24, 88:17
sets 20:13, 36:2, 66:15, 84:16
seven 44:5
several 6:2, 60:7
shale 57:24, 58:1, 69:4
SHAMAILOVA 2:31
shares 14:25
Shatner 62:12
sheet 25:17
Sheila 50:13
SHELDON 1:41, 91:10
shield 9:1, 9:5
shipping 50:19
shirt 86:9
shirts 86:4
show 11:3, 11:7, 27:4, 41:2
showed 10:5, 10:25, 42:23, 50:20, 76:14
showing 79:16
shown 39:14, 85:13
shows 54:20, 54:21, 55:23, 88:12
shut 69:13
shutting 69:6
shy 88:11
sic 88:22
side 8:12, 8:13, 38:22, 47:2, 75:1
signature 64:12
signed 52:2, 52:5
significance 67:21, 76:1, 110

supposition 65:24
surface 44:2
sustain 35:13
sustainability 35:16
Sustained 30:18, 66:6
sustaining 44:3, 44:15, 44:18, 44:23, 44:25, 45:7, 47:16
SWIDERSKI 2:7
Swiger 1:18, 43:6, 46:3, 52:5, 65:13, 65:14, 65:16, 74:11, 81:12, 81:19, 82:6, 87:14
switch 68:11
sword 9:1, 9:5
sworn 18:12
sworn. 18:13
System 48:21, 49:2

< T >
T. 1:43, 2:15
tailoring 88:20
taken. 68:2
talked 13:25, 28:6, 43:22, 63:16, 79:2
talks 60:7, 70:4
tar 68:12
tax 25:5, 58:7, 83:23, 83:24
taxes 84:2
TCU 19:9, 19:16
teacher 25:20
Ten 80:3
tend 33:2, 59:11
term 22:8, 58:10, 85:17
terms 24:15,

26:6
terrible 19:11
test 47:3, 47:6, 47:11, 60:1, 60:23, 79:20, 80:25
testified 9:3, 15:17, 17:6, 17:12, 36:11
testify 6:13, 8:18, 21:7, 21:10, 21:13, 21:17, 22:3
testifying 7:6, 7:13, 12:5
testimony 6:3, 6:8, 7:21, 9:1, 9:2, 10:6, 10:8, 10:13, 10:14, 10:22, 10:24, 11:7, 17:13, 20:11, 37:7, 37:10, 37:12, 37:13
testing 58:15, 66:11, 80:12
tests 59:7
Texas 1:2, 1:29, 3:15, 4:5
Thanks 14:8, 81:13
the'90s 14:17
THEODORE 2:30
thereafter 77:10
thing. 87:9
third 24:25, 25:3, 33:10, 60:16, 63:22, 82:20, 82:23, 84:13
third-party 82:21
THOMAS 2:12, 2:39
THOMPSON 2:33
though 19:15, 72:3
three 8:9, 16:7, 22:7,

22:8, 47:4, 58:5, 59:7, 62:23, 71:24, 79:15, 83:2, 83:20, 88:25
threshold 36:12, 52:24
throughout 17:13, 34:21
thumb 52:24
tie 26:23
Tillerson 1:18, 3:1, 5:25, 28:20, 31:3, 37:13, 52:5, 65:14, 65:17, 85:25, 87:14
timely 23:23, 25:4, 89:12, 89:20
tipped 13:14
TOAL 2:29, 4:13, 7:7, 7:11, 7:16, 8:14, 15:18, 16:16, 16:22, 17:9, 90:10, 91:8, 91:12
today 14:5, 19:7, 20:11, 50:11, 71:15, 71:16, 86:4
together 13:9, 16:6, 16:13, 30:13, 31:15, 31:24, 49:3, 49:5, 61:13, 73:6
Tomorrow 9:21
Tone 5:11, 7:1, 7:3, 84:7, 84:8, 85:3, 85:4, 85:8, 85:14, 86:19, 87:10, 87:17, 88:5, 88:13, 88:18
tones 84:16
took 24:5, 53:15

top 5:12, 7:1, 7:3, 27:21, 41:15, 84:7, 84:8, 85:3, 85:4, 85:8, 85:14, 86:19, 87:5, 87:10, 87:17, 88:5, 88:13, 88:18
total 51:20, 53:16, 53:18, 53:25, 57:19, 73:19, 83:23
totally 11:23
totals 33:4
towards 87:12, 88:21
town 22:7
traded 14:23, 52:15
trading 71:5
train 69:25
transactions 70:22, 71:4
transcript 3:8, 9:2, 10:11
transcription 3:8
transparency 26:2, 26:4, 84:25
transparent 55:19
transportation 38:25, 39:10, 41:22, 41:24, 41:25, 43:11, 43:16, 43:19, 50:16, 50:20, 68:22
trend 29:6, 29:8, 30:25, 33:22, 33:24
trends 28:22, 29:10, 31:7, 31:10, 56:22
trial 6:5, 37:13, 59:13
trigger 59:16, 59:18, 59:20, 112

60:8, 60:13, 60:16, 60:19, 61:10, 61:23, 63:3, 63:8, 63:22, 64:16, 64:22, 64:23, 64:24, 65:1, 65:4, 65:5, 65:11, 65:19, 65:20, 65:25, 66:4, 66:11, 66:14, 66:15, 66:19, 67:9, 67:19, 86:9, 88:8
triggers 60:3, 60:7, 60:11, 61:9, 63:5
truly 5:5
Trust 14:11, 14:12, 14:21, 14:22, 14:25
truthfully 17:12
try 7:20
trying 69:13, 90:10
turn 52:9
turning 50:24
Turtle 1:35
TV 71:23
Tvs 72:1, 72:4
Two 16:6, 23:18, 30:13, 30:20, 34:23, 41:14, 44:14, 54:2, 61:14, 70:5, 71:24, 73:23, 75:23, 81:15, 83:6, 88:6
two-step 60:21
two-year 61:13, 61:20
TX 1:36, 2:4, 2:18, 2:25, 2:42, 2:48
type 14:16
types 53:5
typically 63:21

< U >
ultimately 40:22, 42:17
uncertainties 28:22, 29:16, 31:7, 31:10, 56:22
uncertainty 29:13, 29:14, 30:25
undergraduate 20:17
underlie 7:12
underscored 6:3
understand 14:10, 25:20, 35:22, 43:3, 62:9, 62:13
understanding 28:2
understands 32:9
undiscounted 60:22, 60:23, 81:1
unfairly 9:5
Unfortunately 26:21
Unidentified 91:26
unit 43:23, 44:17
Unitah 83:2, 83:20
United 1:1, 1:27, 4:4, 4:6, 4:8, 21:21
unrealistic 77:14
unreasonable 80:17, 80:21
unsure 29:15
until 79:1
unusual 56:22, 61:19, 62:4
update 77:15, 77:17, 78:24, 78:25

updated 82:23
Upstream 50:14, 63:23, 69:20, 73:9, 86:15
Upwards 88:21
upwards. 88:22
uses 36:18
using 8:9, 36:15, 39:10, 41:24, 49:13, 50:18, 68:18, 70:11, 79:21, 80:22, 83:19
utilize 70:13
utilizing 8:10

< V >
V. 2:30
valuation 10:15, 10:16
value 10:8, 11:11, 11:18, 15:15, 28:4, 58:13, 59:24, 82:10, 83:1, 83:13, 83:20, 83:21, 83:22, 88:16
valuing 11:6
variety 41:2, 47:1
various 24:6, 33:16, 41:17, 49:3
vehicle 7:20
vein 5:7
versus 54:3
viewed 31:11, 86:21
violated 6:21, 23:18, 89:5, 89:14, 89:23, 90:3
violates 51:25
virtue 65:20
visit 19:8
vital 61:7
vogue 14:17, 14:18

VOLUME 1:25, 4:1, 91:1
vortex 61:17, 62:2, 62:11, 62:18
votes 86:24
vs 1:15

< W >
W. 1:18
Wait 62:1, 77:23
Walmart 71:22
wanted 32:1, 41:9, 68:14, 69:3, 71:24, 71:25, 87:2
wants 40:9, 84:23
wants. 87:6, 88:23
warm 62:16
WATKINS 2:40
Webber 50:14
week 44:5
weeks 13:10, 76:4
WEISS 2:34
WELLS 2:30
West 1:47
WHARTON 2:34
Whereas 39:10, 39:17
whether 29:15, 31:5, 34:24, 38:20, 39:5, 39:7, 43:10, 59:15, 63:2, 64:1, 66:19
white 13:7, 13:8, 13:12
whoa 77:23
whole 5:11, 29:22
whom 33:8
WILKINSON 2:14
will 18:23, 27:16, 47:21, 55:24, 58:11,

113

C E R T I F I C A T I O N

I, PAMELA J. WILSON, CSR, certify that the foregoing is a transcript from the record of the proceedings in the foregoing entitled matter.

I further certify that the transcript fees format comply with those prescribed by the Court and the Judicial Conference of the United States.

This the 6th day of May, 2026.

s/Pamela J. Wilson

PAMELA J. WILSON, RMR, CRR
Official Court Reporter
The Northern District of Texas
Dallas Division

115

59:14, 60:24, 85:20
William 62:12
WILSON 3:12
wish 8:5
within 6:2, 41:4, 48:6, 63:8, 64:8, 81:15, 84:8, 84:9, 84:22, 86:21, 87:3
without 30:11, 81:15
WITNESS 14:12, 14:16, 14:19, 15:2, 15:6, 17:8, 17:18, 17:21, 17:25, 18:1, 18:3, 18:13, 18:16, 18:22, 19:1, 19:15, 27:1, 27:24, 56:24, 57:4, 62:3, 62:7, 62:10, 62:15, 62:22, 62:24, 71:13, 71:18, 72:5, 72:22, 90:6, 91:4
witnesses 8:11
Wood 82:23
WOODBURY 1:19
word 5:24, 40:17, 84:13
words 57:12, 84:19
work 11:23, 13:8, 13:10, 13:19, 20:20, 22:13, 27:16, 45:2
workday 15:21
worked 12:23, 18:17, 20:24, 87:4
working 27:12, 27:18, 48:16
Workout 86:16
workpapers

66:18, 67:6
works 71:11
Workshop 35:20, 36:5
world 66:16
worth 16:17, 59:4
write 23:23, 25:4, 30:14, 58:5, 89:12, 89:20
written 58:14, 63:24, 69:24
wrote 13:5

< X >
XTO 10:9, 10:15, 10:16, 10:19, 10:20, 11:11, 14:24, 58:17, 63:10, 63:11, 88:15

< Y >
Y'all 9:18, 9:21, 68:6, 90:18, 90:19
year 6:22, 10:12, 32:2, 32:18, 33:20, 33:24, 38:9, 41:15, 41:20, 42:25, 44:6, 44:17, 45:6, 45:12, 46:7, 46:8, 46:11, 58:25, 64:12, 64:22, 65:1, 70:15, 72:16, 73:18, 73:21, 77:10, 86:7
year-end 38:8, 45:15, 47:19, 47:20
year-to-date 41:17, 43:15
years 35:9, 35:12, 61:15,

62:23, 64:12, 67:4, 67:5, 67:7, 70:17, 73:19, 73:21, 76:19, 79:16, 80:1, 80:3, 80:5, 85:13, 87:4
yellow 64:6
Yes. 43:17
Yesterday 4:13, 4:15, 8:25, 9:2, 10:3, 10:5, 10:14, 10:22, 12:2, 13:25, 16:7, 16:24
York 2:36, 14:23, 66:25, 71:2
yourself 18:24

< Z >
Zero 59:10, 59:12, 75:12

114

PAMELA J.  WILSON,  CSR/RMR/CRR

**App. 1202**

# Exhibit 33

(PROCEEDINGS BEGAN AT 1:10 PM.)

COURT SECURITY OFFICER: All rise.

MR. MELSCHEIMER: Your Honor, we have something to take up.

THE COURT: Okay.

MR. WELLS: Can we have the witness excused?

THE COURT: Okay.

MR. MELSCHEIMER: May we be seated?

THE COURT: Everyone but you. Yes.

Yes, Mr. Wells.

MR. WELLS: Thank you, Your Honor.

In light of the Direct testimony of expert witness Regan, we would like permission to confront him on Cross Examination with the opinion in the New York Attorney General's case. With respect to the issue of culture at the top, the opinion directly addresses Exxon's culture and finds that it had an excellent culture with respect to processes and accounting issues and that everybody testified at the trial, including Mr. Tillerson and Mr. Rosenthal testified truthfully. I can give Your Honor the opinion and put the relevant pages up.

Secondly, with respect to the issue of proved reserves, and remember in that case, the New York Attorney General's case, the issue was what happened in 2015. So it's the same -- it's the same 10-K even though they did not -- "they" being the New York Attorney General -- did not expressly bring 10(D)(5) claims. What is in the opinion, which is the truth, is that the SEC looked at the 10-K in 2015 and reviewed it and dropped the case without bringing any charges and without making any restatement. That's in the opinion.

With respect to the issue of proved reserves, he goes through an analysis of the proved reserves and says basically "What we did was correct in terms of proved reserves," and the proved reserves in that case was Kearl.

With respect to the issue of impairment, the Court observed that there was -- that we testified that there was no trigger and that -- because of the decline in prices. The only difference in the issue of impairment was the New York Attorney General picked a different property. They picked a property called "Mobile Bay." It's all part of the same of Mr. Horne's recovery analysis. They picked a different property, Rocky Mountain, but same property, same years and same analysis. This was all done as one.

So we think -- we'd like the whole opinion in. They can go at it, but we want to confront him with it and give him what he was permitted to do. We think that's fair game and appropriate.

THE COURT: He testified up in New York?

MR. WELLS: He did not. Mr. Regan? He did not. They had a different expert.

THE COURT: Okay. All right. I'm not going to let you do that. I'm denying all that. But you may, or whoever is going to cross him, you're welcome to cross him about anything he said and about Kearl or about these other things, but I'm not going to let you bring in the New York case at this point.

MR. WELLS: Well, Your Honor, could I just -- I accept your ruling. I just want to ---

THE COURT: You don't have to accept it.

MR. WELLS: No, no, no.

THE COURT: Two. Oh.

MR. WELLS: Two -- Two days. This is a separate day. I'm trying to -- I'm trying to get the rules straight.

But, Your Honor, he testified -- Let's just take the culture point. Now he has testified that it's relevant for SEC purposes to look at the culture at the top.

THE COURT: I'm going to let you cross-examine him all about that.

MR. WELLS: Yeah, yeah, but we have a finding about our culture at the top.

THE COURT: I'm not going to let you bring that in.

MR. WELLS: That finding's got to be better than that thing they put up --

THE COURT: Well, maybe.

MR. WELLS: -- on the screen of 527.

THE COURT: But I still don't think that's relevant to this, what happened in that case. I would be asking for the same thing if I were you. But if I were a judge, and I am, I would rule the same way I'm going to rule which is: You got to cross-examine him in this case with this -- this -- this matter.

MR. WELLS: Your Honor, he is an expert. I believe because he is an expert, I have the right to ask him: What did you consider? Did you consider the fact when you told this jury that Exxon had a bad culture at the top, based on 527, did you consider that a judge in New York had expressly ruled that we had a good culture on accounting, et cetera?

I have -- That is what -- To me, that's 101, what he considered. He can't put blinders on. Okay? This is -- This was in the public record. He knows about it. I have every right to ask: Did you consider it? How could you look at that and then testify the way you did to this jury?

That's, to me -- I accept maybe I'm missing something, but that's 101. I can ask him, "Did you look at it? Do you think you should have looked at it?" That's fair -- That's fair Cross Examination.

THE COURT: You want me to say "no" again?

MR. WELLS: Two times.

THE COURT: Well, I'm not going to let you do that. What happened up there, he wasn't a witness there. If he had been a witness, it might be a little closer for me, but I'm not going to let you do that.

Now you can cross-examine him really hard about the

App. 1203

culture and what the culture was and what it wasn't, and that other -- You've had all kinds of people come and talk about the culture already, all of these employees.  And I'm guessing we're going to hear from PwC who's going to tell us all about what they thought about the culture?  "Yes"?  And you can do that, but at this point I'm not going to let you.  I'll keep thinking about it.

MR. WELLS:  Okay.

THE COURT:  Okay?

MR. WELLS:  Because my main point when you're thinking about it is:  It is traditional impeachment of an expert if he did not look at materials that a reasonable expert would have looked at and if he didn't consider those materials.  An expert is not permitted to close his eyes to things that a reasonable expert would have looked at.  So it was undisputed that numerous authors had written that Exxon -- You know, this is a good example:  If there were -- If there were articles saying Exxon had a great culture, and he didn't look at those articles and the only thing he looked at was 527, I'd be permitted to confront him with those articles.

This opinion is like an article.  It's better than an article, but the notion that he didn't look at it because that's the Cross.  To me that's impeachment 101 with all due respect, Your Honor.  I can ask him:  Did you look at this?  Look at it. Does it change your opinion?  That's -- That's 101 impeachment.

Okay.

THE COURT:  You want me to say "no" a third time?

MR. WELLS:  No, but I want you to keep thinking about.

THE COURT:  Yes, sir.

MR. WELLS:  Okay.  I trust in you.

THE COURT:  I respect you, Mr. Wells.  I will.  I'll keep thinking about it and I'll -- I'll keep considering that.

MR. WELLS:  Okay.

THE COURT:  Let me tell you:  Very passionate arguments.  Those are really good.  They really are.  If I ever get in deep trouble, I want you to be available.  Okay?

I'm not planning on it, but it might happen in my later years or something.

But, you know, you've been in front of me numerous times and you've always made good arguments, and I'm just disagreeing on this one.  Okay?

MR. WELLS:  Okay.  Just -- Just -- Just keeping thinking on it, though.

THE COURT:  Yes, sir.  Yes, sir.  Yes, sir.

MR. WELLS:  Okay.

THE COURT:  All right.  Mr. Toal, you may ask him: What all did you consider about the culture?  You just read this one thing.  Anything else?  Did you interview any people?

You can ask that.  Okay?

MR. TOAL:  Thank you, Your Honor.

THE COURT:  In a broad way.

Okay.  We're ready.  Oh, we got to bring him back.

Thanks, Mr. Regan.  If you'll come back.

D. PAUL REGAN

returned to the witness stand and testified as follow:

THE WITNESS:  Thank you, Your Honor.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury seated in the jury box.)

THE COURT:  Thank y'all.  Okay.  Y'all be seated. Thank you.

All right.  Cross Examination, Mr. Toal.

MR. TOAL:  Thank you, Your Honor.

CROSS EXAMINATION

QUESTIONS BY MR. TOAL:

Q.   Good afternoon, Mr. Regan.

A.   Good afternoon Mr. Toal.

Q.   Mr. Regan, you understand there's another accounting expert in this case, correct?

A.   I do.

Q.   And that's Mr. Abington?

A.   Yes.

Q.   And Mr. Abington is an expert on oil and gas accounting, correct?

A.   I believe so.

Q.   And you understand that he disagrees with almost all of your opinions, correct?

A.   I disagree with his opinions.  He disagrees with mine.

Q.   Okay.  And you're used to that in your cases?  All the cases you testify in, there's almost always somebody on the other side who's disagreeing with you, right?

A.   Plaintiffs hire experts.  Defense hires experts.  And by the time you get to trial, they usually have some element of disagreement.

Q.   And you understand some of the key issues in this case are legal issues, correct?

A.   Well, certainly they're not just accounting issues.  That's why you have so many attorneys here today.

Q.   And you understand -- You're not intending to offer a legal opinion, are you?

A.   I am not.

Q.   You're not qualified to do that, are you?

A.   I'm not an attorney.  I said in both of my reports I'm not an attorney and I don't give legal opinions.

Q.   And you're not intending to offer an opinion on anybody's state of mind, are you?

A.   Oh, no.  No, I don't do that.

Q.   And you're not intending to offer an opinion on whether anyone had a legal intent that's required in this case, are you?

A.   I do not.  I don't offer those kind of opinions in reports or in testimony.

13

Q.   And you understand that all the former ExxonMobil employees who have testified in this case have denied doing anything wrong, correct?

A.   That's my understanding, yes.

Q.   And you understand that all of them have testified that they believe that their analyses were correct and complying with the rules, right?

A.   I think that's consistent with my understanding of their testimony.

Q.   Now what you did in this case, Mr. Regan, is you read a number of documents that Plaintiffs' counsel made available to you, right?

A.   Plaintiffs' counsel made available all the documents produced in this case.

Q.   Did you read all the documents produced in this case?

A.   No.  I -- I worked with my staff.  We looked at documents that were introduced in depositions.  We then searched the relative database of documents to see if there were other documents that reflected on the issues that were in dispute.  So we had access to all the documents that were produced in the case.

Q.   And the documents that you read concern accounting issues from more than ten years ago, correct?

A.   Yes.

Q.   And what you did in this case was you read some of those

14

documents long after the fact after you started working on this case in 2023, right?

A.   Yes.  We started in -- The agreement was signed in September, and I think our work started in October.

Q.   And so you formed your opinions by reading those documents many years after they were written, right?

A.   Reading the documents.  I watched some of the testimony on videotape.

Q.   And Plaintiffs have called six fact witnesses in this case, right?

A.   I haven't -- Sir, I haven't counted them.  I know there have been several.

Q.   You know one of witnesses was the Plaintiffs' representative, Mr. Swiderski; right?

A.   Yes.

Q.   And Mr. Swiderski testified he really didn't know anything about the facts in this case, right?

A.   I -- I don't know what his testimony was.

Q.   Okay.  Are you aware that Mr. Swiderski testified as of the time of his deposition he didn't know what "bitumen" was, he didn't know what a "proved reserves" was?

A.   I did not read his deposition.

Q.   Okay.  Everybody else who testified in this case is a former ExxonMobil employee, right?

A.   Yes.

15

Q.   And they're the ones who actually have personal knowledge about the facts in this case, right?

A.   Yes.

Q.   You don't have personal knowledge about the facts in this case, do you?

A.   I think that's a legal term.  I don't -- I have the knowledge I've described.

Q.   You're not a fact witness in this case, right?

A.   No.

Q.   And you've been paid more than a million dollars for your opinion in this case, right?

A.   My firm's billings are in excess of a million dollars, yes.

Q.   And how much are your firm's billings?

A.   I think about a million 3.

Q.   And you're not even an expert in oil and gas accounting, are you?

A.   I don't profess to have an expertise in any particular area.  I'm a CPA with an expertise in accounting rules and SEC -- related SEC rules.  I don't say I'm an expert in pharmaceuticals or oil and gas or retail.

Q.   So you don't claim to be an expert in oil and gas accounting, correct?

A.   No.  I know a lot about oil and gas because I worked on a lot of oil and gas cases, and I owned a partnership interest with five other people in an oil and gas operation in Fort Worth that

16

then expanded to Oklahoma and Louisiana.  So I've become familiar with the cases that I have worked on with respect to oil and gas operations.

Q.   And you know that Plaintiffs previously hired an actual oil and gas accounting expert in this case and then they dropped her and hired you instead, right?

A.   I'm not aware of that.

Q.   You became aware of that at your deposition, didn't you?

A.   I don't remember.

Q.   And this isn't the first time that you've worked with Plaintiffs' counsel, is it?

A.   No.  I worked with plaintiffs' counsel over 30 years about 15 to 20 different cases.

Q.   Fifteen to 20 different cases?

A.   Right.

Q.   Now the only prior experience you've had in oil and gas accounting has come as a paid expert witness, right?

A.   Other than my experience with respect to the wells in Fort Worth and other parts of Texas, Oklahoma and Louisiana.  Other than that, my expertise comes about through other oil and gas cases that I've worked on.

Q.   You've never worked for an oil and gas company, correct?

A.   No, I have not.

Q.   And you reviewed the Complaint that Plaintiff filed in this case, correct?

**App. 1205**

17

A. Yes.

Q. And Plaintiffs' complaint attached a declaration from its prior expert, Charlotte Wright. Isn't that right?

MR. SAHAM: Your Honor, objection. We're getting into prior legal filings in this case, and Mr. Toal's already established that Mr. Regan is not a lawyer and has no legal expertise.

MR. TOAL: This has nothing to do with the legal filings, Your Honor. This is a prior expert that the Plaintiffs had retained who expressed opinions very different from Mr. Regan's.

THE COURT: Okay. And how far are you going to go with this?

MR. TOAL: I'm -- I'm going to ask about his awareness of her background and her expertise.

THE COURT: And then we're going to go into her report?

MR. TOAL: I'm not -- I might go into parts of her report but it will be selective.

MR. SAHAM: Your Honor, there was an entire motion *in limine* filed about this very issue.

THE COURT: Yeah. I thought there probably was. I can't remember exactly what I ruled on on that. What did I say?

MR. TOAL: I think you -- you indicated that it could be discussed at the time. But there is strong case law that we're prepared to discuss about the relevance of this.

18

MR. SAHAM: If we're going to argue about this, I would suggest it be done outside of the presence of the jury.

THE COURT: Yeah, I know.

Ladies and Gentlemen, I got to take this up outside of your presence. Sorry.

Don't talk about the case.

(Jury escorted to the Jury Room by the Court Security Officer.)

THE WITNESS: Do you want me to leave, Your Honor?

THE COURT: No. You make yourself comfy.

MR. SAHAM: Your Honor, if I may.

THE COURT: Not yet.

MR. SAHAM: Okay.

THE COURT: Yeah, I've done some research on this before. Okay. Are you going to make any argument, Mr. Toal?

MR. TOAL: Well, the opinions expressed by a prior expert are recognized to be relevant and appropriate for Cross Examination of the expert. His -- This is an expert previously retained by the Plaintiffs. They submitted her declaration as an attachment to the Complaint. She has -- First of all, she has a great deal more expertise in oil and gas accounting than Mr. Regan has. I'd like to be able to develop that.

She also expressed some opinions that are contrary to opinions that Mr. Regan has expressed, and that's appropriate Cross Examination material.

19

THE COURT: Okay, stop.

Now you, Mr. Saham.

MR. SAHAM: Okay. Thank you, Your Honor.

So this is ten years ago.

THE COURT: Stop.

MR. SAHAM: Oh, my apologies.

THE COURT: You attached her opinion to the Complaint?

MR. SAHAM: A declaration from Ms. Wright was attached to the Complaint. Your Honor struck it and didn't consider it at the Motion to Dismiss stage. This was an opinion offered with no discovery. There's 12 million pages or something that Mr. Regan has had access to. All Ms. Wright had access to were the two corrective disclosures that had occurred. Your Honor, didn't even consider her.

Our Motion *in limine* points out that referring to -- And there's multiple cases, I believe we cited, that this is explosive prejudice, referring to a prior expert and -- and you're not allowed to do it. And there's multiple cases holding that as well, Your Honor.

And her opinions were without any discovery. They were stricken by the Court. This is ten years ago.

THE COURT: Mr. Toal?

MR. TOAL: Yes. Your Honor, the opinions we'd like to bring out have to do with accounting principles. They have nothing to do with the amount of discovery that has taken place

20

in the case. We've pointed to in our response to the motion *in limine* numerous cases recognizing the great relevance of this information. This is a person who has a great deal of expertise in oil and gas accounting, unlike Mr. Regan, and her views on oil and gas accounting principles are relevant to cross-examine Mr. Regan with.

MR. SAHAM: Your Honor, one more point, if I could.

THE COURT: Be loud.

MR. SAHAM: They have Mr. Abington as an expert. They've had six PwC witnesses on their witness list. They have about 20 Exxon witnesses who have all testified about these rules. The declaration offered by Ms. Wright ten years ago with no discovery in this case that Your Honor never even considered is not at all probative and would be highly prejudicial.

THE COURT: Mr. Toal?

MR. TOAL: These are admissions. These are admission, Your Honor. They -- They were in a declaration Ms. Wright filed. That's attached to the Complaint, and her opinions on accounting issues are reflected in the Complaint itself.

THE COURT: All right. I'm going to grant the Motion *in limine*.

Okay. Bring them back in.

MR. SAHAM: Your Honor, can the prior question and answer be stricken as well?

THE COURT: No. You want to strike the rest of it from

**App. 1206**

the record, and the answer is "no."

THE COURT:  Okay.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury seated in the jury box.)

THE COURT:  Y'all be seated.  Thank you.

Mr. Toal?

CONTINUED CROSS EXAMINATION

QUESTIONS BY MR. TOAL:

Q.   Mr. Regan, you've never written any books on oil and gas accounting, have you?

A.   No.

Q.   And you haven't done any academic research in the area of oil and gas accounting, have you?

A.   No.

Q.   And you've never been involved in determining the quantities of proved reserves in any of the prior cases where you served as an expert witness, correct?

A.   Proved reserves were an issue but the determination of the quantities were done by expert consultants who are engineers in that business.

Q.   So you didn't do that, correct?

A.   I didn't do the calculation of proved reserves.

Q.   Now ExxonMobil has a dedicated Global Reserves Group, correct?

A.   Yes.

Q.   And the manager of that Global Reserves Group throughout 2015 was Mr. William Strawbridge, correct?

A.   Yes.

Q.   You're aware that Mr. Strawbridge, his professional background is referenced in ExxonMobil's 2015 10-K, right?

A.   Yes.

Q.   And you're aware that the 10-K reported that Mr. Strawbridge had more than 30 years of experience in reservoir engineering and reserves assessment and a degree in Engineering, right?

A.   Correct.

Q.   And you don't have any experience in reservoir engineering or reserves assessment, correct?

A.   None other than looking at those calculations on other cases I've worked on.

Q.   At the time of your deposition in this case, Mr. Regan, all of your income from the prior four years is derived from your work as an expert witness, correct?

A.   Actually it relates to my work as a forensic accountant. Much of that is -- A lot of that never gets to where I testify in deposition or trial.  So a lot of the work doesn't relate to my testimony.  It relates to discovery analysis that precludes testimony.  In most cases there's no trial.  They settled their -- The cases settle.

Q.   Is it true, Mr. Regan, that all of your work has been in the last four years relating to matters that are either in litigation or likely to be in litigation?

A.   Gosh, that goes all the way back to 1996, so more than four years.

Q.   So it's true that all the way back to 1996 almost all of your income has been derived either from cases that are in litigation or contemplating litigation, correct?

A.   Or might be in litigation, yes, or -- Yeah, that's -- that's fair to say.

Q.   So you're a professional expert witness?

A.   No.  I'm a professional forensic accountant.  Occasionally, I testify about my opinions in the matter in dispute.

Q.   And in the other cases ---

A.   I mean if I -- if I tried to live on my testimony billings, it would -- it would not be enough.

Q.   Well, then you supplement it with cases that might go to litigation, correct?

A.   That's the overwhelming majority of my work.  Most cases settle.  Very few go to trial.

Q.   And you testified on Direct about Kearl's SEC proved reserves estimates.  Do you recall that?

A.   Yeah.  I expect that that was a topic.

Q.   You don't remember?

A.   Well, it -- I don't recall testifying much in terms of the estimates of the proved reserves in terms of the quantity.  I recall testifying whether they were economically producible under existing economic conditions.  I certainly testified about that.

Q.   You recognize that it's possible to produce oil or natural gas from reserves even if they been debooked as SEC proved reserves, right?

A.   Yes.

Q.   And you can still generate cash flow from reserves that have been debooked as SEC proved reserves, right?

A.   You can generate cash flow, yes.

Q.   And reserves that have been debooked can be rebooked the every next year, correct?

A.   If they become economically producible under then existing economic conditions, they can be rebooked onto -- as proved reserves.

Q.   And you understand that the Kearl asset was debooked at the end of 2016, correct?

A.   Yes.

Q.   And you understand that the Kearl asset was then rebooked in 2018, right?

A.   I do.

Q.   And you understand that Kearl continues to be a proved reserve today, right?

A.   That's my understanding, yes.

Q.   You understand that the SEC defines "proved reserves" as those quantities of oil and gas, which by analysis of geoscience and engineering data can be estimated with reasonable certainty

**App. 1207**

25

to be economically producible from a given date forward from known reservoirs and under existing economic conditions, operating methods, and government regulations, correct?

A.   I think that's a good summary, yes.

Q.   And that's the SEC rule that governs SEC proved reserves, right?

A.   Yes.

Q.   So you agree that the SEC proved reserves are an estimate, correct?

A.   An estimate by qualified individuals with reasonable certainty.

Q.   And you're supposed to focus on whether the reserves are economically producible under existing economic conditions, right?

A.   Correct.

Q.   And when you look at it as a whole, you agree that the SEC Proved Reserve Test is a Cash Flow Test, right?

A.   Well, my recollection is the language talks about costs of operation.

Q.   Do you remember you were deposed in this case, Mr. Regan?

A.   I do remember that, yes.

Q.   Okay.  Do you remember you gave testimony on this issue?

A.   I would expect I did, yes.

Q.   And you recognize that you were under oath in that deposition, correct?

26

A.   Yes.

Q.   And did you give truthful testimony in that deposition?

A.   Oh, yes.

Q.   Okay.  Let me show you a copy of your deposition.

MR. TOAL:  May I approach, Your Honor?

THE COURT:  Yes.

Q   (By Mr. Toal) And I'm going to direct your attention to Page 129, starting at Line 21 to 130, Line 1 of your deposition.  Have you found it there, Mr. Regan?

A.   I'm on 129, and you want me to go to what row.

Q.   Line 21.  So you see the question you were asked is:

"So do you" ---

And then there's an Answer:  "Yeah."

Question:  "Do you agree the SEC Proved Reserve Test is a Cash Flow Test?"

Answer:  "Yeah.  When you look at it as a whole, yes."

That was your testimony, correct?

A.   Yes.

Q.   And you agree that Kearl was cash flow positive in 2015, correct?

A.   Only if you exclude sustainable capex which you can't do.

Q.   Well, do you remember being asked about this issue in your deposition?

A.   I don't have a specific recollection.

Q.   Okay.  So let me ask you to take a look at your deposition,

27

Page 198, Line 8 to Page 199, Line 3.

A.   I'm on 198.  Now what line do you want me to look at?

Q.   Down to 199, Line 3.

MR. SAHAM:  But what about starting point?

A.   Where do I start?

Q   (By Mr. Toal) Starting at 198, Line 8.

You testified in your deposition that Kearl was cash flow positive in 2015, correct?

A.   No.  You asked me to compare one number against another number and asked me if one was in excess of the other.

MR. TOAL:  Can we -- Can we, please, pull up this testimony, Mr. Gooden?

Q.   (By Mr. Toal) Okay.  "And do you see" -- You were asked, Line 8:

"And do you see toward the top of this table there's a line that says, 'Realizations, U.S. dollars, U.S. dollar per barrel?'"

Answer:  "Yes."

Question:  "That number is $24.27 cents, right?"

Answer:  "Yes."

Question:  "And then if you go further down, there's a row for cash opex, $1/oeb.  Do you see that?"

Answer:  "Yes."

Question:  "That number is $24.16, right?"

Answer:  "Yes."

Question:  "All right.  So does that mean that Kearl in 2015

28

was cash flow positive?"

Answer:  "On -- On this schedule, re -- comparing those two lines, it would indicate that the realization was 11 cents more than the cash opex."

Question:  "And" ---

Answer:  "So to the extent that if -- if you just make that comparison, yes."

So you're testifying that Kearl was cash flow positive by 11 cents per barrel in 2015, correct?

MR. SAHAM:  Objection; misstates prior testimony.

A.   Well, when you compare ---

THE COURT:  Whoa, whoa, whoa!  Overruled.

A.   When you compare ---

THE COURT:  Stop.  Excuse me.

The testimony is as you heard it, Ladies and Gentlemen, not as the lawyers characterize it.  So just as you remember it.  Go ahead.

A.   When you compare the two lines, there's an 11-cent excess, but you do need to consider sustaining capex which is not in that -- the cost line.  So when we're talking about proved reserves, you can't ignore sustaining capex.

Q.   You actually don't know if sustaining capex is in that cost line or not, do you?

A.   I would need to go back and look at it.

Q.   All right.  And you recognize that -- You'd agree you would

**App. 1208**

not include capital expenditures in an SEC Proved Reserve Test, right?

A. You include cap -- sustaining capex. You don't include development capex.

Q. And that's because capital expenditures are not defined as operating costs, correct?

A. Correct.

Q. And you're aware that ExxonMobil estimated that the SEC price for Kearl at the end of 2015 was $28.70, correct?

A. Yes.

Q. And that's the information that was presented to ExxonMobil management, correct?

A. Yes.

Q. And you also agree that in estimating SEC proved reserves, you not only have to estimate an SEC price, you have to estimate the cost of the operation; correct?

A. Yes. Cost plus capex, sustaining capex.

Q. Well, sustaining capex, ExxonMobil included sustaining capex in its costs, correct?

A. It did.

Q. And that's even though the rules don't require inclusion of capital expenditures in costs, correct?

A. They don't require inclusion of development capex expenditures but costs which are necessary to maintain the operation and sustain the operation of the facility need to be

included.

Q. You haven't cited to any rule indicating that sustaining capex has to be included in the costs in an SEC Proved Reserve test, have you?

A. The SEC rule in 932 talks about repairs and maintenance and other costs necessary to maintain the operation of the facility.

Q. And it doesn't saying anything about sustaining capital expenditures, does it?

A. It doesn't use -- It doesn't use those words, but Exxon interpreted that to mean sustaining capex.

Q. And the SEC rules don't require that when you're estimating the cost of an operation, that you use the full year annual average cost of the operation, do they?

A. No. I would differ. I think it's pretty clear that they talk about a full year. That's how the Exxon document of how the calculations should be made and presented in the 10-K. It says for the full year and for the -- for prices and costs.

Q. That's your understanding of what it says in ExxonMobil's 10-K?

A. No. It's in the -- We have an exhibit here which is of the -- discussion of the rules with respect to the calculation of proved reserves for purposes of the 2015 10-K. It's also consistent with an exhibit that we had during my Direct that shows that full annual costs are -- are most aligned with the SEC rules.

Q. Well, Mr. Regan, you may differ with me on this point today but you didn't differ with me when I asked you this question during your deposition, did you?

A. I'm sorry. What?

Q. You didn't differ with me on this question when I asked it to you in your deposition, did you?

A. Yeah, I do not remember.

Q. Did you read your deposition in preparation for your testimony today?

A. I've read it, parts of it is, and over the last year.

Q. Okay. Let me ask you to take a look at Page 171 of your deposition, Lines 5 to 10.

MR. TOAL: And, Mr. Gooden, if we could pull that up on the screen, please.

Q (By Mr. Toal) So you see here I asked you, Mr. Regan, now the SEC regulations don't liar choir that when estimate being the costs of operation, you use the full year annual average cost of operations, correct answer. There is not that degree of spes city in that accepting guidance. That was your testimony, correct?

A. Yes. They're not degree of specifics city but they do -- they do dictate 12 months in the price and the -- they want all companies to be -- to include those 12 months in the price and when they reporting costs, they want to be comparable. There's no spes city in that word comparable.

Q. With the sex rules do say, Mr. Regan is that you're suppose to the use existing economic conditions when conducting the proved reserves analysis, right?

A. Yes.

Q. And the proved reserves analysis is conducted at the end of the calendar year, right?

A. Yes.

Q. And have you read ExxonMobil's 10-K in this case. Yes.

Q. And you aware that ExxonMobil publicly disclosed if its 10-K that it used year epidemic costs to estimate proved reserves, right?

A. Yes.

Q. You saw that in the 10-K?

A. Yes.

Q. You didn't days crow that to the jury, did you in your direct testimony?

A. Well, if we were going to disclose everything that's disclosed in the 10-K, we would be here for days and days.

Q. And at that point you didn't disclose, did you?

A. No from F and that point).

Q. And ExxonMobil also produced to plaintiff its internal guidance documents from the its Global Reserves Group about how to estimate SEC proved reserves. You're aware of that, correct?

A. I believe so, yes.

Q. And you reviewed that document prior to your testimony?

33

A.   I expect I did, yes.

Q.   Okay.

A.   I need -- I need to see to refresh my recollection, but.

Q.   Okay.  Let's take a look at Defendant's beings Exhibit 338 which is up objected to and we would offer it into evidence, Your Honor?

A.   It's admitted into evidence.

Q.   Do you see this says year end reserves, reports the instructions the there's a date at the bottom of the page October 1st, 2015?

A.   Yes.

Q.   And you recognize this at the insignia of the global reserves work for ExxonMobil, correct?

A.   I do, yes.

Q.   And in reviewing this, did you she it was a guidance document to ExxonMobil employees about how to calculate proved reserves?

A.   Yes.

Q.   And let me ask you to take a look at Page 3 of this document.  It's under the SEC reserves process.  Do you see where it says in accordance with SEC require the, proved development and total proved reserveses will be determined based on::and thin the second bullet is cost in effect on December 31, 2015?

A.   Yes.

Q.   And you were aware of that before your testimony today,

34

correction?

A.   Yes.

Q.   Youdidn't disclose that to the jury, did you?

A.   I interpreted that cost incurred through dose 31, 2015 which are reported in the 10-K.

Q.   It doesn't say cost in effect threw dose, 31st.  It says cost in the effect on dice 31 is, 2024 correct.  I think it's the same then.  Cost on dose 31, that would being a very -- a a very small sample size when you're comparing it to a 12 month average of price.  If you're going to say you're going to attack a 123 month average price an compare it a within day on December 231, twin or twin 15.  Down think that he he with underlying RAMs did he not want top have cost inch screwed one time.

Q.   Well you upon the have problem give testimony on don't 3 two 1st, 2015 -P?

A.   Correct.

A.   I think in exist the emergency conditions that and a my with the cart -R that we saw your today that sat within to much year within year doesn't close several dope lay met.  Symplasmism or that's will the consistent with the late other tomorrowment can I or which is No, Ma'am 1 with twin 1578 American he'll fed a full year of priefsing happening a full year of.

     THE COURT:  Now we'll take a look at those documents a little bit later Mr.

Q.   Are you aware the plaintiffs indicated in their own

35

complaint that period end costs to should be used to estimate proved reserves Your Honor, I plea we just had a ruling on this?

     MR. TOAL:  Your Honor this is their complaint that's a judicial admission.

     THE COURT:  Y.  Yes.

Q   (By Mr. Toal) You raid the complaint from this matter, right

A.   Yes a long time ago.  That would have beenly been in 2023.

Q.   And when you read it back in 2023, did you see that plaintiff also alleged that the cost that you used when calculating SEC approved reserves are period end conference women I would interpret to mean 12 months that ended 12-15 if we tosh being about 10-K that's.

Q.   Just your own and term pre taste, correct?

A.   When or well, when you give me the words.

A.   That's how I understand those it words.

Q.   And you don't cite to any source, any receipt tips that come Do you recall if your understand of that that he'll, correct?

A.   Well costs that will included in the ten K they don't black down those costs that any smaller segment.  They're all you 127 mom.  There he all for 12 months.

Q.   Of the you didn't did I close that is of to the jury Mom you're supposed to use period end costs did you?

     MR. SAHAM:  Your Honor,would be object to reference to employer Moore mooting testimony ma in this case.  That's adequately another mought in limb.

36

Q.   Been in personal is it an a judicial at miss?

A.   It's now.

A.   I did I or think I -P you didn't days cloth close thrown notes normed neither phoned costs.

A.   I think that's -P of what thrown -P is the 12 months ending 12 Monsanto will be been 15789 that the Whoever over then 12 months and be.  12, 31, 15?  Good luck and the -P.

A.   Correct.

Q.   And (the Plaintiffs complaint is where they make allegations about -- about the facts in their lawsuit, correct?

A.   As they understand it at the time which is in this case prior to a great deal of discovery.

Q.   And what plaintiffs understood at the time about the accounting rules is not dependent on the discoveriry that happens in this case, being is it?

     MR. SAHAM:  Okay.  Calls for speculation.  How we know what Plaintiffs understood.

     THE COURT:  Yeah.  Only if I knows.  Only if he knows.

Q   (By Mr. Toal) If you know

A.   Can I hear the question please?

Q.   Well, Mr. -- Regan, you understand that the period in question here is the year 2015, correct?

A.   12 months ened 12-31 opinion 15 okay and the end of that period you agreed is dose 31st, 2015, correct.

A.   Yes.

**App. 1210**

37

Q.   And the accounting determinations that are reflected in the Complaint, the accounting rules they don't change based on discovery that takes place in a lawsuit, does it?

A.   Well, accounting is reflective of the facts and fishings that are relevant during the time period.  So there are a mirror image of -- of what the facts and circumstances were in place at that time.

Q.   The accounting rules themselves don't change based on the discovery in a lawsuit, do they?

A.   Well, it can.  A lot of accounting actually rules rule don't change.  It's the imply men taste rules for example if make a estimate.  The estimate payment the the fact and certain somebody's at that time.  Am am that many changed you're almost impairment.

Q.   Mr. Rope began I'm to to the can't fundamentals much oil and gas accounting, sixth edition written by Carl lot Wright?

MR. SAHAM:  Objection Your Honor.

A.   This is the motion in limine that you just grant granted.

MR. MELSCHEIMER:  Your Honor from is a text.

MR. SAHAM:  Your Honor if we're going to discuss this to the in this front.  Jury but you granted in motion in limb than the of nay and he's pushing into the exact issue.  Improper.

MR. TOAL:  Your Honor we're going Taoistic admit this as a learned treatise.

THE COURT:  Okay is there something in there.

38

MR. SAHAM:  Could we approach, Your Honor.

MR. TOAL:  There is, Your Honor.

THE COURT:  Yeah we got to take this up again.  Don't talk about the case, ladies and gentlemen.  I all rise for the jurors.

(jury escorted to the Jury Room by the Court Security Officer.)

THE COURT:  So I'm assuming Your Honor going to show him some learned treatise that disagrees with him.

MR. TOAL:  I'm going to show him a learned treatise.  Well' see if he recognizes it.  If I can introduce it through Mr. Raglan other we we'll admit it later from the case.

Q.   Okay?

MR. SAHAM:  Your Honor there are was part of the Motion in limine.  Plaintiffs had an expert ten years ago who is a consultant -- an expert who submitted a declaration be at the time an timeline that she somehow didn't want to continue with the case or what not that is the prejudicial nature of going into what she did or didn't do with without any discovery.

THE COURT:  Wait a minute I don't get how that.

MR. SAHAM:  She wrote this oftentment too many wrote the declaration wrote this book and they're trying to back door around the Motion in limine ruling talk about what miss Wright sailed when she was Plaintiff'ses expert.  That the court didn't even consider.  You struck it before ruling on the complaint as

39

inappropriate at the time.

THE COURT:  Yeah you're going have to get this in through somebody else.

MR. TOAL:  Can I at least ask him if he recognizes this as a lien any treatise 2349 field in I I don't have to Keck this to Plaintiff's retention of Dr. Wright, but they're not allot of oil and gas accounting textbooks the there.  Thereth is one of them.

Q.   There's not?  They're not?

MR. TOAL:  Not on my buy book shelf.

MR. SAHAM:  We wouldn't October total use of another oil and gas textbook Your Honor but this is clearly trying back door around the Court's ruling.  It's part of the Motion in limine.

MR. TOAL:  This is not back during anything.

A.   This is -- I can either establish it as a learn he'd treatise through Mr. Regan or to the but we can still use her text knock Bock an the N in it.  To cross account the witness.

THE COURT:  Do it with somebody else.  Nothing do I need to keep bringing are you going to keep pressing me on this one.

MR. TOAL:  I would a never do that, Your Honor.

THE COURT:  No.  No, you wouldn't.  I want to -- I don't want to keep bringing the jury back in and out.  If you got another shot at getting her in, let me know.  Let do it light

40

now.  Okay?

MR. TOAL:  Well if that's you're ruling then I'll obviously abide by your ruling.

THE COURT:  No it's not that you're not abiding but my ruling.  You are doing what lawyers do.  It's just you cut have I sharp corners and that's okay.  I'm not fussing at you about it.  I just want to deal with it while I've got the jury out.  I mean if you got to another sharp corner on this, I just want you to let me know right now.

MR. MELSCHEIMER:  The only things I would say I think there's independent an even recognize it is as a learned treatise.  So you know, it's it's not a perfect substitute to use it with somebody else.

THE COURT:  You're going to have to Tuesday with somebody else.

Okay.  All right.

Being.  (.

>>:  All rise for the jury.

(jury seated in the jury books.)

Thank you all.  Y'all be seated.  You're about into 2000 of your 10,000 steps for the day.  Go ahead, sir

Q   (By Mr. Melscheimer) 23 Mr. Rye began you recognize that you're bound by the duty to act with integrity and the objectivity in this case, right

A.   Yes.

**App. 1211**

41

Q.   But you didn't mention to the jury that Plaintiff's own complaint acknowledged that cost estimates to be used in the proved reserves calculations is the period end costs, right?

A.   My testimony is -- is based on the documents and testimony I reviewed and the applicable accounting rules relating to that testimony, and my opinions.

Q.   And you didn't disclose to the jury that ExxonMobil's 10-K public club disclosed that it used year end covers estimate proved reserves, right?

A.   I think year end costs equal that 12 months ended 12-31-2015 from.

Q.   So to you year end costs meant entire year?

A.   Yes, unless you explain otherwise.  In many instances the explanation -- that may become problematic because it may be not consistent with the applicable rules.

Q.   And if you're implying that -- year end costs equals the one day of December 31, 2015, I've never seen any company ever in the thousand plus 10-Ks I've reviewed where a company makes that kind of a representation or calculation about anything.

Q.   Well, you saw that ExxonMobil in his it's Global Reserves Group guidance that the cause to be outed in on December 31, 2015, right?

A.   I think I saw costs at December 31, 2015.  Can we see the document and seep if it uses the word affect.

Q.   We just looked at that don't a few minutes ago.  Do you

42

remember it?

A.   I remember that it talks about costs at 12-31-15.

Q.   Okay.  Let's pull up Defendant's Exhibit 338.

A.   Okay.  Costs in effect on December 31, 2015.

Q.   And too costs and in effect on December 31, 2015, means costs during the entire entire year?

A.   Yes.

Q.   And you're aware that in January of 2016 ExxonMobil personnel made a presentation to Mr. Tillerson regarding 2015 year end proved reserves, right?

A.   Yes.

Q.   And you're also April bear that presentation he showed a unit lifting the cost for dorm dealing the second after of 2015 am 20 dollars an 30 cents per bar refreshes right?

A.   Sorry can we seat document.

Q.   Yeah, let's pull up defendant's exhibit 36 which has already been admitted.  (check figure).

Q.   Would you like a copy, Mr. Lee began?

A.   No, I can see it.

Q.   Okay.  So you do see this indicates that the costs for the second half of 2015 for Kearl, the unit lifting cost were 21 dollars and 30 cents?

A.   I do she.

Q.   And you didn't disclose that to the jury either, did you?

A.   No.  It's not one of the graphs that we use.

43

Q.   And do you see on the right-hand side of this chart it indicates that the 2015 second half K-1 K-2 operation costs, the price was about 7 dollars per barrel greater than the costs?  Do you see this, Mr. Regan?

A.   I do.

Q.   And do you see in the chart on the bottom left that the 2015 SEC price is 28 dollars 78 sent?

A.   Yes.

Q.   And you agree with me that 28 dollars an 730 top or cents is higher than.  Correct and and the your after nay sis you offer a re savings settlement E price much a barrel were?

A.   Agree and arow with 24 dollars an 66 correct is also higher than 21.30 cents, right.

A.   By I don't make Bates on 456 year estimated.

        THE COURT:  Okay and you understand that in 2015 Kearl had a major expansion during the mid I'll of the year, correct.

A.   It concluded 234 mid he -L of of the year.

Q.   In John within 15 an that beings in offing negative?

A.   Yes.

Q.   And that dramatic clicking unit cost of production, correction?

A.   Well, I see OM months -P okay but you you saw the an cost over the recall.

A.   I've not verified in calculation.

A.   I seep this on the chart but I don't think you can take

44

average costs for the secretary anticipated compare them an SEC right that's been calculated for to 1 percent an whether that 12 Monday has eye open rock if you want at least apples an an accepts you would sake second number In other words -P and the at accepting gives respecific instruction as to price.  A lot specifics city on the price the first day of the monitor every upon the from and you told me in their or your deposition they do in the provide that same level of suppose if I on the cost side, right right.  They're very specific on price but they're not that specific with respect to costs but it would be apples to orange comparison if you took 12 month price particularly if that's a de cleaning place and second half does.  That's not a fair came son.

        THE COURT:  By they who do you means I'm sorry, Your Honor.

        THE COURT:  You said yes.

        THE COURT:  They.

A.   They is Exxon.

        THE COURT:  Okay.

Q   (By Mr. Toal) And the SEC doesn't doesn't require the use of a and a y'all average cost in the SEC proved reserves calculation, does it

A.   It doesn't require that level of specifics city but in its discussion of comparability in some.  Exxon documents, it talks about alignment with the SEC test being an annual test and in the calculation -- in the instructions forth preparation of the 2015

**App. 1212**

10-K, it says annual costs and prices for 2015.

Q.   In the SEC regulation he's?

A.   No.  No.  No.  In the internal discussions at ex upon for preparing preparing the 2015 10-K T discusses the annual prices an costs for 2015 are to be used in the calculation of proved reserves.

Q.   But we just looked at the global reserve group guidance which said costs as of deep December 31st, 2015, right?

A.   As I said, I think that means for the year.  That's what -- those are the costs that are being reported in the 10-K.

Q.   And the you agree that the cost struck our offer percent half of 20is a was not representative of the cost structure in the second half of 2015, right?

A.   I know opt costs it canged.

A.   Some months was lower some month it was high officer and through am -P was never going back to the way it was during the first half of 2015, right.

A.   It would be different.  I also know that the prices the SEC prices are de clean.

Q.   Mr. Regan that court it is sewer would be you'res?

A.   Well unless will were modifications to the facility.

Q.   Exxon wasn't going to under due its earnings pangs project, it was?

A.   I don't know what degree there would be things.  Sometimes there environmental law that is cause junction an change the cost

struck Sure and is that are you speculating about what might happen knowledge I'm saying you shouldn't speculate you should look at your existing economic conditions.

Q.   Mr. Lee began you're not aware of in public statement by ExxonMobil saying that its 2015 proved reserves afall sis for Kearl was incorrect.  Isn't that light?

A.   I've not such a statement.  Any public statement in no I've just seen internal statements if and there no, sir internal statement by ExxonMobil sake we did it wrong, is all right.

A.   Yes frequent there's she'll that Webber and saying that the SEC right price was not calculated properly because the transportation costs were not the cost to shipping the product to the customers.  So there's the short fall in your class was was didn't but or did you all of your you're trains for it is,.

A.   Miss Webber and gears okay.  An anticipate pen has November or never been a row statement in Derek Kearl proved are the suffers for.

A.   Fright no.

Q.   No regulator has come in and said you need to change your proved reserves numbers in your 2010-K right?

A.   I'm not aware of that happening.

Q.   You're No. also not aware 6 any public report or statement staying that ExxonMobil's you'd 14 debooked a year early at the end much 2015, right (fix fix (?

A.   I'm not aware of such a document.

Q.   So the only one you're aware of who claims that Kearl didn't qualify as a proved reserves in 2015 is you and the Plaintiffs, right?

A.   I'm not aware of others.  There may be others but I'm not aware of them.

Q.   Now you testified earlier about the table on Page 9 of the 2015 10-K.  Do you recall that?

A.   I do.

Q.   An let's pull up plaintiffs an exhibit Exhibits 66 which is admitted.  And take a look at Page 9 of this document.  An Mr. Egan summarized the average product right under and by geographic area and by pro double step -P each forth lastee three.  So.  Follow -P makes it's present being average numbers?

A.   Yes, the -- the heads are average production prices and average production costs.

Q.   And below this table, if we go over to Page 10, the text at the bottom explains exactly how ExxonMobil made the calculation of average production prices an average products costs, correct yes.

Q.   And Your Honor aware that this table and in the it is Governmented by a something calmed S-K-12 to 4, right?

A.   He leak to important up defendant he's exhibit 3 I I think sabling to objections by Plaintiffs?

        THE COURT:  Okay.

        MR. TOAL:  Oh, I'm advised by Mr. Thomas that it has

been has been admitted.

        THE COURT:  Okay.

        MR. THOMAS:  Can fell.

Q.   Now item 04 that many open first or if you employs you're shall May by poof brave not guilty kneel registrant's total proved not oil equivalent basis, right?

A.   Yes.

Q.   And owe in Juror that less than 15 partyers Mart?

A.   Anticipate assized said in my number knewly torn HORPLTship.and I on the to the whole number so it equals 15 percent which is the same calculation that Mr. Prestipino had.

Q.   To in your view 14.54 MERS qualifies as 15 percent or more under regulation S-K-12-0-4, correct?

A.   It seems like a natural consequence of the math.

Q.   And the the regulation itself doesn't say anything about rounding up, does it?

A.   It just say 15 percent.

Q.   And you decided to Roundup to get -- get up to 15 percent or more?

A.   Well, if my testimony today, I've not talked about breaking Kearl out on Page P about or Page 9.  It's not been part of the my testimony.  My testimony is they didn't qualify as Mr.

Q.   So you're not disputing that ExxonMobil was under no require to the break out Kearl separately on this Page 9 Table, correct?

A.   That's not been part of the my testimony if -P I were back

49

ABG KHRA what degree did Kearl proof reserves con city tilism its total a. And I was to use a whole number I'm tell you it's 15 percent. I'm not nothing go run to you 12 too 4 -P but am kneel I was told 234ment more preliminary in amount it he corp to smarm -P 15.a 57 percent is lower than.

A. I think you meant to 14.54.

Q. I'm sorry. 14.54 percent is lower than 033 percent right?

A. As a N (.

A. This rule doesn't say 15.00.

Q. It says 15 percent or more?

A. Right about and it says you're supposed to calculate this percentage relative to the total proved reserves, correct.

A. Correct.

Q. Not 15 percent or more of proved liquid reserves, right?

A. Correct if not 15 percent or more of are proved developed reverse, right.

A. Correct.

Q. Not 15 percent or more of bitumen?

A. Correct now let me ask questions of the Rocky Mountain Dry Grass assets. So now we're moving to different area. You testified or you testified that three specific assets were impaired as year end 2015, ewe inch at that, rad or rat ton anziani Juan.

A. Yes.

Q. And you recognize that each of those assets were long level

50

assets, right?

A. Yes.

Q. And those are the XTO assets you're claim being should have been impaired apt year end 2015, right?

A. Yes.

Q. And you recognize that XTO had dozens of other assets, right?

A. Correct.

Q. And agree that ExxonMobil conducted an impairment analysis at the end much 2015, right?

A. No. It calculated and undiscount cash flow.

Q. Well did it do something calmed an asset recoverability review?

A. Asset recoverable. Yeah that's what it was called. Asset recoverable.

Q. Okay and I understand you have some issues with the asset recoverability reviewed but you reaked niece to see if there about as trigger an to it see if almost value?

A. Right.

Q. And you wreck too I that ExxonMobil's analysis concluded that the for these three Rocky Mountain were high you're than than the?

A. Correct.

Q. That please those assets were not impaired, correct?

A. That means you don't do the step 3 fair value analysis.

51

Q. And so that means those assets were are not impaired, correct?

A. Yes. You.

Q. You don't need to write them down on your balance sheet, right?

A. That's correct.

Q. And in each case in ExxonMobil in 2015 ExxonMobil discounted cash flow were at least hundred much million dollars of those care I aring assets?

A. I think that's right.

Q. And your issue with ExxonMobil's azaleas is you disagreement with the price assumption that ExxonMobil used, right?

A. Yes.

Q. Or about up you do a gloss that and long-term price assumptions in the I'm fairment -P anal settlement as it was damaged shows within 15. So much accepts?

THE COURT: So it use the price that is were used bit management might committee amount.

A. Yes.

Q. And you also agree those are the same the plies that's ExxonMobil use in the that analysis were the very same price that is appeared in ExxonMobil's data guide, right?

A. Yes.

Q. And those are the very same price that is ExxonMobil used in its analysis of the ewe any tax stand Juan and Raton Rocky

52

Mountain Dry Grass assets, right?

A. Correct.

Q. And the applicable GAAP standard, the accounting standard provide Thad corporations assessing recoverability of long lived assets shall incorporate the entities own assumptions about its use of the asset, right?

A. That's part of the pair graph, yes.

Q. And you. But it must be reasonable based upon the facts and circumstances that are in play at the filing date.

Q. Well?

A. And these prices were not reasonable.

Q. Well, we'll get to that Mr. Regan. But agree that the standard itself that's says the assumptions used in developing those estimates, the price estimates that that are being used shall be reasonable in relation to the assumptions used in developing other information used by the entity for comparable periods such as internal budgets an projections, arules relate to the incentive compensation plans or information communicated to others, right?

A. Right. It refers the accountant to other information, such as and it suggests some other information.

Q. Okay. And you recognize that ExxonMobil used the prices, the long-term price assumptions in I'll data guy to make multibillion dollars investment decision, I right?

A. I don't know how they operational lieded October 15 four

53

dollars a air you're share while it was operative until it was changed in March of 2016. And if they were were using the data guide in terms of an and acquisition, I expect there were a great dealer airal sis that came into in that short timeframe Yes, sir your suspicion. Well I'm seen hundred of negotiations a where price are determinedded.

MR. MELSCHEIMER: And the they just don't take a number from the book and apply it and say that's how much we're bog to pay you.

Q. Well, these are long-term price assumptions that are used for purposes much evaluating investment opportunities, correct?

A. That's what the plies plan is.

Q. And you've never worked at ExxonMobil?

A. No.

Q. You don't have personal knowledge of ExxonMobil's procedures, right?

A. Correct.

Q. You never union a multi national and fast could -P company, have you?

A. No, have I not.

Q. And you afly under the accounting standard it was a to leaving for ExxonMobil to use projection that is it used to evaluate investment or investment opportunity when the ever these Rocky Mountain Dry Grass assets, right?

A. Only when they're adjusted for fax and surges that are

54

relevant to the calculation.

A. You can't stair take state your name prices and use them without assisting them. These prices were quite stale.

Q. Well, you agree at the time of the deposition that it was her miss -P selling no either yeps or I open by -P judge I I stayed one or must and east son let me and much 253 of the your deposition, lien 7 through 19. #.

Q. See were you asked here and would it also be permissible under the rules in your view for ExxonMobil to use tomb projections it used to evaluate investment opportunities. Answer: Let me -- with-did shall to evaluate investment opportunities?

Question: Yes. Answer: I think it -- it's something that they would -- they could have considered if had he chose to.

Question: And that would have been her or permissible underred rules, correct answer: Yes?

THE COURT: That was your testimony, plea ran, correct.

A. I know in my deposition when this was flushed out further with respect to the IFR I'm-page am and a half amall that it Mrs.S misbe reasonable.

Q. In is testimony at your deposition,correct?

A. Y and it's a 200 and 61 page deposition. And many or areas I mentioned that the prices that are used in the step 2 have to be reasonable based upon the date that those calculations are made. You can't defy that I told that to you in my deposition.

55

Q. That's your testimony -- did you crime any rule in support of your opinion that there's just some free floating reasonableness requirement?

A. I cited 3-A U 3630 and you just read it a few minutes ago. It has to be reasonable.

Q. It has to be reasonable in relation to the price force other corporate purpose, right?

A. Such as an it gives self-other examples and it wills says if has a to be reasonable based upon automatic information available at the time that that mesh showerment is made.

Q. Mr. Regalian, you determined one of your opinions is that the price assumptions that ExxonMobil used for its long-term price plans an its investment decisions was not reasonable, correct?

A. It wasn't reasonable for using in the impairment analysis that was made in the impairment analysis that we've been talking about to take at that black line way on what'sed in the, Cetapred sheets is that right about a right of 60 percent than the ply that as in police on January 1, 2016, then escalated in a very rapid period of time from 2016 to 2020 at 11 percent and 12 percent based upon the history of -- of gas prices. It was not reasonable.

Q. Mr. Regan your expertise is accounting, right?

A. Yes.

Q. Your Honor not an expert in forecasting natural gas prices,

56

are you?

A. No. There were others that were forecasting the natural gas price I. And if you were to look at their forecast, on or around January 1, they would be consistent with and con why that distribute together forly to that black lien from Mr. Re began you never held yourself out as forecasting natural gas price, right.

A. No. I used other sources for -- fare casting natural gas pricing like strip pricing that we used in this calculation that we made.

Q. ExxonMobil has a an entire department calmed corporate strategic planning that analyzes long-term demand and supply for natural fast, rye?

A. Yes and there will Ph.D. recall Anna little that work if that department.

A. Yes.

Q. And you doesn't are an Ph.D. in economic, do you recall no.

Q. Now this case as part of your work on this case you ran your own recoverability assessment of the Rocky Mountain Dry Grass assets using long-term primes assumptions that you came up with on were you own, right?

A. No. We used the Henry -- the strip -- NYMEX strip primeses and we used them up to 2020 and we escalated them at two -P percent.

Q. Soap I used them for five years an then he's is a late them

57

the no.

Q.   An loming mum my hen he are hub an escalate them by two and a half perks did it?

MR. SAHAM:  Objection calls for speculation, lacks foundation.

THE COURT:  Only if he knows.

Q.   Did you see any evidence that that happened?

A.   No, they did not do that.

Q.   So you substituted different price assumptions into ExxonMobil's analysis, light?

A.   Yes.

Q.   And those price assumptions that you came up with they've avenue never been used as a basis for making billion dollar investment decisions, have they?

A.   , my recollection is that Mr. Horne has used -- used strip -- NYMEX strip plies not guilty evaluating the access of XTO, val waiting the entities in 2012 and 2013.

Q.   Mr. Horne never used strip plieses in a asset recoverability review, did he?

A.   I don't know what other asset recoverability reviews he's done.

Q.   You've seen no indication that he's done that, have you?

A.   No, I haven't.

Q.   And you see no indication that ExxonMobil ever made long term inch and vest.S based on strip prices, have you?

58

A.   No that's not something that's Wendy's covered in this case.

Q.   And you used strip prices even though you recognize that the liquidity of the NYMEX strip price beyond two years is limited and not significant, rights?

A.   , it's known to -- after two be traded but I also see for Pricewaterhouse recommending that they use strip plieses an after five years escalate them at -- well actually after five years they say flat line them and I've also seen where strip price were -- were used, say by Mr. Horne in valuing the assets acquired of XTO and other companies from at the time of the XTO mesh merger 2010 is what you're referring to.

A.   Yes.

Q.   And that was not a at set recoverable ability review.  It was determining an invest beings.  And you a I a grow flat being rock by mountain dry -P were harmly undeveloped?

A.   Yes.

Q.   And you am beings negotiate at that they would have had Leach material norm am am expend did tours.

Q.   And you recognize that most of the plan production as those deck said deck kid notify tour?

A.   Yes.

Q.   So another term pleases to an don't or dust pond flow much that's those recommend.  Well they're more cash flows when pause when you build up initial -P charge flow an thin them am two and a half percent.  Have' open relevant to that analysis.

59

Q.   But in you're not employ Tuesday us in that term the baseses aren't relevant to the charge show because?

A.   They don't in the but testimony the N years in the cash flow almost in the 14ment arm range.

A.   They only get to that height bought pause name again amount if testimony Mr. Repreponderance you aren't into you that had a Moore yes.

Q.   An legal fear what who neither or assets impaired, right?

A.   Yes.

Q.   And PricewaterhouseCoopers agree with ExxonMobil's determination that a trigger event had not occur, right?

A.   I think there what a long discussion and they concluded -- they concurred with Exxon that a trigger event had not occurred.

Q.   Ened a PricewaterhouseCoopers has also agreed with Exxon's determination that there are no assets for which a needed to be cake or taken correct?

A.   Yes.

Q.   Only price whatter at the house -P in interaor asset row were the very tame price to evaluation investment opportunities at X on mow.

Q.   And to your knowledge Pricewaterhouse has never withdrawn its Jean anything been of.

Q.   Methamphetamine a Pricewaterhouse copsers public estimated recall statement in Exxon Al mow bills days in the 2015 10-K fairly fairly in all material respects ExxonMobil's financial

60

position, correct?

A.   Yes.

Q.   And PricewaterhouseCoopers also publicly stated that ExxonMobil's financials statements were presented fairly, with accounting persons generally accepted in the Sauer saw safety.

(?

A.   Pace bad on hit audit procedure that it employed from okay.

A.   Willment into he ask you to take a lock at some of the slides if your deck.  If we could bull up -- this is slide 7.

So Mr. Regan, this column earnings, that's a column that includes depreciation, correct.

A.   Yes.

Q.   And depreciation is not included in an SEC proved reserves calculation, right?

A.   Correct.

Q.   And the second column is capital expenditures that's not even a GAAP figure, right?

A.   No second column is estimate cash.

Q.   Estimated cash and that's not a gab figure, is it?

A.   No.  I'm just of the net cash by the -P at this time during a employment.

Q.   Under a grill that the earnings figure was row necked in ExxonMobil's table 99 table, correct?

A.   I don't know.  99 table is a consolidation of hundreds or thousand of wells throughout Canada and South America.

Q.  Okay.  So you're not disputing that these earnings figures are reflected in that table, are you?

A.  I have no idea one way or the other.

Q.  So you have no basis to exclude it?

A.  No no right.

Q.  And you said on your direct testimony that degree much loss you asked yourself how could be economically producible, correct?

A.  Yes.

A.  That wasn't a conclusion.  That was a analytical observation.

Q.  But you can have an asset that is cash flow positive even though it has book losses, correct?

A.  Yes.

Q.  And let's take a look at?

A.  Although if we look, for example at December, you've got your realization is 11 dollars and 5235* 2.

Q.  And even at that price if you exclude capital development cash flow is still positive in that months right?

A.  I don't know.  I looked at that and there's non-cash items included in the income part that were not reversed.

A.  For example, federal income taxes.

Q.  You know there's an indication on the to the chart for Kearl special topics that had a parenthetical that showed even in the month December once you excluded the the company tall costs of the ExxonMobil development corporation,  it was cash flow

---

positive by two million dollars, right?

A.  Y I looked at that and it's incomplete.  You're just pulling out capital, capex from Exxon development.  But there's other items -P to equal a negative.  Think just pull that one year the capex of EMDC but there are other non-cash items and income tacks is one of them because they get a tax benefit from these losses and the that's not a cash item.

Q.  Okay.  Capital cost is a yep matter not included in an SEC proved reserves test, right?

A.  Development call tall costs are not but sustained zap pension is.

Q.  All right.  Let's take a look at Plaintiff's Exhibit 547.  I'm sorry.  This is Slide 18.  Now there chart also had some text on the right side, correct?

A.  Yes.

Q.  So are we able to pull up Plaintiff's exhibit 547?  So if we can go to the same chart, it should be about Page 5 or -R 6.  Okay so the actual chart has text on the side, right?

A.  It does, why he.

Q.  And the No. 2 talks about the second half costs.  Do you see that?

A.  Yes.

Q.  And it says outlock will pass by approximately six dollars per barrel, right?

A.  Yes.

---

Q.  And you didn't point that out to the jury, did you?

A.  No.  The top portion here again is an indication of the strongest alignment with the test which is the SEC cash flow test is to use annual price and unit costs.  So I was point being out that Exxon's calculations which is the strongest alignment with the SEC's test is annual price and annual cost.

Q.  And even for the 2015 annual average it says outlook that will pass by 1 dollars a barrel, right?

A.  Yes.  That's if they can move the lifting cost from 31 dollars and 80 cents down so that it exceeds an SEC year end price of 29 dollars an 50 cents which itself doesn't include all transportation costs.

Q.  Well, the line that excluded costs above field is the dotted yellow, line, right?

A.  No.  I'm knowingly and intentionally talking about the -- you need to bring down the 31 dollars an 80 cents with I is the revised lifting cost.

Q.  That includes things like indirect costs above field?

A.  That one Court of Appeals include all C A-F.

Q.  And even you are not claiming that indirect costs above field should be included in an are?

A.  I'm not sucking that indirect C A:  But direct C after T should be included to the tune much about a dollar sixty.

Q.  Okay.  Let's take a look at 19 of your slide deck?

A.  So had is the from the pretrial-up resources management

---

system.

A.  Right.

Q.  Only this is part of the society of petroleum engineers, Is that correct why he.

Q.  And you know that Mr. Strawbridge was a member of the sole of petroleum engineers, right.  Yes.

Q.  And you know also know that Mr.?

A.  Yes in 2015.

Q.  You never served on the reserves committee for the soft professional engineers, have you?

A.  No.

Q.  And this refers to a remediation, the S P.E. metabolize recommend that a one year historical average of cost?

A.  I do.

Q.  And recommendation is not something that you have to do, is it?

A.  I haven't looked at the use of S P.E. but that's not usually the way recommendation is interpreted.  Sign or look I a recommendation is -- a some form of suggestion.

Q.  Which is not mandatory is it?

A.  It's not a must.

Q.  And there is not an squirreling regulation, right?

A.  It's not.

Q.  And it also says that is though price should be used at thes a the other?

**App. 1217**

65

A.   Yes.

Q.   And default minutes there's sill other ways to do it?

A.   Correct.

A.   Yes.

Q.   And this ton tapped am case resource flight that's quotes.

A.   That's what it's saying.

Q.   In the year 20is of 15 was not a constant row source was?

A.   Neither was the SEC price.  Both of these move.

Q.   Can you answer me question, Mr. Was Kearl a constant cause remorse in 2015?

A.   It row source place changed from a vair if.  It changed from the since I or you know brother to the Kearl expansion project.  An opinion each plan were changes in I'll belt it's resources an its recall costs Mr. Reagain that double its capacity but you're not hey willing it was a drop condition at that point will a -P you're just said it changed hist row source office a monthly basis, Chuck it's opening of its Kearl ex pack.

Q.   So you agree?

A.   The right and cost from changing every month.

Q.   And Mr. Rogahn this also refers to cash flows in the last two words, do you so that?

A.   Yes.

Q.   And let's take a look at Slide 26 of your slide deck.
     Now a reference to production cost figure, correct?

A.   Yes.

66

Q.   And there is a reference to the Page 9 Table, correct?

A.   Correct.

Q.   And you have a big pie chart there that suggest that is Kearl is 88 percent of the total, right?

A.   Of bitumen.

Q.   And that's of the proved reserves, right?

A.   Proved reserves of bitumen.

Q.   But not production.

Q.   Correct?

A.   No.  It's proved reserves.  The I don't know if it's production costs are 88 percent of its Canadian production Government well, you could figure that out from the 10-K, can't you.

A.   I don't -- I don't recall that or seeing that.

Q.   Let's take a look at Page Is of the 10-K which is beings Exhibit 66.  Sorry?

A.   It's Page 13 of the SEC documents.  So it's Page 15 of the exhibit.  And if we go immediately above that, Mr. Gooden, do you she that bottom paragraph it says during 2015 average net production at Kearl was 149,000 barrels per day.

A.   Yes.

Q.   Okay.  And you know the other bitumen asset in Canada was Cold Lake, right?

A.   Yes.

Q.   Okay.  So if you go to Page 10 of the exhibit, you see there

67

is a -- in the middle of the page there is a column for bitumen products right there?  And you see it says consolidated sub sit dairies bitumen production 289,000 barrel a day for Canada an South America?

A.   Yes.

Q.   Oak.  So that would mean it Kearl was producing 149,000 doll per relevance a day.  Cold Lake was produce us about 1 40,000 Barrows is that right?

A.   Yes from a the production from Kearl was about equaled to the.

A.   That's production quantities not production gloves but have you no basis nor saying the production costs from Kearl were 88 percent of the total, do you.

A.   No.  I'm not saying that.

Q.   Well, you put a gigantic pie chart right on the front of this chart about average production prices an costs, light?

A.   No.  This the buy part from the Exhibit ex be Exhibits I which is that you're recommended # 8 percent of the total bitumen if so does this part proved reserves just fine its which into the wrong side about average production costs an average production.

A.   No it gives Reider an understanding of this production or proved reserves were 88 percent of the total.  That's all it's doing.

Q.   And?

A.   I don't judge.

68

Q.   The average production cost and average production price, anytime have you an average you're going have some things that are higher than the lanch an some things are lower, right?

A.   Yeah.  Yes.

Q.   So I not claiming that there's pop -P the asset that is the thrown or learned low end of the average, are you?

A.   Well, if given the magnitude of Kearl, in terms of its percentage of proved reserves, it's percentage of he proved developed reserves, the 23 million of invest, in Kearl investors interest from this, what is disclosed on Page 9 which is average production pricing and compts, and suggesting that there was a positive with respect to Kearl, there should have been some discussion at least in the MD&A to help the redder understanding to what extent that positive is applicable to Kearl or not.  And if Kearl was actually actually had production costs of 27.90 rather than 19 dollars an 20 cents, Reider needs to ant is that a no.

Q.   Well the leader of this chart would understand this is an average production price an average production cost because it says that right above the tables right?

A.   Yeah it's an average but Kearl is so significant that -- and it's production costs are likely to be in excess of 19 it will Lars and 20 cents.  So determining that it has positive contribution of 5.87 cents may be significantly mislead.

Q.   Arranged aware that the feck specificallied and -R ejection

69

being idea of reap queer field telesms of total proved reserves right?

A.   No it doesn't preclude that.

A.   I seen oil and gas companies that shows need are less than 15 percent and the language Sims 15 percent or more you're.

Q.   Now it doesn't?

A.   We're arguably at 15 percent.  I haven't prepared a chart saying that there needs to be presented accept pray on Page 9 or page 35.  If I other the discussion of mag any opportunity some discussion much recall financial circumstance of Exxon as it relates to Yes, ma'am Mr. Regan let a move to to Slide 30 in your deck.  This relates to a newspaper art -R call, correct.

A.   Yes.

A.   Ment or.

THE COURT:  You're not an expert reading newspapers articles, are you.

A.   No.  What does take to be an pension earth reading newspaper articles.

Q.   Bell you tell me.  Most people are able to lead a newspaper article for your their selves, right?

A.   Request from you don't need an accounting expert to do that.

A.   No.

A.   What I thought was important am was death important at the time of the this acquisition the gas price was 4 to 5 dollars and we're now in an environment substantially less than that I by or

70

whip purpose to operate other -P property only and the.

Q.   And the tie of this much she significants you don't why Mr. You purchased?

A.   Much you don't see senior management motivation for this, do you.

A.   No.  It's just basically take be shall ten from the can't gram testimony if we go to slide 31 of the your deck.  Losses on their on are not an impairment trigger, are they.

A.   On their own they are not.

Q.   And you have to look at all the facts and circumstances to decide whether there's a trigger, correct?

A.   Yes.  I think looking at all the facts and sixths is appropriate and losses, for example, I think there was losses in each quarter of 2015.  Losses were very substantial.

A.   It was over a billion dollars.  An there was likely to be continuing de clean in the priefs natural gas.

Q.   Well?

A.   That together with the decreases in pricing Andrea crows ExxonMobil in the price outlook by.  That's three things font.  I think whether a a trigger from April or up you agree losses business same thefts are no a trying letter.

A.   An even if you have you a page pair amount electric they're to be moan the as pets are improvement let tack a look and light the 792 in your am.

Q.   Impairer personal doesn't say that a drop in commodity price

71

is the a trigger, does it?

A.   It talks about a flop it there and.

A.   Yes from and the price of the asset, correct.

A.   Norm.

A.   Well, the here the de clean in natural gas prices had a true and correct and sick effect on the properties that were subject to impairment.  I think it's appropriate to look at the price of natural gas.

Q.   And let's take a look apt Slide 37 in your deck.  You were -- were you in court for Mr. Prestipino's am testimony, correct?

A.   I was -- I arrived near the end from.

Q.   Okay.  And were you here when he explained what he as was doing in this communication was coordinating with PwC's nation nail office so they could get a consistent approach for they are multi-national corporation?

A.   I didn't hear that.  I think I've seen that in other documents in okay.

A.   And I think.

A.   I think that he when PwC was logging that would are have a special consul takes and I mean it Monsanto other PwC companies and supervision morning.  They do a couple of things.  They attack at that long time.

Q.   Mr. Lee began I don't at this you're answer being my question into Your Honor this is improper?

THE COURT:  Some of the Mack your objection me, not to

72

him.

MR. MELSCHEIMER:  Your Honor, I don't think the witness is answer being the question I move to strike.

THE COURT:  Well, we'll see.  Let him give it a shot or ask your is question again.

Q   (By Mr. Toal) Mr. Regan, did you disclose to the jury Mr. Prestipino's testimony that he was toward or coordinating with PwC national 20 try to get a uniform approach for this national multi corporation

MR. SAHAM:  Objection Your Honor.

A.   How is he going to disclose testimony that the jury heard and Mr. Toal sat through?

THE COURT:  Yes, sustained.

Q   (By Mr. Melsheimer) 2 did you identify his testimony in your analysis

A.   Not the analysis that I presented today.

Q.   And let's took a look Slide 38.  So this is the PwC guidance document that you pointed to the do you sigh that?

A.   I do.

Q.   And what you did not highlight is the first sentence in the notes which says future prices used in the valuation should be in nominal dollars, I an must reflection management west estimates?

A.   To you see that.

A.   Yes.

Q.   Up did?

**App. 1219**

73

A.    I certainly used it many, many times today.

Q.    You indicated that these numbers mums reflect management's best Dr. estimate.

A.    I interpret that as they must reflect -- when you did shall-when you build that black line, it has to reflect the best estimate at the time, meaning you can't start at a number which is much higher than the current pricing.  Management then has to estimate how much will it claim in the first five years.  Is it there are best in 2019 than a 11 percent betweenism go it.

A.    In.

Q.    In it is a not unless there's a if suchly these.

Q.    Will be if you had an and tour option this was assess beings long-term supply an dimement.

Q.    I would like?

A.    I would like to hear the version.

Q.    And let's take look at Slide 39.  107 you represented than was a required analysis by ExxonMobil, collect?

A.    (that this.

A.    That's Hoy interpreted the first -- the second highlighted portion of the -- of this chart.

Q.    Okay?

A.    And it was your suggestion that ExxonMobil should have used strip prices for a long material recall term asset valuation.

A.    It says that market futures should be -- should is a word that's equal to must from an accounting perspective.

74

Q.    And?

A.    Collected from the prior dye day close and the pre nerd sources are as follows:

Q.    And this says the purpose of this section is to establish a consistent basis when developing market futures for evaluating opportunities with near price sensitivity right?

A.    Why he.

Q.    Not long-term price sensitivities?

A.    Correct.  For periods after five years, the discussion talks about you take this calculation of market futures and flat line it.

        MR. TOAL:  Your Honor, I probably have ten more minutes but would this be a good time for a break.

        THE COURT:  I'm going to let you go.  Search mooniness or minutes and pray at that that's ten.

        MR. TOAL:  I will pray on it.

        THE COURT:  Imagine if I can make 7 equal 10, you know, how great is that?

Q    (By Mr. Toal) Let me ask to take a look at Slide 40.  And this -- this chart and this green line, this comes from a document from March, 2016, right?

A.    Yes.

Q.    So that green line was not in existence when ExxonMobil was doing its Asset Recoverability Review at 2015, right?

A.    I don't know but I see that identified.  It was in existence

75

by I think this is a March 26 presentation.

Q.    March, 2016?

A.    Yes.

Q.    After ExxonMobil issued its 10-K?

A.    Right.  So it was in existence as late as March 26.

Q.    Well, you didn't see any indication that that green line appeared anywhere in any of the documents that you reviewed prior to March, 2016, did you?

A.    I haven't seen that, but I know how these lines are prepared.  I've seen how the black line was -- was prepared. I've seen the multiple discussions and analysis.  I don't think that green line was prepared on the March 26.

Q.    You don't know?

A.    No.  But the discussion of Mr. Horne was that these things take a long time to prepare.

Q.    And you don't know if this green line had been approved by ExxonMobil senior management, do you?

A.    No.

Q.    You don't know if this had been approved?

A.    Well, eventually -- eventually I believe it was.

Q.    You don't know if it had been approved as of March of 2016, right?

A.    No.

Q.    And you don't know if that number was used by anyone as an basis for investment decision, do you?

76

A.    No.

Q.    All right.  Let's take a look at Slide 41.  Were you in court for Joe Horne's testimony?

A.    Yes.

Q.    And you heard Mr. Horne testify that the numbers he provided were just placeholders?

A.    I don't recall his use of those word.  I'm reading the exhibit which describes bookends.

Q.    And you heard his testimony that these placeholders didn't involve any analysis of supply or demand, right?

A.    Again, I don't -- I don't recall that testimony.

Q.    And you didn't bring that out in your analysis, did you?

        MR. SAHAM:  Your Honor, how can he bring something out if you don't recall in your testimony.

        THE COURT:  Overruled.

A.    No, I don't recall that.

Q.    And let's take a look at your Slide 42.

A.    Yes.

Q.    Now your testimony on this slide said you redid ExxonMobil's proved reserves analysis with what you considered to be reasonable assumptions.  Do you recall that?

A.    Yes.

Q.    And ExxonMobil made billions of dollars of investment decisions on the basis of its long-term price assumption, right.

        MR. SAHAM:  Objection; form and foundation.

**App. 1220**

77

THE COURT:  Overruled.

Q.   Well these are invests have already been made go on the basis of these long-term price assumption, right.

A.   No this was.

MR. SAHAM:  Objection; calls for speculation.

THE COURT:  Overruled.

A.   These investments were made in 2010 when prices of natural gas were between four and five dollars.

Q.   Mr. Regan, in the year 2015, ExxonMobil was making long-term investments of billions of dollars based on its long-term natural gas assumption, right?

MR. SAHAM:  Objection; form, foundation, calls for speculation.

THE COURT:  Overruled.

A.   I don't know what investments Exxon made between October, 2015, and February 24th, 2016.

Q.   And, Mr. Regan, when you testified that you used either Joe Horne's bookend prices or third-party prices to redo your analysis, you didn't actually use those numbers, did you?

A.   No, I didn't testify that I used his bookends.  I testified that we used all of the Excel spreadsheets with respect to expenses, capex, et cetera.  We -- The only thing we changed is the revenue in the first five years.

Q.   Well, when you did an analysis, did you or didn't you do a realization of third-party the projected prices but you only

78

carried them out for five years and then you.

A.   Five years and then escalated by two-and-a-half percent go but if you had out the actual third-party objection these Rocky Mountain would be recoverable.  Inch impair under these assumption, right, no not if you use the price from those third-parties near 12-31-2015 is well you hospital often the you a that sis after five years an it's is a lated the rate of inflation beyond That is correct right I used those for five years just like I use the NYMEX Fournier five gears so you didn't use the entirety of those third party projection, right.

A.   No.  I thought I was trying to be consistent with Mr. Horne's analysis except for just changing his -- his pricing for the first five years.

Q.   All right.  Let's look at Slide 44.  So the title of this slide even the word impairment gave Mr. Tillerson heartburnment you never talked to Mr. Tillerson about there e-mail, right?

A.   It talks about heartburn to the folks on the third floor which my recollection is Mr. Tillerson and others.

A.   I didn't use his name with respect to Slide 44.

Q.   You use his name right on the title of the slide?

A.   He was among the occupants of the third floor from and this e-mail never went to Mr. Tillerson right.

A.   I doubt it.

Q.   This just your interpretation ever this document, right?

A.   I think I said that it gives the folks on the third floor

79

heartburn.

Q.   Well, the title reference Mrs. Tillerson.  Do you see that?

A.   Because he was resided on the third floor if and so did a lot of other people, right.

A.   I don't know how many people were on the third floor.

Q.   And you're not using any expert accounting methodology to offer this view, are you?

A.   No.  It's -- it relates to the accounting what Accountant call tone up at the top.

Q.   And you're aware that ExxonMobil had taken impairments, right?

A.   I'm aware that had he took an impairment with respect to the for and facility of about 300 million dollars but that did shall-I didn't -- I wouldn't -- when I read That is correct I didn't -- I wouldn't call that an impairment.  That was a facility that had suffered a fire and it was sold.  There was no need to do an impairment analysis.  There was a loss on sale.  So it was Bocked as an impairment.

Q.   Will was a fire can result in impairment much an asset, right?

A.   -L but it wasn't recorded as an impairment until there was a sale and then Exxon recognizedded lot on that sale.

Q.   And can you?

A.   They had who choice.  It didn't need do a Step One or Step Two or a step 3.

80

Q.   Well, you recognize there are a number of impair that the had been identified in Mr. Horne's impairment white paper, right?

A.   Yes.

A.   I think there are other impairments relating to certainly properties smaller than these XTO as Yes, sir let's take a look at these Slide 46 of your deck.

THE COURT:  Stop.  Let's take a break.  Don't talk about the case.  You can step down, sir.  Thank you.

THE COURT:  Thanks, Debbie.

>>:  All right for the jury (jury seated in the jury box.)

THE COURT:  Y'all be seated.  Thank you all.  Here we go Mr. Toal.  Tinted Cross Examination.

Q.   Mr. Regan, do you remember you gave some testimony your presentation about Plaintiff's Exhibit 527?

A.   Which one is that.

Q.   It's based on a employee forum.

A.   Yes.

Q.   Okay.  And you offered opinions based on certain comments on the employee follows form, right?

A.   I I read certain comments.

Q.   And and you offered about opinions about the tone at the top based on those comments?

A.   I said they're collective of a tone at the top.

Q.   And you you didn't attend that forum, correct?

**App. 1221**

81

A.    Correct.

Q.    You don't know who attended the forum, right?

A.    Well, I read through the materials about 50 pages.  They were selected I think 36 people selected for their -- their leadership and their -- had certain qualifications as to why they were selected.  And they -- the 50 pages summarized their comments.

Q.    You don't know who made which comment, right?

A.    No.  That's not provided.

Q.    And you don't know what positions they held, right?

A.    No.  There was discussion in the -- in the selection process that described, you know, what positions they held.  Some were in finance.  Some were in other parts of the company.

Q.    And you don't have any reason to believe that anyone who made a comment in that forum had any involvement in Kearl proved reserves or the Rocky Mountain -P dry gas asset, right?

A.    That's correct if and you testified your firm may more than one million dollars from this case, correct.

A.    We but out and we collected that, Yes it and worked for this same law firm between 15 and 20 times -P over the last 30 years.

Q.    So least 30 years has this law firm paid you between 15 and 20 million dollars?

A.    Boy, I haven't made that calculation.  I don't know.

Q    (By Mr. Toal) Nothing further, Your Honor

        MR. SAHAM:  Nothing from the plaintiffs, Your Honor.

82

        THE COURT:  Okay.

        THE COURT:  Okay.  You may step down women thank you.

Q.    Mate witness be excused?  Both sides agree?

        MR. SAHAM:  Yes, Your Honor.

        MR. TOAL:  Yes, Your Honor.

        THE COURT:  Okay.  Thank you, sir wept wit thank you any.

        THE COURT:  With do you have a flight to.

        THE WITNESS:  San Francisco.

        THE COURT:  Well, have a nice trip.  (where do you have).

        MR. THOMAS:  Your Honor, I got two preliminary things before the next witness.

        THE COURT:  I need to send the jury back out again?  Do I need the jury out.

        MR. THOMAS:  Yes maybe you can get them to 11,000 steps.  Did you say yeah again.

        THE COURT:  All right ladies and gentlemen you need to go back.  Every time they say yeah in the courtroom it cost them a hundred dollars an at the end we're going to divvy it up with y'all.  No, I I'm lying about that.

        (jury escort your to the Jury Room by the Court zoo security officer.

        Of the.

        THE COURT:  Okay the jury's out.  Here we go.

83

        MR. THOMAS:  Your Honor, the next witness is Plaintiff's causation of damages expert.

A.    Stephen Feinstein and I noticed two things we got slide decks a little while ago from the plaintiffs that Dr. Feinstein will go through and I noticed a couple ever issues.

A.    One is that he's aall rightly going to offer an Monsanto an market efficiency which he did not disclose if his reports nor in his deposition.  So we do not think that opinion should be allowed.  And also in the slide deck it appears that he is going to testify about what other expert are going to say or have said when those experts haven't yet testified in this case.  You know, specifically, Mr. Ferrell who is his counterpart.  There satisfy slides -P officer relevant agrees with this officer relevant disagrees with this.  Toes type of times the jury should way to see when both.  Them testify whether they agree or disagree with each other.

        THE COURT:  Well, let's assume he's going to stick by what his he says in I deposition.  These people have certainly been de pieced maybe two or three times.  I don't know.  But assume your witness is going to stick by what he says of is it okay so we don't have to drag him back and forth back and forth for him to say in the deposition the witness said da da da.  I disagree with that.  How about that?

        MR. THOMAS:  Your Honor I think that would be better.  Issue is we got summary slides that say fare relevant says this.

84

It's a bullet point of I Tim that's problematic.  That's of course the first issue.  The something issue systematic am market efficiency opinion that wasn't disclosed.

        MR. BURKHOLZ:  We had a different expert at class 7 letters.  Dr. Ferrell it was highly efficient.  The Court adopted that as a fact in the case that the market was -- that Exxon -P stock was traded in an efficient market.  Did profession far Feinstein came along and noted in that Dr. Ferrell said it was efficient and the Court adopted it.  So he's not.

        THE COURT:  Well let me stop you right there is that an issue build the market was of or not in cacique 3 Your Honor I think was a class certificate.  There was the merit We're already had a discussion about the two considers between the two.  It's their burden to determine market efficiency and they don't have None one in this case testifying on that and they strength a expert disclose than opinion.

        MR. BURKHOLZ:  We don't need an expert to show market efficiency.

        THE COURT:  I agree with him I don't they need one no.  I don't think some of the but I'm going to let him before that.

        MR. THOMAS:  Okay.

Q.    And with regard to the other witness, he'll just have to hang around and if he doesn't agree, I mean if there's some dispute, we'll have to come back.  Okay?

        MR. BURKHOLZ:  Okay.

**App. 1222**

85

THE COURT: Sorry you're going have to cope your witness two or three days. That's the way it's going to be. But I'll lit of let him talk about what he other knows about what the other man said in the other man's deposition.

MR. BURKHOLZ: Well he respond top Dr. Ferrell's report.

THE COURT: Report or, anything that's already in writing.

MR. BURKHOLZ: Okay.

Q. Or is record bid a court reporter any of that. But you're going have to make that clear, look, this person has not testified today and he entrapping something different but with regard to what he said there, you disagree and here's why. Is that okay?

MR. BURKHOLZ: That's firearm it's based on his report in the case Dr. Ferrell's report.

THE COURT: Yes. Yes all right. You did days agree with both those an that's okay. I denied your or overruled your okay.

MR. MELSHEIMER: 3 thank you, Your Honor.

THE COURT: You don't have to say thank you when I.

MR. THOMAS: Well I feel bad for saying yeah.

THE COURT: Thank you. I'm or I'll take another.

MR. THOMAS: So do I have one more issue I don't think it's going to come up till Cross Examination I which understand

86

will not be tomorrow like under can wait to raid that but I am going to within the to talk about this other expert with Dr. Feinstein is Mr. Torchy Joe. It's different than what we dealt with miss right. Mr. for I grow put in a report the Court considered it. One much heifers opinions is different than Dr. Feinstein Dr. Feinstein relied on his report.

Q (By The Court) You hen become the began door

MR. THOMAS: Yes.

THE COURT: I all right –R ruled forgot. So the gander gets to do the same thing. So go after it. All right.

MR. THOMAS: Thank you, Your Honor.

THE COURT: Are y'all red R for (.

THE COURT: Spell spell. T-O-R C I-O. For torchy Joe.

THE COURT: Got your there's a.

MR. BURKHOLZ: Thank you.

THE COURT: For do I feed to dress y'all in the morning? Help you?

(.

>>: All rise forth jury.

(jury seated in the jury box.)

THE COURT: Good have y'all back. Y'all be seated.

THE COURT: Burkholz.

MR. BURKHOLZ: May it please the Court.

THE COURT: Yes, sir.

MR. BURKHOLZ: Plaintiffs call Stephen Feinstein.

87

THE COURT: I have to ask: Are you related to the musician.

THE WITNESS: No, no. Michael.

THE COURT: Oh okay.

>>: But my uncle has the same name.

THE COURT: We got to get you sworn in. Race. Do you volume swam certify the witness sworn I'm I did.

THE COURT: Direct examination.

Q. Professor fine fine we've been here all day. Discussing accounting. Are we going to try to make financial a little more interesting forth jury?

A. I'll try.

Q. Okay.

A. My student say I do a God job of that.

Q. Did you cause some?

THE COURT: You're going to make accounting not guilty.

A. It is.

MR. BURKHOLZ: I'm too long to make finance interesting.

Q. Oh okay.

Q. Did you cause some demonstrative slides to be create today assist you in your testimony today before the jury?

A. I did.

Q. Looking at Slide No. 2, can you tell the jury when you started as a professor finance at back son college and a what

88

kind of school is is that?

A. Okay so I'm a college flow percent on I'll he teach at back son come lengths just outside Boston pass massively avenue been there since 1996. So that's 30 years. It's my 30 agree anniversary now I teach classes about the stock markets.

A. I teach classes there about the upon packet I teachment students to be financial analyst the a lot of the students to on to wall street to be –P and I think particularly for for you folks is that may I teach undergrad. weights and MBA students amountment MBA students go to night lasts to I department the city tenths a much they been, whole did I after the their jobs. I try to keep it ex citing to them.

Q. Can you tell the jury about crown shield financial research?

A. Sure. So as long as I can remember I've always wanted to be a teach. When I went to college, I got to know my own college pro he's force isn't I want to the fall their footsteps so I decided what kind of every to be was going to I set out to do at that but I never wanted to be the kind of college professor that was all here Let cam. And out much touch with the ream world. I wanted to be I wanted to teach about the world of finance but I also wanted to be in the world of finance. So starting also in 1996 the same time I started at back son college, I began doing consulting work for a variety of clients. I did work for Government agencies. Contract work For FCC I did work for big banks an I also did work on behalf of en investigators of the

**App. 1223**

89

over the last 30 years my work has gotten more and more specialized in working for investors in cases very similar to this one. I started out doing that work for another company, but then in 2008 I hung up my own shingle went on my only of the hired my own financial analyst I have a staff of ten that assist me -P that's my firm that I started from Boston, crown and shield financial research.

Q. And you've been retained by my firm in many other securities class action case?

A. Yes over the last 30 years I've had about 200 engage the. Not all of them go to court.

A. In fact very few of them go to court but about # two00 cases and let meet add I've had a number of case I'm sorry in the I'm an gas industry -P so I had a case involving BP -P bring niche petrol drop number all at that Mesa val wait the properties near ear also EQ T is a recent caps I had with I the natural gas fracking companies in the United States so I have a lot of experience in oil and gas specifically.

Q. And you've been qualified by courts to testify?

A. Yes.

Q. Many times?

A. Oh yeah many times dozens.

Q. Okay. And can you explain what your P L D in economics was at Yale?

A. Well sure. So I kind of set out on this year past I knew

90

whey wanted to go and what I needed the training I needed in order to be able to do this was I a would get a doctor at that's what you need to get a post at a universitiment I the goment my economic Ph.D. from yeah university but I'm going to add that because I wanted that due -L foe difference academic financial but also traction things finance I also cot chartered financial analyst designation. It's a study have you to pass a whole bat itry ever tests. The degree sick nation is air warded by it's CFA institute. It's premier credential for practices financial analysts what a CPA is for accountants, a CFA is a similar kind of things for financial an number lefts.

Q. And earlier in your career, you had a job at the determined reserve and can you just explain that?

A. Right before I became a proofers so I was a economist at the federal research ways posted federal research back much Atlanta. I had a number of responsible.

A. There.

A. Monitoring financial markets. But in particular I was the aassistant to the bank President, the President of the Federal Reserve bank of Atlanta an it was pie job to help prepare for him for his participation in the federal open market committee meetings. That's called the F-M-O C: F-M-O C is the body in America that is responsible for interest rate policy. So this case has a lot to do with interest rates as we'll talk about later.

91

A. I think that's relevant that I was working in helping the bank President decide what interest rate policies should be in the United States. Just for context, that was 1987 to 19906789 so I was quite young then.

Q. And how many hours have you personally worked on this case.

Q. Approximately?

A. About almost 400.

Q. And what is your hourly rate?

A. 995 per hour P and you've down a lot of work on the case.

A. Right. So those 400 hours are researching Exxon, digging into the data and the documents, running statistical and financial analyses that are appropriate anal says to answer the questions that I was asked to answer.

Q. And responding to the defendants experts opinions and analysis in this case?

A. Right. Right so after I would finish the analyses, I would right a report.Ment report would be submitted to the Court an to the other side they would read T they would respond to it. I would respond to their response and also I sat for a deposition where I testified before.

Q. Okay. Your Honor, at this time I aid like offer professor Feinstein as an expert on loss causation an damages?

MR. THOMAS: No objection.

THE COURT: Then he's admitted a the a loss causation expert on damages.

92

Q (By Mr. Burkholz) Can you describe Slide

A. So these are the questions I was asked to conduct research an analysis to answer these things and it was up to me to decide what research and analysis was the appropriate research and analysis. So was the information that was allegedly concealed important continue vest force in.

When that information was finally disclosed, did it cause Exxon's stock price to fall?

And then if it caused Exxon's as stock fries fall, however did it fallment earn in sure damageness an itch done a number of capes option I know the legal.

A. The the measure of acknowledges is a fudge of how much the stock price was inflamed by the false states and officials and men how much the stock plies them when the truth came out.

Q. You're not testifying as a liability expert here of the correct. So I'm assuming that what plaintiffs are saying happened is what happened and I saying based than assumption, that's what the investor Plaintiffs lost. And before we move on, I think just to explain why these are important questions, I want to recap my understanding of why we're here. So the Plaintiffs are alleging that the company concealed from the marketplace and from them, from the investors, I important information about the condition of Exxon and about conditions at the Kearl Lake facility and Rocky Mountain Dry Grass and they're alleging as a result of that bad information being concealed, Exxon's stock

**App. 1224**

93

price was too high. Exxon stock was overpriced?

A. So there he a saying that between the time the information was concealed and should have come out and the timement information did come out, they were overpaying. Anybody who bought the knock that interval from the end of February, 2016, to the end of October of 2016 so that's eight months, those people overpaid is what they're alleging and I think it's really important I haven't heard it explained quite clearly yet, but it's not all of Exxon's shareholders that are suing that are part of this class. It's just those Exxon shareholders, just those investors who bought between those two days. Between the end of the February, 2016 and the end of October, 2016. They're saying they overpaid. They asked me to calculate if it's true. They asked me to calculate if had he overpay, however did they over ask I or pea and you'd see later it's 3 dollars and 40 odds 4.dollars 40 roll cents.

A. This law out is about the amount they overpaid to get back. Part analysis which is here on these questions I was asked is to see did they actually lose this money? So they overpaid but when the stock right when the news came out did the stock right fall? Did they then lose the money that they overpaid and so that's what I was asked to research.

Q. Add whipped you'll refer to the end of the February you're freshing total 10-K comingment okay. Right that's February 24th, 2015 so the period of time whether they're?

94

THE COURT: 2016 you mean.

A. February 24th, 2016. Et al. in 2016. The beginning of 2016 to the end of 2016 with one of the slurs happening in January of 2017. So they a saying that the people who bought these two dates Rover paid they're sail they payment the okay 20tubes to two dates and they want the amount they overpaid back.

Q. Okay. And is there another part of the your assignment?

A. Right. So in addition to that the main part of the assignment women I just described it was look at Exxon's borrowing of 12 billion dollars in February of 2016. So Exxon for bowed borrowed much money.

A. They've needed it. They wanted it. This he do what's calmed a bond offering to borrow 12 billion dollars. At the time and at the time of the this I'll talk more about that this later but at the moment of the that borrowing Exxon was -- they had a AAA credit rating but it what tee testifying. It was in jeopardy and question was if they had lost their AAA credit agents before the bond issue was I or finished, because they got finish baroque the 12 billion dollars however more interest would they have to pay over the life of the bonds at that they are selling.

A. So I was asked that question, too.

Q. Okay?

A. I just with the to point out that's not part of the damages it's not bond holders that are here. I guess it's part of plaintiff's are saying that's -- that's some. Motivation for why

95

the company might have want to the conceal information.

Q. Let's turn to the summary of your opinions.

A. These are the answers.

A. So after doing extensive research and analysis running a battery of tests, studying a ton documents and date tax I concluded that, yes, the alleged false statements and owe misses the what's alleged to have been false statements an omission option in Exxon's 2015 10-K which was issued on February 24th, 2016, and which was alleged to have been con sold over the class peaks was important information. That's. It was important information. And that information when was ultimately disclosed made Exxon's stock price fall on the days when when that information Kim out. So the answer is yes, Exxon's stock price did decline when the truth was ultimately disclosed in so let's tack about the two disclosure.

A. So these are the dates.

A. I mean the alleged misrepresentations were about Kearl Lake. You heard about a lot about that. The Kearl Lake tar sands project. And also about Rocky Mountain Dry Grass. It was about whether Kearl Lake should be debooked, whether it was profitable, whether it was making money or lose beings tremendous and ever money of the that's the information about Kearl and about Rocky Mountain Dry Grass you know what it is declared on the financials at a correct value or did have to be written down and recognized that it was not worth what the company was telling people it was

96

worth. Those are the allegation. That's the information that is alleged to have been misrepresented.

So the Kearl information came out on October 28th, 2016. On that day, Exxon finally disclosed they would like.

THE COURT: Stop.

MR. THOMAS: Your Honor can we night a question and answer instead of just narratives.

MR. BURKHOLZ: Let's move on to the next Slide 5.

What is your conclusion regarding how much investors overpaid.

A. Actually can I just see the previous slide just for a second so I can add the numbers up. When the Kearl news came out stock price fell 2 dollars 39 cent. Whenment Rocky Mountain Dry Grass aim out the stock price fell a 105 because of that news if you add the 239 and the 105 we get what's on the next page the stock was overpride by 3 dollars an 44 per share.

Q. And you also have an opinion regarding the interest cost that Exxon would have had likely paid if they had been downgraded and what is that?

A. Right. So I used Federal Reserve data and I compared the interest that is on a AAA bond to the interest rate that would be on a AA plus bond and the spread between those two amounts to 831 million dollars of more interest pages over the life of those blonds and on this next slide, do you teach classes in thousand determine stock prices ortho how they're determined.

97

A.   I do.

Q.   And what does this slide show with respect to that?

A.   Well, this -- this explains it.  So your friend and family are going to be amaced you now know about the stock market.  You need to know this in order to understand the details of the case.

Owning a share of stock is like owning a tiny slice of the company.  You own a piece of that company.  I joke with my students that if I buy a share of Disney stock I should being age to go a guess left hand on find my brick okay my tree because I open a past ditz any it it I boy Disney stock.  I tell the students that but it's a joke.

A.   It's not like I own any specific thick that the company has.  I own a tiny slice of everything that the company has.  So as a result, because and the other thing is stock gives you if you buy a share of stock and the company distribute income or money to the owners of the company, you gets your fair share.  All right.

Q.   So let me.

BY MR. THOMAS

Q.   Same objection?

MR. THOMAS:  Same objection  same small is that what you're referring to dividends.  Can you explain to the jury the roam of dividends in templet stock bribes of Exxon.  Sure.

A.   So when you're buying a share of stock, certain stocks pay dividend.  Exxon was a stock that paid difficult dents.  You might want a stream.  Cash flows from a stock from a particular

98

company, a pension fund like the carpenters pension fun.  They have to cut checks to retired carpenters and injured carpenters.

A.   So they want a stream much cash flows copping in so them' look for a stock like Exxon that pays out dividends periodic lick with the retired engineers but the key thing is if you buy a share of stock for the dividends you're bike those dividends you're paying for those dividend much that's what you were looking fork when you bought the stock.

A.   You want a stock that pace dividends butted other thing that I want top describe is that because we you boy a share of stock you're buying a slice of the company, the slam ewe of the stock is tied to the value of the company.  If information comes out that makesment company worth more that makes stock worse.

A.   That amounts.  Am so it's information about how valuable the company is.  It's information about how well the company will do that makes the stock go up and down.

Q.   You testified about the impact of the concealing information.  Can you just describe for the your the 10-K, your opinion on the consolement of information from the 10-K and how that would affect the stock price tank well, sure.  So just like new information that comes out if it's good we'll make the stock price go up and bad information when it comes out will make the stock price go down, concealing information will also affect the stock price.  It could keep the stock price from falling.  If there's bad information and you don't tell people about it, that

99

proms up the stock price an keeps it from falling.  So the concealing sealment much will impact stock prices and the allegation here and what I had to research was did the concealing the information about Kearl Lake and Rocky Mountain Dry Grass, did it inflate overprised Exxon stock from let's talk about the two corrective disclosures to you and let's start with the October 28th disclosure.

Can you describe what you found with respect to information that came out on that day?

A.   Okay.  Well these two dates are really important dates in the life of the company and important dates in the life of this case.  So October 28th, 2016, is when Exxon finally discloses the truth about Kearl.  That's when they said though have to actually said they anticipate having to debook the 3.6 billion barrels of I'm equivalent from Kearl from its reserves of that they would are to we move as aapproved developed recertify of.  The news medias covered it.  This was big news.  Analysts covered T it was big news an it was indisputable that the stock might price fell a than day for Exxon it fell you a recoverability analysis lot from so we're going to show the -P jury some media articles and the some analyst reports.

A.   We all understand what media reporters are report being.  Can you describe what a analyst is too long and what they're reporting with respect to the company.

A.   Okay.  Well financial analyst that cover stockses on Wall

100

Street search an important purpose.

A.   They -- they communicate with the company.  They go meetings like conference they call them conference calms.  They're like press conferences with the company where the company discloses information to them and tells them information an then the analysts will write reports conveying that information total public and also trying to hip the public understand the importance of that information.

Q.   Okay.  And Your Honor, we have an agreement with Mr. Thomas that Count Three publish the media and analyst reports, so I'm going to show profess for Feinstein with the limiting instruction?

THE COURT:  Okay.  A do we have those marked or numbers or no.

MR. BURKHOLZ:  I'm going identify the exhibits action I show them to him but I just want to make sure it was okay that he would put the screen up with the art catch that's all.

MR. THOMAS:  Yes Your Honor I think if we have the instruction I didn't within the to have the pop up every and.

THE COURT:  Okay.  Ladies and gentlemen we done before on these articles.  They're not offered to you that they're the truth.  They just are what they R what is of somebody wrote about T much it's just means it's their opinion okay?  All right here we go.

MR. BURKHOLZ:  Thank you Your Honor.

**App. 1226**

101

So the next slide are two articles they're from Exhibit 551 which is already in evidence. Can you describe your observation of the news coverage on this day.

A. Sure. This was big news. This was headline news. Roy officers a major news organization 6789 they have reportsers and the they distribute news art comes to other newspapers what they re R-E U T-E-R. Is on this day okay October 28th, 2:42 PM they wrote about the update about yes, ma'am being debooked sent again's shares lower and they at that Exxon's shares fell even though it was a good day for again otherwise. At that their floor of the they announced that day beat wall streets art amount.Ly tears updatedded art about the an hour late earn the mark indicates about to close so they were able to so what the stock did that day. Think wrote the unusual or nurse pushed the company's share write-down 2.3 percent on an otherwise upbeat came the profits that were announce beat wall streets expectation. They're saying except for the determine news the other Exxon news was actually good that day.

Q. An the reference to 2.3 percent it's about 20 minutes before the market closed and you tomb hip have the final decline numbers you're going discuss with the jury?

A. Yes that's later from this slide deck.

Q. All right. Lengths look at the next Slide. Again niece are articles from exhibit 551 which I showed Mr. Loosen that will. They're already in evidence. What did you observe with respect

102

to these articles?

A. Well, it was big news. It wasn't just Reuters. Bloomberg is an important financial information source. Financial analyst that is work on wall these and other office and the country have what they call Bloomberg terminals the first things you do including on your Bloomberg terminal and seep what the news of the day was. Bloomberg complete ExxonMobil corporation warned it may be face being the biggest reserves revision in its history. Then made the New York sometimes. So that's just financial news.

A. Exxon concedes it may need to declare lower value or for aisle in foundment and the in the also noted that the pick I accounting revision of reserves in its history if now defense layer may bring other debook beings that happened with Exxon before. What your view of the fact that Bloomberg is re as the biggest reserves revision in its history.

A. Well this will two things that made Kearl different. It was huge it was big. 3.6 much barrels. There hadn't been the a reserves re booking since 1999 but the other thing Kearl had been to the as the future of the company. Kearl had been touted as being a project that would replace Exxon's depleting reserves an it was touted as being a project that would make the company durable or resilient to low oil prices.

A. So the company said, oil price fluctuate. That's true. We want to be re sill yet a so that we do well when prices are home confinement we also want do well when prices are low and Kearl

103

will help us do that. So this was big news because it indicated the project wasn't succeeding.

Q. Okay. Let's turn to the next slide and these are two articles damn Dallas morning news an Houston chronical, both dated October 29th. Plaintiff's Exhibit 761 is the Dallas morning news article. Plaintiffs exhibit Exhibits 726 is the Houston Ron kick or call article Your Honor I'd amove into evidence.

THE COURT: Any objection.

MR. SAHAM: With the limiting strainings.

MR. THOMAS: Not with the limit being instruction.

THE COURT: It's admitted with the same limiting instruction. It's not forth truth.

Q. What did you own with we re respect to those arts?

A. Is a.

A. Ed point here is it made the local papers unlawful is a flood killed yep -P oil sands that is mornings news cuts in the estimate could total 4.6 billion barrels because Kearl was 3.6 and there was another project that was 1 million.

A. Tomb think was an undeveloped other reserve. But the -- but the Dallas morning news also interpreted they said that could affect Exxon's ability to borrow money.

A. Houston chronical, the fact you know have I this on the slide because it made the papers. Exxon's oil fields may not qualify proved reserves and they explained to their reasons

104

because this won't be economic to drill. To drill and Pump really.

Q. And we talked about analyst reports?

A. Up radio he viewed analyst reports that came out that day.

A. Yes.

Q. Okay. Let's look at a couple of them. Slide 11 these are the Raymond James report of October 28th, plaintiff Exhibit 652. RBC cap call royal bank capital markets -P October 21 at S-16 amendment Exhibit 573 request to move intoest Your Honor with the limiting instruction?

MR. THOMAS: Same objection.

THE COURT: Ladies and gentlemen these articles are just like the newspaper articles an the same thing that they're not offered nor the admitted forth truth. Okay. Go ahead.

Q (By Mr. Burkholz) What did you observe with respect these analyst reports

A. Okay. Well, the analyst had a tough job on October 28th, 2016, because that was an earnings announcement which means there's this big company, Exxon, produced a press release and they -- they tolded marketplace about how they were doing in general over all their operation a it was a flood of information it or like drinking from a fire hose there was not of after the am family had to sort out which is important information which is not information or important financial an Raymond Jones is one of the Wall Street analysts follows Exxon.

**App. 1227**

105

A.   They gave a whole list ever details of different kind of information some food some bad that the company announce under then they summed up they said much more serious than this other news we covered is the prospect that up to 4.6 billion par relevance a whopping 18 percent of the bulk of it at Kearl may have to be debooked and they wrote of all the news that came out that day, this was today's mower most surprising rev lanchesment other -R news was kind ever ordinary for an earnings announcement of the this was unusual an extra.

Q.   The and we'll get to your event assistant Ted analysis but does this Raymond James opinion room to your opinion regarding the stock price declined that day being related to the Kearl news?

A.   Light the analysis I had to do is look at all the news that came out an decide which of that news is the news that maid the stock plies fall?  So it's indisputablement stock price F I will to sort out of the pieces and I of ray Monday James said I'll hem I sort out of the piece.  Kearl weighs today's most surprising revelation.

Q.   And with respect tonight RBC capital markets report, what's the significance of the language that you've highlighted?

A.   Well, RBC did a did God job.  I mean they got in my opinion they got it right where it made a difference I mean the Kearl debooking made a difference of the it informed the marketplace that the economics of the project were challenged.  It's not just

106

an accounting revision.  It's not just number ons a piece of paper.  It showed or told the marketplace that there must be something wrong with the economics.  We had been told previously that prices were higher than costs.  Because there's a debooking we now know that's other or the other way and.

A.   Costs are higher than price abs answer that's really about R or about.  C.  Anything you out in from the debook Groundskeeper and did you you're RBC had issued a report on the day after the 10-K apt issue came out.

A.   I did.

Q.   Let's take a look at that.

    Your Honor, this -- let's there is an R about.  C report it's on defendant's exhibit list it's from February 24th, 2016. I assume there's no objection with the limiting instruction that would come in?

    MR. THOMAS:  No objection 2340 objection with the limiting instruction.

    THE COURT:  It then it's in with that limiting instruction.  Weighs the number.

    MR. LINDELL:  24.  So you had a report that came outment day of the 10-K filing, and what did that analyst observe.

A.   Well, this is at the beginning of the class period it's near the beginning 2016.  It's February 24th.  2016.  The company had just released its 10-K.  Before the company released its 10-K,

107

the market was wondering:  Is Exxon going to write-down any of its reserves either debooking or impair in the other oil companies have been doing that.  We know oil prices are low. Other companies have been debooking or rather impairing.  Weighs -- what's Exxon going to do?  The 10-K comes out.  Theres a nothing if will about a debooking that says there be a debooking or that they open a debooking.  There's no impairment.  Rocky Mountain Dry Grass and so RBC interpreted from that that this news demonstrated the efficiency of Kearl.  They looked specifically at the numbers that you folks have been looks at all day and previous days about costs and plises for bitumen and looking at those prices where they saw that the -- what the company said was the price they were getting versus the cost they were paying to produce bitumen, RBC concluded that mut of much I much Kearl they that's the I'm from things pot from the 10-K in February.

Q.   And you sat here through Mr. Regan's testimony where he described Page 9 of the 10-K that listed the prices received Ed received an the production costs or lifting costs?

A.   Right.  So RBC looked at that and they came away with the impression that Kearl was doing well.  Production costs declined and that this specifically they thought relate to the Kearl.

Q.   Right and just so we're clear on Page 9 Exxon did not break out the costs that were reported there between Kearl and other properties, right?

108

A.   Right.

Q.   So?

A.   And so RBC got misinformed.

Q.   RBC was under thing I'm that's it was 19 dollars an 20 cents is that were you or your understanding?

A.   Yes.

Q.   And Mr. Re began testified a and we've seen documents that internally the company had a cost 27.90.  Yes 27 dollars an 90 cents.  So they assumed RBC assume this average applied to Kearl.

Q.   So is it your opinion, your interpretation therefore report that they assumed that they -- had he had not debook the 3.6 billion barrels in the report an they were looking at Page 9 and they're assuming that Kearl's profitable at that time?

A.   Right.

Q.   Okay.  Then lost let's see what RBC report after the debook later from the year.  This is the same analyst company?

A.   Same analyst.  RBC.  Now news comes out in October, towards the end much 2016.  Kearl was going to be debooked and RBC says, well, this tells us that the economics of the project are challenged.

A.   So there's before and A before the disclosure in October they thought Kearl was efficient.  And essentially doing well. The afterment disclosure they now understand that the projects economics are challenge.Ment financial analysts that bright these report have to be very dill pro mat particular an demonstrate

**App. 1228**

109

can't about the words they choose like any report they are need an open line ever communication with the company. So they're not going to use hostile language them' a use very diplomat particular Lang Juan.

A.  Be he's it looks like the project is failing but they wrote economics. Project are challenge well the debooking on October 28th is demonstrating the man indicate that the Kearl project is not now making money.

MR. THOMAS:  Objection lead.

THE COURT:  Sustained.

A.  On a per barrel basis.

THE COURT:  No no no.  I sustained.

THE WITNESS:  The oath oh I'm sorry.

Q.  What is your understanding of the language from the RBC capital markets with respect a Kearl project arc, debooking announcement that came out that day.

A.  Debook information the market that costs are higher than price. That they're losing money on each barrel of oil or bitumen produced.

Q.  And that's different it than the understanding at the time the 10-K came out?

A.  Right.

Q.  Okay?

A.  So unor on profitability on a her barrel basis.

MR. THOMAS:  Your Honor again if we can get question

110

and answer instead he answers a question and adds two paragraphs.

Q   (By Mr. Saham) I'm going to move on

A.  Okay.

Q.  Let's get to the next analyst report this is a an familiar lift report by UBS on October 28th. It's Plaintiff's 655. I would request it be moved into evidence with the same limiting instruction.

MR. THOMAS:  No objection.

THE COURT:  All right it's admitted into evidence with the same instruction regarding it's not for the truth.

Q   (By Mr. Burkholz) An what is your analysis of this an familiar lift report in relation to your opinion in this case

A.  First of all, UBS uncrown bank much Switzerland.

A.  It's another wall street bank it's an interfaultal financial watch an following news, they wrote that Exxon had performed a similar analysis in 2015 an 2 took no write-downs then despite the fact that oil prices were low then. And now they're debooking now. So this races questions for us. So they wrote racing questions over its evaluation process and I just want to point out that it's an art how to write analyst reports it's also an art how to read them. This is very delicate language.

A.  Someone else might have written: What the heck is doing on.

Q.  And do you teach a course at back son regarding the writing of analyst reports?

A.  I do.

111

Q.  And have some your students gone ton become an familists at Wall Street banks?

A.  Right it's a program I developed at back upon and are are there issues with respect to how analysts criticize companies and how you interpret what they say in these kinds of reports. There S there's did shall-there's analysts are very careful not to offense the company. They have to be. They have to cover the news but they also have to be very careful not to offense the company for essentially two reasons:

One is they got to keep the lines of communication open with the company. At these press conferences if you said something bad about the conditioning they may not call on you to answer a question. The others is the bank that they work for do business with ex ons an makes tens of millions of dollars to helping antipot fear of these an number lice if you you're use harsh language or if you don't downplay the part Task Force must. Your company might mess out an big deal make lot of judge in you're review. Document in this case the in the out in the pung lick market place, wax there am shared their you'd on the New York stock exchange.

A.  It.

A.  It was.

Q.  And were there?

A.  They were.

Q.  And you recall opinion from from mean another an number Litz

112

that followed company?

A.  About two dozen.

Q.  And why is that important?

A.  Well, it's it addresses the question of is the stock any an of stock. Efficient means it's information that moving the stock plies.

Q.  Okay?

A.  It's not just stock plies isn't just bouncing around random left it's good news. Make go up and the bad nopes. P order to after market to be much in order for us to know that a market search we look at these sort of indicate templets a lot of the analyst else covering the company helps bring information to the company and helps.

Q.  And did Exxon file annual an quarterly reports with the?

A.  Yes they did and it that flow of information is another factor for make efficient stodge and did if's stock price react to new information when it was disclosedded like October 28th.

A.  Absolutely it or did. The statistics prove it.

Q.  And are these if -R or factors indicative of an efficient some of the yes, they are P an a the Defendant's experts in this case provide testimony?

A.  Yep he did at his deposition.

Q.  And did you when you came on to the case were those was that testimony something you looked at?

A.  I did.

**App. 1229**

113

Q.   Okay.  And did you agree with it?

A.   Yes.  Exxon I would agree with his conclusion that Exxon was an efficient stock That is correct it reacted to information.  It wasn't bun theft companies that would just Browns bounce around for no reason.

Q.   This is what we just talked about.  In Slide 15 I just want to show you professor Ferrell's testimony.  And is this something that you reviewed when you first began working on the case?

A.   I did.

Q.   Okay.  And you agree with professor Ferrell Exxon stock trayed in an efficient market?

A.   I do if did you also conduct what's called an event study.

A.   Yes.

Q.   Okay.  Let's -- arranged you did it -- do you it in almost all of your cases?

A.   Yeah.  Event study analysis is one the more upon quantitative financial an fall cease that financial an al lifts conduct from why do the we look at what you did with respect to this case.

A.   Flock so can you explain to the jury what an event stopped at this is an walk through or them through October 28th and your application of the event study to that date.

A.   Okay.  The purpose of an event study is to figure out what made the stock move.  That's it.  Did the stock move because of information?  Did the stock move because all other stocks were

114

moving?  An event study gets at the anticipates to those questions.  Why did the stock move on a particular day.

Q.   A let's look at the first bullet point.  That shows what?

A.   Okay.  So focus option the event at this time on October 28th, 2016 first step is we looked at how much did the stock move.

A.   It's undisputed it fell about 2 and a half percent an that's the right from the only of the day or the clothes prior day to the close at the end of October 28th, 2016 correct.

A.   Right Tim the close on October 28th and did you look to so whether or not that was an abnormal reaction to the typical way that Exxon stock trade.

A.   I did.

Q.   Okay.

A.   It's on.

Q.   Slide 17 can you explain what slide 17 is with respect to your at any?

A.   Okay.  So one might that I that and a half MERS is not a big movement but for a stock like Exxon it is.  It's very unusual.  It's a one day decline of the so all that drop is in one day and for Exxon which is usually very stable it's an out liar.  It's extreme.  What this chart shows is that there were 174 days during the class period between that February date and that October date and during that hup 174 days this were only four days that had declines this big of 2.49 percent but one of them

115

was October 28th.  So this says at that that there were only three others.  So this is a big drop that draws attention.  I mean there were two days where the stock rose that much so in total there's 6 days where the stock moved that much but out 174 percent this tells thank you is a big big move.

Q.   Let's go back to the slide before.  So why don't you explain what's going on with bullet points No. 2, 3 and 4.

A.   So the question is why did it fall?  Why did the stock fall so eventuated days is aimed at address egg that question.  An I convenient study stakes into consideration that one of the influencings on stock prices is the overall stock market.  So you might hear on the nuptial the market was up today or the mark bass down today.  When you hear that in the news what means is the average stock price either when up or down.

A.   Stock market effect that tie that races or before doing the analysis I maybe the reason it until down that testimony of how do he would know it's Exxon news.  Maybe it's just the whole market.  So the -P to see how do Exxon usually correlate with the overall market an account market's moves that day explain the 2.49 percent de guideline so with respect to the second or the third bullet point, the Exxon's oil and gas Pierce.  P.E. E-R-S.  It or in you're analysis did you use something that Exxon used.

A.   Well, you just want it shall-I just want to close up it that second bullet point satisfy that this tide effect the overall can't explain bur because the market was down that day.

116

A.   That can't explain the 2.49 percent.

A.   The just too little of a stock market effect and the then third -R bullet point is about the oil and gas Pierce.

Q.   Yes.  How did you select peer group that you were looking at to seat effect?

A.   Right Mr. of its Pierce on its stock price.

A.   So another effect on the stock price is the industry itself.  So if news tension out that at that would Roy an in the news is bad for all oil companies it will make Exxon stock fall that's calmed strip sector or pre group we February.Ly to measure.  Too and the way to measure is it a to get a group of is chance are similar to Exxon.than define the secretaries or so we can look at the average among those peer companies and see whether it was good news in the sector that did I or bad news in the sector -R that day.  Was this day a good day forth a pill or was this a.

Q.   And how did you see tide which Pierce dops use in your study?

A.   I used the same peer companies Exxon used.

A.   So it's and filings and in its SEC filings annual report arrange the proxy report the company identifies they said specifically we believe our peer group is and they said it was they said it was shell, chef of owe Chevron, B-F or P an total were the four companies they said was their peer great outment, management same companies that Exxon itself identified and said is the best preparation of our peer group.

117

Q.   We showed jury the 20proxy when Mr. Tillerson was on the -P stand.  That's the document you're talking about who Exxon said at the compared to?

A.   That's what you use the I use from.

Q.   I -P?

THE COURT:  Do you use the peer group that the company uses in its SEC filings such as a proxy in all of your cases.

A.   All.  My other cases unless there's one exception if the company doesn't identify appear gripe can't use a gripe peer group but if the company announces an responds to SEC requirements there is what we believe our prior group I use that peer group I take their word for.

Q.   So the fourth bullet point has a an percentage 2.84 percent that is different than the stock price decline that day of 2.49 percent.  Can you explain to the jury why there's a difference an what the per share number is?

A.   So the event study considers the effect of the overall stock market and it also considers the effect of the peer group.  The industry.  And the statistics tell us that between those two effect Exxon stock should have gone up that day.  Not down.  So taking 23450 account how much Exxon stock should have again up based on those OFAC to, event stied I'll tells us what the effect of the Exxon specific news?  And or but the statistics help us re nine or extract out the stock market effect.  The statistics and the event study help us an extract out industry effect.  What's

118

left is the company's competent information effect and that turned out to be 2.84 translate which translate to 2 toll All right an 43 cents per share deadline a de even or Klein of that much.

Q.   And defendant's expert Dr. Ferrell disputes your January 31st analysis and we'll get to that.  But is there any shall -- does he dispute this part of the your analysis?

A.   No -- okay that.  2.43 is calmed the re I'd -L of residual returnment amount.  Our that I found to be a Lee action to Exxon specific news he didn't dispute that.

Q.   Okay.  The?

THE COURT:  I'm going to stop you.  You're a Ph.D. economist and I'm not going to try but is there a simple mathematical formula that you could tell us right now that doesn't require us to become mathematicses of how reached that number?

THE COURT:  This times thatly news this plus that.

THE WITNESS:  Sure there's a formula but it might not be simple I'll explain it, Your Honor from.

A.   I was afraid it wouldn't be simple.

THE WITNESS:  Shall I give it a hot.

THE COURT:  Fake a shot bit wit there's an analysis called regression analysis which looks at the history of stock Exxon stock prices.

A.   It looks at the his I interest of stock market.  You note

119

overall stock market returns and the history of the peer group returns and based on the history comes up with what they calm coefficient shouldn't of the coefficient shouldn't are numbers like gearing ratio between the stock market effect and Exxon plies us an there's another coefficient for the peer drupe that's like the Good morning ratio between the peer group and Exxon stock prices.  Those gearing railroad slows were not 1 to 1.  They build -- I don't have them in the slides but I can at the timette them for youment I they're in nine report my report that is hose gears ash slobs leak let's say 0.7 -P which means if the stock, Exxon should gun -P .percent.  So you mum tiely the tomb stock market already for or for that day times the regression stock market coefficient and you put that number on the black board.  And then you do the them same thing for the peer group.  You take the regression coefficient forth peer group and multiply that by the peer ass group's return from that day.  You multiply those two numbers together and you add that no, ma'am to the look board up and those two numbers up.

A.   There's almost one more number it's calmedment trend effect photographs or negative friend it's usually pretty close to zero.

A.   So you have these three numbers you add those three numbers up and and it you actually sub track from the with 2 had 49 you stub tack from the 2.49.  So because the numbers the three numbers I put on the board and added up would be a negative number, 2.49 my pause negative numbers increases the Exxon

120

specific -- the Exxon information specific effect object stock fleece is the yesterday that you're trying to take out impact.  Stock market and peers on Exxon stock price with respect to the information that came out specific to the company that rite day.

A.   Light right as I was preparing this I was thinking main it's a little bit like I'm re ago fining.  We have the crude which is P 49 and we have to take out some impurities we have to the found the what you're left with the 2.84 percent which trains rights decline of 2.43 rents cause billed Exxon information.

Q.   And the fifth bullet minute refers to statistical a significance at the 99 percent confidential level.  Can you explain to the jury what that means with respect to this data?

A.   Sure.  So someone might sometimes for some event studies they that the re Sid doubtedly return number was just a normal fluctuation.  At that there's random noise or random fluctuation.  Sometimes even efficient much stocks beings go down a little bit or up a little bit for no reason at all that nobody can identify.  That is test to fine out if that's the T or case it's called the T test the T test looks at that 2.4 is that random volume will tilt and the answer is yes.  For this case.  We can legal out random volatility so now we're are certain it's not just a random fluctuation that was information Exxon stock like T was.

A.   T test tells us how confident we can be in that conclusion.  This number is so big that we could be 99.9 percent confidential that it's statistically significant a, not a random good luck

**App. 1231**

121

flakes did this next slide that you talked about earlier does that support the 99 support confidential level that it was wasn't ran tomorrow volatility.

A.    Well this particular slide suggests that it is.  It's the next slide that Probation Office that it is.  Par support this next slide look test 2.84 and it tells you that there was not a single other or other day during the class period where Exxon specific news had a 2.84 percent impact or rather the re Sid dime return after the you take out stock mark and you're was 2.84. This is historically large for Exxon from and a if an going back to the last bullet Pope I noticed that the that bullet point refers to the stock price decline caused by the Kearl disclosure was 2.39.  Can you explain to the your that number in representation to the 2 dollars an 43 crept per share.

A.    Sure.  So this bass an earnings announcement which means there was flood of information coming out about the company. Some good news, some bad news.  So I had to evaluate all that other news.  An assess how much I pack did that other thus have on Exxon stock.  So recall the event study tells you it's Exxon news that's causing the 2 dollars an 43 rent or court reporter drop but it doesn't tell you which news.  Which Exxon news is cause thawing 2.43 crept drop sip had to look at all the news an days aggregate that.  I can tell you how I did that if you like from so you took out 4 crepes for information ma was to the related to the fraud.

122

A.    That's right much the other an that's just -- frankly, the other numbers on net positive.

Q.    People' goat that.  There was 2340 need really to take okay. 2.434 bulk as conservative as possible, I could assign being -P.

Q.    You understand that plaintiffs have two allegations regarding the Kearl misrepresentations and omissions in this case, one on Page 5 regarding crude reserves an one on Page 9 regarding the production?

A.    Flight costs.  That Kearl was not profitable but also Kearl did not qualify to be a proved reserves.

Q.    Did you need to days aggregate this 2 dollar an 39 statements between these two alleged false statements?

A.    Who from and why not.

A.    Because that is two side same coin.  If it's not profitable on a per barrel basis, then it has to be debooked.  And if it's debook, it he's you it's to the profitable.  So the same disclosure corrected both alleged misrepresentations, allegedded false statements.

Q.    So if one of the statements was found to not be fraudulent but the other one was, is it your opinion that the decline on that day would still be related to that false statement that was found to be misleading in the 10-K?

A.    Right because either connecting either of those two alleged false statements would have told the market that Kearl was economically challenged.

123

Q.    Okay?

A.    So either they could have come out and the said it's not profitable and that would have told R about C what they needed to know that it was not profit profitable or they could have said what they did we're going to debook either of those two things on the front end in February would have told market that there was a problem at Kearl from so Litz look.

A.    You need both misrepresentations to conceal the information from the market.

Q.    Let's look at the information a was disclosed on October 28th.  We've already gone through these two slides.  So let's jump to this information.  What did you observe regarding the information that was disclosed on that date?

A.    Well, the big news as some of the analysts pointed out was the Kearl debooking.  That was new and neglect testify and surprising and unexpected.  There was a long list of other news that wouldn't fit on this slide.  Some positive, some negative. But I did analysis that proved it was on net positive?  But did you take four cents out 2 toll All right an 43 cents forth damage related to the Kearl news in your analysis earnings information that that came out that was not related to the fraud.

A.    I thought -- the most -- to be cautious, to be -- to be overIly careful to be the cause churchings shall moth someone could have said other news what impact it might have had would be negative four don't I took that snout what was it with re Steck

124

the earnings news not related to Kearl debooking that you observed.

A.    Well, the things that the analysts point the out were things like be that there was a a temporary disruption in I'm production in Nigeria because of some terrorist activity in Nigeria.  There was a shortfall in how much oil was being produce in the Nigeria and that's one of negative news.  Another piece of negative news was they said renewing margins in the downstream business, downstreaming was.

A.    Positive news that bald it out but I didn't I mean those are the two major pieces of negative news that I had to pay particular attention to.  But what I noticed.

Q.    What is the significance of the your bullet points numbered 3 and 4 regarding the market action expectations for profits going forward?

A.    Right.  What I noticed is that given this big mix of other news which was more of the ordinary kind of sort that comes out each earnings announcement, each quarter, the market's expectations for short-term profits from the company went up, not down.  So most of the other news that came out referred to things that had just happened, and then that might affect just the rest of the 2016, not long-term.  And there are measures of the market's expectation of how the company's going to do too long if forward.  An after much it announce.  That measure wept up, not down, so that's the proof that the other news in aggregate was

**App. 1232**

125

positive news, not negative news.

Q.   And did you observe the quarterly reports of Exxon in the quarters leading up to this quarter?

A.   I did from and was Exxon, because of the low commodity prices, did the market understand that their earnings were -- were not great in those prior quarters.  That's right but this one think said you know some people said it was the best year.

Q.   Of 20of 16?

A.   S of 2016 that the previous one had opinion bad but there within was better than alled others what is the significance of the testimony Kearl news to your analysis on that Tate.  Well, I mean I'm trying to solve a mystery here.  I'm trying figure out why did the stock foams 2:43 cents and I ruled out the mix of other news besides Kearl.  So I had to look again more closely at Kearl.  So I had to ask the question why was Kearl so surprise ex an was that such pad news and that's what this slide has.

Q.   And what is the secretary bullet point in can you explain that bullet point with respect to area analysis or your opinion?

A.   Kearl was unlike the company's other assets in that it was special.  It was supposed to be the solution to a problem the company was having.  For a long time people had been writing about again that its reserves were getting depleted and they needed to find new research to row please the veers.  Kearl was supposed to answer that question.  Knowed or you heard testimony here the commodity business has fluctuate price.  They're out of

126

the chrome.  Company.  So Kearl was supposed to be an asset that was durable, re sill Correct and help the company be recall low I'll.  So if Kearl wasn't searching those purposes, that's big news.

Q.   Okay.  We talked a little bit about Dr. Ferrell.  Pro fess for Ferrell's opinions of the there are certain things that you re reasonable doubt his materials, certain things that he agrees with you and certain things he doesn't agree with you, right.  Right.

Q.   Let's look at Slide 21.  And can you explain slide 21 and the considers of agreement that you have with him?

A.   Okay.  We both agree that Exxon stock was efficient.  It didn't move for no erroneous.  It moved because of information.

Q.   And can you explain bullet point No. 2 with respect to the object 24th, 2016 stock price reaction to the 10-K?

A.   All right.

A.   So if the Al fashion that investors were forced to overpay for Exxon stocks you think there might have to be a date when Exxon stock yum the up and a well the Travis a stock can become overpliesed because bad news is concealed.  News would have made stock price fall is concealed an so it top make stop price to it can and/or still be overprice you'd.

A.   No proses fess or an I can afoped that the FEIN there's no observer jump in stock minuteses gun and what is the ID E. Consensus statements that you both agone on.

127

THE COURT:  Object institution number brokers estimates system.  Else the am.  Company slam in the field.  Mesh unusual estimates.

A.   The house the market feeling about personal In other words the a such rape company essentially.  There eat recognized leader.

A.   I used eye necessary orbed to identify that the if or to identify that the market sent for future profits in the short-term went up and I-B-E-K or S with slashes.

Q.   And prone fess officer Ferrell in his deposition sailed he's often used it and he agrees the estimates are reliable.

Q.   He use us a different company and we'll get to that but he agreed with you you that eye best at least is reliable?

A.   Right.  It became a question and.

MR. TOAL:  Your Honor or purpose this is a yep answered file leak we're.

THE COURT:  Sustained.

MR. THOMAS:  Thank you.

Q.   Let's move on.

THE COURT:  Let's break.

MR. BURKHOLZ:  Thank you, Your Honor.

THE COURT:  All right.

A.   Intell see you'll atom at 9:00.  Thank you.  Don't talk about the case.

>>:  All rise for the jury.

128

(jury escorted to the Jury Room by the Court Security Officer and excused forth east N (.

(.

THE COURT:  Y'all need anything on the report before I let Debbie go.

MR. BURKHOLZ:  No.

THE COURT:  Okay, great.  (court adjourned at 4:55 PM)

**App. 1233**

# Exhibit 34

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

PEDRO RAMIREZ, JR., Individually     )
and on Behalf of All Others          )
Similarly Situated, and GREATER      )
PENNSYLVANIA CARPENTERS PENSION       )
FUND,                                )
                                     )
              Plaintiffs,            )
                                     )
        vs.                          )  No.  3:16-CV-03111-K
                                     )
EXXON MOBILE CORPORATION,            )  CLASS ACTION
REX W. TILLERSON, ANDREW P. SWIGER,  )
JEFFREY J. WOODBURY, DAVID S.        )
ROSENTHAL,                           )
                                     )
              Defendants.            )
_____ )

VOLUME 4A
BEFORE THE HONORABLE ED KINKEADE
UNITED STATES DISTRICT JUDGE
MAY 1, 2026
DALLAS, TEXAS

FOR THE PLAINTIFFS:

    JOE KENDALL
    KENDALL LAW GROUP
    3811 Turtle Creek Boulevard, Suite 825 Suite 880
    Dallas, TX  75229
    (214) 744-3300

    SCOTT H. SAHAM
    NATHAN R. LINDELL
    SAM SHELDON
    ERIKA OLIVER
    T. ALEX B. FOLKERTH
    SARA BIERL POLYCHRON
    SPENCER A. BURKHOLZ
    ROBBINS GELLER RUDMAN & DOWD, LLP
    655 West Broadway, Suite 1900
    San Diego, CA  92101
    (619) 231-1058

    BALON B. BRADLEY
    BALON B. BRADLEY LAW FIRM
    11910 Greenville Avenue, Suite 220
    Dallas, TX  75243
    (972) 991-1582

    MICHAEL SWIDERSKI
    (Party Representative)

FOR THE DEFENDANTS:

    THOMAS M. MELSHEIMER
    AUSTIN E. SAATHOFF
    EMILY WILKINSON
    DAVID T. HINOJOSA
    KING & SPALDING, LLP
    2601 Olive Street, Suite 2300
    Dallas, TX  75201
    (214) 764-4446

    NINA CORTELL
    JASON JORDAN
    HAYNES and BOONE, LLP
    2801 N. Harwood Street, Suite 2300
    Dallas, TX  75201
    (214) 651-5000

    AUDRA J. SOLOWAY
    DANIEL TOAL
    THEODORE V. WELLS
    LYUBA SHAMAILOVA
    AMITAV CHAKRABORTY
    DAPHNE THOMPSON
    PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
    1285 Avenue of the Americas
    New York, NY  10019-6064
    (212) 373-3000

    SCOTT C. THOMAS
    LATHAM & WATKINS
    100 Crescent Court, Suite 7084
    Dallas TX  75201
    (713) 546-5400

    D. PATRICK LONG
    SQUIRE PATTON BOGGS
    2200 Ross Avenue, Suite 4100w
    Dallas TX  75201
    (214)758-1500

(Rex Tillerson)

PATRICE CHILDRESS
(Party Representative)

Proceedings reported by mechanical stenography,
transcript produced by computer-aided transcription.

--------------------------------------------------------

PAMELA J. WILSON, RMR, CRR
Federal Official Court Reporter
1100 Commerce Street, 13th Floor
Dallas, Texas 75242
pam_wilson@txnd.uscourts.gov
(214) 662-1557

VOLUME 4A - MAY 1, 2026

**P R O C E E D I N G S**

(Outside the presence of the jury.)

THE COURT:  Okay.  On the record but outside the presence of the jury, yesterday there was an issue with regard to comments by the plaintiffs on Plaintiff's Exhibit Number 698, with an attorney, Burkholz, commented on the redactions and asked some other questions regarding that. The defendants objected at the end of that colloquy and I said I would -- I would look at it.  I did.  And I gave my own curative instruction.

And both of the other sides' -- both the plaintiffs and defendants had their own curative instructions, which I chose not to use either of them.  And I have them both here and I will put them in the record as being requested timely, or at the time, and that I denied each of them.

I don't -- I don't recall exactly my own instruction, but it's in the record, and did -- was not as long as either of these.  And so I'm putting both of these proposed curative instructions in the record at this time.  And there's no objection to that, I assume.

MR. SAHAM:  No objection, Your Honor.

THE COURT:  I mean, we're just putting it in the record.

MS. CORTELL:  Your Honor, --

**App. 1234**

THE COURT: Anything else you want me to do?

MS. CORTELL: We would like the court to note that we continue to object.

THE COURT: You continue to object, you have properly objected.

MS. CORTELL: Thank you, Your Honor.

THE COURT: Okay. Did that take care of it?

And that these will be in the record and that you objected and you want me to even now do something more about it and I have -- I have refused.

MS. CORTELL: Thank you, Your Honor.

THE COURT: Okay. Thanks.

Okay. Off the record.

(Discussion off the record in open court.)

THE COURT: All right. Now, on the record.

What were you going to say?

There was a voice from the right side of the courtroom.

MR. MELSHEIMER: I was just going to say that it's nice that Ms. Soloway's Stretch Armstrong is life-size.

THE COURT: It may be. It could be.

I may decide to do that.

**Off the record.

(Discussion off the record in open court.)

THE COURT: Here we go.

MR. SAHAM: Please go to page 69, lines 11 through 15.

THE COURT: Oh, and so you're going to say there's something in this email that contradicts that?

MR. SAHAM: Yeah. If I may, Your Honor --

THE COURT: Yeah.

MR. SAHAM: -- he said plaintiffs will not --

THE COURT: Did you say "yeah"?

MR. SAHAM: I did not, Your Honor.

THE COURT: I think you did.

We can check on the record.

MR. SAHAM: I'm sorry if I did.

THE COURT: Something on the Eastern and West Coast. I don't get it.

Go ahead.

MR. SAHAM: My apologies, profuse apologies --

THE COURT: Quit apologizing, just don't do it.

MR. SAHAM: Okay. "Plaintiff's will not show you a single document, not an email, not a text message, not a memo, showing that Mr. Tillerson or Mr. Swiger or Mr. Rosenthal said anything like 'Make these numbers work. Don't follow the rules.' Those documents don't exist because that never happened."

Now, Mr. Wells -- so we've got two of the greatest lawyers in the United States.

THE COURT: They're probably going to like that.

MR. MELSHEIMER: Can we remain standing?

THE COURT: Well, whatever it is, it won't be tall enough for what you want.

(Laughter)

Yeah. Go ahead.

So let me see what this letter says.

MR. SAHAM: Yeah. I'm going to show you, Your Honor.

THE COURT: There you are again.

MR. SAHAM: I apologize.

THE COURT: I'm going to get you a jar. Every time you do it --

MR. SAHAM: A dollar in there.

THE COURT: $100.

MR. SAHAM: $100.

Mr. Burkholz will give me the money.

So if we could go to Exhibit 760, page 2. This is a letter from March 16th, 2015, to the court in New York, Justice Ostrager, signed by Mr. Wells. "ExxonMobile determined that, however, despite the company's intent to preserve the relevant emails in both of Mr. Tillerson's accounts, due to the manner in which email accounts had been configured years earlier and how they interact with the system, these technological processes did not automatically extend to the secondary email account."

THE COURT: So let me make your argument for you.

You're going to say this: We don't know what he may or may not have said because we don't have a complete record of his email account.

I think that's what those fancy words in that letter say. Is that right?

MR. SAHAM: Correct, Your Honor.

And I believe after opening argument I -- I requested a curative instruction and you told Mr. Melsheimer I can say it and he said when and you said whenever he wants. And I want to now, with Mr. Tillerson. And that -- I was aboveboard. I don't think I needed to send these exhibits to them, but I wanted this blessed beforehand. I sent them last night.

But I want to -- if Mr. Tillerson doesn't answer the questions I need something to --

THE COURT: What's the question you're going to ask?

MR. SAHAM: Well, the question: Did you have two email accounts; did you become aware that one of them wasn't preserved.

Now, Mr. Melsheimer knows all this because he signed a motion in limine number 8, where he --

THE COURT: Okay. And the answer is yes and yes to both of those.

MR. SAHAM: Yeah. Then I wouldn't --

PAMELA J. WILSON, CSR/RMR/CRR

**App. 1235**

THE COURT:  There's a third yeah.  Go ahead.

MR. SAHAM:  I guess when I get excited I say yeah.

THE COURT:  Well, you're up to $400.

(Laughter)

MR. SAHAM:  We'll keep close tally.

THE COURT:  I will, don't worry.

All right.  So that's what you want to do.  And it doesn't seem to me you have to put that letter in to say that.

MR. SAHAM:  Only if Mr. Tillerson fights me.  If he says "I don't know" I believe I would be entitled to -- these are admissions of a party opponent, their lawyer's, Exxon's lawyers, Mr. Tillerson's lawyers.

Also with respect to the opening --

THE COURT:  Well, they're going to make the other argument which is you still haven't offered anything and you're going to say, well, we haven't because there might be something here we don't know about.

MR. SAHAM:  Right.

THE COURT:  You don't have a document that says these things up to this point.  Am I correct?

MR. SAHAM:  Well, other than the documents that have been presented to the jury.

THE COURT:  Other than what you've already presented.

MR. SAHAM:  Correct.  But we know -- what we do know factually is there was a whole another email account that was not preserved that Mr. Melsheimer --

THE COURT:  Fine.  You can say that.

MR. SAHAM:  Okay.

THE COURT:  What are you going to say?

MR. TOAL:  So this letter is also part of the New York Attorney --

THE COURT:  I'm not going to let him get that letter in.  He's not going to get that letter in.  Because he's going to ask Mr. Tillerson.  Mr. Tillerson is going to admit, "Yes, I had this other email account and I had because" -- whatever reason he had it.  I get it.  You've told me.  That's it.

MR. SAHAM:  And then I would be also be able to ask him "And you're aware that it wasn't preserved."  And if he says yes --

THE COURT:  That's fine.

MR. SAHAM:  -- then I move on.

THE COURT:  That's fine.

MR. SAHAM:  If he says no --

THE COURT:  He's not going to say no.

MR. SAHAM:  I wouldn't think so.

THE COURT:  We already know the answer.  So that's as far as we're going to go.  I'm not going to let the camel put its nose any further into that tent.  Okay?

MR. SAHAM:  Understood, Your Honor.

THE COURT:  All right.  So don't do it.

We're not going to go into this trial up there -- let me tell you, you want to get into that trial very much --

MR. SAHAM:  No.  No.  No.  We would never do that, Your Honor.  We would redact the document in its entirety.

THE COURT:  You don't want to do it because it's -- it's -- it's pretty supportive of Exxon and how they operate and they go up there and have that big trial, which I know a whole lot about, and -- and they came out on top.

MR. SAHAM:  And we stipulated --

THE COURT:  Who was the trial lawyer on that?

MR. TOAL:  Mr. Wells and I.

THE COURT:  Then you're going to get to stand up taller than that lawyer down there on the end.  Okay?

You have proven yourself.  And we've got this lawyer down here still talking about it.

MR. SAHAM:  Your Honor, the parties have stipulated that there will be no reference to the New York AG.  The letter would not refer to anything except for that sentence.

THE COURT:  I'm not going to let you put that sentence in.

MR. SAHAM:  As long as -- but I would be able -- if he didn't say yes.

THE COURT:  We'll get there -- if we get there, we'll get there.

MR. SAHAM:  Understood.  Understood, Your Honor.

THE COURT:  Mercy -- we're not even near crossing the Delaware yet.  We're just not there.

MR. SAHAM:  Understood.

THE COURT:  I know you want to anticipate, I get it.  I understand.  But we're just not there yet.  Mercy, he's sitting right there.  He can hear all this discussion.  I think I know what he's going to say, and you do too.

I mean, if he says something else we'll have a break and we'll deal with it then.  How is that?

MR. SAHAM:  That is perfect, Your Honor.

THE COURT:  Whoa, I'm going to write that down.

All right.  What were you going to say?

MR. TOAL:  Thank you, Your Honor.

THE COURT:  Wow.  That's good.

All right.  Y'all are characters, that's all I have to say about that.  Very -- in a good way.  Good way.

(Laughter)

Oh, my.  This is -- this has been one of the joys of my life, trying this case.  I really -- y'all are good lawyers on both sides and I just really like it.

MR. MELSHEIMER:  We share that, Your Honor.

THE COURT:  You like each other?  Good.

All right.  We'll get through it one way or the other.

And I'm going to tell you right now, whoever wins, it isn't because you hadn't had really good lawyering and very expensive lawyering on top of that.

Okay?

And you've got a chart up here -- okay we're -- who's up?

MR. SHELDON:  Your Honor, Sam Sheldon.

We're still doing Mr. Madden.

THE COURT:  Are you going to use this chart?

MR. SHELDON:  Yes, sir.

THE COURT:  Okay.  Great.  Thank you for saying yes.

MR. THOMAS:  Your Honor, when he does that is it okay if I move into the well so I can see it?

THE COURT:  As long as you don't get into the box with them.  I'll remind the jury that y'all can do that.  In fact, I don't know if where you're sitting in number one if you can see the witness very well.

MR. THOMAS:  That's why I moved over.  I'm in number 2.

THE COURT:  I think I would sit in number 2 if I was trying to --

MR. THOMAS:  That's what I've done, Your Honor.

THE COURT:  But y'all do whatever you want to do.

I don't care.  Y'all can get up, stand up, move back, whatever.  You got to be able to see right here.  That's one of the reasons I had them cut the podium down as low as I could.

MR. THOMAS:  It's pretty low, Your Honor.

THE COURT:  I know, all you tall people.

All right.  But -- but you can see -- you can see the witness?

MR. THOMAS:  Yes, Your Honor.  There's a line of sight right here.

THE COURT:  Can you?

MR. TOAL:  I -- I can see the witness, but it's Mr. Thomas' witness.

THE COURT:  I'm fine with that.

Ms. Soloway was having to kind of look all around.

Ms. Soloway, if you need to get up, that's fine.

MR. SOLOWAY:  Thank you, Your Honor.

THE COURT:  Or -- or you can do it like my wife does and get one of those big pillows and sit up real tall.  Either way.

MR. SOLOWAY:  Thank you, Your Honor.

THE COURT:  Okay.  All right.  Here we go.

Where is the pen?

MR. MELSHEIMER:  They defiled my exhibit.

MR. SHELDON:  They took a picture of it for you.

MR. MELSHEIMER:  Thank you.

THE COURT:  Whose -- whose board is that?

MR. MELSHEIMER:  It's Your Honor's board.

THE COURT:  Well, you defiled my board.

MR. MELSHEIMER:  With the court's permission.

THE COURT:  We have a picture of that?

Make sure -- it's a demonstrative, wasn't it?

MR. MELSHEIMER:  Yes, sir.

THE COURT:  Y'all ought to use those papers so we can tear it and you can put it back on the thing.  That's what I would do, but it's not my trial.  I don't care.

Okay.  Here we go.

You know, your -- your demonstrative will get erased, too.

MR. SHELDON:  I couldn't hear you.

THE COURT:  Your demonstrative will get erased.

MR. SHELDON:  I'll take your advice.  It's easier, then we can tear it off for the record.

THE COURT:  Then you can tear it off and use it in your closing argument.

There's Mr. sick Balon Bradley showing back up.

MR. BRADLEY:  Old.

THE COURT:  Agreed.

And you may want a different kind of marker.

We have some good markers for 'em?

Is it the big Sharpie or the wide Sharpie?

MR. SHELDON:  It's a little one.

THE COURT:  Y'all get the big ones.

Off the record.

(Discussion off the record in open court.)

(Back in open court in the hearing of the jury.)

THE COURT:  Okay.  Bring 'em in.

THE SECURITY OFFICER:  All rise for the jury.

THE COURT:  Good morning folks.

THE SECURITY OFFICER:  United States District Court in and for the Northern District of Texas is now in session, the Honorable United States District Judge Ed Kinkeade presiding.

Let us pray.

God bless these United States and this Honorable Court.

THE COURT:  All right.  Y'all be seated.

Thank you.

Well, I thought it was going to be wildly rainy today.  I wasn't trying to lie to you about it.  It's not going to.  It's just going to sprinkle and be cold.  I don't know.  Whatever.

It may be cold in here or warm, I don't know yet.  We'll try to keep it like we've kept it before.

Okay.  We're back and we're still in cross-examination for a few more minutes, correct?

MR. SHELDON: Yes, Your Honor.

THE COURT: Okay. Here we go.

MR. SHELDON: May it please the court.

THE COURT: Yes. Absolutely.

DIRECT EXAMINATION (Cont.)

BY MR. SHELDON:

Q. Good morning, Mr. Madden.

A. Good morning.

MR. SHELDON: Can we pull up Exhibit 338? This has already been admitted into evidence.

And page 7 of 23.

And if we could blow up the chart on the bottom.

THE JUROR: The board is blocking our view.

THE COURT: Thank you. Sorry. I'm down here taking notes, not paying attention.

Appreciate it.

We'll move it and we'll move it back.

BY MR. SHELDON:

Q. Good morning, Mr. Madden.

A. Good morning.

Q. If we could look again at October of 2015, the red represents sales to -- third-party sales to Edmonton; is that correct?

A. Edmonton and Hardisty, yes.

Q. And the blue represented the third-party sales to the United States?

A. To the Gulf Coast, yes.

Q. And those were occurring in October of 2015?

A. On the October 2015 bar?

Q. Correct.

A. Yes.

Q. Now, if we could go back to Exhibit 335, page 20 of 20.

MR. SHELDON: And if we could blow up, Michael, the Kearl bitumen realization.

BY MR. SHELDON:

Q. So, sir, we see the date at the top, "Bitumen Realization Estimate," October 19th, 2015. Is that correct?

A. Yes, that's correct.

Q. And once again this is one week before the October 26, 2015 meeting with Mr. Tillerson?

A. It is.

Q. And we see Kearl Bitumen Realization. Do you see that to the right?

A. I do, yes.

Q. And then we see the date. October 19th.

A. Yes.

Q. And then we see that's MTD is month-to-date; is that correct?

A. It is, indeed.

Q. And so these are actual figures for the sales that would have occurred that we saw on Exhibit 338, correct?

A. The rest of it's for them for those sales, yes.

Q. You said what?

A. The title was it's estimate, so I think it's probably estimates for those sales, yes.

Q. Okay. And those sales are actually occurring though -- are occurring?

A. They -- they are occurring, yes.

Q. And, again, I didn't discuss with you the bitumen realization. Let's -- let's start with MTD Enbridge, and that's the sales that are going from Kearl to Edmonton; is that correct?

A. That is correct.

Q. And we see for those sales it was $1.70 transportation costs, correct?

A. We do see that, yes.

Q. And then we see bitumen realization for those sales to Edmonton of $25.14; is that correct?

A. We do.

Q. Okay. And then if we look at October MTD Keystone, those are the sales going through the pipeline to the United States Gulf Coast?

A. They are, yes.

Q. And, again, we see for those sales in October the cost of transportation is $12.12; is that correct?

A. Yes. On this basis, yes.

Q. And then we see a realization of $17.44 per barrel.

A. We do.

Q. And so that is $7.70 than the realization for the sales to Edmonton; is that correct?

A. $7.70 lower?

Q. Correct.

A. Yes, it is.

Q. So, in essence, in easy terms, you're making $7.70 less than the sales to Edmonton?

A. On this basis, this is a full-cost basis. Yes.

Q. Okay. And if we do the same thing with the sales by rail, for October MTD rail -- those are going by rail to the United States, correct?

A. Yes. If we had some, yes.

Q. Okay. And for those it would be $16.50 a barrel.

A. It would.

Q. And the realization of those would be $11.71.

A. If we did sales that way they would, yes.

Q. And so if we subtract $25 from what you're getting in Edmonton from the 11.71 that you're getting by rail to the United States, that would be $13.43 less; is that correct?

A. It is.

Q. Okay. What I want to do is I'm going to -- actually, so I don't have to keep going back and forth, I'm just going to

write this on here and so we can refer to it.

MR. SHELDON:  Where can we put this?

Because I want to use that, Your Honor --

THE COURT:  Well, let's see.

Maybe right here.  Is that going to mess you up, Pam, if they put it right there?

But they still can't see it.  Right over here, Ronnie.

Where is Vanna White when you need her?

Turn it this way.

Now, success.

MR. SHELDON:  This is all Mr. Melsheimer's fault.

THE COURT:  It is his fault.

BY MR. SHELDON:

Q.   Sir, for the record I've hand-wrotten out some numbers.  Let me just make sure we're on the same page.  I wrote out October 19th 2016.  Do you see that?

A.   Yes.

Q.   And then I wrote $1.70 for the transportation?

A.   For the Edmonton piece.

Q.   And then you see I wrote down $25.14 realization?

A.   I do.

Q.   And then I wrote U.S. pipeline.

A.   Yes, I do.

Q.   12.12 transportation?

A.   Yes.

Q.   And then 17.44 realization.

A.   I see that, yes.

Q.   And then I wrote U.S. rail $16.50 transportation.  Do you see that?

A.   I do.

Q.   And $11.71 realization.  Do you see that?

A.   I do.

Q.   And the numbers I handwrote accurately reflect what we see on page 20 of 20 of Exhibit 335; is that correct?

A.   They are the same numbers, yes.

Q.   Okay.

THE COURT:  Oh, I let both sides, because it's hard to see, they can get up and walk around when we have these kind of charts.

All right.  Go ahead.

BY MR. SHELDON:

Q.   If we could go to Exhibit 117, page 2 of 2.

So we ended the day yesterday, Mr. Madden, with your email discussing your characterization of Mr. Tillerson's feelings of the October 26, 2015 meeting.

Do you remember that?

A.   We ended with my summary of the meeting, yes.

Q.   Yes.  So what I want to do is actually discuss what occurred at this meeting.

MR. SHELDON:  So, sir, if we can go more up top,

Michael.

BY MR SHELDON:

Q.   So we see "CONFIRMATION" --

MR. SHELDON:  Now you can zoom in.

BY MR. SHELDON:

Q.   This was a meeting on October 26, 2015, correct?

A.   It was, yes.

Q.   And we see the meeting time, 1:30 to 2:00?

A.   Yes.

Q.   And the only thing that's being discussed at this meeting is "Kearl Reserves Update."  Is that correct?

A.   That is correct.

Q.   And before you talked about meeting with Chairman Tillerson on a monthly basis where there was other issues being discussed?

A.   I did, yes.

Q.   But this meeting the only thing that's going to be discussed is Kearl, correct?

A.   In this half-an-hour meeting here?

Q.   Yes.

A.   Yes, it was.

Q.   And we see that Mr. Tillerson is an attendee?

A.   We do.

Q.   And Mr. Swiger is an attendee?

A.   Yes.

Q.   Mr. Rosenthal?

A.   Yes.

Q.   And then Mr. Strawbridge is the presenter?

A.   Correct.

Q.   And then Mr. Walters?

A.   Yes.

Q.   There's several other names but Mr. Walters is at the end?

A.   He is.

Q.   And, as we discussed yesterday, you and Mr. Walters flew up that morning from Houston on ExxonMobile's plane to come to the meeting?

A.   We did.

Q.   And at that time ExxonMobile's headquarters was still located in Irving?

A.   It was, yes.

Q.   And when did it relocate to Houston, Texas?

A.   I can't remember exactly, but it's in -- was it 2022 or '21?

I can't remember exactly, but around that time.

Q.   And before this meeting you had met with Mr. Tillerson several times, correct?

A.   Yes, I had.

Q.   And including this meeting when speaking to Mr. Tillerson you never intentionally lied to him; is that

Q. correct?

A. That is correct.

Q. Okay. Now, before we get to what actually happened at this meeting I want to go back to 590 to set the table again.

MR. SHELDON: Exhibit 590. And go to the top email.

BY MR. SHELDON:

Q. And once again, a day before this meeting you received an email from Mr. Strawbridge.

This is Exhibit 590. Do you see that?

A. I do see that, yes.

Q. Do you see October 25th, 2015?

A. Yes, I do.

Q. And he says to you "Thanks Andy. The last back-up charge (sic) was requested by David Rosenthal based on his earlier discussions with the chairman. Evidently a lot of his discussions have centered around U.S. pricing for Kearl and he wanted to make sure we could describe the various sales options for Kearl. Hopefully we won't have to use."

Do you see that?

A. I do see that, yes.

Q. And so you went into the meeting knowing that Mr. Rosenthal, the controller, and Mr. Tillerson, the chairman and CEO of ExxonMobile, have had a lot of discussions around U.S. pricing for Kearl, correct?

A. That is correct.

Q. And then you also went into the meeting knowing that Mr. Rosenthal had told Mr. Strawbridge to include a backup chart, correct?

A. I did from this email, yes.

Q. So let's go to the backup chart, which is --

MR. SHELDON: Let's go back to Exhibit 117. And I believe it's 11 of 11.

BY MR. SHELDON:

Q. And we see at the top this is entitled "Kearl Value Chain - Bitumen Sales Options," correct?

A. We do, yes.

Q. And this is the chart that Mr. Rosenthal told Mr. Strawbridge to include for the meeting.

A. It is, yes.

Q. And then we see on the U.S. side U.S. sales excluded from SEC price, correct?

A. We do.

Q. And at the meeting did Mr. Tillerson ever ask why are we excluding U.S. sales from the SEC price?

A. I don't recall the details -- that being discussed, no.

Q. Did Mr. Swiger ever ask at the meeting why are we excluding U.S. sales from the SEC price?

A. I don't -- I really don't recall.

Q. And finally, once again, did Mr. Rosenthal ever ask that question?

A. I don't recall that.

Q. Now, let's go to page 10 of 11.

Now, this is Kearl SEC Bitumen Pricing Process.

Do you see that?

A. I do, indeed.

Q. And it's an example of the SEC pricing for the month of October 2015?

A. Yes, it is.

Q. And you were at the meeting, correct?

A. I was.

Q. And you're the Vice President of Supply and Transportation?

A. Yes.

Q. And you're the person that has all the records for Kearl sales for 2015; is that correct?

A. My organization has records for those sales.

Q. And your organization also has records of the sales of the geographic locations?

A. They do.

Q. Including the United States?

A. Yes.

Q. And did Mr. Tillerson ever ask you, well, what is the transportation costs for sales to the United States by the pipeline?

A. In this meeting?

Q. Yes.

A. Not that I recall.

Q. Did he ask you that before the meeting?

A. At any time, I -- I mean, I'm sure we have discussed transportation of crude oil at other meetings when I met regularly with him, but I don't recall any details.

Q. And if he would have asked you at the meeting what are the transportation costs for U.S. sales as of October 2015, you would have told him they're $12.12 by pipeline, correct?

A. In that vicinity, yes.

Q. And you also would have told him -- if he asked you what is the price to transport the Kearl bitumen by rail to the United States you would have told him it's $16.50 per barrel.

A. Or thereabouts, yes.

Q. All right. And if he would have -- well, let me ask you this question.

Did he ever ask you at the meeting what's the difference in realization between the Edmonton price and the U.S. price by pipeline?

A. I don't -- I don't recall discussing that.

Q. Do you recall discussing that before the meeting?

A. I mean, we've had a lot of discussions throughout the -- you know, as -- as the material you've discussed -- you've

shown before, we've always had discussions in the company about how much does it cost to move -- to move oil and what are the realizations, would be a normal discussion in my working activity.

Q.   And in those discussions you would have told him in October of 2015 for the Kearl sales by U.S. pipeline we're receiving $7.70 less than we are for the Edmonton price?

A.   This is on a full-cost basis.  I doubt we'd ever have covered that.

Q.   Okay.  But you saw in the email that I showed you, the day before Mr. Tillerson and Mr. Rosenthal are having discussions regarding U.S. pricing?

A.   Yes.  Absolutely.

Q.   And did you ever have any discussions with Mr. Tillerson regarding the realizations at the meeting by U.S. rail versus Edmonton --

A.   In this meeting, no, I don't believe so.

Q.   And what about before?

A.   Not that I recall in detail, but it wouldn't be an unlikely thing to talk about the -- the transportation around the U.S.

Q.   Okay.  Now, Mr. Madden, you were the Vice President of Supply and Transportation, you were eligible to receive bonuses; is that correct?

A.   Yes, it is.

Q.   And you once received approximately a $1 million bonus; is that correct?

A.   Yes, that's correct.

Q.   And when you received that $1 million it was the largest bonus you'd ever received at the time as the Vice President of Supply and Transportation?

A.   I'm not certain, but may have been.

Q.   And you received that bonus at year-end 2015, correct?

A.   I did.

Q.   Now, Mr. Madden, you and I until yesterday have never met each other; is that correct?

A.   That is correct.

Q.   We've never spoken on the telephone?

A.   No.

Q.   And we didn't do anything to prepare for your testimony today.

A.   You and I?

Q.   Correct.

A.   No, we did not.

Q.   And the -- you -- the same lawyers that are representing ExxonMobile are also representing you in this case, correct?

A.   Yes, that's correct.

Q.   And ExxonMobile is paying those lawyers to represent you?

A.   I believe so, yes.

Q.   You're not paying them.

A.   I am not.

Q.   And before -- including today, how many times have you met with the ExxonMobile lawyers?

A.   We had I think four meetings ahead of this -- this meeting here, and then we met this week here as well ahead.

Q.   So four meetings before this week?

A.   Yes.

Q.   And how many meetings this week?

A.   We've had a -- three or four meetings this week.

Q.   So you've met a total of seven or eight times with the ExxonMobile attorneys?

A.   Yes.

Q.   And I don't want to go through each meeting, but just tell me approximately for the seven or eight times that you've met with them, how much time, in total, have you met with the ExxonMobile lawyers?

A.   Maybe four -- 25 hours.

Q.   25 hours for all.  I think that includes all seven or eight meetings?

A.   Maybe 25 to 30.  Again, you said you didn't want to go through them all, but about -- about that, yes.

Q.   And approximately how many documents in total have you reviewed when preparing for your testimony today?

A.   You've asked me approximately, so maybe -- maybe 25 documents, 20, 25 documents.

MR. SHELDON:  Pass the witness, Your Honor.

THE COURT:  All right.

THE WITNESS:  Do we need to move this here?

I have to move a little bit to see the screen.

THE COURT:  We'll do whatever you need.

MR. THOMAS:  Just for a second.

THE COURT:  Go ahead, sir.

MR. THOMAS:  May it please the court?

THE COURT:  Yes.

MR. THOMAS:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. THOMAS:

Q.   Mr. Madden, you met with me all those times, correct?

A.   I did, yes.

Q.   Okay.  Are you here to do anything other than tell the truth?

A.   I am not.  I am here to tell the truth.

Q.   Okay.  And the fact that we're representing you, is that changing what you're doing here?

A.   It does not.

Q.   Okay.  And you prepared so that you could testify truthfully and honestly only today; is that correct?

A.   That's correct.  I want to do -- be able to do that.

Q.   Okay.  And you were asked about a million dollar bonus.

**App. 1241**

Do you remember that?

A.   I was.

Q.   Okay.  And did you get the sense that you were asked about that bonus at the end of 2015 because of some insinuation that he was making about the meeting that happened earlier that month?

A.   That's how it felt.

Q.   Okay.  How'd that -- tell the jury how that made you feel?

A.   That made me feel very uncomfortable, because I would never lie, I would never do anything -- I would never change what I did based upon how I might or my not get paid here, I would always tell the truth, here of course, but also in work.

Q.   And by 2015 how long had you been working at ExxonMobile?

A.   By -- so I starred in 1987, so 28 years.

Q.   Okay.  And that million dollar bonus, was it astronomically higher than any other compensation you've ever received in the mid 2010s?

A.   It was not.

Q.   Okay.  You were shown Exhibit 335, I believe.

        MR. THOMAS:  Can you pull that up, Mr. Gooden, Plaintiff's Exhibit 335.

        Oh, my fault.  I apologize.

Can you show the email at the -- at the first of the page, or the first of the exhibit?

        And then zoom into that part.

        Thank you.

BY MR. THOMAS:

Q.   The chart that plaintiff's counsel showed you is pasted in this email, correct?

        MR. THOMAS:  Go back out, please, Mr. Gooden.

        THE WITNESS:  Yeah, go back out.

BY MR. THOMAS:

Q.   It's right there.  That's the same chart he showed you, right?

A.   Yes.  That is the same chart, yes.

Q.   And that's the same chart that he wrote those numbers on right there.  That's where those numbers came from?

A.   That is where they came from.

        MR. THOMAS:  Go back to the paragraph above.

BY MR. THOMAS:

Q.   Mr. Martenak worked for you?

A.   He did.  Tom worked for me.

Q.   When he's talking about those numbers what did he say in the second sentence of his email?

A.   He says, "These are not actual accounting numbers, but mid-month look-ahead and expected numbers based on-average-to-date published prices."

Q.   So the prices that he said were not actual prices for shipping things up and down the pipeline, correct?

A.   That's correct.

Q.   Okay.  We're going to come back to this a little bit later.

        MR. THOMAS:  May I move this now, Your Honor?

        THE COURT:  Sure.

        MR. THOMAS:  You don't want me to touch it?

        Okay.

        THE COURT:  Thanks, Ronnie.

BY MR. THOMAS:

Q.   Now, Mr. Madden, I want to back up a little bit.  You've been on the stand for a couple of hours now and I want the jury to get to know you just a little bit more.

        As has happened before, the judge took some of my questions from me earlier yesterday.  But you said you're from Scotland originally, correct?

A.   Yes.  I was born in Scotland.

Q.   Did you go to school over -- over there across the pond?

A.   Yes.  Not in Scotland but I went to school in -- in England.

Q.   And Where'd you go to school?

A.   I went to Cambridge university.

Q.   And did you graduate?

A.   I did.

Q.   What was your degree in?

A.   It was in chemical engineering?

Q.   What type of degree did you get?

A.   I got a master's degree in chemical engineering.

Q.   Okay.  And then where'd you go to work after graduating from Cambridge?

A.   As soon as I left Cambridge I joined Exxon -- at the time it was Exxon had a refinery on the south coast of the U.K. and I went to work there.

Q.   What day was that?

A.   It was in September -- actually, it was September the 7th, 1987.

Q.   How do you remember your first day at work so well?

A.   Well, AS far as being my first day at work it's actually where I -- I first met my -- met my wife.

Q.   Are you still married today?

A.   We are indeed.

Q.   Where do you live?

A.   We -- we live in Houston, it's on the north side of Houston.

Q.   And when did you move to Houston full-time?

A.   I moved to Houston in 2015.

Q.   And did you live in the U.S. before then?

A.   Yes.  We were living up in the Virginia area.

Q.   And as you sit here today you're a citizen of what country?

A.   Yes, I'm a citizen of the U.S. and of the U.K., but I have U.S. citizenship.

Q.   When did you become a U.S. citizen?

A.   In 2018.

Q.   Thank you.

And let's go back to that first day of work at Exxon.

What was your job?

A.   So my job was as a -- we called it a contact engineer at the refinery in the south of the U.K.

Q.   What's a contact engineer do?

A.   It's a position where you're providing day-to-day engineering support for the operation of a piece of the refinery.

Q.   And over the years did you hold other positions at the company?

A.   Yes.  I held a number of positions over the years.

Q.   Can you tell the jury about one or two of those, please?

A.   So maybe the position which I before I came into the supply area was I was the refinery manager in a refinery we have in Rotterdam in the Netherlands and where I was responsible for the operation of that -- of that refinery.

Q.   We've talked a lot in this trial, I know you haven't been here, about getting things to refineries, but what does a refinery do?

Can you tell the jury what a refinery does?

A.   I can.  So a refinery turns crude oils, which we get out of the ground, there are many different types of crude oil, as you've I think heard, and a refinery turns those crude oils into products that are useful that we can use, like gasoline and diesel and jet fuel and asphalt and chemicals.  And the refinery is doing -- converting that crude oil, all those crude oils, into those finished products.

Q.   And let's now go to the role that -- that you talked about earlier and you just mentioned, the Vice President of Supply and Transportation.  When did you come into that role?

A.   I came into that role in 2012.

Q.   How long were you in that position?

A.   For four years.

Q.   So until about 2016?

A.   Yes, 'til 2016.

Q.   And what were your responsibilities in that role?

A.   So in that -- in that role I had a few responsibilities as the person who led that organization.  And I was responsible for all of the tradings, the buying and selling of crude oil and -- and products where we were selling them in large quantities.

I have also responsible for opt -- for how do we optimize and make the right products from all of our refineries around the world and then also for transportation of crude oil and products and -- for ExxonMobile.

Q.   You said "trading," what do you mean by that?

A.   Trading is buying and selling, in simply terms.

Q.   Buying and selling what?

A.   Buying and selling both crude oil and products like gasoline and diesel.

Q.   And at that time in -- let's focus on 2015.

How many folks were in your group?

A.   Over a thousand were in the group.

Q.   And where were they located?

A.   So there were people working in my group all over the world, including in the USA and Canada but in many locations across the world.

Q.   And let's go back to the 2015 time frame, in 2014 and '16.

A.   Okay.

Q.   That time frame, did you -- you and your group have anything to do with Kearl?

A.   We did.

Q.   What was -- what was your responsibilities as it related to Kearl?

A.   So we were responsible for marketing and selling the Kearl oil.

Q.   Now, when you say "we", what group in your group was responsible for marketing and trading Kearl?

A.   So inside supply and transportation, yes.  So it was -- we had a North America crude trading team that was responsible for doing that.

Q.   Are there other trading teams for other parts of the world?

A.   There are.

Q.   And the North American trading team, did they only trade that bitumen from Kearl?

A.   No, they did not.  They traded other groups.

Q.   Okay.  And you said a word yesterday, and we saw it on one of the exhibits and we'll see it again, "placement".

What is placement?

A.   So placement is a term that we use for the crude oil where it refers to where does that crude oil actually get run, which refinery does it actually go to, whether it's one of our refineries, ExxonMobile's refineries that we place the oil into, or whether someone else buys it and then where they ultimately take it to the refinery to be turned into products.

Q.   Okay.  And why would -- why would you want to know where the crude is going?

A.   Yeah.  So regardless of how we sold it or where we sold it, we're interested in -- we're interested in knowing which refineries were ultimately running the crude so that we can

App. 1243

target our marketing and sales efforts to the refineries that are well-adapted to be running the crude oil?

Q. Are placement and sales the same things?

A. They are not.

Q. Can you sell crude oil somewhere other than where its placed?

A. You can indeed.

Q. And if you sell it at a loca -- let's say you sell it at location A and the refinery is in location B, who pays to get that crude oil from A to B?

A. If you sold it in A and the person who bought it from you at A who wants to take it to B would pay for it.

Q. But you're still tracking placement of that crude even though the buyer transferred it to location B?

A. That is correct.

Q. Now, what were you selling out of Kearl?

A. So we were selling coal blend, so the -- the coal bitumen diluted with diluent.

Q. We've heard the phrase "dilbit", is that the same as Kearl blend?

A. That is the same as Kearl blend, yes.

Q. And "dil" is diluent and "bit" is bitumen?

A. That's correct.

Q. Who are your customers when you're selling this Kearl blend?

A. There are really two types of customers. There are people who operate refineries and -- refining company, who have refineries. And then there's traders. Traders would also at times buy our -- buy our Kearl blend.

Q. And what do traders do?

A. So traders would then buy and then they would then move it or sell it to someone else.

Q. It's traders with a D, right?

A. Yes. Traders. Yes.

Q. And the refineries, do they prefer one type of crude oil over another?

A. What kind of crude oil a refinery prefers depends upon both the location and the -- you know, what the refinery is like -- what -- what facilities the refinery has.

Q. And can a refinery process -- you've heard of light -- light crude, correct?

A. I have, yes.

Q. Like West Texas crude; is that right?

A. Yes.

Q. And can refineries -- are there refineries that can process light crude and heavy crude?

A. There are refineries that can do both, yes.

Q. And those refineries that -- that have options, do they prefer one crude over another?

A. Yes, they do. Refineries tend to prefer the crude oils

that will fit with what the facilities they have are.

Q. Does that impact the price you can charge for that dilbit or Kearl blend?

A. Maybe you could just phrase that again, could you, for me?

Q. Certainly. Certainly. So you have the refineries -- what's the difference between a refinery to a light crude oil or a heavy crude oil?

A. So A heavy crude oil is harder to process, takes more processing. So a refinery that has that processing will be able to and will want to be able to buy the heavy crude oil and process it. A refinery that doesn't have all that processing might prefer a light crude oil. That's a little simplistic but broadly speaking that's -- that's how that happens.

Q. And that refinery that's doing that extra processing, does that cost the refinery more money than processing a light oil?

A. It does. It costs it more work to do it and it also costs it more in terms of having to invest in the facilities to do that.

Q. And does that impact the price that you can charge for a heavy oil, like bitumen, compared to a light oil, like West Texas crude?

A. Yes, it does.

Q. Okay. And what's the impact of the price?

A. So heavy crude will be of lower price than -- than a light crude.

Q. Now, can someone go online or is there a price sheet for how much a barrel of the Kearl blend dilbit costs?

A. No, there's not. Because there's so many crudes it's not a published price. There's no published price for it.

Q. Then how are prices for Kearl's blend of dilbit determined?

A. Well, ultimately oil prices are determined when you're talking to a customer that you're selling, but the way that we would look at how to -- how much do we think it's worth is we would start by looking at some of the markers or very heavily traded crudes that you can get published prices for.

Q. And when you say "markers", like what are you talking about specifically?

A. So a marker is like -- like WTI or like Brent that we hear a lot of is -- it's a -- it's a crude that's so heavily traded that it's -- it -- it's something that we -- that you publish -- the prices are published for it. They move around daily. They're very reliable prices, so they're -- they're -- they're what the industry uses as a starting point for what is the price of oil.

Q. And for the Kearl blend how do you determine a price

PAMELA J. WILSON, CSR/RMR/CRR

**App. 1244**

based off that WTI marker?

A.   How do we do it?

Q.   Yeah.  How do you come to a price?

A.   So you have to make adjustments for -- to the WTI price to get to something that is what you think Kearl is worth.

Q.   What kind of adjustments?

A.   So the adjustments that you'd make would be one for quality.  You -- you -- you talked to me, as we did yesterday as well, about the fact that Kearl is heavier, and so one would be for the quality of the crude and the other one would be for the location or the market where you're selling or buying the crude.  So there would be a difference.  There would be those two factors.

Q.   I think you've talked to us about that quality difference.  Is that called differential?

A.   It would be the quality differential, yes.

Q.   Is there another differential?

A.   It would be the market differential.

Q.   And that's that second adjustment you were talking about?

A.   It is.

Q.   Tell the jury about that market differential.  Why is that there?

A.   The market differential is there because if -- if you take WTI, the marker, it's -- it's for crude traded at

Cushing Oklahoma, so if you're buying or selling that crude, or any other crude at a different location, then you will adjust the price for the location versus Cushing, Oklahoma. So if you're selling it further away from Cushing, it has to be paid for by someone to get it there so you would get a higher price for moving it away from Cushing, Oklahoma.

Q.   You were just talking about transportation costs, is that the same as this market differential?

A.   It's -- the transportation costs we've been talking here, they're not the same, no.

Q.   Okay.  And where can you sell in -- where could you sell in 2015 the Kearl blend?

A.   So we had a -- we had a -- we had quite a number of options.  We could sell it in Edmonton, you know, Edmonton/Hardisty up in Canada.

     And we could also move it by pipeline out to the West Coast, we could sell it out to the West Coast in Vancouver.

     We could have moved it by pipeline into the U.S.

     And we talked about the Midcontinent or the U.S. Gulf Coast and -- and we could sell it there.  We could also sell it in Eastern Canada, moving it there by pipeline as well.

     And then we had the rail option.  We could have sold it to a number of locations because rail goes to more places than the pipeline in the U.S. and Canada

Q.   How did you decide where to sell the Kearl blend out of

all those options?

A.   So -- so -- so we were always looking for how do we make the most money for every barrel that we're selling.  So we were looking at all the different options and looking at how do we make the most money from -- by selling it.

Q.   When you were making that determination, how'd you start figuring out where it is that you could make the most money?

A.   So what we'd -- what we'd do is we would start by looking at, okay, what's the price we could get for -- we could sell it for in Edmonton up in Canada.  And then we would look at, you know, how much would we have to pay to transport it to another market and how much would we get if we sold it in that other market is how we would look at it.

Q.   And can the Kearl blend go anywhere without going through that Edmonton market first?

A.   It cannot.

Q.   And was there any limit on the volume of Kearl blend that you could sell in Edmonton?

A.   No.  We could -- we could -- we could -- we could sell the whole volume if we wanted to Edmonton.  We might not like the price but we could -- we could sell the whole volume.

Q.   In the fall of 2015 -- I want to focus on the fall of 2015, of all those markets that you're talking about was one market more established than the others?

A.   Yes.

Q.   Which market was that?

A.   It was the Edmonton.  It was the Canada market.

Q.   Now, we've seen and heard a lot about U.S. Gulf Coast sales and there were U.S. Gulf Coast in 2015 and '14 out of Kearl, correct?

A.   There were, yes.

Q.   How would you describe the U.S.'s market for Kearl blend in the fall of 2015?

A.   So the U.S. Gulf Coast market was the one -- as there was more Kearl produced it's the one that was growing.  It was fairly new and it was developing.

Q.   Okay.  Was it fully developed?

A.   No, it was not.  There were a lot of refineries buying it who had never bought it before.

Q.   Did you know as much about those other markets as you did about the Edmonton market?

A.   No, we did.

Q.   And if one had said to you in the fall of 2015 that the Gulf Coast was a more representative market for Kearl's blend would you have agreed with them?

A.   No, I would not.

Q.   Why not?

A.   Because, as I just said, it was -- it was developing. We were selling the crude to new customers who were taking it there and -- and it was changing a lot at this -- at this

point in time, and the logistics were developing and changing to get it there as well, so the pipeline and rail network.

Q. So if Exxon sold Kearl blend to someone in Edmonton and it was processed somewhere else, who pays for the transportation costs to get it from Edmonton to that other place?

A. The person who bought it.

Q. And if Exxon sold Kearl blend to someone in let's say the U.S. Gulf Coast who pays the transportation costs to get it down there?

A. If we sold it in the Gulf Coast?

Q. Yes.

A. Yes. ExxonMobile would pay for it.

Q. And I think you've said that the transportation costs to the Gulf Coast were higher than they were to Edmonton, correct?

A. That's correct.

Q. Why on earth would Exxon agree to -- to pay those transportation costs that are in addition to the other costs to get to the Gulf Coast?

A. Because the amount -- we -- we would do that when the amount of money we got for selling it in the Gulf Coast, the incremental amount of selling it in the Gulf Coast versus selling it in Canada more than covered the transportation costs -- the extra transportation costs that we had to pay to move it there.

Q. And you've mentioned -- we talked about Kearl. Is there another place up in Canada selling diluted bitumen?

A. In ExxonMobile?

Q. Yes.

A. Yeah. At ExxonMobile there is. We also have Cold Lake.

Q. So Cold Lake, does it have its own blend?

A. It does, yes. It does.

Q. But it's a blend of dilbit and bitumen, correct?

A. Yes.

Q. How long had Cold Lake being producing its blend in the middle of 2015?

A. Since the mid-1980s.

Q. Okay. And where had Cold Lake's dilbit historically been sold?

A. Been sold?

Q. Yes.

A. In the Edmonton/Hardisty market predominantly.

Q. Okay. When you began -- when did you begin selling the Kearl blend?

A. When the plant started up in early mid 2013.

Q. And when you began selling the Kearl blend in mid 2013, did you as the Vice President of Supply and Transportation have an idea of where most of that blend would be sold?

A. When we started?

Q. Yes.

A. Yes. In Edmonton/Hardisty.

Q. Okay. And why was that?

A. Because it was the established market, because the customers that we were selling to and were used to and wanted to be able to buy it in that location, and so we -- yes, we expected that's where we would be selling most of it.

Q. I'd like to show Plaintiff's Exhibit 339, which has already been admitted and you were shown?

MR. THOMAS: Can you pull that up, Mr. Gooden?

Can you go to the second page, please.

BY MR. THOMAS:

Q. Mr. Madden, do you recall looking at this -- this slide deck?

A. Yes, I do.

Q. Okay. And what is this, Mr. Madden?

A. So this is a summary of ExxonMobile's equity, which is -- so it's our -- our own crude production, our marketing results for the third quarter of 2015, and also our look-ahead to 20 -- to the fourth quarter of 2015.

MR. THOMAS: Can we go to page 6, please, Mr. Gooden.

And can we zoom in on the chart that we've been looking at?

BY MR. THOMAS:

Q. Now, you were -- you were asked a lot of questions about the last three months on this chart. Do you recall that?

A. I do, yes.

Q. Okay. And let's just -- let's just kind of back up a little bit. At the top there's a key with the colors. We've talked about two colors.

What are all -- what does each of the colors represent?

A. So the red one, as we talked about, is -- is Edmonton/Hardisty markets up in Canada.

The blue one is the U.S. Gulf Coast.

The gray one is Vancouver, so on the West Coast of Canada.

And the TMPL is the pipeline that goes to the West Coast of Canada, so it's sales on the West Coast of Canada.

And then the purple is the Midcontinent, and we talked about it yesterday, too, which is the middle of the U.S.

Q. Okay. And we see just two little purple bars kind of in the Spring of 2015. Do you see that?

A. Yes, I see that.

Q. No purple bars anywhere else on this chart, right?

A. No, no other purple bars.

Q. And you were asked about the comparison of the blue and red bars the last three months, but let's work our way backwards.

From June 2015 to the beginning of 2015 where was the majority of Kearl's diluted bitumen blend sold?

A.    It was sold in Edmonton/Hardisty.

Q.    Let's look at 2014.  Where was the majority of Kearl's diluted bitumen sold.

A.    Also in Edmonton/Hardisty.

Q.    And the three months we see for 2013, where was the majority of Kearl's diluted bitumen sold?

A.    Yes.  Edmonton/Hardisty as well.

MR. THOMAS:  Mr. Gooden, can we go to Plaintiff's Exhibit 338, page 7.

And 338 was already admitted, Your Honor.

BY MR. THOMAS:

Q.    You were shown this as well.  This is from --

MR. THOMAS:  Let's show the date of the email, please.

Thank you, Mr. Gooden.

BY MR. THOMAS:

Q.    The date, this is May of 2016, correct?

A.    That -- that's correct, Yes.

Q.    So we have a little bit more information this time than we did at the presentation we were just looking at, correct?

A.    Yes.  2016, yes.

MR. THOMAS:  Okay.  Can we go to page 7, please, Mr. Gooden.

Can you zoom in on the bottom left chart.

BY MR. THOMAS:

Q.    And we see the same chart with five more months' worth of -- of data, correct?

A.    Yes, we do.

Q.    Okay.  And then those -- in November of 2015 where was the majority of Kearl's blend sold?

A.    In Edmonton/Hardisty.

Q.    In October of 2015 where was the majority of Kearl's blend sold?

A.    In October?

Q.    October.

A.    Yeah.  In Edmonton/Hardisty.

Q.    And that's the same all the way through the end of this chart; is that correct?

A.    Let me just check.

Yes, that is correct.

MR. THOMAS:  All right.  What I'd like to do now, Mr. Gooden, is if I could pull up this chart on the left and then Exhibit 331-A, which was the exhibit that he marked, one page of Exhibit 331, or the right -- right -- I don't care which side you do them on, Mr. Gooden.

Side-by-side, please.

BY MR. THOMAS:

Q.    Mr. Madden, while he's doing that, do you remember

seeing this -- this chart --

A.    I'm sorry --

Q.    -- right here, this pie chart on the right?

A.    Yes, I do.

Q.    Okay.  And he asked you about that and you made a distinction in your answers that it was about placement, right?

Do you remember doing that?

A.    I do remember doing that.

Q.    And so what is this pie chart showing us and the jury?

A.    This is showing us for -- through December 2014 where the crude oil that we produced in Kearl, or the dilbit that we produced in Kearl, was placed or was ultimately run, where -- where -- where the refineries that it was run in were.

Q.    Is this pie chart a chart of sales of Kearl's blend?

A.    No, it is not.

Q.    Would you ever use this to tell someone somewhere the sales actually took place for Kearl's blend?

A.    No, you would not.

Q.    And the dates through December 14th, do you see that?

A.    I do, yes.

MR. THOMAS:  Okay.  Could we do the side-by-side, Mr. Gooden?

THE COURT:  I've got a question.

Remind me what placement means versus sales.

THE WITNESS:  Certainly.  Yeah.  So placement is where it actually gets run through the refinery, where the refineries are.

THE COURT:  So it could have been sold before it got there or when it got there?

THE WITNESS:  It could have been either.  It could be the same but it could be also, and often was, that you sell it somewhere else and someone -- and someone takes it there.

THE COURT:  Okay.  Placement just means where it got refined.

THE WITNESS:  That's absolutely correct, yes.

MR. THOMAS:  And following up, may I proceed --

THE COURT:  Hold on.  I only got one more question.

When was the last time a refinery was built in the United States?

THE WITNESS:  I'm not sure I'm absolutely certain but I believe it was around 1970.

THE COURT:  It's been more than 30, 40, 50 years, right?

THE WITNESS:  It has, indeed.

THE COURT:  And so you've got to replace those pumps in those refineries, and the pump business has gone south and they're all now Flowserve, aren't they, most of

PAMELA  J.   WILSON,  CSR/RMR/CRR

**App. 1247**

them?

THE WITNESS: I don't know -- I'm not quite sure who makes -- but Flowserve is certainly a big piece--

THE COURT: You could see cases I've had before. I'm kind of a -- I don't know, I'm an oil and gas judge, I guess. I don't know. Anyway, I just -- I've -- I mean, there's been no refineries built in America since you worked for Exxon?

THE WITNESS: That's correct.

THE COURT: How about other parts -- other parts of the world some?

THE WITNESS: There have been some in the growing markets in -- in Asia have built in refineries, and the Middle East, but not -- not many.

THE COURT: Okay. And I've got one more question. When -- when I go into Walmart, which I try not to do very much -- well, some, or -- or whatever big box store I'm in, they don't negotiate the price. They go, there's your price, you know. I kind of go, hey, I'm a federal judge, you ought to cut me some slack. They don't do that.

THE WITNESS: They don't.

THE COURT: My question is you're on the phone with buyers -- is it on the phone or by email back and forth, whatever?

THE WITNESS: There will be both.

THE COURT: Is there a negotiation?

THE WITNESS: There is.

THE COURT: And are there some hard-nosed people on the other line kind of like lawyers?

THE WITNESS: I'm not sure they're like lawyers, but there are hard-nosed people.

THE COURT: I opened myself up to that. I'm sorry. But it goes back and forth?

THE WITNESS: It does go back and forth, because the people buying it are trying to bet the best deal and the people selling it are trying to get the best deal.

THE COURT: Who is that guy when you were there -- is it one guy or four or five of you doing it, or 25? I don't know.

THE WITNESS: We have quite a lot of people in the North American crude oil trading team who are the people doing that, I can't remember exactly, but maybe 15, 20 crude oil traders who would be doing that.

THE COURT: All day long?

THE WITNESS: Yes. That's their job, preparing for it and then doing it

THE COURT: And since we're dealing with the world, they're doing it all night?

THE WITNESS: We have people -- we have traders in other parts of the world who will be doing it in London or in

Singapore or elsewhere.

THE COURT: Okay. I got a couple more questions. So at the end of the day do you ever go, ugh, we didn't get enough today, they beat me today, the buyers?

THE WITNESS: Sometimes whenever you don't have good other options you feel like they've got the best deal. Yes, there's days like that.

THE COURT: Okay. Go ahead.

BY MR. THOMAS:

Q. A follow-up on the judge's great question there.

THE COURT: Do you notice they always say great after I ask? It's just not true. Go ahead.

MR. THOMAS: I didn't say which one it was, judge.

THE COURT: Oh, okay. Go ahead.

BY MR. THOMAS:

Q. If you don't get the price that you want on that hard-nosed phone call, what can you do with the Kearl blend within the organization?

A. So at ExxonMobile because we have our own refineries we can also -- if we get more value than we can get from selling it, we can take it to our own refineries.

Q. You don't have to take a bad deal from a third party if you don't want to?

A. We don't, which was an important part of our marketing,

that we could do that.

Q. Okay. Getting back to what we were talking about and following up on the judge's first question about the difference between placement and sales --

THE COURT: Wait, I got one more question. I'm sorry. At some refineries there's this really toxic stuff that goes through the refinery, BP -- I know BP has some kind of toxic stuff that goes through -- isn't that true?

THE WITNESS: Well, I'm not sure BP is different from the rest of us in their refineries, but there are -- I mean, the refineries do have -- when you process them you do have some toxic materials that you're removing from the crude

THE COURT: And that only certain pumps can take that without it just eating the metal up?

THE WITNESS: You do have to have some very special metallurgy to deal with some of the products that are there.

THE COURT: And some of those pumps cost a million dollars?

THE WITNESS: Some very expensive equipment, yes.

THE COURT: Isn't that right?

THE WITNESS: Absolutely.

THE COURT: But then you have regular stuff going through there that's not that toxic?

THE WITNESS: Yeah, the different parts of the

refineries -- the refineries are big complex -- big -- some of the streams are much less toxic and -- they're like gasoline. I mean, gasoline is not particularly toxic.

THE COURT: Well, IT would be if I drank it, but you and I are not planning on doing that today.

(Laughter)

THE WITNESS: We are not.

THE COURT: Go ahead.

MR. THOMAS: Thank you, Your Honor.

BY MR. THOMAS:

Q. The chart on the right is placement, right?

A. It is, yes.

Q. And that means that's where the crude was processed, correct?

A. That's correct.

Q. And you said yesterday the Midcontinent is where?

A. The Midcontinent is that middle of the U.S., sometimes it includes a little bit of Canada but it's normally the middle of the U.S.

Q. And this chart is through December 2014, correct?

A. That's correct.

Q. And it looks like roughly half of the placement was in the Midcontinent refineries; is that right?

A. Yeah. 49 percent, yes.

Q. And we looked earlier, in 2014, in the time leading up to 2014, how many sales were there in the Midcontinent?

A. In 2014?

Q. Yes.

A. There were no sales in the Midcontinent.

Q. So how did the crude get from Kearl to the Midcontinent refineries?

A. So the -- the people who bought it will have shipped it via pipeline probably exclusively, maybe exclusively, to the -- to the Midcontinent refineries.

Q. And where would that Midcontinent -- even though it's in the Midcontinent of the United States, where would that have been sold?

A. It would have been sold in Edmonton and Hardisty.

Q. Is there any physical way it could have been sold in the Gulf Coast?

A. There is not.

Q. Why not?

A. Because at this timeframe there are no pipelines that are running north to get from the Gulf Coast up to the Midcontinent area.

MR. THOMAS: Okay. You can pull this down, Mr. Gooden.

BY MR. THOMAS:

Q. Now, this morning you were shown a slide deck from that October 26, 2015 meeting and -- and -- and the pages showing

the SEC price calculation going left to right.

Do you recall that?

A. I do recall that, yes.

Q. And we'll get back -- we'll get back to that in a moment. But do you recall which market was used to determine that price?

A. The Edmonton/Hardisty market.

Q. Okay. Were there other reasons that you in 2013 in your group used the Edmonton market as a measuring stick for sales from Kearl or Cold Lake?

A. Yeah. We tended to use those -- that market for most of our analysis of our sales.

MR. THOMAS: Mr. Gooden, can you go to page 6 of Exhibit 339, please.

This is Plaintiff's Exhibit 339. It's already in evidence, Your Honor.

THE COURT: Okay.

MR. THOMAS: You'll recognize it.

THE COURT: Okay.

MR. THOMAS: 339, please. This is 338.

Okay. Just leave it here.

BY MR. THOMAS:

Q. This is the bar chart we've seen several times yesterday and today, correct?

A. Yes, it is, indeed.

Q. Okay. I want to turn to the very next page in this exhibit.

MR. THOMAS: Can we do that, Mr. Gooden?

BY MR. THOMAS:

Q. This is page 7.

Now, were you shown this during your examination yesterday afternoon or this morning?

A. No, I was not.

Q. Okay. Tell the jury what this is.

A. So this is a chart showing for the -- for where we'd sold Kearl, and how much money had -- have we got for it versus for the Cold Lake that we'd sell -- sold. So the two crudes that we were selling in Canada, what was the -- how much were we getting for each -- the difference between what we were getting for each of them.

Q. And what were you using as the -- the comparison market for these two different products?

A. We were using our sales in -- in Edmonton.

Q. Why were you using Edmonton for this internal analysis?

A. Because it was our biggest market and it was the most established market and it's -- it is the -- it is the most established market. It's the most representative market.

Q. Now, during this October 2015 time frame were there sales in the Gulf Coast from Kearl and from Cold Lake?

A. There were -- there were, indeed.

Q.   Why not use those in this analysis?
A.   Because those markets were developing and changing and less well-established and so this was a market where we had, you know, good reliable data and information.
     MR. THOMAS:  Thank you, Mr. Gooden.
BY MR. THOMAS:
Q.   Now, Mr. Madden we've talked about pipelines a little bit and I want to talk a little bit more about that.
     Are you familiar with the pipeline system that ExxonMobile used in North America?
A.   I am familiar with it, yes.
Q.   Now, when Kearl first came online in the middle of 2013 was there certainty about the sufficiency of the pipeline system?
A.   No, there was not.
Q.   And tell the jury why not.
A.   Because there was a lot of production increase in crude in Western Canada, both ExxonMobile and other companies had also invested so the production -- the amount of oil being produced was increasing and so there was a need to get -- for more pipelines to be either built or expanded to be able to get enough capacity to move it to refineries across Canada and the U.S.
Q.   Was that uncertainty resolved by the middle of 2014?
A.   It was not.

Q.   Tell the jury why not.
A.   Because the production was still growing and the pipelines take time to come on -- to be built.  It wasn't certain which ones would be built, so there was still a lot of uncertainty.
Q.   Did Exxon do anything to try to address this uncertainty in the pipeline system?
A.   We did.  We did a couple of things.
     We did -- we -- we took commitments on the -- for the pipelines, to the pipelines.  And then we also built the rail terminal -- a rail terminal in Edmonton that we could also then use to ship crude
Q.   What do you mean by "commitments"?
A.   Well, so a commitment on a pipeline is where you basically sign a contract to say we're going to ship oil on your pipeline, you know, every month for the next -- I mean, normally they're for long terms, so like ten-years-plus.  And you take a commitment to do that every month that you -- you're going to do that around you're going to pay for it to do that -- you're going to pay to do that.
Q.   And how many commitments did the company take as it relates to Kearl's product?
A.   And so there were two commitments in -- for the pipelines out of Canada.  And we could have used them for more than just Kearl if we wanted to, but because Kearl was

coming onstream - one was on the Keystone Pipeline, which runs out of Hardisty down to the Gulf Coast and one was on Gulf Coast access, which also connects in further west -- east, I'm sorry, and runs down to the Gulf Coast.
Q.   And how is that paid for.
     How are the pipeline commitments paid for?
A.   So what you basically do is you -- you -- you promise, you contractually agree that you're going to pay for that capacity every month for -- for the whole life of the commitment, so for the ten years forward, regardless of what happens.
Q.   And what was the capacity that the company agreed to?
A.   We took out commitments on those two pipelines both for 50,000 a day.
Q.   So a total of a 100,000 barrels a day?
A.   That's correct.
Q.   And what happens if on one of those pipelines you didn't ship 50,000 barrels a day in a month?
A.   You would still pay the -- the -- as if you had shipped 50,000 barrels a day.  You -- you would pay for the commitment of the full 50,000.
Q.   It's like a Netflix subscription, you're going to pay for it whether you watch anything or not?
A.   That's correct.
Q.   Is there -- is there kind of a shorthand name for these

type of contracts in the oil and gas industry?
A.   We call them commitments or take-or-pay is often used.
Q.   What's the take part of take-or-pay?
A.   So the take part is I'm going to take the contract and use it, so I'm going to ship the 50,000 barrels a day.
     And the pay part is I'm going to pay for it even if I don't take -- take use of that commitment.
     THE COURT:  Can you farm it out?
     We're not producing as much right now, maybe Shell wants to take part of this, could you do that?
     THE WITNESS:  You could do that.  If you -- if you couldn't use it yourself you could -- you -- you could farm it out, yeah --
     THE COURT:  Well, what you want to ship Kearl but all of a sudden you want to ship -- what's another product that you would want to put in a pipeline?
     THE WITNESS:  Well, as long as it's another crude, Cold Lake bitumen, for example.
     THE COURT:  Okay.  Can you mix those together?
     THE WITNESS:  You can -- you can certainly ship both of them.  You wouldn't mix them directly, but you could ship -- you could -- you could use it to ship the Cold Lake instead.
     THE COURT:  But there's not a little thing in the middle that goes, oh, this stops that one, this starts this

**App. 1250**

one.  They're going to get mixed a little bit.

THE WITNESS:  They're going to get mixed A little bit at the interface, but it's a little bit just -- and so you just -- you actually put them down one after the other.

THE COURT:  Okay.  Sorry.  I was just curious about that, how that -- how that works.  It's kind of interesting.

All right.  Go ahead.

BY MR. THOMAS:

Q.   Let's take one of these contracts, and just a month in 2015.

Oh.  Let's back up.  You said Keystone Pipeline.

Was there another Keystone Pipeline that was contemplated that never came about?

A.   There was, the Keystone LX Pipeline.

Q.   Okay.  So that -- the Keystone Pipeline exists and the Keystone XL Pipeline was contemplated but never got running.  Is that right?

A.   Never got built.

THE COURT:  How big are these pipelines?

Were they big as a Hoola-Hoop?

You probably don't know what a --

THE WITNESS:  I remember Hoola-Hoops.

THE COURT:  Did they have those in England?

THE WITNESS:  They did?

THE COURT:  I was a Hoola-Hooper.  So bigger than

that, smaller than that?

THE WITNESS:  They do vary in size, depending on what -- how much they're trying to move, but they would be -- those -- that sort of size (indicating), yeah.

THE COURT:  Wow.  And the one in Alaska is bigger -- a lot bigger than that.

THE WITNESS:  It's a -- it's a big pipe, yes.

THE COURT:  Okay.  All right.  Go ahead

MR. THOMAS:  Can I bring you a Hoola-Hoop on Monday, judge?

THE COURT:  Yes, you may.  But I want it to have that little stuff inside that makes that noise when I get going.

MR. THOMAS:  That's the fun part of it.

THE COURT:  There we go.

BY MR. THOMAS:

Q.   So let's take a day in -- or a month in 2015 and one of these pipelines.

If you shipped 50,000 barrels a day, what are you paying to that pipeline company for that month?

A.   So you will pay -- you'll pay the -- you'll pay the -- there's two things you'll pay, actually.

You'll pay the fixed costs of the agreement that you have for the commitment.

And then you'll also pay -- you pay some incremental

costs when you ship it for, you know, some tankage use and some electricity and power when you ship it.  So you will pay the fixed cost, the commitment cost and then a variable piece as well.

Q.   And, as you say, you don't have to actually ship anything at all, but you're still going to get stuck with that fixed cost.  Is that right?

A.   That's correct.

Q.   And then if you are you paying variable cost are you only paying on barrels sold and shipped?

A.   On the variable costs you only pay those for the ones you ship, yes.

Q.   Okay.  So what -- let's take my example and say you only sold 40,000 a day in that same month, what are you paying to the pipeline company?

A.   So what you would pay is you would pay the fixed piece for the full 50,000 you took the commitment for and then you would pay the variable piece only for the 40,000 that you actually shipped.

Q.   When your company -- When your organization and your trading folks, these 15 or 20 trading folks all over the world, selling of ExxonMobile's crude, when they're analyzing the transaction for selling Kearl's blend, do they take into account those fixed costs for the pipeline?

A.   In terms of deciding where to sell it?

Q.   Yes.

Well, they -- they -- those are going to pay whether we move it or not.  So the decision on where we sell it, we don't take those into account because we're going -- we're going to pay it wherever we sell it.

MR. THOMAS:  Your Honor, at this time I'd like to offer Defense Exhibit 1275.  It is not preadmitted.

THE COURT:  While they're looking at that I've got another question.  The plaintiffs are going to ask you this.

How much -- what was the magic amount of new profit did you have to get to decide we're not going to sell it to Edmonton, we're going to sell it down there on the Gulf Coast?

What -- what was that differential?

Did it have to be 10 percent, 15 percent increase?

You looked at that.

THE WITNESS:  Yeah, we did.  We were -- we were always trying to make as much money as we could --

THE COURT:  Well, I get that.

THE WITNESS:  Even if it was just one cent more we were going to make by selling it to the Gulf Coast, once we paid for transportation, we'd move it to the Gulf Coast.

THE COURT:  For one cent?

THE WITNESS:  For one cent.  A lot of barrels but for one cent per barrel.

MR. THOMAS: No objection to that exhibit.

THE COURT: Hey. That exhibit is admitted in evidence.

MR. THOMAS: Thank you, Your Honor.

Can we pull that up Mr. Gooden?

Defense Exhibit 1275.

Can we look at the date of the email, please?

BY MR. THOMAS:

Q. This is another email from Mr. Martenak. We've heard about him. Could you remind the jury who he is?

A. Yeah, He was one of the people who worked in the crude oil trading area for North America. He was head of all of ExxonMobile's group sales.

Q. Okay. He attaches a Kearl/ERT update, October '06 final. Do you see that?

A. I do see that.

MR. THOMAS: Okay. Could we go to page 2, please, Mr. Gooden.

Actually, go to page 20, if we could.

We have a color copy. Thank you.

That's a little easier to see, I think.

BY MR. THOMAS:

Q. And what is this presentation, Mr. Madden?

A. So this presentation is a presentation describing the marketing strategy that we had for the Kearl oil.

Q. And what does it say there at the bottom below the blue part?

A. It says that the objective that we had was to maximize the long-term value of both Kearl and Cold Lake production.

MR. THOMAS: Can we go to page 21, please, Mr. Gooden.

Zoom into this. A little easier to see, hopefully.

BY MR. THOMAS:

Q. What is --

MR. THOMAS: Scroll back down just so Mr. Madden can see it, he can see the title.

Thank you.

BY MR. THOMAS:

Q. What do we see here, Mr. Madden?

A. We see a page talking about the Kearl production volumes.

Q. Is production the same thing as sales?

A. No, it's not.

Q. Okay. What does the third bullet say, Mr. -- Mr. -- Mr. Madden?

A. The third bullet says "Continued highly variable production profile due to the mechanical nature of the process."

Q. What does that mean in plain English, yours or mine?

A. So it means that the amount that's being produced is --

is not very static -- it's going up and down because it's -- it's a process with lots of -- it's a difficult process so it's not very reliable, so it's shooting down and starting up a fair bit.

MR. THOMAS: And can we zoom in to the red bloody chart there.

BY MR. THOMAS:

Q. Okay. Have you seen this chart before, Mr. Madden?

A. I have, yes.

Q. Okay. You saw it back in 2015?

A. I did.

Q. And it's really hard to see what it all says, but can you tell the jury what it is?

A. So what -- what this is, it's a chart showing the daily volumes produced from Kearl. So every day is a dot on that chart.

Q. Okay. And what does it mean on the left, what are those numbers on the left?

A. So they are thousands of barrels a day. So that's how much oil was being produced in each of those days from Kearl.

Q. Okay. And what happened -- we see it going down to zero on maybe a dozen or so times, what's happening there?

A. What's happening there is the plant is not producing, so for that day or couple of days it's shut down.

Q. This is October 2015 we saw on the PowerPoint -- I mean on the email, correct?

A. It is. The end of the chart.

Q. So we're looking at 2015 and 2014, is that what we're looking at here?

A. Yes, that's what we're looking at.

Q. And what -- what happened in the middle of 2015 at Kearl, generally?

A. The expansion project started up.

Q. And we see after that at least two times that Kearl basically stopped producing the bitumen, right?

A. That's correct.

Q. Did that create reliability concerns with Kearl?

A. Yes. It was very important to get reliability --

Q. And did that -- did that impact your ability to sell the Kearl bitumen?

A. It does impact the ability to sell.

Q. And what did you do back in October given that reliability concern, October 2015?

A. So I'm sorry, when you say what did we...

Q. How did it impact your ability to sell back in October 2015?

A. So we couldn't really be very certain as to how much we were going to be able to sell so that impacted the way in which we would contractually go out and try to sell it if you

weren't certain how much volume you would have.

MR. THOMAS: Okay. Can we go to page 33, Mr. Gooden.

BY MR. SHELDON:

Q. Again, do you -- remind the jury what the -- what the title of this slide deck was.

A. The whole slide deck?

It was Kearl Marketing Strategy.

Q. And when we say "marketing" what are you saying there? What are you trying to get at?

A. Try to get at how do we best sell this product, sell the Kearl, to get the -- get the best value for it.

Q. Okay. We saw this chart a moment ago?

A. We did, yes.

Q. And this is the comparison of Cold Lake prices to Kearl prices, correct?

A. Yes.

Q. Based on selling it where?

A. Selling it at Edmonton.

Q. Why would you use the Edmonton market as a comparison?

A. And -- yeah. Because the Edmonton market, other it's our biggest market, it's the most established market, and it's one that for both Kearl at this point and Cold Lake we had very good knowledge of.

Q. With that knowledge, which would you ever sell it

77

somewhere else?

A. We'd sell it somewhere else where we could get more -- more -- more value for it than selling it in Edmonton.

MR. THOMAS: Okay. Can we go to page 35?

This is page 35 of Exhibit 1275.

Can we zoom in, please, just on the chart.

BY MR. THOMAS:

Q. Mr. Madden, what are we looking at here on this chart?

A. We're looking at the chart here trying to look at -- which is looking at how much do we make for selling Kearl in various markets or putting it in our own refineries, how much do we make by doing those two, versus selling it in Edmonton -- in the Edmonton market.

Q. Why are you comparing everything to Edmonton?

A. Because that's like the base sale that we could sell, if we needed to, all the crude.

Q. What is -- what is this -- it's called axis, right? What is -- what does this axis say?

A. So -- yeah. So the axis says GI netback relative to Edmonton sales.

Q. Okay. That's at a dollar per barrel or dollars per barrel?

A. Yes. This means how much do we make in dollars a barrel versus selling in Edmonton.

Q. Okay. And what is this right here (indicating), this

78

bottom axis? What is that?

A. That's the volume -- that's the volume that we'd -- that we'd sell or place -- place -- in -- of Kearl.

Q. And does this chart include both third-party sales and internal placements?

A. It does. It includes both.

Q. Okay. What do we see here on the left? What's this orange box?

A. So the orange box is for if we were to sell the crude oil and moving it via the Keystone Pipeline down to the U.S. Gulf Coast and sell it to the Gulf Coast it's how much would we make, which is just over $4 a barrel, versus selling it in Canada.

Q. You would -- you would make just $4 a barrel?

A. We would make $4 a barrel more by selling it in -- in the Gulf Coast, having moved it down the pipeline, rather than if we just sold it in Canada.

Q. Okay. And what is this --

THE COURT: Is there a refinery at Edmonton

THE WITNESS: There are three refineries at Edmonton. They're small compared to the ones we have down in Texas, but there are three.

THE COURT: Okay. Go ahead.

BY MR. THOMAS:

Q. And then what is this -- what's -- what's this -- I

79

don't know, orange?

I don't like burnt orange, but maybe that's --

THE COURT: Agreed.

BY MR. THOMAS:

Q. What is that -- that box there?

A. So that one is if we'd, again, moved it down the Keystone Pipeline and paid the transportation costs we do for doing that, but it into our -- ExxonMobile's own Beaumont refinery we would have made $4 more than selling it in Edmonton.

Q. Okay. Let's just -- let's just go to this next widest box. What's this brown box?

A. The brown box is if we'd -- it's a different -- the other pipeline system. If we had shipped it down the Gulf Coast access pipeline system to the Gulf Coast, sold it to third parties in the Gulf Coast, we would have made just under $2 a barrel more.

Q. And what is this big long purple line right there?

A. So -- so that's then selling -- just selling in Edmonton/Hardisty, which not surprising is zero versus selling at Edmonton/Hardisty, so that -- that's what that is, with the big volume we'd sell there.

Q. When you're -- when you're doing -- is this the analysis that you're doing when you're trying to decide where to sell Kearl's blend?

80

A.   It is, yes.

Q.   If you could sell it all at in one place where would you have sold it?

A.   If we had enough capacity to do it, in the Keystone sales, the one on the left, it's the most profitable.

Q.   But you couldn't do that, could you?

A.   No.  Because we had a limited capacity on the pipeline.

THE COURT:  Excuse me.  By the way, when I ask these questions, ladies and gentlemen, it's not because I'm the smartest guy in the room.  I don't think that. These are the smartest people in the room (indicating).  It's because I'm trying to think like y'all.  And I don't know all this stuff and I'm thinking I bet -- I bet the jury might want to know this answer, because this is stuff we don't deal with. You know, when we deal with gasoline it's at the pump, that's what we deal with.  So I just want you to understand that. I'm not anywhere -- anywhere near how these folks are on either side her, but to try to sometimes bring it into Dallas, Texas talk, that's why I ask those questions.  Okay?

All right.  Go ahead.

MR. THOMAS:  No problem, Your Honor.  I appreciate the interruptions.

BY MR. THOMAS:

Q.   So you're comparing these -- these sales to Edmonton, correct?

A.   That's correct.

Q.   In your internal analysis that we looked at, tracking the Kearl Cold Lake sales, you're using Edmonton, correct?

A.   Yes.  That's correct.

Q.   And do you -- did you view Edmonton as a reasonable market to do that analysis?

A.   Yes.  Absolutely.

Q.   Was it conservative given this pricing difference here?

A.   When we are doing the analysis we know that in the other markets we'd sell into we would actually be making more money than selling it into Edmonton, so yes.

THE COURT:  Are there other companies competing for space in the pipelines?

THE WITNESS:  Yes, there are, indeed.  Yes.

THE COURT:  And that are somewhere near where Kearl was and all that, and so they're trying to get space in the -- in the pipeline, too?

THE WITNESS:  They are.  They are, yes.

THE COURT:  Whoever -- whoever pays the most?

THE WITNESS:  Well, that's one of the reasons that -- actually, this -- there's two different types of pipelines.  One of the reasons that we took these commitments early on is that then you've got certainty that you've got space all the way going forward, and other companies will have done the same so they will have some space.

And then for some of the pipelines, like the pipelines there are -- they're what's called common carrier pipelines and on those pipelines there's published tariffs.  So you still have to nominate to put barrels through it but -- but -- but the tariffs are actually regulated on them.

THE COURT:  I see.

Is there a lot of pressure on those pipeline people to kind of play hard on the contracts and go, wait a minute, we can get out of this contract if we look at paragraph 17 and we're going to -- sorry, you're out.  Does that happen?

THE WITNESS:  I mean, the pipeline company -- We all make sure -- we're taking these very long commitments. We will all be very sure that we have -- on both sides, that we have very good contract language, to be able to be sure that we -- that have as little of that as possible.  There's hard-nosed business people on all sides of this.

THE COURT:  But that does happen, doesn't it?

THE WITNESS:  I -- I -- I think it probably does.

THE COURT:  Okay.  Go ahead.

We're going to take a break.

Don't talk about the case.  Thank y'all.

THE COURT:  Off the record, Pam.

(Discussion off the record in open court.)

(Recess taken at 10:33.)

(Proceedings resumed at 11:13.)

(Jury enters the courtroom.)

THE COURT:  All right.  Thank y'all.

Be seated, please.

Okay.  Go ahead.

MR. THOMAS:  May it please the court.

CROSS EXAMINATION (Cont.)

BY MR. THOMAS:

Q.   I want to clear up one thing that I want to make sure I understand the jury understands.  Okay?

A.   Okay.

Q.   The judge asked you if there's refineries up near Edmonton.

A.   Yes.

Q.   When we're -- when we're talking about Edmonton in our discussion, Edmonton's a market where crude oil, like Kearl's blend is sold, right?

A.   Yes, it is.

Q.   Okay.  And so while there may be just a few refineries in Canada, refineries throughout the world could buy it at Edmonton, the market, correct?

A.   They absolutely could, yes.

Q.   Okay.  So the negotiations that you talked about with the judge and earlier when I asked you when you're on the phone with those folks, part of the negotiation is where they're going to buy it; is that right?

PAMELA J.  WILSON,  CSR/RMR/CRR

**App. 1254**

A.    That is correct.

Q.    Okay.  And that can be Edmonton, but then the crude can go anywhere in the world really, right?

A.    That's correct.  I mean, the three refineries in Edmonton you mentioned process very little of the heavy oil.

Q.    But that doesn't impact the fact that all the bitumen could be sold in Edmonton, right?

A.    Absolutely could.  Yeah.

      MR. THOMAS:  Could we go to Plaintiff's Exhibit 335, please?

      And we talked about this briefly, that the numbers on this -- this email and the -- the page at the end of this exhibit that the plaintiff's lawyer used to write on that chart were not actual accounting numbers.

      Do you remember that?

A.    I do remember that.

Q.    Okay.  I want to go to the next sentence, right here (indicating).

      Can you please read that sentence to the jury.

A.    The one that starts with "Also"?

Q.    Yes, sir.

A.    "Also, it's important to know these realizations reflect the full cost of transportation, not the variable cost we use to assess incremental sales."

Q.    Okay.  When we're talking about full costs of transportation in this email, what are we talking about?

A.    When we talked before about the -- the price that you pay whether you ship or not, or the fixed costs, it's talking about that piece, plus any of the variable costs, so it's both of those.  So it's -- it's both those pieces.

Q.    And then he --- Mr. Martenak says to you "not the variable costs that we use to assess incremental sales"?

A.    Yes.  That's correct.  Because when we're looking at whether we sell it somewhere or not, the only piece that we'll bend in addition, if we do ship it via that pipeline or put it on rail, is the variable cost, so that's what we use for evaluating incremental sales.

Q.    And then we have here -- I think this is what you -- you talked about earlier, just at least the process of coming up to a realization number, correct?

A.    Yes.  Correct.

Q.    And the Plaintiff's lawyer wrote down realization on his chart and just transportation.  There's more to it than that, right?

A.    Yes, it is.

Q.    So we start with the WTI price at Cushing, right?

A.    Yes.

Q.    And then we have those differentials that we talked about earlier.

This is what you talked about earlier, correct?

A.    Yes.  The market piece and the quality piece, yes.

Q.    And the market is the location difference between Cushing and the actual markets where Kearl Lake -- Kearl or Cold Lake are sold, right?

A.    Yes, it is.

Q.    Okay.  And then you have the transportation price and the -- the diluent price; is that right?

A.    Yes.  The diluent cost, yes.

Q.    So there's more to it than just the transportation costs?

A.    Yes, there is.  There's the four factors you have there.

Q.    Thank you.

      MR. THOMAS:  Can we go to -- pull that down, please, Mr. Gooden.

BY MR. THOMAS:

Q.    So I want to -- I want to talk about this October 26, 2015 meeting that you talked about with the plaintiff's lawyer and the lead-up to that.

A.    Okay.

Q.    I think you said this October 26, 2015 meeting was not the only time you with Mr. Tillerson or the Management Committee?

A.    Yes.  That's correct.

Q.    You said you had monthly meetings with them?

A.    I did.  I used to go and meet monthly.

Q.    And what was the topic in those meetings?

A.    So the topic I was involved with in those meetings was discussions of what was going on in the world oil markets and also what were ExxonMobile doing around the response to what was happening in the world markets.

Q.    And who would be at those meetings?

A.    So it would be the Management Committee and also the -- the -- myself and then the -- normally the president of the -- and downstream companies at the time.

Q.    Okay.  And in this October 26 meeting that was about the Kearl -- the Kearl field and the references, right?

A.    It was.

Q.    Now, when we talk about -- I think you answered this earlier.  We talked about determining and estimating the quantity of Kearl's reserves for SEC purposes, that's not anything you did; is that right?

A.    No.

Q.    Who do you understand does that work?

A.    Bill Strawbridge and the Global Reserves Group.

      MR. THOMAS:  Can we publish what has already been admitted into evidence which is Plaintiff's Exhibit 333, please.

      Kind of zoom in on the hop half there.

      Thank you.

BY MR. THOMAS:

Q.   This is an email I -- I believe you saw it with the plaintiff's counsel yesterday or maybe even this morning, from Mr. Strawbridge to you on October 15th.

A.   Okay.

Q.   Okay.  Looking at Mr. Strawbridge's first line here, you had not met Mr. Strawbridge at this time; is that right?

A.   That is correct.

Q.   Okay.  Do you have an understanding of why you are asked to go to that meeting?

A.   Yes, I do.  My understanding is it's because -- because of my knowledge about how crudes -- we talked about that in this review.  I was there to be able to do that.

Q.   And that's all the stuff we've been looking at earlier, the pricing of Kearl's crude, the things -- things that you considered in making decisions on what to agree with customers that they would pay for the --

A.   Yeah.  How we bought and sold crude.  Yes, the pricing.

Q.   Okay.  In the lead-up to that meeting did you receive materials related to the meeting?

A.   Yes, I did.

Q.   And who prepared those materials, to your knowledge?

A.   Bill Strawbridge --

Q.   Can we go -- I'm sorry.

A.   Yeah.  Bill Strawbridge and I assume his group helped.

MR. THOMAS:  Can we publish Plaintiff's Exhibit 337, which has already been admitted into evidence.

BY MR. THOMAS:

Q.   This is an email from October 22nd from Mr. Strawbridge to you and others, correct?

A.   Yes, it is.

Q.   Okay.  We saw this yesterday, but Mr. Strawbridge sends it to everyone and he says "Attached is a current draft of Monday's Kearl review package."

Monday would have been October 26, correct?

A.   It would, yes.

Q.   And then he has a note to -- to Ms. Casteel, who you talked about earlier, and then he says, "Andy-Your folks (those who provide us the Kearl pricing data) have reviewed the pricing charts but welcome any comments you might have."

Do you see that?

A.   I do see that.

Q.   And -- and who are your people that he's talking about?

A.   Those would be the people in the North America crude rating team that are buying and selling the crude.

Q.   My apologies.

Those are those the people the judge asked you about, those 50 to 20 people all over the world who are picking up the phone and really in the trenches on how the price is being determined; is that right?

A.   That's right.  The ones doing North America crude trading will predominately be in North America, but absolutely those people.

Q.   That seems efficient.

But Mr. Strawbridge said that he got the data straight from your group that trades and sells and pays -- sells and determines what's going to be paid for that Kearl bitumen, correct?

A.   Yes.

Q.   Okay.

MR. THOMAS:  Can we go to page 6 of this exhibit, please.

Thank you.

BY MR. THOMAS:

Q.   And you see this slide here?

A.   Yes, I do see it.

Q.   Okay.  Is this the pricing data that Mr. Strawbridge was saying he got from your folks, your trading team folks?

A.   Yes, it is the data he got from them.

MR. THOMAS:  Okay.  Can we go to page 9, Mr. Gooden.

BY MR. THOMAS:

Q.   You were shown this -- this slide a couple of times, correct?

A.   I was, yes.

Q.   Okay.  And this slide existed in various drafts of the presentation that Mr. Strawbridge sent to you; is that right?

A.   In the preparation for the meeting, yes, it was.

Q.   Okay.  And, again, we can go back to it, but this email was October 22nd, 2015.  This is four days before that meeting with Mr. Tillerson and others, correct?

A.   Yes, it was.

Q.   Okay.  Were you here for opening statements, sir?

A.   I was, yes.

Q.   You were sitting back there listening?

A.   I did, yes.

Q.   Do you recall the Plaintiff's lawyer saying that some decision was made in that October 26 meeting by the bosses to exclude the U.S. sales?

MR. THOMAS:  Objection, leading, Your Honor.

THE COURT:  I'll let him lead.  Overruled.

THE WITNESS:  Yes, I do.  I recall that.

BY MR. THOMAS:

Q.   This presentation, do you know who prepared this?

A.   This is Bill Strawbridge.

Q.   And this is four days before that meeting?

A.   Yes, it is.

PAMELA  J.   WILSON,  CSR/RMR/CRR

**App. 1256**

Q.   And it says right here, "Third party contracts at Edmonton market," -- that's the market your team used to make comparisons, correct?

A.   Yes, it is.

Q.   And it says "Excludes U.S. sales".  Correct?

A.   It does say that, yes.

Q.   So that was on this slide four days before that meeting correct?

A.   Yes, it was, indeed.

MR. THOMAS:  Can we go to Exhibit 590, Plaintiff's Exhibit 590 which is already in evidence.

I think you saw that this morning.

Let's start at the bottom, Mr. Gooden, just to show that Mr. Strawbridge sent an email.

BY MR. THOMAS:

Q.   What we've done is the bottom of page 1 and the top of page 2.  That's where he cut it off.

And Mr. Strawbridge sent you an email the evening of October 23rd.  It says, "Andy, final version of package with new back-up chart that David Rosenthal asked us to include. Let me know if you have any edits to the package."

So he sent that to you on the 23rd?

A.   Yes, he did, indeed.

MR. THOMAS:  Mr. Gooden, could we go to the bottom of page 1 and see Mr. Madden's response?

BY MR. THOMAS:

Q.   You were asked about a lot of the lines up here.  You were -- and one of them was this sentence here:  "I was more thinking of this as the SEC pricing uses market data at Edmonton to get to a price at the field."

Did I read that correctly?

A.   You did read that correctly, yes.

Q.   In those slides that we looked at that your group used in the marketing strategy presentation in the comparison of Cold Lake versus Kearl bitumen that your group did, you also used the market data at Edmonton to do those analyses, correct?

A.   We did, indeed.

Q.   And at the end of this email - and I don't think you were asked about this line - you say, "I will send you the material my guys sent me you may have seen and which is very consistent."

What did you mean when you said it was "very consistent" to the materials that your guys sent

A.   So the materials my guys sent, which is looking at the pricing, is very much -- looks -- is -- is done in the same way and is, you know, very consistent with the way that it's being used for the SEC pricing.

MR. THOMAS:  Can we go to the top email, please.

BY MR. THOMAS:

Q.   And you were asked about this email from Mr. Strawbridge and he says at the end -- well, let's -- let's look at the whole email to get context.

"Thanks Andy.  The last back-up chart was requested by David Rosenthal based on his earlier discussions with the chairman.  Evidently a lot of his discussions have centered around U.S. pricing for Kearl and he wanted to make sure that we could describe the various sales option for Kearl -- Kearl.  Hopefully we won't have to use."

Did I read that correct?

A.   You did read that correctly, yes.

Q.   I think I flubbed a word or two --

A.   Yeah.

Q.   -- but I got it about right?

A.   I think so.

Q.   When he says "Hopefully we won't have to use," he's asking about that backup slide, correct?

MR. THOMAS:  Objection, calls or speculation.

THE COURT:  Well, if he knows.  Overruled.

THE WITNESS:  Yes.  It's about the backup slide

BY MR. THOMAS:

Q.   Which is what he mentions in the first part of his email, correct?

A.   Yes.

Q.   And we've seen a bunch of slide decks today and a lot of what we've seen is in the backup, correct?

A.   Yes, it is.

Q.   That backup is there in case someone has detailed questions, right?

A.   Yeah, that's why they put the backup there -- yeah, to go to if someone has a question.

Q.   But you hope -- you hope when you put a presentation together that the actual presentation answers all the questions --

MR. THOMAS:  Your Honor, he's leading the witness.

THE COURT:  It is leading.

Sustained.

BY MR. THOMAS:

Q.   Okay.  What is the purpose of the backup section in these slide decks.

A.   So the backup section is to have information available in the meeting, if it's required to go to if a certain question comes up through the main piece of the deck that isn't answered by the main piece of the deck.

Q.   When you were putting together presentations at ExxonMobile was it your intention to try to convey everything you needed to convey in the main portion of the deck?

A.   Yes, it was.

Q.   When you went to meetings did you hope you didn't have to use backup slides?

A.   Yes, I did, indeed.

Q.   Can we go to Plaintiff's Exhibit 117, which has been admitted into evidence and look at page 2, please.

And zoom in on the attendees.  Perfect.

BY MR. THOMAS:

Q.   So you go to this meeting on October 26th, 2015, correct?

A.   Yes, that's correct.

Q.   And it lists Bill Strawbridge as the presenter.

Did Mr. Strawbridge do the presenting at this meeting?

A.   Yes, he did.

Q.   Did you present anything at the meeting?

A.   I did not.

Q.   Okay.  And do you recall anyone having any reactions, up, down, positive, negative, about Mr. Strawbridge's presentation?

A.   I don't recall any particular reactions, no.

Q.   Do you recall anyone instructing Mr. Strawbridge, or anyone else in that meeting, "Make sure Kearl's reserves passed the SEC test, no matter what."?

A.   No, I do not.

Q.   Is that something you would have recalled if it happened?

A.   It is, absolutely.

Q.   Why?

A.   Because it would be very out of character of any discussions I've ever had in my career with senior ExxonMobile managers to instruct someone to do something like that.

MR. THOMAS:  Could we go to Plaintiff's Exhibit 601, please, Mr. Gooden.

And can we zoom in on Mr. Madden's email on the bottom third of the page.

BY MR. THOMAS:

Q.   I believe you were asked about this late yesterday or early this morning by the plaintiff's counsel.  I just want to make sure you get a chance to explain this email.

This is an email from you to Mr. Martenak, who we've been talking about, right?

A.   Yes, it is.

Q.   How close in time is this to the meeting that we had -- you had with Mr. Tillerson on October 26th?

A.   It looks like it's very soon after the meeting concluded.

Q.   Okay.  Then you say to Mr. Martenak, "The review went really well.  Chairman was very happy with the basis of the reserve calculation.  Just concluded at the end by saying keep it running" -- is that supposed to be "and"?

A.   It is.

Q.   You kind of have a lot of typos, don't you?

A.   I do.  Yeah.

Q.   -- "and get costs down further."

What does "keep it running" mean?

A.   It means -- as you know, we had a lot of reliability -- we'd had some reliability issues.  I think it was asking us to -- asking those who run the facility to work hard to keep it reliable and keep it running.

Q.   And when he says -- when you said "get costs down further" what were you intending to convey there?

A.   That it was about the -- keeping the costs for operating Kearl, which is a big expensive operation, keep those costs down because that is what will help make it more comfortable.

Q.   And when we're talking about costs are we talking about production costs or transportation costs?

A.   This would have been referring to the production costs.

Q.   Now, Mr. Madden, from your experience working with Mr. Tillerson, in all those meetings that you had -- how many meetings do you think you had with Mr. Tillerson?

A.   So four years, maybe 50.

Q.   50 meetings over how long?

A.   Over four years.

Q.   Is that that period of time 2012 to '16 when you were in this role?

A.   Yes, it is.

Q.   You said you were here for opening statements, correct?

A.   Yes, I was.

Q.   Did you see the plaintiffs put up a slide that said "King Rex"?

A.   Yes, I did.

Q.   Based on those dozens of meetings and interactions you had with Mr. Tillerson, do you think King Rex is an appropriate description of his management style?

A.   No, I do not.

Q.   Why not?

A.   Because in all my dealings with Rex he was always extremely inclusive.  He always wanted to hear what I had to say and what everybody else had to say in the meeting.  And he in no way ever pushed in a dictatorial type fashion, which I think was implied by that, his view or his decision, without hearing what everybody had to say.

MR. THOMAS:  Thank you, Mr. Madden.

Pass the witness.

MR. SHELDON:  Your Honor, may it please the court?

THE COURT:  Yes, sir.

MR. SHELDON:  Could we put up Plaintiff's Exhibit 338.  Just put up the first page, so we can make sure we see the exhibit.

And then if we could go to page 7, the chart.  Blow that up.

REDIRECT EXAMINATION

BY MR. SHELDON:

Q.   Now, Mr. Madden, you were asked about Kearl placement and also about third-party sales.  Are you with me?

A.   I am, indeed, yes.

Q.   And just so the record is clear, when we're talking about Exhibit 338 we see third-party sales from October 2013 to March 2016.  Is that correct?

A.   Yes, that's correct.

Q.   These are actual sales from Kearl to the United States Gulf Coast, correct?

A.   The ones in blue, yes, they are.

Q.   That was going to be my next question.

A.   Okay.  Sorry.

Q.   And these were actual sales reflected in the blue charts that occurred from Kearl to the United States Gulf Coast in every month from October 2013 to March of 2016?

A.   Yes, they are.

Q.   And for every one of these actual sales there was actual transportation costs that were incurred for these sales; is that correct?

A.   Yes.  That would be correct.

Q.   And your group, Supply and Transportation, had records for every one of these sales going from October 2013 to March 2016 to the United States Gulf Coast.

A.   Yes, we did.

MR. SHELDON:  Pass the witness.

THE COURT:  All right.

MR. SHELDON:  No questions, Your Honor.

THE COURT:  You can step down, sir.

All right.  Are we ready to call our next witness?

And this is going to be -- Mr. Toal, are you going to do this one?

Who's going to do this one?

MR. MELSHEIMER:  I am, Your Honor.

THE COURT:  Okay.  Good.

MR. MELSHEIMER:  Can we have just a moment, Your Honor?

THE COURT:  Sure.  Take your time.  Everyone is shifting around.

MR. MELSHEIMER:  Can we approach briefly, Your Honor?

THE COURT:  Yes.  Yes.

MR. MELSHEIMER:  I know you don't like that, but it's for efficiency, I promise.

(Discussion at the bench off the record.)

(Back in open court in the hearing of the jury.)

THE COURT:  Ladies and gentlemen, y'all's lunch is here, so we'll break now.  And I think today's is Jason's Deli, which I think is the best of all the -- I eat there all the time.  That's why I'm fat.

Don't talk about the case.

It will be a little longer than an hour this time.  Okay.

MR. MELSHEIMER:  Thank you, Your Honor.

THE COURT:  Yes.

(Recess taken at 11:40.)

(Proceedings continued in Volume 4B.)

INDEX - VOLUME 4A

WITNESS NAME                                              Page   Line

ANDREW MADDEN

  DIRECT EXAMINATION (CONT.) BY MR. SHELDON ....... 17    5

  CROSS EXAMINATION BY MR. THOMAS .................. 32    12

  CROSS EXAMINATION (CONT.) BY MR. SHELDON ........ 84    6

  REDIRECT EXAMINATION BY MR. SHELDON ............. 101   1


DEFENSE EXHIBITS


Exhibit      Description              Identified  Admitted  Denied

1275         Email .................... 73                  73

App. 1259

< Dates >
$11.71. 20:18
December 14th, 55:21
December 2014 55:11
December 2014, 61:20
June 2015 53:1
March 16th, 2015, 7:18
March 2016 101:24
March 2016. 101:8
March of 2016 101:17
May 17:3, 32:9, 35:6, 84:5
MAY 1, 2026 1:28, 4:1
May of 2016, 53:19
November of 2015 54:6
October 18:20, 19:20, 19:24, 20:13, 76:18, 89:4, 93:19
October '06 73:14
October 19th 2016. 21:16
October 19th, 2015. 18:12
October 2013 101:7, 101:17, 101:24
October 2015 27:9, 76:19, 76:21
October 2015 64:23, 76:1
October 2015 bar 18:4
October 2015, 28:10
October 22nd 90:5

October 22nd, 2015. 92:8
October 25th, 2015 25:12
October 26 88:11, 92:16
October 26, 90:11
October 26, 2015 18:14, 22:20, 62:25, 87:17, 87:21
October 26, 2015, 23:6
October 26th 98:17
October 26th, 2015, 97:6
October of 2015 18:3
October of 2015 29:6, 54:9
October of 2015, 17:21
September 36:12
$1 30:1, 30:4
$1.70 19:14, 21:18
$100 7:14, 7:15
$11.71 22:6
$12.12 19:25, 28:11
$13.43 20:22
$16.50 20:16, 22:3, 28:15
$17.44 20:2
$2 80:17
$25 20:20
$25.14 19:18, 21:20
$4 79:12, 79:14, 79:15, 80:9
$400 9:3
$7.70 20:4, 20:6, 20:9, 29:7
'21 24:19
(214)758-1500

2:49
**off 5:22

< 0 >
000 67:14, 67:15, 67:18, 67:20, 67:21, 68:5, 70:19, 71:14, 71:17, 71:18

< 1 >
1 23:8, 93:16, 93:25, 104:14
10 27:4, 72:15, 83:24
100 2:41, 67:15
10019-6064 2:36
101 104:14
11 5:25, 26:8, 27:4
11.71 20:21
1100 3:14
117 22:17, 26:7, 97:2
11910 2:3
11:1313.) 83:25
11:4040.) 103:7
12 104:10
12.12 21:24
1275 72:7, 73:6, 78:5, 104:24
1285 2:35
13th 3:14
14 48:4
15 6:1, 58:17, 71:21, 72:15
15th 89:4
16 39:16, 99:23
17 83:9, 104:8
17.44 22:1
1900 1:47
1970 56:19
1987 33:17, 36:13
19th 18:20

2:49
< 2 >
2 7:17, 13:21, 13:22, 22:17, 73:17, 93:17, 97:3
20 18:7, 22:9, 32:1, 51:21, 58:17, 71:21, 73:19, 90:25
2010s 33:20
2012 38:13, 99:23
2013 50:22, 50:23, 53:7, 63:8, 65:12
2014 39:15, 53:4, 61:25, 62:1, 62:2, 65:24, 76:4
2015 27:17, 30:8, 33:4, 33:15, 36:23, 39:8, 39:15, 46:12, 47:22, 47:23, 48:4, 48:8, 48:18, 50:13, 51:20, 51:21, 52:19, 53:1, 69:10, 70:17, 75:10, 76:4, 76:7
2016 38:16, 38:17, 53:23
2018 37:6
2022 24:18
21 74:5
212 2:37
214 1:37, 2:19, 2:26, 3:17
220 2:3
2200 2:47
23 17:11
2300 2:17, 2:24
231-1058 1:49
23rd 93:19, 93:22
25 31:18, 31:19, 31:21, 31:25, 32:1, 105

AMITAV 2:32
amount 49:21, 49:22, 49:23, 65:19, 72:10, 74:25
analyses 94:11
analysis 63:12, 64:19, 65:1, 80:23, 82:2, 82:6, 82:9
analyzing 71:22
ANDREW 1:18, 104:6
Andy 25:14, 93:19, 95:4
Andy-your 90:14
answer 8:14, 8:23, 10:24, 81:14
answered 88:14, 96:19
answers 55:6, 96:8
anticipate 12:7
Anyway 57:6
apologies 6:15, 90:23
apologize 7:10, 33:25
apologizing 6:16
Appreciate 17:16, 81:21
approach 102:16
appropriate 100:8
approximately 30:1, 31:15, 31:23, 31:25
area 36:25, 37:21, 62:20, 73:12
argument 8:1, 8:8, 9:16, 15:20
Armstrong 5:19
around 14:15, 22:13, 24:20, 25:17, 25:25, 29:20, 39:1,

44:21, 56:19, 66:19, 88:5, 95:7, 102:15
Asia 57:13
asphalt 38:7
assess 85:25, 86:8
assume 4:21, 90:1
astronomically 33:19
Attached 90:9
attaches 73:14
attendee 23:22, 23:24
attendees 97:4
attention 17:15
Attorney 4:7, 10:8
attorneys 31:12
AUDRA 2:28
AUSTIN 2:13
automatically 7:24
available 96:16
Avenue 2:3, 2:35, 2:47
aware 8:19, 10:16
away 46:4, 46:6
axis 78:17, 78:18, 78:19, 79:1

< B >
B. 1:43, 2:1, 2:2
Back 14:1, 15:10, 15:21, 16:6, 16:24, 17:17, 18:7, 20:25, 25:4, 26:7, 34:8, 34:9, 34:17, 35:4, 35:12, 37:8, 39:15, 52:5, 57:23, 58:8, 58:9, 60:2, 63:4,

69:11, 74:10, 75:10, 76:18, 76:21, 92:7, 92:13, 102:22
back-up 25:14, 93:20, 95:4
backup 26:3, 26:6, 95:17, 95:20, 96:1, 96:3, 96:5, 96:14, 96:16, 96:25
backwards 52:25
bad 59:23
Balon 2:1, 2:2, 15:21
bar 63:23
barrel 20:2, 20:16, 28:15, 44:5, 47:3, 72:25, 78:21, 78:22, 78:23, 79:12, 79:14, 79:15, 80:17
barrels 67:15, 67:18, 67:20, 68:5, 70:19, 71:10, 72:24, 75:19, 83:4
bars 52:18, 52:21, 52:22, 52:24
base 78:15
Based 25:15, 33:12, 34:24, 45:1, 77:18, 95:5, 100:6
basically 66:15, 67:7, 76:11
basis 20:1, 20:11, 23:14, 29:8, 98:21
beat 59:4
Beaumont 80:8
become 8:19, 37:5
beforehand 8:13
began 50:20, 50:23

begin 50:20
beginning 53:1
Behalf 1:7
believe 8:8, 9:11, 26:8, 29:17, 30:25, 33:22, 56:19, 89:2, 98:10
below 74:1
bench 102:21
bend 86:11
best 58:10, 58:11, 59:6, 77:11, 77:12, 102:25
bet 58:10, 81:13
BIERL 1:44
big 11:10, 14:19, 16:1, 16:3, 57:3, 57:17, 61:1, 69:19, 69:20, 70:7, 80:18, 80:22, 99:11
bigger 69:25, 70:6
biggest 64:20, 77:22
Bill 88:20, 89:24, 90:1, 92:23, 97:9
bit 32:5, 35:4, 35:12, 35:14, 41:22, 52:6, 53:21, 61:18, 65:8, 69:1, 69:3, 75:4
Bitumen 18:9, 18:11, 18:17, 19:9, 19:17, 26:11, 27:5, 28:14, 40:9, 41:18, 41:22, 43:23, 50:3, 50:10, 53:2, 53:5, 53:8, 68:18, 76:11, 76:16, 85:7, 91:9, 94:10, 107

58:13
2601 2:17
28 33:17
2801 2:24
2:00 23:8

< 3 >
30 23:8, 31:21, 56:20
32 104:10
33 77:2
33. 83:24
331 54:21
331-A 54:20
333 88:22
335 18:7, 22:9, 33:22, 33:24, 85:11
337 90:3
338 17:9, 19:1, 53:11, 53:12, 63:20, 100:22, 101:7
339 51:9, 63:14, 63:15, 63:20
35 78:4, 78:5
373-3000 2:37
3811 1:35
3: 1:15

< 4 >
40 56:20, 71:14, 71:18
4100w 2:47
49 61:24
4A 1:25, 4:1, 104:1

< 5 >
5 104:8
50 56:20, 67:14, 67:18, 67:20, 67:21, 68:5, 70:19, 71:17, 90:25, 99:20, 99:21

546-5400 2:43
590 25:4, 25:5, 25:10, 93:10, 93:11

< 6 >
6 51:22, 63:13, 91:13, 104:12
6-CV-03111-K 1:15
601 98:6
619 1:49
651-5000 2:26
655 1:47
662-1557 3:17
69 5:25
698 4:7

< 7 >
7 17:11, 53:11, 53:24, 64:5, 100:24
7084 2:41
713 2:43
73 104:24
744-3300 1:37
75201 2:18, 2:25, 2:42, 2:48
75229 1:36
75242 3:15
75243 2:4
760 7:17
764-4446 2:19
7th 36:13

< 8 >
8 8:22
825 1:35
84 104:12
880 1:35

< 9 >
9 91:22
92101 1:48
972 2:5

991-1582 2:5

< A >
A. 1:45
ability 76:15, 76:17, 76:21
able 10:15, 11:24, 14:2, 32:24, 43:11, 51:7, 65:21, 76:24, 83:14, 89:13
above 34:17
aboveboard 8:11
Absolutely 17:4, 29:13, 56:13, 56:18, 60:22, 82:7, 84:21, 85:9, 91:5, 97:24
access 67:3, 80:15
account 8:4, 10:2, 10:12, 71:24, 72:4
account. 7:25
accounting 34:23, 85:15
accounts 7:22, 8:19
accurately 22:8
across 35:19, 39:14, 65:22
ACTION 1:17
activity 29:4
actual 18:25, 34:23, 35:1, 85:15, 87:4, 96:8, 101:10, 101:15, 101:19
Actually 19:6, 20:24, 22:23, 25:3, 36:12, 36:15, 40:15, 40:16, 55:19, 56:3, 69:4, 70:22, 71:5, 71:19, 73:19, 82:10, 82:21,

83:5
addition 49:19, 86:11
address 66:6
adjust 46:3
adjustment 45:19
adjustments 45:4, 45:6, 45:7
admissions 9:12
admit 10:12
Admitted 17:10, 51:10, 53:12, 73:2, 88:22, 90:3, 97:3, 104:21
advice 15:17
afternoon 64:7
AG 11:20
ago 77:13
agree 49:18, 67:8, 89:16
Agreed 15:23, 48:20, 67:12, 80:3
agreement 70:23
ahead 6:14, 7:5, 9:1, 22:15, 31:5, 31:6, 32:8, 59:8, 59:13, 59:15, 61:8, 69:7, 70:8, 79:23, 81:20, 83:19, 84:4
Alaska 70:5
ALEX 1:43
already 9:24, 10:24, 17:10, 51:10, 53:12, 63:15, 88:21, 90:3, 93:11
America 40:3, 57:7, 65:10, 73:12, 90:21, 91:3, 91:4
American 40:8, 58:16
Americas 2:35, 106

blend 41:17, 41:20, 41:21, 41:25, 42:4, 43:3, 44:5, 44:8, 44:25, 46:12, 46:25, 47:14, 47:17, 48:7, 48:19, 49:3, 49:8, 50:8, 50:10, 50:12, 50:21, 50:23, 50:25, 53:2, 54:7, 54:10, 55:16, 55:19, 59:18, 71:23, 80:25, 84:16
bless 16:15
blessed 8:13
blocking 17:13
bloody 75:5
Blow 17:12, 18:8, 100:24
blue 17:25, 52:11, 52:23, 74:1, 101:12, 101:15
board 15:2, 15:3, 15:4, 17:13
BOGGS 2:46
bonus 30:1, 30:5, 30:8, 32:25, 33:4, 33:18
bonuses 29:24
BOONE 2:23
born 35:18
bosses 92:16
bottom 17:12, 54:1, 74:1, 79:1, 93:13, 93:16, 93:24, 98:7
bought 41:11, 48:14, 49:7, 62:7, 89:18
Boulevard 1:35
box 13:16, 57:17, 79:8,

79:9, 80:5, 80:12, 80:13
BP 60:8, 60:10
BRADLEY 2:1, 2:2, 15:21, 15:22
break 12:11, 83:20, 102:24
Brent 41:18, 102:16
briefly 85:12, 102:16
Bring 16:7, 70:9, 81:18
broadly 43:14
Broadway 1:47
brown 80:12, 80:13
built 56:16, 57:7, 57:13, 65:21, 66:3, 66:4, 66:10, 69:18
bullet 74:19, 74:21
bunch 95:25
Burkholz 1:45, 4:7, 7:16
burnt 80:2
business 56:24, 83:16
buy 42:4, 42:6, 43:11, 51:7, 84:19, 84:25
buyer 41:14
buyers 57:23, 59:4
Buying 38:21, 39:4, 39:5, 39:6, 45:12, 46:1, 48:13, 58:10, 90:22
buys 40:18

< C >
C. 2:39
CA 1:48
calculation 63:1, 98:22
call 59:18,

68:2, 102:6
called 37:10, 45:15, 78:17, 83:2
calls 95:18
Cambridge 35:24, 36:7, 36:8
camel 10:25
Canada 39:13, 46:15, 46:21, 46:24, 47:10, 48:2, 49:24, 50:3, 52:10, 52:13, 52:15, 61:18, 64:13, 65:18, 65:22, 66:24, 79:13, 79:17, 84:19
capacity 65:22, 67:9, 67:12, 81:4, 81:7
care 5:7, 14:1, 15:11, 54:21
career 98:2
CARPENTERS 1:9
carrier 83:2
case 12:22, 30:21, 83:21, 96:3, 103:2
cases 57:4
Casteel 90:13
cent 72:20, 72:23, 72:24, 72:25
centered 25:17, 95:6
CEO 25:24
certain 30:7, 56:18, 60:14, 66:4, 76:23, 77:1, 96:17
Certainly 43:6, 56:2, 57:3, 68:20
certainty 65:13, 82:23
Chain 26:11
Chairman 23:13, 25:16, 25:24,

95:6, 98:21
CHAKRABORTY 2:32
chance 98:12
change 33:11
changing 32:20, 48:25, 49:1, 65:2
character 98:1
characterization 22:19
characters 12:18
charge 25:15, 43:2, 43:22
chart 13:6, 13:10, 17:12, 26:4, 26:6, 26:13, 34:6, 34:11, 34:13, 34:14, 51:24, 52:3, 52:21, 54:1, 54:3, 54:15, 54:19, 55:1, 55:3, 55:10, 55:16, 61:11, 61:20, 63:23, 64:10, 75:6, 75:8, 75:14, 75:16, 76:3, 77:13, 78:6, 78:8, 78:9, 79:4, 85:15, 86:19, 93:20, 95:4, 100:24
charts 22:14, 90:16, 101:15
check 6:10, 54:16
chemical 36:3, 36:5
chemicals 38:7
CHILDRESS 3:3
chose 4:13
citizen 37:1, 37:3, 37:5
citizenship 37:4
CLASS 1:17, 108

clear 84:8, 101:6
close 9:5, 98:16
closing 15:20
coal 41:17
Coast 6:13, 18:2, 19:22, 36:9, 46:17, 46:20, 48:3, 48:4, 48:9, 48:19, 49:9, 49:11, 49:15, 49:20, 49:22, 49:23, 52:11, 52:12, 52:14, 52:15, 62:15, 62:19, 64:24, 67:2, 67:3, 67:4, 72:13, 72:21, 72:22, 79:11, 79:16, 80:15, 80:16, 101:11, 101:16, 101:25
Cold 16:20, 16:22, 50:6, 50:8, 50:12, 50:15, 63:10, 64:12, 64:24, 68:18, 68:22, 74:4, 77:15, 77:23, 82:3, 87:5, 94:10
colloquy 4:9
color 73:20
colors 52:6, 52:7, 52:8
comes 96:18
comfortable 99:12
coming 67:1, 86:15
commented 4:7
comments 4:6, 90:16
Commerce 3:14
commitment 66:14, 66:18, 67:10, 67:21,

68:7, 70:24, 71:3, 71:17
commitments 66:9, 66:13, 66:21, 66:23, 67:6, 67:13, 68:2, 82:22, 83:12
Committee 87:23, 88:8
common 83:2
companies 65:18, 82:12, 82:24, 88:10
company 7:20, 29:1, 37:17, 42:2, 66:21, 67:12, 70:20, 71:15, 71:20, 83:11
compared 43:23, 79:21
comparing 78:14, 81:24
comparison 52:23, 64:16, 77:15, 77:20, 94:9
comparisons 93:3
compensation 33:19
competing 82:12
complete 8:3
complex 61:1
computer-aided 3:8
concern 76:19
concerns 76:13
concluded 98:19, 98:22
configured 7:23
CONFIRMATION 23:3
connects 67:3
conservative 82:8
considered 89:16
consistent

94:18, 94:22
consistent. 94:17
CONT. 17:5, 84:6, 104:8, 104:12
contact 37:10, 37:12
contemplated 69:13, 69:16
context 95:3
continue 5:3, 5:4
Continued 74:21
contract 66:15, 68:4, 83:9, 83:14
contracts 68:1, 69:9, 83:8, 93:1
contractually 67:8, 76:25
contradicts 6:3
controller 25:23
converting 38:8
convey 96:21, 96:22, 99:9
copy 73:20
CORPORATION 1:17
correctly 94:6, 94:7, 95:11
CORTELL 2:21, 4:25, 5:2, 5:6, 5:11
cost 19:24, 29:2, 43:17, 60:18, 71:3, 71:7, 71:9, 85:24, 86:12, 87:9
costs 19:15, 27:25, 28:10, 43:19, 43:20, 44:5, 46:7, 46:9, 49:5, 49:9, 49:14, 49:19, 49:25, 70:23, 71:1,

71:11, 71:24, 80:7, 86:1, 86:4, 86:5, 86:8, 87:11, 99:2, 99:8, 99:10, 99:11, 99:13, 99:14, 99:16, 101:20
counsel 34:6, 89:3, 98:11
country 37:2
couple 35:13, 59:2, 66:8, 75:25, 91:25
course 33:13
court. 5:14, 5:23, 16:5, 83:23
courtroom 5:17
courtroom. 84:1
covered 29:9, 49:24
create 76:13
Creek 1:35
Crescent 2:41
CROSS 32:12, 84:6, 104:10, 104:12
cross-examination 16:24
crossing 12:4
CRR 3:12
crudes 44:6, 44:14, 64:13, 89:12
curative 4:11, 4:13, 4:19, 8:9
curious 69:5
current 90:9
Cushing 46:1, 46:3, 46:4, 46:6, 86:22, 87:4
customer 44:11
customers 41:24, 42:1, 48:24, 51:6, 89:17
cut 14:3, 57:20, 93:17,

DOWD 1:46
down 11:16, 11:18, 12:14, 14:3, 17:14, 21:20, 35:2, 49:10, 62:21, 67:2, 67:4, 69:4, 72:12, 74:10, 75:1, 75:3, 75:22, 75:25, 79:10, 79:16, 79:21, 80:6, 80:14, 86:18, 87:14, 97:15, 99:2, 99:8, 99:12, 102:5
downstream 88:10
dozen 75:23
dozens 100:6
draft 90:9
drafts 92:3
drank 61:4
due 7:22, 74:22
during 64:6, 64:23

⟨ E ⟩
E. 2:13
earlier 7:23, 25:16, 33:6, 35:16, 38:11, 61:25, 84:23, 86:15, 86:25, 87:1, 88:15, 89:14, 90:14, 95:5
early 50:22, 82:23, 98:11
earth 49:18
easier 15:17, 73:21, 74:7
East 57:14, 67:4
Eastern 6:12, 46:21
easy 20:9
eat 102:25

eating 60:15
Ed 1:26, 16:12
edits 93:21
Edmonton/hardisty 46:15, 50:19, 51:3, 52:10, 53:3, 53:6, 53:9, 54:8, 54:13, 63:7, 80:20, 80:21
efficiency 102:20
efficient 91:6
efforts 41:1
eight 31:11, 31:15, 31:20
Either 4:14, 4:18, 14:20, 56:7, 65:21, 81:18
electricity 71:2
eligible 29:23
elsewhere 59:1
em 15:25, 16:7
Email 6:3, 6:18, 7:22, 7:25, 8:4, 8:19, 10:2, 10:12, 22:19, 25:6, 25:9, 26:5, 29:10, 34:1, 34:7, 34:22, 53:15, 57:23, 73:7, 73:9, 76:2, 85:13, 86:2, 89:2, 90:5, 92:7, 93:14, 93:18, 94:14, 94:24, 95:1, 95:3, 95:23, 98:7, 98:12, 98:13, 104:24
emails 7:21
EMILY 2:14
Enbridge 19:10
end 4:9, 11:16, 24:8, 33:4,

54:14, 59:3, 76:3, 85:13, 94:14, 95:2, 98:22
ended 22:18, 22:22
engineer 37:10, 37:12
engineering 36:3, 36:5, 37:14
England 35:22, 69:23
English 74:24
enough 7:3, 59:4, 65:22, 81:4
enters 84:1
entirety 11:7
entitled 9:11, 26:10
equipment 60:20
equity 51:18
erased 15:13, 15:16
ERIKA 1:42
essence 20:9
established 47:24, 51:5, 64:21, 64:22, 77:22
Estimate 18:12, 19:4
estimates 19:5
estimating 88:15
evaluating 86:13
evening 93:18
everybody 100:13, 100:16
Everyone 90:9, 102:14
everything 78:14, 96:21
evidence 17:10, 63:16, 73:3, 88:22, 90:3, 93:11, 97:3
Evidently

25:16, 95:6
exactly 4:17, 24:18, 24:20, 58:17
EXAMINATION 17:5, 32:12, 64:6, 84:6, 101:1, 104:8, 104:10, 104:12, 104:14
example 27:8, 68:18, 71:13
except 11:21
excited 9:2
exclude 92:17
excluded 26:16
Excludes 93:5
excluding 26:20, 26:24
exclusively 62:8
Excuse 81:8
Exhibit 4:6, 7:17, 14:24, 17:9, 18:7, 19:1, 22:9, 22:17, 25:5, 25:10, 26:7, 33:22, 33:24, 34:2, 51:9, 53:11, 54:20, 54:21, 63:14, 63:15, 64:2, 72:7, 73:1, 73:2, 73:6, 78:5, 85:10, 85:14, 88:22, 90:2, 91:13, 93:10, 93:11, 97:2, 98:5, 100:21, 100:23, 101:7, 104:21
EXHIBITS 8:12, 40:12, 104:18
exist 6:21
existed 92:3
exists 69:15
expanded 65:21
expansion 76:9
expected 34:24,

⟨ D ⟩
D. 2:45
daily 44:22, 75:14
Dallas 1:3, 1:29, 1:36, 2:4, 2:18, 2:25, 2:42, 2:48, 3:15, 81:19
DANIEL 2:29
DAPHNE 2:33
data 54:4, 65:4, 90:15, 91:7, 91:19, 91:21, 94:4, 94:11
date 18:11, 18:20, 53:15, 53:19, 73:7
dates 55:21
David 1:19, 2:15, 25:15, 93:20, 95:5
day 22:18, 25:8, 29:11, 36:11, 36:14, 36:15, 37:8, 58:19, 59:3, 67:14, 67:15, 67:18, 67:20, 68:5, 70:17, 70:19, 71:14, 75:15, 75:19, 75:25
day-to-day 37:13
days 59:7, 75:20, 75:25, 92:8, 92:24, 93:7
deal 12:12, 58:10, 58:11, 59:6, 59:23, 60:17, 81:14, 81:15, 81:16
dealing 58:22
dealings 100:11

decide 5:21, 46:25, 72:11, 80:24
deciding 71:25
decision 72:3, 92:16, 100:15
decisions 89:16
deck 51:15, 62:24, 77:6, 77:7, 96:18, 96:19, 96:22
decks 95:25, 96:15
DEFENDANTS 1:22, 2:10, 4:9, 4:13
DEFENSE 72:7, 73:6, 104:18
defiled 14:24, 15:4
degree 36:2, 36:4, 36:5
Delaware 12:5
Deli 102:25
demonstrative 15:7, 15:13, 15:16
Denied 4:16, 104:21
depending 70:2
depends 42:12
describe 25:18, 48:7, 95:8
describing 73:24
Description 100:8, 104:21
despite 7:20
detail 29:19
detailed 96:3
details 26:21, 28:8
determination 47:6
determine 44:25, 63:6
determined 7:20, 44:9, 44:10, 91:2
determines 91:9

determining 88:15
developed 48:12
developing 48:11, 48:23, 49:1, 65:2
dictatorial 100:14
Diego 1:48
diesel 38:7, 39:7
difference 28:19, 43:7, 45:12, 45:15, 60:4, 64:14, 82:8, 87:3
different 15:24, 38:4, 46:2, 47:4, 60:10, 60:25, 64:17, 80:13, 82:21
differential 45:15, 45:16, 45:17, 45:18, 45:22, 45:24, 46:8, 72:14
differentials 86:24
difficult 75:2
dil 41:22
dilbit 41:19, 43:3, 44:5, 44:8, 50:10, 50:15, 55:12
diluent 41:18, 41:22, 87:8, 87:9
diluted 41:18, 50:3, 53:2, 53:5, 53:8
DIRECT 17:5, 104:8
directly 68:21
discuss 19:9, 22:23
discussed 23:10, 23:15, 23:18, 24:10, 26:21, 28:6,

28:25
discussing 22:19, 28:22, 28:23
Discussion 5:14, 5:23, 12:9, 16:5, 29:3, 83:23, 84:15, 102:21
discussions 25:16, 25:17, 25:25, 28:24, 29:1, 29:5, 29:12, 29:14, 88:4, 95:5, 95:6, 98:2
distinction 55:6
District 1:1, 1:2, 1:27, 16:10, 16:11, 16:12
DIVISION 1:3
document 6:18, 9:20, 11:7
documents 6:21, 9:22, 31:23, 32:1
doing 13:9, 32:20, 38:8, 40:4, 43:16, 54:25, 55:8, 55:9, 58:13, 58:17, 58:18, 58:21, 58:23, 58:25, 61:5, 78:12, 80:8, 80:23, 80:24, 82:9, 88:5, 91:3
dollar 7:13, 32:25, 33:18, 78:21
dollars 60:19, 78:21, 78:23
done 13:24, 82:25, 93:16, 94:21
dot 75:15
doubt 29:8,

51:8
expensive 13:4, 60:20, 99:11
experience 99:17
explain 98:12
extend 7:25
extra 43:16, 49:25
extremely 100:12
Exxon 1:17, 9:12, 11:9, 36:8, 36:9, 37:8, 49:3, 49:8, 49:18, 57:8, 66:6
Exxonmobile 7:19, 24:11, 24:14, 25:24, 30:21, 30:23, 31:4, 31:12, 31:17, 33:16, 39:2, 40:17, 49:13, 50:4, 50:6, 51:18, 59:20, 65:10, 65:18, 71:22, 73:13, 80:8, 88:5, 96:21, 98:3

⟨ F ⟩
facilities 42:14, 43:1, 43:20
facility 99:6
fact 13:18, 32:19, 45:9, 85:7
factors 45:13, 87:12
factually 10:2
fair 75:4
fairly 48:11
fall 47:22, 48:8, 48:18
familiar 65:9, 65:11

fancy 8:5
far 10:25, 36:15
farm 68:8, 68:12
fashion 100:14
fat 103:1
fault 21:11, 21:12, 33:25
Federal 3:13, 57:19
feel 33:9, 33:10, 59:6
feelings 22:20
felt 33:7
few 16:25, 38:19, 84:18
field 88:12
field. 94:5
fights 9:10
figures 18:25
figuring 47:7
final 73:15, 93:19
finally 27:1
Fine 10:4, 10:18, 10:20, 14:14, 14:16
finished 38:9
FIRM 2:2
first 34:1, 34:2, 36:14, 36:15, 36:16, 37:8, 47:15, 60:3, 65:12, 89:6, 95:22, 100:22
fit 43:1
five 54:3, 58:13
fixed 70:23, 71:3, 71:7, 71:16, 71:24, 86:4
flew 24:10
Floor 3:14
Flowserve 56:25, 57:3
flubbed 95:12
focus 39:8,

47:22
FOLKERTH 1:43
folks 16:9, 39:9, 71:21, 81:17, 84:24, 90:14, 91:20, 94:15
follow 6:21
follow-up 59:10
following 56:14, 60:3
forth 20:25, 57:23, 58:8, 58:9
forward 67:10, 82:24
four 31:5, 31:7, 31:10, 31:18, 38:15, 58:13, 87:12, 92:8, 92:24, 93:7, 99:20, 99:22
fourth 51:21
frame 39:15, 39:18, 64:23
fuel 38:7
full 67:21, 71:17, 85:24, 86:1
full-cost 20:11, 29:8
full-time 36:22
fully 48:12
fun 70:14
FUND 1:10
further. 99:2

⟨ G ⟩
GARRISON 2:34
gas 57:5, 68:1
gasoline 38:7, 39:7, 61:3, 81:15
gave 4:10
GELLER 1:46
generally 76:8
gentlemen 81:9, 102:23
geographic

27:20
gets 56:3
Getting 20:20, 20:21, 37:25, 60:2, 64:14, 64:15
GI 78:19
give 7:16
given 76:18, 82:8
Global 88:20
God 16:15
Gooden 33:23, 34:8, 51:11, 51:23, 53:10, 53:17, 53:25, 54:19, 54:22, 55:24, 62:22, 63:13, 64:3, 65:5, 73:5, 73:18, 74:6, 77:3, 87:15, 91:23, 93:13, 93:24, 98:6
graduate 35:25
graduating 36:6
gray 52:12
Great 13:12, 59:10, 59:11
GREATER 1:8
greatest 6:23
Greenville 2:3
ground 38:4
Group 1:34, 39:9, 39:10, 39:12, 39:18, 39:25, 63:9, 73:13, 88:20, 90:1, 91:8, 94:8, 94:10, 101:23
groups 40:10
growing 48:10, 57:12, 66:2
guess 9:2, 57:6
Gulf 18:2, 19:22, 46:19, 48:3, 48:4, 48:9, 48:19, 49:9, 49:11,

**App. 1261**

49:15, 49:20, 49:22, 49:23, 52:11, 62:15, 62:19, 64:24, 67:2, 67:3, 67:4, 72:12, 72:21, 72:22, 79:11, 79:16, 80:14, 80:15, 80:16, 101:11, 101:16, 101:25
guy 58:12, 58:13, 81:10
guys 94:16, 94:19, 94:20

< H >
H. 1:39
half 61:22, 88:24
half-an-hour 23:19
hand-wrotten 21:14
handwrote 22:8
happen 83:10, 83:17
happened 25:3, 33:6, 35:15, 75:22, 76:7, 97:23
happened. 6:22
happening 75:23, 75:24, 88:6
happens 43:19, 67:11, 67:17
happy 98:21
hard 22:12, 75:12, 83:8, 99:6
hard-nosed 58:3, 58:6, 59:18, 83:16
harder 43:9
Hardisty 17:24, 62:13, 67:2
Harwood 2:24
have. 90:16

HAYNES 2:23
head 73:12
headquarters 24:14
hear 12:9, 15:15, 44:19, 100:12
heard 38:5, 41:19, 42:15, 48:3, 73:9
hearing 16:6, 100:16, 102:22
heavier 45:9
heavily 44:14, 44:19
heavy 42:21, 43:8, 43:9, 43:11, 43:23, 44:2, 85:5
held 37:18
help 99:12
helped 90:1
higher 33:19, 46:6, 49:15
highly 74:21
HINOJOSA 2:15
historically 50:15
Hold 37:16, 56:15
honestly 32:23
Honorable 1:26, 16:12, 16:15
Hoola-hoop 69:20, 70:9
Hoola-hooper 69:25
Hoola-hoops 69:22
hop 88:24
hope 96:7, 96:24
Hopefully 25:19, 74:7, 95:9, 95:16
hour 103:3
hours 31:18, 31:19, 35:13
Houston 24:11, 24:17, 36:20,

36:21, 36:22, 36:23
How'd 33:8, 47:6

< I >
I. 11:14
idea 50:25
Identified 104:21
impact 43:2, 43:22, 44:1, 76:15, 76:17, 76:21, 85:7
impacted 76:24
implied 100:15
important 59:25, 76:14, 85:23
in. 10:10, 11:23, 16:7, 23:4
include 26:3, 26:14, 79:4, 93:20
includes 31:19, 61:18, 79:6
Including 24:24, 27:22, 31:3, 39:13
inclusive 100:12
increase 65:17, 72:15
increasing 65:20
incremental 49:23, 70:25, 85:25, 86:8, 86:13
incurred 101:20
INDEX 104:1
indicating 70:4, 78:25, 81:11, 85:19
Individually 1:6
industry 44:23, 68:1

information 53:21, 65:4, 96:16
inside 40:2, 70:12
insinuation 33:5
instead 68:23
instruct 98:3
instructing 97:18
instruction 4:11, 4:17, 8:9
instructions 4:13, 4:20
intending 99:9
intent 7:20
intention 96:21
intentionally 24:25
interact 7:23
interactions 100:6
interested 40:24
interesting 69:6
interface 69:3
internal 64:19, 79:5, 82:2
interruptions 81:22
invest 43:20
invested 65:19
involved 88:3
Irving 24:15
issue 4:5
issues 23:14, 99:5

< J >
J. 1:19, 2:28, 3:12
jar 7:11
Jason 2:22, 102:24
JEFFREY 1:19
jet 38:7
job 37:9,

34:24, 51:21
looked 61:25, 72:16, 82:2, 94:8
Looking 44:13, 47:2, 47:4, 47:9, 51:14, 51:24, 53:22, 72:8, 76:4, 76:5, 76:6, 78:8, 78:9, 78:10, 86:9, 89:6, 89:14, 94:20
looks 61:22, 94:21, 98:18
lot 11:11, 25:16, 25:24, 28:24, 37:24, 44:19, 48:3, 48:13, 48:25, 52:2, 58:15, 65:17, 66:4, 70:6, 72:24, 83:7, 94:2, 95:6, 95:25, 98:25, 99:4
lots 75:2
low 14:3, 14:5
lower 20:6, 44:2
lunch 102:23
LX 69:14
LYUBA 2:31

< M >
M. 2:12
MADDEN 13:9, 17:7, 17:19, 22:18, 29:22, 30:10, 32:14, 35:12, 51:14, 51:17, 54:25, 65:7, 73:23, 74:10, 74:14, 74:20, 75:8, 78:8, 93:25, 98:7, 99:17, 100:17, 101:3,

104:6
magic 72:10
main 96:18, 96:19, 96:22
majority 53:2, 53:4, 53:8, 54:7, 54:9
Management 87:22, 88:8, 100:8
manager 37:21
managers 98:3
manner 7:22
marked 54:20
marker 15:24, 44:18, 45:1, 45:25
markers 15:25, 44:13, 44:16
market 45:11, 45:18, 45:22, 45:24, 46:8, 47:12, 47:13, 47:15, 47:24, 48:1, 48:2, 48:7, 48:9, 48:16, 48:19, 50:19, 51:5, 63:5, 63:7, 63:9, 63:11, 64:16, 64:20, 64:21, 64:22, 65:3, 77:20, 77:21, 77:22, 78:13, 82:6, 84:15, 84:20, 87:2, 87:3, 93:2, 94:4, 94:11
Marketing 39:23, 40:1, 41:1, 51:19, 59:25, 73:25, 77:8, 77:9, 94:9
markets 47:23, 48:15, 52:10, 57:13, 65:2, 78:11, 82:10, 87:4, 88:4,

88:6
married 36:17, 73:9, 86:7, 98:13, 98:20
master 36:5
material 28:25, 94:16
materials 60:13, 89:21, 89:23, 94:19, 94:20
matter 97:20
maximize 74:3
mean 4:23, 12:11, 28:6, 28:24, 39:3, 57:6, 60:12, 61:3, 66:13, 66:16, 74:24, 75:17, 76:1, 83:11, 85:4, 94:18, 99:3
means 56:1, 56:11, 61:13, 74:25, 78:23, 99:4
measuring 63:9
mechanical 3:7, 74:22
meet 88:1
meetings 28:7, 31:5, 31:7, 31:9, 31:10, 31:20, 87:25, 88:2, 88:3, 88:7, 96:24, 99:18, 99:19, 99:21, 100:6
Melsheimer 2:12, 8:9, 8:21, 10:3, 21:11
memo 6:19
mentioned 38:11, 50:2, 85:5
mentions 95:22
Mercy 12:4, 12:8

mess 21:5
message 6:18
met 24:21, 28:7, 30:11, 31:4, 31:6, 31:11, 31:16, 32:14, 36:16, 89:7
metal 60:15
metallurgy 60:17
Michael 2:7, 18:8, 23:1
mid 33:20, 50:22, 50:23
mid-1980s 50:14
mid-month 34:24
Midcontinent 46:19, 52:16, 61:16, 61:17, 61:23, 62:1, 62:4, 62:5, 62:9, 62:10, 62:11, 62:20
Middle 50:13, 52:17, 57:14, 61:17, 61:19, 65:12, 65:24, 68:25, 76:7
million 30:1, 30:4, 32:25, 33:18, 60:18
mine 74:24
minute 83:8
minutes 16:25, 68:21
mix 68:19, 68:21
mixed 69:1, 69:2
MOBILE 1:17
moment 63:5, 77:13, 102:12
Monday 70:10, 90:10, 90:11
money 7:16, 43:17, 47:3, 47:5, 47:7, 49:22, 64:11, 72:18, 82:10
month 27:8, 115

---

37:10, 58:20
JOE 1:33
joined 36:8
JORDAN 2:22
joys 12:21
JR 1:6
Judge 1:27, 16:12, 35:15, 57:5, 57:19, 59:10, 59:14, 60:3, 70:10, 84:11, 84:23, 90:24
JUROR 17:13
Jury 4:5, 9:23, 13:17, 16:8, 33:8, 35:14, 37:19, 38:2, 45:22, 55:10, 64:9, 65:16, 66:1, 73:10, 75:13, 77:5, 81:13, 84:1, 84:9, 85:20
jury. 4:3, 16:6, 102:22
Justice 7:19

< K >
K. 36:10, 37:3, 37:11
Kearl/ert 73:14
keep 9:5, 16:23, 20:25, 98:23, 99:3, 99:7, 99:11
keeping 99:10
KENDALL 1:33, 1:34
kept 16:23
key 52:6
Keystone 19:20, 67:1, 69:11, 69:12, 69:14, 69:15, 69:16, 79:10, 80:7, 81:4
Kind 14:15, 15:24, 22:14,

42:12, 45:6, 52:5, 52:18, 57:5, 57:19, 58:4, 60:8, 67:25, 69:6, 83:8, 88:24, 98:25
King 2:16, 100:4, 100:7
Kinkeade 1:26, 16:12
knowing 25:22, 26:2, 40:24
knowledge 77:24, 77:25, 89:12, 89:23
knows 8:21, 95:19

< L >
Ladies 81:9, 102:23
Lake 50:7, 50:8, 50:12, 50:15, 63:10, 64:12, 64:24, 68:18, 68:23, 74:4, 77:15, 77:23, 82:3, 87:4, 87:5, 94:10
language 83:14
large 38:23
largest 30:4
last 8:13, 25:14, 52:3, 52:24, 56:16, 95:4
late 98:10
later 35:5
LATHAM 2:40
Laughter 7:4, 9:4, 12:20, 61:6
LAW 1:34, 2:2
lawyer 9:12, 11:13, 11:16, 11:17, 85:14, 86:18, 87:19,

92:15
lawyering 13:3, 13:4
lawyers 6:24, 9:13, 12:22, 30:20, 30:23, 31:4, 31:17, 58:4, 58:5
lead 92:19
lead-up 87:19, 89:20
leading 61:25, 92:18, 96:10, 96:11
least 76:10, 86:15
leave 63:21
led 38:20
left 36:8, 54:1, 54:19, 63:1, 75:17, 75:18, 79:7, 81:5
less 20:9, 20:22, 29:7, 61:2, 65:3
letter 7:6, 7:18, 8:5, 9:8, 10:7, 10:10, 11:21
lie 16:19, 33:11
lied 24:25
life 12:22, 67:9
life-size 5:19
light 42:15, 42:16, 42:21, 43:7, 43:13, 43:18, 43:23, 44:3
limine 8:22
limit 47:17
limited 81:7
LINDELL 1:40
Line 14:9, 58:4, 80:18, 89:6, 94:15, 104:4
lines 5:25,

94:2
listening 92:13
lists 97:9
little 16:2, 32:5, 35:4, 35:12, 35:14, 43:13, 52:6, 52:18, 53:21, 61:18, 65:7, 65:8, 68:24, 69:1, 69:2, 69:3, 70:12, 73:21, 74:7, 83:15, 85:5, 103:3
live 36:19, 36:20, 36:24
living 36:25
LLP 1:46, 2:16, 2:23, 2:34
loca 41:8
located 24:15, 39:11
location 41:9, 41:14, 42:13, 45:11, 46:2, 46:3, 51:7, 87:3
locations 27:20, 39:13, 46:23
logistics 49:1
London 58:25
LONG 2:45, 4:18, 11:24, 13:16, 33:15, 38:14, 50:12, 58:19, 66:17, 68:17, 80:18, 83:12, 99:21
long-term 74:4
longer 103:3
look 4:10, 14:15, 17:21, 19:20, 44:12, 47:11, 47:13, 53:4, 73:7, 78:9, 83:9, 95:2, 97:3
look-ahead 114

33:6, 66:16, 66:18, 67:9, 67:18, 69:9, 70:17, 70:20, 71:14, 101:17
month-to-date 18:22
monthly 23:14, 87:25, 88:1
months 52:3, 52:24, 53:7, 54:3
morning 16:9, 17:7, 17:8, 17:19, 17:20, 24:11, 62:24, 64:7, 89:3, 93:12, 98:11
motion 8:22
move 10:19, 13:15, 14:1, 17:17, 29:2, 32:4, 32:5, 35:6, 36:22, 42:6, 44:21, 46:16, 50:1, 65:22, 70:3, 72:3, 72:22
moved 13:20, 36:23, 46:18, 79:16, 80:6
moving 46:6, 46:21, 79:10
MR. MELSHEIMER 5:18, 7:1, 12:24, 14:24, 15:1, 15:3, 15:5, 15:8, 102:10, 102:12, 102:16, 102:19, 103:5
MR. SAHAM 4:22, 5:25, 6:4, 6:6, 6:8, 6:11, 6:15, 6:17, 7:7, 7:10, 7:13, 7:15, 8:7, 8:18, 8:25, 9:2, 9:5, 9:10, 9:19,

9:22, 10:1, 10:5, 10:15, 10:19, 10:21, 10:23, 11:2, 11:6, 11:12, 11:19, 11:24, 12:3, 12:6, 12:13
MR. SHELDON 13:8, 13:11, 15:15, 15:17, 16:2, 17:1, 17:3, 17:6, 17:9, 17:18, 18:8, 18:10, 21:11, 21:13, 22:16, 22:25, 23:5, 25:5, 25:7, 26:7, 26:9, 32:2
MR. THOMAS 13:20, 13:24, 14:5, 14:9, 73:1, 92:18, 95:18, 96:10
MR. TOAL 10:7, 11:14, 12:16, 14:12
Ms 4:25, 5:2, 5:6, 5:11, 5:19, 14:15, 14:16, 90:13
MTD 18:22, 19:10, 19:20, 20:13
myself 58:7, 88:9

< N >
N. 2:24
NAME 67:25, 104:4
names 24:7
NATHAN 1:40
nature 74:22
near 24:7, 81:17, 82:15, 84:11
need 8:15,

9:22, 10:1, 10:5, 10:15, 10:19, 10:21, 65:20
needed 8:12, 78:16, 96:22
negative 97:15
negotiate 57:18
negotiation 58:1, 84:24
negotiations 84:22
netback 78:19
Netflix 67:22
Netherlands 37:22
network 49:2
New 2:36, 7:18, 10:7, 11:20, 48:11, 48:24, 72:10, 93:20
next 64:1, 66:16, 80:11, 85:18, 101:13, 102:6
nice 5:19
night 8:13, 58:23
NINA 2:21
No. 1:15, 10:22, 11:6, 30:14, 47:19, 81:7, 97:17
noise 70:12
nominate 83:4
normal 29:3
normally 61:18, 66:17, 88:9
North 36:20, 40:3, 40:8, 58:16, 62:19, 65:10, 73:12, 90:21, 91:3, 91:4
Northern 1:2, 16:11
nose 11:1
note 5:2, 90:13
notes 17:15
notice 59:11
Number 4:7,

14:16, 21:8, 32:4, 32:6, 65:20
14:16, 21:8, 32:4, 32:6, 65:20
8:22, 13:18, 13:21, 13:22, 37:18, 46:13, 46:23, 86:16
numbers 6:20, 21:14, 22:8, 22:10, 34:14, 34:15, 34:21, 34:23, 34:24, 75:18, 85:12, 85:15
NY 2:36

< O >
object 5:3, 5:4, 5:5, 5:9
objected 4:9, 5:5, 5:9
Objection 4:21, 4:22, 73:1, 92:18, 95:18
objective 74:3
occurred 19:1, 22:24, 101:16
occurring 18:3, 19:6, 19:7, 19:8
October 54:11, 54:12
offer 72:7
offered 9:16
OFFICER 16:8, 16:10
Official 3:13
often 56:8, 68:2
oil 28:7, 29:2, 38:4, 38:8, 38:22, 39:2, 39:6, 39:24, 40:14, 40:15, 40:18, 41:2, 41:5, 41:10, 42:10, 42:12, 43:7, 43:8, 43:9, 43:11, 43:13, 43:18, 43:23, 44:10, 44:24, 55:12, 57:5, 58:16, 116

58:18, 65:19, 66:15, 68:1, 73:12, 73:25, 75:20, 79:10, 84:15, 85:6, 88:4
oils 38:3, 38:6, 38:9, 42:25
Oklahoma 46:1, 46:3, 46:6
Old 15:22
Olive 2:17
OLIVER 1:42
on-average-to-date 34:25
once 18:14, 25:8, 27:1, 30:1, 72:21
ones 16:3, 66:4, 71:11, 79:21, 91:3, 101:12
online 44:4, 65:12
onstream 67:1
open 5:14, 5:23, 16:5, 16:6, 83:23, 102:22
opened 58:7
opening 8:8, 9:14, 92:11, 100:1
operate 11:9, 42:2
operating 99:10
operation 37:14, 37:23, 99:11
opponent 9:12
opt 38:24
optimize 38:25
option 46:22, 95:8
Options 25:19, 26:11, 42:23, 46:14, 47:1, 47:4, 59:6
orange 79:8,

79:9, 80:1, 80:2
organization 27:18, 27:19, 38:20, 59:19, 71:20
originally 35:17
Ostrager 7:19
Others 1:7, 47:24, 90:6, 92:9
ought 15:9, 57:20
Outside 4:3, 4:4
Overruled 92:19, 95:19
own 4:11, 4:13, 4:17, 50:8, 51:19, 59:20, 59:22, 78:11, 80:8

< P >
P. 1:18
package 93:19
package. 90:10, 93:21
Page 5:25, 7:17, 17:11, 18:7, 21:15, 22:9, 22:17, 27:4, 34:2, 51:12, 51:22, 53:11, 53:24, 54:21, 63:13, 64:1, 64:5, 73:17, 73:19, 74:5, 74:15, 77:2, 78:4, 78:5, 85:13, 91:13, 91:22, 93:16, 93:17, 93:25, 97:3, 98:8, 100:22, 100:24, 104:4
pages 62:25
paid 33:12,

46:5, 67:5, 67:6, 72:22, 80:7, 91:9
Pam 21:5, 83:22
pam_wilson@txnd.uscourts.gov 3:16
PAMELA 3:12
papers 15:9
paragraph 34:17, 83:9
part 10:7, 34:3, 59:25, 68:3, 68:4, 68:6, 68:10, 70:14, 74:2, 84:24, 95:22
particular 97:17
particularly 61:3
parties 11:19, 80:16
parts 40:5, 57:10, 58:25, 60:25
Party 2:8, 3:4, 9:12, 59:23, 93:1
Pass 32:2, 100:18, 102:2
passed 97:20
pasted 34:6
PATRICE 3:3
PATRICK 2:45
PATTON 2:46
PAUL 2:34
pay 41:12, 47:11, 49:13, 49:18, 49:25, 66:19, 66:20, 67:8, 67:19, 67:20, 67:22, 68:6, 70:21, 70:22, 70:23, 70:25, 71:2, 71:11, 71:16, 71:18, 72:2, 72:5, 86:4, 89:17

paying 17:15, 30:23, 31:1, 70:19, 71:9, 71:10, 71:14
pays 41:9, 49:4, 49:9, 82:19, 91:8
PEDRO 1:6
pen 14:23
PENNSYLVANIA 1:9
PENSION 1:9
people 14:6, 39:12, 42:2, 58:3, 58:6, 58:10, 58:11, 58:15, 58:16, 58:24, 62:7, 73:11, 81:11, 83:7, 83:16, 90:19, 90:21, 90:24, 90:25, 91:5
per 20:2, 28:15, 72:25, 78:21
percent 61:24, 72:15
Perfect 12:13, 97:4
period 99:23
permission 15:5
person 27:16, 38:20, 41:11, 49:7
phone 57:22, 57:23, 59:18, 84:24, 91:1
phrase 41:19, 43:4
physical 62:14
picking 90:25
picture 14:25, 15:6
pie 55:3, 55:10, 55:16
piece 21:19, 37:14, 71:3, 71:16, 71:18, 86:5, 86:10,

produced 3:8, 48:10, 55:12, 55:13, 65:20, 74:25, 75:15, 75:20
producing 50:12, 68:9, 75:24, 76:11
product 66:22, 68:15, 77:11
production 51:19, 65:17, 65:19, 66:2, 74:4, 74:15, 74:17, 74:22, 99:14, 99:15
products 38:6, 38:9, 38:22, 38:25, 39:2, 39:6, 40:20, 60:17, 64:17
profile 74:22
profit 72:10
profitable 81:5
profuse 6:15
project 76:9
promise 67:7, 102:20
properly 5:5
proposed 4:19
proven 11:17
provide 90:15
providing 37:13
publish 44:21, 88:21, 90:2
published 34:25, 44:7, 44:14, 44:21, 83:3
pull 17:9, 33:23, 51:11, 54:19, 62:21, 73:5, 87:14
pump 56:24, 81:15
pumps 56:24, 60:14, 60:18
purple 52:16, 52:18, 52:21, 52:22, 80:18

purpose 96:14
purposes 88:16
pushed 100:14
put 4:15, 9:8, 11:1, 11:22, 15:10, 21:2, 21:6, 68:16, 69:4, 83:4, 86:12, 96:5, 96:7, 100:3, 100:21, 100:22
putting 4:19, 4:23, 78:11, 96:20

< Q >
quality 45:8, 45:10, 45:14, 45:16, 87:2
quantities 38:23
quantity 88:16
quarter 51:20, 51:21
question 8:16, 8:18, 27:2, 28:18, 55:15, 56:15, 57:15, 57:22, 59:10, 60:3, 60:5, 72:9, 96:6, 96:18, 101:13
questions 4:8, 8:15, 35:16, 52:2, 59:2, 81:9, 81:19, 96:4, 96:9, 102:4
Quit 6:16
quite 46:13, 57:2, 58:15

< R >
R. 1:40
rail 20:13, 20:21, 22:3, 28:14, 29:15, 46:22, 46:23,

49:2, 66:10, 66:11, 86:12
rainy 16:18
RAMIREZ 1:6
rather 79:16
rating 90:22
reactions 97:14, 97:17
read 85:20, 94:6, 94:7, 95:10, 95:11
ready 102:6
real 14:19
Realization 18:9, 18:12, 18:17, 19:10, 19:17, 20:2, 20:4, 20:18, 21:20, 22:1, 22:6, 28:20, 86:16, 86:18
realizations 29:3, 29:15, 85:23
really 12:22, 12:23, 13:3, 26:25, 42:1, 60:7, 75:12, 76:23, 85:3, 91:1, 98:21
reason 10:13
reasonable 82:5
reasons 14:3, 63:8, 82:20, 82:22
recall 4:17, 26:21, 26:25, 27:3, 28:4, 28:8, 28:22, 28:23, 29:19, 51:14, 52:3, 63:2, 63:3, 63:5, 92:15, 92:20, 97:14, 97:17, 97:18
recalled 97:22
receive 29:23, 89:20
received 25:8, 30:1, 30:4,

30:5, 30:8, 33:20
receiving 29:7
Recess 83:24, 103:7
recognize 63:18
record 4:4, 4:15, 4:18, 4:20, 4:24, 5:8, 5:13, 5:14, 5:15, 5:22, 5:23, 6:10, 8:3, 15:18, 16:4, 16:5, 21:14, 83:22, 83:23, 101:6
record. 102:21
records 27:16, 27:18, 27:19, 101:23
red 17:21, 52:9, 52:24, 75:5
redact 11:7
redactions 4:8
REDIRECT 101:1, 104:14
refer 11:21, 21:1
reference 11:20
references 88:12
referring 99:15
refers 40:15
refined 56:12
Refineries 37:25, 39:1, 40:17, 40:25, 41:1, 42:2, 42:3, 42:10, 42:20, 42:22, 42:23, 42:25, 43:6, 48:13, 55:14, 56:4, 56:24, 57:7, 57:13, 59:20, 59:22, 60:7, 60:11, 60:12, 61:1, 61:23,

87:2, 96:18, 96:19
piece-- 57:3
pieces 86:6
pillows 14:19
pipe 70:7
Pipeline 19:21, 21:22, 28:1, 28:11, 28:21, 29:6, 35:2, 46:16, 46:18, 46:21, 46:24, 49:2, 52:14, 62:8, 65:9, 65:13, 66:7, 66:14, 66:16, 67:1, 67:6, 68:16, 69:11, 69:12, 69:14, 69:15, 69:16, 70:20, 71:15, 71:24, 79:10, 79:16, 80:7, 80:14, 80:15, 81:7, 82:17, 83:7, 83:11, 86:11
pipelines 62:18, 65:7, 65:21, 66:3, 66:10, 66:24, 67:13, 67:17, 69:19, 70:18, 82:13, 82:22, 83:1, 83:2, 83:3
place 40:17, 49:6, 50:3, 55:19, 79:3, 81:2
placed 41:6, 55:13
Placement 40:12, 40:13, 40:14, 41:3, 41:13, 55:6, 56:1, 56:2, 56:11, 60:4, 61:11, 61:22, 101:3

placements 79:5
places 46:23
plain 74:24
Plaintiff 4:6, 6:17, 33:24, 34:6, 51:9, 53:10, 63:15, 85:10, 85:14, 86:18, 87:18, 88:22, 89:3, 90:2, 92:15, 93:10, 97:2, 98:5, 98:11, 100:21
PLAINTIFFS 1:12, 1:31, 4:6, 4:12, 6:6, 72:9, 100:3
plane 24:11
planning 61:5
plant 50:22, 75:24
play 83:8
Please 5:25, 17:3, 32:9, 34:8, 37:19, 51:12, 51:22, 53:16, 53:24, 54:23, 63:14, 63:20, 73:7, 73:17, 74:5, 78:6, 84:3, 84:5, 85:11, 85:20, 87:15, 88:23, 91:14, 94:24, 97:3, 98:6, 100:19
plus 86:5
podium 14:3
point 9:21, 44:23, 49:1, 77:23
POLYCHRON 1:44
pond 35:20
portion 96:22
position 37:13, 37:20, 38:14
positions 37:16, 37:18
positive 97:15

possible 83:15
power 71:2
Powerpoint 76:1
pray 16:14
preadmitted 72:7
predominantly 50:19
predominately 91:4
prefer 42:10, 42:24, 42:25, 43:13
prefers 42:12
preparation 92:6
prepare 30:15
prepared 32:22, 89:23, 92:22
preparing 31:24, 58:20
presence 4:3, 4:5
present 97:12
presentation 53:22, 73:23, 73:24, 92:4, 92:22, 94:9, 96:7, 96:8, 97:16
presentations 96:20
presented 9:23, 9:25
presenter 24:3, 97:9
presenting 97:10
preserve 7:21
preserved 8:20, 10:3
preserved. 10:16
President 27:13, 29:22, 30:5, 38:11, 50:24, 88:9
presiding 16:13
pressure 83:7
pretty 11:9,

14:5
price 26:17, 26:20, 26:24, 28:14, 28:20, 29:7, 43:2, 43:22, 44:1, 44:2, 44:4, 44:7, 44:24, 44:25, 45:3, 45:4, 46:3, 46:6, 47:9, 47:21, 57:18, 57:19, 59:17, 63:1, 63:6, 86:3, 86:22, 87:7, 87:8, 91:1, 94:5
prices 35:1, 44:8, 44:10, 44:14, 44:21, 44:22, 77:15, 77:16
prices. 34:25
Pricing 25:17, 25:25, 27:5, 27:8, 29:12, 82:8, 89:15, 89:19, 90:15, 90:16, 91:19, 94:4, 94:21, 94:23, 95:7
probably 6:25, 19:4, 62:8, 69:21, 83:18
problem 81:21
proceed 56:14
Proceedings 3:7, 83:25
Process 27:5, 42:15, 42:21, 43:9, 43:12, 60:12, 75:2, 85:5, 86:15
process. 74:23
processed 49:4, 61:13
processes 7:24
processing 43:10, 43:13, 43:16, 43:17,

62:6, 62:9, 65:22, 78:11, 79:20, 84:11, 84:18, 84:19, 85:4
refinery 36:9, 37:11, 37:15, 37:21, 37:23, 38:1, 38:2, 38:3, 38:5, 38:8, 40:16, 40:19, 41:9, 42:12, 42:13, 42:14, 42:15, 43:7, 43:10, 43:12, 43:16, 43:17, 56:3, 56:16, 60:8, 79:19, 80:9
refining 42:2
reflect 22:8, 85:23
reflected 101:15
refused 5:10
regard 4:6
regarding 4:8, 29:12, 29:15
regardless 40:23, 67:10
regular 60:23
regularly 28:8
regulated 83:5
related 39:21, 89:21
relates 66:22
relative 78:19
relevant 7:21
reliability 76:13, 76:14, 76:19, 99:4, 99:5
reliable 44:22, 65:4, 75:3, 99:7
relocate 24:17
remain 7:1
remember 22:21, 24:18, 24:20, 33:1, 36:14,

54:25, 55:8, 55:9, 58:17, 69:22, 85:16, 85:17
Remind 13:17, 51:1, 73:10, 77:5
removing 60:13
replace 56:23
reported 3:7
Reporter 3:13
represent 30:23, 52:8
Representative 2:8, 3:4, 48:19, 64:22
represented 17:25
representing 30:20, 30:21, 32:19
represents 17:22
requested 4:15, 8:8, 25:15, 95:4
required 96:17
reserve 98:22
Reserves 23:11, 88:16, 88:20, 97:19
resolved 65:24
respect 9:14, 93:25
response 88:5, 93:25
responsibilities 38:18, 38:19, 39:21
responsible 37:23, 38:21, 38:24, 39:23, 40:1, 40:4
rest 19:2, 60:11
results 51:20
resumed 83:25
review 89:13, 90:10, 98:20
reviewed 31:24, 90:15

Rex 1:18, 3:1, 100:4, 100:7, 100:11
RIFKIND 2:34
rise 16:8
RMR 3:12
ROBBINS 1:46
role 38:10, 38:12, 38:13, 38:18, 38:19, 99:24
Ronnie 21:7, 35:10
room 81:10, 81:11
Rosenthal 1:20, 6:20, 24:1, 25:15, 25:23, 26:3, 26:13, 27:1, 29:11, 93:20, 95:5
Ross 2:47
Rotterdam 37:22
roughly 61:22
RUDMAN 1:46
rules. 6:21
run 40:16, 55:13, 55:14, 56:3, 99:6
running 40:25, 41:2, 62:19, 62:19, 96:18, 98:23, 99:3, 99:7
runs 67:2, 67:4

< S >
S. 1:19, 21:22, 22:3, 25:17, 25:25, 26:16, 26:20, 26:24, 28:10, 28:20, 29:6, 29:12, 29:15, 29:21, 36:24, 37:3, 37:4, 37:5, 46:18, 46:19, 46:24, 48:3, 48:4, 48:9, 49:9, 52:11,

52:17, 61:17, 61:19, 65:23, 79:10, 92:17, 93:5, 95:7
SAATHOFF 2:13
SAHAM 1:39
sale 78:15
sales. 85:25
Sam 1:41, 13:8
San 1:48
SARA 1:44
saw 19:1, 29:10, 40:11, 75:10, 76:1, 77:13, 89:2, 90:8, 93:12
saying 13:12, 77:9, 91:20, 92:15, 98:22
says 7:6, 9:11, 9:20, 10:17, 10:21, 12:11, 25:14, 34:23, 74:3, 74:21, 75:12, 78:19, 86:7, 90:9, 90:14, 93:1, 93:5, 93:19, 95:2, 95:16, 99:8
school 35:19, 35:21, 35:23
Scotland 35:17, 35:18, 35:21
SCOTT 1:39, 2:39
screen 32:5
Scroll 74:10
seated 16:16, 84:3
SEC 26:17, 26:20, 26:24, 27:5, 27:8, 63:11, 88:16, 94:4, 94:23, 97:20
second 32:7, 34:22, 45:19, 51:12
secondary 7:25

section 96:14, 96:16
SECURITY 16:8, 16:10
seeing 55:1
seem 9:8
seems 91:6
seen 48:3, 63:23, 75:8, 94:16, 95:25, 96:1
sell 41:5, 41:8, 42:7, 46:11, 46:14, 46:17, 46:20, 46:25, 47:10, 47:18, 47:19, 47:21, 56:9, 64:12, 71:25, 72:3, 72:5, 72:11, 72:12, 76:15, 76:17, 76:21, 76:24, 76:25, 77:11, 77:25, 78:2, 78:15, 79:3, 79:9, 79:11, 80:22, 80:24, 81:2, 82:10, 86:10
sells 91:8
send 8:12, 94:15
sends 90:8
senior 98:2
sense 33:3
sent 8:13, 92:4, 93:14, 93:18, 93:22, 94:16, 94:19, 94:20
sentence 11:21, 11:23, 34:22, 85:18, 85:20, 94:3
session 16:11
set 25:4
seven 31:11, 31:15, 31:19
several 24:7,

24:22, 63:23
SHAMAILOVA 2:31
share 12:24
Sharpie 16:1
sheet 44:4
SHELDON 1:41, 13:8, 14:25, 21:2, 23:2, 23:4, 77:4, 100:19, 100:21, 101:2, 102:2, 102:4, 104:8, 104:12, 104:14
Shell 68:9
shifting 102:15
ship 66:12, 66:15, 67:18, 68:5, 68:14, 68:15, 68:20, 68:22, 71:1, 86:11
shipped 62:7, 67:19, 70:19, 71:10, 71:19, 80:14
shipping 35:2
shooting 75:3
shorthand 67:25
show 6:17, 7:7, 34:1, 51:9, 53:15, 93:13
showed 29:10, 34:6, 34:11
showing 6:19, 15:21, 55:10, 55:11, 62:25, 64:10, 75:14
shown 29:1, 33:22, 51:10, 53:14, 62:24, 64:6, 91:25
shut 75:25
sic 25:15
sick 15:21
side 5:17, 26:16, 36:20, 54:22, 81:18
Side-by-side

54:23, 55:23
sides 4:12, 12:23, 22:12, 83:13, 83:16
sight 14:10
sign 66:15
signed 7:19, 8:21
Similarly 1:8
simplistic 43:14
simply 39:4
Singapore 59:1
single 6:18
Sir 13:11, 15:8, 18:11, 21:14, 22:25, 32:8, 85:22, 92:11, 100:20, 102:5
sit 13:22, 14:19, 37:1
sitting 12:9, 13:18, 92:13
Situated 1:8
size 70:2, 70:4
slack 57:20
slide 51:14, 62:24, 77:6, 77:7, 91:17, 91:25, 92:3, 93:7, 95:17, 95:20, 95:25, 96:15, 100:3
slides 94:8, 96:25
small 79:21
smaller 70:1
smartest 81:10, 81:11
sold 40:23, 41:11, 46:22, 47:13, 49:3, 49:8, 49:11, 50:16, 50:17, 50:25, 53:2, 53:3, 53:5, 53:8, 54:7, 54:10, 56:5, 62:12, 62:13,

62:14, 64:11, 64:12, 71:10, 71:14, 79:17, 80:15, 81:3, 84:16, 85:8, 87:5, 89:18
SOLOWAY 2:28, 5:19, 14:15, 14:16, 14:17, 14:21
someone 40:18, 42:7, 44:4, 46:5, 49:3, 49:8, 55:18, 56:9, 96:3, 96:6, 98:3
Sometimes 59:5, 61:17, 81:18
somewhere 41:5, 49:4, 55:18, 56:9, 78:1, 78:2, 82:15, 86:10
soon 36:8, 98:18
Sorry 6:11, 17:14, 55:2, 58:7, 60:6, 67:4, 69:5, 76:20, 83:10, 89:25, 101:14
sort 70:4
south 36:9, 37:11, 56:25
space 82:13, 82:16, 82:24, 82:25
SPALDING 2:16
speaking 24:24, 43:14
special 60:16
specifically 44:17
speculation 95:18
SPENCER 1:45
spoken 30:13
Spring 52:19
sprinkle 16:20
SQUIRE 2:46,

102:7
today 16:18, 30:16, 31:3, 31:24, 32:23, 36:17, 37:1, 59:4, 61:5, 63:24, 95:25, 102:24
together 68:19, 96:8, 96:20
Tom 34:20
took 14:25, 35:15, 55:19, 66:9, 67:13, 71:17, 82:22
top 11:11, 13:4, 18:11, 22:25, 25:5, 26:10, 52:6, 93:16, 94:24
topic 88:2, 88:3
total 31:11, 31:16, 31:23, 67:15
touch 35:8
toxic 60:7, 60:9, 60:13, 60:24, 61:2, 61:3
tracking 41:13, 82:2
trade 40:8
traded 40:10, 44:14, 44:20, 45:25
Traders 42:3, 42:5, 42:6, 42:8, 42:9, 58:18, 58:24
trades 91:8
Trading 39:3, 39:4, 40:1, 40:3, 40:5, 40:8, 58:16, 71:21, 73:12, 91:4, 91:20
tradings 38:21
transaction 71:23

transcript 3:8
transcription 3:8
transferred 41:14
transport 28:14, 47:12
Transportation 19:14, 19:25, 21:18, 21:24, 22:3, 27:14, 27:25, 28:7, 28:10, 29:20, 29:23, 30:6, 38:12, 39:1, 40:2, 46:7, 46:9, 49:5, 49:9, 49:14, 49:19, 49:24, 49:25, 50:24, 72:22, 80:7, 85:24, 86:2, 86:19, 87:7, 87:10, 99:14, 101:20, 101:23
trenches 91:1
trial 11:4, 11:5, 11:10, 11:13, 15:11, 37:24
true 59:12, 60:9
truth 32:17, 32:18, 33:13
truthfully 32:23
Try 16:23, 57:16, 66:6, 76:25, 77:11, 81:18, 96:21
trying 12:22, 13:23, 16:19, 58:10, 58:11, 70:3, 72:18, 77:10, 78:9, 80:24, 81:12, 82:16
Turn 21:9, 64:1
turned 40:19
turns 38:3,

38:5
Turtle 1:35
two 6:23, 8:18, 37:19, 42:1, 45:13, 52:7, 52:18, 64:12, 64:17, 66:23, 67:13, 70:22, 76:10, 78:12, 82:21, 95:12
TX 1:36, 2:4, 2:18, 2:25, 2:42, 2:48
type 36:4, 42:10, 68:1, 100:14
types 38:4, 42:1, 82:21
typos 98:25

< U >
U.S. 48:7
ugh 59:3
ultimately 40:19, 40:25, 44:10, 55:13
uncertainty 65:24, 66:5, 66:6
uncomfortable 33:10
understand 12:8, 81:16, 84:9, 88:19
understanding 89:9, 89:11
understands 84:9
Understood 11:2, 12:3, 12:6
United 1:1, 1:27, 6:24, 16:10, 16:12, 16:15, 18:1, 19:21, 20:14, 20:22, 27:22, 27:25, 28:15, 56:17, 62:11,

101:10, 101:16, 101:25
university 35:24
unlikely 29:20
until 30:10, 38:16
update 73:14
Update. 23:11
USA 39:13
use. 25:19, 95:9
useful 38:6
uses 44:23, 94:4
using 64:16, 64:18, 64:19, 82:3

< V >
V. 2:30
Value 26:10, 59:21, 74:4, 77:12, 78:3
Vancouver 46:17, 52:12
Vanna 21:8
variable 71:3, 71:9, 71:11, 71:18, 74:21, 85:24, 86:5, 86:8, 86:12
various 25:18, 78:11, 92:3, 95:8
vary 70:2
version 93:19
versus 29:15, 46:3, 49:23, 56:1, 64:12, 78:12, 78:24, 79:12, 80:20, 94:10
via 62:8, 79:10, 86:11
Vice 27:13, 29:22, 30:5, 38:11, 50:24
vicinity 28:12

stand 11:15, 14:1, 35:13
standing 7:1
starred 33:17
start 19:10, 44:13, 47:6, 47:8, 86:22, 93:13
started 50:22, 51:1, 76:9
starting 44:23, 75:3
starts 68:25, 85:21
statements 92:11, 100:1
States 1:1, 1:27, 6:24, 16:10, 16:12, 16:15, 18:1, 19:22, 20:14, 20:22, 27:22, 27:25, 28:15, 56:17, 62:11, 101:10, 101:16, 101:25
static 75:1
stenography 3:7
step 102:5
stick 63:9
stipulated 11:12, 11:19
stopped 76:11
stops 68:25
store 57:17
straight 91:7
Strategy 73:25, 77:8, 94:9
Strawbridge 24:3, 25:9, 26:3, 26:14, 88:20, 89:4, 89:6, 89:7, 89:24, 90:1, 90:5, 90:8, 91:7, 91:19, 92:4, 92:23, 93:14, 93:18, 95:1, 97:9, 97:10, 97:15,

97:18
streams 61:2
Street 2:17, 2:24, 3:14
Stretch 5:19
stuck 71:6
stuff 60:7, 60:9, 60:23, 70:12, 81:13, 81:14, 89:14
style 100:8
subscription 67:22
subtract 20:20
success 21:10
sudden 68:15
sufficiency 65:13
Suite 1:35, 1:47, 2:3, 2:17, 2:24, 2:41, 2:47
summary 22:22, 51:18
Supply 27:13, 29:23, 30:6, 37:21, 38:12, 40:2, 50:24, 101:23
support 37:14
supportive 11:9
supposed 98:23
surprising 80:20
Sustained 96:12
SWIDERSKI 2:7
Swiger 1:18, 6:19, 23:24, 26:23
system 7:24, 65:9, 65:14, 66:7, 80:14, 80:15

< T >
T. 1:43, 2:15
table 25:4
take-or-pay 68:2, 68:3

talked 23:13, 37:24, 38:10, 45:8, 45:14, 46:19, 50:2, 52:7, 52:9, 52:16, 65:7, 84:22, 85:12, 86:3, 86:15, 86:24, 87:1, 87:18, 88:15, 89:12, 90:14
tall 7:2, 14:6, 14:19
taller 11:16
tally 9:5
tankage 71:1
target 41:1
tariffs 83:3, 83:5
team 40:3, 40:8, 58:16, 90:22, 91:20, 93:2
teams 40:5
tear 15:10, 15:18, 15:19
technological 7:24
telephone 30:13
ten 67:10
ten-years-plus 66:17
tend 42:25
tended 63:11
tent 11:1
term 40:14
terminal 66:11
terms 20:9, 39:4, 43:20, 66:17, 71:25
test 97:20
testify 32:22
testimony 30:15, 31:24
Texas 1:2, 1:29, 3:15, 16:11, 24:17, 42:18, 43:24, 79:22, 81:19
text 6:18

Thanks 5:12, 25:14, 35:10, 95:4
THEODORE 2:30
thereabouts 28:16
they've 59:6
thinking 81:13, 94:4
Third 9:1, 51:20, 59:23, 74:19, 74:21, 80:16, 93:1, 98:8
third-party 17:22, 17:25, 79:4, 101:4, 101:7
THOMPSON 2:33
though 19:6, 41:14, 62:10
thousand 39:10
thousands 75:19
three 31:10, 52:3, 52:24, 53:7, 79:20, 79:22, 85:4
throughout 28:24, 84:19
til 38:17
Tillerson 1:18, 3:1, 6:19, 7:21, 8:11, 8:14, 9:10, 9:13, 10:11, 18:15, 22:19, 23:14, 23:22, 24:21, 24:25, 25:23, 26:19, 27:24, 29:11, 92:9, 98:17, 99:18, 99:19, 100:7
timeframe 62:18
timely 4:15
title 19:4, 74:11, 77:6
TMPL 52:14
Toal 2:29,

view 17:13, 82:5, 100:15
Virginia 36:25
voice 5:17
VOLUME 1:25, 4:1, 47:17, 47:20, 47:21, 77:1, 79:2, 80:22, 104:1
volumes 74:16, 75:15
vs 1:15

< W >
W. 1:18
Wait 60:5, 83:8
walk 22:15
Walmart 57:16
Walters 24:5, 24:7, 24:10
wanted 8:13, 25:18, 47:20, 51:6, 66:25, 95:7, 100:12
wants 8:10, 41:12, 68:9
warm 16:22
watch 67:23
WATKINS 2:40
week 18:14, 31:6, 31:7, 31:9, 31:10
WEISS 2:34
welcome 90:16
well-adapted 41:2
well-established 65:3
Wells 2:30, 6:23, 7:19, 11:14
West 1:47, 6:12, 42:18, 43:23, 46:16, 46:17, 52:12, 52:14, 52:15, 67:3
Western 65:18
WHARTON 2:34

what. 97:20
Whatever 7:2, 10:13, 13:25, 14:2, 16:21, 32:6, 57:17, 57:24
whenever 8:10, 59:5
Where'd 35:23, 36:6
wherever 72:5
whether 40:16, 40:18, 67:23, 72:2, 86:4, 86:10
White 21:8
Whoa 12:14
Whoever 13:2, 82:19
whole 10:2, 11:11, 47:20, 47:21, 67:9, 77:7, 95:3
wide 16:1
widest 80:11
wife 14:18, 36:16
wildly 16:18
WILKINSON 2:14
will 4:15, 5:8, 6:6, 6:17, 7:16, 9:6, 11:20, 15:13, 15:16, 43:1, 43:10, 43:11, 44:2, 46:2, 57:25, 58:25, 62:7, 70:21, 71:2, 82:24, 82:25, 83:13, 91:4, 94:15, 99:12, 103:3
WILSON 3:12
wins 13:2
within 59:19
without 47:14, 60:15, 100:16
WOODBURY 1:19
word 40:11, 95:12

words 8:5
work 6:20, 33:14, 36:6, 36:10, 36:14, 36:15, 37:8, 43:19, 52:24, 88:19, 99:6
worked 34:19, 34:20, 57:7, 73:11
working 29:4, 33:15, 39:12, 99:17
works 69:6
world 39:1, 39:13, 39:14, 40:6, 57:11, 58:22, 58:25, 71:22, 84:19, 85:3, 88:4, 88:6, 90:25
worry 9:6
worth 44:12, 45:5, 54:3
Wow 12:17, 70:5
write 12:14, 21:1, 85:14
wrote 21:15, 21:18, 21:20, 21:22, 22:3, 34:14, 86:18
WTI 44:18, 45:1, 45:4, 45:25, 86:22

< X >
XL 69:16

< Y >
Y'all 12:18, 12:22, 13:17, 13:25, 14:1, 15:9, 16:3, 16:16, 81:12, 83:21, 84:2, 102:23
year-end 30:8
years 7:23,

33:17, 37:16, 37:18, 38:15, 56:20, 67:10, 99:20, 99:22
yesterday 4:5, 22:18, 24:10, 30:10, 35:16, 40:11, 45:8, 52:17, 61:16, 63:23, 64:7, 89:3, 90:8, 98:10
York 2:36, 7:18, 10:8, 11:20
yourself 11:17, 68:12

< Z >
zero 75:22, 80:20
Zoom 23:4, 34:3, 51:24, 54:1, 74:7, 75:5, 78:6, 88:24, 97:4, 98:7

PAMELA J.   WILSON,   CSR/RMR/CRR

**App. 1264**

C E R T I F I C A T I O N

I, PAMELA J. WILSON, CSR, certify that the foregoing is a transcript from the record of the proceedings in the foregoing entitled matter.

I further certify that the transcript fees format comply with those prescribed by the Court and the Judicial Conference of the United States.

This the 1st day of May, 2026.

s/Pamela J. Wilson

PAMELA J. WILSON, RMR, CRR
Official Court Reporter
The Northern District of Texas
Dallas Division

125

PAMELA J.   WILSON,  CSR/RMR/CRR

**App. 1265**